# EXHIBIT DT



20344293

Jun 20 2008
4:12PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, CIVIL ACTION NO. 06-CV-11337-PBS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 1456<br>Civil Action No. 01-12257-PBS<br><br>Hon. Patti B. Saris |
| | | |

**Executive Summary**

1. This Report calculates a **$108.2 million difference** between (1) what the federal government reimbursed for certain pharmaceutical products provided to Medicaid and Medicare recipients during the eleven-year period 1991 to 2001 and (2) what the federal government would have reimbursed for the same products during the same time period if prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP, WAC, and Direct Price of Abbott products.  The report analyzes Abbott internal transaction data from the relevant time period, as well as paid claims data from the Medicaid and Medicare programs.  The $108.2 million difference does not include the $48.0 million impact on state governments' Medicaid spending or the $10.6 million impact on Medicare recipients' co-payments.

2. The Report also calculates that **2.30 million payments to health care providers would have been lower and 13.21 million claims would have resulted in lower Medicare or Medicaid spending** had alternative prices been used for the AWP, WAC, and Direct Price of certain Abbott products during the relevant time period.  This information along with the information reported in paragraph (1) is summarized in the following table, with dollar amounts listed in millions and the number of claims and provider payments reported in thousands:

| Category | Difference | | | Amount Paid | Reference Table | Claims | Provider Payments |
|---|---|---|---|---|---|---|---|
| | Federal | State | Total | | | | |
| Medicaid | $65.8 | $48.0 | $113.8 | $157.1 | 25 | 3146.9 | 521.7 |
| Medicare DME | $11.1 | $0.0 | $11.1 | $23.5 | 33 | 101.7 | 54.1 |
| Medicare Part B1 | $15.6 | $0.0 | $15.6 | $68.0 | 43 | 4726.3 | 720.6 |
| Medicare Part B2 | $15.7 | $0.0 | $15.7 | $94.2 | 44 | 5234.6 | 1002.2 |
| Total | $108.2 | $48.0 | $156.2 | $342.8 | - | 13209.5 | 2298.6 |

3. The empirical methods that I employed to calculate Abbott prices for the subject drugs are consistent with those that I and other economists typically use in academic research.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                    2

Additionally, the empirical methods that I used for calculating the payment amounts that the Medicaid and Medicare programs would have made are consistent with those that I and other economists typically use in academic research.  And finally, the empirical methods that I used to extrapolate my results from a sample of state Medicaid programs or Medicare insurance carriers to other state Medicaid programs or Medicare insurance carriers are also consistent with those used by myself and other economists in academic research.  The empirical methods that I employed and the assumptions that I made are set forth in exacting detail in the Report so that my results can be replicated and so that any changes in data or assumptions about the data can be readily accommodated in the analysis.

4. At various stages in my analysis – indeed at virtually every step where I believed that there were two or more acceptable ways to proceed in analyzing the Abbott, Medicaid, and Medicare data – I deliberately chose the conservative approach, that is, the approach that minimized the dollar difference and the number of provider payments and claims reported in the preceding table.  Additionally, I have excluded 6 of the 11 J-codes listed in the Complaint from my analyses, with these 6 J-codes accounting for more than 10 percent of Medicare spending on Complaint J-codes from 1991 to 2001. For Medicaid I considered only NDC-based claims, thus excluding Medicaid HCPCS claims from my analyses.  Both of these adjustments will serve to reduce the dollar values, the number of provider payments, and the number of claims reported in the preceding table below what they otherwise would be.

5. All of my conclusions were reached using methods that are generally accepted within the field of economics.  I hold these conclusions with a reasonable degree of professional certainty.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                      3

**I. Qualifications**

My name is Mark G. Duggan.  I am a Professor in the Department of Economics at the University of Maryland, College Park.  I received my Bachelor of Science in Electrical Engineering from M.I.T. in 1992 and my Master of Science in Electrical Engineering from M.I.T. in 1994.  I obtained my doctorate in Economics from Harvard University in 1999.

I was an Assistant Professor in the University of Chicago's Department of Economics and a Visiting Assistant Professor in M.I.T.'s Department of Economics before joining the University of Maryland's Department of Economics in 2003.  I was awarded a two-year Alfred P. Sloan Foundation Fellowship in 2004, an award that is made each year to only six to eight economists who are selected from those in the entire profession who are within six years of receiving their Ph.D.

I have served on several committees at the University of Maryland and have received teaching and/or advising awards at Harvard University, M.I.T., the University of Chicago, and the University of Maryland.  I have served as an advisor to approximately 20 Ph.D. students at the University of Chicago and the University of Maryland, with recent advisees of mine accepting positions at the College of William and Mary, Cornell University, Syracuse University, University of Houston, and the World Bank.

My professional activities include serving as a Research Associate at the National Bureau of Economic Research in the Health Care and Public Economics programs.  I was also recently a Visiting Fellow at the Brookings Institution and I am a member of the American Economic Association and the American Society of Health Economists.  I serve as an Associate Editor of the *Journal of Public Economics* and on the Board of Editors of the *American Economic*

*Journal: Economic Policy*.  I have been the Principal or co-Principal Investigator on numerous research grants, including current ones from the National Science Foundation and the Social Security Administration.  The National Science Foundation-funded grant is for a project with Fiona Scott Morton, Ph.D., and is titled "Government Procurement of Pharmaceuticals."

I have published more than a dozen papers and have presented my research at numerous professional conferences and at dozens of academic institutions, including Columbia University, Harvard University, M.I.T., Princeton University, Stanford University, University of Chicago, and Yale University.  One paper of mine was published as the lead article in the January 2005 issue of the *Journal of Health Economics* and was titled "Do New Prescription Drugs Pay for Themselves?  The Case of Second Generation Antipsychotics."  Another recent paper, jointly authored with Dr. Scott Morton, was titled "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing" and was published as the lead article in the February 2006 issue of the *Quarterly Journal of Economics*.  A more recent paper of mine on the Supplemental Security Income program, jointly authored with my colleague Melissa Kearney, Ph.D. and published in the Autumn 2007 issue of the *Journal of Policy Analysis and Management*, received the Raymond Vernon Memorial Prize for being voted the best research article in that journal in 2007.

Other papers of mine that focus on the Medicaid program have been published in some of the leading journals of my profession, including the *Journal of Public Economics*, the *Quarterly Journal of Economics*, and the *RAND Journal of Economics*.  I have published empirically-oriented papers on other topics in leading journals including the *American Economic Review, Forum for Health Economics and Policy, Journal of Economic Perspectives, Journal of Political Economy, Journal of Policy Analysis and Management*, and the *Journal of Public Economics*.  In

two of my current projects, I am analyzing the impact of Medicare Part D on pharmaceutical prices (with Dr. Scott Morton) and the effect of state governments' Medicaid managed care policies on Medicaid expenditures (with Tamara Hayford).

My research is empirically oriented and focuses on the impact of government expenditure programs such as Medicaid, Medicare, and Social Security. I have conducted several studies in which I apply advanced quantitative methods to large-scale data sets to investigate questions in applied microeconomics that are of interest to academics and policymakers. A central issue in most of these studies is determining whether a causal relationship exists between one variable and another. For example, in my *Journal of Health Economics* paper on pharmaceutical treatments, I investigate the impact of certain new treatments on Medicaid spending and health outcomes.

Much of this work has included the aggregation of highly complex encounter level data to the individual level, which is then often merged with other data. For example in a paper published in the *Journal of Public Economics*, I aggregate Medicaid claims and expenditure data to the individual level and then merge this with data on individual-level HMO enrollment. Similarly, in a recent paper on Medicare Part D with Dr. Scott Morton, I am utilizing encounter-level data from the Medical Expenditure Panel Survey to estimate the "Medicare market share" for every one of the top 1000 drugs in the U.S.

In carrying out this research, I have followed the methods that are generally applied and accepted in my profession to ensure that the data sets that are constructed are as accurate as possible. I have then applied the most appropriate microeconometric methods to investigate causal relationships. For example, in the *Journal of Health Economics* paper referred to above, I utilize instrumental variables methods to estimate the effect of new pharmaceutical treatments on

Medicaid expenditures.  In a *Journal of Public Economics* paper on Medicaid managed care, I utilize a differences-in-differences methodology that exploits the differential timing of county level Medicaid managed care mandates to estimate the effect of HMOs on Medicaid expenditures.  And in the *Quarterly Journal of Economics* paper, we estimate multivariate regression models that are grounded in economic theory to estimate the effect of Medicaid market shares on pharmaceutical prices.

The most appropriate methodologies for the construction of data sets and the analysis of these data sets depend on many factors.  My training and experience as an economist have provided me with a diverse arsenal of microeconometric methods and an understanding of how optimally to respond to the many obstacles that one confronts when analyzing and processing multiple complex, large-scale data sets in the same project.

## II. Overview

In this report, I use data from several different sources to determine the amount by which spending by the federal Medicare and federal-state Medicaid programs would have changed if alternative prices had been used for Abbott products' Average Wholesale Prices (AWPs), Wholesaler Acquisition Costs (WACs), and Direct Prices (DPs).  For my analyses of the Medicaid program, I focus on the 44 NDCs listed in the United States' Complaint and for my analysis of the Medicare program I focus on the 11 J-codes listed in the Complaint.

In the first two main sections, I provide a detailed description of Abbott's direct and indirect transaction data.  I consider how Abbott's sales and prices vary across products, over time, across classes of trade, and across transaction types.  I also provide comparisons of

Abbott's actual transaction prices and the AWPs, WACs, and DPs published by pricing compendia such as First DataBank (FDB) and Red Book.

For example, Figure 1 displays the average price for all customers in Abbott's direct transaction data in each quarter from 1991Q1 to 2001Q4 for the Vancomycin 74653301 product, which is a natural one to focus on given that it accounts for more Medicaid spending than any other Complaint NDC. The Figure also depicts the FDB Direct Price for that same product in each quarter. As the Figure reveals, the discrepancy between actual and published prices increases steadily over time. In the first quarter of 1991, the DP is $38.00 versus an average price of 5.864. During the next ten years, the DP increased by 69.3 percent to $64.35 while the actual average price declined by 26.1 percent to $4.33. During that ten-year period, the ratio of the DP to Abbott's average direct price increased from 6.5 to 1 to 14.9 to 1. Figure 2 displays a similar pair of series for the pharmacy-specific average price in Abbott's indirect transaction data, which represent sales of Abbott products to pharmacies by wholesalers and distributors, versus the FDB AWP in each quarter. In this case, the ratio of the published to the actual price increases from 5.9 to 1 in the first quarter of 1991 to 17.5 to 1 by the first quarter of 2001.

Using Abbott's direct and indirect transaction data, I determine how spending by both the Medicaid and Medicare programs would have changed if alternative prices had been used for the AWP, WAC, and DP when adjudicating claims for both programs. For example, I replace the WAC by the average pharmacy-specific price in Abbott's indirect transaction data, and determine how spending by Medicaid programs that use the WAC would have changed if this alternative price had been used. This average price will overstate the actual average cost to wholesalers and distributors of acquiring Abbott products because it does not include wholesalers' prompt pay discounts, for example. Additionally, by focusing on the pharmacy

classes of trade rather than considering the average price to wholesalers of acquiring products for all classes of trade, the discrepancy between actual and published prices will tend to be lower. This is because, as I demonstrate below, pharmacy prices in both Abbott's direct and indirect transaction data tend to exceed prices to other customers (most notably hospitals for the products in this Complaint).

An examination of the published prices for the Abbott products listed in the Complaint indicates that the AWP is typically 125 percent of the WAC.  My own analysis of Abbott's indirect and direct transaction data reveals the difference between the price at which wholesalers and distributors acquire Abbott products and the corresponding price at which they sell the products is on average much less than 25 percent.  Despite this, I take the conservative approach of replacing the AWP with 125 percent of the average pharmacy indirect price for each NDC in each quarter, and determine how spending by the Medicaid and Medicare programs would have changed if these alternative prices had been used when adjudicating claims for both programs.  I do the same for the Direct Price, though in this case I replace it with Abbott's average, pharmacy-specific price in the direct transaction data.

There are approximately 3.354 million NDC-based Medicaid claims for the Abbott products listed in the Complaint.[1]  In the analyses below, I find that Medicaid spending for 3.147 million of these claims (93.8 percent) would have been lower if the alternative prices described above had been used for the AWP, WAC, and DP.  Similarly, my results indicate that there were 521,695 payments to pharmacies and other health care providers with at least one NDC-based Medicaid claim that would have been paid at a lower amount.  Additionally, I find that Medicaid spending would have been lower by $113.8 million, with this representing 72.4 percent of the

---

[1] It is important to note that I exclude Medicaid HCPCS claims from my analyses.  Thus when I refer to Medicaid claims in the sections that follow, this represents NDC-based Medicaid claims.

$157.1 million in spending for these products during the 1991 to 2001 period.  Because Medicaid is financed both by the federal government and by the individual state governments, part of this spending represents that paid by state governments.  I determine that the federal share of the $113.8 million is $65.8 million.

I perform a similar set of analyses for the federal Medicare program.  During the 1991 to 2001 period, I find that the Medicare program spent more than $211.6 million on the 11 J-codes listed in the Complaint.  I focus exclusively on the 5 (out of 11) J-codes that account for approximately 90 percent of this spending, and find that Medicare spending would have been lower by approximately $42.4 million if alternative values had been used for Abbott products' AWPs as described above.  My results further indicate that Medicare spending would have been lower for 10.063 million of the 15.684 million claims that I consider, and that the total number of provider payments with at least one claim with a reduced payment amount is equal to 1.777 million.  To the extent that there was a similar effect for the six J-codes that I do not consider, the number of claims, payments, and the total impact on Medicare spending would be greater.

Taken together, my results indicate that spending by the federal government for both the Medicaid and Medicare programs would have been lower by at least $108.2 million during the 1991 to 2001 period if alternative prices had been used for the AWP, WAC, and DP of Abbott products as described above.  The total number of payments to health care providers that would have had lower Medicaid or Medicare spending is approximately 2.30 million and the total number of claims on which spending would have been lower is 13.21 million.  The expenditure impact for the federal government does not include the $48 million impact on Medicaid spending by state governments.  Additionally, it does not include the impact on Medicare recipients' co-

payment amounts, which are typically one-fourth of spending by the Medicare program (20 versus 80 percent) for the J-codes considered, which would represent an additional $10.6 million.

## III. Abbott's Direct Transaction Data

The first main set of data that I use in my analysis was provided by Abbott on December 14, 2007, and includes direct transaction data for products listed in the United States' Complaint. The direct transaction data includes detailed information on sales by Abbott to wholesalers, distributors, hospitals, pharmacies, and many other types of health care providers. Data was provided for transactions occurring during the 1991 through 2003 calendar years, though I focus on just the first eleven years (1991 to 2001) in the analyses that follow.

In this section, I describe Abbott's direct transaction data. In preparing this, I have drawn on the deposition of Bruce Stowell, other documents including many provided by Abbott, and my own analysis of the Abbott data. I have also made use of the description of Abbott's data in my previous report for the Texas case against Abbott (see Duggan, 11/12/2007). This is because the format of the direct transaction data provided by Abbott for the federal case is very similar to that provided by Abbott in the Texas case.

*A. The Breakdown by Product and Time Period*

Table 1 provides an initial summary of the Abbott direct transaction data used in my analyses by listing the number of observations along with several other pieces of information for each product. The identifier used for each product is the national drug code (NDC), all 44 of which are listed in the United States' Complaint. As the second column of this table shows, there exists substantial variation across products in the number of transactions, ranging from a

high of 1,019,182 (for 74798309) to a low of 13,125 (for 74653401).  The total number of observations is 12,672,670, with all 44 products represented.

The third column of Table 1 lists total gross sales (EXTPRICE) in thousands of dollars for each NDC, with the sum of this variable across all observations equal to $3.451 billion.[2]  The next column in the table lists the sum of the REBATE-ACCRUAL field for each NDC.  As described by Mr. Bruce Stowell in July 19, 2006 deposition, the Hospital Products Division (HPD) uses this field to account for chargebacks, which typically represent credits or transfers of funds from Abbott back to the customer and thus the dollar amounts for this are negative.  Aggregated across all observations, total chargebacks in the direct transaction data for the products in the Complaint are equal to $1.142 billion.  The fifth column lists the average per-package price for each NDC.  To calculate this average price, I divide the sum of total sales and chargebacks for each NDC by the sum of the total quantity (ICQTY) transacted for that NDC.[3]

The final two columns of the table compare this average per-package price with Abbott's Direct Price and Average Wholesale Price (as published by First DataBank) in effect during the third quarter of 1996, which is roughly halfway through the 11-year time period of interest.[4]  Specifically, in the sixth column I report the ratio of the Direct Price in the third quarter of 1996 to Abbott's average price during the 11-year period, while in the seventh column I report the analogous ratio using the Average Wholesale Price (AWP) in the third quarter of 1996 in the numerator.  The average values of these ratios across all products are 10.07 and 11.95, respectively.  While I examine this issue more thoroughly in the analyses that follow, this first-

---

[2] See Stowell Exhibit 13 for a list of the variable names and Stowell Exhibit 14 for a list of the variable labels.  The EXTPRICE variable was also in some cases labeled LN-XTN (for line extension).  For the purposes of this report, I use the terms revenues and sales interchangeably.

[3] When calculating this average price, I exclude the 67,863 transactions (0.54 percent of the total) that are returns because the units in the ICQTY variable may not be consistent.

[4] It is my understanding that the prices published by First DataBank and other pricing compendia such as Red Book are based on price representations by Abbott.

pass comparison suggests that the published prices for the Abbott products in the Complaint exceeded their actual transaction prices by an average of approximately 10-to-1 (for the Direct Price) or 12-to-1 (for the AWP).

Table 2 lists the number of observations, total sales, and total chargebacks by year and quarter in the direct data during the eleven year period that I consider. The final column of the table lists the number of NDCs with one or more direct transactions in that quarter, which increases from a low of 35 in early 1991 to 44 by the fourth quarter of 1998, where it remains for the next twelve quarters.

*B. The Instruction and Transaction Codes*

There are many different types of transactions that are included in the direct data, and these are described in Abbott's COP Transaction Matrix (Stowell Exhibit 28).[5] The final two columns of this matrix provide numerical values for the instruction code and the transaction code, both of which are included in the direct data. For example the first row of this matrix lists a "normal billing" transaction, which would have an instruction code of 0 and a transaction code of 1. As Table 3 shows, this transaction type is the most common one for the products in the Complaint, accounting for 80 percent of the 12.673 million transactions and 82 percent of the $3.451 billion in gross sales (EXTPRICE).

Table 3 lists 21 other transaction types, which are sorted in descending order of the absolute value of total net sales across all 44 products. The final two columns of this table list the instruction and transaction codes for each row. Many of the transactions listed in the COP Transaction Matrix do not appear in the direct data and thus I do not include them. Transaction

---

[5] A shorter version of this information is also contained in Stowell Exhibit 16.

types with an instruction code between 0 and 18 are labeled as debits in the COP Transaction Matrix whereas those between 60 and 90 and the blank instruction code are labeled as credits.

I include virtually all of the transaction types that appear in Abbott's direct transaction data when calculating average prices and related price statistics in my subsequent analyses. For example, in addition to normal billing transactions, I consider manual splits, price adjustments, and additional product charge transactions. However, because Mr. Stowell noted in his deposition that the units for returns (instruction codes of 60 through 64) might not be comparable, I exclude them. These returns account for just 0.54 percent of transactions and 0.76 percent of total net sales.

*C. Customer Class of Trade*

Among the more than 50 variables included in the direct data is one that can be used to determine the customer's class of trade (CLAS), which are listed in Exhibit 15 of Mr. Stowell's deposition. Table 4 lists the number of observations, total gross sales, and total rebate accruals by class of trade, which are sorted in descending order of total net sales. Only the 27 largest classes of trade in terms of total net sales are listed, with the remaining 81 for which there is data grouped into the final category. The top 27 classes of trade account for 99.4 percent of net sales and 99.2 percent of transactions in Abbott's direct data.

As this table shows, non-profit hospitals are the most common class of trade in the direct data, accounting for 56.3 percent of transactions and 36.8 percent of net sales. The two next most common are Wholesalers and HPD Distributors, which between them account for 10.9 percent of transactions, 39.2 percent of net sales, and 91.1 percent of rebate accruals. These two

classes of trade also account for virtually all of the sales in Abbott's indirect transaction data, which I describe in more detail in Section IV.

An examination of the direct transaction data reveals that the price per package of a product in a specific quarter does vary to some extent across classes of trade.[6]  To shed light on this issue, I calculate the class of trade specific average price for each product in every quarter and divide that by the product's overall average price in the same quarter.  I then average this ratio for each class of trade across all NDC-quarter combinations, weighting by the number of transactions for the class of trade – product – quarter combination.

Given that Abbott provided data for all 44 products and there are 44 quarters, the maximum number of ratios for each class of trade is 1,936.  When one accounts for the fact that not all products have sales in every quarter (see the sixth column of Table 2), the actual maximum number of ratios for each class of trade is 1,832.  To the extent that prices tend to be lower (higher) than the average for a particular class of trade, one would expect this ratio to fall below (above) one.

The second-to-last column of Table 4 lists the average ratio of the class of trade specific price to the overall average price, with the final column listing the number of ratios for each class of trade.  The average ratio of 0.953 for Non-Profit Hospitals indicates that prices for this class of trade tend to be lower than for other classes of trade.  The same is true for City or County Hospitals (ratio of 0.969), For-Profit Hospitals (0.995), and State Hospitals (.983).  Average prices to Retail Pharmacies and Closed Pharmacies tend to exceed the overall average price, with average ratios of 1.199 and 1.269, respectively.  Average prices to Wholesalers and HPD Distributors tend to fall between these two ranges, with average ratios of 1.125 and 1.016, respectively.

---

[6] I define the price to be equal to the net amount paid divided by total quantity.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                        15

*D. A Comparison of Actual and Published Prices: The Case of Vancomycin (74653301)*

Using Abbott's direct transaction data, one can calculate the average price or other price statistics such as the median or the 95th percentile for a specific product in a given time period. To calculate the average price, I first exclude all returns (instruction codes between 60 and 64 inclusive) because their units might not be comparable to the other transactions in the direct data as described above. I then aggregate net sales and quantity across all transactions. I define the time period to be a quarter (January-March, April-June, July-September, October-December) and thus the unit of observation is the NDC-quarter.[7]

The third and fourth columns of Table 5 list the First DataBank Direct Price (hereafter Direct Price or DP) and Abbott's actual average price for all classes of trade for the Abbott product with an NDC of 00074653301. As shown in Section V below, this Abbott product accounts for more Medicaid spending during the eleven-year period of interest than any other product included in the United States' Complaint. In the first quarter of 1991, the average per-package price for this product was $5.864 versus a published Direct Price of $38.000. Thus the published price was 6.5 times greater than the average price at the beginning of the study period.

For two reasons, this ratio of the Direct Price to Abbott's actual average price then increases substantially during the next ten years. First, the Direct Price for this product increases by an average of 5.4 percent per year from the first quarter of 1991 to the first quarter of 2001. Second, Abbott's actual average price decreases by an average of 3.0 percent per year during the same period. Thus in the first quarter of 2001, the ratio of the Direct Price to the actual average price was 14.9 to 1. The Direct Price then declined by 76.9 percent so that the ratio in the final

---

[7] I drop any NDC-quarter observations with total net sales or total quantity that is negative. I also drop NDC-quarter-customer observations that do not have a strictly positive number of purchase units. The customer number that I use is the BILL-TO customer number.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                  16

quarter of 2001 was 3.4 to 1.  This decline in the ratio is driven by the change in the published DP for this product. These quarterly price data – the Direct Price and Abbott's actual average price - are depicted graphically in Figure 1.

The fifth column of Table 5 lists the 95th percentile price for this same Abbott product. As the table shows, these prices are fairly similar to the average price in each quarter and have similar trends over time.  For example the ratio of the Direct Price to the 95th percentile price increases from 6.1 in the first quarter of 1991 to 14.0 in the first quarter of 2001 and then declines sharply to 3.4 to 1 in the fourth quarter of 2001.  The next two columns of this same table list the total number of customers and the number of transactions in each quarter for this Abbott Vancomycin product.

In the final four columns of Table 5, I report analogous information for transactions involving only the retail pharmacy (class of trade A003), chain pharmacy (A007), and closed pharmacy (M070) classes of trade.[8]  Both the level and the trend in Abbott's average and 95th percentile prices are similar for these classes of trade as for all transactions.   Because of this, the ratio of the Direct Price to the actual average price increases from 5.6 in the first quarter of 1991 to 15.3 by the first quarter of 2001.

## IV. Abbott's Indirect Transaction Data

The second main set of data that I use in my analysis was provided by Abbott on November 5, 2007, and includes indirect transaction data for products listed in the United States' Complaint during the 1991 through 2001 calendar years.  The indirect transaction data includes

---

[8] The number of transactions and the total net revenues for the A007 class of trade are 1,258 and $84,167, respectively.  This class of trade is not listed in Table 4 because it is not one of the leading classes of trade and is therefore grouped into the "Remaining 81 Classes of Trade" category.

detailed information on sales by wholesalers and HPD distributors to pharmacies, hospitals, and many other types of health care providers.

In this section, I describe Abbott's indirect transaction data.  In preparing this, I have drawn on the testimony of Ms. Nancy Lee Carlson in her July 20, 2006 deposition, other documents including many provided by Abbott, and my own analysis of the Abbott data.

*A. The Breakdown by Product and Time Period*

Table 6 provides an initial summary of the Abbott indirect transaction data used in my analyses by listing the number of observations along with several other pieces of information for each product.  The identifier used for each product is the national drug code (NDC), all 44 of which are listed in the United States' Complaint.  As the second column of this table shows, there exists substantial variation across products in the number of transactions, ranging from a high of 1,552,124 (for 74196607) to a low of 8,817 (for 74613922).  The total number of observations is 16,131,540, with all 44 products represented.

The third column of Table 6 lists the total amount paid by the end customers (END-CUSTOMER-INVOICE-TOTAL) in thousands of dollars for each NDC, with the sum of this variable across all observations equal to $876.6 million.  The next column in the table lists the total number of packages purchased by end customers (PURCHASE-UNITS) for each NDC.[9] The fifth column includes the sum of customer rebates, discounts, and management fees for each NDC (CUSTOMER-REBATE-DISCOUNT-ETC-TOTAL), though as demonstrated below this

---

[9] While the label for this variable is units, the values are in terms of packages, which must be multiplied by the number of units per package to arrive at the number of units (e.g milliliters).

variable is not populated until the beginning of 1996 in the indirect data.[10]  The sixth column lists

the average per-package price for each NDC.  To calculate this average price, I divide the sum of

the total amount paid for each NDC by the sum of the total quantity transacted for that NDC.

Because I exclude the customer rebates from my average price calculation, these calculated

average prices will tend to exceed the actual average prices during the time period of interest.

The next column of this table lists the corresponding average product-specific price

during the same 1991 to 2001 period for the Wholesaler (W050) and HPD Distributor (M061)

classes of trade in Abbott's direct transaction data.  As I show in the next section, virtually all of

the transactions summarized in the indirect data represent sales from wholesalers or HPD

distributors, which have the W050 and M061 classes of trade, respectively.  A comparison of the

average prices for the W050 and M061 classes of trade in the direct data with the corresponding

end customer average prices in Abbott's indirect data reveals that for 28 out of 44 products they

are within one percent of one another and for 40 out of 44 products the difference in the average

prices is less than five percent (the remaining four are within ten percent).

Table 7 lists the number of observations, total sales, and total customer rebates by year

and quarter in the indirect data during the eleven year period that I consider.  As the table shows,

the customer rebate variable is equal to zero in every quarter from 1991 through 1995,

suggesting that the rebate data for this earlier period are missing.  These rebates were 6.3 percent

of sales from 1996 to 2001, ranging from a low of 5.0 percent in the third quarter of 1996 to a

high of 7.7 percent in the fourth quarter of 2000.  The final column of the table lists the number

of NDCs with one or more indirect transactions in that quarter, which increases from a low of 34

in early 1991 to 44 by the first quarter of 1999.

---

[10] According to Nancy Lee Carlson's deposition, "this field is for potential payments should contractual negotiations
be met." (page 120 of ABT-DOJ 0227180)  The final row of the table in Exhibit 33 of this same deposition suggests
that in addition to customer rebates and discounts, this field may also include management fees.

*B. The Wholesaler Customer Number and Name*

Abbott's indirect transaction data includes two variables labeled WHLSR-NAME and WHLSR-CUSTOMER-NUMBER that provide the name and customer number, respectively, of the selling organization for each transaction. The WHLSR-CUSTOMER-NUMBER can then be used to determine the class of trade for the selling organization by linking with Abbott's direct transaction data. For 74.6 percent of the 16.132 million indirect transactions, the wholesaler customer number does appear in the direct transaction data. Within this set of matched indirect transactions, 56.4 percent have W050 (Wholesaler) as the class of trade and 43.6 percent have M061 (HPD Distributor) as the class of trade.[11] By examining the WHLSR-NAME for the 25.4 percent of the indirect transactions with a customer number that does not appear in the direct data, I can determine the class of trade for the selling organization.[12] For example, 7 customer numbers with a WHLSR-NAME of "AMERISOURCE CORP" do not appear in the direct data. However, another 16 customer numbers with the same WHLSR-NAME do appear in Abbott's direct transaction data and all 16 have W050 as the class of trade.

Table 8 lists the total number of indirect transactions and the total amount of end customer sales (excluding rebates) by the selling organization's name. In constructing this table, I have grouped together similar customer names. Thus for example, "AMERISOURCE", "AMERISOURCE CORP", "AMERISOURCEBERG DRUG", "AMERISOURCE BERGEN DR", and 13 other customer names that appear in the Abbott data and begin with

---

[11] In some cases, there is more than one class of trade for a customer number in the direct transaction data. In those cases I simply use the most common class of trade for that customer number. For a very small number of transactions (less than 0.05 percent) the customer number has a different class of trade. Specifically 0.040 percent have M060 as the class of trade and 0.001 percent have P040 as the class of trade.

[12] One complication is that from 1991 to 1995 the WHLSR-NAME variable is typically missing in the indirect data. In those cases if the customer number does not appear in the direct data, I can link with the indirect data from 1996 to 2001 to determine the WHLSR-NAME.

"AMERISOURCE" are all grouped into the "AMERISOURCE" category. The final column of the table lists the class of trade for this category. As above, when there is more than one class of trade in a category I list the most common one.[13]

As mentioned above and shown in Table 6, the average product-specific end customer prices in Abbott's indirect data are very similar to the average prices for the W050 and M061 classes of trade in Abbott's direct data. Similarly, an examination of Table 4 and Table 8 reveals that total sales are quite similar as well. More specifically, total net sales in Abbott's direct transaction data to the W050 and M061 classes of trade amount to $904.7 million while total sales to end customers in the indirect data are equal to $876.6 million, which represents a difference of 3.1 percent.

*C. End Customer Class of Trade*

Among the variables included in Abbott's indirect data is one that can be used to determine the end customer's class of trade (SHIP-TO-CUSTOMER-CLASS-OF-TRADE). Table 9 lists the number of observations, total sales, and total customer rebates by class of trade, which are sorted in descending order of total sales. Only the 21 largest classes of trade in terms of total sales are listed, with the remaining 68 for which there is data grouped into the final category. The top 21 end customer classes of trade account for 99.2 percent of sales and 99.0 percent of transactions in Abbott's indirect data.

As this table shows, non-profit hospitals are the most common end customer class of trade in Abbott's indirect data, accounting for 64.3 percent of transactions and 58.9 percent of sales. The two next most common are City or County Hospitals and Profit Hospitals, which

---

[13] In two cases (PRO HOSP SPLY and PRIORITY HEALTHCARE), none of the customer numbers from the indirect data in a category appear in the direct data. In those cases I simply use the wholesaler name from the indirect data and determine the most common class of trade in the direct data with the same names.

between them account for 20.3 percent of transactions and 21.1 percent of sales.  If one excludes the "Missing Class of Trade" category, retail pharmacies (A003), closed pharmacies (M070), and chain pharmacies (A007) are numbers 6, 8, and 20, respectively, in terms of total sales in Abbott's indirect transaction data.

An examination of Abbott's indirect transaction data reveals that the price per package of a product in a specific quarter does vary to some extent across classes of trade.  To shed light on this issue, I calculate the class of trade specific average price for each product in every quarter and divide that by the product's overall average price in the same quarter.  I then average this ratio for each class of trade across all NDC-quarter combinations, weighting by the number of transactions for the class of trade – product – quarter combination.

Given that Abbott provided data for 44 products and there are 44 quarters in the time period of interest, the maximum number of ratios for each class of trade is 1,936.  When one accounts for the fact that not all products have sales in every quarter (see the seventh column of Table 7), the actual maximum number of ratios for each class of trade is 1,827.  To the extent that prices tend to be lower (higher) than the average for a particular class of trade, one would expect this ratio to fall below (above) one.

The second-to-last column of Table 9 lists the average ratio of the class of trade specific price to the overall average price, with the final column listing the number of ratios for each class of trade.  The average ratio of 0.988 for Non-Profit Hospitals indicates that prices for this class of trade tend to be lower than for other classes of trade.  The same is true for For-Profit Hospitals (0.993), V.A. Hospitals (0.925), and Military Hospitals (0.970), though not for City or County Hospitals (1.003) and State Hospitals (1.021).  As this same table shows, average prices to Retail

Pharmacies, Closed Pharmacies, and Chain Pharmacies tend to exceed the overall average price, with average ratios of 1.200, 1.093, and 1.369, respectively.

### D. A Comparison of Actual and Reported Prices: The Case of Vancomycin (74653301)

Using Abbott's indirect transaction data, one can calculate the average price or other price statistics such as the median or the 95th percentile for a specific product in a given time period.  To calculate the average price, I aggregate total sales as measured by the END-CUSTOMER-INVOICE-TOTAL variable and divide this by the total of the PURCHASE-UNITS variable.  I define the time period to be a quarter (January-March, April-June, July-September, October-December) and thus the unit of observation is an NDC-quarter.

The third and fourth columns of Table 10 list the AWP and the actual average price in Abbott's indirect data for all end customer classes of trade for the Abbott product with an NDC of 00074653301.  As shown in Section V below, this Abbott product accounts for more Medicaid spending during the 1991 to 2001 period than any other product included in the United States' Complaint.  In the first quarter of 1991, the average per-package price for this product in the indirect data was $6.062 versus an AWP of $45.125.[14]  Thus the AWP was 7.4 times greater than the average price at the beginning of the study period.

For two reasons, this ratio of the AWP to the actual average price then increases substantially during the next ten years.  First, the AWP for this product increases by an average of 5.4 percent per year from the first quarter of 1991 to the first quarter of 2001.  Second, the actual average price for this product decreases by an average of 2.9 percent per year during the same period.  Thus in the first quarter of 2001, the ratio of the AWP to the actual average price in

---

[14] The First DataBank AWP for this product is 18.75 percent greater than the First DataBank Direct Price from the first quarter of 1991 through the second quarter of 2001. This ratio changes slightly in the middle of 2001 to 1.1904.

Abbott's indirect data was 16.9 to 1.  The AWP then declined by 77 percent so that the corresponding ratio in the final quarter of 2001 was 4.0 to 1.

The fifth column of this same table lists the 95th percentile price for this same Abbott product.  As the table shows, these prices are fairly similar to the average price in each quarter and have similar trends over time.  For example the ratio of the AWP for 00074653301 to the product's 95th percentile price increases from 6.6 in the first quarter of 1991 to 15.5 in the first quarter of 2001 and then declines sharply to 3.9 to 1 in the fourth quarter of 2001.  The next two columns of this same table list the total number of customers and the number of transactions in each quarter in Abbott's indirect data for this Vancomycin product.

In the final five columns of Table 10, I report similar information for transactions involving only the retail pharmacy, chain pharmacy, and closed pharmacy classes of trade. Both the level and the trend in the average price are similar for these classes of trade as for all transactions.   Because of this, the ratio of the AWP to Abbott's actual average price for these classes of trade in the indirect data increases from 5.9 in the first quarter of 1991 to 17.5 by the first quarter of 2001.  These quarterly price data – the AWP published by First DataBank and Abbott's average price for the three pharmacy classes of trade - are depicted graphically in Figure 2.  The 95th percentile price is somewhat higher for these three classes of trade than for all customers early in the study period, though as the next column shows, even the maximum price for these three pharmacy classes of trade is substantially lower than the AWP in every quarter during the 1991 to 2001 period.

**V. CMS Medicaid State Drug Utilization Data**

The third main set of data that I utilize in my analysis consists of Medicaid NDC-based claims data[15] for the 44 Abbott products listed in the Complaint for the years 1991 through 2001. These claims provide detailed information about drugs dispensed by pharmacies and reimbursed on an NDC basis by the Medicaid program. Before proceeding to a description of Medicaid individual-level claims data, in this section I summarize the aggregate data on NDC-specific Medicaid spending and utilization that is available on the CMS website.  This aggregate data provides a useful overview of how Medicaid spending varied across products, time, and states for the 44 NDCs in the Complaint during the eleven year period of interest.

Each state administers its own Medicaid program and virtually every state provides periodic updates to CMS regarding the total number of prescriptions filled and the total amount paid for each NDC in every quarter.  This information on NDC-state-quarter-specific Medicaid spending and utilization for the 1991 through 2007 time period is publicly available on the CMS website at the page headed *State Drug Utilization Data* (hereafter SDUD).[16]

The information listed in Table 11 summarizes Medicaid spending and the number of NDC-based prescriptions reimbursed by Medicaid as reported on the CMS website for the 44 products listed in the Complaint from the first quarter of 1991 through and including the fourth quarter of 2001.[17]  As the first four columns of this table show, Medicaid spending for these products varied substantially across states during the 1991 to 2001 period, from a low of $44,000 in Washington, D.C., to a high of $16.483 million in Florida.[18]  The number of prescriptions reimbursed by Medicaid also varied across states, from a low of 1,234 in Idaho, to a high of

---

[15] This does not include Medicaid HCPCS (Healthcare Common Procedure Coding System) claims.
[16] See http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp.
[17] This information was downloaded from the CMS website on October 3, 2007.  The one revision to this data is that I exclude the one observation for the 74653301 product in Texas in the first quarter of 2000 because of an apparent data error.  Specifically the amount of SDUD Medicaid spending for this one product in Texas is 6.2 times greater in this one quarter than in the other 43 quarters combined in Texas for the same product.
[18] Arizona does not cover drugs through the Medicaid Drug Rebate program and thus they do not have Medicaid utilization data listed on the CMS site during the eleven year period. Thus Arizona is not listed in Table 11.

505,076 in Illinois.  Aggregating across all states, this aggregate CMS data indicates that the total number of prescriptions filled and the amount reimbursed by Medicaid for the Complaint products during the eleven-year period of interest are equal to 3.254 million and $146.837 million, respectively.

The next three columns of Table 11 provide a breakdown of the number of prescriptions and total Medicaid spending by NDC.  As the table shows, Medicaid spending varies substantially across the products listed in the Complaint, with a high of $38.951 million for the Vancomycin 74653301 product discussed above and a low of $276,000 for the Sterile Water product 74488750.  The number of prescriptions also varies substantially, with just 3,816 prescriptions filled for the product 74613922 compared with a high of 778,607 for the Sodium Chloride 74196607 product.

The final three columns of Table 11 list the total number of prescriptions and total Medicaid spending in each of the 44 quarters from 1991 through and including 2001.  Medicaid spending for the Complaint products increases steadily during the first ten years of the period, reaching a maximum of $6.218 million in the first quarter of 2001.  Spending then declines by 59.1 percent (to $2.543 million) during the next two quarters, despite the fact that the number of prescriptions declines by just 11.6 percent during this same period.  This decline is primarily driven by the change in the published prices (such as the AWP) for the Abbott products listed in the Complaint that occurred in 2001 and was described and depicted graphically for the Vancomycin 74653301 product above.

**VI. CMS Medicaid SMRF / MAX Data**

In addition to the aggregate Medicaid data described above, CMS also maintains a large amount of Medicaid claims data, much of which is summarized on the CMS website at the page with the heading *Medicaid Analytic eXtract (MAX) General Information*.[19]  For the 1999 to 2004 data, the MAX data summarized at this site consists of five sets of files (person summary, inpatient hospital, long-term care, prescription drugs, and other services) for all fifty states and the District of Columbia.  The prescription drug claim files are the ones that I summarize in this section.  Similar data for prescription drug claims are also available for 30 states in one or more years from 1991 through 1998, with the data referred to as the State Medicaid Research Files (SMRF) during this earlier period.

Table 12A provides a summary of Medicaid spending and the number of claims for the 44 Complaint NDCs for each state from 1999 through 2001.  This table also lists state-level Medicaid spending and the number of prescriptions for Complaint products during the same three-year period as reported in the SDUD data described above.  Before comparing these two sets of data, it is worth noting that my summary of the claims data is based on service dates whereas the SDUD data are based on the date of payment.  Thus one would not expect an exact correspondence between the two sets of data.

As the table shows, for most of the states with relatively high Medicaid spending, there is a close correspondence between Medicaid spending in the two sets of files.  The one exception is Indiana, for which spending in the MAX data is 28.5 percent greater than in the SDUD data.  My examination of the SDUD data for Indiana indicates that it is incomplete during this period, with for example Medicaid spending of just $49,274 in the third quarter of 2000 versus an average of $631,918 per quarter in the second and fourth quarters of the same year.  Quarterly Medicaid

---

[19] See http://www.cms.hhs.gov/MedicaidDataSourcesGenInfo/07_MAXGeneralInformation.asp.

spending for Indiana is much more consistent in the MAX data, with spending of $526,456 in the third quarter of 2000 versus an average of $651,325 in the surrounding two quarters.

An examination of Medicaid spending in the two data sets for the remaining states reveals that some other states have large discrepancies.  For example, in Mississippi, Medicaid spending in the MAX data is 49.3 percent higher than in the SDUD data.  But as Table 12A shows, only 8 quarters of data were available for Mississippi in the SDUD data.  If Mississippi's SDUD Medicaid spending is accurate for these 8 quarters, then one would expect a difference of approximately 50 percent.  In other states with large discrepancies, such as Colorado, Maryland, South Carolina, and Iowa, my examination of both sets of data suggest the discrepancies are typically due to incomplete SDUD data. Overall, total Medicaid spending for Complaint products from 1999 to 2001 is very similar in the two data sets, with $61.9 million in the SDUD data versus $62.9 million in the MAX data.

Table 12B repeats this comparison for the 1996 – 1998 period.  The key difference between this table and the previous one is that SMRF data (the name used from 1991 to 1998, the name MAX was used from 1999 to 2001) is only available for 28 states during this three-year period.  Additionally, only two years of data are provided for the state of California.  Once again with the exception of Indiana, there is a close correspondence between Medicaid spending in the two data sets for states with relatively high Medicaid spending during this three-year period.  For example, in Florida according to the SMRF data, there was $7.432 million in Medicaid spending on Complaint products from 1996 to 1998 versus $7.240 million in the SDUD data.  SMRF Medicaid spending is 32.9 percent lower in California than in the SDUD data, though this is approximately what one would expect given there are just two years of SMRF data for this state.

Medicaid spending for Indiana in the SMRF is more than four times greater than is implied by the SDUD data, though this is primarily driven by the fact that this state has just four quarters of utilization data in the SDUD data set versus 12 in the SMRF.  If one excludes this one state, Medicaid spending for the 27 states in the SMRF is $29.636 million versus $29.571 million in the SDUD for these same states for a difference of just 0.2 percent.

In Table 12C I report state-level SDUD Medicaid spending and prescriptions versus SMRF Medicaid spending and claims for the 1991 – 1995 period.  Because almost none of the states have SMRF data for all five years, the correspondence between Medicaid spending in the two data sets is not as close.   For example, Medicaid spending in the state of New Jersey, which is first in both data sets in terms of Medicaid spending on Complaint products during this five-year period, is 23.6 percent lower in the SMRF than in the SDUD data.  This is primarily because there is no SMRF data for New Jersey in 1991.   If one instead compares spending in New Jersey during the four years from 1992 to 1995, when I have both SDUD and SMRF data, the difference is just 2.7 percent.

To sum up, Medicaid spending in the SDUD and SMRF/MAX data for the Complaint products from 1991 to 2001 yields a similar picture.  The most striking difference is for the state of Indiana, which according to the SMRF/MAX data has spending of $14.808 million (for 1992 to 2001) versus $8.147 million in the SDUD data (for 1991 to 2001).  This discrepancy appears to be driven by incomplete SDUD data for this state.  Most of the other differences among states with relatively high Medicaid spending in Tables 12A, 12B, and 12C are also driven by incomplete data, either because the SMRF/MAX file is not available in a particular year for a state or because the SDUD data for a state in a certain year is incomplete.

## VII. Illinois Medicaid

According to the CMS SDUD data, the state of Illinois was second among all states in terms of total Medicaid spending from 1991 to 2001 on Abbott products in the Complaint. Because the state-level Medicaid claims data are somewhat more complete for Illinois than for Florida (the state ranked first), I begin my state-level Medicaid analyses with Illinois.

The Illinois Department of Health and Family Services provided the United States with Medicaid claims data.  The data were provided in two different formats, one including claims adjudicated from 1991 through 1996 and the other including claims adjudicated in 1996 through 2007.  The data included claims with an adjudication date of May 6, 1991 and later, with the first service date in the files of April 1, 1991.  I restrict attention to those Medicaid claims with a service date during the eleven-year period of interest.

The Illinois Medicaid NDC-based claims data are summarized in Table 13A.  There are 535,493 claims for one of the 44 Complaint NDCs with a service date during the relevant period, with Medicaid spending for these claims equal to $16.589 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  All 44 Complaint NDCs appear in the Illinois Medicaid claims data.  Consistent with the data for the U.S. as a whole, Illinois Medicaid spending is greater for the 74653301 product than for any other one in the Complaint.

The second panel lists the number of claims and total Medicaid spending by year and quarter.  When assigning claims to time periods, I use the service date instead of, for example, the prescription date or the adjudication date.  As the table shows, there are no claims in the first

quarter of 1991.  The similarity between the utilization for the second and third quarters of 1991

suggests that the data are relatively complete for the second quarter of 1991.[20]

*A. Illinois Medicaid Reimbursement*

During the eleven-year period of interest, the Illinois Medicaid program used the AWP

for each product to determine the amount that would be allowed for each Medicaid claim.  More

specifically, from 1991 through June of 1995, Illinois used 90 percent of a product's AWP as its

estimated acquisition cost, which was then multiplied by the number of allowed units to

determine the amount that would be paid for the ingredient.  This scaling factor of 90 percent

was reduced to 88 percent in July of 1995 for generic products, where it remained[21] until July of

2001, when it was reduced to 80 percent.  This final scaling factor was in effect for the remainder

of the 2001 calendar year.[22]

Consistent with the method used by many other states when adjudicating Medicaid

claims, Illinois Medicaid took the sum of the estimated ingredient cost and a dispensing fee,

which for generic products ranged between $3.58 and $15.00 from 1991 through June of 1998.

More specifically, the dispensing fee was set equal to ten percent of the ingredient cost, though if

the calculated amount fell below $3.58 or above $15.00 then the dispensing fee was set to $3.58

and $15.00, respectively.  This algorithm used to calculate the dispensing fee for each claim can

be summarized in the following equation:

$$(1) \quad D_{jkt} = \min\{\$15.00, \max(\$3.58, 0.10 * S_t * AWP_{kt} * U_{jkt})\}$$

[20] This is also suggested by the sharp increase in the number of claims from a service date of March 31, 1991 (when there were zero) to April 1, 1991 (when there were 102, which is similar to the daily average number of claims paid in that same month).

[21] From December 15, 2000 through June 30, 2001, the state used the lesser of 88 percent of the AWP and 112 percent of the Wholesale Acquistion Cost (WAC).  Because the AWPs were 25 percent greater than the WACs for Abbott Complaint products during this period, the AWP would continue to be used.

[22] See Myers and Stauffer state summaries for more details on Illinois and other states' Medicaid adjudication calculations.

in which $D_{jkt}$ is equal to the dispensing fee for claim j for product k in period t, $S_t$ is the AWP

scaling factor in effect in period t, $AWP_{kt}$ is the average wholesale price for product k in period t,

and $U_{jkt}$ is the number of units for product k on claim j in period t.  The minimum and maximum

dispensing fees increased to \$3.69 and \$15.45, respectively, in July of 1998, and then again to

\$3.75 and \$15.70 in July of 1999.  In both instances, ten percent of the ingredient cost would be

paid if the resulting amount fell within the reported range.[23]  On December 15, 2000, the

dispensing fee was set to a flat rate of \$4.17 that was unrelated to the ingredient cost, with this

amount increasing to \$5.10 on July 1, 2001, where it stayed until the end of 2001.

The sum of the estimated ingredient cost and the dispensing fee is compared with the

provider charged amount, with the Illinois Medicaid program paying the lesser of the two.  This

adjudication algorithm is summarized in the following equation:

$$(2) \quad PAID_{jkt} = \min\{(S_t * AWP_{kt} * U_{jkt}) + D_{jkt}, CHARGED_{jkt}\}$$

For approximately 27.4 percent of the claims for Complaint products during the eleven-year

period of interest, the amount paid was equal to the provider charged amount.  It is worth noting

that in Illinois as in most other states, the scaled AWP was sometimes compared with an FUL

(federal upper limit) or SMAC (state maximum allowable cost).  This would typically occur if a

product had an FUL and/or SMAC in effect and either one of them was lower than the scaled

AWP.  In these cases the algorithm described in equation (2) is the same, except that the scaled

AWP would be replaced by the FUL or the SMAC.

*B. The Impact of Alternative Price Parameters on Illinois Medicaid Spending*

Of the 535,493 claims summarized in Table 13, there are 368 that have a paid amount

that is equal to zero (there are no claims with a negative amount paid).  There are an additional

---

[23] From July of 1999 through December 14, 2000, Illinois Medicaid used 10.46 percent instead of 10 percent.

942 claims for which I am unable to replicate the amount paid or in which there appears to be some data error such as an implausibly large dispensing fee. I exclude these 1,384 claims from my analysis sample, which leaves me with a sample of 534,183 claims with service dates from 1991 to 2001 for the 44 remaining products in the complaint.

I then link each claim to the NDC-quarter-specific prices described in the preceding sections to determine how the use of alternative values for the AWP would have affected Illinois Medicaid spending.[24] Because Medicaid payments for outpatient drugs are typically made to pharmacies, I focus on the three pharmacy classes of trade (A003, A007, M070) in the Abbott transaction data. As shown in Tables 4 and 9, prices for these three classes of trade tend to exceed those for the average Abbott customer, which will tend to reduce the discrepancy between the AWP and the actual prices of Abbott products. I further focus on Abbott's indirect transaction data, which provides information on the price per unit paid to wholesalers and HPD distributors for Abbott products.

One issue that arises in linking the claims to the NDC-quarter price statistics is that there are no transactions for the three pharmacy classes of trade in the indirect data for certain NDC-quarter combinations. In these cases, I take the maximum of the most recent previous and the closest subsequent price statistic for that NDC for the three pharmacy classes of trade.[25] Claims affected by this first adjustment account for 5.2 percent of the $16.528 million in Illinois Medicaid spending in the analysis sample. If there is no price statistic within 4 quarters either before or after the NDC-quarter, I instead use the price statistic for all customers for that product

---

[24] It is worth noting that in some cases Illinois or other states may not have used an AWP, WAC, or Direct Price. For example, some states used SMAC prices for one or more Complaint products at some time during the period of interest. This frequently occurred in the Texas Medicaid program for Abbott products (see Duggan 11/12/2007). In these cases, the comparison is therefore between parameters such as the average price and this other price, which would have been used if it resulted in a lower paid amount.

[25] Thus for example if I were missing transaction data for a specific product in the fourth quarter of 1994, I would take the maximum of the corresponding price statistic in the third quarter of 1994 and the first quarter of 1995. If there is only a price before or after, then I use that price.

in the same quarter in Abbott's indirect data. To account for the fact that pharmacy prices tend to exceed prices for other customers, I multiply this price statistic by 1.3. Claims affected by this latter adjustment account for 3.3 percent of the $16.528 million in Illinois Medicaid spending.

I begin with the average NDC-quarter-specific price from the indirect data for the three pharmacy classes of trade to determine whether Medicaid spending for each claim would have been different if this price statistic had been used as the price $P_{kt}$ in Illinois' Medicaid adjudication calculations. I begin by calculating the ingredient cost that would have been calculated if this price statistic had been used. I next determine whether this calculated amount would have affected the dispensing fee, which is a function of the ingredient cost. Additionally, if the amount originally paid was equal to the provider charged amount, I must determine if the sum of the estimated ingredient cost and dispensing fee fell below this amount.

Taking this algorithm to the 534,183 claims in my Illinois Medicaid analysis sample, I find that Illinois Medicaid spending would have been lower for 521,338 (97.6 percent of the total) of them. I define the variable $DIFFERENCE_{sjkt}$ to equal the difference between what Illinois Medicaid actually paid and what they would otherwise have paid with this alternative price statistic s for claim j for product k in time period t. Aggregating this variable across the claims with a strictly positive value of $DIFFERENCE_{sjkt}$, I find that Illinois Medicaid spending would have been lower by $12.528 million. This represents a reduction of 75.8 percent from the actual amount paid of $16.528 million for the claims in my analysis sample. The total number of payments to pharmacies with one or more claims with a value of DIFFERENCE greater than zero is 58,891. This information is summarized in Table 13B.

One can repeat this algorithm for alternative price statistics. For example, instead of restricting attention to just the pharmacy classes of trade, one could consider all classes of trade

in the indirect data when calculating average NDC-quarter specific prices.  Not surprisingly given that pharmacy prices tend to be higher than those for other classes of trade, the number of claims with a strictly positive value of DIFFERENCE is larger in this case (521,918) as is the sum of DIFFERENCE aggregated across all claims with a strictly positive value of DIFFERENCE ($12.781 million).  The number of pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero is also higher in this case (58,994).  In other words, the aggregate DIFFERENCE would be even greater if I included all classes of trade when calculating average prices.

The average prices used in these two sets of calculations essentially divide total net revenues for an NDC in a quarter by the total quantity sold of that same product in the quarter. Thus customers with relatively large quantities will tend to "matter more" in this calculation.  An alternative would be to calculate the average per-customer price, treating every customer with strictly positive sales in the quarter equally.  Using this alternative NDC-quarter-specific price statistic, the number of claims with a value of DIFFERENCE greater than zero declines to 520,839.  Similarly, the total value of DIFFERENCE and the number of pharmacy payments also decline, to $12.434 million and 58,845, respectively.  But in all three cases, the amounts are less than one percent different from those obtained using the weighted average.

If instead of using the pharmacy-specific average price from the indirect data, I use the 95th percentile price, the number of claims with a strictly positive value of difference is very similar at 519,198 while the total value of DIFFERENCE is $11.943 million (58,638 pharmacy payments).  Similarly, if one were to scale Abbott's actual average price for the pharmacy classes of trade in the indirect data by 1.25, the number of claims with DIFFERENCE greater than 0 is 519,450 and the total value of DIFFERENCE is $12.029039 million (58,631 pharmacy

payments).  Thus even if one uses these alternative price statistics, the total value of DIFFERENCE declines by less than 4.7 percent and the number of claims and provider payments decline by less than 0.5 percent.

All of this information is summarized in Table 13B.  As this table makes clear, all three outcome variables of interest are very similar under all five scenarios considered.  And when considering the values in this table, one should bear in mind that the average and the 95th percentile prices are likely to be overstated given that I have not included the rebates, discounts, and management fees (some of which are summarized in the fifth column of Table 7) when calculating prices.  This will serve to reduce the aggregate value of DIFFERENCE below what it otherwise would be.

For the analyses that follow, rather than using Abbott's direct data to calculate the cost to wholesalers and HPD distributors of acquiring Abbott products, I use pharmacy-specific transactions in the indirect data.  This will typically lead to a substantially higher price than would obtain if I instead used Abbott's direct transaction data, as it for example excludes wholesalers' transactions to non-profit hospitals.  This is conservative in that it will serve to reduce the discrepancy between Abbott's actual prices and the published prices such as the AWP.  Furthermore, because I do not include management fees, wholesalers' prompt pay discounts, and rebates in the calculation of average pharmacy-specific prices in the indirect data, I will overstate the actual cost to wholesalers and HPD distributors of acquiring the products that are at issue in the Complaint.[26]  This will also serve to reduce the discrepancy between actual and published prices.

---

[26] In addition to the management fees listed in Table 7, testimony by Barbara Echevarria in her deposition indicates that wholesaler prompt pay discounts are not included in the direct or indirect transaction data provided by Abbott.

The First DataBank AWP is typically 125 percent of the First DataBank Wholesaler Acquisition Cost (WAC) and 118.75 percent of the First DataBank Direct Price (DP) for Abbott products (and thus the FDB WAC is 95 percent of the FDB Direct Price).   According to the data provided by Abbott, the difference between what wholesalers and HPD distributors sell the products for and the cost to them of acquiring the product is substantially lower than 25 percent.

Despite this, in the analyses that follow, I take 125 percent of the average pharmacy indirect price in Abbott's indirect data as the benchmark for AWP, which is the price used in most states when adjudicating Medicaid claims during the time period of interest.  This is a quite conservative approach for two reasons.  First as described above, the cost to the wholesaler of acquiring the product is lower than the pharmacy indirect average price given my exclusion of management fees, prompt pay discounts, and so forth when calculating prices.  And second, the average actual markup on this cost is substantially lower than the 25 percent difference implied by the relationship between the WAC and the AWP for Abbott products.

## VIII. Florida Medicaid

According to the CMS SDUD data described above, the state of Florida was first among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001.  Florida provided the United States with Florida Medicaid claims data for the NDCs in the Complaint.  This data included claims with an adjudication date of October 25, 1993 and later, and thus data for the 1991 to 1993 period are likely to be incomplete.

The Florida Medicaid claims data are summarized in Table 14A.  There are 291,576 claims for the 44 Complaint NDCs with a service date during the 1991 to 2001 period, with Medicaid spending for these claims equal to $15.665 million.  The first panel of this table lists

the number of prescriptions and total Medicaid spending by NDC.  All 44 Complaint NDCs appear in the Florida Medicaid claims data, and consistent with the data for the U.S. as a whole, Florida Medicaid spending is greatest for the 74653301 Vancomycin product.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter of service.  As the table demonstrates, there are very few prescriptions with a service date in 1991 and 1992, and data for the first three quarters of 1993 appear to be incomplete as well.  Even the data for the final quarter of 1993 is likely to be incomplete, as the lag between the service and adjudication date is often less than a week[27] and thus many claims for early October, 1993 may not appear in this data given that October 25, 1993 is the first adjudication date.

Because the Florida Medicaid claims data are incomplete early in the study period, I instead rely on the SDUD data described above for the first 11 quarters (1991Q1 – 1993Q3). These Florida-specific SDUD data for the first 11 quarters are summarized in Table 14B, and I discuss my analyses of them in more detail below.  Even though the Florida Medicaid claims that I utilize may be missing some claims in the fourth quarter of 1993 (those with a service date in October of 1993 and adjudication date of October 24, 1993 or earlier), an examination of Table 14A suggests that only approximately 1,000 are missing (out of more than 290,000 in the entire study period) and I ignore these in the analyses that follow.  And because the SDUD data are assigned to quarters based on date of payment rather than date of service, I will exclude those claims with a service date of September 30, 1993 or earlier and an adjudication date on October 1, 1993 or later.  These omissions will serve to reduce the aggregate value of DIFFERENCE for the state of Florida below what it otherwise would be.

---

[27] For example, of the 299 claims with adjudication dates from October 25-31, 1993, 92 (more than 30 percent) had a lag of 7 or fewer days between the service date and adjudication date.

*A. Florida Medicaid Reimbursement*

For the first 8.5 years of the 1991 to 2001 period, the Florida Medicaid program used the Wholesaler Acquisition Cost for each product to determine the amount that would be paid for each Medicaid claim. More specifically, from 1991 through April 18, 1999, Florida used 107 percent of a product's WAC as its estimated acquisition cost, which was then multiplied by the number of allowed units to determine the amount that would be paid for the ingredient. On April 19, 1999, this methodology was changed to pay the minimum of 88.5 percent of the AWP, 107 percent of the Direct Price (DP), and 107 percent of the WAC, with this algorithm remaining in effect until July 2, 2000. Given that the WAC for Abbott products was typically 20 percent lower than the AWP and 5 percent lower than the DP, 107 percent of the WAC would typically have been the lowest of these three.[28] Thus until July 2, 2000, the state of Florida would use 107 percent of the WAC for NDCs in the Complaint. From July 3, 2000 until the end of the study period, Florida Medicaid paid 86.75 percent of the AWP. This estimated ingredient cost was then added to a dispensing fee, which was typically equal to $4.23 throughout the study period.[29]

The sum of the estimated ingredient cost and the dispensing fee is compared with the provider charged amount, with the Florida Medicaid program paying the lesser of the two. The adjudication algorithm in effect until July 2, 2000 is summarized in the following equation:

$$(3) \quad PAID_{jkt} = \min\{(1.07 * WAC_{kt} * U_{jkt}) + D_{jkt}, CHARGED_{jkt}\}$$

while the formula used from July 3, 2000 through December of 2001 was:

$$(4) \quad PAID_{jkt} = \min\{(0.8675 * AWP_{kt} * U_{jkt}) + D_{jkt}, CHARGED_{jkt}\}$$

---

[28] Suppose that the WAC was equal to 100. This would typically be associated with a Direct Price of 105 and an AWP of 125. The amount used would be the minimum of (107, 112.35, 110.63).
[29] In approximately 2.9 percent of claims the dispensing fee was 50 cents higher at exactly $4.73.

For approximately 20.0 percent of the Florida NDC-based Medicaid claims for Complaint products with service dates from October of 1993 to December of 2001, the amount paid was equal to the provider charged amount.

*B. The Impact of Alternative Price Parameters on Florida Medicaid Spending*

Of the 291,576 Florida NDC-based Medicaid claims summarized in Table 14A, there are 1,588 with a service date on or before September 30, 1993. As mentioned above, I exclude these claims from my first set of Florida analyses. There are an additional 457 claims with a paid amount of zero (none with a negative payment amount), 677 claims with a non-zero third party payment amount, and 895 for which I am unable to replicate the amount paid. I exclude these 3,617 claims from my analysis sample, which leaves me with a sample of 287,959 claims with service dates from October of 1993 through December of 2001 for the NDCs in the Complaint. I then link each claim to the NDC-quarter-specific prices described in the preceding sections to determine how the use of alternative values for the WAC and the AWP would have affected Florida Medicaid spending.

One intuitively appealing set of price statistics to use for the WAC would be the average price paid by wholesalers and HPD distributors in Abbott's direct data. One concern with this, however, is that most of the indirect sales by these organizations are to hospitals, which as shown in Tables 4 and 9 tend to have substantially lower prices than do pharmacies. Thus these price statistics might tend to understate the prices paid by wholesalers and distributors for sales to the three pharmacy classes of trade, leading to an increase in the average value of DIFFERENCE above what would occur if wholesaler / HPD distributor acquisition costs for pharmacy specific transactions were instead used.

To account for this issue, I instead use the prices paid by the three pharmacy classes of trade to wholesalers and HPD distributors in the indirect data.  This is a conservative approach in that it will lead me to on average overstate the actual price paid by wholesalers and HPD distributors for Complaint products sold to the three pharmacy classes of trade, as it does not account for some of their management fees, discounts, rebates and so forth.  And as mentioned above, by focusing on pharmacy classes of trade, the prices that I calculate from Abbott transaction data will on average be substantially greater than it would if I considered all customers, with this serving to reduce the value of DIFFERENCE below what it otherwise would be.  Thus in the first 9.5 years of the period, I use 1.07 times the average pharmacy price in Abbott's indirect transaction data and for the subsequent 1.5 years I use 1.084375 (= 1.25 * 0.8675) times this number.

Using this methodology, I find that 278,623 of the 287,959 claims have a value of DIFFERENCE that is strictly greater than zero.  The aggregate value of DIFFERENCE across these 278,623 claims is $11.700 million and the total number of pharmacy payments with at least one claim with a DIFFERENCE greater than zero is 67,077.  This aggregate DIFFERENCE represents 75.2 percent of the $15.561 million in Medicaid spending for the claims in my analysis sample, which is similar to the ratio found for Illinois above.

Suppose that instead of using prices from the indirect data to calculate the WAC, I use the average amount paid by the W050 and M061 classes of trade in Abbott's direct data for each NDC-quarter.  Not surprisingly given the discussion above, this leads to an increase in the total value of DIFFERENCE to $11.912 million, while the number of claims and the number of pharmacy payments also both rise to 279,356 and 67,168, respectively.

Taken together, the results summarized in this section reveal a total value of DIFFERENCE of approximately $11.700 million for Florida Medicaid claims during the October 1993 to December 2001 period.  Additionally, I find that the value of DIFFERENCE is greater than zero for approximately 96.8 percent of Florida's Medicaid claims.  In the next section, I combine my findings from the claims data with the SDUD described above to calculate corresponding values of DIFFERENCE for the first 2.75 years of the study period.

*C. The 1991Q1 to 1993Q3 Period*

As described above, the Florida Medicaid claims data are incomplete for the first 2.75 years of the study period.  According to the SDUD data displayed in Table 14B, Florida's Medicaid program spent approximately $1.379 million on Complaint products during this period. To determine the amount that the state would have paid if, for example, Abbott's indirect pharmacy average price had been used as the WAC when adjudicating Medicaid claims, I take the following three step approach.  First, I calculate the ratio of DIFFERENCE to the total amount that was actually paid for each NDC in the fourth quarter of 1993 and call this value $DIFF\_FRAC_{j,934}$ for NDC j in the fourth quarter of 1993.  This is the quarter that is closest to the 2.75 year period of interest under consideration.

Rather than simply multiplying this fraction by Medicaid spending for each NDC in the preceding 11 quarters, I account for the possibility that the WAC was lower and/or the average pharmacy price was higher (as the data for Vancomycin 74653301 in Table 10 above suggested), which would serve to reduce the DIFF_FRAC in earlier periods below the 1993 quarter 4 values by applying the following two formulas to SDUD Medicaid spending for each NDC-quarter combination during the 1991Q1 – 1993Q3 period:

$$(5)\ \text{DIFFERENCE}_{j,t} = \text{PAID}_{j,t} * \text{DIFF\_FRAC}_{j,934} * \text{RATIO}_{j,t}$$

$$(6)\ \text{RATIO}_{j,t} = \text{MIN} \{1.00, (\text{AWP}_{j,t} / \text{AVGPRICE}_{j,t}) / (\text{AWP}_{j,934} / \text{AVGPRICE}_{j,934}) \}$$

In this equation, $\text{DIFFERENCE}_{j,t}$ represents my estimate of the difference between what Medicaid spending actually was and what it would have been if the average indirect pharmacy price had been used as the WAC for NDC j in quarter t. $\text{PAID}_{j,t}$ is equal to the amount of Medicaid spending for that NDC in quarter t. $\text{RATIO}_{j,t}$ is a "ratio of ratios" that accounts for the possibility that spreads may have been lower in the first 2.75 years of the period than they were in the fourth quarter of 1993. In calculating this, I divide the quarter-specific AWP (1.25 times the WAC) by the average pharmacy price in each quarter. I then divide this ratio by the corresponding ratio in 1993 quarter 4. To the extent that the percentage "spread" between the WAC and the average pharmacy price was lower in earlier periods, multiplying by $\text{RATIO}_{j,t}$ will reduce DIFF_FRAC below the 1993 quarter 4 value. If the calculated $\text{RATIO}_{j,t}$ exceeds 1, I take the conservative approach of replacing it with 1 so as to never arrive at a value of DIFF_FRAC in an earlier period for an NDC that is greater than the 1993 quarter 4 value.

It is perhaps most instructive to summarize this approach with an example. In the fourth quarter of 1993, the DIFF_FRAC for the 74653301 product, which is calculated from the Florida Medicaid claims data, was .8007. Additionally the ratio of the AWP to the pharmacy average price was 8.30. In the fourth quarter of 1992, the ratio of the AWP to the pharmacy average price was lower at 6.92, implying a lower spread in this earlier period. I therefore multiply the 1993 quarter 4 DIFF_FRAC for this product by the RATIO of 0.834 (= 6.92 / 8.30) to obtain a DIFF_FRAC for 74653301 in the fourth quarter of 1992 of 0.6678 (and if RATIO had exceeded 1 I would replace it with 1). I then take this scaled value of DIFF_FRAC and multiply it by the

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                    43

$18,983 in Florida Medicaid spending for the 74653301 product in the second quarter of 1992 to obtain a value of DIFFERENCE of $12,677 for this NDC-quarter.

Repeating this algorithm for all NDC-quarter observations from 1991Q1 to 1993Q3, I calculate a total value of DIFFERENCE of $939,551, which is 68.1 percent of Florida Medicaid spending on Complaint products in the first 11 quarters of the period.  I use an analogous algorithm to estimate that there were 34,802 prescriptions from January of 1991 through September of 1993 with a value of DIFFERENCE in excess of zero.  Taken together, my results for Florida for the 1991 to 2001 period indicate a total value of DIFFERENCE of approximately $12.640 million along with 313,425 claims and at least 67,076 pharmacy payments with a value of DIFFERENCE greater than zero.

## IX. California Medicaid

According to the CMS SDUD data described above, the state of California was third among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $10.002 million paid.  The State of California's Department of Health Services provided the United States with Medicaid claims data.  The data included NDC-based claims with adjudication dates from March 19, 1994 through and including December 29, 2001.  Because of this, data for 1991, 1992, 1993, and part of 1994 are likely to be incomplete.  Similarly, because there is often a lag of one month or more in processing claims, data for 2001 is also likely to be incomplete.

The California NDC-based Medicaid claims data are summarized in Table 15A.  There are 296,193 claims for the 44 Complaint NDCs with a service date during the eleven-year study period, with Medicaid spending for these claims equal to $9.204 million.  The first panel of this

table lists the number of prescriptions and total Medicaid spending by NDC.  All 44 Complaint NDCs appear at least once in the California Medicaid claims data.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As the table shows, there are zero claims with service dates in 1991 and 1992 and just 25 in all of 1993.  The first quarter of 1994 also appears to be incomplete, with just 840 claims versus 5,112 in the subsequent quarter.  Additionally, the last two quarters of 2001 seem to be incomplete, with a total of 17,035 claims versus 23,531 in the preceding two quarters.

Because the California Medicaid claims data are incomplete early in the study period, I instead rely on the SDUD data described above for the first 13 quarters (1991Q1 – 1994Q1). These California-specific SDUD data for the first 13 quarters are summarized in Table 15B, and I discuss my analyses of them in more detail below.  Even though the California Medicaid claims appear to be missing some claims in the latter half of 2001, an examination of Table 15A suggests that only approximately 6,500 are missing (out of almost 300,000 in the entire study period) and I ignore these in the analyses that follow.  This omission will serve to reduce the aggregate value of DIFFERENCE for the state of California below what it otherwise would be.

*A. California Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the California Medicaid program employed an adjudication formula that utilized the Direct Price (DP) as its estimate of per-unit acquisition costs.  This was then multiplied by the number of allowed units to determine the amount that would be paid for the ingredient.  During this period the dispensing fee for generic products was $4.05, though in a small number of cases this was reduced by 25 or 50 percent to $3.03 and $2.02, respectively.

The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.   For approximately 26.9 percent of the California NDC-based Medicaid claims for Complaint products with service dates from April of 1994 to December of 2001 and in the analysis sample described below, the amount paid was equal to the provider charged amount.  For more than 94 percent of these claims, the actual amount paid by California's Medicaid program was either 25 or 50 cents less than this minimum amount, reflecting policy-induced reductions in reimbursement amounts.

*B. The Impact of Alternative Price Parameters on California Medicaid Spending*

Of the 296,193 California NDC-based Medicaid claims summarized in Table 15A, there are 13,620 that represent reversals of previous claims or claims that are later reversed.  Because the net amount paid for these claim pairs is on average just -$0.07, I exclude them from my analysis.[30]  There are an additional 859 claims with a service date on or before March 31, 1994, and as I mentioned above, I exclude these claims from my first set of California analyses as well. I exclude an additional 423 claims with a paid amount of zero (none with a negative payment amount), 261 claims with a third party payment amount or patient liability and 36 claims for which I am unable to replicate the amount paid.  With these changes, my final analysis sample consists of 280,994 claims with service dates from April of 1994 through December of 2001 for the 44 products listed in the Complaint.

I then apply an algorithm analogous to the ones used above for Illinois and Florida, though in this case I use the average pharmacy price in the direct data for the early part of the

---

[30] For example, the California Medicaid program might pay $10.00 for a claim and later determine that the payment was for the incorrect amount or should not have been paid in the first place.  A new claim would then be generated with a paid amount of -$10.00.  I do not include these transactions in my analyses because the net payment is in virtually every case equal to zero.

study period and the average pharmacy price in the indirect data for the last 7 years of the period.[31]  Applying these prices claim by claim, I find that 267,167 out of the 280,994 claims (95.1 percent) have a value of DIFFERENCE that is strictly greater than zero and that there are 56,269 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.  I also find that the total value of DIFFERENCE is equal to $7.044 million, which represents 76.8 percent of the $9.172917 million for the 280,994 claims in my analysis sample.

Per instructions from the U.S. Department of Justice, I am not considering claims prior to April of 1994.  Taken together, my analyses for California Medicaid suggest a total value of DIFFERENCE during the 1991 to 2001 period of approximately $7.044 million.  My results further indicate that more than 267,167 claims and 56,269 pharmacy payments had a DIFFERENCE that exceeded zero.

Table 15B provides a summary from CMS SDUD data of California's Medicaid spending and utilization for Complaint NDCs during the 1991Q1 to 1994Q1 period.  Following instructions from the United States, I do not consider this period in my analyses.

## X. New Jersey Medicaid

According to the CMS SDUD data described above, the state of New Jersey was fourth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $9.642 million paid.  New Jersey provided the United States with Medicaid claims data.  The data included claims with adjudication dates of December 4th of 1991 through late 2003 (though with service dates through just December 31, 2001).  Because of this, the claims for the early part of 1991 are likely to be incomplete.

---

[31] For 2134 claims in the 1995 to 2001 period without an average pharmacy-specific price in the direct data, I use the average pharmacy-specific price in the indirect data.  The two averages are typically very similar, with the average price in the indirect data slightly higher for the claims in the analysis sample.

The New Jersey Medicaid data are summarized in Table 16A. There are 129,282 claims for the Complaint NDCs with a service date during the eleven-year study period, with Medicaid spending for these claims equal to $8.629 million. The first panel of the table lists the number of prescriptions and total Medicaid spending by NDC. All of the 44 Complaint NDCs appear in the New Jersey Medicaid claims data.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter. As the table shows, there are relatively few claims in the first three quarters of 1991 and substantially less in the fourth quarter of the same year than in any quarter in the following year. Thus data for all four quarters of 1991 appears to be incomplete. Medicaid spending peaks in early 1992, declines steadily during the next three years, and then rises again during the last half of the study period before declining sharply after the first quarter of 2001.

Because the New Jersey Medicaid claims data are incomplete early in the study period, I instead rely on the SDUD data described above for the first 4 quarters (1991Q1 – 1991Q4). These New Jersey-specific SDUD data for the first 4 quarters are summarized in Table 16B, and I discuss my analyses of them in more detail below.

*A. New Jersey Medicaid Reimbursement*

According to Medicaid State Plan Amendments, throughout the 1991 to 2001 period, the New Jersey Medicaid program employed an adjudication formula that utilized the AWP. The amount by which this AWP was scaled varied across time periods and also across claims within a time period.[32] An examination of the claims data reveals that from 1992 to 1995, the most common scaling factor was 1.00, with this accounting for 71.3 percent of claims. An additional

---

[32] An examination of the Medicaid State Plan Amendments reveals that the scaling factor depended on the pharmacy's prior year prescription volume, with high volume pharmacies having somewhat lower scaling factors.

22.0 percent were adjudicated using a scaling factor of 0.94.  From 1996 to 2001, the most common scaling factor was 0.90, with this accounting for 86.3 percent of claims.  An additional 8.1 percent had 0.92 as the scaling factor and 2.1 percent used a scaling factor of 1.00.  In my analyses for New Jersey, I account for the claim-specific scaling factor when determining the amount that would have been paid if the 125 percent of Abbott's average pharmacy price in the indirect data had been used as the AWP.

During this time period, the baseline dispensing fee was equal to 3.73, though additional increments could be made to this depending on whether there was 24-hour emergency availability at the pharmacy ($0.11 extra), patient consultation ($0.08 extra), and an "impact allowance" ($0.15 extra).  An examination of the claims data reveals that the most common dispensing fee paid for Complaint claims during the 1992 to 2001 period was actually $0.00, with this fee used on 87.4 percent of claims.  One possible reason for this is that dispensing fees were often adjusted down on those claims for Medicaid recipients residing in long-term care facilities.  The three next most common dispensing fees were $3.92, $3.73, and $4.07, with these three accounting for an additional 12.3 percent of claims.

The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.   For approximately 9.7 percent of New Jersey's NDC-based Medicaid claims for Complaint products with service dates from 1992 to 2001, the amount paid was equal to the provider charged amount.

*B. The Impact of Alternative Price Parameters on New Jersey Medicaid Spending*

Of the 129,282 New Jersey NDC-based Medicaid claims summarized in Table 16A, there are 2,018 with a service date on or before December 31, 1991, and as I mentioned above, I

exclude these claims from my first set of New Jersey analyses.  I exclude an additional 153 claims with a paid amount of zero (none with a negative payment amount), 304 claims with a third party payment amount, and 734 claims with an AWP scaling factor of less than 0.88 or greater than 1.00.  I exclude an additional 6 claims with dispensing fees between $0.01 and $3.72.  This leaves me with an analysis sample of 126,067.

I then apply an algorithm analogous to the ones used above for Illinois, Florida, and California, determining for each individual claim whether the amount paid by New Jersey Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the NDC-quarter average indirect pharmacy price,[33] I find that 124,513 out of the 126,067 claims (98.8 percent) have a value of DIFFERENCE that is strictly greater than zero and that there are 11,446 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.  My results further indicate that the total value of DIFFERENCE is equal to $7.191 million, which represents 85.1 percent of the $8.453921 million for the 126,067 claims in my analysis sample.  This ratio of the total DIFFERENCE to total Medicaid spending is somewhat higher than for the three previous states, with this to some extent driven by the fact that most New Jersey Medicaid claims for Complaint products during the time period of interest had a dispensing fee of zero.

*C. The 1991Q1 to 1991Q4 Period*

As described above, the New Jersey Medicaid claims data are incomplete for the first year of the study period.  According to the SDUD data displayed in Table 16B, New Jersey's Medicaid program spent approximately $915,760 on Complaint products during this period.  To

---

[33] For the 5.7 percent of claims for which I do not have an indirect pharmacy average price for the relevant NDC-quarter, I estimate this with 1.3 times the all customer average price in Abbott's indirect data.  This is a relatively conservative adjustment given that on average prices for all customers are just 20 percent greater for pharmacies.

estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida and California above, and determine that New Jersey Medicaid spending would have been at least[34] $727,856 lower during the first year of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in New Jersey's Medicaid adjudication calculations.   I also find that 12,374 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my results for New Jersey Medicaid reveal a total DIFFERENCE during the study period of approximately $7.919 million along with 136,887 claims and at least 11,446 pharmacy payments that had a DIFFERENCE that exceeded zero.


## XI. New York Medicaid

According to the CMS SDUD data described above, the state of New York was fifth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $8.748 million paid.  The Office of the Attorney General in New York State provided the United States with Medicaid claims data.  The data included claims with service dates from January 2, 1993 through and including December 31, 2001.  Because of this, the data for 1991 and 1992 are likely to be incomplete.

The New York Medicaid claims data are summarized in Table 17A.  There are 120,794 claims for the Complaint NDCs with a service date during the time period of interest.  Medicaid spending for these claims was equal to $8.938 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 2 of the 44 NDCs in the complaint (74712007 and 74790209).

---

[34] I exclude 6 out of 94 NDC-quarter combinations with $0.014 million in Medicaid spending because of missing data and this will serve to reduce the value of DIFFERENCE below what it otherwise would be.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As the table shows, there are zero claims with service dates in 1991 and 1992. Consistent with the other states, Medicaid spending tends to increase throughout the period until declining in 2000 and 2001.

*A. New York Medicaid Reimbursement*

According to Medicaid State Plan Amendments and to New York state statutes, throughout the 1991 to 2001 period, the New York Medicaid program employed an adjudication formula that utilized the AWP.  The amount by which this AWP was scaled varied over time, with a value of 1.00 during the first 4 years of the study period (1991 to 1994) and a value of 0.90 during the last seven years (1995 to 2001).  In my analyses for New York, I account for the time period-specific scaling factor when determining the amount that would have been paid if 125 percent of the average pharmacy-specific price in Abbott's indirect data had been used as the AWP for Complaint NDCs.

During 1991 to 1994 period, the dispensing fee for generic drugs was equal to $2.60, with this increasing to $5.50 in January of 1995 and then declining to $4.50 in mid-July of 1998.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.   It is worth noting that for approximately 43.9 percent of claims paid from January of 1995 through December of 2001, there was a co-pay of $0.50.  Thus for these claims the amount paid by New York Medicaid was $0.50 lower than it otherwise would have been.

*B. The Impact of Alternative Price Parameters on New York Medicaid Spending*

Of the 120,794 New York NDC-based Medicaid claims summarized in Table 17A, there are 445 claims with a third party payment amount and 34 claims for which I am unable to replicate the amount paid.  I drop these claims and thus my analysis sample has 120,315 claims. For the 16 claims for which I do not have an indirect pharmacy average price for the relevant NDC-quarter, I replace this with 1.3 times the overall average price in Abbott's indirect data.

I then apply an algorithm analogous to the ones used for the four states above, determining for each claim whether the amount paid by New York Medicaid would have been lower if an alternative price had been used as the AWP.  Using the average indirect pharmacy price, I find that 108,386 out of the 120,315 claims (90.1 percent) have a value of DIFFERENCE that is strictly greater than zero and that the total value of DIFFERENCE is equal to $6.878 million, which represents 77.1 percent of the $8.922 million[35] for the 120,315 claims in my analysis sample.  I also find that there are 38,184 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.

*C. The 1991Q1 to 1992Q4 Period*

As described above, the New York Medicaid claims data are incomplete for the first two years of the study period.  According to the SDUD data displayed in Table 17B, New York's Medicaid program spent approximately $192,898 on Complaint products during this period.  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida, California, and New Jersey above, and determine that New York Medicaid spending would have been $149,690 lower during the first two years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in

---

[35] It is worth noting that the amount paid in the sample is actually slightly greater than suggested by the SDUD data summarized in Table 11.  This could for example be driven by incomplete SDUD reporting or by the difference between the dates in the two data sets (date of service versus date of payment).

New York's Medicaid adjudication calculations.   My results further indicate that 5,263 prescriptions during the first two years of the study period had a DIFFERENCE that exceeded zero.

Taken together, my results for New York Medicaid reveal a total DIFFERENCE during the study period of approximately $7.027 million along with 113,649 claims and at least 38,184 pharmacy payments that had a DIFFERENCE that exceeded zero.

## XII. Indiana Medicaid

According to the CMS SDUD data described above, the state of Indiana was sixth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $8.146 million paid.   But as discussed in Section VI above, the SDUD data appears to be quite incomplete for Indiana, with no spending reported in certain years for example.  An examination of the claims data from the CMS SMRF/MAX files suggests that from 1992 to 2001, Indiana Medicaid spending on Complaint products was substantially greater at $14.808 million.  It therefore appears that Indiana was third among all states (behind only Florida and Illinois) in terms of spending on Complaint products during the eleven-year period of interest.

Indiana provided the United States with Medicaid claims data.  The data included claims with service dates from 1998 through 2001, though an inspection of this data as summarized in Table 18A suggests that it is incomplete in many of these later quarters.  For example, according to this data, there were only 171 claims for Complaint products in all of 1999 versus 22,403 claims according to the CMS SMRF/MAX data.  Additionally, the data provided by Indiana did not contain a units or quantity field, which represents the main advantage of the state-level claims data over the SMRF/MAX claims data in the typical state.

I therefore instead use the SMRF/MAX data for my analysis of Complaint products in Indiana, with this data summarized in Table 18B.  As this table shows, all 44 Complaint products have some utilization in Indiana during the eleven-year period of interest.  Additionally, Medicaid spending is generally increasing over time until it declines sharply from the first quarter of 2001 to the final two quarters of 2001.

## A. Indiana Medicaid Reimbursement

According to Medicaid State Plan Amendments, throughout the 1991 to 2001 period, the Indiana Medicaid program employed an adjudication formula that utilized the Average Wholesale Price (AWP).  Specifically, the state paid an amount that was equal to 90 percent of the Average Wholesale Price.  This was then added to the dispensing fee, which was equal to $4.00 throughout the period of interest, to determine the amount that Medicaid would pay.  Indiana then took the lesser of this sum and the provider charged amount.

## B. The Impact of Alternative Price Parameters on Indiana Medicaid Spending

The algorithm that I utilize for Indiana is necessarily somewhat different from the one that I use for the five preceding states because the SMRF/MAX claims data for Indiana do not have a reliable units variable during the time period of interest.  I therefore take the following approach.  Because the adjudication method for Indiana is very similar to the one used in Illinois (both used AWP throughout the eleven-year period of interest), I use the Illinois experience to estimate the total DIFFERENCE and the number of claims with DIFFERENCE greater than zero in Indiana.  Specifically, I calculate the fraction of Illinois claims with a value of DIFFERENCE greater than zero in each NDC-quarter.  I then multiply this by the number of claims in Indiana

to determine how many Medicaid claims in each NDC-quarter had a value of DIFFERENCE that exceeded zero.  This method can be summarized by the following formula:

$$(7) \text{ IN-CLAIMS-DIFF} > 0_{jt} = \text{IL-POS-DIFF}_{jt} * \text{IN-CLAIMS}_{jt}$$

In this equation, $\text{IL-POS-DIFF}_{jt}$ equals the fraction of claims for NDC $j$ in period $t$ in Illinois with a value of DIFFERENCE greater than zero and $\text{IN-CLAIMS}_{jt}$ is the number of claims in Indiana for NDC $j$ in quarter $t$.

I use a similar approach to calculate the total dollar value of DIFFERENCE in Indiana in each NDC-quarter.  One key difference between the two states' reimbursement methodologies is that Indiana paid a fixed dispensing fee whereas Illinois' could increase with the ingredient cost.  To account for this difference, I ignore any reduction in the dispensing fee when calculating the ratio of the total value of DIFFERENCE to the total amount paid for those claims with a value of DIFFERENCE greater than zero in each NDC-quarter.[36]  I then multiply this ingredient cost reduction ratio by IL-POS-DIFF (the fraction of Illinois claims with DIFFERENCE greater than zero) and then by the amount spent for that NDC-quarter in Indiana (less dispensing fees).

Using this algorithm, I estimate that 175,577 of the 182,154 claims[37] in Indiana for Complaint products had a value of DIFFERENCE that was strictly greater than zero and that the total value of DIFFERENCE was $11.214 million, which represented 75.7 percent of the $14.812 million in Indiana Medicaid spending on Complaint NDCs in my analysis sample from

---

[36] Suppose that Medicaid spending for claims with a value of DIFFERENCE greater than zero in an NDC-quarter in Illinois is $1.0 million and that $0.2 million of this is dispensing fees.  Suppose further that the total value of DIFFERENCE is $0.5 million and that $0.05 million of this is attributable to a decline in dispensing fees.  I then calculate that the amount paid for the ingredient fell by 56.25 percent (= (0.5 - .05) / (1.0 − 0.2)) and multiply this by the fraction of claims with a value of DIFFERENCE greater than zero and then by the amount paid for that NDC-quarter in the state of Indiana.

[37] I excluded claims with a paid amount of zero, with a non-zero third party payment amount, and with a paid amount greater than the charged amount, and thus the total number of claims is slightly lower than in Table 18B.

1992 to 2001.  My results further indicate that there are 28,880 pharmacy payments with at least one claim with a value of DIFFERENCE that is strictly greater than zero.[38]

One concern with this approach is that Illinois and Indiana are not exactly identical.  For example as mentioned above, Illinois' dispensing fee can vary with the ingredient cost.  I therefore probe the robustness of my results by taking an alternative approach in which I calculate the amount spent by Indiana Medicaid on dispensing fees and on ingredient costs for each NDC-quarter.  I do this by multiplying the number of claims in the SMRF/MAX data by $4.00 (the per-prescription dispensing fee) to account for dispensing fees and then ingredient costs account for the remainder.  I multiply these aggregate NDC-quarter-specific ingredient costs by the ratio of 125 percent of Abbott's average indirect pharmacy price to the AWP for that same NDC quarter.  Taking the implied amount that would have been paid on the ingredient cost, I then add this to dispensing fees.  Comparing this with the actual amount spent for each NDC-quarter, I find that Medicaid spending would have been lower by $12.449 million in Indiana during the time period of interest.  This value of DIFFERENCE is 11.0 percent greater than the corresponding one that uses Illinois above.  It therefore appears that, if anything, my use of Illinois as a comparison serves to bias down my estimate of the total value of DIFFERENCE.

*C. The 1991Q1 to 1991Q4 Period*

In this final section I investigate the results for Medicaid spending and the number of claims in the first year of the study period, which is not included in the Indiana SMRF claims data.  According to the SDUD data displayed in Table 18C, Indiana's Medicaid program spent

---

[38] To estimate this, I assign each claim a probability of having DIFFERENCE that is greater than zero that is equal to the corresponding probability for claims within the same NDC-quarter.  Approximately 97 percent of these claims are estimated to have DIFFERENCE greater than zero.  I then use the provider id and the payment date as I did for the previous states.

approximately $249,529 on Complaint products during 1991.  To estimate the total value of DIFFERENCE during this period, I merge Indiana's aggregate NDC-quarter level SDUD data in 1991 with data from Illinois on the fraction of claims with a value of difference greater than zero and the ratio of DIFFERENCE to the total amount paid for each NDC-quarter.[39]

Using this algorithm, I find that Indiana Medicaid spending would have been $137,297 lower during 1991 if 125 percent of Abbott's average pharmacy indirect price had been used as the AWP in Indiana's Medicaid adjudication calculations.   My results also reveal that 8,572 prescriptions during 1991 had a DIFFERENCE that exceeded zero.

Taken together, my results for Indiana Medicaid indicate a total DIFFERENCE during the 1991 to 2001 period of approximately $11.352 million.  I also find that 184,149 claims and at least 28,880 pharmacy payments had a DIFFERENCE that exceeded zero.


## XIII. Kentucky Medicaid

According to the CMS SDUD data described above, the state of Kentucky was seventh among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $7.402 million paid.  Kentucky provided the United States with Medicaid claims data.  The data included claims with services dates from January 1, 1995 through and including December 31, 2001.  Because of this, the data for 1991 through and including 1994 are likely to be incomplete.

The Kentucky Medicaid claims data are summarized in Table 19A.  There are 100,561 claims for the Complaint NDCs from 1995 through 2001 and Kentucky Medicaid spending for these claims was equal to $6.203 million.  The first panel of this table lists the number of

---

[39] Because Illinois does not have claims for the first quarter of 1991, I use each NDC's second quarter values.

prescriptions and total Medicaid spending by NDC.  As this table shows, there are zero claims for 1 of the 44 NDCs in the complaint (74797305).

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991, 1992, 1993, and 1994.   Quarterly Medicaid spending reaches its peak in the first quarter of 2001 and then declines during the next three quarters.

*A. Kentucky Medicaid Reimbursement*

According to Medicaid State Plan Amendments and to data from the Pharmaceutical Benefits Survey published by the National Pharmaceutical Council, throughout the 1991 to 2001 period, the Kentucky program employed an adjudication formula that utilized the Average Wholesale Price (AWP).  The amount by which this AWP was scaled varied over time, with a value of 0.95 during the first two quarters of the study period (1991Q1 to 1991Q2) and a value of 0.90 during the last 10.5 years (1991Q3 to 2001Q4).

For the first six months of the study period, the dispensing fee for generic drugs was equal to $3.25.  From July of 1991 through January 15, 2001, the dispensing fee was typically either $4.75 or $5.75, with the latter amount paid when the beneficiary was in a skilled nursing facility.  From January 16, 2001 until the end of the time period of interest, the dispensing fee was typically $4.51.  In certain cases throughout much of the study period, the dispensing fee was 0.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Kentucky Medicaid Spending*

Of the 100,561 Kentucky NDC-based Medicaid claims summarized in Table 19A, there are 18 claims for which the amount paid was less than the charged amount and I drop these claims from my sample.  I drop an additional 536 claims with a third party payment amount. After imposing these inclusion criteria, the number of claims in my analysis sample is equal to 100,007, with 21.8 percent of them paying the provider charged amount.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Kentucky Medicaid would have been lower if an alternative price had been used as each Abbott product's AWP.  Using 125 percent of the average indirect pharmacy price, I find that 96,452 out of the 100,007 claims (96.4 percent) have a value of DIFFERENCE that is strictly greater than zero and that the total value of DIFFERENCE for these 96,452 claims is equal to $4.737 million, which represents 76.5 percent of the $6.191 million for the 100,007 claims in my analysis sample.  I also find that there are 16,044 pharmacy payments with at least one claim with a DIFFERENCE value that is greater than zero.

## C. The 1992Q1 to 1994Q4 Period

As described above, the Kentucky Medicaid claims data are incomplete for the first four years of the study period.  According to the SMRF/MAX data displayed in Table 19B, Kentucky's Medicaid program spent approximately $914,414 on Complaint NDCs during the 1992 to 1994 period.  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida, California, and New Jersey above, though in this case I use the individual-level claims data instead of the aggregate SDUD data.  Of the 20,820 claims summarized in Table 19B, I drop 9 with a Medicaid paid amount that exceeds

the amount charged by the provider, 36 with a strictly positive other third party payment amount, and 50 with an undefined RATIO as defined above in equation (6).

Using the algorithm described above for SDUD data though in this case on a claim-by-claim basis with the SMRF/MAX data, I determine that 17,559 of the 20,725 claims remaining in my sample have a value of DIFFERENCE that is greater than zero. My results also indicate that there are 3,589 pharmacy payments with at least one claim having a DIFFERENCE greater than zero and that the total value of DIFFERENCE across the 17,559 claims is $545,830.

*D. The 1991Q1 to 1991Q4 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the first year of the study period, which is not included in either the Kentucky or the SMRF/MAX data. According to the SDUD data displayed in Table 19C, Kentucky's Medicaid program spent approximately $129,244 on Complaint products during 1991. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for Florida, California, and New Jersey above, and determine that Kentucky Medicaid spending would have been $77,795 lower during the first year of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in Kentucky's Medicaid adjudication calculations. My results also reveal that 2,961 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Kentucky Medicaid indicate a total DIFFERENCE during the study period of approximately $5.361 million along with 116,972 claims and at least 19,633 pharmacy payments that had a DIFFERENCE that exceeded zero.

**XIV. Missouri Medicaid**

According to the CMS SDUD data described above, the state of Missouri was eighth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $7.337 million paid.  Missouri provided the United States with Medicaid claims data that included claims with service dates from February 1, 1998 through and including December 31, 2001.  Because of this, the data for January of 1991 through and including January of 1998 are likely to be incomplete.

The Missouri Medicaid claims data are summarized in Table 20A.  There are 82,976 claims for the Complaint NDCs from 1998 through 2001 and Missouri Medicaid spending for these claims was equal to $4.264 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 1 of the 44 NDCs in the complaint (74712007).

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 through 1997.  Quarterly Medicaid spending peaks in the first quarter of 2000.   It then declines gradually during the following four quarters and sharply late in 2001.

*A. Missouri Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the Missouri Medicaid program used the AWP for most of the time period of interest.  The scaling factor changed over time, from 1.00 through September of 1991 to .8957 for the next nine years.  During the 2000 year, this changed to the lesser of 110 percent of the WAC and 89.57 percent of the AWP.  Because Abbott's WAC is typically 80 percent of the AWP, these two amounts are almost identical.  The dispensing fee

was equal to $3.15 until September of 1991 and then increased to $4.09. The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Missouri Medicaid Spending*

Of the 82,976 Missouri NDC-based Medicaid claims summarized in Table 21A, there are 81 claims with a positive other third party payment amount and 7506 claims that represent a reversal of an earlier claim or the claim that was itself reversed. I drop these 7587 claims, which leaves me with an analysis sample of 75,389, with 26.5 percent of these claims paying the provider's charged amount.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Missouri Medicaid would have been lower if an alternative price had been used as the AWP. Using 125 percent of the average pharmacy price from Abbott's indirect transaction data as the AWP throughout the 1998 to 2001 period, I find that 70,680 of the 75,389 claims (93.8 percent) in the Missouri sample have a value of DIFFERENCE that is greater than zero and that the total value of difference for these claims is $3.448 million. This dollar amount represents 80.9 percent of the $4.263 million spent on the claims in the Missouri sample.

There is no date of payment or pharmacy identifier in the Missouri Medicaid claims. I therefore use the SMRF / MAX claims data for the 1998 to 2001 period to estimate the number of pharmacy payments with at least one claim with a value of DIFFERENCE that is greater than zero. To do this, I use the Missouri Medicaid claims data to calculate the fraction of claims in each NDC-quarter with a value of DIFFERENCE that is greater than zero. I then apply this

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                     63

NDC-quarter-specific probability to each NDC-based Indiana Medicaid claim in the SMRF / MAX data and find that there were 8,304 unique pharmacy payments with at least one claim with a value of DIFFERENCE that exceeds zero.

## C. The 1992Q1 to 1997Q4 Period

As described above, the Missouri Medicaid claims data do not include claims with service dates in the 1991 to 1997 period. According to the SMRF/MAX data displayed in Table 20B, Missouri's Medicaid program spent $3.188 million on Complaint NDCs during the 1992 to 1997 period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for the state of Kentucky. Of the 66,860 claims summarized in Table 20B, I drop 15 with a strictly positive other third party payment amount, and 161 with an undefined RATIO as described in equation (6) above.

Using the algorithm described above for SDUD data though in this case on a claim-by-claim basis with the SMRF/MAX data, I find that 61,884 of the 66,684 claims remaining in my sample have a value of DIFFERENCE that is greater than zero. My results further indicate that there are 8,418 pharmacy payments with at least one claim having a DIFFERENCE greater than zero and that the total value of DIFFERENCE across the 61,997 claims is $2.459 million.

## D. The 1991Q1 to 1991Q4 Period

In this final section I investigate the effect on Medicaid spending and the number of claims in the first year of the study period, which is not included in either the Missouri or the SMRF/MAX data. According to the SDUD data displayed in Table 20C, Missouri's Medicaid program spent $63,533 on Complaint products during 1991. To estimate the total value of

DIFFERENCE during this period, I utilize an algorithm that is analogous to the ones described for other states above, and find that Missouri Medicaid spending would have been $35,736 lower during the first year of the study period if 125 percent of the average pharmacy price in Abbott's indirect data had been used as the AWP in the state's Medicaid adjudication calculations.   My results further reveal that 1,568 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Missouri Medicaid suggest a total DIFFERENCE during the study period of approximately $5.944 million along with 134,132 claims and at least 17,725 pharmacy payments that had a DIFFERENCE that exceeded zero.


**XV. Ohio Medicaid**

According to the CMS SDUD data described above, the state of Ohio was ninth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $5.836 million paid.  Ohio provided the United States with Medicaid claims data that included claims with service dates from January 1st of 1991 through and including December 31st of 2001.

The Ohio Medicaid claims data are summarized in Table 21.  There are 331,440 claims for the Complaint NDCs in the 1991 to 2001 period and Medicaid spending for these claims was equal to $6.563 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are claims for all 44 of the NDCs in the complaint.  Consistent with the pattern for the U.S. as a whole, Ohio Medicaid spending is greatest for the 74653301 product.  The second panel lists the number of prescriptions and total

Medicaid spending by year and quarter.  As this table shows, Medicaid spending is increasing throughout the end of 1998 and then trends up gradually after that.

*A. Ohio Medicaid Reimbursement*

According to Medicaid State Plan Amendments and data from the NPC's Pharmaceutical Benefits Survey, the Ohio Medicaid program used the Average Wholesale Price through June of 1998, with the AWP scaling factor declining from 0.93 to 0.925 on January 1, 1996.  Beginning in July of 1998, the state took the lower of 88.8 percent of the AWP and 111 percent of the WAC, with the latter being slightly lower for products in the Complaint product given that AWP was typically 125 percent of the WAC for Abbott products.  The dispensing fee also changed over time, rising from $3.23 to $3.50 in July of 1994 and again to $3.70 in July of 1998.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

The state of Ohio also frequently substituted a state MAC for generic products.  This price (adjusted by the appropriate scaling factor) was used in place of the AWP or WAC if the paid amount would be lower than that obtained using one of these published prices.

*B. The Impact of Alternative Price Parameters on Ohio Medicaid Spending*

Of the 331,440 Ohio NDC-based Medicaid claims summarized in Table 21, there are 5192 claims with a paid amount of zero and 1394 with some other third party payment.  I drop these claims, leaving me with an analysis sample of 324,854 claims.  I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the

amount paid by Ohio Medicaid would have been lower if an alternative price had been used as the AWP (from 1991Q1 to 1998Q2) or WAC (from 1998Q3 to 2001Q4).

Using 125 percent of the average NDC-quarter-specific indirect pharmacy price as the AWP and the average indirect pharmacy price as the WAC, I find that 276,856 out of 324,854 claims (85.2 percent) in the Ohio sample have a value of DIFFERENCE that is greater than zero and that the total value of difference for these claims is $3.208 million.  This dollar amount represents 48.9 percent of the $6.556 million spent on the claims in the Ohio sample. Additionally, I find that there are 37,695 pharmacy payments with at least one claim that has a value of DIFFERENCE greater than zero.

It is worth noting that the ratio of DIFFERENCE to the total amount of Medicaid spending is substantially lower in Ohio than in the preceding states.  This is largely driven by the state's more frequent use of MACs, which serves to reduce the discrepancy between Abbott's actual prices and those used by the state when adjudicating Medicaid claims.

## XVI. Michigan Medicaid

According to the CMS SDUD data described above, the state of Michigan was tenth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $4.903 million paid.  Michigan provided the United States with Medicaid data that included claims with payment dates from October 1, 2000 through and including December 31, 2001.  Because of this, the data for January of 1991 through and including September of 2000 are likely to be incomplete.

The Michigan Medicaid claims data are summarized in Table 22A.  There are 17,966 claims for the Complaint NDCs in 2000 and 2001 and Medicaid spending for these claims was

equal to $902,664.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 2 of the 44 NDCs in the complaint (74613902 and 74712007).

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 through 1999. The data also appear to be incomplete for the first three quarters of 2000, which is to be expected given that only those claims paid in or after October of 2000 are included.

*A. Michigan Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the Michigan Medicaid program used the Average Wholesale Price throughout the time period of interest.  The scaling factor changed over time, from 0.90 during the 1991 to 1994 period to either .849 or .865 thereafter, depending on the type of pharmacy.  The dispensing fee was equal to $3.72 throughout much of the study period until increasing to $3.77 in late 2000.  However, the amount paid for the dispensing fee was often $11.22 or $11.27 because of the addition of $7.50 for intravenous drugs.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.  Additionally until August of 1995, Michigan Medicaid considered the pharmacy's reported actual acquisition cost, and paid this amount (plus the dispensing fee) if it was lower than the calculated or charged amount.

*B. The Impact of Alternative Price Parameters on Michigan Medicaid Spending*

Of the 17,966 Michigan NDC-based Medicaid claims summarized in Table 22A, there are 120 claims with a paid amount of zero, 9 claims with the amount paid exceeding the charged

amount, 793 with some other third party payment, and 1058 remaining claims with service dates on or before September 30, 2000.  I drop all of these claims, leaving me with an analysis sample of 15,986 claims.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Michigan Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average indirect pharmacy price as the AWP throughout the October 2000 to December 2001 period, I find that 14,389 of the 15,986 claims (90.0 percent) in the Michigan sample have a value of DIFFERENCE that is greater than zero and that the total value of difference for these claims is $537,789.  This dollar amount represents 67.9 percent of the $792,346 spent on the claims in the Michigan sample.  Additionally, I find that there are 4,479 pharmacy payments with at least one claim that has a value of DIFFERENCE greater than zero.

*C. The 1994Q1 to 2000Q3 Period*

As described above, the Michigan Medicaid claims data do not include claims with service dates in the 1991 to 1999 period and the claims are incomplete for the first three quarters of 2000.  According to the SMRF / MAX data displayed in Table 22B, Michigan's Medicaid program spent $4.227 million on Complaint NDCs during the January 1994 to September 2000 period.[40]  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for the states of Kentucky and Missouri.  Of the 81,545 claims summarized in Table 22B, I drop 326 with an undefined RATIO as defined in equation (6) above, leaving me with an analysis sample of 81,219 claims.

---

[40] Because the state considered pharmacies' reported actual acquisition costs until August of 1995, I considered excluding these claims from my analysis sample.  However, an examination of the Michigan SMRF / MAX claims data suggests there was only a slight increase in the average amount paid around that time and thus I include them.

Using the algorithm described above for SDUD data though in this case on a claim-by-claim basis with the SMRF/MAX data, I find that 73,749 of the remaining 81,219 claims remaining in my sample have a value of DIFFERENCE that is greater than zero.  My results further indicate that there are 14,845 pharmacy payments with at least one claim having a DIFFERENCE greater than zero and that the total value of DIFFERENCE across the 73,749 claims is $3.109 million.

*D. The 1991Q1 to 1993Q4 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the first three years of the study period, which is not included in either the Michigan claims or the SMRF/MAX data.  According to the SDUD data displayed in Table 22C, Michigan's Medicaid program spent approximately $157,114 on Complaint products during this three-year period.  To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the one described for other states above, and determine that Michigan Medicaid spending would have been $66,162 lower during the first three years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in Michigan's Medicaid adjudication calculations.   My results also reveal that 6,844 prescriptions during the first year of the study period had a DIFFERENCE that exceeded zero.

Taken together, my results for Michigan Medicaid indicate a total DIFFERENCE during the study period of approximately $3.713 million along with 94,982 claims and 19,324 pharmacy payments that had a DIFFERENCE that exceeded zero.

**XVII. Louisiana Medicaid**

According to the CMS SDUD data described above, the state of Louisiana was twelfth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $4.282 million paid.  Louisiana provided the United States with data that included NDC-based Medicaid claims with payment dates from January 4, 1995 through and including December 26, 2001, with a small number of claims having payment dates in 2002 and 2003 because of service dates in 2001.  Because of this, the data for 1991 through 1994 are likely to be incomplete.

The Louisiana Medicaid claims data are summarized in Table 23A.  There are 95,705 claims for the Complaint NDCs in the period of interest and Medicaid spending for these claims was equal to $3.912 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are zero claims for 1 of the 44 NDCs in the complaint (74397703) and consistent with the experience for the U.S. overall, the 74653301 product accounts for more Medicaid spending than any other Complaint NDC.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 through the second quarter of 1993.  Data for the last two quarters of 1993 and all four quarters of 1994 appear to be incomplete and I therefore exclude them from my analysis.

*A. Louisiana Medicaid Reimbursement*

According to Medicaid State Plan Amendments, the Louisiana Medicaid program used the AWP throughout the 1991 to 2001 period.  The scaling factor changed over time, from 0.895 from 1991 through January of 2000 to 0.850 through August 5, 2001 and 0.865 thereafter.  From July of 1999 forward, the scaling factor was slightly lower for chain pharmacies.  The dispensing

fee was equal to $4.68 in the first 9 months of 1991 and then increased to $5.00 on October 1, 1991, to $5.54 on July 1, 1993, and to $5.77 on July 1, 1994, where it remained through the end of the study period. The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Louisiana Medicaid Spending*

Of the 95,705 Louisiana NDC-based Medicaid claims summarized in Table 23A, there are 1666 with a service date on or before December 31, 1994, 276 claims with a paid amount of zero, 37 claims with the amount paid exceeding the charged amount, and 171 claims with some other third party payment.  I drop these claims from my analysis sample while also excluding 17,035 that represent reversals of previous claims or claims that were themselves later reversed. This leaves me with a sample of 76,520 Louisiana NDC-based Medicaid claims.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Louisiana Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average indirect pharmacy price as the AWP throughout the 1995 to 2001 period, I find that 73,705 of the 76,520 claims (96.3 percent) in the Louisiana sample have a value of DIFFERENCE that is greater than zero and that the total value of DIFFERENCE for these claims is $2.971 million. This dollar amount represents 77.5 percent of the $3.835 million spent on the claims in the Louisiana sample.

There is no pharmacy identifier in the Louisiana Medicaid claims.  I therefore use the SMRF / MAX claims data for the 1995 to 2001 period to estimate the number of pharmacy payments with at least one claim with a value of DIFFERENCE that is greater than zero.  To do

this, I follow an algorithm analogous to the one used for Missouri above in which I use Louisiana's Medicaid claims data to calculate the fraction of claims in each NDC-quarter with a value of DIFFERENCE that is greater than zero. I then apply this NDC-quarter-specific probability to each NDC-based Louisiana Medicaid claim in the SMRF / MAX data and find that there were 7,211 unique pharmacy payments with at least one claim with a value of DIFFERENCE that exceeded zero.

*C. The 1991Q1 to 1994Q4 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the first four years of the study period, which is not included in either the Louisiana or the SMRF/MAX Medicaid claims data. According to the SDUD data displayed in Table 23B, Louisiana's Medicaid program spent approximately $411,653 on Complaint products during the 1991 to 1994 period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the ones described for other states above, and find that Louisiana Medicaid spending would have been $257,830 million lower during the first four years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in the state's Medicaid adjudication calculations. My results also reveal that 8,417 out of 9,408 prescriptions during the 1991 to 1994 period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Louisiana Medicaid indicate a total DIFFERENCE during the study period of approximately $3.229 million along with 82,122 claims and more than 7,211 pharmacy payments that had a DIFFERENCE that exceeded zero.

**XVIII. Wisconsin Medicaid**

According to the CMS SDUD data described above, the state of Wisconsin was seventeenth among all states in terms of total Medicaid spending on Abbott products in the Complaint from 1991 to 2001 with $2.574 million paid.  Wisconsin provided the United States with data that included NDC-based Medicaid claims with payment dates from 1992 to 2001.  However, an examination of the claims data indicates that the data for 1992 and for early 1993 are incomplete.

The Wisconsin Medicaid claims data are summarized in Table 24A.  There are 72,131 claims for the Complaint NDCs in the period of interest and Medicaid spending for these claims was equal to $2.482 million.  The first panel of this table lists the number of claims and total Medicaid spending by NDC.  As this table shows, there are claims for all 44 of the NDCs in the complaint and consistent with the experience for the U.S. overall, the 74653301 product accounts for more Medicaid spending than any other Complaint NDC.

The second panel lists the number of prescriptions and total Medicaid spending by year and quarter.  As this table shows, there are zero claims with service dates in 1991 and the data for 1992 and the first quarter of 1993 appear to be incomplete and I therefore exclude them from my initial analyses.

*A. Wisconsin Medicaid Reimbursement*

According to Medicaid State Plan Amendments and the NPC's Pharmaceutical Benefits Survey, the Wisconsin Medicaid program used the AWP throughout the 1991 to 2001 period.  The scaling factor changed over time, from 0.900 from 1991 through June of 2001 to 0.8875 thereafter.  The most common dispensing fee was $4.69 until June of 1998, with this changing to

$4.88 as of July of 1998.  The sum of the estimated ingredient cost and the dispensing fee was then compared with the provider charged amount, with the state paying the lesser of the two.

*B. The Impact of Alternative Price Parameters on Wisconsin Medicaid Spending*

Of the 72,131 Wisconsin NDC-based Medicaid claims summarized in Table 24A, there are 1,018 with a service date on or before March 31, 1993, 552 claims with a paid amount of zero, 1 claim with the amount paid exceeding the charged amount, 255 claims with some other third party payment, and 160 claims for which I am unable to replicate the amount paid.  I drop these claims, leaving me with a sample of 70,145 Wisconsin NDC-based Medicaid claims.

I then apply an algorithm analogous to the ones used for the other states above, determining for each claim whether the amount paid by Wisconsin Medicaid would have been lower if an alternative price had been used as the AWP.  Using 125 percent of the average indirect pharmacy price as the AWP throughout the 1993Q2 to 2001Q4 period, I find that 63,647 of the 70,145 claims (90.7 percent) in the Wisconsin sample have a value of DIFFERENCE that is greater than zero and that the total value of DIFFERENCE for these claims is $1.683 million.  This dollar amount represents 69.0 percent of the $2.440 million spent on the claims in the Wisconsin sample.  Additionally, I find that there are 13,988 pharmacy payments with at least one claim that has a value of DIFFERENCE greater than zero.

*C. The 1991Q1 to 1993Q1 Period*

In this final section I investigate the effect on Medicaid spending and the number of claims in the 1991Q1 to 1993Q1 period, when the Wisconsin Medicaid claims data are incomplete.  According to the SDUD data displayed in Table 24B, Wisconsin's Medicaid

program spent approximately $107,302 on Complaint products during the 1991Q1 to 1993Q1 period. To estimate the total value of DIFFERENCE during this period, I utilize an algorithm that is analogous to the ones described for other states above, and find that Wisconsin Medicaid spending would have been $73,335 lower during the first four years of the study period if 125 percent of the average pharmacy indirect price had been used as the AWP in the state's Medicaid adjudication calculations. My results further indicate that 2976 prescriptions during the 1991Q1 to 1993Q1 period had a DIFFERENCE that exceeded zero.

Taken together, my analyses for Wisconsin Medicaid reveal a total DIFFERENCE during the study period of approximately $1.756 million along with 73,393 claims and more than 13,988 pharmacy payments that had a DIFFERENCE that exceeded zero.


## XIX. Medicaid Summary for the First Twelve States

The results for the twelve states considered so far, which account for approximately 70 percent of total Medicaid spending on Abbott's Complaint products from 1991 to 2001, are summarized in Table 25. For each state, the table provides information on results from state-specific claims data, SMRF / MAX claims data, and/or CMS SDUD data. The table also lists the time period that is relevant for each data source. For example for the state of Florida I utilized state claims data from 1993Q4 to 2001Q4 and SDUD data for the 1991Q1 to 1993Q3 period.

The next two columns of the table list the number of NDC-based Medicaid claims with a value of DIFFERENCE greater than zero and the total number of claims considered. As the table shows, the Medicaid program would have paid less for 2.306 million out of 2.459 million claims (93.8 percent) if Abbott's actual transaction prices as described above had been used for the Complaint products' AWP, WAC, or DP during the 1991 to 2001 period. The next two

columns list the corresponding information for the total value of DIFFERENCE and the total amount of Medicaid spending.  My results indicate that Medicaid spending would have been lower by $81.222 million out of $109.444 million paid.  This value of DIFFERENCE is 74.2 percent of total Medicaid spending.

In the next column, I report the federal share of this DIFFERENCE. In calculating this, I use the federal matching rate in effect for each state in each year.[41]  As shown in the table, the federal share of DIFFERENCE for these first twelve states is $45.786 million.  The final column lists the number of pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero.  My results indicate that there were at least 375,059 unique pharmacy payments with at least one Medicaid claim with a value of DIFFERENCE greater than zero in these twelve states during the 1991 to 2001 period.

## XX. Medicaid for the Remaining 38 States

For analyses for the remaining 38 states, I utilize the SMRF / MAX data and SDUD data described above.  When it is available I use the SMRF / MAX claims data, which allows me to construct analysis samples analogous to those described above with the state-level claims data.  When this data is not available for a state in a particular year, I instead use the SDUD data.

Table 26A summarizes Medicaid spending on Abbott's 44 Complaint products by state and year for these 38 states in the SMRF / MAX data.  States are sorted in descending order of SDUD Medicaid spending as listed in Table 11.  Total NDC-based Medicaid spending in the SMRF / MAX data for these 38 states (including the District of Columbia but excluding

---

[41] This information was downloaded from the CMS website, which provides the Federal Medicaid Assistance Percentage for each state in each year from 1985 through 2004 at: http://aspe.hhs.gov/health/fmap.htm.

Arizona) during the 1992 to 2001 period[42] is $34.432 million while the total number of claims is 632,673.  Table 26B provides a similar summary of these same states from the SDUD data. However in this table, a state-year cell is only populated if there is not SMRF / MAX data for the state in the same year.[43]  Total NDC-based Medicaid spending summarized in this table is $13.944 million with the total number of claims equal to 286,259.

I begin my analysis of each state's SMRF / MAX data by applying inclusion criteria analogous to those described above for the twelve preceding states.  For example, I drop claims with a paid amount of zero or with a strictly positive third party payment amount.  I then aggregate the number of claims and total Medicaid spending for each state by NDC-quarter.

I then merge this claims data for each of the remaining 38 states to a data set in which the unit of observation is the NDC-quarter and that is constructed using the eleven states' Medicaid claims data described above.[44]  For each NDC-quarter, I first calculate the average fraction of claims with DIFFERENCE greater than zero across all eleven states (fewer if not all eleven have data).  I also calculate the average value of the ratio of DIFFERENCE to the amount of Medicaid spending on these claims.  In calculating these averages, I weight each of the eleven states that have data for that NDC-quarter equally, while states with no claims data for that NDC-quarter have a weight of zero.  I subsequently refer to these averages for NDC j in quarter t as POS-DIFF11$_{jt}$ and DIFF-FRAC11$_{jt}$, respectively.

My comparison of the Medicaid adjudication algorithms used by the 11 states described above with the 38 remaining states suggests that the two groups are very similar.[45]  The vast

---

[42] Only Hawaii and Alabama had SMRF data in 1991 and I rely on SDUD data for both of these states in 1991.
[43] Neither SDUD nor SMRF data is available for Tennessee from 1995 to 1998 and for Idaho in 1993.
[44] I do not include Indiana because as described above I used SMRF / MAX and SDUD data for that state.
[45] The same is true for Medicaid reimbursement per claim.  For example from 1999 to 2001 when all 50 states have SMRF / MAX claims, the average amount spent per claim is actually higher in the remaining 38 states than it is in the 11 states for which we use claims data.   Considering this one NDC at a time, in 24 of 44 cases, the average per claim Medicaid spending is higher for the remaining 38 states and these 24 NDCs account for 74.6 percent of

majority of states in both groups use AWP during the eleven-year period, though some also use the WAC and the DP.  More specifically, of the 11 states for which I use state Medicaid claims data above, 8 used AWP for most or all of the period with the remaining three primarily using either the WAC or the DP.  During this same period, 30 of the remaining 38 states primarily relied on AWP while the remaining 8 used either the WAC or the DP.  Additionally virtually all of the states consider the provider charged amount, taking the lesser of this and the amount that results from applying the adjudication formula.

Additionally as suggested by my analyses above, the fraction of claims with a value of DIFFERENCE greater than zero and the ratio of DIFFERENCE to the total amount paid is quite similar across states, whether the state uses the AWP, the WAC, or the DP.   The most striking outlier is Ohio, which has a low value of DIFFERENCE relative to the total amount paid.[46] Because Ohio is the only state to have provided data for all forty-four quarters (Illinois provided it for 43 quarters), it will have a greater weight than other states which provided data for fewer years.  This will serve to reduce the value of DIFFERENCE for the remaining 38 states below what it would be if I had data for all eleven states in each year.

To estimate the number of claims with a value of DIFFERENCE greater than zero in a state-NDC-quarter, I multiply the number of claims in that cell by POS-DIFF11$_{jt}$.  I employ a similar algorithm for the total value of DIFFERENCE for each state-NDC-quarter, multiplying Medicaid spending in that cell by DIFF-FRAC11$_{jt}$.  To estimate the number of provider payments with at least one claim with a value of DIFFERENCE greater than zero, I merge the individual claims data from each state's analysis sample with the NDC-quarter data on POS-DIFF11$_{jt}$.  I then use an algorithm similar to the one used for other states' SMRF / MAX data

---

Medicaid spending.  It therefore is not the case that these 38 states had on average have very low reimbursement per claim as the state of Ohio did during this period.

[46] This is primarily because of Ohio's more frequent use of MAC prices.

above, assigning each claim a probability of POS-DIFF11$_{jt}$ of having a value of DIFFERENCE greater than zero and then calculating the implied number of provider payments with at least one claim with a DIFFERENCE greater than zero.

I follow a similar algorithm for the SDUD data. Specifically I multiply the number of claims in each state-NDC-quarter cell by POS-DIFF11$_{jt}$ to estimate the number of claims with DIFFERENCE greater than zero. Similarly, I multiply Medicaid spending in the state-NDC-quarter cell by DIFF-FRAC11$_{jt}$.

The results from these analyses for the remaining 38 states are summarized in Tables 27A and 27B. For virtually every state, I list two sets of information – one that uses the SMRF / MAX data and the other using the SDUD data. The format of these two tables is identical to the format of Table 25 above. Consistent with my approach for the twelve states discussed above, I do not estimate provider payments when using SDUD data.

Aggregating across these 38 states and employing the algorithms described above, I find that 840,500 out of 894,567 claims (94.0 percent) have a value of DIFFERENCE that is greater than zero. The fraction with a value of DIFFERENCE greater than zero is almost identical to the corresponding fraction of 93.9 percent for the 12 states considered above.

My results further indicate that the total value of DIFFERENCE for Complaint products during the 1991 to 2001 period is $32.598 million. This represents 68.3 percent of the $47.702 million in Medicaid spending on Complaint products. This ratio is considerably lower than the corresponding ratio of 74.3 percent for the twelve preceding states. Furthermore, it is lower than the state-specific ratio for all but one of the twelve states (with Ohio's 48.9 percent the only one that is lower). Thus if anything it appears that my results understate the total value of DIFFERENCE in these 38 states. The federal share of this DIFFERENCE is $19.990 million

and the number of pharmacy payments with at least one claim with a value of DIFFERENCE that exceeds zero is 146,636.

The final row of Table 25 summarizes the results of my NDC-based Medicaid analyses for all 50 states (with Arizona excluded and DC included).  My results indicate that 3,146,914 claims (93.8 percent of the total) have a value of DIFFERENCE greater than zero.  I also find a total value of DIFFERENCE of $113.820 million (72.4 percent of NDC-based Medicaid spending) with the federal share of this equal to $65.776 million.  The total number of unique pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero is at least 521,695.  This final number is substantially understated because it does not consider pharmacy payments for those state-NDC-quarter cells in which I use aggregate SDUD data.

## XXI. CMS Medicare DME Claims Data

The fourth[47] main set of data that I utilize in my analysis consists of Medicare claims data for the 11 J-codes[48] listed in the United States' Complaint.  In this section I focus on a subset of these claims known as Medicare Durable Medical Equipment (DME) claims.

Whereas the Medicaid program reimburses drugs on an NDC basis, the Medicare program typically uses the Healthcare Common Procedure Coding System ("HCPCS").  Each HCPCS code typically refers to several different NDCs.  Additionally, the payment amounts for each HCPCS code are determined by each insurance carrier (e.g. Palmetto), with the typical carrier using the median AWP of the NDCs included in the carrier's array as the per-unit allowed amount, with this changing to 95 percent of the median on January 1, 1998.[49]  The NDCs that are

---

[47] Sixth if one counts the SDUD, SMRF/MAX, and state-specific Medicaid datasets separately.
[48] These are HCPCS codes in the Complaint that are located in the procedure code field of the Medicare claims data.
[49] In the latter part of the study period, carriers would instead pay the lowest price for a brand name version of a drug if it was lower than the allowed amount resulting from the median of generic products.

included in an array vary across carriers and can vary within the same carrier over time.  I describe the process that is used to determine payment amounts in a subsequent section.

Another key difference between the Medicaid NDC-based claims and the Medicare HCPCS code claims is that Medicare recipients are typically responsible for 20 percent of the total amount paid to the provider.  Thus if the Medicare program pays $40 for a particular claim, typically the Medicare recipient or her other insurer will pay the provider an additional $10. Thus to the extent that alternative prices for Abbott products would reduce Medicare spending, it would also reduce spending by Medicare recipients and their other insurers.

The goal of my analysis in this section is to determine the amount by which spending by the Medicare program on DME claims would have changed if alternative prices had been used for Abbott products.  The mechanism for such a price effect is straightforward.  If, for example, Abbott had one product in a particular carrier's array for one of the HCPCS codes listed in the complaint, then the median price from that array could change with an alternative price.

Suppose for example there are three prices of 8, 10, and 12 in an array for three different products.  If the price of 10 were to decline then the median would be certain to fall.  If the price of 12 were to decline by more than 2 then the median would also fall.  If however the price of 8 were to fall there would be no decline in the median.  Thus to the extent that Abbott prices included in carriers' arrays tend to equal or exceed the median, it is more likely that the amount paid by Medicare would be affected by the use of alternative AWPs.

Using carrier array documents along with Medicare claims data, in this section I examine how alternative AWPs for Abbott products would have affected the median price for Medicare HCPCS codes and thus the amount paid for Medicare DME claims.

*A. Summary of Medicare DME Claims for Complaint HCPCS Codes*

CMS maintains several different types of Medicare claims data, and the DME claims for Complaint HCPCS codes are the ones that I summarize in this section. This data was provided by CMS to the United States. Table 28 provides a summary of Medicare spending in the U.S. on DME claims for Complaint HCPCS codes. As the top of the panel on the left side shows, the vast majority of Medicare DME spending is accounted for by the J3370 Vancomycin HCl HCPCS code. More specifically, the $24.495 million spent on this treatment represents 93.9 percent of the total Medicare DME amount paid for Complaint HCPCS codes.

At the bottom on the left hand side of that same table, I list DME Medicare spending and the number of Medicare claims for each of the five different insurance carriers that processed DME claims for Complaint products. The largest one in terms of spending is Palmetto (885), which accounts for 45.4 percent of the Medicare DME spending. The next three make up virtually all of the rest, with AdminaStar (635), CIGNA (5655), and Travelers (10555) accounting for 27.9, 13.9, and 12.8 percent, respectively, of Medicare DME spending on Complaint HCPCS codes during the 1991 to 2001 period.

The panel on the right side of this same table lists Complaint Medicare DME claims and spending by year and quarter. As the table shows, there are very few claims in the first two years of the period, with the number of claims accelerating rapidly beginning in early 1993. Spending on DME claims is greater than $2.3 million in every quarter during the two year period from the third quarter of 1994 through and including the second quarter of 1996, and then declines by more than 90 percent to just $0.169 million in the fourth quarter of 1996. It then remains persistently low relative to the preceding years until the end of 2001.

*B. Palmetto-Administered Medicare DME Claims and Spending*

The left-side panel of Table 29 lists Medicare spending administered by Palmetto by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, Palmetto-administered Medicare spending for the J3370 code accounts for the vast majority of spending.  Similarly, Palmetto-administered Medicare DME spending was very low in the first two years of the study period, peaked during the late 1994 to early 1996 period, and then declined sharply in late 1996.

To determine the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were created using Palmetto documents for the J3370 code.  For example, for the latter half of 1995, Palmetto used an array for this J3370 code that included five products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-6534-01 | **10.88** | 5.08 |
| 00074-4332-01 | 30.23 | 4.46 |
| 00641-2778-43 | 18.81 | 18.81 |
| 00205-3154-88 | 5.76 | **5.76** |
| 00364-2472-33 | 7.00 | 7.00 |

Prices in this table represent the per-package price.  Given that there are five prices, the median price (in bold) is the one that is less than two prices and greater than two prices - $10.88, which is the price for the Abbott 74653401 product.  This NDC and the one other Abbott NDC (74433201) are both in the Complaint.

Now suppose that one were to replace the Abbott products' AWPs with 125 percent of the products' average pharmacy indirect price in that same time period, which is listed in the

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                    84

next column of the same table above.  In this case, the median price would fall substantially, from $10.88 to $5.76.

I repeat this exercise for all of the Palmetto J3370 arrays derived from Palmetto documents, and this allows me to estimate how Medicare spending would have changed if alternative prices had been used for Abbott products' AWPs.  More specifically, if using 125 percent of Abbott's average indirect pharmacy price as the AWP for Abbott NDCs would reduce the median, I replace the per-package price used by Palmetto in adjudicating the claim with the revised median.  Thus Palmetto Medicare DME claims with a per-unit cost of $10.88 during the time period this array is in effect would be replaced by $5.76.  And similar to the approach used by the Medicaid program, the calculated amount would be compared with the provider charged amount, with the carrier paying the lesser of the two.

To construct the sample of Palmetto J3370 claims, I begin by excluding 63,149 claims with a paid amount of zero from the full set of 108,388 J3370 claims.[50]  I next drop the 253 claims with a third party payment amount or with a deductible and I also drop 13 claims for which I am unable to replicate the amount paid.  Of the 44,972 claims still in the sample at this point, there are 67 claims with a very rare per-package price and I therefore exclude them from my analysis.

With these changes, just 5 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 10.88 (41.2 percent) and then 11.32 (23.0 percent), 18.66 (17.08 percent), 14.69 (10.9 percent), and 18.81 (7.9 percent).  All five of these prices are observed as medians in the arrays that were recreated in excel spreadsheets using Palmetto documents by Myers and Stauffer.  Moreover, all five of these medians end up being replaced by lower medians, and thus every claim that did not simply pay the provider charged

---

[50] I also drop one J3370 claim that is in the 2004 file year.

amount has a value of DIFFERENCE that exceeds zero.  For the claims on which the provider

charged amount is paid, I cannot calculate a per-package price analogous to the one for the other

claims.  Thus I simply use the one that was most common during the quarter of the claim.  Thus

for example from 1995Q2 to 1996Q1, $10.88 was the most common per package price.  I use

this price for any claims on which the provider charged amount was paid and determine whether

the amount that results falls below the amount that was actually paid.  If it does then I estimate a

value of DIFFERENCE greater than zero.

Taking this algorithm to the data, I find that 44,020 of the 44,905 (98.0 percent) Palmetto

DME J3370 claims have a DIFFERENCE that is greater than zero.  The total value of

DIFFERENCE for these 44,020 claims is equal to $4.711 million, which represents 43.1 percent

of the $10.939 million on Palmetto-administered DME claims for code J3370.  It is worth noting

that this value of DIFFERENCE does not include the associated effect on Medicare recipient co-

payment amounts.  And finally, I use the provider identifier along with the payment date to

determine that there are 24,961 unique payments to health care providers that have one or more

claims with a value of DIFFERENCE greater than zero.


*C. AdminaStar-Administered Medicare DME Claims and Spending*

The left-side panel of Table 30 lists Medicare spending administered by the carrier

AdminaStar by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for

the U.S. as a whole, AdminaStar-administered Medicare spending for the J3370 code accounts

for the vast majority of spending.  Similarly, Medicare DME spending for claims administered

by the carrier AdminaStar was very low in the first two years of the study period, peaked during

the late 1994 to early 1996 period, and then declined sharply in late 1996.


Report of Mark G. Duggan, Ph.D., June 19, 2008.                                    86

To determine the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets using Wisconsin Physician Services[51] documents for the J3370 code by Myers and Stauffer.  For example, for the latter half of 1998, AdminaStar used an array for this J3370 code that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-6534-01 | **12.48** | **4.15** |
| 00074-4332-01 | 34.66 | 3.06 |
| 00364-2472-33 | 7.00 | 7.00 |

Prices in this table represent the per-package price.  Given that there are three prices, the median price (in bold) is the one that is less than one price and greater than one price - $12.48, which is the price for the Abbott 74653401 product.  This product and the one other Abbott product (74433201) are both in the Complaint.

Now suppose that one were to replace the Abbott NDCs' AWPs with 125 percent of the products' average pharmacy indirect price in that same time period, which is listed in the next column of the same table above.  In this case, the median price would fall from $12.48 to $4.15.

I then take this algorithm to the AdminaStar arrays that prevailed in earlier periods for the J3370 DME claims.  For this array and for the preceding years from 1994 through 1998, AdminaStar used the arrays of Wisconsin Physician Services.  The allowed amounts for the J3370 code were 10.88, 11.32, and 11.89 in the three preceding years' arrays.  These three account for 57.9 percent of all AdminaStar J3370 DME claims in my AdminaStar sample, which I describe in more detail below.  The $10.88 price was the most common one from 1995Q3 to

---

[51] Beginning in 1994, AdminaStar used WPS arrays for Medicare DME claims.

1996Q1 while \$11.32 was most common from 1996Q2 to 1997Q1 and \$11.89 was most common from 1997Q2 forward.  Replacing the AWPs for the two Abbott products in that array with 125 percent of their average pharmacy indirect prices leads to a reduction in the allowed amounts to \$5.76, \$4.39, and \$4.23.  I also have the AdminaStar array used immediately prior to this, which was also a WPS array, when the allowed amount was \$18.81.  This median falls to \$7.00 when I replace the AWPs for the two Abbott NDCs as in the previous arrays.

One other relatively common per-package price in the AdminaStar J3370 claims was \$7.80, the most common one from 1993Q1 to 1993Q4 accounting for 4.9 percent of claims in my analysis sample.  This was actually the AWP for Lilly's 2144410 NDC in the 1993 Red Book.  However, because the Abbott 74653401 NDC is not listed in the 1993 Red Book and this allowed amount does not otherwise follow from the adjacent array, I exclude claims with this per-package price from my DIFFERENCE calculations below.

To construct the sample of AdminaStar J3370 claims, I begin by excluding the 51,593 claims that have a paid amount of zero.  I next drop the 119 claims with a third party payment amount or with a deductible and I also drop 14 claims for which I am unable to replicate the amount paid.  Of the 31,413 claims still in the sample at this point, there are 258 claims with a very rare per-package price and I therefore exclude them from my analysis, leaving me with a sample of 31,155 claims.[52]

With these changes, just 5 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 18.81 (36.5 percent) and then 10.88 (35.8 percent), 11.32 (22.3 percent), 7.80 (5.0 percent), and 11.89 (0.4 percent).  As explained above, I exclude the 1,314 claims with a per-package price of 7.80 from my analyses below, leaving me with a final sample of 29,841 claims.  All four of the remaining medians end up being replaced

---

[52] I also drop four J3370 claims that are in the 2002 file.

by lower medians, and thus every claim that did not simply pay the provider charged amount has a value of DIFFERENCE that exceeds zero.

Taking an algorithm analogous to the one defined above for Palmetto to the AdminaStar Medicare DME claims data, I find that 29,325 of the 29,841 (98.3 percent) of the DME J3370 claims have a DIFFERENCE that is greater than zero. The total value of DIFFERENCE for these 29,325 claims is equal to $3.686 million, which represents 54.8 percent of the $6.731 million on AdminaStar-administered DME claims in my sample for code J3370. As above, this does not include the effect on Medicare recipients' co-payment amounts. Additionally, I use the provider identifier along with the payment date to determine that there are 14,531 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*D. CIGNA-Administered Medicare DME Claims and Spending*

The left-side panel of Table 31 lists Medicare spending administered by the carrier CIGNA by HCPCS code for the 11 codes in the Complaint. Consistent with the pattern for the U.S. as a whole, CIGNA-administered Medicare spending for the J3370 code accounts for the vast majority of spending. Similarly, Medicare DME spending for claims administered by CIGNA was very low in the first two years of the study period, peaked during the late 1994 to early 1996 period, and then declined sharply in late 1996.

To estimate the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets using CIGNA documents for

the J3370 code by Myers and Stauffer.  For example, for the early part of 1996, CIGNA used an array for this J3370 code that included four products as summarized in the following table:

| NDC | AWP | Alternative AWP |
| --- | --- | --- |
| 00074-6534-01 | **10.88** | 4.33 |
| 00205-3154-88 | 5.76 | 5.76 |
| 00364-2472-33 | 7.00 | **7.00** |
| 00641-2778-43 | 18.81 | 18.81 |

Prices in this table represent the per-package price.  Given that there are four prices, and that CIGNA during this period used the convention of taking the higher of the two middle prices rather than their average, the median price (in bold) is the one that is less than one price and greater than two prices - $10.88, which is the price for the Abbott NDC.  Now suppose that one were to replace the Abbott product's AWP with 125 percent of the product's average pharmacy indirect price in that same time period, which is listed in the next column of the same table above.  In this case, the median price would fall from $10.88 to $7.00.

I then take this algorithm to the CIGNA arrays that prevailed in earlier periods.  The first array has information on the first quarter of 1994 through early 1996, and had a median price of 10.56.  This per-package price accounted for 67.8 percent of the claims in my eventual analysis sample.  Another common price for which I have array information is $9.16 (19.3 percent), which was the most common price from the second quarter of 1996 through the second quarter of 1997.  The third most common is $10.88 (discussed above) and the sixth most common is $9.45, which was in effect in late 1997. I do not have array information for 1993 when the most common price was $5.47 (the per-package price for Lederle's 205315488 NDC), and I exclude claims using this price from my eventual analysis sample.

To construct the sample of CIGNA J3370 claims, I begin by excluding the 27,864 claims that have a paid amount of zero.  I next drop the 51 claims with a third party payment amount or

with a deductible and I also drop 1 claim for which I am unable to replicate the amount paid.  Of the 15,510 claims still in the sample at this point, there are 37 claims with a very rare per-package price and I therefore exclude them from my analysis, leaving me with a sample of 15,473 claims.[53]

With these changes, just 6 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 10.56 (68.0 percent) and then 9.16 (19.3 percent), 10.88 (7.3 percent), 5.47 (3.9 percent), 5.58 (1.2 percent), and 9.45 (0.3 percent).  As explained above, I exclude the claims with a per-package price of 5.47 and also the claims with a per-package price of 5.58 from my analyses below, leaving me with a final sample of 14,729 claims.  All four of the remaining medians end up being replaced by lower medians, and thus every claim in my sample that did not simply pay the provider charged amount has a value of DIFFERENCE that exceeds zero.

Taking an algorithm analogous to the one defined above for Palmetto and AdminaStar to the CIGNA Medicare DME claims data, I find that 14,469 out of the 14,729 (98.2 percent) of the DME J3370 claims have a DIFFERENCE that is greater than zero.  The total value of DIFFERENCE for these 14,469 claims is equal to $1.372 million, which represents 43.0 percent of the $3.190 million on CIGNA-administered DME claims in my sample for code J3370 during the time period of interest.  As above, this does not include the effect on Medicare recipients' co-payment amounts.  Additionally, I use the provider identifier along with the payment date to determine that there are 8,580 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*E. Travelers-Administered Medicare DME Claims and Spending*

---

[53] I also drop one J3370 claim that was in the 2002 file and one J3370 claim that was in the 2004 file.

The left-side panel of Table 32 lists Medicare spending administered by the carrier Travelers by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, Travelers-administered Medicare spending for the J3370 code accounts for the vast majority of spending.  Similarly, Medicare DME spending for claims administered by Travelers was very low in the first two years of the study period, peaked during the late 1994 to early 1996 period, and then declined sharply in late 1996.

To estimate the effect on DME Medicare spending of using alternative prices, such as 125 percent of Abbott's average pharmacy indirect price, for the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets using Travelers documents for the J3370 code by Myers and Stauffer.  For example, for much of 1994, Travelers used an array for this J3370 code that included six products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00002-1444-01 | 7.80 | **7.80** |
| 00074-4332-01 | 29.36 | 4.54 |
| 00205-3154-88 | 5.58 | 5.58 |
| 00364-2472-33 | 7.00 | 7.00 |
| 00469-2210-30 | **10.97** | 10.97 |
| 00641-2778-43 | 18.81 | 18.81 |

Prices in this table represent the per-package price.  Given that there are six prices, and that Travelers during this period used the convention of taking the higher of the two middle prices rather than their average, the median price (in bold) is the one that is less than two prices and greater than three prices - $10.97.  Now suppose that one were to replace the Abbott product's AWP with 125 percent of the product's average pharmacy indirect price in that same time period, which is listed in the next column of the same table above.  In this case, the median price would fall from $10.97 to $7.80.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                          92

I then take this algorithm to the Travelers arrays that prevailed in other time periods.   The first array was described above, and has a median price of 10.97.   This per-package price accounted for 6.3 percent of the claims in my eventual analysis sample.    Another common allowed amount in the claims data in early 1995 is 9.39, which is the amount that resulted when Travelers took the average rather than the higher of the two middle prices (7.80 and 10.97) when there is an even number of NDCs in the array.

The next Travelers array for which I have information was in effect in early 1999, with a median among the three generic products (two of which are Abbott) of 12.48, which is the price of the Abbott 74653401 product using data from the 1998 Red Book.   If an array with these products had been in effect in the previous years then the resulting medians would have been 11.89 (1997 Red Book), 11.32 (1996), and 10.88 (1995), all three of which are Abbott prices. An examination of the Travelers DME claims data reveals that 10.88 is the most common allowed amount from 1995Q2 to 1996Q2 and that 11.32 is most common from 1996Q3 to 1997Q1.   Replacing these Abbott AWPs with 125 percent of the average pharmacy indirect price yields an allowed amount of 4.85 and 4.36, respectively.    Additionally, the price of 9.16 (the average of Abbott's 11.32 and Schein's 7.00) is in effect for part of the period and accounts for 0.6 percent of claims in the sample.   Two relatively common per-package prices that I do not consider are 7.80 (18.3 percent of claims) and 18.51 (1.6 percent).

To construct the sample of Travelers J3370 claims, I begin by excluding the 25,214 claims that have a paid amount of zero.   I next drop the 58 claims with a third party payment amount or with a deductible and I also drop 154 claims for which I am unable to replicate the amount paid.   Of the 17,578 claims still in the sample at this point, there are 83 claims with a

very rare per-package price and I therefore exclude them from my analysis, leaving me with a sample of 17,495 claims.

With these changes, just 7 per-package prices remain for the claims that do not pay the provider charged amount.  The most common is 10.88 (51.6 percent) and then 7.80 (18.4 percent), 11.32 (16.2 percent), 10.97 (6.3 percent), 9.39 (5.2 percent), 18.51 (1.6 percent), and 9.16 (0.6 percent).  As explained above, I exclude the claims with a per-package price of 7.80 and also the claims with a per-package price of 18.51 from my analyses below, leaving me with a final sample of 14,145 claims.  All five of the remaining medians end up being replaced by lower medians, and thus every claim in my sample that did not simply pay the provider charged amount has a value of DIFFERENCE that exceeds zero.

Taking an algorithm analogous to the one defined above for Palmetto, AdminaStar, and CIGNA to the Travelers Medicare DME claims data, I find that 13,861 out of the 14,145 (98.0 percent) of the DME J3370 claims have a DIFFERENCE that is greater than zero.  The total value of DIFFERENCE for these 13,861 claims is equal to $1.334 million, which represents 49.9 percent of the $2.671 million on Travelers-administered DME claims in my sample for code J3370 during the time period of interest. As above, this does not include the effect on Medicare recipients' co-payment amounts.  Additionally, I use the provider identifier along with the payment date to determine that there are 6,028 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*F. Medicare J3370 DME Summary*

To sum up, I calculate that 101,675 of the 103,620 (98.1 percent) DME claims in my Medicare DME analysis sample for J3370 have a value of DIFFERENCE that is greater than

zero.  I exclude 5408 claims from consideration because I cannot generate the per-package price with the available array information.  Aggregating across these 101,675 claims, the total value of DIFFERENCE is $11.103 million.  This represents 47.2 percent of the $23.532 million spent on the Medicare DME claims for the J3370 code in my analysis sample.  And finally, I find that there are 54,100 unique payments to health care providers with at least one Medicare DME claim with a value of DIFFERENCE that exceeds zero.  The information for each of the four carriers along with the sum across the four carriers is summarized in Table 33.

It is important to emphasize that the dollar figure for DIFFERENCE does not account for the effect on the co-payments of Medicare recipients.  Given that co-payments are typically 20 percent of the cost of Part B claims, my results above suggest an increase in co-payments of approximately $2.776 million.   Additionally in this section I have restricted attention to just the J3370 code, which will serve to reduce the value of DIFFERENCE below what it would be if I considered the other ten J-codes (especially J7051) as well.

## XXII. CMS Medicare Carrier Claims Data

In this section I perform analyses similar to those in the preceding section for Medicare Part B Carrier (hereafter Carrier) claims.  As I demonstrate below, the number of insurance carriers that administer these claims is substantially greater than for Medicare DME claims.  Just as in the preceding section, the goal of my analysis in this section is to determine the amount by which spending by the Medicare program on Carrier claims would have changed if alternative prices had been used for Abbott products.  I begin with a summary of Medicare Carrier claims and how this varies over time, across HCPCS codes in the Complaint, and across Part B carriers.

*A. Summary of Medicare Carrier Claims for Complaint HCPCS Codes*

Medicare Carrier claims data were provided by CMS to the United States.  Table 34 provides a summary of Medicare spending in the U.S. on Carrier claims for Complaint HCPCS codes.  As the top of the panel on the left side shows, the majority of Medicare Carrier claim expenditures are accounted for by the J7050 Sodium Chloride HCPCS code.  More specifically, the $97.710 million spent on this J-code represents 52.7 percent of the total Medicare amount paid for carrier claims for Complaint HCPCS codes.  All together there are 22.450 million claims with total Medicare spending of $185.531 million.  And as before, it is important to emphasize that this Medicare spending does not include Medicare recipients' co-payments.

The panel on the right side of this same table lists Complaint Medicare Carrier claims and spending by year and quarter.  As the table shows, spending increases steadily over time, rising from $0.680 million in 1991Q1 to $1.303 million in 1994Q1 to $4.789 million in 1997Q1 and reaches a peak of $8.638 million in the second quarter of 2001.  This contrasts with the pattern for Medicare DME claims, for which spending declined sharply in late 1996 and remained relatively low in subsequent quarters.

In Table 35, I list Medicare spending on Carrier claims and the number of Medicare Carrier claims for each of the insurance carriers that processed Carrier claims for Complaint products.  The number of Carrier codes listed is 92, though in many cases the same carrier has multiple codes.  For example, Wisconsin Physician Services has four different codes – one for Illinois, another for Michigan, a third for Wisconsin, and one final one for Minnesota.

I next perform analyses similar to the ones in the preceding section, in which I use array information for insurance carriers to estimate the effect on Medicare spending if alternative values had been used for the AWPs of Abbott products.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                              96

*B. Connecticut General - Administered Medicare Carrier Claims and Spending*

     The left-side panel of Table 36 lists Medicare spending administered by Connecticut

General[54] (carrier numbers 5440, 5535, and 5130) by HCPCS code for the 11 codes in the

Complaint.  Consistent with the pattern for the U.S. as a whole, Connecticut General (hereafter

CG) administered Medicare spending for the J7050 code accounts for approximately half of

spending.  Similarly, CG-administered Medicare Carrier claims spending increases throughout

most of the time period and reaches its peak in early 2001.

*1. Connecticut General Arrays for J-Codes*

     To estimate the effect on Medicare spending of using 125 percent of Abbott's average

pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were

recreated in excel spreadsheets by Myers and Stauffer using CG documents.  For example, for

the latter half of 2000 and the first half of 2001, CG used an array for the J7050 code (the

HCPCS code for the 250 milliliter Sodium Chloride solution) that included three products as

summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-7983-02 | 11.61 | 1.13 |
| 00264-7800-20 | **10.69** | 10.69 |
| 00338-0049-02 | 9.11 | **9.11** |

Prices in the second column of this table represent the per-package price as listed in the Red

Book.  Given that there are three prices, the median price (in bold) is the one that is less than one

price and greater than one price - $10.69.  The alternative AWP (125 percent of the average

---

[54] Connecticut General and INA merged in 1982 to form CIGNA.

pharmacy indirect price) for Abbott's 74798302 product was $1.13, as compared with the $11.61

price that was published for this product. Replacing the Abbott product's AWP with 125 percent

of the average pharmacy indirect price during this same period yields a median price of 9.11.

Because Medicare started in 1998 to pay 95 percent of the median, the actual allowed amount for

CG-administered J7050 carrier claims would have fallen from 10.16 (95 percent of 10.69) to

8.65 (95 percent of 9.11).

     Comparing this with the Medicare claims data for Connecticut General, I observe that

$10.16 is the most frequent allowed amount per package for the J7050 code from the third

quarter of 2000 through and including the second quarter of 2001. I therefore replace this price

with $8.65 for those claims with this per-unit price to estimate the effect on Medicare spending.

It is important to note, however, that Medicare frequently paid an amount that depended on the

provider charged amount. Similar to the many state Medicaid programs described above,

Medicare takes the lesser of the provider charged amount and the calculated amount (allowed

amount per package times number of packages) when determining the amount paid for a claim.

Thus for claims that paid the provider charged amount (as opposed to the calculated amount

using the median above) from the third quarter of 2000 through and including the second quarter

of 2001 (when $10.16 was the most common allowed amount), I determine whether Medicare

spending would have fallen if the per-package price had been $8.65.

     I repeat this exercise for CG arrays in other time periods and for other products. For CG

and for all subsequent carriers in this section, I restrict attention to the four products with the

highest Medicare spending (J7050, J7040, J7030, J7060) and also consider J3370, which was the

top seller for DME claims above. According to the data summarized in Table 34, these five

products account for 88.5 percent of Medicare Carrier claim spending for the 11 J-codes listed in

the Complaint.  To the extent that the use of alternative prices – such as 125 percent of Abbott's average pharmacy indirect price – for the AWP for the other 6 J-code products would have reduced Medicare spending, my subsequent analyses will understate the total value of DIFFERENCE for this category of Medicare claims.

The array that Connecticut General used in late 2001 contained five Abbott products instead of just one.  As shown in the following table, this array also included three products made by other firms.  Of the five Abbott products in the array, two are included in the list of 44

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-7985-02 | 12.35 | 1.44 |
| 00074-7132-02 | 16.95 | 2.33 |
| 00074-1583-02 | 12.35 | 3.02 |
| 00074-7101-02 | 16.95 | 2.33 |
| 00074-7983-02 | 11.61 | 1.18 |
| 00264-7800-20 | 10.69 | 10.69 |
| 00338-0044-03 | 9.67 | 9.67 |
| 00338-0049-03 | 9.11 | 9.11 |

NDCs in Table 1, and I therefore use the indirect transaction data described above for these two products.  I obtain the corresponding average price for the 74158302 product from Abbott's indirect data that was provided to me for the Texas case and for 74798502 from Cardinal and McKesson wholesaler transaction data.  The final Abbott product (74713202) listed in this CG 7050 array is not observed in any of these data sets and I therefore use the average price for a very similar product (74710102) that has an identical AWP in the same period.  The key difference between these two products is that the 74710102 product has a higher concentration (0.9 percent) than does 74713202 (0.45 percent).  My examination of price data for other very similar Abbott products suggests that, if anything, this method will overstate the true price for 74713202 and thus reduce the effect on the allowed amount and thus on the ultimate value of DIFFERENCE below what it otherwise would be.  Replacing these AWPs with the prices as

described above, the median allowed amount declines from 11.38 to 2.54 (the average of the fourth and fifth highest prices given that there is an even number of products).

I follow this same algorithm for the other CG J7050 arrays that pertain to earlier years and for the other four J-codes under consideration.  The earliest array that I have for the J7030, J7040, J7050, or J7060 codes pertains to the 1997 period, and thus in this section I focus on the 1997 to 2001 period.  For the four primary J-codes, there is one gap in the series of arrays for late 1998 and early 1999.  However, if I simply use an adjacent array and replace the AWPs with those from the previous year's Red Book, I can replicate the most common per-unit allowed amounts that appear in the data during that period.

It is worth noting that all of the 20 Part B CG arrays that I observe for these 5 J-codes during the 1997 to 2001 period contain at least one Abbott product.  In 18 out of 20 cases, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual average prices as described above.  In the next section, I summarize a claim-by-claim analysis of the CG Medicare claims for these five J-codes.

*2. Claims Level Analysis for CG J-Codes: 1997Q1 to 2001Q4*

As shown in Table 36, there are 1,457,552 CG claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 1,182,693 claims.  Initially I restrict attention to only those claims with service years from 1997 through and including 2001, which reduces the number of claims in my analysis sample to 761,549.

I next impose similar inclusion criteria on the claims that I did for the Medicaid and Medicare DME claims above.  Specifically I drop the 193,773 claims with a Medicare paid

amount of zero, the 6343 claims with a payment from a primary payer other than Medicare, and

the 433 claims on which the Medicare recipient pays a non-zero deductible.  And finally, I drop

the 18,536 claims with an allowed amount that is not in one of the arrays described above,

leaving me with a final sample of 542,464 claims.  Total Medicare spending for these claims is

equal to $6.614198 million.

Applying an algorithm analogous to the one described above for Medicare DME claims, I

find that 466,987 of the 542,464 claims (86.1 percent) have a value of DIFFERENCE that is

greater than zero.  Similarly, my results indicate that the total value of DIFFERENCE is equal to

$1.860 million, with this representing 28.1 percent of spending on the claims under

consideration.  And finally, I use the provider identifier along with the payment date to

determine that there are 81,991 unique payments to health care providers that has one or more

claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for CG J-Codes: 1991Q1 to 1996Q4*

While I do not have CG Medicare Part B arrays that were used during the 1991 to 1996

period, I can use the Medicare claims data to investigate whether Abbott NDCs were being used

in the CG arrays during this earlier period.  As discussed above, in some cases when an Abbott

NDC is included in an array, its price (or 95 percent of its price) is the median and is therefore

the allowed amount in the claims data.  Thus if I see one of the Abbott NDC's prices used for a

particular product in a certain time period, I conclude that this product was included in the array.

And because Abbott's AWP would decline if one were to replace it with 125 percent of the

average pharmacy indirect price, the median would fall for these arrays.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                            101

In many cases, however, the Abbott product could be in a Carrier's array, would affect the median if its AWP were replaced with 125 percent of the average pharmacy indirect price, and yet is not the median price.  The first array summarized in the preceding section is one example.  Similarly, if there were an even number of products in an array, the median price would typically be equal to an average of two prices, and thus not equal to an Abbott price even if an Abbott product were one of the two included in the average.  My examination of the Medicare claims data reveals that the number of claims with an Abbott price as the median greatly understates the number of claims with a DIFFERENCE greater than zero.

Examining the Medicare claims data administered by CG during the 1991 to 1996 period, I find that Abbott prices were used for relatively many claims beginning in the second quarter of 1995.  For example, from 1994Q2 to 1995Q1, the Abbott price was used in just 1.2 percent of claims versus 9.2 percent during the subsequent four quarters.  I therefore conclude that CG was using Abbott products in its arrays at least as far back as 1995Q2 and consider Medicare claims for this period.  While it seems likely that CG was using Abbott products in its arrays even prior to this period, I take the conservative approach of ignoring claims from the 1991Q1 to 1995Q1 period from my CG analyses.

For claims from 1995Q2 to 1996Q4, I apply the same set of inclusion criteria as described above, leading me to (for example) exclude all claims with a paid amount of zero.  I then aggregate the number of claims and the total amount paid by Medicare for each J-code during this seven quarter period.  I then estimate the number of claims for each J-code (indexed by j) with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE from 1995Q2 to 1996Q4 using the following two equations:

(8) $\text{CG-CLAIMS-DIFF>0}_{j,95q2-96q4} = \text{CG-POS-DIFF}_{j,97q1-01q4} * \text{CG-CLAIMS}_{j,95q2-96q4}$

$$(9) \quad \text{CG-DIFFERENCE}_{j,95q2\text{-}96q4} = \text{CG-DIFF-FRAC}_{j,97q1\text{-}01q4} * \text{CG-PAID}_{j,95q2\text{-}96q4}$$

To calculate the number of claims for J-code j with a value of DIFFERENCE greater than zero, I multiply the total number of claims from 1995Q2 to 1996Q4 by the fraction of CG claims for that same J-code from 1997 to 2001 with a value of DIFFERENCE greater than zero.  I do the same for the total value of DIFFERENCE, though in this case I multiply the amount paid for J-code j during the 1995Q2 to 1996Q4 period by the ratio of DIFFERENCE to the total amount paid during the five subsequent years.

Taking this algorithm to the data, I find that 115,582 out of the 133,683 (86.5 percent) CG Medicare Part B claims from 1995Q2 to 1996Q4 for the J7050, J7040, J7060, J7030, and J3370 products have a value of DIFFERENCE greater than zero and that there are 23,257 provider payments with at least one claim with a value of DIFFERENCE greater than zero.[55] Similarly, my results indicate a total value of DIFFERENCE of $0.388 million, which represents 25.4 percent of CG Part B Medicare spending for these products during this 1.75 year period.  I ignore the $1.695 million spent by Medicare on the 189,259 CG-administered claims from 1991Q1 to 1995Q1, with all of this information summarized in the first three rows of Table 43.

Taken together, my results indicate a total value of DIFFERENCE for CG-administered Part B claims of $2.248 million along with 105,248 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  As noted above, the dollar value of DIFFERENCE does not include the associated reduction in co-payments by Medicare recipients and their insurers.  Additionally, in my analyses I have not considered six other J-codes (J7070, J7042, J7051, J2912, J7110, J7130) that accounted for 10.5 percent of CG spending on Medicare

---

[55] To calculate this, I multiply the total number of provider payments during this 1.75 year period (26,877) by .865, the fraction of claims with a value of DIFFERENCE greater than zero.  This is considerably lower than the number that I would calculate if I assigned each claim a .865 probability of having DIFFERENCE greater than zero, but it accounts for the fact that there will be some correlation in the probability within time periods given the use of the same array.  It essentially assumes a correlation of 1 and is therefore conservative.

Part B claims during the 1991 to 2001 period. This will serve to reduce the value of DIFFERENCE below what it would be if I considered all J-codes listed in the Complaint.

*C. Wisconsin Physician Services Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 37 lists Medicare spending administered by Wisconsin Physician Services (hereafter WPS with carrier numbers 952, 953, 951, and 954) by HCPCS code for the 11 codes in the Complaint.  Consistent with the pattern for the U.S. as a whole, WPS-administered Medicare spending for the J7050 code accounts for more than half of spending.  Similarly, WPS-administered Medicare Carrier claims spending increases throughout most of the time period and reaches its peak in early 2001.  The rapid increase from the second quarter of 1998 to the third quarter of 1998 is largely driven by a shift in the states of Illinois and Michigan to WPS, which previously were serviced by Illinois Blue Shield.  Minnesota was later added to WPS in 2000, with all of this apparent in Table 39.

*1. Wisconsin Physician Services Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using WPS documents for the J7050 code. For example, for the latter half of 2000 and the first half of 2001, WPS used an array for this J7050 code that included six products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|-----|-----|-----------------|
| 00074-1583-02 | 12.35 | 2.53 |
| 00074-7101-02 | 16.95 | 2.41 |
| 00074-7983-02 | 11.61 | 1.13 |
| 00264-7800-20 | 10.69 | 10.69 |
| 00338-0044-02 | 9.67 | 9.67 |

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                    104

| 00338-0049-02 | 9.11 | 9.11 |
|---|---|---|

Prices in the second column of this table represent the per-package price as listed in the Red Book.  Given that there are six prices, the median price is equal to the average of the third and fourth highest prices - $11.15.  Replacing the three Abbott products' AWPs, all of which exceed the median price, with 125 percent of the average pharmacy indirect price during this same period yields a median price of 5.82.  Because Medicare started in 1998 to pay 95 percent of the median, the actual allowed amount for WPS-administered J7050 carrier claims would have fallen from 10.59 (95 percent of 11.15) to 5.53 (95 percent of 5.82).

Comparing this with the Medicare claims data for WPS, I observe that $10.59 is the most frequent allowed amount per package for the J7050 code from the third quarter of 2000 through and including the second quarter of 2001.  I therefore replace this price with $5.53 for those claims with this per-unit price to estimate the effect on Medicare spending.  For claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the third quarter of 2000 through and including the second quarter of 2001 (when $10.59 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package reimbursement had been $5.53.

I repeat this exercise for WPS arrays in other time periods and for other products, once again restricting attention to the J7050, J7040, J7060, J7030, and J3370 codes.  The earliest array that I have for the J7030, J7040, J7050, or J7060 codes pertains to the 1996Q3 to 1997Q2 period, and thus in this section I focus on the 1996Q3 to 2001Q4 period for these four J-codes.  For the J3370 code I have two earlier arrays and I therefore consider the effect on Medicare spending for this code from 1994Q1 to 2001Q4.

It is worth noting that 27 of the 32 WPS arrays that I observe for these 5 J-codes during the 1996Q3 to 2001Q4 period (1994Q1 to 2001Q4 for J3370) contain at least one Abbott product.  Additionally, in the 27 arrays that do have at least one Abbott NDC, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual pharmacy average indirect prices as described above.  In the next section, I summarize a claim-by-claim analysis of the WPS Medicare claims for these five J-codes.

*2. Claims Level Analysis for WPS J-Codes: 1996Q3 to 2001Q4*

As shown in Table 37, there are 1,505,315 WPS claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 1,218,492 claims.  Initially I restrict attention to only those claims with service dates from July 1, 1996 through and including December 31, 2001 (starting on January 1, 1994 for J3370 because I have an earlier array for this product), which reduces the number of claims in my analysis sample to 1,123,096.

I next impose similar inclusion criteria on the claims that I did for the CG Medicare claims above.  Specifically I drop the 73,302 claims with a Medicare paid amount of zero, the 3,341 claims with a payment from a primary payer other than Medicare, the 697 claims on which the Medicare recipient pays a non-zero deductible, and the 213 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 5,056 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 1,040,487 claims.  Total Medicare spending for these claims is equal to $11.543 million.

Applying an algorithm analogous to the one described above for Medicare CG claims, I find that 912,197 of the 1,040,487 claims (87.7 percent) have a value of DIFFERENCE that is greater than zero.  Similarly, my results indicate that the total value of DIFFERENCE is equal to $4.139 million, with this representing 35.9 percent of Medicare spending of the claims considered.  As noted above, this dollar value does not include the associated reduction in co-payments by Medicare recipients and their insurers.  And finally, I use the provider identifier along with the payment date to determine that there are 116,330 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for WPS J-Codes: 1991Q1 to 1996Q2*

I employ an analogous algorithm to the one described for CG in Section B3 above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1996Q2 (1991Q1 to 1993Q4 for J3370).  I consider only the six quarters from 1995Q1 to 1996Q2 because very few claims in the preceding four years have an Abbott price as the median.[56]  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 36,543 out of 42,507 (86.0 percent) WPS Medicare Part B claims from 1995Q1 to 1996Q2 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 6,911 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  Similarly, my results indicate a total value of DIFFERENCE of $0.100 million, which represents 30.4 percent of WPS Part B

---

[56] For example, in 1995 an Abbott price is the allowed amount for 29.9 percent of WPS-administered Part B claims for the five J-codes considered versus 1.2 percent in 1994.

Medicare spending for these products during this 1.75 year period.  I ignore the $0.346 million

spent by Medicare on the 40,320 WPS-administered claims from 1991Q1 to 1994Q4, with all of

this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for WPS-administered

Part B claims of $4.238 million along with 123,241 provider payments with at least one claim

with a value of DIFFERENCE greater than zero.  This information is summarized in Table 43.

As noted above, the value of DIFFERENCE does not account for the effect on Medicare

recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for

10.4 percent of WPS Medicare Part B spending.  This latter adjustment will serve to reduce the

total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the

Complaint.


*D. Other Carriers in CMS Region Five Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 38 lists Medicare spending administered by seven other

carriers operating in CMS Region 5 (Illinois, Indiana, Michigan, Minnesota, Ohio, and

Wisconsin) by HCPCS code for the 11 codes in the Complaint.  During the latter several years of

the study period, these carriers used the allowed amounts from the WPS arrays described above.

The carriers that operated in each state during each quarter are summarized in Table 39.[57]  As the

Table shows, the states of Indiana, Ohio, and Wisconsin used just one carrier each during the

eleven year period of interest.  However, the other three states (Illinois, Michigan, and

Minnesota) used multiple carriers, with all three states switching to WPS in either 1998 or 1999.

For a period even before this switch, these states' carriers were using WPS allowed amounts.

---

[57] Recall that quarters in the table refer to service dates rather than payment dates.  This explains why in certain cases for several consecutive quarters there are two carriers with claims.

Consistent with the pattern for the U.S. as a whole, Other Region 5 (hereafter OR5) administered Medicare spending for the J7050 code accounts for more than half of spending for the 11 J-codes in the Complaint. However, in contrast to the pattern for the entire U.S., spending peaks for this set of carriers in late 1997 and early 1998. This is because the states of Illinois and Michigan (and later Minnesota) switched to Wisconsin Physician Services around this time and thus claims after the switch are not considered here. Ohio's insurance carrier (16360, which is Nationwide) accounts for 42.2 percent of spending for these seven carriers, with Illinois Blue Shield (621 and 623 in Illinois and Michigan, respectively) accounting for 37.1 percent and the other four carriers (630, 10240, 710, and 720) accounting for the remaining 20.7 percent.

*1. Other Region Five Carrier Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I proceed as in the preceding section by utilizing arrays that were recreated by Myers and Stauffer using WPS documents for the 1996Q3 to 2001Q4 period (1994Q1 to 2001Q4 for J3370). I first verify that the allowed amounts from the WPS arrays are typically observed for these carriers and find that for the 5.5 years that is the case. For example, as was true for WPS above, $10.59 is the most frequent allowed amount per package for the J7050 code from the third quarter of 2000 through and including the second quarter of 2001. In the next subsection, I summarize a claim-by-claim analysis of the OR5 Medicare claims for these J-codes during the 1991 to 2001 period.

*2. Claims Level Analysis for Other Region Five J-Codes: 1996Q3 to 2001Q4*

As shown in Table 38, there are 2,192,109 other Region Five claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 1,729,323 claims.  Initially I restrict attention to only those claims with service dates from July 1, 1996 through and including December 31, 2001 (starting on January 1, 1994 for J3370), which reduces the number of claims in my analysis sample to 1,029,032.

I next impose similar inclusion criteria on the claims that I did for the CG and WPS Medicare claims above.  Specifically I drop the 152,318 claims with a Medicare paid amount of zero, the 3,321 claims with a payment from a primary payer other than Medicare, the 620 claims on which the Medicare recipient pays a non-zero deductible, and the 214 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 27,141 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 845,418 claims.  Total Medicare spending for these claims is equal to $9.312 million.

Applying an algorithm analogous to the one described above for Medicare CG and WPS claims, I find that 596,609 of the 845,362 OR5 claims (70.6 percent) have a value of DIFFERENCE that is greater than zero.  Similarly, my findings indicate that the total value of DIFFERENCE is equal to $2.996 million, with this representing 32.2 percent of Medicare spending on the claims under consideration.  And finally, I use the provider identifier along with the payment date to determine that there are 94,492 unique payments to health care providers that have one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for Other Region 5 J-Codes: 1991Q1 to 1996Q2*

I employ an analogous algorithm to the one described for CG and WPS above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1996Q2.  I consider only the three years from 1993Q3 to 1996Q2 because very few claims in the preceding 2.5 years have an Abbott price as the median.[58]  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 259,509 out of 370,614 (70.0 percent) OR5 Medicare Part B claims from 1993Q3 to 1996Q2 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 49,260 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  Similarly, my results indicate a total value of DIFFERENCE of $0.969 million, which represents 29.7 percent of WPS Part B Medicare spending for these products during this three year period.  I ignore the $1.302 million spent by Medicare on the 176,468 Other Region Five administered claims from 1991Q1 to 1993Q2, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for Other Region Five administered Part B claims of $3.965 million along with 143,752 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  This information is summarized in Table 43.  As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 12.5 percent of OR5 Medicare Part B spending.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

---

[58] For example, from 1993Q3 to 1994Q2, an Abbott price is the allowed amount for 21.3 percent of other region five administered Part B claims for the five J-codes considered versus 0.9 percent in the preceding year.

*E. Kentucky AdminaStar and WV – Nationwide*

The left-side panel of Table 40 lists Medicare spending administered by the West Virginia Nationwide and Kentucky AdminaStar carriers.  Both of these carriers employed WPS allowed amounts for much of the sample period.  This is most likely because Nationwide also served Ohio while AdminaStar also served Indiana, with both of these states in CMS Region 5. An examination of the Medicare carrier claims data reveals that Kentucky's AdminaStar did not start to use these prices until the middle of 1998 while West Virginia's Nationwide was using them prior to this.  Thus in my analyses below I focus on 1996Q3 to 2001Q4 for Nationwide (as I did for CMS Region 5 [59]) and 1998Q3 to 2001Q4 for Kentucky AdminaStar.

Consistent with the pattern for the U.S. as a whole, Medicare spending by Kentucky AdminaStar and West Virginia Nationwide for the J7050 code accounts for more than half of spending for the 11 J-codes in the Complaint.  Additionally, spending trends up throughout the study period and reaches a peak in 2001.  Kentucky's AdminaStar (660) accounts for 75.5 percent of spending for these two carriers, with West Virginia Nationwide accounting for the remaining 24.5 percent.

*1. WV Nationwide and KY AdminaStar Carrier Arrays for J-Codes*

To estimate the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I proceed as in the preceding section by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using WPS documents for the 1996Q3 to 2001Q4 period.  I first verify that the allowed amounts from the WPS arrays are typically observed for these carriers and find that for the 5.5 years considered for

---

[59] Consistent with my Region 5 analyses, I consider Nationwide J3370 claims from January 1, 1994 forward.

Nationwide that is the case.  However, Kentucky AdminaStar begins to use these prices in the middle of 1998, and I therefore initially exclude claims prior to July 1, 1998.  In the next subsection, I summarize a claim-by-claim analysis of the West Virginia Nationwide and Kentucky AdminaStar claims for these five J-codes during the time periods specified above.

*2. Claims Level Analysis for WV Nationwide and KY AdminaStar J-Codes*

As shown in Table 40, there are 483,663 claims for these two carriers for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 416,669 claims.  Initially I restrict attention to only those West Virginia Nationwide claims with service dates from July 1, 1996 through and including December 31, 2001 and those Kentucky AdminaStar claims with service dates from July 1, 1998 to December 31, 2001. This reduces the number of claims in my analysis sample to 232,872.

I next impose similar inclusion criteria on the claims as I did for the CG, WPS, and OR5 Medicare claims above.  Specifically I drop the 15,740 claims with a Medicare paid amount of zero, the 1318 claims with a payment from a primary payer other than Medicare and the 142 claims on which the Medicare recipient pays a non-zero deductible.  And finally, I drop the 123 claims with an allowed amount that is not in one of the arrays described above or for which I cannot replicate the paid amount, leaving me with a final sample of 215,549 claims.  Total Medicare spending for these claims is equal to $2.817 million.

Applying an algorithm analogous to the one described above for Medicare CG, WPS, and OR5 claims, I find that 196,131 of the 215,549 claims (91.0 percent) have a value of DIFFERENCE that is greater than zero.  Similarly, my findings indicate that the total value of

DIFFERENCE is equal to $0.978 million, with this representing 34.7 percent of Medicare spending on the claims under consideration.  And finally, I use the provider identifier along with the payment date to determine that there are 28,446 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for WV Nationwide and KY AdminaStar J-Codes: 1991Q1 to 1996Q2*

I employ an analogous algorithm to the one described for the other carriers above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the preceding years.  I consider only the 1993Q4 to 1998Q2 period for Kentucky Administar because very few claims in the preceding 3.75 years have an Abbott price as the median.[60]  For the same reason, I focus on just the 1993Q4 to 1996Q2 period for WV Nationwide.  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 110,785 out of 121,310 (91.3 percent) KY Administar claims from 1993Q4 to 1998Q2 and West Virginia Nationwide claims from 1993Q4 to 1996Q2 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 17,438 provider payments with at least one claim with a value of DIFFERENCE greater than zero.  Similarly, my results indicate a total value of DIFFERENCE of $0.319 million, which represents 29.0 percent of Medicare spending for these products during the period considered.  I ignore the $0.321 million spent by Medicare on the 38,567 claims administered by these two carriers from 1991Q1 to 1993Q3, with all of this information summarized in Table 43.

---

[60] For example, from 1993Q4 to 1994Q3, an Abbott price is the allowed amount for 21.3 percent of Kentucky AdminaStar administered claims versus 0.2 percent in the preceding year.  For WV Nationwide the ratios are 9.4 percent and 0.2 percent, respectively.

Taken together, my results indicate a total value of DIFFERENCE for Part B claims for Kentucky AdminaStar and West Virginia Nationwide of $1.297 million along with 45,961 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 4.9 percent of Medicare Part B spending on Complaint J-Codes for these two carriers during the 1991 to 2001 period. This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

*F. Metra Health Administered Medicare Carrier Claims and Spending*

The left-side panel of Table 41 lists Medicare spending administered by Metra Health (hereafter MH with carrier numbers 10490, 10250, and 10230) by HCPCS code for the 11 codes in the Complaint.[61] As the table shows, consistent with the pattern for the U.S. as a whole, MH-administered Medicare spending for the J7050 code accounts for approximately half of spending. Similarly, MH-administered Medicare Carrier claims spending increases throughout most of the time period and reached its peak in early 2000, though declined rapidly to zero in the fourth quarter of 2000 as the states of Virginia, Mississippi, and Connecticut shifted to other carriers.

*1. Metra Health Arrays for J-Codes*

To determine the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were recreated in excel spreadsheets by Myers and Stauffer using MH documents. For example, for

---

[61] I exclude the Minnesota (10240) Metra Health carrier as it was included in the other CMS Region Five section above because it followed the WPS prices for most of the latter part of the study period.

the latter half of 1998 and the first half of 1999, MH used an array for this J7050 code that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-7983-02 | **10.53** | 1.14 |
| 00264-7800-20 | 12.30 | 12.30 |
| 00338-0049-02 | 9.11 | **9.11** |

Prices in the second column of this table represent the per-package price as listed in the Red Book. Given that there are three prices, the median price is equal to the second highest price. Replacing the Abbott product's AWP, which is the median price, with 125 percent of the average pharmacy indirect price during this same period yields a median price of 9.11. Because Medicare started in 1998 to pay 95 percent of the median, the actual allowed amount for MH-administered J7050 carrier claims would have fallen from 10.00 (95 percent of 10.53) to 8.65 (95 percent of 9.11).

Comparing this with the Medicare claims data for Metra Health, I observe that $10.00 is the most frequent allowed amount per package for the J7050 code from the third quarter of 1998 through and including the second quarter of 2000. I therefore replace this price with $8.65 for those claims with this per-unit price to estimate the effect on Medicare spending. For claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the third quarter of 1998 through and including the second quarter of 2000 (when $10.00 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package reimbursement had been $8.65.

I repeat this exercise for MH arrays in other time periods and for other products, once again restricting attention to the J7050, J7040, J7060, J7030, and J3370 codes. The earliest array that I have for the J7030, J7040, J7050, or J7060 codes pertains to the 1996Q3 to 1997Q2 period.

However, if I use these same arrays for the preceding year I can replicate the allowed amounts for the J7050 and J7040 codes and I therefore focus on the 1995Q4 to 2000Q3 period (recall that there are zero claims from 2000Q4 to 2001Q4).

It is worth noting that all 22 of the MH arrays that I observe for these 5 J-codes during the study period contain at least one Abbott product.  Additionally, in 20 out of 22 cases, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual pharmacy average indirect prices as described above.  In the next section, I summarize a claim-by-claim analysis of the MH Medicare claims for these five J-codes.

### 2. Claims Level Analysis for Metra Health J-Codes: 1995Q4 to 2000Q3

As shown in Table 41, there are 832,102 MH claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above, which leaves me with a sample of 625,218 claims. Initially I restrict attention to only those claims with service dates from October 1, 1995 through and including September 30, 2000, which reduces the number in my sample to 493,725.

I next impose similar inclusion criteria on the claims that I did for the other Carrier claims above.  Specifically I drop the 69,493 claims with a Medicare paid amount of zero, the 2609 claims with a payment from a primary payer other than Medicare, the 438 claims on which the Medicare recipient pays a non-zero deductible, and the 1200 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 11,349 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 408,636 claims.  Total Medicare spending for these claims is equal to $4.614714 million.

Applying an algorithm analogous to the one described above for Medicare claims, I find that 385,961 of the 408,636 claims (94.5 percent) have a value of DIFFERENCE that is greater than zero. Similarly, my findings indicate that the total value of DIFFERENCE is equal to $1.084 million, with this representing 23.5 percent of Medicare spending on the claims under consideration. And finally, I use the provider identifier along with the payment date to determine that there are 53,652 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

### 3. Claims Level Analysis for Metra Health J-Codes: 1991Q1 to 1995Q3

I employ an analogous algorithm to the one described for the other carriers above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1995Q3. I consider only the 2.75 years from 1993Q1 to 1995Q3 because very few claims in the preceding two years have an Abbott price as the median.[62] As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 77,147 out of 81,168 (95.0 percent) Metra Health Medicare Part B claims from 1993Q1 to 1995Q3 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 14,812 provider payments with at least one claim with a value of DIFFERENCE greater than zero. Similarly, my results indicate a total value of DIFFERENCE of $0.200 million, which represents 27.5 percent of Metra Health Part B Medicare spending for these products during this 2.75 year period. I ignore the $0.194

---

[62] For example, from 1993Q1 to 1993Q4, an Abbott price is the allowed amount for 11.8 percent of other Metra Health administered Part B claims for the five J-codes considered versus 0.7 percent in the preceding year.

million spent by Medicare on the 23,170 Other Region Five administered claims from 1991Q1 to 1992Q4, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for Metra Health administered Part B claims of $1.283 million along with 68,464 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 19.9 percent of Medicare Part B spending on Complaint J-Codes for these two carriers during the 1991 to 2001 period.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

## G. Florida Blue Shield Administered Medicare Carrier Claims and Spending

The left-side panel of Table 42 lists Medicare spending administered by Florida Blue Shield (hereafter FBS with carrier numbers 590 and 591) by HCPCS code for the 11 codes in the Complaint.[63]  As the table shows, consistent with the pattern for the U.S. as a whole, FBS-administered Medicare spending for the J7050 code accounts for more than half of spending. Similarly, FBS-administered Medicare Carrier claims spending increases throughout most of the time period and reached its maximum value in 2001.

## 1. Florida Blue Shield Arrays for J-Codes

To determine the effect on Medicare spending of using 125 percent of Abbott's average pharmacy indirect price as the AWP for Abbott products, I begin by utilizing arrays that were

---

[63] I exclude the Minnesota (10240) Metra Health carrier as it was included in the other CMS Region Five section above because it followed the WPS prices for most of the latter part of the study period.

created by Myers and Stauffer using FBS documents.  For example, from the fourth quarter of 1996 through the second quarter of 1998, FBS used an array for this J7050 code that included three products as summarized in the following table:

| NDC | AWP | Alternative AWP |
|---|---|---|
| 00074-7983-02 | **10.03** | 1.22 |
| 00264-7800-20 | 12.30 | 12.30 |
| 00338-0044-02 | 9.67 | **9.67** |

Prices in the second column of this table represent the per-package price as listed in the Red Book.  Given that there are three prices, the median price is equal to the second highest price. Replacing the Abbott product's AWP, which is the median price, with 125 percent of the average pharmacy indirect price during this same period yields a median price of 9.67.

Comparing this with the FBS Medicare claims data, I observe that $10.03 is the most frequent allowed amount per package for the J7050 code from the fourth quarter of 1996 through and including the fourth quarter of 1997.  For the next two quarters this same median is used, though it is replaced by 9.53 because in 1998 Medicare paid 95 percent of the median.  I therefore replace 10.03 and 9.53 with 9.67 and 9.19, respectively, for those claims with this per-unit price to estimate the effect on Medicare spending.  For claims that paid the provider charged amount (as opposed to the calculated amount using the median above) from the fourth quarter of 1996 through and including the second quarter of 1998 (when $10.03 or $9.53 was the most common allowed amount), I determine whether Medicare spending would have fallen if the per-package reimbursement had been 9.67 from 1996Q4 to 1997Q4 and 9.19 in the first half of 1998.

I repeat this exercise for FBS arrays for other products, once again restricting attention to the J7050, J7040, J7060, J7030, and J3370 codes.  My array information for FBS is restricted to the 1995Q3 to 1998Q2 period, and I therefore focus my FBS analyses on these three years.  As

above, if I do not have an array for a specific period, I investigate whether I can replicate the amount paid in that period by simply updating the AWPs in adjacent arrays.

It is worth noting that all 11 of the FBS arrays that I observe[64] for these 5 J-codes during the 1995Q3 to 1998Q2 period contain at least one Abbott product.  Additionally, in 9 out of 11 cases, the median allowed amount declines when I replace Abbott's AWPs with 125 percent of the actual average pharmacy indirect prices as described above.  In the next section, I summarize a claim-by-claim analysis of the FBS Medicare claims for these five J-codes.

*2. Claims Level Analysis for Florida Blue Shield J-Codes: 1995Q3 to 1998Q2*

As shown in Table 42, there are 2,793,386 FBS claims for the 11 J-codes listed in the Complaint during the eleven-year time period of interest.  I begin by keeping only those claims with one of the five J-codes described above and restricting attention to Carrier 590 (excluding 591 which operates in Connecticut[65]), which leaves me with a sample of 2,147,129 claims. Initially I restrict attention to only those claims with service dates from July 1, 1995 through and including June 30, 1998, which reduces the number in my sample to 598,185.

I next impose similar inclusion criteria on the claims that I did for the other Carrier claims above.  Specifically I drop the 30,485 claims with a Medicare paid amount of zero, the 637 claims with a payment from a primary payer other than Medicare, the 608 claims on which the Medicare recipient pays a non-zero deductible, and the 859 claims for which I am unable to replicate the amount paid by Medicare.  And finally, I drop the 28,384 claims with an allowed amount that is not in one of the arrays described above, leaving me with a final sample of 537,212 claims.  Total Medicare spending for these claims is equal to $6.637356 million.

---

[64] Myers and Stauffer provided me with 5 of these arrays while I recreated the other six using FBS documents.
[65] I do this because an examination of the Medicare claims reveals that the Connecticut FLBS is using different prices during this period.

Applying an algorithm analogous to the one described above for Medicare claims, I find that 473,122 of the 537,212 claims (88.1 percent) have a value of DIFFERENCE that is greater than zero. Similarly, my findings indicate that the total value of DIFFERENCE is equal to $0.783 million, with this representing 11.8 percent of Medicare spending on the claims under consideration. And finally, I use the provider identifier along with the payment date to determine that there are 75,686 unique payments to health care providers that has one or more claims with a value of DIFFERENCE greater than zero.

*3. Claims Level Analysis for Florida BS J-Codes: 1991Q1 to 1995Q2 and 1998Q3 to 2001Q4*

I employ an analogous algorithm to the one described for the other carriers above to estimate the number of claims with a value of DIFFERENCE greater than zero and the total value of DIFFERENCE during the period from 1991Q1 to 1995Q2 and from 1998Q3 to 2001Q4. I ignore the 1991 and 1992 years because very few claims in these two years have an Abbott price as the median.[66]  As discussed above, this is a conservative adjustment as it is plausible that alternative Abbott AWPs would have affected the median in these earlier periods.

Taking this algorithm to the data, I find that 1,095,699 out of 1,242,943 (88.2 percent) Florida Blue Shield Medicare Part B claims from 1993Q1 to 1995Q2 and from 1998Q3 to 2001Q4 for the five J-codes considered have a value of DIFFERENCE greater than zero and that there are 158,227 provider payments with at least one claim with a value of DIFFERENCE greater than zero. Similarly, my results indicate a total value of DIFFERENCE of $1.765

---

[66] For example, from 1992Q1 to 1992Q4, an Abbott price is the allowed amount for 0.0 percent of Florida Blue Shield administered Part B claims for the five J-codes considered versus 16.0 percent in 1993Q1. While Abbott prices are rarely the per-unit allowed amount from 1998Q3 to 2001Q4, my examination of the arrays for other carriers suggests this is because Abbott's prices are increasing relative to other firms during this latter period. For example, virtually none of the CG or WPS administered claims have an Abbott price as the median in 2001 despite the fact that virtually all of them have a value of DIFFERENCE that is greater than zero.

million, which represents 11.9 percent of Florida Blue Shield Part B Medicare spending for these products during this 2.75 year period.  I ignore the $0.773 million spent by Medicare on the 121,823 Florida Blue Shield administered claims from 1991Q1 to 1992Q4, with all of this information summarized in Table 43.

Taken together, my results indicate a total value of DIFFERENCE for Florida Blue Shield administered Part B claims of $2.548 million along with 233,913 provider payments with at least one claim with a value of DIFFERENCE greater than zero. As noted above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments and I have excluded the other six J-codes (J7051, etc.) that account for 10.9 percent of Medicare Part B spending on Complaint J-Codes for these two carriers during the 1991 to 2001 period.  This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.


*H. Medicare Part B Claims for all other Carriers*

Table 43 summarizes the results for the Carriers considered so far.  As the final row of this table indicates, the value of DIFFERENCE exceeds zero for 4.726 million claims and there are 720,579 pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero.  The total value of DIFFERENCE is $15.580 million, which represents 22.9 percent of the $67.954 million in Medicare spending administered by these carriers for the five products considered during the 1991 to 2001 period.

In this section, I use my results from the carriers for which I have array information to conduct analyses analogous to those in the preceding sections for the remaining carriers.  Before doing this, I first considered the Medicare Part B claims for all carriers to determine whether the

two groups were comparable.  An examination of the data suggests that the amount paid per claim for each J-code, the pattern of spending over time, and the proportion of claims accounted for by each of the five J-codes is quite similar.

I next determined the frequency with which each of the two groups has an Abbott NDC's AWP (or 95 percent of its AWP) as the allowed amount per unit.  I do this to investigate whether other carriers used Abbott NDC's as frequently in their arrays during the time period of interest. Weighting each claim by the total amount paid, I find that 24.41 percent of Medicare claims administered by CG and the other carriers described above had an Abbott AWP as the allowed amount during the 1995Q3 (the first quarter for which I have arrays for multiple products) to 2001Q4 period.  The corresponding fraction for all other carriers is 18.44 percent.  In the analyses for the total value of DIFFERENCE that follow, I adjust my estimates for the remaining carriers to account for the fact that the Medicare claims data indicates they use Abbott NDCs somewhat less frequently than CG and the other carriers above.

I perform an analogous adjustment for the fraction of claims with DIFFERENCE greater than zero and the number of provider payments with at least one claim with a value of DIFFERENCE above zero.  From 1995Q3 to 2001Q4, 24.04 percent of claims for CG and the other carriers above have an Abbott AWP as the allowed amount per unit versus 16.53 percent for the remaining carriers.  From 1993Q1 to 1995Q2, these remaining carriers are even more likely to have an Abbott AWP as the allowed amount per unit than in the latter period, with the fraction of claims with an Abbott AWP equal to 21.46 percent.

To estimate the number of claims for these remaining carriers with a value of DIFFERENCE that is greater than zero and the total value of DIFFERENCE, I use an algorithm analogous to the ones described above.  Specifically, for the total value of DIFFERENCE, I

multiply J-code-specific total Medicare spending by these carriers by the ratio of DIFFERENCE to the total amount of Medicare spending for the carriers for this same J-code. I then deflate this value to account for the fact that these other carriers less frequently had Abbott AWPs as their allowed amounts. This algorithm and the corresponding one for the number of claims for J-code j and carrier k are summarized in the following two equations:

$$(10)\ \text{CLAIMS-DIFF} > 0_{j,k,93q1-01q4} = \text{POS-DIFF}_j * \text{CLAIMS}_{j,k,93q1-01q4} * (.1653\ /\ .2404)$$

$$(11)\ \text{DIFFERENCE}_{j,k,93q1-01q4} = \text{DIFF-FRAC}_j * \text{PAID}_{j,k,93q1-01q4} * (.1844\ /\ .2441)$$

In this equation, $\text{POS-DIFF}_j$ represents the fraction of claims for J-code j for the preceding carriers with a value of DIFFERENCE greater than zero and $\text{DIFF-FRAC}_j$ represents the ratio of DIFFERENCE to the total amount paid. I consider the 1993Q1 to 2001Q4 period for these remaining carriers (thus ignoring 1991 and 1992), and calculate the number of provider payments with at least one claim with a value of DIFFERENCE that exceeds zero as described for the other Medicare carriers above.

The results from my analyses for the remaining carriers are summarized in Table 44. In this table, I list information on the total value of DIFFERENCE, the number of claims with a value of DIFFERENCE greater than zero, and so forth, separately by carrier. Additionally, I list two rows for each carrier, one for the results from the 1993 to 2001 period and the second one that summarizes spending and the number of claims for the first two years of the study period, which I do not include in my estimation of DIFFERENCE.

The results in the final row of this table summarize my findings for the remaining carriers. The total value of DIFFERENCE is $15.708 million, which represents 16.7 percent of the total amount spent by these carriers. This is lower than the corresponding ratio of 22.9 percent from Table 43 because I have scaled down the DIFFERENCE as described above.

Similarly, I find that 5.235 million claims have a DIFFERENCE of more than zero and that 1.002 million provider payments have a value of DIFFERENCE that exceeds zero.

As above, the value of DIFFERENCE does not account for the effect on Medicare recipients' co-payments amounts.  Additionally, I have excluded 6 of the 11 J-codes from consideration, with these six accounting for approximately 11.3 percent of Medicare spending for the remaining carriers. This latter adjustment will serve to reduce the total value of DIFFERENCE below what it would be if I considered all eleven J-codes in the Complaint.

## XXIII. Conclusion

In this report I use data from several different sources to determine the amount by which spending by the federal Medicare and federal-state Medicaid programs would have changed if prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP, WAC, and Direct Price of Abbott products.  For my analyses of the Medicaid program, I focus on the 44 NDCs listed in the United States' Complaint and for my analysis of the Medicare program I focus on the 11 J-codes listed in the Complaint.

The results that I summarize above indicate that federal government expenditures for the Medicare and Medicaid programs during the 1991 to 2001 period would have been $108.2 million lower during the 1991 to 2001 period for these 44 NDCs and the 11 J-codes.  This dollar amount does not include the $48.0 million impact on state governments' Medicaid expenditures nor does it include the $10.6 million impact on Medicare recipients' co-payments.  Additionally, my findings indicate that that 2.30 million payments to health care providers would have been lower and 13.21 million claims would have had lower Medicare or Medicaid spending had the

alternative values described above been used for the AWP, WAC, and Direct Price of certain Abbott products during the relevant time period.

At various stages in my analysis – indeed at virtually every step where I believed that there were two or more acceptable ways to proceed in analyzing the Abbott, Medicaid, and Medicare data – I deliberately chose the conservative approach, that is, the approach that minimized the dollar difference and the number of provider payments and claims reported in the Executive Summary Section on page 2 of this Report.  My results are also conservative because I have excluded 6 of the 11 J-codes listed in the Complaint and all Medicaid HCPCS claims from my analyses.

_____

Mark G. Duggan, Ph.D.

June 19, 2008

Figure 1: Abbott's FDB Direct Price vs. Abbott's Direct Avg Price for Vancomycin (74653301)

Figure 2: Abbott's FDB AWP vs. Indirect Avg Price for Pharmacy COTs for Vancomycin (74653301)

**Table 1: Abbott Direct Transaction Data 1991-2001: Revenues, # of Transactions, and Average Prices**

| NDC | # Observations | Sum of Extprice | Sum of Rebate | Avg Price | Ratio Using: 96Q3 Direct | Ratio Using: 96Q3 AWP |
|---|---|---|---|---|---|---|
| 74196607 | 243,694 | $135,449 | -$54,888 | $0.239 | 6.81 | 8.11 |
| 74397703 | 90,859 | $13,202 | -$5,422 | $0.235 | 7.06 | 8.38 |
| 74433201 | 50,273 | $117,259 | -$70,873 | $2.984 | 9.32 | 11.06 |
| 74488710 | 106,869 | $55,179 | -$21,544 | $0.204 | 6.08 | 7.20 |
| 74488720 | 74,187 | $21,828 | -$12,378 | $0.267 | 5.80 | 6.89 |
| 74488750 | 65,418 | $17,188 | -$5,430 | $0.555 | 4.04 | 4.79 |
| 74488810 | 198,015 | $234,735 | -$106,969 | $0.191 | 7.27 | 8.63 |
| 74488820 | 101,468 | $47,306 | -$22,093 | $0.259 | 6.26 | 7.42 |
| 74613802 | 152,011 | $16,429 | -$2,442 | $0.812 | 13.22 | 15.69 |
| 74613803 | 366,553 | $40,969 | -$6,683 | $0.764 | 14.05 | 16.68 |
| 74613822 | 48,069 | $9,472 | -$1,668 | $0.804 | 15.46 | 18.36 |
| 74613902 | 58,413 | $4,356 | -$621 | $0.796 | 13.03 | 15.48 |
| 74613903 | 182,868 | $15,768 | -$3,448 | $0.748 | 13.88 | 16.49 |
| 74613922 | 17,556 | $2,395 | -$318 | $0.815 | 14.75 | 17.51 |
| 74650901 | 49,729 | $139,053 | -$62,492 | $24.381 | 5.13 | 6.09 |
| 74653301 | 71,249 | $311,262 | -$193,224 | $5.536 | 10.04 | 11.92 |
| 74653401 | 13,125 | $9,055 | -$3,909 | $3.390 | 2.95 | 3.51 |
| 74653501 | 30,280 | $65,192 | -$27,110 | $6.144 | 3.26 | 3.87 |
| 74710013 | 325,888 | $213,104 | -$63,399 | $1.270 | 8.01 | 9.52 |
| 74710023 | 282,983 | $128,272 | -$38,163 | $1.285 | 7.92 | 9.40 |
| 74710102 | 125,739 | $27,266 | -$10,696 | $1.722 | 7.15 | 8.50 |
| 74710113 | 296,782 | $142,498 | -$49,996 | $1.291 | 7.88 | 9.35 |
| 74710123 | 419,458 | $214,735 | -$75,023 | $1.312 | 7.75 | 9.21 |
| 74712007 | 111,774 | $27,669 | -$6,681 | $7.052 | 8.21 | 9.75 |
| 74713809 | 696,317 | $111,092 | -$23,873 | $0.800 | 16.44 | 19.51 |
| 74713909 | 603,503 | $79,737 | -$16,399 | $0.771 | 16.51 | 19.60 |
| 74790209 | 552,396 | $114,399 | -$29,630 | $1.158 | 13.59 | 16.14 |
| 74792202 | 466,015 | $47,202 | -$9,270 | $0.616 | 13.94 | 16.56 |
| 74792203 | 395,324 | $29,856 | -$6,402 | $0.620 | 13.86 | 16.45 |
| 74792209 | 426,937 | $23,145 | -$4,840 | $0.750 | 13.38 | 15.89 |
| 74792336 | 244,019 | $96,551 | -$26,312 | $0.954 | 9.50 | 11.28 |
| 74792337 | 245,901 | $80,097 | -$19,126 | $0.961 | 9.43 | 11.20 |
| 74792409 | 293,320 | $15,153 | -$3,409 | $0.801 | 13.68 | 16.24 |
| 74792609 | 873,076 | $144,252 | -$36,104 | $0.786 | 13.94 | 16.55 |
| 74794109 | 541,614 | $38,343 | -$8,362 | $0.802 | 13.67 | 16.23 |
| 74797205 | 45,796 | $4,066 | -$575 | $2.044 | 3.24 | 3.85 |
| 74797305 | 108,339 | $8,975 | -$1,496 | $1.929 | 3.44 | 4.08 |
| 74798302 | 667,459 | $78,682 | -$17,274 | $0.612 | 13.80 | 16.38 |
| 74798303 | 652,034 | $73,356 | -$15,920 | $0.599 | 14.11 | 16.75 |
| 74798309 | 1,019,182 | $272,189 | -$37,742 | $0.668 | 13.72 | 16.28 |
| 74798436 | 268,327 | $75,586 | -$12,307 | $0.964 | 9.39 | 11.16 |
| 74798437 | 338,718 | $100,964 | -$18,584 | $0.964 | 9.40 | 11.16 |
| 74798509 | 570,418 | $37,806 | -$6,954 | $0.752 | 13.43 | 15.95 |
| 74799009 | 180,715 | $9,676 | -$2,206 | $1.011 | 9.16 | 10.88 |
| Total | 12,672,670 | $3,450,764 | -$1,142,253 | Average | 10.07 | 11.95 |

Describes Abbott direct transaction data for the 1991-2001 years.  Data in the second, third, and fourth columns includes all transactions for these 11 years of data.  Data in the third and fourth columns are in thousands of dollars. In calculating the price data reported in the fifth column, returns (instruction code from 60 to 64) are excluded because units may not be comparable.  These returns represent 0.54 percent of all transactions in the 1991-2001 direct data.  The final two columns represent the ratio of the Direct Price and the Average Wholesale Price in effect in the third quarter of 1996 (though for 74613822 and 74613922 the third quarter of 1999 is used because it is the first one with a Direct or Average Wholesale price) to this average price.

**Table 2: Abbott Direct Transaction Data: # Observations and Sales by Year-Quarter**

| Year | Quarter | # Obs | Extprice | Rebate | # NDCs |
|------|---------|-------|----------|--------|--------|
| 1991 | 1 | 284,623 | $64.160 | -$25.022 | 35 |
| 1991 | 2 | 293,312 | $69.317 | -$30.671 | 35 |
| 1991 | 3 | 285,865 | $75.360 | -$34.451 | 35 |
| 1991 | 4 | 301,355 | $82.904 | -$36.470 | 36 |
| 1992 | 1 | 284,294 | $61.768 | -$21.381 | 36 |
| 1992 | 2 | 289,979 | $63.569 | -$20.806 | 37 |
| 1992 | 3 | 320,881 | $76.405 | -$23.807 | 40 |
| 1992 | 4 | 329,426 | $80.769 | -$24.362 | 40 |
| 1993 | 1 | 324,592 | $84.811 | -$24.363 | 42 |
| 1993 | 2 | 324,928 | $79.813 | -$23.541 | 42 |
| 1993 | 3 | 319,793 | $80.482 | -$24.272 | 42 |
| 1993 | 4 | 313,098 | $75.588 | -$21.968 | 42 |
| 1994 | 1 | 312,421 | $75.297 | -$22.275 | 42 |
| 1994 | 2 | 302,340 | $72.563 | -$20.054 | 42 |
| 1994 | 3 | 307,235 | $67.033 | -$18.069 | 42 |
| 1994 | 4 | 302,628 | $70.667 | -$19.986 | 42 |
| 1995 | 1 | 311,997 | $77.287 | -$22.801 | 42 |
| 1995 | 2 | 302,122 | $78.525 | -$24.151 | 42 |
| 1995 | 3 | 281,931 | $78.505 | -$25.585 | 42 |
| 1995 | 4 | 285,408 | $79.772 | -$25.443 | 42 |
| 1996 | 1 | 291,960 | $81.738 | -$26.957 | 42 |
| 1996 | 2 | 292,558 | $80.139 | -$25.642 | 42 |
| 1996 | 3 | 291,848 | $80.085 | -$25.489 | 42 |
| 1996 | 4 | 304,344 | $87.811 | -$27.511 | 42 |
| 1997 | 1 | 294,723 | $86.248 | -$27.518 | 42 |
| 1997 | 2 | 295,157 | $82.097 | -$25.769 | 42 |
| 1997 | 3 | 290,067 | $83.683 | -$26.890 | 42 |
| 1997 | 4 | 298,082 | $89.028 | -$28.904 | 42 |
| 1998 | 1 | 294,001 | $94.907 | -$32.256 | 42 |
| 1998 | 2 | 285,646 | $83.522 | -$27.109 | 42 |
| 1998 | 3 | 285,868 | $79.965 | -$25.515 | 42 |
| 1998 | 4 | 293,296 | $89.527 | -$29.452 | 44 |
| 1999 | 1 | 291,763 | $86.809 | -$28.281 | 44 |
| 1999 | 2 | 275,059 | $80.849 | -$27.773 | 44 |
| 1999 | 3 | 261,553 | $77.415 | -$25.835 | 44 |
| 1999 | 4 | 271,782 | $84.751 | -$28.204 | 44 |
| 2000 | 1 | 263,226 | $80.662 | -$27.386 | 44 |
| 2000 | 2 | 265,384 | $83.904 | -$29.305 | 44 |
| 2000 | 3 | 254,949 | $78.246 | -$27.554 | 44 |
| 2000 | 4 | 263,673 | $80.290 | -$28.525 | 44 |
| 2001 | 1 | 236,338 | $67.055 | -$24.301 | 44 |
| 2001 | 2 | 234,879 | $71.529 | -$25.556 | 44 |
| 2001 | 3 | 230,152 | $74.466 | -$26.347 | 44 |
| 2001 | 4 | 228,134 | $71.442 | -$24.698 | 44 |
| | Total | 12,672,670 | $3,450.764 | -$1,142.253 | 44 |

Dollar amounts in the fourth and fifth columns are in millions of dollars.  The final column represents the number of NDCs with one or more transactions in the quarter.

**Table 3: Direct Transaction Data: # of Obs, Revenues, and Rebate Accruals by Instruction and Transaction Codes**

| | # Obs | Extprice | Rebate | Net | InstrCode | TransCode |
|---|---|---|---|---|---|---|
| Normal Billing 1 | 10,131,641 | $2,829,850 | -$939,176 | $1,890,674 | 0 | 1 |
| Manual Split 1 | 2,140,447 | $446,564 | -$123,643 | $322,921 | 4 | 1 |
| Special Price Deal | 9,688 | $66,721 | $0 | $66,721 | 0 | 4 |
| B.O. Shipment 2 | 124,400 | $143,444 | -$79,423 | $64,021 | 1 | 2 |
| Adjust Product Price | 67,358 | -$20,932 | $4 | -$20,928 | 70 | 1 |
| Return Goods Regular | 52,806 | -$17,848 | $229 | -$17,619 | 60 | 1 |
| Add. Prod. Charge | 22,723 | $5,814 | -$3 | $5,811 | 7 | 1 |
| Mdse Td By Sales Rep | 9,623 | -$3,395 | $3 | -$3,392 | 83 | 1 |
| Mch. Td By Sales Rep | 51,115 | $3,395 | -$12 | $3,383 | 6 | 1 |
| Customer Allowance | 13,940 | -$2,282 | $19 | -$2,263 | 74 | 1 |
| Short Ship | 6,948 | -$2,058 | $3 | -$2,055 | 84 | 1 |
| Bill-Do-Not-Ship | 4,275 | $880 | -$6 | $874 | 5 | 1 |
| Missing | 19,738 | $504 | $0 | $504 | | 1 |
| B.O. Shipment 1* | 302 | $555 | -$249 | $306 | 1 | 1 |
| Cancel - Regular | 336 | -$273 | $0 | -$273 | 80 | 1 |
| Field Destruction | 2,141 | -$172 | $0 | -$172 | 90 | 1 |
| Ret. Gds. Reg. Act. | 15,057 | -$24 | $0 | -$24 | 63 | 1 |
| Man. Split Special Deal | 41 | $22 | $0 | $22 | 4 | 4 |
| Adjust Non-Prod Lines | 36 | -$2 | $0 | -$2 | 71 | 1 |
| Reverse Return or Allowance | 10 | $1 | $0 | $1 | 13 | 1 |
| Normal Billing 2 | 3 | $0 | $0 | $0 | 0 | 2 |
| Expense Account | 42 | $0 | $0 | $0 | 11 | 1 |
| Total | 12,672,670 | $3,450,764 | -$1,142,253 | $2,308,511 | - | - |

Dollar amounts in columns 3, 4, and 5 are in thousands of dollars.  Rows are sorted in descending order of the absolute value of net sales.  Includes data for 1991 through and including 2001.

**Table 4: 1991-2001 Direct Transaction Data: Revenues, Rebate Accruals, and # Observations by Class of Trade**

| COT Code Meaning | COT | # Obs | Revenues | RebateAccrual | Net | Cumulative % of Net | Avg COT Price / Overall Price | # of Ratios |
|---|---|---|---|---|---|---|---|---|
| Non-Profit Hospital | H021 | 7,128,919 | $922,239 | -$73,451 | $848,788 | 36.77% | 0.953 | 1,795 |
| Wholesaler | W050 | 927,871 | $1,421,817 | -$810,198 | $611,619 | 63.26% | 1.125 | 1,783 |
| HPD Distributor | M061 | 454,092 | $523,280 | -$230,184 | $293,096 | 75.96% | 1.016 | 1,691 |
| City or County Hospital | T022 | 2,062,606 | $198,791 | -$13,608 | $185,183 | 83.98% | 0.969 | 1,730 |
| Fresenius | M034 | 8,506 | $76,095 | $0 | $76,095 | 87.28% | 0.979 | 153 |
| Profit Hospital | M021 | 743,149 | $71,473 | -$4,142 | $67,331 | 90.19% | 0.995 | 1,716 |
| Distributor | M060 | 232,478 | $60,516 | -$2,625 | $57,891 | 92.70% | 1.250 | 1,756 |
| Home Care Distribution | P040 | 521,844 | $56,432 | -$1,730 | $54,702 | 95.07% | 1.253 | 1,782 |
| State Hospital | TP25 | 69,061 | $15,768 | -$1,060 | $14,708 | 95.71% | 0.983 | 1,616 |
| Research Foundation & Pharm. Mfg. | A073 | 3,931 | $11,384 | -$32 | $11,352 | 96.20% | 2.324 | 886 |
| Retail Pharmacy | A003 | 79,203 | $7,971 | -$260 | $7,711 | 96.53% | 1.199 | 1,665 |
| State Teaching Institutions | TP28 | 29,146 | $7,888 | -$563 | $7,325 | 96.85% | 0.984 | 1,183 |
| Public Health Service Hosp | US31 | 26,264 | $5,711 | -$32 | $5,679 | 97.10% | 1.012 | 1,534 |
| V.A. Depot | US65 | 275 | $5,199 | $0 | $5,199 | 97.32% | 0.917 | 56 |
| Kaiser Hospital Inpatient Pharmacy | HK21 | 4,411 | $5,141 | -$36 | $5,105 | 97.54% | 1.014 | 268 |
| Physician Office and Clinics | A010 | 56,936 | $5,164 | -$173 | $4,991 | 97.76% | 1.252 | 1,548 |
| Misc Profit Hospital - Admin Offices | M026 | 42,453 | $4,790 | -$230 | $4,561 | 97.96% | 1.155 | 1,508 |
| Animal Health, Etc. Distributors | C043 | 21,738 | $4,441 | $0 | $4,441 | 98.15% | 1.876 | 655 |
| Non-Profit Medical Facility | H026 | 9,347 | $4,011 | -$143 | $3,868 | 98.32% | 1.149 | 948 |
| Closed Pharmacy | M070 | 38,727 | $3,726 | -$110 | $3,616 | 98.47% | 1.269 | 1,264 |
| Military Hospitals | US32 | 11,598 | $3,493 | -$1 | $3,492 | 98.62% | 1.008 | 1,272 |
| Dialysis Centers | H050 | 6,240 | $3,517 | -$142 | $3,375 | 98.77% | 1.021 | 168 |
| Surgery Center (Profit) | M044 | 72,745 | $3,367 | -$95 | $3,272 | 98.91% | 1.183 | 1,458 |
| V.A. Hospitals | US30 | 11,274 | $3,232 | -$4 | $3,229 | 99.05% | 1.066 | 1,078 |
| Defense Personnel Support Ctr Depot | US60 | 660 | $3,108 | $0 | $3,108 | 99.19% | 0.965 | 157 |
| Dialysis Centers | M033 | 3,302 | $3,248 | -$322 | $2,926 | 99.31% | 1.271 | 127 |
| Physicians Supply Houses | A012 | 3,260 | $2,754 | -$208 | $2,546 | 99.42% | 1.277 | 788 |
| Remaining 81 Classes of Trade | - | 102,634 | $16,209 | -$2,907 | $13,302 | 100.00% | 1.548 | 1,646 |
| Total | - | 12,672,670 | $3,450,764 | -$1,142,253 | $2,308,511 | - | Average | 1,151 |

Table 5: Comparison of Price Statistics with Direct Price for Vancomycin 74653301

| Year | Quarter | Direct Price | All Direct Customers | | | | Pharmacy Direct Customers | | | |
|------|---------|--------------|-----------|------------|-------------|----------------|-----------|------------|-------------|----------------|
| | | | Avg Price | 95th Pctile | # Customers | # Transactions | Avg Price | 95th Pctile | # Customers | # Transactions |
| 1991 | 1 | 38.000 | 5.864 | 6.186 | 228 | 1183 | 6.750 | 7.332 | 2 | 6 |
| 1991 | 2 | 44.410 | 6.418 | 7.411 | 224 | 1183 | 7.295 | 7.295 | 1 | 2 |
| 1991 | 3 | 44.410 | 6.202 | 6.402 | 290 | 1772 | 6.420 | 10.653 | 3 | 10 |
| 1991 | 4 | 44.410 | 8.173 | 19.334 | 260 | 1431 | 7.744 | 14.944 | 5 | 9 |
| 1992 | 1 | 44.410 | 6.016 | 6.746 | 235 | 1301 | 6.881 | 7.791 | 4 | 8 |
| 1992 | 2 | 47.070 | 6.410 | 6.574 | 252 | 1561 | 7.117 | 7.791 | 11 | 26 |
| 1992 | 3 | 47.070 | 6.851 | 6.900 | 256 | 1759 | 7.117 | 13.515 | 17 | 49 |
| 1992 | 4 | 47.070 | 6.596 | 6.672 | 298 | 1751 | 6.574 | 13.514 | 22 | 56 |
| 1993 | 1 | 47.070 | 7.941 | 13.110 | 319 | 1717 | 6.892 | 7.664 | 21 | 40 |
| 1993 | 2 | 47.070 | 6.600 | 6.704 | 287 | 1647 | 6.889 | 7.791 | 17 | 34 |
| 1993 | 3 | 49.420 | 6.523 | 6.695 | 293 | 1719 | 6.736 | 7.791 | 21 | 50 |
| 1993 | 4 | 49.420 | 6.646 | 6.696 | 291 | 1657 | 6.555 | 7.450 | 26 | 75 |
| 1994 | 1 | 49.420 | 6.647 | 6.693 | 279 | 1680 | 6.687 | 7.500 | 24 | 83 |
| 1994 | 2 | 49.420 | 7.458 | 12.931 | 283 | 1443 | 8.772 | 7.325 | 23 | 50 |
| 1994 | 3 | 50.900 | 6.379 | 6.914 | 288 | 1466 | 6.094 | 8.632 | 24 | 60 |
| 1994 | 4 | 50.900 | 6.577 | 6.796 | 284 | 1436 | 6.294 | 7.166 | 27 | 51 |
| 1995 | 1 | 50.900 | 6.485 | 6.597 | 265 | 1447 | 6.411 | 6.900 | 24 | 41 |
| 1995 | 2 | 50.900 | 6.369 | 6.419 | 263 | 1752 | 6.316 | 6.880 | 25 | 49 |
| 1995 | 3 | 52.940 | 6.234 | 6.272 | 261 | 1625 | 6.940 | 6.880 | 25 | 50 |
| 1995 | 4 | 52.940 | 6.007 | 5.919 | 255 | 1743 | 6.814 | 6.400 | 23 | 51 |
| 1996 | 1 | 52.940 | 5.887 | 5.919 | 276 | 1742 | 5.951 | 6.900 | 24 | 53 |
| 1996 | 2 | 55.590 | 5.903 | 5.919 | 249 | 1760 | 5.455 | 6.270 | 18 | 57 |
| 1996 | 3 | 55.590 | 5.813 | 5.874 | 247 | 1606 | 5.455 | 6.283 | 25 | 49 |
| 1996 | 4 | 55.590 | 5.761 | 7.658 | 233 | 1463 | 6.584 | 5.820 | 24 | 58 |
| 1997 | 1 | 55.590 | 5.871 | 5.465 | 270 | 1422 | 4.326 | 6.880 | 17 | 47 |
| 1997 | 2 | 55.590 | 5.423 | 5.200 | 227 | 1514 | 4.789 | 5.419 | 29 | 41 |
| 1997 | 3 | 58.370 | 5.037 | 4.901 | 206 | 1482 | 4.613 | 4.812 | 14 | 32 |
| 1997 | 4 | 58.370 | 4.846 | 4.902 | 212 | 1503 | 4.498 | 5.320 | 13 | 35 |
| 1998 | 1 | 58.370 | 4.883 | 4.813 | 241 | 1498 | 4.143 | 4.812 | 19 | 27 |
| 1998 | 2 | 58.370 | 4.926 | 4.787 | 221 | 1539 | 4.498 | 4.734 | 14 | 37 |
| 1998 | 3 | 61.290 | 4.726 | 4.814 | 207 | 1622 | 4.415 | 4.812 | 12 | 42 |
| 1998 | 4 | 61.290 | 4.744 | 5.371 | 209 | 1421 | 4.430 | 4.812 | 13 | 38 |
| 1999 | 1 | 61.290 | 4.907 | 4.699 | 190 | 1400 | 5.789 | 4.889 | 11 | 29 |
| 1999 | 2 | 61.290 | 4.671 | 4.718 | 202 | 1553 | 3.248 | 5.320 | 11 | 25 |
| 1999 | 3 | 64.350 | 4.683 | 5.221 | 218 | 1643 | 4.309 | 5.320 | 14 | 32 |
| 1999 | 4 | 64.350 | 4.820 | 4.732 | 217 | 1689 | 4.245 | 4.889 | 14 | 34 |
| 2000 | 1 | 64.350 | 4.771 | 4.626 | 224 | 1723 | 4.302 | 4.912 | 14 | 36 |
| 2000 | 2 | 64.350 | 4.494 | 4.387 | 216 | 1784 | 4.053 | 4.988 | 12 | 32 |
| 2000 | 3 | 64.350 | 4.414 | 4.484 | 312 | 1675 | 4.093 | 4.988 | 15 | 36 |
| 2000 | 4 | 64.350 | 4.334 | 4.595 | 221 | 1525 | 4.200 | 4.988 | 11 | 41 |
| 2001 | 1 | 64.350 | 4.331 | 4.381 | 223 | 1750 | 4.279 | 4.963 | 12 | 45 |
| 2001 | 2 | 64.350 | 4.321 | — | — | — | 4.365 | 4.937 | 10 | 34 |
| 2001 | 3 | 14.890 | 4.941 | 9.118 | 203 | 1505 | 4.365 | 4.937 | 10 | 34 |
| 2001 | 4 | 14.890 | 4.320 | 4.390 | 214 | 1474 | 4.176 | 4.937 | 14 | 44 |
| Average | | 52.551 | 5.710 | 6.477 | 248 | 1,574 | 5.669 | 6.756 | 17 | 40 |

**Table 6: Summary of Abbott Indirect Transaction Data by NDC for 1991-2001**

| NDC | # Obs in Indirect Data | Sum of End Cust Inv Total | Sum of Purch Units | Sum of Cust Rebate | Avg Price in Indirect Data | Av W050,M061 Price in Direct | Ratio |
|---|---|---|---|---|---|---|---|
| 74196607 | 1,552,124 | $57,725 | 239,938 | $1,694 | $0.241 | $0.239 | 1.008 |
| 74397703 | 260,757 | $4,281 | 18,693 | $88 | $0.229 | $0.229 | 1.002 |
| 74433201 | 405,130 | $35,579 | 12,302 | $634 | $2.892 | $2.993 | 0.966 |
| 74488710 | 646,170 | $20,058 | 104,845 | $552 | $0.191 | $0.194 | 0.986 |
| 74488720 | 273,747 | $6,654 | 25,235 | $128 | $0.264 | $0.263 | 1.003 |
| 74488750 | 222,671 | $6,500 | 11,816 | $122 | $0.550 | $0.549 | 1.002 |
| 74488810 | 1,434,646 | $91,475 | 477,013 | $3,076 | $0.192 | $0.191 | 1.002 |
| 74488820 | 462,788 | $18,528 | 72,018 | $486 | $0.257 | $0.257 | 1.001 |
| 74613802 | 68,741 | $1,735 | 2,050 | $76 | $0.846 | $0.922 | 0.918 |
| 74613803 | 355,060 | $7,042 | 8,972 | $482 | $0.785 | $0.820 | 0.958 |
| 74613822 | 46,728 | $1,330 | 1,626 | $103 | $0.818 | $0.808 | 1.012 |
| 74613902 | 14,960 | $343 | 403 | $12 | $0.851 | $0.921 | 0.925 |
| 74613903 | 141,543 | $2,245 | 2,922 | $173 | $0.768 | $0.781 | 0.984 |
| 74613922 | 8,817 | $222 | 266 | $14 | $0.834 | $0.812 | 1.027 |
| 74650901 | 311,027 | $64,883 | 2,750 | $2,225 | $23.595 | $24.283 | 0.972 |
| 74653301 | 682,165 | $100,710 | 18,877 | $2,498 | $5.335 | $5.553 | 0.961 |
| 74653401 | 67,100 | $4,582 | 1,402 | $160 | $3.269 | $3.359 | 0.973 |
| 74653501 | 191,424 | $34,325 | 5,627 | $1,613 | $6.100 | $6.117 | 0.997 |
| 74710013 | 267,093 | $49,947 | 37,502 | $2,152 | $1.332 | $1.333 | 0.999 |
| 74710023 | 202,183 | $28,266 | 20,963 | $1,072 | $1.348 | $1.350 | 0.999 |
| 74710102 | 122,121 | $7,625 | 4,256 | $322 | $1.792 | $1.786 | 1.003 |
| 74710113 | 254,536 | $34,675 | 25,661 | $1,390 | $1.351 | $1.352 | 1.000 |
| 74710123 | 396,373 | $55,290 | 40,290 | $2,088 | $1.372 | $1.371 | 1.001 |
| 74712007 | 65,781 | $6,251 | 841 | $439 | $7.429 | $7.465 | 0.995 |
| 74713809 | 744,584 | $20,053 | 24,554 | $1,304 | $0.817 | $0.877 | 0.931 |
| 74713909 | 540,250 | $12,878 | 16,168 | $803 | $0.797 | $0.816 | 0.976 |
| 74790209 | 534,048 | $22,891 | 18,702 | $1,662 | $1.224 | $1.236 | 0.990 |
| 74792202 | 322,459 | $7,763 | 12,222 | $528 | $0.635 | $0.639 | 0.994 |
| 74792203 | 234,610 | $3,929 | 6,137 | $223 | $0.640 | $0.643 | 0.996 |
| 74792209 | 246,774 | $3,420 | 4,329 | $208 | $0.790 | $0.791 | 0.999 |
| 74792336 | 120,352 | $15,644 | 15,697 | $981 | $0.997 | $0.990 | 1.007 |
| 74792337 | 119,251 | $14,148 | 14,144 | $882 | $1.000 | $1.001 | 0.999 |
| 74792409 | 162,657 | $2,256 | 2,661 | $123 | $0.848 | $0.846 | 1.002 |
| 74792609 | 809,698 | $20,743 | 25,055 | $1,277 | $0.828 | $0.838 | 0.988 |
| 74794109 | 405,244 | $6,331 | 7,466 | $418 | $0.848 | $0.851 | 0.996 |
| 74797205 | 14,616 | $493 | 233 | $28 | $2.114 | $2.277 | 0.928 |
| 74797305 | 33,111 | $1,277 | 640 | $76 | $1.995 | $2.006 | 0.995 |
| 74798302 | 683,435 | $13,415 | 21,552 | $947 | $0.622 | $0.624 | 0.997 |
| 74798303 | 712,651 | $13,174 | 21,670 | $963 | $0.608 | $0.611 | 0.995 |
| 74798309 | 1,149,048 | $35,394 | 52,243 | $2,718 | $0.677 | $0.679 | 0.997 |
| 74798436 | 144,768 | $14,004 | 13,952 | $899 | $1.004 | $1.002 | 1.002 |
| 74798437 | 192,450 | $19,343 | 19,231 | $1,228 | $1.006 | $1.009 | 0.997 |
| 74798509 | 418,943 | $7,453 | 9,445 | $548 | $0.789 | $0.797 | 0.991 |
| 74799009 | 88,906 | $1,754 | 1,657 | $117 | $1.059 | $1.085 | 0.976 |
| Total | 16,131,540 | $876,635 | 1,424,025 | $37,532 | Average Ratio | | 0.987 |

Dollar amounts in thousands of dollars and purchase units in thousands of units.

**Table 7: Abbott Indirect Transaction Data: # Observations and Sales by Year-Quarter**

| Year | Quarter | # Obs | EndCustInvTotal | CustomerRebate | Rebate / Sales | # NDCs |
|------|---------|-------|-----------------|----------------|----------------|--------|
| 1991 | 1 | 112,759 | $8,087 | $0 | 0.0% | 34 |
| 1991 | 2 | 101,709 | $7,624 | $0 | 0.0% | 35 |
| 1991 | 3 | 104,184 | $7,664 | $0 | 0.0% | 35 |
| 1991 | 4 | 135,265 | $9,492 | $0 | 0.0% | 36 |
| 1992 | 1 | 124,196 | $9,032 | $0 | 0.0% | 36 |
| 1992 | 2 | 152,205 | $11,337 | $0 | 0.0% | 36 |
| 1992 | 3 | 146,227 | $11,118 | $0 | 0.0% | 40 |
| 1992 | 4 | 165,856 | $13,424 | $0 | 0.0% | 40 |
| 1993 | 1 | 207,614 | $17,106 | $0 | 0.0% | 42 |
| 1993 | 2 | 200,962 | $16,987 | $0 | 0.0% | 42 |
| 1993 | 3 | 250,073 | $17,548 | $0 | 0.0% | 42 |
| 1993 | 4 | 237,733 | $17,794 | $0 | 0.0% | 42 |
| 1994 | 1 | 206,366 | $16,313 | $0 | 0.0% | 42 |
| 1994 | 2 | 242,236 | $16,667 | $0 | 0.0% | 42 |
| 1994 | 3 | 137,492 | $10,076 | $0 | 0.0% | 42 |
| 1994 | 4 | 241,783 | $15,623 | $0 | 0.0% | 42 |
| 1995 | 1 | 202,466 | $12,876 | $0 | 0.0% | 42 |
| 1995 | 2 | 322,871 | $20,647 | $0 | 0.0% | 42 |
| 1995 | 3 | 346,897 | $20,713 | $0 | 0.0% | 42 |
| 1995 | 4 | 344,084 | $20,617 | $0 | 0.0% | 42 |
| 1996 | 1 | 403,513 | $25,158 | $1,286 | 5.1% | 42 |
| 1996 | 2 | 390,225 | $22,690 | $1,160 | 5.1% | 42 |
| 1996 | 3 | 469,327 | $25,673 | $1,274 | 5.0% | 42 |
| 1996 | 4 | 435,387 | $23,876 | $1,220 | 5.1% | 42 |
| 1997 | 1 | 438,299 | $24,653 | $1,390 | 5.6% | 42 |
| 1997 | 2 | 436,947 | $23,316 | $1,297 | 5.6% | 42 |
| 1997 | 3 | 506,107 | $24,854 | $1,413 | 5.7% | 42 |
| 1997 | 4 | 484,448 | $24,784 | $1,481 | 6.0% | 42 |
| 1998 | 1 | 510,961 | $27,077 | $1,592 | 5.9% | 42 |
| 1998 | 2 | 484,248 | $25,326 | $1,433 | 5.7% | 42 |
| 1998 | 3 | 474,240 | $25,545 | $1,484 | 5.8% | 42 |
| 1998 | 4 | 547,065 | $26,519 | $1,697 | 6.4% | 43 |
| 1999 | 1 | 532,552 | $26,777 | $1,738 | 6.5% | 44 |
| 1999 | 2 | 552,200 | $26,933 | $1,807 | 6.7% | 44 |
| 1999 | 3 | 527,820 | $25,542 | $1,741 | 6.8% | 44 |
| 1999 | 4 | 515,955 | $24,953 | $1,775 | 7.1% | 44 |
| 2000 | 1 | 542,211 | $26,022 | $1,913 | 7.4% | 44 |
| 2000 | 2 | 542,184 | $25,334 | $1,862 | 7.3% | 44 |
| 2000 | 3 | 570,992 | $25,149 | $1,879 | 7.5% | 44 |
| 2000 | 4 | 536,971 | $25,207 | $1,936 | 7.7% | 44 |
| 2001 | 1 | 530,453 | $22,702 | $1,522 | 6.7% | 43 |
| 2001 | 2 | 582,736 | $23,780 | $1,607 | 6.8% | 44 |
| 2001 | 3 | 580,775 | $20,743 | $1,443 | 7.0% | 44 |
| 2001 | 4 | 552,946 | $23,281 | $1,582 | 6.8% | 43 |
| | Total | 16,131,540 | $876,635 | $37,532 | 4.3% | 44 |

**Table 8: Wholesalers and HPD Distributors in Abbott's Indirect Transaction Data**

| "Wholesaler Customer Name" | # Obs | Revenues | Class-of-Trade |
|---|---|---|---|
| AMERISOURCE | 2,870,047 | $213,966 | W050 |
| OWENS & MINOR | 4,344,110 | $163,637 | M061 |
| CARDINAL | 2,745,347 | $123,766 | W050 |
| MCKESSON | 1,705,531 | $108,275 | W050 |
| BERGEN BRUNSWIG | 899,277 | $65,652 | W050 |
| WHITMIRE DIST | 469,795 | $38,432 | W050 |
| MORRIS & DICKSON | 316,697 | $23,028 | W050 |
| GENERAL MED | 612,073 | $17,939 | M061 |
| STUART MEDICAL | 193,943 | $17,715 | M061 |
| NEUMAN DIST | 81,200 | $12,090 | W050 |
| BINDLEY WESTERN | 120,873 | $9,315 | W050 |
| DURR DRUG | 82,153 | $8,463 | W050 |
| HARDIN'S SYSCO | 153,981 | $6,997 | M061 |
| HUMISTON KEELING | 48,789 | $4,900 | W050 |
| ALLEGIANCE | 311,689 | $4,398 | M061 |
| BURROWS | 192,881 | $4,012 | M061 |
| COMMONS BROS INC | 17,675 | $3,797 | W050 |
| WALSH-LUMPKIN | 54,772 | $3,236 | M061 |
| SMITH DRUG | 41,600 | $3,190 | W050 |
| D & K HEALTHCARE | 41,189 | $2,880 | W050 |
| F DOHMEN CO | 51,032 | $2,874 | W050 |
| PRO HOSP SPLY | 122,976 | $2,711 | M061 |
| FOXMEYER | 25,466 | $2,648 | W050 |
| TENN WHOLESALE | 17,778 | $2,286 | W050 |
| HD SMITH | 40,854 | $1,975 | W050 |
| SUN CHOICE | 5,920 | $1,788 | M061 |
| H D SMITH WHLSE DG CO | 25,908 | $1,712 | W050 |
| SOLOMONS COMPANY | 14,885 | $1,510 | W050 |
| MEYERS & CO | 13,809 | $1,417 | W050 |
| KAY WHOLESALE | 11,883 | $1,310 | W050 |
| US MEDICAL | 1,867 | $1,275 | M061 |
| MD OF BEAUMONT | 17,609 | $1,254 | W050 |
| ALBERS INC | 14,321 | $1,229 | W050 |
| OHIO VLY/CLARKSBURG INC | 12,724 | $1,149 | W050 |
| WHITE & WHITE | 10,028 | $1,098 | M061 |
| AMERICAN MATERIAL MGNMT | 184,232 | $1,071 | M061 |
| PRIORITY HLTHCARE | 25,194 | $1,009 | M060 |
| ALL OTHERS | 231,432 | $12,635 | W050 |
| TOTAL | 16,131,540 | $876,635 | - |

**Table 9: 1991-2001 Indirect Transaction Data: Revenues, Rebates, and # Obs by End Customer Class of Trade**

| COT Code Meaning | COT | # Obs | Revenues | Cust Rebate | Cumulative % of Revenues | AvgRatio | # Ratios |
|---|---|---|---|---|---|---|---|
| Non-Profit Hospital | H021 | 10,368,993 | $516,165 | $24,647 | 58.88% | 0.988 | 1817 |
| City or County Hospital | T022 | 1,846,621 | $108,241 | $4,794 | 71.23% | 1.003 | 1804 |
| Profit Hospital | M021 | 1,421,210 | $76,415 | $2,309 | 79.94% | 0.993 | 1766 |
| Home Care Distribution | P040 | 435,777 | $41,573 | $1,550 | 84.69% | 1.041 | 1533 |
| State Hospital | TP25 | 241,581 | $21,219 | $1,281 | 87.11% | 1.021 | 1505 |
| Retail Pharmacy | A003 | 285,217 | $14,758 | $429 | 88.79% | 1.200 | 1550 |
| V.A. Hospitals | US30 | 101,851 | $12,742 | $26 | 90.24% | 0.925 | 1078 |
| Missing Class of Trade | - | 179,621 | $12,679 | $141 | 91.69% | 1.067 | 1449 |
| Closed Pharmacy | M070 | 195,761 | $12,266 | $376 | 93.09% | 1.093 | 1521 |
| State Teaching Institutions | TP28 | 127,854 | $11,435 | $392 | 94.39% | 0.968 | 1010 |
| Long Term Care Providers | M072 | 179,417 | $11,250 | $468 | 95.68% | 1.044 | 1437 |
| Distributor | M060 | 176,309 | $6,224 | $138 | 96.39% | 1.269 | 1695 |
| Physician Office and Clinics | A010 | 85,455 | $4,869 | $198 | 96.94% | 1.099 | 1249 |
| Military Hospitals | US32 | 42,895 | $3,670 | $3 | 97.36% | 0.970 | 1199 |
| Disproportionate Share Hospitals | GV11 | 50,634 | $3,602 | $145 | 97.77% | 1.042 | 1365 |
| Misc Tax Supported Hosp Admin | T026 | 12,718 | $2,647 | $84 | 98.07% | 1.032 | 926 |
| Misc State Tax Supported Hosp Admin | TP26 | 15,750 | $2,178 | $60 | 98.32% | 1.095 | 1064 |
| Dialysis Centers | M033 | 39,429 | $2,165 | $92 | 98.57% | 0.974 | 436 |
| Misc Profit Hospital - Admin Offices | M026 | 39,072 | $2,163 | $64 | 98.82% | 1.036 | 1188 |
| Surgery Center (Profit) | M044 | 97,273 | $1,866 | $88 | 99.03% | 1.027 | 1233 |
| Chain Pharmacy | A007 | 28,294 | $1,083 | $31 | 99.15% | 1.369 | 1210 |
| Remaining 68 Classes of Trade | - | 159,808 | $7,424 | $217 | 100.00% | 1.086 | 1499 |
| Total | - | 16,131,540 | $876,635 | $37,532 | Total | - | 1826 |

**Table 10: Comparison of Price Statistics with Average Wholesale Price for Vancomycin 74653301**

| Year | Quarter | AWP | All Indirect Customers | | | | Pharmacy Indirect Customers | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Avg Price | 95th Pctile | # Customers | # Transactions | Avg Price | 95th Pctile | Maximum | # Customers | # Transactions |
| 1991 | 1 | 45.125 | 6.062 | 6.820 | 830 | 4,735 | 7.608 | 13.312 | 13.312 | 13 | 46 |
| 1991 | 2 | 52.737 | 6.156 | 7.000 | 868 | 5,339 | 8.430 | 13.790 | 13.790 | 12 | 55 |
| 1991 | 3 | 52.737 | 6.316 | 6.857 | 979 | 5,175 | 7.673 | 12.816 | 15.249 | 18 | 54 |
| 1991 | 4 | 52.737 | 6.467 | 7.000 | 1,099 | 6,309 | 7.002 | 8.925 | 15.249 | 27 | 72 |
| 1992 | 1 | 52.737 | 6.496 | 7.000 | 1,153 | 6,659 | 7.354 | 13.790 | 13.790 | 29 | 93 |
| 1992 | 2 | 55.896 | 6.559 | 7.430 | 1,283 | 8,512 | 8.094 | 13.790 | 13.790 | 42 | 120 |
| 1992 | 3 | 55.896 | 6.650 | 7.920 | 1,376 | 8,553 | 7.929 | 12.800 | 12.800 | 55 | 146 |
| 1992 | 4 | 55.896 | 6.627 | 7.228 | 1,432 | 9,014 | 8.075 | 12.800 | 14.204 | 65 | 215 |
| 1993 | 1 | 55.896 | 6.139 | 6.900 | 1,677 | 11,305 | 8.131 | 13.312 | 14.342 | 81 | 269 |
| 1993 | 2 | 55.896 | 6.628 | 7.510 | 1,793 | 11,735 | 9.212 | 13.790 | 14.342 | 86 | 309 |
| 1993 | 3 | 55.896 | 6.699 | 8.497 | 2,011 | 13,081 | 7.693 | 13.312 | 14.342 | 89 | 346 |
| 1993 | 4 | 58.686 | 6.633 | 7.310 | 2,115 | 14,075 | 7.071 | 8.703 | 13.312 | 116 | 437 |
| 1994 | 1 | 58.686 | 6.579 | 6.977 | 2,095 | 12,692 | 6.954 | 8.665 | 13.312 | 122 | 512 |
| 1994 | 2 | 58.686 | 6.792 | 8.138 | 2,020 | 12,019 | 7.040 | 7.266 | 13.500 | 144 | 579 |
| 1994 | 3 | 60.444 | 6.890 | 13.500 | 1,618 | 7,657 | 7.339 | 13.500 | 13.500 | 127 | 416 |
| 1994 | 4 | 60.444 | 6.673 | 9.063 | 1,978 | 10,995 | 7.131 | 11.485 | 13.500 | 167 | 681 |
| 1995 | 1 | 60.444 | 6.188 | 6.850 | 1,571 | 7,161 | 6.692 | 7.020 | 13.500 | 166 | 629 |
| 1995 | 2 | 60.444 | 6.190 | 6.850 | 1,916 | 11,750 | 6.574 | 6.850 | 13.500 | 220 | 1,084 |
| 1995 | 3 | 62.866 | 6.085 | 6.850 | 2,062 | 11,830 | 6.705 | 7.166 | 13.500 | 224 | 1,111 |
| 1995 | 4 | 62.866 | 5.899 | 6.830 | 2,348 | 13,310 | 6.639 | 8.357 | 13.500 | 248 | 1,136 |
| 1996 | 1 | 62.866 | 5.877 | 6.750 | 2,639 | 16,260 | 6.245 | 6.600 | 16.250 | 308 | 1,503 |
| 1996 | 2 | 66.013 | 5.795 | 6.441 | 2,611 | 15,911 | 6.220 | 6.480 | 13.500 | 341 | 1,494 |
| 1996 | 3 | 66.013 | 5.904 | 7.950 | 2,886 | 18,742 | 6.170 | 6.660 | 13.500 | 362 | 1,957 |
| 1996 | 4 | 66.013 | 5.542 | 6.825 | 2,738 | 18,030 | 5.840 | 6.532 | 13.500 | 354 | 1,844 |
| 1997 | 1 | 66.013 | 5.378 | 6.100 | 2,800 | 17,310 | 5.849 | 7.531 | 13.900 | 383 | 1,784 |
| 1997 | 2 | 66.013 | 4.991 | 5.780 | 2,926 | 16,454 | 5.606 | 7.660 | 13.900 | 381 | 1,711 |
| 1997 | 3 | 69.314 | 4.897 | 5.650 | 3,352 | 18,967 | 5.274 | 6.200 | 13.900 | 405 | 2,036 |
| 1997 | 4 | 69.314 | 4.889 | 5.558 | 3,197 | 18,595 | 5.191 | 6.350 | 13.900 | 420 | 2,022 |
| 1998 | 1 | 69.314 | 4.796 | 5.310 | 3,244 | 19,780 | 4.911 | 5.276 | 13.900 | 432 | 2,250 |
| 1998 | 2 | 69.314 | 4.709 | 5.100 | 3,541 | 21,041 | 4.852 | 5.001 | 13.900 | 470 | 2,381 |
| 1998 | 3 | 72.782 | 4.810 | 5.204 | 3,516 | 20,665 | 4.992 | 5.310 | 13.900 | 455 | 2,292 |
| 1998 | 4 | 72.782 | 4.723 | 5.117 | 3,722 | 22,313 | 4.880 | 5.117 | 13.900 | 487 | 2,485 |
| 1999 | 1 | 72.782 | 4.671 | 5.069 | 3,608 | 21,857 | 4.805 | 5.152 | 13.900 | 481 | 2,294 |
| 1999 | 2 | 72.782 | 4.676 | 4.947 | 3,794 | 23,630 | 4.710 | 4.940 | 13.900 | 518 | 2,748 |
| 1999 | 3 | 76.416 | 4.744 | 5.700 | 3,666 | 21,556 | 4.756 | 5.700 | 13.900 | 499 | 2,579 |
| 1999 | 4 | 76.416 | 4.642 | 4.950 | 3,516 | 21,056 | 4.546 | 4.830 | 13.900 | 464 | 2,482 |
| 2000 | 1 | 76.416 | 4.612 | 4.878 | 3,458 | 20,845 | 4.462 | 4.620 | 13.900 | 478 | 2,511 |
| 2000 | 2 | 76.416 | 4.427 | 4.664 | 3,527 | 22,674 | 4.470 | 4.820 | 13.900 | 521 | 2,996 |
| 2000 | 3 | 76.416 | 4.378 | 4.646 | 3,609 | 22,534 | 4.305 | 4.550 | 13.900 | 526 | 3,018 |
| 2000 | 4 | 76.416 | 4.431 | 4.830 | 3,887 | 17,826 | 4.414 | 5.347 | 13.900 | 532 | 2,494 |
| 2001 | 1 | 76.416 | 4.516 | 4.930 | 3,901 | 22,229 | 4.376 | 5.219 | 13.900 | 561 | 2,977 |
| 2001 | 2 | 76.416 | 4.270 | 4.500 | 3,892 | 23,956 | 4.281 | 4.420 | 13.900 | 556 | 3,406 |
| 2001 | 3 | 17.725 | 4.318 | 4.683 | 4,062 | 23,266 | 4.390 | 6.350 | 13.900 | 579 | 3,430 |
| 2001 | 4 | 17.725 | 4.381 | 4.560 | 4,412 | 24,762 | 4.584 | 9.429 | 13.900 | 591 | 3,289 |
| Average | | 62.407 | 5.571 | 6.407 | 2,608 | 15,504 | 6.124 | 8.217 | 13.911 | 299 | 1,507 |

**Table 11: Medicaid Spending on Complaint NDCs by State, NDC, and Yr-Quarter: CMS SDUD Data**

| | A. Breakdown by State | | | | B. Breakdown by NDC | | | C. Breakdown by Year-Quarter | |
|---|---|---|---|---|---|---|---|---|---|
| State | # Scripts | Paid | Cumulative | NDC | # Scripts | Paid | YrQuart | # Scripts | Paid |
| Florida | 316,734 | $16,483 | 11.23% | | | | | | |
| Illinois | 505,076 | $15,861 | 22.03% | | | | | | |
| California | 321,277 | $10,002 | 28.84% | | | | | | |
| New Jersey | 139,805 | $9,642 | 35.41% | 74653301 | 182,481 | $38,951 | 1991,1 | 13,210 | $434 |
| New York | 121,068 | $8,748 | 41.36% | 74613802 | 374,208 | $13,584 | 1991,2 | 20,900 | $685 |
| Indiana | 127,132 | $8,146 | 46.91% | 74650901 | 39,220 | $10,385 | 1991,3 | 34,655 | $927 |
| Kentucky | 127,921 | $7,402 | 51.95% | 74196607 | 778,607 | $8,716 | 1991,4 | 34,865 | $908 |
| Missouri | 138,074 | $7,337 | 56.95% | 74713809 | 255,610 | $7,208 | 1992,1 | 34,270 | $906 |
| Ohio | 292,317 | $5,836 | 60.92% | 74710123 | 64,826 | $6,190 | 1992,2 | 35,978 | $1,290 |
| Michigan | 103,552 | $4,903 | 64.26% | 74792609 | 105,075 | $4,733 | 1992,3 | 37,990 | $1,297 |
| North Carolina | 45,070 | $4,294 | 67.19% | 74433201 | 33,622 | $4,690 | 1992,4 | 38,286 | $1,315 |
| Louisiana | 85,309 | $4,257 | 70.09% | 74713909 | 52,609 | $4,133 | 1993,1 | 42,392 | $1,463 |
| Georgia | 36,571 | $3,251 | 72.30% | 74798437 | 55,808 | $3,702 | 1993,2 | 40,470 | $1,564 |
| Pennsylvania | 50,642 | $2,920 | 74.29% | 74613822 | 67,325 | $3,518 | 1993,3 | 59,323 | $2,113 |
| Arkansas | 32,738 | $2,724 | 76.14% | 74488810 | 134,236 | $3,174 | 1993,4 | 50,251 | $1,973 |
| Virginia | 63,736 | $2,599 | 77.91% | 74613803 | 128,338 | $2,890 | 1994,1 | 52,659 | $2,060 |
| Wisconsin | 72,254 | $2,574 | 79.67% | 74798302 | 74,818 | $2,870 | 1994,2 | 48,521 | $1,919 |
| Washington | 57,647 | $2,510 | 81.38% | 74798309 | 87,971 | $2,832 | 1994,3 | 52,118 | $2,150 |
| Alabama | 38,912 | $2,138 | 82.83% | 74613902 | 20,567 | $2,629 | 1994,4 | 54,720 | $2,259 |
| Texas | 73,856 | $2,110 | 84.27% | 74653501 | 22,451 | $2,534 | 1995,1 | 44,948 | $2,162 |
| Connecticut | 34,487 | $1,972 | 85.61% | 74710113 | 25,526 | $1,902 | 1995,2 | 49,043 | $1,890 |
| Massachusetts | 39,652 | $1,931 | 86.93% | 74792337 | 34,284 | $1,849 | 1995,3 | 59,633 | $2,658 |
| Mississippi | 18,000 | $1,893 | 88.22% | 74488710 | 176,093 | $1,835 | 1995,4 | 62,883 | $2,652 |
| Colorado | 34,121 | $1,794 | 89.44% | 74798436 | 26,164 | $1,736 | 1996,1 | 68,637 | $2,918 |
| South Carolina | 19,958 | $1,792 | 90.66% | 74790209 | 17,929 | $1,260 | 1996,2 | 78,644 | $3,726 |
| Maryland | 65,977 | $1,736 | 91.84% | 74792202 | 31,171 | $1,205 | 1996,3 | 85,986 | $4,110 |
| Oklahoma | 41,966 | $1,619 | 92.94% | 74798509 | 43,579 | $1,189 | 1996,4 | 78,475 | $3,589 |
| West Virginia | 16,417 | $1,283 | 93.82% | 74792209 | 34,065 | $1,152 | 1997,1 | 76,145 | $3,825 |
| Minnesota | 43,115 | $1,197 | 94.63% | 74710023 | 15,326 | $1,054 | 1997,2 | 84,210 | $3,956 |
| Oregon | 25,233 | $1,028 | 95.33% | 74792336 | 18,157 | $964 | 1997,3 | 87,815 | $4,671 |
| Utah | 26,399 | $887 | 95.94% | 74613903 | 12,615 | $876 | 1997,4 | 85,831 | $4,732 |
| Nevada | 6,103 | $824 | 96.50% | 74798303 | 26,805 | $869 | 1998,1 | 89,283 | $4,643 |
| Nebraska | 20,129 | $760 | 97.02% | 74710102 | 20,672 | $839 | 1998,2 | 98,936 | $5,590 |
| Kansas | 21,261 | $615 | 97.43% | 74794109 | 17,841 | $816 | 1998,3 | 97,095 | $5,239 |
| Iowa | 18,158 | $602 | 97.84% | 74712007 | 11,697 | $774 | 1998,4 | 96,617 | $5,283 |
| South Dakota | 11,234 | $437 | 98.14% | 74488720 | 44,285 | $707 | 1999,1 | 100,876 | $5,275 |
| Rhode Island | 6,408 | $415 | 98.42% | 74710013 | 9,289 | $676 | 1999,2 | 106,919 | $5,571 |
| Hawaii | 11,708 | $328 | 98.65% | 74488820 | 35,281 | $670 | 1999,3 | 102,534 | $5,504 |
| Montana | 7,289 | $327 | 98.87% | 74397703 | 79,503 | $521 | 1999,4 | 106,528 | $6,268 |
| Maine | 5,548 | $300 | 99.07% | 74613922 | 3,816 | $507 | 2000,1 | 120,348 | $5,993 |
| Wyoming | 4,895 | $256 | 99.25% | 74797205 | 15,402 | $503 | 2000,2 | 101,324 | $6,234 |
| Tennessee | 6,327 | $244 | 99.41% | 74799009 | 20,819 | $456 | 2000,3 | 108,688 | $5,462 |
| Delaware | 5,276 | $244 | 99.58% | 74792409 | 9,068 | $419 | 2000,4 | 116,861 | $5,753 |
| North Dakota | 3,571 | $210 | 99.72% | 74797305 | 4,592 | $378 | 2001,1 | 128,975 | $6,218 |
| Idaho | 1,234 | $103 | 99.79% | 74792203 | 10,625 | $358 | 2001,2 | 128,372 | $4,552 |
| New Hampshire | 2,733 | $84 | 99.85% | 74653401 | 4,877 | $308 | 2001,3 | 113,993 | $2,543 |
| New Mexico | 2,093 | $62 | 99.89% | 74488750 | 27,099 | $276 | 2001,4 | 124,145 | $2,555 |
| Alaska | 2,579 | $61 | 99.94% | | | | | | |
| Vermont | 1,433 | $51 | 99.97% | | | | | | |
| Washington, D.C. | 1,357 | $44 | 100.00% | | | | | | |
| Total | 3,254,352 | $146,837 | 100.00% | Total | 3,254,352 | $146,837 | Total | 3,254,352 | $146,837 |

Dollar amounts are in thousands of dollars.

**Table 12A: Comparison of CMS State Drug Utilization and MAX Claims Data: 1999-2001**

| State | State Drug Utilization Data | | | MAX Data | | | |
|-------|---------------|---------|------------|---------------|---------|------------|-------------|
|       | Paid (in $1000) | Scripts | # Quarters | Paid (in $1000) | Claims | # Quarters | % Paid Diff |
| IL | $5,485.12 | 167,756 | 12 | $5,340.28 | 175,249 | 12 | -2.6% |
| FL | $5,471.85 | 113,919 | 12 | $5,237.22 | 113,190 | 12 | -4.3% |
| IN | $4,686.27 | 64,755 | 12 | $6,021.49 | 73,935 | 12 | 28.5% |
| CA | $4,383.94 | 136,390 | 12 | $4,018.46 | 135,419 | 12 | -8.3% |
| NY | $4,324.84 | 63,337 | 12 | $4,016.00 | 62,661 | 12 | -7.1% |
| MO | $3,354.55 | 59,210 | 12 | $3,175.30 | 56,940 | 12 | -5.3% |
| KY | $3,017.40 | 48,700 | 12 | $2,919.16 | 48,415 | 12 | -3.3% |
| OH | $2,980.96 | 150,555 | 12 | $2,879.90 | 147,091 | 12 | -3.4% |
| NC | $2,750.40 | 26,571 | 11 | $2,826.31 | 27,754 | 12 | 2.8% |
| NJ | $2,510.36 | 40,582 | 12 | $2,365.12 | 42,450 | 12 | -5.8% |
| LA | $2,161.75 | 42,139 | 12 | $2,078.44 | 42,010 | 12 | -3.9% |
| MI | $2,032.19 | 35,790 | 11 | $2,150.61 | 39,020 | 12 | 5.8% |
| GA | $1,619.16 | 19,596 | 12 | $1,596.61 | 19,825 | 12 | -1.4% |
| MA | $1,316.56 | 25,700 | 12 | $1,316.90 | 25,179 | 12 | 0.0% |
| PA | $1,281.94 | 28,601 | 11 | $1,327.47 | 28,386 | 12 | 3.6% |
| VA | $1,219.91 | 22,929 | 12 | $1,153.62 | 21,471 | 12 | -5.4% |
| AR | $1,185.05 | 12,917 | 11 | $1,250.22 | 13,867 | 12 | 5.5% |
| WI | $1,051.20 | 29,228 | 12 | $972.62 | 28,637 | 12 | -7.5% |
| AL | $978.26 | 20,453 | 12 | $972.87 | 20,989 | 12 | -0.6% |
| CT | $953.12 | 17,134 | 12 | $905.26 | 16,473 | 12 | -5.0% |
| WA | $945.54 | 21,015 | 12 | $885.64 | 20,957 | 12 | -6.3% |
| MS | $941.88 | 7,280 | 8 | $1,406.04 | 10,837 | 12 | 49.3% |
| OK | $862.19 | 21,922 | 12 | $891.93 | 20,906 | 12 | 3.5% |
| WV | $815.15 | 8,908 | 11 | $865.36 | 9,557 | 12 | 6.2% |
| CO | $762.92 | 16,328 | 11 | $1,090.13 | 16,545 | 12 | 42.9% |
| TX | $725.44 | 38,942 | 12 | $711.04 | 27,663 | 12 | -2.0% |
| NV | $497.00 | 3,502 | 12 | $420.03 | 3,332 | 12 | -15.5% |
| MN | $392.41 | 12,526 | 11 | $403.22 | 16,277 | 12 | 2.8% |
| MD | $316.19 | 18,579 | 12 | $453.99 | 24,933 | 12 | 43.6% |
| SC | $288.23 | 16,641 | 12 | $400.65 | 2,979 | 12 | 39.0% |
| NE | $275.65 | 6,645 | 12 | $258.15 | 6,626 | 12 | -6.3% |
| IA | $260.53 | 4,527 | 6 | $523.38 | 9,021 | 12 | 100.9% |
| UT | $250.17 | 9,008 | 11 | $289.34 | 10,098 | 12 | 15.7% |
| OR | $233.98 | 5,387 | 12 | $220.14 | 5,363 | 12 | -5.9% |
| KS | $175.49 | 7,968 | 10 | $211.33 | 9,365 | 12 | 20.4% |
| RI | $173.77 | 2,783 | 12 | $165.26 | 2,822 | 12 | -4.9% |
| WY | $171.61 | 2,739 | 12 | $174.61 | 2,890 | 12 | 1.7% |
| SD | $166.76 | 3,418 | 12 | $173.16 | 3,716 | 12 | 3.8% |
| ME | $158.85 | 2,993 | 12 | $154.59 | 3,036 | 12 | -2.7% |
| MT | $127.53 | 2,646 | 12 | $126.37 | 2,908 | 12 | -0.9% |
| TN | $127.51 | 5,409 | 6 | $0.17 | 6,941 | 12 | -99.9% |
| DE | $112.25 | 2,921 | 12 | $185.19 | 4,207 | 12 | 65.0% |
| HI | $112.13 | 4,862 | 11 | $55.66 | 3,997 | 12 | -50.4% |
| ND | $110.56 | 1,339 | 8 | $106.77 | 1,342 | 12 | -3.4% |
| ID | $41.80 | 999 | 12 | $38.19 | 1,029 | 12 | -8.6% |
| NH | $29.54 | 775 | 11 | $56.26 | 1,403 | 12 | 90.4% |
| VT | $25.99 | 808 | 12 | $35.15 | 1,270 | 12 | 35.2% |
| NM | $25.56 | 1,043 | 11 | $27.56 | 1,089 | 12 | 7.8% |
| AK | $19.04 | 1,025 | 12 | $17.87 | 926 | 12 | -6.1% |
| DC | $18.25 | 363 | 12 | $23.46 | 466 | 12 | 28.5% |
| AZ | $0.00 | 0 | 0 | $41.36 | 4,691 | 12 | - |
| Total | $61,928.72 | 1,359,563 | - | $62,935.84 | 1,376,153 | - | 1.6% |

**Table 12B: Comparison of CMS State Drug Utilization and SMRF Claims Data: 1996-1998**

| State | State Drug Utilization Data | | | SMRF Data | | | |
| | Paid (in $1000) | Scripts | # Quarters | Paid (in $1000) | Claims | # Quarters | % Paid Diff |
|---|---|---|---|---|---|---|---|
| FL | $7,240.46 | 107,044 | 12 | $7,432.02 | 110,743 | 12 | 2.6% |
| IL | $6,316.94 | 163,101 | 12 | | | | |
| CA | $3,961.35 | 121,906 | 12 | $2,657.78 | 84,252 | 8 | -32.9% |
| NY | $3,285.97 | 35,997 | 12 | | | | |
| KY | $2,880.53 | 43,997 | 12 | $2,762.16 | 41,990 | 12 | -4.1% |
| NJ | $2,877.07 | 41,878 | 12 | $3,024.58 | 42,869 | 12 | 5.1% |
| MO | $2,291.49 | 42,727 | 12 | $2,413.80 | 44,893 | 12 | 5.3% |
| MI | $2,191.23 | 42,131 | 12 | $2,215.45 | 41,273 | 12 | 1.1% |
| IN | $1,664.95 | 17,958 | 4 | $6,737.56 | 64,141 | 12 | 304.7% |
| OH | $1,629.47 | 76,950 | 10 | | | | |
| LA | $1,463.03 | 28,976 | 12 | | | | |
| GA | $1,144.23 | 11,328 | 12 | $1,275.76 | 12,653 | 12 | 11.5% |
| PA | $1,074.61 | 14,739 | 12 | $1,118.56 | 15,164 | 12 | 4.1% |
| AR | $1,072.77 | 12,472 | 11 | $1,121.55 | 13,466 | 12 | 4.5% |
| NC | $1,019.93 | 12,663 | 10 | | | | |
| WA | $981.13 | 22,405 | 12 | $962.71 | 21,723 | 12 | -1.9% |
| SC | $899.35 | 1,972 | 12 | | | | |
| WI | $818.20 | 22,542 | 12 | $858.95 | 23,101 | 12 | 5.0% |
| TX | $781.44 | 19,629 | 12 | | | | |
| AL | $780.57 | 11,629 | 12 | | | | |
| VA | $778.57 | 20,532 | 12 | | | | |
| CT | $761.21 | 10,824 | 12 | | | | |
| MS | $708.88 | 6,414 | 12 | $903.70 | 8,554 | 12 | 27.5% |
| CO | $658.38 | 10,184 | 9 | $844.34 | 13,299 | 12 | 28.2% |
| MD | $630.25 | 22,910 | 12 | | | | |
| OK | $597.36 | 14,978 | 12 | | | | |
| MA | $537.91 | 11,424 | 12 | | | | |
| WV | $372.45 | 5,333 | 12 | | | | |
| UT | $363.11 | 8,654 | 12 | $366.34 | 8,584 | 12 | 0.9% |
| MN | $348.97 | 13,319 | 12 | $377.00 | 12,749 | 12 | 8.0% |
| OR | $256.16 | 5,585 | 12 | | | | |
| KS | $245.35 | 7,404 | 10 | $302.70 | 8,732 | 12 | 23.4% |
| NE | $222.85 | 7,757 | 11 | | | | |
| NV | $197.58 | 1,343 | 9 | | | | |
| RI | $191.31 | 2,703 | 11 | | | | |
| HI | $158.52 | 3,793 | 12 | | | | |
| SD | $152.06 | 3,760 | 12 | | | | |
| MT | $145.56 | 2,674 | 12 | $148.16 | 2,495 | 12 | 1.8% |
| IA | $143.68 | 7,410 | 11 | $363.06 | 7,947 | 12 | 152.7% |
| ME | $107.37 | 1,808 | 12 | $104.60 | 1,706 | 12 | -2.6% |
| DE | $72.36 | 1,131 | 11 | $76.98 | 1,257 | 12 | 6.4% |
| WY | $70.49 | 1,532 | 12 | $117.95 | 1,553 | 12 | 67.3% |
| ND | $63.46 | 1,141 | 12 | $68.17 | 1,164 | 12 | 7.4% |
| NM | $28.30 | 597 | 12 | $27.28 | 590 | 12 | -3.6% |
| ID | $23.52 | 150 | 10 | $27.04 | 180 | 12 | 14.9% |
| AK | $23.20 | 809 | 12 | $23.41 | 806 | 12 | 0.9% |
| NH | $21.38 | 876 | 9 | $22.14 | 1,163 | 12 | 3.5% |
| DC | $15.69 | 397 | 11 | | | | |
| VT | $13.58 | 188 | 11 | $20.64 | 309 | 12 | 52.0% |
| Total-Partial | $31,235.62 | 565,418 | - | $36,374.37 | 587,356 | - | 16.5% |
| Total-All | $52,284.25 | 1,027,674 | - | - | - | - | - |

**Table 12C: Comparison of CMS State Drug Utilization and SMRF Claims Data: 1991-1995**

| State | State Drug Utilization Data | | | SMRF Data | | | |
|---|---|---|---|---|---|---|---|
| | Paid (in $1000) | Scripts | # Quarters | Paid (in $1000) | Claims | # Quarters | % Paid Diff |
| NJ | $4,255.06 | 57,345 | 20 | $3,249.11 | 42,780 | 16 | -23.6% |
| IL | $4,058.98 | 174,219 | 17 | | | | |
| FL | $3,770.69 | 95,771 | 19 | $2,560.08 | 58,686 | 8 | -32.1% |
| IN | $1,795.14 | 44,419 | 18 | $2,049.26 | 44,766 | 16 | 14.2% |
| MO | $1,690.57 | 36,137 | 19 | $1,759.96 | 37,910 | 16 | 4.1% |
| CA | $1,656.31 | 62,981 | 20 | $1,429.15 | 42,869 | 12 | -13.7% |
| KY | $1,504.35 | 35,224 | 20 | $1,465.80 | 32,519 | 16 | -2.6% |
| OH | $1,225.97 | 64,812 | 19 | | | | |
| NY | $1,137.30 | 21,734 | 18 | | | | |
| MD | $789.16 | 24,488 | 20 | | | | |
| WI | $704.97 | 20,484 | 20 | $627.33 | 18,298 | 16 | -11.0% |
| MI | $679.74 | 25,631 | 19 | $677.22 | 18,152 | 8 | -0.4% |
| LA | $631.91 | 14,194 | 19 | | | | |
| SC | $604.16 | 1,345 | 20 | | | | |
| TX | $603.57 | 15,285 | 20 | | | | |
| VA | $600.85 | 20,275 | 20 | | | | |
| WA | $583.32 | 14,227 | 18 | $556.66 | 13,837 | 16 | -4.6% |
| PA | $563.75 | 7,302 | 20 | $554.60 | 7,472 | 16 | -1.6% |
| OR | $537.74 | 14,261 | 20 | | | | |
| NC | $523.93 | 5,836 | 20 | | | | |
| GA | $487.28 | 5,647 | 20 | $493.93 | 6,092 | 12 | 1.4% |
| AR | $465.85 | 7,349 | 20 | $489.14 | 7,228 | 16 | 5.0% |
| MN | $455.88 | 17,270 | 20 | $270.13 | 8,613 | 12 | -40.7% |
| AL | $379.65 | 6,830 | 20 | $411.92 | 7,700 | 18 | 8.5% |
| CO | $372.81 | 7,609 | 16 | $325.43 | 5,793 | 8 | -12.7% |
| UT | $273.51 | 8,737 | 18 | $234.27 | 8,452 | 16 | -14.3% |
| NE | $261.87 | 5,727 | 17 | | | | |
| CT | $257.79 | 6,529 | 20 | | | | |
| MS | $241.73 | 4,306 | 18 | $245.39 | 3,921 | 12 | 1.5% |
| IA | $197.39 | 6,221 | 18 | $168.28 | 5,954 | 16 | -14.8% |
| KS | $193.76 | 5,889 | 16 | $274.93 | 7,819 | 16 | 41.9% |
| OK | $159.04 | 5,066 | 20 | | | | |
| NV | $129.87 | 1,258 | 20 | | | | |
| SD | $117.71 | 4,056 | 20 | | | | |
| TN | $116.41 | 918 | 12 | | | | |
| WV | $95.55 | 2,176 | 19 | | | | |
| MA | $76.38 | 2,528 | 19 | | | | |
| DE | $59.18 | 1,224 | 19 | $42.85 | 919 | 12 | -27.6% |
| HI | $56.96 | 3,053 | 18 | $17.09 | 1,312 | 9 | -70.0% |
| MT | $54.00 | 1,969 | 20 | $46.54 | 1,804 | 16 | -13.8% |
| RI | $50.21 | 922 | 16 | $55.42 | 738 | 4 | 10.4% |
| ID | $38.05 | 85 | 13 | | | | |
| ND | $36.03 | 1,091 | 20 | $32.47 | 967 | 16 | -9.9% |
| ME | $34.18 | 747 | 20 | $101.17 | 675 | 16 | 196.0% |
| NH | $33.46 | 1,082 | 20 | $33.81 | 1,045 | 16 | 1.0% |
| AK | $19.06 | 745 | 20 | $18.56 | 729 | 16 | -2.7% |
| WY | $13.85 | 624 | 18 | $68.69 | 834 | 16 | 396.1% |
| VT | $11.67 | 437 | 19 | $8.29 | 247 | 16 | -29.0% |
| DC | $9.95 | 597 | 20 | | | | |
| NM | $7.92 | 453 | 16 | | | | |
| Partial-Total | $20,640.33 | 481,273 | | $18,267.45 | 388,131 | - | -11.5% |
| Total | $32,624.44 | 867,115 | - | | | | |

**Table 13A: Breakdown of Illinois Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
| --- | --- | --- | --- | --- | --- | --- |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 79,726 | $430,761 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,539 | $16,038 | 1991 | 2 | 11,138 | $147,748 |
| 74433201 | 3,757 | $342,674 | 1991 | 3 | 10,375 | $120,166 |
| 74488710 | 18,860 | $199,309 | 1991 | 4 | 9,164 | $129,952 |
| 74488720 | 3,614 | $42,505 | 1992 | 1 | 9,636 | $145,466 |
| 74488750 | 3,791 | $30,813 | 1992 | 2 | 9,410 | $151,165 |
| 74488810 | 21,730 | $362,477 | 1992 | 3 | 9,791 | $168,957 |
| 74488820 | 4,280 | $95,067 | 1992 | 4 | 10,106 | $197,484 |
| 74613802 | 135,146 | $2,342,979 | 1993 | 1 | 12,651 | $298,538 |
| 74613803 | 50,875 | $629,083 | 1993 | 2 | 13,056 | $307,918 |
| 74613822 | 32,934 | $545,838 | 1993 | 3 | 14,342 | $355,775 |
| 74613902 | 512 | $18,318 | 1993 | 4 | 10,501 | $322,476 |
| 74613903 | 431 | $16,917 | 1994 | 1 | 9,759 | $292,113 |
| 74613922 | 93 | $13,034 | 1994 | 2 | 9,220 | $272,849 |
| 74650901 | 4,920 | $1,383,826 | 1994 | 3 | 8,669 | $263,141 |
| 74653301 | 27,692 | $4,186,597 | 1994 | 4 | 8,823 | $293,907 |
| 74653401 | 413 | $17,899 | 1995 | 1 | 9,811 | $326,904 |
| 74653501 | 4,343 | $254,654 | 1995 | 2 | 10,065 | $350,192 |
| 74710013 | 418 | $29,217 | 1995 | 3 | 9,731 | $324,270 |
| 74710023 | 1,073 | $89,465 | 1995 | 4 | 10,431 | $381,397 |
| 74710102 | 3,126 | $111,724 | 1996 | 1 | 10,846 | $392,798 |
| 74710113 | 7,995 | $316,687 | 1996 | 2 | 11,151 | $458,808 |
| 74710123 | 8,296 | $782,167 | 1996 | 3 | 12,919 | $513,288 |
| 74712007 | 7,780 | $561,971 | 1996 | 4 | 12,760 | $511,253 |
| 74713809 | 28,747 | $848,189 | 1997 | 1 | 12,796 | $480,631 |
| 74713909 | 7,433 | $256,177 | 1997 | 2 | 13,199 | $526,359 |
| 74790209 | 1,209 | $59,432 | 1997 | 3 | 13,352 | $526,154 |
| 74792202 | 3,235 | $114,597 | 1997 | 4 | 13,408 | $526,291 |
| 74792203 | 1,023 | $36,161 | 1998 | 1 | 13,732 | $547,575 |
| 74792209 | 3,270 | $98,727 | 1998 | 2 | 13,673 | $558,440 |
| 74792336 | 2,328 | $84,577 | 1998 | 3 | 18,112 | $682,827 |
| 74792337 | 4,634 | $205,537 | 1998 | 4 | 18,478 | $702,324 |
| 74792409 | 908 | $33,517 | 1999 | 1 | 16,025 | $651,443 |
| 74792609 | 13,096 | $530,409 | 1999 | 2 | 15,946 | $694,784 |
| 74794109 | 1,968 | $78,066 | 1999 | 3 | 15,362 | $694,007 |
| 74797205 | 1,008 | $30,994 | 1999 | 4 | 14,442 | $646,554 |
| 74797305 | 546 | $6,771 | 2000 | 1 | 14,782 | $698,474 |
| 74798302 | 9,345 | $292,364 | 2000 | 2 | 15,115 | $474,921 |
| 74798303 | 2,437 | $65,477 | 2000 | 3 | 13,330 | $290,705 |
| 74798309 | 12,743 | $364,546 | 2000 | 4 | 14,219 | $311,912 |
| 74798436 | 4,028 | $183,839 | 2001 | 1 | 14,325 | $285,880 |
| 74798437 | 7,137 | $342,753 | 2001 | 2 | 13,358 | $202,601 |
| 74798509 | 2,022 | $73,793 | 2001 | 3 | 13,363 | $175,693 |
| 74799009 | 4,032 | $63,500 | 2001 | 4 | 14,121 | $185,308 |
| Total | 535,493 | $16,589,445 | Total | | 535,493 | $16,589,445 |

**Table 13B: The Impact of Alternative Price Statistics on Medicaid Spending in Illinois**

| Price Statistic Used | # w/DIFF > 0 | % w/DIFF > 0 | Aggregate DIFF | # Pharm. Payments |
|---|---|---|---|---|
| Average Pharmacy | 521,338 | 97.60% | $12,528,320 | 58,891 |
| Average All Customer | 521,918 | 97.70% | $12,781,370 | 58,994 |
| Average Pharmacy Unweighted | 520,839 | 97.50% | $12,434,203 | 58,845 |
| 95th Percentile Pharmacy Price | 519,198 | 97.19% | $11,933,859 | 58,638 |
| 1.25 * Average Pharmacy | 519,450 | 97.24% | $12,029,039 | 58,631 |

**Table 14A: Breakdown of Florida Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 68,253 | $970,751 | 1991 | 1 | 1 | $11 |
| 74397703 | 7,738 | $54,562 | 1991 | 2 | 1 | $13 |
| 74433201 | 2,420 | $408,281 | 1991 | 3 | 0 | $0 |
| 74488710 | 13,524 | $164,386 | 1991 | 4 | 2 | $94 |
| 74488720 | 5,200 | $102,732 | 1992 | 1 | 3 | $96 |
| 74488750 | 2,260 | $24,552 | 1992 | 2 | 4 | $138 |
| 74488810 | 4,580 | $130,051 | 1992 | 3 | 5 | $134 |
| 74488820 | 3,252 | $70,290 | 1992 | 4 | 41 | $851 |
| 74613802 | 56,430 | $2,158,183 | 1993 | 1 | 183 | $5,604 |
| 74613803 | 8,081 | $227,864 | 1993 | 2 | 387 | $17,478 |
| 74613822 | 153 | $5,366 | 1993 | 3 | 961 | $47,502 |
| 74613902 | 1,025 | $54,745 | 1993 | 4 | 6,148 | $255,153 |
| 74613903 | 893 | $79,232 | 1994 | 1 | 7,219 | $285,736 |
| 74613922 | 61 | $2,130 | 1994 | 2 | 7,649 | $313,422 |
| 74650901 | 3,310 | $560,850 | 1994 | 3 | 7,881 | $317,176 |
| 74653301 | 15,712 | $3,120,851 | 1994 | 4 | 7,237 | $315,478 |
| 74653401 | 329 | $28,862 | 1995 | 1 | 7,125 | $323,508 |
| 74653501 | 1,953 | $232,486 | 1995 | 2 | 7,117 | $318,124 |
| 74710013 | 1,024 | $142,757 | 1995 | 3 | 7,349 | $342,809 |
| 74710023 | 1,819 | $143,363 | 1995 | 4 | 7,681 | $378,283 |
| 74710102 | 1,578 | $114,060 | 1996 | 1 | 7,994 | $398,554 |
| 74710113 | 1,025 | $115,255 | 1996 | 2 | 8,983 | $461,071 |
| 74710123 | 4,500 | $645,821 | 1996 | 3 | 9,438 | $568,627 |
| 74712007 | 9 | $627 | 1996 | 4 | 8,940 | $592,667 |
| 74713809 | 13,997 | $635,819 | 1997 | 1 | 8,284 | $594,485 |
| 74713909 | 8,648 | $1,872,961 | 1997 | 2 | 8,666 | $661,227 |
| 74790209 | 1,306 | $129,139 | 1997 | 3 | 8,920 | $709,839 |
| 74792202 | 4,949 | $210,763 | 1997 | 4 | 9,483 | $788,968 |
| 74792203 | 1,637 | $67,356 | 1998 | 1 | 9,264 | $694,939 |
| 74792209 | 1,944 | $85,112 | 1998 | 2 | 9,572 | $714,971 |
| 74792336 | 1,256 | $85,285 | 1998 | 3 | 10,744 | $682,912 |
| 74792337 | 6,226 | $300,033 | 1998 | 4 | 11,529 | $672,349 |
| 74792409 | 292 | $18,216 | 1999 | 1 | 8,877 | $525,601 |
| 74792609 | 8,181 | $497,363 | 1999 | 2 | 8,240 | $490,093 |
| 74794109 | 1,391 | $82,875 | 1999 | 3 | 7,316 | $511,900 |
| 74797205 | 942 | $22,655 | 1999 | 4 | 8,175 | $628,026 |
| 74797305 | 52 | $1,988 | 2000 | 1 | 9,359 | $629,261 |
| 74798302 | 9,528 | $451,196 | 2000 | 2 | 8,860 | $491,719 |
| 74798303 | 4,587 | $218,481 | 2000 | 3 | 10,411 | $434,982 |
| 74798309 | 6,634 | $221,799 | 2000 | 4 | 10,693 | $419,219 |
| 74798436 | 2,393 | $230,863 | 2001 | 1 | 10,832 | $406,467 |
| 74798437 | 8,490 | $835,329 | 2001 | 2 | 9,836 | $256,425 |
| 74798509 | 2,556 | $112,184 | 2001 | 3 | 9,908 | $204,734 |
| 74799009 | 1,438 | $27,680 | 2001 | 4 | 10,258 | $204,509 |
| Total | 291,576 | $15,665,151 | Total | | 291,576 | $15,665,151 |

Includes Florida Medicaid claims with one of the 44 complaint NDCs and with a service date between January 1, 1991 and December 31, 2001 inclusive.

**Table 14B: Florida SDUD Medicaid Spending by NDC and Year-Quarter through 1993Q3**

*Breakdown by National Drug Code*          *Breakdown by Service Year and Quarter*

| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
|---|---|---|---|---|---|---|
| 74196607 | 3,735 | $59,612 | 1991 | 1 | 1,337 | $38,945 |
| 74397703 | 775 | $4,941 | 1991 | 2 | 2,280 | $69,328 |
| 74433201 | 189 | $41,015 | 1991 | 3 | 2,645 | $80,938 |
| 74488710 | 2,605 | $35,569 | 1991 | 4 | 3,026 | $95,855 |
| 74488720 | 415 | $7,023 | 1992 | 1 | 3,675 | $110,461 |
| 74488750 | 162 | $1,200 | 1992 | 2 | 3,572 | $113,078 |
| 74488810 | 638 | $12,338 | 1992 | 3 | 3,866 | $138,960 |
| 74488820 | 297 | $10,160 | 1992 | 4 | 3,538 | $139,658 |
| 74613802 | 16,339 | $573,636 | 1993 | 1 | 4,811 | $164,453 |
| 74613803 | 4,990 | $99,939 | 1993 | 2 | 5,822 | $214,937 |
| 74613822 | 0 | $0 | 1993 | 3 | 5,290 | $212,706 |
| 74613902 | 122 | $3,475 | | | | |
| 74613903 | 538 | $47,097 | | | | |
| 74613922 | 0 | $0 | | | | |
| 74650901 | 18 | $4,138 | | | | |
| 74653301 | 297 | $118,239 | | | | |
| 74653401 | 0 | $0 | | | | |
| 74653501 | 0 | $0 | | | | |
| 74710013 | 21 | $1,994 | | | | |
| 74710023 | 24 | $3,139 | | | | |
| 74710102 | 667 | $13,615 | | | | |
| 74710113 | 97 | $11,649 | | | | |
| 74710123 | 251 | $34,876 | | | | |
| 74712007 | 0 | $0 | | | | |
| 74713809 | 4,558 | $93,869 | | | | |
| 74713909 | 759 | $104,605 | | | | |
| 74790209 | 37 | $3,280 | | | | |
| 74792202 | 218 | $9,325 | | | | |
| 74792203 | 202 | $4,251 | | | | |
| 74792209 | 122 | $3,389 | | | | |
| 74792336 | 0 | $0 | | | | |
| 74792337 | 0 | $0 | | | | |
| 74792409 | 34 | $918 | | | | |
| 74792609 | 229 | $10,729 | | | | |
| 74794109 | 34 | $2,019 | | | | |
| 74797205 | 276 | $3,742 | | | | |
| 74797305 | 1 | $18 | | | | |
| 74798302 | 558 | $24,665 | | | | |
| 74798303 | 312 | $13,621 | | | | |
| 74798309 | 232 | $7,333 | | | | |
| 74798436 | 14 | $4,436 | | | | |
| 74798437 | 38 | $7,072 | | | | |
| 74798509 | 47 | $2,214 | | | | |
| 74799009 | 11 | $178 | | | | |
| Total | 39,862 | $1,379,319 | | Total | 39,862 | $1,379,319 |

**Table 15A: Breakdown of California Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 152,833 | $2,061,844 | 1991 | 1 | 0 | $0 |
| 74397703 | 10,271 | $76,968 | 1991 | 2 | 0 | $0 |
| 74433201 | 719 | $118,099 | 1991 | 3 | 0 | $0 |
| 74488710 | 15,387 | $192,451 | 1991 | 4 | 0 | $0 |
| 74488720 | 298 | $4,827 | 1992 | 1 | 0 | $0 |
| 74488750 | 766 | $7,173 | 1992 | 2 | 0 | $0 |
| 74488810 | 34,116 | $1,198,612 | 1992 | 3 | 0 | $0 |
| 74488820 | 478 | $9,785 | 1992 | 4 | 0 | $0 |
| 74613802 | 14,166 | $1,222,712 | 1993 | 1 | 0 | $0 |
| 74613803 | 4,968 | $151,491 | 1993 | 2 | 1 | $32 |
| 74613822 | 499 | $19,844 | 1993 | 3 | 3 | $135 |
| 74613902 | 23 | $2,327 | 1993 | 4 | 21 | $1,162 |
| 74613903 | 18 | $246 | 1994 | 1 | 840 | $24,225 |
| 74613922 | 6 | $788 | 1994 | 2 | 5,112 | $166,019 |
| 74650901 | 242 | $59,204 | 1994 | 3 | 5,425 | $170,983 |
| 74653301 | 4,163 | $949,830 | 1994 | 4 | 5,370 | $178,631 |
| 74653401 | 99 | $20,384 | 1995 | 1 | 5,496 | $181,510 |
| 74653501 | 705 | $88,932 | 1995 | 2 | 6,215 | $214,223 |
| 74710013 | 779 | $78,838 | 1995 | 3 | 6,917 | $228,539 |
| 74710023 | 136 | $11,647 | 1995 | 4 | 7,225 | $253,934 |
| 74710102 | 246 | $17,591 | 1996 | 1 | 8,138 | $244,400 |
| 74710113 | 1,924 | $221,895 | 1996 | 2 | 8,606 | $263,652 |
| 74710123 | 895 | $136,707 | 1996 | 3 | 9,112 | $282,929 |
| 74712007 | 14 | $856 | 1996 | 4 | 10,390 | $315,292 |
| 74713809 | 21,649 | $947,419 | 1997 | 1 | 10,364 | $318,936 |
| 74713909 | 456 | $46,483 | 1997 | 2 | 10,280 | $330,893 |
| 74790209 | 2,434 | $168,999 | 1997 | 3 | 10,732 | $341,521 |
| 74792202 | 663 | $34,161 | 1997 | 4 | 11,579 | $346,852 |
| 74792203 | 377 | $20,266 | 1998 | 1 | 11,779 | $357,745 |
| 74792209 | 1,687 | $69,943 | 1998 | 2 | 11,120 | $342,932 |
| 74792336 | 665 | $38,155 | 1998 | 3 | 10,641 | $316,459 |
| 74792337 | 1,417 | $121,394 | 1998 | 4 | 11,186 | $326,576 |
| 74792409 | 586 | $29,330 | 1999 | 1 | 11,015 | $321,507 |
| 74792609 | 7,609 | $378,402 | 1999 | 2 | 11,110 | $362,903 |
| 74794109 | 1,662 | $93,371 | 1999 | 3 | 10,767 | $386,159 |
| 74797205 | 2,274 | $117,248 | 1999 | 4 | 10,881 | $391,117 |
| 74797305 | 23 | $1,429 | 2000 | 1 | 10,879 | $442,063 |
| 74798302 | 1,976 | $80,479 | 2000 | 2 | 10,907 | $452,581 |
| 74798303 | 1,652 | $60,386 | 2000 | 3 | 11,576 | $462,966 |
| 74798309 | 3,637 | $128,988 | 2000 | 4 | 11,940 | $415,863 |
| 74798436 | 972 | $76,949 | 2001 | 1 | 12,015 | $409,639 |
| 74798437 | 1,024 | $70,591 | 2001 | 2 | 11,516 | $205,214 |
| 74798509 | 1,607 | $65,943 | 2001 | 3 | 9,795 | $89,013 |
| 74799009 | 72 | $1,471 | 2001 | 4 | 7,240 | $57,849 |
| Total | 296,193 | $9,204,455 | Total | | 296,193 | $9,204,455 |

Includes California Medicaid claims with one of the 44 complaint NDCs and with a service date between January 1, 1991 and December 31, 2001 inclusive.

**Table 15B: California SDUD Medicaid Spending by NDC and Year-Quarter through 1994Q1**

*Breakdown by National Drug Code*          *Breakdown by Service Year and Quarter*

| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
|-----|-------------|-------------|------|---------|-------------|-------------|
| 74196607 | 10,729 | $181,820 | 1991 | 1 | 1,697 | $31,326 |
| 74397703 | 1,061 | $9,877 | 1991 | 2 | 1887 | 40284.1 |
| 74433201 | 63 | $9,083 | 1991 | 3 | 2,360 | $48,266 |
| 74488710 | 700 | $10,652 | 1991 | 4 | 897 | $17,987 |
| 74488810 | 3,642 | $95,075 | 1992 | 1 | 1,308 | $26,520 |
| 74613802 | 4,827 | $127,516 | 1992 | 2 | 1,606 | $49,405 |
| 74613803 | 2,487 | $66,672 | 1992 | 3 | 2,361 | $70,109 |
| 74650901 | 5 | $2,972 | 1992 | 4 | 2,640 | $63,289 |
| 74653401 | 14 | $2,767 | 1993 | 1 | 3,163 | $68,091 |
| 74653501 | 18 | $6,392 | 1993 | 2 | 3,478 | $86,751 |
| 74712007 | 20 | $625 | 1993 | 3 | 2,511 | $60,071 |
| 74713809 | 7,531 | $182,133 | 1993 | 4 | 3,583 | $67,519 |
| 74792336 | 93 | $4,189 | 1994 | 1 | 3,910 | $82,132 |
| 74798437 | 211 | $11,978 | | | | |
| Total | 31,401 | $711,750 | Total | | 31,401 | $711,750 |

**Table 16A: Breakdown of New Jersey Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | | *Breakdown by Year and Quarter* | | |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| --- | --- | --- | --- | --- | --- | --- |
| 74196607 | 10,397 | $103,802 | 1991 | 1 | 65 | $3,031 |
| 74397703 | 3,043 | $7,702 | 1991 | 2 | 119 | $5,800 |
| 74433201 | 555 | $58,477 | 1991 | 3 | 135 | $7,097 |
| 74488710 | 2,331 | $18,274 | 1991 | 4 | 1,699 | $132,293 |
| 74488720 | 1,067 | $8,024 | 1992 | 1 | 4,032 | $322,746 |
| 74488750 | 60 | $433 | 1992 | 2 | 3,182 | $251,956 |
| 74488810 | 2,340 | $25,356 | 1992 | 3 | 2,744 | $228,448 |
| 74488820 | 432 | $5,514 | 1992 | 4 | 2,856 | $235,026 |
| 74613802 | 32,302 | $2,748,255 | 1993 | 1 | 3,022 | $252,028 |
| 74613803 | 2,914 | $202,632 | 1993 | 2 | 3,138 | $270,353 |
| 74613822 | 7,168 | $235,097 | 1993 | 3 | 2,845 | $244,784 |
| 74613902 | 6,959 | $1,073,690 | 1993 | 4 | 2,376 | $185,608 |
| 74613903 | 72 | $2,281 | 1994 | 1 | 2,365 | $163,425 |
| 74613922 | 1,302 | $135,779 | 1994 | 2 | 2,333 | $162,856 |
| 74650901 | 188 | $85,507 | 1994 | 3 | 2,106 | $154,500 |
| 74653301 | 3,903 | $845,701 | 1994 | 4 | 2,268 | $163,078 |
| 74653401 | 55 | $3,762 | 1995 | 1 | 2,069 | $130,344 |
| 74653501 | 288 | $64,466 | 1995 | 2 | 2,032 | $123,240 |
| 74710013 | 461 | $29,844 | 1995 | 3 | 2,036 | $120,747 |
| 74710023 | 430 | $56,212 | 1995 | 4 | 2,969 | $167,893 |
| 74710102 | 122 | $22,261 | 1996 | 1 | 3,796 | $205,046 |
| 74710113 | 188 | $22,979 | 1996 | 2 | 3,384 | $212,427 |
| 74710123 | 586 | $98,661 | 1996 | 3 | 3,698 | $218,876 |
| 74712007 | 84 | $6,066 | 1996 | 4 | 4,371 | $257,396 |
| 74713809 | 12,930 | $615,859 | 1997 | 1 | 4,731 | $286,569 |
| 74713909 | 4,494 | $464,417 | 1997 | 2 | 4,542 | $304,257 |
| 74790209 | 1,100 | $65,999 | 1997 | 3 | 3,860 | $271,896 |
| 74792202 | 3,059 | $106,078 | 1997 | 4 | 2,842 | $204,091 |
| 74792203 | 314 | $11,533 | 1998 | 1 | 2,726 | $181,221 |
| 74792209 | 1,651 | $61,448 | 1998 | 2 | 3,208 | $244,650 |
| 74792336 | 2,807 | $129,408 | 1998 | 3 | 2,942 | $260,396 |
| 74792337 | 3,850 | $194,676 | 1998 | 4 | 3,125 | $289,941 |
| 74792409 | 360 | $11,862 | 1999 | 1 | 3,196 | $248,824 |
| 74792609 | 5,308 | $222,371 | 1999 | 2 | 3,537 | $258,436 |
| 74794109 | 819 | $30,318 | 1999 | 3 | 3,489 | $275,045 |
| 74797205 | 439 | $13,643 | 1999 | 4 | 3,010 | $232,774 |
| 74797305 | 3,036 | $322,739 | 2000 | 1 | 3,463 | $244,646 |
| 74798302 | 1,486 | $67,761 | 2000 | 2 | 3,713 | $204,933 |
| 74798303 | 342 | $11,132 | 2000 | 3 | 4,004 | $182,201 |
| 74798309 | 1,836 | $62,548 | 2000 | 4 | 3,733 | $244,469 |
| 74798436 | 1,233 | $64,444 | 2001 | 1 | 4,042 | $299,654 |
| 74798437 | 3,775 | $201,590 | 2001 | 2 | 3,492 | $90,333 |
| 74798509 | 2,924 | $100,191 | 2001 | 3 | 3,110 | $42,374 |
| 74799009 | 272 | $10,127 | 2001 | 4 | 2,877 | $43,205 |
| Total | 129,282 | $8,628,913 | | Total | 129,282 | $8,628,913 |

**Table 16B: New Jersey SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 1 | $3 | 1991 | 1 | 4038 | $228,439 |
| 74397703 | 10 | $113 | 1991 | 2 | 3,164 | $230,217 |
| 74433201 | 2 | $50 | 1991 | 3 | 3,837 | $274,835 |
| 74488710 | 67 | $410 | 1991 | 4 | 2,769 | $182,270 |
| 74488720 | 2 | $14 | | | | |
| 74488750 | 2 | $15 | | Total | 13,808 | $915,760 |
| 74488810 | 5 | $188 | | | | |
| 74488820 | 7 | $57 | | | | |
| 74613802 | 7,856 | $529,133 | | | | |
| 74613803 | 88 | $1,934 | | | | |
| 74613902 | 930 | $110,089 | | | | |
| 74710013 | 11 | $1,150 | | | | |
| 74710023 | 20 | $426 | | | | |
| 74710113 | 3 | $129 | | | | |
| 74710123 | 4 | $2 | | | | |
| 74713809 | 2,810 | $148,935 | | | | |
| 74713909 | 245 | $39,851 | | | | |
| 74790209 | 136 | $8,709 | | | | |
| 74792202 | 41 | $2,298 | | | | |
| 74792203 | 44 | $1,110 | | | | |
| 74792209 | 175 | $7,252 | | | | |
| 74792409 | 64 | $1,639 | | | | |
| 74792609 | 823 | $37,791 | | | | |
| 74794109 | 48 | $1,165 | | | | |
| 74797205 | 15 | $748 | | | | |
| 74797305 | 110 | $13,292 | | | | |
| 74798302 | 24 | $2,172 | | | | |
| 74798303 | 35 | $518 | | | | |
| 74798309 | 124 | $3,520 | | | | |
| 74798509 | 106 | $3,048 | | | | |
| Total | 13,808 | $915,760 | | | | |

### Table 17A: Breakdown of New York Medicaid Spending by NDC and by Year-Quarter

| | *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 28,896 | $477,913 | 1991 | 1 | 0 | $0 |
| 74397703 | 1,090 | $12,566 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,415 | $363,148 | 1991 | 3 | 0 | $0 |
| 74488710 | 11,510 | $135,971 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,463 | $48,158 | 1992 | 1 | 0 | $0 |
| 74488750 | 2,178 | $26,595 | 1992 | 2 | 0 | $0 |
| 74488810 | 3,624 | $74,218 | 1992 | 3 | 0 | $0 |
| 74488820 | 738 | $21,152 | 1992 | 4 | 0 | $0 |
| 74613802 | 3,763 | $98,572 | 1993 | 1 | 1,150 | $57,040 |
| 74613803 | 3,934 | $88,204 | 1993 | 2 | 1,329 | $62,971 |
| 74613822 | 547 | $17,688 | 1993 | 3 | 1,277 | $79,015 |
| 74613902 | 182 | $10,990 | 1993 | 4 | 1,430 | $67,666 |
| 74613903 | 138 | $12,069 | 1994 | 1 | 1,639 | $79,421 |
| 74613922 | 8 | $768 | 1994 | 2 | 1,708 | $91,390 |
| 74650901 | 3,018 | $1,016,202 | 1994 | 3 | 1,809 | $99,173 |
| 74653301 | 8,010 | $3,360,631 | 1994 | 4 | 1,991 | $146,183 |
| 74653401 | 123 | $20,017 | 1995 | 1 | 2,025 | $168,631 |
| 74653501 | 1,267 | $270,624 | 1995 | 2 | 1,767 | $107,718 |
| 74710013 | 2 | $45 | 1995 | 3 | 1,847 | $140,309 |
| 74710023 | 1,127 | $121,656 | 1995 | 4 | 1,904 | $158,314 |
| 74710102 | 423 | $25,543 | 1996 | 1 | 2,120 | $155,773 |
| 74710113 | 561 | $126,881 | 1996 | 2 | 2,324 | $183,938 |
| 74710123 | 2,462 | $555,109 | 1996 | 3 | 2,559 | $184,988 |
| 74712007 | 0 | $0 | 1996 | 4 | 2,960 | $201,213 |
| 74713809 | 17,570 | $511,363 | 1997 | 1 | 2,911 | $216,487 |
| 74713909 | 1,473 | $79,293 | 1997 | 2 | 3,045 | $271,665 |
| 74790209 | 0 | $0 | 1997 | 3 | 3,080 | $296,478 |
| 74792202 | 3,008 | $125,148 | 1997 | 4 | 3,335 | $334,942 |
| 74792203 | 163 | $1,609 | 1998 | 1 | 3,420 | $416,436 |
| 74792209 | 364 | $6,459 | 1998 | 2 | 3,600 | $399,364 |
| 74792336 | 961 | $52,335 | 1998 | 3 | 4,064 | $490,179 |
| 74792337 | 3,460 | $226,005 | 1998 | 4 | 4,413 | $501,985 |
| 74792409 | 23 | $1,510 | 1999 | 1 | 4,182 | $410,929 |
| 74792609 | 688 | $34,934 | 1999 | 2 | 4,339 | $466,490 |
| 74794109 | 422 | $18,988 | 1999 | 3 | 4,815 | $595,487 |
| 74797205 | 349 | $4,087 | 1999 | 4 | 5,201 | $598,988 |
| 74797305 | 27 | $466 | 2000 | 1 | 5,328 | $531,920 |
| 74798302 | 3,044 | $192,859 | 2000 | 2 | 5,078 | $493,981 |
| 74798303 | 1,952 | $49,580 | 2000 | 3 | 5,195 | $197,965 |
| 74798309 | 2,347 | $56,768 | 2000 | 4 | 6,467 | $193,995 |
| 74798436 | 2,153 | $176,732 | 2001 | 1 | 7,120 | $202,182 |
| 74798437 | 4,750 | $508,867 | 2001 | 2 | 5,186 | $119,289 |
| 74798509 | 45 | $1,699 | 2001 | 3 | 4,558 | $114,327 |
| 74799009 | 516 | $4,434 | 2001 | 4 | 5,618 | $101,026 |
| Total | 120,794 | $8,937,854 | | Total | 120,794 | $8,937,854 |

**Table 17B: New York SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1992Q4**

| *Breakdown by National Drug Code* | | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 448 | $6,180 | | 1991 | 1 | 530 | $5,307 |
| 74397703 | 84 | $527 | | 1991 | 2 | 646 | $9,823 |
| 74433201 | 82 | $33,989 | | 1991 | 3 | 774 | $17,599 |
| 74488750 | 85 | $411 | | 1991 | 4 | 835 | $25,962 |
| 74488810 | 159 | $3,564 | | 1992 | 1 | 847 | $43,271 |
| 74488820 | 34 | $467 | | 1992 | 2 | 849 | $37,950 |
| 74613802 | 211 | $2,621 | | 1992 | 3 | 69 | $4,406 |
| 74613803 | 1,688 | $41,644 | | 1992 | 4 | 1,243 | $48,580 |
| 74613902 | 10 | $45 | | | | | |
| 74613903 | 22 | $1,393 | | | Total | 5,793 | $192,898 |
| 74653301 | 83 | $54,628 | | | | | |
| 74710113 | 7 | $476 | | | | | |
| 74710123 | 18 | $3,945 | | | | | |
| 74713809 | 2,568 | $33,327 | | | | | |
| 74713909 | 8 | $172 | | | | | |
| 74792202 | 13 | $577 | | | | | |
| 74792409 | 10 | $333 | | | | | |
| 74792609 | 31 | $1,207 | | | | | |
| 74794109 | 4 | $200 | | | | | |
| 74797205 | 28 | $220 | | | | | |
| 74798302 | 68 | $2,472 | | | | | |
| 74798303 | 58 | $1,974 | | | | | |
| 74798309 | 72 | $2,527 | | | | | |
| 74799009 | 2 | $0 | | | | | |
| Total | 5,793 | $192,898 | | | | | |

**Table 18A: Breakdown of Indiana Medicaid Spending by NDC and by Year-Quarter**

| | Breakdown by National Drug Code | | | Breakdown by Year and Quarter | | |
| --- | --- | --- | --- | --- | --- | --- |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 7,556 | $68,451 | 1991 | 1 | 0 | $0 |
| 74397703 | 342 | $1,916 | 1991 | 2 | 0 | $0 |
| 74433201 | 270 | $5,385 | 1991 | 3 | 0 | $0 |
| 74488710 | 1,796 | $12,000 | 1991 | 4 | 0 | $0 |
| 74488720 | 111 | $558 | 1992 | 1 | 0 | $0 |
| 74488750 | 366 | $1,035 | 1992 | 2 | 0 | $0 |
| 74488810 | 1,847 | $32,792 | 1992 | 3 | 0 | $0 |
| 74488820 | 134 | $2,791 | 1992 | 4 | 0 | $0 |
| 74613802 | 877 | $53,490 | 1993 | 1 | 0 | $0 |
| 74613803 | 762 | $15,874 | 1993 | 2 | 0 | $0 |
| 74613822 | 7,355 | $1,330,546 | 1993 | 3 | 0 | $0 |
| 74613902 | 110 | $11,472 | 1993 | 4 | 0 | $0 |
| 74613903 | 1,584 | $15,988 | 1994 | 1 | 0 | $0 |
| 74613922 | 994 | $242,089 | 1994 | 2 | 0 | $0 |
| 74650901 | 582 | $13,981 | 1994 | 3 | 0 | $0 |
| 74653301 | 1,807 | $74,647 | 1994 | 4 | 0 | $0 |
| 74653401 | 23 | $34 | 1995 | 1 | 0 | $0 |
| 74653501 | 315 | $3,034 | 1995 | 2 | 0 | $0 |
| 74710013 | 60 | $428 | 1995 | 3 | 0 | $0 |
| 74710023 | 87 | $102 | 1995 | 4 | 0 | $0 |
| 74710102 | 337 | $1,084 | 1996 | 1 | 0 | $0 |
| 74710113 | 456 | $584 | 1996 | 2 | 0 | $0 |
| 74710123 | 869 | $10,053 | 1996 | 3 | 0 | $0 |
| 74712007 | 142 | $21 | 1996 | 4 | 0 | $0 |
| 74713809 | 1,345 | $56,209 | 1997 | 1 | 0 | $0 |
| 74713909 | 316 | $9,309 | 1997 | 2 | 0 | $0 |
| 74790209 | 328 | $18,347 | 1997 | 3 | 0 | $0 |
| 74792202 | 296 | $1,585 | 1997 | 4 | 0 | $0 |
| 74792203 | 45 | $85 | 1998 | 1 | 186 | $8,744 |
| 74792209 | 265 | $4,837 | 1998 | 2 | 201 | $9,542 |
| 74792336 | 68 | $564 | 1998 | 3 | 343 | $20,861 |
| 74792337 | 79 | $2,048 | 1998 | 4 | 321 | $18,962 |
| 74792409 | 76 | $3,122 | 1999 | 1 | 10 | $558 |
| 74792609 | 1,189 | $18,260 | 1999 | 2 | 5 | $19 |
| 74794109 | 221 | $2,946 | 1999 | 3 | 29 | $477 |
| 74797205 | 101 | $1,870 | 1999 | 4 | 127 | $1,055 |
| 74797305 | 2 | $41 | 2000 | 1 | 419 | $1,875 |
| 74798302 | 827 | $3,007 | 2000 | 2 | 1,258 | $12,231 |
| 74798303 | 347 | $2,472 | 2000 | 3 | 2,437 | $50,714 |
| 74798309 | 1,114 | $10,624 | 2000 | 4 | 8,310 | $682,567 |
| 74798436 | 321 | $5,316 | 2001 | 1 | 8,945 | $845,487 |
| 74798437 | 945 | $2,099 | 2001 | 2 | 6,358 | $317,146 |
| 74798509 | 514 | $10,504 | 2001 | 3 | 4,830 | $45,631 |
| 74799009 | 132 | $1,388 | 2001 | 4 | 3,534 | $37,123 |
| Total | 37,313 | $2,052,992 | Total | | 37,313 | $2,052,992 |

**Table 18B: Indiana SMRF-MAX Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
| --- | --- | --- | --- | --- | --- | --- |
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 28,675 | $322,831 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,583 | $18,578 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,899 | $338,088 | 1991 | 3 | 0 | $0 |
| 74488710 | 7,134 | $73,414 | 1991 | 4 | 0 | $0 |
| 74488720 | 713 | $5,725 | 1992 | 1 | 2,472 | $79,955 |
| 74488750 | 1,567 | $42,583 | 1992 | 2 | 2,235 | $77,631 |
| 74488810 | 6,587 | $156,965 | 1992 | 3 | 2,109 | $70,890 |
| 74488820 | 767 | $19,553 | 1992 | 4 | 2,207 | $83,731 |
| 74613802 | 25,641 | $1,077,579 | 1993 | 1 | 2,537 | $117,962 |
| 74613803 | 3,295 | $79,264 | 1993 | 2 | 2,778 | $122,417 |
| 74613822 | 12,624 | $2,394,077 | 1993 | 3 | 2,372 | $111,877 |
| 74613902 | 14,475 | $3,358,450 | 1993 | 4 | 2,461 | $129,321 |
| 74613903 | 4,021 | $178,740 | 1994 | 1 | 2,952 | $155,270 |
| 74613922 | 1,344 | $338,187 | 1994 | 2 | 3,569 | $182,459 |
| 74650901 | 2,057 | $474,790 | 1994 | 3 | 3,332 | $148,863 |
| 74653301 | 9,267 | $2,306,145 | 1994 | 4 | 3,130 | $120,190 |
| 74653401 | 289 | $25,087 | 1995 | 1 | 3,532 | $160,514 |
| 74653501 | 1,955 | $237,606 | 1995 | 2 | 2,888 | $151,083 |
| 74710013 | 442 | $29,006 | 1995 | 3 | 2,010 | $118,240 |
| 74710023 | 369 | $24,136 | 1995 | 4 | 4,182 | $218,855 |
| 74710102 | 663 | $33,808 | 1996 | 1 | 4,822 | $300,490 |
| 74710113 | 908 | $95,173 | 1996 | 2 | 5,274 | $424,255 |
| 74710123 | 4,102 | $445,834 | 1996 | 3 | 5,510 | $427,218 |
| 74712007 | 98 | $49,118 | 1996 | 4 | 5,811 | $476,645 |
| 74713809 | 14,077 | $397,368 | 1997 | 1 | 4,777 | $474,317 |
| 74713909 | 6,194 | $533,648 | 1997 | 2 | 4,006 | $377,065 |
| 74790209 | 2,206 | $172,187 | 1997 | 3 | 4,763 | $550,518 |
| 74792202 | 812 | $50,153 | 1997 | 4 | 6,461 | $843,614 |
| 74792203 | 174 | $65,520 | 1998 | 1 | 6,116 | $724,119 |
| 74792209 | 2,292 | $100,311 | 1998 | 2 | 5,408 | $667,908 |
| 74792336 | 140 | $7,875 | 1998 | 3 | 6,030 | $781,312 |
| 74792337 | 541 | $52,329 | 1998 | 4 | 5,163 | $690,100 |
| 74792409 | 771 | $42,944 | 1999 | 1 | 6,480 | $596,867 |
| 74792609 | 8,326 | $396,972 | 1999 | 2 | 5,232 | $472,268 |
| 74794109 | 1,161 | $51,135 | 1999 | 3 | 5,157 | $386,299 |
| 74797205 | 481 | $15,965 | 1999 | 4 | 5,530 | $525,997 |
| 74797305 | 10 | $262 | 2000 | 1 | 6,621 | $628,725 |
| 74798302 | 2,404 | $161,214 | 2000 | 2 | 6,648 | $552,477 |
| 74798303 | 943 | $27,445 | 2000 | 3 | 6,230 | $526,456 |
| 74798309 | 4,061 | $147,575 | 2000 | 4 | 7,513 | $750,173 |
| 74798436 | 973 | $77,560 | 2001 | 1 | 8,544 | $935,666 |
| 74798437 | 2,424 | $216,089 | 2001 | 2 | 6,115 | $381,311 |
| 74798509 | 2,771 | $114,360 | 2001 | 3 | 4,895 | $126,474 |
| 74799009 | 606 | $52,656 | 2001 | 4 | 4,970 | $138,773 |
| Total | 182,842 | $14,808,305 | Total | | 182,842 | $14,808,305 |

**Table 18C: Indiana SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1991Q4**

| | *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 454 | $3,956 | | 1991 | 1 | 1,454 | $34,614 |
| 74397703 | 420 | $2,508 | | 1991 | 2 | 2,495 | $66,310 |
| 74433201 | 25 | $11,080 | | 1991 | 3 | 2,067 | $53,468 |
| 74488710 | 352 | $4,000 | | 1991 | 4 | 3,028 | $95,137 |
| 74488720 | 28 | $275 | | | | | |
| 74488750 | 122 | $945 | | | Total | 9,044 | $249,529 |
| 74488810 | 105 | $1,574 | | | | | |
| 74488820 | 25 | $804 | | | | | |
| 74613802 | 1,737 | $43,220 | | | | | |
| 74613803 | 488 | $7,793 | | | | | |
| 74613902 | 232 | $12,205 | | | | | |
| 74613903 | 392 | $4,239 | | | | | |
| 74653301 | 53 | $22,103 | | | | | |
| 74710013 | 1 | $85 | | | | | |
| 74710023 | 36 | $3,396 | | | | | |
| 74710113 | 8 | $632 | | | | | |
| 74710123 | 213 | $16,113 | | | | | |
| 74713809 | 2,139 | $35,628 | | | | | |
| 74713909 | 572 | $22,897 | | | | | |
| 74790209 | 165 | $7,649 | | | | | |
| 74792202 | 23 | $1,878 | | | | | |
| 74792203 | 25 | $1,024 | | | | | |
| 74792209 | 224 | $7,371 | | | | | |
| 74792409 | 114 | $5,656 | | | | | |
| 74792609 | 445 | $16,012 | | | | | |
| 74794109 | 53 | $1,598 | | | | | |
| 74797205 | 114 | $1,642 | | | | | |
| 74797305 | 3 | $26 | | | | | |
| 74798302 | 29 | $2,238 | | | | | |
| 74798303 | 10 | $162 | | | | | |
| 74798309 | 236 | $6,218 | | | | | |
| 74798509 | 168 | $4,156 | | | | | |
| 74799009 | 33 | $443 | | | | | |
| Total | 9,044 | $249,529 | | | | | |

**Table 19A: Breakdown of Kentucky Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 21,150 | $259,534 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,289 | $17,699 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,545 | $266,694 | 1991 | 3 | 0 | $0 |
| 74488710 | 3,742 | $36,051 | 1991 | 4 | 0 | $0 |
| 74488720 | 1,821 | $23,104 | 1992 | 1 | 0 | $0 |
| 74488750 | 2,615 | $29,892 | 1992 | 2 | 0 | $0 |
| 74488810 | 2,719 | $95,613 | 1992 | 3 | 0 | $0 |
| 74488820 | 1,843 | $38,640 | 1992 | 4 | 0 | $0 |
| 74613802 | 11,994 | $386,095 | 1993 | 1 | 0 | $0 |
| 74613803 | 3,358 | $84,148 | 1993 | 2 | 0 | $0 |
| 74613822 | 2,265 | $87,747 | 1993 | 3 | 0 | $0 |
| 74613902 | 77 | $8,370 | 1993 | 4 | 0 | $0 |
| 74613903 | 142 | $8,058 | 1994 | 1 | 0 | $0 |
| 74613922 | 36 | $7,879 | 1994 | 2 | 0 | $0 |
| 74650901 | 1,615 | $497,247 | 1994 | 3 | 0 | $0 |
| 74653301 | 6,921 | $2,060,230 | 1994 | 4 | 0 | $0 |
| 74653401 | 251 | $29,155 | 1995 | 1 | 2,465 | $109,085 |
| 74653501 | 623 | $102,641 | 1995 | 2 | 2,118 | $104,440 |
| 74710013 | 482 | $53,339 | 1995 | 3 | 2,940 | $147,611 |
| 74710023 | 491 | $29,791 | 1995 | 4 | 3,572 | $179,476 |
| 74710102 | 479 | $47,101 | 1996 | 1 | 4,135 | $212,024 |
| 74710113 | 1,584 | $200,459 | 1996 | 2 | 3,785 | $193,370 |
| 74710123 | 4,111 | $353,570 | 1996 | 3 | 3,621 | $203,795 |
| 74712007 | 700 | $46,948 | 1996 | 4 | 3,617 | $232,469 |
| 74713809 | 2,701 | $103,804 | 1997 | 1 | 3,553 | $233,859 |
| 74713909 | 880 | $34,136 | 1997 | 2 | 3,598 | $243,642 |
| 74790209 | 946 | $57,286 | 1997 | 3 | 3,474 | $260,945 |
| 74792202 | 413 | $19,994 | 1997 | 4 | 3,455 | $243,960 |
| 74792203 | 260 | $9,617 | 1998 | 1 | 3,608 | $268,216 |
| 74792209 | 1,473 | $67,099 | 1998 | 2 | 3,034 | $217,311 |
| 74792336 | 171 | $9,068 | 1998 | 3 | 3,220 | $238,428 |
| 74792337 | 115 | $5,419 | 1998 | 4 | 3,034 | $230,526 |
| 74792409 | 690 | $35,243 | 1999 | 1 | 3,144 | $215,849 |
| 74792609 | 5,535 | $282,525 | 1999 | 2 | 3,120 | $211,617 |
| 74794109 | 585 | $38,188 | 1999 | 3 | 2,824 | $203,146 |
| 74797205 | 1,172 | $89,456 | 1999 | 4 | 2,749 | $196,068 |
| 74797305 | 0 | $0 | 2000 | 1 | 3,560 | $280,756 |
| 74798302 | 3,087 | $138,034 | 2000 | 2 | 3,759 | $293,693 |
| 74798303 | 639 | $28,045 | 2000 | 3 | 4,006 | $319,860 |
| 74798309 | 3,916 | $196,347 | 2000 | 4 | 4,438 | $367,319 |
| 74798436 | 954 | $77,098 | 2001 | 1 | 4,989 | $417,834 |
| 74798437 | 1,826 | $134,877 | 2001 | 2 | 4,926 | $163,590 |
| 74798509 | 2,196 | $100,817 | 2001 | 3 | 4,691 | $102,618 |
| 74799009 | 149 | $6,166 | 2001 | 4 | 5,126 | $111,715 |
| Total | 100,561 | $6,203,220 | Total | | 100,561 | $6,203,220 |

### Table 19B: Kentucky SMRF Medicaid Spending by NDC and by Year-Quarter: 1992Q1-1994Q4

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 1,142 | $13,341 | 1991 | 1 | 0 | $0 |
| 74397703 | 614 | $4,279 | 1991 | 2 | 0 | $0 |
| 74433201 | 533 | $90,837 | 1991 | 3 | 0 | $0 |
| 74488710 | 997 | $11,106 | 1991 | 4 | 0 | $0 |
| 74488720 | 724 | $10,007 | 1992 | 1 | 1,203 | $50,981 |
| 74488750 | 325 | $3,814 | 1992 | 2 | 1,397 | $53,913 |
| 74488810 | 278 | $6,942 | 1992 | 3 | 1,163 | $44,666 |
| 74488820 | 90 | $2,226 | 1992 | 4 | 1,286 | $47,539 |
| 74613802 | 3,004 | $61,490 | 1993 | 1 | 1,293 | $53,155 |
| 74613803 | 1,151 | $16,244 | 1993 | 2 | 1,232 | $63,926 |
| 74613822 | 0 | $0 | 1993 | 3 | 1,415 | $85,345 |
| 74613902 | 12 | $525 | 1993 | 4 | 1,410 | $83,461 |
| 74613903 | 12 | $352 | 1994 | 1 | 2,259 | $100,075 |
| 74613922 | 0 | $0 | 1994 | 2 | 2,740 | $112,179 |
| 74650901 | 31 | $9,131 | 1994 | 3 | 2,356 | $84,906 |
| 74653301 | 688 | $175,444 | 1994 | 4 | 3,066 | $134,268 |
| 74653401 | 27 | $2,674 | | | | |
| 74653501 | 18 | $3,026 | | | | |
| 74710013 | 204 | $19,571 | | | | |
| 74710023 | 272 | $40,590 | | | | |
| 74710102 | 68 | $4,079 | | | | |
| 74710113 | 819 | $46,225 | | | | |
| 74710123 | 1,064 | $100,063 | | | | |
| 74712007 | 23 | $2,789 | | | | |
| 74713809 | 1,252 | $32,155 | | | | |
| 74713909 | 96 | $3,619 | | | | |
| 74790209 | 149 | $5,398 | | | | |
| 74792202 | 98 | $9,487 | | | | |
| 74792203 | 128 | $2,716 | | | | |
| 74792209 | 815 | $21,009 | | | | |
| 74792336 | 5 | $62 | | | | |
| 74792337 | 4 | $290 | | | | |
| 74792409 | 410 | $20,732 | | | | |
| 74792609 | 1,802 | $62,390 | | | | |
| 74794109 | 361 | $18,743 | | | | |
| 74797205 | 533 | $22,247 | | | | |
| 74797305 | 38 | $821 | | | | |
| 74798302 | 946 | $10,875 | | | | |
| 74798303 | 165 | $5,388 | | | | |
| 74798309 | 1,073 | $43,704 | | | | |
| 74798436 | 21 | $1,004 | | | | |
| 74798437 | 24 | $1,806 | | | | |
| 74798509 | 716 | $22,549 | | | | |
| 74799009 | 88 | $4,664 | | | | |
| Total | 20,820 | $914,414 | Total | | 20,820 | $914,414 |

**Table 19C: Kentucky SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1991Q4**

| *Breakdown by National Drug Code* | | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 68 | $511 | | 1991 | 1 | 293 | $10,752 |
| 74397703 | 84 | $510 | | 1991 | 2 | 966 | $33,731 |
| 74433201 | 13 | $1,333 | | 1991 | 3 | 1,147 | $46,205 |
| 74488710 | 50 | $457 | | 1991 | 4 | 995 | $38,556 |
| 74488720 | 44 | $302 | | | | | |
| 74488750 | 45 | $456 | | | Total | 3,401 | $129,244 |
| 74488810 | 22 | $532 | | | | | |
| 74488820 | 3 | $5 | | | | | |
| 74613802 | 677 | $14,494 | | | | | |
| 74613803 | 282 | $3,813 | | | | | |
| 74613902 | 2 | $59 | | | | | |
| 74613903 | 2 | $40 | | | | | |
| 74653301 | 92 | $23,487 | | | | | |
| 74710013 | 29 | $1,001 | | | | | |
| 74710023 | 23 | $4,350 | | | | | |
| 74710102 | 25 | $110 | | | | | |
| 74710113 | 16 | $1,929 | | | | | |
| 74710123 | 68 | $7,234 | | | | | |
| 74713809 | 245 | $5,416 | | | | | |
| 74713909 | 4 | $15 | | | | | |
| 74790209 | 29 | $245 | | | | | |
| 74792202 | 11 | $779 | | | | | |
| 74792203 | 6 | $59 | | | | | |
| 74792209 | 161 | $3,518 | | | | | |
| 74792409 | 102 | $6,966 | | | | | |
| 74792609 | 480 | $20,814 | | | | | |
| 74794109 | 115 | $5,069 | | | | | |
| 74797205 | 327 | $11,805 | | | | | |
| 74797305 | 23 | $371 | | | | | |
| 74798302 | 26 | $1,206 | | | | | |
| 74798303 | 24 | $404 | | | | | |
| 74798309 | 163 | $6,891 | | | | | |
| 74798509 | 118 | $4,190 | | | | | |
| 74799009 | 22 | $874 | | | | | |
| Total | 3,401 | $129,244 | | | | | |

**Table 20A: Breakdown of Missouri Medicaid Spending by NDC and by Year-Quarter**

| | *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | |
| --- | --- | --- | --- | --- | --- | --- |
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 23,070 | $253,728 | 1991 | 1 | 0 | $0 |
| 74397703 | 1,411 | $8,508 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,895 | $131,196 | 1991 | 3 | 0 | $0 |
| 74488710 | 3,041 | $27,739 | 1991 | 4 | 0 | $0 |
| 74488720 | 3,875 | $26,409 | 1992 | 1 | 0 | $0 |
| 74488750 | 260 | $1,331 | 1992 | 2 | 0 | $0 |
| 74488810 | 1,581 | $28,715 | 1992 | 3 | 0 | $0 |
| 74488820 | 685 | $5,135 | 1992 | 4 | 0 | $0 |
| 74613802 | 608 | $14,999 | 1993 | 1 | 0 | $0 |
| 74613803 | 710 | $111,987 | 1993 | 2 | 0 | $0 |
| 74613822 | 609 | $14,924 | 1993 | 3 | 0 | $0 |
| 74613902 | 96 | $2,090 | 1993 | 4 | 0 | $0 |
| 74613903 | 695 | $169,088 | 1994 | 1 | 0 | $0 |
| 74613922 | 23 | $925 | 1994 | 2 | 0 | $0 |
| 74650901 | 3,242 | $821,130 | 1994 | 3 | 0 | $0 |
| 74653301 | 9,728 | $1,599,257 | 1994 | 4 | 0 | $0 |
| 74653401 | 190 | $5,287 | 1995 | 1 | 0 | $0 |
| 74653501 | 643 | $61,619 | 1995 | 2 | 0 | $0 |
| 74710013 | 39 | $2,173 | 1995 | 3 | 0 | $0 |
| 74710023 | 30 | $3,150 | 1995 | 4 | 0 | $0 |
| 74710102 | 712 | $33,795 | 1996 | 1 | 0 | $0 |
| 74710113 | 421 | $23,652 | 1996 | 2 | 0 | $0 |
| 74710123 | 2,532 | $271,396 | 1996 | 3 | 0 | $0 |
| 74712007 | 0 | $0 | 1996 | 4 | 0 | $0 |
| 74713809 | 2,061 | $64,199 | 1997 | 1 | 0 | $0 |
| 74713909 | 667 | $25,446 | 1997 | 2 | 0 | $0 |
| 74790209 | 340 | $15,304 | 1997 | 3 | 0 | $0 |
| 74792202 | 696 | $12,270 | 1997 | 4 | 0 | $0 |
| 74792203 | 279 | $3,112 | 1998 | 1 | 3,044 | $145,994 |
| 74792209 | 811 | $21,222 | 1998 | 2 | 5,048 | $305,809 |
| 74792336 | 188 | $8,776 | 1998 | 3 | 4,510 | $256,660 |
| 74792337 | 305 | $13,345 | 1998 | 4 | 4,426 | $283,798 |
| 74792409 | 320 | $4,097 | 1999 | 1 | 5,193 | $299,568 |
| 74792609 | 2,034 | $83,381 | 1999 | 2 | 5,075 | $297,842 |
| 74794109 | 648 | $24,401 | 1999 | 3 | 4,958 | $299,693 |
| 74797205 | 35 | $411 | 1999 | 4 | 5,524 | $323,521 |
| 74797305 | 11 | $297 | 2000 | 1 | 5,637 | $373,044 |
| 74798302 | 8,905 | $136,619 | 2000 | 2 | 7,823 | $352,651 |
| 74798303 | 2,868 | $30,750 | 2000 | 3 | 5,321 | $312,937 |
| 74798309 | 3,938 | $80,803 | 2000 | 4 | 5,504 | $299,728 |
| 74798436 | 680 | $33,456 | 2001 | 1 | 5,705 | $281,711 |
| 74798437 | 1,070 | $54,391 | 2001 | 2 | 5,151 | $255,250 |
| 74798509 | 701 | $28,615 | 2001 | 3 | 4,656 | $81,345 |
| 74799009 | 323 | $4,649 | 2001 | 4 | 5,401 | $94,227 |
| Total | 82,976 | $4,263,776 | Total | | 82,976 | $4,263,776 |

Table 20B: Missouri SMRF Medicaid Spending by NDC and by Year-Quarter: 1992Q1-1997Q4

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 15,455 | $153,958 | 1991 | 1 | 0 | $0 |
| 74397703 | 1,138 | $6,584 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,110 | $118,875 | 1991 | 3 | 0 | $0 |
| 74488710 | 2,225 | $20,486 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,221 | $18,139 | 1992 | 1 | 1,198 | $48,590 |
| 74488750 | 224 | $1,404 | 1992 | 2 | 1,113 | $50,705 |
| 74488810 | 2,136 | $51,926 | 1992 | 3 | 1,044 | $69,394 |
| 74488820 | 1,404 | $13,111 | 1992 | 4 | 1,248 | $74,171 |
| 74613802 | 2,706 | $53,051 | 1993 | 1 | 1,722 | $80,142 |
| 74613803 | 3,806 | $170,863 | 1993 | 2 | 1,821 | $109,220 |
| 74613822 | 0 | $0 | 1993 | 3 | 2,041 | $93,239 |
| 74613902 | 364 | $10,035 | 1993 | 4 | 2,282 | $97,291 |
| 74613903 | 1,468 | $238,923 | 1994 | 1 | 2,489 | $124,639 |
| 74613922 | 0 | $0 | 1994 | 2 | 2,505 | $122,029 |
| 74650901 | 1,989 | $540,508 | 1994 | 3 | 2,531 | $131,321 |
| 74653301 | 3,461 | $638,695 | 1994 | 4 | 3,079 | $146,102 |
| 74653401 | 24 | $1,077 | 1995 | 1 | 3,685 | $160,026 |
| 74653501 | 190 | $17,468 | 1995 | 2 | 3,909 | $169,624 |
| 74710013 | 348 | $9,043 | 1995 | 3 | 3,475 | $130,052 |
| 74710023 | 98 | $5,511 | 1995 | 4 | 3,768 | $153,416 |
| 74710102 | 271 | $13,852 | 1996 | 1 | 4,292 | $193,022 |
| 74710113 | 232 | $22,894 | 1996 | 2 | 3,902 | $180,510 |
| 74710123 | 2,630 | $200,688 | 1996 | 3 | 3,486 | $169,887 |
| 74712007 | 111 | $2,791 | 1996 | 4 | 3,626 | $169,169 |
| 74713809 | 3,207 | $106,031 | 1997 | 1 | 3,494 | $169,017 |
| 74713909 | 597 | $10,482 | 1997 | 2 | 3,466 | $167,434 |
| 74790209 | 329 | $30,045 | 1997 | 3 | 3,500 | $189,688 |
| 74792202 | 854 | $34,027 | 1997 | 4 | 3,184 | $189,297 |
| 74792203 | 605 | $14,930 | | | | |
| 74792209 | 953 | $45,088 | | | | |
| 74792336 | 1,030 | $32,211 | | | | |
| 74792337 | 366 | $14,230 | | | | |
| 74792409 | 112 | $3,253 | | | | |
| 74792609 | 3,034 | $174,709 | | | | |
| 74794109 | 666 | $28,388 | | | | |
| 74797205 | 50 | $619 | | | | |
| 74797305 | 0 | $0 | | | | |
| 74798302 | 3,851 | $82,935 | | | | |
| 74798303 | 1,061 | $31,133 | | | | |
| 74798309 | 2,744 | $78,825 | | | | |
| 74798436 | 919 | $63,791 | | | | |
| 74798437 | 1,645 | $84,385 | | | | |
| 74798509 | 823 | $32,477 | | | | |
| 74799009 | 403 | $10,544 | | | | |
| Total | 66,860 | $3,187,985 | Total | | 66,860 | $3,187,985 |

**Table 20C: Missouri SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1991Q4**

| *Breakdown by National Drug Code* | | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 74 | $777 | | 1991 | 1 | 39 | $1,239 |
| 74397703 | 25 | $114 | | 1991 | 2 | 261 | $6,380 |
| 74433201 | 11 | $2,804 | | 1991 | 3 | 734 | $15,010 |
| 74488710 | 211 | $1,347 | | 1991 | 4 | 1,102 | $40,904 |
| 74488720 | 22 | $165 | | | | | |
| 74488750 | 9 | $54 | | | Total | 2,136 | $63,533 |
| 74488810 | 45 | $300 | | | | | |
| 74488820 | 6 | $165 | | | | | |
| 74613802 | 243 | $2,346 | | | | | |
| 74613803 | 182 | $1,414 | | | | | |
| 74613902 | 20 | $102 | | | | | |
| 74613903 | 10 | $506 | | | | | |
| 74653301 | 41 | $16,000 | | | | | |
| 74710023 | 2 | $161 | | | | | |
| 74710113 | 3 | $399 | | | | | |
| 74710123 | 23 | $983 | | | | | |
| 74713809 | 294 | $7,637 | | | | | |
| 74713909 | 58 | $558 | | | | | |
| 74790209 | 8 | $89 | | | | | |
| 74792202 | 26 | $1,369 | | | | | |
| 74792203 | 40 | $2,017 | | | | | |
| 74792209 | 74 | $1,927 | | | | | |
| 74792409 | 1 | $23 | | | | | |
| 74792609 | 224 | $9,888 | | | | | |
| 74794109 | 59 | $1,294 | | | | | |
| 74797205 | 4 | $15 | | | | | |
| 74798302 | 119 | $2,259 | | | | | |
| 74798303 | 26 | $952 | | | | | |
| 74798309 | 266 | $7,588 | | | | | |
| 74798509 | 10 | $281 | | | | | |
| Total | 2,136 | $63,533 | | | | | |

**Table 21: Breakdown of Ohio Medicaid Spending by NDC and by Year-Quarter**

| Breakdown by National Drug Code | | | Breakdown by Year and Quarter | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 115,612 | $701,969 | 1991 | 1 | 1,429 | $15,550 |
| 74397703 | 16,028 | $95,429 | 1991 | 2 | 1,436 | $17,271 |
| 74433201 | 8,423 | $366,719 | 1991 | 3 | 1,745 | $18,814 |
| 74488710 | 25,055 | $161,184 | 1991 | 4 | 1,822 | $25,218 |
| 74488720 | 2,836 | $17,617 | 1992 | 1 | 2,522 | $38,471 |
| 74488750 | 5,113 | $35,841 | 1992 | 2 | 2,462 | $39,901 |
| 74488810 | 11,784 | $110,697 | 1992 | 3 | 2,984 | $53,872 |
| 74488820 | 4,367 | $38,163 | 1992 | 4 | 3,430 | $64,783 |
| 74613802 | 13,164 | $182,660 | 1993 | 1 | 3,697 | $68,541 |
| 74613803 | 4,092 | $39,969 | 1993 | 2 | 3,568 | $82,053 |
| 74613822 | 869 | $11,660 | 1993 | 3 | 3,572 | $88,906 |
| 74613902 | 515 | $7,758 | 1993 | 4 | 4,372 | $101,330 |
| 74613903 | 684 | $10,852 | 1994 | 1 | 4,541 | $96,092 |
| 74613922 | 19 | $537 | 1994 | 2 | 4,389 | $85,381 |
| 74650901 | 2,878 | $479,588 | 1994 | 3 | 4,739 | $82,710 |
| 74653301 | 33,357 | $2,175,491 | 1994 | 4 | 4,932 | $88,285 |
| 74653401 | 214 | $17,566 | 1995 | 1 | 6,082 | $109,805 |
| 74653501 | 1,179 | $166,454 | 1995 | 2 | 6,326 | $121,647 |
| 74710013 | 1,573 | $88,048 | 1995 | 3 | 5,508 | $127,412 |
| 74710023 | 1,261 | $57,683 | 1995 | 4 | 5,433 | $133,112 |
| 74710102 | 6,716 | $115,704 | 1996 | 1 | 6,325 | $143,400 |
| 74710113 | 2,660 | $84,699 | 1996 | 2 | 6,884 | $143,801 |
| 74710123 | 4,193 | $169,323 | 1996 | 3 | 7,651 | $160,860 |
| 74712007 | 2,595 | $39,267 | 1996 | 4 | 7,546 | $164,194 |
| 74713809 | 18,488 | $158,684 | 1997 | 1 | 7,214 | $152,307 |
| 74713909 | 2,926 | $51,222 | 1997 | 2 | 7,347 | $168,349 |
| 74790209 | 729 | $31,557 | 1997 | 3 | 7,544 | $172,099 |
| 74792202 | 3,272 | $74,388 | 1997 | 4 | 7,933 | $165,828 |
| 74792203 | 1,199 | $29,845 | 1998 | 1 | 9,778 | $180,598 |
| 74792209 | 2,470 | $51,416 | 1998 | 2 | 9,731 | $200,030 |
| 74792336 | 1,190 | $69,712 | 1998 | 3 | 12,997 | $232,146 |
| 74792337 | 2,070 | $134,132 | 1998 | 4 | 11,226 | $248,293 |
| 74792409 | 493 | $14,525 | 1999 | 1 | 11,508 | $236,053 |
| 74792609 | 4,324 | $126,224 | 1999 | 2 | 11,510 | $228,289 |
| 74794109 | 1,288 | $22,361 | 1999 | 3 | 11,201 | $219,580 |
| 74797205 | 2,302 | $32,918 | 1999 | 4 | 11,939 | $247,925 |
| 74797305 | 32 | $553 | 2000 | 1 | 13,510 | $228,678 |
| 74798302 | 6,048 | $158,959 | 2000 | 2 | 12,389 | $233,139 |
| 74798303 | 1,701 | $23,218 | 2000 | 3 | 12,809 | $250,797 |
| 74798309 | 7,989 | $146,436 | 2000 | 4 | 12,981 | $249,291 |
| 74798436 | 1,425 | $39,296 | 2001 | 1 | 14,052 | $250,726 |
| 74798437 | 5,067 | $174,259 | 2001 | 2 | 13,580 | $257,370 |
| 74798509 | 2,107 | $31,851 | 2001 | 3 | 13,325 | $274,153 |
| 74799009 | 1,133 | $16,187 | 2001 | 4 | 15,471 | $295,562 |
| Total | 331,440 | $6,562,620 | Total | | 331,440 | $6,562,621 |

**Table 22A: Breakdown of Michigan Medicaid Spending by NDC and by Year-Quarter**

| | Breakdown by National Drug Code | | | Breakdown by Year and Quarter | | |
| --- | --- | --- | --- | --- | --- | --- |
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 6,184 | $63,497 | 1991 | 1 | 0 | $0 |
| 74397703 | 688 | $2,940 | 1991 | 2 | 0 | $0 |
| 74433201 | 149 | $17,565 | 1991 | 3 | 0 | $0 |
| 74488710 | 765 | $7,218 | 1991 | 4 | 0 | $0 |
| 74488720 | 187 | $2,485 | 1992 | 1 | 0 | $0 |
| 74488750 | 199 | $2,830 | 1992 | 2 | 0 | $0 |
| 74488810 | 684 | $4,605 | 1992 | 3 | 0 | $0 |
| 74488820 | 186 | $3,965 | 1992 | 4 | 0 | $0 |
| 74613802 | 4 | $29 | 1993 | 1 | 0 | $0 |
| 74613803 | 144 | $3,294 | 1993 | 2 | 0 | $0 |
| 74613822 | 427 | $9,280 | 1993 | 3 | 0 | $0 |
| 74613902 | 0 | $0 | 1993 | 4 | 0 | $0 |
| 74613903 | 8 | $244 | 1994 | 1 | 0 | $0 |
| 74613922 | 5 | $230 | 1994 | 2 | 0 | $0 |
| 74650901 | 672 | $143,168 | 1994 | 3 | 0 | $0 |
| 74653301 | 2,341 | $471,672 | 1994 | 4 | 0 | $0 |
| 74653401 | 48 | $4,002 | 1995 | 1 | 0 | $0 |
| 74653501 | 93 | $8,140 | 1995 | 2 | 0 | $0 |
| 74710013 | 29 | $843 | 1995 | 3 | 0 | $0 |
| 74710023 | 24 | $793 | 1995 | 4 | 0 | $0 |
| 74710102 | 72 | $3,844 | 1996 | 1 | 0 | $0 |
| 74710113 | 47 | $2,377 | 1996 | 2 | 0 | $0 |
| 74710123 | 254 | $14,269 | 1996 | 3 | 0 | $0 |
| 74712007 | 0 | $0 | 1996 | 4 | 0 | $0 |
| 74713809 | 795 | $20,629 | 1997 | 1 | 0 | $0 |
| 74713909 | 181 | $9,521 | 1997 | 2 | 0 | $0 |
| 74790209 | 16 | $330 | 1997 | 3 | 0 | $0 |
| 74792202 | 146 | $5,649 | 1997 | 4 | 0 | $0 |
| 74792203 | 10 | $260 | 1998 | 1 | 0 | $0 |
| 74792209 | 73 | $2,052 | 1998 | 2 | 0 | $0 |
| 74792336 | 123 | $10,201 | 1998 | 3 | 0 | $0 |
| 74792337 | 189 | $11,383 | 1998 | 4 | 0 | $0 |
| 74792409 | 14 | $154 | 1999 | 1 | 0 | $0 |
| 74792609 | 248 | $6,172 | 1999 | 2 | 0 | $0 |
| 74794109 | 38 | $906 | 1999 | 3 | 0 | $0 |
| 74797205 | 241 | $2,634 | 1999 | 4 | 0 | $0 |
| 74797305 | 17 | $1,017 | 2000 | 1 | 211 | $23,103 |
| 74798302 | 512 | $13,467 | 2000 | 2 | 212 | $21,700 |
| 74798303 | 185 | $3,268 | 2000 | 3 | 679 | $54,250 |
| 74798309 | 511 | $13,549 | 2000 | 4 | 3,023 | $208,497 |
| 74798436 | 325 | $13,510 | 2001 | 1 | 3,503 | $256,887 |
| 74798437 | 725 | $13,627 | 2001 | 2 | 3,376 | $127,435 |
| 74798509 | 60 | $1,172 | 2001 | 3 | 3,469 | $103,944 |
| 74799009 | 347 | $5,873 | 2001 | 4 | 3,493 | $106,848 |
| Total | 17,966 | $902,664 | Total | | 17,966 | $902,664 |

**Table 22B: Michigan SMRF-MAX Medicaid Spending by NDC and by Year-Quarter: 1994Q1-2000Q3**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 23,374 | $285,964 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,094 | $9,644 | 1991 | 2 | 0 | $0 |
| 74433201 | 1,072 | $160,499 | 1991 | 3 | 0 | $0 |
| 74488710 | 6,784 | $83,674 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,150 | $28,387 | 1992 | 1 | 0 | $0 |
| 74488750 | 1,382 | $11,307 | 1992 | 2 | 0 | $0 |
| 74488810 | 1,376 | $16,013 | 1992 | 3 | 0 | $0 |
| 74488820 | 1,024 | $17,785 | 1992 | 4 | 0 | $0 |
| 74613802 | 3,610 | $68,811 | 1993 | 1 | 0 | $0 |
| 74613803 | 1,202 | $23,300 | 1993 | 2 | 0 | $0 |
| 74613822 | 253 | $6,840 | 1993 | 3 | 0 | $0 |
| 74613902 | 18 | $202 | 1993 | 4 | 0 | $0 |
| 74613903 | 368 | $8,303 | 1994 | 1 | 1,934 | $85,610 |
| 74613922 | 12 | $340 | 1994 | 2 | 2,147 | $81,279 |
| 74650901 | 2,160 | $768,456 | 1994 | 3 | 2,027 | $66,026 |
| 74653301 | 7,006 | $1,922,148 | 1994 | 4 | 2,168 | $59,247 |
| 74653401 | 310 | $19,579 | 1995 | 1 | 2,385 | $66,946 |
| 74653501 | 811 | $71,466 | 1995 | 2 | 2,337 | $87,896 |
| 74710013 | 937 | $28,233 | 1995 | 3 | 2,646 | $106,195 |
| 74710023 | 512 | $14,466 | 1995 | 4 | 2,508 | $124,025 |
| 74710102 | 440 | $8,472 | 1996 | 1 | 2,950 | $150,662 |
| 74710113 | 518 | $27,320 | 1996 | 2 | 2,930 | $143,389 |
| 74710123 | 1,937 | $107,826 | 1996 | 3 | 2,934 | $126,952 |
| 74712007 | 0 | $0 | 1996 | 4 | 3,161 | $154,037 |
| 74713809 | 4,056 | $66,479 | 1997 | 1 | 3,324 | $167,505 |
| 74713909 | 1,026 | $25,742 | 1997 | 2 | 3,388 | $172,709 |
| 74790209 | 92 | $3,189 | 1997 | 3 | 3,636 | $216,573 |
| 74792202 | 568 | $21,234 | 1997 | 4 | 3,608 | $208,448 |
| 74792203 | 308 | $3,829 | 1998 | 1 | 4,095 | $239,625 |
| 74792209 | 1,099 | $33,379 | 1998 | 2 | 3,942 | $206,241 |
| 74792336 | 794 | $47,743 | 1998 | 3 | 3,800 | $222,796 |
| 74792337 | 926 | $53,845 | 1998 | 4 | 3,505 | $206,518 |
| 74792409 | 61 | $1,518 | 1999 | 1 | 3,397 | $200,599 |
| 74792609 | 1,451 | $22,472 | 1999 | 2 | 3,447 | $220,630 |
| 74794109 | 404 | $8,942 | 1999 | 3 | 3,467 | $206,103 |
| 74797205 | 1,590 | $17,963 | 1999 | 4 | 3,064 | $147,395 |
| 74797305 | 237 | $3,425 | 2000 | 1 | 3,036 | $171,175 |
| 74798302 | 2,045 | $60,771 | 2000 | 2 | 2,797 | $205,509 |
| 74798303 | 477 | $8,357 | 2000 | 3 | 2,912 | $182,723 |
| 74798309 | 1,471 | $33,815 | | | | |
| 74798436 | 1,139 | $49,917 | | | | |
| 74798437 | 1,470 | $45,701 | | | | |
| 74798509 | 386 | $5,954 | | | | |
| 74799009 | 2,595 | $23,503 | | | | |
| Total | 81,545 | $4,226,813 | Total | | 81,545 | $4,226,813 |

**Table 22C: Michigan SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1993Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 2,250 | $20,901 | 1991 | 2 | 1,325 | $18,684 |
| 74397703 | 393 | $2,061 | 1991 | 3 | 965 | $16,442 |
| 74433201 | 62 | $7,960 | 1991 | 4 | 624 | $8,661 |
| 74488710 | 715 | $7,739 | 1992 | 1 | 520 | $8,158 |
| 74488720 | 190 | $1,330 | 1992 | 2 | 554 | $7,697 |
| 74488750 | 103 | $603 | 1992 | 3 | 627 | $8,831 |
| 74488810 | 270 | $2,966 | 1992 | 4 | 835 | $11,588 |
| 74488820 | 311 | $3,747 | 1993 | 1 | 838 | $9,389 |
| 74613802 | 903 | $11,361 | 1993 | 2 | 852 | $11,052 |
| 74613803 | 738 | $5,220 | 1993 | 3 | 1,182 | $24,069 |
| 74613902 | 3 | $12 | 1993 | 4 | 1,400 | $32,541 |
| 74613903 | 104 | $1,354 | | | | |
| 74650901 | 31 | $6,197 | | Total | 9,722 | $157,114 |
| 74653301 | 130 | $28,101 | | | | |
| 74653401 | 16 | $601 | | | | |
| 74653501 | 25 | $1,489 | | | | |
| 74710013 | 59 | $2,517 | | | | |
| 74710023 | 79 | $1,906 | | | | |
| 74710102 | 20 | $354 | | | | |
| 74710123 | 45 | $1,495 | | | | |
| 74713809 | 1,629 | $18,227 | | | | |
| 74713909 | 132 | $1,668 | | | | |
| 74790209 | 12 | $444 | | | | |
| 74792202 | 111 | $4,515 | | | | |
| 74792203 | 59 | $904 | | | | |
| 74792209 | 154 | $2,736 | | | | |
| 74792336 | 8 | $350 | | | | |
| 74792337 | 4 | $186 | | | | |
| 74792409 | 68 | $1,049 | | | | |
| 74792609 | 568 | $10,794 | | | | |
| 74794109 | 30 | $786 | | | | |
| 74797205 | 133 | $1,623 | | | | |
| 74797305 | 2 | $23 | | | | |
| 74798302 | 94 | $1,558 | | | | |
| 74798303 | 35 | $317 | | | | |
| 74798309 | 151 | $2,677 | | | | |
| 74798509 | 81 | $1,274 | | | | |
| 74799009 | 4 | $71 | | | | |
| Total | 9,722 | $157,114 | | | | |

**Table 23A: Breakdown of Louisiana Medicaid Spending by NDC and by Year-Quarter**

| *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 10,769 | $124,647 | 1991 | 1 | 0 | $0 |
| 74397703 | 0 | $0 | 1991 | 2 | 0 | $0 |
| 74433201 | 583 | $88,299 | 1991 | 3 | 0 | $0 |
| 74488710 | 10,066 | $67,572 | 1991 | 4 | 0 | $0 |
| 74488720 | 760 | $10,737 | 1992 | 1 | 0 | $0 |
| 74488750 | 135 | $981 | 1992 | 2 | 0 | $0 |
| 74488810 | 3,560 | $48,102 | 1992 | 3 | 0 | $0 |
| 74488820 | 807 | $15,401 | 1992 | 4 | 0 | $0 |
| 74613802 | 4,684 | $328,131 | 1993 | 1 | 0 | $0 |
| 74613803 | 1,630 | $33,559 | 1993 | 2 | 0 | $0 |
| 74613822 | 3,410 | $162,422 | 1993 | 3 | 2 | -$156 |
| 74613902 | 1,723 | $116,162 | 1993 | 4 | 5 | $45 |
| 74613903 | 260 | $16,574 | 1994 | 1 | 9 | $3,966 |
| 74613922 | 1,174 | $35,943 | 1994 | 2 | 49 | $7,540 |
| 74650901 | 598 | $116,477 | 1994 | 3 | 503 | $18,973 |
| 74653301 | 7,312 | $1,506,881 | 1994 | 4 | 1,098 | $43,685 |
| 74653401 | 597 | $7,036 | 1995 | 1 | 1,946 | $73,423 |
| 74653501 | 1,210 | $57,246 | 1995 | 2 | 2,566 | $104,497 |
| 74710013 | 105 | $10,293 | 1995 | 3 | 1,142 | $68,835 |
| 74710023 | 2,169 | $59,494 | 1995 | 4 | 1,354 | $61,794 |
| 74710102 | 234 | $9,974 | 1996 | 1 | 1,710 | $70,998 |
| 74710113 | 172 | $16,731 | 1996 | 2 | 2,275 | $105,014 |
| 74710123 | 998 | $65,431 | 1996 | 3 | 1,981 | $92,447 |
| 74712007 | 6 | $319 | 1996 | 4 | 2,284 | $99,477 |
| 74713809 | 16,555 | $138,527 | 1997 | 1 | 2,680 | $123,464 |
| 74713909 | 1,310 | $68,624 | 1997 | 2 | 2,357 | $111,501 |
| 74790209 | 134 | $6,140 | 1997 | 3 | 2,802 | $142,665 |
| 74792202 | 2,977 | $70,319 | 1997 | 4 | 2,877 | $138,037 |
| 74792203 | 577 | $9,964 | 1998 | 1 | 3,406 | $150,295 |
| 74792209 | 487 | $10,857 | 1998 | 2 | 2,701 | $118,822 |
| 74792336 | 361 | $15,971 | 1998 | 3 | 2,733 | $137,956 |
| 74792337 | 4,725 | $174,328 | 1998 | 4 | 3,016 | $162,185 |
| 74792409 | 7 | $154 | 1999 | 1 | 3,379 | $163,396 |
| 74792609 | 2,185 | $63,897 | 1999 | 2 | 2,795 | $173,040 |
| 74794109 | 459 | $16,632 | 1999 | 3 | 2,776 | $141,249 |
| 74797205 | 103 | $1,611 | 1999 | 4 | 3,999 | $216,435 |
| 74797305 | 6 | $26 | 2000 | 1 | 5,413 | $196,785 |
| 74798302 | 3,909 | $119,705 | 2000 | 2 | 11,120 | $279,157 |
| 74798303 | 1,333 | $29,683 | 2000 | 3 | 4,931 | $270,462 |
| 74798309 | 2,460 | $72,545 | 2000 | 4 | 4,693 | $229,671 |
| 74798436 | 896 | $46,744 | 2001 | 1 | 5,142 | $207,781 |
| 74798437 | 2,323 | $139,015 | 2001 | 2 | 3,511 | $81,737 |
| 74798509 | 488 | $15,224 | 2001 | 3 | 3,560 | $55,215 |
| 74799009 | 1,448 | $13,879 | 2001 | 4 | 4,890 | $61,872 |
| Total | 95,705 | $3,912,258 | Total | | 95,705 | $3,912,258 |

**Table 23B: Louisiana SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1994Q4**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 941 | $13,169 | 1991 | 1 | 160 | $4,028 |
| 74433201 | 190 | $38,719 | 1991 | 2 | 261 | $6,014 |
| 74488810 | 337 | $6,632 | 1991 | 3 | 159 | $9,084 |
| 74488820 | 346 | $6,826 | 1991 | 4 | 151 | $5,687 |
| 74613802 | 1,694 | $118,715 | 1992 | 1 | 214 | $9,344 |
| 74613803 | 23 | $374 | 1992 | 2 | 277 | $12,898 |
| 74613902 | 243 | $9,795 | 1992 | 3 | 246 | $12,358 |
| 74613903 | 25 | $547 | 1992 | 4 | 336 | $18,814 |
| 74650901 | 79 | $6,482 | 1993 | 1 | 305 | $15,535 |
| 74653301 | 404 | $76,848 | 1993 | 2 | 263 | $14,117 |
| 74653401 | 610 | $9,951 | 1993 | 3 | 376 | $19,819 |
| 74653501 | 7 | $1,565 | 1993 | 4 | 470 | $30,525 |
| 74710013 | 60 | $3,778 | 1994 | 1 | 545 | $38,253 |
| 74710023 | 801 | $18,958 | 1994 | 2 | 500 | $35,515 |
| 74710102 | 3 | $46 | 1994 | 3 | 2,348 | $83,498 |
| 74710113 | 7 | $748 | 1994 | 4 | 2,934 | $96,164 |
| 74710123 | 121 | $7,855 | | | | |
| 74713809 | 215 | $7,208 | Total | | 9,545 | $411,653 |
| 74713909 | 62 | $1,719 | | | | |
| 74792202 | 569 | $13,316 | | | | |
| 74792203 | 637 | $9,727 | | | | |
| 74792209 | 50 | $1,237 | | | | |
| 74792336 | 17 | $1,267 | | | | |
| 74792337 | 1,092 | $25,126 | | | | |
| 74792609 | 169 | $6,792 | | | | |
| 74794109 | 11 | $263 | | | | |
| 74797205 | 49 | $628 | | | | |
| 74798302 | 283 | $9,321 | | | | |
| 74798303 | 281 | $8,179 | | | | |
| 74798309 | 74 | $1,806 | | | | |
| 74798436 | 9 | $509 | | | | |
| 74798437 | 60 | $2,112 | | | | |
| 74798509 | 76 | $1,438 | | | | |
| Total | 9,545 | $411,653 | | | | |

**Table 24A: Breakdown of Wisconsin Medicaid Spending by NDC and by Year-Quarter**

| | *Breakdown by National Drug Code* | | | *Breakdown by Year and Quarter* | | |
| --- | --- | --- | --- | --- | --- | --- |
| **NDC** | **# of Claims** | **Paid Amount** | **Year** | **Quarter** | **# of Claims** | **Paid Amount** |
| 74196607 | 15,307 | $147,417 | 1991 | 1 | 0 | $0 |
| 74397703 | 2,512 | $12,444 | 1991 | 2 | 0 | $0 |
| 74433201 | 468 | $30,355 | 1991 | 3 | 0 | $0 |
| 74488710 | 5,607 | $48,196 | 1991 | 4 | 0 | $0 |
| 74488720 | 2,778 | $30,479 | 1992 | 1 | 17 | $198 |
| 74488750 | 1,252 | $7,901 | 1992 | 2 | 8 | $84 |
| 74488810 | 1,414 | $28,730 | 1992 | 3 | 11 | $102 |
| 74488820 | 1,429 | $14,040 | 1992 | 4 | 213 | $10,712 |
| 74613802 | 6,171 | $182,003 | 1993 | 1 | 769 | $25,593 |
| 74613803 | 770 | $17,232 | 1993 | 2 | 1,254 | $51,834 |
| 74613822 | 749 | $21,118 | 1993 | 3 | 1,193 | $41,572 |
| 74613902 | 156 | $12,309 | 1993 | 4 | 1,457 | $46,850 |
| 74613903 | 117 | $1,029 | 1994 | 1 | 1,744 | $51,209 |
| 74613922 | 39 | $1,395 | 1994 | 2 | 1,770 | $51,230 |
| 74650901 | 1,706 | $304,603 | 1994 | 3 | 1,665 | $59,346 |
| 74653301 | 4,198 | $404,673 | 1994 | 4 | 1,805 | $83,966 |
| 74653401 | 36 | $1,894 | 1995 | 1 | 1,647 | $60,860 |
| 74653501 | 148 | $13,549 | 1995 | 2 | 1,647 | $55,793 |
| 74710013 | 124 | $4,703 | 1995 | 3 | 1,689 | $54,492 |
| 74710023 | 360 | $19,016 | 1995 | 4 | 1,884 | $58,520 |
| 74710102 | 201 | $9,438 | 1996 | 1 | 1,996 | $56,217 |
| 74710113 | 144 | $11,659 | 1996 | 2 | 1,827 | $44,575 |
| 74710123 | 1,062 | $188,380 | 1996 | 3 | 1,754 | $51,906 |
| 74712007 | 489 | $25,424 | 1996 | 4 | 1,929 | $62,222 |
| 74713809 | 4,321 | $94,430 | 1997 | 1 | 1,781 | $59,391 |
| 74713909 | 1,100 | $49,300 | 1997 | 2 | 1,846 | $73,184 |
| 74790209 | 789 | $73,349 | 1997 | 3 | 1,801 | $70,864 |
| 74792202 | 585 | $24,647 | 1997 | 4 | 2,097 | $95,279 |
| 74792203 | 95 | $3,423 | 1998 | 1 | 2,490 | $97,259 |
| 74792209 | 1,836 | $50,310 | 1998 | 2 | 2,038 | $84,079 |
| 74792336 | 370 | $27,359 | 1998 | 3 | 2,031 | $81,431 |
| 74792337 | 782 | $44,136 | 1998 | 4 | 2,171 | $83,831 |
| 74792409 | 736 | $43,096 | 1999 | 1 | 2,393 | $90,636 |
| 74792609 | 3,136 | $161,388 | 1999 | 2 | 2,183 | $93,397 |
| 74794109 | 660 | $30,853 | 1999 | 3 | 1,978 | $86,948 |
| 74797205 | 169 | $2,902 | 1999 | 4 | 2,231 | $92,879 |
| 74797305 | 11 | $143 | 2000 | 1 | 2,632 | $99,865 |
| 74798302 | 1,311 | $54,489 | 2000 | 2 | 2,448 | $77,982 |
| 74798303 | 638 | $17,094 | 2000 | 3 | 2,694 | $93,042 |
| 74798309 | 3,406 | $94,746 | 2000 | 4 | 2,528 | $90,136 |
| 74798436 | 610 | $42,696 | 2001 | 1 | 2,969 | $91,015 |
| 74798437 | 1,201 | $86,697 | 2001 | 2 | 2,717 | $60,929 |
| 74798509 | 623 | $29,048 | 2001 | 3 | 2,210 | $42,723 |
| 74799009 | 2,515 | $14,203 | 2001 | 4 | 2,614 | $50,143 |
| Total | 72,131 | $2,482,297 | Total | | 72,131 | $2,482,297 |

**Table 24B: Wisconsin SDUD Medicaid Spending by NDC and Year-Quarter for 1991Q1-1993Q1**

| *Breakdown by National Drug Code* | | | *Breakdown by Service Year and Quarter* | | | |
|---|---|---|---|---|---|---|
| NDC | # of Claims | Paid Amount | Year | Quarter | # of Claims | Paid Amount |
| 74196607 | 486 | $5,110 | 1991 | 1 | 14 | $3,273 |
| 74397703 | 118 | $566 | 1991 | 2 | 169 | $8,899 |
| 74433201 | 66 | $10,716 | 1991 | 3 | 353 | $15,225 |
| 74488710 | 269 | $1,970 | 1991 | 4 | 304 | $7,244 |
| 74488720 | 630 | $4,403 | 1992 | 1 | 508 | $11,270 |
| 74488750 | 38 | $259 | 1992 | 2 | 399 | $11,970 |
| 74488810 | 92 | $1,199 | 1992 | 3 | 497 | $15,144 |
| 74488820 | 212 | $3,107 | 1992 | 4 | 605 | $16,967 |
| 74613802 | 24 | $258 | 1993 | 1 | 569 | $17,310 |
| 74613803 | 46 | $731 | | | | |
| 74613903 | 1 | $15 | | Total | 3,418 | $107,302 |
| 74650901 | 3 | $577 | | | | |
| 74653301 | 98 | $22,561 | | | | |
| 74710013 | 10 | $944 | | | | |
| 74710023 | 29 | $1,201 | | | | |
| 74710113 | 2 | $386 | | | | |
| 74710123 | 59 | $13,410 | | | | |
| 74713809 | 732 | $13,897 | | | | |
| 74713909 | 143 | $12,464 | | | | |
| 74790209 | 55 | $1,897 | | | | |
| 74792202 | 116 | $5,842 | | | | |
| 74792203 | 1 | $4 | | | | |
| 74792209 | 8 | $209 | | | | |
| 74792409 | 17 | $483 | | | | |
| 74792609 | 120 | $3,951 | | | | |
| 74794109 | 5 | $99 | | | | |
| 74798302 | 10 | $463 | | | | |
| 74798303 | 6 | $137 | | | | |
| 74798309 | 5 | $96 | | | | |
| 74798437 | 2 | $131 | | | | |
| 74798509 | 5 | $125 | | | | |
| 74799009 | 10 | $93 | | | | |
| Total | 3,418 | $107,302 | | | | |

**Table 25: Medicaid Summary for Top Ten States, Louisiana (#12), and Wisconsin (#17)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Illinois | State Claims | 1991Q2-2001Q4 | 519,450 | 534,183 | $12,029,039 | $16,527,505 | $6,014,519 | 58,631 |
| Florida | State Claims | 1993Q4-2001Q4 | 278,623 | 287,959 | $11,700,280 | $15,561,037 | $6,532,311 | 67,076 |
| Florida | SDUD Data | 1991Q1-1993Q3 | 34,802 | 39,861 | $939,551 | $1,379,301 | $514,820 | - |
| California | State Claims | 1994Q2-2001Q4 | 267,167 | 280,994 | $7,044,315 | $9,172,917 | $3,585,421 | 56,269 |
| New Jersey | State Claims | 1992Q1-2001Q4 | 124,513 | 126,067 | $7,191,020 | $8,453,921 | $3,595,511 | 11,446 |
| New Jersey | SDUD | 1991Q1-1991Q4 | 12,374 | 13,798 | $727,856 | $915,392 | $363,928 | - |
| New York | State Claims | 1993Q1-2001Q4 | 108,386 | 120,315 | $6,877,666 | $8,921,858 | $3,438,833 | 38,184 |
| New York | SDUD | 1991Q1-1992Q4 | 5,263 | 5,791 | $149,690 | $192,898 | $74,845 | - |
| Indiana | SMRF / MAX | 1992Q1-2001Q4 | 175,577 | 182,042 | $11,214,412 | $14,812,193 | $6,936,732 | 28,880 |
| Indiana | SDUD | 1991Q1-1991Q4 | 8,572 | 9,044 | $137,297 | $249,529 | $86,826 | - |
| Kentucky | State Claims | 1995Q1-2001Q4 | 96,452 | 100,007 | $4,737,344 | $6,190,786 | $3,331,076 | 16,044 |
| Kentucky | SMRF / MAX | 1992Q1-1994Q4 | 17,559 | 20,725 | $545,830 | $910,013 | $390,572 | 3,589 |
| Kentucky | SDUD | 1991Q1-1991Q4 | 2,961 | 3,401 | $77,795 | $128,833 | $56,759 | - |
| Missouri | State Claims | 1998Q1-2001Q4 | 70,680 | 75,389 | $3,448,247 | $4,263,226 | $2,087,491 | 8,304 |
| Missouri | SMRF / MAX | 1992Q1-1997Q4 | 61,884 | 66,684 | $2,459,315 | $3,184,492 | $1,480,343 | 8,418 |
| Missouri | SDUD | 1991Q1-1991Q4 | 1,568 | 2,136 | $35,736 | $63,533 | $21,377 | - |
| Ohio | State Claims | 1991Q1-2001Q4 | 276,856 | 324,854 | $3,208,340 | $6,556,337 | $1,899,148 | 37,695 |
| Michigan | State Claims | 2000Q4-2001Q4 | 14,389 | 15,986 | $537,789 | $792,346 | $300,440 | 4,479 |
| Michigan | SMRF / MAX | 1994Q1-2000Q3 | 73,749 | 81,219 | $3,109,367 | $4,222,782 | $1,703,230 | 14,845 |
| Michigan | SDUD | 1991Q1-1993Q4 | 6,844 | 9,722 | $66,162 | $157,114 | $36,565 | - |
| Louisiana | State Claims | 1995Q1-2001Q4 | 73,705 | 76,520 | $2,970,914 | $3,834,631 | $2,102,350 | 7,211 |
| Louisiana | SDUD | 1991Q1-1994Q4 | 8,417 | 9,408 | $257,830 | $407,099 | $190,429 | - |
| Wisconsin | State Claims | 1993Q2-2001Q4 | 63,647 | 70,145 | $1,683,017 | $2,440,008 | $998,395 | 13,988 |
| Wisconsin | SDUD | 1991Q1-1993Q1 | 2,976 | 3,248 | $73,335 | $105,891 | $44,110 | - |
| Total for First 12 States | | 1991-2001 | 2,306,414 | 2,459,498 | $81,222,147 | $109,443,642 | $45,786,034 | 375,059 |
| Total for Remaining 38 States | | | 840,500 | 894,567 | $32,597,636 | $47,701,979 | $19,989,558 | 146,636 |
| **Total for All 50 States** | | | **3,146,914** | **3,354,065** | **$113,819,783** | **$157,145,620** | **$65,775,591** | **521,695** |

**Table 26A: SMRF / MAX Medicaid Spending and Utilization for the Other 38 States**

| State | Rank | Total Paid | Total Clms | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 | 1992 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 11 | $2,826,311 | 27,754 | $725,682 | $1,256,144 | $844,485 | | | | | | | |
| Georgia | 13 | $3,366,299 | 38,570 | $448,494 | $617,949 | $530,162 | $520,883 | $436,798 | $318,083 | $214,428 | $169,374 | $110,128 | |
| Pennsylvania | 14 | $3,000,627 | 51,022 | $353,285 | $456,363 | $517,822 | $430,876 | $416,621 | $271,065 | $233,988 | $183,603 | $81,284 | $55,720 |
| Arkansas | 15 | $2,860,904 | 34,561 | $297,699 | $545,795 | $406,726 | $365,113 | $373,510 | $382,926 | $225,452 | $154,887 | $73,143 | $35,653 |
| Virginia | 16 | $1,153,624 | 21,471 | $275,114 | $468,092 | $410,418 | | | | | | | |
| Washington | 18 | $2,405,010 | 56,517 | $138,848 | $324,555 | $422,238 | $312,231 | $215,126 | $435,354 | $167,992 | $157,464 | $141,685 | $89,517 |
| Alabama | 19 | $1,382,100 | 28,681 | $285,938 | $383,800 | $303,136 | | | | $160,879 | $134,685 | $85,736 | $27,926 |
| Texas | 20 | $711,035 | 27,663 | $194,040 | $243,426 | $273,569 | | | | | | | |
| Connecticut | 21 | $905,260 | 16,473 | $123,657 | $269,635 | $511,968 | | | | | | | |
| Massachusetts | 22 | $1,316,903 | 25,179 | $470,458 | $475,184 | $371,261 | | | | | | | |
| Mississippi | 23 | $2,555,123 | 23,312 | $304,662 | $611,198 | $490,180 | $481,837 | $266,232 | $155,626 | $117,913 | $85,520 | $41,955 | |
| Colorado | 24 | $2,259,903 | 35,637 | $275,921 | $444,437 | $369,774 | $270,738 | $313,614 | $259,987 | $164,307 | $161,125 | | |
| South Carolina | 25 | $400,646 | 2,979 | $71,554 | $128,369 | $200,723 | | | | | | | |
| Maryland | 26 | $453,987 | 24,933 | $165,791 | $121,772 | $166,424 | | | | | | | |
| Oklahoma | 27 | $891,933 | 20,906 | $170,312 | $328,495 | $393,126 | | | | | | | |
| West Virginia | 28 | $865,361 | 9,557 | $89,835 | $486,140 | $289,386 | | | | | | | |
| Minnesota | 29 | $1,050,355 | 37,639 | $96,596 | $177,504 | $129,124 | $139,008 | $121,210 | $116,780 | $112,409 | $115,581 | $42,143 | |
| Oregon | 30 | $220,142 | 5,363 | $52,265 | $53,865 | $114,012 | | | | | | | |
| Utah | 31 | $889,949 | 27,134 | $61,414 | $99,521 | $128,407 | $155,904 | $120,226 | $90,211 | $99,170 | $51,448 | $35,204 | $48,444 |
| Nevada | 32 | $420,031 | 3,332 | $41,850 | $153,781 | $224,400 | | | | | | | |
| Nebraska | 33 | $258,153 | 6,626 | $48,659 | $99,241 | $110,253 | | | | | | | |
| Kansas | 34 | $788,957 | 25,916 | $78,975 | $52,064 | $80,293 | $87,729 | $127,260 | $87,710 | $83,457 | $79,795 | $67,298 | $44,376 |
| Iowa | 35 | $1,047,543 | 22,917 | $109,616 | $193,400 | $220,360 | $192,651 | $103,407 | $59,831 | $42,058 | $39,965 | $54,246 | $32,009 |
| South Dakota | 36 | $173,158 | 3,716 | $34,685 | $62,906 | $75,567 | | | | | | | |
| Rhode Island | 37 | $220,677 | 3,560 | $40,280 | $84,291 | $40,684 | | | | $55,422 | | | |
| Hawaii | 38 | $72,715 | 5,305 | $18,333 | $19,480 | $17,843 | | | | | | $9,849 | $7,210 |
| Montana | 39 | $321,062 | 7,207 | $18,489 | $43,911 | $63,972 | $59,601 | $62,869 | $25,685 | $10,219 | $12,618 | $15,125 | $8,573 |
| Maine | 40 | $360,351 | 5,417 | $23,186 | $53,556 | $77,844 | $50,606 | $36,160 | $17,834 | $76,267 | $5,452 | $16,736 | $2,710 |
| Wyoming | 41 | $361,243 | 5,277 | $39,168 | $64,911 | $70,526 | $42,664 | $21,514 | $53,773 | $27,654 | $24,709 | $13,433 | $2,891 |
| Tennessee | 42 | $168 | 6,941 | $168 | $0 | $0 | | | | | | | |
| Delaware | 43 | $305,028 | 6,383 | $75,431 | $72,662 | $37,100 | $24,233 | $20,032 | $32,717 | $24,474 | $11,125 | $7,254 | |
| North Dakota | 44 | $207,405 | 3,473 | $10,582 | $62,091 | $34,098 | $26,137 | $26,381 | $15,647 | $10,392 | $6,428 | $5,227 | $10,422 |
| Idaho | 45 | $65,222 | 1,209 | $20,016 | $12,520 | $5,650 | $12,638 | $5,038 | $9,360 | | | | |
| New Hampshire | 46 | $112,206 | 3,611 | $21,816 | $17,379 | $17,064 | $8,329 | $4,329 | $9,477 | $20,252 | $4,447 | $5,624 | $3,489 |
| New Mexico | 47 | $54,842 | 1,679 | $8,712 | $11,246 | $7,600 | $3,667 | $4,912 | $18,705 | | | | |
| Alaska | 48 | $59,843 | 2,461 | $4,921 | $6,360 | $6,593 | $6,771 | $9,546 | $7,095 | $7,725 | $6,501 | $3,676 | $655 |
| Vermont | 49 | $64,079 | 1,826 | $10,000 | $12,994 | $12,153 | $16,729 | $2,996 | $919 | $3,807 | $1,968 | $949 | $1,564 |
| Washington, D.C. | 50 | $23,455 | 466 | $5,996 | $12,453 | $5,006 | | | | | | | |
| Arizona | - | $41,361 | 4,691 | $6,101 | $24,258 | $11,002 | | | | | | | |
| Total | - | $34,472,971 | 637,364 | $5,218,549 | $8,551,748 | $7,990,949 | $3,208,345 | $2,687,781 | $2,368,785 | $1,858,265 | $1,406,695 | $810,695 | $371,159 |

Table excludes 1991 data when Alabama and Hawaii have $2,695 and $35, respectively, in Medicaid spending for the Complaint products in the SMRF-Max data and all other states have zero.

**Table 26B: SDUD Medicaid Spending and Utilization for Remaining State-Years**

| State | Rank | Paid 91-98 | Clms 91-98 | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 | 1992 | 1991 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| North Carolina | 11 | $1,543,854 | 18,499 | $538,405 | $267,599 | $213,925 | $194,512 | $161,567 | $113,206 | $38,500 | $16,141 |
| Georgia | 13 | $22,313 | 202 | | | | | | | $20,072 | $2,241 |
| Pennsylvania | 14 | $28,360 | 113 | | | | | | | | $28,360 |
| Arkansas | 15 | $20,205 | 527 | | | | | | | | $20,205 |
| Virginia | 16 | $1,381,656 | 40,808 | $294,944 | $232,493 | $253,370 | $201,908 | $182,743 | $104,877 | $79,500 | $31,822 |
| Washington | 18 | $92,451 | 2,063 | | | | | | | | $92,451 |
| Alabama | 19 | $800,957 | 11,629 | $261,291 | $267,171 | $252,113 | | $203,989 | $75,451 | $54,681 | $20,383 |
| Texas | 20 | $1,385,016 | 34,914 | $302,873 | $282,694 | $195,877 | $240,827 | $73,780 | $53,301 | $25,538 | $28,624 |
| Connecticut | 21 | $1,020,758 | 17,355 | $390,245 | $260,312 | $112,415 | $97,409 | $21,907 | $14,949 | $8,105 | $7,759 |
| Massachusetts | 22 | $614,293 | 13,952 | $247,108 | $181,862 | $108,943 | $27,716 | | | | $3,703 |
| Mississippi | 23 | $23,900 | 761 | | | | | | | $18,223 | $5,677 |
| Colorado | 24 | $177,121 | 4,235 | | | | | | $119,972 | $44,246 | $12,902 |
| South Carolina | 25 | $1,503,505 | 3,317 | $360,716 | $251,261 | $287,371 | $299,880 | $175,530 | $84,170 | $38,949 | $5,627 |
| Maryland | 26 | $1,419,412 | 47,398 | $100,633 | $283,898 | $245,721 | $202,494 | $181,086 | $85,035 | $193,505 | $127,041 |
| Oklahoma | 27 | $756,404 | 20,044 | $265,852 | $199,266 | $132,243 | $70,392 | $36,939 | $41,254 | $6,343 | $4,115 |
| West Virginia | 28 | $467,998 | 7,509 | $221,573 | $91,497 | $59,383 | $46,515 | $33,864 | $9,873 | $4,885 | $409 |
| Minnesota | 29 | $106,800 | 5,366 | | | | | | | $52,573 | $54,227 |
| Oregon | 30 | $793,901 | 19,846 | $84,076 | $94,523 | $77,558 | $129,759 | $137,210 | $142,879 | $76,539 | $51,358 |
| Utah | 31 | $37,817 | 701 | | | | | | | | $37,817 |
| Nevada | 32 | $327,451 | 2,601 | $130,699 | $31,809 | $35,076 | $43,536 | $37,803 | $40,783 | $6,435 | $1,309 |
| Nebraska | 33 | $484,720 | 13,484 | $90,619 | $78,368 | $53,865 | $71,810 | $127,778 | $34,028 | $26,971 | $1,281 |
| Kansas | 34 | $10,510 | 733 | | | | | | | | $10,510 |
| Iowa | 35 | $32,121 | 864 | | | | | | | | $32,121 |
| South Dakota | 36 | $269,774 | 7,816 | $50,289 | $62,324 | $39,450 | $50,132 | $32,591 | $16,058 | $12,870 | $6,059 |
| Rhode Island | 37 | $205,523 | 3,054 | $74,846 | $60,864 | $55,600 | | $4,845 | $6,403 | $2,352 | $614 |
| Hawaii | 38 | $198,849 | 5,110 | $76,501 | $49,622 | $32,394 | $14,791 | $20,851 | | | $4,690 |
| Montana | 39 | $7,883 | 171 | | | | | | | | $7,883 |
| Maine | 40 | $3,021 | 81 | | | | | | | | $3,021 |
| Wyoming | 41 | $615 | 21 | | | | | | | | $615 |
| Tennessee | 42 | $116,412 | 918 | | | | | $10,025 | $43,542 | $53,667 | $9,178 |
| Delaware | 43 | $8,418 | 221 | | | | | | | $1,894 | $6,524 |
| North Dakota | 44 | $2,628 | 95 | | | | | | | | $2,628 |
| Idaho | 45 | $38,046 | 85 | | | | $16,104 | $12,214 | | $4,133 | $5,595 |
| New Hampshire | 46 | $2,151 | 89 | | | | | | | | $2,151 |
| New Mexico | 47 | $7,921 | 453 | | | | $3,333 | $1,076 | $574 | $1,907 | $1,032 |
| Alaska | 48 | $765 | 38 | | | | | | | | $765 |
| Vermont | 49 | $4,702 | 192 | | | | | | | | $4,702 |
| Washington, D.C. | 50 | $25,640 | 994 | $11,884 | $2,213 | $1,593 | $1,367 | $1,071 | $1,589 | $3,273 | $2,650 |
| Arizona | - | $0 | 0 | | | | | | | | |
| Total | - | $13,943,873 | 286,259 | $3,502,552 | $2,697,775 | $2,156,896 | $1,712,484 | $1,456,868 | $987,945 | $775,163 | $654,190 |

**Table 27A: Medicaid Summary for States 11 through 31 (excluding LA and WI)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| North Carolina | SMRF / MAX | 1999-2001 | 25,609 | 27,745 | $1,910,915 | $2,857,012 | $1,197,752 | 4,785 |
| North Carolina | SDUD | 1991-1998 | 17,358 | 18,499 | $1,090,550 | $1,543,854 | $699,295 | |
| Georgia | SMRF / MAX | 1993-2001 | 36,134 | 38,431 | $2,361,978 | $3,359,367 | $1,437,914 | 2,382 |
| Georgia | SDUD | 1991-1992 | 186 | 202 | $13,832 | $22,313 | $8,538 | |
| Pennsylvania | SMRF / MAX | 1992-2001 | 46,414 | 50,006 | $2,064,556 | $2,957,576 | $1,107,918 | 15,402 |
| Pennsylvania | SDUD | 1991 | 110 | 113 | $21,991 | $28,360 | $12,456 | |
| Arkansas | SMRF / MAX | 1992-2001 | 32,357 | 34,413 | $2,016,946 | $2,861,483 | $1,477,829 | 9,483 |
| Arkansas | SDUD | 1991 | 459 | 527 | $12,194 | $20,205 | $9,160 | |
| Virginia | SMRF / MAX | 1999-2001 | 19,815 | 21,369 | $777,101 | $1,171,164 | $401,601 | 4,732 |
| Virginia | SDUD | 1991-1998 | 38,077 | 40,808 | $933,092 | $1,381,656 | $474,572 | |
| Washington | SMRF / MAX | 1992-2001 | 52,763 | 56,109 | $1,652,202 | $2,418,868 | $858,617 | 12,358 |
| Washington | SDUD | 1991 | 1,825 | 2,063 | $46,503 | $92,451 | $25,209 | |
| Alabama | SMRF / MAX | 1992,95,1999-01 | 26,717 | 28,514 | $915,906 | $1,402,565 | $640,809 | 4,840 |
| Alabama | SDUD | 1991,1996-98 | 11,184 | 11,778 | $587,926 | $800,957 | $409,415 | |
| Texas | SMRF / MAX | 1999-2001 | 25,610 | 27,633 | $426,132 | $711,035 | $263,022 | 10,849 |
| Texas | SDUD | 1991-1998 | 33,691 | 34,914 | $973,413 | $1,385,016 | $613,417 | |
| Connecticut | SMRF / MAX | 1999-2001 | 15,551 | 16,532 | $652,917 | $952,276 | $326,459 | 1,660 |
| Connecticut | SDUD | 1991-1998 | 16,467 | 17,355 | $743,110 | $1,020,758 | $371,555 | |
| Massachusetts | SMRF / MAX | 1999-2001 | 23,407 | 25,027 | $863,595 | $1,314,523 | $431,798 | 7,161 |
| Massachusetts | SDUD | 1991-1998 | 13,421 | 13,952 | $458,839 | $614,293 | $229,420 | |
| Mississippi | SMRF / MAX | 1993-2001 | 21,906 | 23,262 | $1,838,235 | $2,556,485 | $1,420,321 | 5,804 |
| Mississippi | SDUD | 1991-1992 | 728 | 761 | $14,945 | $23,900 | $11,952 | |
| South Carolina | SMRF / MAX | 1999-2001 | 2,781 | 2,982 | $282,323 | $428,294 | $197,528 | 1,167 |
| South Carolina | SDUD | 1991-1998 | 3,117 | 3,317 | $1,019,022 | $1,503,505 | $720,126 | |
| Colorado | SMRF / MAX | 1994-2001 | 32,614 | 34,589 | $1,520,235 | $2,214,308 | $783,779 | 6,599 |
| Colorado | SDUD | 1991-1993 | 3,999 | 4,235 | $119,482 | $177,121 | $65,057 | |
| Maryland | SMRF / MAX | 1999-2001 | 23,215 | 24,517 | $274,032 | $453,759 | $137,016 | 3,232 |
| Maryland | SDUD | 1991-1998 | 44,968 | 47,398 | $960,343 | $1,419,412 | $480,171 | |
| Oklahoma | SMRF / MAX | 1999-2001 | 19,583 | 20,675 | $621,364 | $892,326 | $441,131 | 4,442 |
| Oklahoma | SDUD | 1991-1998 | 19,228 | 20,044 | $541,024 | $756,404 | $379,672 | |
| West Virginia | SMRF / MAX | 1999-2001 | 8,897 | 9,554 | $579,278 | $885,134 | $432,778 | 2,658 |
| West Virginia | SDUD | 1991-1998 | 7,176 | 7,509 | $337,486 | $467,998 | $248,789 | |
| Minnesota | SMRF / MAX | 1993-2001 | 30,595 | 32,459 | $662,930 | $1,009,694 | $350,631 | 11,909 |
| Minnesota | SDUD | 1991-1992 | 4,940 | 5,366 | $55,115 | $106,800 | $29,765 | |
| Oregon | SMRF / MAX | 1999-2001 | 4,965 | 5,360 | $149,338 | $222,648 | $90,063 | 1,735 |
| Oregon | SDUD | 1991-1998 | 18,896 | 19,846 | $546,655 | $793,901 | $338,964 | |
| Utah | SMRF / MAX | 1992-2001 | 25,131 | 27,122 | $590,522 | $892,038 | $429,372 | 4,616 |
| Utah | SDUD | 1991 | 643 | 701 | $25,815 | $37,817 | $19,333 | |
| Total | | 1991-2001 | 710,537 | 755,687 | $28,661,842 | $41,757,276 | $17,573,204 | 115,814 |

**Table 27B: Medicaid Summary for States 32 through 50**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Nevada | SMRF / MAX | 1999-2001 | 3,102 | 3,333 | $305,435 | $422,338 | $152,806 | 704 |
| Nevada | SDUD | 1991-1998 | 2,413 | 2,601 | $219,973 | $327,451 | $110,655 | |
| Nebraska | SMRF / MAX | 1999-2001 | 6,226 | 6,629 | $177,184 | $273,719 | $108,217 | 2,263 |
| Nebraska | SDUD | 1991-1998 | 12,736 | 13,484 | $328,857 | $484,720 | $200,453 | |
| Kansas | SMRF / MAX | 1992-2001 | 24,070 | 25,749 | $512,508 | $826,369 | $303,890 | 5,404 |
| Kansas | SDUD | 1991 | 606 | 733 | $4,215 | $10,510 | $2,417 | |
| Iowa | SMRF / MAX | 1992-2001 | 21,139 | 22,714 | $719,272 | $1,061,276 | $455,289 | 8,233 |
| Iowa | SDUD | 1991 | 818 | 864 | $20,524 | $32,121 | $13,014 | |
| South Dakota | SMRF / MAX | 1999-2001 | 3,480 | 3,716 | $117,277 | $173,158 | $80,201 | 1,009 |
| South Dakota | SDUD | 1991-1998 | 7,506 | 7,816 | $189,949 | $269,774 | $128,334 | |
| Rhode Island | SMRF / MAX | 1995,1999-01 | 3,279 | 3,544 | $142,379 | $224,157 | $77,244 | 550 |
| Rhode Island | SDUD | 1991-94,1996-98 | 2,922 | 3,054 | $154,502 | $205,523 | $82,806 | |
| Montana | SMRF / MAX | 1992-2001 | 6,743 | 7,204 | $222,865 | $327,431 | $157,710 | 1,907 |
| Montana | SDUD | 1991 | 139 | 171 | $4,527 | $7,883 | $3,247 | |
| Hawaii | SMRF / MAX | 1999-01,1992-93 | 4,631 | 5,003 | $40,998 | $72,730 | $21,043 | 456 |
| Hawaii | SDUD | 1991,1994-98 | 5,149 | 5,527 | $135,933 | $198,849 | $68,058 | |
| Maine | SMRF / MAX | 1992-2001 | 5,054 | 5,419 | $247,269 | $364,368 | $160,690 | 2,439 |
| Maine | SDUD | 1991 | 73 | 81 | $1,538 | $3,021 | $977 | |
| Wyoming | SMRF / MAX | 1992-2001 | 4,946 | 5,235 | $245,884 | $360,392 | $155,375 | 1,855 |
| Wyoming | SDUD | 1991 | 15 | 21 | $345 | $615 | $235 | |
| Tennessee | SDUD | 1991-1994 | 856 | 918 | $74,016 | $116,412 | $50,299 | |
| Delaware | SMRF / MAX | 1993-2001 | 5,907 | 6,381 | $196,402 | $305,021 | $98,277 | 1,298 |
| Delaware | SDUD | 1991-1992 | 177 | 221 | $4,320 | $8,418 | $2,162 | |
| North Dakota | SMRF / MAX | 1992-2001 | 3,159 | 3,362 | $141,548 | $222,881 | $98,981 | 1,921 |
| North Dakota | SDUD | 1991 | 84 | 95 | $1,314 | $2,628 | $920 | |
| Idaho | SMRF / MAX | 1996-2001 | 175 | 180 | $19,674 | $27,036 | $13,578 | 186 |
| Idaho | SDUD | 1991-1995 | 80 | 85 | $25,069 | $38,046 | $17,884 | |
| New Hampshire | SMRF / MAX | 1992-2001 | 3,411 | 3,607 | $71,603 | $112,152 | $35,801 | 1,488 |
| New Hampshire | SDUD | 1991 | 84 | 89 | $1,372 | $2,151 | $686 | |
| New Mexico | SMRF / MAX | 1996-2001 | 551 | 590 | $18,907 | $27,284 | $13,764 | 564 |
| New Mexico | SDUD | 1991-1995 | 419 | 453 | $4,503 | $7,921 | $3,320 | |
| Alaska | SMRF / MAX | 1992-2001 | 2,261 | 2,456 | $35,236 | $59,789 | $18,483 | 579 |
| Alaska | SDUD | 1991 | 35 | 38 | $309 | $765 | $154 | |
| Vermont | SMRF / MAX | 1992-2001 | 1,662 | 1,797 | $40,684 | $63,732 | $25,187 | 429 |
| Vermont | SDUD | 1991 | 176 | 192 | $2,111 | $4,702 | $1,308 | |
| Washington, D.C. | SMRF / MAX | 1999-2001 | 432 | 458 | $14,900 | $23,509 | $7,450 | 241 |
| Washington, D.C. | SDUD | 1991-1998 | 962 | 994 | $17,800 | $25,640 | $8,900 | |
| Total | | | 129,963 | 138,880 | $3,935,794 | $5,944,703 | $2,416,354 | 30,822 |

**Table 28: Summary of Medicare DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J3370 | 284,572 | $24,495,216 | 19911 | 2 | $0 |
| J7051 | 149,811 | $1,540,660 | 19912 | 3 | $0 |
| J2912 | 93,194 | $19,623 | 19913 | 1 | $0 |
| J7030 | 19,567 | $7,605 | 19914 | 2 | $0 |
| J7070 | 8,534 | $6,937 | 19921 | 34 | $85 |
| J7050 | 42,326 | $6,639 | 19922 | 36 | $0 |
| J7060 | 15,267 | $6,636 | 19923 | 38 | $6 |
| J7040 | 11,881 | $2,671 | 19924 | 221 | $3,932 |
| J7042 | 17,449 | $126 | 19931 | 697 | $10,684 |
| J7130 | 380 | $4 | 19932 | 1,176 | $26,322 |
| J7110 | 33 | $0 | 19933 | 2,411 | $57,896 |
| | | | 19934 | 6,730 | $276,292 |
| Total | 643,014 | $26,086,119 | 19941 | 15,000 | $995,684 |
| | | | 19942 | 19,793 | $1,704,857 |
| | | | 19943 | 20,578 | $2,331,864 |
| | | | 19944 | 21,534 | $2,441,013 |
| | | | 19951 | 23,219 | $2,654,761 |
| | | | 19952 | 23,219 | $2,589,107 |
| | | | 19953 | 23,214 | $2,377,620 |
| | | | 19954 | 23,559 | $2,327,443 |
| | | | 19961 | 27,415 | $2,456,958 |
| | | | 19962 | 28,490 | $2,519,795 |
| | | | 19963 | 24,659 | $1,831,696 |
| | | | 19964 | 13,249 | $168,784 |
| | | | 19971 | 12,903 | $61,730 |
| | | | 19972 | 19,341 | $138,287 |
| | | | 19973 | 17,827 | $123,316 |
| | | | 19974 | 17,774 | $107,871 |
| | | | 19981 | 19,346 | $88,786 |
| | | | 19982 | 18,220 | $81,025 |
| | | | 19983 | 18,708 | $63,374 |
| | | | 19984 | 18,552 | $58,251 |
| | | | 19991 | 19,143 | $53,670 |
| | | | 19992 | 18,745 | $55,058 |
| | | | 19993 | 17,212 | $48,349 |
| | | | 19994 | 16,886 | $46,279 |
| | | | 20001 | 18,369 | $35,098 |
| Carrier # | # Claims | Medicare $ | 20002 | 17,951 | $53,702 |
| | | | 20003 | 19,375 | $53,168 |
| 885 | 257,015 | $11,841,587 | 20004 | 18,974 | $52,001 |
| 635 | 184,090 | $7,265,433 | 20011 | 19,600 | $47,238 |
| 5655 | 115,639 | $3,612,608 | 20012 | 18,595 | $47,975 |
| 10555 | 72,862 | $3,347,291 | 20013 | 19,505 | $46,731 |
| 811 | 13,408 | $19,199 | 20014 | 20,708 | $49,411 |
| Total | 643,014 | $26,086,119 | Total | 643,014 | $26,086,119 |

**Table 29: Summary of Medicare Palmetto (885) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J3370 | 108,388 | $11,020,106 | 19911 | 0 | $0 |
| J7051 | 72,770 | $821,426 | 19912 | 0 | $0 |
| J7060 | 5,286 | $55 | 19913 | 0 | $0 |
| J7042 | 5,221 | $0 | 19914 | 1 | $0 |
| J7110 | 5 | $0 | 19921 | 9 | $0 |
| J7070 | 2,606 | $0 | 19922 | 14 | $0 |
| J7030 | 7,486 | $0 | 19923 | 5 | $0 |
| J7050 | 20,510 | $0 | 19924 | 73 | $1,617 |
| J7130 | 273 | $0 | 19931 | 213 | $5,892 |
| J7040 | 3,951 | $0 | 19932 | 377 | $15,497 |
| J2912 | 30,519 | $0 | 19933 | 734 | $32,658 |
|  |  |  | 19934 | 2,010 | $156,582 |
| Total | 257,015 | $11,841,587 | 19941 | 4,929 | $505,622 |
|  |  |  | 19942 | 6,955 | $893,386 |
|  |  |  | 19943 | 6,888 | $1,164,659 |
|  |  |  | 19944 | 6,954 | $1,158,498 |
|  |  |  | 19951 | 8,073 | $1,203,175 |
|  |  |  | 19952 | 8,830 | $1,031,990 |
|  |  |  | 19953 | 9,570 | $981,771 |
|  |  |  | 19954 | 9,383 | $1,008,886 |
|  |  |  | 19961 | 11,897 | $1,050,583 |
|  |  |  | 19962 | 11,953 | $1,054,470 |
|  |  |  | 19963 | 10,967 | $825,053 |
|  |  |  | 19964 | 6,325 | $102,468 |
|  |  |  | 19971 | 5,960 | $34,008 |
|  |  |  | 19972 | 7,411 | $47,288 |
|  |  |  | 19973 | 6,934 | $45,069 |
|  |  |  | 19974 | 6,588 | $43,748 |
|  |  |  | 19981 | 7,434 | $39,650 |
|  |  |  | 19982 | 7,418 | $37,776 |
|  |  |  | 19983 | 7,539 | $31,101 |
|  |  |  | 19984 | 7,465 | $32,191 |
|  |  |  | 19991 | 8,140 | $31,236 |
|  |  |  | 19992 | 7,362 | $31,371 |
|  |  |  | 19993 | 6,976 | $27,231 |
|  |  |  | 19994 | 7,165 | $27,561 |
|  |  |  | 20001 | 7,711 | $20,983 |
|  |  |  | 20002 | 7,679 | $33,318 |
|  |  |  | 20003 | 8,548 | $31,090 |
|  |  |  | 20004 | 8,099 | $30,572 |
|  |  |  | 20011 | 8,460 | $27,651 |
|  |  |  | 20012 | 7,791 | $26,547 |
|  |  |  | 20013 | 7,864 | $24,813 |
|  |  |  | 20014 | 8,311 | $25,576 |
|  |  |  | Total | 257,015 | $11,841,587 |

**Table 30: Summary of Medicare AdminaStar (635) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J3370 | 83,142 | $6,959,594 | 19911 | 1 | $0 |
| J7051 | 29,482 | $269,429 | 19912 | 0 | $0 |
| J2912 | 33,848 | $19,036 | 19913 | 0 | $0 |
| J7050 | 13,752 | $6,185 | 19914 | 0 | $0 |
| J7060 | 4,667 | $5,760 | 19921 | 4 | $85 |
| J7070 | 3,233 | $2,343 | 19922 | 12 | $0 |
| J7030 | 5,563 | $1,628 | 19923 | 18 | $0 |
| J7040 | 4,070 | $1,455 | 19924 | 76 | $2,201 |
| J7130 | 34 | $4 | 19931 | 264 | $4,676 |
| J7042 | 6,276 | $0 | 19932 | 428 | $9,132 |
| J7110 | 23 | $0 | 19933 | 1,021 | $17,520 |
| | | | 19934 | 2,924 | $71,484 |
| Total | 184,090 | $7,265,433 | 19941 | 5,641 | $290,419 |
| | | | 19942 | 6,796 | $469,898 |
| | | | 19943 | 7,123 | $663,628 |
| | | | 19944 | 7,913 | $749,915 |
| | | | 19951 | 8,165 | $784,950 |
| | | | 19952 | 7,138 | $824,503 |
| | | | 19953 | 6,643 | $678,446 |
| | | | 19954 | 6,835 | $610,029 |
| | | | 19961 | 7,393 | $666,374 |
| | | | 19962 | 7,729 | $693,640 |
| | | | 19963 | 6,745 | $495,421 |
| | | | 19964 | 3,469 | $33,502 |
| | | | 19971 | 3,480 | $17,156 |
| | | | 19972 | 4,454 | $31,111 |
| | | | 19973 | 4,700 | $28,001 |
| | | | 19974 | 4,908 | $18,460 |
| | | | 19981 | 4,956 | $10,946 |
| | | | 19982 | 4,849 | $9,194 |
| | | | 19983 | 5,095 | $7,478 |
| | | | 19984 | 5,100 | $6,954 |
| | | | 19991 | 4,811 | $5,561 |
| | | | 19992 | 5,329 | $6,745 |
| | | | 19993 | 4,814 | $5,168 |
| | | | 19994 | 4,431 | $4,921 |
| | | | 20001 | 4,719 | $4,202 |
| | | | 20002 | 4,567 | $6,418 |
| | | | 20003 | 5,084 | $7,205 |
| | | | 20004 | 5,093 | $6,502 |
| | | | 20011 | 5,390 | $5,623 |
| | | | 20012 | 4,637 | $5,872 |
| | | | 20013 | 5,304 | $6,121 |
| | | | 20014 | 6,031 | $5,974 |
| | | | Total | 184,090 | $7,265,433 |

**Table 31: Summary of Medicare CIGNA (5655) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J3370 | 43,428 | $3,285,355 | 19911 | 1 | $0 |
| J7051 | 35,150 | $314,349 | 19912 | 0 | $0 |
| J7030 | 4,527 | $5,915 | 19913 | 0 | $0 |
| J7070 | 1,788 | $4,595 | 19914 | 1 | $0 |
| J7040 | 2,563 | $1,207 | 19921 | 8 | $0 |
| J2912 | 16,035 | $547 | 19922 | 6 | $0 |
| J7050 | 4,738 | $343 | 19923 | 1 | $6 |
| J7060 | 3,272 | $298 | 19924 | 35 | $114 |
| J7110 | 5 | $0 | 19931 | 110 | $63 |
| J7130 | 64 | $0 | 19932 | 196 | $1,547 |
| J7042 | 4,069 | $0 | 19933 | 386 | $4,371 |
|  |  |  | 19934 | 1,212 | $23,958 |
| Total | 115,639 | $3,612,608 | 19941 | 2,746 | $112,547 |
|  |  |  | 19942 | 3,147 | $173,077 |
|  |  |  | 19943 | 3,053 | $269,917 |
|  |  |  | 19944 | 3,133 | $297,581 |
|  |  |  | 19951 | 3,452 | $340,330 |
|  |  |  | 19952 | 3,286 | $363,368 |
|  |  |  | 19953 | 3,331 | $366,818 |
|  |  |  | 19954 | 3,636 | $362,418 |
|  |  |  | 19961 | 3,945 | $375,437 |
|  |  |  | 19962 | 4,026 | $344,589 |
|  |  |  | 19963 | 3,355 | $231,379 |
|  |  |  | 19964 | 1,711 | $17,854 |
|  |  |  | 19971 | 1,791 | $4,736 |
|  |  |  | 19972 | 5,088 | $40,733 |
|  |  |  | 19973 | 3,948 | $32,454 |
|  |  |  | 19974 | 4,073 | $27,228 |
|  |  |  | 19981 | 4,350 | $22,748 |
|  |  |  | 19982 | 3,625 | $21,051 |
|  |  |  | 19983 | 3,689 | $18,714 |
|  |  |  | 19984 | 3,553 | $15,427 |
|  |  |  | 19991 | 3,641 | $13,254 |
|  |  |  | 19992 | 3,581 | $13,704 |
|  |  |  | 19993 | 3,450 | $13,345 |
|  |  |  | 19994 | 3,283 | $10,970 |
|  |  |  | 20001 | 3,981 | $8,008 |
|  |  |  | 20002 | 3,445 | $11,360 |
|  |  |  | 20003 | 3,642 | $12,262 |
|  |  |  | 20004 | 3,682 | $11,883 |
|  |  |  | 20011 | 3,736 | $10,389 |
|  |  |  | 20012 | 4,219 | $12,048 |
|  |  |  | 20013 | 4,092 | $12,493 |
|  |  |  | 20014 | 3,993 | $14,430 |
|  |  |  | Total | 115,639 | $3,612,608 |

**Table 32: Summary of Medicare Travelers (10555) DME Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J3370 | 43,004 | $3,230,099 | 19911 | 0 | $0 |
| J7051 | 10,057 | $116,318 | 19912 | 3 | $0 |
| J7060 | 1,768 | $524 | 19913 | 1 | $0 |
| J7042 | 1,403 | $126 | 19914 | 0 | $0 |
| J7050 | 2,970 | $112 | 19921 | 13 | $0 |
| J7030 | 1,511 | $62 | 19922 | 4 | $0 |
| J2912 | 10,471 | $40 | 19923 | 14 | $0 |
| J7040 | 877 | $10 | 19924 | 37 | $0 |
| J7130 | 9 | $0 | 19931 | 110 | $53 |
| J7070 | 792 | $0 | 19932 | 175 | $145 |
| | | | 19933 | 270 | $3,347 |
| Total | 72,862 | $3,347,291 | 19934 | 584 | $24,270 |
| | | | 19941 | 1,684 | $87,097 |
| | | | 19942 | 2,895 | $168,496 |
| | | | 19943 | 3,514 | $233,659 |
| | | | 19944 | 3,534 | $235,018 |
| | | | 19951 | 3,529 | $326,306 |
| | | | 19952 | 3,965 | $369,246 |
| | | | 19953 | 3,670 | $350,584 |
| | | | 19954 | 3,705 | $346,111 |
| | | | 19961 | 4,180 | $364,563 |
| | | | 19962 | 4,782 | $427,097 |
| | | | 19963 | 3,592 | $279,843 |
| | | | 19964 | 1,744 | $14,960 |
| | | | 19971 | 1,672 | $5,830 |
| | | | 19972 | 2,388 | $19,154 |
| | | | 19973 | 2,245 | $17,794 |
| | | | 19974 | 2,203 | $18,435 |
| | | | 19981 | 2,602 | $15,442 |
| | | | 19982 | 2,325 | $12,969 |
| | | | 19983 | 2,382 | $6,011 |
| | | | 19984 | 2,419 | $3,679 |
| | | | 19991 | 2,479 | $3,620 |
| | | | 19992 | 2,417 | $3,228 |
| | | | 19993 | 1,880 | $2,605 |
| | | | 19994 | 1,831 | $2,806 |
| | | | 20001 | 1,688 | $1,581 |
| | | | 20002 | 1,693 | $2,197 |
| | | | 20003 | 633 | $1,144 |
| | | | 20004 | 0 | $0 |
| | | | 20011 | 0 | $0 |
| | | | 20012 | 0 | $0 |
| | | | 20013 | 0 | $0 |
| | | | 20014 | 0 | $0 |
| | | | Total | 72,862 | $3,347,291 |

**Table 33: Summary for Medicare DME Claims: J3370**

| Carrier | # Clms w/DIFF>0 | # Claims | % of Claims | Aggregate DIFF | Total MCR Paid | % of MCR Paid | # Prov Payments |
|---------|-----------------|----------|-------------|----------------|----------------|---------------|-----------------|
| Palmetto | 44,020 | 44,905 | 98.0% | $4,710,809 | $10,939,132 | 43.1% | 24,961 |
| AdminaStar | 29,325 | 29,841 | 98.3% | $3,685,842 | $6,731,020 | 54.8% | 14,531 |
| CIGNA | 14,469 | 14,729 | 98.2% | $1,372,475 | $3,190,253 | 43.0% | 8,580 |
| Travelers | 13,861 | 14,145 | 98.0% | $1,334,128 | $2,671,129 | 49.9% | 6,028 |
| Total | 101,675 | 103,620 | 98.1% | $11,103,254 | $23,531,534 | 47.2% | 54,100 |

**Table 34: Summary of Medicare Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J7050 | 9,647,324 | $97,710,493 | 19911 | 120,163 | $680,035 |
| J7040 | 3,422,070 | $25,943,107 | 19912 | 131,205 | $803,635 |
| J7030 | 2,526,793 | $17,542,997 | 19913 | 138,739 | $849,036 |
| J7060 | 2,023,911 | $17,331,264 | 19914 | 146,696 | $907,204 |
| J7042 | 727,921 | $6,962,715 | 19921 | 184,394 | $914,887 |
| J7070 | 712,505 | $6,508,680 | 19922 | 202,607 | $1,103,032 |
| J3370 | 367,540 | $5,718,976 | 19923 | 213,469 | $1,190,901 |
| J7051 | 1,810,064 | $4,168,155 | 19924 | 227,487 | $1,279,459 |
| J2912 | 1,163,968 | $3,447,680 | 19931 | 248,450 | $1,457,619 |
| J7130 | 47,371 | $161,243 | 19932 | 251,771 | $1,611,063 |
| J7110 | 914 | $35,621 | 19933 | 244,606 | $1,644,059 |
| | | | 19934 | 258,329 | $1,706,615 |
| Total | 22,450,381 | $185,530,931 | 19941 | 307,213 | $1,303,070 |
| | | | 19942 | 294,432 | $1,466,909 |
| | | | 19943 | 314,295 | $2,177,990 |
| | | | 19944 | 337,569 | $2,351,863 |
| | | | 19951 | 393,673 | $2,775,599 |
| | | | 19952 | 409,426 | $3,121,357 |
| | | | 19953 | 418,084 | $3,243,635 |
| | | | 19954 | 428,113 | $3,247,975 |
| | | | 19961 | 471,037 | $3,613,674 |
| | | | 19962 | 479,667 | $3,884,295 |
| | | | 19963 | 503,110 | $4,191,517 |
| | | | 19964 | 527,271 | $4,492,160 |
| | | | 19971 | 574,703 | $4,789,608 |
| | | | 19972 | 600,840 | $5,129,165 |
| | | | 19973 | 610,478 | $5,306,164 |
| | | | 19974 | 625,975 | $5,455,621 |
| | | | 19981 | 673,842 | $5,494,836 |
| | | | 19982 | 682,068 | $5,724,863 |
| | | | 19983 | 695,431 | $5,980,674 |
| | | | 19984 | 698,740 | $6,005,275 |
| | | | 19991 | 764,763 | $6,451,015 |
| | | | 19992 | 784,584 | $6,880,465 |
| | | | 19993 | 798,722 | $7,145,975 |
| | | | 19994 | 796,880 | $7,127,959 |
| | | | 20001 | 835,468 | $7,539,907 |
| | | | 20002 | 808,093 | $7,530,438 |
| | | | 20003 | 808,272 | $7,490,096 |
| | | | 20004 | 816,109 | $7,640,531 |
| | | | 20011 | 899,691 | $8,182,848 |
| | | | 20012 | 907,208 | $8,637,891 |
| | | | 20013 | 898,673 | $8,487,003 |
| | | | 20014 | 918,035 | $8,513,009 |
| | | | Total | 22,450,381 | $185,530,931 |

**Table 35: Medicare Carrier Claims and Medicare Spending by Carrier Number**

| Carrier # | Carrier Name | # Claims | Medicare $ | Carrier # | Carrier Name | # Claims | Medicare $ |
|---|---|---|---|---|---|---|---|
| 590 | Florida BS | 2,727,819 | $25,899,070 | 826 | Iowa - North Dakota BS | 91,830 | $847,162 |
| 900 | Texas BS | 2,023,834 | $17,484,679 | 834 | Nevada - North Dakota BS | 115,246 | $844,453 |
| 16360 | Ohio - Nationwide Insurance Co. | 874,231 | $6,874,933 | 904 | Virginia - Texas BS | 99,077 | $839,573 |
| 803 | New York - Empire BS | 912,930 | $6,325,406 | 1030 | Arizona - AETNA | 114,094 | $813,987 |
| 31140 | California - National Heritage Ins. | 756,656 | $5,982,213 | 580 | District of Columbia - Pennsylvania BS | 99,408 | $798,594 |
| 865 | Pennsylvania BS | 664,563 | $5,909,024 | 591 | Connecticut - Florida BS | 65,567 | $790,489 |
| 5440 | Tennessee - Connecticut General | 838,684 | $5,864,826 | 31143 | Massachusetts - National Heritage Ins. | 68,729 | $701,759 |
| 5535 | North Carolina - Connecticut General | 583,483 | $5,160,167 | 882 | RRB - South Carolina PGBA | 93,073 | $697,998 |
| 952 | Illinois - Wisconsin Phy Svc | 475,006 | $4,746,578 | 640 | Iowa - Wellmark, Inc. | 83,013 | $679,439 |
| 953 | Michigan - Wisconsin Phy Svc | 490,396 | $4,596,695 | 1290 | Nevada - AETNA | 93,628 | $637,605 |
| 801 | New York - Western BS | 467,029 | $4,319,178 | 512 | Mississippi - Alabama BS | 76,808 | $579,019 |
| 951 | Wisconsin - Wisconsin Phy Svc | 489,333 | $3,958,860 | 710 | Michigan BS | 108,085 | $521,452 |
| 511 | Georgia - Alabama BS | 456,648 | $3,926,952 | 910 | Utah BS | 59,556 | $496,465 |
| 2050 | California - TOLIC | 623,878 | $3,836,842 | 954 | Minnesota - Wisconsin Phy Svc | 50,580 | $446,335 |
| 621 | Illinois BS - HCSC | 449,971 | $3,738,357 | 1390 | Washington - AETNA | 66,989 | $436,813 |
| 805 | New Jersey - Empire BS | 317,003 | $3,561,663 | 1380 | Oregon - AETNA | 66,225 | $427,173 |
| 660 | Kentucky - AdminaStar | 361,137 | $3,378,646 | 870 | Rhode Island BS | 44,918 | $414,469 |
| 510 | Alabama BS | 333,867 | $3,093,427 | 31142 | Maine - National Heritage Ins. | 37,082 | $399,704 |
| 880 | South Carolina BS | 460,437 | $3,012,938 | 902 | Delaware - Texas BS | 36,196 | $313,620 |
| 10490 | Virginia - Metra Health | 391,812 | $2,978,284 | 14330 | New York - GHI | 35,901 | $313,612 |
| 860 | New Jersey - Pennsylvania BS | 302,912 | $2,743,402 | 550 | Colorado BS | 57,909 | $284,076 |
| 542 | California BS | 491,251 | $2,702,111 | 700 | Massachusetts BS | 35,010 | $253,509 |
| 973 | Triple-S, Inc. - Puerto Rico | 223,173 | $2,412,843 | 5130 | Idaho - Connecticut General | 35,385 | $240,915 |
| 623 | Michigan - Illinois Blue Shield | 255,220 | $2,291,903 | 522 | Oklahoma - Arkansas BS | 70,573 | $238,531 |
| 10250 | Mississippi - MetraHealth | 247,939 | $2,202,423 | 10074 | Unlisted | 56,847 | $221,835 |
| 520 | Arkansas BS | 190,394 | $2,132,730 | 31144 | New Hampshire - National Heritage Ins. | 14,466 | $209,228 |
| 820 | North Dakota - North Dakota BS | 234,211 | $2,129,561 | 570 | Delaware - Pennsylvania BS | 28,449 | $205,058 |
| 523 | Missouri - Arkansas BS | 202,218 | $2,035,069 | 31145 | Vermont - National Heritage Ins. | 19,377 | $184,547 |
| 824 | Colorado - North Dakota BS | 249,382 | $1,943,450 | 21200 | Maine - BS of Massachusetts | 22,862 | $173,677 |
| 10230 | Connecticut - MetraHealth | 192,351 | $1,932,539 | 720 | Minnesota BS | 33,436 | $172,157 |
| 528 | Louisiana - Arkansas BS | 239,327 | $1,923,506 | 1370 | Oklahoma - AETNA | 57,177 | $147,707 |
| 836 | Washington - North Dakota BS | 193,983 | $1,763,752 | 780 | New Hamp / Verm - Massachusetts BS | 19,103 | $140,750 |
| 630 | Indiana - AdminaStar | 336,308 | $1,684,826 | 831 | Alaska - North Dakota BS | 13,914 | $138,821 |
| 832 | Arizona - North Dakota BS | 185,426 | $1,630,769 | 833 | Hawaii - North Dakota BS | 18,775 | $132,534 |
| 11260 | Missouri - General American Life | 245,098 | $1,619,978 | 932 | Unlisted | 22,324 | $128,758 |
| 10072 | Unlisted | 293,954 | $1,543,195 | 825 | Wyoming - North Dakota BS | 13,862 | $89,015 |
| 1040 | Georgia - AETNA | 187,385 | $1,523,131 | 521 | New Mexico - Arkansas BS | 29,168 | $76,892 |
| 650 | Kansas BS | 182,474 | $1,369,556 | 1020 | Alaska - AETNA | 6,531 | $50,350 |
| 31146 | So. California - NHIC | 191,620 | $1,358,371 | 1360 | New Mexico - AETNA | 10,328 | $31,678 |
| 655 | Nebraska - Kansas BS | 134,516 | $1,355,106 | 1120 | Hawaii - AETNA | 8,996 | $28,125 |
| 901 | Maryland - Texas BS | 137,496 | $1,119,560 | 883 | Maryland BS | 1,966 | $15,793 |
| 903 | District of Columbia - Texas BS | 123,026 | $1,117,218 | 690 | Unlisted | 6,982 | $10,152 |
| 835 | Oregon - North Dakota BS | 123,033 | $1,105,436 | 884 | Maryland BS | 209 | $692 |
| 16510 | West Virginia - Nationwide Insurance Co. | 122,526 | $1,098,888 | 974 | Triple-S, Inc. - Virgin Islands | 42 | $398 |
| 740 | Missouri - BS Kansas City | 115,802 | $1,039,237 | 524 | Unlisted | 4 | $0 |
| 10240 | Minnesota - MetraHealth | 134,858 | $989,150 | | Total | 22,450,381 | $185,530,931 |
| 751 | Montana BS | 116,091 | $939,566 | | | | |

**Table 36: Summary of Medicare Connecticut General Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|-----------|----------|-----------|
| J7050 | 529,927 | $5,616,009 | 19911 | 13,076 | $72,188 |
| J7060 | 193,920 | $1,657,276 | 19912 | 14,140 | $91,517 |
| J7040 | 239,106 | $1,565,848 | 19913 | 14,818 | $99,938 |
| J7030 | 209,456 | $1,125,915 | 19914 | 14,258 | $98,520 |
| J7070 | 77,255 | $544,441 | 19921 | 17,816 | $110,696 |
| J7042 | 55,709 | $496,226 | 19922 | 18,465 | $123,614 |
| J3370 | 10,284 | $114,805 | 19923 | 19,077 | $131,148 |
| J7051 | 87,475 | $83,104 | 19924 | 18,984 | $123,402 |
| J2912 | 54,279 | $58,125 | 19931 | 19,271 | $132,263 |
| J7110 | 72 | $3,978 | 19932 | 18,894 | $141,100 |
| J7130 | 69 | $179 | 19933 | 18,218 | $131,886 |
|  |  |  | 19934 | 19,624 | $139,117 |
| Total | 1,457,552 | $11,265,907 | 19941 | 24,887 | $87,481 |
|  |  |  | 19942 | 22,146 | $93,999 |
|  |  |  | 19943 | 21,763 | $166,197 |
|  |  |  | 19944 | 22,911 | $174,695 |
|  |  |  | 19951 | 24,972 | $185,365 |
|  |  |  | 19952 | 24,278 | $190,163 |
|  |  |  | 19953 | 25,187 | $196,010 |
|  |  |  | 19954 | 25,949 | $214,212 |
|  |  |  | 19961 | 27,934 | $253,638 |
|  |  |  | 19962 | 29,889 | $292,621 |
|  |  |  | 19963 | 32,778 | $314,853 |
|  |  |  | 19964 | 32,987 | $312,271 |
|  |  |  | 19971 | 36,015 | $316,589 |
|  |  |  | 19972 | 37,589 | $322,412 |
|  |  |  | 19973 | 39,083 | $335,082 |
|  |  |  | 19974 | 39,670 | $329,071 |
|  |  |  | 19981 | 44,589 | $329,592 |
|  |  |  | 19982 | 44,666 | $330,115 |
|  |  |  | 19983 | 44,849 | $332,251 |
|  |  |  | 19984 | 45,589 | $321,139 |
|  |  |  | 19991 | 49,717 | $339,098 |
|  |  |  | 19992 | 46,438 | $336,006 |
|  |  |  | 19993 | 45,226 | $343,177 |
|  |  |  | 19994 | 46,299 | $360,565 |
|  |  |  | 20001 | 50,588 | $392,066 |
|  |  |  | 20002 | 50,411 | $411,276 |
|  |  |  | 20003 | 50,435 | $416,403 |
| Carrier # | # Claims | Medicare $ | 20004 | 48,844 | $407,214 |
|  |  |  | 20011 | 56,236 | $453,602 |
| 5440 | 838,684 | $5,864,826 | 20012 | 54,270 | $441,765 |
| 5535 | 583,483 | $5,160,167 | 20013 | 53,757 | $442,865 |
| 5130 | 35,385 | $240,915 | 20014 | 50,959 | $428,730 |
| Total | 1,457,552 | $11,265,907 | Total | 1,457,552 | $11,265,907 |

**Table 37: Summary of Medicare Wisconsin Phy Svc Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|---|-----------|----------|-----------|
| J7050 | 702,175 | $8,134,858 | | 19911 | 2,314 | $19,740 |
| J7040 | 254,023 | $1,980,228 | | 19912 | 3,157 | $23,033 |
| J7030 | 125,860 | $936,239 | | 19913 | 3,603 | $26,283 |
| J7060 | 89,735 | $722,573 | | 19914 | 3,436 | $26,794 |
| J3370 | 46,699 | $550,556 | | 19921 | 3,612 | $23,632 |
| J7051 | 135,857 | $405,583 | | 19922 | 3,942 | $29,899 |
| J7042 | 41,926 | $393,785 | | 19923 | 4,194 | $31,667 |
| J7070 | 31,865 | $332,684 | | 19924 | 4,342 | $33,181 |
| J2912 | 77,121 | $291,438 | | 19931 | 4,219 | $29,801 |
| J7110 | 12 | $518 | | 19932 | 4,666 | $35,859 |
| J7130 | 42 | $5 | | 19933 | 4,531 | $36,341 |
| | | | | 19934 | 4,601 | $36,466 |
| Total | 1,505,315 | $13,748,467 | | 19941 | 4,592 | $11,968 |
| | | | | 19942 | 3,796 | $29,164 |
| | | | | 19943 | 4,928 | $45,211 |
| | | | | 19944 | 3,849 | $34,894 |
| | | | | 19951 | 6,166 | $48,786 |
| | | | | 19952 | 8,399 | $67,134 |
| | | | | 19953 | 8,921 | $67,766 |
| | | | | 19954 | 8,348 | $64,874 |
| | | | | 19961 | 9,195 | $68,898 |
| | | | | 19962 | 10,464 | $77,493 |
| | | | | 19963 | 11,179 | $85,924 |
| | | | | 19964 | 12,075 | $94,641 |
| | | | | 19971 | 12,794 | $98,187 |
| | | | | 19972 | 13,742 | $102,141 |
| | | | | 19973 | 14,217 | $103,474 |
| | | | | 19974 | 14,728 | $113,772 |
| | | | | 19981 | 17,414 | $125,382 |
| | | | | 19982 | 22,640 | $172,174 |
| | | | | 19983 | 64,200 | $562,640 |
| | | | | 19984 | 73,226 | $662,618 |
| | | | | 19991 | 74,069 | $644,401 |
| | | | | 19992 | 80,896 | $741,039 |
| | | | | 19993 | 85,259 | $819,207 |
| | | | | 19994 | 84,553 | $829,279 |
| | | | | 20001 | 85,652 | $808,659 |
| | | | | 20002 | 90,664 | $873,056 |
| Carrier # | # Claims | Medicare $ | | 20003 | 98,153 | $911,902 |
| | | | | 20004 | 99,734 | $962,091 |
| 952 | 475,006 | $4,746,578 | | 20011 | 102,080 | $970,414 |
| 953 | 490,396 | $4,596,695 | | 20012 | 109,052 | $1,051,093 |
| 951 | 489,333 | $3,958,860 | | 20013 | 111,357 | $1,068,847 |
| 954 | 50,580 | $446,335 | | 20014 | 112,356 | $1,078,646 |
| Total | 1,505,315 | $13,748,467 | | Total | 1,505,315 | $13,748,467 |

0.10357612

**Table 38: Summary of Medicare Other Region 5 Carrier Claims Category 1: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J7050 | 1,001,619 | $8,637,316 | 19911 | 16,413 | $74,490 |
| J7040 | 313,532 | $2,132,895 | 19912 | 18,384 | $95,275 |
| J7030 | 190,189 | $1,415,865 | 19913 | 19,589 | $107,820 |
| J7060 | 182,964 | $1,223,928 | 19914 | 20,003 | $117,898 |
| J3370 | 41,018 | $826,043 | 19921 | 24,203 | $113,039 |
| J7070 | 88,743 | $725,465 | 19922 | 28,542 | $155,356 |
| J7042 | 62,845 | $549,618 | 19923 | 29,151 | $190,759 |
| J7051 | 205,758 | $397,696 | 19924 | 31,855 | $215,011 |
| J2912 | 103,513 | $358,195 | 19931 | 34,473 | $247,554 |
| J7130 | 1,836 | $3,318 | 19932 | 35,969 | $267,083 |
| J7110 | 92 | $2,440 | 19933 | 37,654 | $327,890 |
| | | | 19934 | 38,568 | $291,294 |
| Total | 2,192,109 | $16,272,778 | 19941 | 47,444 | $143,329 |
| | | | 19942 | 42,275 | $176,242 |
| | | | 19943 | 43,618 | $282,382 |
| | | | 19944 | 43,303 | $297,950 |
| | | | 19951 | 50,432 | $305,420 |
| | | | 19952 | 54,743 | $348,357 |
| | | | 19953 | 59,847 | $431,515 |
| | | | 19954 | 59,743 | $401,693 |
| | | | 19961 | 65,429 | $428,625 |
| | | | 19962 | 69,601 | $489,707 |
| | | | 19963 | 74,334 | $601,021 |
| | | | 19964 | 77,582 | $653,146 |
| | | | 19971 | 81,648 | $660,366 |
| | | | 19972 | 88,003 | $733,684 |
| | | | 19973 | 90,555 | $745,360 |
| | | | 19974 | 87,855 | $725,821 |
| | | | 19981 | 89,046 | $701,706 |
| | | | 19982 | 91,930 | $735,865 |
| | | | 19983 | 55,379 | $443,367 |
| | | | 19984 | 43,972 | $325,054 |
| | | | 19991 | 44,579 | $329,677 |
| | | | 19992 | 47,125 | $356,770 |
| | | | 19993 | 48,895 | $378,093 |
| Carrier # | # Claims | Medicare $ | 19994 | 46,320 | $347,684 |
| | | | 20001 | 48,461 | $370,121 |
| 16360 | 874,231 | $6,874,933 | 20002 | 48,451 | $385,884 |
| 621 | 449,971 | $3,738,357 | 20003 | 45,624 | $362,623 |
| 623 | 255,220 | $2,291,903 | 20004 | 40,836 | $328,359 |
| 630 | 336,308 | $1,684,826 | 20011 | 43,775 | $365,658 |
| 10240 | 134,858 | $989,150 | 20012 | 43,747 | $397,869 |
| 710 | 108,085 | $521,452 | 20013 | 43,325 | $415,807 |
| 720 | 33,436 | $172,157 | 20014 | 39,428 | $400,158 |
| Total | 2,192,109 | $16,272,778 | Total | 2,192,109 | $16,272,778 |

Table 39: Number of Claims by Carrier and Year-Quarter in CMS Region 5

| State | Illinois | Illinois | Indiana | Michigan | Michigan | Michigan | Minnesota 10240 | Minnesota 10240 | Minnesota 10240 | Ohio | Wisconsin |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carrier # | 621 | 952 | 630 | 710 | 623 | 953 | 720 | 953 | 954 | 16360 | 951 |
| 1911 | 4,425 | 0 | 957 | 4,097 | 0 | 0 | 1,295 | 743 | 0 | 4,896 | 2,314 |
| 1912 | 5,251 | 0 | 1,409 | 4,029 | 0 | 0 | 1,636 | 749 | 0 | 5,310 | 3,157 |
| 1913 | 5,399 | 0 | 958 | 4,542 | 0 | 0 | 1,785 | 758 | 0 | 6,147 | 3,603 |
| 1914 | 5,974 | 0 | 911 | 4,101 | 1 | 0 | 1,865 | 890 | 0 | 6,261 | 3,436 |
| 1922 | 7,172 | 0 | 1,125 | 6,273 | 3 | 0 | 1,383 | 933 | 0 | 7,314 | 3,612 |
| 1923 | 9,501 | 0 | 1,390 | 6,811 | 6 | 0 | 1,374 | 956 | 0 | 8,504 | 3,942 |
| 1924 | 10,098 | 0 | 1,489 | 6,496 | 23 | 0 | 1,293 | 1,053 | 0 | 8,699 | 4,194 |
| 1931 | 11,083 | 0 | 1,741 | 7,139 | 12 | 0 | 1,318 | 1,054 | 0 | 9,508 | 4,342 |
| 1932 | 12,524 | 0 | 1,566 | 7,613 | 197 | 0 | 1,474 | 1,157 | 0 | 9,942 | 4,219 |
| 1933 | 12,312 | 0 | 1,643 | 8,269 | 137 | 0 | 1,566 | 1,089 | 0 | 10,953 | 4,666 |
| 1934 | 11,554 | 0 | 1,609 | 9,807 | 412 | 0 | 1,635 | 953 | 0 | 11,684 | 4,531 |
| 1941 | 11,325 | 0 | 1,855 | 9,643 | 530 | 0 | 1,848 | 1,044 | 0 | 12,323 | 4,601 |
| 1942 | 12,816 | 0 | 4,446 | 10,427 | 1,745 | 0 | 1,815 | 1,519 | 0 | 14,676 | 4,592 |
| 1943 | 11,111 | 0 | 4,133 | 9,093 | 2,285 | 0 | 1,411 | 1,453 | 0 | 12,789 | 3,796 |
| 1944 | 12,046 | 0 | 3,961 | 8,632 | 1,516 | 0 | 1,891 | 1,713 | 0 | 12,777 | 3,849 |
| 1951 | 12,790 | 0 | 5,594 | 1,113 | 9,238 | 0 | 1,664 | 1,760 | 0 | 16,632 | 6,165 |
| 1952 | 14,543 | 0 | 5,462 | 0 | 10,137 | 0 | 1,831 | 1,695 | 0 | 18,035 | 8,394 |
| 1953 | 16,083 | 0 | 8,737 | 0 | 11,633 | 0 | 1,983 | 1,547 | 0 | 19,668 | 8,919 |
| 1954 | 15,537 | 14 | 10,260 | 0 | 11,014 | 0 | 2,086 | 1,999 | 0 | 18,895 | 8,346 |
| 1961 | 15,820 | 15 | 10,797 | 0 | 11,820 | 0 | 1,747 | 2,007 | 0 | 20,373 | 9,180 |
| 1962 | 17,226 | 20 | 10,657 | 0 | 12,532 | 4 | 536 | 3,965 | 0 | 21,468 | 10,445 |
| 1963 | 18,936 | 30 | 10,554 | 0 | 13,595 | 12 | 0 | 4,945 | 0 | 23,694 | 11,147 |
| 1964 | 21,162 | 88 | 10,656 | 0 | 15,676 | 11 | 0 | 5,238 | 0 | 24,436 | 12,034 |
| 1971 | 20,702 | 139 | 10,080 | 0 | 16,853 | 47 | 0 | 4,926 | 0 | 26,559 | 12,659 |
| 1972 | 22,856 | 195 | 10,479 | 0 | 18,971 | 106 | 0 | 4,831 | 0 | 24,790 | 13,497 |
| 1973 | 25,518 | 715 | 10,311 | 0 | 20,149 | 157 | 0 | 5,121 | 0 | 25,500 | 13,865 |
| 1974 | 26,122 | 1,515 | 11,089 | 0 | 23,162 | 320 | 0 | 5,588 | 0 | 25,603 | 13,693 |
| 1981 | 25,160 | 4,255 | 11,134 | 0 | 22,047 | 775 | 0 | 5,313 | 0 | 26,482 | 15,115 |
| 1982 | 24,516 | 25,104 | 11,478 | 0 | 21,321 | 3,176 | 0 | 5,772 | 9 | 26,270 | 15,208 |
| 1983 | 24,572 | 31,876 | 10,587 | 0 | 24,340 | 23,565 | 0 | 5,890 | 1 | 26,039 | 15,530 |
| 1984 | 5,837 | 31,536 | 11,813 | 0 | 5,865 | 27,031 | 0 | 6,273 | 2 | 26,557 | 14,657 |
| 1991 | 0 | 34,624 | 12,674 | 0 | 0 | 28,762 | 0 | 5,937 | 13 | 27,434 | 16,139 |
| 1992 | 0 | 35,932 | 10,807 | 0 | 0 | 31,090 | 0 | 6,558 | 56 | 28,294 | 17,454 |
| 1993 | 0 | 34,170 | 12,172 | 0 | 0 | 32,312 | 0 | 7,018 | 54 | 29,314 | 18,183 |
| 1994 | 0 | 34,074 | 13,255 | 0 | 0 | 32,428 | 0 | 6,907 | 177 | 28,696 | 17,894 |
| 20001 | 0 | 34,140 | 12,746 | 0 | 0 | 36,988 | 0 | 6,817 | 295 | 28,915 | 18,855 |
| 20002 | 0 | 35,152 | 12,271 | 0 | 0 | 37,995 | 0 | 7,374 | 715 | 27,723 | 18,821 |
| 20003 | 0 | 33,194 | 12,621 | 0 | 0 | 37,182 | 0 | 7,473 | 5,206 | 29,038 | 19,800 |
| 20004 | 0 | 33,872 | 12,682 | 0 | 0 | 37,732 | 0 | 3,840 | 8,481 | 28,565 | 20,877 |
| 20011 | 0 | 34,950 | 12,497 | 0 | 0 | 43,315 | 0 | 0 | 8,141 | 31,154 | 22,335 |
| 20012 | 0 | 34,484 | 12,190 | 0 | 0 | 45,795 | 0 | 0 | 9,045 | 31,065 | 21,742 |
| 20013 | 0 | 34,912 |  | 0 | 0 | 45,541 | 0 | 0 | 9,003 | 30,828 | 22,075 |
| 20014 | 0 |  |  | 0 | 0 |  | 0 | 0 | 9,381 | 27,238 | 22,522 |
| Carrier Total | 449,971 | 475,006 | 336,308 | 108,085 | 255,220 | 490,396 | 33,436 | 134,858 | 50,580 | 874,231 | 489,333 |
| State Total | 924,977 |  | 336,308 | 853,701 |  |  | 218,874 |  |  | 874,231 | 489,333 |

**Table 40: Summary of Medicare KY Administar & WV Nationwide Carrier Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J7050 | 231,293 | $2,429,802 | 19911 | 3,757 | $22,843 |
| J7060 | 30,972 | $589,242 | 19912 | 3,821 | $24,404 |
| J7030 | 72,975 | $586,944 | 19913 | 3,878 | $22,242 |
| J7040 | 79,432 | $577,216 | 19914 | 4,056 | $22,326 |
| J7070 | 13,977 | $80,750 | 19921 | 4,384 | $25,758 |
| J7042 | 10,737 | $78,123 | 19922 | 5,225 | $35,508 |
| J3370 | 1,997 | $75,640 | 19923 | 6,218 | $35,026 |
| J2912 | 15,513 | $42,388 | 19924 | 5,447 | $34,199 |
| J7051 | 26,409 | $15,092 | 19931 | 5,669 | $44,215 |
| J7110 | 69 | $2,272 | 19932 | 5,751 | $52,641 |
| J7130 | 289 | 63.86 | 19933 | 5,484 | $47,995 |
|  |  |  | 19934 | 5,726 | $50,240 |
| Total | 483,663 | $4,477,534 | 19941 | 7,023 | $20,590 |
|  |  |  | 19942 | 6,560 | $30,146 |
|  |  |  | 19943 | 6,427 | $37,391 |
|  |  |  | 19944 | 6,787 | $39,725 |
|  |  |  | 19951 | 7,103 | $42,440 |
|  |  |  | 19952 | 7,940 | $49,076 |
|  |  |  | 19953 | 7,770 | $50,613 |
|  |  |  | 19954 | 8,378 | $56,481 |
|  |  |  | 19961 | 10,105 | $67,119 |
|  |  |  | 19962 | 10,538 | $69,880 |
|  |  |  | 19963 | 11,056 | $78,380 |
|  |  |  | 19964 | 10,924 | $84,653 |
|  |  |  | 19971 | 13,397 | $118,911 |
|  |  |  | 19972 | 13,426 | $124,352 |
|  |  |  | 19973 | 13,287 | $128,543 |
|  |  |  | 19974 | 12,487 | $118,401 |
|  |  |  | 19981 | 12,323 | $112,866 |
|  |  |  | 19982 | 13,422 | $127,360 |
|  |  |  | 19983 | 12,987 | $136,047 |
|  |  |  | 19984 | 14,142 | $151,149 |
|  |  |  | 19991 | 15,818 | $159,433 |
|  |  |  | 19992 | 16,528 | $175,056 |
|  |  |  | 19993 | 17,233 | $184,524 |
|  |  |  | 19994 | 17,213 | $183,588 |
|  |  |  | 20001 | 17,660 | $186,602 |
|  |  |  | 20002 | 18,350 | $204,579 |
|  |  |  | 20003 | 18,510 | $206,340 |
|  |  |  | 20004 | 18,390 | $206,540 |
| Carrier # | # Claims | Medicare $ | 20011 | 19,672 | $225,748 |
|  |  |  | 20012 | 19,388 | $226,264 |
| 660 | 361,137 | $3,378,646 | 20013 | 19,821 | $230,467 |
| 16510 | 122,526 | $1,098,888 | 20014 | 19,582 | $226,873 |
| Total | 483,663 | $4,477,534 | Total | 483,663 | $4,477,534 |

**Table 41: Summary of Medicare Other Metra Health Carrier Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|------------|------------|----------|------------|
| J7050 | 333,128 | $3,445,379 | 19911 | 3,648 | $35,529 |
| J7040 | 153,213 | $1,122,232 | 19912 | 3,985 | $49,938 |
| J7070 | 71,759 | $942,263 | 19913 | 4,334 | $54,061 |
| J7030 | 79,919 | $578,544 | 19914 | 5,027 | $63,971 |
| J7060 | 54,252 | $478,326 | 19921 | 6,818 | $64,871 |
| J7042 | 20,244 | $179,430 | 19922 | 7,906 | $72,349 |
| J7051 | 62,120 | $157,846 | 19923 | 8,822 | $81,968 |
| J2912 | 52,428 | $131,126 | 19924 | 8,968 | $85,499 |
| J3370 | 4,706 | $72,691 | 19931 | 11,073 | $107,099 |
| J7110 | 17 | $3,500 | 19932 | 11,918 | $115,697 |
| J7130 | 316 | $1,909 | 19933 | 11,139 | $107,065 |
| | | | 19934 | 11,858 | $115,211 |
| Total | 832,102 | $7,113,246 | 19941 | 13,419 | $50,181 |
| | | | 19942 | 13,370 | $57,312 |
| | | | 19943 | 13,243 | $116,743 |
| | | | 19944 | 14,560 | $133,559 |
| | | | 19951 | 15,938 | $142,510 |
| | | | 19952 | 17,329 | $159,907 |
| | | | 19953 | 18,543 | $171,032 |
| | | | 19954 | 19,155 | $170,742 |
| | | | 19961 | 21,965 | $189,858 |
| | | | 19962 | 23,781 | $181,332 |
| | | | 19963 | 23,917 | $191,807 |
| | | | 19964 | 24,231 | $192,900 |
| | | | 19971 | 25,812 | $195,294 |
| | | | 19972 | 27,834 | $227,509 |
| | | | 19973 | 30,396 | $260,412 |
| | | | 19974 | 31,814 | $266,213 |
| | | | 19981 | 34,129 | $259,861 |
| | | | 19982 | 34,372 | $281,125 |
| | | | 19983 | 36,147 | $307,051 |
| | | | 19984 | 36,625 | $312,701 |
| | | | 19991 | 38,381 | $316,650 |
| | | | 19992 | 40,136 | $340,771 |
| | | | 19993 | 41,359 | $364,613 |
| | | | 19994 | 41,145 | $371,282 |
| | | | 20001 | 42,298 | $374,479 |
| | | | 20002 | 35,931 | $326,495 |
| | | | 20003 | 20,776 | $197,652 |
| Carrier # | # Claims | Medicare $ | 20004 | 0 | $0 |
| | | | 20011 | 0 | $0 |
| 10490 | 391,812 | $2,978,284 | 20012 | 0 | $0 |
| 10250 | 247,939 | $2,202,423 | 20013 | 0 | $0 |
| 10230 | 192,351 | $1,932,539 | 20014 | 0 | $0 |
| Total | 832,102 | $7,113,246 | Total | 832,102 | $7,113,246 |

**Table 42: Summary of Medicare Florida Blue Shield Carrier Claims: 1991Q1 - 2001Q4**

| Code | # Claims | Medicare $ | Yr-Quarter | # Claims | Medicare $ |
|------|----------|-----------|------------|----------|-----------|
| J7050 | 1,327,934 | $15,333,032 | 19911 | 21,928 | $152,584 |
| J7060 | 334,660 | $3,253,771 | 19912 | 20,911 | $145,485 |
| J7040 | 240,344 | $2,138,356 | 19913 | 19,524 | $140,821 |
| J3370 | 125,779 | $1,971,312 | 19914 | 23,026 | $167,583 |
| J7051 | 346,712 | $1,078,256 | 19921 | 28,327 | $152,641 |
| J7030 | 118,412 | $1,088,226 | 19922 | 27,099 | $161,527 |
| J7042 | 68,249 | $688,867 | 19923 | 25,310 | $143,532 |
| J7070 | 59,493 | $622,531 | 19924 | 29,642 | $179,659 |
| J2912 | 161,877 | $470,056 | 19931 | 33,841 | $207,249 |
| J7130 | 9,814 | $40,673 | 19932 | 31,205 | $202,266 |
| J7110 | 112 | $4,477 | 19933 | 28,367 | $176,801 |
| | | | 19934 | 32,359 | $201,060 |
| Total | 2,793,386 | $26,689,559 | 19941 | 42,129 | $255,230 |
| | | | 19942 | 36,603 | $202,872 |
| | | | 19943 | 37,242 | $220,909 |
| | | | 19944 | 41,643 | $237,065 |
| | | | 19951 | 52,878 | $339,196 |
| | | | 19952 | 49,107 | $447,930 |
| | | | 19953 | 44,235 | $425,836 |
| | | | 19954 | 49,005 | $478,697 |
| | | | 19961 | 61,964 | $597,500 |
| | | | 19962 | 56,914 | $603,774 |
| | | | 19963 | 54,653 | $581,414 |
| | | | 19964 | 64,206 | $700,534 |
| | | | 19971 | 76,170 | $796,202 |
| | | | 19972 | 71,085 | $763,530 |
| | | | 19973 | 64,993 | $705,341 |
| | | | 19974 | 73,684 | $797,821 |
| | | | 19981 | 86,529 | $843,916 |
| | | | 19982 | 80,166 | $797,135 |
| | | | 19983 | 75,924 | $775,940 |
| | | | 19984 | 80,219 | $814,720 |
| | | | 19991 | 102,498 | $1,031,582 |
| | | | 19992 | 91,339 | $917,788 |
| | | | 19993 | 83,677 | $859,829 |
| | | | 19994 | 94,159 | $971,519 |
| | | | 20001 | 109,246 | $1,128,529 |
| | | | 20002 | 93,550 | $980,390 |
| | | | 20003 | 90,074 | $959,249 |
| | | | 20004 | 109,252 | $1,137,226 |
| **Carrier #** | **# Claims** | **Medicare $** | 20011 | 132,642 | $1,253,240 |
| | | | 20012 | 123,378 | $1,336,586 |
| 590 | 2,727,819 | $25,899,070 | 20013 | 112,157 | $1,245,595 |
| 591 | 65,567 | $790,489 | 20014 | 130,526 | $1,451,260 |
| Total | 2,793,386 | $26,689,559 | Total | 2,793,386 | $26,689,559 |

**Table 43: Summary for Medicare Carrier Claims for CG et al: J7050, J7040, J7060, J7030, J3370**

| Carrier | Period | # Clms w/DIFF>0 | # Claims | % of Claims | Aggregate DIFF | Total MCR Paid | % of MCR Paid | # Prov Payments |
|---|---|---|---|---|---|---|---|---|
| Connecticut General | 1997Q1-2001Q4 | 466,987 | 542,464 | 86.1% | $1,860,048 | $6,614,198 | 28.1% | 81,991 |
| Connecticut General | 1995Q2-1996Q4 | 115,582 | 133,683 | 86.5% | $387,723 | $1,526,688 | 25.4% | 23,257 |
| Connecticut General | 1991Q1-1995Q1 | - | 189,259 | - | - | $1,695,009 | - | - |
| WPS | 1996Q3-2001Q4* | 912,197 | 1,040,487 | 87.7% | $4,138,847 | $11,543,402 | 35.9% | 116,330 |
| WPS | 1995Q1-1996Q2 | 36,543 | 42,507 | 86.0% | $99,539 | $327,031 | 30.4% | 6,911 |
| WPS | 1991Q1-1994Q4 | - | 40,320 | - | - | $346,021 | - | - |
| Other Reg 5 | 1996Q3-2001Q4* | 596,609 | 845,362 | 70.6% | $2,996,325 | $9,312,389 | 32.2% | 94,492 |
| Other Reg 5 | 1993Q3-1996Q2 | 259,509 | 370,614 | 70.0% | $969,004 | $3,264,826 | 29.7% | 49,260 |
| Other Reg 5 | 1991Q1-1993Q2 | - | 176,468 | - | - | $1,302,946 | - | - |
| KY AdminaStar | 1998Q3-2001Q4 | 133,840 | 144,163 | 92.8% | $687,250 | $1,978,146 | 34.7% | 18,391 |
| KY AdminaStar | 1993Q4-1998Q2 | 100,953 | 109,936 | 91.8% | $290,354 | $1,005,267 | 28.9% | 14,795 |
| KY AdminaStar | 1991Q1-1993Q3 | - | 30,764 | - | - | $244,611 | - | - |
| WV Nationwide | 1996Q3-2001Q4* | 62,291 | 71,386 | 87.3% | $290,729 | $839,126 | 34.6% | 10,132 |
| WV Nationwide | 1995Q1-1996Q2 | 9,832 | 11,374 | 86.4% | $28,518 | $98,056 | 29.1% | 2,643 |
| WV Nationwide | 1991Q1-1994Q4 | - | 7,803 | - | - | $76,383 | - | - |
| Other Metra Health | 1995Q4-2001Q4 | 385,961 | 408,636 | 94.5% | $1,083,857 | $4,614,714 | 23.5% | 53,652 |
| Other Metra Health | 1993Q1-1995Q3 | 77,147 | 81,168 | 95.0% | $199,630 | $725,336 | 27.5% | 14,812 |
| Other Metra Health | 1991Q1-1992Q4 | - | 23,170 | - | - | $193,774 | - | - |
| Florida Blue Shield | 1995Q3-1998Q2 | 473,122 | 537,212 | 88.1% | $782,623 | $6,637,356 | 11.8% | 75,686 |
| Florida Blue Shield | 93Q1-95Q2, 98Q3-01Q4 | 1,095,699 | 1,242,943 | 88.2% | $1,765,240 | $14,835,432 | 11.9% | 158,227 |
| Florida Blue Shield | 1991Q1-1992Q4 | - | 121,823 | - | - | $773,188 | - | - |
| Total | 1991Q1-2001Q4 | 4,726,272 | 6,171,542 | 76.6% | $15,579,687 | $67,953,899 | 22.9% | 720,579 |

* WPS, Other Region 5, and WV Nationwide consider J3370 from 1994Q1-2001Q4 in the first analyses and exclude this NDC for 1994Q1 and later in subsequent analyses such as WPS 1995Q1-1996Q2, WPS 1991Q1-1994Q4, and so forth.

**Table 44: Summary for Medicare Carrier Claims for Remaining Carriers: J7050, J7040, J7060, J7030, J3370**

| Carrier | Period | # Clms w/DIFF>0 | # Claims | % of Claims | Aggregate DIFF | Total MCR Paid | % of MCR Paid | # Prov Payments |
|---|---|---|---|---|---|---|---|---|
| Texas Blue Shield | 1993Q1–2001Q4 | 1,033,437 | 1,781,416 | 58.0% | $2,986,658 | $18,335,527 | 16.3% | 171,505 |
| Texas Blue Shield | 1991Q1–1992Q4 | - | 62,546 | - | - | $326,545 | - | - |
| North Dakota Blue Shield | 1993Q1–2001Q4 | 505,989 | 865,855 | 58.4% | $1,688,957 | $9,386,067 | 18.0% | 88,073 |
| North Dakota Blue Shield | 1991Q1–1992Q4 | - | 10,725 | - | - | $73,237 | - | - |
| Pennsylvania Blue Shield | 1993Q1–2001Q4 | 473,236 | 802,315 | 59.0% | $1,448,248 | $8,416,902 | 17.2% | 84,880 |
| Pennsylvania Blue Shield | 1991Q1–1992Q4 | - | 44,259 | - | - | $331,244 | - | - |
| Empire Blue Shield | 1993Q1–2001Q4 | 449,046 | 765,546 | 58.7% | $1,440,369 | $8,247,082 | 17.5% | 97,137 |
| Empire Blue Shield | 1991Q1–1992Q4 | - | 26,605 | - | - | $118,561 | - | - |
| National Heritage | 1993Q1–2001Q4 | 473,910 | 805,465 | 58.8% | $1,393,897 | $7,863,487 | 17.7% | 81,570 |
| National Heritage | 1991Q1–1992Q4 | - | 0 | - | - | $0 | - | - |
| Alabama Blue Shield | 1993Q1–2001Q4 | 354,570 | 609,892 | 58.1% | $1,180,673 | $6,743,991 | 17.5% | 48,681 |
| Alabama Blue Shield | 1991Q1–1992Q4 | - | 10,174 | - | - | $140,454 | - | - |
| Arkansas Blue Shield | 1993Q1–2001Q4 | 274,248 | 471,242 | 58.2% | $1,045,772 | $5,816,889 | 18.0% | 47,835 |
| Arkansas Blue Shield | 1991Q1–1992Q4 | - | 7,845 | - | - | $114,697 | - | - |
| Western Blue Shield | 1993Q1–2001Q4 | 190,334 | 318,986 | 59.7% | $712,948 | $3,749,798 | 19.0% | 27,053 |
| Western Blue Shield | 1991Q1–1992Q4 | - | 22,285 | - | - | $135,037 | - | - |
| Kansas Blue Shield | 1993Q1–2001Q4 | 183,956 | 315,219 | 58.4% | $577,932 | $3,417,743 | 16.9% | 32,988 |
| Kansas Blue Shield | 1991Q1–1992Q4 | - | 13,093 | - | - | $103,977 | - | - |
| AETNA | 1993Q1–2001Q4 | 201,839 | 340,740 | 59.2% | $563,454 | $3,200,483 | 17.6% | 44,852 |
| AETNA | 1991Q1–1992Q4 | - | 60,219 | - | - | $330,027 | - | - |
| TOLIC | 1993Q1–2001Q4 | 229,896 | 398,379 | 57.7% | $455,001 | $3,097,014 | 14.7% | 56,645 |
| TOLIC | 1991Q1–1992Q4 | - | 294 | - | - | $7,683 | - | - |
| South Carolina Blue Shield | 1993Q1–2001Q4 | 173,317 | 298,625 | 58.0% | $360,836 | $2,390,481 | 15.1% | 24,067 |
| South Carolina Blue Shield | 1991Q1–1992Q4 | - | 9,705 | - | - | $133,396 | - | - |
| California Blue Shield | 1993Q1–2001Q4 | 148,396 | 252,557 | 58.8% | $332,751 | $1,915,344 | 17.4% | 29,489 |
| California Blue Shield | 1991Q1–1992Q4 | - | 92,458 | - | - | $489,426 | - | - |
| All Others | 1993Q1–2001Q4 | 542,401 | 926,582 | 58.5% | $1,520,950 | $8,848,577 | 17.2% | 167,444 |
| All Others | 1991Q1–1992Q4 | - | 95,274 | - | - | $469,894 | - | - |
| Total | 1991Q1–2001Q4 | 5,234,575 | 9,408,301 | 55.6% | $15,708,446 | $94,203,563 | 16.7% | 1,002,219 |

# EXHIBIT DU

Duggan, Ph.D., Mark G.                    July 14, 2008
                    Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    )

U.S. ex rel. Ven-a-Care of  )  Judge Patti B. Saris

the Florida Keys, Inc.          )

     v.                         )  Chief Magistrate

Abbott Laboratories, Inc.,  )  Judge Marianne B.

No. 06-CV-11337-PBS          )  Bowler

- - - - - - - - - - - - - -

Volume I


        Videotaped deposition of MARK G. DUGGAN PH.D.



                Washington, D.C.

                Monday, July 14, 2008

                9:00 a.m.

Henderson Legal Services, Inc.
202-220-4158                www.hendersonlegalservices.com

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                           July 14, 2008
                    Washington, DC

Page 2

1      Videotaped deposition of MARK G. DUGGAN, PH.D.,
2  held at the law offices of Jones Day, 51 Louisiana
3  Avenue, N.W., Washington, D.C. 20001-2113, the
4  proceedings being recorded stenographically by
5  Jonathan Wonnell, a Registered Professional Court
6  Reporter and Notary Public of the District of
7  Columbia, and transcribed under his direction.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1      A P P E A R A N C E S   O F   C O U N S E L
2
3      On behalf of the United States of America:
4          MARK A. LAVINE, ESQ.
5          U.S. Department of Justice
6          U.S. Attorney's Office
7          99 N.E. 4th Street, Suite 300
8          Miami, Florida 33132
9          (305) 961-9003
10         mark.lavine@usdoj.gov
11         -- and --
12         RENEE BROOKER, ESQ.
13         REBECCA A. FORD, ESQ.
14         The U.S. Department of Justice
15         Civil Division
16         601 D Street, N.W.
17         Washington, D.C. 20044
18         Patrick Henry Building
19         Washington, D.C. 20044
20         (202) 616-3797 (Brooker)
21         (202) 514-1511 (Ford)
22         -- and -- (ct'd)

Page 4

1      A P P E A R A N C E S  (Cont'd)
2
3      On behalf of the United States of America
4          (ct'd):
5          JUSTIN DRAYCOTT, ESQ.
6          U.S. Department of Justice
7          Civil Division
8          P.O. Box 261, Ben Franklin Station
9          Washington, D.C. 20044
10         (202) 305-9300
11         justin.draycott@usdoj.gov
12
13     On behalf of Ven-A-Care of the Florida Keys,
14         Inc.:
15         SUSAN SCHNEIDER THOMAS, ESQ.
16         Berger & Montague P.C.
17         1622 Locust Street
18         Philadelphia, Pennsylvania 19103-6305
19         (215) 875-3000
20         sthomas@bm.net
21
22

Page 5

1      A P P E A R A N C E S  (Cont'd)
2
3      On behalf of Abbott Laboratories, Inc.:
4          DAVID TORBORG, ESQ.
5          Jones Day
6          51 Louisiana Avenue, N.W.
7          Washington, D.C. 20001-2113
8          (202) 879-3939
9          dstorborg@jonesday.com
10         -- and --
11         CAROL P. GEISLER, ESQ.
12         Jones Day
13         77 West Wacker
14         Chicago, Illinois 60601-1692
15         (312) 269-4174
16         cgeisler@jonesday.com
17
18
19
20
21
22

                                    2  (Pages 2 to 5)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Page 6

1           A P P E A R A N C E S (Cont'd)
2
3      On behalf of Dey, Inc., Dey, L.P. and Mylan:
4          MARISA A. LORENZO, ESQ. (via phone)
5          Kelley, Drye & Warren LLP
6          101 Park Avenue
7          New York, New York 10178
8          (212) 808-7697
9          mlorenzo@kelleydrye.com
10
11
12     ALSO PRESENT:
13         ZACHARY SULLIVAN, DOJ intern
14         CONWAY BARKER, videographer
15
16
17
18
19
20
21
22

Page 7

1               C O N T E N T S
2    WITNESS NAME                          PAGE
3    MARK G. DUGGAN PH.D.
4        By Mr. Torborg:              11
5
6
7               E X H I B I T S
8    NO.  DESCRIPTION                      PAGE
9    Exhibit Abbott 1092 United States and Ven-A-Care's
10         Expert Disclosure for Mark G.
11         Duggan, Ph.D. (no Bates ref)  16
12   Exhibit Abbott 1093 Report of Mark G. Duggan,
13         Ph.D. dated 6/19/08           16
14   Exhibit Abbott 1094 Curriculum vitae of Mark
15         G. Duggan, Ph.D.              16
16   Exhibit Abbott 1095 Plaintiff's disclosure of
17         meterials provided to Dr.
18         Duggan in accordance with
19         Federal Rule 26(a)(2)(B)      16
20   Exhibit Abbott 1096 Source log of materials for
21         which Dr. Duggan was custodian 16
22

Page 8

1          I N D E X  O F  E X H I B I T S (Cont'd)
2    NO.  DESCRIPTION                         PAGE
3    Exhibit Abbott 1097 Excerpt of Duggan and Scott
4         Morton article entitled "The
5         distortionary effects of
6         government procurement:
7         Evidence from Medicaid and
8         prescription drug purchasing"  68
9    Exhibit Abbott 1098 Excerpts from 11/30/07
10        deposition of Dr. Duggan in the
11        Texas AWP litigation          79
12   Exhibit Abbott 1099 Brooker e-mail to Daly et al.
13        dated 6/20/08            127
14   Exhibit Abbott 1100 Document comparing 6/10 and
15        6/17 versions of Dr. Duggan's
16        expert report            176
17   Exhibit Abbott 1101 EXP USABT-DUG 006292 through
18        95                    181
19   Exhibit Abbott 1102 Myers & Stauffer state
20        reimbursement summaries      206
21
22

Page 9

1               P R O C E E D I N G S
2                   (9:15 a.m.)
3          THE VIDEOGRAPHER:  In the United States
4    District Court for the District of Massachusetts, In
5    Re Pharmaceutical Industry Average Wholesale Price
6    Litigation, related to the United States of America ex
7    rel. Ven-A-Care of the Florida Keys Incorporated
8    versus Abbott Laboratories Incorporated et al. and
9    other cross noticed cases, MDL Number 1456, Case
10   Number 01-CV-12257 (PBS).
11          This is the deposition of Mark G. Duggan,
12   Ph.D.  Today's date is July 14th 2008.  The location
13   of the deposition is Jones Day, 51 Louisiana Avenue,
14   Northwest, Washington, D.C.  Will counsel please
15   identify yourselves and state whom you represent?
16          MR. TORBORG:  David Torborg from Jones Day
17   on behalf of Abbott Laboratories.
18          MS. GEISLER:  Carol Geisler on behalf of
19   Abbott Laboratories.
20          MR. LAVINE:  Mark Lavine on behalf of the
21   United States.
22          MS. BROOKER:  Renee Brooker on behalf of

                                        3  (Pages 6 to 9)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                          July 14, 2008
            Washington, DC

Page 10

1  the United States.
2       MS. THOMAS:  Susan Thomas on behalf of
3  Ven-A-Care.
4       MS. FORD:  Rebecca Ford on behalf of the
5  United States.  We also have with us Zachary Sullivan
6  who's an intern in our office.
7       THE VIDEOGRAPHER:  The person on the
8  telephone, could you please identify yourself?
9       MS. LORENZO:  Sure.  Marisa Lorenzo from
10 Kelley, Drye & Warren.
11      MR. LAVINE:  Has anybody else signed on to
12 the telephone?
13      THE VIDEOGRAPHER:  Thank you.
14      The court reporter is Jon Wonnell, the
15 video camera operator is Conway Barker, both on behalf
16 of Henderson Legal Services.  This deposition
17 commences at 9:17.  Please swear in the witness.
18            *  *  *  *  *
19      Whereupon,
20          MARK G. DUGGAN PH.D.,
21      called as a Witness, was duly sworn by
22  Jonathan Wonnell, a Notary Public in and for

Page 11

1   the District of Columbia, and was examined
2   and testified as follows.
3            *  *  *  *  *
4   EXAMINATION BY COUNSEL FOR ABBOTT LABORATORIES
5      BY MR. TORBORG:
6   Q.  Good morning, Dr. Duggan.
7   A.  Good morning.
8   Q.  Could you please state your full name for
9   the record?
10  A.  Mark Gregory Duggan.
11  Q.  We've met just this morning, correct?
12  A.  Correct.
13  Q.  Never met before?
14  A.  We have not to the best of my knowledge.
15  Q.  Okay.  Again, my name is David Torborg.  I
16  am with Jones Day.  And we represent Abbott
17  Laboratories in this case.  What is your current home
18  address?
19  A.  8510 Irvington Avenue, Bethesda, Maryland
20  20817.
21  Q.  Thanks.  And what is your current business
22  address?

Page 12

1   A.  3105 -- so my address at the University of
2   Maryland is 3105 Tydings Hall, College Park, Maryland
3   20742.  That's my address at the university.
4   Q.  Okay.  Great.
5   A.  Department of economics.  So I believe it's
6   University of Maryland, Department of Economics, 3105
7   Tydings Hall, College Park, Maryland 20742.  There's
8   no street address in there.
9   Q.  Okay.  Let me say at the outset that I
10  apologize if from time to time I call you Mr. Duggan
11  instead of Dr. Duggan.  I've had a bad habit of doing
12  that in the past.  No disrespect intended.  It's just
13  a habit of doing so many depositions and starting with
14  mister.  Let me say if I say that it's no disrespect,
15  just a bad habit.
16      I understand that you've been deposed at
17  least once in litigation.  Is that right?
18  A.  That is correct.
19  Q.  Okay.  Have you been deposed more than
20  once?
21  A.  I participated in one two-day deposition in
22  November.  And there was another deposition scheduled

Page 13

1   that didn't end up happening.  But that would be the
2   full list.
3   Q.  And those are depositions that involved an
4   AWP litigation in the state of Texas; is that right?
5   A.  Correct.
6   Q.  And my colleague, Carol Geisler, was the
7   one who was asking the questions, right?
8   A.  Correct, with I believe -- were there any
9   questions from Eric Berlin?  There may have been.  But
10  Carol was certainly the one leading the questioning.
11  Q.  And that that's the only time that you've
12  given deposition testimony; is that right?
13  A.  That is correct.
14  Q.  Have you ever provided any trial testimony?
15  A.  I have not.
16  Q.  Have you ever provided any testimony at any
17  hearing or other proceeding?
18  A.  I am not sure what the definition of other
19  proceeding.  But to the best of -- given my
20  understanding of the definition, I certainly don't
21  think so.
22  Q.  What are the things that you're not sure

                              4  (Pages 10 to 13)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

| Page 14 |
| --- |

1  are covered by the definition of proceeding?
2        MR. LAVINE: Objection to form.
3     A.   Conferences when I let's say give a
4  presentation or give a discussion on someone else's
5  presentation.  So as an economist there are frequently
6  conferences where I might present or discuss the
7  results.  So I don't know if that -- that's an example
8  of the kind of thing where I'm just not sure if that
9  constitutes -- if that would fall under the umbrella
10  of what you described.
11     Q.   Apart from the deposition that you took in
12  the Texas case, have you ever been involved in any
13  other testimony that involved the kind of question and
14  answer that we're doing here today?
15     A.   And once again, other than question and
16  answer with maybe the press a couple times based on my
17  research or -- I can't remember the exact number of
18  times.  But that would have been a -- so I'm not
19  trying to be -- I'm just trying to make sure that I'm
20  accurate so I'm trying to err on the side of caution.
21  So I've certainly been interviewed over the phone for
22  questions about research, for example.

| Page 15 |
| --- |

1     Q.   Okay.  Let me go over a few of the basic
2  ground rules of how I'd like to proceed here today.
3  First, I will probably get into some somewhat complex
4  questions of how your analysis works.  I may say some
5  things not quite right.  Please tell me when I say
6  some things not quite right so that question get the
7  best testimony that you can give.  Okay?
8     A.   Sure.
9     Q.   In other words, if you don't understand a
10  question I'm asking, please let me know.  I'll try to
11  clean it up.  Can we have that agreement?
12     A.   Sure.
13     Q.   Okay.  From time to time Mr. Lavine or
14  others in the room may say objection.  Unless you're
15  instructed not to answer my question you can go ahead
16  and answer.  Okay?
17     A.   Yes.
18     Q.   I will try and take a break about every
19  hour.  But if I fail to do that and you need a break
20  to go to the restroom or whatever just let me know and
21  we'll stop.  It's no big deal.
22     A.   Okay.

| Page 16 |
| --- |

1     Q.   You'll need to respond verbally so the
2  court reporter can put down the yes or no.  Okay?
3     A.   Yes.
4     Q.   Or whatever else it is you're going to say.
5     A.   Okay.
6     Q.   Just to get it out of the way, I'd like to
7  mark some exhibits.
8              (Exhibit Abbott 1092,
9       Exhibit Abbott 1093, Exhibit Abbott 1094,
10       Exhibit Abbott 1095, & Exhibit Abbott 1096
11       were marked for identification.)
12        BY MR. TORBORG:
13     Q.   Okay.  For the record, what I've marked as
14  Abbott Exhibit 1092 is entitled "United States and
15  Ven-A-Care's expert disclosure for Mark G. Duggan,
16  Ph.D." What I've marked as Exhibit 1093 I believe is
17  a copy of Mr. Duggan's final expert report in this
18  matter.  Am I right, Dr. Duggan?  The second one,
19  1093.
20        MR. LAVINE:  Let me note page 127 of that
21  does not reflect his signature.
22        MS. BROOKER:  David, can we have an

| Page 17 |
| --- |

1  agreement that an objection by the government stands
2  for Ven-A-Care as well?
3        MR. TORBORG:  Yes.  That would be fine.
4     A.   Yes.  This does appear to be the report,
5  just with the disclaimer that maybe -- I can't be
6  certain that pages weren't omitted or --
7        BY MR. TORBORG:
8     Q.   That's what it looks like, though, from
9  first glance?
10     A.   Sure.  That's true.
11     Q.   What I've marked as 1094 is a copy of your
12  CV; is that right?
13     A.   Correct, as of June 19th.
14     Q.   And what I've marked as Exhibit 1096 is a
15  document titled "In accordance with Federal Rule of
16  Civil Procedure 26(a)(2)(B) the United States and
17  Ven-A-Care disclose that the materials provided to Dr.
18  Duggan included, either electronically or in hard copy
19  format, the items described below," a two paged
20  document.
21        MR. LAVINE:  I'm sorry.  I think you said
22  the wrong number on that.

                                     5 (Pages 14 to 17)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                          Washington, DC

Page 18

1         MR. TORBORG:  That's 1095.  I'm sorry.
2      A.   Can you repeat -- I'm sorry.  You were just
3   reading --
4         BY MR. TORBORG:
5      Q.   I was just reading that.
6      A.   Okay.
7      Q.   And I'm not asking any questions about it
8   at this point.
9      A.   Okay.  I would just point out that the CV,
10  the curriculum vitae, just since submitting it three
11  or four weeks ago there have been updates and that
12  sort of thing.  But as of a month ago it's accurate.
13     Q.   We'll talk about that in a minute.
14     A.   Sure.  Okay.
15     Q.   Abbott Exhibit 1096 is a large document
16  that appears to be a source log of some type.
17        Okay.  Dr. Duggan --
18     A.   Could you just explain?  So you just went
19  over it's a source document of some type.  Is that --
20     Q.   It's the -- one you're looking at right
21  there.
22     A.   Yeah.  It's a source document?

Page 19

1         MR. LAVINE:  Is there a question about
2   1096?
3         MR. TORBORG:  Not that I've asked.
4         MR. LAVINE:  Okay.  Just clarifying.
5   Thanks.
6         BY MR. TORBORG:
7      Q.   Dr. Duggan, I'd like to briefly go over
8   your professional background.
9      A.   Sure.
10     Q.   And why don't we turn to Abbott Exhibit
11  1094, your CV, to assist us in doing that.  Do you
12  have that in front of you?
13     A.   I do.
14     Q.   Okay.  You indicated a moment ago that
15  there were some things that may need to be added to
16  this.  What all would need to be added?
17     A.   So just for example "How does Medicare part
18  D work," that's a paper that's listed at the top of
19  the third page, we actually changed the title of that
20  paper and it is now also officially forthcoming in the
21  Journal of Economic Perspectives.  So a few weeks ago
22  it was still a working paper.  And so I believe now

Page 20

1   the title -- I can get the updated CV to you at some
2   point if that would be useful.  But I believe the
3   title is "Providing prescription drug coverage to the
4   elderly: America's experiment with Medicare part D."
5   Something --
6      Q.   That's a paraphrase?
7      A.   Yeah.  That's a paraphrase.
8      Q.   That's the best you can do from memory?
9      A.   Yeah.  The editors -- we have a slightly
10  different title now.
11     Q.   Why don't we try to get a copy of your most
12  current CV.
13     A.   Okay.
14     Q.   For tomorrow would be fine.
15     A.   Would it be okay if Wednesday -- it might
16  take me a day or two to get it.
17     Q.   That would be fine.
18     A.   Okay.  And the other revision to this would
19  be this the next paper listed there also about
20  Medicare part D we have -- it's now under revision for
21  the American Economic Review.  So we received feedback
22  from the American Economic Review late last week.  But

Page 21

1   it's the same set of papers.
2      Q.   Have they indicated to you that they'll be
3   publishing that piece?
4      A.   No.  The way things typically work, I don't
5   think I've heard of -- so we submitted the paper and
6   we heard back and they invite us to incorporate so
7   that they have had a number of outside reviewers
8   comment on the paper and the editor comments on it as
9   well and just suggests various revisions.  And in
10  general editors rarely make a commitment at that
11  stage.  But I believe that said, we're optimistic
12  about the eventual chances.
13        But in general this is a standard thing
14  among economists updating sort of where papers are in
15  the pipeline, are they in revision, have they already
16  been revised and submitted and so forth.  So that's --
17  it's something that I plan to update the next time
18  that I update my CV.
19     Q.   Why don't we go to the first page of your
20  CV?  What was your first -- what did you do after you
21  graduated from MIT in 1994 with a master's in
22  electrical engineering?

                                    6  (Pages 18 to 21)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                    July 14, 2008
Washington, DC

Page 22

1   A.   So during the summer I worked as a research
2   assistant for a professor at Harvard University for
3   multiple professors and then in the fall I started the
4   Ph.D. program in economics at Harvard, though I
5   continued to work for this professor sort of part time
6   while I was do doing that to some extent during the
7   semester and then again the following summer.
8   Q.   So it looks from my review of the CV that
9   after you graduated with a master's in electrical
10  engineering you moved into the economics field.  Is
11  that fair to say?
12  A.   I suppose -- I wouldn't phrase it exactly
13  that way.  Can I --
14  Q.   Sure.  Phrase it the way you think best
15  fairly describes what happened.
16  A.   Sure.  So I was actually in the electrical
17  engineering Ph.D. program at MIT and sort of figured
18  out in the first year that it wasn't -- that I had --
19  my interests were shifting directions.  And so I
20  started to take courses outside of engineering while I
21  was completing the requirements for my master's.  I
22  had already taken some economics courses as an

Page 23

1   undergraduate, but I took some more during my time in
2   the master's program.
3        And during that time I sat in on a course
4   with -- or actually took a course with Robert Solow,
5   who's a Nobel Prize winning economist at MIT, and
6   really enjoyed the course.  And as a result I started
7   to think I would instead prefer to get a Ph.D. in
8   economics.  And so -- I believe this was in '93 or
9   late '92. I don't remember exactly which.  And then I
10  followed up with Professor Solow and asked him if it
11  would be possible for me to do some research under his
12  direction.  So he's in the economics department.
13       And so I actually did my master's thesis
14  under the direction of Robert Solow and it was very
15  much an economic quantitative empirically oriented
16  economic study.  And for the study actually we also --
17  I also worked with a statistician at Harvard
18  University, Don Rubin, and a statistician at the Sloan
19  School of Management, Arnold Barnett, and so sort of
20  honing -- and so at some level I did quite a lot of
21  economics even while in my master's in engineering
22  program.  And as I said, I took some economics courses

Page 24

1   as an undergraduate as well.
2   Q.   How many courses in economics did you take
3   in your undergraduate study?
4   A.   Two or three, I believe.
5   Q.   How many courses in accounting did you take
6   in your undergraduate work?
7   A.   In my undergraduate work?
8   Q.   Let's start there.  Then we'll move up.
9   A.   Okay.  In accounting, I believe zero.
10  Q.   How many courses in accounting did you take
11  in your master's work for the electrical engineering
12  degree?
13  A.   I believe that I sat in on one accounting
14  course, but I did not enroll in an accounting course
15  during my master's in electrical engineering.
16  Q.   How many economics courses -- or I'm sorry.
17  How many accounting courses did you take in the course
18  of getting your Ph.D. in economics from Harvard?
19  A.   I believe zero.
20  Q.   How many courses in statistics did you take
21  in your undergraduate work?
22  A.   I believe two.  And I also while I was an

Page 25

1   undergraduate I served as a teaching assistant for a
2   probability and statistics course that is offered to
3   MIT undergraduates and graduate students.  And then I
4   did continue that work as a teaching assistant in the
5   first year, in my first year of graduate school at
6   MIT, and then once again taught -- so I taught
7   actually -- okay.  So I took two courses in
8   probability and statistics, to the best of my
9   recollection.
10  Q.   And that's in your undergraduate study,
11  correct?
12  A.   That's correct.  Yeah.
13  Q.   Did you take any statistics courses in
14  getting your master's in electrical engineering or
15  your Ph.D. in economics?
16  A.   Once again, on this I'm -- it's a bit --
17  the distinction between enrolling.  I sat in on a
18  number of courses.  So I know that -- so there may be
19  another statistics course that I sat in on.  But once
20  again, I believe in the master's's intellectual
21  engineering program I continued to teach statistics
22  both in the electrical engineering department and at

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 26

1  the Sloan School of Management.  But as for other
2  courses that I formally enrolled in, I don't think
3  that I did.
4          And this is with the caveat of course that
5  this was quite a while ago.  So it's hard for me to
6  remember every course that I enrolled in.  But to the
7  best of my knowledge during my six years at MIT I
8  enrolled in two statistics -- probability and
9  statistics courses.
10     Q.   And when you sit in on a course and don't
11  enroll, do you take any of the examinations or final
12  examinations or any of the quizzes that would have
13  been offered?
14     A.   Typically no.  And then you had also asked
15  I believe at Harvard about the statistics courses.
16     Q.   Yes, I did.
17     A.   So I certainly -- there is sort of a hazy
18  line between statistics and econometrics in Harvard's
19  department.  And so if I recall I enrolled in four
20  statistics and/or econometrics courses.
21     Q.   What is econometrics?
22     A.   It represents the field that is charged

Page 27

1  with -- econometrics is a very broad field.  There is
2  time series econometrics that is often for the
3  interpretation of macroeconomic data such as GDP and
4  so forth.  Then there is sort of micro econometrics,
5  which is more for the analysis of data involving
6  individual firms, more micro type units.
7          And it is -- it represents a field that
8  is -- sort of tries to -- that is basically charged
9  with the analysis and interpretation of data sets and
10  how to use methodologies -- so an example -- it's
11  impossible for me to do justice to all of the things
12  that econometrics is charged with.  But one common
13  example, very common example, within micro
14  econometrics is the analysis of data with a focus on
15  teasing out causal effects.
16          So for example one is provided with a data
17  set and is interested in the effect of one variable,
18  say, years of schooling, on another variable,
19  earnings, and econometrics is charged with developing
20  a set of tools so that economists can get at that.
21  It's a hard question actually.  That is just one
22  example.

Page 28

1          So causality is one area that micro
2  econometricians have been very, very interested in.
3  But, once again, there are many areas of micro
4  econometrics.  But that's kind of -- within micro
5  econometrics that's certainly the area where my use of
6  econometrics has focused.
7     Q.   And does the field of econometrics -- in
8  trying to determine if there's a causal relationship,
9  does it keep other variables constant?  Is that one of
10  the principles of the trade?
11     A.   I think one of the principles of economics
12  is for a researcher to undertake to answer a question
13  and at the outset to be very transparent about what
14  that question is and what assumptions underlie the
15  analysis.  And it is certainly quite common for
16  economics, micro econometric analyses, to hold other
17  factors constant when trying to understand the effect
18  of one variable on another variable.
19          So for example -- and this really is the
20  most -- my guess is this is one of the most studied
21  areas in micro econometrics.  My former colleague at
22  the University of Chicago, Jim Heckman, was one of the

Page 29

1  pioneers on this question of years of schooling and
2  education.  And so were a person to have gotten
3  another year of schooling, all else equal, ceteris
4  parabus, how much more would they earn.  So that's --
5  certainly that's a common thing.
6     Q.   And in that hypothetical you just gave, the
7  researcher would note they did not consider other
8  factors that may have gone into why the person made
9  more money besides the years of schooling, correct?
10     A.   I guess it would depend on the study.  I'd
11  want to see it.
12     Q.   In your undergraduate work did you take any
13  courses in pharmaceuticals?
14          MR. LAVINE:  Objection to form.
15     A.   I'm guessing organic chemistry doesn't
16  count.
17     Q.   Is that the only one that you can think of?
18     A.   I certainly took some courses in chemistry.
19  At MIT students are required -- it may be a little
20  different now.  But they're required to take courses
21  in physics, in chemistry, in calculus.  And so in
22  terms of my undergraduate courses, if -- so once

8  (Pages 26 to 29)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 30

1  again, I'm just trying to -- that would be the thing
2  that would touch most closely.
3     Q.   Have you taken any courses in
4  pharmaceuticals in getting your master's at MIT or
5  your Ph.D. in economics from Harvard?
6         MR. LAVINE:  Objection to form.
7     A.   So it is certainly true that the area of
8  pharmaceuticals was covered in my coursework in public
9  finance.  So one of my advisors and one of my
10  professors was David Cutler, who was a health
11  economist.  We certainly -- it wasn't the only focus
12  of the course in public economics, but analysis of the
13  public sector were a big part of his public financial
14  course.
15        I don't have -- I don't recall all of the
16  details of the course, but I know that there was a big
17  healthcare component to it.
18    Q.   Do you recall anything in particular
19  relating to pharmaceutical economics from that course?
20    A.   It's difficult to recall because if I
21  remember correctly I took the course in the fall of
22  1995.  So I would need to look back.  But I would -- I

Page 31

1  would need to look back at my notes to have that
2  memory.
3     Q.   In your undergraduate work did you take any
4  courses in healthcare policy?
5     A.   Only to the extent it would have been
6  touched on in the microeconomics course.  So I believe
7  there was some discussion of healthcare in that
8  course.  But there wasn't a specific course titled
9  healthcare policy that I took in undergraduate.
10    Q.   Have you taken any courses either in
11  undergraduate or in your graduate degrees on the topic
12  of marketing?
13    A.   I have not.
14    Q.   You worked at the University of Chicago
15  from 1999 through 2003 as an assistant professor; is
16  that right?
17    A.   That is correct.  There was one year break
18  when I was a visiting assistant professor at MIT,
19  MIT's department of economics.  But I believe my
20  appointment remained current during that one year
21  period.  But I wasn't at Chicago during that one year
22  period.

Page 32

1     Q.   Okay.  And I suspect you can't become an
2  assistant professor without having a Ph.D. in
3  economics?
4     A.   The details vary a bit from one university
5  to the next.  But certainly at the University of
6  Chicago I haven't -- I can't think of anyone who has
7  ever been an assistant professor.  So one thing that
8  will happen sometimes is a person will not finish
9  their Ph.D. by May and maybe they'll wrap up some
10  things over the summer and they'll get their Ph.D. in
11  September.  So that sometimes happens to people.  But
12  in general, to a first order approximation certainly
13  at a place like the University of Chicago, that would
14  be true.
15    Q.   And in 2003 you became an associate
16  professor at the University of Maryland; is that
17  right?
18    A.   That's correct.
19    Q.   Which was the same position you had held at
20  the University of Chicago, right?
21    A.   That's not correct.
22    Q.   Okay.  It was as assistant professor and

Page 33

1  then you turned it into an associate professor.
2  What's the difference between those two across
3  schools?
4     A.   So again, the details vary from one
5  university to the next.  And at the University of
6  Chicago an associate professor can be tenured or
7  untenured.  At the University of Maryland it is -- at
8  least certainly in my department it is a position that
9  is with tenure.  So the difference between being in my
10  four years in Chicago and moving to Maryland was that
11  I was tenured when I moved to Maryland.
12    Q.   Is that why you moved to the University of
13  Maryland?
14    A.   That is part of the reason.  It's a
15  complicated decision about when and whether to move.
16  But that was certainly one piece, one element, to my
17  decision.
18    Q.   Were you offered tenure at the University
19  of Chicago?
20    A.   I was not, although I believe had I stayed
21  until July and so forth I would have been -- they
22  voted me to be an associate professor.  And the view

9  (Pages 30 to 33)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                          July 14, 2008
                    Washington, DC

Page 34

1  there was if you wait another year or two -- certainly
2  what I heard from colleagues there was that it
3  would -- the chances would look very good, but it
4  was -- I was only three and a half years removed from
5  my Ph.D. and it was not something they would typically
6  do, tenure someone in their fourth year.
7       Q.   It sounds very similar to making partner in
8  a law firm, this business of making tenure.
9       A.   Yeah.  There's a little stress involved.
10      Q.   I note in a couple of the articles that
11 you've been working on you worked with a woman by the
12 name of Fiona Scott Morton.  Is that right?
13      A.   That's correct.
14      Q.   How did you come to work with her?
15      A.   So I actually -- there's a little -- I'll
16 just give a little background here.  So in my
17 dissertation there were only three main chapters to my
18 dissertation in graduate school, all of which was sole
19 authored projects.  And upon finishing those projects
20 and getting them published I started working with
21 other economists, David Autor at MIT, Steve Levitt at
22 the University of Chicago, and so forth.

Page 35

1       And then I wrote a couple of papers solo by
2  myself, a paper on Medicaid HMOs and a paper on
3  Medicaid prescription drugs, specifically a category
4  known as antipsychotics.  And I found that I had
5  enjoyed working, collaborating, with people more than
6  working on my own.  And so so much of my thinking and
7  research has been on the Medicaid program and at the
8  time I was becoming increasingly interested in
9  Medicaid prescription drugs, prescription drug
10 procurement.
11      And if I recall correctly I had this
12 thought for a project and I had once met Fiona Scott
13 Morton at a conference or -- I think we overlapped a
14 tiny bit at the University of Chicago.  And I just
15 e-mailed her and said, Fiona, I don't know if you
16 remember me, blah, blah, blah, and sort of proposed
17 the outlines of a project which ended up
18 culminating -- I'm sure it varied -- it changed over
19 time -- but culminating in our subsequent publication
20 in the Quarterly Journal of Economics.
21      So really it was I believe actually I
22 e-mailed her while I was visiting MIT.  I don't

Page 36

1  remember the exact time.  And she -- and so it's
2  been -- and she e-mailed back and things went from
3  there.
4       Q.   And Ms. Scott Morton is also an economist;
5  is that right?
6       A.   Yes.
7       Q.   Do you respect her work as an economist?
8       A.   I respect her -- I'm not familiar with all
9  of her research.  But I have enjoyed working with her
10 and certainly I respect her as an economist.
11      Q.   Who do you think knows more about
12 pharmaceutical policy between you and Ms. Scott
13 Morton?
14      A.   I would need to think about that.  She's
15 done some work on pharmaceuticals outside of our joint
16 work, as have I.  I would need to think more about
17 that.
18      Q.   Is one of the reasons that you proposed
19 working with her on your idea for your paper her
20 experience with pharmaceuticals?
21      A.   Correct.  In her -- in one of the chapters
22 of her dissertation she had done some work on Medicaid

Page 37

1  procurement.
2       Q.   Have you reviewed any of the reports that
3  she's filed in drug pricing litigation?
4       A.   I have not.
5       Q.   Have you been engaged to provide expert
6  opinion in any other case besides the case you're here
7  for today and the Texas litigation?
8       A.   I am unclear on the definition of engaged.
9            MS. THOMAS:  And we need to note that there
10 may be instances where he has not been disclosed as a
11 witness where he may only be a consultant.  So you're
12 going to have to question carefully in this area, I
13 believe.
14      Q.   Have you been retained as a consultant in
15 any other case?
16           MS. THOMAS:  Without identifying a case.
17           THE WITNESS:  Oh.
18      A.   It is my understanding that yes, I have.
19      Q.   Is it your understanding that you'll be
20 providing expert opinions in the United States cases
21 against Dey and Roxane?
22           MR. LAVINE:  Objection.  And let me just

Henderson Legal Services, Inc.

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                           July 14, 2008
                    Washington, DC

Page 38

1  caution the witness that we have a work product
2  privilege to assert and potentially attorney-client as
3  well to the extent it's not a disclosed expert
4  witness.
5        MR. TORBORG:  Are you instructing him not
6  to answer?
7        MR. LAVINE:  Well, what are you asking him
8  again?
9        MR. TORBORG:  I'm asking if it's his
10  understanding that he's been engaged to provide expert
11  opinion in the Dey and Roxane cases.
12        MR. LAVINE:  Yes.  At this point, to the
13  extent it would disclose situations in which he's been
14  retained and not yet designated to testify, I'd
15  instruct him not to answer that question.
16        BY MR. TORBORG:
17     Q.   Apart from the United States cases against
18  Dey and Roxane -- this is a yes or no question -- have
19  you ever been disclosed to provide expert opinion in
20  any other matter?
21     A.   I'm sorry.  Have I been disclosed to
22  provide expert opinion in any other matter?

Page 39

1     Q.   Let me try again.
2        MS. THOMAS:  Other than Texas also.
3     Q.   Other than Texas, the DOJ cases against
4  Abbott, Dey and Roxane -- this is a yes or no
5  question, remember --
6     A.   Okay.  So other than Texas, cases.
7     Q.   Other than Texas, the United States against
8  Dey, Abbott and Roxane, have you been engaged in any
9  role whatsoever in any other cases?
10        MS. THOMAS:  Objection.
11        MS. BROOKER:  I'm sorry.  In your question,
12  "disclosed" did you say?
13        MR. TORBORG:  I never said disclosed.
14        MS. BROOKER:  I'm sorry.  What word did you
15  use?
16        MR. TORBORG:  "Engaged."
17     A.   To the best of my knowledge, no.  But --
18  yeah.  To the best of my knowledge.
19        BY MR. TORBORG:
20     Q.   In your work, in your professional work or
21  otherwise, are you familiar with a concept of a
22  plaintiff seeking something called damages in a civil

Page 40

1  suit?
2     A.   In my work -- can you backtrack?  Can you
3  just start the question over?
4     Q.   Let me try again.  Strike that.  Let's
5  start over.
6     A.   Okay.
7     Q.   In a civil suit -- you're familiar with
8  litigation, correct?
9     A.   Yes.
10     Q.   You're familiar with the concept of
11  damages?
12     A.   Yes.
13     Q.   And what is your understanding of what
14  damages are?
15     A.   So it represents -- it's a legal term that
16  represents -- it is going to vary from case to case
17  what exactly it represents.  But it is a legal term
18  representing some quantification of damage suffered by
19  one or more entities.
20        MR. LAVINE:  I didn't want to interrupt his
21  answer, but let me just object to form for that
22  question.

Page 41

1     Q.   And to finish up on your answer, as a
2  result of the defendant's alleged misconduct; is that
3  right?
4        MR. LAVINE:  Objection to form.
5     A.   Correct.
6     Q.   Have you ever been engaged to assess
7  damages in a civil litigation or other dispute?
8        MR. LAVINE:  Objection to form.
9     A.   So we've talked so far about the two cases
10  in which I've written reports so far.  And in those
11  reports I'm very clear about what exactly I set out to
12  do.  And I believe those reports may represent one
13  input to the determination of damages.
14     Q.   Let me ask you again and see if you can
15  answer it yes or no.  Have you ever been engaged to
16  assess damages in a civil litigation or other dispute?
17        MR. LAVINE:  Objection to form.
18     A.   It is my understanding that yes, what I'm
19  doing in this case and what I did in the Texas case,
20  that yes, that is what -- that is essentially -- it's
21  a legal term, damages.  But it is my understanding
22  that that is the thrust of my analysis.

11  (Pages 38 to 41)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
Washington, DC

Page 42

1    Q.   So it's your understanding that in this
2  litigation you have been retained by the plaintiffs to
3  calculate damages --
4        MR. LAVINE:  Object to form.
5    Q.   -- is that right?
6    A.   There are many things in this litigation
7  that I've been involved in doing and it is my
8  understanding that my analysis certainly touches on
9  the issue of damages.  But that's just one of -- as I
10 try to outline in my report, there are other things
11 that I set out to do as well.
12   Q.   You used the words there touches upon
13 damages and previously you used the phrase that your
14 analysis would be an input into damages.  My question
15 for you, Dr. Duggan, are you calculating damages in
16 this case caused by Abbott's alleged misconduct?
17       MR. LAVINE:  Object to form.
18   A.   Once again, I'm not trying to be difficult
19 here.  But what the first order thing that I'm doing
20 in my analysis is to calculate the difference between
21 what the federal government paid for Abbott products
22 and what they would otherwise have paid given -- we

Page 43

1  can go through that -- I guess we'll go through that
2  later on.  And I do not use the phrase damage.  But it
3  is my understanding that that represents an assessment
4  of damages in this case.  Yes.
5    Q.   It's your understanding that your analysis
6  will be used by the plaintiffs to calculate damages in
7  this case; is that correct?
8        MR. LAVINE:  Object to form.
9    A.   It is my understanding that the number --
10 yes.  It is my understanding that I am calculating
11 what in a legal term would represent damages.
12   Q.   And are you, Dr. Duggan, expressing an
13 opinion in this case on the amount at which the
14 federal government has been damaged by Abbott's
15 alleged misconduct?
16       MR. LAVINE:  Objection to form.
17   A.   Once again, it's difficult to do justice to
18 that with a yes or no because, as I outline in my
19 report, there are a number of products that I don't
20 consider, for example, time periods that I don't
21 consider, and so --
22   Q.   For those time periods and products that

Page 44

1  you do consider, are you calculating damages as a
2  result of --
3        MR. LAVINE:  Please make sure you let him
4  finish his answer.
5    Q.   -- Abbott's alleged misconducted?
6    A.   I'm sorry.  He interrupted so I didn't
7  hear.
8    Q.   For the time periods and products that you
9  do consider in your calculation, are you yourself
10 providing an opinion on the amount at which the
11 federal government has been damaged by Abbott's
12 alleged misconduct in this case?
13       MR. LAVINE:  Object to form.
14   A.   So once again, in the report I try to be
15 very transparent about what exactly I'm doing.  And
16 one thing that I make clear is that -- that I try very
17 hard to make clear is that I'm not advocating the
18 reporting of a specific product for a specific time
19 period and so forth.  But my analysis does what it
20 states that it sets out to do, which is to calculate
21 the difference plugging in the prices that I do for
22 AWPs and so forth.

Page 45

1        And so it is -- given all of the supporting
2  narrative and analyses in my report, the $108.2
3  million difference represents what it says in the very
4  first sentence.  So it doesn't fit -- the problem is
5  that I have this analysis which doesn't fit neatly
6  into the question --
7    Q.   It doesn't fit neatly into the question of
8  damages?
9        MR. LAVINE:  Object to form.
10   A.   It is my understanding that -- can you
11 repeat the question?  Because I don't mean to be
12 talking past each other, but --
13   Q.   You used the term difference in your
14 question, capital letters.  You did not use the word
15 damage; is that right?
16   A.   That is correct.
17   Q.   Why not?
18   A.   Because as an economist that is not a term
19 that is frequently used, whereas this difference, this
20 sort of counter factual -- this difference between
21 what the government would have paid if alternative
22 prices had been reported and what was actually paid.

12  (Pages 42 to 45)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

Page 46

1  But my understanding is that the distinction as
2  between my phrase difference as an economist and the
3  legal term damages, that they are -- are they exactly
4  synonymous?  They're essentially -- that that is
5  reflective of damage.
6      Q.   Are they the same, difference and damage?
7          MR. LAVINE:  Object to form.
8      A.   I would -- once again, there's a lot that
9  goes into my calculation of this difference value.  So
10 it's my understanding that -- as an economist, it
11 represents the -- may I read from my report or --
12     Q.   Sure.
13     A.   "What the federal government reimbursed for
14 certain pharmaceutical products, provided to Medicaid
15 and Medicare recipients during the eleven year period
16 and what the federal government would have reimbursed
17 for the same products during the time period if prices
18 reflective of the actual prices at which Abbott was
19 transacting business had been used for the AWP, WAC
20 and direct price of Abbott products."
21     Q.   Are you saying that damages is not an
22 economic term?

Page 47

1      A.   That's not what I'm saying.  It is
2  primarily a legal term in the context of litigation.
3      Q.   What experience do you have, Dr. Duggan, in
4  calculating and doing damage calculations for
5  litigation?
6          MR. LAVINE:  Objection to form.
7      A.   So in the -- we've talked so far about my
8  work in the Texas case and my work here in the federal
9  case and in which the Texas work that I did was quite
10 analogous to what I'm doing here in the federal case.
11 And so I would consider that to be experience in
12 calculating -- in conducting analyses that the court
13 would find useful in assessing damages.
14     Q.   Is it fair to say that apart from this case
15 and your work in the Texas litigation you've never
16 done work to assist a court in calculating damages in
17 a civil suit?
18         MR. LAVINE:  Objection to form.
19     A.   That's correct.
20     Q.   Have you ever published any articles on
21 that topic?
22         MR. LAVINE:  Objection to form.

Page 48

1      A.   Just it -- I think the analysis that I
2  undertake here is very similar to the analysis that
3  I've undertaken in a large share of my empirical work,
4  which is to get at the causal effect of one or more
5  things on an outcome variable of interest.  And so I
6  believe that my prior research is very relevant for
7  this analysis.
8      Q.   Move to strike as nonresponsive.
9          Apart from your work -- let me ask this
10 question again.  Strike that.
11         Have you written any articles regarding the
12 calculation of damages in litigation?
13     A.   I've produced the two reports that we've
14 talked about here today.
15     Q.   Have you read any economic or legal
16 scholarship regarding what should be in a damage
17 calculation used for litigation?
18         MS. THOMAS:  Objection to form.
19     A.   There are many documents that I have read
20 in the course of my career and also in connection with
21 this case.  And so -- but it's hard for me to pick out
22 a particular study right now.

Page 49

1      Q.   When you set out to do the engagement in
2  Texas and again in the engagement in this case, did
3  you make any effort to review literature regarding how
4  to calculate damages in litigation?
5      A.   I believe that my report outlines in a very
6  transparent way what it is that my analysis does.  And
7  so I reviewed some documents related to AWP
8  litigation, reports by other experts, for example,
9  quite some time ago.  But I believe that what I set
10 out to do in this report and the assumptions that I
11 made in carrying this out are very clear.
12         And to the extent that the court or others
13 assess -- this report is, this algorithm that I have
14 designed, is something that I believe is well-suited
15 to the question that I posed, which is how much more
16 did the federal government spend for the products.
17 And I could go through the whole thing.
18     Q.   I would actually like you to go through the
19 whole thing.
20     A.   Okay.  "What the federal government
21 reimbursed for certain pharmaceutical products
22 provided to Medicaid and Medicare recipients during

                                      13  (Pages 46 to 49)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
                    Washington, DC

Page 50

1  the eleven year period 1991 to 2001 and what the
2  federal government would have reimbursed for the same
3  products during the same time period if prices
4  reflective of the actual prices at which Abbott was
5  transacting business had been used for the AWP, WAC
6  and direct price of Abbott products."
7      Q.   Are you aware that economists have written
8  on the subject of how to calculate damages in
9  litigation?
10      MR. LAVINE:  Objection to form.
11      A.   Economists have written on many things.
12  And I believe that I have examined some of those
13  analyses in my own research and in preparation for
14  this case.
15      Q.   What research or literature have you
16  reviewed on the subject of calculating damages in
17  litigation?
18      MR. LAVINE:  Objection to form.
19      A.   The pharmaceutical industry is quite
20  different from many industries.  And so I have
21  examined -- become familiar with reports by other
22  economists involved in this AWP litigation.  And so I

Page 51

1  don't have them memorized which studies exactly,
2  but --
3      Q.   So the answer to my question is you've read
4  some expert reports in AWP litigation as literature on
5  how to calculate damages in litigation; is that right?
6      MR. LAVINE:  Objection to form.
7      A.   I believe that a very large body of the
8  work that I have reviewed and myself done has prepared
9  me to do the analysis that I set out to do here.  But
10  once again, I can't recall specific damages reports,
11  damages papers.  But in the course of my career I've
12  reviewed thousands of papers.  And so I believe that
13  much of my previous research, given what I set out to
14  do in this report, is quite relevant to what I'm doing
15  here in this case.
16      Q.   Is the answer to my question yes?
17      MR. LAVINE:  Objection to form.
18      A.   Can you restate it?  Can you restate the
19  question?
20      Q.   When you set out and began your work in
21  this case and the Texas litigation is the literature
22  that you reviewed, the materials you reviewed on how

Page 52

1  to calculate damages in litigation, limited to the
2  review of expert reports in other AWP litigation?
3      MR. LAVINE:  Objection to form.
4      A.   To the extent that it was tailored to this
5  case, yes, it was these reports.
6      Q.   And did you review plaintiff's reports,
7  defendant's reports, something else or all of them?
8      A.   A combination of the two.
9      Q.   Do you recall which defendant expert
10  reports that you reviewed?
11      A.   I believe Kolossa is one that I reviewed.
12  But there are others.  And we're very -- I think I
13  certainly provided all of the documents that I
14  considered in drafting my report and finalizing it.
15  That would be one example, though.
16      Q.   Are you aware of any professional standards
17  that govern the preparation of damage estimates in
18  expert reports?
19      MR. LAVINE:  Objection to form.
20      A.   It's my understanding one attempts to make
21  one's assumptions as transparent as possible and then
22  to produce empirical analyses that are as close to

Page 53

1  accurate as is possible given the available data, and
2  once again, making the assumptions throughout the
3  analysis clear.
4      Q.   Are you aware of any professional standards
5  written down for use in the profession that govern the
6  preparation of damage estimates in litigation?
7      MR. LAVINE:  Objection to form.
8      A.   Beyond what I just described, any other
9  related statements that I'd make on the report, no,
10  I'm not.
11      Q.   Do you consider yourself a financial expert
12  in this case?
13      MR. LAVINE:  Object to form.
14      A.   I guess I'm unclear on exactly what you
15  mean.
16      Q.   Are you providing expert opinions that go
17  to issues involving finance?
18      MR. LAVINE:  Objection to form.
19      A.   I believe that my analysis certainly
20  considers financing, both by government entities, and
21  by private firms and so forth.
22      Q.   Are you aware of any professional standards

14  (Pages 50 to 53)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
                  Washington, DC

Page 54

1  that govern the rule of financial experts in
2  litigation?
3        MS. THOMAS:  Objection.
4     A.  I'm confused, because I didn't just say I
5  was a financial expert.  I believe I said I have some
6  expertise in areas that are very relevant to this
7  report.  So just to -- I just want to back up
8  because -- just to make that clarification.  And with
9  that clarification can you restate the question?
10    Q.   Are you aware of any professional standards
11 that govern the role of financial experts in
12 litigation?
13       MR. LAVINE:  Object to form.
14    A.   Beyond the ones that I've discussed and
15 ones relating to -- it would be hard for me -- I would
16 need to think about that some more.  But nothing
17 specific is leaping to mind beyond what I outline in
18 my report.
19    Q.   Do you consider yourself to be an expert in
20 the area of pharmaceutical pricing?
21       MR. LAVINE:  Objection to form.
22    A.   I certainly believe that I have expertise

Page 55

1  in pharmaceutical pricing given my previous and
2  current research on Medicaid, on Medicare.  So that is
3  certainly an area that is something where I believe I
4  have expertise.
5     Q.  Do you consider yourself an expert in
6  preparing damage analyses in litigation?
7        MR. LAVINE:  Object to form.
8     A.   I believe that I have expertise in the
9  sorts of empirical methods that are necessary to carry
10 out the analyses that I do in my report.
11    Q.   When did you first become familiar with the
12 term average wholesale price?
13    A.   I'm not sure exactly.  I would expect
14 several years ago when beginning research on Medicaid
15 and prescription drug reimbursement in trying to get a
16 sense of how states reimburse for products.
17    Q.   And what is your understanding of what the
18 term average wholesale price means?
19       MR. LAVINE:  Objection to form.
20    A.   Well, I believe on this -- I think in my
21 report I am pretty clear about the prices that I am
22 using in place of AWP.  But if one defers to a sort of

Page 56

1  plain language meaning of the term, average price at
2  which wholesalers are selling to the retail sector.
3  But as I outline in my report First Databank and other
4  pricing compendia often introduced a markup on
5  wholesaler acquisition costs for Abbott products of 25
6  percent.  So I suspect we'll get to that at some
7  point.
8        But that's certainly, what I just stated,
9  the plain language definition.  In my analyses I end
10 up using a price that's substantially higher than
11 that, thus being more favorable to Abbott, reducing
12 the value of difference below what it otherwise would
13 be.
14    Q.   Before becoming involved in this case when
15 you used the term average wholesale price or you heard
16 the term average wholesale price what did you mean and
17 understand it to refer to?
18    A.   I didn't get the "before" part.  So could
19 you just do the whole?
20       MR. TORBORG:  Would you read that back for
21 me, Jon?
22       (Whereupon, the requested portion was read

Page 57

1  by the reporter.)
2        MR. LAVINE:  Objection to form.
3     A.   So in my analyses it became especially
4  relevant, this issue, for me in my previous work on
5  Medicaid's procurement with Fiona Scott Morton.  This
6  is just -- I want to give some context here.  And so
7  in our study we end up using the average price that
8  Medicaid paid for a prescription, which is based in
9  the vast majority of states on the AWP.  And one of
10 the things -- that I test --
11    Q.   Let me strike --
12    A.   Can I finish my answer, please?
13       One of the things that I test in that
14 analysis -- that we tested in that analysis was to
15 what extent did the price from Medicaid reimbursement
16 correspond with the price paid by all healthcare
17 consumers.  And what we found was that for the top --
18 for a large subset of products there was a very close
19 correspondence between the average amount paid by
20 Medicaid and the average paid by all healthcare
21 consumers.
22       And so I believe as a result of that we

                                    15  (Pages 54 to 57)

Duggan, Ph.D., Mark G.                                   July 14, 2008
                        Washington, DC

Page 58

1  state in our report, in our study, something along the
2  lines of thus it appears that our measure of the price
3  per prescription using Medicaid state drug utilization
4  data -- I don't remember the exact -- I don't have the
5  sentence quoted -- is an accurate reflection of the
6  price paid by all healthcare consumers.
7         So it's my understanding that there might
8  be a modest markup on let's say the average
9  manufacturer's price.  So this is, once again, with
10 the paper with Fiona.  We sort of cite an example with
11 a markup of about 20 percent.  So it was my
12 understanding that there was a modest markup.  But
13 based on that analysis, it appeared that it was a very
14 good measure of the prices that were paid in the
15 marketplace.
16        MR. TORBORG:  Would you read back my
17 question?
18        MR. LAVINE:  Could we take a break soon?
19 Because we have been --
20        MR. TORBORG:  After I get the question
21 answered I'd be happy to take a break.
22        (Whereupon, the requested portion was read

Page 59

1  by the reporter.)
2     A.   Just to clarify, all that I just described
3  was carried out before my becoming involved in this
4  case.  So we drilled down on this issue of --
5        BY MR. TORBORG:
6     Q.   When you used the term AWP, what did it
7  mean to you?
8     A.   Average wholesale price.
9     Q.   Which means what?
10        MR. LAVINE:  Objection to form.
11    A.   I think I've answered that.
12    Q.   No.  You haven't.
13        MR. LAVINE:  Objection to form.
14    Q.   When you used the term average wholesale
15 price prior to this litigation and you saw the term
16 average wholesale price what did it mean to you?
17        MR. LAVINE:  Objection to form.
18    A.   It's difficult for me to get back to
19 exactly before I knew as much as I now do what did it
20 mean to me.  But what -- based on my analysis of
21 reimbursement that was based on AWP, it looked like a
22 pretty good reflection, perhaps with a slight markup

Page 60

1  over, the prices that were paid by all healthcare
2  consumers.
3         So I think there was -- you know, for that
4  analysis we would have preferred to have actual
5  prices.  But those prices aren't publicly available.
6  And so we used as our next best proxy this Medicaid
7  price per prescription.  And, you know, at the end of
8  the day, to me as an economist what ultimately matters
9  is -- as an empirically oriented economist what
10 matters is what I observed in the data.
11        And what I observed in the data is that AWP
12 was a pretty darn good reflection of prices paid in
13 the market for a large subset of drugs.  There was a
14 statistically significant relationship I believe and
15 the relationship was pretty much one for one between
16 the prices for all healthcare consumers and the prices
17 in the Medicaid reimbursement.
18        So beyond -- you know, what mattered for me
19 in my analysis is was I getting an accurate measure of
20 pharmaceutical prices.  And based on this analysis it
21 looked like I was.  So it seemed, whatever it meant to
22 me, a pretty darn good measure of prices.

Page 61

1     Q.   When you used the term average wholesale
2  price in your work did it refer to the prices
3  published in the drug compendia?
4         MR. LAVINE:  Objection to form.
5     A.   In our work we basically point out that
6  Medicaid reimbursement in most states depends on this
7  average wholesale price.  So I guess -- maybe you can
8  restate the question.
9     Q.   It's a very simple question.
10    A.   Okay.
11        MR. TORBORG:  Would you read it back for
12 me, Jon?  It's a yes or no.
13        (Whereupon, the requested portion was read
14 by the reporter.)
15        MR. LAVINE:  Objection to form.
16    A.   For us that wasn't relevant whether it was
17 published in First Databank or Red Book --
18    Q.   I'm not asking whether it's relevant.
19    A.   Right.
20    Q.   I'm asking when you used the term did it
21 refer to prices in the drug compendia?
22        MS. THOMAS:  Objection.

                                    16  (Pages 58 to 61)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

---

Page 62

1     A.   Once again, it's hard for me to go back to
2  three, three and a half years ago, four years ago,
3  when we were working on this project.  And to the
4  extent -- it was my understanding at the time that the
5  pricing compendia provide information to state
6  Medicaid programs which represents one input into
7  their adjudication of claims.  So I'm just trying to
8  be precise.  I'm trying -- you know, so the state
9  Medicaid programs must get these AWPs.
10          In any particular quarter state Medicaid
11 programs are paying for 20, 25, 30,000 different NDCs.
12 So it was my understanding that the state Medicaid
13 agencies obtain that data from places like First
14 Databank and Red Book.  But once again, that wasn't
15 the thrust of that specific analysis.  So it wasn't
16 something that we exhaustively explored.  Does --
17 so --
18     Q.   And I'm not really asking you what where
19 Medicaid programs got their source of average
20 wholesale price.  I'm asking you when you used the
21 word average wholesale price did you mean to refer to
22 prices located in the compendia, yes or no?

---

Page 63

1          MR. LAVINE:  Objection to form.
2     A.   You know --
3     Q.   Can you answer it yes or no?
4     A.   It's -- I believe that for us what was
5  important is that these AWPs are used by states in
6  reimbursing.  So our key outcome variable of interest
7  in this study --
8     Q.   I'm not interested in --
9          MR. LAVINE:  Dave, you really need to let
10 him finish his answer.
11         MR. TORBORG:  He's not answering my
12 question.  It's a yes or no -- I even asked him if he
13 could answer it yes or no and he can't even say that.
14         MR. LAVINE:  You might not be getting the
15 answer you want, but you're getting your answer.
16         MR. TORBORG:  I'm not getting an answer.  I
17 have not gotten an answer to my yes or no question.
18     A.   It doesn't lend itself to a simple yes/no
19 in the sense that it is difficult for me to recall how
20 on our radar screen the First Databank Red Book issue
21 was.  Obviously at this point right now this issue is,
22 you know, very much on the radar screen.  But for that

---

Page 64

1  specific study where we looked at Medicaid
2  reimbursement per prescription, the role of pricing
3  compendia was not -- that was not something that we --
4  so it may be that at the time it was -- it's just hard
5  for me to recall.
6          BY MR. TORBORG:
7     Q.   Is the reason you can't answer my question
8  yes or no because you don't recall?
9          MR. LAVINE:  Objection to form.
10    A.   There are many -- right.  That's correct.
11    Q.   And when you used the average wholesale
12 prices in your analysis --
13    A.   Right.
14    Q.   -- you got them from the pricing compendia,
15 correct?
16    A.   Incorrect.
17    Q.   Where did you get them?
18    A.   And so once again, in that study we try to
19 be very transparent about what we do.  We used the
20 average amount paid by Medicaid per prescription for
21 prescription drugs.  So for example how much did
22 Medicaid pay for the average Lipitor prescription, for

---

Page 65

1  the average Zoloft prescription and so forth.  And to
2  the extent that AWP affected that -- I mean, at some
3  level the price paid by Medicaid is going to be a
4  weighted average of 50 different state Medicaid
5  programs because we were using national data from the
6  state, SDUD, state drug utilization data.
7          And so it's going to be a weighted average
8  of the prices paid by consumers by Medicaid programs
9  in 50 different states.
10    Q.   Is it your testimony that your analysis
11 that you're talking about used the term average
12 wholesale price to be the average weighted amount the
13 state Medicaid programs used for prescriptions?  I can
14 find that in your article?
15         MR. LAVINE:  Objection to form.
16    A.   No, no, no.  So our key outcome variable in
17 that study is the price per prescription.  Okay?
18 That's what we're especially interested in in that
19 analysis.  There is not publicly available data for
20 prescription drugs on a prescription per prescription.
21 So as an imperfect measure of that we used the price
22 per Medicaid prescription.  Price paid by Medicaid per

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                          July 14, 2008
                    Washington, DC

Page 66

1  prescription.
2      Q.   What do you call that --
3      A.   Can I finish? Can I just finish my
4  explanation?
5      Q.   I think it would be faster if I could --
6      A.   I really would like to -- so the price per
7  Medicaid prescription. And so in explaining what that
8  represents we point out that the typical state
9  Medicaid program uses an adjudication algorithm that
10 depends on the AWP. But we don't -- you know, one of
11 the things that is a challenge for any study is to not
12 overwhelm the reader with details.
13         But we certainly try to be very clear about
14 what exactly our outcome variable is. And one of the
15 standard questions that one obtains -- it's not the
16 perfect outcome variable. So how does it relate -- to
17 the best of your analysis how does it relate with what
18 would be perfect. And we examined that and they
19 looked pretty darn good.
20     Q.   You said in your answer that the work noted
21 that the amount that state Medicaid programs reimburse
22 depends on the AWP. You just said that, correct? You

Page 67

1  used the phrase depends on AWP; is that right?
2      A.   I don't have my answer memorized. But --
3      Q.   Well, you did. So let me follow up.
4          MR. LAVINE: Dave, your interrupting his
5  answers.
6          MR. TORBORG: No. I'm asking my question.
7          MR. LAVINE: In the middle of his answering
8  your prior question.
9          MR. TORBORG: No. He's asking me to
10 clarify my question before I'm done asking it.
11     A.   Can I just -- maybe I didn't say exactly
12 this, but our understanding then was that typically
13 most states use the average wholesale price in
14 determining the amount that they would pay for a
15 prescription.
16         BY MR. TORBORG:
17     Q.   Okay. And where did they get the average
18 wholesale price?
19     A.   And by the way, at some point -- I'm
20 getting kind of parched, so if at some point we could
21 take a break, that would be great.
22         MR. LAVINE: Could we take a break now?

Page 68

1          MR. TORBORG: After this answer, if I get a
2  responsive answer, yeah.
3      A.   Where --
4          BY MR. TORBORG:
5      Q.   Where did the states get the AWP?
6      A.   Well, my current understanding is that many
7  states obtain this from pricing compendia such as
8  First Databank, First Databank being the most common
9  one. But as I said at the time, whether First
10 Databank loomed -- or where exactly states got their
11 AWPs from, whether we delved into that all that much
12 four years ago, I can't recall.
13         MR. TORBORG: Okay. Let's take a break.
14         THE VIDEOGRAPHER: This is the end of tape
15 1. Off the record at 10:42.
16         (Recess.)
17         THE VIDEOGRAPHER: This is the beginning of
18 tape 2 in the deposition of Dr. Mark Duggan. On the
19 record at 11:07.
20             (Exhibit Abbott 1097 was
21             marked for identification.)
22         BY MR. TORBORG:

Page 69

1      Q.   Dr. Duggan, what I've marked as Exhibit
2  1097 --
3      A.   We're back on, right?
4      Q.   Yes, we are.
5          -- is an excerpt, I think you'll tell me,
6  from an article that you worked on with Fiona Scott
7  Morton. Is that right?
8      A.   It looks consistent, right.
9      Q.   The title of this is "The distortionary
10 effects of government procurement: Evidence from
11 Medicaid prescription drug purchasing"?
12     A.   Correct.
13     Q.   Was this article published?
14     A.   Yes, it was.
15     Q.   When we were discussing the term average
16 wholesale price and your understanding of it you were
17 referring to some work you had done. Is this the
18 article?
19     A.   Correct.
20     Q.   Okay. If I could ask you to go to the
21 second page of this exhibit, which is page 6 of the
22 article. And Carol will correct me if I'm wrong. But

18  (Pages 66 to 69)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                   July 14, 2008
                          Washington, DC

Page 70

1  I think we printed this off our your website, the
2  University of Maryland website.
3        MS. GEISLER:  Yes.
4     A.   Okay.
5     Q.   If you would go to the second page, the
6  third full paragraph, it says "First, the state
7  government reimburses the pharmacy that dispensed the
8  drug according to a formula determined at the state
9  level." And the fourth sentence states "The usual
10  approach to reimbursement is some fraction of the
11  drug's AWP, which is a standard industry list price."
12  Do you see that?
13     A.   I see that sentence, yes.
14     Q.   Does this refresh your recollection at all
15  of how it is that you referred to the term average
16  wholesale price prior to your expert work here?
17     A.   Well, this is just one page of a document
18  that I think is, if I recall in its final version, was
19  36 pages, at least in the PDF.  And so here we're
20  trying to give sort of a overview, a big picture
21  overview, of Medicaid drug reimbursement.  So this is
22  I think the first time that we mention AWP.  We then

Page 71

1  later go on to examine -- conduct the analyses that I
2  described in which we examine the extent to which the
3  prices that emerge from these formulas correspond to
4  actual prices paid in the market.
5     Q.   Is it fair to say, Dr. Duggan, that in this
6  sentence the usual approach to reimbursement is "some
7  fraction of the drug's AWP, which is a standard
8  industry list price," that you and Ms. Scott Morton
9  are in fact describing average wholesale price?
10     A.   I would say here we're providing some input
11  to that issue, which we later elaborate on more.
12     Q.   What did you mean when you wrote "which is
13  a standard industry list price"?
14     A.   It's difficult to recall exactly from four
15  years ago, but I'll do my best here.  If I recall
16  correctly at that time I understood that there was a
17  standard markup that was often applied from the actual
18  prices to average wholesale price of between 20 and 25
19  percent.  And so in an example we actually take -- if
20  I recall correctly in this paper we give an example of
21  a drug with an AWP of 110 and an AMP of 90 of just a
22  reflection of how Medicaid drug reimbursement would

Page 72

1  work.
2        And so here this is just recognizing that
3  caveat because of this markup, which was -- my
4  understanding was this was a standard 20 or so
5  percent.  And that's why we -- the example we provided
6  had a markup of I guess 22 percent, between 20 and 25.
7     Q.   But your understanding was that the term
8  average wholesale price did contain some level of
9  markup, as you just described?
10     A.   So yes.  Yes.
11     Q.   So when you used the term average wholesale
12  price in this paper you were not referring to it as an
13  actual average of marketplace prices, correct?
14     A.   We make the distinction between average
15  manufacturer price -- I believe in footnote 4 we
16  define -- which is there -- later in the paper we
17  define average manufacturer price.  And so we have
18  this caveat.  But I should also note that because the
19  key variable in our study is the Medicaid amount paid
20  per prescription, we had to then investigate to what
21  extent this was reflective of prices that were
22  actually paid for all healthcare consumers.

Page 73

1     Q.   But when you used the term AWP in the
2  sentence, you were not referring to AWP as an actual
3  average of marketplace prices, right?
4     A.   So -- once again, I just want to point out,
5  the goal of this paper is to determine the effect of
6  Medicaid procurement on pharmaceutical prices.  And
7  here we are -- it's hard for me to recall.  I've
8  learned a lot about AWP since writing this paper.  But
9  at the time it was my understanding that there was a
10  standard markup over actual average prices.
11     Q.   Marked up where?  Who was doing the marking
12  up?
13     A.   At that time that wasn't something that we
14  needed to drill down on.
15     Q.   Do you know today?  Doesn't your report
16  talk about that?
17        MS. THOMAS:  Objection to form.
18     A.   I think it depends on -- it is my
19  understanding that for many of the products in this
20  case there was a relationship of AWP being equal
21  to 125 percent of the WAC, wholesaler acquisition
22  cost.  And so this is -- we're not doing justice to

                                    19  (Pages 70 to 73)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                          July 14, 2008
                      Washington, DC

Page 74

1  the goal of the paper. We're just trying to provide
2  some guidance on this to the reader to the extent it's
3  necessary for interpreting our subsequent results.
4      Q.   Were you using the term average wholesale
5  price in this sentence to mean the actual average of
6  marketplace prices?
7          MR. LAVINE:  Objection to form.
8      A.   Once again, I think we are careful to make
9  the distinction that AMP -- there is often a
10 discrepancy between the AMP, the average manufacturer
11 price -- and I don't have the footnote here in front
12 of me, so it's hard for me to go to exactly how we do
13 that or the rest of the report. But it is my
14 recollection that when we wrote that we're basically
15 just trying to guide the reader.
16         This paper was published in a general
17 interest economics journal. So we're trying to give
18 the reader the information that they need to interpret
19 our subsequent analyses. And really -- in our
20 subsequent analysis we also looked at the average
21 price paid -- used the same measure, Medicaid
22 reimbursement per prescription, for generic drugs.

Page 75

1  And once again, there it was -- we conducted an
2  analogous set of specifications for generic drugs.
3  But the first set are for brand drugs. And so --
4      Q.   Did you find the difference between the
5  marketplace prices and AWP were higher for generic
6  drugs?
7      A.   There was not data that was available to us
8  on generic prices. So the data set that we -- so
9  there was a report by the National Institute of
10 Healthcare and Management that provided the price per
11 prescription for the 50 top selling drugs in the U.S.
12 And virtually all of those were brand drugs and that's
13 what we corresponded to. But as to a corresponding
14 set of prices for generic drugs, we looked actually
15 but were unable to find publicly available information
16 on actual market prices for a large subset of generic
17 drugs.
18     Q.   So the testimony you gave earlier this
19 morning regarding what you found to be a predictable
20 relationship or a modest markup of 20 to 22 percent,
21 that emanates from your work with brand name drugs,
22 correct?

Page 76

1          MR. LAVINE:  Object to form.
2      A.   I'm confused. Can you restate the
3  question?
4      Q.   This morning when we were earlier talking
5  about -- I don't exactly remember what exactly we were
6  talking about. But you gave some testimony regarding
7  how average wholesale price was in your work found to
8  be 20 to 22 percent above an actual sales price or
9  something of that nature. I don't mean to misquote
10 you. I just recall that.
11     A.   Right.
12     Q.   Do you recall that discussion?
13     A.   Sure. Do you want me to just clarify --
14     Q.   Sure.
15     A.   So basically there we related average price
16 per Medicare prescription. So the focus of our first
17 set of analyses were on brand drugs. And so there we
18 related the average price per Medicaid prescription,
19 which is, as I said, this weighted average of various
20 state adjudication formulas. Some are using 95
21 percent of AWP. Some are using 90. So it's not --
22 but it's going to be very much a function of the AWP

Page 77

1  for the product. Relating that to actual prices that
2  were paid in the market.
3          We couldn't do that for generic drugs, but
4  we certainly at the time didn't have any reason to
5  suspect that our results did not generalize to generic
6  drugs. But once again, there was -- this was sort of
7  a robustness check for our study to sort of see if the
8  mechanism that we had found for brand drugs also
9  existed for generic drugs, where it shouldn't, given
10 what we go through in our theoretical framework.
11         So at the time we felt pretty good about
12 doing a set of analyses using this drug, the Medicaid
13 reimbursement per prescription, as reflective of
14 actual prices for generic drugs. I mean, that's why
15 the reviewers and the editor and we thought that that
16 was a useful complement to our main set of analyses.
17     Q.   Dr. Duggan, do consider yourself an expert
18 in the area of Medicare drug reimbursement policy?
19     A.   I believe that I have some expertise that
20 relates to how Medicare reimburses for prescription
21 drugs. Whether -- yeah. So I believe I have that
22 expertise.

20  (Pages 74 to 77)

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 78

1      Q.   Do you consider yourself an expert in the
2   area of Medicaid drug reimbursement policy?
3      A.   I believe, yes, that I have expertise in
4   Medicaid.  So I believe that I have expertise in the
5   area of Medicaid drug reimbursement policy.  I guess
6   as economists we don't usually go around saying we're
7   an expert.  But where are our areas of expertise, I
8   believe that's even a phrase that -- okay.
9      Q.   I understand that you have some experience
10  and perhaps some expertise on the topic of Medicare
11  and Medicaid drug reimbursement policy.  But would you
12  hold yourself out in a court of law as an expert in
13  Medicare and Medicaid drug reimbursement policy?
14         MR. LAVINE:  Object to form.
15      A.   I believe given all the work that I have
16  done in this area and all of my research past and
17  current and future, that I have expertise that relates
18  to the Medicare and Medicaid programs with respect to
19  drug reimbursement.
20      Q.   And when did you begin to develop that
21  expertise?
22      A.   I would say several years ago, before -- as

Page 79

1   I started into -- so really I've been working on the
2   Medicaid program ever since graduate school.  It was
3   the main focus of my dissertation.  There it was
4   hospitals.  But soon after that I got interested in
5   prescription drugs as well.  And the paper that
6   appears in the January 2005 issue of the Journal of
7   Health Economics, I started working on that probably
8   in 2001, perhaps even sooner.  So quite some time.
9            (Exhibit Abbott 1098 was
10             marked for identification.)
11         BY MR. TORBORG:
12      Q.   Dr. Duggan, I'm handing you an excerpt of
13  the second day of deposition that you sat for in the
14  Texas litigation.  In particular I've handed you some
15  pages that include pages 285 through 292 and page 429
16  through 432.  I'd like to ask you if you would to go
17  to page 288.  In particular, starting with line 3 of
18  page 288 Ms. Geisler asks you "And under your
19  methodology, in order to avoid damages under your
20  methodology Abbott would have had to report one of the
21  prices you selected quarterly, right?"
22         There's an objection, and then you

Page 80

1   answered: "So can we backtrack?  You used the word
2   'damages' and I -- I think the term that I use in my
3   report is 'difference.'  So can you restate the
4   question replacing damages with difference?"  Do you
5   see that?
6      A.   I see that, yes.
7      Q.   Why are did you ask Ms. Geisler to replace
8   the word "damages" with the word "difference" in her
9   question?
10      A.   It's difficult to recall exactly what was
11  going through my mind there.  It was a long two days.
12  But if I recall -- I'm trying to be specific because
13  she's prefaced it with a statement given my
14  methodology to avoid damages, but my methodology is
15  all about calculating these values of difference that
16  I provide.  And so just clarifying that as in the
17  report I produced numbers that represent the
18  difference between what Texas Medicaid paid for Abbott
19  products and what they would have paid if alternative
20  prices had been reported.
21      Q.   Is it fair to say, however, that you felt
22  it important to clarify to Ms. Geisler that you were

Page 81

1   calculating a difference and not damages?
2          MR. LAVINE:  Object to form.
3      A.   I guess I feel like we've gone down this
4   road a bit already.  In my view I basically produced
5   this report which does what it sets out to do, which
6   is to calculate this difference.  And in that report
7   the word "damage" is a legal term typically.  And I'm
8   just trying to be precise using the language as an
9   empirically trained economist.
10         Now, as I said, this value of difference
11  can be an important input or even the -- an important
12  input to damage or even the value of damage itself.
13  But there I was just trying to be -- she was talking
14  about my methodology and moreover in my methodology
15  there are several different values of difference.  And
16  she's talking about different quarterly prices.
17         So it's hard to recall exactly, but I think
18  it was because we were talking about the methodology
19  in my report.  And in my report I used these
20  alternative values of difference.
21      Q.   If you would go to page 432, line 8,
22  starting with line 8 Ms. Geisler asked "Have you

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
Washington, DC

Page 82

1  attempted to calculate damages for the Hospira NDCs at
2  issue in this case?" And there's an objection. You
3  stated "So the word 'damage,' can we -- how about --".
4  And then Ms. Geisler restates her question to state it
5  in terms of difference. Correct? Is that right?
6       MR. LAVINE: Object to form.
7    A.  Yes.
8    Q.  So once again you were about ready to ask
9  Ms. Geisler to change the word "damage" in her
10 question to "difference"; is that right?
11      MS. THOMAS: Objection.
12   A.  So once again, I don't have the entire
13 deposition in front of me. But in these two specific
14 cases it does appear that I asked her to replace the
15 word "damage" with "difference." And it's hard to
16 have -- I don't have the full context of what was
17 leading up to that.
18   Q.  And as you sit here today you don't recall
19 why it is that you asked her to restate her question
20 to eliminate the word "damages" and use the term
21 "difference"?
22      MR. LAVINE: Object to form.

Page 83

1    A.  So I think it is my goal -- it was my goal
2  to be precise throughout the deposition. And so I
3  believe that at these points in the questioning she's
4  asking me about the empirical analyses that I've done
5  and I'm simply using the language from my report in
6  responding to her there. I certainly would expect
7  that I believe that these numbers were quite relevant
8  for the issue of damages, to use the legal term.
9    Q.  If we stay at 432 where Ms. Geisler asked
10 "Have you attempted to calculate damages?" you didn't
11 ask her to restate the term or to use a different word
12 for calculate, did you?
13      MR. LAVINE: Object to form.
14   Q.  She could have used the word determine,
15 estimate, right?
16      MR. LAVINE: Object to form.
17   A.  Once again, it's difficult on the fly when
18 I think that -- was it optimally worded to be
19 consistent with my report? I'm not sure. But at the
20 time I'm clarifying that didn't leap to mind on page
21 432 of my deposition. That's true.
22   Q.  The word that you asked her to substitute

Page 84

1  twice in this deposition was "damages," right?
2       MR. LAVINE: Object to form.
3    A.  Once again, it's difficult for me because I
4  don't have the entire deposition transcript in front
5  of me to know -- I think there were many cases where I
6  corrected Ms. Geisler or just, you know, asked her to
7  rephrase things. So these are two examples. I
8  suspect there are many, many others as well.
9    Q.  Did you discuss with counsel your use of
10 the term "difference" as opposed to "damages"?
11   A.  I believe that I discussed my use of the
12 term "difference" and whether in that conversation
13 we -- I believe -- I don't recall specifically if the
14 conversation -- if there was a conversation about both
15 of those issues. But we certainly talked about choice
16 of number difference, which was sort of adhering to
17 this approach, my training, which is a sort of
18 quantifiable number representing the difference
19 between what the federal government would have paid
20 and what they actually paid.
21   Q.  But it's your testimony here today that you
22 haven't had discussions with counsel on whether to use

Page 85

1  the term "difference" versus the term "damages" in
2  your expert report? That's your testimony?
3       MS. THOMAS: Objection.
4    A.  I believe that we had some discussion of
5  the term "damage." But I don't recall the specifics
6  of the conversation. But yeah.
7    Q.  Tell me what you recall about the
8  discussion regarding the term "damage."
9    A.  Well, I believe that counsel considers me
10 to be a person who can provide expertise regarding the
11 damages in this case. That is, that was conveyed to
12 me.
13   Q.  And do you believe that you are providing
14 to the judge and jury in this case a calculation of
15 the extent to which the federal government was damaged
16 by Abbott's alleged misconduct --
17      MR. LAVINE: Object to form.
18   Q.  -- for the NDCs and time periods that you
19 considered?
20      MR. LAVINE: Same objection.
21   A.  Just adhering to my -- I feel like we've
22 gone down this road a bit already. I believe that my

22  (Pages 82 to 85)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
Washington, DC

Page 86

1  analysis provides information that would be quite
2  useful in the determination of damages in this case.
3      Q.   So would it be fair to say that your
4  analysis provides information that can go into the
5  calculation of damages, but you yourself are not
6  expressing an opinion on damages?
7          MS. THOMAS:  Objection.
8      A.   I did not say that.  No.  That's not what I
9  said.
10     Q.   Okay.  So am I wrong?
11     A.   So maybe you can restate the question.
12 It's kind of hard to --
13     Q.   I'll try to again.  You indicated when I
14 asked if you were opining on damages -- essentially
15 you said you're providing information that would go
16 into a damages calculation.  I'm asking is it fair to
17 say then that you're providing information that goes
18 into a damages calculation, but you, Dr. Duggan, of
19 the University of -- a professor of economics,
20 University of Maryland, are not expressing an opinion
21 on the ultimate question of how much damage was
22 caused?

Page 87

1          MR. LAVINE:  Object to form.
2      A.   It is my opinion that if Abbott had
3  reported prices that reflected those paid in the
4  marketplace, typically generally paid in the
5  marketplace, that my analysis provides, if anything, a
6  lower bound with respect to how much lower federal
7  government spending would have been if they had
8  replaced -- so there are many details in my report.
9  And so once again I think that it's hard for me to do
10 justice to this question with a yes or a no.
11         What I try to provide is an analysis that
12 is as accurate as possible using the assumptions that
13 I state throughout that can provide guidance to the
14 court or others with an interest in this case with
15 respect to the lower bound of the effect on federal
16 government spending.
17     Q.   And one of those assumptions that you state
18 clearly in your report is that if Abbott had reported
19 these and had they been used by Medicare and Medicaid,
20 correct?
21         MR. LAVINE:  Object to form.
22     A.   So once again, I would want to -- if I

Page 88

1  recall correctly, yes, that's how I phrased them.
2      Q.   Dr. Duggan, when were you first contacted
3  to serve as an expert in either the Texas litigation
4  or the United States litigation?
5      A.   Well, I was first contacted -- whether it
6  was to serve as an expert or not I don't recall.  But
7  I was first contacted about the federal case -- about
8  federal cases.  I don't remember all the
9  conversations.  But in if I recall early 2006.  I
10 don't remember the specific date, but --
11     Q.   Were you contacted to serve as a -- I'm
12 sorry.  Let me try again.
13         Were you contacted to serve in some role in
14 the United States cases first or the Texas cases?
15     A.   The United States first.
16     Q.   Who contacted you?
17     A.   It was Renee Brooker the first time.
18     Q.   Was it a phone call?
19     A.   I don't recall if we spoke over the phone
20 before first meeting.  We had some e-mails back and
21 forth about the logistics of the meeting.  I just
22 can't recall if we talked on the phone or not before

Page 89

1  the meeting.  And if we did it might have been about
2  logistics or when to meet, the Metro station, that
3  kind of thing.
4      Q.   Who all attended the first meeting?
5      A.   Renee Brooker, Bunker Henderson, Jim Breen.
6  There may have been one or two others on conference
7  call.
8      Q.   Just do the best you can.  It's really not
9  a memory test.  No one is going to hold you --
10     A.   I think perhaps Gejaa Gobena, I think.  And
11 there may have been one or two others.  I'm doing my
12 best to remember.
13     Q.   Where was that meeting held?
14     A.   In Washington, D.C.
15     Q.   Do you know how it is that the Department
16 of Justice came to call you?
17     A.   I don't know all the details, no.
18     Q.   I imagine when they contacted you you
19 wondered how they got your name.  Right?
20     A.   I'm just trying to recall whether -- yeah.
21 I'm not sure whether it was word of mouth or -- I just
22 don't recall.  Maybe perhaps the Internet, because

23  (Pages 86 to 89)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 90

1  I've done a lot of work on Medicaid.  I'm not sure how
2  they came to me.  I had been -- I mean, it wasn't all
3  that surprising to me to be contacted because I had
4  been contacted before for other cases, like hospital
5  merger cases, for example.  So it wasn't -- I wasn't
6  that curious.
7      Q.   During that first meeting did they discuss
8  with you what the nature of your opinion might be in
9  this case?
10     A.   It is difficult to recall in the sense that
11 it was two and a half years ago.
12     Q.   Sure.  Just do the best you can.
13     A.   So if I recall they asked me a bit about my
14 research, described to me big picture the case, cases,
15 just general issues, the general things that are at
16 issue, and asked whether that is something that I
17 might find of interest to work on.
18     Q.   Did they discuss with you the possibility
19 of providing an opinion on the subject of damages or
20 that could be used on the subject of damages?
21         MS. THOMAS:  Objection.
22     A.   I don't recall if the word damages was used

Page 91

1  in the first meeting.  It may well have been.  But --
2  so I don't recall the specifics.  To some extent what
3  I do recall quite a bit of is discussion of my own
4  work on Medicaid analysis and interpretation of large
5  scale data sets.
6      Q.   They told you that this project might
7  involve looking at a lot of data, I suppose.
8      A.   I think that's one, yeah, was certainly one
9  of the takeaways of the meeting.
10     Q.   And in fact it has involved a lot of data;
11 is that right?
12     A.   Quite a bit.
13     Q.   What prior work have you done -- prior to
14 that time had you done for the United States?
15     A.   Prior to the call?
16     Q.   Yeah, prior to being called by the -- had
17 you done any work, either consulting work, or things
18 of that nature on behalf of the United States?
19     A.   I certainly presented the results of my
20 research to a number of government entities, agencies.
21 So, for example, the Social Security Administration,
22 the Internal Revenue Service, Centers for Medicare and

Page 92

1  Medicaid Services, though I'm not sure if at that
2  point I had presented there, FTC.  So I had presented
3  the results of my research at many conferences or been
4  invited to give speeches to groups.  But other than
5  that nothing leaps to mind.  But I may be
6  misremembering.  But certainly nothing like this.
7      Q.   Now, the various projects that you work
8  on -- I have a couple friends who are college
9  professors so I have a little idea how this works.
10 But the projects that you work on you typically have
11 to go get funding for them, right?
12         MS. THOMAS:  Objection.
13     A.   No.  That's not true.
14     Q.   So the papers that you have done, are those
15 funded entirely by your salary?
16         MS. THOMAS:  Objection.
17     A.   It varies from paper to paper.
18     Q.   For some of those papers do you have to get
19 outside funding for that project?
20     A.   Not necessarily.
21     Q.   How is it paid for if not by your salary?
22     A.   Well --

Page 93

1          MS. THOMAS:  Objection.
2      A.   -- as an economist -- so as a professor,
3  often -- so the university pays me an academic year
4  salary and also often -- both at Chicago and at
5  Maryland.  And to some extent even while I was at MIT
6  visiting, research funds are often provided by the
7  university.  So this is a common thing among academic
8  economists.  Their departments will provide them not
9  only salary but also funding for a research assistant,
10 funding for the purchase of data and so forth.  And it
11 varies from person to person.  Some people more than
12 others.
13     Q.   Do you have an idea of where the research
14 money comes from that you get from the university?
15         MS. THOMAS:  Objection.
16     A.   It seems plausible that it would come from
17 the same place as my salary, but I'm not a hundred
18 percent sure on that.
19     Q.   Do you know if you have received funding
20 from the United States or any state for any of your
21 projects?
22     A.   Let me just backtrack one moment.  I have

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 94

1  had some federal grants.  And so the extent -- like
2  from the National Institutes of Health and the
3  National Science Foundation -- I should just mention
4  that -- for projects that I did.
5        So can you just restate the question that
6  you just asked?  I just wanted to clarify an earlier
7  point because you had asked had I done any work for
8  the United States, so United States agencies and the
9  Social Security Administration have provided funding
10 to some of my research.  So I'm just clarifying.  So
11 make you can repeat your question.
12    Q.   Federal grants -- explain what a federal
13 grant is, if you could.
14    A.   Sure.  It varies from agency to agency and
15 from researcher to researcher.  But typically one
16 submits a proposal outlining research, proposed
17 research, that would be undertaken.  The research is
18 then evaluated by people with expertise in the field.
19 Proposals are scored.  And proposals that are above a
20 certain threshold receive funding.  And funding is
21 basically to advance that research as outlined in the
22 proposal.

Page 95

1        Once again, the details vary from agency to
2  agency.  But that's sort of a big picture.
3    Q.   And you say that you've received some
4  federal grants for some of your papers or projects?
5    A.   Yes.
6    Q.   From which agencies?
7    A.   So it's -- they are listed on my CV.  So,
8  for example --
9    Q.   Where would they be listed?  Grants?  Page
10 3?
11    A.   Yes.  That's right.  So Social Security
12 Administration, National Science Foundation, Robert
13 Wood Johnson Foundation, and so forth.
14    Q.   So much of the grants you have received
15 have been from some branches of the federal
16 government; is that fair to say?
17        MR. LAVINE:  Objection to form.
18    A.   Much of it.  Not all of it, but much of it.
19    Q.   Have you had interactions with individuals
20 at the Department of Health and Human Services
21 including the Office of Inspector General and CMS
22 apart from this litigation?

Page 96

1        MS. THOMAS:  Objection.
2    A.   Sure.  So given the nature of my research I
3  interact with people from government agencies from
4  time to time.  I know that I have presented my
5  research at the Centers for Medicare and Medicaid
6  Services.  And I corresponded with some people from --
7  I guess it was formerly called HCFA -- about the data
8  sets that they had that were available.  So those
9  would be examples.  But whether there were other
10 conversations too -- I'm sure there have been.  But
11 those are two that leap first to mind.
12    Q.   Have you had -- what communications have
13 you had with pharmaceutical manufacturers in the
14 course of your work?
15    A.   I have corresponded with some folks from
16 Pfizer.  They have an economic policy division so for
17 example Manning I think is the head there of their
18 economic policy division.  I've corresponded some with
19 them.  I've corresponded somewhat with -- there may be
20 others too, but that's certainly one that leaps to
21 mind.  So I've had some correspondence with them.
22    Q.   Have you had more correspondence with

Page 97

1  employees of the Department of Health and Human
2  Services or with employees of pharmaceutical
3  manufacturers?
4        MS. THOMAS:  Objection.
5    A.   Probably more with Health and Human
6  Services.  Another one that I should note, one of my
7  advisors in graduate school, Martin Feldstein, he is
8  on the board of Lilly.  I'm not sure if he still is.
9  But we've talked quite a bit about my research, past,
10 previous research.  And that was very useful to talk
11 with him as well.
12    Q.   Prior to your work in the AWP litigations
13 have you had communications -- this is a yes or no
14 question -- with the United States Department of
15 Justice?
16        MR. LAVINE:  Object to form.
17    A.   Prior to my what with the AWP?
18    Q.   Prior to?
19    A.   That first phone call.
20    Q.   And everything else that has happened
21 since.  Have you had communications or interactions
22 with the United States Department of Justice?

25  (Pages 94 to 97)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 98

1    A.   So admittedly I cannot recall if I have
2  presented my research at DOJ or at FTC.  I've
3  presented at one, maybe both of them.  Furthermore, I
4  can't recall whether the individuals who contacted me
5  about hospital mergers, if they were FTC or DOJ.  It
6  is true that a former student of mind ended up with a
7  position at the Department of Justice.  She was a
8  student at the University of Chicago.  She went on the
9  job market and she got a position there.
10    Q.   Who was that?
11    A.   Deborah Healy.  I believe that's also
12  listed on my CV.  She graduated I believe in 2002.
13  Whether I -- it seems likely.  So as you can see here
14  there are about 25 students listed who have received
15  their Ph.D. and I have helped to advise.  And it seems
16  very plausible that someone from DOJ would have
17  contacted me to say tell us about Deborah Healy, is
18  she a good economist, that kind of thing.
19      So it's hard for me -- it seems plausible
20  that I've interacted with DOJ on a number of previous
21  occasions.  It would be hard -- and there may be
22  others that I'm not recalling, but those are the most

Page 99

1  candidates that I remember.
2    Q.   Have you received any funding, including
3  federal grants, for your work from any pharmaceutical
4  manufacturer?
5    A.   Certainly not a grant, although I believe
6  that as we thank -- we've thanked the Merck
7  Corporation for allowing us access to IMS data in our
8  Medicaid study.  And they since gave us an update to
9  that data.  And so what exactly -- so there was --
10  there was no flow of funds --
11    Q.   There was an avoidance of a flow of funds?
12      MR. LAVINE:  Objection to form.
13    Q.   You were able to use that data without
14  having to go purchase it?  Is that what you're trying
15  to say?
16    A.   I would say that this is a data set that
17  the firm was happy to share.  It was willing to share
18  with Fiona Scott Morton and me.  It is one of the
19  costs associated with doing research is
20  acquiring data sets.  So there have been other cases
21  where if we could get data let's say from a website
22  but they may also charge for it.  So it is what I

Page 100

1  stated, which is they provided us this data.
2    Q.   Through yesterday can you estimate the
3  total amount that you have billed to the plaintiffs in
4  this case for your work in this matter?
5    A.   The federal case?
6      MS. THOMAS:  Objection.
7    A.   The federal case?
8    Q.   Yes.
9    A.   So over the course of all 30 months?
10    Q.   Yeah.
11      MR. LAVINE:  Objection.
12    A.   I would say several hundred, but it could
13  be -- I'm not a hundred percent sure exactly.
14    Q.   Several hundred hours?
15    A.   Over the course of 30 months, yes, I would
16  think.  Something in that ballpark.  But, once again,
17  it's hard -- I don't have it all in front of me, so --
18    Q.   Are we talking 200 or 700?  Which is closer
19  if you had to guesstimate?
20    A.   I would guess my best guess would be about
21  six or seven hundred.  But once again, I would want
22  to --

Page 101

1    Q.   Was all of that time in connection just
2  with the United States case against Abbott?
3    A.   So once again, that's why I asked was this
4  for the U.S. case or --
5    Q.   You define the U.S. case to be any case for
6  which you have been engaged to provide any sort of
7  service in United States litigation against --
8    A.   Right.  Not Texas.
9    Q.   Correct.
10    A.   Right.  I just wanted to clear that up.  So
11  can you restate the question?
12    Q.   Let me see if I -- I'm not trying to ask a
13  trick question.
14    A.   Yeah.
15    Q.   Your six or seven hundred hour estimate was
16  your best guess for the total amount of time that you
17  have spent working on United States litigation against
18  Abbott and perhaps other manufacturers?
19    A.   On the -- you know, right here trying to
20  recall as well as possible, that's -- but I'm trying
21  to think about how much was Texas.  And so I would
22  need to go back a little bit.  But that's -- in that

26 (Pages 98 to 101)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                          July 14, 2008
                    Washington, DC

| Page 102 |
|---|

1  ballpark. Not 7,000, not 70.
2      Q.   Does the six to seven hundred include the
3  work for the Texas case?
4      A.   No, it doesn't.
5      Q.   Okay.  How much time have you billed them
6  in the Texas case?
7      A.   That I don't recall.  I finished, completed
8  the work for that case, quite a while ago.  So I would
9  guess 400.
10     Q.   So is it fair to say that over the last 30
11  months you've spent about 1,000 hours roughly speaking
12  on AWP litigation?
13         MR. LAVINE:  Objection to form.
14     A.   In that ballpark.
15     Q.   And what is your hourly rate?
16     A.   So it -- for the first two years it was
17  $300 an hour and beginning March, early March, of this
18  year, it increased to $400 an hour.
19     Q.   Do you have a separate billing rate for
20  times at which you're testifying, like here today?
21     A.   No, I don't.
22     Q.   I'm just trying to put that in your head so

| Page 103 |
|---|

1  you'll --
2      A.   Right, exactly.  Good idea.
3      Q.   Have all of your bills been paid?
4      A.   I doubt it.
5      Q.   Why do you doubt it?
6      A.   There's just a lag with this.  And I'm not
7  even sure if I've submitted some of the recent -- a
8  couple of the recent invoices.  So I'm confident that
9  not every hour up to last night.  So --
10     Q.   Does any part of your compensation in the
11  United States litigation relate to the outcome of the
12  litigation?
13     A.   No.
14     Q.   Have you had anyone within the University
15  of Maryland who has assisted you in your work?
16     A.   No.
17     Q.   No research assistants or anything like
18  that?
19     A.   No.
20     Q.   Any secretary?
21     A.   I don't have a secretary.
22     Q.   Do you have an understanding of who the

| Page 104 |
|---|

1  other experts -- strike that.
2          Do you have an understanding of who the
3  other testifying experts are that have been retained
4  by the United States?
5      A.   What exactly their definition -- whether
6  they are testifying experts or something different,
7  I'm not a hundred percent sure.  But it's my
8  understanding that Professor Marmur, Professor Perri
9  and Professor Schondelmeyer are involved in the case.
10     Q.   Prior to your work in this case have you
11  had any contact with those three individuals?
12         MS. THOMAS:  Objection.
13     A.   To the best of my knowledge, no.  But
14  it's -- I come into contact with many people.  For
15  example, I often serve as a referee for journals.  And
16  it seems plausible that I served as a referee if one
17  of them was an editor on a paper.  So it's hard.  But
18  I certainly don't recall any extended conversation or
19  e-mail with them.
20     Q.   Did you speak with them or have any other
21  communications during your work on this case?
22     A.   When I went to Atlanta for my deposition

| Page 105 |
|---|

1  about a year ago, that was the deposition that didn't
2  end up happening.  But when I arrived that night I
3  joined Professor Perri and others, other counsel from
4  the Texas case, at a restaurant for a little while.  I
5  think I arrived too late for the main course.  I think
6  I only had dessert.  And so I talked with them
7  somewhat at dinner.
8          And I believe I certainly bumped into
9  Professor Schondelmeyer once at the Department of
10  Justice and I think we complained to one another about
11  how busy we were, but that's all that I recall talking
12  with him about.  And I haven't interacted with
13  Professor Marmur at all.  And I believe that that's a
14  complete listing of my interactions with them.
15         And just one question, I don't know if at
16  some point we're going to be breaking for lunch or
17  something, but if at some point it would be --
18         MR. TORBORG:  Let's do it now.  Do you want
19  to do it now?
20         MS. BROOKER:  It's 12:00.  So do you two
21  want to do lunch now or later?
22         MR. TORBORG:  I really don't have much of

27 (Pages 102 to 105)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

Page 106

1  an opinion.  So it's up to you.  Why don't we go off
2  the record and then we'll decide what we want to do.
3       THE VIDEOGRAPHER:  Off the record at 12:08.
4  (Recess.)
5       THE VIDEOGRAPHER:  On the record at 12:19.
6       BY MR. TORBORG:
7    Q.   Okay.  Dr. Duggan, I understand that you've
8  had some consulting experts retained by the United
9  States who have assisted you in preparing your
10  analysis.  Is that right?
11      MS. THOMAS:  Objection.
12   A.   So Steck Consulting and Myers & Stauffer
13  have both at my direction assisted me in this case,
14  yes.  I guess I should also note that a former
15  research assistant of mine also assisted a bit on the
16  case.  Patrick Healy.
17   Q.   What I'd like to do now is talk a little
18  bit about the roles of those consultants in assisting
19  you in your report starting with Steck Consulting.
20  What has been their role?
21   A.   So to try to give a big picture on what
22  they've done -- there are obviously many details to

Page 107

1  this.  But one of the main things that I asked them to
2  assist me with on this case was obtaining data from
3  various sources and including state Medicaid agencies,
4  the federal government and the data from Abbott.  So
5  they assisted me in obtaining that data and then once
6  they had obtained it -- and also corresponding with
7  people, especially in the case of the Medicaid and
8  Medicare data, about the information that would be
9  needed for my analyses.
10      And so they obtained this data and then
11  processed the data, cleaned it up, to facilitate my
12  own analyses of it.  So that's kind of the first part,
13  one part to what they did.  There are others too.  But
14  that's certainly one of the main ones.
15   Q.   What were the other parts of which they've
16  assisted you?
17   A.   So it's inevitably going to -- I'll do my
18  best to recall.  So I'll try to go in descending
19  order.  So that right there is certainly a very big
20  piece of what they did.  I also asked them while I
21  carried out my research to scrutinize the data under
22  my direction to look for errors, problems, anything

Page 108

1  that should be on my radar screen as a way to sort of
2  double-check.
3       And often because so much of my research
4  has been collaborative, either with other coauthors or
5  with research assistants working for me, it's often
6  the case I sort of ask others who are participating in
7  the project to sort of -- for us to sort of check one
8  another's work and that kind of thing.
9       So those are -- have I listed everything
10  that I asked them to do?  These are two of the main
11  ones.
12   Q.   Was Steck Consulting already on board with
13  the United States litigation project before you
14  arrived?
15   A.   I'm not sure.  I believe they were at one
16  of the early meetings.  Whether they had yet been --
17  whether there was yet a contract for them, I'm not
18  sure.  But they were at one of the early meetings.  I
19  can't remember if it was the first meeting or not.
20   Q.   Did you make the decision to retain Steck
21  Consulting?
22      MS. THOMAS:  Objection.

Page 109

1   A.   I made the decision to -- given the
2  availability of Steck Consulting, to have them assist
3  me in my analyses.  So they had -- I believe they have
4  done other work for the Department of Justice, not
5  just the work at my direction.  But basically early on
6  I wasn't sure to what extent I would use them.  And
7  very quickly based on what they produced and my
8  conversations with them they earned my trust as being
9  outstanding at the kind of work they do, the kind of
10  work they did for me in the case.
11   Q.   One of the things, one of the major things
12  that you indicated that they assisted you on was
13  cleaning up the data.  Correct?
14   A.   Correct.
15   Q.   And there we're talking about Medicare
16  claims data, Medicaid claims data, Medicaid aggregate
17  data and Abbott data, correct?
18   A.   Correct.  And there may be others too, but
19  those are the big ones.
20   Q.   Okay.  Which sets of those data had the
21  biggest need for cleanup?
22      MR. LAVINE:  Object to form.

28  (Pages 106 to 109)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 110

1    A.   It depends on how you define that.  So for
2  example if I am remembering correctly, early on the
3  data provided by Abbott did not include certain
4  variables that I had in the Texas case, in my analyses
5  for the Texas case.  So that was a very important --
6  that was important information that was omitted.  So
7  that's the kind of thing that -- and whether
8  exactly -- who figured that out first, was it Steck or
9  was it me, I'm not sure.  I don't recall exactly.
10       But that was one big example in terms of
11 the -- but also I should note that I already had quite
12 a bit of experience analyzing the Abbott data from the
13 Texas case.  And so that sort of -- so on the one
14 hand, given that omission that was a data set that
15 needed a lot of help.  On the other hand, given my
16 work in the Texas case, I was feeling pretty familiar
17 with it.
18            In terms of the Medicare data -- so there's
19 no simple one answer because the data sets vary in
20 different ways.  In terms of the Medicare data there
21 are many, many, many variables in the data.  And so --
22 and one of the things there that they assisted with

Page 111

1  early on, assisted me with, was determining what
2  variables were analogous to the ones that I had used
3  in the Texas case, basically important inputs to the
4  adjudication algorithms and other variables as well.
5            And in the Medicaid -- I'd say the Medicaid
6  is maybe where they spent the most time in the sense
7  that it was data from a number of different agencies,
8  so it wasn't data from just one firm, Abbott, or just
9  one government agency, CMS, but instead was data from
10 a number of different state agencies.  So they
11 provided very useful assistance with all of those data
12 sets.  But if I were to guess, if I were to aggregate
13 up their hours, I would guess the largest share
14 between those three would go to the Medicaid ones.
15       Q.   How many people have you worked with at
16 Steck Consulting on this product?
17       A.   The main person that I have corresponded
18 with throughout is Ian Dew, Mr. Ian Dew.  And I've
19 also corresponded a bit -- this is in the federal
20 case -- with Erica -- and I can't remember her last
21 name.  But it would be in the one of the e-mails, I
22 believe, that I produced.  Erica -- she's one of their

Page 112

1  current employees.  Another person who I corresponded
2  with a bit less than Erica was this person Maria.  But
3  there was no e-mail.  I think I -- once I talked with
4  her in person.  So but Ian Dew is far and away the
5  person that I corresponded with most at Steck
6  Consulting.
7            I also corresponded a bit with Tim Ramsey.
8  But that was mainly for the Texas case.  And that
9  might have been exclusively -- I think that was
10 exclusively for the Texas case.  And very early on a
11 bit with Reuben Steck.  But he sort of -- Ian was the
12 main point person.  And I may be -- with the caveat
13 there may be someone else from Steck I'm forgetting.
14 But really Ian Dew was the main person.
15       Q.   Do you have the sense for the amount of
16 time that Steck Consulting has billed?
17       A.   For the federal Abbott case?
18       Q.   Yes.
19       A.   I'm not sure.
20       Q.   Is it do you think more or less than the
21 time that you've billed?
22       A.   I'm not sure.  I would need to look at

Page 113

1  that.
2       Q.   Your impression is they've, however, done a
3  lot of work?
4       A.   Yes.  For sure.
5       Q.   It wouldn't surprise you if they had billed
6  more time than you have?
7       A.   Correct.
8       Q.   Now, you've invested or you've spent you
9  think six to seven hundred hours in the U.S.
10 litigation, correct?
11            MR. LAVINE:  Objection to form.
12       A.   Once again, I want to caveat that
13 because --
14       Q.   Your best estimate.
15       A.   Closer to 600 to 700 than 6,000 or 7,000.
16 That's my best point estimate of the amount of time
17 that I've spent, yes.
18       Q.   Are you invested in the case?
19            MS. THOMAS:  Objection.
20       A.   I don't know what that means.
21       Q.   Do you want the United States to win?
22       A.   I guess I stand by -- I would say I came

Duggan, Ph.D., Mark G.                        July 14, 2008
                Washington, DC

Page 114

1   into this case with no view one way or the other
2   whether the government was right in this case.  But
3   based on my -- I certainly stand by the results of my
4   analysis, which is the federal government spending for
5   the drugs at issue in this case was higher than it
6   otherwise would have been.  Do I want -- I don't
7   know -- I'm not sure.  I wouldn't --
8       Q.   Okay.  Let's turn now to Myers & -- is it
9   Stauffer or Stauffer?
10      A.   Stauffer.
11      Q.   What has been their role?
12      A.   They have under my direction -- once again,
13  I'm going to try and go in descending order of
14  importance as to what they've done.  One of the most
15  important things they've done is to acquire
16  information about the adjudication algorithm used by
17  state Medicaid agencies and basically at my direction
18  they produced information about each state's formulas
19  and how these changed over time and so forth,
20  obtaining information from a number of different
21  sources.
22      The second main thing that they did was to

Page 115

1   construct arrays for the J code component to my
2   analysis for Medicare in which they used documents
3   from Medicare carriers to determine which NDCs went
4   into the -- which NDCs went into the arrays.  And I
5   won't explain it here right now unless -- I'm happy to
6   explain it if necessary -- but the arrays that
7   determined the amount Medicare would pay for each J
8   code claim.
9       So those were sort of their two main areas.
10  And so -- and once again, they -- in getting the -- so
11  those were their two main charges for me.  I should
12  also note that the information produced by them -- you
13  know, this is the kind of thing that Steck assisted
14  somewhat in verifying the accuracy of what they had
15  produced.  So it was mainly at my direction.
16      Q.   Who wrote the formulas that utilized the
17  adjudication algorithms that led to the difference
18  calculations in your report?
19      MR. LAVINE:  Objection to form.
20      A.   Who carried out the analyses in my report
21  or -- I guess I'm confused.
22      Q.   We'll talk about this a little bit later.

Page 116

1       A.   Yeah.
2       Q.   But in your report when you were
3   calculating the differences --
4       A.   Yeah.
5       Q.   -- you had to rely on some sort of computer
6   process to write a query to figure out how the claims
7   were adjudicated?
8       A.   Right.  Claim by claim I basically have an
9   algorithm for determining to what extent in this state
10  for this NDC in this time period would spending have
11  differed if the prices as I report -- as I described
12  in the report, had been replaced with these
13  alternative prices.
14      Q.   But you don't do it claim by claim; you do
15  it quarter by quarter, NDC by NDC, state by state,
16  correct?
17      MS. THOMAS:  Objection.
18      A.   No.  I mean, basically I have a large data
19  set and I -- as with all -- as with much of my
20  previous research I write a program that basically
21  analyzes for each claim.  So it literally is a claim
22  by claim analysis.  So --

Page 117

1       Q.   The computer does the claim by claim
2   analysis based on the formula that you wrote?
3       MS. THOMAS:  Objection.
4       A.   The program that I wrote carries out the
5   claim by claim analysis.  I mean, I don't know if
6   there's a big distinction of --
7       Q.   What sources did Myers & Stauffer consult
8   to collect information about the adjudication
9   algorithms used by the various states?
10      A.   So one source that they used was the
11  Medicaid state plan amendments.  Another was
12  information from the National Pharmaceutical Council.
13  Another was information from corresponding with
14  officials at state Medicaid agencies.  Those are
15  three.  And there may be others.
16      Q.   Any others?
17      A.   Those are the three that leap to mind.  I
18  should note that it is my understanding that Myers &
19  Stauffer were scrupulous about providing the documents
20  that they consulted in this.
21      Q.   Did you yourself review any of the Medicaid
22  state plan amendments?

30  (Pages 114 to 117)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

Page 118

1     A.    Somewhat, but I -- for -- they were the
2  ones who mainly did that.  But I did to some extent.
3     Q.    Did you yourself review any of the National
4  Pharmaceutical Council summaries?
5     A.    If I recall correctly, yes.  I did.  But
6  once again, they were the ones who took that
7  information and put it into -- they -- but yes, I am
8  familiar with the information in those reports.
9     Q.    You didn't review all 50 for each of the
10 years?
11    A.    Did I review each of the 50?
12    Q.    Yes.
13    A.    I did not, but they did at my direction.
14    Q.    Would it be fair to say then that you had
15 to rely on Myers & Stauffer to correctly summarize how
16 the states adjudicated pharmacy claims?
17    A.    They assisted me in doing that.  But I was
18 also able to determine for myself from the Medicaid
19 claims data whether their descriptions were accurate,
20 and Steck Consulting at my direction also did this.
21 So just to give an example, there was a period in -- I
22 believe it was either New York or California -- where

Page 119

1  for a time a state budget change was in effect.  So
2  the amount paid on each claim was 50 cents less than
3  the adjudication formula was suggested.
4         And that's not something that was in the
5  amendments nor in the NPC documents, nor something
6  they got from correspondence with the state Medicaid
7  officials, at least initially.  We uncovered that and
8  then they went back to them.  So that's an example of
9  they provided me information but Steck at my direction
10 and myself on my own were able to -- weren't just --
11 we were able to scrutinize it ourselves as well.
12    Q.    And you could do that kind of analysis only
13 where you had the Medicaid claims data, correct?
14    MS. THOMAS:  Objection.
15    Q.    You gave an example where you noticed that
16 the claims payment amount was 50 cents less than
17 otherwise you would have expected based upon the state
18 plan amendments, the NPC reports and the
19 correspondence with officials, correct?
20    A.    I'm sorry.  Can you just repeat?
21    Q.    The example that you decided --
22    A.    Right.

Page 120

1     Q.    -- where you found a discrepancy in what
2  was actually paid versus the state plan amendments NPC
3  reports, that was something that you uncovered in a
4  state for which you had claims data, correct?  That
5  was California?
6         MS. THOMAS:  Objection.
7     A.    Right.  But I don't think it's necessarily
8  true that we were unable to uncover problems using the
9  CMS claim by claim data.  So the Centers for Medicare
10 and Medicaid Services also provided us with data for
11 basically all of the states.  And the number of years
12 that were included varied from one state to another.
13 But that data I believe was also useful to us in
14 rooting out issues.  I don't have a specific example
15 on that one.
16    Q.    I was going to ask you.  Do you know of a
17 specific example for those states for which you did
18 not have claims data where you were able to find that
19 kind of anomaly?
20    A.    I can't think of one off the top of my
21 head.
22    Q.    Who had the --

Page 121

1     A.    But, you know, I should also note that
2  anomalies -- there were relatively few anomalies
3  between what Myers & Stauffer produced and what we
4  observed in the data.
5     Q.    Did you have any direct correspondence with
6  Medicaid pharmacy officials?
7     A.    I believe early on -- certainly in the
8  Texas case yes.  And I believe it also, if I recall
9  correctly, early on in this case I was on some of the
10 conference calls with the states as we requested data
11 for the products at issue in the case.
12    Q.    Who do you recall being on the conference
13 calls?
14    A.    I believe that I was on a call for New
15 York.  But this is really -- this was a while ago
16 because -- this was probably two years ago.  That's
17 the one I remember at this point.  I believe there
18 were others too, I just can't recall which states
19 exactly.
20    Q.    Was the subject of the conference call the
21 production or questions about claims data?
22    A.    I think it varied from call to call.

                                  31  (Pages 118 to 121)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 122

1  Typically that was the sort of main goal.  But at
2  times the conversation also -- a focus of it was who
3  exactly knows this data better than anyone else inside
4  and out.  So we not only were requesting data, but
5  also trying to find out the people with the greatest
6  expertise in analyzing it.
7      Q.    You weren't discussing reimbursement policy
8  during these calls or who knew what about AWP; you
9  were talking about claims data, is it fair to say?
10     A.    That is my recollection.
11     Q.    With whom did you work at Myers & Stauffer?
12     A.    Keenan Buoy -- and I'm sure I may be
13  mispronouncing his name -- Kris Knerr and Tim
14  Guerrant.  Those are the three main people.  There may
15  have been one or two others, but those are the main
16  ones.
17     Q.    Did you make the decision to retain Myers &
18  Stauffer?
19        MS. THOMAS:  Objection.
20     A.    I did not.  However, I did make the
21  decision -- initially Patrick Healy was assisting me
22  on the information on Medicaid adjudication

Page 123

1  algorithms.  And I decided that it was -- while he was
2  terrific and an outstanding research assistant on my
3  previous academic research, I decided that it would be
4  helpful to have someone who had done more of this and
5  who had more time available, because he was doing some
6  other work as well.
7        So I requested assistance with -- I made
8  the point in a conference call -- and I can't remember
9  exactly when this was -- that I needed help in putting
10  together these Medicaid adjudication algorithms and
11  additionally the arrays.  And so that's -- yeah.
12     Q.    Did you have any discussions with a man
13  named T. Allan Hansen at Myers & Stauffer?
14     A.    How do you spell the first name?
15     Q.    T, period, Allan Hansen.
16     A.    It's possible.  But I've had many
17  conversations with people.  The main three are the
18  ones I listed.  It's certainly possible I talked with
19  that gentleman as well.  But I don't recall.
20     Q.    Do you recall if there was ever a
21  discussion of the possibility of having Myers &
22  Stauffer testify as an expert in this case?

Page 124

1      A.    Can you repeat the question?
2      Q.    Do you recall any discussion of the
3  possibility of Myers & Stauffer might provide
4  testifying expert opinion in this case?
5      A.    I don't recall discussion of that.
6      Q.    Do you have a sense for how much Myers &
7  Stauffer has billed in terms of hours?
8      A.    Once again, no, I'm not sure.
9      Q.    And what did Mr. Healy -- you said he was
10  the last person who provided some assistance to you
11  under your direction?
12     A.    That's correct.
13     Q.    What did Mr. Healy do?
14     A.    He began to study the state plan amendments
15  and the documents, I believe, if I'm remembering
16  correctly, I believe he started to study the National
17  Pharmaceutical Council's information as well.  But
18  once again, given his other responsibilities he
19  basically I think sort of determined that he wasn't
20  going to be able to do all of it.  But that's what he
21  started on.
22     Q.    Was it your understanding that Myers &

Page 125

1  Stauffer had ongoing communications with state
2  Medicaid programs to answer questions about the
3  adjudication formulas used by those states?
4      A.    I believe so.  So, for example, that
5  example that I gave where we discovered an issue in
6  the data, I believe they then followed up with the
7  state -- and once again, I can't remember if it was
8  California or New York.  And then they drilled down to
9  the issue ultimately.
10     Q.    And was it your issue that Steck Consulting
11  had a number of communications with state Medicaid
12  programs and CMS in order to answer questions about
13  the data?
14     A.    Yes.  At my direction once again I
15  basically asked them to learn everything they could
16  about these data sets so that my analyses would be
17  accurate.  And so it is my understanding that Mr. Dew
18  and others at Steck did have conversations with people
19  at state Medicaid agencies and at CMS.
20        MR. TORBORG:  I'm about ready to start with
21  a new exhibit.  But rather than do that why don't we
22  go ahead and take lunch.

32 (Pages 122 to 125)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
                Washington, DC

Page 126

1        MS. BROOKER:  Yeah.  Sounds good.
2        THE VIDEOGRAPHER:  This is the end of tape
3   2.  Going off the record at 12:51.
4        (Whereupon, at 12:51 p.m. a lunch recess
5   was taken.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 127

1        A F T E R N O O N   S E S S I O N
2                (2:09 p.m.)
3        * * * * *
4   Whereupon,
5        MARK G. DUGGAN PH.D.,
6    the witness testifying at the time of
7    recess, having been previously duly sworn,
8    was further examined and testified as
9    follows.
10       * * * * *
11       (Exhibit Abbott 1099 was
12           marked for identification.)
13   THE VIDEOGRAPHER:  This is the beginning of
14   tape 3 in the deposition of Dr. Mark Duggan.  On the
15   record at 2:09.
16   EXAMINATION RESUMED BY COUNSEL FOR ABBOTT LABORATORIES
17       BY MR. TORBORG:
18   Q.   Welcome back.
19   A.   Thanks.
20   Q.   I've handed you as Abbott Exhibit 1099 an
21   e-mail sent by counsel for the Department of Justice
22   to myself and others representing Abbott Labs that

Page 128

1   forwards a copy of your expert report, disclosure,
2   signature page, CV then a document titled "Duggan
3   index of materials considered" -- and I'll represent
4   to you that that is the document that I've marked
5   today as Exhibit 1095 -- and a Duggan source log,
6   which is a document that I marked today as Abbott
7   Exhibit 1096.
8        I'd like to ask you first about Abbott
9   Exhibit 1095.  I will also note in 1099 that Ms.
10   Brooker stated that the documents marked as Abbott
11   Exhibits 1095 and 1096 were "two indices of materials
12   considered (the actual expert production to follow as
13   per my earlier e-mail)."
14        Okay.  Now with all that out of the way,
15   Abbott Exhibit 1095, can you tell us what this
16   document is?
17   A.   So I don't recall seeing this exact
18   document.  But it appears to me that it is a list of
19   files, data, and so forth, that were provided to me in
20   connection with the case.
21   Q.   Is this a list that you prepared?
22   A.   No, it is not.

Page 129

1   Q.   Okay.  Did you consider in forming your
2   opinions in this case each of the materials listed in
3   Abbott Exhibit 1095?
4   A.   There are many things listed here.  And
5   so -- and once again, this is the first time I've
6   looked at this exact document.  So it's hard for me to
7   answer that question right here.  Many of these things
8   look familiar.  The state plan materials, the Stowell
9   deposition, the Carlson deposition.  There are many
10   things here that look familiar.  And whether -- so it
11   seems plausible that -- but once again, to make sure I
12   would need to go through one by one all 64 items
13   listed.
14   Q.   Let me ask you about the ones I'm concerned
15   about.  Maybe we can do it that way.  Item 16 on the
16   first page, copy of the United States complaint filed
17   against Abbott --
18   A.   Okay.
19   Q.   -- did you review that document?
20   A.   Yes, I did.
21   Q.   Did you review the amended complaint as
22   well?

                         33 (Pages 126 to 129)

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 130

1      A.   Yes.  I believe that I did.  I didn't sort
2  of check them to see exactly what were the
3  differences, but certainly --
4      Q.   Would it be fair to say that since you did
5  not prepare this list you can't say today that you in
6  fact considered all the items on this list?
7          MR. LAVINE:  Object to form.
8          MS. THOMAS:  Objection.
9      A.   Right.  Given that I did not prepare this
10  list with Bates numbers and so forth for certain CDs,
11  I couldn't say that I've considered every one of them.
12     Q.   Okay.
13     A.   As I said, many look familiar.
14     Q.   Item 24 is described as "CDs containing
15  state plan materials."  Do you recall reviewing CDs
16  containing state plan materials?
17     A.   I recall looking at some state plans.
18  Whether they came from CDs or not I just don't recall.
19     Q.   Item 32 refers to two DVDs consisting of
20  Medi-Cal bulletins prepared by the state of California
21  to Abbott.  Do you recall reviewing those?
22     A.   I do not recall reviewing those.  It

Page 131

1  doesn't mean I didn't review them.  I just don't
2  recall.
3      Q.   Item 39 --
4      A.   Can you just help me out?  Was that 32?
5      Q.   Yes.  32.
6          Item 39, the last on the page, is described
7  as two August 15th 2007 letters from Carol Geisler to
8  Mark Lavine regarding CHPs, did you review those
9  letters?
10     A.   I believe that I did, but I'm not a hundred
11  percent sure on that one.
12     Q.   Are you familiar with what CHPs is?
13     A.   Maybe a separate set of transactions
14  that -- I can't -- I don't recall exactly what they
15  are.  But I recall some discussions about the CHPs
16  data.  I just don't recall all the details of it.  I
17  can't give a precise definition right here.
18     Q.   Can you tell me anything about CHPs?
19         MR. LAVINE:  Object to form.
20     A.   I just want to err on the side of caution.
21  I don't recall them sufficiently to --
22     Q.   Do you recall using any CHPs data in your

Page 132

1  analysis?
2      A.   It is possible, even plausible, that it was
3  a part of the Abbott transaction data that I
4  considered, that I utilized in my analyses.  But --
5  yeah, so I'm not a hundred percent sure.
6      Q.   If you could flip the page for me, please,
7  Dr. Duggan.
8      A.   Okay.
9      Q.   Item 41, the second one down, refers to
10  "1996 to 2002 Red Books in PDF format."  Did you
11  review those?
12     A.   I certainly reviewed parts of the Red Book
13  in each one of those years.  If this Red Book is the
14  pricing compendia -- I don't know if there are other
15  things that are called the Red Book, but the pricing
16  list of AWPs and so forth.
17     Q.   Well, which portions of the Red Book did
18  you look at?
19     A.   So I looked at a number of different parts.
20  One that I certainly can remember looking at are the
21  lists of AWPs for Abbott sodium chloride products as
22  for the J code analyses.  So that's one -- if I recall

Page 133

1  I looked at other parts as well, I just don't recall
2  exactly which parts.
3      Q.   Do you recall how much time you spent
4  reviewing pages from Red Book?
5      A.   I would think many hours.  I don't know the
6  exact number of hours.  But at a minimum several
7  hours.
8      Q.   What was the purpose of doing that?
9      A.   For me to get a sense for my J code
10  analyses of the products that might fall under the --
11  might be considered in J 7050 arrays, in J 7040
12  arrays.  We haven't really talked about what J codes
13  are here today.  But that's one thing for which I
14  spent a lot of time.
15     Q.   43 is described as a transcript of day 2 of
16  the deposition of Bruce Rodman.  Did you review that?
17     A.   It is plausible, but I don't recall
18  specifically whether I reviewed this specific one.
19  I'm not sure.
20     Q.   Do you know who Bruce Rodman is?
21     A.   Off the top of my head I do not.  I could
22  go back to look at my -- all the materials.  But I

34  (Pages 130 to 133)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

| Page 134 |
|---|
| 1  don't have his position -- I don't recall exactly who |
| 2  he is. |
| 3      Q.   And finally item 60 refers to "transcript |
| 4  of 30(b)(6) deposition of First Coast Service |
| 5  Options."  Do you see that?  Did you review that? |
| 6      A.   I don't recall if I did or not. |
| 7      Q.   Did you review the deposition transcripts |
| 8  from any of the carrier depositions? |
| 9          MR. LAVINE:  Object to form. |
| 10     A.   To some extent, yes.  Yes, I did. |
| 11     Q.   Which ones do you recall reviewing? |
| 12     A.   I'm not sure if it was Wisconsin Physician |
| 13  or Cigna.  But I believe I reviewed the -- I believe I |
| 14  reviewed a transcript, one or more.  I just don't |
| 15  recall.  I would have done that pretty early on in my |
| 16  Medicare analyses. |
| 17     Q.   How did you come to review those |
| 18  transcripts? |
| 19     A.   Once again, I just want to -- because I |
| 20  can't recall the specific deposition that I reviewed, |
| 21  I'm not a hundred percent certain that I reviewed one |
| 22  of them.  If I did obtain it and if I did review it I |

| Page 135 |
|---|
| 1  would have received it from counsel. |
| 2      Q.   I assume that you received some guidance |
| 3  from counsel on which depositions might be relevant to |
| 4  your opinions in this case? |
| 5      A.   Well, they assisted me when I had, let's |
| 6  say, a question about a data set.  They might refer to |
| 7  so and so in a deposition suggested that carrier A |
| 8  used the arrays provided produced by carrier B.  And |
| 9  basically in the calls for the Medicare J code |
| 10  analyses I asked counsel, Steck and Myers & Stauffer |
| 11  to give me as much information as they could that |
| 12  would allow me to understand how the prices paid in |
| 13  the claims data were arrived at. |
| 14         And so I can't recall all the times that |
| 15  they would refer to deposition testimony. |
| 16     Q.   Would they provide you with guidance on |
| 17  what particular portions of a transcript to review so |
| 18  that you didn't have to review the whole thing to |
| 19  answer your specific question? |
| 20         MR. LAVINE:  Object to form. |
| 21     A.   I don't recall that. |
| 22     Q.   They would just give you a 300 page |

| Page 136 |
|---|
| 1  transcript and tell you the answer is somewhere in |
| 2  there? |
| 3          MS. THOMAS:  Objection. |
| 4      A.   No.  I believe that -- and once again, I -- |
| 5  because I cannot remember as crisply as, let's say, |
| 6  for the Stowell or the Carlson depositions, the exact |
| 7  deposition, I'm not a hundred percent certain |
| 8  that I reviewed one of these.  But -- so just to give |
| 9  an example, I might have a question about the use of |
| 10  HCFA versus actual medians.  And in response to that |
| 11  they may have stumbled on something in deposition |
| 12  testimony that would help me understand something I'm |
| 13  observing in the data. |
| 14     Q.   And they might point you to a specific |
| 15  series of pages for guidance on that question? |
| 16         MS. THOMAS:  Objection. |
| 17     A.   Once again, I don't recall an instance |
| 18  where they pointed me to specific pages.  But I |
| 19  certainly recall some discussions of deposition |
| 20  testimony by representatives of the carriers.  So I |
| 21  certainly don't -- because I don't recall reviewing |
| 22  any specific deposition transcript, I also don't |

| Page 137 |
|---|
| 1  recall their pointing me to the page of any specific |
| 2  deposition transcript by the Medicare carriers, such |
| 3  as Wisconsin Physician. |
| 4      Q.   Apart from carrier depositions and the |
| 5  depositions of Abbott personnel, did you personally |
| 6  review any other depositions taken in this case? |
| 7      A.   It's difficult for me to remember.  As I |
| 8  outline in my report, the -- I believe Wells Florida I |
| 9  believe -- I can't remember if I have the right name. |
| 10  Something about Florida's Medicaid reimbursement.  So |
| 11  at some level for me, for my analyses, what was |
| 12  important was -- one of the things that was important |
| 13  was to understand the data and be able to interpret |
| 14  the data optimally. |
| 15     Q.   Apart from Jerry Wells' testimony regarding |
| 16  a question on Florida's adjudication formula, as you |
| 17  sit here today can you recall any other deposition |
| 18  transcript that you reviewed? |
| 19         MR. LAVINE:  Object to form. |
| 20     A.   Once again, not off the top of my head. |
| 21  But I did produce a binder with all of the e-mails and |
| 22  so forth that I received and a binder with various |

35  (Pages 134 to 137)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                               July 14, 2008
                    Washington, DC

Page 138

1  notes.  I don't recall a specific one here.  But it is
2  plausible that early on -- as I said, I've been
3  working on this case for a while -- that I did review
4  some.
5      Q.   Have we received a copy of -- let me strike
6  that.
7           When you reviewed depositions did you make
8  highlighting or other notes?
9      A.   Not that I recall.  I may have on one or
10  two.
11      Q.   Can you help me understand a little bit
12  what do you mean when you say you produced a binder
13  that had -- something.  Tell me again what it is.
14      A.   It had e-mails that I had received and
15  transmitted to people like Renee Brooker and so forth
16  associated with the case.
17      Q.   Do you recall reviewing any of the
18  deposition transcripts of any state Medicaid pharmacy
19  personnel who had been deposed in this or other cases?
20      A.   Another one would be Martha McNeil in
21  Texas.  I certainly examined that one.  And once
22  again, there may be others as well.  I considered many

Page 139

1  data sets, many documents and so forth.  But I don't
2  have the names of the specific officials.  I just
3  can't recall the specifics.
4      Q.   Do you recall any deposition of a state
5  pharmacy personnel, state pharmacy individual, playing
6  any particular importance in your opinions?
7           MR. LAVINE:  Object to form.
8      A.   My findings reflect the utilization of
9  Medicaid claims data.  And to the extent that I or at
10  my direction Ian Dew and others at Steck Consulting
11  scrutinized the deposition transcripts to get to the
12  best possible understanding.
13      Q.   Do you recall reviewing the deposition
14  transcripts of anyone from CMS?
15      A.   It is my understanding that Bruce Vladek
16  provided a deposition.  But I can't recall when or to
17  what extent I examined them or whether I examined that
18  particular --
19      Q.   How did you come to understand that Mr.
20  Vladek had provided a deposition?
21      A.   I recall the mention on -- so one way --
22  and it may be partly because my only analyses.  But I

Page 140

1  recall a conversation where it was mentioned that he
2  had given a deposition.
3      Q.   Did it come up exactly -- do you recall why
4  you were talking about that deposition?
5      A.   I don't, no.
6      Q.   When you reviewed depositions did you also
7  review the exhibits that were marked during those
8  depositions?
9           MS. THOMAS:  Objection.
10      A.   In certain cases, absolutely.  So for
11  example the Stowell deposition regarding Abbott's
12  direct transaction data, then the Nancy Carlson
13  deposition concerning Abbott's indirect data, would be
14  two examples where I certainly looked at the exhibits.
15      Q.   Going to Abbott Exhibit 1096, Dr. Duggan,
16  have you seen this document before today?
17      A.   I have not.
18      Q.   Do you know who prepared this?
19      A.   I'm not sure.
20      Q.   It indicates on the left column "custodian"
21  and then for each of these it says "Professor Duggan."
22  Do you see that?  You don't have to go through the

Page 141

1  entire document, but --
2      A.   It looks like a lot of --
3      Q.   It looks like a lot of Professor Duggans?
4      A.   That's right.
5      Q.   Do you know if you have copies of each of
6  those documents in your possession?
7           MR. LAVINE:  Object to form.
8      A.   I'm not sure.  There are obviously many
9  documents here and they don't even appear to be
10  chronological.  So it's hard for me to know from this.
11      Q.   But you can't tell me that you reviewed or
12  considered each of these documents for purposes of
13  your report; is that right?
14           MR. LAVINE:  Object to form.
15      A.   I mean, there are more than 16,000 things
16  in this list.  And so -- some of them with names like
17  63.tif.  So yeah, it's hard for me to -- I certainly
18  couldn't tell you whether I've reviewed every single
19  one of these.
20      Q.   Did you ever make a list for counsel of the
21  materials that you considered in forming your opinions
22  in this case?

36  (Pages 138 to 141)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                            July 14, 2008
                    Washington, DC

---

Page 142

1      A.   I did not provide such a list.  In my
2  report I do point out instances when particular item
3  loomed especially large in my analysis.  So, for
4  example, the Stowell deposition, the Carlson
5  deposition, the Echevarria.  But I provided -- I along
6  with Steck Consulting and Myers & Stauffer and counsel
7  provided all of the materials that I would have
8  considered.
9      Q.   But I don't have a list that tells me in
10 fact what you considered.
11         MS. THOMAS:  Objection.
12     Q.   Is that fair?
13         MR. LAVINE:  Objection.
14     A.   I provided my entire hard drive of -- and
15 my e-mails and so there's no specific list.  But I
16 provided everything that -- to the best of my
17 knowledge I provided everything that I considered in
18 this case.
19     Q.   Did you consider everything that was on
20 your hard drive?
21     A.   I would need to go back to examine that.
22 For example, I know that some of the data that was

---

Page 143

1  provided turned out to have problems.  And so I
2  wouldn't have considered all of that data.  And so I'm
3  not sure if I considered every file on my hard drive.
4  It would just be one at a time.
5          MR. TORBORG:  Mark, I don't think I have a
6  list as required by the Federal Rules that tells me
7  what exactly he considered.
8          MR. LAVINE:  A separate list?
9          MR. TORBORG:  A list of the materials that
10 Mr. Duggan considered in his analysis.  I mean, I have
11 got some documents that were sent to him and I have
12 some -- and a list of 16,000 things that he may have
13 considered.
14         MR. LAVINE:  I don't know what you want to
15 hear from me at this point.
16         MR. TORBORG:  Do you think that comports
17 with what's required under the rules?
18         MR. LAVINE:  Of course.  We gave you what
19 we thought was appropriate.  And you've had it for
20 quite some time.  I mean, if you wanted to have a
21 discussion about this we could have done it earlier
22 than in the middle of a deposition.

---

Page 144

1          MR. TORBORG:  Well, I was provided an
2  e-mail that indicated that these were things that he
3  considered.  We've established here today that it
4  doesn't appear as though he has considered all of
5  these things.
6          MR. LAVINE:  That's not at all what you've
7  established.
8          MR. TORBORG:  I haven't established that he
9  didn't consider all these things?
10         MR. LAVINE:  No.  You handed him a big list
11 with some file names that aren't -- they're very
12 limited in nature -- and you asked him to look at a
13 list of 16 items and give a comprehensive answer on
14 the spot.  I don't know how you can draw any
15 conclusions from that.
16         BY MR. TORBORG:
17     Q.   Dr. Duggan, do you think you reviewed all
18 the things on this Abbott Exhibit 1096?
19         MR. LAVINE:  Object to form.
20     A.   It would be difficult for me to answer.
21 There are many things listed here.  And so --
22     Q.   Did you review a program memorandum related

---

Page 145

1  to something called the DOJ AWPs revised pricing?
2          MR. LAVINE:  Object to form.
3      A.   I believe that I reviewed such a document.
4      Q.   Did you review an affidavit from Jerry
5  Wells?
6          MR. LAVINE:  Object to form.
7      A.   I'm not sure if it was an affidavit or what
8  exactly it was.  So I would need to go back and look
9  at the hard drive that I provided.
10     Q.   I asked you earlier do you recall reviewing
11 any transcripts of the depositions of state pharmacy
12 officials?
13     A.   I believe I named two that I did review and
14 I believe that I may have reviewed others as well.
15 But I don't recall them right here.  I do know that at
16 my direction both Steck Consulting and Myers &
17 Stauffer examined many of these as well for the
18 purposes of my analysis.
19     Q.   Since the filing of your expert report have
20 you reviewed any additional materials?
21     A.   I scanned my report and my prior deposition
22 testimony.  Those were two things that I recall

---

37 (Pages 142 to 145)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                Washington, DC

Page 146

1  looking over.  But they would have been already
2  produced.
3     Q.   Have you reviewed any opinions, legal
4  opinions, decisions, in either --
5     A.   I should also note -- I would just like to
6  backtrack.  I also skimmed parts of reports by
7  Professors Marmur, Perri and Schondelmeyer.  So now --
8  I just wanted to go back.  So you can ask the more
9  recent question.
10    Q.   So you have reviewed since the filing of
11 your report opinions from Mr. Schondelmeyer, Dr. Perri
12 and Dr. Marmur, right?
13    A.   I have looked over parts of all three
14 reports, yes.
15    Q.   And what was the purpose of doing that?
16       MS. THOMAS:  Objection.
17    A.   To have an understanding of the -- I
18 obviously heard their names during much of my work on
19 the case.  So it was -- they clearly put in a fair
20 amount of work and it represented an opportunity for
21 me to have a sense of the outcome of their work.
22    Q.   Did you review any court decisions issued

Page 147

1  in the AWP litigation?
2       MS. THOMAS:  Since his report?
3       MR. TORBORG:  At any point.
4     A.   I believe that I reviewed some documents
5  related to settlements in Texas cases.  I can't recall
6  others.  I've seen I believe one thing in the press --
7  and I can't remember if it was since the filing of my
8  report -- about a case in Alabama.  But that's -- so
9  under that umbrella.
10    Q.   In preparing your report did you review any
11 academic literature, such as economic textbooks,
12 accounting textbooks, statistics textbooks, things of
13 that nature?
14    A.   Well, during the course of my training and
15 my work as an economist, I frequently look back at
16 previous studies, examine current studies.  So I'm
17 always trying to educate myself about the fields in
18 which I conduct research.  I certainly observed --
19 scrutinized some of my own work.  So I constantly --
20 it's something that I really enjoy doing, is learning
21 more about economics, learning more about good
22 empirical analysis.  So I'm doing that all the time.

Page 148

1     Q.   But you don't recall going to any
2  particular textbook or other academic literature for
3  purposes of your engagement in this case; is that fair
4  to say?
5     A.   I'm not sure I would agree with that.  I
6  think as you mentioned a moment ago, I can remember
7  things.  I have a pretty good memory for things.  And
8  so I believe that I'm constantly -- in carrying out my
9  research I am constantly drawing on knowledge that
10 I've accumulated from consistent reading of related
11 literature.  So I'm just always -- I'm always reading
12 economic research.
13       And do I recall a specific instance when I
14 went to a particular paper?  I mean, I certainly went
15 to my own work, for example, with Professor Scott
16 Morton on drug procurement.  That would be an example
17 where I certainly went to that.  And because of the
18 use of stud data.  But that's something that is second
19 nature to me.
20       This is from the study that you gave to me
21 earlier?
22    Q.   Yes.

Page 149

1     A.   Yes.
2     Q.   Apart from those individuals that we've
3  talked about already today that you've had
4  communications with in connection with your engagement
5  in this case, is there anyone else that you've had
6  communications with regarding your work in this case?
7  We've already mentioned Steck Consulting, Myers &
8  Stauffer, certain lawyers in the Department of
9  Justice.  Anyone else?
10    A.   Regarding my work on this case.  So I
11 certainly talked with -- we have mentioned a number of
12 people here.  People at DOJ, people at text, people at
13 Myers & Stauffer, people relating the relator.  It is
14 true that I was contacted by another -- a pair of
15 lawyers about the possibility of my assisting them in
16 a case after they had read my report.
17    Q.   Who were those lawyers?
18    A.   I -- one of their names is Barnhill and the
19 other one's name I don't remember.  I believe it was
20 Barnhill with whom I spoke.  And just generally I
21 certainly told my wife, my friends, my family, my
22 coauthors, why is it that I'm often sleep deprived and

                                    38  (Pages 146 to 149)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

Page 150

1  working on weekends and so forth.
2      Q.   When did you have the discussion with the
3  lawyer or lawyers at Barnhill or with Mr. Barnhill?
4      A.   Archibald I think was the other guy's -- is
5  that right?  Archibald I think that was the other
6  guy's name.
7          When did I have that discussion?  Perhaps
8  December or January -- December of '07, January of
9  2008.
10     Q.   Do you recall with what litigation they
11 were contacting you?
12         MS. THOMAS:  Objection.
13     A.   It was in connection with pharmaceutical
14 litigation.  And I don't know the specific firm or
15 firms.  I believe there were multiple states.  Perhaps
16 Wisconsin, perhaps Kentucky, maybe other states as
17 well.  But I talked with them for a bit.
18     Q.   How long did you speak with them?
19         MS. BROOKER:  You know, can I just
20 interject?  And I'm sorry to talk out of turn, Dave.
21 I don't mean to interrupt.  But I'm not so sure that
22 Dr. Duggan knows -- and he may, but I'm not sure --

Page 151

1  we're not asserting any privilege but these may have
2  been confidential communications that he had with
3  others.  So I just don't want him to violate any
4  agreement, informal or otherwise, that he may have had
5  with them.
6          THE WITNESS:  And I obviously apologize in
7  advance -- I'm just trying to answer the questions as
8  truthfully as I can.  So I hope I'm not doing it.
9          MS. BROOKER:  Should we take a break maybe?
10         MR. TORBORG:  Why don't I move on?
11         MS. BROOKER:  Okay.  That would be helpful.
12     A.   I would want to mention just along those
13 same lines that I was recently contacted also -- I
14 didn't have a conversation with him, but I was also
15 contacted by e-mail by a headhunter, like a firm that
16 sort of ties together law firms and experts, in which
17 the firm was requesting was I interested in serving --
18 I don't remember the exact terminology -- serving as
19 an expert or serving in some capacity in a case
20 against the Department of Justice pharmaceutical
21 pricing -- a report by experts on the Department of
22 Justice pharmaceutical pricing case.

Page 152

1          I don't know which -- they didn't mention
2  specifically which case.  But they did mention it was
3  a case for the Department of Justice.  So I should
4  mention that.  And I just sent them back a reply
5  saying I'm not interested at this time.
6          BY MR. TORBORG:
7      Q.   How many in-person meetings would you
8  estimate that you've had with counsel for the relator
9  or the Department of Justice since you started your
10 engagement?
11     A.   Since early 2006?
12     Q.   Yes.
13     A.   Yeah.  And would that include meetings that
14 were for -- I don't mean -- I just am trying to be
15 precise.  Would that be for meetings involving the
16 federal case or for either the federal or the Texas
17 case?
18     Q.   Any meetings at which lawyers for the
19 Department of Justice were in attendance.
20     A.   Ten.  That would be my best guess.
21     Q.   And what is the average length of these
22 meetings?

Page 153

1          MR. LAVINE:  Object to form.
2      A.   Early on in early 2006 they were fairly
3  short, an hour, hour and a half or so.  But more
4  recently they were longer, more in the neighborhood of
5  seven hours, six or seven hours.
6      Q.   And how many phone calls would you estimate
7  that you've had with counsel -- or that have involved
8  counsel for the Department of Justice or the relator
9  in connection with your work in this case?
10     A.   And the Texas one?  Once again, I just want
11 to be --
12     Q.   Yeah.
13     A.   Can I just get a definition of call?  So is
14 call Professor Duggan can you do time X or is a call,
15 you know, something that stretches beyond ten minutes?
16     Q.   Exclude calls that are --
17     A.   Logistical.
18     Q.   Logistical, yeah.
19     A.   75 to 125 somewhere in that range in the
20 course of two and a half years.
21     Q.   And what is the average length of those
22 calls?

39 (Pages 150 to 153)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 154

1        MS. THOMAS: Objection.
2     A.    I would say the typical length is about an
3  hour. Maybe average is a little higher, an hour and
4  fifteen.
5     Q.    Do you recall any calls that went longer
6  than, say, two hours?
7     A.    No, I do not. I have two phones at home.
8  And they both run for about an hour on battery. So I
9  usually switch at some point. But I never recall
10  going out, so I don't recall any going over two.
11     Q.    And you've had e-mail correspondence with
12  counsel for the relator and the Department of Justice?
13     A.    Yes. Very little with counsel for the
14  relator. And some with counsel for either the Justice
15  Department or Texas.
16        I mean, at some point, when we get a chance
17  if we could --
18        MS. BROOKER: He wants to take a break.
19        MR. TORBORG: Yeah. Why don't we go off
20  the record and take a short break.
21        THE VIDEOGRAPHER: Off the record at 2:58.
22  (Recess.)

Page 155

1        THE VIDEOGRAPHER: On the record at 3:13.
2        BY MR. TORBORG:
3     Q.    Dr. Duggan, have you had conversations with
4  anyone from Ven-A-Care of the Florida Keys?
5     A.    I have talked with John Lockwood. I
6  believe that's his name. I can't remember if his
7  first name is John or not, but Lockwood. I believe I
8  talked with him once over the phone. And I believe he
9  was at one of the meetings that I described earlier,
10  one of these meetings with people from DOJ and from
11  relator's counsel, although I believe that was in
12  connection with the Texas case.
13     Q.    And have you talked to anyone else from
14  Ven-A-Care?
15        MR. LAVINE: Object to form.
16     A.    Not that I recall. I believe it's just
17  Lockwood.
18     Q.    When did you have the phone call with Mr.
19  Lockwood?
20     A.    I believe it was in the summer of 2007.
21     Q.    And was that a phone call that was just Mr.
22  Lockwood?

Page 156

1     A.    I don't remember. It is possible that
2  someone from Texas such as Margaret Moore was also on
3  the line. I just -- I don't recall.
4     Q.    What did you talk about?
5     A.    I believe then that we talked about some of
6  the price statistics that I had found, calculated,
7  during the course of my analysis using Abbott. So
8  statistics from Abbott transaction data. And I
9  believe it was about that kind of issue.
10     Q.    Did you discuss the methodology that you
11  would be using in your analysis to calculate
12  differences with Mr. Lockwood?
13     A.    If I remember correctly the conversation
14  occurred after I produced my first Texas report. Once
15  again -- so I do not believe -- to the best of my
16  recollection, my sort of algorithm for determining the
17  difference, I had already arrived at that algorithm
18  before our conversation. It's possible, but I think
19  the first time I spoke with him was after or perhaps
20  shortly before I finished my report, the July -- I
21  believe it was 12th -- 2007 version. Because the
22  eventual version ended up being different.

Page 157

1     Q.    Would it be fair to say, Dr. Duggan, that
2  in the conversations that you've had with counsel for
3  the United States and counsel for the relator that
4  those lawyers have been advocating the plaintiff's
5  position in this case?
6        MS. THOMAS: Objection.
7     A.    I think from the outset I made it very
8  clear to them that I was carrying out my analysis as I
9  saw most fit and I never felt them advocating for me
10  to nudge it one way or another.
11     Q.    But would it be fair to say that they were
12  advocating for why they should be bringing an action
13  against Abbott?
14        MS. THOMAS: Objection.
15     A.    It would be hard for me to recall a
16  specific instance, but it seems plausible that there
17  are instances in which they said things consistent
18  with what's outlined in the complaint, the allegations
19  in the complaint.
20     Q.    And have you had any discussions with
21  counsel for Abbott to hear their side of the story?
22     A.    I have -- had any conversations with them?

40  (Pages 154 to 157)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 158

1    Q.   Yeah.  Have you and I talked, have you
2 talked with anyone from Abbott, any of the lawyers
3 from Abbott, to hear their side of the story?
4        MR. LAVINE:  Object to the form.
5    A.   I would say that in the course of -- I
6 talked a bit about the Abbott depositions, Stowell,
7 Carlson and Echeverria.  I certainly considered their
8 depositions and in many of the exhibits that went with
9 the depositions, at least in some of them, there were
10 letters from Abbott counsel to the Department of
11 Justice.  And I can't remember all the details of
12 those letters.  But I certainly think that I
13 considered some of this.
14       Moreover -- so we've obviously had the
15 previous deposition.  So yeah.  I guess I'll leave it
16 with that.
17   Q.   But have you had any conversations with
18 Abbott or counsel representing Abbott where they
19 presented to you their side of the story about what
20 happened here?
21       MS. THOMAS:  Objection.
22   A.   No, I have not.

Page 159

1    Q.   Have you reviewed any pleadings that Abbott
2 has made in this case?
3        MR. LAVINE:  Object to form.
4    A.   I believe that I have.  Whether it was for
5 Texas or for the federal case, I don't recall.  And
6 moreover, I certainly did become familiar with the --
7 I'm not sure if I'm using the right terminology, but
8 the rebuttal to my report by Dr. Barry in the Texas
9 case, which I believe --
10   Q.   Are you familiar with something called the
11 deliberative process privilege?
12   A.   Can you repeat the question?  I didn't hear
13 what the words were, so --
14   Q.   My guess is I know the answer from what
15 you've given.  But are you familiar with something
16 called the deliberative process privilege?
17   A.   Deliberative process privilege.  I don't
18 know the definition of that.  I could try to -- I
19 don't know the definition of that.
20   Q.   Are you aware of the fact that the United
21 States has withheld documents from Abbott that are
22 responsive to Abbott's requests under a privilege that

Page 160

1 it is asserting as a governmental agency.
2        MR. LAVINE:  Object to form.
3    A.   I'm not aware of that.
4    Q.   Have you read any of the briefing related
5 to that discovery issue?
6        MR. LAVINE:  Object it form.
7    A.   Not to the best of my recollection, no.
8    Q.   We can go to your expert report.  And let
9 me ask you first, Dr. Duggan, I notice you have in
10 front of you something that is not one of the exhibits
11 that I have marked.
12   A.   Right.
13   Q.   Right?  Can you tell me what that is?
14   A.   It's just my report.  It's printed out two
15 pages per sheet.
16   Q.   How do you read that?
17   A.   I don't know.  It is painful.  And it's
18 especially painful if you go to some of the later
19 tables with the small fonts.  But this is something
20 that I thought -- I didn't know if I was going to have
21 it so I figured I'd bring my copy along.
22   Q.   Are there any notes on that?

Page 161

1    A.   I don't think so.
2    Q.   Let me say that if there's anything that I
3 ask you that you don't know off the top of your head
4 because it's buried in some schedule or something, let
5 me know.
6    A.   What's a schedule?  What do you mean by a
7 schedule?
8    Q.   Backup information to your report.  If I
9 ask you a question that requires you to need to see
10 the backup to a calculation I would like for you to
11 let me know that so that we can get that for you so
12 you can answer my question.
13   A.   Okay.  And it's of course also possible
14 that I'll need to scan the report and so forth.
15   Q.   Sure.  Well, if you would take out
16 whichever copy of the report you'd like to use --
17   A.   I'll use the bigger font.
18   Q.   It's Abbott Exhibit 1093.  Let me ask you
19 first, are all the opinions that you currently intend
20 to present to the judge and jury presented in this
21 expert report?
22       MS. THOMAS:  Objection.

41  (Pages 158 to 161)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
                  Washington, DC

---

Page 162

1     A.   I guess it's difficult for me to speculate
2  here on what questions I'll be asked at court.  So
3  certainly it's possible that there would be things
4  outside the report that I would discuss.
5     Q.   But as you sit here today the opinions that
6  you intend to present to the judge and jury are
7  described in this report?
8          MS. THOMAS:  Objection.
9     A.   As you mentioned earlier there is a lot in
10 this report.  It touches on many issues.  And so, once
11 again, it's just hard for me to -- I certainly would
12 expect that this would be one of the -- this would
13 include at least some of the information that I would
14 present at trial.  But whether there is other
15 information I'm not sure.
16    Q.   Have you discussed the possibility of
17 providing any additional opinions with counsel?
18         MS. THOMAS:  Objection.
19         MR. TORBORG:  What's the nature of the
20 objection?
21         MS. THOMAS:  I don't think it's entirely
22 clear to the witness what you mean by opinions.  It

---

Page 163

1  can mean in some formal sense.  It can mean whether he
2  has a view about it.  He doesn't know, for example,
3  what you may ask him.  And so I think it's a difficult
4  question for him to answer.  I think it's not
5  understandable.
6          MR. LAVINE:  And let me just note too that
7  there's some data that we got for the first time very
8  recently that we're still trying to get a handle on.
9  And that may bring up new subjects to deal with.
10         MR. TORBORG:  What data is that?
11         MR. LAVINE:  The data related to the CHPs
12 program.
13         MR. TORBORG:  The CHPs program?
14         MR. LAVINE:  Yeah.  We just got 80
15 gigabytes of data relating to that program.  And I
16 don't remember when it was, but it was not much more
17 than a month ago that we got that.
18         BY MR. TORBORG:
19    Q.   Dr. Duggan, have you had discussions with
20 counsel regarding the possibility of providing
21 opinions or testimony relating to Abbott's home
22 infusion business?

---

Page 164

1          MS. THOMAS:  Objection.
2     A.   I believe that there was a set of data --
3  and perhaps this is the data that Mark Lavine is
4  referring to -- that had not yet been obtained.  So as
5  in my Texas report when I had not yet conducted the
6  analyses for Hospira, because I didn't have the data
7  yet, and I later did some analysis for Hospira, it
8  seems possible that I would do something similar here
9  in the federal case in response to the production of
10 the additional data, because in Texas, I did it in the
11 Texas case, first analyzed the Abbott products and
12 then later there was data provided for some Hospira
13 products.
14    Q.   Are you familiar with the fact that for a
15 time Abbott had a joint venture where it was a
16 co-owner of a home infusion business or assisted home
17 infusion businesses with submitting claims?
18         MS. THOMAS:  Objection.
19    A.   I don't know all the details of this and it
20 is possible that that was discussed at an earlier
21 point.  But to the best of my knowledge I don't yet
22 have data on that.

---

Page 165

1     Q.   Well, tell me everything you know about
2  that topic.
3          MR. LAVINE:  Object to form.
4     A.   I think the most important thing, if I'm
5  remembering correctly, is that there was this set of
6  data that had been requested and had not yet been
7  provided, and thus additional analyses might be
8  warranted.  So I don't know the details of the -- I
9  would want to start with the data and the associated
10 documentation for the data.
11    Q.   Have you discussed in any level at all what
12 type of opinions that you might render with respect to
13 that data?
14         MS. THOMAS:  Objection.
15         MR. LAVINE:  Yeah, let me object.  I mean,
16 here we're talking about opinions based upon analysis
17 that hasn't even been done.  He certainly couldn't
18 have been asked to testify about anything when the
19 data is something that we've just recently received.
20         MR. TORBORG:  Your objection is noted.
21    A.   Can you just repeat the question?
22         MR. TORBORG:  Would you mind reading it

---

42  (Pages 162 to 165)

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 166

1   back?
2        (Whereupon, the requested portion was read
3   by the reporter.)
4        A.   Beyond discussions that it would possibly
5   be useful to analyze that data once it arrives, I
6   can't recall anything else.  But it's possible there
7   was -- I don't recall every detail, but that's what I
8   do recall.
9        BY MR. TORBORG:
10       Q.   Would it be fair to say that it's not as
11  though you have a plan in which you're going to
12  express an opinion on something, you're just waiting
13  for the data?
14       MS. THOMAS:  Objection.
15       A.   I really try -- I said from the beginning
16  when I was brought into this case that I try to
17  conduct empirical analyses as accurately and
18  scrupulously as possible.  And I don't yet know what
19  is in the data.  And so it would be -- I would -- I
20  don't recall any specifics about what might be done
21  with that data.  So it's hard for me to commit to
22  anything.

Page 167

1        I can't really commit to anything without
2   having seen the data.  But I am happy to analyze it
3   once I receive it and try to -- if it makes sense, to
4   incorporate it into my analyses.
5        Q.   Is the data that you've been waiting for
6   the CHPs data?
7        A.   It is my understanding that that's one set
8   of data that we do not -- that was not yet provided to
9   me.  And my understanding is that hasn't been provided
10  to the counsel.  And so I believe that the CHPs data
11  is one set of data for which counsel is currently
12  waiting.  There may be other data sets as well, for
13  example, rebates or something like that.  I'm not
14  sure.
15       Q.   Is it your understanding that the -- do you
16  have an understanding of what the CHPs data relates
17  to?
18       A.   As I said earlier, I don't have this -- I
19  don't have -- I haven't received documentation to my
20  satisfaction where I can answer that with any
21  precision at all.  So I just -- I don't recall the
22  specifics of the CHPs data.  But to the best of my

Page 168

1   knowledge there isn't any -- I don't know that there's
2   any documentation yet and so forth, or deposition akin
3   to the Stowell and Carlson depositions.
4        Q.   Dr. Duggan, do you need to make any
5   corrections to your report?
6        A.   We talked earlier about the update to the
7   CV, for example, in response to one of the working
8   papers becoming a publication and so forth.
9        Q.   Apart from that.
10       A.   To the best of my knowledge at the present
11  time -- to the best of my knowledge right now no,
12  given the goal set set out in the report.  Now, of
13  course, as I mentioned earlier, to the extent that
14  additional data is provided, just as in Texas, as I
15  augmented my initial report with analyses for the
16  Hospira data that were later provided, it seems
17  possible that would happen here in response to the
18  CHPs or other data.
19       Q.   Is there anything in your analysis and the
20  methodologies that you used that you would like to
21  change or do a different way?
22       A.   Not that I can -- nothing significant that

Page 169

1   I can recall.
2        Q.   Anything insignificant?
3        A.   The closest thing would be that I believe
4   in one of the states if the difference was less than a
5   penny I counted it as having a difference greater than
6   zero whereas for the other states it was a difference
7   greater than a penny.  But having looked into that
8   that would I think not even show up in the third
9   decimal point of my analyses.  So it's not a -- for
10  example, my dollar value of difference.
11       Q.   Are you confident that there are no errors
12  in your report?
13       MS. THOMAS:  Objection.
14       A.   Yes, I am confident.
15       Q.   Are you confident that there is nothing
16  flawed with the methodologies that you used?
17       A.   So once again, in the report I try to be as
18  transparent as possible about my assumptions, my
19  methodology, at every step.  As I also mention, I try
20  when there existed a fork in the road where I believed
21  there were two or more appropriate ways to proceed
22  with the analysis, I chose the conservative approach;

43 (Pages 166 to 169)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                          July 14, 2008
                    Washington, DC

Page 170

1   that is, the approach that was favorable to Abbott.
2        And so I'm confident that given my
3   description of the analyses -- there's obviously, as
4   you said earlier, a lot in here.  And there's quite a
5   bit of description that goes into every table.  I
6   believe there are 63 pages of tables and so there's a
7   dot of description and each table summarizes a great
8   deal of data.  And so I really have tried to be very
9   transparent about what I've done.  And yes, I stand by
10  my analysis.
11       Q.  Did you draft the first draft of the
12  report?
13       A.  I did.
14       Q.  Did counsel draft the first version of any
15  sentence in your report?
16       A.  This report reflects my work.  Now, I
17  received some assistance from counsel, perhaps most --
18  in terms of the 192 pages in the report, I would say
19  the place where I received more assistance than in any
20  of the other pages would be just the overall summary
21  because at some level I wrote an early section in an
22  effort to provide a big picture overview of the

Page 171

1   report.  But this was in a sense to augment that
2   report, that section, in an even sort of simpler,
3   shorter place.
4        But again, this all reflects my work here.
5   And everything summarized in these first two pages
6   is -- appears later in my report.
7        Q.  So the summary section you're referring to
8   is on page 2 and 3 of the report under executive
9   summary?
10       A.  That's correct.
11       Q.  Did counsel draft the first version of any
12  sentence on these two pages?
13       A.  Not that I recall, although they may have
14  if -- to the extent that -- here, this -- I don't
15  know.  I would say there was a lot of discussion about
16  these first two pages.  The other 190 were -- there
17  was much less discussion of them.  It was more
18  difference between that and which, and so forth.  And
19  so I don't recall the exact back and forth.  Certainly
20  no one e-mailed me a Word version of this.
21       Q.  How did you receive comments from counsel?
22  Was it over a phone call?  Were you sitting down at a

Page 172

1   meeting where you talk through your thoughts?  What
2   was the nature of your communication?
3        A.  I just don't recall.  I don't believe it
4   was in-person, but I'm not sure.
5        Q.  You had phone calls with counsel where they
6   were providing some suggestions?
7        A.  Sure.  I think the question of how
8   optimally to summarize a report with 125 pages of text
9   and all these tables and figures, they provided
10  guidance on how complicated to make this, because at
11  some level my understanding from talking with them is
12  that this needs to be accessible to a broader audience
13  than the other 190 pages of my report.
14       In general as an economist I am most used
15  to writing things for other economists.  And that's
16  why for this specific part it was helpful for me to
17  receive some feedback about what was the right level
18  of accessibility.  So --
19       Q.  Did you accept all of the suggested edits
20  proposed by counsel?
21       MR. LAVINE:  Object to form.
22       A.  I don't necessarily think so.  So for

Page 173

1   example I think I wanted to provide more numbers in
2   that first table than -- so there are I believe six
3   columns of data there.  And once again, I probably --
4   as you can see from later in my report I like tables
5   with lots of information.  So I believe that is one
6   example of a place where I diverged from what was
7   suggested.
8        And whether there are others, I just don't
9   recall.  I mean, I could wrack my brain and look at
10  this, but that's one.
11       Q.  With whom did you work in the drafting of
12  this report?
13       MS. THOMAS:  Objection.
14       A.  I was assisted by many people in the
15  analyses that underlie the report.  As we mentioned
16  earlier, Mr. Ian Dew from Steck Consulting.
17       Q.  A poor question.  I was asking you a more
18  narrow question which was who assisted you with the
19  drafting of the report?  Who did you get comments
20  from?
21       A.  I received comments from a number of
22  people.  So I believe two or three weeks in advance of

44  (Pages 170 to 173)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 174

1  the due date for my report I e-mailed -- so basically
2  I had done all these analyses and I started writing it
3  up.  And I didn't wait until I had written up all 192
4  pages before sending this to individuals for their --
5  helping me to edit, for example.
6           And so I don't remember the exact first
7  date when I sent a copy of my report.  I believe it
8  was before even I had started to write up the Medicare
9  analyses.  And I would e-mail them to Ian Dew at Steck
10 Consulting, who then sent them to Renee Brooker and so
11 forth.  And then we had a few calls about those
12 versions.
13          And in most cases what happened was that I
14 e-mailed Mr. Dew the report and I was just asking him
15 to check -- most of the times I e-mailed to him it was
16 just for the two of us to have a back and forth so
17 that he would say, actually, I just looked and you
18 wrote 111 here and it's in fact 121.  There would be
19 typos and so forth.  So probably the person who
20 assisted me the most was Ian Dew.
21    Q.    Did you have telephone conversations with
22 any of the lawyers at the department of justice in the

Page 175

1  preparation of your report besides Ms. Brooker?
2     A.   I believe that I also had one or more
3  conversations with Mark Lavine, with Bunker Henderson,
4  with Susan Thomas.  And so were there any other
5  counsel?  Not that I recall.  That's to the best of my
6  recollection.  That's everyone.  But once again, the
7  lion's share of the conversations were between Ian Dew
8  and me as he -- for example, I added a table at one
9  point and had to change all the table numbers
10 throughout the text.  And he -- but there were things
11 beyond that as well.  So most of my conversations were
12 with Dew.
13    Q.    Did counsel for the United States or the
14 relator ever make or show you a presentation that
15 related to any AWP litigation?
16    A.    I'm sorry.  Can you just -- can you restate
17 that?
18    Q.    Did counsel for the United States or the
19 relator ever make or show to you any presentation
20 relating to any AWP litigation?
21          MS. THOMAS:  Objection.
22    A.    Not that I recall.  Presentation -- I had

Page 176

1  discussions as I outlined before.  But nothing that
2  was cross the hurdle, at least given my definition of
3  a presentation.
4     Q.    Were you ever shown a videotape of any kind
5  or a compact disc?
6           MS. THOMAS:  I'm sorry.  Or a what?
7           MR. TORBORG:  A compact disc.
8     A.    Well, I was provided with many compact
9  discs of data.  You mean a video?
10    Q.    A video.  That's right.
11    A.    I mean, really the closest thing would be a
12 video of someone in advance of my Texas deposition
13 just to get a sense of how one -- how depositions
14 typically go.  So that would be the closest thing, an
15 example of a deposition by someone else who -- you
16 know.  As far as video that would be the only thing
17 that I can remember.
18          MR. TORBORG:  Let's mark this as 1100.
19          (Exhibit Abbott 1100 was
20          marked for identification.)
21          BY MR. TORBORG:
22    Q.    Dr. Duggan, Abbott Exhibit 1100 is an

Page 177

1  attempt by us to perform a black line that compares
2  two different versions of your report, a report dated
3  June 10th and a report dated one week later at June
4  17th.  I'd like to ask you to go to page 45 of the
5  document that I handed you.  In particular -- this is
6  under the section done for New Jersey.
7           In the fifth line down it appears that
8  there was an edit to change the word "estimate" to
9  "determine."  Also an edit three lines down to go from
10 "estimate" to "find," then two more lines down from
11 that changing the word "estimates" to "results."  And
12 then I'll represent to you throughout a number of
13 pages in this report the term "estimate" has been
14 eliminated and other language was used.
15          Do you recall making changes to eliminate
16 the word "estimate, estimating, estimates," from your
17 report?
18          MR. LAVINE:  Let me just object to form.
19 And also ask do you have the versions of the report
20 that this was created from?
21          MR. TORBORG:  Yes.
22          MR. LAVINE:  And you're not going to use

45 (Pages 174 to 177)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
Washington, DC

Page 178

1  those? You're just using a document you created?
2         MR. TORBORG: Yeah. Why not? I'm just
3  asking for the substance of the changes because it's
4  easier to do it.
5         MR. LAVINE: Well, to me it's a problem to
6  work with -- you're showing a document that never
7  existed until you created it. I just wanted to
8  make --
9         MR. TORBORG: Is there a rule against that?
10        MR. LAVINE: I have an objection to it and
11 you can go ahead. But I have an objection to it.
12        MR. TORBORG: Okay.
13        BY MR. TORBORG:
14    Q.   Do you recall changing the word "estimate,
15 estimating, estimates" and eliminating those from your
16 report?
17    A.   I recall as I -- so I think in carrying
18 out -- there was obviously a lot of results in this
19 report to summarize. And I basically didn't have --
20 tried to get some text down initially to try to
21 explain the nuts and bolts of what I had done, and I
22 pretty much the nuts and bolts of each stated data. And I pretty much

Page 179

1  copied the version as I went from Illinois to Florida
2  to New York to California and so forth. I tried to
3  use a pretty similar template from one state to the
4  next. Not identical, but pretty similar.
5         And so in reading over this report it is --
6  I basically then had the luxury, after having
7  summarized the results of my analyses, to go back and
8  sort of think about, okay, well, how optimally do I
9  describe this. Now that I've sort of done the main
10 bits of the analysis how do I go through and describe
11 this analysis. And so it is general in academic
12 research the word "estimate" is used quite often to
13 pertain here.
14        But as I went over this -- and it is true
15 that I discussed this a bit with counsel. As I went
16 over this it was my sense that it was a more accurate
17 reflection of what I had done to have slightly crisper
18 language at these points. So given my assumptions
19 about what prices I'm plugging in, the claim by claim
20 analysis and so forth, I felt that a crisper
21 definition of what I had done was justified.
22    Q.   Because in fact you are by virtue of the

Page 180

1  way you did your analysis calculating certain
2  differences with certain assumptions and whatnot, but
3  you are in fact calculating that number, right?
4         MS. THOMAS: Objection.
5     A.   Claim by claim I determine using the --
6  because it's not a simple calculation. It depends on
7  the characteristics of the claim and so forth. But
8  claim by claim I apply my algorithm, which one part of
9  this is a calculation. But there are many parts that
10 go into the algorithm. And what emerges from that
11 algorithm for each claim is my determination of what
12 the federal government would have paid had this
13 alternative price been used in the adjudication
14 algorithm.
15        But it is not -- there is more to it than a
16 simple calculation. As I outline in my report there
17 are quite a few steps to it and so that I think is a
18 more accurate way to describe it.
19    Q.   What did you do to prepare for today's
20 deposition?
21    A.   I -- let's see. On Thursday and Friday
22 last week -- I'm a little bit -- I just have to get my

Page 181

1  days straight. I believe it was Thursday and Friday
2  last week. I met with people, with counsel, at the
3  Department of Justice. And so I met with them on both
4  Thursday and Friday. I familiarized myself with --
5  and I certainly didn't read every page. But I
6  familiarized myself a bit more with the reports by
7  Schondelmeyer, Marmur and Perri.
8         I skimmed my 192 page report. I skimmed my
9  transcript from my deposition in the Texas case. I
10 skimmed some of my own work on pharmaceutical pricing,
11 such as my work on Medicare part D and my work on
12 Medicaid. I -- and I tried to get good sleep.
13        Of course I should caveat that with that is
14 in the last, say, week. At some level the entire two
15 and a half years involvement has been a preparation
16 for -- I mean, yeah.
17               (Exhibit Abbott 1101 was
18               marked for identification.)
19        BY MR. TORBORG:
20    Q.   What I have marked as Abbott Exhibit 1101
21 bears the Bates numbers EXP USABT-DUG 006292 through
22 95. Dr. Duggan, are you familiar with these pages?

46 (Pages 178 to 181)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                    Washington, DC

Page 182

1    A.   (Reading.) I'm guessing this would
2  represent notes that I took.  So this must be from the
3  binder that I provided with my own notes.  Whether
4  this was the federal -- the Texas or the federal case
5  I'm not -- it looks like some of this has to do with
6  the Texas case.
7    Q.   Does it look like some of it has to do with
8  the United States case as well?
9    A.   Possibly.
10    Q.   If you would take a look at 293, what is
11  the first thing under February 20?
12    A.   Medicare and Medicaid program.
13    Q.   Would that suggest to you that relates to
14  the United States case?
15    A.   That's right.  Yeah.  So this is very early
16  on in my involvement.  I would say up to this time I
17  had probably spent a total of -- yeah.  This is very
18  early on in my involvement.
19    Q.   Are these notes that you took of
20  discussions with counsel?
21        MR. LAVINE:  Object to form.
22        MR. TORBORG:  Can I get the clarification

Page 183

1  there?
2        MR. LAVINE:  Well, there's four different
3  pages of notes.  I'm not sure which ones you're
4  referring to.  And these are just a few pages out of a
5  large notebook, so it's out of context.
6        MS. GEISLER:  Mark, this was produced as
7  one document in his production.  This is a single
8  document in his production.
9    A.   So I think that -- so this is, just to
10  give -- once again, it's hard for me to recall a
11  document that I -- some notes that I took down about
12  17 months ago.  But my sense here is that I was trying
13  to get a sense of what all would be involved in my
14  analysis.  And whether this represents my own sort of
15  mulling this over or -- I couldn't say.
16        I mean, this is -- I just don't recall
17  whether this is my own thinking about what are going
18  to be the relevant issues and what issues might
19  possibly fall under the umbrella of my analyses.  I'm
20  not sure.
21    Q.   If we go to the first page, the second --
22    A.   Would that be 292?  6292?

Page 184

1    Q.   Yes.  The second bullet under February 11th
2  2007, does that say "direct testimony submitted in
3  writing"?
4    A.   I can't even -- I'm not sure.  That's what
5  it looks like.
6    Q.   Is that something you would have written by
7  yourself or would that have been something resulting
8  from a conversation with counsel?
9        MR. LAVINE:  Object to form.
10    A.   It seems possible that I would have --
11  there would have been a conversation -- once again,
12  this is just hard to reconstruct what exactly I was
13  doing on this specific date.  But it seems possible
14  that there may have been some discussion about things
15  that would be available to me, including state plan
16  information.  Once again, it's sufficiently long ago
17  and sufficiently early in my involvement with this
18  litigation, it's just hard for me to recall.
19    Q.   Can you read for me the bullets under the
20  second bullet under February 11th 2007?
21    A.   798423?  Do you mean that bullet?
22    Q.   292, the same --

Page 185

1    A.   Right.  Do you mean --
2    Q.   No.  I'm talking about under the bullet
3  that I think says "direct testimony submitted in
4  writing"?
5    A.   Okay.  I'm sorry.  And what is --
6    Q.   Can you read those?  Can you translate that
7  for me?  Is this your handwriting, by the way?
8    A.   Yes.  This is definitely -- this is my
9  handwriting.
10    Q.   Your handwriting is not much better than
11  mine.
12    A.   Which my students -- I get a hard time in
13  my course evaluations from my chalkmanship, as it's
14  been referred to.
15        I can spell that one too for you.
16        So it looks like last and final report for
17  various experts.
18    Q.   Does it say "final trial testimony"?
19    A.   Or "find trial testimonies."  It's hard for
20  me to read that there.
21    Q.   And it's the "report, cross examine"?  Is
22  that what that says?

Henderson Legal Services, Inc.

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                July 14, 2008
                  Washington, DC

Page 186

1    A.   Right.  It appears that says "report" and
2  then "cross examine."
3    Q.   Do you recall having conversations with
4  counsel that your direct testimony would be submitted
5  in writing?
6         MS. THOMAS:  Objection.
7    A.   Certainly not, not that I -- but maybe
8  I'm -- it's just hard for me to remember what this
9  represented.  Perhaps someone submitted a testimony in
10  writing.  But I don't recall having any discussions
11  about me submitting in writing.
12    Q.   Underneath the bullet 798423 -- is that a
13  drug code?
14    A.   That looks like the last six digits of an
15  NDC.
16    Q.   And what does it say underneath that?
17    A.   It says "zero damages."
18    Q.   Do you know what you're referring to there?
19    A.   I have no idea what I was referring to
20  there.  I'm not sure.
21    Q.   And does it also say "zero damages" under
22  what looks like another NDC code, 196607?

Page 187

1    A.   Yeah.
2    Q.   What does it say between -- does that say
3  state drug utilization data?  Is that what that says?
4    A.   Yes.
5    Q.   And then does the last bullet say "put
6  together a list of questions"?
7    A.   Right.  So it could be -- you know, trying
8  to reconstruct this --
9    Q.   Yeah.  Just do your best.
10    A.   I don't have the luxury of having my whole
11  binder in front of me.  So, I mean, it could be
12  that -- yeah.  It says "put together a list of
13  questions," yeah.
14    Q.   Do you know what you would have been
15  referring to there?
16    A.   It's hard to say.
17    Q.   Go to the next page.
18    A.   Is that 293 or 294?
19    Q.   293.  There's a number of bullets under the
20  heading February 20 or Feb 20.  Do you see that?
21    A.   Mm-hmm.
22    Q.   Could you tell me what these are, just

Page 188

1  generally speaking?
2    A.   What the bullets are?
3    Q.   Mm-hmm.  Is this from a conversation with
4  counsel, do you know?  I'm just trying to bear down
5  on --
6    A.   Yeah.  I'm just not sure.  "Medicare and
7  Medicaid program, how drug manufacturers participate,
8  how claims are paid."  I'm not sure about the next
9  one.
10    Q.   Does it say "how reimbursement" --
11    A.   "How reimbursement" -- I'm not sure what
12  that says exactly.
13    Q.   Does the next one say "describe pharm
14  marketplace, how it connects with public sector
15  reimbursement"?  Is that what you're saying there?
16    A.   That's what I've written there it appears,
17  yeah.
18    Q.   Then does it say "roles of manufacturers,
19  wholesalers and retailers and other" -- what does that
20  mean?  What does that say?
21    A.   I'm not sure.
22    Q.   And then does it say "what the drugs are"?

Page 189

1    A.   Mm-hmm.
2    Q.   Does it say "how AWP and WAC came to be" --
3  do you know what that says?
4    A.   I'm not sure what that says.
5    Q.   What does the next one say?
6    A.   It says "published prices incentivize
7  providers and" -- I believe -- "manufacturers."
8    Q.   Were these the types of things that you
9  think you would have written down yourself or was this
10  from discussion with counsel?
11         MS. THOMAS:  Objection.
12    Q.   What's your best guess here today?
13    A.   My sense is that early on I was asked to
14  assist in this case.  And I think pretty early on --
15  and this may be what was going on here, I craved an
16  understanding for myself of the big picture of the
17  case.  And I recognized that my analysis sort of
18  drills down in certain areas, those it touches on many
19  areas.
20         And so my sense is that this may have
21  reflected an effort by me to sort of get a sense, big
22  picture, of what are some of the big issues in the

48  (Pages 186 to 189)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

Page 190

1  case and things that, at least some of them,
2  representing things that I might want to provide
3  guidance on.  So, for example, how much discussion to
4  give of the Medicare and Medicaid program, and so
5  forth.
6      Q.   Is this an outline of potential opinions
7  that you might render?
8      A.   I certainly don't think that's what it is.
9  I think more it's a sense of the big picture of the
10 case.  And it may be -- it may reflect my sense of
11 what are the different elements of the case based on
12 my reading of the complaint and -- like, for example
13 marketing of spreads that -- I don't see that as
14 something that I would have thought then would have
15 fallen into my box.
16     Q.   This is more of a summary of the big
17 picture of what this case is about?
18         MS. THOMAS:  Objection.
19     A.   Once again, I don't want to suggest that
20 this is a sufficient -- this may be instead a sort of
21 stream of consciousness sense of some things that at
22 the time were -- you know, loomed to me as issues that

Page 191

1  I wanted more information on.  It's just -- it's hard
2  to say.
3      Q.   And then you underlined a bullet titled
4  "damages"; is that right?
5      A.   Correct.
6      Q.   And since the outset of this engagement
7  with the Department of Justice and relator's counsel,
8  did they advise you that they wanted you to opine on
9  the subject of damages?
10         MS. THOMAS:  Could you repeat that
11 question?
12         (Whereupon, the requested portion was read
13 by the reporter.)
14         MS. THOMAS:  Objection.
15     A.   Just one thing, if we can take a break at
16 some point in the not too distant future, that would
17 be great.  Just a restroom break.
18         It's hard for me to remember on February
19 7th 2007 -- so 17 months ago -- but at what point in
20 I suspect that there had been conversations in which
21 the issue of damages had come up.  And it was
22 certainly, I would expect -- with the caveat that it's

Page 192

1  hard to go back 17 months, I would expect that my
2  understanding is that my empirical analyses would be
3  important input to the determination of damages.
4          MR. TORBORG:  Why don't we take a break.
5          THE VIDEOGRAPHER:  This is the end of tape
6  3.  Off the record at 4:14.
7          (Recess.)
8          THE VIDEOGRAPHER:  This is the beginning of
9  tape 4 in the deposition of Dr. Mark Duggan.  On the
10 record at 4:29.
11         BY MR. TORBORG:
12     Q.   Dr. Duggan, I'd like to go back to the
13 handwritten notes that we were looking at, page 293.
14     A.   1101?
15     Q.   Yeah.  1101.  Under the heading damages we
16 were looking at there, does it say "Medicare Medicaid"
17 first?
18     A.   Yes.  It appears to.
19     Q.   What does it say below that?
20     A.   "How Medicare reimburses for each drug."
21     Q.   And then can you read the next bullet for
22 me?

Page 193

1      A.   "How do we deal with median issue?  Did
2  their reports influence the median?"
3      Q.   And then go to the next line.  Can you read
4  that for me?
5      A.   "What is AWP that should have been reported
6  and WAC too?"
7      Q.   Do you provide an expert opinion on the
8  prices that Abbott should have reported?
9          MR. LAVINE:  Object to form.
10     A.   I believe as I specify in my report, my
11 analyses are -- examine how spending would have
12 differed if Abbott had reported prices that more
13 accurately reflected what was paid in the marketplace.
14 And there are many specifics to that in my report.
15 I'm certainly not advocating a specific price here,
16 but instead trying to get a sense of how spending
17 would vary if prices at which transactions were
18 occurring had been used as the AWP and the WAC.  And
19 in fact scaled versions of those things, as I outline
20 in the report, which are my scaling of those things
21 being favorable to Abbott.
22     Q.   But you're not taking a position on

49 (Pages 190 to 193)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                          Washington, DC

---

Page 194

1  conceptually the prices Abbott should have reported
2  under the law?
3        MR. LAVINE:  Object to form.
4     A.   In my report my assumptions are very
5  transparent about what it is I'm doing.  And I'm
6  certainly not saying that -- this issue relates to
7  some extent to my analysis.  So for the purposes of my
8  report I did what I set out to do, which was determine
9  how federal spending would be different if more
10 accurate prices had been reported.
11    Q.    And then used by the Medicare --
12    A.   In the adjudication, right.
13    Q.    And then been actually used in the Medicaid
14 and Medicare program?
15    A.   Yes.  And I tried to be very clear about
16 that in my report.
17    Q.    Yes.  I noticed you were very transparent
18 in your report.  Now, in the Texas deposition I recall
19 a good part of the morning was devoted to the topic of
20 what Abbott should have reported.  And I believe in
21 that deposition you made clear that you were not
22 taking a position on what Abbott should have reported

Page 195

1  under the law.  Do you recall that?
2        MS. THOMAS:  Objection.
3     A.    For the purposes of the Texas Medicaid
4  program, I would need to go back to my deposition
5  transcript.  But I certainly recall some discussion of
6  this issue.  There was quite a lot of discussion about
7  it, so --
8     Q.    Are you talking a position on the prices
9  that Abbott should have reported for the complaint
10 NDCs in this case?
11       MR. LAVINE:  Objection to form.
12    Q.    I know you're doing some calculations and I
13 know how they go into your report.  My question is are
14 you providing expert opinion on what Abbott should
15 have reported to satisfy the law?
16       MR. LAVINE:  Objection to form.
17    A.    Well, the prices that -- it is my
18 understanding that the prices that both the -- this is
19 not the issue that I focus on in my report.  But it is
20 my understanding that the Medicare and Medicaid
21 programs rely on pricing compendia to provide
22 information that they can use in the determination of

Page 196

1  things like estimated acquisition cost.  And so that
2  hasn't been the thrust of my analysis.
3        And once again, I try to be very clear
4  about what I'm doing, which is using prices at which
5  customers are paying for these products, scaling them
6  up in a way that's favorable to Abbott, and in a sense
7  providing what, as outlined in my report, is kind of a
8  conservative estimate of this total value of
9  difference.
10    Q.    You've been disclosed as an expert in this
11 case to testify at trial against my trial.  I need to
12 know if you're going to be providing expert opinion
13 about what Abbott should have reported under the law,
14 yes or no.
15       MS. THOMAS:  Objection.
16       MR. LAVINE:  Objection.
17    A.    I suppose it's just difficult to speculate
18 about what I'm going to be asked about at trial.  And
19 any analyses that might be conducted or research that
20 might be conducted between now and then.  I don't -- I
21 certainly -- so it would be hard for me to speculate
22 in advance what I'm going to talk about before -- I

Page 197

1  couldn't possibly speculate about what I'm going to be
2  asked about there.
3     Q.    Can you point me to anything in your expert
4  report where you indicate that you will be providing
5  an opinion on what prices Abbott should have reported
6  under the law?
7     A.    Once again, it's a long report.  And I
8  think that my analysis of pricing -- prices that are
9  actually paid in the market, commonly paid in the
10 market, that that analysis may well be relevant to
11 that issue.
12    Q.    The next bullet point, could you read that
13 for me?
14    A.    "But for the fraud what would otherwise
15 have been paid."
16    Q.    And can you tell me what's meant by that?
17    A.    Well, these are notes that, as I said
18 earlier, I don't even -- taken quite a long time ago,
19 very, very early on in terms of my -- I don't believe
20 at this point I had even analyzed Abbott data and so
21 forth.  But here -- it's just hard for me to remember
22 exactly what I was thinking when I wrote this.

50  (Pages 194 to 197)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
                    Washington, DC

Page 198

1    Q.   As you read it here today could you explain
2  what it means?
3         MS. THOMAS:  Objection.
4    A.   I believe this is a term that has been used
5  in conjunction with this case and with related cases.
6  And so perhaps here what I am saying is that what
7  would have been paid if fraud -- if there were no
8  fraud.  That doesn't mean -- as I said this is so
9  early on in my work on this case that I may have been
10  playing devil's advocate with myself.  I'm not sure.
11  I mean, this is -- it's hard -- without going back to
12  this day it's just hard for me to remember exactly
13  what was happening here.
14    Q.   Are you familiar with the concept of
15  but-for?
16    A.   Sure.
17    Q.   What is your understanding of that concept?
18    A.   So it is similar to the economist's term,
19  ceteris parabus, which is in the absence, all else
20  equal, what would have been paid.  It may not be
21  exactly the same as ceteris parabus, but the idea
22  being had this not occurred what otherwise would have

Page 199

1  been paid by the government.  Another term all else
2  equal.  And once again, I know that the legal
3  profession uses the but-for term much more often at
4  that point economics profession.
5    Q.   And is the legal definition of but-for the
6  same as in economics?
7    A.   I'm not sure about that.  So here what I'm
8  writing to myself is simply, I would think, had this
9  not occurred what would have been paid.  But once
10  again, it's hard -- with the caveat that it's hard for
11  me to recall exactly what -- I would want almost more
12  time to sit down and think about all the other pages
13  in my binder that are around this to help churn up my
14  memory of this.
15    Q.   And then what does the next line say?
16    A.   "Legislators might have had higher
17  dispensing fees."
18    Q.   What did you mean by that?
19    A.   I guess beyond what it says I'm not sure
20  what else I would have meant here.  Legislatures,
21  state legislatures, could have had higher dispensing
22  fees.

Page 200

1    Q.   What caused you to write that note there?
2    A.   Just difficult to remember.  Once again, I
3  don't recall if this was myself writing down and just
4  thinking about all the issues when I'm very early on
5  in the case or a conversation with someone.  There's
6  not enough information here.  If I had the full binder
7  and a lot of time to review it I might be able to
8  reconstruct exactly what was going through my mind
9  then.
10    Q.   In your work on this case since February
11  20th 2007 have you looked into the issue of whether
12  state legislatures might have had higher dispensing
13  fees?
14         MS. THOMAS:  Objection.
15    A.   I've seen for myself in the data that many
16  states have increased their dispensing fees over time.
17  That would be one example of looking into it.
18    Q.   But here what you're saying is "but for the
19  fraud what would have been paid" and right after that
20  you have "legislatures might have had higher
21  dispensing fees."  Is that to say if they had paid
22  less in ingredient cost payments they might have had

Page 201

1  higher dispensing fees?
2         MS. THOMAS:  Objection.
3    A.   I wouldn't say that necessarily follows
4  from that.  And once again, I think that --
5    Q.   That's not how you read this?
6         MS. THOMAS:  Objection.
7         MR. LAVINE:  Objection.  He wasn't finished
8  with his answer.
9    A.   I think here I'm just going through a set
10  of thoughts.  And once again, this was very early on
11  in the case as I'm trying to get a sense of all of the
12  Medicaid reimbursement, how it works and so forth.
13  But I certainly don't think that line N implies line N
14  plus 1 elsewhere on this page.  So it doesn't appear
15  to elsewhere on this page so I don't see why it would
16  there.
17    Q.   No reason that you can think of why lower
18  ingredient cost payments might lead to legislatures
19  having higher dispensing fees?
20         MS. THOMAS:  Objection.
21    A.   I mean, that's something that I would want
22  to sit down and think a bit about.  The -- I think

51  (Pages 198 to 201)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

Page 202

1  dispensing fees represent an important component of
2  Medicaid reimbursement.  And I think though that's not
3  really -- I'll just leave it at that.
4      Q.   So you have not thought further about that
5  issue?
6          MR. LAVINE:  Objection to form.
7      A.   I thought about the dispensing fee issue.
8  I mean, the --
9      Q.   When I say dispensing fee issue, when I
10 said the issue in my question, I was referring to the
11 relationship of lowering ingredient cost payments and
12 the possible need to increase dispensing fees.  Have
13 you thought about that issue more in your work as an
14 economist?
15     A.   Certainly as an economist it is my
16 understanding that that's been mentioned, the
17 dispensing fee issue -- as I recall, for example,
18 Ms. Geisler and I discussed this issue in my
19 deposition in Texas.  I think my analysis is very
20 clear about what it does, holding other factors equal,
21 and this issue about dispensing fees is one that could
22 be studied, whether dispensing fees are appropriate

Page 203

1  that's an issue -- you could examine that issue.
2      Q.   Where else is the issue regarding
3  dispensing fees mentioned apart from the deposition in
4  Texas?
5          MS. THOMAS:  Objection.
6      A.   As I said, I've looked over quite a few
7  documents, so I don't remember exactly where.  But it
8  could be that in reading previous expert reports or
9  deposition testimony.  I'm not sure.  There are many
10 things that I've looked over.  But I'm aware that the
11 dispensing fee issue is -- you know, it's an important
12 component of Medicaid reimbursement.
13     Q.   How would you go about studying the
14 dispensing fee issue?  And when I talk about
15 dispensing fee issue, again, I'm talking about a
16 possibility of a need to increase dispensing fees if
17 there's a decrease in ingredient cost reimbursement.
18         MR. LAVINE:  Objection to form.
19     A.   Well, it's difficult for me, you know, here
20 to do justice to that question because as an economist
21 who likes to sit down and carefully reflect on
22 something before proceeding on a research study, it

Page 204

1  just would be difficult for me to do justice to that
2  here right now.  It's a study -- yeah.
3      Q.   So it's fair to say that you have not
4  considered that issue --
5          MS. THOMAS:  Objection.
6      Q.   -- as an economist?
7      A.   I considered the issue of dispensing fees.
8  Obviously in my analyses dispensing fees represent an
9  important component of Medicaid reimbursement.  And I
10 felt that given what my report sets out to do that it
11 was not necessary to endogenize, to use the
12 economist's phrase, that variable.
13     Q.   Tell me what that endogenize term means.
14     A.   To vary the dispensing fee.
15     Q.   Who made that decision that it was not
16 necessary?
17     A.   That was based on my own my own analysis,
18 my own research.  It is certainly true that many
19 states pay much lower ingredient costs than others.
20 So for example the state of Ohio has a very aggressive
21 maximum allowable cost program.  It's not necessarily
22 the case along with that they have a dispensing fee

Page 205

1  that's so different from the other states.  At least
2  to the best of my recollection.
3      Q.   Why did you make a decision that it was not
4  necessarily to factor in the dispensing fee issue in
5  your study?
6          MS. THOMAS:  Objection.
7      A.   Because my report analyzes how much
8  different federal spending would have been if more
9  accurate prices had been reported and holds fixed the
10 adjudication algorithms used by the various states.
11 Had I seen a state like Ohio with an aggressive
12 maximum allowable cost program paying much higher
13 dispensing fees -- but I didn't -- that might have
14 caused me to -- so that's the kind of thing that went
15 into it.
16         But I can't recall all the factors that
17 went into that decision to not incorporate them.  But
18 that would be one example, because Ohio is an
19 interesting example given its very much lower
20 ingredient costs.
21     Q.   And you're not familiar with the fact that
22 Ohio paid a large compounding fee for infusion drugs,

52  (Pages 202 to 205)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                    Washington, DC

Page 206

1  are you?
2        MR. LAVINE:  Objection to form.
3     A.   I would need to look into that.  But my
4  recollection is that Ohio's Medicaid reimbursement was
5  substantially lower per prescription than the other
6  states, controlling for NDCs.
7              (Exhibit Abbott 1102 was
8              marked for identification.)
9        BY MR. TORBORG:
10    Q.   Dr. Duggan, I have printed off in
11 alphabetical order a series of documents that my guess
12 is you'll tell me are the Myers & Stauffer state
13 reimbursement summaries that you referred to earlier
14 today.  Am I right?
15    A.   This appears to be a version of them.
16 Whether it's the final version of all of the
17 documents, I'm not sure.
18    Q.   If you would flip to Ohio, is this the
19 Myers & Stauffer, at least one version of it, state
20 reimbursement summary for Ohio?
21    A.   Yeah.  I don't remember, obviously, all the
22 details of what they've produced for this where you

Page 207

1  know of the 50 states.  But it looks familiar.
2     Q.   And does this summary indicate anywhere a
3  special dispensing fee for home infusion drugs?
4     A.   No, it does not.
5     Q.   And if Ohio did have a special payment for
6  home IV drugs would that impact your opinions in any
7  way?
8        MS. THOMAS:  Objection.
9     A.   I would need to look more at the details of
10 it.  But I believe that my analysis of the Ohio data
11 revealed much lower reimbursement per prescription for
12 a specific NDC in a specific period on average than in
13 other states.
14    Q.   And it may be that the fees paid for the
15 home infusion compounding were not actually in the
16 data that you looked, correct?
17       MR. LAVINE:  Objection to form.
18    A.   I don't agree with that.  I mean, I'm
19 not -- I would want to see more before speculating on
20 that.
21    Q.   We'll look at that tomorrow.
22       What is the study of economics?

Page 208

1     A.   It is -- it obviously covers many different
2  areas.  It is basically -- economics is really divided
3  between microeconomics and macroeconomics.
4  Microeconomics represents the fields that is charged
5  with the analyzing -- one of the things that it's
6  meant to do -- and I'm sort of going in descending
7  order because there's so much in microeconomics that
8  it would be hard for me to do it all justice in a
9  sentence or two.
10       But microeconomics is charged with
11 theoretically modeling and empirically analyzing the
12 behavior of individuals and firms.  And that would be
13 sort of -- so it more microunits, individuals and
14 firms, whereas macroeconomics to some extent is
15 concerned more with understanding how the aggregation
16 of those individual decisions by people, by firms and
17 so forth, interact to lead to changes in aggregate
18 investment, changes in aggregate consumption, changes
19 in aggregate GDP and so forth.  Within macroeconomics
20 as well there's issues about -- increasingly about
21 international trade, international finance.
22       So within -- there's quite a lot that

Page 209

1  economics is charged with.  But the field that I
2  work -- the one of the two major fields where I work,
3  microeconomics, is charged primarily with assessing,
4  modeling and analyzing the individual behaviors of
5  firms and how they optimize given constraints on their
6  behavior.
7     Q.   What is the difference between economics
8  and accounting?
9     A.   Accounting represents -- so it's difficult
10 for me -- I'm not an accountant.  So it's difficult
11 for me to provide a definition that I feel as
12 comfortable as a definition of economics.  Accounting
13 involves -- right.  So I'll just leave it at that.
14    Q.   Does economics deal with the concept of
15 opportunity cost?
16    A.   Yes, it does.
17    Q.   Could you tell us what that is?
18    A.   So opportunity cost -- when one considers
19 opportunity cost one considers -- an example would be
20 considering -- suppose -- consider the opportunity
21 cost of an investment.  Firms could invest in project
22 A or B.  B is a sure 5 percent return, A a variable

53 (Pages 206 to 209)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                                    July 14, 2008
                        Washington, DC

---

Page 210

1  return.  The opportunity cost -- if that's a complete
2  depiction of all of the available invent
3  opportunities, the opportunity cost of investing in A
4  might be this 5 percent sure return from investment
5  opportunity B.
6          And similarly one could do this -- the
7  opportunity cost for an individual going to school may
8  be the wages that they forgo while they're going to
9  school.  So opportunity costs, yeah, arise quite a lot
10 in economics.
11     Q.   Opportunity cost is an example where you do
12 not keep the variables constant when you change one of
13 the inputs, correct?
14     A.   I guess I don't -- that doesn't -- I don't
15 understand the question.
16     Q.   You used a term earlier, ceteris parabus?
17     A.   Mm-hmm.
18     Q.   Which is -- tell me again what that means.
19     A.   All else equal.
20     Q.   When you did your analysis in this case did
21 you consider any opportunity costs that might have
22 occurred in your but-for world?

---

Page 211

1          MS. THOMAS:  Objection.
2      A.   I'm not sure exactly what you're driving at
3  here, so perhaps you could give me an example of what
4  you mean.
5      Q.   We'll come back to it.
6      A.   Okay.
7      Q.   Do you believe an accountant could have
8  performed the analysis that you did in this case?
9          MS. THOMAS:  Objection.
10     A.   I believe that it would have been -- no, I
11 don't believe that they could have.
12     Q.   Why is that?
13     A.   Because it represents the analysis and
14 interpretation of many different data sets, the
15 merging together of those data sets, a summary of
16 them.  So I think a economist's comparative advantage,
17 at least the people who work in the area that I work,
18 is the analysis -- of the analysis of large scale data
19 sets.  And moreover, the analysis of multiple large
20 scale data sets simultaneously.
21          So, for example, analyses of individual
22 claims, millions and millions of individual claims for

---

Page 212

1  programs like Medicaid and Medicare, relating those to
2  millions and millions of transactions from Abbott and
3  for hundreds of products in -- over an eleven year
4  period, multiple classes of trade, I think this is
5  exactly the kind of thing that economists do in their
6  empirical work, increasingly as larger and larger
7  scale data sets have become available.
8          And it required much of the training that
9  I've acquired as an economist, both in graduate school
10 and since in my I guess nine year as an academic
11 economist.
12     Q.   What is the training of the people you
13 worked with at Steck Consulting?
14     A.   So Ian Dew if I remember correctly has one
15 or two master's degrees and has training and expertise
16 in computer programming and so forth.
17     Q.   Let me ask you to go to page 2 of your
18 report.
19          MR. LAVINE:  We're after 5:00 right now.
20 Are you okay to go for a little bit longer or --
21          THE WITNESS:  Yeah, a few minutes.
22          MS. BROOKER:  Do you have a logical

---

Page 213

1  breaking point coming up?
2          MR. TORBORG:  I'll take a look.
3          MS. BROOKER:  Sure.
4          MR. TORBORG:  I probably have one in ten
5  minutes.
6          THE WITNESS:  All right.
7          MR. LAVINE:  Is that a lawyer's ten
8  minutes?
9          MR. TORBORG:  That's a lawyer's ten
10 minutes.  We'll see.
11         MR. LAVINE:  We don't have time for that.
12         BY MR. TORBORG:
13     Q.   On page 6 of your report, the first full
14 paragraph, you are describing your past research and
15 you note that it's empirically oriented and you also
16 note that "a central issue in most of these studies is
17 determining whether a causal relationship exists
18 between one variable and another."  Right?
19     A.   Right.
20     Q.   Are you providing expert opinion in this
21 case that Abbott's price reporting conduct caused
22 damages to the Medicare and Medicaid programs?

---

54  (Pages 210 to 213)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Duggan, Ph.D., Mark G.                              July 14, 2008
                    Washington, DC

Page 214

1        MR. LAVINE:  Objection to form.
2     A.   The analyses in my report shed light on how
3  federal government expenditures for Abbott products
4  and the J codes listed in the complaint would have
5  differed if Abbott had reported the alternative prices
6  that I described in my report to First Databank, Red
7  Book and so forth and the state Medicaid agencies and
8  the federal government used those numbers.  So
9  absolutely I do believe that the -- given the
10  assumptions that I outline in my report, the report
11  estimates the impact of alternative prices on federal
12  government spending, holding other factors constant.
13        And I should note that in some of these
14  other papers that I mention here I perform -- some of
15  these other publications, I perform similar analyses.
16  So for example had a Medicaid recipient not been in an
17  HMO, but instead been in a fee for service, what would
18  government spending otherwise have been.  Had a
19  Medicaid recipient not taken this specific
20  prescription drug, what would Medicaid spending
21  otherwise have been and so forth.  That is quite
22  consistent with much of my previous research, the

Page 215

1  approach that I used here.
2     Q.   Are you providing expert opinion in this
3  case on whether the state Medicaid programs or
4  Medicare would have used the alternative prices that
5  you calculate in your report?
6        MR. LAVINE:  Objection to form.
7     A.   It is my understanding -- and I try to be
8  specific about this in my report.  It is my
9  understanding that -- it is my assumption that if
10  Abbott had reported alternative prices to First
11  Databank as I described in my report and to the Red
12  Book that state Medicaid agencies and Medicare
13  insurance carriers would have used those prices when
14  adjudicating Medicaid and Medicare claims.  That is a
15  sort of -- that is an assumption that I am making in
16  my report.  And I try to be clear about that.
17     Q.   Yes, you are.  And I did get that.  I just
18  wanted to make sure that I have it.
19     A.   Yeah.
20     Q.   The question of whether Medicare and
21  Medicaid would have used the revised pricing is an
22  assumption in your report, correct?  It's not a

Page 216

1  subject of your testimony?
2        MR. LAVINE:  Objection to form.
3     A.   Well, once again, I'm not certain about
4  what I will end up discussing in testimony.  But for
5  the purposes of my report for the analyses that emerge
6  from my report that are summarized in the executive
7  summary and in the tables and so forth and throughout
8  the text, so I -- that is an assumption that I make in
9  my report.  What I will say about that issue later
10  it's hard for me to speculate now at this point.
11     Q.   Have you done any analysis, reviewed the
12  factual record, to determine if Medicare or Medicaid
13  programs would have used the prices that you calculate
14  in your report?
15        MS. THOMAS:  Objection.
16     A.   Well, I have observed in the data that when
17  the prices reported in First Databank and in the Red
18  Book changed for the Abbott products at issue in this
19  case that Medicaid reimbursement and subsequently
20  Medicare reimbursement did decline.  So that is an
21  example of one kind of thing that I did to -- does
22  that represent everything that I've done, I'm not

Page 217

1  sure.  I would need to go back and look at it.
2        But that's certainly consistent with what
3  one would expect given that assumption Medicaid
4  spending for Abbott products declined -- for the 44
5  Abbott products declined from -- in 2000 and
6  especially 2001, with the details of that varying a
7  bit.
8     Q.   You mentioned something that you saw or did
9  on that point whether or not the Medicare and Medicaid
10  programs would have used those prices.  Have you done
11  the analysis you believe would be necessary as an
12  economist to provide an expert opinion on whether the
13  Medicare and Medicaid programs would have used the
14  prices that you calculate in your report?
15        MR. LAVINE:  Objection to form.
16     A.   I'm confused by that question.  Maybe you
17  can ask it again.  I'm not trying to be difficult.
18  It's just a long day.
19     Q.   Have you done the analysis you believe
20  would be necessary as an economist to provide an
21  expert opinion on whether Medicare and Medicaid would
22  have used the revised prices that you calculate in

55 (Pages 214 to 217)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Page 218

1  your report?
2         MR. LAVINE:  Objection to form.
3     A.   I would need to think more about this,
4  about that issue.  To this point that has not been the
5  thrust of my analysis.  But as I said, I did a number
6  of things to gauge the accuracy of that assumption to
7  the extent that the data permitted me.  As economists
8  we're not often given all of the data we'd like or all
9  of the variation in the world that we would like.  But
10 given the available data and the available variation,
11 I believe that I provided useful information on that
12 issue.
13    Q.   But it's not your understanding of the
14 thrust of your work that you're opining on whether or
15 not the Medicare and Medicaid programs would have used
16 the revised pricing that you calculate, correct?
17        MR. LAVINE:  Objection to form.
18    A.   It has not been the focus of the analysis
19 in my report.  But undertaking the analyses that I did
20 in this report I think provides a quite useful -- shed
21 quite informative light on that issue.  As I
22 mentioned, the sharp decline in Medicaid spending in

Page 219

1  2000 and especially 2001 and in Medicare spending a
2  year or two after that for the J codes at issue in the
3  case.
4     Q.   Now, in the Texas report didn't you drop a
5  footnote making clear that your difference
6  calculations assumed that Texas would have used the
7  alternative prices?  Do you recall that?
8     A.   It's -- that was quite a while ago that I
9  drafted that report.  And I do not recall dropping
10 that specific footnote.  I would want to go back and
11 look at the report and so forth.
12        I should also note that you said earlier
13 ten minutes and it's now about ten minutes.  So if
14 it's the lawyer's ten minutes --
15        MR. TORBORG:  Why don't we stop there then
16 for the day.
17        MS. BROOKER:  Okay.
18        THE VIDEOGRAPHER:  This deposition adjourns
19 for the day at 5:13 and consists of four tapes.
20        (Whereupon, at 5:13 p.m. the videotaped
21 deposition was adjourned.)
22             * * * * *

Page 220

5         _____
6               MARK G. DUGGAN PH.D.

9         SUBSCRIBED and SWORN before and to me this
10 day of _____, 2008.

17        _____
18            NOTARY PUBLIC

22 My Commission expires:

Page 221

1  UNITED STATES OF AMERICA   )
2
3  DISTRICT OF COLUMBIA      )
4         I, JONATHAN WONNELL, a Notary Public in and
5  for the District of Columbia, do hereby certify that
6  the within transcript is a true and accurate record of
7  the testimony under oath and other proceedings in the
8  above-entitled matter.
9         I further certify that I am not a relative,
10 employee, attorney or counsel of any of the parties to
11 this action and that I am in no way interested in the
12 outcome of this matter.
13        IN WITNESS WHEREOF, I have hereunto set my
14 hand this _____ day of _____, 2008.
15
16
17
18        _____
19              JONATHAN WONNELL
20
21 My Commission expires:
22 October 1, 2012

56 (Pages 218 to 221)

3a97e5a2-2785-4fa0-816e-1c498828c20e

Page 222

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL       )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

PRICE LITIGATION            )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    )

U.S. ex rel. Ven-a-Care of  )  Judge Patti B. Saris

the Florida Keys, Inc.      )

     v.                     )  Chief Magistrate

Abbott Laboratories, Inc.,  )  Judge Marianne B.

No. 06-CV-11337-PBS         )  Bowler

- - - - - - - - - - - - - - -


     Videotaped deposition of MARK G. DUGGAN PH.D.

                    Volume II


                    Washington, D.C.

                    Tuesday, July 15, 2008

                    9:00 a.m.

Duggan, Ph.D., Mark G. - Vol. II                        July 15, 2008

Page 223

```
1        Videotaped deposition of MARK G. DUGGAN PH.D.,
2    held at the law offices of Jones Day, 51 Louisiana
3    Avenue, N.W., Washington, D.C. 20001-2113, the
4    proceedings being recorded stenographically by
5    Jonathan Wonnell, a Registered Professional Court
6    Reporter and Notary Public of the District of
7    Columbia, and transcribed under his direction.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 225

```
1    A P P E A R A N C E S (Cont'd)
2
3    On behalf of Ven-A-Care of the Florida Keys,
4        Inc.:
5    SUSAN SCHNEIDER THOMAS, ESQ.
6    Berger & Montague P.C.
7    1622 Locust Street
8    Philadelphia, Pennsylvania 19103-6305
9    (215) 875-3000
10   sthomas@bm.net
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 224

```
1    A P P E A R A N C E S   O F   C O U N S E L
2
3        On behalf of the United States of America:
4        MARK A. LAVINE, ESQ.
5        U.S. Department of Justice
6        U.S. Attorney's Office
7        99 N.E. 4th Street, Suite 300
8        Miami, Florida 33132
9        (305) 961-9003
10       mark.lavine@usdoj.gov
11       -- and --
12       RENEE BROOKER, ESQ.
13       REBECCA A. FORD, ESQ.
14       The U.S. Department of Justice
15       Civil Division
16       601 D Street, N.W.
17       Washington, D.C. 20044
18       Patrick Henry Building
19       Washington, D.C. 20044
20       (202) 616-3797 (Brooker)
21       (202) 514-1511 (Ford)
22
```

Page 226

```
1    A P P E A R A N C E S (Cont'd)
2
3        On behalf of Abbott Laboratories, Inc.:
4        DAVID TORBORG, ESQ.
5        Jones Day
6        51 Louisiana Avenue, N.W.
7        Washington, D.C. 20001-2113
8        (202) 879-3939
9        dstorborg@jonesday.com
10       -- and --
11       CAROL P. GEISLER, ESQ.
12       Jones Day
13       77 West Wacker
14       Chicago, Illinois 60601-1692
15       (312) 269-4174
16       cgeisler@jonesday.com
17
18
19
20
21
22
```

2 (Pages 223 to 226)

a580633e-555e-4e70-82e5-a331182efa1e

Page 227

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of Dey, Inc., Dey, L.P. and Mylan:
4        MARISA A. LORENZO, ESQ. (via phone)
5        Kelley, Drye & Warren LLP
6        101 Park Avenue
7        New York, New York 10178
8        (212) 808-7697
9        mlorenzo@kelleydrye.com
10
11
12   ALSO PRESENT:
13       ZACHARY SULLIVAN, DOJ intern
14       CONWAY BARKER, videographer
15
16
17
18
19
20
21
22

Page 228

1           C O N T E N T S
2    WITNESS NAME              PAGE
3    MARK G. DUGGAN PH.D.
4        By Mr. Torborg:          230
5
6
7           E X H I B I T S
8    NO. DESCRIPTION            PAGE
9    Exhibit Abbott 1103, Dr. Duggan's expert report 260
10       filed in the Texas AWP litigation dated
11       11/12/07 (no Bates ref)
12   Exhibit Abbott 1104, Excerpt from 3/26/08 depo 271
13       of Deirdre Duzor (p. 904-907)
14   Exhibit Abbott 1105, Excerpt from rough draft 287
15       transcript of Dr. Duggan's first day of
16       deposition testimony (corresponds to p.
17       203:1 through 207:21 in the final
18       transcript)
19   Exhibit Abbott 1106, HHC 0091797        296
20   Exhibit Abbott 1107, Excerpt from the 3/14/08 307
21       deposition of Cody Wiberg (p. 170-173)
22

Page 229

1       I N D E X  O F  E X H I B I T S (Cont'd)
2    NO. DESCRIPTION               PAGE
3    Exhibit Abbott 1108, Excerpt from the 11/7/07  318
4        deposition transcript of Susan McCann
5        taken in the Missouri AWP litigation (p.
6        473-480)
7    Exhibit Abbott 1109, HCFA Region VI memo to     327
8        Director, Bureau of Eligibility,
9        Reimbursement and Coverate, dated 9/18/86
10       (no Bates ref)
11   Exhibit Abbott 1110, KY DMS 00000000125698     361
12       through 00000000125744
13   Exhibit Abbott 1111, Excerpt from 3/26/08 depo 381
14       of Deirdre Duzor (p. 511-534)
15
16
17
18
19
20
21
22

Page 230

1            P R O C E E D I N G S
2                 (9:03 a.m.)
3        THE VIDEOGRAPHER:  Today's date is July
4    15th 2008.  This is the volume 2 of the deposition of
5    mark Duggan Ph.D.  The witness has previously been
6    sworn in.  This deposition commences at 9:03.  Could
7    the person on the telephone please identify yourself?
8        MS. LORENZO:  This is Marisa Lorenzo from
9    Kelley Drye.
10       THE VIDEOGRAPHER:  Thank you.  You may
11   proceed.
12               * * * * *
13       Whereupon,
14           MARK G. DUGGAN PH.D.,
15       called as a Witness, having been
16   previously duly sworn by Jonathan Wonnell, a
17   Notary Public in and for the District of
18   Columbia, was further examined and testified
19   as follows.
20               * * * * *
21   EXAMINATION RESUMED BY COUNSEL FOR ABBOTT LABORATORIES
22       BY MR. TORBORG:

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 231

1    Q.   Welcome back, Dr. Duggan.
2    A.   Thanks.
3    Q.   I'd ask you to take out Exhibit 1101 which
4  are some handwritten notes from you, correct?
5    A.   I'll just refresh myself.  That looks
6  correct.  Yes.
7    Q.   And if you would go to the second page with
8  the number ending 293 --
9    A.   Mm-hmm.
10   Q.   -- we had talked about most of this page
11 yesterday, but I wanted to start off where we left off
12 yesterday under the -- where you had in the capital
13 letters, "Legislators might have had higher dispensing
14 fees."
15   A.   Right.
16   Q.   Below that can you translate what you
17 wrote?
18   A.   "How FULs and MACs will affect" -- I
19 believe that's "damages model."
20   Q.   And do you recall -- and did the term MACs
21 have reference to state maximum allowable cost
22 programs?

Page 232

1    A.   Once again, that's my guess based on
2  looking at this page.  But that seems -- that's the
3  most likely thing that I'm referring to there.
4    Q.   That's certainly how you would refer to --
5  that's certainly how you would interpret the document
6  today, right?
7    A.   Once again, I'm not -- I don't have time
8  to -- I haven't yet had a chance to read over this
9  document and the materials leading up to it in my
10 binder.  But taking this sentence and the ones
11 immediately around it, that seems -- yeah, that seems
12 right.
13   Q.   Do you recall having discussions with
14 counsel on the issue of how FULs and state maximum
15 allowable cost programs might affect the damages
16 model?
17   A.   I believe that we discussed it and I don't
18 recall the exact nature of the conversation, but my
19 recollection is that we discussed it on one or more
20 calls.
21   Q.   Do you recall anything at all about the
22 substance of those conversations?

Page 233

1    A.   Nothing specific is leaping to mind beyond
2  the notion that if these prices were used when
3  adjudicating claims that these prices might be used in
4  place of what the typical formula would suggest.
5  Let's say the certain ratio of AWP, for example.
6    Q.   And when you say these prices you're
7  referring to FULs and MACs, correct?
8    A.   Whether other things related to that were
9  also discussed, I'm not sure.  But I believe that,
10 yes, in that case I'm referring to these two sets of
11 prices.
12   Q.   There was an issue that --
13   A.   Actually, it's worth noting it's more than
14 two sets of prices potentially because the MACs can
15 vary across states.
16   Q.   It was an issue that you would have to
17 consider in your damages model, correct?
18       MS. THOMAS:  Objection.
19   A.   I would not say that follows from what is
20 written here.  But as I outline in my report -- and I
21 don't remember on exactly which page, but -- it is
22 something that I do account for.

Page 234

1    Q.   So the answer to my question, which was
2  it's something you would have to consider in your
3  model, is yes, right?
4        MS. THOMAS:  Objection.
5    A.   It would depend.  So, for example, it could
6  be the case that a MAC would exceed the price that
7  would otherwise be paid on a particular claim or set
8  of claims.  And so in that case it might not matter.
9  But in some cases it would, as I indicate in the
10 report.  In some cases for example MAC prices are the
11 ones that are paid.  And so it just depends.
12   Q.   But generally speaking in conducting your
13 analysis it's something you would have to consider,
14 correct?
15       MS. THOMAS:  Objection.
16   A.   Once again, I believe in my report I
17 outline my consideration of these prices.  And so I
18 believe in my report I have considered them.  And so
19 once again it's going to depend on the case.  But I
20 believe in my report I've considered this to the
21 extent that it was necessary.
22   Q.   So it was an issue you had to consider.

                              4 (Pages 231 to 234)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 235

1  Yes?
2        MS. THOMAS: Objection.
3     Q.  It's a very simple question.  I think
4  you've answered it.  I just want you to say yes to my
5  question because it seems to me as though you have
6  difficulty saying yes or no to my questions.  I'd like
7  to solve that early on this morning so we can get
8  through this deposition.
9        MS. THOMAS: Objection.
10    A.  I'm just trying to be precise.  So it is
11  certainly true that for some NDCs in some states in
12  some quarters it was necessary to consider a price
13  such as a MAC price to accurately calculate the value
14  of difference.  So once again, with the caveat that it
15  depends, in some cases yes, it was necessary.
16    Q.  Overall throughout your analysis you had to
17  consider the issue, correct?
18        MR. LAVINE: Objection to form.
19        MS. THOMAS: Objection.
20    A.  It is -- once again, I believe that in the
21  points -- I try to be precise in the report.  And I'm
22  not -- as I said yesterday, I'm just trying to be

Page 236

1  precise.  There are -- it is something that I consider
2  at many points in the analysis.  And to the extent
3  that it was necessary for my findings I believe that I
4  have considered them.
5     Q.  Are you not able to answer my question yes?
6        MS. THOMAS: Objection.
7     A.  Can you just repeat the question?
8     Q.  Overall you had to consider whether FULs
9  and MACs had an impact in your calculation?
10        MS. THOMAS: Objection.
11    A.  It was necessary for me to consider these
12  prices in a number of cases during my analysis.
13    Q.  So is that a yes?
14        MS. THOMAS: Objection.
15    A.  I suppose the statement overall is -- I'm
16  just trying to distinguish between the statement
17  overall --
18    Q.  I mean, I can ask that question every
19  state, every state, every state, but I'm trying to do
20  an overall thing.  It's a concern that you have across
21  all the states, correct?
22        MR. LAVINE: Objection to form.

Page 237

1     Q.  It may not be an issue in each state, but
2  you'd have to see if it was an issue in each state?
3     A.  I think it is the type of thing -- I don't
4  want to -- I'm not asking for you to go through all 50
5  states.  But I think it depends.  I try to be very
6  clear in my report about the analyses that I have
7  conducted.  And so if there's a specific point,
8  because it varies to some extent across states, across
9  time periods, across products, I believe it just --
10  it's depends.
11    Q.  But overall it's an issue you have to
12  consider, correct?
13        MR. LAVINE: Objection.
14    A.  It is an issue that I considered at many
15  points throughout my analysis.
16    Q.  Do you recall receiving any suggestions
17  from counsel or Ven-A-Care regarding how to deal with
18  the issue of maximum allowable costs in your analysis?
19    A.  As I said earlier, there were discussions,
20  I believe, about the issue.  What the exact nature of
21  those discussions was, I'm not sure.  But in one sense
22  the determination of how this would affect my results

Page 238

1  on a claim-by-claim basis ultimately depended on my
2  algorithm.  So there may have been -- I don't recall
3  the exact nature.
4     Q.  The next line, does that say "usual and
5  customary as basis for reimbursement"?  Is that right?
6     A.  Once again, that appears to be what it
7  says, right.
8     Q.  Did you have discussions with counsel
9  regarding how to deal with -- well, strike that.
10        Is that something you have to deal with in
11  your analysis, the issue that some of the claims may
12  have been reimbursed at usual and customary charges?
13    A.  Once again, it's going to depend.  It's an
14  issue that I considered at many points in my analysis
15  as I outline in my report.
16    Q.  Do you recall having discussion with
17  counsel or the relator on how to deal with that issue
18  in your analysis?
19        MR. LAVINE: Objection.
20    A.  I believe there were discussions about
21  usual and customary.  Whether this was in the context
22  of my thinking about Texas or federal, I'm not sure.

5  (Pages 235 to 238)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 239

1  So I don't recall the exact nature of the
2  conversations about usual and customary.
3      Q.   And in the next line down, what does that
4  say?
5      A.   I think that just says either -- I think it
6  just says Medicaid.
7      Q.   I'd like to ask you to flip the page.  Can
8  you tell me what's on this page?
9          MR. LAVINE:  Objection to form.
10     Q.   Are these your handwritten notes?
11     A.   Yes.  These are my handwritten notes.  So I
12 would need to -- I would need a little bit of time to
13 scan the whole page.  Do you want me to summarize
14 everything that's on the --
15     Q.   Just give me a general understanding.
16 These are your handwritten notes of what?
17         MR. LAVINE:  Objection to form.
18     A.   So it appears that part of this represents
19 a set of states.
20     Q.   Why don't we stop there.  Let me follow up
21 with that.  When you say part of this, are you
22 referring to the --

Page 240

1      A.   Upper left quadrant.
2      Q.   Upper left quadrant?
3      A.   Yeah.
4      Q.   Okay.  Can you tell me what that is?
5      A.   The upper left quadrant?
6      Q.   Yes.
7      A.   So I've just there it appears listed eight
8  states under the heading Medicaid data, California,
9  Florida, Illinois, New York, Ohio, Texas, North
10 Carolina and Pennsylvania.
11     Q.   And why do you ever these eight states
12 listed as opposed to some other subset of states or
13 all 50 states?
14     A.   It's hard for me to once again get back to
15 this point 17 months ago.  But this was at a very
16 early point.  And my sense is this may simply have
17 been a list of states with high Medicaid spending
18 overall or high Medicaid prescription drug spending
19 overall.  I'm not a hundred percent sure how I arrived
20 at these eight, but that seems like a plausible -- we
21 don't see, for example, Wyoming on here, Alaska.
22 So --

Page 241

1      Q.   And do you know if eight states are states
2  that you listed or were they from a conversation with
3  counsel?
4          MS. THOMAS:  Objection.
5      A.   If I recall, this may have represented my
6  recollection of a discussion about where things stood
7  with acquiring data, Medicaid data, from various
8  states.
9      Q.   What was your understanding regarding the
10 efforts of the Department of Justice to get claims
11 data from the states?
12     A.   Can you repeat the question?
13     Q.   Let me backtrack one step.
14     A.   Okay.
15     Q.   When you began your analysis in this case
16 did you ask to see claims data from the Medicaid
17 programs?
18     A.   If I recall correctly there were certainly
19 discussions in which we talked about -- I discussed
20 with counsel and for example Mr. Ian Dew -- the
21 acquisition of claims data, Medicaid claims data.
22 And -- yeah.

Page 242

1      Q.   Did you ask to see claims data?
2      A.   At this point this is very early on in my
3  work on this case.  And if I recall correctly, yes, I
4  did want to obtain Medicaid claims data from -- for
5  the purposes of what I believed my analysis would
6  ultimately be.
7      Q.   And why did you want the claims data?
8      A.   I believe it was, as I outline in my
9  report -- well, I end up using these claims data in
10 my -- in the analyses for my report.  And as I
11 envisioned -- and this is at a fairly early stage --
12 how I would optimally go about the analysis.  I
13 believed that seeing Medicaid claims data for the
14 products at issue in the case would assist me in
15 determining how federal government spending would have
16 changed if alternative, for example, prices had been
17 used for the AWP and so forth.
18         So I thought it would assist me in that.
19 And I believe that it has.
20     Q.   Did you ask the Department of Justice to
21 get claims data for all 50 states for all of the years
22 in the claim period for all of the NDCs?

6  (Pages 239 to 242)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                                   July 15, 2008

Page 243

1     A.    Around this specific time or just
2  generally?
3     Q.    At any point.
4     A.    I believe that I requested especially data
5  for the states that accounted for a disproportionate
6  share of Medicaid spending on complaint products.  For
7  example, Illinois.  For example, Florida.  And so
8  forth.
9     Q.    And why did you --
10    A.    And so -- just to clarify --
11    Q.    Sure.
12    A.    -- so I certainly recall requesting data
13  for those large states.
14    Q.    Did you not want claims data for all 50
15  states?
16    A.    I believe that if -- I wasn't opposed to
17  having data for other states, but I felt for the
18  purposes of my analysis it would be -- just a sort of
19  diminishing returns sense.  It would be most important
20  to start with the places that account for the largest
21  amount of Medicaid spending.
22    Q.    Did you want claims data for all 50 states

Page 244

1  to do your analysis?
2          MS. THOMAS:  Objection.
3     A.    I believe that -- so as I outline in my
4  report, there are three different sets of Medicaid
5  data that I used.  Data from state Medicaid agencies,
6  CMS Medicaid claims data for all 50 states and the
7  District of Columbia, and state drug utilization data.
8  I certainly did request that we acquire the CMS data,
9  which did include claims data for all 50 states and
10  the District of Columbia.
11    Q.    That's a different type of claims data than
12  the claims data that you had for certain states,
13  correct?
14    A.    There are some differences between the two
15  states with --
16    Q.    Two sets you mean or states?
17    A.    Between the two sets of data, between
18  the -- once again, it's going to depend, the magnitude
19  of the differences.  It may be that in -- so -- but in
20  general there are some differences between the data
21  provided by the state Medicaid agencies and the data
22  provided by CMS, the claims data provided by CMS.

Page 245

1     Q.    Would you have preferred to have claims
2  data for all 50 states, yes or no?
3          MR. LAVINE:  Objection to form.
4     A.    I believe that -- that's something that I
5  would need to think a bit about.  What I can say is
6  that I believe that if I did have perfect data for
7  every state -- perfect data from state Medicaid
8  agencies for every state, for every NDC in every time
9  period that the results that I describe in my report
10  for this variable difference, for the number of claims
11  with difference greater than zero and so forth, would
12  have been higher.
13          And I go through that in my report about
14  why I believe that to be true.  So I believe that in
15  my report that I undertook the necessary amount of
16  data acquisition to arrive at an accurate, though
17  conservative, finding.
18    Q.    Move to strike as nonresponsive.
19          My question was not what the results --
20  what you think your results would have been if you had
21  data for all 50 states throughout the claim period for
22  all NDCs.  It was whether or not you would have

Page 246

1  preferred to have claim data for all 50 states and for
2  all the time period.  That's the question.
3          MS. THOMAS:  Objection.
4     A.    I believe that in my analysis I did
5  precisely what I preferred given the available data
6  and so forth.  So can the caveat that -- and so I
7  guess I won't discuss the issue I just mentioned.  But
8  I did exactly the analysis that I wanted to do, taking
9  all factors into account.
10    Q.    And one of the factors was the availability
11  of the data, correct?  Yes or no?
12          MR. LAVINE:  Objection to form.
13    A.    It would depend on the specific state.  But
14  I believe that for some states in some time periods
15  that would be true.
16    Q.    So is it your testimony that in doing your
17  analysis for this case and your opinions that you
18  would not have preferred to have data for all 50
19  states?  Is that your testimony?
20          MS. THOMAS:  Objection.
21          MR. LAVINE:  Objection to form.
22    A.    As an economist I've done quite a lot of

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

a580633e-555e-4e70-82e5-a331182efa1e

Page 247

1   research and have followed the research.  And it is
2   rarely true -- I'm not sure it's ever been true --
3   that a study has perfect data.  And I would need to
4   think a bit about whether the -- if someone were to
5   drop CDs here in my lap with perfect data -- in
6   general as an economist I would always like more data
7   to produce because as I said, in the research I've
8   done, in the research I've followed, one never has
9   perfect data.
10       And it is part of what I'm trained to do
11  and economists like me are trained to do is to make
12  the absolute best use of the data that is available to
13  produce the most accurate findings possible.
14      Q.   So applying those general principles to
15  your work here, you would have preferred to have more
16  data?
17      MR. LAVINE:  Objection to form.
18      A.   As an economist there is this term free
19  disposal.  So one can always dispose of something that
20  one receives.  So at some level there is no cost to
21  receiving it.  So in general any economist would say
22  if they could be provided with more data about an

Page 248

1   issue they're studying they would prefer to have it
2   rather than not and they could always just dispose of
3   it, not use it.  So this term of free disposal in
4   general is one that economists frequently mention in
5   the course of carrying out research.
6       Q.   I note that in your list here on page 294
7   of Exhibit 1101 you've got Pennsylvania and North
8   Carolina as states.  If you had received data from
9   those two states would you have disposed of it?
10      MR. LAVINE:  Objection to form.
11      A.   At some level if these are two states that
12  if I -- I wouldn't necessarily dispose of it.  I might
13  consider it.
14      Q.   Is that a way of saying that you don't know
15  what you would do with it until you have it?
16      A.   Well, if I recall these two states are
17  states for which some data was provided by state
18  Medicaid agencies.  And it was my -- and these states
19  I believe are numbers 11 and 13 or 11 and 14 with
20  respect to spending on Abbott products listed in the
21  complaint during the time period of interest.  And I
22  considered the availability of this data provided by

Page 249

1   the states.  But I ultimately used the claims data
2   that was provided by CMS.  And of course in using the
3   CMS claims data I -- well, we can end there.
4       Q.   Are you familiar with how Pennsylvania
5   calculated its maximum allowable costs?
6       MR. LAVINE:  Objection to form.
7       A.   I may have known this at one point, but I
8   don't have it -- I can't recall it exactly right now.
9       Q.   In your report you have a separate section
10  or sections that address particular states, correct?
11  I think it's twelve different states.  Is that right?
12      A.   For Medicaid.
13      Q.   For Medicaid?
14      A.   I believe it is twelve, yes.
15      Q.   And it is for those twelve states that you
16  use claims data that was produced by the state
17  Medicaid program; is that right?
18      MS. THOMAS:  Objection.
19      Q.   Strike that.
20       It is for those twelve states minus Indiana
21  for which you use claims data provided by the Medicaid
22  program?

Page 250

1       MS. THOMAS:  Objection.
2       A.   Provided by the state Medicaid agencies
3   or --
4       Q.   Yes.
5       A.   That is my -- yes.  That is correct.
6       Q.   And how is it that you came to use the
7   claims data provided by the states for those eleven
8   states?
9       MS. THOMAS:  Objection.
10      A.   Well, as I mentioned at the outset, as an
11  economist I set out to answer a question, which was
12  the effect of what we've been discussing on federal
13  government expenditures.  And so if one lines up the
14  50 states from largest spending to smallest spending, it
15  is the case that a state like Illinois or Florida will
16  have a larger effect on this parameter or set of
17  parameters that I set out to estimate than will a
18  state such as Vermont, Wyoming or Alaska.
19       So it is natural as an economist to begin
20  with -- given that -- it is natural to begin with the
21  states that are going to have the largest effect on
22  the parameter that I set out to determine, or set of

8 (Pages 247 to 250)

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 251

1   parameters that I set out to determine.
2       Q.   And do you know how it is that you have
3   claims data from some state Medicaid programs but not
4   others?
5       A.   At my direction Steck Consulting and
6   Patrick Ormond with the -- I guess technically with
7   DOJ or the U.S. Attorney's Office in Boston -- at my
8   direction they initiated conversations with states for
9   the acquisition of data.  Whether they started with
10  Illinois or Florida or New York, I'm not sure exactly.
11  But they made inquiries to states.  If I recall
12  correctly there were cases -- perhaps one.  And I may
13  be misremembering here -- in which when they contacted
14  a state the data might not be available.
15      So, for example, suppose they contacted
16  Vermont and perhaps Vermont did not have data going
17  back to 2001 or earlier.  That's just an example.  I
18  don't recall that specifically.  And so at my
19  direction they initiated these calls and acquired as
20  much data as they could from states.  And I believe
21  that one factor influencing whether or not data was
22  obtained was just the availability of data, whether

Page 252

1   the state Medicaid agency or its contractor had the
2   data.  That I believe was one factor.
3       Q.   If you would go back to the notes on 294
4   that are in front of you -- I'm sorry.  Exhibit 1101
5   at Bates number ending 294 --
6       A.   The same page, right?
7       Q.   The same page.  Under Ohio -- is that
8   "Ohio" under the 1?
9       A.   O-H.
10      Q.   What do the 1, 2 and 3 mean next to those?
11      A.   Next to Ohio?
12      Q.   Well, no.  I'm sorry.  Next to all these
13  states.  There's a 3 next to California and a 1 next
14  to Illinois and a 2 next to Texas.  Would you
15  translate that for me?
16      A.   It's hard for me to recall.  With just
17  Illinois at 1 I would think perhaps is was Medicaid
18  spending for the complaint products.  Florida and
19  Illinois are pretty close.  But with Texas a 2, it
20  could be -- I just don't recall.  It could be where
21  things stood in terms of, you know, what my
22  understanding was, conversations, perhaps the greatest

Page 253

1   progress had been made with Illinois, next-most with
2   Texas.  I'm not sure.  That's one possible thing, but
3   I'm certainly not sure that's the case.
4       Q.   What did you write next to Ohio?
5       A.   "Get" -- something -- "soon."  And I can't
6   read -- "get stuff soon"?
7       Q.   What does the paren say?
8       A.   I believe that says "compound drugs."
9       Q.   And what does that mean?
10      A.   I would want to go back because this may --
11  Ohio may have a specific definition of this.  So I
12  would -- this was written 17 months ago and this is
13  something -- it could be this represents when multiple
14  drugs are combined.  But once again, I would want to
15  go back and look at -- there's a lot -- I would want
16  to go back and look at my full binders and so forth.
17  It's not something -- it's not a term for which the
18  definition crisply leaps to mind.
19      Q.   Was it your understanding that the NDCs at
20  issue in the case were compound drugs?
21          MR. LAVINE:  Object to form.
22      A.   I am not certain what my understanding was

Page 254

1   at this point 17 months ago.
2       Q.   As of today do you have an understanding
3   whether the NDCs at issue in this case are compound
4   drugs?
5       A.   It is my understanding that in some cases
6   the NDCs in this case represent part or all of a
7   compound drug.  But once again, that's something that
8   I would -- that's a pretty specific issue and it's
9   something that I would want to go back to and drill
10  down on some more to do justice to that.
11      Q.   And there's a note to the right, upper
12  right-hand corner.  Could you read that for us?
13      A.   "How drug is reimbursed when compounding."
14  And then -- keep reading?
15      Q.   Yeah.
16      A.   Underneath that "Is AWP used."  Underneath
17  that, "If not then how paid."
18      Q.   And as you sit here today, do you have a
19  guess of why you wrote that?
20          MR. LAVINE:  Object to form.
21      A.   It's just hard to recall.  Once again, it's
22  notes from 17 months ago.  So it is as I outline in my

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 255

1  report, the adjudication of each claim in each state
2  in each period, there are a number of steps that go
3  into the adjudication of each claim.
4      Q.   Why did you -- as you sit here today, do
5  you have any idea why you made note of how drug is
6  reimbursed when compounding?
7      A.   It could be that this represents a note to
8  myself.  I just don't recall.
9      Q.   Is it because of the fact that these drugs
10  were used or in some cases were compound drugs may
11  affect your analysis?
12      MS. THOMAS:  Objection.
13      A.   It's difficult for me to speculate.
14  There's obviously a lot of -- quite a bit of materials
15  in the pages surrounding this in my binder.  So I
16  would want to go back and look at that and look at my
17  analyses.  It is possible, but it is something that I
18  would need to look into more as to whether it would --
19  yeah.  I would just need to look into some more
20  because it is a pretty specific issue.
21      Q.   If we flip the page to 295 at the top it
22  appears to be a note in your handwriting, "March 13.

Page 256

1  Jerry Wells in Florida . . . similar to Martha
2  McNeil."  Is that what you wrote?
3      A.   That is -- that does appear to be what I
4  wrote there, yes.
5      Q.   And do you know why you wrote that note
6  there?
7      A.   Once again, this is about 16 months ago.
8  So it is a while ago.  My sense is that -- so I
9  certainly don't recall what exactly I was thinking
10  here.  It could be that I had already familiarized
11  myself with some testimony by Martha McNeil and that
12  Jerry Wells provided some similar information for the
13  Florida Medicaid program with Martha McNeil being
14  someone who provided testimony on the Texas Medicaid
15  program.
16      Q.   Do you recall speaking with Mr. Wells?
17      MR. LAVINE:  Object to form.
18      A.   To the best of my knowledge, I did not
19  speak with Mr. Wells.
20      Q.   Did you have any e-mail or other written
21  correspondence with Mr. Wells?
22      A.   It is possible because certainly early on

Page 257

1  at a point this early I was often cc'd on e-mails
2  where data dictionaries, for example, were provided.
3  So I do not recall a specific back and forth between
4  Mr. Wells and me.  But it is certainly possible that
5  there were some e-mails which he sent and I was cc'd
6  or which other people sent and we were both cc'd.  So
7  it's just hard to recall.
8      Q.   But you don't recall any as you sit here
9  today?
10      A.   Excuse me?
11      Q.   You don't recall any as you sit here today?
12      A.   I'm trying to think.  Not that I recall.
13      Q.   Did you review any affidavits or deposition
14  testimony provided by Mr. Wells?
15      A.   I believe that I -- once again, this is --
16  I considered a number of documents early on, about a
17  year and a half ago, in this case.  I do believe that
18  I familiarized myself with some of what Mr. Wells -- I
19  don't recall exactly.  But I do believe that I
20  familiarized myself with at least some of what he had
21  to say.  But it's hard to recall.
22      Q.   And were you providing guidance on what to

Page 258

1  review in Mr. Wells' deposition or anything else that
2  you reviewed that would reflect what he had to say?
3      MR. LAVINE:  Object to form.
4      A.   I mean, it could be that I wanted to make a
5  note to myself to encourage Mr. Dew and others at
6  Steck Consulting to read the transcript so as to
7  interpret the data accurately that was provided by
8  Florida Medicaid.
9      Q.   How many days was Mr. Wells deposed?
10      MS. THOMAS:  Objection.
11      A.   I do not recall.
12      Q.   Below that there are some notes under March
13  20.  The reference is "Tuesday, 10:30, next meeting"?
14  Is that what that says?
15      A.   Yes.
16      Q.   And then underneath that does it say
17  "Illinois, compound drugs, documentation not great"?
18  Do you see that?
19      A.   I believe that -- right.  That's what it
20  says.
21      Q.   Do you know what you were writing there,
22  why you were writing that?

10  (Pages 255 to 258)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                              July 15, 2008

Page 259

1    A.   Once again, hard to recollect.  This is
2  going quite a ways back.  But it's possible that here
3  Mr. Dew and Patrick Ormond were in the early stages of
4  acquiring Medicaid claims data from the State of
5  Illinois and that based on what they had received so
6  far perhaps the documentation wasn't as good as I
7  would hope.  But once again, this is early on.  I
8  believe at this point Illinois had not yet provided
9  any data.
10        I could be wrong about this.  But there is
11  sort of a back and forth that happened in the typical
12  state where basically Mr. Dew and Patrick Ormond,
13  would try to get the documentation needed to -- and
14  the available documentation that would allow them to
15  interpret the data accurately and allow me to
16  interpret the data accurately.  But once again, it's
17  hard for me to recall exactly what are these two
18  separate things.  I'm not sure.
19    Q.   And next to Florida does it say "Ready by
20  3/19"?
21    A.   That is what it appears to say, yes.
22    Q.   And does that reflect your team, including

Page 260

1  Steck Consulting, received this information on or
2  around March 19th of 2007?
3    A.   Not necessarily.
4        MS. THOMAS:  Objection.
5    A.   Not necessarily.  It could be that folks
6  from Florida had said that they would have
7  documentation ready by March 19th.  The fact that
8  March 19th precedes March 20th suggests at least the
9  possibility that it reflects a statement by someone
10  that that will be ready by the states and things don't
11  always arrive when they're -- when people expect.
12    Q.   Okay.  If I could ask you to take out a
13  copy of your report again.  Actually, we're at a
14  natural breaking point.  Why don't we go ahead and
15  take a quick break.
16        THE VIDEOGRAPHER:  Off the record at 9:57.
17    (Recess.)
18        (Exhibit Abbott 1103 was
19          marked for identification.)
20        THE VIDEOGRAPHER:  On the record at 10:15.
21        BY MR. TORBORG:
22    Q.   Dr. Duggan, I've handed you what we've

Page 261

1  marked as Abbott Exhibit 1103.  It is a copy of the
2  expert report you filed in the Texas litigation on
3  November 12th 2007.  You can see that on page 46, the
4  date of the signature page.  My question will be on
5  page 27.  If you could turn there, please.
6    A.   27?
7    Q.   Yes.  Under Roman 8, the first sentence
8  that you wrote there was "With an understanding of the
9  Abbott direct data, the VDPs data on NDC and
10  time-specific prices, the Medicaid claims data and the
11  adjudication calculation used by the Texas Vendor Drug
12  Program, it is now relatively straightforward to
13  calculate what the Texas Medicaid program would have
14  paid for each Medicaid claim if Abbott had reported
15  different prices for its petition five products."  Do
16  you see that?
17    A.   Yes.
18    Q.   And then you wrote a footnote -- you put a
19  footnote after that sentence, did you not?
20    A.   I did.
21    Q.   Can you read that footnote into the record
22  for us?

Page 262

1    A.   "This assumes that the Texas VDP" -- which
2  stands, I believe, for vendor drug program -- "would
3  have implemented these reported prices."
4    Q.   And why did you put that footnote at the
5  end of that sentence?
6    A.   It's hard for me to recall exactly what I
7  was thinking at this point.  I believe -- and I would
8  want to go back to think of the big picture.  But I
9  believe here what I'm referring to is that -- so let's
10  suppose we're considering a specific Medicaid claim.
11  If Abbott had reported alternative prices to the Texas
12  Vendor Drug Program then the effect on Medicaid claims
13  assumes that those prices would have been used in the
14  adjudication.
15        So for example if the price had been 50 and
16  I replaced it with let's say 40, it assumes that the
17  Texas Vendor Drug Program would have used 40 instead
18  of 50 in the adjudication algorithm.  It doesn't --
19  yeah.
20    Q.   I understand that that's what you're trying
21  to say.  My question is why are you putting the
22  footnote there?  Why are you making that point in your

11 (Pages 259 to 262)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 263

1   report?
2       A.   To be -- you know, here I'm trying to be --
3   if I remember exactly -- you know, I haven't looked
4   over the entire report.  But if I remember exactly
5   what I'm trying to do here, I'm just trying to make
6   clear my assumption in the analysis that follows.
7       Q.   Why do you think it important to make that
8   assumption clear?
9           MR. LAVINE:  Objection to form.
10      A.   As I crafted the Word document that we're
11  examining here, I believe throughout I'm basically
12  trying to accurately summarize the analysis that I did
13  and the assumptions that underlie the analysis.
14  That's -- you know, pretty much, why do I do this
15  here, it's one part of that effort.
16      Q.   As you sit here today can you tell us why
17  you wanted to make the assumption clear?
18      A.   I don't recall all the reasons.  But I
19  would think that one reason might be that -- yeah.  I
20  don't recall -- beyond what I just said, what beyond
21  making my assumptions transparent, what else I'm
22  trying to accomplish here.  There may be more than

Page 264

1   that.  But I don't recall the specifics.
2       Q.   If we could go back to your report in this
3   case, Abbott Exhibit 1093, in particular page 7 --
4   it's right there --
5       A.   Yup.
6       Q.   -- the first sentence under the section
7   overview I'll read into the record if you'll follow
8   along.  You wrote "In this report I use data from
9   several different sources to determine the amount by
10  which spending by the federal Medicare and federal-
11  state Medicaid programs would have changed if
12  alternative prices had been used for Abbott products'
13  average wholesale prices, wholesaler acquisition costs
14  and direct prices."  Did I read that right?
15      A.   Yes, you did.
16      Q.   And why did you note in your report that
17  your analysis was calculating a difference if
18  alternative prices had been used?
19      A.   Once again, this is sort of in the overview
20  section in which I'm trying to give a big picture
21  sense of all of the analyses that follow.  So it could
22  be that here I'm trying to simplify to make this --

Page 265

1   I'm not sure exactly -- I think in the overview
2   section there's quite a lot to summarize and this is
3   only two and a half pages.  So I can't possibly do
4   justice to everything that I do in the subsequent
5   pages.  But I'm just trying to give a big picture
6   overview here.
7       Q.   I did not see in your report in this case a
8   footnote similar to the report that we just reviewed,
9   your Texas report, along the lines that your analysis
10  assumes that the Medicaid and Medicare programs would
11  have implemented the alternative prices.  Why is that?
12          MR. LAVINE:  Object to form.
13      A.   I don't recall any specific distinction
14  that I was trying to make.  Obviously Texas is a
15  different set of litigation than the litigation here.
16  I don't recall -- if my analysis takes -- proceeds
17  through an analysis with these alternative prices --
18  yeah.  I'm not sure.  I would need to look at the
19  whole report to study the whole report to see if there
20  is a reason.  I don't recall any reason that I left
21  out such a footnote here when I included it in the
22  Texas case.

Page 266

1       Q.   Did you think it was important in your
2   report in this case to make clear that your difference
3   calculation assumes that the Medicare and Medicaid
4   programs would have used the alternative prices that
5   you calculated?
6           MS. THOMAS:  I'm sorry.  Could you read
7   that question back, please?
8           (Whereupon, the requested portion was read
9   by the reporter.)
10          MS. THOMAS:  Objection.
11      A.   So once again, there are many state
12  Medicaid agencies, many time periods, many Medicare
13  carriers.  I am basically -- and so with the caveat
14  that the specifics may vary from one specific case to
15  another, my analysis sort of reflects had Abbott
16  reported these alternative prices for the AWP and so
17  forth in the -- so had Abbott reported those prices
18  First Databank and Red Book published those prices and
19  the state Medicaid agency's and/or Medicare insurance
20  carriers used those prices.
21          So there are these steps.  There's the
22  reporting, the publishing and the utilization of the

                        12  (Pages 263 to 266)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 267

1  prices in the adjudication algorithm.  And if I was
2  not sufficiently clear about that -- and once again,
3  there are going to be nuances from one state to
4  another and from one Medicare carrier to another.  But
5  that is going to commonly be the chain that my
6  analysis assumes.
7      Q.   As an economist would you agree with me
8  that on the issue of whether Abbott's alleged price
9  reporting misconduct caused any damage to the federal
10 government, there is a separate question of whether
11 the state Medicaid programs and Medicare would have
12 used the alternative prices that you calculate with no
13 other changes to reimbursement?
14        MR. LAVINE:  Objection to form.
15     A.   Can you just repeat that question for me,
16 please?
17        MR. TORBORG:  Do you mind reading that
18 back, Jon.
19        (Whereupon, the requested portion was read
20 by the reporter.)
21        MR. LAVINE:  Same objection.
22     A.   I guess I would need to reflect on that

Page 268

1  issue.  There are a number of pieces to that.  So
2  there's a lot in that question and I would need to
3  reflect on that.
4        BY MR. TORBORG:
5      Q.   How much time would you need to reflect on
6  that?
7      A.   As much time as necessary to get to what I
8  believe is the truth, the correct answer.
9      Q.   Do you believe that it is possible that
10 there is a separate question?
11        MR. LAVINE:  Object to form.
12        MS. THOMAS:  Objection.
13     A.   So it seems possible that there is.  I'm
14 not asserting that there necessarily is.  But as I
15 said, I would just need to reflect.  There was a lot
16 in that question.  I would want to reflect on it.  But
17 I do try to be -- if I haven't been sufficiently clear
18 about my assumptions that I employ in my algorithm,
19 I'm trying to be clear about them here, which is the
20 assumption of reporting, those prices then being
21 published and those prices then being utilized.
22        And so I would just need to -- yeah.

Page 269

1      Q.   You would agree with me as an economist
2  that your mere work in recalculating alternative
3  prices and analyzing how they would have gone through
4  the state adjudication formulas if they had been used
5  does not necessarily answer the question of the amount
6  at which the federal government has been damaged in
7  this case?
8        MR. LAVINE:  Objection to form.
9        MS. THOMAS:  Objection.
10     A.   I do not agree with that.  I believe that
11 my results provide evidence on the question that I set
12 out to answer, which is to what extent did federal
13 government spending diverge for these products from
14 what it otherwise would have been given the
15 assumptions that I try to make clear throughout my
16 report.
17     Q.   But you would agree with me that one would
18 have to test the assumptions in your model before
19 coming to a conclusion on the amount at which the
20 federal government was damaged?
21        MR. LAVINE:  Object to form.
22     A.   I would not necessarily agree with that.

Page 270

1      Q.   But you might agree with that?
2        MR. LAVINE:  Object to form.
3      A.   I believe that my report and the analyses
4  that underlie it accomplish what I set out to answer,
5  which is the question that I just stated.  And so I
6  would just want to -- I would need to reflect more on
7  that issue.
8      Q.   Well, you have seen evidence, have you not,
9  that calls into question whether or not state Medicaid
10 programs and Medicare actually would have implemented
11 prices at the levels that you calculate in the report,
12 haven't you?
13        MR. LAVINE:  Object to form.
14     A.   I am not sure exactly what you are
15 referring to.  I mean, one example, there might be
16 cases in which there is an error in a computer program
17 in which instead of implementing a price of 10 and a
18 price of 100, or one gets implemented, that would be
19 one example.  But I guess I'm not sure exactly what
20 you would in mind here.
21     Q.   Well, have you reviewed any evidence that
22 suggests that state Medicaid programs would not have

13 (Pages 267 to 270)

Duggan, Ph.D., Mark G. - Vol. II                          July 15, 2008

Page 271

1    implemented prices at the levels in your calculations?
2          MR. LAVINE:  Object to form.
3      A.   Well, there are many state Medicaid
4    agencies, many products, many quarters of time --
5    three month periods -- that I consider.  I'm not sure
6    exactly what you are referring to.  And I would need
7    to think more.  I've obviously examined a lot of
8    material, quite a lot of material, relevant to this
9    case.  And the kind of issue that you're describing
10   isn't leaping to mind right now.
11              (Exhibit Abbott 1104 was
12              marked for identification.)
13         BY MR. TORBORG:
14     Q.   Dr. Duggan, I've marked as Abbott Exhibit
15   1104 an excerpt from the third day of the deposition
16   of a woman named Deirdra Duzor.  Do you know who
17   Ms. Duzor is?
18     A.   I don't recall.
19     Q.   Have you reviewed her deposition?
20         MS. THOMAS:  Objection.
21     A.   It is possible, but I just don't recall.
22     Q.   I'd like to ask you to go to page 904.

Page 272

1    Starting with line 6 I'm going to read some testimony
2    that spans two pages into the record, if you would
3    follow along, and then I'll have some follow-up
4    questions for you.  There was a question by Mr.
5    Cook --
6      A.   Can I just interrupt with one question?
7      Q.   Mm-hmm.
8      A.   This Ms. Duzor person --
9      Q.   Sure.
10     A.   -- she is from --
11     Q.   I'll tell you who she is.  That's fair.
12     A.   Yeah.
13     Q.   Ms. Duzor is currently the co-leader of the
14   CMS pharmacy team working with Larry Reed.  Do you
15   know who Mr. Reed is?
16     A.   I don't recall the name off the top of my
17   head.  And this was taken --
18     Q.   March 26th 2008.
19     A.   Three and a half months ago.  Okay.
20     Q.   Mr. Cook asks and Ms. Duzor gave the
21   following testimony.  "If, tomorrow, the AWPs
22   published in Red Book were -- instead of as they are

Page 273

1    today were, instead, empirical averages of the amounts
2    that pharmacies and providers paid for drugs -- do you
3    understand the premise of my question there?
4          "Answer:  I think so.
5          "Question:  Do you have an opinion about
6    whether there would be access problems for
7    beneficiaries of Medicaid if that were to happen
8    overnight?"
9          And there was an objection.
10         "Answer:  I will restate your question.
11   You can tell me if it's accurate.  If Medicaid was
12   paying pharmacies at a rate lower than what their
13   purchase price of the drug is" --
14         "Question:  Yes, ma'am.
15         "Answer: -- would there be access problems?
16         "Question:  Yes.
17         "Answer:  I would guess there would be.
18         "Question:  Why?
19         "Answer:  Why?
20         "Question:  Yes, ma'am.
21         "Answer:  Because pharmacies would stop
22   serving Medicaid in order to try to get the

Page 274

1    reimbursement to be raised.
2          "Question:  Do you have any opinion about
3    what would be the consequence if the various state
4    Medicaid programs were paying based upon an AWP that
5    was an empirical average of what pharmacies were
6    obtaining drugs for?
7          "Answer:  Well, states don't want to cause
8    access problems any more than the federal government
9    does.  So if the new AWPs would turn out to be actual
10   purchasing -- the price at which the drug could be
11   purchased, I think states -- we would have a run on
12   state plan amendments to change the formula for
13   reimbursement."
14         Do you see that?
15     A.   I do.
16     Q.   Did you consider that testimony in forming
17   your opinions in this case?
18     A.   I considered that issue, the issue of
19   access, with the -- yes, I considered the access
20   issue.  I don't know if this specific testimony on
21   these two pages, 904 and 905, led me to consider that.
22   But I certainly considered the issue.

14 (Pages 271 to 274)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 275

1    Q.   You don't recall this testimony as you sit
2  here today, do you?
3    A.   I don't recall these specific two pages,
4  904 and 905.  That's right.
5    Q.   How did you consider the question of access
6  in your analysis?
7    A.   So it is a bit difficult to do justice to
8  that question without going into many of the details
9  of my analysis.  So one example, I utilize prices for
10 the pharmacy-specific classes of trade, which tend to
11 be higher than those used by other providers.  I
12 furthermore did not incorporate various rebates,
13 discounts and so forth as I outline in my report.  And
14 I actually scale prices as I outline in my report.
15    So it's difficult -- I think those are
16 three examples of things that I did to address this
17 issue.  And moreover this is -- I'll just leave it at
18 that.
19    Q.   And did you calculate the amount of money
20 at which your adjustments you just referenced actually
21 mattered?
22    MS. THOMAS:  Objection.

Page 276

1    MR. LAVINE:  Object to form.
2    A.   I would say that I calculated many things.
3  And as -- yeah.  I suspect that in carrying out the
4  calculations that was -- those are values that I
5  determined at various stages for various products,
6  different states, different Medicare carriers and so
7  forth.
8    Q.   Did you as an economist perform an
9  analysis -- a full analysis, not just consideration --
10 of how implementation of your prices with no other
11 changes to the system would impact access?
12    MS. THOMAS:  Objection.
13    A.   I considered the issue and I believe as a
14 quite complicated issue as each pharmacy would have
15 many factors to consider as to whether or not to
16 provide prescription drugs to Medicaid recipients, not
17 just for necessarily the profitability of the
18 prescriptions themselves, but the profitability of the
19 products they might purchase as they come in through
20 the door and so forth.  So there are other issues.
21    And moreover, it is -- I'll just leave it
22 at that.

Page 277

1    Q.   Did you consider -- did you perform an
2  analysis that you would deem sufficient as an
3  economist to determine whether implementation of the
4  prices that you calculate would maintain access to
5  care?
6    MR. LAVINE:  Objection to form.
7    MS. THOMAS:  Objection.
8    A.   Can you define what you mean by access to
9  care?
10    Q.   Well, are you familiar with the Medicaid
11 regulations requiring Medicaid programs maintain
12 access to care?
13    A.   I'm familiar with that phrase, yeah.
14 But --
15    Q.   You used -- interpret my question with your
16 understanding of that Medicaid regulation.
17    A.   Okay.
18    MS. THOMAS:  Objection.
19    A.   I apologize.  If you could just restate it
20 again.
21    Q.   Why don't we take out -- did I give you a
22 full copy of your deposition in Texas or just a

Page 278

1  section?  I guess I just gave you a section.
2    A.   Just a section.  I'm happy to have a full
3  copy.
4    Q.   I'll let you see a copy of mine.  Page 377
5  of your Texas deposition, line 3 through line 14.  If
6  you would read that into the record for me.
7    A.   So 377 starting on line 3?
8    Q.   Yeah, through 14.
9    A.   Okay.  So this is by Ms. Geisler.  "Let's
10 focus on the last couple words at the end of the
11 paragraph.  'So that care and services are available
12 under the plan at least to the extent that such care
13 and services are available to the general population
14 in the geographic area.'  Do you see that language at
15 the end of the paragraph?
16    "Yes, I see that.
17    "Do you know how Texas determined whether
18 or not they were meeting this standard?
19    "I have not examined that issue."
20    Q.   Did you examine the issue of access to care
21 in the Texas litigation?
22    MS. THOMAS:  Objection.

15  (Pages 275 to 278)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 279

1    A.   It is an issue that I considered in
2  carrying out my analyses.  But I did not examine
3  specifically -- I did not estimate empirically this
4  effect.
5    Q.   I'm going to show you the previous page of
6  your Texas litigation.
7    A.   Deposition.
8    Q.   Deposition.  Sorry.
9    A.   Right.
10   Q.   If you could read into the record lines 3
11 through 17.
12   A.   On which page?
13   Q.   376.
14   A.   So once again here, I believe the
15 questioner is Ms. Geisler.  And so the question reads:
16 "'And are sufficient'" -- and I believe here she's
17 quoting a document.
18   Q.   A regulation.
19   A.   A regulation.  "'And are sufficient to
20 enlist enough providers so that care and services are
21 available under the plan at least to the extent that
22 such care and services are available to the general

Page 280

1  population in the geographic area.'  Do you see that
2  language?
3        "I see that, yes.
4        "Is that what you refer to as the access to
5  care standard?"
6        Ms. Moore from -- Texas counsel -- "I
7  object to the question."  Mr. Anderson, I believe
8  counsel for the relator, "Objection to form."  And
9  then the witness, me:  "As I said, I didn't study this
10 in advance of today, what is -- exactly are all the
11 potentially relevant regulations concerning access to
12 care."
13   Q.   That's enough.  You can hand that back to
14 me.
15   A.   Okay.
16   Q.   Both of them?
17   A.   Yeah.
18   Q.   That's consistent with the testimony that
19 you gave that you did not separately study the issue
20 of access to care in the Texas litigation, correct?
21       MR. LAVINE:  Objection to form.
22   A.   That is correct.

Page 281

1    Q.   And did you do anything different to study
2  the issue of access to care in this case that you
3  didn't do in the Texas case?  And if so, tell me what
4  you did.
5    A.   So it's obviously difficult for me to
6  recall all of the analyses that I did both in the
7  Texas case and in this case.  Nothing leaps to mind as
8  being substantially different with respect to my
9  approach to that issue in the two cases.  But, once
10 again there, I carried out quite a few analyses in
11 both reports and considered quite a bit of data.  And
12 so I would want to -- it's hard to make that
13 comparison.  But nothing leaps to mind as being
14 substantially different.
15   Q.   Isn't it true that Medicaid programs could
16 have chosen to use compendium prices for these drugs
17 at issue in this case despite knowing that they were
18 not accurate indicators of marketplace prices?
19       MR. LAVINE:  Objection to form.
20   A.   Can you restate the question?
21   Q.   Isn't it true that Medicaid programs could
22 have chosen to use the compendia prices for the drugs

Page 282

1  at issue in this case despite knowing that they were
2  not accurate indicators of marketplace prices?
3        MR. LAVINE:  Object to form.
4    A.   There's quite a lot in that question.
5  Whether state Medicaid officials could do something,
6  I'm not sure about that -- this is sort of outside of
7  the area that I really telescope in on in my analysis.
8  It is possible that policymakers, agency officials and
9  so forth might have known that for certain products
10 during certain periods these prices were not accurate
11 reflections.
12       I am not sure if those officials and
13 policymakers knew the same about -- knew anything
14 similar about these products or -- it's just hard for
15 me to speculate as to what they know.
16   Q.   You have not done a review in your work
17 here regarding what state Medicaid programs, Congress
18 or CMS knew about the relationship between marketplace
19 prices and reported prices for the drugs at issue in
20 this case; is that right?
21       MR. LAVINE:  Object to form.
22   A.   That wasn't the main focus of my analysis.

16  (Pages 279 to 282)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 283

1  But I have certainly seen some written material
2  indicating that there may have been some awareness of
3  this issue of a deviation between actual prices paid
4  in the marketplace and those published in the Red Book
5  and in First Databank and so forth.  But I'm -- so
6  I've seen some discussion of that issue, but that --
7  so I'm aware of it.  But that really hasn't been -- as
8  you can see from the sort of overview of my report,
9  that's really not the focus of my report.
10     Q.   What material are you referring to?
11     A.   It is difficult to recall right now.  It
12  may be -- there are obviously many depositions, many
13  reports, many documents that I considered.  I just
14  don't recall the specific document.  I believe -- it
15  could be that Martha McNeil had mentioned some of this
16  in her deposition.  But once again, I'm not certain of
17  that.  There are a number of documents that I
18  reviewed.  But I'm familiar with that issue.
19     Q.   In calculating the difference that you
20  calculate in this case, does your analysis consider
21  the state of knowledge of state Medicaid programs,
22  Congress and CMS regarding the relationship between

Page 284

1  marketplace prices and reported prices for the drugs
2  at issue in this case?
3          MR. LAVINE:  Object to form.
4     A.   Okay.  There's -- there's just quite a lot
5  in that question.  So if you could just read it back
6  to me that would be helpful.
7     Q.   I'll try my best to give Jon a break.
8     A.   Okay.
9     Q.   In calculating the difference that you
10  calculate in this case, does your analysis consider
11  what state Medicaid programs, Congress and CMS knew
12  about the relationship between marketplace prices and
13  reported prices for the drugs at issue in this case?
14          MR. LAVINE:  Object to form.
15     A.   It is certainly an issue that I am familiar
16  with, as I mentioned a minute ago.  And because of
17  that I believe that it is something that I considered.
18  I mean, as I mentioned yesterday a deviation between
19  published prices and actual prices is something that I
20  considered in my previous research on the Medicaid
21  program investigating the correspondence between
22  actual prices and these published prices.

Page 285

1          I believe I considered the issue -- you
2  know, I learned a great deal in the course of reading
3  the various deposition transcripts and so forth.  And
4  this is one of the things that I educated myself on.
5  And thus I believe that I considered the issue.
6     Q.   How did consideration of that issue impact
7  your analysis?
8          MR. LAVINE:  Object to form.
9     A.   So one example of this is my scaling the
10  prices by 125 percent, as I outline in my report,
11  given this markup for Abbott products above the WAC,
12  this standard 25 percent markup of the AWP above the
13  WAC for Abbott price.  That's one example of a way in
14  which I considered it.  And there may be others.  I'm
15  just not sure.
16     Q.   So you can't think of any other way in
17  which the knowledge of state Medicaid programs,
18  Congress and CMS regarding the relationship between
19  marketplace and reported prices for these products
20  impacts your analysis?  Is that right?
21          MR. LAVINE:  Object to form.
22     A.   I think that I would just need -- to do

Page 286

1  justice to that question I would need to reflect a bit
2  more on it.  Nothing is leaping to mind right now.
3  But of course -- so there's nothing else leaping to
4  mind.  But I don't think I could really make a
5  definitive answer on that question without a bit more
6  reflection.
7     Q.   From the information that you've reviewed
8  do you have an understanding regarding whether state
9  Medicaid programs believed that the reported prices
10  for the products at issue in this case were accurate
11  and reliable indicators of marketplace prices?
12          MR. LAVINE:  Object to form.
13     A.   As I mentioned earlier, I believe Martha
14  McNeil, for example, may have mentioned this issue in
15  her deposition.  Whether they were for the same
16  products I'm not sure, because there were 234 Abbott
17  products at issue in Texas and there are only 44 at
18  issue in the federal case.  But I believe that this --
19  that's one place of an example where a state Medicaid
20  official talked about this discrepancy.  But there may
21  be others too that just aren't -- there are many
22  things that I have reviewed.

17 (Pages 283 to 286)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 287

1    Q.   Go back -- actually, you don't need to go
2  back if you don't want to.  But in your handwritten
3  notes that I marked as Abbott Exhibit 1101, on the
4  second page there was that note that you wrote,
5  capital letters, that says "Legislators might have had
6  higher dispensing fees."  Do you recall that?  Do you
7  recall that, Dr. Duggan?
8    A.   I'm just going to the page.  It was 294 or
9  293?
10   Q.   It was 293 at the bottom of the page.
11   A.   Okay.  So I see that.  Yes.
12   Q.   And yesterday I asked you if you considered
13 in your analysis the potential need to increase
14 dispensing fees in the event of a decrease in the
15 ingredient cost.  Do you recall me asking about that
16 topic at the end of yesterday?
17   A.   Yeah.  I recall that, yes.
18            (Exhibit Abbott 1105 was
19            marked for identification.)
20      BY MR. TORBORG:
21   Q.   What I've marked as Abbott Exhibit 1105 is
22 a portion of the testimony that you gave yesterday.

Page 288

1  It's a rough draft.  I cut and pasted from Jon's
2  document to a Word document because otherwise I could
3  not prevent from printing the entire thing.  I was
4  asking you about this issue and if you go to the
5  second page of what I handed you, the excerpt that I
6  handed you, the first full sentence you wrote "And I
7  felt that given what my report sets out to do that it
8  was not necessary to endogenize, to use the
9  economist's phrase, that variable."
10       Is that consistent with your recollection
11 of the testimony you gave yesterday?
12      MS. THOMAS:  Objection.
13      MR. LAVINE:  Objection to form.
14   A.   That sounds similar to what I remember
15 saying.
16   Q.   And you indicated that endogenize with an
17 economic term; is that right?
18      MR. LAVINE:  Objection to form.
19   A.   Correct.
20   Q.   I Googled what endogenized meant and this
21 is what I came up with.  Tell me if it's consistent
22 with what you meant.

Page 289

1    A.   Sure.
2    Q.   To develop something internally, especially
3  a parameter within an economic model.
4    A.   That's in the ballpark of what I would --
5  yeah.
6    Q.   And when I asked you yesterday "Tell me
7  what that endogenized term means?" you said "To vary
8  the dispensing fee."  And I asked you "Who made that
9  decision that it was not necessary?"  And you said
10 "That was based on my own analysis, my own research."
11 And then you cited the example of the state of Ohio
12 having a very aggressive MAC program but that -- and
13 then you noted it did not have a dispensing fee that's
14 so different from the other states.  Is that right?
15   A.   That's what I said here yesterday.  That's
16 correct.  Yes.
17   Q.   And then if we go to the next page the
18 third line down --
19   A.   The next page, I only have two lines on the
20 next page.
21   Q.   I'm sorry.  Skip one more page.
22   A.   Okay.

Page 290

1    Q.   The third line down, do you see where the
2  words "had I seen a state like Ohio"?  Do you see
3  that?  Do you see that?
4    A.   I see that text, right.
5    Q.   You testified "Had I seen a state like Ohio
6  with an aggressive maximum allowable cost program
7  paying much higher dispensing fees -- but I didn't --
8  that might have caused me to" -- and then you went --
9  "so that's the kind of thing that went into it."
10       What might have that caused you to do if
11 you had seen a state like Ohio with an aggressive
12 maximum allowable cost program paying a much higher
13 dispensing fee?
14      MR. LAVINE:  Object to form.
15   Q.   Basically, finish your thought.
16      MR. LAVINE:  Object to form.
17   A.   There are many things that I considered in
18 here.  So it is -- Ohio is just one example.  And so
19 it is certainly not the only state with a MAC program
20 or that uses maximum allowable costs in the
21 adjudication of its Medicaid claims.  So I was just
22 trying here to give an example.  And I think here -- I

18  (Pages 287 to 290)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 291

1    mean, one thing that economists try -- that I should
2    caveat this with, one thing that economists try to be
3    very careful about is controlling for unobservable
4    factors that can differ across places, time invariant
5    factors that may differ across places over time.
6         So in the case of Ohio there may be other
7    factors that cause differences in addition to an
8    aggressive maximum allowable cost program. So I don't
9    want to overstate what I was saying here. The
10   concern, even if one were to see a higher dispensing
11   fee in Ohio versus other states is that there is some
12   other unobserved factor.
13        Perhaps a cleaner, crisper test of this
14   kind of thing would be an examination within a state
15   when for example very different AWPs were used for
16   Abbott products in the adjudication of claims. In for
17   example 2001 this kind of within-state variation, that
18   would be -- in general economists in general in their
19   analyses incorporated what are called state-fixed
20   effects. And so -- to control for unobserved time
21   invariant factors. So it's difficult to interpret
22   differences across states very much.

Page 292

1         So the analyses that utilized state-fixed
2    effects work off variation that exists within a state.
3    And just, you know, as an example of that kind of
4    thing, there was recently a study published in the
5    Journal of the American Medical Association I believe
6    just last week, looking at AWPs for -- and this is
7    just something I met someone at a conference a couple
8    weeks ago and he told me about this study -- that
9    looks at the -- how various factors changed when
10   alternative AWPs were used for cancer drugs. And
11   that's a sort of within analysis. There's variation
12   within a particular product within a particular
13   geographic area.
14        In general as economists it is difficult to
15   compare. So what I might have been thinking there
16   was, why I might have sort of paused a bit there was
17   my recognition of the importance that economists like
18   myself place on the possibility of other factors that
19   are perhaps unobserved that cause these differences.
20   So at some level the within-state analysis is more --
21   tends to be preferable. And that's -- you know, in
22   much of my research you'll see that these kind of

Page 293

1    county-fixed effects, state-fixed effects, to address
2    exactly this kind of unobserved factor issue.
3    Q.   You've referenced a number of times
4    throughout the last couple of days your observations
5    regarding the reimbursement for Abbott products at
6    issue in this case after Abbott lowered its reported
7    prices or took steps to have the reported prices for
8    its products decreased in the 2000, 2001 time period,
9    correct?
10   A.   I believe I referenced it once, but maybe
11   more.
12   Q.   Have you compared the revised prices that
13   you've found with the revised prices that Abbott
14   reported?
15        MR. LAVINE: Object to form.
16        MS. THOMAS: Objection.
17   A.   I mean, to some extent my analysis does
18   this. I take -- my analysis goes through claim by
19   claim for each claim in each -- so I describe this in
20   quite a bit of detail in my report. So I certainly
21   did this, sure, on many occasions.
22   Q.   Have you compared the amount at which the

Page 294

1    reimbursement decreased in the 2001 time frame to the
2    difference calculations that you make?
3        MS. THOMAS: Objection to form.
4    A.   To some extent to the extent that in my
5    analysis I examine the value of difference -- let's
6    take Illinois, for example. I calculate the value of
7    difference for each claim. And so I have -- if I
8    recall correctly, I have observed a decline in the
9    value of difference in, let's say, 2001.
10        I don't have at my fingertips the exact
11   relationship between, you know, how difference varied
12   over time. I didn't create, for example, an Excel
13   spreadsheet of difference by time. But I am fairly
14   confident that for many claims the value of difference
15   was still greater than zero. It might depend on the
16   product. It might depend on the state and so forth.
17        But I certainly observed a decline in
18   reimbursement and a decline in the value of difference
19   for the average claim was correlated with that decline
20   in reimbursement. It wasn't necessarily a one for one
21   correlation because there are many factors that go
22   into the adjudication formulas.

19 (Pages 291 to 294)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                          July 15, 2008

Page 295

1    Q.   Coming back to Ohio, if you had seen a
2  state like Ohio with an aggressive MAC program having
3  higher dispensing fees, would you then have
4  endogenized the dispensing fee variable in your
5  analysis?
6         MR. LAVINE:  Object to form.
7    A.   So I think I considered many things here in
8  the case.
9    Q.   Yes, you do.
10   A.   I am not sure for the reason that I
11  mentioned earlier about big differences across states
12  in the details of their Medicaid reimbursement whether
13  that would have given me pause.  At some level the
14  within-state analysis that I describe, the examination
15  of, for example, did a state -- as the lower AWPs for
16  these products were applied, did they in response to
17  that change their AWPs.
18        I mean, as a large body of research in
19  economics has demonstrated, there are massive
20  differences across geographic areas in health care
21  patterns.  So more people getting -- many more people
22  getting bypass surgery in Miami than in Minneapolis,

Page 296

1  for example.  So there are many factors that go
2  into -- that vary across places.
3         So I think in general as economists -- as
4  empirically-oriented economists tend to have less --
5  you know, tend to prefer an examination of within-area
6  variation because of this possibility of time
7  invariant or time varying unobserved factors across
8  states.
9         So I think it's more if I were to -- once
10  again here yesterday as we were talking trying to
11  think of all of the various factors, it is more the
12  within-state -- yeah.
13   Q.   If you want to take a break after you're
14  finished --
15   A.   So I think the Ohio example, I would not
16  read too much into that.
17        MR. TORBORG:  Okay.  Let's take a break.
18  Five minutes left on the tape.
19        THE VIDEOGRAPHER:  This is the end of tape
20  1.  Off the record at 11:15.
21        (Recess.)
22        (Exhibit Abbott 1106 was

Page 297

1        marked for identification.)
2        THE VIDEOGRAPHER:  This is the beginning of
3  tape 2 in the deposition of Dr. Mark Duggan.  On the
4  record at 11:35.
5        BY MR. TORBORG:
6    Q.   Welcome back.
7    A.   Thanks.
8    Q.   I asked you yesterday if you were aware of
9  the fact that Ohio paid a compounding fee for infusion
10  drugs.  Do you recall that?
11   A.   I recall your asking me about that, yes.
12   Q.   And you indicated that you at least as of
13  yesterday did not recall that or we needed to look
14  into it or something to that effect.  Is that right?
15        MR. LAVINE:  Object to form.
16   A.   I'm not exactly sure what I said yesterday.
17  So if you want to restate the specific question or --
18   Q.   We looked at at least one version of the
19  state summary prepared by Myers & Stauffer yesterday
20  which was Exhibit 1102.  In particular we looked at
21  the summary for the state of Ohio.  Do you recall us
22  looking at that?

Page 298

1    A.   At Ohio.  Sure.  I'm just pulling it up.
2    Q.   Do you recall when we looked at that
3  yesterday there was nothing in there that noted a
4  separate fee for compounding paid by Ohio?  Is that
5  right?
6    A.   Yeah.  That's correct.
7    Q.   And did you -- have you done --
8    A.   I should qualify that with the -- I'm not
9  certain that this is the eventual version that they
10  created, but --
11   Q.   Did you do any follow-up work since we
12  discussed this issue yesterday to investigate whether
13  Ohio had a separate compounding fee for certain drugs?
14   A.   I did not since yesterday.
15   Q.   I'd like to hand you what we've marked as
16  Abbott Exhibit 1106.  For the record, Abbott Exhibit
17  1106 bears the Bates number HHC 009-1797.  It is a
18  April 26th 2002 e-mail from Robert Reid to a couple
19  individuals.  Do you know who Robert Reid is?
20   A.   No, I don't.
21   Q.   I'll represent to you that he is in the
22  pharmacy program for the state of Ohio.  And he states

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 299

1  in this e-mail, which is, subject, dispensing fees for
2  compounded drugs -- actually, if you would just read
3  that for me to yourself.
4      A.   The whole paragraph?
5      Q.   Just read it to yourself.
6      A.   Okay.  Just give me a minute, please.
7  (Reading.)
8           Okay.
9      Q.   Does this appear to indicate that Ohio had
10 separate dispensing fees for compounded drugs?
11          MS. THOMAS:  Objection.
12     A.   It seems that -- well, the gentleman, Mr.
13 Reid, is indicating that at least as of April 26th
14 2002 for certain compounded drugs there are different
15 dispensing fees.
16     Q.   And that's not something that was noted in
17 Myers & Stauffer's state summary that we looked at
18 yesterday and then again today, correct?
19     A.   So based on my scanning of it right here I
20 don't see any indication of that.  However, with the
21 caveat that I'm not sure that this is the final
22 version of this report, nor that -- of the Myers &

Page 300

1  Stauffer document -- nor that Mr. Reid is correct.
2  But you're correct that there is no mention that I see
3  of compounding drugs beyond what we see there in
4  the -- yeah.  There's no mention of compounding drugs
5  on the Myers & Stauffer Ohio summary.
6      Q.   And because of that the fact that Ohio had
7  a separate dispensing fee for compounded drugs is not
8  something that you would have considered in your work
9  in this case, correct?
10          MS. THOMAS:  Objection.
11     A.   That is not necessarily true.  I would want
12 to go back and look at my program, which is on my
13 drive, the drive that I provided, my programs for
14 Ohio, the claims for Ohio and so forth.  And moreover,
15 this e-mail is from a period outside the eleven year
16 window that I considered.  So -- but I'm not sure.  I
17 would want to go back and look at the program to see
18 whether and to what extent incorporating this
19 information, if it's correct, would affect my
20 analyses.  I'm not sure it would.
21     Q.   But as you sit here today you can't think
22 of how if at all you considered the fact that Ohio had

Page 301

1  a separate dispensing fee for compounded drugs in your
2  analysis, right?
3          MS. THOMAS:  Objection.
4      A.   I don't recall right here off the top of my
5  head.  But I would -- to be able to make a more
6  definitive statement I would need to go back to the
7  analyses that I conducted.
8      Q.   And if we -- and you also indicated that
9  this e-mail comes from a time period that's after your
10 analysis time period, correct?
11     A.   That is correct.
12     Q.   To your left is an orange binder that has
13 some exhibits in it.  If I could ask you to go to the
14 tab that says 577, this is a publication called
15 Medicaid Pharmacy Bulletin dated January/February
16 1990.  Have you read any of these documents, Dr.
17 Duggan?
18          MR. LAVINE:  Object to form.
19     A.   You mean have I read this document?
20     Q.   Have you read any of the Medicaid Pharmacy
21 Bulletins, documents that look like this?
22     A.   I don't recall reading this specific

Page 302

1  document.
2      Q.   Do you recall reviewing any of the Medicaid
3  Pharmacy Bulletins?
4          MR. LAVINE:  Object to form.
5      A.   I don't recall, but as I said earlier there
6  are many documents that I considered.  So it's
7  possible that I did and I just -- I don't recall.
8      Q.   You don't recall reviewing any of these; is
9  that right?
10          MR. LAVINE:  Object to form.
11     A.   These being Medicaid Pharmacy Bulletins?
12     Q.   Correct.
13     A.   I don't recall reading a publication titled
14 Medicaid Pharmacy Bulletin.
15     Q.   I would highly suggest that you become
16 familiar with these documents.
17          MR. LAVINE:  Object to form.
18     Q.   If you would go to the page ending 426.
19     A.   You know, I should also note that it seems
20 plausible to me that Myers & Stauffer would have
21 reviewed these documents.  Possibly.  So I'm not
22 speaking for them, obviously.

21 (Pages 299 to 302)

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 303

1    Q.   At the bottom right is a section titled
2  "Ohio has experienced problems in determining
3  providers' acquisition costs."  Do you see that?
4    A.   I do.
5    Q.   Again, this is dated January/February 1990.
6  The second sentence notes "The program recognizes the
7  compounding services which were sometimes necessary in
8  the preparation of an IV drug and compensates
9  pharmacists $20 per hour for these services."  The
10  next sentence states "The average time it takes to
11  compound is 12 minutes or $4 per bag."  Do you see
12  that?
13        MR. LAVINE:  Object to form.
14    A.   I see that, yes.
15    Q.   Does it appear that at least as early as
16  1990 Ohio was paying a separate compounding fee for IV
17  drugs?
18        MR. LAVINE:  Object to form.
19    A.   I would need to read -- in many cases it
20  appears this -- if this is accurate, in some cases it
21  appears this was true in early 1990.
22    Q.   Do you have any reason to believe it's not

Page 304

1  accurate?
2        MS. THOMAS:  Objection.
3        MR. LAVINE:  Objection.
4    A.   I just -- it's hard to say.  Having not --
5  because I don't recall this specific document, you
6  know, I haven't drilled down more to see if in general
7  this is -- the information here is accurate.  But --
8  who publishes this?
9    Q.   424.  There's a chart there that sets forth
10  some information, also including who's on the advisory
11  panel.
12    A.   Okay.
13    Q.   Now, the Myers & Stauffer state summary for
14  Ohio does not indicate that they talked to anyone from
15  the state of Ohio pharmacy department, is that right,
16  unlike many of the other states?
17        MR. LAVINE:  Object to form.
18    A.   The version that is being provided to me
19  here does not indicate a discussion.  That's correct.
20  But with the caveat that I'm not sure this is the
21  final version they produced.
22    Q.   And if you recall there was a note in your

Page 305

1  notes, handwritten notes, that we marked as Abbott
2  Exhibit 1101 that indicated next to Ohio in a paren
3  "compounded drugs."  Is that right?
4    A.   Which page is this?
5    Q.   294.
6    A.   So you're regular to the part next to Ohio?
7    Q.   Mm-hmm.
8    A.   Yes.  In parentheses "compound drugs."
9  Correct.
10    Q.   Do you know if the claims at issue in this
11  case from the state of Ohio were paid a dispensing fee
12  for compounded drugs?
13    A.   I would want to go back and look before
14  answering that definitively.  I can't recall here
15  whether that is true and whether it was true
16  frequently.  And so it's something that I would want
17  to drill down on more.
18    Q.   If a state like Ohio did have a higher
19  dispensing fee for compounded drugs and it impacted
20  the drugs in this case, would that affect your
21  analysis on whether to endogenize the dispensing fee
22  variable in your analysis?

Page 306

1        MR. LAVINE:  Object to form.
2    A.   Could you start over with that question?
3    Q.   I can't do it again.  That was pretty good.
4    A.   It was good.  I want to do justice to the
5  question.
6    Q.   I even pronounced endogenized correct.
7    A.   That's right.  That's good.
8        (Whereupon, the requested portion was read
9  by the reporter.)
10        MR. LAVINE:  Object to form.
11    A.   I'm not sure.  That's not enough
12  information for me to -- I would need more information
13  to make a -- to determine that.
14    Q.   It raises some questions, though, correct?
15        MR. LAVINE:  Object to form.
16    A.   I would want to go back to the claims to
17  see if it is an important, relevant issue for the
18  claims at issue that I considered in this case.  I'm
19  always open to considering more information.  But I
20  would want to look at the data, the claims and my
21  programs and other materials that I considered.
22    Q.   So it does raise some questions?

22  (Pages 303 to 306)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 307

1         MR. LAVINE: Object to form.
2     A.   I think -- I'll just simply say that I'm
3   always open to additional information.  As an
4   economist who prides myself on producing research that
5   is as accurate -- that is accurate, I'm always open to
6   new information.  But I wouldn't say based on this
7   here, this paragraph from a 1990 publication and an
8   e-mail from a gentleman in early 2002, I'm always open
9   to considering more things if it is shown to me that
10  that's -- I'm always open to considering more
11  information.
12    Q.   Well, let's look at some more information.
13             (Exhibit Abbott 1107 was
14             marked for identification.)
15         BY MR. TORBORG:
16    Q.   Dr. Duggan, Abbott Exhibit 1107 is an
17  excerpt from the deposition of an individual named
18  Cody Wiberg that was taken in this case on March 14th
19  2008.  In particular I've handed you a cover page and
20  pages 170 through 173.  Do you know who Mr. Wiberg is?
21    A.   The name sounds familiar, but I can't
22  recall.

Page 308

1     Q.   Do you know why it sounds familiar?
2     A.   No, I don't.  So I may not be -- I may be
3   confusing him with someone else.
4     Q.   Do you recall reviewing the transcript of
5   Mr. Wiberg?
6     A.   I do not recall, but it's possible that I
7   did review it.
8     Q.   But you don't recall reviewing it as you
9   sit here today; is that fair to say?
10    A.   Right.  I don't recall reviewing these four
11  pages of this document.
12    Q.   Do you recall reviewing any of his
13  testimony?
14         MR. LAVINE: Objection to form.
15    A.   Well, not having seen the other testimony,
16  the other pages of it, it's hard.  But I don't
17  specifically recall reviewing a March 14th 2008 -- I
18  don't recall reviewing it.  But it may be that if I
19  were to see the entire deposition that I would recall.
20  I'm not sure.
21    Q.   Mr. Wiberg was the pharmacy director for
22  the state of Minnesota for a time relevant to your

Page 309

1   analysis.  I'd like you to go to page 172, the third
2   line.  I'd like to read some of Mr. Wiberg's
3   testimony, if you would follow along.
4         He testified "We know AWP 'ain't what's
5   paid.'  But if we move towards more transparency and
6   we get closer to reimbursing on the ingredient side at
7   what providers actually pay, then we have to look at
8   the dispensing fee side in the case of pharmacies,
9   because we've always kept that below what we think the
10  true cost of dispensing is to make up for the fact
11  there is some money being made on the ingredient side.
12        "So to the extent, again, that you start
13  paying people a dispensing fee or a total
14  reimbursement that does not even get back the cost of
15  the drugs, plus the cost of labor and the computer
16  systems and the lights and all that, you could have
17  providers stop -- you know, start dropping out of
18  Medicaid.  And then this creates an access issue for
19  very poor people."
20        Do you see that?
21        MR. LAVINE: Object to form.
22    A.   I see it.

Page 310

1     Q.   Do you recall reviewing that testimony?
2         MR. LAVINE: Object to form.
3     A.   I don't recall that specific -- that part
4   that you read there, no.
5     Q.   Now, the analysis that you do calculates a
6   difference that would have resulted if state Medicaid
7   programs like Minnesota paid at the amount providers
8   actually paid for the drug; is that right?
9         MR. LAVINE: Object to form if they paid --
10  I'm sorry.  Could you just state it again?
11        MR. TORBORG: I'm sorry.
12        THE WITNESS: Would you read it back?  I'm
13  sorry, Jon.
14        (Whereupon, the requested portion was read
15  by the reporter.)
16        MR. LAVINE: Object to form.
17    A.   Actually, my analysis -- the analysis that
18  I describe in my report does something different from
19  that, as I outline in the report.  And so there's many
20  details to the methodology that I employ to calculate
21  this value of difference on a claim-by-claim basis.
22  And so, as I mentioned earlier, there are a number of

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 311

1   ways in which I am conservative in calculating these
2   alternative, for example, AWPs.  And so I don't agree
3   with at least part of that statement.
4        Q.   Well, didn't you find, Dr. Duggan, that
5   using -- even assuming your conservative methods, that
6   there's not much difference between the various
7   classes of trade and the various percentiles?
8        A.   It depends, I would say.  On average, if I
9   recall correctly, pharmacies paid for the complaint
10  products at issue in this case, 25 to 30 percent more
11  than for example hospitals.  And once again I would
12  want to go back.  I'm not looking at the report right
13  now.  But that is an average.  And so there might be
14  some heterogeneity on that one dimension.  And there
15  are others as well.
16       Q.   You would agree with me, though, that your
17  difference calculation, if applied retroactively,
18  would be getting closer to what providers were
19  actually paying for the drug?
20       MR. LAVINE:  Object to form.
21       A.   In most cases that is true.  Not in every.
22       Q.   So if a state Medicaid program like

Page 312

1   Minnesota used your prices, they would be getting
2   closer to what providers actually pay, correct?
3        MR. LAVINE:  Object to form.
4        MS. THOMAS:  Objection.
5        A.   Once again, it depends.  In general -- more
6   often than not that statement is true.
7        Q.   And Mr. Wiberg says if you get closer to
8   reimbursing on the ingredient side to what providers
9   actually pay, then you have to look at the dispensing
10  fee side in the case of pharmacies because they've
11  always kept that below what the true cost of
12  dispensing is, right?  And then he goes on.
13       MS. THOMAS:  Objection.
14       A.   That's what he says here, this gentleman,
15  Mr. Wiberg, from Minnesota.  I'm not sure on what
16  basis he is saying that, but that's what he stated.
17       Q.   And your analysis does not look at the
18  dispensing fee side, does it?
19       MR. LAVINE:  Object to form.
20       A.   My analysis certainly considers dispensing
21  fees pretty much for every claim.
22       Q.   But that's not what I mean.

Page 313

1        MR. LAVINE:  David, he was in the middle of
2   answering your question and you just didn't like his
3   answer.
4        MR. TORBORG:  No.  He's not answering my
5   question and you know it.
6        MR. LAVINE:  Yes, he did.  He told you
7   exactly what you wanted to know.
8        MR. TORBORG:  He's talking about how he
9   dealt with dispensing fees in his algorithm.  He's not
10  answering my question.
11       MR. LAVINE:  You asked him about dispensing
12  fees and he answered and explained how dispensing fees
13  were addressed in his report.  You have to let him
14  finish.
15       MR. TORBORG:  I'll let him finish and then
16  I'll clarify.
17       A.   I was just basically just saying that I do
18  consider dispensing fees in carrying out my analyses
19  to calculate the value of difference.
20       BY MR. TORBORG:
21       Q.   You do not consider the issue that Mr.
22  Wiberg is testifying about here, though, that if you

Page 314

1   decrease reimbursement from the ingredient side you
2   may have to make up for it on the dispensing fee side,
3   correct?
4        MR. LAVINE:  Object to form.
5        A.   As I believe I mentioned earlier, I
6   considered this issue and did -- carried out the
7   analyses that I described.  I did not -- so I think I
8   was aware of this issue and for the reasons that I
9   mentioned earlier I carried out the analyses as I did.
10       Q.   Without increasing dispensing fees,
11  correct, in your analysis?
12       A.   My analysis does not -- my analysis does
13  not vary -- so my analysis varies the AWP, the WAC,
14  the direct price and so forth.  It does not vary the
15  dispensing fee.  That is correct.
16       Q.   Can you point me anywhere in the report
17  where you discuss your consideration of whether or not
18  there should be an increase in the dispensing fee if
19  there's a decrease in the ingredient cost?
20       MS. THOMAS:  I'm sorry.  Can you read back
21  that question?
22       (Whereupon, the requested portion was read

24  (Pages 311 to 314)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 315

1  by the reporter.)
2        MS. THOMAS:  Objection to form.
3     A.   I just want to have my report in front of
4  me.
5        So I don't recall anywhere -- I don't
6  recall where -- I don't recall specifically mentioning
7  this issue in my report.  It could be that I do
8  somewhere in the 127 pages of text.  I don't recall
9  doing it.  But I think my -- I try in the description
10  of my analysis to be very transparent about what I'm
11  doing.  All else equal, what would state Medicaid
12  agencies -- state Medicaid agencies have paid.
13     Q.   Here's my follow-up to that.  You said you
14  tried to be very transparent with what you did,
15  correct?
16     A.   Yes.  That's correct.
17     Q.   And you've given some testimony that you
18  considered whether or not to vary the dispensing fee
19  side of the equation, correct?
20     A.   Correct.
21     Q.   And since you're being transparent in your
22  report I'd like to know where in your report you

Page 316

1  indicate that you made that consideration.
2     A.   I would say that being transparent about my
3  assumptions that I'm basically -- there are many
4  factors one considers when carrying out the best
5  research study possible.  Not all of them necessarily
6  make their way into the text.  But, you know, often in
7  presenting my own research I'll be asked in a seminar
8  what about this issue.  And just because it doesn't
9  appear in my text does not imply that I did not
10  consider it.
11        So I think my summary of what I've done
12  accurately reflects the assumptions that I made and so
13  forth.
14     Q.   In the analysis -- in the difference
15  calculation that you did it's fair to say very
16  detailed, correct?  It's supported by pages and pages
17  of tables, probably thousands of different
18  calculations, correct?
19        MR. LAVINE:  Object to form.
20     A.   I would say the report provides what I
21  believe was the appropriate amount of detail regarding
22  my use of the algorithm, its implementation in the

Page 317

1  data and so forth.
2     Q.   And you set forth when it came to that
3  calculation of difference every step along the way
4  that you took so that the reader of your report can
5  see exactly what you did and why you did it, correct?
6        MS. THOMAS:  Objection.
7     A.   The goal of my report is to accurately
8  summarize the analyses that I conducted and the
9  assumptions that underlie them.  I guess I'm -- and I
10  certainly try to make my analysis as accessible as
11  possible to the court and others who might have an
12  interest in the case, in the litigation.
13     Q.   But when it comes to your consideration of
14  whether to vary the dispensing fee there is not a
15  sentence in your report or a table to your report that
16  shows what you did in that consideration; is that fair
17  to say?
18        MR. LAVINE:  Object to form.
19     A.   As I said earlier, I'm not sure if in the
20  127 pages of text I mentioned the issue.  I don't
21  recall a specific table about this issue.  But I don't
22  recall anything in the report that drills down to

Page 318

1  that.
2     Q.   So when it came to that issue, which you
3  acknowledge that you were aware of, there's nothing in
4  your report that addresses it; fair to say?
5        MS. THOMAS:  Objection.
6        MR. LAVINE:  Object to form.
7     A.   I'm not sure of that.  I would need to go
8  back and look at the entire report.  I wrote much of
9  this quite a while ago.  And I think that I am
10  transparent about the assumptions that I've made.  And
11  I believe that the analysis -- the analyses summarized
12  in my report -- I'm just not sure.  I would need to
13  read over the document again to see.  But I don't
14  recall a specific part where I talk about the issue of
15  varying dispensing fees.
16              (Exhibit Abbott 1108 was
17              marked for identification.)
18        BY MR. TORBORG:
19     Q.   For the record, I've marked as Abbott
20  Exhibit 1108 an excerpt from the deposition of Susan
21  McCann taken in a state litigation related with AWP.
22  In particular I've handed you pages 473 through 480.

25  (Pages 315 to 318)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 319

1       Dr. Duggan, do you know who Susan McCann
2  is?
3       A.   I don't recall off the top of my head, no.
4       Q.   Do you recall reviewing a deposition
5  transcript from her deposition?
6            MR. LAVINE:  Object to form.
7       A.   I do not recall reviewing this -- at least
8  the pages listed here, provided here.
9       Q.   If I could ask you to read to yourself the
10 testimony that starts at page 476, line 3 --
11 actually -- I'm sorry -- 475, line 24, through 479,
12 line 16.
13      A.   So about five pages?
14      Q.   Yes.
15      A.   Okay.  That might take a minute.
16 (Reading.)
17           Okay.  So I've read through the bottom of
18 479.  Correct?  Is that --
19      Q.   Yes.
20           Do you recall reviewing that particular
21 testimony in your work in this case?
22           MR. LAVINE:  Object to form.

Page 320

1       A.   I do not.
2       Q.   Is it fair to say that in this portion of
3  the transcript Ms. McCann, who I'll represent to you
4  was the pharmaceutical consultant for the state of
5  Missouri throughout the time period of your analysis,
6  is stating in her view the dispensing fee paid by
7  Missouri was inadequate?
8            MR. LAVINE:  Object to form.
9       A.   That is right.  She says it was too low.
10      Q.   She says it was too low, right?
11      A.   Right.
12           MR. LAVINE:  Object to form.
13      Q.   And then on 479 line 6 there was a question
14 from counsel "But is it your belief and your
15 understanding as the pharmacist working at Missouri
16 Medicaid that Missouri Medicaid knew it was paying a
17 higher ingredient cost reimbursement than acquisition
18 cost in order to compensate for a dispensing fee that
19 was lower than what it otherwise thought it should
20 have been?"
21           Then there's an objection.
22           "Answer:  That was my understanding."

Page 321

1       Do you see that?
2            MR. LAVINE:  Object to form.
3       A.   I see that paragraph and her answer, yes.
4       Q.   Now, the difference that you calculate in
5  this case would seek to recoup some of that amount
6  that Missouri Medicaid was paying to compensate for an
7  inadequate dispensing fee, correct?
8            MR. LAVINE:  Objection to form.
9            MS. THOMAS:  Objection.
10      A.   Of course there's going to be a lot of
11 heterogeneity across products with different AWPs,
12 with different costs of dispensing and so forth.  And
13 so it's a complicated issue that I'd be -- I think it
14 would be -- it is a complicated issue because there
15 are 25,000 different NDCs all with very different
16 AWPs.  So it's just -- this is a complicated issue.
17           I guess perhaps she was saying something
18 that she believed was true on average.  I'm not sure,
19 though, what her beliefs are based on.  And so it's
20 just hard for me to -- perhaps you can restate the
21 question.  I'm not sure if --
22      Q.   Is your analysis calculating a difference

Page 322

1  seeking to recover some portion of ingredient cost
2  reimbursement that Missouri was using to compensate
3  for an insufficient dispensing fee?
4            MR. LAVINE:  Objection to form.
5            MS. THOMAS:  Objection.
6       A.   I'm not sure of what exactly Missouri
7  Medicaid was trying to do.  It could be that Missouri
8  Medicaid thought that AWP was 125 percent of actual
9  prices and as a result was paying 90 instead of 80
10 percent of AWP.  I'm just not sure without more -- and
11 so it's just hard to answer that because what they
12 have in mind, or what this person has in mind -- I'm
13 not sure of what exactly this person has in mind.
14           If this person is talking about cases in
15 which the AWP is the sort of 20 to 25 percent above
16 that we talked about yesterday, or if there's
17 something different, I'm just not sure.  So I'm not
18 sure what forms the basis for her statements.
19      Q.   Well, if we believe what she says here --
20 and she was there at the time -- she was asked if --
21      A.   She was a consultant; is that right?  She
22 was a consultant?

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 323

1    Q.   Yes.
2    A.   Okay.
3    Q.   She was asked if Missouri Medicaid knew it
4  was paying a higher ingredient cost reimbursement than
5  acquisition cost in order to compensate for a
6  dispensing fee that was otherwise lower than what it
7  otherwise thought it should have been.  I may have
8  said it wrong.  Let's try it again.  I didn't read
9  very well.
10       Missouri Medicaid -- if we believe what she
11 was saying -- and she was there at the time -- she
12 testified that Missouri Medicaid knew it was paying a
13 higher ingredient cost reimbursement than acquisition
14 cost in order to compensate for a dispensing fee that
15 was lower than it otherwise thought it should have
16 been?  If we take that as true, isn't it the case, Dr.
17 Duggan, that your analysis is seeking to recover in
18 this case some of that ingredient cost reimbursement
19 that Missouri was using to compensate for insufficient
20 dispensing fee?
21       MR. LAVINE:  Object to form.
22    A.   I don't agree with that.  Once again, it's

Page 324

1  difficult for me to get into the heads of Missouri
2  Medicaid.
3    Q.   I'm not asking you to get into their heads.
4       MR. LAVINE:  David, you have to let him
5  finish.
6    A.   I guess I would like to finish my answer.
7       So it's difficult for me to get into the
8  heads of the Missouri Medicaid program, or I guess the
9  officials that administer and affect parameters of the
10 program.  It's difficult for me to know what exactly
11 Ms. Adams is -- what her statements are based on.  As
12 I said earlier, it could be that her understanding --
13 maybe she hasn't looked at transaction prices and
14 claims and so forth.  Perhaps she's thinking that AWP
15 is modestly different, 20 to 25 percent different, and
16 that's what she has in mind when she's talking about
17 this.
18       It's just hard to say.  And it's hard for
19 me -- so I wouldn't agree that I necessarily am trying
20 to recoup what she is describing here.
21    Q.   But you might be attempting to recoup some
22 or all of it?

Page 325

1       MR. LAVINE:  Object to form.
2    Q.   Not you, but the United States using your
3  analysis.
4       MR. LAVINE:  Object to form.
5    A.   I just wouldn't agree with that.  It's not
6  clear -- I'm not sure if Ms. Adams here is talking
7  about the 44 products that are at issue in this case.
8  Probably not.  Is she making a general statement about
9  the 25,000 NDCs that Missouri pays for in a typical
10 quarter, 20,000 maybe NDCs, or is she -- I just --
11 without more information it's hard for me to know what
12 forms the basis for her statements.
13    Q.   Do you see anything in this testimony
14 indicating that she was talking about any particular
15 drugs?
16       MR. LAVINE:  Object to form.
17    A.   Well, there are -- these are eight pages
18 taken from --
19    Q.   I'm asking you about this --
20    A.   On the four pages that I read --
21    Q.   Yes.
22    A.   -- I don't see anything about specific

Page 326

1  products.
2    Q.   Do you see her exempting from her answer
3  the 44 NDCs at issue in the United States case against
4  Abbott?
5       MR. LAVINE:  Object to form.
6    A.   No, no.  As I said, her statement could
7  simply reflect -- perhaps her sense was similar to
8  what Fiona Scott Morton and I sort of had the sense in
9  our early research on the Medicaid program, that there
10 might be a disparity of 20 to 25 percent of the AWP
11 above the actual -- and it could be that she's just
12 multiplying whatever Missouri's scaling factor is.
13 Perhaps it's 1 by 1.2 or 1.25.
14       And perhaps this issue of a different
15 discrepancy between actual prices and published prices
16 is not something that's on her radar screen.  You
17 know, it's just hard for me to know what forms the
18 basis of her opinions.
19    Q.   You've seen evidence in this case, have you
20 not, Dr. Duggan, that state pharmacy officials, CMS
21 and Congress knew that there was larger differences or
22 markups between acquisition cost and reported prices

                                   27 (Pages 323 to 326)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                          July 15, 2008

Page 327

1  for generic products than brand name drugs, have you
2  not?
3        MR. LAVINE: Object to form.
4     Q.   You've reviewed the OIG reports on that, I
5  assume.
6        MS. THOMAS: Objection.
7     A.   I am familiar with some documents written
8  by individuals at OIG and perhaps other agencies as
9  well which for a subset of drugs identifies
10 differences on average for whatever drugs they're
11 considering in terms of the difference between actual
12 and published prices. So I'm familiar with some of
13 that, some of those publications, sure.
14            (Exhibit Abbott 1109 was
15            marked for identification.)
16       BY MR. TORBORG:
17    Q.   For the record, what I've marked as Exhibit
18 1109 is a September 18, 1986 memo from HCFA Region VI
19 Dallas to the director bureau of eligibility of
20 reimbursement and coverage. And the first
21 statement -- the first line in the document states "We
22 are submitting the following comments regarding the

Page 328

1  proposed rule on limits on payment for drugs."
2     Dr. Duggan, have you reviewed this document
3  before?
4     A.   I don't recall based on a quick glance.
5  But it's possible that it is something that I
6  reviewed.
7     Q.   Let me ask you some specific questions and
8  see if it refreshes your recollection. Under the
9  pharmacist incentive program on the first page there's
10 a number 1 there. It states "Reimbursement will
11 continue to be based on the average wholesale price
12 even though the lowest AWP is utilized." The next
13 sentence states "Depending on the drug the AWP is
14 highly inflated above what the drug actually costs the
15 pharmacist. This is especially true for generic
16 drugs."
17       Were you familiar, Dr. Duggan, with the
18 fact that as early as 1986, if not earlier, HCFA was
19 aware that AWP was highly inflated above what the drug
20 actually costs the pharmacist, and this was
21 particularly true for generic drugs?
22       MR. LAVINE: Object to form.

Page 329

1     A.   So this is -- I'm not sure who the person
2  is who drafted this document. But it appears that
3  this person believed there was a discrepancy between
4  the AWP and what the drug costs. Now, I'm not sure of
5  what this person's definition of highly inflated is.
6     Q.   Well, the person is J.D. Sconce, who was a
7  regional administrator of HCFA, as you can see on the
8  last page of the document. And some clues as to your
9  questions that you just posed can be found on the next
10 page under competitive incentive program, paragraph 5.
11       It states "The mandatory discount of 25
12 percent off the retail price of brand name drugs for
13 reimbursement of multi-source drugs is insufficient.
14 Data exists which reveal that generic drugs are marked
15 up anywhere from 25 to 150 percent."
16       In the next paragraph he states "The
17 article states that markups on both brand name and
18 generic drugs are similar. This is not true. As
19 stated above, reviews have shown that markups on these
20 drugs vary drastically."
21       Were you aware, Dr. Duggan, that HCFA was
22 aware of the information that I just read?

Page 330

1        MR. LAVINE: Object to form.
2     A.   So I was certainly aware that certain
3  individuals at government agencies were aware of the
4  issue of discrepancies between actual and reported
5  prices. I guess I hesitate to say this person speaks
6  for HCFA. This is one regional administrator
7  written -- and so -- and I'm not sure what data this
8  person is basing their analyses on. So it appears
9  this person was aware of what they've written.
10       So I can really -- I can't speculate much
11 more beyond this particular person, nor do I know on
12 what basis this person came to the conclusions
13 indicated there.
14    Q.   Back to Missouri, the testimony --
15    A.   Just one thing. At some point if we can --
16 I don't know -- do a lunch or -- that would be great.
17    Q.   Why don't I finish my questions on Missouri
18 and we'll do that?
19    A.   Okay. Sounds great.
20    Q.   Unless you need to go right now.
21    A.   No.
22    Q.   The testimony that we looked at from Susan

28 (Pages 327 to 330)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                              July 15, 2008

Page 331

1   McCann of Missouri suggests that Missouri was cross-
2   subsidizing what they felt to be inadequate dispensing
3   fees with a margin on ingredient cost.
4           MS. THOMAS:  Objection.
5           MR. LAVINE:  Objection.
6       A.   So once again, I'm not sure that this
7   person who was a consultant --
8           MS. THOMAS:  I'm sorry.  Was there a
9   question asked?
10          MR. TORBORG:  Yes.
11          THE WITNESS:  Can you restate the question?
12  I'm sorry.
13          (Whereupon, the requested portion was read
14  by the reporter.)
15          MR. TORBORG:  I think I added "does," but
16  that's fine.  I'll add "does" to the beginning of that
17  so we have a question.
18          THE WITNESS:  I'm sorry.  So could we --
19          (Whereupon, the requested portion was read
20  by the reporter.)
21          MS. THOMAS:  Objection.
22          MR. LAVINE:  Objection.

Page 332

1       A.   So once again, I'm not sure that Ms. Adams
2   speaks for --
3       Q.   It's Ms. McCann.
4       A.   I'm sorry.
5           Ms. McCann speaks for Missouri Medicaid.
6   She's apparently a consultant to the state Medicaid
7   program.  Furthermore, I'm not sure what she's
8   referring to here with this statement about ingredient
9   cost reimbursement versus acquisition cost.  Without
10  more information about what precisely she's basing
11  this statement on, it's difficult for me to speculate.
12          As I said in the example earlier, it is
13  possible that what she has in mind is the discrepancy
14  between 125 percent of actual prices and actual
15  prices.  That's just -- it's hard to speculate without
16  more information about what she's -- what forms the
17  basis for this.
18      Q.   Do you have an understanding of what the
19  term "ingredient cost reimbursement" means?
20      A.   Yes.  I believe so.
21      Q.   What is your understanding of what it
22  means?

Page 333

1       A.   I would defer, I guess, to a plain -- it's
2   going to -- I guess it's going to vary to some extent
3   from one state to another because each state may use
4   it somewhat differently.  But I have a general sense
5   that it represents reimbursement for the cost of
6   acquiring the ingredient in a prescription that's
7   dispensed.
8       Q.   And Ms. McCann is testifying to her
9   understanding that Missouri was paying a higher cost
10  for the ingredients in order to compensate for a
11  dispensing fee that was lower than it otherwise should
12  have been.
13          MR. LAVINE:  Object to form.
14      Q.   That's her understanding.  I'm not saying
15  she speaks for Missouri.
16          MR. LAVINE:  Object to form.
17      Q.   Do you agree that's what she's testifying
18  to?
19          MR. LAVINE:  Object to form.
20      A.   It seems that her understanding is that
21  there is a difference between ingredient cost
22  reimbursement and the acquisition cost.  But as -- you

Page 334

1   know, looking here at the Missouri Medicaid
2   adjudication formula I see that during some periods
3   the AWP was used or AWP minus approximately 10
4   percent.  And so it could be that what she has in mind
5   is the discrepancy of 20 to 25 percent above actual
6   prices that I sort of have referred to earlier.
7           And so if you multiply 1.2 P times .9 you
8   get 1.08 P, which would be different from P where P
9   here represents the price of acquiring the drug.  So
10  it could be that she's simply referring to that, that
11  AWP minus 10 percent does not fully offset typical
12  discrepancy that she understands to exist, let's say,
13  AWP and the actual average price.
14      Q.   Your analysis would, if applied to the time
15  period in question, result in lower ingredient cost
16  reimbursement, correct?
17      A.   When you say the time period in question,
18  do you mean 1991 to 2001?
19      Q.   (Nods head).
20      A.   In some cases that is true.
21      Q.   And you calculated that across all states
22  using the analysis that you used the federal share of

29  (Pages 331 to 334)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 335

1    that would be about $108 million; is that right?
2        A.   I determined that I find that the amount
3    is -- I think it's $108.2 million.  But as -- there's
4    quite a lot of information that goes along with that,
5    for example, as I mentioned I don't consider J code
6    Medicaid claims and related claims of that nature.  I
7    don't consider certain products in certain time
8    periods in certain states and so forth.  And for
9    various reasons that I outline in my report I believe
10   that is a conservative estimate of the effect on
11   federal government expenditures for the 44 products at
12   issue during the eleven year period.
13       Q.   Your analysis as applied to the time period
14   in question removes most if not all of the margin that
15   states were paying on ingredient cost reimbursement,
16   correct, for the drugs that -- obviously limited to
17   the drugs that you studied?  Excepting some of the
18   outliers like California where you didn't do analysis
19   for some of the years.
20            MR. LAVINE:  Object to the form.
21            MS. THOMAS:  Objection.
22       A.   Can you restate the question?

Page 336

1        Q.   Your analysis as applied to the time period
2    in question removes much if not all of the margin that
3    states were paying on ingredient cost reimbursement
4    for the drugs at issue -- for the NDCs at issue in
5    this case, correct?
6            MR. LAVINE:  Object to form?
7        Q.   Exempting the J codes that you have cited,
8    the California period where it didn't calculate
9    differences.
10       A.   So as outlined in my report for various
11   states, there are a number of factors that go into the
12   adjudication of each claim.  Typically the ingredient
13   cost is one such number.  And in most cases replacing
14   the AWP with, let's say, 125 percent of the average
15   pharmacy indirect price, as I do, will affect
16   expenditures through that component.  So there are
17   other components as well which can be effective.  But
18   much of the effect is on the ingredient cost
19   reimbursement.
20       Q.   And the testimony of Ms. McCann from
21   Missouri was that Missouri was using that margin on
22   ingredient cost to subsidize an insufficient

Page 337

1    dispensing fee, correct?
2            MR. LAVINE:  Object to form.
3        A.   So I guess here there are again two issues.
4    I'm not sure that she knows what Missouri Medicaid was
5    trying to document and even if she did it is possible
6    that -- and, you know, Missouri Medicaid represents --
7    there are many people who work at Missouri Medicaid
8    agency.  There are policymakers and so forth.  And
9    even if she did it could be that what she has in mind
10   here is this disparity that emerges when one deflates
11   the AWP by 10 percent if one believes that the AWP is
12   scaled up by 20 or 25 percent.
13            So I just -- I think there's a lot that is
14   unclear here.
15       Q.   And have you sought to get clarification
16   from the state of Missouri on this issue answering
17   some of the questions that you raised?
18            MR. LAVINE:  Object to form.
19       A.   At my direction Myers & Stauffer certainly
20   talked with people in the Missouri Medicaid office.
21   The -- I'm just getting a little bit tired so if we
22   can break for lunch pretty soon I would appreciate it.

Page 338

1            So -- can you just restate the question?
2        Q.   I see from the Missouri summary that Myers
3    & Stauffer prepared that they had -- they had
4    apparently received some data from an Amy Wood and
5    others within the Missouri Division of Medical
6    Assistance?
7        A.   Right.  I think we're looking at the same
8    document.
9        Q.   And my question is did you ask Myers &
10   Stauffer to inquire about whether they wanted to
11   subsidize insufficient dispensing fees with margins on
12   ingredient cost, or did you simply ask them to limit
13   their discussion on the reimbursement methodology?
14            MR. LAVINE:  Object to form.
15       A.   Once again, I directed them to acquire
16   information that would be useful in understanding the
17   adjudication of claims.  Whether certain officials at
18   Missouri Medicaid in 2008 can -- I didn't ask Myers &
19   Stauffer in its 2008 conversation to figure out what
20   was in the minds of Medicaid officials and other
21   individuals who influenced the program during the
22   eleven year period of interest.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 339

1    Q.   Why not?
2         MR. LAVINE:  Object to form.
3    Q.   In short, why were you only concerned about
4    the reimbursement methodology mechanics and not
5    concerned about the policy issues underlying the
6    dispensing fee issue?
7         MS. THOMAS:  Objection.
8    A.   Once again, I would say that I considered,
9    for example, the dispensing fee issue and I believe
10   that for the purpose of analyses that Myers &
11   Stauffer -- once again, I would need to go back and --
12   I'd really appreciate it if we could take at least a
13   bathroom break in a minute here.
14        MR. LAVINE:  Yeah, we really need to break
15   for lunch.
16   A.   I thought this was going to be --
17        So as I mentioned earlier, I certainly
18   considered the dispensing fee issue, for example.
19   Q.   One final question and I'll be done.  You
20   considered the dispensing fee issue, but you didn't
21   review Susan McCann's transcript and you didn't ask
22   Myers & Stauffer to ask the state officials who they

Page 340

1    talked with about the dispensing fee issue; fair to
2    say?
3         MS. THOMAS:  Objection.
4         MR. LAVINE:  Object to form.
5    A.   Can you restate?
6         (Whereupon, the requested portion was read
7    by the reporter.)
8    A.   So I think as I mentioned earlier I don't
9    recall examining this -- at least these eight pages of
10   the Susan McCann deposition testimony, nor do I
11   recall -- I had many conversations with folks at Myers
12   & Stauffer.  Do I recall specifically the context of
13   our Missouri Medicaid conversations?  So it's hard for
14   me to draw on that at this point.
15        MR. TORBORG:  Okay.  Let's take lunch.
16   Sorry to hold you.
17        THE VIDEOGRAPHER:  This is the end of tape
18   2.  Off the record at 12:47.
19        (Whereupon, at 12:47 p.m. a lunch recess
20   was taken.)
21
22

Page 341

1         A F T E R N O O N   S E S S I O N
2              (2:05 p.m.)
3              * * * * *
4    Whereupon,
5         MARK G. DUGGAN, PH.D.,
6    the witness testifying at the time of
7    recess, having been previously duly sworn,
8    was further examined and testified as
9    follows.
10             * * * * *
11   EXAMINATION RESUMED BY COUNSEL FOR ABBOTT LABORATORIES
12        THE VIDEOGRAPHER:  This is the beginning of
13   tape 3 in the deposition of Dr. Mark Duggan, volume 2.
14   On the record at 2:05.
15        BY MR. TORBORG:
16   Q.   Welcome back, Dr. Duggan.
17   A.   Thanks.
18   Q.   I'm going to hand you some pages from your
19   Texas deposition again.  In particular these will be
20   volume 2, pages 369 through 376.  I have highlighted
21   in pen and marked off in pen on the left side some
22   particular testimony, some on page 370 and some on

Page 342

1    page 373 through 374.  If you would read for me into
2    the record the bracketed portions of the testimony
3    that -- the testimony that I have bracketed.
4         MS. THOMAS:  What pages again?  I'm sorry.
5         MR. TORBORG:  One was 370 and the other was
6    373 through 374.
7         MR. LAVINE:  From day two?
8         MR. TORBORG:  Day two, unless it was a
9    really long day one.
10        MR. LAVINE:  I've broken 400 pages on a
11   deposition.
12        MR. TORBORG:  I have too.  It's tough.  A
13   very fast talking witness.
14   A.   So you want employee to read out lout the
15   two bracketed portions?
16        BY MR. TORBORG:
17   Q.   Yes, please.
18   A.   The question, I believe by Ms. Geisler,
19   "When you plugged the various prices that you
20   calculated into the Texas Medicaid reimbursement
21   formula, did you consider whether or not the
22   dispensing fee was adequate in that calculation?

31  (Pages 339 to 342)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                          July 15, 2008

Page 343

1        "Objection, form" by Mr. Winter, counsel
2    for Texas.
3        My response:  "Can you define adequate?"
4        By Ms. Geisler:  "Question:  Adequate to
5    cover the expenses of the provider."
6        Objection by Mr. Anderson, who I believe is
7    counsel for the relator.
8        The witness, myself:  "I did not consider
9    that issue."
10        On the next page, the next bracketed
11   section, "So did you consider whether or not Texas
12   Medicaid had to maintain ingredient costs at a
13   particular level in order to compensate for inadequate
14   dispensing fees?
15        "Objection, form" by Ms. Moore.
16        My response:  "So there's the dispensing
17   fee, the profit margin and the delivery fee that also
18   go into the calculation.  So there's -- you know,
19   there's a bunch of pieces to this calculation as I've
20   outlined.  But I did not for -- I don't think that's
21   relevant to what I was charged to do and what I think
22   is in my judgment relevant for this."

Page 344

1        Q.    If you could hand that back to me?
2        A.    Okay.  Sure.
3        Q.    Would it be fair to say, Dr. Duggan, that
4    in the Texas litigation you did not consider the
5    adequacy of the dispensing fees?
6        MS. THOMAS:  Objection to form.
7        A.    To -- so once again, can you -- I'm sorry.
8        Q.    Would that help?
9        (Mr. Torborg hands document to the
10   witness.)
11        A.    Okay.  Sorry.
12        Q.    Okay.
13        A.    "Adequate to cover the expenses of the
14   provider."  So that is -- I did not consider the
15   adequacy of dispensing fees in my Texas report.  That
16   is, I did not examine the adequacy of Texas dispensing
17   fees in my report.
18        Q.    Did you do anything additional on that
19   issue, the adequacy of dispensing fees, in your work
20   in this case from what you did in the Texas case?
21        A.    I believe the two sets of analyses, those
22   that underlie my Texas report and the ones that

Page 345

1    underlie my report in the federal case, are quite
2    similar in the sense that my algorithm holds constant
3    all other factors.  So the thrust of my analysis -- I
4    mean, the details vary somewhat from one case to the
5    other.  But the thrust of my analysis in Texas and
6    then again in the federal case is very much the same.
7        Q.    Did you consider in the Texas litigation
8    the issue of whether or not Texas needed to maintain a
9    margin in ingredient cost reimbursement to compensate
10   for inadequate dispensing fees?
11        MS. THOMAS:  Objection.
12        A.    So that was not one of the components to my
13   analysis.
14        Q.    And is there anything that you did in this
15   case to determine whether Medicare in the 50 Medicaid
16   states including the District of Columbia needed to
17   include a margin in ingredient costs to compensate for
18   inadequate dispensing fees?
19        MR. LAVINE:  Objection to form.
20        A.    So in terms of my analysis, the analyses in
21   my report, I held constant all other factors which, as
22   I mentioned I believe either earlier today or

Page 346

1    yesterday, is an accepted method for the research that
2    I have done and that others have done in the past.  In
3    working on this project I have been aware of the
4    dispensing fee issue, but that was not -- can you
5    restate the question?  I apologize.
6        (Whereupon, the requested portion was read
7    by the reporter.)
8        MR. LAVINE:  Objection to form.
9        A.    That's not something that I examined for my
10   analysis, in my analysis.
11        Q.    And did you conduct any analysis of the
12   adequacy of dispensing fees paid for the subject drugs
13   at issue in this case across the 50 states?
14        A.    No.  That was not the focus of my analysis.
15        Q.    Would you take out Exhibit 581 there?  Is
16   that in that binder?
17        A.    It goes to 579, it appears.
18        Q.    Okay.
19        MR. TORBORG:  Mark or Renee, would you help
20   him find 581 and 582?  It should be probably in the
21   last box in each set.
22        MS. BROOKER:  Sure.

32  (Pages 343 to 346)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 347

1    A.   581?
2        BY MR. TORBORG:
3    Q.   Yes, sir.  If you would take a look at that
4  document.
5    A.   Medicaid pharmacy actual acquisition costs?
6  Is that one?
7    Q.   Yeah.  For the record this is a document
8  that was produced from the files of OIG that contains
9  among other things the record of discussion of a
10  meeting held August 30th and 31st 1994 at the Radisson
11  Hotel, Richmond, Virginia, that included in its
12  attendance some people at OIG, HCFA and various
13  Medicaid pharmacy representatives.
14    A.   Okay.
15    Q.   Dr. Duggan, have you --
16        MR. LAVINE:  Just to clarify, I object to
17  your testimony about the document.  And just to
18  clarify also, it's pronounced Duggan.
19        MR. TORBORG:  What did I say?  Duggan
20  again?  My apologies.
21    A.   It happens a lot.
22        BY MR. TORBORG:

Page 348

1    Q.   Have you seen this document before?
2    A.   No.  To the best of my knowledge, I have
3  not.
4    Q.   Were you aware that there was a meeting
5  that included representatives of HCFA, OIG and
6  Medicaid pharmacy representatives in Richmond,
7  Virginia to discuss a project that OIG was undertaking
8  to compare invoice prices with AWP?
9    A.   It's possible that I heard something about
10  this.  But no, I don't believe that I'm -- certainly I
11  don't recall the existence of such a meeting.
12    Q.   If you would go to the second page of the
13  document, 202, under the section comments?
14    A.   Okay.
15    Q.   The document states "We informed the states
16  that they were one of twelve randomly selected states
17  to be used to develop a nationwide estimate of the
18  difference between invoice price of drugs and AWP.  We
19  stated that HCFA had requested us to perform this
20  review as the moratorium on pharmacy reimbursement
21  would expire on December 31, 1994."  Let me stop
22  there.

Page 349

1        Are you familiar with the moratorium that
2  Congress had put on changes to pharmacy reimbursement
3  as part of the Omnibus Budget Reconciliation Act of
4  1990?
5        MR. LAVINE:  Objection to form.
6    A.   I don't recall knowing of this moratorium.
7    Q.   Can I assume then that you have not
8  reviewed the CMS testimony regarding their
9  understanding of what Congress' intent was with that
10  moratorium?
11        MS. THOMAS:  Objection to the form.
12    A.   Yes, though with the caveat that it's
13  possible that this was referred to in some depositions
14  and so forth that I did -- or documents that I did
15  consider.  Just -- so yes with a caveat.
16    Q.   You calculate damages for the period
17  January 1, 1991 through December 31, 1994, correct,
18  for some states?
19        MS. THOMAS:  Objection to form.
20    A.   Just to follow up on language in my report,
21  I calculate the value of difference.  So I basically
22  perform a comparable set of empirical analyses for

Page 350

1  those four years as I do for the latter seven years.
2  Not identical because, for example, we talked about
3  California, the exclusion of California earlier.
4    Q.   And can I assume that you did not consider
5  the impact of the congressional moratorium on
6  decreases in pharmacy reimbursements in calculating
7  your difference?
8        MR. LAVINE:  Object to form.
9    A.   I'm not sure you can assume that in the
10  sense that it's possible that the effects of the
11  moratorium would be observable for example in the
12  claims data that I considered.  So that would be one
13  possibility.
14    Q.   But you don't recall thinking about this
15  issue of the moratorium and how it might impact your
16  analysis of what state Medicaid programs would have
17  paid had your alternative prices been implemented;
18  fair to say?
19        MR. LAVINE:  Objection to form.
20    A.   Yes.
21    Q.   Are you aware of the findings that OIG came
22  up with as a result of this twelve state survey?

33 (Pages 347 to 350)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 351

1         MS. THOMAS:  Objection.
2      A.  I'm not sure if this is -- so no.  No.
3  Well, I guess it doesn't lend itself to an easy yes or
4  no in that I am familiar with the results from some --
5  I believe what was one or more OIG surveys.  Whether
6  it is the same as this one, I don't recall.  Okay?
7      Q.  Did you analyze what the various states who
8  were involved in this survey did to change the
9  reimbursement methodologies after the OIG findings
10 were conveyed to them?
11        MR. LAVINE:  Objection to form.
12     A.  So to the extent that my analyses
13 incorporate what is my best understanding of the
14 adjudication algorithms used by each state, so to the
15 extent that anything led to an effect on Medicaid
16 reimbursement, I believe my analyses would account for
17 it.  Whether certain changes were attributable to this
18 meeting or the survey or so forth, I'm not sure.
19     Q.  But you didn't separately analyze the
20 question of what the states did in response to this,
21 to the findings in OIG's work, right?
22        MS. THOMAS:  Objection.

Page 352

1      A.  No.  I do not believe that I did.
2      Q.  Go to the next paragraph in the comments.
3  The document states "The state officials expressed
4  concern that our review was limited to one aspect of
5  pharmacy reimbursement.  They said that any effort to
6  lower the reimbursement for acquisition cost should
7  also include some review of dispensing fees."  Do you
8  see that?
9      Q.  Now, the analysis that you performed in
10 this case was focused on the ingredient cost aspect of
11 pharmacy reimbursement, correct, although you
12 considered what impact -- well, strike that.  Let me
13 stop before I edit it.  Let's start over.
14        The analysis that you did in this case was
15 focused on the ingredient aspect of pharmacy
16 reimbursement, correct?
17     A.  I think that fair to say.  Yes.
18     Q.  And as you stated earlier you did not
19 review the adequacy of dispensing fees, correct?
20     A.  No with a caveat.  Just that the adequacy
21 of dispensing fees isn't -- no.
22     Q.  If we could go to the next document, 582,

Page 353

1  the next tab in that binder there, Exhibit 582, this
2  is a similar document but for September 27th and 28th
3  1995.  Under the purpose it states "to discuss the
4  results of our nationwide review of the difference
5  between invoice price for drugs and AWP for Medicaid
6  pharmacy providers."
7        Look at the second paragraph under
8  comments.  It states "We reviewed a draft copy of a
9  state report.  The state officials believed that the
10 report should include the following disclaimer."  And
11 then it states "Our review was limited to ingredient
12 acquisition costs and did not address other areas such
13 as the effect of Medicaid business as a contribution
14 to other store sales, the cost to provide professional
15 services other than dispensing a prescription, such as
16 therapeutic interventions, patient education,
17 physician consultation, and the cost of dispensing,
18 which includes costs for computers, multipart labels,
19 containers, technical staff, transaction fees,
20 Medicaid-specific administrative costs and general
21 overhead.  We also did not take into consideration the
22 effect of federal upper limit amounts on generic drug

Page 354

1  reimbursements or usual and customary charge
2  limitations."
3        Dr. Duggan, is it fair to say that your
4  analysis in this case also did not include the effect
5  of Medicaid business as a contribution to other store
6  sales, costs to provide professional services other
7  than dispensing a prescription, such as therapeutic
8  interventions, patient education, physician
9  consultation and the cost of dispensing, which
10 includes costs for computers, multipart labels,
11 containers, technical staff, transaction fees,
12 Medicaid-specific administrative costs and general
13 overhead?
14        MR. LAVINE:  Object to form.
15     A.  These variables here were certainly not the
16 focus of my analysis.  So it is correct to state that,
17 though with the caveat that to some extent I believe
18 the issues are -- at least some of the issues are
19 incorporated to the extent for example -- so -- but
20 that they certainly were not the focus of my analysis,
21 which is an analysis of all else equal how much
22 different would federal government expenditures have

34  (Pages 351 to 354)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

<table>
<tr><td>

Page 355

1  been if the alternative AWPs and so forth had been
2  used.
3      Q.   Can you tell me how your analysis does
4  address the effect of Medicaid business as a
5  contribution to other store sales?
6      A.   I guess as I read it over it is -- I was --
7  what I had in mind was -- and now that I read it a
8  second time it's not exactly what I thought it was.
9  These variables were certainly not the focus of my
10 analysis.
11     Q.   Were they any part of your analysis?
12         MS. THOMAS:  Objection to form.
13     A.   There's obviously many things listed here.
14 But these are not factors that I examined in my
15 empirical analyses.
16     Q.   Flip the page.  The first paragraph states
17 "The state officials were concerned that without the
18 above disclaimer that uninformed state officials might
19 overreact to our report and adjust pharmacy
20 reimbursement without considering the other aspects of
21 reimbursement."  Do you see that?
22     A.   Yes.  I see that.

</td><td>

Page 357

1         MR. LAVINE:  Objection.
2      A.   Of course there are -- I believe that the
3  court and jurors and others with an interest in the
4  case should consider whatever factors they deem
5  relevant.  And I believe my report, and perhaps my
6  testimony, will represent one element of that.
7      Q.   You're not representing that the damages
8  analysis that you perform is the whole picture, are
9  you?
10         MS. THOMAS:  Objection.
11         MR. LAVINE:  Object to form.
12     A.   I believe that the analyses that are
13 summarized in my report are a very useful -- represent
14 a useful piece of information using a method that is
15 readily accepted in my profession of holding other
16 factors constant how different would spending by the
17 federal government be.
18         So it is -- will there be issues other than
19 my report that -- it's hard for me to speculate what
20 things -- what issues jurors, the court and others
21 with an interest in the case will deem relevant.
22     Q.   Do you think your report presents the whole

</td></tr>
<tr><td>

Page 356

1      Q.   Do you have an understanding of what
2  they're saying there?
3         MR. LAVINE:  Object to form.
4      A.   Yes.  I believe I do.
5      Q.   Are you concerned that the jurors in this
6  case might overreact to the findings contained in your
7  analysis about the difference between marketplace
8  prices and the reported prices in the compendia?
9         MR. LAVINE:  Object to form.
10     A.   I believe that my analysis provides
11 information -- the analyses summarized in my report
12 provide information that would be useful to the court
13 and others, perhaps jurors, with an interest in the
14 case.  And given that I've tried to be very clear
15 about my assumption of -- that I've tried to be very
16 clear about my assumptions, I feel confident in the --
17 I'm not concerned about the overreacting.
18     Q.   Do you believe that the jurors in this case
19 should consider the other aspects of reimbursement,
20 including costs to provide professional services,
21 costs of dispensing and other issues?
22         MS. THOMAS:  Objection.

</td><td>

Page 358

1  picture?
2         MS. THOMAS:  Objection.
3      A.   The whole picture to -- can you --
4      Q.   Do you think your analysis presents the
5  whole picture of how much, if at all, the Medicare and
6  Medicaid programs overpaid for the drugs at issue in
7  this case?
8         MS. THOMAS:  Objection.
9         MR. LAVINE:  Objection.
10     A.   I believe that it is a very important
11 element of that determination.  It is possible that
12 other factors would come into play as well for jurors,
13 the court and others with an interest in the case.
14 But I believe that my report accurately summarizes how
15 the expenditures by the programs would have differed
16 if, holding other factors constant, alternative AWPs
17 and so forth had been used.  So it just -- yeah.
18     Q.   Have you been following in your work, Dr.
19 Duggan, what's been going on in the Medicaid pharmacy
20 reimbursement field today?
21         MS. THOMAS:  Objection.
22     A.   To some extent yes, I have.  So for

</td></tr>
</table>

35 (Pages 355 to 358)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 359

1  example -- just as one example, for my work on part D,
2  Medicare part D, it turns out that a very large
3  fraction of spending, prescription drug spending, by
4  Medicaid is accounted for by Medicare recipients. And
5  so many of those recipients have been shifted into
6  Medicare part D plans.
7       If I remember correctly, the dual
8  eligibles, eligible for both Medicaid and Medicare,
9  account for a big share of Medicaid prescription drug
10 spending.  It did right before the introduction of
11 part D.  So a very large group of them have shifted
12 from Medicaid into Medicare prescription drug plans or
13 Medicare Advantage drug plans.  So that's certainly
14 been my view, one very important development in
15 Medicaid drug reimbursement.
16     Q.   Have you been following the controversy
17 regarding the base of the calculation of how to
18 calculate a new federal upper limit using AMP?
19          MR. LAVINE:  Objection to form.
20     A.   I have not followed that issue, that
21 discussion, closely.
22     Q.   Are you aware of the steps that various

Page 360

1  states have taken to increase dispensing fees in the
2  event that ingredient cost reimbursement is decreased
3  with the implementation of an AMP-based FUL?
4          MS. THOMAS:  Objection.
5          MR. LAVINE:  Objection, form.
6     A.   I am not aware of the specific discussions
7  on that issue.
8     Q.   Are you aware of anything generally?
9     A.   I would just mention that AMP represents --
10 it's my understanding that for example for the
11 products at issue in this case it would include many
12 sales, most of the sales, actually, that went into the
13 calculation would represent sales to hospitals -- in
14 terms of the retailers, would represent sales to
15 hospitals.
16         And I try to be -- and so were one to look
17 at just, let's say, average prices for all classes of
18 trade that would be on average lower than the price
19 for pharmacies.  So that's the -- I think there's --
20 but just something that -- as I note in my report, I
21 try to telescope in on the pharmacy classes of trade.
22     Q.   Are you aware of studies that have found

Page 361

1  that there is a much higher cost to dispense
2  intravenous prescriptions than your ordinary pill that
3  you would get in a retail pharmacy?
4          MR. LAVINE:  Object to form.
5     A.   No studies of that nature leap to mind
6  right now.
7               (Exhibit Abbott 1110 was
8               marked for identification.)
9          BY MR. TORBORG:
10     Q.   Dr. Duggan, I've handed you as Abbott
11 Exhibit 1110 an October 2003 survey of dispensing and
12 acquisition costs of pharmaceuticals in the
13 commonwealth of Kentucky prepared by Myers & Stauffer.
14 Feel free to take a look at that to the extent
15 necessary to tell me whether you reviewed this
16 document or not and then I'll have some questions for
17 you.
18     A.   (Reading.)  So I don't recall reviewing
19 this document, no.
20     Q.   Do you recall reviewing any reports that
21 Myers & Stauffer did for various state Medicaid
22 programs to either analyze the costs to dispense

Page 362

1  prescriptions or perform studies on acquisition costs
2  for drugs.
3     A.   No, I do not recall.
4     Q.   I'd like to ask you to go to page 35 of
5  this report.  There's a section titled "Intravenous
6  and infusion pharmacies."  Are you with me there?
7     A.   Mm-hmm.  Yes, I am.
8     Q.   The second sentence of that paragraph reads
9  "In every dispensing cost survey performed by Myers &
10 Stauffer in which data on the provision of intravenous
11 or infusion services was collected, the provision of
12 this service has been associated with higher
13 dispensing costs."  Do you see that?
14     A.   I see that, yup.
15     Q.   Were you aware of those studies?
16          MR. LAVINE:  Object to form.
17          MS. THOMAS:  Objection.
18     A.   In carrying out my analyses I was not aware
19 of these studies.
20     Q.   If you would go to page 23 of this report
21 there's a chart in the middle of the page, table 3.3,
22 "cost per prescription, specialty versus other

36  (Pages 359 to 362)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 363

1    pharmacies," do you see that?
2        A.   Yes, I do.
3        Q.   If you would take a minute to look at that,
4    would you let me know if you understand what that
5    chart is reflecting?
6        MS. THOMAS:  Objection to form.
7        A.   (Reading.)  It appears to be a -- to
8    represent an average unweighted -- so once again, I
9    haven't read the whole report.  But based on the text
10   that is immediately surrounding it it appears to
11   represent an average cost of -- average dispensing
12   costs for providers of specialty services versus all
13   other pharmacies that did not offer specialty
14   services, with 15 specialty pharmacies participating
15   in the survey and 362 other pharmacies.
16       Q.   And does the chart show that this study
17   found the unweighted average of the mean cost to
18   dispense for specialty pharmacies, which are described
19   as IV infusion pharmacies in this chart, was $49.81?
20       MR. LAVINE:  Object to the form.
21       A.   That's the number that is listed in the
22   table.  What exactly goes into the calculation of that

Page 364

1    number I obviously can't be sure of just having looked
2    at this right here.
3        Q.   And that's quite a bit higher than the
4    unweighted average mean cost found for other
5    pharmacies of $6.40, correct?
6        MR. LAVINE:  Objection to form.
7        A.   That is different and -- yeah.  That's
8    different.  And once again with the caveat that I
9    don't know -- as an economist I know that in
10   interpreting differences such as this it's important
11   to consider the possibility there are other
12   differences that are not captured just in this simple
13   table.
14       Q.   Now, Myers & Stauffer was engaged to assist
15   you in this case, correct?
16       MR. LAVINE:  Objection to form.
17       A.   I'm not sure what the exact term is.  But
18   they certainly assisted me in this case.  And whether
19   they were engaged or had a contract or what exactly --
20   but they certainly assisted me in the case.  So
21   engaged to assist seems reasonable to me.  I just
22   don't know if there is a specific meaning to engaged.

Page 365

1        Q.   And you don't recall them bringing to your
2    attention any of their studies which showed a much
3    higher cost to dispense for intravenous prescriptions;
4    is that right?
5        MR. LAVINE:  Objection to form.
6        A.   I do not recall discussing the specifics of
7    any study that examined this issue with them.
8        Q.   And in preparing your damage analysis in
9    this case, do you wish Myers & Stauffer would have
10   made you aware of that information?
11       MS. THOMAS:  Objection.
12       MR. LAVINE:  Object to the form.
13       A.   As I said at the outset, I'm always open to
14   the receipt of additional information.  It is
15   difficult for me to speculate here because I don't
16   know exactly what all is in this report.  So I'm just
17   not sure.
18       Q.   As an economist performing a model that you
19   know is going into a damage claim in civil litigation,
20   do you believe that information on the higher cost to
21   dispense intravenous prescriptions should have been
22   shared with you in this case?

Page 366

1        MR. LAVINE:  Object to form.
2        MS. THOMAS:  Objection.
3        A.   I don't agree with that at this point
4    without looking into -- I don't agree with that at
5    this point.
6        Q.   But you might agree with it at some point?
7        MS. THOMAS:  Objection.
8        A.   I believe that my analysis accomplishes
9    exactly what I set out to accomplish, which was
10   holding other factors constant to estimate the effect
11   of alternative prices on Medicaid and Medicare
12   expenditures.  And so I feel very confident in the
13   results from my analysis given the assumptions that I
14   made and so forth.
15       And so given the objective that I had for
16   my report I don't feel that I would have needed this
17   information for what I set out to do in my report.
18       Q.   Because what you set out to do in your
19   report was to hold everything but the ingredient cost
20   portion of the analysis constant, correct?
21       MR. LAVINE:  Object to form.
22       MS. THOMAS:  Objection.

37 (Pages 363 to 366)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 367

1    A.   There are other things that vary, can vary,
2  with the ingredient cost.  So, for example, in some
3  states the dispensing fee might vary with the
4  ingredient cost.  But the majority of my analysis
5  does, yes, focus on the ingredient cost exclusively.
6    Q.   If I could ask you to go back to page 35 of
7  this Myers & Stauffer report.
8    A.   Okay.  I'm there.
9    Q.   Incidentally, Kentucky is one of the twelve
10 states for which you have a separate section in your
11 report calculating differences, correct?
12   A.   Yes.
13   Q.   The last paragraph going over to the next
14 page on 36, I'll read it into the record if you'd
15 follow along.  It states "Under current policies the
16 Kentucky Department for Medicaid Services reimburses
17 for intravenous prescriptions in a dispensing fee plus
18 ingredient fee reimbursement formula similar to
19 traditional retail prescriptions.  Although dispensing
20 costs at intravenous pharmacies is well in excess of
21 the current dispensing fee, this reimbursement
22 methodology has been accepted by these pharmacies

Page 368

1  because of the margin on ingredient reimbursement has
2  allowed pharmacies to offset any shortfall from the
3  dispensing fee.
4        "In the case of intravenous prescriptions
5  the typical ingredient reimbursement per prescription
6  is much higher than for traditional retail
7  prescriptions.  Margins realized on the ingredient
8  portion of reimbursement have traditionally been
9  sufficient to subsidize the difference between
10 dispensing costs and dispensing reimbursement.  So
11 long as the ingredient reimbursement rate remains at
12 AWP minus 12 percent, the need for the department to
13 set a separate dispensing fee for intravenous drugs is
14 somewhat mitigated by the margins realized by
15 ingredient reimbursement."
16        Do you see that?
17   A.   Yes.
18   Q.   Had you read that language before I read it
19 to you just now?
20   A.   I don't recall reading that language before
21 now.
22   Q.   If you were performing a damage analysis in

Page 369

1  this case rather than a difference analysis, is this
2  the type of information which you would have wanted to
3  consider?
4        MS. THOMAS:  Objection.
5        MR. LAVINE:  Object to form.
6    A.   I think that -- so not necessarily this --
7  I'm not sure what exactly drugs were -- products were
8  considered in this analysis.  And so there's quite a
9  lot that went into their report here that I don't have
10 the luxury of acquainting myself with.  But it is -- I
11 believe given -- I believe that the analysis that I
12 conducted represents -- will represent an important
13 input to -- would plausibly represent an important
14 input to the determination of damages.
15        Whether this information -- I'm just not
16 sure whether this information does bear directly on
17 the 44 products at issue in this case, for example,
18 and there -- as I mentioned, there are many -- you
19 know, because AWP was for many products marked up 20
20 to 25 percent from actual prices, or that is I think a
21 sense that individuals had, there would be some
22 ingredient margin even for the typical drug.

Page 370

1        So it's just -- it is --
2    Q.   Are you done?
3    A.   I believe this information, just to recap
4  in case I -- that this information was not necessary
5  for the analyses that I carried out in my report, and
6  I would need to look into it more, look into this --
7  look at this report more to weigh in on that specific
8  question you had earlier.
9    Q.   Well, do you know if the 44 NDCs at issue
10 in this case are intravenous prescriptions?
11   A.   It is my understanding that certainly some
12 of them, many of them, are.  Whether all 44 of them
13 are or not, I'm not sure.  But that -- so just as an
14 example, I'm not sure if it follows that specialty
15 pharmacies would be the only ones to dispense the
16 products at issue in this case, meaning perhaps the
17 other pharmacies also dispense and perhaps there are
18 some other differences between the specialty
19 pharmacies and the other pharmacies that aren't fully
20 captured by this table on 23 that you showed me.
21   Q.   You understand that the relator in this
22 case, Ven-A-Care, was a specialty infusion pharmacy,

38  (Pages 367 to 370)

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 371

1   correct?
2         MS. THOMAS:  Objection.
3         MR. LAVINE:  Object to form.
4     A.    That is my understanding, yes.
5         And just if at some point we can take a
6   restroom break at some point soon.
7     Q.    One more question.
8     A.    Okay.
9     Q.    Let me ask again, if you were to perform as
10  an economist a damage calculation versus the
11  difference calculation that you calculate in your
12  report, would you have wanted to consider the types of
13  facts set forth on pages 35 to 36 of this report?
14        MR. LAVINE:  Object to form.
15    A.    I believe the analysis in my report
16  utilizes a method that is used repeatedly in my
17  profession, a method of adjusting one variable and
18  holding all other factors constant.  The -- as I -- so
19  it is possible that other factors would be relevant.
20  But for the purposes of my analysis I believe that the
21  results that emerge from a ceteris parabus study are
22  ones that are consistent with the methods that I use

Page 372

1   in performing my own work and that other academic
2   economists use in carrying out their research as well.
3         MR. TORBORG:  Of course I have a follow-up,
4   but I'll let you go.
5         THE WITNESS:  Okay.
6         THE VIDEOGRAPHER:  Off the record at 2:58.
7   (Recess.)
8         THE VIDEOGRAPHER:  On the record at 3:20.
9         BY MR. TORBORG:
10    Q.    Welcome back.
11    A.    Thanks.
12    Q.    In response to my last question you
13  indicated something along the lines -- I'm
14  paraphrasing -- that your analysis holding all other
15  factors constant was an accepted methodology that you
16  use in your work; is that right?  Something along
17  those lines.  Correct me -- if you need to extrapolate
18  on that, feel free.
19    A.    Right, that in estimating -- so I gave an
20  example of one paper in which I employed that
21  methodology.  So certainly in some of my work I have
22  used that methodology.  Yes.

Page 373

1     Q.    And is that field econometrics or something
2   else?
3     A.    It spans many fields within microeconomics.
4   So it spans the fields of -- it is -- it depends on
5   the question that is being asked.  But it is a common
6   way for an economist to disentangle the effect of one
7   variable on another variable.
8     Q.    Do you know if such a model of holding
9   variables constant --
10    A.    Holding what constant?  I'm sorry?
11    Q.    Variables I think is the word you used.
12        -- is an accepted methodology for
13  calculating damages in a civil litigation?
14        MS. THOMAS:  Objection.
15        MR. LAVINE:  Object to form.
16    A.    It is my understanding that an assessment
17  of damages would incorporate -- would utilize the
18  results from analyses exactly like the one that I have
19  conducted.  I'm -- so --
20    Q.    Where do you get that understanding?
21        MR. LAVINE:  Object to form.
22    A.    So to some extent from my own -- it's hard

Page 374

1   to recall from -- exactly from where I understand
2   that.  But it is -- I think that my analysis
3   represents the effect of government -- the effect of
4   alternative price reporting on federal government
5   spending using the assumptions that I outline in my
6   report.  And it is my understanding -- and I don't
7   know exactly when I reached this understanding -- that
8   damages are to assess the damage, the effect, on some
9   outcome variable.
10        It could firm revenues.  It could be firm
11  profits.  It could be federal government expenditures.
12  And in this case it's about the latter of those.  And
13  it's going to vary of course from one case to another.
14    Q.    Have you discussed the adequacy of this
15  approach with counsel?
16        MS. THOMAS:  Objection.
17        MR. LAVINE:  Object to form.
18    A.    I certainly discuss the approach and my
19  design of my algorithm and so forth with counsel.  I
20  guess I'm not -- so I've had many, obviously,
21  discussions with counsel about my analyses.  And so I
22  guess I'm not sure what you're asking exactly.

39  (Pages 371 to 374)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                        July 15, 2008

Page 375

1    Q.   Let me put a finer point on it.  I
2  personally think that your analysis of holding all
3  other things constant, particularly ignoring likely
4  increases in dispensing fees, does not pass muster
5  under the legal standards.  Have you discussed that
6  kind of issue with counsel?
7        MR. LAVINE:  Object to form.
8        MS. THOMAS:  Objection.
9    A.   I believe that counsel -- it's hard for me
10  to get into the heads of each person on my left and
11  the other counsel associated with the case.  But it is
12  my understanding that counsel believes the results
13  from my analysis are quite useful in the determination
14  of damages in this case.  That's my understanding.
15    Q.   Have you had discussions about whether your
16  approach is appropriate under legal standards
17  governing damages in civil litigation?
18        MS. THOMAS:  Objection.
19    A.   I suspect that there have been discussions
20  along those lines.  I don't recall the specifics of a
21  conversation.  But I do believe that counsel is
22  confident, as I am, in the results from my analysis

Page 376

1  and their usefulness to the court and others with an
2  interest in the case in the assessment of damages.
3    Q.   Have you ever had a damages calculation
4  accepted by a court of law or a jury in assessing
5  damages?
6        MS. THOMAS:  Objection.
7    A.   No, I have not.
8    Q.   You indicated that in your analysis you
9  held other factors constant, right?
10    A.   I'm not sure, but that's the gist of what I
11  say at various points in my analysis, I believe.  Yes.
12    Q.   What other factors have you held constant?
13    A.   So, for example, I have held constant the
14  number of prescriptions for the NDCs in this case.
15  That's one example.  And the timing of those
16  prescriptions.
17    Q.   And you've also held constant the amount of
18  dispensing fees that would be paid on those claims
19  with the rare exception of those situations like
20  Michigan where the dispensing fee might be impacted by
21  the ingredient cost calculation?
22        MS. THOMAS:  Objection.

Page 377

1    A.   I don't remember the details in Michigan
2  right here off the top of my head.  So can you
3  repeat -- I'm sorry.
4        MR. TORBORG:  Jon, would you mind --
5        (Whereupon, the requested portion was read
6  by the reporter.)
7    A.   Yes.  That's correct.
8        BY MR. TORBORG:
9    Q.   Now, you raised an issue there with holding
10  prescriptions constant.  I was going to come at it
11  later, but let's talk about it now since you brought
12  it up.  As an economist -- strike that.
13        Have you reviewed how the reported prices
14  for the complaint NDCs compared with generically
15  equivalent products in the marketplace?
16        MR. LAVINE:  Objection to form.
17    A.   It some extent, yes, I have done that.
18    Q.   And was that something that you -- what
19  caused you to do that?
20    A.   For my analyses of the J codes that are the
21  issue in this case, for example, that is one thing,
22  one set of work that I did in carrying out those

Page 378

1  analyses.
2    Q.   And at a high level what did you observe in
3  that comparison?
4        MR. LAVINE:  Object to form.
5    A.   Well, as a first cut it tended to be the
6  case -- and of course as I outline with -- I try to be
7  very specific in my report.  But it tended to be the
8  case that the AWPs for Abbott products such as the
9  vancomycin 653301 and the sodium chlorides tended to
10  exceed the prices for competitor products.  And that
11  is partly reflected in the fact that when Abbott
12  products did appear in the arrays, when I adjusted
13  their AWPs much, much more often than not the median
14  declined.
15        And basically given the definition of a
16  median, if you vary one of, let's say, the units of
17  observation in the calculation of a median down and
18  the median falls, it by definition is either at or
19  above the median.  So as a first cut the prices tended
20  to exceed those of the competitors.
21    Q.   For the solution products, speaking of the
22  LVPs -- do you know what I'm talking about with the

40  (Pages 375 to 378)

a580633e-555e-4e70-82e5-a331182efa1e

Page 379

1  LVPs, a term used in the complaint, large volume
2  parenterals?
3      A.   Maybe you can elaborate.
4      Q.   Those would be the dextrose solutions, the
5  sodium chloride solutions, those products.
6      A.   Yes.  Okay.
7          MR. LAVINE:  Object to form.
8      Q.   What did you observe -- did you observe
9  that the -- many of the other manufacturers had prices
10  that were fairly close to the prices that were
11  reported for the Abbott products?
12          MR. LAVINE:  Object to form.
13      A.   So with the caveat that it depends on the
14  time period and on the sort of products considered, it
15  is true that in many cases -- for example, the prices
16  for Baxter products were similar to those for Abbott
17  products, but certainly there were cases where there
18  were discrepancies between -- Baxter is just one that
19  leaps to mind right now.  I know there are other
20  competitors as well.  And so -- but that is in the
21  similar ballpark.  Generally lower.  As I specified
22  earlier, generally lower.

Page 380

1      Q.   But there were some instances where they
2  were higher than Abbott's reported price as well?
3          MR. LAVINE:  Object to form.
4      A.   I believe that's true, yes.
5      Q.   And in any event they were -- those prices
6  were much higher than the revised prices that you
7  calculated for those NDCs, correct?
8          MR. LAVINE:  Object to form.
9      A.   Not in every case, but typically, yes.
10      Q.   Now, as an economist do you have an opinion
11  on if the reported prices for the Abbott products in
12  the compendia equal the revised prices that you
13  calculated back in 1991 whether the Medicare and
14  Medicaid programs would have reimbursed more or less
15  claims for those Abbott products over the next ten
16  years?
17          MR. LAVINE:  Object to form.
18      A.   I suppose it depends.  There -- it depends.
19      Q.   It depends on what?
20      A.   So just to give two examples, on the one
21  hand it could be the case that people like Martha
22  McNeil in the state of Texas would observe this

Page 381

1  difference and other Medicaid officials, and perhaps
2  try to steer utilization towards Abbott products
3  perhaps by a change in the formulary or other things.
4  So that would be -- on the one hand it could be that
5  the number of Abbott prescriptions, though, for the 44
6  Abbott products listed in the complaint could go up.
7          On the other hand, it could be that
8  pharmacies would respond if there were a financial
9  incentive to the larger discrepancy -- let's say for a
10  Baxter product -- by using that firm's product.  So I
11  suppose it could go either way.  Yeah.  Those are just
12  two factors, of course, and there are possibly others
13  as well.  And it's the kind of thing I would want
14  to -- so --
15          (Exhibit Abbott 1111 was
16          marked for identification.)
17      BY MR. TORBORG:
18      Q.   Dr. Duggan, I've handed you another excerpt
19  from the deposition of Deirdra Duzor.
20      A.   Can you remind me who this person is again?
21      Q.   Ms. Duzor is currently, I think, the -- one
22  of the co-leaders of the CMS pharmacy team, which

Page 382

1  traditionally has focused on Medicaid reimbursement
2  issues on the national level.
3      A.   Okay.
4      Q.   I've given you more pages actually than I
5  mean to ask you about.  I changed my mind on what I
6  was going to ask you about.
7      A.   Okay.
8      Q.   If I could ask you to go to page 522 -- for
9  the record, I have given you page 511 through 534 of
10  the second day of her transcript.  I'd ask you if you
11  want to read to yourself page 522, line 10.
12      A.   Okay.  Line 10 on 522.
13      Q.   Yeah.  Let me figure out if there's a way I
14  can make you not have to read it all at one time.
15      A.   Okay.  Sure.
16      Q.   Starting with 522 through -- actually, why
17  don't you read that all the way through -- I don't
18  want to do that.  Sorry.  I'm trying to make this a
19  little quicker.
20          Why don't you go through 525, line 17.
21      A.   Which page again?
22      Q.   522, line 10, through 525, line 17.

41 (Pages 379 to 382)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 383

1    A.   And just read it to myself, right?
2    Q.   Yes.
3    A.   Okay.  (Reading.)
4         Okay.
5    Q.   Were you able to follow what was being
6  asked there?
7    A.   Yes.
8    Q.   And is your understanding of the premise of
9  this law suit consistent with what I set forth in that
10  questioning to which Ms. Duzor responded that that was
11  her understanding?
12        MR. LAVINE:  Objection to form.
13    A.   It is similar, but I certainly wouldn't say
14  it's identical in the sense that, for example, if we
15  assume that on a particular date -- I guess I'm
16  thinking more in the context of my own analysis.
17    Q.   Okay.
18    A.   If we assume that on a particular date all
19  of the prices reflect an actual average acquisition
20  cost, so there are -- it is certainly related to the
21  issues that you described.  But I wouldn't say it's
22  identical.

Page 384

1    Q.   Why don't we start with line 526 -- I'm
2  sorry -- page 526, line 5.  I'd like to read some
3  questioning and have you follow along.
4         "Question:  Would you feel comfortable
5  assuming that a price that is the actual average that
6  manufacturers sold to wholesalers would be sufficient
7  to ensure that pharmacies would dispense drugs to
8  Medicaid beneficiaries without any other changes to
9  the system?  No change in dispensing fees, nothing
10  else."
11        Then there's an objection.
12        "Answer:  Again, we have to stipulate that
13  we're not talking about AWP but the acquisition cost
14  to the pharmacy so the two are not synonymous.
15        "Question:  If the price -- if the AWP were
16  an actual amount --
17        "Answer:  At which a pharmacy could buy a
18  drug?"
19        She was finishing my question.  I said
20  "Correct."
21        She said "Okay."
22        "Would you feel comfortable in assuming

Page 385

1  that that payment with no change to prior dispensing
2  fees would be sufficient to ensure that pharmacies
3  would dispense drugs to Medicaid beneficiaries?"
4         There was an objection.
5         "Answer:  I think that that question would
6  need to be considered on a state by state basis to
7  take into account the dispensing fee.  Given that
8  they're not all the same I think it just follows that
9  there could not be one answer that would be consistent
10  across all states.
11        "Question:  Is it fair to say you can think
12  of states where you would not feel comfortable that
13  paying a true acquisition cost with no other changes
14  to the reimbursement system would not be sufficient to
15  ensure access?"
16        There was an objection.
17        "Answer:  I don't know where the line would
18  be drawn.  But I think that there may be some states
19  that were paying very low dispensing fees where that
20  would not be adequate reimbursement for a pharmacy.
21        "Question:  And would you feel comfortable
22  that a change in paying actual acquisition cost would

Page 386

1  not have resulted in any change to dispensing fees at
2  any of the state Medicaid programs?"
3         There was an objection.
4         And then "Answer:  No.  I think it may have
5  resulted in a change in dispensing fees."
6         Do you see that?
7    A.   Yes.
8    Q.   And did you consider this testimony in
9  forming your opinions in this case?
10        MR. LAVINE:  Object to form.
11    A.   I do not recall reading over this testimony
12  in preparation for the case, though I would note that
13  this paying actual acquisition cost is not -- is not
14  what I'm doing in my analysis exactly.
15    Q.   You're paying something very close to
16  actual acquisition cost, are you not?
17        MR. LAVINE:  Objection to form.
18    A.   In -- I try to outline in my report the
19  various ways I believe that I am conservative in
20  calculating these alternative AWPs, for example.  So
21  for the case of an alternative AWP I'm scaling the
22  actual prices by 25 percent for the pharmacy-specific

42  (Pages 383 to 386)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 387

1  classes of trade. And moreover, in the calculation of
2  that I'm not taking into account rebates, discounts
3  and so forth, as I outline in my report.
4        So I believe that the number that I -- that
5  the numbers that I utilize are greater and the amount
6  greater will depend on the specific NDC, the specific
7  time period and so forth. And there are other things
8  that I talk about in the report on that issue.
9     Q.   And we're going to try to do this at some
10  point. But the amount at which your price exceeds an
11  actual average can be expressed in percentage terms or
12  a matter of dollars and cents, correct?
13        MR. LAVINE: Object to form.
14     A.   Correct.
15     Q.   And have you calculated what your
16  conservative assumptions actually equate to in dollars
17  and cents for the various NDCs?
18        MR. LAVINE: Object to form.
19     A.   It is -- certainly a number that -- it's a
20  number that in carrying out my algorithm I calculate,
21  but I don't have the numbers for each NDC in each time
22  period here at my fingertips.

Page 388

1     Q.   Do you have a sense for what the dollar or
2  cent impact is of your conservative assumptions across
3  the NDCs?
4     A.   I think I would need to go back and look at
5  my -- the results from my analysis, the various tables
6  in my report and so forth.
7     Q.   Do you have any sense at all? Are we
8  talking ten dollars or are we talking ten cents?
9        MS. THOMAS: Object to form.
10     A.   I believe it would lie very much within
11  that range. Not ten dollars, not ten cents, in that
12  range. More than ten cents, less than ten dollars. I
13  would just need to go back to the analysis to look at
14  that.
15     Q.   You wouldn't expect that across the drugs
16  that the average of that amount would be any more than
17  a dollar, would you?
18        MR. LAVINE: Object to form.
19     A.   It is possible that it could be more than a
20  dollar, certainly. And certainly for certain products
21  in certain time periods it might well be more than a
22  dollar.

Page 389

1     Q.   Would you agree that for the vast majority
2  of the NDCs it's going to be less than a dollar?
3        MR. LAVINE: Object to form.
4     A.   I wouldn't necessarily agree with that. I
5  would just need to go back and look at it. There are
6  44 NDCs. The quarter is my time period of interest.
7  So we're talking about almost 2,000 NDCs quarter
8  combinations. So it's a bit hard to do justice to
9  that question here without the data in front of me to
10  analyze.
11     Q.   You would agree with me, though, that your
12  difference analysis if applied to the time period in
13  question would have the states paying something closer
14  to an actual average than they were paying at the
15  time, correct?
16        MR. LAVINE: Object to form.
17     A.   In most cases, yeah, for most of the
18  claims, yes, that's true. I believe about 97 percent
19  of the claims for Medicaid, for example, I find a
20  difference greater than zero. And how much closer
21  it's going to vary from one claims to another.
22     Q.   On page 530 of Ms. Duzor's transcript, line

Page 390

1  11, I'll read some testimony if you'd follow along.
2        "Question: Do you feel comfortable in
3  making any assumptions about what the total amount of
4  reimbursement would have been had the AWPs in the
5  compendia actually represented the actual price at
6  which pharmacies purchased drugs?"
7        There's an objection.
8        "Answer: Sitting here I couldn't give you
9  a figure. I think it would be substantial and that
10  such an estimate would be possible.
11        "Question: And that estimate may depend on
12  the specific drugs at issue?
13        "Answer: Yes. For the drugs at issue.
14        "Question: There may have been some drugs
15  where the reimbursement would have been higher than it
16  was if you increased the dispensing fees to an
17  adequate amount; is that fair to say?"
18        There was an objection.
19        "Answer: Certainly mathematically
20  possible. I don't know. You'd have to look at it to
21  try to calculate that.
22        "Question: And how would you go about

43 (Pages 387 to 390)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 391

1  making -- how would you go about trying to determine
2  what the total savings would be if there were a change
3  in the AWPs reported in the compendia from what they
4  were to an actual average price?"
5          There was an objection.
6          "Answer:  I don't know how I could possibly
7  estimate that because you would need to know what the
8  actual prices were, which are right now --
9          "Question:  If you had those how would you
10 do the calculation?
11         "Answer:  If you had those?  You would look
12 at what Medicaid, what was paid for those drugs, and
13 then look at what would have been paid under -- with a
14 lower AWP.
15         "Question:  What would you do with the
16 dispensing fee side of the equation?  Would you ignore
17 it and assume there would be no increases at all?"
18         There was an objection.
19         "Answer:  No.  I think an estimator would
20 develop a dispensing fee that was sort of considered
21 to be an average appropriate dispensing fee.
22         "Question: How would you know if that was

Page 392

1  enough to ensure provider access?
2          There's an objection and then "Question:
3  That amount?
4          "Answer:  Well, in the hypothetical it's
5  impossible to truly know whether it would or wouldn't.
6  You would have to make some -- based upon data
7  available, there are all these Myers & Stauffer
8  studies and other things -- you would come up with a
9  reasonable estimate of what you thought was the cost
10 of dispensing.
11         "Question:  And would you make separate
12 allowance based upon the cost of dispensing for drugs
13 that were more difficult to administer that weren't
14 pills, that were injection and infusion products?
15         "Answer:  That would be a possible
16 permutation.  There -- in most estimations there are a
17 lot of assumptions and they can be done in greater or
18 lesser detail.  So --
19         "Question:  But you wouldn't just ignore
20 the fact that there were some drugs that were a lot
21 more expensive to dispense to beneficiaries, would
22 you?"

Page 393

1          There was an objection.
2          "Answer:  If you're looking at a limited
3  set of drugs and there's an unusual characteristic in
4  one of those drugs, then that would be more reason to
5  take that into account than to just do an average."
6          Do you see that?  Were you able to follow?
7  A.   Yes.
8  Q.   Did you review that testimony in forming
9  your opinions in this case?
10 A.   I don't recall reviewing this specific
11 testimony.
12 Q.   And on page 532, line 2, I asked her if she
13 would ignore the dispensing fee side of the equation
14 and assume there were no increases at all.  And she
15 said "No.  I think an estimator would develop a
16 dispensing fee that was sort of considered to be an
17 average appropriate dispensing fee."  Right?
18         Did you ignore the dispensing fee side of
19 the equation in doing your analysis in this case?
20         MS. THOMAS:  Objection.
21         MR. LAVINE:  Object to the form.
22 A.   So I did not ignore it.  Basically the 44

Page 394

1  products that are at issue in this case account for in
2  a typical year less than one-tenth of one percent of
3  all Medicaid drug spending.  And so in determining --
4  for a pharmacy to determine whether or not to provide
5  Medicaid, the issue won't be necessarily the
6  profitability every -- all 25,000 NDCs one by one, but
7  a sense of the overall profitability taking into
8  account all factors, perhaps how many other products
9  they purchase when coming into the store and so forth.
10         And so to the extent that the 44 products
11 at issue in this case, to the extent that they had
12 alternative AWPs akin to the ones that I described in
13 my report, the effect on the overall profitability for
14 many providers would relatively small.  It would vary
15 from one provider to another.  So it's certainly an
16 issue that I considered.  But for the 44 products at
17 issue -- for the 44 products that I considered --
18 Q.   In your model you did not consider the
19 dispensing fee side of the equation, whether there
20 would need to be an increase in dispensing fee if you
21 decreased the ingredient cost reimbursement, correct?
22         MR. LAVINE:  Object to form.

                          44  (Pages 391 to 394)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 395

1       A.   I did not adjust the dispensing fee for my
2    analyses in which I replaced the AWPs for these 44
3    products with the alternative prices that I described
4    in my report.
5       Q.   And you did not consider the higher cost to
6    dispense for the intravenous drugs included in this
7    case; is that right?
8            MR. LAVINE:  Object to form.
9       A.   Once again, I haven't -- just to clarify, I
10   haven't yet agreed with the point that the 44 products
11   at issue in this case had higher dispensing fees on
12   average.  So I'm not -- you've just said --
13      Q.   You haven't considered that issue?
14           MS. THOMAS:  Objection.
15           MR. TORBORG:  Sorry.  I shouldn't have
16   interrupted him there.  I'll take the heat on that
17   one.
18           THE WITNESS:  Can you restate the question?
19           (Whereupon, the requested portion was read
20   by the reporter.)
21      A.   As -- my analyses -- I'm just trying to be
22   clear about what my analyses do.  They hold fixed the

Page 396

1    dispensing fee.  And it may be the case that the
2    dispensing fee in some cases is below a specific
3    pharmacy's cost in a certain time period.  It's going
4    to depend whether that's true in general during the
5    time period of interest.  And so -- and as I've noted,
6    it's -- the cost of dispensing is one factor of many
7    that any profit maximizing firm would consider in
8    determining whether or not to provide access to these
9    treatments at the facility.
10   BY MR. TORBORG:
11      Q.   Dr. Duggan, would you feel comfortable with
12   counsel for the plaintiffs stating that you, Dr.
13   Duggan, a professor of economics at the University of
14   Maryland, has calculated how much less the federal
15   government in fact would have paid through the
16   Medicare and Medicaid programs in total reimbursement
17   to providers for dispensing the drugs at issue in this
18   case had the AWP, WAC and direct prices for those
19   drugs been at the revised prices that you've
20   calculated?
21           MR. LAVINE:  Object to form.
22      A.   As -- that may diverge slightly from what

Page 397

1    exactly I write in my report.  But with the
2    assumptions that I make -- once again, any good
3    economist is going to be careful to specify the -- not
4    only their findings, but also the assumptions that
5    underlie their findings.  And so I'd be quite
6    comfortable with, for example, the $108.2 million
7    number with the caveat -- with the assumptions -- with
8    having specified the assumptions that I make, which I
9    believe are reasonable for the question I set out to
10   answer, and with the caveat that for example the
11   findings are if anything conservative for the reasons
12   that I outline in the report.
13      Q.   If those assumptions that are laid out in
14   your report were not clearly stated, would you feel
15   comfortable with counsel for the plaintiffs stating
16   that you have calculated how much less the federal
17   government in fact would have paid through the
18   Medicare and Medicaid programs in total reimbursement
19   to providers for dispensing the drugs at issue in this
20   case --
21           MR. LAVINE:  Object to form.
22      Q.   -- had the AWP, WAC and direct prices for

Page 398

1    those drugs been at the revised prices that you
2    calculate?
3            MR. LAVINE:  Object to form.
4       A.   I would -- so we've drilled down a bit on
5    this dispensing fee issue here, for example, this
6    assumption of holding constant the dispensing fee.
7    Because the 44 products at issue in this case
8    accounted for less than one-tenth of one percent of
9    all Medicaid spending during the eleven year period of
10   interest, I am comfortable with the assumption that
11   replacing these 44 products' prices with the
12   alternative AWPs that I outlined in my report, and
13   WACs and direct prices, that the -- that these 44
14   products, that the dispensing fees would not have
15   changed substantially in response to that.
16           Now, additionally -- so that is, you know,
17   one -- in general any paper that I've written or I
18   read, there is often an abstract at the beginning of
19   the paper that summarizes the results from the
20   analysis.  And, you know, it's a question of how much
21   time one has to elaborate on the analyses that
22   underlie it.  An abstract is typically about five

45  (Pages 395 to 398)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 399

1  sentences long.  And often one doesn't have the luxury
2  in those five sentences, because there's so much else
3  to do, in describing everything else that underlies
4  all the assumptions and so forth.
5        And so given infinite time, you know, I
6  would certainly think it would be reasonable, it would
7  be appropriate to specify every one of the assumptions
8  that I make, every -- and as one compresses the amount
9  of available time inevitably there will be some
10 simplification that might occur as academics do all
11 the time in summarizing their research right at the
12 beginning of each paper for others who may not have as
13 much expertise in the area to learn from the results.
14 And people who with a particular interest can then
15 drill down to understand what assumptions underlie
16 that.
17       So, you know, it would depend -- if you
18 said to me that counsel had infinite time to describe
19 the results of my report I would say, well, I would
20 hope they'll describe every element of it.  I enjoy --
21 I am proud of and feel very good about every iota of
22 what I produced and feel comfortable that the analyses

Page 400

1  that I did produced accurate estimates.  If they had
2  15 seconds to describe it they might not have time to
3  describe everything.  And of course there's a
4  continuum of time in between these two extremes.
5     Q.   So in the but-for world that your
6  difference calculation assumes --
7     A.   And just if we can get in a little while a
8  restroom break before --
9     Q.   I'll finish this line and take a break.
10    A.   Great.
11    Q.   So in the but-for world that your
12 difference calculation assumes, which is decreasing
13 the ingredient reimbursement for the 44 NDC products
14 at issue in this case, and that but-for world across
15 all the NDCs reimbursed by Medicaid programs, it is
16 only these 44 NDCs that get reduced to something that
17 approximates actual acquisition costs, right?
18       MR. LAVINE:  Object to form.
19    A.   I'm sorry.  I'm unclear on what exactly
20 you're asking.  Could you state it again?
21    Q.   In the but-for world that would be assumed
22 if you applied your analysis -- that is, decreasing

Page 401

1  ingredient reimbursement for these 44 products from
2  1991 to 2000 -- do you follow me so far?
3     A.   Yeah.
4     Q.   In that but-for world the only prices that
5  get reduced across all the NDCs reimbursed by the
6  state Medicaid programs and Medicare are Abbott's
7  products, right?
8     A.   Right.
9        MR. LAVINE:  Object to form.
10    Q.   Okay.
11    A.   A subset of Abbott products.
12    Q.   A subset of these 44 Abbott products?
13    A.   Right.  44 of the however many Abbott
14 products there are.
15    Q.   Is that a realistic assumption --
16       MR. LAVINE:  Object to form.
17    Q.   -- that it's only these 44 products that
18 get their prices reduced?
19       MR. LAVINE:  Object to form.
20    A.   Well, I think one of the -- an important
21 issue, it seems to me, in this litigation is if the
22 prices for these 44 treatments had more accurately

Page 402

1  reflected the actual prices paid, generally paid in
2  the market, for these treatments, how different would
3  Medicaid spending have been, of course -- now, I don't
4  have transaction price data for other firms.  What I
5  can say is that I've -- in the context of my work for
6  Texas I considered many other -- I think more than 200
7  other Abbott products.
8        And so one could broaden to consider for
9  example other Abbott products beyond these 44.  But
10 that's not what at least for the Medicaid analyses I
11 am ultimately doing.  For the Medicaid I'm focusing
12 just on these 44 Abbott products.  Whether -- you
13 know, once again, to what extent the findings from
14 this study translate to many of the 25,000 other NDCs,
15 and probably during this eleven year period I would
16 not be surprised if there were 40,000 or more NDCs
17 across all firms that were being reimbursed for
18 Medicaid in one or more years.
19       Whether similar discrepancies are common
20 for the other 40,000 NDCs, that's not something that I
21 could say.  Maybe for some others, for a small subset.
22 It's hard to speculate without having looked, for

46  (Pages 399 to 402)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 403

1  example, at products for all these other firms and
2  prices for all these other firms.  But it's really --
3  it seems to me the litigation is about these 44
4  products by Abbott, not Abbott's other products,
5  except -- at least for the purposes of Medicaid and
6  not other firm's products.
7       MR. TORBORG:  Okay.  Let's take a break.
8       THE VIDEOGRAPHER:  This is the end of tape
9  3.  Off the record at 4:10.
10       (Recess.)
11       THE VIDEOGRAPHER:  This is the beginning of
12  tape 4 in the deposition of Dr. Mark Duggan, volume 2.
13  On the record at 4:30.
14       BY MR. TORBORG:
15  Q.   Welcome back.
16  A.   Thanks.
17  Q.   We'll try to go another 45 minutes.
18  A.   Okay.
19  Q.   You indicated you'd like to stop at 5:15 at
20  the latest.
21  A.   That would be great.
22  Q.   I'd like to turn now it a different topic,

Page 404

1  which is the calculations that you did to come up with
2  revised pricing in this case.  This covers page 11
3  through 24 of your report, roughly.
4  A.   Okay.
5  Q.   It might be helpful to have that in front
6  of you.
7  A.   1093, right?
8  Q.   Yup.  That sounds right.
9       MS. BROOKER:  1093.
10  A.   Which pages again?
11  Q.   It's pages 11 through 24.
12  A.   Okay.
13  Q.   And it's the broad topic of your
14  calculation of revised pricing for the 44 complaint
15  NDCs.  And if you could summarize without all the gory
16  detail the various price points and prices that you
17  recalculated and put in your report.
18       MS. THOMAS:  Objection to form.
19  A.   So in --
20  Q.   Strike that.  That's going to take too
21  long.
22  A.   Right.

Page 405

1  Q.   Let me try and do something a little
2  faster.
3  A.   All right.
4  Q.   You calculated revised direct prices,
5  correct?
6  A.   I calculated directed prices, prices from
7  Abbott's direct transaction data.  Right.
8  Q.   And you also calculated revised AWPs,
9  right?
10  A.   Correct.
11  Q.   That were different from the AWPs that were
12  reported through the compendia, correct?
13  A.   In most cases they were different, correct.
14  Q.   And you used Abbott's indirect sales data
15  for that, correct?
16  A.   For the AWP part, yes, I used the Abbott
17  indirect data for the pharmacy classes of trade.
18  Q.   Well, you also calculated actual average
19  wholesale prices from the indirect data as well,
20  correct?
21  A.   Considering all --
22       MS. THOMAS:  Objection to form.

Page 406

1  A.   Does that consider all classes of trade,
2  such as non-profit hospitals and --
3  Q.   Yes.
4  A.   Yes.  I believe that I did at some point in
5  my analyses calculate those average prices.
6  Q.   You calculated revised wholesale
7  acquisition costs based on Abbott's indirect data as
8  well, correct?
9  A.   That is correct.  So rather than using the
10  direct data, I would frequently summarize sales by
11  Abbott to wholesalers and HPD distributors, for
12  example, I instead used the prices that -- at which
13  those wholesalers and HPD distributors -- typically
14  those are the two in the indirect data -- sold the
15  products to the pharmacy classes of trade.
16       And as I outlined in my report, the reason
17  that I used the indirect data as opposed to the direct
18  data is that in the direct data wholesalers -- many of
19  the units that they purchase of a product may be sold,
20  let's say, at a non-profit hospital.  Those are the
21  most common, if I recall correctly, classes of trade
22  in the indirect data.

47 (Pages 403 to 406)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 407

1        Those prices -- prices to those
2   organizations are on average lower than the prices to
3   pharmacies.  And so had I used the -- let's say the
4   average cost to wholesalers and HPD distributors for
5   acquiring the products for all of the classes of
6   trade, that would have led to a significantly lower
7   price typically than my use of the indirect data to
8   the pharmacy class of trade.
9        Q.   And you used the pharmacy class of trade in
10  your difference calculations because it's pharmacies
11  who in large part submitted the claims at issue in
12  this case?  Is that why you used the --
13       A.   Right.  It's not typically, let's say,
14  non-profit hospitals.  Right.  It would much more
15  often be pharmacies.
16       Q.   So using the pharmacy class of trade versus
17  an overall average across all purchasers, that wasn't
18  something you did necessarily to be conservative in
19  Abbott's favor; it was just because that was the
20  appropriate way to do it?
21       MS. BROOKER:  Objection, form.
22       A.   Well, I think there are two things here to

Page 408

1   note.  First, I do believe that it is appropriate --
2   although in my Texas report one of the criticisms
3   levied by -- I believe it was Dr. Barry -- against my
4   report was that I was focusing on transactions by
5   classes of trade -- I was focusing on classes of
6   trades that accounted for a small share of total
7   transactions.
8        And so to some extent as I show for -- I
9   think it's Illinois -- had I used the -- had I
10  considered all customers instead of just the pharmacy
11  customers, the values of difference that I would have
12  obtained would have been considerably higher.  And so
13  it is both -- it's similar to what I did in Texas and
14  I believed then that it was the appropriate thing to
15  do.
16       But I just wanted in response -- partly in
17  response to this criticism, I wanted interested
18  individuals, the court and perhaps others interested
19  in the findings in my report, to understand that had I
20  considered all transactions my findings, my results,
21  would have resulted in a larger value of difference.
22       Q.   And you say that was a considerably larger

Page 409

1   difference?
2        A.   I believe it was 5 percent.  So $500,000, I
3   believe.  I can go -- let me just go and see.  I don't
4   have it memorized.
5        Q.   5 percent of what?
6        A.   No.  It wasn't as much as -- just a 2
7   percent increase.  So had I considered all customers.
8   So in this -- let's say if we look in table 13B.
9        Q.   I'm with you.
10       A.   Yeah.  You'll see there that the estimate
11  is $253,000 higher when I consider all customers,
12  which is approximately a 2 percent increase, which --
13  I don't know.  It depends I guess on -- $253,000 is a
14  lot of money, but 2 percent -- you know, it just
15  depends on whether we're talking about percentage or
16  dollars, to return to your earlier point.
17       Q.   And how much is that per claim difference?
18  It's a dollar amount of a per claim difference --
19       A.   I mean, it's about 50 cents per claim
20  difference, it looks like.  500,000 claims, $250,000,
21  so, yeah, about 50 cents a claim difference higher.
22  And approximately $5 per pharmacy payment, as I

Page 410

1   outline there to the right.  About 59,000 of those
2   four and a half dollars per pharmacy payment.
3        Q.   Dollars per pharmacy payment?
4        A.   Right.  So there are -- the difference
5   between -- the average all customer difference and the
6   average pharmacy difference is $253,000.
7        Q.   How did you do that math so fast?
8        A.   Because that's --
9        Q.   So you've taken the 12,781 and the 12,434?
10       A.   No.  12,528.
11       Q.   12,528.
12       A.   253,050 --
13       Q.   Okay.
14       A.   -- is the difference.
15       Q.   12,528, 320 --
16       A.   Minus.  You'll get a negative number.
17  12,781,370.
18       Q.   253,000?
19       A.   Yeah.  253,050 is what -- I think.
20       Q.   Okay.  And you said something about number
21  of pharmacy -- did you use that next column for some
22  purpose?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a580633e-555e-4e70-82e5-a331182efa1e

Page 411

1    A.   Right.  So the first thing that I had said
2  was that's about 50 cents per claim because as you can
3  see over to the left there are about 522,000 claims
4  with a value of difference greater than zero.  So if
5  you divide 253,000 by 522,000 you get slightly less
6  than 50 cents per claim, in that ball park.
7        If alternatively you divide that $253,000
8  number by the number of pharmacy payments with at
9  least one claim with a value of difference greater
10 than zero, the dollar amount on average is about $4
11 and -- I could go through this here -- $4.30 or -- I'm
12 not sure exactly.
13   Q.   What is that four dollars and --
14 whatever -- thirty cents?
15   A.   $4.30 represents the average amount.
16 There's a modest uptick in the number of pharmacy
17 payments going from row 1 to row 2.  But it represents
18 basically how much higher the total value of
19 difference would be on the average pharmacy payment
20 with at least one claim with a value of difference
21 greater than zero.  Okay?
22   Q.   I thought the number of pharmacy payments

Page 412

1  was simply the number of payments where there is a
2  difference greater than zero?
3    A.   Right.  Where there is basically a claim,
4  at least one claim and perhaps more, with a value of
5  difference greater than zero.  Right.  That's right.
6  So it's equivalent to what you just said.
7        So basically here, the idea is that in a
8  typical week a pharmacy might have ten claims with a
9  value of difference greater than zero, but the state
10 Medicaid agency may disburse twice a month or once a
11 week.  And so in terms of the actual disbursement of
12 funds, all of those claims might go into one
13 transaction.
14   Q.   You also -- you can see this on 13B.
15   A.   Yup.
16   Q.   You also calculated a 95th percentile
17 price?
18   A.   That is correct.  Yes.
19   Q.   Okay.  Can you explain what that is?
20   A.   That represents -- if instead of using the
21 average pharmacy price for each NDC in each quarter --
22 and when I say pharmacy, I specify which classes of

Page 413

1  trade that refers to in the report.  But instead of
2  using the average pharmacy price in place of -- in
3  this case I believe it is the AWP -- if I instead use
4  the 95th percentile price, then -- basically that's
5  the price -- I described this parameter in the report.
6    Q.   Yeah.
7    A.   Then the total value of difference will be
8  somewhat lower, falling from 12.53 million to about
9  11.93 million.  So falling by about -- a little
10 less -- about 595, $594,000.
11   Q.   And the 95th percentile, how you come to
12 that is that you take all of the sales in a particular
13 quarter for a particular NDC, put them in a row and
14 draw a line at the 95 percentile and that's the price?
15 Does that do justice roughly to what you did or am I
16 misstating?
17   A.   Right.  It's basically the price such that
18 95 percent of the units are sold for that price or
19 lower and 5 percent of the units are sold for that
20 price or higher.
21   Q.   And how did you come to choose that
22 percentile as what you would put in your report?

Page 414

1    A.   It was what I would put in table 13B.
2    Q.   And you calculated that price -- let me
3  strike that and ask you another question.
4        Did you calculate the 95th percentile price
5  for all of the NDCs across all of the time periods?
6    A.   I believe that -- right -- it would be
7  necessary so the -- in Illinois -- I think Illinois
8  I'm using data for 43 quarters out of a total of 44.
9  And there are 44 NDCs.  So -- but not all of the NDCs
10 have transactions in every quarter.  But for the most
11 part it's pretty much the case that all of the NDCs
12 have transactions in every quarter.
13       So it is true that for this -- in carrying
14 out this algorithm for Illinois, carrying out my
15 algorithm for Illinois, in which I replace the AWP in
16 the adjudication formula with the 95th percentile
17 price, I would have calculated that 95th for each NDC
18 in each quarter for the pharmacy class of trade that I
19 specify with the caveat that if there were no sales in
20 that quarter I might not have a parameter in that
21 quarter.
22   Q.   But you did calculate that price across all

49 (Pages 411 to 414)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                         July 15, 2008

Page 415

1  the NDCs for all the years?
2      A.   Right.  All 11 years, all 44 quarters.  44
3  NDCs, 44 quarters.  So what that -- and I believe that
4  works out to 1936 possible NDC-quarter combinations.
5  The actual number is somewhat lower for the reason
6  that I mentioned.  But yes.  So probably 1850 or so
7  NDC-quarter combinations I would have a 95th
8  percentile pharmacy price.
9      Q.   And I'm sorry if I missed the first thing
10 you said.  Why did you choose the 95th percentile as
11 opposed to something else?
12     A.   Right.  The 96th or the 93rd --
13     Q.   Yeah.
14     A.   In general as in economic research, the
15 parameter that is most commonly used to summarize a
16 distribution -- so as an empirically oriented
17 economist I'm used to trying to summarize complicated,
18 large scale data sets for the reader of my studies,
19 readers of my studies.  And so the most common
20 parameter that is used to summarize a distribution is
21 the average pharmacy price.
22     But one issue is that there may be some

Page 416

1  heterogeneity in the sense that it may be that
2  certain -- that there is some heterogeneity across
3  customers in the price.  And so this -- really this
4  95th percentile price is -- you know, at some level it
5  is -- the 95th percentile is a parameter that is often
6  used to summarize a distribution to get a sense in
7  comparison with the average of how much heterogeneity
8  there is in the data.
9      Of course one can represent all 100
10 percentiles or even all of the data.  But in general
11 this is a way to get a sense of the heterogeneity.
12 And so what I'm trying to provide to the reader of my
13 report here is some guidance on to what extent that
14 moving from, let's say, the average to the 95th
15 percentile would influence my difference calculations.
16     And then below that is the 125 percent of
17 the average pharmacy price, which is the one that I
18 use in the analyses that follow.  That becomes
19 basically the benchmark.  And this here is just to
20 give the reader a sense of how things vary, for
21 example, if one uses an unweighted average as opposed
22 to a weighted average, one considers all customers, if

Page 417

1  one considers the points at the very high end of the
2  distribution, and so forth.
3      In general, an examination of this table
4  reveals the number of claims with a difference value
5  of zero is moving by less than one percent in each
6  case -- by less than a half a percent, I think, in
7  each case.  Maybe slightly more than a half a percent
8  in one case.  And the value of difference is moving
9  by -- I guess from the average all customer to the
10 95th percentile it moves by about 7 percent.
11     But as you can see, the benchmark that I
12 used is this 125 percent of the average, which
13 produces a set of four numbers that are quite similar
14 to those for the 95th percentile.
15     Q.   And what you found is that using the
16 benchmarks that you calculated here and that are shown
17 on figure 13B is there was not much difference in
18 which measure you used in the difference calculation;
19 is that fair to say?
20     A.   Once again, we return here to the issue of
21 dollars versus proportions.  But in going from, let's
22 say, the average to the 95th percentile, for example,

Page 418

1  the decline in the total difference is less than 5
2  percent.  In going from the average -- and the decline
3  in the number of claims is less than a half a percent.
4  So, you know, whether that is -- to me given the -- it
5  is certainly not a massive change.  You know, there's
6  some variation.
7      Q.   You found that the results across those
8  five scenarios were very similar; is that right?
9      A.   Right.  I think they -- based on --
10 proportionally, yes, they're quite similar.
11     Q.   Now, in the Texas litigation you calculated
12 a 99th percentile price; is that right?
13     A.   That's correct.  I also did a median, a
14 75th and a 90th.  But yeah, I did six parameters there
15 and in this case I'm doing several calculations as
16 well.  But -- some unweighted, some all customer and
17 so forth.  But that's right, I did do a 99th -- I
18 conducted analyses with a 99th percentile as well.
19     Q.   And in the Texas litigation --
20     A.   Can I -- I'm just going to grab my Texas
21 report --
22     Q.   Sure.

50  (Pages 415 to 418)

a580633e-555e-4e70-82e5-a331182efa1e

Page 419

1    A.   -- so that I'm on the same page.
2    Q.   Table 11 maybe is the place we ought to go.
3    1103.
4    A.   And I believe here if one wants to sort of
5    do -- as I mentioned earlier, the Texas case, there
6    are many more products.  So in the interests of a sort
7    of more apples to apples comparison, table 12A is more
8    comparable to my -- let's say -- because it's for HPD
9    products, hospital products division, it's more
10   comparable, with the caveat that in Texas the time
11   period that's under consideration is late 1995 to I
12   believe 2005.  Maybe it's 2006.
13        So the time periods don't overlap
14   perfectly.  But the PPD products, for example,
15   summarized in table 12B, there's much more
16   heterogeneity -- much more decline moving from the
17   average to the 95th than one observes in going from
18   the average to the 95th for the HPD products.
19   Q.   And you would attribute that to differences
20   in the -- I can't pronounce the word you used --
21   heterogeneity in the PPD products than the HPD
22   products across all the sales; is that right?

Page 420

1    A.   It could represent the confluence of two
2    factors, differences in the degree of heterogeneity,
3    but also differences in the magnitude of the
4    discrepancy between the actual average and, let's say,
5    the published average.  So just to give an example,
6    suppose that for HPD products there are two prices, 1
7    and 2, and they're equally common and the published
8    price is 10, whereas for PPD products there are two
9    prices, 1 and 2, and with an average price of 1 and a
10   half.
11        I'm not sure -- I mean, I'm trying to do an
12   example here on the fly.  Basically they have the same
13   amount of heterogeneity, but whether one uses the
14   average or the 95th is going to depend -- they have
15   the identical amount of variation in their price
16   distributions, but whether the magnitude by which that
17   difference will decline as you go from the average to
18   the 95th, it's going to be a much greater decline in
19   the case of the PPD versus the HPD.
20   Q.   Now, as I understand it in this case you
21   did or someone did calculate a 99th percentile price
22   for the 44 NDCs; is that right?

Page 421

1         MS. BROOKER:  Objection, form.
2    A.   For the federal case?
3    Q.   Yes.
4    A.   Yes.  I believe that in carrying out my
5    analyses I calculated a 99th percentile.  Here I
6    presented the average and the 95th, not the 75th, not
7    the 50th and not the 90th nor the 99th because to some
8    extent there are many states and so forth.  And so it
9    is -- here the -- which price parameter exactly I
10   report for there's much less heterogeneity.
11        And that is apparent also from table 12A.
12   And this is in my Texas report.  And as I said the
13   difference doesn't move much in Texas as you go from
14   the average to the 95th.  And the same is -- nor does
15   it move much going from the 95th to the 99th.
16   Q.   Is that for the HPD products?
17   A.   Yeah, for the HPD -- they're different,
18   because I believe there are 44 products at issue in
19   the federal complaint and I believe approximately half
20   of those appeared in the Texas case.  So there are
21   about 95, I believe, HPD products in the Texas case.
22   So it's certainly not an apples to apples, both

Page 422

1    because the products differ somewhat and because the
2    time periods differ somewhat.
3         But, you know, they're the same -- a
4    similar relationship here.  I think the decline going
5    from the average to the 95th in Texas is slightly
6    higher.  And that could reflect the fact that
7    different time periods are being considered there.  I
8    can -- it could reflect many things, but --
9    Q.   Why did you not indicate in your report in
10   this case that you had calculated a 99th percentile
11   price?
12        MS. BROOKER:  Objection, form.
13   A.   Once again, there's -- I believe that --
14   part of the purpose of this table right here is to
15   give the reader a sense of this heterogeneity issue.
16   I felt that two parameters that would quite -- in
17   addition to the average unweighted, the average all
18   customer, 125 percent of the average, I felt that two
19   parameters that would very usefully summarize my
20   results would be the average and the 95th.
21        I also didn't include the median, the 75th
22   and the 90th.  And to some extent that was in the

51  (Pages 419 to 422)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 423

1   interests of -- there's obviously -- as you mentioned
2   earlier, there's a lot in the report.  And so I'm
3   trying to provide analyses but not -- I'm trying to
4   summarize a massive amount of data, but not completely
5   overwhelm the court and others with an interest in the
6   case.
7           I would fully expect that -- yeah.  So --
8       Q.   Did you discuss whether or not to indicate
9   that you would calculate a 99th percentile with
10  counsel?
11      A.   No, not that I recall.
12      Q.   If you would go to table 10 of your report.
13      A.   Okay.
14      Q.   In the federal case?
15      A.   This is in the Federal Court -- yeah.
16      Q.   This is a comparison of price statistics
17  with average wholesale price for a particular
18  vancomycin NDC.
19      A.   Mm-hmm.
20      Q.   On the right part of the page you have a
21  section called pharmacy indirect customers.  There's a
22  95th percentile price -- an average price, then a 95th

Page 424

1   percentile price, then a maximum price.  Do you see
2   that?
3       A.   Mm-hmm.  Right.
4       Q.   What is the maximum price?  Is that the 99
5   percentile?
6       A.   It can be.  The two can be equal.  My
7   recollection is that the maximum, though, sometimes
8   exceeds the 99th percentile -- often would exceed the
9   99th percentile.  So basically if you have, let's say,
10  a thousand customers and they all purchase, let's say,
11  the exact same quantity -- let's say they all purchase
12  one unit -- basically the 99th percentile is going to
13  be the price such that 990 paid less or the same and
14  10 pay the same or more, whereas the maximum is going
15  to be the absolute maximum out of all 1,000
16  transactions.
17      Q.   So the maximum prices in this table reflect
18  at least one sales price that occurred in that
19  quarter --
20          MS. BROOKER:  Objection, form.
21      Q.   -- correct?
22      A.   Yes.  That is correct.

Page 425

1       Q.   Now, if you'd go down to let's say 1997
2   quarter 1, there's a -- it looks like the price there
3   is $13.90.  Do you see that?  Maximum price?
4       A.   Yes, I do.
5       Q.   And then that amount remains the same
6   through 2004 -- I'm sorry -- 2001 quarter 4, correct?
7   The same maximum price -- you found the same maximum
8   price for that product for every quarter from 1997
9   quarter 1 through 2001 quarter 4, correct?
10      A.   Yeah.  That appears to be true, yes.
11      Q.   Now, do you know why that is, why there is
12  such consistency there?
13      A.   In the maximum price?
14      Q.   Yes.
15      A.   No.  I'm not exactly sure, just as I'm not
16  exactly sure why the average is declining during that
17  same period.
18      Q.   If we go back to 13B, what you did -- I
19  think you indicated this earlier -- what served as the
20  but for price, so to speak, in your analysis across
21  the states was a 1.25 average pharmacy price when
22  you're dealing with states that used AWP; is that

Page 426

1   right?
2           MS. BROOKER:  Objection to form.
3       A.   That is correct.
4       Q.   And you could have used a 1.25 95th
5   percentile price instead, right?
6       A.   I could have done that, but I don't
7   believe -- I believe -- as I mention in my report,
8   already by telescoping in on the pharmacy classes of
9   trade I think I'm being conservative.  And then by
10  scaling by an additional 25 percent I believe that I'm
11  being conservative.  I wouldn't -- so that is -- I
12  could have, but I wouldn't have felt it was
13  appropriate.
14      Q.   Now, in your Texas deposition Ms. Geisler
15  was asking you some questions about some things about
16  this percentile issue.  And you stated "I haven't
17  stated -- I haven't said that the difference that
18  should be used is the one that uses the 90th or the
19  50th.  I have said this is how the Texas Medicaid
20  spending would have changed if Abbott had reported
21  prices that were actually paid for its products such
22  as the average, the median, the 75th, 95th and so

52 (Pages 423 to 426)

Duggan, Ph.D., Mark G. - Vol. II                          July 15, 2008

Page 427

1  forth."
2        And then page 176 --
3    A.   I don't think I have this.  Do I have this?
4        MS. BROOKER:  I assume he's going to let
5  you look at it after he's done.
6        MR. TORBORG:  I will.
7        BY MR. TORBORG:
8    Q.   I'll let you look at page 176, it's
9  probably a little bit cleaner.  175, line 22, through
10 177, line 1.  How about just to make it easier, so you
11 don't have to memorize this, I'll do what I did before
12 which is just to --
13   A.   Bracket it.
14   Q.   -- bracket it.  Just take a look through
15 that, if you would.  You don't need to read it aloud.
16   A.   (Reading.)  Okay.  I got it.
17   Q.   I think the gist of the testimony there was
18 that you were not advocating for a specific parameter
19 to be used in the difference calculation; is that
20 right?
21   A.   I think that that's -- yes.
22   Q.   And in this case you used the average

Page 428

1  parameter; is that right?
2    A.   125 percent of the average in most -- for
3  most states.  But, I mean, it's exactly -- the
4  principle that applied in the Texas case is what
5  applies here in table 13B, which is I am trying to
6  give the interested reader, the court and others with
7  an interest in my results, guidance on the extent to
8  which the difference varies as I, for example, move
9  from the average to the 95th percentile or as I move
10 from the average weighted to the average unweighted,
11 or as I move to consider all customers simultaneously.
12       So in a sense I -- that's exactly what I'm
13 trying to accomplish here.  And, you know, as I said,
14 I believe that I'm choosing -- to the extent I'm
15 telescoping in on one of these rows, I'm telescoping
16 in on one that I believe is conservative for the
17 reasons that I've mentioned before.
18   Q.   At the end of the day when you did the
19 executive summary for the report and calculated the
20 difference of $108 million, you had to make a choice
21 of which to use to present your findings; is that fair
22 to say?

Page 429

1        MS. BROOKER:  Objection to form.
2    A.   As I outline in the report, my results --
3  my findings for Medicaid and for Medicare reflect the
4  use of -- for example, here, 125 percent of the
5  average.  So I telescoped in on that as a plausible --
6  as I said in the report, I believe, a conservative
7  estimate of what -- how federal government spending
8  would have varied if the alternative prices that I
9  described had been reported, published and used.
10       And so here the reader can see for
11 themselves the magnitude of the heterogeneity, granted
12 for a specific state.  And it is -- I did focus on
13 this one.  But it is exactly why I provided this other
14 information about how my findings vary if I use an
15 unweighted rather than a weighted average, how it
16 varies when I use the 95 percentile and so forth, so
17 that the interested reader could see for themselves.
18 And this issue loomed much larger in the case in Texas
19 for the PPD products and the Pedialyte products than
20 for the HPD products.
21       So part of the reason that I went into more
22 detail on this issue in Texas than here was that it

Page 430

1  was clearly an important -- it did have a greater
2  effect, for example, going from the average to the
3  95th, changing things by more than 40 percent, I
4  believe, about 40 percent, whereas here it's less than
5  5 percent.
6    Q.   But if you look at table 10 it relates to
7  the vancomycin product that you referred to repeatedly
8  in your report as having the highest expenditures of
9  any NDC.
10   A.   For Medicaid.
11   Q.   For Medicaid.
12   A.   And I should just give the five minute
13 warning.  We had said 5:15, so I just want to --
14   Q.   Yeah.
15       If you had used the 99th percentile for
16 that product, given what you see on table 10, you may
17 not have as much heterogeneity as table 13B suggests;
18 is that right?
19   A.   My -- I would of course want to go back and
20 look at this.  But my recollection is that in general
21 for the Abbott products the 99th percentile was
22 typically closer to the 95th percentile than to the

53 (Pages 427 to 430)

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 431

1  maximum.  And that's partly because the maximum price
2  was often a price where very few units were sold,
3  perhaps.  And I'm not sure exactly why that is.  But
4  in general if one -- you know, the numbers are already
5  pretty small.  If I had added a 99th percentile column
6  in here my sense is that on average it would be closer
7  to the 95th than to the maximum.
8          And, you know, that is -- so even though --
9  like at some of them the maximum is the 100th
10  percentile.  So the 99th is in that respect closer to
11  the 100th than the 95th.  But given the distribution
12  of prices I'm pretty sure -- it's certainly quite
13  distant from the maximum on average.
14    Q.   You could have used the maximum price as
15  one of your price points as well, right?
16    A.   Right.  In general, as I outline in my
17  report, what my -- one of my goals is to assess how
18  Medicaid and Medicare spending would have changed if
19  prices that were generally and currently paid were
20  used in the adjudication of claims.  So there may
21  be -- the maximum is often a very rare price.  And so
22  it doesn't seem to me that that's generally and

Page 432

1  currently paid.  It can be depending on the NDC and
2  the quarter at issue.
3    Q.   And if you used the maximum price your
4  result -- your overall difference calculation of $108
5  million may have been much less, correct?
6      MS. BROOKER:  Objection, form.
7    A.   It may have been somewhat less.  So for
8  example if we just do a mechanical examination here,
9  for example, in that quarter you referred to, you
10  know, the 7.5 versus 13.9, so 7.5 95th and 13.9
11  maximum versus an AWP of 66.  So there would be a
12  mechanical decline in that case.  So the disparity
13  would go from about $59 to about -- the disparity
14  would go from about $58 to about $52, so decline by
15  about 10 percent.
16          In this particular case that you had
17  outlined earlier, though, I should note that in the
18  case of the Medicare array analysis, often this kind
19  of issue would have very little effect -- and I guess
20  we haven't gotten through that -- but because it isn't
21  necessarily a one for one decline there because the
22  median is moving.

Page 433

1    Q.   One last question and then I'll let you go.
2    A.   Okay.
3    Q.   The $66 AWP may not have been what any
4  state Medicaid program paid for that particular
5  product in that quarter, correct?  They could have
6  paid a maximum allowable cost?  They could have paid a
7  usual and customary, right?
8      MS. THOMAS:  Objection to form.
9    A.   In that specific quarter, 1997, quarter 1,
10  I don't -- I obviously don't recall what was paid for
11  every 653301 claim, Medicaid claim, during that
12  quarter.  It's certainly true that some were paid on
13  the usual and customary.  Some may have been paid
14  using a MAC.  But I would expect that in some cases
15  too this AWP was used.  It would vary -- it would
16  depend on the state and depend on the specific claim
17  and so forth.  But it is -- I think that it was
18  often -- did form the basis for the reimbursement.
19      MR. TORBORG:  Okay.  Why don't we conclude
20  for today.  I understand we're going to come back next
21  Friday --
22      MS. BROOKER:  And start at 10:00, right?

Page 434

1      MR. TORBORG:  -- starting at 10:00.  I'll
2  do my best to get done then.
3      THE VIDEOGRAPHER:  This deposition adjourns
4  for today.  The time is 5:15.  And it consists of four
5  tapes.
6        (Whereupon, at 5:15 p.m. the videotaped
7  deposition was adjourned.)
8              * * * * *
9
10
11        _____
12        SIGNATURE OF THE WITNESS
13
14  Subscribed and sworn to and before me
15  this _____ day of _____, 20_____.
16
17
18  _____
19      Notary Public
20
21
22

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. II                    July 15, 2008

Page 435

1   UNITED STATES OF AMERICA   )
2
3   DISTRICT OF COLUMBIA      )
4          I, JONATHAN WONNELL, a Notary Public in and
5   for the District of Columbia, do hereby certify that
6   the within transcript is a true and accurate record of
7   the testimony under oath and other proceedings in the
8   above-entitled matter.
9          I further certify that I am not a relative,
10  employee, attorney or counsel of any of the parties to
11  this action and that I am in no way interested in the
12  outcome of this matter.
13         IN WITNESS WHEREOF, I have hereunto set my
14  hand this _____ day of _____, 2008.
15
16
17
18         _____
19              JONATHAN WONNELL
20
21  My Commission expires:
22  October 1, 2012

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

a580633e-555e-4e70-82e5-a331182efa1e

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 436

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -


     Videotaped deposition of MARK G. DUGGAN PH.D.

                    Volume III


                    Washington, D.C.

                    Friday, July 25, 2008

                    9:00 a.m.

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 437

1       Videotaped deposition of MARK G. DUGGAN PH.D.,
2   held at the law offices of Jones Day, 51 Louisiana
3   Avenue, N.W., Washington, D.C. 20001-2113, the
4   proceedings being recorded stenographically by
5   Jonathan Wonnell, a Registered Professional Court
6   Reporter and Notary Public of the District of
7   Columbia, and transcribed under his direction.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 438

1        A P P E A R A N C E S   O F   C O U N S E L
2
3        On behalf of the United States of America:
4            MARK A. LAVINE, ESQ.
5            U.S. Department of Justice
6            U.S. Attorney's Office
7            99 N.E. 4th Street, Suite 300
8            Miami, Florida 33132
9            (305) 961-9003
10           mark.lavine@usdoj.gov
11           -- and --
12           RENEE BROOKER, ESQ.
13           The U.S. Department of Justice
14           Civil Division
15           601 D Street, N.W.
16           Washington, D.C. 20044
17           Patrick Henry Building
18           Washington, D.C. 20044
19           (202) 616-3797
20
21
22

Page 439

1        A P P E A R A N C E S   (Cont'd)
2
3        On behalf of Ven-A-Care of the Florida Keys,
4            Inc.:
5            SUSAN SCHNEIDER THOMAS, ESQ.
6            Berger & Montague P.C.
7            1622 Locust Street
8            Philadelphia, Pennsylvania 19103-6305
9            (215) 875-3000
10           sthomas@bm.net
11
12
13
14
15
16
17
18
19
20
21
22

Page 440

1        A P P E A R A N C E S   (Cont'd)
2
3        On behalf of Abbott Laboratories, Inc.:
4            DAVID TORBORG, ESQ.
5            Jones Day
6            51 Louisiana Avenue, N.W.
7            Washington, D.C. 20001-2113
8            (202) 879-3939
9            dstorborg@jonesday.com
10           -- and --
11           CAROL P. GEISLER, ESQ. (via phone)
12           Jones Day
13           77 West Wacker
14           Chicago, Illinois 60601-1692
15           (312) 269-4174
16           cgeisler@jonesday.com
17
18
19
20
21
22

2 (Pages 437 to 440)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                              July 25, 2008

Page 441

A P P E A R A N C E S (Cont'd)

1
2
3    On behalf of Dey, Inc., Dey, L.P. and Mylan:
4        MARISA A. LORENZO, ESQ. (via phone)
5        Kelley, Drye & Warren LLP
6        101 Park Avenue
7        New York, New York 10178
8        (212) 808-7697
9        mlorenzo@kelleydrye.com
10
11
12    ALSO PRESENT:
13        ZACHARY SULLIVAN, DOJ intern
14        MEREDITH TOOLE, DOJ intern
15        DAVID MONTES, DOJ intern
16        DAVID VOIGHTSBERGER, videographer
17
18
19
20
21
22

Page 443

I N D E X   O F   E X H I B I T S (Cont'd)

1
2    NO.  DESCRIPTION                        PAGE
3    Exhibit Abbott 1118, Expert Report of Stephen   575
4        Schondelmeyer (no Bates ref)
5    Exhibit Abbott 1119, Excerpt from the 3/12/08   599
6        deposition of Harry Leo Sullivan (p.
7        58-61, 106-109 and 150-157)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 442

C O N T E N T S

1
2    WITNESS NAME                           PAGE
3    MARK G. DUGGAN PH.D.
4        By Mr. Torborg:              445
5
6
7            E X H I B I T S
8    NO.  DESCRIPTION                        PAGE
9    Exhibit Abbott 1112, EXP USABT-DUG 146161    477
10   Exhibit Abbott 1113, excerpt from the 1997   481
11       National Pharmaceutical Council report (p.
12       2/11)
13   Exhibit Abbott 1114, Spreadsheet produced by   482
14       Jones Day entitled state rankings based on
15       CMS data (no Bates ref)
16   Exhibit Abbott 1115, EXP USABT-DUG 147477    486
17       through 147484
18   Exhibit Abbott 1116, Four page document    508
19       entitled "max9901.log" (no Bates ref)
20   Exhibit Abbott 1117, EXP USABT-DUG 003190    532
21       through 003191
22

Page 444

P R O C E E D I N G S

1
2                    (10:14 a.m.)
3        THE VIDEOGRAPHER:  Good morning.  Here
4    begins tape 1, volume 3 of the continued video
5    deposition of Mark G. Duggan Ph.D.  We are on the
6    record.  Today is July 25th 2008 and the time is
7    10:14.  Go ahead.
8        MR. TORBORG:  Sorry.  I have an issue.
9    Let's go off the record.  Sorry.
10       THE VIDEOGRAPHER:  Off the record.
11       (Discussion off the record.)
12       THE VIDEOGRAPHER:  We are back on the
13   record at 10:16.
14                * * * * *
15       Whereupon,
16           MARK G. DUGGAN PH.D.,
17       called as a Witness, having been
18   previously duly sworn by Jonathan Wonnell, a
19   Notary Public in and for the District of
20   Columbia, was further examined and testified
21   as follows.
22                * * * * *

3 (Pages 441 to 444)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                        July 25, 2008

Page 445

1  EXAMINATION RESUMED BY COUNSEL FOR ABBOTT LABORATORIES
2        BY MR. TORBORG:
3     Q.   Welcome back, Professor Duggan.
4     A.   Thank you.
5     Q.   Just to review the way things work here,
6  some ground rules for today, you realize that you're
7  still under oath, correct?
8     A.   Yes.
9     Q.   Most importantly, if you don't understand
10 any question I ask, please ask me to clarify.  Okay?
11    A.   Objection.
12    Q.   I'll try to take a break about every hour.
13 Let me know if you need to take a break before then.
14    A.   Okay.  Sounds great.
15    Q.   Since your first two days of your
16 deposition last week have you had discussions with
17 counsel?
18    A.   Yes, I have.
19    Q.   Did those discussions involve anything more
20 than logistics?
21    A.   Anything more than logistics.  Certainly
22 logistics was one issue.  Yes, I believe a bit more.

Page 446

1  Yes.
2     Q.   Okay.  Who did you have those discussions
3  with?
4     A.   With Susan Thomas and with Renee Brooker.
5     Q.   Anyone else involved?
6     A.   I believe just those two.
7     Q.   Apart from logistics, what did you discuss
8  with Ms. Brooker and Ms. Thomas?
9     A.   One issue that I recall discussing was that
10 it would be -- you know, it might be helpful to
11 expedite things if I leaded with an answer and then --
12 as opposed to giving background and then leading up to
13 an answer, just try to start sooner with an answer.
14 That might help to move things along.
15    Q.   Do you recall anything else that you
16 discussed?
17    A.   I recall my thinking out loud a bit about
18 where I felt I was not as crisp as I could have been
19 and, you know, there's -- that would be one thing.
20    Q.   Which areas did you think that -- and when
21 you say you were not as crisp you meant in the
22 deposition?  Is that -- or in your report?

Page 447

1     A.   Yes, in the deposition.
2     Q.   In the deposition?
3     A.   Yes.
4     Q.   And which areas were you thinking out loud
5  for which you thought you were not as crisp as you
6  otherwise would have liked to have been?
7     A.   It's difficult for me to recall exactly
8  where now.  So just let me think a bit.  So basically
9  I scanned over my transcript.  I certainly didn't read
10 it carefully, but scanned over it.  And places where I
11 felt I could have explained my algorithm, for example,
12 more crisply.  That would be one example.  But it's
13 difficult for me to recall.  Sort of just going over
14 all of the back and forth.
15         I discussed a bit with them my desire to
16 look into the Ohio issue that you brought up.  So you
17 had raised an issue in the deposition about Ohio
18 dispensing fees, compound drugs.  And so -- and
19 basically I am in the process of drilling down on that
20 issue now.  So those are -- I'd be -- those are two
21 examples.
22    Q.   Anything else you recall?

Page 448

1     A.   I recall talking a bit about the dispensing
2  fee issue that we discussed.
3     Q.   And when you say dispensing fee issue what
4  do you mean by that?  Let me see if I can short cut it
5  a little bit.
6     A.   Sure.
7     Q.   Because I think we talked about the
8  dispensing fee issue last time and came to an
9  agreement, I think, about what it means.  Is it the
10 notion that if you reduce the ingredient cost payment
11 you may have to increase the dispensing fee aspect of
12 reimbursement?  Is that a fair characterization of
13 what you meant when you said dispensing fee issue?
14    A.   That's along the same lines of what I would
15 describe.  That's not exactly how I would -- like you
16 may have -- but just this issue of ingredient cost and
17 dispensing fees, yeah, that issue.
18    Q.   What do you recall discussing with them
19 about that issue?
20    A.   So I recall making the point that in my
21 judgment -- so essentially what I recall is that later
22 in the deposition I felt like I sort of answered in a

4 (Pages 445 to 448)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                          July 25, 2008

Page 449

1  crisper way, but it took me a while to get to that.
2      Q.   Now, what I recall about that -- but I
3  don't know it's a fair characterization of what you're
4  remembering.  But toward the end I think you came out
5  and said that you really didn't address that issue.
6  Is that fair to say?
7          MR. LAVINE:  Object to form.
8          MS. THOMAS:  Objection.
9      A.   I guess that's not how I would describe it.
10     Q.   Tell me how you would describe it.
11     A.   Okay.  So what I think I said was that I
12 considered the issue of dispensing fees but there's --
13 I guess there's quite a bit I said so I don't want to
14 go through everything.  But some of the big picture
15 points that I felt that I had made was that I
16 considered the issue, these 44 products represent a
17 very small share of all Medicaid drug spending.  I
18 believe if we were to integrate over the '91 to 2001
19 period I believe it would be less than a tenth of a
20 percent of all Medicaid spending.
21         And so given that that would have a small
22 effect on Medicaid revenues, given these 44 drugs.  It

Page 450

1  seems unnecessary to me to change dispensing fees for
2  all 40,000 NDCs, or more.  I don't know exactly how
3  many NDCs were being reimbursed during that eleven
4  year period.
5      Q.   Did you have discussions with counsel
6  between the two days of your deposition last time?
7  Apart from logistics.
8      A.   I'm trying to recall.  I think no.  I
9  pretty much afterwards was tired.  They had sort of
10 told me in advance we'll say it's going well
11 regardless.  And I was just curious.  It's hard to
12 judge if you're being articulate and crisp and so
13 forth.  But they seemed to think that I had done okay,
14 just in the general sense of -- but I can't recall
15 talking really at all about substantive stuff.  It's
16 possible.  But if I recall I pretty much left here and
17 walked -- went for a walk afterwards.  So -- and then
18 I don't think we talked that night over the phone or
19 anything.
20     Q.   Did you have any substantive conversations
21 during the breaks that we took in the first two days
22 of deposition?

Page 451

1      A.   I recall one thing at lunch on the second
2  day, that it would be useful to try to get to the
3  answer more quickly, you know, up-front, and then
4  provide the option to elaborate.  And so that is
5  something that I recall.
6      Q.   Now, on the dispensing fee issue is it your
7  opinion, Dr. Duggan, that there would be no need to
8  increase dispensing fees for the 44 NDCs at issue in
9  this case if reimbursement for ingredient cost was
10 reduced to the prices you calculated in your report?
11         MS. THOMAS:  Objection.
12     A.   Can you clarify what you mean by necessary?
13     Q.   In order to pay a fair amount to providers.
14         MR. LAVINE:  Object to form.
15     A.   I guess just to lead, I'm unclear on the
16 definition of a fair amount to providers.
17     Q.   Well, you know what I mean by amount,
18 right?
19     A.   Sure.
20     Q.   You know what I mean by providers, right?
21     A.   Fair I think is the word.
22     Q.   It's the fair that you want to get some

Page 452

1  clarification on.  Well, when you use the word fair in
2  your day-to-day interactions what do you mean by it?
3      A.   I guess it varies from situation to
4  situation.  I probably can't replicate what's in
5  Webster's.
6      Q.   How about "equitable"?
7      A.   That in the dictionary as one?
8      Q.   Lots of possibilities for fair, including a
9  gathering held at a specified time or place for the
10 buying and selling of goods.  I don't mean that.
11     A.   Right.
12     Q.   I mean the typical understanding of what
13 fair would mean in terms of the equitable notion of
14 it.
15     A.   Right.
16         MR. LAVINE:  Object to form.
17     A.   So I think that of course over the first
18 two days we discussed this issue a bit.  And one of
19 the things that I said was that a pharmacy or
20 healthcare provider in making a decision about whether
21 to participate in Medicaid or not, there are many,
22 many factors to consider.  Of course not just these 44

5  (Pages 449 to 452)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                                July 25, 2008

Page 453

1  NDCs, but other NDCs.  And of course not just what the
2  people -- what the net revenues are for those
3  products, but also if the net revenues associated with
4  people who come in the door and buy -- you know, buy
5  other things.
6        And as an economist, I also know that
7  accurately measuring costs is -- you know, it's a
8  formidable challenge.  There's the distinction between
9  average costs and marginal costs.  There's the issue
10 of -- it's quite complicated, this issue of measuring
11 costs.  And so the two points that I want to make is
12 that I think the one important thing for a pharmacy in
13 deciding whether to participate in Medicaid or not
14 will be the impact on their profitability from these
15 44 NDCs from the other 40,000 NDCs or however many --
16 you know, they may not consider all of them -- and
17 from the other revenue that's generated when people
18 come in the door.
19       Additionally these effects on profits, it
20 may be that if Medicaid reimbursement changes,
21 increases, more pharmacies decide to sign up --
22 possible -- or that if Medicaid reimbursement declines

Page 454

1  Medicaid pharmacies elect not to -- possible.  That's
2  an issue that policymakers confront when designing
3  these programs.  And hospitals, for example, all the
4  time decide we're not going to go with Medicaid
5  anymore, we are going to go with Medicaid and so
6  forth.  It's not necessarily a good or bad thing.  One
7  has to drill down on the details.
8        Q.   Let's focus, Professor Duggan, on the 44
9  NDCs at issue in this case and the reimbursement paid
10 by Medicaid to providers for those NDCs.  Do you have
11 an opinion on whether reducing payment for ingredient
12 costs down to your levels, whether it would be
13 necessary to increase dispensing fees to provide fair
14 compensation for the dispensing of those products?
15       MR. LAVINE:  Object to form.
16       A.   As I said, it's difficult to separate that
17 issue from the issues that I raised before, the sort
18 of interconnectedness between these 44 NDCs and others
19 from Medicaid.  And so my -- I guess getting back to
20 what my report sets out to do, as we talked about it
21 does hold fixed these dispensing fees.  And in my view
22 that was this ceteris parabus analysis.  All else

Page 455

1  equal, it was an appropriate and informative thing to
2  do taking all relevant factors into account.
3        Q.   Is it fair to say given your response that
4  you don't have an opinion on the question that I
5  asked?
6        MR. LAVINE:  Object to form.
7        A.   Can you just -- can you read back the
8  question?
9        Q.   I can try to restate it and maybe it will
10 help get us to where I want us to go.
11       A.   Okay.
12       Q.   Focusing on the 44 NDCs at issue in this
13 case and the reimbursement that would be paid for
14 those 44 products to providers under your but-for
15 world -- do you understand what I'm talking about?
16       A.   (Nods head).
17       Q.   Basically reducing ingredient costs to the
18 levels that you provide in your report.  Do you have
19 an opinion as whether it would be necessary to
20 increase dispensing fees in that but-for world in
21 order to provide fair reimbursement to providers?
22       MR. LAVINE:  Object to form.

Page 456

1        A.   Once again, I just -- I think the term
2  necessary is -- it's somewhat vague.  And that's sort
3  of why I --
4        Q.   Take out necessary.  Do you have an opinion
5  on whether to provide fair reimbursement to providers
6  of these NDCs in your but-for world you would need to
7  increase dispensing fees?
8        MR. LAVINE:  Object to form.
9        A.   It seems to me that -- I think it is -- for
10 the reasons that I mentioned before, because any
11 pharmacy in making a decision is going to consider not
12 necessarily one NDC at a time out of all the 40,000
13 NDCs, but it's going to take in the big picture.  So
14 given that these 44 NDCs account for such a small
15 share of total drug spending, Medicaid drug spending,
16 it in my view is not necessary for what I set out to
17 do to adjust the dispensing fee.
18       Now, my understanding is there's a process
19 that policymakers and so forth and providers and --
20 for debating these kinds of issues.  And so to some
21 extent -- I'll just leave it at that.  But it seems
22 there is a process where everyone can get to the table

6  (Pages 453 to 456)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 457

1  and debate that kind of issue.
2      Q.   Everybody can get to the table and debate
3  what a fair reimbursement amount would be, correct?
4          MR. LAVINE: Object to form.
5      A.   It seems that there are discussions
6  frequently about -- between healthcare providers and
7  the government and other interested parties about the
8  details of reimbursement policy. There's a certain
9  set of -- each state and the federal government have a
10 certain adjudication algorithm in place. And if given
11 that adjudication algorithm there's an issue there's a
12 process by which providers and policymakers can
13 discuss that issue.
14         But it seems to me the issue of reporting
15 these prices were, as I outline in my report, far
16 higher than the actual transaction prices. In some
17 cases 10 or even 15 to 1, 1500 percent, above.
18     Q.   Prices are the reported prices?
19     A.   Reported. The published prices. That's
20 right.
21         So it seems -- I guess that was a decision
22 that the firm made, Abbott made, or -- you know,

Page 458

1  there's -- about what prices to report. So that was
2  their decision as opposed to a back and forth of here
3  are our prices, now let's talk about this dispensing
4  fee issue. Abbott decided to publish these prices
5  that were ten or fifteen times greater in some cases.
6  In some cases they were very close, but in some cases
7  ten or fifteen times greater. Abbott decided to do
8  that, it's my understanding.
9      Q.   Do you have any evidence, Professor Duggan,
10 that Abbott sat around to look at these prices and
11 said, gee, they're ten times to fifteen times higher
12 than acquisition cost --
13         MR. LAVINE: Object to form.
14     Q.   -- and they made a decision to report those
15 in order to fool or cheat Medicare or Medicaid? Any
16 evidence whatsoever of that?
17         MR. LAVINE: Object to form.
18     A.   I know that -- it is my understanding based
19 on the prices that appear in First Databank and Red
20 Book for average wholesale price, wholesaler
21 acquisition cost and direct price that Abbott had
22 something to do with the prices that appeared in those

Page 459

1  compendia, that they reported those prices, and -- you
2  know, there are always exceptions to anything. But in
3  general that Abbott reported those prices.
4          I understand that Abbott has produced quite
5  a lot of documentation associated with products at
6  issue in this case. That hasn't been the thrust of my
7  analysis. What I do know is that Abbott was selling
8  products for the kind of prices that I utilize in my
9  report and very different prices were published in the
10 pricing compendia. That's what I know. I haven't
11 gotten inside the Abbott box to assess who's doing
12 what. But there is -- as a company they're selling at
13 one set of prices and given the assumption -- I'm
14 assuming that First Databank and Red Book are in most
15 cases reporting what Abbott published -- published
16 what Abbott reported.
17         So they're selling for a certain set of
18 prices, reporting at a very different set of prices,
19 and that's the -- I think the company, the entity, I
20 think there was knowledge of the prices and there was
21 knowledge of the publishing of these other prices.
22 And --

Page 460

1      Q.   Knowledge by who?
2          MR. LAVINE: Object to form.
3      A.   So, once again, just with a caveat that I
4  am not someone who's tried to figure out who in Abbott
5  reports prices to the compendia and who -- that's not
6  been the area of my analysis. But my understanding is
7  that -- my assumption is that someone at Abbott
8  provided information to these pricing compendia that
9  led to these prices being published. I don't know
10 who. I don't know who that might have been.
11     Q.   Now, you stated a while back -- you talked
12 about parties coming to the table to discuss
13 reimbursement issues that may happen if there's a
14 change in ingredient cost reimbursement. Right?
15         MR. LAVINE: Object to form.
16     A.   If there's a change -- I guess can you
17 restate the question?
18     Q.   You stated earlier something about a
19 process to debate this issue. I'm just reading my
20 notes.
21     A.   Sure.
22     Q.   A process to debate this issue, parties

                                  7 (Pages 457 to 460)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                         July 25, 2008

Page 461

1  coming to the table.  What were you talking about
2  there?
3      A.   You know, that's certainly not an area that
4  is the focus of my analysis.  But there are --
5  Medicaid and Medicare are two very complicated
6  programs with a set of rules in place.  And companies
7  have the option to participate in these -- like in
8  Medicaid, for example -- or not.  A company, a
9  healthcare provider, be it a hospital, an HMO or a
10 pharmaceutical firm, pharmacy, what have you, might
11 raise issues to policymakers and there can be -- there
12 is -- it seems to me that there is an opportunity for
13 firms or people affected by government programs to
14 voice their concerns.
15      So once again, that area is not the focus
16 of my analysis but here there's a certain set of
17 adjudication algorithms in place at any point in time
18 in Massachusetts, in Arizona, Florida, California, so
19 forth.  And given that adjudication algorithm a
20 healthcare provider may raise the concern to the
21 government, wait a second, this is problematic for
22 reason XYZ.

Page 462

1      So that seems -- it seems to me -- and once
2  again, this is not the area of -- this is not the
3  focus of my analysis.  But it seems to me that Abbott
4  could have reported prices that were more reflective
5  of prices paid in the market and there could have been
6  an ensuing discussion.  But once again, that's not
7  the -- as you see in this report, that's really not
8  the -- this legislative decision-making and so forth
9  isn't the focus of my analysis.
10     Q.   Indeed the entire but-for world that your
11 analysis creates, paying ingredient cost levels at
12 amounts that you calculate, skips the entire parties
13 coming to the table and people expressing their
14 concerns and the possible need to increase payments in
15 other areas, correct?
16          MR. LAVINE:  Object to form.
17     A.   For -- because, as I mentioned at the
18 outset, this is a pretty specific set of products,
19 this is a very small set of products, it is -- we're
20 talking about 44 products.  Now, it could have been --
21 the number of products in this case could have been
22 larger.  I wasn't involved in the selection of the

Page 463

1  products.  In Texas there were many more products than
2  are here.  They are very specific.  There were some
3  more Abbott products at issue in Texas than there are
4  here.
5          At issue here are these 44 products.  And
6  as I've pointed out last time, these 44 products
7  constitute a very small share of -- would represent a
8  very small share of revenues for any pharmacy.  And so
9  for -- in terms of these 44 products, if prices had
10 been reported more accurately for these 44 products,
11 the impact on a pharmacy's reimbursement -- and you
12 can find an example of some pharmacy somewhere for
13 which this wouldn't be true.  But in general it's
14 going to be a very, very small share of their overall
15 business.
16     Q.   Do you know what types of providers
17 provided the 44 NDCs at issue in the case?
18          MR. LAVINE:  Object to form.
19     A.   So it is my understanding that the main
20 type of provider, if we sort of think big picture,
21 would be pharmacies.
22     Q.   What kind of pharmacies?  Wallgreens?

Page 464

1          MR. LAVINE:  Object to form.
2      A.   There are some prescriptions from Walgreens
3  in the data.  I don't know exactly how much.  So
4  it's -- I would want to go -- I'm just going to look
5  at something here in my report for a second.
6      Q.   Incidentally, to clarify my question, it is
7  the type of providers who purchased these products or
8  used these products and sought Medicaid reimbursement?
9  That's a better question.  I think that's how you
10 understood the question.  I just wanted to refine it.
11     A.   Okay.
12          MR. LAVINE:  Object to form.
13     A.   So using the Abbott classification of the
14 products at issue in this case, the ones that I focus
15 on are the retail pharmacies and the closed pharmacies
16 and to some extent the chain pharmacies, but as --
17 chain pharmacies are smaller than those other two.
18 And by focusing on those classes of trade -- I could
19 have considered all classes of trade, non-profit
20 hospitals, city or county hospitals and so forth.  But
21 those hospital providers tend to have lower prices.
22 Instead I focused on pharmacies which tend to have

8 (Pages 461 to 464)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 465

1  higher prices, which reduced this value of difference
2  below what it otherwise would be.  In a sense it was
3  favorable to Abbott.
4          I would want -- you know, I could -- I
5  understand that the pharmacy -- the typical pharmacy
6  that provides these drugs may not be exactly
7  representative of the typical pharmacy that
8  participates in Medicaid.  But I would want to drill
9  down on that issue somewhat more before -- you know,
10 I've sort of deferred to some extent -- I've
11 considered many documents in this, but I've deferred
12 to some extent to the Abbott classification.
13         Abbott has more than 400 classes of trade
14 that it can use and for these products it chooses to
15 use retail pharmacy, closed pharmacy and chain
16 pharmacy quite frequently.  There isn't really much of
17 a distinction between -- within those categories.  But
18 as I said, I expect that the pharmacies that provide
19 these products probably differ somewhat from the
20 typical pharmacy, just as the pharmacies that tend to
21 provide Lipitor probably differ if you telescope in on
22 a certain group.

Page 466

1     Q.   Do you have a sense for what proportion of
2  the claims filed to Medicaid programs for these 44
3  products were retail pharmacies, chain pharmacies,
4  closed pharmacies or other types of providers?  Any
5  sense at all?
6     A.   I'm sorry.  Can you -- I just want to make
7  sure I understand what you said.  Can you repeat it?
8     Q.   That was about as good as I can do.
9          MR. TORBORG:  Can you read it back?
10         (Whereupon, the requested portion was read
11 by the reporter.)
12         MR. LAVINE:  Object to form.
13    A.   Are we talking about NDC-based Medicaid
14 reimbursement?
15         BY MR. TORBORG:
16    Q.   Yes.  Good question, though.
17    A.   J code NDC.  Yeah.
18    Q.   Good question.  Good clarification.
19    A.   In terms of NDC-based Medicaid
20 reimbursement it would certainly be higher than it
21 would for J code reimbursement.
22    Q.   What would be higher?

Page 467

1     A.   The proportion -- what proportion of the
2  claims for these 44 products are for prescriptions
3  dispensed by retail pharmacies, closed pharmacies,
4  that proportion would -- I'm pretty confident -- I
5  haven't calculated it, but I'm pretty confident that
6  percentage would be substantially higher than the
7  NDC-based.  So the NDC-based -- for example hospitals
8  would plausibly use these.  But once again, as I
9  outline in my report, I've focused exclusively on the
10 NDC-based Medicaid claims within Medicaid.
11    Q.   I'm sorry.  I think we might be at a
12 different wavelength.  Let me see if I can clarify the
13 question.
14    A.   Sure.
15    Q.   Do you know what specialty pharmacies are
16 as opposed to like a Walgreens or an independent
17 pharmacy that typically dispenses pills?
18    A.   I have some familiarity.  I haven't
19 examined that specific, what are the exact differences
20 between them and so forth.  And there might be of
21 course -- as there always are when you categorize
22 things there are these hazy lines, pharmacies that

Page 468

1  could be classified under one or the other but it's a
2  bit hazy.  But I haven't carefully examined that
3  specific distinction.
4     Q.   So my question clarified is do you have a
5  sense for the proportion of who filed these NDC-based
6  claims to Medicaid programs between a retail pharmacy
7  versus a specialty pharmacy and other pharmacies like
8  that?
9          MS. THOMAS:  Objection to form.
10    Q.   "Like that" being the specialty pharmacies.
11         MS. THOMAS:  Objection to form.
12    A.   I would want to look into that issue more
13 just because I'm not sure if the -- the crisp
14 definition of specialty pharmacies.  So within the
15 Abbott data retail pharmacy and closed pharmacy are
16 two quite common providers.  Would specialty within
17 Abbott's accounting system be classified as closed or
18 retail or something else, I just would want to examine
19 that issue more and formulate a precise definition of
20 a specialty pharmacy that differs from -- because, you
21 know, my experience with this kind of thing, whenever
22 one tries to categorize things neatly, specialty

9 (Pages 465 to 468)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 469

1   versus -- it is often hazy.
2        It seems plausible to me it would be hazy
3   here. And given that it's going to depend on where
4   one draws the line between specialty and others.
5        Q.   Have you prepared any kind of analysis that
6   would determine what proportion of revenues that the
7   providers who submitted the claims for the drugs at
8   issue in this case -- what proportion of the revenues
9   are attributable to those 44 NDCs? That wasn't the
10  best-worded question, but I'm hoping that you got it.
11       MR. LAVINE: Object to form.
12       A.   It's tricky because if one looks the number
13  of pharmacies that dispense these -- so wait. Let me
14  just try to.
15       Q.   The question was whether you have done the
16  analysis.
17       A.   Haven't done.
18       Q.   Okay. That was my question.
19       A.   Right. But I just -- can I clarify now?
20       Q.   Do you feel a need to?
21       A.   I'm endeavoring to answer it sooner and
22  then clarify.

Page 470

1        It is tricky because if one looks at the
2   number of pharmacies that dispense these drugs, how
3   does one weight the different pharmacies. Some
4   pharmacies may dispense many of the prescriptions,
5   many may dispense relatively few. So there are some
6   tricky identification issues involved there. But I
7   have not done the specific analysis that you -- if I
8   understand correctly, what you asked was have you done
9   the analysis figuring out what fraction of a
10  pharmacy's revenues these 44 drugs account for. Is
11  that a paraphrasing --
12       Q.   Yeah. Good enough.
13       A.   Yeah. I have not done that analysis.
14       Q.   And you have done no analysis to determine
15  what it costs a provider to provide these drugs to a
16  Medicaid beneficiary; is that right?
17       MR. LAVINE: Object to form.
18       A.   That is correct. That is not something
19  that I did. Although I should mention that -- with
20  the caveat that the cost to dispense the drug is not
21  the only relevant issue for the things that I
22  mentioned earlier, because of the reasons I mentioned

Page 471

1   earlier.
2        Q.   What other issues? The other products that
3   they made?
4        A.   So just to give you an example, how does
5   one apply fixed costs of operation, electricity, for
6   example, across prescriptions. People have thought a
7   lot about that issue. There can be very big
8   differences between average and marginal costs. If
9   one looks at average one might get one picture,
10  marginal a very different picture. Moreover, separate
11  from that is the issue of what other things the person
12  may purchase when they come through the door.
13       And the healthcare landscape is constantly
14  evolving. There's churning. There's pharmacies
15  opening, closing, hospitals opening and closing. It's
16  a very dynamic industry. There's quite a lot going
17  on.
18       Q.   You indicated a desire to look into the
19  Ohio issue of compound drugs and dispensing fees for
20  compound drugs, right? Have you done any analysis of
21  that since we met last week?
22       A.   At my direction Ian Dew, Mr. Ian Dew from

Page 472

1   Steck Consulting, has begun an examination of this
2   issue and that is -- you know, that's still in
3   progress. But basically you mentioned this point and
4   I was myself curious. I wanted to drill down. And
5   we've had limited time since the deposition, so I
6   haven't had time to sort of fully drill down on that
7   yet. But Mr. Ian Dew has started to look into it and
8   we've had some back and forth on it.
9        Q.   What have you discovered thus far in the
10  back and forth, in the preliminary work that you've
11  done?
12       A.   I don't have what he has found memorized.
13  But I do know that in the data -- so one thing that
14  we've started to do is drill down on the Medicaid
15  claims that I considered. So in Ohio I believe -- I'm
16  just going to pull out my Ohio sheet so I refresh my
17  memory.
18       Q.   Where are you looking, Professor Duggan, so
19  I can follow along?
20       A.   Table 21.
21       And so we started to examine those 331,000
22  claims. And as I outline in my report, I end up

10 (Pages 469 to 472)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 473

1  dropping some of them and so forth for various reasons
2  before my analysis. But basically beginning to
3  examine -- one step to what I've instructed him to do
4  is to examine -- drill down on all of these claims and
5  figure out if there's something that was missed. And
6  so what he has learned so far is that, if I recall
7  correctly, in the vast majority of cases the
8  dispensing fee that was implied by the algorithm was
9  accurate or -- there are some cases where it's off by
10 a dime. So we're looking into that.
11        But in any case, we started to -- I
12 certainly haven't reached closure on the issue. But
13 we've started to look at these claims.
14    Q.   Is there anything that you've found thus
15 far in looking at this issue that may require a change
16 to your analysis? I'm not asking for a final answer,
17 just what you know at this point.
18    A.   Not that I'm certain of. This 10-cent
19 issue for a small fraction of the claims -- but my
20 recollection is if we were to aggregate it up across
21 all the claims where it's an issue, I'm not sure it
22 would appear in the third decimal point of the numbers

Page 474

1  that I calculate so far. So that's one example of
2  something where I'm looking into it more probably
3  because our discussion last week made me curious.
4    Q.   Now, apart from asking Mr. Dew to look at
5  the claims data for Ohio, have you done anything else?
6  For example, have you talked to anyone from Ohio about
7  the issue?
8    A.   I have not yet. I have not. It's possible
9  that I will. It's possible that Mr. Dew will. But I
10 haven't yet. I did -- I'm kind of embarrassed, but I
11 took some vacation between the last deposition and
12 this one. So I admit I haven't been working all
13 eleven days since our last deposition.
14    Q.   Nothing to be ashamed of.
15    A.   Okay. All right.
16    Q.   As I understand it -- do you have an
17 understanding what compounding is?
18    A.   Some understanding of it. I am not a
19 pharmacist, but I have some understanding that that
20 represents in some cases at least combining two or
21 more drugs, two or more -- yeah, two or more drugs,
22 two or more treatments -- into one.

Page 475

1    Q.   Is it possible that if Ohio did pay a
2  compounding fee as some of the materials I showed you
3  last week indicated they may have during the claims
4  period that it wouldn't necessarily be in the data for
5  the specific NDCs we look at here? I mean, which drug
6  would you apply the compounding fee to if there's more
7  than one?
8        MR. LAVINE:  Object to form.
9    A.   As I said, we're looking into it. And the
10 kind of issue that you've just raised is something
11 that I intend to look into. I should note that even
12 if -- I suppose it is true that there are some
13 compounding fees that are not included in these
14 claims. I suppose it's true that there are some
15 compounding fees that are not included in these
16 claims.
17        In that it's not necessarily true that my
18 analysis which replaces the prices Ohio used to
19 adjudicate claims with these alternative prices that I
20 describe in my report, it's not necessarily true that
21 compounding fee would change. So it is -- and once
22 again, because it's not something that I've reached

Page 476

1  closure on, I'm digging deeper on the issue.
2        But it's -- even if it is true that we
3  missed it, you know, another possibility is that half
4  of the time -- suppose that there are two drugs that
5  tend to be compounded, an Abbott drug and a drug by
6  some other company. It could be the half of the time
7  it appears allocated to the Abbott product and half
8  the time to the other. It's possible. If it's an
9  issue that needs to be considered I'll get to the
10 bottom of it.
11    Q.   How long did you speak with Ms. Brooker and
12 Ms. Thomas? Was it a phone call or did you have an
13 in-person meeting? I'm talking about the meeting
14 between last week and today.
15    A.   Yeah. Not in-person. If I were to
16 aggregate up -- because I think there were two or
17 three -- because Susan Thomas wasn't in -- they didn't
18 have me on speaker phone, for example. I guess we did
19 do -- I think there were -- I think I had one call
20 with Susan and one call with both of them on a
21 conference call. And Mark was on that conference call
22 also. Mark Lavine. I apologize. So that's just to

11  (Pages 473 to 476)

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 477

1  backtrack.
2       So I would say if I were to aggregate up,
3  an hour and a half.
4       MR. TORBORG: Okay. I think we need to
5  change the tape, so why don't we go ahead and take a
6  break.
7       THE WITNESS: Okay.
8       THE VIDEOGRAPHER: Okay. We're off the
9  record at 11:11.
10      (Recess.)
11            (Exhibit Abbott 1112 was
12            marked for identification.)
13      THE VIDEOGRAPHER: This is the beginning of
14 tape 2 of the video deposition of Mark Duggan. We are
15 back on the record at 1:29.
16      BY MR. TORBORG:
17  Q.  Dr. Duggan, I've handed you what we've
18 marked as Abbott Exhibit 1112. It bears the Bates
19 number EXP USABT-DUG 146161. For the remainder of the
20 day instead of reading off all the letters I'm just
21 going to read off for the record the last six digits.
22  A.  Okay. Sure.

Page 478

1   Q.  This is an e-mail from Renee Brooker to a
2  distribution. Particularly I wanted to ask you to
3  look at the e-mail at the bottom of the page. Ms.
4  Brooker refers to having a single phone call this week
5  instead of our usual Tuesday and Friday. My question
6  is, Dr. Duggan, do you have phone calls twice a week
7  with counsel?
8   A.  Let me think. So I think during the
9  full -- we're back on, right? I can't even remember
10 if we --
11  Q.  We are.
12  A.  Okay.
13      During the full 30 months -- 29, 30 months,
14 whatever it is -- typically no. I do think there were
15 times when -- and I'm just trying to remember what was
16 going on in December of 2007. I think this was around
17 the time of my Texas deposition, which I believe was
18 on -- a couple days earlier. So I think that there
19 were a period of time where we did some twice a week
20 calls. But for the vast majority of the time it was
21 once a week.
22      In fact if I were to guess based on what I

Page 479

1  recall I would say zero calls was more common than two
2  calls in a week. But there were some weeks when --
3  especially when Texas was ramping up or was -- yeah.
4  There was two.
5   Q.  The last sentence of Ms. Brooker's e-mail
6  states "Susan, maybe you can have Bill ready to join
7  us when we complete the other issues to discuss the
8  FDB project." Do you see that? Do you have any idea
9  what is being referred to with the FDB project?
10  A.  I'm just trying to recall. I'm not sure
11 exactly. We certainly talked about First Databank.
12 But I don't know what she's referring to here, the
13 First Databank project. I'm not sure.
14  Q.  I notice there's a woman with a name of
15 Margaret Moore on this e-mail chain.
16  A.  Yes.
17  Q.  She's an attorney for the state of Texas;
18 is that right?
19  A.  That's right.
20  Q.  Did you have a number of discussions with
21 her in connection with your work in the Texas
22 litigation?

Page 480

1   A.  Yes.
2   Q.  If you had to estimate how many, what would
3  you say?
4   A.  So if she was on a conference call, would
5  that be -- calls basically in which both of us were on
6  the phone?
7   Q.  That's right.
8   A.  With the caveat that I'm abstracting from
9  the logistic type calls and so forth, I would say 40,
10 35. But there's some -- there's a confidence interval
11 around that. But that's my best guess, 40.
12  Q.  And you also had some discussions with
13 officials from the Texas Medicaid program, correct?
14  A.  I believe it was -- yes, I did have some.
15  Q.  And those discussions included the topic of
16 claims data; is that right?
17  A.  Yes.
18  Q.  Last time we looked at an exhibit which we
19 marked as Exhibit 1101 which were your handwritten
20 notes. Do you recall us talking about those?
21  A.  Yes, I do.
22  Q.  And in particular there was some

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                     July 25, 2008

Page 481

1  handwritten notes about states for which you had
2  requested claims data. Do you remember that?
3     A.   Yes.
4     Q.   Now, one of the ones on that list was
5  Texas. Do you remember that?
6     A.   I don't recall that, but I'll believe -- I
7  think there were a list of like eight or nine states.
8  And yeah, I think Texas was on there. But I'm not a
9  hundred percent sure.
10    Q.   Now, Texas is one of the largest -- Texas
11 has -- it's one of the largest states in terms of
12 Medicaid drug expenditures; is that right?
13    A.   If one considers all Medicaid -- all NDCs,
14 that is correct. NDC-based Medicaid drug
15 reimbursement, yes.
16         MR. TORBORG: Let's mark this as Exhibit
17 113.
18              (Exhibit Abbott 1113 was
19              marked for identification.)
20         BY MR. TORBORG:
21    Q.   This is an excerpt, Dr. Duggan, from the
22 1997 National Pharmaceutical Council report. You're

Page 482

1  familiar with these reports, right?
2         MR. LAVINE: Object to form.
3     A.   Yes. I'm not sure if I've seen this one,
4  but I'm familiar with NPC reports. Yeah.
5     Q.   If you go to the second page of this
6  exhibit -- which I've given you an excerpt -- the
7  second page of the exhibit, you'll see that Texas
8  ranks third for the year 1996 of all the states based
9  on drug payments; is that right?
10    A.   That's correct. Right. I'm just -- these
11 numbers seem plausibly to be total NDC-based Medicaid
12 spending by state. It doesn't say that on the -- but
13 that's what it appears. It seems like that, that's
14 what it is.
15              (Exhibit Abbott 1114 was
16              marked for identification.)
17         BY MR. TORBORG:
18    Q.   Professor Duggan, this is an analysis that
19 I've had prepared that purports to rank the states for
20 total drug expenditures both across all drugs and then
21 for the drugs in the complaint for the claim period at
22 issue in this case, which is 1991 to 2001, according

Page 483

1  to the state drug utilization data maintained by CMS.
2  I'm not asking you to vouch for this. But does it
3  appear --
4     A.   Just can you say again what this is?
5     Q.   This is an analysis that I've asked -- that
6  people who help me get ready for this deposition have
7  prepared to rank the states by total drug expenditure
8  amounts both for all drugs and then for the drugs at
9  issue this case, which is the third column entitled
10 "CMS utilization stipulated drugs." Okay?
11    A.   Okay. So the first one is everything, all
12 drugs.
13    Q.   Correct.
14    A.   And the third column is the drugs at issue
15 in this case.
16    Q.   That's right.
17    A.   Okay. Sorry.
18         MS. THOMAS: I would just note that on this
19 exhibit it indicates that there is stuff that is
20 shaded in blue and it does not appear to be in what
21 was produced.
22         MR. TORBORG: Yeah. I don't have a colored

Page 484

1  copy. But I'll represent to you that that doesn't
2  really matter for the questioning.
3         MS. THOMAS: Okay.
4         MR. TORBORG: But I see your point.
5         BY MR. TORBORG:
6     Q.   Dr. Duggan, does it appear here that Texas
7  had the fourth highest expenditures on all drugs
8  according to this table?
9         MR. LAVINE: Object to form.
10    A.   Fourth highest NDC-based expenditures
11 across all drugs, according to the SDUD data. Yes.
12 Once again, as you said --
13    Q.   I'm not asking you to vouch for it.
14    A.   Yeah.
15    Q.   I'm just trying to get to the point here.
16    A.   Yeah. Absolutely.
17    Q.   And then for the drugs at issue in this
18 case they were 13th, isn't that right, according to
19 this schedule?
20    A.   Correct. According to this.
21    Q.   Now, Texas is not one of the 12 states for
22 which you have a separate analysis in your report,

                              13 (Pages 481 to 484)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 485

1  correct?
2      A.   That is correct.  One thing I just should
3  note about this number, ranked 13th.
4      Q.   Sure.
5      A.   My recollection is that in Texas there was
6  an anomaly.  So one thing I try to do in research is
7  figure out is there a problem here or there in the
8  data.  And there was a particular quarter when
9  spending was -- appeared to be -- there appeared to be
10 an error in the SDUD data.
11      So I believe if there's one case in
12 which -- I think this was really the only case in the
13 SDUD data -- where I -- there was one quarter of
14 information which had, I think, a million and a
15 half -- I can't remember, but let's say a million and
16 a half in spending in one quarter for a couple of
17 prescriptions or something.  And it was my -- and
18 based on my examination it appeared to be wrong.
19      So this 13th rank, this is -- actually
20 early on when I was first doing the project this is
21 similar to the rank that I got.  But once I corrected
22 when I'm pretty certain was an error, it fell down to

Page 486

1  about 20th.  I believe it's 20th, in that -- 19th,
2  20th, something like that -- in my list.  But you're
3  right, Texas is not one of the ones that I telescope
4  in on.
5      Q.   You telescope in on 12 states in which you
6  had a separate analysis, correct?
7      A.   Yes.
8      Q.   And 11 of those states are ones where you
9  use claims data produced by the state to perform the
10 analysis; is that right?
11      A.   Right.  And the discrepancy between the 11
12 and 12 is Indiana where I considered that data but
13 discovered it to have problems.  And that was one of
14 the values of having data from three different
15 sources.  I can sort of check data sets against one
16 another.
17      MR. TORBORG:  Let me mark another exhibit.
18          (Exhibit Abbott 1115 was
19           marked for identification.)
20      BY MR. TORBORG:
21      Q.   For the record, what I've marked as Abbott
22 Exhibit 1115 has the same prefix we talked about

Page 487

1  before and the Bates numbers 147477 through 84.  It
2  includes an e-mail from Ian Dew to a Kris Knerr.
3      A.   Kneer, I believe.
4      Q.   And it purports to attach a spreadsheet
5  that discusses the data that has been produced.  Let
6  me ask you first if you have ever seen this e-mail.  I
7  know you're not on it.
8      A.   I don't recall seeing this e-mail, no.
9      Q.   If you would look at the page ending with
10 the Bates number 479, the third page in, this is a
11 chart.  It looks like an Excel chart.  Bates page 480
12 appears to be a continuation of what's on 479.  It's
13 one of those really wide spreadsheets where you can't
14 fit it on one legal sized page.
15      A.   Right.  Sure.
16      Q.   The way I read this -- well, let me ask you
17 first, have you seen this chart or some version of
18 this chart before?
19      A.   I don't recall seeing this specific chart,
20 but certainly the information that appears to be
21 contained in that is familiar to me.
22      Q.   The way I read this is there's a column C,

Page 488

1  D and E and F that have a subheading "claims."  Then
2  there's some different rows between that, "NDC,
3  J code, formulary, Medicare.  Do you see that?
4      A.   Mm-hmm.
5      Q.   And there is a check mark next to various
6  states in various columns.  Do you see that?
7      A.   Yes.  I do.
8      Q.   And we've got a check mark next to Texas
9  for NDC and then to the right there's columns M and N,
10 there's a date range that says '96 through 2006.  Do
11 you see that?
12      A.   I do.
13      Q.   Does this indicate that your team had
14 received claims data for NDC claims for the state of
15 Texas for the period 1996 through 2006?
16      MR. LAVINE:  Object to form.
17      A.   That is what it -- that's what I think it
18 indicates, yes.
19      Q.   Did you have claims data for that period
20 for the 44 NDCs from the state of Texas?
21      A.   I don't recall the specific years for which
22 I had data, but I think I did have data for Texas.

14  (Pages 485 to 488)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                                    July 25, 2008

Page 489

1  That's right.
2      Q.   Why was Texas not one of your 11 states?
3      A.   So just to go to my report for -- I'm going
4  to go to my report for a second. I'm looking at table
5  12A in my report, which basically just lists -- I'm
6  sorry. It shouldn't be 12A. It should be 11 that I'm
7  looking at. Table 11. That lists spending by each
8  state on the -- according to the SDUD data after that
9  one correction with Texas that I described here.
10         And basically just giving a little
11 background, I basically -- at my direction Mr. Dew and
12 others at Steck Consulting focus initially on states
13 like Florida, Illinois and California instead of
14 states like Vermont, Alaska and New Mexico near the
15 bottom. And I analyzed most of the states for which I
16 had data -- Texas was one where I did not -- and it
17 was a sort of diminishing returns type reason, that
18 basically with -- and I in a sense penalized the
19 difference number later by using what I feel is a
20 quite conservative method to estimate difference for
21 states like Texas where I didn't use the data.
22         But it was this sense of it's number 20 as

Page 490

1  opposed to one of the top, let's say, 10 or -- the
2  closest one to Texas that I did consider was
3  Wisconsin, which was number 17, above Texas. And I
4  believe Wisconsin's data went back further. And so I
5  drew the line there. And to the extent that I didn't
6  analyze Texas I was conservative in my estimates for
7  it.
8      Q.   Do you think your analysis, Dr. Duggan, is
9  conservative in the favor of Abbott for the damages
10 that you calculate for the state of Texas? That's
11 what you think?
12     A.   I believe that -- so there are 38 states
13 for which I used the experience of the 12 states to
14 estimate the value of difference for these other 38
15 states. And on the whole I believe that the numbers
16 that emerge from my analysis are indeed conservative.
17 And, you know, how -- you know, whether one NDC in one
18 period in one state that's not true or -- you know,
19 but overall I think it is quite conservative.
20     Q.   Do you think it's conservative for the
21 state of Texas based on what you know about the state
22 of Texas and how it reimbursed these drugs?

Page 491

1      A.   The time periods at issue in the Texas case
2  and here were different, '91 to 2001 versus '95 to
3  2005. There was some action in Texas about certain
4  drugs being taken off the formulary and MACs being
5  applied to them and so forth. But my sense of my
6  findings for Texas, if we go later to -- it's pretty
7  far in. I believe it is.
8          Let's say table -- so in Texas I believe
9  that my -- so it's -- I have some data here that shows
10 a total difference, federal difference -- a total
11 difference of approximately 1.4 million relative to
12 expenditures of approximately 2.1 million. So that's
13 not the federal difference. That's the aggregate
14 difference. So -- and that is less than two-thirds of
15 spending in the state of Texas.
16         And it's not a perfect apples to apples
17 comparison because the HPD products in the Texas case
18 are somewhat different and the time periods covered
19 are somewhat different. But it is my sense that for
20 Texas the numbers are conservative and it is -- I'm
21 even more confident for the 38 states all told that
22 the numbers are conservative. Because when you

Page 492

1  telescope in on any one of 38 it's possible there's
2  a -- it's less conservative for Texas than, let's say,
3  for West Virginia. But in general I think for those
4  38 states it's quite conservative.
5      Q.   Well, we'll take a look at that today, I
6  promise.
7      A.   Yeah. Okay.
8      Q.   Is there a reason why Texas was not
9  included in your 11 states because it was only --
10 because it had less expenditures for the complaint
11 products?
12     A.   That isn't the only reason. That is -- I
13 considered many factors when determining which states
14 to include. So for example Wisconsin is number 17 in
15 terms of SDUD spending. And I consider that partly
16 because the data went back so far in time. As I
17 recall Wisconsin went back to -- let me check here in
18 my report. It went back to early '93, which wasn't
19 true for many of the states for which we obtained
20 data.
21     Q.   Any other reasons you can enunciate here
22 today why you did not include Texas in your 11 states

15  (Pages 489 to 492)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 493

1  or -- when I say 11 states I mean the -- what term
2  should I use for that?  Claims data states?  Would
3  that work?
4      A.   You can say "the eleven."
5      Q.   "The eleven"?  So when I say that --
6      A.   Yeah.  I think we're on the same page if
7  you just say "the eleven."
8           So my recollection is that in the case of
9  Texas it was a combination of the fact that
10 utilization -- you know, Texas isn't Alaska.  Alaska
11 has -- or Washington, D.C., they have very low
12 utilization.  But they have lower utilization for
13 these products than the other states that I did
14 consider.  So total spending was one factor.  How much
15 data we had was another factor.
16          Those were two of the more important -- I
17 would want to go back and look at was there anything
18 else.  But those were two factors that certainly
19 loomed large.  And especially for Texas it was
20 possible for me to gauge things by examining my Texas
21 report.  And I recall doing that to some extent
22 because there I believe the difference for the HPD

Page 494

1  drugs -- and at different time periods and somewhat
2  different drugs -- but it was somewhat higher if I
3  recall correctly, a different ratio.
4      Q.   A different set of products?
5      A.   Somewhat different.  But --
6      Q.   About half the products at issue in this
7  case were at issue in the Texas case?  Does that sound
8  right?
9      A.   Correct, although if we weight it by -- as
10 I show in that same table, table 11, there's a lot of
11 variation.  So for example 653301, that's in the Texas
12 case.  And that one right there accounts for, you
13 know, more than a fourth of spending for these
14 products.  So it's my sense that to the extent that
15 there was overlap between the two cases it was
16 differentially for products with a decent amount of
17 spending in that list of the 44 NDCs.
18     Q.   Now, last time I asked you why you focused
19 on giving claims data from certain states and not
20 others, correct?
21     A.   (Nods head).
22     Q.   And you stated "I believe that I requested

Page 495

1  especially data for the states that accounted for a
2  disproportionate share of Medicaid spending on
3  complaint products.  For example, Illinois."  Right?
4      A.   Sure.  Yeah.
5      Q.   Now, a particular state's expenditures for
6  the complaint NDCs is going to be based upon what?
7  What factors will go into that?
8           MS. THOMAS:  Objection to form.
9      A.   So a number of factors will go into it, the
10 number of Medicaid recipients, the number of
11 prescriptions per Medicaid recipient, those will be
12 two of the more important factors.  As you can see in
13 that list, the only states with 100,000 or more
14 prescriptions for the products at issue in this case
15 are the top ten in that list, Michigan and up.
16     Q.   What table were you on?  I'm sorry.
17     A.   This was table 11 of my report.  So if you
18 look in panel A of table 11 you'll see that the number
19 of prescriptions is for Michigan at number 10 and all
20 states above Michigan is 100,000 or more.  And for
21 Louisiana, number 11, or all states below it is less
22 than 100,000.  So at some level the first order of a

Page 496

1  quite important determinant, as that breaking point
2  makes clear, is the number of prescriptions in the
3  state reimbursed for the complaint products.
4           Another will be the amount paid for the --
5      Q.   Per claim?
6      A.   -- for a specific NDC, right.  So in
7  general, right.  That's exactly right.
8           So you can see from this table, for
9  example, that Ohio, which is one of the states that I
10 considered, is lowest among or states in terms of the
11 amount paid per prescription.  And this is a somewhat
12 crude measure because it's aggregating 44 products
13 into these two numbers.  And so there can be things
14 going on underneath this, different states may have
15 more vanco than sodium chloride and other states are
16 the reverse.
17          But in general it's -- Ohio is an example
18 of a state where the amount paid per prescription is
19 quite low.
20     Q.   So the amount of total expenditures will be
21 a function of the number of prescriptions and the
22 amount paid per prescription; is that fair to say?

16  (Pages 493 to 496)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 497

1     A.   Right.  It's basically a summation
2  across -- you can think of each prescription having a
3  price attached to it.  And so it's sort of an
4  aggregation across thousands and thousands of claims
5  within a particular state.  And so -- but that
6  price -- and it's sort of, to use an economist's
7  terminology, it's sort of a vector of prices.  So in a
8  sense each row of the data representing an NDC and
9  each column of the data representing a time period.
10  So it's like a vector of prices for the state.  That's
11  true.
12          And then there's of course the usual and
13  customary and so forth that can come in as well.
14     Q.   Now, by focusing on states with high
15  expenditures for the complaint products, isn't it
16  possible and in fact likely that your selection of
17  which states to include in the 11 states will be
18  upwardly biased to include states with higher amounts
19  of reimbursements paid per claim?
20          MS. THOMAS:  Objection.
21     A.   So I looked into this specific issue
22  because one concern would be suppose that -- suppose

Page 498

1  that every state had the same number of prescriptions,
2  for example.  And the same prescriptions for the same
3  products and so forth.  Then the variation would
4  purely be driven by that.  In this case as you can see
5  from the table much of the variation is driven by this
6  number of prescriptions.
7          But to sort of -- in considering that issue
8  of a sort of sample selection bias, I looked at
9  reimbursement -- NDC-specific reimbursement for the 11
10  states that I -- for the 11 states versus the 38
11  remaining.  And my recollection is that if anything
12  the amount paid per claim was higher than for the
13  other 38.  But they were comparable.  Because that's
14  certainly an issue that I was -- that was on my radar
15  screen.
16     Q.   Let's take a look at Louisiana in your
17  table 11.
18     A.   Sure.
19     Q.   85,000 roughly prescriptions.  Payment of
20  $4.3 million roughly; is that right?
21     A.   Yeah.
22     Q.   And Louisiana according to the table that

Page 499

1  is included on the document I marked as Exhibit 1115,
2  you had data for that state from 1995 through 2007,
3  right?
4     A.   Let me see here for a second.  I'm looking
5  at the e-mail and the attached spreadsheet?
6     Q.   Yeah.  Page 479.
7     A.   Okay.  Yeah.  I see that.  Right.  So
8  Louisiana had a bit of data in '94, but yeah.  '95
9  forward is fairly accurate.
10     Q.   And Texas had about 74,000 prescriptions
11  according to your table, right?
12     A.   Mm-hmm.
13     Q.   But much lower amount total paid than
14  Louisiana, correct?
15     A.   That's true.
16     Q.   You included Louisiana but you didn't
17  include Texas.  Why?
18     A.   Well, this -- comparing -- as I mentioned a
19  few minutes ago, comparing these two numbers one
20  can -- it obscures a lot of what's going on
21  underneath.  So for example in Texas, if I recall, the
22  utilization was relatively higher early in the sample

Page 500

1  period when prices would tend to be lower than later
2  in the sample period.  So there's variation that
3  underlies the Louisiana/Texas comparison.  Perhaps
4  Texas has fewer vanco claims -- vanco, if I recall, is
5  a product with relatively high spending per
6  prescription -- and more, let's say, sodium chloride
7  prescriptions, which are lower.
8          And so one can't with these two numbers,
9  you know, determine whether there really is any
10  difference.  One can drill down.  But one can make the
11  opposite argument too.  Looking at Louisiana versus
12  North Carolina above it, North Carolina had higher
13  reimbursement per prescription and it wasn't one of
14  the 11 states either.  And in general -- so in
15  considering the 11 versus the 38, if anything my
16  analysis suggests that -- they were very, very
17  comparable.
18          So inevitably -- one can then do the Ohio
19  is low and North Carolina is high and so forth.  So I
20  considered that very issue, the sample selection
21  issue, and it is -- at some level Ohio is the biggest
22  outlier in terms of average reimbursement per

17  (Pages 497 to 500)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 501

1  prescription.  And that holds when you drill down to
2  specific NDCs.  But I considered that and I actually
3  gave that state disproportionate weight in my analysis
4  even though at some level it has the lowest
5  reimbursement.
6         And giving Ohio disproportionate weight
7  relative to the other ten states in my subsequent
8  analyses is certainly favorable to Abbott.
9     Q.   You only gave Ohio disproportionate weight
10 because that was the state that had the most claims
11 data, right?
12        MS. THOMAS:  Objection.
13    Q.   They had claims data for all the quarters
14 in the complaint?
15    A.   Ohio had complaint data for all 44
16 quarters.  That's right.
17    Q.   That's why Ohio got more weight, right?
18    A.   That's correct.
19    Q.   Not because of any choice you made to make
20 it conservative to Abbott?
21    A.   No.  I think -- I guess I disagree with
22 that.  This is an example of a sort of fork in the

Page 502

1  road where I could have given other states greater
2  weight.  So just as an analogue later in my report I'm
3  looking at Medicare carriers.  And I have fewer arrays
4  for Florida Blue Shield than I do for Wisconsin
5  Physician Services.  And so it was a fork in the road.
6  And there I gave Florida Blue Shield similar weight,
7  the same weight as Wisconsin Physician Services, even
8  though I had fewer arrays for it.
9         So here is a good example of a fork in the
10 road where if -- I think it would be perfectly
11 reasonable to give Ohio one-eleventh of the weight
12 here.  But it would also I think be defensible to give
13 it disproportionate weight because I have more claims.
14 So here's a fork in the road where when it was
15 favorable to Abbott for Ohio I gave it
16 disproportionate weight and when it was favorable to
17 Abbott to do the reverse I did the reverse in the
18 example of Florida Blue Shield.
19        But you are right that the reason that Ohio
20 gets disproportionate weight is there is more claims
21 data for it.
22    Q.   And in Ohio the reason why they have lower

Page 503

1  reimbursement claims is because they had maximum
2  allowable costs established for the drug products,
3  correct?
4         MS. THOMAS:  Objection.
5     Q.   That's what you note in one of your
6  footnotes in your report?
7     A.   That is certainly one contributing factor,
8  right.
9     Q.   And do you know if those MACs were
10 established in the early periods where Ohio was given
11 greater weight than other states because it's the one
12 that has claims data?
13        MR. LAVINE:  Object to form.
14    A.   I would need to go back and look at that.
15    Q.   You mentioned before that one of the
16 reasons Texas may have had lower expenditures per
17 claim is because it may have had less utilization of
18 the NDC 74653301.
19    A.   Yeah.  That's one example of why it might
20 be.
21    Q.   And it could also be because Texas had a
22 MAC on that drug too, right?

Page 504

1     A.   For some of the period, although for --
2  certainly not for all of the period.  But just to
3  reiterate, I did this -- I looked at these -- I
4  compared these 11 states with these 38 states not on a
5  sort of aggregate basis like this, but digging more
6  deeply, NDC by NDC, and found them to be quite
7  comparable.
8     Q.   We're going to look at that.  Trust me.
9     A.   Okay.
10    Q.   Page 33 of your report, footnote 24, there
11 is a discussion there of states using SMAC prices for
12 one or more complaint products, correct?
13    A.   Yes.  I see that.
14    Q.   And you noted that this frequently occurred
15 in the Texas Medicaid program for Abbott products,
16 right?
17    A.   Yes.
18    Q.   Okay.  And a state having a maximum
19 allowable cost reduces the amount paid per claim than
20 if it did not have a MAC; is that right?
21    A.   In most cases it would.  In some cases
22 there might be a usual and customary paid or

18  (Pages 501 to 504)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                              July 25, 2008

Page 505

1  something.  But in most cases it sure would.
2      Q.   So including -- had you included Texas in
3  your 11 states that would have been something that was
4  conservative to Abbott, correct?
5      A.   I'm not sure about that.  Yeah.  I'm not
6  sure that's true.
7      Q.   I'm not asking if you're sure.  What do you
8  think?
9          MR. LAVINE:  Object to form.
10         MS. THOMAS:  Objection.
11     A.   I will say that the ratio of difference to
12  the amount paid for Texas in this federal report is
13  actually lower, if I recall correctly, than the
14  corresponding ratio in Texas, even though in Texas
15  the -- it extends beyond 2001 where the difference
16  ratios would be relatively lower because lower prices
17  were being used.  So I'm not sure that's true.  I
18  actually -- I don't think it would have a big effect.
19  And so I'm not sure.
20         I think -- you know, if one -- and
21  moreover, if one had included the states North
22  Carolina, Pennsylvania and so forth, that would push

Page 506

1  down Ohio's impact, which is -- you know, as I mention
2  in my report is in some respects the biggest outlier
3  of all.  And so if one were to -- I don't think it's
4  true for -- it's necessarily true for Texas.  And when
5  you say what do I think, I'm not sure.
6         So of the 38 states that remain it may be
7  that there is one state or more that if you put it in
8  would have a slight impact on this difference.  But in
9  the case of Texas, I actually -- I'm not sure that's
10  true.
11     Q.   Well, you state in your report more than
12  once that the inclusion of Ohio brings down the
13  average for the 11 states when you extrapolate it to
14  the other states, right?
15     A.   Sure.  It does.
16     Q.   And that's because they have maximums on
17  drugs, right?
18     A.   And -- that is certainly a part of the
19  reason.  But I don't think one can do a sort of apples
20  to apples comparison between Ohio and Texas because --
21  one could drill down on that issue, but my sense is
22  that Ohio -- I mean, Texas is different.  They dropped

Page 507

1  some of these products from the formulary for a
2  period.  But I think during the '91 to 2001 period my
3  sense is that Texas' numbers would be much higher than
4  Ohio's.
5      Q.   But they would also be lower than the other
6  11 states?  That would be your sense, right?
7      A.   I don't agree with that.  I really don't.
8  I mean, I just think it would necessitate more -- I
9  don't think it would have a big effect.  And to the
10  extent it would have an effect I think it would just
11  as plausibly raise that $108.2 million number as it
12  would lower that number.  But, you know, I don't have
13  all the data right here in front of me right now.  But
14  I think it's quite plausible.
15     Q.   You haven't done the calculation?
16     A.   I haven't done the calculation of 12 and 37
17  with Texas being one of the 12 versus my -- the
18  current 11 and 38.
19     Q.   Is it an issue you thought about before
20  today?
21     A.   This broad issue of sample selection and as
22  something that -- you know, as an economist trained in

Page 508

1  the analysis of microeconomic data that's never the
2  universe of data that one would like, one always has
3  to think about how does the data that you have compare
4  with the more general population.  And I definitely
5  considered that issue and am comfortable -- I made
6  exactly the selection that I feel was appropriate for
7  this.
8         And so -- but the sample selection issue
9  certainly occurred to me.  And that's exactly why I
10  drilled down on it.
11     Q.   You drilled down on it a bit, right?
12         MS. THOMAS:  Objection.
13         MR. LAVINE:  Objection.
14     A.   It depends on one's definition of a bit.  I
15  think I did quite a lot.  Looking at average
16  reimbursement by NDC for one group versus the other
17  group I think I did quite a lot.  And that's not some
18  simple back of the envelope type thing.
19             (Exhibit Abbott 1116 was
20             marked for identification.)
21         BY MR. TORBORG:
22     Q.   For the record, what I've marked as Abbott

19 (Pages 505 to 508)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 509

1   Exhibit 1116 is a four page document produced as part
2   of Mr. Duggan's work in this case at the top titled
3   "max9901.log."
4       A.   This is an extract, right, from my program?
5       Q.   I'm hoping you can tell me exactly what it
6   is.
7           MR. LAVINE:   Just to remind you, Dave, you
8   just slipped into your Mister instead of Doctor.
9           MR. TORBORG:   Oh.  Sorry about that.
10      A.   Let me just try to -- it's hard to -- this
11  is pages 150 to 153 of the output of Strata program.
12  And so here -- I'm just going to try to look at my
13  report for a second. (Reading.)
14          Right.  So I believe that -- was there a
15  question that you wanted me to explain what this is?
16      Q.   Yes.
17      A.   So if I recall this represents -- or I mean
18  I do recall.  This represents the output of one of my
19  many programs.  And this particular program is one of
20  the ones that I wrote to analyze the CMS MACs -- SMRF
21  MACs data.  I guess it's MACs from 1991 to 2001.  SMRF
22  from '98 and earlier.

Page 510

1           And so here I am -- I don't have page 149,
2   but I believe what's happening on 149 and earlier is
3   that I'm reading in the data state by state, this MACs
4   data, combining it into one file which includes --
5   basically you can think of this as a big Excel
6   spreadsheet with state -- with basically the unit of
7   observation being state NDC and quarter.
8           So really 51 states, let's say
9   potentially -- I don't know if Arizona or Tennessee
10  were in here, but -- let's say about 50 states, about
11  44 NDCs and about 44 quarters.  But perhaps now --
12  wait.  Not 44 quarters.  It's 12 quarters.  So --
13  right, 50 states, 44 NDCs, 12 quarters.  So -- but the
14  number of observations is lower than that product
15  would suggest, 18,734, because some states may not
16  have claims for a certain NDC and so forth.
17          But here basically I'm just summarizing a
18  bit this data for -- this is, yeah, just a summary of
19  the data.  So I've basically collapsed it by state and
20  listed the amount.  So it does look like all 51 states
21  are in there, including D.C.
22      Q.   What time period is this?

Page 511

1       A.   This is '99 to 2001.  And as you can see,
2   as I mentioned earlier, Texas is lower here than they
3   are overall.  They're 26th as opposed to 20th overall.
4           So I've listed basically the number of
5   prescriptions and total spending by state and then by
6   NDC and then by quarter.  And the numbers here diverge
7   slightly from those in table 12A because if I recall
8   correctly I dropped some claims before this table 12A.
9   But they're very similar.  So for example if you'd
10  look, Illinois has 175,249 claims in table 12A and
11  175,309 claims here.  So I dropped a very small
12  number.  I don't think that's --
13      Q.   In that column at the bottom of page 150
14  toward the right, MCD underscore PM tilde T?
15      A.   Yeah.  That's a Medicaid payment amount.
16      Q.   That E is -- basically that's saying 6
17  million there, right?
18      A.   Yeah that's right.  6.0 million.
19      Q.   Which correlates roughly to the amount we
20  see in 12A, for example, Indiana?
21      A.   Yes.
22      Q.   6.02 million?

Page 512

1       A.   Yeah.
2       Q.   Okay.  So tell me what you're doing here.
3       A.   Basically here in this part of my report
4   I'm introducing two of the data sets that I will use
5   to analyze the Medicaid data.  One is the state drug
6   utilization data, which is summarized on the table 11,
7   and the other is the CMS MACs data summarized in table
8   12A.  And what basically -- these are two data sets
9   that I'm in a sense -- what I'm doing right here is
10  just trying to summarize this data, so there's a lot
11  in the data, but summarizing it in a form that would
12  be accessible to a reader.
13          And then in the table I end up comparing it
14  to the SDUD data, the state drug utilization data.
15  And just to see to what extent the two line up.  Even
16  if there was not one single flaw in either data set,
17  the two wouldn't perfectly line up because this MACs
18  data year here, time period, is categorized by service
19  year whereas the SDUD data is categorized by a payment
20  period.  But here I'm just seeing are they in the same
21  ballpark to one another for each state.
22      Q.   Did you prepare this Strata sheet?  The

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                          July 25, 2008

Page 513

1   Strata is the program that's being used, as I
2   understand it.
3       A.   Yeah.  I ran this on my own computer.
4   That's right.
5       Q.   So this is a document you created?
6       A.   Right.  This gets created -- so I write a
7   program, run the program, and this is the output from
8   the program, basically.
9       Q.   And do you have all of your Strata on the
10  computer back at your office?
11      A.   It's at home.  So I have worked on this,
12  all this stuff, at home on a dedicated computer.  And
13  so this max9901 file -- now, it's hard for me -- this
14  was run on April 5th 2008.  It could be that between
15  that data and two and a half months later when I put
16  it in my report that I corrected an error or
17  something.  So this max9901.dta file may be slightly
18  different.  But basically a very close variant of it
19  should be on my computer.
20          MR. TORBORG:  We need to change the
21  videotape, so let's go ahead and take a break here.
22          THE WITNESS:  Okay.  That sounds good.

Page 514

1          MR. TORBORG:  I think we should try to get
2   another hour in before we do lunch because we didn't
3   start until 10:00, but I'll leave that to you guys,
4   what you want to do.
5          MS. BROOKER:  It's up to you.
6          THE WITNESS:  Yeah.  It's okay.  We can do
7   a 45 --
8          THE VIDEOGRAPHER:  This is the end of tape
9   2.  We're off the record at 12:26.
10         (Recess.)
11         THE VIDEOGRAPHER:  Here begins tape 3 of
12  the video deposition of Mark Duggan.  We are back on
13  the record at 12:42.
14         BY MR. TORBORG:
15      Q.   Welcome back.
16      A.   Thank you.
17      Q.   Would you go to page 78 of your report,
18  footnote 45?  Take moment to read that to yourself.
19      A.   (Reading.)  Okay.
20      Q.   Okay.  I think we've touched upon this
21  topic already today.
22      A.   Right.

Page 515

1       Q.   I asked those who helped me to provide me
2   if they could find it where in your analysis -- where
3   in your spreadsheets and your Strata you performed the
4   analysis that is discussed in this footnote.  Okay?
5   They did the best they could, I think, in providing me
6   what I've marked as Abbott Exhibit 1116.
7          Can you tell me if this document contains
8   the analysis that you did that you discuss in footnote
9   45; that is, comparing the reimbursement per claim for
10  the 11 states to the 38 states for the time period '99
11  through 2001?
12         MS. THOMAS:  Objection to form.
13         MR. TORBORG:  What the basis?
14         MS. THOMAS:  The intro about your people
15  looking and doing the best they could.
16         MR. TORBORG:  All right.  Okay.
17      A.   I'm not sure what is on pages 1 through 49
18  of this program.  It does appear this goes to the end
19  of a program.  So it is possible that it is in this
20  file.  It is possible that it is in -- it's possible
21  that it is in this file.  It does not appear to be.
22  But once again, I don't have the luxury of the full --

Page 516

1   the 149 pages that precede it.  But my guess from
2   looking at it is that that is not in here.
3       Q.   Okay.  Can you help -- do you know where
4   this analysis is in your Strata program?
5       A.   I certainly don't recall off the top of my
6   head.  I could certainly give instructions for how to
7   go about it.  And if -- because I have a fair number
8   of programs.  Basically there are these 18,734
9   observations.  And if one -- I would want to go back
10  and look.  I don't remember exactly.
11         MR. TORBORG:  Mark, if I could put a
12  request in for him to locate for me in the numerous
13  documents you've produced the Strata that supports
14  footnote 40, I think it will be in everyone's
15  interest.  There's a lot of stuff in his files and
16  this is what those people who helped me were able to
17  find.  And he's indicating he doesn't think this is
18  it, so maybe you can help me find it.
19         THE WITNESS:  And if it's the case that I
20  am unable to find it, I'm happy to try to reconstruct
21  it if that's not -- so --
22         MR. LAVINE:  We can talk about it and

21 (Pages 513 to 516)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

1  decide separately --
2       MR. TORBORG:  Okay.
3       MR. LAVINE:  -- how to handle it.
4       BY MR. TORBORG:
5       Q.   Because what 1116 shows me is it does show
6  me the number of claims per state -- Medicaid payment
7  amount per state for the time period 1999 to 2001,
8  right?
9       A.   That's across all NDCs, right.
10      Q.   And that's some of the stuff that you talk
11  about in footnote 45, right?  There you were looking
12  at this, time period 1999 through 2001, right?
13      A.   Yup.
14      Q.   But here this table doesn't have the actual
15  numbers, the average?
16      A.   The NDC-specific average.
17      Q.   Or the state-specific average either.
18      A.   Right.  So what I'm saying here in this
19  footnote is from -- during this three-year period the
20  average amount spent per claim is higher in 38 states
21  than it is for 11.  And at some level one could
22  calculate that from the -- it's possible one could

1  calculate that just from table 11 or 12A.  But then if
2  one drills down NDC by NDC, this is -- you know, it's
3  looking basically for each NDC the average for the 38
4  versus the 11.
5       Q.   And you believe that that analysis that you
6  did is contained on a schedule in your Strata
7  database?
8       A.   It is -- I think it is fairly -- it seems
9  plausible that it is.  I suppose it is possible that
10  I -- I mean, right here I try to be very clear about
11  what exactly that I'm doing.  So it seems plausible
12  that it's in the output of the program.  But once
13  again, because I analyze this data over a period of
14  time, correcting an error here or there -- yeah, I'm
15  not sure.  But if it isn't I think the footnote makes
16  pretty clear what it is that I'm doing.
17      Q.   Now, a particular claim might have
18  different amounts of units for an NDC; is that right?
19  For example, one claim may have five units of
20  vancomycin, one may have one unit of vancomycin?
21      A.   That's true.
22      Q.   How does that impact your analysis?

1       MR. LAVINE:  Object to form.
2       A.   Which analysis?
3       Q.   The analysis that you do that you discuss
4  in footnote 45.
5       A.   So it is -- the adjudication of each claim
6  takes into account a number of factors, the dispensing
7  fee, the usual and customary, the number of units, the
8  per unit cost that will be used and so forth.  So it
9  is -- the amount paid per prescription is to some
10  extent a function of the number of units.
11      Q.   Now, you did the analysis you discuss in
12  footnote 45 only for the years 1999 through 2001,
13  right?
14      A.   It is possible that I did it for other
15  periods and that this is just an example.  I can't
16  recall exactly if I did it for '91 to '98.  But I
17  believe that this was -- this was certainly one thing
18  that I did to consider the comparability of the
19  states.
20      Q.   Tell me everything else that you did to
21  compare the comparability of the states.
22      A.   Well, one thing I did, as I outline in my

1  report, is consider the frequency with which each
2  state used AWP, WAC or direct in the set of 38 states
3  to which I am extrapolating the Alaskas, the Vermonts
4  and so forth, relative to the 11 states for which
5  I'm -- the 11 states that we've been talking about.
6  And I believe that I have -- I think that's right
7  after footnote 45, you see that the majority of the 11
8  states, 8 out of 11, use the AWP, which is I guess
9  about 72 percent, whereas for the other 38 it is 30
10  out of 38, which is a little more, probably 76
11  percent.
12          The fractions are -- yeah.  So the
13  fractions are quite comparable.  That's an example of
14  another thing.  I'd need to go back to look at --
15  refresh my memory on things to see if there were other
16  things too.  But these are two things I outline in my
17  report to do that.
18      Q.   Okay.  As you sit here today can you tell
19  me, apart from the analysis you discuss in footnote 45
20  and the analysis that you discuss that you just
21  testified about and the comparison of the number of
22  times states used AWP versus other measures, anything

22  (Pages 517 to 520)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 521

1  else that you did to compare the 11 states to the 38
2  states?
3      A.   I mean, nothing is leaping to mind right
4  now, but it doesn't mean I didn't do other things.
5  It's just hard to recall everything that went into
6  this.  But these are the two things that I felt were
7  very important to mention.  But there may be -- I
8  don't think there are others mentioned elsewhere in
9  the report.  But I would need to go back and look at
10 it.  But I don't recall.  To answer your question, I
11 don't recall.
12     Q.   And you don't know if you did any
13 comparison of the type you discuss in footnote 45 for
14 the years 1991 through 1998; isn't that right?
15         MS. THOMAS:  Objection to form.
16     A.   Yeah.  I don't recall.
17     Q.   You could have excluded those years from
18 your 38-state difference calculation, right?
19     A.   1991 to 1998?
20     Q.   Yes.
21     A.   I don't think it would have been
22 appropriate to exclude them.  But I could have.  But I

Page 522

1  don't think -- I certainly don't think it would have
2  been appropriate to exclude them.
3      Q.   It would have been more conservative in
4  Abbott's favor to have excluded them, right?
5      A.   So --
6      Q.   Yes or no.
7          MS. THOMAS:  Objection to form.
8      A.   I'm -- if you mean would it reduce the
9  value of difference, then yes, it would be more
10 conservative, though I don't believe that it would be
11 more appropriate.  And I guess I'd also just like to
12 mention that if one looks at the 38 states versus the
13 11, the ratio of difference to the amount paid is
14 lower for those 38 states than it is for any of the
15 other states except for Ohio.
16         So in general the states California, New
17 Jersey, Florida, New York and so forth, in general
18 those difference ratios are on the order of 75
19 percent.  And typically for the other 38 states I
20 believe it's like 68 or 67 percent.  And so only Ohio
21 is lower than that.  And so in a sense I -- so yeah.
22     Q.   Are you familiar with the concept of

Page 523

1  circular reasoning in economics?
2      A.   I guess I would need for you to be -- I'm
3  familiar with the concept of circular reasoning,
4  but --
5      Q.   Well, the difference percentage that you
6  calculate for the 38 states is entirely dependent on
7  the application of the difference calculation you
8  establish for the 11 states, right?
9      A.   It depends on a bunch of factors.
10     Q.   And the product mix?
11     A.   What's that?
12     Q.   And the product mix?
13         MR. LAVINE:  David, please let him finish
14 his answers.
15     A.   It depends on many factors.  And basically
16 I -- you know, I try in my report to go through -- I
17 guess this is section 20 in my report -- to be as
18 transparent as I possibly can be in what my analysis
19 does.  And as an economist who's done a lot of applied
20 microeconomic research, I am conscious -- I have
21 experience with this issue of sort of one has a sample
22 but wasn't doesn't have the full population perhaps.

Page 524

1          And in a sense I believe I penalize the
2  difference number in Abbott's favor, in a sense, with
3  the method that I use to estimate difference in east
4  state -- for each product in each quarter in each
5  state basically on a claim-by-claim basis.
6      Q.   Do you think that you penalize Abbott as to
7  each of the 38 states?
8          MS. THOMAS:  Objection.
9      A.   No, no, no.  What I think I said is that I
10 penalize -- I reduce the difference amount, I lower
11 the difference amount, in -- I try to be conservative
12 in a number of ways that I've outlined in my report,
13 but I'm also trying to be accurate.  So it is my
14 belief that where I'd have every -- you know every
15 claim for every state that the value of difference
16 that would emerge would be higher than this $108
17 million.
18     Q.   But you've never done that analysis because
19 you don't have the data --
20         MS. THOMAS:  Objection.
21     Q.   -- yes or no?
22     A.   I have not done that analysis.  However,

23 (Pages 521 to 524)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 525

1  I've done something which I think very, very, very
2  closely approximates it.
3      Q.   So for 20 of the 44 NDCs your analysis
4  found the 38 states paid less per claim than the 11
5  states, correct?
6      A.   Yes.  That's what it says in the footnote.
7      Q.   Now, why would that happen?
8          MS. THOMAS:  Objection to form.
9      A.   And I should also note that -- just to
10  clarify something you said -- that the 24 where the
11  opposite was true account for 75 percent of the
12  spending.  But it could be true because -- there are a
13  number of reasons why it could be true.  One would be
14  the importance of the dispensing fee may differ
15  between two states for two pairs of drugs.
16          So for example you may have a drug, two
17  states, one with a dispensing fee of 5, the other with
18  a dispensing fee of 3, and, you know, there could be
19  something else about the formula that would differ.
20  There are just many factors.  It could be something
21  about the dispensing fee, something about the
22  ingredient cost reimbursement, the number of units,

Page 526

1  the price that's being used and so forth.  So there
2  are a number of factors that could produce that.
3      Q.   Do you know how much lower the average
4  amount spent per claim was for those 20 NDCs?
5      A.   I don't recall that right here nor do I
6  recall the average amount that the 24 were higher,
7  that the other 24 before higher.
8      Q.   My question was about the 20, not the 24.
9      A.   Right.  Okay.
10      Q.   If they want to talk to you about the 24,
11  they can come over after I'm done and ask about the
12  24.
13      A.   Okay.
14      Q.   Why not exclude the 20 NDCs from your
15  difference calculation?
16      A.   Once again, I don't think it would be
17  appropriate.  I'm trying -- in my report I'm trying to
18  get as accurate as possible an estimate of this
19  difference parameter that we've discussed.  And I
20  don't think it would be appropriate.
21      Q.   It would have been conservative in Abbott's
22  favor to exclude those 20 NDCs from your difference

Page 527

1  calculation, right?
2          MS. THOMAS:  Objection.
3      A.   It would serve to reduce -- it would tend
4  to reduce the value of difference.
5      Q.   Across all of the NDCs did you perform any
6  analysis to determine which states had lower than
7  average amount of reimbursement per claim?  Maybe I
8  should restate that.  I think you understand what I'm
9  saying, but it's not a very good question.
10          In your analysis of comparing the 11 states
11  to the 38 states, did you perform any analysis to
12  determine which of the 38 states had lower
13  reimbursement amounts per claim than the 11 states?
14      A.   If I recall -- and it's hard for me to --
15  one thing I recall I think was that Minnesota may have
16  been somewhat lower.  And I'm just going to go to my
17  report now and see if I'm remembering this correctly.
18  But --
19      Q.   What table are you looking at?
20      A.   Table 11.  But I -- basically it is
21  possible that within the 38 there are some that
22  reimburse -- it is likely that there will be some

Page 528

1  within the 38 that reimburse less than the average and
2  some more so.  And that could vary over time.  Some
3  states may use MAC and so forth somewhat more.  But I
4  didn't -- I considered that, but I didn't -- I don't
5  recall examining in detail which of the 38 is akin to
6  Ohio, let's say.
7      Q.   Why not?
8      A.   Because in general here 38 states, 44
9  products, 44 quarters, I'm trying to come up with a
10  conservative method of estimating on a claim-by-claim
11  basis and I examined the issue of whether the 11 were
12  comparable to the 38.  And to the extent that I
13  overestimate a difference for one claim in one state
14  and so forth, I believe that I will much more often
15  than that understate the difference in some other
16  state for a specific NDC for a specific quarter.
17          And so integrating that over all the claims
18  it is my sense that -- I suspect as I said earlier,
19  one can find an example of anything when one has as
20  many data points as exist in this data.  The question
21  for me as an economist examining this is aggregating
22  across everything, across all of these claims, what is

24  (Pages 525 to 528)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 529

1  the most accurate picture to emerge.  So to the extent
2  that there -- so yeah.
3      Q.   If you really wanted to be conservative in
4  Abbott's favor, Dr. Duggan, would it not have been
5  prudent to identify those states which have lower
6  reimbursement amounts per claim and either exclude
7  those from your difference calculation or seek to get
8  the claims data for those states?
9          MS. THOMAS:  Objection.
10     A.   You know, once again, at a number of points
11  in the analysis when I believed that there was a fork
12  in the road, as I discussed earlier, I endeavored to
13  be conservative.  It is the issue of whether one of
14  these 38 states -- I believe I -- my sense from
15  examining the data is that any -- to the extent that
16  there are any cases where I would overestimate I would
17  much more often than not -- so it's not -- I'm not
18  trying to be arbitrarily conservative.  I'm trying to
19  be conservative while getting the most accurate number
20  possible.  And so at some level the most conservative
21  thing would be to consider no Medicaid claims for any
22  states or Medicare claims.

Page 530

1      Q.   That's what I would like you to do.  I'm
2  teasing.  Go ahead.
3      A.   So I applied the absolute -- I really did
4  use all my training to try to produce for the court
5  and others with an interest in this case an estimate
6  that I think -- that I think will stand the
7  test of time and that it is accurate.  And in doing
8  that when the data wasn't perfect I tried to penalize
9  things in Abbott's favor.
10     Q.   Now, the suggestion that I made about
11  locating those states that have the lower
12  reimbursement amounts per claim --
13     A.   Right.
14     Q.   -- excluding them from your analysis,
15  getting the claims data, that's not something that's
16  being arbitrarily conservative, is it, that
17  suggestion?
18     A.   I think the algorithm that I've used is an
19  appropriate one and a conservative one.  To the extent
20  that there is -- I believe that if I were to take a
21  symmetric approach to these 38 states and suppose had
22  perfect data for every one of them, that, as I said,

Page 531

1  the numbers would be higher.  That would be a
2  conservative -- it might -- I'm not even sure that it
3  would serve to reduce the value of difference.  But I
4  believe that exactly what I did was appropriate for
5  the question in hand.
6      Q.   And my question was a narrower one.  It's
7  not judging your entire analysis whether it's fair or
8  not.
9      A.   Right.
10     Q.   It's was my suggestion being arbitrarily
11  conservative.
12         MR. LAVINE:  Object to form.
13         MS. THOMAS:  Objection.
14     A.   I would need to -- I guess I would need to
15  reflect on that issue a bit more.
16     Q.   I'll ask you next time.
17         If you would go to Exhibit 1113.  This is
18  the except from the 1997 report.
19     A.   Two pages, right?
20     Q.   Yes.  Does this show that for all drug
21  payments for the year 1996 the State of Pennsylvania
22  ranked fifth?

Page 532

1          MR. LAVINE:  Object to form.
2      A.   It does.  I'm not sure if this is NDC-based
3  only, but that's what it says.
4      Q.   Pennsylvania, if you recall, was one of the
5  states you had identified in your handwritten notes as
6  one from which you would seek to get claims data; is
7  that right?
8          MS. THOMAS:  Objection to form.
9          MR. LAVINE:  Object to form.
10     A.   In my -- I believe those notes were from
11  February of 2007.  So very, very early on.  And it is
12  true that in those notes from February of '07 or March
13  of '07 that Pennsylvania was listed.
14             (Exhibit Abbott 1117 was
15              marked for identification.)
16         BY MR. TORBORG:
17     Q.   Okay.  What I've marked as Exhibit 1117
18  bears the Bates number EXP USABT-DUG --
19     A.   Yeah, 3190.
20     Q.   -- 3190.  This appears to me to be some
21  e-mail correspondence between representatives of the
22  State of Pennsylvania and individuals with Steck

25  (Pages 529 to 532)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                                July 25, 2008

Page 533

1  Consulting that deals with the topic of getting claims
2  data from the State of Pennsylvania.
3        Do you recall, Professor Duggan, anything
4  about Steck Consulting or the government's attempt to
5  get claims data from the State of Pennsylvania?
6        MR. LAVINE: Object to form.
7     A.  I recall that they were a state that was
8  contacted fairly early on. So this is consistent with
9  my recollection that they were contacted pretty early
10 on. I don't recall the details. I don't think I'm
11 cc'd on this. I don't recall the details of this
12 discussion here.
13    Q.  If you go to Abbott Exhibit 1115, which is
14 the e-mail correspondence that has the chart of claims
15 data that we looked at earlier, does it appear as
16 though some claims data for NDC claims was produced by
17 the State of Pennsylvania, starting with the year
18 1998?
19       MR. LAVINE: Object to form.
20    A.  I'm sorry. Where are we?
21    Q.  Abbott Exhibit 1115, Bates page ending 479.
22    A.  479?

Page 534

1     Q.  Yes.
2     A.  Yes, I see that. So your question again
3  was -- I see the Pennsylvania on there. I don't
4  remember exactly what your question was.
5     Q.  Does it appear to you as though Steck
6  Consulting received claims data from the State of
7  Pennsylvania?
8        MR. LAVINE: Object to form.
9     A.  It does appear that way, yes, from this.
10    Q.  And you do not have a separate -- I'll
11 state it another way. Pennsylvania is not one of the
12 11 states, correct?
13    A.  That's correct.
14    Q.  Do you know why not?
15    A.  As I said earlier, I considered at least
16 two factors -- well, I guess at least three factors --
17 when determining whether to add, let's say, a state.
18 One was did we have data from it. Two was is it large
19 amount of Medicaid spending. And three, how much
20 coverage do we have for the state. And so here we can
21 see Pennsylvania has -- of the 11 states I considered,
22 Pennsylvania's spending is higher only than Wisconsin.

Page 535

1  But for Wisconsin the data went back all the way to
2  1993.
3        And so it is -- my sense is that for the
4  same sort of diminishing returns reason one has to
5  draw the line somewhere. If one works from the bottom
6  of the table up, Washington D.C., Vermont, Alaska,
7  those aren't on the sort of cusp. I drew the line
8  where I felt was appropriate given the data that was
9  available and those other issues.
10       THE WITNESS: I don't know when we're going
11 to do lunch.
12       MS. BROOKER: Are you okay keeping going?
13       MR. TORBORG: I'm about done with this
14 line.
15       MS. BROOKER: Just tell Dave when you think
16 you need to break.
17       MR. TORBORG: I probably have about five
18 minutes.
19 BY MR. TORBORG:
20    Q.  You did utilize -- or included in your 11
21 states are states that had less claims data than
22 Pennsylvania, though, am I right?

Page 536

1     A.  Only Wisconsin. Well, actually, Wisconsin
2  has more claims.
3     Q.  Years of claims data.
4     A.  Correct. So it would a sort of two pronged
5  decision.
6     Q.  Like for the state of Michigan you had
7  claims data only starting in the fourth quarter of
8  2000, right?
9     A.  I don't recall. That sounds right.
10    Q.  Missouri you had claims data starting in
11 the first quarter of 1998, right?
12    A.  That's correct. That's what I recall. So
13 inevitably when one draws the line there's going to be
14 a state that's close to the line and, you know, on
15 either side. And Pennsylvania was a state --
16 Washington D.C. wasn't close to the line.
17 Pennsylvania was. But I drew the line where I felt it
18 was appropriate.
19    Q.  Who made the decision on where to draw the
20 line? Was that you or Steck Consulting or was there a
21 discussion about that?
22       MR. LAVINE: Object to form.

26 (Pages 533 to 536)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 537

1    A.   I made the decision.
2    Q.   Did you have a discussion with Steck
3 Consulting about it?
4    A.   It seems plausible.  Yeah.  I think we did.
5 We talked about that issue.
6        MR. TORBORG:  Okay.  I'm going to be moving
7 on to something else, so why don't we go ahead and
8 take lunch.
9        THE WITNESS:  Okay.  Great.
10       THE VIDEOGRAPHER:  We're off the record at
11 13:21.
12       (Whereupon, at 1:17 p.m. a lunch recess was
13 taken.)
14
15
16
17
18
19
20
21
22

Page 538

1      A F T E R N O O N   S E S S I O N
2                  (2:23 p.m.)
3             * * * * *
4     Whereupon,
5         MARK G. DUGGAN PH.D.,
6     the witness testifying at the time of
7     recess, having been previously duly sworn,
8     was further examined and testified as
9     follows.
10            * * * * *
11    EXAMINATION RESUMED BY COUNSEL FOR THE
12        ABBOTT LABORATORIES
13       THE VIDEOGRAPHER:  This begins tape 4 of
14 the video deposition of Mark Duggan.  We are back on
15 the record at 14:23.
16       BY MR. TORBORG:
17    Q.   Welcome back, Professor.
18    A.   Thank you.
19    Q.   I'm going to switch gears here a little
20 from what we were talking about and ask you to go to
21 page 12.  This is that section of the report where
22 you're discussing your analysis of pricing issues.

Page 539

1        MR. LAVINE:  You said page 12?
2        MR. TORBORG:  Page 12.  That's right.
3        BY MR. TORBORG:
4    Q.   And on page 12 you're discussing a table 1
5 in your report, which calculates -- I'm sorry -- which
6 reflects the average prices that you calculate,
7 correct?  Among other things it displays those for the
8 44 NDCs?
9    A.   Yeah.  Right, basically, if I recall what
10 that represents is across all 44 quarters what is the
11 average price in the Abbott direct transaction data.
12 So listed separately by each NDC.
13    Q.   And then you note in your report that
14 the -- this is on page 12 -- that the average values
15 of these ratios across all products are 10.07 and
16 11.95 respectively.  The 10.07 is the ratio for direct
17 price, right?
18    A.   Right.  That's correct.
19    Q.   And the ratio is what over what?
20    A.   So this represents the direct price for
21 each NDC as published by First Databank divided by the
22 average -- so that's in 1996 quarter 3.  And that is

Page 540

1 divided by the average price over -- in the Abbott
2 data for the entire eleven year period.  So here I'm
3 sort of doing a table 1 first pass analysis.  '96
4 quarter 3 is midway through the eleven year period.
5        And so it's kind of a first glance at
6 the -- a first comparison between published and actual
7 average prices.
8    Q.   What is a ratio?
9    A.   In this case I am dividing the published
10 price by the Abbott price in the transaction data.
11 And so here I'm just -- for example, if the Abbott --
12 perhaps it's most helpful to illustrate it with an
13 example.  If the Abbott price is a dollar -- if the
14 average price is a dollar and the published price is
15 $3 then that ratio would be 3.  So a ratio of 1 would
16 reflect a quality between the two prices.  The higher
17 the ratio the greater sort of proportional difference
18 between the two prices.
19    Q.   What is the difference between expressing
20 something as a ratio and expressing something as a
21 percentage?
22    A.   It depends.  So in that earlier example of

27 (Pages 537 to 540)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                          July 25, 2008

Page 541

1   1 and 3 the percent by which the published price is
2   greater than the actual price it's basically 200
3   percent greater, the difference. It's published 3,
4   actual 1, and so the difference is 2 divided by 1. So
5   in percentage terms things would be -- and once again,
6   it depends on what is going into the denominator as
7   well. But in that example the ratio of 3 would
8   correspond to a published price that's 200 percent
9   greater.
10      Q.   The ratio and percentage are two different
11  ways of expressing the same thing, which is the
12  percentage by which one number is different than
13  another?
14      MR. LAVINE:  Object to form.
15      A.   I think that -- yeah. In this example, I
16  think that captures it. So for example if the ratio
17  were 2 to 1 then the percentage would be a hundred
18  percent greater.
19      Q.   So why in this report do you express your
20  findings as a ratio?
21      A.   Why right here?
22      Q.   Yeah. And then you discuss it in your

Page 542

1   report too. You say the average value ratios. And
2   then you have some detail in this table 1.
3       A.   It seemed to me a natural way to describe
4   the data. And so once again, this is literally the
5   first of the 63 tables in my report. And so I'm
6   mainly here just trying to give the interested reader
7   a sense of how these two things relate with one
8   another. I suppose if one takes that first row where
9   it's 6.81, I could alternatively have written 581
10  percent. But I think the two -- it seemed to me the
11  most natural way to summarize it.
12      Q.   Did you ever consider expressing your
13  findings in terms of dollars and cents as opposed to
14  ratios?
15      A.   It's a -- here I'm trying to do an apples
16  to apples comparison. And so the Abbott data -- the
17  transaction amounts in the Abbott data are different
18  from the transaction amounts in the Medicaid claims
19  data. I mean, I later do go on to list -- for
20  example, in table 11 -- the number of prescriptions
21  and the total amount paid from which it would be
22  straightforward to calculate the average amount paid

Page 543

1   per prescription.
2       And so it's going to vary from one NDC to
3   another. But it just seemed to me like the most
4   natural way to start the description of the data.
5       Q.   Did you have discussions with counsel
6   regarding whether to express your findings regarding
7   the difference between reported prices and your prices
8   as a ratio versus some sort of dollar amount?
9       A.   I don't recall any such discussion. And
10  this decision here as to how to summarize the data is
11  one that I believe that I made very on when starting
12  to analyze it, the data.
13      Q.   But you could have on table 1 for the first
14  product, for example, the 239 -- I'm sorry -- the 24
15  cents roughly, you show a ratio of $6.81, right?
16      A.   A ratio of 6.81, yeah.
17      Q.   You could have expressed the difference in
18  a dollar amount, right?
19      MR. LAVINE:  Object to form.
20      A.   It is -- it would have been possible,
21  though it's worth noting that these average prices are
22  not necessarily reflective of or even close to

Page 544

1   reflective of what the typical number of units would
2   be on let's say a claim or what have you. But
3   certainly it would be possible. I mean, it would be
4   straightforward to do it. So it is -- that would have
5   been one way to do it.
6       Q.   What would the dollar difference be on this
7   particular NDC for this quarter?
8       MR. LAVINE:  Object to form.
9       Q.   If you do that without the calculator I'll
10  be truly impressed.
11      MS. THOMAS:  Don't challenge him.
12      A.   I do want to preface it. So the dollar
13  difference if I had -- it depends on if the dollar
14  difference is for this unit or if it's for the typical
15  number of units in a claim. But if it's just for this
16  unit here then, you know, it would be 6.8 times 24
17  cents. I guess that is -- I mean, I'll just multiply
18  that. I won't try to be --
19      (Witness using calculator.)
20      The difference per unit would be about --
21  so here I'm basically multiplying it by 5.81 -- would
22  be $1.39 per unit. But, you know, as I said, the

28  (Pages 541 to 544)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 545

1  number of units in a typical claim may be very
2  different from that.
3      Q.   Why are you timing it by 5.81 instead of
4  6.81?
5      A.   Well, if I -- so the price here -- the
6  published price must have been 1.63 about.  And so --
7      Q.   Now, tell me how you got there.  You took
8  0.239 times 6.81, right?
9      A.   Yeah.
10     Q.   That gives you $1.63?
11     A.   About.
12     Q.   And you subtracted out 24 cents and that
13 gets you $1.39?
14     A.   Yeah.
15     Q.   So that would be the dollar difference
16 there?
17     A.   Per unit.  Which doesn't necessarily
18 correspond with what's --
19     Q.   Now, you used the term units, right?
20     A.   It is -- this is -- it's this issue of
21 package versus units like milliliters and so forth.
22 And I take care in my analysis when comparing the two

Page 546

1  sets of prices to compare apples to apples, to adjust,
2  for example, the FDB prices to correspond to the ones
3  in the Abbott data.
4      Q.   In this NDC we're looking at here, the top
5  one, how many units are in that?
6      A.   How many units?  I don't have memorized
7  what this product is.  But we see there are -- it's
8  tricky because in some cases, if I recall correctly,
9  in depositions products are referred to in units when
10 in a sense it represents packages.  So it depends on
11 if we're thinking of this in terms of units like
12 milliliters, for example.  Here my recollection is
13 that these prices represent the price per package.
14     Q.   That's what I thought.
15     A.   Yeah.  So --
16     Q.   You used the term unit before, so I wasn't
17 sure you meant.
18     A.   Yeah.
19     Q.   This is like one package, right, this top
20 one?  Abbott sold this as one package.  It may be more
21 than one unit, right?
22     A.   That's my recollection.  But let me just --

Page 547

1  just give me one second here, please.
2           Yeah.  That's my recollection.
3      Q.   Now, in figure 1 -- actually, let's go to
4  page 16.
5      A.   Page 16 and figure 1 at the same time?
6      Q.   Yes.
7      A.   I have those both.
8      Q.   Here you're discussing the product 653301,
9  vancomycin, right?
10     A.   Correct, yeah.
11     Q.   And both in the report and in figure 1 of
12 your report here you do express the amount of the
13 difference between reported prices and your prices in
14 terms of dollars and cents; am I right?
15     A.   Yes.  That's correct.
16     Q.   And am I right that this is the only
17 product in your report or in your schedules where you
18 express the difference between reported price and your
19 average price calculations in terms of dollars and
20 cents; is that right?
21     A.   Right.  I sort of am here, as I did in my
22 Texas report, essentially just depicting the patterns

Page 548

1  for the product with the most utilization.  So this
2  vancomycin product has three times more Medicaid
3  spending -- at least three times more Medicaid
4  spending than any other and seemed like a natural one
5  just to give the reader a sense of it at first between
6  those.
7      Q.   Does the amount of the dollar difference
8  between reported prices and the prices you calculate
9  for this product and that you put on figure 1, express
10 in figure 1, does that fairly depict the average
11 dollar difference for the other complaint NDCs?
12         MS. THOMAS:  Objection to form.
13     A.   Each NDC is different.  And part of the
14 reason that -- so this is -- I don't think this is
15 representative of the other NDCs.  But that's not
16 really what I'm trying to -- I'm just trying to give
17 the reader a sense really of what's in the data.  And
18 so -- but yeah, this NDC is not reflective of the
19 other 43.
20     Q.   If you would go to table 11 here, the
21 second column of your table 11, there you list the
22 breakdown by NDC of Medicaid expenditures according to

                                    29  (Pages 545 to 548)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                        July 25, 2008

Page 549

1  CMS's SDUD data, right?
2     A.   Yes.
3     Q.   And if we look at those there are six NDCs
4  that have over $5 million of expenditures, is that
5  right, according to this table?
6     A.   Yes.
7     Q.   The first one, 653301, we talked about that
8  one already, right?
9     A.   Right.
10    Q.   Now, the next one, 74613802, if we go to
11 table 1 --
12    A.   Okay.  613802?
13    Q.   Yeah.  The average price you calculated was
14 about 81 cents, right?
15    A.   That's right.
16    Q.   And can you tell me the dollar difference
17 between that price and the reported direct price?
18    A.   I think it's going to be about $10, but
19 I'll go through.  (Witness using calculator.)  $9.92.
20    Q.   The second highest product was a vancomycin
21 product and it's $9.01?
22    A.   The second highest product -- the third

Page 550

1  highest product.
2     Q.   The third highest -- I'm sorry -- product.
3     A.   Yeah.
4     Q.   That one the average price is $24.38 that
5  you calculated, right?
6     A.   Right.
7     Q.   Now, do you know what that product is?
8     A.   650901?
9     Q.   Yeah.  Do you know what that is?
10    A.   I don't recall right here.
11    Q.   It's vancomycin 5 gram.
12    A.   Okay.
13    Q.   Do you have a sense for whether a 5 gram
14 dosage of vancomycin is a typical dosage given to a
15 patient in a particular infusion sitting?
16       MR. LAVINE:  Object to form.
17    A.   I'm not sure about that.
18    Q.   Do you know what the average dose of
19 vancomycin that is administered to a patient is in one
20 sitting?
21    A.   No, I don't.
22    Q.   Do you know how this product is provided to

Page 551

1  the patient?
2     A.   I would think it would vary from one
3  patient to the next.
4     Q.   Fair to say that you're not familiar with
5  how this product is given to a patient?
6     A.   Yeah, that's -- I haven't drilled down on
7  that issue.
8     Q.   Fair to say that you're not familiar with
9  the steps that a provider has to take to infuse
10 vancomycin into a patient?
11       MR. LAVINE:  Object to form.
12    A.   Yeah.  That's fair to say.
13    Q.   The product with the fourth highest
14 expenditures -- I'm skipping the fourth because we did
15 that one already, right?
16    A.   Yeah.
17    Q.   The fifth one ends with 809.  74713809.
18 It's about halfway down.  80 cents.  What is the
19 dollar amount of the spread for that drug?
20    A.   Of the difference?
21    Q.   Yeah.
22    A.   (Witness using calculator.)  This is the

Page 552

1  713809?
2     Q.   Yes.
3     A.   This is the disadvantage of having it two
4  pages per sheet.  It looks like it's going to be about
5  $12.30, I would guess.  $12.35, yeah.
6     Q.   And then the next product is 023, about
7  five above.  The price that you calculated was 1.285?
8     A.   0123?
9     Q.   Yeah.  It might be easier to look at the
10 average price, 1.285.
11    A.   That's 0023.
12    Q.   Yes.  That's what I meant.
13    A.   That's way down on the list.  I think you
14 mean 0123.
15    Q.   74710023.
16    A.   Okay.  But if you were going down the line,
17 I think if you go to table 11, I think you want
18 7101023.
19    Q.   Sure.  That's the one I want.
20    A.   So in that case 7101023, because that's the
21 next one in terms --
22    Q.   Yeah.  Is that the one with the price of --

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                                July 25, 2008

Page 553

1     A.   1.312?
2     Q.   Yeah.
3     A.   (Witness using calculator).  So it's $8.86.
4   That's the difference.
5     Q.   As an economist, Professor Duggan, what has
6   more significance, the dollar amount of the difference
7   or the ratio of the difference?
8         MS. THOMAS:  Objection.
9     A.   I think they just provide different
10  information.  And it's worth noting with this that in
11  some cases typically the number of units that appears
12  to be getting dispensed, at least in some cases,
13  exceeds 1.  So it's going to depend.  I think they
14  both -- part of the reason that I provided the average
15  price, the ratio, and later the amount spent per
16  Medicaid claim was that an interested reader could go
17  through and calculate those things for themselves, try
18  to figure out what's the dollar difference for a
19  package and get a sense of how many packages are there
20  in the typical claim and so forth.
21        But I think both -- you know, my analysis,
22  my calculation of difference, ultimately relies on

Page 554

1   dollar amounts.  But I think both shed light on the
2   question at hand.
3         MR. TORBORG:  Can I ask you to get out the
4   orange binders, Mark?  I'm sorry.  With Exhibit 475.
5   I won't have to have of that today.
6         MS. BROOKER:  475?
7         MR. TORBORG:  475.
8         THE WITNESS:  Thank you.
9         BY MR. TORBORG:
10    Q.   This is a paper prepared by the
11  Congressional Budget Office, December of 2004.  You
12  can skip through to see if you've seen it before.
13  I'll have a question for you on page 11.  You have to
14  count in.  It's the eleventh page in.
15        MR. LAVINE:  What was that exhibit number?
16        MR. TORBORG:  475.
17        MR. LAVINE:  Dave, shouldn't there be two
18  copies of every exhibit over here?
19        MR. TORBORG:  There should be.  Oh.
20  There's one over there.  I'll get it.
21        BY MR. TORBORG:
22    Q.   Professor Duggan, the section that I'd like

Page 555

1   to draw your attention to is under the section
2   measuring markups.  Do you see that?
3     A.   On page 11?
4     Q.   I'm sorry.  It's the eleventh page into the
5   exhibit.  You'll have a page 3 in the upper right-hand
6   corner.  You may have to go backwards.
7     A.   Okay.  I see it.
8     Q.   Under that section the CBO wrote "In
9   addition to dollar terms the difference between the
10  amount that Medicaid pays pharmacies for prescription
11  drugs and the amount that manufacturers charge
12  pharmacies for the drugs can be expressed in
13  percentage terms as a margin (or gross margin) -- that
14  is, the difference between what Medicaid pays a
15  pharmacy and the cost of acquiring the drug from the
16  manufacturer, divided by Medicaid's payment."
17        Do you see that?
18    A.   I see that.
19    Q.   Now, in your report in table 1 you're
20  expressing the difference between two measures as a
21  marginal percentage, correct?
22    A.   In that particular column I am.

Page 556

1     Q.   The next paragraph states "The two
2   measures, the markup and the margin, yield very
3   different pictures.  For example, the percentage
4   margin retained by pharmacies and wholesalers has been
5   about the same in recent years for both newer and
6   older generic drugs, but because Medicaid's
7   reimbursements for newer drugs have been higher, the
8   dollar markup on them has been more than three times
9   that on older generic drugs."
10        And then it states, the next paragraph,
11  "Because pharmacies' cost of filling a prescription is
12  largely unrelated to the cost of acquiring its
13  ingredients or the size of the prescription, the
14  dollar markup is a better indicator of the size or
15  adequacy of Medicaid's reimbursements to pharmacies
16  than is the percentage margin."  Do you see that?
17    A.   I see that.
18    Q.   Then it says "The time a pharmacist spends
19  filling a prescription is generally unrelated to the
20  drug's cost and is only marginally greater for larger
21  prescriptions than for smaller ones.  Moreover, the
22  shelf space required to store a $5 pill is no

31  (Pages 553 to 556)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 557

1  different from that for a $1 pill." Do you see that?
2      A.  I see that.
3      Q.  Do you have an understanding of what
4  they're saying there?
5      A.  Sure.  I mean, I would want to -- I have a
6  sense of what they're saying right here -- read more
7  of the report.  But yeah, I follow the point here.
8      Q.  As an economist would you agree with the
9  CBO that the dollar markup is a better indicator of
10 the size or adequacy of Medicaid's reimbursement to
11 pharmacies than is the percentage margin?
12         MR. LAVINE: Object to form.
13     A.  I guess I would want to look at the rest of
14 the report.  I think that both numbers can be useful.
15 But as I mentioned earlier, there may be variation
16 from one NDC to the next in terms of the margin and so
17 forth.  But I think it's just going to depend on the
18 context.  To some extent that's why I provided both
19 the dollar price and the ratio here.
20     Q.  But you don't express the difference as a
21 dollar value, do you?
22     A.  Well, my -- the very first number that I

Page 558

1  mention in my report is very much about this
2  difference, this dollar difference.  And later in my
3  report I do -- when discussing, for example, the
4  Medicare arrays I often sort of highlight the
5  difference in dollar terms.  So it just -- I think
6  there are cases if the report where I highlight those
7  dollar differences beyond just this figure 1 and
8  figure 2.
9      Q.  You're familiar with something called
10 average manufacturer price, I take it?
11     A.  Yes.
12     Q.  That is something that is defined by
13 statute; is that right?
14         MR. LAVINE: Object to form.
15     A.  That is my understanding.
16     Q.  And is it your understanding that there are
17 statutes and regulations that tell a drug manufacturer
18 how to calculate average manufacturer price?
19         MS. THOMAS: Objection.
20     A.  I haven't examined that issue in enough
21 detail to know if there are -- you know, what is all
22 the guidance that's provided on that calculation.

Page 559

1      Q.  You're generally familiar with the fact
2  that there is guidance out there; you're not familiar
3  yourself with all the detail; is that fair to say?
4      A.  That's fair to say.
5      Q.  Now, in this case you have recalculated
6  revised prices for three different pricing measures,
7  direct price, average wholesale price and wholesale
8  acquisition cost, right?
9      A.  That's correct.
10     Q.  Did you look at anything to determine what
11 should and should not be included in your revised
12 prices for those three things?
13         MR. LAVINE: Object to form.
14     A.  I think I looked at a number of things.
15 And so I looked at quite a number of things relating
16 to -- many of which I discuss in my report.  So for
17 example my decision to focus on the pharmacy classes
18 of trade which tend to have higher prices than the
19 more common consumers for these drugs was based on my
20 sense that the providers being reversed on this NDC
21 basis are pharmacies, different kinds of pharmacies
22 perhaps.  And so certainly I looked into that issue.

Page 560

1  I also -- I don't know.  It's hard to do justice to
2  that because I feel that so much of what I say in my
3  report is on that very issue.
4      Q.  Did you look at any literature, whether it
5  be regulations, statutes, anything else written, to
6  help you decide how you should calculate your revised
7  DPs, AWPs and WACs?
8      A.  To some extent yes, but that was not a
9  primary focus of my analysis.
10     Q.  What did you look at?
11     A.  I don't recall the specific document or
12 documents that I did look at.  I remember a discussion
13 of estimated acquisition cost.  There's nothing that I
14 recall about focusing exclusively on pharmacies, for
15 example.  But I did that because -- even though most
16 of these drugs are sold to hospitals, I did that
17 because -- you know, to be conservative, as I mention
18 in the report.  But I don't recall the specific
19 document.  I recall a discussion of estimated
20 acquisition cost.  But I don't recall which document.
21     Q.  So in your analysis in your report you
22 thought it fair to use a pharmacy class of trade

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 561

1    subgroup because those were the providers you
2    understood would be submitting the claims at issue in
3    this case?
4        A.   That is a fair characterization I would
5    say, yes, although I did conduct some -- we've talked
6    about this I believe on the previous day, one of the
7    two previous days, how things would differ if I had
8    considered transactions for all classes of trade
9    simultaneously.  And in general that served to
10   increase the value of difference as we talked a bit
11   last time.
12       Q.   Are you aware of any guidance that would
13   inform a manufacturer like Abbott what -- strike that.
14            Are you aware of any guidance that would
15   inform a manufacturer like Abbott how to calculate a
16   direct price?
17       MS. THOMAS:  Objection to form.
18       A.   Nothing leaps to mind right now.  That
19   wasn't the focus of my analysis.
20       Q.   Would it be fair to say that as was your
21   testimony in the Texas case that you're not offering
22   an expert opinion in this case about what Abbott

Page 562

1    should have reported as its drug price?
2        MR. LAVINE:  Object to form.
3        A.   I -- my report does what I describe.  It
4    calculates these alternative prices.  Whether at -- so
5    my report does not focus on that issue of should.  It
6    tries to basically give the interested reader a sense
7    of how Medicaid reimbursement would have differed if
8    these alternative prices had been used.  So that's the
9    nature of my report.
10            It's difficult for me to speculate at this
11   time in the weeks and months ahead what issues exactly
12   I'll weigh in on.
13       Q.   That's not something that you address here
14   in your report; is that fair to say?
15       MR. LAVINE:  Object to form.
16       A.   My report I'd say touches on the issue.
17   The very first sentence talking about the difference
18   between what the government paid and what they would
19   have paid if prices that are reflective of actual
20   prices had been used for AWP and so forth.  So that --
21   it is my understanding that the Abbott and other firms
22   are supposed to report prices -- just generally here.

Page 563

1    This is not crisp clean -- but that are reflective of
2    the prices that are generally and currently paid in
3    the market.
4            And so it is my understanding that that is
5    the kind of guidance that is provided to these firms.
6    And so to -- I'm not -- should they have reported
7    the -- not taking -- that really isn't the focus of my
8    analysis.  But to some extent by carrying out this
9    analysis in which I analyzed how spending would have
10   been different if prices that were more reflective of
11   those paid in the market had been published, you know,
12   it touches on the issue.  But it's certainly not --
13   the "should" issue is certainly not the focus of my
14   analysis.
15       Q.   Where do you get the understanding that
16   during the time period at issue in this case that
17   manufacturers were supposed to report prices that were
18   reflective of the prices at which the prices were
19   generally and currently available in the marketplace?
20       MR. LAVINE:  Object to form.
21       A.   It's hard to identify all the places where
22   that may have come up.  I feel as if I've seen

Page 564

1    documents that discuss estimated acquisition cost, for
2    example.  I just don't remember where those
3    documents -- who produced those documents.  And -- you
4    know, it's I think an issue that has been mentioned by
5    counsel at some point in the case.  But it's not
6    something that I -- you know, it's something I've seen
7    elsewhere as well.
8        Q.   Are you aware of anything that's been
9    directed to manufacturers like Abbott that indicates
10   to them that the reported prices that you focus on in
11   this case should have reflected the prices at which
12   these products were generally and currently available
13   on the marketplace?
14       MS. THOMAS:  I'm sorry.  Could you read
15   that back?  I lost the second or third word.
16            (Whereupon, the requested portion was read
17   by the reporter.)
18       MR. LAVINE:  Object to form.
19       MR. TORBORG:  That's kind of cheating.
20       MS. THOMAS:  To only object when it's
21   reread?
22       A.   That hasn't been the focus of my work on

33 (Pages 561 to 564)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 565

1  this.  So nothing leaps to mind right now.
2          BY MR. TORBORG:
3      Q.   What is your understanding of -- let me
4  strike that and start over.
5          AWP is something that's published in First
6  Databank and Red Book, right?
7      A.   Yes.
8      Q.   What is your understanding of Abbott's
9  involvement in that process by which the AWPs get
10  reported in the compendia?
11     A.   With the caveat that I certainly haven't
12  examined everything that would be relevant to that
13  issue, it is my understanding that Abbott provides
14  First Databank and Red Book -- or whoever publishes
15  those, the publishers of those, those who administer
16  those databases -- with one or more prices and that
17  those prices -- that price or if there's more than
18  one, the two or more prices -- are typically published
19  and that those prices may also be scaled to arrive at
20  other published prices.
21          So for example I think there is, you know,
22  a relationship, as I mention in my report, typically

Page 566

1  between AWP and WAC, between direct and WAC.  Not in
2  every case.  One can find exceptions, as always.  But
3  typically, for example, the AWP is 25 percent greater
4  than the wholesaler acquisition cost.  What exactly
5  Abbott delivers to First Databank is not -- that's not
6  something that I've -- and what First Databank or Red
7  Book do with that, that's hasn't been the focus of --
8  but it's my understanding they provide something.
9  It's not that First Databank and Red Book are pulling
10  this out of thin air.
11     Q.   Do you know what it is that Abbott
12  provides, what one of those prices is?
13     A.   Which of the three?
14     Q.   Or something else.
15     A.   It is my understanding that what they
16  typically report is either used as the WAC or the
17  direct price.  But I could be -- I don't want to
18  overstate here.  This once again has not been the
19  focus of my analysis.  But it's my understanding
20  that -- for example, if we take a quarter in which
21  they report just one price, that that -- that First
22  Databank -- that that price represents either the WAC

Page 567

1  or the direct price.
2          But I could be wrong.  It may be at times
3  they were reporting what was the AWP.
4      Q.   Now, in this case you performed a detailed
5  analysis of Abbott's indirect and direct sales data to
6  calculate revised pricing measures for DP, AWP and
7  WAC, right?
8      A.   That's correct.
9      Q.   Are you aware of any evidence that Abbott
10  during the claim period attempted to make the type of
11  calculations that you did here?
12          MS. THOMAS:  Objection to form.
13     A.   Well, I'm using here their direct
14  transaction data -- so Abbott's direct transaction
15  data -- and Abbott's indirect transaction data.  I
16  don't have firsthand knowledge about what the Abbott
17  employees did with this data.  It would surprise me if
18  they didn't at least have familiarity with transaction
19  prices and so forth, someone at -- but how exactly
20  they used it I can't really speculate.  That would be
21  difficult for me to speculate.
22          THE WITNESS:  And let me just ask if we

Page 568

1  could go a restroom break soon that would be great.
2          MR. LAVINE:  When should we do it?
3          THE WITNESS:  A couple minutes.
4          MR. TORBORG:  I just have one more
5  follow-up and then we can do it.
6          BY MR. TORBORG:
7      Q.   Professor Duggan, do you have any evidence
8  that Abbott had any clue that it was violating some
9  law by not making the kind of calculations that you
10  made in your report in reporting or causing to be
11  reported DPs, AWPs or WACs reflective of the price at
12  which those products were generally and currently
13  available in the marketplace?
14          MS. THOMAS:  Objection.
15          MR. LAVINE:  Object to form.
16     A.   Is it okay if I have them read that back to
17  me?
18          MR. TORBORG:  That would be fine.  I can't
19  do any better than that.
20          (Whereupon, the requested portion was read
21  by the reporter.)
22          MS. THOMAS:  Objection to form.

34  (Pages 565 to 568)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 569

1    A.   It certainly has not been the focus of my
2 analysis what Abbott employees knew.  That really
3 hasn't been.  So I can't -- nothing leaps to mind on
4 that specific issue right here.  So I don't think I'm
5 aware. It's possible that I read something.  But
6 nothing specific is leaping to mind on that issue.
7          MR. TORBORG:  Okay.  Why don't we take a
8 break.
9          THE VIDEOGRAPHER:  We're off the record at
10 15:17.
11        (Recess.)
12        THE VIDEOGRAPHER:  This is the beginning of
13 tape 5 of the video deposition of Mark Duggan.  We are
14 back on the record at 15:41.
15        BY MR. TORBORG:
16    Q.   Welcome back.
17    A.   Thank you.
18    Q.   You teach economics courses?
19    A.   Yes.
20    Q.   Which ones do you teach?
21    A.   So presently I teach undergraduate public
22 finance and graduate public finance, though I've

Page 570

1 taught other courses as well.
2    Q.   Have you taught like the entry level
3 macroeconomics course?
4    A.   When I was a teaching fellow at Harvard I
5 did.  So it was a Principles of Economics course that
6 is really the first exposure that undergraduates there
7 have to economics.  And I was a teaching fellow for
8 that I think for two years.  So I think that, yeah,
9 covered macro to some extent in there.
10    Q.   How about micro?
11    A.   Yeah.  So the principles, it was kind of
12 divided into micro and macro.  So roughly half of the
13 year was spent on macro, half on micro.  I've also
14 taught -- for example, when I was at the University of
15 Chicago I taught intermediate microeconomics which is
16 also -- really, typically the first economics course
17 that Chicago undergraduates take, although they feel
18 at Chicago like you can just start right off with
19 intermediate.  Most places are -- so I taught that --
20        I'm trying to think of other things that
21 I've taught.  And we talked a bit last time my
22 teaching probability and statistics in the electrical

Page 571

1 engineering department at MIT and in the Sloan School
2 of Management at MIT.  So --
3    Q.   Do you recall the names of the textbooks
4 that you used for these various classes?
5    A.   So for the Intermediate Micro we used
6 Varian's Intermediate Micro textbook if I'm
7 remembering correctly and supplemented it with I think
8 it was Nicholson.  But I'm not sure on that.
9    Q.   Would you spell the first one for him?
10    A.   Yeah.  Varian is V-a-r-i-a-n.  That's the
11 one that I recall us using.  In the Principles of
12 Economics course if I remember correctly we used
13 Baumal and Blinder, but I may be misremembering that.
14 But I'm pretty sure.  That was ten years ago.  And
15 that would be B-a-u-m-a-l and Blinder, B-l-i-n-d-e-r.
16        In terms of my more recent teaching, the
17 public finance, I've used the textbook both by Harling
18 Rosen, R-o-s-e-n, and I've used the textbook by
19 Jonathan Gruber, G-r-u-b-e-r.  And the statistics
20 courses I used a book by Al Drake who was a
21 statistician.  He was actually in the electrical
22 engineering department at MIT.  And for the Sloan

Page 572

1 School course I don't recall which textbook we used.
2 It was a different statistics textbook.  The Drake
3 book was more probability.
4        And let's see.  For my graduate public
5 finance course it is -- the focus -- the course draws
6 mainly on papers.  We refer to some extent to -- to
7 the extent that we used books there's a textbook
8 series called the Handbook of Public Economics, four
9 volumes of that.  So there are various chapters.  We
10 certainly don't use all of it.  There are various
11 chapters of that handbook series that I have used.
12        And -- yeah.  That's pretty much
13 everything, I think.
14    Q.   Do you have any input on which books you
15 use to teach?
16    A.   Sure.  Yes.  So certainly for the public
17 finance, the courses this I'm currently teaching, it's
18 completely up to me which textbooks I use.  And in
19 terms of -- I'm trying to think -- at Chicago when I
20 taught Intermediate Micro -- I taught public finance
21 there graduate and undergraduate and I had free rein
22 of what books to use there.  As for the Intermediate

35  (Pages 569 to 572)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 573

1  Micro, the Varian book, it may be that that was -- I
2  was kind of steered to that book.  So in other words I
3  think there were sort of several sections of
4  Intermediate Micro and I think most did use Varian.  I
5  could have used another one, but I think that's the
6  one I used.
7        And then for the Feldstein when I taught
8  principles as a teaching fellow, that really wasn't up
9  to me.  I was a graduate student then.
10     Q.   Are you familiar with the concept of
11  something called a list price?
12     A.   Yes.
13     Q.   When you hear that term what does it mean
14  to you?
15     A.   I believe it was the term that was used
16  when I -- I think it varies from sector to sector.
17  I'm not sure -- if in the automobile industry there's
18  the MSRP.  Is that a list price.  I'm not really sure.
19  I have -- certainly we -- I certainly don't have a
20  precise definition of the term list price.  My sense
21  is that it could represent a price listed somewhere.
22  But it's not something I've drilled down a whole

Page 574

1  lot -- drilled down on a whole lot.
2     Q.   Do you have an understanding of what the
3  term list price means in the pharmaceutical sector?
4     A.   A bit.  I mean, we -- in our paper we sort
5  of mention that term.  We discussed that last week, I
6  believe, apart from the paper.  And it is -- my sense
7  is that it represents a price that may be -- I guess I
8  haven't -- I don't have a good sense of the extent to
9  which it varies.  So one firm may define a list price
10  to be one thing.  Another firm may define it to be
11  something different.  So it could represent a price at
12  which something is listed in a catalog, for example.
13     Q.   Is it your understanding that a list price
14  is a price that comes before discounts?
15        MS. THOMAS:  Objection.
16     A.   I don't really have the lay of the land on
17  what list price represents across firms within the
18  pharmaceutical sector or across sectors.  I guess it
19  would -- I would think it would depend on the firm, on
20  the industry.
21     Q.   Okay.  I'd like to hand you --
22     A.   That looks daunting.

Page 575

1     Q.   Don't worry, I'm only going to ask you
2  about a couple pages.  We'll make this 1118.
3        (Exhibit Abbott 1118 was
4              marked for identification.)
5        BY MR. TORBORG:
6     Q.   Okay.  What I've marked as Abbott Exhibit
7  1118 is a copy of the expert report that was filed by
8  Stephen Schondelmeyer here in the case.  You indicated
9  earlier last week that you did review some portion of
10  Mr. Schondelmeyer's report, at least some version of
11  it.  Do you recall that?
12     A.   Yes.
13     Q.   Do you recall what version of his report
14  that you reviewed?
15     A.   I think it was the final version, the one
16  dated June 20th.  But yeah.
17     Q.   Do you recall what portions of his report
18  you reviewed?  Or do you recall any of the portions
19  that you reviewed?
20     A.   I reviewed to some extent -- one thing that
21  I know that I reviewed was the sort of -- I forget
22  what he called it exactly.  The -- I certainly looked

Page 576

1  at the summary of the report and I recall reading
2  through that.  As for the rest of the document, as I
3  mentioned last week, I looked at this I think the
4  weekend before my deposition, skimmed a bit.  And so I
5  certainly didn't read it cover to cover.
6     Q.   I'd like to ask you to go to page 25 of the
7  report.
8     A.   Okay.
9     Q.   This was a portion of Mr. Schondelmeyer's
10  expert report where he's describing key drug pricing
11  terms.
12     A.   Mm-hmm.
13        MS. THOMAS:  It is Dr. Schondelmeyer by the
14  way.
15        MR. TORBORG:  Is it?  Thank you.
16        BY MR. TORBORG:
17     Q.   I'd like to read into the record how he
18  described the term average wholesale price.  He wrote
19  "The average wholesale price is a list price used for
20  invoices between drug wholesalers and pharmacies or
21  other appropriate drug purchasers and is typically
22  used as a benchmark for all classes of trade without

36 (Pages 573 to 576)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 577

1  adjustment for discounts, rebates, purchasing
2  allowances or other forms of economic consideration."
3       Then I'm going to skip down a little bit.
4  Where he says "AWP has been a term that typically does
5  not include adjustments for discounts, rebates,
6  purchasing allowances or other forms of economic
7  consideration.  The AWP is typically 20 to 25 percent
8  above the WAC for brand name drugs, but may be
9  considerably higher (20 to 70 percent) than WAC for
10 generic drugs.  Because of different levels of
11 discounts across drug products and specific classes of
12 trade, the AWP does not generally have a reliable
13 relationship to the actual acquisition cost.
14      "Within the retail class of trade the AWP
15 may have a consistent relationship with the actual
16 acquisition cost for single source brand name
17 (patented and exclusivity protected brands) drug
18 products, but not for innovator multiple source
19 (off-patent brands) or non-innovator multiple source
20 (generic) drug products."
21      Did I read that right?
22   A.   Yes.

Page 578

1    Q.   Did you review Dr. Schondelmeyer's
2  description of average wholesale price before
3  submitting your expert report?
4       MS. THOMAS:  Objection.
5    A.   I did not.
6    Q.   Now in this case you calculated revised AWP
7  prices for the 44 Abbott NDCs, correct?
8    A.   By the way, can we just backtrack.  Did you
9  say did you consider?  Can I ask to -- I just want to
10 make sure I'm accurate.  I believe I considered to
11 some extent -- oh, it's before the expert report.  I
12 did not consider or I did not yet have this report
13 before my own expert report.  So I just want to
14 correct --
15   Q.   In this case part of your project was to
16 calculate revised average wholesale prices for the
17 Abbott NDCs at issue in this case, correct?
18   A.   That was -- yeah, that was one piece.
19 Basically calculate alternative prices that I would
20 plug in as AWPs.
21   Q.   And you know that the 44 NDCs at issue here
22 are all generic products, right?

Page 579

1    A.   Yes.
2    Q.   Did your revised AWP prices include the
3  effect of discounts?
4    A.   I discuss in my report -- so I'm going to
5  go to my report for a second.
6       So there's a variable listed in table 7 in
7  my report labeled customer rebate.  And it was labeled
8  also in the Abbott data customer rebate, discount, et
9  cetera.  And as I mention in the report this
10 represents about 7 percent of sales in each year, in
11 each quarter for the periods that I have this data.
12 And I do not consider that thing that is labeled in
13 the Abbott indirect data customer rebate, discount, et
14 cetera, total -- I do not consider that.
15   Q.   When you say you do not consider that, what
16 do you mean by that?
17   A.   I'm sorry.  I did not include it when
18 calculating the prices.  So had I then the prices
19 would have been somewhat lower.
20   Q.   How about purchasing allowances?
21   A.   Can you clarify what you mean?
22   Q.   Did your calculation of revised AWP include

Page 580

1  adjustment for purchasing allowances?
2       MR. LAVINE:  Object to form.
3    A.   I would need to go back and look a bit at
4  the description of the data.  The variable that I used
5  was this end customer invoice total that is listed
6  right next to customer rebate in table 7 as my measure
7  of revenues.  And I guess I -- my understanding --
8  could you define purchasing allowances?
9    Q.   Do you know what purchasing allowances are?
10   A.   In the context -- it is possible that those
11 are included in the end customer invoice total.  I
12 would just need to look into that.
13   Q.   So as you sit here today you don't know,
14 right?
15   A.   The purchasing allowances?
16   Q.   Yes.
17      MR. LAVINE:  Object to form.
18   A.   I don't recall a separate variable
19 labeled -- that had a definition similar to purchasing
20 allowance.  So I don't recall.  I would want to look
21 at that.
22   Q.   Do your revised AWP calculations include

37 (Pages 577 to 580)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                     July 25, 2008

Page 581

1  adjustment for other forms of economic consideration?
2      MS. THOMAS:  Objection.
3      A.   It is possible that -- I guess it's just --
4  that's a pretty vague -- other forms of economic
5  consideration.  I'm -- you know, I try to be
6  transparent about how I am calculating my prices using
7  the Abbott data.  And it is -- you know, this end
8  customer invoice total variable is the key one.  And
9  whether -- this other forms of economic consideration
10  is a bit vague.  I would want to look at the report a
11  bit more to see if I can get the context for what he
12  has in mind.
13      Q.   Does your calculation of revised AWPs in
14  this case include adjustments for at least some
15  discounts?
16      MR. LAVINE:  Object to form.
17      A.   It is possible that a -- suppose a
18  purchaser buys X units of a product and because of
19  that gets a discount for having slightly higher -- you
20  know, sales above let's say some threshold.  It seems
21  plausible that that would be included in this end
22  customer invoice total.  So -- you know, I would --

Page 582

1  one could -- I think that the primary category of
2  discounts, the one that is labeled customer rebate
3  discount, et cetera, total, is not something that I
4  considered.
5          Whether end customer invoice total
6  incorporates some other discount, I don't recall a
7  discussion of that in the documents that I've read.
8  But -- so --
9      Q.   Well, do you have an understanding of how
10  it is that end purchasers of the products at issue in
11  this case arrived at the prices at which they
12  purchased the products?
13      MR. LAVINE:  Objection to form.
14      A.   I would think that it would vary from one
15  customer to another.  But I certainly don't have all
16  the details at how customer is typically arrived at.
17  I haven't, you know, examined all the contracts and so
18  forth.
19      Q.   Do you have an understanding that some of
20  them negotiate the prices based on a discount off of
21  the reported AWP?
22      MS. THOMAS:  Objection to form.

Page 583

1      A.   It sounds possible, but I haven't seen
2  documents that would indicate that.
3      Q.   Do you have an understanding of how it is
4  that the average prices that you calculated are
5  different than the reported prices?
6      MR. LAVINE:  Object to form.
7      A.   I mean, we've talked a bit about that, that
8  I compare the prices in the Abbott data with the
9  published prices let's say in the First Databank.  So
10  I have I think some understanding of that, yeah.
11      Q.   And isn't the reason because providers were
12  negotiating or getting discounts off of reported
13  prices?
14      A.   Isn't the reason for what?
15      Q.   The difference between the prices that you
16  calculate and reported prices.
17      MR. LAVINE:  Object to form.
18      A.   That's not an issue that I've drilled down
19  on a whole lot, how did customer A negotiate price B
20  with Abbott.  So it's just not something that I've
21  looked into that much.
22      Q.   Do your revised AWPs include adjustment for

Page 584

1  chargebacks?
2      A.   I believe that the end customer invoice
3  total is the amount paid by the customer to the
4  wholesaler and that there then may be a chargeback
5  transaction between the wholesaler and Abbott.  But
6  end customer invoice total if I remember is the
7  difference between -- is X minus Y with Y labeled
8  chargeback.
9      Q.   Does that mean that your final price
10  includes the --
11      A.   And customer invoice total represents the
12  price at which the pharmacy is buying from the
13  wholesaler.  And then from the data and from my
14  reading of the relevant depositions and other
15  documents, is that there is then a separate
16  transaction between the wholesaler -- so from the
17  point of view of the pharmacy and the wholesaler the
18  chargeback goes from the pharmaceutical firm to the
19  wholesaler.
20          The pharmacy -- it's my understanding this
21  end customer invoice total represents what the
22  pharmacy is paying to the wholesaler.  And so it is --

38  (Pages 581 to 584)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 585

1  so if the wholesaler acquires a product for 20 and
2  sells it to an end customer for 12, perhaps there
3  would be a chargeback of 9, you know, and so that they
4  on net sell for 12 and purchase for 11 in that
5  example.
6      Q.   So it sounds like your price that you
7  calculate does include the impact of chargebacks,
8  right?
9      A.   Yes.  There are sort of two sets of
10 transactions that are occurring.  There's the
11 pharmaceutical firm to the wholesaler and then there's
12 the wholesaler to the pharmacy.  So in that example
13 that I just described the wholesaler buys the product
14 for 20 from Abbott, sells it for 12 to the pharmacy,
15 and then Abbott pays the wholesaler let's say 9, or
16 whatever they pay.  Maybe they pay 8.  So it's a
17 break-even in that example.
18     So in that example 12 would represent the
19 end customer invoice total.
20     Q.   That's what's in your number, right?
21     A.   That's correct.
22     Q.   That's my understanding of it too.

Page 586

1      A.   That's the price -- that's the amount that
2  the pharmacy is paying to the wholesaler for the
3  product.
4      Q.   So your revised prices do include the
5  impact of the chargeback, right?
6          MR. LAVINE:  Object to the form.
7      A.   I think -- you know, my price does what I
8  just described in that example.  And so the chargeback
9  represents a flow of funds not from the pharmacy to
10 the wholesaler or the wholesaler to the pharmacy, but
11 between the wholesaler and Abbott.  And so my price
12 considers what the pharmacy pays the wholesaler for
13 the product.  And so I guess the chargeback isn't --
14 that isn't -- that doesn't represent a flow of funds
15 from a pharmacy to the wholesaler or the wholesaler to
16 the pharmacy based on my understanding.
17     Q.   So can you answer my question yes or no or
18 is it just not --
19     A.   I guess it just didn't lend itself -- I'm
20 trying to be specific.
21     Q.   Fair enough.
22     A.   The wholesaler buys it for 20, sells it for

Page 587

1  12, maybe they charge back for 8, what I'm using is
2  12.  And so it seems to me that is what is relevant to
3  determine the transactions between wholesalers and
4  pharmacies, wholesalers and HPD distributors and
5  pharmacies.
6      Q.   Mr. Schondelmeyer noted in his definition
7  of AWP that for generic drugs the AWP may be
8  considerably higher, 20 to 70 percent, than the WAC,
9  right?
10         MS. THOMAS:  Objection to form.
11     A.   It appears to be, yeah.  That's what he
12 says here on page 25.
13     Q.   Now, the revised prices that you calculate
14 for the Abbott generic products at issue in this case,
15 they're not 70 percent -- there's not a 70 percent
16 difference between your revised WACs and your revised
17 AWPs; is that right?
18         MS. THOMAS:  Objection.
19     A.   Well, there's sort of two things going into
20 it.  It represents -- it may have been -- at the end
21 of things be close to that in the typical case in the
22 sense that I'm scaling the average indirect price for

Page 588

1  pharmacies by 25 percent, whose prices tend to be
2  higher than other -- than the typical consumer by
3  about 30 percent, 25 or 30 percent.
4      And I am ignoring rebates and discounts and
5  so forth, although I guess that's -- so there's two
6  things going on.  There's both by telescoping in on
7  the pharmacies I'm getting a higher estimate than just
8  the 125 percent alone would suggest.  More like, let's
9  say, 1.6 or --
10     Q.   Did you discuss with counsel before the
11 deposition today comments that Judge Saris had made at
12 yesterday's hearing regarding the so-called 30 percent
13 speed limit?
14     A.   I certainly didn't remember the phrase
15 speed limit.  And I recall them saying there was a
16 hearing yesterday and nothing substantive about the
17 hearing, no.  So I don't recall any discussion along
18 those lines.
19     Q.   Do you recall anything about the 30 percent
20 something?
21     A.   Not about yesterday, no.  Not about
22 yesterday.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                         July 25, 2008

Page 589

1    Q.   How about otherwise, apart from yesterday's
2  hearing.
3    A.   I seem to recall in one of the documents
4  perhaps an expert report that I read mention of a 30
5  percent.  Was it by Hartmann or -- maybe it was by
6  Saris.  I recall -- I seem to recall a 30 percent
7  mention somewhere.
8    Q.   Mention of a 30 percent yardstick or
9  something like that?
10   A.   I don't know if it was yardstick, but I
11 remember 30 percent.  Yeah.
12   Q.   How does your analysis compare with that 30
13 percent yardstick or whatever the term was from Mr.
14 Hartmann?
15      MS. THOMAS:  Objection.
16   A.   Well, I would need to look more at exactly
17 what he did.  Did he -- before I could do justice to
18 that question I would need to look carefully at what
19 he did.
20   Q.   Professor Duggan, do you know if the way in
21 which you calculated the revised average wholesale
22 prices in this case are consistent with description of

Page 590

1  average wholesale price that Mr. Schondelmeyer has on
2  page 25 of his expert report?
3      MS. THOMAS:  Objection to form.  And again,
4  it is Dr. Schondelmeyer.
5    A.   I mean, I would need some time to look at
6  this.  It's a densely-phrased paragraph here.  And so
7  I would need to sit down and look and reflect a bit on
8  it.
9    Q.   Do you know how CMS officials, what they
10 understood when they heard the term average wholesale
11 price?  Is that something that's been part of your
12 report?
13      MR. LAVINE:  Object to form.
14   A.   It wasn't a part of my report, no.
15   Q.   Have you read testimony regarding what CMS
16 officials understood when they heard the term average
17 wholesale price?
18   A.   I believe you presented me with a document
19 last week on this matter for an administrator from a
20 specific region.  Maybe when it was HCFA.  So I recall
21 that document.  And nothing else is leaping to mind
22 right now on that whether it was person A at CMS or

Page 591

1  OIG or other places, I can't recall which agency.  But
2  I've read some stuff related to that.  And some of
3  that we discussed last time.
4    Q.   Do you know how state Medicaid officials,
5  those who administer the drug program from the states,
6  how they -- what they understood when they used the
7  term average wholesale price?
8      MR. LAVINE:  Object to form.
9    A.   There are 50 different state Medicaid
10 agencies, many people employed by them.  It would
11 be -- I've read a couple of pieces of a couple of
12 depositions or of some depositions by some folks in
13 those agencies.  And whether they accurately reflect
14 others at their agency or other state Medicaid
15 agencies, I'm not sure.
16      So we talked a little bit though last time
17 about -- I think it was McCann or something from --
18 who was a consultant in Missouri.  And so I have
19 familiarity with what a few people thought.
20   Q.   And from what you've reviewed, either
21 before preparing your report or as part of this
22 deposition, what is your understanding of how the

Page 592

1  state Medicaid programs interpreted the term average
2  wholesale price?
3      MR. LAVINE:  Object to form.
4    A.   I guess generally it seems plausible to me
5  that -- with the caveat that this is not an issue that
6  I've drilled down a lot on trying to get an accurate
7  summary of what all these Medicaid agency officials
8  thought AWP was.  But it seems plausible that they may
9  have thought it was, you know, marked up to some
10 extent above something like the prices by 20 or 25
11 percent.
12      I don't have any reason to think that they
13 understood the kinds of differences that I've
14 uncovered in this case.  But once again, there's many
15 agencies, many people.  Hard to do justice to that.
16   Q.   Did you know that Bruce Vladeck, the
17 administrator of HCFA from 1993 through 1997 testified
18 that he knew as early as the 1980s that there were
19 discounts of up to 99 percent on solutions like saline
20 solution and dextrose solutions?  Were you aware of
21 that testimony?
22      MR. LAVINE:  Object to form.

40  (Pages 589 to 592)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 593

1    A.   I don't recall reading that testimony, no.
2    Q.   Would you agree with me that if states did
3  not define or understand average wholesale price the
4  way that you have calculated it in your report,
5  substitution of your prices into the reimbursement
6  methodologies might be inconsistent with the state's
7  expectations and intentions when they set
8  reimbursement based upon AWP?
9         MR. LAVINE:  Object to form.
10   A.   Can I get that read back?
11        (Whereupon, the requested portion was read
12  by the reporter.)
13        MR. LAVINE:  Object to form.
14        THE WITNESS:  I'm sorry.  I'm getting a
15  little tired.  Could you read it back again?  There's
16  a lot packed into it.
17        (Whereupon, the requested portion was read
18  by the reporter.)
19   A.   I guess it's just -- it is really difficult
20  for me to speculate what state Medicaid officials'
21  intentions were.
22        BY MR. TORBORG:

Page 594

1    Q.   I'm not asking you to do that.
2    A.   No.
3         I think that -- so we reviewed some
4  documents last time in which there was this discussion
5  of margin on ingredient cost and dispensing fees and
6  so forth.  And it seems plausible or possible to me
7  that what some people would have in mind there is the
8  kind of thing that we've been talking about, this 20
9  to 25 percent markup, which would typically lead to
10  higher ingredient costs than acquisition costs.
11        And so I don't necessarily think that if
12  Abbott had reported prices more reflective of those
13  paid that that -- I don't know that -- I don't
14  necessarily think for the reasons we've talked a bit
15  about this issue already, these are just 44 NDCs out
16  of about 40,000 in effect during this eleven year
17  period -- I don't know that I agree with that.
18   Q.   So you disagree with it?
19        MR. LAVINE:  Object to form.
20   A.   It really depends on which person we're
21  talking about, what their views are, what -- it's a
22  fairly general question and we're looking at -- asking

Page 595

1  me to look across 50 state Medicaid agencies,
2  intentions of all these different people.  And so I
3  think it's really not -- I guess I would need to
4  specifics.
5    Q.   My question there was whether substitution
6  of your prices might be inconsistent with the state's
7  expectations and intentions when they set
8  reimbursement based upon AWP.
9         MR. LAVINE:  Object to form.
10   Q.   With that clarification would you disagree
11  with my statement?
12        MR. LAVINE:  Object to form.
13   A.   I would just need to think more about that.
14   Q.   Let me try it one more time.
15   A.   Okay.
16   Q.   Would you agree with me that if the states
17  did not define or understand AWP the way that you have
18  calculated it in your report, substitution of your
19  prices into the reimbursement methodologies might be
20  inconsistent with the state's expectations and
21  intentions when they set reimbursement upon AWP?
22        MR. LAVINE:  Object to form.

Page 596

1    A.   I just -- I think it is difficult for me
2  to -- so here we're talking about 44 products out of
3  40,000 products.  And it -- the people at Medicaid
4  agencies may have opinions about certain issues.
5  They're one of the stakeholders in the discussion
6  about program parameters.  It is -- you know, had
7  Abbott reported more accurate prices for the reasons
8  I've discussed I don't think it is -- you know, we've
9  talked about, say, the dispense -- it's just not
10  specific enough.  And I'm not trying to be difficult
11  on this answer.  It's just -- I guess I just -- I feel
12  like we've treaded on this a little bit already with
13  the dispensing fee issue and so forth.
14   Q.   So you can't answer my question today yes
15  or no; you need to think about it; is that fair to
16  say?
17        MR. LAVINE:  Object to form.
18   A.   At some level it's a very broad question.
19  There are many people who work at these agencies and
20  it requires -- it would require me to have drilled a
21  bit deeper on the issue of the -- I think it is -- I
22  do think Medicaid officials and CMS officials and so

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 597

1 forth understood that there might be a divergence of
2 actual prices from published prices.
3       And I guess I don't have any reason to
4 think if the spreads -- if these ratios had been
5 reduced from, let's say, 10 to 1 to 1.25 to 1, I don't
6 have any reason to think that that would -- you know,
7 it's just going to depend on the specific person and
8 the specific agency. It is -- I guess I don't have
9 any sense of whether these individuals were aware of
10 the magnitude of the differences that we've talked
11 about. So it --
12    Q.   Are you done?
13    A.   So I guess I would want to think a little
14 more about that issue.
15    Q.   You would agree with me that --
16       MS. THOMAS:  Did you ask for a break
17 before?
18       THE WITNESS:  Yeah.  It would be great if
19 we could get literally a five minute break.
20       MR. TORBORG:  You want to do it right now?
21       THE WITNESS:  Yeah.
22       MR. TORBORG:  That's fine.  Let's do it

Page 598

1 right now.
2       MR. LAVINE:  Probably 15 minutes ago he
3 asked.
4       MR. TORBORG:  Oh, I'm sorry.  It totally
5 slipped my mind.  I apologize.  Let's go off.
6       THE VIDEOGRAPHER:  Going off the record at
7 16:29.
8       (Recess.)
9       THE VIDEOGRAPHER:  This begins tape 6 of
10 the video deposition of Mark Duggan.  We are back on
11 the record at 16:44.
12       BY MR. TORBORG:
13    Q.   Welcome back.
14    A.   Thank you.
15    Q.   Professor Duggan, have you reviewed any
16 testimony from state Medicaid officials where those
17 officials indicated that they wanted to pay some
18 margin between the provider's acquisition cost and
19 what the Medicaid program was reimbursing?
20       MS. THOMAS:  Objection to form.
21    A.   Who wanted to?
22    Q.   The state Medicaid programs.

Page 599

1    A.   The thing that is leaping most to mind is
2 our discussion last week of -- I believe it was
3 McCann, the consultant from Missouri. I can't
4 remember everything that she talked about, but she
5 raised this sort of issue of ingredient cost margins,
6 I believe. I don't know what exactly phrase she used
7 for it, but she raised this issue. So that's one
8 example. So whether I have -- nothing else leaps to
9 mind right now, but as I said, I've reviewed a bunch
10 of -- quite a few documents.
11    Q.   And that's -- the testimony from Susan
12 McCann was testimony that I showed you at your
13 deposition; is that right?
14    A.   That is correct.
15    Q.   Not something that you recall reviewing
16 before we visited last week; is that right?
17    A.   That's correct.
18            (Exhibit Abbott 1119 was
19            marked for identification.)
20       BY MR. TORBORG:
21    Q.   I'd like to hand you what I've marked as
22 Abbott Exhibit 1119. It is an except of a deposition

Page 600

1 of a man name Harry Leo Sullivan who I will represent
2 to you was the Medicaid pharmacy director for the
3 state of Tennessee during the time period of the
4 complaint. And I bracketed the pages I'd like you to
5 read to yourself starting at page 152 line 16 through
6 154 line 22. You'll see the bracket.
7    A.   Just read it to myself, right? Don't read
8 it out loud?
9    Q.   Yes.
10    A.   (Reading.) Okay.
11    Q.   Do you have an understanding generally of
12 what Mr. Sullivan was stating here?
13       MR. LAVINE:  Object to form.
14    A.   For this state he's talking about the issue
15 of compounding drugs and the idea that when setting
16 the MAC he may account -- or when he and others at his
17 agency -- may account for the other costs, some other
18 costs, for example -- so, yeah. He's basically
19 suggesting that a MAC, to quote, "And I'll make sure
20 that the MAC incorporates other costs."
21       So it seems -- I should note Tennessee is a
22 very different Medicaid program from the others for

42 (Pages 597 to 600)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 601

1  these drugs, for example, at issue in this case.
2  They're one of the smallest of all states.  And so
3  Tennessee even before -- so it's a different -- it's a
4  pretty different state.
5      Q.   Why are you noting that it's a small
6  expenditure state?
7      A.   Yeah.  I'm just noting that it is just --
8  for much of the period they had managed care in
9  effect.  And I know from my previous experience in med
10  indicated that Tennessee is different.  They have
11  TennCare.  Much of that wouldn't appear in the claims
12  data.
13     Q.   Why are you pointing that out to me?
14     A.   Just that when -- I think when I think
15  of -- you know, Tennessee is a fairly large state with
16  a large number of Medicaid recipients.  But for the
17  products at issue in this case that specific state
18  doesn't loom especially large.  That's all.  That's
19  just what I was saying.  But it's not -- but so --
20  that's all.
21     Q.   By why are you pointing that out to me?
22          MS. THOMAS:  Objection.

Page 602

1      A.   For the reason that I just mentioned.
2  That's all.  In the limit, if Tennessee were zero
3  dollars for these drugs I would point that out.  It's
4  not zero.
5      Q.   Now, here Mr. Sullivan is testifying that
6  he would use the payment for the drug itself,
7  ingredient cost, to cross-subsidize other things that
8  might need to be paid fairly, right?
9          MR. LAVINE:  Object to form.
10     A.   So here we're talking about compounding --
11  the compounding fee, the compounding drugs.  And so he
12  agrees when whoever is questioning him asks "You would
13  use the payment for the drug itself to cross-subsidize
14  other things," and then he answers "And that would
15  include compounding." so -- yeah, he's talking about
16  here compounding.
17     Q.   So he's building a margin between
18  acquisition costs to a provider and what Tennessee is
19  paying in order to compensate for compounding fees and
20  also nursing services, right?
21          MR. LAVINE:  Object to form.
22     A.   One thing that I just want to ask just for

Page 603

1  clarification.  When was he doing -- when was he in
2  charge of the Tennessee Medicaid?  I'm just trying to
3  understand.  When was he running it?
4      Q.   I'll give you my best recollection.
5      A.   Okay.
6      Q.   I deposed him, so I should know.  Late '80s
7  or early '90s to 2004 with a six month break somewhere
8  between that where he went -- was a pharmacist again.
9      A.   Okay.  So just with that -- can he repeat
10  whatever question you asked?
11     Q.   Sure.
12          (Whereupon, the requested portion was read
13  by the reporter.)
14          MR. LAVINE:  Object to form.
15     A.   So I don't know that it's -- he
16  administered the Tennessee Medicaid program.  So this
17  is his description of what the Tennessee Medicaid
18  program is doing, his interpretation of it.  I'm not
19  sure if he -- he administers the program -- if he --
20  if that -- it's hard for me to know if his view
21  reflects the view of others in Tennessee in this
22  Medicaid agency or other stakeholders who have an

Page 604

1  influence on the Tennessee Medicaid program.
2      So he who administered was the top person
3  at Tennessee Medicaid, that's his interpretation of
4  this.  But it's not just one person in Tennessee
5  Medicaid, sort of thing.
6      Q.   Let's assume that Mr. Sullivan's testimony
7  accurately reflects the policy of the state of
8  Tennessee.  Now would you answer my question?
9          MR. LAVINE:  Object to form.
10     A.   Pulling out these two-plus pages of his
11  deposition, it appears that in this part he is talking
12  about this margin as a way to account for these other
13  costs.  That appears to be when he's -- and so if he
14  is speaking for -- yeah.  So --
15     Q.   And would you agree with me, Professor
16  Duggan, that application of your prices, which closely
17  approximate acquisition cost, in a but-for world going
18  back to 1991 might frustrate what Mr. Sullivan was
19  attempting to accomplish in building a margin between
20  acquisition cost of the provider and Tennessee
21  Medicaid reimbursement?
22          MR. LAVINE:  Object to form.

43 (Pages 601 to 604)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 605

1    A.   It is difficult for me to speculate what
2  this gentleman has in mind, what kind of ingredient
3  cost margins he has in mind and moreover, if he's
4  thinking of it NDC by NDC or sort of integrating
5  across all NDCs.  As he points out there can be
6  variation from one NDC to another.  So I don't think
7  it would necessarily frustrate his attempts, if he's
8  especially when one considers that it's really just
9  these 44 products that are at issue.  But it's hard
10 for me to know exactly what he has in mind.
11    Q.   These 44 products at issue in this case
12 involve compounding much of the time, do they not?
13    MR. LAVINE:  Object to form.
14    A.   In some cases they do.  I don't have at my
15 fingertips the fraction of claims or spending that
16 represents compounded claims.  That's not something I
17 have at my fingertips right now.
18    Q.   That's not anything you analyzed, right?
19    A.   I think that my analysis considers some
20 claims that are -- may consider some claims that are
21 compounded.  But I didn't try to arrive at -- in the
22 way that I tried to arrive -- tried to list many

Page 606

1  numbers for the interested reader here, that's not a
2  number that I did drill down on to calculate across
3  all the states, all the claims and so forth.
4    Q.   My question before that last one was
5  whether application of your revised pricing might have
6  frustrated what Tennessee Medicaid was trying to
7  accomplish if you assume Mr. Sullivan's testimony is
8  consistent with his intention.  You said not
9  necessarily.  Is that another way of saying that it
10 might have?
11    MR. LAVINE:  Object to form.
12    A.   I think it's difficult for me to speculate
13 here.  I suppose it is possible.  But without more
14 information it's hard for me to -- it's just hard for
15 me to know without more information about his thoughts
16 on the Medicaid program as a whole.  But possible that
17 this one gentleman in this one state -- or this one
18 state -- possible within this one state, possible.
19    Q.   And there may be states all across the 50
20 states that incorporated the same kind of thinking and
21 logic as Mr. Sullivan testified that he used for
22 Tennessee, right?  You don't know because you haven't

Page 607

1  talked to all those people, right?
2    MR. LAVINE:  Object to form.
3    A.   It's difficult for me to speculate what
4  people in other states are thinking or have in mind or
5  what the policymakers in those other states have in
6  mind.  That wasn't the focus of my analysis.
7    Q.   If you would go to page 37 of your report.
8  In the second paragraph of this page you discuss the
9  fact that you took 125 percent of the average pharmacy
10 indirect price.  Do you see that?
11    A.   Yeah.
12    Q.   You indicated that that was quite
13 conservative for two reasons, right?
14    A.   Mm-hmm.
15    Q.   And the first reason that you gave was that
16 your prices did not include the impact of management
17 fees, prompt-pay discounts and so forth, right?
18    A.   Mm-hmm.
19    Q.   What's included in the so forth?  Rebates?
20    A.   Yeah.  I believe so.
21    Q.   Anything else?
22    A.   It is difficult here -- I recall there's

Page 608

1  this variable in the Abbott data, customer rebate
2  discount, et cetera, total.  And in looking over the
3  deposition description of that variable the person --
4  Carlson, I believe -- was a bit vague on what all was
5  included there.  And I think that's part of the reason
6  that I put "and so forth" there.  So rebates, right,
7  would be another thing there.
8    Q.   What are management fees?
9    A.   Well, that is --
10    MR. LAVINE:  Object to form.
11    A.   I would need to go back to the deposition
12 testimony.  I don't recall off the top of my head.
13    Q.   What is the case for -- I think you stated
14 in some of your earlier testimony that -- strike that.
15    Would whether to include management fees or
16 not in your calculation have been one of the forks in
17 the road that you had to choose whether to be
18 conservative in Abbott's favor or not?
19    A.   I would think rebates yes, discounts yes.
20 As I said, I can't recall exactly what management fees
21 represent.  And so I would just need to study that
22 issue a bit more.  But the customer rebates discount

44 (Pages 605 to 608)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 609

1  that is included in the variable in that table -- I
2  believe it was 10 or -- that we looked at earlier --
3  maybe it was 7 -- the exclusion of that, that would
4  exclude these rebates and discounts.  And whether it
5  also excludes these management fees or whether the
6  management fees are something separate, I just don't
7  remember right here off the top of my head.
8      Q.   So let's suppose here that excluding the
9  management fees is the right fork, including the
10  management fees is the left road.  What's the case for
11  going down the right road and what's the case for
12  going down the left road for management fees?
13     A.   As I said, I don't recall exactly what
14  management fees capture in the Abbott data.  The
15  discounts and the rebates that I've talked about, to
16  me that did represent such a fork.  But I would just
17  need to go back a bit more to study the deposition
18  testimony and the data itself to refresh my memory on
19  what exactly these management fees represent.
20     Q.   Do you have any sense for the amount of
21  money that is involved here in terms of dollars and
22  cents?  Like if you had included management fees, how

Page 610

1  much would it have decreased the calculated prices?
2      MS. THOMAS:  Objection to form.
3      A.   Once again, because I don't remember if
4  management fees fell into this rebate discount
5  variable or not, it's hard for me to speculate.  By
6  excluding rebate and discounts, though, that led me to
7  arrive at a price that was on average about 7 percent
8  higher than I would have arrived at if I had
9  incorporated that rebate discount variable, and the
10  magnitude is going to vary to some extent across
11  products, across time, and so forth.
12     Q.   So maybe I can shortcut this a bit.
13     A.   Yeah.  Sure.
14     Q.   You're saying across all of the -- what's
15  included in the description of management fees, prompt
16  pay discounts and so forth, you found that this
17  resulted in you having a price 7 percent higher than
18  otherwise, right?
19     MR. LAVINE:  Object to form.
20     A.   Once again, I -- with the caveat that I
21  don't remember if management fees are in this customer
22  rebate discount et cetera total variable.  If they are

Page 611

1  not in that variable then just the consideration of
2  the discounts and rebates leads to a 7 percent higher
3  price.  And if they are in the variable then the
4  exclusion of management fees, prompt pay discounts,
5  you know, in hindsight perhaps I should have written
6  rebates here as well because the variable is labeled
7  and the testimony indicates this prompt pay discounts
8  and -- but yeah -- so once again, with the management
9  fees I would just need to drill down on that more.
10         Really what I'm trying to refer to there is
11  that column of the data, table 7, that is -- I think
12  it's table 7 -- where I list these customer rebate
13  that I'm not including that variable.  If memory
14  serves that's what I'm referring to there.
15     Q.   Where does one find the 7 percent figure
16  that you were talking about?
17     A.   So if you look in the next column there
18  there is a number that increases over time from 5.1 to
19  6.8 percent and in some periods it's as high as 7.7
20  percent.  And so basically that represents the sort of
21  ratio of customer rebate to the end customer invoice
22  total.

Page 612

1          And basically 6 or 7 percent, if we had
2  calculated a price from this data -- let's say we'd
3  get like 23.9 -- suppose that end customer invoice was
4  just a price.  We would go from 25.2 to about 23.9,
5  and 25.2 is about 6 percent higher than 23.9.  It's a
6  little bit more than this ratio.  It depends on what
7  you put in the denominator.  But that's where I'm
8  getting the 6 or 7 percent from.
9      Q.   Are the prompt pay discounts in that 6 to 7
10  percent?
11     A.   If I recall in her testimony Ms. Carlson
12  mentioned that there might be some discounts that
13  would not be included in either the direct or the
14  indirect data.  So the variable doesn't indicate what
15  exactly the customer rebate represents, is it a prompt
16  pay discount, you know, what exactly is it.  So it was
17  unclear from the deposition to me, if I remember
18  correctly.
19         But I do remember that it seemed that there
20  were other discounts.  And prompt pay discounts, at
21  least some prompt pay discounts may be one of them
22  that were not included in either the direct or the

45  (Pages 609 to 612)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 613

1  indirect data.
2      Q.   Most of the 44 NDCs at issue in this case
3  are a dollar or less on your average price
4  calculations; is that right?
5          MR. LAVINE:  Object to form.
6      A.   Let's go to the --
7      Q.   Table 1.  At least as of 1996.
8      A.   It looks like many of them hover around a
9  dollar and then there are a decent number above a
10 dollar and also a decent number below.  I don't know
11 if there are 22 less than a dollar.  But yeah, it
12 looks plausible that more are below a dollar than
13 above a dollar per package.
14     Q.   Are you familiar with when manufacturers
15 calculate AMP whether they include or exclude the
16 impact of prompt pay discounts?
17         MS. THOMAS:  Objection to form.
18     Q.   Strike that.  Bad question.
19         Do you know under current CMS guidance
20 whether when calculating AMPs manufacturers include
21 the impact of prompt pay discounts?
22         MS. THOMAS:  Objection to form.

Page 614

1      A.   I'm not sure.
2      Q.   Now, you also -- the second reason you
3  indicated that you were quite conservative was the
4  scaling up of your average prices by 25 percent,
5  right?
6          MR. LAVINE:  Object to form.
7      A.   Yes.
8      Q.   Why did you scale up by 25 percent?
9      A.   I believe that I discussed this earlier in
10 the report, that my examination of the data revealed
11 that for most of the 44 products in most periods the
12 AWP was 25 percent greater than the WAC, wholesaler
13 acquisition cost.  And so even though -- so basically
14 here even though the average price at which
15 wholesalers are selling is typically much less than 25
16 percent greater than the price at which wholesalers
17 are acquiring products, I used this 25 percent scaling
18 factor that First Databank had in effect.
19         So in general actually if one looks at the
20 price at which wholesalers sell the products and the
21 price they pay for them, there's very little
22 difference between those two, certainly not close to

Page 615

1  25 percent on average.
2      Q.   Well, the 25 percent was a scaling factor
3  that First Databank had in effect, correct, as you
4  just testified?
5          MR. LAVINE:  Object to form.
6      A.   So I am not the person who -- whether
7  Abbott reported multiple prices -- I raised the
8  possibility earlier that Abbott reported not just one,
9  but multiple prices.  So it seems possible that Abbott
10 reported prices with, you know, a WAC of 40 and an AWP
11 of 50.  So whether in some cases that 25 percent
12 margin was First Databank induced or Abbott induced
13 I'm not a hundred percent sure.  But yeah, my
14 understanding is that First Databank often applied
15 this 25 percent markup.
16     Q.   So it wouldn't be fair in your view to hold
17 Abbott responsible for an additional 25 percent
18 scaling factor that it may not have had influence
19 upon?
20         MR. LAVINE:  Object to form.
21     A.   I don't know about fair.  I think, though,
22 that I am saying here suppose the WAC had been

Page 616

1  reported more accurately and then we -- although it
2  won't have all of the -- it is missing some things.
3  It seems plausible to me that Abbott was aware of this
4  125 percent scaling factor.  So it's -- the issue of
5  fair or not, I'm not really sure how to respond to
6  that.
7      Q.   Well, what was Abbott supposed to do about
8  the 25 percent scaling factor?
9          MR. LAVINE:  Object to form.
10     A.   That's not an issue that I've looked into.
11 Perhaps Abbott could have reported, in my earlier
12 example, a WAC of 40 and an AWP of 41 instead of 40
13 and having 50 result.  I'm not sure what -- that's
14 just not something I've looked into much.
15     Q.   You found that the difference between WAC
16 and -- or the price at which purchasers or providers
17 purchased the drugs from wholesalers were only 2 to 3
18 percent higher than what again?
19     A.   What wholesalers --
20     Q.   Purchased it from manufacturers?
21     A.   Right.  It's first order.  It's going to
22 vary across products and all that.

46  (Pages 613 to 616)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                          July 25, 2008

Page 617

1      Q.   So are you saying that Abbott should have
2  reported a direct price that was 22 to 23 percent
3  below the price at which it sold to wholesalers to
4  avoid the scaling factor from First Databank?
5      A.   Oh, no, no, no.
6         MS. THOMAS:  Objection to form.
7      A.   In my example, suppose that wholesalers are
8  paying 40 for a product and pharmacies are paying
9  wholesalers 41 for that product.  Whether Abbott -- so
10 my analysis essentially says let's say Abbott reported
11 40 and did not report an AWP.  It was my understanding
12 that First Databank might have -- once again, this is
13 not an area where I've drilled down a lot -- First
14 Databank might have taken that 40 and scaled it up by
15 25 percent to arrive at 50.  Or they could reported
16 the direct and that was scaled in different ways.
17        So 40 and 50 was what ends up getting
18 published.  I'm not saying Abbott should have done
19 anything.  What I'm saying is it is possible.  I don't
20 know if Abbott had said to First Databank wholesalers
21 are acquiring it for 40 and pharmacies are buying it
22 for 41, would First Databank have overwritten that

Page 618

1  with a 40 and 50.  I don't know.  I'm not sure.  What
2  I'm saying here is that I observe in the data this 125
3  percent markup from -- 125 percent difference between
4  AWP and WAC.  And so I'm utilizing that going forward.
5  The report is not -- it is -- I'm not -- yeah.  So
6  anyway.
7      Q.   It's getting late in the day.  And let me
8  see if I can cut to the point.
9      A.   Okay.
10     Q.   Here's what I don't get.  You're saying
11 that this approach is conservative favoring Abbott,
12 but how is it conservative that you scale the 25
13 percent -- that you include the scaling factor of 25
14 percent that Abbott didn't even control?  How is that
15 conservative in Abbott's favor?
16        MR. LAVINE:  Object to form.
17     A.   Well, in that example that I just gave
18 wholesalers are acquiring their product for 40,
19 they're selling it to let's say pharmacies at 41.  I
20 would be basically -- actually, in that example I
21 would be replacing the AWP with 41 times 1.25 as
22 opposed to 40 times 1.25.  So even -- so I'm basically

Page 619

1  marking up by 25 percent what pharmacies actually
2  acquire the product for from wholesalers and HPD
3  distributors, which is higher than what wholesalers
4  acquire the product for, based on my observation of
5  the data.  Slightly higher.  Not hugely higher.
6         And so it is conservative in the sense that
7  $51.25 -- I believe that's right -- $51.25 is 25
8  percent greater than the price the pharmacies are
9  actually acquiring the product for on average from the
10 wholesalers.  And so it seems possible to me -- and
11 perhaps this is not true -- but it seems possible to
12 me that Abbott could have said to First Databank --
13 actually, our wholesaler acquisition cost is 40 and
14 our AWP is 41 in this example -- forget about this 25
15 percent ratio.  But once again, that is not really an
16 area that I have really drilled down on.
17        But I do want to be clear that in that
18 example I'm using 41 as the WAC, which is -- which
19 tends to be greater than the price at which
20 wholesalers are actually acquiring the products.
21 Slightly.  That's a slight difference.
22     Q.   So your analysis is conservative in the

Page 620

1  sense that the price you use is 25 -- it's greater
2  than the markup that the wholesalers puts on the
3  product, right?
4         MR. LAVINE:  Object to form.
5      A.   It's really just marking up by 25 percent
6  what the pharmacies are acquiring the product for.  So
7  it's even -- it's multiplying something that is higher
8  than WAC by 125 percent in that example that I just
9  gave.
10     Q.   But it wasn't Abbott that was marking it up
11 by 25 percent, was it?
12        MR. LAVINE:  Object to form.
13     A.   You know, as I said earlier, whether Abbott
14 was reporting two or three of these prices instead of
15 just one, I'm not sure.  Whether Abbott knew that
16 First Databank and/or Red Book scaled things by 1.25
17 or 1.1875 if it was the direct price, I'm not sure
18 about that.  But I think it is -- it seems -- I am
19 simply here -- so it -- I'm not sure whether Abbott
20 could have -- perhaps Abbott could have controlled
21 that 25 percent by saying 40 and 41.  But that's
22 really not been the focus of my analysis.

47  (Pages 617 to 620)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 621

1        But to the extent that that $51.25 is much
2   greater than the actual average price at which these
3   pharmacies are acquiring the product, it is as I write
4   in my report here and elsewhere, it is in my view
5   conservative.  And I should also note here that I'm
6   telescoping in on the pharmacy classes of trade, as
7   opposed to the hospitals, which would really drag down
8   these prices.
9        Q.   Which you think is the appropriate thing to
10  do in this case?
11       A.   That's right.
12       Q.   That's not a fork; it's a this is the
13  appropriate way to do it, right?
14            MR. LAVINE:  Object to form.
15       A.   Well, it is -- it's interesting that you
16  raise that because when I -- in the Texas case when I
17  wrote a report and I did exactly that and the report
18  that was a response to my report criticized me for
19  focusing only on the pharmacy classes and trade and
20  said, basically, they were just X percent of
21  transactions for these products.  And so at least it
22  seemed that this individual -- I believe it was Dr.

Page 622

1   Barry -- felt that a more appropriate thing to do
2   based on that report, based on his -- I don't know
3   what you call it, whether it's rebuttal or -- it seems
4   he at least thought that it would have been more
5   appropriate to consider all customers.  That's my
6   recollection of it.
7        So it's not -- it seemed appropriate to me
8   in Texas.  But then I was criticized for it.  And so
9   here I try to address that issue here in my report
10  here.
11       Q.   As part of your analysis in this case,
12  Professor Duggan --
13       A.   And I don't know if we're going to be
14  wrapping --
15       Q.   Yup.  I'm going to finish up.
16            As part of your analysis in this case you
17  reviewed the reported AWPs, DPs and WACs for the 44
18  products in detail, right?
19       A.   The published prices, yeah.
20       Q.   Yes.  You looked at those prices for every
21  quarter for every NDC; is that right?
22       A.   I believe, right, there's an Excel

Page 623

1   spreadsheet in which these prices appear and I'm
2   certainly pretty familiar with that Excel spreadsheet.
3   Did I look at every NDC quarter direct -- you know,
4   all three prices.  So it's 44 products, 44 quarters,
5   three prices, that's 6,000 prices -- I'm not sure I
6   looked at all 6,000 prices one by one.  But I looked
7   at many of them.
8        Q.   You put all the prices into an Excel
9   spreadsheet for a purpose, right?
10       A.   Mm-hmm.
11       Q.   What was the purpose?
12       A.   So --
13       Q.   Strike that.  Actually, I don't need the
14  answer to that.  Let me ask a different question.
15            You reviewed that spreadsheet, right?
16       A.   Sure.  Definitely.
17       Q.   At some points in your report you stated
18  that you observed those prices increased over the 11
19  year period of the case, right?
20       A.   Yes.
21       Q.   What did you observe about the level of
22  those reported increases over time?

Page 624

1            MR. LAVINE:  Object to form.
2        A.   In many years -- and I don't remember -- I
3   don't think it was every year.  But in many of the
4   years the increase was 5 percent.  So if you looked at
5   the AWP for a specific product on June 30th of 1994
6   and then looked again at the AWP for that same product
7   June 30th 1995, with the caveat that -- I recall it
8   wasn't always exactly 5 percent, but it was generally
9   about 5 percent per year.
10       Q.   Did you observe that the increases in the
11  prices were generally consistent?
12            MR. LAVINE:  Object to form.
13       A.   I would hesitate to -- my recollection is
14  that 5 percent was very common.  Was it -- were there
15  certain NDCs that consistently diverged.  I recall 5
16  percent being a very common increase.  And it's
17  ultimately an empirical issue.  If one went back to
18  the 2,000 pairs of -- or -- really not 2,000 pairs.
19  44 products, 10 years, so like 400 increases.  How
20  many of them would be 5 percent, I think that's a
21  knowable thing.  I think most of them were 5 percent,
22  but I don't --

48 (Pages 621 to 624)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                          July 25, 2008

Page 625

1    Q.   Do you know why Abbott -- why the prices
2 for those products increased by amounts approximating
3 5 percent?
4        MR. LAVINE:  Object to form.
5    A.   I do not.
6    Q.   What do the consistent increases
7 approximating 5 percent tell you about Abbott's
8 pricing behavior?
9        MR. LAVINE:  Objection to form.
10   A.   I mean, they tell me that prices tended to
11 increase by 5 percent from one year to the next for
12 the same product.  I don't know what more --
13   Q.   You did not observe in your analysis any
14 radical increases in the pricing for these products,
15 did you?
16       MR. LAVINE:  Object to form.
17   Q.   From year to year.
18   A.   Yeah.
19       MR. LAVINE:  Can you close to done, David,
20 because I really want room in that airport?
21       MR. TORBORG:  Very close.
22   A.   So if we look at table 10 with vancomycin,

Page 626

1 there is an example.  There was an increase of like 15
2 percent, it appears to be, early '91.
3    Q.   What table are you on?
4    A.   Table 10 of my report.
5        But then after that it looks like --
6 yeah -- it was about 5 percent per year.  A little
7 more than 5 percent the next year.  That's a 3.2
8 increase which is more than 5 percent.  It's over 6.
9 It's about 6.  So I would need to -- the increases
10 look like about 5 percent, but then there are some
11 where it's less.  So 1994, for example, relative to
12 the previous year is an increase of only 1.8 relative
13 to the previous year, which is about 3 percent
14 increase.  So there was some fluctuation in this.  The
15 next year that's like a 4 percent increase and then
16 3.1 -- that looks like about 5 percent.  And I think
17 thereafter it's about 5 percent.
18       So it looks like early on there was a bit
19 of bouncing around.  It was 15, then it was 3, and
20 then it was 4.  I'm just trying to do this head math
21 on the fly.  But it looks like it wasn't 5 percent
22 throughout.

Page 627

1    Q.   This was one product?
2    A.   This was one product, right.  So it's an
3 empirical question whether the other products follow
4 the same pattern.
5    Q.   And in your review of the pricing for these
6 44 products throughout the 11 year time period, you
7 didn't see any funny business for the pricing, did
8 you?
9        MR. LAVINE:  Object to form.
10   A.   Can you define just what you mean by funny
11 business?
12   Q.   No.
13       MR. LAVINE:  Object to form.
14   A.   I just -- I would need to go back and --
15 nothing leaps to mind, but it's 6,000 numbers.  And so
16 it's possible there is some funny -- I just don't
17 recall anything off the top of my head.  It doesn't
18 look -- here there is an increase the amount of
19 which -- the percent by which it increases varies from
20 year to year, although it tends to remain at 5, I
21 think, later in the period.  And then there's this big
22 decrease late in 2001 that we see.

Page 628

1        MR. TORBORG:  Okay.  Why don't we go off
2 the record and end for the day.  We'll -- I think
3 we're both penciling in next Thursday.
4        THE WITNESS:  Yeah.  And if I go home and
5 there's something that wasn't in my Google calendar
6 I'll let them know and they'll let you know.  And the
7 same for you.  But it's my hope.  Yeah.
8        MR. TORBORG:  Great.  Thank you.
9        THE WITNESS:  Yeah.  Thanks very much,
10 Dave.
11       THE VIDEOGRAPHER:  This deposition is
12 concluded.  We're going off the record at 17:33.
13       (Whereupon, at 5:33 p.m. the videotaped
14 deposition was adjourned.)
15              *  *  *  *  *
16
17
18
19
20
21
22

49 (Pages 625 to 628)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Duggan, Ph.D., Mark G. - Vol. III                    July 25, 2008

Page 629

1
2
3
4
5
6
7    _____
8         SIGNATURE OF THE WITNESS
9
10   Subscribed and sworn to and before me
11   this _____ day of _____, 20____.
12
13
14   _____
15         Notary Public
16
17
18
19
20
21
22

Page 630

1    UNITED STATES OF AMERICA   )
2
3    DISTRICT OF COLUMBIA      )
4         I, JONATHAN WONNELL, a Notary Public in and
5    for the District of Columbia, do hereby certify that
6    the within transcript is a true and accurate record of
7    the testimony under oath and other proceedings in the
8    above-entitled matter.
9         I further certify that I am not a relative,
10   employee, attorney or counsel of any of the parties to
11   this action and that I am in no way interested in the
12   outcome of this matter.
13         IN WITNESS WHEREOF, I have hereunto set my
14   hand this _____ day of _____, 2008.
15
16
17
18   _____
19         JONATHAN WONNELL
20
21   My Commission expires:
22   October 1, 2012

50 (Pages 629 to 630)

6ffad2bc-cf47-4043-8c98-ff6bb6d13ad1

Page 631

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL      :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  :  CIVIL ACTION

PRICE LITIGATION            :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    :

U.S. ex rel. Ven-a-Care of  :  Judge Patti B. Saris

the Florida Keys, Inc.      :

     v.                     :

Abbott Laboratories, Inc.,  :  Chief Magistrate

No. 06-CV-11337-PBS         :  Judge Marianne B.

- - - - - - - - - - - - - -x    Bowler


        Videotaped deposition of MARK G. DUGGAN, Ph.D.

                    Volume IV

                    Washington, D.C.

                    Tuesday, February 17, 2009

                    9:11 a.m.

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
                        Washington, DC

Page 632

1       Videotaped telephone deposition of Mark G.
2   DUGGAN, Ph.D., a witness herein, called for
3   examination by counsel for Abbott Laboratories in the
4   above-entitled matter, pursuant to notice, the
5   witness being duly sworn by SUSAN L. CIMINELLI, a
6   Notary Public in and for the District of Columbia,
7   taken at the offices of Jones Day, 51 Louisiana
8   Avenue, N.W., Washington, D.C. at 9:11 a.m., and the
9   proceedings being taken down by Stenotype by SUSAN L.
10  CIMINELLI, CRR, RPR, and transcribed under her
11  direction.
12
13
14
15
16
17
18
19
20
21
22

Page 633

1   APPEARANCES:
2
3       On behalf of Abbott Laboratories:
4
5           DAVID S. TORBORG, ESQ.
6           HILARY RAMSEY, ESQ.
7           Jones Day
8           51 Louisiana Avenue, N.W.
9           Washington, D.C.  20001-2113
10          (202) 879-3939
11          dstorborg@jonesday.com
12
13
14      On behalf of the United States:
15
16          MARK A. LAVINE, ESQ.
17          U.S. Department of Justice
18          U.S. Attorney's Office
19          99 N.E. 4th Street, Suite 300
20          Miami, FL  33132
21          (305) 961-9003
22          mark.lavine@usdoj.gov

Page 634

1   APPEARANCES CONTINUED:
2
3       On behalf of Ven-A-Care:
4
5           SUSAN SCHNEIDER THOMAS, ESQ.
6           Berger & Montague, P.C.
7           1622 Locust Street
8           Philadelphia, PA  19103-6305
9           (215) 875-3000
10          sthomas@bm.com
11
12
13      Also Present:
14
15          SOLOMON FRANCIS, VIDEOGRAPHER
16
17
18
19
20
21
22

Page 635

1           C O N T E N T S
2
3   WITNESS: MARK G. DUGGAN, Ph.D.          PAGE
4   Examination By Mr. Torborg................. 637
5
6
7           E X H I B I T S
8   NUMBER          DESCIPTION          PAGE
9   Exhibit Abbott-Duggan 001 - EXPUSABT-DUG 070211
10          email 4/28/08...... 723
11  Exhibit Abbott-Duggan 002 - Deposition excerpt
12          12/3/08 Vaccaro.... 771
13  Exhibit Abbott-Duggan 003 - EXPUSABT-DUG070518
14          - 520, Email chain. 780
15  Exhibit Abbott-Duggan 004 - USvAbbottWA-00001571
16          - 1587............. 791
17  Exhibit Abbott-Duggan 005 - Binder............. 796
18
19
20
21
22

                            2 (Pages 632 to 635)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                         Washington, DC

Page 636

1         P R O C E E D I N G S
2
3         THE VIDEOGRAPHER: Good morning. This
4    begins tape number 1 of the videotaped deposition
5    of Dr. Mark Duggan taken in the matter of
6    Pharmaceutical Industry Average Wholesale Price
7    Litigation, pending in the U.S. District Court for
8    the District of Massachusetts, Civil Action Number
9    01-CV-12257-PBS.
10        This deposition is being held at the law
11   offices of Jones, Day, located at 51 Louisiana
12   Avenue, Northwest, Washington D.C. on February
13   17th, 2009 at approximately 9:11 a.m.
14        My name is Solomon Francis and our court
15   reporter is Susan Ciminelli, and we are from
16   Henderson Legal Services. For the record, will
17   counsels please introduce themselves and whom they
18   represent?
19        MR. TORBORG: David Torborg from Jones,
20   Day on behalf of Abbott Laboratories.
21        MR. LAVINE: Mark Lavine on behalf of
22   the United States.

Page 637

1         MS. THOMAS: Susan Schneider Thomas
2    representing Ven-A-Care of the Florida Keys.
3         THE VIDEOGRAPHER: Will the court
4    reporter please swear or affirm in the witness.
5
6    Whereupon,
7         DR. MARK G. DUGGAN,
8    was called as a witness by counsel for Defendant
9    Abbott, and having been duly sworn by the Notary
10   Public, was examined and testified as follows:
11
12   EXAMINATION BY COUNSEL FOR DEFENDANT ABBOTT
13   BY MR. TORBORG:
14   Q.  Welcome back, Professor Duggan.
15   A.  Thank you. It's good to be here.
16   Q.  Again, my name is David Torborg. I'm an
17   attorney with Jones, Day. And Jones, Day
18   represents Abbott Laboratories in this case. You
19   understand that you are still here in connection
20   with a case brought by the United States and Ven-
21   A-Care, relator, against Abbott, correct?
22   A.  Yes, I do.

Page 638

1    Q.  You understand that you're still under
2    oath, right?
3    A.  Yes. I do.
4    Q.  And you're obligated to provide truthful
5    responses to my questions, right?
6    A.  Yes.
7    Q.  Just to briefly reiterate a couple of
8    the instructions that we went over the first time
9    that we met. First, you'll need to respond
10   verbally to the questions.
11   A.  Okay.
12   Q.  So that Susan can transcribe your
13   response. You will need to wait until I finish my
14   question before answering, and it's always a good
15   idea to leave just a little bit of a pause between
16   my question and your answer to give an opportunity
17   for your counsel to object. This makes things go
18   a little smoother.
19   A.  Okay.
20   Q.  I'll do my best not to cut you off in
21   the middle of your answer. And you'll do your
22   best to try to listen through my question, right?

Page 639

1    A.  Yes. I will.
2    Q.  And most importantly, if you don't
3    understand a question, please let me know and then
4    I'll try to restate it so that it's more clear,
5    okay?
6    A.  Yes.
7    Q.  If you need to take a break, let me
8    know. I'll try to take a break at the hour, but
9    if you need to do it before that, let me know
10   okay.
11   A.  Okay. Thank you.
12   Q.  From time to time, I may slip into the
13   bad habit of addressing you as Mr. Duggan instead
14   of Dr. Duggan or Professor Duggan. I apologize at
15   the outset for that. It's just doing so many
16   depositions where it's Mister, you get into a
17   habit, so no disrespect intended.
18   A.  Sure.
19   Q.  I assume, counsel, will we have the same
20   agreement we had last time which is an objection
21   by either of you will count as an objection for
22   both of you?

Henderson Legal Services, Inc.

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 640

1        MS. THOMAS:  That's fine.
2        MR. LAVINE:  Yes.
3  BY MR. TORBORG:
4        Q.  All right.  Professor Duggan, you were
5  last deposed in this case in July of 2008, is that
6  right?
7        A.  That is my recollection.  Yes.
8        Q.  Have you had an opportunity to review
9  the transcripts of the three days of testimony
10 that you gave earlier?
11       A.  Yes.  I have.
12       Q.  Did you read them all the way through or
13 just certain -- certain sections of them?
14       A.  If I recall correctly, I did read them
15 over.  If I recall correctly, I read them over and
16 --
17       Q.  Do you remember when you did that?
18       A.  I believe that I read over -- so there
19 were three days, I believe, of deposition
20 testimony that I did in July.  Two of the days
21 were back to back, and then there was a third day,
22 I believe, a week or so later.  And so I recall

Page 641

1  reading over the first two days in between, if I
2  remember -- if I'm remembering correctly.  This
3  was obviously a while ago but, and then the third
4  day soon after, soon after that, that third day of
5  testimony was given.
6        Q.  And you haven't reviewed them since
7  shortly after the deposition, fair to say?
8        A.  I also late last week skimmed them over
9  somewhat.  And so -- but skim would be the more
10 appropriate term than read, I believe.
11       Q.  In reviewing your transcripts either
12 shortly after the deposition or again late last
13 week, did you notice any answers that you would
14 change?
15       MS. THOMAS:  Objection.  Form.
16       THE WITNESS:  In a substantive way, not
17 that I recall.  I don't believe so.  There are
18 certainly places where I might have been a bit
19 more articulate but -- or crisper.
20 BY MR. TORBORG:
21       Q.  We could all say that.  When I look back
22 through them, I could see instances where my

Page 642

1  questions could have been more articulate.  But
2  substantively, no changes that you are aware of,
3  correct?
4        A.  Not that I recall.
5        Q.  Any additions that you would add to your
6  testimony?
7        MS. THOMAS:  Objection.  Form.  Do you
8  mean at the time or things that he has since
9  learned or in connection with his supplemental
10 report?  I think that's why it's a hard question
11 for him to respond to.
12 BY MR. TORBORG:
13       Q.  Let me rephrase.  When you were
14 reviewing your transcript, looking at the answers
15 to the questions that I actually asked on the
16 substantive matters that I asked you about, did
17 you see anything where you said, oh, I should have
18 said this, too.  Not necessarily a change to the
19 testimony, but a further comment that you would
20 make to make your answer, in your view, a better
21 reflection of your opinions?
22       A.  The first order thing that I would

Page 643

1  remember would be just to -- trying to converge
2  more rapidly to an ultimate answer, but in terms
3  of, you know, I don't recall substantive changes
4  that I didn't eventually say.
5        Q.  Okay.  Now you provided a supplemental -
6  - a supplemental report in the United States
7  versus Abbott litigation, correct?
8        A.  That is correct.
9        Q.  Okay.  And can you give me a sense for
10 how much time you've billed on the Abbott matter
11 since last July when you were deposed?
12       A.  With the caveat that it is difficult to
13 do this precisely because it's been a fairly long
14 amount of time, I would think less than -- less
15 than 50.  But how much less I'm not -- that would
16 be an upper bound in that -- 30 or 40 maybe.
17       Q.  When you bill the United States for your
18 time in the litigations -- now, I understand now
19 you've also prepared reports for the United States
20 cases against Dey and Roxane, correct?
21       A.  Yes.
22       Q.  When you bill the time in the three

                                4 (Pages 640 to 643)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 644

1  matters, do you bill it collectively or do you
2  separate it out?
3      A.  I bill it collectively.
4      Q.  Can you give me a sense for how much
5  time you have billed on the three matters combined
6  since we met last July?
7      A.  I'd say in the neighborhood of 250 hours
8  across the three.  But with the caveat that it's a
9  range.  That's in the neighborhood, I think.
10     Q.  Now, you issued your first report in the
11 Abbott matter in June of 2008, right?
12     A.  In the federal Abbott matter in June of
13 2008.  Correct.
14     Q.  And it's now February of 2009, correct?
15     A.  Correct.
16     Q.  Is there anything in that initial report
17 that needs to be corrected?
18     MS. THOMAS:  Objection.  Form.
19     THE WITNESS:  I believe the supplement
20 that I produced January 23rd, I think it was
21 January 23rd provided a summary of changes, the
22 effect of some changes to that initial report.

Page 645

1  BY MR. TORBORG:
2      Q.  And are the changes that you made in the
3  supplemental report that relate to the State of
4  Ohio, are those changes to your original report or
5  corrections to your original report?
6      MR. LAVINE:  Object to form.
7      THE WITNESS:  Could you clarify what you
8  mean?
9  BY MR. TORBORG:
10     Q.  When you -- you've used the word
11 correction, right, in your work?
12     A.  Sure.
13     Q.  What is your understanding of what it
14 means?
15     A.  So for example, in a paper, if one made
16 a mistake and realized -- suppose one wrote 7 when
17 one meant to write 9, that would be -- and
18 corrected that, that would be one example of a
19 correction.  So just -- so that would -- it would
20 represent a revision of something that was wrong,
21 inaccurate.
22     Q.  Using that understanding of the term

Page 646

1  correction, were the changes that you made in the
2  supplemental report with respect to Ohio, were
3  those corrections to the original report?
4      A.  In the -- I'm sorry.  It would diverge
5  from that example that I just provided, the sort
6  of correcting 7 with a 9, let's say, or -- it
7  represents -- so I tried in that initial report as
8  an empirical economist, I try when I write
9  something like a report or a paper to be very
10 transparent about what I'm doing, very clear about
11 what I'm doing.
12     And so the -- that report given the
13 assumptions and so forth, I believe is, you know,
14 I don't -- I guess I'm a little unclear once again
15 on the significance of correct versus change, so I
16 had this initial report.  I basically took Ohio
17 out of the analysis in the supplement.  And as a
18 result, some numbers from that initial report
19 changed.
20     And so I guess it is in, in a sense it's
21 in this middle ground perhaps between change and
22 correction.  I'm not -- but it's certainly a

Page 647

1  change to the initial report.  And whether it is a
2  correction, it's not the case that I -- that my
3  analyses for Ohio -- I guess I don't mean to be
4  vague on this.  I suppose I would say that given
5  the -- the pulling Ohio out of the analysis, the
6  report necessarily changed.
7      Q.  Why did you remove Ohio from your
8  analysis?
9      A.  It was based on instructions that I
10 received from counsel.
11     Q.  Did they explain to you why they were
12 asking you to remove Ohio from your analysis?
13     A.  I -- my understanding is that the Ohio -
14 - some new information came to light regarding
15 Ohio's adjudication methodology.  I didn't study
16 all of the, all of the elements of that revision,
17 but in response to that, it is my understanding
18 that in response to that information, counsel
19 decided to -- instructed me to remove them.
20     Q.  And in your damage analysis in this
21 case, you're taking instructions from the United
22 States about what to include and not to include,

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 648

1  correct?
2       MR. LAVINE:  Object to form.
3       THE WITNESS:  Yes.  So the Ohio, State
4  of Ohio would be one example.  The time period
5  would be another example.  1991 to 2001, so yes.
6  BY MR. TORBORG:
7    Q.  But even within the time period of the
8  case, your damage analysis is affected by
9  instructions from the United States, correct?
10      MR. LAVINE:  Object to form.
11      THE WITNESS:  Well, based on that
12 example that I just gave of Ohio, that is true.
13 And I believe in the report, I also mentioned that
14 the State of California early on in the time
15 period, I don't consider that period.  So it is --
16 it is the case that the -- it's certainly not the
17 case that the methodology that I'm using is
18 determined by those kind of instructions, but the
19 -- but that Ohio example suggests that's true.
20 BY MR. TORBORG:
21   Q.  What new information came to light about
22 Ohio's adjudication formula?

Page 649

1    A.  With the caveat that I don't know all of
2  the details of this, it is my understanding that
3  the prices used by Ohio, let's say for the
4  ingredient cost reimbursement may not have been in
5  some cases directly affected by, let's say, an AWP
6  or a WAC.  But I do want to caveat that with the
7  statement that that's not an issue I've drilled
8  down on.
9    Q.  And there may be other states throughout
10 the country where the prices paid by the state
11 were not directly impacted by the AWPs or WACs for
12 products, correct?
13      MS. THOMAS:  Objection, form.
14      THE WITNESS:  By the AWPs or the WACs or
15 the direct prices, by the published prices for the
16 products just -- if I could just ask for that
17 revision because states differ in terms of what
18 prices they use, it is -- it is possible.
19      But the -- at my direction, Myers and
20 Stauffer, we talked about them a bit last time,
21 has -- individuals at Myers and Stauffer have
22 examined the reimburse the methodologies used by

Page 650

1  the other states.  And it is my understanding from
2  looking over the results of their analysis, from
3  studying the results of their analysis that in the
4  vast majority of states, in the vast majority of
5  time periods, for the vast majority of products,
6  the AWP, WAC or direct prices, those published
7  prices would have been used.
8  BY MR. TORBORG:
9    Q.  Would have been used to set the payment
10 amount for the claim?
11      MR. LAVINE:  Object to form.
12 BY MR. TORBORG:
13   Q.  Right?  Like historically, actually were
14 used.  Is that what you're saying?
15   A.  With the caveat that in some states, I
16 mean, for some claims, the amount paid would be --
17 would end up being the charged amount, but then
18 there is also the time period when I believe it
19 was 2000 or so, middle of 2000, when some states
20 adopted revised prices that were in most cases
21 lower than the published AWPs, revised AWPs.  So
22 there are -- you know, with exceptions.

Page 651

1    Q.  And there are instances where states had
2  a MAC on the complaint products, correct?
3    A.  Yes.  That is my understanding.
4  Correct.
5    Q.  I think in your report, you noted that -
6  - you saw that or you divined that from the data
7  in Illinois that there was some NDCs where
8  Illinois had a MAC, correct?
9    A.  I don't recall Illinois specifically,
10 but I do recall the use of MAC prices, maximum
11 allowable cost prices, but I would need to go back
12 and refamiliarize myself to remember which states
13 and which time periods for which products, and so
14 forth.
15   Q.  Why don't you eliminate claims that were
16 paid on the maximum allowable cost from other
17 states besides Ohio?
18      MR. LAVINE:  Object to form.
19      THE WITNESS:  As I discuss -- I believe
20 I discuss in the report, in some cases, a MAC may
21 be in effect, but if, let's say, the AWP fell
22 below, if the reimbursement amount would be lower

6 (Pages 648 to 651)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 652

1  using the published AWP for a product, that AWP
2  would, in those cases, be used in place of the
3  MAC.
4  BY MR. TORBORG:
5      Q.   And in those instances, situations you
6  described, you would be calculating a difference
7  between the MAC amount and your but-for AWP driven
8  price, correct?
9      A.   I mean, essentially, what my analysis
10 would do -- would do that to some extent.
11 Essentially what my analysis would do would be to
12 determine whether the reimbursement amount using,
13 let's say, an alternative AWP would fall below the
14 reimbursement amount using the MAC -- MAC price.
15     Q.   So you would calculate difference in
16 those situations?  You potentially might, correct?
17     A.   Correct.
18     Q.   So now that's not something -- strike
19 that.
20          Isn't it the case that you found in your
21 original report for Ohio that your revised AWPs
22 fell below the MACs that Ohio created.  That's why

Page 653

1  you had a difference in Ohio, right?
2          MR. LAVINE:  Object to form.
3          THE WITNESS:  As an empirical economist,
4  I know that having -- having put together that
5  analysis for Ohio, I know there are many time
6  periods, products and so forth that were
7  considered.  So it's something that I would -- it
8  is possible, but it would require some drilling
9  down because as you saw the difference relative to
10 the amount paid in Ohio was much -- was
11 significantly lower than in the other states.
12         And this likely reflects lower
13 difference or perhaps in many cases zero
14 difference, so it would just depend on the
15 specific product, the specific time period, even
16 the specific claim.
17 BY MR. TORBORG:
18     Q.   But there were instances with the State
19 of Ohio where you calculated a difference between
20 a MAC amount and your but-for AWP price, correct?
21     A.   I believe that is true, but it wouldn't
22 be prudent for me to -- I believe that's true.

Page 654

1      Q.   And you no longer do that, correct?
2          MR. LAVINE:  Object to form.
3          THE WITNESS:  For the State of Ohio.
4  BY MR. TORBORG:
5      Q.   Correct.
6      A.   And additionally, I don't do that for
7  other claims in the State of Ohio, where a MAC
8  price was not used if that's the case.  So Ohio is
9  just completely eliminated from the analysis.
10     Q.   Did you -- was some of the new
11 information you learned from Ohio was that Ohio
12 was not a lower of state?
13         MR. LAVINE:  Object to form.
14 BY MR. TORBORG:
15     Q.   When it came to its MACs versus its EAC?
16         MR. LAVINE:  Object to form.
17         THE WITNESS:  It is my understanding
18 that at least for part of the period, and for some
19 of the products at issue in the case, that even if
20 the reimbursement amount -- that what, that this
21 lesser of was not in effect.  Whether that was
22 true for all 44 products, for all 44 quarters, I'm

Page 655

1  not sure, because I haven't drilled down.
2  BY MR. TORBORG:
3      Q.   Why would it change by product?
4          MR. LAVINE:  Object to form.
5          THE WITNESS:  There can be distinctions
6  between different products, for example, brand
7  versus generic.  And so I -- but that's not -- I
8  would need to -- it may just be a time period
9  effect.  I'm not sure.
10 BY MR. TORBORG:
11     Q.   All right.  Are you aware of any facts
12 that Ohio was -- are you actually aware of any
13 time period that Ohio would have paid a price
14 below its MAC?
15         MS. THOMAS:  Objection.  Form.
16         THE WITNESS:  Once again, I haven't
17 studied for the 44 quarters that I consider in
18 this case, so I'm not aware of that, but I
19 haven't, I haven't studied it, so --
20 BY MR. TORBORG:
21     Q.   Did you review the deposition testimony
22 of Robert Reed from Ohio?

7 (Pages 652 to 655)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 656

1     A.  I did not.
2     Q.   So what you learned, new information
3  would include that Ohio for some of the claim
4  period would pay its MAC amount regardless of
5  whether the estimated acquisition cost formula
6  figure would generate a lower number, right?
7        MR. LAVINE:  Object to form.
8        THE WITNESS: It's my understanding that
9  that is the -- that at least for some time
10  periods, that was true.
11 BY MR. TORBORG:
12    Q.   And that's -- and you understand that
13  that's why the United States asked you to drop
14  Ohio from your difference analysis, correct?
15       MR. LAVINE:  Object to form.
16       THE WITNESS:  Not having been involved
17  in the discussions that led to that instruction,
18  it's my understanding that that's one input to
19  that instruction, and whether that was the only
20  one, I -- that's the one that I'm aware of.
21 BY MR. TORBORG:
22    Q.   You just take your instructions from the

Page 657

1  Department of Justice with regard to what states
2  to include in the damage analysis?
3        MR. LAVINE:  Object to form.
4        THE WITNESS:  I wouldn't put it that
5  way.
6  BY MR. TORBORG:
7     Q.   Well, in the State of Ohio, you took
8  their instruction to take it out, right?
9        MS. THOMAS:  Objection.  Form.
10       THE WITNESS:  That is -- it is true that
11  I removed Ohio from the analysis for what seemed
12  to me, once again, but my caveat before was just I
13  don't know all of the factors that went into it.
14  But the factor that we have been discussing seemed
15  to me like a reasonable reason to drop them.
16       Had they said drop state X, with no
17  reason at all, I -- I don't know, but that's
18  certainly not what happened.  It seemed like a
19  reasonable thing to do, just as with one of the
20  other cases in which I'm engaged, the state had
21  already settled and so I believe they are not
22  considered in the analysis.

Page 658

1        So there are -- those seem like to me
2  given what I set out to do in my analysis, my
3  empirical analysis of the Abbott data, Medicaid
4  data, and the Medicare data, that seemed like a
5  reasonable reason on which to exclude them.
6  BY MR. TORBORG:
7     Q.   You would agree with me, Dr. Duggan,
8  that if Ohio had a reimbursement mechanism that
9  paid its MAC even if the EAC formula generated a
10  lower amount, it wouldn't be appropriate to
11  calculate a difference for Ohio, right?
12       MR. LAVINE:  Object to form.
13       THE WITNESS:  I'm not sure I -- I'm not
14  sure I agree with that.  One could -- you know, as
15  I outline in my report, one of the things that I
16  did not examine was the effect of Abbott's
17  published AWPs on, let's say, reimbursement for
18  non-NDC-based claims, or for that matter, on
19  maximum allowable costs.  It is possible and I
20  haven't -- not having drilled down on this issue,
21  but it is possible that Abbott's published AWPs
22  influence the MAC for certain products, and thus

Page 659

1  their -- but that's not an issue that I've drilled
2  down on.
3  BY MR. TORBORG:
4     Q.   And were you informed that Mr. Reed
5  testified that the published AWPs rarely, if ever,
6  affect the maximum allowable cost that they
7  calculated?
8        MR. LAVINE:  Object to form.
9        THE WITNESS:  I haven't studied his
10  deposition transcript.  And I don't recall hearing
11  that specific piece of that specific quote from
12  his deposition.
13  BY MR. TORBORG:
14    Q.   And in any event, you would agree with
15  me that the way in which you calculated a
16  difference for Ohio and the numbers that you
17  calculated in the initial report are not
18  consistent with the new information that you
19  learned subsequent to that report, correct?
20       MR. LAVINE:  Object to form.
21       THE WITNESS:  For certain time periods,
22  it appears that published AWPs would not have

8 (Pages 656 to 659)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 660

1  replaced the MACs as my -- that's -- I tried to be
2  very clear in my initial report, so it -- based on
3  new information, it seems that the published AWPs
4  would not have overridden the MAC, and would not
5  have been used in place of the MAC in that state
6  at least for part of the period, so --
7  BY MR. TORBORG:
8      Q.  So there was a mistake that needed to be
9  corrected, right?
10         MR. LAVINE:  Object to form.
11  BY MR. TORBORG:
12     Q.  Not necessarily a mistake that you made,
13  but a mistake in the overall analysis based on
14  changing information, correct?
15         MR. LAVINE:  Object to form.
16         THE WITNESS:  Given -- so just to be
17  clear, given the assumptions that I laid out, I
18  believe the -- as an economist who has done this
19  kind of work before with large scale data, I
20  believe that is accurate, new information -- I'm
21  always in my research open to incorporating new
22  information as it becomes available.  And the --

Page 661

1  so it does seem that one of the assumptions that I
2  made in Ohio for at least part of the period may
3  not have been accurate, and so I revised the -- my
4  analysis accordingly.
5         I don't want to point fingers at anyone
6  in particular, I just -- I believe that I always -
7  - I strive to produce research that will stand the
8  test of time.  And that's what I've strived to do
9  in this report.  And I did make one revision, make
10  this revision since eight months ago.
11  BY MR. TORBORG:
12     Q.  Apart from issues relating to Ohio, are
13  there -- are you aware of any other revisions or
14  corrections or modifications that need to be made
15  to your original report?
16         MR. LAVINE:  Object to form.
17         THE WITNESS:  Well, the --
18  BY MR. TORBORG:
19     Q.  And let me see if I can short cut that.
20     A.  Sure.
21     Q.  I include in my Ohio carveout, how you
22  extrapolate to 38 states.

Page 662

1      A.  Right.  So --
2      Q.  I know that changes.
3      A.  Right.  These changes are detailed on
4  the first page of the supplement, but then there
5  are some other additions.  It says there is some
6  additional information in the supplement that I
7  provided on January 23rd, a few weeks ago.
8      Q.  And that relates to the Abbott CHIPs
9  data, is that right?
10     A.  Correct.
11     Q.  There is nothing -- and that's not an
12  issue that you address in your original report,
13  right?  Your original report has no analysis of
14  the CHIPs data, right?
15     A.  That is correct.
16     Q.  So let me ask you again, apart from any
17  issues that relate to pulling Ohio out of the
18  analysis and the analysis of the CHIPs data, are
19  you aware of any other corrections or revisions to
20  your initial report?
21         MR. LAVINE:  Object to form.
22         THE WITNESS:  I'm not.

Page 663

1  BY MR. TORBORG:
2      Q.  So you're not aware of any additional
3  revisions or corrections that need to be made,
4  right, regarding carving out Ohio?
5         MR. LAVINE:  Object to form.
6         THE WITNESS:  Given what I set out to do
7  in that initial report, I'm not aware of any
8  changes, but as I -- as for example, I outlined in
9  that report, there are some things that I excluded
10  from consideration, certain J codes, for example,
11  so given what I set out to do in that initial
12  report, in that report, that is true.
13  BY MR. TORBORG:
14     Q.  For the Abbott litigation, apart from
15  the work that you did in preparing the
16  supplemental report, have you done anything else
17  in this case since your last deposition?
18         MR. LAVINE:  Object to form.
19  BY MR. TORBORG:
20     Q.  Let me rephrase.  For purposes of
21  preparing your opinions in the Abbott litigation
22  against the United States, apart from the work you

9 (Pages 660 to 663)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                      Washington, DC

Page 664

1    did to prepare your supplemental report and the
2    analysis that went into that, is there anything
3    else that you've done since your last deposition?
4         MR. LAVINE:  Object to form.
5         THE WITNESS:  Well, as I mentioned
6    earlier, I did skim over my initial deposition
7    transcripts late last week.  I also skimmed over
8    my report to try to refamiliarize myself with the
9    empirical analyses.  And there were, I believe,
10   some discussions on at least one phone call.  And
11   so it is difficult for me to recall everything
12   during this last, let's say, seven months.  But
13   the things that leap to mind include the
14   production of the supplement, skimming the
15   deposition transcripts, skimming the report, and a
16   meeting on Friday of last week.
17   BY MR. TORBORG:
18        Q.   And is the meeting in addition to the
19   phone call?
20        A.   Correct.  Yes.
21        Q.   Okay.  Who was on the phone call?
22        A.   So I'm not sure of the -- it seems

Page 665

1    plausible that this was discussed on the same
2    call, and it may have been on multiple calls as,
3    let's say, Dey and Roxane discussions were
4    occurring.  But if I recall, it would have been
5    Mark Lavine, Susan Thomas, Bunker Henderson, Renee
6    Brooker, Ian Dew, folks from Myers and Stauffer.
7    I may be forgetting someone, but that's --
8         Q.   When was the call?
9         A.   It just -- I don't remember
10   specifically.  I just remember this would have
11   been a discussion in advance of my supplement, of
12   producing my supplement.  And as I said, it may
13   have been on multiple phone calls just a part of
14   these other phone calls.  I don't recall there
15   being a specific Abbott phone call, although the
16   meeting that I just mentioned was more focused on
17   Abbott.
18        Q.   And that was a meeting last week?
19        A.   Yes.
20        Q.   And who was at the meeting?
21        A.   Renee Brooker.  Mark Lavine.  Ian Dew
22   from Steck Consulting were there.  And at times

Page 666

1    during the day, Bunker Henderson was on the call.
2    At times Jim Breen was on the call.  At times
3    Myers and Stauffer -- when I say on the call, I
4    mean sort of like we are doing here with our -- I
5    don't know if there is someone on this phone here,
6    but someone on speaker.  And I may be -- but
7    that's my best recollection of who was involved.
8         Q.   What was discussed in the meeting?
9         MR. LAVINE:  Object to form.
10        THE WITNESS:  To some extent, I'd say if
11   -- there are many things discussed during the
12   meeting.  It was -- the main focus of it was to
13   try to sort of -- quite a bit of time had elapsed
14   since the third day of my deposition testimony.
15   And so much of it was just trying to discuss what
16   were the issues then, and sort of because, you
17   know, my memory is not perfect, so I'm just trying
18   to refresh my memory on things.
19   BY MR. TORBORG:
20        Q.   What issues do you recall being
21   discussed?
22        MR. LAVINE:  Object to form.

Page 667

1         THE WITNESS:  So certainly the Ohio
2    issue that we've been talking about was discussed.
3    The issue of -- sort of talked a little bit about
4    dispensing fees last time.  That was discussed.
5    Discussions about correspondence, if any, between
6    my methodology and this analysis and the Dey and
7    Roxane analysis.
8    BY MR. TORBORG:
9         Q.   What do you recall discussing about that
10   issue?
11        A.   Whether substantively, I had made any
12   revisions to the methodology used in my analysis.
13        Q.   And have you made any substantive
14   revisions to the analysis between the Abbott case
15   and the Dey and Roxane cases?
16        A.   The -- substantively, the methodology
17   that I used in the Abbott case, I used in these
18   other two cases.  The products are different.  The
19   time periods are different.  The data sets are
20   different and so forth, but in terms of the thrust
21   of the analysis, they are very, very similar.
22        Q.   What are the differences?

10  (Pages 664 to 667)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 668

1    A.  One difference is that the time periods
2  are different, and so there was somewhat more
3  activity post 2001 in the states in terms of
4  Medicaid.
5    Q.  What do you mean by activity?
6    A.  Revisions to adjudication methodologies.
7  The --
8    Q.  How does that impact your approach?
9    A.  The approach -- I'm just trying to think
10  of differences between the two.  So in terms of my
11  methodology, I'm just trying to think out loud
12  here.  There are three pretty large-scale reports.
13  The -- in terms of the thrust of my analysis, it
14  doesn't affect things.  It just -- those cases,
15  Medicare looms somewhat larger than in the current
16  case.  I'm just -- I'm trying to, I'm just trying
17  to think out loud here about what are the key
18  differences.
19       The Medicaid analyses I -- there were a
20  couple of additional states that I could use
21  claims data for in those reports.
22    Q.  A couple?  Or a lot more than a couple,

Page 669

1  isn't it?
2       MR. LAVINE:  Object to form.
3       THE WITNESS:  I believe that here in my
4  initial Abbott report, I used 11 states and those
5  I believe I used -- I don't have those reports in
6  front of me but I believe one of them was 13 and
7  the other one 15.  I can't -- but I don't have the
8  reports in front of me, so I'm not sure, but there
9  were -- I think two more in one state and four
10  more in the other state if I remember correctly.
11  I mean, in one report and four in the other
12  report.  And I don't remember which was which.
13  Was it Dey or Roxane.
14  BY MR. TORBORG:
15    Q.  Apart from the issues relating to Ohio
16  that we've discussed, issues relating to
17  dispensing fees which we discussed last time, and
18  discussions about correspondence between reports
19  in the Abbott case versus reports in the Dey and
20  Roxane cases, any other, anything else subject-
21  wise that was discussed at the meeting?
22       MR. LAVINE:  Object to form.

Page 670

1       THE WITNESS:  I'm sure other things were
2  discussed.  It's just hard for me to recall.  We
3  did talk about this footnote 45 that you -- my
4  understanding is you had emailed Miss Brooker
5  asking for some clarification on how I had arrived
6  at some of those numbers in that footnote.  And so
7  we talked a bit about that because in response to
8  her question, I basically showed where -- I sent
9  her a short email describing how I had -- how I
10  calculated, come up with some of those numbers in
11  footnote 45.  And so that was discussed a bit as
12  well.
13  BY MR. TORBORG:
14    Q.  Anything else that you recall being
15  discussed?
16       MR. LAVINE:  Object to form.
17       THE WITNESS:  I believe there was a bit
18  of discussion about damage versus difference that
19  we talked a bit about in my -- in the first couple
20  of days of my deposition.
21  BY MR. TORBORG:
22    Q.  What did -- let me stop you there.  I'll

Page 671

1  come back and see if there is anything else.  But
2  what did you discuss at the meeting on the subject
3  of the difference -- I'm sorry, the damage versus
4  difference issue?
5    A.  It was basically in the -- in the
6  initial deposition, there were a number of
7  questions about the issue.  And so I don't recall
8  the specifics, but basically the -- that my -- in
9  the deposition, I talked about how the damage is
10  difference I defined in my report to be what it
11  is, what -- I go through this, I'll try to go
12  through this very transparent explanation of what
13  this difference is.
14       And my -- and this may represent the
15  damage or a factor that would be very relevant in
16  the damage where damages -- just the distinction
17  between the two terms.  I used my -- the language
18  that I have acquired over my time as an empirical
19  economist.
20    Q.  What is the distinction between the two
21  terms, damage and difference?
22       MR. LAVINE:  Object to form.

11 (Pages 668 to 671)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                              Washington, DC

Page 672

1        THE WITNESS:  Well, it is my
2   understanding that the two -- that the damage
3   represents a legal term, but that the two may, in
4   fact, be synonymous, may be the same.  So for, you
5   know, the question that I set out to answer, which
6   is how much more did the government spend on
7   Abbott products that would have been paid if
8   prices that were more reflective of what was
9   generally and currently paid had been used as the
10  AWPs, that is how I defined the difference.  And
11  that may well end up -- I think that is an
12  important -- perhaps the only input to the damage.
13  BY MR. TORBORG:
14     Q.   You say in that answer that it perhaps
15  may be the only number.  And then earlier you say
16  that your number may represent damages, or may be
17  a factor in the damage analysis.  My question is,
18  Dr. Duggan, are you calculating, as a professor of
19  economics, damages in the case?
20       MR. LAVINE:  Object to form.
21       THE WITNESS:  Just to reiterate, and we
22  talked about this a fair amount in the first

Page 673

1   couple of days.  Maybe it was the third day of my
2   deposition that I believe that the analysis that I
3   embarked on, that I -- that I -- the analyses that
4   I formed as an empirical economist accurately
5   capture the difference between what the government
6   would have paid and being very transparent about
7   my assumptions.
8        It may be -- so it is my understanding
9   that this -- that damages -- just to reiterate
10  what I said before, maybe it seems this difference
11  may indeed be or is indeed -- may indeed be the
12  damage, in this case the damage, given the
13  assumptions that I made.  And I guess we are
14  around an hour now, so I don't know if we can take
15  a break at some point, but --
16       MR. LAVINE:  Yes.  Can we take a break
17  because historically we've tended to keep
18  stretching it, although let me just say before we
19  go off the record that I'm studiously limiting my
20  objections to form, but there is quite a few
21  questions that are repeats of what were addressed
22  in the first depositions.  And we are in the

Page 674

1   fourth day of deposition here.  But we are not
2   promising another day of deposition for Professor
3   Duggan, so I hope that we are able to get through
4   a lot more today.
5        MR. TORBORG:  The reason I asked is he
6   had some discussion with counsel about this issue
7   and I wanted to see what impact, if any, that had.
8        MR. LAVINE:  I understand.  You can
9   pursue, you know, whatever questions you like, but
10  again, just because it's the fourth day, and I
11  want to make sure you understand we are not
12  promising a fifth day for this witness.
13       THE VIDEOGRAPHER:  The time is 10:13
14  a.m.  We are going off the record.
15       (Recess.)
16       THE VIDEOGRAPHER:  The time is 10:31
17  a.m.  We are back on the record.
18  BY MR. TORBORG:
19     Q.   Welcome back, Professor.
20     A.   Thanks.
21     Q.   I'd like to finish up this bit of
22  questioning of damages versus difference with a

Page 675

1   couple of, I hope, easy to answer questions.  You
2   stated that your difference calculation has a
3   number of assumptions in it, correct?
4     A.   Yes.
5     Q.   One of those assumptions is that the
6   Medicare Medicaid programs would use the revised
7   prices that you calculate, right?
8        MS. THOMAS:  I'm sorry.  Could you read
9   that back?
10       THE REPORTER:  "Question:  One of those
11  assumptions is that the Medicare Medicaid programs
12  would use the revised prices that you calculate,
13  right?"
14       MS. THOMAS:  Objection.  Form.
15       THE WITNESS:  Had they been reported as
16  AWPs and so forth, or published as AWPs and so
17  forth.
18  BY MR. TORBORG:
19     Q.   And that's a yes?
20     A.   Right.  With the -- with just the
21  addition, had they been the published AWPs.
22     Q.   And if the jury disagrees with the

12  (Pages 672 to 675)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
                    Washington, DC

Page 676

1  assumption that the Medicaid and Medicare programs
2  would have used the revised pricing that you
3  calculate, your analysis would no longer calculate
4  the difference between what the Medicare and
5  Medicaid programs would have paid providers to
6  dispense the complaint NDCs, right?
7         MR. LAVINE: Object to form.
8         THE WITNESS: There -- there is a lot
9  hacked into that, so just, you know, there are
10 many different state Medicaid programs, many
11 different Medicare carriers and DMERCs and so
12 forth. And so -- but the assumption that -- one
13 of the assumptions that I do make in the analysis
14 is that the -- that they would be used in the
15 adjudication algorithms and the arrays and so
16 forth. And if that assumption is not right, then
17 in some cases, a change may be necessary. It
18 would just -- it depends on the details.
19 BY MR. TORBORG:
20    Q.   And another one of your assumptions in
21 your analysis is that dispensing fees would not
22 increase if your revised pricing was used, right?

Page 677

1         MR. LAVINE: Object to form.
2         THE WITNESS: If -- that is correct, for
3  the 44 products here in this case. That's right.
4  BY MR. TORBORG:
5     Q.   And if a jury were to disagree with that
6  assumption, your difference calculation between
7  what Medicare and Medicaid would have paid to
8  providers to dispense those 44 NDCs would need to
9  change, right?
10        MR. LAVINE: Object to form.
11        THE WITNESS: Depends.
12 BY MR. TORBORG:
13    Q.   What would it depend on? But it might
14 need to change, right?
15        MR. LAVINE: Object to form.
16        THE WITNESS: The -- it's possible, but
17 if dispensing fees rose, if they rose, which for
18 the reasons we talked about last time, these
19 products are a small share of all Medicaid sales
20 and so forth, I think that there is a reasonable
21 assumption, but were they to arise, the dollars
22 would possibly be distributed somewhat

Page 678

1  differently, not necessarily to Abbott customers,
2  so it just depends. It depends on the details of
3  what -- what one has in mind.
4  BY MR. TORBORG:
5     Q.   Your calculation may change, right?
6         MS. THOMAS: Objection. Form.
7         THE WITNESS: As an empirical economist
8  who has done a lot of research in programs like
9  Medicare, Medicaid and so forth, I am always open
10 to additional information to try to, as I strive
11 to get the most accurate answer to a specific
12 question possible, so that's how -- you know,
13 that's how science advances is people should be
14 trying to build and improve upon.
15 BY MR. TORBORG:
16    Q.   You understand that since we last met in
17 July of 2008, a number of state Medicaid programs
18 have -- have provided deposition testimony, right?
19    A.   That is my understanding.
20    Q.   A lot of people who actually worked in
21 these programs during the relevant time period
22 have been deposed and provided extensive

Page 679

1  testimony, right?
2         MR. LAVINE: Object to form.
3         THE WITNESS: I -- I haven't examined
4  when the various folks worked. This 2001 is the
5  end of the period, so that was eight years ago.
6  But I understand that there has been some
7  deposition testimony by officials from multiple
8  states so I'm aware of that.
9  BY MR. TORBORG:
10    Q.   What have you done to review that
11 testimony?
12    A.   At my direction, Myers and Stauffer is -
13 - has considered those -- those depositions as
14 they strive to arrive at the most accurate
15 description possible of state Medicaid
16 adjudication algorithms.
17    Q.   So your understanding is that you've
18 instructed Myers and Stauffer to review these
19 depositions for purposes of what they may provide
20 in terms of the adjudication formulas, right?
21    A.   I have instructed them to -- yes.
22 That's correct.

13  (Pages 676 to 679)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
Washington, DC

Page 680

1    Q.  Have you reviewed yourself any of the
2  testimony that has been taken since your last
3  deposition of a state Medicaid official?
4    A.  Not that I recall.
5    Q.  And apart from some of the transcripts
6  that I -- some excerpts that I showed you of
7  testimony last time, have you reviewed any other
8  Medicaid testimony that was taken before July of
9  2008 in these cases or any other case?
10     MS. THOMAS:  Objection.  Form.
11     THE WITNESS:  I don't recall myself
12  reading such transcripts, but I certainly have
13  instructed Myers and Stauffer to study and examine
14  this information in addition to other information.
15  BY MR. TORBORG:
16    Q.  And is that -- are your instructions to
17  Myers and Stauffer to review the depositions to
18  see what they may provide in terms of the
19  adjudication formulas?
20     MS. THOMAS:  Objection.  Form.
21     THE WITNESS:  I think these transcripts
22  represent one component, one piece of -- one type

Page 681

1  of information that Myers and Stauffer is
2  considering as they aim to converge to the most
3  accurate possible description of state
4  adjudication formulas.  So this is one component
5  of -- of the materials that they consider,
6  deposition transcripts and there are others as
7  well.
8  BY MR. TORBORG:
9    Q.  Apart from the summaries that Myers and
10  Stauffer has prepared for you, that lay out
11  information regarding each state's adjudication
12  formulas, you know what I'm talking about, right?
13    A.  Uh-huh.  Yes.  I do.
14    Q.  Has Myers and Stauffer provided any
15  other information regarding what they learned by
16  reviewing the state deposition transcripts?
17     MR. LAVINE:  Object to form.
18     THE WITNESS:  I've had a number of
19  conversations with individuals at Myers and
20  Stauffer and I'm not sure that every iota of what
21  we've discussed appears on those things, so I
22  might have asked for clarification on something.

Page 682

1  But I think the key factors for the purposes of my
2  analysis are included in those state summaries.
3  BY MR. TORBORG:
4    Q.  Did they report to you on issues such as
5  what the states understood about the difference
6  between AWP and acquisition costs?
7     MR. LAVINE:  Object to form.
8     THE WITNESS:  Just for a clarification,
9  when you say the states, who do you mean?
10     MR. TORBORG:  I'm referring to the state
11  deposition testimony that's been taken, either in
12  -- actually, in any AWP case?
13     MR. LAVINE:  Object to form.
14     THE WITNESS:  I believe that is an issue
15  that we have touched on, if I recall.
16  BY MR. TORBORG:
17    Q.  What do you recall them telling you?
18    A.  These are conversations that have
19  happened over the course of many months, so for
20  example, there -- can you just, can you repeat the
21  question.  I'm sorry.
22    Q.  I'm going to strike that and ask -- just

Page 683

1  try another thing.  Would it be fair to say,
2  Professor Duggan, that you have not yourself
3  reviewed the transcripts of the various Medicaid
4  official depositions that have been taken in this
5  case and others to see if their testimony is
6  consistent with the difference calculation that
7  you make?
8     MS. THOMAS:  Objection.  Form.
9     THE WITNESS:  So I have reviewed some of
10  those Medicaid transcripts and at my direction,
11  Myers and Stauffer studied them, examined them as
12  they -- but I haven't studied and read every one
13  of them certainly, but I have studied and read
14  some ofthem.
15  BY MR. TORBORG:
16    Q.  Which ones have you studied and read?
17    A.  I don't recall now.  This was -- I don't
18  recall.
19    Q.  Have you reviewed -- have you studied
20  and read any testimony, since your July 2008
21  deposition, of Medicaid officials?
22    A.  Just to reiterate, I don't recall since

14 (Pages 680 to 683)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 684

1  July of 2008.  That doesn't mean I didn't -- I've
2  done a lot since July of 2008 so --
3      Q.  Is it fair to say that you can't recall
4  a single Medicaid official deposition that you
5  have reviewed since July 2008, right?
6          MR. LAVINE:  Objection to form.
7          THE WITNESS:  I just want to clarify
8  that.
9  BY MR. TORBORG:
10     Q.  Yes or no?
11         MR. LAVINE:  Objection to form.
12         THE WITNESS:  Indirectly, at my
13  direction, as I said, Myers and Stauffer has
14  studied these.  I personally don't recall having
15  read -- having read them since July of 2008.
16  BY MR. TORBORG:
17     Q.  I showed you some transcripts of some
18  Medicaid officials at your last deposition.  Do
19  you recall that?
20     A.  I do.
21     Q.  I think I showed you some testimony from
22  Leo Sullivan in Tennessee, Susan McCann from

Page 685

1  Missouri, and I think Cody Wiberg from Minnesota.
2  And my question is, have you conducted any review
3  of those depositions since our last meeting?
4      A.  I have not.
5      Q.  Myers and Stauffer prepared a new set of
6  the state summaries, is that right?
7      A.  You mean since July of 2008?
8      Q.  Yes, sir.
9      A.  Yes.  They have updated some of the
10  state adjudication algorithms.
11     Q.  I'd like to hand you a binder that
12  contains copies of some of the Myers and Stauffer
13  reports of the new summaries that were produced on
14  a disk to me a couple of weeks ago.  I've put
15  North Carolina on the front, because I noticed
16  last night looking at them that my secretary
17  missed that one, so that's sort of on the side
18  there, and I'll give you guys a copy.  Yours are
19  not in color, but his is.  Here's your copy of
20  North Carolina.
21         And Professor Duggan, why did Myers and
22  Stauffer prepare updated summaries for one or more

Page 686

1  of the states?
2      A.  So one reason is that I am -- I've also
3  been engaged as an expert for the Dey and Roxane
4  cases, which span a more recent time period.  So
5  partly because of that, it was important to update
6  the information because the Abbott timeline from
7  my analysis ends in 2001, but that's not the case
8  in those other two cases.  So that is -- that's
9  one, one reason that they -- that they have
10  provided updates.
11     Q.  Now, I notice in reviewing these, there
12  seems to be a lot more information on the issue of
13  compounding fees and IV.  Is that consistent with
14  your recollection?
15         MR. LAVINE:  Objection to form.
16         THE WITNESS:  There -- they have added
17  information for certain states, additional
18  information about compounding.  I'm not sure about
19  -- I don't recall, off the top of my head here,
20  the specific time periods, but that is one of the
21  things.
22  BY MR. TORBORG:

Page 687

1      Q.  Did you ask Myers and Stauffer to pay
2  particular attention to make sure that they
3  understood how all the states were dealing with
4  compound drugs?
5      A.  So I asked -- I asked them to -- to
6  relentlessly pursue information about how states
7  reimburse for the products at issue in this case,
8  and in those other cases, the Dey and Roxane
9  cases.  And compounding is one such issue that
10  comes up.  And so I certainly instructed them to
11  do as accurate a job as they could on that front
12  and others.
13     Q.  Did any of the new information that
14  Myers and Stauffer provided you with respect to
15  the states' reimbursement formulas require you to
16  change your analysis in any way, apart from the
17  Ohio issue that we already talked about?
18     A.  Based on my discussions with Myers and
19  Stauffer, my understanding is that there were not
20  major changes to the adjudication formulas in
21  effect, other than this Ohio one that we've talked
22  about already.

15  (Pages 684 to 687)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 688

1      Q.   You've got a copy of your report in
2   front of you there, the initial report?
3      A.   Yes, I do.
4      Q.   Do you guys have copies or do you need
5   copies?
6         MR. LAVINE:  I have it.
7         MR. TORBORG:  Do you have a copy?
8         MS. THOMAS:  I'll take one.
9   BY MR. TORBORG:
10     Q.   If you could go to page 24.  I'll ask
11  you a little bit about the SDUD data and the SMRF
12  and MAX data?
13     A.   Sure.
14        MR. LAVINE:  I'm sorry.  Which page?
15  BY MR. TORBORG:
16     Q.   Paid 20.  Maybe I said the wrong one?
17     A.   Page 25.
18     Q.   Page 25.  Bottom of page 24.  Some
19  general questions on the SDUD.  I guess I
20  shouldn't say SDUD data, because the D is data,
21  right?
22     A.   I thought about that.  SDU.

Page 689

1      Q.   As I understand it, this is data that's
2   generated from the Medicaid rebate program.  Is
3   that your understanding?
4         MR. LAVINE:  Object to form.
5         THE WITNESS:  This is data that's
6   produced by CMS to summarize Medicaid NDC-based
7   reimbursements by quarter by NDC for
8   pharmaceutical products.
9   BY MR. TORBORG:
10     Q.   It's aggregate data, is that right?
11     A.   The unit of observation in this data is
12  state by NDC by quarter, so in a typical year,
13  there would be -- well, let's say 10 or 15 or
14  20,000 NDCs on average across states, four
15  quarters, 50 states, so there would be a pretty
16  large number of observations, but it is
17  aggregated, the data is aggregated to the state
18  NDC quarter level.
19     Q.   And it also shows you the number of
20  units that were reimbursed in that quarter by that
21  state federal NDC, is that right?
22     A.   That is one of the three variables that

Page 690

1   is in addition to state, year, quarter, NDC and so
2   forth, that is one of the three variables.
3      Q.   So it gives you the payment amount, it
4   gives you the number of units paid, right?
5      A.   Gives you the payment amount, the number
6   of units and the number of prescriptions.
7      Q.   Those are the three things it gives you?
8      A.   Those are the three that I recall.
9   There may be others, but those are the three that
10  I recall.
11     Q.   So those would be the three fields of
12  information that you use in your analysis?
13        MR. LAVINE:  Object to the form.
14        THE WITNESS:  I used two of those fields
15  in my analysis.
16  BY MR. TORBORG:
17     Q.   You used the payment amount and number
18  of scripts?
19     A.   Number of prescriptions.  That's right.
20     Q.   You do not use the units amount?
21     A.   That is correct.  It's because of my
22  previous experience with SDU data.

Page 691

1      Q.   What's the prior experience?
2      A.   That the units variable -- so I use this
3   data in some of my own research before, and that
4   the units variable is -- has some issues.
5      Q.   Now, the payment amount field that you
6   use, that includes dispensing fees, right?
7      A.   Correct.  That is my understanding.
8      Q.   So the aggregate amount in there is the
9   amount paid for ingredient costs and dispensing
10  fees, right?
11     A.   That is my understanding, and for the --
12  I just should -- I would caveat with the point
13  that this -- that there are NDC quarter, state
14  combinations where there is no -- where the data
15  isn't populated.  So it's -- there may be cases in
16  which the data is missing.  So it -- but it is --
17  it includes -- basically it represents aggregate
18  spending by NDC and quarter.
19     Q.   If you can go to table 11 of your report
20  towards the back.
21     A.   Okay.
22     Q.   This chart shows us in the left most

16 (Pages 688 to 691)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 692

1    column, the number of prescriptions and payment
2    amounts for the NDCs for the various states,
3    right?
4         A.   Correct, from the SDU data.
5         Q.   Yes.  For -- and then one could figure
6    out how much each state on average is paying per
7    prescription, right?
8         A.   So this is an aggregate of the 44
9    products over the 11-year time period, but it is
10   true that one could use this to -- for example,
11   for Florida, it looks like about 50 some odd
12   dollars per prescription.
13        Q.   And is there a difference between number
14   of scripts and number of claims, say?
15             MS. THOMAS: Objection. Form.
16             THE WITNESS: It depends.  So just as an
17   example, in some cases, a state will reimburse a
18   claim and then there will be a reversal of that
19   claim later.  And then a third claim that, let's
20   say, gets the payment amount right.
21             So for example, suppose a state pays $50
22   for a prescription, then there this is a reversal,

Page 693

1    minus 50, and then perhaps they pay 54.  And that
2    would be three claims, but this number of
3    prescriptions data, it's my understanding there --
4    that in most cases, that would represent one
5    prescription.  So there are cases where they
6    diverge, but in general they are similar.
7    BY MR. TORBORG:
8         Q.   And you noted in Florida that you could
9    figure out the amount paid per prescription and
10   you said it would be about $50, right?
11        A.   Yes, 52, 53.
12        Q.   52.04 I think is the real number.  I put
13   a calculator there.
14        A.   Okay.
15        Q.   In Illinois, you could do that too,
16   right? You could see how much on average the state
17   paid per prescription, right?
18        A.   Correct.
19        Q.   And if you did that for Illinois, you'd
20   see that it was $31 --
21        A.   32.
22        Q.   $31, $32?  Right?  And then if you went

Page 694

1    down to say New Jersey, you'd be about 68, $69,
2    right?  And in New York, you'd be about $70,
3    right?
4         A.   Sounds correct.
5         Q.   And then if you went to Ohio, you'd be
6    less, you'd be about $20?
7         A.   Correct.
8         Q.   Right?  If you went to Louisiana, it
9    would be about $50, right?
10        A.   That's right.
11        Q.   Kind of all over the board on that,
12   right?
13             MR. LAVINE: Object to form.
14             THE WITNESS: I wouldn't say all over
15   the board.  I mean, this here obscures, for
16   example, differences across states and the
17   intensity with which they use each of the drugs.
18   So if we look over to the second panel of that
19   same table, you know, some of the products, for
20   example, the Vanco 653301 is in the neighborhood
21   of about $200 per prescription.
22             And so to the extent that a state is

Page 695

1    Vanco intensive, it will tend to have a larger
2    amount paid per prescription using this sort of --
3    so that's just you know one example, these -- this
4    aggregate.  There is some stuff going on
5    underneath these aggregates, including
6    heterogeneity in which NDCs are most intensively
7    used by state.
8    BY MR. TORBORG:
9         Q.   And there are other factors that could
10   play into that difference as well, right?  For
11   example, we know Ohio had the MACs on the
12   products, right?
13             MR. LAVINE: Object to form.
14             THE WITNESS: Correct.
15   BY MR. TORBORG:
16        Q.   And that spending was you found to be
17   lower on average than say a state like New York,
18   right?
19             MR. LAVINE: Object to form.
20             THE WITNESS: That is apparent from this
21   panel, right, that it's about $20 per prescription
22   in Ohio versus about $70 per prescription in New

17 (Pages 692 to 695)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
Washington, DC

Page 696

1   York.  But even with that, you know, one couldn't
2   rule out that it's partly driven by -- partly or
3   fully driven by differences in the utilization of
4   specific NDCs.  Now, for the reasons we've talked
5   about earlier, Ohio even for a specific NDC in a
6   specific quarter is often going to reimburse less
7   than New York.
8   BY MR. TORBORG:
9       Q.   There are a number of variables that
10  could cause there to be a difference in the amount
11  paid per prescription between the states, right?
12      A.   Yes.
13      Q.   All right.  Now, the SMRF and the MAX
14  data is different from the SDUD data, correct?
15          MS. THOMAS:  Objection.  Form.
16          THE WITNESS:  Correct.
17  BY MR. TORBORG:
18      Q.   And which fields in this data are you
19  using?
20          MR. LAVINE:  Object to form.
21          THE WITNESS:  I'm going to need a bit of
22  time just to refresh, so certainly one of them

Page 697

1   would be the paid amount, the NDC obviously, the
2   service date.  I would need to get an exhaustive
3   list of everything that I use -- use in many of
4   the variables.  But those are certainly three of
5   the most important ones.
6   BY MR. TORBORG:
7       Q.   For purposes of how it matters to your
8   analysis, what is the difference between the
9   fields in the SDUD data versus the SMRF MAX data?
10          MR. LAVINE:  Object to form.
11          THE WITNESS:  Oh, well, one thing that
12  the SMRF MAX data has is the provider identifier.
13  So one of the variables that I produced later in
14  the report, in sort of summary of my Medicaid
15  analyses is the number of provider payments.  So
16  the individual level claims data also allows me to
17  drop certain claims from the analyses, from the
18  analysis that, that sort of for each state, for
19  each of the first 11 or so states, I sort of go
20  through the construction of the analysis sample,
21  and I do something analogous for the SMRF MAX
22  data.

Page 698

1   BY MR. TORBORG:
2       Q.   You do something -- do you take out any
3   claims for the 38 states based on review of the
4   SMRF data, SMRF MAX data because the claims seem
5   wrong or --
6       A.   Yes.
7           MR. LAVINE:  Object to form.
8   BY MR. TORBORG:
9       Q.   But that's not something that you can do
10  when you just have the SDUD data, right?
11          MR. LAVINE:  Object to form.
12          THE WITNESS:  That is correct.  Although
13  you know, I do want to point out that I
14  scrutinized the SDUD data to -- you know, to look
15  for problems with it as well.  I mean, we talked a
16  bit last time about Texas, for example, which if
17  one strictly aggregated the SDUD spending for
18  these 44 products for the 11 state -- 44 products
19  in 11 years state by state, Texas would actually
20  be, I think, about number 13 in the rankings as
21  opposed to 20.  But upon examination there in
22  Texas, discovered that there was what appeared to

Page 699

1   be a data error, so that quarter NDC combination
2   was dropped from the analysis for Texas.
3   BY MR. TORBORG:
4       Q.   With the 11 states, I guess now 10
5   states in your analysis where you used actual
6   state provided claims data, you take out some
7   anomalous claims, right?
8       A.   That's correct.
9       Q.   And you've told me now that you do the
10  same thing when you have SMRF and MAX data for the
11  38 states, correct?
12      A.   I do something analogous to that.
13      Q.   But you don't take out the -- you know,
14  because you don't have individual claims
15  information in the SDUD data, that's not something
16  you need to do with the SDUD data, right?
17          MR. LAVINE:  Object to form.
18          THE WITNESS:  That specific claim isn't
19  something that I can do, but just that Texas
20  example is a way as an empirical economist what I
21  try to do, whenever I use a data set, is to find
22  the problems with it.  And so I, you know, I have

18  (Pages 696 to 699)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                         Washington, DC

Page 700

1  a lot of experience working with data that's not
2  perfect.  And so you know, that's partly so much
3  of -- an important part of my training has been to
4  root out problems in data that -- that would, you
5  know, to arrive at the most accurate analysis
6  possible.
7  BY MR. TORBORG:
8      Q.  One of the things the SMRF MAX data has
9  is it has information on individual claims, right?
10     A.  Correct.
11     Q.  And it provides you the NDC amount in
12  that claim or it provides you the particular NDCs
13  that are reimbursed in that claim, as well as the
14  total payment amount that was paid by NDC, right?
15     A.  Right.  It has the NDC, the payment
16  amount, along with a bunch of other information,
17  service date, for example, provider identifier and
18  so forth.
19     Q.  There may be more than one NDC on a
20  particular claim?
21     A.  So for the -- it is for the purposes of
22  my analysis, there are cases -- these claims are

Page 701

1  in the vast majority of cases as they are recorded
2  in the SMRF MAX data, summarizing utilization for
3  one specific NDC.  And so it -- the -- in my own
4  research when referring to claims, I believe that
5  it may be, there may be cases where someone else
6  would refer to a, you know, a prescription, two
7  NDCs as one claim.  But the way SMRF MAX -- it
8  would typically appear in SMRF MAX data would be
9  as two separate records.
10     Q.  Okay.
11     A.  Which I refer to as claims.
12     Q.  Thanks for that.  The paid amount in the
13  SMRF for the NDCs that you were looking at, that
14  would include a dispensing fee if one were paid,
15  right?
16     A.  Typically, yes.
17     Q.  The SMRF and MAX data doesn't tell you
18  the basis of payment for a particular claim,
19  right?
20         MR. LAVINE:  Object to form.
21         THE WITNESS:  It is possible from the
22  SMRF so I don't agree with that.  I don't agree

Page 702

1  with that.
2  BY MR. TORBORG:
3      Q.  Why not?
4      A.  Because for some of the claims, one can
5  look at the amount billed or the amount charged
6  and see that it exactly coincides with the amount
7  paid so that's --
8      Q.  So you're saying that the SMRF MAX data
9  includes the amount billed by provider?
10     A.  I just want to -- I just want to look at
11  my report for a second, just so --
12     Q.  You don't know?
13         MR. LAVINE:  Object to form.
14         MS. THOMAS:  Objection.
15  BY MR. TORBORG:
16     Q.  You can look.
17     A.  It's my recollection the amount charged
18  by the provider.
19     Q.  So what you're saying then is that one
20  could, if they wanted to, as you said, compare the
21  amount billed with the amount paid to see if it
22  was paid at charges, right, that's what you're

Page 703

1  saying?
2      A.  Yes.  Or paid, for example, like one of
3  the things that I do in sort of constructing my
4  analyses samples is drop claims with an amount
5  paid that is greater than the amount charged.  So
6  -- right, but one can see -- and I guess it varies
7  from one state to another, from one product to
8  another, from one time period to another.
9      Q.  And maybe I heard you wrong, but did you
10  say that you dropped claims from your analysis
11  sample where the amount paid was larger than the
12  amount charged?  That's not what you mean, is it?
13         MR. LAVINE:  Object to form.
14         THE WITNESS:  I believe that in many of
15  the states, there is an adjudication formula that
16  uses, let's say, AWP and so forth dispensing fees
17  and comes up with amount paid.  And then compares
18  that with the amount billed.  And so it takes the
19  lesser of those two.  So we can go to a -- so for
20  example, I think that is something that I do in
21  certain states, given that lesser of formula.
22  BY MR. TORBORG:

19 (Pages 700 to 703)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 704

1      Q.  Does the SMRF MAX, did you actually
2   determine the percentage in volume of claims that
3   were paid at charges in the 38 states using the
4   SMRF data?
5      A.  I would have to go back and look at my
6   programs to see if I -- if I tabulated that
7   number.  But if I hadn't, it would be a
8   straightforward addition to my program to do that.
9   I just -- I would have to -- I would have to drill
10  down a bit on that issue.
11     Q.  Does the SMRF MAX data allow you to
12  determine whether or not a claim was paid using a
13  MAC?
14         MR. LAVINE:  Object to form.
15         THE WITNESS:  I -- there are many
16  variables that are included in the SMRF MAX data,
17  but if memory serves, that is not something that
18  can be gleaned as easily as the sort of -- was it
19  paid at charged amount that we just talked about.
20  BY MR. TORBORG:
21     Q.  There is no actual field within the data
22  that says, basis of payment, right?  That tells

Page 705

1   you this was paid at charges, this was paid at
2   MAC, this was paid at FUL, this was paid at EAC,
3   right?  There is no such field?
4      A.  I'm not certain in that's true or not.
5   I don't recall.  That would -- you know, for the
6   reasons we discuss, it is possible from the data
7   to figure out if it was paid at charged.  Whether
8   it is also possible to figure out, for example,
9   was it paid at a MAC, my recollection is that it's
10  not possible to do that accurately.  But for the
11  purposes of my analysis, that you know, it is,
12  well, we can --
13     Q.  Page 27 of your report, Dr. Duggan, you
14  were talking about table 12-A, which is a chart
15  that summarizes Medicaid spending for the period
16  1999 to 2001.  Here you're comparing the SDUD and
17  the SMRF MAX data, right?
18     A.  That's correct.
19     Q.  And why are you doing that?  What's the
20  purpose of the table?
21     A.  This is the kind of thing that I do in a
22  lot of my research when one has multiple data

Page 706

1   sets.  It is, I think, best practice to sort of
2   use the two data sets and just try to compare them
3   to see -- to uncover potential problems in one or
4   the other.
5      Q.  And what you note on page 27 is that
6   there is a close correspondence in the data for
7   the states with relatively high Medicaid spending
8   for the NDCs, right?
9      A.  That's correct.
10     Q.  And then there is one issue that deals
11  with Indiana that you were able to explain, right?
12     A.  That's right.
13     Q.  And that -- that correspondence or that
14  -- I'm sorry, correlation between the two data
15  sets gave you comfort regarding the reliability of
16  that data, right?
17         MR. LAVINE:  Object to form.
18  BY MR. TORBORG:
19     Q.  That's why you were doing the analysis?
20         MR. LAVINE:  Object to form.
21         THE WITNESS:  It is -- right, for the --
22  I do point out in the report that one wouldn't

Page 707

1   expect an exact correspondence between the two
2   because one -- in one, the date is the service
3   date.  And in the other, the date is the payment
4   date.  And so even if both -- one wouldn't expect
5   an exact correspondence, but that's true that --
6   the fact that they are, they do correspond fairly
7   closely, quite closely is -- was something that
8   increases my confidence in both of them.
9   BY MR. TORBORG:
10     Q.  Now, in table A, how about for the
11  states with --
12     A.  Table 12-A.
13     Q.  Yes.  Sorry.  How about for the states
14  with relatively low Medicaid spending.  Is there a
15  close correspondence in that data?
16     A.  There are more cases where there are
17  discrepancies, so most strikingly -- at least
18  going in descending order down the table -- would
19  be Mississippi, where -- in which in the -- at the
20  SDU data, looks like about $940,000.  And in the
21  MAX data, about 1.4 million.  But if I recall
22  having drilled down on that issue, that reflected

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 708

1    the fact that Mississippi was missing SDU data in
2    one of the three years.
3    BY MR. TORBORG:
4        Q.   Yes.  It says Mississippi, there is only
5    eight quarters there.
6        A.   That's correct.
7        Q.   Whereas you got 12 quarters in the, in
8    the MAX data which help explain why the MAX data
9    would be higher, right?
10       A.   That's correct.
11       Q.   And now let's take a look at Colorado,
12   three down.  You've got roughly 760,000 in the
13   SDUD data for 11 quarters, right?
14       A.   Uh-huh.
15       Q.   But then you've got about 1.1 million
16   for 12 quarters in the MAX data, right?
17       A.   Correct.
18       Q.   There is a higher degree of variability
19   there, right?
20       A.   That's correct.
21       Q.   And if we look at Maryland, the SDUD
22   data we have the same number of quarters, correct?

Page 709

1        A.   Correct.
2        Q.   But the MAX data is 43.6 percent more,
3    right?
4        A.   Correct.
5        Q.   Similarly for South Carolina, we have
6    the same number of quarters, but the MAX data has
7    39 percent higher expenditures, right?
8        A.   Correct.
9        Q.   And if we look at Delaware, same number
10   of quarters, that's toward the bottom, same number
11   of quarters, but Delaware's spending is 65 percent
12   higher in the MAX data, right?
13       A.   Correct.
14       Q.   So would it be fair to say that there is
15   less heterogeneity in the states with lower
16   Medicaid spending, right?
17       MR. LAVINE:  Object to form.
18       THE WITNESS:  I'm sorry.  Could you
19   repeat that?  I think you flipped it but -- there
20   is less -- so I don't agree with what you said.
21   Maybe you should --
22   BY MR. TORBORG:

Page 710

1        Q.   Okay.  There is more variability --
2    there is not as close a correspondence between the
3    two data sets for the states with relatively low
4    Medicaid spending?
5        MR. LAVINE:  Object to form.
6        THE WITNESS:  So for -- on average, that
7    is true.  But having drilled down on that issue,
8    in many of these cases, it was often driven by
9    incomplete SDU data.  So even if it had some
10   utilization, so for example, we talked a bit about
11   Indiana where having drilled down on it, it has
12   the same number of quarters in the two data sets,
13   but there is still this disparity that exists.
14   And having drilled down on it, if I recall, the
15   SDU data was very low in that time period, like
16   for a couple of quarters was peculiarly low.
17       So with the -- so it is typically, you
18   know, there are exceptions, like Tennessee, for
19   example, as you can see.  But typically, it is the
20   incomplete SDU data.
21   BY MR. TORBORG:
22       Q.   For -- take Colorado, for example.  We

Page 711

1    looked at that one earlier?
2        A.   Yes.
3        Q.   Are you aware of any facts that the SDUD
4    data is incomplete for that state, but for the one
5    quarter you're missing?
6        A.   No.  This would be a -- I don't recall.
7    It seems plausible, but I don't recall.
8        Q.   Same answer for Maryland?
9        MR. LAVINE:  Object to form.
10       THE WITNESS:  Correct.  I just don't
11   recall.  And at some point, if we could take a
12   bathroom break, that would be great.
13       MR. TORBORG:  We've got to change the
14   tape anyway, so why don't we take a break.
15       THE VIDEOGRAPHER:  The time is 11:26
16   a.m.  This completes tape number one.
17          (Recess.)
18       THE VIDEOGRAPHER:  The time is 11:41
19   a.m.  This begins tape number two.
20   BY MR. TORBORG:
21       Q.   Professor Duggan, if you could go to
22   your table 12-B.  Keep your hand on page 28, too.

                              21 (Pages 708 to 711)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 712

1    A.  Yes.
2    Q.  This is a table where you compare the
3  amounts paid in the SDUD and SMRF data, this time
4  for the period 1996 through 1998, correct?
5    A.  Yes.  That's right.
6    Q.  And I take it you do that comparison for
7  the same comparison that you -- the same reason
8  that you did the '99 to 2001 comparison, right?
9    A.  Correct.
10   Q.  And you again note on page 28 of your
11  report that there is a close correspondence in the
12  data for those states with relatively high
13  Medicaid spending, right?
14   A.  Right.
15   Q.  And then if you look at some of the
16  states toward the bottom of the chart, these would
17  be the states with relatively lower spending,
18  right?
19   A.  Correct.
20   Q.  And you observed that the correspondence
21  in the data is not as close for the states with
22  relatively low spending, right?

Page 713

1        MR. LAVINE:  Object to form.
2        THE WITNESS:  On average, I would say
3  that's true.  If we looked at, for example,
4  Montana on down the line, the correspondence there
5  is not as great as above.
6  BY MR. TORBORG:
7    Q.  All right.  If you look at -- go up
8  above to Mississippi, for example, there is a
9  state where you have 12 quarters of data between
10  both sets, right?
11   A.  Correct.
12   Q.  Right in the middle.
13   A.  Yes.
14   Q.  Yet the SMRF data has 27.5 percent more
15  expenditures, right?
16   A.  That's correct.  And once again, it's
17  this -- my examination of this is typically that
18  it's driven by the incomplete SDU data.
19   Q.  And do you -- what makes you think that
20  the SDUD data for, say, Mississippi is incomplete?
21  Have you done an analysis of that?
22       MR. LAVINE:  Object to form.

Page 714

1        THE WITNESS:  Not that I recall for
2  Mississippi for the specific time period, but just
3  similar to the Indiana example, for example, on
4  the previous page, there are cases where the SDU
5  data for certain states is low, is peculiarly low,
6  just as the data for Texas is peculiarly high in
7  certain cases, in one particular quarter.
8  BY MR. TORBORG:
9    Q.  But you haven't gone into these states
10  with low, relatively lower spending and analyzed
11  whether the SDUD data for a particular quarter is
12  complete or not, right?
13       MR. LAVINE:  Objection to form.
14       THE WITNESS:  Well, I think I've done
15  some of that already here by providing -- I mean,
16  part of the reason that I provided this number of
17  quarters variable was to allow interested readers
18  to assess this issue.  And similarly, the reason
19  that I did this for claims and number of
20  prescriptions was that that provided some
21  potentially useful information on that front, too.
22  BY MR. TORBORG:

Page 715

1    Q.  If you go to the next table, table 12-C,
2  this is a similar comparison between the SDUD and
3  SMRF data for the period 1991 through 1995, right?
4    A.  That's correct.
5    Q.  And you note here that almost none of
6  the states have SMRF data for all five years
7  because --
8    A.  Maybe that none of them do, right.
9    Q.  What's that?
10   A.  It may be that none of them do.  But
11  yes, virtually none of them do.
12   Q.  Now, if you take a look at -- let's look
13  at Florida.  Actually, let's look at California
14  for a minute, in table 12-C.  The SDUD data shows
15  1,656,000 roughly paid in the SDUD data for 20
16  quarters, right?
17   A.  Yes.
18   Q.  For about 63,000 scripts, right?
19   A.  Yes.
20   Q.  And one could compare, if they wanted
21  to, the average -- or one could calculate the
22  average payment per script, right?  For the SDUD

22  (Pages 712 to 715)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 716

1  data?
2      A.  Yes.
3      Q.  And what would that be here?  There is a
4  calculator there if you want to use it.
5      A.  I'm going to go with 27, but I'm going
6  to try and -- 26.30, so wrong.
7      Q.  And one could similarly compare the
8  amount paid per claim under the SMRF data,
9  correct?
10     A.  Correct.
11     Q.  And that would come to about $33, right?
12     A.  Sounds about right.
13     Q.  And so there is a difference there in
14 the amount per claim paid, right?  Between the two
15 data sets?
16     A.  Correct.
17     Q.  Why would that be?
18     A.  Well, there -- it -- first, it is the
19 case that the SMRF data corresponds to the three,
20 '93, '94 and '95 when -- and so -- whereas the
21 other data, the SDU data corresponds to those
22 three years and also '91 and '92.  So to the

Page 717

1  extent that reimbursement per claim per
2  prescription for a given NDC rises over time, all
3  else equal, one would expect a higher average in
4  the SMRF data than in the SDU data.
5          Additionally, it seems plausible that
6  the intensity of certain NDCs, so the frequency
7  with which certain NDCs are represented from '93
8  to '95 might diverge somewhat from the
9  corresponding one in '91 and '92.  So that could
10 produce a difference as well.  There are
11 differences between sort of service date and
12 payment dates that we've discussed.  And so those
13 are some examples of reasons that they -- that
14 they might diverge.
15     Q.  Look down at Minnesota.  It's about the
16 10th one down.  There is about 680,000 of
17 expenditures for 19 quarters in the SDUD data,
18 right?
19         MR. LAVINE:  Before you go further --
20         THE WITNESS:  That's Michigan, right?
21 BY MR. TORBORG:
22     Q.  Oh, I'm sorry.  You're right.  Michigan.

Page 718

1  I'm sorry.  Yes.  MI.
2      A.  Yes.
3      Q.  In the SMRF data, we've got just about
4  the same amount of expenditures, 677,000 for just
5  eight quarters, right?
6      A.  Correct.
7      Q.  So what's going on there?
8          MR. LAVINE:  Object to form.
9          THE WITNESS:  I don't recall what the
10 reason is for this particular divergence.  So I'm
11 not sure.  I would -- I haven't drilled down on
12 that specific issue that I recall.
13 BY MR. TORBORG:
14     Q.  And similarly, if you look at Georgia
15 about 10 more down, there is actually less amounts
16 paid in SDUD data for 20 quarters than there is
17 paid in the SMRF data for 12 quarters, right?
18     A.  Right.  But here this is -- this is --
19 it's worth noting that utilization for these
20 products is rising over time.  So that's one
21 reason that one wouldn't necessarily expect the,
22 let's say, the right panel to be just 60 percent

Page 719

1  of the left panel.
2          And additionally, the discrepancy
3  between service date and payment date would, all
4  else equal, tend to lead to higher spending and
5  utilization in the SMRF data than in the SDUD
6  data.  And so -- and then there is the -- so it is
7  -- it could be that in '91 and '92, Georgia didn't
8  have much utilization for these products, for
9  example, in the SDUD data.  But it's -- that one
10 is -- well, that looks -- also there is the issue
11 about claims.  Some of those claims that we talked
12 about before.  The claims and scripts may not be
13 exactly identical.
14     Q.  And similarly, Arkansas is another
15 example of a state that has more quarters in SDUD
16 data but less expenditures than one sees in the
17 SMRF data for less quarters, right?
18     A.  Right.  And once again, that -- that
19 really doesn't surprise me because the '91 -- what
20 SMRF is missing is '91, when spending for these
21 products was very low.  And then on top of that,
22 SMRF is based on service date.  So essentially,

23  (Pages 716 to 719)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 720

1  you know, '95 quarter 4 service dates are included
2  in SMRF, but they are not included -- they may not
3  be included in Arkansas SDUD data.  So that one
4  isn't -- that one strikes me as consistent with
5  what I -- close to what I'd expect.
6      Q.  How long does it typically take to get a
7  -- the SDUD data is -- that is using the date of
8  payment, right?
9      A.  Correct.
10     Q.  How long does it take between the
11  service and getting the claim paid?  Is it that
12  different?
13     A.  It varies.  In some cases, it's -- I
14  think typically it's probably several weeks.
15  Depends on the state.  But yes, this here, '91 was
16  a pretty you know low utilization period.  As you
17  can see from panel C of table 11, you know,
18  utilization in '91 was, you know, 85 percent lower
19  than in '95.  In early '91, let's say.  If we
20  average across '91, we are talking about, let's
21  say, seven -- 700,000 per quarter versus in '95
22  more like 2.5 or 2.6, so about 75 percent lower.

Page 721

1  So it's a lot lower in '91.  So that's -- that
2  combined with the lag could produce these kinds of
3  results for sure.
4      Q.  It could, but you haven't done the
5  analysis, right?
6      MR. LAVINE:  Object to form.
7      THE WITNESS:  I believe that this right
8  here already, I'm drilling down to some extent on
9  this issue precisely so that interested readers
10  could assess the two data sets.  So I feel like as
11  an economist, this is, you know, what I do all the
12  time.  And this is -- lines up with what I would
13  expect, but I don't recall drilling down on
14  Arkansas from '91 to '95, for example.
15  BY MR. TORBORG:
16     Q.  Would it be fair to say that, generally
17  speaking, on a per quarter basis, the SMRF MAX
18  data has higher paid amounts than the SDUD data?
19     MR. LAVINE:  Object to form.
20     THE WITNESS:  I think that there are two
21  forces in this data that lead that to -- that to
22  appear to be the case.  The first one is that SMRF

Page 722

1  tends to have the more recent data and spending TN
2  tends to be higher in the more recent period.  So
3  that's one reason.
4      And second, SMRF is based on date of
5  service as opposed to date of payment, and that's
6  another reason.  So I -- and then the third reason
7  is that, you know, as we've discussed, the SDU
8  data appears to be incomplete in certain quarters,
9  so I think those are the three main contributors
10  to that disparity.
11  BY MR. TORBORG:
12     Q.  You would agree with me that looking at
13  these three tables collectively, that the SDUD and
14  MAX data are not as consistent for the states with
15  lower -- relatively lower Medicaid spending,
16  right?
17     MR. LAVINE:  Object to form.
18  BY MR. TORBORG:
19     Q.  Than it is with states with higher
20  spending?
21     MR. LAVINE:  Object to form.
22     THE WITNESS:  So I'm -- no.  I mean, I

Page 723

1  think Indiana at some level is a relatively high
2  spending state, and that's one where -- in which
3  there is, you know, that's perhaps the most
4  striking disparity in all of the data is Indiana.
5      But so I think that may be true, but I
6  would have to study that further to assess whether
7  there is a statistically, you know, significant
8  difference.  From eyeballing it, table 12-A, table
9  12-B, especially 12-A, that seems plausible.  But
10  expenditure weighted, were I to do it on an
11  expenditure weighted sense, I mean, Indiana is
12  pretty far up the chain in those high spending
13  states.  And it's off by a fair amount.
14      And to the extent that there are
15  discrepancies in the lower states, it's, you know,
16  more common further, further down the line.  For
17  example, Delaware that we talked about and so
18  forth.
19  BY MR. TORBORG:
20     Q.  I'd like to mark this as our next
21  exhibit.  Let's call this Abbott Duggan 1.
22     (Exhibit Abbott-Duggan 001 was

24  (Pages 720 to 723)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 724

1  marked for identification.)
2  BY MR. TORBORG:
3      Q.  For the record, what I've marked as
4  Abbott Duggan 1, there is a Bates number EXPUSABT-
5  DUG 070211.  It is an email from Judith Becherer
6  to David Campana, subject, Medicaid pharmacy
7  pricing, dated April 28th, 2008.
8          Professor Duggan, I don't know if you've
9  seen emails before, but when you look at this
10 document, I think you'll see that it is an email
11 from Myers and Stauffer requesting Mr. Campana's
12 assistance with gathering information relating to
13 how the state reimbursed drugs.  If you can take a
14 look at that, let me know if that's what it looks
15 like to you.
16         MR. LAVINE:  Object to form.  Do you
17 have the second page of this, David?
18         MR. TORBORG:  I don't know that there is
19 a second page.
20         MR. LAVINE:  It's labeled page 1 of 2 in
21 the upper right-hand corner.
22         MR. TORBORG:  I don't now.

Page 725

1          THE WITNESS:  Okay.
2  BY MR. TORBORG:
3      Q.  Are you familiar with requests like this
4  that were going out to the states from Myers and
5  Stauffer?
6      A.  Yes.
7      Q.  This lists some specific information
8  that Myers and Stauffer is looking to collect from
9  Mr. Campana, right?
10         MR. LAVINE:  Object to form.
11         THE WITNESS:  Correct.
12 BY MR. TORBORG:
13     Q.  Particularly, he is -- there is a
14 request to review a reimbursement summary that
15 Myers and Stauffer has prepared, right?
16         MR. LAVINE:  Object to form.
17         THE WITNESS:  Correct.  That appears to
18 be -- that's what it appears to be.
19 BY MR. TORBORG:
20     Q.  And states in particular, we need for
21 you to confirm the complete history of pharmacy
22 pricing for your state, including, and then it

Page 726

1  lists some items which I'll paraphrase.
2      A.  Right.
3      Q.  Effective dates, description of the EAC
4  methodology for both brand and generic drugs,
5  dispensing fee amounts, the pricing compendia
6  used, when a state MAC program was implemented,
7  methodology used to establish state MAC program,
8  any exceptions, and anything else that affects
9  pricing.  Do you see that?
10     A.  Yeah, I do.
11     Q.  Okay.  Did you have any part in deciding
12 what it was that Myers and Stauffer requested of
13 the states?
14         MR. LAVINE:  Object to form.
15         THE WITNESS:  Yes, I did.
16 BY MR. TORBORG:
17     Q.  Who came up with a list of topics to
18 request to the states?
19     A.  These are certainly things that I would
20 at least -- I don't recall a conversation in which
21 we conversed to these eight specific things, but
22 these are precisely the kinds of plan parameters

Page 727

1  that I would have -- that I would have requested.
2      Q.  But you had input into what it was that
3  Myers and Stauffer was asking of the states,
4  correct?
5      A.  Yes.  Absolutely.
6      Q.  And you could have requested Myers and
7  Stauffer to ask the states about other things,
8  right?
9          MR. LAVINE:  Object to form.
10         THE WITNESS:  So as I just stated, I
11 don't recall the conversation where these eight
12 specific things were decided upon, and there may
13 be, you know, other things as well that we talked
14 about.  So I guess -- I guess I'm unclear on the
15 question.  Sorry.  Can you repeat it?
16 BY MR. TORBORG:
17     Q.  The question is, you knew Myers and
18 Stauffer was going to talk to these various states
19 to get information about their drug pricing,
20 correct?
21     A.  About --
22         MS. THOMAS:  Objection.

25  (Pages 724 to 727)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 728

1      THE WITNESS: About their -- their
2  Medicaid reimbursement, right.
3  BY MR. TORBORG:
4      Q.  And you could have asked them to ask
5  about a number of different things, in addition to
6  the specific information that's in this email,
7  right?
8      MR. LAVINE: Object to form.
9      THE WITNESS: And I -- yes.  And I may
10 have.  It's -- it's hard for me to recall right
11 now if these are the only eight things that I
12 asked them because -- but as they tried to
13 converge to the most accurate information possible
14 on the states' reimbursement methodology in that -
15 - in that, there are things that I asked them,
16 like this anything else that affects, I might have
17 written Medicaid reimbursement at the bottom.  But
18 it's exactly the kind of thing that I would have
19 asked them to just be on the lookout for anything
20 that's in addition that we haven't thought of yet,
21 that's important.
22 BY MR. TORBORG:

Page 729

1      Q.  Did you ask Myers and Stauffer to
2  inquire of the states how they came up with the
3  EAC pricing? How those methods were developed,
4  such as AWP minus 10 percent?
5      MR. LAVINE: Object to form.
6      THE WITNESS: So why one state was AWP
7  minus 10 and some other state was AWP minus 5, for
8  example?
9  BY MR. TORBORG:
10     Q.  Something along those lines.  Basically,
11 what I'm looking for is, did you ask for
12 information about how the state came to establish
13 an EAC formula as it did?
14     MR. LAVINE: Object to form.
15 BY MR. TORBORG:
16     Q.  What were the political compromises
17 going various ways, things of that nature?
18     MR. LAVINE: Object to form.
19     THE WITNESS: I certainly asked them to
20 have a big picture understanding of Medicaid
21 reimbursement as it related to products at issue
22 in this case during the 11-year period, and

Page 730

1  anything that would affect Medicaid, you know, the
2  analysis -- so I don't recall asking for the full
3  history of the back and forth between the state
4  Senate, the Department of Health Services and so
5  forth.
6      But you know, that's -- there are -- I
7  don't recall asking specifically for all of that
8  but it's -- it is certainly -- so --
9  BY MR. TORBORG:
10     Q.  And as you sit here today, you can't
11 think of any information that Myers and Stauffer
12 gave you on the topic of how a state came to a
13 particular reimbursement methodology, right?
14     MR. LAVINE: Object to form.
15     THE WITNESS: Right.  It's hard to -- I
16 think there are a number of cases in which they
17 learned through the process of their analyses
18 that, you know, one thing a state may be trying to
19 do was to, you know, do the best they could for
20 the taxpayers in their state, and for the
21 beneficiaries of the program.
22     And so there is nothing specific that's

Page 731

1  leaping to mind but it doesn't mean that there is
2  a lot of -- quite a few conversations with Myers
3  and Stauffer about the Medicaid reimbursement
4  methodologies.  So nothing is leaping to mind
5  right now about how, what legislative process
6  culminated in the policies that are observed in
7  these spreadsheets.
8  BY MR. TORBORG:
9      Q.  Did you ask Myers and Stauffer to
10 inquire of the states what they meant when they
11 used the term AWP, WAC, or direct price in their
12 EAC formula?
13     MR. LAVINE: Object to form.
14     THE WITNESS: Could you just clarify?
15 I'm not sure I understand the question.
16 BY MR. TORBORG:
17     Q.  Many of these -- we go through the Myers
18 and Stauffer summaries, they lay out an EAC
19 formula, right, such as AWP minus 10 percent,
20 right?  Did you ask Myers and Stauffer to
21 determine what the states meant and understood
22 when they used the term AWP in that methodology?

26 (Pages 728 to 731)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 732

1        MR. LAVINE: Object to form.
2        THE WITNESS: To the extent that it
3   diverged, let's say, from -- let's say the AWPs
4   and First DataBank and so forth and other pricing
5   compendia, I would have wanted to know that
6   information. Did I specifically ask -- or I don't
7   know if I phrased the question exactly that way,
8   but pretty much asked them to get all the
9   information that would be relevant to understand
10  the Medicaid reimbursement methodologies.
11  BY MR. TORBORG:
12      Q.  Do you recall Myers and Stauffer
13  providing any information from the states with
14  regard to what they meant and intended when they
15  used the term AWP in the reimbursement model?
16      MR. LAVINE: Object to form.
17      THE WITNESS: Not that I recall. But
18  it's possible that it's been a while since I did
19  this, so with the caveat that I may well have
20  talked about it, but there is --
21  BY MR. TORBORG:
22      Q.  Have you ever yourself evaluated or had

Page 733

1   Myers and Stauffer evaluate how any state Medicaid
2   program defined the term average wholesale price
3   in its state plan?
4       MR. LAVINE: Object to form.
5       THE WITNESS: At my direction, Myers and
6   Stauffer considered the Medicaid state plan
7   amendments and many other documents and
8   conversations with people in the agencies
9   themselves. And through doing that, they obtained
10  information, including you know, which pricing
11  compendia the state -- in certain examples at
12  least, which pricing compendia were used by the
13  states in these adjudication formulas. So First
14  DataBank was frequently used by states to
15  determine the average wholesale price for the NDCs
16  in their Medicaid program.
17  BY MR. TORBORG:
18      Q.  My question is slightly different.
19      A.  I'm sorry.
20      Q.  It's not -- I'm not asking whether you
21  did evaluation or asked Myers and Stauffer to do
22  an evaluation about where they looked for average

Page 734

1   wholesale prices, but rather whether you evaluated
2   or had Myers and Stauffer evaluate how the state
3   actually defined the term average wholesale price
4   in their state plans?
5       MR. LAVINE: Object to form.
6       THE WITNESS: That's -- how average
7   wholesale price was defined in the state plans.
8   Did I do an evaluation of how to -- that's not an
9   evaluation that I did, but at my direction, Myers
10  and Stauffer certainly considered the
11  reimbursement information that was contained in
12  those documents. State plan amendments, for
13  example. But there were other documents, too.
14  BY MR. TORBORG:
15      Q.  Do the Myers and Stauffer summaries
16  contain information about how the state defined
17  average wholesale price in its state plan?
18      MR. LAVINE: Object to form.
19      THE WITNESS: Not that I recall, except
20  we talked about First DataBank where they obtained
21  their information.
22  BY MR. TORBORG:

Page 735

1       Q.  Did you ask Myers and Stauffer to
2   evaluate and ask -- I'm sorry. Strike that.
3   Let's start over.
4           Did you ask Myers and Stauffer to ask
5   the states about their awareness of differences
6   between average wholesale prices published in the
7   compendia versus actual acquisition costs for
8   drugs?
9       MR. LAVINE: Object to form.
10      THE WITNESS: That was not the focus of
11  what I asked them to do.
12  BY MR. TORBORG:
13      Q.  And do you recall Myers and Stauffer
14  providing you any reports from the states about
15  what you understood of the relationship between
16  average wholesale prices published in the
17  compendia and acquisition costs?
18      MR. LAVINE: Object to form.
19      THE WITNESS: So based on their
20  conversations and reading transcripts and so
21  forth, what was the knowledge of certain
22  individuals in these Medicaid departments of

27 (Pages 732 to 735)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 736

1  health services, Medicaid agencies and so forth.
2  I'm sorry, I'm just trying to clarify exactly what
3  it is. So the question you just directed at me,
4  can you just repeat it?
5  BY MR. TORBORG:
6      Q.  I think you got it, but it's basically,
7  did you ask Myers and Stauffer to report to you,
8  and if so, did they report to you, any information
9  about what state officials understood about the
10  relationship between published AWPs and
11  acquisition costs?
12         MR. LAVINE:  Object to form.
13         THE WITNESS:  That was -- you know, what
14  the knowledge was of various government officials
15  was not the focus of my analysis, and was not
16  something that I instructed them to do.  They may
17  have -- we may have discussed it, but for the
18  purposes of my analysis, that was not -- I sort of
19  described what I asked them to do.  And that was
20  the main thing that I asked them to do.
21  BY MR. TORBORG:
22      Q.  Did you ask Myers and Stauffer to

Page 737

1  inquire of the states whether they understood that
2  they were paying a margin on the complaint
3  products?
4         MR. LAVINE:  Object to form.
5         THE WITNESS:  On the 44 specific
6  products at issue here?
7  BY MR. TORBORG:
8      Q.  Yes.  And you understand what I mean by
9  margin, right?
10         MR. LAVINE:  Object to form.
11         THE WITNESS:  The -- essentially the
12  spread between the actual price and the published
13  price.
14  BY MR. TORBORG:
15      Q.  Actually, what I mean is the spread
16  between the actual price and what they paid in
17  reimbursements.
18         MR. LAVINE:  Object to form.
19         THE WITNESS:  That was certainly not the
20  -- once again, that wasn't the focus of my
21  analysis.  From my own examination of transcripts
22  in the past, there has been some discussion of

Page 738

1  disparities between published AWPs and actual
2  transaction prices, you know, for certain drugs
3  whether those were disparities of 5 percent, 10
4  percent, or you know, 1,000 percent.  I'm not
5  sure.  But --
6  BY MR. TORBORG:
7      Q.  Did you ask Myers and Stauffer to
8  inquire of the states whether they wanted to pay a
9  margin between the acquisition cost providers and
10  the amount that they paid reimbursement for the
11  complaint NDCs?
12         MR. LAVINE:  Objection to form.
13         THE WITNESS:  I did not ask them to do
14  that.
15  BY MR. TORBORG:
16      Q.  So you really don't have any knowledge
17  incorporated into your analysis about whether or
18  not states wanted to pay a margin between
19  acquisition costs and state payments for the
20  complaint NDCs, correct?
21         MR. LAVINE:  Object to form.
22         THE WITNESS:  I think it's important to

Page 739

1  point out that in my analysis, I do build in a
2  quite significant margin between the actual prices
3  and the, and these published prices that would
4  result -- so we talked about this -- a bit about
5  this in my previous three days, that this 25
6  percent scaling factor that I introduce, the focus
7  on pharmacies, only on pharmacies, the exclusion
8  of the various rebates and so forth, I think that
9  that already -- my analysis already is
10  conservative in that respect.
11         I'm not aware if specific Medicaid
12  officials were aware of the kind of disparities,
13  spreads that we've discussed, and whether one
14  specific person or two specific people were aware
15  of them, it's not clear that that's official
16  policy.
17  BY MR. TORBORG:
18      Q.  Now, the 25 percent scaling factor that
19  you provide, when you incorporate your revised
20  AWPs into the state reimbursement formulas, some
21  of that's taken away, right?
22         MR. LAVINE:  Object to form.

                                    28  (Pages 736 to 739)

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

BY MR. TORBORG:
    Q.   AWP minus 10 percent, for example, takes
away 10 percent of the 25, right?
        MR. LAVINE:  Object to form.
        THE WITNESS:  Correct.  It takes away
some -- it reduces, it results in a, in less than
125 percent reimbursement.  That's true.
BY MR. TORBORG:
    Q.   And we talked about this last time as
well.  Most of the revised prices that you
calculate for these drugs hover around a dollar or
$2, right?
        MR. LAVINE:  Object to form.
        THE WITNESS:  Depends on the units that
are used.
BY MR. TORBORG:
    Q.   But on a --
    A.   I think it's Vanco which is the biggest
one.
    Q.   I'm not asking about Vanco.  I'm asking
about over all the products, where the revised
price comes down to?

        MS. THOMAS:  Objection.
BY MR. TORBORG:
    Q.   We go to table one in your report.
There is a column, average price, right?
    A.   Right.
    Q.   And that's a per package price, correct?
    A.   I believe that's right.
    Q.   And if you go down here, we'll see that
most of the products, most of the 44 NDCs are
between 1 and $2, actually many below $1, and then
some hovering around 1 to $2, right?
        MR. LAVINE:  Object to form.
        THE WITNESS:  That's the actual price.
BY MR. TORBORG:
    Q.   Correct.  That's the price for which you
calculate your -- your margin, right?
        MR. LAVINE:  Object to form.
        THE WITNESS:  Well, I would be scaling
that by 125 percent, and I would actually -- it
would end up being a higher price, because I focus
on the pharmacies, excluding, for example,
hospitals which tend to have lower prices.

        So prices that I ultimately plug in,
let's take an example of 196607, very first one at
24 cents.  And the price that I would be using
just given the 25 percent would be more like 30
and then you take into account the pharmacy, it
would be -- this price is a little bit -- let's
say it's about 30 percent lower than the one that
I actually plug in.
    Q.   And you think it's appropriate to use
the pharmacy class of trade here, right?
        MR. LAVINE:  Object to form.
BY MR. TORBORG:
    Q.   As opposed to the price hospitals pay
because hospitals aren't the ones that reimbursed
-- or were paid the claims at issue, right?
    A.   Right.  So these are averages across all
consumers.  So I'm just -- I'm just sort of trying
to point out why there is a discrepancy between
this number that we are looking at in table one
and the ones that I use in my methodology.  But
that's exactly right.  That's why I used the
pharmacy because I felt that was the more

appropriate thing to do in my analysis.
    Q.   So it's not necessarily you were being
conservative.  You thought that was the
appropriate way to go, right?
        MR. LAVINE:  Object to form.
        THE WITNESS:  Well, what's interesting
is that in my initial work on sort of Abbott-
related matters for Texas, I focus on the pharmacy
only classes of trade.  And I was criticized quite
a bit in the rebuttal report for focusing on the
specific category of customers, so I think it's
the more appropriate thing, but was -- I was
criticized for doing it.  That's why I have the
later analyses where I show that it's -- it's
just, you know, that I was criticized by the
person who responded to my Texas report for that.
So that wasn't why, that wasn't the expert --
Abbott's expert in the Texas case didn't agree
with that apparently.
BY MR. TORBORG:
    Q.   What I'm trying to get around -- what
I'm trying to get to is to take your notion that

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 744

1    you're building in a quite significant margin.
2    I'm trying to put that into dollars and cents for
3    this case, okay?  And you look at the average
4    prices even if you scale them up to, to a pharmacy
5    class of trade, it's not going to be that much
6    different, right?
7         MR. LAVINE:  Object to form.
8    BY MR. TORBORG:
9       Q.  That's what you conclude in your
10   analysis, there wasn't that much difference
11   between the classes of trades, right?
12        MR. LAVINE:  Object to form.
13        THE WITNESS:  Well, it didn't make much
14   difference in the total difference because the
15   spreads were so large.  So a spread that would be
16   a thousand percent might become 850 percent with
17   the pharmacy.  It wouldn't have much effect on the
18   total difference.
19        But in terms of the Medicaid
20   reimbursement, it would potentially have a
21   nontrivial -- nontrivial effect.  So -- and this
22   is, you know, these are specific units.  These are

Page 745

1    per package.  Typically, in these prescriptions
2    there are more, there is more than one package
3    being reimbursed in these -- you know, as you can
4    see from the average amount per prescription,
5    there is many more units than simply one package
6    in the typical prescription.
7    BY MR. TORBORG:
8       Q.  What is the average per prescription?
9         MR. LAVINE:  Object to the form.
10        THE WITNESS:  It's going to depend on
11   the product and the time period and so forth.
12   That's not something that I've drilled down on.
13   BY MR. TORBORG:
14      Q.  Well, let's take the first NDC.  This
15   accounts for the fourth highest expenditures in
16   the case?
17      A.  196607.
18      Q.  Yes.  Your average price is 24 cents
19   roughly, right?
20        MR. LAVINE:  Object to the form.
21        THE WITNESS:  That -- yes.
22   BY MR. TORBORG:

Page 746

1       Q.  If you scale that up to a pharmacy class
2    of trade, you might get to 30 cents, right, rough
3    figures?
4       A.  Sure.
5       Q.  Okay.  Let's say there were four units -
6    - let's say there were five units in this claim,
7    right?
8       A.  Right.
9       Q.  How much is your analysis paying in
10   margin above the acquisition costs?
11        MR. LAVINE:  Object to form.
12        THE WITNESS:  So for this specific
13   product, if there were five, then it looks -- it
14   appears that the AWP for this product is about $2
15   per package in '96, quarter 3.  And so --
16   BY MR. TORBORG:
17      Q.  Wait a second.  You're on 996607?
18      A.  Yes.
19      Q.  Where are you getting the $2?
20      A.  Just multiplying 24 by 8 over on the
21   right.  So average price is 24 cents, the AWP --
22   the ratio of the AWP to that is about eight.

Page 747

1       Q.  Okay.
2       A.  So two times five would be $10 versus,
3    in my methodology, let's say, $1.50, which would
4    be the difference of about $8.50 for that specific
5    prescription.  Now, that's -- you know, that's one
6    with relatively low average price per package.  If
7    you look at the other ones, I think that's just
8    about the lowest, actually.  There were quite a
9    few -- obviously, the Vanco one is 550, which is,
10   you know, substantially higher.  So it just -- it
11   depends on the specific product.
12      Q.  Okay.  But if you scale up your 24 cents
13   per package to a pharmacy class of trade, we'll
14   say 30 cents, okay?
15      A.  Yes.
16      Q.  And then we take that times 1.25, that
17   gets me to 37.5 cents, right?
18      A.  Sure.
19        MR. LAVINE:  Object to form.
20   BY MR. TORBORG:
21      Q.  And let's say we have five packages in a
22   claim.  Now we are $1.87.5, right?

30  (Pages 744 to 747)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 748

1          MR. LAVINE:  Object to form.
2          THE WITNESS:  Right.
3    BY MR. TORBORG:
4       Q.  How much margin are you paying on that
5    prescription?
6          MR. LAVINE:  Object to form.
7          THE WITNESS:  Well, for that specific
8    one, it would be about 8 or $9, and that's --
9    BY MR. TORBORG:
10      Q.  8 or 9 dollars that your analogy is
11   coming to?
12         MR. LAVINE:  Please let him finish his
13   question.  That's the second time you cut him off
14   in the middle of answering your question.  And he
15   needs to be able to answer his question -- your
16   question.
17         THE WITNESS:  So all I'm saying here is
18   that the average price here is, let's say, it's 30
19   cents for the pharmacy and 37.5 cents that you
20   have for the pharmacy scale.  And we determine
21   that the AWP in the middle of '96 was about two,
22   okay?  So that reflects -- oh, I see.  I see what

Page 749

1    you're saying.
2          So the 37.5 cents, that 7.5 cents versus
3    5, that's a margin of about 40 cents on that
4    specific one.  But that is, you know, that's
5    straightforward to see from table 11, where we
6    look at reimbursement per prescription, that
7    specific product is very low with respect to the
8    amount paid per prescription.  Like it's just
9    about the lowest at about $11 per prescription.
10         So my sense is that if one were to look
11   at the prescription difference relative to the
12   amount paid would be much smaller than for
13   something like Vanco, where the amount paid per
14   prescription is over 200.  So those are, you know,
15   those are kind of the two -- the two -- for those
16   two, it's very different.
17   BY MR. TORBORG:
18      Q.  But the margin that you would pay in our
19   scenario would be about 40 cents?
20         MR. LAVINE:  Object to form.
21   BY MR. TORBORG:
22      Q.  Right?

Page 750

1          MR. LAVINE:  Object to form.
2          THE WITNESS:  For five units of that
3    specific product, that's true.  But for -- and so
4    --
5    BY MR. TORBORG:
6       Q.  I'm not asking about -- this one.
7       A.  Okay.  Yes.
8          MR. LAVINE:  Object to form.
9    BY MR. TORBORG:
10      Q.  Did you ask Myers and Stauffer to ask
11   the states whether they had a maximum allowable
12   cost on the complaint NDCs during the claim
13   period?
14         MR. LAVINE:  Object to form.
15         THE WITNESS:  This is -- I mean,
16   ultimately, the data was going to be the key place
17   to determine that, but I certainly asked them to
18   explore whether the state had MAC programs, and
19   you know, that's -- so I certainly asked them to
20   look into that.  That's partly how I knew about
21   Ohio being special in the -- in the first -- when
22   we first talked back in July.

Page 751

1    BY MR. TORBORG:
2       Q.  Did you ask them specifically, I want
3    you to bear down on these 44 NDCs and see if there
4    is a MAC on those products?
5          MR. LAVINE:  Object to form.
6          THE WITNESS:  No.  That is the -- that's
7    precisely the kind of thing that I strove to do in
8    my analysis of the data, and -- but they -- I did
9    not ask them to catalogue what time periods and
10   what -- you know, what NDC quarter combinations
11   might there have been a MAC in effect.
12   BY MR. TORBORG:
13      Q.  Did you ask Myers and Stauffer to
14   inquire of the states whether they believe their
15   dispensing fees were adequate to cover the cost of
16   dispensing the complaint NDCs?
17         MR. LAVINE:  Object to form.
18         THE WITNESS:  That is not something that
19   I asked them to do.  I should just -- I don't know
20   if we can take a lunch break fairly soon, but it
21   would be great if we could.
22   BY MR. TORBORG:

                              31 (Pages 748 to 751)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
Washington, DC

Page 752

1    Q.  Did you ask Myers and Stauffer to
2  inquire of the states whether they recognized that
3  a margin being paid on ingredient cost was making
4  up for an inadequacy on dispensing fees for the
5  complaint NDCs?
6        MR. LAVINE:  Object to form.
7        THE WITNESS:  Can you just repeat -- I
8  feel like that's what you just asked, but I must
9  have missed something.
10  BY MR. TORBORG:
11    Q.  The first question was whether you asked
12  the states if they believes the dispensing fees
13  were adequate to cover the cost of dispensing the
14  complaint NDCs.  This question is, did you ask
15  Myers and Stauffer to inquire of the states
16  whether they recognized that a margin on
17  ingredient cost payments was making up for an
18  inadequacy of the dispensing fees related to the
19  complaint NDCs?
20        MR. LAVINE:  Object to form.
21        THE WITNESS:  That sort of presumes that
22  dispensing fee for these products, I think, were

Page 753

1  inadequate, that statement.  So I didn't ask them
2  to do what you just said.  But the question of
3  adequate is -- an adequate dispensing fee is --
4  that is a bit vague.
5  BY MR. TORBORG:
6    Q.  Well, you didn't ask Myers and Stauffer
7  --
8        MR. LAVINE:  Can we discuss lunch plans,
9  because I know Professor Duggan just asked about a
10  break.  It's 12:30.  Are you -- do you want to go
11  a few more minutes?  Are you ready to take a break
12  now? I don't know how you're feeling.
13        MR. TORBORG:  I have a question pending.
14  Can I finish the question, and I'll be done?  I
15  mean, you're asking about lunch plans in the
16  middle of a question.
17        MR. LAVINE:  Well, we started talking at
18  the same time.  You didn't actually get a whole
19  question out, and he asked about a lunch break a
20  few minutes ago.  I was letting you go with a
21  couple of questions, but now I wasn't sure how
22  long you're going to go, and I just wanted to take

Page 754

1  a minute to figure that out.
2        THE WITNESS:  I can do another question.
3  BY MR. TORBORG:
4    Q.  Back up one step.
5    A.  Okay.
6    Q.  I think you told me that you didn't ask
7  Myers and Stauffer to inquire of the states
8  whether they believe the dispensing fees were
9  adequate for the complaint NDCs, right?
10        MR. LAVINE:  Object to form.
11        THE WITNESS:  I did not ask them to
12  inquire of the states, but it's important, they
13  spoke with specific people in these state
14  agencies.  So I just want to be specific.  When
15  they talked with people, you know, it -- when one
16  says the states, did the states know of, there --
17  this issue of knowledge and so forth is -- that
18  wasn't the thrust of my analysis.
19        MR. TORBORG:  Go off the record.
20        THE VIDEOGRAPHER:  The time is 12:36
21  p.m.  We are going off the record.
22        (Whereupon, at 12:36 p.m., the

Page 755

1  deposition in the above-entitled matter was
2  recessed, to reconvene at 1:30 p.m., this same
3  day.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

32  (Pages 752 to 755)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
                      Washington, DC

Page 756

1    A F T E R N O O N   S E S S I O N
2            (1:50 p.m.)
3
4    Whereupon,
5        DR. MARK G. DUGGAN,
6    the witness on the stand at the time of recess,
7    having been previously duly sworn, was further
8    examined and testified as follows:
9
10       THE VIDEOGRAPHER:  The time is 1:50 p.m.
11   We are back on the record.
12
13       EXAMINATION BY COUNSEL FOR DEFENDANT ABBOTT
14   (RESUMED) BY MR. TORBORG:
15   Q.  Welcome back, Professor.
16   A.  Thank you.
17   Q.  What I'd like to do now is ask you to go
18   to page 30, moving right along here through the
19   report.  This begins the section of your report
20   where you summarize the analysis that you did for
21   a number of states for which you used claims data
22   provided by the state, right?

Page 757

1    A.  That's correct.  I believe it's Illinois
2    first.  That was the first one.
3    Q.  Yes.  Illinois was the first one in here
4    and it had, I believe, the second highest
5    expenditures?
6    A.  Right.
7    Q.  Of the states?
8    A.  Right.
9    Q.  And I think I have a handle generally on
10   what you did, but I just want to walk through just
11   a few questions.  I'm not going to ask you to go
12   through all the gory details.  On page 32, I
13   wanted to ask you a question about what something
14   meant.  Section B at the bottom, the impact of
15   alternative price parameters on Illinois Medicaid
16   spending?
17   A.  Yes.
18   Q.  The first sentence there, you -- you
19   summarized the 535 odd claims that are sort of in
20   your original pool of claims that are subject to
21   your analysis, right?
22   A.  Correct.

Page 758

1    Q.  And then you remove some claims from
2    that analysis, right?
3    A.  Correct.
4    Q.  And those would be ones where you see
5    anomalies in the data, right?
6        MR. LAVINE:  Object to form.
7        THE WITNESS:  That -- yes.  Yes.
8    BY MR. TORBORG:
9    Q.  And then the last sentence, carrying
10   over -- on page 32 carrying over on 33, you write,
11   "there are an additional 942 claims for which I am
12   unable to replicate the amount paid or which there
13   appears to be some data errors, such as an
14   implausibly large dispensing fee," right?
15   A.  Right.
16   Q.  What do you mean when you say you're
17   unable to replicate the amount paid?
18   A.  It varies to some extent from one state
19   to another, depending on which variables are
20   included.  So I would -- you know, this is -- this
21   was sort of a miscellaneous category to capture
22   things like, suppose that the amount paid should

Page 759

1    be the sum of A and B in a claim.  I don't
2    remember if it's Illinois specifically, and the
3    sum diverged from that substantially, then I would
4    drop that claim from my analysis.
5        So it is -- here, basically, this is a
6    standard thing that I do in my work on empirical
7    projects, is to try to purge the analysis of
8    possible errors that exist.  So I don't know,
9    without going back to the program itself, or the
10   data itself, I don't recall exactly why these 942
11   were.
12   Q.  You said that you would determine what
13   the amount paid should be based upon your
14   expectations, right, something like that?
15   A.  Right.  So looking over the data, I
16   would -- so one example, and I don't know if I
17   grouped it in here, because elsewhere I dropped
18   them, but if there was a paid amount, for example,
19   that fell below the charged amount, that would be
20   a case in which there was a divergence between
21   what I -- possibly an error in the data.
22   Q.  Now, a claim can be reimbursed on -- the

                              33  (Pages 756 to 759)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
                    Washington, DC

Page 760

1  actual payment amount could be derived in more
2  than one way here, right?  You could have a claim
3  that was paid at charges, right?
4      A.  Right.  Yes.  That's right.
5      Q.  You could have a claim that was paid
6  based upon the AWP minus formula or WAC plus
7  formula, right?
8      A.  Correct.  I don't know if this -- I
9  can't recall if this -- but, whether they also
10 used WAC at certain times, but right, that would
11 be, that would be an example.
12     Q.  And then it may be that a particular
13 claim may be paid on a MAC, right?  Based on a MAC
14 price, right?
15     A.  Possibly.  I'm not sure if in Illinois -
16 - I don't recall.  But it's possible.  Sure.
17     Q.  If you look at footnote 24, you know, it
18 is worth noting that in some cases, Illinois or
19 other states may not have used an AWP, WAC, or
20 direct price.  For example, some states used SMAC
21 prices for one or more complaint products at some
22 time during the period of interest, right?

Page 761

1      A.  Right.
2      Q.  And I guess my overall question is this.
3  When you do your analysis, are you attempting --
4  or did you reverse engineer the payments so that
5  you can tie each of the claims to a recognized
6  basis of payment, such as a charged amount, an AWP
7  minus formula or a MAC?
8          MR. LAVINE:  Object to form.
9          THE WITNESS:  Some cases, I did.  I
10 believe that, for example, that I explored whether
11 claims were paid at the charged amount.  And that
12 varied to some extent over time and across states
13 with respect in terms of the frequency with which
14 that occurred.  In other cases -- so I -- so I
15 certainly did that to some extent.
16 BY MR. TORBORG:
17     Q.  And we'll look at, believe it or not,
18 some of your data and we'll go through and I can
19 see where you identified claims that are paid at
20 charges.  And I think how you do that is you see
21 if the amount billed is equal to the amount paid,
22 give or take five cents?

Page 762

1      A.  Yes.  Right.
2      Q.  Right.  So you do do analysis to figure
3  out how you can tie the amount paid to the charged
4  amount, right?
5          MR. LAVINE:  Object to form.
6  BY MR. TORBORG:
7      Q.  How about, do you do an analysis that
8  tries to trace if the claims were paid under the
9  AWP or WAC formula?
10     A.  I guess I'm unclear on what you mean.
11     Q.  Let me ask it a different way.
12     A.  Okay.
13     Q.  Have you done an analysis where you can
14 say for all of these 500,000 claims, roughly, in
15 Illinois, I have gone through and I can tell you
16 that they all are reimbursed at charges, under an
17 AWP minus formula consistent with the state plan,
18 or a MAC?
19         MR. LAVINE:  Object to form.
20         THE WITNESS:  I'm not sure if I did that
21 specifically for the State of Illinois.  But as I
22 -- so I'm not sure if I did that for Illinois.  I

Page 763

1  don't recall doing that for Illinois.
2  BY MR. TORBORG:
3      Q.  Okay.  I have your log of what you did
4  and I don't see that there.  I'm just making sure
5  I'm not missing something.
6      A.  Sure.
7      Q.  And you don't recall doing, you know,
8  actually confirming that, I looked at these
9  534,000 claims and I can tell you that all 534 of
10 them were either reimbursed on a -- at charges or
11 the AWP formula, right?
12         MR. LAVINE:  Object to form.
13         THE WITNESS:  Right.  I think the way
14 that I talk about it in the report is they are
15 sort of -- there is multiple steps.  There is this
16 lesser of, so there is a formula that's used, and
17 they may use an AWP or a MAC, depending on the
18 state, the time period, the product and so forth.
19         And that would be compared with a
20 charged amount.  And so the analysis basically if
21 there is an -- if it uses an AWP or if it uses a
22 MAC, the -- in general, one, it is plausible that

34  (Pages 760 to 763)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                      Washington, DC

Page 764

1  for the MAC price, the cases if the MAC was used,
2  the difference might be lower, all else equal,
3  then using an AWP formula.
4  BY MR. TORBORG:
5     Q.  Now, do you know which of the -- let's
6  stay with the states for which you have a
7  calculation that is based upon the claims data.
8  So I guess that would be in the 10 states.  I'm --
9  I'm excepting Illinois from that because you do an
10 extrapolation -- I'm sorry, Indiana from that
11 because you do an extrapolation for Illinois.  So
12 for the 10, what should we call those, so we are
13 on the same wave length, claims data states, or
14 what's the best term?
15    A.  Call them the 10.
16    Q.  What's that?
17    A.  The 10.
18    Q.  Okay.  Of the -- of the 10, do you know
19 which of them had MACs on any of the products at
20 issue?
21    MR. LAVINE:  Object to form.
22    THE WITNESS:  That's not a number that I

Page 765

1  -- you know, it depends.  As I note in my report,
2  there are sort of 44 products, 44 quarters and so
3  whether -- I don't know, I can't -- I certainly
4  can't recall the frequency with which state A used
5  the MAC versus state B.
6  BY MR. TORBORG:
7     Q.  But you don't have anywhere in your
8  analysis where you've identified where states of
9  the 10 had a MAC on particular products in
10 particular quarters, right?
11    A.  Yes, not that I recall, but it may -- it
12 may be that I do for certain states depending on
13 the details of which variables are included and so
14 forth.  But you know, the algorithm that I employ
15 takes the same approach whether a MAC or an AWP is
16 being used to determine whether a lower amount
17 paid would result if that alternative AWP were in
18 effect.
19    Q.  Now, for situations where there was a
20 MAC on one of the 44 NDCs in a particular quarter,
21 the amount that was paid by the Medicaid program
22 is not based on the reported price of the Abbott

Page 766

1  product, correct?
2     MR. LAVINE:  Object to form.
3     THE WITNESS:  That's an input in it, but
4  if ultimately what -- if the MAC results in a
5  lower amount paid than would result if the AWP
6  were used, then the AWP isn't used -- it is used,
7  right, it's used in the adjudication formula, but
8  it is, it's not the one on which the ultimate
9  payment amount is based.
10 BY MR. TORBORG:
11    Q.  And there are instances where you're
12 still calculating a difference, right?  In those
13 instances, right?
14    A.  That is correct.  And in some cases, it
15 may be zero.
16    Q.  Now, in footnote 24, the second
17 sentence, you wrote, this frequently occurred in
18 the -- again, we are talking about the MACs.  This
19 frequently occurred in the Texas Medicaid program
20 for Abbott products.  Then you state, in these
21 cases, the comparison is therefore between
22 parameters such as the average price and this

Page 767

1  other price which would have been used if it
2  resulted in a lower payment amount, right?
3     A.  Correct.
4     Q.  And in making that statement, you rely
5  upon the Myers and Stauffer work that set forth
6  the reimbursement algorithms used by the states,
7  correct?
8     A.  That was one input to it.
9     Q.  What other input is in it?
10    A.  Well, I've done -- here I'm citing the
11 Texas program.  So for that -- for example, for
12 that program, if they had a MAC in effect for a
13 certain product, but an AWP would -- or a direct
14 price, I guess, in the case of Abbott would have
15 resulted in a lower amount paid than -- so it's
16 not only from that.  It's from some of my
17 experience on, for example, the Texas case there.
18 It's my understanding that how it would have
19 worked in this Texas example.
20    Q.  Are you aware of any instance where a
21 state actually paid for a drug claim that would be
22 covered by a MAC at amounts below the MAC?

35  (Pages 764 to 767)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 768

1      A.   You mean below the alternative price or
2   below the -- can you just restate the question?
3   I'm just not sure I heard it right.
4      Q.   Your analysis presumes that if an EAC
5   formula generated an amount lower than a state's
6   MAC, that lower amount would be paid, correct?
7         MR. LAVINE:  Object to form.
8         THE WITNESS:  Correct.  That it would
9   basically replace the MAC.
10  BY MR. TORBORG:
11     Q.   And are you -- are you aware of any
12  instance where that actually happened in a state,
13  where there was a drug claim for a drug that was
14  covered by the MAC program, yet it actually was
15  paid at lower than the MAC rate?
16        MR. LAVINE:  Object to form.
17        THE WITNESS:  Abstracting from the
18  charged issue because in some cases you may have a
19  claim with a charged --
20  BY MR. TORBORG:
21     Q.   Yes.
22     A.   Whether -- I haven't drilled down on

Page 769

1   that specific issue.  It could be that, for
2   example, when states -- certain states used the
3   alternative -- replaced their AWPs in early 2000,
4   it may be in those cases that fell below the MAC
5   that was in effect.  So I haven't -- I haven't
6   looked at that specific issue, but it seems
7   plausible that there were cases there, where those
8   fell below state MACs.  For example, in Texas, it
9   could be.
10     Q.   That's not an area that you studied,
11  though, right?
12        MR. LAVINE:  Object to form.
13        MS. THOMAS:  Objection.
14        THE WITNESS:  Whether it is the case
15  that an alternative AWP, an AWP -- I just want to
16  clarify the question.  If this alternative price
17  would be used in place of the MAC in the
18  adjudication formula?  That's not something that
19  I've -- I've certainly worked with the data, and
20  it may be that we worked quite a bit with this
21  data and maybe that -- I don't recall coming
22  across that specific, specific thing, but it's not

Page 770

1   something that was a focus of my analysis.
2   BY MR. TORBORG:
3      Q.   Now, had -- if we implement the revised
4   pricing that your report calculates going back in
5   time, back to 1991 through 2001 which is what your
6   report does obviously.
7      A.   Yes.
8      Q.   At the AWPs -- I'm sorry, the
9   reimbursements generated for the Abbott NDCs might
10  be the only companies whose products fall below
11  state MAC, right?
12        MR. LAVINE:  Object to form.
13        THE WITNESS:  It's possible.  But I just
14  haven't examined that.
15  BY MR. TORBORG:
16     Q.   And if that were the case, what kind of
17  incentives would that provide to providers?
18        MR. LAVINE:  Object to form.
19        THE WITNESS:  It depends on the
20  specifics.  If one assumes all else equal, let's
21  say that the pharmacy can buy at the same price
22  from different makers of Vanco or sodium chloride

Page 771

1   or what have you, it would lead to a higher
2   reimbursement -- lower reimbursement for the
3   Abbott NDCs than for the other NDCs.  But that
4   would be true also if other firms had higher AWPs.
5   Even without a MAC, that might be true of Abbott's
6   competitors.
7   BY MR. TORBORG:
8      Q.   I want to mark this Abbott Duggan 2.
9         (Exhibit Abbott-Duggan 002 was
10  marked for identification.)
11  BY MR. TORBORG:
12     Q.   Dr. Duggan, this an excerpt from a
13  deposition of a Medicaid employee from the State
14  of New Jersey named Ed Vaccaro, dated December
15  3rd, 2008.  If I could ask you to go to the third
16  page in the exhibit.  It's the last page you have
17  -- it starts with page 568 on the top.  Do you see
18  that?
19     A.   Sure.  Whose -- you said it's Vaccaro,
20  not McLaughlin or Kim.
21     Q.   The deposition, the witness is Edward
22  Vaccaro.

36 (Pages 768 to 771)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 772

1     A.  Okay.
2     Q.  Who is with the New Jersey Department of
3  Human Services.  Are you familiar with that name?
4     A.  Vaccaro?
5     Q.  Yes.
6     A.  Vaccaro.  I don't recall that name.
7     Q.  Starting on line 6, I'm going to be
8  reading lines 6 on page 568 through line 12 of
9  568, if you'd follow along, I'll ask the
10  questions.
11     A.  Sure.
12     Q.  The question, response 24, I can
13  represent to you that he is being asked about a
14  survey that Mr. Vaccaro gave to the OIG relating
15  to the so-called DOJ AWP pricing.
16     A.  Uh-huh.
17     Q.  Response 24, sir, it's the last
18  question, says, "do you believe that these new
19  prices will have significant long-term cost saving
20  impact.  Could you provide us with data to support
21  this?"
22        Question, and then it says, "I don't

Page 773

1  think so because the providers will stop supplying
2  drugs."
3        Question, do you agree with that
4  statement?
5        And the answer that Mr. Vaccaro provided
6  was, will stop providing those NDCs that were
7  assigned a new AWP.  They won't purchase those
8  NDCs, they will purchase the other ones.  Don't
9  you see? The point here is if you reduce the AWP
10  on a, on an NDC and offer me an opportunity to
11  benefit from some profit, I'm just going to switch
12  to a different NDC and not have to be concerned
13  about the new AWP.  That's what the statement
14  means.
15        Question, would they -- would they stop
16  supplying drugs all together.
17        Answer, they will stop supplying that
18  NDC.
19        Question, but it says --
20        Answer, I know, I know.
21        Question, will stop supplying drugs.
22        Answer, what it says.  Unfortunately, I

Page 774

1  can't vouch for the quality of the person who
2  responded but the reality is he is saying is the
3  NDC sales will go down and another NDC will
4  replace it.
5        Do you see that?  Do you have an
6  understanding of what he is saying there?
7        MR. LAVINE:  Object to form.
8        THE WITNESS:  Sure.
9  BY MR. TORBORG:
10     Q.  What's your understanding of what he is
11  saying there?
12        MR. LAVINE:  Object to form.
13        THE WITNESS:  The idea -- so suppose one
14  has two different products that are identical,
15  generically equivalent, and reimbursement is
16  reduced for one of them, but not the other.  And
17  prior to this, everything else between the two was
18  identical, same reimbursement, same price from the
19  pharmaceutical firm and so forth, that may reduce
20  the amount of revenue, net revenue, profit that
21  the pharmacy gets from the first NDC, the one
22  whose reimbursement was reduced.  Thus leading to

Page 775

1  a relative increase in the profitability of the
2  other NDC, in that example.  So I don't -- you
3  know -- I don't know what -- this is clearly a
4  hypothetical example here.  To what extent it is
5  reflective -- you know, it's a hypothetical
6  example.
7  BY MR. TORBORG:
8     Q.  Now, in your -- I'm sorry.  Were you
9  done?
10     A.  Sure.  Yes.
11     Q.  Now, in your analysis for this case, you
12  just reduced the AWP prices for the Abbott
13  products, right?
14        MR. LAVINE:  Object to form.
15        THE WITNESS:  For the 44 Abbott products
16  at issue in this case, that's -- that's correct.
17  BY MR. TORBORG:
18     Q.  And we talked about this a little bit
19  last time, but you know that for many of the
20  products, including the 44, there were competing
21  companies who offered -- also offered those
22  generic drugs, right?

37 (Pages 772 to 775)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                            Washington, DC

Page 776

1      A.  Yes.
2      Q.  And reducing the AWP for the Abbott
3  products, but not the others, might lead to the
4  situation that Mr. Vaccaro is talking about here,
5  where people stop using the Abbott product and use
6  a competing generic product, right?
7          MR. LAVINE:  Object to the form.
8          THE WITNESS:  It is -- it is possible,
9  though, with -- can I -- just with this
10 qualification, that at some level, any business,
11 like a pharmacy, that's contracting with various
12 pharmaceutical firms and so forth, or wholesalers,
13 it -- there are many factors that any business
14 would consider in deciding precisely which
15 products to stock.
16         It could be that for whatever reason
17 they have a relationship with Abbott on many of
18 Abbott's other products.  So it is -- it is
19 possible that -- but once again, it's not obvious
20 what -- this -- it's theoretically possible that
21 this introduces some change in incentives.
22 Whether that would be quantitatively important,

Page 777

1  given all the other factors, isn't clear.  I
2  didn't look at the other firm's transaction data,
3  for example.
4  BY MR. TORBORG:
5      Q.  Do you have an opinion on whether or not
6  reducing the AWP levels for the Abbott products to
7  the amounts contained in your report, whether that
8  would lead to decreased sales of the -- of those
9  NDCs?
10         MR. LAVINE:  Object to the form.
11         THE WITNESS:  It is theoretically
12 possible, but it seems like here one needs to
13 consider both sort of, you know, multiple factors.
14 It seems plausible that -- you know, we sort of
15 went through this example here about the -- a
16 specific -- nothing else changing, just thinking
17 of it from the pharmacy's perspective, but it
18 could be that state Medicaid officials then
19 encourage pharmacies to purchase the Abbott
20 product, because it's going to result in a lower
21 Medicaid amount paid for their program.
22         I mean, indeed, I think that kind of

Page 778

1  thinking was behind some of the -- we've talked a
2  bit about Martha McNeil in Texas who dropped a
3  number of Abbott products from the formulary.  So
4  it could be -- it's -- there are forces, I think,
5  that push in both directions.
6  BY MR. TORBORG:
7      Q.  If there were less sales of the Abbott
8  products, based on the implementation of the
9  revised pricing for the period of 1991 to 2001,
10 your difference calculation would be lower?
11         MR. LAVINE:  Object to form.
12 BY MR. TORBORG:
13     Q.  Or would need to change, right?
14     A.  I'm not -- I don't agree with that.  I
15 think the -- my report is very -- I aim to be as
16 transparent as I possibly can be about what
17 assumptions are being made.  And in the analysis
18 and I -- it depends on the question.  I suppose it
19 depends on many factors, but I think for -- in
20 terms of -- for the purposes of my analysis,
21 holding constant Abbott utilization, I think that
22 is a very important number.  One could consider

Page 779

1  how utilization might have changed with these
2  alternative AWPs, and I think theoretically it's
3  ambiguous.
4      Q.  Well, you wouldn't calculate a
5  difference for a claim that didn't exist, right?
6  So if you reduce the number of claims for the
7  Abbott NDCs, you wouldn't calculate a difference
8  for those, right?
9          MR. LAVINE:  Object to form.
10         THE WITNESS:  See, it's -- I think that
11 the -- I guess I'm a little -- I think that one
12 could conduct an analysis to -- of whether and to
13 what extent the utilization of Abbott products
14 would surge or plummet if alternative AWPs were
15 used.
16         If I recall from my own analysis -- so
17 you know, one piece of information here that might
18 be useful is if one looks at the utilization of
19 Abbott products in the latter part of the period,
20 it is not -- it doesn't plummet when these
21 alternative AWPs are being -- are taking effect.
22         But you know, that's not an issue that

                                       38  (Pages 776 to 779)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 780

1  I've drilled down on or pursued.  But based on, I
2  think, the -- the report, the analyses that sort
3  of underline my report, I think, are quite useful
4  and seem to me like a reasonable, quite reasonable
5  -- like the -- a quite reasonable approach to this
6  question.
7       MR. TORBORG:  If I could mark as our
8  next Exhibit, this will be Abbott Duggan 3.
9          (Exhibit Abbott-Duggan 003 was
10 marked for identification.)
11      MR. LAVINE:  Is that an extra?
12      MR. TORBORG:  Yes.  Would you like it.
13      MR. LAVINE:  Yes, please.
14      MR. TORBORG:  I gave you one.
15      MR. TORBORG:  You gave one to Susan.  I
16 was being polite in not pointing that out.
17 BY MR. TORBORG:
18      Q.  Okay.  What I've marked as Abbott Duggan
19 3, there is a Bates number EXPUSABT-DUG-070518
20 through 20.  This is a -- some email
21 correspondence between Judith Becherer of Myers
22 and Stauffer and Jarvis Jackson from Minnesota.

Page 781

1  In particular, I'd like to direct your attention
2  to the Bates page ending 519.  In particular, Mr.
3  Jackson's email of May 5th, 2008.  This provides
4  some information on Minnesota's methodology?  Am I
5  right?
6       A.  It appears.  Yes.
7       Q.  Have you reviewed this email before?
8       A.  No, I have not.  Not that I recall.
9       Q.  Last paragraph of Mr. Jackson's email,
10 he states, SMACs, do you understand that to be
11 referring to state maximum allowable costs?
12      A.  Yes.
13      Q.  States SMACs are based on an informal
14 survey of a few retail pharmacies that have agreed
15 to share costs.  We tried to include an average
16 profit of about $7 for each prescription using
17 SMAC.  This $7 includes the $3.65 dispensing fee.
18 The SMAC are maintained using information from
19 pharmacies referenced above, our PDL contractor,
20 and MAC lists from other states.  Do you see that?
21      A.  Yes.
22      Q.  Were you aware that Minnesota tried to

Page 782

1  include an average profit of $7 for each
2  prescription when it set a SMAC?
3       MR. LAVINE:  Object to form.
4       THE WITNESS:  No.  I was not aware.
5  BY MR. TORBORG:
6       Q.  And do your -- does application of your
7  but-for prices from 1991 through 2001 generate at
8  least a $3.35 margin on ingredient cost?
9       MR. LAVINE:  Object to form.
10      THE WITNESS:  Will vary across products
11 and time periods.  It's hard, you know, he hasn't
12 -- this person, Jarvis -- it would just -- it
13 might depend, there will be heterogeneity in the
14 margin that I've built in across products.  We
15 talked about that a little earlier with 196607
16 versus the big Vanco NDC, and whether that would
17 result in an average overall of -- of something in
18 that neighborhood, I'm not sure.
19 BY MR. TORBORG:
20      Q.  So it may be that there are NDCs --
21 excuse me, quarter NDCs or quarters in NDCs, when
22 I use the term quarter NDC, do you understand what

Page 783

1  I mean?
2       A.  Sure.
3       Q.  There may be quarter NDCs where your
4  analysis does not provide a margin on ingredient
5  costs of $3.35, right?
6       MR. LAVINE:  Object to form.
7       THE WITNESS:  Right.  There may be cases
8  where it's below and there may be cases where it's
9  above.
10 BY MR. TORBORG:
11      Q.  If I could get you to take out the Myers
12 and Stauffer binder that's in front of you there,
13 particularly, Iowa.  It should be roughly
14 alphabetical order.  I noticed in reviewing them
15 last night that there are some that are not, but
16 generally speaking, the Is are with the Is and the
17 Ns are with the Ns.  If you could go to Iowa for
18 me?
19      A.  Go to where, Iowa?
20      Q.  Yes.  Now, the way that I read this
21 table -- tell me if you read it differently --
22 Iowa did not have a state MAC until July of 2002,

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
Washington, DC

Page 784

1  right?
2      A.  Correct.
3      Q.   But when it did implement a MAC, it used
4  a methodology that's described in footnote 9 of
5  this report, right?
6      A.  Yes.
7      Q.  It says, footnote 9, beginning November
8  1, 2002, SMAC prices were set as average wholesale
9  acquisition price for a drug and all equivalents
10 adjusted by a multiplier of at least one, plus a
11 dispensing fee, then it goes on, but I'll stop
12 there for now.  Do you know what the term average
13 wholesale acquisition price was?
14          MR. LAVINE:  Object to form.
15          THE WITNESS:  I sort of -- here, I would
16 -- I'm not sure if this has a special meaning, but
17 it seems to be reasonable that it would represent
18 an average of the price of acquiring a product
19 from a wholesaler.
20 BY MR. TORBORG:
21     Q.   Did you ask Myers and Stauffer to have
22 Iowa explain what goes into that price?

Page 785

1          MR. LAVINE:  Object to form.
2          THE WITNESS:  I did not.
3  BY MR. TORBORG:
4      Q.   Do you have an understanding of what it
5  means by a multiplier of at least 1.0?
6          MR. LAVINE:  Object to form.
7          THE WITNESS:  Not -- this is obviously a
8  -- I believe that I have an understanding of that.
9  BY MR. TORBORG:
10     Q.   What is your understanding of what a
11 multiplier of at least 1 means?
12          MR. LAVINE:  Object to form.
13          THE WITNESS:  So beginning in November
14 of 2002, and I would want to -- it's a bit
15 ambiguous, but my sense from this -- yes, I'm
16 reading this -- is that it would be multiplied by
17 one, and then with a dispensing fee added.
18 BY MR. TORBORG:
19     Q.   But you're not sure what this means,
20 right?
21          MR. LAVINE:  Object to form.
22          THE WITNESS:  It appears to mean -- so I

Page 786

1  would want to -- it -- unless there is something
2  misleading here, it would seem to read that it's
3  at least as much as this average wholesale
4  acquisition price, not less than this average
5  wholesale acquisition price.
6  BY MR. TORBORG:
7      Q.   And then later in the footnote, it
8  indicates that the multiplier that was actually
9  used by the department until March 28th of 2003
10 was 2.1, correct?
11          MR. LAVINE:  Object to form.
12          THE WITNESS:  So during that almost
13 five-month period, that appears to be true.
14 BY MR. TORBORG:
15     Q.   So that would evidence a policy to pay
16 at least double the average wholesale acquisition
17 price for a generic class of drugs, right?
18          MR. LAVINE:  Object to form.
19          THE WITNESS:  Well, I'm not sure which
20 products are -- have these SMAC prices in effect.
21 And during this almost five-month period, in late
22 2002 and early 2003.  But it appears that during

Page 787

1  that period for the products that had a MAC, and
2  once again, I'm not sure, but it does appear that
3  it is about double the acquisition cost for these
4  pharmacies that they serve.
5  BY MR. TORBORG:
6      Q.   And in your analysis, you don't pay at
7  least double of the revised prices that you
8  calculate, correct?
9          MR. LAVINE:  Object to form.
10          THE WITNESS:  No.  No.  My analysis does
11 -- does what I state in my report.
12 BY MR. TORBORG:
13     Q.   So the answer is no, right?
14          MR. LAVINE:  Object to form.
15          THE WITNESS:  That's correct.
16 BY MR. TORBORG:
17     Q.   If you go to Oklahoma, this indicates
18 that Oklahoma established a state MAC program July
19 1st, 1993, is that right?
20          MR. LAVINE:  Object to form.
21          THE WITNESS:  Yes.
22 BY MR. TORBORG:

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 788

1    Q.  And there is a footnote two under the
2  column, state MAC description for the period 3-1-
3  90 through 9-30-95, right?  Do you see that?
4    A.  I see it.
5    Q.  And the footnote states, per TN number
6  93-16, state MAC products and price are
7  established based upon the recommendation of a
8  special committee consisting of representatives
9  for the medical, osteopathic and pharmaceutical
10 associations.  The price is set as a percentile of
11 the available medication specific products.  Do
12 you see that?
13   A.  Yes, I do.
14   Q.  Okay.  What percentile did Oklahoma use?
15       MR. LAVINE:  Object to form.
16       THE WITNESS:  I'm not sure from this.
17 BY MR. TORBORG:
18   Q.  Not important to your analysis to
19 understand that, right?
20       MR. LAVINE:  Object to form.
21       THE WITNESS:  As I said, I'm not sure
22 what the percentile is, so whether this would, for

Page 789

1  the purposes of my analysis -- I'm not sure that
2  these MAC prices were used, so I don't see this as
3  problematic for my analysis, but --
4  BY MR. TORBORG:
5    Q.  Do you know if --
6    A.  Right.
7    Q.  Do you know if Oklahoma had MACs on the
8  44 complaint products?
9    A.  I do not.
10   Q.  What if they did, and Oklahoma had a
11 policy to pay 200 percent of what it believed to
12 be acquisition costs?  Would that be problematic
13 in your analysis?
14       MR. LAVINE:  Object to form.
15       THE WITNESS:  It is possible there could
16 be cases where -- so I guess I'm not clear exactly
17 -- so could you just restate the question?
18 BY MR. TORBORG:
19   Q.  I've kind of done the best I can.
20   A.  Yes.  Okay.
21   Q.  The question is, if there was a policy
22 in Oklahoma to pay 200 percent of what it believed

Page 790

1  to be the acquisition cost of the product, would
2  that be problematic for your analysis?
3        MR. LAVINE:  Object to form.
4        THE WITNESS:  Not necessarily.  It would
5  just -- it would depend on whether these MAC
6  prices were used for the products at issue in the
7  case, and whether the state would allow an AWP
8  that would result in the lower amount paid to be
9  used as --
10 BY MR. TORBORG:
11   Q.  When a state sets a MAC -- let me ask
12 you this.  You are aware of the fact, are you not,
13 Professor Duggan, that states across the country
14 in establishing MACs don't often just set it at
15 the acquisition price, right?
16        MS. THOMAS:  Objection.  Form.
17        THE WITNESS:  It may vary somewhat
18 across states and over time, how exactly they
19 arrive at a MAC.
20 BY MR. TORBORG:
21   Q.  Are you aware of the fact that there are
22 states across the country who set a MAC price at

Page 791

1  above what it thinks it costs the average
2  pharmacist to purchase the drug?  Are you aware of
3  that evidence?
4        MR. LAVINE:  Object to the form.
5        THE WITNESS:  The determination of MAC
6  prices is not something that I exhaustively
7  studied in this, so I certainly am aware of
8  certain cases where that might have been true.
9  BY MR. TORBORG:
10   Q.  And if a state sets a maximum allowable
11 cost above what it believes the average provider
12 pays for the drug, as an economist, what does that
13 tell you about the policy of the state?
14        MR. LAVINE:  Object to form.
15        THE WITNESS:  It would be -- it would
16 just depend.  I would need more information to
17 make an inference about the goals of a policy, but
18 that's one piece of information.  I'd need more
19 information.
20        MR. TORBORG:  Mark this as our next
21 exhibit.
22        (Exhibit Abbott-Duggan 004 was

41 (Pages 788 to 791)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 792

1   marked for identification.)
2   BY MR. TORBORG:
3       Q.  For the record, what I've marked as
4   Abbott Duggan 4 is a document that was produced by
5   the State of Washington.  It bears the Bates
6   number USVAbbott WA-00001570 through 87.  I'd like
7   to ask you to go to the second page of the
8   document.
9       A.  Okay.
10      Q.  There is a discussion.  This folder --
11  this document was produced in a folder, it had a
12  MAC history.  And the second page is titled, MAC
13  policies and rules governing assignment of MAC
14  prices.  I'd like to go to the second paragraph.
15  It states, the maximum allowable MAC -- I'm sorry.
16  The maximum allowable cost, MAC, process began
17  with the establishment of a recommended MAC price
18  generated by the computer.  This price was a
19  guarantee availability of at least three
20  manufacturers to provide the drug --
21      A.  Wait.  I'm sorry.  Where are you again?
22      Q.  Second paragraph.

Page 793

1       A.  Okay.  Yes.
2       Q.  This price was to guarantee the
3   availability of at least three manufacturers to
4   provide the drug and to be used as a basis to
5   compare costs regionally across national averages.
6   It is also used to compare against the prices that
7   pharmacists pay through local distribution
8   systems.  Once a complete list of potential MAC
9   drugs is developed, representatives from WSPA and
10  MAA met to establish the MAC for each drug.  Price
11  information from distributors, wholesalers,
12  manufacturers, federal upper limit data, and MAA
13  files were used to ensure whatever MAC price
14  developed was workable, fair and consistent.
15  Consensus was reached on each drug.  Do you see
16  that?
17      A.  I see it.
18      Q.  Now, did you make any effort to
19  determine whether or not states believed that the
20  MAC prices that they set for their drugs were
21  workable, fair and consistent?
22          MR. LAVINE:  Object to form.

Page 794

1           THE WITNESS:  Did I make any effort to
2   determine if my -- if the 125 percent, the prices
3   used in my analysis are -- is that the question?
4   BY MR. TORBORG:
5       Q.  No.
6       A.  Okay.  Sorry.  I'm trying to --
7       Q.  The question was, there are states which
8   have MACs on the NDCs at issue in this case,
9   correct?
10      A.  Right.  Correct.
11      Q.  And you're not familiar with in each
12  instance with the process that states used to
13  establish those MACs, right?
14          MR. LAVINE:  Object to form.
15          THE WITNESS:  Right.  I certainly don't
16  know all of them or -- right.
17  BY MR. TORBORG:
18      Q.  It may be that the state met with
19  pharmacy providers and they talked about a price
20  that, all things considered, including issues of
21  availability, what it costs to dispense the drug,
22  et cetera, arrived at a price they thought was

Page 795

1   fair and workable, right?
2       A.  I'm not sure.  I guess I don't
3   understand the -- the question.
4       Q.  Is it not possible that state Medicaid
5   programs and providers engaged in a process where
6   they looked at proposed MAC levels, considered all
7   the issues that might go into drug payment policy
8   and decided on a MAC level that was fair and
9   workable?
10          MR. LAVINE:  Object to form.
11          THE WITNESS:  It is possible.  It's just
12  not an area that has been the focus of my
13  analysis.
14  BY MR. TORBORG:
15      Q.  I'm going to do one quick area of
16  questioning, and then I'll get to some binders, if
17  that's okay?
18      A.  If we can do -- I don't know, we are
19  coming back on an hour.
20      Q.  Do you want to take a break now?
21      A.  Sure.  If now is a natural time.
22      Q.  It is.

42  (Pages 792 to 795)

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
Washington, DC

Page 796

1    A.  Okay.
2    Q.  Let's do that.
3        THE VIDEOGRAPHER:  The time is 2:47 p.m.
4  This completes tape number two.
5        (Recess.)
6        (Exhibit Abbott-Duggan 005 was
7  marked for identification.)
8        THE VIDEOGRAPHER:  The time is 3:08 p.m.
9  This begins tape number three.
10 BY MR. TORBORG:
11   Q.  Welcome back, Professor Duggan.
12   A.  Thank you.
13   Q.  We are going to get into some very
14 boring stuff here.  I've handed you a binder that
15 has tabs A through L.  And A through K -- behind A
16 through K are various printouts of what I think
17 you'll tell me are the STATA logs from your
18 analysis in this case.
19   A.  Right.  This is a subset of them.
20   Q.  Subset of them.  And if -- why don't we
21 start with Tab A.
22   A.  Okay.

Page 797

1    Q.  The file name at the top there, does
2  that help you identify what this -- what we are
3  seeing here behind Tab A?
4    A.  Yes.  It does.
5    Q.  What is it?
6    A.  Yes, it does help me.  Oh, I'm sorry.
7  It's -- it appears to be one of the files for the
8  State of California.
9    Q.  How many files do you have for the State
10 of California related to your Medicaid analysis?
11   A.  Right.  I don't have the directory in
12 front of me.  But I believe I had more than one,
13 because I think California was the first state
14 that I tackled, so as I got familiar with the
15 data, and so forth.
16   Q.  Included in the file name is something
17 called -- there is some letters that say MGD-
18 final.  Do you see that?
19   A.  Yes.
20   Q.  What does that mean?
21   A.  I think that is -- I think I -- if I
22 recall, I created basically a -- created a

Page 798

1  directory that -- you know, shortly before or
2  perhaps it was shortly after the -- my report was
3  finalized on June 19th.  And so this -- you know,
4  I wrote a report and then basically copied the do
5  files, the log files and so forth into this big
6  directory, MGD-final.
7    Q.  What does the final indicate?
8    A.  If I remember correctly, this is not --
9  if you look at the, at the -- at lines 2 and 3,
10 you see that that doesn't have the MGD-final in
11 it.  Basically, I just created a directory on an
12 external drive that I gave to Ian Dew, Mr. Ian Dew
13 at Steck Consulting for production.  So I just --
14 I don't know, perhaps I already had a directory on
15 there named MGD.  I'm not sure.  But it was just
16 meant to say, here's the production of the stuff
17 that went into my report.
18   Q.  MGD are your initials?
19   A.  Yes.  That's right.  Oh, I'm sorry.  If
20 that's what you were asking, I apologize.  Mark
21 Gregory Duggan.
22   Q.  And the 93 -- at the bottom at the end

Page 799

1  of the file name is 9301.  That signifies the
2  period of time that you had claims data for
3  California, 1993 through 2001, am I right?
4    A.  That -- I'm pretty sure that's right.
5  Yes.
6    Q.  And these are STATA that you prepared,
7  at least this one is, right?
8    A.  That's correct.
9    Q.  And you provided this to Steck
10 Consulting, is that right?
11       MR. LAVINE:  Object to form.
12       THE WITNESS:  Right.  My recollection is
13 that this was one of the files, this represents
14 the output of what is called a do file in STATA,
15 so this is the output of a do file that's probably
16 named CA-93-01.do.
17 BY MR. TORBORG:
18   Q.  What's a do file?
19   A.  I'm sorry.
20   Q.  As in Ian Dew or is that something else?
21   A.  No.  So Ian Dew is D-E-W, do file is D-
22 O.  So it basically is a file that executes a

43 (Pages 796 to 799)

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 800

1  program or set of programs typically for the
2  analysis of a data set.
3      Q.  So this log explains or memorializes
4  what you did in your California analysis for
5  Medicaid, right?
6          MR. LAVINE:  Object to form.
7          THE WITNESS:  As I said, I'm not sure if
8  this is the -- I haven't looked through it all,
9  but that seems -- that seems plausible.
10 BY MR. TORBORG:
11     Q.  Let's go to page 28, if we could.
12         MR. LAVINE:  I'm sorry, you're going to
13 page 28 of what?
14         MR. TORBORG:  Of Tab A.
15         MR. LAVINE:  I'm sorry.
16         MR. TORBORG:  Bottom right corner.
17         MR. LAVINE:  Mine starts on 41 and then
18 goes back to number 1.
19         MR. TORBORG:  It does?
20         MR. LAVINE:  Okay.  Go ahead.
21 BY MR. TORBORG:
22     Q.  Okay.  If we go to line 1085 of page 28,

Page 801

1  do you see that?
2      A.  Yes.
3      Q.  There is language that says
4  PROFNL_fee_fee.  What does that mean?
5      A.  I believe that is the dispensing fee.
6      Q.  Is this the dispensing fees that are
7  observed in the data?
8      A.  I -- yes, I believe this is true, but we
9  are -- yes.  Yes.  I believe that's a variable
10 that's included in the claims data.
11     Q.  And page 29 has similar --
12     A.  Frequency distribution.
13     Q.  Has similar tables for this professional
14 fee that we see in the data variable, right?
15     A.  That's correct.
16     Q.  And there is some -- my understanding of
17 this is is you have more than one table here
18 because there was some issues with California
19 having some slight changes based on the Balanced
20 Budget Act reduction or something like that, is
21 that right?
22     A.  Sounds plausible.

Page 802

1      Q.  And if you see, if you go to page 29,
2  for example, line 1122.
3      A.  Uh-huh.
4      Q.  This is showing you for this category of
5  claims, the distribution of the professional fees
6  and the data.  You've got zero -- you've got 3,148
7  claims with zero.  And so forth, right?
8      A.  Right.
9          MR. LAVINE:  Object to form.
10 BY MR. TORBORG:
11     Q.  If you go to the next page for this
12 category of claims, you've got about 20,000 claims
13 with a zero dispensing fee, right?
14         MR. LAVINE:  Object to form.
15         THE WITNESS:  Yes.
16 BY MR. TORBORG:
17     Q.  If we go to page 31, line 1195 through
18 1199, there is language that says, if billed
19 amount was used, EST paid would fall if formula
20 generates lower paid amount than the billed amount
21 previously did, be conservative by assuming
22 minimum 4.05 fee, if the fee is set to zero in the

Page 803

1  claim.  Do you see that?
2          MR. LAVINE:  You read that wrong.  You
3  read minimum instead of maximum.
4          THE WITNESS:  Be conservative by
5  assuming the maximum 4.05 dollar fee if the fee is
6  set to zero in the claim.
7  BY MR. TORBORG:
8      Q.  What's -- can you tell me what's the
9  purpose of this logic, this language in your
10 STATA?
11     A.  So if I recall correctly, you're looking
12 at a subset of this log file, but I believe here -
13 - so we've observed that in some cases the
14 dispensing fee fell below $4.05, 3.03, 2.02 and
15 zero from the preceding frequency distributions.
16         And so -- so with the caveat that I
17 don't remember all the nuances to the California
18 data as I did this eight and a half months ago,
19 but my recollection is that if there is a -- if
20 they are paying the charged amount, it might not
21 be obvious what the -- what dispensing fee would
22 have been used if they had not paid the charged

44  (Pages 800 to 803)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 804

1  amount.
2       Suppose we consider two worlds.  A claim
3  in which there is a charged amount of 30 and that
4  same claim with the charge amount of 50.  In the
5  first case, the charged amount would be used.  In
6  the second case, maybe it wouldn't.
7       What dispensing fee would they have used
8  in there.  In plugging in the alternative AWP and
9  running it through the adjudication formula, I add
10 to it the $4.05 fee, so once again, with the
11 caveat that I don't know -- I can't remember all
12 the nuances to this data, my guess is that, you
13 know, without further drilling down on this, my
14 guess is that here I can't tell if they would have
15 used 4.05, 3.03, 2.02 or zero.  I will use 4.05.
16 That will result in a higher amount paid, and thus
17 a lower difference than if I sometimes use zero,
18 2.02 or 3.03.
19     Q.  Is it your understanding that when a
20 claim is reimbursed at charges, it often does not
21 include a separate dispensing fee for the data?
22     A.  Yes.

Page 805

1      Q.  And what you're doing here is you're
2  saying -- well, strike that.
3       And what you're saying in that situation
4  is, well, if I'm going to -- actually, why don't
5  you explain why you're adding a dispensing fee to
6  the --
7      A.  Yes, sure.
8      Q.  To the claims where there is zero
9  dispensing fee in the data?
10     A.  So in adjudicating the claim, typically
11 a state would compare the result that obtained
12 from the formula with the charged amount.  And the
13 formula would include the dispensing fee.  Okay.
14      And so just to put numbers on it, let's
15 say the -- given the AWP that was in effect, there
16 was a calculation of the ingredient cost of 30, a
17 dispensing fee of 4, and a charged amount of 25.
18 So 34 exceeds 25 in that example, the state would
19 pay 25.  Okay.  But now I use an alternative AWP
20 and that 30 changes to 15.  Okay?
21     Q.  Okay.
22     A.  And then -- but I -- you know, once

Page 806

1  again, not remembering the nuances of the
2  California data right here, but my -- from what
3  I'm doing here on the subtitle of the program, my
4  guess is that I couldn't tell when it paid the
5  charged amount, would they have used the $4.05
6  professional fee that they typically use, or would
7  they have used one of those other one, 3.03, 2.02
8  or zero.
9       And so I just basically use the 4.05,
10 which will result in the highest amount paid, and
11 thus the lowest difference.  You know, as we saw,
12 there were a non-trivial number of cases where
13 zero, 2.02 or 3.03 were paid.  But I'm just going
14 to assume in all cases that it's 4.05 there.
15     Q.  Because what you're doing in your
16 analysis to use your hypothetical?
17     A.  Yes.
18     Q.  You're now reducing ingredient costs to
19 $15, right?  But that claim that was paid at the
20 $25 at charged amount may not have a dispensing
21 fee associated with it in the data, correct?
22     A.  That's right.

Page 807

1      Q.  And so you're, in effect, imputing a
2  dispensing fee, so you're adding the $4 and $15,
3  right?
4      A.  Right.
5      Q.  And that's something that you feel is
6  necessary, and otherwise you wouldn't have paid a
7  dispensing fee on that claim?
8      MR. LAVINE:  Object to form.
9      THE WITNESS:  Right.  So I'm -- I'm just
10 trying to basically replicate the algorithm that
11 they used to arrive at the amount paid with this
12 alternative AWP.  And so in some cases, in that
13 example, I'm saying the paid amount would be 19.
14 It may be that the paid amount would be 18, 17 or
15 15 in some cases but I'm just saying it would have
16 been, it would have been 19.
17 BY MR. TORBORG:
18     Q.  Now, you say here that be conservative
19 by assuming the maximum $4.05 fee if the claim is
20 set to zero in the claim, right?  What that means
21 is that if the data for whatever reason has zero
22 in the professional fee column --

45  (Pages 804 to 807)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 808

1      A.   Yes.
2      Q.   You're going to -- when you do the but-
3   for -- your but-for number, you're going to add
4   $4.05, right?
5           MR. LAVINE:  Object to form.
6           THE WITNESS:  Right.
7   BY MR. TORBORG:
8      Q.   All right.  So for all of the instances
9   where there is -- you observe a zero in the
10  dispensing fee column on pages 28 through 30 for
11  all those claims that have zero, you're adding
12  4.25 in your but-for payment amount, correct?
13          MR. LAVINE:  Object to form.
14          THE WITNESS:  All right.  So in a case
15  where it is zero, so I think this variable check
16  that we were -- that there is six different
17  frequency distributions that we looked on in
18  tables 28 to 30.  And now this is starting to
19  become -- starting to jog my memory somewhat.
20          So there are two things here.  There is
21  the 1, 2, 3, 11, 12 and 13 are the six possible
22  values.  And it appears that the first three are

Page 809

1   for those cases where the formula was used, and
2   the last three are those for which the provider
3   charged amount was used for the payment amount.
4   And so for the sort of 27 percent observations
5   where the charged amount was used, I use a
6   professional fee of $4.05 when zero is listed in
7   the claim.  So --
8      Q.   Can I back you up one second?
9      A.   Sure.  Yes.
10     Q.   You said that you've got different
11  frequencies.  Are you referring to the different
12  charts that are next to the language PROFNL_fee?
13     A.   So if we start at line 1083, so that --
14  in economics one refers to that as -- would refer
15  to that as a frequency distribution.  It tells you
16  the frequency with which $2.03, $3.04 and $4.05
17  are observed in the data.
18          And so this is a frequency distribution.
19  So I'd start with doing the unconditional
20  frequency distribution for all of the claims tab
21  check missing on line 1069.  That's all of them.
22  That's the -- that is the overall distribution of

Page 810

1   this variable check.  And then there is six
2   different possibilities and then I do the
3   dispensing fee frequency distribution separately
4   for each of the six different values of check
5   corresponding to charged amount versus -- and you
6   know, these budget reductions that you talked
7   about also.
8      Q.   Now you said something about the first
9   three being formula amounts, and the last three
10  being at charged amounts, something like that?
11     A.   Correct.
12     Q.   How do you get that?
13     A.   I'm just recalling this is -- you know,
14  I haven't looked at the first 27 pages, but if I
15  recall, I basically here tried to determine for
16  each claim, so there are these six different
17  values, and it appears that if -- if it appears
18  that the -- the value -- so there are two digits
19  to this check variable, so that the first digit
20  refers to whether or not it was paid at charged
21  amount and the second digit to whether or not
22  there was a 25, 50 cent or zero reduction in the

Page 811

1   amount paid.
2           And so this is just now -- this is
3   churning up my memory now.  And obviously I
4   haven't looked at this program in a little while
5   but it's churning up my memory as to what -- what
6   this variable represents.
7      Q.   And so the check one, two and three are
8   claims that were not reimbursed at charges, right?
9      A.   Right.  Where the charged amount perhaps
10  was greater than the amount that obtained from the
11  formula.
12     Q.   Okay.
13     A.   And so charged amount wasn't used, was
14  not the paid amount.
15     Q.   In the actual world, like what actually
16  happened, right?
17     A.   Yeah.  That's right.
18     Q.   11, 12 and 13 are those that are
19  reimbursed at charges?
20     A.   Exactly.  So it could be, as I go
21  through this, it could be that the claims on which
22  the charged amount is paid, when I used an

46  (Pages 808 to 811)

96f198b7-ae91-4060-90e1-699fb4165f81

Page 812

1  alternative AWP, the paid amount may then fall
2  below the charged amount which -- and so that's
3  basically what I think the next part -- what I do
4  subsequently.
5      But you can basically see if -- if you
6  go down a little bit, let's say at line 1160 or
7  so, you can see that the difference between the
8  amount paid -- so if you add the professional fee,
9  the allowed amount, it is 25 cents greater than
10 the reimbursement amount.  And this is this 25
11 cent reduction.  For check value of two, it's a 50
12 cent difference.  And for check value three, there
13 is no difference.  So in any case, the -- but that
14 -- now this is coming back to me somewhat.
15     Q.  Okay.  I think you said that you -- did
16 you only add the $4.05 dispensing fee when the
17 claim was paid at charges?
18         MR. LAVINE:  Object to form.
19         THE WITNESS:  No.  If you go to line
20 1185, you'll see I generate this variable EST paid
21 which is the estimated amount paid using this
22 alternative price.  And it is equal to this

Page 813

1  variable INGRED, which I'm -- which above would be
2  the ingredient cost that would result if the
3  alternative AWP was used plus the professional fee
4  minus 25 cents for the check equals one world,
5  minus 50 cents for the -- so I'm using the
6  professional fee for those places where the
7  formula was used.
8      And then for the charged amount cases, I
9  basically am doing the same thing unless the
10 professional fee is zero.  You know, if I had --
11 and so here I'm saying, add in the $4.05
12 dispensing fee even if it says zero in the -- in
13 the claims data for the charge -- for the charge
14 payments, because it is plausible that even if --
15 if this alternative AWP would have overridden the
16 charged amount, but the $4.05 would have been used
17 in the majority of cases.  So I'm just going to
18 assume it's used in all of them.  That's going to
19 result in a lower difference than would obtain if
20 -- if I didn't do that adjustment.
21     Q.  Yes.  And you don't have any instances
22 of zero in the dispensing fee amount for the first

Page 814

1  three?
2      A.  There are a tiny number, if I recall, so
3  --
4      Q.  I don't see it.
5      A.  Okay.  I guess they are not.
6      Q.  I'm looking at the first three, they are
7  all at 2.03, 3.04 or 4.05?
8      A.  So they are not.
9      Q.  Right.  So for all the at charges ones
10 that had a zero in there, you're adding 4.05?
11     A.  Yes.
12     Q.  For the reasons we talked about?
13     A.  Right.
14     Q.  Okay.  If I can ask you to go to Tab H.
15 Is this your STATA log, at least one of them for
16 the State of Missouri?
17     A.  That's what it looks like.  MO.  That
18 would be Missouri.  9801.
19     Q.  And this is also, at least titled at the
20 top, the final one?
21     A.  It's in this final directory, but that's
22 just because I put everything, all of my do log

Page 815

1  and STATA files into this final directory.  This
2  is like the final production.
3      Q.  Do you know if there is a newer one of
4  this, like a more updated one?
5      A.  Missouri 9801?
6      Q.  Yes.
7      A.  Not that I -- I don't believe so.  But
8  there may be -- with the caveat, there may be in
9  this directory, MO 9801 B.log, which I'm not sure.
10     Q.  If we go to page 12 of this log, behind
11 Tab H.  Line 452, the language, do they pay
12 charged amount.  And then the -- some lines that
13 follow, here is where your STATA is asking the
14 data to tell you whether or not the claim was paid
15 at charged amount, right?
16     A.  Yes.
17     Q.  And you determined that it was paid at
18 charged amount if the difference between the
19 amount billed and not paid was less than 5 cents,
20 is that?
21     A.  Half a Penny.
22     Q.  Half a Penny.  Okay.

                              47  (Pages 812 to 815)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

---

Page 816

1     A.   So basically, it turns out that in
2  STATA, you can have two numbers that look
3  identical, 1863 and 1863, but they may be eight
4  digits out not exactly the same, so I just do this
5  to make sure there are no quirks like that in the
6  data.
7     Q.   Okay.  And a one in the -- in line 461,
8  that indicates that this number of claims were
9  paid at charges, right?  So 19,973 were paid at
10  charges?
11    A.   Yes, that's right.
12    Q.   26.49 percent?
13    A.   Yes.
14    Q.   Of the total of 75,389 claims, right?
15    A.   Yes.
16    Q.   And I was assured to actually find these
17  figures on page 63 of your report?
18    A.   That's good.
19    Q.   So I think I understand what's going on.
20    A.   Uh-huh.
21    Q.   So you've got 19,973 claims that are at
22  charges, right?

---

Page 817

1     A.   Yes.
2     Q.   Now if we go to page 16, line 619, 620,
3  your STATA states, now figure out amount paid, be
4  conservative and assume 428 if pay charged.
5  Right?
6     A.   Okay.
7     Q.   So is this your direction in STATA to
8  impute a $4.24 dispensing fee to all claims that
9  are paid at charges?
10    A.   I'm just going to look it over for a
11  second just to -- yes.  So you can see there,
12  there is a similar frequency distribution.  In
13  this case, I don't have this -- these three
14  different -- I don't have six different frequency
15  distributions.
16         Before for California, there was charged
17  versus not paid at charged, and then the 25.50
18  with zero cent reduction, so there are six
19  different scenarios.  Here, there are two
20  scenarios, pay charged and not pay charged.  And
21  you can see here that again this dispensing fee is
22  often zero for these claims on which the charged

---

Page 818

1  amount is paid.
2     Q.   Almost always.  19,679 of the 19,973?
3     A.   Right.
4     Q.   Claims paid at charges, you're imputing
5  a dispensing fee of $4.24, right?
6     A.   That's right.
7     Q.   Similar to what you did in California?
8     A.   Right.
9     Q.   Now, there also appears to be, according
10  to this table, 10,806 claims where there is no
11  dispensing fee in the data.  For claims that were
12  not paid at charges, right?
13         MR. LAVINE:  Object to form.
14         THE WITNESS:  Right.
15  BY MR. TORBORG:
16    Q.   Okay.  Now, why would there be 10,806
17  claims not paid at charges where the dispensing
18  fee was zero?
19    A.   I don't recall right now.  It could be
20  that -- yeah.  I'm not sure.  I don't recall
21  specifically.
22    Q.   And do you add a dispensing fee or

---

Page 819

1  impute a dispensing fee at all for those 10,806
2  claims?
3     A.   I do not impute one to those, to those
4  10,000.  I do to the other 20,000, but not those
5  10,000.
6     Q.   Okay.  Why not?
7     A.   Because it is my -- I would have to go
8  back and refresh my memory, churn up my memory on
9  this, but it could be that for these claims,
10  perhaps a dispensing fee wasn't paid if there
11  were, if there was a -- if there -- if in certain
12  circumstances, a dispensing fee wasn't paid even
13  if the ingredient cost was used.
14    Q.   When you say ingredient cost, do you
15  mean the AWP?
16    A.   Right.
17    Q.   The AWP formula?
18    A.   The AWP formula, right.  Right.
19    Q.   So when I looked at this, this seemed a
20  little odd, because I always understood that if
21  the AWP formula is used, you'd have a dispensing
22  fee, right?

---

Henderson Legal Services, Inc.

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 820

1        MR. LAVINE:  Object to form.
2        THE WITNESS:  There may be cases in
3   which the dispensing fee would be -- would be
4   zero.  For example, it could be -- you know, once
5   again, not drilling down on the specifics of the
6   Missouri Medicaid adjudication algorithms here,
7   there may be -- it may be that if a person had a
8   certain number of prescriptions, there are
9   multiple NDCs on the same quote claim, they
10  wouldn't pay a dispensing fee on both of them.  I
11  don't know.  I would just need to go back and
12  look.  But it -- but --
13       Q.   You're not -- you're not sure, right?
14       A.   Yes.  I would need to drill down on that
15  some more for exactly why those are zeros.
16       Q.   Assuming we come back for another day,
17  that would be a question maybe I'll ask you again.
18       A.   Okay.
19       Q.   See if we can get to the bottom of it.
20  Is it also possible that these were paid at
21  charges, but the charge amount was more than half
22  a cent different than the paid amount?

Page 821

1        A.   It is -- I just -- I wouldn't want to
2   speculate.  I would just want to drill down on
3   that more, to see what are the common
4   characteristics of those claims.
5        Q.   But in any event, in your but-for
6   analysis here, rightfully or wrongly, we've got
7   10,806 claims out of 75,389 in your Missouri
8   analysis for which there is no dispensing fee
9   being added in your but-for scenario, correct?
10       MR. LAVINE:  Object to form.
11       THE WITNESS:  That is -- that is correct
12  but you know, as I said, it may be that this is
13  part of one -- I would want to drill down on that,
14  but for these 10,806, the dispensing pee is zero,
15  that's right.
16       And just, you know, it's useful to have
17  a sense of the quantitative importance of this, it
18  would be about $45,000 out of a total difference
19  of about 3.2 or 3.3 million.  So a bit more than
20  one percent of the total difference would be -- if
21  -- suppose that one were to impose 4.24 on those
22  10,806.

Page 822

1   BY MR. TORBORG:
2        Q.   What you're saying is a change may be
3   necessary, but it would not, in your view, be
4   material to your analysis?
5        MR. LAVINE:  Object to form.
6        THE WITNESS:  I'm just trying to give a
7   sense of the quantitative importance of it.
8   Possible the upside quantitative importance of it,
9   but it is -- given that you just said that this is
10  an issue that -- given what you said about this is
11  being an issue that is of interest, it's something
12  that I could drill down on in the same way that I
13  drilled down on footnote 45 for you.
14  BY MR. TORBORG:
15       Q.   I'm just trying to figure out what's
16  going on.
17       A.   Yes.
18       Q.   If we could go to Tab E.  Is this a
19  similar STATA analysis for the State of Kentucky?
20       A.   Yes.  From 1995 -- at least part of 1995
21  to 2001.
22       Q.   And if we go to page 10, line 355

Page 823

1   through 362, this is the part of your STATA
2   analysis where you calculate the number of claims
3   paid at charges?  Correct?
4        A.   Paid at the charged amount.  Yep.
5        Q.   And your analysis finds 21,753 claims
6   that are paid at charges, correct?
7        A.   Yes.
8        Q.   If we go to page 11, there is a -- we
9   start at line 413 through 419, could you tell me
10  what this chart is?  Let me back up.  It will help
11  us get through.  Go back to page 10.
12       A.   Sure.  I'm splitting out the time period
13  into three different time periods.  And so it's
14  just a frequency distribution of the dispensing
15  fee for each of the three different time periods.
16       Q.   If we go to page 10, line 379, the total
17  claims at this point in the analysis is 100,007,
18  right?
19       A.   Uh-huh.
20       Q.   And we go to page 11 and the
21  distribution analysis of the dispensing fee we
22  have the same number of claims, 100,007, right?

49  (Pages 820 to 823)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 824

1    A.  Right.
2    Q.  And this shows 6,105 claims throughout
3  these three different time periods that have a
4  zero dispensing fee, right?
5    A.  Yes.
6    Q.  But on page 10, we see there were 21,753
7  claims at charges, right?
8    A.  Yes.
9    Q.  Why would there be -- would this mean
10  that there are dispensing fees for claims that
11  were paid at charges?  Is that how you would
12  interpret the data?
13      MR. LAVINE:  Object to form.
14      THE WITNESS:  I would want to go back
15  and look at it a bit more carefully, but based on
16  this extract of my program, extract to the output
17  of my program, my guess is that this field may be
18  populated, even if it isn't paid.  So it just may
19  be, you know, states differ a bit.  One, states
20  differ a bit.  And the -- and their coding of the
21  Medicaid claims, so it seems plausible.  It would
22  -- you know, I'd want to refresh my memory a bit

Page 825

1  more.  But it seems plausible to me that these --
2  that for -- in these cases, the field was
3  populated even if it wasn't used in calculating
4  the exact amount paid.
5    Q.  Which field are we populating, the
6  dispensing fee?
7    A.  The dispensing fee.  That's right.  As
8  it was for some of the cases, for example, in
9  California.
10    Q.  There were instances where the --
11    A.  Dispensing fee was populated and it was
12  paid at charges.
13    Q.  So in any event, we have 21,753 claims
14  that are paid at charges?
15    A.  Uh-huh.
16    Q.  Right?
17    A.  Yes.
18    Q.  Go to line 15.  I'm sorry.  Page 15.
19  Line 558.  Do you see that language there?
20    A.  Uh-huh.
21    Q.  Can you tell me what that language is
22  doing?

Page 826

1    A.  Which line am I on again?
2    Q.  568.  It starts with GEN EST paid
3  equals.
4    A.  Sure.  So in this case, it appears that
5  in taking the minimum of the estimated ingredient
6  cost which is calculated on line 565, add it to
7  the dispensing fee as it appeared in the frequency
8  distribution above, taken the minimum of that sum
9  and the charged amount.
10    Q.  So this shows that in calculating your
11  but-for reimbursement amounts, you're including
12  the dispensing fee that was in the data, correct?
13      MR. LAVINE:  Object to form.
14      THE WITNESS:  Yes.
15  BY MR. TORBORG:
16    Q.  Which means that if the dispensing fee
17  was zero in the data, you did not impute a
18  dispensing fee to that claim, correct?
19    A.  Well, as -- you know, as someone who
20  works with -- I don't have the -- as I said above,
21  it may be that the dispensing fee variable was
22  populated just as frequently from the charged

Page 827

1  amount as it was for the other claims.  I'm not
2  sure.  But this is a bit different from what I did
3  for the California example or the -- or the
4  Missouri example, but this may reflect differences
5  in how they populate this field.  So it -- as we
6  saw above, there were -- there were -- the zeros
7  seemed to be less frequent here than before.
8    Q.  What I see in your STATA, Professor
9  Duggan, is you've got 61,005 claims where the data
10  shows no dispensing fee was paid, correct?
11      MR. LAVINE:  Object to the form.
12  BY MR. TORBORG:
13    Q.  That's on page 11, line 416?
14    A.  Yes.  6,105, so 6.1 percent of the
15  100,000.
16    Q.  Where in the STATA do you, if you do,
17  add -- or impute any dispensing fee to those
18  claims when you do your but-for price?  Because I
19  don't see it.
20    A.  Right.  I mean, once again, this is -- I
21  would need to look into this some more, but it
22  appears from this extract of my program that for

                              50 (Pages 824 to 827)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 828

1  this -- in this example, I may not be imputing it
2  and it may simply be because, you know, just of
3  differences in the way -- in the characteristics
4  of these zeros across the different states.
5        So with each of these states, rather
6  than using one algorithm and just applying it, I
7  tried to tailor it based on what was -- what
8  information was provided in the claims, so you
9  know, each time I would try to drill down, drill
10 down, drill down to get the most accurate estimate
11 possible. So I would need to go back and refresh
12 my memory on some of this, because this is a --
13 this is a -- you know, this is something that
14 could be examined. I just -- it's hard to do it
15 right here. It's hard to do it justice right
16 here.
17    Q.   But as we sit here today, it looks like
18 we've got 6,105 claims where your but-for price
19 does not include a dispensing fee?
20       MR. LAVINE:  Object to form.
21 BY MR. TORBORG:
22    Q.   Correct?

Page 829

1     A.   For these claims, yes, and that may be -
2  - right, so for these 6,105, yes.
3     Q.   And that -- that may be an oversight
4  that needs to be corrected. You just want to
5  think about it some more before telling me whether
6  you think there might need to be a change?
7        MR. LAVINE:  Object to form.
8  BY MR. TORBORG:
9     Q.   Is that right?
10    A.   You know, it's -- it is -- this is
11 drilling down quite deeply until one of the many
12 programs that I wrote. And so it is -- it is not
13 that I think that what I did here was wrong, but
14 I'm always open to exploring things to -- you
15 know, if there, if there is something. I mean, I
16 want my analysis to be as accurate as possible. I
17 think it's correct, but this is -- you've raised a
18 question. I'm happy to explore it.
19    Q.   Well, in California, you imputed a
20 dispensing fee for all of the at charge claims
21 that had a zero dispensing fee in the data,
22 correct?

Page 830

1     A.   That's correct. Yes.
2     Q.   For the reasons that we talked about,
3  you don't need to do it again, right?
4     A.   Right.
5     Q.   Here, what I'm saying is 6,105 claims
6  with a zero dispensing fee, for claims that could
7  have been paid at charges, your data doesn't tell
8  me that, where you're not adding a dispensing fee?
9        MR. LAVINE:  Object to form.
10 BY MR. TORBORG:
11    Q.   I'm trying to figure out whether that's
12 an inconsistency.
13       MR. LAVINE:  Object to form.
14       THE WITNESS:  You know, once again, I
15 don't necessarily think that it is. I think in
16 California, what was striking was that those zeros
17 all arose from the claims that were paid at
18 charges, at charged amount.
19       And not having the time to look over the
20 whole program, it seems plausible to me that
21 California was just different, and so I don't see
22 it as necessarily an inconsistency. As I say,

Page 831

1  the program -- going from one state to another,
2  the program necessarily -- my algorithm
3  necessarily changes because the details of each,
4  each data set and so forth differs. So I don't
5  see it as an inconsistency, but it's hard to do it
6  justice right here. I mean, if I had the computer
7  in front of me, I could try to do it, but it's
8  hard to.
9  BY MR. TORBORG:
10    Q.   The 6,105 claims that have a zero
11 dispensing fee in the data, do you know if those
12 are paid at charges, those claims were paid at
13 charges?
14       MR. LAVINE:  Object to form.
15       THE WITNESS:  I certainly don't recall.
16 BY MR. TORBORG:
17    Q.   Let's go to Tab G. Is this a STATA log
18 showing your evaluation for the State of Michigan?
19    A.   Yes, it is.
20    Q.   Let's go to line 9?
21    A.   Line 9 or page 9.
22    Q.   I'm sorry. Page 9. Do lines 326

                              51 (Pages 828 to 831)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 832

1  through 347 of page 9 contain your analysis in
2  STATA of the amount of claims paid at charges?
3        MR. LAVINE:  Object to form.
4        THE WITNESS:  It's a frequency
5  distribution of the pay charged variable versus
6  the quarter.
7  BY MR. TORBORG:
8     Q.  It shows that in the time period for
9  which you have Michigan's claims data, do you see
10 that, and the time period you have Michigan claims
11 data is just two years, right?
12    A.  From the state, I also have the SMRF MAX
13 claims data, but from the State of Michigan, I
14 believe these are the two years for which I have
15 data, yes.
16    Q.  For those two years, you've got -- your
17 analysis finds that 4,812 claims were paid at
18 charges, right?
19    A.  Uh-huh.  Correct.
20    Q.  And then on line 351, and carrying over
21 to page 10, your log states the prof fee as
22 written is sometimes greater than 11.22 or 11.27,

Page 833

1  but these amounts are the ones actually used.  Can
2  you tell me what that means?
3     A.  I believe here -- so once again, I
4  believe there was a small number of cases less
5  than 1 percent of the claims for which the
6  professional fee is written exceeded these numbers
7  of 11.22 and 11.27, but that I -- so once again,
8  it's hard to recall everything, but it seems that
9  these, this 11.22 and 11.27 were actually used,
10 not the ones that were populated in that
11 dispensing fee variable.  So you know, it's hard
12 for me to -- but for these 154 out of 17,000
13 claims, it appears there is a deviation there.
14    Q.  What is the -- when you say as written,
15 what does that mean?  Where is that written?
16    A.  As it appears in the data, I believe.
17 So here I'm just -- so it would probably be more
18 accurate here to say, as in the data.  So the
19 professional fee variable.
20    Q.  Then you say, the 11.22 or 11.27 were
21 the amounts that were actually used, right?
22    A.  Yes.

Page 834

1     Q.  Now, when you say actually used, that's
2  used by who?
3     A.  Used in determining the payment amount.
4     Q.  Okay.  So the data for some reason says
5  for some of these claims, dispensing fee is higher
6  than 11.22 or 11.27, but you figured out somehow
7  that's not what was paid?
8        MR. LAVINE:  Object to form.
9        THE WITNESS:  That's what it appears,
10 but I certainly don't remember the specific --
11 these specific 154 claims, but that's what it
12 appears.  Right.
13 BY MR. TORBORG:
14    Q.  Page, if you would, 13 --
15    A.  And if we could do a break at some time
16 soon, that would be great.
17    Q.  This is the last page I'm going to ask
18 you about on this.
19    A.  Okay.
20    Q.  Entire binder.
21    A.  Okay.
22    Q.  And I'll be done with this fun issue and

Page 835

1  then -- is that okay?  It will be a good breaking
2  point.
3     A.  Sure.  Sure.  That's fine.
4     Q.  Okay.  Line 492, it starts with G-E-N,
5  GEN logic?
6     A.  Right.
7     Q.  Can you tell me what that formula is
8  doing?
9     A.  That's generating this variable EST paid
10 which represents basically the amounts that -- the
11 amount that would be paid if the alternative
12 price, prices that I described have been used in
13 adjudicating the claim.  So it's the minimum of
14 the formula minus co-pay and the charged amount
15 minus co-pay.
16    Q.  This is where you calculate the but-for
17 price?
18        MR. LAVINE:  Object.
19 BY MR. TORBORG:
20    Q.  The but-for reimbursement, is that
21 right?
22        MR. LAVINE:  Object to form.

52  (Pages 832 to 835)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 836

1        THE WITNESS:  I -- yes.  Let me see.
2   That appears to be true.  Yes.
3   BY MR. TORBORG:
4        Q.   Now, where in your STATA logic do you
5   impute the dispensing fee to the 4,812 claims that
6   your analysis showed were paid at charges?
7        MR. LAVINE:  Object to form.
8        MR. TORBORG:  What can I do to improve
9   the question?
10       MR. LAVINE:  It's just misleading.
11       MR. TORBORG:  How is it misleading?
12       MR. LAVINE:  You're suggesting that
13  there is something in here that's not necessarily
14  in here.
15       THE WITNESS:  You know, I don't see it,
16  but once again, this was tailored to the State of
17  Michigan, and so -- but yes, I don't see the same
18  imputation that was done for California, for
19  example, occurring here.
20  BY MR. TORBORG:
21       Q.   Why -- is there any reason why you would
22  not impute a dispensing fee to the at charge

Page 837

1   claims in Michigan?
2        A.   It may be, once again, that that
3   variable is populated even if they paid the
4   charged amount.  So -- or there may be, you know,
5   I would -- I don't recall the specifics of that,
6   but it -- California was -- appears to have been,
7   at least based on, the looking at these log files,
8   appears to be somewhat different with respect to
9   having so many zeros populated for the charged
10  amount of claims.
11       Q.   Do you know if the 4,812 claims paid at
12  charges had a dispensing fee?
13       A.   I don't recall.  So -- yes, I don't
14  recall here, but that's -- once again, this is a
15  pretty, this is pretty deep down in the, in the
16  program, but I don't recall if those 4800 claims,
17  so --
18       Q.   Let's take a break.
19       THE VIDEOGRAPHER:  The time is 4:09 p.m.
20  We are going off the record.
21          (Recess.)
22       THE VIDEOGRAPHER:  The time is 4:29 p.m.

Page 838

1   We are back on the record.
2   BY MR. TORBORG:
3        Q.   Welcome back, Professor.  I'd like to
4   ask you to go to page 31 of your report.
5        A.   Okay.
6        Q.   Under the section A, Illinois Medicaid
7   reimbursement, you have a section there in the
8   first paragraph that discusses the reimbursement
9   formula for Illinois, is that right?
10       A.   Yes.
11       Q.   You note that they were paying 90
12  percent of AWP for both brand and generic drugs
13  from 1991 through June of 1995, correct?
14       A.   Yes.
15       Q.   And then this was changed in 1995 for
16  generic products to 88 percent of AWP, correct?
17       A.   Yes.
18       Q.   So Illinois increased the discount from
19  AWP for generic drugs, right?
20       A.   Yes.  In July of '95.
21       Q.   Do you know why Illinois did that?
22       A.   I do not.

Page 839

1        Q.   And then in July of 2001, they reduced
2   the scaling factor for generics to 80 percent of
3   AWP, correct?
4        A.   Yes.
5        Q.   And do you know why Illinois increased
6   its discount off of AWP for generic drugs in 2001?
7        A.   I do not.
8        MR. LAVINE:  Object to form.
9   BY MR. TORBORG:
10       Q.   As of July of 2001, your difference
11  calculation would serve to reduce your but-for AWP
12  by 20 percent for the complaint NDCs, correct?
13       MR. LAVINE:  Object to form.
14       THE WITNESS:  That is correct.
15  BY MR. TORBORG:
16       Q.   And then as of July 1995, your
17  difference calculation would serve to reduce your
18  but-for AWP for the complaint NDCs by 12 percent,
19  right?
20       MR. LAVINE:  Object to form.
21       THE WITNESS:  Correct.
22  BY MR. TORBORG:

53 (Pages 836 to 839)

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
                        Washington, DC

Page 840

1    Q.   But if you had applied your analysis to
2  brand name drugs, you would be only taking 10
3  percent off, correct?
4         MR. LAVINE:  Object to form.
5         THE WITNESS:  Seems plausible.  I'm not
6  sure, because I don't have that in front of me, so
7  I guess here I don't specify whether brand --
8  things also change for brand products.  So they
9  may -- it could be that it remained at 90.  It
10  seems plausible.
11  BY MR. TORBORG:
12    Q.   We can look at the Myers and Stauffer
13  summary.  That's what you would have relied upon,
14  right?
15    A.   Yes.  So it did remain AWP minus 10 for
16  brands.
17    Q.   So your analysis would result in the
18  State of Illinois paying a greater percentage off
19  market prices for generic drugs than brand name
20  drugs, correct?
21        MR. LAVINE:  Object to form.
22        THE WITNESS:  That's what -- the State

Page 841

1  of Illinois was using a slightly greater discount
2  for generics than for brands.
3  BY MR. TORBORG:
4    Q.   Well, the state was taking higher
5  discounts off of AWPs as published by First
6  DataBank, right?
7    A.   Yes.
8    Q.   They weren't taking a higher discount
9  off of market prices akin to what you calculate
10  here, right?
11        MS. THOMAS:  Objection to form.
12        THE WITNESS:  It depends.  I don't -- I
13  haven't analyzed transaction prices for other
14  firms, so it's for -- it's a 12 percent discount
15  for these products that I'm considering.  To what
16  -- whether and to what extent published prices
17  correspond to actual prices for other firms is --
18  that's a separate issue.  But there is a bigger
19  discount for generics.  That's true.
20  BY MR. TORBORG:
21    Q.   And you don't know why they had bigger
22  discount for generics, right?

Page 842

1    A.   I do not.
2    Q.   Did they want to penalize the use of
3  generic drugs?
4         MR. LAVINE:  Object to form.
5         MS. THOMAS:  Objection.  Form.
6         THE WITNESS:  Once again, I'm not sure
7  what -- when you say they, who exactly is they?
8  BY MR. TORBORG:
9    Q.   Illinois.
10        MR. LAVINE:  Object to form.
11        THE WITNESS:  As I said, I'm not sure
12  what the various factors were that led to this 90
13  to 88 percent change.
14  BY MR. TORBORG:
15    Q.   I'd like to hand you what's been marked
16  as Roxane Exhibit 17 in the Illinois 30(b)(6)
17  deposition.  This is an October 15th, 2000
18  document titled JCAR staff analysis.
19    A.   You said the date again was what?  I'm
20  sorry.
21    Q.   October 15th, 2001.
22    A.   Okay.

Page 843

1    Q.   And may I ask you if you've reviewed
2  this document before today?
3    A.   I have not.
4    Q.   Under the summary, I think you'll see if
5  you glance through it, that this is -- this memo
6  is addressing a change in the reimbursement
7  formula for Illinois that was occurring around
8  this time.  Do you see that?
9         MR. LAVINE:  Object to form.
10        THE WITNESS:  Yes.
11  BY MR. TORBORG:
12    Q.   Including increasing the discount for
13  generic drugs from 12 percent to 20 percent.  Do
14  you see that?
15        MR. LAVINE:  Object to form.
16        THE WITNESS:  Yes.
17  BY MR. TORBORG:
18    Q.   If you go to the next page under
19  background, would you read the -- read that
20  paragraph to yourself.
21    A.   Okay.
22    Q.   Do you have an understanding of what's

54  (Pages 840 to 843)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 844

1  being discussed there?
2       MR. LAVINE:  Object to form.
3       THE WITNESS:  Yes.
4  BY MR. TORBORG:
5     Q.  Okay.  Does this document suggest to
6  you, Professor Duggan, that Illinois wanted to
7  allow a margin on the ingredient cost for generic
8  drugs?
9       MR. LAVINE:  Object to form.
10      THE WITNESS:  This specific document --
11 I'm sorry.  Can you just ask the question again?
12 I can reread it to understand it.
13 BY MR. TORBORG:
14    Q.  Does this document suggest that Illinois
15 wanted to allow a margin on ingredient costs for
16 generic drugs?
17      MR. LAVINE:  Object to form.
18      THE WITNESS:  I'm not sure what they
19 wanted.  It is -- it indicates that one effect of
20 the difference between brand and generic drugs is
21 the financial incentive to use a generic over a
22 brand drug.  It is -- I guess I hesitate to say

Page 845

1  what the state wanted to do without examining --
2  you know, as an economist, I would hesitate to,
3  based on this two-page document, whether there are
4  into what the state wanted, whether there are
5  other issues that came into play as well.
6       But this notes one potential benefit of
7  the -- of the somewhat greater disparity between
8  published prices and actual prices for generics.
9  BY MR. TORBORG:
10    Q.  To paraphrase a bit, this paragraph
11 discusses an OI -- an HHS audit finding that on
12 average, generic drugs were selling at 65 percent
13 discounts off of AWP, correct?
14      MR. LAVINE:  Object to form.
15      THE WITNESS:  Right.  They are referring
16 to this audit.  I guess it's by HHS with that --
17 with that finding, but you know, I don't know what
18 went into the report, how they came up with those
19 numbers, but it does appear that there is a bigger
20 -- from what they have written here, that there is
21 a bigger disparity for generic than brand drugs on
22 average.

Page 846

1  BY MR. TORBORG:
2     Q.  And Illinois is reducing its -- or
3  increasing its discount from AWP for generics from
4  12 percent to 20 percent, is that correct?
5     A.  Yes.
6     Q.  And it's aware that it's leaving an
7  overall average profit level of 44 percent on
8  generics, right?
9       MR. LAVINE:  Object to form.
10      THE WITNESS:  Based on this document,
11 with the caveat that I haven't obviously
12 considered all of the relevant materials, but
13 based on this document, it appears there is a
14 recognition of a greater profit for generic drugs
15 than brand drugs.
16 BY MR. TORBORG:
17    Q.  And Illinois decided not to remove all
18 of that profit for generic drugs, according to
19 what this document suggests, right?
20      MR. LAVINE:  Object to form.
21      THE WITNESS:  They did not eliminate.
22 They reduced this disparity, but they did not

Page 847

1  eliminate it.
2  BY MR. TORBORG:
3     Q.  Instead of going from 12 percent
4  discount to 65 percent discount, they only went
5  from 12 percent discount to 20 percent discount,
6  right?
7       MR. LAVINE:  Object to form.
8       THE WITNESS:  Correct.
9  BY MR. TORBORG:
10    Q.  So they left some margin on the generic
11 drugs, right?
12      MR. LAVINE:  Object to form.
13      THE WITNESS:  On average, a margin did
14 remain, but with the caveat that it would be
15 important to consider things like MACs and so
16 forth for, you know, for all the generic products
17 in terms of -- it depends.  There may be a
18 variation, but it seems that this document
19 suggests an awareness.
20 BY MR. TORBORG:
21    Q.  And now back to your analysis, you're
22 coming in and you're, in your but-for world,

55 (Pages 844 to 847)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                           Washington, DC

Page 848

1  eliminating that profit margin that Illinois was
2  aware of and permitted to remain, correct?
3          MR. LAVINE:  Object to form.
4          THE WITNESS:  Well, this 20 percent
5  discount during the time period is the biggest
6  discount that any of the states employed, if I
7  remember correctly.  So in this particular case,
8  in the vast majority of states, for the vast
9  majority of the time period, there remains a
10 margin built in to my analysis.  And so this is
11 the case where that margin would be smallest.
12 Illinois in 2001.
13 BY MR. TORBORG:
14     Q.  Well, we'll get specific here.  In
15 Illinois, the margin built into your analysis is,
16 in 2001, about 5 percent, right?  You're scaling
17 up 25 percent, Illinois is taking 20 percent away,
18 right?
19         MR. LAVINE:  Object to form.
20         THE WITNESS:  It's bringing that -- I
21 mean, there are other -- it is bringing that --
22 that built-in, that -- it is reducing that

Page 849

1  disparity between my alternative AWP and the
2  transaction price with the scaling factor, that's
3  true, bringing it -- yes, it's reducing it.
4  BY MR. TORBORG:
5      Q.  And now you're coming in in this case
6  and increasing the discount even more, right?
7          MR. LAVINE:  Object to form.
8          THE WITNESS:  And here they are
9  discussing all generic products.  Unfortunately,
10 there are literally thousands.  And I'm
11 considering 44 specific products over an 11-year
12 period.  This is a document as you said from mid
13 October of 2001, so I mean -- but I think it's --
14 it is clear from -- yeah, so I guess I wouldn't
15 agree with -- could you -- I'm sorry, could you
16 just restate what you just said.
17 BY MR. TORBORG:
18     Q.  What I'm saying is your analysis is
19 coming in and removing more of the profit that was
20 paid to providers, correct?
21         MR. LAVINE:  Object to form.
22         THE WITNESS:  In certain cases, my

Page 850

1  alternative AWPs would serve to reduce the profit
2  on certain prescriptions.  That's true.  Not in
3  every case, but in certain cases.
4  BY MR. TORBORG:
5      Q.  Well, your report says something like 90
6  some percentile, you're reducing the payments per
7  what was paid, right?
8          MR. LAVINE:  Object to form.
9          THE WITNESS:  I don't have it in front
10 of me, but if I recall, Illinois was -- there were
11 -- Illinois had a high fraction with a difference
12 greater than zero.  Although most of those claims
13 would haven been for the earlier time period, pre-
14 2000.
15 BY MR. TORBORG:
16     Q.  And I take it that you're not familiar
17 with the extensive testimony that's been provided
18 by state Medicaid witnesses about how they knew of
19 larger spreads for generic drugs than brand name
20 drugs throughout the entirety of the time period
21 of your analysis, correct, because you haven't
22 reviewed the testimony, right?

Page 851

1          MR. LAVINE:  Object to form.
2          THE WITNESS:  That wasn't the focus of
3  my analysis.  We discussed, for example, some
4  documents last time where -- in which larger
5  disparities were discussed for generic versus
6  brand drugs, whether they were in the neighborhood
7  of kind of spreads that were in this case, it --
8  I'm not sure, but in any case, it was not the
9  focus of my analysis to -- that was not the focus
10 of my analysis, what the state Medicaid officials
11 knew.
12 BY MR. TORBORG:
13     Q.  Did you know that state Medicaid
14 officials sat around in a meeting in Richmond in
15 1994, where they talked about the fact that
16 hospitals and home infusion pharmacies could
17 purchase drugs at even greater discounts than
18 other pharmacies?
19         MR. LAVINE:  Object to form.
20         THE WITNESS:  I'm not aware of that
21 meaning.
22 BY MR. TORBORG:

56 (Pages 848 to 851)

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                        Washington, DC

Page 852

1     Q.   Moving to the State of Florida.  You
2  know that Jerry Wells was deposed in the Abbott-
3  United States litigation in December?
4     A.   I know he has been deposed.  The name
5  Jerry Wells -- I know Jerry Wells has been
6  deposed.  I didn't know the exact date.
7     Q.   Have you reviewed any testimony from Mr.
8  Wells since your last deposition?
9     A.   I have not.
10    Q.   So fair to say, then, that you wouldn't
11 have reviewed his transcript of the deposition
12 that was taken in December of 2008, right?
13    A.   That is correct.
14    Q.   Now, if we go to the Florida section of
15 your report.  In particular, page 39, where you're
16 summarizing the Florida reimbursement methodology.
17 Do you see that?
18    A.   Yes.
19    Q.   Towards the end of the first paragraph,
20 I think it's the third sentence from the end, it
21 says, thus until July 2nd, 2000.  Do you see that?
22    A.   Yes.

Page 853

1     Q.   Continuing, the State of Florida would
2  use 107 percent of the WAC for NDCs in the
3  complaint.  Do you see that?
4     A.   I do.
5     Q.   And do you know if the State of Florida,
6  in processing claims for the Abbott NDCs at issue,
7  actually used a WAC for those NDCs until July 2nd,
8  2000?
9          MR. LAVINE:  Object to form.
10         THE WITNESS:  I recall the quirk in the
11 Florida Medicaid adjudication methodology computer
12 issue.  I can't recall exactly right now.  So
13 based on what I've written here, Florida was using
14 107 percent of the WAC for the NDCs in the
15 complaint because of the mechanical relationship
16 between the WAC and AWP for these products.  The
17 WAC was 80 percent of the AWP, and so that would
18 be the lesser of, although it would be very close
19 to the amount from the AWP.  But it's my
20 understanding that 107 percent of the WAC was
21 used.
22 BY MR. TORBORG:

Page 854

1     Q.   Were you able to confirm that Florida
2  actually, in processing the claims, took a WAC for
3  these NDCs and applied it in its adjudication
4  formula?
5          MR. LAVINE:  Object to form.
6          THE WITNESS:  I don't recall.  But --
7  BY MR. TORBORG:
8     Q.   Do you know -- I'm sorry, were you
9  finished?
10    A.   Yeah.  I don't recall.
11    Q.   Do you know if there were even WACs for
12 the Abbott products in the data set that Florida
13 used from First DataBank from 1991 through 2000?
14         MR. LAVINE:  Object to form.
15         THE WITNESS:  It is my understanding
16 that in cases when a state didn't have access,
17 let's say, to a WAC, in a case like this one, it
18 would use one of the alternative prices, for
19 example, the AWP, and the other example.  I don't
20 recall that during that 10-year period, Florida
21 did not have WACs fro Abbott products.  But the --
22 so I don't recall that.

Page 855

1          But I certainly recall an issue with the
2  computer -- and this may be the quirk that I'm
3  referring to -- but part of the reason for that
4  footnote 28 is to demonstrate that -- which of the
5  three prices is used won't really matter because
6  of the mechanical relationship.  It won't -- the
7  reimbursement amount under each of the three
8  prices is quite similar, given the -- it's WAC is
9  scaled up, AWP is scaled down, and the
10 reimbursement is pretty darn close between the
11 three.
12 BY MR. TORBORG:
13    Q.   Now, is it your understanding from the
14 Myers and Stauffer summary that until June 30th of
15 1999, Florida, in its EAC formula, only had WAC
16 plus 7 percent?
17         MR. LAVINE:  Object to form.
18         THE WITNESS:  I would have to go back
19 and review.
20 BY MR. TORBORG:
21    Q.   It's in your report.  Page 39.  Second
22 sentence of that page.  Here's what I'm getting

                              57 (Pages 852 to 855)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                          Washington, DC

Page 856

1   at, Dr. Duggan.  Let me see if I can shortcut
2   this.  You say in your report, second sentence of
3   page 39, more specifically, from 1991 through
4   April 18, 1999, Florida used 107 percent of a
5   product's WAC as its estimated acquisition cost,
6   and then it continues.
7        My question is, do you know if Florida
8   actually did use a WAC for these NDCs?
9        MR. LAVINE:  Object to form.
10       THE WITNESS:  It is -- it is my
11  understanding that they did, but -- it is my
12  understanding that they did.
13  BY MR. TORBORG:
14       Q.  Do you recall learning that in instances
15  where Florida did not have access to a WAC, that
16  it would use a proxy for WAC using AWP?
17       A.  Yes.  That's what I was referring to
18  before.  I don't -- I don't know if the proxy was
19  -- I don't remember the specific proxy, but a
20  proxy would be used.  It's not as if no amount
21  would be paid.
22       Q.  You indicated earlier that you excluded

Page 857

1   a portion of time in your California analysis per
2   instructions from the Department of Justice?
3   Correct?
4        A.  That is correct.
5        Q.  And did you have an understanding of why
6   it was that you were asked to exclude that time
7   period from your analysis?
8        MR. LAVINE:  Object to form.
9        THE WITNESS:  Well, I knew from my own
10  research on California Medicaid reimbursement for
11  prescription drugs that the state utilized
12  different set of identifiers for pharmaceutical
13  products from the 11 digit NDC.  They used a
14  seven-character code which was different during
15  this '91, '92, '93 period, and early '94.  And
16  that switched in early '94.  So I knew that from
17  my own research, that California had -- there was
18  something different going on in California prior
19  to early 1994.
20       And what all the -- what other
21  differences existed, I don't recall right now, but
22  it was very different.  And from my own work with

Page 858

1   Medicaid claims data, for example, my Journal of
2   Health Economics paper that uses that state's
3   data, the claims -- the claims were very
4   different.  So it resonated with me when pre-'94
5   was pointed out as a different -- a very different
6   period.
7        Q.  We discussed this before, but your
8   analysis has, as one of its assumptions, that the
9   states would have used the revised pricing that
10  you generate, right?
11       MR. LAVINE:  Object to form.
12       THE WITNESS:  That's correct.
13  BY MR. TORBORG:
14       Q.  And are you familiar with a project that
15  was spearheaded in the late 1990s by the
16  Department of Justice and the National Association
17  of Medicaid Fraud Control Units to calculate more
18  alternative AWPs for about 400 NDCs and then
19  provide those to the states?
20       MR. LAVINE:  Object to form.
21       THE WITNESS:  I'm not sure exactly when
22  it was launched, or whether it was just DOJ.  And

Page 859

1   I don't know -- but that -- that is -- that
2   certainly is my understanding, that there was
3   about 400 or so products with these revised AWPs
4   that were the subject of a report.
5   BY MR. TORBORG:
6        Q.  And do you know what the impetus was
7   behind that project?
8        A.  I do not.  Certainly not all of the
9   factors that led to it.
10       Q.  Can I call that general topic the DOJ-
11  AWP project?  Will you understand what I mean?
12       MR. LAVINE:  Object to form.
13       THE WITNESS:  Sure.
14  BY MR. TORBORG:
15       Q.  And again, I'm referring there to
16  efforts in the late 1990s, early in the next
17  decade, to provide alternative AWPs for about 400
18  NDCs, okay?
19       A.  Okay.
20       Q.  Do you know what NDCs or types of drugs
21  that were at issue in the DOJ-AWP project?
22       MR. LAVINE:  Object to form.

58  (Pages 856 to 859)

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                    Washington, DC

Page 860

1        THE WITNESS:  I haven't studied that
2   specific report.  I believe many of them were
3   generic products.  Many, perhaps all for products
4   like sodium chloride and, you know, other generic
5   products.
6   BY MR. TORBORG:
7        Q.   Are you aware of the fact that included
8   in that project were revised pricing for many
9   national drug codes, in addition to sodium
10  chloride, to Vancomycin and dextrose solutions?
11       MR. LAVINE:  Object to form.
12       THE WITNESS:  Again, it's been a while
13  since I looked at that report, but it is my
14  understanding that Vanco was also in there and I
15  don't recall whether dextrose was, but it seems
16  plausible.
17  BY MR. TORBORG:
18       Q.   I can represent to you that it was.
19       A.   Okay.
20       Q.   Various NDCs of sodium chloride
21  solutions, dextrose solutions and Vancomycin
22  hydrochloride were involved in the DOJ-AWP

Page 861

1   project.  I'll make that representation to you
2   because I know that to be a fact, okay?
3        A.   Okay.
4        MR. LAVINE:  Object to form.
5   BY MR. TORBORG:
6        Q.   Now, the drugs at issue in this case are
7   also Vancomycin hydrochloride, dextrose solutions,
8   sodium chloride solutions as well as a few NDCs
9   for sterile water, right?
10       MR. LAVINE:  Object to form.
11       THE WITNESS:  I'm not sure that's an
12  exhaustive list, but it sounds pretty close to
13  exhaustive.
14  BY MR. TORBORG:
15       Q.   So there is a big overlap between the
16  drugs involved in the DOJ-AWP project and your
17  analysis in this case, right?
18       MR. LAVINE:  Object to form.
19       THE WITNESS:  It seems plausible, but I
20  have not gone through to determine for each of the
21  44 NDCs in this case, are they in those -- are
22  they in that report, are they among -- are they

Page 862

1   all among the 400 or so NDCs in this DOJ-AWP
2   project.
3   BY MR. TORBORG:
4        Q.   But you're aware that there is a
5   significant overlap between the two sets of NDCs,
6   right?
7        MR. LAVINE:  Object to form.
8        THE WITNESS:  It's my understanding
9   there is some overlap.
10  BY MR. TORBORG:
11       Q.   I'd like to hand you what was marked as
12  Exhibit 14 to the deposition of California's Kevin
13  Gorospe's deposition on March 19th, 2008.  For the
14  record, this document includes email
15  correspondence on November 6, 2000 between Doug
16  Hillbloom and Phil Hinton and Marion Lewis, who
17  are involved with the California Medicaid
18  department.
19       It's also a -- the second page is a
20  memorandum from the Secretary of Health and Human
21  Services for MediCal, to the cabinet secretary,
22  with some additional documents.  I think if you

Page 863

1   scan through these, Dr. Duggan, you'll see that
2   they relate to what we've been referring to here
3   as the DOJ-AWP project.  Feel free to glance at
4   those to the extent necessary to tell me whether
5   you reviewed these before, and then I'll have some
6   questions for you.
7        A.   Just before I do, do you have a sense of
8   what the plan is timing-wise?  We are at 5:05.
9        Q.   What time would you like to leave, other
10  than three hours ago.
11       A.   Well, we can just keep talking, but I'll
12  just throw it out there that it's 5:05.  Let me
13  just review this for a second.  OIL, do you know
14  what that stands for?  It's the second word in the
15  email.
16       Q.   I can't represent to you.  I have a
17  guess, but I'm not going to make a guess.
18       A.   Okay.  Right.  I don't recall reading
19  this specific document.  Do you want me to read
20  through it?
21       Q.   I just wanted to ask you first if you
22  recall the document.  And I'll have some question

                              59 (Pages 860 to 863)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                         Washington, DC

Page 864

1  for you.
2      A.  No, I don't.  I don't recall this
3  document.
4      Q.  Do you know if the -- strike that.  Have
5  you ever compared the but-for prices that you
6  calculate to the DOJ's revised pricing that was
7  presented to these states around the 1999-2000
8  time frame?
9          MR. LAVINE:  Object to form.
10         THE WITNESS:  Well, my algorithm for
11  certain states, to some extent, does that.  But I
12  have not lined up, for example, my AWPs by NDC by
13  quarter versus these ones.  I have not.  But
14  indirectly, my algorithm does that for certain
15  states.
16 BY MR. TORBORG:
17     Q.  Did you observe anything there, whether
18  your prices were lower than DOJ AWPs or higher or
19  roughly the same?
20         MR. LAVINE:  Object to form.
21         THE WITNESS:  I believe that -- across
22  all 44, I'm not sure.  I believe that, for

Page 865

1  example, for Vanco, the large Vanco one, I believe
2  it was my prices were somewhat lower, but I'm not
3  sure by exactly how much.
4  BY MR. TORBORG:
5      Q.  And do you know if -- strike that.  Do
6  you know if California used the DOJ AWPs?
7          MR. LAVINE:  Object to form.
8          THE WITNESS:  I don't recall.
9  BY MR. TORBORG:
10     Q.  Have you made any analysis of which
11  states used the DOJ AWPs and -- or not?
12         MR. LAVINE:  Object to form.
13         THE WITNESS:  That's not an issue that I
14  myself have drilled down on.
15 BY MR. TORBORG:
16     Q.  If you go to the Bates page ending 374.
17  There is a section toward the bottom that says
18  impact.  Do you see that?
19     A.  Yes.
20     Q.  It states, accepting these new AWPs as
21  the basis for providing reimbursement in MediCal
22  is a serious policy consideration, this change

Page 866

1  would result in dramatic decreases in the reported
2  AWP for approximately 400 drugs.  Decreases of as
3  much as 80 percent in some cases.  The new AWP
4  reductions apply to drugs which are usually
5  administered in physician's offices or clinics,
6  however, the same drugs are often administered at
7  patient's homes via pharmacy dispensing and home
8  health care administration.  Do you see that?
9      A.  I see it.
10     Q.  And if you go to the last page of the
11  exhibit, Bates page 376, there is a last section
12  says recommendation.  Do you see that?
13     A.  I see it.
14     Q.  It states, we recommend that MediCal not
15  implement the new price reporting mechanism due to
16  the serious impact on both providers and
17  beneficiaries.  Do you see that?
18     A.  I see that.
19     Q.  Okay.  And does that suggest that the
20  State of California did not institute the DOJ AWPs
21  because of concerns on a serious impact to both
22  providers and beneficiaries?

Page 867

1          MR. LAVINE:  Object to form.
2          THE WITNESS:  This is a recommendation
3  and I'm not sure who wrote this specific -- these
4  specific pages, who we is, for example.  But it
5  appears that whoever wrote this is concerned for
6  these 400 products.  Are they more concerned for
7  certain products than for others, this is -- this
8  is a very, you know, as an economist, it seems
9  plausible to me that -- I don't know how much
10  analysis went into this, so whether this is a
11  well-grounded -- yeah.  I don't know what
12  underlines it, but it seems that this person,
13  whoever we is, is concerned about that effect for
14  these 400 different products.
15 BY MR. TORBORG:
16     Q.  Do you know -- were you aware that the
17  30(b)(6) representative for the State of
18  California testified that California did not adopt
19  the DOJ AWPs for any of the drugs because of
20  concerns about access to care?
21         MR. LAVINE:  Object to form.
22         THE WITNESS:  I was not aware that

60  (Pages 864 to 867)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                    February 17, 2009
                         Washington, DC

Page 868

1   California had not implemented the DOJ prices.
2   BY MR. TORBORG:
3       Q.   And you didn't do any study of why they
4   did not adopt the DOJ AWPs, correct?
5           MR. LAVINE:  Object to form.
6           THE WITNESS:  Correct.
7   BY MR. TORBORG:
8       Q.   Now, here in your but-for world, you are
9   retroactively instituting the DOJ AWPs into this
10  time period?  Actually, you're instituting prices
11  that are generally lower than the DOJ AWPs in your
12  analysis of California, correct?
13          MR. LAVINE:  Object to form.
14          THE WITNESS:  Once again, I'm not sure
15  what the overlap is between the 44 complaint
16  products and the 400 DOJ products, and nor am I
17  certain about the correspondence between the
18  prices that were based on how the transaction data
19  that I utilized and those -- the DOJ prices.  So
20  it would be difficult for me to speculate without
21  more information.
22  BY MR. TORBORG:

Page 869

1       Q.   If there is overlap between the DOJ AWPs
2   that California elected not to institute, and the
3   complaint NDCs here, and if we assume that
4   California in fact decided not to institute the
5   DOJ AWPs out of concerns for access, do you have a
6   concern with your analysis changing the well-
7   reasoned policy of the state retroactively?
8           MR. LAVINE:  Object to form.
9           THE WITNESS:  Well, it -- there are --
10  this is one group's -- state's set of individuals
11  views.  And without more information about how
12  they arrived at these conclusions, it would be --
13  I think given the assumptions that I lay out in my
14  report, I think the analysis that I did is
15  appropriate.
16  BY MR. TORBORG:
17      Q.   One of the assumptions you lay out in
18  your report is that the states would have used the
19  prices, correct?
20          MR. LAVINE:  Object to form.
21          THE WITNESS:  Yes.  It is true that my
22  assumption is that the states would have used the

Page 870

1   alternative AWPs, for example.
2   BY MR. TORBORG:
3       Q.   You're not opining that the states would
4   have, in fact, used the prices, right?
5           MR. LAVINE:  Object to form.
6           THE WITNESS:  That is an assumption that
7   I made in my analysis, and so that is an
8   assumption.
9           MR. LAVINE:  It's 5:15.  Is this a good
10  time to end?
11          MR. TORBORG:  I think given what the
12  witness has said earlier looking at his watch,
13  that's fine.
14          MR. LAVINE:  I mean, our position on
15  another day is the same that after four full days,
16  I understand you may not have covered everything
17  you wanted to, but --
18          MR. TORBORG:  Do you want me to keep
19  going then?
20          MR. LAVINE:  No.  Because you said you
21  can't finish today anyway, so actually 10 or 15
22  minutes is not going to -- not going to help you

Page 871

1   conclude with this witness.  So I don't think
2   there is any purpose in us all staying later
3   today.
4           MR. TORBORG:  Well, if you're not going
5   to give me another day, then I could at least get
6   some more in.
7           MR. LAVINE:  Well, you've known all day
8   that we weren't going to go there.  And I mean, we
9   just ended up on you asking for the third time at
10  least about his assumptions about whether or not
11  the states would use the data, and that's a big
12  reason we haven't gotten through everything.
13          So I mean, I'll leave it up to the
14  witness if you want to push on for a little bit
15  longer, but it's 5:15.  We were shooting to get
16  out of here by 5, and it's been a long day.  I
17  mean, I'd rather just finish now, because it
18  doesn't seem like an extra five or 10 minutes is
19  going to make a big difference to where you end
20  up.
21          MS. THOMAS:  We are done.
22          MR. TORBORG:  That's fine.  Why don't we

61 (Pages 868 to 871)

96f198b7-ae91-4060-90e1-699fb4165f81

Duggan, Ph.D., Mark G. - Vol. IV                February 17, 2009
                    Washington, DC

Page 872

1    go off the record and we can talk about it.
2         THE VIDEOGRAPHER:  The time is 5:23.
3    This concludes today's deposition.
4         (Whereupon, at 5:23 p.m., the
5    taking of the instant deposition ceased.)
6
7
8
9
10
11
12         _____
13         Signature of the Witness
14
15   SUBSCRIBED AND SWORN to before me this _____ day
16   of _____, 2009.
17
18         _____
19         NOTARY PUBLIC
20   My Commission expires:  _____
21
22

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

# EXHIBIT DV

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*,<br>CIVIL ACTION NO. 06-CV-11337-PBS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 1456<br>Civil Action No. 01-12257-PBS<br><br>Hon. Patti B. Saris |
| | | |

Supplement to Mark G. Duggan, Ph.D. Report, January 23, 2009

**I. Summary of Revisions to Medicaid Analyses – The Removal of Ohio**

Following instructions from the United States in *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, I have removed the state of Ohio from the Medicaid analyses in my June 19, 2008 report. As a result of this change, Tables 25, 27A, and 27B are revised as shown in the three Tables on the subsequent three pages. Specifically, the Ohio entry in Table 25, which originally included results from 12 states, has been deleted. Additionally, I no longer use the state of Ohio in my analyses for the remaining 38 states, and thus the results in Tables 27A and 27B have also changed.  The following table, which is a revised version of the table on page 2 of my June 19, 2008 report, summarizes the effect of these changes (with dollar amounts reported in millions and both claims and provider payments reported in thousands):

| Category | Difference | | | Amount Paid | Reference Table | Claims | Provider Payments |
|---|---|---|---|---|---|---|---|
| | Federal | State | Total | | | | |
| Medicaid | $64.7 | $47.2 | $111.9 | $150.6 | 25 | 2875.1 | 484.7 |
| Medicare DME | $11.1 | $0.0 | $11.1 | $23.5 | 33 | 101.7 | 54.1 |
| Medicare Part B1 | $15.6 | $0.0 | $15.6 | $68.0 | 43 | 4726.3 | 720.6 |
| Medicare Part B2 | $15.7 | $0.0 | $15.7 | $94.2 | 44 | 5234.6 | 1002.2 |
| Total | $107.1 | $47.2 | $154.3 | $336.3 | - | 12937.7 | 2261.6 |

The total federal DIFFERENCE in the second column declines from $108.2 million to $107.1 million. Similarly, the total number of provider payments with a DIFFERENCE greater than zero declines from 2.299 million to 2.262 million while the total number of claims with a DIFFERENCE greater than zero declines from 13.210 million to 12.938 million.

**II. Summary of Abbott's CHIP Data**

The attached tables provide a summary of data from Abbott's CHIP (Client Home Infusion Program) system. From 1990 to 2000, Abbott ran its own infusion pharmacy, where it

supplied pharmaceutical products directly to patients.  Abbott billed third party payers including

Medicaid and Medicare for these products using the CHIP system. Abbott also used the CHIP

system to bill third party payers, including Medicare and Medicaid, on behalf of other health care

providers, with this service continuing through at least the fourth quarter of 2001.  All of these

tables are based on data that was supplied by Abbott.[1]

Table A provides an overview of all sales recorded in the CHIP system. The number of

line items is considerably larger than the number of claims because each claim could include

many products.  The first several columns summarize transactions with both Abbott clients and

other providers' clients, while the latter several columns consider only clients of Abbott's

pharmacy clients.

As the first several columns show, the total number of claims, the number of line items,

the total amount billed, and the total amount paid steadily increased until late 1998, and then

declined after that.  The total amount paid during the period was $661.897 million, with

$158.336 million (24 percent of the total) of this accounted for by customers of Abbott's

pharmacy. The share of sales accounted for by Abbott's pharmacy, which exceeded 40 percent in

every quarter through 1993Q2, declined steadily during the last several years.

Tables B and C repeat this exercise while restricting attention only to Medicaid and

Medicare claims, respectively, that have at least one line item for one of the products listed in the

United States' Complaint. Payments from Medicaid were equal to $23.103 million for all clients

and to $5.342 million for customers of Abbott's pharmacy. Payments from Medicare were equal

to $22.653 million, with Abbott pharmacy clients accounting for $5.675 million of that amount.

---

[1] There was a total of 104 gigabytes of data provided by Abbott. An examination of the data revealed that all of it represented backups of transactions and lookup tables and thus duplicate observations, to the extent that they could be identified, were dropped so as to avoid double-counting.

Supplement to Mark G. Duggan, Ph.D. Report, January 23, 2009

Tables D and E provide similar information while restricting attention to line items for those pharmaceutical products included in the United States' Complaint against Abbott. As shown in the first of these two tables, the total amount paid by Medicaid across all customers was $419,215. Clients of Abbott's pharmacy accounted for $110,860 in that spending and for 6,160 line items for Complaint products. The total amount paid by Medicare across all customers was $2.497 million. Clients of Abbott's pharmacy accounted for $269,639 of that spending and for 8,484 line items for Complaint products.

Table F displays the average amount billed versus the average AWP of Complaint products in the CHIP system. As the table shows, the billed amount is typically substantially greater than the AWP for Complaint products.

_____
Mark G. Duggan, Ph.D.
January 23, 2009

**Table 25: Medicaid Summary for Top Nine States, Louisiana (#11), and Wisconsin (#16)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Illinois | State Claims | 1991Q2-2001Q4 | 519,450 | 534,183 | $12,029,039 | $16,527,505 | $6,014,519 | 58,631 |
| Florida | State Claims | 1993Q4-2001Q4 | 278,623 | 287,959 | $11,700,280 | $15,561,037 | $6,532,311 | 67,076 |
| Florida | SDUD Data | 1991Q1-1993Q3 | 34,802 | 39,861 | $939,551 | $1,379,301 | $514,820 | - |
| California | State Claims | 1994Q2-2001Q4 | 267,167 | 280,994 | $7,044,315 | $9,172,917 | $3,585,421 | 56,269 |
| New Jersey | State Claims | 1992Q1-2001Q4 | 124,513 | 126,067 | $7,191,020 | $8,453,921 | $3,595,511 | 11,446 |
| New Jersey | SDUD | 1991Q1-1991Q4 | 12,374 | 13,798 | $727,856 | $915,392 | $363,928 | - |
| New York | State Claims | 1993Q1-2001Q4 | 108,386 | 120,315 | $6,877,666 | $8,921,858 | $3,438,833 | 38,184 |
| New York | SDUD | 1991Q1-1992Q4 | 5,263 | 5,791 | $149,690 | $192,898 | $74,845 | - |
| Indiana | SMRF / MAX | 1992Q1-2001Q4 | 175,577 | 182,042 | $11,214,412 | $14,812,193 | $6,936,732 | 28,880 |
| Indiana | SDUD | 1991Q1-1991Q4 | 8,572 | 9,044 | $137,297 | $249,529 | $86,826 | - |
| Kentucky | State Claims | 1995Q1-2001Q4 | 96,452 | 100,007 | $4,737,344 | $6,190,786 | $3,331,076 | 16,044 |
| Kentucky | SMRF / MAX | 1992Q1-1994Q4 | 17,559 | 20,725 | $545,830 | $910,013 | $390,572 | 3,589 |
| Kentucky | SDUD | 1991Q1-1991Q4 | 2,961 | 3,401 | $77,795 | $128,833 | $56,759 | - |
| Missouri | State Claims | 1998Q1-2001Q4 | 70,680 | 75,389 | $3,448,247 | $4,263,226 | $2,087,491 | 8,304 |
| Missouri | SMRF / MAX | 1992Q1-1997Q4 | 61,884 | 66,684 | $2,459,315 | $3,184,492 | $1,480,343 | 8,418 |
| Missouri | SDUD | 1991Q1-1991Q4 | 1,568 | 2,136 | $35,736 | $63,533 | $21,377 | - |
| Michigan | State Claims | 2000Q4-2001Q4 | 14,389 | 15,986 | $537,789 | $792,346 | $300,440 | 4,479 |
| Michigan | SMRF / MAX | 1994Q1-2000Q3 | 73,749 | 81,219 | $3,109,367 | $4,222,782 | $1,703,230 | 14,845 |
| Michigan | SDUD | 1991Q1-1993Q4 | 6,844 | 9,722 | $66,162 | $157,114 | $36,565 | - |
| Louisiana | State Claims | 1995Q1-2001Q4 | 73,705 | 76,520 | $2,970,914 | $3,834,631 | $2,102,350 | 7,211 |
| Louisiana | SDUD | 1991Q1-1994Q4 | 8,417 | 9,408 | $257,830 | $407,099 | $190,429 | - |
| Wisconsin | State Claims | 1993Q2-2001Q1 | 63,647 | 70,145 | $1,683,017 | $2,440,008 | $998,395 | 13,988 |
| Wisconsin | SDUD | 1991Q1-1993Q1 | 2,976 | 3,248 | $73,335 | $105,891 | $44,110 | - |
| Total for First 11 States | | 1991-2001 | 2,029,558 | 2,134,644 | $78,013,807 | $102,887,305 | $43,886,885 | 337,364 |
| Total for Remaining 38 States | | | 845,533 | 894,567 | $33,889,385 | $47,701,979 | $20,782,466 | 147,370 |
| **Total for All 49 States** | | | **2,875,091** | **3,029,211** | **$111,903,192** | **$150,589,284** | **$64,669,351** | **484,734** |

**Table 27A: Medicaid Summary for States 10 through 30 (excluding LA and WI)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| North Carolina | SMRF / MAX | 1999-2001 | 25,916 | 27,745 | $1,948,443 | $2,857,012 | $1,221,323 | 4,785 |
| North Carolina | SDUD | 1991-1998 | 17,445 | 18,499 | $1,144,755 | $1,543,854 | $734,245 | |
| Georgia | SMRF / MAX | 1993-2001 | 36,667 | 38,431 | $2,446,058 | $3,359,367 | $1,489,405 | 2,381 |
| Georgia | SDUD | 1991-1992 | 181 | 202 | $15,522 | $22,313 | $9,582 | |
| Pennsylvania | SMRF / MAX | 1992-2001 | 46,854 | 50,006 | $2,139,722 | $2,957,576 | $1,148,431 | 15,526 |
| Pennsylvania | SDUD | 1991 | 98 | 113 | $20,390 | $28,360 | $11,549 | |
| Arkansas | SMRF / MAX | 1992-2001 | 32,661 | 34,413 | $2,091,702 | $2,861,483 | $1,532,739 | 9,537 |
| Arkansas | SDUD | 1991 | 427 | 527 | $11,494 | $20,205 | $8,634 | |
| Virginia | SMRF / MAX | 1999-2001 | 20,053 | 21,369 | $796,867 | $1,171,164 | $411,807 | 4,748 |
| Virginia | SDUD | 1991-1998 | 38,231 | 40,808 | $986,933 | $1,381,656 | $501,870 | |
| Washington | SMRF / MAX | 1992-2001 | 53,125 | 56,109 | $1,725,678 | $2,418,868 | $896,904 | 12,444 |
| Washington | SDUD | 1991 | 1,669 | 2,063 | $44,831 | $92,451 | $24,303 | |
| Alabama | SMRF / MAX | 1992-95,1999-01 | 27,016 | 28,514 | $950,328 | $1,402,565 | $665,019 | 4,868 |
| Alabama | SDUD | 1991,1996-98 | 11,218 | 11,778 | $613,960 | $800,957 | $427,538 | |
| Texas | SMRF / MAX | 1999-2001 | 25,976 | 27,633 | $445,888 | $711,035 | $275,230 | 10,924 |
| Texas | SDUD | 1991-1998 | 33,681 | 34,914 | $1,028,027 | $1,385,016 | $647,844 | |
| Connecticut | SMRF / MAX | 1999-2001 | 15,672 | 16,532 | $669,467 | $952,276 | $334,734 | 1,668 |
| Connecticut | SDUD | 1991-1998 | 16,507 | 17,355 | $775,840 | $1,020,758 | $387,920 | |
| Massachusetts | SMRF / MAX | 1999-2001 | 23,643 | 25,027 | $879,875 | $1,314,523 | $439,937 | 7,245 |
| Massachusetts | SDUD | 1991-1998 | 13,440 | 13,952 | $476,952 | $614,293 | $238,476 | |
| Mississippi | SMRF / MAX | 1993-2001 | 22,136 | 23,262 | $1,897,069 | $2,556,485 | $1,465,927 | 5,828 |
| Mississippi | SDUD | 1991-1992 | 728 | 761 | $15,581 | $23,900 | $12,461 | |
| South Carolina | SMRF / MAX | 1999-2001 | 2,809 | 2,982 | $289,061 | $428,294 | $202,237 | 1,175 |
| South Carolina | SDUD | 1991-1998 | 3,134 | 3,317 | $1,068,745 | $1,503,505 | $755,351 | |
| Colorado | SMRF / MAX | 1994-2001 | 32,904 | 34,589 | $1,575,437 | $2,214,308 | $812,481 | 6,642 |
| Colorado | SDUD | 1991-1993 | 4,009 | 4,235 | $130,144 | $177,121 | $70,868 | |
| Maryland | SMRF / MAX | 1999-2001 | 23,463 | 24,517 | $280,994 | $453,759 | $140,497 | 3,242 |
| Maryland | SDUD | 1991-1998 | 44,918 | 47,398 | $1,006,703 | $1,419,412 | $503,351 | |
| Oklahoma | SMRF / MAX | 1999-2001 | 19,766 | 20,675 | $651,574 | $892,326 | $462,578 | 4,467 |
| Oklahoma | SDUD | 1991-1998 | 19,290 | 20,044 | $572,390 | $756,404 | $401,679 | |
| West Virginia | SMRF / MAX | 1999-2001 | 9,008 | 9,554 | $593,159 | $885,134 | $443,135 | 2,669 |
| West Virginia | SDUD | 1991-1998 | 7,207 | 7,509 | $354,305 | $467,998 | $261,214 | |
| Minnesota | SMRF / MAX | 1993-2001 | 30,781 | 32,459 | $703,661 | $1,009,694 | $372,243 | 11,989 |
| Minnesota | SDUD | 1991-1992 | 4,678 | 5,366 | $56,197 | $106,800 | $30,367 | |
| Oregon | SMRF / MAX | 1999-2001 | 5,029 | 5,360 | $154,109 | $222,648 | $92,942 | 1,733 |
| Oregon | SDUD | 1991-1998 | 18,826 | 19,846 | $569,411 | $793,901 | $353,024 | |
| Utah | SMRF / MAX | 1992-2001 | 25,290 | 27,122 | $614,549 | $892,038 | $446,942 | 4,634 |
| Utah | SDUD | 1991 | 647 | 701 | $27,184 | $37,817 | $20,358 | |
| Total | | 1991-2001 | 715,103 | 755,687 | $29,773,005 | $41,757,276 | $18,255,145 | 116,505 |

**Table 27B: Medicaid Summary for States 31 through 49**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Nevada | SMRF / MAX | 1999-2001 | 3,151 | 3,333 | $313,653 | $422,338 | $156,916 | 711 |
| Nevada | SDUD | 1991-1998 | 2,413 | 2,601 | $230,364 | $327,451 | $115,912 | |
| Nebraska | SMRF / MAX | 1999-2001 | 6,286 | 6,629 | $183,483 | $273,719 | $112,073 | 2,250 |
| Nebraska | SDUD | 1991-1998 | 12,779 | 13,484 | $349,284 | $484,720 | $212,924 | |
| Kansas | SMRF / MAX | 1992-2001 | 24,239 | 25,749 | $539,427 | $826,369 | $319,822 | 5,416 |
| Kansas | SDUD | 1991 | 521 | 733 | $3,784 | $10,510 | $2,170 | |
| Iowa | SMRF / MAX | 1992-2001 | 21,315 | 22,714 | $748,339 | $1,061,276 | $473,722 | 8,249 |
| Iowa | SDUD | 1991 | 682 | 864 | $20,242 | $32,121 | $12,835 | |
| South Dakota | SMRF / MAX | 1999-2001 | 3,523 | 3,716 | $121,249 | $173,158 | $82,919 | 1,018 |
| South Dakota | SDUD | 1991-1998 | 7,492 | 7,816 | $199,782 | $269,774 | $134,959 | |
| Rhode Island | SMRF / MAX | 1995,1999-01 | 3,320 | 3,544 | $146,362 | $224,157 | $79,411 | 548 |
| Rhode Island | SDUD | 1991-94,1996-98 | 2,921 | 3,054 | $162,159 | $205,523 | $86,912 | |
| Montana | SMRF / MAX | 1992-2001 | 6,811 | 7,204 | $232,208 | $327,431 | $164,312 | 1,914 |
| Montana | SDUD | 1991 | 128 | 171 | $4,709 | $7,883 | $3,378 | |
| Hawaii | SMRF / MAX | 1999-01,1992-93 | 4,676 | 5,003 | $42,857 | $72,730 | $21,989 | 451 |
| Hawaii | SDUD | 1991,1994-98 | 5,074 | 5,527 | $141,798 | $198,849 | $70,989 | |
| Maine | SMRF / MAX | 1992-2001 | 5,101 | 5,419 | $257,479 | $364,368 | $167,290 | 2,437 |
| Maine | SDUD | 1991 | 48 | 81 | $1,659 | $3,021 | $1,054 | |
| Wyoming | SMRF / MAX | 1992-2001 | 5,010 | 5,235 | $256,674 | $360,392 | $162,206 | 1,873 |
| Wyoming | SDUD | 1991 | 12 | 21 | $350 | $615 | $239 | |
| Tennessee | SDUD | 1991-1994 | 863 | 918 | $81,949 | $116,412 | $55,695 | |
| Delaware | SMRF / MAX | 1993-2001 | 5,962 | 6,381 | $206,399 | $305,021 | $103,282 | 1,299 |
| Delaware | SDUD | 1991-1992 | 171 | 221 | $4,375 | $8,418 | $2,189 | |
| North Dakota | SMRF / MAX | 1992-2001 | 3,174 | 3,362 | $147,621 | $222,881 | $103,241 | 1,925 |
| North Dakota | SDUD | 1991 | 82 | 95 | $1,359 | $2,628 | $951 | |
| Idaho | SMRF / MAX | 1996-2001 | 176 | 180 | $20,409 | $27,036 | $14,085 | 184 |
| Idaho | SDUD | 1991-1995 | 80 | 85 | $25,988 | $38,046 | $18,538 | |
| New Hampshire | SMRF / MAX | 1992-2001 | 3,424 | 3,607 | $74,806 | $112,152 | $37,403 | 1,496 |
| New Hampshire | SDUD | 1991 | 47 | 89 | $760 | $2,151 | $380 | |
| New Mexico | SMRF / MAX | 1996-2001 | 554 | 590 | $20,076 | $27,284 | $14,615 | 559 |
| New Mexico | SDUD | 1991-1995 | 415 | 453 | $4,812 | $7,921 | $3,548 | |
| Alaska | SMRF / MAX | 1992-2001 | 2,280 | 2,456 | $37,159 | $59,789 | $19,485 | 578 |
| Alaska | SDUD | 1991 | 26 | 38 | $302 | $765 | $151 | |
| Vermont | SMRF / MAX | 1992-2001 | 1,683 | 1,797 | $42,645 | $63,732 | $26,400 | 422 |
| Vermont | SDUD | 1991 | 157 | 192 | $1,806 | $4,702 | $1,119 | |
| Washington, D.C. | SMRF / MAX | 1999-2001 | 436 | 458 | $15,415 | $23,509 | $7,708 | 246 |
| Washington, D.C. | SDUD | 1991-1998 | 962 | 994 | $18,654 | $25,640 | $9,327 | |
| Total | | 1991-2001 | 130,430 | 138,880 | $4,116,380 | $5,944,703 | $2,527,321 | 30,865 |

Table A: Total Number of Claims and Line Items in CHIP Data: All Clients and Abbott Only

| Yr-Quarter | All Clients | | | | Abbott Only | | | | Abbott Share |
|---|---|---|---|---|---|---|---|---|---|
| | # Claims | # Line Items | Total Billed | Total Paid | # Claims | # Line Items | Total Billed | Total Paid | |
| 19901 | 47 | 437 | $173,354 | $94,370 | 29 | 381 | $116,514 | $55,226 | 58.5% |
| 19902 | 67 | 1,762 | $281,066 | $121,519 | 57 | 1,633 | $255,406 | $110,177 | 90.7% |
| 19903 | 154 | 1,736 | $412,872 | $167,937 | 111 | 1,439 | $332,141 | $138,566 | 82.5% |
| 19904 | 356 | 5,018 | $1,215,182 | $431,671 | 187 | 2,706 | $883,206 | $281,339 | 65.2% |
| 19911 | 662 | 8,263 | $1,796,435 | $778,126 | 351 | 4,478 | $1,202,485 | $472,762 | 60.8% |
| 19912 | 1,360 | 15,072 | $3,914,608 | $1,674,322 | 686 | 8,742 | $2,509,630 | $1,004,541 | 60.0% |
| 19913 | 3,275 | 41,929 | $9,632,801 | $4,655,946 | 1,507 | 21,591 | $5,023,214 | $2,251,414 | 48.4% |
| 19914 | 8,011 | 96,119 | $19,802,433 | $10,812,743 | 3,319 | 48,371 | $9,715,675 | $5,189,572 | 48.0% |
| 19921 | 11,434 | 120,325 | $24,869,932 | $13,718,104 | 4,537 | 59,849 | $11,940,865 | $6,577,474 | 47.9% |
| 19922 | 11,683 | 136,062 | $25,473,375 | $14,471,795 | 4,782 | 57,637 | $11,823,324 | $6,635,717 | 45.9% |
| 19923 | 13,396 | 158,314 | $29,525,456 | $16,317,450 | 5,472 | 67,435 | $13,461,749 | $7,384,773 | 45.3% |
| 19924 | 14,442 | 174,106 | $31,371,201 | $17,724,772 | 5,827 | 74,279 | $13,254,334 | $7,809,348 | 44.1% |
| 19931 | 14,560 | 167,942 | $29,366,365 | $16,402,104 | 5,445 | 65,799 | $11,307,385 | $6,630,449 | 40.4% |
| 19932 | 15,116 | 180,662 | $29,593,732 | $15,977,106 | 5,232 | 64,656 | $10,414,497 | $6,566,971 | 41.1% |
| 19933 | 14,137 | 186,281 | $28,048,436 | $16,115,351 | 4,713 | 59,012 | $9,715,769 | $6,230,510 | 38.7% |
| 19934 | 15,273 | 187,104 | $26,784,935 | $15,219,134 | 4,196 | 50,841 | $8,076,268 | $5,287,752 | 34.7% |
| 19941 | 12,814 | 152,130 | $21,489,038 | $10,549,126 | 2,658 | 31,317 | $5,798,689 | $3,204,799 | 30.4% |
| 19942 | 12,282 | 149,532 | $21,012,512 | $9,885,335 | 2,441 | 34,880 | $6,315,646 | $3,272,879 | 33.1% |
| 19943 | 13,015 | 161,978 | $22,750,036 | $10,457,018 | 2,380 | 31,619 | $5,852,759 | $3,144,020 | 30.1% |
| 19944 | 13,841 | 178,793 | $24,603,725 | $11,140,351 | 2,567 | 34,778 | $6,224,689 | $3,593,561 | 32.3% |
| 19951 | 16,867 | 202,779 | $29,107,520 | $12,228,528 | 3,108 | 43,378 | $7,141,472 | $4,078,348 | 33.4% |
| 19952 | 20,463 | 236,520 | $34,897,330 | $14,231,312 | 3,675 | 48,238 | $8,190,347 | $4,510,088 | 31.7% |
| 19953 | 20,794 | 274,075 | $37,174,636 | $15,318,542 | 4,158 | 59,256 | $9,439,186 | $5,109,410 | 33.4% |
| 19954 | 23,266 | 299,355 | $39,612,668 | $16,891,388 | 5,186 | 78,601 | $11,044,525 | $5,976,621 | 35.4% |
| 19961 | 26,394 | 328,215 | $44,006,352 | $17,954,527 | 5,308 | 83,197 | $11,992,965 | $6,471,739 | 36.0% |
| 19962 | 26,883 | 335,611 | $42,020,654 | $17,337,510 | 5,337 | 84,767 | $11,431,461 | $6,087,389 | 35.1% |
| 19963 | 28,619 | 351,586 | $44,572,580 | $17,848,615 | 5,204 | 85,282 | $11,814,298 | $6,247,331 | 35.0% |
| 19964 | 32,613 | 375,141 | $47,185,405 | $18,479,390 | 4,966 | 80,956 | $11,659,209 | $5,927,769 | 32.1% |
| 19971 | 37,696 | 410,461 | $56,299,604 | $20,725,693 | 5,001 | 77,360 | $11,971,486 | $6,268,861 | 30.2% |
| 19972 | 40,285 | 455,743 | $58,096,370 | $21,461,021 | 4,847 | 68,588 | $9,764,379 | $5,075,492 | 23.6% |
| 19973 | 45,718 | 493,419 | $62,195,909 | $22,180,165 | 4,537 | 64,302 | $9,316,798 | $4,795,406 | 21.6% |
| 19974 | 55,017 | 514,807 | $62,459,872 | $22,087,722 | 4,224 | 56,857 | $8,804,977 | $4,470,366 | 20.2% |
| 19981 | 59,116 | 526,485 | $66,168,029 | $22,280,910 | 3,818 | 47,853 | $7,454,055 | $3,690,861 | 16.6% |
| 19982 | 65,779 | 583,896 | $77,559,927 | $23,142,874 | 3,352 | 44,299 | $6,811,953 | $3,316,508 | 14.3% |
| 19983 | 60,282 | 627,213 | $79,105,097 | $23,900,603 | 3,516 | 43,873 | $7,252,251 | $3,377,657 | 14.1% |
| 19984 | 47,094 | 622,722 | $79,339,259 | $23,338,923 | 3,296 | 42,057 | $6,787,513 | $3,259,013 | 14.0% |
| 19991 | 42,633 | 555,722 | $70,890,807 | $21,454,031 | 2,339 | 26,735 | $4,709,198 | $2,271,951 | 10.6% |
| 19992 | 38,122 | 496,599 | $65,336,425 | $19,259,144 | 968 | 11,927 | $2,404,282 | $1,167,382 | 6.1% |
| 19993 | 31,208 | 479,971 | $64,816,567 | $18,746,097 | 19 | 71 | $203,025 | $78,842 | 0.4% |
| 19994 | 30,612 | 494,357 | $65,322,181 | $19,511,800 | 19 | 115 | $436,897 | $192,511 | 1.0% |
| 20001 | 28,952 | 445,088 | $63,004,148 | $18,942,334 | 15 | 68 | $326,233 | $114,465 | 0.6% |
| 20002 | 27,171 | 420,201 | $56,265,686 | $16,752,172 | 4 | 39 | $77,571 | $5,788 | 0.0% |
| 20003 | 23,784 | 383,600 | $53,868,457 | $15,809,795 | 1 | 18 | - | - | - |
| 20004 | 20,756 | 333,126 | $43,341,533 | $11,642,555 | - | - | - | - | - |
| 20011 | 16,322 | 257,281 | $33,115,441 | $9,993,068 | - | - | - | - | - |
| 20012 | 15,276 | 239,086 | $30,533,248 | $8,446,058 | - | - | - | - | - |
| 20013 | 9,547 | 168,518 | $18,488,614 | $3,364,884 | - | - | - | - | - |
| 20014 | 3,070 | 52,383 | $8,979,755 | $1,852,712 | - | - | - | - | - |
| Total | 1,070,264 | 13,087,525 | $1,785,881,567 | $661,896,653 | 129,395 | 1,769,280 | $293,258,324 | $158,335,648 | 23.92% |

**Table B: Total Number of Medicaid Claims with 1+ Complaint Line Item in CHIP Data: All Clients and Abbott Only**

| Yr-Quarter | All Clients | | | | Abbott Only | | | | |
| | # Claims | # Line Items | Total Billed | Total Paid | # Claims | # Line Items | Total Billed | Total Paid | Abbott Share |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 19911 | 3 | 143 | $35,337 | $10,390 | - | - | - | - | - |
| 19912 | 17 | 412 | $77,287 | $15,688 | - | - | - | - | - |
| 19913 | 33 | 830 | $187,389 | $51,392 | - | - | - | - | - |
| 19914 | 90 | 2,601 | $447,681 | $142,551 | - | - | - | - | - |
| 19921 | 101 | 2,767 | $414,221 | $105,354 | - | - | - | - | - |
| 19922 | 97 | 2,639 | $480,006 | $120,219 | - | - | - | - | - |
| 19923 | 112 | 3,200 | $609,479 | $165,552 | 4 | 59 | $13,091 | $5,220 | 3.2% |
| 19924 | 115 | 2,927 | $507,084 | $143,329 | 8 | 119 | $20,384 | $10,514 | 7.3% |
| 19931 | 102 | 2,606 | $472,215 | $104,672 | 11 | 199 | $33,324 | $13,242 | 12.7% |
| 19932 | 139 | 3,442 | $737,991 | $146,717 | 7 | 101 | $20,490 | $5,544 | 3.8% |
| 19933 | 142 | 3,752 | $657,640 | $156,095 | 7 | 144 | $24,861 | $5,084 | 3.3% |
| 19934 | 202 | 5,390 | $969,171 | $228,811 | 34 | 1,210 | $211,600 | $64,306 | 28.1% |
| 19941 | 292 | 7,807 | $1,362,997 | $304,325 | 65 | 2,411 | $457,626 | $132,161 | 43.4% |
| 19942 | 340 | 9,417 | $1,648,345 | $354,263 | 78 | 2,768 | $484,515 | $139,909 | 39.5% |
| 19943 | 376 | 10,556 | $1,736,406 | $359,464 | 73 | 2,287 | $435,225 | $128,739 | 35.8% |
| 19944 | 459 | 13,489 | $2,356,853 | $420,813 | 99 | 3,025 | $530,245 | $119,895 | 28.5% |
| 19951 | 649 | 17,667 | $3,041,081 | $581,648 | 122 | 4,028 | $664,115 | $166,589 | 28.6% |
| 19952 | 854 | 21,656 | $4,037,132 | $717,143 | 167 | 5,372 | $915,838 | $192,899 | 26.9% |
| 19953 | 835 | 24,335 | $4,227,129 | $818,928 | 169 | 5,612 | $1,035,803 | $239,947 | 29.3% |
| 19954 | 699 | 19,823 | $3,354,118 | $702,280 | 186 | 5,363 | $934,967 | $275,849 | 39.3% |
| 19961 | 766 | 20,588 | $3,823,183 | $812,289 | 231 | 7,769 | $1,405,680 | $383,204 | 47.2% |
| 19962 | 784 | 23,626 | $3,754,205 | $803,727 | 225 | 7,531 | $1,279,430 | $329,881 | 41.0% |
| 19963 | 760 | 20,806 | $3,120,752 | $659,548 | 194 | 5,623 | $940,492 | $253,160 | 38.4% |
| 19964 | 777 | 21,153 | $3,311,091 | $620,618 | 231 | 7,208 | $1,223,851 | $327,572 | 52.8% |
| 19971 | 832 | 22,693 | $3,723,685 | $696,800 | 194 | 5,852 | $1,037,776 | $297,135 | 42.6% |
| 19972 | 888 | 26,115 | $4,308,370 | $909,410 | 175 | 5,105 | $1,053,189 | $354,366 | 39.0% |
| 19973 | 1,270 | 35,106 | $6,156,650 | $1,321,796 | 208 | 7,247 | $1,449,286 | $453,497 | 34.3% |
| 19974 | 1,722 | 36,624 | $6,363,860 | $1,103,515 | 208 | 7,606 | $1,535,304 | $486,764 | 44.1% |
| 19981 | 1,809 | 38,563 | $7,652,368 | $1,965,605 | 140 | 4,575 | $909,235 | $278,139 | 14.2% |
| 19982 | 2,142 | 42,652 | $6,439,166 | $1,166,686 | 87 | 2,918 | $535,298 | $156,073 | 13.4% |
| 19983 | 2,210 | 44,068 | $6,670,653 | $1,087,698 | 91 | 2,752 | $659,833 | $191,842 | 17.6% |
| 19984 | 1,939 | 37,932 | $5,898,788 | $957,499 | 86 | 2,393 | $577,031 | $173,463 | 18.1% |
| 19991 | 1,670 | 34,993 | $5,077,684 | $1,001,054 | 63 | 1,491 | $352,651 | $101,449 | 10.1% |
| 19992 | 1,173 | 28,985 | $4,271,103 | $916,711 | 21 | 719 | $188,842 | $55,173 | 6.0% |
| 19993 | 835 | 21,841 | $3,353,999 | $672,282 | - | - | - | - | - |
| 19994 | 1,049 | 25,569 | $3,845,864 | $669,243 | - | - | - | - | - |
| 20001 | 759 | 16,219 | $2,713,394 | $699,193 | - | - | - | - | - |
| 20002 | 454 | 11,664 | $1,667,748 | $469,767 | - | - | - | - | - |
| 20003 | 258 | 7,154 | $995,477 | $268,827 | - | - | - | - | - |
| 20004 | 223 | 5,635 | $844,550 | $227,444 | - | - | - | - | - |
| 20011 | 265 | 6,619 | $869,054 | $204,336 | - | - | - | - | - |
| 20012 | 142 | 3,122 | $477,334 | $148,166 | - | - | - | - | - |
| 20013 | 108 | 2,361 | $513,576 | $71,015 | - | - | - | - | - |
| 20014 | 6 | 264 | $32,020 | $0 | - | - | - | - | - |
| **Total** | **28,498** | **689,811** | **$113,244,135** | **$23,102,865** | **3,184** | **101,487** | **$18,929,980** | **$5,341,613** | **23.12%** |

**Table C: Total Number of Medicare Claims with 1+ Complaint Line Item in CHIP Data: All Clients and Abbott Only**

| Yr-Quarter | All Clients | | | | Abbott Only | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # Claims | # Line Items | Total Billed | Total Paid | # Claims | # Line Items | Total Billed | Total Paid | Abbott Share |
| 19911 | 4 | 137 | $27,251 | $8,487 | - | - | - | - | - |
| 19912 | 6 | 117 | $23,212 | $5,896 | - | - | - | - | - |
| 19913 | 26 | 635 | $148,128 | $52,800 | - | - | - | - | - |
| 19914 | 52 | 1,364 | $242,257 | $84,479 | - | - | - | - | - |
| 19921 | 42 | 1,145 | $290,227 | $105,404 | 1 | 36 | $19,260 | $5,813 | 5.5% |
| 19922 | 50 | 1,621 | $354,116 | $123,870 | - | - | - | - | - |
| 19923 | 71 | 1,956 | $513,110 | $187,344 | 2 | 72 | $46,609 | $14,416 | 7.7% |
| 19924 | 47 | 1,085 | $290,229 | $101,598 | 1 | 29 | $15,884 | $4,223 | 4.2% |
| 19931 | 43 | 939 | $240,316 | $86,019 | 5 | 142 | $81,657 | $19,728 | 22.9% |
| 19932 | 46 | 1,277 | $391,608 | $125,496 | 8 | 216 | $119,300 | $34,910 | 27.8% |
| 19933 | 59 | 1,679 | $484,462 | $149,414 | 3 | 127 | $94,898 | $29,315 | 19.6% |
| 19934 | 110 | 2,575 | $668,788 | $216,900 | 13 | 370 | $176,272 | $53,539 | 24.7% |
| 19941 | 149 | 3,244 | $763,752 | $196,294 | 10 | 205 | $111,938 | $30,613 | 15.6% |
| 19942 | 221 | 3,956 | $941,836 | $245,531 | 15 | 423 | $176,896 | $39,872 | 16.2% |
| 19943 | 204 | 5,283 | $1,274,047 | $307,048 | 31 | 986 | $245,179 | $69,300 | 22.6% |
| 19944 | 332 | 8,094 | $2,006,343 | $465,764 | 69 | 2,269 | $595,732 | $168,352 | 36.1% |
| 19951 | 418 | 9,638 | $2,253,831 | $555,442 | 100 | 3,220 | $757,599 | $240,552 | 43.3% |
| 19952 | 536 | 12,593 | $2,818,951 | $566,003 | 128 | 3,619 | $757,146 | $169,964 | 30.0% |
| 19953 | 603 | 16,421 | $3,871,402 | $774,653 | 171 | 5,450 | $1,118,903 | $286,981 | 37.0% |
| 19954 | 649 | 17,962 | $4,023,620 | $845,753 | 222 | 7,531 | $1,418,965 | $385,741 | 45.6% |
| 19961 | 744 | 18,844 | $4,502,311 | $915,071 | 244 | 7,390 | $1,595,145 | $445,285 | 48.7% |
| 19962 | 663 | 19,760 | $4,175,143 | $871,010 | 255 | 8,622 | $1,763,191 | $431,970 | 49.6% |
| 19963 | 668 | 19,313 | $3,916,747 | $785,181 | 239 | 7,696 | $1,469,236 | $353,110 | 45.0% |
| 19964 | 576 | 15,875 | $3,486,686 | $660,071 | 207 | 6,362 | $1,287,619 | $291,616 | 44.2% |
| 19971 | 710 | 19,114 | $4,738,567 | $900,853 | 205 | 6,005 | $1,461,924 | $400,055 | 44.4% |
| 19972 | 861 | 24,051 | $4,778,160 | $996,367 | 162 | 4,709 | $1,167,218 | $327,240 | 32.8% |
| 19973 | 1,148 | 27,764 | $5,063,143 | $867,003 | 130 | 3,779 | $1,015,592 | $269,098 | 31.0% |
| 19974 | 1,457 | 30,479 | $4,928,167 | $856,088 | 117 | 3,029 | $965,397 | $257,361 | 30.1% |
| 19981 | 1,394 | 29,743 | $4,783,369 | $814,592 | 96 | 2,732 | $881,214 | $232,076 | 28.5% |
| 19982 | 1,739 | 38,813 | $5,600,014 | $970,267 | 98 | 3,243 | $1,169,785 | $354,138 | 36.5% |
| 19983 | 1,787 | 37,168 | $5,705,180 | $934,939 | 106 | 3,836 | $1,315,070 | $368,377 | 39.4% |
| 19984 | 2,218 | 44,599 | $5,626,218 | $851,816 | 93 | 2,960 | $964,464 | $246,788 | 29.0% |
| 19991 | 1,935 | 40,698 | $4,888,746 | $724,282 | 76 | 2,267 | $651,579 | $106,697 | 14.7% |
| 19992 | 1,879 | 37,791 | $4,917,191 | $676,618 | 56 | 1,271 | $291,447 | $38,218 | 5.6% |
| 19993 | 1,768 | 36,924 | $6,009,270 | $815,094 | - | - | - | - | - |
| 19994 | 1,565 | 35,337 | $5,266,932 | $787,663 | - | - | - | - | - |
| 20001 | 1,353 | 27,106 | $3,958,007 | $673,826 | - | - | - | - | - |
| 20002 | 1,211 | 23,666 | $3,507,925 | $551,737 | - | - | - | - | - |
| 20003 | 850 | 18,286 | $2,985,527 | $597,724 | - | - | - | - | - |
| 20004 | 847 | 16,656 | $2,805,932 | $736,807 | - | - | - | - | - |
| 20011 | 870 | 15,597 | $2,459,560 | $588,270 | - | - | - | - | - |
| 20012 | 655 | 10,902 | $2,361,178 | $809,725 | - | - | - | - | - |
| 20013 | 283 | 5,149 | $985,165 | $61,988 | - | - | - | - | - |
| 20014 | 13 | 310 | $41,673 | $1,346 | - | - | - | - | - |
| **Total** | **30,862** | **685,666** | **$119,118,316** | **$22,652,533** | **2,863** | **88,596** | **$21,735,119** | **$5,675,347** | **25.05%** |

**Table D: Total Number of Medicaid Claims and Line Items for Abbott Complaint Products in CHIP Data: All Clients and Abbott Only**

| Yr-Quarter | All Clients | | | | Abbott Only | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # Claims | # Line Items | Total Billed | Total Paid | # Claims | # Line Items | Total Billed | Total Paid | Abbott Share |
| 19911 | 3 | 7 | $19 | $6 | - | - | - | - | - |
| 19912 | 17 | 31 | $3,196 | $676 | - | - | - | - | - |
| 19913 | 33 | 53 | $2,414 | $608 | - | - | - | - | - |
| 19914 | 90 | 182 | $2,304 | $680 | - | - | - | - | - |
| 19921 | 101 | 169 | $2,511 | $847 | - | - | - | - | - |
| 19922 | 97 | 177 | $3,829 | $1,407 | - | - | - | - | - |
| 19923 | 112 | 209 | $6,872 | $1,798 | 4 | 4 | $568 | $203 | 11.3% |
| 19924 | 115 | 203 | $7,485 | $2,478 | 8 | 10 | $2,757 | $1,439 | 58.1% |
| 19931 | 102 | 170 | $10,698 | $3,005 | 11 | 16 | $3,287 | $1,518 | 50.5% |
| 19932 | 139 | 214 | $10,304 | $1,582 | 7 | 9 | $596 | $178 | 11.2% |
| 19933 | 142 | 261 | $14,176 | $2,523 | 7 | 10 | $971 | $236 | 9.4% |
| 19934 | 202 | 335 | $11,900 | $2,541 | 34 | 56 | $3,066 | $1,335 | 52.5% |
| 19941 | 292 | 520 | $12,151 | $2,200 | 65 | 128 | $2,915 | $869 | 39.5% |
| 19942 | 340 | 625 | $13,880 | $3,631 | 78 | 159 | $3,768 | $1,341 | 36.9% |
| 19943 | 376 | 828 | $22,614 | $3,644 | 73 | 156 | $3,721 | $1,245 | 34.2% |
| 19944 | 459 | 1,082 | $40,477 | $6,524 | 99 | 210 | $10,427 | $2,576 | 39.5% |
| 19951 | 649 | 1,334 | $44,611 | $9,868 | 122 | 247 | $14,159 | $4,209 | 42.6% |
| 19952 | 854 | 1,745 | $64,579 | $11,740 | 167 | 327 | $16,274 | $3,747 | 31.9% |
| 19953 | 835 | 1,853 | $91,461 | $14,262 | 169 | 331 | $23,557 | $5,126 | 35.9% |
| 19954 | 699 | 1,401 | $75,108 | $12,827 | 186 | 322 | $24,625 | $6,818 | 53.1% |
| 19961 | 766 | 1,499 | $87,581 | $18,991 | 231 | 471 | $37,852 | $9,562 | 50.4% |
| 19962 | 784 | 1,662 | $85,135 | $18,378 | 225 | 458 | $32,788 | $8,728 | 47.5% |
| 19963 | 760 | 1,604 | $83,077 | $13,549 | 194 | 375 | $28,383 | $6,267 | 46.3% |
| 19964 | 777 | 1,618 | $79,599 | $13,109 | 231 | 466 | $34,885 | $8,109 | 61.9% |
| 19971 | 832 | 1,825 | $88,876 | $13,242 | 194 | 403 | $31,093 | $7,184 | 54.2% |
| 19972 | 888 | 2,132 | $91,029 | $17,887 | 175 | 326 | $22,987 | $6,271 | 35.1% |
| 19973 | 1,270 | 3,047 | $137,351 | $20,261 | 208 | 423 | $32,018 | $8,269 | 40.8% |
| 19974 | 1,722 | 3,508 | $182,709 | $20,205 | 208 | 408 | $26,619 | $7,020 | 34.7% |
| 19981 | 1,809 | 3,715 | $159,579 | $18,502 | 140 | 250 | $18,077 | $4,685 | 25.3% |
| 19982 | 2,142 | 4,380 | $199,448 | $22,698 | 87 | 174 | $13,814 | $3,970 | 17.5% |
| 19983 | 2,210 | 4,367 | $203,340 | $25,544 | 91 | 148 | $13,450 | $4,289 | 16.8% |
| 19984 | 1,939 | 3,854 | $184,930 | $20,963 | 86 | 132 | $9,602 | $2,818 | 13.4% |
| 19991 | 1,670 | 3,631 | $134,258 | $15,816 | 63 | 100 | $6,156 | $1,989 | 12.6% |
| 19992 | 1,173 | 2,847 | $102,650 | $15,564 | 21 | 41 | $2,957 | $864 | 5.5% |
| 19993 | 835 | 2,191 | $98,225 | $13,178 | - | - | - | - | - |
| 19994 | 1,049 | 2,789 | $132,608 | $15,302 | - | - | - | - | - |
| 20001 | 759 | 1,891 | $80,276 | $17,978 | - | - | - | - | - |
| 20002 | 454 | 1,338 | $64,914 | $15,653 | - | - | - | - | - |
| 20003 | 258 | 654 | $28,861 | $5,255 | - | - | - | - | - |
| 20004 | 223 | 576 | $24,137 | $4,755 | - | - | - | - | - |
| 20011 | 265 | 715 | $30,407 | $5,532 | - | - | - | - | - |
| 20012 | 142 | 342 | $14,262 | $3,078 | - | - | - | - | - |
| 20013 | 108 | 231 | $16,155 | $928 | - | - | - | - | - |
| 20014 | 6 | 17 | $2,077 | $0 | - | - | - | - | - |
| **Total** | **28,498** | **61,832** | **$2,752,072** | **$419,215** | **3,184** | **6,160** | **$421,373** | **$110,860** | **26.44%** |

**Table E: Total Number of Medicare Claims and Line Items for Abbott Complaint Products in CHIP Data: All Clients and Abbott Only**

| | All Clients | | | | Abbott Only | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Yr-Quarter | # Claims | # Line Items | Total Billed | Total Paid | # Claims | # Line Items | Total Billed | Total Paid | Abbott Share |
| 19911 | 4 | 7 | $40 | $4 | - | - | - | - | - |
| 19912 | 6 | 7 | $648 | $503 | - | - | - | - | - |
| 19913 | 26 | 49 | $5,601 | $3,903 | - | - | - | - | - |
| 19914 | 52 | 124 | $50,026 | $21,198 | - | - | - | - | - |
| 19921 | 42 | 83 | $40,403 | $21,772 | 1 | 1 | - | - | - |
| 19922 | 50 | 129 | $56,063 | $31,721 | - | - | - | - | - |
| 19923 | 71 | 151 | $66,086 | $12,596 | 2 | 3 | $96 | $36 | 0.3% |
| 19924 | 47 | 97 | $32,044 | $15,958 | 1 | 2 | $43 | $17 | 0.1% |
| 19931 | 43 | 67 | $30,048 | $7,248 | 5 | 8 | $1,261 | $588 | 8.1% |
| 19932 | 46 | 88 | $53,274 | $8,978 | 8 | 16 | $7,031 | $2,500 | 27.8% |
| 19933 | 59 | 119 | $81,131 | $10,445 | 3 | 8 | $2,528 | $1,298 | 12.4% |
| 19934 | 110 | 174 | $119,643 | $26,786 | 13 | 19 | $3,354 | $1,324 | 4.9% |
| 19941 | 149 | 239 | $121,912 | $22,554 | 10 | 17 | $3,225 | $1,336 | 5.9% |
| 19942 | 221 | 311 | $172,704 | $36,934 | 15 | 31 | $5,730 | $2,231 | 6.0% |
| 19943 | 204 | 430 | $189,284 | $50,039 | 31 | 74 | $10,631 | $4,170 | 8.3% |
| 19944 | 332 | 655 | $282,401 | $73,429 | 69 | 200 | $16,032 | $4,061 | 5.5% |
| 19951 | 418 | 847 | $337,816 | $86,659 | 100 | 290 | $26,831 | $7,930 | 9.2% |
| 19952 | 536 | 1,256 | $493,531 | $111,512 | 128 | 361 | $50,715 | $11,977 | 10.7% |
| 19953 | 603 | 1,588 | $565,852 | $132,771 | 171 | 565 | $83,290 | $16,862 | 12.7% |
| 19954 | 649 | 1,613 | $620,359 | $117,388 | 222 | 689 | $100,998 | $22,379 | 19.1% |
| 19961 | 744 | 1,873 | $629,939 | $146,344 | 244 | 740 | $97,584 | $32,818 | 22.4% |
| 19962 | 663 | 2,034 | $588,327 | $140,714 | 255 | 905 | $118,083 | $33,361 | 23.7% |
| 19963 | 668 | 2,053 | $579,989 | $99,727 | 239 | 810 | $82,160 | $19,640 | 19.7% |
| 19964 | 576 | 1,522 | $347,111 | $63,936 | 207 | 600 | $57,200 | $10,700 | 16.7% |
| 19971 | 710 | 1,730 | $397,466 | $54,384 | 205 | 543 | $51,091 | $13,108 | 24.1% |
| 19972 | 861 | 2,293 | $510,554 | $97,768 | 162 | 449 | $55,147 | $16,955 | 17.3% |
| 19973 | 1,148 | 3,056 | $498,076 | $107,336 | 130 | 401 | $55,642 | $19,691 | 18.3% |
| 19974 | 1,457 | 3,783 | $465,965 | $75,616 | 117 | 291 | $37,820 | $9,542 | 12.6% |
| 19981 | 1,394 | 3,893 | $462,683 | $71,711 | 96 | 203 | $19,199 | $3,925 | 5.5% |
| 19982 | 1,739 | 5,018 | $416,779 | $66,940 | 98 | 274 | $28,826 | $6,542 | 9.8% |
| 19983 | 1,787 | 4,829 | $448,333 | $80,348 | 106 | 382 | $34,165 | $11,580 | 14.4% |
| 19984 | 2,218 | 5,430 | $511,389 | $81,666 | 93 | 231 | $29,757 | $4,284 | 5.2% |
| 19991 | 1,935 | 4,512 | $561,322 | $85,999 | 76 | 225 | $34,140 | $6,355 | 7.4% |
| 19992 | 1,879 | 4,090 | $548,962 | $81,626 | 56 | 146 | $29,417 | $4,430 | 5.4% |
| 19993 | 1,768 | 3,876 | $740,440 | $107,981 | - | - | - | - | - |
| 19994 | 1,565 | 4,039 | $555,496 | $76,140 | - | - | - | - | - |
| 20001 | 1,353 | 3,065 | $420,168 | $68,291 | - | - | - | - | - |
| 20002 | 1,211 | 2,887 | $314,525 | $57,776 | - | - | - | - | - |
| 20003 | 850 | 2,246 | $264,631 | $63,265 | - | - | - | - | - |
| 20004 | 847 | 1,929 | $175,913 | $31,100 | - | - | - | - | - |
| 20011 | 870 | 1,899 | $128,354 | $20,871 | - | - | - | - | - |
| 20012 | 655 | 1,331 | $107,259 | $22,790 | - | - | - | - | - |
| 20013 | 283 | 634 | $70,094 | $1,965 | - | - | - | - | - |
| 20014 | 13 | 30 | $10,084 | $735 | - | - | - | - | - |
| **Total** | **30,862** | **76,086** | **$13,072,725** | **$2,497,428** | **2,863** | **8,484** | **$1,041,995** | **$269,639** | **10.80%** |

### Table F: Billed Amount versus AWP for Complaint Products

| | All Clients | | | Abbott Only | |
| --- | --- | --- | --- | --- | --- |
| NDC | Unweighted average billed amount per package | Unweighted average FDB package AWP | NDC | Unweighted average billed amount per package | Unweighted average FDB package AWP |
| 00074196607 | 3.94 | 1.98 | 00074196607 | | |
| 00074397703 | 2.66 | 2.15 | 00074397703 | | |
| 00074433201 | 66.01 | 31.19 | 00074433201 | 66.01 | 29.36 |
| 00074488710 | 2.00 | 1.50 | 00074488710 | 1.66 | 1.46 |
| 00074488720 | 1.51 | 1.72 | 00074488720 | | |
| 00074488750 | 2.80 | 2.72 | 00074488750 | | |
| 00074488810 | 2.10 | 1.69 | 00074488810 | 2.19 | 1.63 |
| 00074488820 | 1.93 | 1.94 | 00074488820 | | |
| 00074613802 | 27.00 | 13.39 | 00074613802 | | |
| 00074613803 | 25.40 | 12.93 | 00074613803 | 25.26 | 12.82 |
| 00074613822 | 27.00 | 14.75 | 00074613822 | | |
| 00074613902 | 2.70 | 11.74 | 00074613902 | | |
| 00074613903 | 27.00 | 12.33 | 00074613903 | 27.00 | 12.33 |
| 00074653301 | 81.65 | 67.92 | 00074653301 | 76.33 | 69.33 |
| 00074653501 | 89.84 | 23.60 | 00074653501 | | |
| 00074710013 | 16.30 | 13.18 | 00074710013 | | |
| 00074710023 | 16.00 | 12.80 | 00074710023 | | |
| 00074710102 | 20.15 | 15.44 | 00074710102 | | |
| 00074710113 | 16.29 | 12.77 | 00074710113 | | |
| 00074710123 | 14.61 | 12.61 | 00074710123 | | |
| | | | 00074712007 | | |
| 00074713809 | 17.02 | 14.81 | 00074713809 | | |
| 00074713909 | 19.20 | 14.08 | 00074713909 | 27.00 | 15.11 |
| 00074790209 | 30.05 | 19.50 | 00074790209 | | |
| 00074792202 | 15.76 | 11.14 | 00074792202 | | |
| 00074792203 | 24.06 | 10.18 | 00074792203 | 27.00 | 9.71 |
| 00074792209 | 19.50 | 12.31 | 00074792209 | | |
| 00074792336 | 15.05 | 11.13 | 00074792336 | 14.20 | 10.98 |
| 00074792337 | 15.33 | 11.08 | 00074792337 | 14.20 | 10.66 |
| 00074792409 | 17.09 | 13.21 | 00074792409 | | |
| 00074792609 | 19.80 | 13.36 | 00074792609 | | |
| 00074794109 | 23.49 | 13.29 | 00074794109 | | |
| 00074797205 | 11.30 | 7.19 | 00074797205 | 11.30 | 7.06 |
| 00074797305 | 27.00 | 8.42 | 00074797305 | | |
| 00074798302 | 17.60 | 10.69 | 00074798302 | | |
| 00074798303 | 16.81 | 10.35 | 00074798303 | 27.00 | 9.56 |
| 00074798309 | 20.56 | 11.49 | 00074798309 | | |
| 00074798436 | 14.44 | 11.10 | 00074798436 | 14.20 | 10.65 |
| 00074798437 | 14.63 | 11.31 | 00074798437 | 14.20 | 11.11 |
| 00074798509 | 20.41 | 12.49 | 00074798509 | | |

# EXHIBIT DW

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*,<br>CIVIL ACTION NO. 06-CV-11337-PBS | MDL No. 1456<br>Civil Action No. 01-12257-PBS<br><br>Hon. Patti B. Saris |

**REBUTTAL REPORT OF MARK G. DUGGAN, PH.D.**

**Introduction**

In this document I respond to the primary criticisms in Dr. Hughes' and Mr. Young's reports of my June 19, 2008 report, which calculated the difference between what the federal government reimbursed for certain pharmaceutical products provided to Medicaid and Medicare recipients during the 1991 to 2001 period and what the federal government would have reimbursed for the same products during the same period if prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP and WAC of Abbott Complaint products.

**Holding All Else Equal**

One of Dr. Hughes' and Mr. Young's criticisms of the analysis in my Abbott report is that I hold other factors constant when determining the amount that the federal government would have paid if alternative AWPs and WACs had been used for Abbott's products when adjudicating claims for the Medicare and Medicaid programs (see e.g. Dr. Hughes' report in paragraphs 21 and 28 and Mr. Young's report in paragraphs 33 and 56). When estimating the causal effect of one variable on some other variable, it is common practice in applied microeconomics to hold other factors constant and to focus on the direct rather than the indirect effects.  For example, in my own previous research on Medicaid managed care that was published in the *Journal of Public Economics* (2004), I estimated the effect on Medicaid expenditures of shifting Medicaid recipients from fee-for-service into managed care while holding other factors constant. To do this, I utilized Medicaid claims and enrollment data to compare spending for the same person before and after they were shifted into Medicaid managed care, and estimated the extent to which average spending changed as a result.

It is indeed possible that the shift from fee-for-service into managed care might have affected enrollment in the program, as some individuals might have decided to enroll in Medicaid or disenroll from Medicaid at different times as a result. This would of course induce a change in Medicaid spending that would not be captured by the analysis described above. Similarly, the state may have elected to change hospital or physician reimbursement if it had not moved to Medicaid managed care. However, in this study and in many similar studies by myself and others specializing in applied microeconomic research, I held these other factors, which represent two of the many possible indirect effects of the policy change, constant.[1]

Of course the details of my 2004 study differ in certain respects from the application considered in my report. But once one opens up the possibility of indirect effects, as Dr. Hughes and Mr. Young do in their own reports, it is important to remember that many of the most plausible indirect effects would *increase* rather than reduce the damages summarized in my report. Additionally, estimates of the magnitude of each one of these indirect effects will in many cases be driven by the researcher's often untestable assumptions and his/her subjective judgments about which factors to allow to change.  For example, would pharmacies have reduced their purchases of Complaint products in response to the more truthful AWPs, and if so by how much? Would the more truthful reporting by Abbott have caused its competitors to report more truthful prices? Would state Medicaid agencies have raised their dispensing fees in response to lower AWPs for 44 out of the 25,000 or so NDCs covered? By how much would they have raised these dispensing fees? How much would state governments' MAC prices have

---

[1] Other examples of studies that aim to isolate the causal effect of one variable on one or more other variables by holding other factors constant abound in economics. See, for example, Evans and Snyder (2006) regarding the effect of income on mortality, Levitt (1997) for the effect of police on crime rates, Gruber and Poterba (1994) for the effect of tax incentives on health insurance coverage, Angrist and Evans (1998) for the effect of the number of children on maternal labor supply, and Card and Krueger (1994) for the effect of the minimum wage on employment. In these studies and many related ones, the authors focus on the direct effect of the variable of interest rather than the many possible indirect effects.

Mark G. Duggan, Ph.D. Rebuttal Report – April 23, 2009                    3

changed as a result of the alternative AWPs and WACs?  Would these lower AWPs and WACs have caused the state governments to implement their MAC prices sooner or the federal government to implement FUL (federal upper limit) prices sooner? Would Medicare utilization have increased because of the lower consumer co-pay on J-code products, and if so by how much?

All of these factors and many more become potentially relevant once one opens up the possibility that more truthful price reporting by Abbott would have had indirect effects. The direct effects that I consider in my report, which hold other factors constant, are based on claims that were actually paid by the Medicaid and Medicare programs, and demonstrate a significant effect on federal expenditures, state expenditures, and out-of-pocket costs for Medicare recipients.

**Medicaid Utilization**

Dr. Hughes argues (in paragraphs 74, 75, and 86 of his report) that if Abbott had reported prices that were more reflective of actual transaction prices for Complaint products, pharmacies would have refused to fill prescriptions for Complaint products and would not have participated in Medicaid.  However, Dr. Hughes does not offer credible empirical evidence to support the claim that this would have a material impact on my findings.  And indeed if this were true, then it would serve to increase rather than reduce the total value of DIFFERENCE, because the federal government would not have paid anything for those claims because they would not have been submitted.

Furthermore, if one were to consider the effect that alternative AWPs for Abbott's Complaint products would have had on utilization for these products, it is instructive to consider

a real-world example that to some extent mimics the AWP changes that I consider in my report. In 2000 and 2001, substantially lower AWPs were implemented for Abbott Complaint products described in my report. For example, the AWP for Abbott's Vancomycin 653301 product fell by 77 percent, from $76.43 to $17.73, while similarly large AWP declines occurred for Abbott's other Complaint products, and there were not corresponding changes in dispensing fees. In the subsequent three years, little change was observed in the use of these same Abbott products. For example, the total number of prescriptions for Abbott's Complaint products actually increased by 5 percent from the fourth quarter of 1999 until the fourth quarter of 2003.[2]  Thus even with this massive change in AWPs and no significant changes in dispensing fees, there was not a correspondingly significant change in the utilization of these products, thus undermining the claim that utilization of Abbott's Complaint products would have plummeted if they had reported more truthful AWPs.

**Medicaid Dispensing Fees**

A related point that Dr. Hughes makes in paragraphs 64 to 75 of his report and that Mr. Young makes in paragraph 33 is that, if Abbott had reported more truthful AWPs and WACs for Complaint products, the state Medicaid agencies would have adjusted their dispensing fees to offset the reduction in pharmacies' ingredient cost profits.  Once again, Dr. Hughes and Mr. Young offer little credible evidence to support this claim. In considering the validity of this

---

[2] An examination of the utilization data does suggest a modest effect of the revised prices on utilization. More specifically, from 1999Q4 to 2000Q4, the number of prescriptions for Abbott's Complaint products increased from 94,777 to 105,034 after having risen steadily in the preceding years along with Abbott's AWPs. By 2003Q4, this had declined to 99,476, suggesting that the lower ingredient cost reimbursement may have led to a modest reduction in utilization of Abbott products below what it otherwise would have been. It is also worth noting that there may be a stronger response by pharmacies to changes in published AWPs when they are increasing than when they are declining, as once they have paid the fixed cost to establish a contract with Abbott they might stick with it. Indeed, asymmetric price responses have been reported for other sectors, such as the practice of retail gas outlets to raise prices more quickly in response to increases in the price of crude oil than to lower them when crude oil prices decline (Borenstein, Cameron, and Gilbert, 1997), which has been dubbed the "rockets and feathers" phenomenon.

Mark G. Duggan, Ph.D. Rebuttal Report – April 23, 2009                                    5

point, it is important to note that Abbott's Complaint products accounted for less than 0.1 percent of Medicaid prescription drug spending in each year considered. Thus the effect on pharmacies' overall reimbursement would have been very small, undermining the claim that this would have necessitated across-the-board increases in pharmacy's dispensing fees.

It is once again instructive to consider the example cited above when considering this issue. An examination of the state-specific dispensing fees indicates that there was not a large increase after the change in Abbott and other firms' AWPs that occurred in 2000 and 2001 when states implemented the DOJ prices. More specifically, there were 33 states (excluding Ohio) that used the DOJ prices, with 19 holding their dispensing fees fixed around that time, 5 reducing their dispensing fees, and 9 increasing their dispensing fees. Among the fourteen that changed dispensing fees[3], the average change was actually less than zero (-$0.14), as the dispensing fee reductions for the 5 that reduced more than offset the effect of the 9 that increased. Additionally, this coincided with substantial price changes for hundreds more products with much greater Medicaid spending than is considered in my report.

Dr. Hughes and Mr. Young however imply that one must instead consider an across the board change in price reporting for all of the approximately 25,000 pharmaceutical products currently being reimbursed by the Medicaid program when evaluating the appropriateness of the transaction-based AWPs for the 44 Complaint NDCs described in my report. Of course, this would require knowledge of the spread between AWPs and actual transaction prices for all 25,000 of these products. And this would include not only generic products but also brand products, for which my previous research with Dr. Scott Morton in the *Quarterly Journal of Economics* (2006) on Medicaid drug reimbursement suggests that Medicaid's average AWP-

---

[3] It is worth noting that the timing of the dispensing fee change and the implementation of DOJ prices did not in all cases line up exactly, though I restrict to changes that occurred in 2000 and 2001.

based reimbursement amounts per prescription are a quite reliable guide to actual average prices. Given that brand products account for more than 80 percent of Medicaid drug spending, if one were to scale actual average prices by 1.25 for all pharmaceutical products' AWPs, it seems plausible that pharmacies would on average have higher ingredient cost reimbursement overall. Put simply, the spreads that existed for Abbott's Complaint products are unlikely to be representative of the spread for all pharmaceutical products.

In evaluating the merit of Dr. Hughes' and Mr. Young's assertions, it is also instructive to consider the increase in the use of MAC prices by state Medicaid programs during the time period of interest. An examination of dispensing fees during the same time period provides no evidence to suggest that there was a sea change in dispensing fees that accompanied the reduction in ingredient cost reimbursement for generic products.  In just five out of twenty-three cases when a state implemented a MAC program during the time period of interest did it also increase its dispensing fee around the same time, with an additional two states lowering their dispensing fee.[4] The average change in the dispensing fees among these twenty-three states was just nine cents, thus undermining the theory that significant changes in dispensing fees would have occurred if Abbott had reported more accurate prices for its AWPs and WACs.

Additionally, it is very likely that the use of the alternative AWPs and WACs that I describe in my report would have substantially lowered the state MAC prices in a similar fashion to the effect of more truthful AWPs on Medicare reimbursement. This would reduce reimbursement not only for Abbott's products but for some of its competitors' products in the same drug group as well. As I mention in my report, this would almost certainly have led to a

---

[4] It is once again worth noting that the timing of the dispensing fee change and the implementation of SMAC prices did not in all cases line up exactly.

substantial increase in the total value of DIFFERENCE. However, Dr. Hughes and Mr. Young essentially ignore this plausible effect in their reports.

**Many Plausible Indirect Effects Raise Rather than Reduce DIFFERENCE**

In pointing to the possible indirect effects of the alternative AWPs that I calculate from Abbott's transaction data, which are just 25 percent greater than actual average pharmacy prices rather than the 500 or 1000 percent greater as were those reported by Abbott, Dr. Hughes and Mr. Young point only to those indirect effects that would lower the total value of DIFFERENCE in my report, such as the increase in Medicaid dispensing fees. But as noted above, neither Dr. Hughes or Mr. Young offer empirical evidence to support their theory that pharmacies would have refused to fill prescriptions or would have dropped out of Medicaid in response to more accurate published prices for Complaint products. Dr. Hughes and Mr. Young also omit any consideration of those indirect effects that would lead to an increase in the value of DIFFERENCE, thus essentially cherry picking those indirect effects that go in the direction that is favorable to Abbott.

**An Analogy to Medicaid Hospital Reimbursement**

In considering the criticism of the "all else equal" assumption that I make in my report, it is useful to consider an analogy. Suppose that a hospital could not profitably serve Medicaid patients at a state's current reimbursement rates. It could then contact the state Medicaid agency and relay this concern to government officials, with this possibly leading to an increase in hospital reimbursement.  Or it could choose to serve these Medicaid patients even though it would be unprofitable for them to do so, recognizing that Medicaid patients are on average

unprofitable for hospitals, nursing homes, physicians, and many other health care providers as well (Gruber, 2003).  Or it could simply decide not to serve the Medicaid population. Alternatively, the hospital could decide to go an entirely different route by "upcoding" the Medicaid patients' diagnoses to more serious ones (thus boosting its revenues) or by reporting more services on the Medicaid claims than were actually performed. This might be motivated by a concern for Medicaid patients or simply by a desire to increase hospital profits.

If this hospital was caught in the act of upcoding or filing false claims, it might then be called upon to pay damages equal to the difference between the actual amount paid and the amount that would have been paid if it had not upcoded or submitted false claims. The hospital might then assert that if it had been truthful, it would not have been able to serve Medicaid patients, and thus utilization at this hospital would have been zero. Using Dr. Hughes' and Mr. Young's argument that total compensation to the provider is the only appropriate consideration, this would imply no damage to the government, as these patients would simply have been treated elsewhere and Medicaid revenues at the hospital would have been zero. Or this hospital might argue that if it had been truthful, it would have advocated strongly for higher reimbursement from the state Medicaid agency to make it more profitable for them to treat these patients. Thus the savings one would estimate using the proper diagnoses (rather than the upcoded ones) or the correct number of claims for Medicaid patients would be misleading. But this is indeed extremely speculative, as it is unclear that such a reimbursement change would have occurred and the magnitude of this change would be impossible to estimate with any precision, as it would reflect the outcome of a negotiation between the hospital and the state Medicaid agency.

Unfortunately for this hospital and by analogy for Abbott, none of these arguments change the fact that they could have been truthful (or less misleading) but elected not to be. The

available evidence suggests that Abbott aimed to use these extremely inaccurate and inflated

AWPs to its financial advantage in an effort to improve the company's market position and thus

its revenues. I am unaware of any evidence that Abbott inflated its published prices out of a

concern about access for Medicaid recipients.  And even if one assumes that the hospital in my

analogy or Abbott in this case had altruistic motives to ensure access for Medicaid recipients, it

does not appear to justify providing extremely inaccurate information to the government.


**Within State Extrapolation**

For my Medicaid analyses, I utilized claims data from state Medicaid agencies for 10

states. These 10 states account for 64 percent of all claims for Abbott's Complaint products.  The

reason that they account for such a large share of claims is that I utilized state claims data for all

of the states with the largest number of claims, including California, Florida, and New York, but

did not analyze the states with the smallest number of claims, such as Vermont, Wyoming, and

the District of Columbia.

In certain periods for each of these 10 states, I did not have complete state claims data,

and thus utilized either SMRF/MAX/MSIS claims data from CMS or aggregate SDUD data from

CMS. More specifically, for 86.8 percent of the 1.94 million claims for these 10 states I used

state Medicaid claims data, while I used SMRF/MAX/MSIS claims data for 8.7 percent, and

aggregate SDUD data for an additional 4.5 percent. This is depicted graphically in Figure A,

with the corresponding expenditure shares in Figure B.[5] The advantage of using each state's own

claims data when extrapolating to those NDC-quarters when I do not have state claims data is

---

[5] The red area in the middle of the bars represents the amount of all claims or expenditures in each year that use a within-state extrapolation.

that these NDC-quarters will typically share the same adjudication methodology and provider characteristics as in the NDC-quarters for which I do have state claims data.

Dr. Hughes in paragraph 90 of his report and Mr. Young in paragraph 38 of his report criticize my analyses for these 10 states when I do not utilize state claims data as being unreliable. As I make clear in my report, my algorithm during those periods when I do not have state claims data is quite conservative, as I adjust if the spread between actual and reported prices is lower (thus reducing the DIFFERENCE) but do not adjust if the spread between actual and reported prices is higher.  For example, suppose that the ratio of DIFFERENCE to Medicaid spending is 0.5 for an NDC-quarter in 1995Q1 and that this is the first quarter for which I have claims data.  If the spread between the AWP and the actual average price is lower in 1994Q4 then I adjust this 0.5 ratio down accordingly. However, if the spread is higher, which would generally imply a ratio higher than 0.5, I do not scale this upward.

Nevertheless, to probe on the validity of Dr. Hughes' and Mr. Young's criticism, I took the following approach. For each of the five largest states for which I performed within-state extrapolations (Florida, California, New Jersey, New York, and Kentucky), I pretended that the state Medicaid claims data started one year later than they actually did.  I then utilized the SMRF/MAX/MSIS claims data if it was available and otherwise used the SDUD data to estimate the total value of DIFFERENCE during these one-year periods. My findings indicate that the total value of DIFFERENCE is actually substantially *higher* when I use the state claims data compared to when I extrapolate using these alternative sources of data, leading to an overall increase of 0.2 percent in the total value of DIFFERENCE. Of course, the increase in DIFFERENCE is much larger for those one-year periods with the extrapolation. It therefore appears that, if anything, the fact that I do not have complete state Medicaid claims data for the

entire eleven-year period for these states serves to reduce rather than to increase the total value of DIFFERENCE.

Mr. Young did uncover two programming errors in my analyses when I applied the extrapolation methodology to the SMRF/MAX data for the states of Michigan and Missouri. Correcting these mistakes leads to a reduction in the federal DIFFERENCE and in the share of claims with a DIFFERENCE that is greater than zero for both states. More specifically, the total federal DIFFERENCE in Michigan declines from $2.040 million to $1.731 million while the total federal DIFFERENCE in Missouri declines from $3.589 million to $3.356 million. These adjustments do not affect my results for any other state, and thus the total federal DIFFERENCE for Medicaid declines by $542 thousand. The effects of the corrections to the SMRF/MAX analyses for Michigan and Missouri are summarized in the attached Table 25rev.

**Across State Extrapolation**

Dr. Hughes, in paragraphs 89-91 of his report, and Mr. Young in paragraphs 38-43 of his report, criticize my use of data for just 10 of the 48 states considered and the methodology that I use to estimate the total value of DIFFERENCE in the remaining 38 states. As mentioned above, these states account for a disproportionate share of all Medicaid claims for Complaint products (64 percent), as they include the large states such as New York and California while excluding states with relatively few claims such as Wyoming and Vermont. Additionally, my coverage with state claims data is most complete during those years with the highest number of Medicaid claims and Medicaid expenditures. This is depicted graphically in Figures A and B for Medicaid claims and expenditures, respectively.[6]

---

[6] The beige bars at the top represent the amount of claims or expenditures in the year for the 38 states.

In considering the validity of the extrapolation, it is worth noting that the two groups of states share many common features.  All of the states reimburse for the same Abbott Complaint drugs and all of the states are subject to the same federal regulations. All of the states use published prices when adjudicating claims and the vast majority of the states use the AWP. The fraction of states in the two groups that use the WAC is similar and the scaling factors for these prices are on average similar between the two groups. All of the states in the two groups have a "lower of" methodology. Additionally the stability of the ratio of DIFFERENCE to total Medicaid spending across the ten states - despite their different adjudication methodologies – is striking.

It is also important to remember that often in applied microeconomic research there is no data for those entities to which the extrapolation is being performed. However, in this setting I am utilizing multiple sources of detailed information regarding Medicaid claims for the Complaint products for those states to which I am extrapolating. Additionally, I do not extrapolate to any state or time period in which I do not have CMS claims data or SDUD data.

Furthermore, it is indeed common practice in applied microeconomic research to use data for a subset of the entire population when estimating the effect for the full population. For example, the seminal research on the effect of the unemployment insurance (UI) program, including work by Bruce Meyer that was published in *Econometrica* in 1990, utilized administrative UI data for twelve states to estimate the effect of the UI program on trends in the national labor market.  Additionally, research by Adams, Gruber, and Newhouse published in the *Journal of Human Resources* in 1997 examined the effect of physician fee changes in Tennessee while using Georgia as a control to shed light on the effect of Medicaid physician reimbursement on the treatment of Medicaid recipients.  Additionally, it is common practice in applied

microeconomic research to use data for a sample that may not be fully representative to estimate results for the U.S. as a whole. For example, recent work published by Jon Gruber and David Rodriguez in the *Journal of Health Economics* in 2007 utilizes data for a subset of physicians to estimate the amount of uncompensated care that physicians in the U.S. provide.

When considering the algorithm that I use in my analysis, it is important to emphasize that I use data for up to 10 states for more than one thousand NDC-quarter combinations when estimating the value of DIFFERENCE for these same NDC-quarter combinations in each of the remaining states. My examination of the adjudication algorithms used by these states, their reimbursement per claim, and so forth indicates that they are indeed very similar to the 38 states. Additionally, the findings summarized in my report indicate that if anything NDC-specific per-claim reimbursement is on average lower in the ten states than in the 38 to which I am extrapolating, suggesting that if anything my extrapolation will be biased downward.

It is worth noting that the 10 are not a random sample of the initial 48, but this is because I focused attention on the largest states to obtain the maximum amount of precision. Put simply, it is more important to the total value of DIFFERENCE to be as accurate as possible for the state of Florida, with more than $16 million in Medicaid spending on Complaint products, than it is in the state of Vermont, which spent less than $51 thousand on these same products.

**Medicare Array Information**

Dr. Hughes in paragraph 36 and Mr. Young in paragraph 49 criticize my analyses for Medicare because he argues that I am missing array information for the majority of the carrier-quarter and DMERC-quarter combinations. To shed light on this issue, it is helpful to consider this issue for each category of Medicare claims separately. As I demonstrated in Table 28 of my

June 19, 2008 report, there are essentially just four DMERCs that dispense DME prescriptions for Complaint products during the time period of interest. Additionally, one of the J-codes (J3370) accounts for 94 percent of Medicare spending for these DME claims and I therefore focus exclusively on J3370 (Vancomycin) claims in my DME analyses.

Further examination of Table 28 demonstrates that the vast majority of Medicare spending – indeed approximately 93 percent – is concentrated during the 1994Q1 through 1996Q3 period. With four DMERCs this implies that there are 44 DMERC-quarter combinations that account for the vast majority of the spending. An examination of array documents along with Medicare claims data[7] indicates that I have array information that applies to more than 90 percent of the claims for these DMERC-quarters. As I detail in my report, I drop those claims for which I am unable to replicate the allowed amount from the claim from the array documents. Thus Dr. Hughes' and Mr. Young's criticism does not apply to the DME claims, which account for more than one-fourth of the total Medicare DIFFERENCE that is summarized in my June 19, 2008 report. It is also important to note that my total DIFFERENCE is conservative because I drop DME claims for all of the other J-codes listed in Table 28.

For the Medicare carrier claims, I focus only on the top four J-codes in terms of total Medicare expenditures that are listed in Table 34 of my June 19, 2008 report and also consider the J3370 code. By doing this, I ignore approximately 4.5 million carrier claims for the remaining J-codes, which will serve to reduce the value of DIFFERENCE below what it would be if I considered all claims. As indicated in Table 35 of my June 19, 2008 report, I have array information for 21 of the 91 carriers listed. Because these carriers tend to be significantly larger than the average, they account for a disproportionate share (40 percent) of Medicare carrier

---

[7] As I explain in my report, in a few quarters for Travelers, I extrapolate back in time using the DMERC's arrays by replacing the AWPs for the included products with the previous year's AWPs.

claims for the five J-codes that I consider. Thus while this fraction is somewhat smaller than the corresponding one for the Medicaid analyses described above (64 percent), it is still greater than economists frequently have for analyses of government programs. For example, the twelve states for which Meyer had data in the *Econometrica* paper described above account for just 27 percent of the U.S. population.

Of the 6.172 million claims for the twenty-one carriers for which I do have some array information, I have array information from carrier documents for 3.590 million (58.2 percent) of them.  As I describe in my report, I extrapolate back in time for additional claims. Before doing this, however, I examine the claims data to check that there is some evidence that the carrier was using Abbott products in its arrays by checking whether an Abbott product's AWP is the allowed amount in some cases. When there is little evidence to suggest that Abbott products appeared in the AWP, I drop the claims from consideration, which leads me to drop 590 thousand (9.6 percent) of the claims for these twenty-one carriers.[8]

After dropping these claims, I apply an extrapolation methodology for the Medicare carrier claims that remain that is analogous to the one described above for the 10 Medicaid states (e.g. Florida and Illinois). As was true above for Medicaid, my methodology for this is quite conservative, both because I drop claims as described above and because the ratio of DIFFERENCE to Medicare spending for these 1.992 million claims is forty percent lower than the corresponding ratio for those carrier-quarters when I do have array information (28.5 versus 17.2 percent). Because of this, 76 percent of the $15.580 million DIFFERENCE for these carriers results from those carrier-quarter combinations in which I have arrays.

---

[8] Mr. Young also argues that I calculate a positive value of DIFFERENCE for MetraHealth in the second quarter of 1997 when the array that was in effect would have suggested no impact. It is true that for approximately 60 of the 1500 claims in that quarter, I do calculate a positive value of DIFFERENCE, though this is because the claims use an allowed amount from a later array and thus these claims may have been paid at a different time. Additionally, the total value of DIFFERENCE for these 60 claims is just $161.

As for the remaining seventy carriers, which account for 60 percent of Medicare carrier claims for the five J-codes that I consider, I apply an extrapolation methodology that is similar to the across-state one that I use for the Medicaid analyses. As I describe in my report, my examination of the Medicare claims data for the two groups of carriers (the 21 and the 70) indicates that the amount paid per claim for each J-code, the pattern of spending over time, and the proportion of claims accounted for by each of the five J-codes is similar. However, my analyses also indicate that the frequency with which the seventy carriers used Abbott products in their arrays appears to be lower. More specifically, I find that 24.4 percent of the claims administered by the 21 carriers had an Abbott AWP as the allowed amount versus just 18.4 percent of the claims paid by the remaining seventy carriers.[9]

I therefore adjust my DIFFERENCE estimates for these 70 carriers downward to account for this factor. The methodology that I employ is similar to the one that I and other economists use when extrapolating the results from a sample that may not be representative to the full population. For example, Gruber and Rodriguez in their 2007 *Journal of Health Economics* study have data for a sample of just one percent of all physicians, and the characteristics of these physicians differ substantially from the average physician in the U.S. Despite this, they adjust their estimates accordingly to arrive at estimates for the provision of uncompensated care by all physicians in the U.S.

Using an appropriate and transparent methodology to adjust my DIFFERENCE results for the twenty-one carriers to the remaining seventy, I find that the ratio of DIFFERENCE to spending for the remaining seventy is substantially lower for this latter group. More specifically,

---

[9] It is important to emphasize that for more than 1.3 million claims for these seventy carriers, I am certain that an Abbott product was included in the array because its AWP was the allowed amount and no other firm's product typically had that same AWP at the same time.

the ratio of DIFFERENCE to spending for these seventy carriers is 16.7 percent versus 22.9 percent for the initial twenty-one carriers.

Taken together, my findings for the total DIFFERENCE for Medicare claims is quite conservative for the reasons mentioned above and because I exclude from consideration seven of the twelve Complaint J-codes, which account for more than 11 percent of Medicare spending on Complaint J-codes. It is also important to emphasize that my results do not include the effect on Medicare recipients' co-payment amounts, which given a total DIFFERENCE of more than $42 million would exceed $10 million.[10]

**Medicare Dispensing Fees**

Dr. Hughes and Mr. Young also argue that dispensing fees would have increased for Medicare claims if the alternative transaction-based AWPs had been used for Abbott's Complaint products when determining allowed amounts.  In considering this issue, one must also incorporate the corresponding effect of other changes, such as more truthful reporting by other firms whose products were included in the arrays for the Complaint J-codes.  If that were done, the decline in allowed amounts for the ingredient cost would be substantially greater than the ones that I estimate, which would serve to offset the effect of the rise in dispensing fees. Also, if the alternative transaction-based AWPs were not limited to the pharmacy classes of trade, which tend to have higher prices, when calculating average prices, but instead considered customers in all classes of trade, the average prices would have been lower. These and other similar factors, all of which were ignored by Dr. Hughes and Mr. Young, would serve to increase the value of DIFFERENCE.

---

[10] Medicare recipients or their secondary insurers cover 20 percent of the costs while Medicare pays the rest.

Furthermore, it is not appropriate to change the adjudication methodology that the government used when calculating the effect of the inflated AWPs on reimbursement for Complaint products. During the time period considered, which includes 1991 through 2001, the federal government used the methodology for reimbursement of Medicare claims for Complaint J-codes that I apply in my empirical analyses.

**Use of Abbott's Indirect Data for Pharmacy Classes of Trade**

Mr. Young, in paragraph 51 of his report, criticizes my use of Abbott's indirect data for the pharmacy classes of trade because these customers account for a relatively small share of all customers in Abbott's indirect data. However, as I note in my report, the prices that these customers pay tend to exceed those of other customers, leading to a lower value of DIFFERENCE than I would otherwise estimate. I demonstrate this empirically for my Medicaid Illinois analyses in Table 13B of my June 19, 2008 report, where the DIFFERENCE increases by more than $253 thousand when I shift from using pharmacy customers to all customers in my calculation of alternative AWPs. Furthermore, it is appropriate to focus on these customers, as they will tend to be the ones that dispense prescriptions to Medicaid recipients.

Mr. Young further criticizes my use of Abbott's indirect data because it does not include sales by certain distributors in the P040 and M061 classes of trade. However, as I show in Table 4 of my June 19, 2008 report, these two classes of trade account for just 11 percent of all sales to wholesalers and distributors in Abbott's direct data and thus are likely to exert relatively little impact on Abbott's average prices. Mr. Young, in paragraph 20 of his report, asserts that Abbott "had no visibility to the price paid by these providers" when they purchased from these other

distributors and wholesalers. In light of this, it is not obvious how these sales could have affected

Abbott's conduct in reporting its AWPs and WACs.

Mark G. Duggan, Ph.D.

April 23, 2009

## References

Kathleen Adams, Jonathan Gruber, and Joseph Newhouse (1997), "Physician Fee Policy and Medicaid Program Costs," *Journal of Human Resources*, 32(4), 611-634.

Joshua Angrist and William N. Evans (1998), "Children and Their Parents' Labor Supply: Evidence from Exogenous Variation in Family Size," *American Economic Review* 88, 789-712.

Severin Borenstein, Colin Cameron and Richard Gilbert (1997). "Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes?" *Quarterly Journal of Economics*, 112(1), 1997.

David Card and Alan Krueger (1994) "Minimum Wages and Employment: A Case Study of the Fast Food Industry in New Jersey and Pennsylvania," *American Economic Review* 84.

Mark Duggan and Fiona Scott Morton (2006), "The Distortionary Effects of Government Procurement: Evidence for Medicaid Prescription Drug Purchasing." *Quarterly Journal of Economics*, 1-31.

Mark Duggan (2004), "Does Contracting Out Increase the Efficiency of Government Programs? Evidence from Medicaid HMOs," *Journal of Public Economics* 88, 2549-2572.

William N. Evans and Steven Snyder (2006), "The Impact of Income on Mortality: Evidence from the Social Security Notch," *Review of Economics and Statistics*, 88(3), 482-495.

Jonathan Gruber and David Rodriguez (2007), "How Much Uncompensated Care to Doctors Provide?" *Journal of Health Economics*, 26, p. 1151-1169.

Jonathan Gruber (2003), "Medicaid," in Robert Moffitt, ed., *Means Tested Transfer Programs in the U.S.* Chicago: University of Chicago Press, pp. 15-77.

Jonathan Gruber and Jim Poterba (1994), "Taxation and the Demand for Health Insurance: The Case of the Self-Employed," *Quarterly Journal of Economics* 109, 701-733.

Steven Levitt (1997), "Using Electoral Cycles in Police Hiring to Estimate the Effects of Police on Crime," *American Economic Review* 87(3), 270-290.

Bruce Meyer (1990), "Unemployment Insurance and Unemployment Spells," *Econometrica* 58, 757-782.



**Figure A: Number of Claims by Data Source by Year**



Figure B: Paid Amount by Data Source and by Year

**Table 25: Medicaid Summary for Top Nine States, Louisiana (#11), and Wisconsin (#16)**

| State | Source | Time Period | # Clms w/DIFF>0 | # Claims | Aggregate DIFF | Total MCD Paid | Federal DIFF | # Pharm. Payments |
|---|---|---|---|---|---|---|---|---|
| Illinois | State Claims | 1991Q2-2001Q4 | 519,450 | 534,183 | $12,029,039 | $16,527,505 | $6,014,519 | 58,631 |
| Florida | State Claims | 1993Q4-2001Q4 | 278,623 | 287,959 | $11,700,280 | $15,561,037 | $6,532,311 | 67,076 |
| Florida | SDUD Data | 1991Q1-1993Q3 | 34,802 | 39,861 | $939,551 | $1,379,301 | $514,820 | - |
| California | State Claims | 1994Q2-2001Q4 | 267,167 | 280,994 | $7,044,315 | $9,172,917 | $3,585,421 | 56,269 |
| New Jersey | State Claims | 1992Q1-2001Q4 | 124,513 | 126,067 | $7,191,020 | $8,453,921 | $3,595,511 | 11,446 |
| New Jersey | SDUD | 1991Q1-1991Q4 | 12,374 | 13,798 | $727,856 | $915,392 | $363,928 | - |
| New York | State Claims | 1993Q1-2001Q4 | 108,386 | 120,315 | $6,877,666 | $8,921,858 | $3,438,833 | 38,184 |
| New York | SDUD | 1991Q1-1992Q4 | 5,263 | 5,791 | $149,690 | $192,898 | $74,845 | - |
| Indiana | SMRF / MAX | 1992Q1-2001Q4 | 175,577 | 182,042 | $11,214,412 | $14,812,193 | $6,936,732 | 28,880 |
| Indiana | SDUD | 1991Q1-1991Q4 | 8,572 | 9,044 | $137,297 | $249,529 | $86,826 | - |
| Kentucky | State Claims | 1995Q1-2001Q4 | 96,452 | 100,007 | $4,737,344 | $6,190,786 | $3,331,076 | 16,044 |
| Kentucky | SMRF / MAX | 1992Q1-1994Q4 | 17,559 | 20,725 | $545,830 | $910,013 | $390,572 | 3,589 |
| Kentucky | SDUD | 1991Q1-1991Q4 | 2,961 | 3,401 | $77,795 | $128,833 | $56,759 | - |
| Missouri | State Claims | 1998Q1-2001Q4 | 70,680 | 75,389 | $3,448,247 | $4,263,226 | $2,087,491 | 8,304 |
| Missouri | SMRF / MAX | 1992Q1-1997Q4 | 54,763 | 66,684 | $2,070,637 | $3,184,492 | $1,246,043 | 8,024 |
| Missouri | SDUD | 1991Q1-1991Q4 | 1,568 | 2,136 | $35,736 | $63,533 | $21,377 | - |
| Michigan | State Claims | 2000Q4-2001Q4 | 14,389 | 15,986 | $537,789 | $792,346 | $300,440 | 4,479 |
| Michigan | SMRF / MAX | 1994Q1-2000Q3 | 66,339 | 81,215 | $2,551,829 | $4,222,782 | $1,393,735 | 14,000 |
| Michigan | SDUD | 1991Q1-1993Q4 | 6,844 | 9,722 | $66,162 | $157,114 | $36,565 | - |
| Louisiana | State Claims | 1995Q1-2001Q4 | 73,705 | 76,520 | $2,970,914 | $3,834,631 | $2,102,350 | 7,211 |
| Louisiana | SDUD | 1991Q1-1994Q4 | 8,417 | 9,408 | $257,830 | $407,099 | $190,429 | - |
| Wisconsin | State Claims | 1993Q2-2001Q4 | 63,647 | 70,145 | $1,683,017 | $2,440,008 | $998,395 | 13,988 |
| Wisconsin | SDUD | 1991Q1-1993Q1 | 2,976 | 3,248 | $73,335 | $105,891 | $44,110 | - |
| Total for First 11 States | | 1991-2001 | 2,015,027 | 2,134,640 | $77,067,591 | $102,887,305 | $43,343,090 | 336,125 |
| Total for Remaining 38 States | | | 845,533 | 894,567 | $33,889,385 | $47,701,979 | $20,782,466 | 147,370 |
| **Total for All 49 States** | | | **2,860,560** | **3,029,207** | **$110,956,976** | **$150,589,284** | **$64,125,556** | **483,495** |

# EXHIBIT DX

Page 240

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

                             )

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -


    Videotaped deposition of MARK G. DUGGAN, PH.D.

                 Volume II


              Washington, D.C.

              Tuesday, May 19, 2009

              9:30 a.m.

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
Washington, DC

Page 241

1     Continued videotaped deposition of MARK G.
2  DUGGAN, PH.D., held at the law offices of Jones Day,
3  51 Louisiana Avenue, N.W., Washington, D.C. 20001,
4  the proceedings being recorded stenographically by
5  Jonathan Wonnell, a Registered Professional Court
6  Reporter and Notary Public of the District of
7  Columbia, and transcribed under his direction.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 242

1    A P P E A R A N C E S   O F   C O U N S E L
2
3     On behalf of the United States of America:
4        GEJAA T. GOBENA, ESQ.
5        U.S. Department of Justice
6        Civil Division
7        P.O. Box 261, Ben Franklin Station
8        Washington, D.C. 20044
9        (202) 305-9300
10       gejaa.gobena@usdoj.gov
11       justin.draycott@usdoj.gov
12
13    On behalf of Abbott Laboratories:
14       DAVID TORBORG, ESQ.
15       TARA M. STUCKEY, ESQ.
16       Jones Day
17       51 Louisiana Avenue, N.W.
18       Washington, D.C. 20001-2113
19       (202) 879-3939
20       dstorborg@jonesday.com
21       tmstuckey@jonesday.com
22

Page 243

1    A P P E A R A N C E S  (Cont'd)
2
3    ALSO PRESENT:
4        CONWAY BARKER, videographer
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 244

1          C O N T E N T S
2
3  WITNESS NAME                        PAGE
4  MARK G. DUGGAN, PH.D.
5    By Mr. Torborg............................ 248
6
7
8          E X H I B I T S
9  NUMBER              DESCRIPTION      PAGE
10 Exhibit Duggan Rebuttal 001 - Handwritten notes
11          by Dr. Duggan.... 272
12 Exhibit Duggan Rebuttal 002 - Rebuttal expert
13          report of Mark G.
14          Duggan, Ph.D..... 291
15 Exhibit Duggan Rebuttal 003 - Expert report of
16          James W. Hughes.. 314
17 Exhibit Duggan Rebuttal 004 - Expert report of
18          James W. Hughes.. 325
19 Exhibit Duggan Rebuttal 005 - Excerpts from the
20          deposition of
21          Thomas A. Scully
22          dated 5/15/07.... 332

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 245

1        E X H I B I T S  (CONTINUED)
2    NUMBER           DESCRIPTION        PAGE
3    Exhibit Duggan Rebuttal 006 - Document entitled
4                     "Performance
5                     Audit: Cost
6                     Containment for
7                     State
8                     Prescription Drug
9                     Expenditures"
10                    dated 6/28/02.... 359
11   Exhibit Duggan Rebuttal 007 - Abt Associates
12                    report entitled
13                    "The Per Diem
14                    Costs of Home
15                    Infusion Therapy
16                    Services" dated
17                    1/26/06.......... 383
18   Exhibit Duggan Rebuttal 008 - Becherer e-mail
19                    to Duggan dated
20                    4/22/09 with
21                    attachment....... 405
22   (CONTINUED)

Page 246

1        E X H I B I T S  (CONTINUED)
2    NUMBER           DESCRIPTION        PAGE
3    Exhibit Duggan Rebuttal 009 - Myers and
4                     Stauffer draft
5                     reimbursement
6                     summaries........ 408
7    Exhibit Duggan Rebuttal 010 - Henderson e-mail
8                     to Buoy dated
9                     5/3/08 with
10                    attachment....... 413
11
12
13
14
15
16
17
18
19
20
21
22

Page 247

1              P R O C E E D I N G S
2                 (9:36 a.m.)
3
4         THE VIDEOGRAPHER:  In the United States
5    District Court for the District of Massachusetts
6    In Re: Pharmaceutical Industry Average Wholesale
7    Price Litigation related to the United States of
8    America ex rel. Ven-A-Care of the Florida Keys,
9    Incorporated versus Abbott Laboratories
10   Incorporated et al. MDL Number 1456, Master File
11   01-CV-12257 PBS, this is the deposition of Mark
12   Duggan Ph.D.  Today's date is May 19th 2009.  The
13   location of the deposition is Jones Day, 51
14   Louisiana Avenue, Northwest, Washington, D.C.
15          Will counsel please identify yourselves
16   and state whom you represent?
17         MR. GOBENA:  David Torborg from Jones
18   Day on behalf of Abbott Labs.
19         MS. STUCKEY:  Tara Stuckey from Jones
20   Day on behalf of Abbott Labs.
21         MR. GOBENA:  Gejaa Gobena with the
22   Department of Justice on behalf of the United

Page 248

1    States.
2         THE VIDEOGRAPHER:  The court reporter is
3    Jon Wonnell.  The video camera operator is Conway
4    Barker, both on behalf of Henderson Legal
5    Services.  This deposition commences at 9:37.
6    Please swear in the witness.
7
8    Whereupon,
9           MARK G. DUGGAN, PH.D.,
10   called as a Witness, was duly sworn by Jonathan
11   Wonnell, a Notary Public in and for the District
12   of Columbia, and was examined and testified as
13   follows.
14
15          EXAMINATION BY COUNSEL FOR
16          ABBOTT LABORATORIES
17   BY MR. TORBORG:
18       Q.  Welcome back, Dr. Duggan.
19       A.  Thank you.
20       Q.  Again, my name is David Torborg from
21   Jones Day and I represent Abbott Laboratories in
22   this case.  You understand that you're still under

                              3 (Pages 245 to 248)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 249

1  oath and are obligated to provide truthful
2  responses to my questions, correct?
3      A.  I do.
4          MR. TORBORG:  Okay.  Let me state at the
5  outset -- we don't need to argue about this.  The
6  sides' positions are clear.  But Abbott does
7  oppose plaintiff's proffering of rebuttal reports
8  in this case as being inconsistent with prior case
9  management orders in the case.  I understand your
10 position on that.  We don't need to argue about
11 it.
12         MR. GOBENA:  Your objection is noted.
13         MR. TORBORG:  Because the court has not
14 resolved the issue we're here to take Dr. Duggan's
15 deposition in case the court concludes his
16 rebuttal opinions are appropriately proffered.
17 BY MR. TORBORG:
18     Q.  Dr. Duggan, you were last deposed in
19 this case in February of 2009, correct?
20     A.  I admittedly can't remember the date of
21 the fourth day.  I did I believe two or three in
22 July and then a fourth day --

Page 250

1      Q.  It was earlier this year?
2      A.  Yeah, it was earlier this year, is my
3  recollection.
4      Q.  Have you had a chance to review the
5  transcript that was taken of that deposition, the
6  latest one?
7      A.  I believe that I looked it over.  That's
8  my recollection.
9      Q.  Did you observe any answers that would
10 need to change or be corrected in any way?
11     A.  Not that I recall.  No.
12     Q.  Do you recall either when reviewing the
13 transcript or thinking about the deposition after
14 you left that you would have said something
15 differently, altered your answers in any way?
16     A.  I think one would always like to be a
17 bit more articulate and crisp in answering.  But
18 in terms of substantive ways, I don't recall
19 anything.  Nothing leaps to mind.
20     Q.  You issued an initial report in this
21 litigation in June of 2008, correct?
22     A.  That's correct.  June 19th.

Page 251

1      Q.  Is there anything in that report that
2  needs to be changed or corrected that you're aware
3  of?
4      A.  I discuss in my more recent report, the
5  rebuttal report that was produced April 23rd, a
6  couple of corrections.  I believe it was for the
7  Medicaid analyses for the states of Missouri and
8  Michigan.  And I've provided details on that in
9  the rebuttal report.  So that's one thing that
10 leaps to mind right now.  Nothing else leaps to
11 mind right now, but that's certainly one
12 correction that I have made since June of 2008.
13     Q.  And you also issued a supplemental
14 report in this litigation in January of 2009,
15 correct?
16     A.  That's right.  That's right.  I did.
17     Q.  And in that report you removed Ohio from
18 the state analysis for Medicaid as well as
19 proffered some opinions relating to Abbott's home
20 infusion business; is that right?
21     A.  That is correct.  So I should backtrack.
22 I was thinking only of the correction in this

Page 252

1  April document.  But there -- I appreciate you're
2  reminding me of the January one.  There were also
3  some changes made in the January one including the
4  removal of Ohio from the analysis, from the
5  Medicaid analysis.  That's right.  So I apologize
6  for not remembering.
7      Q.  Now, as I understand it, you've also
8  proffered expert opinions in two additional cases
9  where the United States Department of Justice has
10 brought suit against drug manufacturers, and I'm
11 speaking of the Dey and Roxane cases.  Correct?
12     A.  That is correct.
13     Q.  And you've also proffered some expert
14 opinions in a case brought by Ven-A-Care of the
15 Florida Keys against Abbott relating to the drug
16 erythromycin, correct?
17     A.  That is correct.  I'm not sure of the
18 precise terminology for who brought it.  I think
19 the -- yeah.  But there is an erythromycin case
20 brought where the arrangement is slightly
21 different from the other three.
22     Q.  How many national drug codes are

4 (Pages 249 to 252)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 253

1  involved in the Dey litigation roughly?
2      A.  In the Dey litigation?
3      Q.  Yes.
4      A.  My best recollection is there are 26.
5      Q.  How many NDCs are involved in the Roxane
6  litigation?
7      A.  I believe 35.  That's my recollection.
8  The Dey is 26 and the Roxane is 35.  I may have
9  those flipped.  But that's the right order of
10  magnitude.
11     Q.  How many NDCs are involved in the action
12  brought by Ven-A-Care relating to erythromycin?
13     A.  Low 40s, I believe.  I don't remember
14  exactly how many, but between 40 and 45.
15     Q.  Have you been engaged as an expert in
16  any other AWP related litigation?
17     A.  Just for completeness, in case -- the
18  closest thing would be the work I did in Texas as
19  an expert in the case against Abbott.
20     Q.  And how many NDCs were involved in that
21  litigation?
22     A.  More than 200.

Page 254

1      Q.  Is it fair to say that in all of those
2  proffered opinions in those AWP cases your
3  analysis would serve to reduce ingredient cost for
4  these NDCs?  Correct?
5      A.  In some cases that is true, but not in
6  all cases.  For example, in the case of the Texas
7  report there were many NDCs for which I calculated
8  no decline in ingredient cost reimbursement.
9      Q.  But there were many NDCs in the Texas
10  litigation where you did calculate a difference or
11  a decline in Medicaid reimbursement, right?
12         MR. GOBENA:  Object to form.
13     A.  I don't recall the exact breakdown, but
14  there were more than 44 in Texas where I
15  calculated the strictly positive value of
16  difference.
17     Q.  And have you been engaged as a
18  consulting expert on any other AWP related
19  litigation?
20     A.  I did a tiny bit of -- had a few
21  discussions with individuals in Texas about
22  subsequent cases that they're now in the process

Page 255

1  of -- that they're now working on.  But I think
2  the total time that I spent there was three or
3  four hours and that was a few months ago.
4      Q.  You understand that you'll be engaged in
5  those cases?
6      A.  No, I will not.  I understand that I
7  will not.
8      Q.  Any other instances where you've been
9  approached to serve as an expert, either a
10  consulting role or an expert role, in AWP
11  litigation that we haven't talked about already?
12     A.  I've been approached by -- just to
13  backtrack, other than these five cases, the Texas
14  Abbott, the one we're talking about today Abbott,
15  the Abbott ery, Roxane and Dey, the only place
16  where I've spent an appreciable amount of time
17  would be this Texas thing that I mentioned.  I was
18  approached though by people from other states.
19     Q.  Do you have any understanding on whether
20  you will be engaged to provide expert opinions to
21  the jury in those other cases?
22     A.  At the present time I do not expect to

Page 256

1  in those cases, but it's hard to say with
2  certainty.  But at this point in time it's not my
3  expectation.
4      Q.  And do you know how many NDCs are
5  involved in these other cases for which you've
6  been approached?
7      A.  I do not.
8      Q.  Now, you've issued three reports in this
9  litigation thus far, correct?
10     A.  I'm unclear when you say this
11  litigation.
12     Q.  The Abbott versus United States
13  litigation that you're here for today.
14     A.  The one in June, the one in January and
15  the one in April?
16     Q.  Yes.
17     A.  Yes.
18     Q.  Do you feel you're ready to testify at
19  trial and provide your opinions to the jury at
20  this time?
21     A.  My understanding is that trial would
22  take place at some point perhaps months from now.

5 (Pages 253 to 256)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 257

1  I certainly am prepared to discuss my analyses, my
2  findings, my opinions and so forth.  So I feel --
3  I guess I'm not sure -- I feel ready to talk about
4  the results in my report.
5      Q.  Have you had the opportunity to review
6  all that you believe you need to review to provide
7  testimony to the jury in this case?
8      A.  I've reviewed a significant amount of
9  material.  I have conducted a significant amount
10 of analysis.  Whether there may be other things
11 that it would be appropriate for me to drill down
12 on between now and trial, it's just hard for me to
13 anticipate.
14     Q.  But as far as you know sitting here
15 today you've had an opportunity to review the
16 factual record that has been developed in these
17 cases?  And when I refer to these cases I mean all
18 AWP cases.
19         MR. GOBENA:  Object to form.
20     A.  These are very big cases, the Abbott
21 one, Dey one, Roxane one.  I've telescoped in on a
22 specific area and have done what in my judgment as

Page 258

1  an economist is necessary to learn what I need to
2  do carry out my report.  But I recognize these are
3  big cases, very, very, very big cases with many
4  components and so I'd hesitate to say that I sort
5  of have a complete lay of the land in all AWP
6  cases.
7      Q.  You're aware of the fact that numerous
8  state and federal officials who administered the
9  Medicare and Medicaid drug programs have been
10 deposed in both this and other AWP cases, right?
11     A.  It is my understanding that government
12 officials from agencies like HCFA and/or CMS
13 and/or state Medicaid agencies have -- a number of
14 them have been deposed, whether by -- whether for
15 this case or for other cases.
16     Q.  And as you sit here today you've had the
17 opportunity to review what exists of that
18 testimony that is necessary for you to render
19 opinions to the jury, correct?
20     A.  The focus of my analysis has not been to
21 examine/investigate the testimony by all
22 government officials.  I have considered some of

Page 259

1  those documents, some of -- I know that there are
2  -- from my understanding there have been dozens of
3  these depositions.  That really has not been the
4  focus of my analysis.
5         And to get the sort of -- to do a full
6  scale analysis of what individual at each
7  government agency, what they reported, what they
8  believed and so forth -- I try to be pretty clear
9  in my report about what I set out to do.  And I
10 feel as an economist very comfortable with my
11 analyses as they are.  But it certainly hasn't
12 been the focus of my analysis to read cover to
13 cover every deposition transcript by government
14 officials.
15     Q.  Which deposition transcripts of state
16 and CMS officials have you reviewed?
17     A.  Just as an example, in my many days of
18 deposition testimony I have seen a fair amount of
19 them.  But in terms of myself looking at them, I
20 recall looking at Martha McNeil in Texas.  A
21 gentleman in Florida.  Maybe it was Wells, but I
22 may be confusing that name with someone else.

Page 260

1  Those are two examples, and there may be others.
2      Q.  Can you think of any others that you
3  have reviewed as you sit here today?
4      A.  I have reviewed parts of I think a
5  Vladeck deposition.  Nothing else is leaping to
6  mind right now.  By it is true that there's a lot
7  of information that I considered.  We just saw an
8  example earlier of my -- it's not -- my forgetting
9  about the January supplement.  So it's hard to
10 sort of bring to mind everything.  But those are
11 three that I recall.
12     Q.  Which part of the Vladeck testimony did
13 you review?
14     A.  I don't recall the specific part.  I
15 actually read it in advance of one of my
16 depositions.  But I don't recall the exact part.
17     Q.  Is it fair to say that because you can't
18 recall the subject matter of the testimony it
19 didn't have a particularly important impact on
20 your opinions?
21         MR. GOBENA:  Object to form.
22     A.  I wouldn't necessarily say that.  I

                                    6 (Pages 257 to 260)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 261

1  would hesitate to say that.  But I don't recall
2  revising my analyses in response to watching that.
3  But it's hard to disentangle -- having looked at
4  many things for this, it's hard for me to
5  disentangle the precise impact of every component
6  on what culminates in my ultimate analysis
7  findings and confuse --
8      Q.  The accounts -- I'm sorry.  Were you
9  finished?
10     A.  Yeah, I'm finished.
11     Q.  Did counsel recommend particular
12  portions of the Vladeck testimony for you to
13  review?
14     A.  It was suggested to me -- mentioned to
15  me.  I don't know if suggested is the right word.
16  It was mentioned to me that there was a part of
17  the testimony that involved questioning by someone
18  who would be deposing me.  And so this provided an
19  opportunity to get a sense of style, the kind of
20  questioning in advance of a deposition.
21     Q.  Do you recall then reading that portion of
22  the transcript of Dr. Vladeck where he testified

Page 262

1  regarding his understanding of the difference
2  between AWP list prices and marketplace prices for
3  solutions such as dextrose and saline?
4      A.  I do not recall that part of his
5  deposition transcript.
6      Q.  Have you reviewed the deposition
7  transcripts of Jim Hughes and Steve Young that
8  have been taken in the last couple weeks?
9      A.  I've reviewed their reports.  I have not
10  reviewed -- I have certainly not done a cover to
11  cover analysis.  I believe that I did review a bit
12  of -- I think it was the Hughes deposition.
13     Q.  Which bit did you review?  What was the
14  subject matter?
15     A.  Dr. Hughes was discussing part of my
16  analysis and I don't recall the exact specifics of
17  it.
18     Q.  Well, how about generally?
19     A.  I'm trying to separate out the work from
20  the transcript.  I believe it concerned my
21  extrapolation methodology.  That's my best
22  recollection.

Page 263

1      Q.  For Medicare or Medicaid or both?
2      A.  I believe it was for Medicaid, but it's
3  -- with the caveat that I can't remember this with
4  precision.
5      Q.  When you were reviewing Dr. Hughes'
6  testimony on the extrapolation methodology used
7  you used for Medicaid, did you have any reaction
8  to it, like boy, he's got that wrong or he's
9  missing the point of something of that nature?
10     A.  Just to reiterate, I'm not a hundred
11  percent certain it was about the Medicaid
12  extrapolation.  That's my best recollection.  For
13  the reasons I outline in my rebuttal report I
14  recall the points being to some extent similar to
15  those made in his report.  I just -- I don't
16  recall all the nooks and crannies of what he was
17  saying.  But it is -- for the reasons I outline in
18  my rebuttal report and for that matter in my
19  initial report, I feel -- as an economist I feel
20  the methodology I have employed is very
21  appropriate.
22         So it's standard -- as an economist

Page 264

1  who's done a lot of research on applied
2  microeconomic topics it is standard for one to
3  have one's analyses pushed somewhat.  And as
4  people often say, nothing is perfect.  And so one
5  might push on this issue or that issue.  But his
6  comments -- I did my best in the rebuttal report
7  to sort of do justice to his comments and
8  thoughtfully sort of explain why in my judgment as
9  an economist who does a lot of research on
10  Medicaid and Medicare and related issues that this
11  methodology is very appropriate.
12         But having written many papers and sent
13  them off to journals, I'm very -- like many other
14  economists, I'm used to having -- and presenting
15  in seminars -- I'm used to having my work pushed.
16  And I believe that he did push.  But I absolutely
17  stand by what I did.
18     Q.  Did you make a list of the documents,
19  transcripts or other materials that you have
20  reviewed or considered in forming your rebuttal
21  opinion?
22     A.  Well, as you can see in the rebuttal

7 (Pages 261 to 264)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 265

1  report one of the things that I attached near the
2  end was a list of papers which in my judgment shed
3  useful light on some of the issues raised by Dr.
4  Hughes and by Mr. Young.
5      Q.  Apart from this list of articles have
6  you made a list of any testimony or documents in
7  the factual record that you have considered in
8  forming your rebuttal opinion?
9      A.  In forming the rebuttal opinion it's a
10 bit tricky in the sense that in forming the
11 rebuttal opinion I'm drawing on a lifetime of
12 research and training.  So it is -- having done
13 this kind of research many, many times, I pointed
14 to studies that I felt were most relevant.  I also
15 wrote down some notes in the process of preparing
16 these reports, which I provided.
17         Is there anything beyond that that leaps
18 to mind?  I'm just short of leafing through here,
19 as you can see.  I don't recall myself making a
20 list of additional documents.  But I'm just trying
21 to see if there is anything else beyond these
22 papers that I reference.  But in any case I did

Page 266

1  provide what I thought would be helpful to Dr.
2  Hughes, Mr. Young, the court and others with an
3  interest in my findings and for my reports.
4      Q.  You don't list anywhere in your report
5  any additional deposition transcripts that you
6  reviewed of state and federal officials for
7  purposes of preparing your rebuttal opinions,
8  correct?
9      A.  That is correct.  I don't recall between
10 the time -- so I believe -- if in the interim
11 between my report and -- the production of my
12 initial report and this additional materials were
13 provided to me, those would have been produced by
14 Steck Consulting.  But there's nothing right now
15 that leaps to mind about additional things that I
16 -- additional deposition transcripts beyond of
17 course I guess at some level I reference several
18 times the reports of both Dr. Hughes and Mr.
19 Young.
20         I guess technically I didn't list those
21 at the end in the references section.  So those
22 would obviously be other -- those would be

Page 267

1  documents that I considered in this.
2         MR. TORBORG:  Counsel, I note for the
3  record a complaint by us that Dr. Duggan has not
4  prepared a list of the materials he has considered
5  in forming his rebuttal opinions.  I understand
6  your position from the e-mail from Peter Griffin
7  yesterday that you have provided copies of the
8  documents rather than preparing a list.
9         Our position is that the rule requires
10 the report to list them out.  I understand your
11 position.  I'm not here to argue about it.  I'm
12 just here to tell you that we disagree with that.
13 If you want to fix it that's up to you and if you
14 don't then you'll suffer the consequences if there
15 are any.
16         MR. GOBENA:  Our position is you have
17 the materials.  That's the substantive objective
18 of the rule, so we obviously disagree.
19         MR. TORBORG:  So everything that Mr.
20 Duggan has considered has been produced to us in
21 the supplemental productions?
22         MR. GOBENA:  That's my understanding.

Page 268

1         MR. TORBORG:  Okay.
2  BY MR. TORBORG:
3      Q.  When did you decide to do your rebuttal
4  report, Dr. Duggan?
5      A.  I don't remember the specific date.  I
6  recall from even before producing my first report
7  -- perhaps not before producing my first report
8  back in June.  But I certainly recall earlier in
9  2009 and I think even late 2008 understanding that
10 it was possible that following the production of
11 reports by the defendants that I might elect to
12 essentially respond to them.  But I don't
13 remember.
14         Between the time that -- I believe that
15 the Abbott experts produced their reports in late
16 February or early March -- and when between then
17 and April 23rd -- certainly by April 1 or by -- so
18 I don't remember the exact date.  Sometime in
19 March.
20      Q.  Am I correct that you had discussions
21 with counsel for the United States and Ven-A-Care
22 regarding the submission of a rebuttal report?

8 (Pages 265 to 268)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 269

1          MR. GOBENA: Object to form.
2          A.  I did have discussions with them.  And
3  as I said, as early as -- it may well have been
4  years ago when this was first mentioned that the
5  sort of natural progression is a report and then
6  the defendants produce their reports and then
7  rebuttal reports.  So I certainly had
8  conversations going far back, and, yeah, more
9  recently in March as well.
10         Q.  Who did you have discussions with in
11 March?
12         A.  So Mr. Henderson, Ms. Brooker, Mr.
13 Levine, Mr. Breen, Ms. Thomas and to some extent
14 Mr. Dew at Steck Consulting, to some extent Mr.
15 Hynes at StoneTurn.
16         Q.  At where?
17         A.  Oh, I'm sorry.  I'm confusing.  Forget
18 that last part.  I apologize.  I'm confusing --
19         Q.  Confusing cases?
20         A.  Yeah.  I'm sorry.  So Mr. Dew at Steck
21 Consulting.
22         So those six people.  Were there others?

Page 270

1  Those were the six who are -- who leap to mind
2  most on it.
3          Q.  How many discussions did you have with
4  those attorneys in the March/April time frame?
5          A.  Do you mind just defining -- do you mean
6  from the time that --
7          Q.  The last couple months.
8          A.  -- those reports came out to the time I
9  produced my rebuttal report?
10         Q.  Correct.
11         A.  Well, the frequency with which each
12 person would be on a call -- on any given call --
13 I don't think there was a single call where all
14 six of those people were on it.  So with that
15 caveat my best estimation would be five or six.
16         Q.  Any in-person meetings?
17         A.  I certainly met in person with Mr. Dew
18 at Steck Consulting.  Not that I recall, but I
19 admit that the -- I'm not a hundred percent
20 certain, but I don't recall an in-person meeting.
21 But I may be --
22         Q.  From the inception of your engagement by

Page 271

1  Ven-A-Care and the United States in AWP litigation
2  -- and I'm including here the three cases the
3  Department of Justice is involved in as well as
4  the erythromycin case -- how much have you billed
5  for purposes of those engagements?
6          A.  So if I recall correctly I started in
7  March of 2006.  And my best guess -- would this --
8  this does not include Texas then?  This would not
9  include Texas?
10         Q.  Let's include Texas in there too.  I
11 appreciate the clarification.
12         A.  My best guess would be in the
13 neighborhood of 1200 to 1400 hours over the course
14 of three-plus years.  But I'm -- you know, there's
15 some -- I recognize that's not a -- I may be off
16 on that.  That's my best recollection.
17         Q.  Your billing rate is $425 an hour?
18         A.  It is $400, although for much of that
19 time, in fact for the first two years, it was
20 $300.
21         MR. TORBORG:  I'd like to mark as Duggan
22 Rebuttal Exhibit 1 this document.

Page 272

1          (Exhibit Duggan Rebuttal 001 was
2  marked for identification.)
3          THE WITNESS:  I brought the originals
4  too just in case.  It was hard for me to scan it.
5          MR. TORBORG:  Good.
6          THE WITNESS:  I tried to make it dark
7  when I scanned them but --
8          MR. TORBORG:  We may need to go to
9  those.  Do you have those in front of you?
10         THE WITNESS:  Okay.  Sure.  Do you want
11 me to --
12         MR. TORBORG:  Yeah.  Why don't you get
13 those out.
14         THE WITNESS:  I also brought along one
15 of the pieces.  I tore off parts because it
16 involves stuff that wasn't relevant.  And I
17 brought these along so that no one wonders whether
18 I am tearing off stuff I shouldn't have torn off.
19         MR. TORBORG:  Okay.
20         THE WITNESS:  So this was not produced
21 because it's not pertinent to the matter, but I
22 brought it just in case anyone -- because the page

9 (Pages 269 to 272)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                      Washington, DC

Page 273

1  looks like this (indicating) and so --
2       MR. TORBORG: Okay.
3       THE WITNESS: Yeah.
4  BY MR. TORBORG:
5       Q.  For the record, what I've marked as
6  Duggan Rebuttal Exhibit 1 bears the Bates numbers
7  EXP USABT DUG 160451 through 58. Dr. Duggan,
8  you're familiar with this document?
9       A.  Eight pages. I'm just going to count
10  them in my original to see if I have eight pages
11  as well. Yeah. It looks like there's a good
12  correspondence.
13      Q.  These are your -- these are in your
14  handwriting?
15      A.  These are in my handwriting. And these
16  involve notes not just for Abbott, but for Dey and
17  Roxane. But there was nothing confidential it
18  seemed to me here, so that I just -- it would have
19  been hard to -- I would have had to slice and dice
20  even more.
21      Q.  So I'm going to do my best to ask you
22  about the Abbott ones and avoid the others,

Page 274

1  although it's hard to tell sometimes.
2       A.  Right.
3       Q.  Were these notes taken during
4  conversations that you had with counsel for the
5  United States or Ven-A-Care?
6       A.  In many cases these were notes that I
7  myself wrote down as I was going through doing
8  analyses. So -- in fact most of them appear to be
9  notes that I sort of took as I was doing some
10  analyses, or talking with Ian Dew at Steck
11  Consulting about specific numbers.
12      Q.  If you would go to the Bates page ending
13  454 halfway through the notes --
14      A.  Yes.
15      Q.  -- it appears to be a listing of states
16  with numbers next to them?
17      A.  Yes.
18      Q.  Can you tell me what that is besides the
19  fact that it's state abbreviations with numbers
20  next to them?
21      A.  Right. If I recall this represents the
22  state IDs for the states that were included in one

Page 275

1  of the analyses. I think it was the Bruce Meyer
2  Econometrica paper in his analysis of unemployment
3  insurance programs. And it basically -- I think
4  these numbers next to them represent -- I think
5  this is -- it could be their row number in an
6  Excel file with state populations.
7       Q.  Okay. Let me ask you about Bates page
8  456, two more pages in the document.
9       A.  Okay.
10      Q.  I think this is the page for which
11  you've got a partial document there.
12      A.  Yeah. And you can see these other --
13      Q.  I don't need to see them. At the top
14  you see Dr. Hughes and Young. Those are Abbott's
15  experts, correct?
16      A.  Mm-hmm.
17      Q.  The second line down you have "WAC
18  versus AWP." Can you tell me the significance of
19  that note, why you were writing that down?
20      A.  So this is something I wrote down it
21  appears around March 31. And if I recall this WAC
22  versus AWP issue was a focus by one of the experts

Page 276

1  in the Dey matter. And so I don't recall the
2  exact -- what exactly led up to my writing that.
3  But my best guess as I sit here in front of you is
4  that this refers to this WAC versus AWP issue
5  raised by another expert in the Dey matter.
6       Q.  The next line down, it looks like you've
7  written "noncargeback whole" -- is that meant to
8  be "noncargeback wholesaler distributor"?
9       A.  Right. That looks like that's what it
10  is, right.
11      Q.  And below that you have -- I think it's
12  "they don't know"?
13      A.  Correct.
14      Q.  And then after that "$10 versus $10.20."
15  Do you see that?
16      A.  Right.
17      Q.  Could you translate? Could you tell me
18  what you were thinking there when you wrote that?
19      A.  I don't recall. It seems that this is
20  certain -- I think once again -- it's a little
21  difficult because and I'm sort of thinking
22  simultaneously of all three rebuttal reports. And

                              10  (Pages 273 to 276)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 277

1  if I recall certain distributors did not do
2  chargebacks and thus would not be in indirect data
3  or might not be in indirect data.  And so that may
4  be what I'm referring to there.  But admittedly
5  that's hard to remember exactly.
6      Q.   How about the $10 versus $10.20?  Is
7  that based on any study?
8      A.   Not that I recall.  I'm I think there --
9  perhaps there I was trying to get a sense of the
10 magnitude of the difference if there was let's say
11 a 2 percent difference in price.  And once again,
12 this is just trying to sort of help me think
13 through the various issues just to try to get -- I
14 sometimes do this.  If there's a percent
15 difference I'll just write down an example of a
16 couple prices just to get a sense of how big that
17 difference is.
18     Q.   It wasn't based on any study that you
19 were aware of?
20     A.   Not that I recall but it is possible
21 that -- yeah.  Not that I recall.
22     Q.   Skipping down to two-thirds down the

Page 278

1  page there's a note that starts "if you are"?
2      A.   Mm-hmm.
3      Q.   Can you read that for me?
4      A.   "If you are getting underpaid you don't
5  lie to make up for it."
6      Q.   Okay.  And then after that -- what does
7  it say after that?
8      A.   "Broke the law" I believe is what I
9  said.
10     Q.   Okay.  And after that what does it say?
11     A.   "Why look ten years later at law?"
12     Q.   Okay.  What are you saying in those
13 notes?
14     A.   Here I think -- obviously this is a
15 somewhat more colloquial description.  It's just
16 sort of -- these are notes to myself.  It is --
17 one of the arguments in this case and for that
18 matter in the other cases is that dispensing fees,
19 quote, were not adequate.  And that's a
20 complicated -- there's a lot that underlies an
21 assertion like that.  But in any case I think
22 partly here I'm sort of trying to think through

Page 279

1  what is just a simple way of thinking about the --
2  that argument.
3      And so it is -- and then -- so -- but
4  once again, I don't remember everything that went
5  into this and whether this was a Dey issue or
6  Roxane issue or an Abbott issue.  I'm not sure.
7      Q.   This is a comment that a lawyer made to
8  you during a telephone call, wasn't it?
9      MR. GOBENA:  Objection to form.
10     A.   I do not agree with that.  And once
11 again, I don't recall this exact conversation.
12 But this is -- these represent -- at some level as
13 I thought about how to address this issue, I
14 certainly don't recall anyone saying this
15 statement to me.  So in any case --
16     Q.   The next line down looks like it says
17 "footnote 45 part."  Can you read the rest of that
18 note for me?
19     A.   "Footnote 45 point.  They clearly are
20 not less aggressive."
21     Q.   How about the next line?
22     A.   "So tight" -- I think that's "around" --

Page 280

1  "75 percent."
2      Q.   Okay.  The point you're trying to make,
3  or what you're thinking about there is you have a
4  footnote in your original report, footnote 45,
5  that compared the average reimbursement per claim
6  amongst those states for which you used detailed
7  claims data and those states that you extrapolate
8  to, correct?
9      A.   Right.  That's referring I believe to my
10 footnote 45 from my Abbott report in June.
11     Q.   Okay.  And when you did the original
12 report you had included Ohio in that per claim
13 analysis, correct?
14     A.   That is correct.
15     Q.   And have you updated your footnote 45
16 analysis to reflect the fact that Ohio is no
17 longer in the states for which you used the
18 detailed claims data set?
19     A.   Not that I recall.
20     Q.   And you talked about this I believe at
21 your earlier deposition.  But Ohio was a state
22 that had a high prevalence of MACs on the

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 281

1  complaint products, correct?
2      A.  Correct.
3      Q.  Which resulted in a lower reimbursement
4  amount per claim as something you state very
5  clearly in your first report, correct?
6      A.  That is correct.  All else equal, NDC,
7  quarter, and so forth, apples to apples.
8      Q.  And you've taken Ohio out of your ten
9  state analysis that you used to extrapolate to 38
10 states, correct?
11     A.  It is true that I removed Ohio from the
12 analysis and Ohio really is sort of an outlier, as
13 I discussed before, and -- but yes, I removed them
14 from the state by state analysis and removed them
15 from the extrapolation averages, which resulted in
16 -- I think it was 3 or 4 percent increase in the
17 difference for those states.
18     Q.  What analysis have you done to consider
19 whether your removal of Ohio from the detailed
20 claims data set has on your per claim analysis
21 that you reflect in footnote 45?
22     A.  On average, the ratio of difference to

Page 282

1  Medicaid spending for Ohio is about 50 percent
2  compared with about 75 percent for the others.  It
3  is one of the ten states utilized in that.  So it
4  will pull down somewhat.  But I have not updated
5  footnote 45.  But to be clear it is also true that
6  a state like Wisconsin is also a relatively --
7  it's not as aggressive as Ohio, but it is thought
8  to be a relatively aggressive state and that's
9  reflected in a lower difference for Wisconsin
10 relative to the other states.
11         So this period from '91 to '01 in
12 contrast to more recent years was not as active in
13 terms of these MACs and so forth.
14     Q.  Apart from the reports filed by Dr.
15 Hughes and Mr. Young, did you review any other
16 expert reports submitted on behalf of Abbott?  Let
17 me throw out some names to see if it helps.  Dr.
18 Louis Rossiter?
19     A.  The name certainly rings a bell.  It
20 seems plausible that -- I have it here, so it
21 seems plausible that I scanned that around
22 February when the reports became available.  But I

Page 283

1  don't recall specifically.  I recall that the
2  focus for me was Hughes and Young.
3      Q.  How about Elvin Montenez, who is an
4  operator of the home infusion?  He's involved in
5  the home infusion business.  Did you review his
6  report?
7      A.  That name does not ring a bell.
8      Q.  How about Robert Helms?  Does that name
9  ring a bell?
10     A.  It does, but --
11     Q.  It does you said?
12     A.  It does, but I don't recall -- it may
13 just be that people mentioned his name.  Really to
14 the extent that I reviewed Abbott expert reports
15 they were primarily Hughes and Young.
16     Q.  What was the scope of your assignment in
17 preparing your rebuttal report?
18     A.  Well, I'll do my best to be efficient
19 and complete.
20     Q.  Let me strike that and see if I can make
21 it faster and easier on us.
22     A.  Okay, sure.

Page 284

1      Q.  You state in the first sentence of your
2  rebuttal report "In this document I respond to the
3  primary criticisms in Dr. Hughes and Mr. Young's
4  reports of my January [sic] 19th 2008 report which
5  calculated the difference between what the federal
6  government reimbursed," and then it goes on.
7      A.  And it's June 19th, just to --
8      Q.  June 19th.  My apologies.
9      A.  That's all right.
10     Q.  Is that a fair characterization of the
11 scope of your proffering of rebuttal opinions in
12 this case?
13     A.  It's a fair summary of the first order
14 thing that I set out to do in producing this
15 document.
16     Q.  And you read the reports of Dr. Hughes
17 and Mr. Young in their entirety, I assume?
18     A.  I read those reports.
19     Q.  So any response to the primary
20 criticisms in those individual reports would be
21 reflected in your rebuttal report, correct?
22         MR. GOBENA:  Objection to form.

12 (Pages 281 to 284)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 285

1     A.  I think there is a trade-off that one
2  confronts in producing a document such as this one
3  between -- at some level there were more
4  criticisms in their documents than perhaps I have
5  addressed here.  In this report I set out to
6  address what I considered to be the primary ones.
7  One can always write more.
8        This is a trade-off that I often
9  confront in writing my own research or critiquing
10  my own or critiquing others' research or
11  responding to others' critique of my research.
12  And so I endeavored to draw the line between sort
13  of what are the primary criticisms so as not to --
14  you know, to have a document that was relatively
15  crisp and focus on these key things.
16        So I -- just to clarify, I think there
17  were other criticisms.  And nothing right now is
18  leaping to mind -- that I may not have directly
19  addressed here.  But it seems plausible that I
20  would be prepared to address them if -- at some
21  future point if need be.
22     Q.  You focused on what you thought were the

Page 286

1  key criticisms, right?
2     A.  That is correct.
3     Q.  What are your rebuttal opinions?
4     A.  Well, they're summarized in -- to a
5  large extent they're summarized in this document.
6  And so -- I don't know.  We've been going for -- I
7  don't know if it would be okay to take a restroom
8  break or something --
9     Q.  That would be fine.
10     A.  Because that question --
11     Q.  That question could take more than a
12  minute.  So let's take a break.
13        THE VIDEOGRAPHER:  Off the record at
14  10:39.
15        (Recess.)
16        THE VIDEOGRAPHER:  On the record at
17  10:50.
18  BY MR. TORBORG:
19     Q.  Welcome back, Professor Duggan.
20     A.  Thank you.
21     Q.  When we had broke I had asked you about
22  the scope of your rebuttal opinions on this

Page 287

1  matter.  And let me ask you -- what I don't need
2  you to do right now is give me the gory details of
3  each of these.  I just want to get a high level,
4  one sentence explanation of, you know, this is the
5  issue, this is the opinion.  We'll talk about the
6  details later, I promise.
7     A.  Okay.
8     Q.  I just want to sort of categorize the
9  various opinions that you have.  So with that
10  being said I turn the floor over to you.
11     A.  So I will try to trade off efficiency
12  for accuracy.  I'll try to do my best.
13        So in the report I discuss several
14  issues regarding the criticisms of my June 19,
15  2008 report and the subsequent addendum to that.
16  I forget what it's called.  So in the first
17  section -- I'm just going to leaf through it here
18  as I do this -- I discuss the holding all else
19  equal assumption.
20        So one of the things that Dr. Hughes and
21  Mr. Young criticized me for is holding other
22  factors constant.  And so I discuss in the report

Page 288

1  why as an economist who's done work on Medicaid
2  and Medicare and related issues before and studied
3  the research of many others who have done similar
4  research, this is an appropriate thing to do.
5        And then I discuss specifically the
6  issues of assuming that utilization stayed the
7  same, would have stayed the same, and assuming
8  that dispensing fees would have stayed the same
9  and why those based on some additional data that I
10  provide in the report and for other reasons too,
11  why those are appropriate assumptions.
12        I then discuss why the -- at some level
13  the criticism of Hughes and Young -- well, I'll
14  just leave that there.  I'll try to do a high
15  level.  So all else equal assumption, why I
16  believe that is appropriate.  That's sort of big
17  picture picture point number one.
18        Big picture point number two I would say
19  is the extrapolation for Medicaid.  I'm just going
20  through the headings here, so I'm not really
21  making any -- so the extrapolation, both within
22  states and across states and why the methodology

13 (Pages 285 to 288)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 289

1  that I've designed to do this is appropriate and
2  is consistent with the kind of work that I myself
3  have done and that others have done when
4  extrapolating results from one sample to another,
5  to a full population.
6          And then similar issues regarding
7  Medicare and, you know, sort of the examination,
8  extrapolation, within and across carriers.
9          So those are sort of three big picture
10 bullet points, all else equal, which I suppose the
11 Medicaid dispensing fee on page 18 would fall
12 into, the extrapolations for Medicaid and for
13 Medicare, and the use of Abbott's indirect data
14 and why -- I focus there on the pharmacy classes
15 of trade, why that's appropriate.
16         That's at a very high level.  I
17 certainly haven't done justice to all the nooks
18 and crannies of the rebuttal report, but those
19 were sort of from my quick scan through it some of
20 the big things that I cover.
21     Q.  Okay.  So I'll briefly summarize with
22 the caveat that there's detail within that that I

Page 290

1  won't cover in my summary.  The first big picture
2  one opinion is holding all else equal is
3  appropriate in this case.  And there we're talking
4  about if you reduce reimbursement for ingredient
5  cost to the levels in your difference calculation,
6  correct?
7      A.  Yeah.  I think that's an accurate
8  description.
9      Q.  Big picture number two is the
10 extrapolation of difference ratios from one set of
11 states and one set of carriers to different sets
12 of states and carriers is appropriate and that
13 extrapolating backward in time within a state is
14 appropriate; fair to say?
15     A.  (Nods head).
16     Q.  Is that a yes?
17     A.  Yes.
18     Q.  And big picture number three is that
19 your use of indirect data was appropriate, right?
20     A.  With the -- and so -- I would just add
21 to all of those the point that the methodology
22 that I devised to extrapolate to utilize the

Page 291

1  indirect data is appropriate.  It's not
2  necessarily always appropriate.  It depends.  But
3  using the methodology -- the methodology that is -
4  - it is a standard one that economists use.  It is
5  appropriate.  Yeah.
6      Q.  You've got a copy of your report in
7  front of you, right?
8      A.  I do.
9      Q.  Why don't we mark that as Exhibit Number
10 2.  Does it have any notes on it?
11     A.  I'm not sure.  It's from all the way
12 back from when I was deposed back in July.  So
13 perhaps I could just -- I'm happy to look through
14 it, but it may have -- I haven't looked through it
15 to see.  I didn't just print it out last night, in
16 other words.
17         MR. TORBORG:  Why don't we mark this as
18 the next exhibit.
19         (Exhibit Duggan Rebuttal 002 was
20 marked for identification.)
21 BY MR. TORBORG:
22     Q.  I'd like to ask you to go to page 8.

Page 292

1  There's a section at the bottom entitled "An
2  analogy to Medicaid hospital reimbursement."  And
3  this is a section in which you analogize the facts
4  of this case to what might happen in the Medicaid
5  hospital setting, correct?
6      A.  Correct.
7      Q.  At the bottom of page 9, the last
8  paragraph starting at the end of the page starting
9  "unfortunately," do you see that?
10     A.  I do.
11     Q.  You wrote "Unfortunately for this
12 hospital and by analogy for Abbott, none of these
13 arguments change the fact that they could have
14 been truthful (or less misleading) but elected not
15 to be."  Do you see that?
16     A.  I do.
17     Q.  Okay.  Are you saying that Abbott was
18 not truthful in its price reporting?
19     A.  Here I suppose I would consider just as
20 an example figure 2 in my initial report in which
21 I display the quarterly average wholesale price
22 for vancomycin versus the actual average price

14 (Pages 289 to 292)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 293

1  paid to wholesalers by pharmacies and that latter
2  price will be higher than the overall average
3  price paid to wholesalers.
4       So the top series is published average
5  wholesale price. The bottom series is actual
6  average wholesale price, average price paid to
7  wholesalers by pharmacies. And so that disparity,
8  which by the end of the period has increased to
9  approximately 15 to 1, yes, in my opinion is
10 misleading.
11      Q. Okay. Misleading to whom?
12      A. I haven't endeavored to determine who
13 all received and processed and considered the
14 published AWPs. But both the Medicaid program and
15 the Medicare program based payments for
16 pharmaceutical products on these published prices.
17 And it is -- I haven't tried to identify specific
18 individuals. But it -- I just -- one looks at
19 actual average price of about 5 versus published
20 average price of about 77. That seems to me to be
21 misleading to whoever is considering the
22 information.

Page 294

1       Q. Well, have you read any of the
2  deposition testimony in this case about whether or
3  not state and federal officials were misled about
4  published AWPs for the products at issue in this
5  case?
6           MR. GOBENA: Objection, form.
7       A. As I stated earlier, it really was not
8  the focus of my analysis to get the full lay of
9  the land on all of the depositions by state
10 Medicaid officials, by CMS officials and so forth.
11 As an economist I have spent an incredible amount
12 of effort to examine Abbott's transaction data to
13 arrive at the most accurate price statistics
14 possible. But it certainly hasn't been my focus
15 to try to survey all the views of Medicaid
16 officials.
17      Q. So you don't know one way or another
18 whether or not state and federal officials were
19 misled about the published AWPs for the complaint
20 products because you haven't done that analysis,
21 correct?
22      A. Perhaps I can --

Page 295

1       Q. Yes or no?
2           MR. GOBENA: Object to form.
3       A. I have not done an analysis of what the
4  government knew, what all individuals within the
5  government knew about published prices. But to me
6  as an economist if a firm publishes a price of 78
7  when it's selling at 5, that is misleading. And
8  that 78 is used in the adjudication of Medicaid
9  claims and Medicare claims for programs that serve
10 100 million people.
11      But the focus of my analysis has
12 certainly not been on determining what individuals
13 throughout the government knew. It is a big case.
14 There are many components to it. But in my own
15 research I have used these prices, these AWPs,
16 with Fiona Scott-Morton as a measure of prices.
17 So it's -- it is I think -- you know, as someone
18 with interest in the health care industry, it is
19 striking to me that the published data that is out
20 there is so widely at odds with the actual prices
21 for these products.
22      Q. Now, last time we met -- the first time

Page 296

1  we had a deposition I asked you a number of
2  questions about whether or not you had opinions on
3  what prices Abbott should have reported. Do you
4  recall us engaging in that conversation?
5       A. I'm not sure if it was you, but I recall
6  some conversations along those lines. So that
7  sounds true.
8       Q. And didn't you say that that issue, what
9  Abbott should have reported, was "not the issue
10 that I focused on in my report" and was not the
11 thrust of your analysis? That's testimony you
12 gave, isn't it?
13      A. I don't have the deposition transcript
14 in front of me. So I'm not sure if that is
15 exactly right. But it sounds correct, that I am
16 not necessarily asserting that Abbott should have
17 reported 5 in 2001 quarter 1. My results shed
18 light on had they reported prices that were less
19 at odds how much different would Medicaid and
20 Medicare spending have been. But to me as an
21 economist, I look at these prices for vancomycin
22 and for the other products that are at issue in

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 297

1   this case and it is striking to me how big these
2   disparities are.
3        I understood even before coming on these
4   cases that there were in some cases discrepancies
5   between AWPs and actual prices.  Indeed I note
6   that in one of my own previous papers before I
7   even started on this work.  But this -- so I stand
8   by my statement that I'm not saying that Abbott
9   should have reported exactly X, but I think my
10  report sheds considerable light on if that spread,
11  that 15 to 1 spread, had been much smaller how
12  much different would spending for these programs
13  have been.
14       Q.  And I take it you've read the testimony
15  of numerous state officials who testified that
16  they would not be surprised at all by published
17  AWPs being several times higher than marketplace
18  prices for generic products in general --
19            MR. GOBENA:  Objection to form.
20       Q.  -- before you opined that the prices
21  were misleading --
22            MR. GOBENA:  Same objection.

Page 298

1        Q.  -- right?
2        A.  Once again, I have not done a full scale
3   analysis of what individuals at specific agencies
4   knew and how those views changed over time.
5   That's really not been the thrust of my analysis.
6   So I've conducted an analysis that sheds light on
7   how different spending for these programs would
8   have been if more accurate prices had been
9   reported.
10       Q.  So do you intend to tell the jury
11  without doing any fashion of research to see what
12  state and federal officials knew about published
13  AWPs that the prices reported by Abbott were
14  misleading?
15            MR. GOBENA:  Objection to form.
16       A.  It is very difficult for me to
17  anticipate what I'm going to say at trial.  It
18  seems plausible that will occur months from now.
19  I have done my best in this report to provide --
20  and the subsequent addendums and so forth -- to
21  provide the court and others with an interest in
22  this case with information on how Medicaid and

Page 299

1   Medicare spending would have changed if more
2   accurate AWPs had been reported.
3        I certainly would not be surprised if I
4   were to present something along the lines of
5   figure 2.  But it's just difficult to forecast
6   what I'll weigh in on at trial.  But the thrust of
7   my analysis is summarized in the report, the
8   rebuttal and the addendum, or whatever the January
9   one is called.
10       Q.  If Abbott actually did have sales at the
11  list prices that it reported, are you saying that
12  it should not have reported those list prices?
13       A.  Can you repeat the question?
14       Q.  If Abbott did have sales at the list
15  prices that it reported, are you opining that
16  Abbott should not have reported those list prices?
17            MR. GOBENA:  Object to form.
18       A.  When you say -- do you mean the average
19  wholesale prices that they reported?
20       Q.  Well, did Abbott report average
21  wholesale prices for these products?  Do you even
22  know?

Page 300

1        A.  It is -- I don't know all of the details
2   about the back and forth between Abbott and the
3   pricing compendia such as First Databank.  It is
4   the case that typically there was a -- the AWP was
5   25 percent greater than the WAC for most Abbott
6   products.  I can't remember if it was 20 or 25.
7   Let's say it's 25 percent.  So whether Abbott
8   reported the WAC and that was scaled, or reported
9   the AWP and that was scaled or reported both, that
10  hasn't been the focus of my analysis.
11       What I do know is these are the prices
12  that were published by the pricing compendia,
13  which are quite close to the WACs for the same
14  Abbott products and these are the prices that were
15  used by most state agencies and by the Medicare
16  program in adjudicating claims.
17       Q.  So it's your understanding that the
18  prices that Abbott reported which are the alleged
19  false statements that form the basis of this case
20  are the reporting of WACs --
21            MR. GOBENA:  Objection to form.
22       Q.  -- to the compendia?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 301

1      A.  I did not say that.  I said I wasn't
2  sure about the back and forth between Abbott and
3  First Databank and so forth about how the prices
4  that ultimately appeared in their paper versions
5  and their electronic versions of their data sets,
6  that's certainly not been the focus of my
7  analysis.
8        So what I said was I'm not sure if it
9  was the reporting of -- which of the prices, WAC,
10 direct price or average wholesale price.  And in
11 most cases my recollection is that the WAC for an
12 Abbott product was 5 percent below the direct
13 price and the AWP was 25 percent above the WAC.
14 And I may have those ratios off.
15        But that was for the most part -- as
16 always with stuff like this there are exceptions.
17 But in the vast majority of cases those are the
18 ratios that I think held.  And which one that --
19 which individuals at Abbott reported which prices,
20 that hasn't been the focus of my analysis.  What
21 I'm focusing on is what are the published prices
22 by First Databank and other pricing compendia.

Page 302

1      Q.  Where are these WACs that Abbott
2  supposedly reported for the complaint products?
3  Where would one find them?
4        MR. GOBENA:  Objection to form.
5      A.  Once again, I said earlier I'm not
6  certain about the inventory of WAC, direct price,
7  AWP and so forth.  What I am using here, what I
8  focus on in this analysis is the AWP.  But my
9  recollection is that in many cases -- and
10 sometimes a price may have been missing in a
11 certain quarter.  But my recollection is that
12 there was typically a close correspondence between
13 WACs and AWPs for example, for vanco.
14        Would those appear in the paper version
15 of First Databank, the electronic versions?  I
16 believe so, but that's really not the -- for the
17 most part the AWPs are the ones that are used by
18 both Medicaid and Medicare.
19      Q.  The next sentence on page 9 starts with
20 "the"?  Do you see that?  You wrote "The available
21 evidence suggests that Abbott aimed to use these
22 extremely inaccurate and inflated AWPs to its

Page 303

1  financial advantage in an effort to improve the
2  company's market position and thus its revenues."
3  Do you see that?
4      A.  I see that.
5      Q.  What available evidence are you
6  referring to?
7      A.  Well, I am certainly not the person who
8  has focused on the marketing issues in this case.
9  It is that -- as I talked about earlier, I'm
10 telescoping in on a specific area.  My
11 understanding from Professor Perri's report and
12 from -- well, from Professor Perri's report -- is
13 that there is some evidence suggesting this.
14        I don't come down -- I partly qualified
15 this because that has not been the focus of my
16 analysis.  I mention that it suggests that Abbott
17 aimed to use these prices.  And so that is not --
18 that's certainly not the focus of my analysis and
19 that's precisely why I qualified it with the
20 "suggests."
21      Q.  Did you consider all of the evidence
22 where Abbott employees said that they did not set

Page 304

1  prices to gain a financial advantage by improving
2  their market share?
3        MR. GOBENA:  Objection to form.
4      A.  That has not been the focus of my
5  analysis, sort of researching all of the
6  statements by -- depositions and so forth by
7  Abbott employees.  And so this is -- that's
8  precisely why -- you know, there are areas in
9  which I telescope in, drill down and so forth.
10 And in those cases I -- those areas are the focus
11 of my analysis.  The marketing area is not the
12 focus of my analysis.
13      Q.  So if the marketing area was not the
14 focus of your analysis and you haven't reviewed
15 any of the Abbott testimony, why would you say
16 that the available evidence suggests that Abbott
17 aimed to use inflated AWPs to market the spread?
18        MR. GOBENA:  Objection to form.
19      A.  Once again, I qualified this.  And so
20 it's my understanding from reading the complaint
21 from the very beginning of my work on the case and
22 from considering -- from my familiarity with

17 (Pages 301 to 304)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 305

1  Professor Perri's report I thought hard about my
2  wording here of this.  And part of the reason that
3  I put "suggests" is that this has not been the
4  focus of my analysis.
5        And so that is sort of -- my analysis is
6  over here.  Professor Perri's analysis is over
7  here.  And I'm not coming down.  That's not the
8  focus of my analysis, but it's certainly
9  suggestive based on my reading of it that this did
10 occur.  But as I said, that's exactly why I
11 qualify it with a "suggests."
12    Q.   The last sentence of that paragraph you
13 wrote "And even if one assumes that the hospital
14 in my analogy or Abbott in this case had
15 altruistic motives to ensure access to Medicaid
16 recipients, it does not appear to justify
17 providing extremely inaccurate information to the
18 government." Do you see that?
19    A.   Mm-hmm.
20    Q.   What inaccurate information did Abbott
21 provide -- well, strike that.
22        When you say "to the government" who do

Page 306

1  you mean?  Do you mean the federal government, the
2  state government, both?
3     A.   I mean to agencies that administer the
4  Medicaid and Medicare programs.  So these would be
5  government agencies such as state Medicaid
6  agencies, for example.  And so once again, the
7  diffusion of information from Abbott to the
8  pricing compendia and then indirectly to the
9  government, or in some cases directly to the
10 government, as in Texas, what exactly the -- how
11 exactly the information flowed, that wasn't the
12 focus of my analysis.
13        But for the same reason that I said
14 before that the pricing series to me in figure 2
15 are -- that those published prices are not an
16 accurate reflection of average wholesale prices.
17    Q.   So the only information that you're
18 aware of, Dr. Duggan, where -- the only evidence
19 you're aware of of a direct report by Abbott of
20 price information to a government agency that
21 administered a Medicare and Medicaid drug program
22 relates to the State of Texas; is that right?

Page 307

1     A.   In terms of average wholesale price
2  Abbott provides -- my understanding is that
3  typically Abbott provides information to First
4  Databank, Red Book and other pricing compendia.
5  And these prices are used by government agencies
6  in adjudicating Medicaid and Medicare claims.  In
7  certain cases -- Texas is one example and there
8  may be others.  I just haven't studied it in
9  advance of today -- a firm such as Abbott would
10 report information directly to the state Medicaid
11 agency.
12        So the provision of information I guess
13 directly to the government and indirectly through
14 these pricing compendia.
15    Q.   You're familiar with the concept of
16 average manufacturer price, I assume?
17    A.   Yes, I am.
18    Q.   And you're aware, I hope, that Abbott
19 reported AMP to the federal government for every
20 single quarter on every single one of the NDCs at
21 issue in this case from 1991 to 2001, correct?
22        MR. GOBENA:  Objection.

Page 308

1     A.   I'm not aware -- I haven't studied
2  whether and to what extent Abbott provided AMPs.
3  But it seems plausible that they provided AMPs as
4  it is a requirement for Medicaid.
5     Q.   So when you wrote about the information
6  that Abbott provided to government agencies you --
7  and I'm talking directly to government agencies --
8  you focused on some information you were aware of
9  in Texas but completely ignored the average
10 manufacturer price reporting that Abbott made
11 directly to the federal government, the plaintiff
12 in this case, correct?
13        MR. GOBENA:  Objection to form.
14    A.   The focus of my analysis has been on the
15 AWP based Medicaid reimbursement and in some cases
16 WAC based or even direct price based Medicaid
17 reimbursement.  I have not -- yeah.  AMPs which
18 for example form the basis for rebates have not
19 been the focus of my analysis.
20    Q.   If you would go to page 4 and 5 of your
21 report.  Under the section Medicaid utilization,
22 the second paragraph that starts with

18 (Pages 305 to 308)

Duggan, Ph.D., Mark G. - Vol. II                        May 19, 2009
                    Washington, DC

Page 309

1   "furthermore" you wrote "Furthermore, if one were
2   to consider the effect that alternative AWPs for
3   Abbott's complaint products would have had on
4   utilization for these products, it is instructive
5   to consider a real world example that to some
6   extent mimics the AWP changes that I consider in
7   my report."  Do you see that?
8       A.  I do.
9       Q.  And then you go on to discuss
10  substantially lower AWPs that were implemented for
11  Abbott complaint products in 2001, right?
12      A.  That's correct.
13      Q.  Why would you think it instructive to
14  look at a real world example?
15      A.  Well, one of the criticisms that is
16  leveled against my analysis by Dr. Hughes is that
17  I hold fixed Medicaid utilization.  And so he
18  argues for example that had Abbott reported prices
19  -- had reported the transaction-based AWPs that I
20  calculate, utilization for Abbott products would
21  have been lower.  This is one example of a place
22  in which Abbott's AWPs did fall substantially and

Page 310

1   yet there was certainly not a sea change in
2   utilization for Abbott products.
3           Moreover, I think when considering this
4   at some level this is the case in which one would
5   expect a big -- potentially expect a big
6   utilization change than if right from the outset
7   in figure 2 back in 1991 or even before that the
8   price reports had been more accurate.  And so here
9   this is one example of a change in the middle of
10  the period that would have lowered Abbott's AWPs,
11  that did lower Abbott's AWPs.  There wasn't a big
12  change in utilization.
13          And as I mention elsewhere in the
14  report, if one thinks about sort of the reporting
15  AWPs over the longer term, there are other
16  indirect effects that may go serve to increase the
17  difference.
18      Q.  My question was a little simpler there.
19  And it's you believed it important to see what
20  happened in the real world, right?  That's why you
21  quoted this.  This is something that actually
22  happened, right?

Page 311

1       A.  This --
2       Q.  Yes or no?
3           MR. GOBENA:  Objection to form.
4       A.  I believe this example sheds some light
5   on this issue of holding constant utilization.
6       Q.  Do you believe it important to consider
7   what happens in the real world for purposes of
8   testing the conclusions you reach in your
9   analysis?
10      A.  Can you repeat that question?
11      Q.  Do you believe it important to consider
12  what happens in the real world for purposes of
13  testing the conclusions that you reach in your
14  analysis?
15      A.  It depends on the context.
16      Q.  But it might be?  You cite an example to
17  support your approach of holding all else
18  constant, correct?
19          MR. GOBENA:  Objection to form.
20      A.  This is one -- this is certainly a
21  change that suggests that assumption is -- that
22  holding fixed the utilization is a reasonable one.

Page 312

1   Moreover, for the reasons that I mentioned
2   elsewhere, even if utilization would have changed,
3   it's not obvious that that -- and to some extent
4   it's a legal issue -- the substituting -- if firms
5   had substituted away from Abbott products then the
6   difference at some level would -- the decline
7   would be even larger because payment spending for
8   those products would have been zero.
9       Q.  We'll get to that.  And Dr. Duggan, I
10  really would like you just to try to answer the
11  question I ask you.  I have a big challenge by
12  getting through everything I want to ask by 3:30.
13      A.  Okay.  We'll do.
14      Q.  We'll have more success if you could
15  just answer that I ask.  You'll have an
16  opportunity at trial to explain everything you
17  want to explain to the jury.
18      A.  Okay.
19      Q.  For purposes of today if you could just
20  answer my questions.
21          MR. GOBENA:  Counsel, he is answering
22  your question.  If you don't like the answers

19 (Pages 309 to 312)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 313

1  that's one thing.  But he is doing exactly what
2  you're asking him to do.
3      Q.  Dr. Duggan, do you believe it important
4  to consider what happens in the real world to test
5  the assumptions in your analysis?
6      A.  It depends on the real world issue that
7  is being considered.  It depends on the
8  assumption.  It just depends.  So I'm happy to go
9  point by point and discuss them.  But it's just
10  difficult to speculate.  That's a very broad
11  statement.  And in some cases yes and in some
12  cases perhaps not.  It just depends.
13      Q.  In what instances would what happened in
14  the real world not be relevant to testing the
15  validity of your assumptions?
16      MR. GOBENA:  Objection to form.
17      A.  Well, in some cases it's difficult to
18  find a real world situation that is applicable to
19  the issue at hand.  It just depends.  I mean, I'm
20  happy to -- we're talking very broadly about an
21  infinite number of possible assumptions, an
22  infinite number of possible real world factors.

Page 314

1  So it's hard to -- it's really just impossible to
2  do justice to that question without talking more
3  specifically.
4      Q.  And when you talk about AWP changes --
5  I'm sorry.  When you talk -- you use the word
6  "mimics the AWP changes that I consider in my
7  report."  I take it there you're talking about the
8  reductions in ingredient cost reimbursement for
9  the complaint products that would occur in your --
10  let's call it but-for world?
11      A.  Yes, although it's tricky, as I was
12  just mentioning, in the sense that this is a
13  change near the end of the period, as opposed to
14  from the beginning had the prices been more
15  accurate.  So it's certainly not a perfect twin to
16  what I am considering.  But I believe it is
17  instructive and that's precisely why I put it in
18  my rebuttal report.
19      MR. TORBORG:  Let's mark as Duggan
20  Rebuttal Exhibit 3.
21      (Exhibit Duggan Rebuttal 003 was
22  marked for identification.)

Page 315

1  BY MR. TORBORG:
2      Q.  For the record what I've marked as
3  Duggan Rebuttal Exhibit 3 is a copy of the expert
4  report of James W. Hughes.  You've reviewed this
5  report prior to today, Dr. Duggan?
6      A.  Not last night, but I have reviewed it.
7      Q.  How much time did you spend reviewing
8  it, to the best of your recollection?
9      A.  I don't recall.  I'm not sure.
10      Q.  Is there anything in the report that you
11  do not understand?
12      A.  I'm going to leaf through it.  I'm
13  trying to train my memory.  Nothing leaps to mind
14  as being unclear right now.  But -- I mean,
15  obviously I disagree with many of the points
16  raised in the report, but --
17      Q.  And I take it that if there's something
18  you didn't understand you would have asked counsel
19  for Ven-A-Care and the relator to inquire of Dr.
20  Hughes to clarify what he meant in his report;
21  would that be a fair assumption?
22      MR. GOBENA:  Objection to form.

Page 316

1      A.  Not necessarily.  It would depend on
2  whether it was pertinent to my -- the issues in my
3  -- that I'm considering.
4      Q.  And in response to Dr. Hughes' report,
5  you did some additional work, including some
6  additional economics research; is that right?
7      A.  Correct.
8      Q.  And you also did yourself or had someone
9  else do some additional factual research; is that
10  right?
11      A.  Can you repeat -- some additional?
12      Q.  Factual research.
13      A.  That is correct.
14      Q.  And the factual research that you did
15  that comes to my mind off the top of my head is
16  you asked Myers and Stauffer to do some analyses
17  regarding the changes in dispensing fees that did
18  or did not occur in association with ingredient
19  cost reimbursement reductions, correct?
20      A.  That is an example, yes.
21      Q.  Okay.  What other factual research did
22  you do for purposes of your rebuttal report?

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 317

1      A.   One of the things that I did and
2  actually Mr. Dew, Ian Dew at Steck Consulting, did
3  at my direction was to aggregate the number of
4  claims by data source by year to shed some light
5  on the difference on basically the number of
6  claims for which I have -- I'm using state claims
7  data -- the number of claims that I'm
8  extrapolating.  So for example the analyses that
9  underlie figure A and B, that's one example of an
10  additional piece of factual research.
11      Q.   And that was something that you did --
12  strike that.
13           Whose idea because it to evaluate the
14  change in dispensing fees that did or did not
15  occur in association with reductions of ingredient
16  cost reimbursement?
17      A.   It was something that occurred to me
18  during an earlier deposition in which Mr. Escobar,
19  I believe it was, was pointing to a change in
20  which a state had reduced its ingredient cost
21  reimbursement and had simultaneously raised its
22  dispensing fee.  I forget the specific example.

Page 318

1      Q.   Was it California?
2      A.   Possibly, but I don't remember.
3           And so it occurred to me that that was
4  sort of anecdotal and it would be informative to
5  scrutinize that issue a bit more.  And so it's
6  certainly something that I recall thinking would
7  be useful.
8      Q.   And you asked Myers and Stauffer who had
9  been assisting you in other aspects of this matter
10  to drill down into the specifics on a state by
11  state level, correct?
12      A.   Yes.  There was some more specifics
13  about what I asked them to do.  But I asked them -
14  - I summarized the analyses that they did in the
15  Medicaid dispensing fee section that begins on
16  page 5 in my report.
17      Q.   You didn't do the factual research
18  yourself, correct?
19      A.   At my direction Myers and Stauffer did
20  the research.  But there was a considerable amount
21  of back and forth.
22      Q.   What did you do to test the validity of

Page 319

1  their findings?
2      A.   Well, I have the state Medicaid
3  adjudication methodologies they have put together.
4  And so in some cases I went to the methodologies
5  and looked at whether a change had occurred, maybe
6  it was ambiguous in certain cases, maybe it
7  changed for brands but not for generics.  So in a
8  number of cases I drilled down on the findings
9  they had shared with me.
10           MR. TORBORG:  Why don't we take a quick
11  break here.  That way maybe we can get another 45
12  minutes before lunch.  Does that make sense?
13           MR. GOBENA:  Sure.
14           MR. TORBORG:  Let's go off the record.
15           THE VIDEOGRAPHER:  This is the end of
16  tape 2.  Going off the record at 11:41.
17           (Recess.)
18           THE VIDEOGRAPHER:  This is the beginning
19  of tape 2 in the deposition of Dr. Mark Duggan.
20  On the record at 11:53.
21  BY MR. TORBORG:
22      Q.   Dr. Duggan, if you could go to page 13

Page 320

1  of Dr. Hughes' report.  In this session he's
2  talking about Medicare.  In the last sentence of
3  paragraph 23 Dr. Hughes writes "Administration
4  fees would not have changed according to Dr.
5  Duggan despite the need for trained professionals
6  to store, prepare, deliver and administer these
7  injectable and infusion products."  Do you see
8  that?
9      A.   I see the sentence.
10      Q.   Okay.  Do you have an understanding of
11  what he's saying there?
12      A.   I do.
13      Q.   And it's true that in your difference
14  calculation and in your but-for world
15  administration fees are not changed, correct?
16      A.   I revise Abbott's AWPs but hold fixed
17  other factors.
18      Q.   So you don't increase Medicare
19  administration fees, correct?
20      A.   That is correct.
21      Q.   Okay.  Paragraph 24 and 25 discuss the
22  Medicare Modernization Act of 2003, correct?

21 (Pages 317 to 320)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                     Washington, DC

Page 321

1      A.  Correct.
2      Q.  And you had an opportunity to look at
3  the impact of the MMA of 2003 in connection with
4  your work in the Dey and Roxane cases, correct?
5      A.  Can you repeat the question?
6      Q.  You've looked at the impact of the
7  Medicare Modernization Act of 2003 on dispensing
8  fees for purposes of the Dey and Roxane cases,
9  right?
10         MR. GOBENA:  Can you read back the
11  question, please?
12         (Whereupon, the requested portion
13  was read by the reporter.)
14         MR. GOBENA:  Object to form.
15     A.  In my rebuttal reports for Dey and
16  Roxane I do some analyses of dispensing fees,
17  Medicare dispensing fees.
18     Q.  In paragraph 24 Dr. Hughes states in the
19  second and third sentences "If Dr. Duggan's
20  characterization of the but-for world is in fact
21  accurate, we should expect the payment system of
22  the MMA constructed in response to the alleged

Page 322

1  shortcomings of the earlier system at issue here
2  to closely mimic the but-for payment system
3  proposed by Dr. Duggan.  It does not."  Do you see
4  that?
5      A.  I see that.
6      Q.  And did you evaluate the impact of the
7  changes made by the MMA of 2003 on the
8  administration codes involved with the products at
9  issue in this case?
10         MR. GOBENA:  Object to form.
11     A.  I did not.
12     Q.  Do you know what procedure codes, HCPCS
13  codes, were associated with physician administered
14  claims involving the J-codes at issue in this
15  case?
16     A.  I list the J-codes themselves for the
17  products in the various tables at the end of the
18  report, such as J7050, J7040 and so forth.
19     Q.  And I'm talking about the administrative
20  fee codes associated with physicians administering
21  those J-codes to Medicare beneficiaries.
22     A.  I do not know those codes right here,

Page 323

1  no, today.
2      Q.  That's not something that you've
3  analyzed for purposes of your difference
4  calculation, correct?
5         MR. GOBENA:  Objection to the form.
6      A.  It is correct.  I held constant other
7  factors.
8      Q.  If you would go to the page 14, the
9  first full sentence, Dr. Hughes wrote "However,
10  the statute recognized that the administration
11  fees, where applicable, of the earlier system
12  would be inadequate to compensate providers for
13  the cost of the drug preparation, delivery and
14  administration services." Do you see that?
15     A.  I do.
16     Q.  Do you have any factual basis to
17  disagree with that statement?
18     A.  It is -- I think in considering this one
19  has to bear in mind that MMA revised many things
20  simultaneously.  So it is not simply the case that
21  MMA changed AWPs for Abbott products but there
22  were other factors that changed as well.  And so

Page 324

1  as I note in my analyses in many cases revising an
2  Abbott AWP has no effect on Medicare spending
3  because there are many products in the arrays and
4  the median does not move.
5         So this statement refers to a time
6  period that's outside the window of the Abbott
7  case, '91 to 2001.  It's far outside the window.
8  And moreover, it's referring to a very different
9  system from the law that existed at the time from
10  '91 to 2001.
11     Q.  So are you saying that anything that
12  happened after 2001 in the reimbursement system
13  for Medicare and Medicaid is irrelevant to this
14  case?
15     A.  That's not what I said.  I noted that
16  this law took effect outside the time window.  And
17  I also noted that there were many other things
18  that changed with MMA, not just administration
19  fees.  And so I am -- my analyses consider the
20  law, adjudication methodology, as it existed at
21  the time.  And in many cases it considers the --
22         MR. TORBORG:  Mark this as Duggan

                              22 (Pages 321 to 324)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                      Washington, DC

Page 325

1   Rebuttal Exhibit 4.
2          (Exhibit Duggan Rebuttal 004 was
3   marked for identification.)
4   BY MR. TORBORG:
5      Q.  For the record, what I've marked as
6   Duggan Rebuttal Exhibit 4 is the exhibit 5 in Dr.
7   Hughes' expert report. Dr. Duggan, have you
8   reviewed this exhibit before?
9      A.  It looks familiar. I don't recall
10  specifically, but it certainly looks familiar.
11     Q.  And you understand that Dr. Hughes in
12  these two charts is comparing Medicare's total
13  expenditures before and after the implementation
14  of the MMA of 2003, one for J7040, one for J7060?
15     A.  I see that he's looking at 2001 quarter
16  3 and 2007 according to this.
17     Q.  In paragraph 27 of his report Dr. Hughes
18  writes "Exhibit 5 shows examples of the effect of
19  applying the real world MMA alternative
20  reimbursements on Dr. Duggan's calculations for J-
21  codes 7040 and 7060 rather than the fanciful and
22  unrealistic but-for reimbursements he employs."

Page 326

1   Do you see that?
2      A.  I see the sentence.
3      Q.  Do you have any factual basis to
4   disagree with the exemplar calculations that Dr.
5   Hughes displays here in Exhibit 5?
6          MR. GOBENA:  Objection to form.
7      A.  Well, these are two examples. And there
8   are many additional details that underlie this.
9   So there isn't a sort of systematic analysis. So
10  it's hard to -- I mean, there are literally
11  millions of claims for these products. And so--
12  but this is -- 2007, this is six years after the
13  law changed and the product price that's being
14  used here is substantially lower for both of these
15  products than the one that emerges from any of my
16  median calculations.
17         And as you can see from -- or you can
18  see in the report and in the analyses -- the
19  prices in my analyses typically fall by far less
20  than this and often not at all. And so -- but
21  there is -- many factors changed with MMA. That
22  was a different time period and in terms of the

Page 327

1   law that existed at the time from 1991 through
2   2001 my analysis uses the law as it existed then.
3      Q.  Well, the law that existed during the
4   time of your analysis was to pay average wholesale
5   price as reported in compendia, right?
6          MR. GOBENA:  Objection to form.
7      A.  It was to pay the median of the AWPs of
8   several products, or 95 percent of the median from
9   the array of several products, or in some cases
10  the provider-charged amount. So that was the
11  methodology used to determine Medicaid spending
12  for the J-codes.
13     Q.  And you're aware of the fact that CMS
14  instructed its Medicare carriers to get or to
15  determine the AWP median calculations from AWPs
16  reported in the Red Book, right?
17         MR. GOBENA:  Objection to form.
18     A.  It sounds plausible. I don't recall a
19  specific document saying Red Book versus First
20  Databank or something else. But I think that's
21  correct. It sounds plausible.
22     Q.  If you would go to paragraph 26 of Dr.

Page 328

1   Hughes' report, in this paragraph he's talking
2   about the way in which MMA of 2003 treated
3   infusion drugs that were administered through DME.
4   Do you understand that? Feel free to read that if
5   you need to again.
6      A.  (Reading). Okay. I see that.
7      Q.  Okay. Were you aware of -- is it your
8   understanding that in the MMA of 2003 Congress
9   mandated that infusion drugs administered through
10  DME were to be reimbursed at 95 percent of AWP and
11  not 106 percent of ASP?
12     A.  I'm sorry. Can you repeat the question?
13         MR. TORBORG:  Do you mind reading that
14  back for me?
15         (Whereupon, the requested portion
16  was read by the reporter.)
17     A.  It is my understanding that the precise
18  change varied to some extent across products.
19  That was caused by MMA. MMA changed many things
20  simultaneously. So there were many, many factors
21  that changed along with this one. But I was aware
22  that there is heterogeneity across the products or

23 (Pages 325 to 328)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 329

1  the claim types with respect to what MMA changed
2  the methodology to.
3  BY MR. TORBORG:
4      Q.  But you don't have any factual basis to
5  disagree with Dr. Hughes' statement that Congress
6  mandated that these infusion drugs administered
7  through DME were to be reimbursed at 95 percent of
8  AWP as published in the price compendia, do you?
9      A.  Nothing leaps to mind right now.  I just
10 -- yeah.  I don't have the details of the change
11 memorized with respect to how it varied across all
12 drugs.  But it seems plausible.
13     Q.  Do you have any factual basis to
14 disagree with Dr. Hughes' statement that
15 vancomycin, a drug at issue in this matter, was
16 during times relevant to your analysis an infusion
17 drug administered through DME?  In fact that's
18 something you know from your claims data work,
19 correct?
20         MR. GOBENA:  I object to form.
21     A.  It is the case that vancomycin was paid
22 through Medicare DME claims.  However, that

Page 330

1  spending essentially ground to a halt in '96, late
2  '96, as you can see from my table 28.  So to a
3  first order approximation of the 26 million in
4  utilization for Medicare DME claims --
5      Q.  That's not my question, Dr. Duggan.
6      A.  -- it seems 95 percent happened in '96
7  or earlier.  So I'm saying that vancomycin was
8  reimbursed as a Medicare DME through '96.  But my
9  understanding is that after '96 not much.
10     Q.  Yeah.  Because Medicare quit covering
11 vancomycin through the DME benefit because it no
12 longer required the use of an external infusion
13 pump, right?
14     A.  That's my understanding.
15     Q.  Okay.  But during the times for which
16 you calculate damages Medicare was covering
17 vancomycin through the DME benefit, correct?
18         MR. GOBENA:  Object to form.
19     A.  From '93 to '96 Medicare was paying
20 vancomycin through DME, paying it through DME
21 claims.
22     Q.  And you're aware of course that

Page 331

1  vancomycin when it's being reimbursed through a
2  durable medical equipment carrier is something
3  that's being infused into patients, right?
4      A.  That is my understanding.  I'm sure
5  there are exceptions, but --
6      Q.  What did you do to investigate why
7  Congress exempted infusion drugs administered
8  through DME from the 106 percent of ASP
9  methodology?
10     A.  I did not examine -- I did not conduct a
11 full scale analysis to see what all the factors
12 were that culminated in that decision.
13     Q.  Did you consider the congressional
14 exemption of infusion drugs administered through
15 DMEs in your difference analysis for purposes of
16 this case?
17         THE WITNESS:  Can you read that back?
18         (Whereupon, the requested portion
19 was read by the reporter.)
20         THE WITNESS:  Can you just clarify?  I'm
21 unclear.
22 BY MR. TORBORG:

Page 332

1      Q.  Did you consider this exemption for
2  purposes of your differences calculation in this
3  case?
4      A.  I did not consider the DME infusion drug
5  exception.
6         MR. TORBORG:  Let's mark that as Duggan
7  Rebuttal Exhibit 5.
8         (Exhibit Duggan Rebuttal 005 was
9  marked for identification.)
10 BY MR. TORBORG:
11     Q.  For the record, I have marked an excerpt
12 of the deposition of Thomas Scully, a deposition
13 of May 15th 2007.  Have you reviewed Mr. Scully's
14 deposition before, Dr. Duggan?
15     A.  Not that I recall.
16     Q.  Do you know who Dr. Scully -- or I think
17 it's Mr. Scully -- was?
18     A.  He was an administrator, I believe, of -
19 - whether it was HCFA or CMS, I'm not sure.  At
20 the time he was an administrator.
21     Q.  And it's your understanding that he was
22 involved in the negotiations that led to the MMA

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                      Washington, DC

Page 333

1  of 2003?
2      A.  It's my understanding he was involved.
3      Q.  Okay.  If we go to page 366 of the
4  minuscript, starting at line 12, I'm going to read
5  through line 367:10 into the record.  If you'd
6  follow along then I'll have some questions for
7  you.
8          "Question:  So it would appear the
9  Congress, at least for these drugs and in that
10  setting of home infusion, has determined to
11  continue to subsidize the provision of the
12  services by overpaying for the drugs, correct?
13         "Mr. Gobena:  Object to the form.  The
14  legislation speaks for itself.
15         "Mr. Breen:  Objection to the form.
16         "Mr. Daly:  Question:  You can go ahead.
17         "Answer by Mr. Scully:  Yes.  I was
18  surprised to see this.  I forgot we did it.  It
19  was certainly never discussed by members.  I'm
20  sure the staff -- staff person who wrote it works
21  with me at Alston & Bird, so I'll go back and ask
22  him, but I'm sure that it's probably, they froze

Page 334

1  it to freeze it, and some level of cross-subsidy
2  apparently.
3          "I'm not sure what the congressional
4  intent there was, but I think it was Senator
5  Grassley's staff that did that provision.  So I
6  had totally forgotten that we did it, that it was
7  in the bill.  It wasn't something that was widely
8  discussed at all."
9          Do you see that?
10     A.  I see that.
11     Q.  Does it appear here that Mr. Scully is
12  testifying that the reason for excepting infusion
13  drugs administered through DME from the new ASP
14  methodology was the desire to freeze in some level
15  of cross-subsidy?
16         MR. GOBENA:  Objection to form.
17     A.  I'm not sure.  It seems to me from the
18  reading it he's a bit uncertain.  He forgot about
19  it.  He mentioned this is a possibility --
20  "probably" -- but it was someone else who did the
21  provision apparently.  So it's just hard to
22  speculate.

Page 335

1      Q.  Well, he was asked "So it would appear
2  that Congress, at least for these drugs and in
3  that setting of home infusion, has determined to
4  continue to subsidize the provision of the
5  services by overpaying for the drugs, correct?"
6          The answer:  "Yes."
7          MR. GOBENA:  Objection to form.
8      Q.  Do you see that?
9          MR. GOBENA:  Mischaracterizes the
10  testimony.
11     A.  You're sort of telescoping in on this
12  one paragraph, and it strikes me that he is a
13  little bit uncertain here.  He clearly wasn't
14  intimately involved.  And then there is of course
15  the point that at this time vancomycin was not
16  being reimbursed as a Medicare DME product.  So
17  it's not obvious to me why -- I mean, this is
18  several years later.  So -- but I guess I wouldn't
19  read this one paragraph of at least a 370 page
20  deposition and glean from it that he's sure of
21  this.
22     Q.  In any event, you haven't read this

Page 336

1  testimony before today, correct?
2      A.  Not that I recall.
3      Q.  Now, this is an example of a real world
4  event that happened in the Medicare reimbursement
5  scheme for infusion drugs administered through
6  DME, correct?
7      A.  I -- without more examination I would
8  hesitate to -- you know, without more examination
9  of what exactly happened with MME with respect to
10  Medicare DME, I don't know all the details so it's
11  difficult for me here to speculate.  I think this
12  is sort of a different issue because CMS or HCFA
13  had stopped paying vanco as a DME product about
14  seven years before DME was enacted.  So I think
15  this is a different situation and --
16     Q.  Can you think of any other reason why
17  Congress would exempt infusion drugs administered
18  through DME from the ASP methodology apart from
19  the need to cross-subsidize home infusion
20  services?
21         MR. GOBENA:  Objection to the form.
22     A.  I'm not sure.  I mean, it's difficult to

Henderson Legal Services, Inc.

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 337

1  speculate.  Perhaps those products reimbursed
2  under Medicare DME were known to have AWPs that
3  were more -- that were closer to the actual
4  average prices.  It's just difficult to speculate
5  without more information about what the Medicare
6  DME products were that were being reimbursed
7  during this period.
8      Q.  So I suppose you haven't evaluated
9  schedules on CMS's website that show that the
10 reimbursement amounts for infusion drugs through
11 DME can be ten times higher than reimbursements to
12 physicians under the ASP methodology, right?
13         MR. GOBENA:  Objection to form.
14     A.  I don't recall looking at that specific
15 page of the CMS website.  And those are for
16 totally different products than vancomycin.
17     Q.  Well, vancomycin is in fact and was in
18 fact during the time period of your analysis an
19 infusion drug administered through DME, correct?
20     A.  Right, from '93 to '96 it was an
21 infusion drug.
22     Q.  In any event, this was a criticism that

Page 338

1  Dr. Hughes made of your analysis, correct, the
2  fact that you ignored this exception for infusion
3  drugs through DME, right, right here in his
4  report?
5         MR. GOBENA:  Objection to form.
6      A.  Yes.  I see that.
7      Q.  And that's not a criticism that you
8  addressed in your rebuttal report, correct?
9      A.  I do discuss the Medicare dispensing fee
10 issue in my -- on pages 18 and 19 of my rebuttal
11 report.  As I said, there are -- this is -- so at
12 some level I've already addressed this issue in
13 the rebuttal report.  But as to the specific of
14 Medicare DME being exempt from the changes, those
15 are different products than the products at issue
16 here.  And Medicare stopped paying DME claims for
17 vanco in '96.  CMS then changed the program seven
18 years later for different DME products.
19         It's just not -- to use the language
20 from my rebuttal report, this isn't really
21 mimicking, not coming close to mimicking the
22 change that my analysis is using.  So it's just --

Page 339

1  it's seven years later on completely different
2  products.
3      Q.  Well, how do you know that it's
4  completely different products?  Have you compared
5  the infusion drugs that were administered in 1995
6  to the infusion drugs that were administered in
7  2005 --
8         MR. GOBENA:  Object to form.
9      Q.  -- to see that there is in fact a great
10 deal of overlap between the two?
11     A.  Oh, I'm very confident that there's
12 overlap between the J-codes paid through Medicare
13 DME claims in '95 and '05.  But it also appears
14 that DME claims are not being paid for vanco,
15 which is the product that is really -- the only
16 one that I analyzed in my difference calculations
17 for the DME claims.  So I have -- I would be
18 surprised if there wasn't a lot of overlap from
19 '95 to '05, but vanco is not part of that overlap.
20     Q.  So this exception that Congress put in
21 for infusion drugs administered through DME in
22 order to cross-subsidize home infusion has no

Page 340

1  application to your opinions because it doesn't
2  specifically apply to vancomycin because
3  vancomycin was no longer covered at this time,
4  correct?
5         MR. GOBENA:  Objection.
6      A.  There's a lot packed into that question
7  so I wonder if you could read it back to me.
8         (Telephone interruption.)
9         MR. TORBORG:  Okay.  Why don't we go off
10 the record.
11        THE VIDEOGRAPHER:  Off the record at
12 12:25.
13        (Discussion off the record.)
14        THE VIDEOGRAPHER:  On the record at
15 12:25:39.
16        MR. TORBORG:  And I'm going to move to
17 strike my last question and we can move along.
18        THE WITNESS:  And we'll be doing lunch
19 at some point in the not too distant future?
20        MR. TORBORG:  Yeah.  The not too distant
21 future.
22        THE WITNESS:  Okay.

26 (Pages 337 to 340)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 341

1       MR. TORBORG:  We've only been going for
2   about a half hour.  Do you want to go for another
3   ten minutes?
4       THE WITNESS:  Yeah.  Another ten
5   minutes.  I just see it over there and it's
6   inviting.  I appreciate it.
7   BY MR. TORBORG:
8    Q.  If you would go to paragraph 40 of Dr.
9   Hughes' report.  Dr. Hughes wrote "First, as is
10  the case with Medicare, Dr. Duggan's damage
11  estimates for Medicaid are tainted by reliance on
12  a but-for world that is at odds with the record in
13  this matter.  For Medicaid Dr. Duggan's but-for
14  world relies on the following assumptions."
15      Now I'm going to paraphrase these to
16  move along.  The first is that your analysis
17  assumes the state and federal officials were
18  unaware of basically the difference between AWP,
19  WAC and marketplace prices.  The second is it
20  assumes that had officials been aware of these
21  pricing realities they would not only have changed
22  reimbursement policy immediately but they would

Page 342

1   have also based Medicaid reimbursement on his
2   calculation of average acquisition cost.
3       Third is it assumes in the but-for world
4   dispensing fees would not increase.  And fourth,
5   it assumes that all states are the same and they
6   would respond in the same way to challenges and
7   obstacles.
8       Did I fairly paraphrase those?
9    A.  Sure.
10   Q.  Now, in your rebuttal report you tackle
11  the issue that is classified under the third
12  category, right?  "Third, Dr. Duggan assumes in
13  the but-for world that dispensing fees would not
14  increase."  That's something that your rebuttal
15  report addresses, correct?
16   A.  It discusses the issue of ingredient
17  cost changes in states' methodologies and the
18  relationship if anything with dispensing fee
19  changes.
20   Q.  Does your rebuttal report address the
21  criticism Dr. Hughes makes that your analysis
22  assumes the state and federal officials were

Page 343

1   unaware for the entire relevant time period that
2   AWP did not constitute a selling price and WAC did
3   not include discounts and rebates?
4    A.  As I mentioned earlier today, the
5   knowledge of government officials was not an area
6   that I focus on for my analysis.
7    Q.  Let me ask you this.  Does your
8   difference calculation consider what state and
9   federal officials understood contemporaneously
10  about the relationship between AWP, WAC and actual
11  prices in the marketplace?
12      MR. GOBENA:  Objection to form.
13      THE WITNESS:  Can you repeat the
14  question?
15   Q.  I can read it back.
16   A.  Okay.
17   Q.  Does your difference calculation
18  consider what state and federal officials
19  understood contemporaneously about the
20  relationship between AWP, WAC and actual prices in
21  the marketplace?
22      MR. GOBENA:  Same objection.

Page 344

1    A.  As I said, that's really not -- there
2   were many state and federal officials employed at
3   the agencies during this time period.  And it has
4   not been a focus of what I set out to do or what
5   I've done.
6    Q.  In your rebuttal report do you address
7   the criticism that Dr. Hughes makes that your
8   difference calculation assumes that had officials
9   been aware of these pricing realities they would
10  not only have changed reimbursement policy
11  immediately but also that they would have based
12  Medicaid reimbursement on its calculation of
13  average acquisition cost?
14   A.  My analysis examines how Medicaid
15  spending would have changed if transaction-based
16  AWPs had been used holding other factors constant.
17  So had Abbott reported more accurately its prices
18  for vancomycin and the other products at issue in
19  this case to First Databank in some cases, Red
20  Book in other cases, state governments in other
21  cases, and those values been utilized in
22  adjudication methodologies, my analysis determines

                              27 (Pages 341 to 344)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                        Washington, DC

Page 345

1  how spending would have changed.
2         And so my analysis calculates how --
3  this is sort of, once again, touching on this
4  knowledge of government officials issue.  And it's
5  really -- that just wasn't the focus of my
6  analysis.
7      Q.  Is it your understanding that what Dr.
8  Hughes is saying there -- just to try to
9  paraphrase just to move along -- is that he's
10  saying that your difference calculation assumption
11  that states would have used much lower prices in
12  calculating ingredient prices if they were
13  available?
14     A.  It assumes that state agencies would
15  have used the AWPs when adjudicating the claims,
16  the alternative AWPs.
17     Q.  And I think we covered this at length in
18  your prior deposition so I don't want to belabor
19  it here.  But you've agreed that whether states
20  would have used much lower prices in adjudicating
21  ingredient cost reimbursements is an assumption in
22  your report, correct?

Page 346

1      A.  My analyses assume that the alternative
2  AWPs that I calculate from Abbott's data would
3  have been used by state Medicaid programs in
4  adjudicating the claims.  That is correct.  In
5  some cases, however, they would not have been --
6  they would have been overwritten by things like
7  usual and customary, for example.  So --
8      Q.  And have you done anything more in your
9  work on this case to consider or test the
10  assumption that states would have used much lower
11  prices in calculating ingredient reimbursements?
12         THE WITNESS:  Can you read that back?
13         (Whereupon, the requested portion
14  was read by the reporter.)
15     A.  That is an -- so I -- since receiving
16  this report I have not examined this issue
17  further.  However, I examined it, considered it to
18  some extent earlier in my earlier report.
19  BY MR. TORBORG:
20     Q.  Okay.  You would agree with me that your
21  rebuttal report doesn't address the issue of
22  whether or not states would have used lower prices

Page 347

1  akin to the prices you calculate in calculating
2  ingredient reimbursements, correct?
3      A.  It to some extent addresses it in that
4  it discusses the events that followed the change
5  in AWPs that's apparent from figure 1 and figure 2
6  for Abbott products and that's summarized
7  elsewhere in the report and that were later used -
8  - and then one can see the decline in Medicaid
9  spending that followed that.
10     Q.  Can you show me where in your report you
11  address this question, in your rebuttal report?
12     A.  Well, in an indirect way I am addressing
13  it when I discuss the change to Abbott's AWPs that
14  happened in 2001.  And it is apparent from -- it's
15  my own table 11.  There was a sharp decline in
16  Medicaid spending that followed that.  So I
17  address it tangentially, but not head-on, perhaps.
18         THE WITNESS:  Is this --
19         MR. TORBORG:  Why don't we take a lunch
20  break.
21         THE WITNESS:  Okay.  Great.
22         THE VIDEOGRAPHER:  Off the record at

Page 348

1  12:37.
2         (Whereupon, at 12:37 p.m. a lunch
3  recess was taken.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

28  (Pages 345 to 348)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 349

1      A F T E R N O O N   S E S S I O N
2              (1:17 p.m.)
3
4  Whereupon,
5        MARK G. DUGGAN, PH.D.,
6  the witness testifying at the time of recess,
7  having been previously duly sworn, was further
8  examined and testified as follows.
9
10       THE VIDEOGRAPHER:  On the record at
11 1:17.
12
13       EXAMINATION RESUMED BY COUNSEL
14       FOR ABBOTT LABORATORIES
15 BY MR. TORBORG:
16    Q.  Welcome back, Dr. Duggan.
17    A.  Thank you.
18    Q.  I'd like to ask you to go to paragraph
19 41 of Dr. Hughes' report.
20    A.  Okay.
21    Q.  He writes "An accurate assessment of the
22 but-for world is essential to a valid damages

Page 350

1  analysis." Do you agree with that in concept?
2     A.  It's not an easy yes or no.
3     Q.  Okay.
4     A.  Do you want me to --
5     Q.  Yes.
6     A.  Oh, I'm sorry.  I wasn't sure.
7        As I outline in my rebuttal report my
8  analyses, both for Medicaid and for Medicare, hold
9  constant other factors when replacing Abbott's
10 AWPs with alternative AWPs based on actual
11 transaction prices.  The -- we talked about a
12 couple of the criticisms, the change in dispensing
13 fee, the change in utilization somewhat, and also
14 the challenges that are inherent in determining
15 how the world would have looked if Abbott for the
16 eleven year period considered had reported more
17 accurate prices.
18       As I outline in my rebuttal report a
19 number of these, as I term them, indirect effects
20 would serve to increase rather than to reduce the
21 value of difference.  In my judgment the analysis
22 that I undertook accurately captures the effect of

Page 351

1  alternative -- more accurate prices, more accurate
2  published prices, on expenditures for the Medicaid
3  and the Medicare programs.
4        And we looked at figure 1 and we talked
5  about figure 1.  And that's just one of the 44
6  products at issue in this case.  In thinking about
7  the sorts of issues that Dr. Hughes has raised,
8  it's important to think of the full time period.
9  So I stand by my analysis as shedding useful
10 insight into how much more these programs spent.
11       At some level -- do I think that there
12 exists one or more claims that might not have been
13 submitted?  Possibly.  But for my analysis -- I
14 believe that my analysis is completely valid for
15 all the reasons that I mentioned in the initial
16 report, the supplement to it and then the rebuttal
17 report.
18    Q.  I'm going to ask you another question.
19 And if you can't answer it yes or no tell me you
20 can't answer is yes or no --
21    A.  Okay.  I tried to do that last time.
22    Q.  -- and we'll move on.  Because I need to

Page 352

1  get done in less than two hours.  If you can't
2  answer it yes or no, if it's too complicated,
3  fine.  Just tell me.
4     A.  Okay.
5     Q.  That's how I'm going to proceed with a
6  lot of these.  If you can't answer it yes or no
7  the jury will know Dr. Duggan can't answer that
8  yes or no, which is fine.  But I don't want to ask
9  you a yes or no question and get a three minute
10 response.
11    A.  I'm sorry.  That's precisely why I
12 paused the last time.
13    Q.  All right.  Fair enough.  I didn't read
14 your communication to me.  My fault.
15       Dr. Hughes also writes "What information
16 government officials had about pharmaceutical
17 prices and when they had it is highly relevant to
18 characterizing the but-for world."  Do you agree
19 with that statement, yes or no?
20    A.  Not necessarily.
21    Q.  Okay.  In paragraph 42 Dr. Hughes states
22 "Evidence will be presented at trial as to what

29 (Pages 349 to 352)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 353

1  government officials knew or did not know about
2  pharmaceutical pricing practices and how these
3  affected reimbursements."  And then he cites some
4  of that evidence.  Then he states "The point is
5  that whatever the facts turn out to be from trial
6  testimony, they are relevant to the accurate
7  assessment of damages, yet Dr. Duggan has ignored
8  such factors in his damage calculation."
9       Do you agree with that statement, yes or
10 no?  Again, if you can't answer it yes or no tell
11 me you can't.
12     A.  I'm sorry.  Which statement?
13     Q.  The last sentence.
14     A.  "Dr. Duggan has ignored such factors"?
15     Q.  Yes.
16     MR. GOBENA:  Object to form.  There's
17 multiple concepts embodied in that sentence.
18     A.  I think some of this is embedded in my
19 analysis.
20     Q.  Which part is embedded in your analysis?
21     A.  Well, to the extent for example that I
22 investigated whether dispensing fees changed

Page 354

1  following the use of alternative AWPs for Abbott
2  products, whether -- so --
3      Q.  If you would go to paragraph 60.  Dr.
4  Hughes is talking about the fact that the
5  accounting firm of Myers and Stauffer conducted
6  numerous studies from 1987 through 2001 relating
7  to Medicaid pharmacy reimbursement.  Do you see
8  that?
9      A.  I see this.
10     Q.  Did you consider the Myers and Stauffer
11 reports that they issued from 1987 to 2001?
12     A.  I am familiar with one or more of these
13 reports.  But I have not done an exhaustive study
14 of all of them.
15     Q.  Okay.  Did you consider them in forming
16 your opinions?
17     A.  It is difficult to disentangle the
18 effect of each component that I considered on my
19 ultimate opinions.  I considered them in carrying
20 out the analysis that culminated in my report, the
21 supplement and the rebuttal.
22     Q.  In paragraph 62 Dr. Hughes writes "Dr.

Page 355

1  Duggan's damage calculations are predicated on a
2  but-for world where the extant reimbursement
3  method is the result of government ignorance
4  rather than deliberate government policy."  Is
5  that true?
6      MR. GOBENA:  Object to form.
7      A.  Not necessarily.
8      Q.  All right.  Paragraph 33.
9      A.  33?
10     Q.  63.  I'm sorry.  The second and third
11 sentences.  Look at the second sentence.  "A valid
12 methodology would need to consider" -- and he's
13 talking a damages methodology.  "A valid
14 methodology would need to consider the information
15 available to government officials at various
16 points in time, acknowledge attempts to change the
17 reimbursement method in light of this information,
18 and why government agencies or the Congress
19 rejected these alternatives."
20     Do you agree or disagree with that
21 statement?
22     A.  It's difficult to say.  It depends --

Page 356

1  44.  So this case is about 44 Abbott NDCs.  It
2  seems plausible that other -- some of what he's
3  referring to consists of a much broader set of
4  products or a different set of products.  It's
5  hard to say.  But I certainly think that my
6  methodology is valid and the focus and the
7  knowledge of government officials has not been a
8  focus of my analysis.
9      Q.  And so you can't just simply agree with
10 that statement here today, right?
11     MR. GOBENA:  Objection to form.  Asked
12 and answered.
13     A.  There's just so much -- it's a very
14 vague statement.  It's government officials.
15 There are many different agencies, state Medicaid
16 agencies, CMS and so forth, many officials working
17 at them at various points in time.  It's very
18 open-ended and broad.  But in my judgment as an
19 economist I telescoped in on the factors that were
20 unnecessary to arrive at the results that I did.
21 And I certainly think that the methodology I
22 employed and all the factors that I've considered,

30 (Pages 353 to 356)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                     Washington, DC

Page 357

1  it's appropriate.
2      Q.  Dr. Duggan, have you attempted to
3  quantify as a measure of damages in this case the
4  difference between what the government would have
5  paid and what it did pay had it known of the
6  alleged false or fraudulent nature of Abbott's
7  price reporting?
8          THE WITNESS:  Can you repeat that
9  question?
10         (Whereupon, the requested portion
11  was read by the reporter.)
12     A.  The government -- who in the government?
13  I guess I'm confused.
14  BY MR. TORBORG:
15     Q.  The federal government.
16     A.  The federal government employs millions
17  of individuals.  I mean, it's a broad --
18     Q.  People who administered the Medicare and
19  Medicaid programs?  Who did you think I was asking
20  about?
21     A.  I'm just --
22         MR. GOBENA:  He's asking for a

Page 358

1  clarification, Counsel.  He's entitled to do that.
2          THE WITNESS:  I'm a little bit
3  disoriented.  Can we go back to the initial
4  question?
5          (Whereupon, the requested portion
6  was read by the reporter.)
7      A.  Government knowledge really was, as I've
8  said several times now, was really not the focus
9  of my analysis, determining what individuals
10  within the government at CMS or in the Medicaid
11  agencies knew.  And I understand that that's an
12  issue that others, other experts, have focused on
13  in this case.  That's certainly not been the focus
14  of my work.
15  BY MR. TORBORG:
16     Q.  We talked about this before the break.
17  But one of your assumptions in this case is that
18  the Medicaid and Medicare programs would have used
19  lower prices of the type that you calculate in
20  your report, correct?
21         MR. GOBENA:  Objection to form.
22     A.  I assume Medicaid and Medicare would

Page 359

1  have used these alternative AWPs, correct.
2      Q.  It's an assumption of your report,
3  right?
4      A.  My analyses calculate, determine,
5  examine, what Medicare and Medicaid would have
6  paid if these alternative AWPs had been in effect.
7      Q.  And they were in fact used?
8      A.  And they were used in adjudicating
9  claims for both programs.
10         MR. TORBORG:  Mark this as Duggan
11  Rebuttal Exhibit 6.
12         (Exhibit Duggan Rebuttal 006 was
13  marked for identification.)
14  BY MR. TORBORG:
15     Q.  Dr. Duggan, if you would just take a
16  glance at this to the extent necessary to tell me
17  whether or not you've ever seen this document.  I
18  will just have a relatively few questions for you
19  on this.
20     A.  I don't recall this specific document.
21     Q.  I'd like to ask you to go to page 9 of
22  the document.  There's a section at the top of

Page 360

1  this report.  For the record, this is a 2002
2  document entitled "Performance audit:  Cost
3  containment for state prescription drug
4  expenditures."  It's from the office of state
5  auditor, Claire McCaskill, June 28th 2002.  It
6  relates to the state of Missouri.
7          Missouri is one of the states that you
8  have claims data for, right?
9      A.  That is correct.
10     Q.  Which means that it is a state with
11  significant expenditures for the subject drugs,
12  correct?
13     A.  I don't remember the exact dollar
14  amount, but it was relatively high, higher than
15  certainly the average.
16     Q.  There's a section here on page 9 that's
17  titled "Lower reimbursement rates for home
18  infusion drugs not used."  It states "Missouri
19  continues to pay more than it should on home
20  infusion drugs because division officials have not
21  yet implemented more accurate drug prices.  In May
22  2000 the federal Department of Justice provided

31 (Pages 357 to 360)

Duggan, Ph.D., Mark G. - Vol. II                              May 19, 2009
                        Washington, DC

Page 361

1  all states with more accurately average wholesale
2  prices for 437 primarily home infusion dispensed
3  drugs.
4         "Some prices were more than 80 percent
5  less than the average wholesale prices previously
6  reported by the pharmaceutical companies.  The
7  state could have saved an estimated $1.5 million
8  of the $8.4 million spent on these 437 drugs in
9  fiscal year 2001 had officials used the more
10 accurate average wholesale prices and a dispensing
11 fee structure similar to one implemented in
12 another state." Do you see that?
13    A.  I see that paragraph.
14    Q.  Okay. The third paragraph down states
15 "Missouri officials initially implemented the more
16 accurate prices for provider reimbursement using
17 the normal $4.09 dispensing fee which was not
18 designed to cover these drugs. Division officials
19 reversed this decision after home infusion
20 providers threatened to cease services due to
21 insufficient dispensing fees. Provider personnel
22 admitted the former reimbursement rates exceeded

Page 362

1  their product acquisition costs, but they used the
2  excess reimbursement to offset the higher
3  dispensing fee costs of home infusion drugs."
4         Did I read that right?
5     A.  That sounds right.
6     Q.  Now, you're familiar with the -- I think
7  we called it last time, the DOJ AWP effort.
8  Right?
9     A.  Yes. I'm familiar with it.
10    Q.  And you're aware of the fact that that
11 effort involved many of the NDCs involved in this
12 litigation, correct?
13    A.  Many, but I don't think all.
14    Q.  But it involved vancomycin, dextrose
15 solutions and saline solutions, correct.
16    A.  That's sounds plausible.  I don't recall
17 exactly, but that sounds plausible.
18    Q.  Did counsel make you aware of this
19 document before today?
20    A.  The Claire McCaskill document?
21    Q.  Yes.
22    A.  Not that I recall.

Page 363

1     Q.  Would you agree with me that the DOJ AWP
2  effort seeking to have states implement lower
3  prices for vancomycin, saline solutions and
4  dextrose solutions among other drugs mimics the
5  AWP changes set forth in your report?
6     A.  Well, it's a bit tricky in the sense
7  that I don't know all of the factors that Missouri
8  officials considered here. It's hard for me just
9  with this document put in front of me to think of
10 that.  Moreover, the products at issue in this
11 case are a very small subset of the full set of
12 products.  And so it is -- it would be hard to
13 say.
14    Q.  So is it your testimony that the state
15 of Missouri or the DOJ AWP effort does not mimic
16 in any way the AWP changes proposed in your
17 report?
18        MR. GOBENA:  Objection to form.
19    A.  Not necessarily, in the sense that these
20 prices were coming from DOJ rather than from First
21 Databank.  Perhaps Missouri elected to reflect
22 more -- an examination here of Missouri's

Page 364

1  expenditures on complaint products by quarter
2  indicates that they plummeted in mid-2001, exactly
3  when Abbott's First Databank AWPs declined.  So
4  this is -- having the Department of Justice
5  intervene and contact the agency, perhaps Missouri
6  officials felt more comfortable sticking to the
7  First Databank prices.
8         It's just difficult to speculate without
9  more information.  But I can see from the data
10 that I have provided here that if one looks at
11 spending on these products it fell from 300,000 in
12 2000 quarter 4 to 81,000 in 2001 quarter 3, even
13 though the number of prescriptions didn't change
14 much. So it appears that they did apply the
15 Abbott AWPs once they were produced through First
16 Databank.
17        MR. TORBORG:  Objection, nonresponsive.
18 BY MR. TORBORG:
19    Q.  Is it your understanding, Dr. Duggan,
20 that the DOJ actually had First Databank put into
21 First Databank's data the DOJ AWPs?  Were you
22 aware of that?

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 365

1      A.  I was not -- I certainly have not
2   endeavored to conduct a full analysis of all the
3   back and forth between Abbott, DOJ, First Databank
4   and so forth.  What I do see is that First
5   Databank's AWP from figure 1 did not decline until
6   the middle of 2001, whereas this change that we're
7   talking about is May of 2000.
8          So it seems there was this window,
9   perhaps a year, in between when the DOJ first made
10  this information available and when it was revised
11  in First Databank.  I don't -- you know, so --
12     Q.  And here according to this document
13  Missouri officials were aware that some prices in
14  the DOJ AWPs were 80 percent less than the
15  previous AWPs, right?
16     A.  They --
17     Q.  That's what it says right here, right?
18     A.  It says that some prices were more.  So
19  it seems that at least by May 2002, and I'm
20  guessing sooner than that, or June 2002, that they
21  were aware -- perhaps right when DOJ announced it
22  -- that there were these lower prices.

Page 366

1      Q.  And Missouri officials dropped or
2   stopped using those lower DOJ AWP prices out of a
3   concern for access, right, to home infusion
4   therapies?
5      A.  It would be -- what all the factors that
6   were relevant here, I'm not sure.  This first --
7   so I think states differed a bit.  Some states
8   used the prices immediately.  In other states
9   there was a lag.  Missouri appears to be a state
10  in the latter category.
11     Q.  Well, do you have any evidence that
12  Missouri ever used the DOJ AWPs?
13     A.  Well, an examination of my own table 20A
14  in my report strongly suggests that the lower AWPs
15  that are apparent in figure 1 were used once they
16  were in the First Databank system.  I haven't
17  drilled down on the specifics of what exactly
18  happened in Missouri from May of 2000 to mid, late
19  2001, regarding this issue.  But what I can see
20  from the data, from my analysis of the claims
21  data, is that it appears those lower prices were
22  ultimately used.

Page 367

1      Q.  And it could be that the lower prices
2   that were used were the lower prices that Abbott
3   reported in 2001, not the DOJ AWPs, right?
4      A.  It is possible.  Both were substantially
5   lower than the baseline.
6      Q.  But you would agree with me that this is
7   a real world example of whether or not states
8   would use lower prices for ingredient cost
9   payments?
10        MR. GOBENA:  Objection to form.
11     A.  I think here it's important to consider
12  the full context.  It appears there was a delay.
13  Perhaps partly because of the issue raised in the
14  third paragraph there.  But it does appear that
15  ultimately Missouri did use much lower AWPs for
16  Abbott products.
17     Q.  And that's because Abbott lowered its
18  prices, correct?
19     A.  As I said a little while ago, what
20  exactly was the chain of events that led to
21  Missouri using a much lower AWP for Abbott's
22  complaint products in 2001, I'm not sure.  Was it

Page 368

1   -- so that has not been -- determining the back
2   and forth between the state, First Databank, DOJ
3   and so forth, that's certainly -- you know, that
4   was not a focus of my analysis.
5          But what the data tells me is that they
6   did ultimately use a much lower price that's much
7   closer to my price, 125 percent of the average
8   pharmacy price, than it is to the baseline price
9   for the Abbott product.
10     Q.  So it could be that the expenditures
11  went down because Abbott voluntarily lowered its
12  prices, correct, saving money?
13        MR. GOBENA:  Objection to form.
14     A.  Once again, I --
15     Q.  You don't know?
16     A.  It has not been my focus to determine
17  the chain of events that led to states updating
18  the prices they used in their adjudication
19  methodologies.
20     Q.  If you would go to paragraph 4 of Mr.
21  Hughes' report, in the last sentence of that
22  paragraph Dr. Hughes wrote "He," meaning Dr.

33 (Pages 365 to 368)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 369

1  Duggan, "ignores substantial evidence showing that
2  concern over inadequate dispensing fees and the
3  potential effects of patient access was in fact a
4  major factor in shaping states' reimbursement
5  policies." Do you see that?
6      A.  I see that sentence.
7      Q.  Do you have an understanding of what
8  he's saying there?
9      A.  Yes, I have some understanding.
10     Q.  Okay.  What is your understanding of
11  what he's saying there?
12     A.  It touches on the issue that we were
13  just discussing in Missouri, the notion that
14  perhaps dispensing fees -- and, you know, there
15  are some terms here that are just to me
16  frustratingly vague.  "Inadequate dispensing
17  fees."  So we've talked many times about the
18  dispensing fee issue and the possibility that were
19  one to reduce ingredient cost that would affect
20  the pharmacy's net revenues from the
21  prescriptions.
22         We've talked about the dispensing fee

Page 370

1  issue.  So having talked about it over the course
2  of several days of depositions, I'm pretty
3  familiar with the issue.  But I still maintain
4  that it's vague as stated here.
5      Q.  Let me see if I can get us on the same
6  page about what you may mean when you say
7  dispensing fee issue and what Dr. Hughes may mean.
8  I understand that in your rebuttal report and in
9  your prior testimony you've done an analysis and
10  made some comments about whether if you lowered
11  ingredient cost reimbursements for these drugs
12  whether there would be an increase in dispensing
13  fees, right?  That's what you've done a rebuttal
14  report on?
15         MR. GOBENA:  Objection to form.
16     Q.  One of the things that you talk about in
17  your rebuttal report, right?
18     A.  One of the things I talk about in the
19  rebuttal report is whether when states lower cost
20  ingredient cost reimbursement through various
21  channels is there around the same time a change in
22  dispensing fees.

Page 371

1      Q.  Now, what I'm talking about is something
2  a little different than that.  It's not what would
3  happen.  It's when the policies were adopted at
4  the time was the concern over the adequacy of
5  dispensing fees -- whether that had an impact on
6  the methodologies that were in place.  Do you
7  understand the distinction I'm drawing between
8  that and what you speak about in your rebuttal
9  report?
10         MR. GOBENA:  Objection, form.
11         THE WITNESS:  Could you repeat the
12  question?
13         (Whereupon, the requested portion
14  was read by the reporter.)
15     A.  To some extent I think I do.
16  BY MR. TORBORG:
17     Q.  If you would go to paragraph 67 of Dr.
18  Hughes' report.  He references a report prepared
19  in 2002 by Myers and Stauffer for the State of
20  California.  Have you reviewed that report before?
21     A.  I've considered -- I've seen the report.
22  I have not read it cover to cover.  And I don't

Page 372

1  know if there are multiple California Myers and
2  Stauffer ones, but --
3      Q.  Have you considered whether or not
4  states may have permitted a margin on ingredient
5  cost in order to make up for inadequate dispensing
6  fee payments?
7          MR. GOBENA:  Objection to form.
8      A.  What you've directed me to, point 67
9  here, paragraph 67, refers to the state's Medicaid
10  adjudication methodology as a whole for tens of
11  thousands of different NDCs.
12     Q.  Let me -- let me retract 67 and ask you
13  a new question --
14     A.  Okay.
15     Q.  -- that I think just asks -- I think
16  it's a yes or no answer.  Have you considered the
17  fact that states may have permitted a margin on
18  ingredient cost to make up for inadequate
19  dispensing fee payments?
20         MR. GOBENA:  Objection to form.
21     A.  It seems plausible that in considering
22  the adjudication methodology as a whole for all of

34 (Pages 369 to 372)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 373

1   the tens of thousands of products simultaneously,
2   both brand and generic, at some level in designing
3   the methodology what -- I guess just to backtrack.
4   Once again, what the state individuals, what their
5   motivations were and what their knowledge was,
6   that really was not the focus of my analysis.  I
7   used the adjudication methodologies that were in
8   effect during the eleven year period considered.
9       Q.  If we go to page 33 of Dr. Hughes'
10  report there's a quote from Cody Wiberg of
11  Minnesota.  If you go to the second block quote,
12  the fourth line down, he states "We've always kept
13  that."  Do you see that?
14      A.  I see that.
15      Q.  Let me read the full sentence so it's a
16  better context.
17      A.  Sure.
18      Q.  Mr. Wiberg testified "But if we move
19  towards more transparency and we get closer to
20  reimbursing on the ingredient side at what
21  providers actually pay, then we have to look at
22  the dispensing fee side in the case of pharmacies

Page 374

1   because we've always kept that below what we think
2   the true cost of dispensing is to make up for the
3   fact that there is some money being made on the
4   ingredient side."  Do you see that?
5       A.  I see that.
6       Q.  Did you consider that type of testimony,
7   namely that states may have kept dispensing fees
8   below what they thought they should be in order to
9   make up for the fact that there was some money
10  being made on the ingredient side?
11      MR. GOBENA:  Objection to form.
12      A.  Well, here, once again it's hard for me
13  to speculate what all the context is of how he's
14  arriving at this, at these two sentences or at
15  this one sentence.  At some level Medicaid
16  expenditures, more than 80 percent of them go to
17  brand drugs.  And when one varies the adjudication
18  methodologies in most cases that's going to have -
19  - as I've said earlier, the products at issue
20  here, these 44 products, represent a small share
21  of all products reimbursed by Medicaid, less than
22  0.1 percent per year in terms of spending.

Page 375

1       What the motivation was of individual
2   state officials in arriving at their methodology
3   was not the focus of my analysis for the tens of
4   thousands of NDCs that Medicaid covers
5   prescriptions for.  So this really -- drilling --
6   doing a systematic analysis on each state's
7   motivation for its adjudication methodology at
8   every point in time, that was not something that I
9   set out to do.
10      Q.  Okay.  Let's talk about these drugs
11  then.  Paragraph 65 of Dr. Hughes' report.  The
12  second sentence and the third sentence Dr. Hughes
13  wrote "The inadequacy of dispensing fees was
14  especially evident for the drugs at issue in this
15  litigation.  These injectable drugs must be stored
16  in controlled conditions to maintain sterility and
17  stability and compounded in a sterile environment
18  requiring the use of specialized treatment.
19      "These drugs are not self administered
20  but require the services of a trained professional
21  to ensure the right dose is administered on the
22  right schedule and that the proper infusion device

Page 376

1   is used and used or installed correctly."  Do you
2   see that?
3       A.  I see that.
4       Q.  Do you have any factual basis to
5   disagree with those statements?
6       MR. GOBENA:  Objection to form.
7       A.  It seems plausible that the cost of
8   dispensing a prescription varies to some extent
9   across individuals and across treatments.  But
10  when considering this issue I think it's worth
11  bearing in mind that the services that are
12  provided could plausibly scale up in response to
13  bigger possible profits from the treatments.
14      So I think one -- in considering this
15  kind of issue it's also useful to have in mind the
16  -- even if one had a perfect measure of cost it's
17  somewhat more complicated than that.  And plus, as
18  I've said before, the pharmacies to some extent
19  elect whether or not to stay in the Medicaid
20  program.  There may be variation across NDCs with
21  respect to their profit margins.
22      But even if -- so there are just many

Henderson Legal Services, Inc.

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 377

1   factors to consider, not even mentioning the
2   difference between things like average cost and
3   marginal cost. So it's a -- I certainly would
4   expect that there would be heterogeneity across
5   pharmaceutical treatments and the cost of
6   dispensing the prescription.
7       Q.  And you've read some of the Myers and
8   Stauffer reports; not that were done for you in
9   this case, but the contemporaneous ones done for
10  the various state Medicaid programs? You've said
11  you've considered some of those; is that right?
12      A.  I've considered some of them. Certainly
13  not all of the 47 that were mentioned there in
14  paragraph 66.
15      Q.  And have you noted that in numerous of
16  those reports they have called out the fact that
17  it costs a lot more money to administer an
18  intravenous prescription?
19      A.  I don't recall all the specifics of
20  their studies. I do recall them discussing
21  differences across NDCs in their measure of costs.
22      Q.  Well, don't they specifically point out

Page 378

1   in numerous of these reports that it costs a lot
2   more money to administer intravenous prescriptions
3   --
4           MR. GOBENA: Objection to form.
5       Q.  -- or do you not recall that?
6       A.  I haven't studied all 47 of their
7   reports. I seem to recall that in one of them
8   that I've considered there was a discussion of
9   this issue. But I don't recall all the details.
10      Q.  I'm going to show you what's been marked
11  as Abbott Wells Exhibit 1006. You indicated you
12  have read the deposition transcript of Mr. Wells,
13  at least portions of it?
14      A.  Mr. Wells?
15      Q.  Jerry Wells of Florida.
16      A.  Oh, right. Right. I'm confusing him
17  with -- yeah.
18      Q.  Is that a yes?
19      A.  Yes. Some parts if I recall correctly.
20  A while ago.
21      Q.  Let me ask you if you have ever seen
22  this document?

Page 379

1       A.  It's hard to say. A little more than
2   two pages. I don't remember it. So not to the
3   best of my recollection.
4       Q.  If you look at the first sentence of
5   this document it states "Intravenous/intramuscular
6   administration of drugs such as antibiotics,
7   cancer chemotherapy, immune suppression agents and
8   many others during the past six years has moved
9   dramatically from the inpatient hospital
10  environment to the patient's home. As a result
11  parenteral/enteral pharmacy, a distinct permit
12  entity by the board of pharmacy, is increasingly
13  the provider of services for Medicaid patients."
14  Do you see that?
15      A.  I see that.
16      Q.  Are you familiar with the type of
17  providers that submitted the Medicaid claims at
18  issue in this litigation for which you calculate a
19  difference?
20      A.  I talk about this in my initial report,
21  the supplement and in the rebuttal, that for the
22  most part I telescope in on pharmacies and in some

Page 380

1   cases these pharmacies might be specialized
2   pharmacies, home infusion pharmacies or other
3   types of pharmacies. But I focus primarily on
4   pharmacies as opposed to hospitals, nursing homes
5   and other health care providers, because those are
6   the claims that will be paid for the most part by
7   Medicaid and Medicare in my analysis.
8       Q.  Then the document states "The Medicaid
9   prescribed drug program developed to reimburse
10  community pharmacies for self administered oral
11  and topical administrations does not respond to
12  the requirements of this new therapeutic modality.
13  Cost savings resulting from reduced inpatient days
14  are dramatic but result in increased costs for
15  prescribing drugs."
16          Then it says "The current dispensing fee
17  ($4.23) does not approach the cost of providing
18  these services and no current reimbursement exists
19  for ancillary supplies (syringes/needles, tubing,
20  admixture bags, IV pumps, et cetera)." Do you see
21  that?
22      A.  I see that.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 381

1      Q.   Did you read the testimony of Mr. Wells
2  when he was asked about this document?
3      A.   I do not recall.  Yeah.  I don't recall
4  him mentioning this October 1, 1998 document.
5      Q.   Are the products at issue in this case
6  the type that fall into this new therapeutic
7  modality addressed in this document?
8      A.   It is difficult for me to speculate
9  exactly what he was -- what all treatments he was
10 referring to here, you know, cancer, chemotherapy,
11 antibiotics, whether and to what extent the
12 treatments he's considering overlap with -- this
13 is after -- whether the treatments overlap with
14 the salines and so forth, many of which will be
15 provided in an intravenous way.
16         THE WITNESS:  Can you -- I just lost my
17 train of thought?  Do you mind repeating the
18 initial question?
19         MR. TORBORG:  Let me try it again.
20         THE WITNESS:  Okay.
21 BY MR. TORBORG:
22     Q.   Is it your understanding that the

Page 382

1  products at issue in this case would be included
2  in the new therapeutic modality that is being
3  talked about in this document?  I think you've
4  answered the question, but --
5      A.   It seems possible that some are, but
6  once again, I hesitate to speculate without more
7  complete information.
8      Q.   Do you have any idea what it cost on a
9  per prescription or per dispensing basis to
10 dispense the NDCs at issue in your analysis?
11         MR. GOBENA:  Objection, form.
12     A.   It seems plausible that cost would vary
13 across providers and might also be a function of
14 whether multiple products are being dispensed
15 simultaneously, thus providing multiple dispensing
16 fees potentially.  I am confident that there is
17 heterogeneity across providers.  Some are more
18 efficient than others at doing this.  But I don't
19 have -- I have not done an exercise to calculate
20 average and/or marginal costs for this.
21     Q.   Would it be fair to say that you have
22 done no analysis at all on what it cost providers

Page 383

1  to dispense the products at issue in this case?
2      A.   I have not examined pharmacy's costs,
3  though to some extent the issue is considered in
4  my analyses when for example Abbott's AWPs
5  changed.  But I have not drilled down on costs,
6  you know, pharmacy- specific costs, for that.
7          MR. TORBORG:  Let's mark this as Duggan
8  Rebuttal Exhibit 7.
9              (Exhibit Duggan Rebuttal 007 was
10 marked for identification.)
11         THE WITNESS:  Would this be a natural
12 time to take a break --
13         MR. TORBORG:  This will be very quick if
14 you don't mind doing this one exhibit ask then
15 we'll be done, and we'll take a break.  I suspect
16 this will be quick unless you've analyzed the
17 document.
18 BY MR. TORBORG:
19     Q.   For the record, what I've marked as
20 Duggan Rebuttal Exhibit 7 is a 2006 report titled
21 "The per diem costs of home infusion therapy
22 services dated January 26th 2006" prepared by an

Page 384

1  outfit called ABT Associates or Abt Associates.
2  Have you ever reviewed this document, Professor
3  Duggan?
4      A.   Not that I recall.
5      Q.   Would the per diem costs of home
6  infusion therapy be relevant to your opinions?
7      A.   Per diem costs for what?
8      Q.   Providing home infusion therapy
9  services.
10     A.   For complaint products?
11     Q.   This is talking about home infusion
12 generally.
13     A.   It's difficult for me to say whether
14 it's relevant without seeing what you have in
15 mind.
16     Q.   Have you ever attempted to compare in
17 your analysis in this case -- let's take a sample
18 claim.  Let's say pharmacy X in Florida
19 administered one bag of saline solution to a
20 Medicaid patient on let's say January 1st 1997.
21     A.   Okay.
22     Q.   Gained -- let's suppose for purposes of

37 (Pages 381 to 384)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 385

1   my hypothetical they were reimbursed on AWP. So
2   let's say they were reimbursed for this one bag
3   $10 and they got a dispensing fee in Florida of
4   $4.23 so the total reimbursement was $14.23. Do
5   you follow me there?
6       A.  I'm with you.
7       Q.  Okay. Let's say that the provider's
8   acquisition cost for that bag of saline was $2
9   under my hypothetical. Okay? Have you ever
10  attempted to determine what the provider's actual
11  cost to dispense that product was in order to
12  determine on that per claim basis whether or not
13  Medicaid's reimbursement in total was in excess of
14  the provider's cost to acquire the drug and
15  dispense the product?
16      A.  As I said earlier, I have not examined
17  pharmacy's costs.
18      Q.  So the answer to my question would be no
19  you have not done that analysis, correct?
20      A.  Of pharmacy costs? I have not -- right.
21  I have not examined pharmacy costs.
22      Q.  So would the answer to my question be

Page 386

1   yes? Or no?
2       MR. GOBENA: Nice try, David.
3       THE WITNESS: Could you repeat the
4   question, just so I'm career on the question.
5           (Whereupon, the requested portion
6   was read by the reporter.)
7       A.  I have not.
8       MR. TORBORG: We'll take a break.
9       THE VIDEOGRAPHER: This is the end of
10  tape 2. Off the record at 2:15.
11          (Recess.)
12      THE VIDEOGRAPHER: This is the beginning
13  of tape 3 in the deposition of Dr. Mark Duggan.
14  On the record at 2:27.
15  BY MR. TORBORG:
16      Q.  Welcome back.
17      A.  Thank you.
18      Q.  Almost done relatively speaking.
19          You refer in your rebuttal report in the
20  section regarding holding all else equal to some
21  research that you had done in 2004 as well as some
22  articles in a footnote where economists have aimed

Page 387

1   to isolate the causal effect of one variable by
2   holding other factors constant, correct?
3       A.  Which page is this on? I'm sorry.
4       Q.  Roughly page 2 through 4. The footnote
5   is on page 3. Right? You refer to those?
6   Correct?
7       A.  Yes.
8       Q.  These were studies that were done for
9   what purpose? Do you know?
10      A.  Well, I talk in detail about my own
11  research on Medicaid that was in my judgment quite
12  relevant to this issue on Medicaid managed care
13  and whether that increased or lowered Medicaid
14  spending. And more generally within economics
15  there are many studies that essentially try to
16  control for other factors, hold other factors
17  constant when isolating the effect of one variable
18  on some other variables.
19          So just as an example the Evans and
20  Snyder paper looking at the effect of income on
21  mortality is one example, the Gruber and Poterba
22  paper on the effect of tax incentives on health

Page 388

1   insurance, and so forth. This is just sort of
2   papers within applied microeconomics that -- five
3   of many possible examples -- that do things to
4   some extent similar to the Medicaid analysis of my
5   own that I describe in detail in the report.
6       Q.  To your knowledge were any of those
7   studies done in the context of litigation?
8       A.  It's possible the one on minimum wages,
9   but I'm not sure.
10      Q.  Is it your opinion that there is not a
11  well recognized correlation between the level of
12  ingredient cost payments and the level of
13  dispensing fees?
14      MR. GOBENA: Object to form.
15      THE WITNESS: Do you mind reading that
16  back?
17          (Whereupon, the requested portion
18  was read by the reporter.)
19  BY MR. TORBORG:
20      Q.  Let me rephrase --
21      A.  Just to answer, I investigated that
22  issue to some extent in the report by examining

                              38 (Pages 385 to 388)

Duggan, Ph.D., Mark G. - Vol. II                     May 19, 2009
                    Washington, DC

Page 389

1  systematically across all states, across all
2  periods during this eleven year period when states
3  revised their ingredient cost methodology was
4  there an associated change in dispensing fee. And
5  there was as I detail in the report small -- to
6  the extent there was any relationship it was
7  small. In one case it actually went the opposite
8  way, which is when ingredient cost reimbursement
9  fell so too did dispensing fees on average.
10     Q.  So you don't believe there is a
11  correlation between the level of ingredient cost
12  payments and the level of dispensing fees, correct
13  --
14          MR. GOBENA:  Objection.
15     Q.  -- based on your work?
16          MR. GOBENA:  Same objection.
17     A.  That's not what I said.  I said that I
18  examined whether when states revised their
19  ingredient costs did they also revise their
20  dispensing fees.  And there was little evidence of
21  such relationship in terms of within the state
22  variation.

Page 390

1     Q.  Have you reviewed the testimony from
2  state officials on that question, whether there's
3  a relationship between ingredient cost payments
4  and dispensing fees?
5     A.  Well, I haven't done a full scale
6  analysis of what all of the officials at state
7  Medicaid agencies and so forth said about this
8  issue.  But I have analyzed the data.  And it's
9  always -- I'm sure there are cases where -- in
10  fact I know there are cases in which the
11  ingredient cost falls and dispensing fee rises.
12  And my study set out to investigate whether that
13  was systematic or if that was just anecdotal.  And
14  so I've looked at systematically in terms of the
15  actual adjudication methodologies.
16     Q.  Well, Myers and Stauffer also did that,
17  correct?
18          MR. GOBENA:  Object to form.
19     A.  Myers and Stauffer performed some
20  analyses at my direction that would assist me in
21  making that determination.
22     Q.  One of the points that you make in your

Page 391

1  rebuttal report is that "It is important to
2  remember that many of the most plausible indirect
3  effects would increase rather than reduce the
4  damages summarized in my report." Right? I'd
5  like to go through -- is that one of your points?
6     A.  Which page are we on?
7          MR. GOBENA:  Page 3?
8     Q.  Page 2.
9          MR. GOBENA:  That was page 3.
10     Q.  Page 3, the second paragraph.  The
11  second part of the second sentence.
12     A.  (Reading).
13     Q.  That is a point you make in your report,
14  right?
15     A.  Right.  I state "It is important to
16  remember that many of the most plausible indirect
17  effects would increase rather than reduce."
18     Q.  Did you draft the first draft of this
19  rebuttal report?
20     A.  I did.
21     Q.  Did you get comments from counsel?
22     A.  On -- I'm trying to recall the

Page 392

1  chronology of this.
2     Q.  Strike that.  Strike the question.
3     A.  Okay.
4     Q.  I don't need to go into it.  One of your
5  -- I would like to go through some of your
6  potential increases to your difference
7  calculation.  One of them is that pharmacies would
8  reduce their purchase of the complaint products,
9  right?
10     A.  That is one of the -- I think that's the
11  first one I mention.
12     Q.  How would that increase your damages or
13  difference?
14     A.  Well, here I think on page 3 I'm just
15  pointing out that some of these indirect effects
16  increase and some of them reduce the difference.
17  And at some level one could argue if pharmacies
18  substitute away from Abbott products then spending
19  for that claim would be zero.
20          So the difference at some level, you
21  know, in my executive summary on page 2 of my very
22  first report sort of calculate what the difference

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 393

1  is between what the government would have
2  reimbursed for the same products during the same
3  period if prices reflective of the actual prices -
4  - so one could argue that the difference would be
5  even larger than my numbers calculated.
6         Of course there would be possibly some
7  substitution to other products, but it is -- in
8  terms of spending on Abbott products, it would
9  decline by the full amount of the Medicaid
10 spending.  But here I was simply listing several
11 factors, several of these sort of indirect
12 effects, that once one opens up these indirect
13 effects, they go in -- you know, some serve to
14 increase and others serve to reduce the results in
15 my analysis.
16    Q.  But if an Abbott product was not used
17 there would be no claim for which you could
18 calculate a difference upon, correct?
19    A.  I am examining -- just going back to the
20 analysis that I've done, I'm using the claims that
21 were paid for these products during the period,
22 calculating the difference.  I think one of the --

Page 394

1  I sort of discuss the utilization point in detail
2  on the next page, starting on the next page, on
3  page 4.  And I think in considering this issue it
4  is important to think about not just the kind of
5  price drop that we saw in late 2001, which I think
6  is informative, but also to consider the full
7  trajectory of prices throughout the eleven year
8  period.
9         And here it seems plausible for example
10 that if the AWP had been considerably lower in
11 1991 that it would have had effects such as
12 causing competitors to report more truthful prices
13 and so forth.  So I sort of go through some of
14 these indirect effects here.  The utilization
15 effect I discuss in more detail on the next page.
16    Q.  Let's talk about the one you just
17 mentioned there.  Is it your opinion that more
18 truthful reporting by Abbott would have caused
19 competitors to report more truthful prices?
20    A.  I have not done all the analysis that
21 would be necessary on that front.  It certainly
22 seems plausible or at a minimum -- or

Page 395

1  alternatively, that it would have caused states to
2  implement MAC prices --
3     Q.  Let's stick with the first one first.  I
4  want to do these one at a time.
5     A.  Okay.
6     Q.  It would be easy enough to see whether
7  or not Abbott's price reductions in 2001, for
8  example, caused its competitors to also get their
9  prices more in line with marketplace prices,
10 correct?
11        MR. GOBENA:  Objection to form.
12    A.  That's a different exercise at some
13 level than had they reported truthfully throughout
14 the eleven year period.  And that's a very hard,
15 difficult world to consider because it departs for
16 42 quarters in a row there were these massive
17 spreads between published prices and actual
18 prices.  And it's not -- it is -- it seems
19 plausible that a competitor observed Abbott's AWP
20 and that affected it in its reporting.  It seems
21 possible that that 38 back in 1991 quarter 1 had
22 an effect on what competitors reported.

Page 396

1         So it is the kind of indirect effect
2  that would serve to reduce rather than increase
3  the value of difference, would serve to increase
4  rather than reduce.
5     Q.  You didn't look to see whether or not
6  Abbott's price reductions in 2001 had any impact
7  on its competitors' price reporting, did you?
8     A.  I did not examine --
9     Q.  Yes or no?
10    A.  No, I did not examine whether
11 competitors prices had an impact in 2001.
12    Q.  Have you done any analysis to determine
13 if Abbott lowering its prices would have changed
14 the MAC prices used in state Medicaid programs,
15 yes or no?
16    A.  Can you repeat the question?
17        (Whereupon, the requested portion
18 was read by the reporter.)
19        MR. GOBENA:  Object to form.
20    A.  It is my understanding that some states
21 in calculating MAC prices look at the distribution
22 of prices and take some statistic from that

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                        Washington, DC

Page 397

1   distribution.  So mechanically in some cases it is
2   my understanding that it would influence MAC
3   prices.  But that's not an issue that I drilled
4   down on systematically.  But in the same way that
5   it would affect Medicare, it affected Medicare
6   spending later in the report, it would affect
7   Medicaid spending not just for Abbott products
8   potentially but for other firms' products as well.
9       Q.  Okay.  So you can't name me a single
10  state where a change in Abbott's price would
11  impact a MAC price, correct?
12      MR. GOBENA:  Object to form.
13      A.  I don't have that memorized here which -
14  - how states -- the MAC methodologies of
15  individual states.  But it's my understanding that
16  some states do use -- do consider the full
17  distribution of prices and similarly for the FUL
18  prices.
19      Q.  The bottom of page 4, returning to the
20  real world example that mimics your AWP changes
21  that you discuss --
22      A.  Yeah.

Page 398

1       Q.  -- you say "In connection with Abbott's
2   lowering its prices there were not corresponding
3   changes in dispensing fees."  What's the factual
4   basis for that statement?
5       A.  Where were we again?  Sorry.
6       Q.  Page 5.
7       A.  (Reading).  So an examination of the
8   Myers and Stauffer methodologies in effect around
9   that time, I later talk about some analysis of
10  changes in MAC.  But an examination of around this
11  same time indicates that there were not
12  correspondingly large changes in dispensing fees
13  for the state Medicaid programs around this time.
14      Q.  Is this an analysis that you did
15  yourself by looking through the Myers and Stauffer
16  summaries?
17      A.  To some extent and Myers -- yeah, to
18  some extent.
19      Q.  Do you have any work papers that reflect
20  that work?
21      A.  I many times leafed through all of the
22  50 state Medicaid adjudication formulas.  So the

Page 399

1   next two, as we can see, this is to some extent
2   touched on on page 6 in which I discuss the state-
3   specific dispensing fees when states implemented
4   the DOJ prices.  So 33 states used them for the
5   437 products that we were talking about earlier,
6   which is much larger than the 44 products at issue
7   here.
8       33 used them, 19 held them fixed, 5
9   lowered them, 9 increased them.  But actually on
10  average the ones that reduced reduced by more and
11  so the average dispensing fee change was actually
12  negative.
13      Q.  Trust me.  We're going to talk to that.
14      A.  Yeah.
15      Q.  But we'll get to that when I get to
16  that.  I'm asking about the 2001, 2000 Abbott
17  price decreases, not about the DOJ prices at this
18  point.  But we'll get to that.
19      A.  Okay.  They're around the same time
20  period, but --
21      Q.  You note that -- the last sentence on
22  that paragraph we were looking at on page 5 you

Page 400

1   wrote "thus."  Do you see that?
2       A.  Mm-hmm.
3       Q.  "Thus even with this massive change in
4   AWPs and no significant changes in dispensing fees
5   there was not a correspondingly significant change
6   in the utilization of these products, thus
7   undermining the claim that utilization of Abbott's
8   complaint products would have plummeted if they
9   had reported more truthful AWPs."  Do you see
10  that?
11      A.  I see that.
12      Q.  Okay.  Why are you noting this?
13      A.  Well, one of the criticisms that is made
14  in -- I think it's Dr. Hughes.  I can't remember
15  if it's Dr. Hughes or Mr. Young -- in their
16  reports was that I did not incorporate the effect
17  of more accurate AWPs on utilization.  And so as I
18  note in the footnote at the bottom, there is a
19  deceleration in the trend increase in utilization
20  of Abbott products.  So it rose by about 10
21  percent from '99 to '01 and then it fell by a few
22  percent during the subsequent two years.  Yeah,

                                    41 (Pages 397 to 400)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                   Washington, DC

Page 401

1  from '99 to 2000.
2        So there may have been a modest decline,
3  but it was certainly not a -- it was pretty darn
4  close to the utilization as it stood in 2000.
5     Q.  Page 9.
6     A.  Of my report, my rebuttal?
7     Q.  Yes.  Of your report.  We touched upon
8  this earlier, but you wrote, carrying over to page
9  10, "The available evidence suggests that Abbott
10 aimed to use these extremely inaccurate and
11 inflated AWPs to its financial advantage in an
12 effort to improve the company's market position
13 and thus its revenues," right?  We talked about
14 that earlier.
15    A.  And we talked about that earlier, right.
16    Q.  And isn't it true that the only
17 empirical evidence that you are aware of indicates
18 that Abbott's allegedly inflated prices had no
19 impact on the sale of Abbott's products?
20        MR. GOBENA:  Objection to form.
21        THE WITNESS:  Can you repeat that back?
22 There was a lot packed into that one.

Page 402

1        MR. TORBORG:  I try to get as much as I
2  can.
3        THE WITNESS:  Right.
4        (Whereupon, the requested portion
5  was read by the reporter.)
6     A.  It is -- as I note in that footnote
7  there is some evidence of a modest decline in the
8  utilization for Abbott's products.  And moreover
9  it is possible that the responsiveness of
10 pharmacies to price changes differ on the way up
11 as on the way down.  My understanding is that, for
12 example, Abbott's share of -- yeah.  So there
13 could be some asymmetry.
14        This was a place where there was a
15 decline, but -- and it looks like there was a
16 modest change in utilization.  But perhaps
17 pharmacies are more responsive on the way up.  And
18 that's part of the reason I note there that
19 Borenstein, Cameron and Gilbert paper about
20 asymmetric responses to price changes.
21 BY MR. TORBORG:
22    Q.  But what you found in your work was that

Page 403

1  the level of the AWPs for these products had very
2  little impact on the sale of those products,
3  correct?
4        MR. GOBENA:  Objection to the form.
5     A.  In 2001 -- from 2000 to 2003 there was
6  not certainly a sea change in utilization for
7  these products.
8     Q.  We're not talking about a sea change.
9  We're talking about very little impact, right?
10    A.  As I said, it seems possible to me.
11 There were some other price changes.  As we look
12 at figure 1 you can see there were literally nine
13 different occasions when Abbott increased its AWP
14 during the time period of interest.  And if one
15 were -- it seems possible that those -- I haven't
16 explored the effect on Abbott's market share for
17 vancomycin, for example, of those 5 percent per
18 year price increases.
19        This one big reduction does not seem to
20 have greatly lowered things.  But as I said, it is
21 quite possible that pharmacies are more responsive
22 -- or differentially responsive to price increases

Page 404

1  than to price reductions.  And there's empirical
2  evidence at least of this for other sectors
3  certainly.  I mean, one could do that I guess to
4  look at what happened to Abbott's vanco share from
5  '91 to 2001 on that issue.
6     Q.  And one would also need to consider the
7  fact that Abbott was the only reliable producer of
8  vancomycin during much of that time period,
9  wouldn't you?
10        MR. GOBENA:  Objection to form.
11    A.  I haven't studied the entire vancomycin
12 marketplace that existed during that eleven year
13 period.
14    Q.  So you didn't know that there were
15 supply problems from other manufacturers with
16 vancomycin, the antibiotic of last resort; is that
17 right?
18        MR. GOBENA:  Objection to form.
19    A.  I did not examine supply problems for
20 other pharmaceutical firms.
21    Q.  In your report when you say that 33
22 states utilized the DOJ AWPs where are you getting

42 (Pages 401 to 404)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 405

1  that number?
2      A.  I believe -- which page are we on again?
3      Q.  Page 6.
4      A.  It is my recollection that Myers and
5  Stauffer provided that number.  And it may have
6  been perhaps some OIG.  I'm not sure.  Perhaps
7  from their own examination of discussions with
8  states.
9          MR. TORBORG:  Let's mark this as Duggan
10 Rebuttal Exhibit 8.
11         (Exhibit Duggan Rebuttal 008 was
12 marked for identification.)
13 BY MR. TORBORG:
14     Q.  Are you familiar with this document,
15 Professor Duggan?  Yes or no.
16     A.  Yes.  I recall getting an e-mail from
17 Judith Becker at Myers and Stauffer.
18     Q.  The Bates label is EXP USABT-DUG 161344
19 through 52.  Is this where one can find support
20 for the statement that 33 states used the DOJ
21 AWPs?
22     A.  It's hard for me to recall.  I remember

Page 406

1  discussing this over the phone with Ms. Becker to
2  some extent.
3      Q.  Well, let me ask you this.  Let me see
4  if I can short circuit this a little bit.  If you
5  go to the page Bates page ending 345 --
6      A.  Mm-hmm.
7      Q.  -- this page has on the right DOJ
8  pricing and then it has some states as well.  Do
9  you see that?
10     A.  (Reading).
11     Q.  Do you see that?
12     A.  Sorry.  Can you repeat?
13     Q.  This page has columns devoted to DOJ
14 pricing?
15     A.  Yes.
16     Q.  As well as some -- and this is done on a
17 state by state basis?
18     A.  Mm-hmm.
19     Q.  The way it's printed out is we have sort
20 of a DOJ pricing analysis on every other page --
21     A.  Mm-hmm.
22     Q.  -- and then the MAC and some of the

Page 407

1  other analyses elsewhere.  And sometimes in some
2  of these states there's no X in the DOJ pricing
3  columns.  Would those be states that did not use
4  the DOJ AWPs?
5      A.  There's a lot in this document, so I'm
6  trying to remember.  But if I recall, Ms. Becker
7  and I also had some back and forth about this
8  document.  But if I recall that is correct.  And I
9  think the 33 number may have excluded Ohio.
10     Q.  Okay.  So for example California doesn't
11 have an X anywhere.  That's because they didn't
12 use the DOJ AWPs?  Some of that we talked about
13 last time, right?
14     A.  That appears to be true, yes.
15     Q.  Okay.  Now, some of the states that do
16 have an X in them are states that used the DOJ
17 AWPs at some time but then later dropped out,
18 right?
19     A.  So for example Missouri?
20     Q.  That would be one that I would call your
21 attention to.  Yes.
22     A.  I'm not sure about the rest, but

Page 408

1  Missouri is included among the 33 here.
2      Q.  Okay.  Illinois is also included.  They
3  stopped using the DOJ AWPs about one year after
4  they started, didn't they?
5      A.  Possibly.  But as was true for Missouri
6  above, they also ultimately end up seeing a 70
7  percent decline in spending, suggesting the First
8  Databank AWPs showed in figure 1 are in use.  But
9  the DOJ prices, I'm not sure about the history in
10 Illinois, what exactly was the sort of procession
11 of events between let's say -- you know, April of
12 2000 and late 2001 in Illinois.  But it appears
13 they did apply them at least initially.
14     Q.  Well, do you have a copy of the Myers
15 and Stauffer reimbursement summaries --
16     A.  I do not.
17     Q.  -- with you?
18     A.  Sorry.  No.
19     Q.  Okay.  Let me mark this as the next
20 exhibit.
21         (Exhibit Duggan Rebuttal 009 was
22 marked for identification.)

43 (Pages 405 to 408)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 409

1  BY MR. TORBORG:
2      Q.  It seems these have gotten out of order
3  here.
4      A.  Where do you want me to go?
5      Q.  Illinois.  If you get there before me --
6      A.  I'll let you know.
7      Q.  -- let me know.
8      A.  I think it's in descending backwards
9  alphabetical order after a little ways.
10     Q.  Yeah.  That trick works part of the way.
11     A.  If you just go backward alphabetical
12  order it will get to it.
13     Q.  About three-fourths of the way through?
14  Here we go.  Have you got it?
15     A.  I've got it.
16     Q.  Do you see -- go to footnote 10.
17  "Illinois used DOJ prices sent by First Databank
18  from 5/1/2000 through 5/31/2002."  Do you see
19  that?
20     A.  I see that.
21     Q.  Any reason to doubt the accuracy of that
22  footnote?

Page 410

1      A.  No.
2      Q.  Okay.  Why would you not take out states
3  like Illinois that stopped using the DOJ AWPs in
4  doing your analysis?  Wouldn't it be appropriate
5  to do so?
6      A.  Not necessarily.  This change occurred
7  25 months after they first implemented the DOJ
8  prices and it seems plausible that, you know, in
9  June of 2002 perhaps the move from those DOJ
10  prices to other prices wasn't as pronounced as the
11  one early on.  So it's difficult to speculate.
12  But this clearly was in effect for 25 months.  And
13  I don't know all the factors that led to the
14  change on May 31st 2002, which I should note is
15  outside the time period I consider.
16     Q.  You don't consider anything that happens
17  outside of 2001 for this case; is that right?
18     MR. GOBENA:  Object to form.
19     A.  I have already -- we discussed earlier -
20  - some analysis that I did of Medicaid utilization
21  for Abbott products from 2000 to 2003.  And so I
22  have done -- I've certainly done some analysis,

Page 411

1  though the clock for the difference calculation
2  stops in 2001 for both Medicaid and Medicare.
3      Q.  Now, you've -- I can't help but ask you
4  about this.  Utah you have as a state that had no
5  change in your analysis because of the DOJ
6  pricing; is that right?
7      A.  Let me see.  Let me go back to --
8      Q.  Page 351.
9      A.  Which exhibit?
10     Q.  Duggan Exhibit 8.
11     A.  Hang on.
12         It says -- in the Utah row it says "no
13  change."  In the Utah row of the PDF file that
14  Judith Becker sent it says "no change."
15     Q.  Were you aware of the fact that Utah did
16  increase its dispensing fees in connection with
17  the implementation of the DOJ AWPs?  If you go to
18  the Utah analysis.  Do you have it?  Why don't we
19  go to footnote 7.  "Special category fees includes
20  addition of differential fee payment for selected
21  drugs reconstitute for home IV infusion as
22  typically prepared by specialty pharmacy.

Page 412

1  Specialty pharmacies have low volume but high
2  overhead expenses.
3         "The Department of Justice (DOJ) in the
4  year 2000 repriced the AWP for 437 NDC specific
5  products.  The repriced products necessitated four
6  new dispensing fees.  The four fees are defined as
7  category J, category K, category L and category
8  M," which can be reflected up in the dispensing
9  fees above by category.  Do you see that?
10     A.  I see that.
11     Q.  So you would agree with me that Utah did
12  increase its dispensing fees because of the DOJ
13  AWPs, correct?  That was an error in the schedule.
14     MR. GOBENA:  Objection to form.
15     A.  I would hesitate to say that.  I'm not
16  sure if the specialty pharmacies are -- what
17  fraction of claims they account for in Utah.  So I
18  would need to consider that.  It's possible, but I
19  think -- yeah.  I would hesitate.  I just don't
20  know to what extent these fees applied to
21  complaint products, to what extent specialty
22  pharmacies were included and so forth.

44 (Pages 409 to 412)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 413

1      So it is possible but it still, you
2  know, remains true that the majority of states
3  that implemented the DOJ prices held their
4  dispensing fee fixed or lowered them around the
5  same time. And so --
6      Q.   And many of those states actually
7  dropped the DOJ AWPs altogether, right?
8      A.   I don't know about many. We've talked
9  about Missouri. And what I have seen a fairly
10  consistent pattern across states is that for the
11  most part -- and inevitably in analyses like this
12  one can pull out exceptions. But for the most
13  part spending per claim fell down. In some it
14  fell down a bit sooner than others, but it fell
15  substantially from 1998 to 2001 across -- for the
16  Medicaid program.
17      MR. TORBORG: Let's mark this as Duggan
18  Exhibit 10.
19          (Exhibit Duggan Rebuttal 010 was
20  marked for identification.)
21  BY MR. TORBORG:
22      Q.   For the record, what I've marked as

Page 414

1  Duggan Exhibit 10 bears the Bates numbers EXP
2  USABT-DUG, 145746 through 56. It is an e-mail
3  from George Henderson to Kenan Buoy at Myers and
4  Stauffer attaching a letter. That letter is at
5  page 747. The letter states in substance "This
6  will advise you regarding certain laws of the
7  State of New York governing pharmacy reimbursement
8  for drugs under New York's Medicaid program.
9      "The addendum to this letter sets forth
10  the relevant text of certain statutory amendments
11  enacted by the State of New York. Feel free to
12  share this letter with Professor Mark Duggan
13  should you feel it appropriate. If you do, please
14  let me know." Do you see that?
15      A.   I do.
16      Q.   And it attaches some regulations from
17  the State of New York. Are you familiar with
18  these regulations?
19      A.   I would need some time to see. I don't
20  recall this exact document, but this was sent more
21  than a year ago. Is it possible that I have
22  scanned it in the past twelve and a half months?

Page 415

1  Yes, it's possible. I'm trying to read this here.
2  It's many pages. But I don't recall this specific
3  document.
4      Q.   So it appears at least based on your
5  lack of recollection of the document today that
6  Myers and Stauffer did not deem it appropriate to
7  share this letter with you?
8      MR. GOBENA: Objection to the form.
9      Q.   Or this -- not letter. Statute.
10      MR. GOBENA: Same objection.
11      A.   I hesitate to say that they did not. I
12  have received quite a few e-mails and documents
13  and I've seen plenty of documents that look like
14  this. But this one, it just doesn't leap to mind
15  right now.
16      Q.   If we go to Bates page 750, this is a
17  series of regulations for New York that Mr.
18  Henderson of the DOJ thought might be relevant to
19  your opinions. Let me ask you if in fact they are
20  something you considered, focusing on 750, if we
21  go to the fifth line down that starts with
22  "however" -- I'm sorry. "Provided further." Do

Page 416

1  you see that?
2      A.   Up at the top?
3      Q.   Yeah. Fifth line down from the top.
4      A.   I see it. "Provided further."
5      Q.   I'll read it into the record, if you
6  follow along.
7      A.   Okay.
8      Q.   "Provided further, however, that if any
9  court of federal administrative body finds that
10  the provisions relating to the ingredient costs
11  for multiple-source prescription drugs and brand
12  name prescription drugs for which no specific
13  upper limit has been set by the Federal Health
14  Care Financing Agency as implemented by the
15  department of social services are found to be in
16  violation of current federal law or regulation
17  relating to the levels of payment for prescription
18  drugs under the federal Medicaid program pursuant
19  to Title XIX of the Federal Social Security Act."
20      Let me stop there. Your understanding
21  here is the NDCs issued in this case for multiple-
22  source drugs for which there is no FUL, correct?

45 (Pages 413 to 416)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                        Washington, DC

Page 417

1     A.   During this time period, right.
2     Q.   Okay.  Let me continue.
3          "The department of social services shall
4  establish a formula for paying pharmacies for such
5  drugs in a manner consistent with current federal
6  law and regulation and a dispensing fee which
7  shall reflect appropriate adjustments so that the
8  established formula is implemented in a fiscally
9  neutral manner."  Do you see that?
10    A.   I see that.  It's just hard for me to
11 know what all led up to this.  Could you just give
12 me a bigger broader context to this?
13    Q.   Let me just cut to the chase, because
14 I'm running short on time.  The way I read this is
15 that if an ingredient cost payment for multiple-
16 source drugs and brand-name drugs that don't have
17 a FUL is found to be in violation of federal law
18 or regulation, that a dispensing fee should be
19 increased so that the overall payment is fiscally
20 neutral.  Is that how you read it?
21         MR. GOBENA:  Objection to form.
22    A.   I guess I'm -- fiscally neutral is a bit

Page 418

1  vague.  Is it fiscally neutral NDC by NDC,
2  fiscally neutral pharmacy by pharmacy, fiscally
3  neutral brand versus generic, fiscally neutral
4  Medicaid drug spending?  I mean, it's just -- it
5  is -- so I would certainly need more information
6  on this to sort of consider it.  But fiscally
7  neutral could mean many things.
8     Q.   In any event, you didn't consider this
9  regulation in forming your difference calculation,
10 correct?
11    A.   It is possible that I considered --
12 received this document and considered it.  As I
13 said earlier, it's difficult to disentangle the
14 impact of any specific piece of information on my
15 ultimate analyses.  I don't recall it here sitting
16 in front of you.  But we've talked a bit about
17 this dispensing fee -- the set of issues
18 surrounding dispensing fees.
19    Q.   Okay.
20    A.   And so I don't know all that underlies
21 this in New York in 1994.
22    Q.   Do you know how New York Medicaid

Page 419

1  currently reimburses vancomycin treatment?
2     A.   In May of 2009?
3     Q.   Now.
4     A.   I do not.
5     Q.   Have you evaluated whether New York or
6  any other state has established per diems for home
7  infusion therapy such as vancomycin?
8     A.   I have not examined the per diem issue,
9  the prevalence of it, the -- yeah.  I just haven't
10 examined the per diem issue as it exists today.
11    Q.   On page 10 of your report --
12    A.   My rebuttal report?
13    Q.   Yeah.  Your rebuttal report, sir.  I
14 want to ask you a question about your within-state
15 extrapolation section, the last sentence on page
16 10.
17    A.   Okay.  Let me get it.  Where are we
18 again?
19    Q.   The last sentence of page 10 carrying
20 over to page 11.  You note that the -- I'm
21 paraphrasing here.  The advantage of using a
22 state's own claims data when extrapolating to

Page 420

1  those NDC quarters when I do not have claims data
2  is that these NDC quarters will typically share
3  the same adjudication methodology and provider
4  characteristics.  Do you see that?
5     A.   I see that.
6     Q.   What do you mean by provider
7  characteristics?
8     A.   So it seems plausible that the providers
9  that dispensed Abbott's complaint products, the
10 types of providers, varied to some extent across
11 states.  And so it could be that in some cases the
12 providers had a high volume and other cases they
13 had low volume.  There are many different ways in
14 which one provider could differ from another.
15    Q.   You note the programming error related
16 to Michigan and Missouri that we touched upon
17 earlier.  How does that not impact the
18 extrapolation to other states?  Could you explain
19 the mechanics of that for me?
20    A.   Sure.  So for Michigan and Missouri --
21 let me just go back to my -- for Michigan and
22 Missouri I analyzed state claims data for certain

46 (Pages 417 to 420)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                    Washington, DC

Page 421

1  years and then used SMRF MAX data for previous
2  years when extrapolating back. And so Michigan
3  and Missouri were the two states for which I did
4  the most backwards extrapolation and --
5      Q.  I think I get it.
6      A.  Yeah. And so the correction was to the
7  difference for the SMRF MAX and SDUD portions of
8  the Missouri and Michigan analyses.
9      Q.  I think I get it. And those are not
10 counted in the extrapolations --
11     A.  To the other states.
12     Q.  Got it. Okay. On page 18 and 19 you
13 talk about Medicare dispensing fees. You're
14 responding to some criticisms that Dr. Hughes and
15 Mr. Young have where they contend dispensing fees
16 would have increased. And you say "In considering
17 this issue one must also incorporate the
18 corresponding effect of other changes, such as
19 more truthful reporting by other firms whose
20 product were included in the arrays for the
21 complaint J-codes." Do you see that?
22     A.  I do.

Page 422

1      Q.  Are you saying that the other
2  manufacturers in those arrays did not have
3  truthful reporting?
4      A.  While it seems plausible that some
5  disparity existed between the AWPs of competitors'
6  products and their actual prices, I have not
7  drilled down on that specific issue. It is true
8  that in some cases the AWPs of competitor products
9  were not that far off from the Abbott AWPs.
10     Q.  You say "If that were done the decline
11 in allotted amounts for ingredient costs would be
12 substantially greater than the ones that I
13 estimate, which would serve to offset the effect
14 of the rise in dispensing fees." Do you see that?
15     A.  I see that.
16     Q.  Where have you done this calculation to
17 support the statement that this additional
18 ingredient cost reduction would serve to
19 completely offset a rise in dispensing fees?
20     A.  The point here that I am making, I did
21 have analysis as we discussed earlier in the Dey
22 and Roxane matter in which I considered each firm

Page 423

1  in isolation and then the combination of the two
2  firms' price changes to AWP changes. And the
3  resulting difference was much, much greater in the
4  combined scenario than in the two individual
5  scenarios, the sum of the two individual
6  scenarios.
7      And the-- I have not -- the point
8  here is that the revision in the entire
9  methodology, at least for certain categories of
10 Medicare J-codes, changed. It wasn't just changes
11 from AWP to 106 percent of ASP, which I should
12 note is substantially lower than the alternative
13 price that I'm putting in, because I use 125
14 percent and I focus on pharmacies. So for both of
15 those reasons my prices are much higher than 106
16 percent of ASP.
17     But additionally it is plausible that to
18 the extent that the costs or the prices for
19 competitors are in the same ballpark as the Abbott
20 prices to competitors, then the decline in the
21 median, just as I observed from the Dey and Roxane
22 matter, would be close to perhaps one for one with

Page 424

1  the change in the Abbott AWPs.
2      So it's in a sense the adjustments --
3  the changes to the Abbott AWPs in many cases have
4  absolutely no effect on the allowed amounts
5  because there are so many products in the arrays.
6  So this would -- one can't -- one has to bear in
7  mind that the FUL methodology changes from AWP
8  medians to 106 percent of sales prices.
9      Q.  One last sentence to ask you about and
10 then I'll let you go. Let me ask you about one
11 last sentence and then I'll let you go. Page 19.
12 You say "Furthermore it is not appropriate to
13 change the adjudication methodology that the
14 government used when calculating the effect of the
15 inflated AWPs on reimbursement for complaint
16 products." Right? That's what you wrote?
17     A.  That's what I wrote.
18     Q.  Okay. Have you reviewed the state plans
19 or any testimony regarding where the state
20 Medicaid programs were to obtain the AWP prices
21 for use in their adjudication methodology?
22     A.  I'm sorry. Can you read that back?

47 (Pages 421 to 424)

Duggan, Ph.D., Mark G. - Vol. II                    May 19, 2009
                        Washington, DC

| Page 425 |
| --- |

1    Q.  Have you reviewed the state plans or any
2  testimony regarding where the state Medicaid
3  programs were to obtain the AWP prices that they
4  used in their adjudication methodologies?
5    A.  I don't understand.  I'm sorry.
6    Q.  Did you look at the state plans and the
7  testimony to see if they directed the state to go
8  to someone in particular to get their AWP prices?
9    A.  I did not examine how states obtained
10  their AWPs.  That was not a focus of my analysis.
11    Q.  Were you familiar with the fact that the
12  documentary and testimony evidence indicates that
13  those state Medicaid programs were to use the AWP
14  list prices in the compendia?
15    MR. GOBENA:  Objection to form.
16    A.  I guess I'm not sure what you're
17  referring to.
18    Q.  Well, have you seen in the state plans
19  that it says you are to pay lower of U&C, MAC,
20  FUL, or EAC and EAC being defined as, such as, for
21  example, 90 percent of AWP as published in First
22  Databank?

| Page 427 |
| --- |

1                SIGNATURE OF THE WITNESS
2
3
4
5
6    _____
7             MARK G. DUGGAN, Ph.D.
8
9  Subscribed and sworn to and before me
10  this _____ day of _____, 20____.
11
12
13  _____
14    Notary Public
15
16
17
18
19
20
21
22

| Page 426 |
| --- |

1    A.  It's been a while, a little while since
2  I've looked at the Medicaid state plan amendments.
3  So it's not leaping to mind right now.
4    Q.  But using your market-based prices in
5  the adjudication methodologies for the states are
6  you not yourself changing the adjudication
7  methodology that those states were to use?
8    MR. GOBENA:  Objection to form.
9    A.  My methodology determines how Medicaid
10  spending and the Medicaid component would have
11  changed if the alternative AWPs, the transaction-
12  based AWPs, had been used in the adjudication
13  methodologies, as I've said earlier.
14    MR. TORBORG:  I think that we are at our
15  time period according to Conway.  So we'll wrap it
16  up.  I thank you again for your time.
17    THE WITNESS:  Yeah.  Thanks.
18    THE VIDEOGRAPHER:  This deposition
19  concludes at 3:27 and it consists of three tapes.
20         (Whereupon, at 3:27 p.m. the
21  videotaped deposition was adjourned.)
22

| Page 428 |
| --- |

1  UNITED STATES OF AMERICA   )
2
3  DISTRICT OF COLUMBIA        )
4       I, JONATHAN WONNELL, a Notary Public in and
5  for the District of Columbia, do hereby certify that
6  the within transcript is a true and accurate record of
7  the testimony under oath and other proceedings in the
8  above-entitled matter.
9       I further certify that I am not a relative,
10  employee, attorney or counsel of any of the parties to
11  this action and that I am in no way interested in the
12  outcome of this matter.
13       IN WITNESS WHEREOF, I have hereunto set my
14  hand this _____ day of _____, 20____.
15
16
17
18    _____
19             JONATHAN WONNELL
20
21  My Commission expires:
22  October 1, 2012

# EXHIBIT DY

# CMS Manual System

## Pub. 100-08 Medicare Program Integrity

**Department of Health & Human Services (DHHS) Centers for Medicare & Medicaid Services (CMS)**

| **Transmittal 114** | **Date: JUNE 10, 2005** |
|---|---|

**CHANGE REQUEST 3734**

*NOTE: Transmittal 108, dated April 29, 2005 is rescinded and replaced with Transmittal 114, dated June 10, 2005. There was a change in I. A. Background, the change in this section is identified in bold font. All other information remains the same.*

**SUBJECT: Change in Statistical Sampling Instructions**

**I. SUMMARY OF CHANGES:** Revisions to Chapter 3, Section 10 – Use of Statistical Sampling for Overpayment Estimation to implement MMA Section 935(a), which amends Section 1893 of the Social Security Act by adding new subsection (f)(3) Limitation on Use of Extrapolation.

**NEW/REVISED MATERIAL - EFFECTIVE DATE\*: December 8, 2004**
**IMPLEMENTATION DATE: May 31, 2005**

*Disclaimer for manual changes only: The revision date and transmittal number apply to the red italicized material only. Any other material was previously published and remains unchanged. However, if this revision contains a table of contents, you will receive the new/revised information only, and not the entire table of contents.*

**II. CHANGES IN MANUAL INSTRUCTIONS:**
   **(R = REVISED, N = NEW, D = DELETED)**

| R/N/D | CHAPTER/SECTION/SUBSECTION/TITLE |
|---|---|
| R | 3/Table of Contents |
| R | 3/3.10.1.1/General Purpose |
| R | 3/3.10.1.2/The Purpose of Statistical Sampling |
| R | 3/3.10.1.3/Steps for Conducting Statistical Sampling |
| R | 3/3.10.1.4/Determining When Statistical Sampling May be Used |
| R | 3/3.10.1.5/Consultation With a Statistical Expert |
| R | 3/3.10.1.6/Use of Other Sampling Methodologies |
| R | 3/3.10.2/Probability Sampling |
| R | 3/3.10.3.1/Selection of Period for Review |
| R | 3/3.10.3.2/Defining the Universe, the Sampling Unit, and the Sampling Frame |
| R | 3/3.10.3.2.1/Composition of the Universe |
| R | 3/3.10.3.2.2/The Sampling Unit |
| R | 3/3.10.4.1.3/Stratified Sampling |
| R | 3/3.10.4.1.4/Cluster Sampling |

| **R** | 3/3.10.4.2/Random Number Selection |
|---|---|
| **R** | 3/3.10.4.3/Determining Sample Size |
| **R** | 3/3.10.4.4/Documentation of Sampling Methodology |
| **R** | 3/3.10.4.4.1/Documentation of Universe and Frame |
| **R** | 3/3.10.4.4.3/Worksheets |
| **R** | 3/3.10.4.5/Informational Copies to GTL, Co-GTL, SME or CMS RO |
| **R** | 3/3.10.5.1/The Point Estimate |
| **R** | 3/3.10.6/Actions Performed Following Selection of Provider or Supplier and Sample |
| **R** | 3/3.10.6.1/Notification of Provider or Supplier of the Review and Selection of the Review Site |
| **R** | 3/3.10.6.1.1/Written Notification of the Review |
| **R** | 3/3.10.6.1.2/Determining Review Site |

**III.  FUNDING:  Medicare contractors shall implement these instructions within their current operating budgets.**

**IV.  ATTACHMENTS:**

| x | **Business Requirements** |
|---|---|
| x | **Manual Instruction** |
|   | **Confidential Requirements** |
|   | **One-Time Notification** |
|   | **Recurring Update Notification** |

**\*Unless otherwise specified, the effective date is the date of service.**

# Attachment – Business Requirements

| Pub. 100-08 | Transmittal: 114 | Date: June 10, 2005 | Change Request 3734 |
|---|---|---|---|

*NOTE:  Transmittal 108, dated April 29, 2005 is rescinded and replaced with Transmittal 114, dated June 10, 2005.  There was a change in I. A. Background, the change in this section is identified in bold font.  All other information remains the same.*

**SUBJECT:  Change in Statistical Sampling Instructions**

## I.   GENERAL INFORMATION

**A.   Background:**  Section 935(a) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) amended Section 1893 of the Social Security Act by adding new subsection (f)(3) – Limitation on Use of Extrapolation.  As mandated by MMA, there must be a sustained or high level of payment error, **or** documented educational intervention has failed to correct the payment error, in order to use extrapolation to determine overpayment amounts to be recovered by recoupment, offset, or otherwise.  The effective date of this new subsection was one year after the date of enactment of the MMA, which was December 8, 2003.

**B.   Policy:**  To ensure that this mandate is included in current statistical sampling for overpayment estimation instructions, the Program Integrity Manual is being updated.

**C.   Provider Education:**  None

## II.   BUSINESS REQUIREMENTS

*"Shall" denotes a mandatory requirement*
*"Should" denotes an optional requirement*

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | FI | RHHI | Carrier | DMERC | Shared System Maintainers | | | | Other |
| | | | | | | FISS | MCS | VMS | CWF | |
| 3734.1 | In order to use extrapolation to determine overpayment amounts, contractors shall determine that there is a sustained or high level of payment error; | X | X | X | X | | | | | PSC's |

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | FI | RHHI | Carrier | DMERC | Shared System Maintainers | | | | Other |
| | | | | | | FISS | MCS | VMS | CWF | |
| 3734.2 | A sustained or high level of payment error may be determined to exist through a variety of means, including, but not limited to:<br>- error rate determinations by MR, PSC, BI unit, or other area<br>- probe samples<br>- data analysis<br>- provider/supplier history<br>- information from law enforcement investigations<br>- allegations of wrongdoing by current or former employees of a provider or supplier | x | x | x | x | | | | | PSC's |
| 3734.3 | In order to use extrapolation to determine overpayment amounts, contractors shall have documented that educational intervention has failed to correct the payment error; | x | x | x | x | | | | | PSC's |
| 3734.4 | The period of review shall be determined by many factors, including how long the pattern of sustained or high level of payment error is believed to have existed. | x | x | x | x | | | | | PSC's |

## III.   SUPPORTING INFORMATION AND POSSIBLE DESIGN CONSIDERATIONS

**A.   Other Instructions:  N/A**

| X-Ref Requirement # | Instructions |
|---|---|
|  |  |

**B.   Design Considerations:  N/A**

| X-Ref Requirement # | Recommendation for Medicare System Requirements |
|---|---|
|  |  |

**C.   Interfaces:  N/A**

**D.   Contractor Financial Reporting /Workload Impact:  N/A**

**E.   Dependencies:  N/A**

**F.   Testing Considerations:  N/A**

## IV.   SCHEDULE, CONTACTS, AND FUNDING

| | |
|---|---|
| **Effective Date\*: December 8, 2004**<br><br>**Implementation Date:  May 31, 2005**<br><br>**Pre-Implementation Contact(s): Elizabeth Horn, x60973; Elizabeth.Horn@cms.hhs.gov**<br><br>**Post-Implementation Contact(s): Gary D. Williams x66433; Gary.Williams4@cms.hhs.gov** | **PSC's and Medicare contractors shall implement these instructions within their current operating budgets.** |

**\*Unless otherwise specified, the effective date is the date of service.**

# Medicare Program Integrity Manual
## Chapter 3 - Verifying Potential Errors and Taking Corrective Actions

**Table of Contents**
***(Rev.114, 06-10-05)***

*3.10.1.2 - The Purpose* of Statistical Sampling

*3.10.1.4 - Determining* When Statistical Sampling May be Used

### 3.10.1.1 – General Purpose
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05 )*

The purpose of this section is to provide *instructions for PSCs and Medicare contractor BI or MR units on the use of* statistical sampling *in their reviews* to calculate and project *(i.e., extrapolate)* overpayment *amounts to be recovered by recoupment, offset or otherwise.* These instructions are provided to ensure that a statistically valid sample is drawn and that statistically valid methods are used to project an overpayment where the results of the review indicate that overpayments have been made.  These guidelines are for reviews performed by the PSC or Medicare contractor BI *or MR* unit.  Reviews that are conducted by the PSC or Medicare contractor BI *or MR* unit to assist *law enforcement* with the identification, case development and/or investigation of suspected fraud or other unlawful activities may *also* use *sampling methodologies* that differ from those prescribed herein.

These instructions are provided so that a sufficient process is followed when conducting statistical sampling to project overpayments.  Failure by the PSC or Medicare contractor BI *or MR* unit to follow one or more of the requirements contained herein does not necessarily affect the validity of the statistical *sampling that was conducted or the projection of the overpayment*.  An appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted.  Failure by the PSC or Medicare contractor BI *or MR* unit to follow one or more requirements may result in review by CMS of their performance, but should not be construed as necessarily affecting the validity of the statistical sampling *and/or the projection of the overpayment.*

*Use of statistical sampling to determine overpayments may be used in conjunction with other corrective actions, such as payment suspensions and prepayment review.*

### 3.10.1.2 – *The Purpose of* Statistical Sampling
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05 )*

Statistical sampling is used to calculate and project *(i.e., extrapolate)* the amount of overpayment(s) made on claims. *The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), mandates that before using extrapolation to determine overpayment amounts to be recovered by recoupment, offset or otherwise, there must be a determination of sustained or high level of payment error, or documentation that educational intervention has failed to correct the payment error.  By law, the determination that a sustained or high level of payment error exists is not subject to administrative or judicial review.*

### 3.10.1.3 - Steps for Conducting Statistical Sampling
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05 )*

The major steps in conducting statistical sampling are: (1) Selecting the provider or supplier; (2) Selecting the period to be reviewed; (3) Defining the universe, the sampling unit, and the sampling frame; (4) Designing the sampling plan and selecting the sample; (5) Reviewing each of the *sampling units* and determining if there was an overpayment or an underpayment; and, as applicable, (6) Estimating the overpayment.  Where an overpayment has been determined to exist, follow applicable instructions for notification and collection of the overpayment.

### 3.10.1.4 – *Determining* When Statistical Sampling May Be Used
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

*The PSC and Medicare contractor BI and MR  units shall use statistical sampling when it has been determined that a sustained or high level of payment error exists, or where documented educational intervention has failed to correct the payment error.  A sustained or high level of payment error may be determined to exist through a variety of means, including, but not limited to:*

- *error rate determinations by MR unit, PSC, BI unit, or other area*
- *probe samples*
- *data analysis*
- *provider/supplier history*
- *information from law enforcement investigations*
- *allegations of wrongdoing by current or former employees of a provider or supplier*
- *audits or evaluations conducted by the OIG*

*Once a determination has been made that statistical sampling may be used, f*actors also to be considered for determining when to undertake statistical sampling *for overpayment estimation instead of a claim-by-claim review* include, but are not limited to: the number of claims in the universe and the dollar values associated with those claims; available resources; and the cost effectiveness of the expected sampling results.

### 3.10.1.5 - Consultation With a Statistical Expert
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The sampling methodology used to project overpayments must be reviewed by a statistician, or by a person with equivalent expertise in probability sampling and estimation methods.  This is done to ensure that a statistically valid sample is drawn and that statistically valid methods for projecting overpayments are followed.  The PSC or Medicare contractor BI *or MR* unit shall obtain from the statistical expert a written approval of the methodology for the type of statistical sampling to be performed.  If this sampling methodology is applied routinely and repeatedly, the original written approval is adequate for conducting subsequent reviews utilizing the same methodology.  The PSC or Medicare contractor BI *or MR* unit shall have the statistical expert review the results of

the sampling prior to releasing the overpayment demand letter.  If questions or issues arise during the on-going review, the PSC or Medicare contractor BI *or MR* unit shall also involve the statistical expert.

At a minimum, the statistical expert (either on-staff or consultant) shall possess a master's degree in statistics or have equivalent experience.  See section 3.10.10 for a list, not exhaustive, of texts that represent the minimum level of understanding that the statistical expert should have.  If the PSC or Medicare contractor BI *or MR* unit does not have staff with sufficient statistical experience as outlined here, it shall obtain such expert assistance prior to conducting statistical sampling.


### 3.10.1.6 - Use of Other Sampling Methodologies
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

*Once it is has been determined that statistical sampling may be used, n*othing in these instructions precludes the Centers for Medicare and Medicaid Services (CMS) or the PSC or Medicare contractor BI *or MR* unit from relying on statistically valid audit sampling methodologies employed by other *law enforcement agencies*, including but not limited to the OIG, the *DOJ, the FBI*, and other authoritative sources.

Where it is foreseen that the results of a *PSC, Medicare contractor BI or MR unit's* review may be referred to law enforcement or another agency for litigation and/or other enforcement actions, the PSC or Medicare contractor BI *or MR* unit shall discuss specific litigation and/or other requirements as they relate to statistical sampling with it's statistical expert prior to undertaking the review.  In addition, *the PSC or Medicare contractor BI or MR unit shall* discuss sampling requirements with law enforcement or other authorities before initiating the review (to ensure that the review will meet their requirements and that such work will be funded accordingly).


### 3.10.2 - Probability Sampling
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

Regardless of the method of sample selection used, the PSC or Medicare contractor BI *or MR* unit shall follow a procedure that results in a probability sample.  For a procedure to be classified as probability sampling the following two features must apply:

- It must be possible, in principle, to enumerate a set of distinct samples that the procedure is capable of selecting if applied to the target universe.  Although only one sample will be selected, each distinct sample of the set has a known probability of selection.  It is not necessary to actually carry out the enumeration or calculate the probabilities, especially if the number of possible distinct samples is large - possibly billions.  It is merely meant that one could, in theory, write down the samples, the sampling units contained therein, and the probabilities if one had unlimited time. and

• Each sampling unit in each distinct possible sample must have a known probability of selection. For statistical sampling for overpayment estimation, one of the possible samples is selected by a random process according to which each sampling unit *in the target population* receives its appropriate chance of selection. The selection probabilities do not have to be equal but they should all be greater than zero. In fact, some designs bring gains in efficiency by not assigning equal probabilities to all of the distinct sampling units.

For a procedure that satisfies these bulleted properties it is possible to develop a mathematical theory for various methods of estimation based on probability sampling and to study the features of the estimation method (i.e., bias, precision, cost) although the details of the theory may be complex. If a particular probability sample design is properly executed, i.e., defining the universe, the frame, the sampling units, using proper randomization, accurately measuring the variables of interest, and using the correct formulas for estimation, then assertions that the sample and its resulting estimates are "not statistically valid" cannot legitimately be made. In other words, a probability sample and its results are always "valid." Because of differences in the choice of a design, the level of available resources, and the method of estimation, however, some procedures lead to higher precision (smaller confidence intervals) than other methods. A feature of probability sampling is that the level of uncertainty can be incorporated into the estimate of overpayment as is discussed below.

### 3.10.3.1 - Selection of Period for Review
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

Following selection of the provider or supplier, determine the *time* period *and* the number of days, weeks, months, or years, for which sampling units will be reviewed.  The *target* universe shall be *defined according to* this period.  The period of review is determined by considering several factors, including (but not limited to):

> • How long the pattern of *sustained or high level of payment error* is believed to have existed;

> • The volume of claims that are involved;

> • The length of time that a national coverage decision or regional or local coverage policy has been in effect (i.e., should the provider or supplier have succeeded in adjusting their billing/utilization practices by now);

> •The extent of prepayment review already conducted or currently being conducted;

> • The dollar value of the claims that are involved relative to the cost effectiveness of the sample; and/or,

> • The applicable time periods for reopening claims (see the Medicare Carriers and Intermediary Manuals: MCM, Part 3, chapter XII, section 12100, and MIM, Part 3, chapter VIII, section 3799, for Reopening Standards).

**NOTE:**   When sampling claims that are paid through cost report (as opposed to claims paid under a PPS reimbursement methodology), all claims reviewed must be drawn from within a provider's defined cost reporting year.  **If the period under review is greater than one year, select a separate sample for each cost-reporting year.**

### 3.10.3.2 - Defining the Universe, the Sampling Unit, and the Sampling Frame
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The universe and sampling frame will usually *cover* all relevant claims or line items for the period under review.  The discussion that follows assumes that the sampling unit is the claim, although this is not required.  The sampling unit may also be *a cluster of claims, as*, for example, the patient, a treatment "day", or any other sampling unit appropriate for the issue under review.

### 3.10.3.2.1 - Composition of the Universe
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

**A.    Part A Claims:** For providers reimbursed through cost report, the universe of claims from which the sample is selected shall consist of fully and partially adjudicated claims obtained from the shared systems.  For such claims, use the service date to match findings to the cost report.

For providers reimbursed under PPS, the universe of claims from which the sample is selected will consist of all fully and partially paid claims submitted by the provider for the period under review.

**B.    Part B Claims:** The universe shall *consist of* all fully and partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed.  For example, if the review is of Physician X for the period January 1, 2002 through March 31, 2002, and laboratory and other diagnostic tests have been selected for review, the universe would include all fully and partially paid claims for laboratory and diagnostic tests billed by that physician for the selected time period.  For some reviews, the period of review may best be defined in terms of the date(s) of service because changes in coverage policy may have occurred.

### 3.10.3.2.2 - The Sampling Unit
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

Sampling units are the elements that are selected according to the *design of the survey and the* chosen method of statistical sampling.  They may be an individual line(s) within claims, individual claims, or clusters of claims (e.g., a beneficiary).  For example, possible sampling units may include specific beneficiaries seen by a physician during the time period under review; or, claims for a specific item or service.  In certain circumstances, e.g., multi-stage sample designs, other types of clusters of payments may be used.  In principle, any type of sampling unit is permissible as long as the total aggregate of such units covers the population of potential mis-paid amounts.

Unlike procedures for suppliers, overpayment projection and recovery procedures for providers and non-physician practitioners who bill intermediaries, in a non-PPS environment, must be designed so that overpayment amounts can be accurately reflected on the provider's cost report.  Therefore, sampling units must coincide with a projection methodology designed specifically for that type of provider to ensure that the results can be placed at the appropriate points on the provider's cost report.  The sample may be either claim-based or composed of specific line items.  For example, home health cost reports are determined in units of "visits" for disciplines 1 through 6 and "lower of costs or charges" for drugs, supplies, etc.  If claims are paid under cost report, the services reviewed and how those units link to the provider's cost report must be known.  Follow the instructions contained in section 3.10, but use the projection methodologies provided

in PIM, Exhibits 9 through 12, for the appropriate provider type.   PIM, Exhibits 9 through 12, are to be used only for claims not paid under PPS.

### 3.10.4.1.3 - Stratified Sampling
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

Stratified sampling involves classifying the sampling units in the frame into non-overlapping groups, or strata.  *The* stratification *scheme should try to ensure that* a sampling unit from *a particular* stratum *is* more likely *to be* similar in overpayment amount to others in its stratum than to sampling units in other strata.  Although the amount of an overpayment cannot be known prior to review, it may be possible to stratify on an observable variable that is correlated with the overpayment amount of the sampling unit.  Given a sample in which the total frame is covered by non-overlapping strata, if independent probability samples are selected from each of the strata, the design is called stratified sampling.  The independent random samples from the strata need not have the same selection rates.  A common situation is *one in which* the overpayment amount in a frame of claims is thought to be significantly correlated with the amount of the original payment to the provider or supplier.  The frame may then be stratified into a number of distinct groups by the level of the original payment and separate simple random samples are drawn from each stratum.  Separate estimates of overpayment are made for each stratum and the results combined to yield an overall projected overpayment.

The main object of stratification is to define the strata in a way that will reduce the margin of error in the estimate below that which would be *attained* by other sampling methods, as well as to obtain an unbiased estimate or an estimate with an acceptable bias.  The standard literature, including that referenced in Section 3.10.10, contains a number of different plans; the suitability of a particular method of stratification depends on the particular problem being reviewed, and the resources allotted to reviewing the problem.  Additional discussion of stratified sampling is provided in Section 3.10.11.1.

### 3.10.4.1.4 - Cluster Sampling
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

Cluster sampling involves drawing a random sample of clusters and reviewing *either all units* or a sample of units *selected from each of* the sampled clusters.  Unlike strata, clusters are groups of units that do not necessarily have strong similarities, but *for which their selection and review as clusters is more efficient economically than, for example, simple random sampling*.  For example, if the sampling unit is a beneficiary and the plan is to review each of the set of payments for each selected beneficiary, then the design is an example of cluster sampling with each beneficiary constituting a cluster of payments.  The main point to remember (when sampling all the units in the cluster) is that the sample size for purposes of estimating the sampling error of the estimate is the number of clusters, not the total number of individual payments that are reviewed.

A challenge to the validity of a cluster sample that is sometimes made is that the number of sampling units in a cluster is too small.  (A similar challenge to stratified sampling is also raised – i.e., that the number of sampling units in a stratum is too small).  Such a challenge is usually misguided since the estimate of the total overpayment is a

combination of the individual cluster (or, in the case of stratified sampling, stratum) estimates; therefore the overall sample size is important, but the individual cluster (or stratum) sample sizes are usually not critical.  Additional discussion of cluster sampling is provided in Section 3.10.11.2.

Both stratification and cluster sampling *involve the* grouping *of more elementary* units. The former is frequently recommended when there is sufficient *prior* knowledge to group units that are similar in some aspect and potentially different from other units.  The latter is frequently recommended when there are natural groupings that make a study more cost effective.  When carried out according to the rules of probability sampling both of the methods, or a combination, are valid.  The use of any of the methods described in this section will produce valid results when done properly.

### 3.10.4.2 - Random Number Selection
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The PSC or Medicare contractor BI *or MR* unit shall identify the source of the random numbers used to select the individual sampling units.  The PSC or Medicare contractor BI *or MR* unit shall also document the program and its algorithm or table that is used; this documentation becomes part of the record of the sampling and must be available for review.  The PSC or Medicare contractor BI *or MR* unit shall document any starting point if using a random number table or drawing a systematic sample.  In addition, the PSC or Medicare contractor BI *or MR* unit shall document the known seed value if a computer algorithm is used.  The PSC or Medicare contractor BI *or MR* unit shall document all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection.

There are a number of well-known, reputable software statistical packages (SPSS, SAS, etc.) and tables that may be used for generating a sample.  One such package is RAT-STATS, available (at time of release of these instructions) through the Department of Health and Human Services, Office of Inspector General Web Site.  It is emphasized that the different packages offer a variety of programs for sample generation and do not all contain the same program *features* or the same ease in operation.  For any particular problem, the PSCs or Medicare contractor BI *or MR* unit's statistician or systems programmer shall determine which package is best suited to the problem being reviewed.

### 3.10.4.3 - Determining Sample Size
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The size of the sample (i.e., the number of sampling units) will have a direct bearing on the precision of the estimated overpayment, but it is not the only factor that influences precision.  The standard error of the estimator also depends on (1) the underlying variation in the target population, (2) the particular sampling method that is employed (such as simple random, stratified, or cluster sampling), and (3) the particular form of the estimator that is used (e.g., simple expansion of the sample total by dividing by the selection rate, or more complicated methods such as ratio estimation).  It is neither possible nor desirable to specify a minimum sample size that applies to all situations.  A determination of sample size may take into account many things, including the method of sample selection, the estimator of overpayment, and prior knowledge (based on experience) of the variability of the possible overpayments that may be contained in the total population of sampling units.

In addition to the above considerations, real-world economic constraints shall be taken into account.  As stated earlier, sampling is used when it is not administratively feasible to review every sampling unit in the target population.  In determining the sample size to be used, the PSC or Medicare contractor BI *or MR* unit shall also consider their available resources. That does not mean, however, that the resulting estimate of overpayment is not valid, so long as proper procedures for the execution of probability sampling have been

followed.  A challenge to the validity of the sample that is sometimes made is that the particular sample size is too small to yield meaningful results.  Such a challenge is without merit as it fails to take into account all of the other factors that are involved in the sample design.

### 3.10.4.4 - Documentation of Sampling Methodology
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The PSC or Medicare contractor BI *or MR* unit shall maintain complete documentation of the sampling methodology that was followed.

### 3.10.4.4.1 - Documentation of Universe and Frame
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

An explicit statement of how the universe is defined and elements included shall be made and maintained in writing.  Further, the form of the frame and specific details as to the period covered, definition of the sampling unit(s), identifiers for the sampling units (e.g., claim numbers, carrier control numbers, etc.), and dates of service and source shall be specified and recorded in your record of how the sampling was done.  A record shall be kept of the random numbers actually used in the sample and how they were selected.  Sufficient documentation shall be kept so that the sampling frame can be re-created, should the methodology be challenged.  The PSC or Medicare contractor BI *or MR* unit shall keep a copy of the frame.

### 3.10.4.4.3 - Worksheets
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The PSC or Medicare contractor BI *or MR* unit shall maintain documentation of the review and sampling process.  All worksheets used by reviewers shall contain sufficient information that allows for identification of the claim or item reviewed.  Such information may include, for example:

- Name and identification number of the provider or supplier;
- Name and title of reviewer;
- The Health Insurance Claim Number (HICN), the unique claim identifier (e.g., the claim control number), and the line item identifier;
- Identification of each sampling unit and its components (e.g., UB92 or attached medical information)
- Stratum and cluster identifiers, if applicable;
- The amount of the original submitted charges (in column format);
- Any other information required by the cost report worksheets in PIM Exhibits 9 through 12;
- The amount paid;
- The amount that should have been paid (either over or underpaid amount); and,
- The date(s) of service.

### 3.10.4.5 - Informational Copies to GTL, Co-GTL, SME or CMS RO
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

The PSC or Medicare contractor BI *or MR* unit shall send informational copies of the statistician-approved sampling methodology to their GTL, Co-GTL, SME or CMS RO. The GTL, Co-GTL, SME or CMS RO will keep the methodology on file and will forward to CO upon request.  If this sampling methodology is applied routinely and repeatedly, the PSC or Medicare contractor BI *or MR* unit shall not repeatedly send the methodology to the GTL, Co-GTL, SME or CMS RO.

### 3.10.5.1 - The Point Estimate
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

In simple random or systematic sampling the total overpayment in the frame may be estimated by calculating the mean overpayment, net of underpayment, in the sample and multiplying it by the number of units in the frame.  In this estimation procedure, which is unbiased, the amount of overpayment dollars in the sample is expanded to yield an overpayment figure for the universe. The method is equivalent to dividing the total sample overpayment by the selection rate. The resulting estimated total is called the point estimate of the overpayment, i.e., the difference between what was paid and what should have been paid.  In stratified sampling, an estimate is found for each stratum separately, and the weighted stratum estimates are added together to produce an overall point estimate.

In most situations the lower limit of a one-sided 90 percent confidence interval shall be used as the amount of overpayment to be demanded for recovery from the provider or supplier.  The details of the calculation of this lower limit involve subtracting some multiple of the estimated standard error from the point estimate, thus yielding a lower figure.  This procedure, which, through confidence interval estimation, incorporates the uncertainty inherent in the sample design, is a conservative method that works to the financial advantage of the provider or supplier.  That is, it yields a demand amount for recovery that is very likely less than the true amount of overpayment, and it allows a reasonable recovery without requiring the tight precision that might be needed to support a demand for the point estimate.  However, the PSC or Medicare contractor BI *or MR* unit is not precluded from demanding the point estimate where high precision has been achieved.

Other methods of obtaining the point estimate are discussed in the standard textbooks on sampling theory.  Alternatives to the simple expansion method that make use of auxiliary variables include ratio and regression estimation.  Under the appropriate conditions, ratio or regression methods can result in smaller margins of error than the simple expansion method.  For example, if, as discussed earlier, it is believed that the overpayment for a sample unit is strongly correlated with the original paid amount, the ratio estimator may be efficient.  The ratio estimator is the ratio of the sample net overpayment to the sample total original payment multiplied by the total of original paid dollars in the frame.  If the actual correlation between the overpayment and the original paid amount is high enough, greater precision in estimation will be attained, i.e., the lower limit of the one-sided 90 percent confidence interval will be closer to the point estimate.  Exercise caution about using alternatives such as ratio or regression estimation because serious biases can be introduced if sample sizes are very small.  (The term bias is used here in a technical sense and does not imply a finding that treats the provider or supplier unfairly.  A biased estimator is often used rather than an unbiased estimator because the advantage of its greater precision outweighs the tendency of the point estimate to be a bit high or low.)

### 3.10.6 - Actions Performed Following Selection of Provider or Supplier and Sample
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05 )*

**NOTE:**     The instructions in this section dealing with notification and determination of location of the review do not supersede instructions for PSCs or Medicare contractor BI *or MR* units that are using statistical sampling for overpayment estimation as part of an investigation, either planned or on-going, into potential Medicare fraud.

### 3.10.6.1 – Notification of Provider or Supplier of the Review and Selection of the Review Site
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05 )*

The PSC or Medicare contractor BI *or MR* unit shall first determine whether it will be giving advance notification to the provider or supplier of the review.  Although in most cases the PSC or Medicare contractor BI *or MR* unit shall give prior notification, the provider or supplier is not always notified before the start of the review.  When not giving advance notice, the PSC or Medicare contractor BI *or MR* unit shall obtain the advance approval of the GTL, Co-GTL, SME or CMS RO.  When giving advance notice, provide written notification by certified mail with return receipt requested (retain all receipts).

Second, regardless of whether you give advance notice or not, you shall determine where to conduct the review of the medical and other records: either at the provider or supplier's site(s) or at your office (PSC or Medicare contractor BI *or MR* unit).

### 3.10.6.1.1 - Written Notification of Review
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05 )*

You shall include at least the following in the notification of review:

- an explanation of why the review is being conducted (i.e., why the provider or supplier was selected),
- the time period under review,
- a list of claims that require medical records or other supporting documentation,
- a statement of where the review will take place (provider/supplier office or contractor/PSC site),
- information on appeal rights,
- an explanation of how results will be projected to the universe if claims are denied upon review and an overpayment is determined to exist, and
- an explanation of the possible methods of monetary recovery if an overpayment is determined to exist.  .

When advance notification is given, providers and suppliers have 30 calendar days to submit (for PSC or Medicare contractor BI *or MR* unit site reviews) or make available (for provider/supplier site reviews) the requested documentation.  Advise the provider or supplier that for requested documentation that is not submitted or made available by the end of 30 calendar days, you will start the review and you will deny those claims for which there is no documentation.  The time limit for submission or production of requested documentation may be extended at your discretion.

**NOTE:**     You do not have to request all documentation at the time of notification of review.  For example, you may decide to request one-half of the documentation before you arrive, and then request the other half following your arrival at the provider/supplier's site.

When advance notification is **not** given, you shall give the provider or supplier the written notification of review when you arrive at their site.


## 3.10.6.1.2 - Determining Review Site
*(Rev. 114 , Issued: 06-10-05,  Effective: 12-08-04, Implementation: 05-31-05  )*

**A.     Provider/Supplier Site Reviews**

Provider/supplier site reviews are performed at the provider's or supplier's location(s). Considerations in determining whether to conduct the review at the office of the provider or supplier include, but are not limited to, the following:

- the extent of aberrant billing or utilization patterns that have been identified;
- the presence of multiple program integrity issues;
- evidence or likelihood of fraud or abuse; and/or,
- past failure(s) of the provider or supplier to submit requested medical records in a timely manner or as requested.

**B.  PSC or Medicare contractor BI *or MR* unit Site Reviews**

PSC or Medicare contractor BI *or MR* unit site reviews are performed at a location of the PSC or Medicare contractor BI *or MR* unit.

# EXHIBIT DZ

# Program Memorandum Carriers

**Department of Health & Human Services (DHHS)**
**Centers for Medicare & Medicaid Services (CMS)**

| **Transmittal  B-03-022** | **Date:  MARCH 21, 2003** |
|---|---|

This Program Memorandum re-issues Program Memorandum B-02-007, Change Request 1363 dated February 7, 2002.  The only change is the discard date; all other material remains the same.

**CHANGE REQUEST 1363**

**SUBJECT:**   **Use of Statistical Sampling for Overpayment Estimation When Performing Administrative Reviews of Part B Claims**

This Program Memorandum (PM) provides clarified guidance and direction for Medicare carriers to use when conducting statistical sampling for overpayment estimation.  The attached replaces the prior Sampling Guidelines Appendix for reviews conducted after issuance of this PM.  For reviews conducted prior to this issuance, the attached are a clarification to aid interpretation of the earlier instructions, particularly where specific numbers are suggested.

This PM obsoletes the Medicare Carriers Manual (MCM) Sampling Guidelines Appendix that has been in effect since December 1975 (MCM Part 3, Chapter VII).

The *effective date* for this PM is January 8, 2001.

The *implementation date* for this PM is as soon as possible, but no later than February 9, 2001.

This PM should be implemented within your current operating budget.

**This PM may be discarded after March 20, 2004.**

If you have any questions, contact Betsy Horn at (410) 786-0973.

Attachment

**CMS-Pub. 60B**

ATTACHMENT

USE OF STATISTICAL SAMPLING FOR OVERPAYMENT ESTIMATION WHEN PERFORMING ADMINISTRATIVE REVIEWS OF PART B CLAIMS

## I.   **Introduction.--**

A.   <u>General</u>.--The purpose of these instructions is to provide Medicare carriers (hereinafter you or your) with the guidance necessary to use statistical sampling to calculate and project overpayments identified following administrative review of Part B claims.  These instructions are provided to ensure that a statistically valid sample is drawn and that statistically valid methods are used to project an overpayment where the results of the review indicate that overpayments have been made.  These guidelines are for administrative reviews performed by you.  Reviews using statistical sampling conducted by you to assist with the identification, case development and/or investigation of suspected fraud or other unlawful activities may use procedures that differ from those prescribed herein.

These instructions are provided so that you follow a sufficient administrative process when you are conducting statistical sampling to project overpayments.  Failure by you to follow one or more of the requirements contained herein does not necessarily affect the validity of the statistical sample.  An appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted.  Your failure to follow one or more requirements may result in review by CMS of your performance, but should not be construed as necessarily affecting the validity of the statistical sample.

B.   <u>Use of Statistical Sampling</u>.--Statistical sampling is used to calculate and project the amount of overpayments made on Part B claims.  CMS Ruling 86-1 (CMSR 86-1) explains CMS's authority to use statistical sampling to estimate overpayments made to physicians and suppliers.  The ruling recognizes that statistical sampling conserves the resources of the Medicare program when reviews are performed on a large universe of claims.  The ruling states that in most cases it would not be administratively feasible, given the volume of records involved and the cost of retrieving and reviewing all the beneficiary records, for you to examine all individual claims for the period in question.

C.   <u>Statistical Sampling Steps</u>.--The major steps in conducting statistical sampling are: (1) Selecting the physician or supplier; (2) Selecting the period to be reviewed; (3) Defining the universe, the sampling unit, and the sampling frame; (4) Designing the sampling plan and selecting the sample; (5) Reviewing each of the claims (or portions thereof), and determining if there was an overpayment, or, for administrative reviews, an underpayment; and, as applicable, (6) Estimating the overpayment.  Where an overpayment has been determined to exist, follow applicable instructions for notification and collection of the overpayment (see §VII).

D.   <u>When Statistical Sampling is Appropriate</u>.--You may use statistical sampling to project overpayments to physicians and suppliers when erroneous billing or reimbursement, or over-utilization is suspected, and when a case-by-case review is not administratively feasible or practical.

Your use of statistical sampling to determine overpayments may be used in conjunction with other corrective actions.  Reviews that involve the use of statistical sampling may be utilized when there is a "major level of concern" regarding the physician or supplier's billing, reimbursement, and/or utilization (see Program Memorandum AB-00-72, dated 8/7/2000, Change Request 1285 - Progressive Corrective Action (PCA)).

Factors also to be considered for determining when to undertake statistical sampling include, but are not limited to, the number of claims in the universe and the dollar values associated with those claims; your available resources; and the cost effectiveness of the expected sampling results.

E.   <u>Consultation With a Statistical Expert</u>.--Initially, all statistical sampling procedures you use must be reviewed by a statistician or other person with equivalent expertise in statistical sampling and estimation methods.  This is done to ensure that a statistically valid sample is drawn and that you use statistically valid methods.  You must obtain from the statistical expert a written approval of the methodology for the type of statistical sampling to be performed.  If this sampling methodology is applied routinely and repeatedly, the original written approval is adequate for conducting subsequent reviews utilizing the same methodology.  You must have the statistical expert review the results of the sample prior to releasing the demand letter.  If questions or issues arise during the on-going review, you must also involve the statistical expert.

At a minimum, the statistical expert you use (either on-staff or consultant) should possess a master's degree in statistics or have equivalent experience.  See Appendix A for a list, not exhaustive, of texts that represent the minimum level of understanding that the statistical expert should have.  If you do not have staff with sufficient statistical experience as outlined here, obtain such expert assistance prior to conducting statistical sampling.

F.   <u>Use of Other Sampling Methodologies</u>.--Nothing in these instructions precludes the Health Care Financing Administration (CMS) or you from relying on statistically valid audit sampling methodologies employed by other audit organizations, including but not limited to the Office of Inspector General, the General Accounting Office, and other authoritative sources.  Where it is foreseen that the results of your review may be referred to a law enforcement or other agency for litigation and/or other enforcement actions, discuss specific litigation and/or other requirements as they relate to statistical sampling with your statistical expert prior to undertaking the review.  In addition, discuss sampling requirements with law enforcement or other authorities before initiating the review (to ensure that your review will meet their requirements, and that such work will be funded accordingly).

## II.   **Probability Sampling**.--

Regardless of the method of sample selection you use, the procedure must result in a probability sample.  For a procedure to be classified as probability sampling the following features must apply:

- It must be possible, in principle, to enumerate a set of distinct samples that the procedure is capable of selecting if applied to the target universe.  Although only one sample will be selected, each distinct sample of the set has a known probability of selection.  It is not necessary to actually carry out the enumeration or calculate the probabilities, especially if the number of possible distinct samples is large - possibly billions.  It is merely meant that one could, in theory, write down the samples, the sampling units contained therein, and the probabilities if one had unlimited time.

- Each sampling unit in each distinct sample has a known probability of selection.  One of the possible samples is selected by a random process according to which sampling unit receives its appropriate chance of selection.  The selection probabilities do no have to be equal but they should all be greater than zero.  In fact, some designs bring gains in efficiency by not assigning equal probabilities to all of the distinct sampling units.

For a procedure that satisfies these bulleted properties it is possible to develop a mathematical theory for various methods of estimation based on probability sampling and to study the features of the estimation method (i.e., bias, precision, cost) although the details of the theory may be complex.  If a particular probability sample design is properly executed, i.e., defining the universe, the frame, the sampling units, using proper randomization, accurately measuring the variables of interest, and using the correct formulas for estimation, then assertions that the sample and its resulting estimates are "not statistically valid" cannot legitimately be made.  In other words, a probability sample and its results are always "valid."  Because of differences in the choice of a design, the level of available resources, and the method of estimation, however, some procedures lead to higher precision (smaller confidence intervals) than other methods.  A feature of probability sampling is that the level of uncertainty can be incorporated into the estimate of overpayment as is discussed below.

### III. <u>Selection of Period to be Reviewed and Composition of Universe.</u>--

A.   <u>Selection of Period for Review</u>.--Following your selection of the physician or supplier, determines the period of time to be reviewed.  That is, determine the number of days, weeks, months, or years, for which sampling units will be reviewed.  You will select your universe from this period.  The period of review is determined by considering several factors, including (but not limited to):

- How long the pattern of erroneous billing or overutilization is believed to have existed;

- The volume of claims that are involved;

- The length of time that a national average decision or regional or local coverage policy has been in effect (i.e., should the physician or supplier have succeeded in adjusting their billing/utilization practices by now);

- The extent of prepayment review already conducted or currently being conducted;

- The dollar value of the claims that are involved relative to the cost effectiveness of the sample; and/or

- The applicable time periods for reopening claims (see the Medicare Carriers Manual, §§12100ff., for Reopening Standards.)

B.   <u>Defining the Universe, the Sampling Unit, and the Sampling Frame</u>.--Your universe and sampling frame will usually be all relevant claims for the period under review.  The discussion which follows assumes that the unit of the universe is the claim, although situations may arise in which it is necessary to review all claims for a beneficiary, or all claims on all patients treated on the same day.  The unit of the universe may be the patient, a treatment "day", or any other unit appropriate for the issue under review.

1.   <u>Composition of the Universe</u>.--The universe will be all fully and partially paid claims submitted by the physician or supplier for the defined period of review for the sampling units to be reviewed.  For example, if you are reviewing Physician X for the period January 1, 2000 – March 31, 2000, and you have selected for review laboratory and other diagnostic tests, your universe would include all fully and partially paid claims for laboratory and diagnostic tests billed by that physician for the selected time period.  For some reviews the period of review may be best defined in terms of the date of service because changes in coverage policy may have occurred.

2.   <u>The Sampling Unit</u>.--Sampling units are the elements that are selected according to the chosen method of statistical sampling.  They may be individual lines within claims, individual claims, or clusters of claims (e.g., a beneficiary).  For example, possible sampling units may include specific beneficiaries seen by a physician during the time period under review; or, claims for a specific item or service.  In certain circumstances, e.g., multi-stage sample designs, other types of clusters of payments may be used.  In principle, any type of sampling unit is permissible as long as the total aggregate of such units covers the population of potential mispaid amounts.

3.   <u>The Sampling Frame</u>.--The sampling frame is the "listing" of all the possible sampling units from which the sample is selected.  The frame may be, for example, a list of all beneficiaries receiving items from a selected supplier, a list of all claims for which fully or partially favorable determinations have been issued, or a list of all the line items for specific items or services for which fully or partially favorable determinations have been issued.

The ideal frame is a list that covers the target universe completely.  In some cases the frame must be constructed by combining lists from several sources and duplication of sampling units may result.  Although duplicate listings can be handled in various ways that do not invalidate the sample, it is recommended that you eliminate the duplicates before selecting the sample.

## IV. **Sample Selection.--**

    A.  <u>Sample Design</u>.--Identify your sample design.  The most common designs used are simple random sampling, systematic sampling, stratified sampling, and cluster sampling, or a combination of these.

       1.  <u>Simple Random Sampling</u>.--Involves using a random selection method to draw a fixed number of sampling units from the frame without replacement, i.e., not allowing the same sampling unit to be selected more than once.  The random selection method must ensure that, given the desired sample size, each distinguishable set of sampling units has the same probability of selection as any other set - thus the method is a case of "equal probability sampling."  An example of simple random sampling is that of shuffling a deck of playing cards and dealing out a certain number of cards (although for such a design to qualify as probability sampling a randomization method that is more precise than hand shuffling and dealing would be required.)

       2.  <u>Systematic Sampling</u>.--Requires that the frame of sampling units be numbered, in order, starting with the number one (1) and ending with a number equal to the size of the frame. Using a random start, the first sampling unit is selected according to that random number, and the remaining sampling units that comprise the sample are selected using a fixed interval thereafter.  For example, if a systematic sample with size one-tenth of the frame size is desired, select a random number between one and ten, say that it is "6", and then select every tenth unit thereafter, i.e., "16, 26, 36, …." until the maximum unit number in the frame has been exceeded.

       3.  <u>Stratified Sampling</u>.--Involves classifying the sampling units in the frame into non-overlapping groups, or strata.  One useful stratification results in a sampling unit from one stratum more likely being similar in overpayment amount to others in its stratum than to sampling units in other strata.  Although the amount of an overpayment cannot be known prior to review, it may be possible to stratify on an observable variable that is correlated with the overpayment amount of the sampling unit.  Given a sample in which the total frame is covered by non-overlapping strata, if independent probability samples are selected from each of the strata, the design is called stratified sampling.  The independent random samples from the strata need not have the same selection rates. A common situation is where the overpayment amount in a frame of claims is believed to be significantly correlated with the amount of the original payment to the physician or supplier.  The frame may then be stratified into a number of distinct groups by the level of the original payment and separate simple random samples are drawn from each stratum.   Separate estimates of overpayment are made for each stratum and the results combined to yield an overall projected overpayment.

The main object of stratification is to define the strata in a way that will reduce the margin of error in the estimate below which would be obtained by other sampling methods, as well as to obtain an unbiased estimate or an estimate with an acceptable bias.  The standard literature, including that referenced in Appendix A, contains a number of different plans; the suitability of a particular method of stratification depends on the particular problem being reviewed, and the resources allotted to reviewing the problem.  Additional discussion of stratified sampling is provided in Appendix B.

       4.  <u>Cluster Sampling</u>.--Involves drawing a random sample of clusters and reviewing everything or a sample of units in the sampled clusters.  Unlike strata, clusters are groups of units that do not necessarily have strong similarities, but can be efficiently accessed for review purposes. For example, if the sampling unit is a beneficiary and the plan is to review each of the set of payments for each selected beneficiary, then the design is an example of cluster sampling with each beneficiary constituting a cluster of payments.  The main point to remember (when sampling all the units in the cluster) is that the sample size for purposes of estimating the sampling error of the estimate is the number of clusters, not the total number of individual payments that are reviewed.

A challenge to the validity of a cluster sample that is sometimes made is that the number of sampling units in a cluster is too small.  (A similar challenge to stratified sampling is also raised – i.e., that the number of sampling units in a stratum is too small).  Such a challenge is usually misguided since the estimate of the total overpayment is a combination of the individual cluster (or, in the case of stratified sampling, stratum) estimates; therefore the overall sample size is important, but the

individual cluster (or stratum) sample sizes are usually not critical. Additional discussion of cluster sampling is provided in Appendix B.

Both stratification and cluster sampling are methods of grouping units. The former is frequently recommended when there is sufficient knowledge to group units that are similar in some aspect and potentially different from other units. The latter is frequently recommended when there are natural groupings that make a study more cost effective. When carried out according to the rules of probability sampling both of the methods, or a combination, are valid. The use of any of the methods described in this section will produce valid results when done properly.

5. Design Combinations.--A sample design may combine two or more of the methods discussed above. For example, clusters may be stratified before selection; systematic sampling rather than simple random sampling may be used for selecting units within strata; or clusters may be subsampled using either simple random sampling or systematic sampling, to cite some of the possible combinations of techniques.

The benefits of stratification by claim amount may be achieved without actually stratifying if the frame is arranged in ascending order by the original payment amount and systematic sampling applied with a random start. That is because the systematic selection "balances out" the sample over the different levels of original payment in a manner similar to the effect of formal stratification. Thus systematic selection is often used in the hope that it will result in increased precision through "implicit stratification."

B. Random Number Selection.--You must identify the source of the random numbers used to select the individual sampling units. Also document the program and its algorithm or table that is used; this documentation becomes part of the record of the sample and must be available for review. You must document any starting point if you are using a random number table or drawing a systematic sample. In addition, document the known seed value if a computer algorithm is used. You must document all steps in the random selection process exactly as you did them to ensure that the necessary information is captured for anyone attempting to replicate the sample selection.

There are a number of well-known, reputable software statistical packages (SPSS, SAS, etc.) and tables that may be used for generating a sample. One such package is RAT-STATS, available (at time of release of these instructions) through the Department of Health and Human Services, Office of Inspector General Web site. It is emphasized that the different packages offer a variety of programs for sample generation and do not all contain the same program services nor the same ease in operation. For any particular problem, your statistician or systems programmer should determine which package is best suited to the problem being reviewed.

C. Determining Sample Size.--The size of the sample (i.e., the number of sampling units) will have a direct bearing on the precision of the estimated overpayment, but it is not the only factor that influences precision. The standard error of the estimator also depends on (1) the underlying variation in the target population, (2) the particular sampling method that is employed such as simple random, stratified, or cluster sampling, and (3) the particular form of the estimator that is used (e.g., simple expansion of the sample total by dividing by the selection rate, or more complicated methods such as ratio estimation). It is neither possible nor desirable to specify a minimum sample size that applies to all situations. A determination of sample size may take into account many things, including the method of sample selection, the estimator of overpayment, and prior knowledge (based on experience) of the variability of the possible overpayments that may be contained in the total population of sampling units.

In addition to the above considerations, real-world economic constraints must be taken into account. As stated earlier, sampling is used when it is not administratively feasible to review every sampling unit in the target population. In practice, sample sizes may be determined by available resources. That does not mean, however, that the resulting estimate of overpayment is not valid as long as proper procedures for the execution of probability sampling have been followed. A challenge to the validity of the sample that is sometimes made is that the particular sample size is too small to yield meaningful results. Such a challenge is without merit as it fails to take into account all of the other factors that are involved in the sample design.

D. Documentation of Sampling Methodology.--You must provide complete documentation of the sampling methodology that you followed.

1. Documentation of Universe and Frame.--An explicit statement of how the universe is defined and elements included must be made in writing. Further, the form of the frame and specific details as to the period covered, definition of the sampling units, identifiers for the sampling units (e.g., claim numbers, carrier control numbers, etc.), and dates of service and source must be specified and recorded in your record of how the sampling was done. A record must be kept of the random numbers actually used in the sample and how they were selected. Sufficient documentation must be kept so that the sampling frame can be re-created, should the methodology be challenged. You must keep a copy of the frame.

2. Arrangement and Control Totals.--It is often convenient in frame preparation to array the universe elements by payment amount, e.g., low to high values, especially when stratification is used. At the same time, tabulate control totals for the numbers of elements and payment amounts.

3. Worksheets.--You must maintain documentation of the review and sampling process. All worksheets used by reviewers must contain sufficient information that allows for identification of the claim or item reviewed. Such information may include, for example:

    a. Name and identification number of the physician or supplier;
    b. Name and title of reviewer;
    c. The Health Insurance Claim Number (HICN), the unique claim identifier (e.g., the claim control number), and the line item identifier;
    d. Stratum and cluster identifiers, if applicable;
    e. The amount paid;
    f. The amount that should have been paid (either over or underpaid amount); and,
    g. The date(s) of service.

4. Overpayment/Underpayment Worksheets.--Worksheets should be used in calculating the net overpayment. The worksheet should include data on the claim number, line item, amount paid, audited value, amount overpaid, reason for disallowance, etc., so that each step in the overpayment calculation is clearly shown. Underpayments identified during reviews should be similarly documented.

E. Informational Copies to RO.--Send informational copies of your statistician-approved sampling methodology to the RO. The RO will keep the methodology on file and will forward to CO upon request. If this sampling methodology is applied routinely and repeatedly, you do not need to repeatedly send the methodology to the RO.

## V.  Calculating the Estimated Overpayment.--

A. The Point Estimate.--In simple random or systematic sampling the total overpayment in the frame may be estimated by calculating the mean overpayment, net of underpayment, in the sample and multiplying it by the number of units in the frame. In this estimation procedure, which is unbiased, the amount of overpayment dollars in the sample is expanded to yield an overpayment figure for the universe. The method is equivalent to dividing the total sample overpayment by the selection rate. The resulting estimated total is called the point estimate of the overpayment, i.e., the difference between what was paid and what should have been paid. In stratified sampling, an estimate is found for each stratum separately, and the weighted stratum estimates are added together to produce an overall point estimate.

In most situations the lower limit of a one-sided 90 percent confidence interval should be used as the amount of overpayment to be demanded for recovery from the physician or supplier. The details of the calculation of this lower limit involve subtracting some multiple of the estimated standard error from the point estimate, thus yielding a lower figure. This procedure, which, through confidence interval estimation, incorporates the uncertainty inherent in the sample design, is a conservative method that works to the financial advantage of the physician or supplier. That is, it yields a demand amount for recovery that is very likely less than the true amount of overpayment,

and it allows a reasonable recovery without requiring the tight precision that might be needed to support a demand for the point estimate. However, you are not precluded from demanding the point estimate where high precision has been achieved.

Other methods of obtaining the point estimate are discussed in the standard textbooks on sampling theory. Alternatives to the simple expansion method that make use of auxiliary variables include ratio and regression estimation. Under the appropriate conditions, ratio or regression methods can result in smaller margins of error than the simple expansion method. For example, if, as discussed earlier, it is believed that the overpayment for a sample unit is strongly correlated with the original paid amount, the ratio estimator may be efficient. The ratio estimator is the ratio of the sample net overpayment to the sample total original payment multiplied by the total of original paid dollars in the frame. If the actual correlation between the overpayment and the original paid amount is high enough, greater precision in estimation will be attained, i.e., the lower limit of the one-sided 90 percent confidence interval will be closer to the point estimate. Exercise caution about using alternatives such as ratio or regression estimation because serious biases can be introduced if sample sizes are very small. (The term bias is used here in a technical sense and does not imply a finding that treats the physician or supplier unfairly. A biased estimator is often used rather than an unbiased estimator because the advantage of its greater precision outweighs the tendency of the point estimate to be a bit high or low.)

    B.  Calculation of the Estimated Overpayment Amount.--The results of the sampling unit reviews is used to project an estimate of the overpayment amount. Each result shall be recorded except that a sampling unit's overpayment shall be set to zero if there is a limitation on liability determination made to waive physician or supplier liability for that sampling unit (per provisions found in §1879 of the Social Security Act (the Act)) and/or there is a determination that the physician or supplier is without fault as to that sampling unit overpayment (per provisions found in §1870 of the Act). Sampling units for which the requested records were not provided are to be treated as improper payments (i.e., as overpayments). Sampling units that are found to be underpayments, in whole or in part, are recorded as negative overpayments and are also used in calculating the estimated overpayment.

## VI.  Actions to be Performed Following Selection of Physician or Supplier and Sample.-

**NOTE:**   The instructions in this section dealing with notification and determination of location of the review do not supercede instructions for benefit integrity investigations, either planned or on-going.

    A.  Physician/Supplier Notification of Review and Review Site.--First, determine whether you will be notifying the physician or supplier of the review. Although in most cases prior notification is provided, the physician or supplier is not always notified before the start of the review. When not giving advance notice, you must obtain RO advance approval as required by applicable instructions. When giving advance notice, provide written notification by certified mail with return receipt requested (retain all receipts).

Second, regardless of whether you give advance notice or not, determine where you will conduct your review, at the physician's or supplier's site(s) or at your offices (contractor site).

    1.  Written Notification.--Include in the notification an explanation of why the review is being conducted (i.e., why the physician or supplier was selected and the period of review), the list of claims that require medical records or other supporting documentation, where the review will take place (physician/supplier site or contractor site), information on appeal rights, and an explanation of the possible methods of monetary recovery if claims are denied upon review. Also include an explanation of how results will be projected to the universe.

When advance notification is given, physicians and suppliers have 30 calendar days to submit (for contractor site reviews) or make available (for physician/supplier site reviews) the requested documentation. Advise the physician or supplier that should requested documentation not be submitted or made available by the end of 30 calendar days, you will start the review and you will deny those claims for which there is no documentation. You do not have to request all

documentation at time of notification of review.  For example, you may decide to request one-half of the documentation before you arrive, and then request the other half following your arrival at the physician/supplier's site.  The time limit for submission or production of requested documentation may be extended at your discretion.

When advance notification is **not** given, give the physician or supplier the written notification when you arrive at their site.

       2.   <u>Determining Review Site</u>.--

         a.   <u>Physician/Supplier Site Reviews</u>.--Physician/supplier site reviews are performed at the physician's or supplier's location(s). Considerations in determining whether to conduct a physician/supplier site review include:

- The extent of aberrant patterns identified;
- The presence of multiple program integrity issues;
- Evidence or likelihood of fraud; and/or,
- Past failure(s) of a physician or supplier to submit requested
- Medical records in a timely manner or as requested.

         b.   <u>Contractor Site Reviews</u>.--Contractor site reviews are performed at the contractor's location.

    B.   <u>Meetings to Start and End the Review</u>.--In-person meetings to start and end the review are encouraged, but are not required or always feasible.  If you hold an in-person meeting at the start of the review, explain the scope and purpose of the review and discuss the next steps at the end of the review.  Attempt to answer the physician's or supplier's questions related to the review.

During an exit meeting, you may discuss the basic or preliminary findings of the review.  Give the physician or supplier an opportunity to discuss or comment on the claims decisions that were made.  Advise the physician or supplier that a demand letter detailing the results of the review and the statistical sampling will be sent if an overpayment is determined to exist.

    C.   <u>Conducting the Review</u>.--Following your receipt of the requested documentation (or the end of the period to submit or make available the requested documentation, whichever comes first), start your review of the claims.  Obtain additional documentation as necessary for an objective and thorough evaluation of the payments that have been made.  Use physician consultants and health professionals in the various specialties as necessary to review or approve decisions involving medical judgment.  The review decision is made on the basis of the Medicare law, CMS rulings, regulations, national coverage determinations, and regional/local carrier medical review policies that were in effect at the time the item(s) or service(s) was provided.

Document all findings made so that it is apparent from your written documentation if your initial determination has been reversed.  Document the amount of all overpayments and underpayments and how they were determined.

You are encouraged to complete your review and calculate the net overpayment within 90 calendar days of the start of the review (i.e., within 90 calendar days after you have either received the requested documentation or the time to submit or make available the records has passed, whichever comes first).  However, there may be extenuating circumstances or circumstances out of your control where you may not be able to complete the review within this time period (e.g., you have made a fraud referral to the OIG and are awaiting their response before pursuing an overpayment).

Your documentation of overpayment and underpayment determinations must be clear and concise.  Include copies of the local medical review policy and any applicable references needed to support individual case determinations.  Compliance with these requirements facilitates adherence to the physician and supplier notification requirements.

VII.     **Overpayment Recovery**.--

A.   <u>Recovery from Physician or Supplier</u>.--Once an overpayment has been determined to exist, proceed with recovery based on applicable instructions (see MCM §7130).  Regardless of which unit within the carrier pursues the overpayment, include in the overpayment demand letter information about the review and statistical sampling methodology followed.

An explanation of the sampling methodology that was followed should include:

- A description of the universe, the frame, and the sample design;

- A definition of the sampling unit, the sample selection procedure, and the numbers and definitions of the strata and size of the sample, including allocations, if stratified;

- The time period under review;

- The sample results, including the overpayment estimation methodology and the calculated sampling error as estimated from the sample results; and

- The amount of the actual overpayment/underpayment from each of the claims reviewed.

Also include a list of any problems/issues identified during the review, and any recommended corrective actions.

B.   <u>Informational Copy to RO</u>.--Send an informational copy of the demand letter to the RO.  The RO will maintain copies of demand letters and will forward to CO upon request.  If the demand letter is used routinely and repeatedly, you do not need to repeatedly send it to the RO.

VIII.    **Corrective Actions.**--Take other corrective actions you deem necessary (such as payment suspension, imposition of civil money penalties, institution of pre- or post-payment review, additional edits, etc.)

IX.     **Changes Resulting from Appeals.**--If the decision issued on appeal contains either a finding that the sampling methodology was not valid, and/or reverses the revised initial claim determination, you must take appropriate action to adjust the extrapolation of overpayment.

A.   <u>Sampling Methodology</u>.--If the decision issued on appeal contains a finding that the sampling methodology was not valid, there are several options for revising the estimated overpayment based upon the appellate decision:

1.   If the decision issued on appeal permits correction of errors in the sampling methodology, you must revise the overpayment determination after making the corrections.  Consult with CO through RO to determine whether such an action is consistent with the hearing officer (HO), administrative law judge (ALJ) or Departmental Appeals Board (DAB) decision, or court order.

2.   You may elect to recover the actual overpayment related to the sample claims and then initiate a new review of the physician or supplier.  If the actual overpayments related to the sampling units in the original review have been recovered, then these units should be eliminated from the sampling frame used for any new review.  Consult with CO through RO to determine whether such an action is consistent with the HO, ALJ or DAB decision, or court order.

3.   You may conduct a new review (using a new methodology) for the same time period as was covered by the previous review.  Before employing this option, consult with CO through RO to verify that the action is consistent with the HO, ALJ or DAB decision, or court order.  If this option is chosen, you may not recover the overpayments on any of the sample claims found to be in error in the original sample.

B.   <u>Revised Initial Determination</u>.--If the decision on appeal upholds the sampling methodology but reverses one or more of the revised initial claim determinations, the estimate of overpayment must be recomputed.

APPENDIX A

Resources:

American Institute of Certified Public Accountants, Statistical Sampling Subcommittee, *Audit Sampling*, 1999.

Arkin, H., *Handbook of Sampling for Auditing and Accounting*, 1984.

Cochran, W. G., *Sampling Techniques,* 3rd ed., New York: John Wiley and Sons, 1977.

Deming, W. E., *Sample Design in Business Research,* New York: John Wiley and Sons, 1960 (Paperback 1990).

Hansen, M. H., Hurwitz, W. W., and Madow, W. G., *Sample Survey Methods and Theory,* New York: John Wiley and Sons, 1953 (Paperback 1993).

Hedayat, A., Bekas, K. S., *Design and Inference in Finite Population Sampling*, John Wiley & Sons, New York, 1991.

Kish, L., *Survey Sampling,* New York: John Wiley and Sons, 1967, 2nd printing.  (Paperback 1995).

Levy, P. and Lemeshow, S., *Sampling of Populations Methods and Applications*, 3rd ed., John Wiley & Sons, 1999.

Scheaffer, R. L., Mendenhall, W., and Ott, L., *Elementary Survey Sampling*, 5th ed., Duxbury Press, 1996.

Som, R. K., *Practical Sampling Techniques*, M. Dekker, New York, 1996, 2nd ed.

## Additional Discussion of Stratified Sampling

Generally, one defines strata to make them as internally homogeneous as possible with respect to overpayment amounts, which is equivalent to making the mean overpayments for different strata as different as possible. Typically, a proportionately stratified design with a given total sample size will yield an estimate that is more precise than a simple random sample of the same size without stratifying. The one highly unusual exception is one where the variability from stratum mean to stratum mean is small relative to the average variability within each stratum. In this case, the precision would likely be reduced, but the result would be valid. It is extremely unlikely, however, that such a situation would ever occur in practice. Stratifying on a variable that is a reasonable surrogate for an overpayment can do no harm, and may greatly improve the precision of the estimated overpayment over simple random sampling. While it is a good idea to stratify whenever there is a reasonable basis for grouping the sampling units, failure to stratify does not invalidate the sample, nor does it bias the results.

If it is believed that the amount of overpayment is correlated with the amount of the original payment and the universe distribution of paid amounts is skewed to the right, i.e., with a set of extremely high values, it may be advantageous to define a "certainty stratum", selecting all of the sampling units starting with the largest value and working backward to the left of the distribution. When a stratum is sampled with certainty, i.e., auditing all of the sample units contained therein, the contribution of that stratum to the overall sampling error is zero. In that manner, extremely large overpayments in the sample are prevented from causing poor precision in estimation. In practice, the decision of whether or not to sample the right tail with certainty depends on fairly accurate prior knowledge of the distribution of overpayments, and also on the ability to totally audit one stratum while having sufficient resources left over to sample from each of the remaining strata.

Stratification works best if one has sufficient information on particular subgroups in the population to form reasonable strata. In addition to improving precision there are a number of reasons to stratify, e.g., ensuring that particular types of claims, line items or coding types are sampled, gaining information about overpayments for a particular type of service as well as an overall estimate, and assuring that certain rarely occurring types of services are represented. Not all stratifications will improve precision, but such stratifications may be advantageous and are valid.

Given the definition of a set of strata, the designer of the sample must decide how to allocate a sample of a certain total size to the individual strata. In other words, how much of the sample should be selected from Stratum 1, how much from Stratum 2, etc.? As shown in the standard textbooks, there is a method of "optimal allocation," i.e., one designed to maximize the precision of the estimated potential overpayment, assuming that one has a good idea of the values of the variances within each of the strata. Absent that kind of prior knowledge, however, a safe approach is to allocate proportionately. That is, the total sample is divided up into individual stratum samples so that, as nearly as possible, the stratum sample sizes are in a fixed proportion to the sizes of the individual stratum frames. It is emphasized, however, that even if the allocation is not optimal, using stratification with simple random sampling within each stratum does not introduce bias, and in almost all circumstances proportionate allocation will reduce the sampling error over that for an unstratified simple random sample.

## Additional Discussion of Cluster Sampling

Selecting payments in clusters rather than individually usually leads to a reduction in the precision of estimation. However, your reasons for using cluster sampling instead of simple random sampling may be driven by necessity and/or cost-savings related to the location of records or the nature of a record. For example, for medical review to determine the appropriateness of certain charges for a beneficiary it may be necessary to examine the complete medical record of the patient. This then may allow for review of claims for several services falling within the selected review period. In another instance, the medical records that you must review may be physically located in a cluster (e.g., the same warehouse, the same file drawer, the same folder) with the medical records for other similar claims and it is cost effective to select units from the same location. Whenever the cost in time and other resources of selecting and auditing clusters is the same as the cost of simple random

sampling the same number of payments, it is better to use simple random sampling because greater precision will be attained.

When reviewing all the units in each cluster, the sample size is the number of clusters, not the number of units reviewed. This is single-stage cluster sampling, a method frequently used when sampling beneficiaries. One may choose to review a sample of units within each cluster rather than all units. Textbooks that cover the topic of multi-stage sampling provide formulas for estimating the precision of such sample designs. One example for which multi-stage sampling might be an appropriate choice of design is the case of reviewing a supplier chain where records are spread out among many locations. The first-stage selection would be a sample of locations. At the second stage a subsample of records would be selected from each sampled location.