# EXHIBIT EL

```
11/21/03              PDD FILE--DRUG DISPLAY SCREEN              INQUIRY

        NDC-CODE: 00074-6138-03    LAST-TRANS: 09/02/03      USER: 999
    PREVIOUS-NDC:                  BEGIN-DATE: 01/01/82   END-DATE: 99/99/99
       DRUG NAME: SODIUM CHLORIDE                  STRENGTH: 0.9%
   GENERIC-IND: M GENERIC-CD: 45360   GENERIC NAME: SODIUM CL IRRIG SOLN
    THERAPEUTIC-CLASS: 40:36.00 W8F                DEA: 0           DESI: 2
    MANUFACTURER: ABBOTT LABS.                  LEGEND: L      VALID-SEX: B
       DOSE-FORM: SW IRRIG SOLN               FAM-PLAN: N     EPSDT-IND: N
          PKG-SZ:     500.000    MIN     MAX        U/D: 0    PHARM-ASST: N
   UNIT/MEAS: ML      DAYS:       0      34      PREAUTH: N       KDP-IND: N
   DIAGNOSIS:         QTY:     0.000 7500.000    PEND-CD: N     GEN-OVRRD: N
    IDC-CODE: 000      AGE:     000     999     BYPS FEE: N   MAINT-DRUG: N
                       AWP:   0.00376          AWP-DATE: 050702
   ----------E.A.C.----------  ---------I.D.C.----------  -------F.G.U.L.--------
   BEGIN    END       PRICE    IND BEGIN   END      PRICE    IND BEGIN  END     PRICE
   070103 999999    0.00327 W  102397 999999      0.00222
   050702 063003    0.00330 W
   040601 050602    0.00264 W
   042996 040501    0.01619 W
   040196 042896    0.02360 D
   040395 033196    0.02248 D
   NOTE:
```

*(handwritten annotations)*

11/21/2003
Bobbi Hilbn
Horneson phng

Jo IDC Valid

IDC

Per Tinny — one sent for updating

MD0005721

# EXHIBIT EM

**Carrier Privilege Log - Documents Covered by Attorney-Client Privilege or Work Product Doctrine**

| Document Number | Date | Doc Type | Description | Author | Addressee | Copyee | Privilege Designation |
|---|---|---|---|---|---|---|---|
| AWP901-01720172 | 8/20/2002 | Email messages | Email regarding summary of Aranesp issue with handwritten notes | Stone, John M. | Neville, John B. | | Attorney-Client |
| AWP901-0191-0192 | 3/6/2003 | Email messages | Email correspondence regarding Darbepoetin and Aranesp pricing | Stone, John M. | Neville, John B.; Tohill, Lora A.; Kreeck, Boyd | | Attorney-Client |
| AWP901-0202-0204 | XX/XX/XXXX | Spreadsheet | Spreadsheet containing Darbepoetin Alfa (Aranesp) - Epotein Alpha comparison -- Work product | | | | Attorney - Client; Work Privilege |
| AWP901-0205-0208 | 4/15/2002 | Email | Email regarding Aranesp | Hackathorn, Kathy; Payne, Carolyn; Wichtia Nephrology Group | Moore, Darrell | | Attorney-Client |
| AWP902--06660666 | 1/2/2004 | Memorandum | Document describing carrier subpoenas seeking documents related to pharmaceutical litigation | Walters, Gerald, CMS; Carson, Gregory, CMS | | | Attorney-Client |
| AWQ908-00010002 | 1/16/2004 | Fax and Letter | Counsel's request to carrier for investigative files concerning drug pricing policy formulation and CMS implementation process for policy changes | Jimenez, Marcos Daniel | Partin, George | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00030003 | 11/20/2003 | Memorandum | Contractor generated summary solicited by DOJ concerning drug pricing methodology and processes | Sandlin, Winnette | Partin, George | | Law Enforcement/ Investigatory |
| AWQ908-00040008 | 10/7/2003 | Fax | Government counsel's inquiries to carrier concerning carrier process for setting reimbursement rates for drugs | Jimenez, Marcos Daniel | Partin, George | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00090009 | 10/14/2003 | E-mail | Counsel's inquiry to carrier for investigative file information concerning identity of parties responsible for contractor drug pricing | Dangerfield, Cynthia G | Sandlin, Winnette | Partin, George | Attorney-Client; Law Enforcement/Investigatory |
| AWQ908-00120012 | 11/21/2003 | Memorandum | Carrier memorandum responding to attorney administrative investigation into responsibility for drug pricing | Partin, George | Lavine, Mark | Martinez, Mario; Sandlin, Winnette | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00130013 | 11/21/2003 | Memorandum | Carrier summary concerning contractor drug pricing methodology prepared in response to inquiry by government counsel | Sandlin, Winnette | Partin, George | | Law Enforcement/ Investigatory |
| AWQ908-00160016 | 11/20/2003 | Memorandum | Carrier summary concerning contractor drug pricing methodology prepared in response to inquiry by government counsel | Sandlin, Winnette | Partin, George | | Law Enforcement/ Investigatory |
| AWQ908-00170021 | 10/8/2003 | Fax | Government counsel's inquiries to carrier concerning carrier process for setting reimbursement rates for drugs | Lavine, Mark A. | Partin, George | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00220022 | 10/14/2003 | E-mail | Counsel's inquiry to carrier for information concerning identity of parties responsible for contractor drug pricing | Dangerfield, Cynthia G | Sandlin, Winnette | Partin, George | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00260027 | 2/11/2004 | E-mail | Internal e-mail and handwritten notes concerning attorney-carrier communication in DOJ drug pricing investigation | Sandlin, Winnette | Rogers, Lydia; Higginbotham, Darlene | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00280029 | 1/16/2004 | Fax | Counsel's information request to carrier for agency files concerning predecisional policy development and implementation process for drug pricing policy | Sandlin, Winnette | Martinez, Raul | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00300031 | 2/20/2004 | Memorandum | Carrier communication to counsel concerning document production | Petty, Robert | Connelly, William | Jenkins, Mike | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00320036 | 2/13/2004 | Memorandum | Advice to carrier concerning production of records in response to carrier subpoenas for documents | Carson, Gregory G.; Walters, Gerald | | Ras; CCMOs; Polise, Lou; Hinson, Jeff; Rinker, Verne; Walters, Gerald, Bennett, Carol; Barsky, Troy; Connelly, William; Polston, Mark | Attorney-Client |
| AWQ908-00370039 | 3/12/2004 | Memorandum | Advice clarification to carrier concerning funding process and production of records in response to subpoenas for documents | Polise, Louis; Walters, Gerald | | Ras; CCMOs; Polise, Lou; Hinson, Jeff; Rinker, Verne; Walters, Gerald, Bennett, Carol; Barsky, Troy; Connelly, William; Polston, Mark | Attorney-Client |
| AWQ908-00400046 | 1/2/2004 | Memorandum | Guidance concerning Carrier Subpoenas seeking documents related to Pharmaceutical Litigation | Carson, Gregory G.; Walters, Gerald | | Ras; CCMOs; Polise, Lou; Hinson, Jeff; Rinker, Verne; Walters, Gerald, Bennett, Carol; Barsky, Troy; Connelly, William; Polston, Mark | Attorney-Client |
| AWQ908-00470048 | 12/18/2003 | Subpoena | Attachment to guidance concerning carrier subpoenas seeking documents related to pharmaceutical litigation | | | | Attorney-Client |
| AWQ908-00490057 | XX/XX/XXXX | Report | Attachment to guidance concerning carrier subpoenas seeking documents related to pharmaceutical litigation | | | | Attorney-Client; Law Enforcement/ Investigatory |

Carrier Privilege Log - Documents Covered by Attorney-Client Privilege or Work Product Doctrine

| Document Number | Date | Doc Type | Description | Author | Addressee | Copyee | Privilege Designation |
|---|---|---|---|---|---|---|---|
| AWQ908-00680068 | 11/17/2006 | Report | Minutes of agency conference call discussion concerning drug pricing | Bastinelli, Sandra; Brandt, Kim | | | Deliberative Process |
| AWQ908-00690070 | 2/1/2007 | E-mail | Carrier file search results of agency investigatory files to assist government counsel in drug pricing litigation | Wagner, Diane | Kardules, Kathleen | Pressley, Carol; Martin, Carolyn; Jolley, Jennifer; Walden, Nina; Leigh, Robin L.; Albert, Rosemary; Vogel, Thomas | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00710071 | 2/1/2007 | E-mail | Results from carrier search of agency investigatory files to assist counsel in drug pricing litigation | Wagner, Diane | Kardules, Kathleen | Martin, Carolyn; Albert, Rosemary | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ908-00720075 | 1/31/2007 | E-mail | Advice concerning production of records from investigatory files in response to carrier subpoenas for documents | Kardules, Kathleen | Bates, Dale; Wagner, Diane; McConnell, Elizabeth; Piatt, Glenda; Sevens, Janet; Jolley, Jennifer; Houston, Kevin; Kinzelman, Mary; White, Patricia J.; Kamps, Robert | Heilbrunn, Bonnie | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-00010023 - part of - AWQ909-00010076 | 1/31/2007 | E-mail | Agency investigative files compiled by carrier to assist attorney in pharmaceutical litigation | Hartung, Kelly | | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-00770088 | XX/XX/XXXX | Report | Attorney guidance to carriers concerning agency investigation and draft responses to requests for production of documents in pharmaceutical litigation | Hartung, Kelly | | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-00890124 | 1/5/2007 | Report | Legal guidance and instructions to carrier concerning agency investigative files and document production in pharmaceutical litigation | | | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-0125; 0253-0261--part of - AWQ909-01250261 | 2/19/2004 | Letter | Carrier report to government counsel concerning agency investigative files to assist counsel in response to request for production | Hartung, Kelly | William Connelly | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-02620264 | 1/31/2007 | E-mail | Carrier update to counsel concerning response to request for production according to legal guidance and instructions | Cynthia Warner/WPSIC | Theresa Gass/WPSIC@WPSIC | | Attorney-Client privilege |
| AWQ909-02650266 | 1/30/2007 | E-mail | Carrier request for advice of counsel concerning responses to request for production and agency investigative files | Cynthia Warner/WPSIC | Theresa Gass/WPSIC@WPSIC | Kelly Hartung/WPSIC@WPSIC | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-02670271 | 1/10/2007 | E-mail | Discussion between carrier and counsel concerning advice and updates related to agency investigative files and provider response to WPS request for production | Kelly Hartung/WPSIC | Stafford, Leslie (HHS/OGC) Leslie.Stafford@HHS.GOV | Barsky, Troy (HHS/OGC) Troy.Barsky@HHS-GOV | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-02720272 | XX/XX/XXXX | Report | Report of contact between carrier and agency counsel concerning accumulation of administrative investigation files and coordination of effort | Hartung, Kelly | Barsky, Troy | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ909-02730281 | 1/15/2007 | E-mail | Carrier-Attorney conversations regarding agency investigation for subpoena and document production in pharmaceutical litigation | Hartung, Kelly | Jane Wagner/WPSIC@WPSIC; Denise Gray/WPSIC@WPSIC | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ912-00010012 | 01/09/2004 | E-Mail | J1563-Email Correspondence Regarding IVIG problem in final rule | Baldo, Marjorie | Stone, Robin, Wade, Rick, Nunn, Mary; Thompson, Donald | | Attorney-Client |
| AWQ912-00130019 | 01/08/2004 | E-Mail | J1563-Email string regarding IVIG Problem | Nunn, Mary | Stone, Robin; Jones, Kerri | | Attorney-Client |
| AWQ912-00360142 | 01/29/2004 | Letter/List | J7619-Redbook information for quarters April 1999, July 1999 on October 2000 | Stone, Robin | Mao, Andy | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ912-01430143 | 05/21/2004 | Letter | J7619-Documentation for Albuterol | McClurkin, Shannell; Business Analyst | Mao, Andy | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ912-01440150 | 06/21/2004 | E-Mail | J7619-Redbook Albuterol | Stone, Robin | McClurkin, Shannell | | Attorney-Client; Law Enforcement/ Investigatory |
| AWQ912-01510257 | 01/29/2004 | Letter/List | J7619-Additional Documentation for Albuterol | Stone, Robin | Mao, Andy | | Attorney-Client; Law Enforcement/ Investigatory |

# EXHIBIT EN

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 Civil Action No. 1-12257-PBS |
| THIS DOCUMENT RELATES TO: *United State of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.* | ) ) ) ) ) ) ) | MASTER FILE NO. Judge Patti B. Saris |

# EXPERT REPORT OF JAMES W. HUGHES

**I.      Introduction**

1.      I am the Thomas Sowell Professor of Economics at Bates College.  I prepared this report at the request of counsel for Abbott Laboratories Inc. ("Abbott") to review and evaluate the Government's liability and damage calculation in this matter as proposed by its expert Dr. Mark Duggan.

2.      In my opinion Dr. Duggan's calculation of damages is fatally flawed in both concept and execution.  First, as he admits, his is not a damage calculation, but only a calculation of a "difference" in government expenditures.  His concept of the but-for world does not consider the evidence in the record of the likely consequences were state and federal agencies to adopt the alternative payment methodologies he proposes.  He ignores, for example, the testimony of state officials and other evidence that reimbursements like the ones he proposes would require increases in dispensing or administration fees.  He ignores the fact that when the government reformed the Medicare and Medicaid systems to address the issues that are the subject of this litigation, the reforms adopted bear no resemblance to his alternative payment method.  A valid vision of the but-for world should take into account the likely consequences for, and reactions by, market participants.  Dr. Duggan's does not do this in my opinion.

3.      Even if one were to accept Dr. Duggan's but-for world, his method of calculating damages is in my opinion fatally flawed.  For Medicare, his estimates are based on a small amount of variable data that is in no manner a random or representative sample of the data.  From these flawed data, he performs extrapolations across time and space that have no statistical validity.  Even though Abbott did not account for 100 percent of the sales in the data he uses in his calculations, and even though he has no idea whether

2

Abbott's alleged wrongful actions were in fact the cause of injury in his extrapolations, he attributes 100 percent of the damages he calculates to Abbott.

4.      For Medicaid, he bases his national damage estimates on incomplete claims data on only ten states.  The ten states he chose are not a representative sample of the population of states.  He ignores data on other states that is in his possession, or presumably available from the government.  He uses extrapolation to estimate damages to 38 other states, introducing needless error into his estimates.  For these and other reasons, the resulting estimates are in my opinion inaccurate and unreliable.  Dr. Duggan also fails to consider the consequences of his proposed reimbursement method on patient access.  He ignores substantial evidence showing that concern over inadequate dispensing fees and the potential effects on patient access was, in fact, a major factor in shaping states reimbursement policies.

5.      By using flawed, incomplete unrepresentative data, and using these data to calculate extrapolations that are flawed and unrepresentative of the but-for world, it is my opinion that Dr. Duggan's damage methodology and resulting estimates are inaccurate and unreliable.

## II.      Background and Experience

6.      I specialize in the fields of Industrial Organization; Law and Economics; Health Economics; Environmental Economics; and Labor Economics.  I earned my M.A. in Economics, from Boston University in 1978, and my PhD in Economics from The University of Michigan in 1987.  I joined the faculty of Amherst College in 1987 and the faculty of Bates College in 1992.  In 2005, I was named the Thomas Sowell Professor of Economics.

7.      I have  experience in the economic analysis of competition issues in the

pharmaceutical industry, including injury and damage issues in the AWP litigation.  I

submitted a report in an AWP action regarding certain injectable drugs brought by the

Attorney General of Connecticut[1].  I also submitted a report in the AWP actions in the

states of Montana and Nevada[2].  Outside of the AWP actions, I have testified and/or

offered reports in matters involving the prescription pharmaceuticals Cipro, Cardizem,

Rezulin and Procardia XL.  I have also testified in a class certification matter involving

the prescription benefit manager Medco Health Systems.  My curriculum vita is attached

as Exhibit 1, and a list of cases in which I have provided testimony appears as Exhibit 2.

### III.      Basic Allegations and My Assignment

8.      The Government alleges that Abbott reported "false, fraudulent and inflated"[3]

prices to the pricing compendia such as the Red Book.  The Government further claims

that such allegedly false reporting caused agencies to pay "excessive"[4] reimbursements to

Abbott's customers.

9.      The Government also claims that Abbott consciously manipulated the so-called

"spread" between the AWP (used in computing some government reimbursements) and

the price actually paid by Abbott customers.  This alleged manipulation operated by

either indirectly raising the AWP, or lowering the customer's purchase price, or both,

---

[1] State of Connecticut v. Aventis Pharmaceuticals, Docket X07 CV03-0083299 S (CLD).
[2] In Re Pharmaceutical Industry Average Wholesale Price Litigation, in the matters of:
*State of Nevada v. American Home Prods. Corp., et al.,* 02-CV-12086-PBS; and *State of Montana v. Abbott Labs., Inc., et al.,* 02-CV-12084-PBS, MDL NO. 1456, Master File No. 01-CV-12257-PBS.
[3] In Re Pharmaceutical Industry Average Wholesale Price Litigation, The United States' First Amended Complaint, Civil Action No. 01-12257-PBS, at ¶3.  [Hereafter cited as "Complaint"]
[4] Id. at ¶3

thus increasing the customer's profit, not Abbott's profit, from the transaction.
According to the complaint, Abbott allegedly profited from this "scheme" by increasing
sales of its products.[5]

10.     I have been asked by counsel for defendant Abbott to evaluate the Government's
liability theory and damage claims.  I have been asked to review the methodology
employed by the Government's expert for estimating the injury, damages, and penalties
allegedly incurred by Medicare and Medicaid as a result of the alleged wrongful actions,
and to offer my opinion as an economist about the opinions, methodology and accuracy
of the resulting estimates.  A list of materials I relied upon is attached as Exhibit 3.  I am
being compensated at a rate of $575 per hour.

## IV.     Factual Background

### A.     Nature of the Products at Issue

11.     Pharmaceuticals are generally classified as either "brand-name" (i.e., patent-
protected) drugs, or "generic," also referred to as multisource drugs.[6]  Most of the
products at issue in this litigation fit in neither the brand nor generic categories.  Most of
the products here are legacy hospital products that have never been patent-protected.
These are basic, commodity products—saline solution, sterile water, dextrose solution—
that have been used in hospitals and elsewhere for decades.  Many companies have long
manufactured such solutions.  Any company meeting the FDA standards for sterility,
purity and manufacturing practice can produce such products.  As these solutions are

---

[5] Id. at ¶3, 103
[6] One of the subject drugs of this litigation, vancomycin, is an example of a generic
multisource drug.

uncomplicated, barriers to entry are low by the standards of pharmaceutical markets. Today, there are up to 15 manufacturers for these products.[7]

12.      Legacy hospital products are commodity products.  Each firm's products are functionally and literally identical to the products of every other manufacturer.  Markets for such commodity products tend to be quite competitive.  As such, day-to-day prices change with the forces of supply and demand.  If one or more manufacturers face supply issues, prices in the market may rise in response.  Unforeseen emergencies such as natural disasters can lead to increases in demand and price.  Products may be sold to different customers at different prices depending on market and demand circumstances.

### B.      The Use of List Prices

13.      Firms in many different industries use list prices as both actual transaction prices and a starting point for negotiations with larger customers, regular customers, and/or new customers whose business they are trying to win.  Such a practice allows firms to charge the list price to "spot" customers, who may buy either small quantities of the product, or on a one-time basis.  Larger, regular customers or buying groups can negotiate lower prices, the size of the discounts correlating generally with the importance of the customer.  Price discounting in this way helps firms compete for business by rewarding their best customers, and/or attracting new customers with lower purchase prices. Multiple products may be grouped together and sold as a portfolio of products.[8] Generally, customers who purchase all or substantially all of the portfolio of products can receive more favorable pricing and terms.

---

[7] Electronic Orange Book, accessed online at www.fda.gov/cder/ob/docs/queryai.
[8] Deposition of Michael Sellers, March 31, 2008, v. II at 594.

14.     It is well established in the economics literature that monopolistic collusion is

facilitated when firms can observe each other's actual selling prices.[9]  Competitive price-

cutting is, on the other hand, greatly encouraged when, as in this case, firms can keep

their discounting practices confidential.  A leading text on competitive strategy,

discussing how competitors might facilitate price collusion, states:

> When sales transactions are "public," deviations from cooperative pricing
> are easier to detect than when prices are secret.  … [I]n many industrial
> goods markets, prices are privately negotiated between buyers and sellers,
> so it may be difficult for a firm to learn whether a competitor has cut its
> price.  Because retaliation can occur more quickly when prices are public
> than when they are secret, price cutting to steal market share is likely to be
> less attractive, enhancing the chances that cooperative pricing can be
> sustained.

When sellers can keep their sales prices confidential, competition is

enhanced:

> Secrecy is a significant problem [for colluders] when transactions involve
> other dimensions besides a list or invoice price, as they often do in
> business-to-business marketing settings.  … [A] manufacturer…that wants
> to steal business from a competitor…can cut its "net price" by increasing
> trade allowances to retailers or by extending more favorable credit terms.
> Because it is often more difficult to monitor trade allowance deals or
> credit terms than list prices, competitors may find it difficult to detect
> business-stealing behavior, hindering their ability to retaliate.[10]

15.     In short, offering discounts from list price to gain and keep customers is more

successful when the discounts are kept confidential than when they are done publicly.

Publicly announced reductions in selling price may be quickly matched by competitors,

making them an ineffective method for gaining or keeping customers.  Publicly

---

[9] The antitrust economics literature is replete with schemes would-be colluders have
employed to force disclosure of transaction prices.  Reporting prices to trade associations,
basing-point pricing and the like are recognized as classic methods of facilitating
collusion through the use of published transaction prices.

[10] David Besanko, David Dranove, and Mark Shanley, *The Economics of Strategy,* 2d ed.,
(New York, John Wiley & Sons, 2000) at 305-306.

announced discounts are more costly to producers as the firm's other customers will demand similar discounts.  As lower prices for manufacturers' products ultimately benefits consumers, economists believe that such discounting should be encouraged rather than discouraged.

16.     Professor Fiona Scott-Morton examined the effect on drug prices of the Medicaid "Most-Favored Customer" (MFC) requirement contained in the Omnibus Budget Reconciliation Act of 1990 (OBRA 90).[11]  An MFC clause requires that all customers must receive the lowest price given to any one customer.  An MFC clause is thus identical in effect to the public disclosure of pricing discounts, as any discount must be applied to all covered customers.  Professor Scott-Morton found that drug selling prices actually rose somewhat after the passage of OBRA 90.  Discounting became more expensive for firms, and firms thus did less of it.  She also found that the dispersion of selling prices became less, again indicating less discounting.  Professor Scott-Morton concluded that the MFC requirements of OBRA 90 actually caused the prices paid by some pharmaceutical customers to rise.[12]

17.     Abbott's former Hospital Products Division published a list price.  This list price was the price at which Abbott sold directly to a provider who did not have a negotiated contract,[13] that is, it was the price for spot purchases.[14]  For repeat customers and larger

---

[11] Fiona Scott-Morton, "The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored-Customer Rules," Rand Journal of Economics, v.28 n. 2, Summer, 1997 at 269-90, and "The Interaction between a Most-Favored-Customer Clause and Price Dispersion: an Empirical Examination of the Medicaid Rebate Rules of 1990," Journal of Economics and Management Strategy, v.6 n. 1, Spring 1997 at 151-174.

[12] Scott-Morton, Rand Journal at 269.

[13] Deposition of Michael Sellers, March 16, 2008 v. 1 at 245.

[14] On May 1, 2004, Abbott sold its Hospital Products Division.

customers, Abbott offered contracts whereby such customers could purchase products from Abbott at a price less than the list price. These discounts were offered, and at times increased, both to meet competition for existing customers and/or to win new business.[15] Abbott's profit or loss on such contract sales did not depend on whether the providers using its products would be reimbursed by Medicare Part A (hospital care), Medicare Part B (physician care), Medicaid, private insurance, or cash payment. Abbott's profit or loss would depend only on the price paid to Abbott by the customer and the quantity sold at that price.

18.     It is important to understand that Abbott sold its products directly or indirectly (i.e., through a wholesaler or distributor) to providers (e.g. hospitals, pharmacies, dialysis centers, outpatient surgery centers, home infusion pharmacies), and was paid by providers for these products. Providers then dispensed or administered these products to patients. Third-party payers, Medicare or Medicaid, or the patients' cash payments reimbursed providers for these patient services. Third party payer reimbursements were made to the providers, not to Abbott.[16] The Government claims that Abbott profited from the alleged AWP manipulation scheme by increasing its sales.[17] Dr. Duggan's report presents no evidence to support this allegation.

---

[15] Abbott's contracts with customers generally contained clauses requiring Abbott to match any competitor's offered price for the products in the contract. See, for example, Corum Healthcare Contract, at ABT-DOJ 0205106.

[16] Abbott operated three home infusion pharmacies in California, New Jersey and Illinois at various times between 1984 and 1999. Sellers Deposition at 481. These pharmacies received reimbursements from Medicaid. Dr. Duggan calculates that total Medicare and Medicaid spending through Abbott's home infusion pharmacies totaled only $380,499 over the period 1992-1999. Duggan Supplemental Report , p. 3.

[17] Complaint at p. 1, ¶¶3, 75-77, 103, and 146.

19.     Abbott announced list price changes annually for its hospital products.  Because

of the competitive nature of the market for these products, these changes were generally

limited to no more than the relevant rate of inflation.  As such, these price changes were

not real (after inflation) price increases, but rather consistent with inflation.  Exhibit 4

shows the time trend of price for the NDCs at issue in this litigation, graphed against the

Consumer Price Index for Medical Products.

**V.     Dr. Duggan's Damages Calculations Are Inaccurate And Unreliable As They
Are Based On A Fanciful and Untenable Vision of the But-For World**

20.     When estimating damages, an economist compares the price actually paid with

the price that would have been paid in the "but-for" world, that is, the world absent the

defendant's alleged wrongful behavior.[18]  Any valid vision of this but-for world must be

based on the available evidence as to the situation that would actually exist in the world

without the alleged wrongdoing.  This evidence must include not only the alleged but-for

price, but also include an assessment of actors' anticipated responses to the incentives,

rewards, and costs imposed by the changed circumstances.  To do otherwise will result in

an inaccurate and misestimated "but-for price" that will yield inaccurate and unreliable

estimates of alleged damages.

21.     Dr. Duggan does not conduct such an economic analysis.  His characterization of

the but-for world is one-dimensional, divorced from the realities of the market he

purports to analyze.  He calculates a "difference between (1) what the federal government

reimbursed for certain pharmaceutical products provided to Medicaid and Medicare

recipients during the eleven-year period 1991 to 2001 and (2) what the federal

---

[18] See Roger Blair and William Page, "Speculative Antitrust Damages," 70 Wash. L.
Rev., April 1995.

government would have reimbursed for the same products during the same time period of prices reflective of the actual prices at which Abbott was transacting business had been used for the AWP, WAC, and Direct Price of Abbott products."[19]  He then assumes that Medicare and Medicaid reimbursements would have been reduced to the payment levels utilized in his "difference" calculation.[20]  Everything else, including provider participation in the programs, dispensing or administration fees paid to compensate providers for the cost of preparing, delivering and administering the drug and other factors are assumed to remain constant.  Other influences, such as the need to meet Federal mandates to ensure access in the Medicaid program, the information available to government officials, or the presence of MACs, or other reimbursement methodologies willingly negotiated between providers and state Medicaid agencies are not taken into account in Dr. Duggan's analysis.  All of these factors would be an integral part of any viable and accurate economic assessment of alleged damages.

22.     As I will discuss in more detail below, by ignoring these very real economic factors in his analysis, Dr. Duggan's calculations do not constitute a damage analysis in this matter.  Notably, he himself never uses the word "damage" in his entire initial report in this matter,[21] and resists characterizing his calculation as "damages" caused by Abbott's alleged misconduct at deposition,[22] preferring instead to refer to his calculations as merely a "difference" in government payments between the actual and his but-for

---

[19] Report of Mark G. Duggan, Ph.D., June 19, 2008 at ¶1.
[20] Id. at 8-9.
[21] Id.
[22] Deposition of Mark G. Duggan, PhD., vol I, July 15, 2008 at 37:13-47:21 and 76:20-79:6.

world.[23]  He says that his calculations are merely "one input into the calculation of

damages."[24]  Dr. Duggan ignores a vast amount of evidence and testimony in this matter

that speaks directly to the accuracy of his characterization of the but-for world.  Dr.

Duggan admits that he uses assumptions in his analysis that he has not verified.[25]  He

does not use all of the actual claims data in his possession, nor did the government

provide to him other claims data that the Government presumably has in its possession.

Instead, his alleged damage estimates are based on extrapolations that are themselves

flawed.  He ignores the fact that, almost fifteen years after the filing of this matter, after

many successful and unsuccessful attempts to reform drug reimbursements under

Medicare and Medicaid, no state or Federal program has replaced the reimbursement

system at issue here with a system with the same or similar characteristics to the one

proposed by Dr. Duggan.  He ignores the fact that, even today, CMS continues to

approve state Medicaid implementation plans containing the same allegedly flawed

reimbursement system that gave rise to the current litigation.[26]

    **A.**    **Medicare**

        **1.**    **Dr. Duggan's But-For World Is Inconsistent With Government Reforms Of The Medicare Reimbursement System**

---

[23] While Dr. Duggan uses the term "difference" rather than "damage" to describe his calculations, it is my understanding that the Government is using his calculations as their estimate of damages in this matter.  For this reason, I refer to Dr. Duggan's calculations as damage or alleged damage calculations.

[24] Id. at 39.

[25] Duggan Deposition at 28-29, 86-88, 193-96, 674-82, and 858-65.

[26] According to the CMS website, all but two states' reimbursement systems are based on AWP in some way.  U.S. Health and Human Services, Centers for Medicare and Medicaid, "Medicaid Prescription Reimbursement Information by State—Quarter Ending December, 2008," accessed online at http://www.cms.hhs.gov/Reimbursement/Downloads/MedicaidPrescriptionReimbursementInformationbyStateDecember2008.pdf.

23.     During the relevant period for this litigation, Medicare reimbursed at either 100 percent or 95 percent of AWP.  In the case of multisource drugs produced by many manufacturers, like the ones at issue in this litigation, Medicare paid 95 or 100 percent of the median AWP for the product, plus in some cases an administration fee.[27]  In Dr. Duggan's but-for world, if Abbott alone had reported the average acquisition cost of its products, he claims that the median AWP, and therefore the Medicare reimbursement would fall.  Administration fees would not have changed according to Dr. Duggan, despite the need for trained professionals to store, prepare, deliver and administer these injectable and infusion products.

24.     The Medicare reimbursement system in place during the relevant time period was replaced by a new system specified in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003[28], known as the "MMA."  If Dr. Duggan's characterization of the but-for world is in fact accurate, we should expect the payment system of the MMA, constructed in response to the alleged shortcomings of the earlier system at issue here[29], to closely mimic the but-for payment system proposed by Dr. Duggan.  It does not.

25.     Under the new MMA system, the drug reimbursement for most drugs would be set at 106 percent of the average sales price (ASP) of the manufacturer,[30] calculated

---

[27] In 1999, reimbursement was changed to 95% of the median AWP or the lowest brand AWP, if a brand product existed.

[28] "Medicare Prescription Drug, Improvement, and Modernization Act of 2003," CMS Legislative Summary, April, 2004, accessed at:
http://www.cms.hhs.gov/MMAUpdate/downloads/PL108-173summary.pdf.

[29] "Medicare and its beneficiaries are making excessive payments for prescription drugs. The published AWPs that are currently being used for Medicare-contracted carriers bear little resemblance to actual wholesale prices that are available to the physician and supplier communities that bill for those drugs."  U.S. HHS Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," December, 1997 at ii.

[30] Id. at p.48.

according to a specific formula contained in the statute.  However, the statute recognized

that the administration fees, where applicable, of the earlier system would be inadequate

to compensate providers for the cost of the drug preparation, delivery and administration

services.  Thus, in direct contradiction of Dr. Duggan's characterization of the but-for

world, where administration costs are assumed to be constant, the new legislation called

for a substantial increase in these drug administration costs.  These new costs were to be

based on survey information from providers regarding the actual cost of providing such

services.[31]  On top of this resource-based adjustment, the MMA required an additional 32

percent increase in the administration fees for 2004, and another three percent in 2005 to

facilitate the transition.[32]  Congress mandated that Medicare drug reimbursements could

not be so drastically reduced without a substantial increase in administration fees.  Dr.

Duggan completely ignores this fact, an omission that, in my opinion, invalidates his

damages methodology.

26.     Importantly for the current matter, infusion drugs administered using durable

medical equipment (DME) were exempted from the reduction in reimbursement that

would result from the new payment method.  Vancomycin, a drug at issue in this matter,

fits into this category during the relevant time period.  Congress mandated that these

drugs were to continue to be reimbursed at 95 percent of AWP (as published by the

pricing compendia), exactly the methodology that Dr. Duggan claims would be

abandoned.[33]  Dr. Duggan ignores this fact in constructing his but-for world.

---

[31] Id. at p. 49-50.
[32] Id. at p. 50.
[33] "Infusion drugs furnished through an item of covered durable medical equipment
would be paid at 95 percent of the October 1, 2003 AWP until such drugs were under the
competitive bidding system for durable medical equipment." Id. at 48.  One subject drug,

27.     Exhibit 5 shows examples of the effect of applying the real-world MMA alternative reimbursements on Dr. Duggan's calculations for J-codes 7040 and 7060, rather than the fanciful and unrealistic but-for reimbursements he employs.

28.     When the Medicare drug reimbursement system was overhauled in 2003 by an act of Congress, after years of analysis and public criticism regarding the alleged shortcomings of the extant reimbursement system, the system adopted bore little resemblance to that posited by Dr. Duggan.  Where reimbursements were reduced, drug administration fees were raised to compensate providers for the costs of preparing, delivering and administering these products.  For drugs like one of the drugs at issue here, the former system was deliberately maintained.  Because of the demonstrated disconnect between Dr. Duggan's but-for world, and the actual reforms to the system adopted by Congress, I conclude that any calculations based on such a misapprehension of the but-for world are inaccurate and unreliable.

### 2.     It Is Impossible For Abbott To Enrich Itself Under The Medicare System By Manipulating AWP As Alleged

29.     When reimbursing multisource drugs like the ones at issue in this litigation, Medicare adopted a policy of reimbursing at 95 percent of the "median AWP" of the drug, regardless of which manufacturer's product was dispensed.  Because the carriers

---

vancomycin, is no longer covered under Medicare Part B DME benefit.  However, former HCFA Administrator Scully testified that vancomycin is in the class of drug that would be exempted were it still paid under Medicare. Deposition of Thomas A. Scully, May 15, 2007, v. I at 361-362.  A large proportion of the vancomycin claims were administered through DME.

and DMERCs did not use consistent methods to calculate this median, reimbursements were neither common nor consistent across carriers or across time.[34]

30.     Medicare carriers would form "arrays" of drug AWPs from the pricing compendia (Red Book).  Even the small number of arrays used by Dr. Duggan indicate a lack of accuracy, consistency, and uniformity.[35]  First, the number of products in the array and the NDCs[36] chosen for the array were ad hoc.  Carriers would choose different numbers of products and different NDCs both across carriers and over time. [37]  As a result, it is not clear that any Abbott NDCs would in fact be used in any carrier's array at any point in time.  If Abbott's AWP does not appear in a particular array, Abbott's AWP could have no effect on the level of the reimbursement.  Second, carriers would include products of different package sizes in a single array.  Placing the wrong package sizes or drug strengths in an array could cause the median AWP, and thus the reimbursement, to be higher or lower than warranted by the package size or strength called for in the particular J-code.[38]

31.     With such unsystematic and ad hoc construction of arrays across carriers and across time, it would have been impossible for Abbott to manipulate its AWP so as to increase its own profits.  Abbott could not have known if its NDCs were in any particular array, if so, which of its NDCs were in the array, which other producers' NDCs were in

---

[34] OIG Report, "Excessive Medicare Payments…" <u>supra</u>. note 34 at 9, Duggan Report, at 83-95.
[35] Duggan Report, at 81-82.
[36] The acronym NDC stands for National Drug Code, a numerical code that uniquely identifies a manufacturer, drug product, dosage and package size.
[37] See, for example, Exhibit 6.
[38] See, for example, Exhibit 7.

the array, and the AWPs of those products.  Without such information, Abbott could not possibly manipulate AWP in such a way so as to alter the median AWP to its advantage.

32.     More telling is the fact that, regardless of the information available, Abbott could not increase its profit through manipulation of its AWP under the Medicare program. Any increase in Medicare payments due to the alleged AWP manipulation would accrue to providers, and not to Abbott.  Increases in Medicare reimbursements to providers could not provide any competitive benefit to Abbott as all manufacturers' products were reimbursed at the same rate.  According to the Government complaint, Abbott allegedly profited by increasing its sales of its products.[39]

33.     Given the structure of the Medicare reimbursement system, it would be impossible for Abbott or any other company to move sales to itself by manipulating its AWP.  Under the Medicare system, providers received the same reimbursement regardless of which manufacturer's product was dispensed.  Even if Abbott's alleged AWP manipulation caused the median AWP to increase, the increased reimbursement would be paid on all manufacturers' products, not just on Abbott's.  As the reimbursement to providers is the same regardless of which manufacturer's product is dispensed, no provider would have the incentive to switch to Abbott's products even if Abbott's pricing led to an increase in the Medicare reimbursement.  No amount of alleged AWP manipulation could increase Abbott's sales through the Medicare system. No amount of alleged AWP manipulation could increase Abbott's profit through the Medicare system.

---

[39] See note 17 supra.

34.      I conclude that Dr. Duggan's basis for calculating damages is based on a flawed

vision of the but-for world.   He calculates Medicare damages based on a theory of

wrongful behavior that Abbott had neither the ability nor the incentive to engage in.  He

bases his damage estimates on a vision of the but-for world containing an alternate

reimbursement method that is at odds with the methods actually adopted under the

Medicare program.  Ignoring the realities of the Medicare system leads Dr. Duggan to

estimates of damages that are inaccurate and unreliable.

### 3.      Dr. Duggan's Damage Calculations Under Medicare Are Arbitrary And Speculative

35.      Even if one were to accept the but-for world of Dr. Duggan's Medicare damage

calculations, which I do not, the implementation of his method is fatally flawed.  As I

noted above, the Medicare reimbursements were based on the median AWP for the J-

Code regardless of manufacturer.  These medians were derived from arrays that were

themselves flawed due to the lack of a standard methodology across time and carrier,

changing product inclusion and the inclusion of assorted product sizes and strengths.

36.      Dr. Duggan compounds these existing problems by calculating out of sample

extrapolations that completely lack any statistical basis or other foundation.  First, Dr.

Duggan relies on actual arrays from carriers[40] that cover only about five percent of the

relevant time periods for each carrier and J-code, of this action as shown in Exhibit 8.

Second, the arrays he uses are in no way a random sample of carriers' arrays.  Rather, it

---

[40] Medicare contracts out its claim processing work to private firms known as "carriers."
These carriers are often insurance companies like Blue Cross/Blue Shield.  There were 28
such carriers around the country in 1997.  Arrays were supposed to be updated quarterly,
and there were 44 quarters over the 11-year period of this litigation.  In principle, there
should be one array per carrier, per J-code for each of the 44 quarters covered by this
claim.

is my understanding that he relies solely on the arrays that were provided by the Government.  In such a sample of convenience, there is no reason to believe that the arrays used are in any way representative of arrays used by other carriers, at other times, for other J-codes, or throughout the eleven–year time period.  Extrapolations from such a nonrandom, arbitrary sample of arrays have no statistical validity, and are doubtless inaccurate and unreliable. I have no confidence that a different ad hoc sample of arrays would not result in an entirely different damage calculation.

37.     With such a limited sample of convenience, without any indication of whether Abbott NDCs were used in or influenced the median of the missing arrays, Dr. Duggan's damage estimates are nothing more than speculation.  He speculates, but neither knows nor demonstrates, that Abbott NDCs, the correct Abbott NDCs, are in every array for every carrier at every point in time.  He speculates, but neither knows nor demonstrates, that it is the AWP for an Abbott NDC that causes the movement in the median and consequent reimbursement.  He speculates, but neither knows nor demonstrates that the available array for one carrier at one point in time is identical to all other carriers' arrays at that point in time.  The available arrays show this assumption to be baseless, as carriers' arrays vary greatly at a single point in time.  He speculates, but neither knows nor demonstrates that the array for a given carrier in a given period is the same for that carrier for all other periods where he does not have an array.  Again, Dr. Duggan's own evidence shows this assumption to be without basis, as individual carriers' arrays vary across time.  Any extrapolation from such a slipshod sample to other carriers or periods of time is baseless and without merit.

38.    Further evidence of the fanciful and unrealistic nature of Dr. Duggan's alleged damage estimates is shown by his attribution to Abbott of 100 percent of the alleged damages to the Medicare system from the drugs at issue in this matter.  Despite his repeated claims that his damage estimates are "conservative," it is difficult to imagine how Dr. Duggan could consider such baseless and counterfactual choices to be conservative.  Abbott competed for business with more than ten other manufacturers of these products.  Abbott never accounted for 100 percent of sales during any time period or in any geographical region.  Dr. Duggan offers no evidence to the contrary.  Dr. Duggan offers no evidence that Abbott was the only manufacturer whose compendium AWP was greater than its average selling price, and would therefore be the only AWP to be adjusted in his but-for world.  Nevertheless, in Dr. Duggan's but-for world, Abbott is the only manufacturer whose price reporting was to change.  Dr. Duggan assumes that Abbott's AWP moved the median AWP in each and every array at every point in time, without offering any evidence that Abbott NDCs were even contained in all of the arrays.  Far from being conservative in his choices, Dr. Duggan in this case has made choices that have the effect, in my opinion, of overstating Abbott's alleged damages by attributing 100 percent of damages to Abbott when such a conclusion is clearly at odds with the facts.

39.    Dr. Duggan's damage estimates for the Medicare program are hopelessly compromised as they are based on a but-for world that is flatly contradicted by the available evidence, and use a methodology that is speculative, overreaching, and lacking in any scientific validity.

    **B.    Medicaid**

20

40.     As is the case with Medicare, Dr. Duggan's damage estimates for Medicaid are tainted by reliance on a but-for world that is at odds with the record in this matter.  For Medicaid, Dr. Duggan's but-for world relies on the following assumptions: First, it assumes that state and federal officials were unaware for the entire relevant period that AWP did not constitute a selling price and WAC did not include discounts and rebates. Second, it assumes that, had officials been aware of these pricing realities, they would have not only changed reimbursement policy immediately, but also that they would have based Medicaid reimbursements on his calculation of average acquisition cost. Third, Dr. Duggan assumes in the but-for world that dispensing fees would not increase to compensate for the loss in revenue to providers from the reduction in reimbursement; Fourth, his but-for world assumes that all states are the same, that they face the same challenges in ensuring access to care, and all states respond in the same way to such challenges and obstacles.  Clearly, this is not the case, as illustrated by the fact that Medicaid implementation plans are designed and approved on a state-by-state basis.  As I will show in the following pages, all of these assumptions are at odds with the record in this matter.  By ignoring these factors in constructing his but-for world, Dr. Duggan has in my opinion greatly overstated the likely damages resulting from the alleged wrongful behavior in this case.

### 1.     What Information Did Medicaid Officials Have About Pharmaceutical Pricing Practices?

41.     An accurate assessment of the but-for world is essential to a valid damages analysis.  What information government officials had about pharmaceutical prices and when they had it is highly relevant to characterizing the but-for world.  AWP has never been equal to average acquisition price.  Dr. Duggan's damage assessment assumes the

government never knew this fact over the past forty plus years.  If, conversely, many or most government officials were fully aware that AWP does not equal average acquisition cost, and formed their reimbursement systems in full cognizance of that fact, a very different but-for world and very different damage assessment would result.

42.     Evidence will be presented at trial as to what government officials knew or did not know about pharmaceutical pricing practices and how these affected reimbursements. The facts and testimony cited below are the result of my nonexhaustive review of the record.  I understand that the record is replete with other similar facts.  The point is that whatever the facts turn out to be from trial testimony, they are relevant to the accurate assessment of damages, yet Dr. Duggan has ignored such factors in his damage calculation.

### a.      Government Reports

43.     A long history of reports both by, and commissioned by, government agencies, testimony before Congress and legislatures, filings in legal challenges and other public actions shows that government officials at all levels had considerable information available to them that AWP was not a selling price and that WAC did not include discounts and rebates.  This history now stretches back over 40 years.

44.     In 1968, the U.S. Department of Health, Education and Welfare (HEW) published a report on prescription drugs.[41]  The task force noted,

> …wholesalers, retailers, hospitals and government agencies often pay markedly different prices for the same drug and dosage form.[42]

---

[41] U.S. Department of Health, Education and Welfare, "Task Force on Prescription Drugs: The Drug Makers and Drug Distributors," U.S. Government Printing Office, 1968.

[42] Id. at 31

and,

> The *Red Book* and Blue Book do not reflect actual manufacturers' prices to wholesalers and retailers which are determined by the amounts of various kinds of discounts.[43]

> The catalog [list] price constitutes an 'umbrella' beneath which the company can maneuver against competing products.[44]

45. In 1974, an HEW Federal Register Notice read

> Red Book data, Blue Book data (i.e. AWP) and other standard prices…were frequently in excess of actual acquisition cost.[45]

46. A 1977 HCFA action memo to states noted that

> [T]he Department is not convinced that those states which continue to reimburse at average wholesale price or wholesale invoice cost have made a real effort to approach actual acquisition cost.[46]

47. In 1984, a report from the Office of the Inspector General for the Department of Health and Human Services found that pharmacies purchased most drugs at an average price 15.9 percent below AWP,[47] while actual prices were as much as 42 percent below AWP. The report noted that AWP was not "…even an adequate estimate of the prices providers are generally paying for their drugs. AWP represents a list price and does not reflect several types of discounts."[48]

---

[43] Id.

[44] Id. at 33

[45] U.S. DHEW, "Proposed Reimbursement of Drug Cost," 39 Fed. Reg. 230 at 41,480, November 27, 1974.

[46] HCFA Action Transmittal 77-113 (MMB) ""—Formula for Determining EAC for Drugs at ¶28,714.

[47] HCFA Action Transmittal, No. 84-12, September, 1984, "Medicaid—Limitation of Payment for Drugs" at ¶34,157 p. 10,193.

[48] Id. at p. 10,206.

48.     In 1987, the Federal Upper Limit program (FUL) was established for Medicaid.[49]

This program was enacted to assure the Medicaid program a uniform price nationally for

multisource drugs, and to limit reimbursement to the AWP of the lowest-priced

therapeutically equivalent product.[50]  While FULs could be implemented by CMS once

three generic versions of the drug were on the market, the agency consciously chose not

to implement FULs for injectable drugs like the ones at issue in this litigation.  According

to Sue Gaston, the Federal official responsible for implementing the FUL program, her

agency, while aware of sometimes large differences between AWP and acquisition cost,

formulated and maintained a policy not to implement FULs for injection drugs like the

ones at issue here.[51]  This policy continues to this day, as FULs are still not in place for

these drugs.

49.     A 1989 U.S. Senate staff report concluded,

> There are two markets in the U.S for most big selling prescription drugs: a
> price competitive market characterized by deep discounts off of list price,
> and a high-priced market, where retail customers, Medicare and Medicaid
> purchase their prescription drugs.[52]

The report also found that the Veterans' Administration received an average discount of

41 percent off AWP for single source drugs and 67 percent off of AWP for multiple

source drugs.  In the private sector, the report noted that hospitals, managed care entities

---

[49] Federal Register, "Part 447: Payments for Services" v. 52 n. 147 July 31, 1987 at
28557-28558.

[50] A FUL could be adopted for a multisource drug once there were three therapeutically
equivalent products in the market.  CMS website at
http://www.cms.hhs.gov/Reimbursement/05_FederalUpperLimits.asp

[51] Deposition of Sue Gaston, January 24, 2008 at 244-252.

[52] United States Senate, Special Committee on Aging, "Prescription Drug Prices: Are We
Getting Our Money's Worth?" August, 1989 at 3.

and nursing home that have contracts with wholesalers receive discounts of up to 99 percent off of AWP.[53]

50.     An OIG report in 1992 indicated the difference between AWP and acquisition cost.  The report fount this difference ranges from 12 percent to 83 percent for the most common chemotherapy drugs.[54]  The report stated that "AWP is not a reliable indicator of physician cost; indeed *Red Book* officials confirmed that AWP is not designed to reflect physicians' costs."[55]  The OIG concluded, "…there is no single discount rate which can be applied to the AWP to provide a reasonably consistent estimate of physician's acquisition cost."[56]

51.     In the 1992 OIG report on dialysis drugs, it was reported that a 500mg unit of vancomycin was being purchased by dialysis centers at prices ranging from $3.45 up to $26.61.  The $26.61 figure is some 39 percent above the then-current AWP of $19.17.  The OIG estimated acquisition cost  based on surveys of dialysis centers, and recommended that vancomycin be reimbursed at $5.00.[57]

52.     The current action was filed in 1995.  The complaint details as part of the allegations the difference between AWP and acquisition cost, and gives numerous examples involving the drugs at issue in this litigation.[58]  These examples quantify exactly the information the Government claims that CMS and state agencies lacked—the existence and size of spreads between AWP and provider acquisition cost.

---

[53] Id. at 11.
[54] U.S. HHS Office of Inspector General, "Physicians' Costs for Chemotherapy Drugs," November, 1992 at Appendix 3
[55] Id. at 5
[56] Id. at Appendix 2
[57] U.S. HHS Office of Inspector General, "Cost of Dialysis-Related Drugs," October, 1992 at 9, 15.
[58] Complaint at Exh. 1.

53.     A lengthy article on the divergence between AWP and acquisition costs appeared in the June 10, 1997 issue of *Barron's* newspaper.  Entitled "Hooked on Drugs," the article found acquisition costs for multisource drugs 60 to 85 percent below AWP.[59]  The *Barron's* survey included vancomycin, one of the drugs at issue here.  This article was quoted in the 1997 OIG report on generic drug pricing.[60]

54.     The relator in this matter, Ven-a-Care, invited states to a meeting in September 1995 to encourage state AGs to initiate litigation parallel to the Federal action.  The acquisition costs for the drugs at issue in this litigation were discussed in detail at this meeting.  The state AGs and the Justice Department were provided with specific information about the actual acquisition costs for the subject drugs at this meeting.[61]

55.     In 1997 the OIG conducted a study based upon invoices collected from pharmacies with the stated purpose of calculating the difference between AWP and actual acquisition costs.  The OIG concluded "we have determined that there is a significant difference between pharmacy acquisition cost and AWP."[62]

56.     Also in 1997, the OIG reported that "Medicare allowed between 2 and 10 times the actual average wholesale prices…"[63]  Subsequent to this report, President Clinton addressed Medicare and Medicaid reimbursement in his radio address in December 1997,

> Sometimes the waste and abuses aren't even illegal; they're just embedded in the practices of the system…  These overpayments occur because Medicare reimburses doctors according to the published average

---

[59] Barron's Newspaper, "Hooked on Drugs" June 10, 1997.

[60] U.S. HHS, Office of the Inspector General, "Medicaid Pharmacy—Actual Acquisition Cost of Generic Prescription Drug Products," August, 1997 at 1-2.

[61] Gaston Deposition at 98 and Abbott Exh 453.

[62] U.S. HHS Office of Inspector General, "Medicaid Pharmacy—Actual Acquisition Cost of Generic Drug Products," August, 1997 at 5.

[63] OIG, "Excessive Medicare Payments…," supra note 29 at 8.

wholesale price, the so-called sticker price for drugs. Few doctors actually
pay the full sticker price. In fact, some pay just one-tenth…[64]

### b.    State Medicaid Officials' Testimony

57.    In the 14 years since the filing of this action, in deposition and trial testimony in
this and related matters, state and federal officials have spoken to the extensive
knowledge at various levels of HCFA (later CMS) and state agencies that AWP was not a
sales price. I note that Dr. Duggan has testified that he has reviewed none of this
testimony from state Medicaid officials, despite its obvious relevance to the matter at
hand.[65]

58.    For example, a Florida Medicaid official testified that he knew by as early as
1987 that "everyone gets a discount" from AWP,[66] and by 1990 knew that AWP was not
a "reasonable indicator" of sales price for generic drugs.[67] In Ohio, Robert Reid of the
Department of Human Services testified that he was aware that "nobody paid AWP"
going back to 1969, and that the differences between AWP and acquisition cost varied
greatly by drug.[68] In Delaware, a 1996 study showed pharmacies purchasing generic
drugs at an average discount from AWP of over 60 percent.[69] A representative from New
Jersey Medicaid testified that

---

[64] President William Clinton, Radio Address 12/13/97, John T. Woolley and Gerhard
Peters, *The American Presidency Project* [online]. Santa Barbara, CA: University of
California (hosted), Gerhard Peters (database). Available from World Wide Web:
http://www.presidency.ucsb.edu/ws/?pid=53703.

[65] Duggan Deposition at 679-680.

[66] Deposition of Jerry Wells, Florida State Medicaid, December 15, 2008 at 69-70.

[67] Id. at 340.

[68] Deposition of Robert Reid, Ohio Department of Job and Family Services, December
15, 2008 at 101-104.

[69] Deposition of Cynthia Danemark, Delaware Division of Medicaid and Medical
Assistance, December 9, 2008 at 142-145. Ms. Danemark also testified that she did not
think there was any predictable relationship between AWP and acquisition cost in her

New Jersey, the state, has always had an understanding of what AWP was. We didn't operate within a vacuum.  There were always ongoing discussions, and…going back to the '90s there were ques – even back in the '80s there were questions regarding   AWP, its value with respect to establishing a benchmark for reimbursement.[70]

59.     I have found similar references in the deposition testimony of at least nine other state officials,[71] all testifying to the fact that it was known in their particular state agencies that AWP was only a starting place for negotiations, that discounts, sometimes deep discounts from AWP were common.  Several of these officials spoke of their awareness of these facts in the context of trying to change reimbursement systems, and/or reasons why they decided against such changes.

60.     The accounting firm of Myers & Stauffer conducted studies of drug acquisition costs in the Medicaid program on behalf of both state Medicaid agencies and the Office of the Inspector General of the Department of Health and Human Services.  Many state Medicaid agencies conducted these studies because, in the words of one such study conducted 22 years ago in Connecticut, "…the federal government is increasingly emphasizing controlling Medicaid costs by the use of more conservative estimates of

---

experience. Id. at 269.  She knew that AWP was not a valid basis for reimbursement back to 1988. Id. at 311-312.

[70] Deposition of Edward Vaccaro, New Jersey Department of Human Services, December 3, 2008 at 638.

[71] Deposition of Harry Sullivan, Director of Pharmacy Services, TennCare, March 12, 2008; Deposition of Kevin Gorospe, California Department of Human Services, March 19, 2008; Deposition of Cody Wiberg, Minnesota Department of Human Services, March 14, 2008; Deposition of Sandra Kramer, Michigan Medical Services Administration, March 25, 2008; Deposition of Gerry Dubberly, Georgia Department of Community Health, December 15, 2008; Deposition of Benny Ridout, North Carolina Department of Health and Human Services, December 5, 2008; Deposition of James Parker, Illinois Department of Healthcare and Human Services, November 18, 2008; Deposition of Jesse Anderson, Oregon Department of Human Services, December 16, 2008; Deposition of Mary Terrebonne, Louisiana Department of Health and Hospitals, November 7, 2008.

estimated acquisition cost."[72] Myers & Stauffer conducted around twenty such studies on pharmacy acquisition costs from 1987 to 2001, some covering multiple states. A summary of these studies shows that Myers & Stauffer found that for multisource drugs, there were discounts from AWP ranging from 41 percent to over 80 percent.[73] The commissioning of these studies indicates not only that many state Medicaid officials were aware of the divergence between AWP and pharmacy acquisition costs, but that they were also seeking to do something about it. I note that Dr. Duggan relied on Myers & Stauffer for support in understanding state Medicaid figures, but made no inquiries concerning the development or implementation of state reimbursement systems.[74]

61.     Dr. Duggan's but-for world acknowledges none of this. He fails to state what his assumptions are regarding these factors. The U.S. DHEW first examined the issues with Medicaid reimbursements over 40 years ago. Over time the evidence shows that these issues were a subject of interest at many levels of government. State agencies had specific and detailed information from a number of sources that AWP was higher than the pharmacy acquisition cost for prescription drugs.

62.     Dr. Duggan's damage calculations are predicated on a but-for world where the extant reimbursement method is the result of government ignorance, rather than deliberate government policy. Dr. Duggan's but-for world assumes that the Government

---

[72] Myers & Stauffer, "A Survey of Costs of Dispensing Prescriptions and Estimated Acquisition costs in the State of Connecticut," February, 1987 at 53.

[73] Myers & Stauffer, "A Survey of Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky," November, 2001 at Table B.1; Myers & Stauffer, "A Survey of Acquisition Costs of Pharmaceuticals in the State of Arkansas," June 2001 at Table B.1; See also "Pharmacy Final Reports Related to Dispensing and Acquisition Costs Produced by Myers and Stauffer," Exhibit 7, Deposition of Tracy Allan Hansen, December 10, 2008.

[74] Duggan Deposition at 680-685.

would have based reimbursements on his estimate of average acquisition cost once they learned that AWP was not equal to acquisition cost.  Even a cursory examination of evidence over the past 40 years demonstrates that the government had copious information that AWP was not acquisition cost, yet the reimbursement method did not change.

63.    A valid damage methodology in this matter would not simply assume government ignorance of the facts.  A valid methodology would need to consider the information available to government officials at various points in time, acknowledge attempts to change the reimbursement method in light of this information, and why government agencies or the Congress rejected these alternatives.  Dr. Duggan does none of this.

**2.    Dr. Duggan's Methodology Wrongly Focuses On Ingredient Costs In Isolation, Rather Than Focusing On The Total Reimbursement To Providers**

64.    Reimbursement methodologies varied by state and over time.  One common model for Medicaid ingredient cost reimbursements to pharmacies during this period was to set reimbursement equal to the lesser of 1) AWP minus a percentage ("scaled AWP"); 2) the pharmacy's usual and customary charge (U&C); 3) the state maximum allowable charge (MAC); or 4) the federal upper limit price (FUL), if any.  A dispensing fee is added to each of these ingredient cost reimbursements except U&C.  The dispensing fee is intended to cover all of the pharmacy's costs, including the cost of storing, preparing, delivering and administering the prescription.

65.    It was widely reported that the actual cost of filling a prescription at a pharmacy generally exceeded the Medicaid dispensing fees.  The inadequacy of dispensing fees was especially evident for the drugs at issue in this litigation.  These injectable drugs must be

stored in controlled conditions to maintain sterility and stability, and compounded in a sterile environment requiring the use of specialized equipment.  These drugs are not self-administered, but require the services of a trained professional to ensure the right dose is administered on the right schedule and that the proper infusion device is used and used or installed correctly.  Professional services are also needed to flush the infusion system properly between doses, and to monitor the patient for adverse reactions.[75]

66.     The accounting firm of Myers and Stauffer conducted a total of 47 studies of dispensing fees, pharmacy dispensing costs and/or pharmacy acquisition costs between 1987 and 2007.[76]  The Myers and Stauffer surveys showed that state Medicaid dispensing fees were often lower than the actual average costs of filling prescriptions in the states.  Again, the Myers and Stauffer cost surveys were primarily focused on the costs of filling prescriptions for patient administered drugs—not infusion drugs like the ones at issue here which cost far more to compound, distribute and administer.

67.     It is important to note that the Myers and Stauffer reports often explicitly recognized the fact that ingredient cost reimbursement above acquisition cost made up for deficiencies in the dispensing fee payments for both private and public payers.  A June 2002 Myers & Stauffer report to the State of California found that,

> Findings from this study indicate that the current pharmacy ingredient reimbursement rate of AWP less 5% provides payments in excess of the costs actually incurred by California pharmacies in acquiring pharmaceutical products for Medi-Cal recipients. In fact, the acquisition cost study findings indicate that for a "typical" prescription, a pharmacy's margin on ingredient reimbursement is approximately $10. *These margins on ingredient cost must be considered in tandem with an analysis of*

---

[75] House Committee on Ways and Means, "Statement of the National Home Infusion Association," accessed online at http://waysandmeans.house.gov/hearings.asp?formmode=view&id=6334
[76] Deposition of Tracy Allen Hansen, 12/10/2008, at Exh. 7.

> *pharmacy dispensing cost and dispensing fee reimbursement in order to*
> *fully evaluate the issue of the adequacy of Medi-Cal pharmacy*
> *reimbursement.* [emphasis added][77]

A second 2002 report specifically on dispensing fees in California states,

> The Department's current pharmacy dispensing fee is below the average
> cost of dispensing prescriptions. This finding alone does not indicate that
> the current pharmacy reimbursement rates are inadequate since both
> dispensing and ingredient reimbursement rates should be considered in
> tandem.[78]

A Kentucky report noted that other third party payers used ingredient cost payments to

make up for low dispensing fees.

> Dispensing fees paid by most third party payers are set at levels well
> below the dispensing cost of most pharmacies.  Margins are still realized
> on third party prescriptions, however, due to the level of ingredient
> reimbursement.[79]

68.     The drugs studied in the Myers and Stauffer papers were predominantly patient-

administered pills and liquids.  The discrepancy between dispensing fees and actual

dispensing costs would be greater still for the physician-administered injectable drugs at

issue here.[80]

69.     These studies reported to state Medicaid agencies that dispensing fees were often

inadequate to cover the costs of filing prescriptions.  These reports also indicate that

attempts to lower ingredient cost reimbursement by increasing the discount from AWP

needed to be in the context of the resulting adequacy of the overall reimbursement.

---

[77] "A Survey of Acquisition Costs of Pharmaceuticals in the State of California," Myers
and Stauffer, June 2002 at 4-5.

[78] "A Study of Medi-Cal Pharmacy Reimbursement," Myers and Stauffer, June, 2002 at
6.

[79] "A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the
Commonwealth of Kentucky, Myers and Stauffer, 2000 at 35.

[80] See Myers & Stauffer, "Study of Medi-Cal Pharmacy Reimbursement," at 59-62.

70.     There is substantial testimony in this matter from many state Medicaid officials

that they were aware that their dispensing fees were generally inadequate to compensate

pharmacists for filling prescriptions generally, and for home infusion drugs in

particular.[81]  Officials testified that attempts to reduce reimbursements substantially

would require increases in dispensing fees to compensate pharmacists.  Cody Wiberg of

the Minnesota Department of Human Services testified,

> …you have to understand that there's two sides of the equation, that the
> dispensing fees are kept artificially low. That if you just reduce the
> ingredient reimbursement to actual acquisition cost, and don't do anything
> with the dispensing fee, there's at least the possibility that you're going to
> have access problems for patients, because pharmacies at that point might
> drop out of the system.
>
> […]
>
> But if we move towards more transparency and we get closer to
> reimbursing on the ingredient side at what providers actually pay, then we
> have to look at the dispensing fee side in the case of pharmacies, because
> we've always kept that below what we think the true cost of dispensing is
> to make up for the fact that there is some money being made on the
> ingredient side. So to the extent, again, that you start paying people a
> dispensing fee or a total reimbursement that does not even get back the
> cost of the drugs, plus the cost of labor and the computer systems and the
> lights and all that, you could have providers…start dropping out of
> Medicaid.[82]

---

[81] State officials testifying about the inadequacy of dispensing fees include Sullivan
Deposition, Director of Pharmacy Services, TennCare, supra. note 71; Gorospe
Deposition California Department of Human Services, supra. note 71; Wiberg Deposition
Minnesota Department of Human Services, supra. note 71; Dubberly Deposition, Georgia
Department of Community Health, supra. note 71; Ridout Deposition, North Carolina
Department of Health and Human Services, supra. note 71; Parker Deposition, Illinois
Department of Healthcare and Human Services, supra. note 71; Terrebonne Deposition,
Louisiana Department of Health and Hospitals, supra. note 71; Danemark Deposition,
Delaware Division of Medicaid and Medical Assistance, supra. note 71; Vaccaro
Deposition, New Jersey Department of Human Services, supra. note 71; and Wells
Deposition, Florida State Medicaid, supra. note 71.
[82] Wiberg Deposition, supra. note 71 at 170-172.

71.     Jerry Dubberly of Georgia testified that the fact dispensing fees were kept low because ingredient costs were high was not only a common practice of the states he had contact with, but also that this practice was well known to the Federal agencies, HCFA or later, CMS.[83]

72.     Officials from other states testified that their payments were intentionally set to allow for a profit to be paid to providers.  For example, Idaho's Medicaid statute mandates that pharmacy payments be based on the reasonable costs of filling prescriptions, and must also include a profit for providers.[84]  Other states including Illinois[85], Oklahoma[86], and Tennessee[87] also sought to set payments so as to provide a profit to providers.[88]

73.     In his analysis, Dr. Duggan assumes that nothing in the Medicaid reimbursement changes but the ingredient cost reimbursement.  Despite overwhelming evidence to the contrary, he assumes that even if ingredient cost reimbursements were based on his estimate of average acquisition cost, pharmacies would continue to participate in the Medicaid programs, even if the extant dispensing fees are inadequate to cover costs.  If dispensing fees are inadequate to cover the costs of compounding and administering the drugs at issue here, these same fees will be even less adequate when ingredient cost reimbursement is reduced to Dr. Duggan's version of average acquisition cost.

---

[83] Dubberly Deposition, supra. note 71 at 384-386.
[84] Idaho Administrative Code, Agency 16.03.09.817.
[85] Parker Deposition at 137.
[86] Deposition of Nancy Nesser, Oklahoma Health Care Authority, December 12, 2008 at 60.
[87] Sullivan Deposition at 161.
[88] See, e.g., Danemark Depostion at 179:7-181:15; Parker Deposition at 137:13-21; Terrbonne Deposition at 216:5-217:4; Sullivan Deposition at 59:17-61:14, 62:13-63:3, 240:20-241:8; Wiberg Deposition at 67:15-69:21, 72:12-18, 183:17-186:12.

74.     This assumption does not conform to reality.  As an economist, it is clear to me that if the overall reimbursement (ingredient cost plus dispensing fee) does not cover the costs of filling prescriptions, these pharmacies will refuse to fill such prescriptions. Another Government expert acknowledges this basic economic point.  Dr. Stephen Schondelmeyer, in his recent report on proposed reductions in Medi-Cal pharmacy reimbursements in California writes,

> If the payment method sets the prescription payment amount below the actual costs for either drug product cost, cost of dispensing and related additional costs, or both, then problems with Medicare [sic] beneficiary access to pharmacy services will occur.
>
> …Any reasonable pharmacy…would be unwilling to provide prescriptions when the total payment falls short of the total actual drug product costs and the costs of dispensing and other costs.[89]

75.     Dr. Schondelmeyer recognizes what Dr. Duggan fails to grasp: the total payment for the prescription, regardless of what portion is ingredient cost and what portion is dispensing fee, must cover the pharmacy's costs, otherwise they will not participate in Medicaid.  Despite copious evidence that existing dispensing fees do not cover the costs of storing, preparing and administering the drugs at issue in this matter, Dr. Duggan assumes that state Medicaid agencies can dramatically lower ingredient cost reimbursement to his version of average acquisition cost, and keep dispensing fees at their low, unremunerative levels with no effect at all on pharmacy viability or continued participation in Medicaid program.

> **3.      There is No Evidence of Any State Medicaid Program Adopting a Reimbursement Method Resembling the Method Assumed By Dr. Duggan**

---

[89] Stephen Schondelmeyer, "Impact of the 10 Percent Fee-for-Service Payment Reductions on Medi-Cal Beneficiaries and Pharmacies," June 3, 2008 at ii.

76.     For all of the reports, testimony and other facts that Dr. Duggan ignores in constructing his version of the but-for world, the best test is to examine whether any state, in the decades since the alleged problems with the current reimbursement system were widely reported, has adopted a reimbursement system that resembles the system proposed by Dr. Duggan.  If Dr. Duggan's proposed system were realistic, then we would expect the recent reimbursement changes enacted by the U.S. Congress to conform closely to what Dr. Duggan has proposed.  While states and the federal government have modified reimbursement methods over the years, and major changes were enacted by Congress in 2005, Dr. Duggan has presented no evidence and no example, up to the present day, of a single state replacing the reimbursement system at issue here with one resembling his.  Where states have lowered ingredient cost reimbursements and held dispensing fees constant, none have reduced ingredient cost reimbursements to an average acquisition cost calculated similarly to that of Dr. Duggan.  In states that have substantially reduced ingredient cost reimbursements, such reductions have been accompanied by increases in dispensing fees.[90]

77.     In fact, while it is clear from the record that for many years public reports have shown that AWP is not the same as acquisition cost, the reimbursement system at issue in this litigation continues to be used widely.  To this day, states continue to use, and CMS continues to approve State Implementation Plans using the scaled AWP methodology.[91]  Attempts to change the reimbursement method have been met with political resistance and legal actions by physician and pharmacy associations.  In some states, injunctions

---

[90] For example, California lowered ingredient cost reimbursements from AWP - 10% in 2000 to AWP – 17% in 2004.  However, dispensing fees were increased from $4.05 in 2000 to $7.25 in 2004.
[91] See note 26 supra.

have been granted blocking proposed changes that were more modest than the changes proposed by Dr. Duggan.[92]

78.    At the Federal level, HCFA revised the Medicaid manual in 1989 to require states' EACs to include a "significant discount" from AWP.  One year later, Congress imposed a moratorium on state changes to pharmacy reimbursement policies lasting from 1990 until December 31, 1994.  Dr. Duggan ignores this moratorium in his damage calculations.

79.    It is again instructive to compare Dr. Duggan's but-for world with the changes to the reimbursement method instituted by the Federal government.  Congress enacted these changes in 2005 following extensive public discussion of the alleged shortcomings of the reimbursement system at issue here.  If Dr. Duggan's vision of the but-for world is correct, we should expect it to closely resemble the new methods enacted by Congress.  Again, it does not.

80.    In 2005, Congress reformed the Medicaid reimbursement system as part of the Deficit Reduction Act (DRA).  Congress established a new Federal Upper Limit (FUL) at 250% of the Average Manufacturer's Price (AMP) of the lowest cost therapeutically equivalent drug.[93]  Generally, providers will be reimbursed at the lesser of this FUL, a

---

[92] Independent Living Center of Southern California, Inc. et al. v. Sandra Shewry, Director of Department Health Care Services, State of California, n. 08-56061, July 11, 2008; Arkansas Pharmacist Association v. Patricia Harris, Secretary of United States Department of Health and Human Services, n. 79-1592, February 12, 1980; Florida Pharmacy Association v. Douglas M. Cook 4:97cv322-r  September 3,  1998; American Society of Consultant Pharmacists v. Ann Palta, Director of Illinois Department of Public Aid and The Illinois Department of Public Aid, case no. 00c7821, February 27, 2001; Pennsylvania Pharmaceutical Association v. Department of Public Welfare of the Commonwealth of Pennsylvania, case no. 80-1790, July 9, 1982.

[93] U.S. DHHS, Centers for Medicare and Medicaid Services, "Implementation of the Deficit Reduction Act (DRA) of 2005" Medicaid Drug Rebate Program, release No. 144,

state MAC, if any, EAC, or the pharmacist's usual and customary charge (U&C).

Providers also receive a dispensing fee for FUL, EAC or MAC reimbursements.  As part

of the implementation of this new FUL, states were directed to review the accompanying

dispensing fees to assure their adequacy,

> [S]tates should reexamine and reevaluate the reasonableness of the
> dispensing fee paid as part of the pharmacy claim. If States adjust their
> payment methodologies to reflect the ingredient cost of the prescription
> drug, we suggest that they also reevaluate their dispensing fees to ensure
> that these fees are reasonable.[94]

81.     The differences between the actual system enacted by Congress and Dr. Duggan's

purported but-for reimbursement system are significant.  Dr. Duggan calculates his

version of average acquisition cost, which is different than the Federal AMP.  He then

adds 25 percent to this amount, to arrive at his but-for version of AWP.  He assumes that

a 25 percent markup is adequate to cover provider profit margin and any dispensing,

delivery and administration costs not covered by the dispensing fee.  Congress in reality

enacted a markup of 250 percent, ten times that proposed by Dr. Duggan.[95]  Second, Dr.

Duggan's but-for reimbursement system does not allow dispensing fees to be adjusted to

compensate providers for their actual costs of preparing, delivering and administering the

drugs.  Congress, again contrary to Dr. Duggan's assumption, expressly directed states to

review their dispensing fees in light of the new FUL regulations to ensure their adequacy.

82.     I note that this new FUL calculation, even with its 250 percent markup over AMP,

has yet to be enacted.  The National Association of Chain Drug Stores filed suit to block

---

December 15, 2006 at 1.  Accessed at
http://www.cms.hhs.gov/DeficitReductionAct/Downloads/rel144.pdf.
[94] Id. at 2.
[95] When considering low-cost drugs like the products at issue here, it is important to think
in dollars, not percentages.  A 25% profit may sound adequate, but not when one
considers that 25% of an AMP of $1.00 is only $0.25.

implementation of this change, arguing that the FUL calculation, despite being ten times higher than that envisioned by Dr. Duggan, remains inadequate to compensate pharmacies for their costs.[96]

83.     Dr. Duggan has assumed a but-for world for Medicaid pharmaceutical reimbursements far lower than what Congress actually enacted.  This assumption has caused Dr. Duggan's calculation of alleged damages to be grossly inflated compared to what they would be if he had used as a but-for world the reimbursement calculation for Medicaid actually enacted by the Congress.  Exhibit 9 shows some examples of the difference between Dr. Duggan's calculation of the alleged overpayment under Medicaid, and the actual "overpayment" calculated as the difference between what Medicaid actually paid, and what it would have paid had the new DRA FUL calculation been in place earlier.[97]  For products like the ones at issue here, Medicaid was paying less under the system at issue in this litigation compared to what they would pay today under the congressionally mandated FUL.

84.     As another example, the Department of Justice provided an "alternative source" of AWP data for the drugs at issue here to the pricing compendia, which published them on May 1, 2000.[98]  The DOJ encouraged Medicare and state Medicaid agencies to use

---

[96] National Association of Chain Drug Stores et al., v. United States Department of Human Services et al., Case: 1:07-cv-02017, November 7, 2007.

[97] I note that to this day, CMS has not implemented a FUL for the drugs at issue in this case, even though CMS has the authority to do so.  See ¶48 supra.

[98] U.S. HCFA, "An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program," Program Memorandum AB-00-86, dated September 8, 2000.

these lower substitute AWPs as the DOJ claimed their AWPs were a better measure of cost, as their data was derived from wholesaler prices.[99]

85.     The reaction of the state Medicaid agencies was mixed.  Exhibit 10 shows that some states did not adopt the DOJ prices at all, while other states adopted the DOJ prices as the basis for reimbursement, only to abandon them.  At least one state, Utah, adopted the DOJ prices, but raised their dispensing fees at the same time.  The fact that states did not universally adopt and maintain their use of the DOJ prices is further evidence that Dr. Duggan's world is not an accurate rendition of the but-for world.[100]

### 4.     Dr. Duggan Ignores The Real World Consequences Of His Assumed But-For World

86.     Had states adopted Dr. Duggan's proposed but-for reimbursement system based on his calculation of average acquisition cost and no change in dispensing fees, it is clear such reimbursements would not be remunerative for large numbers of pharmacies.  If Dr. Duggan's but-for reimbursements are inadequate for pharmacies to cover their costs of acquiring and distributing the drugs, the pharmacies will stop participating in state Medicaid programs.[101]

87.     In making his unrealistic and unsubstantiated assumptions about the but-for world, Dr. Duggan is assuming that state Medicaid officials were not attentive to the legal mandate to provide access to care for Medicaid clients by having an adequate pharmacy

---

[99] Id.

[100] On the Medicare side, it is noteworthy that the DOJ prices were introduced in September 2000.  By November 2000, CMS abandoned the DOJ prices, prohibiting its carriers from using any of the DOJ prices in setting reimbursements.  CMS required that reimbursements continue to be based on the AWPs published in carriers' "usual source[s]."  U.S. HCFA  "Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program," Program Memorandum AB-00-115, dated November 17, 2000.

[101] See text accompanying ¶70 and ¶74.

network commensurate to that available to the general public.  There is substantial

testimony in this matter from state Medicaid officials stating that providing such access

was a mandate they took very seriously.  These officials also testified how adoption of a

reimbursement such as described by Dr. Duggan would jeopardize patient access to

pharmacy services, and how such a restriction in pharmacy access would be

unacceptable.

88.     Dr. Duggan's but-for reimbursements would likely raise government expenditures

for administering the drugs at issue in this case.  His inadequate reimbursements would

jeopardize the continued existence of chemotherapy infusion centers and home infusion

services.  Without adequate reimbursements to prepare, deliver and administer these

drugs, these less expensive, more convenient services could not survive.  As a result,

Medicaid recipients would have no choice but to receive these infusion services in a

hospital,[102] at much higher cost to the government.

### 5.     Dr. Duggan's Damage Calculations Are Unscientific And Highly Speculative

89.     Dr. Duggan's selects ten states out of fifty.  For these ten states, he calculates an

assumed but-for AWP equal to his estimate of average acquisition cost plus 25 percent.

This but-for AWP is then scaled by whatever percentage discount was used in these states

at a particular time to calculate a but-for reimbursement.  He calculates damages by

taking the difference between the his calculation of the actual reimbursement paid by that

state and his assumed but-for reimbursement.  He then uses the difference between the

---

[102] National Home Infusion Association, supra. note 72.

two reimbursements for his ten states to extrapolate what he claims the damage would be in the other 38 states he analyzes.[103]

90.     First, Dr. Duggan introduces error into his estimates by extrapolating unnecessarily.  CMS, the relevant government agency in this matter, should have access to all of the claims data for all of the state Medicaid programs.  Dr. Duggan had the ability to directly conduct his alleged damage calculation using actual data from each of the state Medicaid programs.  He chose instead to use actual claims data from only ten states, some with incomplete data across the relevant time period, and then to extrapolate damages to the other 38 states.[104]  He offered no explanation for ignoring the actual claims data.  By extrapolating in this way, he makes the baseless and untested assumption that the reimbursement systems and resulting reimbursements are the same between his exemplar states and the other 38.  He provides no factual basis for such an assumption. He provides no statistical tests of the accuracy of his extrapolations.  Dr. Duggan's use of out of sample extrapolation, instead of analyzing actual claims data, introduces needless error and uncertainty into his damage estimates.

91.     Second, his ten "exemplar" states are chosen in an ad hoc and unscientific manner.  He makes no attempt, and offers no evidence, that the ten states from which he extrapolates are in any way representative of the population of states.  This shortcoming further reduces confidence in his extrapolations, as the states from which he is extrapolating are not a random sample of the population.  Dr. Duggan claims in his initial

---

[103] Out of 51 states and the District of Columbia, he chooses ten exemplar states.  He excludes Arizona and Ohio from his analysis.  Indiana he treats as a special case, extrapolating its alleged damages solely based on Illinois.

[104] He extrapolates damages for Indiana from data from only one state, Illinois.  Indiana is then included as one of his exemplar states.

that he chose twelve states accounting for approximately 70 percent of total reimbursements for these drugs.[105]  His selection of these exemplar states is not random, and Dr. Duggan presents no evidence that it is.

92.      Third, Dr. Duggan's extrapolations are simply mechanical exercises, paying no attention at all to the actual reimbursement system in any particular state.  Dr. Duggan only manipulates the numbers in the data, paying scant attention to the circumstances of individual states and of individual claims.  This mechanical methodology does not check the accuracy of the transaction entries, and does not reveal the basis of reimbursement. His method does not indicate whether any particular reimbursement was in fact based on AWP as opposed to some other non-AWP-based methodology, or whether his calculation of damages in fact made sense for any particular state.  Without such inquiries, Dr. Duggan cannot even tell whether any particular transaction was actually affected by the alleged AWP manipulation, that is, whether Abbott should even be liable on a particular claim under the Government's theory.

93.      His dropping of Ohio from his analysis is another example of the ad hoc nature of Dr. Duggan's selection of exemplar states.  Ohio was a low-reimbursement MAC state contained in his set of exemplars.  Eliminating Ohio from the set of exemplar states caused total damages extrapolated to the other 38 states to rise.  The reason, of course, is that eliminating low-damage Ohio raises the average damage calculated for the remaining exemplar states.[106]  This higher average damage figure is then extrapolated to the other

---

[105] Duggan Report at 76.

[106] An obvious question is why Dr. Duggan did not replace Ohio, which DOJ dropped from the complaint, with another low cost state.  Whether Ohio is contained in the Government complaint is irrelevant to whether it is representative of other states for purposes of extrapolation.  As an alternative, Dr. Duggan is very familiar with Texas,

38 states.  This situation clearly shows that Dr. Duggan's damage methodology is very susceptible to manipulation, as nationwide damage estimates may be raised or lowered by the judicious choice of particular exemplar states.

94.     Dr. Duggan also makes no attempt to assess the information available or to address these issues in particular states to determine whether Medicaid transactions were in fact affected by the alleged AWP manipulation, or inconsistent with state policy. Evidence in the record indicates that officials in many states were quite knowledgeable about the facts of drug pricing, and were actively forming reimbursement policies in light of that knowledge.  Dr. Duggan ignores the realities of state reimbursement policies, and assumes without basis that all states sought to set reimbursement equal to acquisition cost, regardless of the consequences to provider solvency and patient access.

95.     To contain drug spending, some states adopted Maximum Allowable Cost (MAC) rules for a wide range of multisource drugs, including the drugs at issue in this case. MAC prices are generally the result of negotiation between the state Medicaid agency and pharmacies.  Given the goals of the MAC program, MAC prices are a good indicator of the lowest reimbursement mutually acceptable to providers and the state.  Furthermore, MAC prices reflect state policy, and embody the state Medicaid agencies' balancing of the dual, but conflicting, mandates of cost containment and patient access.

96.     Dr. Duggan's methodology ignores all of this relevant history.  He labels these negotiated MAC prices as being too high and fraudulent, and assesses alleged damages each time a MAC price exceeds his but-for price.  The fact that the state mandated maximum allowable cost, often negotiated in light of actual acquisition costs, lies above

having served as plaintiff's expert in that state's AWP action, and Texas is another low-reimbursement state.

his assumed but for price, is taken as an indication of fraud, rather than as an indication

of a state agency trying to control costs while assuring adequate access to its constituents.

97.     Other states did not negotiate directly with providers to determine MAC prices,

but rather simply adopted the MAC price list paid by a third party payer operating in the

state.  That a third party payer was conducting negotiations does not change the

conclusion that Dr. Duggan should not have considered such transactions to be

fraudulent.  Third-party payers face exactly the same problem as Medicaid agencies, that

is, to contain drug spending while paying reimbursements high enough to maintain an

adequate network of providers to serve their insureds.  That some states would economize

on negotiation by adopting MAC prices negotiated by a private sector insurer with the

same basic goals does not alter the conclusion that such MACs were the embodiment of a

considered state policy, rather than a fraudulent reimbursement as Dr. Duggan apparently

believes.

98.     Dr. Duggan takes great pains to claim that his alleged damage estimates are

conservative—that is, favor Abbott—at every juncture in his analysis.  In my opinion, it

is not conservative to introduce error into one's estimates by extrapolating where one can

calculate alleged damages directly.  It is not conservative to use a damage methodology

so obviously susceptible to manipulation by judicious choice of exemplars.  It is not

conservative to base one's extrapolations on an unscientific, nonrandom and

unrepresentative sample of the states, assuming away differences between his exemplar

states and the other 38 states.  It is not conservative to ignore the realities of state

reimbursement policies, and instead base one's estimates on a but-for world that has not

been adopted by a single state in the fifteen years since the filing of this matter.  It is not

conservative to ignore well-considered state policies designed to contain costs and ensure access, and to label as fraudulent and wrongful drug reimbursements made under such state policies.  In my opinion, such obvious omission of important institutional details renders Dr. Duggan's alleged damage estimates inaccurate and unreliable.

## VI.    Concluding Comments

99.     For all of the foregoing reasons, it is my opinion that Dr. Duggan's estimates are flawed, inaccurate and unreliable.

I reserve my right to supplement my opinions at trial or as new information warrants.

Dated:  March 6, 2009

James W. Hughes, Ph.D.

# EXHIBIT EO

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) |  |
| **IN RE PHARMACEUTICAL** | ) | **MDL NO. 1456** |
| **INDUSTRY AVERAGE WHOLESALE** | ) | **Civil Action No. 1-12257-PBS** |
| **PRICE LITIGATION** | ) |  |
| _____ | ) | **MASTER FILE NO.** |
| **THIS DOCUMENT RELATES TO:** | ) |  |
| *United States of America ex rel.* | ) | **Judge Patti B. Saris** |
| *Ven-a-Care of the Florida Keys,* | ) |  |
| *Inc., v. Abbott Laboratories, Inc.* | ) |  |
| _____ | ) |  |

# EXPERT REPORT OF STEVEN J. YOUNG

# Table of Contents

I.     Qualifications and Compensation.................................................................. 1

II.    Scope of My Report .................................................................................... 3

III.   Summary of Opinions ................................................................................. 4

IV.    Abbott Products at Issue............................................................................. 5

    A.     How Abbott Sold the Products........................................................... 6

    B.     Abbott's Primary Customers .............................................................. 7

V.     Product Administration and Reimbursement............................................... 8

    A.     Medicare and Medicaid Reimbursement ............................................. 8

        1.     The Medicare Program....................................................... 8

        2.     The Medicaid Program ....................................................... 9

        3.     Medicare and Medicaid Hospital Reimbursement......................... 10

    B.     Compensation to Providers for Dispensing and
        Administration Costs ..................................................................... 10

VI.    Dr. Duggan's Methodology ....................................................................... 11

VII.   Dr. Duggan's Analysis of Reimbursement Paid for These Products...... 12

    A.     Dr. Duggan's Medicaid Reimbursement Calculation ................... 12

        1.     Dr. Duggan Did Not Consider the Interrelationship of Product
            Cost and Dispensing Fees .......................................... 12

        2.     Dr. Duggan Limited His Review of Actual Claims Data................ 14

        3.     Dr. Duggan Extrapolated To Unanalyzed Populations.................. 16

            a) Dr. Duggan's Methodology Did Not Consider the
              Variability of Medicaid Reimbursement Across States .............. 17

            b) Dr. Duggan's Methodology Did Not Consider the
               Variability of Dispensing Fees ................................. 19

    B.     Dr. Duggan's Medicare Reimbursement Calculations ................. 21

VIII.  Dr. Duggan's Analysis of "But For" Reimbursement for These
      Products................................................................................... 22

    A.    **Dr. Duggan's Creation of His "Calculated Price" to Contracted Pharmacies**............................................................ 23

    B.    **Dr. Duggan's Medicaid "But For" Reimbursement Calculations** ...................................................................... 25

    C.    **Dr. Duggan's Medicare "But For" Reimbursement Calculations** ...................................................................... 26

IX.    **Dr. Duggan's "DIFFERENCEs" Are Also Impacted By Various Other Factors** ............................................................................ 29

    A.    **Analysis of Dr. Duggan's "DIFFERENCE" Period**............................ 29

    B.    **Dr. Duggan's "DIFFERENCE" Includes Claims That Have Been Resolved** ........................................................... 30

    C.    **Dr. Duggan's "DIFFERENCE" Does Not Account for the Rebates Paid by Abbott to Every State Medicaid Program** ......... 31

X.    **Other Opinions**............................................................................ 31

    A.    **Available Sources of Product Pricing Information** ...................... 31

    B.    **Context for Spread Allegations**.................................................. 33

    C.    **Analysis of Unit Sales**................................................................ 34

    D.    **Annual Price Changes** ................................................................ 34

## I.     Qualifications and Compensation

1)      I have been a consultant to the health care industry for approximately twenty five years.  I have substantial experience with health insurance reimbursement, pharmaceutical pricing and the related distribution channels.  My Curriculum Vitae and listing of testimony is attached as Exhibit 1.

2)      I have substantial experience related to pharmaceutical manufacturer pricing for both branded and generic products.  I have worked with pharmaceutical companies in performing detailed analyses of their pricing, charge-backs, and rebate data.

3)      I have advised clients in various industries that sell commercial products to the government, including furniture, security equipment, durable medical equipment, secure communications systems, pharmaceuticals and satellite telephones.  My work with these clients has included extensive analysis of pricing, discounting and rebate data for disclosure to the government.

4)      I have substantial experience in analyzing private insurance companies' claims data and reimbursement schedules.  For example, I have worked with health insurance companies to analyze their claims and membership data to assess their Medicare coordination of benefits processes.

5)      I have extensive experience assisting insurance and managed care companies with their reimbursement processes and practices, the related claims processing systems and output, contractual agreements, claims system assessments and validation procedures, and assessments of medical management practices.

6)      I have experience working with Medicare Fiscal Intermediaries and Medicare Carriers to assist them with various government contracting requirements and the transitioning of Medicare claims processing activities to a successor contractor.  I am therefore familiar with the operating structure of these organizations and their reimbursement processes.

7)      I have experience assisting insurance and managed care companies in structuring and preparing proposals to perform managed care support contracts for the Department of Defense under the TRICARE program, which provides health insurance to active duty and retired military personnel and their families.  My work has focused on assisting managed care companies structure and price operations to perform all requirements of the contract, including claims processing, customer service, provider relations, provider contracting, utilization management, and quality management.  As part of these engagements, I have worked closely with the insurance companies' management as well as their actuarial and technical experts to make overall strategic pricing assessments relating to the various components of health care pricing and their related administrative costs.

8)      I am being compensated at an hourly rate of $425.00.  No portion of my firm's compensation is dependent on the nature of my findings or on the outcome of this matter.  A list describing the data and information I relied upon is attached as Exhibit 2.

## II.    Scope of My Report

9)      The United States has brought suit against Abbott Laboratories Inc.

("Abbott") relating to the pricing and marketing of certain pharmaceutical products

manufactured and sold by Abbott, and the payments made by the Medicare and

Medicaid programs to providers for those products.  It is my understanding that the

United States contends that Abbott caused the Medicare and Medicaid programs to pay

"excessive reimbursements" to providers that dispensed or administered certain

products from 1991 to 2001.[1]  The products at issue are certain national drug codes

(NDCs) of vancomycin, dextrose, sodium chloride and sterile water.

10)      In support of its claims that Abbott caused the Medicare and Medicaid

programs to pay "excessive reimbursements" to providers, the United States has served

two expert reports from Dr. Mark G. Duggan.  Using a variety of data sets, and relying

upon certain work conducted by two firms (Myers & Stauffer and Steck Consulting), Dr.

Duggan has described his work as follows:

> This Report calculates a $108.2 million difference between (1) what
> the federal government reimbursed for certain pharmaceutical
> products provided to Medicaid and Medicare recipients during the
> eleven-year period 1991 to 2001 and (2) what the federal
> government would have reimbursed for the same products during the
> same period if prices reflective of the actual prices at which Abbott
> was transacting business had been used for the AWP, WAC and Direct
> Price of Abbott's products.[2]

---

[1] See The United States' First Amended Complaint, Case 1:01-cv-12257-PBS, Document 4281
Filed June 4, 2007.

[2] See Dr. Duggan's Report dated June 19, 2008, p. 2.

11)    Dr. Duggan later revised his calculation to $107.1 million in a supplemental report dated January 23, 2009.[3]

12)    I have been asked by counsel for Abbott to review, evaluate, and comment upon the analysis conducted by Dr. Duggan that led to his $107.1 million "DIFFERENCE" calculation.

13)    Finally, given my experience in the health care field, I have been asked to comment upon certain assertions made in the United States First Amended Complaint.

## III.   Summary of Opinions

14)    My primary (but not exhaustive) concerns with Dr. Duggan's approach and his conclusions fall within the following categories:

- Dr. Duggan calculated his "DIFFERENCE" by limiting his analysis to a small sub-population of Medicare and Medicaid reimbursement data (limited in both time and scope).

  o Dr. Duggan extrapolated this limited information to other sub-populations including other states (Medicaid), other geographic regions (Medicare) and other time periods (eleven years) that he chose not to analyze, in spite of the variability over time and among these populations.

  o Dr. Duggan calculated a "DIFFERENCE" for Medicare payments during the relevant time period, acknowledging that he included units sold not by Abbott but by other manufacturers.

- Dr. Duggan created his "Calculated Price"[4] by limiting his analysis to less than 2% of sales, selecting only negotiated contract sales to certain pharmacy customers.[5]

---

[3] See Dr. Duggan Report dated January 23, 2009, Section I.

[4] I have been unable to find a single defined term used by Dr. Duggan in his report (e.g., he uses "pharmacy average price," "average pharmacy specific price, "average pharmacy indirect price," "alternative price," etc.).  For convenience, I use the term Dr. Duggan's "Calculated Price."

[5] I compared the direct and indirect sales for the customer categories analyzed by Dr. Duggan (A003, A007, and M070) found in Dr. Duggan's Table 4 and Table 9 to total sales for these products.

- Dr. Duggan ignored the important relationship between ingredient cost and dispensing/administration fees in arriving upon the total reimbursement for a Medicare and Medicaid provider.

- Beyond these fundamental problems, Dr. Duggan's "DIFFERENCE" is overstated due to certain other assumptions he appears to have made and certain calculation errors.

15)     I disagree with Dr. Duggan both in concept (i.e., that his proposed approach is appropriate) and in application (i.e., that he properly implemented his proposed methodology).  I will expand on my concerns below.

16)     I have also been asked to provide additional opinions related to the allegations in this matter.  These opinions are included in Section X. of this report and relate to:

- Available sources of product pricing information

- Context for spread allegations

- Analysis of unit sales

- Annual price changes

## IV.    Abbott Products at Issue

17)     The four Abbott Products named in this complaint – dextrose, sodium chloride, sterile water and vancomycin (referred to collectively as "products") -- are generic hospital solutions and intravenous antibiotics.  Unlike self-administered drugs, most of these products are bulky solutions that typically involve unique storage, mixing, maintenance, and distribution requirements.  In addition, the products require administration by a healthcare professional rather than the patient.

18)     These products have been on the market for decades and face extensive competition.  Abbott marketed and sold the products through its former Hospital

Products Division to customers that negotiate a contract with Abbott ("Contract" purchases).[6]  The products were also available for purchase by end purchasers without a negotiated contract with Abbott ("Non-contract" purchases).  Abbott's primary customers included hospitals, wholesalers, distributors and government purchasers.

## A.    How Abbott Sold the Products

19)    Healthcare providers were able to purchase these products directly from Abbott or through a wholesaler or distributor.  When the provider purchased directly from Abbott, Abbott distributed the product to the customer.  Some customers were able to negotiate a contract with Abbott but arrange to take delivery of the products through a wholesaler.  This allowed customers ordering many products from many different manufacturers to streamline inventory and delivery.  For those purchases, the wholesaler would honor the negotiated contract price with Abbott's customer, and seek from Abbott any difference between the customer contract price and the amount originally paid by the wholesaler to Abbott for the product.[7]

20)    Providers that did not have a negotiated contract with Abbott purchased Abbott's product either directly from Abbott, or indirectly from a wholesaler or distributor.  Situations in which a customer might purchase a product without negotiating a contract could include small customers that purchase in small volumes or customers that had contracts with other manufacturers but experienced supply problems.  Wholesalers and distributors made Non-contract sales of Abbott's products

---

[6] On May 1, 2004, Abbott divested its Hospital Products Division and is no longer in this business.

[7] This amount is referred to as a "chargeback."

at whatever price the market would bear.  Abbott had no visibility to the price paid by

these providers.  Figure 1 illustrates the distribution process.



## B.    Abbott's Primary Customers

21)    Abbott's primary customers for these products were hospitals.  My review

of Abbott's sales data during the relevant time period in this case reflects that

approximately 83% of sales for these particular products were to hospitals.  The

remaining sales of these products were to other customers including wholesalers,

distributors, government programs, and other non-hospital healthcare providers (e.g.

home health care services, outpatient clinics and other pharmacies).

22)    Figure 2 below illustrates Abbott's sales for the products at issue during

the relevant time period.



## V.    Product Administration and Reimbursement

## A.    Medicare and Medicaid Reimbursement

23)    When a provider administers these products to a patient, it seeks reimbursement.  Some patients have private insurance or are covered by certain government programs like Medicare and Medicaid.  This case involves reimbursement by Medicare and Medicaid to providers.  The Medicare and Medicaid programs are administered by the Centers for Medicare and Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration ("HCFA")), which is part of the United States Department of Health and Human Services ("HHS").

### 1. The Medicare Program

24)    The Medicare program provides health care coverage for people over the age of 65, individuals with certain disabilities or with End Stage Renal Disease ("ESRD"). During the relevant time period, Medicare reimbursed for these products under

Medicare Part B.[8]  In order to administer the day to day operations and process the claims for Medicare Part B throughout the United States, CMS contracted with commercial insurance companies, such as Blue Cross Blue Shield plans ("Carriers").  For example, there were 28 different carriers in 1997.[9]

25)     Under Medicare Part B, physician claims for drug reimbursement are not based on the drug manufacturer's National Drug Code (NDC), but are instead based on "J-codes."  The J-code claim submission system is the established industry-wide basis for coding, billing, processing and paying for physician-administered drugs.  This universal structure was established through the Healthcare Common Procedure Coding System ("HCPCS") maintained by CMS.  For products that are sourced from more than one manufacturer (e.g. multi-source or generic drugs), J-codes are based on the category of drug.  In those circumstances, many manufacturers' products are included within a single J-code.

## 2. The Medicaid Program

26)     The Medicaid program provides health care benefits to certain low-income individuals and families fitting into an eligibility group defined by federal and state law. The federal government outlines general guidelines for the program, and each state establishes, with approval of CMS, the requirements for their own program.  During the period at issue, each Medicaid program provided reimbursement to providers under a prescription drug benefit.

---

[8] Medicare Part B covers reimbursement for physician administered drugs outside of the hospital setting.  Medicare Part A, which covers hospital inpatient reimbursement, is not at issue in this case.

[9] See CMS, Part B Carrier Locality Codes after December 31, 1996. Report Prepared By CMS September 17, 2004.

27)     CMS also administers the Medicaid Drug Rebate Program which requires a drug manufacturer to enter into a national rebate agreement with the Department of Health and Human Services (HHS) for states to receive Federal funding for outpatient drugs dispensed to Medicaid patients.[10]  The Drug Rebate Program was designed to allow the state Medicaid programs to decrease drug expenditures by requiring manufacturers to pay a rebate to each state based on the state's utilization of the manufacturer's drugs.

### 3. Medicare and Medicaid Hospital Reimbursement

28)     Under Medicare and Medicaid, Abbott's primary customers (hospitals) were generally reimbursed for the total service rendered (i.e., surgery) and not separately reimbursed for the drugs administered as part of the service.  Accordingly, the issues in this case do not apply in the hospital setting.  Dr. Duggan acknowledged this fact by excluding hospitals from his analyses.

## B.     Compensation to Providers for Dispensing and Administration Costs

29)     Both Medicare and Medicaid programs have recognized the need, when setting reimbursement, to evaluate both the costs associated with product purchases as well as the costs associated with both dispensing and administration of the product ("dispensing/administration").  Medicare reimbursement to providers has included a

---

[10] See Schondelmeyer report dated June 20, 2008, p. 16.

product reimbursement and a separate administration fee.[11]  Similarly, Medicaid has

reimbursed providers for both an ingredient cost and a dispensing/administration fee.[12]

30)     The Abbott products in this case are more expensive to administer and

dispense than other drugs such as self-administered outpatient drugs (e.g. pills)

because, for example:

- A medical professional must take extra steps to prepare and administer these products to the patient intravenously.

- Treatment occurs over an extended period of time (i.e., hours and sometimes days).

- A pharmacy professional must measure and/or mix the product with other products to allow for safe administration (e.g., vancomycin is an antibiotic that is mixed with a solution and administered intravenously).

- Because these products are primarily solutions, they are sold in bags and other large packages that require extra storage space and special delivery methods.[13]

## VI.    Dr. Duggan's Methodology

31)     Dr. Duggan calculated his "DIFFERENCE" by comparing the amount he

contends was reimbursed to providers, and an amount that he believes would have

been paid utilizing his "Calculated Price" to contracted pharmacies.  With this

"Calculated Price" Dr. Duggan created alternative published prices including AWP, WAC,

---

[11] See Payment for Medicare Part B Drugs, Herb Kuhn, Director, CMS testimony before House Subcommittee on Health of the Committee on Ways and Means, Thursday, July 13, 2006.

[12] See "Study of Medi-Cal Pharmacy Reimbursement" Prepared for the California Department of Health Services, prepared by Myers and Stauffer, June 2002, p. 12.

[13] See National Home Infusion Association FAQ at www.nhia.org/faqs.

and Direct Price that he then used to determine his "but for" reimbursement for Medicare and Medicaid.[14]

*Duggan's Reimbursement Paid – Duggan's "But For" Reimbursement = Difference*

## VII.   Dr. Duggan's Analysis of Reimbursement Paid for These Products

32)     Dr. Duggan attempted to quantify the actual reimbursement paid by Medicaid and Medicare by analyzing reimbursement claims information for a limited number of states and carriers and for limited time periods, and he extrapolated the results to other reimbursement populations for the entire country for the entire eleven year period that he chose not to analyze.[15]

## A.     Dr. Duggan's Medicaid Reimbursement Calculation

### 1. Dr. Duggan Did Not Consider the Interrelationship of Product Cost and Dispensing Fees

33)     The reimbursement paid to providers for these products is comprised of both product and dispensing/administration costs.  It is well established that payors and providers view both components together when assessing the adequacy of the reimbursement.  Dr. Duggan failed to consider the important interrelationship between these components of reimbursement.  The high cost of dispensing/administering these particular products increases the importance of this interrelationship.

34)     Myers & Stauffer performed an analysis of dispensing costs by reviewing data collected on over 100 surveys.

---

[14] Dr. Duggan calculated his alternative published prices for AWP by adding 25% to his "Calculated Price."

[15] Dr. Duggan has not calculated differences for Arizona or Ohio.  See footnote 18 on page 25 of Dr. Duggan's report dated June 19, 2008 and Section I in Dr. Duggan's report dated January 23, 2009.

35)     With respect to the higher cost of dispensing these products, Myers &

Stauffer reported that:

> The data suggests that dispensing cost ranging from $20 to $40
> per intravenous prescription would be considered typical. . . . It is
> therefore possible that some pharmacies could very well have
> dispensing costs in excess of $40 per prescription.[16]

36)     Myers & Stauffer noted the critical interrelationship between ingredient

cost reimbursement and dispensing fees:

> Based on the results of the acquisition cost study performed
> simultaneously with the dispensing cost survey and the assumption
> of the Department's current ingredient reimbursement formula of
> AWP minus 5%, it is estimated that such an average prescription
> would yield a margin on ingredients of approximately $42. This
> margin typically allows for adequate reimbursement of the
> pharmacy's dispensing cost.   So long as the ingredient
> reimbursement rate remains at AWP minus 5% or any other
> relatively "high" level, the need for the Department to set a
> separate dispensing fee for intravenous drugs is somewhat
> mitigated by the margins realized on ingredient reimbursement.[17]

37)     The combined effect of the interrelationship and the magnitude of the

under-reimbursement for dispensing these drugs was proven in practice in the State of

Utah in 2000.  Myer & Stauffer explained this real world example as follows:

> In recent years, some states have dealt with the issue of
> intravenous prescription reimbursement rates *in light of reduced*
> *reimbursement.*  For example, the state of Utah recently adopted
> "revised AWPs" for certain products based on the recommendations
> of the United States Department of Justice and the National
> Association of Medicaid Fraud Control Units (NAMFCU). . . .
> Subsequent to the adoption of these prices, intravenous and home
> infusion pharmacies alleged that the margins on ingredient

---

[16] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement.* Prepared for the California Department of Health Services, June 2002, p. 59-60.

[17] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement.* Prepared for the California Department of Health Services, June 2002, p. 59-60.

reimbursement were no longer sufficient such that they could accept the typical Medicaid dispensing fee.  As a result of these allegations, the state of Utah created alternate dispensing fees. . .[18]

## 2. Dr. Duggan Limited His Review of Actual Claims Data

38)     Rather than analyzing actual claims data from every state at issue over the entire time period, Dr. Duggan chose to calculate his Medicaid "DIFFERENCE" by extrapolating from a limited number of states for a limited period of time.[19]  Dr. Duggan limited his analysis of actual detailed claims data to 10 states.

- In no state did he look at actual claims data over the entire 11 year time period (e.g., Dr. Duggan only analyzes 5 quarters of actual claims data for Michigan).

- Within the 10 states where Dr. Duggan chose to analyze some actual detailed claims data, he simply extrapolated the results from the earliest available quarter to all other quarters where he did not look at actual claims data at all.[20]

  o Setting aside the issues with his extrapolation, Dr. Duggan's analysis included numerous errors.  For example, Dr. Duggan improperly applied his "DIFFERENCE" amount to the states of Michigan and Missouri resulting in an overstatement of "DIFFERENCE" in excess of $500,000.

- Dr. Duggan ignored actual claims data for certain states with significant Medicaid utilization and enrollment such as Texas, Ohio and Pennsylvania.  (See Exhibit 3).

39)     Figure 3 identifies the limited actual Medicaid claims data reviewed by Dr. Duggan.

---

[18] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement,* prepared for the California Department of Health Services, June 2002, p. 59-60.

[19] Dr. Duggan was provided with actual claims data for at least 8 other states (which he chose not to review).

[20] Dr. Duggan also extrapolated the number of claims with a "DIFFERENCE" for periods that he did not analyze using a random number generator to determine those he counts as "DIFFERENCE" claims.

**Figure 3**
**Dr. Duggan's Actual Claims Data Reviewed**

### 3. Dr. Duggan Extrapolated To Unanalyzed Populations

40)    Dr. Duggan extrapolated his results from the 10 states to the unanalyzed

38 other states.  Dr. Duggan has not articulated a sufficient basis for assuming that the

populations he extrapolated from are comparable to the populations he extrapolated to.

Instead, he merely:

- Confirmed that the 38 states used AWP or WAC in some fashion in their reimbursement methodologies.[21]

- Dr. Duggan attempted to compare the average cost per claim (1999-2001) for the 10 states he chose to analyze to the other 38 states that he chose not to analyze.  Myers & Stauffer's reports, however, indicate that such comparisons would be meaningless due to the way that claims were submitted to Medicaid for these products.  Specifically, Myers & Stauffer finds:

    > There is some difficulty, however, in determining an average dispensing cost . . . There is a significant inconsistency in the way in which pharmacies count the number of intravenous prescriptions dispensing.  A pharmacy may mix and deliver many "dispensings" of a daily intravenous solution from a single prescription, thus incurring additional costs spread over a smaller number of prescriptions. Alternatively, some pharmacies count each daily dispensing individually.[22]

41)    Dr. Duggan has not articulated a sufficient basis for assuming that the

reimbursement methodologies of his 10 states are similar to the 38 states to which he

extrapolates.  A review of Myers & Stauffer's analyses would suggest that such

---

[21] See Dr. Duggan report dated June 19, 2008, p. 79.

[22] See Myers and Stauffer *Study of Medi-Cal Pharmacy Reimbursement,* prepared for the California Department of Health Services, June 2002, p. 59-60.

extrapolation is not appropriate given the variability of reimbursement and dispensing fee methodologies implemented by different states at different times.[23]

### a) Dr. Duggan's Methodology Did Not Consider the Variability of Medicaid Reimbursement Across States

42)     Dr. Duggan made no attempt to determine the basis of payment for the claims for which he seeks recovery in this case but rather assumes liability for all of the claims for which he calculated a "DIFFERENCE".  Figure 4 illustrates one of many examples of the variability in the per unit reimbursement for a single sodium chloride NDC for which Dr. Duggan calculates a "DIFFERENCE."



Figure 4
Kentucky Claims:
Sodium Chloride .9% VIAL (NDC 000748810)

---

[23] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for all states provided.

43)    Dr. Duggan used actual claims data for the 10 states for limited periods. Dr. Duggan then extrapolated from those 10 states to aggregate spending data for the 38 other states by NDC and by quarter.  It is important to note that the aggregate spending data (i.e., SMRF and SDUD data) included dispensing fees.  I have identified a number of problems arising from Dr. Duggan's extrapolation of actual Medicaid claims data to his unanalyzed populations.  For example:

- For some quarters he extrapolated data from as little as one quarter of a single state to 38 other states. [24]  For example, as illustrated in Figure 3, Illinois was the only basis of extrapolation to all 38 other states in 1991.[25]

- Dr. Duggan did not consider the wide variation of product reimbursement formulas across states.[26]

  o  For example, Dr. Duggan ignored data for certain high volume states (such as Texas) with lower Medicaid reimbursements as a result of MAC programs in arriving at his 10-state analyzed population.[27]  He also extrapolated to other lower volume states (such as Maryland) with lower Medicaid reimbursements as a result of MAC programs.[28]

  o  In his revised report, Dr. Duggan has excluded Ohio claims data from his extrapolation.  Removing Ohio from the analysis increased Dr. Duggan's "DIFFERENCE" for the unanalyzed 38 states by $792,908.  This demonstrates the impact one state can have on Dr. Duggan's extrapolation.  Dr. Duggan has acknowledged that the

---

[24] Dr. Duggan also improperly duplicated "DIFFERENCE" for the states of Alabama and Hawaii in certain periods.

[25] In addition to the 38 other states, Dr. Duggan applied his "DIFFERENCE" ratio from Illinois to the state of Indiana for the entire period.

[26] See HHD006-0060.

[27] See Determination of the Cost of Dispensing Pharmaceutical Prescriptions For the Texas Vendor Drug Program Prepared for the Texas Health and Human Services Commission August 2002, p. 7.

[28] See Fine Dep. 12/9/08 MD Department of Health and Mental Hygiene Exhibit 13 (MD0021454 – MD0021497).

"DIFFERENCE" increase is due to the fact that Ohio used MACs which lowered the state's reimbursement for these products.[29]

o  Dr. Duggan did not consider individual states' definitions of Usual and Customary (U&C).  None of the 10 states that he analyzed defined U&C as the lowest price paid by Third Party Payors (TPPs), while at least five of the 38 states did (e.g., Massachusetts, Arkansas, Georgia, Rhode Island, and Vermont).[30]

o  Dr. Duggan ignored the impact of the publication of the Department of Justice AWP's (DOJ AWP's) by including a difference for claims paid after the implementation of the DOJ AWP's and claims paid using the DOJ AWP's. [31]

o  Dr. Duggan calculated a "DIFFERENCE" on transactions that were not paid based on the states' articulated reimbursement methodology (e.g., Dr. Duggan included a "DIFFERENCE" for Florida claims paid based on AWP when Florida's reimbursement methodology called for the use of a WAC).

- Dr. Duggan ignored individual states' intentions to provide a margin to providers related to the reimbursement for drugs.[32]

### b) Dr. Duggan's Methodology Did Not Consider the Variability of Dispensing Fees

44)    One of the most significant problems in Dr. Duggan's extrapolations is his

failure to account for the differences across states in both amount and treatment of

dispensing fees for these products.

- As discussed previously, Myers & Stauffer found that the average cost of dispensing these products ranged between $20 and $40 with various states addressing dispensing fees in various ways.  Myers & Stauffer's documentation indicates that at least 15 of the 38 states that Dr. Duggan chose not to analyze had enhanced dispensing and/or

---

[29] See Dr. Duggan report dated January 23, 2009, section I.

[30]  See HHD127-0023 – HHD127-0025 (For example, the state of Massachusetts defines Usual and Customary as "the lowest price for a given volume of drugs that a pharmacy charges to or accepts as payment from any purchaser or reimburser, including those with contracts that represent less than one percent of the pharmacy's total prescriptions revenue").

[31] See Program Memorandum Intermediaries/Carriers. Transmittal AB-00-86. September 8, 2000.

[32] See Dubberly Dep. December 15, 2008, p. 331.

compounding fees for these products during the relevant time period.[33]

- For each of his 10 states, Dr. Duggan calculated "the average value of the ratio of "DIFFERENCE" to the amount of the Medicaid spending on these claims" for each NDC and quarter.[34] This average represents the percentage by which total Medicaid spending would have allegedly decreased, had Dr. Duggan's revised prices been used in the 10 states' reimbursement calculations. He then applied his ratio of "DIFFERENCE" for the analyzed populations to unanalyzed populations. The "DIFFERENCE" calculation for the population he analyzed and the total Medicaid spending for the population he extrapolated to included both dispensing fee and product reimbursement.

45)    The unique nature of these products combined with the related variability of dispensing fees makes it inappropriate to assume consistency between the populations as it relates to dispensing fee. Dr. Duggan did nothing to establish that the ratio of dispensing fees to total payments was consistent between the analyzed and the unanalyzed populations.

46)    For example, Nevada (one of the 38 unanalyzed states) paid home health providers an enhanced dispensing fee of $16.80 per dose for the first medication and $5.60 per dose for second medication given concurrently.[35] Given the enhanced dispensing fee for home IV drugs paid by Nevada, it is not surprising that Nevada's average payment per claim is relatively high. Dr. Duggan's analysis ignored the impact of these types of dispensing fees and improperly applied the "DIFFERENCE" factor from

---

[33] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for all states provided.

[34] Dr. Duggan's "ratio of DIFFERENCE" is calculated by giving equal weight to each NDC quarter for which he has actual claims data. States with no claims data in that NDC quarter have a weight of zero. See Dr. Duggan p. 78.

[35] See Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology – Nevada.

the 10 states to Nevada.  I can provide more examples of this phenomenon across the 38 states, where Dr. Duggan's "DIFFERENCE" is not based upon actual claims data.

47)     The significant variability of dispensing fees and the higher incidence of enhanced dispensing fees for home IV drugs in the 38 states causes Dr. Duggan's "DIFFERENCE" for the 38 states to be unreliable.

## B.    Dr. Duggan's Medicare Reimbursement Calculations

48)     Because J-codes used in Medicare reimbursement do not identify the manufacturer of the drug for which the claim has been submitted, the Medicare claims data does not identify claims submitted for any products manufactured by Abbott.  Dr. Duggan has not identified any Medicare claims submitted for any products manufactured by Abbott.  Dr. Duggan assigned 100% of the "DIFFERENCE" to Abbott and does not consider the source of the product.

49)     Rather than analyzing reimbursement practices from every Medicare carrier over the entire time period, Dr. Duggan chose to calculate his Medicare "DIFFERENCE" by extrapolating from a limited number of carriers for a limited period of time.  For example:

- Dr. Duggan analyzed the actual median calculations for a limited number of carriers and time periods and extrapolated the results to all carriers for eleven years.[36]

- For those J-codes and time periods for which Dr. Duggan calculated a Medicare Part B "DIFFERENCE" it appears that he only analyzed approximately 5% of the Medicare carrier median array calculations. Figure 5 identifies the quarters for which Dr. Duggan analyzed actual

---

[36] Dr. Duggan also extrapolated the number of claims with a "DIFFERENCE" for periods that he did not analyze using a random number generator to determine those he counts as "DIFFERENCE" claims.

carrier median array calculations for the J-codes at issue in arriving at his Medicare Part B "DIFFERENCE."

**Figure 5**
**Dr. Duggan's Actual Claims Data Reviewed**

| Carrier | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|---|
| AdminaStar | | | | | | | | | |
| AETNA | | | | | | | | | |
| Alabama Blue Shield | | | | | | | | | |
| All Others | | | | | | | | | |
| Arkansas Blue Shield | | | | | | | | | |
| BCBSFL | | | | | | | | | |
| California Blue Shield | | | | | | | | | |
| Cigna | | | | | | | | | |
| Empire Blue Shield | | | | | | | | | |
| Kansas Blue Shield | | | | | | | | | |
| Metra Health | | | | | | | | | |
| National Heritage | | | | | | | | | |
| Nationwide | | | | | | | | | |
| North Dakota Blue Shield | | | | | | | | | |
| Other Region 5 | | | | | | | | | |
| Pennsylvania Blue Shield | | | | | | | | | |
| South Carolina Blue Shield | | | | | | | | | |
| Texas Blue Shield | | | | | | | | | |
| TOLIC | | | | | | | | | |
| Western Blue Shield | | | | | | | | | |
| WPS | | | | | | | | | |

Key: □ Claims Only   ■ Claims and Array   □ No "DIFFERENCES"

- Dr. Duggan's assessment of reimbursement is limited to the product portion of the Medicare claims and ignored the administration fee.

## VIII.  Dr. Duggan's Analysis of "But For" Reimbursement for These Products

50)    As previously mentioned, Dr. Duggan calculated a difference by comparing his assessment and extrapolation of reimbursement paid to the reimbursement he contends should have been paid in his "but for" world.  Dr. Duggan creates a "Calculated Price" and uses that as part of his formula to generate a "but for" reimbursement amount.

*Duggan's Reimbursement Paid – Duggan's "But For" Reimbursement = Difference*

## A.  Dr. Duggan's Creation of His "Calculated Price" to Contracted Pharmacies

51)   In creating his "Calculated Price," Dr. Duggan limited his analysis to less than 2% of sales and selected only negotiated contract sales to certain pharmacy customers. [37]  By focusing only on this very limited set of transactions, Dr. Duggan failed to properly consider prices paid by other customers such as a provider who purchased either directly from Abbott at a different price or directly from a wholesaler or distributor at an unknown price.  Non-contract sales, for example, are at higher prices and have a significant impact.  Dr. Duggan incorrectly assumed that calculating an average by looking at less than 2% of Contract pharmacy sales is appropriate. [38]

52)   Figure 6 illustrates the significant number of wholesaler and distributor sales to Non-contract end purchasers compared to the retail pharmacy Contract sales Dr. Duggan analyzed.

---

[37] See footnote 5.

[38] Dr. Duggan relied on indirect contract sales to pharmacies in every state except California during the period 1995-2001.  See Dr. Duggan's report dated June 19, 2008, p. 47.



53)     In fact, according to Dr. Schondelmeyer, wholesalers and distributors "add a markup and fees to the manufacturer's drug product cost to cover the cost of distribution and other services they provide."[39]  Dr. Duggan's approach would therefore result in many providers, such as those without negotiated contracts with Abbott, who purchased from a wholesaler or distributor, being reimbursed below the price they paid for the product.

54)     Figure 7 provides two examples that would have been reimbursed less than the amount they paid under Dr. Duggan's methodology.

---

[39] See Schondelmeyer report dated June 20, 2008 page 17.

**Figure 7**

**Under-Reimbursement to Providers Under Dr. Duggan's Methodology**

| | Transaction #1 | | | | Transaction #2 | | | |
|---|---|---|---|---|---|---|---|---|
| | SODIUM CHLORIDE 0.9% SOLN<br>NDC: 00074710113<br>Date of Service: 12/21/1998<br>Provider: MEMORIAL COMM HOSP PHARM<br>Wisconsin (AWP Less 10%) | | | | DEXTROSE 5%/WATER IV SOLN.<br>NDC: 00074792203<br>Date of Service: 6/14/2001<br>Provider: SPRINGVILLE PHARMACY INC<br>New York (AWP Less 10%) | | | |
| | Price Per Unit | Units | Disp. Fee | Total | Price Per Unit | Units | Disp. Fee | Total |
| Dr. Duggan's "But For" Reimbursement | $ 0.03247 | 100 | $4.88 | $ 8.53 | $ 0.00185 | 3500 | $4.50 | $ 11.77 |
| Provider Reimbursed Amount | $ 0.20 | 100 | $4.88 | $ 24.50 | $ 0.00280 | 3500 | $4.50 | $ 14.30 |
| Difference | | | | $ (15.97) | | | | $ (2.53) |

## B.   Dr. Duggan's Medicaid "But For" Reimbursement Calculations

55)    Without any consideration for the adequacy of the total reimbursement to the provider, Dr. Duggan created his "but for" reimbursement by adding a 25% mark-up to his "Calculated Price" to contracted pharmacies for each NDC and substituting the result into each state's reimbursement methodology.[40]  Extrapolation of the results of Dr. Duggan's 10-state analysis to the remaining states, without analyzing the comparability of the analyzed and unanalyzed populations would lead to anomalous results.

- For example, inserting his "Calculated Price" to contracted pharmacies into the reimbursement methodology used by Kansas (AWP less 50%) would result in the majority of Kansas providers being reimbursed significantly less than the amount they paid. (See Figure 8 below).

- Similarly, Dr. Duggan's approach would lead to illogical results when MACs or other payment limits are in place even for the Contracted pharmacies he chose to analyze.  As just one example, Dr. Duggan's approach would have the state of Maryland paying much less than

---

[40] Dr. Duggan's "but for" reimbursement adjustment of 25% is inconsistent with Congress's decision to implement the Deficit Reduction Act of 2005 where a factor of 250% was added to the Average Manufacturer Price in arriving at the Federal Upper Limit (FUL) reimbursement level for drugs.

acquisition cost.[41]  Dr. Duggan acknowledged that he did not focus on the impact of this issue. [42] (See Figure 8 below).

| | State Reimbursement Methodology | Dr. Duggan "Calculated Price" | State Reimbursement | | Dr. Duggan's "But For" Reimbursement | Contracted Provider Loss |
|---|---|---|---|---|---|---|
| **Figure 8**<br>**"But For" Calculation 1995 Q1: for Vancomycin 1GM Vial**<br>**(NDC 00074653301)** | | | | | | |
| Kansas | AWP - 50% | $    6.69 | (6.69*1.25)*50% = 8.37 | | $    4.18 | $    (2.51) |
| Maryland | MAC | $    6.69 | $    9.63 | | $    2.17 | $    (4.52) |

- Dr. Duggan ignored the important relationship between product cost and dispensing/administration fee in his "but for" world by employing his "all else equal" methodology.[43] Dr. Duggan failed to properly adjust dispensing/administration fees when he lowered his product reimbursement levels. The need for this adjustment has been recognized by State Medicaid Agencies and the consultants that advised them.

- Dr. Duggan did not consider any factors that states are required to assess in determining reimbursement levels (e.g., access to care issues, geographic differences, variability of prices paid by providers, etc.).

## C.    Dr. Duggan's Medicare "But For" Reimbursement Calculations

56)    Without any consideration for the adequacy of the total reimbursement to the provider, Dr. Duggan created his "but for" reimbursement by adding a 25% mark-up to his "Calculated Price" to contracted pharmacies for each NDC and substituted the result into each carrier's median array calculation.

- Dr. Duggan's "but for" reimbursement amount led to illogical results. For example, Dr. Duggan arrived at 9 different "but for"

---

[41] See Fine Dep. December 9, 2008 MD Department of Health and Mental Hygiene Exhibit 13 (MD0021454 – MD0021497).

[42] See Duggan Dep. February 17, 2009, p. 768 – 770.

[43] See Duggan Dep. February 17, 2009 p. 770 – 771.

reimbursement amounts for one J-code for the same period of time. (See Figure 9).[44]

**Figure 9**
**Dr. Duggan's "But For" Array Medians for 1998 Q2**

| Carrier | J-code | "But For" Median | Price Source |
|---|---|---|---|
| CIGNA | J3370 | $ 2.74 | Cigna array for 1999Q2 |
| Other Region 5 | J3370 | $ 3.74 | No carrier array identified |
| WPS Other Region 5 Nationwide | J3370 | $ 3.94 | No carrier array identified |
| WPS Other Region 5 | J3370 | $ 4.02 | No carrier array identified |
| Other Region 5 | J3370 | $ 4.23 | WPS array for 1997Q3 |
| BCBSFL | J3370 | $ 4.97 | No carrier array identified |
| Metra Health | J3370 | $ 5.31 | Metra Health array for 1998Q1 |
| CIGNA | J3370 | $ 5.42 | No carrier array identified |
| BCBSFL Metra Health | J3370 | $ 6.06 | BCBSFL array for 1998Q2 Metra Health array for 1998Q2 |

- Dr. Duggan did not consider the relationship between product cost and administration fees in determining his "but for" Medicare reimbursement. When Congress changed Medicare reimbursement to use a Medicare "Average Sales Price" ("ASP") method, it increased the administration fees to appropriately compensate providers.[45] Figure 10 illustrates the increase in administration fees for three common administration codes associated with these products.

---

[44] Dr. Duggan's insertion of his "Calculated Price" into the carrier median arrays did not always produce a revised median. For example, Dr. Duggan's "Calculated Price" resulted in no change in the median Medicare reimbursement for Metra Health's J7060 for quarter 2, 1997. It should be noted that Dr. Duggan still did generate a "DIFFERENCE" for this J-code even though his array analysis indicated no "DIFFERENCE" should exist.

[45] See Payment for Medicare Part B Drugs, Herb Kuhn, Director, CMS testimony before House Subcommittee on Health of the Committee on Ways and Means, Thursday, July 13, 2006.

**Figure 10**

**Medicare Administration Fees - Post 2002**

| Carrier: 80303 (BCBS/Empire NY) | | | Non-Facility | | | | |
|---|---|---|---|---|---|---|---|
| Number | Description | HCPCS Code [1] | 2003 | 2004 | 2005 | 2006 | 2007 |
| 1 | Chemotherapy, infusion method | 96410, G0359, 96413 | $ 64.18 | $ 233.69 | $ 190.37 | $ 185.25 | $ 178.24 |
| 2 | IV Infusion therapy, 1 hour | 90780, G0345, 90760 | $ 46.31 | $ 126.59 | $ 69.44 | $ 67.83 | $ 65.90 |
| 3 | Chemotherapy, push technique | 96408, G0357, 96409 | $ 40.70 | $ 166.25 | $ 134.64 | $ 131.13 | $ 128.50 |

1) Changes in HCPCS as reported by American Society of Clinical Oncology, "2006 Coding Changes for Drug Administration Services".

- Looking at the difference in the administration fee, as seen in Figure 10, between 2003 and 2007 the increase in administration fee is significantly higher than Dr. Duggan's average per claim "DIFFERENCE" across all J-codes analyzed as seen in Figure 11 below.

**Figure 11**

**Average Dr. Duggan Medicare Part B "DIFFERENCE" per Claim**

| J-code (Part B) | "DIFFERENCE" Per Claim |
|---|---|
| J3370 | $8.44 |
| J7050 | $4.08 |
| J7030 | $1.68 |
| J7040 | $1.40 |
| J7060 | $1.14 |

- The Figure 12 below displays the example of combined drug and administration reimbursements associated with sodium chloride (J7050 and 90780) as a result of the Medicare Modernization Act (MMA) of 2003.  This figure illustrates that (1) the product reimbursement is relatively small in relationship to the administration fee reimbursement and (2) the total reimbursement to the provider actually increased after MMA adjusted product reimbursement to ASP and administration fee to full payment.



**Figure 12**
**Impact of Medicare Modernization Act (2003)**
**Drug and Administration Reimbursement**
**(BCBS/Empire)**

## IX.    Dr. Duggan's "DIFFERENCEs" Are Also Impacted By Various Other Factors

## A.    Analysis of Dr. Duggan's "DIFFERENCE" Period

57)    I have been asked by counsel to quantify the percentage of "DIFFERENCE" attributable to the time period before the filing of the complaint in this matter on June 23, 1995.  I have determined that amount is 18% of Dr. Duggan's "DIFFERENCE".  Stated another way, 82% of Dr. Duggan's "DIFFERENCE" is attributable to the time period after the filing of the original complaint.  I will be prepared to quantify other time periods as deemed appropriate.

58)    I was also asked to chart Dr. Duggan's calculated "DIFFERENCE" for the period from 1991-2000.  Figure 13 depicts this chart.



**Figure 13**

Dr. Duggan Total "DIFFERENCE" by Year

### B.   Dr. Duggan's "DIFFERENCE" Includes Claims That Have Been Resolved

59)   Dr. Duggan calculated the "DIFFERENCE" for the Federal share of

Medicaid for all states.[46]  I have been advised that certain settlements have been

reached that resolve Medicaid claims for the products at issue.  I will be prepared at

trial to quantify any offsets that should be made to the government's proposed

"DIFFERENCE" on this basis.

60)   In addition, various Medicaid and Medicare providers have returned funds

to the government related to incorrect or inappropriate claims during this eleven year

period.  Dr. Duggan has not considered the impact of this recoupment.

---

[46] See Dr. Duggan's report dated June 19, 2008, p.77.

## C.   Dr. Duggan's "DIFFERENCE" Does Not Account for the Rebates Paid by Abbott to Every State Medicaid Program

61)    Dr. Duggan ignored Medicaid rebates in his calculations of "DIFFERENCE." As discussed earlier, Abbott made quarterly submissions to CMS of its AMP and issued rebate checks to each state Medicaid program resulting in a net reduction in the Medicaid expenditures for Abbott products.  For purposes of his calculations, he has not offset his "DIFFERENCE" by the Medicaid rebates paid by Abbott for the products for the relevant time period.

## X.   Other Opinions

62)    I have also been asked my opinion with the respect to the following issues:

## A.   Available Sources of Product Pricing Information

63)    During the relevant time period, there was a variety of pricing information available to the government.  For example:

- Myers & Stauffer conducted various provider purchase price and dispensing cost surveys on behalf of state Medicaid agencies during the relevant time period.  Some of these states in fact overlapped the states analyzed by Dr. Duggan including California, Kentucky, Florida, New Jersey, and Louisiana.  In addition, Myers & Stauffer performed similar projects for many of the states Dr. Duggan chose not to analyze.[47]

- On a quarterly basis, Abbott provided CMS with its Average Manufacturer Prices (AMP).  AMP is calculated based on a formula prescribed by the government and reflects prices to the retail class of trade.  In addition, each state Medicaid program had the ability to discern AMP from the various exchanges between the parties with respect to Abbott's Medicaid Rebate payments because the rebate is calculated as a percentage of AMP for these products.

---

[47] See KYDMSPL1022497.

- Abbott also provided the Veterans Administration with pricing information reflecting the discounted pricing available to some of its largest customers in the course of assisting the government in establishing the Federal Supply Schedule (FSS) pricing for Abbott's products.

- State Medicaid programs had visibility to transaction prices in the course of processing claims information.  For example, many claims were submitted and paid at amounts below the AWP-based reimbursement, and reflected discounts available to certain providers (See e.g., Figure 4).  In addition, some states required providers to submit information regarding their actual acquisition cost.[48]

- State Medicaid programs had visibility to transaction prices through the administration of 340B/Public Health Service programs where the providers were required to submit their actual acquisition costs to the state.

- The government had access to other market based pricing information (e.g., IMS Health).

- Starting in 1994, First DataBank began calculating and publishing a "BaseLine Price."  According to User Manual, "[t]he BaseLine concept involves all prices, shows the current market price and reflects changes in the market as they occur."[49]

- State Medicaid agencies determined their own state Maximum Allowable Cost ("MAC") to limit reimbursement of generic products for which the prices pharmacies paid differed significantly from the published prices.[50]  In certain cases states used the Federal Upper Limit (FUL) as their state MAC price.  These are generic products that the government could have implemented an FUL but the government elected not to do so.[51]

---

[48] See, e.g., HHD006-0060.

[49] See 2001 BMW032-0020 -0026.

[50] See "Study of Medi-Cal Pharmacy Reimbursement" Prepared for the California Department of Health Services. Prepared by Myers and Stauffer, June 2002, page 6.

[51] The majority of the NDCs in this matter met the requirements to have a FUL calculated, but the CMS did not do so.

## B.  Context for Spread Allegations

64)     In my view it is important to put into context the purported size of the
alleged spreads by looking at those spreads not in terms of a percentage but rather in
terms of dollars per package.  The complaint displays the dollars associated with the
spreads on a case price; however, providers do not dispense the products to patients at
the case level and Abbott's published prices for these products are reported at the
package level.  I believe that a package (not per case) pricing is a more meaningful
comparison when looking at provider reimbursement data.  I compared Dr. Duggan's
"but for" price at the package level to the published price to quantify the variance
between the AWP and Dr. Duggan's "but for" price at a package level.  This analysis
indicates that large percentage spreads do not translate into large dollar spreads.
Figure 14 below illustrates the spread associated with three of these products.

| Figure 14 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dollar Value of Spread Using Dr. Duggan's "But For" | | | | | | | |
| NDC | Drug Name | Year | Quarter | AWP Per Package | "But For" Per Package | Dollar Spread | Spread % |
| 00074798309 | SODIUM CHLORIDE 0.9% SOLN | 1997 | 1 | 10.87000 | 0.96685 | 9.90315 | 1024% |
| 00074792209 | DEXTROSE 5%/WATER IV SOLN. | 1997 | 2 | 12.51000 | 1.05939 | 11.45061 | 1081% |
| 00074799009 | STERILE WATER FOR INJECTION | 1998 | 2 | 12.12000 | 1.09990 | 11.02010 | 1002% |

65)     I have been asked to evaluate the dollar value difference for a product for
which Judge Patti Saris found no liability after the Track 1 MDL trial.[52]  The spread
percentage was approximately 30% and the dollar value of the spread per package was
between $176 and $207 depending upon the NDC.  The dollar spread for Abbott's
products were significantly lower than these amounts.

---

[52] See Findings of Fact and Conclusions of Law, Track 1 MDL-1456, June 21, 2007, p.167.

## C.    Analysis of Unit Sales

66)    I have been asked to compare Abbott's unit sales between 2001 and 2002. As seen in Figure 15, I have found that the unit sales are higher in 2002 than 2001.

| | | |
|---|---|---|
| **Figure 15** | | |
| **Direct Sales Total Units** | | |
| | **2002** | **2001** |
| **Total Units** | **335,866,492** | **315,801,246** |

## D.    Annual Price Changes

67)    I have been asked to quantify the number of price changes published by First DataBank ("FDB") for the products at issue. I determined that FDB published at most eleven price changes for these products between 1991 and 2001 (approximately one change per year).

Executed on:  March 6, 2009

By: _____
Steven J. Young
Huron Consulting Services LLC

Exhibit 1A

## Steven J. Young
**Managing Director**

P 312 583 8763
F 312 583 8701
syoung@huronconsultinggroup.com

550 West Van Buren Street
Chicago, Illinois 60607

**Curriculum Vitae**

Steve began his career with Arthur Andersen in 1983 where he became a partner in 1995. He became a Managing Director in Huron Consulting Group's Healthcare practice in May of 2002.

Professional experience
Steve has 25 years of experience assisting healthcare clients with complex financial, contractual and regulatory compliance, systems and government contracting issues. His work focuses upon the quantification of the impact of historical contractual or regulatory compliance issues; Investigations and disputes associated with those contractual or regulatory issues, preparation of proposals and pricing submissions under cost based, competitive and commercial pricing contracts; and various operational consulting projects within the healthcare industry.  This work normally entails analyzing large data sets and/or statistical sampling to quantify the impact of the issue being addressed as part of the dispute, investigation of compliance review, working with operations personnel from various functional areas to understand the historic practices and governing contractual relationships and requirements, presenting of the results to outside counsel, arbitrators or the court.  In addition, Steve works with companies' management and general counsels to review compliance procedures of the company, assisting in the preparation and implementation of corrective actions through systems and related procedures improvements, and testing of the companies' processes and resulting outcomes to assess compliance with the contractual or regulatory requirements.  This work also includes voluntary disclosures to regulatory bodies or negotiated settlements to contractual disagreements by commercial entities.

Steve has an extensive background in serving the unique financial and operating needs of companies in the health care industry, but he has also done work in the office furniture, engineering, electronics, and communications.  Some of his specific areas of expertise are:

_Pharmaceutical and DME Experience_

Steve performed various projects for pharmaceutical manufacturers to analyze sales, chargeback, rebate and other pricing data to assess compliance with government regulations such as Medicaid Rebate Act, Veterans Healthcare Act, Medicare Part B ASP and FSS contract requirements and has worked with clients to quantify the financial aspects of contractual relationships related to managed care, distribution or co-promotion agreements entered into by his clients.

- Analyzed the companies historic practices and assessed inconsistencies with guidance letters issued by the applicable Federal Agency.
- Assessed a pharmaceutical company's cost allocation to product lines as a consulting expert in a litigation matter.
- Assisted a pharmaceutical company in performing a royalty audit under the provisions of their joint marketing agreement.
- Served as an expert witness for various pharmaceutical manufacturers related to class action litigation matters associated with pharmaceutical pricing and reimbursement issues.  This included extensive work and analysis of manufacturer, wholesaler, pharmacy benefit manager, provider and health insurance data involved in the distribution and reimbursement of pharmaceutical drugs.
- Served as an expert witness related to a dispute between two manufacturers regarding the proper payments under a co-promotion agreement including various revenue and cost issues associated with quantifying the appropriate payments required under the agreement.
- Downloaded historical sales, chargeback and rebate data for each of the companies NDCs to integrate the data from various sources to arrive at comprehensive best price and average manufacturer price in accordance with the specific Federal guidance, and Steve presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.

- Tested manufacturers recalculations of historic pricing submissions, identified findings that were corrected by the manufacturer and presented the results to the applicable Federal agency and provided the supporting work papers to the agency and its audit staff.
- Performed compliance reviews, voluntary disclosures and investigation support related to Federal Supply Schedule contracts including identification and differentiation of most favored customer pricing, commercial contract reviews to establish pricing and concessions disclosures, and quantification of potential issues in rebuttal to Federal audits or investigations.
- Assisted in the preparation of computer extracts, work flows and procedures to maintain compliance with the applicable pricing requirements.
- Served as an expert in an arbitration dispute between a Pharmaceutical Manufacturer and a PBM regarding the appropriateness of rebates billed by the PBM over the course of a two year contract.

*Healthcare Claims Processing and Reimbursement*

Steve has had various experience assisting health plans analyze historical claims processing and reimbursement issues to identify overpayment or underpayments related to those issues and prepare, execute and support the related refunds or recoveries.  Steve has:

- Assisted Health Plans extract large data sets to quantify the historic impact of certain system and process deficiencies related to compliance with Medicare Secondary Payment requirements.
- Assisted Health Plans analyze historical reimbursements for compliance with various provider contract, state regulatory requirements (such as prudent layperson and prompt pay) or subcontracted outsourcing agreements.
- Assisting a Health Plan in assessing a claims processing conversion to analyze claims data and the underlying data sources to identify incorrect payments under the new system and determine the root cause and propose corrective actions to the system logic or the underlying claims processor workflows.  Performing stratified statistical samples of paid and denied claims to quantify the historical impact and potentially restate medical cost trends for establishing premium increases.

*Other experience*

In addition to the areas discussed above Steve has experience related to various other regulatory and government contract issues including:

- Claims for equitable adjustment related to contract changes
- FSS Defective pricing and price reduction compliance reviews in numerous industries
- Defective pricing reviews
- Accounting, compliance and administrative procedure preparation and review
- Indirect Rate Determination and submission
- Performing attestation engagements related to various compliance and pricing areas.
- Labor reporting system reviews
- Contract administration control reviews
- Compliance training assessments and presentations
- Interpreting and complying with Cost Accounting Standards (CAS) and the cost principles of the Federal Acquisition Regulation (FAR)
- Preparing CASB Disclosure Statements and determining the cost impact of cost accounting changes and violations of the Standards
- Contract Accounting and Project Reporting system design and implementation


Education & certification
- Bachelor's Degree in Accounting, Northern Illinois University
- Certified Public Accountant (Illinois)

Professional associations
- American Institute of Certified Public Accountants
- Illinois CPA Society
- Associate Member of the Public Contract Law Section of the ABA and a co-chair of the healthcare public contract law committee
- Member of Health Care Compliance Association and National Contract Management Association

Exhibit 1B

# RECENT TESTIMONY OF STEVEN J. YOUNG AT DEPOSITION, HEARING OR TRIAL

HARRY E. STETSER, DALE E.NELSON, and MICHAEL de MONTBRUN, individually and on behalf of themselves and all others similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC.; ABBOTT LABORATORIES; TAKEDA CHEMICAL INDUSTRIES, LTD.; JOHNSON & JOHNSON; ETHICON ENDO-SURGERY, INC.; INDIGO LASER CORPORATION; DAVID JETT; CHRISTOPHER COLEMAN; SCOTT HIDALGO; and EDDY JAMES HACK, Defendants; STATE OF NORTH CAROLINA, NEW HANOVER COUNTY, SUPERIOR COURT DIVISION FILE NO. 1-CV-5268; Deposition taken on June 1 and 2, 2004.

IN RE: LUPRON MARKETING AND SALES PRACTICES LITIGATION (MDL 1430), U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, MASTER FILE NO. 01-CV-10861; Deposition taken on July 13, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01; Deposition taken on August 13, 2004.

IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, U.S. DISTRICT COURT DISTRICT OF MASSACHUSETTS, MDL NO. 1456, CIVIL ACTION NO.01-12257; Testimony taken November 18 and 19, 2004.

BERNARD WALKER, individually and on behalf of those similarly situated, Plaintiffs, v. TAP PHARMACEUTICAL PRODUCTS, INC., et. al., Defendants, STATE OF NEW JERSEY, CAPE MAY COUNTY, SUPERIOR COURT DIVISION FILE NO. CPM-L-682-01; Hearing Testimony on April 20, 2005.

ADVANCEPCS HEALTH L.P., Claimant, v. TAKEDA PHARMACEUTICALS AMERICA, INC., Respondent, AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION TRIBUNAL, CASE NO. 76 193 00202 04 JMLE; Deposition taken on August 26, 2005.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on December 9, 2005.

SACRED HEART HEALTH SYSTEM, INC., ET AL., Plaintiffs, vs. HUMANA MILITARY HEALTHCARE SERVICES, INC., Defendant, IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION, CASE NO. 3:07-cv-62-MCR/EMT; Deposition taken on December 21, 2007.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Deposition taken on September 30, 2008.

PENTECH PHARMACEUTICALS, INC., Plaintiff, vs. PAR PHARMACEUTICALS, INC., Defendant; IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION CASE NO. 04C3149; Testimony at trial on December 16, 2008.

EXHIBIT 2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| The United States' First Amended Complaint | Case 1:01-cv-12257-PBS | |
| Dr. Mark G. Duggan report dated June 19, 2008 | | PDF |
| Dr. Mark G. Duggan report dated January 23, 2009 | | PDF |
| Dr. Stephen W. Schondelmeyer report dated June 20, 2008 | | PDF |
| HHD108 | Abbott- 20071016-0001 | CD |
| HHD103 | Abbott- 20071002-0001 | CD |
| HHD145 | Abbott-20071127-0001 | CD |
| HHD153 | Abbott-20071210-0002 (Copy | CD |
| HHD150 | Abbott-20071210-0001 (Copy) | CD |
| HHD155 | 12/21/2007 | CD |
| HHD177 | Abbott-20080218-0002 (Copy) | CD |
| HHD201 | Abbott-20080325-0001 | CD |
| 1991 Direct Sales Data | ABT-DOJ 0351756 | CD |
| 1992 Direct Sales Data | ABT-DOJ 0351757 | CD |
| 1993, 1995, 1996 Direct Sales Data | ABT-DOJ 0351758 | CD |
| 1994 Direct Sales Data | ABT-DOJ 0351759 | CD |
| 1997-1999 Direct Sales Data | ABT-DOJ 0351760 | CD |
| 2000 & 2001 Direct Sales Data | ABT-DOJ 0351761 | CD |
| 2002 & 2003 Direct Sales Data | ABT-DOJ 0351762 | CD |
| 2003 Direct Sales | ABT-DOJ 0309999 | CD |
| 2002 Direct Sales | ABT-DOJ 0309998 | CD |
| 2001 Direct Sales | ABT-DOJ 0309997 | CD |
| 2000 Direct Sales | ABT-DOJ 0309996 | CD |
| 1999 Direct Sales | ABT-DOJ 0309995 | CD |
| 1998 Direct Sales | ABT-DOJ 0309994 | CD |
| 1997 Direct Sales | ABT-DOJ 0309993 | CD |
| 1996 Direct Sales | ABT-DOJ 0309992 | CD |
| 1995 Direct Sales | ABT-DOJ 0309991 | CD |
| 1994 Direct Sales | ABT-DOJ 0309990 | CD |
| 1993 Direct Sales | ABT-DOJ 0309989 | CD |
| 1991 & 1992 Direct Sales | ABT-DOJ 0309988 | CD |
| Indirect Sales- Jan-Dec (1991) | ABT-DOJ 0309974 | CD |
| Indirect Sales- Jan-Dec (1992) | ABT-DOJ 0309975 | CD |
| Indirect Sales- Jan-Dec (1993) | ABT-DOJ 0309976 | CD |
| Indirect Sales- Jan-Dec (1994) | ABT-DOJ 0309977 | CD |
| Indirect Sales- Jan-Dec (1995) | ABT-DOJ 0309978 | CD |
| Indirect Sales- Jan-Dec (1996) | ABT-DOJ 0309979 | CD |
| Indirect Sales- Jan-Dec (1997) | ABT-DOJ 0309980 | CD |
| Indirect Sales- Jan-Dec (1998) | ABT-DOJ 0309981 | CD |
| Indirect Sales- Jan-Dec (1999) | ABT-DOJ 0309982 | CD |
| Indirect Sales- Jan-Dec (2000) | ABT-DOJ 0309983 | CD |
| Indirect Sales- Jan-Dec (2001) | ABT-DOJ 0309984 | CD |
| Indirect Sales- Jan-Dec (2002) | ABT-DOJ 0309985 | CD |
| Indirect Sales- Jan-Jun (2003) | ABT-DOJ 0309986 | CD |
| Indirect Sales- Jul-Dec (2003) | ABT-DOJ 0309987 | CD |
| HHD124 | Abbott- 20071104-0001 (Copy) | CD |
| HHD229 | Abbott-20080423-0001 | CD |
| HHD235 | Abbott-20080515-5-0001 | CD |
| HHD237 | Abbott-20080520-S-0001 | CD |
| Abbott's AMP Data | ABT-DOJ 0236637 | CD |
| Idaho Medicaid Physicians Institutional | AWP- Idaho | CD |
| Report Definitions and Supplemental Information | AWP- Idaho | CD |
| 1997 Corrected Pharmacy (Medicaid Rx Claims) | AWP- Idaho | CD |
| 1993-2004 (Medicaid Rx Claims) | AWP- Idaho | CD |
| Idaho Medicare Claims Without Name & Date of Birth | AWP- Idaho | CD |
| 2005 (Medicaid Rx Claims) | AWP- Idaho | CD |
| HHD246 | Abbott-20080616-5-0001 | CD |
| Response by the State of Washington | | CD |
| HHD271 | Abbott- 20080814-5-0001 | CD |
| HHD277 | Abbott- 20080926-5-0001 | CD |
| AWP Claims- 2005-2006-Idaho | AWP- Idaho | CD |
| HHD314 | Abbott-20081212-S-0001 | CD |
| CO Pharmacy Reimbursement MethodologyRev12 02 08 | Myers and Stauffer | PDF |

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| California Pharmacy Reimbursement MethodologyRev12 03 08 | Myers and Stauffer | PDF |
| Arkansas Pharmacy Reimbursement MethodologyRev11 6 08 | Myers and Stauffer | PDF |
| Alaska Medicaid Pharmacy Reimbursement MethodologyRev10 28 08 | Myers and Stauffer | PDF |
| Alabama Medicaid Pharmacy Reimbursement MethodologyRev10 27 08(2) | Myers and Stauffer | PDF |
| WY Pharmacy Reimbursement MethodologyRev06 03 08(R) | Myers and Stauffer | PDF |
| WV Pharmacy Reimbursement MethodologyRev10 27 08 | Myers and Stauffer | PDF |
| WI Pharmacy Reimbursement MethodologyRev01 10 09) | Myers and Stauffer | PDF |
| WA Pharmacy Reimbursement MethodologyRev12 10 08 | Myers and Stauffer | PDF |
| VT Pharmacy Reimbursement MethodologyRev08 05 08(R) | Myers and Stauffer | PDF |
| VA Pharmacy Reimbursement MethodologyRev12 28 08 | Myers and Stauffer | PDF |
| Utah Medicaid Pharmacy Reimbursement MethodologyRev01 08 09 | Myers and Stauffer | PDF |
| TN Pharmacy Reimbursement MethodologyRev01 08 09 | Myers and Stauffer | PDF |
| Texas Medicaid Pharmacy Reimbursement MethodologyRev12 19 08 | Myers and Stauffer | PDF |
| SD Pharmacy Reimbursement MethodologyRev05 14 08(R) | Myers and Stauffer | PDF |
| SC Pharmacy Reimbursement MethodologyRev11 14 08 | Myers and Stauffer | PDF |
| RI Pharmacy Reimbursement MethodologyRev0725 | Myers and Stauffer | PDF |
| Pennsylvania Medicaid Pharmacy Reimbursement MethodologyRev12 16 08 | Myers and Stauffer | PDF |
| OR Pharmacy Reimbursement MethodologyRev08 19 08 | Myers and Stauffer | PDF |
| OK Pharmacy Reimbursement MethodologyRev10 31 08 | Myers and Stauffer | PDF |
| Ohio Medicaid Pharmacy Reimbursement MethodologyRev121208 | Myers and Stauffer | PDF |
| NY Pharmacy Reimbursement MethodologyRev12 01 08 | Myers and Stauffer | PDF |
| North Carolina Medicaid Pharmacy Reimbursement MethodologyRev12 20 08 | Myers and Stauffer | PDF |
| NM Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| New Jersey Medicaid Pharmacy Reimbursement MethodologyRev12 22 08 | Myers and Stauffer | PDF |
| New Hampshire Medicaid Pharmacy Reimbursement MethodologyRev10 17 08 | Myers and Stauffer | PDF |
| Nevada Medicaid Pharmacy Reimbursement MethodologyRev0604 | Myers and Stauffer | PDF |
| NE Pharmacy Reimbursement MethodologyRev11 17 08 | Myers and Stauffer | PDF |
| ND Pharmacy Reimbursement MethodologyRev12 02 08 | Myers and Stauffer | PDF |
| MT Pharmacy Reimbursement MethodologyRev10 24 08 | Myers and Stauffer | PDF |
| Missouri Medicaid Pharmacy Reimbursement MethodologyRev12 31 08 | Myers and Stauffer | PDF |
| Mississippi Medicaid Pharmacy Reimbursement MethodologyRev11 28 08 | Myers and Stauffer | PDF |
| Minnesota Medicaid Pharmacy Reimbursement MethodologyRev05 19 08(R) | Myers and Stauffer | PDF |
| Michigan Medicaid Pharmacy Reimbursement MethodologyRev12 28 08 | Myers and Stauffer | PDF |
| Massachusetts Medicaid Pharmacy Reimbursement MethodologyRev01 06 09 | Myers and Stauffer | PDF |
| Maryland Medicaid Pharmacy Reimbursement MethodologyRev06 09 08 | Myers and Stauffer | PDF |
| Maine Pharmacy Reimbursement MethodologyRev11 03 08(2) | Myers and Stauffer | PDF |
| Louisiana Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| Kentucky Medicaid Pharmacy Reimbursement MethodologyRev11 03 08 | Myers and Stauffer | PDF |
| Kansas Medicaid Pharmacy Reimbursement MethodologyRev12 1 08 | Myers and Stauffer | PDF |
| Iowa Pharmacy Reimbursement MethodologyRev10 31 | Myers and Stauffer | PDF |
| Indiana Medicaid Pharmacy Reimbursement MethodologyRev01 07 09 | Myers and Stauffer | PDF |
| Illinois Medicaid Pharmacy Reimbursement MethodologyRev01 06 09 | Myers and Stauffer | PDF |
| Idaho Medicaid Pharmacy Reimbursement11 17 08 | Myers and Stauffer | PDF |
| Hawaii Medicaid Pharmacy Reimbursement MethodologyRev10 06 08 | Myers and Stauffer | PDF |
| Georgia Medicaid Pharmacy Reimbursement MethodologyRev12 15 08 | Myers and Stauffer | PDF |
| Florida Pharmacy Reimbursement MethodologyRev 12 05 08 | Myers and Stauffer | PDF |
| District of Columbia Medicaid Pharmacy Reimbursement MethodologyRev09 12 08 | Myers and Stauffer | PDF |
| Delaware Medicaid Pharmacy Reimbursement MethodologyRev12 08 08 | Myers and Stauffer | PDF |
| Connecticut Medicaid Pharmacy Reimbursement MethodologyRev11 28 08 | Myers and Stauffer | PDF |
| Myers & Stauffer LC (T. Allan Hansen) - Dep dated 12-10-08 and Exhibits | KYSMSPL1022485 | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AK, AR and CA (AK 199812) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 198906 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199405 Sched D G | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199405 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199807 Sched F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 199807 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 200106 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - AR 200106 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CA 2002 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CA 2002 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CA 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - CT, ID, IN and KS Reports (CT 198702) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - ID 1998 | Myers and Stauffer | PDF |

EXHIBIT  2

**Exhibit 2- Documents Relied Upon**

| Document | Reference Number | Type |
|---|---|---|
| 09_24_08  Myers & Stauffer Pharmacy Report - IN 2004 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - IN 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199203 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199310 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199705 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KS 199909 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 199808 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 199908 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200006 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200011 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200012 Acq | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200012 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200111 Disp | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY 200310 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - KY and LA (KY 199801) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 199909 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 200103 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - LA 20070301 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - MN, NV, OK, TX, WY (MN 2006) | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - NV 2007 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - OK 2000 OSEEGIB AUP | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - OK 2000 Pharmacy Benefit Design OSEEGIB | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - TX 200208 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199010 Sched F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199010 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199508 Sched B C F | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199508 | Myers and Stauffer | PDF |
| 09_24_08  Myers & Stauffer Pharmacy Report - WY 199903 | Myers and Stauffer | PDF |
| Exhibit Abbott Maryland 13 (MD0021454 - MD0021497) | Duggan deposition | |
| HHD127-0023 - HHD127-0025 | | |
| Memorandum Intermediaries/Carriers. Transmittal AB-00-86. September 8, 2000 | | |
| http://www.pmewswire.co.uk/cgi/news/release?id=122086 | | |
| CMS, Part B Carrier Locality Codes After 12/31/1995 Report Prepared by CMS 9/17/04 | | |
| Testimony of Herb Kuhn before the House Subcommittee on Health of the Committee on Ways and Means July 13, 2006 | | |
| http://www.nhia.org/faqs.cfm | | |
| HHD006-0060 | | |
| Testimony of Jerry Dubberly on December 15, 2008 | | PDF |
| Testimony of Dr. Mark G. Duggan February 17, 2009 | | PDF |
| IMS Hospital Supply Index Data 1992 - 2003 | ABT-DOJ 0377285 | CD |
| Findings of Fact and Conclusions of Law, Track 1 MDL-1456, June 21, 2007, p.167. | | |
| BMW032-0020-0026 | | PDF |
| State of West Virginia vs. Warrick Pharm., et al. Civil Action No. 01-C-3011; Kanawha County (Stucky, J.) | | CD |

Exhibit 3

Exhibit 3

| State | Claims Data Received | CMS Utilization All Drugs [1] | | Rank | Medicaid Fee for Service Enrollment 1997 [2] | Rank | CMS Utilization Stipulated Drugs [1] | | Rank |
|---|---|---|---|---|---|---|---|---|---|
| | | **Paid Amount** | | | **# of Enrollees** | | **Paid Amount** | | |
| CALIFORNIA | X | $ | 16,417,749,204 | 1 | 2,936,959 | 1 | $ | 10,001,593 | 3 |
| NEW YORK | X | $ | 13,807,473,246 | 2 | 1,635,754 | 3 | $ | 8,748,113 | 5 |
| FLORIDA | X | $ | 8,241,298,851 | 3 | 514,322 | 8 | $ | 16,482,599 | 1 |
| TEXAS | X | $ | 8,031,620,626 | 4 | 1,803,346 | 2 | $ | 3,456,074 | 13 |
| OHIO | X | $ | 6,248,293,493 | 5 | 742,435 | 5 | $ | 5,836,390 | 9 |
| PENNSYLVANIA | X | $ | 5,598,465,961 | 6 | 715,442 | 6 | $ | 2,920,290 | 15 |
| ILLINOIS | X | $ | 5,584,126,592 | 7 | 1,183,306 | 4 | $ | 15,861,036 | 2 |
| MASSACHUSETTS | X | $ | 4,391,802,312 | 8 | 254,476 | 16 | $ | 1,930,850 | 22 |
| NORTH CAROLINA | X | $ | 4,379,036,900 | 9 | 474,421 | 9 | $ | 4,294,250 | 11 |
| NEW JERSEY | X | $ | 4,171,671,273 | 10 | 300,236 | 14 | $ | 9,642,486 | 4 |
| GEORGIA | X | $ | 3,954,194,226 | 11 | 320,861 | 13 | $ | 3,250,664 | 14 |
| LOUISIANA | X | $ | 3,605,247,816 | 12 | 595,203 | 7 | $ | 4,256,698 | 12 |
| MICHIGAN | X | $ | 3,604,663,274 | 13 | 250,469 | 17 | $ | 4,903,153 | 10 |
| KENTUCKY | X | $ | 3,408,333,261 | 14 | 259,006 | 15 | $ | 7,402,284 | 6 |
| MISSOURI | X | $ | 3,269,943,106 | 15 | 350,287 | 12 | $ | 6,360,406 | 8 |
| VIRGINIA | X | $ | 2,739,334,082 | 16 | 215,276 | 20 | $ | 2,599,335 | 17 |
| TENNESSEE [3] | | $ | 2,499,227,518 | 17 | - | 49 | $ | 243,918 | 42 |
| WASHINGTON [3] | X | $ | 2,471,516,696 | 18 | - | 50 | $ | 2,509,996 | 19 |
| WISCONSIN | X | $ | 2,403,738,899 | 19 | 217,347 | 19 | $ | 2,574,373 | 18 |
| ALABAMA | | $ | 2,397,577,589 | 20 | 89,791 | 31 | $ | 2,138,490 | 20 |
| SOUTH CAROLINA | X | $ | 2,224,254,066 | 21 | 379,164 | 11 | $ | 1,791,730 | 25 |
| INDIANA | X | $ | 2,033,147,693 | 22 | 185,000 | 23 | $ | 6,707,961 | 7 |
| MISSISSIPPI | | $ | 2,004,932,074 | 23 | 462,305 | 10 | $ | 1,892,501 | 23 |
| CONNECTICUT | X | $ | 1,864,905,341 | 24 | 128,280 | 26 | $ | 2,063,566 | 21 |
| MINNESOTA | X | $ | 1,636,558,269 | 25 | 233,458 | 18 | $ | 1,197,250 | 29 |
| MAINE | X | $ | 1,537,944,918 | 26 | 143,013 | 24 | $ | 300,399 | 40 |
| MARYLAND | | $ | 1,506,745,317 | 27 | 117,496 | 27 | $ | 1,735,601 | 26 |
| WEST VIRGINIA | | $ | 1,461,160,998 | 28 | 185,189 | 22 | $ | 1,283,144 | 28 |
| ARKANSAS | X | $ | 1,389,789,038 | 29 | 108,067 | 28 | $ | 2,723,668 | 16 |
| SOUTH DAKOTA | | $ | 1,367,064,699 | 30 | 18,870 | 46 | $ | 436,538 | 36 |
| OKLAHOMA | | $ | 1,326,049,934 | 31 | 214,343 | 21 | $ | 1,618,591 | 27 |
| OREGON | | $ | 1,136,816,437 | 32 | 64,000 | 34 | $ | 1,027,877 | 30 |
| IOWA | X | $ | 927,844,495 | 33 | 129,386 | 25 | $ | 601,602 | 35 |
| KANSAS | | $ | 904,839,965 | 34 | 90,871 | 30 | $ | 614,600 | 33 |
| NEBRASKA | | $ | 892,935,884 | 35 | 51,153 | 37 | $ | 760,370 | 32 |
| COLORADO | | $ | 865,541,304 | 36 | 44,558 | 40 | $ | 1,794,111 | 24 |
| UTAH | | $ | 601,349,966 | 37 | 24,558 | 44 | $ | 886,794 | 31 |
| RHODE ISLAND | | $ | 587,096,408 | 38 | 43,218 | 42 | $ | 415,287 | 37 |
| NEW MEXICO | | $ | 488,235,374 | 39 | 103,108 | 29 | $ | 61,788 | 47 |
| NEW HAMPSHIRE | | $ | 425,889,194 | 40 | 61,820 | 36 | $ | 84,390 | 46 |
| IDAHO | X | $ | 416,754,362 | 41 | 48,125 | 39 | $ | 95,856 | 45 |
| MONTANA | | $ | 404,234,902 | 42 | 8,817 | 48 | $ | 327,080 | 39 |
| HAWAII | X | $ | 377,262,235 | 43 | 31,525 | 43 | $ | 327,599 | 38 |
| DISTRICT OF COLUMBIA | | $ | 369,205,769 | 44 | 44,279 | 41 | $ | 43,888 | 50 |
| ALASKA | X | $ | 330,494,681 | 45 | 87,475 | 32 | $ | 61,299 | 48 |
| DELAWARE | | $ | 309,673,884 | 46 | 15,500 | 47 | $ | 243,786 | 43 |
| NEVADA | | $ | 271,187,177 | 47 | 62,124 | 35 | $ | 611,154 | 34 |
| VERMONT | | $ | 264,417,769 | 48 | 74,039 | 33 | $ | 48,139 | 49 |
| NORTH DAKOTA | | $ | 264,096,811 | 49 | 21,008 | 45 | $ | 210,056 | 44 |
| WYOMING | | $ | 141,567,612 | 50 | 48,348 | 38 | $ | 255,949 | 41 |
| **Total** | | $ | **135,557,311,511** | | **16,088,034** | | $ | **145,635,571** | |

Note - Dr. Duggan calculated damages on states shaded grey.
1) Source: http://www.cms.hhs.gov/MedicaidDrugRebateProgram/SDUD/list.asp.
2) Source: http://www.cms.hhs.gov/MedicaidDataSourcesGenInfo/Downloads/mmcer97.pdf
3) Tennessee and Washington had waiver programs with no fee for service.

EXHIBIT EP

**From:** "Jackson, Jarvis" <Jarvis.Jackson@state.mn.us>
**To:** "Judith Becherer" <jbecherer@MSLC.COM>
**Date:** 5/19/2008 2:31 PM
**Subject:** RE: Medicaid Pharmacy Pricing Questions



1) yes that is correct.

2) footnotes are OK

-----Original Message-----
From: Judith Becherer [mailto:jbecherer@mslc.com]
Sent: Monday, May 12, 2008 11:31 AM
To: Jarvis.Jackson@state.mn.us
Subject: Medicaid Pharmacy Pricing Questions

Dear Mr. Jarvis,
   I have begun making the corrections to the reimbursement summary as you have directed, however, I have two more questions before I can finalize it.

   1) When I delete the 7/30/2001 - 2/28/2003 dates, how should the beginning and ending dates be adjusted for the period immediately above and below? According to your notes, it appears that I should modify the end date of the line above to reflect 7/1/1997 - 2/28/2003 and leave the period immediately below as is. Is this correct?
   2) Did you review all of the footnotes to determine whether they are both accurate and applicable to pharmacy pricing?

   Once I have heard back from you, I will revise the summary and resend it to you for final review.
   Thank you so much.

Sincerely,
Judith

Judith E. Becherer
Health Policy Consultant
Myers and Stauffer, LC
Certified Public Accountants
9265 Counselors Row, Suite 200
Indianapolis, Indiana 46240-6419

This message (and attachments) is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this email message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is prohibited. If you have received this email in error, please notify us immediately by telephone at (317) 846-9521 and also include the sender's name. Thank you.

**EXHIBIT**
Abbott 003
Duggan
2/17/09

Print View                                                               Page 1 of 3

From:     "Jackson, Jarvis" <Jarvis.Jackson@state.mn.us>
To:       "Judith Becherer" <jbecherer@mslc.com>                
Date:     Monday - May 5, 2008 4:12 PM
Subject:  RE: Medicaid Pharmacy Pricing


Judith

I am sending a corrected grid back to you.  Some things to note.

We have had the ability to have SMACs back to 1-1-1990.  Our logic has
been to pay the lower of U&C ( submitted), EAC or whatever value
populated the SAMC/FUL field.  We only have one field for the SAMC/FUL
so whatever was populated in that field was used.   FUL were used almost      ✓ FN#9
exclusively in that field ( except for some OTCs) until year 2000.  The
state has increased it's use of SMAC and the list now includes all
commonly used generics.  FULs are now only used if a SMAC doesn't exist.


We have used FDB pricing for as long as anyone can remember.   ) FN #10

SMACs are based on a informal survey of a few retail pharmacies that
have agreed to share their costs.  We try to include an average profit      FN#11
of about $7.00 for each prescription using SMAC.  This $7 includes the
3.65 dispensing fee.  The SMAC are maintained using information from
pharmacies referenced above, our PDL contractor and MAC list from other
states.


-----Original Message-----
From: Judith Becherer [mailto:jbecherer@MSLC.COM]
Sent: Monday, April 28, 2008 1:39 PM
To: Jarvis.Jackson@state.mn.us
Subject: Medicaid Pharmacy Pricing


Dear Mr. Jackson:
    Thank you for taking the time to speak with me regarding the
lawsuit filed by the United States against several pharmaceutical

EXP USABT-DUG 070519

D R A F T

State of   **MINNESOTA**

Medicaid Pharmacy Reimbursement Methodology

| Effective Time Period | "Lower of" Reimbursement Methodology | | | | Estimated Acquisition Cost (EAC)[2] | | Physician Override (DAW/Brand Medically Necessary) | Brand/Generic | Dispensing Fee[3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Usual and Customary | FUL | EAC | SMAC | Drugs Not Subject to Price Reduction | Price Reduction due to Nat'l Assoc of Fraud Control[4] | | | Intravenous Drugs w/Mixing | Parenteral Nutrition w/Mixing 1 Liter Qty | >1 Liter Qty |
| 1/1/1990 - 7/31/1991 | Y | Y | Y | Y | AWP -10% | | Y | $4.10 | | | |
| 8/1/1991 - x/xx/1994 | Y | Y | Y | Y | AWP -10% | | Y | $4.10 (plus $.30 pharmacy packaging unit-dose blister card system)[1] | 8.00 | 30.00 | 44.00 |
| .../1994 - x/xx/1996 | Y | Y | Y | Y | AWP - 7.6% | | Y | $4.10 (plus $.30 pharmacy packaging unit-dose blister card system)[1] | 8.00 | 30.00 | 44.00 |
| .../1996 - 6/30/1997 | Y | Y | Y | Y | AWP - 9% | | Y | $4.10 (plus $.30 pharmacy packaging unit-dose blister card system)[1] | 8.00 | 30.00 | 44.00 |
| 7/1/1997 - 7/29/2001 | Y | Y | Y | Y | AWP - 9% | | Y | $3.65 (plus $.30 pharmacy packaging unit-dose blister card system)[1] | 8.00 | 30.00 | 44.00 |
| 7/30/2001 - 2/28/2003 | Y | Y | Y | Y | AWP - 5% | AWP | Y | $3.65 (plus $.30 pharmacy packaging unit-dose blister card system)[1] | 8.00 | 30.00 | 44.00 |
| 3/1/2003 - 6/29/2003 | Y | Y | Y | Y | AWP - 14% | AWP | Y | $3.65 (plus $.30 pharmacy packaging unit-dose blister card system)[1] | $8.00 except Cancer Chemotherapy IVS which is $14.00 | 30.00 | 44.00 |

EXP USABT-DUG 070520

02/1/08

# EXHIBIT EQ

```
File: W:\Abbott_DOJ\PBC Hard-Drive\Abbott_DOJ_PBC_6_20_08\ABBOTT-20080618-S-0001\from_duggan_to_steck\mgd-fina
l\medicaid\ndc_based\il\log\il9196-main.log   6/5/2008, 6:48:41PM

                                                                                          Page: 4

118
119     Variable |      Obs        Mean    Std. Dev.      Min        Max
120   ----------+--------------------------------------------------------
121   servallowc~g |   213293    25.44601    72.58545        0     9949.9
122
123   . drop if servallowchrg==0 | servallowchrg==.
124   (117 observations deleted)
125
126   . sum servallowchrg
127
128     Variable |      Obs        Mean    Std. Dev.      Min        Max
129   ----------+--------------------------------------------------------
130   servallowc~g |   213176    25.45998    72.60292      .01     9949.9
131
132
133   . * drop if billed amount is less than paid amount, it's often identical
134   . drop if servsubmtchrg < servallowchrg
135   (0 observations deleted)
136
137
138   . * do they pay provider charged amount?
139
140   . gen byte paycharged = (abs(servsubmtchrg - servallowchrg) < .005)
141
142   . tab servyr paycharged, missing
143
144              paycharged
145    servyr |       0         1   |    Total
146   --------+-----------------------+----------
147     1991 |   9,409    21,267   |   30,676
148     1992 |   8,994    29,942   |   38,936
149     1993 |  16,373    34,166   |   50,539
150     1994 |  15,811    20,648   |   36,459
151     1995 |  20,668    18,853   |   39,521
152     1996 |   9,806     7,239   |   17,045
153   --------+-----------------------+----------
154    Total |  81,061   132,115   |  213,176
155
156
```

 

File: T:\Abbott_DOJ\PBC Hard-Drive\Abbott_DOJ_PBC_6_20_08\ABBOTT-20080618-S-0001\from_duggan_to_steck\mgd-fina
l\medicaid\ndc_based\il\log\il9701-main.log  6/1/2008, 7:40:46PM

```
274
275  .
276  . * do they pay provider charged amount?
277  .
278  . gen byte paycharged = (abs(servicepayableamt - providerchargeamt) < .005)
279
280  . tab fileyear paycharged, missing
281
282           |       paycharged
283  fileyear |        0          1 |      Total
284  ---------+----------------------+----------
285     1997  |   30,022     21,650 |    51,672
286     1998  |   37,153     14,435 |    51,588
287     1999  |   57,546      9,477 |    67,023
288     2000  |   49,817      7,650 |    57,467
289     2001  |   49,424      7,232 |    56,656
290     2002  |   31,393      4,863 |    36,256
291     2003  |      883        383 |     1,266
292     2004  |       12          9 |        21
293  ---------+----------------------+----------
294    Total  |  256,250     65,699 |   321,949
295
296
297  .
298  . * time period for adjudication formula to use
299  .
300  . gen timeperiod = 0
301
302  .
303  . * an indicator for whether dispensing fee appears to be "wrong" given program
304  >  rules, etc.
305  . * lowest dispensing fee in effect during period was 3.58
306  .
307  . gen byte wrongdisp = 0
308
309  . replace  wrongdisp = 1 if prof < 3.575
310  (2 real changes made)
311
312  .
```