# EXHIBIT FA

*Ira Burney*
*202 – 690 – 7600*

# FINAL REPORT

## ON THE

# "Prices Established by the Private and Public Sectors for Drugs Also Covered Under Medicare Part B"

SUBMITTED January 11, 2002

The statements contained in this report are solely those of the author and do not necessarily reflect the views or policies of the Center for Medicare and Medicaid Services. The contractor assumes responsibilities for the accuracy and completeness of the information contained in this report.

Prepared by
**Jing Xing Technologies, Inc.**
Contract Number 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/0017

HHD128-0164          F

# "Prices Established by the Private and Public Sectors for Drugs Also Covered Under Medicare Part B"

Submitted by

## John Long, M.D., Ph.D., M.B.A.
### Health Care Consultant and Medical Director for Jing Xing Technologies, Inc.

## ACKNOWLEDGEMENTS

**Guice Galloway** – Data analyst, Statistician and Research Associate
Who learned more about drugs that she ever intended...
Received more excuses from drug sources than a street buyer without a twenty...
And balanced all with grace and style.

**John Aforisimo** – President and CEO, R. J. Health Systems, Inc.
Wethersfield, CT.
One of the few who is dedicated to making the business fair while educating those who have to decipher the regulatory quagmire. John offered his assistance to this research team and was accepted as a co-member.

**E. M. (Mick) Kolassa, Ph.D.** – Associate Professor of Pharmacy Administration, Coordinator, Pharmaceutical Marketing and Management Research Program, and Associate Director, Center for Pharmaceutical Marketing and Management, School of Pharmacy, University of Mississippi
Mick allowed us to bounce ideas, concepts and problems off his staff and himself. His knowledge of the marketplace and its philosophies proved enlightening and, at times, disconcerting. We express our thanks to Mick and his team at Ole' Miss.

**CMS Team – Glenn W. Kendall, Esq.**
**Marvin Stoogenke, R.Ph.**
**Joanne Spalding**
**Joan Proctor-Young**
Thanks for your leadership and input to this report and all the research that it entails. You could have just accepted this as another assignment, instead you embraced it with enthusiasm. It turned out better because of you.

HHD128-0165

# CONTENTS

**Executive Summary**                                                iv

**Research**

      INTRODUCTION                                      1
      BACKGROUND                                        2
      METHODOLOGY                                       3
      ANALYSIS                                          6
      FINDINGS                                          7
      MEDICARE SAVINGS                                  12
      CONCLUSIONS                                       14
      RECOMMENDATIONS                                   15
      POTENTIAL AREAS FOR FUTURE RESEARCH               15

**Appendix I (attached)**

      GLOSSARY                                          18
      TOP 20 DRUG ANALYSES AND DATA                     21

**Appendix II (separate cover)**

      TOP 60 DRUG DATA

**Appendix III (separate cover)**

      BACKGROUND

HHD128-0166

# Tables

Table 1: Top 20 Drugs (by Expenditure) Provided by Physicians — 4

Table 2: HCPCS J1745 Remicade Products — 5

Table 3: Sources of Commercial Pricing — 6

Table 4: Average Provider Profit from the Brand and Generic Markets — 8

Table 5: Variability Between Carrier Allowable Amounts and the Number of Products within a HCPCS Code — 9

Table 6: The Lowest RedBook (Line Graph) vs. Lowest Acquisition Price by Product (0 Baseline) — 11

Table 7: Summary of Findings — 12

HHD128-0167

# EXECUTIVE SUMMARY

## PRICES ESTABLISHED BY THE PRIVATE AND PUBLIC SECTORS FOR DRUGS COVERED UNDER MEDICARE PART B

This research has been commissioned by the Provider Billing and Education Group, Center for Medicare Management, within the Centers for Medicare and Medicaid Services to study drugs covered under Part B regarding the current carrier reimbursement practices, commercial and government market place pricing, market monitoring and feasible reimbursement strategies. The caveats attached to any strategies included the following fairness issues: 1.) the reimbursement strategy must allow beneficiary access to the drug, 2.) the strategy must allow a reasonable profit to the provider, and 3.) the strategy provides for potential taxpayer savings (via the Medicare Trust Fund).

The drugs targeted in this research were injectable pharmaceutical agents, administered by a provider and billed to carriers for reimbursement from the Medicare Part B program. This research did not include drugs issued by pharmacies under the DMERC program. Of the potential 450 HCPCS codes of potential interest, only the top 60 (by expenditure) were collected. A detailed analysis was conducted on 20 of the top 60 drugs, representing some 65% of all Part B Medicare drug expenditures for the year 2000.

Representative samples of prices available to the commercial and government purchasers were collected. Medicaid prices were not addressed since it represented an entirely different statutory delivery model. Prices were obtained from the Federal Supply Service, the Veteran's Administration, pharmaceutical distribution centers, market monitors, retail markets, internet pharmacies, industry representatives, physicians and clinics.

Once these prices were obtained, the analytical phase of the research began, focused upon two questions:

(1)     Analyze the current carrier payment methodology and determine if there is a variance between carrier payments; if so, what is the impact to the Medicare Trust Fund?

(2)     Obtain and analyze prices for Part B pharmaceuticals at the levels of provider acquisition, discounts or wholesale, RedBook, WAC and FSS. Analyze using the NDC codes and suggest alternative pricing methodologies.

This study differs from prior GAO and OIG reports in many respects. Prior reports did not collect prices by NDC for assured accuracy, nor did they assess the large and complicated generic market. This study also differs in that the actual carrier payment amounts were obtained and analyzed. This research was careful to define "acquisition" price as that price available to any provider within the continental United States whether a single unit (low volume) buyer or greater. This study also names the sources of pricing and the actual manufacturer that provided the product.

iv

HHD128-0168

# CONCLUSIONS

1.) The allowable amounts calculated by the various carriers vary considerably. The calculations for brand drug products have less variability between carriers, but results in an annual Trust Fund loss of $ 27,357,960.20. The calculations for generic or off-patent products have a higher degree of variability, resulting in an annual Trust Fund loss of $40,640,970.00. (Figures based on 16 brand and 4 generic drugs representing 65% of part B expenditures in the year 2000).

2.) A savings of $67,998,930.20 was achieved by using a single source for calculating allowable amounts (single pricer) and without changing the regulations.

3.) Using the current formula of 95% of the RedBook or a similar price generally works for brand products. (Results in an average provider profit of less than 20%)

4.) The present Medicare reimbursement system provides physicians and clinics with a net profit or return on investment of 18.07% for brand products. This average is skewed to the high side due to two brand products (Anzemet and Lupron). Without these two outliers, the ROI averages 11.14%.

5.) The present Medicare reimbursement system cannot take advantage of the lowering prices as a drug product moves from a brand (patented) to a generic market (off-patent) because of RedBook dependency and methods for calculating allowables.

6.) The two methodologies for calculating allowable amounts for generic drug products are flawed. When the median price of the multi-source or generic drug is used for calculations, the results do not follow the decreasing prices available in this market. This results in provider profit margins averaging 583.5%. When the second method is applied, finding the lowest priced "brand" name (other than chemical name), this depends upon whether or not a manufacturer decides to name their generic version of the drug. If most manufacturers did attach their own name, the lower acquisition price (times 95%) would always result in a net loss to the provider. Between these two methodologies lies a solution.

7.) Various formulae to calculate AWP were tested (options 2 and 3) and found to result in savings to the Trust Fund.

    a. Option 2 averaged the RedBook price plus the lowest available acquisition price to calculate AWP. This resulted in an annual savings of $495,899,851.60 for the 20 drugs studied.

    b. Option 3 averaged the RedBook price plus the two lowest acquisition prices to calculate AWP. This resulted in an annual savings of $493,039,238.10 for the 20 drugs studied.

8.) When calculating a new generic AWP and allowable amount using either option 2 or 3, option 3 maintained a similar net profit to the providers as the current brand methodology (less than 20%).

9.) The ASP proposal before the legislature insures a 20% return on investment to the providers. Both the current brand AWP calculations and option 3 for the generic AWP calculations allow for an average of 11 to 12% ROI to the providers. Given that providers can increase their margins through discounts, a single drug pricer, using a market-monitoring approach, can approximate the effect of ASP with less governmental intrusion

10.) The present paper claim forms accept decimals allowing a provider to indicate that 1.5 or 2.3 units were administered to a patient. The new electronic format does not allow for decimals in the appropriate field, thus forcing the providers and carriers to always "round up" to the next full unit. With chemotherapy units costing hundreds of dollars and many units being administered at one time, this "rounding" could prove costly.

HHD128-0169

# RECOMMENDATIONS

1.) Establish a single drug pricing entity to calculate allowable amounts for the carriers on a monthly basis. Allow the carriers to use the central pricing as a national recommendation thus saving a minimum of $68 million annually or mandate such use; which may require regulation.

2.) Connect the FDA data files with the single pricing entity to communicate newly approved pharmaceutical agents as well as patent expiration dates by NDC.

3.) The establishment of a single pricing entity provides a platform to accept changes to the current payment formula or pricing methodology (ASP) with accuracy.

4.) Price all drugs by NDC (used now by FDA and the pharmaceutical industry) and provide a HCPCS to NDC crosswalk to assure accuracy of calculations.

5.) Maintain the current <u>brand</u> AWP methodology that is producing about a 12% ROI to the providers.

6.) Revisit the formula for calculating the allowable amount for <u>generic</u> drug products with the goal of producing a similar ROI for providers as the brand system. Using option 3 above results in a fair generic reimbursement rate while saving the Trust Fund significant dollars ($493 million annually).

7.) Focus more on the generic market rather than the brand market, but monitor the brand market and build in some "circuit breakers" that trip when an excessive ROI is noted (e.g., Lupron).

8.) Reciprocally, build in "circuit breakers" that ensure the allowed amounts do not drop below the prices available to providers

9.) Make sure that the methodology for calculating AWP and allowable amounts is visible to all interested parties to foster cooperation, trust and feedback for improvement.

10.) Conduct a cost to benefit study that would compare the cost of changing the "units" field in the electronic claim form to accept decimals versus the Trust Fund expenditure for "rounding up" all drug units.

HHD128-0170

# REPORT

## PRICES ESTABLISHED BY THE PRIVATE AND PUBLIC SECTORS FOR DRUGS COVERED UNDER MEDICARE PART B

This research has been commissioned by the Provider Billing and Education Group, Center for Medicare Management, within the Centers for Medicare and Medicaid Services to study drugs covered under Part B regarding the current carrier reimbursement practices, commercial and government market place pricing, market monitoring and feasible reimbursement strategies. The caveats attached to any strategies included the following fairness issues: 1.) the reimbursement strategy must allow beneficiary access to the drug, 2.) the strategy must allow a reasonable profit to the provider, and 3.) the strategy provides for potential taxpayer savings (via the Medicare Trust Fund).

The drugs targeted in this research were injectable pharmaceutical agents, administered by a provider and billed to carriers for reimbursement from the Medicare Part B program. This research did not include drugs issued by pharmacies under the DMERC program. Of the potential 450 HCPCS codes of potential interest, only the top 60 (by expenditure) were collected. A detailed analysis was conducted on 20 of the top 60 drugs, representing some 65% of all Part B Medicare drug expenditures for the year 2000.

Representative samples of prices available to the commercial and government purchasers were collected. Medicaid prices were not addressed since it represented an entirely different statutory delivery model. Prices were obtained from the Federal Supply Service, the Veteran's Administration, pharmaceutical distribution centers, market monitors, retail markets, internet pharmacies, industry representatives, physicians and clinics.

Once these prices were obtained, the analytical phase of the research began, focused upon two questions:

(1)     Analyze the current carrier payment methodology and determine if there is a variance between carrier payments; if so, what is the impact to the Medicare Trust Fund?

(2)     Obtain and analyze prices for Part B pharmaceuticals at the levels of provider acquisition, discounts or wholesale, RedBook, WAC and FSS. Analyze using the NDC codes and suggest alternative pricing methodologies.

This study differs from prior GAO and OIG reports in many respects. Prior reports did not collect prices by NDC for assured accuracy, nor did they assess the large and complicated generic market. This study also differs in that the actual carrier payment amounts were obtained and analyzed. This research was careful to define "acquisition" price as that price available to any provider within the continental United States whether a single unit (low volume) buyer or greater. This study also names the sources of pricing and the actual manufacturer that provided the product. The extensive analysis by product is attached as Appendix I.

1

# BACKGROUND

Reports by the Department of Health and Human Services' (HHS), Office of the Inspector General (OIG), the Department of Justice (DOJ), and the House Committee on Commerce found that, in some cases, Medicare's payments for part B covered drugs were significantly higher than physicians' and other providers' actual costs of acquisition[1]. They found that the average wholesale prices (AWP), the "list" prices set by drug manufacturers and used by Medicare to calculate payment rates, were not representative of the actual cost of these drugs to providers.

The drugs provided by physicians (non-self administrable) account for the largest share of Medicare expenditures for drugs under Part B, while billing volume is dominated by the drugs provided by pharmacy providers. Drugs provided in the physician office account for over 75 percent of Medicare spending for drugs in 1999[2]. Three medical specialties, hematology-oncology, medical oncology and urology bill Medicare primarily for drugs used in the treatment of cancer and represented 80 percent of total Medicare payments to physicians for drugs. By contrast, pharmacy suppliers accounted for over 80 percent of Medicare drug billing volume and less than 20 percent of corresponding payments[3]. This study focuses on the drugs provided by physicians within these three medical specialties.

Physicians, hospitals, clinics, and other facilities where Medicare beneficiaries receive their medical care provide and pay for drugs, supplies and devices used in the diagnosis and treatment of their patients. These medical providers "invoice" the Medicare program seeking reimbursement or "coverage". In the case of drugs, Medicare generally covers medicines that are provided "incident to" the physician's service (as explained in the Social Security Act of 1965, Section 1861(s)(2)(A)). There is no prescription drug benefit, as yet, so outpatient drugs (those given in the home) or prescriptions are typically not covered. Drugs given to a beneficiary in an inpatient (admitted to a facility) or within the outpatient facility are usually covered under the same criteria as "incident to" drugs. Drugs so furnished are reimbursed to the facility or health care provider using various formulae.

Medicare bases its reimbursement to physicians and other providers of drugs on the average wholesale price (AWP). AWPs are published for each drug identified by an NDC. Drug manufacturers periodically report AWPs for NDCs to publishers of drug pricing data, such as Medical Economics Company, Inc., which publishes the RedBook, or First Data Bank, which compiles the National Drug Data File. Publishers of AWPs and other drug prices have stated that they list the prices as reported to them by the manufacturers. Medicare carriers, the contractors responsible for paying Part B claims,

---

[1] GAO 01-1118, page 2

[2] Medicare Payment for Covered Outpatient Drugs Exceed Providers Cost, September, 2001 (GAO 01-1118) United States General Accounting Office, Report to Congressional Committees.

[3] Medicare Physician Fee Schedule: Practice Expense Payments to Oncologists Indicate Need for overall Refinements, October, 2001 (GAO 02-53)

2

HHD128-0172

use published AWP to determine the Medicare allowed amount, or payment, which is 95% of AWP for each HCPCS coded drug. Because on HCPCS code may have multiple NDCs that match the HCPCS code product's definition, the carriers may determine the Medicare payment by analyzing multiple NDCs

Section 4556 of the BBA established payment for drugs and biologics not paid on a cost or prospective payment basis at the lower of the actual billed amount or 95 percent of the AWP, effective January 1, 1998. Before this date, drugs (and biologics) not paid on a cost or prospective payment basis were paid on the lower of the estimated acquisition cost (EAC) or the national average wholesale price (AWP) as reflected in sources such as the Red Book, Blue Book, or Medispan.

The regulations before the BBA final rule (*Federal Register* on November 2, 1998), provided that, for multiple-source drugs, the AWP equals the median AWP of the generic forms of the drug. The AWP of the brand name products was ignored on the presumption the brand AWP is always higher than the generic AWPs. While this may have been true when the policy was first promulgated, it is not always true now. Therefore, the AWP for multiple-source drugs was revised to equal the lower of the median price of the generic AWPs or the lowest brand name AWP. A "brand name" product is defined as a product that is marketed under a labeled name that is other than the generic chemical name for the drug or biological.

# METHODOLOGY

Multiple data sources were used to collect information relevant to this report. In order to obtain drug payment and utilization data for the year 2000, we accessed HCFA's (DSAF) National Claims History file and obtained a 100% file containing the allowed charges for all the Part B physician-injected drugs. This file also contained the final payment amounts that Medicare paid the providers after co-insurances, primary insurance deductions and the like were removed. The first file containing allowed charges was used in this research. The total amount allowed added up to $4,315,821,342.00 for the year 2000.

We contacted each Medicare carrier in order to obtain their current drug reimbursement amounts for covered drugs. We obtained the amounts of funds spent on each HCPCS drug product grouping by each carrier. The methodologies were also requested and obtained for calculating these amounts. Most of the carriers responded in a timely fashion, however, not all of their prices and calculations were always received.

Wholesale drug prices, retail vendors, drug pricing software venders, catalog sources, internet sources and any other distributing source available to the average provider was sampled for specific drug prices (Table 3). The Veteran's Administration was contacted in order to obtain Federal Supply Service (FSS) pricing and Federal ceiling prices (FCP). HCFA's (CMS) Medicaid Drug Rebate Initiative system was also queried for current pricing and rebate rates, but no data was provided.

3

HHD128-0173

## SELECTING DRUGS FOR REVIEW

Medicare identifies covered drugs using (HCPCS). The HCPCS codes define the type of drug and, in many cases, a dosage amount. The National Claims History File was queried for all HCPCS drug codes with regard to their Medicare Trust Fund utilization for the year 2000. From this utilization file, a second list of drug codes that comprised approximately 96% of all expenditures was created. This second list of non-self-administered drug products yielded 60 HCPCS coded pharmaceuticals. These 60 HCPCS codes were used for this study. The data for each of these codes is contained in the attached data files.

In order to further condense the study into a manageable size, a detailed analysis was conducted for only one third of the most expensive drugs. These top 20 drugs were responsible for 65% of the injectable drug expenditures made by the Medicare Trust Fund ($2,768,988,715.00). See Table 1 for a summary of these drugs.

### Table 1: Top 20 Drugs (by Expenditure) Provided by Physicians

| HCPCS | Chemical/Generic Name | Brand Name | Allowed Charges | Percent of Total |
|-------|----------------------|------------|-----------------|------------------|
| J9217 | leuprolide acetate (depot) | Lupron Depot | $636,918,103.00 | 14.76% |
| Q0136 | epoetin alpha | Epogen; Procrit | $544,266,588.00 | 12.61% |
| J9265 | Paclitaxel | Taxol | $287,312,312.00 | 6.66% |
| J2430 | pamidronate disodium | Aredia | $157,851,169.00 | 3.66% |
| J9045 | Carboplatin | Paraplatin | $141,489,337.00 | 3.28% |
| J9310 | Rituximab | Rituxan | $136,925,448.00 | 3.17% |
| J9206 | Irinotecan | Camptosar | $118,992,696.00 | 2.76% |
| J9170 | Docetaxel | Taxotere | $111,823,991.00 | 2.58% |
| J9201 | gemcitabine HCl | Gemzar | $101,524,582.00 | 2.35% |
| J1260 | dolasetron mesylate | Anzemet | $83,293,977.00 | 1.93% |
| J0640 | leucovorin calcium | | $69,761,827.00 | 1.62% |
| J1745 | Infliximab | Remicade | $61,267,310.00 | 1.42% |
| J2405 | ondansetron HCl | Zofran | $55,496,061.00 | 1.29% |
| J1561 | immune globulin (500mg) | | $54,855,808.00 | 1.27% |
| J1562 | immune globulin (5gm) | | $51,178,608.00 | 1.19% |
| J1626 | granisetron HCl | Kytril | $42,994,129.00 | 1.00% |
| J9355 | Trastuzumab | Herceptin | $36,774,303.00 | 0.85% |
| J9350 | Topotecan | Hycamtin | $35,150,282.00 | 0.81% |
| J9390 | vinorelbine tartrate | Navelbine | $28,083,535.00 | 0.65% |
| J2275 | morphine sulfate | | $13,028,649.00 | 0.31% |

Unlike the GAO and OIG reports preceding this research, even HCPCS codes with multiple sourced drug products were included in the study. This accounted for the four "generic" pharmaceutical lines (J2275, J1561, J1562 and J0640) as noted by the blank "Brand Name" fields in Table 1.

4

HHD128-0174

HCPCS codes that represent brand products usually contained between 1 and 10 total products from a single source (manufacturer) or up to four sources (manufacturer plus licensees). HCPCS codes that identified the four generic lines could have up to 150 products from dozens of sources. In order to accurately account for these products, all drug products were converted to their individual NDC number.

## MATCHING HCPCS CODES TO NATIONAL DRUG CODES

The VA, Medicaid and FDA identify drugs using National Drug Codes (NDC). These codes are used by manufacturers to identify their own products. Every drug manufactured or distributed in the United States has a unique NDC. There are three components to each NDC product code. The first NDC component identifies the manufacturer of the drug (Table 2 shows Remicade, produced by Centocor bears an NDC that begins with 57894). The second component is the product dose form (Table 2 NDC numbers 0030 represent Centor's Remicade 100mg product). The final component indicates the package size (Table 2 NDC numbers 01 refer to Centocor's single vial product). From the NDCs, one can determine the number of competing products within each HCPCS code (in the case below, there are three products by two companies). There may be dozens of NDCs or unique drug products found under one HCPCS code. Many similar products or a "multiple source drug" may have a wide variation in pricing between the various manufacturers, whereas a HCPCS code with only one NDC (single source drug) may present a single price.

All covered drugs were listed by their available NDCs as well as HCPCS codes. These two lists were carefully merged into a "HCPCS to NDC" conversion file. Using this conversion file, we could enter a HCPCS drug code and gain access to the current NDC products available.

### Table 2: HCPCS J1745 Remicade Products

| Brand | Manufacturer | Mg | Strength | Size | NDC |
|-------|-------------|-----|----------|------|------|
| Remicade | Centocor | 100 | 100mg | Each | 57894-0030-01 |
| Dexferrum | Amer Regent | 500 | 50mg/ml | 10x1ml | 00517-0134-10 |
| Dexferrum | Amer Regent | 1,000 | 50mg/ml | 10x2ml | 00517-0234-10 |

By utilizing the NDC codes, we could match individual prices to products in order to increase our overall study accuracy.

## COLLECTING PRICES

Three different types of sources were tapped for pricing data: (1) Government agencies such as the Veterans Administration and the Food and Drug Administration, (2) Private companies that compile drug data such as RedBook, First Data Bank, R. J. Health Systems, and the various Medicare carriers, and (3) Pharmacies, distributors, wholesalers, retailers, manufacturers of pharmaceuticals as well as Medicare providers and clinics (see Table 3).

5

HHD128-0175

Table 3: Sources of Commercial Pricing

| | | |
|---|---|---|
| AARP Pharmacy | FloMed Corporation | Prime Med Rx |
| All Pharma Inc. | Florida Infusion | Promini |
| America Rx | Forrest Laboratories, Inc. | Realfast Drug Store |
| Barr Laboratories | Freedom Drug | Rx City |
| CVS Pharmacy | GIV | Rx USA International |
| Destination Rx | Ivax Corporation | Schein Pharmaceuticals |
| Drug Emportium | M.D. Depot | Teva Pharmaceutical Industries |
| E Surg | Mylan Laboratories, Inc. | U.S. Medication |
| Eckerd | Overseas Pharmacy Connection | Vital Rx |
| Eveready Drug | Perrigo Company | Watson Pharmaceuticals |
| Express-Scripts | Pharmerica | Web Rx |
| Facts and Comparisons | Phar-Mor Pharmacy | Zenith Goldline |
| Fertility Rx | Pill Bottle | |

Instead of adopting an investigative posture to obtain the various price sources, we took the approach of a potential low volume purchaser located in a semi-remote area. This approach assured us that the prices we obtained would be the same as actual acquisition costs to a "small town" provider located within the continental United States. At no time were discounts or rebates added to our analyses. Yet, we were offered between 5% and 15% off list prices for the brand products and up to 55% off the generics (see various catalogs and web sites).

## ANALYSIS

Sixty HCPCS codes, representing 96.134% of Part B injectable expended funds, were analyzed during the course of this research. A subset of 20 HCPCS codes representing 65% of Medicare Trust Fund Part B drug expenditures (for the year 2000) was subjected to pattern analysis as well as provider cost, allowable amount and RedBook breakdowns. The total amount of Trust Funds expended on the 20 drugs was $2,768,988,715.00 as reported from the Part B data obtained from the DSAF files.

These data were analyzed for variations of allowable amounts (payment dollars) between carriers. When a variation occurred, the possible reasons for the variance was hypothesized. Payment amounts were subjected to means analysis, mode determinations and standard deviation calculations. Each of the carriers' sources of information was studied as well as their methods of calculation and the specific products they used.

The Veterans Administration was contacted and the appropriate Federal Supply Schedule (FSS) drug prices were obtained. These prices were entered into a data file by NDC code. Close to the FSS prices are the negotiated "Big 4" prices made available to certain government agencies. These prices were also obtained and entered by NDC.

The RedBook prices available during the year 2000 were obtained from previous editions of the RedBook. Additionally, First Data Base (reflecting AWP) and R.J. Health Systems (reflecting 95% of AWP) were entered into the data files.

6

HHD128-0176

Acquisition prices were obtained from the sources noted in Table 3. Some sources carried many of the drugs in this study, while others might have handled only a few products. Each of the product prices were matched to their correct NDC numbered product and entered into the data. NDC prices were then converted to a "unitized" price for purposes of comparison.

All prices entered into the data file were listed on individual HCPCS data sheets, labeled "prices". Additional data sheets, labeled "unit prices", were created in order to unitize all strengths and sizes of packaging into the same size units. The unit size corresponded to the defined size of the drug as regulated by the HCPCS code. Thus, all prices discussed in this report are "unitized" prices, i.e., if the HCPCS definition of a payment unit was 5 mg., all drug prices within that HCPCS code were converted to 5 mg units. This methodology assures an equal comparison of drug prices.

# FINDINGS

## THE PROVIDER
### Provider Costs

The prices obtained for this study assumed certain parameters:

> 1.) The provider was a low volume purchaser
> 2.) The provider was not a member of any purchasing group
> 3.) Sale prices, discounts or rebates were not available
> 4.) Delivery charges were included in the drug cost

Given these parameters, we were confident that any physician within the continental U.S. could obtain the prices we acquired. All prices were entered into the data spread sheets labeled "prices" and "unit prices" found in Appendix I by HCPCS code.

### Provider Profit Margin

The potential profit margin to each provider is dependent upon provider purchasing volume, availability of purchasing groups, and relationships with distributors and manufacturers' representatives. It is also clear to us that any physician could easily have improved upon our calculations to increase their profit margins.

The sixteen brand name drug lines provided physicians with an average profit margin of 18.07%. Anzemet, Navelbine and Lupron all carried profit margins above 20% while the other 13 branded products were below 20%. Anzemet and Lupron clearly stood out as the profit leaders among the brands. A summary of all the provider profit margins (return on investment or ROI) can be seen on Table 7.

In contrast, the four generic drug lines provided physicians with an average profit margin of 583.5%. Morphine, the oldest generic of the four, provided the highest margin of 1187% while the other three did not dip below 259% profit. The average profit per brand product versus generic product is depicted in Table 4.

7

HHD128-0177

The dollars available within a product's marketplace follow two distinct patterns. The first pattern, the brand or patent product pattern, controls the degree of provider profit through price setting and discounting. The main portion of the dollars returns to the manufacturer to recover costs of development. The second pattern, the generic or off-patent pattern, is driven by the costs of drug manufacture (rather than development and manufacturing costs). This allows for deep price drops and discounts from multiple manufacturers and discounters. The profit margins should shift from the manufacturers to equally distribute across the marketplace. In reality, the Medicare carriers fail to drop their allowable amounts to parallel the market. Two reasons were found for this problem: first, the RedBook was used almost exclusively used as a basis for pricing, and second, the formulae used to calculate AWP for generics is faulty. This results in high Medicare payment rates when compared to actual provider acquisition costs. In effect, instead of the profit margins equalizing across the market, it shifts toward the providers because Medicare carriers calculations are not allowed to follow the dropping market.

**Table 4: Average Provider Profit from the Brand and
Generic Markets**



**Wedge 1**: Provider Profit from the average of sixteen **Brand** products
**Wedge 2**: Provider Profit from the average of four **Generic** Products

## THE MEDICARE CARRIERS

### Carrier Variance in Calculating Allowable Amounts

A comparison between the various carriers and their methods for calculating allowable amounts found that most carriers adhered to the mandated formulae. There was usually consensus between the carriers when few drug products occupied a particular HCPCS code. This is the case of brand or trade products, controlled by a single source.

Confusion between the carriers increased as multiple source drugs appeared under the HCPCS code (Table 5). Higher rates of disagreement for reimbursable amounts also appeared as larger numbers of RedBook prices became available.

**Table 5: Variability Between Carrier Allowable Amounts**

8

HHD128-0178

**Table 5: Variability Between Carrier Allowable Amounts
and the Number of Products within a HCPCS Code**



There are three identifiable "spikes" in Table 5. These represent three of the four generic drug lines that were not included in the GAO and OIG reports (Immune globulin 500 mg, Morphine, and Immune globulin 5gm). By erasing these three spikes, it might appear that the carriers' allowable calculations were within approximately 20% of each other. With the generic spikes in place, it is clear that the carriers have difficulty agreeing on an allowable amount (25% to 85%) when more than 5 individual drug products make up a HCPCS code. The generic drug not so easily detected as a spike is Leucovorin. Another apparent small spike is Epogen (see Epogen report for details of carrier confusion).

Recall from the introduction that the regulation for determining the AWP for multiple-source (generic) drugs was revised to equal the lower of the median price of the generic AWPs or the lowest brand name AWP. It appears that the carriers attempt to establish their AWPs using the "median price" part of the regulation. This results in a payment that is much higher than the lowest priced product available. Using the second method of the formula was also a problem.

There is no rule that requires a manufacturer or distributor to label a generic product with their own name (brand). Almost all of these generic drug houses use the chemical or generic name for their label (example: the chemical name morphine sulfate is used by 86% of the distributors rather than attaching a name that attributes their company logo to the product). If a distributor does attach such a "brand" name, then and only then would their price be considered in the second method. There is no relationship between a "branded" multi-source drug and its pricing within the generic marketplace. Therefore, the second method of using the "lowest brand product available" to obtain AWP has no consistent basis and cannot be relied upon to assist the carriers' in their calculations.

9

HHD128-0179

In addition, when queried, the various carriers were unsure how to validate whether a drug was generic or brand. While this process is not beyond their potential scope, the carriers would have to allow much more time than they currently allocate (2.8 FTE's from the carriers' own reports).

Forty (40%) of the variability between carriers occurs with the brand products. This amounts to $27,357,960.20 annually and is due to variations between carriers regarding:

1.) Base prices from RedBook, First Data Bank, etc.
2.) Editions of reference prices (1999 RedBook, 3rd quarter, etc.)
3.) Which drug product (NDC) to use as median
4.) Math errors (usually decimal point errors)
5.) Typographical and transposition errors

The four generic HCPCS codes accounted for $40,640,970.00, or 60% of all the money lost ($67,998,930.20) due to carrier contractor variability (recall that this study employs only 65% of the part B drug expenditure for the year 2000). The reasons for this incredible annual loss lie in the carriers' inability to follow the generic market and price accordingly. In the generic arena, the degree of inaccuracy of reimbursement from Medicare to the providers increases as the number of available drug products increases.

## THE REDBOOK PRICES

The RedBook prices generally reflect the middle to high retail acquisition price of brand pharmaceuticals before any discounts or rebates. It does not reflect the "wholesale" market. It does not reflect any "average". For generic products, the RedBook prices do not follow the actual acquisition market and should not be used to calculate allowable amounts without other factors.

The lowest RedBook price was compared to the lowest available acquisition price. The difference between these two lowest prices was always a positive number, indicating that the RedBook price exceeded the acquisition 100% of the time. The degree of this difference is shown on Table 6.

In the table, the RedBook price was computed as a percentage (as depicted by the line graph) over the actual acquisition price (baseline). Overall, the RedBook price exceeded the acquisition price by an average of 149.8%. This percentage is not consistent, so we broke down the generic and branded results. As revealed in Table 6, there is one tall spike that represents the generic drug, Leucovorin (J0640) and a number of smaller spikes, each depicting one of the other three generic products (Immune globulin 500 mg, Morphine and Immune globulin 5 gm) plus Lupron (J9217) and Epogen (Q0136).

When the brand products were averaged alone, the RedBook price was 132% above the best acquisition price before discounts The largest exception is Lupron with a RedBook price 327% above acquisition. Lupron's manufacturer presents a very difficult set of strengths and package sizes to work with while the other brand products are consistently easier. Generally, the RedBook prices are slightly more than 114% of the acquisition price. This more than makes up for the 5% reduction from AWP payment established by law.

10

**Table 6: The Lowest RedBook (Line Graph) vs. Lowest Acquisition Price by Product ( 0 Baseline)**



When _generic_ products were averaged, the RedBook price was 223% higher than the acquisition price. This, again reflects the problem with the RedBook price being the sole source of pricing data for the generic drugs. Coupled with their only other inconsistent option of using the lowest priced "brand" generic, the carriers, and thus the taxpayers, are paying too high a generic allowable rate.

**RedBook and Allowable Amounts**

RedBook prices are used to calculate the Medicare allowable amounts 82% of the time. This allows us to use Table 6 to visualize the reimbursement rates to the providers. The X axis baseline of "0" represents the price that the provider purchased the product (before discounts and rebates). The Y axis presents the RedBook price as a percentage above the acquisition price. By visualizing a 5% reduction from the linear graph, one can see what the allowable amount reimbursed to a provider (AWP (RedBook) x 95%) would be. Note that there is always a profit to the provider in all 20 drugs products studied.

In order to see if carriers were calculating prices according to the generic regulations, we analyzed the various median prices and "brand" pricing available by NDC code. Most carriers attempted to establish a median price based upon the RedBook. Empire and Puerto Rico actually researched a lower priced "brand" product as their basis for pricing. Without the ability to utilize an NDC/HCPCS crosswalk, most of the carriers were forced to rely on the RedBook.

11

HHD128-0181

with this concept is that there is no consistent logic pattern followed by the industry in naming or labeling their "brand" of generic. With Morphine, we found Elkins-Sinn and Baxter produced Duramorph, Wyeth had Infumorph, and Purdue Fredrick had MSIR. One MSIR unitized price was $ 0.53 and another was $ 0.50 as advertised by Family Meds and Web Rx. These prices were enough to base an AWP calculation of 95% of $0.50 or $0.48 allowable amount per 10 mg unit. If this had occurred, many of the average providers would not be able recover their drug expenses. The average of multiple drug prices reflect a more accurate picture of the true cost.

## THE MEDICARE SAVINGS

Three separate options were hypothesized as the data from this research began to emerge. The first option targeted the variability between carriers while the second two options focused on the numbers used to calculate AWP and subsequent payment calculations. The summary of the savings achieved by each of these options can be seen on Table 7.

### Table 7: Summary of Findings

| HCPCS | Brand Name | Chemical Name | Provider ROI | Option 1 Single Pricer | Option 2 RedBook + 1 | Option 3 RedBook + 2 |
|-------|-----------|---------------|--------------|------------------------|----------------------|----------------------|
| J9265 | Taxol | Paclitaxel | 7.90% | $19,063,710.00 | $38,928,520.00 | $38,455,050.00 |
| Q0136 | Epogen | Epoetin alfa | 8.70% | $6,809,000.70 | $135,238,190.00 | $114,898,200.00 |
| J2430 | Aredia | Pamidronate disodium | 8.60% | $0.00 | $9,905,920.00 | $12,337,180.00 |
| J9310 | Rituxan | Rituximab | 13.16% | ($5,170.00) | $10,502,768.00 | $9,344,100.00 |
| J9045 | Paraplatin | Carboplatin | 9.80% | $3,882,836.00 | $8,958,352.00 | $10,389,568.00 |
| J1561 | | Immune globulin | 435.00% | $11,173,140.00 | $27,883,996.00 | $26,115,683.00 |
| J9170 | Taxotere | Docetaxel | 7.90% | ($1,692,281.80) | $6,765,314.80 | $5,196,646.80 |
| J2275 | | Morphine sulfate | 1187.00% | $10,816,442.00 | $11,443,495.00 | $11,651,263.00 |
| J1260 | Anzemet | Dolasetron mesylate | 75.20% | $627,056.28 | $19,543,370.00 | $18,544,432.00 |
| J9201 | Gemzar | Gemcitabine HCl | 13.00% | ($529,658.68) | $7,653,848.40 | $9,003,537.90 |
| J9206 | Camptosar | Irinotecan | 8.50% | ($7,800.00) | $7,409,653.80 | $7,247,007.50 |
| J0640 | | Leukovorin calcium | 453.00% | $14,533,570.00 | $46,430,245.00 | $55,874,508.00 |
| J1562 | | Immune globulin | 259.00% | $4,117,818.30 | $20,883,221.00 | $19,088,221.00 |
| J2405 | Zofran | Ondansetron HCl | 10.70% | $0.00 | $3,773,363.90 | $3,911,413.90 |
| J9350 | Hycamtin | Topotecan | 13.10% | ($8,320.00) | $4,067,893.00 | $4,586,503.80 |
| J1745 | Remicade | Infliximab | 10.80% | ($87,192.57) | $4,398,380.60 | $4,582,453.70 |
| J1626 | Kytril | Granisetron HCl | 7.80% | ($1,683.00) | $2,546,254.30 | $2,839,996.50 |
| J9355 | Herceptin | Trastuzumab | 13.00% | $480,381.82 | $2,948,970.60 | $3,107,903.90 |
| J9390 | Navelbine | Vinorelbine tartrate | 23.00% | $10,622.95 | $3,220,315.20 | $3,364,229.10 |
| J9217 | Lupron | Leuprolide acetate | 58.00% | ($1,183,541.80) | $123,397,780.00 | $132,501,340.00 |
| | | | **Totals** | $67,998,930.20 | $495,899,851.60 | $493,039,238.10 |

12

**Option 1: The Single Pricing Entity**

With the variability between carriers noted above, a hypothesis was formed that if there were a single pricing entity that followed the current Medicare rules for calculating allowable amounts, would this increase or decrease Medicare Trust Fund expenditure?

The amount of actual savings to the Trust Fund amounted to $67,998,930.20, mostly from generic rather than brand drug product lines. This annual savings translates into a monthly loss of some five and one half million dollars. One month's loss could more than pay for the creation and maintenance of a single pricing database for a period of two years. Without changing any of the regulations, a single pricer could calculate the AWP, multiply by 95% to obtain the allowable amount, use individual product NDC numbers to assure accuracy, and transmit this information to the carriers on a monthly basis.

**Option 2: RedBook Plus One**

After noting that the current allowable calculations depend too heavily upon RedBook figures, especially with the generic drugs, another method was suggested. What would be the result if the current RedBook price was not used alone, but averaged with an actual acquisition price available to all providers? This new AWP, multiplied by 95%, would produce a lower allowable amount of reimbursement.

The lowest available price for a unitized product was obtained from the data and averaged with the RedBook price most frequently used by the carriers. Ninety five percent of this average produced an allowable amount that was then extrapolated to the total allowable charges for the year 2000. Since the RedBook prices were always higher than the acquisition prices, there were no instances where the new allowable depleted the Trust Fund more.

The total savings to the Trust Fund for a period of one year was $495,899,851.60. The four generic products produced $106,640,950.00 or roughly 21% of this savings. There were instances where the best price for a brand drug was equal to or below 95% of the average (RedBook plus best acquisition price). In these instances, the provider would incur a loss when reimbursed at the new rate. The formula worked well, however, for generic products.

**Option 3: RedBook Plus Two**

Using the concept of option 2 and adding in another actual acquisition price to the average resulted in this third option. The total savings to the Trust Fund equaled some $493,039,238.10 using this method of calculation. There were no instances where either a generic or a brand product yielded a provider loss, yet it was clear that the generic market would be the clear target for such an option.

The current allowable calculation regulations for both the brand and generic can be improved upon. The calculations for brand products are workable and yield reasonable provider profit margins (usually about 10%). On the other hand, the generic calculation, using the lower of the median price of the generics, yields large profits to the providers and losses to the Trust Fund. This leaves the second portion of the calculation, i.e., or the

13

HHD128-0183

lowest "brand name" generic. To find the lowest available generic acquisition price, then multiply that by 95% assures a provider loss 100% of the time. This portion of the regulation is unworkable. Even the ASP concept uses actual acquisition prices and multiplies them by 120%, not 95%.

When two or more prices are used to calculate the AWP, the generic manufacturers will have no idea which of the dozens of available prices are chosen to be factored into the equation. This negates the so-called "observer effect" where some degree of market manipulation is expected when the one being observed attempts guidance. We do believe that the calculations and their derivations should be visible to the providers and contractors, but the size of the generic market will dampen any moves toward manipulation.

# CONCLUSIONS

1.) The allowable amounts calculated by the various carriers vary considerably. The calculations for brand drug products have less variability between carriers, but results in an annual Trust Fund loss of $ 27,357,960.20. The calculations for generic or off-patent products have a higher degree of variability, resulting in an annual Trust Fund loss of $40,640,970.00. (Figures based on 16 brand and 4 generic drugs representing 65% of part B expenditures in the year 2000).

2.) A savings of $67,998,930.20 was achieved by using a single source for calculating allowable amounts (single pricer) and without changing the regulations.

3.) Using the current formula of 95% of the RedBook or a similar price generally works for <u>brand</u> products. (Results in an average provider profit of less than 20%)

4.) The present Medicare reimbursement system provides physicians and clinics with a net profit or return on investment of 18.07% for <u>brand</u> products. This average is skewed to the high side due to two brand products (Anzemet and Lupron). Without these two outliers, the ROI averages 11.14%.

5.) The present Medicare reimbursement system cannot take advantage of the lowering prices as a drug product moves from a brand (patented) to a generic market (off-patent).

6.) The two methodologies for calculating allowable amounts for <u>generic</u> drug products are flawed. When the median price of the multi-source or generic drug is used for calculations, the results do not follow the decreasing prices available in this market. This results in provider profit margins averaging 583.5%. When the second method is applied, finding the lowest priced "brand" name (other than chemical name), this depends upon whether or not a manufacturer decides to name their generic version of the drug. If most manufacturers did attach their own name, the lower acquisition price (times 95%) would always result in a net loss to the provider. Between these two methodologies lies a solution.

7.) Various formulae to calculate AWP were tested (options 2 and 3) and found to result in savings to the Trust Fund.

    a. Option 2 averaged the RedBook price plus the lowest available acquisition price to calculate AWP. This resulted in an annual savings of $495,899,851.60 for the 20 drugs studied.

    b. Option 3 averaged the RedBook price plus the two lowest acquisition prices to calculate AWP. This resulted in an annual savings of $493,039,238.10 for the 20 drugs studied.

14

HHD128-0184

8.) When calculating a new generic AWP and allowable amount using either option 2 or 3, option 3 maintained a similar net profit to the providers as the current brand methodology (less than 20%).

9.) The ASP proposal before the legislature insures a 20% return on investment to the providers. Both the current brand AWP calculations and option 3 for the generic AWP calculations allow for an average of 11 to 12% ROI to the providers.

10.)The present paper claim forms accept decimals allowing a provider to indicate that 1.5 or 2.3 units were administered to a patient. The new electronic format does not allow for decimals in the appropriate field, thus forcing the providers and carriers to always "round up" to the next full unit. With chemotherapy units costing hundreds of dollars and many units being administered at one time, this "rounding" could prove costly.

## RECOMMENDATIONS

1.) Establish a single drug pricing entity to calculate allowable amounts for the carriers on a monthly basis. Allow the carriers to use the central pricing as a national recommendation thus saving a minimum of $68 million annually.

2.) Connect the FDA data files with the single pricing entity to communicate newly approved pharmaceutical agents as well as patent expiration dates by NDC.

3.) The establishment of a single pricing entity provides a platform to accept changes to the current payment formula or pricing methodology (ASP) with accuracy.

4.) Price all drugs by NDC and provide a HCPCS to NDC crosswalk to assure accuracy of calculations.

5.) Maintain the current <u>brand</u> AWP methodology that is producing about a 12% ROI to the providers.

6.) Revisit the formula for calculating the allowable amount for <u>generic</u> drug products with the goal of producing a similar ROI for providers as the brand system. Using option 3 above results in a fair generic reimbursement rate while saving the Trust Fund significant dollars ($493 million annually).

7.) Focus more on the generic market rather than the brand market, but monitor the brand market and build in some "circuit breakers" that trip when an excessive ROI is noted (e.g., Lupron).

8.) Make sure that the methodology for calculating AWP and allowable amounts is visible to all interested parties to foster cooperation, trust and feedback for improvement.

9.) Conduct a cost to benefit study that would compare the cost of changing the "units" field in the electronic claim form to accept decimals versus the Trust Fund expenditure for "rounding up" all drug units.

## POTENTIAL AREAS FOR FUTURE RESEARCH

1.) In theory, a system of pricing could work using the RedBook as the high retail price and the Federal Ceiling Price as the lowest available. Regulations state that the FCP, which is not published, must be 24.1% below the most favored customer price. Using these prices to set the high and low of the market would allow numerous formulae to be piloted.

2.) In order to validate the large discrepancy between the four generic products studied in this research and the sixteen brand drug products, it would be advantageous to expand this research to include 3 more generic products.

15

HHD128-0185          L

# EXHIBIT FB

## 2000 Pricing

**J7050**

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | INFO DATE | LISTED DOSAGE PER REDBOOK | ML | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE @ 95% |
|------|-------------|-------------|-------------------------------|-----------|---------------------------|----|--------------|-------------------|-----------------|
| J7050 | Infusion, Normal Saline Solution | 250 cc | Sodium Chloride (Abbott Hosp) | 2000 ann | Lifecare plastic .9% 250 ml 24's | 24 | $ 278.73 | $ 11.61 | $ 11.03 |
| | | | B. Braun McGaw | 2000 ann | (excel) .9% 250 ml | 1 | $ 10.69 | $ 10.69 | $ 10.16 |
| | | | Baxter | 2000 ann | Single-pack 250 ml 36's | 36 | $ 327.89 | $ 9.11 | $ 8.65 |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! |

| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |
|-----------|--|--|--|--|--|--|--|---------|---------|
| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! | #DIV/0! |

| Generic Median | $ | 10.69 | Lowest Brand | #DIV/0! |
|----------------|---|-------|--------------|--------|
| 95% = Par | $ | 10.16 | 95% = Par | #DIV/0! |
| Non-Par | $ | 9.65 | Non-Par | #DIV/0! |
| Limiting Charge | $ | 11.09 | Limiting Charge | #DIV/0! |

# EXHIBIT FC

WPS00322

Page 1

WPS00558

| ode | Drug Name | Pice | mfctn | Qty | Price | Each | | Page |
|---|---|---|---|---|---|---|---|---|
| N2030 | Sodium Chloride (Normal)-(0.9%) 00074-7983-03 rlc 1-8-2008 | 1000cc | Abbott | 12's | 151.19 | $12.60 | | |
| | | 1000cc | Braun McGaw | 0.9% 1000ml | 14.16 | $14.16 | | |
| | | 1000cc | Braun McGaw | 0.9% 1000ml | 11.34 | $11.34 | X | |
| | | 1000cc | Baxter | 12's | 118.37 | $9.86 | | |
| | | 1000cc | Phys Total Care | 0.9% 1000ml | 2.30 | $2.30 | | |
| N2050 | Sodium Chloride (Normal)-(0.9%) 00074-1583-62 00074-7983-tot 00074-7101-02 00074-7983-02 rlc 1-8-2003 | 250cc | Abbott | 12's | 148.20 | 12.35 | | |
| | | 250cc | Abbott | 24's | 406.70 | 16.95 | | |
| | | 250cc | Abbott | 24's | 278.73 | 11.61 | X | |
| | | 250cc | Braun McGaw | 0.9% 250ml | 10.69 | 10.69 | X | |
| | | 250cc | Baxter | 12's | 116.06 | 9.67 | | |
| | | 250cc | Baxter | 36's | 327.89 | 9.11 | | |

AWQ036-0322

# EXHIBIT FD

DRAFT

**ORIGINAL ARRAY (Per Carrier Array Documents)**

1997 Pricing    Par: $10.44    Non Par: $9.92    Lmt Chrg: $11.40

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | NDC | INFO. DATE | LISTED DOSAGE PER RED BOOK | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE |
|------|-------------|-------------|-------------------------------|-----|-----------|---------------------------|-------------|-------------------|-----------|
| J7050 | Normal Saline | 250cc/250ml | Sodium Chloride (Abbott | 00074-7101-02 | 96ann | Add Vantage Life Care 0.9%, 250ml, 24s | $334.31 | $13.93 | $10.15 |
| | | | (Abbott Hosp.) | 00074-1583-02 | | Life Care Plastic 0.9%, 250 ml 12s | $121.84 | $10.15 | |
| | | | (Abbott Hosp.) | 00074-7983-02 | | Life Care Plastic 0.9%, 250 ml 24s | $229.43 | $9.56 | |
| | | | (Abbott Hosp.) | 00074-6138-02 | | Aqualite 0.9%, 250ml, 12s | $145.64 | $12.14 | |
| | | | Sodium Chloride (Baxter) | | 96ann | 0.9%, 250ml, 12s | $59.52 | $4.96 | |
| | | | | | | 0.9%, 250ml, 12s | $116.06 | $9.67 | |
| | | | | | | 0.9%, 250ml, 24s | $277.34 | $11.56 | |
| | | | | | | 0.9%, 250ml, 36s | $327.89 | $9.11 | |
| | | | (McGaw) | | 96ann | USP Excel 0.9%, 250ml | $10.28 | $10.28 | |

**REVISED ARRAY**

1997 Pricing    Par: $10.44    Non Par: $9.92    Lmt Chrg: $11.40

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | NDC | INFO. DATE | LISTED DOSAGE PER RED BOOK | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE |
|------|-------------|-------------|-------------------------------|-----|-----------|---------------------------|-------------|-------------------|-----------|
| J7050 | Normal Saline | 250cc/250ml | Sodium Chloride (Abbott | 00074-7101-02 | 96ann | Add Vantage Life Care 0.9%, 250ml, 24s | $334.31 | $2.71 | $9.11 |
| | | | (Abbott Hosp.) | 00074-1583-02 | | Life Care Plastic 0.9%, 250 ml 12s | $121.84 | $10.15 | |
| | | | (Abbott Hosp.) | 00074-7983-02 | | Life Care Plastic 0.9%, 250 ml 24s | $229.43 | $1.22 | |
| | | | (Abbott Hosp.) | 00074-6138-02 | | Aqualite 0 9%, 250ml, 12s | $145.64 | $1.28 | |
| | | | Sodium Chloride (Baxter) | | 96ann | 0.9%, 250ml, 12s | $59.52 | $4.96 | |
| | | | | | | 0.9%, 250ml, 12s | $116.06 | $9.67 | |
| | | | | | | 0.9%, 250ml, 24s | $277.34 | $11.56 | |
| | | | | | | 0.9%, 250ml, 36s | $327.89 | $9.11 | |
| | | | (McGaw) | | 96ann | USP Excel 0.9%, 250ml | $10.28 | $10.28 | |

**NOTES:**

1. Source: Electronic array. AWPCD104\AWP020\AWP020-00010002\Part B\Old disks from file cabinet\No date on disk files\Drugbook_I1940-J9062\J7050.WPD
2. The original array old not contain NDC numbers. The NDC numbers for the Abbott products were annotated by Myers and Stauffer from the 1996 annual Drug Topics Red Book, page 451.
3. According to the carrier array document, the Medicare allowance ("Allowable") is located in cell K6 of the original array and cell K25 of the revised array and is the median of the "Cost Unit/Dosage" values.



DRAFT

**ORIGINAL ARRAY (Per Carrier Array Documents)**

1999
Pricing
Par: $ 11.16
Non Par: 10.60 $
Lmt Chrg: 12.19 $

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | NDC | INFO. DATE | LISTED DOSAGE PER RED BOOK | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE @ 95% |
|---|---|---|---|---|---|---|---|---|---|
| J7050 | Infusion, Normal saline Solution | 250 cc | Sodium Chloride (Abbott Hosp.) | 00074-1583-02 | 99 ann | Wecare plastic .9% 250 ml 12's | $141.08 | $11.75 | $11.16 |
|  |  |  | B. Braun McGaw |  |  | (excel) .9% 250 ml | $12.30 | $12.30 |  |
|  |  |  | Baxter |  |  | Single-pack 250 ml 36's | $327.89 | $9.10 |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

**REVISED ARRAY**

1999
Pricing
Par: $ 11.16
Non Par: 10.60 $
Lmt Chrg: 12.20 $

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | NDC | INFO. DATE | LISTED DOSAGE PER RED BOOK | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE @ 95% |
|---|---|---|---|---|---|---|---|---|---|
| J7050 | Infusion, Normal saline Solution | 250 cc | Sodium Chloride (Abbott Hosp.) | 00074-1583-02 | 99 ann | Wecare plastic .9% 250 ml 12's | $141.08 | $11.75 | $11.16 |
|  |  |  | B. Braun McGaw |  |  | (excel) .9% 250 ml | $12.30 | $12.30 |  |
|  |  |  | Baxter |  |  | Single-pack 250 ml 36's | $327.89 | $9.10 |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

**NOTES:**

1. Sources: Hard copy array, scanned image file, AWQ005-0857, and electronic array, AWPCD104\AWP020\AWP020-00010002\Part B\Old disks from file cabinet\99 Drug Files\Drug Book 99\j7050.doc

2. The original array did not contain NDC numbers. The NDC number for the Abbott product was annotated by Myers and Stauffer from the 1999 annual Drug Topics Red Book, page 541.

3. According to the carrier array document, the Medicare allowance ("Allowable @ 95%") is calcuated in cell L7 of the original array and cell L22 of the revised array and is 95% of the median of the "Cost Unit/Dosage" values.

File: ARRAYS_CIGNA_J7050.xls
Tab: 1999 Q2


RAFT

**ORIGINAL ARRAY (Per Carrier Documents)**

| 1 | 2 | 3 | 4 | 5 | Redbook | | | | | |
| HCPCS | Allowable Amount | Basis | Effective Date | NDCs | Price Per Unit Dose | Date | Price | Date | Price | Date |
| | | | | | | | | | | |
| | **Contractor Data** | | | | | **Source Data** 6 | | | | |
| **J7050** | 10.16 | | 06012000 | 00074-7983-02 | 11.61 | Ann-2000 | | | | |
| | | | | 00264-7800-20 | 10.69 | | | | | |
| | | | | 00338-0049-02 | 9.11 | | | | | |

**REVISED ARRAY**

| 1 | 2 | 3 | 4 | 5 | Redbook | | | | | |
| HCPCS | Allowable Amount | Basis | Effective Date | NDCs | Price Per Unit Dose | Date | Price | Date | Price | Date |
| | | | | | | | | | | |
| | **Contractor Data** | | | | | **Source Data** 6 | | | | |
| **J7050** | 8.65 | | 06012000 | 00074-7983-02 | 1.13 | Ann-2000 | | | | |
| | | | | 00264-7800-20 | 10.69 | | | | | |
| | | | | 00338-0049-02 | 9.11 | | | | | |

**NOTES:**

1. Source: Electronic array, AWPCD104\AWP020\AWP020-00010002\Part B\Sue's drug files\HCFA Replys Ours-May Contain Sensitive Info\drug pricing rept.xls

2. According to the carrier array document, the Medicare allowance ("Allowable Amount") is calculated in cell B7 of the original array and cell B20 of the revised array and is 95% of the median of the "Price Per Unit Dose" values.

File: ARRAYS_CIGNA_J7050.xls
Tab: 2000 Q2

DRAFT

**ORIGINAL ARRAY (Per Carrier Array Documents)**

2000 Pricing    J7050

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | NDC | INFO. DATE | LISTED DOSAGE PER RED BOOK | ML | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE @ 95% |
|------|-------------|-------------|--------------------------------|-----|------------|----------------------------|-----|--------------|-------------------|-----------------|
| J7050 | Infusion, Normal Saline Solution | 250 cc | Sodium Chloride (Abbott Hosp) | 00074-7983-02 | 2000 ann | Lifecare plastic .9% 250ml 24's | 24 | 278.73 | 11.61 | 11.03 |
| | | | B. Braun McGaw | | 2000 ann | (excel) .9% 250 ml | 1 | 10.69 | 10.69 | 10.16 |
| | | | Baxter | | 2000 ann | Single-pack 250 ml 36's | 36 | 327.89 | 9.11 | 8.65 |
| | | | | | | | | #DIV/0! | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! | #DIV/0! |

| | | | | | | |
|---|---|---|---|---|---|---|
| Brand RX: | | | | | #DIV/0! | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | #DIV/0! | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | #DIV/0! | #DIV/0! | #DIV/0! |

| Generic Median | $ | 10.69 | Lowest Brand | #DIV/0! |
|----------------|---|-------|--------------|---------|
| 95% = Par | $ | 10.16 | 95% = Par | #DIV/0! |
| Non-Par | $ | 9.65 | Non-Par | #DIV/0! |
| Limiting Charge | $ | 11.09 | Limiting Charge | #DIV/0! |

**REVISED ARRAY**

2000 Pricing    J7050

| CODE | DESCRIPTION | UNIT DOSAGE | PRICING DRUG NAME / MANUFACTURE | NDC | INFO. DATE | LISTED DOSAGE PER RED BOOK | ML | AWP RED BOOK | COST UNIT/ DOSAGE | ALLOWABLE @ 95% |
|------|-------------|-------------|--------------------------------|-----|------------|----------------------------|-----|--------------|-------------------|-----------------|
| J7050 | Infusion, Normal Saline Solution | 250 cc | Sodium Chloride (Abbott Hosp) | 00074-7983-02 | 2000 ann | Lifecare plastic .9% 250ml 24's | 24 | 278.73 | 1.13 | 1.07 |
| | | | B. Braun McGaw | | 2000 ann | (excel) .9% 250 ml | 1 | 10.69 | 10.69 | 10.16 |
| | | | Baxter | | 2000 ann | Single-pack 250 ml 36's | 36 | 327.89 | 9.11 | 8.65 |
| | | | | | | | | #DIV/0! | #DIV/0! | #DIV/0! |
| | | | | | | | | #DIV/0! | #DIV/0! | #DIV/0! |

| | | | | | | |
|---|---|---|---|---|---|---|
| Brand RX: | | | | | #DIV/0! | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | #DIV/0! | #DIV/0! | #DIV/0! |
| Brand RX: | | | | | #DIV/0! | #DIV/0! | #DIV/0! |

| Generic Median | $ | 9.11 | Lowest Brand | #DIV/0! |
|----------------|---|------|--------------|---------|
| 95% = Par | $ | 8.65 | 95% = Par | #DIV/0! |
| Non-Par | $ | 8.22 | Non-Par | #DIV/0! |
| Limiting Charge | $ | 9.45 | Limiting Charge | #DIV/0! |

**NOTES:**

1. Source: Hard copy array, scanned image file, AWQ005-0631
2. The original array did not contain NDC numbers.  The NDC number for the Abbott product was annotated by Myers and Stauffer from the 2000 annual Drug Topics Red Book, page 515.
3. According to the carrier array document, the Medicare allowance ("95% = Par") is calcluated in cell C16 of the original array and cell C36 of the revised array and is 95% of the median of the "Cost Unit/Dosage" values.



DRAFT

**ORIGINAL ARRAY (Per Carrier Documents)**

| 2001 Pricing 3rd Quarter | Code: J7050 | Description: Normal Saline Solution | | | | Date: 05-31-01 | | |
|---|---|---|---|---|---|---|---|---|
| UNIT DOSAGE | MANUFACTURED BY | NDC | INFO DATE | RED BOOK LISTED DOSAGE | | Factor Used to Achieve Unit Dose | RB AWP | RB COST PER UNIT DOSAGE |
| 250cc | Abbott Hosp. | 00074-7985-02 | Ann-2001 | Sol,IV,(Add-Vantage), 0.45%,250ml,24s | | 24 | 296.40 | 12.35 |
| | | 00074-7132-02 | | Sol,IV,(Add-Vantage), 0.45%,250ml,24s | | 24 | 406.70 | 16.95 |
| | | 00074-1583-02 | | Sol,IV,(Lifecare Plastic), 0.9%,250ml,12s | | 12 | 148.20 | 12.35 |
| | | 00074-7101-02 | | Sol,IV,(Add-Vantage,Lifecare) 0.9%,250ml,24s | | 24 | 406.70 | 16.95 |
| | | 00074-7983-02 | | Sol,IV,(Lifecare Plastic) 0.9%,250ml,24s | | 24 | 278.73 | 11.61 |
| | B Braun | 00264-7800-20 | | Sol,IV,(Excel),0.9%,250ml | | 1 | 10.69 | 10.69 |
| | Baxter | 00338-0044-03 | | Sol,IV,(Single Pack,Mini-Bag),0.9%,250ml,12s | | 12 | 116.06 | 9.67 |
| | | 00338-0049-03 | | Sol,IV,(Single Pack,Mini-Bag),0.9%,250ml,36s | | 36 | 327.89 | 9.11 |
| | | | | | | | | #DIV/0! |
| | | | | | | | | #DIV/0! |
| | | | | | | | | |
| Brand RX: | | | | | | | | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! |
| Red Book Generic Median | $ 11.98 | Red Book Lowest Brand | | | | | | |
| 95% = Par | $ 11.38 | 95% = Par | $ - | | | Priced by: Sue W | | Date: 05-31-01 |
| Non-Par | $ 10.81 | Non-Par | $ - | | | Reviewed by: | | Date: |

**REVISED ARRAY**

| 2001 Pricing 3rd Quarter | Code: J7050 | Description: Normal Saline Solution | | | | Date: 0 -31-01 | | |
|---|---|---|---|---|---|---|---|---|
| UNIT DOSAGE | MANUFACTURED BY | NDC | INFO DATE | RED BOOK LISTED DOSAGE | | Factor Used to Achieve Unit Dose | RB AWP | RB COST PER UNIT DOSAGE |
| 250cc | Abbott Hosp. | 00074-7985-02 | Ann-2001 | Sol,IV,(Add-Vantage), 0.45%,250ml,24s | | 24 | 296.40 | 12.35 |
| | | 00074-7132-02 | | Sol,IV,(Add-Vantage), 0.45%,250ml,24s | | 24 | 406.70 | 16.95 |
| | | 00074-1583-02 | | Sol,IV,(Lifecare Plastic), 0.9%,250ml,12s | | 12 | 148.20 | 12.35 |
| | | 00074-7101-02 | | Sol,IV,(Add-Vantage,Lifecare) 0.9%,250ml,24s | | 24 | 406.70 | 2.36 |
| | | 00074-7983-02 | | Sol,IV,(Lifecare Plastic) 0.9%,250ml,24s | | 24 | 278.73 | 1.14 |
| | B Braun | 00264-7800-20 | | Sol,IV,(Excel),0.9%,250ml | | 1 | 10.69 | 10.69 |
| | Baxter | 00338-0044-03 | | Sol,IV,(Single Pack,Mini-Bag),0.9%,250ml,12s | | 12 | 116.06 | 9.67 |
| | | 00338-0049-03 | | Sol,IV,(Single Pack,Mini-Bag),0.9%,250ml,36s | | 36 | 327.89 | 9.11 |
| | | | | | | | | #DIV/0! |
| | | | | | | | | #DIV/0! |
| | | | | | | | | |
| Brand RX: | | | | | | | | #DIV/0! |
| Brand RX: | | | | | | | | #DIV/0! |
| Red Book Generic Median | $ 10.18 | Red Book Lowest Brand | | | | | | |
| 95% = Par | $ 9.67 | 95% = Par | $ - | | | Priced by: Sue W | | Date: 05-31-01 |
| Non-Par | $ 9.19 | Non-Par | $ - | | | Reviewed by: | | Date: |

NOTES:

1. Source: Hard copy array, scanned image file, AWQ005-0441

2. According to the carrier array document, the Medicare allowance ("95% = Par") is calcluated in cell B23 of the original array and cell B49 of the revised array and is 95% of the median of the "RB Cost Per Unit Dosage" values.

# EXHIBIT FE

Jacksonville, FL

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------x

IN RE: PHARMACEUTICAL            ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       )

PRICE LITIGATION                 ) CIVIL ACTION:

                                 ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO         )

U.S. ex rel. Ven-A-Care of       )

The Florida Keys, Inc. v. Abbott )

Laboratories, Inc., et al.       )

No. 06-CV-11337-PBS              )

--------------------------------x


        Videotaped Deposition of FIRST COAST SERVICE

OPTIONS, INC., by and through JEAN VEAL, taken on

behalf of Abbott Laboratories, Inc., on Tuesday,

March 25, 2008, at Smith, Gambrell & Russell, LLP,

50 North Laura Street, Suite 2600, Jacksonville,

Florida, before Karen F. Howard, Registered

Professional Reporter and Notary Public in and for

the State of Florida at Large.

17e8bf2c-d8c2-4e4d-b573-44fcbcf3b952

## Jacksonville, FL

Page 82

1  should be the same.
2      Q    Were you aware of any carriers that did
3  not use Red Book or one of the other published
4  compendia such as Blue Book or Medi-Span --
5      A    No.
6      Q    -- for their AWP pricing?
7      A    No.
8      Q    And, as we discussed earlier, you for
9  First Coast relied on the Red Book because it was
10  directed to do so by CMS?
11          MR. LAVINE:  Object to form.
12      A    Well --
13      Q    It was directed to use Red Book or another
14  published price compendia?
15      A    That's correct.
16      Q    If a manufacturer had multiple products
17  that were the same dosage for a given J-Code, would
18  First Coast include both of those product listings
19  in its array for that J-Code?
20      A    Could you repeat the first part of that?
21      Q    Sure.
22      If a particular manufacturer had more than one

Page 83

1  product for a particular J-Code and it was the same
2  dosage amount as what was being arrayed --
3      A    Uh-huh.
4      Q    -- would First Coast include both of those
5  product listings in the array?
6      A    I didn't, but I'm not sure if anyone else
7  had ever done that in the past.
8      Q    Why did you not do so?
9      A    I just didn't have any instructions to do
10  so, so I didn't think you should do it.  I figured
11  one was enough.
12      Q    If there were two product listings, which
13  price would you include in the array?
14      A    Two product listings from the same
15  manufacturer?
16      Q    Correct.
17      A    Well, I tried to find the one that best
18  fit the descriptor of the procedure code.
19      Q    Okay.
20      A    And the one that wasn't a specialty-type
21  delivery system, you know, maybe try to use a
22  multidose file instead of a special syringe or

Page 84

1  something.
2      Q    Would the price of the product have any
3  implication onto which product you chose?
4      A    No, I don't think so.  I mean, I don't
5  recall anything like that, just, you know, picking a
6  price -- picking one because it was lowest or
7  anything like that.
8      Q    Do you know whether your practice of
9  including only one manufacturer's product in the
10  array was also the practice of others within First
11  Coast from 1991 through 2001?
12      A    I'm pretty sure that that's the way
13  everyone did it.
14      Q    Do you have any knowledge as to whether
15  other carriers utilized this same practice --
16      A    No.
17      Q    -- to include only one manufacturer's
18  product listing for a particular --
19      A    I don't know.
20      Q    Ms. Veal, I'm going to be handing you our
21  next exhibit, which the court reporter will inform
22  me of that number, Abbott Exhibit --

Page 85

1          THE REPORTER:  715.
2          (Exhibit First Coast Service 715 was
3          marked for identification)
4      Q    -- 715.
5          If you could take a minute to read this
6  letter.  If you could let me know after you've had a
7  chance to read this letter.
8      A    I've read it.
9      Q    First off, do you know -- it seems as
10  though the first word is a person's name.  It looks
11  to me like "Lorna."
12      A    That's correct.
13      Q    Is that correct?
14      A    Uh-huh.
15      Q    Who is Lorna?
16      A    Lorna is the lady that calculated the
17  drugs before I did.
18      Q    So before late 1997 or early 1998?
19      A    Right.
20      Q    How long did she calculate payment
21  amounts?
22      A    I was told she started, I think, in '84

22  (Pages 82 to 85)

17e8bf2c-d8c2-4e4d-b573-44fcbcf3b952

## Jacksonville, FL

Page 98

1    A   Yes, uh-huh.
2    Q   Do you know which of these products is the
3  brand and which is the generic?
4    A   The -- just from looking at it, I think
5  the first three are brand and the bottom three are
6  generic.
7    Q   Is that something that you understand from
8  your work with these J-Codes?
9    A   Yes.  I mean, just looking at the
10 descriptors, the vancomycin is the brand -- I mean,
11 the generic, and the others don't say that.
12   Q   And the fourth product listed below is,
13 again, an Abbott product; is that correct?
14   A   Yes.
15   Q   And here we know that because it says
16 "Abbott" under the manufacturer, correct?
17   A   Uh-huh.
18   Q   There's only one Abbott product listed in
19 this array; is that correct?
20   A   That's correct.
21   Q   Ms. Veal, I'm handing you what has
22 previously been marked as Abbott Exhibit 605.  This

Page 99

1  exhibit does not have the sticker on the front
2  because we have not gotten back from the court
3  reporter, but it was 605. And this is -- well, why
4  don't you tell me what this is.
5    A   It looks like pages out of the 1998 Red
6  Book.
7    Q   Correct.
8        And the page that is included includes the
9  price listings for vancomycin --
10   A   Yes.
11   Q   -- is that correct?
12   A   That's correct.
13       MS. RAMSEY:  Vancomycin, for the record,
14 is one of the subject drugs at issue.  It's
15 J3370.
16       MR. LAVINE:  Should we just mark this
17 separately with a new number anyway, because
18 we don't have one that's actually marked as
19 605? I don't know.  Make sure we tie it back
20 to the right one.
21       MS. RAMSEY:  You know, I've never had any
22 problem in the past with -- I can represent

Page 100

1  this is an exact copy of Abbott Exhibit 605.
2        MR. LAVINE:  All right.
3  BY MS. RAMSEY:
4    Q   Ms. Veal, have you had an opportunity to
5  look at this document.
6    A   Yes.
7    Q   Now, I'm going to ask you to flip back and
8  forth between two exhibits now.
9    A   Okay.
10   Q   But the array that we're just looking at
11 in Abbott Exhibit 716, the second page, which is an
12 array from 1998 for J3370 --
13   A   Okay.
14   Q   -- and then corresponding with that is the
15 Red Book page that has the vancomycin price
16 listings.
17       If we look at the NDC listed in Abbott
18 Exhibit 716 --
19   A   Uh-huh.
20   Q   -- we see that it's 00074-6534-01; is that
21 correct?
22   A   That's correct.

Page 101

1    Q   And that is the only Abbott NDC that was
2  used to calculate the payment amount in 1998; is
3  that correct?
4        MR. LAVINE:  Object to form.
5    A   For this one -- I guess for this one, yes.
6    Q   Now, when you look at vancomycin
7  hydrochloride and Abbott, which is in the middle of
8  the page -- are you with me?
9    A   Uh-huh.
10   Q   -- you see that Abbott has two 500
11 milligrams vancomycin products; is that correct?
12   A   That's correct.
13   Q   And the price listed in the Red Book for
14 the first product is 124.81; is that correct?
15   A   That's correct.
16   Q   And looking back at Abbott Exhibit 716,
17 that's the price that was included in the 1998
18 pricing array; is that correct?
19   A   That's correct.
20   Q   Now, consistent with the practice that you
21 testified earlier to only include one product from
22 each manufacturer, is that why Abbott's second

26 (Pages 98 to 101)

17e8bf2c-d8c2-4e4d-b573-44fcbcf3b952

## Jacksonville, FL

Page 102

1    product was not included in this pricing array?
2        A    Yes.
3        Q    And would you expect this to be the same
4    methodology applied for the time period of 1991
5    through 2001?
6        A    I would expect it, but I can't really be
7    sure.
8        Q    That's because we don't have the --
9        A    Right.
10       Q    -- actual pricing arrays; is that correct?
11       A    That's correct.
12           MR. LAVINE:  Object to form.
13   BY MS. RAMSEY:
14       Q    But you would have intended to only
15   include this first price, the 124.81; is that
16   correct?
17       A    That's correct.
18           MR. LAVINE:  Object to form.
19   BY MS. RAMSEY:
20       Q    If everything was done according to your
21   typical practice, that would be the only one
22   included?

Page 103

1           MR. LAVINE:  Object to form.
2        A    When I was doing it, yes, that's how I
3    would have done it.
4        Q    And it was your understanding, though,
5    that this practice was also done before you began in
6    1998; is that correct?
7           MR. LAVINE:  Object to form.
8        A    I -- that's how I thought it was, but I
9    can't really be sure.  You know, I don't know what
10   Lorna was going with.
11       Q    And looking at the first page of 716,
12   although this document is undated, it is this same
13   Abbott product listed in the array --
14       A    Yes.
15       Q    -- is that correct?
16       A    That's correct.
17       Q    Looking for a moment just at 716, one of
18   the columns on this array is titled "UD."  Do you
19   know what that stands for?
20       A    No, I don't.  Maybe unit price?  I don't
21   know.  Looks like it was blank.  I don't know.
22       Q    Now, the -- the column titled "AWP" at the

Page 104

1    right end of the document has prices listed
2    underneath it --
3        A    Yes.
4        Q    -- is that correct?
5        A    That's correct.
6        Q    How were those prices determined?
7        A    They came straight off the Red Book CD,
8    and it's based on how this NDC is sold.  Like the
9    first one is -- looks like is just one 500-
10   milligram vial and the third one is a box of ten
11   500-milligram vials.
12       Q    What would be done differently in the
13   instance where there are ten vials versus when
14   there's one vial?
15       A    If there were ten, we'd take that amount,
16   let's say 57.56, and divide it by 10.  So for one
17   500-milligram vial, it would be 5.756 for the AWP.
18       Q    Now, the prices that would actually be
19   used to calculate the payment amount --
20       A    Uh-huh.
21       Q    -- are not listed on this document; is
22   that correct?

Page 105

1           MR. LAVINE:  Object to form.
2        A    Well, it kind of looks like they are
3    listed.
4        Q    Where would that be?
5        A    I mean, over here on the bottom, I mean,
6    handwritten -- handwritten on here, where I have
7    7.40 times .95 is 7.03, I think is what that says.
8    So it looks like I used a 7.40, whichever one was
9    7.40.  I don't know if it was the median or if that
10   one you can't -- can't see 7.40.
11       Q    Yeah, I was wondering where this 7.40 came
12   from.  Is that the median of the generic products or
13   is that a --
14       A    I don't know.  I probably would need a
15   calculator to figure it out.  Let's see, it's not
16   that one.  I don't know if -- it must be 7 plus
17   7.80, maybe, which would be 14.80 divided by 2.
18   Yeah, that'd be 7.40.  So must have been the 7.80
19   and the 7 dollar one.
20       Q    Now the 7.80, though, is a branded
21   product; is that correct?
22       A    Let me look.

27 (Pages 102 to 105)

17e8bf2c-d8c2-4e4d-b573-44fcbcf3b952

# EXHIBIT FF

Duzor, Deidre - Vol. III                    March 26, 2008
                    Washington, DC

Page 535

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )  Judge Patti B. Saris

the Florida Keys, Inc.          )

        v.                      )  Chief Magistrate

Abbott Laboratories, Inc.,      )  Judge Marianne B.

No. 06-CV-11337-PBS             )  Bowler

- - - - - - - - - - - - - - -

        (cross-captions on following pages)


                    Washington, D.C.

                    Wednesday, March 26, 2008

                    9:22 a.m.


        Videotaped deposition of DEIRDRE DUZOR

                    Volume III

Duzor, Deidre - Vol. III                     March 26, 2008
                    Washington, DC

Page 904

1        MS. MARTINEZ:  Object to form.
2        THE WITNESS:  Yes, and most don't
3    distinguish between their payments rates for
4    generics and brands.
5    BY MR. COOK:
6        Q.  If, tomorrow, the AWPs published in
7    Redbook were -- instead of as they are today
8    were, instead, empirical averages of the amounts
9    that pharmacies and providers paid for drugs --
10   do you understand the premise of my question
11   there?
12       A.  I think so.
13       Q.  Do you have any opinion about whether
14   there would be access problems for beneficiaries
15   of Medicaid if that were to happen overnight?
16       MS. MARTINEZ:  Objection.  Form.
17       THE WITNESS:  I will restate your
18   question; you can tell me if it's accurate.  If
19   Medicaid was paying pharmacies at a rate lower
20   than what their purchase price of the drug is --
21   BY MR. COOK:
22       Q.  Yes, ma'am.

Page 905

1        A.  -- would there be access problems?
2        Q.  Yes.
3        A.  I would guess there would be.
4        Q.  Why?
5        A.  Why?
6        Q.  Yes, ma'am.
7        A.  Because pharmacies would stop serving
8    Medicaid in order to try to get the reimbursement
9    to be raised.
10       Q.  Do you have any opinion about what
11   would be the consequence if the various state
12   Medicaid programs were paying based upon an AWP
13   that was an empirical average of what pharmacies
14   were obtaining drugs for?
15       A.  Well, states don't want to cause access
16   problems any more than the federal government
17   does, so if the new AWPs would turn out to be
18   actual purchasing -- the price at which the drug
19   could be purchased, I think states -- we would
20   have a run on state plan amendments to change
21   their formula for reimbursement.
22       Q.  In what way?

Page 906

1        A.  To increase it so that -- you know,
2    pharmacies are for-profit businesses.  I think
3    Medicaid doesn't -- its goal is not to not
4    reimburse appropriately; it is to reimburse
5    appropriately.
6        Q.  And just to follow up on that theme a
7    little bit, when you talk about reimbursing
8    appropriately, part of the difficulty of figuring
9    out what it is to reimburse appropriately is the
10   fact that by virtue of it being a formula, you
11   are having one price that applies to several
12   types of providers, right?
13       A.  Several types of providers?  What do
14   you mean by --
15       Q.  Or several types of pharmacies.  The
16   same price to Joe's Pharmacy as it is to
17   Walgreens as to CVS as to an infusion pharmacy as
18   to a nursing home pharmacy, for example.
19       A.  If that's the way the state has done
20   their formula, which most states do.
21       Q.  And most states also --
22       A.  They could differentiate, but most

Page 907

1    states do not.
2        Q.  And most states also have a formula
3    that applies the same formula to pills as it does
4    to IV drugs or infusion drugs as it does to a
5    compounded drug for a pediatric purpose, right?
6        A.  Yes.  Some states have different
7    compound drug reimbursements -- or, actually,
8    it's dispensing fees that differ for compound
9    drugs, yes, you're right.
10       Q.  But in various ways there is a one size
11   fits all aspect to this payment system that
12   Medicaid uses for drugs, right?
13       A.  Yes.  We cover -- the Medicaid program
14   covers probably close to 50,000 drugs, so these
15   are not priced on an individual basis.  That
16   would be very impractical.
17       Q.  And so by the very nature of the
18   program, some drugs will be priced at larger gaps
19   from acquisition cost than other drugs depending
20   upon what the drug is, who the provider is, where
21   the pharmacy is located, and probably more
22   factors than I could think of right now, right?

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

20f05866-234b-46da-bf0b-d8962eb8d876

# EXHIBIT FG

**EXHIBIT**

Duggan Reb. 10
5/19/09    02

| | |
|---|---|
| **From:** | Henderson, George (USAMA) <George.Henderson2@usdoj.gov> |
| **Sent:** | Saturday, May 3, 2008 1:21 PM |
| **To:** | Keenan Buoy <Kbuoy@MSLC.COM> |
| **Cc:** | Claire (CIV) Norsetter <Claire.Norsetter@usdoj.gov>; Mark (USAFLS) Lavine <Mark.Lavine@usdoj.gov>; Renee (CIV) Brooker <Renee.Brooker@usdoj.gov> |
| **Subject:** | AWP Litigation |
| **Attach:** | 2008-05-03 GBH LT Buoy re NY law.pdf |

Please see the attached letter.

<<2008-05-03 GBH LT Buoy re NY law.pdf>>

EXP USABT-DUG 145746



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

| | |
|---|---|
| *Writer's Direct Dial Number:*<br>*(617) 748-3272*<br>*Telecopier: (617) 748-3971* | *John Joseph Moakley U.S. Courthouse, Suite 9200*<br>*1 Courthouse Way*<br>*Boston, Massachusetts 02210* |

May 3, 2008

Keenan Buoy
Myers & Stauffer, LC
9265 Counselors Row, Suite 200
Indianapolis, Indiana 46240-6419

Re:     In re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No.
        1456, No. 01-12257-PBS (D. Mass.)

Dear Mr. Buoy:

        This will advise you regarding certain laws of the State of New York governing
pharmacy reimbursement for drugs under New York's Medicaid program.  The
Addendum to this letter sets forth the relevant text of certain statutory amendments
enacted by the State of New York.

        Feel free to share this letter with Professor Mark Duggan should you deem it
appropriate.  If you do, please let me know.

                                        Sincerely,

                                        George B. Henderson, II
                                        Assistant U.S. Attorney

cc:     Renee Brooker

**EXP USABT-DUG 145747**

**ADDENDUM**


NY LEGIS 190 (1990)
McKINNEY'S 1990 NEW YORK SESSION LAWS THE 213th SESSION
CHAPTER 190

§ 378. Section 367-a of the social services law is amended by adding two new
subdivisions 9 and 10 to read as follows:
    9. The department shall establish payment levels for multi-source prescription
drugs consistent with federal law and regulations.
    10. Any provider except for those providers certified under article twenty-eight of
the public health law, of ordered services or supplies under the medical assistance
program may be required to provide financial security to assure that funds are available to
repay any overpayments made to the provider under this title and to assure the financial
security of the medical assistance program. For the purposes of this subdivision, "ordered
services or supplies" shall mean those services or supplies described in paragraphs (g), (i)
and (j) of subdivision two of section three hundred sixty- five-a of this title.

_____


NY LEGIS 170 (1994)
McKINNEY'S 1994 SESSION LAW NEWS OF NEW YORK 217th Legislature
CHAPTER 170
Approved June 9, 1994, effective as provided in section 564 (Approx. 287 pages, total)

\* \* \*

§ 456. Subdivision 9 of section 367-a of the social services law is REPEALED and a new
subdivision 9 is added to read as follows:

    NY SOC SERV § 367-a

    9. Notwithstanding any inconsistent provision of law or regulation to the contrary,
for those drugs which may not be dispensed without a prescription as required by section
sixty-eight hundred ten of the education law and for which payment is authorized
pursuant to paragraph (g) of subdivision two of section three hundred sixty-five-a of this
title, payments under this title shall be made at the following amounts:
    (a) for drugs provided by medical practitioners and claimed separately by the
practitioners, the actual cost of the drugs to the practitioners; and

-i-

EXP USABT-DUG 145748

(b) for drugs dispensed by pharmacies:

(i) if the drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal health care financing administration, an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug, and

(ii) if the drug dispensed is a multiple source prescription drug or a brand-name prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. Estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less ten percent thereof, and updated monthly by the department.

(c) Notwithstanding subparagraph (i) of paragraph (b) of this subdivision, if a qualified prescriber certifies "brand medically necessary" or "brand necessary" in his or her own handwriting directly on the face of a prescription for a multiple source drug for which a specific upper limit of reimbursement has been established by the federal agency, in addition to writing "d a w" in the box provided for such purpose on the prescription form, payment under this title for such drug must be made under the provisions of subparagraph (ii) of such paragraph.

(d) In addition to the amounts paid pursuant to paragraph (b) of this subdivision to pharmacies for those drugs which may not be dispensed without a prescription, as required by section sixty-eight hundred ten of the education law and for which payment is authorized pursuant to paragraph (g) of subdivision two of section three hundred sixty-five-a of this title, the department shall pay a pharmacy dispensing fee for each such prescription drug dispensed, which dispensing fee shall not be less than the following amounts:

(i) for prescription drugs categorized as generic by the prescription drug pricing service used by the department, five dollars and fifty cents per prescription; and

(ii) for prescription drugs categorized as brand-name prescription drug by the prescription drug pricing service used by the department, four dollars and fifty cents per prescription.

§ 564. This act shall take effect immediately provided, however, that:

\* \* \*

(c) the provisions of section four hundred fifty-six of this act, amending section 367-a of the social services law in relation to the payment of a dispensing fee for certain drugs dispensed by pharmacies under the medical assistance program shall be effective if, and for so long as, the provisions of this act in relation to payment for ingredient costs for multiple source prescription drugs and brand-name prescription drugs for which no

-ii-

EXP USABT-DUG 145749

specific upper limit has been set by the federal health care financing agency as implemented by the department of social services are not found by any court or federal administrative body to be in violation of current federal law or regulation relating to the levels of payment for prescription drugs under the federal medicaid program pursuant to title XIX of the federal social security act; provided further, however, that if any court or federal administrative body finds that the provisions relating to the ingredient costs for multiple source prescription drugs and brand-name prescription drugs for which no specific upper limit has been set by the federal health care financing agency as implemented by the department of social services are found to be in violation of current federal law or regulation relating to the levels of payment for prescription drugs under the federal medicaid program pursuant to title XIX of the federal social security act, the department of social services shall establish a formula for paying pharmacies for such drugs in a manner consistent with current federal law and regulation and a dispensing fee which shall reflect appropriate adjustments so that the established formula is implemented in a fiscally neutral manner . . . .

---

NY LEGIS 19 (1998)
McKINNEY'S 1998 SESSION LAW NEWS OF NEW YORK 221st Legislature
CHAPTER 19
Approved March 20, 1998, effective as provided in section 4 [eff. July 18, 1998 per credits] (Approx. 1 page)

§ 2. Subdivision 9 of section 367-a of the social services law, as added by chapter 170 of the laws of 1994, is amended to read as follows:

NY SOC SERV § 367-a

9. Notwithstanding any inconsistent provision of law or regulation to the contrary, for those drugs which may not be dispensed without a prescription as required by section sixty-eight hundred ten of the education law and for which payment is authorized pursuant to paragraph (g) of subdivision two of section three hundred sixty-five-a of this title, payments under this title shall be made at the following amounts:

(a) for drugs provided by medical practitioners and claimed separately by the practitioners, the actual cost of the drugs to the practitioners; and

(b) for drugs dispensed by pharmacies:
(i) if the drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal health care financing administration, an

-iii-

EXP USABT-DUG 145750

amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug, and

(ii) if the drug dispensed is a multiple source prescription drug or a brand-name prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. Estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less ten percent thereof, and updated monthly by the department.

(c) Notwithstanding subparagraph (i) of paragraph (b) of this subdivision, if a qualified prescriber certifies "brand medically necessary" or "brand necessary" in his or her own handwriting directly on the face of a prescription for a multiple source drug for which a specific upper limit of reimbursement has been established by the federal agency, in addition to writing "d a w" in the box provided for such purpose on the prescription form, payment under this title for such drug must be made under the provisions of subparagraph (ii) of such paragraph.

(d) In addition to the amounts paid pursuant to paragraph (b) of this subdivision to pharmacies for those drugs which may not be dispensed without a prescription, as required by section sixty-eight hundred ten of the education law and for which payment is authorized pursuant to paragraph (g) of subdivision two of section three hundred sixty-five-a of this title, the department shall pay a pharmacy dispensing fee for each such prescription drug dispensed, which dispensing fee shall not be less than the following amounts:

(i) for prescription drugs categorized as generic by the prescription drug pricing service used by the department, four dollars and fifty cents per prescription; and

(ii) for prescription drugs categorized as brand-name prescription drug by the prescription drug pricing service used by the department, three dollars and fifty cents per prescription.

\* \* \*

§ 4. This act shall take effect 120 days after it shall have become a law and shall expire and be deemed repealed March 31, 2000.

-iv-

EXP USABT-DUG 145751

NY LEGIS 62 (2003)
McKINNEY'S 2003 SESSION LAW NEWS OF NEW YORK 226th Legislature
CHAPTER 62
Approved May 15, 2003, Part A through A5, effective as specifically provided in the last
[eff. May 15, 2003, deemed eff. July 1, 2003 {per credits}]
[Cite as N.Y. Laws 2003, Chap. 62, Part Z2.]

Section 1. Subparagraph (ii) of paragraph (b) of subdivision 9 of section 367-a of the
social services law, as amended by chapter 19 of the laws of 1998, is amended to read as
follows:

NY SOC SERV § 367-a

(ii) if the drug dispensed is a multiple source prescription drug or a brand-name
prescription drug for which no specific upper limit has been set by such federal agency,
the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing
pharmacy's usual and customary price charged to the general public. Estimated
acquisition cost means the average wholesale price of a prescription drug based upon the
package size dispensed from, as reported by the prescription drug pricing service used by
the department, less twelve percent thereof, and updated monthly by the department.

\* \* \*

---

NY LEGIS 58 (2004)
McKINNEY'S 2004 SESSION LAW NEWS OF NEW YORK 227th Legislature
CHAPTER 58
Approved August 20, 2004, Parts A through H effective as specifically provided in the

[L.2004, c. 58, pt. C, § 3, eff. Aug. 20, 2004, deemed eff. May 1, 2004]

§ 3. Paragraph (b) of subdivision 9 of section 367-a of the social services law, as amended
by chapter 19 of the laws of 1998, subparagraph (ii) as amended by section 1 of part Z2
of chapter 62 of the laws of 2003, is amended and two new paragraphs (e) and (f) are
added to read as follows:

NY SOC SERV § 367-a

-v-

EXP USABT-DUG 145752

(b) for drugs dispensed by pharmacies:

(i) if the drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal  centers for medicare and medicaid services, an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug, and

(ii) if the drug dispensed is a multiple source prescription drug or a brandname prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public.  For sole and multiple source brand name drugs, estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve and seventy-five hundredths of one percent thereof, and updated monthly by the department; or, for a specialized HIV pharmacy, as defined in paragraph (F) of this subdivision, acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve percent thereof, and updated monthly by the department. For multiple source generic drugs, estimated acquisition cost means the lower of the average wholesale price of a prescription drug based on the package size dispensed from, as reported by the prescription drug pricing service used by the department, less sixteen and one-half percent thereof, or the maximum acquisition cost, if any, established pursuant to paragraph (e) of this subdivision; or, for a specialized HIV pharmacy, as defined in paragraph (f) of this subdivision, acquisition cost means, the lower of the average wholesale price of a prescription drug based on the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve percent thereof, or the maximum acquisition cost, if any, established pursuant to paragraph (e) of this subdivision.

(e) For a multiple source generic drug for which no specific upper payment limit has been established by the federal centers for medicare and medicaid services, the commissioner of health may establish a maximum acquisition cost for such drug which shall be effective until such time as a specific federal upper payment limit has been established for such drug. The department shall use a similar methodology in establishing such an interim price as that utilized by the centers for medicare and Medicaid services in establishing the federal upper payment limit. For this purpose, the department is authorized to enter into a contract with an entity to provide technical and administrative support to the commissioner of health.

(f) For the purposes of this section, a specialized HIV pharmacy shall mean a pharmacy, approved by the commissioner, which meets all of the following criteria:

(i) over ninety percent of the patients serviced by the pharmacy require antiretrovirals used in the treatment of HIV/AIDS;

(ii) the pharmacy provides specialized, computer automated and dispensed

-vi-

EXP USABT-DUG 145753

packaging, that improves medication adherence including daily, patient specific packets that individually list the patients name, medication, expiration date and precise date and time the medication should be taken;

(iii) the pharmacists of the pharmacy at least biannually attend continuing education programs specific to HIV medications;

(iv) the pharmacy provides full monthly order of drugs for their patients;

(v) the pharmacy provides home delivery of drugs to patients;

(vi) the pharmacy must be located within and licensed by the state of New York;

(vii) the pharmacy may not operate as a satellite pharmacy, located within the same building as another retail pharmacy; and

(viii) the pharmacy must provide comprehensive support services to benefit patients with HIV/AIDS.

* * *

§ 36. This act shall take effect immediately and shall be deemed to have been in full force and effect on and after April 1, 2004; provided, however, that:

* * *

2. section three of this act shall be deemed to have been in full force and effect on and after May 1, 2004 and section eleven of this act shall be deemed to have been in full force and effect on and after July 1, 2004;

3. the amendments made to subdivision 9 of section 367-a of the social services law by section three of this act shall not affect the expiration and reversion of such subdivision pursuant to section 4 of chapter 19 of the laws of 1998, as amended, and shall be deemed to expire therewith;

* * *

---

EXP USABT-DUG 145754

NY LEGIS 109 (2006)

McKINNEY'S 2006 SESSION LAW NEWS OF NEW YORK 229th Legislature

CHAPTER 109

Approved June 23, 2006, effective as provided in section 3 (Approx. 101 pages)

§ 32. Subparagraph (ii) of paragraph (b) of subdivision 9 of section 367-a of the social services law, as amended by section 3 of part C of chapter 58 of the laws of 2004, is amended to read as follows:

NY . § 367-a

(ii) if the drug dispensed is a multiple source prescription drug or a brandname prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. For sole and multiple source brand name drugs, estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less thirteen and twenty-five hundredths of one percent thereof, and updated monthly by the department; or, for a specialized HIV pharmacy, as defined in paragraph (f) of this subdivision, acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve percent thereof, and updated monthly by the department. For multiple source generic drugs, estimated acquisition cost means the lower of the average wholesale price of a prescription drug based on the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twenty percent thereof, or the maximum acquisition cost, if any, established pursuant to paragraph (e) of this subdivision; or, for a specialized HIV pharmacy, as defined in paragraph (f) of this subdivision, acquisition cost means, the lower of the average wholesale price of a prescription drug based on the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve percent thereof, or the maximum acquisition cost, if any, established pursuant to paragraph (e) of this subdivision.

-viii-

EXP USABT-DUG 145755

NY LEGIS 58 (2007)

McKINNEY'S 2007 SESSION LAW NEWS OF NEW YORK 230TH LEGISLATURE

CHAPTER 58

Approved and effective April 9, 2007 (Approx. 150 pages)

§ 23. Subparagraph (ii) of paragraph (b) of subdivision 9 of section 367-a of the social services law, as amended by section 32 of part C of chapter 109 of the laws of 2006, is amended to read as follows:

NY SOC SERV § 367-a

(ii) if the drug dispensed is a multiple source prescription drug or a brand-name prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. For sole and multiple source brand name drugs, estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less fourteen percent thereof, and updated monthly by the department; or, for a specialized HIV pharmacy, as defined in paragraph (f) of this subdivision, acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve percent thereof, and updated monthly by the department. For multiple source generic drugs, estimated acquisition cost means the lower of the average wholesale price of a prescription drug based on the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twenty-five percent thereof, or the maximum acquisition cost, if any, established pursuant to paragraph (e) of this subdivision; or, for a specialized HIV pharmacy, as defined in paragraph (f) of this subdivision, acquisition cost means the lower of the average wholesale price of a prescription drug based on the package size dispensed from, as reported by the prescription drug pricing service used by the department, less twelve percent thereof, or the maximum acquisition cost, if any, established pursuant to paragraph (e) of this subdivision.

-ix-

EXP USABT-DUG 145756

# EXHIBIT FH



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

*Writer's Direct Dial Number:*          *John Joseph Moakley U.S. Courthouse, Suite 9200*
*(617) 748-3272*                        *1 Courthouse Way*
*Telecopier: (617) 748-3971*            *Boston, Massachusetts 02210*

November 12, 2008

*By E-mail*

Eric Gortner, Esq.                 Neil Merkl, Esq.
Kirkland & Ellis                   Kelley Drye & Warren, LLP
200 East Randolph Drive            101 Park Avenue
Chicago, Illinois 60601-6636       New York, NY 10178

                                   David Torborg, Esq.
                                   Jones Day
                                   51 Louisiana Ave., N.W.
                                   Washington, D.C. 20001-2113

Re:    *United States of America, ex rel. Ven-a-Care of the Florida Keys Inc. v. Roxane Laboratories, Inc. et al,* MDL No. 1456/Civil Action No. 01-12257-PBS; *United States ex rel. Ven-A-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* C.A. No. 06-11337-PBS ; *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS

Dear Counsel:

       Plaintiffs have made the determination to drop our claim for the federal share of Medicaid damages for Medicaid claims in the state of Ohio for the subject drugs during the time period at issue in the above three cases.   Accordingly, we have notified the state that we have cancelled the Rule 30(b)(6) deposition (that we originally noticed on July 11, 2008) and that was postponed to November 24 and 25, 2008.

                              Sincerely,
                              /s/ *Barbara Healy Smith*

                              Barbara Healy Smith
                              Assistant United States Attorney

cc     Drew Duffy, AAG
       Louise Roselle, Esq.

# EXHIBIT FI

# JONES DAY

51 LOUISIANA AVENUE, N.W.  •  WASHINGTON, D.C.  20001-2113

TELEPHONE: (202) 879-3939  •  FACSIMILE: (202) 626-1700

Direct Number:  (202) 879-5562
dstorborg@jonesday.com

November 19, 2008

VIA EMAIL

Barbara Healy Smith, Esq.
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:    In Re: Pharmaceutical Industry Average Wholesale Price Litigation

Dear Ms. Smith:

This letter responds to your letter and email correspondence of November 12, 2008, November 17, 2008, and November 18, 2008 concerning discovery of Ohio and Robert Reid in connection with drug pricing litigation brought by United States against Abbott, Dey, and Roxane.  Your correspondence indicates that Plaintiffs "have made a determination to drop our claim for the federal share of Medicaid damages for Medicaid claims for the subject drugs during the time period at issue in the above three cases," and asserts that there is now "no basis for either a 30b6 or 30b1 subpoena."

First, please explain why, after issuing a 30(b)(6) notice to Ohio, conducting years of investigation and formal discovery, and asserting (and having its expert calculate) damages for Ohio—not to mention the time and expenses Defendants incurred to obtain and review Ohio documents—the Government no longer seeks to recover damages relating to the state of Ohio.

Second, for reasons which overlap substantially with Mr. Merkl's letter of earlier today we disagree with your assertion that there is no basis for discovery of Ohio or Mr. Reid.  Like Dey, Abbott believes that there is still a need to depose Mr. Reid.  We therefore intend to issue our own deposition notice and subpoena to Mr. Reid in the Government's case against Abbott (No. 06-CV-11337-PBS) and other cases (including No. 07-CV-11618-PBS).

Very truly yours,

/s/ David S. Torborg

David S. Torborg

Barbara Healy Smith, Esq.
November 19, 2008
Page 2


cc:     Louise Roselle, Esq.
        Drew Duffy, Esq.
        Neil Merkl, Esq.
        John Reale, Esq.
        Gary Azorsky, Esq.