# EXHIBIT FJ

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
CITIZENS FOR CONSUME, et al  . CIVIL ACTION NO. 01-12257-PBS
  Plaintiffs                 .
                             .
        V.                   . BOSTON, MASSACHUSETTS
                             . DECEMBER 4, 2008
ABBOTT LABORATORIES, et al   .
  Defendants                 .
. . . . . . . . . . . . . . .
```

### TRANSCRIPT OF MOTION HEARING
#### BEFORE THE HONORABLE MARIANNE B. BOWLER
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States:
Justin Draycott, Esquire, Anne St. Peter Griffith,
Esquire, United States Attorney's Office, 99 N.E. 4th
Street, Miami, FL 33132, 305-961-9000,
justin.draycott@usdoj.gov.

George B. Henderson, Esquire, United States Attorney's
Office, 1 Courthouse Way, Suite 9200, Boston, MA 02210,
617-748-3272, george.henderson2@usdoj.gov.

Gejaa T. Gobena, Esquire, United States Department of
Justice, 601 D Street NW, Patrick Henry Building, Room
9028, Washington, DC 20004, 202-307-1088,
gejaa.gobena@usdoj.gov.

For Abbott Labs.:
Jason Winchester, Esquire, Jones Day, 77 West Wacker
Drive, Chicago, IL 60601-1692, 312-782-3939.

Sarah Reid, Esquire, Kelley Drye & Warren LLP, 101 Park
Avenue, New York, NY 10178.

James R. Daly, Esquire, Jones, Day, Reavis & Pogue, 77
West Wacker Drive, Chicago, IL 60601-1692, 312-782-3939.

Court Reporter:
Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

51

1  electronic submissions as they do today, the data is not all

2  there is.  There is an electronic claim form that would contain

3  some information.  Maybe that's something we need to figure out

4  after this but at least it's our understanding that that's

5  there.  If it is there then we want a representative sample.

6  If they want to come back and tell the Court as to the

7  electronic there's nothing more, we have nothing more to give,

8  that's fine.  And as to the paper we used to have them but we

9  just don't have them anymore then fine, tell us that.  But if

10  you've got it we want it on a limited basis, on a sample basis.

11        THE COURT:  I think on a sample basis is perfectly

12  fair.

13        MR. DRAYCOTT:  Well, Your Honor, just to make it

14  clear, there's nothing that we have that we are somehow

15  withholding and refusing to give.  And, Your Honor, frankly I

16  had presumed that this part of this request was failed by now.

17  What the government had produced is not only all the claims

18  data that we've been talking about, we've given – the only edit

19  that we've run on any data would have been to just make sure

20  that we're giving Abbott claims data and that we're not giving

21  Abbott Day claims data or Roxane claims data.

22        THE COURT:  Well, I've made a ruling.  To be produced

23  on a sample basis.

24        MR. DRAYCOTT:  Your Honor, I'm frankly at a loss as

25  how to respectfully, how to comply with it given that what

# EXHIBIT FK

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL          )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )   CIVIL ACTION

PRICE LITIGATION               )   01-CV-12257-PBS

_____

          Videotaped Rule 30(b)(6) Deposition

          of MICHAEL SELLERS, at 77 West Wacker

          Drive, Chicago, Illinois, commencing

          at 9:00 a.m. on Sunday, March 16,

          2008, before Donna M. Kazaitis, RPR,

          CSR No. 084-003145.

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 30

1  Guy Wiebking, myself.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   At the time the decision was made, was
4  there a concern regarding consistency with regard
5  to management concerning the pricing?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I don't recall a specific
8  concern, no.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   What else did you discuss with
11 Mr. Gonzalez regarding the change in organization
12 of Contract Marketing for Alternate Site?
13     A.   That was it.
14     Q.   Did Mr. Gonzalez or anyone else discuss
15 anything else concerning that topic, the change in
16 organization for Contract Marketing?
17     A.   No.
18     Q.   Okay.  What about the decision to close
19 down Home Infusion?  What was asked of
20 Mr. Gonzalez and what did he answer?
21     A.   I believe the question was what do you
22 recall about the decision to close down Home

Page 31

1  Infusion Services.  And Mr. Gonzalez answered
2  that, as he remembered it, Home Infusion Services
3  was a small component of the Hospital Products
4  Division, that in the later years as he looked at
5  the business and when it was fully burdened with
6  the full cost of the division and corporate
7  overhead, that it wasn't profitable.  So he made a
8  decision to close it down.
9      Q.   And that was Mr. Gonzalez's decision?
10     A.   Yes.
11     Q.   When was that decision made?
12     A.   I believe it was in 1997.
13     Q.   I appreciate this might be in your
14 personal capacity, but do you know what position
15 Mr. Gonzalez held in 1997?
16     A.   He was the president of the Hospital
17 Products Division.
18     Q.   What else did Mr. Gonzalez discuss
19 concerning closure of Home Infusion?
20     A.   That was it.
21     Q.   Is there anything else that was
22 discussed in this conversation with Mr. Gonzalez?

Page 32

1      A.   No.
2      Q.   Sir, other than what you've testified to
3  so far, did you do anything else to prepare for
4  today's deposition?
5      A.   No.  I don't believe so.
6      Q.   What happened when the change in
7  reporting relationship occurred in 2000 for
8  Alternate Site Contract Marketing?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  What happened?
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Sure.  Well, let me ask you, from a
13 personnel standpoint what happened?  Was there a
14 change in -- first, what was the change in terms
15 of the reporting relationships?  Who reported to
16 who and what change occurred in that reporting
17 relationship?
18     A.   Lynn Leone and her Contract Marketing
19 organization, which was probably around eight
20 people that reported to her, if I remember right,
21 that organization prior to the change, as I said
22 before, reported to the general manager of Product

Page 33

1  Sales, Pete Baker.  There was no physical movement
2  of people.  So they remained where they were prior
3  to the change.
4          The difference was that Lynn and
5  her group became a part of the overall Contract
6  Marketing group.  And instead of Pete reviewing
7  what Lynn and her folks were doing, I took over
8  that responsibility.
9      Q.   In addition, were there any other
10 changes with regard to the day-to-day
11 responsibilities of the individuals in Contract
12 Marketing and Alternate Site that occurred as a
13 result of this change?
14     A.   Nothing other than, you know, we
15 established periodic meetings between me and Lynn
16 as well as myself meeting with her team so they
17 understood who I was, what we were trying to do.
18     Q.   What did you discuss with them during
19 those meetings?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Typically, with all of my
22 managers I would have what I would call a

9  (Pages 30 to 33)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 66

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Mr. Sellers, what else did you do in
3  connection with evaluating the inadvertent
4  discrepancies between catalog or list price and
5  contract price in 2001?
6           You did the analysis; right?
7      A.   Right, right.
8      Q.   Anything else?
9      A.   Once the decision was made, we
10 implemented the prices.
11     Q.   Why did Abbott make the decision to
12 lower its prices in 2001?
13         MS. TABACCHI: I'm going to caution the
14 witness not to reveal the substance of any
15 communication with counsel.
16         THE WITNESS: We made a consensus
17 decision to change the prices.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Why?
20         MS. TABACCHI: Same objection.
21         THE WITNESS: I can't answer that.
22 BY MS. ST. PETER-GRIFFITH:

Page 67

1      Q.   Why can't you answer that?
2      A.   It's relevant to discussions with
3  counsel.
4      Q.   I'm not asking about your discussions
5  with counsel.
6           I'm asking for the fact. Why
7  factually as a matter of fact did Abbott make a
8  decision to change its prices in 2001?
9          MS. TABACCHI: Object to the form, asked
10 and answered.
11         MS. ST. PETER-GRIFFITH: It's not been
12 asked and answered.
13         THE WITNESS: As we've said before, we
14 made the decision to more properly align our list
15 prices with our prevailing contract prices.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   Why was that important?
18         MS. TABACCHI: Object to the form,
19 beyond the scope.
20         THE WITNESS: It seemed like the right
21 time and the right thing to do.
22 BY MS. ST. PETER-GRIFFITH:

Page 68

1      Q.   Why didn't Abbott do it much earlier?
2          MS. TABACCHI: Object to the form,
3  beyond the scope of the Notice.
4          THE WITNESS: As I said before, we
5  didn't determine the issue until the fall of 2000.
6          MS. ST. PETER-GRIFFITH: Okay. We've
7  got five minutes left on the tape. Is now a good
8  time to take a break?
9          MS. TABACCHI: Sure.
10         THE VIDEOGRAPHER: We are off the record
11 at 10:22 a.m. with the end of Tape No. 1.
12         (WHEREUPON a recess was taken.)
13         THE VIDEOGRAPHER: We are back on the
14 record at 10:38 a.m. with the beginning of Tape
15 No. 2.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   Mr. Sellers, we left off with your
18 testifying that Abbott didn't determine that there
19 was an issue until 2000 concerning what you'd
20 characterize as the inadvertent discrepancies
21 between catalog prices and, or list prices and
22 contract prices.

Page 69

1          In or around 2000 did the letter
2  from Pete Stark, Congressman Pete Stark, in any
3  way cause Abbott to evaluate these discrepancies
4  or at least identify whether there was an issue?
5          MS. TABACCHI: Object to the form.
6          THE WITNESS: There was quite a bit of
7  discourse, noise, whatever you want to call it
8  regarding this issue both in Congress and in the
9  press and so on. So I don't know to what extent
10 Pete Stark's letter contributed.
11         Looking at the issue, in my
12 recollection, had begun prior to us receiving that
13 letter, or me seeing that letter, let's put it
14 that way.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.   When did you see that letter?
17     A.   I believe it was like in October or
18 November of 2000.
19     Q.   Did you discuss the letter with anyone?
20     A.   Not that I recall.
21     Q.   How did you receive the letter?
22     A.   I don't remember.

18 (Pages 66 to 69)

00c5aa93-b25b-40ff-b422-e7070d802fa9

# EXHIBIT FL

# DOJ Pharmacy Reimbursement Project

# Alabama

EXP USABT-DUG 068539

III. Administration:

    Alabama Medicaid Agency

IV. Provisions Relating to Prescribed Drugs:

    A. General Exclusions: Cosmetics and anti-obesity, certain drug products classified by FDA as less than effective.

    B. Prescribing or Dispensing Limitations:

        1. Quantity of Medication: Normal prescriptions are limited to a maximum of 5 refills. The quantities (units) of drugs prescribed by a physician SHALL NOT be arbitrarily changed by a pharmacy except by authorization of the physician. Authorization to alter the units of a prescription must be noted on the prescription form by the pharmacist. Prescriptions for Title XIX nursing home patients who are on long-range therapy or maintenance drugs should be written for at least a minimum thirty (30) day supply.

        2. Refills: When authorized by prescriber, a prescription may be refilled a maximum of five (5) times. (subject to DS/UR). All prescriptions should be refilled only in quantities commensurate with dosage schedule and refill instructions.

    C. Prescription Charge Formula: Medicaid pays for prescribed legend and non-legend drugs authorized under the program based upon and shall not exceed the lowest of:

- The Maximum Allowable Cost (MAC) of the drug plus a dispensing fee.
- The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or
- The provider's usual and customary charge to the public for the drug.

    Professional Fee:
- Retail pharmacies: $3.75

    D. Variable Co-Payment for Prescription Drugs. Medicaid patients are required to pay and pharmacies are required to collect the maximum designated variable co-pay amount for each prescription filled and each refill.

**EXEMPTIONS:** No co-payment amount is to be collected by the pharmacy or paid by the recipient on the following:

- Family planning drugs or supplies.
- Drugs dispensed to a Medicaid recipient under 18 years of age.
- Drugs dispensed to Medicaid eligible pregnant women.
- Drugs dispensed to Medicaid recipients residing in a long-term care facility (nursing home).

Co-payment (Effective November 1, 1988) Retail Pharmacies:

| Drug Ingredient Cost | Copay Amount for Collection |
|---|---|
| $00.00 - $ 6.25 | $0.50 |
| 6.26 - 21.25 | 1.00 |
| 21.26 - 46.25 | 2.00 |
| 46.26 or more | 3.00 |

    F. Ingredient reimbursement basis:

        Wholesale acquisition cost (WAC) plus 9.2%

V. Miscellaneous Remarks:

1. Fiscal Intermediary:      Price adjustments to:

    E.D.S.               First DataBank
    P.O. Box 7600        1111 Bayhill Drive
    Montgomery, AL 36107   San Bruno, CA 94066
    (205) 834-3330 or 1/800/392-5741

        **Officials, Consultants and Committees**

1. Officials - Alabama Medicaid Agency:

    Carol A. Herrmann, Commissioner
    2500 Fairlane Drive
    Montgomery, AL 36130   205/277-2710
    Haynes C. Byrne, M.D.
    Professional Services

    Larry A. Tatum, R.Ph., Associate Director
    Pharmaceutical Programs
    Alabama Medicaid Agency
    2500 Fairlane Drive
    Montgomery, AL 36130
    205/277-2710

EXP USABT-DUG 068540

III. Administration:

    Alabama Medicaid Agency

IV. Provisions Relating to Prescribed Drugs:

  A. General Exclusions: Cosmetics, most OTCs, anti-obesity, certain drug products classified by FDA as less than effective.

  B. Prescribing or Dispensing Limitations:

    1. Quantity of Medication: Normal prescriptions are limited to a maximum of 5 refills. The quantities (units) of drugs prescribed by a physician SHALL NOT be arbitrarily changed by a pharmacy except by authorization of the physician. Authorization to alter the units of a prescription must be noted on the prescription form by the pharmacist. Prescriptions for Title XIX nursing home patients who are on long-range therapy or maintenance drugs should be written for at least a minimum 30-day supply.

    2. Refills: When authorized by prescriber, a prescription may be refilled a maximum of five (5) times. (subject to DS/UR). All prescriptions should be refilled only in quantities commensurate with dosage schedule and refill instructions.

  C. Prescription Charge Formula: Medicaid pays for prescribed legend and non-legend drugs authorized under the program based upon and shall not exceed the lowest of:

- The Maximum Allowable Cost (MAC) of the drug plus a dispensing fee.
- The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or
- The provider's usual and customary charge to the public for the drug.

Professional Fee:

- Retail pharmacies: $5.40

  D. Variable Co-Payment for Prescription Drugs. Medicaid patients are required to pay and pharmacies are required to collect the maximum designated variable co-pay amount for each prescription filled and each refill.

**EXEMPTIONS:** No co-payment amount is to be collected by the pharmacy or paid by the recipient on the following:

- Family planning drugs or supplies.

- Drugs dispensed to a Medicaid recipient under 18 years of age.
- Drugs dispensed to Medicaid eligible pregnant women.
- Drugs dispensed to Medicaid recipients residing in a long-term care facility (nursing home).

Co-payment (Effective October 1, 1991) Retail Pharmacies:

| Drug Ingredient Cost | Copay Amount for Collection |
|---|---|
| $ 0.00 - $ 4.60 | $0.50 |
| 4.61 - 19.60 | 1.00 |
| 19.61 - 44.60 | 2.00 |
| 44.61 or more | 3.00 |

  F. Ingredient reimbursement basis:

    Wholesale acquisition cost (WAC) + 9.2%

V. Miscellaneous Remarks:

  Injectable Drug List: Yes.

1. Fiscal Intermediary:
E.D.S.
P.O. Box 7600
Montgomery, AL 36107
(205) 834-3330 or 1/800/392-5741

Price adjustments to:
First DataBank
1111 Bayhill Drive
San Bruno, CA 94066

**Officials, Consultants and Committees**

1. Officials - Alabama Medicaid Agency:

Brian Moore, Commissioner
2500 Fairlane Drive
Montgomery, AL 36130 205/277-2710

Haynes C. Byrne, M.D.
Professional Services

Larry A. Tatum, R.Ph., Associate Director
Pharmaceutical Programs
Alabama Medicaid Agency
2500 Fairlane Drive
Montgomery, AL 36130
205/277-2710

2. Medicaid Rebate Contacts:

*Technical:* Sarah Mingledorff, 205/270-1876
*Policy:* Larry Tatum, 205/277-2710 x315
*Audits:* Sally Cornett, 205/277-2710 x 322
*DUR:* Joe Hicks, 205/277-2710 x 763
*PA:* Larry Tatum, 205/277-2710 x 315

EXP USABT-DUG 068541

*Replaced by 98-05*

AL-92-7
Attachment 4.19-B
Page 3

### Effective Date:  07/01/91

b. <u>Multiple Source Drugs</u>.  Reimbursement for covered multiple source drugs in the Medicaid Program shall not exceed the lowest of:

   (1)   The federally mandated upper limit (FAC) for certain multiple source drugs as established and published by HCFA plus a reasonable dispensing fee as discussed in 4.d. below, or the Alabama upper limit (AFAC) as described by Medicaid for certain additional multiple source drugs plus a reasonable dispensing fee;

   (2)   The Alabama Estimated Acquisition Cost (AEAC) for the drug plus a reasonable dispensing fee.  AEAC is defined by Medicaid as the Wholesale Acquisition Cost (WAC) + 9.2%; or

   (3)   The provider's Usual and Customary charge to the general public for the drug.

EXCEPTION:  The federal (FAC) may be waived for an innovator multiple-source drug if "brand necessary" in the physician's own handwriting appears on the face of the prescription.  Reimbursement for innovator multiple source drugs that do not have federal upper reimbursement limits will be made only if the physician's signature appears on the "Dispense as Written" line on the prescription.

c. <u>Other Drugs</u>.  Reimbursement for covered drugs other than multiple source drugs shall not exceed the lower of:

   (1)   The Alabama Estimated Acquisition Cost (AEAC) for the drug plus a reasonable dispensing fee; or

   (2)   The provider's Usual and Customary charge to the general public for the drug.

d. <u>Dispensing Fees</u>  A reasonable dispensing fee is set by the Agency.  This fee is reviewed periodically for reasonableness and, when deemed appropriate by Medicaid, may be adjusted considering such factors as inflation and/or fee studies or surveys.  A differential dispensing fee for dispensing may be applied according to pharmacy type.  Dispensing fees paid by the Agency effective 06/01/92 are:

| | |
|---|---|
| Retail | $5.40 |
| Institutional | $3.99 |
| Government | $5.40 |
| Dispensing Physicians | $1.21 |

No payments made pursuant to methods and standards described in this Attachment 4.19B will exceed upper limits established in 42 CFR Section 447, Subpart D.F

TN No. <u>AL-92-7</u>     **OCT 30 1992**
Supersedes     Approval Date  __/ /__  Effective Date 06/01/92
TN No. <u>AL-91-29</u>

EXP USABT-DUG 068542

Reproduced by 04.98.05

AL-97-14
Attachment 4.19-B
Page 2

    For crossover claims the allowable payment to the provider is determined not by the Alabama Medicaid Agency but by Medicare.  The Alabama Medicaid Agency will pay no more than the part of the allowable payment not paid by Medicare and other insurers who are obligated to pay part of the claim.

3.    <u>Physicians and Other Practitioners</u>

    **Effective Date:  10/01/91**
    a.    For all claims, except crossover claims, payment will not exceed the 275th percentile of charges submitted to the Alabama Medicaid Agency from all counties and by all specialties.  A statewide maximum payment will be calculated (or otherwise chosen) for each service designated by a procedure code recognized by the Alabama Medicaid Agency as designating a covered service.  In order to increase provider participation and improve access to care, providers of all specialties in rural counties will be paid an enhanced rate for office visits and hospital visits. Providers in rural counties whose specialty is OB/GYN, Family Practice, General Practice or Pediatrics, an enhanced rate will be paid for global delivery codes and delivery only codes.

    **Effective Date:  04/01/90**
    b.    For Medicare crossover claims, refer to item 19 in this attachment.

    **Effective Date:  07/01/87**
    c.    Medicaid recipients are required to pay and providers are required to collect designated copayments for services, supplies, appliances, and equipment, except for the designated exemptions.  The allowable copayment amount shall be credited against the Medicaid payment to the providers according to the copayment table in Attachment 4.18-A. Designated exemptions include services provided for pregnancy, nursing home residents, inpatient hospital visits, recipients under 18 years of age, emergencies, surgery fees, physical therapy, and family planning.

    <u>**Effective Date:  06/01/90**</u>
    d.    Payment to Certified Registered Nurse Anesthetists will not exceed 85% of the maximum allowable rate paid to physicians for providing the same service.

4.    <u>Prescribed Drugs</u>

    **Effective Date:  07/01/91**
    a.    Medicaid pays for covered outpatient drugs prescribed by doctors of medicine, osteopathy, and dentistry legally licensed to prescribe the drugs authorized under the program and dispensed by a licensed pharmacist or licensed authorized physician in accordance with state and federal laws.

---

TN No. <u>AL-97-14</u>
Supersedes     Approval Date 1/20/98     Effective Date <u>10/01/97</u>
TN No. <u>AL-94-10</u>

EXP USABT-DUG 068543

## C. ADMINISTRATION

Alabama Medicaid Agency.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Formulary:* Open formulary. General exclusions include cosmetics, anorectics, vitamins, food supplements, cough and cold preparations, and products classified by FDA as less than effective.

*Prior Authorization:* Prior authorization needed for nutritional supplements, anabolic steroids, all growth hormone preparations, Retin A, Accutane, and Dipyridamole.

*Drug Utilization Review:* PRODUR system implemented in July 1996.

*Coverage of Injectables:* Reimburses for injectable medicines used in physician offices, home health care, and extended care facilities.

*Vaccines:* Reimbursable as part of the EPSDT service.

*Unit Dose:* Reimburses for unit dose packaging.

*OTC Coverage:* Reimburses for some OTC drugs.

*Prescribing or Dispensing Limitations:*

1.  Quantity of Medication: Maximum is a 30-day supply, however, prescriptions for nursing home patients who are on long-range therapy or maintenance drugs should be written for at least a minimum 34-day supply.
2.  Refills: Maximum of five refills.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $5.40.

*Ingredient Reimbursement Basis:* EAC = WAC + 9.2%.

*Prescription Charge Formula:* Medicaid pays for prescribed legend and non-legend drugs authorized under the program based upon and shall not exceed the lowest of:

1.  The Maximum Allowable Cost (MAC) of the drug plus a dispensing fee,
2.  The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or

3.  The provider's usual and customary charge to the public for the drug.

*Maximum Allowable Cost:* State imposes Federal Upper Limits as well as state-specific limits on generic drugs. 223 drugs are listed on the state-specific MAC list. Override requires "Brand Medically Necessary."

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* Variable copayment.

| Drug Ingredient Cost | Copayment |
|---|---|
| $ 0.00 - $ 10.00 | $0.50 |
| 10.01 - 25.00 | 1.00 |
| 25.01 - 50.00 | 2.00 |
| 50.01 or more | 3.00 |

Exemptions: No copayment amount is to be collected by the pharmacy or paid by the recipient for the following:

- Family planning drugs or supplies.
- Drugs dispensed to a Medicaid recipient under 18 years of age.
- Drugs dispensed to Medicaid eligible pregnant women.
- Drugs dispensed to Medicaid recipients residing in a long-term care facility (nursing home).

## E. USE OF MANAGED CARE

Does not use MCOs to deliver services to Medicaid recipients.

## F. STATE CONTACTS

### State Drug Program Administrator

Mary Finch
Alabama Medicaid Agency
501 Dexter Avenue
P.O. Box 5624
Montgomery, AL  36103-5624
334/242-5473

### Alabama Medicaid Agency Officials

Gwendolyn H. Williams
Commissioner
Alabama Medicaid Agency
501 Dexter Avenue
P.O. Box 5624
Montgomery, AL  36103-5624
334/242-5600

EXP USABT-DUG 068544

## C.  ADMINISTRATION

Alabama Medicaid Agency.

## D.  PROVISIONS RELATING TO DRUGS

### Benefit Design

*Formulary:* Open formulary.  General exclusions include cosmetics, anorectics, vitamins, food supplements, cough and cold preparations, and products classified by FDA as less than effective.

*Prior Authorization:* Prior authorization needed for nutritional supplements, anabolic steroids, all growth hormone preparations, Retin A, Accutane, Dipyridamole, NSAIDS and antihistamines (non-sedating & other brands).

*Drug Utilization Review:* PRODUR system implemented in July 1996.

*Coverage of Injectables:* Injectables reimbursable through the Prescription Drug Program when used in physician offices, home health care, and extended care facilities.

*Vaccines:* Vaccines reimbursable as part of the EPSDT service and the Vaccines for Children Program.

*Unit Dose:* Unit dose packaging reimbursable.

*OTC Coverage:* The following OTC drugs are reimbursable with prescription: Allery, asthma and sinus; analgesics; cough and cold preparations; digestive products; feminine products; topical products; smoking cessation products; antidiabetic agents; prenatal vitamins; and hemorrhoidal products.

*Prescribing or Dispensing Limitations:*

1.  Quantity of Medication: Maximum is a 30-day supply, however, prescriptions for nursing home patients who are on long-range therapy or maintenance drugs should be written for at least a minimum 34-day supply.
2.  Refills: Maximum of five refills.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $5.40.

*Ingredient Reimbursement Basis:* EAC = WAC + 9.2%.

*Prescription Charge Formula:* Medicaid pays for prescribed legend and non-legend drugs authorized under the program based upon and shall not exceed the lowest of:

1.  The Maximum Allowable Cost (MAC) of the drug plus a dispensing fee,
2.  The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or
3.  The provider's usual and customary charge to the public for the drug.

*Maximum Allowable Cost:* State imposes Federal Upper Limits as well as state-specific limits on generic drugs. 235 drugs are listed on the state-specific MAC list. Override requires "Brand Medically Necessary."

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* Variable copayment.

| Drug Ingredient Cost | Copayment |
|---|---|
| $0.00 to $10.00 | $0.50 |
| $10.01 to $25.00 | $1.00 |
| $25.01 to $50.00 | $2.00 |
| $50.01 or more | $3.00 |

Exemptions: No copayment amount is to be collected by the pharmacy or paid by the recipient for recipients who are under 18, pregnant or living in nursing facilities.

## E.  USE OF MANAGED CARE

Does not use MCOs to deliver services to Medicaid recipients.

## F.  STATE CONTACTS

### State Drug Program Administrator

Mary Finch
Alabama Medicaid Agency
501 Dexter Avenue
P.O. Box 5624
Montgomery, AL  36103-5624
334/242-5039
334/242-0557 (fax)

### Alabama Medicaid Agency Officials

Gwendolyn H. Williams
Commissioner
Alabama Medicaid Agency
501 Dexter Avenue
P.O. Box 5624
Montgomery, AL  36103-5624
334/242-5600

EXP USABT-DUG 068545

## C. ADMINISTRATION

Alabama Medicaid Agency.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Drug Benefit Product Coverage:* Products covered: cosmetics; prescribed insulin, disposable needles and syringe combinations for insulin; blood glucose test strips; urine ketone test strips; total parenteral nutrition; and interdialytic parenteral nutrition. Prior authorization required for: cosmetics, Retin A, Accutane, Dipyridamole. Products not covered: fertility drugs and experimental drugs.

*Over-the-Counter Product Coverage:* Products covered if prescribed by a physician: allergy, asthma and sinus products; analgesics; cough and cold preparations; digestive products, topical products; antidiabetic products; prenatal vitamins; hemorrhoidal products. Products not covered: smoking deterrent products and feminine products.

*Therapeutic Category Coverage:* Therapeutic categories covered: antibiotics; anticoagulants; anticonvulsants; antidepressants; antidiabetic agents; antilipemic agents; anxiolytics, sedatives, and hypnotics; cardiac drugs; chemotherapy agents; contraceptives; estrogens; hypotensive agents; misc. GI drugs; sympathomimetics (adrenergic); thyroid agents. Prior authorization required for: anabolic steroids; analgesics, antipyretics, NSAIDs; antihistamine drugs; anti-psychotics; ENT anti-inflammatory agents; growth hormones; nutritional supplements. Therapeutic categories not covered: anorectics; prescribed smoking deterrents.

*Coverage of Injectables:* Injectable medicines reimbursable through the Prescription Drug Program when used in physician offices, home health care, and extended care facilities.

*Vaccines:* Vaccines reimbursable as part of the EPSDT service and the Vaccines for Children Program.

*Unit Dose:* Unit dose packaging reimbursable.

### Formulary/Prior Authorization

*Formulary:* Open formulary.

*Prior Authorization:* State currently has a formal prior authorization procedure. Review by Medicaid's Assoc. Medical Director required for appeal of prior authorization decisions.

### Prescribing or Dispensing Limitations

*Prescription Refill Limit:* Maximum of five refills.

### Drug Utilization Review

PRODUR system implemented in July 1996. State currently has a DUR Board with a quarterly review.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $5.40.

*Ingredient Reimbursement Basis:* AWP-10%, WAC + 9.2%.

*Prescription Charge Formula:* Medicaid pays for prescribed legend and non-legend drugs authorized under the program based upon and shall not exceed the lowest of:

1. The Maximum Allowable Cost (MAC) of the drug plus a dispensing fee,
2. The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or
3. The provider's usual and customary charge to the public for the drug.

*Maximum Allowable Cost:* State imposes Federal Upper Limits as well as state-specific limits on generic drugs. Override requires "Brand Medically Necessary."

*Incentive Fee:* None.

*Patient Cost Sharing:* Variable copayment.

| Drug Ingredient Cost | Copayment |
|---|---|
| $0.00 to $10.00 | $0.50 |
| $10.01 to $25.00 | $1.00 |
| $25.01 to $50.00 | $2.00 |
| $50.01 or more | $3.00 |

Exemptions: No copayment amount is to be collected by the pharmacy or paid by the recipient for recipients under age 18, pregnant or living in nursing facilities.

*Cognitive Services:* Does not pay for cognitive services.

## E. USE OF MANAGED CARE

Does not use MCOs to deliver services to Medicaid recipients.

EXP USABT-DUG 068546

## C. ADMINISTRATION

Alabama Medicaid Agency.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Drug Benefit Product Coverage:* Products covered: prescribed insulin, disposable needles used for insulin; and syringe combinations for insulin (considered OTC). Products covered as DME: blood glucose test strips; urine ketone test strips; total parenteral nutrition; and interdialytic parenteral nutrition. Prior authorization required for: cosmetics, Retin A, Accutane, Dipyridamole. Products not covered: cosmetics; fertility drugs and experimental drugs.

*Over-the-Counter Product Coverage:* Products covered if prescribed by a physician: allergy, asthma and sinus products; analgesics; cough and cold preparations; digestive products; prenatal vitamins; hemorrhoidal products. Partial coverage for: topical products. Products not covered: smoking deterrent products and feminine products.

*Therapeutic Category Coverage:* Therapeutic categories covered: anabolic steroids; anoretics; antibiotics; anticoagulants; anticonvulsants; antidepressants; antidiabetic agents; antilipemic agents; anxiolytics, sedatives, and hypnotics; cardiac drugs; chemotherapy agents; estrogens; hypotensive agents; misc. GI drugs; sympathomimetics (adrenergic) and thyroid agents. Partial coverage for: anti-psychotics; prescribed cold medications; and contraceptives. Prior authorization required for: analgesics, antipyretics, and (brand name) NSAIDs; antihistamine drugs (adult only); ENT anti-inflammatory agents; growth hormones; and nutritional supplements. Therapeutic categories not covered: prescribed smoking deterrents.

*Coverage of Injectables:* Injectable medicines reimbursable through the Prescription Drug Program when used in physician offices, home health care, and extended care facilities.

*Vaccines:* Vaccines reimbursable as part of the EPSDT service and the Vaccines for Children Program. Adult vaccines are available through the Health Department.

*Unit Dose:* Unit dose packaging reimbursable.

### Formulary/Prior Authorization

*Formulary:* Open formulary.

*Prior Authorization:* State currently has a formal prior authorization procedure. Review by Medicaid's Medical Director required for appeal of prior authorization decisions.

### Prescribing or Dispensing Limitations

*Prescription Refill Limit:* 30 day supply, maximum of five refills.

### Drug Utilization Review

PRODUR system implemented in July 1996. State currently has a DUR Board with a quarterly review.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $5.40.

*Ingredient Reimbursement Basis:* AWP-10%, WAC + 9.2%.

*Prescription Charge Formula:* Medicaid pays for prescribed legend and non-legend drugs authorized under the program based upon and shall not exceed the lowest of:

1. The Maximum Allowable Cost (MAC) of the drug plus a dispensing fee,

2. The Estimated Acquisition Cost (EAC) of the drug plus a dispensing fee, or

3. The provider's usual and customary charge to the public for the drug.

*Maximum Allowable Cost:* State imposes Federal Upper Limits as well as state-specific limits on generic drugs. Override requires "Dispense as Written" and "Brand Medically Necessary."

*Incentive Fee:* None.

*Patient Cost Sharing:* Variable copayment.

| Drug Ingredient Cost | Copayment |
|---|---|
| $0.00 to $10.00 | $0.50 |
| $10.01 to $25.00 | $1.00 |
| $25.01 to $50.00 | $2.00 |
| $50.01 or more | $3.00 |

Exemptions: No copayment amount is to be collected by the pharmacy or paid by the recipient for recipients under age 18, pregnant or living in nursing facilities.

*Cognitive Services:* Clozaril care management fee of $3.00.

EXP USABT-DUG 068547

# EXHIBIT FM

*Replaced by 00-13*

Attachment 4.19-B

10/1/93   <u>PRESCRIBED DRUGS</u>



Reimbursement for prescribed drug claims is made in accordance with the provisions of 42 CFR 447.331 as pertaining to upper limits.

1.   Reimbursement for covered drugs dispensed by a licensed pharmacy that has been approved to be an eligible provider, or a physician filling his own prescriptions if there is no licensed pharmacy within a ten mile radius of his office, shall not exceed the lowest of:

(a)   The generic upper limit of payment (GULP), if established, for multiple source drugs, unless the drug is included on the Florida Negative Formulary, plus a dispensing fee.

(b)   The estimated acquisition cost for the drug plus a dispensing fee.

(c)   The provider's usual and customary charge to the general public (non-Medicaid), for the same drug, quality, and strength.   *FL OBSOL*

<u>Definitions</u>
1.   EAC - Estimated Acquisition Cost (EAC) is the department's best estimate of what price providers generally and currently are paying for a drug, based on the package sizes providers buy most frequently.   Except for a small number of drugs with special pricing problems for which various EAC methodologies are employed, EAC is calculated at wholesaler acquisition cost plus a percentage mark-up, based on acquisition price data supplied by American Drug Data Base (Blue Book).   Wholesale Actual Cost (WAC) plus 7% is used for most drugs.   WAC plus 18% to 22% is used for CII DEA controlled substances that vary with the actual market rate.   This is usually defined as the Actual Wholesale Price (AWP).

2.   GULP- Generic upper limit of payment as established by the Health Care Financing Administration or the state agency for multiple source drugs.

<u>Multiple Source Drug Reimbursement Limitations</u>
1.   If the EAC for a multiple source drug dispensed by a provider is less than the established GULP for that product, the provider shall be reimbursed based upon the EAC price.

2.   The generic upper limit of payment will be the maximum ingredient cost per unit payable unless listed on the Florida Negative Formulary.

<u>Dispensing Fees</u>
Dispensing fees for the program may be determined on the basis of surveys that are conducted periodically and take into account such pharmacy operational costs as overhead, professional services and profit.   A $4.23 dispensing fee per payable prescription shall be paid to pharmacies.   For in-house unit dose packaging (as opposed to manufacturer pre-packaged), add 1 1/2 cents per dose.

Amendment 93-56
Effective 10/1/93
Supersedes 91-18

4          Approval   *3-3-94*

HHC008-0029          FL

# EXHIBIT FN

*Deposition*
Wellsj_2004-12-15_vol1.txt

```
07        A    Not that I know about.  I am sure there were,
08   but I was not there, so I would not know about it.
09        Q    You didn't learn about any prior study at that
10   point in time?
11        A    I did not.
12        Q    And has the State of Florida conducted any
13   similar surveys since the Myers and Stauffer 1986
14   report?
15        A    The State of Florida has not.
16        Q    Do you recall the people who were involved in
17   that survey from Myers and Stauffer?
18        A    Darrell Stauffer was the contact that I worked
19   with.  There was some other people in the company I
20   spoke with on the telephone.  Darrell is now deceased.
21        Q    Now let me see if I understand what you were
22   saying before.  The result of all this was that the
23   State was looking at the entire reimbursement formula,
24   the dispensing fees and ingredient costs, to decide
25   whether or not to make any changes, correct?
00037:01  A    That is correct.
02        Q    And after the communications from the federal
03   government and the survey, there were changes made in
04   the reimbursement methodology, correct?
05        A    That is correct.
06        Q    Can you tell us what those changes were?
07        A    In Florida, we adopted the wholesaler
08   acquisition cost as a pricing basis and marked that up
09   by 7 percent.  And we changed the dispensing fee for
10   pharmacies to $4.23.
11        Q    When did those changes come into effect?
12        A    I don't remember the date.
13        Q    Before you left to go to the Department of
14   Health?
15        A    That would be correct.
16        Q    So --
17        A    Those were in place before I left to go to the
18   Department of Health.
19        Q    So sometime before or -- before 1989, correct?
20        A    Yes.
21        Q    Now you mentioned wholesale acquisition costs
22   or WAC.  When is the first time you ever heard that
23   time?
24        A    Wholesaler acquisition costs, not wholesale
25   acquisition costs -- and I make that distinction -- the
00038:01  first time I ever heard that term was when I worked for
02   Roche Laboratories.
03        Q    In what context did you hear that term?
04        A    That was a term that sales management in Roche
05   Laboratories used as the wholesaler cost, wholesaler
06   acquisition.
07        Q    In your time at Roche, did Roche have an AWP
08   price and a WAC price for their products?
09        A    They did.  And a direct price.
10        Q    What was a direct price?
11        A    The direct price was a price that the company
12   would sell to a pharmacy who bought in large enough
13   volumes to qualify as a direct purchaser.
14        Q    That is sales that went to the pharmacy
15   without going through a wholesaler?
16        A    That's correct.
17        Q    Did Roche have any other prices, price
18   categories?
19        A    Yes.  They had a federal government, federal
```

Page 15

Handwritten margin notes:
* V. AC + 17% ?
  DF  4.23
*

EXP USABT-DUG 068804

NPC - 1991                                                                                                          Florida - 2

III.  Administration:

By the Department of Health and Rehabilitative Services.  Claims processing and payment by contract with fiscal agent.

IV.  Provisions Relating to Prescribed Drugs:

A.  Limitations and Exclusions:

1.  Vitamins and phosphate binders only for dialysis patients.

2.  Protheses; appliances; devices; and personal care items;

3.  Non-legend drugs (except for prescribed insulin, pancreatic enzymes, and buffered and enteric coated aspirin when prescribed as an anti-inflammatory agent only).

4.  Anorexiants unless the drug is prescribed for an indication other than obesity (i.e. narcolepsy, hyperkinesis);

5.  Oral vitamins with exception of fluorinated pediatric vitamins prescribed for pediatric patients, vitamins for dialysis patients, prenatal vitamins & hematinics for nursing home recipients;

6.  Digestants, except when prescribed for hepatic or pancreatic diseases;

7.  Laxatives and Lactulose preparations, except when prescribed as a chelating agent;

8.  Nursing home floor stock drugs.

B.  Formulary:  Open.

C.  Prescribing or Dispensing Limitations:

1.  Prescription limits effective January 1, 1989:  6 prescriptions monthly for community patients; 8 prescriptions per month for community institutionalized patients.  Increased grants are available based on need and diagnosis.

2.  The recipient must present a monthly eligibility card to the provider.

3.  Maintenance medication should be dispensed and billed for at least a one-month supply.

4.  Refills must be authorized by the prescriber and can be made for up to one year, except that controlled

substances can be refilled only in accordance with federal and state regulations.

5.  Drugs with questionable efficacy, as rated by the FDA (DESI), are disallowed.

6.  Investigational, experimental, and appetite suppressant items are not covered.

D.  Prescription Charge Formula:

Fee - effective March 11, 1986

Lower of:

(1)  GULP plus $4.23
(2)  EAC plus $4.23 (EAC is wholesaler acquisition cost plus 7%).
(3)  Usual and Customary
(4)  In-house unit dose diff. % 0.015/dose.

V.  Miscellaneous Remarks:

A.  Some High Volume EACs set at large package size

B.  Provisions for medically necessary considerations

C.  General Upper Limit Price (GULP)

1.  Federal GULP drug list
2.  Generic drugs are required to be dispensed if available in the market place and substitution not prohibited by the Florida Negative Formulary.

D.  Fiscal Agent:

Tom Stockdale
Consultec, Inc.
P. O. Box 7070
Tallahassee, Florida  32314-7070
904/656-7776

Officials, Consultants and Committees

1.  Department of Health and Rehabilitative Services Officials:

Bob Williams, Secretary
Dept of Health & Rehabilitative Services

Gary Clarke, Asst. Secretary for Medicaid
Susan McCloud, Acting Program Manager

Fran Trainor, Senior Pharmacist
Medicaid Office of Program Development
Building 6, Room 282
1317 Winewood Boulevard
Tallahassee, FL  32399-0700
904/487-4441

EXP USABT-DUG 068805

Attachment 4.19-B

## PRESCRIBED DRUGS

1/1/92

Reimbursement for prescribed drug claims is made in accordance with the provisions of 42 CFR 447.331 as pertaining to upper limits.

1.   Reimbursement for covered drugs dispensed by a retail pharmacy that has been approved to be an eligible provider, or a physician filling his own prescriptions if there is no licensed pharmacy within a ten mile radius of his office, shall not exceed the lowest of:

(a)   The generic upper limit of payment (GULP), if established, for multiple source drugs, unless the drug is included on the Florida Negative Formulary.

(b)   The estimated acquisition cost for the drug plus a dispensing fee.

(c)   The provider's usual and customary charge to the general public (non-Medicaid), for the same drug, quality, and strength.

Amendment 92-08
Effective 1/1/92
Supersedes 92-29
Approval  APR 23 1993

3e      Revised Submission   AUG  7 1992

**EXP USABT-DUG 068806**

III. Administration:

By the Department of Health and Rehabilitative Services. Claims processing and payment by contract with fiscal agent.

IV. Provisions Relating to Prescribed Drugs:

A. Limitations and Exclusions:

1. Vitamins and phosphate binders only for dialysis patients.

2. Protheses; appliances; devices; and personal care items;

3. Non-legend drugs (except for prescribed insulin, pancreatic enzymes, buffered and enteric coated aspirin when prescribed as an anti-inflammatory agent only, vaginal antifungal agents, and single entity hematerics).

4. Anorexiants unless the drug is prescribed for an indication other than obesity (i.e. narcolepsy, hyperkinesis);

5. Oral vitamins with exception of fluorinated pediatric vitamins prescribed for pediatric patients, vitamins for dialysis patients, prenatal vitamins;

6. Cough and cold products only available to EPSDT children under 21.

7. Nursing home floor stock drugs.

B. Formulary: Open.

Injectable Drug List: None.

C. Drug Utilization Review: Retrospective Drug Utilization Review has been in place since 1982. The administration of the program is shared by the state Medicaid agency and the Florida Pharmacy Association, which performs the reviews. Implementation of an on-line, point of sale DUR program is anticipated in October 1992.

D. Prescribing or Dispensing Limitations:

1. Prescription limits effective January 1, 1989: 6 prescriptions monthly for community patients; 8 prescriptions per month for community institutionalized patients. Increased grants are available based on need and diagnosis.

2. The recipient must present a monthly eligibility card to the provider, permanent plastic cards will be available 7/1/92.

3. Maintenance medication should be dispensed and billed for at least a one-month supply.

4. Refills must be authorized by the prescriber and can be made for up to one year, except that controlled substances can be refilled only in accordance with federal and state regulations.

5. Anti-ulcer, anti-anxiety, and sedative hypnotic drugs limited to 1 per therapeutic class per month, 1 refill per prescription.

6. Drugs with questionable efficacy, as rated by the FDA (DESI), are disallowed.

7. Investigational, experimental, and appetite suppressant items are not covered.

E. Copayment: effective April 10, 1992, Medicaid recipients shall pay a $1.00 copayment per prescription.

F. Prescription Charge Formula:

Fee - effective March 11, 1986

Lower of:

(1) GULP plus $4.23
(2) EAC plus $4.23 (EAC is wholesaler acquisition cost plus 7%).
(3) Usual and Customary
(4) In-house unit dose diff. + 0.015/dose.

V. Miscellaneous Remarks:

A. Some High Volume EACs set at large package size

B. General Upper Limit Price (GULP)

1. Federal GULP drug list
2. Generic drugs are required to be dispensed if available in the market place and substitution not prohibited by the Florida Negative Formulary.

D. Fiscal Agent:

Don Bruns
Consultec, Inc.
P. O. Box 7070
Tallahassee, Florida 32314-7070
904/656-7776

Officials, Consultants and Committees

1. Department of Health and Rehabilitative Services Officials:

Bob Williams, Secretary

EXP USABT-DUG 068807

III.  Administration:

By the Department of Health and Rehabilitative Services.  Claims processing and payment by contract with fiscal agent.

IV.  Provisions Relating to Prescribed Drugs:

A.  Limitations and Exclusions:

1.  Vitamins and phosphate binders only for dialysis patients.
2.  Protheses; appliances; devices; and personal care items;
3.  Non-legend drugs (except for prescribed insulin, pancreatic enzymes, buffered and enteric coated aspirin when prescribed as an anti-inflammatory agent only, vaginal antifungal agents, and single entity hematerics).
4.  Anorexiants unless the drug is prescribed for an indication other than obesity (i.e. narcolepsy, hyperkinesis);
5.  Oral vitamins with exception of fluorinated pediatric vitamins prescribed for pediatric patients, vitamins for dialysis patients, prenatal vitamins;
6.  Smoking cessation products;
7.  Cough and cold products only available to EPSDT children under 21.
8.  Nursing home floor stock drugs.

B.  Formulary:  Open.

Injectable Drug List:  None.

C.  Drug Utilization Review:  Retrospective Drug Utilization Review has been in place since 1982.  The administration of the program is shared by the state Medicaid agency and the Florida Pharmacy Association, which performs the reviews.  Implementation of an on-line, point of sale DUR program is anticipated in 1994.

D.  Prescribing or Dispensing Limitations:

1.  Prescription limits effective January 1, 1989:  6 prescriptions monthly for community patients; 8 prescriptions per month for community institutionalized patients.  Increased grants are available based on need and diagnosis.

2.  The recipient must present a monthly eligibility card to the provider, permanent plastic cards will be available 7/1/92.

3.  Maintenance medication should be dispensed and billed for at least a one-month supply.

4.  Refills must be authorized by the prescriber and can be made for up to one year, except that controlled substances can be refilled only in accordance with federal and state regulations.

5.  Anti-ulcer, anti-anxiety, and sedative hypnotic drugs limited to 1 per therapeutic class per month, 1 refill per prescription.

6.  Drugs with questionable efficacy, as rated by the FDA (DESI), are disallowed.

7.  Investigational, experimental, and appetite suppressant items are not covered.

E.  Copayment:  effective April 10, 1992, Medicaid recipients shall pay a $1.00 copayment per prescription.

F.  Prescription Charge Formula:

Fee - effective March 11, 1986

Lower of:

(1)  GULP plus $4.23
(2)  EAC plus $4.23 (EAC is wholesaler acquisition cost plus 7%).
(3)  Usual and Customary
(4)  In-house unit dose diff. + 0.015/dose.

G.  Vaccines:  Reimbursable at cost as part of the EPSDT service.

V.  Miscellaneous Remarks:

A.  Some High Volume EACs set at large package size

B.  General Upper Limit Price (GULP)

1.  Federal GULP drug list
2.  Generic drugs are required to be dispensed if available in the market place and substitution not prohibited by the Florida Negative Formulary.

D.  Fiscal Agent:

Don Bruns
Consultec, Inc.
P. O. Box 7070
Tallahassee, Florida  32314-7070
904/656-7776

EXP USABT-DUG 068808

**III. Administration**

By the Agency for Health Care Administration. Claims processing and payment by contract with fiscal agent.

**IV. Provisions Relating to Prescribed Drugs**

A. Limitations and Exclusions:

1. Vitamins and phosphate binders only for dialysis patients.
2. Protheses; appliances; devices; and personal care items;
3. Non-legend drugs (except for prescribed insulin, pancreatic enzymes, buffered and enteric coated aspirin when prescribed as an anti-inflammatory agent only, vaginal antifungal agents, and single entity hematinics).
4. Anorexiants unless the drug is prescribed for an indication other than obesity (i.e. narcolepsy, hyperkinesis);
5. Oral vitamins with exception of fluorinated pediatric vitamins prescribed for pediatric patients, vitamins for dialysis patients, prenatal vitamins;
6. Smoking cessation products only to EPSDT clients under age 21.
7. Cough and cold products only available to EPSDT children under 21.
8. Nursing home floor stock drugs.

B. Formulary: Open.

Injectable Drug List: None.

C. Drug Utilization Review: Retrospective Drug Utilization Review has been in place since 1982. The administration of the program is shared by the state Medicaid agency and the Florida Pharmacy Association, which performs the reviews. Implementation of an on-line, point of sale DUR program is anticipated in 1994.

D. Prescribing or Dispensing Limitations:

1. Prescription limits effective January 1, 1989: 6 prescriptions monthly for community patients; 8 prescriptions per month for institutionalized patients. Increased grants are available based on need and diagnosis.

2. Maintenance medication should be dispensed and billed for at least a one-month supply.

3. Refills must be authorized by the prescriber and can be made for up to one year, except that controlled substances can be refilled only in accordance with federal and state regulations.

4. Anti-ulcer, anti-anxiety, and sedative hypnotic drugs limited to 1 per therapeutic class per month, 1 refill per prescription.

5. Drugs with questionable efficacy, as rated by the FDA (DESI), are disallowed.

6. Investigational and experimental items are not covered.

E. Copayment: no longer in effect due to legal challenge

F. Prescription Charge Formula:

Fee - effective March 11, 1986

Lower of:

(1) GULP plus $4.23
(2) EAC plus $4.23 (EAC is wholesaler acquisition cost plus 7%).
(3) Usual and Customary
(4) In-house unit dose diff. + 0.015/dose.

G. Vaccines: part of the EPSDT service, not pharmacy item.

**V. Miscellaneous**

A. Some High Volume EACs set at large package size

B. General Upper Limit Price (GULP)

1. Federal GULP drug list
2. Generic drugs are required to be dispensed if available in the market place and substitution not prohibited by the Florida Negative Formulary.

C. Point-of-Sale claims adjudication in place since August 1992

D. Fiscal Agent:

Gordon McCleary
Provider Services Manager
Unisys Corporation
2525 South Monroe Street
Tallahassee, FL 32301
1-800/289-7799

309

EXP USABT-DUG 068809

Deposition
WellsJ_2004-12-16_vol2.txt

```
00253:01        Q    And the computer, in order to make that
      02   decision, has to -- somebody has to put in their entries
      03   into one of the fields that reflect these five items,
      04   right?
      05        A    I think we are on the same page and I don't
      06   want to argue with you about it.  The computer looks at
      07   different pricing elements and makes a calculation of an
      08   allowable charge.  It selects the lowest of those
      09   allowable charges and then looks at the amount billed by
      10   the provider, the charged amount, and decides which one
      11   of those is lower, and it selects the lowest of the
      12   options as reimbursement.
      13        Q    Okay.  And in order for it to make that
      14   electronic decision as to the reimbursement amount,
      15   somebody would have provided through the CSR process
      16   that we discussed yesterday the information for the
      17   computer to look at, right?
      18        A    That would be correct.
      19        Q    And in terms of the amount billed, that is the
      20   information that comes in on the claims submitted by the
      21   pharmacist, right?
      22        A    That's correct.
      23        Q    And the amount billed is what we have been
      24   discussing as the usual and customary amount, right?
      25        A    That's correct.
00254:01        Q    Now the State maximum allowable costs is state
      02   MAC.  That is a number that the State of Florida has the
      03   power to include in the database for reimbursement,
      04   right?
      05        A    That's correct.
      06        Q    And you personally are the one that
      07   establishes those state MACs, right?
      08        A    No, I have worked on the establishment of some
      09   state MACs, but that's not a unique responsibility to
      10   me.
      11        Q    You are the sign off for those state MACs,
      12   right?
      13        A    The bureau chief is the sign off for state
      14   MACs.
      15        Q    The bureau chief is the sign off on state
      16   MACs?
      17        A    That's correct.
      18        Q    And does the bureau chief -- does he have to
      19   sign off on every state MAC?
      20        A    It's a she.
      21        Q    I am sorry.  Does she have to sign off on
      22   every state MAC?
      23        A    If it requires a CSR to implement, that's
      24   correct.
      25        Q    I am not asking you about the CSR.
00255:01        A    We may make adjustments to the state MACs that
      02   are in place without bureau chief sign off.
      03        Q    Let's back up a little bit.  Before it ever
      04   gets to the fiscal agent, somebody at the Medicaid
      05   office in your area would come up with a state MAC,
      06   right?
      07        A    That is correct.
      08        Q    Can you tell us the exact process that's used
      09   in the State of Florida in the Medicaid office and
      10   pharmacy section to determine and come up with a state
      11   MAC?
      12        A    I cannot because that's not an exact process.
      13   There are a variety of factors that are taken into
```

Page 32

EXP USABT-DUG 068810

WellsJ_2004-12-16_vol2.txt

14  consideration for establishing a state MAC and there is
15  not a specific formula of things that we go look at to
16  establish a state MAC.
17      Q    Now when you say that the bureau chief has to
18  sign off, is that a recent change in the process?
19      A    If it requires a CSR, the bureau chief has to
20  sign off.  If we are adjusting a state MAC price, then I
21  would probably make that adjustment.
22      Q    Well, let's see, you review all the state MACs
23  before they are set and sign off on them, right?
24      A    That would generally be the case, yes.
25      Q    And nobody above you has to sign off on the
00256:01 setting of the state MAC, correct?
02      A    If it requires a CSR, the bureau chief will
03  have to sign off on it.
04      Q    Will have to sign off on the CSR?
05      A    That's correct.
06      Q    But in terms of making the determination as to
07  what a particular state MAC will be, nobody above you
08  has to make that determination, right?
09      A    They are not required to.  I am not required
10  to.  Somebody who reports to me could make the
11  determination of what they want to recommend that the
12  state MAC be set at.
13      Q    There is no single way of determining a state
14  MAC in your office, is there?
15      A    There is not.
16      Q    And are there any limitations on your power to
17  set a state MAC?
18          MR. BREEN:  Objection to the form.
19          THE WITNESS:  Certainly.
20  BY MR. ESCOBAR:
21      Q    What are they?
22      A    Common sense and the judgment of the Medicaid
23  director, of the bureau chief, the marketplace.  There
24  are a lot of limitations on my power to set a state MAC.
25      Q    When you say the marketplace, what do you mean
00257:01 by that?
02      A    I am not going to be able to set a state MAC
03  for product at a price that it is not available to
04  providers generally across the state at or below.  In
05  other words, there may be a price of 2 cents on a given
06  drug, but that's only available from one supplier, and
07  they don't distribute in all areas of the state, so I
08  can't use that as a basis for setting a state MAC.
09      Q    And what do you look at in order to set a
10  state MAC?
11      A    I look at provider invoices, information from
12  manufacturers, comments from providers who tell me what
13  they think our reimbursement is too high for or too low
14  for.  There are a variety of things.  I talk with other
15  states about what levels they set state MACs at.
16      Q    Is one of the considerations that you use in
17  setting a state MAC is that making sure that the
18  difference between the state MAC and the acquisition
19  cost for the pharmacist leaves a sufficient spread for
20  the pharmacist to stay in business?
21          MR. BREEN:  Objection to the form.
22          MR. THOMAS:  Objection.
23          THE WITNESS:  That's not a judgment that I
24  have enough information to make.  I make sure that
25  when we set a state MAC, that it's not going to be
00258:01 lower than pharmacies can generally acquire the
                        Page 33

EXP USABT-DUG 068811

WellsJ_2004-12-16_vol2.txt

02    product.  I don't try to ensure that every pharmacy
03    statewide can get it at that price every day.  But
04    generally it should be available to all providers
05    at or below that price.
06 BY MR. ESCOBAR:
07    Q    And the -- would you agree that the concept
08 behind the state MAC is to give you the power to control
09 pharmaceutical costs?
10    A    The concept behind a state MAC was to be able
11 to address products where the federal upper limit or
12 federal MAC pricing system failed to address those
13 products and where we have evidence that pharmacies all
14 over the state are able to buy the product well below
15 the published price information provided to us by the
16 manufacturer.
17    Q    So if -- by that information, a published
18 price or information from the manufacturer, you are
19 referring to AWP and WAC, right?
20    A    AWP and WAC or manufacturer catalog prices.
21 Some manufacturers are kind enough to provide us
22 information.
23    Q    And at what point -- how much of a difference
24 between the manufacturer provided price and the
25 acquisition costs were attributed to set a state MAC?
00259:01    A    That would vary with the volume of the product
02 and the attention that it has.  Any time that I would
03 see a product that's three times the published price, I
04 probably would pay attention to it.  It varies with the
05 impact of the drug.  I mean, there are some drugs that
06 we are only going to pay one claim a month, or two or
07 three claims a month, on isolated drugs and I am not
08 going to pay a lot of attention to those.
09    Q    Let me see if I understand.  When -- I am
10 trying to find out at what point your interest in
11 setting a MAC, a state MAC is triggered.  And when you
12 say if you see that the -- that there is more than three
13 times the acquisition costs, is that -- where the AWP or
14 the WAC is more than three times the acquisition cost,
15 is that what triggers it?
16    A    That would be an example.  I didn't say that
17 that's what triggers it.  If you are asking me to give
18 you a definition of exactly when am I going to wake up
19 and do something, that's going to vary by product and
20 vary by the day and what else is on the plate.
21    Q    And what are the ranges of spread that would
22 lead you to decide whether to set a state MAC?
23    A    Well, we have looked at -- I gave you an
24 example of a factor of 3.
25    Q    To 300 percent?
00260:01    A    300 percent certainly would get my attention.
02 I have seen products where the factor was as high as 10
03 or 12, and I think that warrants attention.
04    Q    10 times?
05    A    Yes.
06    Q    Meaning 1,000 percent?
07    A    Meaning 1,000 percent.
08    Q    Anything lower than 300 percent?
09    A    Well, it depends on the relative cost of the
10 product.  300 percent on a tablet that costs you a cent
11 and a half and the patient only gets 30 a month, so you
12 got 45 cents in ingredient cost or maybe the price we're
13 reimbursing is three times that, so we are paying $1.35,
14 I am not going to pay a lot of attention to that.  And I
                          Page 34

EXP USABT-DUG 068812

WellsJ_2004-12-16_vol2.txt

15  don't think that it's worth paying attention to.
16      If there is $10,000 involved in that, then I
17  think that that's worth paying attention to.
18      Q    And when you say $10,000, do you mean in
19  aggregate reimbursement for a particular product or do
20  you mean individual transactions?
21      A    Well, we've had both cases, aggregate and
22  individual.
23      Q    And is this -- is any of this -- in terms of a
24  triggering point, is any of this written down anywhere?
25      A    It is not.
00261:01     Q    So the state MAC process is somewhat ad hoc
02  based on your judgment?
03      A    State MAC was introduced, not based on my
04  judgment, based on the agency's judgment to address
05  egregious pricing discrepancies.
06      Q    And would you agree then that the state MAC is
07  a tool to limit the spread if you choose to do so?
08      A    It's a tool to limit financial exposure for
09  the Medicaid program.
10      Q    Created by spreads between reimbursed amounts
11  and acquisition amounts, right?
12          MR. BREEN:  Objection to the form.
13          THE WITNESS:  Created by whatever means.  If
14      there is a financial risk that we feel is
15      inappropriate to the Medicaid program, we have a
16      tool called the state maximum allowable costs that
17      we can use to adjust that.
18  BY MR. ESCOBAR:
19      Q    And one of the sources of that financial risk
20  could be the spread between AWP or WAC and the
21  acquisition costs, right?
22      A    Yes.
23      Q    Do you ever consult with pharmaceutical
24  manufacturers on whether you should set a state MAC?
25      A    I don't consult with pharmaceutical
00262:01  manufacturers.  I get volunteered information from the
02  pharmaceutical manufacturer representatives, sometimes
03  internal to the company, and sometimes from a
04  competitor, suggesting that we might want to set state
05  MACs.
06      Q    And you had instances in the last ten years
07  where a pharmaceutical manufacturer would come into your
08  office and tell you that they were losing sales because
09  a competitor had a bigger spread than that manufacturer
10  had; is that right?
11      A    That is correct.
12      Q    And you have had instances where that happened
13  as long as 10, 15 years ago, right?
14      A    I don't recall an incidence 15 years ago.  I
15  do recall an incident about 9 years ago.
16      Q    What is the incident that you recall?
17      A    Immunoglobulins, Id, Ig.
18      Q    Who are the manufacturers at issue there?
19      A    All manufacturers were implicated in that
20  issue.
21      Q    And what was it that came to your attention?
22  Tell us what happened.
23      A    Apparently a pricing war had gotten started,
24  there was an oversupply of immunoglobulin in the
25  marketplace.  The prices reported to us at that time by
00263:01  manufacturers were almost universally in the 80 to $85
02  per gram range as AWPs.  The WAC prices that were being
Page 35

EXP USABT-DUG 068813

WellsJ_2004-12-16_vol2.txt

```
03  reported were 65 to $70 a gram.  The market price had
04  eroded for that product to less than $25 a gram.  And
05  Florida was a big marketplace.  So we were getting lots
06  of claims for immunoglobulins.
07          A manufacturer representative brought it to my
08  attention that the pricing was well below what was being
09  published to us.  And I asked one of my staff to contact
10  the wholesalers -- the distributors for those products
11  and get catalogs and they were kind enough to share that
12  information with us.  In fact, we found some of it on
13  the internet as well and established state MAC prices
14  for immunoglobulins.
15          Q    Who was the manufacturer that came to you?
16          A    I don't recall which one it was.
17          Q    And this was in about '94, '95?
18          A    Yes, '95, '96.
19          Q    And when you say the prices that were being
20  reported, were those AWP prices?
21          A    The prices that were being reported AWP and
22  wholesaler acquisition costs to First DataBank and
23  passed through to us from First DataBank.
24          Q    And the information that you received, both
25  from the manufacturer and from looking into it, was that
00264:01 there was a very substantial spread between AWP and WAC
02  on the one hand and acquisition costs on the other hand?
03          A    That is correct.
04          Q    And that spread was having -- that spread was
05  money that was being realized by the pharmacist
06  dispensing immunoglobulin?
07          A    Actually there were a very small number of
08  pharmacies involved, and that essentially what turned
09  out to be a scam, in my opinion.  But it was a small
10  number of providers and they all appeared to be buying
11  from specialty distributors.  We had some legitimate
12  community pharmacies, and this would give you an example
13  of the limitation on our ability to impose those kinds
14  of prices.  We had some legitimate community pharmacies
15  who had an isolated case of a patient that truly
16  required immunoglobulin to survive and who were buying
17  it through regular wholesalers instead of specialty
18  distributors and were actually having to pay 65 to $67 a
19  gram for the product.
20          When we imposed those state MAC prices, we had
21  to redirect these pharmacies to purchase through
22  specialty distributors where the manufacturers were
23  making the lower prices available.
24          Q    Now after you did the research that you
25  mentioned and speaking with the manufacturers, did
00265:01 you -- you did, in fact, set a state MAC?
02          A    I did.
03          Q    And was that the first state MAC that you ever
04  set?
05          A    No.
06          Q    What was the prior one?
07          A    We had set state MACs prior to that on the
08  hemophilia factor products.
09          Q    And what had led you to set the state MACs on
10  the hemophilia factor products?
11          A    We had one of our staff do an invoice review
12  of the providers of hemophilia products and determined
13  that the prices that were being reported by
14  manufacturers for those products were not reflective of
15  the prices they were really selling them for.
```

Page 36

EXP USABT-DUG 068814

16     Q    Who was the person on your staff that did the
17 invoice review?
18     A    Rick Odenheimer.
19     Q    When you say invoice review, that is reviewing
20 invoices from pharmacies showing what they had paid?
21     A    That's correct. You didn't even compliment on
22 being able to remember Rick's name. That was over ten
23 years ago.
24        MS. JOHNSON: I want to hear you spell it.
25        THE WITNESS: O-d-e-n-h-e-i-m-e-r.
00266:01 BY MR. ESCOBAR:
02     Q    Is there anything memorable about him that
03 sticks in your mind?
04     A    No, he was a pharmacist on staff. No longer
05 works with the agency.
06     Q    And his task was to go out and get invoices
07 from pharmacies that would show what they had paid for
08 the hemophilia factor?
09     A    To get those invoices, interview the pharmacy
10 providers, and determine what the real prices were that
11 were being paid for hemophilia factor, and come up with
12 a proposal to me and other staff for a reasonable level
13 of state MAC pricing for factor.
14     Q    And he, in fact, conducted that invoice
15 review?
16     A    He did.
17     Q    Do you know how many pharmacies he contacted
18 to get invoices?
19     A    I think there were seven or eight providers.
20 There is not a lot of providers that deal in that
21 market. He contacted every provider that had submitted
22 a claim for factor in the last six months.
23     Q    And the result of that invoice review was that
24 there was, from the invoices you could tell that there
25 was a substantial spread between what the pharmacies
00267:01 were paying and what they were reporting through AWP or
02 WAC?
03     A    That's correct.
04     Q    Do you recall the range of the spread?
05     A    I don't.
06     Q    As a result of that hemophilia factor review,
07 you then set a state MAC?
08     A    We did. We called the providers in and talked
09 with them about establishing a state MAC because the
10 invoices were not totally reflective of the real cost of
11 doing business. The invoices did not reflect, for
12 instance, free goods that were being made available to
13 providers or off invoice cash considerations that were
14 being made available to providers that we perceived as
15 kickbacks.
16     Q    That lowered the costs and provided other
17 incentives?
18     A    It was just a cash kickback, supposedly an
19 unrestricted educational grant. There were also special
20 prices for short day merchandise. We ran into a lot of
21 things when we started doing this review which took,
22 from start to finish, including negotiating with the
23 provider community, it took about six months to go
24 through that process and there were only seven or eight
25 providers.
00268:01        It's a lengthy painstaking process to go
02 through. But we established state MAC prices for all
03 hemophilia products at that point.
            Page 37

EXP USABT-DUG 068815

WellsJ_2004-12-16_vol2.txt

```
04        Q    And did you set that state MAC price at some
05   level below what the manufacturers of the hemophilia
06   factor were reporting through First DataBank?
07        A    We did.
08        Q    How far below?
09        A    I think -- I don't recall the percentage below
10   at that time.  Today the state MAC pricing on hemophilia
11   products is about AWP minus 37 and a half percent.
12        Q    And the AWP minus 37 and a half percent still
13   provides some level of spread for the providers, right?
14             MR. BREEN:  Object to the form.
15             THE WITNESS:  The providers are able to stay
16        in business and apparently make a profit at the
17        level that we are reimbursed today.
18   BY MR. ESCOBAR:
19        Q    When you say today it's AWP minus 37 percent,
20   has that been higher?  Has the deduction from AWP been
21   higher or lower in the past?
22        A    I think it's actually been lower than that in
23   the past.
24        Q    So you've lowered the reimbursement price,
25   correct?
```

00269:01        A    No, we have increased the reimbursement price.
```
02        Q    Okay.  And the current increases, what led to
03   that?
04        A    Providers sharing invoices with us indicating
05   that they were unable to purchase product at the prices
06   that we had set.
07        Q    Now other than the two -- let me back up to
08   the immunoglobulin that you mentioned before.  At what
09   level did you initially set the state MAC for that
10   product?
11        A    I don't recall the exact level.  I think it
12   was around $30.
13        Q    Was that expressed as a percentage off of one
14   of the benchmarks?
15        A    It was not calculated as a percentage off.
16   Once you've set a number, it can be calculated as a
17   percentage, but that's not the way it was established.
18        Q    How did you set it up with respect to the
19   fiscal agent?  What would they see with respect to that
20   product?
21        A    They would see a number.
22        Q    Just a flat dollar amount?
23        A    That's correct.
24        Q    Was the hemophilia factor state MAC the first
25   state MAC that you set?
```

00270:01        A    I don't think so.  I don't recall what the
```
02   first state MAC was.  That was the first really large
03   dollar impact state MAC that we set.
04        Q    If we look again at page 6-3, we talked about
05   the amount billed and the state MAC.  The federal upper
06   limit you've mentioned.  Before I turn to that, on each
07   one of the first four items, AWP, WAC, federal upper
08   limit, and state MAC, it indicates here that in addition
09   to the ingredient cost you pay a dispensing fee, right?
10        A    That's correct.
11        Q    If you pay -- if you reimburse on the amount
12   billed, you don't pay a dispensing fee, right?
13        A    The amount billed includes the dispensing
14   fee --
15        Q    So you --
16        A    -- requested by the pharmacy.
```
                              Page 38

EXP USABT-DUG 068816

WellsJ_2004-12-16_vol2.txt

17    If they charge -- the charge to us the amount
18  billed is less than our allowable charge, and the
19  allowable charge includes the dispensing fee added to
20  ingredient cost calculated by any one of the four
21  methods, if their amount billed is less than that, then
22  that's the amount we pay.
23    Q    And they don't get a separate segregated $4.23
24  dispensing fee, right?
25    A    That's correct.
00271:01    Q    Now the federal upper limit, can you tell us
02  your understanding of that item?
03    A    The federal upper limit is established by CMS
04  according to a formula published in the Federal
05  Register.
06    Q    What's your understanding of how that works?
07    A    Are you asking for my personal opinion whether
08  it's a good system or bad system or are you asking how
09  I -- how they price it?
10    Q    Let's go with your personal opinion.  That
11  sounds more interesting.
12    A    I suspected you would go there.
13    I think they could have devised a better
14  system because the system that they settled on in some
15  cases winds up setting prices higher than I think they
16  should be for some products.
17    THE VIDEOGRAPHER:  Off the record.
18    (Brief recess.)
19    (The requested portion was read.)
20    THE VIDEOGRAPHER:  We are back on the record.
21    This is tape number 4.  It's 11:22.
22  BY MR. ESCOBAR:
23    Q    Before the tape change, Mr. Wells, you were
24  stating your view on the federal upper limit.
25    And you indicated that you thought they could
00272:01  have done a better job of that because in some instances
02  the federal upper limit set prices that were higher than
03  other products?
04    A    That is correct.  Well, higher than the
05  marketplace.
06    Q    And when you say higher than the marketplace,
07  what prices in the marketplace category are you
08  including?
09    A    The example that I would use and what I see in
10  our claims, because some manufacturers, most
11  manufacturers, in fact, are very conscientious and
12  honestly report their WAC price.  They may have AWP
13  prices that are all over the map, but when they report
14  their WAC price correctly, according to the federal
15  statutes, the federal upper limit price sometimes is
16  substantially higher than our reimbursement scheme under
17  the handbook we are looking at now which was the
18  wholesaler acquisition cost plus 7 percent would be
19  substantially under the federal upper limit price.  So
20  in that situation, I think the federal upper limit price
21  missed the boat.
22    Q    Missed the boat in terms of being an effective
23  ceiling on prices for reimbursement?
24    A    That's correct.
25    Q    And do you know how the federal upper limit is
00273:01  calculated?
02    A    The federal upper limit is calculated by rule
03  at 150 percent of the lowest AWP, average wholesale
04  price, published in the red book where there are three

Page 39

EXP USABT-DUG 068817

*Wells' Amended Dep.*

2.  I am the Bureau Chief for Pharmacy Services at the Florida Agency for Health Care Administration (AHCA). I have held this position since February, 2005. My previous position at AHCA was Pharmaceutical Program Manager.

3.  The AHCA is the designated single state agency to administer the Florida Medicaid Program.

4.  I am also a licensed pharmacist and have practiced pharmacy since 1963.

5.  My duties as Bureau Chief for Pharmacy Services for AHCA include, among other things, setting Medicaid reimbursement rates for pharmaceuticals for the Florida Medicaid Program; selecting pharmaceuticals for Florida's Medicaid formulary; and setting the state maximum allowable cost for certain pharmaceuticals.

6.  AHCA's fiscal agent is Affiliated Computer Services (ACS). Pursuant to a contract with AHCA ACS processes reimbursement claims submitted by Medicaid providers for pharmaceuticals.

7.  AHCA's reimbursement rate for pharmaceuticals is based on AHCA's best estimate of acquisition cost (EAC) to the pharmacy providing the drug. From July 1, 1994 through and including June 30, 2000, EAC was the lower of: Wholesale Acquisition Cost (WAC) plus seven (7) percent; the Federal Upper Limit (FUL); or the State Maximum Allowable Cost (SMAC). Pursuant to a legislative change effective July 1, 2000, an additional test to determine EAC was added. Based on this legislative change, EAC was the lower of: Average Wholesale Price minus 13.25 percent; WAC plus seven percent; the FUL; or SMAC. Pursuant to a legislative change effective July 1, 2004, the EAC is the lower of: AWP less 15.4 percent; WAC plus 5.75 percent; the FUL; or SMAC. whichever is less.

7/1/94



2

EXP USABT-DUG 068818

MAY-24-2005  17:36      AG MFCU                          850 487 9475      P.04/07

8.  From July 1, 1994 through the present, with the exception of the time period

set forth in paragraph 10 below, AHCA reimbursed Medicaid providers for

pharmaceuticals either the EAC, as described in paragraph 7 above, plus a dispensing     ✳ U + C

fee, or the provider's usual and customary charge to the public, whichever was lower.          D F

9.  From July 1, 1994 through and including July 2, 2000, and again from on or

about April 30, 2002 through and including June 30, 2004, the Florida Medicaid

Program reimbursed Medicaid Providers according to the formula described in

paragraph 8 above for the following Dey products:

| Dey | Albuterol Sulfate .083% | 25s | 49502-0697-03 |
| Dey | Albuterol Sulfate .083% | 30s | 49502-0697-33 |
| Dey | Albuterol Sulfate .083% | 60s | 49502-0697-60 |
| Dey | Albuterol Sulfate 5 mg/ml Solution | 20 ml | 49502-0105-01 |
| Dey | Acetylcysteine Solution 10% | 4 ml | 49502-0181-04 |
| Dey | Acetylcysteine Solution 10% | 10 ml | 49502-0181-10 |
| Dey | Acetylcysteine Solution 10% | 30 ml | 49502-0181-30 |
| Dey | Acetylcysteine Solution 20% | 4 ml | 49502-0182-04 |
| Dey | Acetylcysteine Solution 20% | 10 ml | 49502-0182-10 |
| Dey | Acetylcysteine Solution 20% | 30 ml | 49502-0182-30 |
| Dey | Cromolyn Sodium 2 ml | 60s | 49502-0689-02 |
| Dey | Cromolyn Sodium 2 ml | 120s | 49502-0689-12 |
| Dey | Ipratropium Bromide 2.5 ml | 25s | 49502-0685-03 |
| Dey | Ipratropium Bromide 2.5 ml | 30s | 49502-0685-33 |
| Dey | Ipratropium Bromide 2.5 ml | 60s | 49502-0685-60 |

EXP USABT-DUG 068819



JEB BUSH, GOVERNOR

RHONDA M. MEDOWS, MD, FAAFP, SECRETARY

April 3, 2003

Ms. Paula Holder
Senior Investigator
Office of the Attorney General
Medicaid Fraud Control Unit
Plaza Level 01, The Capitol
Tallahassee, Florida 32399-1050

Dear Ms. Holder:

Per your request, the pricing screens for the list of National Drug Codes you requested are
enclosed. Where prices were consistent across all packages for a single product, screens for only
one package are included.

Pricing logic for each of these drugs prior to June 30, 2000 is as follows:
The lower of, WAC+7% (screen 4 reflects WAC price), Federal Upper Limit, State MAC or the
billed amount.

Pricing logic from July 1, 2000 through April 29, 2002 is as follows:
The lower of AWP-13.25% (screen 3 reflects AWP price), Federal Upper Limit, State MAC or
the billed amount.

Pricing logic from April 30, 2002 to date is as follows:
The lower of AWP-13.25%, WAC+7%, Federal Upper Limit, State MAC or the billed amount.

Dispensing fees are in addition to ingredient cost in all cases up to August 1, 2001, and are
$4.23. Dispensing fees for nursing home patient prescriptions increased to $4.73 in August of
2001.

If you have further questions please give me a call at 488-3560.

Sincerely,

Steve Grigas
Assistant Deputy Secretary for Medicaid Operations

EXHIBIT
20-Wells Fr

**HIGHLY
CONFIDENTIAL**

OAG FLA 017911

2727 Mahan Drive • Mail Stop #38

G FL0030874



DV 3952

2308 Killearn Center Boulevard • Suite 100
Tallahassee, Florida 32308-3574
(850) 201-1111 — FAX (850) 201-1331

June 12, 2000

Ms. Sally Morton
Chief of Medicaid Contract Management
Agency for Health Care Administration
2308 Killearn Center Boulevard, Suite 200
Tallahassee, FL 32308-3575

SUBJECT:   Response to CSR 0232
           AWP Pricing Change
           FM000612F

Dear Ms. Morton:

This letter is in response to CSR 0232, AWP Pricing Change, which requests that Consultec modify the existing reimbursement logic to pay at the lower of the AWP less 13.25%, FULP, SMAC, or amount billed (Usual and Customary).

Implementation of this CSR involves modification of the current pricing logic to reflect the requirements stated above.  Currently, PDCS calculates reimbursement based on the  following logic: The lesser of the Federal MAC (if present), AWP - 11.5%, Direct + 7%, WAC +7%, Submitted, or State Mac (if present).  The new requirements do not include Direct or WAC in the reimbursement calculation, and thus these parameters will be removed from the logic and the AWP percent will be modified from 11.5% to 13.25%. For the Public Health Service (PHS) providers, we have hardcoded some pricing logic to look at ingredient cost in addition to the parameters required above, and we will need to include this in our change as well.  We will make sure that these providers continue to have the ingredient cost included in their reimbursement calculation.

There is no documentation required for this CSR.

Attached is a time estimate for this CSR.  Once approved we will begin work on this CSR.

EXHIBIT
61-Wells-FL

OAG-FL-0030874

EXP USABT-DUG 068821

# EXHIBIT FO

# DOJ Pharmacy Reimbursement Project

# Massachusetts

EXP USABT-DUG 069122

HHS report HCFA - 2082

III.  Administration:

State Department of Public Welfare.

IV.  Provisions Relating to Prescribed Drugs:

A.  General Exclusions:  Immunizing biologicals available from DPH, legend vitamins not on Drug List, non-legend drugs not on Drug List.  Restrictions on certain therapeutic classes.  Legend cough and cold medications excluded. Restrictions on propoxyphene containing products.

B.  Formulary:  No.

C.  Prescribing or Dispensing Limitations:

1.  Quantity of Medication:  Not more than a 6-month supply may be prescribed.

2.  Refills:  Prescription may be refilled, as authorized with a limit of up to 5 refills within a 6-month period from the filling of the original prescription.

3.  Dollar Limits:  None.

D.  Prescription Charge Formula:

1.  Legend Drugs:  $4.06 dispensing fee.

2.  Payment shall be for the lower of the usual and customary charge or MAC or MMAC or EAC cost plus dispensing fee.

3.  Non-Legend Drugs:  Not to exceed the lower of:  (A) EAC plus dispensing fee.  (B) Usual and customary charge to pharmacy's retail customers.

V.  Miscellaneous Remarks:

Fiscal Intermediary:

Unisys Corporation
P.O. Box 9101
Somerville, MA  02145
617/625-0120

Multisource:  payment shall be for the lower of the usual and customary charge, or MMAC or FUL plus a dispensing fee.

All other:  payment shall be for the lower of the usual and customary charge, or EAC plus a dispensing fee.  EAC is defined as WAC plus 10%.

### Officials, Consultants and Committees

1.  Welfare Department:

Carmen Canino-Siegrist, Commissioner
Department of Public Welfare
180 Tremont Street
Boston, MA  02111

Bruce M. Bullen
Associate Commissioner for Medical Services (Medicaid)

Arnold H. Shapiro, R.Ph.
Pharmacy Program Manager
600 Washington Street
Boston, MA  02111
617/348-5217

2.  Executive Officers of State Medical and Pharmaceutical Societies:

A.  Massachusetts Medical Society:

William M. McDermott, M.D.
Executive Vice President
1440 Main Street
Waltham, MA  02254-9118
617/893-4610

B.  Massachusetts State Pharmaceutical Association:

Jeffrey J. Burgoyne
Executive Director
27 Cambridge Street, P.O. Box 160
Burlington, MA  01803
617/272-7879

C.  Massachusetts Osteopathic Society, Inc.:

Gladys M. Davis
Executive Secretary
237 Main Street, Box 147
Reading, MA  01867
617/944-5586

D.  State Board of Pharmacy:

Harold R. Partamian, R.Ph.
Executive Secretary
100 Cambridge Street
Room 1514
Boston, MA  02202-0001
617/727-7390

EXP USABT-DUG 069123

III. Administration:

State Department of Public Welfare.

IV. Provisions Relating to Prescribed Drugs:

A. General Exclusions: Immunizing biologicals available from DPH, legend vitamins not on Drug List, non-legend drugs not on Drug List. Restrictions on certain therapeutic classes. Legend cough and cold medications excluded. Restrictions on propoxyphene containing products.

B. Formulary: No.

C. Prescribing or Dispensing Limitations:

1. Quantity of Medication: No restrictions except federal and state controlled drug limitations.

2. Refills: Prescription may be refilled, as authorized with a limit of up to 5 refills within a 6-month period from the filling of the original prescription.

3. Dollar Limits: None.

D. Prescription Charge Formula:

1. Legend drugs: $4.06 dispensing fee.

2. Payment shall be for the lower of the usual and customary charge or MAC or MMAC or EAC cost plus dispensing fee.

3. Non-Legend Drugs: Not to exceed the lower of: (A) EAC plus dispensing fee. (B) Usual and customary charge to pharmacy's retail customers.

V. Miscellaneous Remarks:

Fiscal Intermediary:

Unisys Corporation
P.O. Box 9101
Somerville, MA 02145
617/576-4483

Multisource: payment shall be for the lower of the usual and customary charge, or MMAC or FUL plus a dispensing fee.

All other: payment shall be for the lower of the usual and customary charge, or EAC plus a dispensing fee. EAC is defined as WAC plus 10%.

## Officials, Consultants and Committees

1. Welfare Department:

Joseph Gallant, Commissioner
Department of Public Welfare
180 Tremont Street
Boston, MA 02111

Bruce M. Bullen
Deputy Commissioner for Medical Services
(Medicaid)

Arnold H. Shapiro, R.Ph.
Pharmacy Program Manager
600 Washington Street
Boston, MA 02111
617/348-5558

2. Medicaid Rebate Contacts:

*Technical:*    Gerard J. Polcari, 617/348-5595

*Policy:*    Arnold Shapiro, 617/348-5558

3. Executive Officers of State Medical and Pharmaceutical Societies:

A. Massachusetts Medical Society:

William M. McDermott, M.D.
Executive Vice President
1440 Main Street
Waltham, MA 02254-9118
617/893-4610

B. Massachusetts State Pharmaceutical Association:

Jeffrey J. Burgoyne
Executive Director
27 Cambridge Street, P.O. Box 160
Burlington, MA 01803
617/272-7879

C. Massachusetts Osteopathic Society, Inc.:

Gladys M. Davis
Executive Secretary
237 Main Street, Box 147
Reading, MA 01867
617/944-5586

D. State Board of Pharmacy:

Harold R. Partamian, R.Ph.
Executive Secretary
100 Cambridge Street
Room 1514
Boston, MA 02202-0001
617/727-7390

EXP USABT-DUG 069124

e.  Medical or any other type of remedial care recognized under the laws of the Commonwealth furnished by licensed practitioners within the scope of their practice as defined by the laws of the Commonwealth – audiological services, optometric services (including professional fee and items dispensed such as eye glasses) — fixed negotiated fee schedules.

Home health care services -- fixed negotiated fee schedules established by the Rate Setting Commission.

g.  Private duty nursing services -- fee schedule established by the Rate Setting Commission.

h.  Clinic services - fixed fee per visit for each clinic established by the Rate Setting Commission.

Freestanding Ambulatory Surgical Centers:
(1) facility component reimbursed by a fee schedule established by the Rate Setting Commission;
(2) prosthetic devices reimbursed separately from the facility component by a fee schedule established by the Rate Setting Commission.

i.  Rural health clinics:
(1) rural health clinics services--an all-inclusive rate will be determined by the carrier at the beginning of the reporting period by dividing the estimated total allowable costs by estimated total visits for rural health clinic services;
(2) other ambulatory services -- fee schedules established by the Rate Setting Commission.

j.  Dental services (including dentures and prosthetic devices) -- fixed negotiated fee schedule

Physical therapy and related services--fixed negotiated fee schedule.

l.  Prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist, whichever the individual may select -- fee schedules established by the Rate Setting Commission. Payment for prescribed drugs shall not exceed the lower of the provider's usual and customary charge or:
(1) for multiple source drugs for which a Massachusetts Maximum Allowable Charge (MMAC) or a HCFA Upper Limit (MAC) has been established -- the MAC or MMAC price plus a dispensing fee;
(2) for all other drugs -- the Estimated Acquisition Cost (EAC) which is defined as Wholesale Acquisition Cost (WAC) plus 10%, plus a dispensing fee.

m.  Other diagnostic, screening, preventive, and rehabilitative services--fixed negotiated fee schedules, or fee schedules established by the Rate Setting Commission.

n.  Inpatient hospital services and skilled nursing home services for individuals 65 years or age or over in an institution for tubercular or mental diseases:
(1) inpatient hospital services -- see Attachment 4.19-A;
(2) skilled nursing home services -- see Attachment 4.19.D.

o.  Transportation for medical care -- usual and customary charge for taxicabs.

Any other medical care recognized under state law including ambulance service, oxygen, and podiatry.

93-03                                          Effective date 1/1/93

MASS DPW EPSDT 93-03
MEDICAID
DEC COM   6/23/93

OFFICIAL

HHD040-0030        L

EXP USABT-DUG 069125

lts - 3     NPC - 1994

**III. Administration**

State Department of Public Welfare.

**IV. Provisions Relating to Prescribed Drugs**

A. General Exclusions: Experimental and anorectics excluded. Immunizing biologicals available from DPH, legend vitamins not on Drug List, non-legend drugs not on Drug List. Restrictions on certain therapeutic classes. Legend cough and cold medications excluded. Restrictions on propoxyphene-containing products.

B. Formulary: None.

Injectable Drug List: None

C. Prescribing or Dispensing Limitations:
  1. Quantity of Medication: No restrictions except federal and state controlled drug limitations (Schedule II and III drugs are limited to a 30-day supply, except Ritalin and Dexedrine, which may be dispensed in up to a 60-day supply).

  2. Refills: Prescription may be refilled, as authorized with a limit of up to 5 refills within a 1 year period from the filling of the original prescription.

  3. Dollar Limits: None.

D. Prescription Charge Formula:

  1. Legend drugs: $4.06 dispensing fee.

  2. Payment shall be for the lower of the usual and customary charge or MAC or MMAC or EAC cost plus dispensing fee.

  3. Non-Legend Drugs: Not to exceed the lower of: (A) EAC plus dispensing fee or (B) Usual and customary charge to pharmacy's retail customers.

  4. For AID to the Blind drugs, the supplier bill the State Commission for the Blind directly, which pays the vendor through the fiscal intermediary (Unisys Corp.).

**V. Miscellaneous**

Fiscal Intermediary:

Paramax/Unisys Corporation
P.O. Box 9101
Somerville, MA  02145
617/576-4483

Multisource:  payment shall be for the lower of the usual and customary charge, or MMAC or FUL plus a dispensing fee.

All other:  payment shall be for the lower of the usual and customary charge, or EAC plus a dispensing fee.  EAC is defined as WAC plus 10%.

Copayment:  $.50 with the following exceptions:

Institutionalized patients
Children under age 19
Pregnant and postpartum women
Hospice care
Family planning items

**VI. Use of Managed Care Organizations**

Not available

**VII. Officials, Consultants and Committees**

A. Welfare Department:

Joseph Gallant, Commissioner
Department of Public Welfare
180 Tremont Street
Boston, MA  02111

Bruce M. Bullen
Deputy Commissioner for Medical Services
(Medicaid) 617/348-5690

Arnold H. Shapiro, R.Ph.
Pharmacy Program Manager
600 Washington Street
Boston, MA  02111
617/348-5217

B. Medicaid Rebate Contacts:

Technical:  Gerard J. Polcari, 617/348-5595
Policy:  Arnold Shapiro, 617/348-5217
DUR:  Dennis Lymo, 617/742-6606

C. Executive Officers of State Medical and Pharmaceutical Societies:

  1. Massachusetts Medical Society:

William M. McDermott, M.D.
Executive Vice President
1440 Main Street
Waltham, MA  02254-9118
617/893-4610

EXP USABT-DUG 069126

## C. ADMINISTRATION

Division of Medical Assistance.

## D. PROVISIONS RELATED TO DRUGS

### Benefit Design

*Formulary:* Open formulary. General exclusions include experimental and anorectic drugs, immunizing biologicals available from the Department of Public Health, legend vitamins not on Drug List, non-legend drugs not on Drug List. Restrictions on certain therapeutic classes. Legend cough and cold medications excluded. Restrictions on propoxyphene-containing products. Ritalin and amphetamines are limited to treatment of hyperkinesis for children under age 17, except by prior authorization, ADD by prior authorization, and are not covered for appetite control. Products rated by the FDA as less-than-effective are not covered.

*Prior Authorization:* Prior authorization procedure screening for individual drugs. Products requiring PA include anti-ulcer medication, benzodazapean, and biotechnology drugs.

*Drug Utilization Review:* PRODUR system implemented in October, 1995.

*Coverage of Injectables:* Reimbursement for injectable medicines used in physician offices, home health care, and extended care facilities varies.

*Vaccines:* Reimburses for vaccines as part of the EPSDT service if not provided by the Department of Public Health.

*Unit Dose:* Reimburses for unit dose packaging, however, will not pay extra for the packaging.

*OTC Coverage:* Reimburses for OTCs for children up through age 18. All others require prior authorization and a physician statement of "Medically Necessary."

*Prescribing or Dispensing Limitations:*

1. Quantity of Medication: Schedule II and III drugs are limited to a 30 day supply, except Ritalin and Dexedrine, which may be dispensed in up to a 60 day supply.
2. Refills: Prescription may be refilled, as authorized, with a limit of up to 5 refills within 6 months from the filling of the original prescription.
3. Dollar Limits: None.

## Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.00.

*Ingredient Reimbursement Basis:* EAC = WAC + 10%.

*Prescription Charge Formula:* Payment shall be for the lowest of:

1. EAC plus dispensing fee;
2. The usual and customary charge; or
3. FULP plus a dispensing fee.

*Maximum Allowable Cost:* Imposes State MAIC Upper Limits which parallels the Federal Upper Limits.

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* Copayment = $0.50 with the following exceptions:

- Institutionalized patients
- Children under age 19
- Pregnant and postpartum women
- Hospice care
- Family planning items

## E. USE OF MANAGED CARE

Massachusetts has implemented a managed care program.

## F. STATE CONTACTS

### State Drug Program Administrator

Arnold H. Shapiro, R.Ph.
Pharmacy Program Manager
600 Washington Street
Boston, MA 02111
617/348-5217

### Executive Offices of Health and Human Services

Joseph Gallant, Secretary
1 Ashburton Place
Boston, MA 02108

Bruce M. Bullen
Commissioner
Division of Medical Assistance

EXP USABT-DUG 069127

NPC 1997

## C. ADMINISTRATION

Executive Offices of Health and Human Services, Division of Medical Assistance.

## D. PROVISIONS RELATING TO DRUGS

**Benefit Design**

*Formulary:* Open formulary. General exclusions include experimental and anorectic drugs, immunizing biologicals (available free of charge from the Department of Public Health), legend vitamins not on Drug List, non-legend drugs not on Drug List. Restrictions on certain therapeutic classes. Legend cough and cold medications excluded. Restrictions on propoxyphene-containing products. Ritalin and amphetamines are limited to treatment of hyperkinesis for children under age 17, except by prior authorization, ADD by prior authorization, and are not covered for appetite control. Products rated by the FDA as less-than-effective are not covered.

*Prior Authorization:* Prior authorization procedure screening for individual drugs. Products requiring PA include anti-ulcer medication, benzodiazepines when used for sleep, and biotechnology drugs.

*Drug Utilization Review:* PRODUR system implemented in October 1995.

*Coverage of Injectables:* Reimbursement for injectable medicines used in physician offices, home health care, and extended care facilities.

*Vaccines:* Reimburses for vaccines as part of the EPSDT service if not provided by the Department of Public Health.

*Unit Dose:* Reimburses for unit dose packaging, however, will not pay extra for the packaging.

*OTC Coverage:* Reimburses for OTCs for children up through age 18. All others require prior authorization and a physician statement of "Medically Necessary."

*Prescribing or Dispensing Limitations:*

1.  Quantity of Medication: Schedule II and III drugs are limited to a 30-day supply, except Ritalin and Dexedrine, which may be dispensed up to a 60-day supply.
2.  Refills: Prescription may be refilled, as authorized, with a limit of up to 5 refills within 6 months from the filling of the original prescription.

3.  Dollar Limits: None.

**Pharmacy Payment and Patient Cost Sharing**

*Dispensing Fee:* $3.00.

*Ingredient Reimbursement Basis:* EAC = WAC + 10%.

*Prescription Charge Formula:* Payment shall be for the lowest of:

1.  EAC plus dispensing fee;
2.  The usual and customary charge defined as the lowest price charged or accepted by a provider for any payor; or
3.  FULP plus a dispensing fee.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs. Override requires "Brand Medically Necessary."

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* Copayment = $0.50 with the following exceptions:

-   Institutionalized patients
-   Children under age 19
-   Pregnant and postpartum women
-   Hospice care
-   Family planning items

## E. USE OF MANAGED CARE

Massachusetts has implemented a managed care program.

## F. STATE CONTACTS

**State Drug Program Administrator**

Arnold H. Shapiro, R.Ph.
Pharmacy Program Manager
Division of Medical Assistance
600 Washington Street
Boston, MA 02111
617/210-5596
617/210-5597 (fax)

**Executive Offices of Health and Human Services**

William O'Leary
Secretary
Executive Offices of Health and Human Services
1 Ashburton Place
Boston, MA 02108

2-Massachusetts

EXP USABT-DUG 069128

OBSOLETED BY TN# 01-002
98 1/1/01

# Attachment 4.19B, page 2

e.  Medical or other type of remedial care recognized under the laws of the Commonwealth furnished by licensed practitioners within the scope of their practice as defined by the laws of the Commonwealth;

   1)  Audiological services, fee schedule established by the Division of Health Care Finance and Policy
   2)  Chiropractor services, fee schedule established by the Division of Health Care Finance and Policy,
   3)  Optometric services (including professional fee and certain items dispensed), fee schedule established by the Division of Health Care Finance and Policy.

f.  Home health care services – fixed fee schedules established by the Division of Health Care Finance and Policy. (see pages 2a1 through 2a10)

g.  Private duty nursing services - fee schedule established by the Division of Health Care Finance and Policy.

h.  Clinic services - fixed fee per visit for each clinic established by the Division of Health Care Finance and Policy.

   1)  Freestanding Ambulatory Surgical Centers:

       a)  facility component reimbursed by a fee schedule established by the Division of Health Care Finance and Policy;
       b)  prosthetic devices reimbursed separately from the facility component by a fee schedule established by the Division of Health Care Finance and Policy.

   2)  Section 638 Tribal Facilities. Payment is made to § 638 tribal facilities in accordance with the most recently published *Federal Register* notice addressing the I.H.S. encounter rate. Medicaid services covered by the all-inclusive rate include the following:

       a)  Early and periodic screening, diagnosis and treatment services;
       b)  Family planning services and supplies;
       c)  Physicians' services;
       d)  Medical care and any other remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law (i.e., podiatrist, optometrist, chiropractor and audiologist services);
       e)  Rural health clinic services;
       f)  Home health services;
       g)  Private duty nursing services;
       h)  Clinic services;
       i)  Dental services;
       j)  Physical therapy and related services;
       k)  Other diagnostic, screening, preventive, and rehabilitation services;
       l)  Nurse-midwife services;
       m)  Case management services;
       n)  Extended services for pregnant women;
       o)  Ambulatory prenatal care for pregnant women;
       p)  Pediatric or family nurse practitioner's services.

i.  Rural health clinics

   (1)  rural health clinics services – an all-inclusive rate will be determined by the carrier at the beginning of the reporting period by dividing the estimated total allowable costs by estimated total visits for rural health clinic services;
   (2)  other ambulatory services – fee schedule established by the Division of Health Care Finance and Policy.

TN: 00-006                          Approval                          Effective
Supersedes: 97-008                  Date: 10-19-00                    Date: 1/1/00

HHD040-0032

EXP USABT-DUG 069129

j.  Dental services (including dentures and prosthetic devices ) – fee schedule established by the Division of Health Care Finance and Policy.

k.  Physical therapy and related services – fee schedule established by the Division of Health Care Finance and Policy.

l.  Prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist, whichever the individual may select – fee schedules established by the Division of Health Care Finance and Policy.  Payment for prescribed drugs shall not exceed the lower of the provider's usual and customary charge or:

  (1)  for multiple source drugs for which a Massachusetts Maximum Allowable Charge (MMAC) or a HCFA Upper Limit (MAC) has been established – the MAC or the MMAC price plus a dispensing fee;

  (2)  for all other drugs –the Estimated Acquisition Cost (EAC) which is defined as Wholesale Acquisition Cost (WAC) plus 10%, plus a dispensing fee.

TN: 00-006
Supersedes: 97-008

Approval
Date: 10-19-00

Effective
Date: 1/1/00

HHD040-0033          L

EXP USABT-DUG 069130

# EXHIBIT FP

# DOJ Pharmacy Reimbursement Project

# Rhode Island

EXP USABT-DUG 069586

OBSOLETED BY 101    [illegible]    1-1-95

**OFFICIAL**

(2)  Early, periodic screening, diagnosis and treatment of individuals under 21 years of age:  on the basis of negotiated fee schedule.

(3)  Family planning services, drugs and supplies for individuals of child-bearing age when such services are under the supervision of a physician, as determined according to the elements inherent in the family planning service or the drugs and contraceptive devices necessary.  On the basis of negotiated physician fee schedule and the pharmacy fee schedule.

e.  Physicians' services:  on the basis of negotiated fee schedule.

f.  Medical care of any other type of remedial care recognized under State law furnished by licensed practitioners within the scope of their practice as defined by law limited to:

(1)  Podiatry services. on the basis of a negotiated fee schedule.

(2)  Optometry services. on the basis of a negotiated fee schedule.

g.  Home Health services:  on the basis of a fixed fee schedule.

h.  Dental services. on the basis of a negotiated fee schedule.

i.  Prescribed drugs, dentures and prosthetic devices: and eyeglasses prescribed by a physician skilled in diseases of the eye or by the optometrist, whichever the individual may select.

(1)  The cost of drugs as determined by the drug product allowance established by the HCFA Upper Payment Limits plus a reasonable professional Dispensing Fee; the drug product allowance established by the State Upper Payment Limits plus a reasonable Dispensing Fee; the estimated acquisition cost for all other drugs plus a reasonable Dispensing Fee;  or the usual and customary charge to the general public, whichever is lower.  In those instances in which the drug product allowance is less than the established HCFA Upper Payment Limits and for those drug products which the State agency has established the Upper Payment Limits the drug allowance represents the lowest cost at which the product is generally available at a local level to the community pharmacies.

*\
→ FN#1
no EAC defn.

A professional Dispensing Fee of $3.40 per presciption for medication dispensed to recipients residing at home will be allowed for legend prescription drugs in addition to the allowable cost of the drug.

DF

A professional Dispensing Fee of $2.85 per prescription for medication dispensed to recipients residing in licensed Skilled Nursing and Intermediate Care Facilities will be allowed for legend prescription drugs in addition to the allowable cost of the drug.

DF for institutions

Reimbursement for over-the-counter items is based upon the lowest of the drug product allowance plus the professional Dispensing Fee, the allowable cost of the drug plus a 50% mark-up  or the usual and customary charge to the general public, but not less a $1.50 minimum charge per prescription.

(2)  Dentures:  on the basis of a negotiated fee schedule.

(3)  Surgical and prosthetic devices:  all payments are made for covered

TN #87-15                     Approval                Effective
Supersedes  TN #85-24        Date   2/17/88          Date  10/1/87

HHD040-0062        F

EXP USABT-DUG 069587

NPC - 1991

Rhode Island

III. Administration:

State Department Human Services.

IV. Provisions Relating to Prescribed Drugs:

A. General Exclusions:

OTC and certain medicine chest items and injectables:

Prior authorization is required for all injectables (excluding insulin and adrenalin), appetite depressant drugs, central nervous system stimulants, expensive vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint), expensive and/or new preparations.

Prescribed drugs requiring prior authorization may be refilled if requested by the attending physician and approved by the Division of Medical Services.

B. Prescribing or Dispensing Limitations:

1. Quantity of Medication:  One month's supply of drugs.

2. Maintenance Medication:  The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-days' supply of these drugs – whichever is greater.

3. Refills:  Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc.

   Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), Corticosteroids, appetite depressants and pentazocine.

4. Dollar Limits:  None

C. Prescription Charge Formula:

1. *Prescription Drugs Dispensed to Eligible Recipients Residing in Their Own Homes:*

   A Professional Fee for Service of $3.40 will be allowed for all prescriptions in addition to the cost of the drug.

   In accordance with federal regulation the upper limit for payment for prescribed

drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever lower.

Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

2. *Prescription Drugs Dispensed to Recipients Residing in Skilled Nursing or Intermediate Care Facilities:*

   A Special Professional Fee for Service of $2.85 will be allowed for these prescriptions in addition to the cost of the drug to the pharmacist.

   In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

   Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

3. Ingredient reimbursement basis:  AWP (EAC on certain package sizes, direct on some items, and upper limits list)

4. The estimated acquisition cost for products manufactured by the following pharmaceutical companies is the direct reimbursements:

   *FN#2*
   Abbott-Ross
   Lederle
   Merck Sharp & Dohme
   Parke-Davis
   Pfipharmics
   Pfizer-Roerig
   Squibb
   Upjohn
   Warner-Chilcott
   Wyeth-Ayerst

EXP USABT-DUG 069588

III. Administration:

State Department Human Services.

IV. Provisions Relating to Prescribed Drugs:

A. General Exclusions:

OTC and certain medicine chest items and injectables:

Injectable Drug List:  None.

Prior authorization is required for all injectables (excluding insulin and adrenalin), appetite depressant drugs, central nervous system stimulants, expensive vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint), expensive and/or new preparations.

Prescribed drugs requiring prior authorization may be refilled if requested by the attending physician and approved by the Division of Medical Services.

B. Prescribing or Dispensing Limitations:

1. Quantity of Medication:  One month's supply of drugs.

2. Maintenance Medication:  The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-days' supply of these drugs -- whichever is greater.

3. Refills:  Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc.

   Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), Corticosteroids, appetite depressants and pentazocine.

4. Dollar Limits:  None

C. Prescription Charge Formula:

1. *Prescription Drugs Dispensed to Eligible Recipients Residing in Their Own Homes:*

   A Professional Fee for Service of $3.40 will be allowed for all prescriptions in addition to the cost of the drug.

In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

2. *Prescription Drugs Dispensed to Recipients Residing in Skilled Nursing or Intermediate Care Facilities:*

   A Special Professional Fee for Service of $2.85 will be allowed for these prescriptions in addition to the cost of the drug to the pharmacist.

   In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

   Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

3. Ingredient reimbursement basis:  AWP (EAC on certain package sizes, direct on some items, and upper limits list)

4. The estimated acquisition cost for products manufactured by the following pharmaceutical companies is the direct reimbursements:

   Abbott-Ross
   Lederle
   Merck Sharp & Dohme
   Parke-Davis
   Pfipharmics
   Pfizer-Roerig
   Squibb
   Upjohn

272

EXP USABT-DUG 069589

III. Administration:

State Department Human Services.

IV. Provisions Relating to Prescribed Drugs:

A. General Exclusions:

OTC and certain medicine chest items and injectables:

Injectable Drug List:  None.

Prior authorization is required for all injectables (excluding insulin and adrenalin), appetite depressant drugs, central nervous system — adults only,  stimulants, expensive vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint), expensive and/or new preparations.

Prescribed drugs requiring prior authorization may be refilled if requested by the attending physician and approved by the Division of Medical Services.

B. Prescribing or Dispensing Limitations:

1. Quantity of Medication:  One month's supply of drugs.

2. Maintenance Medication:  The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-days' supply of these drugs – whichever is greater.

3. Refills:  Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc.

Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.

4. Dollar Limits:  None

C. Prescription Charge Formula:

1. *Prescription Drugs Dispensed to Eligible Recipients Residing in Their Own Homes:*

A Professional Fee for Service of $3.40 will be allowed for all prescriptions in addition to the cost of the drug.

In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

2. *Prescription Drugs Dispensed to Recipients Residing in Skilled Nursing or Intermediate Care Facilities:*

A Special Professional Fee for Service of $2.85 will be allowed for these prescriptions in addition to the cost of the drug to the pharmacist.

In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

3. Ingredient reimbursement basis:  AWP (EAC on certain package sizes, direct on some items, and upper limits list)

4. The estimated acquisition cost for products manufactured by the following pharmaceutical companies is the direct reimbursements:

Abbott-Ross
Lederle
Merck & Co.
Pfipharmics
Pfizer-Roerig
Squibb
Upjohn
Warner-Chilcott
Wyeth-Ayerst

5. The quantity of the drug dispensed on the original prescription would be determined on the basis of a 30-day supply to the patient.  A

355

EXP USABT-DUG 069590

NPC - 1994

Rhode Island

### III. Administration

State Department Human Services.

### IV. Provisions Relating to Prescribed Drugs

A. General Exclusions:

OTC and certain medicine chest items and injectables:

Injectable Drug List: None.

Prior authorization is required for appetite depressant drugs, central nervous system—stimulants over 21 days, brand name vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint).

Prescribed drugs requiring prior authorization may be refilled if requested by the attending physician and approved by the Division of Medical Services.

B. Prescribing or Dispensing Limitations:

1. Quantity of Medication: One month's supply of drugs.

2. Maintenance Medication: The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-days' supply of these drugs -- whichever is greater.

3. Refills: Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc.

   Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.

4. Dollar Limits: None

C. Prescription Charge Formula:

1. Prescription Drugs Dispensed to Eligible Recipients Residing in Their Own Homes: A Professional Fee for Service of $3.40 will be allowed for all prescriptions in addition to the cost of the drug.

   In accordance with federal regulation the upper limit for payment for prescribed

drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

2. Prescription Drugs Dispensed to Recipients Residing in Skilled Nursing or Intermediate Care Facilities: A Special Professional Fee for Service of $2.85 will be allowed for these prescriptions in addition to the cost of the drug to the pharmacist.

   In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

   Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

3. Ingredient reimbursement basis: AWP (EAC on certain package sizes, direct on some items, and upper limits list)

4. The estimated acquisition cost for products manufactured by the following pharmaceutical companies is the direct reimbursements:

   *FN #2*

   Abbott-Ross
   Lederle
   Merck & Co.
   Pfipharmics
   Pfizer-Roerig
   Squibb
   Upjohn
   Warner-Chilcott
   Wyeth-Ayerst

5. The quantity of the drug dispensed on the original prescription would be determined on the basis of a 30-day supply to the patient. A maximum of 5 refills in addition to the original prescription will be allowed when so indicated the physician.

490

Official

STATE OF RHODE ISLAND

(2)   Early, periodic screening, diagnosis and treatment of individuals under 21 years of age: on the basis of negotiated fee schedule.

(3)   Family planning services, drugs and supplies for individuals of child-bearing age when such services are under the supervision of a physician, as determined according to the elements inherent in the family planning service or the drugs and contraceptive devices necessary: on the basis of negotiated physician fee schedule and the pharmacy fee schedule.

e.   Physicians' services: on the basis of negotiated fee schedule.

f.   Medical care of any other type of remedial care recognized under State law furnished by licensed practitioners within the scope of their practice as defined by law limited to:

(1)   Podiatry services: on the basis of a negotiated fee schedule.

(2)   Optometry services: on the basis of a negotiated fee schedule.

g.   Home Health services: on the basis of a fixed fee schedule.

h.   Dental services: on the basis of a negotiated fee schedule.

i.   Prescribed drugs, dentures, prosthetic devices, and eyeglasses prescribed by a physician skilled in diseases of the eye or by the optometrist, whichever the individual may select.

(1)(a)   The reimbursement of legend drugs is the lower of the following:

o   the drug product allowance established by the HCFA Upper Payment Limits plus a reasonable professional Dispensing Fee; or,   ✱

o'   the drug product allowance established by the State Upper Payment Limits plus a reasonable professional Dispensing Fee; or,

o   the estimated acquisition cost (which shall be the manufacturer's reported Wholesale Acquisition Cost plus a 10% markup) plus a reasonable professional Dispensing Fee; or,

o   the usual and customary charge to the general public (to include all discounts such as senior citizen discounts, or if lower, the amount reimbursed by other third party payors).   FN#3

The professional Dispensing Fee has been established to be $3.40 for those recipients living in their own home or $2.85 for those recipients living in a licensed Nursing Facility or an Intermediate Care Facility for the Mentally Retarded.   ✱ DF

(b)   Reimbursement for over-the-counter items is based upon the lowest of the drug product allowance plus the professional Dispensing Fee, the allowable cost of the drug plus a 50% markup or the usual and customary charge to the general public, but not less than a $2.00 minimum charge per prescription.

(2)   Dentures: on the basis of a negotiated fee schedule.

(3)   Surgical and prosthetic devices: all payments are made for covered

TN No. 95-005
Supersedes
TN No. 87-15

Approval Date: 6-6-01          Effective Date: 1/1/95

HHD040-0061          L

EXP USABT-DUG 069592

Official

ATTACHMENT 4.19B
Page 2

STATE OF RHODE ISLAND

(2)    Early, periodic screening, diagnosis and treatment of individuals under 21 years of age: on the basis of negotiated fee schedule.

(3)    Family planning services, drugs and supplies for individuals of child-bearing age when such services are under the supervision of a physician, as determined according to the elements inherent in the family planning service or the drugs and contraceptive devices necessary:   on the basis of negotiated physician fee schedule and the pharmacy fee schedule.

e.    Physicians' services: on the basis of negotiated fee schedule.

f.    Medical care of any other type of remedial care recognized under State law furnished by licensed practitioners within the scope of their practice as defined by law limited to:

(1)    Podiatry services: on the basis of a negotiated fee schedule.

(2)    Optometry services: on the basis of a negotiated fee schedule.

g.    Home Health services: on the basis of a fixed fee schedule.

h.    Dental services: on the basis of a negotiated fee schedule.

i.    Prescribed drugs, dentures, prosthetic devices, and eyeglasses prescribed by a physician skilled in diseases of the eye or by the optometrist, whichever the individual may select.

(1)    The cost of drugs as determined by the drug product allowance established by the HCFA Upper Payment Limits plus a reasonable professional Dispensing Fee; the drug product allowance established by the State Upper Payment Limits plus a reasonable Dispensing Fee; the estimated acquisition cost (which shall be the manufacturer's reported Wholesale Acquisition Cost plus a 5% markup) for all other drugs plus a reasonable Dispensing Fee; or the usual and customary charge to the general public (to include all discounts such as senior citizen discounts, or if lower, the amount reimbursed by other third party payors), whichever is lower.  In those instances in which the drug product allowance is less than the established HCFA Upper Payment Limits and for those drug products which the State agency has established the Upper Payment Limits the drug allowance represents the lowest cost at which the product is generally available at a local level to the community pharmacies.

*Changed from WAC+10%

} FN #3

A professional Dispensing Fee of $3.40 per prescription for medication dispensed to recipients residing at home will be allowed for legend prescription drugs in addition to the allowable cost of the drug.

* DF

A professional Dispensing Fee of $2.85 per prescription for medication dispensed to recipients residing in licensed Nursing and Intermediate Care Facilities for the Mentally Retarded will be allowed for legend prescription drugs in addition to the allowable cost of the drug.

Reimbursement for over-the-counter items is based upon the lowest of the drug product allowance plus the professional Dispensing Fee, the allowable cost of the drug plus a 50% markup or the usual and customary charge to the general public, but not less than a $1.50 minimum charge per prescription.

(2)    Dentures: on the basis of a negotiated fee schedule.

(3)    Surgical and prosthetic devices: all payments are made for covered

TN No. 95-017       Approval Date: 6-6-01       Effective Date: 7/1/95
Supersedes
TN No. 95-005

EXP USABT-DUG 069593

## C. ADMINISTRATION

*Same as TN 95-017*

State Department Human Services.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Formulary:* Open formulary. General exclusions include: DESI drugs, smoking cessation drugs, drugs for hair growth, and drugs for fertility purposes.

*Prior Authorization:* Prior authorization is required for appetite depressant drugs, central nervous system stimulants over 21 years of age, brand name vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint).

*Drug Utilization Review:* PRODUR system implemented in December, 1994.

*Coverage of Injectables:* Reimburses for injectable medicines used in physician offices, home health care, and extended care facilities.

*Vaccines:* No information provided.

*Unit Dose:* Does not reimburse for unit dose packaging.

*OTC Coverage:* Reimburses for some OTC drugs including analgesics, cough and cold preparations, and digestive products.

*Prescribing or Dispensing Limitations:*

1. Quantity of Medication: One month's supply of drugs.
2. Maintenance Medication: The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30 days' supply of these drugs - whichever is greater.
3. Refills: Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc. Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.
4. Dollar Limits: None

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40, effective in 1987. Dispensing fee for nursing homes = $2.85.

*Ingredient Reimbursement Basis:* WAC + 5%.

*Prescription Charge Formula:*

1. In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

2. Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the Professional Fee for Service.

*Maximum Allowable Cost:* Imposes State MAIC Upper Limits parallel to HCFA Upper Limits. Override requires "Brand Medically Necessary."   *FN#5*

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* No copayment.

## E. USE OF MANAGED CARE

75,000 Medicaid recipients are enrolled in MCOs; all receive pharmacy services through managed care.

### Managed Care Organizations

- Rite-Care (Managed Care) HMO
- United Health Plans
- HMO-RI
- Neighborhood Health Plan
- Harvard/Pilgrim

## F. STATE CONTACTS

### State Drug Program Administrator

Paula Avarista, R.Ph.
Chief of Pharmacy
Department of Human Services
600 New London Avenue
Cranston, RI  02920
401/464-2183

### Department of Human Services Officials

Christine Ferguson
Director
Department of Human Services
600 New London Avenue
Cranston, RI  02920

EXP USABT-DUG 069594

NPC 1997

## C. ADMINISTRATION

State Department Human Services.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Formulary:* Open formulary. General exclusions include: DESI drugs, smoking cessation drugs, drugs for hair growth, and drugs for fertility purposes.

*Prior Authorization:* Prior authorization is required for anorexiants, central nervous system stimulants for recipients over 21 years of age, brand name vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint).

*Drug Utilization Review:* PRODUR system implemented in December 1994.

*Coverage of Injectables:* Reimburses for injectable medicines used in physician offices, home health care, and extended care facilities.

*Vaccines:* Limited coverage.

*Unit Dose:* Does not reimburse for unit dose packaging.

*OTC Coverage:* Reimburses for some OTC drugs including analgesics, cough and cold preparations, and digestive products.

*Prescribing or Dispensing Limitations:*

1.  Quantity of Medication: One month's supply of drugs.
2.  Maintenance Medication: The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-day supply of these drugs - whichever is greater.
3.  Refills: Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc. Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.
4.  Dollar Limits: None

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40, effective in 1987.
Dispensing fee for nursing homes = $2.85.

*Ingredient Reimbursement Basis:* EAC = WAC + 5%.

*Prescription Charge Formula:*

1.  In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.
2.  Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the professional fee for service.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs. Override requires "Dispense as Written" or "Brand Medically Necessary." Documentation must be submitted with a medical reason why a generic cannot be used.

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* No copayment.

## E. USE OF MANAGED CARE

75,000 Medicaid recipients are enrolled in MCOs; all receive pharmacy services through managed care.

### Managed Care Organizations

-   United Healthcare of New England
-   Coordinated Health Partners, Inc.
-   Neighborhood Health Plan of Rhode Island
-   Harvard/Pilgrim Healthcare of New England

## F. STATE CONTACTS

### State Drug Program Administrator

Paula Avarista, R.Ph.
Chief of Pharmacy
Department of Human Services
600 New London Avenue
Cranston, RI  02920
401/464-2183

### Department of Human Services Officials

Christine Ferguson
Director
Department of Human Services
600 New London Avenue
Cranston, RI  02920

2-Rhode Island

EXP USABT-DUG 069595

NPC 1998

## C. ADMINISTRATION

State Department Human Services.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Formulary:* Open formulary. General exclusions include: DESI drugs, smoking cessation drugs, drugs for hair growth, and drugs for fertility purposes.

*Prior Authorization:* Prior authorization is required for anorexants, central nervous system stimulants for recipients over 21 years of age, brand name vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint).

*Drug Utilization Review:* PRODUR system implemented in December 1994.

*Coverage of Injectables:* Injectable medicines reimbursable when used in physician offices, home health care, and extended care facilities.

*Vaccines:* Limited coverage.

*Unit Dose:* Unit dose packaging not reimbursable.

*OTC Coverage:* Some OTC drugs reimbursable, including analgesics, cough and cold preparations and digestive products.

*Prescribing or Dispensing Limitations:*

1. Quantity of Medication: One month's supply of drugs.
2. Maintenance Medication: The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-day supply of these drugs - whichever is greater.
3. Refills: Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anticonvulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc. Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.
4. Dollar Limits: None

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40, effective in 1987.
Dispensing fee for nursing homes = $2.85.

*Ingredient Reimbursement Basis:* EAC ≈ WAC + 5%.

*Prescription Charge Formula:*

1. In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

2. Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the professional fee for service.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs. Override requires "Dispense as Written" or "Brand Medically Necessary." Documentation must be submitted with a medical reason why a generic cannot be used.

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* No copayment.

## E. USE OF MANAGED CARE

75,000 Medicaid recipients are enrolled in MCOs; all receive pharmacy services through managed care.

### Managed Care Organizations

- United Healthcare of New England
- Coordinated Health Partners, Inc.
- Neighborhood Health Plan of Rhode Island
- Harvard/Pilgrim Healthcare of New England

## F. STATE CONTACTS

### State Drug Program Administrator

Paula Avarista, R.Ph.
Chief of Pharmacy
Department of Human Services
600 New London Avenue
Cranston, RI  02920
401/464-2183

### Department of Human Services Officials

Christine Ferguson
Director
Department of Human Services
600 New London Avenue
Cranston, RI  02920

*Same as TN 95-017*

EXP USABT-DUG 069596

NPC 1999

## C. ADMINISTRATION

State Department Human Services.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Formulary:* Open formulary.  General exclusions include: DESI drugs, smoking cessation drugs, drugs for hair growth, and drugs for fertility purposes.

*Prior Authorization:* Prior authorization is required for anorexants, central nervous system stimulants for recipients over 21 years of age, brand name vitamins, hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint).

*Drug Utilization Review:* PRODUR system implemented in December 1994.

*Coverage of Injectables:* Injectable medicines reimbursable when used in physician offices, home health care, and extended care facilities.

*Vaccines:* Limited coverage.

*Unit Dose:* Unit dose packaging not reimbursable.

*OTC Coverage:* Some OTC drugs reimbursable, including analgesics, cough and cold preparations and digestive products.

*Prescribing or Dispensing Limitations:*

1. Quantity of Medication: One month's supply of drugs.
2. Maintenance Medication: The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-day supply of these drugs - whichever is greater.
3. Refills: Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc.  Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.
4. Dollar Limits: None

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40, effective in 1987.
Dispensing fee for nursing homes = $2.85.

*Ingredient Reimbursement Basis:* EAC = WAC + 5%.

*Prescription Charge Formula:*

1. In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

2. Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the professional fee for service.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs.  Override requires "Dispense as Written" or "Brand Medically Necessary." Documentation must be submitted with a medical reason why a generic cannot be used.

*Incentive Fee:* None.

*Cognitive Services:* Does not pay for cognitive services.

*Patient Cost Sharing:* No copayment.

## E. USE OF MANAGED CARE

Approximately 75,000 unduplicated Medicaid recipients were enrolled in managed care in 1997.  All received pharmacy services through managed care.

### Managed Care Organizations

- United Healthcare of New England
- Coordinated Health Partners, Inc.
- Neighborhood Health Plan of Rhode Island
- Harvard/Pilgrim Healthcare of New England

## F. STATE CONTACTS

### State Drug Program Administrator

Paula Avarista, R.Ph.
Chief of Pharmacy
Department of Human Services
600 New London Avenue
Cranston, RI  02920
401/464-2183

### Department of Human Services Officials

Christine Ferguson
Director
Department of Human Services
600 New London Avenue
Cranston, RI  02920

*Source of TN 95-017*

EXP USABT-DUG 069597

## C. ADMINISTRATION

State Department Human Services.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Drug Benefit Product Coverage:* Products not covered: DESI drugs; smoking cessation drugs; drugs for hair growth; and fertility drugs. Prior authorization required for: anorexants; central nervous system stimulants for recipients over 21 years of age; brand name vitamins; and hematinics and lipotropic preparations (selling for over $10 per 100 tablets/capsules or pint).

*Over-the-Counter Product Coverage:* analgesics; cough and cold preparations; and digestive products.

*Coverage of Injectables:* Injectable medicines reimbursable when used in physician offices, home health care, and extended care facilities.

*Vaccines:* Limited coverage.

*Unit Dose:* Unit dose packaging not reimbursable.

### Formulary/Prior Authorization

*Formulary:* Open formulary.

### Prescribing or Dispensing Limitations

*Prescription Refill Limit:* Refills to a maximum of five are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc. Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.

*Monthly Quantity Limit:* One month's supply of drugs.

*Maintenance Medication:* The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-day supply of these drugs - whichever is greater.

*Monthly Dollar Limits:* None

### Drug Utilization Review

PRODUR system implemented in December 1994.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40, effective in 1987.
Dispensing fee for nursing homes = $2.85.

*Ingredient Reimbursement Basis:* EAC = WAC + 5%.

*Prescription Charge Formula:*

1. In accordance with federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

2. Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the professional fee for service.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs.  Override requires "Dispense as Written" or "Brand Medically Necessary." Documentation must be submitted with a medical reason why a generic cannot be used.

*Incentive Fee:* None.

*Patient Cost Sharing:* No copayment.

*Cognitive Services:* Does not pay for cognitive services.

## E. USE OF MANAGED CARE

Managed care recipients receive pharmaceutical benefits through managed care plans.

### Managed Care Organizations

- United Healthcare of New England
- Coordinated Health Partners, Inc.
- Neighborhood Health Plan of Rhode Island
- Harvard/Pilgrim Healthcare of New England

## F. STATE CONTACTS

### State Drug Program Administrator

Paula Avarista, R.Ph.
Chief of Pharmacy
Department of Human Services
600 New London Avenue
Cranston, RI  02920
401/462-2183

*[handwritten: Same as TN 05-017]*

**EXP USABT-DUG 069598**

## C. ADMINISTRATION

State Department Human Services.

## D. PROVISIONS RELATING TO DRUGS

### Benefit Design

*Drug Benefit Product Coverage:* Products covered: prescribed insulin; disposable needles and syringe combinations used for insulin; urine ketone test strips. Products covered under DME: blood glucose test strips; total parenteral nutrition (prior authorization required); and interdialytic parenteral nutrition (prior authorization required). Products not covered: cosmetics; fertility drugs; experimental drugs; DESI drugs.

*Over-the-Counter Product Coverage:* Products covered: analgesics (acetaminophen); cough and cold preparations (guifenisin, diphenhydramine, chlorpheniramine); digestive products (non-H2 antagonists); feminine products (contraceptive foams, gels and creams); topical products; antacids; and laxatives. Products not covered: allergy, asthma, and sinus products; digestive products (H2 antagonists); and smoking deterrent products.

*Therapeutic Category Coverage:* Products covered: anabolic steroids; analgesics, antipyretics, and NSAIDs; antibiotics; anticoagulants; anticonvulsants; antidepressants; antidiabetic agents, antihistamine drugs; antilipemic agents; anti-psychotics; anxiolytics, sedatives, and hypnotics; cardiac drugs; chemotherapy agents, prescribed cold medications; contraceptives; ENT anti-inflammatory agents; estrogens; hypotensive agents; misc.GI drugs; sympathomimetics (adrenergic); and thyroid agents. Prior authorization required for: anoretics. Partial coverage: growth hormones. Therapeutic categories not covered: prescribed smoking deterrents; products for hair growth.

*Coverage of Injectables:* Injectable medicines reimbursable under the Prescription Drug Program when used in home health care and extended care facilities and through physician payment when used in physician offices.

*Vaccines:* Limited coverage under the Vaccines for Children Program.

*Unit Dose:* Unit dose packaging not reimbursable.

### Formulary/Prior Authorization

*Formulary:* State has a formulary. Prior authorization is used to manage the formulary.

### Prescribing or Dispensing Limitations

*Prescription Refill Limit:* Refills to a maximum of 5 are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc. Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.

*Monthly Quantity Limit:* One month's supply for non-maintenance drugs.

*Maintenance Medication:* The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-day supply of these drugs - whichever is greater.

*Monthly Dollar Limits:* None

### Drug Utilization Review

PRODUR system implemented in December 1994.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40 (ambulatory) and $2.85 (nursing homes), effective 1987.

*Ingredient Reimbursement Basis:* EAC = WAC + 5%.

*Prescription Charge Formula:*

1.  In accordance with Federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

2.  Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the professional fee for service.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs. Override requires "Dispense as Written" or "Brand Medically Necessary," with a documented medical reason why a generic cannot be used.

*Incentive Fee:* None.

*Patient Cost Sharing:* No copayment.

*Cognitive Services:* Does not pay for cognitive services.

**EXP USABT-DUG 069599**

## C.  ADMINISTRATION

Rhode Island Department Human Services.

## D.  PROVISIONS RELATING TO DRUGS

### Benefit Design

*Drug Benefit Product Coverage:* Products covered: prescribed insulin; disposable needles and syringe combinations used for insulin; urine ketone test strips. Products covered under DME: blood glucose test strips; total parenteral nutrition (prior authorization required); and interdialytic parenteral nutrition (prior authorization required).  Products not covered: cosmetics; fertility drugs; experimental drugs; DESI drugs.

*Over-the-Counter Product Coverage:* Products covered: analgesics (acetaminophen); cough and cold preparations (guifenisin, diphenhydramine, chlorpheniramine); digestive products (non-H2 antagonists); feminine products (contraceptive foams, gels and creams); topical products; antacids; and laxatives.  Products not covered: allergy, asthma, and sinus products; digestive products (H2 antagonists); and smoking deterrent products.

*Therapeutic  Category Coverage:* Products covered: anabolic steroids; analgesics, antipyretics, and NSAIDs; antibiotics; anticoagulants; anticonvulsants; anti-depressants; antidiabetic agents, antihistamine drugs; antilipemic agents; anti-psychotics; anxiolytics, sedatives, and hypnotics; cardiac drugs; chemotherapy agents, prescribed cold medications; contraceptives; ENT anti-inflammatory agents; estrogens; hypotensive agents; sympathomimetics (adrenergic); and thyroid agents.  Prior authorization required for: anoretics; misc. GI drugs; erectile dysfunction products; and Cox 2 inhibitors; partial coverage: growth hormones.  Therapeutic categories not covered: prescribed smoking deterrents; products for hair growth.

*Coverage of Injectables:* Injectable medicines reimbursable under the Prescription Drug Program when used in home health care and extended care facilities and through physician payment when used in physician offices.

*Vaccines:* Limited coverage under the Vaccines for Children Program.

*Unit Dose:* Unit dose packaging not reimbursable.

### Formulary/Prior Authorization

*Formulary:* State has a formulary.  Prior authorization is used to manage the formulary.

### Prescribing or Dispensing Limitations

*Prescription Refill Limit:* Refills to a maximum of 5 are allowed for specified drugs: anti-hypertensives, diuretics, anti-convulsants, coronary vasodilators, tranquilizers, antidepressants, hormones, antibiotics, etc.  Refills are not allowed for specified drugs, e.g., central nervous system stimulants, narcotics (Schedule II, III), and pentazocine.

*Monthly Quantity Limit:* One month's supply for non-maintenance drugs.

*Maintenance Medication:* The attending physician may prescribe certain maintenance drugs of 100 tablets, capsules or pint of liquid or a 30-day supply of these drugs - whichever is greater.

*Monthly Dollar Limits*: None

### Drug Utilization Review

PRODUR system implemented in December 1994.

### Pharmacy Payment and Patient Cost Sharing

*Dispensing Fee:* $3.40 (ambulatory) and $2.85 (nursing homes), effective 1987.

*Ingredient Reimbursement Basis:* EAC = WAC + 5%.    *Same*

*Prescription Charge Formula:*

1.   In accordance with Federal regulation the upper limit for payment for prescribed drugs will be based upon the amount allowed by the Medical Assistance Program or the usual and customary charge to the general public, whichever is lower.

2.   Payment for over-the-counter drugs (non-legend drugs) will be based upon the lower of either the allowable cost of the drug plus 50 percent, the usual and customary charge to the general public, or the allowable cost plus the professional fee for service.

*Maximum Allowable Cost:* State imposes Federal Upper Limits on generic drugs.  Override requires "Brand Medically Necessary" with a  documented medical reason why a generic cannot be used.

*Incentive Fee:* None.

*Patient Cost Sharing:* No copayment.

*Cognitive Services:* Does not pay for cognitive services.

**EXP USABT-DUG 069600**

# EXHIBIT FQ

Olympia, WA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE           ) Civil Action No.

LITIGATION                        ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel.  ) Saris

Ven-A-Care of the Florida Keys,   )

Inc. v. Abbott Laboratories, Inc.,) Chief Magistrate

Civil Action No. 06-11337-PBS;    ) Judge Marianne

United States of America ex rel.  ) B. Bowler

Ven-A-Care of the Florida Keys,   )

Inc. v. Dey, Inc., et al., Civil  ) DEPOSITION OF

Action No. 05-11084-PBS; and      ) WA DEPT. OF

United States of America ex rel.  ) SOCIAL AND HEALTH

Ven-A-Care of the Florida Keys,   ) SERVICES by AYUNI

Inc. v. Boehringer Ingelheim      ) HAUTEA-WIMPEE

Corp., et al., Civil Action No.   )

07-10248-PBS                      ) NOVEMBER 24, 2008

--------------------------------X

9ee0c979-f127-403d-9cab-f60504868883

Olympia, WA

| Page 106 | Page 108 |
|---|---|

Page 106

1   available from each wholesaler and we tried
2   basically to make sure that there was at least
3   one product available from each one to -- to
4   arrive at the price, because we wanted to make
5   sure there was access to the drugs.  You know,
6   depending on who their main wholesaler was, we
7   wanted to make sure that they -- that they had
8   something they could obtain from that wholesaler.
9   And we would set the price at that point.  That
10  was not always the lowest possible price because,
11  again, depending on the sources available from
12  each wholesaler, you know, we want to make sure
13  that we had a mixture available.  And we would
14  look at -- we would then prepare -- I would
15  prepare a matrix to say this is what my research
16  told me or showed me; these are the products
17  available from this wholesaler, here's the second
18  one, here's the third one, and our proposed price
19  is this one, you know, and I would send that to
20  representatives of the Washington State Pharmacy
21  Association and I would ask them for input and
22  they would normally respond back and said yes,

Page 108

1   A.  Yes.
2   Q.  But not for all multi-source drugs?
3   A.  Correct.
4   Q.  And when setting AMAC, you would look
5   at pricing available to wholesalers?
6   A.  From wholesalers, yes.
7   Q.  Excuse me, from wholesalers?
8   A.  Um hum.
9   Q.  In Washington State?
10  A.  Yes.
11  Q.  Okay.  And you would look at an array
12  of those prices and determine at what price
13  pharmacists could actually obtain the product
14  for?
15  A.  Correct.
16  Q.  And you mentioned that one concern was
17  access; is that correct?
18  A.  Yes.
19  Q.  And so you wanted to set a price that
20  was -- that pharmacists could purchase the drug
21  at, but you wanted to make sure that pharmacists
22  throughout the state could obtain that drug at

Page 107

1   this is available, no, this is not, and even
2   though they list this as available, we can't get
3   our hands on it anywhere in this state or
4   something and we would then go look for
5   alternatives and see where we could set it, but
6   it was always, you know, being mindful of access
7   and availability because we did not -- we wanted
8   to make sure that we paid the lowest possible,
9   but also not compromise access at that point.  So
10  we would do that.  And we -- after they send in
11  their comments, we would set the prices, publish
12  them with the numbered memos, and let people
13  know. And we would give them an effective date.
14  BY MS. FORD:
15  Q.  And so stepping back, MAC pricing could
16  apply to multi-source drugs; is that right?
17  A.  Yes.
18  Q.  And MAC pricing did not apply to
19  single-source drugs?
20  A.  That is correct.
21  Q.  Okay.  And so for some multi-source
22  there was AMAC set; is that correct?

Page 109

1   that price?
2   A.  Yes.  What we would do is, like I said,
3   we would publish these prices.  We would consult
4   with them first and make sure that it's
5   available, you know, the drug is available at
6   that price, and we would publish the price.  On
7   some occasions somebody, not necessarily every
8   pharmacist, but one or two pharmacists would say
9   I am temporarily out of this and I can't get this
10  at this price, and that -- those -- in those
11  isolated cases they would call in for prior
12  authorization and they would say I don't have
13  this product, but I have the brand name and this
14  client is sitting here in front of me wanting
15  this prescription now.  They would get then a
16  dispensation or an authorization to give that
17  client the, you know, the brand name or whatever
18  it is that they have available in store at that
19  point, but it's -- it's a limited dispensation.
20  It would just say for this once you can do this
21  and there's a prior authorization number that you
22  can use on your claim that will allow the system

28  (Pages 106 to 109)