# EXHIBIT B

Judy Waterer
May 9, 2007

Page 1

```
 1              IN THE CIRCUIT COURT OF
            MONTGOMERY COUNTY, ALABAMA
 2
    STATE OF ALABAMA,
 3       Plaintiff,
    vs.              CIVIL ACTION NO. 2005-219
 4  ABBOTT LABORATORIES, INC.,
    et al.,
 5       Defendants.
 6  -----------------------------------------
 7    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
                STATE OF HAWAII
 8
    STATE OF HAWAII,
 9       Plaintiff,
    vs.              CIVIL NO. 06-1-0720-04 EEH
10  ABBOTT LABORATORIES, INC.,
    et al.,
11       Defendants.
12  -----------------------------------------
13           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
14
    THE COMMONWEALTH OF MASSACHUSETTS,
15       Plaintiff,
    vs.              C.A. NO. 03-11865 PBS
16  MYLAN LABORATORIES, INC.,
    et al.,
17       Defendants.
18     *    *    *    *    *    *    *    *
19                  VOLUME I
20    The videotaped deposition of JUDY WATERER,
    VOLUME I, was taken before Cornelia J.
21  Baker, Certified Court Reporter and
    Certified Shorthand Reporter, as
22  Commissioner, on Wednesday, May 9, 2007,
    commencing at approximately 10:13 a.m., in
23  the law offices of Kirkland & Ellis, 153
    East 53rd Street, New York, New York
24  pursuant to the stipulations set forth
    herein.
25
```

Judy Waterer
May 9, 2007

Page 73

```
 1              A.  WAC is the price that we sell
 2   the drug to the wholesaler.  WAC is the price
 3   that will remain.  If the wholesaler does not
 4   sell that through a contract where we would
 5   honor a lower price, it will sell at WAC.  If
 6   the wholesaler returns the item to us, we
 7   give them WAC back.  WAC is on the invoice.
 8   WAC is the price.
 9              Q.  Does Roxane ever report WAC
10   directly to the Alabama Medicaid Agency?
11              A.  I don't know.
12              Q.  Well, if Roxane did report WACs
13   directly to the Alabama Medicaid Agency, you
14   would know that, wouldn't you?
15              A.  I don't know that I've ever had
16   information about what information goes
17   specifically to what state.
18              Q.  Who would know that at Roxane?
19              A.  I'm not sure.
20              Q.  Are you saying you think it may
21   or may not go on, and you just don't know
22   about it, or are you saying you don't think
23   it happens?
24              A.  I don't know.
25              Q.  And you don't know who would?
```

Judy Waterer
May 9, 2007

Page 74

```
 1            A.   I'd have to speculate.  I don't
 2    know.
 3            Q.   Does Roxane ever change the
 4    AWPs that are reported to First DataBank?
 5            A.   Roxane has changed AWPs and
 6    subsequently reported the changes.
 7            Q.   And do the changes -- well,
 8    what has to happen for Roxane to change an
 9    AWP?
10            A.   I don't understand.
11            Q.   Why would Roxane change an AWP?
12            A.   We have products in a variety
13    of categories.  Some of our products, where
14    the competitive environment will permit us to
15    take a price increase, we would take a price
16    increase.  Somewhat the way a brand product
17    might, as the cost of living goes up, we
18    would take a price increase.  That would be
19    one example.
20            Q.   Does Roxane ever change AWPs
21    based on customer concerns?
22            A.   I can recall one example.
23            Q.   Tell me what you remember about
24    that example.
25            A.   We had a product, Furosemide --
```

Judy Waterer
May 9, 2007

Page 75

```
 1    I think it was Furosemide.
 2                THE COURT REPORTER:  What was
 3                that?
 4                THE WITNESS:  I think it was
 5                Furosemide, F-U-R-O-S-E-
 6                M-I-D-E.
 7          A.   Competitive situations, we'd
 8    never really sold much.  I think we had less
 9    than a one- or two-percent market share.
10    Sold virtually none of it.
11                The competitive situation
12    changed in the marketplace.  A number of
13    vendors came to us and said, Hey, we never
14    looked at you or talked to you about it
15    before, because we were happy with our
16    vendor.  Now we're not.  Can you give us a
17    bid?
18                We gave them very competitive
19    bids.  And the feedback that we got from the
20    customers was not joy that we'd given them
21    competitive bids, but frustration, because
22    they indicated that our AWP was out of line
23    with everybody else's in the market, and they
24    would be unable to award us any business at
25    that AWP.
```

Judy Waterer
May 9, 2007

Page 76

```
 1              Q.   And what did Roxane do as a
 2   result of those customer concerns?
 3              A.   After quite a few months of
 4   analysis and verification that it wasn't just
 5   one customer that was saying this, we ended
 6   up bringing our pricing in line with
 7   everybody else's in the business.
 8              Q.   I mean, in part, competitive-
 9   ness drives the AWP that Roxane reports,
10   correct?
11              MS. WITT:  Object to the form.
12              A.   I think it's probably a
13   mischaracterization of the importance of AWP.
14   AWP is almost always the same for everybody,
15   so it's not something that people consider.
16              Q.   Well, you know that state
17   Medicaid agencies consider AWP when they
18   reimburse, correct?
19              A.   I've become aware of that, yes.
20              Q.   What do you mean when you say
21   you've become aware of that?
22              A.   This litigation in various
23   forms has been going on for many, many, many
24   years.  And because of it, I've learned a lot
25   of things that I wouldn't normally need to
```

Judy Waterer
May 9, 2007

Page 77

```
 1   know for my day-to-day activities.
 2              Q.  Didn't you know back as early
 3   as 1996 that state Medicaid agencies
 4   reimbursed based on AWP?
 5              A.  I don't know if I knew
 6   specifically state.  I would say that I had a
 7   general awareness that private-party
 8   insurers, that AWP may be of -- something
 9   that they tied reimbursement to.
10              I don't recall having specific
11   knowledge as to an individual state or a
12   program.
13              Q.  But you've known since as early
14   as 1996 when you started with Roxane that the
15   AWP that Roxane reported was relied upon by
16   certain payors when they reimbursed, correct?
17              A.  In a broad general sense,
18   that's -- as I said before, aware that
19   certain payors, primarily private payors,
20   have some formulas that tied to that, yes.
21              Q.  There is no other reason or
22   purpose for Roxane to report AWPs, other than
23   the fact that certain payors rely on that AWP
24   when they reimburse, correct?
25              A.  No.
```

Judy Waterer
May 9, 2007

Page 130

```
 1            A.   That was one of her
 2   responsibilities when she reported to me,
 3   yeah.
 4            Q.   All right.  I'm going to show
 5   you an exhibit I'm going to mark as
 6   Plaintiffs' Exhibit 5.  This was previously a
 7   deposition exhibit in Ed Tupa's deposition,
 8   654.  Take a look at that, please, ma'am, and
 9   tell me if you recognize it.
10                 (Whereupon Plaintiffs' Roxane
11                  Waterer No. 5 was marked for
12                  identification and attached
13                  hereto.)
14                 (Witness reviewed document.)
15            A.   I think this might have come up
16   in prior depositions.
17            Q.   Do you remember this document?
18            A.   With regard to seeing it before
19   on depositions, yes.  With regard to
20   originally writing it, no.
21            Q.   The top portion of the document
22   is an e-mail from Ms. Paoletti to yourself,
23   correct?
24            A.   Yes.
25            Q.   Dated November 5th, 1999,
```

Judy Waterer
May 9, 2007

Page 131

```
 1   correct?
 2          A.   Yes.
 3          Q.   And Ms. Paoletti says to you
 4   that she's spoken with Terri from First
 5   DataBank and that First DataBank is now
 6   willing to remove Roxane's WAC pricing from
 7   the database, correct?
 8          A.   Yes.
 9          Q.   Roxane had requested that First
10   DataBank remove WAC pricing from the
11   database?
12          A.   We had requested that they
13   cease publishing incorrect WAC information.
14   And we had taken a position that we were no
15   longer reporting WAC.  So what they had in
16   their system was inaccurate.
17          Q.   How was it discovered that
18   First DataBank was publishing inaccurate WAC
19   information?
20          A.   I'm not sure how it was
21   exactly, quote, discovered.  The trail of
22   this e-mail would indicate that there were
23   customer complaints on reimbursement which
24   led us to check the data and find out that
25   the information was incorrect.
```

Judy Waterer
May 9, 2007

Page 731

```
 1                  CERTIFICATE PAGE
                         and
 2                    ERRATA SHEET

 3       I,                              , the
     Witness herein, have read the transcript of
 4   my testimony and the same is true and
     correct, to the best of my knowledge.  Any
 5   corrections and/or additions, if any, are
     listed below.
 6

 7
     Deponent's Signature         Date
 8

 9   Sworn to and subscribed before me, this
     the       day of      , 20  .
10

11
     Notary Public in and for
12   The State of
     My Commission expires               .
13

14   PAGE   LINE   CORRECTION             REASON

15

16

17

18

19

20

21

22

23

24

25
```

334.262.3332                Baker & Baker Reporting and Video Services, Inc.                334.262.3332
888.253.3377           Certified Court Reporters and Certified Legal Video Specialists      888.253.3377