# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
In Re:                           )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 1 - 51
```

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 16, 2007, 10:05 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

```
 1              THE COURT:  And somebody else's is 10 cents.
 2              MR. CROSS:  Yes.  It's my --
 3              THE COURT:  Wouldn't you at least be liable for the
 4   20 cents?
 5              MR. CROSS:  No, because if Mylan's published price
 6   is 30 cents, everybody in the industry gets reimbursed at
 7   30 cents.  Well, 30 cents plus --
 8              THE COURT:  No, you're theory is that somebody else
 9   out there, X-Y-Z, is 10 cents and --
10              MR. CROSS:  No.  The FUL is set on the lowest price
11   published in any compendia for any manufacturer, and every
12   drug company that makes that drug gets reimbursed at that
13   level.
14              THE COURT:  But you're saying, if everyone lies,
15   everyone's off the hook?
16              MR. CROSS:  No.  The people who set the FUL.  She
17   has to plead who set the FUL.  If my client didn't set the
18   FUL because my WAC was higher than Mylan's WAC, I've got
19   nothing to do with that transaction.
20              THE COURT:  Unless you lied.
21              MR. CROSS:  No.  I had nothing to do with that
22   transaction.  Nobody --
23              THE COURT:  Can I say this:  That's a perfect issue
24   to vet up in a motion to dismiss.  If you pleaded out your
25   theory, we can do this as a matter of law; you plead out your
```

# EXHIBIT B

1

```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - -x
In re: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION
- - - - - - - - - - - - - - - - -x
THIS DOCUMENT RELATES TO:
                                  MDL No.1456
CITY OF NEW YORK, et al.,         Master File
v.                                No.01-12257-PBS
ABBOTT LABORATORIES, et al.
- - - - - - - - - - - - - - - - - x
                C O N F I D E N T I A L
                  November 20, 2008
                    9:04 a.m.


            Videotaped deposition of SUMANTH
ADDANKI, taken by attorneys for Plaintiffs,
pursuant to notice, held at the offices of Ropes
& Gray LLP, 1211 Avenue of the Americas, New
York, New York, before Helen Mitchell, a
Shorthand Reporter and Notary Public.
```

### Page 26

1  researchers that works on these -- on all my
2  assignments with me, and they would have got the
3  data, made sure they understood the data, and
4  then done the calculations, made the tables, and
5  I wrote the affidavit.
6      Q    And what calculations were you
7  asked to conduct?
8      A    Really, exactly what's set forth
9  in -- under B on page 2, starting "on behalf" on
10 page 2, calculate the spread between the AMP and
11 the AWP, and calculate the percent of sales made
12 near WAC.
13         THE WITNESS:  This case is an
14     alphabet soup.
15         THE COURT REPORTER:  Got it.
16     Q    And who identified the data that
17 you would need in order to perform the
18 calculations you'd been asked to do?
19     A    I did.
20     Q    And how did you -- how did you
21 know what data to ask for?
22     A    Because if I'm going to calculate

### Page 27

1  a spread between AMPs and AWPs, it's fairly
2  clear what the ingredients to that calculation
3  would be, that's the AWPs and the AMPs.
4         And as far as the percent of sales
5  made near WAC, at or near WAC, is concerned, I
6  had done that kind of exercise for at least some
7  of these products in connection with the MDL,
8  and so I knew what data I would need for that.
9      Q    And when you say "AMP" you're
10 referring to average manufacturer's price?
11     A    Yes.
12     Q    And AMP is something that Schering
13 is required to calculate by federal law.
14        Do you understand that?
15     A    Yes.
16     Q    Do you have any involvement in the
17 calculation of AMP for Schering Plough?
18     A    I do not.
19     Q    So you simply asked Schering to
20 provide you with the AMPs you would need in
21 order to -- to calculate the AMP/AWP spreads
22 that are set forth in your declaration?

### Page 28

1      A    Yes, I did.
2      Q    Were you provided with a single
3  set of AMPs by Schering Plough?
4      A    Yes, they sent the AMPs that they
5  had on file at the time.
6      Q    And do you know how Schering
7  calculates its AMPs?
8      A    The specific steps that they take?
9      Q    Yes.
10     A    No.  I just know generally how
11 AMPs are calculated.
12     Q    Describe for me, please, what you
13 know in terms of how Schering calculates its
14 AMPs.
15     A    All I know is how AMPs are
16 generally calculated, which is that they are
17 meant to represent, and are calculated so as to
18 represent, the price obtained by the
19 manufacturer on the sales that it makes to the
20 AMP-related classes of trade, which are, broadly
21 speaking, the classes of trade which end up
22 dispensing product that Medicaid might

### Page 29

1  reimburse.  And these prices are calculated net
2  of discounts, but before PBM rebates.
3         And that's my understanding of how
4  Schering does it.
5      Q    What does AMP stand for?
6      A    Average manufacturer price.
7      Q    And do you know how often Schering
8  reports AMPs to the federal government?
9      A    They're reported quarterly, and
10 they're updated periodically.  I'm not quite
11 sure exactly how frequently.
12     Q    And do you know specifically which
13 classes of trade Schering -- which class of
14 trade prices Schering includes when it
15 calculates its AMPs?
16     A    Again, they're, broadly speaking,
17 the AMP-related classes of trade, which would be
18 classes of trade where you might expect drugs to
19 be dispensed that might be reimbursed by
20 Medicaid.  And I could recall some of them, I
21 probably couldn't give you an exhaustive list.
22     Q    If I could, may I direct your

170

1  program?
2      A   That's right.
3      Q   Okay.
4          Okay, let's move on to the next
5  sentence of this third note.
6          "If net revenue for a particular
7  NDC and customer number for the prevailing WAC
8  period was negative" -- and there you quantify
9  that amount as negative 266.5 million.
10         Do you see that?
11     A   I do.
12     Q   Can you -- let me read the whole
13 sentence into the record.
14         -- "266.5 million, or if the
15 revenue or quantity before chargebacks or price
16 paid were missing or otherwise non-positive
17 ($5.7 billion total), or if the WAC was not
18 available (804.5 million total), it was
19 dropped."
20         I realize I didn't read that --
21 all the numbers into the record, but this is in
22 essence what the sentence says; correct?

171

1      A   Basically, yes.
2      Q   Now, I'd like to go through this
3  sentence if you could bear with me.
4          The prevailing WAC period, is it
5  correct that that's the period of time for which
6  a particular WAC was unchanged?
7      A   Yes, for a particular NDC eleven.
8      Q   Okay.
9          And what do you mean when you say
10 the net revenue for the prevailing WAC period
11 was negative?
12     A   This basically happens when you've
13 got an NDC that is being discontinued and you
14 get a lot of returns with no sales transactions
15 anymore, or tiny sales transactions and lots of
16 returns.  And so the net revenue is negative.
17 Then you know that they're not actually selling
18 product, to that customer at any rate, in that
19 period.
20     Q   Are there other reasons why the
21 net revenue for prevailing WAC period may be
22 negative?  For example, the payment of

172

1  chargebacks that are owed at a particular time
2  or that are paid at a particular time?
3      A   Occasionally you can have a
4  situation where you have a WAC prevailing for a
5  very short time, right, and it so happens during
6  the period at which that WAC prevails, you don't
7  have any originating sale transactions, you've
8  only got adjustment, so that can be one reason
9  why, you know.  In a prevailing WAC period, you
10 don't get a price.
11     Q   Now, let me ask you, do you have
12 any sense of what portion of the 2.8 --
13         MS. CICALA:  I'm sorry.
14     Q   What portion of the $28.8 billion
15 of total sales are attributed to the class of
16 trade that are relevant in this litigation?
17     A   I think you asked me that question
18 before, and -- and I gave you a quick answer,
19 which said it's going to be a pretty high
20 percentage, but something less than a hundred.
21 And the truth is, actually, I don't know
22 because -- sorry, can we back up?  You asked me

173

1  a different question.
2          The answer to this question is
3  it's going to be pretty high because of the
4  classes of trade we're talking about there for
5  sharing drugs amounts to a pretty substantial
6  portion of their sales.  I don't know
7  specifically how big.
8      Q   Which classes of trade do you
9  believe to be relevant for this litigation?
10     A   You know, let me go back.
11         Was your question, earlier
12 question, about what I felt is relevant to this
13 litigation or what I felt was the ones I
14 identified here?
15     Q   My question two moments ago is
16 what portion of the 28.8 you felt was
17 attributable to the relevant classes of trade.
18     A   Okay, I'm sorry, when you say
19 "relevant" I thought you were using that as
20 shorthand for what I call the AMP-related
21 classes of trade here.
22     Q   No.

174

1   A   Okay.
2       In that case, I have not thought
3   with any -- I have not reached any conclusion of
4   what's relevant in terms of classes of trade for
5   this particular litigation.
6       I apologize, I thought we were
7   talking about what was in my note here.
8   Q   That's fine, I appreciate the
9   clarification.
10      So then is it fair to say that you
11  don't know if the -- if your AMP-related classes
12  of trade represent the relevant classes for this
13  case or not?  You don't know one way or the
14  other?
15  A   I have not looked into whether --
16  what New York counties are alleging here
17  would -- creating a limitation or expansion of
18  the classes of trade that would be relevant.
19  Q   Okay.
20      Returning to your third note in
21  Exhibit 4 to your declaration, the sentence --
22  we just discussed the phrase "prevailing WAC

175

1   period was negative."  I'm moving on now to --
2   to that portion of the sentence that reads, "or
3   if the revenue or quantity before chargebacks or
4   price paid were missing or otherwise
5   non-positive."
6       I'm creating a messy record, so
7   let me start from the top again, please.
8       According to this note, if net
9   revenue for a particular NDC and customer
10  number --
11      MS. CICALA:  Let me try it this
12  way.
13  Q   When you say, "if the revenue or
14  quantity before chargebacks or price paid were
15  missing or otherwise non-positive was dropped,"
16  what does that mean?
17  A   What I mean is that, again,
18  looking at the asset, which is the eleven-digit
19  NDC and customer number during a prevailing WAC
20  period, if I look at all of the transactions for
21  that customer for that NDC for that period and
22  find that the revenue and quantity before I even

176

1   think about chargebacks or anything else are
2   missing, or non-positive, negative, or zero,
3   which amounts to only $5.7 million, so it's a
4   pretty small adjustment, that particular item
5   was just dropped.
6       I think when you read it earlier
7   you read it as 5.7 billion because of all the
8   digits that my researchers insist on putting in
9   there.  It's only 5.7 million there.
10  Q   Thank you.
11      When you're calculating -- when
12  you're conducting this evaluation of percentage
13  of sales close to WAC, you're not -- you're not
14  only considering the sales to the wholesalers,
15  right, you're reviewing sales to all classes of
16  trade?
17  A   Absolutely.
18  Q   And it's fair to say that the --
19  that the figures that we see in this third
20  bullet, the 266 million, the 5.7 million, the
21  804 million, also refer to amounts associated
22  with sales to all classes of trade, not just

177

1   transactions to the wholesaler?
2   A   That's correct.
3   Q   Okay.
4       The last part of this sentence
5   refers to WACs being unavailable.  That's what
6   we discussed earlier, right, when the WAC
7   doesn't appear in the publisher -- in the
8   publishing compendia?
9   A   That's correct.
10  Q   Have you ever engaged in an
11  analysis of what the -- how Schering's average
12  sales price to wholesalers compares with its
13  reported WAC?
14      MR. MONTGOMERY:  Ever?
15  A   I believe that for the products
16  involved in the MDL, I did carry out
17  calculations of exactly that kind.
18  Q   So it was a more narrow
19  computation of an average sales price, it was
20  just an average sales price to the wholesaler?
21  A   That's correct.
22  Q   That was in addition to the work

**182**

1  be of total sales?
2     Q  Yes. Thank you.
3     A  I haven't done that calculation.
4     Q  The next sentence reads,
5  "Wholesale entries from the chargebacks data
6  were matched with wholesale entries in the sales
7  data by prevailing WAC."
8     A  Right.
9     Q  Can you explain that, please?
10    A  All that's really saying is that
11 the wholesaler names that show up in the
12 indirect sales, the chargeback data, are matched
13 in to the wholesaler data on the direct sales
14 side within the WAC period that we're talking
15 about, you know, whatever particular WAC is
16 prevailing.
17    Q  What do you mean when you say
18 "wholesale entries"?
19    A  Transactions in the direct sales
20 file that have a wholesaler as a customer, and
21 transactions in the direct -- in the indirect
22 sales file that talk about which wholesaler was

**183**

1  involved.
2     Q  Okay, thank you.
3        So -- so if a -- what if a
4  chargeback was paid to a wholesaler after the
5  WAC the wholesaler had initially paid had
6  changed?
7     A  You -- if I remember right, one of
8  the reasons we match within a period was --
9  well, two reasons. When you go out of the
10 period you don't know how far back you go in
11 order to match transactions, so how many WACs do
12 you skip in order to get a transaction match.
13 And so recognizing that you're going to get a
14 little bit -- that the borders are not going to
15 line up exactly between the indirect and the
16 direct, you accept where you can get true
17 overlap and leave out the little bit on either
18 side because, you know, you don't know how to
19 match it because you don't know how far forward
20 or back you're going to need to go to match.
21        So just as we are calculating all
22 of the adjustment entries within a prevailing

**184**

1  WAC period, we do the chargeback match within a
2  WAC period.
3     Q  Would it be correct to say that
4  the program that was run on the data would
5  reflect an instruction to do the chargeback to
6  match the chargeback within the prevailing WAC
7  period?
8     A  All the matching is done within
9  the prevailing WAC period.
10    Q  Let's jump down now -- you'll be
11 happy to hear -- to the bullet that begins with
12 "ratios."
13        "Ratios of average price to WAC
14 were annualized to the customer and eleven-digit
15 NDC level, weighting by gross sales activity in
16 quantity."
17        This statement reflects what we've
18 discussed earlier, does it not, regarding --
19 well, can you explain what that sentence means,
20 please?
21    A  Sure.
22        Again, you've got -- if you've

**185**

1  got, for instance -- it's probably easiest to do
2  it by example. If you've got a WAC that was in
3  effect from July 1st of a year to June 30th the
4  following year, just for example, and say that
5  was 2000-2001, the prevailing WAC period is, if
6  you will, 7 -- 7/00 through 6/01, and you've got
7  customer transactions that you've identified and
8  put into this bucket for that NDC eleven, but
9  you're going to try to square that with a
10 calendar year, the WAC didn't prevail for a
11 calendar year. There was previous WAC for the
12 first half of 2000, and this WAC for the second
13 half of 2000, and in order to get a WAC that
14 applies to 2000, right, or an analysis that
15 applies to 2000, we used, again, the GSAs as
16 weights in order to figure out what the 2000
17 ratio of that customer's net price per unit was
18 to the WAC.
19    Q  If you didn't -- if you didn't
20 need to set forth your results on a calendar
21 basis, that would not -- the inclusion of
22 weighting would not be necessary then; is that

# EXHIBIT C

1

```
               UNITED STATES DISTRICT COURT

                 DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -X

In re: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.

- - - - - - - - - - - - - - - - -x 01-12257-PBS

THIS DOCUMENT RELATES TO:          ) Subcategory

THE CITY OF NEW YORK, et al.       ) Case No.

v.                                 ) 03-10643-PBS

ABBOTT LABORATORIES, et al.        )

                                   )

- - - - - - - - - - - - - - - - -X


                     April 22, 2009

                       9:10 a.m.



        Videotaped deposition of SUMANTH ADDANKI,

taken by attorneys for Plaintiffs, pursuant to

notice, held at the offices of Ropes & Gray LLP,

1211 Avenue of the Americas, New York, New York,

before Helen Mitchell, a Shorthand Reporter and

Notary Public.
```

Addanki, Sumanth                                                    April 22, 2009
New York, NY

38 (Pages 146 to 149)

146

1  participants have any relevance to the
2  relationships described in paragraph eleven?
3       MR. PALERMO:  Objection to the form.
4       A.  To the extent that I understand your
5  question, if you're asking whether this paragraph,
6  when I'm talking about AWP, is generally
7  understood to be greater than WAC, does that
8  relate in any way to the expectations that were at
9  issue in that case.  Not really.
10      I mean, I guess I'm having a little
11 difficulty with your question, because
12 expectations in the larger sense, these are
13 definitely among the expectations that people have
14 about pricing in the pharmaceutical industry.
15      Q.  And when you refer to these being among
16 the expectations, are you simply referring to the
17 fact that AWP is generally understood to be
18 greater than WAC?
19      A.  Yes.  In this case, yes.
20      Q.  That, and only that, in this particular
21 paragraph?
22      A.  Yes.

147

1       Well, it's for instance -- that's what
2  I'm referring to in the paragraph, absolutely,
3  that's correct.
4       Q.  And what is the basis for your statement
5  that such was the expectation in the industry?
6       A.  Well, to begin with, that's generally
7  true for published prices.  Second, these
8  reference prices, just from the standpoint of
9  where they are in the distribution chain, just a
10 matter of simple economics tells us that a price
11 at the wholesaler to pharmacy level is going to be
12 higher than a price at the manufacturer to the
13 wholesaler level, because otherwise the
14 wholesaler's not going to stay in business very
15 long.
16      Q.  I notice in your answer you made
17 reference to published prices; correct?  Published
18 -- so I'm assuming what you're saying now, the
19 published AWP is generally understood to be
20 greater than the published WAC; is that right?
21      A.  Well, I'm not sure there are any AWPs
22 that are not published AWPs.

148

1       Q.  Well, there are true AWPs.
2           MR. BUEKER:  Objection as to form.
3           MR. PALERMO:  Objection.
4       Q.  Let me ask you a question.
5           You're aware that Mr. Devor has set
6  forth alternative calculations of AWPs for 13
7  defendants; right?
8       A.  He's calculated something which he calls
9  an AWP, that's correct.  The Harris Devor AWP.
10      Q.  And among your criticisms of Mr. Devor
11 is that his calculated AWPs, as you put it,
12 frequently violate a relationship generally
13 understood to hold in the industry and that they
14 are -- they are -- they are lower than his
15 calculated WACs; is that right?
16      A.  For instance, they're lower than his
17 calculated WACs.  That's an example, yes.
18      Q.  And Mr. Devor's work in this regard,
19 with regard to calculating AWP and calculating
20 WAC, is done without regard to what the 13
21 defendants published as their AWP and WAC; isn't
22 that right?

149

1           MR. BUEKER:  Objection as to form.
2       A.  I don't know what you mean by "without
3  regard."
4       Q.  Mr. Devor was endeavoring to calculate
5  an accurate average wholesale price for the 13
6  defendants' products --
7           MR. BUEKER:  Objection --
8       Q.  -- correct?
9           MR. PALERMO:  Objection.
10          MR. BUEKER:  -- to form, and calls for
11 speculation.
12      A.  I haven't the slightest idea what he was
13 endeavoring to do.
14      Q.  You have no understanding of what Mr.
15 Devor was endeavoring to do with his calculations?
16      A.  I've read his report, I know what he
17 said he did, but I don't know what he was trying
18 to do.  I can't get into his head.
19      Q.  Is it -- is it your testimony that Mr.
20 Devor's report does not explain what he was
21 endeavoring to do?
22      A.  That's not my testimony.

**150**

1   Q. What is your understanding of what Mr.
2   Devor's -- Mr. Devor was endeavoring to do using
3   defendants' sales and transactional data?
4       MR. BUEKER: Objection as to the form of
5   the question.
6   A. I don't know why you keep saying
7   "endeavoring." I mean, I see that he's made some
8   calculations, and that he calls them a WAC and an
9   AWP. But beyond that, I can't speculate as to
10  what he -- what he was doing.
11  Q. Okay.
12      And he made those calculations using
13  defendants' own sales and transactional data;
14  correct?
15  A. That's what he says.
16  Q. Do you doubt that that's so?
17  A. I haven't checked. I haven't verified
18  whether he has in fact done exactly what the
19  calculations already said he did.
20  Q. Instead you reviewed his conclusions,
21  correct, and you've evaluated them against
22  industry standards; isn't that right?

**151**

1       MR. BUEKER: Object to form.
2   A. I've reviewed his results --
3   Q. His results, right.
4   A. Yes.
5   Q. And you criticized them as they -- you
6   criticize them based on industry standards, or how
7   they don't reflect industry standards; isn't that
8   correct?
9   A. I have a whole section in my report that
10  contains my opinions on his calculations. I don't
11  think I'd like to agree with the characterization
12  that you just made. That is simply one of them.
13  Q. Well, you certainly don't offer
14  alternative calculations to Mr. Devor's correct?
15  A. That's correct.
16  Q. Nor do you -- well, let me ask it this
17  way.
18      What data from the 13 defendants did you
19  evaluate to determine if their -- if their pricing
20  was consistent with the industry standards that
21  you refer to in your report?
22      MR. BUEKER: Objection as to form.

**152**

1   A. I don't think I understand your
2   question.
3   Q. You -- your report states that Mr.
4   Devor's calculated WACs and AWPs violate
5   relationships generally understood to hold in the
6   industry; correct?
7   A. Yes.
8   Q. If you -- if you were to accept Mr.
9   Devor's definition of WAC as a net price, as
10  opposed to a list price, would you, Dr. Addanki,
11  be able to use defendants' own data to calculate
12  that net price?
13      MR. BUEKER: Objection as to form.
14  A. Putting aside Mr. Devor's
15  characterization of anything, if one wanted to
16  calculate a net price, one could do it from
17  transactions data, yes. Assuming that one had all
18  the data needed.
19  Q. Now, you've testified that you don't
20  agree with the proposition that WAC is a net
21  price; correct?
22  A. That it's not understood to be that in

**153**

1   the industry, that's correct.
2   Q. Right. I understand that that is your
3   testimony.
4       Have you determined what any of the 13
5   defendants' WACs would be if they were calculated
6   to be net prices?
7       MR. PALERMO: Objection to the form.
8   A. As far as I can tell, you are asking me
9   if I have calculated the defendants' net prices,
10  and I have not.
11  Q. Now, you are aware, are you not, that
12  certain defendants pay -- pay their retail
13  customers rebates in certain scenarios; correct?
14      MR. BUEKER: Objection as to form.
15      MS. CICALA: Let me -- let me rephrase
16  the question. Let me rephrase the question.
17  Q. Can you envision any scenario where the
18  -- where the net sales price to retail pharmacies
19  is less than a net WAC -- WAC as a net price, not
20  as a list price?
21      MR. BUEKER: Objection as to form.
22      You can answer if you understand the