# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>)  Subcategory Case No: 03-10643-PBS<br>) |
| THIS DOCUMENT RELATES TO:<br><br>    *The City of New York, et al.*<br><br>*v.*<br><br>    *Abbott Laboratories, et al.* | ) Judge Patti B. Saris<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS RELATED TO FULS AND APPLICABLE TO THE FUL THIRTEEN and RESPONSE TO ADDITIONAL  UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules of this Court, Plaintiffs, the City of New York and the New York Counties in MDL 1456 hereby submit this Reply Statement of Undisputed Material Facts Related to Federal Upper Limits ("FULs") and Applicable to the FUL Thirteen ("Plaintiffs' Common 56.1").  Plaintiffs also herein respond to the "additional undisputed material facts" presented by defendants in their joint response to plaintiffs' Common 56.1 [Dkt. No. 6117].

**The New York Medicaid Program**

**1.     New York Medicaid, like all State Medicaid programs, is required to reimburse providers, at their "estimated acquisition cost" ("EAC") of the drug plus a reasonable dispensing fee.  42 C.F.R. 447.301 (2006).**

Response to Statement  No. 1:  Disputed.

Defendants dispute that reimbursement for the drugs at issue in Plaintiffs' Motion for Partial Summary Judgment was governed by 42 C.F.R. § 447.301. Although brand and other non-multiple source drugs are to be reimbursed at the lesser of EAC and a pharmacist's usual and customary charge to the general public, ingredient cost

reimbursement for multiple source drugs subject to a Federal Upper Limit ("FUL") is subject only to the aggregate limitation imposed by § 447.332. *See* 42 C.F.R. § 447.331. Furthermore, as the regulatory history makes clear, § 447.332 was promulgated with the knowledge and intent that pharmacists could acquire multiple source drugs below the mandated aggregate cap. *See, e.g.*, Medicare and Medicaid Programs; Limits on Payments for Drugs, 51 Fed. Reg. 29,560, 29,562 (Aug. 19, 1986) ("[P]harmacists would be encouraged to purchase as prudently as possible because . . . they would retain the difference between what they pay for the drug product and the upper limit of payment established by HCFA for the particular drug."); Medicare and Medicaid Programs; Limits on Payments for Drugs, 52 Fed. Reg. 28,648, 28,648-56 (July 31, 1987) (stating that by basing the FUL on published prices, HCFA (CMS's predecessor) was "building into [] rates for ingredients, a profit margin for pharmacists") (emphasis added).

**Plaintiffs' Reply to Statement # 1:**

**Defendants' dispute is baseless for the reasons set forth in plaintiffs' reply memorandum in support of plaintiffs' motion for partial summary judgment at Point I ("Pl. FUL Reply"), which are incorporated herein.  In addition, the dispute is contrary to CMS testimony.  In response to the question why CMS did not use AWPs to set a FUL, CMS witness Gail Sexton testified**

> **Because EAC or estimated acquisition cost for drugs that did not have a federal upper limit or even for drugs that had a federal upper limit were AWP minus a percent and that varied by state.  And if a FUL was calculated to be higher than the majority of the AWPs, then it did not – it would not yield cost savings to set a federal upper limit that was higher than an EAC already established by a state."**

**Sexton, Gail (May 20, 2008) 72:21-76:11, attached as Exhibit D to Plaintiffs' Common 56.1 [Docket No. 6060, Sub-docket No. 62].**

2.    **EAC is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of the drug most frequently purchased by providers."** *Id.*

Response to Statement No. 2:  Disputed in part.

While defendants do not dispute that plaintiffs have accurately quoted the definition of EAC set forth in § 447.301, the definition is irrelevant to the reimbursement of multiple source drugs subject to a FUL. See 42 C.F.R. § 447.331, § 447.332.

**<u>Plaintiffs' Reply to Statement # 2</u>:**

**The parties agree that EAC is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of the drug most frequently purchased by providers." The statement is clearly relevant for the reasons set forth in plaintiffs' reply memorandum in support of plaintiffs' motion for partial summary judgment at Point I ("Pl. FUL Reply"), which are incorporated herein and in light of CMS witness Gail Sexton's testimony, cited in reply to statement #1 above and incorporated herein. No further reply is required.**

**3.     The New York Medicaid reimbursement formula has always been set by the legislature. During the relevant period of 1997-2005 it provided that New York Medicaid would reimburse providers based on the FUL if a FUL was in place. Specifically:**

**(b) for drugs dispensed by pharmacies:**

**(i) if the drug dispensed is a multiple source prescription drug for which an upper limit has been set by the federal health care financing administration, [reimbursement will be] an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug,**

**N.Y. Soc. Serv. L. sec 367-a(9)(b)(i).**

<u>Response to Statement No. 3</u>:  Disputed in part.

Defendants dispute plaintiffs' assertion that New York Medicaid's reimbursement formula has always been set by the legislature. In fact, from 1976 until 1994, the reimbursement methodology was dictated by a consent decree negotiated by and entered into between the New York Department of Health ("NYDOH") and the Pharmaceutical Society of the State of New York ("PSSNY"). *See* 7/7/78 Stipulation at ¶ 4, *PSSNY v.*

*Cuomo*, Civ. No. 76-5080 (KTD) (S.D.N.Y.), attached as Exhibit A to the Declaration of Kim B. Nemirow in support of Defendants' Response To Plaintiffs' Local Rule 56.1 Statement Of "Undisputed" Facts Applicable To All Defendants And Statement Of Additional Undisputed Material Facts, filed June 15, 2009 ("Nemirow Decl.").

In 1987, NYDOH attempted to modify the reimbursement rate, by regulation, to comply with the then newly-promulgated FUL regulation. It was prevented from doing so when PSSNY successfully moved the court for an injunction on the grounds that such a modification violated the consent decree. *See* 12/19/89 Affidavit of Mary Alice Brankman at ¶¶ 8-11, *PSSNY v. Cuomo*, Nemirow Decl. at Ex. B; 2/29/88 Order, *PSSNY v. Carey*, Nemirow Decl. at Ex. C.  It was not until 1994 that the New York *legislature* set the reimbursement rate and, then, the rate that was adopted by the legislature was the product of a negotiation between NYDOH and the pharmacists to settle and finally resolve their long-running legal battle over the adequacy of pharmaceutical reimbursement rates. Defendants do not dispute that plaintiffs accurately quote N.Y. Soc. Serv. L. § 367-a(9). N.Y. Soc. Serv. L. § 367-a(9) (1994) (amended 2003).

**Plaintiffs' Reply to Statement # 3:**

**The parties agree that since 1994, the New York Medicaid reimbursement formula has always been set by the legislature.  And the parties agree that during the relevant time period of 1997 to 2005, N.Y. Soc. Serv. L. sec. 367-a(9)(b)(i) provided that New York Medicaid would reimburse providers based on the FUL if a FUL was in place.  The remainder of defendants' response constitutes argument improper on 56.1.  No further reply is required.**

**The Federal Upper Limit**

4.    **The purposes of the Federal Upper Limit ("FUL") program are to ensure access to prescription drugs while achieving cost savings.  Gaston, Sue (March 19, 2008) Vol. II 498:16-22 (Exhibit A hereto).**

Response to Statement No. 4: Undisputed.

**Plaintiffs' Reply to Statement # 4:**

**No further reply is required.**

4

> **5.**     To achieve cost savings for states and Medicaid, CMS seeks to set a reasonable reimbursement rate on drugs that are commonly used by the Medicaid population in an outpatient setting.  Gaston, Sue (January 24, 2008) 216:14-19; 245:12-246:16 (Exhibit B hereto); Gaston, Sue (March 19, 2008) Vol. II, 329:10-331:3; 456:10-457:6 (Exh. A hereto); see also Brief of the United States on the Federal Upper Limit, p. 2-3, *citing* 51 Fed. Reg. at 29563 (Docket No. 4413) (Exh. C hereto); Sexton, Gail (May 20, 2008) 72:21-76:11, 91:18-93:19 (Exh. D hereto).

> Response to Statement No. 5:  Undisputed.

> **Plaintiffs' Reply to Statement # 5:**

> **No further reply is required.**

> **6.**     A reasonable FUL was considered to be somewhere between WAC and AWP.  Gaston, Sue, Vol. II (March 19, 2008) 446:1-453:1; 488:2-19. (Exh. A hereto).

> Response to Statement No. 6:  Disputed.

> The testimony cited by plaintiffs in support of this contention makes no reference to AWP at all, or to the reasonableness of a FUL in relation to AWP. Instead, the cited testimony provides an example of CMS's decision not to use the lowest published price in the setting of the FUL for lorazepam, one of the drugs that was the subject of the targeted discovery in this matter.  *See* Gaston Tr. 446:1 – 453:1, Nemirow Decl. at Ex. D. Ms. Gaston's testimony further highlights why the decision was made to disregard the lowest reported WAC price – to ensure that all providers were able to purchase the drug within the limits set by CMS. *See* Gaston Tr. at 428:21 – 429:1 (agreeing that "sometimes discretion was used to ensure that the FUL was reasonable"), Nemirow Decl. at Ex. D; Gaston Tr. at 429:2 – 429:8 (further acknowledging that discretion was used to set the FUL at a level that allowed the drug to be acquired in the marketplace), Nemirow Decl. at Ex. D.

> **Plaintiffs' Reply to Statement # 6:**

> **Defendants cannot reasonably dispute the Statement.  The testimony provided by CMS witnesses in this litigation makes clear that a reasonable FUL was somewhere between AWP and WAC.  First, Ms. Gaston's testimony is that the WAC was considered to be a lowest published price, and that is why CMS added a 150% mark-up to establish the FUL.  A reasonable FUL was greater than WAC. Ms. Gaston's testimony reads:**

"**Q:    I want to ask you about some text that's written in the middle of the page in bold and it's preceded by a couple of stars.  It says 'FULs price not greater than another supplier.' Do you see that?**

**A:    Yes.**

**Q:    Is that text that the FULs system in your experience would have put on a page like this?**

**A:    Correct.**

**Q:    Explain to me what that means.**

**A:    I think it was checking on the supplier.  It has to make sure there's at least three suppliers.  And here again, I haven't dealt with this for a while, so I need to refresh my memory.**

**Q:    Well, let me see if we can get at it this way.  Just above the text do you see a low price?**

**A:    Correct.**

**Q:    And you see that it's .1999?**

**A:    Correct.**

**Q:    Okay.  And you see there's a number that's crossed out that's .2999 over in the left-hand side just before the bolded text we were talking about?**

**A:    Correct.**

**Q:    And that – because it's cut off, perhaps it would help to refer to Exhibit 5.  But that's the FUL price that the FULs system calculated, correct?**

**A:    Correct.**

**Q:    -- the crossed out number .2999?**

**A:    Correct.**

**Q:    And that FUL number that's calculated by the system would have been based on this low price of .1999, correct?**

**A:    Correct.**

**Q:    And if you go up and look at the list of published prices above, you would agree with me that there's no published price that's below that .2999 number, right?**

**A:    Correct.**

**Q:    Except the one price in which the FUL was based?**

**A:    Yes.**

**Q:    Or I shouldn't say based.  Was calculated by the system.  So, does that help to refresh your recollection that indeed this warning, 'FULs price not greater than another supplier,' was essentially an occasion that the FULs**

system had detected that by basing a FUL on the lowest published price the FUL was being set at below the next published price?

A:    Correct.

Q:    Is that a warning – you talked the last time in your last deposition about certain flags that the system had to tell you and your colleagues that you needed to conduct a manual review.  Is this one of those flags?

A:    Yes.

Q:    And why was it important that the FULs system cautioned you to look at or manually review a FUL that was set in this manner?

A:    Because if we allowed the FUL to be based at this price then it would be an availability issue.

Q:    In other words, that if you allowed a FUL to be set at this price based on this lowest published price, then you'd have an availability issue and that's a problem, it's not a reasonable FUL?

A:    Correct.

Q:    And so that number is crossed out and a different number is written in that's .5718, right?

A:    For the FUL price.

Q:    For the FUL price.

A:    Correct.

Q:    And that appears to be based on from the note on the bottom a United Research Labs or URL's WAC?

A:    Correct.

Q:    And URL's WAC was not the lowest published price in this instance, right?  Because we've seen for example Major Pharmaceuticals had a lower published price?

A:    Well, I thought you meant excluding that published price.

Q:    No.  I didn't mean that.

A:    Yeah.  Major's was the next lowest.  The next lowest was URL.

Q:    So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct?

A:    Correct.

Q:    And for the record, why is it that CMS would have chosen to ignore the lowest published price?

MS. MARTINEZ:    Objection, form.

7

  **A: Because setting the FUL on the lowest published price here might not allow us to have a reasonable FUL price for this drug."**

**Gaston, Sue (March 19, 2008) 446:1-453:1, attached as Exhibit A to Plaintiffs'**

**Common 56.1 [Docket No. 6060, Sub-docket No. 62].**

  **Second, Gail Sexton testified that a reasonable FUL was less than AWP, but**

**greater than WAC.  Ms. Sexton's testimony follows:**

  **"Q: Okay.  There's a handwritten note at the bottom of Exhibit 7 that reads to me three WACs then a less than sign, FUL, dash, FUL, less than sign, AWP, minus.  Do you see that?**

  **A: Yes.**

  **Q: Is that note you made?**

  **A: Three WACs less than the FUL meant that we saw that there were three wholesale acquisition costs or three prices that would be available to the providers that were less than the federal upper limit.  In other words, there were – we could see that there were NDCs available within the federal upper limit.**

  **Q: Why did you look at that?**

  **A: Basically because when I was taught the program that is one of the criteria that they had looked at as far as in setting a federal upper limit.  And so that was just something I documented on every sheet.  However, that's not – there were no set amount of wholesale acquisition costs that would be looked at as far as when I did the FULs that would have to be less than the FUL.**

  **Q: And who taught you to do this kind of analysis?**

  **MR. FAUCI: Objection, form.**

  **A: Cindy Bergin taught be the FULs program.**

  **Q: Did she explain to you why this kind of analysis was done?**

  **MR. FAUCI: Objection, form.**

  **A: Over the course of time the pharmacy community had – they raised a lot of concern and in fact on an ongoing basis whether NDCs were available at the federal upper limit reimbursement amount.  And to my knowledge it was used kind of as a checkpoint system to say, well, we can see where there are prices that are less than the federal upper limit where drugs could be obtained within the reimbursement amount.**

  **Q: So is that a check on availability?**

  **MR. FAUCI: Objection, form.**

A:     A check on – well, availability and cost.

Q:     Let me make sure I got it.  So the reason you'd like to see whether there were WACs less than the federal upper limit is to determine whether there was drugs available on the marketplace at the federal upper limit price?

MR. FAUCI: Objection, form.

A:     That's why I documented, because that was just how I learned – that's how I was taught.  That's one thing that was looked at.  However, I did not set a FUL based on that criteria.  It was just something that I guess at some point was looked at.

Q:     But it was a check that you continued to do during the period of time October 2004 to December 2006, correct?

MR. FAUCI: Objection, form.

A:     Yes.

Q:     And the second part of that statement says "FUL less than AWP minus"; is that correct?

A:     That's not a minus.  That's just a marking.  It's just "FUL less than AWP."

Q:     Okay.  I think you explained it, certainly.  But why would you look at that?  Why would you make that comparison?

A:     Because EAC or estimated acquisition cost for drugs that did not have a federal upper limit or even for drugs that had a federal upper limit were AWP minus a percent and that varied by state.  And if a FUL was calculated to be higher than the majority of the AWPs, then it did not – it would not yield cost savings to set a federal upper limit that was higher than an EAC already established by a state."

Sexton, Gail (May 20, 2008) 72:21-76:11, attached as Exhibit D to Plaintiffs'

Common 56.1 [Docket No. 6060, Sub-docket No. 62].

No further reply is required.


7.     Federal regulations provide that CMS may set a FUL when two criteria are met:  (1) there must be at least three therapeutic equivalents (A-rated) listed for the generic drug in the FDA Orange Book publication, Approved Drug Products with Therapeutic Equivalence Evaluations; and (2) there must be at least three suppliers of the generic drug listed in the pricing compendia.  42 CFR § 447.332(a)(i) and (ii).

Response to Statement No. 7:  Disputed.

Plaintiffs mischaracterize the applicable federal regulation. Title 42, Code of Federal Regulations, Section 447.332 provides that "CMS *will* establish" a FUL when the specified criteria are met. 42 C.F.R. § 447.332(a)(1) (emphasis added). The regulation cited does not merely permit CMS to set a FUL in those circumstances, it *requires* CMS to do so. *Id.* However, responding further, the undisputed record evidence shows that CMS often chose not to establish a FUL even if those criteria were met. *See, e.g.*, Defendants' Local 56.1 Statement of Undisputed Material Facts Supporting Defendants' Joint Motion for Summary Judgment on Plaintiffs' "FUL Fraud" Claims, dated May 15, 2009 [Docket No. 55] ("Defs.' 56.1 Stmt.") at ¶ 31

**Plaintiffs' Reply to Statement # 7:**

**The parties agree that CMS is supposed to establish a FUL for multiple source drugs when two criteria are met: (1) there must be at least three therapeutic equivalents (A-rated) listed for the generic drug in the FDA Orange Book publication, Approved Drug Products with Therapeutic Equivalence Evaluations; and (2) there must be at least three suppliers of the generic drug listed in the pricing compendia. 42 CFR § 447.332(a)(i) and (ii). The remainder of defendants' response is irrelevant to the Statement and argument improper in the context of a 56.1.**

**8.     Once these two criteria were met, the regulations provided that CMS may establish the FUL by taking "150 percent of the lowest published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or if the drug is not commonly available in quantities of 100, the package size commonly listed)…" 42 CFR § 447.332(b).**

Response to Statement No. 8:  Disputed.

Defendants dispute plaintiffs' assertions insofar as plaintiffs mischaracterize the regulation. The cited regulation requires that CMS set a FUL at 150% of the lowest published price even though the undisputed record evidence shows that CMS very often chose to disregard the regulatory requirements when setting FULs. *See, generally*, Affidavit of Sumanth Addanki, dated May 15, 2009 [Docket No. 57]; *see also* 42 C.F.R. § 447.332.

**Plaintiffs' Reply to Statement # 8:**

**The parties agree that the regulations provide that CMS establish the FUL by taking "150 percent of the lowest published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or if the drug is not commonly available in quantities of 100, the package size commonly listed)..." 42 CFR § 447.332. The remainder of defendants' response is improper argument requiring no reply.**

**9.     At all times relevant hereto, CMS had a computer application ("FUL system" or "FULS") that analyzed the FDA Orange Book ratings and the publishing compendia (First Data Bank, Red Book and Medispan) price information to automatically find the therapeutic equivalent with the lowest published price (AWP, WAC, and DP) and multiply it by 150 percent. Gaston, Sue (January 24, 2008) 232:22-237:9 (Exh. B hereto).**

Response to Statement No. 9:  Undisputed.

**Plaintiffs' Reply to Statement # 9:**

**No further reply is required.**

**10.     CMS's FULs program pulled published prices from First Data Bank, Red Book and Medispan to establish the FUL. Gaston, Sue (January 24, 2008) 145:5-146:16 (Exh. B hereto).**

Response to Statement No. 10:  Undisputed as written.

Defendants dispute plaintiffs' assertions to the extent the word "establish" is intended to imply that CMS set the FULs mechanically, and did not perform a subsequent manual review and/or exercise substantial discretion. *See infra* at Response to Alleged Fact No. 11; *see also* Defs.' 56.1 Stmt.,¶¶ 7, 15-36.

**Plaintiffs' Reply to Statement # 10:**

The parties agree that in addition to the process performed by the FULs program, CMS would sometimes perform a manual review.  However, plaintiffs do not agree that CMS performed a manual review in every instance a FUL was set. Ms. Gaston and Ms. Sexton clearly testified that CMS did not perform a manual review every time a FUL was set:

> "Q:    And then you begin a manual review process at that point to decide whether or not to set a FUL?
>
> A:    If it was necessary.  It might have enough information we wouldn't have to do a manual review."

Gaston, Sue (March 19, 2008) 533:5-10.

> "Q:    but is it fair to say then that there's a manual review process that you undertake with regard to each federal upper limit that you established?
>
> MR. FAUCI: Objection, form.
>
> A:    I wouldn't' say each.  I would say in cases where I saw that manual intervention could have changed the price, changed the federal upper limit, or where it appeared that perhaps the criteria was not met and that further intervention should have been taken."

Sexton, Gail (May 20, 2008) 95:10-20.

**11.    In addition to the two criteria mandated by the federal regulation governing the FUL, CMS on occasion engaged in a manual review to ensure availability of the drug and accuracy of pricing information.  Gaston, (January 24, 2008) 257:3-12 (Exh. B hereto).**

Response to Statement No. 11:  Disputed in part.

CMS testimony makes clear that the manual review of the computer-set FUL pricing was done in nearly every case, rather than "on occasion," and often resulted in a modification to the FUL. *See, e.g.*, Gaston Tr. at 234:7 – 234:18 ("but basically there's a lot of manual review that's included before the final FUL listing will come out"), 411:8 - 411:13, 416:10 – 416:15, 429:18 – 429:22, 533:5 – 533:10), Nemirow Decl. at Ex. D; Sexton Tr. at 89:2 – 89:10, 93:19 – 94:13, Nemirow Decl. at Ex. E (stating that Ms. Sexton conducted "further manual interventions" into the FUL for albuterol because she had "learned of other suppliers that were marketing this drug"); *id*. at 95:15 – 95:20, Nemirow Decl. at Ex. E (stating that she would conduct a manual review "in cases where

I saw that manual intervention could have changed the price, changed the federal upper limit, or where it appeared that perhaps the criteria was not met and that further intervention should have been taken"); *id*. at 138:6 – 138:7, Nemirow Decl. at Ex. E ("When possible we would manually verify that drugs were available."). In fact, considering the FULs set for the drugs that were the subject of the targeted discovery in this matter, the FUL was manually reviewed and set on a price other than the lowest published price available at the time in nearly 75% of all cases (23 out of 31 cases). *See* Defs.' 56.1 Stmt., ¶ 7.

**Plaintiffs' Reply to Statement # 11:**

The parties agree that CMS did not perform a manual review in every instance a FUL was established. The parties agree that the FUL was based on a price other than the lowest published price in 23 out of the 31 cases in which CMS set a FUL during the relevant time period for the subject drugs.

However, it is speculative that CMS engaged in a manual review "in nearly 75% of all cases (23 out of 31 cases)" in which the FUL was set during the relevant time period (1997 to 2005) for the subject drugs. CMS has not testified regarding every single case in which a FUL was set (31 cases) for the drugs and time period at-issue in this motion. CMS's testimony concerns 11 cases in which CMS performed a manual review to set the FUL. No further reply is required.

12.     The 2003 Compliance Program Guidance for Pharmaceutical Manufacturers issued by the Office of the Inspector General of the U.S. Department of Health and Human Services, Federal Register, Vol. 68, No. 86, Monday May 5, 2003 ("2003 OIG Guidance"), provides:

> [Pharmaceutical manufacturers have a] legal duty to avoid submitting false or inaccurate pricing or rebate information to any federal health care program. 68 Fed. Reg. at 23732.
>
> The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent

> **or misleading information is actionable.  68 Fed. Reg. 23733**
>
> **In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.  68 Fed. Reg. 23734.**

**A copy of the 2003 OIG Guidance is attached as Exhibit E hereto.**

Response to Statement No. 12:  Disputed.

Defendants dispute plaintiffs' assertion that the OIG Guidance cited above has any relevance to this motion. To the contrary, it is irrelevant and inappropriately relied upon. The OIG guidance bulletin clearly states that it is "intended to present voluntary guidance to the industry and not to represent binding standards for pharmaceutical manufacturers." 2003 Compliance Program Guidance for Pharmaceutical Manufacturers issued by the Office of the Inspector General of the U.S. Department of Health and Human Services, Federal Register, Vol. 68, No. 86, Monday May 5, 2003 at 23731 ("Guidance Memo") (attached as Exhibit "E" to Plaintiff's Statement of Undisputed Material Facts). Moreover, the Guidance relates to specific governmentally-defined pricing measures such as AMP and is intended is to offer suggestions for pharmaceutical manufacturers' development of compliance programs, and does not speak directly to reporting requirements and standards. It is therefore irrelevant to the motion before the Court. *Id.*

**Plaintiffs' Reply to Statement # 12:**

**Defendants cannot reasonably dispute that the cited 2003 OIG Guidance is relevant to plaintiffs' motion given that it confirms defendants' obligations to report accurate prices to the government.  No further reply is required.**

## PLAINTIFFS' RESPONSE TO STATEMENT OF "ADDITIONAL UNDISPUTED MATERIAL FACTS"

1.  The various pricing measures used in the pharmaceutical industry are widely understood to have the following ordinal relationship:  AWPs are expected to be higher than WACs, and WACs are often higher than the AMPs reported by manufacturers to CMS for particular products.  *See* Affidavit of Sumanth Addanki, dated June 15, 2009 ("6/15/09 Addanki Aff."), at ¶ 8.

**Plaintiffs' Response to Additional Statement #1:**

The Statement is too vague to permit a response.  Defendants do not define what they mean by "pharmaceutical industry".  To the extent defendants define "pharmaceutical industry" to include plaintiffs, the statement is disputed because defendants' false price reports have perverted reality and any expectations as to "ordinal relationships" have been polluted by the false reports that plaintiffs' lawsuit seeks to address.  The Statement is also irrelevant to plaintiffs' motion which establishes the falsity of defendants' price reports based on defendants own data and testimony.

2.    Plaintiffs' expert, Harris Devor, testified, consistent with this widely-held understanding, that he understood that AWPs are typically higher than WACs.  See, e.g., Deposition of Harris Devor ("Devor Tr.") at 163:22-164:4, Nemirow Decl. at Ex. F (stating that he had "an understanding of the way the chain works, and that generally in any chain, the provider is paying more than the wholesaler paid the manufacturer because usually the wholesaler is in the business to make a profit"); Devor Tr. at 164:9-11 (stating specifically that his expectation was that "[o]verall that the AWP probably would have been higher than the WAC in most cases.  That's what my expectation would have been"), Nemirow Decl. at Ex. F; Devor Tr. at 472:11-20 (reviewing his own Rule 26 Statement, and agreeing that "normally AWP would be higher than WAC"), Nemirow Decl. at Ex. F; Devor Tr. at 473:11 - 473:13 (testifying that he "think[s] overall [he] would expect AWPs to be greater than WAC"), Nemirow Decl. at Ex. F.

<u>Plaintiffs' Response to Additional Statement #2:</u>

The phrase "widely held understanding" is disputed for the reasons set forth in plaintiffs' response to Statement #1 above, which is incorporated herein.  Plaintiffs do not dispute Mr. Devor's testimony, which speaks for itself.  The Statement is irrelevant to plaintiffs' motion which establishes the falsity of defendants' price reports based on defendants own data and testimony.

3.    In as many as sixty percent (60%) of Mr. Devor's AWP and WAC calculations, his "but for" AWP was less than his "but for" WAC for a given drug.  *See* 6/15/09 Addanki Aff. at ¶ 9; *see also, e.g.*, Devor Tr. at 480:3 – 480:8 ("Q: Comparing

your estimated WACs on 5.01 with your estimated AWPs on 5.02, you will agree with me that for many of the quarters your estimated AWP is below your estimated WAC, right?  A:  I do see that ...”), Nemirow Decl. at Ex. F; Devor Tr. at 480:12-20 (confirming his calculation for a given drug in a given quarter that resulted in a WAC of $207.22 and an AWP of $24.09), Nemirow Decl. at Ex. F; Devor Tr. at 751:19 – 752:8 (acknowledging in deposition testimony that his “but for” AWPs in exhibits 10.01 and 10.02 to his Rule 26 Statement were “very significantly lower in most instances than the estimated WACs”), Nemirow Decl. at Ex. F.

**Plaintiffs' Response to Additional Statement #3:**

Plaintiffs have not moved on the basis of Mr. Devor's AWPs and hence the statement is irrelevant their motion.  The Statement is also irrelevant because it says nothing whatsoever- let alone material- regarding the truth of defendants' reported prices or the inaccuracy of Mr. Devor's results. Defendants' failure to proffer such counter-evidence renders the Statement worthless in the context of a Rule 56 motion.

4.  Thirty-four percent (34%) of Mr. Devor's calculated AWPs were less than the AMP reported by the manufacturer during that quarter.  6/15/09 Addanki Aff. at ¶ 10; Ex. 4; *see also, e.g.*, Devor Tr. at 874:15 - 874:18 (acknowledging that in a given quarter, the AMP for enalapril maleate was three times greater than Mr. Devor's calculated AWP), Nemirow Decl. at Ex. F; Devor Tr. at 885:6 - 885:15 (acknowledging that the reported AMP for a given drug was a “far in excess of [his] estimated AWPs by a factor of several”), Nemirow Decl. at Ex. F.

**Plaintiffs' Response to Additional Statement #4:**

Plaintiffs incorporate their response to Statement #3 herein.

5.  In eleven percent (11%) of the instances in which Mr. Devor calculated either an AWP or a WAC, at least one of those calculated figures was a negative number. 6/15/09 Addanki Aff. at ¶ 10.

**Plaintiffs' Response to Additional Statement #5:**

The Statement is immaterial and irrelevant to any issue presented by plaintiffs' motion.  No further response is required.

**6.** When the "but for" prices he calculated were negative, Mr. Devor created "proxies" which he used instead of the negative number.  Typically, his proxy was the last positive figure he calculated.  *See, e.g.*, Devor Tr. at 139:20 – 140:1 ("Q:  So when a WAC was negative you used a proxy?  A:  Yes, I mean, it doesn't make sense to have a negative WAC, if you think about it ..."), Nemirow Decl. at Ex. F; Devor Tr. at 141:17 – 141:21 ("You also, if you look at Exhibit 14.02, use proxies for AWP when you have a negative AWP, when you calculate a negative AWP, correct?  A:  Right, and I see the last line item on the page is actually a negative AWP, correct."), Nemirow Decl. at Ex. F; Devor Tr. at 437:2 – 437:8 ("And in this analysis . . . we took as a proxy the most recent month that wasn't negative."), Nemirow Decl. at Ex. F; but *see, e.g.*, Devor Tr. at 792:15 – 793:4 ("Q:  You calculated a negative estimated WAC for three quarters here, correct?  A:  That's correct.  Q:  But unlike Exhibit 10.17, you do not substitute a proxy for the negative WAC, correct?  A:  That's correct.  Q:  Why the difference in your methodology? ...  A:  I can't – the answer is I don't know.  I don't know.  Could have been an oversight.  I don't know."), Nemirow Decl. at Ex. F.

<u>**Plaintiffs' Response to Additional Statement #6:**</u>

**Plaintiffs' dispute defendants' paraphrasing and characterization of Mr. Devor's testimony, which speaks for itself.  The Statement is immaterial and irrelevant to any issue presented by plaintiffs' motion.   No further response is required.**

**7.** Mr. Devor also used proxies when he detected an "outlier" figure in the data, claiming that to do otherwise would "distort the whole analysis."  *See, e.g.*, Devor Tr. at 141:22 – 142:22 (testifying that a "proxy" was used when he detected an "outlier" or when a change in AWP or WAC would "distort the whole analysis," while admitting he could not "recall whether we actually had those cases, we may have, given how much, you know, how many drugs and how many periods we analyzed, there could have been one or two.  With respect to those we would have also used a proxy which I believe in both cases would have been the calculated AWP or WAC just prior to that, I believe"), Nemirow Decl. at Ex. F; Devor Tr. at 143:1 – 143:6 ("Q: What was your standard for determining when something was an outlier and that you would use a proxy?  A:  I think that was only if it was – the answer – I don't remember having any so it is hard for me to say my standard ..."), Nemirow Decl. at Ex. F.

<u>**Plaintiffs' Response to Additional Statement #7:**</u>

Plaintiffs dispute defendants' paraphrasing and characterization of Mr. Devor's testimony, which speaks for itself. The Statement is also immaterial and irrelevant to any issue presented by plaintiffs' motion.  Plaintiffs note further that the use of proxies is a convention employed by defendants own expert when he works with defendants' data (something Dr. Addanki, notably, did not undertake to do here).  *See* November 20, 2008 Addanki Deposition at 170:4-172:10; 174:20-176:9; 182:4-184:2; 184:10-185:18 (Exh. B to Affidavit of Kathryn B. Allen, sworn to June 30, 2009 and submitted in opposition to defendants' motion to exclude testimony of Harris L. Devor).  No further response is required.

**8.**  WAC is (and was during the relevant time) often described as, and commonly understood and used to mean in the pharmaceutical industry, an undiscounted invoice or list price for sales to wholesalers.  (examples omitted)

<u>**Plaintiffs' Response to Additional Statement #8:**</u>

Disputed for all the reasons set forth, at length, in plaintiffs' motion, the papers submitted in support thereof and plaintiffs' opposition to defendants' motion, which are incorporated herein.  Disputed further on the grounds that the Statement directly contradicts the findings of this Court in *Commonwealth of Massachusetts v. Mylan*, 608 F. Supp. 2d 127 (D. Mass. 2008) made after review of essentially the same materials.  Disputed on the grounds that defendants took the deposition of 20 CMS witnesses over 28 days and yet, notably, do not present a single stitch of testimony that CMS believed defendants' WACs to be false and yet chose to rely on them when setting the FUL. Disputed because defendants not supplied any record evidence whatsoever regarding what New York Medicaid knew or understood in respect of defendants' WACs.  Disputed because defendants have

supplied no record evidence that any of their examples were ever reviewed or considered by New York Medicaid or CMS.  Disputed on the grounds that none of defendants' examples are New York Medicaid specific and therefore reveal nothing about New York Medicaid's knowledge.  Disputed on the grounds that the examples are incomplete and unreliable. For example, defendants selectively point to certain OIG reports but omit the OIG's 2003 Compliance Program Guidance for Pharmaceutical Manufacturers, Federal Register, Vol. 68, No. 86, Monday May 5, 2003 ("2003 OIG Guidance") which expressly instructs and reminds that reported prices "should accurately take into account price reductions, cash discounts, free goods, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants or other price concessions or similar benefits offered to some or all purchasers." *See* 68 Fed. Reg. 23733-34 (Exhibit E to plaintiffs' Common 56.1) [Dkt. 6060].  Responding further, plaintiffs incorporate herein their response to Statement #6 above.

**9.**  Similarly, to the extent that AWP is relevant to plaintiffs' motion, and defendants contend that AWP is not relevant as FULs were never based on AWPs, *see* Defs.' 56.1 Stmt., ¶ 34, the term "AWP" as used in the generic market is (and during the relevant time was) a pricing benchmark that, by standard convention, had to be set at least 10% below the AWP for the equivalent brand drug so that the pricing compendia would identify the particular drug as a generic.  *See, e.g.*, Pls.' L.R. 56.1 Stmt. of Undisputed Material Facts as to Schering Corp., Schering-Plough Corp. and Warrick Pharm. Corp., ¶ 19.

**Plaintiffs' Response to Additional Statement #9:**

Disputed.  Defendants admit that the published prices presented in the FULs printouts included AWPs and thus defendants cannot be heard to say AWP is not relevant to plaintiffs' motion.  *See* Defendants' Response to Plaintiffs' Local Rule

**56.1 Statement of "Undisputed" Facts Applicable To All Defendants and Statement of Additional Undisputed Material Facts [Dkt#:6117] ("Defs. Common Response") at ¶9.   Responding further, plaintiffs agree that record evidence firmly establishes that the FUL thirteen set their AWPs without any regard to actual prices whatsoever.   *See* plaintiffs' individual local rule 56.1 statements as to each defendant.**

Dated: June 30, 2009

Respectfully submitted,

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala_____

By:    Joanne M. Cicala
       James P. Carroll Jr.
       Jocelyn R. Normand
       Kathryn Allen

*Counsel for the City of New York and New York Counties in MDL 1456 except Nassau and Orange*

Ross B. Brooks, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
**LEVY PHILLIPS & KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022

(212) 605-6205
*Counsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS RELATED TO FEDERAL UPPER LIMITS ("FULS") APPLICABLE TO ALL THIRTEEN FUL DEFENDANTS (THE "FUL THIRTEEN"), to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  June 30, 2009

_____/s/_____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue,16th Floor
New York, NY 10022
(212) 371-6600