# EXHIBIT A

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF

MASSACHUSETTS

IN RE:  PHARMACEUTICAL           )
INDUSTRY AVERAGE WHOLESALE       )
PRICE LITIGATION                 )
_____  )  MDL No. 1456
                                 )  Civil Action
THIS DOCUMENT RELATES TO:        )  01-CV-12257-PBS
City of New York, et al.         )
v.                               )  Judge Patti B. Saris
Abbott Laboratories, et al.      )
                                 )


         VIDEOTAPED

    30(b)(6) DEPOSITION

    OF PUREPAC & ALPHARMA

     (PATRICIA O'MALLEY)

```
                                                    30
 1      A.  That is my understanding.
 2      Q.  And do you understand that when a brand
 3  comes off patent, a single generic manufacturer is
 4  typically granted exclusivity for a period of time
 5  to manufacture the generic version of the brand?
 6      A.  Could you repeat that last statement
 7  again?  The last one.
 8      Q.  Is it your understanding that when a
 9  brand drug comes off patent, a single generic
10  manufacturer can obtain exclusive rights to
11  manufacture the generic version of that brand for
12  a period of time?
13      A.  It is my understanding that that is
14  sometimes a possibility.
15      Q.  And has Purepac ever been in the
16  position with respect to the four drugs that we
17  have identified here to have that period of
18  exclusivity?
19      A.  I do not believe, recollect that
20  Purepac had exclusivity period for any of the four
21  drugs in question here.
22      Q.  Okay.  So then at the point when
```

```
                                                    31
 1  Purepac began to market or manufacture these four
 2  drugs, other generic companies were already
 3  manufacturing or marketing these drugs.
 4      MR. FLEDER:  Objection.  I don't think that
 5  follows from what she said.  She can answer that
 6  question.  It seems unduly vague.
 7      If you can answer it, answer it.
 8      A.  Would you repeat the question?  Sorry.
 9      Q.  Certainly.  If Purepac didn't -- did
10  not have exclusivity when it entered the market
11  for these four drugs, then is it fair to say that
12  another manufacturer was already in the market
13  manufacturing any one of these drugs?
14      A.  I believe that could have been one of
15  the scenarios.  There could have been others.
16      Q.  Are you aware whether Purepac --
17  withdrawn.
18      Are you aware whether any other generic
19  manufacturers manufactured or marketed Clonazepam
20  at the same time that Purepac was marketing and
21  manufacturing Clonazepam?
22      A.  I believe that there were other generic
```

```
                                                    32
 1  manufacturers marketing Clonazepam at the same
 2  time.
 3      Q.  And were there other generic
 4  manufacturers marketing Isosorbide Mononitrate?
 5      MR. FLEDER:  Counsel, if you could just
 6  clarify.  Are you talking about in response -- in
 7  this question the time period of 1995 to 2005 or
 8  are you making a more broader period than that?
 9      MS. CICALA:  No.  Thank you for the
10  clarification and I believe you meant 1997 through
11  2005.  All of my questions here today concern only
12  the time period of 1997 through 2005.
13      THE WITNESS:  Understood.
14      Q.  So between that time period, are you
15  aware whether there were other generic
16  manufacturers marketing Isosorbide Mononitrate?
17      A.  I believe there were other generic
18  manufacturers marketing the Isosorbide during the
19  relevant time period.
20      Q.  Do you recall identifying those time
21  periods in your Massachusetts deposition?
22      A.  I cannot recall offhand.  However, I
```

```
                                                    33
 1  believe it may be available that we could refer
 2  to.
 3      Q.  We needn't.  We needn't.
 4      A.  Okay.
 5      Q.  Do you recall, when you reviewed your
 6  deposition transcript, finding that your
 7  statements with regard to the competitive
 8  environment, meaning the other manufacturers of
 9  these particular products as Clonazepam -- let me
10  rephrase.  In Massachusetts, your testimony as I
11  understand it, concerned Clonazepam, Isosorbide
12  Mononitrate and Lorazepam; correct?
13      A.  Correct.
14      Q.  It did not concern Enalapril.
15      A.  I believe that's also correct.
16      MR. FLEDER:  For the record, the Commonwealth
17  asked many questions and showed many documents to
18  this witness that clearly did not relate to any of
19  those three drugs, but if you are asking if those
20  are the three drugs that are relevant to the
21  Massachusetts case, you are correct.
22      Q.  So --
```

**226**

1  determinations with regard to that calculation.
2      But we are prepared to proffer that it is
3  clearly a methodology that is approved by CMS
4  under the statute.  There's just a number of
5  places where you can pivot left or right, and you
6  oftentimes need advice of counsel which way to go.
7  We'd rather not get into that.
8      MS. CICALA:  I understand and I respect your
9  position.  So, for example, you are not prepared
10 to tell me if prices to mail-order, mail-order
11 pharmacies are included in AMP?
12     MR. FLEDER:  Let me also say there is nothing
13 in this case that alleges that the AMPs that were
14 calculated by the company were in any way
15 improperly done.  So I don't see how this is
16 relevant to this case.
17     MS. CICALA:  While I have no obligation to
18 respond as to the relevance, for the sake of
19 advancing the argument, I will state that to the
20 extent AMP is probative of the veracity of WAC and
21 other prices and Purepac's knowledge as to retail
22 prices, it is directly relevant and there are AMP

**227**

1  allegations in the complaint apart from that.
2  Setting all that aside, I understand Purepac's
3  position and we can address it as needed off the
4  record.
5      Q.  I have placed before you, Ms. O'Malley,
6  Exhibit 22 which is an excerpt of the AMP data
7  that was supplied to us by counsel in connection
8  with this litigation.  And I don't know whether
9  you are in a position to do this, but I was hoping
10 to authenticate that the data provided to us, of
11 which I am showing you merely an excerpt for
12 illustrative purposes, is true and complete and
13 represents the actual AMPs that Purepac supplied
14 to CMS for the identified time periods.  I don't
15 know if you are in a position to authenticate this
16 for us or perhaps counsel can assist.
17     **A.  I don't recall seeing this document.**
18     Q.  It is merely an excerpt of a very
19 lengthy collection of data points that Purepac has
20 supplied to us as their AMPs.
21     MR. FLEDER:  So 22 is a document that was
22 generated by the New York Counties and City; is

**228**

1  that correct?
2      MS. CICALA:  We exported your data into an
3  Excel spreadsheet.  No.  Excuse me one moment,
4  please.  Off the record.
5      THE VIDEOGRAPHER:  Going off the record.  The
6  time is 3:50 p.m.
7      (Discussion held off the record.)
8      THE VIDEOGRAPHER:  We are back on the record.
9  The time is 3:51 p.m.
10     MS. CICALA:  Let me correct a statement I
11 just made regarding Exhibit 22.  We received TIFF
12 images, actual hard copies of documents from
13 Purepac that were represented to us to be the
14 Purepac AMPs, I believe, for all of our at issue
15 drugs.
16     I realize today our focus is only on the four
17 drugs.  I am trying to get confirmation what we
18 received from Purepac is what was submitted for
19 the NDCs represented in that data.
20     MR. FLEDER:  I think we can represent the AMP
21 data we provided were in fact the AMPs that were
22 generated in connection with the drugs at issue

**229**

1  here today.
2      MS. CICALA:  And in turn, the AMPs that were
3  supplied by Purepac to CMS.
4      MR. DUFF:  Yes.
5      MR. FLEDER:  Yes.
6      MS. CICALA:  Thank you very much.
7      Q.  Turning back to the subject of
8  compliance for a moment, Ms. O'Malley, are you
9  aware whether Purepac has ever issued any
10 guidelines whatsoever regarding how suggested AWPs
11 should be calculated?
12     **A.  I am not aware of any such guidelines.**
13     Q.  And are you aware of any guidelines
14 issued by anyone within Purepac or otherwise
15 regarding how Purepac WACs should be calculated?
16     **A.  I am not aware of any such guidelines.**
17     Q.  I would like to take a short break if
18 we could and go off the record.
19     MR. FLEDER:  Before we go off the record, let
20 me state one thing for the record. 12:07, Ms.
21 Cicala asked to take a lunch break and we didn't
22 object.  And indicated desire to resume at one

# EXHIBIT B

```
                                                                    1

              UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS

                 C.A. NO. 03-11865 PBS

    ------------------------------X

    THE COMMONWEALTH OF              :

    MASSACHUSETTS,                   :      VIDEOTAPED

              Plaintiff,             :   DEPOSITION OF:

         vs.                         :   ROBERTO MIRANDA

    MYLAN LABORATORIES, INC., BARR   :

    LABORATORIES, INC., DURAMED      :   OCTOBER 19, 2007

    PHARMACEUTICALS, INC., IVAX      :   FLORHAM PARK, NJ

    CORPORATION, WARRICK             :

    PHARMACEUTICALS CORPORATION,     :

    WATSON PHARMACEUTICALS, INC.,    :

    SCHEIN PHARMACEUTICAL, INC.,     :

    TEVA PHARMACEUTICALS USA, INC.,  :

    PAR PHARMACEUTICAL, INC., DEY,   :

    INC., ETHEX CORPORATION,         :

    PUREPAC PHARMACEUTICAL CO.,      :

    and ROXANE LABORATORIES, INC.,   :

              Defendants.            :

    _____X
```

Miranda, Roberto  
Florham Park, NJ  
October 19, 2007

5 (Pages 14 to 17)

---

Page 14

1   A.  Could you repeat that, please.
2   Q.  To the best of your recollection, when
3   did you start in the position of bids and
4   contracts administrator?
5   A.  That would have been, to the best of my
6   recollection, about '84, '85.
7   Q.  And how long did you hold that
8   position?
9   A.  I believe possibly about five years,
10  four or five years later.
11  Q.  And what was your next position with
12  PurePac?
13  A.  It was basically a change in title to
14  bids and contracts manager.
15  Q.  And how long did you have the title of
16  bids and contracts manager?
17  A.  Until -- I believe it was sometime
18  2001, 2002.
19  Q.  And what happened then?
20  A.  A change in title.
21  Q.  Okay.  And what was your new title
22  then?

Page 15

1   A.  Contract manager, key accounts.
2   Q.  Key, k-e-y?
3   A.  K-e-y.
4   Q.  And have you had any changes in title
5   since then?
6   A.  No, sir.
7   Q.  Do you think it's fair, it's accurate
8   to say that essentially you've had the same job
9   with different titles since '84 or '85?
10  A.  I believe so, yes.
11  Q.  I'd ask you to focus on your duties and
12  responsibilities in that position, and just
13  describe for me in general terms what it is you
14  do, what you are responsible for.
15  A.  I am responsible for submitting bid
16  offers based on requests for proposals that the
17  company receives from potential customers.
18  Q.  And if the bid is accepted and the
19  customer agrees to do business with PurePac, do
20  you have any duties or responsibilities with
21  regard to the contract?
22  A.  Yes, sir.  That would be to administer

Page 16

1   the contract and to implement the contract.
2   Q.  And are there any other duties or
3   responsibilities that you've had in these various
4   bid and contract positions that you've held?
5   A.  Not to my knowledge.
6   Q.  Over the years that you've held this
7   position, have you had people that you supervised
8   that worked for you?
9   A.  For which period are we talking about,
10  sir?
11  Q.  I guess let's take the whole period.
12  Sometime during that period have you had some
13  staff people that worked for you and helped you
14  do these jobs?
15  A.  I can only recall of one.  Actually,
16  I'm sorry, it would be two, two instances.
17  Q.  Why don't you tell me who those people
18  were.
19  A.  I believe her name was Fran
20  Defedericko.  D-e-f-e-d-e-r-i-c-k-o, I believe.
21  Q.  And do you recall that other person?
22  A.  Teisha, T-e-i-s-h-a, Davis, D-a-v-i-s.

Page 17

1   Q.  And do you remember when they worked
2   for you?
3   A.  Fran, I vaguely remember, sir.
4   Q.  So it's way back?
5   A.  Yes.
6   Q.  And what about Teisha?
7   A.  Teisha would have been from -- I
8   believe it was somewhere around 2000, 2001.
9   Q.  I think you said you thought it was
10  probably around '84 or '85 that you became bid
11  and contract administrator?
12  A.  Yes, sir.  I believe so.
13  Q.  If you can, can you take me through who
14  your bosses have been and who you reported to in
15  the positions that you've had involving bids and
16  contracts?
17  A.  To the best of my recollection -- and I
18  am not sure as to the timeline -- but it was Bill
19  Barish, B-a-r-i-s-h, Pat O'Malley, Jane Cebula,
20  C-e-b-u-l-a, Pat O'Malley again, Bob Jones, Pat
21  O'Malley again, and currently, Joseph Corsetti.
22  Q.  Joseph who?

# EXHIBIT C

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-11865-PBS

-----------------------------X

| | | |
|---|---|---|
| THE COMMONWEALTH OF | ) | |
| MASSACHUSETTS, | ) | VIDEOTAPED |
| Plaintiff, | ) | DEPOSITION UPON |
| v. | ) | ORAL EXAMINATION |
| MYLAN LABORATORIES INC., et | ) | OF |
| al., | ) | BRADFORD JOHN |
| Defendants. | ) | CUNNINGHAM |

-----------------------------X

T R A N S C R I P T of the stenographic notes of JANE LORFING COLWELL, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the offices of Veritext/New Jersey, 25B Vreeland Road, Suite 301, Florham Park, New Jersey, on Tuesday, October 23, 2007, commencing at 8:42 a.m.

Cunningham, Bradford John　　　　　　　　　　　　October 23, 2007
Florham Park, NJ

7 (Pages 22 to 25)

### Page 22

1  Schiaparelli?
2     A. Not very long. I would say no more
3  than two years.
4     Q. Then I think you said you went to
5  Mylan.
6     A. Yes.
7     Q. And what was your position at Mylan?
8     A. I was a director of national accounts
9  in the west.
10    Q. How long were you with them?
11    A. Mylan, I started in '92, and went
12 through the summer of 2000.
13    Q. Then I think you said you went to
14 Purepac.
15    A. Yes.
16    Q. How did that come about?
17    A. I was contacted by Purepac as a
18 possible candidate for employment.
19    Q. For what position?
20    A. Vice president of sales.
21    Q. Who contacted you?
22    A. Robert Sanzen, S-A-N-Z-E-N.

### Page 23

1     Q. How did you know Bob?
2     A. I knew Bob through working at Mylan.
3     Q. You and he had worked together at Mylan
4  at the same time?
5     A. Yes.
6     Q. And when was it that you came to work
7  at Purepac?
8     A. That was in the summer -- late summer
9  of 2000.
10    Q. What was your position when you start
11 with Purepac?
12    A. Vice president of sales.
13    Q. What were your duties and
14 responsibilities?
15    A. Mostly sales. My background, so that's
16 what I did.
17    Q. And you supervised Purepac's sales
18 force?
19    A. Yes.
20    Q. Any other duties and responsibilities?
21    A. When I started?
22    Q. Yes.

### Page 24

1     A. No.
2     Q. Okay. How long do you stay with
3  Purepac?
4     A. I stayed with Purepac until the fall of
5  2002.
6     Q. And I think you said you went to Clay-
7  Park Labs; is that right?
8     A. Yes.
9     Q. What's the business of Clay-Park Labs,
10 or what was it at the time you joined?
11    A. I joined their RX division.
12    Q. What's that?
13    A. That was a prescription product
14 portfolio.
15    Q. Prescription product portfolio. Can
16 you explain to me what that is?
17    A. That is a number of products that
18 require a prescription from a physician to be
19 dispensed.
20    Q. And are you selling them?
21    A. Yes.
22    Q. To whom were you selling them?

### Page 25

1     A. To national accounts.
2     Q. What kind of products? Is it
3  pharmaceuticals or what?
4     A. They were predominantly dermatology
5  products.
6     Q. So things for the skin.
7     A. Yes.
8     Q. But they required a prescription.
9     A. Yes.
10    Q. And where was Clay-Park Limited
11 located?
12    A. Bronx, New York.
13    Q. How long were you with them?
14    A. I was with them until spring of 2005.
15    Q. What do you do then?
16    A. Pardon me?
17    Q. What was -- your next employer, I
18 guess, is Allan Pharmaceuticals?
19    A. Yes.
20    Q. When do you start with Allan?
21    A. I started with Allan in March of 2007.
22    Q. Were you employed between the spring of

# EXHIBIT D

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-11865-PBS

| | | |
|---|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | ) ) | VIDEOTAPED 30(b)(6) |
| Plaintiff, | ) | DEPOSITION UPON |
| v. | ) | ORAL EXAMINATION |
| MYLAN LABORATORIES INC., et al., | ) ) | OF PATRICIA EILEEN |
| Defendants. | ) | O'MALLEY |
| _____ | ) | |

T R A N S C R I P T of the stenographic notes of JANE LORFING COLWELL, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the offices of Veritext LLC, 25B Vreeland Road, Suite 301, Florham Park, New Jersey, on Wednesday, September 19, 2007, commencing at 9:28 a.m.

**34**

 1  **Products Division, Inc.**
 2  **May 15, 2006, Purepac Pharmaceutical Co.**
 3  **was converted to a Delaware limited liability company**
 4  **and its name changed to Actavis Elizabeth LLC.**
 5  **Actavis Elizabeth LLC continues to do business under**
 6  **the 00228 labeler code.**
 7  Q   Okay.  When you are referring to labeler
 8  codes, that's numbers assigned by the Food and Drug
 9  Administration in connection with approving
10  pharmaceuticals?
11  A   I believe that's correct.
12  Q   If I can, I'd like to just go back and try
13  and make sure I understand the corporate history you
14  have provided.
15       When you joined the company in 1979, it was
16  operating under the name Purepac; is that right?
17  A   I believe that is correct.
18  Q   And it was owned, I think you said, by a
19  company with the name Kalipharma, Inc.; is that
20  right?
21  A   I believe that's what I said.
22  Q   And Kalipharma, Inc., what country or

**35**

 1  what -- where was that located?  Was that a German
 2  company?  Either it or its parent?
 3  A   I believe either it or its parent's company
 4  was German.
 5  Q   I think later on you said -- I think it was
 6  in 1982 -- that Purepac was acquired by a company
 7  that was part of the Faulding group of companies; is
 8  that right?
 9  A   **I believe I said September 2, 1982,**
10  **Moleculon Biotech, Inc., an affiliate of FH Faulding**
11  **& Co. Limited.**
12  Q   And Faulding was an Australian company?
13  A   I believe that is correct.
14  Q   And in essence, rather than getting into
15  the details of the corporate reorganization, Faulding
16  takes over, and Kalipharma, the German company, is
17  out of the picture after that; is that right?
18  A   I believe that is correct.  I am not
19  certain of the exact date.
20  Q   Okay.  And then at some point Alpharma
21  becomes the parent company; is that right?
22  A   I believe that is correct, also.

**36**

 1  Q   Where is Alpharma from?  What country are
 2  they?
 3  A   Norway.
 4  Q   And they, in essence, replaced Faulding as
 5  the parent company?
 6  A   That's correct.
 7  Q   And they operated under -- using the
 8  Purepac name, I think; is that right?  The Alpharma
 9  people?
10  A   I believe they used the Purepac name.
11  Q   And then I think you said that it was
12  sometime in 2005 that the Actavis group takes over as
13  the parent and Alpharma is out of the picture; is
14  that right?
15  A   **I believe that is correct, December of**
16  **2005.**
17  Q   Where is Actavis from?
18  A   **Actavis headquarters, I believe, in**
19  **Iceland.**
20  Q   Throughout the whole time that you were
21  there, from '79 up through 2006, did the business
22  always operate using the Purepac name?

**37**

 1  A   **While I was there, I believe the Purepac**
 2  **name was used, yes.**
 3  Q   Okay.  All right.
 4       During the questions I ask you today,
 5  sometimes I will make reference to the relevant time
 6  period for the purposes of this case.  And that's
 7  essentially the years 1997 through 2003.  During that
 8  time period where was Purepac headquartered?
 9  A   **I am not sure where the headquarters were**
10  **specifically during that time period, from 1997**
11  **through 2003.**
12  Q   Do you know at any point during that time
13  period where it was headquartered?
14  A   **I believe I know sometime during that**
15  **period where it was headquartered.  I am not sure of**
16  **the dates, though.**
17  Q   Where are you aware of it having
18  headquarters?
19  A   **I believe there was a headquarters in**
20  **Elizabeth, New Jersey.**
21  Q   Is that where you worked?
22  A   **I worked in Elizabeth, New Jersey, from**

**70**

1  Q  When we are talking about wholesalers, I
2  guess -- you tell me if this is correct, that
3  currently in the U.S. pharmaceutical market there's
4  basically three big national wholesalers?
5  A  We are talking about today, 2007?
6  Q  Yes.
7  A  I believe that would be correct.
8  Q  All right. These distributors that you
9  mentioned, they'd be smaller operations. They might
10 not be national or they might specialize in a
11 particular type of customer, but they do essentially
12 the same thing as wholesalers do?
13 A  I'm sorry, you had said that
14 distributors -- you said a couple of things there.
15 They are not national and --
16 Q  Let me back up. I am trying to understand
17 who these distributors are. I think you said that
18 they are customers that buy directly from a
19 manufacturer like Purepac; is that right?
20 A  Correct.
21 Q  And then they in turn resell the product to
22 customers that they have.

**71**

1  A  That is correct; that's my understanding.
2  Q  That's essentially what the wholesalers do
3  as well; right?
4  A  That is my understanding.
5  Q  Is it fair -- is it accurate the way the
6  terms are used in the industry that people that are
7  called distributors are usually smaller operations
8  than the wholesalers?
9  A  That is my understanding, that distributors
10 would be smaller.
11 Q  And they might have a more limited focus, a
12 particular type of customer or something.
13 A  I don't know their focus for customers.
14 Q  Let's focus for a moment on the indirect
15 customers. What kinds of businesses would be
16 indirect customers of Purepac during the relevant
17 time period?
18 A  Would you like me to name a customer or
19 just the type?
20 Q  Sure, either -- whichever is easier for
21 you.
22 A  Indirect customer for Purepac could be the

**72**

1  VA.
2  Q  Okay. Anyone else?
3  A  An indirect customer, I believe, for
4  Purepac could be a pharmacy buying group.
5  Q  Anyone else?
6  A  An indirect customer for Purepac could be a
7  GPO, which is a group purchasing organization.
8  Q  Anyone else?
9  A  No one that comes to the top of my head.
10 Q  How about nonwarehousing chains?
11 A  I believe that nonwarehousing chains could
12 be added to that list of Purepac indirect customers
13 during the relevant time period.
14 Q  And I think you mentioned pharmacy buying
15 groups and GPOs. Can you explain to me the
16 difference between those two terms?
17 A  I believe that a pharmacy buying group
18 would be a group of pharmacies that formed a buying
19 association to purchase product, and the GPO would be
20 group purchasing organization, and that would be a
21 group of hospitals who formed a group to purchase
22 products.

**73**

1  Q  So GPOs are usually hospitals?
2  A  That is my belief.
3  Q  And essentially they pool their purchasing
4  power, they negotiate with the manufacturer, but they
5  don't actually take delivery of the product. The
6  product goes through the warehouse -- the
7  wholesalers?
8  A  That's correct.
9  Q  Okay. During the relevant time period, '97
10 to 2003, how large was the Purepac field sales force?
11 How many salesmen would you have out calling on
12 customers?
13 A  I believe that we discussed this, and
14 during the relevant time period there was a range of
15 sales reps. It could have been as few as three up to
16 ten. I do recall reviewing some org charts.
17 Q  Does anybody stand out in your mind as
18 having been a longtime field salesperson for Purepac?
19     MR. FLEDER: Objection. Unduly vague.
20 That question is unduly vague. I don't know what you
21 mean by stand out.
22 Q  Mr. Fleder can make objections, and they

90

1 it was a requirement by customers to submit AWPs at
2 the time of launch that was necessary to have a
3 product rated as a generic in order to have it
4 dispensed and sold ultimately as a generic product.
5   Q   Why did the customers want or need to know
6 what the AWP was?
7   A   I can't speak for the customer. I don't
8 know why they needed that.
9   Q   Did you become aware that many third-party
10 payors reimbursed based on AWP?
11   A   I believe I was aware at some point that
12 third-party payors reimbursed on AWP.
13   Q   Among the third-party payors would be
14 various health insurance firms?
15   A   I believe they would be some of the
16 third-party payors.
17   Q   Sometimes union health and welfare funds
18 and people like that would be third-party payors.
19   A   I am not aware specifically of unions.
20   Q   Are you aware that the federal government
21 has a program called the Medicaid program that
22 reimburses for pharmaceuticals?

91

1   A   I am aware of the federal government having
2 a Medicaid reimbursement program.
3   Q   Is it fair -- is it accurate to say that
4 Purepac as a company, that it was aware that many
5 third-party payors, including the Medicaid program,
6 would reimburse based on AWP and WAC prices?
7   A   To clarify, this is part of the 30(b)(6)?
8   Q   Yes.
9      MR. FLEDER:  You are including both AWP and
10 WAC, Mr. Mullin?
11      MR. MULLIN:  Yes.
12   A   I believe that there was an understanding
13 that AWP was used for reimbursement. I do not
14 believe that there was an understanding that WAC was
15 used for reimbursement.
16   Q   Who at Purepac during the time that you
17 were there do you believe was the most knowledgeable
18 person with regard to reimbursement for
19 pharmaceuticals?
20   A   I don't believe I am aware of anyone that
21 was knowledgeable about reimbursement for
22 pharmaceuticals.

92

1   Q   If some questions came up in the course of
2 a day, a customer call, a salesman's call, something
3 like that, and there was some reimbursement question
4 as part of it, and you didn't know the information,
5 is there someone in the company you'd say, well, if
6 anybody knows this, it's probably so-and-so, and
7 you'd go to that person?
8   A   And this is the relevant time period or
9 over the course of time I have been there?
10   Q   Anytime you are there.
11   A   I don't believe there was anyone
12 specifically that I would ask a question to that I
13 can recall.
14   Q   Let's go back to AWP. I think you said
15 typically, usually at launch Purepac would set its
16 AWP at 10.1 percent below the branded AWP; right?
17   A   That is what I said.
18   Q   Were there ever occasions when Purepac
19 would change its AWP after launch?
20   A   I believe in reviewing some documents
21 yesterday that Purepac had changed -- and that was
22 specifically the AWP?

93

1   Q   Yes.
2   A   Yes, I believe I saw some documents.
3   Q   And what would prompt Purepac to change its
4 AWP on a product?
5   A   I do not know the answer.
6   Q   As Purepac's representative, you know that
7 it happened, but you don't know why it happened?
8   A   That is correct.
9   Q   Okay. If the president of the company
10 asked you to find out why it happened, what would you
11 do?
12   A   During the relevant time period?
13   Q   Yes.
14   A   During the relevant time period if the
15 president of the company had asked me personally to
16 find out, I would have checked to see what possible
17 reason there could have been, what I could have --
18 documents could have been available at the time.
19   Q   Who would you check -- were there people
20 that you would check with?
21   A   I believe that would depend on when the
22 change occurred and who was responsible for the