# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| *The City of New York, et al.* | ) ) |
| *v.* | ) |
| *Abbott Laboratories, et al.* | ) ) ) |

MDL NO. 1456
Civil Action No. 01-12257-PBS
 Subcategory Case No: 03-10643-PBS

Judge Patti B. Saris

## PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WYETH

Pursuant to Rule 56.1 of the Local Rules of this Court, plaintiffs hereby submit this Reply Local Rule 56.1 Statement of Undisputed Material Facts as to Defendant Wyeth.

## I.   WYETH SPECIFIC FACTS

1.     The Wyeth drug and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Wyeth's Published AWPs and WACs for this Drug and NDCs, any operative Federal Upper Limit ("FUL") and Wyeth's AMPs.   The exhibit notes which NDCs are associated with package sizes that set the FUL.

**Wyeth's Response:   Wyeth does not dispute that Exhibit A to Plaintiffs' Statement purports to list the Wyeth drug and associated National Drug Codes ("NDCs") that Plaintiffs claim to have examined in connection with Plaintiffs' Motion.  Wyeth also does not dispute that Exhibit A purports to set forth AWPs, WACs, any operative FUL, and Wyeth's AMPs for the Wyeth drug and NDCs that Plaintiffs claim to have examined.  Wyeth disputes that it reported AWPs or WACs for Lorazepam during the time period in question.  *See* responses to paragraphs 2, 6 and 9, *infra*. Wyeth does not dispute that Exhibit A purports to note which NDCs are associated with the package sizes that set the FUL.   Wyeth disputes the data set forth in Exhibit A to the extent it is not properly supported by evidence in the record. Plaintiffs have cited no evidentiary basis for the data set forth in Exhibit A, as required by Local Rule 56.1.**

**Plaintiffs' Reply  to Statement # 1**:   Wyeth's dispute as to the data set forth in Exhibit A not being supported by evidence in the record is baseless.  Plaintiffs properly cited Wyeth as the source of the Wyeth AMP data.  *See* Exhibit A, p. 4 to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts as to Wyeth ("Wyeth 56.1 Statement") [Dkt. No. 6074, Sub-dkt. No. 75].  Plaintiffs properly cited the First Databank NDDF data file (Alabama Production, FDB-AWP 030785-030795) as the source of all other data.  *See Id*.  This is the same source cited by Wyeth's expert Dr. Addanki.  *See* Affidavit of Dr. Sumanth Addanki dated May 15, 2009 [Dkt. No. 6056] at Exhibit 2 (identifying "First DataBank (Alabama Production) Data and NDDF (National Drug Data File)™ Documentation Manual (Rev. April 2000)" as a Data source).

Furthermore, Wyeth produced AMP data to plaintiffs on May 16, 2008.  *See* email from Wyeth's counsel to plaintiffs' counsel dated May 16, 2008, attached hereto as Reply Exhibit A.  To the extent Wyeth disputes that it reported AWPs or WACs for Lorazepam during the time period in question, plaintiffs incorporate their replies to Statements 2, 6 and 9, *infra*.

*See also* Reply Affidavit of Joanne M. Cicala, sworn to June 30, 2009 and submitted in further support of plaintiffs' motion for partial summary judgment at ¶2, which is incorporated herein.

2.      **The specific Wyeth drug at issue is the Lorazepam 1MG Tablet.**

**Wyeth's Response:  Wyeth does not dispute that the Lorazepam 1 mg tablet ("Lorazepam") is one of the nine drugs, identified by the Generic Code Number or GCN, assigned by First Databank to a "therapeutically equivalent" group of drugs, that is the subject of the targeted FUL discovery set forth in CMO 33.**

**Plaintiffs' Reply to Statement # 2**:  No further reply is required.

3.     Wyeth manufactures prescription drugs and transacts business in the State and City of New York.  *See* Defendant Wyeth's Answer and Affirmative Defenses to Revised First Amended Consolidated Complaint, ("Wyeth Answer") [Docket #5640] at ¶44.

**Wyeth's Response**:  Wyeth admits that it manufactures prescription drugs and transacts business in the State and City of New York.

**Plaintiffs' Reply to Statement # 3**:  No further reply is required.

4.     Wyeth executed the federal Medicaid rebate agreement.  *See* Wyeth Answer at ¶ 116-123, ¶ 132.

**Wyeth's Response**:  Wyeth admits that it executed a Medicaid Rebate Agreement with the Secretary of Health and Human Services.

**Plaintiffs' Reply to Statement # 4**:  The parties agree that Wyeth executed a Medicaid Rebate Agreement with the Secretary of Health and Human Services.  No further reply is required.

5.     Wyeth launched lorazepam in 1998 and ceased selling it in 2003.  *See* Wyeth 30(b)(6) (Truex, Richard) dated 6/19/08 ("Wyeth 30(b)(6)(Truex) 6/19/08 Dep.) (Exhibit B) at 109:2-4; *see also* Wyeth 30(b)(6) (Bartone, Dominick) 5/22/08 ("Wyeth 30(b)(6)(Bartone) 5/22/08 Dep.) (Exhibit C) at 35:6-8.

**Wyeth's Response**:  Wyeth admits that it launched Lorazepam tablets in 1998. Wyeth disputes that the portions of Mr. Bartone's deposition testimony cited in paragraph 5 of Plaintiffs' Statement pertain to Lorazepam.  Wyeth nonetheless admits that it ceased booking direct sales for Lorazepam in the United States in 2003.  *See* excerpts of the Deposition of Dominick Bartone ("Bartone Dep.") at 34:18-35:1; 35:9-11; 36:5-11, attached collectively as Exhibit A to the Declaration of Kelly J. Davidson.

**Plaintiffs' Reply to Statement # 5**: The parties agree Wyeth launched Lorazepam tablets in 1998 and ceased booking direct sales for Lorazepam in the United States in 2003.  No further reply is required.

**Wyeth Set and Reported Its AWPs and WACs**

3

6.     At all times, from 1997 to 2005, Wyeth reported or caused to be reported the AWPs (in the form of SWPs) for its drugs to the publishing compendia. *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 63:7-64:22; 74:22-75:8; 113:5-114:11. Wyeth knew the publishing compendia would publish the SWPs as AWPs, without altering the SWPs reported. *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 63:7-64:22; 81:17-82:2.

> **Wyeth's Response**: The alleged undisputed facts in paragraph 6 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs. *See* Defs. 56.1 Stmt. at ¶ 34. To the extent these allegations are deemed material, Wyeth disputes that at all times from 1997 to 2005, it reported or caused to be reported the AWPs (in the form of SWPs) for its drugs to the publishing compendia. Plaintiffs do not provide an evidentiary basis for this assertion, because the testimony cited does not support this asserted fact. To the contrary, Dr. Truex testified that he was not aware of a time between 1997 and 2005 where Wyeth reported an AWP to the compendia for Lorazepam, but that Wyeth instead provided a "suggested AWP" for Lorazepam during the time period in question. *See* Deposition excerpts of Richard Truex, Ph.D. ("Truex Dep.") at 63:13-16, attached collectively as Exhibit B to the Declaration of Kelly J. Davidson. Wyeth disputes that the acronym "SWP" was used by Dr. Truex in his testimony or defined by Wyeth to mean "suggested AWP." Wyeth disputes that it knew the publishing compendia would publish suggested AWPs as AWPs, without altering the suggested AWPs reported. Although Dr. Truex testified that it appears that the compendia published the suggested AWP as the AWP for Lorazepam (*id.* at 81:20-82:5), his testimony as a Wyeth corporate designee was that once the suggested AWP went to the compendia, "it was out of our hands" and that Wyeth did not "know what they did once it was in their shop." Id. at 63:21-64:9. Dr. Truex speculated (over objection) about what the pricing compendia actually did with Wyeth's suggested AWPs. *Id.* at 64:4-22; see also 94:1-95:3.

**Plaintiffs' Reply to Statement # 6:** Wyeth disputes the Statement to the extent it is immaterial and irrelevant because "FULs were never based on AWPs." Plaintiffs dispute that AWPs are immaterial and irrelevant to their motion. While CMS may never have set a FUL on AWPs, CMS considered AWPs in setting the FUL. *See* 42 CFR § 447.332(b); *see* Gaston, Sue (1/24/2008) 144:21-146:16, attached as Exhibit B to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts Related to Federal Upper Limits ("FULs") and Applicable to All Thirteen FUL Defendants (the "FUL Thirteen")[Dkt. No. 6060, Sub-dkt. No. 62]); *see* Gaston, Sue (3/19/08) 458:1-459:7 (Corrected Exh. B to Affidavit of Joanne M. Cicala in Opposition to

Defendants' Joint Motion for Summary Judgment on Plaintiffs' "FUL Fraud" Claims [Dkt. No.

6144, Sub-Dkt. No. 97]).

The parties agree that Wyeth provided "suggested AWP" (which plaintiffs refer to as

"SWPs") for Lorazepam to the compendia.

Wyeth disputes that it knew publishing compendia would publish Wyeth's suggested

AWPs as AWPs.  The cited testimony of Wyeth's 30(b)(6) designee, Dr. Truex, speaks for itself

as follows:

> "Q:  For Lorazepam, Wyeth reported suggested AWPs?
> A:  I believe so.
> Q:  Did Wyeth also report direct prices for Lorazepam?
> A:  I believe so.
> Q:  Was there ever a time between '97 and '05 for Lorazepam that Wyeth reported AWP's to the compendia instead of suggested AWPs?
> A:  I do not believe so.
> Q:  And the suggested AWP's and direct price for Lorazepam would have been supplied to the compendia by the price catalog unit, correct?
> A:  That's correct.
> Q:  And was Wyeth aware what the compendia would do with the suggested average wholesale prices that Wyeth supplied to them?
> A:  Once it went to the compendium, it was out of our hands.
> Q:  Nevertheless, do you know, do you know what, how the publishing compendia treated the suggested average wholesale prices it received from Wyeth for Lorazepam?
> A:  I can speculate, but I don't know what they did once it was in their shop.
> Q:  So, for example, you're unaware that they multiplied the suggested AWP by a factor of one to arrive at an average wholesale price that was published by Wyeth product?
> Ms. Davidson:  Objection.
> The Witness:  The short answer is no.  As a matter of fact, I would have a different interpretation, I guess.
> Q:  What interpretation would you have?
> Ms. Davidson:  Objection.
> The Witness:  My speculation would have been they didn't multiply it by anything."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [Dkt. No. 6074, Sub-dkt.

No. 75]) at 63:7-64:22.

> "Q:  Do you know how, what method the compendia used with regard to the suggested AWP's that Wyeth reported for Lorazepam?
> A:  For Lorazepam, I believe they used the suggested AWP that Wyeth provided.

Q:  And they published the suggested AWP as the AWP for Lorazepam?
A:  I believe that's what they did.
Q:  And would that be the case from '97 to '05?
A:  I would believe so."

*Id*. at 81:17-82:2.

Wyeth cites the following testimony in support of its position regarding Statement #6:

"Q:Was it – was Wyeth's practice of providing suggested AWP's for Lorazepam unique to Lorazepam?
A:  It was not.
Q:  Wyeth provided suggested AWP's for its entire generic product line?
A:  I believe so.
Q:  And I think you testified that those suggested AWP's would appear in the compendia as AWP's.
Ms. Davidson:  Objection.
The Witness:  It's speculation on my part.  I would speculate, yes, but I'm not sure that's true.
Q:  I think you testified a short while ago that it was your understanding that the AWP's that appeared in the compendia were the same as the suggested AWP's.
A:  That's what I would expect to happen.  Again, once it goes to the compendium, it's out of our hands a little bit."

Wyeth  30(b)(6)(Truex)  6/19/08  (Exhibit  B  to  Declaration  of  Kelly  J.  Davidson  ("Davidson

Decl.")  [Dkt. No. 6148-2]) at 94:1-95:3.

"Q:  Earlier, you testified that it was important for Wyeth to have an AWP appear in the compendia for reimbursements purposes, correct?
A:  That's correct.
Q:  Is it your testimony that the amount of that AWP was irrelevant to Wyeth?
Ms. Davidson:  Objection.
The Witness:  It was not irrelevant to us.
Q:  And, so how – what steps did Wyeth take to insure that the AWP that was published reflected that which Wyeth wanted to be published?
Ms. Davidson:  Objection.
A:   If we became aware it was incorrect, we would try to suggest AWP to the compendium."

*Id*. at 95:4-20.

**7.       Wyeth reported or caused to be reported the same AWPs to all three of the national compendia.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 74:22-75:8.**

**Wyeth's Response:**   The alleged undisputed facts in paragraph 7 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.   *See* Defs. 56.1 Stmt. at ¶ 34.  To the extent these allegations are deemed material, the deposition testimony cited does not support the allegation in paragraph 7 of Plaintiffs' Statement and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.  Wyeth disputes that it reported AWPs for Lorazepam during the time period in question.   *See* response to paragraph 6, *supra*.  Although Dr. Truex testified that Wyeth would not have reported different suggested AWPs to the compendia, and further acknowledged that First DataBank, Red Book and Medispan are compendia, he did not testify that Wyeth actually supplied a suggested AWP to all three compendia for Lorazepam at all times during the time period in question.  *See* Truex Dep. at 74:11-75:8.

**Plaintiffs' Reply to Statement # 7:**   Plaintiffs incorporate their Reply to Statement # 6 herein.  Responding further, Wyeth cannot dispute that it did not supply the same AWPs (in the form of suggested AWPs) to all three of the national compendia.  Even the testimony cited by defendant establishes the point as follows:

> Q:  When Wyeth reported a suggested AWP to Lorazepam to the compendia, did it report the same suggested AWP to all of the compendia?
> A:  I believe, I believe that would be the policy.
> Q:  Was there a Wyeth policy regarding what to report to the compendia?
> A:  There was no policy written down, per se.
> Q:   But you believe it would have been Wyeth's practice to report the same suggested AWP to all of the publishing compendia?
> A:  I would be surprised if it was not.
> Q:  And when we talk of the compendia here, can we agree we are talking about, at least, First DataBank, Red Book and Medispan?
>  A:  Yes.
> Q:  And would your answer regarding Wyeth reporting the same suggested AWP to all of the compendia be the same throughout the time period, 1997 to 2005?
> A:  Yes."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Davidson Decl. [Dkt. No. 6148-2]) at 74:11-75:8.

> 8.    Wyeth knew and controlled the AWPs for its drugs that were published by the national drug pricing compendia. Wyeth's price catalog unit verified that the correct AWPs were published by the pricing services.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 117:2-22.  If Wyeth became aware that the published AWPs were incorrect, Wyeth would request the compendia to publish the correct AWPs.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 95:14-20.

**Wyeth's Response:**   The alleged undisputed facts in paragraph 8 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.   *See* Defs. 56.1 Stmt. at ¶ 34.  To the extent these allegations are deemed material, Wyeth disputes the first sentence because it contains argument and conclusory statements that are not proper to include in a Local Rule 56.1 statement. Wyeth also disputes the assertions in the first sentence because they are not supported by any reference to the evidentiary record as required by Local Rule 56.1.  Wyeth disputes that it reported AWPs for Lorazepam during the time period in question.   *See* response to paragraph 6, *supra*.  Wyeth disputes that its price catalog unit would verify that correct AWPs were published by the pricing services. Instead, Wyeth's price catalog unit would verify, only if asked to do so by the compendia, that the compendia had an accurate record of the suggested AWPs Wyeth may have sent to the compendia.  Truex Dep. at 117:15-21.  The statement in the last sentence of paragraph 8 was elicited over objection (id. at 95:14-20) and was followed by Dr. Truex' testimony that he did not recall any occasion where Wyeth requested the compendia to publish the "correct AWPs" for Lorazepam.  *Id.* at 95:22-96:3.

**Plaintiffs' Reply to Statement # 8:**  Plaintiffs incorporate their Reply to Statement # 6 herein.

Further responding,    Wyeth cannot reasonably dispute that it verified the Wyeth prices appearing in the compendia.  Wyeth's Corporate Representative's testimony speaks for itself as follows:

> "Q:  Just a couple of more questions.  Once again, at the end of the first paragraph, Ms. Patel wrote, 'For ESI Oral Solids, only 'suggested AWP' is provided to the pricing services.'
> A:  Absolutely.
> Q:  Okay.  And in the third paragraph, Ms. Patel writes, 'Also, hard copies are used as a backup to verify correct information was published by the pricing services.' Did I read that correctly?
> A:  I alluded to that before when I thought everything was communicated in some form of hard copy.  I can't imagine us working off verbals.
> Q:  This suggests also that Ms. Patel's unit is, among other tasks, verifying the correct information is published by the pricing services.
> A:  Right.  As the documents were shown to me when they would send those back to her asking her to verify the prices that she sent them was correct."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [Dkt. No. 6074, Sub-dkt. No. 75])) at 117:2-21.

Wyeth cannot reasonably dispute that Wyeth requested the compendia to publish the "correct AWPs" for Lorazepam.  The testimony speaks for itself as follows:

> "Q:  And, so how – what steps did Wyeth take to insure that the AWP that was published reflected that which Wyeth wanted to be published.
> Ms. Davidson:  Objection.
> The Witness:  If we became aware it was incorrect, we would try to suggest AWP do (sic) the compendium."

*Id*. at 95:14-20.  No further reply is required.

Wyeth states that Dr. Truex testified that he did not recall an occasion when Wyeth requested that the compendia publish the correct AWPs for Lorazepam.  Indeed, Dr. Truex explained that Wyeth did not "pay much attention to the generic side of the business…"  His testimony follows:

> "Q:  And do you recall occasions where Wyeth determined that the AWP's that were published for Lorazepam were incorrect?
> A:  For Lorazepam, I don't remember that.
> Q:  Yet, do you recall occasions where AWP's for other generic products were incorrect when they appeared in the compendia?
> A:  I recall AWP's on the branded side possibly being not consistent with what they did with our other product.
> Q:  Okay.  But you have no such recollection with regard to the AWP's reported for Lorazepam?
> A:  We didn't pay much attention to the generic side of the business, quite frankly.
> Q:  Do you ever recall any discussions at Wyeth as to what, what Medicaid was spending on Lorazepam?
> A:  No.  Medicaid was such a small percent of the business, less than ten percent, generally speaking, that it was not a concern.
> Q:  So then, for example, you're not aware that the City of New York and the counties I represent spent almost three and one-half million on Lorazepam between '97 and '05?
> A:  We wouldn't focus on that, really.  Commercial business is such a large portion of the business, that's where all the focus would be."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Davidson Decl. [Dkt. No. 6148-2])) at 95:22-97:4.

**9.     At all times, from 1997 to 2005, Wyeth reported or caused to be reported WACs or DPs for its drugs to the publishing compendia.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 45:13-20.**

**Wyeth's Response**:   The deposition testimony cited does not support the allegation in paragraph 9 of Plaintiffs' Statement and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.   In fact, the record evidence is to the contrary:   Wyeth generally did not report WACs or direct prices to the pricing compendia for Lorazepam.   Truex Dep. at 113:5-114:12.   Indeed, after having his recollection refreshed with documents shown to him by Plaintiffs' counsel (*id.*), Dr. Truex testified that his earlier recollection (reflected in the section of the transcript selectively cited in Plaintiffs' Statement) was "called into question" and confirmed that Wyeth only reported a "suggested AWP" for Lorazepam.   Id. at 114:2-11.   *See also id*. at 117:1-6 (confirming that only a "suggested AWP" was provided); id. at 108:10-15 and Exhibit 12 (confirming that a communication pertaining to Lorazepam showed that Wyeth did not report WACs for Lorazepam).

**Plaintiffs' Reply to Statement # 9**:   Wyeth's 30(b)(6) designee testified that at certain times Wyeth reported Direct Price to the publishing compendia (see Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]) at 45:13-20) and that Direct Price was the same as WAC. See Wyeth's response to Statement #10 which is incorporated herein. No further reply is required.

10.      Wyeth referred to WACs and DPs interchangeably.  *See* **Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 77:21-78:7; 86:19-22.**

**Wyeth's Response**:   Wyeth admits that it generally defines WAC to be the same as a direct, list, book or catalog price.   Truex Dep. at 77:21-78; 78:16-79:1.

**Plaintiffs' Reply to Statement # 10**:   The parties agree that Wyeth generally defines WAC to  be the same as direct price.   To the extent Wyeth disputes that WAC and direct price were used interchangeably, the testimony speaks for itself.   The testimony reads as follows:

"Q:  And what does WAC mean?
A:  In general, it's the same as a direct price.
Q:  Wyeth did not report WAC's to the publishing compendia for Lorazepam or Ativan, is that correct?
A:  Again, WAC and direct price are used interchangeably, so if you report one, you are basically reporting the other.

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]) at 77:21-78:7.

Dr. Truex testified that Wyeth verified the DPs that it reported to the compendia.  His testimony follows:

> Q:  Okay.  And do you know what would be done in the ordinary course at Wyeth when it received a product listing verification such as Exhibit 4?
> A:  I would assume they verify it.  In other words, they are sending back the prices they are going to put down and we just acknowledge that, these checkmarks acknowledge that this is the direct price, so she is acknowledging, in my eyes, that this direct price is the price that she has given them."

*See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]) at 68:16-69:3.

Furthermore, Dr. Truex testified regarding a FDB Turnaround document that showed the

WAC and DP were the same:

> Q:  Exhibit 7 marked for identification.  We have placed before you a document that was produced to us by Wyeth in this litigation and you will see it's a National Drug Data File Product Update Report prepared by First DataBank and it's dated 1997.  Do you see that on the first page?
> A.  I do ….
> Q:  You see in Exhibit 7 that there are, the document reflects a lengthy list of products with NDC's and assorted prices for each?
> A:  I do.
> Q:  There is a column entitled WHLNET, which I take to mean wholesale net, would you agree?
> A:  That would be my guesstimate of that term, yes.
> Q:  And this next column says DIR, which I would take to mean direct price, would you agree?
> A:  I would also.
> Q:  And then the next column reads AWP, do you see that?
> A:  I do…
> Q:  If you go three lines down, Dr. Truex, you see there are, there are two Lorazepam products that appear there.  I acknowledge that they are syringes and not tablets, but for the sake of illustration, I would like to focus on them.  Do you see the entries for the Lorazepam syringes?
> A:  I do.
> Q:  And do you see to the right of both products, there is a wholesale net price of $66.50?
> A:  Yes.
> Q:  And a direct price of $66.50?
> A:  Yes.
> Q:  And then an AWP of $83.10?
> A:  Yes.
> Q:  And the direct price of $66.50 would be equivalent to the WAC for that product in Wyeth's view, correct?

A:  That's correct."

*See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-

dkt. No. 75]) at 83:22-86:22.

No further reply is required.

**11.     Wyeth reported or caused to be reported the same WACs/DPs to all three of the national compendia.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 77:21-78:11.**

**Wyeth's Response**:   The deposition testimony cited does not support the allegation
in paragraph 11 of Plaintiffs' Statement and Plaintiffs therefore have failed to
provide an evidentiary basis as required by local Rule 56.1.   In fact, the record
evidence is to the contrary.  *See* response to paragraph 9, *supra*.

**Plaintiffs' Reply to Statement # 11:** Wyeth's 30(b)(6) designee testified that DP and

WAC are used interchangeably.  *See*  Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1

Statement [[Dkt. No. 6074, Sub-Dkt. No. 75]) at 77:21-78:7.  Wyeth's designee further testifies

that at certain times Wyeth reported DP/WAC to the compendia.   *See* plaintiffs' reply to

statement #9 which is incorporated herein.

**12.     Wyeth knew and controlled the WACs/DPs for its drugs that were being
published by the national drug pricing compendia.  *See* Wyeth 30(b)(6)(Truex) 6/19/08
(Exhibit B) at 66:1-69:3.  In the ordinary course of business, Wyeth received product
verifications from Red Book.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 71:19-22.
In the ordinary course of business, Wyeth confirmed the published WACs/DPs and
returned the verification with any necessary changes.  *See* Wyeth 30(b)(6)(Truex) 6/19/08
(Exhibit B) at 69:19-69:3.**

**Wyeth's Response**:   Wyeth disputes the first sentence because it contains argument
and legal conclusions that are not proper to include in a Local Rule 56.1 statement.
Wyeth also disputes the first sentence because the deposition testimony cited does
not support them, and Plaintiffs therefore have failed to provide an evidentiary
basis as required by local Rule 56.1.  Wyeth disputes that it knew and controlled the
WACs/DPs for its drugs that may have been published by the national drug pricing
compendia for Lorazepam.    *See* response to paragraph 9, *supra*.  Wyeth also
disputes that the deposition testimony cited as asserted support for the first sentence
of paragraph 12 pertains to Lorazepam.  *See* Truex Dep. (Ex. B) at 66:5-13
(introducing a Red Book Product Listing Verification containing certain NDCs for
the brand Ativan, not the generic Lorazepam); *id.* at 70:10 (confirming that the

**document contains NDCs for the brand Ativan, not the generic Lorazepam).  Wyeth admits that it received Product Listing Verifications from Red Book, but disputes that there is any evidence in the record that these documents pertained to Lorazepam.  There is also no evidence cited to support the assertion in the third sentence that Wyeth confirmed a published WAC or DP for Lorazepam and returned the verification with any necessary changes to Red Book.  Notably, the document being discussed during the testimony cited in the second and third sentences of paragraph 12 does not pertain to Lorazepam.  *See* Truex Dep. at 70:5-10 (confirming that the document being shown to him by Plaintiffs' counsel contained no NDCs for Lorazepam).**

<u>**Plaintiffs' Reply to Statement # 12:**</u>  The parties agree that Wyeth received Product Listing Verifications from Red Book.

Wyeth disputes certain portions of the statement because the documents and testimony do not pertain to Lorazepam in particular.  Wyeth cannot reasonably dispute the statement because it pertains to Wyeth's general practices in the ordinary course of business with respect to verifying WACs, which Wyeth interchangeably called  Direct Prices (*see* Plaintiffs' Reply to Statement # 10).  The testimony is as follows:

> "Q:  We have marked as Exhibit 4, a document produced to us in our litigation by Red Book.  Red Book is one of the publishing compendias, is that correct?
> A:  It is.
> Q:  And this document is entitled Red Book Product Listing verification dated September 26, 1997, do you see that?
> A:  I do.
> Q:  And this verification is addressed to Wyeth-Ayerst Laboratories, do you see that?
> A:  I do.
> Q:  Have you ever seen a product listing verification such as Exhibit 4?
> A:  I don't deal with that.
> Q:   In 1997, a verification of this type would have gone to Miss Patel's unit, is that correct?
> A:  Yes.  I believe Laurie Tierney was in that position.
> Q:  Is that Miss Tierney's signature at the bottom of Exhibit 4?
> A:  I don't know.
> Q:  It appears to be an L-A-T, does it not?
> A:  It appears to be.
> Q:  Do you see that this particular product listing verification concerns the drugs, the drug Lorazepam and Ativan, correct?
> A:  Yes.

Q: And do you see that at the bottom left corner of the document are the words, 'Instructions: Please make corrections directly on this printout'? Did I read that correctly?

A: That's correct.

Q: And there are two boxes, one that says 'OK as is' and the other says 'OK with changes.' Do you see that that?

A: That's correct.

Q: And here the box, 'OK as is' has been checked.

A: That's correct.

Q: There is a signature line on the document, correct?

A: There is.

Q: And as we just discussed, it appears to be the initials LAT on that signature line.

A: Yes.

Q: But you can't confirm that those are Laurie Tierney's signature?

A: I cannot confirm that.

Q: Do you have any reason to believe that is not her signature?

A: I don't.

Q: And she's listed as the contact name for this particular document, right?

A: That's correct.

Q: Okay. And do you know what would be done in the ordinary course at Wyeth when it received a product listing verification such as Exhibit 4?

A: I would assume they verify it. In other words, they are sending back the prices they are going to put down and we just acknowledge that, these checkmarks acknowledge that this is the direct price, so she is acknowledging, in my eyes, that this direct price is the price that she has given them. "

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt.

No. 75]) at 66:1-69:3.

Responding further, plaintiffs incorporate their Reply to Statement #9 herein.

**13.    Wyeth knows that Medicaid reimbursements can be based on AWPs.** *See* **Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 41:9-42:2; 43:4-6.**

**Wyeth's Response:   The alleged undisputed facts in paragraph 13 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.   *See* Defs. 56.1 Stmt. at ¶ 34.   To the extent these allegations are deemed material, the deposition testimony cited does not support the assertion in paragraph 13 of Plaintiffs' Statement and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.   Wyeth admits that it knew that if a generic product did not have an AWP, the entity dispensing the product would not be reimbursed for that product by any payor.   Truex Dep. at 41:9-42:2; 42:21-43:6; 43:4-6; 60:19-22.   Dr. Truex merely confirmed, in response to a statement by Plaintiffs' counsel, that Medicaid was an example of a payor that would not reimburse for a generic product if that product did not have an AWP.   *Id*. at 41:15-**

14

**20.  Wyeth disputes Paragraph 13 to the extent that it mischaracterizes Dr. Truex' testimony as being specific to Medicaid.**

**Plaintiffs' Reply to Statement # 13:**

Wyeth admits that it knew that if a generic product did not have an AWP, the entity

dispensing the product would not be reimbursed for that product by any payor and that Medicaid

is an example of such a payor. No further reply is required.

**14.    Wyeth knows that CMS sets the FUL on published prices for generic products.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 137:5-16.  Wyeth understands that CMS establishes a FUL when there are at least three manufacturers of a particular generic product.  *Id.*  Wyeth's understanding is that the FUL is equal to 150% of the lowest published price.  *Id.***

**Wyeth's Response:   The deposition testimony cited does not support the assertion in the first sentence of paragraph 13 of Plaintiffs' Statement and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.  The assertions in the second and third sentences of paragraph 14 reflect Dr. Truex' understanding of what the phrase "federal upper limit" means.  Truex Dep. 137:5-16.  Wyeth admits that it is Dr. Truex' understanding that the FUL is 150 percent of the lowest price published.  *Id*. at 137:8-11.  Wyeth admits that Dr. Truex confirmed the statement by Plaintiffs' counsel that the FUL is established when there are three or more manufacturers of a particular generic product.  *Id*. at 137:12-16.**

**Plaintiffs' Reply to Statement # 14:**  Wyeth designated  Dr. Truex to testify as Wyeth's

Corporate Representative.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Reply Exhibit B attached hereto)

at 24:8-21.  Wyeth cannot now run from its designee's testimony.  That testimony confirms that

Wyeth knew CMS set FULs at 150 percent of the lowest price published.  The testimony

follows:

"Q:  What does the federal upper limit mean?
Ms. Davidson:  Objection.
Q:  I'll rephrase it.  What's your understanding of the phrase a federal upper limit?
A:  My understanding is, it's 150 percent of the lowest price published.
Q:  And do you understand that the federal upper limit is established by CMS when there is (sic) three or four manufacturers of a particular generic product?
A:  Yes."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]]) at 137:5-16.

**Wyeth's Published AWPs and WACs had No Relationship to Actual Prices**

15.     Wyeth set AWPs at or near the AWPs set by the competing generic manufacturers selling the same generic drug.  *See* **Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 60:9-18.**

> **Wyeth's Response**:   The alleged undisputed facts in paragraph 15 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.   *See* **Defs. 56.1 Stmt. at ¶ 34.** To the extent these allegations are deemed material, the deposition testimony cited does not support the assertion in paragraph 15 of Plaintiffs' Statement and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.  Wyeth disputes that it set AWPs. *See* **response to paragraph 6, supra.**  Wyeth derived no benefit from what the AWP was (id. at 42:21-43:6), and strove to suggest AWPs that were no higher than necessary to sell its products.  *Id*. at 42:6-20; 43:7-17.  To that end, Wyeth admits that it sought to make sure its suggested AWPs were not higher than the AWPs of other generic manufacturers selling the same generic drug.  *Id*. at 42:6-20.

> **Plaintiffs' Reply to Statement # 15:**

Wyeth disputes the Statement to the extent it is not supported by the testimony.   The dispute is specious.  The cited testimony speaks for itself and is as follows:

> "Q:  Starting with Wyeth's AWPs for Lorazepam, can you tell us how Wyeth set its AWP's for Lorazepam?
> A:  The suggested AWP's were set by the generic division  relative to competition.
> Q:  Did the  -- what do you mean when you say 'relative to  competition'?
> A:  My understanding is, they looked at what the AWP was for other generic Lorazepams and they set it in relationship to that as a suggested AWP."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]]) at 60:9-18**.**

Wyeth's statement that it "derived no benefit from what the AWP was … and strove to suggest AWPs that were no higher than necessary to sell its products" is irrelevant to Statement #15.  While Dr. Truex said, "Wyeth derived no benefit from what the AWP was," he also agreed

that Wyeth needed an AWP in order for its customers to be reimbursed. *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]) at 42:21-43:6. Responding further, plaintiffs incorporate their responses to Statement #6 herein.

**16.     Wyeth did not factor in what wholesalers charged pharmacies in establishing suggested AWPs.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 100:6-102:13.**

> **Wyeth's Response:  The alleged undisputed facts in paragraph 16 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.  *See* Defs. 56.1 Stmt. at ¶ 34.  To the extent these allegations are deemed material, Wyeth admits that what wholesalers charged pharmacies was not a factor it considered in arriving at a suggested AWP.**

> **Plaintiffs' Reply to Statement # 16:**

The parties agree that what wholesalers charged pharmacies was not a factor Wyeth considered in arriving at suggested AWPs. Responding further, plaintiffs incorporate their responses to Statement #6 herein.

**17.     Wyeth's AWPs were not set based on actual prices, but rather based on its competitors' AWPs.  *Id*.**

> **Wyeth's Response:  The alleged undisputed facts in paragraph 17 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.  *See* Defs. 56.1 Stmt. at ¶ 34.  To the extent these allegations are deemed material, the deposition testimony cited does not support the assertion in paragraph 17 of Plaintiffs' Statement and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.  The phrase "actual prices" is not defined in Plaintiffs' Statement and is not addressed by or defined in the deposition testimony cited in paragraph 17 of Plaintiffs' Statement.  Moreover, Wyeth disputes that it set AWPs.  See response to paragraph 6, supra.  Wyeth admits that it sought to make sure its suggested AWPs were not higher than the AWPs of other generic manufacturers selling the same generic drug.  *Id*. at 42:6-20.  *See* response to paragraph 15, *supra*.**

> **Plaintiffs' Reply to Statement # 17:**

Wyeth disputes the statement to the extent the phrase "actual prices" is not defined.  The Court has defined AWP as "the average price which wholesalers sell drugs to their customers, including physicians and pharmacies."  *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F.Supp.2d 20, 94 (D.Mass. June 21, 2007).  Wyeth cannot reasonably dispute the Statement because it admits, in response to Statement # 16, that Wyeth did not consider the prices wholesalers charged pharmacies in setting its suggested AWPs.  And therefore, Wyeth cannot reasonably dispute that its AWPs (or suggested AWPs) were not based on actual prices, or "the average price which wholesalers sell drugs to their customers."  Responding further, plaintiffs incorporate their reply to Statement # 6 herein.

**18.     According to a study Wyeth performed in the year 2000, the difference between AWP and WAC/DP ranged from 25% to 1,646%. Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 120:6 – 20. The difference between AWP and the customers' actual prices would be even greater.  *See* Truex, Richard 124:20-125:8.**

> **Wyeth's Response:   The alleged undisputed facts in paragraph 18 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.   *See* Defs. 56.1 Stmt. at ¶ 34.  To the extent these allegations are deemed material, Wyeth disputes any mischaracterizations by Plaintiffs as to the scope and content of the document being discussed in the cited deposition testimony and refers to that document for a full and complete statement of its provisions.  Wyeth admits that the internal memorandum referred to in paragraph 18 contains a paragraph stating that the difference between AWP and direct price for the ESI Lederle oral solid lines was in the range identified.  Truex Dep. at 120:12-17.  With respect to the second sentence, the phrase "actual prices" is not defined in Plaintiffs' Statement and is not addressed by or defined in the deposition testimony cited in paragraph 18 of Plaintiffs' Statement.  Although Wyeth admits that the direct or list price for Lorazepam contained in the internal memorandum may not reflect what customers were paying for the product because competition drove the price of Lorazepam down (*id*. at 124:20-125:2), it disputes that the internal memorandum contained any statements or conclusions to the effect that the difference between AWP and the customers' "actual prices" would be even greater than the difference between AWP and direct or list price.**

**Plaintiffs' Reply to Statement # 18:** Wyeth admits that the cited record evidence contains a paragraph stating that the difference between AWP and direct price for the ESI Lederle oral solid lines (which includes Lorazepam) was in the range identified.

Wyeth disputes that "the internal memorandum cited contained any statements or conclusions to the effect that the difference between AWP and the customers' 'actual prices' would be even greater than the difference between AWP and direct or list price." Wyeth's Corporate Representative's testimony speaks for itself as follows:

> "Q: Even this list price, this list price would not reflect what Wyeth's customers were actually paying for this product?
> A: That's true because competition drove the price down.
> Q: So, the spread would actually be larger if you were to not calculate them based on the list price, but whatever the customer's actual prices were?
> Ms. Davidson: Objection.
> A: To our dismay, yes."

Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-Dkt. No. 75]) at 124:20-125:8. Wyeth's other responses are immaterial and disputed. Plaintiffs incorporate their responses to Statements #6 and #17 herein.

19.     **Wyeth's contract prices were lower than Wyeth's published WAC/DP.** *See* **Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 125:8-126:14.**

> **Wyeth's Response:** **Wyeth admits that contract prices for Lorazepam would generally tend to be lower than the direct, list or book prices in Wyeth's product catalog, but disputes that this was necessarily the case for every contract that may have been in place for Lorazepam. Bartone Dep. at 125:19-126:9. To the extent this paragraph is intended to suggest that Wyeth provided or reported WACs or DPs to any compendia for Lorazepam, the deposition testimony cited does not support this assertion and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1. Wyeth disputes that it generally provided or reported WACs or DPs to any compendia for Lorazepam.** *See* **response to paragraph 11,** *supra*.

> **Plaintiffs' Reply to Statement # 19:** The parties agree that Wyeth's contract prices for

Lorazepam would generally tend to be lower than Wyeth's direct, list or book prices. The parties

also agree that Wyeth referred to WACs and DPs interchangeably.  *See* Plaintiffs' Reply to Statement #10.  Responding further, plaintiffs incorporate their reply to Statement # 9 herein.

**20.     As competition progressed, the price Wyeth charged its customers would decline, but Wyeth never would lower its WAC/DP when it lowered the prices to its customers.** *See* **Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) 46:5-48:22.**

> **Wyeth's Response:  Wyeth admits that the price for Lorazepam eroded very quickly after Wyeth entered the Lorazepam market in relation to the price that initially appeared in Wyeth's price list or catalog.  Truex Dep. at 46:5-47:11.  Wyeth admits that it did not release a new generic product list or catalog every time the price for Lorazepam dropped.  *Id*. at 48:1-9.  To the extent this paragraph is intended to suggest that Wyeth provided or reported WACs or DPs to any compendia for Lorazepam, the deposition testimony cited does not support this assertion and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.  Wyeth disputes that it generally provided or reported WACs or DPs to any compendia for Lorazepam.  *See* response to paragraph 11, *supra*.**

> **Plaintiffs' Reply to Statement # 20:** The parties agree that after Wyeth entered the market, the price Wyeth charged its customers for Lorazepam eroded very quickly in relation to the price that initially appeared in Wyeth's price list or catalog.  The parties agree that Wyeth did not release a new generic product list or catalog every time the price for Lorazepam dropped.

>  Responding further, plaintiffs incorporate their reply to Statement # 9 herein.

**21.     The majority of sales to Wyeth customers would be at a price less than the DP/WAC.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 49:5-11.**

> **Wyeth's Response:   Wyeth admits that the majority of its sales of Lorazepam were likely to be at a price less than the direct or list price.**

**Plaintiffs' Reply to Statement # 21:** The parties agree that the majority of Wyeth's sales of Lorazepam were likely to be at a price less than the direct or list price.  Wyeth referred to WAC and direct price interchangeably.  *See* Plaintiffs' Reply to Statement #10.  Therefore, it cannot reasonably be disputed that Wyeth's admission applies to WAC as well as direct price.

22.     At all times from 1997 to 2005, Wyeth sold its drugs to the three national wholesalers and/or one of their predecessor companies.  *See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 44:10 - 45:5.

**Wyeth's Response**:  The deposition testimony cited does not support the assertions in paragraph 22 and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.  Wyeth admits that from 1997 to 2005, AmerisourceBergen, Cardinal, McKesson, and some regional wholesalers were direct customers of Wyeth.

**Plaintiffs' Reply to Statement # 22:**  The parties agree that from 1997 to 2005, AmerisourceBergen, Cardinal, McKesson and some regional wholesalers were direct customers of Wyeth.  No further reply is required.

23.     The WAC, used interchangeably with Direct Price, reported or caused to be reported by Wyeth does not account for rebates paid to wholesalers.  *See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 175:14-177:11.

**Wyeth's Response**:  Wyeth admits that it generally defines WAC to be the same as a direct, list, book or catalog price.  *See* response to paragraph 10, *supra*.  Wyeth disputes, however, that WAC and direct price are necessarily interchangeable in the context of the hypothetical questions being posed by Plaintiffs' counsel.  *See* Bartone Dep. at 176:5-177:6.  The cited deposition testimony does not support the assertion in paragraph 23 that Wyeth "reported or caused to be reported" WAC or direct price for Lorazepam to any entity for any particular purpose.  Of note, Wyeth disputes that it generally provided or reported WACs or DPs to any compendia for Lorazepam.  *See* response to paragraph 11, *supra*.  Wyeth admits that its direct prices do not account for rebates paid to wholesalers.

**Plaintiffs' Reply to Statement # 23:**  The parties agree that Wyeth's direct prices do not account for rebates paid to wholesalers.  The parties agree that WAC is generally defined to be the same as direct, list, book or catalog price.  To the extent Wyeth disputes that WACs are not the same as direct price, plaintiffs incorporate their Reply to Statement #10 herein.

Wyeth disputes the Statement to the extent WAC and direct price are not used interchangeably in the testimony cited.  The testimony speaks for itself and is as follows:

"Q: When – if a, if a, if a wholesaler – if there's no contract in place between Wyeth and a wholesaler, concerning a, a sale, what price does the wholesaler pay Wyeth for the product?

A:  The catalog prices we've –
Q:  The direct –
A:  talked about today.
Q:  The direct prices?
A:  Direct.
Q:  And do you know if that's the same as the WAC?
A:  In, in those instances, yes, I believe it is.
Q:  Uh-huh.  And so these – just to be clear, the direct prices or the book prices are – do not take into account any rebates that might be paid to the wholesaler; is that right?
A:  That's right."

Wyeth 30(b)(6)(Bartone) 5/22/08 (Exhibit C to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt.

No. 75]) at 175:14-177:11.

Wyeth disputes the Statement insofar as it concerns Wyeth's reporting of WACs or DPs

for Lorazepam to any compendia.  Plaintiffs incorporate their reply to Statement # 9 herein.

**24.   As a standard practice, Wyeth offered its wholesaler customers quarterly rebates that reduced the wholesalers' acquisition cost.  *See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep.(Exhibit C) at 129:11-131:2.  Such quarterly rebates are based on net sales to the wholesaler – they are based on "sales less chargeback units, adjustments and returns."  *See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 133:8-18.**

> **Wyeth's Response:   The deposition testimony cited does not support the assertions in the first sentence of paragraph 24 and Plaintiffs therefore have failed to provide an evidentiary basis as required by local Rule 56.1.   Wyeth disputes that, as a standard practice, it offered its wholesaler customers quarterly rebates that reduced the wholesalers' acquisition cost.   Wyeth disputes any mischaracterizations by Plaintiffs as to the scope and content of the document being discussed in the cited deposition testimony and refers to that document for a full and complete statement of its provisions.   Wyeth admits that Mr. Bartone accurately read the phrase "sales less chargeback units, adjustments and returns" when responding to counsel's question concerning the content of sub-paragraph b of the document in question.**

> **Plaintiffs' Reply to Statement # 24:**  The parties agree that Wyeth offered its customers

quarterly rebates that reduced the wholesalers' acquisition cost.  Wyeth disputes that such was

"standard practice" but its corporate designee's testimony and the referenced exhibit speaks for

itself  as follows:

> "Q:  Letter B provides, To provide a quarterly rebate of, parens – a percentage not filled in – excluding chargeback units adjustments, and returns on all contracted products,

parens, see attached list of contracted items, close parens, based upon the quarterly purchases.  Did I read that correctly?

A:  Yes, you did.

Q:  Do you know whether it was standard practice to have payments of quarterly rebates to wholesalers by ESI Lederle when  contracts were in place?

A:  Only based on that phrase – my reading that phrase.  I have no direct knowledge of it.

Q:  As, as corporate designee for Wyeth, do you know  whether Wyeth routinely offered quarterly rebates to the wholesalers along the lines of what we see in sub B on this template?

A:  That would be my interpretation of the document.

Q:  …Can you explain how this quarterly rebate would operate?

Ms. Davidson:  Objection.

A:  No.  Only in, only in the most general terms.

Q:  I'll take those general terms.

A:  There would be a calculation of the actual purchases by the contracted party.  There would be a net amount calculated as a result of these three  exclusions.   A total  amount would be arrived at.  And either a credit to their account or a check would be issued for that totaling amount."

Wyeth 30(b)(6)(Bartone) 5/22/08 (Exhibit C to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-Dkt. No. 75]) at 129:11-131:2.

Responding further, Wyeth's sales and transactional data sets forth in detail the rebates chargebacks and other incentives paid by Wyeth to the wholesaler, all of which would have the effect of reducing the wholesaler's acquisition cost.   *See* Exhibit #17.01-17.21 attached to Exhibit A of the Declaration of Harris L. Devor in Support of Plaintiffs' Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-b [Docket No. 6061, Sub-docket No. 61] ("Exh. A to the Devor Dec., Exhs. #17.01-17.21").

**25.    Wyeth sells drugs to pharmacies pursuant to contract.** *See* **Wyeth 30(b)(6)(Bartone) 5/22/08 Dep.(Exhibit C) 64:9-14; 68:7-14.**

**Wyeth's Response:   To the extent this statement implies that Wyeth always sells or sold its products to pharmacies pursuant to contracts, it is disputed.  Rather, Wyeth admits that during the period 1997 to 2005, it may have had contractual relationships with one or more of the major chain retail stores that covered generic products such as Lorazepam.  Bartone Dep. 68:7-14.**

**Plaintiffs' Reply to Statement # 25:**  The parties agree that Wyeth sold its products to pharmacies pursuant to contracts. Wyeth disputes that it does or did so "always".  Plaintiffs' statement did not use the word "always".  Moreover, the cited testimony cited speaks for itself and reads as follows:

> "Q:  Do you know, between '97 and '05, whether the direct retail customers purchased or had contractual relationships with Wyeth?
> A: Branded side?  Generic side?
>  Q:  Either.
> A:  Yes."

Wyeth 30(b)(6)(Bartone) 5/22/08 (Exhibit C to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]) at 64:9-14;

> "Q:  Okay, that's fine.  Do you know, whether between '97 and '05, Wyeth had any contractual relationships with any of the major chain retail stores?  …
> A:  Yes, I believe we did."

Wyeth 30(b)(6)(Bartone) 5/22/08 (Exhibit C to Wyeth 56.1 Statement [[Dkt. No. 6074, Sub-dkt. No. 75]) at 68:7-14.

No further reply is required.

**26.    Wyeth's contract prices are generally lower than Wyeth's published prices.**
***See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 125:8-126:14.**

**Wyeth's Response:  The phrase "published prices" is not defined in Plaintiffs' Statement.  To the extent this phrase refers to the direct, list or book prices in Wyeth's product catalog, Wyeth admits that contract prices for Lorazepam would generally tend to be lower than catalog prices, but disputes that this is necessarily the case for all contracts that may have been in place for Lorazepam.  Bartone Dep. at 125:19-126:9.  Wyeth disputes that it generally provided or reported WACs or DPs to any compendia for Lorazepam.  See response to paragraph 11, *supra*.**

**Plaintiffs' Reply to Statement # 26:**  The parties agree that Wyeth's contract prices for Lorazepam would generally tend to be lower than catalog prices.  Wyeth cannot reasonably dispute that the term "catalog prices" does not refer to Wyeth's WACs.  Wyeth referred to WACs and direct prices interchangeably.  *See* Plaintiffs' Reply to Statement #10.

Responding further, plaintiffs incorporate their reply to Statement # 9 herein.

**27.     Wyeth offers discounts and promotions for its generic products to retail pharmacy customers.  *See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 90:1-12. These discounts and promotions include free shelf-keeping units, extending a one-time 10% discount on initial stocking orders, and free goods.  *See* Wyeth 30(b)(6)(Bartone) 5/22/08 Dep. (Exhibit C) at 91:6-93:10, 96:20-97:3, 99:14-20.**

> **Wyeth's Response:   Insofar as generic products are concerned, Wyeth admits that there were discounts and promotions available that may have gone directly to retailers.  Bartone Dep. at 90:9-12.  Examples of such discounts or promotions that may have been provided are free shelf-keeping units, extending a one-time 10% discount on initial stocking orders, and free goods.   Each of these examples is described fully on pages 6-9 of Exhibit 5 to Mr. Bartone's deposition, portions of which Plaintiffs' counsel read into the record.  See, e.g., Bartone Dep. at 91:6-15; 96:16-97:3.  Wyeth disputes any mischaracterizations by Plaintiffs as to the scope and content of the document being discussed in the cited deposition testimony and refers to that document for a full and complete statement of its provisions.  There is no support for the implication in paragraph 27 that these promotions and discounts were routinely provided to all retail pharmacy customers for all generic products, let alone with respect to Lorazepam, which is the product at issue.**

> **Plaintiffs' Reply to Statement # 27:** The parties agree that Wyeth may have provided

retailers with discounts and promotions.  The parties agree that examples of such discounts or

promotions that may have been provided are free shelf-keeping units, extending a one-time 10%

discount on initial stocking orders, and free goods.

Wyeth's data shows that it paid such discounts and promotions to retailers for purchases

of Lorazepam.  *See* Exhs. #17.01-17.21, Exh. A to the Devor Dec.,[Dkt. No. 6061, Sub-dkt. No.

61].

**Wyeth Marketed the Spread**

**28.     Wyeth's customers were interested in evaluating, and made purchasing decisions based on the reimbursement spread between its cost and the reimbursement price of an AWP.  Wyeth believed it was at a competitive disadvantage because there were other drug manufacturers who reported higher AWPs.     *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 130:17-131:9.  Wyeth understood that retail customers were incentivized to purchase generic products with the largest difference between their acquisition cost and the reimbursement price.   *Id*.  Wyeth admits that it could have reported lower AWPs than it**

did, but Wyeth believes retailers would not have purchased their product.  *See* Wyeth 30(b)(6)(Truex) 6/19/08 (Exhibit B) at 131:13-132:3.

**Wyeth's Response**:   The alleged undisputed facts in paragraph 28 concerning AWP are immaterial and irrelevant to Plaintiffs' Motion because FULs were never based on AWPs.  *See* Defs. 56.1 Stmt. at ¶ 34.  To the extent these allegations are deemed material, Wyeth disputes the assertions in the first sentence because they are not supported by any reference to the evidentiary record as required by Local Rule 56.1.  Wyeth further disputes that its customers' business practices are material to Plaintiffs' Motion.  Wyeth disputes the second and third sentences of paragraph 28 insofar as the cited deposition testimony concerns a document dated November 2005, which is at least two years after Wyeth ceased selling Lorazepam (see response to paragraph 5, *supra*) and after Wyeth had ceased manufacturing and selling all generic products.   Bartone Dep. at 114:20-22.   Wyeth also disputes Plaintiffs' characterization of Dr. Truex' testimony in the second, third and fourth sentences of Paragraph 28.  Wyeth admits that Dr. Truex testified as follows:

Q.     I see that.  It's on page 49675.  And this slide is entitled "Wyeth's Proposed Position Medicaid."  The second bullet reads, "Wyeth recommends use of a catalog-based, cost-plus system as is used by Medicaid in certain states."

The first arrow reads, "This system will eliminate the 'advantage' created by companies that set artificially average high wholesale prices, AWP, and thereby 'market spread.'"  Is that what you were just referring to?

A.     Yeah. We felt we were actually at a competitive disadvantage in that regard,  so that's why we thought a more fair system that we wanted instituted was cost plus.

Q.     Why was Wyeth at a competitive disadvantage in that regard?

A.     Because there were other companies that were setting AWP's higher, which put us at a disadvantage when a retailer was choosing which product to dispense.

Q.     Because the retailer had an incentive to choose the generic alternative with the largest difference between the retailers' acquisition cost and the reported reimbursement price?

A.     That's true?

MS. DAVIDSON:  Objection, but you could have answered anyway.

**Q.     So, Wyeth, Wyeth could have reported higher AWP's than
         it did, could it not?**

**A.     It could have.  We were not playing that game.**

**Q.     Wyeth could have also reported lower AWP's  than it did,
         correct?**

**A.     We could have and not sold a product.**

**Q.     Because with lower AWP's, the difference between the
         reimbursement price and the cost would have decreased?**

**MS. DAVIDSON:  You can answer.**

**A:     Because the retailer had a choice and they wouldn't use our
         product.**

*Id.* **at 130:7-132:3**

**Plaintiffs' Reply to Statement # 28:**

Wyeth cannot reasonably dispute that the first sentence of the Statement is not supported

by the testimony cited in the remainder of the Statement.

Wyeth's knowledge that its customers purchased on the spread between reimbursement

price and acquisition price is relevant to plaintiffs' motion insofar as it undergirds Wyeth's

knowledge that its reported prices were being used for reimbursement and were not tethered to

those acquisitions prices. Wyeth's dispute that the referenced document at-issue is dated 2005 is

irrelevant.   The time period at-issue on plaintiffs' motion is 1997 to 2005.   Wyeth cannot

reasonably dispute that a document dated within the relevant time period and revealing Wyeth's

knowledge of how its false prices impacted spread and reimbursement is irrelevant on this

motion.

**Wyeth's AMPs**

29.   At all times, from 1997 to 2005, Wyeth has calculated on a quarterly basis the average manufacturer's price ("AMP") for all its products as required by the federal rebate statute.  Wyeth reports AMPs to HHS.  *See* Wyeth Answer at ¶ 126.

**Wyeth's Response:**   Wyeth admits that from 1997 to 2005, Wyeth calculated AMP on a quarterly basis for its products as required by the federal Medicaid rebate statute and reported AMPs to the Secretary of Health and Human Services.

**Plaintiffs' Reply to Statement # 29:**  No further reply is required.

Dated: June 30, 2009

Respectfully submitted,

**City of New York and New York Counties in MDL 1456 except Nassau and Orange by**

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala
By:   Joanne M. Cicala
      James P. Carroll Jr.
      Jocelyn R. Normand
      Kathryn B. Allen

Ross B. Brooks, Esq.
MILBERG LLP
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300
*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
LEVY PHILLIPS &
KONIGSBERG, LLP
800 Third Avenue
New York, NY  10022
(212) 605-6205
*Counsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT AS TO WYETH to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  June 30, 2009

_____/s/ _____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600