# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>) MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>)  Subcategory Case No: 03-10643-PBS<br>) |
| THIS DOCUMENT RELATES TO:<br><br>    *The City of New York, et al.*<br>*v.*<br>    *Abbott Laboratories, et al.* | )<br>) Judge Patti B. Saris<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' REPLY TO DEFENDANT WATSON PHARMACEUTICALS, INC. AND WATSON PHARMA, INC.'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WATSON PHARMACEUTICALS, INC. AND WATSON PHARMA, INC.**

Pursuant to Local Rule 56.1, Plaintiffs' hereby submit this Reply to Defendants Watson Pharmaceuticals, Inc. and Watson Pharma, Inc.'s (f/k/a Schein Pharmaceutical, Inc.) (collectively, "Watson" or the "Watson Defendants") response to the Statement of Undisputed Material Facts Applicable to Watson that Plaintiffs filed in support of their Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-B.

## I.    WATSON SPECIFIC FACTS

**1.    The Watson Drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Watson's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limits ("FUL") and Watson's AMPs.  That exhibit notes which NDCs are associated with package sizes that set the FUL.**

<u>RESPONSE NO. 1</u>:  Watson states that the drugs sold by Watson that are at issue for purposes of this motion are accurately listed on Exhibit A.  However, Watson states that because Plaintiffs fail to cite with specificity the sources for the prices

and date ranges set forth on Exhibit A, despite the requirements of Local Rule 56.1, Watson cannot confirm whether the data set forth on Exhibit A accurately reflects prices it reported to First DataBank.  *See* O'Brien v. Town of Agawam, 440 F. Supp. 2d 3, 5 n.1 (D. Mass 2006) (disregarding "purported statements of 'fact' not properly supported by citations to the record" in summary judgment pleadings as required by Local Rule 56.1).  Moreover, Watson disputes that it reported "AWPs" to First DataBank for all of the time period identified in Exhibit A, as Watson reported SWPs (suggested wholesale prices) beginning in 2000. *See* Plaintiffs' 56.1 Statement Applicable to Watson, ¶ 11 (hereinafter "SOF-W, ¶ _").  Accordingly, Watson disputes the allegations set forth in SOF-W, ¶ 1.

**PLAINTIFFS' REPLY TO STATEMENT #1:**

The parties agree that the drugs sold by Watson that are at issue for purposes of this motion are accurately listed on Exhibit A.

Watson's dispute as to the data in Exhibit A not being properly supported by evidence in the record and that Watson cannot determine its accuracy is baseless.  Plaintiffs properly cited Watson as the source of the Watson AMP data and the First Databank NDDF data file (Alabama Production, FDB-AWP 030785 – 030795) as the source of all other data (*see* Exhibit A at 32), which is the same source cited by Watson's expert Dr. Addanki.  *See* Affidavit of Dr. Sumanth Addanki dated May 15, 2009 [Dkt# 6056] at Exhibit 2 (identifying "First DataBank (Alabama Production) Data and NDDF (National Drug Data File)™ Documentation Manual (Rev. April 2000)" as a Data source). *See also* Reply Affidavit of Joanne M. Cicala, sworn to June 30, 2009 and submitted in further support of plaintiffs' motion for partial summary judgment at ¶2, which is incorporated herein.

Watson admits that it reported AWPs from at least 1997-2000.  Watson cannot reasonably dispute its published AWPs from 2000-2005 on the basis that it reported SWPs.  The record evidence shows that Watson's SWPs were equivalent to its AWPs.  *See* Watson Pharmaceuticals, Inc. 30(b)(6) (Mark Hartman) dated 6/03/09 ("Watson 30(b)(6) (Hartman) 6/03/09 Dep.") ("Reply Exhibit A" attached hereto) at 290:12-22 ("A: The terminology was

changed from AWP to SWP on the documents.  Q: Was the methodology of establishing the AWP or SWP changed?  A: No, ma'am."); *see also id.* at 338:12-20 ("So we had a list price, and we had an AWP or SWP, which were interchangeable").

**2.      The specific Watson drugs at issue are the Albuterol 90 MCG Inhaler, Clonazepam .5 MG Tablet, Enalapril Maleate 20 MG Tablet, Lorazepam 1 MG Tablet, Metropolol 100 MG Tablet and Ranitidine 150 MG Tablet.**

RESPONSE NO. 2:  Watson does not dispute that the list of drugs set forth in SOF-W, ¶ 2 are the targets of discovery for this portion of the case (see Case Management Order 33), and that Watson sold these drugs at least for part of the time frame under consideration.

**PLAINTIFFS' REPLY TO STATEMENT #2:**

The parties agree that Albuterol 90 MCG Inhaler, Clonazepam .5 MG Tablet, Enalapril Maleate 20 MG Tablet, Lorazepam 1 MG Tablet, Metropolol 100 MG Tablet and Ranitidine 150 MG Tablet are the Watson drugs at issue on this motion.

***Watson and Schein***

**3.      Watson Pharma, Inc. was formerly known as Schein and has been a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. since 2000.  Answer and Affirmative Defenses of Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. to Revised First Amended Consolidated Complaint [Docket # 4858] ("Watson Answer") ¶46.[1]**

RESPONSE NO. 3:  Undisputed.

**PLAINTIFFS' REPLY TO STATEMENT #3:**

No further response is required.

***Watson's Knowledge of the Federal Medicaid Rebate Agreement***

**4.      Watson has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8.  *See* Watson Answer at ¶68; *Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) ("*Mylan*") at \*22.**

---

[1]Hereinafter, references to the practices or knowledge of Watson shall include Watson and Schein during the period 1997-2005 unless Schein's practices or knowledge differed, in which case Schein will be separately identified.

RESPONSE NO. 4:  Watson admits that Schein entered into a federal rebate agreement with the Secretary of HHS, and that certain of Watson Pharmaceuticals' subsidiaries have entered into rebate agreements with the Secretary of HHS.  Because Watson Pharmaceuticals is a holding company, it has not entered into a Rebate Agreement.  *See* Watson's March 31, 2008 Rule 56.1 Response, Dkt 493, ¶ 3, Case 1:03-cv-11865-PBS (hereinafter, "Watson's 3-31-08 Rule 56.1 Response").

## PLAINTIFFS' REPLY TO STATEMENT #4:

The parties agree that Schein and certain subsidiaries of Watson Pharmaceuticals have entered into federal rebate agreements.

Watson cannot reasonably dispute that Watson Pharmaceuticals, Inc. has not entered into a Rebate Agreement because it is a holding company, is wholly inconsistent with its Answer to the FACC.  *See* Watson Answer at ¶46 [Dkt #: 6112], stating that "Watson admits that Watson Pharmaceuticals, Inc. is a Nevada corporation with its principal place of business located at 311 Bonnie Circle, Corona, CA 92880 and that it is engaged in the business of manufacturing and selling pharmaceuticals."  *See also id.* at ¶ 68, stating that "[t]o the extent the allegations in Paragraph 132 and the exhibit referenced therein are directed at Watson, Watson admits that it has executed a rebate agreement with HHS."

**5.     Watson was required as matter of law to familiarize itself with the legal requirements, standards and procedures of the Medicaid program. *Mylan*, 2008 WL 5650859 at \*25.**

RESPONSE NO. 5:  Watson states that the allegations set forth in SOF-W, ¶ 5 consist merely of conclusions of law, and not of allegations of fact, and therefore, no response is required.  To the extent that the allegations set forth in SOF-W, ¶ 5 seek to characterize the federal rebate agreements that Schein or Watson Pharmaceuticals' subsidiaries entered into with HHS, Watson states that the agreements speak for themselves and otherwise Watson denies the allegations set forth in SOF-W, ¶ 5.  Indeed, the Medicaid Rebate Agreement imposes no general obligation for pharmaceutical companies to familiarize themselves with the legal requirements of the Medicaid program with respect to reimbursement of pharmacies.

**PLAINTIFFS' REPLY TO STATEMENT #5:**

Watson's execution of the rebate agreement is among the bases for Watson's obligations to abide by Medicaid's legal requirements, standards and procedures, including reimbursement formulas. *See Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) ("*Mylan*")(citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 63-65, (1984)) at *25. No further reply is required.

**6.     Watson is aware of State Medicaid reimbursement formulas.  *See* Deposition of Lisa Recchia dated 10/11/07 ("Recchia 10/11/07 Dep.") (Exhibit B) at 155:3-158:19; *see also* Exhibit C (Recchia 10//11/07 Dep. Exhibit 23 (email, dated 11/17/99, from Lisa Recchia with attached gross profit analysis demonstrating a reimbursement formula of AWP minus 13)).**

> RESPONSE NO. 6:  Watson states that the testimony and documents cited in SOF-W, ¶ 6 demonstrate only that Ms. Recchia used a single reimbursement formula of "AWP minus 13%" at an unspecified period of time to conduct an internal analysis.  See, e.g., SOF-W, Ex. B, at 156-57 ("Q: How did you make the determination that reimbursement formula would be AWP minus 13?  A: I would have expected probably to get that information somewhere.  Q: Do you recall now where you got it?  A: No.").  The cited materials do not support the broader statement that "Watson is aware of State Medicaid reimbursement formulas," and therefore, the allegations set forth in SOF-W, ¶ 6 are denied.

**PLAINTIFFS' REPLY TO STATEMENT #6:**

Watson cannot reasonably dispute that it was aware of State Medicaid reimbursement formulas.  As a matter of law, having entered into the rebate agreements, which Watson admits (*see* Plaintiffs' Reply to Statement #4), Watson was required to familiarize itself with the legal requirements, standards and procedures of the Medicaid program, including the reimbursement formulas. *See Mylan*, 2008 WL 5650859 (D.Mass) at *25 (citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 63-65, (1984)).

Responding further, the Statement is supported by a reasonable inference concerning reimbursement formulas generally ("a standard that was put in place") from the exemplar discussed in the cited record evidence.  The record evidence speaks for itself:

> Q:  How did you make the determination of the per unit reimbursement for the products listed on the page two of Exhibit Recchia 023?
> A:  There appears to be a legend in the corner that shows a formula.
> Q:  How did you make the determination that reimbursement formula would be AWP minus 13?
> A:  I would have expected probably to get that information somewhere.
> . . .
> Q:  But, in any event, the estimate of reimbursement, based on an AWP minus 13, was something given to you by something else?
> A:  I would assume it would have been, yes, a standard that was put in place.

Recchia 10/11/07 Dep. (Exhibit B) at 156:17-158:9.

Responding further, Watson 30(b)(6) witnesses have testified as follows:

> Q:  You are aware, sir, that during your time at Watson that the AWPs and WACs that First DataBank published for Watson drugs were relied upon state Medicaid agencies in their reimbursement formulas are you aware of that?
> MR. MATTHEWS:  Objection.
> A:  Yes.

Watson 30(b)(6) (Hartman) 6/03/09 Dep.") (Reply Exhibit A) at 40:16-23,

> A:  I would say Watson knew that a third party, whether it be a state or some other third-party organization may be using AWP to determine their reimbursement, along with whatever calculation they were using from that.

Watson Pharmaceuticals, Inc. 30(b)(6) (Andrew Boyer) dated 5/04/09 ("Watson 30(b)(6) (Boyer) 5/04/09 Dep.") ("Reply Exhibit B" attached hereto) at 44:22-45:4.

**7.     Watson knew and understood that most drugs purchases are paid for by third-party payors, including Medicaid, and not by cash paying customers.  *See* Exhibit D (Schein 30(b)(6) (Clark) Dep. Exhibit 4  (Schein memo dated February 17, 1998, stating**

**that most pharmacists average from seventy to a hundred percent third-party prescriptions)).**

> RESPONSE NO. 7:  Watson states that the document cited in SOF-W, ¶ 7 is a Schein memorandum dated February 17, 1998, and it sets forth a unsupported hearsay conclusion that "[r]ecent surveys show that most pharmacists average from 70-100% third party prescriptions with very few exceptions."  Therefore, this memorandum is inadmissible and is neither evidence of the underlying facts alleged nor of Schein or Watson Pharmaceutical's knowledge of such alleged facts in February 1998 or at any other time.  Accordingly, the allegations set forth in SOF-W, ¶ 7 are denied.

**PLAINTIFFS' REPLY TO STATEMENT #7:**

Watson's denial of Statement No. 7 is baseless.  Schein 30(b)(6) (Clark) Dep. Exhibit 4 is a Schein memo, dated 2/17/1998 authored by Werner Englebert, which states:

> I have inquired among a number of pharmacists and buyers throughout the country, researching third party pricing and reimbursement.
> .....
> Statistics show that in 1989 third parties accounted for 30% of prescriptions (this agrees with figures from my old pharmacy). Recent surveys show that most pharmacists average from 70-100% third party prescriptions with very few exceptions.

*See* Exhibit D (Schein 30(b)(6) (Clark) Dep. Exhibit 4)

The above statement falls within the business record exception to hearsay, where availability of the declarant is immaterial. FED. R. EVID. 803 (6).  The witness, Mr. Clark, as the Schein 30(b)(6) designee, was qualified to authenticate the document, and the document speaks for itself.

Further responding, Watson's 30(b)(6) witnesses have clearly testified that Medicaid reimbursement, alone, accounts for between 9 and 11 percent of Watson's sales.  *See* Watson 30(b)(6) (Boyer) 5/05/09 Dep. (Reply Exhibit B) at 440:13-18; *see also* Watson Pharmaceuticals, Inc. 30(b)(6) (Kathleen Karlsson) dated 5/05/09 ("Watson 30(b)(6) (Karlsson) 5/05/09 Dep.") ("Reply Exhibit C" attached hereto) at 190:12-191:4.

7

8.      **Watson knew that third-party payors, including state Medicaid programs, used SWP, AWP and WAC to set reimbursement rates for drugs.**  *See* Watson Pharmaceuticals, Inc. 30(b)(6) (Andrew Boyer) dated 6/27/07 ("Watson 30(b0(6) (Boyer) 6/27/07 Dep.") (Exhibit E) at 110:6-111:22; Schein 30(b)(6) (Napoleon Clark) dated  6/27/07 ("Schein 30(b)(6) (Clark) 6/27/07 Dep.") (Exhibit F) at 47:20-48:6l; *see also* Recchia 10/11/2007 Dep. (Exhibit B) at 28:13-33:21; Exhibit G (Recchia 10//11/07 Dep. Exhibit 1 (price verification form sent from FDB to Lisa Recchia at Schein, dated November 17, 1995, explaining that several states use wholesale prices as the basis for Medicaid reimbursement)).

> RESPONSE NO. 8:  Watson disputes the allegations set forth in SOF-W, ¶ 8 to the extent that they go beyond or are inconsistent with the testimony cited therein. Moreover, Watson knew that most of its drugs were subject to maximum allowable costs ("MACS") or FULs.  *See* Declaration of Sara Jane Shanahan ("Shanahan Decl."), Ex. 2 (Deposition of Napoleon Clark, June 28, 2007 ("Clark Dep."), at 102-03); *see also id.*, Ex. 1 (Declaration of Meredith Rosenthal, Feb. 28, 2008 ("Rosenthal Decl."), ¶ 29) ("In particular, when there are multiple generics (usually at least three) payers often create their own list price, called a Maximum Allowable Cost (MAC).").   Furthermore, Mr. Boyer testified that Medicaid reimbursements were such a small percentage of Watson's sales that "it doesn't come into play when I look to make any decisions."  Shanahan Decl., Ex. 3 (Deposition of Andrew Boyer, July 14, 2004 ("2004 Boyer Dep."), at 83).

**PLAINTIFFS' REPLY TO STATEMENT #8:**

Watson disputes the allegations set forth in Statement No. 8 "to the extent that they go

beyond or are inconsistent with the testimony cited ***therein***."   This means that Watson does not

dispute the Statement.  The cited record evidence speaks for itself, as follows :

> Q:      Third-party payors could be entities such as . . . the Massachusetts Medicaid program, entities such as the Medicaid programs from . . . the 49 other states.  It could be anybody who reimburses providers for Watson's drugs.
> A:      And I would tell you there are people that use SWP. There are people that use WAC.  There are PBMs that own mail-order organizations and know what the price in the mail-order facilities are buying the product for, and they set their max – or their pricing, their reimbursement price based upon that. . . .  [I]t could be based upon contract price, WAC, SWP or any other host of third party information that they have the ability to get in the marketplace.
>     . . .
> [D]epending on who called or who was looking for an SWP, each one utilizes it differently.  I can't tell you whether they are being

> reimbursed based upon WAC or SWP or anything else.  There may
> be some that use SWP.  There may be some that use WAC.  There
> may be some that use the information they are getting from their
> mail-order organizations.  You know, it all depends.

Watson 30(b)(6) (Boyer) 6/27/07 (Exhibit E) at 110:6-111:22.  *See also* Schein 30(b)(6) (Clark)

6/27/07 Dep. (Exhibit F) at 48:4-6 ("A: It was Watson's understanding that AWP – that

customers are reimbursed based upon our AWP price, yes, that's correct.").

Watson offers nothing to contradict the record evidence cited by plaintiffs. *See Cooprider*

*v. John Hancock Mut. Life Ins. Co.*, 7 F. 3d 218, 1993 WL 382212, at *2 (1st Cir .(Mass.)

(holding that to defeat summary judgment the nonmoving party must provide more than

"conclusory allegations, improper inferences, and unsupported speculation.").  Watson's citation

of the testimony of Napoleon Clark only supports plaintiffs' statement, "AWP is one basis of

reimbursement.   There are other categories that are used to reimburse customers, to my

understanding. . . .  [C]ustomers could be reimbursed through MAC pricing.  I believe federal

upper limit pricing and other pricing categories that may be set by their third-party payors."

Watson Opp. Ex. 2 ("Clark Dep.") at 102:18-103:9.

Responding further, the testimony cited by Watson regarding the percentage of Watson

sales subject to Medicaid reimbursement is irrelevant to the Statement.  Moreover, Mr. Boyer

recently testified, " Q.  And certainly Watson is not willing or interested in giving up that 9 to

11-percent Medicaid dollars a year, correct?  MR. MATTHEWS:  Objection.  A.  I think, as I

said before, that all of our business is important to us, including Medicaid."  Watson 30(b)(6)

(Boyer) 5/05/09 Dep. (Reply Exhibit B) at 440:19-441:2.

Responding further, to the extent that Watson disputes statement #8 on the basis that its

pharmaceuticals were subject to MAC and/or FUL, the record evidence clearly demonstrates that

MACs and FULs are set based on published prices.  *See* Watson 30(b)(6) (Hartman) 6/03/09

Dep.") (Reply Exhibit A) at 216:21-217:1 ("Again my understanding of the FUL is determined

based on several criteria; and one of them being that it is based on the lowest published cost out

there."); *see also id*. at 296:10-15. ("Q: Earlier you testified that you were aware that the Federal

Upper Limit is set based on published prices.  Do you recall that testimony?  MR. MATTEWS:

Objection.  A:  Yes."),

Finally, plaintiffs dispute and object to all citations herein to Ex. 1 to the Shanahan

Decl.,(Rosenthal Decl), to the extent that it lacks proper foundation.

*Watson Set and Reported Its AWPs and WACs[2]*

**9.      For each of its generic drugs, Watson generally set the AWP at about 10% to 11% below the corresponding brand AWP.  *See* Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 41:10-16 and 76:07-14; Deposition of Napoleon Clark dated 12/01/05 ("Clark 12/1/05 Dep.") (Exhibit H) at 39:15-40:08; Watson Pharmaceuticals, Inc. 30(b)(6) (Andrew Boyer) dated 6/27/07 ("Watson 30(b)(6) (Boyer) 6/27/07 Dep.") (Exhibit E) at 90:7-13.  If there was other generic competition for the product, then Watson set AWP at or near the AWPs set by the competing generic manufacturers selling the same generic drug.  *See* Watson 30(b)(6) (Boyer) 6/27/07 Dep. (Exhibit E) at 91:12-92:16); Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 41:10-16 and 45:4-17; *see also* Recchia 10/11/07 Dep. (Exhibit B) at 118:14-120:3.**

> RESPONSE NO. 9:  Watson disputes the allegations set forth in SOF-W, ¶ 9 to
> the extent that they are unsupported by or go beyond the materials cited.  For
> example, the testimony cited in support of the first sentence of SOF-W, ¶ 9 (Exs.
> E, F, and H) relates only to products that were "new to market."  The testimony
> cited in support of the second sentence of SOF-W, ¶ 9 (Exs. B, E, and F)
> demonstrates that suggested prices were based upon "what's happening in the
> marketplace."  *See, e.g.*, SOF-W, Ex. E, at 92:15-16.  In addition, the materials
> cited relate solely to generalized practices.  Accordingly, the materials cited do
> not constitute specific allegations regarding the prices reported for the drugs that
> are the subject of this motion.  Finally, Watson disputes that it "set" AWP or any
> other reported price.  Instead, Watson reported AWP, and later SWP, as a
> suggestion of a wholesale price, as defined by First Databank.  *See* Shanahan
> Decl. Ex. 4 (Declaration of Non-Party First DataBank's Custodian of Business

---

[2] Lisa Recchia testified that the policies of Watson and Schein for setting WACs and AWPs were similar.  *See* Recchia 10/11/07 Dep. (Exhibit B) at 122:1-7.

Records ("First Databank Decl."), Exs., A-E); *see id.*, Ex. 6 (Declaration of Jesse Childs ("Childs Decl."), Attachment 2).

**PLAINTIFFS' REPLY TO STATEMENT #9:**

Watson disputes the allegations set forth in statement #9 to the extent they are unsupported or go beyond the materials cited. That means Watson does not dispute the statement. The record evidence speaks for itself. Schein 30(b)(6) designee, Napoleon Clark testified, "[t]he SWP for new products basically established 10 to 11 percent off the brand WAC – I mean brand AWP, sorry. If it's an existing product, again, we try to price our product comparably to SWPs of our competitors." Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 76:07-14. Mr. Clark also testified, "SWP for new products is usually determined to be no greater than 90 percent of the brand AWP, SWP." Clark 12/1/05 Dep.") (Exhibit H) at 40:6-8. Watson 30(b)(6) Designee, Andrew Boyer testified:

> Q. [...] Referring first to the situation in which Watson is the first generic on the market and there is no other competition, the way that the AWP is set is to set it at either 10 or 11 percent or so of the AWP or SWP of the brand; is that correct?
> A: Correct.

Watson 30(b)(6) (Boyer) 6/27/07 Dep. at 90:7-13.

> Q: Now let's take the next scenario being a scenario in which Watson is not the first generic on the market but there is either one or more other competitors who have generics on the market before Watson. How is Watson's AWP set?
> A: Usuallly consistent with what's in the marketplace.
> . . .
> A: What everybody's WAC is. They are all the same from the standpoint of having to meet competition in the market. You'll se t your pricing accordingly, SWP, WAC, contract pricing or net pricing, what you were referring to before. It's all a function of what's happening in the marketplace –

*Id*. at 91:12-92:16

Responding further, plaintiffs incorporate their reply to Statement #1 herein insofar as it concerns Watson's dispute that it set its AWPs.

Finally, plaintiffs dispute and object to all citations herein to the Shanahan Decl. Ex. 4 ("First Databank Decl."), insofar as the included exhibits (Exs. A-F) have not been authenticated and otherwise lack proper foundation.

**10.     Watson set its WAC for new products at 20 to 25 percent off of AWP.  _See_ Clark 12/1/05 Dep. (Exhibit H) at 41:9-14; _see also_ Watson 30(b)(6) (Boyer) 6/27/07 Dep. (Exhibit E) at 91:7-11.  For products in competitive markets, Watson sets the WAC by comparing its price to that of its competitors' WACs. _See_ Clark 12/1/05 Dep. (Exhibit H) at 41:9-42:2.**

> RESPONSE NO. 10:  Watson disputes the allegations set forth in SOF-W, ¶ 10 to the extent that they are unsupported by or go beyond the materials cited.  For example, the testimony cited in support of the first sentence of SOF-W, ¶ 10 (Exs. E and H) relates only to products that were "new to market."  The testimony cited in support of the second sentence of SOF-W, ¶ 10 does not relate to WAC, although Mr. Clark did testify that for products that have been on the market for some time, "we review our WAC prices as compared to our competitors."  SOF-W, Ex. H, at 40:15-19.  In addition, the materials cited relate solely to generalized practices.  Accordingly, the materials cited do not constitute specific allegations regarding the prices reported for the drugs that are the subject of this motion.  Finally, Watson disputes that it "set" WAC or any other reported price.  Instead, Watson reported WAC as an undiscounted price to wholesalers.  _See_ Shanahan Decl., Ex. 4 (First Database Decl., Ex. F) ("As you are aware, rebates or other adjustments which, if granted, may result in an effective net price to some purchasers of less than the listed WAC."); _id._, Ex. 3 (2004 Boyer Dep. at 94) ("[WAC is] just the price [a] wholesaler pays for the product.  It's our list price to the wholesaler."); _id._, Ex. 1 (Rosenthal Decl. ¶ 26); _id._, Ex. 5 (Deposition of Dr. Paul Jeffrey, Pharmacy Director for Massachusetts Medicaid, Oct. 19, 2007 ("Jeffrey 30(b)(6) Dep.") at 169-70).

**PLAINTIFFS' REPLY TO STATEMENT #10:**

Watson cannot dispute that the record evidence supports the statement in sentence one. _See_ Clark 12/1/05 Dep. (Exhibit H) at 41:9-14, ("Q. You were just discussing how your WAC price was 20 to 25 percent off your SWP?  A. For new products.  Q. Was that also a policy at Schein?  A. That was a procedure that we used for introducing new products at Schein.")  Mr.

Clark also testified to the same facts in his capacity as a 30(b)(6) witness for Watson.  *See* Watson 30(b)(6) (Napoleon Clark) dated   5/6/09 ("Watson 30(b)(6) (Clark) 5/6/09 Dep.") ("Reply Exhibit D" attached hereto) at 91:22-92:5, stating that "WAC is 20 to 25 percent below for any new generic product to the market.  For products that we are marketing that has existing generic competition, it is not necessarily the case that WAC would be 20 to 25 percent below AWP, SWP."

In further response, the second sentence of the statement is supported by the record evidence.  *See*  Clark 12/1/05 Dep. (Exhibit H) at 40:15-19 ("Q. For products that have been on your market for some time, how do you determine what you WAC pricing would be?  A. We review our WAC prices as compared to our competitors.").

The remainder of Watson's response is improper argument, self-serving ipse dixit, unsupported by evidence and irrelevant.  As a matter of law, the Court has addressed the meaning of WAC and rejected that WAC was understood to be an undiscounted list price.  See Mylan at 143.  No further reply is required

**11.    Before 2000, Watson reported only AWPs to FDB.  In 2000, Watson switched from reporting AWP to reporting a "Suggested Wholesale Price" or "SWP." *Mylan* at \*9.  However, Watson knew that SWP represented the same price as AWP.  *See* Watson 30(b)(6) (Boyer) 6/27/07 Dep. (Exhibit E) at 60:22-61:6.**

> RESPONSE NO. 11:  The allegations set forth in the first and second sentences of SOF-W, ¶ 11 are undisputed.  However, the allegations set forth in the third sentence of SOF-W, ¶ 11 are disputed, as the cited testimony does not support the allegations.  The cited testimony demonstrates only that Watson intended to clarify that it was reporting a suggested wholesale price.  SOF-W, Ex. E, at 60:22-61:6.

**PLAINTIFFS' REPLY TO STATEMENT #11:**

The Parties agree that prior to 2000, Watson reported AWPs to FDB and that in 2000, Watson instead reported SWP.  Watson cannot reasonably dispute that its SWPs were published by FDB as Watson AWPs. The testimony of Watson's 30(b)(6) witnesses speaks for itself:

> A:      Legal was involved in the discussion.  ***The acronym, I guess, is average wholesale price***.  I don't believe the intent of average or suggested wholesale price has ever been changed.  It was always a suggested price.  ***But I believe that to clarify it in the marketplace, it was changed to SWP instead of AWP***.

Watson 30(b)(6) (Boyer) 6/27/07 Dep. (Exhibit E) at 60:22-61:6 (emphasis added).

Responding further, plaintiffs incorporate their reply to Statement #1 herein insofar as it concerns Watson's dispute that it set its AWPs.  No further reply is required.

**12.      In addition to AWP and SWP, Watson at times reported WAC or WHNET to FDB.  *See* Watson 30(b)(6) (Boyer) 6/27/07 Dep. (Exhibit E) at 65:5-69:4; *see* Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 28:3-30:22; Exhibit I (Schein 30(b)(6) (Clark) 6/27/07 Dep. Exhibit 2 (Schein product status report, dated March 20, 1996)); *see also* Recchia 10/11/07 Dep. (Exhibit B) at 28:13-30:15, 39:05-12; Exhibit G (Recchia 10/11/07 Dep. Exhibit 1 (price verification form sent from FDB to Lisa Recchia at Schein, dated November 17, 1995, listing AWPs and WHLNETs)); *see also* Schein 30(b)(6) (Napoleon Clark) dated  6/28/07 ("Schein 30(b)(6) (Clark) 6/28/07 Dep.") (Exhibit J) at 113:22-115:3; *see* Clark 12/01/05 Dep. (Exhibit H) at 137:18-140:14; Exhibit K (Clark 12/01/05 Dep. Exhibit 14 (Schein letter, dated May 27, 1998, communicating AWP, WAC and direct price changes)).**

> RESPONSE NO. 12:  Undisputed that Watson at times reported a WAC to First DataBank, although Watson did not report a WHNET or a WHLNET to First DataBank.  The cited testimony shows that the data cited in the "WHLNET" column was WAC, which Watson understood to be an undiscounted list price.  *See* SOF-W, Exs. B and G; Shanahan Decl., Ex. 4 (First Database Decl., Ex. F) ("As you are aware, rebates or other adjustments which, if granted, may result in an effective net price to some purchasers of less than the listed WAC."); *id.*, Ex. 3 (2004 Boyer Dep. at 94) ("[WAC is] just the price [a] wholesaler pays for the product.  It's our list price to the wholesaler."); *id.*, Ex. 1 (Rosenthal Decl., ¶ 26); *id.*, Ex. 5 (Jeffrey 30(b)(6) Dep. at 169-70); see also Watson's 3-31-08 Rule 56.1 Response, ¶ 23.

**PLAINTIFFS' REPLY TO STATEMENT #12:**

The parties agree that Watson at times reported a WAC to First Databank.

Responding further, plaintiffs object and dispute the additional testimony and documents cited by Watson as irrelevant to the Statement.

Plaintiffs further object and dispute the citation to "Watson's 3-31-08 Rule 56.1 Response, ¶ 23" as improper and unidentifiable.

No further reply is required.

*Watson's Knowledge of the Federal Upper Limits and Maximum Allowable Cost.*

**13.     Watson knew that the Federal Upper Limit (FUL) limited the reimbursement paid by third-party payors.  *See* Recchia 10:11/07 Dep. (Exhibit B) at 146:11-152:2; Exhibit L (Recchia 10/11/07 Dep. Exhibit 21 (Schein memo, dated 8/27/96, approving a strategy intended to increase FUL)).**

> RESPONSE NO. 13:  Watson disputes the allegations set forth in SOF-W, ¶ 13 to the extent that they are unsupported by or go beyond the materials cited and to the extent that they seeks to characterize the role and purpose of the FUL, which is prescribed by legislation and has been described by CMS.  *See, e.g.,* L.R. 56.1 Stmt. of Undisputed Material Facts Supporting Defs.' Jt. Mot. for Summary Judgment on Pls.' "FUL Fraud" Claims, ¶¶ 7-9; 37-38 (Dkt. 6054) (D. Mass., 01-cv-12257-PBS) (hereinafter "Defs.' 56.1 Stmt.").

**PLAINTIFFS' REPLY TO STATEMENT #13:**

Watson's response makes no contact whatsoever with plaintiffs' statement.  Nor does the "evidence" cited by Watson contradict it.  Plaintiffs stand by the Statement and the supporting record evidence.  Ms. Recchia testified as follows:

> Q:  And do you know what the purpose of the FUL is?
> A:  Probably reimbursement.
> Q:  Is it not true that the FUL is the Federal upper limit?
> A:  Federal upper limit is what I said earlier.  Right.
> Q:  Yes.  So, its function is to limit the pricing to be paid on the drugs to which it applies.  Correct?
> A:  Yes, sir.

Recchia Dep. 10/11/07 (Exhibit B) at 149:1-11.

In further response, Mr. Hartman, a Watson's 30(b)(6) witness, testified:

A: The MAC would be, you know, the Maximum Allowable Cost that a pharmacist would be reimbursed on a product, so we wanted to make sure that our contract prices allowed them to at least break even.

Q: Right. You wanted to make sure that your contract prices did not exceed the FUL or the MAC, correct?

A: That's correct.

Watson 30(b0(6) (Hartman) 6/3/09 (Reply Exhibit A) at 185:16-186:1.

Q: A state's never going to pay more than the FUL is it, sir?

MR. MATTHEWS: Objection.

A: No, sir.

Q: The only way a state would pay less than a FUL is if Watson reported a price that was less than the FUL, correct?

MR. MATTHEWS: Objection.

A: I presume so, yes.

*See id.* at 200:23-201:8.
.

***Watson Paid Wholesalers Chargebacks and Rebates***

14. **At all times from 1997 to 2005, Watson sold drugs to the three national wholesalers and/or one of their predecessor companies.** ***See*** **Watson Pharmaceuticals, Inc. 30(b)(6) (Andrew Boyer) dated 7/14/04 ("Watson 30(b)(6) (Boyer) 7/14/04 Dep.") (Exhibit M) at 20:9-17;** ***see also*** **Exhibit N (Watson 30(b)(6) (Boyer) 7/14/04 Dep Exhibit 11 (Schein letter to McKesson, dated October 20, 1999, with attached Select Generics Program Supplier Agreement));** ***see also*** **Exhibit O (Watson 30(b)(6) (Boyer) 7/14/04 Dep. Exhibit 12 (Schein document, Response to Terms and Conditions AmeriSource SELECT)).**

RESPONSE NO. 14: Undisputed.

**PLAINTIFFS' REPLY TO STATEMENT #14:**

No further response is required.

15. **Watson pays the wholesalers chargebacks and rebates that reduce the wholesalers net cost.** ***See*** **Recchia 10/11/07 Dep. (Exhibit B) at 197:16-200:22; Exhibit P (Recchia 10/11/07 Dep. Exhibit 10 (Schein memo from Lisa Recchia, dated December 6, 1996);** ***see*** **also Deposition of Kathleen Barclay dated 11/21/05 ("Barclay 11/21/05 Dep.") (Exhibit Q) at 45:9-14. Watson knew that non-warehousing chains purchased Watson's products from wholesalers below WAC, and the wholesalers received chargebacks from Schein, resulting in a net cost to the wholesaler of WAC less the chargeback.** ***See*** **Recchia 10/11/07 Dep. (Exhibit B) at 116:4-117:9; Exhibit R (Recchia 10/11/07 Dep. Exhibit 13 (Schein pricing grid)).**

RESPONSE NO. 15:   Watson disputes the allegations set forth in the first sentence of SOF-W, ¶ 15 to the extent that they are unsupported by or go beyond the materials cited.  For example, the testimony cited references chargebacks and rebates to wholesalers, but does not provide details of times or dates, customer names, products, amounts, or terms or circumstances upon which rebates or chargebacks are provided.   However, Watson does not dispute that it paid wholesalers chargebacks and rebates that reduced the wholesalers' net costs on purchases of drugs that were then resold to customers that had contracts with Watson.  Shanahan Decl., Ex. 2, at 124-25.  Watson disputes the allegations set forth in the second sentence of SOF-W, ¶ 15 to the extent that they are unsupported by or go beyond the material cited.  For example, the testimony cited relates to chargebacks provided by Schein for three specific products at a specific point in time (SOF-W, Ex. R).

**PLAINTIFFS' REPLY TO STATEMENT #15:**

The parties agree that Watson paid wholesalers chargebacks and rebates that reduced the wholesalers' net costs on purchases of drugs that were then resold to customers that had contracts with Watson.   Beyond that, Watson disputes Statement #15 to the extent that the allegations are unsupported by or go beyond the material cited.   This means Watson does not dispute the Statement.   The record evidence speaks for itself as follows:

Q:  And I ask you to look at model two at the bottom of page 1, where your recommendation is "WAC would be significantly lower than our competitors.  This model would reduce the amount of wholesaler rebate payments and chargeback debits." What are wholesaler rebate payments and chargeback debits?
A:  Chargeback.
Q:  Chargeback debits are the normal chargebacks.  That's just chargeback.  There is nothing special about it.  Nothing special about chargeback debit?
A:  Yes.
. . .
Q:  How did you know that by lowering the WAC, it would reduce the amount of wholesaler rebates payments.  You did draft this memo?
A:  Yes.  Just from the simple formula of rebate, being a rebate, a percentage off or some amount off.

Q:  If a wholesaler purchased the drug at WAC and was part of a wholesaler rebate program, then it is wholesale – its net cost would be less than WAC?

MR. FARQUHAR:  If they meet the terms of the rebate program.  Right.  Is that your question?

MR. CARROLL:  Yes.

A:  Yes.

Recchia 10/11/07 Dep. (Exhibit B) at 197:16-200:22.

Q:  How about chargebacks, what is the chargebacks department's responsibility?

A:  They basically process the chargeback requests that come in from wholesalers.

Q:  Are any rebates paid to wholesalers?

A:  Yes.

Barclay 11/21/05 Dep. at 45:9-14.

Q:  Sure.  In connection with that – I think what you said was that the, for product that is purchased through a wholesaler, the wholesaler pays Schein at WAC.  Correct?

A:  Yes.

Q:  Okay.  And then, when the non warehousing chain purchases from the wholesaler from this grid, it would pay less than the WAC?

A:  That would be correct.

Q:  It would pay less than the WAC.  Right?

A:  Yes.

Q:  In connection with that transaction, would Schein pay the wholesaler a chargeback?

A:  There would be a chargeback generated.

Q:  What would be the net cost to the wholesaler for that transaction?

A:  To my understanding, the formula would be WAC minus the contract price.

Q:  The net cost to the wholesaler would be WAC less the chargeback.  Correct?

A:  I guess.

Q:  The wholesaler would have paid the net cost to the wholesaler for that product, would be what it paid Schein less what Schein paid them back.  Correct?

Actually, you are going to have to speak up because of the telephone.

A:  Yes, yes.

18

Recchia 10/11/07 Dep. (Exhibit B) at 116:4-117:9.

No further response is required

***Other Watson Customers Received Rebates***

**16.   Watson knew that customers such as Kerr Drug, Publix, and Winn Dixie, who purchase Watson drugs through wholesalers, received pass-through rebates from wholesalers in the form of credit. *See* Barclay 11/21/05 Dep. (Exhibit Q) at 45:19-46:16.**

RESPONSE NO. 16:  Watson disputes the allegations set forth in SOF-W, ¶ 16 to the extent that they are unsupported by or go beyond the materials cited.  For example, the testimony cited makes clear that, to the witness' knowledge, only Kerr Drug, Publix, and Winn Dixie received pass-through rebates.  Furthermore, the testimony does not state the amount of the rebate, under what circumstances it applied, or to which products it applied.

**PLAINTIFFS' REPLY TO STATEMENT #16:**

Watson disputes Statement #16 to the extent that it is unsupported or goes beyond the

material cited.  This means that Watson does not dispute the Statement.  The record evidence

speaks for itself as follows:

Q. [...] Which customers do you have an expectation were passed along rebates by the wholesalers?
A:  We have a customer that buys through their wholesaler.  We actually let the wholesaler provide credit to them instead of paying them a check.  That is a specific agreement.
Q:  Which customer is that?
A:  Kerr Drug.  It's a retailer.  And those are specifically called pass-through rebates so that it's understood.  We have very few of them.
Q:  Can you think of any other customers who get pass-through rebates from wholesalers?
A:  Publics, and Winn Dixie, I believe.  I don't recall any others.

*See* Barclay 11/21/05 Dep. (Exhibit Q) at 46:2-46:16.

**17.   For the period between 1997 and 2005, Watson offered rebates of 2% to 19% off of net sales to various classes of trade. *See* Barclay 11/21/05 Dep. (Exhibit Q) at 104:5-111:20 and 113:7-114:8; Exhibit S (Barclay 11/21/05 Dep. Exhibit 4 (June 14, 1994 memo describing rebates for warehousing and non-warehousing chains as high as 8 percent off net sales; and administrative fees for nursing homes, hospitals and GPOs of 2 percent)).**

<u>RESPONSE NO. 17</u>:  Watson disputes the allegation set forth in SOF-W, ¶ 17 to the extent that it is unsupported by or goes beyond the materials cited and to the extent that the phrase "net sales" is vague and undefined.  Specifically, the cited materials describe rebates generally given to various classes of trade over time off of contract prices or invoice prices, whereas the allegation in SOF-W, ¶ 17 is misleading as it fails to distinguish between classes of trade or to define the phrase "net sales."

## PLAINTIFFS' REPLY TO STATEMENT #17:

Watson disputes Statement #17 to the extent that it is unsupported by or goes beyond the

materials cited and to the extent that the phrase "net sales" is vague and undefined.  This means

that Watson does not dispute the testimony.  Plaintiffs stand by the Statement and the supporting

record evidence.  The record evidence speaks for itself :

> Q:      And what it the range of rebates that you give to warehousing chains, in your experience, since 1997 to the present?
> A:      They basically range from 5 percent to 19 percent.
> Q:      And how about the next category, non-warehousing chains?  It says again, up to 8 percent rebate.  Is that again, off of net sales?
> A:      Yes.
> Q:      And is that consistent with the rebates that you provided to non-warehousing chains between '97 and today?
> A:      We don't currently differentiate between warehousing and non-warehousing.  But it seems consistent with those customers.

Barclay Dep. 11/21/05 at 105:20-106:13.

> Q:      And what was the size of the administrative fee to long-term GPOs?
> A:      2 percent.
> Q:      And is that still true today?
> A:      2 to 3 percent today.
> Q:      When did it begin to go 2 to 3 percent?
> A:      Several years ago.  That was the new requirement for the bid.

*Id*. at 107:7-14.

> Q:      How about managed care organizations, do they receive any rebates?

A:     Yes.

Q:     What's the range of rebates they receive between 1997 and 2005?  And if it changed during the course of that period you can just give me ranges.

A:     Schein did not have any, so my only knowledge is after 2000.  It would depend on the product.  It could be anywhere from 2 percent to 40 percent.

*Id*. at 111:10-20.

Q:  So with regard to retail chains, can you tell me, were they eligible for off-invoice discounts during the period '97 and 2005?

A:  Yes.

Q:   And what percentage off-invoice discount were they eligible for?

A:  Percentage of what?  Basically they received a contract price.

Q:  A contract price.  And were there off-invoice discounts off that price?

A:  Off of that price?  Only payment terms.

Q:  Prompt payment terms?

A:  Yes.

Q:  Was that 2 percent off for prompt payment?

A:  1 or 2.

Q:   And were they eligible for any other discounts or rebates to lower their acquisition cost?

A:  They were eligible for rebates.

Q:  And what was the range of rebates from '97 to 2005 for retail chains?

A:  It varies.  You know, at some point they were as low as 5 percent.  Now they can be as high as 19 percent.

*Id*. at 113:7-114:8.


***Watson's Published AWPs and WACs had No Relationship to Actual Prices***


**18.     Watson knows that none of its customers pay AWP for generic drugs (*see* Barclay 11/21/05 Dep. (Exhibit Q) at 96:9-10; *see also* Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 44:7-21; *see* Recchia 10/11/07 Dep. (Exhibit B) at 202:7-12).**

<u>RESPONSE NO. 18</u>:  Watson disputes the allegation set forth in SOF-W, ¶ 18 to the extent that it is unsupported by or goes beyond the materials cited, and is inherently misleading.  Specifically, the cited testimony relates to prices paid by Watson's contracted customers.  Moreover, the allegation ignores that AWP (or

SWP in Watson's case, after 2000) is a suggestion of a wholesale price to be paid by the wholesaler's customer to the wholesaler (not to Watson), *see* Shanahan Decl., Ex. 7 (Deposition of Andrew Boyer, May 4, 2009 ("2009 Boyer Dep."), at 268) ("We are selling to direct customers, being chains, wholesalers, mail order. What they chose after that to sell the product for, a wholesale distributor marketplace, I don't have any control over.  I don't know what the price would be . . . [t]here is a markup, I just don't know what it is."), and therefore, the allegation ignores the ordinal relationships widely understood to apply to pricing measures used in the pharmaceutical industry.  See June 15, 2009 Defs' Jt. Response to Plaintiffs' Rule 56.1 Statement Applicable to All Defendants, Additional Undisputed Material Facts, ¶ 1 ("AWPs are expected to be greater than WACs").

## PLAINTIFFS' REPLY TO STATEMENT #18:

Watson disputes the allegation set forth in Statement #18 to the extent that it is unsupported by or goes beyond the materials cited, and is inherently misleading.  This means that Watson does not dispute the testimony**.**  Plaintiffs stand by the Statement and supporting record evidence, which clearly shows that Watson did not sell its products to its customers at AWP.  The record evidence speaks for itself:

> Q:      Now, customers who buy from Schein or Watson buy at what price?  Do they buy at list price or bid price?  What do you call that?
> A:      If they have a contract they would buy at their contract price.
> Q:      Does anybody buy at WAC?
> A:      Yes.
> Q:      Who buys at WAC?
> A:      Most wholesalers.  Actually, all wholesalers, and anyone who doesn't have a contract.
> Q:      Does anybody buy at AWP?
> A:      Directly from us?  Not to my knowledge.

Barclay Dep 11/21/05 (Exhibit Q) at 95:21-96:10.

*See also* Clark Dep. 6/27/07 (Exhibit F) at 44:13-15 ("Q:  And you don't charge them the AWP, right?  A:  No.  Not a contracted customer, no.").

Responding further, Watson's commentary on "ordinal relationships" and the "pharmaceutical industry" is too vague as to permit a response.  No further response is required.

.

**19.    With increasing competition, the price Watson charged its customers would decline as Watson's AWPs and WACs normally increased.  *See* Watson 30(b)(6) (Boyer) 6/27/07 Dep. (Exhibit E) at 121:18-122:7.**

RESPONSE NO. 19:  Disputed.  The cited testimony does not support this allegation. The full quote reads:

> Q:  Suppose that nothing else was happening in the marketplace. What would you do   with regard to your reported AWP or SWP?
> A:  Probably discontinue the product.
> Q:  And why is that?
> A:  Because we have not been -- we have not been the ones that have really tried to   change WACs or AWPs in the marketplace other than on exclusive products, which   means most times they are going up.  I think in most cases we have been meeting the   competition in the marketplace as it relates to contract pricing and WAC and SWP in the multiplayer market.  Normally, when the product gets that low anyway, there isn't a   whole lot of profitability in it on our side of the equation, so what's the point of being in   it?" (SOF-W, Ex. E, at 121:13 – 122:7.)

**PLAINTIFFS' REPLY TO STATEMENT #19:**

The parties agree that the cited testimony does not support the allegation.

In further response, the record evidence shows that when the market for a drug became more competitive, Watson increased its AWP while decreasing its WAC.  The testimony is as follows:

> Q. To continue with the quote, as the chart below inicates, significant changes were made to Scheins' WAC and AWP pricing.  These revisions were made to be more competitive with Mylan in the marketplace, end quote.
> A. Yes, that is correct.
> . . .
> Q. –you're reducing the wholesale acquisition cost, or WAC, and at the same time, increasing the AWP, correct?
> A. Yes.
> Q. Do you believe that to be a manipulation of either the AWP or the WAC to increase the spread for reimbursement purposes?

A. Well, I don't call it the spread for reimbursement purposes, but I call it exactly what they say it is.  These revisions were made to be more competitive with Mylan in the marketplace.

Boyer 05/04/09 (Reply Exhibit B) Dep. at 263:7-265:3.

**20.    Watson maintained tiered product pricing for various classes of trade, which are the presumptive prices that would be charged to each particular customer.  *See* Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 74:10-76:19; *see also* Recchia 10/11/07 Dep. (Exhibit B) at 40:18-44:4, 113:20-118:8; Exhibit R (Recchia 10/11/07 Dep. Exhibit 13 (Schein pricing grid listing AWP and WAC for various classes of trade including non-warehousing chains, warehousing chains, large and small nursing home providers and hospitals)); *see also* Recchia 10/11/07 Dep. (Exhibit B) at 143:15-145:14; Exhibit T (Recchia 10/11/07 Dep. Exhibit 19 (pricing grid listing by NDC the SWP, WAC and pricing levels for category levels B, D, D and E)); Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 71:9-75:19.**

RESPONSE NO. 20:  Watson disputes the allegations set forth in SOF-W, ¶ 20 to the extent that they are unsupported by or go beyond the materials cited.  Specifically, the cited testimony demonstrates nothing more than that Watson provided various levels of discounts to various classes of trade.  *See, e.g.*, SOF-W, Ex. F at 71: 15-19 ("Q:  So it would be prices that as a general matter would apply to different classes of trade that are your customers that you are selling to? A:  Correct, contract pricing."); *id.* at 73:13 – 74:5 ("Q:  Okay.  Can you just work through just an example of how the level B price would be charged to a wholesaler in a transaction?  A:  Wholesaler purchases at the WAC price directly.  Q:  So that would be at WAC.  A:  At WAC.  Q:  Okay.  A:  They would sell the product out to customer or through their source program.  When we get the chargeback, the units would be applied to the difference between the WAC price and the wholesaler price.  The wholesale level B price.  Then there would be applicable rebates on it to get to the rollover net price.").

**PLAINTIFFS' REPLY TO STATEMENT #20:**

Watson disputes the allegations set forth in Statement #20 to the extent they are

unsupported by or go beyond the materials cited.  This means that Watson does not dispute the

Statement.  Plaintiffs stand by the Statement and supporting record evidence.  The testimony of

Mr. Clark, a 30(b)(6) Watson designee, speaks for itself:

Q:  Now, you said there is a pricing grid – pricing points, they are just different from this, that are now in effect at Watson; is that correct?
A:  Correct.

Q:  Do you know what those pricing points are?

A:  SWP, WAC, level 1, level 2, level 3, level 4, level 5.

. . .

A:  Okay.  To the best of my knowledge, level 1 is reserved for the larger national chain accounts.

Level 2 would be synonymous here with the level C, nonwarehousing, indirect, small GPO accounts.

Level 3 would normally be wholesaler pricing and large distributors.

Level 4 would be like the retail buying group, a larger retail buying group.

Level 5 would be more GPOs, group purchasing organizations.

Q:  Levels 1, 2, 3, 4 and 5 or B, rollover net, C, D and E, those all refer to specific amounts that would be charged to a particular customer; isn't that correct?

A:  Trade class, yes.

Q:  And the way that that is used in Watson's business is that once you determine what the trade group is, that would be the presumptive price that's charged to that customer; isn't that correct?

A:  Correct.

Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 74:10-76:3.


**21.    Because Mylan, contract sales which comprised the majority of its business, were always priced below WAC (see Deposition of Joseph Canny dated 12/2/05 ("Canny 12/2/05 Dep.") (Exhibit U) at 149:6-22, 151:7-11), Mylan knew that its published WACs were false.  Mylan, 2008 WL 5650859 at \*26.**

RESPONSE NO. 21:  Disputed.  For purposes of this response, Watson assumes that the references to Mylan were intended to be references to Watson.  Watson denies that its reported WAC was ever intended to be a price that was net of all discounts and rebates and denies that its reported WACs were "false."  See Shanahan Decl., Ex. 4 (First Database Decl., Ex. F) ("As you are aware, rebates or other adjustments which, if granted, may result in an effective net price to some purchasers of less than the listed WAC."); id., Ex. 3 (2004 Boyer Dep. at 94) ("[WAC is] just the price [a] wholesaler pays for the product.  It's our list price to the wholesaler."); id., Ex. 1 (Rosenthal Decl., ¶ 26); id., Ex. 5 (Jeffrey 30(b)(6) Dep., at 169-70); see also id., Ex. 2  (Clark Dep., at 124-25) and Ex. 3 (2004 Boyer Dep. at 241); SOF-W, Ex. F at 73:16-19 ("A:  Wholesaler purchases at the WAC price directly.  Q:  So that would be WAC.  A. At WAC.").  Watson further states that the cited testimony demonstrates only that Mr. Canny estimated that contract sales accounted for approximately 90% of Watson's sales for two brand drugs (Ferrlecit and InFeD).

**PLAINTIFFS' REPLY TO STATEMENT:**

The parties agree that references to "Mylan" in the initial statement were intended to reference "Watson."

Watson's argument that its WAC was not intended to reflect a price net of all discounts and rebates is irrelevant and disputed.   The data produced by Watson in this case demonstrates the extent to which Watson's sales were at prices below WAC.  *See* Exhibit A.

In further response to Watson's denial that contract sales account for 90% of Watson's products, Watson's 30(b)(6) witness testified to the contrary:

> Q:  --you, in fact, have about 90 percent of your business through contracts, direct contracts with customers, correct?
> A:  That's today, yes.
> Q:  And that goes back for some time, at least to 1996, correct?
> A:  That's correct – to '96?  I don't know about '96, but, you know, it goes back.

*See* Watson 30(b)(6) (Boyer) 5/05/09 Dep.") (Reply Exhibit B) at 267:9-17.

***Watson Marketed the Spread***

**22.    Watson knew that the reimbursement spread basically marketed itself, as it was self-evident to Watson's pharmacy customers for all of its drugs as they were aware of how they would be reimbursed by Medicaid.  *See* Exhibit V (Barclay 11/21/05 Dep. Exhibit 13 (March 1996 pricing grid comparing the AWPs of Schein and Mylan)).**

> RESPONSE NO. 22:  Disputed.  It is improper for Plaintiffs to contend that an argument about what was "self-evident" or known to a third party is an allegation of fact as to Watson or Watson's knowledge.  Moreover, the cited document does not support the allegation set forth in SOF-W, ¶ 22.

**PLAINTIFFS' REPLY TO STATEMENT #22:**

The parties agree that the cited evidence is an internal document that does not support the statement.

In further response, other record evidence does support the proposition. *See e.g.* Reply Exhibit E, attached hereto(Watson 30(b)(6) (Boyer) 5/04/09 Dep. Ex. 7) (Letter from Tom

Hadley to GeriMEd, dated 4/23/98, explaining that "there is an added benefit for all members to move to Microzide since the spread for Microzide is better than generic 25mg HCTZ."). *See also e.g.* Reply Exhibit F, attached hereto (Watson 30(b)(6) (Boyer) 5/04/09 Dep. Exhibit 22 (Watson letter to Rite Aid Corp., dated 12/2/97, explaining that "[t]his will allow us to increase our AWP spread even higher than we had discussed."). Mr. Boyer comments on Reply Exhibit F, testifying as follows:

> [W]hat they've done here is tell them that they have the ability to make more money. But no matter what they tell them, it really isn't going to matter. They're going to have to make their own calculations of the pricing that we're offering and the rebates that we're offering here based upon the market share increases that they think that they can attain as to whether that would make them more profitable or not.

Watson 30(b)(6) (Boyer) 5/04/09 (Reply Exhibit B) Dep**.** at 256:4-14.

**23.       As opportunities to increase prices became limited, Watson lowered its AWP, knowing that it would affect an increase in the FUL resulting in increased reimbursement for Watson's drugs.  *See* Recchia 10:11/07 Dep. (Exhibit B) at 146:11-152:2; Exhibit L (Recchia 10:11/07 Dep. Exhibit 21 (Schein memo, dated 8/27/96, approving a strategy intended to increase FUL)); *see also* Clark 12/1/05 Dep. (Exhibit H) at 107:8-108:21; Exhibit W (Clark 12/1/05 Dep. Exhibit 10 (Schein procedural document advising that a review of WAC should also include a comparison to FUL)); *see also* Schein 30(b)(6) (Clark) 6/27/07 Dep. (Exhibit F) at 54:12-56:16.**

> RESPONSE NO. 23:  Disputed.  The allegations set forth in SOF-W, ¶ 23 are not supported by the materials cited.  Moreover, there is no evidence showing that Watson's changing of AWP affected the FUL at all, as FULs were not based on AWPs.  *See* Defs' 56.1 Stmt., ¶ 34.  Finally, a change in the FUL would provide no competitive advantage for Watson, as all therapeutically equivalent drugs were reimbursed at the FUL price.  See Addanki Affidavit of May 15, 2009, ¶ 20 (Dkt. 6056) (D. Mass., 01-cv-12257-PBS).

**PLAINTIFFS' REPLY TO STATEMENT #23:**

The record evidence speaks for itself.  In the Schein memo dated 8/27/96, Lisa Recchia writes under a subheading entitled "Strategy Recommendation Moving Forward," that "AWP spread form the brand will be reduced to approximately 12% from the current 25.1% (100's) and

23.4% (1000's).  This will help raise the FUL price when HCFA reviews them in December."

*See* Exhibit L (Recchia 10/11/07 Dep. Exhibit 21 at bates MDLW 19174).  No further response

is required.

### Watson's Knowledge of the OIG Guidelines

    **24.**    **Watson knew about the OIG Guidelines.  *See* Canny 12/02/05 Dep. (Exhibit U) at 75:7-17; Deposition of Timothy Callahan dated 11/29/05 (Exhibit X) at 546:6-15.**

    RESPONSE NO. 24:  Undisputed, to the extent that the phrase "OIG Guidelines" references the 2003 Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731.  Watson further notes that the cited testimony appears to relate only to reimbursement for the dialysis market in 2005.

### PLAINTIFFS' REPLY TO STATEMENT #24:

    The parties agree that Watson knew about the 2003 Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731.

    No further response is required.

### Watson's AMPs

    **25.**    **Watson reports its average manufacturer's price ("AMP") to HHS.  *See* Watson Answer at ¶ 62; *see also Mylan*, 2008 WL 5650859 at \*30.**

    RESPONSE NO. 25:  Undisputed, to the extent that the Plaintiffs' reference to AMP coincides with the statutory definition of the information that Watson reported.

### PLAINTIFFS' REPLY TO STATEMENT #25:

    The parties agree that Watson reports its statutorily defined average manufacturer's price

("AMP") to HHS.  No further response is required.

Dated: June 30, 2009

                              Respectfully submitted,

                              **City of New York and New York Counties in MDL 1456 except Nassau and Orange by**

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala_____

By:    Joanne M. Cicala
      James P. Carroll Jr.
      Jocelyn R. Normand
      Kathryn B. Allen

Ross B. Brooks, Esq.
MILBERG  LLP
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
LEVY PHILLIPS &
KONIGSBERG, LLP
800 Third Avenue
New York, NY 10022
(212) 605-6205
*Counsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' REPLY RESPONSE TO DEFENDANT WATSON PHARMACEUTICALS, INC. AND WATSON PHARMA, INC.'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WATSON PHARMACEUTICALS, INC. AND WATSON PHARMA, INC., to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties. The confidential exhibits to the foregoing have been served electronically directly to counsel for Watson Pharmaceuticals, Inc. and Watson Pharma, Inc.

Dated:  June 30, 2009

_____/s/_____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600