# REPLY EXHIBIT A

# Condensed Transcript

# Deposition of
# Mark Andrew Hartman

**taken on
6/3/2009**

**State of Alabama
v.
Watson Laboratories, Inc., etc., et al**

**Case No. CV-2005-219**



**Certified Court Reporters,
Certified Legal Video Specialists,
and Trial Presentation Consultants
(334) 262-3332  888-253-3377
www.baker-baker.com**

*    *    *    *    *    *    *    *

The videotaped deposition of MARK TIMOTHY
HARTMAN was taken before Cornelia J. Baker,
Certified Court Reporter, ABCR 290, and
Certified Shorthand Reporter, as
Commissioner, on June 3, 2009, commencing at
approximately 10:28 a.m., at the Dunhill
Hotel, 237 North Tryon Street, Charlotte,
North Carolina.

*    *    *    *    *    *    *    *

                IN THE CIRCUIT COURT OF
                   MONTGOMERY COUNTY
                   STATE OF ALABAMA
In the Matter of:
ALABAMA MEDICAID
PHARMACEUTICAL AVERAGE        MASTER DOCKET
WHOLESALE PRICE LITIGATION   NO. CV-2005-219


-------------------------------------------
This Document Relates to:
State of Alabama v.
Watson Laboratories, Inc.
No. 2005-219.74
State of Alabama v.
Watson Pharma, Inc.
No. 2005-219.75
State of Alabama v.
Watson Pharmaceuticals, Inc.
No. 2005-219.76

*    *    *    *    *    *    *

Mark Andrew Hartman
June 3, 2009

```
 1         *    *    *    *    *    *    *
 2
 3              TRAVIS COUNTY, TEXAS
                19TH JUDICIAL DISTRICT
 4             CAUSE NO. D-1-GV-001566
 5    The State of Texas, ex rel.,
      Ven-A-Care of the Florida Keys, Inc.,
 6       v.
      Alpharma USPD f/k/a
 7    Barre-National, Inc., et al.
 8
 9         *    *    *    *    *    *    *
10
11     IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
12               STATE OF HAWAII
13    State of Hawaii
         v.    Civil No. 06-1-0720-04-EEH
14    Abbott Laboratories, Inc., et al.
15    State of Hawaii
         v.    Civil No. 07-1-1639-09-EEH
16    Schering Corporation;
      DOE Corporations 1-100;
17    DOE Entities 1-100.
18
19         *    *    *    *    *    *    *
20
21
22
23
                                    Page  2
```

```
 1         *    *    *    *    *    *    *
 2
                IN THE CHANCERY COURT OF
                RANKIN COUNTY, MISSISSIPPI
 3             20TH CHANCERY COURT DIVISION
 4
 5    State of Mississippi
 6      v.   Civil Action No. G2009-65597
 7    Watson Pharma, Inc.
 8
 9    State of Mississippi
10      v.   Civil Action No. G2009-65629
11    Watson Pharmaceuticals, Inc.
12
13    State of Mississippi
14      v.   Civil Action No. G2009-65630
15    Watson Laboratories, Inc.
16         *    *    *    *    *    *    *
17
18               STATE OF FLORIDA
19         CIRCUIT COURT FOR LEON COUNTY
20                  98-3032-G
21
22         *    *    *    *    *    *    *
23
                                    Page  4
```

```
 1
 2         *    *    *    *    *    *    *
 3           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
 4
      IN RE PHARMACEUTICAL INDUSTRY
 5    AVERAGE WHOLESALE PRICE LITIGATION
      MDL 1456
 6    Master File No. 1456
 7    Subcategory Case No. 07-12141-PBS
 8    This Document Relates To:
 9    State of Iowa
         v.
10    Abbott Laboratories, et al.
11    The City of New York, et al.
         v.
12    Abbott Laboratories, et al.
13
14         *    *    *    *    *    *    *
15
16
17
18
19
20
21
22
23
                                    Page  3
```

```
 1         *    *    *    *    *    *    *
 2               APPEARANCES
 3
      Representing the State of Alabama:
 4
 5         MR. CLINTON C. CARTER
           Attorney at Law
 6         Beasley, Allen, Crow, Methvin,
           Portis & Miles, P.C.
 7         272 Commerce Street
           Montgomery, Alabama  36104
 8         334.269.2343
           clint.carter@beasleyallen.com
 9
10    Representing the State of Texas:
11         MS. MARGARET MOORE
           Assistant Attorney General
12         Texas Attorney General's Office
           Post Office Box 12548
13         Austin, Texas  78711-2548
           margaret.moore@oag.state.tx.us
14
15    Representing the State of Kansas:
16         MR. JAMES BARTIMUS
           Attorney at Law
17         Bartimus, Frickleton, Robertson &
              Gorny
18         11150 Overlook Road
           Suite 200
19         Leawood, Kansas  66211
           913.266.2300
20         jb@bflawfirm.com
21
22
23
                                    Page  5
```

2  (Pages 2 to 5)

**Page 38**

1  price; you're aware of that, aren't you, sir?

2  MR. MATTHEWS: Objection.

3  A   Again, we published something

4  to them that was the same as we published to

5  the wholesalers.  I did not dictate what FDB

6  published.

7  Q   Right.

8  A   If it was the same, then...

9  Q   But you have knowledge that it

10  was the same number?

11  A   It was often the same, yes.

12  Q   Can you give the Jury an

13  example where Watson reported an AWP to First

14  DataBank and First DataBank in turn published

15  a different number?  Can you give the Jury

16  one example of that happening?

17  A   No, sir.

18  Q   So it's fair to say, to the

19  best of your knowledge, that the AWP price

20  that Watson reported to First DataBank was

21  the same price that First DataBank published

22  for Watson drugs, correct?

23  MR. MATTHEWS: Objection.

**Page 39**

1  A   Yes.

2  Q   And is the same true for the

3  WAC price, sir?

4  MR. MATTHEWS: Objection.

5  A   Again, we published a WAC price

6  as well.

7  Q   Watson reported a WAC price to

8  First DataBank; First DataBank in turn

9  published that WAC price, correct, sir?

10  A   I don't know.  In some cases

11  they reported WACs, some cases they did not

12  report WAC, is my understanding.

13  Q   Between 1997 and 2002, it's

14  your testimony that you're not sure whether

15  or not First DataBank published WAC prices

16  for Watson drugs?

17  A   My recollection is that in some

18  cases, the WACs were reported, and in some

19  cases they were not, whether they were Watson

20  products or other companies products, whether

21  they reported WACs or not.

22  Q   Well, I'm just talking about

23  Watson products.

**Page 40**

1  A   Okay.  Again, as far as I

2  recall, most products were published, if we

3  sent them a WAC.  There was a period of time

4  when I don't believe we sent WACs to them.

5  Q   Do you know whether or not

6  First DataBank continued to publish a WAC for

7  Watson drugs even though Watson was not

8  reporting WAC prices to First DataBank?

9  A   I do not know, sir.

10  Q   Was anybody in your division in

11  charge of monitoring the prices that First

12  DataBank published for Watson drugs?

13  A   We had a pricing contracts

14  group that would keep track of that, yes,

15  sir.

16  Q   You are aware, sir, that during

17  your time at Watson that the AWPs and WACs

18  that First DataBank published for Watson

19  drugs were relied upon state Medicaid

20  agencies in their reimbursement formulas; are

21  you aware of that?

22  MR. MATTHEWS: Objection.

23  A   Yes.

**Page 41**

1  Q   In fact, that's one of the

2  reasons that Watson reported prices to First

3  DataBank was so state Medicaid agencies could

4  rely on those prices when they reimbursed

5  providers for Watson drugs, correct?

6  MR. MATTHEWS: Objection.

7  A   Yeah.  I mean, we reported AWPs

8  and WACs and had actual -- that were prices

9  that were, again, suggested prices to them.

10  We do not report actual net prices.

11  Q   And I'll get to that in a

12  minute.  But one of the reasons that Watson

13  reported WACs and AWPs to First DataBank was

14  because Watson knew that state Medicaid

15  agencies would rely on those prices when

16  reimbursing providers for Watson drugs,

17  correct?

18  MR. MATTHEWS: Objection.

19  A   All pharmacies relied on AWPs

20  and third-party, whether it's states or

21  whether it's managed care organizations

22  relied on AWP at that time to report -- to do

23  their drug reimbursement at pharmacy.

11 (Pages 38 to 41)

Mark Andrew Hartman
June 3, 2009

| | |
|---|---|
| 1  it?  It's possible? | 1  meeting, the intention of the program is to |
| 2      A   It's possible, depending again | 2  provide Rite Aid Corporation the opportunity |
| 3  on each state's reimbursement structure. | 3  to earn increased profitability via lucrative |
| 4      Q   And you're not familiar with | 4  spreads and incremental rebates on the entire |
| 5  Alabama's reimbursement formula, correct? | 5  family of Watson's oral contraceptives. |
| 6      A   I'm not familiar with the | 6      Q   Watson's goal of entering into |
| 7  specific reimbursement formula, no, sir. | 7  this program with Rite Aid was to provide |
| 8      Q   You're not familiar with the | 8  Rite Aid with the opportunity for increased |
| 9  reimbursement formulas for any of the state | 9  profitability on Watson drugs, correct? |
| 10  Medicaid agencies; is that correct? | 10      MR. MATTHEWS:  Objection. |
| 11      A   Sir, I understand that many of | 11      A   It was to increase their |
| 12  the states reimbursed on an AWP-minus basis | 12  profitability on the total contraceptive |
| 13  or some states also reimbursed on an AWP-plus | 13  line, sir. |
| 14  basis, so I understand there was a variance | 14      Q   Which would include Watson |
| 15  state by state. | 15  drugs, correct? |
| 16      Q   All right, sir.  Let me show | 16      A   Yes, sir, in this case. |
| 17  you what I'm going to mark as Exhibit 5 to | 17      Q   And the way -- or one way that |
| 18  your deposition. | 18  Watson wanted to increase Rite Aid's |
| 19          (Whereupon Plaintiff's Exhibit | 19  profitability on Watson drugs was through |
| 20          No. 5 was marked for | 20  lucrative spreads; is that correct, sir? |
| 21          identification and attached | 21      MR. MATTHEWS:  Objection. |
| 22          hereto.) | 22      A   That's the terminology used, |
| 23          (Witness reviewed document.) | 23  yes, sir. |
| Page 90 | Page 92 |

| | |
|---|---|
| 1      A   Okay. | 1      Q   That's your terminology. |
| 2      Q   Take a second and look at that, | 2  Lucrative spreads is the terminology you used |
| 3  sir.  I'll tell you that it is a letter | 3  to explain to Rite Aid how you could increase |
| 4  authored by you while at Watson Laboratories | 4  Rite Aid's profitability on Watson drugs; is |
| 5  to a director of purchasing and marketing at | 5  that correct, sir? |
| 6  the Rite Aid Corporation dated December 2nd, | 6      MR. MATTHEWS:  Objection. |
| 7  1997; do you see that? | 7      A   Yes.  That's what I wrote, yes, |
| 8      A   Yes, sir. | 8  sir. |
| 9      Q   Is that your signature at the | 9      Q   You also wrote that you could |
| 10  bottom of this letter? | 10  increase Rite Aid's profitability by the use |
| 11      A   Yes, sir. | 11  of incremental rebates, correct? |
| 12      Q   And your letter discusses Oral | 12      A   That is correct. |
| 13  Contraceptive Compound Management Program, | 13      Q   And again, those are rebates |
| 14  correct? | 14  that the more Watson drugs that Rite Aid |
| 15      A   That's correct. | 15  sells, the higher the rebate that Watson pays |
| 16      Q   This is the proposed agreement | 16  to Rite Aid, correct? |
| 17  between Watson and the Rite Aid Corporation | 17      A   Yes. |
| 18  for Watson drugs, correct? | 18      Q   And no matter what that rebate |
| 19      A   That is correct. | 19  is, no matter how high it is, it's never |
| 20      Q   Can you read the second | 20  reported to First DataBank, correct? |
| 21  sentence of that letter to the Jury, please, | 21      A   Correct. |
| 22  sir? | 22      MR. MATTHEWS:  Objection. |
| 23      A   As discussed during our last | 23      A   Excuse me, correct. |
| Page 91 | Page 93 |

24  (Pages 90 to 93)

Mark Andrew Hartman
June 3, 2009

1    is.
2          Q   Or it could be an AWP with a
3    higher spread, correct?
4              MR. MATTHEWS:  Objection.
5          A   It could be a higher AWP in
6    conjunction with a lower contract price,
7    which would create a greater spread.
8          Q   A higher AWP spread, correct?
9              MR. MATTHEWS:  Objection.
10         A   As you appear to be defining
11   it, that's the difference between the AWP
12   that's listed and the contract price or
13   direct price that the wholesaler and retail
14   customer buys it for, yes.
15         Q   Right.  And that seems to be
16   what this special concern is addressing,
17   correct?
18             MR. MATTHEWS:  Objection.
19         A   Again, it appears to be talking
20   about the delta between the two, yes, sir.
21         Q   All right.  And you see he goes
22   on to say, If you are confused with AWP
23   pricing and spreads, give sales training a

Page 182

1    call.  Do you see that, bottom of the third
2    paragraph?
3          A   I don't see that, no, sir.  If
4    you'd -- bottom of the -- sorry.
5          Q   It's okay.
6          A   I might be looking at the wrong
7    side.
8          Q   Do you see the italicized part
9    that starts with "this"?
10         A   Okay, okay.  Right.
11         Q   Can you read that to the Jury,
12   please, sir?
13         A   Okay.  Yeah.  If you are
14   confused with AWP pricing and spreads, give
15   sales training a call.
16         Q   And then what's the last -- the
17   very last thing he says under, Special
18   concern?
19         A   Thank you for your help and
20   cooperation with this project.  This
21   agreement demonstrates Schein Pharmaceuticals
22   continued commitment to long-term care
23   market.  Good selling.

Page 183

1          Q   The last thing he says is what?
2          A   Good selling.
3          Q   Are you familiar -- when you
4    were with Watson, were you familiar with
5    FULs?
6          A   Federal Upper Limits, MACs,
7    yes, sir.
8          Q   Do you know how the Federal
9    Upper Limit worked?
10         A   It was, you know -- it's my
11   understanding the Federal Upper Limit was
12   established based off of existing products,
13   multisource products that are on the market,
14   had to be at least three products on the
15   market, two generics and a brand, in order to
16   establish a MAC or a Federal Upper Limit.
17         Q   You know that sometimes the
18   Federal Upper Limit was also called a MAC,
19   correct?
20         A   Yes, sir.
21             MR. MATTHEWS:  Objection.
22             THE WITNESS:  Oh, sorry.
23         Q   Is that correct?

Page 184

1              MR. MATTHEWS:  Objection.
2          A   Yes.
3          Q   When you were at Watson, was
4    Watson concerned with whether or not there
5    would be a FUL or a MAC on its drugs?
6          A   Can you define what you mean
7    "concerned"?
8          Q   Did you pay any attention to
9    whether or not Watson drugs were FUL'd or
10   MAC'd?
11         A   We would look at which
12   products, how they were reimbursed and which
13   ones had a MAC on them, yes, sir.
14         Q   And why would you look to see
15   which ones had a MAC?
16         A   The MAC would be, you know, the
17   Maximum Allowable Cost that a pharmacist
18   would be reimbursed on a product, so we
19   wanted to make sure that our contract prices
20   allowed them to at least break even.
21         Q   You wanted to make sure
22   that your contract prices did not exceed the
23   FUL or the MAC, correct?

Page 185

47  (Pages 182 to 185)

Mark Andrew Hartman
June 3, 2009

| | |
|---|---|
| 1   A   That's correct. | 1   THE VIDEOGRAPHER:  We're going |
| 2   Q   As you -- I mean, the best case | 2   back on the Record at |
| 3   scenario, you wanted the provider to make a | 3   2:54 p.m. |
| 4   profit on a Watson generic drug even if it | 4   MR. MATTHEWS:  Clint, just |
| 5   was FUL'd or MAC'd, correct? | 5   before we go on, for the |
| 6   MR. MATTHEWS:  Objection. | 6   Record, I have now had an |
| 7   A   In a multisource market and | 7   opportunity to review the |
| 8   generic competitor market where there's | 8   unredacted version of what |
| 9   multiple payers, you always want to make sure | 9   we've marked today as |
| 10  that you're competitive.  So with that | 10  Exhibit 16 to Mr. Hartman's |
| 11  regard, if there was a product with a FUL or | 11  deposition, which is a |
| 12  a MAC, we would want to make sure that our | 12  document Bates No. |
| 13  product was competitive with the other | 13  WATL000131848.  Based on my |
| 14  multisource products that were out there. | 14  review of that document, I |
| 15  Q   And one way you'd do that is | 15  believe it was |
| 16  set a contract price that was lower than the | 16  appropriately redacted. |
| 17  FUL or the MAC, correct? | 17  The information related to |
| 18  MR. MATTHEWS:  Objection. | 18  Watson's gross profit, |
| 19  A   Yes. | 19  which as you know, Judge |
| 20  Q   And the difference between the | 20  Price in the Alabama case |
| 21  contract price and the FUL or the MAC for a | 21  has already ruled is not |
| 22  Watson drug could be termed as "the spread" | 22  admissible at trial at |
| 23  to that provider, correct? | 23  least in the other |
| Page 186 | Page 188 |

| | |
|---|---|
| 1   MR. MATTHEWS:  Objection. | 1   Defendant trials.  And it's |
| 2   A   The way -- it could be the | 2   our position that we are |
| 3   margin that the -- that the pharmacists could | 3   entitled to redact that, |
| 4   make. | 4   and so therefore, I'm not |
| 5   Q   The difference between what the | 5   going to be producing an |
| 6   provider paid to acquire the drug and what | 6   unredacted document at this |
| 7   the provider was reimbursed for the drug by | 7   time. |
| 8   state Medicaid agencies, correct? | 8   I would also note |
| 9   MR. MATTHEWS:  Objection. | 9   for the Record that |
| 10  A   Would again be the profit that | 10  Mr. Hartman testified that |
| 11  they would make on the product, yes, sir. | 11  he had not seen the |
| 12  Q   Which is sometimes called the | 12  document before and did not |
| 13  spread, correct? | 13  know -- so even if you are |
| 14  A   Many have called that the | 14  entitled to the document, |
| 15  spread, yes, sir. | 15  there are no questions that |
| 16  MR. CARTER:  All right.  Let's | 16  he could answer about it |
| 17  take a break.  I have a few | 17  based on his personal |
| 18  more documents I need to go | 18  knowledge. |
| 19  through. | 19  MS. MOORE:  I'm sorry, what was |
| 20  THE WITNESS:  Okay. | 20  that exhibit again? |
| 21  THE VIDEOGRAPHER:  We're going | 21  MR. MATTHEWS:  Sixteen, Hartman |
| 22  off the Record at 2:42 p.m. | 22  16. |
| 23  (Brief recess) | 23  MR. CARTER:  All right.  Well, |
| Page 187 | Page 189 |

48  (Pages 186 to 189)

Mark Andrew Hartman
June 3, 2009

1  reimbursed for a Watson drug, correct?

2              MR. MATTHEWS:  Objection.

3       A   As stated before, we kept track

4  of FULs and MACs and the -- our contract

5  terms, a chargeback processes, the rebate

6  structures, everything to make sure that we

7  were not upside down from a margin standpoint

8  at Watson; and also that the customer was not

9  in a negative position in dispensing our

10  products.

11       Q   So the difference between what

12  a provider paid to obtain the Watson drug

13  versus what the provider was reimbursed for a

14  Watson drug was something that Watson kept

15  note of, correct?

16              MR. MATTHEWS:  Objection.

17       A   We kept note of what our

18  contract prices were compared to our

19  competition by customer and by competitive

20  bids situation, yes, sir.

21       Q   And you also kept note of what

22  providers were being reimbursed for Watson

23  drugs, correct?

Page 198

1              MR. MATTHEWS:  Objection.

2       A   Again, it was common knowledge

3  as to the reimbursement, but we could not

4  determine what each customer was reimbursed,

5  because every one of the customers has a

6  different reimbursement mix.  A CVS may have

7  contracts with many managed care parties at a

8  variety of degrees of rates.  We do not have

9  that knowledge because, again, it was

10  something that due to confidentiality was

11  that the customers are the only ones that

12  know that.  So our basis was comparing heavy

13  competitive AWP and a competitive contract

14  price in order to ensure that we were on an

15  even playing field with our competitors.

16       Q   Well, the Medicaid

17  reimbursement formulas, those are not

18  confidential, correct?

19       A   No, sir.

20       Q   And Watson would know what each

21  of its customers were being reimbursed by

22  state Medicaid agencies for Watson drugs,

23  correct?

Page 199

1              MR. MATTHEWS:  Objection.

2       A   We would know what the -- if

3  there's a MAC, what the MAC would be.  If

4  there's a -- you know, we know when our

5  rebate percentages is fixed.  Right?

6       Q   Well, if there was a FUL in

7  place, Watson would know what the FUL was,

8  correct?

9              MR. MATTHEWS:  Objection.

10       A   Yes.

11       Q   Watson would try to set a

12  contract price that was lower than the FUL in

13  order to allow a provider to make a profit on

14  Watson drugs, correct?

15              MR. MATTHEWS:  Objection.

16       A   We would put a price that was

17  below the FUL; otherwise, your product would

18  not be dispensed.  And thus it would be the

19  only alternative may be an alternate brand,

20  which was even more expensive; thus the

21  patients and the states would end up paying a

22  higher price.

23       Q   A state's never going to pay

Page 200

1  more than the FUL, is it, sir?

2              MR. MATTHEWS:  Objection.

3       A   No, sir.

4       Q   The only way a state would pay

5  less than a FUL is if Watson reported a price

6  that was less than the FUL, correct?

7              MR. MATTHEWS:  Objection.

8       A   I presume so, yes.

9       Q   But Watson never reported a

10  price to First DataBank that was less than

11  the FUL; isn't that correct, sir?

12              MR. MATTHEWS:  Objection.

13       A   Watson only reported AWPs, sir.

14  We did not report FULs or contract pricing.

15       Q   And Watson knew that if it

16  reported an AWP to First DataBank that was

17  less than the FUL, that states would pay on

18  the lower AWP as opposed to the FUL; is that

19  correct?

20              MR. MATTHEWS:  Objection.

21       A   I do not know, sir, honestly.

22       Q   You're aware that lots of state

23  Medicaid agencies have what's called lower-of

Page 201

51 (Pages 198 to 201)

Mark Andrew Hartman
June 3, 2009

1  choice for that customer than if you were
2  Medicaid reimbursable, yes, ma'am.
3       Q.  Okay.  So when a manufacturer's
4  products are reimbursed by a Medicaid state
5  that does use Wholesale Acquisition Cost, do
6  you know how the Wholesale Acquisition Cost
7  is used?
8            MR. MATTHEWS:  Objection.
9       A.  Again, ma'am, I'm not sure how
10  each state does it and whether they use that
11  as a cost plus or a cost minus, I do not
12  know.
13       Q.  What do you mean when you say
14  "cost plus or cost minus"?
15       A.  Well, again, whether it is
16  Wholesale Acquisition Cost plus a percentage
17  or minus a percentage from that to determine
18  their reimbursement.
19       Q.  But you are familiar, I would
20  take it, that there are states that have the
21  AWP minus formulas, correct?
22       A.  Yes, ma'am.
23       Q.  And are you aware that Texas

Page 210

1  has an AWP minus compared to a wholesale cost
2  plus formula?
3       A.  Again, ma'am, I don't know the
4  particular states.  If you're telling me that
5  that's what it is, then I believe you.  But
6  I...
7       Q.  I want to show you Exhibit No.
8  No. 21.
9            (Whereupon Plaintiff's Exhibit
10            No. 21 was marked for
11            identification and attached
12            hereto.)
13            (Witness reviewed document.)
14       Q.  Do you recognize this document?
15       A.  It appears to be an e-mail from
16  myself to Vince Rinaudo, who was the national
17  account director for Wal-Mart.
18       Q.  And the date on this e-mail is
19  what?
20       A.  Friday, September 18th, 1998.
21       Q.  All right.  And this is an
22  e-mail you wrote in response to an e-mail
23  that appears below it, correct?

Page 211

1       A.  Yes, ma'am.
2       Q.  And that e-mail appears to have
3  come from a Vince Rinaudo; is that correct?
4       A.  Yes, ma'am.
5       Q.  Who is Vince Rinaudo?
6       A.  As I mentioned Vince Rinaudo
7  was a national account manager for Watson
8  Laboratories who called on Wal-Mart.
9       Q.  And Allen Slovsky, who is he?
10       A.  Allen Slovsky was a director of
11  sales at that point in time who Vince Rinaudo
12  reported in to.
13       Q.  The first sentence says that
14  Wal-Mart is requesting a meeting, I assume
15  with Watson personnel, correct?
16       A.  I am assuming so, yes, ma'am.
17       Q.  Do you recognize what is
18  described here as the WAC pricing issue?
19       A.  Again, ma'am, depending on the
20  date, I'm not sure which product or products
21  or product lines this is referring to.  It's
22  very difficult to take -- to tell from these
23  two e-mail trails.

Page 212

1       Q.  Okay.  I want to refer you back
2  to what's been marked as Exhibit 7 in this
3  deposition.
4       A.  Okay.
5       Q.  And ask you if looking at that
6  exhibit helps refresh your recollection about
7  the WAC issue?
8       A.  Okay.  Yes, ma'am.
9       Q.  All right.  Would you tell us
10  what happened here?
11       A.  Yes, ma'am.  This -- it appears
12  they're both related to the Rugby
13  acquisition.  And in the case where WAC
14  prices and AWPs had not been adjusted for
15  over two to three years on our acquisition of
16  Rugby, we reviewed the whole product line,
17  the whole pricing policies of Rugby as well
18  as Watson to formulate one pricing policy in
19  the integration.  So therefore, we put
20  together a list of products that we adjusted
21  the WACs, if you'll note on
22  the back of Exhibit 7, all of the
23  spreadsheets will show probably 350 to 400

Page 213

54  (Pages 210 to 213)

Mark Andrew Hartman
June 3, 2009

1  WAC declines that Watson made on the Watson
2  and the Rugby product lines.  Those were to
3  make adjustments to the market conditions
4  that were out there, thus lowering the impact
5  of the -- of the reimbursement.  I mean, it
6  lowered the cost to the states or to any
7  third-party manufacturer -- or third-party
8  payer.  But what the memo to Watson and to
9  Rite Aid refers to is that there was a belief
10 in the timing of when we did the price
11 decreases in August of 1998, along with the
12 time when HCFA reports their changes in
13 Federal Upper Limits and MACs.
14         There was a code -- it ended up
15 being where the two coincided.  And there was
16 an accusation made on me and on Watson of
17 affecting reimbursement at retail pharmacy
18 level based on our changes of the products
19 and the WACs of the Rugby and the Watson
20 line.
21     Q    So could you explain to us how
22 it is that your lowering your prices costs
23 them what they described as a significant

Page 214

1  amount of money?
2      A    Well, again, ma'am, in the memo
3  from Wal-Mart and from Rite Aid initially,
4  what they felt was a cost -- of our lowering
5  the price to be a cost to them on money is --
6  obviously each state reimburses differently,
7  but the -- some off of WAC as you mentioned;
8  and some off of AWP.  For those that
9  reimburse off of WAC, then lowering of the
10 WACs would lower the reimbursement that would
11 go to the individual retailer.  In this case,
12 because of them accusing us, it was really a
13 timing issue.  Watson lowered all of them to
14 remain market competitive.  On some products
15 our WACs were so high and our contract prices
16 were so low that because of the cash terms,
17 the 2 discount for paying on time with the
18 WACs, high at the wholesalers, that discount
19 was greater than what the contract price was
20 for the product.  So we did it to adjust to
21 make sure that we weren't losing
22 profitability.  We also did it to then bring
23 those in line so that it would continue to

Page 215

1  reduce the cost to the end user, whether it's
2  third-party payer, the state Medicaids,
3  and/or a cash-paying customer.
4      Q    And just so that -- I don't
5  remember all of your prior testimony.  But
6  can you tell us, again, you talked about the
7  timing issue between the lowering of the
8  HCFA, MAC, or FUL --
9      A    Yes.
10     Q    -- and your adjusting of these
11 WACs --
12     A    Yes, ma'am.
13     Q    -- and wasn't that connection
14 made because in fact the FUL is based upon
15 the lowest published wholesale cost?
16         MR. MATTHEWS:  Objection.
17     Q    Is that true or not?
18     A    Again, my understanding --
19         MR. MATTHEWS:  Objection.
20         THE WITNESS:  Excuse me.
21     A    Again, my understanding of the
22 way the FUL is determined is based on several
23 criterion; and one of them being that it is

Page 216

1  based on the lowest published cost out there.
2      Q    Well, and isn't that --
3      A    Plus a percentage.
4      Q    But isn't that why you assured
5  your customers that you couldn't have been
6  the reason the FUL was lowered, because you
7  did not at that time publish a Wholesale
8  Acquisition Cost?
9      A    Ma'am, we did not publish a
10 Wholesale Acquisition Cost.  Rugby may have
11 before.  The timing -- and the reason the
12 document was put together and the spreadsheet
13 was put together is we were being accused of
14 decreasing the profitabilities at the retail
15 level.
16     Q    Sure.
17     A    I contacted HCFA directly and
18 talked with the people at HCFA, product by
19 product, and went through whose product it
20 was that was determined the Federal Upper
21 Limits and the changes in the MAC.  As a
22 service and as a -- to present a program back
23 to them that says, Look, we were accused at a

Page 217

55 (Pages 214 to 217)

1  or WAC.  We cannot tell them what to sell it
2  at.  If they wanted to sell it at a penny
3  over WAC, they could.  We are suggesting what
4  we felt like was a competitive price in
5  giving them an SWP.
6          The third-party database
7  companies had to determine by averaging what
8  the surveys of the wholesalers were to come
9  up with an average of what was -- those
10  wholesalers might sell out to their
11  customers.
12          Q    But what I'm asking you though,
13  is after the date of this exhibit,
14  August 24th, 2000, Watson began reporting an
15  SWP instead of an AWP; and that's the only
16  difference, correct?
17          MR. MATTHEWS:  Objection.
18          A    The terminology was changed
19  from AWP to SWP on the documents.
20          Q    Was the methodology of
21  establishing the AWP or SWP changed?
22          A    No, ma'am.
23          MS. MOORE:  Thank you.  You

Page 290

1          want to just change the
2          tape?
3          THE VIDEOGRAPHER:  This is the
4          end of Tape Five.  We're
5          going off the Record at
6          5:33 p.m.
7          (Whereupon a brief recess was
8          taken.)
9          THE VIDEOGRAPHER:  This is Tape
10          Six of the video deposition
11          of Mark Hartman.  We're
12          going back on the Record at
13          5:28 p.m.
14  BY MS. MOORE:
15          Q    Okay.  Mr. Hartman, I have
16  handed you a document marked Exhibit 44.  Do
17  you recognize that document?
18          (Whereupon Plaintiff's Exhibit
19          No. 44 was marked for
20          identification and is attached
21          hereto.)
22          A    Again, it appears to be an
23  e-mail from myself to Dr. Chao regarding a

Page 291

1  launch grid for Buspirone.
2          Q    So the second page of this is
3  another one of the launch pricing grids that
4  we've discussed before for other products,
5  correct?
6          A    Yes --
7          MR. MATTHEWS:  Objection.
8          A    -- ma'am.  Sorry.  Yes.
9          Q    And who is Dr. Chao?
10          A    Dr. Chao is the founder and
11  chairman of Watson Laboratories.
12          Q    Why were you sending this
13  information to him?
14          A    Probably because, at that point
15  in time, I was reporting direct into him.
16  There was -- Fred Wilkinson had left, and I
17  was reporting straight in to Dr. Chao.
18          Q    All right.  And I recall now
19  that you testified to that way back earlier
20  today.
21          A    Yes.
22          Q    All right.  Looking at page two
23  of this document, in the column of this

Page 292

1  spreadsheet that is labeled I --
2          A    Yes, ma'am.
3          Q    -- do you see some descriptions
4  added to this launching, pricing grid?
5          A    Yes, ma'am.
6          Q    And what is next to Level D?
7          A    It says warehousing chain,
8  ma'am.
9          Q    Okay.  Thank you.
10          MS. MOORE:  I'm going to pass
11          the Witness at this time to
12          New York and to you.
13          Here's what my preference
14          is:  We have, as you know,
15          have a large volume of
16          production.  We've gone
17          through as much as we can.
18          I'm hoping that this is all
19          the questions I will need
20          to ask of Mr. Hartman.  I
21          will reserve the rest of
22          our time in case I find
23          additional documents in

Page 293

74  (Pages 290 to 293)

Mark Andrew Hartman
June 3, 2009

| | |
|---|---|
| 1    that review that | 1              Record. |
| 2    necessitate questioning | 2    BY MR. CARROLL: |
| 3    him.  But for now, I'm | 3              Q.  Mr. Hartman, hi.  My name is |
| 4    passing the Witness. | 4    James Carroll.  I'm with Kirby McInerney. |
| 5    MR. MATTHEWS:  Okay.  And just | 5    And I represent the City of New York and New |
| 6    to clarify for the -- at | 6    York counties as well as the State of Iowa in |
| 7    the time -- for now, based | 7    parallel litigation that the other counsel |
| 8    on what you have had the | 8    has questioned you about today.  And I just |
| 9    opportunity to review to | 9    have a few follow-up questions. |
| 10    date, you are satisfied | 10              Earlier, you testified that you |
| 11    that you have had enough | 11    are aware that the Federal Upper Limit is set |
| 12    time to take the deposition | 12    based on published prices.  Do you recall |
| 13    of Mr. Hartman today? | 13    that testimony? |
| 14    MS. MOORE:  Today.  But I -- | 14              MR. MATTHEWS:  Objection. |
| 15    MR. MATTHEWS:  You'll only have | 15              A.  Yes. |
| 16    additional questions if you | 16              Q.  And I believe you testified |
| 17    come across additional | 17    that you had spoken to someone at HCFA |
| 18    documents that you haven't | 18    concerning -- concerning the Federal Upper |
| 19    seen to date?  Is that | 19    Limit.  Do you recall that testimony? |
| 20    your -- | 20              A.  I recall testifying that I |
| 21    MS. MOORE:  Yes.  Because we | 21    spoke to someone at HCFA centered around the |
| 22    have not completed our | 22    changes in the WAC pricing structure that we |
| 23    review of that entire | 23    did when we integrated the Rugby product line |
| **Page 294** | **Page 296** |

| | |
|---|---|
| 1    database.  And I wanted | 1    into Watson's product line and whether our |
| 2    to -- because of your | 2    changes had an impact or a cause and effect |
| 3    cross-notice, I frankly | 3    of their published August -- I believe it was |
| 4    just wanted to participate | 4    2000 -- no, August 1998 publication of |
| 5    to the extent that I could. | 5    changes to their Federal Upper Limits. |
| 6    And if I've completed it, | 6              Q.  Right, correct.  And during |
| 7    great.  And if I haven't, | 7    that testimony, I believe you testified that |
| 8    we'll let you know. | 8    Watson could not affect the Federal Upper |
| 9    MR. MATTHEWS:  All right.  I | 9    Limit because they did not publish WACs; is |
| 10    understand your position. | 10    that correct? |
| 11              Mr. Carroll, you're | 11              MR. MATTHEWS:  Objection. |
| 12    up next. | 12              A.  That is correct. |
| 13    MR. CARROLL:  Yes.  Okay.  Is | 13              Q.  They did not -- let me strike |
| 14    there an echo?  Because | 14    that. |
| 15    when I speak, I hear an | 15              They could not impact the |
| 16    echo. | 16    Federal Upper Limit because they did not |
| 17    MS. MOORE:  Not here. | 17    provide WACs that were published; is that |
| 18    MR. MATTHEWS:  Not here. | 18    correct? |
| 19    MR. CARROLL:  Okay.  That's | 19              MR. MATTHEWS:  Objection. |
| 20    fine.  I can hear myself | 20              A.  We did not publish WACs.  And |
| 21    anyway.  Are we on the | 21    that was a statement from the HCFA folks to |
| 22    Record? | 22    me that they had no access to our WACs.  So |
| 23    COURT REPORTER:  We are on the | 23    therefore, there was no way that our WACs |
| **Page 295** | **Page 297** |

75 (Pages 294 to 297)

Mark Andrew Hartman
June 3, 2009

1   change the focus right now for a moment and
2   ask you about pricing:  You are familiar with
3   the phrase "Average Wholesale Price," or
4   "AWP," from your years of experience in the
5   industry, right?
6       A.  Yes, sir.
7       Q.  In all the years that you have
8   worked in the industry, what is your
9   understanding of what a manufacturer's
10  reported Average Wholesale Price is intended
11  to represent?
12      A.  It's intended to represent a
13  suggested retail price that the wholesaler
14  would then sell out to retail or could sell
15  out to retail.  We, you know, could not tell
16  and cannot direct because antitrust issues
17  of -- tell them what to sell our products
18  for.  So we had a list price, and we had an
19  AWP or SWP, which were interchangeable, that
20  we provided to them.
21      Q.  And during the entire time that
22  you worked for Watson, was that your
23  understanding of what Watson intended the

Page 338

1   Average Wholesale Price it established and
2   published to third parties to represent?
3       A.  Yes.
4       Q.  Let me ask you about WAC, or
5   Wholesale Acquisition Cost.  You're familiar
6   with that phrase, right?
7       A.  Yes.  Yes, sir.
8       Q.  And during the entire time that
9   you have been employed in the pharmaceutical
10  industry, do you have an understanding of
11  what manufacturers mean to represent when
12  they establish a Wholesale Acquisition Cost?
13      A.  Yes, sir.
14      Q.  And what's that understanding?
15      A.  The Wholesale Acquisition Cost
16  is the actual list price or invoice price
17  that the wholesaler is billed at or invoiced
18  at when we ship product to them.
19      Q.  Okay.  And that was true for
20  Watson during the entire time that you were
21  employed by Watson, correct?
22      A.  That is correct.
23      Q.  Now, was your understanding and

Page 339

1   Watson's understanding of definitions of AWP
2   and WAC kept a secret from the industry?
3       A.  Definitions, no, sir.
4       Q.  Okay.  And, in fact, have you
5   ever heard of anyone in the industry, other
6   than the Plaintiffs in this action, who
7   believe that AWP and WAC represented averages
8   of actual transaction prices?
9       A.  No, sir.
10      Q.  In fact, if Watson -- at some
11  point in time, did Watson change how it
12  reported AWPs to First DataBank?
13      A.  Yes.  I believe we reviewed
14  some documents today that showed -- I think
15  it was in 2000 when we changed from producing
16  documents that had AWP on it to changing them
17  to SWP with a clarification to show that
18  that's what, you know, again, we intended all
19  along that it is in reality a suggested
20  price.  And it was up to the third-party
21  database companies to report the AWP, to
22  contact the wholesalers to determine what was
23  our, again, suggested price provided to the

Page 340

1   wholesalers as a sale price.  And they would
2   then average those to come up with an AWP.
3       Q.  And that was in August of 2000,
4   right?
5       A.  I believe so, yes, sir.
6       Q.  And at that -- before that
7   time, had Watson reported WACs to third-party
8   publishers?
9       A.  No.
10      Q.  And so did Watson at that
11  time make a decision to begin reporting
12  WACs for the first time to third-party
13  publishers?
14      A.  We made a decision, as I
15  recall, to report SWPs.  The WAC reporting --
16  I'm sorry.  I'm blanking right now.  I think
17  that we did not produce WACs.
18      Q.  Let me show you a document, if
19  I can find it here, and see if it refreshes
20  your recollection on that.
21      A.  There were changes from AWP to
22  SWP.
23      Q.  Let me show you what was

Page 341

86 (Pages 338 to 341)

# REPLY EXHIBIT B

# Condensed Transcript

# Deposition of
# Andrew Boyer

**taken on
May 4 - 5, 2009**

**ALABAMA MEDICAID PHARMACEUTICAL
AVERAGE WHOLESALE PRICE LITIGATION
Master Docket No. 2005-219**

**This Document Relates to:**

**State of Alabama v. Watson Laboratories, Inc.
Case No. 2005-219.74**

**State of Alabama v. Watson Pharma, Inc.
Case No. 2005-219.75**

**State of Alabama v. Watson Pharmaceuticals, Inc.
Case No. 2005-219.76**



BAKER&BAKER

**Certified Court Reporters,
Certified Legal Video Specialists,
and Trial Presentation Consultants
(334) 262-3332  888-253-3377
www.baker-baker.com**

Andrew Boyer
May 4, 2009

Page 1

\*     \*     \*     \*     \*     \*     \*     \*

The videotaped deposition of ANDREW
BOYER, VOLUME I, was taken before Cornelia
J. Baker, Certified Court Reporter, ABCR
290, and Certified Shorthand Reporter, as
Commissioner, on Monday, May 4, 2009,
commencing at approximately 1:41 p.m., in
the law offices of Alston & Bird, 90 Park
Avenue, New York, New York.

\*     \*     \*     \*     \*     \*     \*     \*

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY

STATE OF ALABAMA

In the Matter of:

ALABAMA MEDICAID

PHARMACEUTICAL AVERAGE          MASTER DOCKET

WHOLESALE PRICE LITIGATION    NO. CV-2005-219

-------------------------------------------

This Document Relates to:

State of Alabama v.

Watson Laboratories, Inc.

No. 2005-219.74

State of Alabama v.

Watson Pharma, Inc.

No. 2005-219.75

State of Alabama v.

Watson Pharmaceuticals, Inc.

No. 2005-219.76

Andrew Boyer
May 4, 2009

```
 1      *    *    *    *    *    *    *
 2      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
                 STATE OF HAWAII
 3
 4    State of Hawaii
 5      v.
 6    Abbott Laboratories, Inc., et al.
 7    Civil No. 06-1-0720-04-EEH
 8
 9    State of Hawaii
10      v.
11    Schering Corporation; DOE
      Corporations 1-100; DOE
12    Entities 1-100
13    Civil No. 07-1-1639-09-EEH
14
          *    *    *    *    *    *    *
15
      STATE OF WISCONSIN CIRCUIT COURT DANE COUNTY
16                  Branch 9
17    State of Wisconsin
18      v.
19    AMGEN, Inc., et al.
20    No. 04-CV-1709
21      *    *    *    *    *    *    *
22
23
                                       Page 2
```

```
 1      *    *    *    *    *    *    *    *
 2           STATE OF SOUTH CAROLINA
                 COUNTY OF RICHLAND
 3
 4        IN THE COURT OF COMMON PLEAS
          FOR THE FIFTH JUDICIAL CIRCUIT
 5
 6        Master Case No. 2006-CP-40-4394
          The Honorable J. Cordell Maddox, Jr.
 7
 8    In Re: South Carolina Pharmaceutical
      Pricing Litigation
 9
10    The document relates to:
11    Watson Pharma, Inc., and
      Watson Pharmaceuticals, Inc.
12
13    Civil Action No. 06-CP-40-7152
      Civil Action No. 06-CP-40-7155
14
15      *    *    *    *    *    *    *    *
16       IN THE SUPERIOR COURT FOR THE
                 STATE OF ALASKA
17        THIRD JUDICIAL DISTRICT AT ANCHORAGE
18    State of Alaska
19      v.          Case No. 3AN-06-12026-CI
20    Alpharma Branded Products
21    Division, Inc., et al.
22
23      *    *    *    *    *    *    *    *
                                       Page 4
```

```
 1      *    *    *    *    *    *    *
 2           IN THE CIRCUIT COURT OF
                 COOK COUNTY, ILLINOIS
 3        COUNTY DEPARTMENT, CHANCERY DIVISION
 4    The People of the State of Illinois
 5      v.
 6    Abbott Laboratories, et al.
 7    No. 05-CH-2474
 8      *    *    *    *    *    *    *
 9    IN THE DISTRICT COURT OF THE FOURTH JUDICIAL
      DISTRICT OF THE STATE OF IDAHO, IN AND FOR
10            THE COUNTY OF ADA
11    State of Idaho
12      v.
13    Alpharma USPD INC.; AstraZeneca
      Pharmaceuticals LP; AstraZeneca LP
14
      Case No. CV0C07-01847
15
16      *    *    *    *    *    *    *
17           TRAVIS COUNTY, TEXAS
             419TH JUDICIAL DISTRICT
18          CAUSE NO. D-1-GV-001566
19    The State of Texas, ex rel.,
      Ven-A-Care of the Florida Keys, Inc.,
20
        v.
21
      Alpharma USPD f/k/a
22    Barre-National, Inc., et al.
23      *    *    *    *    *    *    *
                                       Page 3
```

```
 1      *    *    *    *    *    *    *    *
 2           IN THE CHANCERY COURT OF
              RANKIN COUNTY, MISSISSIPPI
 3          20TH CHANCERY COURT DIVISION
 4    State of Mississippi
 5      v.        Civil Action No. G2009-65597
 6    Watson Pharma, Inc.
 7
 8    State of Mississippi
 9      v.        Civil Action No. G2009-65629
10    Watson Pharmaceuticals, Inc.
11
12    State of Mississippi
13      v.        Civil Action No. G2009-65630
14    Watson Laboratories, Inc.
15      *    *    *    *    *    *    *    *
16
17
18
19
20
21
22
23
                                       Page 5
```

2  (Pages 2 to 5)

Andrew Boyer
May 4, 2009

**Page 42**

```
1    third-party compendias like First DataBank.
2         Q.  And Schein and Watson
3    calculated and provided AWPs to First
4    Databank with the knowledge that First
5    DataBank would, in turn, publish an AWP for
6    the Schein and Watson drugs, correct?
7         A.  Would publish a number that
8    they called AWP, yes.
9         Q.  And Schein and Watson knew that
10   third-party payers, such as State Medicaid
11   agencies, would utilize that published AWP
12   when reimbursing providers, correct?
13        MR. MATTHEWS:  Objection.
14        A.  Third-party providers pulled
15   data from First DataBank and make decisions
16   on what they choose to do as it relates to
17   reimbursement, maybe AWP or SWP or WAC, or
18   some other utilization of that data, or other
19   data that they have access to, and will
20   determine reimbursement based upon that.
21        Q.  And I get that.  I'm trying to
22   focus on AWP between 1991 and 2002, and what
23   Watson and Schein did and what Watson and
```

**Page 43**

```
1    Schein knew, okay?
2         A.  I'm trying my best to help you
3    out.
4         Q.  All right.  So between -- and
5    let me ask you if we can do this for the
6    purposes of this question:  Can I ask you
7    about Watson and include Schein?
8         A.  Sure.
9         Q.  Okay.  So here's my question:
10   Between 1991 and 2002, Watson calculated AWPs
11   and reported those AWPs to First DataBank
12   with the knowledge that First DataBank would
13   publish those AWPs, correct?
14        A.  First DataBank would publish a
15   number called AWP based upon data they
16   received from Watson.
17        Q.  Right.  And Watson knew that
18   State Medicaid agencies, not all, but at
19   least some, would utilize that published AWP
20   when reimbursing providers, correct?
21        MR. MATTHEWS:  Objection.
22        A.  I would say that some would use
23   SWP or AWP or whatever algorithm or other
```

**Page 44**

```
1    number they choose to determine
2    reimbursement.
3         Q.  All right.  If a State Medicaid
4    agency had in its formula AWP as a factor,
5    then Watson was well aware that the published
6    AWP would be utilized by State Medicaid
7    agencies in reimbursement, correct?
8         A.  I don't think that Watson was
9    looking at what a state was doing with the
10   AWP to determine reimbursement.  It could
11   have been utilized.  Was it utilized to some
12   extent by which states, it absolutely could
13   have been utilized.
14        Q.  And Watson knew that it was, in
15   fact -- and I'm not trying to pin you down to
16   exact states, but Watson knew without
17   question that some states had AWP in their
18   formulas, and some states were relying on
19   that AWP when they reimbursed providers,
20   correct?
21        MR. MATTHEWS:  Objection.
22        A.  I would say Watson knew that a
23   third party, whether it be a state or some
```

**Page 45**

```
1    other third-party organization, may be using
2    AWP to determine their reimbursement, along
3    with whatever calculation they were using
4    from that.
5         Q.  AWP stands for Average
6    Wholesale Price, correct?
7         MR. MATTHEWS:  Objection.
8         A.  I guess.  It depends who's
9    talking about it, how they're utilizing it.
10        Q.  Well, AWP literally stands for
11   Average Wholesale Price, correct?
12        MR. MATTHEWS:  Objection.
13        A.  To who?
14        Q.  To everybody.
15        A.  Who's everybody?
16        Q.  Well, if Average Wholesale
17   Price doesn't stand -- let me start over.
18        If AWP is not an acronym for
19   Average Wholesale Price, what is it an
20   acronym for?
21        MR. MATTHEWS:  Objection.
22        A.  I've said to you that the
23   acronym that we used AWP for was Average
```

12 (Pages 42 to 45)

Andrew Boyer
May 4, 2009

| | |
|---|---|
| 1       A.  I think the intent of this was | 1       contracts, the wholesalers |

Column 1 (Page 266):

```
 1          A.  I think the intent of this was
 2     to market it competitively with Mylan in the
 3     marketplace.
 4          Q.  Well, we'll move along then.
 5     Let's talk about a different subject.
 6              Would you agree that AWP is not
 7     a price that is regularly paid by retail
 8     pharmacists to purchase Watson's drugs?
 9          A.  At what point in time?
10          Q.  Any point in time.
11          A.  Today, I wouldn't believe that
12     anybody is purchasing product for AWP -- but
13     I'm guessing -- or paying it at retail.  I
14     can't tell you back eighteen, nineteen years
15     ago how much the markup above the contract or
16     WAC or price would have been.
17          Q.  Can you point to a single
18     example for this Jury of a single retail
19     pharmacist that ever paid the AWP that was
20     calculated by either Schein or Watson?
21          A.  I would have no way of knowing
22     that.
23          Q.  So the answer is no, you
```

Page 266

Column 2 (Page 268):

```
 1              contracts, the wholesalers
 2              were.
 3          A.  We are selling to direct
 4     customers, being chains, wholesalers, mail
 5     order.  What they chose after that to sell
 6     the product for, a wholesale distributer
 7     marketplace, I don't have any control over.
 8     I don't know what price that would be.
 9          Q.  Well, chain --
10          A.  There is a markup, I just don't
11     know what it is.
12          Q.  Chain drugstores, Mr. Boyer --
13          A.  Yes.
14          Q.  -- they are retail pharmacies,
15     correct?
16          A.  That is correct.
17          Q.  Watson and Schein both sell
18     directly to those retail pharmacies, correct?
19          A.  That is correct.
20          Q.  Those retail pharmacies include
21     the major chains, such as Rite Aid,
22     Walgreens, Walmart, correct?
23          A.  That is correct.
```

Page 268

Column 3 (Page 267):

```
 1     cannot, correct?
 2          A.  I'm telling you that I've had
 3     no way of knowing what they paid at retail
 4     unless they purchased it directly from
 5     Watson.
 6          Q.  Well, that -- with all due
 7     respect, Mr. Boyer --
 8          A.  Yes.
 9          Q.  -- you, in fact, have about 90
10     percent of your business through contracts,
11     direct contracts with customers, correct?
12          A.  That's today, yes.
13          Q.  And that goes back for some
14     time, at least to 1996, correct?
15          A.  That's correct -- to '96?  I
16     don't know about '96, but, you know, it goes
17     back.
18          Q.  With those direct customers,
19     you knew exactly what price Schein was
20     charging them, or Watson, correct?
21              MR. FARQUHAR:  Objection.
22              Schein and Watson weren't
23              charging the prices to the
```

Page 267

Column 4 (Page 269):

```
 1          Q.  In those instances, Watson and
 2     Schein knew exactly what those retail
 3     pharmacies were paying for their drugs,
 4     correct?
 5          A.  That would be correct.
 6          Q.  Let's limit my question to
 7     those types of retail customers.  Are you
 8     with me?
 9          A.  Absolutely.
10          Q.  Can you point this Jury to a
11     single one of those customers that ever paid
12     AWP for a single Schein or Watson drug?
13          A.  No, I cannot.
14          Q.  Let's move on to the next
15     topic.
16              Are you aware that there is a
17     certain window of time when a brand name drug
18     goes off patent and generic manufacturers
19     come into the marketplace that there is no
20     Federal Upper Limit or Maximum Allowable Cost
21     in place?
22          A.  It's not something that I'm
23     aware of.  Not something that I would
```

Page 269

68  (Pages 266 to 269)

Andrew Boyer
May 4, 2009

1   page of the Exhibit 20 marked 23733, and
2   you'll note that there it provides, quote,
3   Where appropriate, manufacturers reported
4   prices should accurately take into account
5   price reductions, cash discounts, free goods
6   contingent on a purchase agreement, rebates,
7   upfront payments, coupons, goods in kind,
8   free or reduced price services, grants or
9   other price concessions, or similar benefits
10  offered to some or all purchasers.
11          Mr. Boyer, my question for you
12  is:  In Watson's view, would it be
13  appropriate for Watson to report to
14  third-party publishers an AWP that took into
15  account all of those price concessions
16  described in that paragraph?
17      A.  No.
18      Q.  Why not?
19      A.  It's not possible.  We don't
20  have any discounts or rebates off of SWP, so
21  it would be impossible to calculate that.
22      Q.  If you provided an AWP that
23  took into account all of those numbers while

Page 342

1   at the same time maintaining the AWP that you
2   currently report, would it be appropriate to
3   report that different price?
4       A.  It would be inaccurate.
5       Q.  Mr. Boyer, from Watson's
6   perspective, would it be appropriate for
7   Watson to report a Wholesale Acquisition Cost
8   which took into account all of the price
9   concessions which are referred to in that
10  paragraph?
11      A.  No.  The Wholesale Acquisition
12  Cost is just that.  It's not a contracted
13  price with all of those deductions from it.
14  That would be a direct or an indirect
15  contract price.
16      Q.  So, in fact, from Watson's
17  perspective, if it reported a WAC which
18  included all of those price concessions,
19  Watson would be lying, wouldn't it?
20      A.  It would be inaccurate.
21      Q.  Mr. Boyer, I'd like to show you
22  what was marked yesterday as Exhibit 22 to
23  your deposition.  And there are a few

Page 343

1   questions I'd like to ask about that.  To
2   orient the Jury, please, could you just tell
3   the Jury what Exhibit 22 is?
4       A.  It is a letter from Mark
5   Hartman to Jerry Prentice of Rite Aid, the
6   Director of Brand Pharmaceutical Purchasing
7   and Marketing.
8       Q.  Okay.  Rite Aid is not a
9   wholesaler, is it?
10      A.  No.  Rite Aid is a retail
11  chain.
12      Q.  Do you know how many states
13  Rite Aid operates in?
14      A.  Probably two-thirds of the
15  United States.
16      Q.  Do you know whether it would be
17  possible for Watson to know all of the
18  different reimbursement formulas that
19  insurance companies may use to calculate
20  reimbursements that they pay to Rite Aid for
21  dispensing Watson's products?
22      A.  Absolutely not.
23      Q.  Do you have any idea how many

Page 344

1   different reimbursement formulas may be used
2   by third-party payers who reimburse Rite Aid
3   for dispensing products manufactured by
4   Watson?
5       A.  It's got to be hundreds for all
6   the different programs.
7       Q.  Does Watson have any way to
8   know what the spread will be between the
9   price Rite Aid pays for a particular product
10  from Watson and the amount that it may be
11  reimbursed when it dispenses that product at
12  one of its outlets in one of the states in
13  the United States of America?
14      A.  No.
15      Q.  Mr. Boyer, I'd like to show you
16  what was marked yesterday at your deposition
17  as Exhibit 23 and ask you a couple of
18  questions about that.  And again, so the Jury
19  is oriented, could you tell the Jury what
20  Exhibit 23 is?
21      A.  It's a memo on Cimetidine
22  tablets from Chris Vales to Schein's sales
23  representatives.

Page 345

87  (Pages 342 to 345)

Andrew Boyer
May 4, 2009

1   Watson drugs, correct?
2            MR. MATTHEWS:  Objection.
3       A.  The entity being who?
4       Q.  Whoever the provider purchased
5   the Watson drugs from.
6            MR. MATTHEWS:  Objection.
7       A.  CVS purchases product directly
8   from Watson.
9       Q.  Okay.  Let me start over.
10  Let's do it that way.
11      A.  So I can understand it.
12  Thanks.
13      Q.  Medicaid reimburses CVS for
14  Watson products, correct?
15      A.  That would be correct.
16      Q.  CVS, in turn, pays Watson for
17  Watson products, correct?
18           MR. MATTHEWS:  Objection.
19      A.  That is correct.
20      Q.  So in that sense, Medicaid
21  reimbursement dollars flow through CVS back
22  to Watson, correct?
23           MR. MATTHEWS:  Objection.

Page 438

1   you could look at, you know, I'm sure, Aetna
2   or CIGNA or anybody else, if we have the
3   data, is what percentage of our business is
4   different -- you know, different third party,
5   although I don't know we have access to all
6   that third party.
7       Q.  Well, I'm not interested in
8   insurance companies.
9       A.  Okay.
10      Q.  I'm just talking about just
11  state Medicaid dollars.
12      A.  Okay.
13      Q.  Nine to 11 percent of Watson's
14  annual business comes from state Medicaid
15  reimbursement dollars, correct?
16      A.  Okay.
17      Q.  Is that correct?
18      A.  Yes.
19      Q.  And certainly Watson is not
20  willing or interested in giving up that 9 to
21  11-percent Medicaid dollars a year, correct?
22           MR. MATTHEWS:  Objection.
23      A.  I think, as I said before, that

Page 440

1       A.  No.  We don't do any business
2   with Medicaid per se.  We pay -- we do
3   business with CVS.
4       Q.  Right.  Who, in turn, does
5   business with state Medicaid agencies through
6   reimbursement, correct?
7       A.  The State pays CVS to provide a
8   service.  We pay CVS -- CVS pays us for
9   products.
10      Q.  And in that sense, State
11  Medicaid dollars flow through CVS to Watson,
12  correct?
13           MR. MATTHEWS:  Objection.
14      A.  I don't see it as flowing
15  through to Watson.  CVS's dollars flow to
16  Watson.
17      Q.  Okay.  Well, where does the 9
18  to 11 percent come from?  You've testified
19  that 9 to 11 percent of Watson's annual sales
20  are attributable to Medicaid reimbursement.
21  Where does that come from?
22      A.  Medicaid -- Medicaid business,
23  if you look at it that way, much the same as

Page 439

1   all of our business is important to us,
2   including Medicaid.
3       Q.  And you want all of the
4   business you can get, including state
5   Medicaid reimbursement dollars, correct?
6       A.  Well, we really can't control
7   our Medicaid business, remember.  We're
8   selling to chains or we're selling to
9   wholesalers, who are, in turn, selling to
10  independents.  Who they choose to dispense
11  that product to is beyond our control.  So
12  when you say that the Medicaid business is
13  important to us, it's important, but we don't
14  control it.  Who really controls that is the
15  company that's actually dispensing the
16  product at retail.  So if we told you
17  tomorrow we didn't want Medicaid business, it
18  doesn't really help us, because CVS is the
19  one that controls that decision of who
20  they're dispensing product to.
21      Q.  But just as a practical -- just
22  as your practical knowledge, you understand
23  that CVS is going to purchase Watson drugs

Page 441

111  (Pages 438 to 441)

REPLY EXHIBIT C

# Condensed Transcript

# Deposition of
# Karlsson Kathleen

### taken on
### May 5, 2009

**ALABAMA MEDICAID PHARMACEUTICAL
AVERAGE WHOLESALE PRICE LITIGATION
Master Docket No. 2005-219**

**This Document Relates to:**

**State of Alabama v. Watson Laboratories, Inc.
Case No. 2005-219.74**

**State of Alabama v. Watson Pharma, Inc.
Case No. 2005-219.75**

**State of Alabama v. Watson Parmaceuticals, Inc.
Case No. 2005-219.76**



**Certified Court Reporters,**

Page 1

    *    *    *    *    *    *    *    *

The videotaped deposition of KATHLEEN
KARLSSON, was taken before Cornelia J.
Baker, Certified Court Reporter, ABCR 290,
and Certified Shorthand Reporter, as
Commissioner, on Tuesday, May 5, 2009,
commencing at approximately 11:56 a.m., in
the law offices of Alston & Bird, 90 Park
Avenue, New York, New York.

    *    *    *    *    *    *    *    *

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY

STATE OF ALABAMA

In the Matter of:

ALABAMA MEDICAID

PHARMACEUTICAL AVERAGE      MASTER DOCKET

WHOLESALE PRICE LITIGATION   NO. CV-2005-219

-------------------------------------------

This Document Relates to:

State of Alabama v.

Watson Laboratories, Inc.

No. 2005-219.74

State of Alabama v.

Watson Pharma, Inc.

No. 2005-219.75

State of Alabama v.

Watson Pharmaceuticals, Inc.

No. 2005-219.76

Karlsson Kathleen
May 5, 2009

```
 1       *    *    *    *    *    *    *
 2       IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
                 STATE OF HAWAII
 3
 4     State of Hawaii
 5      v.
 6     Abbott Laboratories, Inc., et al.
 7     Civil No. 06-1-0720-04-EEH
 8
 9     State of Hawaii
10      v.
11     Schering Corporation; DOE
       Corporations 1-100; DOE
12     Entities 1-100
13     Civil No. 07-1-1639-09-EEH
14
           *    *    *    *    *    *    *
15
       STATE OF WISCONSIN CIRCUIT COURT DANE COUNTY
16                   Branch 9
17     State of Wisconsin
18      v.
19     AMGEN, Inc., et al.
20     No. 04-CV-1709
21       *    *    *    *    *    *    *
22
23
                                         Page 2
```

```
 1       *    *    *    *    *    *    *    *
 2            STATE OF SOUTH CAROLINA
                COUNTY OF RICHLAND
 3
 4         IN THE COURT OF COMMON PLEAS
           FOR THE FIFTH JUDICIAL CIRCUIT
 5
 6        Master Case No. 2006-CP-40-4394
          The Honorable J. Cordell Maddox, Jr.
 7
 8     In Re: South Carolina Pharmaceutical
          Pricing Litigation
 9
10     The document relates to:
11     Watson Pharma, Inc., and
       Watson Pharmaceuticals, Inc.
12
13     Civil Action No. 06-CP-40-7152
       Civil Action No. 06-CP-40-7155
14
15       *    *    *    *    *    *    *    *
16       IN THE SUPERIOR COURT FOR THE
                STATE OF ALASKA
17       THIRD JUDICIAL DISTRICT AT ANCHORAGE
18     State of Alaska
19      v.            Case No. 3AN-06-12026-CI
20     Alpharma Branded Products
21     Division, Inc., et al.
22
23       *    *    *    *    *    *    *    *
                                         Page 4
```

```
 1       *    *    *    *    *    *    *
 2           IN THE CIRCUIT COURT OF
                COOK COUNTY, ILLINOIS
 3        COUNTY DEPARTMENT, CHANCERY DIVISION
 4     The People of the State of Illinois
 5      v.
 6     Abbott Laboratories, et al.
 7     No. 05-CH-2474
 8       *    *    *    *    *    *    *
 9     IN THE DISTRICT COURT OF THE FOURTH JUDICIAL
       DISTRICT OF THE STATE OF IDAHO, IN AND FOR
10                THE COUNTY OF ADA
11     State of Idaho
12      v.
13     Alpharma USPD INC.; AstraZeneca
       Pharmaceuticals LP; AstraZeneca LP
14
       Case No. CV0C07-01847
15
16       *    *    *    *    *    *    *
17            TRAVIS COUNTY, TEXAS
               419TH JUDICIAL DISTRICT
18            CAUSE NO. D-1-GV-001566
19     The State of Texas, ex rel.,
       Ven-A-Care of the Florida Keys, Inc.,
20
        v.
21
       Alpharma USPD f/k/a
22     Barre-National, Inc., et al.
23       *    *    *    *    *    *    *
                                         Page 3
```

```
 1       *    *    *    *    *    *    *
 2           IN THE CHANCERY COURT OF
              RANKIN COUNTY, MISSISSIPPI
 3           20TH CHANCERY COURT DIVISION
 4     State of Mississippi
 5      v.          Civil Action No. G2009-65597
 6     Watson Pharma, Inc.
 7
 8     State of Mississippi
 9      v.          Civil Action No. G2009-65629
10     Watson Pharmaceuticals, Inc.
11
12     State of Mississippi
13      v.          Civil Action No. G2009-65630
14     Watson Laboratories, Inc.
15       *    *    *    *    *    *    *
16
17
18
19
20
21
22
23
                                         Page 5
```

2  (Pages 2 to 5)

**Page 190**

1    A.  I don't believe that I have,
2  no.
3        Q.  Read No. 9 for the Jury,
4  please, ma'am.
5            MRS. KOSKI:  Objection.  She's
6            already gone through all of
7            this, Clint.
8        Q.  Can you read No. 9?
9        A.  Percentage of Defendants' total
10  sales attributed to the Medicaid channel
11  between 1991 to 2005.
12       Q.  And I believe there is
13  testimony that the total sales attributable
14  to Alabama Medicaid is between 9 and
15  11 percent, correct?
16           MRS. KOSKI:  Objection.
17       A.  Could you restate that
18  question, please?
19       Q.  Well, let me just ask you:
20  What is the percentage of Watson's total
21  sales attributable to Alabama between 1991
22  and 2005?
23       A.  I don't have the percentage for

**Page 191**

1  Alabama.
2        Q.  What is the percentage
3  nationwide?
4        A.  Nine to 11 percent.
5        Q.  And do you know what that 9 to
6  11 percent would equal in a dollar amount?
7            MRS. KOSKI:  Objection.
8        A.  No, I do not.
9        Q.  Why not?
10           MRS. KOSKI:  Objection.
11       A.  Because Medicaid does not
12  purchase products from us, therefore we don't
13  track it as sales.
14       Q.  Well, how do you know that 9 to
15  11 percent of Medicaid reimbursements --
16  strike that.
17           How do you know that 9 to
18  11 percent of Watson's total sales are
19  attributable to Medicaid?
20       A.  We compared the units.
21       Q.  Can't you assign dollar values
22  to those units?
23           MRS. KOSKI:  Objection.

**Page 192**

1    A.  It's not something that I've
2  done.
3        Q.  Could you?
4        A.  I could.
5        Q.  You just chose not to do it in
6  preparation for this deposition, correct?
7            MRS. KOSKI:  Objection.
8        Q.  Is that right?
9        A.  I did not think about doing it
10  or not doing it.  It's not something we
11  track.
12       Q.  If asked, you could track that,
13  couldn't you?
14       A.  It would be an estimate.
15       Q.  How would you do it?
16       A.  Off the top of my head, I'm not
17  sure.  I'd have to take a look at the usage
18  and see how we could back into sales.
19       Q.  Does Watson have to communicate
20  its prices to state Medicaid programs in
21  order to participate in state Medicaid
22  programs?
23           MRS. KOSKI:  Objection.

**Page 193**

1    A.  No, it does not.
2        Q.  How would Watson participate in
3  state Medicaid programs without communicating
4  its prices to state Medicaid programs?
5            MRS. KOSKI:  Objection.
6        A.  Information is provided from
7  CMS.  And I believe they provide the unit
8  rebate amounts to the state agencies.
9        Q.  Right.  But the other side of
10  that is that the state Medicaid agencies have
11  to reimburse for Watson's products, correct?
12       A.  Yes.
13       Q.  If Alabama didn't reimburse for
14  any of Watson's products, Watson would not
15  send a rebate to Alabama Medicaid, correct?
16       A.  Correct.
17       Q.  So how does the Alabama
18  Medicaid Agency obtain Watson's prices?
19           MRS. KOSKI:  Objection.
20       A.  We are not allowed to -- we are
21  not required to send the states actual
22  prices.
23       Q.  Well, how does Alabama get the

49 (Pages 190 to 193)

# REPLY EXHIBIT D

Clark, Napoleon D. - Vol. II CONFIDENTIAL                    June 28, 2007
Morristown, NJ

Page 95

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-CV-11865-PBS

----------------------------X

THE COMMONWEALTH OF              )

MASSACHUSETTS,                   )        VIDEOTAPED

            Plaintiff,           )    DEPOSITION UPON

       v.                        )    ORAL EXAMINATION

MYLAN LABORATORIES INC., et )             OF

al.,                             )    NAPOLEON D. CLARK

            Defendants.     )      V O L U M E   2

----------------------------X

               =========================

               C O N F I D E N T I A L

               =========================


T R A N S C R I P T of the stenographic notes of

JANE LORFING COLWELL, a Certified Shorthand

Reporter and Notary Public of the State of New

Jersey, taken at the Madison Hotel, One Convent

Road, Morristown, New Jersey, on Thursday, June

28, 2007, commencing at 8:20 a.m.

Clark, Napoleon D. - Vol. II CONFIDENTIAL                June 28, 2007
                          Morristown, NJ

Page 102

1    questions, there was one matter that I wanted to

2    clarify from Mr. Clark's testimony yesterday, and

3    Mr. Heidlage has kindly given me permission to

4    proceed with that question now as opposed to

5    waiting until the end of his questioning.

6              Mr. Clark, yesterday you were asked a

7    question about whether customers of

8    pharmaceutical products from Watson Pharma, Inc.,

9    are reimbursed based on AWP, and you answered

10   that question yes. First of all, do you have

11   personal knowledge of how customers of Watson

12   Pharmaceuticals are reimbursed for their drug

13   products?

14             THE WITNESS:  Personal in the sense of

15   what process they go through to get reimbursed?

16             MR. FARQUHAR:  Right.

17             THE WITNESS:  No.

18             MR. FARQUHAR:  And are all -- to your

19   understanding, are all of your customers

20   reimbursed based on AWP?

21             THE WITNESS:  To my understanding, some

22   are.  AWP is one basis of reimbursement.  There

a407b562-52d1-4dc8-a3a9-a76f264de526

Clark, Napoleon D. - Vol. II CONFIDENTIAL          June 28, 2007
                    Morristown, NJ

                                                        Page 103

 1    are also other categories that are used to

 2    reimburse customers, to my understanding.

 3           MR. FARQUHAR:  What kind of other

 4    standards are there?

 5           THE WITNESS:  We have customers --

 6    customers could be reimbursed through MAC

 7    pricing.  I believe federal upper limit pricing

 8    and other pricing categories that may be set by

 9    their third-party payors.

10           MR. FARQUHAR:  Thank you.

11           Thank you, Mr. Heidlage.

12           MR. HEIDLAGE:  Thank you.

13

14           N A P O L E O N   D.   C L A R K,

15    360 Mount Kemble Avenue, Morristown, New Jersey

16    07960, having been previously sworn, testifies as

17    follows:

18

19              CONTINUED DIRECT EXAMINATION

20    BY MR. HEIDLAGE:

21        Q.   Good morning, Mr. Clark.

22        A.   Good morning.

a407b562-52d1-4dc8-a3a9-a76f264de526

REPLY EXHIBIT E

PLAINTIFF'S
EXHIBIT
Boyer No. 7
WATSON 5/4/09

April 23, 1998

Susan Rhodus
Vice President of Operations
GeriMEd
9707 Shelbyville Road
Louisville, Kentucky  40223

Dear Susan,

Attached is a proposed spreadsheet of rebates for Microzide based on market share.  Please notice that the scale was based on the market share of HCTZ.  It appears that it may not be profitable for your members to switch Maxzide and Dyazide patients until they reach a higher rebate level.

As we had discussed, there is an added benefit for all members to move to Microzide since the spread for Microzide is better than generic 25mg HCTZ.

*All figures are based on a 30 day supply.*

Microzide 12.5 mg HCTZ:
|  |  |  |
|---|---|---|
| AWP for 30 day supply = | $12.135 |  |
| @ AWP less 10% = | 10.92* |  |
| Cost of goods = | 9.00** |  |
| Spread = | 1.92 | per 30 day supply |

Generic 25mg HCTZ:
|  |  |  |
|---|---|---|
| Generic AWP for 30 day supply = | $5.16 |  |
| HCFA MAC @ $1.49/c = | 0.447 |  |
| Estimated cost of goods = | 0.09 |  |
| Spread = | 0.357 | per 30 day supply |

\* Price supplied by GeriMed
\*\* Based on GeriMed contract price of $29.97/c

With the current spread, Microzide is producing an additional $1.56 per 30 day supply.  With an increase in market share to just 15%, the spread increases to $2.10 per 30 day supply.

HIGHLY CONFIDENTIAL

WATL000132593

Susan, the switch to a low dose of 12.5 mg HCTZ, like Microzide, can be supported by many studies as well as the JNC VI. The studies show that 12.5 mg HCTZ is comparable in efficacy to 25mg, with a side effect profile comparable to placebo. Often 25mg HCTZ is associated with changes in potassium, cholesterol, and uric acid.

The JNC VI has supported the use of diuretics as first line therapy because they have shown to reduce morbidity and mortality. Furthermore, it may be beneficial to add a second agent in cases where patients are not being controlled with monotherapy. HCTZ 12.5 mg, like Microzide, has shown to have synergistic effects with ACEs, beta blockers, and CCBs.

We are prepared to provide an updated formulary kit, studies, a copy of the JNC VI, as well as suggested letters for patient switches if needed, to the consultant pharmacists who will be converting the patients.

Susan, thank you again for the opportunity to present this market share program. I look forward to working with you in the future. Please let me know how the proposed program was received at the member meeting.

Sincerely,


Tom Hadley
Microzide Product Manager

HIGHLY CONFIDENTIAL

WATL000132594

## Microzide Market Share Conversion Scale

| Usage 7/01/97 - 9/30/97 | Current Extended Units | Current MKT Share | |
|---|---|---|---|
| Total HCTZ | 1,016,300 | | |
| Microzide | 2,300 | 0.226% | Microzide cost per cap = $0.30 |
| 25mg | 880,600 | 86.648% | MACed at $1.49/C, $14.90/M |
| 50mg | 132,300 | 13.018% | |
| 100mg | 800 | 0.08% | |

| Market Share Goal of Total HCTZ Usage* | Extended Units | Current Cost$ | Discount Rate | Rebate | Adjusted Cost/Cap | Additional Gross Profit/Cap | Adjusted Spread/Cap | Adjusted Spread/30day Rx |
|---|---|---|---|---|---|---|---|---|
| 1% | 10,163 | $3,049 | 2% | $60.98 | 0.294 | $0.052 | $0.058 | $1.74 |
| 3% | 30,489 | $9,147 | 3% | $274.40 | 0.291 | $0.052 | $0.061 | $1.83 |
| 5% | 50,815 | $15,245 | 4% | $609.78 | 0.288 | $0.052 | $0.064 | $1.92 |
| 10% | 101,630 | $30,489 | 5% | $1,524.45 | 0.285 | $0.052 | $0.067 | $2.01 |
| 15% | 152,445 | $45,734 | 6% | $2,744.01 | 0.282 | $0.052 | $0.070 | $2.10 |
| 20% | 203,260 | $60,978 | 8% | $4,878.24 | 0.276 | $0.052 | $0.076 | $2.28 |
| 25%+ | 254,075 | $76,223 | 10% | $7,622.25 | 0.270 | $0.052 | $0.082 | $2.46 |

* Although each member will individually enroll and payment will be only to those who perform, this illustration is based on the total HCTZ usage for GeriMed.

HIGHLY CONFIDENTIAL

WATL000132595

REPLY EXHIBIT
F



**WATSON**
Laboratories, Inc.

A Subsidiary of Watson Pharmaceuticals, Inc.

December 2, 1997

Jerry Prentice
Director of Brand Pharmaceutical
Purchasing and Marketing
Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011

Dear Jerry,

Attached please find a revised Oral Contraceptive Compound Management program. As discussed during our last meeting, the intention of the program is to provide Rite Aid Corporation the opportunity to earn increased profitability via lucrative spreads and incremental rebates on the entire family of Watson oral contraceptives.

Per your feedback, we have altered the sliding scale for the Market Share rebates to 5% increments, and doubled the maximum percentage Rite Aid may earn to 10%.

I hope the data provided helps us finalize our agreement on the oral contraceptive line. As a side note, I left the reimbursement percentage the same on Zovia because Demulen just announced a price increase for the brand. This will allow us to increase our AWP spread even higher than we had discussed. Their increase in price will hopefully allow you to increase both your retail sell prices on Demulen and Zovia.

I look forward to discussing the next steps with you. I am in all week, but will be out of town Monday – Thursday of next week.

Sincerely,

*Mark T. Hartman*

Mark T. Hartman
Director of Marketing, Trade & Managed Care
Watson Laboratories, Inc.

PLAINTIFF'S
EXHIBIT
Boyer No. 22
WATSON  5/4/09

HIGHLY CONFIDENTIAL                    WATL000070313

 # Watson Laboratories Oral Contraceptive Proposal
December 2, 1997

## Rite Aid Corporation

Watson Laboratories proposes the following Performance Based Market Share Program for its Oral Contraceptive line.

**Objective:**   To provide Rite Aid Corporation the opportunity to earn increased profitability through lucrative spreads and incremental rebates on the Watson family of oral contraceptives.

**Products included:**
- Zovia
- Necon / Genora
- Levora
- Nor-QD

**Pricing:**
Contract pricing for each product.

**Market Share Incentive:**

Watson Laboratories will pay a Market Share rebate to Rite Aid Corporation for movement of share from a baseline in the following percentages:

| Market Share Increase | Percent Rebate |
|---|---|
| 1-5% | 1% |
| 6-10% | 2% |
| 11-15% | 3% |
| 16-20% | 4% |
| 21-25% | 5% |
| 26-30% | 6% |
| 31-35% | 7% |
| 36-40% | 8% |
| 41-45% | 9% |
| 45-50% | 10% |

HIGHLY CONFIDENTIAL

**Example:**
- If Zovia share is 25% as a baseline.

| Market Share Level | Rebate Percentage |
|:---:|:---:|
| 30% | 1% |
| 35% | 2% |
| 40% | 3% |
| 45% | 4% |
| 50% | 5% |
| 55% | 6% |
| 60% | 7% |
| 65% | 8% |
| 70% | 9% |
| 75% | 10% |

HIGHLY CONFIDENTIAL

## Rite Aid - Compound Management Program vs Levlen & Nordette

### Assumptions

Units based on Cycles dispensed.
Units are annualized based on data provided by account.

| Levora Worksheet - Rite Aid | | | |
|---|---|---|---|

| Pricing per Cycle | 21 | | 28 |
|---|---|---|---|
| Levora | $ 10.00 | $ | 10.00 |
| Nordette | $ 21.22 | $ | 21.49 |
| Levlen | $ 21.28 | $ | 21.28 |

| Annualized Sales | | | | |
|---|---|---|---|---|
| **Levora** | 21 | | 28 | Totals |
| Cycles Dispensed | 4,200 | | 195,000 | 199,200 |
| Dollars | $ 42,000 | $ | 1,950,000 | $ 1,992,000 |
| | | | | |
| **Nordette** | 21 | | 28 | |
| Cycles Dispensed | 6,200 | | 290,000 | 296,200 |
| Dollars | $ 131,564 | $ | 6,232,100 | $ 6,363,664 |
| | | | | |
| **Levlen** | 21 | | 28 | |
| Cycles Dispensed | 2976 | | 125640 | 128,616 |
| Dollars | $ 63,329 | $ | 2,673,619 | $ 2,736,948 |
| | | | | |
| **Total Market** | 21 | | 28 | |
| Cycles Dispensed | 13376 | | 610640 | 624,016 |
| Dollars | $ 236,893 | $ | 10,855,719 | $ 11,092,612 |

| Current Rite Aid Market Share | 21 | 28 | |
|---|---|---|---|
| Levora | 31% | 32% | 32% |
| Nordette | 46% | 47% | 47% |
| Levlen | 22% | 21% | 21% |

| Market Share Conversion Rebates - Annualized: Paid on Moving Share to Levora. | | | | |
|---|---|---|---|---|

| %Market Share Goals | % Gain Over Baseline | % Rebate | Rebate on Incr. Gain | |
|---|---|---|---|---|
| 37% | 5% | 1% | $ 3,120 | |
| 42% | 10% | 2% | $ 12,480 | |
| 47% | 15% | 3% | $ 28,081 | |
| 52% | 20% | 4% | $ 49,921 | Redacted |
| 57% | 25% | 5% | $ 78,002 | |
| 62% | 30% | 6% | $ 112,323 | |
| 67% | 35% | 7% | $ 152,884 | |
| 72% | 40% | 8% | $ 199,685 | |
| 77% | 45% | 9% | $ 252,726 | |
| 82% | 50% | 10% | $ 312,008 | |

HIGHLY CONFIDENTIAL

# Rite Aid - Compound Management Program vs Levlen & Nordette
## Gross Profit Analysis Worksheet

**Assumptions**
Units based on Cycles dispensed.
Units are annualized based on data provided by account.

11/6/97

| Levora Worksheet - Rite Aid | | |
|---|---|---|

| Pricing per Cycle | | 21 | | 28 |
|---|---|---|---|---|
| Levora | $ | 10.00 | $ | 10.00 |
| Nordette | $ | 21.22 | $ | 21.49 |
| Levlen | $ | 21.28 | $ | 21.28 |

| Annualized Sales | | | | | | |
|---|---|---|---|---|---|---|
| Levora | | 21 | | 28 | | Totals |
| Cycles Dispensed | | 4,200 | | 195,000 | | 199,200 |
| Dollars | $ | 42,000 | $ | 1,950,000 | $ | 1,992,000 |
| | | | | | | |
| Nordette | | 21 | | 28 | | |
| Cycles Dispensed | | 6,200 | | 290,000 | | 296,200 |
| Dollars | $ | 131,564 | $ | 6,232,100 | $ | 6,363,664 |
| | | | | | | |
| Levlen | | 21 | | 28 | | |
| Cycles Dispensed | | 2,976 | | 125,640 | | 128,616 | 12% of total market |
| Dollars | $ | 63,329 | $ | 2,673,619 | $ | 2,736,948 |

| Total Market | | | | | | |
|---|---|---|---|---|---|---|
| | | 21 | | 28 | | |
| Cycles Dispensed | | 13,376 | | 610,640 | | 624,016 |
| Dollars | $ | 236,893 | $ | 10,855,719 | | $11,092,612 |

| Current Rite Aid Market Share | | | |
|---|---|---|---|
| | 21 | 28 | |
| Levora | 31% | 32% | 31.9% |
| Nordette | 46% | 47% | 47.5% |
| Levlen | 22% | 21% | 20.6% |

| Per Cycle AWP | | 21 | | 28 |
|---|---|---|---|---|
| Levora | $ | 24.07 | $ | 24.07 |
| Nordette | $ | 26.53 | $ | 26.86 |
| Levlen | $ | 25.16 | $ | 25.16 |

| Redacted |
|---|

| Current Reimbursement to Rite Aid | | | | | | Totals |
|---|---|---|---|---|---|---|
| | | 21 | | 28 | | |
| Levora | $ | 97,946 | $ | 4,547,507 | $ | 4,645,454 |
| Nordette | $ | 157,780 | $ | 7,462,831 | $ | 7,620,611 |
| Levlen | $ | 72,208 | $ | 3,048,454 | $ | 3,120,661 |
| If all Levora | | | | | | |
| Levora | $ | 303,887 | $ | 13,873,008 | $ | 14,176,895 |

HIGHLY CONFIDENTIAL

**Net Cost to Rite Aid***

|  | 21 | 28 | | Totals |
|---|---|---|---|---|
| Levora | $ 42,000 | $ 1,950,000 | $ | 1,992,000 |
| Nordette | $ 131,564 | $ 6,232,100 | $ | 6,363,664 |
| Levlen | $ 63,329 | $ 2,673,619 | $ | 2,736,948 |
| **If all Levora** | | | | |
| Levora | $ 133,760 | $ 6,106,400 | $ | 6,240,160 |

Redacted

**Average Patient Reimbursement - per Cycle**

|  | 21 | 28 |
|---|---|---|
| Levora | $ 22.72 | $ 22.72 |
| Nordette | $ 25.45 | $ 25.73 |
| Levlen | $ 24.26 | $ 24.26 |

**Cost Per Cycle**

|  | 21 | 28 |
|---|---|---|
| Levora | $ 10.00 | $ 10.00 |
| Nordette | $ 21.22 | $ 21.49 |
| Levlen | $ 21.28 | $ 21.28 |

Redacted

Redacted

**Reimbursement if brand was dispensed as Levora**

|  | 21 | 28 | Total |
|---|---|---|---|
| Nordette | $ 140,857 | $ 6,588,452 | $ 6,729,309 |
| Levlen | $ 67,611 | $ 2,854,390 | $ 2,922,001 |

Redacted

HIGHLY CONFIDENTIAL

## Rite Aid - Compound Management Program vs Demulen

### Assumptions
Units based on Cycles dispensed.
Units are annualized based on data provided by account.

| Zovia Worksheet - Rite Aid | | | | | |
|---|---|---|---|---|---|

| Pricing per Cycle | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
|---|---|---|---|---|---|
| Zovia | $ 7.96 | $ 7.96 | $ 7.96 | $ 7.96 | |
| Demulen | $ 20.76 | $ 20.97 | $ 21.14 | $ 21.35 | |

| Annualized Sales | | | | | |
|---|---|---|---|---|---|
| Zovia | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | Totals |
| Cycles Dispensed | 6,480 | 20,123 | 1,039 | 5,000 | 32,642 |
| Dollars | $ 51,581 | $ 160,179 | $ 8,270 | $ 39,800 | $ 259,830 |
| | | | | | |
| Demulen | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
| Cycles Dispensed | 21,696 | 67,368 | 3,480 | 16,740 | 109,284 |
| Dollars | $ 450,409 | $ 1,412,707 | $ 73,567 | $ 357,399 | $ 2,294,082 |

| Total Market | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
|---|---|---|---|---|---|
| Cycles Dispensed | 28,176 | 87,491 | 4,519 | 21,740 | 141,926 |
| Dollars | $ 501,990 | $ 1,572,886 | $ 81,838 | $ 397,199.00 | $ 2,553,912 |

| Current Rite Aid Market Share | | | | | |
|---|---|---|---|---|---|
| | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
| Zovia | 23% | 23% | 23% | 23% | 23% |
| Demulen | 77% | 77% | 77% | 77% | 77% |

| Market Share Conversion Rebates - Annualized: Paid on Moving Share to Zovia. | | | | |
|---|---|---|---|---|

| %Market Share Goals | % Gain Over Baseline | % Rebate | Rebate on Incr. Gain | |
|---|---|---|---|---|
| 28% | 5% | 1% | $ 565 | |
| 33% | 10% | 2% | $ 2,259 | |
| 38% | 15% | 3% | $ 5,084 | |
| 43% | 20% | 4% | $ 9,038 | |
| 48% | 25% | 5% | $ 14,122 | Redacted |
| 53% | 30% | 6% | $ 20,335 | |
| 58% | 35% | 7% | $ 27,678 | |
| 63% | 40% | 8% | $ 36,151 | |
| 68% | 45% | 9% | $ 45,754 | |
| 73% | 50% | 10% | $ 56,487 | |

HIGHLY CONFIDENTIAL

**Rite Aid - Compound Management Program vs Demulen**

## Gross Profit Analysis Worksheet
### Third Party Payor Version

**Assumptions**                                                        11/17/97
Units based on Cycles dispensed.
Units are annualized based on data provided by account.

| Zovia Worksheet - Rite Aid | | | | |
|---|---|---|---|---|

| Pricing per Cycle | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 |
|---|---|---|---|---|
| Zovia | $ 7.96 | $ 7.96 | $ 7.96 | $ 7.96 |
| Demulen | $ 20.76 | $ 20.97 | $ 21.14 | $ 21.35 |

| Annualized Sales | | | | | |
|---|---|---|---|---|---|

| Zovia | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | Totals |
|---|---|---|---|---|---|
| Cycles Dispensed | 6,480 | 20,123 | 1,039 | 5,000 | 32,642 |
| Dollars | $ 51,581 | $ 160,179 | $ 8,270 | $ 39,800 | $ 259,830 |

| Demulen | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
|---|---|---|---|---|---|
| Cycles Dispensed | 21,696 | 67,368 | 3,480 | 16,740 | 109,284 |
| Dollars | $ 450,409 | $ 1,412,707 | $ 73,567 | $ 357,399 | $ 2,294,082 |

| Total Market | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
|---|---|---|---|---|---|
| Cycles Dispensed | 28,176 | 87,491 | 4,519 | 21,740 | $ 141,926 |
| Dollars | $ 501,990 | $ 1,572,886 | $ 81,838 | $ 397,199 | $ 2,553,912 |

| Current Rite Aid Market Share | | | | | |
|---|---|---|---|---|---|
| | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
| Zovia | 23% | 23% | 23% | 23% | 23% |
| Demulen | 77% | 77% | 77% | 77% | 77% |

| Per Cycle AWP | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 |
|---|---|---|---|---|
| Zovia | $ 24.85 | $ 24.85 | $ 27.71 | $ 27.71 |
| Demulen | $ 27.77 | $ 28.05 | $ 30.96 | $ 31.25 |

| Redacted |
|---|

| | | | | | Totals |
|---|---|---|---|---|---|
| **Current Reimbursement to Rite Aid** | | | | | |
| | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
| Zovia | $ 151,464 | $ 470,355 | $ 26,782 | $ 128,882 | $ 777,482 |
| Demulen | $ 575,401 | $ 1,802,987 | $ 101,896 | $ 494,353 | $ 2,974,636 |
| If all Zovia | | | | | |
| Zovia | $ 658,586 | $ 2,045,015 | $ 116,484 | $ 560,379 | $ 3,380,463 |

| | | | | | Totals |
|---|---|---|---|---|---|
| **Net Cost to Rite Aid\*** | | | | | |
| | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | |
| Zovia | $ 51,581 | $ 160,179 | $ 8,270 | $ 39,800 | $ 259,830 |
| Demulen | $ 450,409 | $ 1,412,707 | $ 73,567 | $ 357,399 | $ 2,294,082 |
| If all Zovia | | | | | |
| Zovia | $ 224,281 | $ 696,428 | $ 35,971 | $ 173,050 | $ 1,129,731 |

HIGHLY CONFIDENTIAL                                      WATL000070320

Redacted

**Average Patient Reimbursement - per Cycle**

|          | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 |
|----------|-----------|-----------|-----------|-----------|
| Zovia    | $    23.37 | $    23.37 | $    25.78 | $    25.78 |
| Demulen  | $    26.52 | $    26.76 | $    29.28 | $    29.53 |

Redacted

Redacted

**Reimbursement if brand was dispensed as Zovia**

|          | 1/35mg 21 | 1/35mg 28 | 1/50mg 21 | 1/50mg 28 | Total |
|----------|-----------|-----------|-----------|-----------|-------|
| Demulen  | $   507,122 | $  1,574,660 | $   89,702 | $  431,497 | $  2,171,484 |

Redacted

HIGHLY CONFIDENTIAL

WATL000070321