# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| *The City of New York, et al.* | ) ) |
| *v.* | ) ) |
| *Abbott Laboratories, et al.* | ) ) ) |

MDL NO. 1456
Civil Action No. 01-12257-PBS
 Subcategory Case No: 03-10643-PBS

Judge Patti B. Saris

## PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO BARR LABORATORIES, INC.

Pursuant to Rule 56.1 of the Local Rules of this Court, plaintiffs hereby submit their

Reply Statement of Undisputed Material Facts Applicable to Defendant Barr Laboratories, Inc.

("Barr") in support of their Motion for Partial Summary Judgment.

## I.     BARR SPECIFIC FACTS

**1.     The Barr Drug and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Barr's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limit ("FUL") and Barr AMPs.  The exhibit notes which NDCs are associated with package sizes that set the FUL.**

<u>Barr's Response to Alleged Fact No. 1:</u>  Disputed. Barr does not dispute that Exhibit A to Plaintiffs' Barr-Specific Statement purports to (1) list the Barr drug and NDCs that Plaintiffs have examined in connection with their motion, (2) set forth Barr's published AWPs and WACs for this drug and these NDCs, any operative FUL, and Barr's AMPs, and (3) note which NDCs are associated with the package sizes that set the FUL. Barr disputes that Plaintiffs' Exhibit is an accurate and/or complete portrayal of the AWP and WAC prices, the operative FULs, and AMPs for this Barr drug and these NDCs for any given time period. Barr further disputes that Plaintiffs' Exhibit accurately reflects or updates the prices for this Barr drug and these NDCs and/or the dates that they become effective. Further, Barr objects to Alleged Fact No. 1 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement. See Fed. R.

Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien v. Town of Agawam, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006). Moreover, Barr objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation. See Fed. R. Evid. 602.

**PLAINTIFFS' REPLY TO STATEMENT # 1**:

Barr's dispute as to the data in Exhibit A not being properly supported by evidence in the record is baseless.  Plaintiffs properly cited Barr as the source of the Barr AMP data and the First Databank NDDF data file (Alabama Production, FDB-AWP 030785 – 030795) as the source of all other data (*see* Exhibit A at 3), which is the same source cited by Barr's expert Dr. Addanki. *See* Affidavit of Dr. Sumanth Addanki dated May 15, 2009 [Dkt# 6056] at Exhibit 2 (identifying "First DataBank (Alabama Production) Data and NDDF (National Drug Data File)™ Documentation Manual (Rev. April 2000)" as a Data source.  *See also* Reply Affidavit of Joanne M. Cicala, sworn to June 30, 2009 and submitted in further support of plaintiffs' motion for partial summary judgment at ¶2, which is incorporated herein.

Barr disputes that Plaintiffs' Exhibit is accurate and/or complete but offers no evidence in support as required by Rule 56.1.  The remainder of Barr's response is likewise baseless and unsubstantiated.  No further reply is required.

> 2.     **The specific Barr drug at issue is the Cefadroxil 500 MG Capsule.**
>
> Barr's Response to Alleged Fact No. 2:  Barr does not dispute that Barr's Cefadroxil 500mg capsule is a drug at issue in Plaintiffs' Motion for Partial Summary Judgment.

**PLAINTIFFS' REPLY TO STATEMENT # 2**:

No reply is required.

3.     **Barr manufactures and sells prescription drugs in the State of New York, including the City of New York and in the Counties, that are eligible for reimbursement under Medicaid.   *See* Barr Laboratories, Inc.'s Answer to Plaintiffs' Revised First Amended Consolidated Complaint ("Barr Answer") [Docket #4830] at ¶ 44.**

2

<u>Barr's Response to Alleged Fact No. 3:</u>  Barr does not dispute that it manufactures and sells prescription drugs in the State of New York that are eligible for reimbursement under Medicaid.

## PLAINTIFFS' REPLY TO STATEMENT # 3:

No reply is required.

**4.     Barr has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8.  *See* Barr 30(b)(6) (Timothy Catlett) 5/7/08 Deposition Transcript (Exhibit B) at 42:13-14 (hereinafter "Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B"); Barr Answer at ¶ 132.**

<u>Barr's Response to Alleged Fact No. 4:</u>   Barr does not dispute that Barr Laboratories, Inc. has entered into and executed a Medicaid Rebate Agreement with the Secretary of Health and Human Services on behalf of all States. However, this fact is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

## PLAINTIFFS' REPLY TO STATEMENT # 4

The parties agree that Barr executed federal Medicaid rebate agreements.  This fact is material because Barr's agreement to this rebate agreement is among the bases for Barr's obligations to abide by Medicaid's legal requirements, standards and procedures.  *See Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) ("*Mylan*")(citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 63-65, (1984) at *25. No further reply is required.

### *Barr Set and Reported Its AWPs and WACs*

**5.     At the time of launch of a new product Barr sets an AWP for its drugs.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 61:6-13.**

<u>Barr's Response to Alleged Fact No. 5:</u>  Disputed. As an initial matter, Barr objects to Alleged Fact No. 5 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. See Deposition of Sue Gaston, March 19, 2008 ("3/19/08 Gaston Dep.") at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. See D. Mass. L.R. 56.1; St. Paul Fire and Marine Ins. Co. v.

Birch, Stewart, Kolasch & Birch, LLP, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial facts as part of a motion for summary judgment). Furthermore, this alleged fact is not properly supported by evidence in the record. See O'Brien, 440 F. Supp. 2d at 5 n.1. Mr. Catlett testified only regarding situations in which Barr was "the first generic manufacturer to launch a product." Deposition of Timothy Catlett, May 7, 2008 ("5/7/08 Catlett Dep.") at 61:6-13 (Ex. 2). Further, Mr. Catlett's testimony did not concern Cefadroxil, the only drug at issue in Plaintiffs' Motion for Partial Summary Judgment.

## PLAINTIFFS' REPLY TO STATEMENT # 5

 The parties agree that Barr sets an AWP for its drugs when Barr is first manufacturer to launch a product.

Barr cannot reasonably dispute that it set an AWP for all its drugs as it admits that it has only one AWP at any one time for a given product.  *See* Plaintiffs Reply to Statement #6. Responding further, Mr. Catlett's testimony establishes that it did:

> Q.      Barr is sometimes not the first to market; is that correct?  With its generic product?
> A.   We are not always first.
> Q.   If Barr is not first, does it still set its AWP at approximately 10 percent below the brand AWP?
> A.   Best -- that's our general policy to the best of my recollection, that's -- my tenure, that's what we have done.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Reply Exhibit A, attached hereto) at 62:1-10

Responding further, Barr's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  In setting the FUL, CMS considered the published prices from First Databank, Red Book and Medi-Span that were presented in the FULs printouts.  *See* Gaston Decl. at ¶3 (statement of general practice).  This included AWPs, WACs and Direct Prices.  *See id.* at Exhibits A & D (FULs system printouts showing AWP prices).  Defendants admit that the published prices presented in the FULs printouts included AWPs.  *See* Defendants' Response to

Plaintiffs' Local Rule 56.1 Statement of "Undisputed" Facts Applicable To All Defendants and

Statement of Additional Undisputed Material Facts [Dkt#:6117] ("Defs. Common Response") at

¶9.

Regarding Barr's specious argument that Mr. Catlett's testimony did not concern

Cefadroxil, Barr designated Mr. Catlett as its 30(b)(6) fact witness to testify about Barr business

practices, including the setting of AWPs for all its drugs.  No further Reply is needed.

**6.      Barr has only one AWP at any time.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 70:22-71:7.**

> Barr's Response to Alleged Fact No. 6: While Barr does not dispute it has only one AWP at any one time for a given product, Barr disputes that this fact is material to Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. See 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

**<u>PLAINTIFFS' REPLY TO STATEMENT # 6:</u>**

The parties agree that Barr has only one AWP at a time.

Responding further, this is a material Statement because CMS considered all published

prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**7.      At all times, from 1997 to 2005, Barr reported the AWPs for its drugs to all three of the national pricing compendia.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 71:3-7; 236:17-237:6.**

> Barr's Response to Alleged Fact No. 7:    Disputed. As an initial matter, Barr objects to Alleged Fact No. 7 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider  AWPs in setting FULs. See 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation

5

where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  In addition, Barr disputes Plaintiffs' statement insofar as it asserts that Barr "reported" any prices to "all three of the national pricing compendia" on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1. *See* O'Brien, 440 F. Supp. 2d 3, 5 n.1.

## PLAINTIFFS' REPLY TO STATEMENT # 7

Barr is disputing this fact only insofar as it is alleging that plaintiffs have cited no evidentiary basis for this statement.  Therefore Barr is not disputing this fact.  It cannot be reasonably disputed that plaintiffs' have an evidentiary basis for this statement as plaintiffs are relying on the testimony of the 30(b)(6) witness that Barr itself designated to testify about the topics in plaintiffs' deposition notice, which included reporting AWP to the national pricing compendia.  *See* Second Revised Notice of Deposition of Barr Laboratories, Inc. and Duramed Pharmaceuticals, Inc., dated May 5, 2008, at p. 4 (Reply Exhibit B, attached hereto).  Barr is merely being obstructive and wasting both this Court's and all parties' time.  The cited testimony speaks for itself:

> Q.   So if Barr reports an AWP to First DataBank it's reporting the same AWP to Medi-Span and Red Book; correct?
> A.   I certainly hope so.  If any situation didn't take place it would have been a mistake.
>
> *   *   *
> Q.   During the period that you were at Barr, is it 1995 to 2007?
> A.   That's correct.
> Q.   During that period did Barr supply its AWPs to First DataBank?
> A.   Yes.
> Q.   During that period did Barr supply its AWPs to Red Book?
> A.   Yes.
> Q.   During that period of time did Barr supply its AWPs to Medi-Span?

A.  Yes.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 71:3-7; 236:17-237:6.

Moreover, Barr admits in response to Statement #14 "that the prices First DataBank

reports as AWPs are the prices that [Barr] supplied to First DataBank," 5/7/08 Catlett Dep. at

87:6-9 (Ex. 2).

Responding further, this is a material Statement because CMS considered all published

prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**8.      In March, 1999, Barr began reporting Suggested Wholesale Price ("SWP")
instead of AWP.  *See* Barr 30(b)(6) (Timothy Catlett) 5/30/07 Deposition Transcript
(Exhibit C) at 174:12-18 (hereinafter "Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit C)").
Barr knew that SWP was equivalent to AWP, and used the terms interchangeably.  *See*
Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit C) at 119:4-6.**

> Barr's Response to Alleged Fact No. 8:   Disputed in part. Barr does not dispute
> that it began providing SWPs to certain pricing compendia. However, Barr
> disputes Plaintiffs' allegation that this practice did not begin until March 1999
> because it is not properly supported by evidence in the record. See O'Brien, 440
> F. Supp. 2d at 5 n.1. In fact, Plaintiffs have not cited any evidence that Barr did
> not begin reporting SWPs until "March, 1999." Indeed, Mr. Catlett testified that
> he did not know when Barr began reporting SWPs to the pricing compendia.
> Deposition of Timothy Catlett, May 30, 2007 ("5/30/07 Catlett Dep.") at 174:19-
> 21 (Ex. 3). Nor have Plaintiffs cited any evidence that "Barr knew that SWP was
> equivalent to AWP." Further, Barr objects to Alleged Fact No. 8 insofar as it
> relies on, refers to, or otherwise mentions AWP, which has no relevance or
> bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not
> consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q.
> What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can
> you think of any instance in which CMS based a FUL on the published AWP
> price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr
> disputes that AWP is material to Plaintiffs' Motion for Partial Summary
> Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F.
> Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for
> summary judgment).

## PLAINTIFFS' REPLY TO STATEMENT # 8

The parties agree that at some point Barr began reporting SWPs instead of AWPs. Barr's

contention that plaintiffs have not cited any evidence that "Barr knew that SWP was equivalent

to AWP" is specious, as Barr's 30(b)(6) witness testified that he used the terms AWP and SWP interchangeably: "A. I believe it was probably just the AWP, the SWP. I use those interchangeably."  Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit C) at 119:4-6.

Responding further, this is a material Statement because CMS considered all published prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**9.     At all times from 1997 to 2005, Barr reported the same AWP to all three of the national compendia.  See Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 70:22-72:1.**

> Barr's Response to Alleged Fact No. 9:   Disputed. While Barr does not dispute that its "hope" was to provide the same AWP to First DataBank, RedBook, and MediSpan, 5/7/08 Catlett Dep. at 71:3-7 (Ex. 2), Barr disputes this alleged fact to the extent it is not properly supported by evidence in the record.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1. Plaintiffs have not cited any evidence that Barr did in fact report the same AWP (for Cefadroxil or any other product) to each of the pricing compendia at all times from 1997 to 2005. Indeed, Mr. Catlett acknowledged that Barr may not have reported the same AWP to each of the pricing compendia. 5/7/08 Catlett Dep. at 71:3-7 (Ex. 2). Furthermore, Barr objects to Alleged Fact No. 9 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

**PLAINTIFFS' REPLY TO STATEMENT # 9**

Again, Barr proffers a specious objection to the proposition that it reported the same AWP to all three of the national compendia, including misrepresenting its own witness's testimony.  Plaintiffs' cited testimony speaks for itself:

> Q.  Let me rephrase the question.  Barr reports its AWPs to the publishing compendia?
> A.  Yes.
> Q.  Barr reports the same AWP to all the publishing compendia?
> A.  We don't have multiple AWPs.

> Q.  So if Barr reports an AWP to First DataBank it's reporting the same AWP to Medi-Span and Red Book; correct?
> A.  I certainly hope so.  If any situation didn't take place it would have been a mistake.
> Q.  And --
> A.  I know of none.

*See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 70:18-71:9.

Responding further, this is a material Statement because CMS considered all published prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**10.    Barr set WACs for its products and reported them to the pricing compendia.** *See* **Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 72:8-73:5; Barr 30(b)(6) (Lauren Cunningham) 2/2/07 Deposition Transcript (Exhibit D) at 60:11-15 (hereinafter "Barr 30(b)(6) (Cunningham) 2/2/07 Dep. (Exhibit D)").**

> Barr's Response to Alleged Fact No. 10:   Barr does not dispute that it set WACs for its products and provided them to the pricing compendia. However, Barr disputes Plaintiffs' statement insofar as it asserts that Barr "reported" any prices to "the pricing compendia" on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1. *See* O'Brien, 440 F. Supp. 2d 3, 5 n.1.

## PLAINTIFF'S REPLY TO STATEMENT # 10

Barr's dispute makes no sense.  The parties agree that Barr set WACs for its products and provided them to the pricing compendia.

**11.    Barr only had one WAC at a given time.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 73:11-14.**

> Barr's Response to Alleged Fact No. 11:   Barr does not dispute that, at any given time, it has only one WAC for each of its products.

## PLAINTIFF'S REPLY TO STATEMENT # 11

No reply needed.

**12.    Barr reported the same WAC to all of the national compendia.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 73:6-14.**

> Barr's Response to Alleged Fact No. 12:   Disputed in part. While Barr does not dispute that its "intent" was to provided the same WAC to those of the pricing

compendia that requested Barr's WACs, 5/7/08 Catlett Dep. at 73:6-10 (Ex. 2), Barr disputes that Barr at all times "reported" "WAC to all of the national compendia." This alleged fact is not properly supported by evidence in the record or the testimony cited. *See* O'Brien, 440 F. Supp. 2d at 5 n.1. Furthermore, Plaintiffs have not cited any evidence that Barr reported WACs for Cefadroxil (the only product at issue in Plaintiffs' motion) or any other of its products to "all of the national compendia." Indeed, Mr. Catlett testified that Barr provided WACs for its drugs to "some, maybe all" of the pricing compendia. 5/7/08 Catlett Dep. at 72:8-14 (Ex. 2). Nor have Plaintiffs cited any evidence that Barr did in fact report the same WAC to the various compendia.

## PLAINTIFF'S REPLY TO STATEMENT # 12

Barr claims that there is no evidence that Barr did in fact report the same WAC to the various compendia because its witness stated that it was Barr's "intent" to do so. This is a specious argument attacking its witness's phrasing and plaintiffs stand by the cited testimony:

> Q.  Okay.  And is it fair to say that when Barr reported a WAC to the publishing compendia, it reported the same WAC to each publisher?
> A.  That would certainly be our intent, to provide the same WAC to each publisher.
> Q.  There's only one WAC for each Barr product; is that correct, at a given time?
> A.  There's only one WAC for each Barr product.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 73:6-14.

**13.    Barr knew and controlled the prices for its drugs that were published by the national drug pricing compendia.  Barr knew that the pricing compendia would publish the prices that Barr provided to them.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 87:3-9.**

Barr's Response to Alleged Fact No. 13:   Disputed. Barr disputes Alleged Fact No. 13 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony. Barr disputes that it "knew and controlled the prices for its drugs that were published by the national drug pricing compendia." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the testimony cited by Plaintiffs does not support this assertion. *See* O'Brien, 440 F. Supp. 2d at 5 n.1.

With respect to the second sentence of Alleged Fact No. 13, Barr does not dispute that "the prices First DataBank reports as AWPs are the prices that [Barr] supplied to First DataBank." 5/7/08 Catlett Dep. at 87:6-9 (Ex. 2). Except as noted, Barr disputes that it "knew that the pricing compendia would publish the

10

prices that Barr provided to them." Plaintiffs have not provided any evidentiary bases for this assertion, as is required by Local Rule 56.1, and the testimony cited by Plaintiffs does not support this assertion. *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

Barr disputes Alleged Fact No. 13 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established. In particular, Barr disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding. See Deposition of Patricia Kay Morgan, Nov. 30, 2007 ("11/30/07 Morgan Dep.") at 33:1-20, 149:12-20 (Ex. 4).

To the extent Alleged Fact No. 13 concerns AWP, Barr disputes that Alleged Fact No. 13 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1).

## PLAINTIFF'S REPLY TO STATEMENT # 13

Barr attempts to dispute that it "knew that the pricing compendia would publish the prices that Barr provided to them," but the cited testimony, which Barr does not dispute, speaks for itself:

> Q.  First DataBank does report prices that are labeled AWP, does it not?
> A.  Yes.
> Q.  And the prices that First DataBank reports as AWPs are the prices that you have supplied to First DataBank; correct?
> A.  That's correct.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 87:3-9.

The rest of Barr's response concerning how the AWPs of secondary and subsequent generic market entrants were established is irrelevant to this Statement and merits no reply.

Responding further, this is a material Statement because CMS considered all published prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**14.    All published AWPs and WACs would reflect what Barr had submitted to the pricing compendia. *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 87:3-9.  Barr**

**would review forms sent to it by First DataBank, Redbook and MediSpan to ensure the accuracy of the prices before they were published.**  *See* **Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 75:10-76:3; 77:9-19; Barr 30(b)(6) (Cunningham) 2/2/07 Dep. (Exhibit D) at 66:11-68:7; 87:13-21.  Barr is not aware of any instances in which the publishers did not publish what Barr reported.**  *See* **Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 78:5-19; Barr 30(b)(6) (Cunningham) 2/2/07 Dep. (Exhibit D) at 60:19-61:14.**

Barr's Response to Alleged Fact No. 14: Disputed. Barr disputes Alleged Fact No. 14 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony. In particular, Barr disputes Plaintiffs' statement insofar as it permits an inference that Barr actively "monitored" the prices reported by First DataBank. While Barr does not dispute that "the prices First DataBank reports as AWPs are the prices that [Barr] supplied to First DataBank," 5/7/08 Catlett Dep. at 87:6-9 (Ex. 2), Barr disputes that "all published AWPs and WACs would reflect what Barr had submitted to the pricing compendia." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the testimony cited by Plaintiffs does not support this assertion. See O'Brien, 440 F. Supp. 2d at 5 n.1.

With respect to the second sentence of Alleged Fact No. 14, Barr does not dispute that it received certain forms from First DataBank, RedBook, and MediSpan seeking verification of the pricing information Barr had submitted to the pricing compendia. Barr disputes that it reviewed such forms "to ensure the accuracy of the prices before they were published." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the testimony cited by Plaintiffs does not support this assertion. *See* id. With respect to the third sentence of Alleged Fact No. 14, Barr does not dispute that it is not aware of any instances in which the pricing compendia did not publish the AWPs or WACs that Barr reported. However, Barr disputes any suggestion that it reviewed the AWPs and WACs published by the pricing compendia to ensure their accuracy. *See* 5/30/07 Catlett Dep. at 158:9-159:8 (Q. Was there anyone at Barr whose responsibility it was to check the First DataBank or other price reports . . . to determine whether or not the prices that Barr had reported as its AWP price were correctly loaded. . . ? [ ] A. That's not something that we do, no.") (Ex. 3).

Barr disputes Alleged Fact No. 14 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established. In particular, Barr disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding. *See* 11/30/07 Morgan Dep. at 33:1-20, 149:12-20 (Ex. 4). Furthermore, Barr disputes that Alleged Fact No. 14 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1).

**PLAINTIFF'S REPLY TO STATEMENT # 14**

Barr does not dispute that "the prices First DataBank reports as AWPs are the prices that [Barr] supplied to First DataBank." Barr does however dispute that "all published AWPs and WACs would reflect what Barr had submitted to the pricing compendia."  The dispute is specious given that the cited testimony is as follows:

> Q.   First DataBank does report prices that are labeled AWP, does it not?
> A.   Yes.
> Q.   And the prices that First DataBank reports as AWPs are the prices that you have supplied to First DataBank; correct?
> A.   That's correct.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 87:3-9.

Barr attempts to dispute the fact that it reviewed the AWPs and WACs published by the pricing compendia to ensure their accuracy, however the cited testimony speaks for itself:

> Q.   Miss Cunningham, can you identify Exhibit-6?
> A.   This is a product listings for Redbook.
> Q.   Now, is Exhibit-6 a document that Barr sent to Redbook or that Redbook sent to Barr?
> A.   Redbook sent this to Barr.
> Q.   And do you know what the purpose in Redbook's sending this to Barr was?
> A.   To confirm and follow up from all the product information and pricing we previously submitted to them.
> Q.   So in other words, this is a request from Redbook to ask Barr to confirm that the information that Redbook had on Barr's drugs was accurate; isn't that correct?
> A.   Yes.
> Q.   And in fact, what they did is they required you to, or asked you to, approve each page and sign it; is that correct?
> A.   Yes.
> Q.   And the signature down below is yours, correct?
> A.   Yes.
> Q.   And on every page of the verification, at least?
> A.   Yes.
> Q.   Now, is Redbook the only price reporting service that asked Barr to verify the information being published by the price reporting service?

A.  Were they the only ones?
Q.  Right.  Did you receive the same kind of things from anyone else?
A.  Yes.
Q.  What other price reporting services asked Barr to verify the information being published by price reporting service?
A.  Well, First DataBank.  I can't remember specifically which ones.
Q.  But First DataBank, at least at some point, has asked Barr to verify the information that First Databank was publishing with regards to Barr's drugs; is that correct?
A.  Yes.
Q.  Do you recall how often that occurs?
A.  Specifically for who?
Q.  First DataBank.
A.  I believe once a year.

Barr 30(b)(6) (Cunningham) 2/2/07 Dep. (Exhibit D) at 66:11-68:7.

Q.   And generally speaking, does Exhibit 3 represent the manner in which Barr would communicate its reported -- I'm sorry, its AWPs and WAC to First DataBank when it made such reports?
A.   Yes.  I mean this is one format that -- it's the general format that we would use to report such pricing data to them.  I believe either First DataBank or one of the others does send us a report on some interval asking us to check the AWPs and the WACs so they might actually come back to us and say here is what we currently have.  Please do a check.  So I think there's a couple of mechanisms, but this is our format for reporting to them.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 75:10-76:3

Q.   Exhibit 7 appears to be this sort of -- a turnaround document that you were referring to moments ago.  It's produced to us by Barr in our litigation and it appears to come from Red Book back to Barr seeking Barr -- requesting that Barr verify the Barr published prices; is that correct?
A.   That's what it says.  I am actually not familiar with this document, but I know -- what I testified earlier, I know we do get that back.  This could very well be that format.

30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 77:9-19.

The rest of Barr's response concerning how the AWPs of secondary and subsequent generic market entrants were established is irrelevant to this Statement and requires no response.

14

Responding further, this is a material Statement because CMS considered all published prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**15.    When Barr changed the AWP or WAC price of a drug, it would inform the pricing compendia by letter and request confirmation that the compendium had received Barr's pricing change.  *Id*.**

> Barr's Response to Alleged Fact No. 15:  Disputed. Barr does not dispute that when it changed the AWP or WAC for one of its products, it would inform the pricing compendia of the change and seek confirmation that the compendia had received the change. However, Barr disputes that this alleged fact is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Further, Barr disputes Alleged Fact No. 15 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony. In particular, Barr disputes Plaintiffs' statement insofar as it permits an inference that Barr actively "monitored" the prices reported by First DataBank. Barr also disputes any suggestion that it reviewed the AWPs and WACs published by the pricing compendia to ensure their accuracy. *See* 5/30/07 Catlett Dep. at 158:9-159:8 (Q. Was there anyone at Barr whose responsibility it was to check the First DataBank or other price reports . . . to determine whether or not the prices that Barr had reported as its AWP price were correctly loaded. . . ? [ ] A. That's not something that we do, no.") (Ex. 3).

## PLAINTIFF'S REPLY TO STATEMENT # 15

The parties agree that when Barr changed the AWP or WAC for one of its products, it would inform the pricing compendia of the change and seek confirmation that the compendia had received the change.  This Statement is material because CMS considered all published prices when setting the FUL.  See Plaintiffs' Reply to Statement # 5.

The remainder of Barr's response regarding apparent inferences is irrelevant and does not dispute this Statement nor require a response.

**16.    Barr reported false prices via the publishing compendium knowing that pharmacies would present claims to New York's Medicaid program which would be reimbursed based on a formula that utilized the inflated price to determine the appropriate reimbursement amount.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 182:18-183:1; 53:3-16.**

<u>Barr's Response to Alleged Fact No. 16:</u>  Disputed. Barr disputes that it "reported false prices via the publishing compendium knowing that pharmacies would present claims to New York's Medicaid program which would be reimbursed based on a formula that utilized the inflated price to determine the appropriate reimbursement amount." Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien*, 440 F. Supp. 2d at 5 n.1. Moreover, Barr objects to Plaintiffs' statement on the basis that it lacks adequate foundation. *See* Fed. R. Evid. 602. Not only have Plaintiffs have failed to provide any evidentiary basis for this assertion, as is required by Local Rule 56.1, the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. In particular, Barr disputes any suggestion that the AWPs and WACs reported by Barr to the pricing compendia were "false" or "inflated." "WAC" is a manufacturer's invoice price to wholesalers and distributors. *See* 5/30/07 Catlett Dep. at 100:10-20 (Ex. 3); *see also* 42 U.S.C. § 1395w-a(c)(6)(B) (defining WAC as "the manufacturer's list price . . . to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price. . . ."). "AWP" is a "reference price" set "to get generic classification" for a drug. *See* 5/30/07 Catlett Dep. at 134:15-135:7 (Ex. 3); 5/7/08 Catlett Dep. at 80:20-81:3 (Ex. 2). At all times, Barr reported AWPs and WACs consistent with these definitions, and Plaintiffs have cited no evidence to the  contrary.

To the extent Alleged Fact No. 16 concerns AWP, Barr disputes that Alleged Fact No. 16 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1).

## PLAINTIFF'S REPLY TO STATEMENT # 16

The cited testimony demonstrates that Barr knew that pharmacies would present claims to New York's Medicaid program which would be reimbursed based on a formula that utilized the price to determine the appropriate reimbursement amount:

> Q.   Can you tell me, please, what you are - - tell the jury more accurately, please, what you are aware of in terms of how state Medicaid programs reimburse pharmacies for Barr products.
>
> MS. WALKER: Objection. Foundation. Go ahead.
>
> A.   I understand that there are a variety of formulas and reference prices that are used to reimburse or MACs or FULs. I'm

> sure these are all terminologies we'll get into later on, that are used to reimburse states by the provider -- that are used by the states to reimburse the provider of the service, which is generally a pharmacy.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 53:3-16.

Further responding, the Court has defined AWP as "the average price which wholesalers sell drugs to their customers, including physicians and pharmacies." *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 94 (D. Mass. 2007).   In the class trial the Court determined that defendants' AWPs were false and misleading when they did not represent true average wholesale prices that "approximated provider actual acquisition costs or [were] within well-established industry expectations…" *Id*. at 95.   Barr cannot reasonably dispute that its AWPs are not "the average price(s) which wholesalers sell drugs to their customers" or that they "approximated provider actual acquisition costs or [were] within well-established industry expectations". Barr has put nothing in record to demonstrate veracity of its AWPs.   Given this and Barr's testimony regarding how AWPs were set (*see* Statement #18), Barr cannot reasonably dispute that its AWPs did not reflect true (or actual) prices to Barr customers.  *See* Plaintiffs' Reply to Statement #18, which is incorporated herein.

With regard to WAC, the Court in *Mylan* applied the plain meaning rule and found that it was "clear that WAC [meant] 'the actual cost at which wholesalers acquired a drug." *Mylan*, 2008 WL 5650859 at *15.   Barr admits that its WACs do not include chargebacks, rebates, and other pricing incentives. *See* Barr Response to Statement #26.   The Court found that "defendants' WACs were false for those drugs where WACs were not true prices paid by most wholesalers." *Mylan*, 2008 WL 5650859 at *15.   Barr's data reveals the extent to which its sales occurred at prices below WAC.   Barr has supplied no record evidence demonstrating the veracity of its WACs.

Responding further, this is a material Statement because CMS considered all published prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

The remainder of Teva's response is self-serving ipse dixit, unsupported by evidence and irrelevant.  No further reply is required.

**17.     Barr knows that CMS establishes the Federal Upper Limit (FUL) by taking 150% of the lowest published price.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 58:4-59:17.**

      Barr's Response to Alleged Fact No. 17:   Disputed. As an initial matter, Barr disputes Plaintiffs' Alleged Fact No. 17 to the extent that it permits an inference that Barr possessed any more or less awareness of reimbursement practices than that which was generally available public knowledge based on the statutory scheme for reimbursement. While Barr does not dispute that CMS's regulations indicate that the Federal Upper Limit ("FUL") is established by taking 150 percent of the lowest published price, Barr disputes that CMS did in fact set a FUL at 150 percent of the lowest published price and answers that the undisputed record evidence shows that CMS very often chose to disregard the regulatory requirements when setting FULs. *See generally* Affidavit of Sumanth Addanki, dated May 15, 2009; *see also* 42 C.F.R. § 447.332.

      To the extent Alleged Fact No. 17 concerns AWP, Barr disputes that Alleged Fact No. 17 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A.  Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1).

**PLAINTIFF'S REPLY TO STATEMENT # 17**

Barr appears to be disputing alleged "inferences" but does not dispute this Statement, as in fact, it cannot, as the cited testimony speaks for itself:

      Q.   Well, can you explain, what do you mean when you refer to federal upper limit?

      A.     Basically means that a drug has become -- my definition of federal upper limit is that a drug has become multisource.  It's generally when there are at least, you know, the brand and two other suppliers is kind of what the guidelines were in the past, and that CMS would put in a federal upper limit or a state might decide to put in their own MAC.  I kind of use the term there interchangeably.  It just means there's some ceiling.

> Q.   And do you know how CMS would establish the federal upper limit?
>
> A.   I believe when CMS -- I don't know if they always follow it, but I believe the guidelines is 150 percent of the lowest published price is my recollection.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 58:4-21.

The remainder of Barr's response is disputed for all the reasons set forth in Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-b [Docket No. 6077] and Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion for Summary Judgment on Plaintiffs' "FUL Fraud" Claims and in Further Support of Plaintiffs' Motion for Partial Summary Judgment on Their § 145-b Claim [Docket No. 6147].  Responding further, Barr's response ignores that CMS considered AWPs when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

***Barr's Published AWPs and WACs had No Relationship to Actual Prices***

**18.   Barr knows that and admits that its reported AWPs were not tethered to the actual prices that anyone pays.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 80:20-81:11.**

> Barr's Response to Alleged Fact No. 18:  Disputed. Barr disputes that it "knows [ ] and admits that its reported AWPs were not tethered to the actual prices that anyone pays." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1 and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. Furthermore, Barr objects to Alleged Fact No. 18 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20- 458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, LLP, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

**PLAINTIFF'S REPLY TO STATEMENT # 18**

Barr can attempt to dispute that its reported AWPs were not tethered to the actual prices

that anyone pays, but the cited testimony speaks for itself:

> Q.   What is Barr's definition of AWP?
>
> A.   Average -- our definition of AWP is, you know -- yes, the definition is correct, it's average wholesale price.  That's what the acronym stands for.  But what that means -- we refer to it as a reference price.
>
> Q.   And as you've already testified, Barr sets the AWP in relationship to the brand AWP; correct?
>
> A.   That's correct.
>
> Q.   Barr doesn't set the AWP based on the average prices from the wholesaler to the retailer?
>
> A.   That's correct.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 80:20-81:11.  Responding further, Barr admits

in response to Statement #21 that that it does not invoice or charge its customers AWP.

Responding further, this is a material Statement because CMS considered all published

prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**19.    Barr defines AWP as a "reference price."  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 80:20-81:3.**

> Barr's Response to Alleged Fact No. 19:  While Barr does not dispute that Barr understood (consistent with industry understanding) AWP as a "reference price," Barr disputes that this alleged fact is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1).  Further, Barr disputes any suggestion or implication that its understanding of AWP was inconsistent with the understanding in the industry or New York Medicaid's understanding of AWP.  *See generally* L.R. 56.1 Stmt. of Undisputed Material Facts Supporting Defs.' Jt. Mot. For Summary Judgment on Pls.' "FUL Fraud" Claims, (Dkt. 6054) (D. Mass., 01-cv-12257-PBS).

**PLAINTIFF'S REPLY TO STATEMENT # 19**

The parties agree that Barr defines AWP as a "reference price."  Barr's reference to "industry understanding" is too vague to permit a response.  There is no record evidence whatsoever that Medicaid, an industry participant, understood that generic manufacturers such as Barr set their published prices without any regard whatsoever for actual transaction prices and at mega-spread levels.  No further reply is needed.

20.     **For each of its generic drugs, Barr sets its AWPs approximately 10% below the AWPs of the branded versions of the drugs.  See Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 61:6-13.**

Barr's Response to Alleged Fact No. 20:   Disputed. As an initial matter, Barr objects to Alleged Fact No. 20 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Moreover, Barr disputes Plaintiffs' Alleged Fact No. 20 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database. *See* 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct? A. That's correct.") (Ex. 4); *id.* at 33:6-10 ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct? A. That's correct.") (Ex. 4); *id.* at 33:11-20 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 4). In order for a product to be classified by First DataBank as a generic, Barr's SWP had to be at least 10 percent off the corresponding brand's AWP.

Barr also disputes Alleged Fact No. 20 insofar as it implies that it was the manufacturer,  rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established. In particular, Barr disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules

which predetermined the allowable price ranges to maintain a generic coding. *See* 11/30/07 Morgan Dep. at 33:1-20, 149:12-20 (Ex. 4). Barr further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank. See Deposition of Richard Foster, Feb. 20, 2008 ("2/20/08 Foster Dep.") at 182-83 (Ex. 5). While Barr does not dispute that it was its "general policy" to set its AWP at approximately 10 percent below the brand AWP, 5/7/08 Catlett Dep. at 61:6-13, 62:5-10 (Ex. 2), Barr disputes that it set the AWPs "[f]or each of its generic drugs" in this manner. Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See O'Brien*, 440 F. Supp. 2d at 5 n.1.

## PLAINTIFF'S REPLY TO STATEMENT # 20

Barr does not dispute that it was its "general policy" to set its AWP at approximately 10 percent below the brand AWP. Barr attempts to parse the testimony of its 30(b)(6) witness to state that the witness did not testify that Barr set the AWP for *each* generic drug at 10 percent below the brand AWP. The cited testimony is as follows:

> Q.   Now, Barr -- if Barr was the first generic manufacturer to launch a product, Barr set its AWPs at approximately 10 percent below the brand AWP; is that correct?
>
> MS. WALKER:  Objection to form.
>
> A.   Generally that's been our policy, that's our approach. That's the methodology we use.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 61:6-13.

Barr's dissertation about how the AWP field is populated in the database is completely irrelevant to this Statement. The rest of Barr's response concerning how the AWPs of secondary and subsequent generic market entrants were established is equally irrelevant to this Statement. Neither requires a response.

Plaintiffs add, however, Barr offers no foundation whatsoever for the testimony of Richard Foster, cited above for this proposition. Barr does not indicate who Mr. Foster is, who

he worked for, or what his connection is to this case.  A reading of the cited testimony shows that

the deposition was taken in another case by different parties and that Mr. Foster was an

employee of Teva.  This is wholly inappropriate and completely irrelevant to plaintiffs' case

against Barr.

Responding further, this is a material Statement because CMS considered all published

prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**21.      Barr admitted that it does not sell any of its generic drugs at AWP.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 253:11-21.**

> Barr's Response to Alleged Fact No. 21:   Disputed. While Barr does not dispute
> that it does not invoice or charge its customers AWP, Barr objects to Alleged Fact
> No. 21 insofar as it relies on, refers to, or otherwise mentions AWP, which has no
> relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS
> did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7
> ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q.
> Can you think of any instance in which CMS based a FUL on the published AWP
> price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr
> disputes that AWP is material to Plaintiffs' Motion for Partial Summary
> Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F.
> Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for
> summary judgment).

**PLAINTIFF'S REPLY TO STATEMENT # 21**

Barr admits that it does not invoice or charge its customers AWP. Barr disputes the

materiality of the Statement.

Responding further, this is a material Statement because CMS considered all published

prices when setting the FUL.  *See* Plaintiffs' Reply to Statement # 5.

**22.      When Barr lowers the dead net price to any of its customers, it is not reflected in Barr's reported prices.  See Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit B) at 190:6-13.**

> Barr's Response to Alleged Fact No. 22:   Disputed. Barr disputes Alleged Fact
> No. 22 because it misstates, mischaracterizes, and/or misconstrues the cited
> deposition testimony. In particular, Mr. Catlett testified only that lower contract
> prices "would not necessarily be reflected" in the AWP Barr reported to First

DataBank. 5/30/07 Catlett Dep. at 190:6-13 (Ex. 3). Except as noted, Barr disputes that "[w]hen [it] lowers the dead net price to any of its customers, it is not reflected in Barr's reported prices." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. Barr also disputes this statement because the meaning of the term "reported prices" is vague and ambiguous. Barr "reported" Average Manufacturer Price ("AMP") to CMS, and changes to the dead net price are reflected in AMP. *See* 5/30/07 Catlett Dep. at 245:15-19 (AMP is "a good estimate of the dead net price.") (Ex. 3).

Further, Barr objects to Alleged Fact No. 22 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. See 3/19/08 Gaston Dep. at 457:20- 458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1). Accordingly, Barr disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

## PLAINTIFF'S REPLY TO STATEMENT # 22

As evidenced by the cited testimony, Barr's witness was testifying about prices reported by Barr to the pricing compendia, namely WAC and AWP:

> Q. The fact that you make a determination to lower the dead net price to any of your customers would not necessarily be reflected in any way to the prices you reported to First Data Bank, isn't that true?
>
> A. To the SWP or AWP price, that's correct.
>
> Q. And that's all you **reported** to First Data Bank, isn't that true?
>
> A. We **report** WAC --
>
> MS. WALKER: Objection, mischaracterizes his testimony.
>
> A. -- to First Data Bank.

Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit B) at 190:6-13 (emphasis added).

Plaintiffs reply further that the statement is material because because CMS considered all published prices when setting the FUL.  See Plaintiffs' Reply to Statement # 5.

23.     **Barr's WACs were not set based on actual prices, but rather Barr set its WACs based on its competitors' WACs: if Barr was the first generic manufacturer to enter the market, it set its WAC at approximately 20% below the WAC of the branded version of the drug (*see* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 61:14-17).  If Barr was not the first to enter the market and competition existed, its WAC would not be set based on market conditions.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 62:11-64:2.**

> Barr's Response to Alleged Fact No. 23:   Disputed in part. With regard to the first sentence of Alleged Fact No. 23, Barr does not dispute that, if it was the first generic manufacturer to enter the market, it would establish its WAC price approximately 20 percent below the brand WAC. Barr disputes that its "WACs were not set based on actual prices." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d at 5 n.1. Indeed, to the extent Barr set its WACs based on competitors' WACs, its WACs were based on prices paid in the market by some wholesalers. *See* 5/7/08 Catlett Dep. at 222:6-223:2 ("[T]here were definitely product[s] purchased at WAC.") (Ex. 2); Deposition of Lauren Cunningham, Feb. 2, 2007 ("2/2/07 Cunningham Dep.") at 55:24-56:3 ("Q. Do you know whether the WAC, that is listed in your product catalog, is a price that is actually charged to any customer? A. I do know that some customers would pay that price.") (Ex. 6).
>
> With regard to the second sentence of Alleged Fact No. 23, Barr disputes that "[i]f Barr was not the first to enter the market and competition existed, its WAC would not be set based on market conditions." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1.  To the contrary, Mr. Catlett testified that, if Barr was not the first generic manufacturer to introduce a product, "*certainly* market conditions would come into play" when Barr set its WAC. 5/7/08 Catlett Dep. at 62:11-15 (emphasis added) (Ex. 2).

**PLAINTIFF'S REPLY TO STATEMENT # 23**

Barr does not dispute the fact that if it was the first generic manufacturer to enter the market, it would establish its WAC price approximately 20 percent below the brand WAC, rather than on the actual price to the wholesalers.

The parties agree that if Barr was not the first generic manufacturer to introduce a product that market conditions would come into play when Barr set its WAC.

Record evidence further shows that those market conditions were the WAC pricing of

Barr's competitors:

> Q.   If Barr is not the first to market with its generic product, it sets its WAC based on market conditions; is that correct?
>
> A.   Certainly market conditions would come into play, yes.
>
> Q.   And what is meant by the term market conditions?
>
> A.   What current pricing structures may be in the marketplace from competitive products.
>
> Q.   What do you mean by current pricing structures?
>
> A.   Where other competitors may be setting their WAC.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 62:11-63:1.

Responding further, Barr's reported WACs do not account for rebates, chargebacks and

other incentives.  *See* Plaintiffs' Reply to Statement #26.

**24.    Barr provides numerous incentives, discounts and rebates to its wholesaler and distributor customers, including base rebates, chargebacks, billbacks or slotting, market share agreements, marketing fee credits, preferred products incentive, free goods allowances, full line rebates, prompt pay discounts, incremental rebates, volume discounts, and preferred customer discounts, among others.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 217:12-221:17.**

> Barr's Response to Alleged Fact No. 24:   Barr disputes that discounts and incentives offered to its customers are material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D.  Mass. L.R. 56.1 (requiring movant to "include a concise statement of the *material* facts of record as to which the moving party contends there is no genuine issue to be tried") (emphasis added); *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider a summary judgment movant's immaterial facts). Barr does not dispute that it provides various incentives, discounts, and rebates to its wholesaler and distributor customers. Barr disputes Alleged Fact No. 24 to the extent it purports to assert that each of the enumerated incentives and/or discounts is extended to all customers for all products.

**PLAINTIFF'S REPLY TO STATEMENT # 24**

Barr does not dispute that it provides various incentives, discounts and rebates to its wholesaler and distributor customers.  Plaintiffs stand by the cited testimony which demonstrates that Barr provided these pricing incentives to its customers.

The referenced pricing incentives are material because, as Barr admits, they lower the prices that Barr's customers actually pay for Barr drugs and reveal that Barr knows that its published prices, on which Medicaid reimbursements are based, are false.

**25.    For example, Barr offered Bindley Western, a wholesaler, a contract to sell Cefadroxil at the WAC price listed in the offer and a 50% rebate.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 115:10-19; Exhibit E (Barr 30(b)(6) (Catlett) 5/7/08 Dep. Exhibit 18 (Bid Proposal)).  Barr made a presentation to McKesson for Warfarin Sodium offering a 15-18% rebate off of WAC.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 137:18-21; Exhibit F (Barr 30(b)(6) (Catlett) 5/7/08 Dep. Exhibit 20 (Bid Proposal)).  Barr offered Harvard Drug Group, a distributor, a rebate of 70-71% for Cefadroxil.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 153:12-155:5; Exhibit G (Barr 30(b)(6) (Catlett) 5/7/08 Dep. Exhibit 22 (Bid Proposal)).  Barr provided this customer with such a "significant" rebate because it did not have the electronic capability to process chargebacks.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 155:13-156:5.  Barr provided significant rebates on Cefadroxil to all of its customers.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 155:6-12.  Barr offered Medco a quarterly rebate payment on Warfarin Sodium of 33.3%.  *See* Exhibit H (Barr 30(b)(6) (Catlett) 5/7/08 Dep. Exhibit 27 (Memo from Catlett to file including AWP, invoice price, new dead net price, difference between deadnet price and AWP, and percent rebate)).  Barr kept track of the difference (i.e. spread) between Medco's deadnet price and the AWP (81% off).  *See id*.**

Barr's Response to Alleged Fact No. 25: Disputed. Barr disputes Alleged Fact No. 25 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony and/or documents. Further, Barr disputes that discounts and incentives offered to its customers are material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1 (requiring movant to "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried") (emphasis added); *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider a summary judgment movant's immaterial facts). Barr does not dispute that it offers certain discounts, rebates, and chargebacks to its wholesaler and distributor customers, nor does Barr dispute that it offered or discussed with customers the specific rebates outlined in Alleged Fact No. 25. Barr disputes that it offered "substantial" rebates to all of its customers on Cefadroxil. Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1 and the cited

testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1. Mr. Catlett testified only that Barr offered its customers rebates on Cefadroxil "to meet the competitive forces in the marketplace." 5/7/08 Catlett Dep. at 156:6-12 (Ex. 2).

## PLAINTIFF'S REPLY TO STATEMENT # 25

Barr does not dispute that it offered or discussed with customers the specific rebates outlined in Alleged Fact No. 25.   Therefore, Barr does not dispute this Statement.  Barr does not explain how it believes plaintiffs "misstate[], mischaracterize[], and/or misconstrue[] the cited deposition testimony and/or documents".  That is likely because plaintiffs have presented record evidence about the percentage rebates Barr was offering its customers, which percentages Barr does not dispute.

Plaintiffs note that they did not assert that Barr offered "substantial" rebates to its customers on Cefadroxil, although they believe that rebates of up to 81% (referenced above) would be considered substantial by most people.  The testimony by Mr. Catlett that Barr cites does not dispute plaintiffs' statement.

The referenced pricing incentives are material because, as Barr admits, they lower the prices that Barr's customers actually pay for Barr drugs and reveal that Barr knows that its published prices, on which Medicaid reimbursements are based, are false.

26.    **Rebates, discounts, chargebacks and other pricing incentives lowered the wholesaler's dead net cost below WAC.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 223:12-225:1.**

> Barr's Response to Alleged Fact No. 26:   Disputed. Barr disputes that discounts or rebates offered to its customers (in particular, discounts and rebates on products other than Cefadroxil) are material to Plaintiffs' Motion for Partial Summary Judgment. See D. Mass. L.R. 56.1 (requiring movant to "include a concise statement of the *material* facts of record as to which the moving party contends there is no genuine issue to be tried") (emphasis added); *St. Paul Fire and Marine Ins. Co.,* 379 F. Supp. 2d at 186 n.1 (refusing to consider a summary judgment movant's immaterial facts). Barr does not dispute that it offers certain discounts, rebates, and chargebacks to its wholesaler and distributor customers.

However, "WAC" is a manufacturer's invoice price to wholesalers and distributors and does not include discounts, rebates, or chargebacks. *See* 5/30/07 Catlett Dep. at 100:10-20 (Ex. 3); *see also* 42 U.S.C. § 1395w-a(c)(6)(B) (defining WAC as "the manufacturer's list price . . . to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price. . . ."). Therefore, Barr disputes any suggestion or implication that WAC was understood or expected to be "wholesaler's dead net cost." Further, Barr disputes that wholesalers' dead net costs were always less than WAC. Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1. Indeed, certain wholesalers purchased Barr's drugs at WAC. 5/7/08 Catlett Dep. at 222:6-223:2 ("[T]here were definitely product[s] purchased at WAC.") (Ex. 2); 2/2/07 Cunningham Dep. at 55:24-56:3 ("Q. Do you know whether the WAC, that is listed in your product catalog, is a price that is actually charged to any customer? A. I do know that some customers would pay that price.") (Ex. 6).

## PLAINTIFF'S REPLY TO STATEMENT # 26

Plaintiffs stand by the cited testimony which demonstrates that rebates, discounts, chargebacks and other pricing incentives lowered the wholesaler's dead net cost for Barr drugs below WAC:

> Q.   Mr. Catlett, let me show you what's been marked, two exhibits, one Exhibit 35, the other one Exhibit 36.  For the record, Exhibit 35 is a letter, actually it's multipage exhibit consisting of three letters from Barr to AmerisourceBergen; correct?
>
> A.   Yes, all three are to AmerisourceBergen.
>
> Q.    If you walk with me through the letter, it's -- how would you refer to this, as a pricing letter?  Looking specifically the one on the top --
>
> A.    Sorry.  It's a letter, standard letter.  We saw some earlier today, or standard format of our bids and pricing group.  It appears to be providing revised pricing due to changes in the marketplace for a product called diphenhydramine.
>
> Q.    And the first page of the document, Bates 029107, shows for this particular product, it shows the WAC price as well as the dead net price that's offered to AmerisourceBergen.
>
> A.   That's correct.

> Q.   The letters that follow in the exhibit are similar; am I correct?  In that they present the dead net price as well as the WAC price for these particular drugs that Barr is offering to AmerisourceBergen; correct?
>
> A.   That's correct.
>
> Q.   Am I correct the dead net price in each of these situations is less than the WAC price as a result of the kinds of incentives that we have been talking about?
>
> A.   That's correct.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 223:12-225:1.

Responding further, plaintiffs incorporate herein their reply to Statement #16.

Finally, the referenced pricing incentives are material because, as Barr admits, they lower the prices that Barr's customers actually pay for Barr drugs and reveal that Barr knows that its published prices, on which Barr knows Medicaid reimbursements are based, are false.

**27.    The rebates, discounts, chargebacks and other pricing incentives paid by Barr reduced the wholesaler's actual acquisition cost below the invoice price.  *See* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 221:18-222:5.**

> Barr's Response to Alleged Fact No. 27:   Disputed. Barr disputes that discounts or rebates offered to its customers (in particular, discounts and rebates on products other than Cefadroxil) are material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1 (requiring movant to "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried") (emphasis added); *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider a summary judgment movant's immaterial facts). Barr does not dispute that it offers certain discounts, rebates, and chargebacks to its wholesaler and distributor customers. However, "WAC" is a manufacturer's invoice price to wholesalers and distributors and does not include discounts, rebates, or chargebacks. *See* 5/30/07 Catlett Dep. at 100:10-20 (Ex. 3); *see also* 42 U.S.C. § 1395w-(c)(6)(B) (defining WAC as "the manufacturer's list price . . . to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price. . . ."). Therefore, Barr disputes any suggestion or implication that WAC was understood or expected to be "wholesaler's dead net cost." Further, Barr disputes that wholesalers' actual acquisition costs were always less than the invoice price. Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1. Indeed, some

wholesalers purchased Barr's drugs at invoice price. *See* 5/7/08 Catlett Dep. at 222:6-223:2 ("[T]here were definitely product[s] purchased at WAC.") (Ex. 2); 2/2/07 Cunningham Dep. at 55:24-56:3 ("Q. Do you know whether the WAC, that is listed in your product catalog, is a price that is actually charged to any customer? A. I do know that some customers would pay that price.") (Ex. 6).

## PLAINTIFF'S REPLY TO STATEMENT # 27

Barr does not dispute the fact that the rebates, discounts, chargebacks and other pricing incentives are not included in WAC.  Barr does not dispute that rebates, discounts, chargebacks and other pricing incentives reduce the wholesaler's actual acquisition cost.  Barr objects to alleged inferences which are irrelevant and does not dispute the statement itself.  The cited testimony speaks for itself:

> Q.   These rebates and other incentives that we have been discussing, they reduce the actual price paid by the wholesalers below the invoice price; correct?
>
> A.   The actual price paid by the customer.
>
> Q.   Right.
>
> A.   Maybe a wholesaler, maybe by chain.  Direct customer or indirect customer.   We saw examples today of indirect customers that got rebates.

Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 221:18-222:5.

The extent to which Barr's customers pay sub-WAC pricing is revealed in the Barr data and confirms the falsity of Barr's reported WACs.  *See* Devor Decl. [Dkt# 6061] at Exhibit A (Exhibits 5.01 to 5.06); Exhibits B-23 and B-24.

Barr has presented no evidence whatsoever to support the veracity of its published WACs.  The referenced pricing incentives are material because, as Barr admits, they lower the prices that Barr's customers actually pay for Barr drugs and reveal that Barr knows that its published prices, on which Medicaid reimbursements are based, are false.

28. **Barr considered "invoice dollars" to be "gross sales", and calculated its net sales by subtracting payment terms, rebates, allowances, shelf stock adjustments, returns, discounts and chargebacks.** *See* **Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit C) at 79:8-80:14.**

Barr's Response to Alleged Fact No. 28:   Barr does not dispute Alleged Fact No. 28, but states that it is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

## PLAINTIFF'S REPLY TO STATEMENT # 28

Barr does not dispute this Statement except insofar as it questions its materiality.   No

further reply is needed.

29. **Barr provided its pharmacy customers with numerous incentives including base rebates, billbacks or slotting, market share agreements, marketing fee credits, preferred products incentives, free goods allowances, full line rebates, prompt pay discounts, volume discounts, and preferred customer discounts, among others.** *See* **Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 217:12-221:17.**

Barr's Response to Alleged Fact No. 29:   Barr disputes that discounts or rebates offered to its pharmacy customers (in particular, discounts and rebates on products other than Cefadroxil) are material to Plaintiffs' Motion for Partial Summary Judgment.   *See* D. Mass. L.R. 56.1 (requiring movant to "include a concise statement of the *material* facts of record as to which the moving party contends there is no genuine issue to be tried") (emphasis added); *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider a summary judgment movant's immaterial facts). Barr does not dispute that it provided certain pharmacy customers with certain incentives including base rebates, billbacks or slotting, market share agreements, marketing fee credits, preferred products incentives, free goods allowances, full line rebates, prompt pay discounts, volume discounts, and preferred customer discounts. However, Barr disputes Alleged Fact No. 29 to the extent it purports to assert that each of the enumerated incentives and/or discounts was extended to all pharmacy customers for all drugs. Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1. Indeed, some wholesalers purchased Barr's drugs at invoice price.  *See* 5/7/08 Catlett Dep. at 222:6-223:2 ("[T]here were definitely product[s] purchased at WAC.") (Ex. 2); 2/2/07 Cunningham Dep. at 55:24-56:3 ("Q. Do you know whether the WAC, that is listed in your product catalog, is a price that is actually charged to any customer? A. I do know that some customers would pay that price.") (Ex. 6).

**PLAINTIFF'S REPLY TO STATEMENT # 29**

Barr does not dispute the fact that it provided its pharmacy customers with numerous pricing incentives.

Barr's cited testimony concerning WAC is irrelevant as this Statement refers to pharmacy customers.

The referenced pricing incentives are material because, as Barr admits, they lower the prices that Barr's customers actually pay for Barr drugs and reveal that Barr knows that its published prices, on which Medicaid reimbursements are based are false.

30.    **These rebates, discounts and other pricing incentives reduced Barr's pharmacy customers' actual acquisition price.** *See* **Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 180:11-181:2; 221:18-222:5.  A "substantial number of customers" obtained rebates or had their net price adjusted accordingly.** *See* **Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 177:21-178:22.**

> Barr's Response to Alleged Fact No. 30:   While Barr does not dispute that rebates, discounts and other pricing incentives reduced Barr's pharmacy customers' net acquisition price, Barr disputes prices published by First DataBank or other pricing compendia were understood or expected to be "customers' actual acquisition price." *See generally* L.R. 56.1 Stmt. of Undisputed Material Facts Supporting Defs.' Jt. Mot. For Summary Judgment on Pls.' "FUL Fraud" Claims (Dkt. 6054) (D. Mass., 01-cv-12257-PBS). Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1, and the cited testimony does not support this assertion. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1. Indeed, some wholesalers purchased Barr's drugs at invoice price. *See* 5/7/08 Catlett Dep. at 222:6-223:2 ("[T]here were definitely product[s] purchased at WAC.") (Ex. 2); 2/2/07 Cunningham Dep. at 55:24-56:3 ("Q. Do you know whether the WAC, that is listed in your product catalog, is a price that is actually charged to any customer? A. I do know that some customers would pay that price.") (Ex. 6).
>
> To the extent Alleged Fact No. 30 concerns AWP, Barr disputes that Alleged Fact No. 30 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a situation where they did.") (Ex. 1).

**PLAINTIFF'S REPLY TO STATEMENT # 30**

Barr does not dispute the fact that its rebates, discounts and other pricing incentives reduced its pharmacy customers' net acquisition price. The remainder of Barr's response concerning is obviously disputed, hence the instant litigation.

Barr's cited testimony concerning WAC is irrelevant as this Statement refers to pharmacy customers.

Responding further, this is a material Statement because CMS considered all published prices when setting the FUL. *See* Plaintiffs' Reply to Statement # 5.

*Barr Marketed the Spread*

**31.    Barr knew that eligibility for reimbursement by Medicaid was an important issue for its customers; it was standard procedure for Barr to include the AWP and contract or invoice prices in its bids to both its wholesaler customers (*see* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 115:20-116:6; 200:6-14) and its retail customers (*see* Barr 30(b)(6) (Catlett) 5/7/08 Dep. (Exhibit B) at 281:4-11).**

> Barr's Response to Alleged Fact No. 31: Disputed. While Barr does not dispute that, pursuant to industry practice and its customers' requests, its "standard format" included AWP and contract or invoice price in communications with or bids to its wholesale and retail customers, 5/7/08 Catlett Dep. at 116:2-12; 281:8-11 (Ex. 2), Barr disputes that such communications or bids constitute "marketing the spread," or that it "knew that eligibility for reimbursement by Medicaid was an important issue for its customers." Plaintiffs have not provided any evidentiary basis for these assertions, as is required by Local Rule 56.1, and the testimony cited does not support these assertions. *See O'Brien*, 440 F. Supp. 2d 3, 5 n.1. Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation. *See* Fed. R. Evid. 602. Further, the purported "important[ce]" of Medicaid reimbursement to Barr's customers is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

**PLAINTIFF'S REPLY TO STATEMENT # 31**

Barr does not dispute that it included the AWP and contract or invoice prices in its bids to both its wholesaler and pharmacy customers.

The importance of Medicaid reimbursement to Barr's customers, and Barr's knowledge

that its customers gauged profitability by analyzing spread between reimbursement prices (AWPs/WACs/FULs) and actual prices, supports plaintiffs' position that Barr's reporting and control of its false AWPs and WACs was purposeful, intentional and knowing.

Responding further, Teva's objection to plaintiffs' Statement concerning Barr is entirely irrelevant.

***Barr's AMPs***

**32.     At all times, from 1997 to 2005, Barr has calculated on a quarterly basis the average manufacturer's price ("AMP") for all its products as required by the federal rebate statute.  *See* Barr 30(b)(6) (Catlett) 5/30/07 Dep. (Exhibit B) at 233:1-24; *Mylan*, 2008 WL 5650859 at \*30.**

> Barr's Response to Alleged Fact No. 32:   Barr does not dispute Alleged Fact No. 32, but states that this fact is immaterial to Plaintiffs Motion for Partial Summary Judgment.

## PLAINTIFF'S REPLY TO STATEMENT # 32

Barr's provision of AMPs is material because it reveals that Barr can calculate and supply, report, transmit, relay, send, submit or communicate actual prices to certain customers on a quarterly basis when it wants to do so.  Similarly, Barr could have calculated and reported accurate WACs. Barr disputes the Statement only to the extent it alleges the statement is not material.  Therefore, Barr does not dispute the Statement.  No further reply is required.

Dated: June 30, 2009

Respectfully submitted,

**City of New York and New York Counties in MDL 1456 except Nassau and Orange by**

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala

By:    Joanne M. Cicala
James P. Carroll Jr.
Jocelyn R. Normand
Kathryn B. Allen

Ross B. Brooks, Esq.
MILBERG LLP
One Pennsylvania Plaza
New York, NY  10119
(212) 594-5300
*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
LEVY PHILLIPS &
KONIGSBERG, LLP
800 Third Avenue
New York, NY  10022
(212) 605-6205
*Counsel for the County of Orange*

## CERTIFICATE OF SERVICE

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO BARR LABORATORIES, INC., to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  June 30, 2009

_____/s/_____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600

# EXHIBIT A

Page 1

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3      --------------------------------X

4    IN RE PHARMACEUTICAL INDUSTRY     ) MDL NO. 1456

5    AVERAGE WHOLESALE PRICE LITIGATION) Master File No.

6      --------------------------------X 01-12257-PBS

7    THIS DOCUMENT RELATES TO:         ) Judge Patti B.

8    City of New York, et al. v. Abbott) Saris

9    Laboratories, et al. Civil Action )

10   No. 04-cv-06054 et al.            )

11     ----------------------------X

12                    - and -

13              COMMONWEALTH OF KENTUCKY

14            FRANKLIN CIRCUIT COURT - DIV. 1

15     --------------------------------X

16   COMMONWEALTH OF KENTUCKY ex rel. )  CIVIL ACTION NO.

17   JACK CONWAY, ATTORNEY GENERAL    )  04-CI-1487

18      v.                            )

19   ALPHARMA USPD, INC., et al.      )

20     --------------------------------X

21      VIDEOTAPED DEPOSITION OF TIMOTHY CATLETT

22                  MAY 7, 2008

Catlett, Timothy                    HIGHLY CONFIDENTIAL                    May 7, 2008
                                        Woodcliff, NJ

Page 62

1    Q.   Barr is sometimes not the first to
2    market; is that correct?  With its generic
3    product?
4    A.   We are not always first.
5    Q.   If Barr is not first, does it still set
6    its AWP at approximately 10 percent below the
7    brand AWP?
8    A.   Best -- that's our general policy to
9    the best of my recollection, that's -- my tenure,
10   that's what we have done.
11   Q.   If Barr is not the first to market with
12   its generic product, it sets its WAC based on
13   market conditions; is that correct?
14   A.   Certainly market conditions would come
15   into play, yes.
16   Q.   And what is meant by the term market
17   conditions?
18   A.   What current pricing structures may be
19   in the marketplace from competitive products.
20   Q.   What do you mean by current pricing
21   structures?
22   A.   Where other competitors may be setting

Page 63

1    their WAC.
2    Q.   How does Barr familiarize itself with
3    how -- where other competitors are setting their
4    WACs?
5    A.   It may be available through third party
6    compendium.  It may be available through other
7    data sources that customers have marketed in the
8    past.  There has been some wholesalers that have
9    marketed pricing data in the past.  It may be
10   available just from what people pick up, what
11   representatives pick up and, you know, from their
12   activities in the field.
13   Q.   In other words, the representatives may
14   learn of competitors' WAC from the
15   representative's customers?
16   A.   From customers, not from competitors
17   certainly.  I don't want to suggest that, but
18   from feedback from our customers.
19   Q.   So then is it fair to say that the
20   methodology Barr employs for setting its WAC is
21   different, depending whether Barr is the sole
22   source manufacturer or a multisource

Page 64

1    manufacturer?
2    A.   Yes.
3        I want to make sure I am answering that
4    correctly.  Could you read that question back?
5        (Record read.)
6    A.   It may be different.
7    Q.   Why do you say it may be different?
8    A.   Because depending upon what information
9    one picks up from the variety of sources I just
10   discussed with the Court, one would make a
11   decision and you might price it differently.  You
12   might not price it differently.
13   Q.   It might turn out the market conditions
14   result in Barr setting the Multisource generic at
15   -- in Barr setting the WAC for the Multisource
16   generic at 20 percent below the brand WAC?
17   A.   It could lead to that.  Or it could
18   lead to something lower than that.
19   Q.   But when Barr is not the first generic
20   manufacturer on the market, it employs the
21   methodology that you described in terms of
22   reviewing the market conditions?

Page 65

1    A.   If we are not first to the marketplace,
2    we would take those items that I discussed, those
3    areas of gaining knowledge and employ them before
4    setting our prices.
5    Q.   And why does Barr do that?
6    A.   I think any good business would take
7    whatever business knowledge was available in
8    making a decision on their business, their
9    pricing structure.  It's available data.  Just as
10   if we were a sole source, we look at what data is
11   available for the brand product.  If there's more
12   product available, we look up the initial data.
13   Q.   And it's fair to say, is it not, that
14   when Barr is not the first generic manufacturer
15   to market with a particular product, Barr is
16   entering a competitive environment?
17       MS. WALKER:  Objection to the form.
18   A.   You are always in a competitive
19   environment.  I've seen situations with brand
20   products that are as competitive as if it was
21   generic was entering the marketplace.
22   Q.   Is that one of the reasons why Barr

17 (Pages 62 to 65)

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | |
| THIS DOCUMENT RELATES TO: | ) ) |
| *The City of New York, et. al.* | ) ) |
| *v.* | ) ) |
| *Abbott Laboratories, et al.* | ) ) ) |

MDL NO. 1456
Civil Action No. 01-12257-PBS

Judge Patti B. Saris

## SECOND REVISED NOTICE OF DEPOSITION OF BARR LABORATORIES, INC. AND DURAMED PHARMACEUTICALS, INC.

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, plaintiffs will take the deposition, by oral examination on the following date

of the representative of defendant Barr Laboratories, Inc. and Duramed Pharmaceuticals, Inc.

(collectively "Barr") who is the most knowledgeable regarding the issues identified herein and

the subject drugs of the litigation.  Defendant Barr shall designate one or more officers, directors,

managing agents or other persons who consent to testify on its behalf, and may set forth, for each

person designated, the matters on which the person will testify.  The deposition shall be taken

before a notary public or other person authorized to administer oaths and shall be recorded by

stenographic and video means.  The deposition will commence on May 7, 2008 at 9:00 a.m. at

The Hilton Woodcliffe Lake, 200 Tice Blvd., Woodcliffe Lake, NJ 07677 and will continue day

to day until completed.

As used herein the term "subject drugs" refers to the drugs and NDCs listed in Revised

Exhibit B to the First Amended Consolidated Complaint filed on June 8, 2007, with spreads of



30% or greater. Pursuant to CMO 33, the time period covered by the topics identified in this Notice of Deposition is 1997 through 2005. To the extent they are relevant, this notice incorporates by reference the definitions and rules of construction delineated in Plaintiffs' First Request for Production of Documents to All Defendants dated October 18, 2007.

Barr shall designate a person or persons to testify under oath about the following topics:

1.      The reason(s) Barr signed Medicaid rebate agreements pursuant to 42 U.S.C. § 1396r(a)(1).

2.      Barr's knowledge of the federal Medicaid program's laws, regulations, and rules including 42 C.F.R. 447.331 and 42 C.F.R. 447.301, specifically, Barr's knowledge that Medicaid reimbursements to providers are based on or derived from the prices published by pricing compendia such as First Databank.

3.      Barr's knowledge of the New York Medicaid program's laws, regulations, and rules including Barr's knowledge that the New York Medicaid program's reimbursement formula for prescription drugs uses the reported Average Wholesale Price ("AWP") and the Federal Upper Limit ("FUL").

4.      The customers who purchase the subject drugs from Barr, and the competitive environment in which the subject drugs were marketed and sold.

5.      The sales made to and prices charged to customers for the subject drugs pursuant to contracts with Barr.

6.      Chargebacks for the subject drugs, whether bundled or not, and the implementation of Barr's chargeback system.

7.      All rebates, discounts, free goods, administrative fees, and off-invoice allowances for the subject drugs, whether bundled or not.

8.   Who determines what Barr's customers pay for the subject drugs.

9.   How Barr determined what customers paid for subject drugs, including but not limited to the initial prices offered to prospective customers and the final net cost or price of the subject drugs to the purchaser.

10.   How Barr informed customers of price and price changes for the subject drugs, and who was involved in those communications.

11.   The rebates, discounts, incentives, fees or any other consideration of any kind offered to Barr's customers who purchase, dispense, or award formulary placement to the subject drugs.

12.   The net prices paid by Barr customers for direct or indirect purchases from Barr of the subject drugs.

13.   How Barr measures and records the profitability of the subject drugs sold by Barr.

14.   How Barr tracks sales and revenue for the subject drugs.

15.   Whether Barr calculates a net price for the subject drugs after taking into account any and all rebates, discounts, incentives, fees or other consideration paid by Barr, and if so, what the methodology is for such calculation.

16.   Barr's net revenue for the subject drugs as a percentage of Barr's reported prices.

17.   Barr's marketing and sales policies, strategies, and practices regarding the subject drugs.

18.   Who at Barr is/was responsible for developing marketing or sales policy and marketing or sales strategies regarding the subject drugs.

19.   The structure of Barr's marketing and sales force or department as it relates to the subject drugs.

20.    The training, marketing, promotional, informative and/or other sales materials supplied to Barr's sales force for the subject drugs.

21.    How Barr compensates its sales force for sales related to the subject drugs.

22.    Whether, and to what extent Barr ever considers/ed a customer's reimbursement for the subject drugs when marketing or selling the subject drugs.

23.    Whether Barr ever made reference, either orally or in writing, to published prices, reimbursement prices, reimbursement methodology, AWP, WAC or FUL for the subject drugs.

24.    The prices Barr reports for the subject drugs to the publishing compendia, including but not limited to First DataBank, Medispan and Redbook.

25.    Who at Barr determines the prices reported to the publishing compendia, including but not limited to First DataBank, Medispan and Redbook.

26.    How Barr determines what prices to report to the publishing compendia, including but not limited to First DataBank, Medispan and Redbook.

27.    How the publishing compendia use the prices Barr reports.

28.    Any communications between Barr and the publishing compendia, regarding how they use the prices reported by Barr.

29.    Communications between Barr and the publishing compendia.

30.    Barr's reasons for supplying pricing information to the publishing compendia.

31.    Whether Barr ever communicated to First DataBank, the Redbook, or Medispan that the AWP or WAC or WAC equivalent that Barr reported to these entities was not the price actually charged by wholesalers to providers or paid by wholesalers to Barr for the subject drugs and, if so, when such communications took place and of what they consisted.

32.     Whether Barr ever communicated to anyone in the New York Medicaid Program that the AWP, WAC or WAC equivalent that Barr reported to First DataBank, the Redbook, or Medispan was not a price actually charged by wholesalers to providers or paid by wholesalers to Barr for subject drugs and, if so, when such communications took place and of what they consisted.

33.     Average Manufacturer's Price ("AMP") (as defined by 42 U.S.C. § 1396r-8(k)(1)) for the subject drugs, including the methodology used by defendant to calculate AMP.

34.     Any effort made by Barr to determine the formulary status or reimbursement status of the subject drugs.

35.     Any effort made by Barr to determine when the subject drugs were reimbursed based on FUL, or the level of any such FUL.

36.     Any effort made by Barr to determine which company's reported price(s) for the subject drugs were being used by CMS to set a FUL.


Dated:  May 5, 2008

KIRBY McINERNEY LLP


By:          /s/
         _____
         Joanne M. Cicala, Esq.
         James P. Carroll Jr., Esq.
         Aaron D. Hovan, Esq.
         830 Third Avenue
         New York, New York 10022
         (212) 371-6600

         *On behalf of the Captioned Counties, other*
         *Than the Counties of Nassau and Orange*

Ross B. Brooks, Esq.
**MILBERG WEISS LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*


Stanley J. Levy
Theresa A. Vitello
**LEVY PHILLIPS&**
**KONIGSBERG, LLP**
800 Third Ave. 13th Floor
New York, New York 10022
Telephone: (212) 605-6200
Facsimile: (212) 605-6290

*Counsel for the County of Orange*

6

## CERTIFICATE OF SERVICE

I, Aaron D. Hovan, hereby certify that I caused a true and correct copy of the foregoing Second Revised Notice of Deposition to be served on counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: May 5, 2008

/s/    Aaron D. Hovan
Kirby McInerney LLP

7