# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>)<br>) MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>)  Subcategory Case No: 03-10643-PBS<br>) |
| THIS DOCUMENT RELATES TO:<br><br>  *The City of New York, et al.*<br>*v.*<br>  *Abbott Laboratories, et al.* | )<br>)<br>) Judge Patti B. Saris<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO DEY L.P. AND DEY, INC.

Pursuant to Rule 56.1 of the Local Rules of this Court, plaintiffs hereby submit their

Reply Statement of Undisputed Material Facts Applicable to Defendants Dey L.P., and Dey, Inc.

(collectively "Dey") in support of their Motion for Partial Summary Judgment.

## I.    DEY SPECIFIC FACTS

**1.** The Dey drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto. This exhibit also sets forth Dey's Published AWPs and WACs for these drugs and NDCs. The exhibit notes which NDCs are associated with package sizes that set the FUL.

Dey's Response to Statement No. 1:

Dey disputes Plaintiffs' SOF ¶ 1 and Exhibit A. Specifically, Dey does not publish Average Wholesale Prices ("AWPs") or Wholesale Acquisition Costs ("WACs"), but instead reports AWPs and WACs to third party pricing compendia such as First DataBank, which then publish AWPs and WACs which are not necessarily the AWPs and WACs reported by Dey. Dey disputes the characterization implicit in the statement "package sizes that set the FUL." Plaintiffs admit in their own Memorandum of Law that "FULs are not automatically set," and that a "manual review" is performed by CMS as part of CMS's setting of FUL. See Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Issues Relating to the Federal Upper Limit and Under New York Social Services Law § 145-B, at 5. The undisputed evidence demonstrates that the Centers for Medicare and Medicaid Services ("CMS")

exercised considerable discretion in the setting of Federal Upper Limits ("FULs") for sound policy reasons and routinely chose to disregard lower published prices. Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Reid Decl."), Ex. A (Deposition of Sue Gaston, dated 3/19/08 ("Gaston 3/19/08 Dep.")), at 498:16-499:06. Plaintiffs state that "the exhibit notes which NDCs are associated with package sizes that set the FUL," however, the package sizes listed in Exhibit A have no bearing on which manufacturer's NDC did in fact set the FUL. Exhibit A incorrectly reports AWP, WAC, FUL, and AMP values. In addition, in numerous instances, Exhibit A lists published prices or FUL prices after a price's effective or obsolete date, and is thus unreliable and unsupported by the evidence cited.

**PLAINTIFFS' REPLY:**

Dey's dispute as to the data in Exhibit A not being properly supported by evidence in the record is baseless. Plaintiffs properly cited Dey as the source of the Dey AMP data and the First Databank NDDF data file (Alabama Production, FDB-AWP 030785 – 030795) as the source of all other data (*see* Exhibit A at 11), which is the same source cited by Dr. Addanki. *See* Affidavit of Dr. Sumanth Addanki dated May 15, 2009 [Dkt# 6056] at Exhibit 2 (identifying "First DataBank (Alabama Production) Data and NDDF (National Drug Data File)™ Documentation Manual (Rev. April 2000)" as a Data source). *See also* Reply Affidavit of Joanne M. Cicala, sworn to June 30, 2009 and submitted in further support of plaintiffs' motion for partial summary judgment at ¶2, which is incorporated herein.

Dey disputes that Plaintiffs' Exhibit is accurate and/or complete but offers no evidence in support as required by Rule 56.1. Dey's other objections concerning admissibility are likewise baseless and unsubstantiated.

No further reply is required.

**2.** The specific Dey drugs at issue are the Albuterol .83 mg/ml solution and the Albuterol 90 MCG Inhaler.

<u>Dey's Response to Statement No. 2:</u>

Dey does not dispute Plaintiffs' SOF ¶ 2, except avers that Albuterol .83 mg/ml
solution ("Albuterol Solution") and Albuterol 90 MCG Inhaler as ("Albuterol
Inhaler") were among the nine drugs identified by Plaintiffs and Defendants in
this case for targeted FUL-related discovery. Dey disputes the characterization
implicit in the statement "specific Dey drugs at issue" to the extent it implies that
Dey's reported AWPs or WACs for such drugs were actually used or could have
been used to set the FUL.

**PLAINTIFFS' REPLY:**

The parties agree that the identified Dey Albuterol products are at issue in this motion.

The remainder of Dey's response is irrelevant and disputed.  No further reply is required.

3.        Dey has entered into and executed the federal Medicaid rebate agreement
pursuant to 42 U.S.C. § 1396r-8.  *See*, Deposition of Dey, L.P. and Dey, Inc. 30(b)(6) (Pamela
Marrs) 5/15/08 (Exhibit B) at 38:6-10 (hereinafter "Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit
B)").  Defendants Dey, L.P. and Dey, Inc.'s Answer and Affirmative Defenses to Plaintiffs'
Revised First Amended Consolidated Complaint ("Dey Answer")[Dkt #4853] at ¶132.

<u>Dey's Response to Statement No. 3:</u>

Dey does not dispute Plaintiffs' SOF ¶ 3, but states that Plaintiffs' SOF ¶ 3 is
immaterial to the issues before the Court. On January 1, 1991, pursuant to 42
U.S.C. § 1396r-8, Dey entered into a federal rebate agreement with the Secretary
of Health and Human Services. Reid Decl., Ex. B (Rebate Agreement between
Secretary of HHS and Dey, dated January 1, 1991, DL-TX-000914 – DL-TX-
000946 ("Dey Rebate Agreement")).

**PLAINTIFFS' REPLY:**

The parties agree that Dey signed the federal Medicaid rebate agreement. The remainder

of Dey's response is irrelevant and disputed.  No further reply is required.

4.        Dey understands that pharmacies that dispense Dey drugs to Medicaid
beneficiaries get reimbursed by state Medicaid agencies, including New York's.  *See* Dey
30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 37:2-6.

Dey's Response to Statement No. 4:

Dey disputes Plaintiffs' SOF ¶ 4 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 4 because while Dey acknowledges that it is aware that a pharmacy filling a prescription for a Medicaid patient should be reimbursed by its state Medicaid agency to the extent the pharmacy files a proper claim, Dey has no visibility into the ultimate customers of pharmacies or the amounts reimbursed. Reid Decl., Ex. C (Deposition of Russell Johnston, dated 12/10/08 ("Johnston 12/10/08 Dep.")), at 168:2-12. Dey did not consider State Medicaid reimbursement formulas when setting prices for its Albuterol Solution and Albuterol Inhaler. Dey witnesses have testified that Dey did not track how its products were being reimbursed by various state Medicaid agencies. Reid Decl., Ex. D (Deposition of Dey's 30(b)(6) designee, Pamela Marrs, dated 5/15/08 ("Dey 5/15/08 Dep.")), at 185:7-186:1. Dey also notes that Plaintiffs' SOF ¶ 4 miscites the cited testimony of Ms. Marrs, which was not specific to Medicaid reimbursement in New York.

**PLAINTIFFS' REPLY:**

Dey admits that a pharmacy filling a prescription for a Medicaid patient should be reimbursed by its state Medicaid agency to the extent the pharmacy files a proper claim. The remainder of Dey's response is irrelevant and disputed. No further reply is required.

**5.**        Dey understands that state Medicaid reimbursements are based on AWP. *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 149:3-9.

Dey's Response to Statement No. 5:

Dey disputes Plaintiffs' SOF ¶ 5 which is not supported by the cited testimony of Pamela Marrs. State Medicaid programs have generally reimbursed for the ingredient cost of each drug based on the lowest of the EAC as set by the states, the maximum allowable cost ("MAC") set by the state, the FUL, or the providers' usual and customary charge, or other state-specific bases. For those states that base EAC on AWP, EAC is calculated as AWP less a percentage. See Reid Decl., Ex. E (Medicaid Prescription Reimbursement Information by State, June 2008); Reid Decl., Ex. F (Medicaid Prescription Reimbursement Information by State, March 2009); N.Y. Soc. Serv. L. § 367-a(9)(b).

Furthermore, some state Medicaid reimbursements are based on WAC. See Reid Decl., Exs. E & F. Dey understood that a variety of factors went into the ultimate reimbursement rate for the ingredient cost of a prescription drug under Medicaid. As stated by Pamela Marrs:

> Q. And, of, course Dey knows that Medicaid reimbursements can be based upon AWPs; correct?
>
> THE WITNESS: Well, I mean, I've seen charts prepared that summarize reimbursement by state for Medicaid, and it -- in some cases it's AWP minus. I'm also aware of the fact that the state has the opportunity to set a MAC, to use usual and customary and use other benchmarks in setting price, that it's not -- I don't believe that it's required to use AWP minus, but it is one of the options available to the states.

Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 149:3-15. Russell Johnston also testified that AWP is one of many bases used by states for Medicaid reimbursement and that each state can have different reimbursement methodologies. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 69:1-12; 168:13-169:7. Dey further disputes Plaintiffs' SOF ¶ 5 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court.

**PLAINTIFFS' REPLY:**

The parties agree that "[f]or those states that base EAC on AWP, EAC is calculated as AWP less a percentage." The remainder of Dey's response is irrelevant and disputed. No further reply is required.

6.     Debbie Collie testified that her handwritten notes of a managers' meeting in 1995 reflected a decision to use the district sales managers to deal directly with state Medicaid offices to determine reimbursement landscape for Dey's pricing and marketing activities. Deposition of Deborah Jane Collie dated 2/19/03 ("Collie 2/19/03 Dep.")(Exhibit C) at 134:9-135:14; Collie 2/19/03 Dep. Exhibit 741, Bates DL-TX-0097756 (Exhibit C).

Dey's Response to Statement No. 6:

Dey disputes Plaintiffs' SOF ¶ 6 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 6 because the evidence Plaintiffs cited does not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. Dey's 30(b)(6) witness testified that Dey did not track how its products were being reimbursed by various state Medicaid agencies. As explained by Pamela Marrs:

> I mean, the documents that I've seen from the company at this point don't show evidence that there was a monthly report or any regular report that was distributed to people that had this kind of information on it. I'm not saying that people weren't generally aware that that was the reimbursement formula in some way. I – I haven't seen documents that would suggest it was tracked in a regimented and structured way.

Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.

Dey further disputes Plaintiffs' SOF ¶ 6 because it mischaracterizes the testimony of Cynthia Jane Collie. Ms. Collie did not testify that her handwritten notes reflected a decision to use district sales managers to "deal directly with state Medicaid offices to determine the reimbursement landscape for Dey's pricing and marketing activities." In fact, Ms. Collie was asked why Medicaid came up at a manager's meeting in 1995. In response, she explained that it was important to Dey's customers that Dey drugs be on the state Medicaid formularies and that as a result it was important to Dey that its drugs be approved and reimbursed by state Medicaid programs. Reid Decl., Ex. G (Deposition of Cynthia Jane Collie, dated 2/19/03 ("Collie 2/19/03 Dep.")), at 134:21-135:14.

Dey further states that Dey launched Albuterol Inhaler in November 1996, after the date of the meeting cited by Plaintiffs. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 177:10- 178:17; Exhibit 13 to Dey 5/15/08 Dep. Therefore, any discussion in 1995 regarding possible calls to Medicaid agencies could not have related to the marketing of Dey's Albuterol Inhaler.

**PLAINTIFFS' REPLY:**

The parties agree that Ms. Collie testified that it was important to Dey's customers that

Dey drugs be on the state Medicaid formularies and that as a result it was important to Dey that

its drugs be approved and reimbursed by state Medicaid programs.  The remainder of Dey's

response is irrelevant and disputed.  No further reply is required.

    **7.**        Carrie Jackson testified that she was instructed to gather information about the Medicaid reimbursement rates in all 50 states, and regularly update that information for use by Dey sales and marketing personnel, and that she did so.  *See* Deposition of Carrie Jean Jackson dated 4/18/03 ("Jackson 4/18/03 Dep.")(Exhibit D) at 22:16-23:10; Jackson Dep. Exhibit 230 (Exhibit D).

        Dey's Response to Statement No. 7:

        Dey disputes Plaintiffs' SOF ¶ 7 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 7 because the evidence Plaintiffs cited does not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. As part of its business, Dey was aware of State Medicaid reimbursement. However, Dey did not track how its products were being reimbursed by various state Medicaid agencies nor did it set prices based on such. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.

        Dey further states that state Medicaid offices do not generally purchase Dey's drugs directly; rather, pharmacies and other providers dispense Dey's drugs and those pharmacies or providers may be reimbursed by Medicaid, and Dey has no visibility into third party reimbursements to providers. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 68:4-11; 168:2-12.

Dey also disputes Plaintiffs' SOF ¶ 7 because it is unsupported by the cited evidence. The document cited by Plaintiffs is titled "Medicare Update" and it contains no Medicaid reimbursement information for any state. Further, Dey disputes Plaintiffs' SOF ¶ 7 because it mischaracterizes the testimony of Carrie Jean Jackson. Ms. Jackson did not state that her memo was "for use by Dey sales and marketing personnel." In fact, Ms. Jackson testified that she did not know which personnel, if any, would receive the information:

        Q. As you sit here today do you have any understanding as to why you were being asked to do this?

        A. Just to update if there were any dollar changes or procedure changes at the individual states. I didn't -- at that point I did not know what distribution would be with this information.

Reid Decl., Ex. H (Deposition of Carrie Jean Jackson, dated 4/18/03 ("Jackson 4/18/03 Dep.")), at 24:23-25:4.

**PLAINTIFFS' REPLY:**

The parties agree that "Dey was aware of State Medicaid reimbursement." The remainder of Dey's response is irrelevant and disputed. No further reply is required.

**8.** Dey's handbook of sales protocols sets out procedures for selling to different classes of trade, and lists State Medicaid Offices as a type of sales call. *See* Dey Sales Call Protocol, Bates DL-TX-0091427(Exhibit E). Addressing these calls, the handbook says, "Sales calls to state Medicaid offices are important to keep abreast of the rapidly changing Medicaid landscape. The most important issues are determining if Dey products are reimbursed by the state and at what rate. Be sure to be up-to-date as to procedures for approval of new product entries." *Id*.

> Dey's Response to Statement No. 8:
>
> Dey disputes Plaintiffs' SOF ¶ 8 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 8 because the evidence Plaintiffs cited does not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. Furthermore, Plaintiffs cite to a single page of a six-page document which is dated August 4, 1995. As part of its business, Dey was aware of State Medicaid reimbursement. However, Dey did not track how its products were being reimbursed by various state Medicaid agencies nor did it set prices based on such. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.
>
> Dey further states that state Medicaid offices do not generally purchase Dey's drugs directly; rather, pharmacies and other providers dispense Dey's drugs and those pharmacies or providers may be reimbursed by Medicaid, and Dey has no visibility into third party reimbursements to providers. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 68:4-11; 168:2-12. Dey further states that Dey launched Albuterol Inhaler in November 1996, after the date of the document cited by Plaintiffs. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 177:10-178:17; Exhibit 13 to Dey 5/15/08 Dep. Therefore, Exhibit E to Plaintiffs' SOF, which is dated August 4, 1995, has no relevance to the marketing of Dey's Albuterol Inhaler.

**PLAINTIFFS' REPLY:**

Dey does not dispute that plaintiffs have accurately quoted from the Dey Sales Call protocol. No further reply is required.

**9.**　　　　Dey's sales call protocol handbook goes on to direct District Sales Managers to "meet with program director or equivalent," "[d]etermine if Dey products are 'covered' by [the] state," "[i]f so, verify reimbursement rates," and "[d]iscuss methods used to determine reimbursement rates, a. AWP + dispensing fee[,] b. AWP – x% + dispensing fee[,] MAC + dispensing fee[, and] d. [a]ny other method." *Id.*

> Dey's Response to Statement No. 9:
> 　　　　Dey disputes Plaintiffs' SOF ¶ 9 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 9 because the evidence Plaintiffs cited does not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. Furthermore, Plaintiffs cite to a single page of a six-page document which is dated August 4, 1995. As part of its business, Dey was aware of State Medicaid reimbursement. However, Dey did not track how its products were being reimbursed by various state Medicaid agencies nor did it set prices based on such. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.
> 　　　　Dey further states that Dey launched Albuterol Inhaler in November 1996, after the date of the document cited by Plaintiffs. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 177:10-178:17; Exhibit 13 to Dey 5/15/08 Dep. Therefore, Exhibit E to Plaintiffs' SOF, which is dated August 4, 1995, has no relevance to the marketing of Dey's Albuterol Inhaler.

**PLAINTIFFS' REPLY:**

Dey does not dispute that plaintiffs have accurately quoted from the Dey Sales Call protocol.  No further response is required.

**10.**　　　　Dey also admits that its own documents reveal that certain sales and marketing people were aware that Medicaid reimbursements were made on the basis of Dey's published prices.  *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 187:14-188:8.

> Dey's Response to Statement No. 10:
> 　　　　Dey disputes Plaintiffs' SOF ¶ 10 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 10 because the evidence Plaintiffs

cited does not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. In fact, in the cited testimony, Ms. Marrs stated that while certain sales and marketing people knew that many states made Medicaid reimbursements based on published prices, it was not "something that people knew broadly throughout corporate." Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 187:14-188:8. As part of its business, Dey was aware of State Medicaid reimbursement. However, Dey did not track how its products were being reimbursed by various state Medicaid agencies nor did it set prices based on such. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.

Dey further states that state Medicaid offices do not generally purchase Dey's drugs directly; rather, pharmacies and other providers dispense Dey's drugs and those pharmacies or providers may be reimbursed by Medicaid, and Dey has no visibility into third party reimbursements to providers. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 68:4-11; 168:2-12.

**PLAINTIFFS' REPLY:**

The parties agree that "certain Dey sales and marketing people knew that many states made Medicaid reimbursements based on published prices." The remainder of Dey's response is irrelevant and disputed. No further reply is required.

**11.**		Dey knew that eligibility for reimbursement by Medicaid was important to its customers. *See* Deposition of Dey, L.P. and Dey, Inc. 30(b)(6) (Pamela Marrs) dated 7/10/08 ("Dey 30(b)(6) (Marrs) 7/10/08 Dep.") (Exhibit F) at 450:5-15.

Dey's Response to Statement No. 11:
		Dey disputes Plaintiffs' SOF ¶ 11 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 11 because it is not supported by the testimony cited, which is a discussion of Medicare and not Medicaid reimbursement, in which Ms. Marrs in fact testified that while Medicare reimbursement is important to some customers, it is irrelevant to others:

		Q. Okay. Has it been important in Dey's business to understand how Medicare reimbursement applies with respect to Dey's drugs?

A. It's important from the standpoint if it affects the customer and if the customer brings it up as an issue in their business. And sometimes they do and sometimes they don't. You know, it seems to come up more frequently when -- when there is an inequity amongst -- amongst competitors for common drugs.

Reid Decl., Ex. I (Deposition of Dey's 30(b)(6) designee, Pamela Marrs, dated 7/10/08 ("Dey 7/10/08 Dep.")), at 450:5-15. Dey's customer base includes a wide variety of types of customers, and for many of their customers, such as hospitals, for example, Medicaid reimbursement is simply irrelevant. Reid Decl., Ex. J (Deposition of Todd Galles, dated 3/1/06 ("Galles 3/1/06 Dep.")), at 423:3-5.

The exhibit and testimony cited by Plaintiffs do not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. As part of its business, Dey was aware of State Medicaid reimbursement. However, Dey did not track how its products were being reimbursed by various state Medicaid agencies nor did it set prices based on such. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.

Dey further states that state Medicaid offices do not generally purchase Dey's drugs directly; rather, pharmacies and other providers dispense Dey's drugs and those pharmacies or providers may be reimbursed by Medicaid, and Dey has no visibility into third party reimbursements to providers. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 68:4-11;168:2-12.

**PLAINTIFFS' REPLY:**

The parties agree that Medicaid reimbursement is important to certain of Dey's customers. The remainder of Dey's response is irrelevant and disputed. No further reply is required.

**12.**       Dey's sales protocol handbook directs sales personnel to "[d]iscuss the Medicaid reimbursement rate," and "[i]nform R.Ph. if our products are covered," in the context of describing the procedure for calling on an independent retail pharmacy owner or manager. Dey Sales Call Protocol, Bates DL-TX-0091417 (Exhibit E)

Dey's Response to Statement No. 1:

Dey disputes Plaintiffs' SOF ¶ 12 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 12 because the evidence Plaintiffs

cited does not provide evidence of any general pattern or knowledge of Dey which was improper or related to pricing or reporting of AWP or WAC to the compendia. Furthermore, Plaintiffs cite to a single page of a six-page document which is dated August 4, 1995. As part of its business, Dey was aware of State Medicaid reimbursement. However, Dey did not track how its products were being reimbursed by various state Medicaid agencies nor did it set prices based on such. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 185:7-186:1.

Dey further states that state Medicaid offices do not generally purchase Dey's drugs directly; rather, pharmacies and other providers dispense Dey's drugs and those pharmacies or providers may be reimbursed by Medicaid, and Dey has no visibility into third party reimbursements to providers. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 68:4-11; 168:2-12.

Dey further states that Dey launched Albuterol Inhaler in November 1996, after the date of the meeting cited by Plaintiffs. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 177:10-178:17; Exhibit 13 to Dey 5/15/08 Dep. Therefore, Exhibit E to Plaintiffs' SOF, which is dated August 4, 1995, has no relevance to the marketing of Dey's Albuterol Inhaler.

**PLAINTIFFS' REPLY:**

Dey does not dispute that plaintiffs have accurately quoted from the Dey Sales Call protocol. No further response is required.

**13.**       At all times, from 1997 to 2005, Dey reported both AWP and WAC for its drugs to all three of the national compendia – First DataBank, RedBook and Medi-Span. *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 75:17-21; 74:13-76:21; 136:12-18.

Dey's Response to Statement No. 13:

Dey does not dispute Plaintiffs' SOF ¶ 13. Dey reported its AWP for these drugs to the publishers so that its drug could be recognized by the industry and third party payors as generics. At launch, pricing for a first-to-market generic, like Dey's Albuterol Solution, is set in relationship to the brand AWP. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 129:22-130:11. Dey's practice of establishing AWPs for the Subject Drugs at a percentage lower than the therapeutically equivalent brand AWPs was consistent with industry practice.  Reid Decl., Ex. I (Dey 7/10/08 Dep.), at 460:2-8. According to Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, there was a "perception in the industry" that a generic drug had to be priced at least 10 percent less than the brand price. Reid

Decl., Ex. K (Deposition of Patricia Kay Morgan, dated 11/30/07 ("Morgan 11/30/07 Dep.")), at 21:4-18.

WAC is Dey's invoice price to wholesalers. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 75:22-76:3; 144:21-145:1; Reid Decl., Ex. I (Dey 7/10/08 Dep.), at 537:9-15; Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 29:6-12, 31:14-16; Reid Decl., Ex. L (Deposition of Russell Johnston, dated 12/11/08 ("Johnston 12/11/08 Dep.")), at 501:2-17; Reid Decl., Ex. M (Letter from Dey to New York Medicaid, dated July 18, 2000, DL-0050107 – DL-0050113 ("July 18, 2000 Letter")). Ms. Marrs explained: "The WAC that's reported is the invoice price to the customer – to the wholesaler." Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 144:21-145:1.

Dey regularly updated its WACs in a manner that directly reflected underlying pricing activity. Reid Decl., Ex. N (Deposition of Robert Mozak, dated 4/30/02 ("Mozak 4/30/02 Dep.")), at 372:11-20. Ms. Marrs explained, in testimony cited by Plaintiffs' SOF ¶ 13, that as market prices decline, Dey has also reduced its reported WAC. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 136:16-21. Moreover, Dey notified price reporting services and state Medicaid offices as soon as the WAC was lowered. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 137:6-17.

**PLAINTIFFS' REPLY:**

The parties agree that  at all times, from 1997 to 2005, Dey reported both AWP and WAC for its drugs to all three of the national compendia.  The remainder of Dey's response is irrelevant and disputed.  No further reply is required.

**14.**      Dey knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia.  *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 133:16-136:10; Deposition of Robert Mozak dated 11/6/02 ("Mozak 11/6/02 Dep.") (Exhibit G) at 509:01-513:20.

Dey's Response to Statement No. 14:

Dey disputes Plaintiffs' SOF ¶ 14. Dey avers that it reported certain AWP and WAC prices to the drug pricing compendia, but what happened to those prices after they were received by the compendia was in the control of the compendia, and not Dey. A review of the prices published by the various compendia show that the prices were updated at various times, and not all of the

compendia list the same price at the same time. Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at Exhibit 15, page 2.

Dey further disputes Plaintiffs' SOF ¶ 14 because it mischaracterizes the testimony of Pamela Marrs and Robert Mozak. Ms. Marrs did not testify that Dey knew and controlled the AWPs and WACs published by the national drug pricing compendia. In fact, she stated that Dey did not control the publication of Dey's prices and that Dey could not know if the published prices accurately reflected those reported by Dey:

A. …. We do not -- we do not now -- and I'm not sure if we even did then, other than this piece of paper we got from them actually physically look in the published document to see if our prices were input correctly.

Q. But Dey does know that the prices that are reported in First DataBank, Medispan, and Redbook are the prices that were reported to it by Dey; correct?

A. No. That's what I was trying to explain. In the early years they would send us a piece of paper back, not the -- not the published document, but a confirmation form, where we would look at it, it appears from the documentations I've looked at, and validate that that was, in fact, what we sent them. That doesn't happen any longer. What we do now is we send them a letter notifying them of a price change, and we ask them to sign off and send back to us a confirmation that they received the information. We do not then go and -- and verify that they've posted the correct amount, which became obvious when this whole issue happened with the generic products in 2003, where they lowered our AWP. We didn't actually know anything about it until customers started calling and complaining.

Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 135:1-136:10.

Mr. Mozak simply testified about Dey's annual policy of reviewing pricing compendia price pages to ensure Dey's prices are accurate and to correct any identified discrepancies. Reid Decl., Ex. O (Deposition of Robert Mozak, dated 11/6/02 ("Mozak 11/6/02 Dep.")), at 510:14-17; 512:22-513:16.

**PLAINTIFFS' REPLY:**

Dey's response to SOF 14 attempts to deny its control of the reported prices with evidence that it did not systematically check the compendia to see if the control it exercised

through its regular correspondence with the compendia was complete and entire.   Dey

acknowledges that it relied on its customers to inform it if there were variances between what it

reported to the compendia and what was published.   This is evidence of Dey's control of the

prices that were published, rather than a lack of control.   Dey was sufficiently confident in its

control of the published prices that it could wait to let customers point out the occasional

discrepancy.   This does not mean that Dey was not in control of the published prices, or that

Dey even seriously disputes that control.   The remainder of Dey's response is irrelevant and

disputed.  No further reply is necessary.

> **15.**      First Databank, Redbook and Medispan sent requests to Dey to verify the
> accuracy of the AWPs and WACs for its drugs and Dey confirmed and acknowledged that the
> published prices were the same as those Dey had submitted for publication.  *See* Dey 30(b)(6)
> (Marrs) 5/15/08 Dep. (Exhibit B) at 133:16-136:2.

> > <u>Dey's Response to Statement No. 15:</u>
> >       Dey disputes Plaintiffs' SOF ¶ 15. Dey further disputes Plaintiffs' SOF ¶
> > 15 because it mischaracterizes the testimony of Ms. Marrs. Ms. Marrs testified
> > that Dey could not know if the published prices accurately reflected those
> > reported by Dey:
> >
> > > A. …. We do not -- we do not now -- and I'm not sure if we even
> > > did then, other than this piece of paper we got from them actually
> > > physically look in the published document to see if our prices were
> > > input correctly.
> > >
> > > Q. But Dey does know that the prices that are reported in First
> > > DataBank, Medispan, and Redbook are the prices that were
> > > reported to it by Dey; correct?
> > >
> > > A. No. That's what I was trying to explain. In the early years they
> > > would send us a piece of paper back, not the -- not the published
> > > document, but a confirmation form, where we would look at it, it
> > > appears from the documentations I've looked at, and validate that
> > > that was, in fact, what we sent them. That doesn't happen any
> > > longer. What we do now is we send them a letter notifying them of

15

a price change, and we ask them to sign off and send back to us a confirmation that they received the information. We do not then go and -- and verify that they've posted the correct amount, which became obvious when this whole issue happened with the generic products in 2003, where they lowered our AWP. We didn't actually know anything about it until customers started calling and complaining.

Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 135:1-136:10.

Dey further states that it reported certain AWP and WAC prices to the drug pricing compendia, but what happened to those prices after they were received by the compendia was in the control of the compendia, and not Dey. A review of the prices published by the various compendia show that the prices were updated at various times, and not all of the compendia list the same price at the same time. Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at Exhibit 15, page 2.

**PLAINTIFFS' REPLY:**

Plaintiffs' reply to Dey's response to Statement No. 14 is incorporated herein.  No further reply is required, other than to point out that Marrs' testimony about what happens now, after the relevant time frame, is of no consequence in light of her admissions about how Dey confirmed the prices to the compendia during the relevant time frame.

**16.**   Dey knew of the Federal Upper Limit (FUL) and that it is a limitation on reimbursement below AWP that is set on published prices.  *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 145:11-18.

Dey's Response to Statement No. 16:
Dey disputes Plaintiffs' SOF ¶ 16. Plaintiffs' SOF ¶ 16 is subject to multiple interpretations and mischaracterizes the testimony of Ms. Marrs, who did not address in any way the relationship between FUL and AWP. Ms. Marrs's testimony was as follows:

Q. What is a "FUL"?

A. "FUL" stands for Federal Upper Limit.

Q. How is a FUL set?

16

> A. It's a percentage -- I think it's 150 percent of a – some published price, but it's my understanding there's some controversy over exactly what it's 150 percent of, the lowest price in the market or something like that. I'm not clear on the definition based on my conversations with some others.

Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 145:11-20.

The setting of a particular FUL is not automatic. CMS officials would not use a particular published price if that manufacturer "only distribute[d] to maybe [a] limited amount of states and not all states." Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 429:9-17. CMS used a computer program ("the FULs System") to gather both Orange Book data and pricing data from the three national compendia and to initially calculate FULs for those drugs that met the specified criteria. Reid Decl., Ex. P (Deposition of Sue Gaston, dated 1/24/08 ("Gaston 1/24/08 Dep.")), at 232:22-234:6; 237:7-9; Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 410:14-411:7. Then, CMS officials would engage in a "manual review" process because "we want to be sure that that lowest price is a true price." Reid Decl., Ex. P (Gaston 1/24/08 Dep.), at 232:22 – 241:7; Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 410:14 – 411:18; 416:10-15; 429:18-22; 432:14-433:6; 533:5-21; Reid Decl., Ex. Q (Deposition of Gail Sexton, dated 5/20/08 ("Sexton 5/20/08 Dep.")), at 89:2-5; 93:12-94:16 (stating that Ms. Sexton conducted "further manual interventions" into the FUL for albuterol because she had "learned of other suppliers that were marketing this drug"); 95:15-20 (stating that she would conduct a manual review "in cases where I saw that manual intervention could have changed the price, changed the federal upper limit, or where it appeared that perhaps the criteria was not met and that further intervention should have been taken"); 138:6-7 ("When possible we would manually verify that drugs were available."); 147:8-15 (stating that upon finding "an outlier situation" she would "do some manual verifications on whether that NDC was available and available at that price").

The manual review was used to determine whether a drug was "truly available or not" and whether or not "you should follow up and see if it's available." Reid Decl., Ex. P (Gaston 1/24/08 Dep.), at 229:8 – 230:14. This manual review was implemented for the Dey albuterol drugs at issue in this motion. See, e.g., Reid Decl., Ex. Q (Sexton 5/20/08 Dep.), at 89:2-5; 93:12-94:16; Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 470:7 – 472:21; 474:7-16; 496:21-497:7; 497:18-499:9. Ms. Gaston testified that CMS removed the FUL for the 90 MCG albuterol inhaler upon learning of a shortage of the drug's raw material because "if the product is not available, then it wouldn't make sense to

put a FUL price on it." Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 470:7 –
472:21. CMS removed the FUL for the 90 MCG albuterol inhaler even
though CMS's pre-conditions for setting a FUL were subsequently met:

> Q. So in other words, CMS didn't establish or reestablish a FUL --
> or revise the FUL for the 90-microgram inhaler in this 2001 time
> period; it actually removed the FUL?
>
> A. Correct.
>
> Q. And it did so despite the fact there are shown on this sheet a
> series of manufacturers' reported published prices, right?
>
> A. Correct.
>
> * * *
>
> Q. In other words, there were three manufacturers who were
> reported published prices for the 90-microgram inhaler?
>
> A. Correct.
>
> Q. And so in other words the conditions necessary for CMS to
> establish a FUL were met at this time?
>
> A. The conditions were met, but the pricing condition wasn't met.
>
> Q. What pricing condition was that?
> A. It was that if you would take the prices that are remaining and
> multiply by 150 percent you're going to have a price that's, it
> looks like, over what the AWPs are. So you're sort of defeating the
> purpose of the FUL program.
>
> Q. Which was, again, soft savings?
>
> A. Soft savings to the states. The states can set their own
> reimbursement level at that point.
>
> Q. So as we've kind of seen throughout, CMS is trying to establish
> a FUL that's not too low and not too high to achieve a cost

savings, but also not set it too low to create an access issue; that's the balance CMS is trying to strike?

A. Correct.

Q. And you did that -- the balance was struck, sometimes the computer program worked as it was supposed to and that balance was struck by the computer program, but other times it was the result of manual intervention?

A. Correct.

Q. And the manual intervention resulted in CMS making a choice in its discretion, correct?

A. Correct.

Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 496:21-497:7; 497:18-499:9.

CMS officials would decline to set a FUL when the FUL was equal to an AWP because states' "regular reimbursement methodology would be a percentage off of AWP," such that setting a FUL that was equal to AWP "would kind of counter what the states were doing with their other reimbursement methodology." Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 456:10-20 (discussing the FUL for cefadroxil). See also Reid Decl., Ex. Q (Sexton 5/20/08 Dep.), at 76:20 – 77:13 (stating that she could not recall ever having a set a FUL based on an AWP).

CMS did not have any written policy in place for employees to follow in setting FULs, and CMS officials individually made decisions about whether and at what rate to set a FUL on a case-by-case basis. Reid Decl., Ex. P (Gaston 1/24/08 Dep.), at 250:2-6; 252:3-6; Reid Decl., Ex. A (Gaston 3/19/08 Dep.), at 464:7 – 465:16; Reid Decl., Ex. Q (Sexton 5/20/08 Dep.), at 60:18 – 61:7. CMS officials were informally taught by other CMS officials how to exercise their discretion to set FULs manually so as to meet the dual objectives of cost savings and access. Reid Decl., Ex. P (Gaston 1/24/08 Dep.), at 225:16 – 226:7; Reid Decl., Ex. Q (Sexton 5/20/08 Dep.), at 73:14 – 74:22.

## PLAINTIFFS' REPLY:

The parties agree that the FUL was a limit on reimbursements for drugs below AWP, and that Dey was aware of this.  The remainder of Dey's response is irrelevant and disputed.  No further reply is required.

**17.**     Dey admits that its reported AWPs are not tethered to the actual prices anyone pays. AWP has no connection whatsoever to actual prices Dey charges to any customers. *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 131:8-133:15 (practice of setting AWP at launch and never changing it to reflect falling prices); 138:6-21; Deposition of Robert Mozak dated 11/1/01 ("Mozak 11/1/01 Dep.") (Exhibit H) at 120:23-121:6; Mozak 11/6/02 Dep. (Exhibit G) at 685:02-688:20; Mozak 11/6/02 Dep. Exhibit 345 (Exhibit G) (reporting the increase of a product's AWP while the actual price of the product remained unchanged); Deposition of Robert Mozak dated 3/13/03 ("Mozak 3/13/03 Dep.") (Exhibit I) at 930:13-21 (AWP is known not to be a real price); 1026:6-8; Deposition of Dey, L.P. and Dey, Inc. 30(b)(6) (Gary Walker) dated 7/9/08 ("Dey 30(b)(6)(Walker 7/9/08 Dep.") (Exhibit J) at 482:05-438:10.

Dey's Response to Statement No. 17:

Dey disputes Plaintiffs' SOF ¶ 17 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 17 because Dey reported its AWP for these drugs to the publishers so that its drug could be recognized by the industry and third party payors as generics. At launch, pricing for a first-to-market generic, like Dey's Albuterol Solution, is set in relationship to the brand AWP. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 129:22-130:11. Ed  Edelstein of First Databank informed Dey that a generic AWP must be at least 10% lower than the corresponding brand AWP in order to be listed as such by First DataBank. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 129:22-131:14; Reid Decl., Ex. R (Deposition of Robert Mozak, dated 3/13/03 ("Mozak 3/13/03 Dep.")), at 731:17-24.

Dey's practice of establishing AWPs for the Subject Drugs at a percentage lower than the therapeutically equivalent brand AWPs was consistent with industry practice. Reid Decl., Ex. I (Dey 7/10/08 Dep.), at 460:2-8. According to Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, there was a "perception in the industry" that a generic drug had to be priced at least 10 percent less than the brand price. Reid Decl., Ex. K (Morgan 11/30/07 Dep.), at 21:4-18. Accordingly, Dey set its AWPs for unit dose albuterol at approximately 10% of the brand AWP, and that, consistent with what it believed to be the industry practice for generics, Dey did not thereafter change AWP. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 131:8-132:12.

Dey continually re-affirmed the nature of its AWPs as benchmarks set only at the launch of a new product. Ms. Marrs stated that "on the notifications to the reporting agency it was clearly set forth since 1999 that…AWP was not a real price." Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 138:18-20.

For example, a July 18, 2000 letter from Dey to Mark Richard Butt, R.Ph., the Pharmacy Program Manager of New York Medicaid, regarding the introduction of Dey's new Albuterol Inhaler, contains the following language:

> As you know, the AWP listed here does not represent any actual price which will be or has been charged or paid for this product. Generally, it is Dey's practice to set an AWP before a product is first sold and not to subsequently change that AWP. We understand that this is consistent with industry practice. We believe this to be clearly understood by state and federal Medicaid regulators.

Reid Decl., Ex. M (July 18, 2000 Letter).

Dey also disputes Plaintiffs' SOF ¶ 17 because it is not supported by the evidence cited and mischaracterizes the testimony of Robert Mozak. The evidence cited in Plaintiffs' SOF ¶ 17 is an internal sales commentary and not a report of any kind. Reid Decl., Ex. O (Mozak 11/6/02 Dep.), at Exhibit 345. Moreover, the language cited by Plaintiffs is unrelated to generic Albuterol Solution and Albuterol Inhaler, but instead discusses Euthyrox, a brand drug not at issue in this litigation. *Id.*

Dey further disputes Plaintiffs' SOF ¶ 17 as confusing and because it mischaracterizes the testimony of Gary Walker. Plaintiffs' SOF ¶ 17 cites Mr. Walker's testimony from 482:05-438:10 [sic]. Mr. Walker did not testify that AWP is not a real price or that it is known not to be a real price. Mr. Walker stated that "[i]n preparation for this [deposition], it's my understanding that [AWPs] haven't changed over time." Reid Decl., Ex. S (Deposition of Dey's 30(b)(6) designee, Gary Walker, dated 7/9/08 ("Dey 7/9/08 Dep.")), at 481:17-483:9. Further, Mr. Walker testified that he had "never [ ] seen a definition of how [AWP] should be calculated or reported." Reid Decl., Ex. S (Dey 7/9/08 Dep.), at 481:22-482:3.

**PLAINTIFFS' REPLY:**

Dey does not dispute that its reported AWPs are not tethered to the actual prices anyone pays, or that their reported AWP has no connection whatsoever to actual prices Dey charges to any customers. The remainder of Dey's response is irrelevant and disputed. No further reply is required.

**18.**     Wholesalers have contracts with Dey.  *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 274:20-285:16; Deposition of Dey, L.P. and Dey, Inc. 30(b)(6) (Gary Walker) dated 5/14/08 ("Dey 30(b)(6)(Walker) 5/14/08 Dep.") (Exhibit M) at 263:01-264:17; Dey 30(b)(6)(Walker) 5/14/08 Dep. Exhibit 15 (Exhibit M).

> Dey's Response to Statement No. 18:
>
> Dey disputes Plaintiffs' SOF ¶ 18 as both confusing and ambiguous. Dey further disputes Plaintiffs' SOF ¶ 18 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Plaintiffs' SOF ¶ 18 identifies neither with whom nor for what products Dey had contracts. Dey sells its drugs through two primary distribution channels – direct sales and indirect sales. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 90:11-91:8. In a direct sale, Dey invoices its customer for a product and then ships the product directly from Dey's distribution center to that customer. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 90:13-16. All sales to wholesalers are direct sales as well as all sales to purchasers who can take delivery at their own distribution center. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 91:2-4. Dey's WAC is the invoice price that it charges wholesalers. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 144:21-145:1; Reid Decl., Ex. T Reid (Deposition of Dey's 30(b)(6) designee, Pamela Marrs, dated 8/19/04 ("Dey 8/19/04 Dep.")), at 8:16-18; Reid Decl., Ex. U (Deposition of Robert Mozak, dated 11/1/01 ("Mozak 11/1/01 Dep.")), at 117:11-15; 68:13-18.
>
> An indirect sale can be a sale that takes place between Dey's wholesale customer and one of Dey's contract customers who does not have the ability to take delivery of the product. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 90:17-19. Wholesalers also make indirect sales to customers with no contracts. In an indirect sale with a contract, Dey negotiates a contract price with an indirect customer that will ultimately purchase Dey's product from a wholesaler. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 90:17-91:1; 91:5-8. The contract price sets forth the price between Dey and the indirect customer, not the price between the indirect customer and the wholesaler. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 99:21-100:5. In indirect sales, Dey has no visibility into the price paid by the wholesaler's customer. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 104:10-12.

**PLAINTIFFS' REPLY:**

The parties agree that Dey had contracts with  its customers.  The remainder of Dey's response is irrelevant and disputed.  No further reply is required.

19.     Some of Dey's wholesaler contracts provide for product specific pricing and incentives. Product specific incentives reduce wholesaler's acquisition cost for the relevant Dey product.  *See* Dey 30(b)(6)(Marrs) 7/10/08 Dep. (Exhibit K) at 541:8-542:9; 543:22-544:14; Deposition of Charles Rice dated 10/30/01 ("Rice 10/30/01 Dep.") (Exhibit L) at 87:23-93:13.  Some wholesaler contracts provide for baseline (across the board rebates). *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 91:10-93:1; 274:20-279:8; Dey 30(b)(6) (Walker) 5/14/08 Dep. (Exhibit M) at 268:5-20.   Baseline rebates reduce wholesaler's acquisition cost for all Dey products.  *See* Dey 30(b)(6) (Marrs) 7/10/08 Dep. (Exhibit K) at 541:8-542:9; 543:22-544:14; Rice 10/30/01 Dep. (Exhibit L) at 94:25-97:2.

Dey's Response to Statement No. 19:

Dey disputes Plaintiffs' SOF ¶ 19 as immaterial and not specific to the drugs at issue on this motion. Dey further disputes SOF ¶ 19 because it is not supported by the cited testimony of Pamela Marrs, Charles Rice, and Gary Walker. Ms. Marrs did not address either "product specific" pricing or incentives. Ms. Marrs in fact testified that the government knew WAC was an undiscounted price and that Dey employees were more familiar with WAC than with AWP. Reid Decl., Ex. I (Dey 7/10/08 Dep.), at 541:8-542:9; 543:22-544:14. (is this true?)

Nor did Charles Rice discuss "product specific" pricing or incentives. Mr. Rice explained that discounts and/or rebates would lower the ingredient cost of Dey products to wholesalers. Reid Decl., Ex. V (Deposition of Charles Rice, dated 10/30/01 ("Rice 10/30/01 Dep.")), at 92:14-93:13.

Neither Ms. Marrs nor Mr. Walker testified that "[s]ome wholesaler contracts provide for baseline (across the board rebates)." Ms. Marrs explained that certain types of "rebates that over time have been paid to wholesalers." Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 91:17-18.

Mr. Walker merely testified that the "base full-line rebate" referenced in Cardinal Health's Generic Wholesale Service Agreement would show up in Dey's "rebate Access database" Reid Decl., Ex. W (Deposition of Dey's 30(b)(6) designee, Gary Walker, dated 5/14/08 ("Dey 5/14/08 Dep.")), at 268:5-20; Exhibit 15 to Dey 5/14/08 Dep.

In support of its statement that "[b]aseline rebates reduce wholesaler's acquisition cost for all Dey products" Plaintiffs' SOF ¶ 19 cites the same Pamela Marrs testimony used to support Plaintiffs' assertions that Dey wholesaler contracts provide for "product specific" pricing and incentives. As noted above, the cited testimony in fact states that the government knew WAC was an

undiscounted price and that Dey employees were more familiar with WAC than with AWP. Reid Decl., Ex. I (Dey 7/10/08 Dep.), at 541:8-542:9; 543:22-544:14. (is this true?)

Charles Rice also did not testify about "baseline rebates" reducing wholesaler acquisition costs for "all Dey products." Mr. Rice explained the nature of compliance rebates and market share rebates and whether either could be "known on the date an invoice is printed." Reid Decl., Ex. V (Rice 10/30/01 Dep.), at 94:25-97:2

**PLAINTIFFS' REPLY:**

The parties agree that customers who purchased Dey products on contract obtained special pricing and incentives. Pamela Marrs, Dey's CFO, is uniquely qualified, and was designated to testify on behalf of Dey concerning the pricing and incentives offered by Dey to its contract customers. Marrs is, however, incompetent to testify about what any government official knew or did not know, or that the government itself "knew" any matter at all, for lack of personal knowledge. Dey has admitted that Marrs has never held a government office of any kind whatsoever, much less in a state Medicaid agency. The cited testimony is therefore inadmissible for the purpose of showing government knowledge. The remainder of Dey's response is irrelevant and disputed. No further reply is required.

**20.**   Of all Dey's sales to wholesalers, half are subject to chargebacks. *See* Dey 30(b)(6) (Walker) 7/9/08 Dep. (Exhibit J) at 518:14-519:6.

> Dey's Response to Statement No. 20:
>
> Dey disputes Plaintiffs' SOF ¶ 20 as incomplete, because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 20 because in the passage quoted by Plaintiffs, Mr. Walker testified that the ratio of sales to wholesalers has changed over time, and that he was not sure of whether the percentage has increased or decreased. Reid Decl., Ex. S (Dey 7/9/08 Dep.), at 519:2-6. Therefore, it is not clear what percentage of Dey's sales of Albuterol Solution and Albuterol Inhaler are subject to chargebacks, nor how this percentage changed over time for these two drugs.

**PLAINTIFFS' REPLY:**

Gary Walker, Dey's corporate designee to speak on the topic of the transactional data which Dey had or would produce in this matter, testified as follows:

> Q:    Do you know what percentage of total Dey sales Dey pays chargebacks on?
>
> A:    My general understanding is an overall perspective over quite a bit of time that probably half of our sales go through wholesalers.  I know if that answers your question as far as the chargeback.  **Assuming that whatever we sell to wholesalers comes through chargebacks.**
>
> Q:    **So approximately half of your sales you would have chargebacks?**
>
> A:    **That's my understanding**.  I think that ratio has changed over time.  I don't know if it's gone up or down, **but it's always been my rough understanding that half of our product goes through wholesalers.**

Dey 30(b)(6) (Walker) 7/9/08 Dep. (Exhibit J to the original 56.1 Statement) at 518:14-519:6 (emphasis supplied).

The parties agree that over time, roughly half of Dey's sales are subject to chargebacks.

The remainder of Dey's response is irrelevant and disputed.  No further reply is required.


**21.**    Dey negotiates contract prices to the majority of its non-wholesaler customers, principally pharmacies, which are below the WAC for each of its drugs.   *See* Dey 30(b)(6) (Walker) 7/9/08 Dep. (Exhibit J) at 408:7-409:5; Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 82:13-16; Rice 10/30/01 Dep. (Exhibit L) at 199:19-205:2; Rice 10/30/01 Dep. Exhibit 78 (Exhibit L).

> Dey's Response to Statement No. 21:
>
> Dey disputes Plaintiffs' SOF ¶ 21 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court and ambiguous. Dey further disputes Plaintiffs' SOF ¶ 21 because Dey sells its drugs through two primary distribution channels – direct sales and indirect sales. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 90:11-91:8. In a direct sale, Dey invoices its customer for a product and then ships the product directly from Dey's distribution center to that customer. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at

90:13-16. To the extent that Plaintiffs' SOF ¶ 21 is intended to describe such sales, Dey enters into contracts with customers in various classes of trade at negotiated prices which are below its WAC list price. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 105:5-8.

Wholesalers also make indirect sales of Dey's drugs via customers that have no contracts with Dey. Reid Decl., Ex. L (Johnston 12/11/08 Dep.), at 456:5-457:7. Dey's WAC accordingly serves as an undiscounted list price – an advertised maximum price that buyers purchasing from Dey can expect to pay. Reid Decl., Ex. W (Dey 5/14/08 Dep.), at 199:13-200:7. As such, prices paid to wholesalers by off-contract customers can be above WAC. Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 151:17-153:10.

In a July 18, 2000 letter from Dey to Mark Richard Butt, R.Ph., the Pharmacy Program Manager of New York Medicaid, regarding the introduction of Dey's new Albuterol Inhaler, Dey states that:

As you know, WAC is referred to by data reporting services and government agencies as an "estimate," and Dey believes that WAC generally means the invoice price charged by a pharmaceutical manufacturer to drug wholesalers. As you also know, WAC does not include the net effect of discounts from invoice price (based on volume of purchases, speed of payment and other factors), rebates, chargebacks, administration fees and other cost adjustments which are well-known and commonplace in the pharmaceutical industry and can affect, to a greater or lesser degree, the actual "final" cost to each purchaser. These discounts many not be determined until some months after the date of the invoice. Therefore, we remind you that WAC may well not be representative of actual market costs to those entities which you are reimbursing under Medicaid.

Reid Decl., Ex. M (July 18, 2000 Letter).

**PLAINTIFFS' REPLY:**

The parties agree that Dey enters into contracts with its direct customers in various classes of trade at negotiated prices which are below its WAC list price. The remainder of Dey's response is irrelevant and disputed. No further reply is required.

22.    Dey pays its non-wholesaler customers rebates, discounts, floor stock adjustments, fees, incentives and other pricing allowances that further reduce their actual acquisition cost. *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 107:6-111:18; Deposition of Robert Mozak dated 4/30/02 ("Mozak 4/30/02 Dep.") (Exhibit N) at 443:14-445:16; 447:11.

Dey's Response to Statement No. 1:

Dey disputes Plaintiffs' SOF ¶ 22 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court. Dey further disputes Plaintiffs' SOF ¶ 22 because it is not supported by the testimony cited. Plaintiffs cite to testimony in which Mr. Mozak discusses an exhibit, but they do not provide the exhibit, and the cited testimony specifically relates to the price of ipratropium bromide for a particular customer, and not the albuterol products which are the subject of this motion. Furthermore, Dey notes that the testimony of Mr. Mozak cited by Plaintiffs refers to the publicly available Federal Supply Schedule and VA prices which are reported to the Federal Government for direct purchases by the Government. Mr. Mozak testifies that the contract price in this particular instance should be no lower than the FSS and VA price. Reid Decl., Ex. N (Mozak 4/30/02 Dep.), at 444:4-5. Because the FSS and VA prices are the lowest price to the commercial customers, and because those prices are publicly available, Dey disputes the implication in SOF ¶ 22 that the actual acquisition cost to Dey's customers is never known.

WAC is Dey's invoice price to wholesalers. Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 75:22-76:3; 144:21-145:1; Reid Decl., Ex. I (Dey 7/10/08 Dep.), at 537:9-15; Reid Decl., Ex. C (Johnston 12/10/08 Dep.), at 29:6-12, 31:14-16; Reid Decl., Ex. L (Deposition of Russell Johnston, dated 12/11/08 ("Johnston 12/11/08 Dep.")), at 501:2-17; Reid Decl., Ex. M ("July 18, 2000 Letter"). Ms. Marrs explained: "The WAC that's reported is the invoice price to the customer – to the wholesaler." Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 144:21-145:1.


**PLAINTIFFS' REPLY:**

Dey does not specifically dispute the Statement. Neither does Dey provide evidence that its non-wholesaler customers do not receive rebates, discounts, floor stock adjustments, fees, incentives and other pricing allowances that further reduce their actual acquisition cost. The cited evidence speaks directly to the fact that Dey's non-contract customers receive incentives that reduce their cost for Dey's products below the invoiced price. No further reply is required.


23.     The majority of Dey's sales are made to various contract customers who buy at prices below WAC, and only "some" purchase DEY products from wholesalers without the benefit of a

contract.  Deposition of Russell Johnston dated 12/11/08 (Johnston 12/11/08 Dep.") (Exhibit O) at 456:5-457:7.

Dey's Response to Statement No. 23:

Dey disputes Plaintiffs' SOF ¶ 23 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court.  Dey further disputes Plaintiffs' SOF ¶ 23 because it mischaracterizes the testimony of Russell Johnston. Mr. Johnston did not testify that the majority of Dey's sales are to contract customers at prices below WAC:

> Q. …. You earlier testified about contract prices, contract prices with Cardinal –
>
> A. Uh-huh.
>
> Q. -- and contract prices with McKesson, do you recall that?
>
> A. Again, the contracts for their sales out.
>
> Q. Yes. Those are products that the wholesaler acquires from Dey and then turns around and sells them to customers, right?
>
> A. And those contracts are used for the subsequent sale to their customers and then the subsequent chargeback, yes.
>
> Q. And the net price that the wholesaler pays for those drugs after chargebacks is almost always less than WAC, correct?
>
> A. The wholesaler buys a lot of products and only a certain portion would be going to these wholesale source contracts. It's my knowledge the majority of them go to non-source customers, non-source contracts. And, in fact, in some cases no contracts at all.

Reid Decl., Ex. L (Johnston 12/11/08 Dep.), at 456:5-457:7.

**PLAINTIFFS' REPLY:**

The cited evidence speaks directly to the fact that Dey only has "some" customers who do not purchase from the wholesaler on contracts which reduce their cost for Dey's product below the invoice price.  Johnstone is quoted immediately above, "It's my knowledge the

majority of them go to non-source customers, non-source contracts. And, in fact, in some cases no contracts at all."  The majority go to contracts and only "some" are non-contract sales.  It stands to reason that contracts reduce the price below the WAC, because if the customer is willing to buy at WAC, no contract would be required.  The Statement is not seriously disputed. No further reply is required.


**24.**     Dey knew of the OIG Guidelines. *See* Deposition of Dey, L.P. and Dey, Inc. 30(b)(6) (Pamela Marrs) dated 10/2/08 ("Dey 30(b)(6)(Marrs) 10/02/08 Dep.") (Exhibit P) at 658:14-660:1.

Dey's Response to Statement No. 24:

Dey does not dispute Plaintiffs' SOF ¶ 24 except avers that Ms. Marrs's testimony was as follows:

> Q. Ms. Marrs, I've handed you what has been marked as Exhibit 39, which is a federal register notice dated May 5, 2003. And it's issued -- it was issued by the office of inspector general of the Department of Health and Human Services, and it's entitled "OIG Program Compliance Guidance For Pharmaceutical Manufacturers." Have you ever seen this publication before?
>
> A. I don't know if I've seen it in this form. I've seen it or excerpts from it. I don't recall that it looked exactly like this.
>
> Q. Okay. And do you understand that this is a notice issued by the office of inspector general of the Department of Health and Human Services setting forth guidelines for a compliance program for pharmaceutical manufacturers?
> A. I do understand that it was a guideline issued. Yes.
>
> Q. When did you first become aware of this guidance document?
>
> A. I couldn't specifically tell you. I'm sure it was in 2003, but I don't know the specific date.
>
> Q. It was brought to your attention sometime after it was published, I take it?

>A. Well -- I don't know. If it was general knowledge that one was
>coming out, maybe I knew before. I just don't remember.

Reid Decl., Ex. X (Deposition of Dey's 30(b)(6) designee, Pamela Marrs, dated 10/2/08 ("Dey 10/2/08 Dep.")), at 658:14-660:1. Dey does dispute the inclusion of Plaintiffs' SOF ¶ 24 because it does not relate specifically to any of the drugs at issue and because it is immaterial to the issues before the Court.

**PLAINTIFFS' REPLY:**

The parties agree that Dey knew of the OIG guidelines.  The remainder of Dey's response is irrelevant and disputed.  No further reply  is required.

25.     At all times, from 1997 to 2005, Dey has calculated on a quarterly basis the average manufacturer's price ("AMP") for all its products and reported it as required by the federal rebate statute. *See* Dey 30(b)(6) (Marrs) 5/15/08 Dep. (Exhibit B) at 168:10-169.

>Dey's Response to Statement No. 25:
>Dey does not dispute Plaintiffs' SOF ¶ 25.

**PLAINTIFFS' REPLY:**

The Statement is undisputed.  No reply is required.

**PLAINTIFFS' RESPONSE TO DEFENDANT'S ADDITIONAL STATEMENTS OF UNDISPUTED MATERIAL FACTS**

26.     Throughout the relevant time period, Dey has been a party to a rebate agreement with the Secretary of the Department of Health and Human Services on behalf of HHS and the states, including the State of New York, pursuant to 42 U.S.C. §1396r-8.  *See* Reid Decl., Ex. B (Dey Rebate Agreement); Reid Decl., Ex. Y (Deposition of Bruce Vladeck, dated 5/4/07 ("Vladeck 5/4/07 Dep.")), at 241; 7-21; Reid Decl., Ex. Y (Deposition of Bruce Vladeck, dated 5/4/07 ("Vladeck 5/4/07 Dep.")), at 615:11-18.  The Rebate Agreement requires Dey to calculate and report to CMS AMPs for all its products, including the Dey Generics.  Reid Decl., Ex. B (Dey Rebate Agreement), at §I(a) (Enclosure A).  Throughout the relevant time period, Dey calculated and reported AMPs for the Dey Generics to CMS.  Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 168:10-15.  CMS used the AMPs reported by Dey to calculate URAs, which it in turn reported to the states, including New York.  Reid Decl., Ex. B (Dey Rebate Agreement), at 5;  Revised First Amended Consolidated Complaint, ¶ 129.  For multiple-source non-innovator drugs, the URA is 11% of the AMP.  *See* 42 U.S.C. 1396r-8(c)(3)(A-B); Reid Decl., Ex. B (Dey Rebate

Agreement), at 3.  New York invoices Dey for rebates based on the URAs it receives from CMS.  *See* Reid Decl., Ex. B (Dey Rebate Agreement), at 5; 42 U.S.C. 1396r-8(b)(2).

**Plaintiffs' Response:**

Plaintiffs do not dispute Statement No. 26.

27.     Throughout the relevant time period, Dey has been a party to a Manufacturer Drug Rebate Agreement entered into between Dey Laboratories Inc. and the New York State Elderly Insurance Coverage Program ("EPIC") on January 13, 1993.  Pursuant to the EPIC Rebate Agreement Dey agreed to provide New York's EPIC program with both AMP data and "best price."  Best Price, as defined by the EPIC Rebate Agreement, means "the lowest price at which the manufacturer sells the Covered Outpatient Drug to any purchaser in the United States in any pricing structure. . . Best price *includes prices to wholesalers, retailers,* nonprofit entities, or governmental entities. . . The best prices *shall be inclusive of cash discounts, free goods, volume discounts, and rebates. . .*" Reid Decl., Ex. aa (Rebate Agreement between Dey and New York EPIC Program, dated January 13, 1993, DEY-LABS-0356210-240 ("EPIC Rebate Agreement")), at I. (a) (emphasis added).

**Plaintiffs' Response:**

Plaintiffs dispute the implication of Statement No. 27 that Dey's provision of AMP or Best Price to EPIC is relevant or material to any matter at issue on the present motion.  By its very terms, the contract referenced by Dey contains a confidentiality provision which prevents NY Medicaid from obtaining or using the information for reimbursement purposes.  Furthermore, NY Medicaid is prohibited by statute, regulation, the federal Medicaid Rebate agreement, and CMS policy from utilizing AMP or Best Price for the purpose of determining or setting drug reimbursement.  Plaintiffs do not dispute the Statement otherwise.

28.     Albuterol Solution is a liquid unit dose solution that is administered via a nebulizer.  Dey's Albuterol Solution was first approved in 1992.  *See* Reid Decl., Ex. Bb (application number and date of entry for Dey's Albuterol Solution).  Dey launched its Albuterol Solution in March 1992.  Reid Decl., Ex. D (Dey 5/15/08 Dep.) at 169:14-20.

**Plaintiffs' Response:**

Undisputed.

29.     Albuterol Inhaler is a metered dose inhaler product.  Dey launched its Albuterol Inhaler in November 1996.  Reid Decl., Ex. D (Dey 5/15/08 Dep.), at 177:10-178:17, Exhibit 13 to Dey 5/15/08 Dep.

**Plaintiffs' Response:**

Undisputed.

30.     The government, through the Department of Veterans Affairs and the Department of Defense, negotiates Federal Supply Schedule ("FSS") prices for federal purchases of pharmaceuticals.  Reid Decl., Ex. Cc (United States General Accounting Office, Report to Congressional Requesters, "DOD AND VA PHARMACY: Progress and Remaining Challenges in Jointly Buying and Mailing Out Drugs," may 2001, GAO-01-588), at 8-10.  The FSS contains prices at which federal buyers are able to purchase pharmaceuticals.  FSS prices for generic drugs are negotiated based on contract price and term information for most favoured customers, which is requested from and provided by Dey.  *See id.*

**Plaintiffs' Response:**

Plaintiffs dispute Statement No. 30 to the extent that it implies that prices at which government entities may take title and possession of drugs on a negotiated basis are relevant to a program such as Medicaid, which must estimate the price at which pharmacy providers may purchase drugs for delivery to beneficiaries and then reimburse those pharmacies for their cost to acquire the drug ingredient.  Plaintiffs do not otherwise dispute the Statement.

31.     FSS prices are lower than the published prices alleged by Plaintiffs in their Exhibit A to SOF.  *See id.; U.S.* Department of Veterans Affairs website, *available at* http://www.pbm.va.gov/DrugPharmaceuticalPrices.aspx ("VA Website").  The FSS prices are not confidential and recent prices are reported by the US Department of Veterans Affairs on their website.  *See* VA Website.  FSS prices are therefore known or knowable to New York, *See id.*

**Plaintiffs' Response:**

Plaintiffs dispute Statement No. 31 to the extent that it implies that prices at which government entities may take title and possession of drugs on a negotiated basis are relevant to a program such as Medicaid, which must estimate the price at which pharmacy providers may

purchase drugs for delivery to beneficiaries and then reimburse those pharmacies for their cost to

acquire the drug ingredient.  Plaintiffs do not otherwise dispute the Statement.


Dated: June 30 , 2009                      Respectfully submitted,

                                           **KIRBY McINERNEY, LLP**
                                           825 Third Avenue
                                           New York, New York 10022
                                           (212) 371-6600

                                           /s/ Joanne M. Cicala_____
                              By:          Joanne M. Cicala
                                           James P. Carroll Jr.
                                           Jocelyn Normand
                                           Kathryn Bale Allen

                                           *Counsel for the City of New York and New York*
                                           *Counties in MDL 1456 except Nassau and Orange*

                                           Ross B. Brooks, Esq.
                                           **MILBERG LLP**
                                           One Pennsylvania Plaza
                                           New York, NY 10119
                                           (212) 594-5300

                                           *Special Counsel for the County of Nassau*

                                           Theresa A. Vitello, Esq.
                                           **LEVY PHILLIPS &**
                                           **KONIGSBERG, LLP**
                                           800 Third Ave.
                                           New York, NY 10022
                                           (212) 605-6205

                                           *Counsel for the County of Orange*

## **CERTIFICATE OF SERVICE**

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO DEY L.P. AND DEY, INC., to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.  The confidential exhibits to the foregoing have been served electronically directly to counsel for Dey L.P. and Dey, Inc.

Dated:  May 15, 2009

_____/s/_____
James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600
