# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) )  MDL NO. 1456 )  Civil Action No. 01-12257-PBS )   Subcategory Case No: 03-10643-PBS )  |
| THIS DOCUMENT RELATES TO: | )  )  Judge Patti B. Saris )  |
| *The City of New York, et al.* | )  )  |
| *v.* | )  |
| *Abbott Laboratories, et al.* | )  )  |

## PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO TEVA PHARMACEUTICALS USA, INC.

Pursuant to Rule 56.1 of the Local Rules of this Court, plaintiffs hereby submit this Reply Local Rule 56.1 Statement of Undisputed Material Facts As to Teva.

## I.     TEVA SPECIFIC FACTS

**1.     The Teva drugs and NDCs that have been examined in connection with this motion are set forth in Exhibit A hereto.  This exhibit also sets forth Teva's Published AWPs and WACs for these Drugs and NDCs, any operative Federal Upper Limit ("FUL") and Teva's AMPs.  The exhibit notes which NDCs were associated with package sizes that set the FUL.**

<u>Teva's Response to Alleged Fact No. 1</u>:  Disputed.  Teva does not dispute that Exhibit A to Plaintiffs' Teva-Specific Statement purports to (1) list the Teva drugs and NDCs that Plaintiffs have examined in connection with their motion, (2) set forth Teva's published AWPs and WACs for these drugs and NDCs, any operative FUL, and Teva's AMPs, and (3) note which NDCs are associated with the package sizes that set the FUL.  Teva disputes that Plaintiffs' Exhibit is an accurate and/or complete portrayal of the AWP and WAC prices, the operative FULs, and AMPs or these Teva drugs and NDCs for any given time period.  Teva further disputes that Plaintiffs' Exhibit accurately reflects or updates the prices for these Teva drugs and NDCs and/or the dates that they become effective.  Further, Teva objects to Alleged Fact No. 1 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006).

Moreover, Teva objects to Alleged Fact No. 1 insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

**PLAINTIFFS' REPLY TO STATEMENT #1:**

Teva's dispute as to the data in Exhibit A not being properly supported by evidence in the record is baseless.  Plaintiffs properly cited Teva as the source of the Teva AMP data and the First Databank NDDF data file (Alabama Production, FDB-AWP 030785 – 030795) as the source of all other data (*see* Exhibit A at 12), which is the same source cited by Teva's expert Dr. Addanki.  *See* Affidavit of Dr. Sumanth Addanki dated May 15, 2009 [Dkt# 6056] at Exhibit 2 (identifying "First DataBank (Alabama Production) Data and NDDF (National Drug Data File)™ Documentation Manual (Rev. April 2000)" as a Data source).  *See also* Reply Affidavit of Joanne M. Cicala, sworn to June 30, 2009 and submitted in further support of plaintiffs' motion for partial summary judgment at ¶2, which is incorporated herein.

Teva disputes that Plaintiffs' Exhibit is accurate and/or complete but offers no evidence in support as required by Rule 56.1.  The remainder of Teva's response is likewise baseless and unsubstantiated.  No further reply is required.

**2.     The specific Teva drugs at issue are:  Clonazepam .5mg Tablet; Enalapril Maleate 20mg Tablet; Metroprolol 100mg Tablet and Ranitidine 150mg Tablet.**

Teva's Response to Alleged Fact No. 2:  Teva does not dispute that Teva's Clonazepam 0.5mg tablet, Enalapril Maleate 20mg tablet, Metroprolol 100mg tablet, and Ranitidine 150mg tablet are drugs at issue in Plaintiffs' Motion for Partial Summary Judgment.  However, Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.

**PLAINTIFFS' REPLY TO STATEMENT #2:**

No further reply is required.

**3.     Teva has entered into and executed the federal Medicaid rebate agreement pursuant to 42 U.S.C. § 1396r-8.  *See* Answer of Teva Pharmaceuticals USA, Inc.'s and**

**Sicor Inc.'s Answer and Affirmative Defenses to Revised Amended Consolidated Complaint ("Teva Answer") [Dkt #4823] at ¶132.**

> Teva's Response to Alleged Fact No. 3:   Teva does not dispute that Teva Pharmaceuticals USA, Inc. has entered into and executed a Medicaid Rebate Agreement with the Secretary of Health and Human Services on behalf of all States.   However, Teva states that this fact is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

**PLAINTIFFS' REPLY TO STATEMENT #3:**

The parties agree that Teva executed the Medicaid Rebate Agreement. This fact is material because Teva's execution of the agreement is among the bases for Teva's obligations to abide by Medicaid's legal requirements, standards and procedures. *See Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) ("*Mylan*")(citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 63-65, (1984)) at *25. No further reply is required.

**4.      Teva participates voluntarily in the state Medicaid programs, including the New York State Medicaid Program.   *See* Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(John Wodarczyk) dated 10/10/06 ("Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep.") (Exhibit B) at 20:19-21:11.**

> Teva's Response to Alleged Fact No. 4:   Teva does not dispute Alleged Fact No. 4. However, Teva states that this fact is immaterial to Plaintiffs' Motion for Partial Summary Judgment.

**PLAINTIFFS' REPLY TO STATEMENT #4:**

Teva's response that this Statement is not material is incorrect.  *See* Plaintiffs' Reply to Statement #3.   No further reply is required.

**5.      Teva knew that eligibility for reimbursement by third party payors like Medicaid was an important issue for its customers as the reimbursement determines revenue for its customers.   *See* Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(John Denman) dated 4/16/08 ("Teva 30(b)(6)(Denman) 4/16/08 Dep.") (Exhibit C) at 34:9-37:16, 192:19-193:21.**

> Teva's Response to Alleged Fact No. 5:  Disputed.  Teva disputes that it "knew that eligibility for reimbursement by third party payors like Medicaid was an important issue for its customers."   Teva also disputes that reimbursement is determinative of its customers' overall revenue.  Plaintiffs have not provided any evidentiary basis for these

assertions, as is required by Local Rule 56.1.   *See* O'Brien, 440 F. Supp. 2d at 5 n.1.
Further, the testimony cited by Plaintiffs does not support their assertions.  Rather, in the
cited testimony, Mr. Denman testified only that reimbursement was "relevant" to Teva's
customers, and that the amount of reimbursement to Teva's customers determines their
revenue for "certain products."  Deposition of John Denman, Apr. 16, 2008 ("4/16/08
Denman Dep.") at 193:12-21 (Ex. 1).  Further, the purported "important[ce]" of Medicaid
reimbursement to Teva's customers is immaterial to Plaintiffs' motion.  Finally, Teva
objects to Alleged Fact No. 5 on the grounds that Plaintiffs fail, contrary to the
requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible
evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving
party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d
at 5 n.1 (D. Mass. 2006).  Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it
lacks adequate foundation.  *See* Fed. R. Evid. 602.

**PLAINTIFFS' REPLY TO STATEMENT #5:**

Teva disputes the Statement as not being supported by evidence.  Teva's dispute is

baseless.  Plaintiffs stand by their Statement and the cited record evidence.  Mr. Denman's

testimony speaks for itself:

> Q.      Is it fair to say that the -- the
> amount of the reimbursement from the third party
> is an essential element for Wal-Mart to know and
> to understand its profit for dispensing any given
> drug?
> A.      The primary, uhm, reason that any
> pharmacist dispenses medication and understands
> the whole practice is to get medication to sick
> patients and to improve their quality of life,
> and, uhm, generics is a great low-cost way to do
> that.
> Uhm, as a business, Wal-Mart absolutely
> understands the entire process, prescription-
> filling process and their interaction and the
> involvement of third-party payors, and PBMs.
> Again, anyone -- anyone involved in pharmacy from
> Main Street Pharmacy, the little pharmacist that
> owns one store to other chain pharmacies and
> hospital pharmacies, anyone involved with
> pharmacies understands reimbursement, understands
> the different types of reimbursement that, uhm,
> insurers choose to use contractually.  Uhm, so
> everyone understands it and -- and -- and works
> with the system.

Teva 30(b)(6)(Denman) 4/16/08 Dep.") (Exhibit C) at 35:16-37:16

Responding further, Teva's response that the Statement is not material is incorrect. Teva's knowledge of the importance of Medicaid reimbursement and reimbursement prices (AWPs/WACs/FULs) is material as it relates to actual prices charged by Teva supports plaintiffs' position that Teva's reporting and control of its false AWPs and WACs was purposeful, intentional and knowing.  No further reply is required.

**6.     Teva knew that state Medicaid agencies reimbursed based on WAC, AWP and FUL (or state MAC lists) for Teva drugs.  *See* Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(John Wodarczyk) dated 8/23/07 ("Teva 30(b)(6)(Wodarczyk 8/23/07 Dep.") (Exhibit D) at 92:7-17; Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(Paul Krauthauser) dated 1/29/08 ("Teva 30(b)(6)(Krauthauser) 1/29/08 Dep.") (Exhibit E) at 77:6-10, 103:21-104:8; Teva 30(b)(6)(Denman) 4/16/08 (Dep. (Exhibit C) at 34:9-35:2, 152:14-21.**

> Teva's Response to Alleged Fact No. 6:  Disputed.  As an initial matter, Teva disputes Alleged Fact No. 6 to the extent it permits an inference that Teva possessed any more or less awareness of reimbursement practices than that which was generally available public knowledge based on the statutory scheme for reimbursement.  To the extent Alleged Fact No. 6 purports to suggest that the reason Teva reported pricing information was so that pharmacists could be paid by third party payors, Teva objects.  Taken as a whole, the deposition testimony of Teva's witnesses is directly to the contrary, explicitly explaining that Teva was required to report "a number of characteristics along with AWP and a WAC" in order to be listed as a generic by First DataBank.  *See, e.g.,* Deposition of Richard Foster, Feb. 20, 2008 ("2/20/08 Foster Dep.") at 74 (Ex. 2); Deposition of Paul Krauthauser, Jan. 29, 2008 ("1/29/08 Krauthauser Dep.") at 64-65 (Ex.3).
>
> Furthermore, Teva objects to Alleged Fact No. 6 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* Deposition of Sue Gaston, March ("3/19/08 Gaston Dep.") at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP,* 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005)  (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva also disputes Alleged Fact No. 6 to the extent it is not properly supported by evidence in the record.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  Mr. Wodarczyk, Mr. Krauthauser, and Mr. Denman testified only that Teva understood that AWP, WAC, FUL, and MAC were used by "third party payors and government programs" as a basis for reimbursement to pharmacies.  *See* Deposition of John Wodarczyk, Aug. 23, 2007 ("8/23/07 Wodarczyk Dep.") at 92:8-17 (Ex. 5); 1/29/08 Krauthauser Dep. at 77:6-10, 103:21-104:8 (Ex. 3); 4/16/08 Denman Dep. at 34:9-35:2 (Ex. 1).  Plaintiffs have not cited any evidence concerning Teva's knowledge that state Medicaid agencies, and New York's Medicaid agency in particular, reimbursed based on AWP, WAC, and FUL (or state MAC lists).

## PLAINTIFFS' REPLY TO STATEMENT #6:

Teva does not dispute that it knew that WAC, AWP and FUL (or state MAC lists) were used for Medicaid reimbursement purposes.  Ivax disputes only the materiality of the Statement and an alleged inference.

Teva cannot reasonably dispute that it knew state Medicaid agencies, including New York Medicaid, reimbursed based on WAC, AWP and FUL (or state MAC lists) for Teva drugs.  Teva's dispute is baseless, frivolous and not made in good faith.  As a matter of law, having entered into the rebate agreements, which Teva admits (*see* Plaintiffs' Reply to Statement #3) and voluntarily participating in the New York Medicaid program (*see* Plaintiffs' Reply to Statement #4), Teva was required to familiarize itself with the legal requirements, standards and procedures of the Medicaid programs, including the reimbursement formulas.  *See Mylan*, 2008 WL 5650859 (D.Mass) at *25 (citing *Heckler v. Community Health Servs.*, 467 U.S. 51, 63-65, (1984)).

Responding further, Teva's dispute that the Statement permits an inference that "Teva possessed any more or less awareness of reimbursement practices than that which was generally available public knowledge based on the statutory scheme for reimbursement" is also baseless.  New York's reimbursement scheme is statutorily defined and publically available.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  In setting the FUL, CMS considered the published prices from First Databank, Red Book and Medi-Span that were presented in the FULs printouts.  *See* Gaston Decl. at ¶3 (statement of general practice).  This included AWPs, WACs and Direct Prices.  *See id*. at Exhibits A & D (FULs system printouts showing AWP prices).  Defendants admit that the published prices presented in the FULs printouts included AWPs.  *See* Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of "Undisputed" Facts Applicable To All Defendants and Statement of Additional Undisputed Material Facts [Dkt#:6117] ("Defs. Common Response") at ¶9.

**7.      Teva knew that the FUL was used by state Medicaid agencies and set based on published prices.  *See* Deposition of Eugene Cioschi 2/12/08 Dep. ("Cioschi 2/12/08 Dep.") (Exhibit F) at 160:2-17.**

> Teva's Response to Alleged Fact No. 7:  Disputed.  Teva disputes Alleged Fact No. 7 to the extent it is not properly supported by evidence in the record.  Further, Teva disputes that the Centers for Medicaid and Medicare Services ("CMS") did in fact set FULs based on published prices and according to federal regulatory requirements, and answers that the undisputed record shows that CMS very often chose to disregard these requirements when setting FULs.  *See generally* Affidavit of Summanth Addanki, dated May 15, 2009; see also 42 C.F.R. § 447.332.

**PLAINTIFFS' REPLY TO STATEMENT #7:**

Teva has elsewhere admitted that published prices are used in setting the FUL.  *See* Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of "Undisputed" Facts Applicable To All Defendants and Statement of Additional Undisputed Material Facts [Dkt#:6117] ("Defs. Common Response") at ¶9.  Teva's dispute to this part of the statement is therefore baseless.  Teva also cannot dispute that it knew New York Medicaid used the FUL.  In response to Statement #6 Teva admitted it had generally available public knowledge about New York's

Medicaid reimbursement statute.  The reimbursement statute expressly provides that New York

Medicaid reimburses at the FUL when a FUL is in place.

***Teva Set and Reported Its AWPs and WACs***

8.     Teva sets one WAC and one AWP or SWP for each of its products.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 25:1-4; *see also Commonwealth of Mass. v. Mylan*, 2008 WL 5650859 (D.Mass) at *7.  Teva's AWP and SWP are interchangeable.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 49:2-9.

> Teva's Response to Alleged Fact No. 8:  Disputed in part.  Teva does not dispute that it sets one WAC for each of its products.  Teva disputes Plaintiffs' Alleged Fact No. 8 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.   In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.   *See* Deposition of Patricia Kay Morgan, Nov. 30, 2007 ("11/30/07 Morgan Dep.") at 33, 149 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of  a variety of issues  (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  See 2/20/08 Foster Dep. at 182-83 (Ex. 2).
>
> Teva disputes the second sentence of Alleged Fact No. 8 to the extent the term "interchangeable" is vague and ambiguous.  To the extent Plaintiffs contend that AWP, like SWP, is a "suggested" or reference price, Teva does not dispute such assertion.  However, Teva objects to Alleged Fact No. 8 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

**PLAINTIFFS' REPLY TO STATEMENT #8:**

The parties agree that Teva sets one WAC for each of its products.

Teva's argument that FDB, rather than Teva, determined how Teva's AWPs were set is

belied by the cited record evidence (*see* Plaintiffs' Replies to Statement #17, #18 and #19 below, which are incorporated herein), Teva's own admissions (*see* Teva's response to Statement # 9, which is incorporated herein) and contrary to the rulings of the Court (*see* below).

Responding further, plaintiffs dispute and object to the use and citation of the 11/30/07 Deposition of Patricia Kay Morgan.  The deposition was noticed in the *Commonwealth of Massachusetts v. Mylan* case, which is neither the NY Counties case nor part of MDL 1456. Moreover, the deposition was neither noticed nor cross-noticed in the New York Counties case nor any other case in MDL 1456.  Thus, the NY County plaintiffs had no opportunity to examine Ms. Morgan in connection with her November 30, 2007 testimony.  Nor has there been any agreement between the parties that the 11/30/07 Morgan transcript could be used in this case. The 11/30/07 transcript therefore is inadmissible hearsay that cannot be relied upon properly in the context of a Rule 56 motion. *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).  Moreover, plaintiffs object to the Statement insofar it lacks foundation. *See* Fed.R.Evid. 602.  The exclusion of this improper transcript is all the more appropriate given that Ms. Morgan was deposed in the instant case for three full days (January 11 & 12, 2005 and August 27, 2007) and defendants certainly could have elicited the favored testimony during that time. They did not.  Last, it is indisputable that the Court has conclusively addressed First Databanks' role in these matters and has consistently found (including in *Mass. v. Mylan*, the venue case of the improper Morgan testimony), that defendants provide and control their published AWPs and WACs.  *See Mylan*, 2008 WL 5650859 (D.Mass) at *4 ("The defendants, like all manufacturers, supply their AWPs and WACs to third party publishers which publish pricing lists organized by drug. [...] Some defendants did not report WACs to FDB for certain

drugs; FDB, in turn, would not publish a WAC for that drug."); *see also In re Pharm Indus Average Wholesale Price Litig.* 252 F.R.D. 83 (D.Mass 2008); *In re Pharm Indus Average Wholesale Price Litig.* 478 F Supp. 2d 164, 170 (D Mass 2007); *see also Inola Drug, Inc. v. Express Scripts, Inc.*, 2009 WL 801838 (N.D.Okla., March 25, 2009) at *1 (recognizing that manufacturers control AWPs and pricing services like First Databank, Medi-Span and Redbook publish them).

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect. *See* Plaintiffs' Reply to Statement #6, which is incorporated herein. The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition. No further response is required.

**9.     At all times, from 1997 to 2005, Teva's general practice was to set the AWP or SWP for its drugs at 10% of the brand AWP when it was the first to introduce the generic drug.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 106:8-15; Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 70:15-73:2, 135:14-18.  When Teva was not the first to introduce the drug, then Teva would analyze the AWPs of the competition and if the competition was not at 10% of the brand then Teva would probably match the competition.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 79:11-80:11.**

Teva's Response to Alleged Fact No. 9:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 9 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment. CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP  is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Further, with respect to the first sentence of Alleged Fact No. 9, Teva disputes that its "general practice"—as the first manufacturer to introduce a generic drug—"was to set the AWP or SWP for its drugs at 10% of the brand AWP" (i.e., 90 percent below the brand AWP).  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  Mr. Denman and Mr. Krauthauser testified that when Teva was the first manufacturer to introduce a generic drug, Teva's

"general practice" was to set its AWP at 10 percent below the brand AWP. 4/16/08 Denman Dep. at 72:12-20 (Ex. 1); 1/29/08 Krauthauser Dep. at 106:8-15 (Ex. 3).

With regard to the second sentence of Alleged Fact No. 9, Teva disputes that its practice—where it was not the first manufacturer to introduce a generic drug—was to "analyze the AWPs of the competition and if the competition was not at 10% of the brand [i.e., 90 percent below the brand AWP] then Teva would probably match the competition." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See* O'Brien, 440 F. Supp. 2d at 5 n.1. Mr. Denman testified that when Teva was not the first manufacturer to introduce a generic drug, Teva set its AWP at 10 percent below the brand AWP. 4/16/08 Denman Dep. at 72:21-73:2 (Ex. 1). However, if Teva's competitors were "at a particular point which was 10 percent at one time" but not at the time Teva entered the market, then Teva "would probably match that." 1/29/08 Krauthauser Dep. at 79:6-80:2 (Ex. 3).

Moreover, Teva disputes Plaintiffs' Alleged Fact No. 9 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database. See 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct?   A. That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct? A. That's correct.") (Ex.6); *id.* at 33:11-20 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6). In order for a product to be classified by First DataBank as a generic, Teva's SWP had to be at least 10 percent off the corresponding brand's AWP. *See* 1/29/08 Krauthauser Dep. at 72-73, 75 (Ex. 3).

Teva also disputes Plaintiffs' Alleged Fact No. 9 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established. In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding. *See* 11/30/07 Morgan Dep. at 33, 149 (Ex. 6). Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank. *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

## PLAINTIFFS' REPLY TO STATEMENT #9:

The parties agree that when Teva was the first manufacturer to introduce a generic drug,

Teva's "general practice" was to set its AWP at 10 percent below the brand AWP.

The parties agree that when Teva was not the first manufacturer to introduce a generic drug, Teva set its AWP at 10 percent below the brand AWP.

The parties agree that if Teva's competitors were at a particular point which was 10 percent at one time but not at the time Teva entered the market, then Teva would probably match that.

Teva's argument that FDB, rather than Teva, determined how Teva's AWPs were set and controlled is belied by the cited record evidence (*see* Plaintiffs' Replies to Statement #17, #18 and #19 below, which are incorporated herein), Teva's own admissions to this Statement and contrary to the rulings of the Court.  *See* Plaintiffs' Reply to Statement #8, which is incorporated herein.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein. The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition.  No further response is required.

**10.   Teva set the AWP or SWP for its drugs at 10% discount to the brand AWP to obtain the generic drug indicator and be deemed a generic.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 72:10-73:9.**

> Teva's Response to Alleged Fact No. 10:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 10 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion  for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; St. *Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Moreover, Teva disputes Alleged Fact No. 10 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *See* 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct? A. That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct?  A. That's correct.") (Ex. 6); *id.* at 33:11-20 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A. That's correct.") (Ex. 6).   In order for a product to be classified by First DataBank as a generic, Teva's SWP had to be at least 10 percent off the corresponding brand's AWP.  *See* 1/29/08 Krauthauser Dep. at 72-73, 75 (Ex. 3).

Teva also disputes Plaintiffs' Alleged Fact No. 10 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* 11/30/07 Morgan Dep. at 33, 149 (Ex. 6).  Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case  basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank.  *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

**PLAINTIFFS' REPLY TO STATEMENT #10:**

Plaintiffs stand by their Statement and the cited record evidence.  The testimony of Mr.

Krauthauser, as a designated Teva corporate witness, speaks for itself:

> A.      Whatever the brand product is for which we have a generic our policy would be to discount the brand AWP or SWP by 10 percent and that was the price point at which our products would be classified as a low cost alternative to the brand.
> Q.      Okay.
> And why was 10 percent selected?
> A.      I don't know what particular formula a price house uses, but for -- again, for reporting purposes for our product to be dispensed as a low cost generic I know that 10 percent would be the point at which it would be classified at those

> pricing compendias at a low cost generic.
>
> Q.      Is it fair, is it accurate to say that
> throughout the relevant time period TEVA
> understood that in order for its product to be
> classified by First DataBank and other price
> reporting services that its -- that the AWP price
> that it reported to the service had to be at
> least 10 percent below the brand AWP?
>
> A.      Yes.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 72:10-73:9.

Teva's argument that FDB, rather than Teva, determined how Teva's AWPs were set and controlled is belied by the cited record evidence (*see* Plaintiffs' Replies to Statement #17, #18 and #19 below, which are incorporated herein), Teva's own admissions (*see* Plaintiffs' Reply to Statement #9, which is incorporated herein) and contrary to the rulings of the Court (*see* Plaintiffs' Reply to Statement #8, which is incorporated herein).

Responding further, plaintiffs object to and dispute the use of the 11/30/07 Deposition of Kay Morgan. *See* Plaintiffs' Reply to Statement #8, which is incorporated herein.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect. *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition. No further response is required.

**11.     Teva admits that it would still have been deemed a generic if its AWP or SWP had been at a 15% or 20% discount to the brand AWP. *Id.* at 73:11-18.**

> Teva's Response to Alleged Fact No. 11: Disputed. As an initial matter, Teva objects to Alleged Fact No. 11 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion  for Partial Summary Judgment. CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not. Q. Can you think of any instance in which CMS based a FUL on the published AWP price? A. I can't think of a

situation where they did.") (Ex. 4).   Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; St. Paul Fire and Marine Ins. Co., LLP, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva also disputes Alleged Fact No. 11 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding.  *See* 11/30/07 Morgan Dep. at 33:1-20, 149:12-20 (Ex. 6).   Teva further disputes Plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank. *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

## PLAINTIFFS' REPLY TO STATEMENT #11:

Plaintiffs stand by their Statement and the cited record evidence.  The testimony of Mr. Krauthauser, as a designated Teva corporate witness, speaks for itself:

> Q. [...] If you reported a price that was 15 percent below the AWP, did TEVA understand that it would have been designated as a generic?
> A.      Yes.
> Q.      All right.
>         If you were 20 percent below, it would have been designated as a generic, right?
> A.      Yes.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 73:11-18.

Teva's argument that FDB, rather than Teva, determined how Teva's AWPs were set and controlled is belied by the cited record evidence (*see* Plaintiffs' Replies to Statement #17, #18 and #19 below, which are incorporated herein), Teva's own admissions (*see* Plaintiffs' Reply to Statement #9, which is incorporated herein) and contrary to the rulings of the Court (*see* Plaintiffs' Reply to Statement #8, which is incorporated herein).

Responding further, plaintiffs object to and dispute the use of the 11/30/07 Deposition of

Kay Morgan.  *See* Plaintiffs' Reply to Statement #8, which is incorporated herein.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein. The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition.  No further response is required.

**12.     Teva set its AWP as high as it could or at least at what the market would bear for its products depending on the competition.  *Id*. at 73:19-74:8.**

Teva's Response to Alleged Fact No. 12:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 12 insofar as it relies on, refers to, or otherwise mentions AWP, which has  no relevance or bearing on Plaintiffs' Motion  for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  See 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co., LLP,* 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Furthermore, Teva disputes that it "set its AWP as high as it could or at least at what the market would bear for its products depending on the competition."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1. Moreover, Teva disputes Alleged Fact No. 12 in that it incorrectly implies that manufacturers, and not First DataBank, are in control of populating the AWP field in the database.  *See* 11/30/07 Morgan Dep. at 33:1-5 ("Q. During the period when you were employed by First DataBank, the manufacturer did not decide whether First DataBank used the suggested AWP as its Blue Book AWP, correct? A. That's correct.") (Ex. 6); *id.* ("Q. During the time period when you were employed by First DataBank, manufacturers did not control the methodology used by First DataBank in populating its Blue Book AWP fields, correct?  A: That's correct.") (Ex. 6); *id.* at 33:6-10 ("Q. During the time period you were employed by First DataBank, manufacturers did not set the AWPs listed in First DataBank's Blue Book AWP fields, correct? . . . A: That's correct.") (Ex. 6).  In order for a product to be classified by First DataBank as a generic, Teva's SWP had to be at least 10 percent off the corresponding brand's AWP.  *See* 1/29/08 Krauthauser Dep. at 72-73, 75 (Ex. 3).

Teva also disputes Alleged Fact No. 12 insofar as it implies that it was the manufacturer, rather than First DataBank, that established how the AWPs of secondary and subsequent generic market entrants were established.  In particular, Teva disputes Plaintiffs' statement because the decisions regarding the setting of

AWP were guided primarily by the rules established by First DataBank—rules which predetermined the allowable price ranges to maintain a generic coding. *See* 11/30/07 Morgan Dep. at 33:1-20, 149:12-20 (Ex. 6). Teva further disputes plaintiffs' statement in that it overly simplifies the protocols established by First DataBank, as AWP was set on a case-by-case basis, after thorough consideration of a variety of issues (including supply and manufacturing capability), all of which existed within the heartland of the protocols established by First DataBank. *See* 2/20/08 Foster Dep. at 182-83 (Ex. 2).

**PLAINTIFFS' REPLY TO STATEMENT #12:**

Teva disputes the Statement as not being supported by evidence. Teva's dispute is baseless. Plaintiffs stand by their Statement and the cited record evidence. The testimony of Mr. Krauthauser, as a designated Teva corporate witness, speaks for itself:

> Q.      Now, why did TEVA pick 10 percent as a
> policy?
> A.      For any market that you're in the --
> well, first of all, 10 percent again was the
> trigger. As in any market, depending on the
> competition, TEVA would want to charge as much as
> it could or at least what the market could bare
> for its products. So, if that's the ceiling then
> everything would be below that.
>             So, you're basically limiting yourself
> to depending on what happens in a particular
> market with a number of competitors.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 73:19-74:8.

Teva's argument that FDB, rather than Teva, determined how Teva's AWPs were set and controlled is belied by the cited record evidence (*see* Plaintiffs' Replies to Statement #17, #18 and #19 below, which are incorporated herein), Teva's own admissions (*see* Plaintiffs' Reply to Statement #9, which is incorporated herein) and contrary to the rulings of the Court (*see* Plaintiffs' Reply to Statement #8, which is incorporated herein).

Responding further, plaintiffs object to and dispute the use of the 11/30/07 Deposition of Kay Morgan. *See* Plaintiffs' Reply to Statement #8, which is incorporated herein.

17

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein. The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition.  No further response is required.

**13.     If a competitor increased its AWP, Teva would respond by raising its own AWP so as not to disadvantage it customers in their reimbursement from third party payors.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 133:2-20.**

Teva's Response to Alleged Fact No. 13:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 13 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion  for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva further disputes Plaintiffs' statement that "[i]f a competitor increased its AWP, Teva would respond by raising its own AWP."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  14 Mr. Cioschi testified only that the question of whether Teva would raise its AWP was a "product by product situation."  Deposition of Eugene Cioschi, Feb. 12, 2008 ("2/12/08 Cioschi Dep.") at 133:2-12 (Ex. 7).  Teva also disputes Plaintiffs'  statement that "[i]f a competitor increased its AWP, Teva would respond by raising its own AWP so as not to disadvantage it customers in their reimbursement from third party payors," on the grounds that the cited deposition testimony pertains only to a drug not at issue in Plaintiffs' Motion for Partial Summary Judgment. See *id.* at 133 (Ex. 7).  Accordingly, Teva disputes that this statement is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva also disputes that it raised its AWPs "so as not to disadvantage its customers in their reimbursement from third party payors."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  Teva's longstanding corporate policy prohibits consideration of reimbursement in setting or changing its AWPs. Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over

competing drugs.") (Ex. 10).  Plaintiffs have not cited any evidence that indicates that Teva ever departed from this policy.

**PLAINTIFFS' REPLY TO STATEMENT #13:**

Teva disputes the Statement as not being supported by evidence.  Teva's dispute is baseless.  Plaintiffs stand by their Statement and the cited record evidence.  Mr. Krauthauser's testimony speaks for itself:

> Q. [...] Was it the policy at TEVA during the relevant time period to raise TEVA's AWP if one of your generic competitors raised their AWP?
> A.       I don't remember if it was policy, but there again this to me would say it's a product to product situation that would dictate what's the best for our customer based on what they're going to be paid by the third party.
>                So, again, here as this shows, it's a product to product situation. It's nothing that's -- something that's set in stone.
> Q.       And the reason to increase the AWP would be because the competitor had a higher AWP than TEVA?
>                MS. LEVY: Objection; calls for something. You may answer.
>                THE WITNESS: Yes, it's probably so that our customers are not disadvantaged when they're paid by the third parties.

Cioschi 2/12/08 Dep. (Exhibit F) at 133:2-20.

Responding further, Teva's response that the Statement is not material is incorrect. Teva's actions regarding the setting of AWPs for its drugs in the face of competition is material and supports plaintiffs' position that Teva's reporting and control of its false AWPs and WACs was purposeful, intentional and knowing.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

Plaintiffs object to and dispute the additional citations by Teva concerning any corporate policy prohibiting consideration of reimbursement in setting or changing its AWPs in sofar as it seeks to establish as fact that the policy was followed and trumps Teva's actual practices as established by the record evidence on this motion. The record evidence supporting the Statement shows that Teva's actual practice was contrary of any such "policy".

Responding further, plaintiffs do not maintain that Terazosin is a drug at issue on this motion, however, the record evidence showing that Teva raised its AWP to match the AWP of the competition and is material because establishes as fact that Teva's practice was other than its "policy". It cannot reasonably be disputed that a competitor raised its AWP and Teva responded by raising its own AWP so as not to disadvantage it customers in their reimbursement from third party payors in direct contradiction to Teva's stated "policy".

The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition. No further response is required.

**14.   At all times, from 1997 to 2005, at the time of launch of a new product Teva initially set the WAC for its generic drugs typically at 75% of the AWP or SWP.** *See* **Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 164:22-167:5; Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep.") (Exhibit D) at 94:5-14. When Teva was not the first to introduce the generic drug, then Teva would analyze the WACs of the competition and set its WAC comparably with the competition.** *Id.*

> Teva's Response to Alleged Fact No. 14: Disputed. As an initial matter, Teva disputes Plaintiffs' statement insofar as it inappropriately fails to take into account materially distinct scenarios in which varying factors have an effect on establishing an appropriate WAC. Specifically, Plaintiffs' statement misstates the situation when Teva is the sole generic on the market, because in such circumstances Teva's standard was to set the WAC for that exclusive generic product at 80 percent of the SWP/AWP of the corresponding branded product. *See* 2/20/08 Foster Dep. at 92 (Ex. 2). When there are multiple generic equivalents on the market at the same time, Teva did not use any predetermined percentage off the branded products' AWP for its WAC, because in those circumstances Teva's WACs could vary (based on numerous factors) in relation to a particular SWP/AWP. See *id.* at 206-07 (Ex. 2). Moreover, Teva disputes the alleged fact insofar as it disregards several factors Teva evaluates in

determining the appropriate level at which to set its WACs.   *See* 2/20/08 Foster Dep. at 207 (noting that in analyzing how to arrive at the appropriate WAC invoice price, he would assess "[h]ow many competitors are there, how low is my AWP cost, how low is my lower manufacturing costs, what are my discounts that I have to give off WAC so I can understand what those numbers would be.  Those would all factor into my calculation.") (Ex. 2).  Furthermore, Teva disputes that it always set its WAC at 75 percent of AWP, and Plaintiffs have not provided any evidentiary basis for this assertion.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.

## PLAINTIFFS' REPLY TO STATEMENT #14:

The parties agree that when Teva is the sole generic on the market, Teva's standard was to set the WAC for that exclusive generic product at 80% of the SWP/AWP of the corresponding branded product.  The parties agree that when there are multiple generic equivalents on the market at the same time, Teva did not use any predetermined percentage off the branded products' AWP for its WAC, because in those circumstances Teva's WACs could vary (based on numerous factors) in relation to a particular SWP/AWP. Responding further, Teva's dispute that the statement does not present every factor considered by Teva when setting its WAC is unnecessary.  The Statement, on its face, accurate describes the record evidence regarding what "typically" occurred.  Here is the testimony from Teva's corporate designee

> Q.      And during the relevant time period, what was the policy at TEVA with regard to establishing the WAC price with regard to new products at launch?
> A.      I'll start with the simplest example which would be a situation in which TEVA's exclusive, our policy would be to set our AWP or SWP at 10 percent below the brand AWP and then our WAC would typically be 75 percent of that AWP that we -- or SWP that we just established and that would be in a market with limited or no competition.
>
> If there are additional competitors at the time of the launch, what would typically do is try to obtain what their WAC pricing was and then based on where their WAC pricing was that we would set ours appropriately.

Q.      When you say appropriately, you mean comparably around the same level?

A.      Yes.

Q.      Going back to the situation where you're either the exclusive or limited volume of competition, why 75 percent of the AWP that you established?

A.      I think that higher than that -- well, I'm not sure. I think I've seen some instances where it's been 80 percent of AWP, but I'm not exactly sure why it's set at 75. It's something that has been done historically and that's what we do today.

Q.      And is it true, is it correct that throughout the relevant time period, '95 to 2003, that the general policy at TEVA was at launch in situations where you're exclusive or limited competition the WAC price would be established at 75 percent of whatever AWP price you set?

A.      Yes.

Q.      And that if there were several generic competitors at the time TEVA was launching, you would look at the WAC prices if you could find them, the WAC prices of the other competitors and TEVA's WAC would be set at a level at or about the same level? Is that accurate?

A.      Yes.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 164:22-166:21.

Q.      What was the policy or guideline at Teva with regard to setting WAC prices at launch of a new pharmaceutical?

A.      I believe the WAC is set at 25 percent of Teva's SWP?

Q.      All right. And prior to being a SWP, how was the WAC set?

A.      I believe it was the same practice, but that's more of a question for Paul Krauthauser tomorrow.

Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep.") (Exhibit D) at 94:5-14

**15.     Teva did not sell to small wholesalers at WAC.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep.") (Exhibit E) at 174:4-16.**

<u>Teva's Response to Alleged Fact No. 15</u>:  Disputed.  Teva disputes that it "did not sell to small wholesalers at WAC."  As an initial matter, Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1. Indeed, Mr. Krauthauser testified that "there are some wholesalers, small wholesalers that we have that don't buy at WAC. . . ."  1/29/08 Krauthauser Dep. at 174:9-16 (emphasis added) (Ex. 3).  Teva's WAC prices in many instances actually were the prices that Teva charged its   customers in the marketplace, and the prices at which Teva invoices its wholesalers.  *See* 8/23/07 Wodarczyk Dep. at 159:8-15 (explaining that "certain sales are made at WAC") (Ex. 5); 2/20/08 Foster Dep. at 90-91 ("The WAC price is what the wholesalers would essentially buy the product for.") (Ex. 2); *id.* at 91 ("Q.  [W]hen [the product] was shipped to a wholesaler [it] would be invoiced at the WAC price?  A.  As far as I recall, while I was at TEVA, yes. ") (Ex. 2).

**PLAINTIFFS' REPLY TO STATEMENT #15:**

The parties agree that there are some wholesalers, small wholesalers that "don't buy"

Teva products at WAC.

The remainder of Teva's dispute is disputed and irrelevant to the Statement.  No further

reply is required.

**16.     Teva knew that in the generic market place that its contract prices and WACs would go down over time and that generally AWPs would go unchanged over the same time period.  *See id.* at 177:18-178:20; Cioschi 2/12/08 Dep. (Exhibit F) at 61:1-62:4.**

<u>Teva's Response to Alleged Fact No. 16</u>:  Disputed.  As an initial matter, Teva states that it has literally hundreds of NDCs and therefore disputes Plaintiffs' attempt to characterize, based on this limited testimony, the movement of every single contract price for every single Teva pharmaceutical product in the whole of Teva's product line.   Teva disputes Alleged Fact No. 16 on the grounds that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence");  O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.   *See* Fed. R. Evid. 602.  Plaintiffs' Motion for Partial Summary Judgment concerns specific Teva NDCs, from a specific time frame, which had particularized movements in contract prices for varying (and drug-specific) reasons, including supply concerns, competitive reasons, and the like.   *See* 1/29/08 Krauthauser Dep. at 95-97, 182-83, 217-220 (Ex. 3).

Further, Teva disputes Alleged Fact No. 16 to the extent it is not properly supported by evidence in the record.   Plaintiffs have cited no evidentiary basis for the assertion that "Teva knew that in the generic market place that its contract

prices and WACs would go down over time and that generally AWPs would go unchanged over the same time period." *See* O'Brien, 440 F. Supp. 2d at 5 n.1. To the contrary, Mr. Krauthauser testified that, in a market with multiple competitors, "typically a contract price would tend to go down" and that "over time you may see a reduction in WAC."   1/29/08 Krauthauser Dep. at 177:18-178-20 (Ex. 3).  Teva disputes that this occurred in every case (or even in most cases), and Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  Similarly, Plaintiffs have failed to provide any evidentiary basis for the assertion that "AWPs would go unchanged over the same time period."  *See id.*

## PLAINTIFFS' REPLY TO STATEMENT #16:

Teva disputes the Statement as not being supported by evidence.  Teva's dispute is baseless.  The cited record evidence is testimony from Teva corporate designee.  It speaks for itself:

> Q. [...]  And is it also true that during the relevant time period, '95 to 2003, these three prices, AWP, WAC and contract price can move independent of each other?
> A.      With respect to TEVA's products or just TEVA's products, in other words, the fact that contract prices are going down doesn't necessarily mean that WAC and AWP are going down or vice versa the. For instance, moving independent -- in independent direction from each other.
>           I would -- if I had to characterize in a general sense your question, I would say that typically -- again, typically a contract price would tend to go down given that markets conditions are the same meaning there's a number of competitors and they're all vying for the same business that over time you may see a reduction in WAC. And that's probably the way I would characterize it.
> Q.      And generally AWP would remain the same?
> A.      Generally, I would say that they do. There may be instances in which they really -- I would say generally.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 177:18-178:20.

The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition.  No further response is required.

**17.    At all times, from 1997 to 2005, Teva provided the WAC and either an AWP or SWP for its generic drugs to the national pricing compendia – First DataBank, RedBook and Medi-Span.**  *See* **Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 57:4-19, 104:9-17, 178:22-179:11; Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep.") (Exhibit D) at 81:11-82:1; Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 74:8-75:19;** *see also Mylan***, 2008 WL 5650859 at \*7.**

> Teva's Response to Alleged Fact No. 17:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 17 insofar as it relies on,  refers to, or otherwise mentions AWP or SWP, which have no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs. *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva  disputes that AWP or SWP are material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d  at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).
>
> In addition, Teva disputes Plaintiffs' Statement insofar as it asserts that Teva "reported" any prices to First DataBank or any other entity.  Further, Teva disputes Alleged Fact No. 17 on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d 3, 5 n.1.  Teva disputes that it reported WACs to First DataBank, RedBook, and MediSpan "[a]t all times, from 1997 to 2005."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  Indeed, Mr. Denman testified that Teva provided WACs only to "some of the databases that requested it" and "did not always report WACs to all publishing compendia."  4/16/08 Denman Dep. at 74:8-75:19 (Ex. 1).

**PLAINTIFFS' REPLY TO STATEMENT #17:**

Teva response is obstructive and baseless.  Teva cannot reasonably dispute that it provided either an AWP or SWP for its generic drugs to the pricing compendia from 1997 to 2005.  The record evidence is that Teva's Corporate Designee testified as follows:

> Q. [...] And this would be classification by
> price reporting agencies?
>     A.     Correct.

Q.      And among the price reporting agencies are you familiar with something called First DataBank?

A.      Yes.

Q.      And that's an industry publication that reports pricing information relating to pharmaceuticals?

A.      Yes.

Q.      And throughout the relevant time period did TEVA report prices to First DataBank?

A.      Yes.

Q.      And during the relevant time period what prices did TEVA typically report to First DataBank?

A.      AWP or SWP, depending on whenever that switch occurred and WAC for our generic products.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 57:4-19

Q.      Mr. Marth continues: As wholesale practices change insurance begin discounting AWP to reflect these changes. It was TEVA's understanding that pricing compendia such as First DataBank, Medispan and Red Book published AWP for use by pharmacies and insurers.

And was that true throughout the relevant time period, 1995 to 2003?

A.      Yes.

*Id.* at 104:9-17.

Q.      During the relevant time period did TEVA report any of its reports to industry reporting services?

A.      Do you mean like a pricing compendia?

Q.      Yes.

A.      Yes.

Q.      What prices did it report during the relevant time period?

A.      SWP and WAC or AWP/SWP and WAC.

Q.      And that was true throughout the time period '95 to 2003?

A.      Yes.

*Id.* at 178:22-179:11.

> Q. [...] Teva reported AWPs or SWPs for every
> active NDC; correct?
>
> A.       To the best of my knowledge, yes,
> ma'am.
>
> Q.       Did Teva also report WACs for Teva NDCs
> between 1997 and 2005?
>
> A.       To some of the databases that requested
> it.  Uhm, WACs, again, would be a value that we -
> - we could provide.
>
> Q.       From your -- from your answer, it
> sounds as if Teva did not always report WACs to
> all publishing compendia; is that correct?
>
> A.       Again, to the best of my knowledge,
> that would be correct.
>
> Q.       What factors influenced whether Teva
> would report a WAC for a particular NDC to the
> publishing compendia?
>
> A.       It would be, again, at the request of
> the compendium.  If it was something they
> requested, it was something we would provide.
>
> Q.       Do you know why the compendium would
> sometimes request a WAC?
>
> A.       No, ma'am.
>
> Q.       Do you have any responsibility in your
> current position at Teva for the reporting of
> WACs to publishing compendia?
>
> A.       That function is under my current
> responsibility.  Do I do that myself?  No, but a
> member of my team or members of my team have that
> responsibility, yes, ma'am.
>
> Q.       Does Teva report WACs for its drugs to
> the publishing compendia today?
>
> A.       If the compendium requests the
> information, we -- we absolutely provide it.

Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 74:8-75:19.

Teva does not dispute that it provided WAC for its generic drugs to the pricing compendia from 1997 to 2003.  Teva's corporate designee testified that, for the period 2004 to 2005, Teva provided WACs when requested by the pricing compendia.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated

herein.

**18.    The SWPs and AWPs for Teva drugs were always the same.  *See* Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 135:4-6, 199:12-15.**

> Teva's Response to Alleged Fact No. 18:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 18 insofar as it relies on,  refers to, or otherwise mentions AWP or SWP, which have no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?   A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP or SWP are material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  Further, Teva disputes Alleged Fact No. 18 on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d 3, 5 n.1.

**PLAINTIFFS' REPLY TO STATEMENT #18:**

Plaintiffs admit that the citations referenced for this Statement were incorrect in that they presented the correct line number but wrong page of testimony.  Even with the typographical error, Teva cannot reasonably dispute that the SWPs and AWPs for Teva drugs were always the same.   The proper citation is Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 137:4-6, 200:12-15, which states:

> Q.      In your experience at Teva, has Teva
> SWP and the reported AWP ever been different?
> A.      Not to my knowledge.

Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 137:4-6

> Q.      And as you testified earlier, the SWPs
> and the AWPs were always the same for Teva
> anyway, right?
> A.      Correct.  Correct.

*Id*. at 200:12-15.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect. *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

**19.    Teva knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia like First Databank.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 110:17-111:2.  Teva was in communication with First Databank about its prices and received information from First Databank that would show Teva WACs, AWPs and SWPs for Teva drugs and Teva would verify if the information provided was correct.  *See* Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep. (Exhibit D) at 172:14-174:20; Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 227:12-229:15.  When Teva made a change to its published prices, Teva would confirm that First Databank received the price changes.  *Id*.**

Teva's Response to Alleged Fact No. 19:  Disputed.  Teva disputes Alleged Fact No. 19 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony.  In particular, Teva disputes Plaintiffs' statement insofar as it permits an inference that Teva actively "verified" the prices reported by First DataBank.  In fact, the testimony cited by Plaintiffs provides that Teva only intermittently observed First DataBank's benchmark pricing figures, and did so merely to ensure that there were no misunderstandings surrounding SWP levels.  *See* 2/12/08 Cioschi Dep. at 110-11 (Ex. 7).  Teva disputes that it "knew and controlled the AWPs and WACs for its drugs that were published by the national drug pricing compendia like First DataBank."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.

Teva disputes that it "received information from First DataBank that would show Teva WACs, AWPs and SWPs for Teva drugs" and would "verify if the information provided was correct."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See id.* Moreover, Teva disputes Plaintiffs' statement because it improperly seeks to establish an alleged fact (that First DataBank sent Teva a list of NDCs each year for verification purposes) on an inadequate evidentiary basis.  *See* Fed. R. Evid. 602.  Specifically, the deposition testimony cited does not support the proposition that First DataBank sent a list of prices to Teva for verification.  In fact, deposition testimony from Teva witnesses specifically provides the opposite; *viz.*, that Teva was unaware of any formal system of verification.  *See* 1/29/08 Krauthauser Dep. at 228 (Q. "[D]id Teva receive from First DataBank printouts of the information that Teva -- that First DataBank was publishing relating to Teva and ask Teva to verify the accuracy of the information?" A: "I'm not aware of that.")  (Ex. 3); 2/20/08 Foster Dep. at 145-46 (expressing a lack of knowledge of any such process of verification occurring on any regular basis) (Ex. 2). Indeed, Mr. Krauthauser testified that he was not aware of any situation in which Teva received printouts or "turnaround documents" from First DataBank that Teva used

to verify the accuracy of First DataBank's published AWPs or WACs for Teva's drugs.  1/29/08 Krauthauser Dep. at 228:1-15 (Ex. 3).  *See* also 8/23/07 Wodarczyk Dep. at 174:11-19 ("Q. In addition, are you aware as to whether or not the First DataBank would send information to the company and ask the company to respond and verify whether or not what First DataBank had was accurate?  A. I think First DataBank would send a receipt that they received the email, but that's about it. . . .") (Ex. 5).

Teva further disputes the alleged facts insofar as they misstate, mischaracterize and/or misconstrue the cited deposition testimony by suggesting that Teva employees contacted First DataBank to confirm price changes.  To this end, the deposition testimony of a Teva witness makes clear that Teva does not make subsequent efforts, following the initial notification of a price change, to contact First DataBank to confirm the receipt of price changes.  *See* 8/23/07 Wodarczyk Dep. at 174:11-19 (Ex. 5).  Rather, Teva may, on occasion, ask First DataBank to "verify with a particular company that they're, in fact, still marketing a product."  1/29/08 Krauthauser Dep. at 228-29 (Ex. 3).

To the extent Alleged Fact No. 19 concerns AWP, Teva disputes that Alleged Fact No. 19 is material to Plaintiffs' motion because CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).

**PLAINTIFFS' REPLY TO STATEMENT #19:**

Teva disputes the Statement as not being supported by evidence and mischaracterizing the evidence.  Plaintiffs stand by their Statement and the cited record evidence from the Teva corporate witnesses, which speaks for itself:

> Q.    At TEVA during the relevant time period
> was there any practice or procedure to monitor the
> reported prices of the competing products relating
> to TEVA's product line to look for any changes in
> AWPs or WACs?
> A.    Yes, there was -- my recollection is when
> you occasionally look at it if were there any
> issues where the SWPs were that I recall.

Cioschi 2/12/08 Dep. (Exhibit F) at 110:17-111:2.

> Q.    What use was made by the company of the
> information provided by First DataBank?
> A.    I know they checked to see if the
> information listed is correct, but it's more

of a question for Paul. I have never really
had a use for it.

        Q.     Okay. Other than the marketing
department, do you know of any other
department in the company making use of
information provided by First DataBank?

        A.     Not that I know of.

        Q.     Okay. I think you said that you were
aware that people I assume in the marketing
department would actually check the data
received from First DataBank and make sure
that they had accurately reported the
information that the company had sent them; is
that right?

        A.     That's what I believe, yes.

Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep. (Exhibit D) at 173:14-174:10.

        Q. [...] With regard to communications by TEVA
during the relevant time period with First
DataBank, I think you've told us that it was
TEVA's policy to communicate its AWP and its WAC
at launch; is that right?

        A.     Yes.

        Q.     And to the extent that TEVA changed its
AWP or WAC it would communicate those changes to
First DataBank?

        A.     In the same fashion, yes.

        Q.     Okay.
And from time to time, the relevant
time period, did TEVA receive from First DataBank
printouts of the information that TEVA -- that
First DataBank was publishing relating to TEVA
and ask TEVA to verify the accuracy of the
information?

        A.     I'm not aware of that. I know that we
have been asking that they confirm that they
received the information. I'm not aware that we
have asked them to print out and send it back to
us for us to review that. I'm not aware of that
occurring.

        Q.     Have you heard of the term turnaround
documents from First DataBank?

        A.     No.

        Q.     This would be documents not requested
by TEVA, but sent by First DataBank asking for

verification. Are you aware of the company
receiving any such documents?
      A.    So, are you saying at the request of
First DataBank have we been asked to verify
information in their system?
      Q.    Right. They send a printout of what
they've got and ask the company to confirm that
what they've got is accurate, that if you stop
selling products, that you line them out, that
they got the right number, things like that?
      A.    I'm not aware of seeing something like
that, but if that's a situation where, you know,
as I indicated in earlier testimony where we've
been in contact with First DataBank to say would
you say please verify with a particular company
that they're, in fact, still marketing a product,
then I don't see why that wouldn't have been
reciprocated on products that TEVA has simply
because of the number of NDCs that we've amast
over the years.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 227:12-229:15.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect. *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition. No further response is required.

    **20.    Teva subscribed to First Databank Price Alert (hardcopy), First Databank Price Probe (CD) and First Databank AnalySource (internet) services to monitor both the Teva published prices and that of its competitors. *See* Cioschi 2/12/08 Dep. (Exhibit F) at 113:22-116:15; *see also* Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep.") (Exhibit B) at 38:17-40:1. John Wodarczyk testified that he had never heard of the pricing compendia publishing a price different than the one Teva provided. *See* Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep. (Exhibit B) at 40:2-7.**

    <u>Teva's Response to Alleged Fact No. 20</u>: Disputed. Teva disputes Allege Fact No. 20 because it misstates, mischaracterizes, and/or misconstrues the cited deposition testimony. In particular, Teva disputes Plaintiffs' statement insofar as it permits an inference that Teva actively "monitor[ed]" the prices reported by First DataBank. In fact, the testimony cited by Plaintiffs provides that Teva only

intermittently observed First DataBank's benchmark pricing figures, and did so merely to ensure that there were no misunderstandings surrounding SWP levels. *See* 2/12/08 Cioschi Dep. at 110-11 (Ex. 7). Of course, this practice would occasionally include determining whether Teva's SWPs were in line with the AWPs of its competitors. *See id.* (Ex. 7). As such, Teva disputes Plaintiffs' statement because Plaintiffs, absent any evidence, improperly transpose an occasional check for accuracy into an active and unvarying "monitor[ing]" of First DataBank's price figures. *See id.* (Ex. 7). For similar reasons, Teva disputes the suggestion that there was any "formal" procedure in place to "monitor" what prices First DataBank reported. *Id.* (Ex. 7).

Teva further objects to Plaintiffs' statement in that Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1. Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation. *See* Fed. R. Evid. 602.

## PLAINTIFFS' REPLY TO STATEMENT #20:

Teva dispute is baseless and obstructive. Plaintiffs stand by their Statement and the cited record evidence of Teva's corporate designee, which speaks for itself:

> Q. Was there a period of time when you received inquiries from First DataBank and request to verify the prices that First DataBank had in its database for TEVA products?
>
> A. Well, we never had really contacted them because we usually had on sight some type of First DataBank. They make a pricing program available to customers such as us. We're customers. We're considered customers of First DataBank. So, for a long time new we purchased those products that includes prices. They give it to the marketplace, everybody, SWPs and WACs. So, there's a way to monitor what's going on.
>
> Q. And is it fair, is it accurate to say that, you know, throughout the relevant time period the Marketing Department at TEVA had the First DataBank pricing database?
>
> A. We had part of it. We had -- during the early years they only published a paper, basically a paper book which we all subscribed to, and it basically only listed SWPs. Later on we subscribed to an article or a program called Price Probe which

is a CD that they sent I believe twice a month
which had updates of products, NDCs, SWPs, WAC, all
that information. And so it kind of evolved into
-- they were making more available and more
sophisticated and more on-line kinds of vehicles.

Q.      When you refer to early on as it being a
hard copy book, was that known as the Blue Book?

A.      Well, that was one of the publications.
The one I'm most familiar with was a standard --
was called Price Alert. They also -- to the best
of my memory, they also pushed, as you mentioned,
Blue Book, but I don't even know if that still
exists. That was kind of a vestige in the
industry, a hard copy compilation in like
everything.

Q.      And was that an annual publication?

A.      I believe it was annual with -- it may
have had monthly supplements, but I believe it was
annual.

Q.      All right.
And you mentioned Price Alert?

A.      Price Alert.

Q.      That was a hard copy publication?

A.      Of First DataBank, yes.

Q.      Okay.
And then I think you said that at some
point you started getting CDs that were referred to
as Price Probe?

A.      Price Probe.

Q.      All right.
And then since Price Probe has it
advanced any further?

A.      Yes. Actually, we now buy, I know it's
out of the period you're interested in, it's called
Analysource which is kind of real time stuff. It's
through the Internet that we purchase and Price
Probe makes it available to the marketplace,
whoever wants to pay them the money.

Cioschi 2/12/08 Dep. (Exhibit F) at 113:22-116:15

Q.      And then do you -- does anybody as far
as you know in your corporation track what's
done with the prices that were sent to First
Data Bank?

A.      We receive a file from First Data Bank

which Teva pays for which shows the AWP and WAC
for all products issued by a brand and a
generic.

Q.      I see.

A.      And we receive it on a biweekly or
monthly basis.

Q.      So you get a CD which tells you all
the listed prices of First Data Bank, all the
AWPs and WACs, for not just your products but
the other products --

A.      Correct.

Q.      -- through offer manufacturers' sales;
is that correct?

A.      Correct.

Q.      And you get that how often?

A.      Every two weeks or every month, I'm
not sure. I don't receive it. The marketing
department receives it.

Q.      And that's a way to check what's
happened to the prices that Teva sent in to
First Data Bank; is that correct?

A.      I imagine it's used as a confirmation
to make sure the prices are accurately
reflected.

Q.      Did any of these publications to your
knowledge ever publish a price that was
different than the one that Teva sent in?

A.      I'm not sure.

Q.      Have you ever heard of that happening?

A.      No, I've never heard of it.

Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep.") (Exhibit B) at 38:17-40:7.

**21.     Teva does not sell its generic drugs at AWP.  *See* Teva 30(b)(6)(Wodarczyk) 10/10/06 Dep. (Exhibit B) at 45:1-10.**

Teva's Response to Alleged Fact No. 21:  While Teva does not dispute that it did
not invoice or sell generic drugs at AWP,  Teva objects to Alleged Fact No. 21
insofar as it relies on, refers to, or otherwise mentions AWP, which has no
relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS
did not consider AWPs in setting FULs.   *See* 3/19/08 Gaston Dep. at 457:20-
458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did
not.  Q. Can you think of any instance in which CMS based a FUL on the
published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).
Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial
Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*.,

379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

**PLAINTIFFS' REPLY TO STATEMENT #21:**

The parties agree that Teva did not invoice or sell generic drugs at AWP. Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect. *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

**22.    Teva admits that its reported AWPs or SWPs were not tethered to the actual prices that anyone pays.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 107:2-108:11; Exhibit H (Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. Exhibit 5 (Sales and Marketing Policies and Procedures dated August 14, 2003).**

Teva's Response to Alleged Fact No. 22:  Disputed.  Teva objects to Alleged Fact No. 22 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4). Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; St. Paul Fire and Marine Ins. Co., 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial facts as part of a motion for summary judgment).

In addition, Teva disputes Plaintiffs' Statement insofar as it asserts that Teva "reported" any prices to First DataBank or any other entity.  Further, Teva disputes Alleged Fact No. 22 on the grounds that Plaintiffs have cited no evidentiary basis for this alleged fact, as is required by Local Rule 56.1, and the testimony cited does not support Plaintiffs' assertions.  *See* O'Brien, 440 F. Supp. 2d 3, 5 n.1.

**PLAINTIFFS' REPLY TO STATEMENT #22:**

Teva's dispute is baseless and obstructive.  The cited record evidence is testimony from Teva's corporate designee and speaks for itself:

> Q. [...] When a drug within a GNC is a generic
> or a brand. SWP is not calculated -- is not a
> calculated price based on actual sales data and
> not intended to reflect actual transactions.
> And that statement applies to the AWPs
> in the prior period, is that right, that they're

36

not based on actual sales data and they didn't
relate actual transactions; is that right?
      A.     I'm wondering if -- first, you mean
referring from TEVA to a customer from a customer
to a pharmacy?
      Q.     I'm referring to what TEVA reported to
the price reporting services, the AWP prices.
Those prices weren't based on -- they weren't an
average of actual sales and they didn't reflect
actual transactions; correct?
      A.     According to the document, yes.
      Q.     He goes on and says: TEVA considers
its contract prices to customers to be highly
confidential; is that true?
      A.     Yes.
      Q.     And has -- did TEVA consider its
contract prices to customers to be highly
confidential throughout the relevant time period?
      A.     Yes.
      Q.     And did it consider that the
publication of such information would be
competitively harmful?
      A.     Yes.
      Q.     And was it company policy to maintain
the confidentiality of customer contract prices?
      A.     Yes.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 107:2-108:11;

Responding further, Teva's Response that AWP prices are not relevant or material to

plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated

herein.

**23.    Teva considers its contract prices to customers to be highly confidential and says publication of the contract prices would be competitively harmful.  *Id*.  Teva's confidential contract prices were normally below WAC.  *See* Deposition of Eugene Cioschi 7/11/08 Dep. ("Cioschi 7/11/08 Dep.") (Exhibit G) at 181:11-17.**

        <u>Teva's Response to Alleged Fact No. 23</u>:  Disputed.  Teva objects to Alleged Fact
No. 23 to the extent that it misstates, mischaracterizes and/or misconstrues the
deposition testimony and other evidence cited in support thereof.  While Teva
does not dispute the fact that pricing information was deemed to be confidential in
a sense, Teva certainly disputes that it ever concealed its true prices from third
party payors such as the New York Medicaid.  Further, Teva further disputes

Plaintiffs' statement that "contract prices were normally below WAC" on the
grounds that Teva's WAC prices in many instances actually were the prices that
Teva charged its customers in the marketplace, and the prices at which Teva
invoices its wholesalers.  *See* 8/23/07 Wodarczyk Dep. at 159:8-15 (explaining
that "certain sales are made at WAC") (Ex. 5); 2/20/08 Foster Dep. at 90-91 ("The
WAC price is what the wholesalers would essentially buy the product for.") (Ex.
2); *id.* at 91 ("Q.  [W]hen [the product] was shipped to a wholesaler [it] would be
invoiced at the WAC price?  A.  As far as I recall, while I was at TEVA, yes. ")
(Ex. 2).  Further, Teva disputes that Alleged Fact No. 23 is material to Plaintiffs'
motion.

**PLAINTIFFS' REPLY TO STATEMENT #23:**

Teva's dispute is baseless and obstructive.  Plaintiffs stand by their Statement and the

cited record evidence.  *See* Plaintiffs' Reply to Statement #22, which is incorporated herein.

Responding further, the testimony of Mr. Cioschi speaks for itself:

> Q.      And the contract price is held
> confidential by Teva.  Is that correct?
> A.      Yes.
> Q.      And the contract price would be, I
> think we agreed would be -- normally it would be
> below the wholesale acquisition cost?
> A.      That's correct.

Cioschi 7/11/08 Dep. (Exhibit G) at 181:11-17.

The remainder of Teva's response is self-serving ipse dixit, unsupported by evidence and

irrelevant.  No further reply is required.

**24.      Contract prices are the "real prices" that Teva's customers actually pay
Teva, which were not reported to the pricing compendia.  *See* Cioschi 2/12/08 Dep. (Exhibit
F) at 72:11-73:5.  For any given Teva product at any given time typically the AWP was the
highest price, then the WAC and then the contract prices would be below WAC.  *Id*. at
60:16-22.**

Teva's Response to Alleged Fact No. 24:  Disputed.  As an initial matter, AWPs
are not (and never have been) intended to represent actual contract prices, as the
State of New York was well aware.  *See generally* L.R. 56.1 Stmt. of Undisputed
Material Facts Supporting Defs.' Jt. Mot. for Summary Judgment on Pls.' "FUL
Fraud" Claims, (Dkt. 6054) (D. Mass., 01-cv-12257-PBS).  Although Teva does
not dispute that contract prices "were not reported to the pricing compendia,"
Teva disputes that this fact is material to Plaintiffs' Motion for Partial Summary

Judgment.  Further, Teva disputes any suggestion that contract prices are the only "real prices" that Teva's customers pay or that the AWPs and WACs submitted to the pricing compendia are not "real prices."  Plaintiffs have not provided any evidentiary basis for such assertions, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.

With regard to the second sentence of Alleged Fact No. 24, Teva does not dispute that, as a general matter, AWPs for a Teva product were higher than WACs and contract prices are generally below WACs.  Teva disputes any suggestion that all customers paid contract prices or that customers' contract prices were always lower than WAC.  Plaintiffs have not provided any evidentiary basis for these assertions, as is required by Local Rule 56.1.  *See id.*

Finally, Teva objects to Alleged Fact No. 24 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs? A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

## PLAINTIFFS' REPLY TO STATEMENT #24:

The parties agree that, as a general matter, AWPs for a Teva product were higher than WACs and contract prices are generally below WACs.

Teva's dispute that the Statement is not supported by evidence is baseless and obstructive.  The cited testimony speaks for itself:

> Q.      Would the company report contract prices to any price reporting services?
> A.      No.
> Q.      Did the company have any policies or practices with regard to whether it considered contract prices to be confidential or not confidential?
> A.      My feeling is that we consider that the prices are confidential and should not be, you know, made public. They're between us and the customer.
> Q.      All right. And that would relate to the contract prices?

> A.      The real price, the real price. That's
> what they actually get paid or what they actually
> pay us.

Cioschi 2/12/08 Dep. (Exhibit F) at 72:11-73:5.

Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is

incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

The remainder of Teva's response is improper argument, self-serving *ipse dixit*,

unsupported by evidence and irrelevant.  No further reply is required.

**25.     Teva knew the WAC price to the wholesalers did not include chargebacks, discounts, rebates, billbacks and other incentives Teva offered that got the wholesalers to their net cost.  *See* Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 219:14-226:6, 261:19-267:4; Exhibit I (Teva 30(b)(6)(Denman) 4/16/08 Dep. Exhibit 20 (comparison of net price to wholesalers Cardinal and McKesson after chargebacks, rebates, discounts and other price allowances for Ursodiol and Albuterol)).**

> Teva's Response to Alleged Fact No. 25:  Disputed.  As an initial matter, Teva's
> WAC prices in many instances actually were the prices that Teva charged its
> customers in the marketplace, and the prices at which Teva invoices its
> wholesalers.  *See* 8/23/07 Wodarczyk Dep. at 159:8-15 (explaining that "certain
> sales are made at WAC") (Ex. 5); 2/20/08 Foster Dep. at 90-91 ("The WAC price
> is what the wholesalers would essentially buy the product for.") (Ex. 2); *id.* at 91
> ("Q. [W]hen [the product] was shipped to a wholesaler [it] would be invoiced at
> the WAC price?  A. As far as I recall, while I was at TEVA, yes. ") (Ex. 2).
>
> Moreover, it is factually confounding to allege that a manufacturer's WAC
> should somehow equal a net price, despite the long-standing and well-settled
> historical fact (codified in the Medicare Modernization Act of 2003) that WAC is
> and always has been understood to be a list invoice price that does not include any
> potential discounts, rebates or chargebacks.  *See* 42 U.S.C. § 1395w-3a(c)(6)(B)
> (providing that the "term 'wholesale acquisition cost' means, with respect to a
> drug or biological, the manufacturer's list price  for the drug or biological to
> wholesalers or direct purchasers in the United States,  not including prompt pay or
> other discounts, rebates or reductions in price, . . . as reported in wholesale price
> guides or other publications of drug or biological pricing data.") (emphasis
> added).
>
> Further, Teva objects to Alleged Fact No. 25 on the grounds that Plaintiffs
> fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure,
> to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P.
> 56(e)(1)  (requiring moving party to proffer "facts that would be admissible in
> evidence");  O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to

Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602. 26.

**PLAINTIFFS' REPLY TO STATEMENT #25:**

Teva admits that its WAC is not a net price.  Beyond that, Teva's dispute is baseless. The cited record evidence, which includes Exhibit I (Teva 30(b)(6)(Denman) 4/16/08 Dep. Exhibit 20),  shows that Teva compared the net price to wholesalers Cardinal and McKesson for Ursodiol and Albuterol by taking the WAC for those drugs and subtracting chargebacks, rebates, cash discounts and other price allowances to get to the net price.  This Exhibit shows, *inter alia*, that Teva knew that its WAC did not include chargebacks, discounts, rebates, billbacks and other incentives that Teva offered and paid.          .

The remainder of Teva's response is improper argument, self-serving ipse dixit, unsupported by evidence and irrelevant. No further reply is required.

**26.    More than 90% of Teva sales are below WAC after discounts, rebates and chargebacks.  *See* Teva 30(b)(6)(Wodarczyk) 8/23/07 Dep. (Exhibit D) at 160:14-21; Teva 30(b)(6)(Krauthauser) 1/29/08 Dep.") (Exhibit E) at 174:17-175:11; *see also Mylan*, 2008 WL 5650859 at \*7.**

Teva's Response to Alleged Fact No. 26: Disputed.   Teva disputes that Alleged Fact No. 26 is material to Plaintiffs' motion and disputes that "[m]ore than 90% of Teva sales are below WAC after discounts, rebates, and chargebacks." Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.

Finally, it is factually confounding to allege that a manufacturer's WAC should somehow equal a net price, despite the long-standing and well-settled historical fact (codified in the Medicare Modernization Act of 2003) that WAC is and always has been understood to be a list invoice price that does not include any potential discounts, rebates or chargebacks.  *See* 42 U.S.C. § 1395w-3a(c)(6)(B) (providing that the "term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price  for the drug or biological to wholesalers or direct purchasers in the United States,  not including prompt pay or other discounts, rebates or reductions in price, . . . as reported in wholesale price

guides or other publications of drug or biological pricing data.") (emphasis added).

## PLAINTIFFS' REPLY TO STATEMENT #26:

Teva's dispute is baseless and obstructive. Plaintiffs stand by their Statement and the cited record evidence. The testimony of Mr. Wodarczyk, Teva's corporate designee speaks for itself:

> Q.   All right.
> Looking at those wholesalers that do
> buy at WAC, and I take it -- or at least are
> invoiced at WAC, I'm looking for the percentage
> of sales that will be subject to a chargeback, a
> rebate or some type of a discount?
>
> A.   I would think, and this is just an
> educated guess, but I would think 90 plus
> percent.
> Q.   Okay.
> And that's based on your experience
> with the company, right?
> A.   Yes.
> Q.   And as TEVA's representative you
> believe that to be true throughout the relevant
> time period, '95 to 2003?
> A.   Correct.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep.") (Exhibit E) at 174:17-175:11

The remainder of Teva's response is improper argument, self-serving ipse dixit, unsupported by evidence and irrelevant. No further reply is required.

### *Teva Marketed the Spread*

**27.    Teva admits that in setting its AWP as high as possible that Teva's AWP was a "fictitious" price that Teva knew was being used for reimbursement. Teva set its AWP as high as possible so as not to disadvantage its customers and maximize the reimbursement to its customers. *See* Cioschi 2/12/08 Dep. (Exhibit F) at 84:12-85:2.**

Teva Response to Alleged Fact No. 27:  Disputed.  Teva objects to Alleged Fact No. 27 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS

did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Further, Teva disputes that it set its AWP "as high as possible."  Plaintiffs fail, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer admissible evidence in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence");  O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' Alleged Fact insofar as it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Mr. Cioschi testified that Teva set the AWP for its drugs at 10 percent below the brand AWP in order to be designated as a generic drug by the pricing compendia.  2/12/08 Cioschi Dep. at 83:16-84:8 (Ex. 7);  *see* also Exhibit 5 to 1/29/08 Krauthauser Dep. ("SWP is set at 10% below the referenced brand on which the ANDA is based, because 10% is the minimum discount off the referenced brand needed to ensure a drug will be treated as a generic by the pricing compendia.") (Ex. 10).  Teva could have set its AWP at a higher level, but it would not have received a generic designation.  1/29/08 Krauthauser Dep. at 73:2-9 (Ex. 3).

With respect to the second sentence of Alleged Fact No. 27, Teva disputes that it set its AWP "so as not to disadvantage its customers and maximize the reimbursement to its customers."  Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1.  *See* O'Brien, 440 F. Supp. 2d at 5 n.1.  While one effect of setting the AWP for a generic drug at 10 percent below brand AWP is to maximize the reimbursement for that drug (to the extent reimbursement is based on AWP), Teva did not consider reimbursement in setting its AWP.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("Teva does not consider reimbursement in setting its prices, and in no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex. 10).

## PLAINTIFFS' REPLY TO STATEMENT #27:

The parties agree that one effect of setting the AWP for a generic drug at 10 percent

below brand AWP is to maximize the reimbursement for that drug to the extent reimbursement is

based on AWP.

Teva disputes the Statement as not supported by evidence.  Teva's dispute is baseless.

Plaintiffs stand by their Statement and the cited record evidence.  The testimony of Mr. Cioschi

speaks for itself:

> Q.      And why would TEVA not want to set it at
> 15 percent below the brand?
> A.      Because we want to make sure that the --
> we know that those fictitious prices are used, SWPs
> by the third parties to establish reimbursement
> schemes or could be used. So, we don't want to put
> our customers at a disadvantage when they send for
> reimbursement.
> Q.      So, by setting the AWP at the smaller
> discount off the brand, being right up at the 90
> percent maximum, it will maximize the reimbursement
> to the customer?
> A.      That's right.

Cioschi 2/12/08 Dep. (Exhibit F) at 84:12-85:2.

Plaintiffs object to and dispute the additional citations by Teva concerning any corporate policy prohibiting consideration of reimbursement in setting or changing its AWPs in sofar as it seeks to establish as fact that the policy was followed and trumps Teva's actual practices as established by the record evidence on this motion.  The record evidence supporting the Statement shows that Teva's actual practice was contrary of any such "policy".  *See also* Plaintiffs' Reply to Statements #13 and #28.

The remainder of Teva's response is improper argument, self-serving ipse dixit, unsupported by evidence and irrelevant. No further reply is required

**28.     Teva says that marketing of the spread between a published AWP or SWP and the actual cost at which a pharmacy purchases Teva drugs is inherent in the reimbursement system.  Teva competes on the basis of spread when lowering contract prices.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 114:19-115:11.**

> Teva's Response to Alleged Fact No. 28:  Disputed.  Teva objects to Alleged Fact No. 28 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).

Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment. *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).

Teva's corporate representative testified that it was never Teva's policy to market the spread. *See* 1/29/08 Krauthauser Dep. at 120-21 ("As the individual responsible for pricing during part of the relevant time frame I know that we don't quote, unquote, market the spread. I know from speaking with Linda [Nase, the previous individual responsible] that that was also the case during her time frame.") (Ex. 3); *see* also Exhibit 5 to 1/29/08 Krauthauser Dep. ("A spread between published SWP and actual retail pharmacy acquisition price is built into the reimbursement system and is the product of price competition. It is Teva's intent to maximize its sales and profitability through competitive pricing; however, in no event shall Teva employees or agents market the reimbursement spread to providers as a factor for purchasing the company's products.") (emphasis added) (Ex. 10).

Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1. Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation. *See* Fed. R. Evid. 602.

The evidence also clearly shows that Teva's methodology for establishing AWPs/SWPs was primarily based on adherence to the protocols established by First DataBank, and that such pricing figures were established without regard to changes in reimbursement. *See* 8/23/07 Wodarczyk Dep. at 183:15-184:9 ("Q. And is there any unit or group within the company that follows the Medicaid program and essentially tries to stay on top of any changes in Medicaid? A. In terms of reimbursement? Q. In terms of the program in general, but reimbursement in particular. A. I have government pricing and the only areas my group is concerned with is processing of Medicaid claims and any changes that CMS would have to the calculation of AMPs or best price or ASPs or with the VA, with how the VA pricing should be calculated or for 340B, how the 340B pricing should be calculated. Q. Okay. So, it's not your group? A. I don't think it's any Teva group that I know of. Q. Are you aware of anyone at Teva in general maintaining current or up-to-date with regard to changes in Medicaid reimbursement? A. Not that I know of.") (Ex. 5); 2/20/08 Foster Dep. at 185-186 (in discussing the methodology of establishing AWPs/SWPs, "[m]y issue was not reimbursement.") (Ex. 2).

In addition, Teva disputes Plaintiffs' statement to the extent it purports to suggest that the reason Teva provided pricing figures in its product catalogues was so that pharmacists and third party payors could determine the "spread." Once again, the deposition testimony of Teva's witnesses is directly to the contrary, explicitly explaining that Teva was required to report "a number of characteristics along with AWP and a WAC" in order to be listed as a generic by First DataBank. *See*, *e.g.*, 2/20/08 Foster Dep. at 74 (Ex. 2); 1/29/08 Krauthauser

Dep. at 64-65 (explaining that pricing information was reported so that Teva products could be dispensed as a low-cost alternative) (Ex. 3).

Finally, with respect to the first sentence of Alleged Fact No. 28, Teva disputes that "marketing of the spread between a published AWP or SWP and the actual cost at which a pharmacy purchases Teva drugs is inherent in the reimbursement system." Plaintiffs have not provided any evidentiary basis for this assertion, as is required by Local Rule 56.1. *See* O'Brien, 440 F. Supp. 2d at 5 n.1.

**PLAINTIFFS' REPLY TO STATEMENT #28:**

Teva's dispute is baseless. Plaintiffs stand by their Statement and the cited record evidence. The testimony of Mr. Teva's corporate designee speaks for itself:

> Q.       Turning to Page 2 of Exhibit 5 Marketing the Spread: A spread between a published SWP and an actual retail pharmacy acquisition is built into the reimbursement system.
> Is it fair, is it accurate to say that TEVA knew that throughout the relevant time period?
> A.       One second, I'm just reading. I read slow. Yes.
> Q.       And throughout the relevant time period has TEVA aware that in some instances generic products compete on the basis of that spread?
> A.       If you mean by lowering contract price, then yes.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 114:19-115:11.

Plaintiffs object to and dispute the additional citations by Teva concerning any corporate policy prohibiting consideration of reimbursement in setting or changing its AWPs insofar as it seeks to establish as fact that the policy was followed and trumps Teva's actual practices as established by the record evidence on this motion. The record evidence supporting the Statement shows that Teva's actual practice was contrary of any such "policy". *See also* Plaintiffs' Reply to Statements #13 and #28.

Responding further, Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

The remainder of Teva's response is improper argument, self-serving ipse dixit, unsupported by evidence and irrelevant. No further reply is required..

**29.    Teva knew that when it raised the AWP or SWP for a Teva drug that reimbursement based on AWP would increase.  *See* Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 150:15-151:11.  Teva knowingly raised AWPs if it had room to increase the reimbursement to its customers.  *See* Cioschi 2/12/08 Dep. (Exhibit F) at 148:3-19.**

> Teva's Response to Alleged Fact No. 29:  Disputed.  Teva objects to Alleged Fact No. 29 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co*., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  Further, Teva disputes that it "knowingly raised AWPs if it had room to increase the reimbursement to customers."  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.   *See* Fed. R. Evid. 602. Moreover, Teva's longstanding corporate policy prohibits consideration of reimbursement in setting or changing its AWPs.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex. 10).

**PLAINTIFFS' REPLY TO STATEMENT #29:**

Teva's dispute is baseless.   Plaintiffs stand by their Statement and the cited record evidence.  The testimony of Mr. Cioschi and Mr. Denman, a designated Teva corporate witness, speaks for itself:

Q.      My question is very simple and -- and --- and narrow.  If a -- if a Medicaid program is reimbursing based on AWP, and Teva raises its AWP, as it apparently has done here, that means the Medicaid program's reimbursement amount increases; correct?

MS. LEVY:  Objection.  Incomplete hypothetical, and asked and answered quite a few times.

But you may answer the question again.

THE WITNESS:  So, again, based upon the AWP and, again, the methodology that the state has decided to use, uhm, without consulting Teva, I mean, that -- again, I don't know the full understanding of how you decided why you decided to use AWP or SWP, but if that is your sole indication of reimbursement, then when SWP or AWP would increase, then reimbursement would increase as well.

Teva 30(b)(6)(Denman) 4/16/08 Dep. (Exhibit C) at 150:15-151:11.

Q.      And then what you have is some information relating to Gemfribrozil tablets, right?

A.      Yes.

Q.      And what you listed is the brand AWP, what the highest existing generic AWP was and what TEVA's AWP was and what you were suggesting to change it to?

A.      Okay, yes.

Q.      And essentially you're recommending approximately a $10 increase in AWP?

A.      Uh-hum.

Q.      And is that because there's now more than a 10 percent difference between the brand and TEVA's AWP?

A.      That's what it appears to be. We had that room to help the customer with third parties.

Cioschi 2/12/08 Dep. (Exhibit F) at 148:3-19.

Plaintiffs object to and dispute the additional citations by Teva concerning any corporate

policy prohibiting consideration of reimbursement in setting or changing its AWPs in sofar as it

seeks to establish as fact that the policy was followed and trumps Teva's actual practices as established by the record evidence on this motion. The record evidence supporting the Statement shows that Teva's actual practice was contrary of any such "policy". *See also* Plaintiffs' Reply to Statements #13, #28 and #30.

Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect. *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

The remainder of Teva's response is improper argument, self-serving *ipse dixit*, unsupported by evidence and irrelevant. No further reply is required

**30.    Teva competed on spread by raising its AWP or SWP instead of lowering the price to its customer. *See* Cioschi 7/11/08 Dep. (Exhibit G) at 197:20-201:1; Exhibit J (Cioschi 7/11/08 Dep. Exhibit 42 (email string in November 2000 recommending an AWP increase in response to the wholesaler Bindley Western's request that the AWP spread be increased to 35% to help sell a Teva drug to Bindley's pharmacy customers)); *see also* Exhibit K (Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. Exhibit 4 (email from Paul Krauthauser (Teva) to Rick Foster (Teva) suggesting that Teva raise the SWP on Methazolamide instead of lowering the WAC or contract price to bid for Caremark's business).**

Teva's Response to Alleged Fact No. 30: Disputed.  As an initial matter, Teva objects to Alleged Fact No. 30 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion  for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; *St. Paul Fire and Marine Ins. Co.*, 379 F. Supp. 2d 183, 186 n.1 (D. Mass. 2005) (refusing to consider immaterial facts as part of a motion for summary judgment).

Further, Teva disputes that it "competed on spread by raising its AWP or SWP instead of lowering the price to its customers."  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Teva's longstanding corporate policy prohibits consideration

of reimbursement in setting or changing its AWPs.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event will SWP be set for any generic drug in order to increase the reimbursement spread to providers over competing drugs.") (Ex. 10); *see* also 1/29/08 Krauthauser Dep. at 115:12-15 ("Q. In some instances have generic products competed on the basis of increasing AWPs?  A. I can't think of anything off the top of my head where that's the case.") (Ex. 3), and the cited evidence does not indicate that Teva ever departed from this policy.  Mr. Cioschi's testimony relates to one particular instance in which a customer requested that Teva raise the AWP for R-Tannate Pediatric Suspension—a product not at issue in Plaintiffs' Motion for Partial Summary Judgment. Deposition of Eugene Cioschi, July 11, 2008 ("7/11/08 Cioschi Dep.") at 198:13-199:16 (Ex. 8).  While Mr. Cioschi suggested to his superiors that Teva increase the AWP to match its competitors' AWPs, *id.* at 199:20-200:1 (Ex. 8), Mr. Cioschi did not know whether his suggestion was acted upon.  *Id.* at 200:12-14. Similarly, Mr. Krauthauser testified  that he suggested increasing the SWP for Methazolamide—a product not at issue in Plaintiffs' motion—because a communication from a customer alerted Teva that the brand had increased its SWP and there was now more than a 10 percent difference between Teva's SWP and the brand AWP.  1/29/08 Krauthauser Dep. at 115:20-116:17 (Ex. 3). However, these is no indication whether the SWP for Methazolamide was ever changed.

**PLAINTIFFS' REPLY TO STATEMENT #30:**

Teva's dispute is baseless.  Plaintiffs stand by their Statement and the cited record evidence.

Exhibit J (Cioschi 7/11/08 Dep. Exhibit 42) is an email string in November 2000 showing that Teva recommended an AWP increase in response to a request from wholesaler Bindley Western that the AWP spread be increased to 35% to help sell a Teva drug to Bindley's pharmacy customers.

Exhibit K (Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. Exhibit 4) is an email from Paul Krauthauser (Teva) to Rick Foster (Teva) suggesting that Teva raise the SWP on Methazolamide instead of lowering the WAC or contract price to bid for Caremark's business.

Responding further, the testimony of Mr. Cioschi supports the Statement and speaks for itself:

Q.      Okay.  And it says, "We are having trouble with one of your products. R-Tannate Pediatric Suspension 4oz (38245-0109-14)."  I take it those numbers are the NDC code?

A.      Yes.

Q.      On 2/5/2000 we had a cost increase to $13.30 but the AWP only went up to $16.65.  Now the spread is only 20%.  I have this item on the GAP program and if I price it above cost then the pharmacy loses money on reimbursement!  I usually try to make 10% Gross Margin which means the spread for the pharmacy goes down to 10%, not good, even for a brand drug.

I hope you -- "I know you intend to discontinue the product and are not making it any longer but unless the spread gets to 35% or better I can't sell it at a profit.  I currently have about 2,000 bottles I would like to sell through but I am getting complaints about my pricing being too high relative to AWP.  Can you help out?  I do not want to return this and I am sure you do not want it back."

Okay.  So what he's complaining about, Mr. Worrell?

A.      He's complaining that the pharmacist is not making money.

Q.      Right.  And that's because the spread is only 20 percent?

A.      Right.

Q.      And then it goes to you, and what do you recommend?

A.      Suggest the AWP is raised to match competition.

Q.      I'm sorry, I didn't hear that?

A.      I'm sorry, the AWP to match competition.

Q.      So you wanted the -- you recommended to Bill Marth, Teva's now president, that they raise the AWP to make the spread greater.  Is that correct?

MR. BRYAN:  Object to form.

THE WITNESS:  That would be the result.

BY MR. BARNHILL:

Q.      Was this AWP actually raised?

A.      That, I don't know.  I would have to go back in the records and check.

51

> Q.  Why didn't you lower the cost?
> A.  That was out of my hands.  I didn't get involved with the costs.
> Q.  That would be a way to make sure that the persons weren't losing money, wouldn't it?
> A.  They could reduce the cost.
> Q.  Yes.
> A.  That would -- yeah, that would be another method.

Cioschi 7/11/08 Dep. (Exhibit G) at 197:20-201:1.

Plaintiffs object to and dispute the additional citations by Teva concerning any corporate policy prohibiting consideration of reimbursement in setting or changing its AWPs in sofar as it seeks to establish as fact that the policy was followed and trumps Teva's actual practices as established by the record evidence on this motion.  The record evidence supporting the Statement shows that Teva's actual practice was contrary of any such "policy".  *See also* Plaintiffs' Reply to Statements #13, #28, #29 and #31.

Responding further, plaintiffs do not maintain that Methazolamide and R-Tannate Pediatric Suspension are drugs at issue on this motion, however, the record evidence showing that Teva raised its AWP to get its customers' business is material because it establishes as fact that Teva's practice was other than its "policy".

Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.  The remainder of Teva's response is disputed, irrelevant and constitutes argument that is not properly part of a 56.1 opposition.  No further response is required.

**31.    Teva maintained "Effective Pharmacy Selling Tips", which instructed Teva sales people in the "Ask for Information" section to ask the pharmacist to compare AWP with the retail pricing in order to show the greater profit margin (spread) on the Teva product.  *See* Exhibit L (Cioschi 7/11/08 Dep. Exhibit 35 ("Effective Pharmacy Selling Tips")) at 2.**

<u>Teva's Response to Alleged Fact No. 31</u>:  Disputed.  As an initial matter, Teva objects to Alleged Fact No. 31 insofar as it relies on, refers to, or otherwise mentions AWP, which has no relevance or bearing on Plaintiffs' Motion  for Partial Summary Judgment.  CMS did not consider AWPs in setting FULs.  *See* 3/19/08 Gaston Dep. at 457:20-458:7 ("Q. What role if any did AWP play in setting FULs?  A. Generally, it did not.  Q. Can you think of any instance in which CMS based a FUL on the published AWP price?  A. I can't think of a situation where they did.") (Ex. 4).  Accordingly, Teva disputes that AWP is material to Plaintiffs' Motion for Partial Summary Judgment.  *See* D. Mass. L.R. 56.1; St. Paul Fire and Marine Ins. Co., 379 F. Supp. 2d at 186 n.1 (refusing to consider immaterial facts as part of a motion for summary judgment).  Teva does not dispute that it produced a document entitled "Effective Pharmacy Selling Tips" relating to the branded drug Lofibra—a product not at issue in Plaintiffs' motion, *see* 7/11/08 Cioschi Dep. at 148:15-17 (Ex. 8); Exhibit 35 to 7/11/08 Cioschi Dep.—nor does Teva dispute that the document asks representative to "compare AWP and retail pricing to demonstrate greater profit margin with Lofibra."  *Id.*  However, Teva does dispute that (1) it produced such documents other than on this one occasion, (2) the document mentions or refers to the "spread," and (3) it "marketed the spread" on this or any other occasion. Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1. Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  Indeed, Teva's longstanding corporate policy prohibits Teva employees from "marketing the spread" to providers.  Exhibit 5 to 1/29/08 Krauthauser Dep. ("[I]n no event shall Teva employees or agents market the reimbursement spread to providers as a factor for purchasing the company's products.") (Ex. 10).

## PLAINTIFFS' REPLY TO STATEMENT #31:

The parties agree that Teva produced a document entitled "Effective Pharmacy Selling Tips" relating to the branded drug Lofibra—a product not at issue in Plaintiffs' motion, *see* 7/11/08 Cioschi Dep. at 148:15-17 (Ex. 8); Exhibit 35 to 7/11/08 Cioschi Dep.  The parties agree that the document asks representative to "compare AWP and retail pricing to demonstrate greater profit margin with Lofibra."

Responding further, plaintiffs do not maintain that Lofibra is a drug at issue on this motion, however, the record evidence showing that Teva asks representative to compare AWP

and retail pricing to demonstrate greater profit margin is material because it establishes as fact

that Teva's practice was other than its "policy".

Teva's Response that AWP prices are not relevant or material to plaintiffs' motion is

incorrect.  *See* Plaintiffs' Reply to Statement #6, which is incorporated herein.

The remainder of Teva's response is disputed, irrelevant and constitutes argument that is

not properly part of a 56.1 opposition.  No further response is required.

**32.     Teva knew that when a FUL or MAC was in place that it limited the
reimbursement that state Medicaid agencies were willing to pay to pharmacies for Teva
drugs.  *See* Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 190:13-16.**

> Teva's Response to Alleged Fact No. 32:  Teva objects to Plaintiffs' statement on the
> basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.  However, Teva does not
> dispute that FULs or MACs generally lower reimbursement.

**PLAINTIFFS' REPLY TO STATEMENT #32:**

The parties agree that FULs or MACs generally lower reimbursement. Teva's dispute

that the statement lacks foundation is baseless.  Teva's corporate designee testified as follows:

> Q.     What the FUL does it puts a cap on how
> much Medicaid will pay to a pharmacy for filling
> a prescription with your drug, right?
> A.     Yes.

Teva 30(b)(6)(Krauthauser) 1/29/08 Dep. (Exhibit E) at 190:13-16.

**33.     Teva had a strategy on at least one occasion to institute a change in the FUL.
The strategy consisted of calling First Databank to eliminate products from its database,
informing CMS of a Teva price increase and soliciting chain drugs stores to call CMS to
complain about the FUL pricing.  All of this was an effort by Teva to get a FUL removed
which would increase reimbursement to its customers.  *See* Cioschi 2/12/08 Dep. (Exhibit F)
at 162:6-164:8; Exhibit M (Cioschi 2/12/08 Dep. Exhibit 10 (collections of documents
including published prices and emails in January and February 2003 discussing a strategy
to get CMS to change the FUL to solve the problem with a low FUL for the Teva drug
Gemfibrozil)); *see also* Exhibit N (Cioschi 2/12/08 Dep. Exhibit 11 (email string dated in
June 2000 discussing the successful results of Teva's efforts to get CMS to change or delete
FUL on several Teva drugs.)).**

<u>Teva's Response to Alleged Fact No. 33</u>:  Disputed.  Teva does not dispute that on at least one occasion and in response to its customers' requests, it communicated with CMS concerning updates to the FULs for five Teva drugs to account for changes in the market prices of those drugs.  Teva disputes that it "had a strategy" to institute changes in the FUL for any drug  and that it sought to change the FUL for any drug on any other occasion, including FULs for the particular Teva drugs at issue in Plaintiffs' Motion for Partial Summary Judgment.  Plaintiffs have failed, contrary to the requirements set forth in the Federal Rules of Civil Procedure, to proffer any evidence, admissible or otherwise, in support of this statement.  *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1.  Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation.  *See* Fed. R. Evid. 602.

**PLAINTIFFS' REPLY TO STATEMENT #33:**

Teva does not dispute that on at least one occasion, it communicated with CMS concerning updates to the FULs for five Teva drugs to account for changes in the market prices of those drugs.  Beyond that, Teva's objection to the statement is baseless.  The record evidence consists of the following:

Exhibit M (Cioschi 2/12/08 Dep. Exhibit 10) is a collection of documents, including published prices and emails from January and February 2003, that discuss a strategy to get CMS to change the FUL to solve the problem with a low FUL for the Teva drug Gemfibrozil.

Exhibit N (Cioschi 2/12/08 Dep. Exhibit 11) is an email string dated in June 2000 discussing the successful results of Teva's efforts to get CMS to change or delete FUL on several Teva drugs.

The testimony of Mr. Cioschi also supports the Statement and speaks for itself:

> Q.     Your solution, the first step is to
> verify which marketers are still in the market,
> right? You say that's done.
> A.     Yes.
> Q.     Then you're going to ask First DataBank
> to call Richmond Pharm. Who is that?
> A.     I don't recall that company, but it was
> probably -- my guess is it's probably a repackager

because it doesn't look like it's a remanufacturer
to me. See, they're in the database, so if they
were inordinately low CMS was using a company that
not only is inordinately low, but it was -- I think
I established that they weren't even in the
marketplace.

     Q. All right.
So, you're going to call First DataBank
and see if you can get Richmond Pharm eliminated
from the database, right?

     A.     If they didn't market the product.

     Q.     Then you're going to send a copy by
e-mail of the price increase to HCFA, to Cindy
Pelter, right?

     A.     Yes.

     Q.     Then you're going to follow up and call
Cindy and tell her that the FUL was out of the line
with market cost, right?

     A.     Right.

     Q.     And the reason it would be out of line
was because TEVA was trying to implement a price
increase, right?

     A.     That was part of it probably.

     Q.     Then you were going to identify three
chains. That would be retail pharmacy chains?

     A.     Uh-hum.

     Q.     And ask them to call HCFA and complain
about the pricing?

     A.     Yes.

     Q.     And then you were then going to follow up
with a change to make sure they had done that?

     A.     Yes.

     Q.     Then follow up a couple weeks later with
Cindy to make sure -- to see if you could get an
update?

     A.     Uh-hum.

Cioschi 2/12/08 Dep. (Exhibit F) at 162:6-164:8.

    **34.    Teva was generally familiar with the 2003 OIG Guidelines.  *See* Teva
30(b)(6)(Denman) 4/16/08 (Dep. (Exhibit C) at 275:22-276:9.  Teva does not agree with the
definition of spread in the OIG guidelines.  *Id.* at 279:2-16.**

    <u>Teva's Response to Alleged Fact No. 34</u>:  Disputed.  Teva disputes that it did "not
agree with the definition of spread in the OIG Guidelines."  Plaintiffs have failed,
contrary to the requirements set forth in the Federal Rules of Civil Procedure, to

proffer any evidence, admissible or otherwise, in support of this statement. *See* Fed. R. Civ. P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); O'Brien, 440 F. Supp. 2d at 5 n.1. Moreover, Teva objects to Plaintiffs' statement on the basis that it lacks adequate foundation. *See* Fed. R. Evid. 602. Further, the testimony cited does not support Plaintiffs' statement. Rather, Mr. Denman testified as to his understanding as a representative of Teva that the definition of "spread" in the OIG Guidelines was "incorrect" and noted that he did not agree with it. Others testifying in the same capacity have defined "spread" more broadly and in a manner consistent with the definition in the OIG Guidelines. 1/29/08 Krauthauser Dep. at 95:6-8 ("Spread is just the difference between two numbers") (Ex. 3). Further, Teva's longstanding corporate policy characterized "spread" as the difference "between published SWP and actual pharmacy retail acquisition price." Exhibit 5 to 1/29/08 Krauthauser Dep. (Ex. 10).

**PLAINTIFFS' REPLY TO STATEMENT #34:**

Teva does not dispute that it was familiar with the 2003 Guidelines and that it did not

agree with the definition of spread set forth therein.

The remainder of Teva's response is irrelevant and requires no further reply.

*Teva's AMPs*

**35.    At all times, from 1997 to 2005, Teva has calculated and reported on a quarterly basis the average manufacturer's price ("AMP") for all its products as required by the federal rebate statute.** *See* **Kauthauser 1/29/08 Dep. (Exhibit E) at 180:3-8; Deposition of Teva Pharmaceuticals USA, Inc. 30(b)(6)(John Wodarczyk) dated 4/17/08 ("Teva 30(b)(6)(Wodarczyk) 4/17/06 Dep.") (Exhibit O) at 158:11-22.**

> Teva's Response to Alleged Fact No. 35:  Teva does not dispute that it calculates quarterly AMPs for all of its products and reports these AMPs to both CMS as well as New York Medicaid's EPIC Program.  Deposition of John Wodarczyk, April 17, 2008, ("4/17/08 Wodarczyk Dep.") at 220:4-220:11.

**PLAINTIFFS' REPLY TO STATEMENT #35:**

The parties agree that at all times, from 1997 to 2005, Teva has calculated and reported

on a quarterly basis the AMPs for all its products as required by the federal rebate statute.

Plaintiffs dispute and object to Teva's statement that it provided AMPs to CMS and the

New York EPIC as lacking proper evidentiary support, irrelevant and misleading.

Dated: June 30, 2009

Respectfully submitted,

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala_____

By:   Joanne M. Cicala
      James P. Carroll Jr.
      Jocelyn Normand

*Counsel for the City of New York and New York*
*Counties in MDL 1456 except Nassau and Orange*

Ross B. Brooks, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
**LEVY PHILLIPS &**
**KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022
(212) 605-6205
*Counsel for the County of Orange*

## <u>CERTIFICATE OF SERVICE</u>

I, James P. Carroll Jr., hereby certify that I caused a true and correct copy of the foregoing PLAINTIFFS' REPLY LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO TEVA PHARMACEUTICALS USA, INC., to be served on counsel of record via electronic service pursuant to paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  June 30, 2009

_____/s/_____

James P. Carroll, Jr.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600
