# EXHIBIT C

# (DEVOR FUL AFFIDAVIT (EXCERPTS)

| | |
|---|---|
| In re: Pharmaceutical Industry Average Wholesale Price Litigation : : : : : This Document relates to: : : The City of New York, et al : v. : Abbott Laboratories, Inc., et al. : : : | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br><br>Judge Patti B. Saris |

## RULE 26 STATEMENT OF HARRIS L. DEVOR

The following constitutes the Rule 26 Statement of Harris L. Devor (the "Statement") in the above-captioned litigation (the "Litigation").

**EXHIBIT C**

## Table of Contents

I. QUALIFICATIONS ................................................................................................... 3
II. PRIOR TESTIMONY ............................................................................................... 3
III. COMPENSATION .................................................................................................... 3
IV. MATERIALS REVIEWED ...................................................................................... 3
V. SCOPE OF ASSIGNMENT ...................................................................................... 3
VI. SUMMARY OF FINDINGS ..................................................................................... 4
VII. BACKGROUND ....................................................................................................... 5
  Average Wholesale Price ......................................................................................... 6
  Wholesale Acquisition Cost ..................................................................................... 6
  Relationship between WAC and AWP .................................................................... 7
VIII. DEFFENDANTS' PARTICIPATION IN THE STATE OF NEW YORK'S MEDICAID REIMBURSEMENT PROGRAM AND THE REPORTING OF WACs AND AWPs ......... 7
  General Discussion Pertaining to the Transactional Data Provided by Defendants .............. 7
  Summary of Defendant-Specific Discovery Relating to the Determination of WAC and AWP ........ 9
   *Barr* ................................................................................................................... 9
   *Dey* .................................................................................................................. 11
   *Ethex* ............................................................................................................... 15
   *Ivax* ................................................................................................................. 17
   *Mylan* .............................................................................................................. 20
   *Par* .................................................................................................................. 23
   *Purepac* ........................................................................................................... 26
   *Roxane* ............................................................................................................ 29
   *Sandoz* ............................................................................................................. 31
   *Warrick* ........................................................................................................... 34
   *Teva* ................................................................................................................ 36
   *Watson* ............................................................................................................ 40
   *Wyeth* .............................................................................................................. 42
IX. COMPUTATIONS OF AWP AND WAC ............................................................... 44
  Data Obtained from Defendants ............................................................................ 44
  Computation of Average WAC .............................................................................. 45
   *Rolling 12-month Analysis* ............................................................................ 46
  Computation of AWP ............................................................................................ 48
   *Rolling 12-month Analysis* ............................................................................ 49
X. AMP AND THE RELATIONSHIP TO FUL ......................................................... 50

## I. QUALIFICATIONS

1. I am a Certified Public Accountant and a shareholder of the accounting firm of Shechtman Marks Devor PC ("SMD"). My professional experience since graduating from Temple University in 1973 has been as an accountant and auditor for large and small companies in a variety of industries. I have lectured on various topics, including financial reporting to the Securities and Exchange Commission ("SEC"), accounting, auditing and statistical sampling, and have been retained by counsel and rendered opinions in a number of matters relating to the reporting of wholesale acquisition cost ("WAC") and average wholesale price ("AWP") by pharmaceutical manufacturers, for use by state Medicaid agencies. A copy of my resume is attached to this Statement as Exhibit #1.

## II. PRIOR TESTIMONY

2. Expert testimony at trial or by deposition given by me in the past four years is described in Exhibit #2 to this Statement.

## III. COMPENSATION

3. SMD is compensated for services performed on an hourly basis at its applicable billing rates. My hourly rate is $550.

## IV. MATERIALS REVIEWED

4. As part of my analysis in connection with the preparation of this Statement, I, or my staff working under my supervision, have reviewed the data, documents and deposition testimony (either in their totality or for pertinent excerpts), including related exhibits, listed in Exhibit #3 to this Statement.

## V. SCOPE OF ASSIGNMENT

5. Counsel for Plaintiffs in the Litigation has asked that I compute, as of the end of each quarterly period beginning January 1, 1997 and ending December 31, 2005 (the "relevant timeframe"), an estimated measure of WAC and AWP that could have been computed and reported by Defendants for nine selected generic, non-innovator, multi-source pharmaceutical

products ("drugs"), based on transactional data provided to Counsel by Defendants. The prices I have computed represent estimated measures of average WACs and AWPs that, had similar computations been performed by Defendants using their own transactional data, could presumably have been used by Defendants for purposes of reporting supportable WACs and/or AWPs to the pharmaceutical pricing compendia that were used by state Medicaid agencies for purposes of claim reimbursement to pharmaceutical providers (to be described in more detail below).

6. Accordingly, Counsel has also asked that I compute what is referred to as a Federal Upper Limit ("FUL"), a measure of the amount of reimbursement to be paid to a provider in connection with a particular drug and a measure that was used by, specifically, the State of New York and affiliated agencies for purposes of calculating reimbursement on Medicaid pharmacy claims during the relevant timeframe, for all drugs subject to a FUL.

7. Additionally, Counsel has asked that I compute an estimate of FUL using Average Manufacturer Prices ("AMPs") data provided by the Defendants. Defendants were obligated, under federal statute and a governing Medicaid rebate agreement, to report AMPs to during the relevant timeframe.

## VI. SUMMARY OF FINDINGS

8. Based upon the review of items listed in Exhibit #3 to this Statement and my analysis of the transactional data provided by Defendants, my computations of measures of WAC and AWP are summarized in Exhibits #5-17 to this Statement. Subject to the satisfactory completion of my testing procedures, the data demonstrates that the estimates of WAC and AWP I have computed, representing measures of WAC and AWP that could have been determined by the Defendants from their own transactional data and, accordingly, reported to the pricing compendia from which the Center for Medicare & Medicaid Services ("CMS"), the organization to which the State of New York looked for the prices at which it would reimburse Medicaid providers (to be described below), were lower than what was actually reported by Defendants and published by the pricing compendia during the relevant timeframe. Accordingly, the determination of a FUL by CMS would have been influenced, during the relevant timeframe, by what appear to have

4

been exaggerated prices, thereby having increased the cost of reimbursement incurred by the State of New York.

9.  I have also summarized my computations of FULs using the AMP data provided by Defendants in Exhibits to this Statement.

10. I currently expect to present and explain the computations referred to above (and discussed and summarized both herein and in Exhibits #5-17 to this Statement) at trial. This Statement is based on evidence presented in the Litigation to date and provided to me by Counsel for the Plaintiffs. Although computations of average prices have been performed, all of my testing of such has not been completed. Thus, my analysis is ongoing and, to the extent additional discovery or facts become known to me or, if any errors are noted in my testing of the computations, I reserve the right to supplement and/or amend the computations discussed herein.

## VII. BACKGROUND

11. During the relevant timeframe, the State of New York maintained a program (the "New York Medicaid Reimbursement Program") for reimbursing "pharmacy providers," including all forms of licensed pharmacies such as retail pharmacies, chain pharmacies, specialty pharmacies, home infusion companies, long-term care pharmacies, out-patient clinic pharmacies, and any other enrolled pharmacy provider, for the dispensing and/or administering of drugs to Medicaid participants. (First Amended Consolidated Complaint ("FACC"), ¶ 107)

12. The New York Medicaid reimbursement program employed a formula for reimbursing participant pharmacy providers at the FUL determined by CMS, whenever a FUL was in place. (N.Y. Soc. Serv. L. §367-a(9); FACC, ¶ 6) CMS Regulations provided that the FUL was to be set at "150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacist in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size." (42 CFR § 447.332; FACC ¶13) It is my understanding, however, based upon discovery in the Litigation, that CMS did not always set the FUL based on the lowest published price. (Gaston (January 24, 2008)

5

13. During the relevant timeframe, that FUL was generally determined by CMS based upon the WACs and/or AWPs reported by Defendants and published by pricing compendia.[1]

14. Each of the Defendants relating to whose products I have computed estimated measures of WAC and/or AWP participated in the New York Medicaid reimbursement program and, relating thereto, either directly or indirectly reported prices to the pricing compendia. As such, to the extent any, or each, of the Defendants manufactured a particular product and reported (and ultimately had published by the pricing compendia) a WAC or an AWP, the determination of a FUL or other measure for reimbursement by CMS for that drug was apparently impacted thereby.

### Average Wholesale Price

15. AWP is defined as an average price which a wholesaler (or distributor) would charge a pharmacy (or other provider) for a particular product. (FDB-AWP 28850) The plain meaning definition of AWP proffered by the Honorable Patti B. Saris, United States District Judge (District of Massachusetts), in the Litigation, included recognition that the term "wholesale" (representing the middle word in the acronym) was defined as "of, relating to, or engaged in the sale of goods or commodities in quantity for resale." As noted above, AWP was considered by CMS in its determination of the FUL.

### Wholesale Acquisition Cost

16. WAC is defined as the price paid by a wholesaler (or distributor) to a manufacturer for the purchase of a particular product. (FDB-AWP 6290) I have calculated a measure of WAC using the above definition and the Defendants' transactional data because, as noted above, WAC was considered by CMS in its determination of the FUL.

---

[1] It is my understanding, based upon discovery in the Litigation, that CMS did not always determine and set a FUL if, in certain instances, the calculated FUL would have been greater than all of the published AWPs for that drug. (Sexton (May 20, 2008), p. 59:16-22)

6

drugs. In order to perform my computations, I was provided this data for the NDCs discussed herein and for which I have summarized my computations in the Exhibits attached to this Statement.

175. Because the data was provided individually by each of the defendants, the data came in many forms and required, therefore, efforts to standardize (as much as possible) and format the data in a manner that would be useful for computations and that would facilitate the types of queries and analysis needed for my computations. In formatting the transactional data, all of the information contained therein that would factor into my computations was retained; none of the data was altered in substance, in any way.

176. The transactional data provided by defendants included information delineating sales (and, similarly, invoices), sales returns, customer credits, and customer rebates, among other things, as well as information relating to chargebacks. Each of the aforementioned fields of information, as provided by the Defendants, was considered in my computation of either average WAC or AWP.

**Computation of Average WAC**

177. As stated above, WAC is defined as the price paid by a wholesaler (or distributor) to a manufacturer for a particular product. As such, my computations relating to WAC for each of the NDCs in the Litigation centered on determining, from the transactional data, an estimate of the actual, net price paid by wholesalers and distributors in their transactions with the manufacturer Defendants. It was my determination that such a price would represent the best estimate of WAC and a price that Defendants could have determined, from their own transactional data, for purposes of reporting a price to the pricing compendia during the relevant timeframe.

178. In arriving at an estimated, average net price, it was necessary to consider the impact of customer credits and rebates. As indicated above, that information was generally provided in the transactional data. Consideration of such an impact was appropriate, in my opinion, because, according to my experience with, and understanding of, the manner in which wholesalers and

45