# EXHIBIT D

# (WISCONSIN DISCOVERY DECISION)

| STATE OF WISCONSIN | CIRCUIT COURT | DANE COUNTY |

STATE OF WISCONSIN,

PLAINTIFF

VS.

AMGEN, INC., *ET AL*,

DEFENDANTS

DECISION & REPORT
OF DISCOVERY MASTER:

PLAINTIFF'S MOTION TO COMPEL
[NOVARTIS PHARMACEUTICALS]

MAY 2, 2006

~~####~~

CASE NO. 04 CV 1709
UNCLASSIFIED-CIVIL: 3003

\* \* \* \* \* \* \*

Charles Barnhill, William P. Dixon, Elizabeth J. Eberle and Robert S. Libman, for the Plaintiff State of Wisconsin.

Attys. Kim Grimmer and Jennifer L. Amundsen for Defendant Novartis Pharmaceutical Corporation.

\* \* \* \* \* \* \*

### INTRODUCTION & SUMMARY OF DECISION

This is an action by the State of Wisconsin against several pharmaceutical manufacturers based on allegations that Defendants have violated Wisconsin antitrust and other laws. Specifically, the State alleges that Defendants have reported artificially inflated wholesale drug prices to pharmaceutical compendia, while "hiding" the true prices, with the result that purchasers, such as the State of Wisconsin (whose Medicaid reimbursement formula for prescription drugs is based on those published prices), have suffered substantial financial loss. And the State claims that these acts violate several Wisconsin statutes dealing with price deception and similar matters. Specifically, the State says:

> In sum, it is unlawful for a company to publish a price for a
> product—whether it is called a suggested list price, a manufacturer's

**EXHIBIT D**

price or a wholesale price—where that price does not represent a price at which the product is actually sold.

By order of the court dated June 23, 2005, I was appointed Special Master with authority, *inter alia*, to "decide discovery disputes … within the scope of Wis. Stat. §§ 804.01(3) and (4), and §§ 804.12(1), (2)(b), and (4)."

The State has filed an Interrogatory seeking, among other things, information concerning Novartis's calculations of "a unit price, average sales price, aggregate sales figure or other numerical price or sales figure … net of any or all Incentives," for several "targeted" drugs.   Interposing several objections to form, etc., Novartis responded by stating that it would produce records from which answers to the interrogatory could be derived, and would also provide an employee with knowledge of these figures for deposition.   The State also filed a documentary request asking for "[d]ocuments containing an average sales price or composite price identified … in response to Interrogatory No. 1."  Novartis stated that it had no documents responsive to the request.

Gary Rosenthal, Novartis's Vice President for Finance and Administration, had given a deposition in another case, and the State claims that that testimony "establishes that Novartis is improperly withholding certain net revenue calculations," which it contends are responsive to the Interrogatory and document request.   According to the State, Rosenthal's testimony shows that Norvartis generates monthly internal reports that contain "net revenue calculations" as part of its ongoing profit and loss computations, and it says it is entitled to these "net revenue documents" in response to its discovery requests.  Novartis claims the information has no relation to either the requests or the State's claims in the lawsuit.

For the reasons that follow, I conclude that, because the sought-after documents are not relevant within the meaning of § 804.01(2)(a), *Stats.*, in that they are not calculated to lead to the discovery of admissible evidence relevant to the claims being advanced by the State in these cases, the Motion to Compel should be denied.

<u>**DISCUSSION**</u>

The State begins its argument by stating that, in an earlier ruling (involving another defendant) in this case, I recognized that the same (or a similar) interrogatory and document request, "s[ought] relevant information."  That I did.  But, as Novartis states, that is not the issue here: the issue is whether the net revenue reports demanded by the State from Novartis are responsive to the discovery requests and/or relevant to any of its claims in this litigation.

What follows are excerpts from Rosenthal's deposition testimony.

> Q.  Does Novartis ever do any analysis of net revenue over [sic] the units of the drugs sold for each drug?
>
> A.  Yes.
>
> Q.  What is that called?
>
> A.  There is no name for it.  There have been reports that called it, maybe net revenue per unit or net price, there is not really a product that's sold at that price, it's simply a mathematical financial summary of what's left over after all parties are dealt with.
>
> Q.  But Novartis runs that calculation?
>
> A.  Novartis would prepare a calculation like that, yes.  (Rosenthal Deposition, at 140)
>
> * * * * * *
>
> Q.  I want to know what it is called at Novartis.
>
> A.  There is not really a terminology for—you could call it net sales, per unit, net revenue per unit, because it is not an official name, it is not—there is not like a designator that we solely use.  The implication is, what is—at the end of the day what is left over available [sic] per product divided by the number of units….. (*Id.*, at 144-45)

* * * * * *

Q.   Are there documents at Novartis which would reflect how that calculation was made?

A.   There are documents that would lay out gross sales or X factory sales and they would also indicate the total level of rebates discounts sales—I'm sorry, returns, Medicaid rebates, et cetera, to determine a net revenue there would be that document...

Q.   What is that document called?

A.   There is not really a name for it, we have it [a]s part of our profit and loss statement.

Q.   Who generates it?

A.   The raw data domes through the general ledger system of our business.

Q.   And this is done on a per drug basis?

A.   Yes it is.

Q.   How frequently is this report made?

A.   We do it monthly.

Q.   Who is it distributed to?

A.   It is part of our—it is one of the materials that is part of the monthly distribution of financial statements.

Q.   Who is it given to .... Is it the same group of people you testified to earlier who received the financial statements?

A.   Yes.  There are multiple financial statement reports, some just report net sales for a brand, and then there are also some reports that have gross sales revenue.  Each of these individual numbers in aggregate for an individual brand and there are various parties, many of which are the financial people that I mentioned earlier....

Q.   How is the report used by the different people receiving it?

A.   The financial statements is normally to determine at the end of the day, did we make any money on selling the product .... It is

really to combine all of costs and revenues that are earned for that brand in one format, in order to enable us to know whether or not this is a brand that makes any money or not. (*Id.*, at 146-7)

\* \* \* \* \* \*

Q.  Is that document distributed—is that available on electronic format?

A.  Let me answer—you asked me—actually, I want to clarify one part of your question and I can also answer your question.  The P and L for brand does not calculate net per unit, it calculates net sales.  There is another report that would have information that says net.  I don't know whether it says net sales, you know, per unit or net revenue per unit, et cetera, and that report is electronic.

Q.  And is that report created monthly?

A.  Yes it is. …..

Q.  [And that's calculated] for every drug?

A.  I can't say every drug, but I can say for many of our drugs….
(*Id.*, at 148-50)

The State maintains that the "net profit" information is included in the terms of the Interrogatory—which, as indicated, asks whether Novartis has ever calculated a "unit price, average sales price, aggregate sales figure or other numerical price or sales figure for a targeted drug net of an or all Incentives."  The State emphasizes Rosenthal's comment that, while there is no defined name for the internal calculations of which he spoke, "[t]here have been reports that called it, maybe net revenue per unit or net price," and that the calculations could also be called "net sales, per unit" or "net revenue per unit."  It follows, says the state, that the resulting figure must be the "average price" that lies at the heart of its lawsuit.[1]

---

[1]  The state argues in its Reply Memorandum that "whether these or any other calculations are responsive to the interrogatory does not depend on the internal name assigned by Novartis, even if that name were accurate." (Reply Memorandum, at 6-7).  Much of the State's argument, however is just that.  Only a few lines earlier, for example, the State, arguing that the calculations are responsive to its discovery requests, stresses (as it did in its initial Memorandum) that "Mr. Rosenthal, Novartis's Vice President for Finance and Administration, testified that although there is not a defined name for the internal calculations, he refers to them as 'net sales per unit,' 'net price,' and 'net revenue per unit.'"

Novartis, noting that the State has not defined "average sales price" or "composite price" in its discovery requests, characterizes them as "appear[ing] to seek information regarding Novartis's calculation (if any) of the price paid for Novartis drugs by Providers or others in the distribution chain." (Brief, at 10)  And it says that the "net revenue reports" discussed in the Rosenthal deposition "do not reflect an actual or average price paid for Novartis drugs by any 'class of trade,' let alone a calculation of the price paid by retail dispensers to wholesalers." (*Id.*)  Pointing to Rosenthal's testimony that the purpose of the calculation is "to determine at the end of the day [whether Novartis] ma[de] any money selling the product[s]," it asserts that they constitute but "one component of the monthly financial statements …used by Novartis for the limited purpose of determining whether a particular drug is profitable *to Novartis*." (*Id.*, at 6) (Emphasis in the original.)  Finally, emphasizing Rosenthal's comment that, while some reports call the figures "maybe net revenue per unit or net price, there is not really a product that's sold at that price, it's simply a mathematical financial summary of what's left over…," Novartis states that, as the testimony indicates:

> "Rosenthal was merely listing examples of how one might refer to the calculations; he was not testifying that those labels accurately describe the calculations.  To the contrary, the substance of Mr. Rosenthal's deposition testimony establishes that Novartis's net revenue is not responsive to Plaintiff's discovery requests because it does not correspond to any price paid by any party for Novartis drugs." (*Id.*, at 14)

There is no question that the right to discovery extends only to material that is relevant to the subject matter of the action, *State ex rel. bin rilla v. Circuit Court*, 76 Wis.2d 429, 435, 251 N.W.2d 480 (1977); and "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Sec. 804.01(2)(a), *Stats*.  Additionally, "[i]t is not grounds for objection that the information sought will be inadmissible at the trial if the information sought appears

reasonably calculated to lead to the discovery of admissible evidence." *Id.*   It is also true that Wisconsin's discovery rules are to be "liberally applied so that the issues for trial may be narrowed, settlement promoted, and litigants fully informed about the facts which may come out at trial…[and, as such] discovery should be applied in a manner which aids, not hinders, the working of the adversary process." *State ex rel. Dudek v. Circuit Court*, 34 Wis.2d 559, 576, 150 N.W.2d 559 (1967).  *See*, also, *Konle v. Page*, 205 Wis.2d 389, 393-94, 556 N.W.2D 380 (Ct. App. 1996).

The linchpin of the relevancy analysis is the claim as the plaintiff has framed it. *See*, for example, *Cobell v. Norton*, 226 F.R.D. 67, 79 (D.D.C. 2005), where the court stated that "[t]he only relevant consideration for the purposes of Rule 26[2] is the nature of the clams that the parties have asserted."

The parties disagree as to who has the burden of establishing the relevance (or non-relevance) of the request.  Citing *Transcor v. Furney Charters, Inc.*, 212 F.R.D. 588, 591 (D. Kan. 2003), Novartis contends that "[w]hen the relevancy is not apparent on the face of the request, the party seeking discovery has the burden to show the relevancy of the request." The State, on the other hand, cites cases indicating that where one party has moved to compel production, the resisting party bears the burden of establishing lack of relevance.  *See*, for example, *Gober v. Citry of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000); *Golden Valley Mocrowave Foods, Inc. v. Weaver Popcorn Co.*, 132 F.R.D. 204, 212 (N.D. Ind. 1990).  While far from clear, based on the parties' briefs, the rule advanced by the State appears to be consistent with § 804.01(3)(a), *Stats.*, which interposes a "good cause shown" requirement for any party seeking a protective order. Whatever the case, I am persuaded that, on this record, the sought-after revenue information is not discoverable.

---

[2]  F.R.C.P. 26(a) authorizes discovery of "any matter, not privileged, that is relevant to the claim or defense of any party," and notes that, to be relevant for discovery purposes, the information "need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." It thus tracks the applicable Wisconsin Statute, § 804.01(2)(a), rendering federal cases interpreting the federal rule "persuasive authority" in construing the Wisconsin rule. *See*, *Neylan v. Vorwald*, 124 Wis.2d 85, 99, 368 N.W.2d 6487 (1985).  *See*, *Meunier v. Ogurek*, 140 Wis.2d 782, 7888, 412 N.W.2d 155 (Ct. App. 1987) (because Wisconsin's discovery rule is substantially identical to F.R.C.P. 26, the federal decisions are "persuasive").

The State describes the "two central issues" in its case as: "[1] the true prices of Novartis's drugs, and [2] Novartis's knowledge that the prices it reported to the medical compendia … are false and inflated." (Memorandum in Support of Motion to Compel, p. 1)   As to the first, it is true, as mentioned above, that at some points in Rosenthal's disposition, he uses the terms "net price," "net sales per unit" an "net revenue per unit." Taken in context, however, I consider the substance of the testimony to be that the calculations have little, if anything, to do with the prices of Novartis's products.   He testified that while some reports have referred to the calculations as "net revenue" or "net price," it is really none of those things: "there really is not a product that's sold at that price, it's simply a mathematical … summary of what's left over" at the end of the day. (Deposition, at 140, 144-145)   I thus agree with Novartis that, while Rosenthal was listing examples of how one might refer to the calculations, he was not testifying that those labels accurately described them.   To the contrary, the substance of his testimony suggests that the company's net revenue, as calculated to determine Novartis's end-of-the-day profits, is not responsive to the State's requests "because it does not correspond to *any* price paid by *any* party for Novartis drugs."   (Memorandum in Opposition to Motion to Compel, p. 14)   As Novartis states, its net revenue is "not a proxy for the true average prices of Novartis's drugs." (*Id.*)

Beyond that, the State seeks information regarding Novartis's calculations of the "average sales rice" of its products, net of incentives; and it seeks to know "the applicable class[es] of trade for which each determination is made."   It also asks "whether [Novartis' disclosed the numerical figure[s] to any publisher, customer or governmental entity."   As Rosenthal states in his affidavit, the monthly revenue reports do not show the "actual prices at which [the] drugs were sold by wholesalers,"[3] for (in Rosenthal's words) "they have nothing to do with the prices at which wholesalers sell Novartis drugs. Rather, they show the net *revenue* per product obtained by Novartis when [various]

---

[3] In its memorandum, the State asserts that the purpose of its request is "to determine the true prices of Novartis's drugs and to show that Novartis knew that the actual prices at which its drugs were sold by wholesalers were well below the prices that Novartis was reporting to the Medical Compendia." (Memorandum, at 6)

deductions ... are taken into account."[4]  (Affidavit, at 2)   Nor do the calculations appear to have anything to do with whether Novartis knew that the prices it is claimed to have reported to the price compendia were "false and inflated." Novartis argues persuasively that

> ... the net amount Novartis received after all deductions, including money paid to Plaintiff itself long after the sale to wholesalers an resale to retailers took place, has no baring on whether the company knew how the AWPs it reported for its drugs compared to the actual price paid by any retailer to any wholesaler for its drugs.  The actual price that retailers paid to wholesalers for Novartis drugs is ... beyond the scope of the net revenue reports.  (Memorandum, at 11-12)[5]

I agree.  And I note that Novartis has responded to the State's request by offering to provide documents that would reflect the discounts, rebates, and other incentives it provides to its own customers, along with sales revenue figures[6]—an offer that appears, in large part at least, to be responsive to the request.  (And if the State feels it is not, it is free to supplement its request to seek additional or other *relevant* information.)  On this

---

[4] The "deductions," according to Rosenthal, include:

> [i] discounts to wholesalers for prompt payment or subsequent to a price increase to allow them the opportunity to buy at the old price; [ii] chargebacks to wholesalers to compensate for lower-than-WAC prices they receive from certain purchasers ... pursuant to contractual arrangements between Novartis and the purchaser; [iii] rebates or allowances to private entities that do not take possession of drugs but which reimburse pharmacies for drugs provided to insured patients ...; [iv] rebates associated with discount programs for indigent patients in which Novartis has participated ...; [v] Medicaid rebates that Novartis pays to state governments (including Wisconsin itself; and ]vi] credit given for returned product due to outdating, low demand, recalls, damage, or order entry errors." (Rosenthal Affidavit, at 2-3)

[5] Rosenthal stated in his affidavit, for example, that the net revenue calculations are

> ... completely different from what Plaintiff purports to seek here: the true prices of Novartis' drugs," that is, "the actual prices at which its drugs were sold by wholesalers." (Pl. Mem. At 6)   Novartis does not—and ultimately cannot—calculate the "actual prices at which its drugs were sold by wholesalers," because Novartis is not part of that sale transaction.   Novartis does not sell its drugs directly to individual retail pharmacies." (Affidavit, at 2)

[6] *See,* Exhibit 1 to Novartis Memorandum in Opposition to the Motion to Compel (letter from Novartis's counsel to counsel for the State dated February 10, 2006).

record, however, I conclude that the State's request is not relevant under the applicable rules.

## CONCLUSION

For the reasons discussed above, I conclude that, on the record before me, the sought-after documents—Novartis's monthly revenue calculations, as Rosenthal testified to in his deposition in a related case (and as he discussed in his affidavit in these proceedings)—are not relevant, within the meaning of § 804.01(2)(a), *Stats.*, in that they are not likely to lead to the discovery of admissible evidence relevant to the claims being advanced by the State in this case.  It follows that the State's Motion to Compel should be, and hereby is, denied.

* * * * * * *

Dated at Madison, Wisconsin, this 2nd day of May, 2006

_____

William Eich
Special Discovery Master