# Exhibit G

AdminaStar Federal (Eiler, Cheryl) - Vol. IV                                    September 23, 2008
Indianapolis, IN

463

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      )
PRICE LITIGAION,                )
                                )  MDL NO. 1456
U.S. ex re. Ven-A-Care of       )  CIVIL ACTION:
the Florida Keys, Inc., v.      )  01-CV-12257-PBS
Abbott laboratories, Inc.,      )  Judge Patti B. Saris
et al.  No. 06-CV-11337-PBS    )


    The videotaped deposition upon oral examination of ADMINASTAR FEDERAL BY CHERYL EILER, a witness produced and sworn before me, Paula A. Morgan, Notary Public in and for the County of Hamilton, State of Indiana, taken on the 23rd day of September, 2008, in the offices of National Government Services, 8115 Knue Road, Marion County, Indiana, pursuant to the Federal Rules of Civil Procedure.  This deposition was taken on behalf of the United States of America in the above-captioned matter.

**484**

1   A. We --
2       MS. RAMSEY: Objection.
3   A. We, even when we started the database, we
4   still get the hard copy. So we still get the
5   monthlies and the annual. And that was a source
6   that was reliable as far as when we would get it
7   each month or each quarter.
8   Q. And, to your knowledge, did other
9   carriers or DMERCs use RedBook?
10      MS. GIULIANA: Objection. Form.
11  A. Yes.
12  Q. Did you develop an understanding as to
13  whether or not RedBook was a recognized source of
14  pricing information in the drug industry?
15      MR. HECK: Objection.
16  A. Yes.
17  Q. And what was that understanding?
18  A. Because --
19      MS. GIULIANA: Objection.
20      THE WITNESS: I'm sorry?
21      MR. HENDERSON: The objection is noted.
22  Go ahead.

**485**

1   A. When CMS gave us the instructions as far
2   as how to calculate the drugs, that was a source
3   they gave us. So you went by the sources that they
4   instructed you to use.
5   Q. Okay. Now, in general, for generic
6   drugs, tell us in one sentence or two, very briefly
7   -- and we'll discuss it in more detail -- how you
8   determined the allowed amount for a particular
9   drug.
10  A. When we looked at the product name, as
11  far as the description from the HCPCS code, you
12  would look in the RedBook. If it was an uppercase,
13  capitalized, or a lowercase, that's how you
14  determined if it was a generic or a brand. And
15  that was the instructions given to us.
16  Q. And then what did you do with that
17  information that you got out of the RedBook?
18  A. We then calculated the fee based on the
19  narrative description as far as if it stated for
20  five milligrams, ten milligrams. That's the
21  products you used in order to calculate your fee.
22  And you used the AWP fee for that.

**486**

1   Q. And if you had two or more generic drugs
2   that fit the description, how did you calculate the
3   fee?
4   A. You put all that data on a sheet or made
5   your calculation, and then you would do the median
6   of the generics.
7   Q. And the median is the middle price --
8   A. Price.
9   Q. -- in a group, correct?
10  A. Yes.
11  Q. If there was only one NDC that fit the
12  narrative description, what would you do in that
13  situation?
14  A. You would use only that fee because
15  that's all you had.
16  Q. And what about if there was an even
17  number of generics that fit the description? How
18  would you calculate the median in that case?
19  A. If you -- say, for example, you had four
20  -- four drugs. You would take number two and three
21  and do an average.
22  Q. When you selected the NDCs from the

**487**

1   RedBook to include in these calculations, I think
2   you said you would select them based on the
3   narrative description of the J-code.
4   A. Yes.
5   Q. Is that right? Was the narrative
6   description always perfectly clear for purposes of
7   selecting the NDCs?
8       MR. HECK: Objection.
9   A. No.
10      MR. HECK: Form.
11  A. No.
12  Q. Sometimes did you have to use some
13  judgment in selecting the appropriate NDCs?
14  A. Yes. And that judgment, I would look at
15  our Physician's Desk Reference book that lists the
16  drug products, gives you information on that. And,
17  also, I would check with our medical director, Dr.
18  Oleck, if I was not sure --
19  Q. All right.
20  A. -- before I would use --
21  Q. And when you determined pricing for
22  generic drugs, did there come a time when you also

**544**

1  correctly?
2      A.  Yes.
3      Q.  Then the next sheet, which is the second
4  quarter of 2000, which means there would have been
5  two missing arrays in between these two pages, it
6  has the three Dey drugs, all of which appear to be
7  the same, with the same price per milligram prices;
8  is that correct?
9      A.  Yes.
10     Q.  And then instead of Compumed, the
11 second-page array has Alpharma and an indication
12 that the -- there was a change in the fee for that
13 particular drug.  Do you see that?
14     A.  Yes.
15     Q.  And then it has three Roxane drugs, and
16 those appear to be the same drugs and the exact
17 same prices as on the first page; is that correct?
18     A.  Yes.
19     Q.  And then there are two Physician Total
20 Care drugs, which also appear to be exactly the
21 same as on the first page, and then the median is
22 the same.

**545**

1  So if one were to reconstruct the two missing
2  arrays that are in between these two, what would
3  you expect to find?
4      MS. GIULIANA:  Objection.  Form.
5      A.  I would expect to find that when I looked
6  at the RedBook, the Alpha -- I'm sorry.  The new
7  product that was on the second page would have been
8  included in one of those RedBooks.  And they still
9  would not have had the Compumed listed in the
10 RedBook.
11     Q.  Yep.
12     A.  And I would still have the same products,
13 as far as what's on these sheets, that were not
14 those two that were different.
15     Q.  Okay.  On the second page, the effective
16 date is shown as April 1 of 2000.  And what quarter
17 would that indicate that this became effective?
18     A.  In my second quarter of 2000.
19     Q.  Okay.  I see in the footer, in the lower
20 right-hand corner, it has a footer of July 1, 1999,
21 which is the same as the footer on the first page.
22 Is this an example where you may have neglected to

**546**

1  update the date of the footer?
2      A.  Yes.
3      MR. HECK:  Objection.
4      A.  A lot of times when I did my
5  spreadsheets, I would copy them from one worksheet
6  to the next worksheet, and I would not change some
7  of my footers.
8      Q.  Okay.
9      A.  I was more interested in getting the
10 source right and the date that I changed it.
11     Q.  Yep.
12     MR. HENDERSON:  Okay.  Now I would like
13 to ask the stenographer to mark this next document
14 as Exhibit U.S. Eiler 10.
15         (Exhibit U.S. Eiler 010 was marked
16 for identification.)
17     Q.  So I've -- you've been handed what's been
18 marked as Exhibit U.S. Eiler No. 10.  Is this --
19 this is a two-page sheet with Bates stamp numbers
20 AWP033-0737 and 0738.
21     Ms. Eiler, this has a header at the top that
22 appears to indicate October 2001.  What, if

**547**

1  anything, does that tell you about the date when
2  this array became effective?
3      A.  The October -- the header being October
4  '01 means this is the quarter that I did this data,
5  looked at this data.  When I used the headers, it's
6  based off of the tab that my spreadsheet had on it.
7  And also by the July 2001 source, that tells me
8  that was my October update.
9      Q.  Now, in this array, which appears to
10 carry on, onto the second page, this has the three
11 Roxane drugs that appear to be the same ones we saw
12 a little earlier, in an earlier array.  And then in
13 the column -- in the panel for brand-name drugs
14 there are three drugs that we haven't seen before
15 in any of the earlier arrays we've talked about,
16 for Ipratropium Bromide-Novaplus/Roxane.  Do you
17 see those?
18     A.  Yes.
19     Q.  Now, in the -- in the RedBook, how do you
20 -- how do you identify what is a brand-name drug
21 and what is a generic drug?
22     A.  In the RedBook, if it was capitalized,

**548**

1  that meant it was a brand name. If it was smaller
2  case, that meant it was a generic.
3      Q. Okay. And if there is a -- if the
4  RedBook shows a cross-reference to a drug that's
5  identified in all capital letters, does that
6  indicate whether it's a brand or a generic?
7      A. If it was all capital letters, to me,
8  that meant it was a brand.
9      Q. Okay. Now, if the -- if the AWPs for the
10 three Novaplus/Roxane drugs had been -- and I'm
11 looking at the price per milligram AWP, which is
12 shown on the second page. Can you line up those
13 columns?
14     A. Uh-huh.
15     Q. Instead of -- if they had been, instead
16 of $3.52, if per milligram AWPs had been, say, $1,
17 what effect, if any, would that have had on the
18 price that you determined for this J-code?
19         MR. HECK: Objection.
20         MS. GIULIANA: Form.
21     A. It would have made a difference because
22 it would have been lower than the generic. So we

**549**

1  would have used those prices instead of the
2  generic.
3      Q. So if the price per milligram for the
4  Roxane Novaplus drugs had been $1, what would have
5  been the allowed amount?
6          MR. HECK: Objection.
7      A. It would have been a dollar -- well, 95
8  percent of a dollar, so it would be 95 cents.
9      Q. Okay. And would that allowed amount,
10 again, have applied to all of the drugs reimbursed
11 under that J-code?
12         MR. HECK: Objection.
13     A. Yes, for that time frame.
14     Q. Now I want to suggest to you, Ms. Eiler,
15 that Novaplus actually has always been a generic
16 product, not a brand product. And that if one -- I
17 want you to assume that if one had done additional
18 research, the generic status of that drug might
19 have been discovered. If the -- if the per
20 milligram AWP price for that Novaplus drug had been
21 significantly lower, say a dollar, would that have
22 caused you to do any additional research to

**550**

1  determine the status of that drug?
2          MS. RAMSEY: Objection.
3      A. I didn't look basically on the price
4  because I was looking at whether it was generic or
5  whether it was brand. I didn't compare what the
6  two different prices would have been. The only way
7  I would have looked any further is if I could not
8  have distinguished whether it was a generic or a
9  brand.
10     Q. Okay. So in this instance is it fair to
11 say that probably it would not have made any
12 difference had that price been lower for the
13 Novaplus?
14         MR. HECK: Objection.
15     A. As far as -- the only difference would
16 have been if it should have been generic instead of
17 brand and I put it in the wrong column. But other
18 than that, no.
19     Q. Okay. Just to clarify -- because I don't
20 think my question was clear enough.
21     A. I'm sorry.
22     Q. And, therefore, your answer may not have

**551**

1  been clear enough. Is it your testimony that had
2  the price per milligram of the Roxane Novaplus
3  products been around a dollar, for example, that
4  probably would not have made any -- that probably
5  would not have caused you to do any additional
6  research into whether or not that was a generic or
7  a brand?
8      A. No.
9          MR. HENDERSON: Now I'd like to have the
10 stenographer mark this next document as Exhibit
11 U.S. Eiler 11.
12         (Exhibit U.S. Eiler 011 was marked
13 for identification.)
14     Q. Now we've shown you U.S. Eiler 11, which
15 is an array. And, Ms. Eiler, I'll represent to you
16 that your summary spreadsheet, which is Exhibit 5,
17 indicates that this is an array for the third
18 quarter of 2002. And if you look at the header at
19 the very bottom, in the center of the first page,
20 what does that indicate?
21     A. That this was my spreadsheet for July
22 2002.

**596**

1  is about. The first one has a Bates number of
2  AWP033-0436.
3      A.  Okay. I must be looking at the wrong --
4      Q.  All right. Are you looking at 119, which
5  is all of the ipratropium -- I'm sorry, 118. I'm
6  very sorry.
7      A.  No, I was looking at 119.
8      Q.  Yep. And that's my fault. I'm sorry
9  about that.
10         MR. HENDERSON: Okay. Let's start over,
11  Jared. What entry on this spreadsheet are you
12  referring to again?
13         MR. HECK: We're looking at second
14  quarter of 2000 on the spreadsheet, which is on
15  Page 13 of 16 in U.S. Eiler Exhibit 5. And I'm
16  also asking her to look at Roxane Exhibit 118 --
17  once again, my apologies -- and flip to the page --
18  the first page that indicates an effective date of
19  April of 2000.
20      A.  Okay. And that was the AWP --
21      Q.  033-0436.
22      A.  Okay.

**597**

1      Q.  Okay. Do you see that?
2      A.  Yes.
3      Q.  Now, I don't know if you recall from last
4  time, but I asked you -- because if you look at the
5  next two pages of this exhibit, which is Roxane
6  Exhibit 118, those also have a header of April of
7  2000. Do you see that?
8      A.  Yes.
9      Q.  Okay. And last time you indicated that
10  one of these documents would have been in the array
11  but not the other one; is that right?
12      A.  Yes.
13      Q.  Now, if you look at your spreadsheet,
14  which is, once again, U.S. Eiler Exhibit 5, you
15  indicate in the comments column for the second
16  quarter of 2002 that AWP033-0434 to 435 is not
17  final. And you indicate a RedBook printout to look
18  at; is that right?
19      A.  Sorry. Just a second.
20      Q.  Sure.
21      A.  Yes.
22      Q.  Now, if you look at these exhibits -- or,

**598**

1  I'm sorry, the actual arrays, which are in Roxane
2  Exhibit 118, it looks like that array has more
3  prices under the generic column than the one on the
4  previous page; is that right?
5      A.  Yes.
6      Q.  Okay. Now, you're indicating, at least
7  in this note, that those prices in the April 2000
8  array are not on the RedBook printout that you used
9  for that quarter; is that right?
10      A.  That's what I've stated, yes.
11      Q.  Okay. Now, do you know why these
12  additional prices would not have been considered in
13  the AWP033-434 and 435 document?
14      A.  Without going back and looking at the
15  previous and then looking at the RedBook that I
16  copied, that I don't have in front of me right at
17  the moment, I would have to compare them to see
18  why.
19      Q.  Okay. But it's your understanding, since
20  going back and looking through these, that the
21  second document -- or, I'm sorry, the second array
22  in Roxane Exhibit 118 would not have been the one

**599**

1  you used?
2      A.  Correct.
3      Q.  And that's because you compared it to the
4  RedBook printout that you had for the January 2000
5  database; is that right?
6      A.  Correct.
7      Q.  Okay.
8      A.  And like I had stated when you showed me
9  these, without knowing what was in my folder with
10  it, I could not accurately state that that was the
11  final.
12      Q.  Okay. And so you went back and compared
13  it to the folder that you had; is that right?
14      A.  Yes.
15      Q.  Okay. Now, I just have probably two more
16  questions left for you, and I'm going to ask them
17  about U.S. Eiler Exhibit 11, which is the last
18  document that Mr. Henderson gave you.
19         MR. HENDERSON: Hang on. Let's find it.
20         MR. HECK: Sure.
21      A.  Okay.
22      Q.  Okay. Now, if you recall with Mr.

**Page 600**

1  Henderson -- or I'm sorry. As you recall, Mr.
2  Henderson pointed out to you that there are six
3  entries in the brand name column for Ipratropium
4  Bromide-Novaplus/Roxane. Do you see those?
5      A.  Yes.
6      Q.  And he indicated to you that those are
7  actually generic drugs, but you indicated them as
8  brand; is that right?
9      A.  Yes.
10     Q.  Now, you indicated -- and please correct
11 me if I'm wrong. You determined if a drug was
12 branded or generic by seeing if it was all capitals
13 in the RedBook; is that right?
14     A.  Correct.
15     Q.  Now, if you flip to the next page of this
16 exhibit, it appears that all of the product names
17 are in all caps; is that right?
18     A.  But this was off the database. On the
19 database you have --
20     Q.  Well -- I'm sorry. Continue.
21     A.  On the database you would look -- you
22 have two different files. You have one that lists

**Page 601**

1  all the products that are available and all the
2  products that are brand. And we would look at the
3  products that was on the database. They are a
4  small print. So on the database, when you first
5  look up this product, you have the option of small
6  print or the capital, and the capital was in the
7  brand, and the small print was the generics.
8      Q.  Okay. So it would have been on a
9  different page of -- I'm sorry. What you're
10 saying, if I understand correctly, is that there
11 would have been a different prompt or a different
12 page in the database that would have shown some
13 drug names in lowercase and some in all capitals;
14 is that right?
15     A.  As far as on the main menu screen, yes.
16     Q.  Okay. So you would look at that main
17 menu screen when you determined if something was
18 branded or generic; is that right?
19     A.  You would look -- you would pull up the
20 one that has all of the listings on it. So the
21 generic -- the one that was smaller case would have
22 all products listed, whether it was generic or

**Page 602**

1  brand.
2      Q.  And that's not the page that we have --
3  that we're looking at right now, though; is that
4  right?
5      A.  This is the page that you get when you
6  look up that difference. It doesn't -- they don't
7  distinguish between upper and lower on the second
8  page.
9      Q.  Okay. So you wouldn't have used this
10 page in particular to determine if something was
11 branded or generic; is that right?
12     A.  Can you repeat that, please.
13     Q.  Sure. The page that's Bates numbered
14 AWP038-0705, which is Page 2 of U.S. Eiler Exhibit
15 11, you wouldn't have used this page of the RedBook
16 to figure out if something was branded or generic;
17 is that right?
18     A.  I would have compared this to what I had
19 previously, and then I would have used that
20 knowledge to determine whether it was generic or
21 brand because I --
22     Q.  And I'm sorry. I'm sorry. What do you

**Page 603**

1  mean by compare to what you have done previously?
2      A.  When we used -- when we set the fees, we,
3  at that time, determined whether it was generic or
4  brand. So we had no indication unless the RedBook
5  told us that it changed from a generic to a brand.
6      So if I was looking at this, based on my sheet
7  that I had, I had them listed all as generic -- as
8  a brand. Unless it's stated on my main menu screen
9  that it changed to a generic, I would not have
10 noticed that.
11     Q.  Okay. So you wouldn't have changed -- so
12 if I understand correctly, you would have
13 determined, the first time a drug was listed,
14 whether it was branded or generic; is that right?
15     A.  Initially, yes.
16     Q.  And then the only way you would ever
17 change that is if you saw some notation in the
18 RedBook that indicated it had changed from branded
19 to generic or vice versa; is that right?
20     A.  Correct.
21        MR. HECK: Okay. I think that's all I
22 have for questions. Thank you, Ms. Eiler.

**604**

1  THE WITNESS: Thank you.
2  THE VIDEOGRAPHER: We've got about six
3  minutes of videotape left.
4  MR. HENDERSON: Does anyone have six
5  minutes of questions?
6  MS. RAMSEY: Let's go off the record.
7  THE VIDEOGRAPHER: This concludes tape
8  three in the deposition of Cheryl Eiler today.
9  We're off the record at 12:13.
10  (A recess was taken.)
11  THE VIDEOGRAPHER: We're back on the
12  record at 1:21. This begins tape number four in
13  the deposition of Cheryl Eiler.
14  EXAMINATION,
15  QUESTIONS BY MS. RAMSEY:
16  Q. Welcome back, Ms. Eiler. My name is
17  Hilary Ramsey, and I represent Abbott Laboratories.
18  I have just a few follow-up questions for you.
19  First, since your last day of deposition,
20  which was at the end of August, what preparation
21  have you done between then and now?
22  A. The only thing I've done is gone back and

**605**

1  relook at the worksheet that I had at that time.
2  Q. Have you met with your attorney or anyone
3  from the Department of Justice?
4  A. I talked to Mr. Henderson yesterday.
5  Q. Anything else?
6  A. No.
7  Q. What about working with the paralegal at
8  the Department of Justice?
9  A. No, I haven't worked with her since we
10  stopped the last time. Oh, I'm sorry. I
11  apologize. Yes, I did talk to Katie on Thursday,
12  and she gave me -- asked me to look at a couple of
13  missed typos on my worksheet. But that's all.
14  Q. So she directed you to certain errors in
15  what's been marked as U.S. Eiler 5, and you made
16  corrections according to her instructions?
17  MR. HENDERSON: Objection.
18  A. Some were her -- as far as her helping me
19  transpose the numbers. I have trouble reading
20  numbers sometimes, and it takes me a little bit to
21  get them right.
22  Q. Do you recall, looking at U.S. Eiler 5,

**606**

1  do you recall which errors you corrected on your
2  own?
3  A. I -- as far as I noticed the errors or --
4  Q. Yes.
5  A. No, because I was keeping track on paper,
6  and I wasn't saying who -- you know, I didn't keep
7  note of whether I noticed it or Katie noticed it.
8  Q. Okay. Anything else with regard to your
9  preparation?
10  A. No, ma'am.
11  Q. We spoke earlier about the sharing
12  arrangement that Region 5 had with respect to
13  pricing. Do you recall that?
14  A. Yes.
15  Q. And I apologize if you said this before,
16  but do you recall which years the sharing
17  arrangement was in place?
18  A. I would have to say it was from '94 to
19  '97 because in '98 is when we started looking at
20  it, the DMERCs, as far as, you know, different.
21  Q. Are you aware of any other region that
22  had a sharing agreement similar to that in Region

**607**

1  5?
2  A. I was only aware of our region.
3  Q. Now, you testified earlier that another
4  carrier, WPS, was responsible for calculating the
5  reimbursement amounts for J3370. Do you recall
6  that?
7  A. Yes, ma'am.
8  Q. Now, when -- when WPS was doing the
9  calculations for J3370, would you still do your own
10  calculations for this J-code?
11  A. When we were doing the shared
12  calculations, the only time I would go back and
13  check another contractor's fee is if I had received
14  a question about how was the fee calculated that
15  was not one of mine. And that's the only time I
16  would go back and research it.
17  Q. Would you look at U.S. Exhibit 5 for
18  J3370, for Quarter 3 for 1995. That's on the first
19  page. It indicates that the array fee is $18.81,
20  but the comments fee indicates the WPS fee was
21  $7.80. Do you see that?
22  A. Yes, ma'am.