# Exhibit E

Young, Steven J. - Vol. II                                May 14, 2009

Chicago, IL

286

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL      )MDL No. 1456

INDUSTRY AVERAGE WHOLESALE )Master 01-CV-12257-PBS

PRICE LITIGATION           )Sub No. 06-CV-11337-PBS

_____)

THIS DOCUMENT RELATES TO:  )     VOLUME II

_____)

United States of America,  )

ex rel.                    )

Ven-A-Care of the Florida  )

Keys, Inc., v. Abbott      )

Laboratories, Inc., CIVIL  )

ACTION NO. 06-11337-PBS    )


    The continuation of the videotaped discovery

deposition of STEVEN J. YOUNG, taken in the

above-entitled cause, before DERALYN GORDON,

a notary public of Cook County, Illinois, on the

14th day of May, 2009, at 77 West Wacker Drive,

Suite 3500, Chicago, Illinois, beginning at

approximately 9:19 a.m., pursuant to Notice.

563

1  to do in this report.

2  BY MR. BREEN:

3       Q.   If I handed you a piece of paper right

4  now, could you write out any statistical formula

5  whatsoever that you contend Dr. Duggan should have

6  applied in this case, and you believe from a

7  review of his report in supporting materials that

8  he did not apply in this case?

9            MR. TORBORG:  Objection, form.

10      A.   I haven't been asked to do that, and I'm

11 not prepared to do that here.

12 BY MR. BREEN:

13      Q.   Can you just name a statistical principle

14 that you think he violated?

15           MR. TORBORG:  Objection, asked and

16 answered.

17      A.   Again, my role was not to get into the

18 statistics or lack thereof associated with his

19 analysis.

20           My role was as a health care expert

21 that has seen overpayments to providers done

22 and other overpayment calculations done before

564

1  apply that knowledge to the calculations that
2  he's performed.
3           And I have seen obviously other people
4  provide statistical-based analyses, random
5  samples of the entire population to arrive at a
6  conclusion.  He did not do that in his
7  calculation.
8           But the purpose of my analysis is to say
9  what facts exist based on the data and the other
10 information available in this case that raises
11 concern regarding his methodology in relationship
12 to the standards that I've seen within the
13 industry to arrive at calculations of this nature.
14          MR. BREEN:  Objection, nonresponsive.
15 BY MR. BREEN:
16    Q.    My question for you, sir, is since
17 you're going to be testifying to the trier of
18 fact, in criticizing a Ph.D. in economics, in
19 criticizing the statistical techniques he's
20 applied, I want you to state one statistical
21 standard, just one, using correct statistical
22 terminology that's accepted amongst statistical

1   experts that will indicate to the Court and the

2   jury that you're even qualified to critique

3   somebody's statistical analysis or application

4   of statistics.

5          Name one standard using proper statistical

6   terminology.

7          MR. TORBORG:  Objection, asked and

8   answered, argumentative.

9      **A.    I do not believe that the opinions in my**

10  **report are based on the statistical analysis that**

11  **he has performed.**

12          **The critiques in my report are based on**

13  **the standards that I've seen established in the**

14  **industry as to what's necessary to calculate**

15  **overpayments of provider claims based on the**

16  **information that's available.  And that is the**

17  **purpose of my report.  And I think my opinions**

18  **are clear on that point.**

19  BY MR. BREEN:

20      Q.    All right.  So share with me one or two

21  of the learned treatises in the area of statistics

22  that you've studied and are now applying the

1  standards that are articulated therein and

2  accepted among experts that apply statistics so

3  that the Court and the jury can evaluate the

4  standards that you're applying in critiquing

5  Dr. Duggan.

6     A.    I apologize if I wasn't clear in my last

7  response, but my opinions in this matter are not

8  related to opining upon the statistical

9  methodologies or basis.

10          My opinions are based on what the

11 standards are in the industry based on what

12 I've seen for individuals to calculate to

13 sustain a position that there's been overpayments

14 on claims to providers, and the process that one

15 goes through to analyze the issues that exist

16 and apply those to the facts and circumstances

17 here.

18          My opinions were not related to the

19 statistics, to make myself clear, hopefully I

20 am this time.  My opinions are contained in my

21 report.  And, therefore, it's not within the scope

22 of my work to provide the information that you

567

1    asked for in your last question, and I have not
2    done that.
3        Q.   Okay.  So these standards that you just
4    testified about in your last response just a few
5    minutes ago, name one book, one treatise, one
6    article where I can go look them up so I could
7    figure out what standards you're applying, please.
8            MR. TORBORG:  Objection, asked and
9    answered.
10       A.   Again, the analysis of claims data
11   that's done day in and day out to establish
12   overpayments are done by government personnel,
13   by health plans, by providers, and by many
14   consultants, such as myself, that are CPAs, do
15   not follow a book or a treatise to do the
16   calculation.
17           They go through logical analysis of
18   the specific facts related to the circumstances,
19   properly assess those facts, put them forward,
20   and then have the other party critique them and
21   reach agreement or rely on a trier of fact to make
22   the determination.

568

1            **So in that context there is no treatise on**
2       **how to calculate overpayments that I'm aware of**
3       **for provider claims.**
4       BY MR. BREEN:
5          Q.   Okay.  So is that it?  You can't list the
6       standards or anything else?
7               MR. TORBORG:  Objection, form, misstates
8       his testimony.
9       BY MR. BREEN:
10         Q.   Let me -- can I write them down?  Can you
11      list the specific standards you're applying here?
12         **A.   Okay.**
13         Q.   If the answer is no, just say "no."
14         **A.   Again, to repeat the response to the**
15      **question --**
16         Q.   My question, sir, is can you list the
17      standards?  Yes or no?  If the answer is no, just
18      say so.
19              MR. TORBORG:  Objection, asked and
20      answered.
21         **A.   The standards that I have described**
22      **orally --**

569

 1

 2  BY MR. BREEN:

 3      Q.   Give me the titles of them, the name of

 4  the standard.  Give me one.

 5           MR. TORBORG:  Objection, asked and

 6  answered, argumentative.

 7  BY MR. BREEN:

 8      Q.   One standard.

 9           MR. TORBORG:  Objection, asked and

10  answered, argumentative.

11      **A.   Okay.  As I indicated before, I have done**

12  **many of these calculations, and I have reviewed**

13  **other people's calculations and had those**

14  **calculations critiqued.**

15           **They're established in the industry.  They**

16  **are not written down in a treatise or a book.**

17  BY MR. BREEN:

18      Q.   Do they even have a name?  Just give me a

19  name of one standard.  That's all I'm asking you

20  for, a name.

21      **A.   There is no name that describes the**

22  **standard that I have described in my previous**

570

1  answer.
2      Q.   So unless I did like the Vulcan mind weld
3  with you, I can't figure out what those standards
4  are?  Is that what you're saying?
5      **A.   I think the standards that I've put**
6  **forth in my report as to the issues that have to**
7  **be addressed by Dr. Duggan to properly accomplish**
8  **his objectives are clear.**
9           **And ultimately we'll leave it to the trier**
10 **of fact to make the determination as to whether**
11 **that's adequate to meet the objectives.**
12     Q.   Well, one of the standards that you -- I
13 guess the standards -- I'll call them the no name
14 standards.
15          Your no name standards, some of those
16 standards, at least one of those standards, lead
17 you to conclude that there was a relationship
18 between the amount of dispensing fees the states
19 pay, the level of dispensing fees, and the level
20 of ingredient costs, correct?
21          MR. TORBORG:  Objection, form.
22     **A.   That's the established practice in the**