# Exhibit F

Hughes, James W. - Vol. I                                           May 5, 2009
                              Chicago, IL

                                                                            1

                        UNITED STATES DISTRICT COURT

                         DISTRICT OF MASSACHUSETTS


   IN RE:   PHARMACEUTICAL           )
   INDUSTRY AVERAGE WHOLESALE        ) MDL No. 1456
   PRICE LITIGATION                  )
   _____ ) Master File
                                     ) No. 01-CV-12257-PBS
   THIS DOCUMENT RELATES TO:         )
   _____ ) Subcategory
                                     ) No. 06-CV-11337-PBS
   United States of America,         )
   ex rel. Ven-A-Care of the         )
   Florida Keys, Inc., v.            )
   Abbott Laboratories, Inc.,        )
   CIVIL ACTION NO. 06-11337-PBS)       VOLUME I


           Videotaped Deposition of JAMES W.
   HUGHES, Ph.D., at 77 West Wacker Drive, 35th
   Floor, Chicago, Illinois, commencing at the hour
   of 9:13 a.m. on Tuesday, May 5, 2009.

280

1   these two methodologies are not the same in a
2   statistical sense, or I'm sorry, do not give the
3   same result in a statistical sense.
4            And if it's not statistically
5   significantly different, then economists would
6   generally conclude that either method, the
7   methods give, statistically speaking, the same
8   result. And so there's no reason to choose one
9   over the other.
10           But just to say well, this is .2
11  percent higher done with claims data than done
12  through extrapolation, is that a lot or is that a
13  little, I don't have a, I cannot articulate a
14  standard for saying that that's a lot or that's a
15  little.
16       Q.   So you don't have an opinion as to
17  whether the differential between the two methods
18  that he employed are material to this case?
19       **A.   Well, again, he seemed to think they**
20  **were material because after he did the**
21  **calculation, he says to me through his rebuttal**
22  **report, see, if I did it differently, this would**

Hughes, James W. - Vol. I                                          May 5, 2009

Chicago, IL

281

1    have come out, the difference calculation would
2    have come out higher.
3              And then he doesn't say but, by a
4    statistically insignificant amount or by an
5    amount that really doesn't matter.  He says look,
6    it's different.
7              So I will follow him, and it seemed it
8    was material enough for him to point it out.
9        Q.   But you haven't done any such analysis;
10   correct?
11             MR. BERLIN:  Objection, form.
12             THE WITNESS:  I don't have access to
13   the data, no.  I haven't been asked to conduct
14   any such analysis.
15   BY MR. LAVINE:
16       Q.   Also with the Medicaid program, you
17   said that your other major criticism of Professor
18   Duggan was the manner in which his but-for world
19   was created.
20             Are there any differences between your
21   criticisms of the but-for world in the Medicaid
22   arena as compared to the Medicare arena?

                                                                282

1        A.   Well, generally no.  But specifically
2   yes.
3             Again, there are numerous bits, not
4   numerous bits, numerous pieces of evidence from
5   testimony, from reports, from government
6   publications, speaking to the consequences for
7   access and speaking to the consequences for the
8   viability of providers if ingredient costs are
9   reduced.  And, again, as I've said earlier, Dr.
10  Duggan does nothing to take this into, does
11  nothing to take this into account.
12            So he is, again, ignoring specifically
13  lots of evidence in this matter that suggests
14  that the way he has characterized the but-for
15  world is not an accurate representation of the
16  world that would have existed absent the alleged
17  wrongful behavior of Abbott in this matter.
18       Q.   Because, again, you are of the opinion
19  that if he lowered the ingredient cost the way he
20  did in his method, there needed to have been some
21  way of accounting for increased dispensing fees
22  that would have been necessary as a result of

                                                              283

1   that?
2        A.   Well, I mean that's one part of it.
3             But the other part is of course that to
4   reduce, according to the testimony that I read,
5   to reduce ingredient costs by that amount while
6   assuming everything else, particularly dispensing
7   fees, stays constant, remain constant, that that
8   would threaten patient access to the Medicaid
9   system.  And that would violate the mandate in
10  the Medicaid law that requires that Medicaid
11  recipients have the same access to medical care
12  as nonMedicaid recipients, a mandate that is
13  co-equal in my understanding with the mandate to
14  keep the costs of the program low.
15       Q.   I'm not sure I understand how this
16  criticism is different than the similar criticism
17  you've leveled in connection with the Medicare
18  program.
19            You're saying that dispensing fees and
20  the ingredient cost need to be considered
21  together.  If you don't consider it together,
22  it's an unrealistic but-for world.  And one of

1   the reasons for that is because of the access
2   issues that may result from not doing that.
3           Is there anything else in that?
4      A.   Well, but I mean the other thing is
5   that of course this is a state-by-state program
6   and that these plans are approved on a
7   state-by-state basis.
8           So that how states are going to or how
9   the evidence shows that states balance access
10  versus cost issues, how states approach cost
11  containment.  I mean when state budgets get bad,
12  they often just go after Medicaid.  So it may
13  have very little to do with the issues that may
14  be active in this matter.
15          So there's the added part here is that
16  because these things are determined on a
17  state-by-state basis, that there's going to be
18  some variance in these consequences when
19  ingredient costs are attempted to be lower.
20          I mean if you look at the evidence,
21  some states, over the period of this lawsuit,
22  some states were able to reduce their ingredient

285

1    cost by a little bit.  Some of them raised

2    dispensing fees, some of them didn't.

3              But it remains the case that nobody had

4    the kind of wholesale Draconian cut in ingredient

5    cost that Dr. Duggan proposes in his report.

6         Q.   So is this criticism at least in part

7    that Professor Duggan doesn't account for the

8    individual differences between the state Medicaid

9    programs?

10        A.   Well, in some of his, in some of his

11   data analysis he certainly, you know, he

12   certainly does.

13             I mean he takes into account if a state

14   has a MAC for a drug for example.  So I mean

15   there are differences that he certainly does

16   attempt to take into account.

17             But on the bigger picture, on the

18   consequential issues that what happens when you

19   lower ingredient costs by so much, how are states

20   going to react, how are providers in states going

21   to react, the evidence seems to suggest that some

22   states worry more about access than others.

286

1           So how much you would actually be able
2   to lower ingredient costs and still keep the
3   viable network of providers would vary from state
4   to state.
5           But, again, my criticism is he
6   absolutely ignores all of that because he assumes
7   that the provider networks stay the same,
8   dispensing fees stay the same, everything stays
9   the same, but in some states he can cut the
10  reimbursements by ninety percent and have nothing
11  happen.  And that just seems unrealistic to me.
12      Q.   So are you also of the opinion that the
13  manner in which the extrapolation was performed
14  had some mathematical flaw?
15      A.   Well, it was, again, unnecessary in
16  many cases.
17           It requires the making of assumptions
18  that Dr. Duggan does not state for us what those
19  assumptions are.
20           I did not in my review of his report,
21  and I did not review the data, but in my review
22  of his report I did not detect that his

287

1  subtraction was in any way flawed, no.

2      Q.   Is that a review you understood to be
3  handled by Huron Consulting?

4      A.   Not specifically, but I suppose that it
5  was.  I mean nobody ever said to me yes, that's
6  what's Huron is doing.  But I assume that's what
7  Mr. Young did.

8      Q.   That never came up in any conversation
9  with counsel as to shouldn't there be somebody
10 looking at the actual data in this case?

11     A.   Oh, there's all sorts of experts Abbott
12 has.  I couldn't tell you what any of them are
13 doing specifically.

14          It wasn't anything that was discussed
15 with me.  And I never asked.  I mean outside of
16 Mr. Young, I actually couldn't name any of the
17 other Abbott experts.

18     Q.   And you didn't make any recommendations
19 as to type of data analysis that might be done in
20 connection with this case?

21     A.   Only to the extent that things appeared
22 in the exhibits to my report.