# Exhibit H

CIN: A-  84-00070,      $CF\text{-}10$
                         $CF\text{-}18$

# A-06-00-00023

### RECORD OF DISCUSSION

**DATE:**   August 30-31, 1994

**PLACE:**   Radisson Hotel, Richmond, Virginia

**PARTICIPANTS:**

| OIG | Medicaid Pharmacy Reps. |
|---|---|
| George Reeb, AIGA, HCFAD | Susan McCann, Missouri |
| Ben Jackson, Audit Manager | Susan McCleod, Florida |
| Gordon Sato, Audit Manager | Donna Bovell, D.C. |
| Bill Shrigley, Senior Auditor | David Shepherd, Virginia |
| Paul Chesser, Auditor | Elizabeth Miller, Virginia |
|  | Joe Fine, Maryland |
| HCFA | Allen Fung, California |
|  | Ed Vaccaro, New Jersey |
| Dave McNally | Cindy Denemark, Delaware |
| Mike Keogh | Benny Ridout, North Carolina |
|  | Terry Krantz, Montana |

**PURPOSE:**

To discuss and plan our natiowide review of the difference between the invoice price for drugs and AWP, for Medicaid pharmacy providers.

**COMMENTS:**

We informed the States that they were 1 of 12 randomly selected States to be used to develop a nationwide estimated of the difference between invoice price of drugs and AWP. We stated that HCFA had requested us to perform this review as the moratorium on pharmacy reimbursement would expire on December, 31, 1994. We further explained that we would be requesting the largest invoice for a designated month from 48 pharmacies in each State, with 12 pharmacies being selected from 4 categories of pharmacies -- Rural-Chain, Rural-Independent, Urban-Chain, and Urban-Independent. We indicated that each State would receive a report showing the results for their State and that the combined results would be reported to HCFA.

The State officials expressed concern that our review was limited to one aspect of pharmacy reimbursement. They said that any effort to lower the reimbursement for acquisition cost should also include some review of dispensing fees. They stated that we should include a fifth category of pharmacies to include non-



2/3

A-06- 0 0 - 0 0 0 2 5

CF-10
CF-18

traditional retail pharmacies such as hospitals, home IV, nursing homes, physicians etc... The State officials believed that these pharmacies purchased at substantially bigger discounts than traditional retail pharmacies* They also stated that we should request the largest invoice from each different type of supplier rather than just the largest invoice.

R R R

We agreed to add the fifth category of pharmacies. We also agreed to request the largest invoice from each different type of supplier. We decided that the types of suppliers would be identified as; 1) wholesaler, 2) chain warehouse, 3) manufacturer, and 4) generic distributors. Additionally, we determined together, that for the purposes of this review, chain pharmacies would include all pharmacies with four or more stores. We also composed the letter to be sent to each pharmacy requesting the invoices.

R3

R1

The State officials agreed to provide us with a listing of the pharmacy providers in their State. The listing would identify the pharmacies as chain, independent or other (non-traditional). We would determine whether the pharmacy was rural or urban by comparing the county location of the pharmacy to an MSA listing.

R2

We agreed to meet upon the completion of the review to discuss the reporting of our results.

R1

\* The state officials believed that including the non-traditional pharmacies would overstate the estimate of the difference. We agreed to exclude the non-traditional pharmacies from the overall estimates. Most state were never interested in seeing what the non-traditional paid for drugs, so we decided to do for them an estimate for these.

R'

P Oberg
12-4-95

3/3

**Qui Tam Cases Intervened or Partially Intervened Based On Election Decision Date**

| FY | Dismissed No FCA Recovery | Final Judgment for Defendant | Final Settlement/Judgment for U.S. | Partial Settlement/Judgment for U.S. | Pending | Consolidated | Total Cases Intervened\Partially Intervened |
|---|---|---|---|---|---|---|---|
| 1995 | 2 | 1 | 43 | | 2 | | 48 |
| 1996 | | | 48 | | | | 48 |
| 1997 | 2 | | 46 | 1 | | | 49 |
| 1998 | 4 | 2 | 82 | 3 | 1 | | 92 |
| 1999 | 4 | 1 | 63 | | 1 | | 69 |
| 2000 | 9 | 3 | 98 | 1 | 1 | | 112 |
| 2001 | 7 | 2 | 82 | 3 | 1 | | 95 |
| 2002 | 5 | | 62 | 2 | 2 | | 71 |
| 2003 | 2 | 1 | 56 | 3 | 3 | | 65 |
| 2004 | | | 64 | 4 | 1 | | 69 |
| 2005 | 4 | | 77 | 4 | 8 | | 93 |
| 2006 | 2 | | 61 | 9 | 10 | 1 | 83 |
| 2007 | | | 45 | 11 | 24 | | 80 |
| 2008 | | | 37 | 7 | 17 | | 61 |
| TOTAL | 41 | 10 | 864 | 48 | 71 | 1 | 1035 |
| Percentage | 4% | 1% | 83% | 5% | 7% | 0% | |

D-5

CIN: A-06 97 - 00052

## RECORD OF DISCUSSION

DATE:       March 20, 1997

PLACE:      Medicaid Pharmacy Administrators Symposium
            Asheville, NC

TIME:       2:00 pm

PARTICIPANTS:

1. Elizabeth Geary, Connecticut Dept. of Social Services
2. Pat Gladden, Texas Dept. of Health
3. Marvin Hazelwood, Illinois Department of Public Health
4. Bob Reid, Ohio Dept. of Human Services
5. Benny Ridout, North Carolina Dept. of Human Resources
6. David Shepherd, Virginia Dept. of Medical Assistance
7. M. J. Terrebonne, Louisiana Dept. Of Health and Hospitals
8. Jerry Wells, Florida Medicaid Office of Pharmacy Services
   Paul Chesser, HHS-OIG

DISCUSSION:

The purpose of this meeting was to get input from State Medicaid pharmacy representatives concerning rebates based on AWP rather than AMP. All State officials attending this meeting expressed support for the idea of basing rebates on AWP but were unsure how easily it could be done. They believed that basing rebates on AWP would result in AWP becoming a meaningful number on which they could base reimbursement. They also thought that those drug manufacturers that play games with AWP (overstate AWP for marketing purposes) would immediately lower their AWPs to a more realistic level. They pointed out some possible problems and concerns related to this issue:

- The percentage difference between AWP and AMP varies widely from manufacturer to manufacturer.

- Manufacturers may not always establish AWP. There may be instances where the wholesalers actually set the AWP.

- Any legislative change to the rebate legislation could result in the drug manufacturers pressuring Congress to lower or eliminate drug rebates.

Despite these problems and concerns, the State officials were in favor of pursing rebates based on AWP. They wondered if the definition of AMP could be changed by HCFA without any additional legislation. They suggested that HCFA could merely change to definition of AMP to



EXHIBIT
Roxane 156
10/28/08  SCV

HHD031-0396

CIN: A-06- 97 - 0 0 0 5 2

AWP less some percentage. The percentage most talked about was 20 percent, as we informed them that a preliminary analysis of AMP versus AWP had shown that the difference between them was about 20 percent. They thought by changing AMP to AWP minus 20 percent would allow States to keep their current reimbursement methodology.

State officials stated that if legislative changes were required to convert to rebates base on AWP that another issue to address would be entry level pricing. The officials believe that new drug pricing (drug manufacturers setting new drug prices at unreasonable levels) is a problem and could become a bigger problem in the future.

Some officials also thought we should do away with rebates for generic drugs while other officials did not want to.

HHD031-0397