UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Hon. Patti B. Saris |
| | ) | |
| *United States of America ex rel. Ven-a-Care of* | ) | Magistrate Judge Marianne B. Bowler |
| *the Florida Keys, Inc., et al. v.  Boehringer* | ) | |
| *Ingelheim Corporation, Inc., et al.,* CIVIL | ) | |
| ACTION NO. 07-10248-PBS | ) | |

**UNITED STATES' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO
THE ROXANE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      ROXANE'S PRICE REPORTING PRACTICES . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.     THE IMPACT OF ROXANE'S PRICE REPORTING ON THE
MEDICAID AND MEDICARE PROGRAMS . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          A.     The Impact on Medicaid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          B.     The Impact on Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    III.    ROXANE'S KNOWLEDGE OF ITS PRICES AND THEIR USE BY THE
MEDICAID AND MEDICARE PROGRAMS . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.     Roxane's Launch of Ipratropium Bromide . . . . . . . . . . . . . . . . . . . . . . 8

          B.     Roxane's AWP Increases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          C.     Roxane Promoted the Spread to Its Customers . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.      The United States Is Entitled to Partial Summary Judgment Regarding the
Falsity of Roxane's AWPs for the Subject Drugs . . . . . . . . . . . . . . . . . . . . . . . 11

          A.     Roxane's AWPs for the Subject Drugs Are Objectively False . . . . . . . . 11

          B.     None of the Evidence Cited by Roxane Demonstrates Government
Approval of Roxane's False Price Reporting . . . . . . . . . . . . . . . . . . . . . 13

    II.     The United States Is Entitled to Partial Summary Judgment That Roxane's
Conduct Related to the Submission of False Claims Was "Knowing" and
Roxane's Eleventh Defense of Consent Must Fail . . . . . . . . . . . . . . . . . . . . . . . 18

    III.    The United States Is Entitled to Partial Summary Judgment Regarding
Materiality and Causation for False Claims Involving the Medicaid
Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

IV.     Roxane Is Not Entitled to Summary Judgment Regarding Damages for
        False Claims Involving the Medicaid Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.      The United States Is Entitled to Partial Summary Judgment Regarding
        Materiality and Causation for False Claims to the Medicare Program . . . . . . . . 24

VI.     Roxane Is Not Entitled to Summary Judgment with Respect to Medicare
        Claims Involving NovaPlus Ipratropium Bromide . . . . . . . . . . . . . . . . . . . . . . . 25

        A.      Roxane's NovaPlus Ipratropium Bromide Was Launched as Part of
                the NovaPlus Brand of Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.      The DMERCs Correctly Classified Roxane's NovaPlus Ipratropium
                Bromide Product As a "Brand" According to Criteria Published in the
                Federal Register . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                1.      A "brand" includes any product that is marketed under a
                        "proprietary name" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                2.      NovaPlus ipratropium bromide was marketed under a
                        "proprietary name" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        C.      The Classification of NovaPlus Ipratropium Bromide as a Brand
                Was Foreseeable to Roxane . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        D.      The Inclusion of Competitors' Pricing at Various Times by the
                DMERCs Was Foreseeable to Roxane and Does Not Qualify as an
                "Intervening Factor That Negates Causation" . . . . . . . . . . . . . . . . . . . . . 31

VII.    The United States Is Entitled to Summary Judgment on Roxane's Eleventh
        Affirmative Defense of Failure to Mitigate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VIII.   Roxane Is Not Entitled to Summary Judgment on the United States' Claim for
        Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## **TABLE OF AUTHORITIES**

*Auer v. Robins,*
     519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Dixson v. U.S.,*
     465 U.S. 482 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

*In re Lupron Sales Practices,*
     295 F. Supp. 2d 148 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Massachusetts v. Mylan Labs.,*
     608 F. Supp. 2d 127 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 21

*In re Pharm. Indus. Average Wholesale Price Litig.,*
     254 F.R.D. 35 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Pharm. Indus. Average Wholesale Price Litig.,*
     460 F. Supp. 2d 277 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

*In re Pharm. Indus. Average Wholesale Price Litig.,*
     478 F. Supp. 2d 164 (D. Mass. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Pharm. Indus. Average Wholesale Price Litig.,*
     491 F. Supp. 2d 20 (D. Mass. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

*In re Pharm. Indus. Average Wholesale Price Litig.,*
     520 F. Supp. 2d 267 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rhode Island Hospital v. Leavitt,*
     548 F.3d 29 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Russo v. Baxter Healthcare Corp.,*
     140 F.3d 6 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 32

*South Shore Hospital, Inc. v. Thompson,*
     308 F.3d 91 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States ex rel. Durcholz v. FKW Inc.,*
     189 F.3d 542, 545 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States ex rel. Franklin v. Parke-Davis,*
     2003 WL 22048255 (D. Mass. Aug. 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 30

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
  2009 WL 1959259 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States ex rel. Loughren v. Unumprovident Corp.*,
  604 F. Supp. 2d 259 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States ex rel. Loughren v. Unumprovident Corp.*,
  2008 WL 4280133 (D. Mass. Sept. 15, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26

*United States v. President and Fellows of Harvard College*,
  323 F. Supp. 2d 151 (D. Mass. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*U.S. v. Maxwell*,
  254 F.3d 21 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## STATUTES & REGULATIONS

False Claims Act ("FCA"), 31 U.S.C. § 3729 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 21, 22, 24

42 U.S.C. § 1396r-8(b)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

44 U.S.C. § 1507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 C.F.R. § 405.517(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42  C.F.R. § 447.332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

63 Fed. Reg. 30,818, 30,845 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

63 Fed. Reg. 58,814, 58,849 (Nov. 2, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

71 Fed. Reg. 51,276, 51,302 (August 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## INTRODUCTION

For as hard fought as this case has been, there is really little dispute about the essential facts pertaining to the defendants (hereafter, "Roxane").  *First*, Roxane deliberately reported Average Wholesale Prices ("AWPs") that bore little or no relationship to the prices at which it was selling the Subject Drugs.[1]  *Second*, Roxane knew that the Medicaid program relied upon its reported AWPs to calculate reimbursement for the Subject Drugs, and that the Medicare program relied upon its reported AWPs to calculate reimbursement for ipratropium bromide.  *Third*, Roxane marketed the "spread" between the purchase prices of its drugs and the reimbursement amounts, and intended that its customers submit claims for the Subject Drugs to the Medicaid and Medicare programs.  *Fourth*, Roxane's customers did submit Medicare and Medicaid claims and obtained reimbursement amounts based on Roxane's reported false prices.  *Finally*, despite its current protestations of "government knowledge," Roxane cannot point to any government report or statement by a government employee indicating approval of Roxane's conduct, and Roxane did not rely upon government statements when it chose to report false AWPs.

The above conduct violates Sections 3729(a)(1) and (a)(1)(B) of the FCA.[2]  Roxane's

---

[1] The First Amended Complaint ("Amended Complaint") alleges violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, with respect to nine Subject Drugs: azathioprine, diclofenac sodium, furosemide, hydromorphone, ipratropium bromide, Oramorph SR, Roxicodone, Roxanol and sodium polystyrene sulfonate.  Amended Complaint, Master Docket ("MD") # 5733, Sub. # 96, at ¶ 58 and Exh. A; United States' L.R. 56.1 Statement of Undisputed Material Facts as to Roxane ("US-BR-SF"), ¶ 8.

[2] The FCA was recently amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009.  Section 3729(a)(1)(B) was formerly Section 3729(a)(2), and is applicable to this case by virtue of Section 4(f) of FERA, while Section 3729(a)(1) of the statute prior to FERA remains applicable here.  "The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729(a)(1), as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date . . . ."  FERA, section 4(f).

Motion for Summary Judgment does not establish a basis for ruling in Roxane's favor on any point.  *First*, there is no merit to Roxane's contention that the United States cannot show that Medicaid claims were paid using Roxane's AWPs or wholesale acquisition costs ("WACs"). Extensive discovery of how state Medicaid programs calculate reimbursement established that the overwhelming majority of states use computerized formulas that automatically input Roxane's reported AWPs or WACs, then calculate a "lower of" reimbursement amount for the Subject Drugs.  Claims data from both the Centers for Medicare and Medicaid Services (CMS) and the states show that Medicaid programs around the country reimbursed for the Subject Drugs during the time period the reimbursement formulas were in effect.

*Second*, having chosen to label its "Novaplus" ipratropium bromide product under a proprietary brand name, Roxane cannot now complain because the product was classified as a brand for calculating Medicare reimbursement.  Because such a consequence was entirely foreseeable, the United States is entitled to seek damages based on Roxane's false AWPs.

*Third*, despite production of hundreds of thousands of pages from federal and state government files, and depositions of nearly 100 current and former government employees from the Department of Health and Human Services (HHS) and state Medicaid programs, Roxane still cannot point to a shred of evidence that the government specifically approved Roxane's reporting of false prices for the Subject Drugs.  Nor is there evidence that Roxane interpreted any government report or statement as approval of its conduct.  Without such evidence, Roxane cannot obtain summary judgment on Medicaid and Medicare claims post-December 31, 2000.

*Finally*, Roxane was unjustly enriched from the sales of the Subject Drugs, which Roxane's own employees testified were enhanced by the inflated AWPs and WACs, and the

United States has presented sufficient evidence to defeat summary judgment. [3]

## SUMMARY OF UNDISPUTED FACTS

Roxane is a pharmaceutical company which markets primarily multi-source drugs. US-BR-SF ¶ 2-3; Corrected Roxane Local Rule 56.1 Statement of Undisputed Material Facts In Support of Its Motion For Summary Judgment (MD # 6207) ("Roxane SOF"), ¶ 97). Each of the nine Subject Drugs at issue is covered by Medicaid, and ipratropium bromide is covered by Medicare. Although all of the Subject Drugs are multiple-source drugs, Roxane markets several products as "branded generics," meaning that Roxane assigns the products a brand name and markets them as "branded" products. (US-BR-SF ¶ 7)

Roxane sells the Subject Drugs to various classes of customers, including wholesalers, retail pharmacies, homecare pharmacies, and hospitals. (*Id.* ¶ 9) Roxane sells its drugs through two primary distribution channels – direct sales and indirect sales. In a direct sale, Roxane invoices and ships directly to its customer. Sales to wholesalers (among others) fall within this category. (*Id.* ¶ 10) An indirect sale is generally a sale between Roxane's wholesale customer and one of Roxane's non-wholesale contract customers. In the typical indirect sale, Roxane negotiates a contract price with the indirect customer who ultimately purchases Roxane's product. The contract prices between Roxane and the indirect customer are almost always below Roxane's "WAC" invoice price to the wholesaler. Consequently, to prevent the wholesaler from incurring a loss, Roxane pays the wholesaler a "chargeback" that includes the difference between

---

[3]Pursuant to an agreed schedule, the United States will address Roxane's argument regarding the statute of limitations and jurisdiction in its opposition to Roxane's Motion to Dismiss on this topic. Roxane also seeks summary judgment as to damages for Medicare claims relating to azathioprine; the United States does not intend to calculate or pursue those damages.

the WAC invoiced to the wholesaler and the indirect contract price.   (US-BR-SF ¶ 11-13)

## I.     ROXANE'S PRICE REPORTING PRACTICES

As Roxane acknowledges, its historic practice has been to report its internally determined AWPs to First Data Bank ("FDB"), Red Book, and Medi-Span (the "Publishers"), at the time it launches a drug to the market. (Roxane SOF, ¶ 112; US-BR-SF, ¶¶ 18-21)  Roxane expected that the Publishers would publish the reported prices, and the Publishers did. (*Id.*)

The AWPs Roxane caused to be published were inflated when the drugs were launched, and became even more inflated as Roxane's prices to customers dropped and the AWPs remained unchanged.  (US-BR-SF, ¶¶ 26-37) In several instances, Roxane increased the AWPs for a drug several years after launch, including when its sales prices for the drug were flat or declining.  For example, in or around August 2000, Roxane more than tripled the AWPs for several of its furosemide products. (*Id.*, ¶¶ 32, 84)  Roxane also increased the AWPs for azathioprine in 1999 and hydromorphone in 1998.  (*Id.*, ¶¶ 61, 71-72)

The United States' expert accountant, Simon D. Platt, has calculated on a quarterly basis the average of Roxane's sales to the retail pharmacy class of trade, net of chargebacks and rebates, and compared those average prices to the AWPs published by FDB.  For ipratropium bromide, he has also compared those average prices to the AWPs published by Red Book.  (*Id.*, 26-37)  Mr. Platt has also computed examples of the percentage spread between the average sales price ("ASP") and the AWP, using annually aggregated sales data.[4]  These comparisons

---

[4]  The spreads are calculated consistent with the approach selected by the Court in *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 87 n.61 (D. Mass. 2007).

demonstrate that the AWPs Roxane reported for the Subject Drugs were false.  Addendum A to this memorandum shows representative spreads on each of the Subject Drugs.  The spreads for Roxane's ipratropium bromide products, for example, were 296.8% in 2000 and 494% in 2002. (*Id.*, ¶ 28)  The spreads on Roxane's furosemide product were 156.8% in 1999 and 1411.9% at the end of 2000, after Roxane increased its AWPs in August of that year.  (*Id.*, ¶ 32)

Prior to late 1997, Roxane also reported WACs to the Publishers for all of the Subject Drugs.  In or around late 1997 and early 1998, Roxane lowered the WACs for over 200 of its multi-source products. (*Id.*, ¶¶ 120-21)  Roxane stopped reporting new WACs to the Publishers, and knew that if it did not report its new (reduced) WACs, FDB would continue to report its last published (and higher) WACs. (*Id.*, ¶¶ 124-25)  In or around late 1999, Roxane instructed the Publishers to remove WACs for its multi-source products, so that "all multi-source product pricing except AWP [was] updated to reflect a zero price." (*Id.*, ¶¶ 133-36)  As a result, starting in late 1999, Roxane's AWPs were the only published prices for its multi-source drugs.

## II.   THE IMPACT OF ROXANE'S PRICE REPORTING ON THE MEDICAID AND MEDICARE PROGRAMS

### A.   The Impact on Medicaid

The reimbursement methodology employed by every state Medicaid program included a "lower of" component.  (US-C-SF, ¶¶ 29, 30)  A very common methodology was that a state set its drug reimbursement at the lower of (1) an Estimated Acquisition Cost ("EAC"), usually based on a published AWP and sometimes based on a published WAC, (2) the Usual & Customary Charge ("U&C"), (3) a Maximum Allowable Cost ("MAC") or (4) Federal Upper Limit ("FUL").  (*Id.*)  FULs are established by CMS under that agency's FUL program, described at 42 C.F.R. § 447.332. (*Id.*)  A limited number of states reimburse based on the lower of (a) EAC plus

a dispensing fee, (b) U&C, (c) the FUL (if any) plus a dispensing fee, (d) the MAC (if any) plus a dispensing fee, or (e), if applicable, the "DOJ Price" plus a dispensing fee.[5]

Because states incorporate AWPs and/or WACs into their determination of EAC, and EAC is one of several price points considered in determining the "lower of" reimbursement amount, there is no genuine issue that inflated AWPs and/or WACs are materially *and* causally connected to the submission of claims to the government for the Subject Drugs.

### B.    The Impact on Medicare

Since the early 1990s, Medicare has typically paid for covered drugs using AWPs published in the Red Book.  The carriers who paid the Medicare claims at issue here are known as the Durable Medical Equipment Regional Carriers ("DMERCs").  The DMERCs processed claims for ipratropium bromide, a respiratory drug used with durable medical equipment such as nebulizers.  (US-BR-SF, ¶ 143)  The United States seeks partial summary judgment as to claims for ipratropium bromide processed by the DMERC for Region D, CIGNA Government Services ("CIGNA") from April 1, 1997, through September 30, 2001.[6]  The DMERCs processed such claims using three HCPCS codes.  (*Id.*)  The allowed amount was the lower of the fee calculated by the DMERC or the amount submitted by the provider in the claim form.  (US-C-SF, ¶ 145)

CIGNA (like the other DMERCs) determined the allowed fee for ipratropium on a quarterly basis using the AWPs published in the Red Book.  From 1996 through 1997, CIGNA

---

[5]The "DOJ Price" refers to prices provided in 2000 by the Department of Justice and the National Association of Medicaid Fraud Control Units ("NAMFCU"), and published by FDB.  (US-C-SF, ¶ 17)

[6]  Background information concerning DMERCs and Medicare payment policies and practices regarding DME drugs is described in the United States' L.R. 56.1 Statement of Material Facts Common to All Defendants.  (US-C-SF, ¶¶ 1-16)

followed HCFA instructions and calculated the allowable amount as the median AWP of the generic forms of the drug, recording its determinations in an "array" usually prepared quarterly. (US-BR-SF, ¶ 150)  That median then served as the basis for reimbursing for all drugs within the HCPCS code, regardless of manufacturer. (US-C-SF, ¶ 4, 11-13)  Effective January 1, 1998, following passage of the Balanced Budget Act of 1997, CIGNA calculated the allowable fee as 95% of the lower of the median AWP of the generic forms of the drug or the AWP of the lowest priced brand name drug.  (*Id.*, ¶ 12)

An examination of the CIGNA arrays shows with mathematical precision that if the AWPs for Roxane's ipratropium bromide products[7] had been lower by just one percent, the allowed amounts for Medicare claims processed from the second quarter of 1997 through the third quarter of 2001 would have been lower.[8] (US-BR-SF, ¶ 160)  The Medicare claims processed by CIGNA demonstrate that during this period claims for ipratropium bromide were paid using the allowed amounts that were based in part on Roxane's AWPs.  (*Id.*, ¶ 161).

## III.   ROXANE'S KNOWLEDGE OF ITS PRICES AND THEIR USE BY THE MEDICAID AND MEDICARE PROGRAMS

There is ample undisputed evidence that Roxane was familiar with Medicare and Medicaid reimbursement procedures, and also knew that those programs used the AWPs and

---

[7] As discussed below, Roxane sold this drug under both a Roxane label and a NovaPlus brand label.  The United States is not seeking partial summary judgment with respect to the NovaPlus label.

[8] For quarters after 2001 Q3, the allowed amount is lower if the AWPs for both the Dey and Roxane ipratropium products are reduced by one percent or more.  In light of the joint harm caused to the United States by Dey and Roxane's false AWPs for this drug, the United States intends to move to consolidate the two cases for trial.  In this motion, however, the United States does not seek summary judgment based on the joint harm to the Medicare program caused by Roxane and Dey's reported AWPs.

WACs reported to the Publishers in setting reimbursement rates.  In April 2000, for example, a Roxane employee circulated an email under the heading, "Medicare reimbursement of Combivent UDV," stating that Medicare reimbursement "is based on the AWP."  The employee further specified that "generic products" were reimbursed by Medicare at the "median of all generic AWPs," and he included examples of Medicare reimbursement for certain drugs and dosages.  (US-BR-SF, ¶ 117)  Roxane also included information about Medicare and Medicaid reimbursement as part of its marketing documents (*id.*, ¶¶ 112-13, 115), and understood the advantage of having its products included in state drug formularies. (*Id.*, ¶ 114)  For example, the launch plan for Roxane's 15/30 mg Roxicodone tablets included a "Medicaid Reimbursement Plan" outlining steps for notifying state Medicaid programs of Roxicodone's availability and for submitting requests that the products be added to state formularies.  (*Id.*, ¶ 115)

A.     **Roxane's Launch of Ipratropium Bromide**

Roxane's June 1996 launch of its ipratropium bromide product illustrates Roxane's price reporting practices for the Subject Drugs.  Ipratropium bromide is the generic version of Atrovent Unit Dose Vial, a branded drug marketed by Roxane's sister company (BIPI).  Roxane was the first entrant to the generic ipratropium bromide market and enjoyed a several-month period of exclusivity prior to other generic manufacturers being able to enter the market.  (*Id.*, ¶¶ 42-44)

Roxane retained a consultant named Mark Pope, who had previously worked for Dey Laboratories, to help with the launch of ipratropium bromide.  (*Id.*, ¶ 45)  In early 1996, Mr. Pope researched "Medicare reimbursement" and met confidentially with key customers. (*Id.*, ¶¶ 46-47) Mr. Pope reported to Roxane that one customer had suggested that the AWP for

8

ipratropium bromide be set at "no lower than 20% less than the brand[,]" but Mr. Pope

recommended that 10% under the brand would be "best."[9] (*Id.*, ¶ 48)  Roxane followed the

recommendation, and the launch plan explained that this price structure was used "to create an

attractive spread between WAC and AWP, encouraging accounts to convert from the brand name

to the generic product as quickly as possible." (*Id.*, ¶ 51) Product announcements conspicuously

identified the AWP and encouraged customers to "[c]ompare acquisition cost and AWP." (*Id.*, ¶

53)  From 1996, Roxane offered regular price reductions on ipratropium bromide, but never

lowered the AWP.  By 2002, Roxane's AWP for ipratropium bromide was inflated by as much

as 494%. (*Id.*, ¶ 28)

> **B**.      **Roxane's AWP Increases**

For several of the Subject Drugs, Roxane raised the AWP many years after the product's

launch.  The purpose was to increase reimbursement to customers and thereby increase product

sales.  For example, in or around December 1998, Roxane learned that competitors had raised

their AWPs for azathioprine, and that this was negatively impacting Roxane's sales. (*Id.*, ¶ 68) A

December 1998 Monthly Report from Roxane's National Accounts Managers indicates that

customers had requested that Roxane "raise [its] AWP but not [its] price" for azathioprine. (*Id.*)

Roxane chose, instead, to raise its AWP *and* to lower its sales prices.  Roxane offered regular

price reductions to customers during 1999 and, in September of that year, Roxane raised the

AWP for this product from $116.74 to $131.08, which was slightly higher than the AWPs of its

generic competitors. (*Id.*, ¶¶ 69-72)  Officials in Roxane's marketing department testified that the

---

[9] Roxane claims its practice was to set the AWP for its generic products at 10% below the
brand. The evidence establishes that, when Roxane did follow this "practice," it did so in order to
gain a "competitive advantage."  (US-BR-SF, ¶ 39)

increased AWP provided Roxane a "competitive advantage" in selling azathioprine. (*Id.*, ¶ 72)

Similarly, in April 2000, Roxane learned that customers were complaining that the AWPs for its furosemide products were "too low." (*Id.*, ¶¶ 74-76)  Roxane was unable to sell significant volumes of furosemide during this time frame and, rather than discontinue the product, Roxane chose to dramatically increase its furosemide AWPs by as much as 300% in August 2000. (*Id.*, ¶ 84)  Roxane made this decision knowing full well that the government was investigating allegations of inflated AWPs in the pharmaceutical industry.  Roxane employees variously described the decision to raise the furosemide AWPs as "touchy" and "sensitive." (*Id.*, ¶¶ 77-78) In a July 7, 2000 email, Roxane's Director of National Accounts wrote that while he realized there was "political pressure on AWP currently [] it should not run our business.  Logic dictates that no matter what the AWP is, if big brother wants to punish, they will so why not make some money meanwhile." (*Id.*, ¶ 80)  By the end of 2000, Roxane's AWPs for its furosemide products were inflated by as much as 1400%.  (*Id.*, ¶ 32)  Multiple Roxane employees testified that the furosemide AWP increase resulted in greater sales.  (*Id.,* ¶ 88)

### C.    Roxane Promoted the Spread to Its Customers

Roxane regularly communicated its AWPs to customers, including when Roxane notified customers of reductions in contract prices. (*Id.*, ¶¶ 53, 56, 63, 65, 69)  Moreover, Roxane promotional literature encouraged customers to compare AWPs to acquisition costs, and Roxane's sales force emphasized AWP spreads as a reason to purchase Roxane's products.  For example, a marketing memorandum related to a change in AWP for Oramorph SR attached a worksheet "illustrating the impact on profit for the retailer," and told sales representatives that they should "be comfortable enough with the math that you can work the actual numbers out with the

10

pharmacists." (*Id.*, ¶ 91)  Although Judy Waterer, a senior Roxane employee, testified in 2001 that

she wouldn't "know how to begin to market a spread," the evidence establishes that Ms. Waterer

in fact was aware that sales representatives promoted "spreads" as a reason to buy Roxane's

products and, moreover, that she herself trained sales personnel how to do so. (*Id.*, ¶ 110)

Likewise, according to an "Inside Sales Department November 1997 Monthly Report," Roxane ran

a "mini-pilot on selling Azathioprine and Hydroxyurea using the spread between WAC and

AWP."  (*Id.*).

## ARGUMENT

### I.    The United States Is Entitled to Partial Summary Judgment Regarding the Falsity of Roxane's AWPs for the Subject Drugs

The United States seeks partial summary judgment regarding the falsity of Roxane's

AWPs for the Subject Drugs and, based on the same undisputed facts, the United States opposes

Roxane's motion for summary judgment on all Medicaid claims.

#### A.    Roxane's AWPs for the Subject Drugs Are Objectively False

Based on the plain meaning definition of AWP adopted in this matter,[10] this Court has

held that AWP and WAC prices that have no relationship to the actual prices paid by the

defendants' customers are false.   *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F.

Supp. 2d 20, 103, 105-08 (D. Mass. 2007); *In re Pharm. Indus. Average Wholesale Price Litig*,

520 F. Supp. 2d 267, 270 (D. Mass. 2008).  Roxane itself was aware that, at various times, FDB

defined AWP as follows:

> AWP is the average wholesale price.  That is, AWP is the average of the prices
> charged by the national drug wholesalers for a given product (NDC).  The

---

[10]*In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 287 (D. Mass. 2006).

operative word is average.  AWP was developed to provide a price which all
parties could agree upon for electronic pricing to be possible.

(US-BR-SF, ¶ 118)  A September 2000 Roxane "Reimbursement Background" memorandum

distributed to Roxane's palliative care sales force stated that AWPs "were meant to reflect an

average of suggested list prices that wholesalers charged various customer outlets (e.g., retail

pharmacies and physician offices)."  (*Id.,* ¶ 104)

Tellingly absent from Roxane's brief or statement of facts is any claim or evidence that

the prices it reported as AWPs for the Subject Drugs were truthful.  According to a Roxane

employee, "[t]hese are published prices only.  The AWP and WAC have little relation to actual

net selling price after chargebacks, discounts, rebates, etc."  (*Id.,* ¶ 59)  By any objective

measure, Roxane's AWPs for the Subject Drugs were false, and its reports of these AWPs to the

Publishers constitute false statements under the FCA.  Those false statements in turn render the

claims submitted for Roxane's drugs false or fraudulent under the FCA.

Roxane's stated practice was to set the AWP for its multi-source drugs at 10% below the

AWP of the corresponding branded/innovator drug at the time of launch.  (Roxane SOF, ¶ 99;

US-BR-SF ¶ 38)   Roxane officials acknowledged that Roxane considered AWP spreads,

profitability to customers, and whether it could gain a competitive advantage when setting prices

for its products.  (US-BF-SF,  ¶¶ 39, 72)  Roxane generally did not change the AWPs for its

multi-source drugs following launch, but sometimes raised its AWP to match those of its

competitors (*id.,* ¶¶  69-73, 83-86), even when the price actually charged was unchanged or

falling.  (*E.g., id., ¶¶* 69 -73)

As a result of these practices, Roxane's reported AWPs for the Subject Drugs were false.

The calculations and comparisons done by the United States' expert show that the AWPs that

Roxane caused to be published for the Subject Drugs were substantially higher than the prices at which Roxane sold those products to its indirect customers.  (*Id.,* ¶¶ 26-37)  The spreads on the Subject Drugs are summarized in Addendum A.

Despite these undisputed differences between Roxane's reported prices and what its customers were charged, Roxane claims the United States cannot prove falsity as a matter of law.  (*Roxane Defendants' Memorandum in Support of Their Motion for Summary Judgment*, MD #6200 ("Rox SJ Br.") at 4)  Roxane argues that the United States "must come forward with evidence that each State Medicaid program actually paid each claim for which it seeks recovery using Roxane's AWPs or WACs." (*Id.*)  Roxane's argument with respect to falsity conflates liability under the FCA with whether the government sustained damages as a result of the fraudulent course of conduct at issue.  A finding that the inflated AWPs or WACs actually affected the payment is irrelevant to the issue of falsity.  It is, instead, a damages issue:  would a true or accurate AWP or WAC have resulted in lower reimbursement for a specific drug.  In other words, the falsity of a claim does not depend upon the basis on which the claim was *paid*; it depends on the basis on which the claim was *made*.  Here, claims were false or fraudulent due to Roxane's conduct.

**B.     None of the Evidence Cited by Roxane Demonstrates Government Approval of Roxane's False Price Reporting**

Roxane does not dispute the falsity of its prices prior to December 31, 2000.[11]  Instead,

---

[11]The United States' damages calculations cover Medicare damages for the period of 1996 through 2003 for ipratropium bromide, and Medicaid damages for the period of 1996 through the present for ipratropium bromide, for the period of 1999 through the present for azathioprine, diclofenac sodium, furosemide, hydromorphone and sodium polystyrene, and for the period of 1999-2001 for oramorph SR, roxanol, and roxicodone.

Roxane argues that after 2000, "government knowledge" precludes a finding of falsity.  (Rox SJ Br. at 25.)  That argument fails as a matter of law.  As noted in the United States' Common Brief and recognized by the Court, the majority view is that a determination of falsity should be made independent of any purported knowledge by the government.  Even if such knowledge is taken into account, however, it is only relevant to the extent there has been *approval* by the government of the conduct at issue.  The case law consistently speaks in terms of *specific* approval of the *specific* conduct engaged in by the defendant.[12]  *See, e.g.*, *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) (government's knowledge negates fraud or falsity only where government knew and approved "the particulars").  To hold otherwise would provide a monumental safe harbor for fraud, as every defendant engaged in a scheme that is identified in an Office of Inspector General (OIG) report would argue, as Roxane does, that the government's failure to determine how to fix the problem is tantamount to government approval of the conduct even if, as is the case here, the conduct at issue was viewed and described as problematic, abusive, and fraudulent, causing "unnecessary" or "excessive" reimbursement, and resulting in taxpayers being "cheated."  (*See, e.g.*, Roxane SOF, Tabs 71, 92, 104, 114)

Roxane points to a variety of sources of information available to the government (Rox SJ Br. at 28-32), and then argues that the government's failure to scrap its regulatory system connotes government approval of Roxane's conduct.  (*Id.* at 32-34)  The evidence cited, however, simply does not demonstrate government approval of Roxane's false pricing.  First,

---

[12]Roxane does not even allege that any such approval was ever given to Roxane, and the government vigorously contends otherwise.

Roxane contends that providing its AMPs, rather than true AWPs or WACs, absolves it of liability, because the government could have reimbursed based on AMPs, but failed to do so. (Rox SJ Br. at 28-29)  This Court already rejected that argument in the context of Medicaid, holding that the state's failure to reimburse based on AMPs does not equate to government knowledge or approval.  *Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 152 (D. Mass. 2008) ("*Mylan Labs*").  The ruling applies with equal force to Medicare, particularly since AMPs are reported only in the context of the Medicaid rebate program.

Roxane's argument ignores that, by statute, AMPs were required to be kept confidential and were in fact treated as confidential by CMS.  The Medicaid Drug Rebate Program, created by the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90"), expressly requires that AMPs provided to CMS be kept confidential and not be disclosed by CMS *except for the purpose of carrying out the purposes of the rebate program*.  42 U.S.C. § 1396r-8(b)(3)(D) (emphasis added).  Indeed, that limitation was incorporated into the specific rebate agreements entered into between Roxane and CMS. (US-C-SF, ¶ 103)  In light of the statutory restraint, CMS concluded that the data could not be used for any purpose other than the rebate program.  (US-C-SF, ¶ 104) CMS has publicly and consistently reiterated this position.  (*E.g.*, US-C-SF, ¶¶ 108, 110, 112)

Roxane then argues that OIG reports, a Congressional press release, and testimony by former CMS administrators showing awareness that AWPs overstated actual prices translates into the required approval.  Rox SJ Br. at 29-30.  Yet the very OIG reports that Roxane cites in fact demonstrate the government's *disapproval* of this conduct, consistently referring to AWPs which bear no predictable relationship to actual prices as a "problem" leading to "excessive reimbursement" and millions of dollars in "unnecessary payments."   The disapproval is most

clear in the 2003 OIG Pharmaceutical Compliance Guidelines, where the government explicitly

condemns -- as violative of the FCA -- the very conduct engaged in by Roxane.[13] (US-C-SF, ¶ 98)

Roxane also points to disclosures by the Relator regarding pricing discrepancies.  (Rox

SJ Br. at 30)  The Court rejected this argument as well, holding in the Massachusetts case that

relator's disclosures do "not support an across-the-board government knowledge defense

because there is no evidence of government sanction."  On the contrary, the Court observed, "the

purpose of the meeting was to alert government officials to possible fraud.  That the government

responded lethargically to the knowledge of fraud does not translate into approval."  *Mylan Labs*,

608 F. Supp. 2d at 151.

Roxane next points to the existence of specific pricing information for ipratropium

bromide.  (Rox SJ Br. at 31-32)  Again, however, Roxane cites no evidence of approval.  Roxane

identifies a 1998 OIG report comparing Medicare reimbursement with the amounts paid by

Department of Veterans Affairs for drugs.  That comparison is inapt.  As one CMS witness

explained, such comparisons failed to alert CMS to the extent by which Roxane's AWPs were

inflated because the VA, unlike CMS, bought drugs directly from manufacturers and at a steep

discount.  Medicare, by contrast, reimbursed for drugs at prices generally available in the

marketplace.  (US-C-SF, ¶ 14)  In sum, despite this laundry list of disparate sources of

information available to various individuals and departments within the federal government,

Roxane does not cite a single instance of approval of its conduct in reporting inflated AWPs; that

---

[13]Roxane also points to the FUL process to buttress its argument here.  (Rox SJ Br. at 31)
Again, however, the FUL process illustrates the agency's ongoing efforts to *reduce* drug
reimbursement, and is squarely at odds with any notion of approval of false price reporting.

is because no such approval was ever given.

Nor does Roxane prove the case for "approval" through delay or failure to pass corrective legislation.  Roxane argues that rejection by Congress of successive proposed overhauls to the reimbursement system and Congress's repeated rejection of "attempts to reimburse at levels closer to actual acquisition cost," somehow translates to government approval.  (Rox SJ Br. at 32-34)  Roxane contends, for example, that Congress somehow approved of its conduct when it stopped HCFA from directing the Medicare Carriers to apply prices similar to the DOJ AWPs in 2000, ignoring that the Benefits Improvement and Protection Act of 2000 arose out of efforts by Congress to stop what one representative termed "illegal behavior" and an "outrage."  (US-C-SF, ¶ 19).  As stated in a HCFA program memorandum, the purpose was to give the General Accounting Office ("GAO") time to review Medicare payment policies and to make specific recommendations to the Secretary and Congress as to how to revise drug payment methodologies. (*See* US-C-SF, ¶ 18)  Far from endorsing the reporting of false prices, the subsequent GAO report recommended that HHS "[e]stablish Medicare payment levels for part-B prescription drugs and their delivery and administration that are more closely related to their costs.  Payments for drugs should be set at levels that reflect actual market transaction prices and the likely acquisition cost to providers."  (Roxane SOF, Tab 131).

Given the prevalence of health care fraud in this country, as illustrated by the OIG's ongoing investigations and reports, it cannot be the case that the government's failure to abandon a reimbursement mechanism that parties are abusing connotes approval of the abuse.  Again, this Court and others have specifically rejected that contention in the context of AWP fraud.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 460 F. Supp. 2d at 285 ("The weight of the

17

legislative history reflects congressional intent to have the AWP moored to actual wholesale pricing, and a nagging concern that AWP was no longer a reasonable price."); *In re Lupron Sales Practices*, 295 F. Supp. 2d 148, 168 n. 19 (D. Mass. 2003) ("recognition on the part of government regulators of inefficiencies in the administration of Medicare does not, as defendants contend, amount to condonation of fraudulent conduct.").

In sum, Roxane cannot demonstrate that the government specifically approved Roxane's reporting of false prices to FDB, and so has not met the legal standard for showing government approval. Roxane also points to no evidence even suggesting that its officials reviewed government reports and inferred from those reports that the government sanctioned Roxane's reporting conduct. Indeed, the contrary is true. (US-BR-SF, ¶ 137) The United States therefore has established falsity for claims both before and after 2000.

## II. The United States Is Entitled to Partial Summary Judgment That Roxane's Conduct Related to the Submission of False Claims Was "Knowing" and Roxane's Eleventh Defense of Consent Must Fail

For purposes of the FCA, "knowledge" that the statement or claim was false or fraudulent means that the defendant:

1. had actual knowledge that the information was false;

2. acted in deliberate ignorance of the truth or falsity of the information; or

3. acted in reckless disregard of the truth or falsity of the information.

No specific intent to defraud is required. 31 U.S.C. § 3729(b); *United States ex rel. Loughren v. Unumprovident Corp.*, 2008 WL 4280133 *3 (D. Mass. Sept. 15, 2008). Knowledge may be established on summary judgment. *See, e.g.*, *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 2009 WL 1959259 (5th Cir. 2009) (granting summary judgment on scienter to government in FCA case); *United States v. President and Fellows of Harvard College*, 323 F.

Supp. 2d. 151, 190 (D. Mass 2007) (granting summary judgment to government on defendant's knowledge under the FCA). Based on undisputed evidence, it is apparent that Roxane acted "knowingly" in choosing to report false AWPs, and thereby caused the submission of false or fraudulent claims.  Roxane knew that its reported AWPs bore little to no relation to its actual transaction prices.  As previously noted, a long-time Roxane employee described their AWPs as "published prices only," which have "little relation to actual <u>net</u> selling price after chargebacks, discounts, rebates, etc."  (US-BR-SF, ¶ 59)

Roxane was also aware that Medicare and most state Medicaid programs utilized AWPs in setting reimbursement, and that many third party payors, including Medicaid agencies, used FDB to obtain AWPs.  (*Id.,* ¶¶ 115, 117)  Roxane regularly included information about Medicare and Medicaid reimbursement in marketing documents that were used by its sales force or provided to customers, as evidenced by the 1995 circulation of a Memorandum containing, *inter alia*, Medicare "reimbursement rules by region," (*id.* ¶ 46), and a 1996 Memorandum prompting sales representatives to "go back over the Medicare selling message" when marketing azathioprine. (*Id.*, ¶ 66, 111-13)  It is also clear that Roxane regarded inclusion of its drugs on state Medicaid formularies as important to the success of a product.  (*Id.*, ¶ 114)  A July 1998 memo indicates awareness of state MACs and their potential impact on reimbursement. According to an internal report, Roxane determined it was losing market share for its hydromorphone 2 mg and 4 mg tablets, as a result of its "AWP being positioned incorrectly" and because the product was "still not MAC'd, so that [Roxane's] ability to sell the product is being negatively impacted." (*Id.*, ¶ 115)

Roxane officials acknowledged that Roxane set its AWPs with an eye toward increasing

19

reimbursement for its products.  (*Id.,* ¶ 40, 72)  For example, the launch plan for ipratropium bromide explained the pricing was designed "to create an attractive spread between WAC and AWP."  (*Id.*, ¶ 51)  And when Roxane raised its AWPs for azathioprine and furosemide, it did so in order to increase reimbursement and make its products more attractive to customers. (*Id.*, ¶¶ 60-61, 70-73, 81-88)  Remarkably, undisputed evidence shows that Roxane continued to knowingly report false AWPs even after becoming aware of government investigations.  By 1999, Roxane was aware that the government was investigating inflated AWPs in the pharmaceutical marketplace.  (*Id.*, ¶¶ 82, 138)  Nevertheless, Roxane's senior employees responded to the increased tempo of government investigations by deciding to inflate their AWPs until "big brother" caught up with them (*id.*, ¶ 74-88), and by encouraging yet more AWP manipulation with respect to drugs that the government was not yet investigating.  (*Id.*, ¶ 141)

Finally, Roxane cannot point to any evidence of government knowledge that has any bearing on its scienter either before or after 2000.  As explained above, Roxane cannot demonstrate that either HHS or any state Medicaid agency approved its submission of false pricing information and the resultant false claims.  Even if Roxane could point to any such evidence, Roxane admittedly did not take such information into account in deciding, at the time, to report false AWPs. (*Id.*, ¶ 137)  As a result, Roxane's Eleventh Defense of Consent must also fail.

## III.   The United States Is Entitled to Partial Summary Judgment Regarding Materiality and Causation for False Claims Involving the Medicaid Program

This Court has held that "[w]hether a false statement is material depends on whether it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" *United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d. at 181-82 (citing *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F. 3d 908, 914 (4th Cir.

2003) (parenthetical omitted).[14]  There is no dispute that the majority of states used a reimbursement methodology that relied on Roxane's reported AWPs, as did the Medicare program.  The United States has set forth state Medicaid methodologies on a state by state basis in its Common Rule 56.1 Statement of Facts, and further demonstrated that the states actually implemented the reimbursement formulas in their electronic claims processing systems by downloading AWPs from the Publishers.  (US-C-SF, ¶¶ 26-85 )  Since the false conduct and statements affected government drug payment levels, they clearly had the natural tendency to influence – or were capable of influencing – the payment of government money for Roxane's products.  Thus, the falsity of the claims to Medicaid was material under 31 U.S.C. § 3729(a)(1), and the reported prices were false statements material to false or fraudulent claims to Medicaid under 31 U.S.C. § 3729(a)(1)(B).

As to causation, which is also explained in the United States' Common Brief, a defendant is liable under § 3729(a)(1) of the FCA when it causes to be presented a false claim for payment.  As this Court recently noted, the FCA "attaches 'liability upon *presentment* of a false or fraudulent claim, rather than *actual payment* on that claim.'" *Mylan Labs*, 608 F. Supp. 2d at 147, quoting *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F. 3d 428, 445-46 (6th Cir. 2005) (emphasis in original).  The test for causation directly applicable to the facts here was set forth by the Court in *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255 (D. Mass. Aug. 22, 2003): first, was the defendant's conduct a "substantial factor" in causing the presentation of false claims to the Medicaid program; and second, was the

---

[14]As part of FERA, Congress codified this interpretation and described materiality as "having a natural tendency to influence, or to be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

submission of false Medicaid claims by pharmacists a foreseeable consequence of the defendant manufacturer's conduct.

By reporting false prices to the Publishers used by Medicaid programs, Roxane caused the claims submitted by providers for Medicaid reimbursement on Roxane's drugs to be false or fraudulent. This Court has already determined that the reporting of prices not reflective of actual transaction prices – conduct not disputed by defendants – is sufficient to cause the presentment of inflated provider claims where reimbursement is calculated based on those prices. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164, 175 (D. Mass. 2007).[15] Since the United States has demonstrated that (1) Roxane reported false AWPs to the Publishers for the Subject Drugs; (2) claims for reimbursement for Roxane's Subject Drugs were submitted to state Medicaid programs; and (3) the majority of states used Roxane's false AWPs to estimate acquisition cost,[16] causation under 31 U.S.C. § 3729(a)(1) is established.

As it did in the falsity context, Roxane again conflates liability with damages and, rather than focusing on submission of the claim, contends that the government must show how a claim was paid. A finding that the inflated AWPs or WACs actually affected the specific amount of the payment for Roxane's drugs is unnecessary to the issue of causation.

---

[15]Plaintiffs have established, through the Myers & Stauffer summaries of each state's reimbursement formula and testimony of many state Medicaid personnel, that all states whose Medicaid claims are covered by this litigation utilized the prices published by the pricing compendia, based upon defendants' reported prices, in calculating reimbursement for defendants' drugs.

[16]As shown in summaries prepared by plaintiffs' consultants, Myers & Stauffer, the manufacturers' AWP – discounted by a modest percentage – was used as the primary basis for determining the EAC component of the states' methodology by at least 42 of the covered states. (US-C-SF, ¶ 30).

IV.     **Roxane Is Not Entitled to Summary Judgment Regarding Damages for False Claims Involving the Medicaid Program**

Roxane first argues that extrapolation by the United States' damages expert, Professor Mark Duggan, Ph.D, somehow indicates that claims data does not even exist for certain states or significant time periods.  That is not correct.  As explained in detail in the Common Brief and Statement of Facts, Dr. Duggan used either state or federal claims data for all states in calculating damages.  He used state-supplied claims data for 16 states, which represents 68 percent of all claims for Roxane's Subject Drugs. (US-C-SF, ¶ 118)  The federal data used by Dr. Duggan also clearly shows reimbursement by state Medicaid programs for the Subject Drugs by NDC.  The federal claims data is based on claims data submitted by the states to CMS.  (US-C-SF, ¶ 116) Thus, for states or time periods in which Dr. Duggan did not have claims data provided by the state itself, he had data provided by the states to CMS.  (*Id.*)

Roxane then argues that extrapolation cannot be used in an FCA case, completely ignoring this Court's recent conclusion in an FCA case that "extrapolation is a reasonable method for determining the number of false claims so long as the statistical methodology is appropriate."  *United States ex rel. Loughren v. Unumprovident Corp.*, 604 F. Supp. 2d 259, 261 (D. Mass. 2009).  As set forth in the United States' Common Brief, Roxane cannot demonstrate any inappropriate extrapolation here.

Roxane also contends that it is entitled to summary judgment on any claim paid on something other than the state's reimbursement methodology or even paid based on any element other than EAC, such as a FUL, MAC or U&C. (Rox SJ Br. at 11-12)  The latter argument fails.  Under the "lower of" methodology used by the overwhelming number of states, the inflated AWPs and WACs are still being relied upon in the State's computerized algorithm and therefore

still influence the payment to be made for the drug by the government.  The issue is not whether

the claim was reimbursed with the FUL or MAC or U&C amount – the issue is whether a true or

accurate AWP or WAC would have resulted in lower reimbursement for a specific NDC.[17]

**V.      The United States Is Entitled to Partial Summary Judgment Regarding Materiality
          and Causation for False Claims to the Medicare Program**

The United States seeks partial summary judgment with respect to materiality and

causation for false claims to the Medicare program processed by CIGNA (the Region D

DMERC), from April 1, 1997, through September 30, 2001, caused by Roxane's false AWPs for

its Roxane-labeled ipratropium bromide.  From 1993 through December 31, 1997, the DMERCs

paid for Part B covered multiple-source drugs based on the lower of the provider's billed charge

or the median AWP of the generic forms of the drug.  (US-BR-SF, ¶ 145)  From January 1, 1998,

through December 31, 2003, the DMERCs paid for Part B covered multiple-source drugs based

on (a) the amount submitted by the provider on the claim, or (b) 95 percent of the lesser of the

median average wholesale price for all sources of the generic forms of the drug or biological or

the lowest AWP of the brand name forms of the drug or biological.  (US-C-SF, ¶ 12)  CIGNA

(like the other DMERCs) determined the allowed fee for ipratropium on a quarterly basis using

the AWPs published in the Red Book, including Roxane's AWPs.  (US-BR-SF ¶ 150) As

explained in the United States' Common Brief, that fact alone establishes the materiality of the

false statements about Roxane's AWPS under § 3729(a)(1)(B), as well as the materiality of the

falsity of the claims under § 3729(a)(1).

---

[17]The United States will not seek single FCA damages in those limited instances, if any,
where a state would not have applied EAC to determine reimbursement, no matter what the
defendant reported. This is different from the more common situation where a state paid on a basis
other than EAC, but would have applied EAC had the defendant reported truthful prices.

There can be no question but that causation under § 3729(a)(1) is also established here because Roxane's conduct was a "substantial factor" in causing the presentation of false claims to the Medicare program, and the submission of false Medicare claims by pharmacists was a foreseeable consequence of Roxane's conduct.  CIGNA paid on behalf of Medicare many provider claims for reimbursement for ipratropium bromide based on a median average wholesale price that was arrived at based on Roxane's reported AWP.  (US-BR-SF, ¶¶ 160-161) From April 1, 1997 to September 30, 2001, if Roxane had reported AWPs that were even slightly lower, Medicare reimbursement would have been lower.  (*Id.*)

## VI.   Roxane Is Not Entitled to Summary Judgment with Respect to Medicare Claims Involving NovaPlus Ipratropium Bromide

Roxane's argument that it is entitled to summary judgment on claims where the DMERCs classified its NovaPlus ipratropium bromide product as a "brand" (Rox SJ Br. at 12-23), misses the mark.  The argument depends in the first instance on proof that the classification was in error.  Other than calling it a "misclassification" (*id.,* p. 14), however, Roxane fails to make any such showing.  A final rule published in the Federal Register plainly states that a product  "marketed under a proprietary name" is a "brand" for purposes of determining Medicare reimbursement.  NovaPlus is a proprietary name, and Roxane's promotion of NovaPlus ipratropium bromide consistently identified the product as part of the NovaPlus brand.

Roxane's remaining complaints about the DMERCs' supposedly "idiosyncratic" and "random" procedures for classifying products as brands or generics are both misleading and irrelevant.  The specific details of how individual DMERCs classified products as brands cannot be an "intervening factor that negates causation" where, as here, the product at issue was *correctly* classified as a brand according to a rule published in the Federal Register.  *See*, *e.g.*

*Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 11 (1st Cir. 1998) ("intervening forces insulate a party from liability only if they are not foreseeable").  Roxane's argument that its lacks scienter on account of the DMERCs' "errors" (Rox SJ Br.at 24-25) fails for similar reasons; Roxane's professed lack of a specific intention that the DMERCs classify NovaPlus ipratropium bromide as a brand is irrelevant under the FCA, *Unumprovident Corp.*, 2008 WL 4280133 at* 3, and Roxane was on notice that products marketed under a proprietary name were treated as "brands" for purposes of Medicare reimbursement. *Dixson v. U.S.*, 465 U.S. 482, 489 n. 6 (1984) ("The appearance of rules and regulations in the Federal Register gives legal notice of their contents.")

### A.     Roxane's NovaPlus Ipratropium Bromide Was Launched as Part of the NovaPlus Brand of Products

Novation, LLC ("Novation") is a large group purchasing agent that represents several thousand health care organizations. (Resp. to ¶ 140 of Roxane SOF)  Novation operates a "private label" program, known as "NOVAPLUS," which consists of several product categories marketed to Novation's membership under a common brand name. (Resp. to ¶ 141 of Roxane SOF)  Novation advertises that NOVAPLUS "delivers value to suppliers" through "solid brand recognition" and that "the NOVAPLUS brand" helps smaller manufacturers - with less common market recognition - compete against larger manufacturers.  (*Id.*)

In early 1999, Roxane won a contract to supply ipratropium bromide under the NovaPlus label to Novation's member health care organizations.  (Resp. to  ¶ 142 of Roxane SOF)  In or around May 1999, Roxane launched a new ipratropium bromide product called "Ipratropium Bromide Inhalation Solution 0.02% (NovaPlus®)" and "NOVAPLUS™ Ipratropium Bromide." (Resp. to ¶¶ 141, 148 of Roxane SOF)  Roxane continued to promote its generic ipratropium bromide products (launched previously in 1996) under separate NDCs.  Roxane expected that

launching NovaPlus ipratropium bromide would enable Roxane to win more ipratropium business among Novation's members.  (Resp. to Paragraph ¶ 141 of Roxane SOF)

**B.   The DMERCs Correctly Classified Roxane's NovaPlus Ipratropium Bromide Product As a "Brand" According to Criteria Published in the Federal Register**

**1.   A "brand" includes any product that is marketed under a "proprietary name"**

Effective November 1998, CMS implemented a final rule changing the reimbursement for multi-source drugs under Medicare part B to be 95% of the "lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name forms of the drug or biological."  42 C.F.R. § 405.517(b) and (c) (1999); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 38-39 (D. Mass. 2008).  Per the June 5, 1998 Federal Register notice, the rationale for including the AWPs for brand name forms of drugs in the reimbursement methodology was as follows:

> Our current regulations provide that, for multiple source drugs, the AWP equals the median AWP of the generic forms of the drug.  The AWP of the brand name products is ignored on the presumption that brand AWP is always higher than the generic AWPs.  While this may have been true when the policy was first promulgated, it is not always true now.  Therefore, we are proposing that the AWP for multiple-source drugs would equal the lower of the median price of the generic AWPs of the lowest brand name AWP.

63 Fed. Reg. 30,818, 30,845.  As a result of comments made during the rulemaking process, CMS adopted 42 C.F.R. § 405.517(c) with several "clarifications" including, *inter alia*, that "[a] 'brand' product is defined as a product that is marketed under a labeled name that is other than the generic chemical name of the drug or biological."  63 Fed. Reg. 58,814, 58,849 (Nov. 2, 1998).  CMS specifically considered and rejected a definition of "brand" that was limited to the product of the innovator company:

> Comment: ****
> Our definition of "brand" is any product that is marketed under a name other than the generic chemical name of the drug.  *If a manufacturer chooses to market its product under a proprietary name rather than the generic chemical name of the drug, we believe this is a brand.  We do not limit the definition of "brand" to the innovator company product or any product manufactured under a direct license from the innovator.*

*Id.* (emphasis supplied).[18]  CMS made clear that it adopted this definition of brand to ease the administrative burden on the DMERCs by providing a clear rule for determining when a product was a brand.  *Id.* ("[W]e believe that it is an unreasonable administrative burden to require our contractors to determine which of the thousands of AWPs they must look up, to determine which of those are innovator drugs or licensed by the innovator company").

### 2.     NovaPlus ipratropium bromide was marketed under a "proprietary name"

Roxane's argument that the DMERCs incorrectly classified NovaPlus ipratropium bromide as a brand rests on the fiction that there is no difference between marketing a product as "ipratropium bromide" and marketing a product as "ipratropium bromide NOVAPLUS®." (Rox SJ Br., p. 22).  This is contrary both to common sense and to the rule that the definition of brand includes any product marketed under "a proprietary name."  63 Fed Reg. 58,814, 58,849-50.

There is no doubt that NovaPlus is a "proprietary name."  Black's law dictionary defines a "proprietary name" as "[a] nondescriptive name that may be owned and registered as a

---

[18]To the extent that an agency's "clarification" of a rule offered as part of an answer to a public comment is not the same thing as a regulation, it is still entitled to "substantial deference" and will not be disturbed unless clearly erroneous.  *See Auer v. Robins*, 519 U.S. 452, 461-62 (1997).  Agency deference is at its "apex" when a regulation concerns a "complex and highly technical regulatory program" such as Medicare.  *See South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91 (1st Cir. 2002); *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 34 (1st Cir. 2008) ("Judicial deference is further magnified in cases involving complex and highly technical administrative programs, such as Medicare").

trademark." Black's Law Dictionary, 8th Ed., 1049; *see also* Stedman's Medical Dictionary, 28th Ed., 1576 (defining "proprietary name" as "[t]he protected brand name or trademark, registered with the U.S. Patent Office, under which a manufacturer markets its product.  It is written with a capital initial letter and is often further distinguished by a subscript R in a circle")[19]   Novation owns the trademark for NOVAPLUS®, and suppliers participating in the NovaPlus program are required to legibly apply the trademark to all NovaPlus products.  Resp. to ¶ 141 of Roxane SOF. Roxane understood this requirement and its promotion of NovaPlus ipratropium bromide consistently referred to the NovaPlus name.  For example, Roxane's initial product announcement identified the product as "Ipratropium Bromide Inhalation Solution 0.02% (NOVAPLUS®)."  (Resp. to ¶ 142 of Roxane SOF)  Likewise, a letter sent by Roxane to wholesalers promoted the availability of "Ipratropium Bromide Inhalation Solution 0.02% with a NOVAPLUS® label."  (*Id.*)  Moreover, Roxane's own promotional materials distinguish between Roxane's generic "Ipratropium Bromide Inhalation, 0.02%" and "Ipratropium Bromide Inhalation Solution - NOVAPLUS, 0.02%." (*Id.*)

This marketing practice falls squarely within CMS' definition of "brand."  Roxane chose to distinguish its NovaPlus ipratropium bromide products from generic ipratropium bromide by including a proprietary trade name in the product's label and description, and by marketing the product as part of the NovaPlus brand.  In such circumstances, the DMERCs acted appropriately and in accord with published guidance in classifying NovaPlus ipratropium bromide as a brand.

---

[19]Other guidance published in the Federal Register is consistent with the conclusion that the term "proprietary name" includes products marketed under a private label.  *See* 71 Fed. Reg. 51,276, 51,302 (August 29, 2006) ("The proprietary name (sometimes referred to as trade name) is generally the drug's marketed or advertised name as designated by the manufacturer, repacker, relabeler, *or private label distributor*") (emphasis supplied).

### C.     The Classification of NovaPlus Ipratropium Bromide as a Brand Was Foreseeable to Roxane

Roxane claims that the United States cannot prove that reported AWPs for NovaPlus ipratropium bromide legally caused any harm to the Medicare program because of the DMERCs' disregard of "regulatory mandates for distinguishing generics from brands is an intervening factor that negates causation."  This argument is misplaced for at least two reasons.

First, intervening forces insulate a party from liability only if they are not foreseeable. *See U.S. ex rel. Franklin. v. Parke-Davis, Div. Of Warner-Lambert Co.*, 2003 WL 22048255, *5 (D. Mass. 2003) ("Under black letter law [] an intervening force only breaks the causal connection with it is unforeseeable.").  Here, the DMERCs *correctly* classified NovaPlus ipratropium bromide as a brand pursuant to an agency rule.   Furthermore, Roxane was on notice that any product marketed under a "proprietary name" was a "brand" product.  *See* 44 U.S.C. § 1507 (publication in Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it"); *see also Dixson v. U.S.*, 465 U.S. at 489 n. 6 (1984); *U.S. v. Maxwell*, 254 F.3d 21, 25 (1st Cir. 2001).  The particular details of exactly *how* the DMERCs made classification decisions are irrelevant, as Roxane plainly should have foreseen that NovaPlus ipratropium bromide was likely to be classified as a brand, and foreseeable events do not break the chain of causation.  *Baxter Healthcare Corp.*, 140 F.3d at 11

Second, Roxane fails to show that the DMERCs internal procedures for classifying drugs were actually inconsistent with regulatory mandates.  Roxane claims, without support, that the DMERCs "disregarded" regulatory mandates for classifying drugs as brands (Rox SJ Br. at 14) and, instead, classified drugs based principally on whether a product's name was capitalized in

30

the Red Book pricing compendia (Rox SJ Br., p. 17-18).  The evidence in fact establishes that

the DMERCs classified products as brands depending on whether they had label names other

than the generic chemical name. (Resp. to Roxane SOF, ¶ 180)  Moreover, while the DMERCs

did utilize the Red Book in making classification decisions, from 1999 onwards, they used

quarterly CD-ROM updates to the Red Book, on which the "Product Information screen" listed

products according to their published names.  (*Id.*; *see also* Rox SOF, Tab 180)  The use of such

information is consistent with CMS' rule, and with the DMERCs' practice of classifying

products as brands according to whether they had label names "other than the generic chemical

name."  (Resp. to Roxane SOF, ¶ 180)

> **D.     The Inclusion of Competitors' Pricing at Various Times by the DMERCs
> Was Foreseeable to Roxane and Does Not Qualify as an "Intervening Factor
> That Negates Causation"**

Roxane also claims that three of the four DMERCs failed to timely include the AWP of a

competitor, Zenith Goldline, in their arrays, and that if they had, Roxane's AWP would not have

affected their calculations.  (Rox SJ Br. at 23-24.)  *First*, Roxane incorrectly characterizes the

DMERC omission as an "intervening factor."  The DMERCs were under no legal obligation to

update their arrays within any specific time frame, and Roxane had no expectation – legally,

factually, or otherwise – that updates would always be perfect.  The practice of quarterly

updating was for the benefit of the provider community (to ensure providers were reimbursed

based on current market information), not to shield manufacturers from the effects of inflated

price reporting.  Roxane's false prices clearly were the "but for" cause of inflated

reimbursements, and the fact that updates were not always done at the earliest opportunity does

not break the causal chain.[20]   *Second*, as noted *supra*, intervening forces insulate a party from liability only if they are not reasonably foreseeable.   *See Baxter Healthcare Corp.*, 140 F.3d at 11.   It was certainly foreseeable to Roxane that the DMERCs would not update their pricing arrays with perfect synchronicity.   *Third*, Roxane ignores that the United States' claim for damages includes the joint harm to the Medicare program caused by both Roxane and Dey's false price reporting.   Under that claim (which Roxane has not put at issue on summary judgment), the damages caused by Roxane continue through 2003 for all DMERCs, and the inclusion or non-inclusion of the additional Zenith Goldline AWPs in the pricing arrays does not affect causation.

## VII.   The United States Is Entitled to Summary Judgment on Roxane's Eleventh Affirmative Defense of Failure to Mitigate

The United States also seeks partial summary judgment with respect to Roxane's Eleventh Affirmative Defense of failure to mitigate.   (Roxane Answer to United States' Amended Complaint, MD# 5784 at 32-33.)   As set forth in the United States' Common Brief, as a matter of law, there is no such defense to an FCA action brought by the United States.

## VIII.   Roxane Is Not Entitled to Summary Judgment on the United States' Claim for Unjust Enrichment

Roxane's argument that the United States has no evidence Roxane was unjustly enriched fails as an initial matter because it is based on the false premise that Roxane's enrichment could only consist of the amount by which its sales or market share increased over the relevant period

---

[20]Moreover, the evidence suggests that the inclusion of the Zenith Goldline products in the pricing arrays was in error.   (Resp. to ¶ 247 of Roxane SOF)

for the Subject Drugs.[21]  Roxane need not have increased its sales -- numerically or in relation to its competitors -- in order to have been enriched by its fraud.  Due to widespread manipulation of AWPs in the generic marketplace (*see* Roxane SOF, ¶¶ 99, 106), market share did not necessarily reflect which products cost less, but instead which had the best spread.  The absence of evidence of market share increase does not disprove enrichment.

There is ample evidence, however, that Roxane *did* improve its market position when it increased its spreads, and that Roxane believed a higher spread led to increased sales. (*E.g.*, US-BR-SF, ¶¶ 109-110)  For example, Roxane saw a tremendous increase in market share when it decided to report an even more inflated false AWP for its Furosemide products in August of 2000.  (*See generally* US-BR-SF, ¶¶ 70-85)  By April of 2000, Roxane was reporting an AWP for Furosemide of $45.25, while that of its competitors was in excess of $140. (*Id.*, ¶ 71).  Sales of Roxanne's Furosemide products were significantly below expected levels and Roxane attributed this to its AWPs. (*Id.*, ¶¶ 72, 74).  In July of 2000, seeking approval from the Roxane hierarchy to increase its reported AWP, a sales representative complained that customers were rejecting Roxane's Furosemide because the lower AWP caused it to have "worse profitability" than its competitors.  (*Id.*, ¶ 79).  Less than one month later, Roxane decided to raise its reported AWPs for its Furosemide products by as much as 300%.  Roxane soon landed significant additional Furosemide sales, which its employees attributed to the AWP increase.  (*Id.*, ¶ 84).

---

[21] Roxane's argument - that a flat or decreasing sales and market share prove Roxane was not enriched by its fraud - may make sense in one hypothetical situation: if Roxane were the only manufacturer of the Subject Drugs reporting inflated prices during the Relevant Period. Such is not the case here.

Those increased sales prove enrichment, even under Roxane's view of the law.[22]

## **CONCLUSION**

For all of the foregoing reasons, the United States requests that the Court grant the United

States' motion for partial summary judgment and deny Roxane's motion for summary judgment.

DATED July 24, 2009                    Respectfully submitted,

                                       MICHAEL F. HERTZ
                                       DEPUTY ASSISTANT ATTORNEY GENERAL

                                       MICHAEL J. LOUCKS
                                       ACTING UNITED STATES ATTORNEY

                        By:    /s/ Barbara Healy Smith
                                       GEORGE B. HENDERSON, II
                                       BARBARA HEALY SMITH
                                       JAMES J. FAUCI
                                       Assistant U.S. Attorneys
                                       United States Courthouse
                                       1 Courthouse Way, Suite 9200
                                       Boston, MA 02210
                                       (617) 748-3100

                                       JOYCE R. BRANDA
                                       DANIEL R. ANDERSON
                                       LAURIE A. OBEREMBT
                                       Civil Division
                                       Commercial Litigation Branch
                                       P. O. Box 261, Ben Franklin Station
                                       Washington, D.C.  20044
                                       (202) 514-3345

---

[22]The other two of Roxane's three arguments relating to the statute of limitations and the adequacy of the remedy at law are addressed in the Common Brief.

For the relator, Ven-A-Care of the Florida
Keys, Inc.,

JAMES J. BREEN
The Breen Law Firm, P.A.
Suite 260
5755 North Point Parkway
Alpharetta, Georgia 30022
Phone (770) 740-0008

SUSAN S. THOMAS
GARY L. AZORSKY
ROSLYN G. POLLACK
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above
"CONSOLIDATED MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT" to be served on all counsel of record via electronic
service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to
LexisNexis File & Serve for posting and notification to all parties.

    /s/ James J. Fauci
JAMES J. FAUCI
Dated: July 24, 2009                  Assistant U.S. Attorney

## RULE 7.1 CERTIFICATION

The undersigned counsel certifies pursuant to Local Rule 7.1(a)(2) that he has conferred
with counsel for Relator and the Defendants on the issues raised in this motion, and the parties
were unable to agree.

    /s/ James J. Fauci
JAMES J. FAUCI
Assistant U.S. Attorney
Dated: July 24, 2009                  Department of Justice

35