UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | MDL No. 1456 |
| LITIGATION | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| | ) | Subcategory No. 06-11337-PBS |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | Hon. Patti B. Saris |
| *United States of America ex rel. Ven-a-Care of* | ) | |
| *the Florida Keys, Inc. v. Dey, Inc., et al.*, Civil | ) | |
| Action No. 05-11084-PBS | ) | |

**UNITED STATES' LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS AS TO DEY**

Pursuant to LR 56.1, the United States hereby submits its Statement of Undisputed

Material Facts Applicable to all Defendants in Support of its Motion for Partial Summary

Judgment.  Additional Undisputed Material Facts, which are common to Abbott Laboratories,

Inc. (Civil Action No. 06-11337-PBS), the Dey defendants, and the Boehringer

Ingelheim/Roxane defendants (Civil Action No. 07-10248-PBS), are set forth in a separate

United States' Local Rule 56.1 Statement of Undisputed Material Facts Applicable to All

Defendants, filed herewith.[1]  The Relator joins in this Statement of Undisputed Facts.

---

[1]  The Plaintiffs reserve the right to argue that, to the extent any particular
statement of fact is genuinely disputed, it is immaterial.

**CONTENTS**

I.    INTRODUCTION
      A.    Dey's Products
      B.    Dey's Subject Drugs
      C.    Dey's Customers, and Its Sales and Contracting Practices

II.   DEY REPORTED AWPS AND WACS TO FIRST DATABANK, MEDISPAN, AND
      RED BOOK

III.  DEY'S REPORTED PRICES WERE FALSE
      A.    The AWPs that Dey Caused to Be Published Were Substantially Higher Than the
            Prices Known to Dey and Generally and Currently Paid In the Market for the
            Subject Drugs
      B.    The WACs that Dey Caused FDB to Be Published For Its Albuterol Sulfate Unit
            Dose Solution, NDC Nos. 49502-0697-03, 49502-0697-33, and 49502-0697-60,
            From 1995 Q2 -1997 Q4 Were Substantially Higher Than the Prices At Which
            Dey Sold the Drugs to Wholesalers

IV.   DEY KNOWINGLY REPORTED FALSE AWPS AND WACS FOR THE PURPOSE
      OF INCREASING REIMBURSEMENTS TO PROVIDERS WHO PURCHASED
      DEY'S DRUGS
      A.    The Launch of Albuterol Sulfate Unit Dose
      B.    Dey Collected Information About Medicare and Medicaid Reimbursement
            Methodologies
      C.    The Launch of Cromolyn Sodium
      D.    Early Training of Dey Sales Representatives
      E.    The 1994 National Sales Meeting
      F.    The 1995 National Sales Meeting
      G.    Dey's Reimbursement Comparison Worksheet
      H.    Dey's May 1995 Reporting of False WACs Was Intended to Increase the Spread
      I.    Dey's Launch of Albuterol Sulfate Metered Dose Inhaler, 17g
      J.    Dey's Launch of Ipratropium Bromide
      K.    Dey's Launch of Albuterol Sulfate Multi-Dose Solution, .5%, 20 ml.
      L.    Dey Employees Marketed the Spread
      M.    Dey Knew or Should Have Known That Its Conduct Was Wrong

V.    DEY'S FALSE AWPS FOR ITS IPRATROPIUM BROMIDE PRODUCTS CAUSED
      THE MEDICARE PROGRAM TO PAY MORE THAN IT WOULD HAVE PAID
      ABSENT THE FALSITY
      A.    The Medicare Part B Payment Methodology, CIGNA Government Services

B.     Dey's False AWPs Affected CIGNA's Calculations of Medicare Allowable
       Amounts for Ipratropium Bromide
C.     The Joint Impact of False AWPs Reported by Dey and Roxane Caused Medicare
       To Overpay
D.     Missing Arrays

VI.    DEY HAS BEEN UNJUSTLY ENRICHED BY ITS FRAUDULENT CONDUCT

## I.     INTRODUCTION

1.      The Plaintiffs hereby incorporate by reference the United States' Local Rule 56.1 Statement of Undisputed Material Facts Common to All Defendants, filed this date.

2.      Defendant Dey, Inc. is a corporation organized under the laws of Delaware with its principal offices in Napa, California.  Prior to June 30, 1998, Dey, Inc. was known as "Dey Laboratories, Inc."  (United States' First Amended Complaint (hereinafter "Complaint") ¶ 12; Dey, Inc., Dey L.P., Inc., and Dey, L.P.'s Answer and Defenses to the United States' First Amended Complaint (hereinafter "Answer") ¶ 12.)

3.      Dey, Inc. is the general partner of the defendant Dey L.P., a limited partnership, and is the sole owner of the other partner, defendant Dey L.P., Inc.  (Complaint ¶¶ 13-14; Answer ¶¶ 13-14.)  The three Dey entities are collectively referred to herein as "Dey."

4.      In approximately 1990 Dey was acquired by Lipha Pharmaceuticals.  In approximately January 2001, Lipha changed its name to EMD, Inc.  Dey is wholly owned by EMD, Inc.  Effective October 2, 2007, EMD, Inc., including Dey, was acquired by Merk S.A., which in turn is wholly owned by Merk KGaA.  (Declaration of George B. Henderson, II ("Henderson") Ex. 1, at 20-21)

5.      On or about October 2, 2007, Dey was acquired by Mylan Pharmaceuticals, Inc. (Henderson Ex. 2, at 38-41)

6.      Dey's five-digit labeler code is 49502.  Dey has sold Albuterol, Albuterol Sulfate, Cromolyn Sodium, and Ipratropium Bromide in various package sizes and strengths.  (Complaint ¶ 29; Answer ¶ 29.)

7.      In 1991, Dey signed a Medicaid Rebate Agreement with the Secretary of Health and Human Services.  (Declaration of Sarah L. Reid In Support of Dey L.P, Dey L.P., Inc., and Dey L.P. Inc.'s Motion For Partial Summary Judgment ("Reid Decl."), Ex. 34.)  An accompanying letter to Dey informed Dey that under the Medicaid program States receive federal funding for drugs dispensed to Medicaid recipients.  (Henderson Ex. 3)

**A.      Dey's Products**

Dey's Albuterol Products

8.      Dey's principal generic albuterol product is a liquid unit dose solution that is administered via a nebulizer, which is an item of durable medical equipment.  (Dey Defendants' Statement of Undisputed Material Facts in Support of Dey, Inc., Dey, L.P., and Dey L.P., Inc.'s Motion for Partial Summary Judgment ("Dey SOF") ¶ 11.)

9.      In early 1992 Dey received FDA approval of an abbreviated new drug application for albuterol unit dose solution, 0.083%.  Dey launched the generic product in March 1992 and became the first pharmaceutical manufacturer to launch a generic albuterol unit dose solution. Dey was the only generic manufacturer in the albuterol unit dose solution market for over one year after launch.  (Dey SOF ¶¶ 12-13.)

10.     Dey launched its multi-dose albuterol product in March 1996, and its metered dose inhaler albuterol product in November 1996.  (Dey SOF ¶ 21.)

Dey's Cromolyn

11.     In addition to albuterol, Dey was also pursuing opportunities to launch

other generic respiratory inhalation solutions in the late 1980s and early 1990s.  Dey thus

submitted an Abbreviated New Drug Application ("ANDA") for cromolyn sodium, which was

the next generic inhalation solution coming off patent.  (Dey SOF ¶ 27.)

12.     Cromolyn sodium ("cromolyn") is a prophylactic respiratory inhalation

drug used to treat patients with bronchial asthma.  Dey's generic cromolyn product is a liquid

unit dose solution that is administered via a nebulizer, which is a piece of durable medical

equipment.  (Dey SOF ¶29.)

13.     Dey launched its cromolyn product in May 1994.  As with unit dose albuterol,

Dey was the first generic cromolyn on the market.  (Dey SOF ¶¶ 30-31.)

14.     Dey stopped manufacturing cromolyn in February 2008.  (Dey SOF ¶ 32.)

Dey's Ipratropium Bromide

15.     Ipratropium bromide ("ipratropium") is a respiratory inhalation drug used

for the maintenance treatment of bronchospasms associated with Chronic Obstructive Pulmonary

Disease ("COPD"), which is a term used to describe a number of airway diseases, including both

chronic bronchitis and emphysema.  (Dey SOF ¶34.)

16.     In January 1997, Dey launched a sterile generic unit dose ipratropium bromide

solution. (Henderson Ex. 4)  Dey's generic ipratropium product is a unit dose liquid solution that

is administered via a nebulizer, which is a piece of durable medial equipment.  Dey continues to

sell ipratropium.  (Dey SOF ¶¶ 36-38.)

**B.     Dey's Subject Drugs**

17.     The Complaint alleges claims against Dey arising from reimbursement by

Medicare and Medicaid programs to providers for dispensing varying dosages, concentrations,

6

and sizes of Dey's albuterol sulfate, cromolyn sodium, and ipratropium bromide (the "Subject Drugs").  (Complaint; Dey SOF ¶ 43.)  All of the Subject Drugs are generic drugs.  (Dey SOF ¶ 44.)

18.     The Subject Drugs are or were sold under a number of National Drug Codes (NDCs).  NDCs are 11-digit codes that uniquely identify the drug by manufacturer, active ingredient, and package size.  Dey has assigned successor NDCs to a number of its products due to changes in the packaging.  (Dey SOF ¶ 45.)

19.     The following are the NDCs for the Subject Drugs with date of first and last shipment date as applicable:

| Subject Drug | Formulation | Strength/ Package Size | NDC | First Shipment Date | Last Shipment Date |
|---|---|---|---|---|---|
| Albuterol Sulfate | metered dose inhaler | 17g | 49502-0303-17 | Q1 1996 | Q2 2000 |
| Albuterol Sulfate | metered dose inhaler | 17g, 90 mcg | 49502-0333-17 | Q3 2000 | Q1 2003 |
| Albuterol Sulfate | MDI refill | 17g | 49502-0303-27 | Q4 1996 | Q2 2000 |
| Albuterol Sulfate | MDI refill | 17g | 49502-0333-27 | | |
| Albuterol Sulfate | multi dose solution | .5%, 20 ml | 49502-0196-20 | Q1 1996 | Q1 2000 |
| Alburterol Sulfate | multi dose solution | .5%, 20 ml | 49502-0105-01 | Q3 1999 | Q3 2003 |
| Alburterol Sulfate | unit dose solution | .083%, 3 ml, 25s | 49502-0697-03 | Q1 1992 | Q2 2004 |

| Subject Drug | Formulation | Strength/ Package Size | NDC | First Shipment Date | Last Shipment Date |
|---|---|---|---|---|---|
| Albuterol Sulfate | unit dose solution | .083%, 3ml, 25s | 49502-0697-24 | Q1 2004 | current |
| Albuterol Sulfate | unit dose solution | .083%, 3ml, 30s | 49502-0697-33 | Q4 1993 | Q1 2004 |
| Albuterol Sulfate | unit dose solution | .083%, 3ml, 30s | 49502-0697-29 | Q1 2004 | current |
| Albuterol Sulfate | unit dose solution | .083%, 3ml, 30s | 49502-0697-30 | Q1 2005 | current |
| Albuterol Sulfate | unit dose solution | .083%, 3ml, 60s | 49502-0697-60 | Q2 1992 | Q3 2004 |
| Albuterol Sulfate | unit dose solution | .083%, 3ml, 60s | 49502-0697-61 | Q1 2004 | current |
| Cromolyn Sodium | unit dose solution | 20 mg, 2ml, 120s | 49502-0689-12 | Q2 1994 | Q1 2004 |
| Cromolyn Sodium | unit dose solution | 20 mg, 2ml, 60s | 49502-0689-02 | Q2 1994 | Q3 2004 |
| Cromolyn Sodium | unit dose solution | 20 mg, 2ml, 60s | 49502-0689-61 | Q1 2004 | Q1 2008 |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 25s | 49502-0685-03 | Q1 1997 | Q1 2004 |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 25s | 49502-0685-24 | Q1 2004 | Q2 2006 |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 25s | 49502-0685-26 | Q2 2006 | current |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 30s | 49502-0685-33 | Q3 1997 | Q1 2004 |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 30s | 49502-0685-29 | Q1 2004 | Q3 2005 |

| Subject Drug | Formulation | Strength/ Package Size | NDC | First Shipment Date | Last Shipment Date |
|---|---|---|---|---|---|
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 30s | 49502-0685-31 | Q2 2005 | current |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 30s | 49502-0685-30 | Q1 2005 | current |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 60s | 49502-0685-60 | Q1 1997 | Q2 2004 |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 60s | 49502-0685-61 | Q1 2004 | Q3 2008 |
| Ipratropium Bromide | unit dose solution | .02%, 2.5 ml, 60s | 49502-0685-62 | Q2 2005 | current |

(Complaint ¶ 29; Dey SOF ¶ 46; Expert Report of Simon D. Platt (not filed), Summary 5.)

20.     NDC #49502-0333-17 was a successor to NDC #49502-0303-17 and consisted of the same drug in changed packaging.  (Henderson Ex. 5.)

21.     NDC #49502-0333-27 was a successor to NDC #49502-0303-27 and consisted of the same drug in changed packaging.  (*Id.*)

22.     NDC #49502-0105-01 was a successor to NDC #49502-0196-20 and consisted of the same drug in changed packaging.  (Henderson Ex. 6.)

23.     NDC #49502-0697-24 was a successor to NDC #49502-0697-03 and consisted of the same drug in changed packaging.   (Henderson Ex. 7.)

24.     NDC #49502-0697-29 was a successor to NDC #49502-0697-33 and consisted of the same drug in changed packaging.  (*Id.*)

25.     NDC #49502-0697-30 was a successor to NDC #49502-0697-33 and consisted of the same drug in changed packaging.  (*id.*)

26.     NDC #49502-0697-61 was a successor to NDC #49502-0697-60 and consisted of the same drug in changed packaging.  (*id.*)

27.     NDC #49502-0689-61 was a successor to NDC #49502-0689-02 and consisted of the same drug in changed packaging.  (*id.*)

28.     NDC #49502-0685-24 was a successor to NDC #49502-0685-03 and consisted of the same drug in changed packaging.  (*id.*)

29.     NDC #49502-0685-26 was a successor to NDC #49502-0685-24 and consisted of the same drug in changed packaging.  (Dey SOF ¶ 46.)

30.     NDC #49502-0685-29 was a successor to NDC #49502-0685-33 and consisted of the same drug in changed packaging.  (*id.*)

31.     NDC #49502-0685-31 was a successor to NDC #49502-0685-29 and/or NDC #49502-0685-33 and consisted of the same drug in changed packaging.  (Henderson Ex. 8.)

32.     NDC #49502-0685-30 was a successor to NDC #49502-0685-31 and consisted of the same drug in changed packaging.  (Henderson Ex. 9.)

33.     NDC #49502-0685-61 was a successor to NDC #49502-0685-60 and consisted of the same drug in changed packaging.  (Henderson Ex. 7.)

34.     NDC #49502-0685-62 was a successor to NDC #49502-0685-61 and consisted of the same drug in changed packaging.   (Henderson Ex. 8.)

**D.     Dey's Customers, and Its Sales and Contracting Practices**

35.     Dey sells the Subject Drugs to various classes of customers, including wholesalers, retail generic distributors, chain pharmacies, independent pharmacies, homecare pharmacies, hospitals, and long term care facilities.  (Dey SOF ¶ 47.)

10

36.     Dey sells its drugs through two primary distribution channels – direct sales and indirect sales.  In a direct sale, Dey invoices its customer for a product and then ships the product directly from Dey's distribution center to that customer.  All sales to wholesalers as well as all sales to purchasers who can take delivery at their own distribution center are direct sales.  Dey SOF ¶¶ 48 - 50.

37.     An indirect sale is typically a sale that takes place between Dey's wholesale customer and one of Dey's contract customers who does not take direct delivery of the product from Dey.  In an indirect sale with a contract, Dey negotiates a contract price with an indirect customer.  The contract price sets forth the price between Dey and the indirect customer, not the price between the indirect customer and the wholesaler.  Dey SOF ¶¶ 51 - 53.  The indirect customer purchases Dey's product from the wholesaler.

38.     Virtually all indirect sales are at prices that are lower than Dey's WAC invoice price to the wholesaler.  (Henderson Ex. 10, at 104:19-105:10)  The wholesaler agrees to honor the contract price.  (Henderson Ex. 10, at 106:20-107:3)  Because the price paid by the indirect customer is less than the WAC invoice price from Dey to the wholesaler, Dey pays the wholesaler a "chargeback" to make the wholesaler whole.  (Henderson Ex. 10, at 105) The chargeback on an indirect sale is typically the difference between the indirect contract price and the WAC on the invoice to the wholesaler.

39.     Cardinal Health, Inc., one of the three largest national wholesalers, does not charge the indirect customer more than the indirect contract price; rather, Cardinal honors the price in the indirect contract.  (Henderson Ex. 11, at 245-248)

11

40.     McKesson, also one of the three largest national wholesalers, honors the indirect

contract price.  (Henderson Ex. 12, at 12)

41.     Cardinal makes a profit on indirect sales through an administrative fee or rebate

paid by the manufacturer. (Henderson Ex. 11, at 181:5-182:12, 246:21-247:14, 248; Henderson

Ex. 13, at 168)

42.     Dey knows that wholesaler margins are very small.  (Henderson Ex. 14;

Henderson Ex. 15, at 226:20-227:2)

43.     Major wholesalers have "source programs" developed by the wholesaler in which

the wholesaler will sell products to defined groups of customers at special contract prices

negotiated between the wholesaler and a drug manufacturer.   The contract price between the

wholesaler and the manufacturer is below WAC, and the manufacturer pays the wholesaler a

chargeback consisting of the difference between the WAC and the contract price. (Henderson Ex.

16, at 144:10-145:10; Henderson Ex. 11, at 254:15-22, 272:17-273:5)  Wholesalers solicit bids

from manufacturers to supply drugs for subsequent sale through the source programs.

44.     Dey sells drugs via direct sales to wholesalers pursuant to contracts between Dey

and the wholesaler.  Some of these contracts are for the supply of drugs that will be sold by the

wholesaler through source programs.  (Henderson Ex. 17, at 351-353, Dep. Ex. 49.)

45.     Dey contracts with wholesalers for direct sales to the wholesaler at prices below

WAC.  For example, for a period of time in the 1990s, Dey sales personnel used a "cheat sheet"

containing prices at which different classes of customers, including wholesalers, could buy

product from Dey.  (Henderson Ex. 10, at 150:21-151:13, and Dep. Ex. 18.)  Dey sales personnel

were authorized to sell product at or above the price shown on the cheat sheet without further

authorization.  A 1993 cheat sheet accompanying Johnston Ex. 18 shows the prices to the wholesaler class of trade for Dey's albuterol unit dose, packages of 25s and 60s,  (NDC #49502-0697-03 and 49502-0697-60), effective 8/1/1993, as $18.95 and $44.40, respectively.  Dey's reported WACs in 1993 Q3 were $25.00 and $54.00, respectively, significantly above the actual wholesale prices shown on the cheat sheet.

46.     The memorandum at Johnston Ex. 18 includes the statement, "As shown in the chart, Dey's wholesale price change, effective August 1, will keep the reimbursement spread to Dey's advantage."  (*Id*.)

47.     Similarly, in 2002, a representative of Cardinal Health wrote to Dey requesting that Dey verify all contract prices in effect between Cardinal and Dey, including contracts relating to Cardinal's sales programs called PreferredSOURCE, ManagedSOURCE, Generic Alliance, Cardinal GAP/Winn Dixie, Mail Order Alliance, NeighborCare LTC, LTC Generics, Owen Alliance, Access Expanded and Access Acute/Continuum.  (Henderson Ex. 17, at 49.) The request included a spreadsheet that set forth the Dey-Cardinal contract prices for Dey drugs, as well as the AWPs and WACs (referred to in the spreadsheet as "NIFO," according to p. 2 of the exhibit).

48.     The spreadsheet shows a comparison of contract prices and WACs for approximately 168 distinct NDC/contract prices.  Every one of the contract prices is below the WAC.  The spreads between the contract price and the WAC range from 12% to 53%. (Henderson Ex. 18.)

49.     Dey representative Russell Johnston signed the verification of the contract prices. (Henderson Ex. 17.)

50.     Cardinal's Rule 30(b)(6) designee testified that Cardinal often negotiates a 15 percent "purchase-based rebate" off the contract price.  (Henderson Ex. 11, at 153-155.)

51.     If Dey negotiates a contract price with a wholesaler for a particular drug, and that price is below WAC, the wholesaler submits a chargeback claim to Dey after paying the initial WAC invoice price.  Subsequently Dey reimburses the wholesaler for the difference between the WAC and the contract price, thereby reducing the wholesaler's actual net cost to a price below WAC.  (Henderson Ex. 17, at 351-353, and Dep. Ex. 34; Henderson Ex. 11, at 170:17-171:1.)

52.     In this fashion, Dey pays chargebacks to wholesalers in connection with direct sales to wholesalers.  (Henderson Ex. 17, at 351-353; Henderson Ex. 11, at 170:17-171:1, 171:19-172:3.)

53.     Cardinal Health measures its ultimate acquisition price of product on a "dead net" basis, which would be the price actually paid when factoring in rebates, chargebacks and other discounts.  (Henderson Ex. 11, at 118.)

54.     In the sales transaction data produced by Dey, gross sales for all the Subject Drugs, prior to adjustments for chargebacks, rebates, and other miscellaneous adjustments, total approximately $2.488 billion.   (Henderson Ex. 19, at ¶ 13.)

55.     In the sales transaction data produced by Dey, the data reflects approximately $480.6 million in chargebacks (19.3% of gross sales), approximately $1,392 million in rebates (5.6% of gross sales), and $46.0 million (1.8% of gross sales) in other miscellaneous adjustments.  (*Id.*)

56.     The indirect transaction data, which reflects sales for which chargebacks were paid, shows gross sales prior to adjustments for chargebacks of $1.303 billion.

14

57.     In the indirect transaction data, chargebacks total approximately $441.4 million (33.9% of gross sales).  (Henderson Ex. 19, at ¶ 15.)

## II.     DEY REPORTED AWPS AND WACS TO FIRST DATABANK, MEDISPAN, AND RED BOOK

58.     When Dey launched a drug, it reported its internally determined AWPs and WACs for drugs to certain publishers and data services, including First Data Bank ("FDB") (which maintains the National Drug Data File), Medi-Span, and Red Book (the "Publishers"). (Henderson Ex. 19A (Dey Answers to Interrogatories, Response No. 1)); Dey SOF ¶ 76.)

59.     After the launch of a drug, Dey periodically reported its AWPs and WACs to the Publishers.  Dey reported prices to the Publishers when there was a price change.  (Dey Answers to Interrog., Response No. 1; (Henderson Ex. 20, at 104.)

60.     Dey expected that the WACs and AWPs that it reported to First DataBank and the Red Book would be the WACs and AWPs that First DataBank and the Red Book would publish. (Henderson Ex. 21, at 467:19-467:22; Henderson Ex. 10, at 71.)

61.     Dey continues to report WAC and AWP to FDB.  (Henderson Ex. 22, at 303-304; Henderson Ex. 23, at 84.)

62.     Dey supplies WAC and AWP to FDB because State Medicaid programs use it as a reference guide for pricing in the industry.  (Henderson Ex. 24, at 299-300.)

63.     It was the practice of Thompson PDR, Inc., the publisher of Red Book, annually to send to each manufacturer whose products were listed in Red Book a "Product Listing Verification."  (Henderson Ex. 25, at 94-97, and Dep. Ex. 7.)  A Product Listing Verification report is a listing, generated by the publisher of Red Book, of all the manufacturer's products that

15

Red Book lists that the publisher believes are still currently manufactured.  (*Id.*)  The publisher

sent the Product Listing Verification report to the manufacture and requests that the manufacturer

return it to the publisher with any price changes and effective dates.  (*Id*.)

64.     Documents produced by Dey and Thompson PDR indicate that Dey received from

Thompson PDR Product Listing Verification reports and returned them with changes to

Thompson PDR.  (Henderson Ex. 25, at Dep. Ex. 7; Henderson Ex. 26, at DEY-BO-0018984;

Henderson Ex. 27.)

65.     From 1993 to 2001 or 2002, Robert Mozak, Dey's former vice president of Sales

and Marketing, and various employees in Dey's marketing department, including former

employees Debra Bronstein, Helen Burnham Selenati, and Todd Galles, participated in

recommending, or determining AWP and WAC prices for the Subject Drugs.  Since 2001 or

2002, the persons responsible for reviewing AWP and WAC pricing have included various

members of the contracts, sales, marketing, and finance departments, including Russell Johnston.

(Henderson Ex. 19A; Henderson Ex. 20, at 104; Henderson Ex. 10, at 55-56.)

66.     When Dey launched its ipratropium bromide products NDC 49502-0685-03 and

49502-0685-60 in January 1997, Dey reported to FDB and Red Book AWPs of $44.10 and

$105.60, respectively.  (Henderson Ex. 28, at Dep. Ex. 275; Henderson Ex. 4, at DL-TX-

0093102; Henderson Ex. 30, at 07116.)  Red Book published those prices.  (Declaration of

George B. Henderson, II Submitting Exhibits in Support of Motions for Partial Summary

Judgment ("Henderson Common") Ex. 3, ¶ 26 & Ex. C.)  First DataBank published prices of

$44.00 and $105.60, respectively.  (Henderson Ex. 19, at Summary A9 and A11.)

67.     Helen Burnham Selenati, a Marketing Manager at Dey from 1990 to 1995, had responsibility for reporting Dey's AWPs and WACs to the pricing compendia during her tenure at Dey.   She knew that the Publishers published those numbers in their databases, Red Book and Blue Book.  (Henderson Ex. 1, at 13-15, 42-44.)

Dey Reported False WACs to FDB In 1995

68.     On May 30, 1995, Dey reported to First DataBank WAC prices for its Albuterol Sulfate Unit Dose Solution, 0.083%, 3ml, as follows:

| NDC | PRODUCT DESCRIPTION | SIZE | UNITS PER CARTON | AWP | WAC |
|---|---|---|---|---|---|
| 49502-697-03 | Albuterol Sulfate Inhalation Solution 0.083% | 3 mL | 25 | $30.25 | $24.75 |
| 49502-697-33 | Albuterol Sulfate Inhalation Solution 0.083% | 3mL | 30 | $36.30 | $29.70 |
| 49502-697-60 | Albuterol Sulfate Inhalation Solution 0.083% | 3 mL | 60 | $72.60 | $59.40 |

(Henderson Ex. 31; Henderson Ex. 32, at FDB00918.)

69.     FDB published the WAC prices reported to it by Dey for the drugs identified in the preceding paragraph, and FDB generally continued to publish those prices until January 1, 1998.  (Henderson Ex. 19, at Summaries A5, A12, A13.)

70.     By letter dated December 31, 1997, Dey reported to FDB that, effective January 1, 1998, Dey's WACs for the Albuterol Sulfate Unit Dose Solution, 0.083%, 3ml products were reduced to:

| 49502-0697-03 | Albuterol Sulfate Inhalation Solution 0.083% | $9.50 |
|---|---|---|
| 49502-0697-33 | Albuterol Sulfate Inhalation Solution 0.083% | $11.40 |
| 49502-0697-60 | Albuterol Sulfate Inhalation Solution 0.083% | $22.80 |

(Henderson Ex. 33.)

71.     Effective January 1, 1998, FDB published the lower WAC prices reported to it by

Dey.  (Henderson Ex. 18, at Summaries A5, A12, A13.)

**III.    DEY'S REPORTED PRICES WERE FALSE**

**A.      The AWPs that Dey Caused to Be Published Were Substantially Higher
          Than the Prices Known to Dey and Generally and Currently Paid In the
          Market for the Subject Drugs**

72.     The United States' expert, Simon D. Platt, CPA, has calculated Dey's average

sales prices ("ASP")[2] for the Subject Drugs, aggregating the sales transaction data on a quarterly

basis, and net of chargebacks, rebates, and discounts.  Mr. Platt has calculated net ASPs for

Dey's direct sales, and for Dey's indirect sales.  (Henderson Ex. 19, at ¶¶ 12,14.)

73.     Mr. Platt has also compared Dey's average net sales prices to the AWPs and

WACs reported by First DataBank and Red Book, and has calculated the "spreads" on Dey's

drugs, i.e., the percentage markup over Dey's ASP, aggregating the data annually.  These

calculations and comparisons show that Dey's AWPs were substantially higher than the prices

generally and currently paid in the market for Dey's products.  (Henderson Ex. 19, at ¶¶ 12, 14.)

---

[2]  The term "average sales price" or "ASP" is not intended to refer to the term as
used in the Medicare statute, 42 U.S.C. § 1395w-3a(c).

18

        1.    <u>Albuterol Sulfate Unit Dose Solution, 0.083%, 3 ml</u>

74.    The AWPs that Dey caused to be published for Dey's Albuterol Sulfate Unit Dose Solution, 0.083%, 3 ml, products, NDC Nos. 49502-0697-03, 49502-0697-24, 49502-0697-33, 49502-0697-29, 49502-0697-30, 49502-0697-60, and 49502-0697-61 ("Albuterol Sulfate Unit Dose"), were substantially higher than the prices at which Dey sold those products to its indirect customers.  (Henderson Ex. 19, Graph A4.)   Specifically, the spreads between Dey's ASPs for its indirect sales and the published AWPs ranged from 75.6% in 1992 to 301.8% in 1998, to 1246.1% in 2007.  (*Id.*, Summaries A4, A5, A6.)

        2.    <u>Albuterol Sulfate Metered Dose Inhaler</u>

75.    The AWPs that Dey caused to be published for Dey's Albuterol Sulfate Metered Dose Inhaler, 17g, NDC Nos.49502-0303-17 and 49502-0333-17 ("Albuterol Sulfate MDI"), were substantially higher than the prices at which Dey sold those products to its indirect customers.  (Henderson Ex. 19, Graph A1.)  Specifically, the spreads between Dey's ASPs for its indirect sales and the published AWPs ranged from 73.6% in the first year of sales, 1995, to over 638% in 2000, and 408.9% in 2003.  (Henderson Ex. 19, Summary A1.)

        3.    <u>Albuterol Sulfate MDI Refill</u>

76.    The AWPs that Dey caused to be published for Dey's Albuterol Sulfate MDI Refill, 17g, NDC Nos. 49502-0303-27 and 49502-0333-27, were substantially higher than the prices at which Dey sold those products to its indirect customers.  (Henderson Ex. 19, Graph A2.)  Specifically, the spreads between Dey's ASP for its indirect sales and the published AWPs ranged from 356.7% in 1996 to approximately 600% in 2000.  (*Id.*, Summary A2.)

### 4.   Albuterol Sulfate Multi-Dose Solution, .5%, 20 ml

77.   The AWPs that Dey caused to be published for Dey's Albuterol Sulfate Multi-Dose Solution, .5%, 20 ml, NDC Nos. 49502-0196-20 and 49502-0105-01, were substantially higher than the prices at which Dey sold those products to its indirect customers.  (Henderson Ex. 19, Graph A3.)  Specifically, the spreads between Dey's ASP for its indirect sales and the published AWPs ranged from 160.5% in 1996 to 364.8% in 2003.  (*Id.,* Summary A3.)

### 5.   Cromolyn Sodium Unit Dose Solution

78.   The AWPs that Dey caused to be published for Dey's Cromolyn Sodium Unit Dose Solution, 20 mg, 2 ml, NDC Nos. 49502-0689-12, 49502-0689-02, and 49502-0689-61, were substantially higher than the prices at which Dey sold those products to its indirect customers.  (Henderson Ex. 19, Graphs A7 & A8.)  Specifically, the spreads between Dey's ASP for its indirect sales and the published AWPs ranged from 42.1% in 1994 to 424.7% in 2004. (*Id*., Summaries A7 & A8.)

### 6.   Ipratropium Bromide Unit Dose Solution

79.   The AWPs that Dey caused to be published for Dey's Ipratropium Bromide Unit Dose Solution, .02%, 2.5 ml, NDC Nos. 49502-0685-03, 49502-0685-24, 49502-0685-26,, 49502-0685-33, 49502-0685-29, 49502-0685-31, 49502-0685-30, 49502-0685-60, 49502-0685-61, and 49502-0685-62, were substantially higher than the prices at which Dey sold those products to its indirect customers.  (Henderson Ex. 19, Graphs A9, A10, A11.)  Specifically, the spreads between Dey's ASP for its indirect sales and the published AWPs ranged from 105.6% in 1997 to 1699.8% in 2003.  (*Id*., Summaries A9, A10, A11.)

**B.      The WACs that Dey Caused FDB to Be Published For Its Albuterol Sulfate Unit Dose Solution, NDC No.s 49502-0697-03, 49502-0697-33, and 49502-0697-60, From 1995 Q2 -1997 Q4 Were Substantially Higher Than the Prices At Which Dey Sold the Drugs to Wholesalers**

80.      The WACs that Dey caused FDB to publish from June 1, 1995, to December 1, 1998, were substantially higher than the prices generally and currently paid by wholesalers who purchased the drugs from Dey.   (Henderson Ex. 19, Graphs A12, A13.)  Specifically, the spreads between Dey's ASP for its direct sales to the wholesaler class of trade and the published WACs ranged from 150% in the second half of 1995 to 237% in 1997 Q4.  (*Id*., Summaries  A12,  A13.)

**IV.    DEY KNOWINGLY REPORTED FALSE AWPS AND WACS FOR THE PURPOSE OF INCREASING REIMBURSEMENTS TO PROVIDERS WHO PURCHASED DEY'S DRUGS**

**A.      The Launch of Albuterol Sulfate Unit Dose**

81.      Before the launch of Dey's Albuterol Sulfate Unit Dose product, NDC 49502-697-03, Dey's Vice President of Sales and Marketing, Robert Mozak, sent a memorandum dated February 24, 1992, to Pamela Marrs, Charles Rice, and Jean-Pierre Termier, setting forth the proposed pricing for Dey's new product, Albuterol Sulfate Inhalation Solution, in the unit dose form, NDC 49502-697-03.  Pamela Marrs was and is the Chief Financial Officer; Charles Rice was the Chief Operating Officer and became President and CEO in the summer of 1992 (Henderson Ex. 34, at 341); and Jean-Pierre Termier was the President at the time.  The memorandum includes an attachment which described Dey's pricing strategy for the drug.  The attachment shows a proposed AWP for the Dey product of $32.30.  In the attachment, in bullet-points, one of Dey's three "pricing objectives" was to:

> PROVIDE AN INCENTIVE TO RETAIL AND CHAIN
> PHARMACIES TO PURCHASE DEY'S ALBUTEROL UNIT

21

DOSE BY INCREASING THE SPREAD ON
MEDICARE/MEDICAID REIMBURSEMENTS.

(Henderson Ex. 35.)  There follows a description of Dey's "pricing strategies," with the first two

bullets stating:

1)    INCREASE THE SPREAD TO RETAIL/HOMECARE
ACCOUNTS BY LOWERING ACQUISITION COST
MORE THAN AWP

2)    PHARMACY CHAIN BID RANGE: $23.95 - $26.50
(AVG. $25.95) WILL INCREASE SPREAD FOR RETAIL
AND PROVIDE DEY WITH HIGHEST PROFIT

(*Id.*)

82.    Also before the launch of Dey's albuterol sulfate unit dose, NDC 49502-0697-03,

Dey's Vice President of Sales and Marketing, Robert Mozak, asked Dey Marketing Manager

Helen Burnham (later Helen Selenati) to contact First DataBank ("FDB") and find out what

would be the highest AWP that Dey could report and still ensure that the drug would be

classified by FDB as a generic.  Ms. Burnham contacted Ed Edelstein at FDB who, according to

Ms. Burnham, told her that, in order to ensure its status as a generic, the AWP had to be at least

ten percent below the AWP of the brand version.  (Henderson Ex. 36, at 46-47.)

83.    Ms. Burnham prepared a marketing plan for the albuterol unit dose product, dated

February 1992.  (Henderson Ex. 37, at 281-282 & Dep. Ex. 51 (selected pages).)  The marketing

plan contained a "pricing strategies" discussion that included language identical to that quoted in

paragraph 81, above.  (*Id.*)  The marketing plan also stated that "Selling price will average $15.00

in first 12 months."  (*Id.*)

84.     Dey reported an AWP of $32.25 to FDB, which was about ten percent below that of the brand.  (Henderson Ex. 19, Summary A4.)  Dey's average selling price for most of 1992 was about $17.900.  (*Id*.)

85.     For reasons that are unclear, beginning the third quarter of 1994 Dey dropped its AWP to $30.25.  Thereafter Dey never changed it.  (Henderson Ex. 19, Summary A4.)

86.     Sales for Dey's Albuterol unit dose product were strong in 1992.  By January 1993, Dey had doubled in size as a company due to its Albuterol product, adding many new sales personnel.  (Henderson Ex. 38.)

87.     In approximately July 1993, Dey began facing competition from another generic manufacturer for the albuterol sulfate unit dose product.  (Henderson Ex. 39.)  Dey reduced its prices to meet the competition.  (*Id*.)  Dey did not reduce its AWPs.  (Henderson Ex. 19, Summary A4.)

88.     In the years that followed, increasing competition caused Dey to lower its sales prices.  Dey did not lower its AWPs.  (Henderson Ex. 19, Graphs A4,  A5, A6.)

**B.     Dey Collected Information About Medicare and Medicaid Reimbursement Methodologies**

89.     In 1993 Dey Marketing Assistant (and later Product Manager) Robert Ellis was assigned to collect information about the reimbursement methodologies of state Medicaid programs and the Medicare program, as they related to Dey's drugs.  (Henderson Ex. 40, at 12-17.)  He and Dey employee Carrie Jackson collected and created an extensive database of information about state Medicaid reimbursement methodologies and Medicare reimbursement information.  he called the state agencies and recorded what their reimbursement structures were

and developed a database.   (Henderson Ex. 40, at 13; Henderson Ex. 41, at 109-112, and Dep.

Ex. 880; Henderson Ex. 42.)

90.     The information on Medicare and Medicaid reimbursement was distributed to

Dey's sales force.  (*Id.* at 110:23-112:5.)

91.     In later years Dey from time to time acquired information concerning

reimbursement practices of State Medicaid programs and Medicare Part B.  (Henderson Exs. 43,

44, 45).

92.     Robert Mozak, the former head of Sales and Marketing, knew that Medicaid

authorities paid based on prices reported to FDB or Medispan or Red Book.  (Henderson Ex. 46,

at 492.)

### C.     The Launch of Cromolyn Sodium

93.     In late 1993, Dey began to prepare for the launch of its cromolyn sodium

inhalation solution product ("cromolyn").  Robert Mozak, Dey's Vice President of Sales and

Marketing, prepared an October 15, 1993, memorandum to CFO Pamela Marrs and Charles Rice,

who by then was President of Dey, in which Mozak set forth the pricing structure recommended

for the upcoming launch.  (Henderson Ex. 47.)  The accompanying pricing description set forth

in detail for Dey's cromolyn the AWP, the direct prices to different classes of trade, and the

"spread to homecare pharmacists," which was $0.07 per vial.  (*Id.*)  The document also set forth

similar information regarding the brand product with which Dey would compete, Intal

(manufactured by Fisons), and showed that the "spread to homecare pharmacist" for Intal was

$0.01.  (*Id.*)

24

94.     In December 1993, Robert Ellis, then a Dey marketing assistant, prepared

detailed Marketing Plan for Cromolyn . (Henderson Ex. 48.)  His marketing plan included an

analysis of the profit that a homecare pharmacist would make from Medicare reimbursement.

(Ex. 476.)  It also included a section on pricing objectives that stated as one objective,

"PROVIDE AN INCENTIVE TO RETAIL/CHAIN PROVIDERS TO PURCHASE DEY'S

CROMOLYN BY INCREASING THE SPREAD ON MEDICARE/MEDICAID

REIMBURSEMENTS."  (*Id.*)  The launch plan then set forth a pricing analysis similar to the one

recommended in Mr. Mozak's October 15, 1993, memorandum.  It recommended setting the

AWP for the package of 60s (NDC 49502-0689-02) at $44.40, and the AWP for the package of

120s (NDC 49502-0689-12) at $82.80.  (*Id.*)

95.     Mr. Ellis's recommended pricing for cromolyn was based on his understanding of

the company's past experience with albuterol.  (Henderson Ex. 40, at 29-31)

96.     Mr. Ellis also prepared an "Abridged Marketing Plan" for cromolyn sodium, dated

January 1, 1994, which included as a pricing objective "PROVIDE AN INCENTIVE TO

RETAIL/CHAIN PROVIDERS TO PURCHASE DEY'S CROMOLYN BY INCREASING THE

SPREAD ON MEDICARE/MEDICAID REIMBURSEMENTS."  (Henderson Ex. 49)

97.     Charles Rice, Dey's President, would have been copied on the Abridged

Marketing Plan.  (Henderson Ex. 50, at 759.)

98.     Mr. Rice testified as follows regarding the Abridged Marketing Plan:

> Q.  And was the intent there to arrange a spread on
> medicare/medicaid reimbursement on Dey's generic cromolyn that
> was -- that was a greater spread than what the pharmacy would
> enjoy if they bought the brand?
> A.  I believe that was probably what Mr. Ellis intended, yes.

25

> Q.  And that was the intention of -- of Dey in terms of its pricing
> strategy whenever it launched a generic drug, correct?
> A.  That's correct.
> Q.  Build in a bigger spread than the pharmacist or provider could
> make if it -- than if -- than if it bought the brand drug?
> A.  That's correct.

*(Id.,* at 759)

99.    Dey launched the cromolyn product in April or May 1994.  (Henderson Ex. 51; Dey SOF ¶ 30.)

100.   The AWPs that Dey subsequently reported for publication were slightly lower than the figures recommended in the Mozak memorandum and the Ellis launch plan ($42.00 and $84.00, respectively).  (Henderson Ex. 51; Henderson Ex. 19, Summaries A7, A8.)

101.   Dey collected information on the status of the coverage of cromolyn by each state's Medicaid program.  (Henderson Ex. 52.)

**D.    Early Training of Dey Sales Representatives**

102.   In 1994, newly hired Dey sales representatives received training from Dey employee Debi Codute. (Henderson Ex. 15, at 143-144, 178-179; Henderson Ex. 53.)

103.   When newly-hired sales representative William Hill received training from Debbie Codute in 1994, they covered how to educate pharmacists on the different reimbursements of Dey's product as compared to a competitor's product.  The training included comparing the reimbursement on Dey's unit dose product as compared to a competitor's multidose product.  That comparison was for the purpose of educating the pharmacist on the fact that the pharmacist could make more profit by selling Dey's unit

26

dose product as compared to selling a competitor's multidose product.  (Henderson Ex.
15, at 143-144, 178-179.)

104.    Former Dey sales representative Michael Ricks-Bey similarly received
introductory training from Ms. Codute, as well as subsequent training, which included instruction
on how much profit the pharmacist would make on Medicaid reimbursement (Henderson Ex. 53,
at 54:11- 55:4, 76:13 - 77:13)

### E.    The 1994 National Sales Meeting

105.    In January 1994 Dey held a National Sales Meeting in Napa, California.
Substantially all of the Dey sales force attended.  (Henderson Ex. 54, at 95-97 & Depo. Ex. 778;
Henderson Ex. 1, at 134-135.)  At the 1994 convention, Dey sales manager Ross Uhl gave a
presentation called "Working a Homecare Pharmacy."  (Henderson Ex. 54, at Dep. Ex. 778);
(Henderson Exhibit 55.)

106.    Items that Dey personnel wished to place on the agenda for a National Sales
Meeting had to be reviewed and approved by management before they could be placed on the
agenda.  (Henderson Ex. 54, at 96:16-20; Henderson Ex. 56, at 91-92.)

107.    In his presentation at the 1994 National Sales Meeting, Mr. Uhl sought to explain
how a pharmacy and a durable medical equipment (DME) dealer both profited and worked by
purchasing either Dey's product or a competitor's or compounding it and then getting a
reimbursement from either a Medicaid or a Medicare provider.  (Henderson Ex. 54, at 95-97,
106-108.)   The presentation handout stated that Medicare and Medicaid reimbursed based on
AWP.  (Henderson Ex. 54, at Dep. Ex. 778.)  Mr. Uhl understood that providers were motivated
in part by reimbursement.  (Henderson Ex. 54, at 108.)

### F.      The 1995 National Sales Meeting

108.     In January 1995, Dey held another National Sales Meeting in Scottdale, Arizona. (Henderson Ex. 57, at Dep. Ex. 9.)  A large number of sales representatives from all over the country attended.

109.     The 1995 National Sales meeting included three workshops, each of which was mandatory.  (Henderson Ex. 15, at 157-159.)  One of the workshops taught strategies for converting customers from using the albuterol sulfate multi-dose product sold by Dey's competitors (Schering and Warrick) to using Dey's Albuterol Sulfate Unit Dose product. (Henderson Ex. 15, at 170; Henderson Ex. 57 (Hill Dep. Ex. 9 at p. DEY-058-0204.)

110.     Dey employees Ross Uhl and Debi Codute presented information and a handout at this workshop.  (Henderson Ex. 15, at 170; Ex. 57 at DEY-058-0204.)

111.     According to testimony of William Hill, the handout for this workshop, (Henderson Ex. 58) was made available to all the sales representatives who attended the workshop.  (Henderson Ex. 15, at 157-159.)

112.     The handout states,

> •    AWP Reimbursement: Why it's important, how it's calculated and what it means in terms of reimbursement from the third-party payers to the managed care organizations.
> •     Why "Multi-dose to Unit dose" Albuterol Conversion makes good business sense for the Customer Base.
> •    The dramatic effect the conversion has in real dollars yielding significant gain to the bottom line profit of the targeted accounts.

(Henderson Ex. 58 (underscore in original).)

113.    There was discussion at the workshop about each of these topics.

(Henderson Ex. 58, at 164-167.)

114.    Former Dey sales representative William Hill testified:

Q.  And what do you recall about why converting from multidose to unit dose Albuterol would make good business sense for the customer?
A.  Well, based on some assumptions that were gathered in the field in a couple different markets -- specifically I guess that Debi Codute had done the majority of their research in this area with unit test and multidose.  It was her conclusion that there would be opportunity both for a profit alternative for a pharmacy and then also the other things we talked about earlier with product safety and lack of infection risk.

(Henderson Ex. 15, at 164-165.)

115.    The handout at the 1995 National Sales Meeting also included two worksheets.  One was entitled "Albuterol Unit Dose Worksheet," which referred to Dey's Albuterol Sulfate Unit Dose product, and which was a vehicle by which sales representatives could calculate the profit that a pharmacist would potentially realize by dispensing the Dey unit dose product.  The other was entitled "Albuterol Multidose Worksheet," which was for the multi-dose product sold by Dey's competitor, Schering or Warrick, and was intended to illustrate the potential profit realized by dispensing the competitor's product.  The last line, with the words "Gain in Profit," was designed to quantify the higher profit realized from selling Dey's unit dose as compared to the profit realized from selling the competitor's multidose product.  (Henderson Ex. 15, at 167-169; Ex. 58.)

29

116.    Former Dey sales representative William Hill recalled that the scenarios in these worksheets were presented at the workshop.   (Henderson Ex. 15, at 179.)

117.    It was a marketing objective of Dey to convert potential customers from purchasing a competitor's multi-dose albuterol to purchasing Dey's unit dose albuterol.

### G.    Dey's Reimbursement Comparison Worksheet

118.    Dey personnel created a "Reimbursement Comparison Worksheet.  Dey manager Todd Galles and Dey employee Steve Robertson were involved in its creation.  (Henderson Ex. 59, at 346, 350, and Dep. Ex. 37.)   Mr. Galles was assigned to work with Mr. Robertson to come up with a workable format and create a tool for the sales force to use.  (Henderson Ex. 59, at 347-348.)

119.    On April 5, 1995, Todd Galles sent a memo to Dey's sales force, the subject of which was "Marketing Update – AWP Pricing and Profit Gain Worksheet."  In the memorandum he stated:

> At the national sales meeting our Managed Care Group presented the reimbursement advantages of our unit-dose packaging over multidose products.  Several requests were made for additional information so we thought a memo in order.
> Attached for your review and use are an AWP price listing guide and a Profit Gain Worksheet for use on your retail calls.  The AWP price listing is company confidential and intended only for your reference and not to be left behind with any customers.  The worksheet is more impactful when you work through it with a customer, but it can be left. [Thanks to Steve Robertson for the format.]
>
> If you have any questions about the material be sure to discuss it with your manger.  It can be a very compelling story when presented properly.
>
> Continued good selling!

(Henderson Ex. 60 (brackets in original).)

120.   The Reimbursement Comparison Worksheet was officially approved by Helen Burnham, Robert Mozak, and Charles Rice in April 1995.  (Henderson Ex. 61, at 700-703 and Dep. Ex. 44 and 45.)

121.   New editions of the Reimbursement Comparison Worksheet were approved and copyrighted in 1996 and 1999, as indicated in the footers in the new editions.  (Henderson Ex. 62.)

### H.   Dey's May 1995 Reporting of False WACs Was Intended to Increase the Spread

122.   In mid-1995 Dey Marketing Manager Helen Burnham learned from Ross Uhl, a Dey sales representative who at the time sold Dey drugs in Florida, that Dey had lost a customer's business because the spread on the albuterol product of a competitor, Warrick, was greater than the spread on Dey's product.  (Henderson Ex. 1, at 109-110, 192.)

123.   Florida's Medicaid program at the time reimbursed for drugs based in part on WAC, and Florida used the FDB Blue Book.  (Henderson Ex. 42, at p. DL0050034 - DL0050035; Henderson Common Ex. 24.)

124.   Helen Burnham wrote a memorandum dated May 30, 1995, to Dey's sales force that stated:

> Re:   Albuterol WAC Pricing
> Attached is a copy of a fax sent to all database managers to update their records with out wholesale acquisition cost (WAC) for albuterol.
> As you know, the following states are now using WAC instead of AWP to calculate Medicaid reimbursement:
> Alabama
> Colorado

31

>            Florida
>            Maryland
>            Massachusetts
>        WAC is not representative of our published wholesale list
> prices, but like AWP, is used for calculation of reimbursement.
> Our updated WAC values are in line with the Warrick WAC values
> provided by First Data Bank and should level the playing field for
> Medicaid reimbursement.
>            Please give me a call if you have any questions.

(Henderson Ex. 64.)

125.    Attached to the May 30, 1995, Burnham memorandum was a fax from Dey to

FDB notifying FDB that, "For your records, we are updating our prices as follows:

| NDC NUMBER | PRODUCT DESCRIPTION | SIZE | UNITS PER CARTON | AWP | WAC |
|---|---|---|---|---|---|
| 49502-697-03 | Albuterol Sulfate Inhalation Solution 0.083% | 3 mL | 25 | $30.25 | $24.75 |
| 49502-697-33 | Albuterol Sulfate Inhalation Solution 0.083% | 3mL | 30 | $36.60 | $29.70 |
| 49502-697-60 | Albuterol Sulfate Inhalation Solution 0.083% | 3mL | 60 | $72.60 | $59.40 |

(Henderson Ex. 64.)

126.    The May 30, 1995, Memorandum was distributed to Dey's Sales and Marketing

personnel.  (Henderson Ex. 37, at 229-30.)

127.    The Hearst Corporation, the owner of FDB, has produced from FDB files a

substantially identical copy of the May 30, 1995, fax attached to Helen Burnham's memorandum.

(Henderson Ex. 32.)

128.    Effective June 1, 1995, FDB published the WAC prices as shown above.

(Henderson Ex. 19.)   The FDB prices remained in effect until January 1, 1998.  (*Id.*)

32

I.     **Dey's Launch of Albuterol Sulfate Metered Dose Inhaler, 17g**

129.    In November 1995, Dey prepared to launch its Albuterol Sulfate Metered Dose Inhaler ("MDI"), 17g, NDC 49502-0303-17.  Todd Galles prepared a Launch Plan, dated November 1995.  (Henderson Ex. 65.)

130.    The launch plan set forth sales and marketing objectives.  It stated as "Assumptions" that "There will be generic competition within 3 months after launch," and "Average selling price can be maintained at $12/unit in first 12 months."   (*Id*.)

131.    The launch plan included a table entitled, "MDI Pricing" that compared proposed pricing for Dey's new MDI product and the brand products, which weres Ventolin and Proventil. The launch plan stated that the AWP for the Dey product would be "$21.70 (Proventil AWP-10%)," which was approximately ten percent below the AWP of the Proventil product.  (*Id*.)

132.    The "MDI Pricing" table also set forth "Direct Pricing" to various classes of customers, including Wholesaler, Generic Distributor, Mail Order, and Homecare Pharmacy, with recommended prices ranging from a high of $17.06 to a low of $13.70.  (*Id.*)

133.    Dey launched the drug in January 1996.  (Henderson Ex. 66.)  Dey set the AWP at $21.70 and notified Publishers accordingly. (Henderson Ex. 67.)

134.    First DataBank published an AWP for this drug of $21.70.  (Henderson Ex. 19, Summary A1.)

135.    By fax memorandum dated January 9, 1996, Dey's CEO reported to Dey's parent company that "The albuterol MDI launch has thus far exceeded our expectations, over $1 million in sales after five days on the market!  And many of the wholesaler orders are yet to be processed."  (Henderson Ex. 68.)

J.     **Dey's Launch of Ipratropium Bromide**

136.    In mid-1996, Dey prepared to launch Ipratropium Bromide Inhalation Solution 0.02%.   A Marketing Plan was prepared by Todd Galles, Eve Gmeiner, and Debra Bronstein. (Henderson Ex. 69.)

137.    The Marketing Plan observed that there were two competitors who distributed ipratropium bromide solution: Boehringer Ingelheim ("BI"), which distributed the branded product *Atrovent*, and Roxane Laboratories, a subsidiary of Boehringer, who distributed the generic equivalent.  (*Id*., at DL-TX-0092993.)  The Marketing Plan devoted four pages to discussion of these two competitors.   (*Id*., at DL-TX-0092993 - 0092996.)

138.    The Marketing Plan included a "Product Comparison Chart" that compared the features of the Dey ipratropium bromide product and the Roxane and BI products.  ( *Id*., at DL-TX-00930004.)

139.    The Dey Marketing Plan for ipratropium bromide also included the following:

VII.    **MARKETING STRATEGIES AND TACTICS**

STRATEGY

**6.      Set price and AWP to enhance sales while maximizing customer loyalty.**

TACTICS

1.    Develop price matrix comparing competitive listed prices.
2.    Notify pricing databases and verify information is loaded into their systems.
3.    Establish pricing guidelines for customer classes based upon volume and ability to move market share.
4.    Prepare reimbursement worksheets.

*(Id*., at p. DL-TX-0093016.)

140.    The Dey Marketing Plan also included the following table:

| Ipratropium Pricing Guidelines: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **DEY LABORATORIES** | | | | **ROXANE** | | **BOEHRINGER** | |
| **Customer Type:** | **25's** | **25's Per vial** | **60's** | **60's Per vial** | **25's** | **25's Per vial** | **25's** | **25's Per vial** |
| **AWP** (% off brand) | 44.10 -10% | 1.76 | 105.60 | 1.76 | 44.06 -10.1% | 1.76 | 49.00 | 1.96 |
| **WAC** (% off *Atrovent* AWP) | 25.50 - 48% | 1.02 - 48% | 60.90 - 48.2% | 1.015 - 48.2% | 26.44* - 46% | 1.06 - 46% | 40.80 | 1.63 |
| **Independent Retail Hospital List** (% above WAC) | 27.29 + 7% | 1.09 + 7% | 65.10 + 7% | 1.085 + 7% | 27.83 | 1.11 | | |

*(Id.*, at p. DL-TX-00930210.)

141.    A Fall 1996 Launch Manual, distributed to Dey Sales and Marketing personnel, included lengthy discussion of anticipated competition with Boehringer Ingelheim and Roxane. (Henderson Ex. 70.)

142.    In early January 1997, Dey launched the Ipratropium Bromide products, 49502-685-03 (carton of 25), 49502-685-60 (carton of 60).  (Henderson Ex. 71 (mis-dated January 1996); Henderson Ex. 72.)   Dey reported, and FDB and Red Book published, an AWP for the package of 25s that was $44.10, the same as the AWP stated in the Ipratropium Pricing Guidelines in the Marketing Plan.  (*Id.*)

143.    In the second quarter of 1997, the average price to the retail pharmacy class of trade for Dey's ipratropium package of 25s was $19.21, and the spread was 129%.  By the second half of 2003, prices had dropped to the point where the spread was 710%.  (Henderson Ex. 19, at Summary A9.)

35

144.    In August 1997, Dey introduced ipratropium bromide in a carton of 30, NDC #49502-0685-33, partly in response to Roxane's launch of a 30s pack.  Dey notified the pricing Publishers of its AWP and WAC.  (Henderson Ex. 73.)

145.    Documents produced by Dey indicate aggressive price competition between Dey and Roxane.  (Henderson Ex. 74.)

### K.    Dey's Launch of Albuterol Sulfate Multi-Dose Solution, .5%, 20 ml.

146.    In early 1996 or before, Dey decided to compete directly in the albuterol multi-dose market.  In March 1996, Dey launched Albuterol Sulfate Multidose Solution, .5%, 20ml, NDC 49502-0196-20.   (Henderson Ex. 75.)  In 1999 the product package was changed and sold under the NDC #49502-0205-01.

147.    This product was a concentrated form of albuterol sulfate that required, in the normal course of usage, measuring the appropriate amount of the drug and storing the bottle for reuse.  (Henderson Ex. 76.)   The Dey product was manufactured by Glaxo Wellcome, the manufacturer of the brand version, Ventolin. ( *Id.*)   At the time of the launch, several other companies competed in this generic market.  (*Id.*, at DL-TX-0076236.)

148.    A Launch Manual, dated March 1996, was prepared by Dey product manager Todd Galles.  (Henderson Ex. 76; Henderson Ex. 77 at 95; Henderson Ex. 78 at 476.)

149.    The Launch Manual included a version of the Reimbursement Comparison Worksheet substantially similar to the one circulated to Dey's sales staff with Mr. Galles's April 5, 1995, memorandum (see paragraph 119 above).

150.    The Launch Manual contained an "ALBUTEROL MULTI-DOSE PRICING" table showing an AWP of $14.90 for the Dey product and prices to different classes of customer,

including "wholesaler," "homecare pharmacy," and "Retain/Hospital/MedSurg List Price," with

the prices for these classes of customer shown as $7.90, $6.90, and $8.70, respectively.

(Henderson Ex. 76, at DL-TX-0076256.)

151.    On or about March 4, 1996, Dey sent the Launch Manual to its sales force with a

cover memorandum by Mr. Galles dated March 4, 1996.  The memorandum stated:

> We are very pleased to announce the addition of another Glaxo
> Wellcome product to our comprehensive line albuterol products.
> The addition of this product now moves us into the prestigious
> position of having the most extensive respiratory product line of
> any generic manufacturer.  The multidose niche of the respiratory
> market has not directly been accessible to us in the past.  However,
> now you can target accounts that you were not able to convert, and
> accounts that you know have a sizable multidose business.  Try to
> leverage this business to gain even more Unit-dose business.
>
> In this launch manual you will find a copy of the presentation you
> saw recently at your sales meeting, including the launch plan,
> market overview, sales direction, our pricing matrix terms,
> literature, a training module and copies of all announcement
> mailings.  In addition, we included the "Multidose to Unit-dose
> Conversion" reprint and worksheet, and the "Retail Profit Gain"
> worksheet.  You used both successfully last year.  Re-familiarize
> yourselves with these two pieces so they can work to your
> advantage again.  These pieces should reinforce the importance of
> our Unit-dose business and also help you strategize where to pick
> up multidose business.  Let us not forget that Unit-dose should
> remain our top priority.

(Henderson Ex. 76.)

### L.    Dey Employees Marketed the Spread

152.    According to Mr. Galles, the Reimbursement Comparison Worksheet was "one of

the tools that was provided for sales reps to use accordingly with their account."  (Henderson Ex.

78, at 354.)

153.    Mr. Galles testified that he "got feedback that reps liked it, that regional managers

liked it." (*Id.,* at 353-354.)

154.    Former Dey sales representative William Hill testified:

> Q.   Coming back to Exhibit No. 12, did you use this worksheet or
> a worksheet like this when you made sales calls for Dey?
> MS. GIULIANA:  Objection to the form.
> THE WITNESS:  Occasionally I would, sometimes in a formal
> sense.  I don't recall using this one specifically, but I would be
> more of a legal pad and sort of model things out rather than
> assuming that's what a customer's business model might be,
> something I had prepared, conceptually talk about how this would
> fit in their business model and then take a legal pad and sort of
> have them work through and plug and play with their own
> numbers.
> BY MR. HENDERSON:
> Q.   And did you use this in connection with the Dey unit dose
> Albuterol product?
> A.   Yes.

(Henderson Ex. 15 at 181-182.)

155.    The Reimbursement Comparison Worksheet was on a "Literature Request Form"

that was used by Dey sales representatives to request Dey promotional materials.  (Henderson

Ex. 15, at 203-205, and Depo. Ex. 16.)

156.    Michael Ricks-Bey, who was a Dey sales representative from 1994 to 1996, used

the reimbursement comparison worksheet on his account calls.  (Henderson Ex. 53, at 85-86.)

157.    When Dey launched its albuterol sulfate multi-dose product, Dey sales

representative understood that the sales of Dey's unit dose product was still a top priority.

(Henderson Ex. 15, at 237.)   Hill understood that it was "Dey's policy that sales reps continue to

use the reimbursement comparison worksheet in order to convert customers from using a

multidose competitor product to Dey's unit dose product at least where it seemed appropriate in

the circumstances." (*Id.,* at 237-238.)

158. By the mid-1990s, major wholesalers were providing their pharmacy customers

with computer software that allowed the customer to compute spreads and compare spreads

among related drug products.  (Henderson Ex. 79, at 183:7-185:11.)

**M.  Dey Knew or Should Have Known That Its Conduct Was Wrong**

159. On or about October 31, 1997, Dey received the first federal subpoena from the

HHS OIG seeking documents concerning Dey's pricing practices.  (Henderson Ex. 80.)

160. In April 2000, Dey received a Civil Investigative Demand from the State of Texas

Office of Attorney General requesting documents concerning Dey's pricing practices.

(Henderson Ex. 81.)

161. In late July or early August 2000, Dey received a second federal subpoena from

the HHS OIG seeking documents concerning Dey's pricing practices.  (Henderson Ex. 82.)

162. On October 30, 2001, Dey's President Charles Rice testified on October 30, 2001,

as follows:

> Q.  Did Dey Laboratories ever, or Dey, Inc., ever market the spread
> between reimbursement amounts and the actual cost for Dey
> products in an effort to get customers to purchase Dey
> Laboratories' Albuterol?
> MR. HUDSPETH: Objection to form.
> A.  I'm sorry.  Could you repeat the question?
> MR.BREEN: Would you please read the question back.
> (Requested portion was read.)
> THE WITNESS: To my knowledge, we did not.  There have been
> occasions where customers has – have asked us to identify "the
> spread."  but an active marketing promotion which was solely
> based on "the spread," no.  Nor would we condone that.

(Henderson Ex. 83, at 161:25 - 162:14.)

163.   Mr. Rice testified further:

Q.   That was my question.  Is it wrong to promote Dey's product
over Warrick's product based upon a bigger spread?  That's my
question.
MR. HUDSPETH:  Objection to form.
THE WITNESS:  In -- in my view?
Q.   (By Mr. Breen)  Yes.
A.   Yes.
Q.   Why?
A.   Because it's against what Dey Laboratories represents.
Q.   And what does Dey Laboratories represent that makes that
wrong?
A.   We treat our customers fairly.  We treat our products fairly.
We sell our products on the merits of the product -- the clinical, the
safety, and the product presentation itself.  We do not sell on the
spread, period.

(*Id.,* at 164:10-165:24.)

164.   Mr. Rice on October 30, 2001, also testified that "Marketing the spread is actually

going out and promoting this to customers without customers requesting it.  We do not create

promotional materials.  This is not on Dey letterhead.  I don't know if this ever went to the

customer and I have said – again, I'll repeat: I would not condone it and I do not believe Bob

Mozak would condone it."  (*Id..* at 168:21 - 169:2.)

165.    On November 1, 2001, Robert Mozak testified to his understanding of what the

term "spread" meant, and to his understanding of whether or not Dey had ever engaged in the

practice of marketing this spread to its customers.

166.   He testified:

Q.   So, is spread the difference between what is reimbursed to
those vendors and the amount that they actually paid to acquire
the product?

40

> A.   Yes.
> Q.   Is it Dey's policy to market the spread in its interaction
> with its customers?
> A.   No, it is not.
> Q.   Has Dey ever engaged in the practice of marketing the
> spread?
> A.   Not to my knowledge.
> Q.   If it came to your attention that your employees were
> engaged in the practice of marketing the spread, would you
> condone that practice?
> A.   No, I would not.
> Q.   I'll represent to you that Mr. Rice was, shall we say
> adamant that he did not condone the practice of marketing
> the spread. Do you share that feeling?
> A.   Yes, I do.
> Q.   Can you tell us why?
> A.   Well, I just -- I don't think it's -- it's – it's proper. We have
> never -- that has never been the policy of the company to
> market on that basis. We market on the basis of the product
> attributes.

(Henderson Ex. 84, at 85:19 - 86:24.)

167.    In response to the HHS OIG subpoenas served to Dey in 1997 and 2000, as well

as subpoenas from the California and Texas litigation, Dey's Manager of Sales Operations,

Cynthia Collie, prepared four banker's boxes of documents, some of which related to marketing

of the spread.  The bates ranges covered by the boxes comprised of DL-TX 0096540 through

0100303,   0100564 through 0104152, and 0105048 through 0106572.  (Henderson Ex. 56, at

76:3 - 77:18.)

168.    Before she left her employment at Dey in May 2001, Ms. Collie had a

conversation with Dey's Vice President of Sales and Marketing Robert Mozak about the

documents in her boxes.  Ms. Collie testified to the following:

> Q. (By Mr. Winter) Prior to delivering those four boxes of
> documents to Ms. Marrs, did you have any conversations with

> Bob Mozak as to what should be done with your four boxes
> of documents?
> A. I did.
> Q. And what did Mr. Mozak tell you?
> A. He asked me to shred anything I had in my possession.

(*id.,* at p. 72:1 - 72:8; <u>see</u> <u>also</u>, *id.*, at  20:18.)

169.    Ms. Collie refused to destroy the documents, and instead delivered them to

Pamela Marrs.  (Henderson Ex. 56, at 77:23 - 78:8.)

170.    Robert Mozak had received copies of the HHS OIG subpoenas served on Dey and

knew of the government investigation of Dey's price reporting to government agencies at the

time he instructed Ms. Collie to shred her four boxes of documents.  (Henderson Ex. 85, at 323:3

- 323:10.)

171.    Over a year later, in late January 2003, Dey produced the following documents:

DL-TX-00900851-00900855 (Albuterol Pricing Strategy, discussed at ¶  81 above); DL-TX-

0091106 (Cromolyn Launch Pricing Structure, discussed at ¶ 47 above); DL-TX-0091006

(Cromolyn Marketing Plan, discussed at ¶ 94 above); DL-TX-0090967 (Cromolyn Abridged

Marketing Plan, discussed at ¶ 96 above); DL-TX-0090875 (AWP Reimbursement handout at

the 1995 National Sales Meeting, discussed at ¶ 112 above (Exhibit Hill 10); and DL-TX-

0091109 (Memorandum to sales personnel on Reimbursement Comparison Worksheet, discussed

above in paragraph 119. )  (Henderson Ex. 86.)

172.    On or about February 4, 2003, Dey produced the following documents: DL-TX-

0093357 (Albuterol Marketing Plan, discussed above in ¶¶ 129-132.), and DL-TX-0092981

(Ipratropium Launch Plan, discussed in ¶¶ 136-139 above).  (Henderson Ex. 86A.)

173.    On or about February 13, 2003, Dey produced the document DL-TX-0096741 (1995 National Sales Meeting handout, discussed at ¶ 108 above).  (Henderson Ex. 87.)

174.    On or about February 18, 2003, Dey produced the documents in the banker's boxes that Mr. Mozak had told Ms. Collie to shred, bates ranges DL-TX-0096540 through DL-TX-0100303 (box No. 1);DL-TX-0100564 through DL-TX-0104152 (box no. 2); and bates range DL-TX-0105048 through DL-TX-0106572 (box no. 3).  (Henderson Ex. 56, at p. 76.)

175.    On or about April 28, 2003, Dey produced to the Document Control Sheet evidencing formal approval by Mr. Mozak and Mr. Rice of the Reimbursement Comparison Worksheet (discussed at ¶ 120 above).  (Henderson Ex. 88; Henderson Ex. 89.).  This document was also produced from one of the four banker's boxes Mr. Mozak attempted to have destroyed.

176.    On or about May 15, 2000, Dey received a letter from Congressman Tom Bliley, Chairman of the House Committee on Commerce.  (Henderson Ex. 90.)  The letter stated in part:

> During the course of its investigation, the Committee also has learned some troubling information that may suggest why at least some of these substantial price variations are occurring with respect to Medicare-covered drugs.  It appears that certain manufacturers may be inflating Medicare drug reimbursement rates as set by the AWP in order to help them better market their drugs.  By establishing the AWP for Medicare-covered drugs at prices far above what doctors or other providers are actually charged, manufactures create a "spread."  The spread is defined as the difference between the Medicare reimbursement price (95 percent of AWP) and the actual cost to doctors.  Because providers can keep the spread, they thus have a monetary incentive to prescribe or utilize drugs with larger spreads.  Likewise, the manufacturers of these drugs have an incentive to manipulate the AWP in order to increase spreads, and thus improve their competitiveness and sales of their drugs.  In fact, the Committee has learned information indicating that some companies may have increased the spread on

43

certain drugs in a calculated and deliberate effort to use this
Medicare-funded windfall as a marketing tool to induce medical
providers to use their drugs, and thereby enable themselves to gain
additional market share in the sale of their products.

If true, such actions would not only result in the Medicare
program paying far more for certain drugs than the average
wholesale price, but also cause Medicare beneficiaries to pay more
out of there pockets for Medicare-covered drugs and biologicals,
since they are responsible for co-payment charges tied to the AWP
as well.  Such outcomes clearly would be unacceptable and, as
Chairman of the Committee charged with oversight of certain
aspects of the Medicare program.  I intend to find out whether the
Medicare program and our Nation's senior citizens are being
financially gouged for certain drugs.  I will not tolerate taxpayers
and Medicare beneficiaries being forced to subsidize the efforts of
certain drug manufacturers to increase their sales.  If drug
manufacturers are deliberately gaming the setting of
reimbursement rates for such purposes, I firmly believe that they
should be exposed and held fully accountable.

*(Id.*, at 2)

177.    On May 5, 2003, the HHS OIG published OIG Compliance Program Guidance

For Pharmaceutical Manufacturers.  (Henderson Ex. 91 (68 Fed. Reg. 23731 (May 5, 2003)).)

The Guidance states in part:

Many federal and state healthcare programs establish or ultimately
determine reimbursement rates for pharmaceuticals either
prospectively or retroactively.  Using price and sales data directly
or indirectly furnished by pharmaceutical manufacturers, the
government sets reimbursement with the expectation that the data
provided are complete and accurate.  The knowing submission of
false, fraudulent or misleading information is actionable.

\*   \*   \*

Where appropriate, manufacturers' reported prices should
accurately take into account price reductions, cash discounts, free
goods contingent on a purchase agreement, rebates, up-front
payments, coupons, goods in kind, free or reduced price services,
grants for other price  concessions or similar benefits offered to
some or all purchasers.

44

(Henderson Ex. 91, at 23733-34.)

178.    Dey did not contact any State Medicaid agencies or federal Medicare officials to find out if it was appropriate to report inflated prices.  (Henderson Ex. 10, at 28-29.)

179.    Dey never contacted any Medicare carrier to ask whether it was permissible to report and cause to be published average wholesale prices that were higher than actual market prices.  (*Id.,* at p. 28.)

180.    On April 4, 2008, the United States served upon Dey a Notice of Deposition pursuant to Fed. R. Civ. P. 30(b)(6), which listed topics of inquiry that included the following:

> 6.    With regard to the plaintiffs' claim in the Complaint (at ¶ 50) that Dey made false or fraudulent representations about drug prices and costs to *RedBook*, First DataBank, and Medispan, the factual basis for the statement in Dey's Thirteenth Defense that, "As to any statement asserted against Dey that Plaintiff allege [sic] to be false or misleading, Dey had no reasonable grounds to believe, and did not believe at the time such a statement was made, that the statement was false or misleading."  This topic shall include but not be limited to:
> > a.    The identity of each employee (current and former) of Dey who held a belief that Dey's price representations were not false or fraudulent;
> > b.    The time period when such person held that belief;
> > c.    Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;
> > d.    All other information that formed a basis for the belief.
>
> 8.    Dey's belief, if any, that the United States government (or any agency or agent thereof) approved of or acquiesced in Dey's practice of causing the publication of AWPs for Dey products that were higher than actual average wholesale prices or WACs that were higher than actual wholesale acquisition costs, including:
> > a.    The identity of each employee (current and former) of Dey who held such a belief;

b.   The time period when such person held that belief;
c.   Each communication and the identity of each
     document relied upon, considered or used by the
     person in forming the belief;
d.   All other information that formed a basis for
     the person's belief.

(Henderson Ex. 92.)

181.   Dey designated Dey employee Pamela Marrs to testify on behalf of the Company

regarding these topics, among others.  With regard to Topic #6 above, Ms. Marrs produced two

binders containing numerous government reports, plus a letter from Dey President Charles Rice

to the Hon. Thomas Bliley, marked as deposition Exhibits 33A, 33B, and 33C, respectively

(collectively "Exhibit 33").  (Henderson Ex. 21, at 509-510.)

182.   The materials in Exhibit 33 were compiled by Dey's lawyers.  (Henderson Ex. 21,

at 533:21 - 534:16.)

183.   In preparation for the deposition, Ms. Marrs did not talk to anyone at Dey

concerning Topic #6 other than counsel.  (*Id*., at 521:21 - 522:8.)

184.   Ms. Marrs testified that she had spoken previously to Mr. Mozak about the topic

prior to 2002 and "early on in the litigation."  (*Id*., at 517:5-16.)  Mr. Mozak did not say he had

read any of the reports.  (*Id*., at 517 - 518).  Ms. Marrs testified " what he knew or didn't know

about these other reports prior to that time, I'm not aware.  You'd have to ask him."  (*Id*., at

518:10 - 519:22.)

185.   When asked who at Dey held a belief that the government approved of Dey's

reporting of inflated prices, Ms. Marrs answered:

THE WITNESS:  Well, if it's really the same people, it's Bob
Mozak.  It's whoever else had the knowledge from the attorneys of

46

> these various government reports as well as -- and I don't know
> other than Mozak to list names, quite frankly.  I suspect Russ
> Johnston is probably aware of all these government publications,
> but I haven't specifically spoken with him about it, so it's hard for
> me to name anyone other than Bob.

*(Id.* at 528:15 - 528:1.)

186.    Ms. Marrs testified that there is nobody at Dey who is more knowledgeable about

the government reports in Deposition Exhibit 33 than she.  (*Id.*, at 530:9-12.)

187.    At the time of the deposition, Ms. Marrs had not read any of the reports in

Deposition Exhibit 33 in its entirety.  (*Id.*, at 530:17-22.)

188.    Dey is not aware of anyone else at Dey who has read any of the government

reports in Deposition Exhibit 33.  (*Id.*, at 531.)

189.    Dey does not know when any Dey employee might have read any of the

government reports in Deposition Exhibit 33.  (*Id.*, at 532:6-13.)

190.    The United States' Rule 30(b)(6) notice to Dey included the following Topic #10:

> Dey's belief, if any, that the United States government (or any
> agency or agent thereof) approved of or acquiesced in Dey causing
> the Medicare program to reimburse providers for Dey drugs in
> amounts significantly in excess of provider acquisition costs plus
> any established dispensing fee, including:
> a.      The identity of each employee (current and former) of Dey
>         who held such a belief;
> b.      The time period when such person held that belief;
> c.      Each communication and the identity of each document
>         relied upon, considered or used by the person in forming
>         the belief;
> d.      All other information that formed a basis for the person's
>         belief.

(Henderson Ex. 92.)

191.    In response to Topic #10(a), Ms. Marrs testified that Mr. Mozak and Mr. Russell Johnston held the belief that the government approved of Dey's price reporting practices.  (Henderson Ex. 61, at 628-631, 633-634.)

192.    With regard to Topic No. 10.c, Ms. Marrs testified that she did not prepare on this topic.  (*Id*., at 632:2-12.)

193.    With regard to Topic No. 10.c, Ms. Marrs testified that she did not know what documents informed Mr. Mozak in his belief.  (*Id*., at 635-636.)

194.    Ms. Marrs testified that Russell Johnston believed that the government knew and approved of Dey's price reporting practices.  (*Id*., at 636:19 - 638:7.)

195.    Ms. Marrs testified that she holds the belief that the government knew and approved of Dey's price reporting practices.  (*id.,* at 638:12 - 639:18.)

196.    Ms. Marrs testified that her belief was based on communications with counsel.  She declined to disclose the content of her communications with counsel.  (*Id*., at 638:12 - 639:18.)

197.    After the Rule 30(b)(6) deposition, Russell Johnston testified that he has not read any OIG reports, and has no understanding one way or the other whether the federal government has approved of Dey's price reporting practice.  (Henderson Ex. 10, at 26-27.)

198.    Dey has no evidence that during the period 1994 through October 1997 (when the first OIG subpoena was served) that any Dey employee read or was aware of any government report concerning AWP or WAC prices.  (Henderson Ex. 21, at 521-532; Henderson Ex. 61, at 632-639.)

199.    Dey has no evidence that when Dey set the AWPs and WACs for the Subject

Drugs and reported those AWPs and WACs to the Publishers, Dey or any of its employees

considered or relied on any government report concerning AWP or WAC pricing.  (Henderson

Ex. 21, at 521-532; Henderson Ex. 61, at 632-639.)

## V.    DEY'S FALSE AWPS FOR ITS IPRATROPIUM BROMIDE PRODUCTS CAUSED THE MEDICARE PROGRAM TO PAY MORE THAN IT WOULD HAVE PAID ABSENT THE FALSITY

### A.    The Medicare Part B Payment Methodology, CIGNA Government Services

200.    The Court is respectfully referred to paragraphs 1 - 16 of the United States' Local

Rule 56.1 Statement of Undisputed Material Facts Common to All Defendants for certain facts

concerning Medicare Part B payment for DME drugs.

201.    During the relevant time period, Medicare Part B paid claims for ipratropium

bromide inhalation solution, .02%, unit dose, when used in connection with durable medical

equipment.  (Henderson Common Ex. 3, ¶ 3.)  There were three different HCPCS codes used to

process claims for ipratropium bromide.  The HCPCS code J7645 was used from January 1,

1995, through March 31, 1997.  The HCPCS code K0518 applied from April 1, 1997, through

December 31, 1999.  The code J7644 applied from January 1, 2000, through the present.  (*Id.*

¶ 16.)

202.    The DMERC for Region D, CIGNA Government Services, Inc. ("CIGNA"), paid

on behalf of Medicare many provider claims for reimbursement for ipratropium bromide.

(Henderson Ex. 63, ¶¶  9-13 and Exhibits C and D thereto.)

203.     CIGNA reimbursed for covered drugs at the lower of the allowable amount calculated by the carrier or the amount submitted by the provider in the claim.  (Henderson Common Ex. 3, ¶ 3.)

204.     CIGNA performed drug pricing calculations using average wholesale price (AWP) data obtained from Red Book.  (Henderson Common Ex. 3, ¶ 9.)  In general, CIGNA performed drug pricing updates quarterly.

205.     Generally, to determine the allowable fee for a particular DME drug, CIGNA used the Red Book to select the NDCs falling within the narrative description of the HCPCS code. CIGNA then created an array of prices that included the AWP for each selected NDC, using Red Book data.  CIGNA converted each AWP price to a unit price, so that there was a common measure of price.  (Henderson Common Ex. 3, ¶¶  9-10.)

206.     Using the array, CIGNA then determined the median AWP for the NDCs in the array.  If there was only one NDC with a published AWP in the array, CIGNA selected that price as the median.  If there was an odd number of NDCs in the array, CIGNA selected the middle price.  If there was an even number of NDCs in the array, CIGNA took the average of the middle two NDC prices to achieve a median.  (Henderson Common Ex. 3, ¶ 11.)

207.     The precise method followed by CIGNA for determining allowable reimbursement rates changed in the 1996-2003 period, in accordance with changing regulations or CMS instructions.  (Henderson Common Ex. 3, ¶ 12.)

208.     From 1994 through December 31, 1997, CIGNA calculated the allowable reimbursement rate as 100% of the median AWP of the generic forms of the drug (unless, as indicated above, only a brand drug was available).   (Henderson Common Ex. 3, ¶ 13.)

209.     Beginning January 1, 1998, as a result of the Balanced Budget Act of 1997, the DMERCs began paying providers at ninety-five percent of the median AWP.  Accordingly, for quarters beginning January 1998, CIGNA calculated the allowable fee by multiplying the median AWP by 0.95.  (Henderson Common Ex. 3, ¶ 13.)

210.     Effective approximately January 1999, HCFA issued instructions to the DMERCs that the allowable fee was to be determined as the lower of the median of the generic sources of the drug or the lowest priced brand name AWP.  (Henderson Common Ex. 3, ¶ 13; Henderson Ex. 94.)

211.     Once CIGNA determined a new allowable fee for a HCPCS code, the new or updated price was entered into the electronic claims processing system used by the DMERCs for paying Part B claims, referred to as the ViPS Medicare System.  Once a new or updated allowable fee was entered, the ViPS Medicare System used that price for determining the reimbursement of all applicable Medicare Part B claims that had not already been processed through the pricing part of the system.  (Henderson Common Ex. 3, ¶ 14.)

**B.     Dey's False AWPs Affected CIGNA's Calculations of Medicare Allowable Amounts for Ipratropium Bromide**

212.     The arrays used by CIGNA to determine the allowable amount for ipratropium bromide from the third quarter of 1996 ("1996 Q3") through 2003 Q4 are at Exhibit A to the Declaration of Carolyn Helton, the CIGNA DMERC pricing analyst.  (Henderson Common Ex. 3, ¶ 16.)

51

213.    For quarters prior to 1997 Q2, Dey's products do not appear in the array. Therefore Dey's reported prices had no impact on the amounts paid by CIGNA for ipratropium bromide for claims processed before April 1, 1997.  (Henderson Common Ex. 3, ¶ 18.)

214.    For each the arrays for the quarters from 1997 Q2 through 2003 Q4, Dey's products did appear in the arrays.  (Henderson Common Ex. 3, Exhibit A thereto.)  Roxane's ipratropium bromide products also appeared in the arrays.  (Henderson Common Ex. 3, ¶ 18 and Ex. A thereto.)

215.    In the arrays for the period 2001 Q2 through 2003 Q4, Roxane's NovaPlus ipratropium bromide products (having NDCs beginning with 00054-8402) appear in the arrays as brand products.  (Henderson Common Ex. 3, Exhibit A thereto.)  Dey's expert Dr. David Bradford has no opinion whether the Roxane NovaPlus products were properly treated as brand products.  (Henderson Ex. 95, at 409-410.)

216.    All of the arrays from 1997 Q2 through 2003 Q4 show the same median generic unit price, $3.52 per milligram, for K0518 and J7644.  (Henderson Common Ex. 3, Exhibit A thereto.  During the period 1997 Q2 through December 31, 1997, the allowable amount determined by CIGNA for K0518 and J7644 was 100 percent of the median, or $3.52 per milligram.  (*Id*.)

217.    After January 1, 1998, the effective date of the Balanced Budget Act of 1997, the allowable amount determined by CIGNA for K0518 and J7644 was 95 percent of $3.52, or $3.34.  (Henderson Common Ex. 3, Exhibit A thereto.)

218.    For the periods 1997 Q2 through 2001 Q3, any reduction of one percent or more in the AWPs of the Dey products (whether the AWP is expressed as a unit price or as the

package price) would have lowered the median and therefore the Medicare allowed amount. (Henderson Common Ex. 3, ¶ 23.)

219.     For the period 1997 Q2 through 2003 Q4, any reduction of one percent or more in the AWPs of both the Dey and Roxane ipratropium bromide products would have reduced the Medicare allowed amount, regardless of whether one changes the Roxane NovaPlus prices. (Henderson Common Ex. 3, ¶ 24.)

220.     During the period April 1, 1997, through September 30, 2001, CIGNA processed for payment 1,165,290 claims for reimbursement for HCPCS codes K0518 or J7644.  Of these, 910,835 claims were paid based on an allowed unit amount of either $3.52 or $3.34.  (Henderson Ex. 63, at  ¶ 14.)

### C.     The Joint Impact of False AWPs Reported by Dey and Roxane Caused Medicare To Overpay

221.     Dr. Duggan calculates damages to the Medicare program with respect to the ipratropium bromide HPCPS codes by replacing Dey's reported AWPs in the DMERCs' pricing arrays with alternative AWPs (calculated as 125 percent of the average net indirect sales price to the retail pharmacy class of trade), and quantifying the difference in the reimbursement.  (Reid Decl. Ex. 270B, pp. 97-131.)

222.     In his report, Dr. Duggan illustrates the effects of considering the impacts of the Dey and Roxane AWPs separately versus jointly in the following table, derived from one of the Palmetto arrays:

| NDC | Firm | AWP | Alternative Dey AWP | Alternative Dey & Roxane AWP |
|---|---|---|---|---|
| 00403-0229-18 | Compumed | 3.22 | 3.22 | 3.22 |
| 49502-0685-03 | Dey | 3.53 | 1.64 | 1.64 |
| 49502-0685-33 | Dey | 3.52 | 1.66 | 1.66 |
| 49502-0685-60 | Dey | 3.52 | 1.64 | 1.64 |
| 00054-8402-11 | Roxane | 3.52 | 3.52 | 1.70 |
| 00054-8402-13 | Roxane | 3.52 | 3.52 | 1.73 |
| 00054-8402-21 | Roxane | 3.52 | 3.52 | 1.74 |
| MEDIAN | - | 3.52 | 3.22 | 1.70 |

The bottom row shows the median of the listed prices.  (Reid Decl. Ex. 270B, p. 98.)

223.    The third column ("AWP") shows the published AWPs as listed in the original

array.  In the fourth column ("Alternative Dey AWP"), Dr. Duggan replaces Dey's AWPs with

alternative AWPs calculated from Dey's sales transaction data, without replacing any other

AWPs.  In the fifth column ("Alternative Dey & Roxane AWP"), Dr. Duggan replaces both the

Dey and Roxane AWPs with alternative AWPs calculated from the Dey and Roxane sales

transaction data, respectively.   (Reid Decl. Ex. 270B, p. 98.)

224.    In the "Dey-only" scenario (fourth column), the median drops by $0.30, from

$3.52 to $3.22.  If one were to calculate a "Roxane-only" scenario, in which the Roxane AWPs

were replaced with the alternative AWPs calculated by Dr. Duggan, the resulting median would

drop by the same amount of $0.30.   (Reid Decl. Ex. 270B, p. 98.)

225.    In the Dey-only and Roxane-only scenarios, the total loss in the above illustration

would be $0.60 ($0.30 + $0.30).  In the "Dey and Roxane" scenario illustrated above (fifth

column), the median drops by $1.82, from $3.52 to $1.70.

54

226.    The sum of the calculated losses in the "Dey-only" and "Roxane-only" scenarios is less than the loss calculated in the "Dey and Roxane" scenario.  A similar result is described in the Declaration of CIGNA employee Carolyn Helton ¶¶ 32-40.  (Henderson Common Ex. 3, ¶¶ 32-40.)

227.    Dr. Duggan calculates damages to the Medicare program for ipratropium bromide under three scenarios:

- First, Dr. Duggan calculates damages by replacing the AWPs for Dey's ipratropium bromide products (NDC Nos. 49502-0685-03, 49502-0685-33, 49502-0685-60).  In numerous arrays, the median generic AWP does not change, resulting in no calculated damages for those quarters.  (Reid Decl. Ex. 270B, pp. 97-101.)

- Second, Dr. Duggan calculates damages by replacing AWPs for Dey's ipratropium bromide products and the AWPs for Roxane's ipratropium bromide generic products, including Roxane's NovaPlus ipratropium bromide products.  In this scenario, the allowed amount in every array changes as a result of replacing the AWPs.  During the periods when the NovaPlus products are in the brand portion of the arrays, the NovaPlus products are less than the median of the products in the generic portion of the array, and Dr. Duggan attributes all of the losses in those quarters to Roxane.  In the quarters when the NovaPlus products are not in the brand portion of the array, Dr. Duggan allocates the damages between Dey and Roxane according to their relative market shares.  (*Id.*, at 101-102 & Table 36; Henderson Ex. 96 (February 2009 supplement to Dr. Duggan's report).)

- Third,  Dr. Duggan calculates damages by replacing AWPs for Dey's ipratropium bromide products and the AWPs for Roxane's ipratropium bromide generic products, but not the AWPs for the NovaPlus products.  In this scenario, the allowed amount changes in every array.  Dr. Duggan allocates the total damages between Dey and Roxane according to their relative market shares.  (*Id.*, 101-102 & Table 36; Henderson Ex. 96 (February 2009 supplement to Dr. Duggan's report).)

228.    With regard to the second and third alternatives above, because the Medicare allowed amount often was based on the median of the generic AWPs, the submission of inflated

55

AWPs by multiple manufacturers combined to create a joint impact on the Medicare allowed amount that was greater than the sum of the individual impacts.  (Reid Decl. Ex. 270B, pp. 14, 124-25; Henderson Ex. 3, ¶¶ 32-40).

**D.     Missing Arrays**

229.    Palmetto GBA, the DMERC for Region C, was unable to locate pricing arrays for K0518 (ipratropium bromide) for 1999 Q1 and 1999Q2.  The Palmetto arrays on either side of this gap, i.e., for 1998 Q4 and 1999 Q3, are reproduced in Henderson Ex. 97.  (See also Henderson Ex. 98, ¶ 5 & Ex. A.)  The 1998 Q4 and 1999 Q3 arrays show the following generic products listed:

| Array for 1998 Q4 | | Array for 1999 Q3 | |
|---|---|---|---|
| Compumed | 0043-0229-18 | Dey | 49502-0685-03 |
| Dey | 49502-0685-03 | Dey | 49502-0685-33 |
| Dey | 49502-0685-33 | Dey | 49502-0685-60 |
| Dey | 49502-0685-60 | Phys Total Care | 54868-4082-01 |
| Roxane | 00054-8402-11 | Phys Total Care | 54868-4082-00 |
| Roxane | 00054-8402-13 | Roxane | 00054-8402-11 |
| Roxane | 00054-8402-21 | Roxane | 00054-8402-13 |
|  |  | Roxane | 00054-8402-21 |

230.    The Palmetto array for 1999 Q3 states, "Deleted Compumed (00403-0229-18) because it was not on Mar 99 CD."  (Henderson Ex. 97.)

231.    The Red Book annual publications  typically are published during the second quarter of each year.  (Henderson Ex. 99, at 193:17-193:22.)  The Red Book annual publications

for 1998 and 1999, show no change in the number or identity of the generic manufacturers of

ipratropium bromide from one edition to the next.  (Henderson Ex. 97.)

232.    The CIGNA arrays for 1998 Q4, 1999 Q1, and 1999 Q2 show no changes in the

manufacturers whose products appear in the arrays during those quarters.  (*Id.;* Henderson Ex. 3,

Ex. A thereto (AWQ021-0220, AWQ021-0221, AWQ020 CD#1\J7644.xls Tab 1999 Q2).)

## VI.    DEY HAS BEEN UNJUSTLY ENRICHED BY ITS FRAUDULENT CONDUCT

233.    Dey's share of the market for Medicaid-reimbursed ipratropium bromide was

approximately 37.5% for the first quarter of 1998.  Dey's market share then increased every

quarter through the second quarter of 2000, when it peaked at 70.2%.  Dey's market share then

leveled off to approximately 50% for each subsequent quarter through 2003.  From 1998 through

2003, Dey's market share of Medicaid-reimbursed Ipratropium bromide averaged 55.6%.

(Henderson Ex. 100.)

234.    Over the Relevant Period, Dey has earned millions of dollars on the Subject

Drugs.  Examples of evidence of Dey's earnings (consisting of net sales minus costs, expressed as

"contribution margin") on the Subject Drugs are as follows: In 1994, Dey earned contribution

margins of $65,324,206 for Albuterol Sulfate (NDCs 49502-0697-03, -33, and -60), and

$12,128,586 for Cromolyn Sodium (NDCs 49502-0689-02 and -12).  (Henderson Ex. 101.)  In

1997, Dey earned contribution margins of $1,057,718 for Albuterol MDI (NDC 49502-0196-20);

$3,552,833 for Albuterol Inhalation 17gm (NDCs, 49502-0303-17 and -27); $62,630,048 for

Albuterol Sulfate (NDCs 49502-0697-03, -33 and -60); $47,778,085 for Ipratropium Bromide

(NDCs 49502-0685-03, -33, and -60); and $24,431,859 for Cromolyn Sodium (NDCs

49502-0689-02 and -12).  (*Id*.)  In 2000, Dey earned contribution margins of $2,077,173 on

Albuterol MDI (NDCs 49502-0105-01 and 49502-0196-20 (which was net of a loss on 0196-20 of $45,721)); $2,663,890 on Albuterol Inhalation 17gm (NDCs 49502-0303-17 & -27 and 49502-0333-17 and -27 (net of a loss of $10. For 0333-17); $37,011,793 on Albuterol Sulfate (NDCs 49502-0697-03, -33 and -60); $72,462,937 on Ipratropium Bromide (NDCs 49502-0685-03, -33 and -60); and $6,281,455 on Cromolyn Sodium (NDCs 49502-0689-02 and -12).  (*Id.*)

 Respectfully submitted,

MICHAEL F. HERTZ
DEPUTY ASSISTANT ATTORNEY
GENERAL

/s/ *Laurie A. Oberembt*

Joyce R. Branda
Daniel R. Anderson
Laurie A. Oberembt
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 514-3345

MICHAEL K. LOUCKS
ACTING UNITED STATES
ATTORNEY

By:   /s/ *George B. Henderson, II*

George B. Henderson, II
Barbara Healy Smith
James J. Fauci
Assistant U.S. Attorneys
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3272

FOR THE RELATOR,

James J. Breen
Allison Warren Simon
The Breen Law Firm, P.A.
5755 Northpoint Parkway, Suite 260
Alpharetta, GA 30022
Tel.  (770) 740-000
fax:  (954) 499-1173

Susan Schneider Thomas, Esq.
Gary Azorsky, Esq.
Berger & Montague, P.C.
1622 Locust St.
Philadelphia, PA 19103
(215) 875-3090

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above "UNITED STATES' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO DEY" to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

/s/ George B. Henderson, II

Dated: July 24, 2009                     George B. Henderson, II