# Exhibit 1

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc., et al.*,
Civil Action No. 05-11084-PBS


Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of Plaintiffs' Motion For Partial Summary Judgment
and In Opposition To Dey's Motion For Partial Summary Judgment

Selenati, Helen - May 4, 2005 09:06:00 a.m.

```
1:1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR LEON COUNTY, FLORIDA

  2     THE STATE OF FLORIDA              )

  3                                       ) ex rel.                        )

  4                                       ) )

  5     VEN-A-CARE OF THE                 ) FLORIDA KEYS, INC.,            )

  6     a Florida Corporation, by         ) and through its principal      )

  7     officers and directors,           ) ZACHARY T. BENTLEY and         )

  8     T. MARK JONES,                    ) )

  9              Plaintiffs,              ) )

 10     VS.                               )   CIVIL ACTION NO. )  98-3032A

 11     BOEHRINGER INGELHEIM              ) CORPORATION; DEY, INC.; DEY,    )

 12     L.P.; EMD PHARMACEUTICALS,        ) INC.; LIPHA, S.A.; MERCK,       )

 13     KGaA; MERCK-LIPHA, S.A.;          ) SCHERING CORPORATION;           )

 14     SCHERING-PLOUGH CORPORATION;      ) ROXANE LABORATORIES, INC.;      )

 15     and WARRICK PHARMACEUTICALS       ) CORPORATION,                    )

 16              Defendants.              )

 17

 18                      *-*-*-*-*

 19

 20

 21          VIDEOTAPED DEPOSITION OF HELEN SELENATI

 22                      Volume 1

 23

 24

 25
```

Selenati, Helen - May 4, 2005 09:06:00 a.m.

2:1              On the 4th day of May, 2005, between the

  2     hours of 9:06 a.m. and 4:59 p.m., at the Marriott San

  3     Mateo San Francisco Airport, 1770 South Amphlett

  4     Boulevard, San Mateo, California, before me, CYNTHIA

  5     VOHLKEN, a Certified Shorthand Reporter for the State

  6     of Texas, appeared HELEN SELENATI, who, being by me

  7     first duly sworn, gave an oral deposition at the

  8     instance of the Plaintiffs in said cause, pursuant to

  9     the Florida Rules of Civil Procedure.

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25

Selenati, Helen - May 4, 2005 09:06:00 a.m.

13:1    until '89 when I moved to the United States.

2              And I got a job with a company called

3       Oscor Medical in Palm Harbor, Florida, and I worked

4       for them for a year.  And then I was employed by Dey

5       Labs from 1990 to '95.  And then from '95 to 2000 I

6       worked for Inhale Therapeutic Systems here in Palo

7       Alto or San Carlos.  And then I left in 2000 to pursue

8       my studies and my new career in psychotherapy and

9       coaching.

10      Q.   Let me ask you a bit about your -- your

11      experiences with Dey Laboratories.  You started there

12      in 1990?

13      A.   Correct.

14      Q.   What was your title?

15      A.   I was marketing manager.

16      Q.   And was that the same title that you had

17      throughout your five-year tenure?

18      A.   Correct.

19      Q.   In general what were your -- what were your

20      duties?  What did the marketing manager at Dey

21      Laboratories do?

22      A.   Well, initially when I started I was the only

23      person in the marketing department, so I -- I did a

24      lot more than -- my responsibilities covered

25      everything in the marketing department.  I -- my main

Selenati, Helen - May 4, 2005 09:06:00 a.m.

14:1    focus was on promotional materials, creating

    2    promotional materials for the sales force to use.

    3    Also in organizing the trade shows, our attendance at

    4    trade shows.  I also trained the sales force on the

    5    clinical aspects of our drugs and how they worked

    6    and -- so that they had a background of the clinical

    7    way in which these drugs operated.

    8        Q.    And you had stated that your duties grew over

    9    the five years that -- while you were --

    10       A.    Well, my --

    11       Q.    -- a marketing manager throughout the entire

    12    period.  You had kind of ended your -- your first

    13    sentence saying, at first when I started that's what I

    14    did.  Did your duties change over the five years?

    15       A.    Well, I had more responsibilities in that by

    16    the time I left Dey I had two product managers

    17    reporting to me, as well as a market research person,

    18    a convention coordinator and admin assistant.

    19       Q.    Did your job change appreciably when you got

    20    in your department reporting to you the two product

    21    managers, the market researcher and the convention

    22    coordinator and the administrative assistant or did

    23    you simply get more help doing what you had originally

    24    been doing?

    25       A.    I got more help doing what I was originally

Selenati, Helen - May 4, 2005 09:06:00 a.m.

15:1    doing, but my day-to-day functioning was more in

2    management rather than the day to day creations of

3    promotional materials and attendance at conventions,

4    and so forth.

5        Q.    I see.  What were the names of the people who

6    reported to you, the two product managers, the market

7    researcher, the convention coordinator and the

8    administrative assistant?

9        A.    The first product manager that I employed was

10    Rob Ellis and then Todd Galles.  Eve Fagrell Gmeiner

11    was my market research person.  Carrie Jackson was the

12    convention coordinator and Margarita Flores was my

13    admin assistant when I left.

14        Q.    And who did you report to when you began at

15    Dey Laboratories in 1990?

16        A.    I reported to Bob Mozak.

17        Q.    Is that who you reported to by the time you

18    had left in 1995?

19        A.    Correct.

20        Q.    What was Mr. Mozak's title?

21        A.    He was vice president of sales and marketing

22    at that time.

23        Q.    And you say at that time.  Did his title

24    change while you were there?

25        A.    Well, after -- after I left he became

Selenati, Helen - May 4, 2005 09:06:00 a.m.

18:1     them and that's what they did.  They managed the

2     company.

3          Q.   Do you know what other direct reports the CEO

4     had other than Mr. Mozak?

5          A.   Gosh, if I can think of all the departments.

6     Well, there was a person in charge of regulatory and

7     clinical development, so he had that vice president

8     reporting to him.  Production reported to him.

9     Quality assurance reported to him, sales and marketing

10    reported to him, operations, the warehouse and we had

11    a facility down in Dallas.  The manager of the Dallas

12    facility, which was mostly a warehousing facility,

13    reported in to him.  I don't know whether I've left

14    anything out, but every -- every function reported in

15    to him.

16         Q.   Was there a chief financial officer that

17    reported also to the CEO?

18         A.   Oh, correct, yes.  Finance department.

19         Q.   Well, let me continue working my way up.  If

20    the CEO was the ultimate chief of -- do you need to

21    take a break?

22         A.   No.  It's just the air conditioner.  It's

23    okay.  I'm okay to go.

24         Q.   Okay.  I was going to say, let me know if

25    you're cold or -- or hot or you need a break.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

19:1                    Let's continue working our way up the --

2      the corporate ladder.  If the ultimate head of Dey

3      Laboratories is the CEO -- is Dey Laboratories a

4      stand-alone corporation or is it -- is it a subsidiary

5      of another corporation, do you know?

6                      MR. ESCOBAR:  Objection to the form.

7                      THE WITNESS:  I beg your pardon?

8                      MR. ESCOBAR:  I'm objecting.  Maybe we

9      should just note on the record that the witness is

10     obviously not represented by counsel, so she may not

11     be familiar with the deposition roles of everybody

12     here.

13                     You'll probably hear objections from me

14     or other counsel here occasionally.  We have to object

15     if we find Mr. Thomas' question to be -- have some

16     flaw, be misleading or otherwise preserve the

17     objection for later use at a trial.  So you'll

18     occasionally hear us object and the objection is

19     directed more at Mr. Thomas.

20         Q.   (BY MR. THOMAS)  And, of course, if you can

21     answer the question, please do.

22                     MR. McDONALD:  And, Mark, can we agree

23     that an objection by one is good for all, so we don't

24     all need to keep trying to --

25                     MR. THOMAS:  That's fine.  That's fine.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

20:1    A.   So what are you saying, that I can still

   2   answer the question?

   3     Q.  (BY MR. THOMAS)  Yes.  It's merely an

   4   objection, but -- but just -- just to get it back on

   5   the record again.  From your understanding while you

   6   were at Dey from '90 to 1995, was -- again, pursuant

   7   to your understanding and recollection, was Dey a

   8   stand-alone corporation or was it owned by any other

   9   corporations?  Was it affiliated with any

  10   corporations?  Did have it a parent?

  11           MR. ESCOBAR:  Objection.

  12     A.   It had a parent company in that it belonged

  13   to -- Lipha Pharmaceuticals purchased Dey and then

  14   later Lipha was acquired by Merck in Germany.

  15     Q.  (BY MR. THOMAS)  This purchase of Dey by

  16   Lipha, did that occur while you were there, sometime

  17   between 1990 and 1995, do you recall?

  18     A.   I think it had just happened when I joined

  19   the company because Jean-Pierre was already onboard

  20   when I arrived in Napa.

  21     Q.   Was there any relationship at all between

  22   Lipha purchasing the company and Jean-Pierre Termier

  23   leaving and Charles Rice taking his place?

  24     A.   No.

  25           MR. ESCOBAR:  Objection.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

21:1      A.   Jean-Pierre -- Jean-Pierre was the CEO that

   2   was -- he was employed by Lipha to come and run the

   3   company.

   4      Q.   I see.  And while you were at Dey from '90 to

   5   '95, is that a reasonable time frame pursuant to your

   6   recollection of the time when Merck purchased Lipha?

   7      A.   Well, somewhere in between there Lipha --

   8   Merck purchased Lipha.

   9      Q.   Okay.  So your basic understanding is that

   10   while you were there Dey was owned by Lipha, Lipha was

   11   owned by Merck?

   12           MR. ESCOBAR:  Objection.

   13      A.   Lipha became owned by Merck somewhere along

   14   the way, yeah.

   15      Q.   (BY MR. THOMAS)  Do you have any idea what

   16   the reporting relationship of Mr. Termier and Mr. Rice

   17   were from Dey up through Lipha, Merck?

   18           MR. ESCOBAR:  Objection.

   19      A.   Well, in the beginning Charles Rice reported

   20   to Jean-Pierre Termier when he was in charge of

   21   production and then later when Jean-Pierre moved back

   22   to France, Charles Rice took over as CEO at Dey.  And

   23   I don't know whether he then still reported in to

   24   Jean-Pierre at Lipha, but I do know that Jean-Pierre

   25   on occasion still visited at Dey and so I'm assuming

Selenati, Helen - May 4, 2005 09:06:00 a.m.

42:1    responsibilities was to report prices to the

2    databases.  Is that a fair characterization?

3        A.    Correct.

4        Q.    What do you mean by that?  What prices were

5    reported and what are databases?

6        A.    Well, databases kept -- well, they reported

7    prices of all pharmaceutical products.  Everybody was

8    listed in this database.  If you had a product that

9    was sold in the pharmaceutical industry it was listed

10    in this database.  And pharmacies and chain stores and

11    other avenues of trade in the pharmaceutical industry

12    would refer to these databases for product numbers,

13    product pricing, and so forth.

14                MR. McDONALD:  Objection, nonresponsive.

15        Q.    (BY MR. THOMAS)  When you say everybody, are

16    you referring to pharmaceutical manufacturers?

17        A.    Yes.  They would be part of everybody.

18        Q.    And when you say "they would report," persons

19    to your knowledge with your functions in other

20    corporations would be reporting prices to the

21    databases; is that your understanding?

22                MR. ESCOBAR:  Objection, no foundation.

23    I actually don't even understand the question.

24        A.    I don't know what functions would report the

25    prices into the databases.  I know that that was part

Selenati, Helen - May 4, 2005 09:06:00 a.m.

43:1   of my responsibility because it happened as part of

2   the launch plan, but I don't know who in the other

3   companies would report that.

4        Q.   (BY MR. THOMAS)  And you said databases, so

5   there's more than one?

6        A.   Correct.

7        Q.   Do you know the names of any of them?

8        A.   Can I refer to my notes?

9        Q.   Absolutely.  Mr. Escobar may want to take a

10   look at what it is that you're referring to, but feel

11   free to reference anything that you've brought with

12   you today.

13             MR. ESCOBAR:  Maybe you can arrange,

14   Mr. Thomas, for a copy of the materials that the

15   witness refers to.  It would be useful for us to have.

16             MR. THOMAS:  Surely, Mr. Escobar, we'll

17   do that.

18        A.   Well, I don't know where -- where it is right

19   now.

20        Q.   (BY MR. THOMAS)  Take your time.

21        A.   It was First DataBank was the one and I can't

22   remember the name of the other data bank.  First

23   DataBank was the one.

24        Q.   Would Medi-Span be one of the companies?

25        A.   Correct.  Medi-Span would be one of the

Selenati, Helen - May 4, 2005 09:06:00 a.m.

44:1   companies.

2       Q.    Medical Economics?

3       A.    And Medical Economics was the other one,

4   yeah.

5       Q.    So these are --

6       A.    Thank you.

7       Q.    These are external entities that -- that are

8   not owned by Dey, don't own Dey?

9       A.    That's correct.

10      Q.    To your knowledge, what do these databases do

11  with the prices that you had reported to them?

12            MR. ESCOBAR:  Objection, no foundation.

13      A.    Well, they publish them in something called a

14  Redbook or a Bluebook.

15      Q.    (BY MR. THOMAS)  And what was the purpose of

16  publishing the prices, do you know?

17            MR. ESCOBAR:  Objection, no foundation,

18  asking for speculation.

19      A.    I don't know.

20      Q.    (BY MR. THOMAS)  Have you ever heard the term

21  "AWP"?

22      A.    Yes, I have.

23      Q.    It's an acronym?

24      A.    Yes, it is.  It stands for average wholesale

25  price.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

66:1     Q.    Was Mr. Termier, do you know?

2        A.    Yes, he sure was.

3        Q.    How about Mr. Rice, was he aware of the

4    Medicaid program?

5        A.    Yes, he was.

6        Q.    Could you offer to what degree Mr. Mozak was

7    aware of the Medicaid program?  Did you have any

8    discussions with him as to any details regarding the

9    Medicaid program?

10            MR. ESCOBAR:  Objection to the form.

11   Kind of a broad question.  You're asking her to

12   speculate, also, about somebody else.

13            MR. THOMAS:  Thank you, Counsel.

14       A.    Well, Mr. Mozak and I had frequent

15   discussions about the Medicaid program, especially

16   when it came -- when it concerned reimbursement issues

17   and when it concerned the spread and when it concerned

18   how we were going to position our pricing in the

19   marketplace.  Medicaid and Medicare came up as

20   discussion points.

21       Q.    (BY MR. THOMAS)  Did you have any similar

22   conversations with Mr. Termier?

23            MR. ESCOBAR:  Objection to the form.

24       A.    No, I didn't.

25       Q.    (BY MR. THOMAS)  Did you have any similar

Selenati, Helen - May 4, 2005 09:06:00 a.m.

67:1   conversations with Mr. Rice?

2      A.   No, I didn't personally.

3      Q.   Are you aware of any conversations Mr. Mozak

4   might have had with Mr. Rice?

5      A.   No, I -- not -- no, not firsthand knowledge.

6      Q.   Can you offer for us today your basic

7   understanding of how it is that Medicaid is reimbursed

8   for the pharmaceuticals that are dispensed to Medicaid

9   recipients?

10         MR. ESCOBAR:  Objection to the form.

11   Can I -- can I just hear the question again --

12         (Requested portion was read)

13         MR. ESCOBAR:  Objection to the question.

14      Q.  (BY MR. THOMAS)  Can you answer?  Would you

15   like me to ask it again?

16      A.   Well --

17      Q.   I would be happy to.

18      A.   Sure.  Ask it again, but -- yeah.

19   Reimbursement to whom for what?

20      Q.   I'm just trying to get some sense as to what

21   your appreciation, understanding is how you perceive

22   it is that the state Medicaid programs in general

23   reimburse for pharmaceuticals.  So could you offer for

24   us just in general some sense as to how Medicaid pays?

25         MR. ESCOBAR:  Again, I object.  It's way

Selenati, Helen - May 4, 2005 09:06:00 a.m.

68:1   overbroad.  It covers 50 states, covers many years.

   2   I'm not sure how anybody could answer that, but --

   3              MR. THOMAS:  Thank you.

   4              MR. ESCOBAR:  -- objection.

   5   Q.   (BY MR. THOMAS)  Let me re-ask.

   6   A.   Yeah.

   7   Q.   Are you aware if Medicaid ever reimburses --

   8   a Medicaid program may ever reimburse based upon AWP?

   9   A.   I think that was what was -- when I first

   10  arrived at Dey that is how Medicaid reimbursed

   11  providers of services for drugs that were dispensed to

   12  Medicaid patients.  They used to use the AWP plus some

   13  formula applied to that for reimbursement purposes.

   14  Q.   Are you aware if any of the Medicaid programs

   15  ever utilize wholesaler acquisition cost as a basis

   16  for reimbursement?

   17  A.   I think there were some states that used

   18  wholesale acquisition cost later on.

   19  Q.   Is it your understanding that Medicaid bases

   20  its reimbursement based upon estimated acquisition

   21  cost of the pharmaceutical by the Medicaid provider?

   22             MR. ESCOBAR:  Objection to the form.

   23  A.   Can you say that again?

   24             MR. THOMAS:  Could you please read that

   25  last question?

Selenati, Helen - May 4, 2005 09:06:00 a.m.

69:1                THE REPORTER:  You were covering your

2    mouth --

3                MR. THOMAS:  Sure.

4                THE REPORTER:  -- so I had real hard

5    time, so can you repeat it?  I got behind on it.

6      Q.   (BY MR. THOMAS)  Is it your understanding,

7    Ms. Selenati, that Medicaid programs in general

8    attempt to estimate the acquisition cost of Medicaid

9    providers in the dispensing of pharmaceuticals?

10               MR. ESCOBAR:  Objection to the form.

11   And I think that's a misleading question, Mr. Thomas.

12               MR. THOMAS:  Thank you, Counselor.

13     A.   Well, I think Medicaid would like to

14   reimburse the providers for -- for the acquisition

15   cost of the product, plus some added profit for their

16   efforts and for their overheads.

17     Q.   (BY MR. THOMAS)  I would like to show you

18   what's been marked as Exhibit 9 in the Pamela Marrs

19   deposition.

20     A.   (Witness reviewing document).  Okay.

21     Q.   Have you ever seen that document before?

22     A.   I have not seen it before, no.

23     Q.   It's entitled "Dey Laboratories, Inc.

24   Memorandum"; is that correct?

25     A.   Correct.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

```
70:1        Q.    To Pam Marrs, Charles Rice, Jean-Pierre

   2    Termier; is that correct?

   3        A.    Correct.

   4        Q.    From Robert F. Mozak?

   5        A.    Correct.

   6        Q.    Dated February 24, 1992.

   7        A.    Correct.

   8        Q.    Let me read the first sentence, if I may,

   9    into the record.  "Although the pricing strategy will

  10    be reviewed at the March 6 meeting, I thought you

  11    would be interested in reviewing it sooner in light of

  12    the earlier approval" -- "approval of Albuterol."  Do

  13    you think this relates to the introduction of the Dey

  14    Albuterol product that you had mentioned in response

  15    to one of my earlier questions in early 1992?

  16        A.    Yes, it does.

  17        Q.    Do you think the March 6th meeting refers to

  18    a pricing committee meeting?

  19              MR. ESCOBAR:  Objection to the form.

  20        A.    I don't know what meeting that was.  It could

  21    have been a meeting between Pam Marrs, Charles Rice

  22    and Jean-Pierre because other people from the pricing

  23    committee were not copied on this memo.  So if it was

  24    to go to the pricing committee, if it -- if March 6th

  25    referred to a pricing committee meeting, I would have
```

Selenati, Helen - May 4, 2005 09:06:00 a.m.

71:1   imagined that Mark Pope's name would have been on here

2   and Cindy Daulong's name would have been on here as

3   well.  So I think this might have been an executive

4   meeting about the pricing strategy and the -- and the

5   launch.

6      Q.   At the time that this memo went out is it

7   correct to state that Pam Marrs was the chief

8   financial officer?

9      A.   Correct.

10      Q.   Jean-Pierre Termier was the chief executive

11   officer?

12      A.   Correct.

13      Q.   Was Charles Rice the head of production at

14   the time of the memo?

15      A.   Well, he was in charge of production.  There

16   was a stage there where Charles sort of got an interim

17   promotion and I don't really know what his title was

18   there, you know.  But, yeah, he was -- he was heading

19   up towards becoming part of the top executive team,

20   but he was still in charge of production, yes.

21      Q.   And at the time Mr. Mozak was the vice

22   president of sales and marketing?

23      A.   That's correct.

24      Q.   Let me take you to the second page of the

25   Marrs Exhibit Number 9, if I might.  The third

Selenati, Helen - May 4, 2005 09:06:00 a.m.

72:1    paragraph on the page, the third bullet.  Let me read

2    it into the record.  "To provide incentive to

3    retail/chain providers to use Dey's Albuterol UD by

4    increasing the spread on Medicare" dash -- sorry,

5    "/Medicaid reimbursements."  Do you see that bullet

6    item?

7        A.   Yes, I do.

8        Q.   Let me ask you a couple of questions about

9    that.  What does UD stand for after Albuterol, do you

10    know?

11        A.   Unit dose.

12        Q.   You had mentioned the word "spread" in

13    response to a question of mine I think three questions

14    ago.  I also see the word "spread" in that bullet that

15    we're just talking about in the third line, "by

16    increasing the spread."  What does that mean to you?

17            MR. ESCOBAR:  Objection to the form.

18        A.   Spread means the differential between what a

19    provider paid for the product and what a provider

20    would be reimbursed for the product.  That's commonly

21    known as the spread.  So that would be the gross

22    profit margin.

23        Q.   (BY MR. THOMAS) Okay.  The second bullet

24    item on the page, "To seek long-term (3 years)

25    agreements with major purchasing groups for all Dey

Selenati, Helen - May 4, 2005 09:06:00 a.m.

73:1    products through leveraging of Albuterol UD."  Do you

2    see that bullet item?

3        A.    Yes, I do.

4        Q.    Were you involved at all with any initiative

5    at Dey that that bullet refers to?

6        A.    No.  That was a contracts department

7    function.

8        Q.    Let me move you two pages back, "Pricing

9    Strategies."  By the way, did you help write any of

10    the contracts?

11            MR. ESCOBAR:  Two pages back takes us

12    out of the exhibit, yes?

13            MR. THOMAS:  It is Texas Bates number

14    0090854.

15            MR. ESCOBAR:  So two pages forward,

16    okay.

17        Q.    (BY MR. THOMAS)  The fourth page of the

18    five-page exhibit.

19        A.    Okay.  Got it.

20        Q.    "Pricing Strategies."  If I can read the

21    first one into the record, number one.  "Increase the

22    spread to retail/homecare accounts by lowering

23    acquisition cost more than AWP."  What does that mean,

24    do you know?

25            MR. ESCOBAR:  Objection to the form,

Selenati, Helen - May 4, 2005 09:06:00 a.m.

74:1   foundation.

2       A.   Well, this refers to maximizing the spread

3   for the retail pharm -- for the retail and home

4   healthcare pharmacies.  So by lowering the acquisition

5   cost to below the AWP, which is the -- the -- the --

6   the industry standard that was then used to calculate

7   reimbursement, you were maximizing the spread if you

8   lowered the acquisition cost and kept the AWP at an

9   elevated level.

10       Q.   (BY MR. THOMAS)  I'll read the second bullet

11   item.  "Pharmacy/chain bid range $23.95-$26.50 (AVG.

12   $25.95) will increase spread for retail and provide

13   Dey with highest profit."  As you just did with the

14   first bullet, can you give me your understanding of

15   what the second bullet means?

16            MR. ESCOBAR:  Objection to the form.

17       A.   It's my understanding that the for means

18   that -- that the bullet means that if Dey kept its

19   price to pharmacy and chains at an average price of

20   25.95, we would -- Dey would be provided with the

21   highest profit and we will also be allowing our

22   pharmacy and chain customers in the retail trade to

23   make an increased spread.

24       Q.   (BY MR. THOMAS)  Let me go back to one item

25   that I asked you about three questions previous.  Is

Selenati, Helen - May 4, 2005 09:06:00 a.m.

75:1   it your understanding that the Medicaid programs in

2   any states utilized reported prices like AWP and WAC

3   as a basis for estimating pharmacy acquisition cost?

4          MR. ESCOBAR:  Objection to the form.

5     A.   Yes.  States commonly used AWP and WAC to

6   calculate our reimbursement.

7     Q.   (BY MR. THOMAS)  Would that to your

8   understanding represent the top portion of what you

9   had just described as spread?

10          MR. ESCOBAR:  Objection to the form.

11     A.   Would what represent the top portion?

12     Q.   (BY MR. THOMAS)  The reported prices to

13   include WAC and AWP.

14     A.   I don't understand the question.

15     Q.   Surely.  Let me ask it again.  You had just

16   noted that per your understanding Medicaid utilized

17   reported prices to include WAC and AWP as a basis to

18   estimate the acquisition cost of pharmaceutical

19   products --

20     A.   I said they --

21     Q.   -- to Medicaid providers?

22     A.   -- they used WAC and AWP to calculate the

23   reimbursement.

24     Q.   Would that calculated reimbursement represent

25   the top half of the price spread that you had just

Selenati, Helen - May 4, 2005 09:06:00 a.m.

76:1   mentioned?

2      A.   That's right.

3           MR. ESCOBAR:   Objection to the form.

4      Q.   (BY MR. THOMAS)  Let me direct you to what's

5  been previously marked as Exhibit 571 in the Charles

6  Rice deposition.  If we could --

7           THE REPORTER:  That's Texas.

8           MS. MILLER:  It's Texas.

9      Q.   (BY MR. THOMAS)  Which is being marked as

10  Florida Exhibit Number 39.

11          (Exhibit 39 marked)

12     A.   (Witness reviewing document).  Okay.  I've

13  reviewed it.

14     Q.   (BY MR. THOMAS)  Does this document look

15  familiar to you?

16     A.   Well, yes.

17     Q.   You've seen it before?

18     A.   Yes, I have.

19     Q.   Does it appear that you authored it?

20     A.   It appears so.

21     Q.   On or about May 29, 1992?

22     A.   Correct.

23     Q.   Included on the copy list were Pam Marrs,

24  Mr. Mozak, Mark Pope, Charles Rice, Mr. Termier?

25     A.    Correct.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

77:1      Q.   If I could direct you to the second page of

2    that exhibit, the very last paragraph.  The very last

3    sentence.

4      A.   Yes.

5      Q.   "Our spread between pharmacy direct price and

6    AWP remains very competitive even with the reduction

7    in AWP."

8      A.   That's correct.

9      Q.   What's your interpretation of that?

10           MR. ESCOBAR:  Objection to the form.

11      A.   Well, we -- it appears that we had to reduce

12   our AWP price in order to be 10 percent below the

13   originator company's AWP and so this would then give

14   us generic product status.  And even though we had

15   reduced the AWP, we still maintained a good profit

16   margin for our pharmacy customers even though we

17   reduced the AWP and it was competitive compared to our

18   other competitor -- competitors on the -- in the

19   marketplace.  So our spread was better than everybody

20   else's, or competitive at least.

21      Q.   (BY MR. THOMAS)  Let me ask you a question or

22   two about spread.  Do you understand that spread is

23   important to your customers?

24           MR. McDONALD:  Object to the form.

25      A.   Yes, it was very important to our customers.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

```
78:1        Q.   (BY MR. THOMAS)  How so?

  2         A.   Well, that's where they derived their profit

  3    from.

  4         Q.   How did you come to know that this is

  5    important to your customers, spread?

  6         A.   Well, it was part of everything that was ever

  7    discussed at Dey.  From the very beginning that I got

  8    there was -- it was important to keep the spread

  9    competitive with everybody else's.  It wasn't that

 10    important at what price the customer bought the

 11    product, it was important that they got a -- enjoyed a

 12    good spread between their acquisition price and their

 13    reimbursed price.  So it was something that was part

 14    of every discussion about pricing, about products,

 15    about competition, about market share.  It -- it was

 16    part of every discussion.

 17         Q.   Did you have any conversations that you

 18    recall with Mr. Mozak regarding spread?

 19         A.   Many conversations.

 20         Q.   Did you ever have any conversations with

 21    Mr. Rice regarding spread?

 22         A.   No.

 23         Q.   Let me show you next what's been previously

 24    marked in the Pamela Marrs Deposition Exhibit Number

 25    33.
```

Selenati, Helen - May 4, 2005 09:06:00 a.m.

79:1     A.   (Witness reviewing document).  Okay.  I've

2    reviewed it.

3        Q.   Do you recall ever seeing this document

4    before?

5        A.   Yes, I do.

6        Q.   It appears to be from Rob Ellis?

7        A.   Correct.

8        Q.   That's the same Robert Ellis that was the

9    product manager who reported to you in the marketing

10   department?

11       A.   Correct.

12       Q.   You were copied on this?

13       A.   Yes, I was.

14       Q.   As was Mr. Mozak and Mr. Rice?

15       A.   Correct.

16       Q.   The regarding line says, "Copley's Albuterol

17   Pricing."  Who or what is Copley?

18       A.   Copley was a competitor that came out with a

19   generic equivalent.

20       Q.   On the second page of the document is a

21   lengthy distribution list.  From what you can tell

22   from the document these are the people that got this

23   memo?

24       A.   Correct.  Yeah.  We had a distribution list

25   that was always just called distribution and that

Selenati, Helen - May 4, 2005 09:06:00 a.m.

80:1    would normally be sales and marketing people and

2    without having to always put out everybody's name on

3    the memo front we used to have "To distribution" and

4    everybody else who wasn't on the distribution list

5    would be cc'd on the memo.  So this was common

6    practice.

7       Q.   Let me direct your attention to the graphic

8    in the middle of the page.  On the horizon column

9    "Copley" and "Dey"?

10       A.   Yes.

11       Q.   And the vertical "Wholesale Price," "AWP" and

12    "Spread"?

13       A.   Yes.

14       Q.   Is it correct to state that pursuant to this

15    memorandum the Copley wholesale price of Albuterol is

16    stated to be $19.50 with an AWP of $32?

17       A.   Yes.

18       Q.   The difference between those, $12.50?

19       A.   That's correct.

20       Q.   Would this appear to be the spread between

21    those two?

22       A.   That's correct.

23       Q.   And then dropping down one line.  The Dey

24    wholesale price, would that appear to be $18.95?

25       A.   Correct.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

81:1      Q.    And the AWP at $32.30?

2         A.    Correct.

3         Q.    The difference between those two, the spread,

4    would be $13.35?

5         A.    Correct.

6         Q.    Is it your understanding that the profit to

7    the purchaser of the Albuterol would be the spread as

8    demonstrated here?

9         A.    That's correct.

10        Q.    From what you can tell in the memo?

11        A.    That's correct.

12        Q.    The Dey's spread, the Dey's profit on the

13   drug would be greater than that of Copley?

14        A.    That would be correct.

15        Q.    You had mentioned discussions with Mr. Mozak

16   of spread.  You had discussions regarding spread with

17   other employees at Dey?

18        A.    Correct.

19        Q.    Do you recall ever having any discussions

20   with Bob Pallas about spread?

21        A.    Oh, yes.

22        Q.    How about with Ross Uhl?

23        A.    Oh, yes.

24        Q.    Pamela Marrs?

25        A.    Not in particular.  I don't remember any

Selenati, Helen - May 4, 2005 09:06:00 a.m.

109:1     A.   It appears from this memo that Rob Ellis

2    might have adjusted the AWP of Dey's product in the

3    upwards direction to improve the spread for our

4    customers on the Dey product.

5    Q.  (BY MR. THOMAS)  Okay.  Did Dey consider

6    Warrick more of a competitor on Albuterol than Copley?

7                MR. ESCOBAR:  Objection.

8                MR. McDONALD:  Object to the form.

9    A.   Oh, they were both competitors of -- we

10   didn't rank our competitors.  Anybody was a threat at

11   any time depending on where they came out with

12   pricing.

13   Q.  (BY MR. THOMAS)  Let me ask you a couple of

14   questions about WAC.  Did Dey adjust its WAC prices in

15   relationship to WAC pricing for any Warrick Albuterol

16   products?

17               MR. ESCOBAR:  Objection to the form.

18   A.   Can you say that again?

19   Q.  (BY MR. THOMAS)  Surely.  Did Dey adjust its

20   WACs on Albuterol on account of WAC prices on Warrick

21   Albuterol?

22               MR. McDONALD:  Object to the form.

23               MR. ESCOBAR:  Objection to the form.

24   A.   Yes.  When -- when the Florida situation

25   happened where Warrick was taking away business from

Selenati, Helen - May 4, 2005 09:06:00 a.m.

110:1   us we did increase our WAC in order to be competitive

    2   with the Warrick spread.

    3       Q.   Do you recall --

    4            MR. McDONALD:  Objection, nonresponsive.

    5       Q.   (BY MR. THOMAS)  Do you recall when that was,

    6   approximately, what date?

    7       A.   Somewhere around the middle of '95.

    8       Q.   How did Dey become aware of Warrick's WAC

    9   pricing?

   10       A.   I think it was Ross Uhl that brought it to

   11   our attention that one of his clients was no longer

   12   buying the Dey product and they were quite a large

   13   customer of Dey's and we were concerned about the

   14   situation and we were concerned that this might be a

   15   trend that we were going to lose out on some of the

   16   larger customers.

   17            MR. McDONALD:  Objection, nonresponsive.

   18       Q.   (BY MR. THOMAS)  Is it your understanding

   19   that in that time period, in the middle of '95,

   20   pursuant to communications from Ross Uhl that the

   21   spread on Warrick's Albuterol was higher, larger than

   22   the spread on Dey's Albuterol?

   23            MR. McDONALD:  Object to the form.

   24       A.   That was correct.

   25       Q.   (BY MR. THOMAS)  Was Dey's adjustment

Selenati, Helen - May 4, 2005 09:06:00 a.m.

111:1    successful?

2                    MR. ESCOBAR:  Objection to the form.

3       A.   The adjustment in the -- the upward

4    adjustment in the WAC, was that successful --

5       Q.   (BY MR. THOMAS)  Yes.

6       A.   -- is that what you're asking me?

7       Q.   Yes.

8       A.   Yes, it was successful.

9       Q.   How do you know?

10      A.   Well, after we adjusted the WAC all the

11   commotion in the sales force died down and everybody

12   seemed to be happy and able to compete again in the

13   marketplace.

14      Q.   Did you ever have any conversations with

15   employees at competitors regarding spreads on drugs?

16      A.   No, never.

17      Q.   Is it your understanding or belief that

18   your -- that Dey's competitors were concerned about

19   spreads on drugs?

20                   MR. ESCOBAR:  Objection to the form.

21                   MR. McDONALD:  Object to the form.

22      A.   I never had any personal knowledge of that,

23   but that was what was reported from the sales force,

24   that that was the main selling angle that they used

25   with their customers.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

112:1            MR. McDONALD:  Objection, nonresponsive.

2      Q.   (BY MR. THOMAS)  Do you recall any specific

3   conversations with any of the internal or external

4   sales executives regarding how Dey's competitors

5   viewed spread on drugs?

6            MR. ESCOBAR:  Objection to the form.

7      A.   Well, not specific conversations.  As I said,

8   these are -- oh, God, this was, you know, 12, 15 years

9   ago and I know there were lots of general

10   conversations, but any specific conversation that I

11   recall, no.  It was such a common industry practice.

12   It was part of everyday conversation in managers'

13   meetings and sales meetings that this is the way the

14   product was sold and, you know.  As a marketing person

15   I wished that they had sold it on features and

16   benefits because that's what I produced all the

17   marketing materials around, but clearly the game was

18   played on price.

19      Q.   And that was going to be --

20            MR. McDONALD:  Objection, nonresponsive.

21      Q.   (BY MR. THOMAS)  That was going to be my next

22   question.  We've talked a lot about the -- the impact

23   of spread on -- on marketing and the attractiveness of

24   manufacturers' products to customers.  What else is

25   there?  You as a marketing executive, what else did

Selenati, Helen - May 4, 2005 09:06:00 a.m.

113:1    you rely upon to sell Dey's drugs?

2                MR. ESCOBAR:  Objection to the form.

3        A.   Well, initially when we launched Albuterol it

4    had many benefits over the Schering and the Ventolin

5    product from Glaxo in terms that it was a unit-dose

6    that was manufactured in a form-filled sealed format

7    which made it sterile so we didn't have to use any

8    preservatives.  And it was proved that some of the

9    preservatives that were added to the unit-dose that

10   Schering and Glaxo was selling caused actually

11   bronchoconstriction in asthmatic patients.  And, I

12   mean, this product was prescribed to dilate the

13   bronchials of asthmatic patients, so why would you

14   want to put a preservative in there that did the

15   opposite.

16              And, also, the other -- the competitor's

17   products were very difficult to open.  It was tiny

18   little screw cap bottles and the elderly patients with

19   arthritic fingers had difficulty in opening these

20   products, so our vials were very easy twist-open caps.

21              As opposed to the multi-dose product,

22   there was no measuring required, so, therefore, the

23   clients weren't -- the patients weren't -- you weren't

24   relying on the patient's accuracy for measuring out

25   the doses.  So we had quite a few benefits in that

Selenati, Helen - May 4, 2005 09:06:00 a.m.

114:1   regard.

2       Q.   (BY MR. THOMAS)   Is it your understanding

3    that any of Dey's customers relied upon those

4    nonspread marketing efforts?

5              MR. ESCOBAR:   Objection to the form.

6       A.   In the beginning they definitely did.

7       Q.   (BY MR. THOMAS)   And then after the

8    beginning?

9              MR. ESCOBAR:   Objection to the form.

10      A.   Well, once competitors entered the market,

11   then pricing became an issue.   Because in the

12   beginning all you were trying to do was convert --

13   convert users from preserved unit-dose to a

14   nonpreserved unit-dose with an easier opening

15   mechanism.   But once generic competition came onto the

16   market, it was all about price.

17      Q.   (BY MR. THOMAS)   And is it your belief that a

18   nonpreserved formulation is superior to a preserved

19   formulation?

20      A.   Well, it's better for the patient.

21      Q.   And why is that?

22             MR. McDONALD:   Object to the form.

23      A.   Because the preservatives that were put into

24   the unit-dose products was shown to be detrimental for

25   asthmatic patients.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

115:1    Q.  (BY MR. THOMAS)  Were there any nonspread

2    advantages of the Dey's Albuterol product over the

3    Copley generic Albuterol product?

4            MR. ESCOBAR:  Objection to the form.

5    A.  You know, I don't even remember what Copley

6    looked like, whether it was the same little preserved

7    unit preserve dose.  I don't even remember what

8    Copley's product looked like.  At that stage there

9    were many competitors on the market and I -- I can't

10    remember what Copley's looked like.

11    Q.  (BY MR. THOMAS)  Were there any nonspread

12    advantages of the Dey generic Albuterol product over

13    the Warrick generic Albuterol product?

14    A.  Yes, there was.

15            MR. McDONALD:  Object to the form.

16            MR. ESCOBAR:  Objection.

17    Q.  (BY MR. THOMAS)  What were those?

18            MR. McDONALD:  Object to the form.

19    A.  It was the sterile formulation that didn't

20    have preservative and the easy opening vials.

21    Q.  (BY MR. THOMAS)  If you could, let me direct

22    you to Exhibit Number 35 in the book in front of you

23    from the Pamela Marrs deposition.  That's the big

24    composite exhibit where the first document is a

25    memorandum that you wrote and the second document is a

Selenati, Helen - May 4, 2005 09:06:00 a.m.

116:1   memorandum that your a direct report, Carrie Jackson,

    2   wrote.

    3      A.   Yes, I've got -- which one do you want me to

    4   look at?

    5      Q.   The Carrie Jackson report.  Specifically if

    6   you could turn to the page that's got Florida pricing

    7   on it.

    8            MR. McDONALD:  Do you have a Bates

    9   number?

   10            MR. ESCOBAR:  905.

   11            MR. McDONALD:   Thank you.

   12            MR. THOMAS:  905.

   13      A.   Okay.  I've got it.

   14      Q.   (BY MR. THOMAS)  Carrie Jackson was a direct

   15   report to you?

   16      A.   That's correct.

   17      Q.   What's the purpose of this report that Carrie

   18   Jackson wrote?

   19            MR. ESCOBAR:  Objection.

   20      A.   Well, this was to inform the salespeople in

   21   adjustments that were made from time to time in

   22   reimbursement formats, whether you needed to get your

   23   product on the formulary, what Medicare was doing,

   24   what Medicaid was reimbursing.  It was to give the --

   25   keep the sales force up-to-date what was happening in

Selenati, Helen - May 4, 2005 09:06:00 a.m.

117:1   each one of the states in terms of reimbursement.

2      Q.   (BY MR. THOMAS)  If I can get you to turn one

3   page forward to Bates page 90906.

4      A.   I've got it.

5      Q.   At the very top of the page, third line down.

6   Underneath the column entitled "Reimburse. Basis."  I

7   assume that means reimbursement.

8      A.   Yes.

9      Q.   WAC plus seven percent.

10      A.   Correct.

11      Q.   What does that mean?  What's the significance

12   of WAC plus seven percent?

13      A.   Well, that's what the provider of the

14   medication to the patient was reimbursed by Medicaid

15   and that was the WAC price plus seven percent on top

16   of the WAC price.

17      Q.   Okay.  And that's -- comports with what you

18   had stated earlier, that WAC and AWP pricing is based

19   upon a statewide specific formula.

20                MR. ESCOBAR:  Objection to the form.

21                MR. McDONALD:  Object to the form.

22      A.   Well, not statewide, but -- yeah, each

23   state --

24      Q.   (BY MR. THOMAS)  I'm sorry.

25      A.   -- had their own formula.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

134:1     A.   No, I never went to a regional meeting, not

2     that I can recall.

3          MR. AZORSKY:  Can I have this document

4     marked as Exhibit 41, please.

5               (Exhibit 41 marked)

6     Q.   (BY MR. AZORSKY)  Ms. Selenati, I've had a

7     document marked as Exhibit 41 and I'll ask you to take

8     a look and review that document.

9     A.   (Witness reviewing document).  Okay.  I think

10    I've -- I've seen this.

11    Q.   Okay.  Can you identify this document?

12    A.   Well, this looks very similar to a

13    presentation that Ross Uhl made at that national sales

14    meeting in -- at the Claremont Hotel.

15    Q.   And the national sales meeting in the

16    Claremont Hotel was in 1994; is that correct?

17    A.   That's correct.

18    Q.   And this is dated Monday, January 24, 1994,

19    with the time of 12:00 p.m. to 1:00 p.m., correct?

20    A.   Correct.

21    Q.   So does that indicate to you that this was

22    a -- either a handout or a part of the presentation

23    that Mr. Uhl gave at that national sales meeting?

24    A.   Well, I particularly recognize this one slide

25    with the question mark and all the acronyms on there.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

135:1    I particularly remember that slide and I was impressed

2    with Ross Uhl's capabilities of doing, you know,

3    computer-generated slides.  So I -- I, you know,

4    recognize some of these slides as overheads that were

5    presented at the national sales meeting.

6    Q.   Does that indicate to you that this is --

7    that this document is -- is part of a presentation

8    that Mr. Uhl gave at that national sales meeting?

9           MR. ESCOBAR:  Objection to the form.

10    A.   That's -- that's what I think it is, yes.

11    Q.   (BY MR. AZORSKY)  And Mr. Uhl presented --

12    let me start that over.  Mr. Uhl gave a presentation

13    at the national sales meeting in 1994 to --

14    A.   Correct.

15    Q.   -- to whom?

16    A.   Well, it was everybody that was -- that

17    attended the national sales meeting.  Starting at the

18    top, Bob Mozak.  Well, Charles Rice was there.  I

19    don't know whether he sat in on every single

20    presentation, but he certainly was a looming character

21    there.  So Charles Rice, Bob Mozak, Bob Pallas, Bruce

22    Tipton, Cindy Daulong, myself, all my product

23    managers.  If Eve was there at the time, Eve Fagrell,

24    she would have been in the audience as well.  All the

25    regional sales managers and all the -- the field sales

Selenati, Helen - May 4, 2005 09:06:00 a.m.

154:1    A.   Well, it would make me believe that this

2   could very well have been that presentation that was

3   presented at the meeting.  But if Ross Uhl said he

4   presented at that meeting, I wouldn't question that.

5    Q.   (BY MR. AZORSKY)  Would you please turn to

6   Florida Exhibit 36?

7    A.   Pam Marrs deposition 36.

8    Q.   Yes.

9    A.   Okay.

10    Q.   Ms. Selenati, do you recognize the document

11   previously marked as Florida Exhibit 36?

12    A.   Yes, I do.

13    Q.   And what is that?

14    A.   This was a commonly used sales aid that the

15   sales force used to demonstrate the profit that a

16   provider could make off our product, off the Dey

17   product, versus multi-dose.

18    Q.   And how does this worksheet indicate that

19   such a profit would be made?

20         MR. ESCOBAR:  Objection to the form.

21    A.   Well, it's got the two profits compared at

22   the bottom here, the multi-dose estimated profit, and

23   then the Dey dose -- the Dey unit-dose estimated

24   profit.  And then there would be a -- at the bottom

25   conclusion of this worksheet would be the gain in

Selenati, Helen - May 4, 2005 09:06:00 a.m.

155:1   profit with Dey unit-dose substitution would be the

2   result of deducting the profit made from the

3   multi-dose from the profit made from the Dey unit-dose

4   and that would be the gain in profit that the store or

5   the plan or the home healthcare pharmacy would make if

6   they switched to Dey unit-dose versus Albuterol

7   multi-dose.

8       Q.   Well, let's take one side of this

9   reimbursement comparison worksheet.  The left side is

10   entitled "Albuterol Multidose Bottles" 20 milligram;

11   is that correct?

12       A.   20 milliliters, yes.

13       Q.   20 milliliters.  And the first item under

14   "Example" is what?

15       A.   AWP is 12.5 per 20 mL bottle.

16       Q.   And under that is?

17       A.   Cost is $5.75.

18       Q.   And under that?

19       A.   Reimbursement per bottle is AWP minus 30

20   percent, which calculates out to $8.75.  And this is

21   assuming 40 treatments per bottle.

22       Q.   So is that calculating profit based upon the

23   spread between reimbursement and the cost of the

24   Albuterol multi-dose bottles?

25              MR. ESCOBAR:  Objection to the form.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

156:1   That section you just had her read?

2               MR. AZORSKY:  The left side of this.

3       A.   Yeah.  It -- it doesn't calculate -- it only

4    tells you what the reimbursement is going to be.   It

5    doesn't calculate the difference between the

6    reimbursement and the cost just yet.

7       Q.   (BY MR. AZORSKY)  Okay.

8       A.   That happens further down the price sheet.

9       Q.   Okay.  Let's --

10      A.   The worksheet.

11      Q.   Let's go further down the worksheet.  Next is

12   the reimbursements; is that correct?

13      A.   That's right.

14      Q.   And after reimbursements are calculated then

15   costs are calculated?

16      A.   That's right.

17      Q.   And then after that what is there,

18   "Annualized Per Patient"?

19      A.   That's right.

20      Q.   What does that refer to?

21      A.   That means you're taking the doses that each

22   patient would take in a year and you calculate how

23   many doses that would be.  And then you would multiply

24   that by the reimbursement per dose and the cost per

25   dose and you would come out with -- you'd -- you'd

Selenati, Helen - May 4, 2005 09:06:00 a.m.

157:1    land up with a multi-dose estimated profit.

2     Q.   Well, when you say you -- you take the

3    treatments and you multiply it by the reimbursement

4    and the costs --

5     A.   Uh-huh.

6     Q.   -- how -- how are the costs -- costs are

7    subtracted from the total reimbursement; is that

8    correct?

9           MR. ESCOBAR:  Objection to the form.

10     A.   To -- to arrive at the estimated profit

11    that's -- that's what you have to do.  You have to

12    deduct the cost from the total reimbursement.

13     Q.  (BY MR. AZORSKY)  So the profit is derived

14    from the spread between the reimbursement and the

15    cost?

16           MR. ESCOBAR:  Objection to the form.

17     A.   The profit is derived from the difference

18    between the reimbursement and the cost, yes.

19     Q.  (BY MR. AZORSKY)  How about on the right side

20    of the sheet with the Dey unit-dose Albuterol, how is

21    the profit calculated on that part of the worksheet?

22           MR. ESCOBAR:  Objection.  And I don't

23    think there is calculation there, at least not on my

24    copy.

25     A.   Well, calculation is done in the same way.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

158:1       Q.   (BY MR. AZORSKY)  There is a formula on -- on

     2   this side of the page for calculating a profit; is

     3   that correct?

     4               MR. ESCOBAR:  Objection to the form.

     5       A.   That's correct.

     6       Q.   (BY MR. AZORSKY)  And -- and what is the

     7   formula -- formula on the worksheet --

     8       A.   What --

     9       Q.   -- that a salesperson was to use with Dey's

    10   customers for calculating the Dey unit-dose estimated

    11   profit from the -- from the sale of multi-dose

    12   Albuterol?

    13               MR. ESCOBAR:  Objection to the form.

    14       A.   It's the same formula that was used for the

    15   multi-dose in the case of the multi-dose, except that

    16   this was the total reimbursement that the client would

    17   get from the Dey product minus the cost that the

    18   client would pay for the Dey product and that would

    19   leave you what -- the Dey unit-dose estimated profit.

    20       Q.   (BY MR. AZORSKY)  And that Dey unit-dose

    21   estimated profit then is also based upon the spread

    22   between the amount that the customer would be

    23   reimbursed by the government and the cost to the

    24   customer of purchasing that drug; is that correct?

    25               MR. ESCOBAR:  Objection to the form.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

159:1     A.   That is correct.

2     Q.   (BY MR. AZORSKY)   You indicated that this

3     reimbursement comparison worksheet was commonly used

4     by Dey's sales force?

5               MR. ESCOBAR:   Objection to the form and

6     mischaracterizes the testimony.

7               MR. AZORSKY:   I believe that was exactly

8     her testimony.

9     A.   It was -- it was commonly used in the sales

10    force.  Worksheets like this were used for many other

11    products as well.

12    Q.   (BY MR. AZORSKY)   And when you say worksheets

13    like this were used for other products, what types of

14    worksheets were used -- like this were used for other

15    products?

16    A.   Worksheets like this to -- to -- to determine

17    the spread between the Dey -- the spread offered to

18    the client for the Dey product and the -- versus the

19    spread offered to the client by a competitor product.

20    Q.   Do you remember what other products those

21    worksheets related to?

22    A.   Well, I would imagine it was used for

23    cromolyn and it was used for ipratropium later on.  I

24    mean, this was -- this was a format that was commonly

25    used.

Selenati, Helen - May 4, 2005 09:06:00 a.m.

160:1    Q.   Well, I'm not asking you to speculate.  I'm

2    asking you based upon your --

3    A.   Specific recall.

4    Q.   -- your recollection do you recall what other

5    products' worksheets such as this that calculated

6    profits from the spread --

7    A.   I think it was --

8    Q.   -- related to?

9    A.   I think I remember it being used in the Intal

10    Fisons' situation.

11    Q.   And that's cromolyn sodium?

12    A.   Cromolyn sodium.

13    Q.   Now, at the very bottom of Exhibit 36 in

14    small print, do you see a line across the bottom

15    that's in small print?

16    A.   Yes, I do.

17    Q.   Can you read that?

18    A.   "Albuterol sulfate inhalation Solution 0.083%

19    (potency expressed as Albuterol)."  "Copyright 1995

20    DEY Laboratories."  Napa, California 94558.  March '95

21    and 09-338-00 and then I don't know what it says after

22    that.  "PROFIT" -- yeah, PROFITGN XLS."

23    Q.   Focusing on the -- the small print on the

24    bottom right of the page, do you know what 3/95 refers

25    to?

Selenati, Helen - May 4, 2005 09:06:00 a.m.

161:1      A.   I think that was March of '95.

2      Q.   Do you know what date that refers to?

3      A.   What date in March?

4      Q.   No.  What -- what is significant about March

5      '95?

6           MR. ESCOBAR:  Objection to the form.

7      Q.   (BY MR. AZORSKY)  As noted on this page?

8           MR. ESCOBAR:  Objection.

9      Q.   (BY MR. AZORSKY)  Do you know why it's noted

10      there?

11      A.   That was probably when this document was

12      created.

13      Q.   How about the number after that, the

14      09-338-00, do you know what that is?

15      A.   I think it might be the product number.  I

16      don't know.  This wasn't my document.

17      Q.   When you say this wasn't your document,

18      what -- what do you mean?

19      A.   I didn't generate this document.  So whoever

20      generated this document put a footer in here what

21      their reference is so that they could probably find it

22      somewhere in the computer filing system.

23      Q.   Please turn to the Pamela Marrs Exhibit 37.

24      A.   (Witness complies).

25           MR. AZORSKY:  Do you have that?

Selenati, Helen - May 4, 2005 09:06:00 a.m.

192:1        A.    I beg your pardon?

2        Q.    Do you recall an incident involving Mr. Uhl

3    and a Florida customer known as Pharmacy Factors?

4        A.    I think that might have been the pharmacy

5    where he first ran into the problem with the Warrick

6    spread being better than the Dey spread.

7        Q.    Well, please tell us everything you remember

8    about what Mr. Uhl told you or that you otherwise

9    learned about what Mr. Uhl discovered in that regard.

10            MR. ESCOBAR:   Objection to the form,

11    compound.

12        A.    Ross Uhl contacted head office with the news

13    that Warrick was beating us on spread at one of his

14    customers in Florida and I -- and I -- I think I

15    remember it was Pharmacy Factors, but I'm not a

16    hundred percent sure.  And he mentioned that he

17    couldn't -- this was a good client and he couldn't get

18    our product sold into the client any longer because

19    the client said -- objected to our product on the

20    basis that they were getting a better spread on the

21    Warrick product.

22            MR. McDONALD:   Objection, nonresponsive.

23        Q.    (BY MR. AZORSKY)  What was the reaction, if

24    any, at Dey to Warrick's action in having a -- a

25    larger spread for its Albuterol product than Dey's