# Exhibit 1

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL NO. 1456 / CIVIL ACTION NO. 01-12257-PBS

- - - - - - - - - - - - - - - - - - - - x

IN RE:   PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

- - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

UNITED STATES OF AMERICA, EX REL.

VEN-A-CARE OF THE FLORIDA KEYS, INC.

                 vs.

BOEHRINGER INGELHEIM CORPORATION, ET AL.

CIVIL ACTION NO. 07-10248-PBS

- - - - - - - - - - - - - - - - - - - - x

        CAPTIONS CONTINUED ON FOLLOWING PAGES

       Videotape deposition of MARK SHAFFER, taken

pursuant to the Federal Rules of Civil Procedure,

before Melissa J. Kelly, RPR, CRR, Licensed

Shorthand Reporter #00307, and Notary Public within

and for the State of Connecticut, held at the

Sheraton Danbury Hotel, 18 Old Ridgebury Road,

Danbury, Connecticut, on May 21, 2007, at 10:09 a.m.

Shaffer, Mark                                                May 21, 2008
                              Danbury, CT

                                                                  Page 2

1                UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF MASSACHUSETTS
3        MDL NO. 1456 / CIVIL ACTION NO. 01-12257-PBS
4    - - - - - - - - - - - - - - - - - - - - - - - x
5    IN RE:  PHARMACEUTICAL INDUSTRY AVERAGE
6    WHOLESALE PRICE LITIGATION
7    - - - - - - - - - - - - - - - - - - - - - - - x
8    THIS DOCUMENT RELATES TO:
9    STATE OF CALIFORNIA, EX REL.
10   VEN-A-CARE
11                   vs.
12   ABBOTT LABORATORIES INC., ET AL.
13   CASE NO. 03-CV-11226-PBS
14   - - - - - - - - - - - - - - - - - - - - - - - x
15
16
17
18
19
20
21
22       (CAPTIONS CONTINUED)

Shaffer, Mark                                         May 21, 2008
                              Danbury, CT

Page 43

1      A.   I don't recall the name that was --
2           MS. RIVERA:  I'm sorry.  Can you say
3    that again.  Ethical pharmaceuticals --
4           MS. POLLACK:  -- business unit.
5    BY MS. POLLACK:
6      Q.   And you said -- I believe you said the
7    human pharmaceuticals.  In other words, it
8    excluded the veterinary medicines and the pure --
9      A.   Yes.
10     Q.   -- chemicals?  You have to let me
11   finish my question.  Was there a change in your
12   job responsibilities in 1998?
13     A.   Not that I recall.
14     Q.   Okay.  Well, your resume indicates in
15   '99 you became director of sales for palliative
16   care?
17     A.   Yes.
18     Q.   Is that correct?
19     A.   Yes.
20     Q.   Is that when you first had that
21   position?
22     A.   Yes.

Shaffer, Mark                                                May 21, 2008
                              Danbury, CT

Page 44

1    Q.  And your resume says "Roxane
2  Laboratories, Inc./Boehringer Ingelheim."  So did
3  you have that position for both entities?
4    A.  Roxane Laboratories was a subsidiary of
5  Boehringer Ingelheim.
6    Q.  And didn't you consider them all the
7  same company?
8    A.  No.
9         MS. RIVERA:  Object to form.
10        MS. POLLACK:  Okay.  I think we're
11 going to go off the record for a few minutes.
12        THE VIDEOGRAPHER:  Going off the record
13 at 10:38.
14            (Whereupon a recess was taken.)
15        THE VIDEOGRAPHER:  We are now back on
16 record at 11:01.
17 BY MS. POLLACK:
18   Q.  Mr. Shaffer, you told us earlier you
19 had provided some documents to your counsel.
20        MS. POLLACK:  Ms. Rivera, have those
21 documents been provided to the plaintiffs?
22        MS. RIVERA:  Yes.

1   for?
2       A.   The consultant pharmacists could work
3   for themselves; they could be independent, or
4   they could work for a long-term care pharmacy
5   provider.
6       Q.   And what's an example of a long-term
7   care pharmacy provider?
8       A.   You're asking for names of companies?
9       Q.   Yes.
10      A.   Like PharMerica, Omnicare.
11      Q.   You mentioned earlier that some of the
12  products that you sold were branded generics.
13  What is a branded generic?
14      A.   My definition of a branded generic is a
15  generic product that is given a brand name and
16  promoted like a brand.
17      Q.   What do you mean by "promoted like a
18  brand"?
19      A.   Detailed to physicians to describe that
20  brand.
21      Q.   But you also promoted some of the
22  branded generics to pharmacists, correct?

Shaffer, Mark                                                May 21, 2008
Danbury, CT

Page 67

1         MS. RIVERA:  Object to form.
2         THE WITNESS:  Back with the hospital
3    pharmacy when we called on the hospitals, yes.
4    BY MS. POLLACK:
5         Q.  During the time that you had the
6    palliative care group, did you also promote the
7    branded generics to retail pharmacies?
8         MS. RIVERA:  Object to form.
9         THE WITNESS:  No, we did not.  With
10   palliative care group, we had the two or three
11   promoted branded products.
12   BY MS. POLLACK:
13        Q.  And you promoted them only to
14   physicians?
15        A.  Yes.
16        Q.  Were any of those products sold
17   pursuant to contracts?
18        A.  Yes.  Some of them were on contract.
19        Q.  Who would the contracts be with?
20        A.  I believe those contracts were
21   primarily through GPOs, group purchasing
22   organizations.

Shaffer, Mark                                                    May 21, 2008
                              Danbury, CT

Page 224

1            THE WITNESS:  Again, that's -- you keep
2    bringing that up, and that's not how I'm looking
3    at it.
4    BY MS. POLLACK:
5       Q.   How are you looking at it?
6       A.   I'm looking at it that the product was
7    priced so pharmacies would bring the product in
8    and we would not be substituted because of the
9    new 15 and 30 milligram strengths being available
10   and prescriptions are being driven.
11      Q.   Okay.  Now, Roxane at that time
12   manufactured and sold a 5 milligram Roxicodone
13   tablet; is that correct?
14      A.   Yes, correct.
15      Q.   So you could have been substituted with
16   the Roxane product under your scenario, correct?
17      A.   It could have been, yes.
18      Q.   Okay.  Now we get to page 35 which is
19   also Shaffer 1486, and this outlines the pricing
20   approach, doesn't it?
21      A.   That's what the document says, "pricing
22   approach."