# Exhibit 5

United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

## In The Matter Of:

*THE STATE OF TEXAS v.*
*DEY, INC., ET AL.*

---

*EDWARD J. TUPA*
*January 31, 2003*

---

*FREDERICKS-CARROLL REPORTING*
*Court Reporting-Video Services-Litigation Support*
*7719 WOOD HOLLOW DRIVE, SUITE 156*
*Austin, TX 78731*
*(512) 477-9911    FAX: (512) 345-1417*

*Original File 30131ET.V1, 261 Pages*
*Min-U-Script® File ID: 4124027092*

**Word Index included with this Min-U-Script®**

Page 1

[1]     CAUSE NO. GV002327
[2]  THE STATE OF TEXAS           ) IN THE DISTRICT COURT
     ex rel.                      )
[3]     VEN-A-CARE OF THE         )
     FLORIDA KEYS, INC.,          )
[4]     Plaintiffs,                )
[5]  VS.                          ) TRAVIS COUNTY, TEXAS
[6]  DEY, INC.; ROXANE            )
     LABORATORIES, INC.; WARRICK  )
[7]  PHARMACEUTICALS CORPORATION; )
     SCHERING-PLOUGH CORPORATION; )
[8]  SCHERING CORPORATION;        )
     LIPHA, S.A.; MERCK-LIPHA, S.A.;)
[9]  MERCK, KGAA; AND EMD         )
     PHARMACEUTICALS, INC.,       )
[10]    Defendants.                ) 53RD JUDICIAL DISTRICT
[11]
             ORAL AND VIDEOTAPED DEPOSITION OF
[12]
                   EDWARD J. TUPA
[13]
                  JANUARY 31ST, 2003
[14]
[15]
[16]     ORAL AND VIDEOTAPED DEPOSITION OF
[17] EDWARD J. TUPA, produced as a witness at the instance
[18] of the State of Texas and duly sworn, was taken in the
[19] above-styled and numbered cause on the 31st of
[20] January, 2003, from 8:28 a.m. to 3:53 p.m., before
[21] Debra L. Sietsma, CSR in and for the State of Texas,
[22] reported by machine shorthand, at 52 East Gay Street,
[23] Columbus, Ohio, pursuant to the Texas Rules of Civil
[24] Procedure and provisions as previously set forth.
[25]

Page 2

[1]            APPEARANCES
[2]
[3]  FOR THE PLAINTIFF:
[4]     MS. CYNTHIA O'KEEFFE
        Office of the Attorney General
[5]     State of Texas
        Post Office Box 12548
[6]     Austin, Texas 78711-2548
[7]  FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]     MR. JARRETT ANDERSON
        Attorney at Law
[9]     2411 Hartford Road
        Austin, Texas 78703
[10]
     FOR DEFENDANT DEY, INC.:
[11]
        MS. LEILA R. PITTAWAY
[12]    Coudert Brothers
        1114 Avenue of the Americas
[13]    New York, New York 10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]    MR. STEPHEN E. McCONNICO
        Scott, Douglass & McConnico, L.L.P.
[16]    One American Center, Fifteenth Floor
        600 Congress Avenue
[17]    Austin, Texas 78701
[18]    - and -
[19]    MR. PAUL J. COVAL
        Vorys, Sater, Seymour and Pease, L.L.P.
[20]    52 East Gay Street
        P.O. Box 1008
[21]    Columbus, Ohio 43216-1008
[22] FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
     SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[23]
        MS. KARIN B. TORGERSON
[24]    Locke Liddell & Sapp, L.L.P.
        2200 Ross Avenue, Suite 2200
[25]    Dallas, Texas 75201-6776

THE STATE OF TEXAS v.
DEY, INC., ET AL.

EDWARD J. TUPA
January 31, 2003

Page 38

[1] A: Boehringer Ingelheim Corporation was the
[2] parent company of Roxane, yes.
[3] Q: And is that who Mr. Berkle worked for?
[4] A: Yes.
[5] Q: Other than Mr. Wojta and Mr. Berkle, was
[6] there anyone else who would have had to have approved
[7] the marketing plan for Ipratropium bromide?
[8] A: I — I don't know that.
[9] Q: Is it that you do not recall or you don't
[10] know whether or not any other approvals were needed?
[11] A: I don't know beyond — I — I don't know if
[12] Mr. Berkle needed approval higher up, so I — I just
[13] don't know that.
[14] Q: You've told me everybody that you know that
[15] needed —
[16] A: That — yes, yes.
[17] Q: — to approve it?
[18] Was one of the first tasks that you had
[19] when you looked at this project, at the marketing
[20] launch for this drug, to identify the markets for the
[21] drug?
[22] A: One of the first tasks was — no, I don't —
[23] I don't think that's correct.
[24] Q: Tell me what the first tasks were.
[25] A: The — the first tasks were trying to make a

Page 39

[1] decision as to whether Roxane should launch the
[2] product preemptively before other companies entered
[3] the market or not and decisions on production
[4] capacities and how we could handle both Atrovent
[5] and — and the Roxane generic launch.
[6] Q: And as the head of sales and marketing, this
[7] production decision was — was one of your tasks?
[8] A: I was involved in — in considering that
[9] issue. It wasn't — I wasn't alone in that,
[10] obviously.
[11] Q: After those initial tasks, did you need to
[12] identify the markets for the drug once it was
[13] manufactured?
[14] A: Yes.
[15] Q: And did you identify those markets?
[16] A: Well, to the best of the company's ability,
[17] they did. You know, I didn't do it personally, but
[18] people in the company did that, yes.
[19] Q: And they informed you what those markets
[20] were; is that correct?
[21] A: Yes.
[22] Q: Did those markets include wholesalers?
[23] A: Yes.
[24] Q: Group purchasing organizations?
[25] A: Yes.

Page 40

[1] Q: Mail order pharmacies?
[2] A: I don't recall that specifically but —
[3] Q: Is it possible that was one of the markets?
[4] A: Sure.
[5] Q: Warehousing chains?
[6] A: Yes.
[7] Q: Nonwarehousing chains?
[8] A: Again, it's logical that there was — I just
[9] don't remember anything specific about that.
[10] Q: And when we're talking about warehousing and
[11] nonwarehousing chains, are we talking about pharmacy
[12] chains?
[13] A: Yes, we are.
[14] Q: And was an additional market that was
[15] identified for the drug the home health care market?
[16] A: Yes, it was.
[17] Q: Would it be fair to say that Roxane had
[18] previous experience in all these markets except home
[19] health care?
[20] A: Yes.
[21] Q: Did you hire a consultant to educate you and
[22] your company about the home health care market?
[23] A: Would you ask that again? I'm sorry.
[24] Q: Did you hire a consultant to educate you and
[25] your company about the home health care market?

Page 41

[1] A: Yes.
[2] Q: And what was the consultant's name?
[3] A: Pope.
[4] Q: And can you tell me who recommended Mr. Pope
[5] to you?
[6] A: My recollection is I had put the — since we
[7] didn't know anything about that market, I had asked my
[8] staff to — to recommend if they knew of anybody, to
[9] recommend someone that we could hire. And it came
[10] through my own staff as to who — as to the
[11] availability of Pope. I never new — heard of Pope
[12] before, so that's how it came about. I don't — I
[13] don't recall which person specifically gave me that
[14] recommendation.
[15] Q: Could it have been —
[16] A: But it came from within the organization.
[17] Q: Sure.
[18] Could it have been Rich Feldman?
[19] A: No.
[20] Q: Could it have been Tom Via?
[21] A: It could have been. I — I just don't know,
[22] but it couldn't have been Rich Feldman because it was
[23] before his time —
[24] Q: Okay.
[25] A: — I — I believe.

EDWARD J. TUPA  
January 31, 2003

THE STATE OF TEXAS v.  
DEY, INC., ET AL.

**Page 42**

[1] Q: Did you consider hiring any other
[2] consultants, or was he the only one that was suggested
[3] to you?
[4] A: I don't recall another one. I — I don't
[5] know if we looked at others or not. I just don't
[6] remember.
[7] Q: You don't have any recollection of —
[8] A: I don't have a recollection of that at all.
[9] Q: Did you talk to him over the telephone or
[10] personally interview him before deciding to hire him,
[11] or did you rely on your staff's recommendation and go
[12] ahead and make a deal with him?
[13] A: I believe we had him come into the office
[14] prior to his being hired. Again, it's so long ago, I
[15] can't — can't remember the sequence, but I believe we
[16] did that.
[17] Q: What was it that you were looking for in a
[18] consultant?
[19] A: We — we had — at least I — I felt that our
[20] staff — and the staff agreed — that we — we didn't
[21] have any knowledge of this marketplace.
[22] Boehringer Ingelheim didn't have much knowledge of
[23] that same marketplace, and they felt that they lost a
[24] lot of opportunities along the way. And so we just
[25] needed someone that had been in that marketplace at

**Page 43**

[1] one time and — and could guide us through — to the
[2] extent possible, guide us through to understanding it.
[3] Q: And I believe you indicated that
[4] Boehringer Ingelheim had had some — less than success
[5] in that area in the past.
[6] Would that have been with the drug
[7] Atrovent?
[8] A: Yes.
[9] Q: And would it be fair to say that in the
[10] marketing of Atrovent they had underestimated or not
[11] taken into account the impact of the home health care
[12] market?
[13] A: That was my understanding.
[14] Q: Do you recall what kind of an impression
[15] Mr. Pope made on you when you met him initially?
[16] A: I don't recall any specifics, no.
[17] Q: You must have been pretty impressed, though,
[18] because you decided to hire him?
[19] A: Obviously, yeah.
[20] Q: Okay. Had he worked for other drug
[21] manufacturers?
[22] A: He had worked for Dey Laboratories at one
[23] time.
[24] Q: Did that seem to you to be a good thing, an
[25] advantage that he had, an advantage that your company

**Page 44**

[1] would have in hiring him for this consulting position?
[2] A: Not particularly. What we were looking for
[3] was someone that would know the home health care
[4] market. Whether it came from Dey or it came from a
[5] home health care company, I really — didn't really
[6] care.
[7] Q: His previous experience at Dey had nothing to
[8] do with it?
[9] A: No. As a matter of fact, it may have been
[10] something we would consider carefully that we — as a
[11] matter of fact, I remember instructing him that I
[12] never wanted to see anything from Dey Laboratories,
[13] that this would have to be an aboveboard kind of
[14] planning consultancy for us.
[15] Q: Did you ever become aware that Mr. Pope was
[16] married to a Dey sales representative?
[17] A: I didn't know that, no.
[18] Q: You've never heard that?
[19] A: I — I don't recall that.
[20] Q: What did you tell Mister — first of all,
[21] what kind of a deal did you come to — what kind of a
[22] financial arrangement did you have with Mr. Pope for
[23] his consulting services?
[24] A: I don't remember that.
[25] Q: Do you remember what he was paid at all?



**Page 45**

[1] A: No, I don't.
[2] Q: Not even a ballpark?
[3] A: No.
[4] Q: What did you tell Mr. Pope that you wanted
[5] him to do?
[6] A: I — I don't know exactly. I — again, our
[7] situation was we didn't understand the home health
[8] care market, and I needed — I, we, as a company,
[9] needed help in understanding that. So we — we were
[10] looking for, you know, who are the players in that
[11] market, what introductions can you give us to — to
[12] those individuals, what are the nuances of the market
[13] that we don't understand that we have to consider,
[14] that sort of thing. And then his role was to provide
[15] that information and — which would then be given to
[16] our marketing people, and they would then come up with
[17] their own marketing plan based on all the various
[18] inputs they had.
[19] Q: So would it be fair to say that he had the
[20] level of experience in marketing generic drugs to the
[21] home health care market that he could educate your
[22] staff on how to do that effectively?
[23] A: That was the intent.
[24] Q: At this time, Mr. Tupa, I'd like to hand you
[25] what's been marked Exhibit Tupa 641 and ask you to

Case 1:01-cv-12257-PBS   Document 6307-6   Filed 07/24/09   Page 6 of 11

EDWARD J. TUPA                                                THE STATE OF TEXAS v.
January 31, 2003                                              DEY, INC., ET AL.

Page 66

[1] to be finalized, but the estimated average selling
[2] price for 1996 is $21."
[3]   Q: With regard to the first part of that
[4] sentence, it refers to an acronym, AWP.
[5]   Could you explain to me what AWP is?
[6]   A: It stands for average wholesale price.
[7]   Q: And is that pricing term the term for the
[8] price that Medicare is reimbursed off of?
[9]   A: I — I don't know.
[10]  Q: Do you have any knowledge that AWP is used in
[11] the calculation that the government makes to reimburse
[12] providers for drugs?
[13]  A: I understand that some governments utilize
[14] that reference point.
[15]  Q: Some Federal and some State?
[16]  A: I don't know that.
[17]  Q: But you do know that some government entities
[18] do that?
[19]  A: I — I don't know if they still do but
[20] they —
[21]  Q: Okay.
[22]  A: — they did.
[23]  Q: At this time they did?
[24]  A: Best of my knowledge, yes.
[25]  Q: And would Medicare be one of those entities?

Page 67

[1]   A: I don't know that.
[2]   Q: This sentence indicates that it should be
[3] noted that AWP would be ten percent below Atrovent's
[4] AWP at the time of launch.
[5]   Who determines what AWP is?
[6]   A: The manufacturer — the marketer.
[7]   Q: So Roxane is in control of what its AWP is
[8] going to be?
[9]   A: Yes.
[10]  Q: And in this case it had been decided that it
[11] would be ten percent below Atrovent's AWP; is that
[12] correct?
[13]  A: That's what this sentence says, yes.
[14]  Q: Okay. And do you have any idea why that
[15] particular percentage was set for AWP?
[16]  A: I — I don't know why. I — I presume it was
[17] not different from any other product that was being
[18] launched as a first generic.
[19]  Q: Do you know that that's true, that most
[20] generics, when they come on the market, the AWP price
[21] is set at ten percent below the brand drug to which
[22] the generic corresponds?
[23]  A: I — I don't recall if that was universal or
[24] not. I —
[25]  Q: Is that what Roxane usually did?

Page 68

[1]   A: I don't know that.
[2]   Q: The last part of this sentence relates to
[3] contract pricing, and it indicates that contract
[4] pricing still needed to be finalized. But there's
[5] already an estimate here for the — what the contract
[6] pricing would be, correct?
[7]   A: That — that — I interpret that to be that,
[8] yes.
[9]   Q: And that would be the price at which
[10] customers would buy Ipratropium bromide pursuant to a
[11] contract with Roxane; is that correct?
[12]  A: My understanding is that that was an
[13] estimated average for selling prices for — for that
[14] period to contract customers.
[15]  Q: And that price is indicated in this sentence
[16] to be $21; is that correct?
[17]  A: Yes.
[18]  Q: And this figure had been estimated
[19] approximately five months prior to the launch of the
[20] product; is that correct?
[21]  A: I don't know when the product was launched,
[22] so I can't tell you that.
[23]  Q: Do you have any recollection that the product
[24] was launched in June of 1996?
[25]  A: I don't know when it was launched.

Page 69

[1]   Q: Further down the page under the paragraph
[2] entitled, "Strategy," there's a sentence kind of right
[3] smack dab in the middle of that paragraph. It says,
[4] "It should additionally be noted that the gathering of
[5] the required information must be done in a low-profile
[6] manner. This will allow Roxane the opportunity to
[7] develop and implement the marketing strategy without
[8] alerting Dey Labs to our plans, offering them a chance
[9] to develop a counter-strategy based upon our marketing
[10] plan."
[11]  Did I read that correctly?
[12]  A: You did, yes.
[13]  Q: And was that an important point for you to
[14] consider in your marketing strategy in the launch of
[15] this product, to keep Dey from understanding what your
[16] plans were with regard to this launch?
[17]  A: I'll — I'll answer that in general terms
[18] it's — it's always — it's always desirable not to
[19] have your competition know what your strategy will be.
[20]  Q: And this was your — Dey was your primary
[21] competitor in this instance?
[22]  A: Yes, yes.
[23]  Q: With regard to the next page, there's a list
[24] of — of six companies at the top of the page, listed
[25] one through six.

Page 146

[1] Q: Who was it that came to visit?
[2] A: I don't remember.
[3] Q: You don't remember their names?
[4] A: No, no.
[5] Q: Does the name Neil Yeager sound familiar?
[6] A: He flew the fastest airplane in the world
[7] maybe, Yeager?
[8] No, I don't know.
[9] Q: Do you have any knowledge that a couple of
[10] gentlemen that were principals in RDI eventually went
[11] to jail?
[12] A: No, I don't know that.
[13] Q: You weren't aware of that?
[14] A: No.
[15] Q: Okay. Well, at this time I will pass the
[16] microphone to Mr. Anderson, who represents Ven-A-Care,
[17] and I'll allow him to ask some questions.
[18] A: Can we take about one minute?
[19] MR. ANDERSON: Well, actually, let's go
[20] off the record.
[21] THE VIDEOGRAPHER: We're off the record
[22] at 12:04 p.m.
[23] (Recess from 12:04 to 12:50).
[24] THE VIDEOGRAPHER: We're back on the
[25] record at 12:50 p.m.

Page 147

[1] EXAMINATION
[2] BY MR. ANDERSON:
[3] Q: Mr. Tupa, my name is Jarrett Anderson. I
[4] represent the relator, who is a coplaintiff in this
[5] litigation.
[6] I would ask that while I'm asking you
[7] questions, if for any reason you don't understand a
[8] question, please stop me and ask me to rephrase it,
[9] because it's very important that the testimony you
[10] provide today can be relied upon by the jury as
[11] accurate and truthful testimony.
[12] Is that agreeable?
[13] A: That's agreeable.
[14] Q: In your prior testimony this morning, you
[15] mentioned a term known as WAC.
[16] A: Yes.
[17] Q: You're familiar with the term known as WAC?
[18] A: Yes.
[19] Q: What is your understanding of WAC in the
[20] pharmaceutical industry?
[21] A: It's the transfer price of merchandise from
[22] the marketer — pharmaceutical marketer, to the
[23] wholesaler or central warehousing chain.
[24] Q: Is that the price that the wholesaler
[25] receives on an invoice?

Page 148

[1] A: Yes.
[2] Q: Is that the price which is on the invoice
[3] from the manufacturer to the wholesaler?
[4] A: Would you ask that again?
[5] Q: Is WAC the price which is on a given invoice
[6] for a given transaction from a pharmaceutical
[7] manufacturer to a wholesaler?
[8] A: Yes.
[9] Q: And does that hold true for both brand
[10] pharmaceuticals and generic pharmaceuticals?
[11] A: It — I'll relate to Roxane —
[12] Roxane Laboratories, to my knowledge, does, yes.
[13] Q: Okay. And when you say it does that, you
[14] mean Roxane invoices wholesalers at WAC for both brand
[15] and generic pharmaceuticals?
[16] A: Yes.
[17] Q: Is it your understanding that that's the
[18] price which is paid by the wholesalers?
[19] A: Yes.
[20] Q: Is it your understanding that oftentimes
[21] generic drugs are sold by wholesalers to other
[22] customers at prices less than WAC?
[23] MS. TORGERSON: Objection, form.
[24] THE WITNESS: The — yes. I'll carry
[25] that further.

Page 149

[1] Q: (BY MR. ANDERSON) And is that pursuant to
[2] contract prices?
[3] A: Yes.
[4] Q: And that's because most generics are sold
[5] pursuant to contract between generic pharmaceutical
[6] manufacturers and their customers, correct?
[7] MS. TORGERSON: Objection, form.
[8] THE WITNESS: I don't know about most
[9] but — depends on the product. Some products yes,
[10] some products more.
[11] Q: (BY MR. ANDERSON) All right. Let's — let's
[12] focus on Ipratropium bromide, which was sold in a
[13] generic form by Roxane.
[14] Is it your experience that most, if not
[15] all, of those sales were pursuant to contract prices
[16] between Roxane and its customers?
[17] A: I don't want to qualify most or — it was a
[18] substantial amount, but I don't —
[19] Q: All right.
[20] A: That's a qualitative issue.
[21] Q: All right. Well, there's been testimony in
[22] this litigation from other Roxane witnesses that that
[23] was — almost one hundred percent of the sales of
[24] Ipratropium bromide were pursuant to contract prices.
[25] Does that sound fair?

Page 158

[1] Q: I'll represent to you that — and we're going
[2] to have some other documents on this. And, in fact,
[3] there's — there's already a deposition exhibit in
[4] this case which shows that the — the WAC decreases
[5] were actually implemented, I believe, on March 16th of
[6] 1998.
[7]     Assuming that I've stated it correctly,
[8] would that mean to you that the process of analyzing
[9] the necessity for lowering WACs probably started
[10] sometime around October of 1997?
[11] A: I — I guess I — you — you say the
[12] necessity of lowering WACs. It's not a necessity.
[13] Q: All right. I — I don't — I don't mean to
[14] focus on the word "necessity." I'm just asking
[15] whether or not — well, strike that.
[16]    This was a rather intensive project,
[17] wasn't it?
[18] A: Yes, it was.
[19] Q: Okay. And it took some time to implement
[20] this project, correct?
[21] A: That's correct.
[22] Q: And when I say "project," I'm talking about
[23] the ultimate lowering of the WACs?
[24] A: Yes.
[25] Q: Okay. And given that that occurred on or

Page 159

[1] about March 16th of '98, would it be fair that the
[2] process actually started sometime around in, like,
[3] October or earlier of 1997?
[4] A: That could be in — at that time.
[5] Q: Okay. All right. Well, I notice that this
[6] memo's dated February 7th of '98. Is that correct?
[7] A: Yes.
[8] Q: And it's discussing a, quote, "trial WAC
[9] adjustment" which had already been performed. True?
[10] A: Yes.
[11] Q: And that was performed on two products,
[12] Ranitidine and Ipratropium bromide unit dose vial,
[13] correct?
[14] A: Yes.
[15] Q: Do you know whether or not the WAC on
[16] Ipratropium bromide was actually lowered in
[17] February or March of 1998?
[18] A: I don't know that it was. I — I do know
[19] that we had a — a trial WAC adjustment earlier than
[20] the — when we finally did the large one, largely to
[21] see how this whole process was going to work before we
[22] went with everything else.
[23] Q: Well, would it be your opinion that
[24] Ranitidine and Ipratropium bromide were chosen for the
[25] trial WAC adjustment because they were actually

Page 160

[1] planned to be a part of the ultimate WAC adjustment?
[2] A: I would expect that, yes.
[3] Q: All right. Would it seem odd if — if
[4] Ipratropium bromide was not actually ultimately part
[5] of the WAC adjustment?
[6] A: I don't know that. I'm sure there were
[7] products that — I shouldn't say that. I'm not sure.
[8]    I — I believe there were products that
[9] we didn't do a WAC adjustment on, so I don't know how
[10] the selections were being done.
[11]    MR. ANDERSON: Okay. I understand —
[12] I'll object, nonresponsive.
[13] Q: (BY MR. ANDERSON) I'm asking a more specific
[14] question, and that is: Assuming that Ipratropium
[15] bromide was not a part of the WAC adjustment which was
[16] performed on or about March 16th of 1998, do you have
[17] an explanation as to why Ipratropium bromide was
[18] chosen as one of two drugs for the trial WAC
[19] adjustment?
[20] A: I would guess that Ms. Waterer felt a
[21] particularly higher level of urgency on these two than
[22] maybe others, but that's speculation. You'll have to
[23] ask her that.
[24] Q: All right. But you don't have any knowledge
[25] about why that may be the case?

Page 161

[1] A: I don't know.
[2] Q: Do you recall what the primary benefit to
[3] Roxane was going to be of lowering many of the WACs on
[4] its products?
[5] A: Yes.
[6] Q: What was that?
[7] A: It was believed by our staff that we were
[8] missing a substantial opportunity to develop business
[9] relationships with our wholesalers if we got in —
[10] better in line with the prevailing market prices of
[11] our competition.
[12] Q: Is it your testimony that some wholesalers
[13] were displeased with the WAC prices on some Roxane
[14] products?
[15] A: Yes.
[16] Q: How were they displeased?
[17] A: The — the — they were displeased because
[18] the chargebacks were relatively large and they just
[19] felt that this was — they weren't — they felt that
[20] they weren't able to sell products at the full WAC
[21] and, therefore, all we were working with is — was
[22] exchanging data, if you will, to — to make chargeback
[23] adjustments.
[24] Q: Were wholesalers paying a price and then
[25] subsequently receiving a chargeback?

Page 162

[1] A: When — in the instances where — well, first
[2] of all, the — the WAC was their price, and then they
[3] were getting a chargeback for the difference between
[4] WAC and the contract prices they were servicing the
[5] contract.
[6] Q: Right. And what I'm asking is were — I'm —
[7] I'm really focusing more on the timing of the
[8] chargeback.
[9]     In 1998 was it your experience that
[10] wholesalers received the chargeback before or after
[11] they paid the, quote, invoice price?
[12] A: After.
[13] Q: And is that why they were upset, because they
[14] were paying the invoice price prior to the receipt of
[15] the chargeback?
[16] A: That was voiced as a concern, yes.
[17] Q: And did that hold true for small wholesalers
[18] as well as large wholesalers?
[19] A: I don't know that I can distinguish the two
[20] in that regard.
[21] Q: Well, let's focus upon this memo itself. And
[22] I notice that the second sentence of the second
[23] paragraph reads, "While the rollout was widely
[24] accepted by our smaller customers, we are still
[25] have" — I think that should probably say "having" —

Page 163

[1] "significant unresolved concerns with our largest
[2] wholesalers who are, for the most part, demanding a
[3] WAC to WAC adjustment."
[4]     Did I read that correctly?
[5] A: Yes.
[6] Q: Okay. Now, I'll ask you again: Do you have
[7] a memory that small wholesalers typically received
[8] chargebacks after they, quote, "paid WAC," and as a
[9] result they were unhappy?
[10] A: We had one policy with respect to handling
[11] chargebacks for everybody, and that was after — after
[12] the fact, meaning the chargeback didn't occur until
[13] after the wholesaler reported the sale of the unit at
[14] a price lower than WAC to a contract customer.
[15] Q: Yes, sir. And that's also my understanding
[16] of the marketplace; but really what I'm focusing more
[17] on is the payment of the, quote, "invoice price" by
[18] the wholesaler to the manufacturer.
[19] A: Uh-huh.
[20] Q: And in that context, have you ever become
[21] aware that large wholesalers typically, if not always,
[22] received the chargebacks on generic products prior to
[23] the payment of, quote, "invoice price"?
[24] MS. TORGERSON: Objection, form.
[25] THE WITNESS: I — I don't know the

Page 164

[1] timing relationships.
[2] Q: (BY MR. ANDERSON) You've never been aware?
[3] A: There — there's — no, I've not been aware
[4] specifically of that or seen a study done on that.
[5] Q: Well, without seeing a study done, did you
[6] know basically what the operation of the chargeback
[7] system was at Roxane?
[8] A: In general terms.
[9] Q: But even though you had that general
[10] knowledge, you don't understand what the timing — the
[11] typical timing of the chargeback payment was?
[12] A: No, I don't.
[13] Q: Do you recall hearing the term "chargeback
[14] advances" or the concept of advancing chargeback
[15] payments?
[16] A: Yes, yes, I have.
[17] Q: And who would be advancing what?
[18] A: Well, what the wholesalers wanted was the
[19] manufacturer to estimate what the chargebacks would be
[20] up front and give — give — give them the credit
[21] before the transaction took place.
[22] Q: And did some generic manufacturers advance
[23] chargebacks to major wholesalers?
[24] A: I don't know that they did or not. I — I —
[25] I'd heard by the grapevine — I probably heard from

Page 165

[1] wholesalers that that happened but, of course, they'd
[2] say anything to try and get me to do something.
[3] Q: Because they wanted you to advance
[4] chargebacks as well —
[5] A: Correct, right.
[6] Q: — and "you" is Roxane in this instance,
[7] right?
[8] A: Right.
[9] Q: Okay. And did you ever hear of a term in the
[10] industry known as "chargeback float," or "floating
[11] chargebacks," something along those lines?
[12] A: I — I — I guess I wouldn't know what that
[13] meant.
[14] Q: All right. It — "the float" or "chargeback
[15] float" doesn't ring a bell to you?
[16] A: No.
[17] Q: What about a similar term known as "fronting
[18] chargebacks"?
[19]     Have you ever heard of that?
[20] A: I have not — that's not a term I'm familiar
[21] with.
[22] Q: Okay. Was there — was there a concern on
[23] Roxane's part that the terms on — that it paid on WAC
[24] were causing it to pay too high of an effective
[25] discount?

Page 178

[1] "considered by Roxane." It was considered by somebody
[2] at Roxane —
[3] Q: Who do you understand — -
[4] A: — and I don't — don't know why or what or
[5] the context. I just — I can't relate to it because I
[6] don't know who did.
[7] (Exhibit 353 marked).
[8] MR. ANDERSON: All right. Well, let's
[9] take a break and change tapes, and I'll allow you to
[10] review this exhibit regarding —
[11] THE VIDEOGRAPHER: We're off the record
[12] at 1:31 p.m. This concludes Tape No. 3.
[13] (Recess from 1:31 to 1:36).
[14] THE VIDEOGRAPHER: We're back on the
[15] record at 1:36 p.m. This is the beginning of Tape 4.
[16] Q: (BY MR. ANDERSON) Mr. Tupa, have you had an
[17] opportunity to review Exhibit 653?
[18] A: Yes, I have.
[19] Q: ROX-TX839?
[20] A: Yes.
[21] Q: Is this the document which you were shown a
[22] few days ago by counsel for Roxane?
[23] A: Yes.
[24] Q: I'll read this for the record, and then you
[25] can correct me if I read it incorrectly.

Page 179

[1] "Just an FYI. I discussed with Kathy
[2] from First DataBank that we no longer want to publish
[3] or supply to them our WAC prices. It's okay with them
[4] that we do not supply the WAC price. However, there
[5] are approximately ten states that use WAC for state
[6] Medicaid instead of the AWP. She informed me that
[7] these states will use the last published WAC to
[8] determine state Medicaid for those states. So if we
[9] decide" them — "decide not to supply them with WAC
[10] for price increases, they will use old pricing. She
[11] did not address new products. Cheri." Or Cheri. Is
[12] that correct?
[13] A: Cheri.
[14] Q: Cheri.
[15] And this is made — addressed to
[16] Judy Waterer, correct?
[17] A: Correct.
[18] Q: And it cc's you and Mr. Feldman, correct?
[19] A: That's correct.
[20] Q: Do you recall this e-mail at all?
[21] A: No, I do not.
[22] Q: But this is something that's relatively out
[23] of the ordinary, correct?
[24] A: It would — it would — it's an interesting
[25] question.

Page 180

[1] Q: Okay. Who is — who is Cheri Mayhew?
[2] A: She worked in part of Mr. Feldman's area,
[3] probably two or three levels down.
[4] Q: Was she within the — the trade relations
[5] department?
[6] A: I believe that's correct.
[7] Q: And that department's responsible for
[8] communicating with customers in selling Roxane's
[9] pharmaceuticals, correct?
[10] A: It's involved in that, yes.
[11] Q: And this is dated December 8th, 1997; is that
[12] correct?
[13] A: Yes.
[14] Q: Do you have any idea how the decision to not
[15] publish WAC relates to Roxane's analysis in — and
[16] decision in lowering WACs on many of its products?
[17] A: I — I have no — I have no — no knowledge
[18] of that.
[19] Q: Well, let's take the statement that's made in
[20] this e-mail that — that, quote, "approximately ten
[21] states that use WAC for state Medicaid instead of
[22] AWP," close quote.
[23] Given that information, if it's true,
[24] when Roxane chose not to publish WAC and then
[25] subsequently lowered WACs on several products,

Page 181

[1] wouldn't that have the effect of preventing at least
[2] ten state Medicaids from learning of the WAC decrease?
[3] A: If — if such a thing occurred, yes.
[4] Q: All right. And would that be appropriate for
[5] Roxane to not allow state Medicaids to receive the
[6] most current and up to date, quote "invoice price to
[7] wholesalers"?
[8] MR. MCCONNICO: Objection, form.
[9] THE WITNESS: No.
[10] Q: (BY MR. ANDERSON) Have you ever heard of
[11] marketing the spread?
[12] A: Have I heard of the term, "marketing the
[13] spread"?
[14] Q: Or the concept.
[15] A: Yes.
[16] Q: How do generic pharmaceutical manufacturers
[17] market the spread?
[18] A: I don't know that they do.
[19] Q: Well, in what context have you heard of
[20] marketing the spread?
[21] A: I was asked if that was a term that I knew of
[22] and whether it was something we did at Roxane.
[23] Q: Who asked you?
[24] A: Mr. Coval.
[25] Q: When did Mr. Coval ask you if you heard —

Page 222

[1] If I could, I'm going to draw your
[2] attention to ROX-05632; and this previously has been
[3] used as an exhibit. Although this copy doesn't have
[4] the actual exhibit number, I'll represent on the
[5] record I believe it's Exhibit 253.
[6] MR. COVAL: Do you recall whose
[7] deposition?
[8] MR. ANDERSON: It was used in
[9] Mr. Feldman's deposition.
[10] MR. COVAL: Feldman. Okay. Thank you.
[11] MR. ANDERSON: Take your time and review
[12] that, and I'll ask you some questions when you're
[13] done.
[14] THE WITNESS: Okay.
[15] Q: (BY MR. ANDERSON) Now, I'd like to draw your
[16] attention particularly to the second paragraph written
[17] by Judy Waterer. It states, "What will it take for us
[18] to get them meperidine," question mark, question mark.
[19] "Our WAC is just about their dead-net acquisition
[20] price from Barr already, but our AWPs are higher than
[21] Barr's. This makes our product more profitable to the
[22] pharmacies to sell - not MAC'd yet," exclamation
[23] point, exclamation point. "At similar pricing, we'll
[24] be preferred by the pharmacy, a fact our reps are not
[25] forgetting to mention," exclamation point. "That's a

Page 223

[1] value Bergen can take to their customers and get
[2] mileage out of," exclamation point, exclamation point.
[3] "By switching to Roxane, Bergen will be bringing
[4] increased profits to their customers and illustrating
[5] they're doing a good job of protecting the retail
[6] pharmacy's interests."
[7] Did I read that correctly?
[8] A: Yes, you did.
[9] Q: And this was written by Judy Waterer,
[10] correct?
[11] A: Yes.
[12] Q: And this was written back in July of '97,
[13] right?
[14] A: That's correct.
[15] Q: And Judy was reporting directly to you back
[16] in July of '97?
[17] A: That's correct.
[18] Q: And you're copied on this e-mail, aren't you?
[19] A: Yes.
[20] Q: Do you recall getting this e-mail?
[21] A: No, I don't.
[22] Q: Does this concept of marketing a product
[23] based upon its AWP seem appropriate to you?
[24] A: The — pointing — pointing out all the
[25] facts, I — I do not find it inappropriate.

Page 224

[1] Q: Who sets AWPs?
[2] A: We in the company do.
[3] Q: So Roxane has control over the level at which
[4] it sets its AWP, correct?
[5] A: Yes.
[6] Q: Well, given that, is it appropriate for
[7] Roxane to be marketing products on the basis of its
[8] AWP?
[9] MR. MCCONNICO: Objection, form.
[10] THE WITNESS: The — again, I go back
[11] to — to saying that — that to provide customers with
[12] the facts I don't find inappropriate. I — the facts
[13] are the facts. If it's advantageous, obviously the
[14] salesperson will more likely talk about it than if
[15] it's disadvantageous.
[16] Q: (BY MR. ANDERSON) Right. And in this
[17] instance, the organization who controls the facts is
[18] Roxane, because they're controlling the AWP, correct?
[19] A: The AWP is set by the company.
[20] Q: Was this the type of discussion that you
[21] routinely had when you were at Roxane?
[22] A: No, not whatsoever.
[23] Q: Does this seem like an unusual marketing
[24] tactic that Ms. Waterer is discussing?
[25] A: I — I see all the exclamation points as

Page 225

[1] being rather overkill.
[2] Q: She's excited, isn't she?
[3] A: She's — well, we don't know. I think this
[4] may be one — she — shortly after she was hired, and
[5] maybe she was trying to make a point of being there.
[6] But, anyway, it — I — I find it — I
[7] find that it's inaccurate, also, in the sense that
[8] just a MAC or just a reimbursement level does not —
[9] just from that, you can't figure out whether the
[10] pharmacist is better off or worse off.
[11] Q: Well, it's all based upon the assumption that
[12] the contract prices will be equal, correct?
[13] A: Right. Well, not just contract prices, but
[14] there are also some — you know, companies will throw
[15] out a special promotional program, and you have to
[16] know all of the intricacies that are going on out
[17] there before you — you really know. The only person
[18] that really can know is the ultimate buyer.
[19] Q: Sure. And Roxane is very interested in
[20] staying abreast of all the deals competitors offer its
[21] customers, right?
[22] A: Yeah, but we never found them — all of them,
[23] by any — by any means.
[24] Q: Well, you can — you can never be perfect,
[25] but you certainly try very hard to stay abreast of