# Exhibit 6

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

## In The Matter Of:

### THE STATE OF TEXAS ex rel. v. DEY, INC., ET AL.

### JUDY WATERER
Vol. 2, April 1, 2003

### FREDERICKS-CARROLL REPORTING
Court Reporting-Video Services-Litigation Support
7719 WOOD HOLLOW DRIVE, SUITE 156
Austin, TX 78731
(512) 477-9911    FAX: (512) 345-1417

Original File 30401JW.V1, 319 Pages
Min-U-Script® File ID: 4228907553

**Word Index included with this Min-U-Script®**

APR 17 2003

Page 308

[1] CAUSE NO. GV002327
[2] THE STATE OF TEXAS ) IN THE DISTRICT COURT
ex rel. )
[3] VEN-A-CARE OF THE )
FLORIDA KEYS, INC., )
[4] Plaintiffs, )
[5] VS. ) TRAVIS COUNTY, TEXAS
[6] DEY, INC.; ROXANE )
LABORATORIES, INC.; WARRICK )
[7] PHARMACEUTICALS CORPORATION; )
SCHERING-PLOUGH CORPORATION; )
[8] SCHERING CORPORATION; )
LIPHA, S.A.; MERCK-LIPHA, S.A.;) 
[9] MERCK, KGAA; AND EMD )
PHARMACEUTICALS, INC., )
[10] Defendants. ) 53RD JUDICIAL DISTRICT
[11]
ORAL AND VIDEOTAPED DEPOSITION OF
[12]
JUDY WATERER
[13] VOLUME II
APRIL 1ST, 2003
[14]
[15] ORAL AND VIDEOTAPED DEPOSITION OF
[16] JUDY WATERER, produced as a witness at the instance of
[17] the State of Texas and duly sworn, was taken in the
[18] above-styled and numbered cause on the 1st of April,
[19] 2003, from 9:06 a.m. to 6:10 p.m., before
[20] Debra L. Sietsma, CSR in and for the State of Texas,
[21] reported by machine shorthand, at the offices of
[22] Vorys, Sater, Seymour & Pease, L.L.P., 2100 One
[23] Cleveland Center, Cleveland, Ohio, pursuant to the
[24] Texas Rules of Civil Procedure and the provisions as
[25] previously set forth.

Page 309

[1] APPEARANCES
[2]
[3] FOR THE PLAINTIFF, STATE OF TEXAS:
[4] MS. CYNTHIA O'KEEFFE
    Office of the Attorney General
[5] State of Texas
    Post Office Box 12548
[6] Austin, Texas 78711-2548
[7] FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8] MR. JARRETT ANDERSON
    Attorney at Law
[9] 2411 Hartford Road
    Austin, Texas 78703
[10]
    FOR DEFENDANT DEY, INC.:
[11]
    MS. LEILA R. PITTAWAY
[12] Coudert Brothers
    1114 Avenue of the Americas
[13] New York, New York 10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15] MR. STEPHEN E. McCONNICO
    MR. R. ERIC HAGENSWOLD
[16] Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
[17] 600 Congress Avenue
    Austin, Texas 78701
[18]
    - and -
[19]
    MR. PAUL J. COVAL
[20] Vorys, Sater, Seymour and Pease, L.L.P.
    52 East Gay Street
[21] P.O. Box 1008
    Columbus, Ohio 43216-1008
[22]
    FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
[23] SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[24] MR. JOHN P. MCDONALD
    Locke Liddell & Sapp, L.L.P.
[25] 2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776

Page 316

Q: And how long did you meet?
A: Probably — maybe four to six hours, better part of the day.
Q: And was that the only meeting you had with anyone in preparation for this deposition?
A: Yes.
Q: Okay. In October of 2001 you testified that you were an employee of the defendant Roxane Laboratories but that your job was in transition.
Who is your current employer?
A: Ben Venue Laboratories.
Q: And does Ben Venue have the same parent corporation as Roxane?
A: Yes.
Q: And is that Boehringer Ingelheim?
A: Yes.
Q: So are Ben Venue and Roxane considered sister companies?
A: One could use that term.
Q: What is your job title at Ben Venue?
A: Associate director multisource marketing.
Q: Are your duties and responsibilities any different from what you were doing at Roxane?
A: No.

Page 317

Q: And what department are you in?
A: Roxane multisource marketing.
Q: And that is a department of Ben Venue?
A: Yes.
Q: Okay. And who do you supervise?
A: Lesli Paoletti and Kristina Fight are my two direct reports.
Q: Okay. And what job responsibilities do they have, and titles?
A: Lesli Paoletti is the product manager. Currently she's responsible for all existing multisource products and the launch phase of new products.
Christina has just come on board, and she's fulfilling a role as forecaster and analyst.
Q: Would that be sales forecast and sales analyst or —
A: More marketing. Over time she might do some things for the sales force, but she's doing more market research.
Q: And have you received a raise or promotion since October of 2001?
A: I have an annual raise. I don't believe I've had a promotion.
Q: In your previous deposition testimony of

Page 318

October 2001 you testified that one of your first job responsibilities with regard to marketing activities once you were hired at Roxane was to train sales representatives.
    Is that an accurate statement?
A: In terms of training sales representatives, there is training the sales representatives on individual products.
Q: My question is: Did you train sales representatives when you first came on board at Roxane?
A: Yes.
Q: And can you, please, tell me what type of training you did for these sales representatives?
A: We would go through the products, covering things from pronunciation and indication to where the market segments were and what the plan was that they needed to implement.
Q: Did you meet one-on-one with the sales representatives?
A: I have ridden with a sales representative on occasion, but that would be the only one-on-one.
Q: And did you hold sales training meetings with the sales representatives?
A: The meetings were generally not specifically

Page 319

to training. It would be a national sales meeting where basically all of the business issues would be addressed and I would have a portion of time at that meeting to cover issues that were important to the products I was representing or responsible for.
Q: Did you hold any teleconferences with sales representatives?
A: We do it commonly now. I don't believe it was really — it's — it's evolved over time. When we have a new launch product, we will typically have a teleconference if we can't get all of the national account managers in.
Q: When you first came on board at Roxane, what did you do, or did you do anything to get to know each of the sales representatives?
A: I attended the national sales meetings and, during the meetings, would talk with them, try to get to know them, yeah.
Q: How often were the national sales meetings?
A: It varied. I — I don't think it was more than two or three times a year.
Q: Do you recall whether there was a national sales meeting shortly after you arrived at Roxane?
A: There was a meeting in progress when I arrived, but I was not in attendance at it.

Page 432

[1] like the initial pricing was set in 1990. I have no
[2] idea how many years they were off the market. It was
[3] a product that was manufactured for us, and our
[4] manufacturer was unable to make it. We developed it
[5] internally and launched it. So it wasn't a price
[6] increase. It was a launch of a brand-new product.
[7]    Q: Well, is it your testimony, Ms. Waterer, that
[8] if an AWP on a generic product is set lower than
[9] competitor AWPs, that after the fact — after the
[10] launch that that AWP can be increased?
[11]    A: I'm sorry?
[12]    Q: In essence, you're saying that "The AWP was
[13] old, so we could increase it." Is that right?
[14]    MR. MCCONNICO: Objection —
[15]    THE WITNESS: No. In essence what I
[16] was —
[17]    MR. MCCONNICO: Wait. When I have to
[18] object, just wait a minute.
[19]    Objection, form.
[20]    THE WITNESS: Okay.
[21]    MR. MCCONNICO: Go ahead.
[22]    THE WITNESS: What I was saying is you
[23] can't change an AWP that doesn't exist. If we had
[24] discontinued the product, the AWP — and it probably
[25] explains why the databases are different, because the

Page 433

[1] other database probably reflected that the product had
[2] been discontinued and this was a new launch product.
[3] So I was setting an AWP for the very first time. It
[4] was a new product.
[5]    Q: (BY MR. ANDERSON) Do you know what Barr's
[6] AWP was?
[7]    A: We looked into it. I don't recall.
[8]    Q: Well, I've also looked into it through the
[9] price reporting compendia, and I believe it's $129 and
[10] change.
[11]    Does that sound right?
[12]    A: What I recall out of it was that there was
[13] like a 50-cent difference between us.
[14]    Q: And 50 cents to the advantage of Roxane,
[15] correct?
[16]    A: Our AWP was 50 cents higher, yes.
[17]    Q: Okay. Now —
[18]    THE VIDEOGRAPHER: We need to change the
[19] videotape.
[20]    MR. ANDERSON: All right.
[21]    THE VIDEOGRAPHER: We're off the record
[22] at 12:00 p.m. This concludes Tape No. 2.
[23]    (Discussion off the record).
[24]    THE VIDEOGRAPHER: We're back on the
[25] record at 12:01 p.m. This is the beginning of Tape 3.

Page 434

[1]    Q: (BY MR. ANDERSON) When did you first realize
[2] that back in July of '97 there may have been a 50-cent
[3] advantage of Roxane's AWP over Barr's AWP?
[4]    A: Shortly after we launched it, or set the
[5] launch plan, I should say. This memo is kind of the
[6] eureka moment.
[7]    Q: And in this context you're — you're
[8] describing a launch of a product as a bringing of an
[9] existing product back to the marketplace?
[10]    A: To me it was bringing a new product to the
[11] marketplace. It had been in existence years ago, but
[12] it wasn't marketed for quite a period in between; so
[13] it wasn't existing. It was something that they'd had
[14] a long time ago.
[15]    Q: What's your understanding of why the AWP on a
[16] generic meperidine product would increase four times
[17] from 1990 to 1997?
[18]    A: There was a — there's a general rule of
[19] thumb in generics that you peg your AWP at ten percent
[20] under brand. You see it very, very commonly.
[21]    When I came on board with Roxane, they
[22] didn't know that; so all of the products that I
[23] launched, I priced the way you're supposed to price
[24] generics.
[25]    Q: That being ten percent less the brand?

Page 435

[1]    A: Less than the brand's AWP.
[2]    Q: Okay. And given that rule of thumb in
[3] generics, if the AWP on a brand product increases year
[4] after year after year —
[5]    A: Uh-huh.
[6]    Q: — then that enables the AWP on a generic
[7] product to likewise increase year after year after
[8] year?
[9]    A: Usually you don't bother doing that because
[10] the impact would be a couple pennies and it wouldn't
[11] be meaningful.
[12]    Q: Well, apparently here on meperidine we're
[13] talking about quadrupling the AWP of the product; so
[14] that would be significant, wouldn't it?
[15]    A: I'm talking about relaunching a product as a
[16] new product under a generic pricing strategy.
[17]    Q: Right.
[18]    A: They didn't have the old — they couldn't buy
[19] the old stuff versus the new stuff. The old stuff had
[20] been away for a couple of years. It didn't exist. It
[21] was no different to me than launching a brand-new
[22] product.
[23]    Q: And my question is: What enabled the AWP on
[24] meperidine to quadruple from 1990 to 1997?
[25]    MR. MCCONNICO: Objection, form.

Page 440

[1] Q: To your attorneys?
[2] A: Yes.
[3] Q: Okay.
[4] MR. MCCONNICO: Objection, form. Don't
[5] get into what we have and don't have. Obviously,
[6] these go to a drug that's not part of the lawsuit; so,
[7] you know, we're talking about something that's not
[8] relevant here, and that's the objection.
[9] MR. ANDERSON: Well, I disagree with you
[10] about the relevance; but I will agree that the drug's
[11] not named in the lawsuit.
[12] Q: (BY MR. ANDERSON) Is this sentence comparing
[13] your WAC — Roxane's WAC to Barr's dead-net
[14] acquisition indicating to you that Barr was, in
[15] effect, charging more in the marketplace to end
[16] customers than Roxane was on this meperidine product?
[17] A: No.
[18] Q: Well, a WAC price is subject to discounting;
[19] is that correct?
[20] A: Generally.
[21] Q: There's rebates that come off of a WAC price,
[22] correct?
[23] A: In some contracts.
[24] Q: And if there's a contract price, then to the
[25] extent a wholesaler buys at WAC, then there's a

Page 441

[1] chargeback that's incurred, correct?
[2] A: If there's a contract price.
[3] Q: Okay. Well, assuming that meperidine's on
[4] contract, what you're describing in this second
[5] sentence is a situation where a WAC price that may be
[6] subject to future discounts is actually equal to a
[7] competitor's dead-net real price; is that correct?
[8] A: Correct.
[9] Q: So, in effect, because Barr's spread exceeded
[10] Roxane's prior to July 1st of '97, they were able to
[11] go out in the marketplace and charge more for their
[12] product?
[13] MR. MCDONALD: Object to the form.
[14] MS. PITTAWAY: Objection —
[15] THE WITNESS: I'm — I'm not sure I
[16] follow that.
[17] MR. ANDERSON: Well, let's read it back,
[18] because I tried to make it as straightforward as
[19] possible.
[20] THE WITNESS: Yeah, please.
[21] (The requested portion was read).
[22] MR. MCCONNICO: Objection, form.
[23] THE WITNESS: To the best of my
[24] recollection, Roxane didn't have product that they
[25] were marketing prior — Barr was on the market already

Page 442

[1] when we entered the market, so what Barr sold it
[2] for — they were, I believe, a sole generic out there.
[3] We were out of the market.
[4] Q: (BY MR. ANDERSON) Right. But then at least
[5] in July of '97 you were in the market, correct?
[6] A: We came back in the market, yes.
[7] Q: So then it's Roxane versus Barr, generic to
[8] generic?
[9] A: Right.
[10] Q: Okay. And in this situation, apparently,
[11] because Barr had this historical spread, they were
[12] still charging a greater real price than what Roxane
[13] was charging?
[14] MR. MCCONNICO: Objection, form.
[15] MS. PITTAWAY: Objection, form.
[16] THE WITNESS: Roxane wasn't charging
[17] anything. We didn't have product.
[18] Q: (BY MR. ANDERSON) When you entered the
[19] marketplace, you had product.
[20] A: Right.
[21] Q: And you were trying to displace Barr,
[22] correct?
[23] A: Correct.
[24] Q: And you tried to do that by having a price
[25] which was lower than Barr's?

Page 443

[1] A: A bid price which was lower than Barr's, yes.
[2] Q: Right. And at the same time, you also had a
[3] higher AWP than Barr, correct?
[4] A: By a few cents, 50 cents, yes.
[5] Q: So, in effect, you had a larger spread than
[6] Barr did, right?
[7] A: I don't know what Barr was bidding it for.
[8] Q: Well, apparently you did, because you said
[9] their dead-net acquisition price equaled your WAC.
[10] A: That was from the attachment that Jerry sent
[11] in saying, "This is what they're selling it for. What
[12] do we — what do you want to do to get the business?"
[13] Q: And that's something —
[14] A: That was when I found out what their bid
[15] price was.
[16] Q: Okay. And I'm sorry. I didn't mean to cut
[17] you off. I thought you were done.
[18] A: Yeah.
[19] Q: And that is something that's routine in the
[20] generic industry, where generic manufacturers go out
[21] and get competitive intelligence on what their
[22] competitors are charging in the marketplace, correct?
[23] A: Correct.
[24] MR. MCDONALD: Object to the form.
[25] Q: (BY MR. ANDERSON) Okay. And so given that

Page 476

[1] to change the amount that a reimburser is reimbursing
[2] if they're reimbursing on that. If they're — if
[3] they're not buying mine because they're buying
[4] somebody else's, changing the price of mine to what
[5] the other people's are isn't going to change what
[6] reimbursers are paying. Is that —
[7]   Q: (BY MR. ANDERSON) Well, when you raised the
[8] AWP on hydromorphone, did you raise it above the
[9] competitors or did you raise it to exactly the same
[10] level as the competitors?
[11]   A: I don't know. It would have probably been
[12] within a couple cents.
[13]   Q: Higher or lower?
[14]   A: I don't know. Typically we would have used a
[15] formula and plugged it — come up with a formula that
[16] put it in a range that was competitive with the
[17] competitors that were there.
[18]   Q: What type of formula would you use? The
[19] ten percent rule?
[20]   A: In a product that was already established in
[21] the market, if we did — if I were to do a price
[22] increase today — and I'm assuming that that was the
[23] thought process I went through here — what would have
[24] seemed reasonable is to look at where everybody else's
[25] is and put ours somewhere in that range.

Page 477

[1]   Q: Does the range on generic AWPs, in your
[2] experience, increase over time when the brand AWP for
[3] that same product is increasing?
[4]   A: Sometimes yes and sometimes no.
[5]   Q: In the situation where a brand is raising its
[6] AWP, it's also raising its real market prices, isn't
[7] it?
[8]   A: Uh-huh.
[9]   Q: And those are the prices that that —
[10]   A: Well, actually, I'm not sure of that. I can
[11] say that it's — it is raising its WAC at the same
[12] time because, on the brand side, WAC and AWP are
[13] defined as either 16 and two-thirds or 20 percent
[14] different, and every product within a company's
[15] product line has the exact same formula.
[16]   Q: You make a good point.
[17]     And that's because with brand drugs
[18] there's a very well-defined relationship between WAC
[19] and AWP, correct?
[20]   A: Correct.
[21]   Q: So if the AWP's increasing, you would expect
[22] the WAC that customers are paying out in the
[23] marketplace to also increase, correct?
[24]   A: I don't know what the customers' bid price
[25] is, but I would expect the WAC price to go up as well,

Page 478

[1] yes.
[2]   Q: Now, with generic drugs, is it your
[3] experience that market prices increase when an AWP
[4] increases?
[5]   A: Oftentimes.
[6]   Q: And why is that?
[7]   A: Market conditions change. If competition
[8] changes and a number of players exit the market, it's
[9] very common in a mature generic product that a product
[10] will begin to be sold below its cost of manufacture.
[11] You can't stay in business selling product below cost.
[12] Many manufacturers exit. Then there will be another
[13] round where people will no longer have to sell it
[14] below cost to get business. So we do find some price
[15] changes in that.
[16]   Q: Is that situation that you just described
[17] kind of known as a sole-source generic?
[18]   A: A product can become a sole-source generic or
[19] it can be launched as a sole-source generic. It can
[20] be a sole-source generic at any point.
[21]   Q: Basically, it's a situation where there's a
[22] generic in the market and there's a brand in the
[23] market but there's no competing generics, correct?
[24]   A: Correct.
[25]   Q: Okay. Well, let's, for this line of

Page 479

[1] questions, assume that there are competing generics.
[2]     If an AWP is increasing on a generic
[3] product —
[4]   A: Uh-huh.
[5]   Q: — when there's generic competition, do you
[6] find that the real prices in the marketplace are also
[7] increasing?
[8]   MS. PITTAWAY: Objection, form.
[9]   THE WITNESS: Sometimes yes and
[10] sometimes no.
[11]   Q: (BY MR. ANDERSON) Do you find that, when the
[12] real prices are increasing in the marketplace, that
[13] that's due to an increase in the spread?
[14]   MS. PITTAWAY: Objection, form.
[15]   MR. MCDONALD: Object to the form.
[16]   THE WITNESS: No. It usually has to do
[17] with a change in the competition. A couple players
[18] drop out. There may still be three there.
[19]   Q: (BY MR. ANDERSON) Well, let's take a look at
[20] Deposition 253, Deposition Exhibit 253. And you'll
[21] recall that 253 reflects that at one point in
[22] July of '97 that Barr had a dead-net acquisition price
[23] that was actually higher than Roxane's dead-net
[24] acquisition price. Is that true?
[25]   A: I believe that's what it says.

Page 500

[1] **A:** To me, when I hear "Medicaid," what comes to
[2] my mind is Medicaid rebate. That's — that's the
[3] relationship our company has with Medicaid.
[4] **Q:** Do you recall approximately when Roxane began
[5] considering doing an across-the-board WAC decrease on
[6] dozens of SKUs?
[7] **A:** I know we did it. We did a small subset
[8] first and then the whole rest of it. I don't remember
[9] the specific time frame.
[10]    (Exhibit 855 marked).
[11] **Q:** (BY MR. ANDERSON) Ms. Waterer, I'm going to
[12] hand you what's been marked as Deposition Exhibit 855,
[13] ROX-TX-14599 sequentially through 14608. It's a
[14] composite exhibit, and it was produced by Roxane in
[15] this litigation.
[16]    Steve, you're welcome to take a look at
[17] it, if you want.
[18] **MR. MCCONNICO:** Thank you.
[19] **MR. ANDERSON:** I've highlighted some
[20] portions of it.
[21] **MR. MCCONNICO:** Thank you.
[22] **MR. ANDERSON:** Sure.
[23] **Q:** (BY MR. ANDERSON) You're welcome to review
[24] the entire exhibit, Ms. Waterer.
[25] **A:** Thank you.

Page 501

[1] **Q:** My first question is: This document has a
[2] cover letter dated March 13th of 1998; is that
[3] correct?
[4] **A:** Yes.
[5] **Q:** And the first bullet point is "WAC/AWP
[6] Changes." Is that correct?
[7] **A:** Correct.
[8] **Q:** And then attached to the letter is a listing
[9] of — of all of Roxane's drugs and the new AWP, the
[10] new WAC, the old AWP and the old WAC. Is that
[11] correct?
[12] **A:** Yes. I — I think it's all of the products.
[13] I don't know if there were a couple left off the
[14] change.
[15] **Q:** All right. But you don't have any reason to
[16] think that there were any products left off here, do
[17] you?
[18] **A:** I — I really don't remember.
[19] **Q:** Okay.
[20] **A:** I don't know if that's the whole list or just
[21] the ones that were changed. I know it's the ones that
[22] were changed.
[23] **Q:** But there are some on here that didn't change
[24] at all, correct?
[25] **A:** I didn't see it —

Page 502

[1] **Q:** You haven't had a chance to —
[2] **A:** — in that much detail but —
[3] **Q:** Okay. Well, we're going to get into that;
[4] and we may point out a few that didn't change at all.
[5]    Now, that's dated March 13th of '98; and
[6] that's when the WAC decrease and the AWP changes were
[7] implemented, correct?
[8] **A:** Yes.
[9] **Q:** And that was not only sent to Roxane's
[10] customers, but that was sent to the pricing services?
[11] **A:** Yes.
[12] **Q:** Was this sent to First DataBank?
[13] **A:** Rich would have sent it. He was doing all
[14] the communications with First DataBank at that point.
[15] It would have been his responsibility to send it. I
[16] would have to assume that he did send it.
[17] **Q:** Well, since in December of '97 Roxane had
[18] chose to no longer publish WAC prices to First
[19] DataBank, would Roxane have sent those new WACs?
[20] **A:** They would have sent just the AWPs then.
[21] **Q:** Right. Just the AWPs?
[22] **A:** Correct.
[23] **Q:** Okay.
[24] **A:** I believe so.
[25] **Q:** Now, I also would like to point your

Page 503

[1] attention to Tupa Exhibit 652; and this was a two-page
[2] exhibit, ROX-TX-01264 and 1265.
[3]    Steve?
[4] **MR. MCCONNICO:** No.
[5] **Q:** (BY MR. ANDERSON) Okay. This was used in
[6] the deposition of Mr. Tupa, your former boss; and it's
[7] written by you to Mr. Gerstenberg, and you copied
[8] Mr. Tupa. It's dated February 7th, '98 —
[9] **A:** Okay.
[10] **Q:** — titled "WAC Adjustment Implementation
[11] Update." If you could, take a look at that, and then
[12] I'll have some questions about that as well.
[13]    Do you recall roughly when Roxane
[14] started analyzing whether or not they should do a WAC
[15] adjustment?
[16] **A:** When they started, no.
[17] **Q:** Would it have been several months prior to
[18] February 7th of '98?
[19] **A:** I believe — I — I believe it's even
[20] referred to in here. We did something that we called
[21] baby WAC and big WAC; and baby WAC was run the year
[22] before we implemented the big WAC, as a trial balloon.
[23] If big WAC happened in '98, baby WAC would have been
[24] third or fourth quarter '97.
[25] **Q:** And when you say "baby WAC," are you

Page 504

[1] referring to the — the preliminary test run, so to
[2] speak, that was done regarding Ranitidine and — and
[3] Ipratropium bromide unit-dose vial?
[4]    A: This was right in December, yeah. Yeah.
[5]    Q: Okay. So when Roxane chose to no longer
[6] publish WAC to First DataBank in December of '97,
[7] Roxane was well aware that there was going to be an
[8] across-the-board WAC decrease on dozens of drugs,
[9] right?
[10]    A: I don't think they were related in any way.
[11] We were talking about not publishing WAC for — since
[12] I got there.
[13]    Q: All right.
[14]    A: The industry doesn't publish WAC. I think
[15] you're putting a correlation that doesn't exist.
[16]    Q: Well, I'm — objection, nonresponsive.
[17]     I'm not trying to imply a correlation.
[18] I'm asking: Did Roxane know that a WAC decrease for
[19] dozens of SKUs was coming up in December of '97 when
[20] they chose to no longer publish WAC to First DataBank?
[21]    A: Yes.
[22]    Q: All right. Now —
[23]    A: When they finalized the — I don't know when
[24] they started on First DataBank, but they're in the
[25] same time frame, yes.

Page 505

[1]    Q: Interestingly, what you mentioned as the baby
[2] WAC decrease included Ipratropium bromide unit-dose
[3] vial, didn't it?
[4]    A: Yes.
[5]    Q: Do you recall whether or not Ipratropium
[6] bromide was in the — the large WAC decrease that was
[7] actually implemented in March of '98?
[8]    A: I'd have to check. I don't know.
[9]    Q: Well, let's do that. Let's take a look at
[10] Ipratropium bromide — the Ipratropium bromide entries
[11] that are listed in Deposition Exhibit 855, ROX-TX-0 —
[12] pardon me — 14603. That's the particular page.
[13]     If you could, look at those entries for
[14] Ipratropium bromide and tell me whether or not
[15] anything changed.
[16]    A: No.
[17]    Q: Do you know why it is that Roxane chose not
[18] to change the AWPs or the WACs on Ipratropium bromide
[19] in March of '98?
[20]    A: Probably because they changed them in baby
[21] WAC, so it was no longer — baby WAC was a trial
[22] balloon of getting the whole line of WACs down. We
[23] were paying too much in terms to the wholesaler.
[24]    Q: Did the decrease in WAC by Roxane have
[25] anything to do with Medicaid reimbursements?

Page 506

[1]    A: No.
[2]    Q: Were the decreases in WACs reported to all
[3] the respective Medicaids who based their reimbursement
[4] off of WAC?
[5]    A: I didn't report to Medicaid, so I don't know.
[6]    Q: Do you know whether or not the Medicaid
[7] program in the State of Texas, known as the Vendor
[8] Drug Program, received the WAC decrease notification
[9] in March of '98?
[10]    A: I didn't know the vendor program in Texas
[11] existed until this case happened. There were people
[12] responsible for reporting things to different states
[13] that had unusual requirements, and I presume people
[14] did their jobs.
[15]    Q: Who is it that you understand was ultimately
[16] responsible for reporting prices to the State of
[17] Texas?
[18]    A: Now that I know that there is a State of
[19] Texas reporting issue, Beth Trowbridge was doing that.
[20]    Q: And do you know what information
[21] Beth Trowbridge relied upon in reporting prices to the
[22] State of Texas Vendor Drug Program?
[23]    A: We had gold sheets, and she called and asked
[24] for pricing when she needed it.
[25]    Q: When a price change was implemented at Roxane

Page 507

[1] on an AWP or a WAC price, did Roxane routinely issue
[2] gold sheets?
[3]    A: Yes, on — on multisource products.
[4]    Q: On generic drugs, which were your bailiwick,
[5] right?
[6]    A: Yes.
[7]    Q: And so when you would change the WAC or an
[8] AWP on a generic drug, the marketing department under
[9] your command would issue a gold sheet, right?
[10]    A: Yes.
[11]    Q: And those gold sheets would go throughout the
[12] Roxane company, correct?
[13]    A: It was a large distribution sheet.
[14]    Q: And that distribution included regulatory
[15] affairs and particularly Ms. Trowbridge, right?
[16]    A: I believe so.
[17]    Q: Do you know why it is that Ms. Trowbridge
[18] didn't report to the State of Texas the WAC decrease
[19] for dozens of SKUs listed in that exhibit that
[20] happened on March of '98 until April of '99?
[21]    A: I don't know — I didn't know she was doing
[22] it in the first place, so I don't know whether she did
[23] or didn't or what she might have done.
[24]    Q: Well, you — do you have any understanding or
[25] information regarding why Ms. Trowbridge would not

Page 512

[1] Q: Now, I've highlighted some drugs here on
[2] Exhibit 855.
[3] A: Uh-huh.
[4] Q: And particularly — and please verify this,
[5] but flip through here and the drugs that I've
[6] highlighted — and they're — they're numerous — all
[7] have AWP prices which are increasing. We've got
[8] alum hydroxide gel, codeine phosphate, dexamethasone,
[9] diazepam. Anyway, it goes on and on.
[10]    If you could, take a look at that and
[11] confirm that those drugs have AWP increases that are
[12] occurring in March of '98.
[13] A: Yes, they do. I looked at it when — when
[14] you gave it to me —
[15] Q: Oh, good. Okay. Thank you.
[16]    And are there corresponding WAC
[17] increases with those AWP increases?
[18] A: Yeah. Those products are analogous to our
[19] brand products.
[20] Q: They're sole-source generics?
[21] A: They are sole-source products, unique SK —
[22] they're slightly different. There's something that
[23] makes each of them unique from competition.
[24] Q: Okay. Now, let's take a look, for instance,
[25] at this one drug, but there's several that had an AWP

Page 513

[1] decrease — I mean — strike that — WAC decrease,
[2] particularly this haloperidol product,
[3] NDC No. 4346-31.
[4] A: Uh-huh.
[5] Q: The old WAC is listed at $465.75 —
[6] A: Uh-huh.
[7] Q: — while the new WAC instituted on
[8] March of ninety — March 16th of '98 was $33.06.
[9]    Did I read that correctly?
[10] A: Correct.
[11] Q: Okay. But I notice there's no corresponding
[12] AWP decrease. The AWP remained at $650; Is that
[13] right?
[14] A: Uh-huh.
[15] Q: Why didn't the AWP go down when the WAC went
[16] down?
[17] A: I'd have to look into it, but I believe the
[18] AWP was competitive with what everybody else in the
[19] market was. And we have to get back to the reason
[20] that we were doing the WAC, and that's a fantastic
[21] illustration of it.
[22]    We were paying terms to a wholesaler on
[23] a product that sold for a couple bucks a bottle. This
[24] particular product we discontinued years ago. I don't
[25] know how shortly it was after this. But when you're

Page 514

[1] paying two percent terms on a product that's $450,
[2] you're paying a wholesaler terms that are seven
[3] dollars on a product that sells for — I don't know —
[4] four or five bucks. That was why we did the WAC
[5] change, because this whole paying two percent terms to
[6] the wholesaler was just ridiculous.
[7] Q: Well, really, let's do the math on that.
[8]    At the old WAC of 450 bucks, two percent
[9] would be nine dollars.
[10] A: Nine dollars. I did it wrong.
[11] Q: Yeah.
[12] A: Yeah.
[13] Q: So you're talking about a nine-dollar
[14] prompt-pay cash discount; is that right?
[15] A: Yeah.
[16] Q: And you're saying that the haloperidol
[17] product was selling in the marketplace for around five
[18] bucks?
[19] A: I'd have to check. That's a bottle of a
[20] thousand. It might have — very cheap — to the point
[21] whether it was 12 bucks or five bucks, I — it was to
[22] the point where on some of our products the terms that
[23] we were paying were close to what we were selling. It
[24] was just — it was stupid. It was very poor business
[25] practices to have this, and we had to do this to get

Page 515

[1] the product so that we could stay in the market. If
[2] we hadn't done — well, we ended up deleting it
[3] anyway. But you can't — you can't pay that kind of
[4] money for terms on a product that doesn't sell for
[5] that. It's out of — completely out of kilter.
[6] Q: Do you believe it would be out of kilter for
[7] a state Medicaid program to base its reimbursement on
[8] that 450-dollar WAC?
[9] MR. MCDONALD: Object to the form.
[10] THE WITNESS: I kind of think that most
[11] of the reimbursement programs that I've seen are
[12] stupid — well, I'm sorry — don't make sense based on
[13] business, and I think they've been like that forever.
[14] Q: (BY MR. ANDERSON) Why is it that
[15] reimbursement programs, in your opinion, don't make
[16] sense?
[17] A: Because when I hear that a reimbursement
[18] program is basing something on WAC and continues to
[19] base something on WAC but comes and tells us that WAC
[20] isn't the price they want — that they meant it to be
[21] based on, I don't understand why this — why it
[22] doesn't just get fixed. That's a — a frustration to
[23] me.
[24] Q: Well, let's take a look at these drugs where
[25] the AWP went up and the WAC went up.

## Page 516

A: Uh-huh.

Q: Wouldn't it be appropriate on this generic drug, hydrochlorothiazide, for a Medicaid program to base reimbursement on a WAC there?

MR. MCDONALD: Object to the form.

THE WITNESS: It's — one could argue whether it's a generic drug.

Q: (BY MR. ANDERSON) Okay. Well, is that the WAC that's being charged in the marketplace?

A: WAC is the price that wholesalers buy every one of our products for.

Q: And you've raised the WAC on that product because the market prices have gone up, correct?

A: We've raised the price on that product, it looks like, probably by consumer price index, because it's like a brand product.

Q: And if a Medicaid program didn't pay off of WAC on that product, would your customers be upset?

MR. MCDONALD: Object to the form.

THE WITNESS: I — I don't know what would or wouldn't upset them if they didn't base it on WAC and based it on something else that made sense. I don't think anybody would object. I don't know. I — I don't — I — I didn't set this up. It was in existence before I think generics even began.

## Page 517

Q: (BY MR. ANDERSON) When you were at Roxane, you controlled the AWP and the WAC prices, correct?

MR. MCCONNICO: Objection, form.

THE WITNESS: I had influence over them.

Q: (BY MR. ANDERSON) You set those prices; and then ultimately Ed Tupa authorized the publishing of those prices, correct?

A: I instituted changes to the prices, and on new-launch products I set them; but I did not create the pricing that was there prior to me getting there.

Q: Well, that's a good point. And, for instance, we had questioning today about hydromorphone.

When you got to Roxane, you raised the AWP on that generic product, didn't you?

A: Yes.

Q: And that went out and Medicaids reimbursed based upon that increased AWP?

A: I brought the AWP into standard with everybody else so that we not — were not getting discriminated against in purchasing decisions. Did I go out and set a new price that was designed to impact the reimbursement on a program I didn't know existed to influence a buying decision, no. I just leveled the playing field. I tried to take away a

## Page 518

[1] disadvantage because analysis said that was causing
[2] it. Apparently the systems that were in place were
[3] forcing us to be disadvantaged.
[4]     Q: When you lowered the WAC on the haloperidol
[5] product from $450 to $33, did you notify the Medicaids
[6] of that decrease?
[7]     A: I don't notify Medicaid of anything.
[8]     Q: Did you notify First DataBank of that
[9] decrease?
[10]    A: We don't report WACs to First DataBank.
[11]    Q: Did you report to First DataBank the increase
[12] in AWP?
[13]    A: We report AWPs, whether they go up or down or
[14] stay the same, to First DataBank.
[15]    Q: Well, that's a good point.
[16]        If you could, do you know whether or not
[17] a single AWP of all these drugs listed in 855 went
[18] down?
[19]    A: No.
[20]    Q: Not a single one?
[21]    A: I don't know. I'd have to go through and
[22] look at it.
[23]    Q: But, yet, several went up, didn't they?
[24]    A: On the brand products they went up. I don't
[25] know if any went down. I'd have to study it.

## Page 519

[1]     Q: Well, take your time. Flip through that and
[2] tell me if any of those AWPs went down.
[3]     A: There's nine pages. I'm on Page 6. I
[4] haven't found one; so if any did, it would have been
[5] very few.
[6]     Q: All right. Now, earlier I mentioned briefly
[7] if you knew a gentleman named Jim Rowenhorst; is that
[8] right?
[9]     A: Yes.
[10]    Q: And your — your response was that you had
[11] heard the name but you couldn't —
[12]    A: I probably met him; but he's not somebody
[13] that I know well enough that, if I saw him again, I'd
[14] be "There's Jim."
[15]    Q: All right.
[16]    A: He would be familiar to me.
[17]    Q: Have you reviewed some documents recently
[18] pertaining to communications you had with
[19] Mr. Rowenhorst?
[20]    A: I don't think so, no.
[21]    Q: Have you reviewed any documents recently that
[22] pertained to the WAC and AWP changes implemented in
[23] March of '98?
[24]    A: I don't think so. I don't recall.
[25]    Q: If I could, I'd like you to take a look at

Page 524

Lesli Paoletti. And particularly one of the e-mails — two of the e-mails, one written by you and another written by Mr. Rowenhorst, are dated November 4th, 1999.

Eric, feel free to take a look at that. That's the original.

(Discussion off the record).

Q: (BY MR. ANDERSON) Have you had a chance to review Exhibit 654?

A: Yes.

Q: Do you recall that Exhibit 655 and Exhibit 654 were done in conjunction with one another?

A: It appears that they were making references here about trying to get First DataBank to report correct information.

Q: Do you recall that Lesli Paoletti worked with First DataBank to remove all historical WAC pricing regarding Roxane's generics?

A: Yes.

Q: And in the e-mail chain that's reflected in 654, that's what you and Mr. Rowenhorst and Lesli are discussing, right?

A: Correct.

Q: Okay. And that deletion of historical WAC and direct pricing was being done at your direction,

Page 525

correct?

A: Correct.

Q: And it was also being done at the direction of Mr. Rowenhorst, correct?

A: He was involved in it. I don't know who was directing it.

Q: Okay. He had requested that this be done, and then you directed that it be done, correct?

MR. HAGENSWOLD: Object to form.

THE WITNESS: He — he was requesting — he was illuminating problems associated with incorrect data and asking us to make sure it got fixed.

Q: (BY MR. ANDERSON) And the incorrect data that you're referring to is the historical WAC and direct pricing on Roxane's generics, right?

A: I think initially it was just getting the WAC not listed. Then apparently there was a problem where First DataBank said, "If we take your WAC out, it's going to default to what the WAC was the last time you did it, which is even more incorrect than the one before."

So in order to have their database not provide incorrect information to the customers, they would have to fix either — I don't know — fix the programming so it didn't reflect an incorrect price or

Page 526

fix the data so it didn't reflect an incorrect price. We were trying to work with them to make sure they were not reporting incorrect information.

Q: And the ultimate goal of this was to remove any current or historical WAC pricing from First DataBank, correct?

MR. HAGENSWOLD: Object to form.

THE WITNESS: I didn't care about — about any historical data. I cared that — that people utilizing that database were not getting incorrect data. Apparently the programming, the way they had it set up, was that if we — if we didn't report what the WAC is today, it would automatically report what the WAC was yesterday. I mean the information on WAC history was out there for years. There was nothing secret about it. We used to report it. So it wasn't about removing history. It was trying to make — trying to get First DataBank to adjust the way they were reporting our data so customers would not get incorrect information.

Q: (BY MR. ANDERSON) In your experience in the generic industry, do you ever recall an instance where a WAC on a generic product exceeded the AWP on that same generic?

A: No.

Page 527

Q: So typically isn't it true that WACs on generics are always lower than the corresponding AWP on that same product?

A: Yes.

Q: So in deleting WAC prices on Roxane's generics from First DataBank, First DataBank was left to publish higher AWP prices?

MR. HAGENSWOLD: Object to form.

THE WITNESS: It was left to publish AWP prices. There's no correlation in generics — there's no consistent correlation between AWP and WAC, so it was a different kind of price that I don't think anybody would have made an assumption what WAC was or wasn't based on what AWP was. So I think it's apples and oranges.

Q: (BY MR. ANDERSON) Well, are you aware that some Medicaids and other third-party payers, for that matter, base their reimbursement upon either AWP or WAC?

A: I'm learning more about it now. No. During the period of this, no.

Q: Well, let's take a look at what Mr. Rowenhorst had written to you back in November of '99.

Well, let's first start with the entry

Page 584

[1] what specific software the wholesalers offer, so no.
[2] Q: (BY MR. ANDERSON) Now, if I could, I'll draw
[3] your attention to page ROX-TX-04076, particularly the
[4] paragraph H titled "Low Price and Best Spreads -
[5] Contract pricing will be evaluated on lowest price
[6] and/or best spread between AWP and the contract price
[7] for multisource products."
[8]     Did I read that correctly?
[9] A: Yes.
[10] Q: Would you have any involvement in addressing
[11] that concern of Roxane's customer, GeriMed?
[12] MR. HAGENSWOLD: Object to form.
[13] THE WITNESS: I didn't know that this
[14] was a request of GeriMed, so no; but I think it's
[15] common knowledge in the industry. And I think we've
[16] already stated that AWP, if it's not in range with
[17] your competitors, will exclude you from consideration.
[18] So didn't know this was GeriMed, but kind of not
[19] surprising.
[20] Q: (BY MR. ANDERSON) In your experience, do
[21] generic manufacturers consider the marketing impact of
[22] where their AWP is in relation to competitors?
[23] MR. MCDONALD: Object to form.
[24] MR. HAGENSWOLD: Object to form.
[25] THE WITNESS: Can you say that again?

Page 585

[1] I'm —
[2] Q: (BY MR. ANDERSON) You've worked at at least
[3] two generic manufacturers — Endo and Roxane —
[4] correct?
[5] A: Correct.
[6] Q: Have you ever worked at any other generic
[7] manufacturers?
[8] A: No.
[9] Q: And currently you're at Ben Venue?
[10] A: Yes.
[11] Q: Is Ben Venue a generic manufacturer?
[12] A: Both brand and generic. It's a manufacturing
[13] site.
[14] Q: Okay. And currently in your job
[15] responsibilities at Ben Venue, are you selling generic
[16] drugs?
[17] A: I'm selling Roxane products, yes.
[18] Q: Okay. You're — you're still selling Roxane
[19] generic drugs just as you were when you were at
[20] Roxane?
[21] A: Correct.
[22] Q: Okay. Given your experiences in the generic
[23] industry, is it your testimony that it's a factor that
[24] generic manufacturers consider in setting their AWP in
[25] relation to their competitors regarding the

Page 586

[1] marketability of that generic?
[2] MR. MCDONALD: Object to form.
[3] MS. PITTAWAY: Object to form.
[4] MR. HAGENSWOLD: Object to form.
[5] MR. ANDERSON: Let me simplify it. Let
[6] me —
[7] THE WITNESS: I — I'm not sure. When I
[8] set a price that's a new launch, it's ten percent off
[9] AWP; and that, I think, is an industry standard. When
[10] you launch later to a market, I think the industry
[11] standard is to price your product competitively with
[12] what's out there. I'm not sure if that's a "Yes" or a
[13] "No" to what you're asking me.
[14] Q: (BY MR. ANDERSON) If you launch a generic
[15] product and then some time passes and there's generic
[16] competitors that enter —
[17] A: Uh-huh.
[18] Q: — and in the meantime the brand price for
[19] that therapeutic class is increased —
[20] A: Uh-huh.
[21] Q: — and, as a result, some of the
[22] late-entering generic products were able to launch
[23] with a higher AWP —
[24] A: Uh-huh.
[25] Q: — it's your testimony that it would be

Page 587

[1] appropriate for Roxane to, in turn, raise its AWP to
[2] be roughly the same as its competitors, correct?
[3] MR. MCDONALD: Object to the form.
[4] THE WITNESS: No. I think that Roxane's
[5] price would be roughly the same as its competitors.
[6] Typically brands raise a product three percent
[7] annually; so if they launch a year later, they might
[8] have a 50- or 60-cent difference. It's immaterial.
[9] That's not going to change — at least I don't think
[10] that's going to change the majority of people's
[11] opinion of whether or not they're going to use a
[12] Roxane product. When you're talking a 20-dollar
[13] difference on a product, then I think that's something
[14] that is so egregious that a customer may consider
[15] that.
[16] Q: (BY MR. ANDERSON) Well, like with the
[17] hydromorphone situation, you chose to raise that AWP,
[18] for instance, from 27.98 to 37.18 in August of '98; is
[19] that correct?
[20] A: I — I believe so, yeah.
[21] Q: Okay. And then another AWP on hydromorphone
[22] went from 31.10 to 47.17?
[23] A: I'll take your word for it.
[24] Q: All right. Well, take — take my word for
[25] it, and — and in that situation you're — you're

Page 588

raising AWP somewhere between — roughly 30 percent. Is that right?
  A: Ten bucks on — yeah.
  Q: Okay. Is that a situation where raising that AWP would be significant?
  MR. MCDONALD: Object to the form.
  THE WITNESS: I believe that was a situation where our AWP was out of line with the rest of the industry and that bringing it in line would allow us to compete fairly; therefore, it was significant enough for us to go to the effort of changing it, yes.
  Q: (BY MR. ANDERSON) And the AWP at Roxane had allegedly got out of line because over time the brand AWP had increased within that therapeutic class —
  A: Oh, no.
  Q: — and that would have enabled —
  A: Oh, no.
  Q: Why was it out of line?
  A: I don't know why. My belief is that they never priced it at ten percent off AWP from the get-go.
  Q: What would stop generic manufacturers from raising their AWP in tandem with the brand AWP to eternity?

Page 589

  MR. MCDONALD: Objection, form.
  THE WITNESS: Nothing that I'm aware of.
  Q: (BY MR. ANDERSON) Since AWP is publicly available for Medicaids to set their reimbursement and the AWPs on generic drugs can increase —
  A: Or decrease. They can change, yes.
  Q: Have you ever known of Roxane decreasing an AWP on a generic?
  A: I'd have to check it. One's not coming to mind.
  Q: But you do recall instances where Roxane's raised the AWP. We've gone over numerous of those today, right?
  A: Yes.
  MR. HAGENSWOLD: Object to form.
  Q: (BY MR. ANDERSON) Okay. Well, what can the Medicaid programs, in your opinion, rely upon to set their reimbursements other than AWP?
  MR. HAGENSWOLD: Object to form.
  MR. MCDONALD: Object to the form.
  THE WITNESS: I think that there could be thousands of different ways they could set it.
  Q: (BY MR. ANDERSON) Would —
  A: I don't have the magic pearl; but MAC-ing, for example, makes a lot of sense. You — you — you

Page 590

[1] run a survey of a couple of similar markets on a
[2] quarterly or annual basis and you say, "What's your
[3] market price," and you MAC it, would be one way. That
[4] would be setting it on something that was tied to a —
[5] a — a true market price.
[6]   Q: Well, is it your understanding that MACs are
[7] based upon the prices reported by manufacturers?
[8]   A: I'm not sure how MACs are set.
[9]     Let me specify that. I'm not sure how
[10] MACs are set, and I know that there are a variety of
[11] different kinds of MACs. My understanding is that the
[12] insurance companies have a system that ties their MACs
[13] close to what a fair market price would be.
[14]   Q: Are you aware of some third-party reimbursers
[15] that have what's known as a closed formulary?
[16]   A: I might need more information.
[17]   Q: Are you aware of third-party payers who can
[18] choose what generic product within a therapeutic class
[19] they're going to reimburse for?
[20]   A: HMOs do that.
[21]   Q: In your opinion, can the state Medicaid
[22] programs choose what generic product within a
[23] therapeutic class they're going to reimburse for?
[24]   MR. HAGENSWOLD: Object to form.
[25]   MS. PITTAWAY: Objection, form.

Page 591

[1]   THE WITNESS: I think they can do
[2] anything they decide to do. I don't — I don't know
[3] what you mean by this.
[4]   Q: (BY MR. ANDERSON) Are you familiar with the
[5] law titled OBRA '90?
[6]   A: Sounds familiar. Give me more details.
[7]   Q: Do you know whether or not OBRA '90 requires
[8] state Medicaids to carry generic drug manufacturers'
[9] products on their formulary so long as that
[10] manufacturer signs a Medicaid rebate agreement?
[11]   A: I'm not sure. I'm not up on Medicaid law.
[12]   Q: Do you believe, Ms. Waterer, that Roxane owes
[13] any duty to any third-party reimburser regarding its
[14] publication of generic AWP prices?
[15]   MS. PITTAWAY: Objection as to form.
[16]   MR. MCDONALD: Object to the form.
[17]   THE WITNESS: I believe that it owes a
[18] duty to everybody to publish the prices that are
[19] correct and to have due diligence to make sure that
[20] those prices that are published are correct to the
[21] degree that they're able to validate it.
[22]   Q: (BY MR. ANDERSON) In your earlier deposition
[23] on Page 182 — and I'll represent that I'm reading at
[24] Page — I'm actually starting on Page 181, Line 19.
[25]   Question: "Is it important to Roxane