# Exhibit 11

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

Sykora, Robert C.                                             December 4, 2008
Atlanta, GA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL         ) MDL No. 1456
INDUSTRY AVERAGE WHOLESALE    ) Civil Action No.
PRICE LITIGATION              ) 01-12257-PBS
_____)
THIS DOCUMENT RELATES TO:     )
United States of America,     )
et al. v. Ven-a-Care of the   )
Florida Keys, Inc. v.         )
Boehringer Ingelheim Corp.,   )
et al., CIVIL ACTION NO.      )
07-10248-PBS                  )

- - -

       Videotaped deposition of ROBERT C.
SYKORA, taken pursuant to the stipulations
agreed to herein, before Suzanne Beasley,
Registered Professional Reporter and Notary
Public, at 1031 Virginia Avenue, Atlanta,
Georgia, on the 4th day of December, 2008,
commencing at the hour of 10:38 a.m.

7e08331d-cd17-4b4c-a728-8afc97c6e127

```
                                                              Page 2
 1    APPEARANCES OF COUNSEL:
 2        On behalf of the United States of America:
 3               JAMES J. FAUCI, Esq.
 4               Assistant United States Attorney
 5               John Joseph Moakley Federal Courthouse
 6               1 Courthouse Way
 7               Suite 9200
 8               Boston, Massachusetts  02210
 9               (617) 748-3298
10               jeff.fauci@usdoj.gov
11
12        On behalf of Ven-a-Care of the Florida Keys, Inc.:
13               C. JARRETT ANDERSON, Esq.
14               Anderson LLC
15               208 West 14th Street
16               Suite 3-B
17               Austin, Texas  78701
18               (512) 469-9191
19               jarrett@anderson-llc.com
20
21
22
```

Sykora, Robert C.                                     December 4, 2008
                              Atlanta, GA

Page 44

1     Q.   Did that seem odd to you at all?
2     A.   It did.
3     Q.   Did you ever ask?
4     A.   No.
5          (Exhibit Sykora 003 was marked for
6     identification.)
7     BY MR. ANDERSON:
8     Q.   All right.  If you could, take a look
9     at what's been marked as Sykora Exhibit 003.  You
10    agree that appears to be a sales key account org
11    chart, correct?
12    A.   Correct.
13    Q.   And you're listed as the second man in
14    charge under Rich Feldman, correct?
15    A.   Correct.
16    Q.   And your title's director, national
17    accounts, right?
18    A.   Correct.
19    Q.   And that was the position you held
20    while employed by Boehringer Ingelheim, correct?
21    A.   Correct.
22    Q.   And what years did you hold that

Page 45

1    position?
2         A.   December 1997 through December of 2000.
3         Q.   Were these national account managers
4    listed on Exhibit 003 under your command during
5    that time period?
6         A.   Yes.
7         Q.   And can you explain big picture what
8    your job responsibilities were as director of
9    national accounts?
10        A.   Correct.  We represented the Roxane
11   generic and the brand products to wholesalers and
12   chain -- warehousing chain pharmacies, and tried
13   to get, for generics, we tried to get placement
14   on their source programs or their preferred
15   vendor formularies, and for brand products, we
16   would go in at the initial launch period and try
17   to get them to purchase product and put on the
18   shelf to fulfill prescriptions being written.
19        Q.   What was a typical day for you as
20   national account director?
21        A.   Go in, answer telephone calls and
22   e-mails, et cetera, from the national account

Sykora, Robert C.                                          December 4, 2008
                              Atlanta, GA

Page 109

1      Q.   And if you could, look at that little
2  box in the lower right-hand corner.  You see a
3  column titled "280 percent AWP adjust to"?
4      A.   Yes.
5      Q.   Does that refresh your memory that you
6  were recommending basically a tripling of
7  Roxane's Furosemide AWPs?
8      A.   No.
9      Q.   Do you have any understanding of what
10 the "280 percent AWP adjust to" references?
11     A.   Could you repeat the question?
12     Q.   Do you have any understanding of what
13 that "280 percent AWP adjust to" means?
14     A.   I'm guessing that there were
15 suggestions from the marketing department in
16 terms of where the adjustment of the AWP would
17 be, and so this spreadsheet shows what the effect
18 would be of that adjustment.  I didn't ever -- I
19 never had any responsibility for adjusting or
20 changing the AWPs myself.  I just gathered
21 information.
22     Q.   Well, who do you think suggested the

Sykora, Robert C. December 4, 2008
Atlanta, GA

Page 110

1  280 percent increase?  Somebody in your sales
2  force organization or somebody in marketing, like
3  Judy or Lesli?
4       A.   Any suggestions would come out of the
5  marketing department.
6       Q.   Okay.  But you'll agree at least if you
7  do the math that a 280 percent increase is
8  essentially a tripling of the AWPs?
9            MR. KAVANAUGH:  Objection to form.
10           THE WITNESS:  Yeah.  Yes.
11 BY MR. ANDERSON:
12      Q.   Because 300 percent would be triple?
13      A.   Correct.
14      Q.   Okay.  So that's a pretty significant
15 AWP increase, right?
16      A.   I can't tell you what others did at the
17 time in comparison.  If there were other
18 companies in the competitive marketplace doing
19 600, that would seem to be small.  And if other
20 companies were doing 100, that would seem to be
21 large.  So I don't have any reference point.
22      Q.   I'll help you with that reference

Sykora, Robert C.                                December 4, 2008
                           Atlanta, GA

Page 125

1   time when, you know, or a definitive product
2   where they were adjusted up.  It doesn't say that
3   they weren't.  I just can't remember a distinct
4   time.
5   BY MR. ANDERSON:
6       Q.   Okay.  And then after Judy writes this
7   message on August 2nd around 10:30 in the
8   morning, you respond later that afternoon, just a
9   few hours afterward, correct?
10      A.   Correct.
11      Q.   And you say, "Ask and ye shall receive!
12  Based upon the info below, Hannaford Brothers
13  awarded us Furo all strengths, 2,000 bottles of
14  Furo 40 mg 1000 and OptiSource has awarded us all
15  strengths as well, unit volume being assembled.
16  Steve is contacting CVS to see if there is still
17  an opportunity to garner that biz.  Crank up the
18  machines.  We're rockin on the Furo train!!!!"
19           Did I read that correctly?
20      A.   You did.
21      Q.   And basically what you're conveying
22  there is that the AWP increases have enabled you

Sykora, Robert C.                                    December 4, 2008
                              Atlanta, GA

Page 126

1    and your sales force to sell more Furosemide for
2    Roxane?
3         A.   That's correct.
4         Q.   And the cranking up of the machines is
5    there needs to be an increase in production
6    because now you're going to sell a lot more of
7    the Furosemide?
8         A.   More demand, you need more product,
9    correct.
10        Q.   Bingo.  Okay.  Oh, one last question.
11   Who's Martin Hlavac, or however you pronounce
12   that?
13        A.   I think it was Hlavac.
14        Q.   Hlavac?
15        A.   He was in production planning, and so
16   he would be the individual who worked with the
17   manufacturing people to make sure that it got
18   into the schedule to make more product.
19        Q.   And the reason Martin's involved in the
20   discussions now about Furosemide and he hadn't
21   been involved in the prior discussions that we've
22   looked at today is because now the increase in

Sykora, Robert C.                                               December 4, 2008
                              Atlanta, GA

Page 127

1    sales is coming to fruition and he needs to pump
2    up production?
3         A.   Correct.
4              (Exhibit Sykora 011 was marked for
5    identification.)
6    BY MR. ANDERSON:
7         Q.   All right.  Thank you.  Along those
8    lines, Mr. Sykora, if you could, take a look at
9    what's been marked as Exhibit 11.
10             Focusing your attention, sir, on the
11   middle portion of Exhibit 11, do you agree that
12   looks like an e-mail from Judy Waterer to Rich
13   Feldman with copies to you and Martin Hlavac?
14        A.   That looks correct.
15        Q.   And this is a few days, this is about
16   six days in August of 2000 after the initial
17   sales presentations were made by you and your
18   staff with the new Furosemide increased AWPs,
19   correct?
20        A.   That the new AWPs were expressed to
21   customers, yes.
22        Q.   Right.  And do you agree that Judy's

Sykora, Robert C.                                    December 4, 2008
                              Atlanta, GA

Page 133

1    my primary functions at Roxane.
2    BY MR. ANDERSON:
3        Q.   Oh.  Just managing the national sales
4    force and helping facilitate the sale of Roxane
5    drugs?
6        A.   Correct.
7        Q.   Oh, okay.  All right.  I'm going to --
8    do you recall attending a year 2000 palliative
9    care sales meeting in Phoenix, Arizona?
10       A.   I don't recall attending it, but I know
11   I was there.
12       Q.   How do you know that?
13       A.   Because I saw some documents yesterday.
14           (Exhibit Sykora 012 was marked for
15   identification.)
16   BY MR. ANDERSON:
17       Q.   I got you.  Mr. Sykora, take a moment
18   and review what's been marked as Exhibit 012.  Do
19   you agree this appears to be a cover letter sent
20   out by Mark Shaffer and then an agenda or a
21   schedule for a meeting of the palliative care
22   sales group?

Page 134

 1       A.    That is correct.
 2       Q.    And you are -- the meeting's noted to
 3   take place Monday, September 18th, through
 4   Thursday, September 21st, correct?
 5       A.    Yes.
 6       Q.    And you are noted as being a person
 7   who's going to make some presentations, correct?
 8       A.    That's correct.
 9       Q.    For instance, you're shown on the
10   second page as presenting a presentation on
11   distribution to all attendees, correct?
12       A.    That's correct.
13       Q.    And then on the second page -- I mean,
14   pardon me, third page of the Exhibit 012, you're
15   shown also as presenting a distribution workshop
16   to two different groups of people attending the
17   sales meeting?
18       A.    That's correct.
19       Q.    Then if you look at the back of this
20   document, the second to last page, Mr. Sykora,
21   you see a group A and a group B listing of
22   individuals?

Sykora, Robert C. December 4, 2008
Atlanta, GA

Page 135

1   A. I do.
2   Q. Is that the listing of sales
3   representatives that you presented these two
4   presentations to?
5   A. To tell you the truth, I don't
6   remember, but that's probably a pretty good
7   guess.
8   Q. It stands to reason, given that they're
9   identified as group A and B, and then over here
10  where you're shown as presenting the workshop on
11  distribution, there's two groups listed, A and B,
12  correct?
13  A. Correct.
14  Q. And I've been to the Biltmore. That's
15  a pretty nice place, isn't it?
16  A. You know, I don't remember it too much,
17  but --
18  Q. You don't remember going to the
19  Biltmore?
20  A. No, but we have a Biltmore in North
21  Carolina just not too far and it's pretty nice up
22  there.

Sykora, Robert C.                                                December 4, 2008
                                   Atlanta, GA

Page 208

1   rebates we talked about earlier?
2           MR. KAVANAUGH:  Objection to form.
3           THE WITNESS:  They would charge an up
4   charge to the customer, to the pharmacy, for the
5   purchase of the product.
6   BY MR. FAUCI:
7       Q.   Can you tell me what an up charge is?
8       A.   Yeah.  Let's say a customer bought
9   something at $2.  They wouldn't pay $2, they
10  would pay $2 plus three percent or 4 percent or 5
11  percent or 6 percent, whatever the wholesaler
12  would negotiate with that particular pharmacy.
13      Q.   Were up charges something that occurred
14  in direct sales, direct contract sales?  When
15  there was a contract between Cardinal -- I'm
16  sorry, let me start again.
17           If there was a -- did Cardinal service
18  situations where there was a contract between the
19  drug manufacturer and the pharmacy?
20      A.   If it was a large chain pharmacy, yes.
21      Q.   Were up charges involved in those
22  transactions?

Sykora, Robert C.                                            December 4, 2008
                              Atlanta, GA

Page 209

1      A.   Yes.
2      Q.   And were there times when the drug
3  manufacturers sold directly to Cardinal and then
4  Cardinal in turn sold the product on?
5      A.   That's the wholesale model.
6      Q.   Can you tell me roughly, you said two
7  to four percent, I think, were the numbers you --
8  two to six percent were the numbers you quoted
9  earlier.  Was that roughly the range which the up
10 charge would be?
11          MR. KAVANAUGH:  Objection to form.
12          THE WITNESS:  The range could be
13 enormous.  I mean, when I first started at
14 Cardinal, it wasn't uncommon for it to be, you
15 know, wholesale acquisition cost or contract cost
16 plus two to six percent.  By the time I left, it
17 actually had moved to sometimes WAC of the
18 contract cost plus zero.
19 BY MR. FAUCI:
20     Q.   So would you -- is it fair to say that
21 the magnitude or the size of the up charge
22 decreased in the time you were at Cardinal?

Sykora, Robert C.                                December 4, 2008
                        Atlanta, GA

Page 210

1     A.   That would be true.
2     Q.   And when it started out, it could be as
3  high as six percent, and then it went down from
4  there?
5     A.   Correct.
6     Q.   After you came to work for Roxane in
7  1997, did you assist them in developing or
8  improving their Generic Source program?
9     A.   That was part of my job was to assist
10 them in getting products on the Generic Source
11 programs, yes.
12    Q.   What did you do to achieve that goal?
13    A.   In most cases, worked with the contract
14 pricing that would be offered and then put
15 together incentives, such as if they -- the
16 wholesaler would provide certain market share,
17 maybe they'd get some sort of tiered rebate as a
18 result of that, or if they increased volume to a
19 certain extent so that we achieved manufacturing
20 efficiencies, we would, you know, pass some of
21 that value on to them.
22    Q.   Do you have any understanding what the