# Exhibit 12

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

Page 1

NO. GV3-03079

```
THE STATE OF TEXAS           ) IN THE DISTRICT COURT
                             )
ex rel.                      )
   VEN-A-CARE OF THE         )
   FLORIDA KEYS, INC.,       )
        Plaintiff(s),        )
                             )
VS.                          ) TRAVIS COUNTY, TEXAS
                             )
ROXANE LABORATORIES, INC.,   )
BOEHRINGER INGELHEIM         )
PHARMACEUTICALS, INC., BEN   )
VENUE LABORATORIES, INC. and )
BOEHRINGER INGELHEIM         )
CORPORATION,                 )
        Defendant(s).        ) 201ST JUDICIAL DISTRICT
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
RICHARD FELDMAN
November 17, 2004
(ATTORNEYS' EYES ONLY PENDING ENTRY OF
CONFIDENTIALITY ORDER)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

   ORAL AND VIDEOTAPED DEPOSITION OF RICHARD FELDMAN, produced as a witness at the instance of the Plaintiff(s), and duly sworn, was taken in the above-styled and numbered cause on the 17th of November, 2004, from 9:15 a.m. to 4:42 p.m., before CYNTHIA VOHLKEN, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Robinson & Cole, One Boston Place, Boston, Massachusetts, pursuant to the Texas Rules of Civil Procedure and the provisions attached previously.

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF(S):
 3           Mr. Joseph V. Crawford
              Wright & Greenhill, P.C.
 4            221 West 6th Street, Suite 1800
              Austin, Texas  78701-3495
 5
      FOR THE RELATOR:
 6
              Mr. Jarrett Anderson
 7            Anderson LLC
              1300 Guadalupe, Suite 103
 8            Austin, Texas  78703
 9    FOR THE DEFENDANT(S):
10            Mr. Stephen E. McConnico
              Scott, Douglass & McConnico, L.L.P.
11            One American Center, Fifteenth Floor
              600 Congress Avenue
12            Austin, Texas 78701
13            -and-
14            Mr. Edward Miller
              Assistant General Counsel, Legal Department
15            Boehringer Ingelheim Pharmaceuticals, Inc.
              900 Ridgebury Road
16            P.O. Box 368
              Ridgefield, Connecticut 06877-0368
17
      FOR THE U.S. DEPARTMENT OF JUSTICE:
18
              Mr. George B. Henderson
19            Assistant U.S. Attorney
              U.S. Department of Justice
20            U.S. Attorney's Office
              United States Courthouse
21            1 Courthouse Way
              Suite 9200
22            Boston, Massachusetts  02210
23    ALSO PRESENT:
24            Mr. Hank Wisrodt, Videographer
25                        *-*-*-*-*
```

1  preparing for the full line WAC.  Did I read that
2  correctly?
3      A.  Yes.
4      Q.  So is it true that back in November and
5  possibly earlier in 1997 you and others on the Roxane
6  management team were analyzing a full line WAC change?
7      A.  Yes.
8      Q.  And was Judy Waterer also part of that team
9  that was analyzing WAC?
10     A.  Yes.
11     Q.  And Mr. Tupa as well?
12     A.  I don't know if he was part of the team or
13 not.  I know he was there, obviously, because the memo
14 suggested he was there, but do not know if he was part
15 of the team.
16     Q.  Why was it that some of the WACs were
17 decreased?
18     A.  It's a commodity -- Roxane was in a commodity
19 business, generic business, multisource business, and
20 as marketplaces change, there was a need to review to
21 stay market competitive.  So a process was put in
22 place to review the WACs.
23     Q.  Now, if you could, flip to what's been marked
24 as Exhibit 34, also marked as Tupa Exhibit 653.
25     A.  Say that again.  Which one was it, just so I

Page 125

1  DataBank, Medi-Span or the Texas Medicaid program?
2       A.   I don't remember whether I was in the meeting
3  or not.
4       Q.   Ms. Mayhew -- you know who Ms. Cheri Mayhew
5  is, don't you?
6       A.   Yes.
7       Q.   Ms. Mayhew testified that shortly after
8  December 8th of 1997 when she wrote this e-mail marked
9  as Exhibit 34, you took over the responsibility of
10 reporting prices to First DataBank; is that correct?
11      A.   No.
12      Q.   Did you and your group ever take over the
13 responsibilities for reporting prices to First
14 DataBank on behalf of Roxane?
15      A.   No.  I think that all came through -- I
16 believe it was Beth Trowbridge, but I may be wrong.
17      Q.   Did you or anybody else at Roxane ever write
18 to the state Medicaid programs of America and notify
19 them that you had decreased the WAC prices on March
20 16th, 1998?
21      A.   I did not.
22      Q.   But you did send out a form letter to all
23 your customers notifying them, didn't you?
24      A.   The customers that bought product directly
25 from us so that they could update their databases so

1  that they could submit purchase orders that had the
2  right prices on them, yes.
3       Q.   And you did that unsolicited, didn't you?
4       A.   We would send prices to the customers that
5  were buying our products to make sure that they
6  updated their databases, yes.
7       Q.   So it was unsolicited?
8       A.   Well, it was purpose.  I mean, it was
9  unsolicited by them for a price update because they
10 were the ones buying the product from us.
11      Q.   Right.  And they didn't know about the price
12 update, obviously, until they received your form
13 letter, correct?
14      A.   That's how normally they would get notified
15 of a price change.
16      Q.   So why didn't you send the same price
17 notification to all the state Medicaid programs?
18      A.   State Medicaid programs don't buy anything
19 directly from Roxane.  They're not our customer.
20      Q.   But they do reimburse for your drugs, don't
21 they?
22      A.   Some of them, yeah.
23      Q.   And some of them use WAC as the baseline for
24 reimbursement, don't they?
25      A.   Don't know that.

Page 127

1  Q. Well, take a look at Cheri Mayhew's e-mail to
2  you, which is marked as Exhibit 34.
3  A. Uh-huh.
4  Q. You knew it on December 8th, 1997, didn't
5  you?
6  A. I read the memo, yes.
7  Q. And you knew that 10 states were using WAC as
8  a baseline for reimbursement, didn't you?
9  A. I did and if the state wanted that
10 information, they could very easily just send a letter
11 or call and ask for that information.
12  Q. On December -- pardon me. On March 16th,
13 1998 how would a state know if there was a WAC
14 decrease if you wouldn't notify them?
15  A. There was no need for them because they
16 didn't buy anything.
17         MR. ANDERSON: Could you mark that,
18 please.
19         (Exhibit 89 marked)
20  Q. (BY MR. ANDERSON) Mr. Feldman, please review
21 what's been marked as Exhibit 89, also marked as
22 Waterer 855, which is ROX TX 14599 --
23  A. That's mine?
24  Q. -- through 14608. Yeah, this (indicating) is
25 your copy, sir. Is Exhibit 89 the -- the WAC price

Page 175

1    Q.   You were in charge of sales, weren't you?
2    A.   Yes.
3    Q.   But you don't remember whether all these
4  chain drug stores and wholesalers started buying more
5  furosemide after August of 2000?
6    A.   I do not.  I just don't remember.
7    Q.   You were the guy in charge of reporting those
8  furosemide AWP increases, weren't you?
9    A.   No, I didn't report, you know, AWP changes.
10   Q.   You sent letters to all of your customers,
11 didn't you?
12   A.   Yes.
13   Q.   And you notified them of an AWP increase,
14 didn't you?
15   A.   I would have notified the customers that were
16 buying product from us of a change in AWP.
17   Q.   And that change was upward, wasn't it?
18   A.   I don't remember.
19   Q.   Okay.  We'll look at some exhibits about
20 that.
21   A.   If it was, then I would -- I'll say that.
22   Q.   Take a look at Exhibit 64, please,
23 Mr. Feldman.
24   A.   Okay.  (Witness reviewing document).  Okay.
25   Q.   Does Exhibit 64, now that you reviewed it,

1    Q.   From March '98 to the present is it your
2  understanding that Roxane continues to report AWP
3  increases to First DataBank?
4    A.   Yes.
5    Q.   Why is that?
6    A.   Because that's the data that competitively we
7  felt we needed to report to a pricing service.
8    Q.   And AWP prices are always the highest price
9  that could possibly exist on a drug product, aren't
10 they?
11   A.   In general, yes.
12   Q.   Why don't you just take the approach at
13 Roxane like you take with the WACs and just let the
14 Medicaids find that on their own?
15   A.   Because we were lining up with the
16 competitive market environment.  Our competitors in
17 the commodity marketplace were reporting AWP, so we
18 felt to be competitive Roxane needed to report as
19 well.
20   Q.   Is it your testimony that so long as other
21 generic companies refuse to publish correct WACs to
22 First DataBank Roxane can, too?
23            MR. McCONNICO:  Objection, form.
24   A.   That's not a factual -- I mean, the question
25 cannot be answered in that -- in that form.