# Exhibit 13

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment



*experience does matter*

**CASE:  In Re: Pharmaceutical Industry Average Wholesale Price Litiagation**
**DATE:  January 8, 2009**

Enclosed is the REVISED transcript of the testimony of  **Thomas Russillo**.  The date on the previous version was incorrect, and the new transcript reflects the proper date of the proceedings.  Please destroy all transcript copies sent previously.

Thank you for your understanding.  If you have any questions or concerns, please contact us.

Sincerely,

Henderson Legal Services

Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Russillo, Thomas                            January 8, 2009
                        Irvine, CA

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE          ) Master File No.

LITIGATION                       ) 01-12257-PBS

_____)

                                 )

THIS DOCUMENT RELATES TO:        ) VIDEOTAPED

                                 ) DEPOSITION OF

United States of America ex rel. ) THOMAS RUSSILLO

Ven-a-Care of the Florida Keys,  )

Inc., v. Boehringer Ingelheim    ) JANUARY 8, 2009

Corp. et al., Civil Action No.   )

07-10248-PBS, and The City of    )

New York et al. v. Abbott        )

Laboratories et al., Civil       )

Action No. 03-10643-PBS.         )

_____)


(Cross-noticed captions on following pages.)

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 2

1   IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI

2              FIRST JUDICIAL DISTRICT

3    - - - - - - - - - - - - - - - - - -

4   STATE OF MISSISSIPPI,              )

5              Plaintiff,             )

6       vs.                          ) Civil Action No.

7   ABBOTT LABORATORIES, INC., et al. ) G2005-2021

8              Defendants.            )

9    - - - - - - - - - - - - - - - - - -

10

11

12

13

14       Videotaped deposition of THOMAS RUSSILLO, a

15   witness herein, called for examination by counsel

16   for the plaintiff in the above-entitled matter,

17   pursuant to notice, taken at 18800 MacArthur

18   Boulevard, Corona del Mar Conference Room, Irvine,

19   California, beginning at 9:01 a.m. and ending at

20   5:06 p.m., on Wednesday, January 8, 2009, before

21   Lisa O'Sullivan, California Certified Shorthand

22   Reporter No. 7822, RMR, CRR.

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 23

1    consumer health business, and branded products.

2        Q    To your knowledge, Roxane Laboratories was a

3    part of BIPI?

4        A    I believe it was.

5        Q    Were you ever an employee of BIPI?

6        A    I think -- I'm not sure.  I told you

7    earlier, my paycheck came from Ben Venue.

8        Q    Your paycheck came from Ben Venue?

9        A    Yes.

10        Q    Did your paycheck ever come from any other

11    Boehringer Ingelheim entities from the period of

12    November 1997 until 2005?

13        A    I don't believe so.

14        Q    Did you have any responsibility for any

15    portions of BIPI's business?

16        A    Yes.

17        Q    What responsibilities were those?

18        A    At what point in time are you talking about?

19        Q    Take me from 1998 up to the present, to the

20    best of your ability.

21        A    From 1997, November 1997, at the time of the

22    acquisition, I was retained in my current title,

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

Page 24

1    retained as president and chief operating officer

2    of Ben Venue Laboratories.

3            So Ben Venue Laboratories, its contract

4    manufacturing division, and Bedford Laboratories,

5    its generic marketing arm for injectables

6    manufactured by Ben Venue, was under my

7    responsibility.

8            Sometime at the end of 1998, I was also

9    given additional responsibilities for the Roxane

10   multisource business.

11       Q    Did you ever have any responsibilities for

12   the branded drug business?

13       A    No, I did not.

14       Q    What is Roxane Laboratories?

15       A    Roxane Laboratories, as I understood them,

16   was a Columbus-based manufacturing operation that

17   had some branded products and multisource products.

18       Q    And to your knowledge, you were never paid

19   by Roxane Laboratories?

20       A    That is correct.

21       Q    But in the course of your employment with

22   Ben Venue Laboratories, from some point in 1998

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 54

1      A    For the most part, I would not be personally
2    involved.  Judy would propose an AWP; and for the
3    most part, I would have approved it.
4      Q    Was there anyone else that was involved in
5    decisions to set AWPs for Roxane's multisource
6    products?
7      A    Not normally.
8      Q    What is your understanding of what an
9    average wholesale price or AWP is?
10     A    It's not what it says it is.  It's not an
11   average wholesale price.
12          It is a misnomer or an arbitrary term that
13   is used in the generic business to report yourself
14   to the database companies that you are marketing a
15   generic product.
16     Q    So did Roxane report its AWPs to pricing
17   compendia?
18     A    Yes, they did.
19     Q    Were you aware that starting in the
20   1998-1999 time frame, there were investigations
21   into inflated AWPs?
22     A    Yes.

Russillo, Thomas                          January 8, 2009
                          Irvine, CA

Page 66

1    appears to be a draft.

2        Q   BY MR. FAUCI:  What gives you that opinion?

3        A   It doesn't have his correct letterhead on

4    it, and it's not signed.

5        Q   I don't know if you've answered this or not.

6    Do you have any recollection as to whether or not

7    you gave Mr. Coval any comments on this letter?

8        A   I remember looking at the letter when it was

9    being prepared.

10       Q   Do you know if you gave Mr. Coval any

11   comments about the content of the letter?

12       A   I don't recall.

13       Q   Are you familiar with the term

14   "reimbursement spread" or "AWP spread"?

15       A   Yes, I am.

16       Q   What do those terms mean to you?

17       A   It normally means the difference between the

18   AWP and the acquisition cost.

19       Q   Did Roxane consider AWP spreads when setting

20   prices for its product?

21           MS. RIVERA:  Object to form.

22           THE WITNESS:  Are you talking about the

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

Page 67

1    multisource piece?

2        Q    BY MR. FAUCI:  Yes.

3        A    Yes, they did.

4        Q    Did Roxane try and set AWP spreads at a

5    large level to increase the profitability of its

6    products to customers?

7            MS. RIVERA:  Object to form.

8            THE WITNESS:  You want to try that one again

9    for me, please?

10           MR. FAUCI:  Can you repeat that back?

11               (Record is read.)

12           THE WITNESS:  I would not phrase it that

13   way.  I would say that Roxane recognized that the

14   spread was important and that, depending on the

15   customer, there was discounts from AWP that had to

16   be taken into account.

17       Q    BY MR. FAUCI:  Important to who?

18       A    The customer.

19       Q    Why was it important to the customer?

20       A    Because it was important that the customer

21   would prescribe the generic drug over the branded

22   product.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                        January 8, 2009
                                Irvine, CA

                                                              Page 93

1           MS. RIVERA:   Object to form.

2           THE WITNESS:   The only justification I would

3      remember discussing would have been that

4      competitors had a different AWP than us.

5           Q   BY MR. FAUCI:   Competitors having a higher

6      AWP?

7           A   Higher or lower.

8           Q   Why would you be concerned if a competitor's

9      AWP was lower?

10          A   Because we normally set AWPs to be

11     competitive.   That was the style.

12          Q   And if an AWP was -- if a competitor's AWP

13     was higher than yours, why would you change to set

14     your AWP at the same level?

15          MS. RIVERA:   Object to form.

16          THE WITNESS:   The multisource business was

17     aware of the fact that the AWP was used as a

18     benchmark and that discounts were taken from the

19     AWP.

20          Q   BY MR. FAUCI:   As a benchmark for

21     reimbursement?

22          A   For reimbursement, yes.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

1      Q    Turn your attention to Step 3, the paragraph

2  starting, "Product manager to coordinate following

3  departments/personnel."

4           Do you see that?

5      A    No, I don't.

6      Q    Do you see Step 3?

7      A    I see Step 3.  Okay, the second?

8      Q    The second bolded --

9      A    Yeah, I have it.

10     Q    And then for an AWP change, do you see that

11  Mr. Feldman, executive director, trade and pharmacy

12  affairs, is to compose a letter to the pricing

13  compendia?

14     A    Yes.

15     Q    Is that consistent with your recollection

16  that Mr. Feldman would notify the pricing compendia

17  when Roxane changed its AWP?

18     A    It all depends on the time.  This is a

19  procedure -- I don't know if it was ever

20  implemented or not.

21          In that 2000, 2001 time frame, Feldman was

22  there, so I guess he could have been doing that.

Russillo, Thomas                                January 8, 2009
                              Irvine, CA

Page 95

1    Subsequent to that, Judy was in charge of that.

2        Q    Was it your understanding that if Roxane

3    changed the AWP, that change would be reported to

4    the pricing compendia?

5        A    Yes.

6        Q    If a WAC changed, do you know if Roxane

7    would notify the pricing compendia?

8        A    I'm not sure whether we were reporting WACs

9    or not.

10       Q    Can you think of a reason why you wouldn't

11   be reporting WACs?

12       A    I don't believe there was any requirement to

13   report WACs.

14       Q    Skip ahead to Step 5.  It's two pages

15   turned, where it says, "Create gold sheet for

16   product if AWP or NWDA changes."

17           Do you see that?

18       A    Yes.

19       Q    And then it says, "Gold sheet standard form

20   (Roxane) is to be used to notify internal personnel

21   of price changes, packaging changes, as well as

22   additions and deletions to product line.  Note:

Russillo, Thomas                              January 8, 2009
                         Irvine, CA

Page 99

1        THE WITNESS:  At this point in time, I was

2    very sensitive to the AWP litigation that was

3    floating around.

4        Q    BY MR. FAUCI:  So as of the late 1990s, you

5    were aware that there was investigations into

6    inflated AWPs?

7        A    Yes, I was.

8        Q    Let's turn to the first page of the exhibit,

9    of the attachment, where it says, "Impact of June

10   2000, BU Reorganization on PAC Process."

11       A    Yes.

12       Q    Was there a reorganization of the business

13   unit in or around June 2000?

14       A    Yes, there was.

15       Q    What was the result of that?

16       A    The result of that was, as best I recall,

17   the pricing decision committees, as you've shown me

18   in the previous things, were implemented on the

19   brand side, and we were left pretty much on the

20   side to do our own thing, on the multisource side.

21       Q    Turn to page 4 of the document, where it

22   says "PTC Team Post-June 2000."  What is the PTC

Russillo, Thomas                          January 8, 2009
                          Irvine, CA

Page 129

1       A    Meijers and Krogers were two pharmacy
2   companies.
3       Q    Customers of Roxane?
4       A    Yes.
5       Q    Do you see anything wrong with raising a
6   product's AWP but not its price?
7            MS. RIVERA:  Object to form.
8            THE WITNESS:  In theory, no.  I don't know
9   that we did that here, but I don't see that there
10  would necessarily be a problem.
11      Q    BY MR. FAUCI:  You're aware that AWP plays a
12  role in setting the reimbursement Medicare and
13  Medicaid pay for products?
14      A    Yes.
15      Q    And so raising the AWP would have the effect
16  of increasing the amount of money the government
17  pays for one of Roxane's products; correct?
18           MS. RIVERA:  Object to form, foundation.
19           THE WITNESS:  Raising the AWP would have an
20  impact for all of our customers.
21      Q    BY MR. FAUCI:  Including Medicare and
22  Medicaid?

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                              January 8, 2009
                          Irvine, CA

Page 130

1       A    Yes.

2       Q    And you see nothing wrong with raising the
3  AWP even though the price wasn't raised?

4       A    Like I said, in general, I don't know that
5  there's a problem with that necessarily.

6       Q    Same paragraph, a little further down, the
7  document reads, "Sykora, this offers us an
8  opportunity to overcome two of the most common
9  complaints heard for the lower than usual generic
10 substitution rate for aza:  Too small a spread
11 between AWP."

12           Who's Sykora?

13      A    He was second-in-command under Feldman.

14      Q    Is it Bob Sykora?

15      A    Yes.

16      Q    Were you aware that it was a common
17 complaint by Roxane's customers that the spread on
18 Roxane's azathioprine product was too small?

19      A    My memory is refreshed that there was a
20 concern.

21      Q    And would you expect that increasing the
22 spread would increase sales?

Russillo, Thomas                          January 8, 2009
                      Irvine, CA

Page 140

1    Q   So it appears it's being proposed to raise

2   the AWP above that of the generic competitor;

3   correct?

4    A   I believe it's being proposed to raise the

5   AWP to be in line with the competition, not

6   necessarily above.

7    Q   But the proposed is very slightly higher

8   than the AWP of the competition; correct?

9    A   Because of the calculation, it works out

10   that way.

11    Q   And it's higher than the AWP of the generic

12   competition; correct?

13    A   Yeah, by 17 cents or whatever it is.

14    Q   Does this refresh your recollection on

15   whether Roxane was concerned about having higher or

16   equivalent AWP spreads to other generic drug

17   companies?

18       MS. RIVERA:  Object to form.

19       THE WITNESS:  You know, I can't make an

20   assumption about what happened 10 years ago.

21    Q   BY MR. FAUCI:  Well, you see that Roxane's

22   AWP was lower than the generic competitor; correct?

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                January 8, 2009
                           Irvine, CA

                                                          Page 141

1        A    Yes.

2        Q    And it appears as if it's being proposed

3    to be higher or as high as the generic competitor;

4    correct?

5        A    Yes.

6        Q    Does this refresh your recollection on

7    whether Roxane was concerned about having

8    equivalent or greater reimbursement spreads than

9    its generic competitors?

10            MS. RIVERA:  Object to form.  Go ahead.

11            THE WITNESS:  What this tells me is Roxane

12   was the first azathioprine in 1996.  It was set --

13   its AWP was set at the time.

14            In subsequent years, Glaxo raised their

15   price.  When Faro later introduced their generic,

16   they did the same thing.  They took a 10 percent

17   from a higher AWP.

18            We were competitively disadvantaged, and we

19   were trying to catch up.

20       Q    BY MR. FAUCI:  And you wanted the AWP spread

21   on your product to be at least as great as that of

22   your generic competitor; correct?

Russillo, Thomas                           January 8, 2009
                        Irvine, CA

Page 142

1      A    That's correct.

2      Q    I'm going to give you Exhibit 21.

3           (Exhibit Russillo 021 is marked.)

4      Q    BY MR. FAUCI:  It's an e-mail, two e-mails,

5   dated September 10, 1999, "Subject:  Azathioprine

6   AWP."  It's too many As.

7           I've going to direct your attention to the

8   bottom e-mail, from Anthony Tavolaro.  Do you see

9   that?

10     A    Yes, I do.

11     Q    Mr. Tavolaro writes -- strike that.  Who is

12  Mr. Tavolaro?

13     A    I believe he was in the legal department,

14  but I'm not positive.

15     Q    He writes, "Judy, could you give me an

16  update on a proposed AWP change for azathioprine.

17  Our AWP is lower than Geneva's, and I have a mail

18  order pharmacy asking us to raise the AWP or lower

19  our price to meet the spread."

20          Do you see that?

21     A    Yeah.  Now I know who he is.  He was a

22  national accounts person for Roxane.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                      January 8, 2009
                              Irvine, CA

                                                          Page 143
 1       Q    Okay.

 2       A    Yes, I see that.

 3       Q    What does it mean to meet the spread?

 4            MS. RIVERA:  Object to form.

 5            THE WITNESS:  Well, based on what he's

 6    saying here, I think he's telling us that our AWP

 7    is out of line with the competition.

 8       Q    BY MR. FAUCI:  Out of line how?

 9       A    I would assume lower.

10       Q    And the pharmacy is asking to either raise

11    the AWP or lower the price.  Do you see that?

12       A    Yes.

13       Q    Either of those would have the effect of

14    increasing the spread; correct?

15       A    Yes, they would.

16       Q    Would it be a hindrance to sales on one of

17    Roxane's products if the spread was lower than that

18    of a generic competitor?

19            MS. RIVERA:  Object to form.

20            THE WITNESS:  My guess here is what was

21    happening was that our customer had been given an

22    opportunity to switch to Geneva.  They were going

                    Henderson Legal Services, Inc.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                           January 8, 2009
                        Irvine, CA

Page 144

1    to make more money.  And so we were going to

2    adjust, as we did, our AWP so that they wouldn't

3    switch.

4        Q    BY MR. FAUCI:  And by adjusting the AWP,

5    that would help you to keep business or potentially

6    get new business; correct?

7        A    It would make us compet -- now, this wasn't

8    new business.  This was existing business.  And it

9    would keep that business, and we would remain

10   competitive.

11       Q    Let me ask again.  By adjusting the AWP,

12   increasing the AWP, that would help Roxane retain

13   current business?

14       A    Yes.

15       Q    And it could also help Roxane get new

16   business; correct?

17       A    Possibly.

18       Q    Look at the top e-mail.  It's from you.  It

19   says, "Go ahead and implement the $131.08 and

20   $144.18 AWP change."  Do you see that?

21       A    Yes, I do.

22       Q    Did you approve increasing the AWPs on

Russillo, Thomas                          January 8, 2009
                          Irvine, CA

                                                    Page 145

1    Roxane's azathioprine products in 1999?

2        A    That's what the e-mail says.

3        Q    Do you recall if you did that?

4        A    I wouldn't have recalled it without this

5    e-mail.

6        Q    But with the e-mail, you're able to recall

7    that?

8        A    I still don't recall doing it.  I see that I

9    did.

10       Q    And the AWP was done in order to increase

11   the spread; was it not?

12            MS. RIVERA:  Object to form.

13            THE WITNESS:  No.  The AWP was done in order

14   to remain competitive.

15       Q    BY MR. FAUCI:  And the effect of increasing

16   the AWP was to increase the spread; correct?

17       A    Yes, it did.

18       Q    Were you aware at this time that Congress

19   and other governmental agencies were concerned

20   about inflated AWPs?

21            MS. RIVERA:  Object to form.

22            THE WITNESS:  I was aware that there were

Russillo, Thomas                              January 8, 2009
                         Irvine, CA

                                                    Page 165

1      Q    BY MR. FAUCI:  Why would customers?

2      A    Well, when we raised our AWP, since the

3  pricing was a discount to AWP, there would

4  obviously be a difference in the marketplace.

5      Q    Would it be difficult to explain to

6  customers?

7      A    Those are not my words.  Those are her

8  words.

9      Q    I understand that.  I'm asking what your

10 interpretation of her words are.  You were copied

11 on this e-mail.  Do you see that?

12     A    Yeah, I do.  My interpretation was --

13          MS. RIVERA:  Hold on.  Object to form.

14 Calls for speculation.  Go ahead.

15          THE WITNESS:  My interpretation is it needs

16 to be well documented.  She would have shown me the

17 information.  And if I was supporting it, it must

18 have been well documented.

19     Q    BY MR. FAUCI:  Why do they need to be well

20 documented?

21     A    She would have had to show me reason for

22 changing AWP to be competitive.  That's what

Russillo, Thomas                               January 8, 2009
                          Irvine, CA

Page 166

1    documentation would consist of.

2        Q    And so as long as she showed you that the

3    AWP change was necessary to make Roxane's AWPs as

4    high as its competitors, that would be enough for

5    you to approve it?

6        A    In general, that would probably be enough.

7        Q    Were you concerned about the government's

8    investigations into AWP inflations?

9        A    Absolutely.

10       Q    Let's look at the top e-mail from

11   Ms. Waterer.  She says, "Bob, got the information

12   yet?  Discussed it with Tom; and depending on the

13   strength of the customer information you can pull

14   together, he'll support it.  No guarantees of

15   getting it through."

16           Do you see that?

17       A    Yes, I do.

18       Q    If you were -- if it was your decision as to

19   whether or not to approve it, why wouldn't there be

20   any guarantee of getting it through?

21       A    I don't know what she was referring to when

22   she said that.  She could have been referring no

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 166

1    documentation would consist of.

2        Q    And so as long as she showed you that the

3    AWP change was necessary to make Roxane's AWPs as

4    high as its competitors, that would be enough for

5    you to approve it?

6        A    In general, that would probably be enough.

7        Q    Were you concerned about the government's

8    investigations into AWP inflations?

9        A    Absolutely.

10       Q    Let's look at the top e-mail from

11   Ms. Waterer.  She says, "Bob, got the information

12   yet?  Discussed it with Tom; and depending on the

13   strength of the customer information you can pull

14   together, he'll support it.  No guarantees of

15   getting it through."

16           Do you see that?

17       A    Yes, I do.

18       Q    If you were -- if it was your decision as to

19   whether or not to approve it, why wouldn't there be

20   any guarantee of getting it through?

21       A    I don't know what she was referring to when

22   she said that.  She could have been referring no

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

                                                        Page 172

1    brother wants to punish, they will, so why not make

2    some money meanwhile."

3         Do you see that?

4    A    Yes, I do.

5    Q    What do you understand Mr. Sykora to be

6    referring to when he writes "big brother"?

7         MS. RIVERA:  Object to form and foundation.

8         THE WITNESS:  I don't know for sure.  I can

9    only speculate who he meant.

10   Q    BY MR. FAUCI:  Have you ever heard of the

11   government referred to as big brother?

12   A    Yes.

13   Q    And you know the government was concerned

14   about inflated AWPs?

15   A    Yes.

16   Q    As early as 1999?

17   A    Yes, I do.

18   Q    Can you think of any reason why Boehringer

19   Ingelheim would be upset with Roxane for raising

20   its AWPs on furosemide?

21        MS. RIVERA:  Object to form.

22        THE WITNESS:  What do you mean by Boehringer

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                     Irvine, CA

Page 172

1    brother wants to punish, they will, so why not make

2    some money meanwhile."

3         Do you see that?

4    A    Yes, I do.

5    Q    What do you understand Mr. Sykora to be

6    referring to when he writes "big brother"?

7         MS. RIVERA:  Object to form and foundation.

8         THE WITNESS:  I don't know for sure.  I can

9    only speculate who he meant.

10   Q    BY MR. FAUCI:  Have you ever heard of the

11   government referred to as big brother?

12   A    Yes.

13   Q    And you know the government was concerned

14   about inflated AWPs?

15   A    Yes.

16   Q    As early as 1999?

17   A    Yes, I do.

18   Q    Can you think of any reason why Boehringer

19   Ingelheim would be upset with Roxane for raising

20   its AWPs on furosemide?

21        MS. RIVERA:  Object to form.

22        THE WITNESS:  What do you mean by Boehringer

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 173

1    Ingelheim?

2       Q    BY MR. FAUCI:   BIC and/or BIPI.

3            MS. RIVERA:   Object to form and foundation.

4            THE WITNESS:   Yeah.   You mean that the

5    company would be upset?

6       Q    BY MR. FAUCI:   Yeah.   The question is can

7    you think of any reason why BIC and/or BIPI would

8    punish Roxane for raising its AWPs?

9            MS. RIVERA:   Object to form and foundation.

10           THE WITNESS:   I don't know whether in this

11   case the AWP was actually raised or not.   All I

12   know is that I would have reviewed it.   If I

13   thought it was justified, I would have approved it.

14           And I believe that the people you're

15   referring to, BIC or BIPI or whomever, would not

16   have had any objection.   I wouldn't have signed off

17   on it if I thought there was going to be a problem.

18      Q    BY MR. FAUCI:   You wouldn't have signed off

19   on it without their approving?

20      A    I wouldn't have signed off on it if I

21   thought it was going to be a problem.

22           If I was concerned about it, I would have

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

1    called Werner Gerstenberg and told him what I

2    thought was going on and what I thought should be

3    done.  And then he would have either agreed or

4    disagreed.

5        Q    So do you think you consulted with Werner

6    Gerstenberg about the decision as to whether or not

7    to raise AWPs for Roxane?

8        A    Don't recall.

9        Q    For furosemide, I apologize.

10       A    I don't recall.

11       Q    In the top e-mail from Ms. Waterer, the

12   second paragraph down, she writes, "You've

13   indicated that AWP on furosemide is critical now

14   and that we'd have real business opportunities if

15   we could change it.  As you've been informed, Tom

16   is prepared to take furosemide up the line."

17          Do you see that?

18       A    Yes.

19       Q    Who would you be taking furosemide up the

20   line to?

21       A    I believe she's referring to that if I

22   needed to, I would take it up the line.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

                                                      Page 179

1    Boehringer Ingelheim in Connecticut, unless I felt

2    there were circumstances that I needed to review

3    with Werner Gerstenberg.

4        Q    BY MR. FAUCI:  And do you recall if you felt

5    as if there were circumstances you needed to review

6    that related to the AWP increase for furosemide?

7        A    I don't recall at this point in time,

8    because I didn't have the data yet.

9        Q    You just have no recollection one way or the

10   other?

11       A    No.  I'd have to see the next series of

12   e-mails and information that would have passed.

13       Q    So it's possible that depending on what the

14   sales justification looked like, you might have

15   felt the need to go to Boehringer Ingelheim; is

16   that correct?

17       A    It is possible.

18            MS. RIVERA:  Object to form.

19       Q    BY MR. FAUCI:  And you don't know one way or

20   another whether you did?

21       A    No, I don't.

22       Q    Did you regard the decision to raise AWPs on

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                January 8, 2009
                          Irvine, CA

                                                        Page 180

1    furosemide as sensitive?

2           MS. RIVERA:  Object to form.

3           THE WITNESS:  I regarded any decision to

4    raise AWPs as needing to be justified.

5       Q   BY MR. FAUCI:  You write, "Rich can assure

6    you of the mood in BI."  Do you see that?

7       A   Yes.

8       Q   Is "Rich" Richard Feldman?

9       A   I believe that's who I'm referring to.  Yes.

10      Q   What do you mean, the mood in BI?

11      A   The mood at Boehringer Ingelheim was the

12   same as mine.  It was very sensitive to AWP

13   changes.

14      Q   Because of its awareness of the lawsuits

15   that had been filed?

16      A   Yes.

17      Q   You can put that aside.  I'm going to show

18   you an exhibit marked Exhibit 27.

19          (Exhibit Russillo 027 is marked.)

20      Q   BY MR. FAUCI:  This is a somewhat lengthy

21   document.  Take a moment to review it, and just

22   indicate to me when you're ready for a question.

Russillo, Thomas                                    January 8, 2009
                                Irvine, CA

Page 183

1      Q    Would enabling Roxane to remove the barrier

2   to securing additional furosemide business have

3   been a reason why you would have approved of an AWP

4   increase for furosemide?

5      A    I'm having difficulty understanding what

6   your question says.

7      Q    Is it true that raising the AWPs for

8   furosemide would help Roxane win additional

9   business?

10     A    Yes.

11     Q    Let's put that aside.  I'm going to go back

12  to that.  Let's look at it in conjunction with

13  Exhibit 28.

14          (Exhibit Russillo 028 is marked.)

15     Q    BY MR. FAUCI:  Take a moment to familiarize

16  yourself with it, but Exhibit 28 -- I'm looking at

17  an e-mail from Judy Waterer to Lesli Paoletti and

18  several other people.  You're copied on the e-mail.

19  It's dated August 2, 2000.

20          Do you see that?

21     A    Yes, I do.

22     Q    Ms. Waterer writes, "Tom Russillo just

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Russillo, Thomas                          January 8, 2009
                    Irvine, CA

Page 189

1       Q   Turn your attention to the very last page of
2   Exhibit 27, under where it says "furosemide,
3   20-milligram, 1,000."  Tell me if you see that.
4       A   I see it.
5       Q   What was the actual AWP for furosemide --
6   for that furosemide product at that time?
7       A   The 40, or the 20?
8       Q   The 20-milligram, 1,000s.
9       A   30 -- I think it's 36.05.
10      Q   It says the average contract price was $10?
11      A   $10.
12      Q   Look at Exhibit 30 [29] now, please.  Tell
13  me if you agree that the new AWP for the 1,000
14  package of 20-milligram furosemide tablets is now
15  $139.90.
16      A   That's what it says.
17      Q   So does it appear that the AWP was
18  actually -- was about tripled?
19      A   Three and a half times.  Yeah.
20      Q   And the new AWP is approximately 13 times
21  higher, 14 times higher than the average contract
22  price.  Do you see that?

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 190

1      A    I do.

2      Q    Did you have any concern with raising the

3   AWPs for this product to a level more than 14 times

4   higher than the average contract price?

5          MS. RIVERA:  Object to form.

6          THE WITNESS:  No, because it was the same

7   AWP as Mylan.

8      Q    BY MR. FAUCI:  So as long as Mylan's AWP was

9   high, that high, it was okay?

10         MS. RIVERA:  Object to form.

11         THE WITNESS:  "High" is a word -- I don't

12   use the word "high."

13     Q    BY MR. FAUCI:  What if Mylan's AWP was $300?

14         MS. RIVERA:  Jeff, you've got to let him

15   finish his answer.

16     Q    BY MR. FAUCI:  I apologize.  Finish it.

17     A    Okay.  It doesn't matter what the number is.

18   We were trying to be competitive.  If Mylan's AWP

19   is $300, we probably would have raised it to $300

20   to be competitive.

21     Q    Do you think it mattered to Medicaid and

22   Medicare agencies what the AWP was?

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 191

1          MS. RIVERA:  Object to form, foundation.

2     Calls for speculation.

3       Q   BY MR. FAUCI:  You're aware that Medicaid

4     and Medicare relied on AWPs in setting their

5     reimbursement.  You've already testified to that;

6     correct?

7       A   I testified that they relied on a discount

8     from AWP for setting their reimbursement.

9       Q   Do you think it mattered to Medicare and

10    Medicaid what the AWPs were?

11         MS. RIVERA:  Object to form and foundation.

12         THE WITNESS:  I suppose it mattered.

13      Q   BY MR. FAUCI:  But it didn't matter to

14    Roxane?

15      A   Well, what mattered most --

16         MS. RIVERA:  Object to form.

17         THE WITNESS:  -- was their discount, not the

18    AWP.

19      Q   BY MR. FAUCI:  Now that we've looked a

20    little bit into the actual decision to raise AWPs

21    and your approval of that decision, does any of

22    this refresh your recollection as to whether or not

Russillo, Thomas                                    January 8, 2009
                           Irvine, CA

Page 192

1   this is a decision that you would have taken to

2   Werner Gerstenberg?

3       A    Based on the data that I've seen here and

4   the quick review, I would say I probably did not.

5       Q    What was the type of decision you would take

6   to him?

7       A    If we were raising an AWP without adequate

8   justification, meaning I didn't see a competitor's

9   analysis that showed we were just blending in with

10  the rest.

11      Q    So with knowledge the AWP investigations

12  were going on, and with knowledge that this AWP

13  increase raised the AWPs to 14 times the average

14  contract price, that would not have been reason for

15  you to go to Mr. Gerstenberg and say, "Is this

16  okay?"

17      A    I can't answer your question exactly,

18  because this -- as you've seen from the e-mail

19  trails on this and others, there were a number of

20  these going on.

21          Once I had established Werner Gerstenberg's

22  position on this, I would have implemented it.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 193

1   So -- and I don't remember eight years ago how

2   concerned he was.

3           I might have brought it to him.  I don't

4   think I did, because we've had others before that.

5   I knew where he stood.

6       Q   Would you have done this without feeling

7   comfortable that Mr. Gerstenberg was okay with it?

8       A   I can't tell you at the time.  I don't know

9   whether I went to him or not.

10      Q   You said you knew where he stood.  What do

11  you mean by that?

12      A   I knew that his position was if we were

13  meeting competitors, to stay competitive and that's

14  why we were raising the AWP, we would not be

15  perceived as taking advantage of the AWP.

16      Q   Where did you get that understanding of

17  Mr. Gerstenberg's position from?

18      A   Over many conversations with him.

19      Q   Did you have those -- was anybody else

20  involved in those conversations?

21      A   There may have been.  I don't -- I don't

22  recall the specific conversations.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                         January 8, 2009
                        Irvine, CA

```
                                              Page 194
 1      Q    Could legal have been involved in those
 2   conversations?
 3      A    Could have been.  Yes.
 4      Q    Would legal inside counsel -- were those
 5   Boehringer Ingelheim employees, or Roxane
 6   employees?
 7      A    Which ones?
 8      Q    Any inside counsel that might have been
 9   involved in those decisions.
10           MS. RIVERA:  Object to form.
11           THE WITNESS:  Legal services was a shared
12   service.  We did not have, within Roxane or Ben
13   Venue, specific attorneys at that time.
14      Q    BY MR. FAUCI:  Where was the legal services
15   based?
16      A    Connecticut.
17      Q    With Boehringer Ingelheim?
18           MS. RIVERA:  Object to form.
19           THE WITNESS:  Well, they were in the
20   Boehringer Ingelheim environment.  Yes.
21      Q    BY MR. FAUCI:  Let's show you Exhibit 30.
22           (Exhibit Russillo 030 is marked.)
```

Russillo, Thomas                                January 8, 2009
Irvine, CA

Page 216

1     Q   What information do you have about Roxane's

2   communication of spread information to the

3   government?

4        MS. RIVERA:   Object to form.

5        THE WITNESS:   I'm not sure what your

6   question is.

7     Q   BY MR. ANDERSON:   Are you aware of any

8   disclosures by Roxane about spreads to the

9   government?

10    A   You mean discounts to AWP?

11    Q   Yes, sir.

12    A   No.   Roxane does not do that.

13    Q   Why not?

14    A   They don't have to.

15    Q   What do you mean?

16    A   All the government has to do is pick up an

17  IMS database, and they can see the pricing.

18    Q   Is IMS available?

19    A   To -- yes, it is.

20    Q   Is it publicly available?

21    A   No.   You buy it.

22    Q   You have to have a license?

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 217

1       A    No.   You just buy it.   My guess is people

2    from the government who have probably worked for

3    the industry could easily have copies of it.

4    There's lots of data around.

5       Q    To your knowledge, has anyone on Roxane's

6    behalf ever disclosed any market pricing

7    information to the government?

8           MS. RIVERA:   Object to form.

9           THE WITNESS:   What do you mean by market

10   price?

11      Q    BY MR. ANDERSON:   Acquisition cost paid by

12   providers.

13      A    No.

14      Q    Back to this concept of relationships

15   between AWPs and WACs.   Did Roxane ever undertake

16   an effort to decrease its WAC prices?

17      A    Yes.

18      Q    Why?

19      A    The WAC price, as I mentioned earlier, is

20   the invoice price that wholesalers pay.   If our WAC

21   is out of line and we're charging too much WAC,

22   they're taking a discount when they pay us.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                    Irvine, CA

Page 221

1    manner in which Roxane priced its drugs?

2       A   I recall reviewing pricing.  I recall taking

3    a look at sales figures, profit figures.  In all of

4    that context, I'm sure we looked at the way they

5    priced.

6           You know, this was 10 years ago.  I just

7    don't remember the exact details.

8       Q   I believe you testified this morning that in

9    connection with evaluating Roxane pricing, Roxane

10   did consider relative AWP spreads; is that correct?

11      A   Yes.

12          MS. RIVERA:  Object to form.

13      Q   BY MR. ANDERSON:  Is that one of the issues

14   that you considered in evaluating the Roxane

15   pricing?

16          MS. RIVERA:  Object to form.

17          THE WITNESS:  The way we would have done it

18   is we looked at the market share.  We looked at the

19   pricing of the competitors and asked the question

20   why, if we were competitively priced, we weren't

21   getting more business, and what we needed to do.

22      Q   BY MR. ANDERSON:  And one mechanism that

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                      January 8, 2009
                              Irvine, CA

Page 222

1    Roxane could increase its sales would be by

2    matching relative spreads of other generic

3    companies; correct?

4            MS. RIVERA:  Object to form.

5            THE WITNESS:  Matching spreads?  What do you

6    mean by that?

7       Q   BY MR. ANDERSON:  Raising AWPs or decreasing

8    market prices to match relative spreads being

9    offered on competitive generic drugs.

10      A   We would raise AWPs if competitors' pricing

11   was higher than ours and we had to match up to it.

12   Yes.  We would do that.

13      Q   And was that done with authority from

14   Boehringer Ingelheim?

15           MS. RIVERA:  Object to form.

16           THE WITNESS:  That was my decision to do it.

17      Q   BY MR. ANDERSON:  And did you believe that

18   was authorized?

19      A   Yes, I did.

20      Q   By your superior, Mr. Gerstenberg, on behalf

21   of BI?

22           MS. RIVERA:  Object to form.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 223

1          THE WITNESS:  By my superior.

2      Q    BY MR. ANDERSON:  Did you ever receive any

3  form of discipline from Mr. Gerstenberg about the

4  way in which Roxane had priced its drugs?

5      A    I don't recall any.  No.

6      Q    Did you ever receive any type of negative

7  feedback or complaints from anyone about -- anyone

8  that was superior to you in the Boehringer

9  organization about the way Roxane's drugs were

10  priced?

11      A    That's a difficult question to answer,

12  because we were constantly looking at our profit

13  and loss statements and trying to maximize our

14  potential.

15          So as --

16      Q    It's too broad.

17      A    -- a business unit operator, I was under

18  constant -- I won't say warning, but I was always

19  told, you know, do -- keep doing a better job.

20      Q    I understand.  I'll be a little more

21  specific, because that was pretty broad.

22          Did you ever receive any negative feedback

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                          Irvine, CA

                                              Page 238

1    between brand and WAC, and the difference between

2    our AWP and any competitors that might be out

3    there.

4        Q    So the competitive spreads were the primary

5    consideration?

6            MS. RIVERA:  Object to form.  Misstates his

7    testimony.

8            THE WITNESS:  This is not about spread.

9    This is about what the competitor's price was, AWP

10   price.

11       Q   BY MR. ANDERSON:  The competitive AWPs were

12   a primary consideration; is that correct?

13       A   Absolutely.

14       Q   All right.  What are the other

15   considerations, if any, in approving AWPs?

16           MS. RIVERA:  Object to form.

17           THE WITNESS:  The difference between the AWP

18   and the brand AWP.

19       Q   BY MR. ANDERSON:  Any other considerations?

20       A   Probably not.

21       Q   Did you consider any Medicaid regulations?

22       A   No.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 239

1    Q    Did you consider any laws or other statutory

2    information concerning Medicaid or Medicare?

3    A    No.

4    Q    Did you consider any anti-kickback statute

5    implications?

6    A    In setting AWPs?

7    Q    Yes, sir.

8    A    No.

9    Q    Did you ever consider any OIG guidance?

10   A    No.

11   Q    Are you aware that the OIG, the Office of

12   Inspector General for the United States, ever

13   issued any guidance about AWP?

14   A    I believe there was something written as a

15   draft.

16   Q    Did you review it?

17   A    I don't recall it.

18   Q    How did you come to understand that there

19   was a draft of some OIG guidance?

20   A    My recollection is that the Office of

21   Inspector General issued a draft proposed

22   definition of AWP at some point in time.  But it

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                         Irvine, CA

```
                                                    Page 244
 1   not do it.

 2       Q    BY MR. ANDERSON:   Bedford chose not to --

 3       A    Right.

 4       Q    -- have its drugs eligible for

 5   reimbursement?

 6       A    No.   Bedford did not need to publish AWPs,

 7   because the customers that they were talking about

 8   were not reimbursed for drugs.

 9       Q    Okay.   Let's shift gears now to Roxane.

10   Roxane did have customers that were -- such as

11   pharmacies, big chain pharmacies like CVS, that

12   were reimbursed by Medicaid; correct?

13       A    Yes.

14       Q    Why did Roxane publish its prices to First

15   DataBank in that context?

16       A    Because they knew that CVS and/or other

17   companies would be selling products that would be

18   reimbursed by Medicaid.

19       Q    And Roxane appreciated that its drugs needed

20   to be eligible for Medicaid reimbursement in order

21   to be successful in selling to chain drug stores?

22       A    Yes.
```

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 245

1     Q    Why did Roxane specifically choose to
2  publish AWPs to First DataBank?
3     A    To be eligible for -- so that its products
4  would be eligible for Medicaid.
5     Q    Medicaid drug reimbursement?
6     A    Reimbursement.
7     Q    Yes, sir.  And I realize some of my
8  questions may sound self-evident to you, but I've
9  got to ask them anyway.
10         Did Roxane voluntarily publish those AWPs to
11 First DataBank?
12    A    Yes.
13    Q    And did Roxane do that with the expectation
14 that Medicaid would rely on that pricing?
15         MS. RIVERA:  Object to form.
16         THE WITNESS:  Roxane did that with the
17 expectation that Medicaid would have a discounted
18 price that was starting -- the starting point would
19 be AWP.
20    Q    BY MR. ANDERSON:  During the course of
21 today's deposition, have you had your memory
22 refreshed about whether or not Roxane published its

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

                                              Page 247

1      A    It might tip your competitors.

2      Q    It might --

3      A    Tip your pricing to your competitors.

4      Q    Tip your pricing.  Is WAC pricing considered

5    a trade secret price?

6          MS. RIVERA:  Object to form.

7          THE WITNESS:  It is a price from which a lot

8    of people discount.  So if somebody's price is

9    based on a discount from WAC, if they knew the WAC

10   and they knew the discount, they knew your price.

11     Q    BY MR. ANDERSON:  Are you aware that some

12   drug companies choose not to publish WAC pricing?

13     A    Yes.

14     Q    Do you consider WAC pricing to be some type

15   of trade secret or confidential price?

16     A    Me personally?

17     Q    Yes, sir.

18     A    I don't think it means much.

19     Q    Are you aware of any justification for not

20   publishing WAC prices, other than that it may tip

21   your pricing?

22         MS. RIVERA:  Object to form.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                            Irvine, CA

                                                        Page 252

1      A    I don't use the term "market price."  Market
2   price is not in my vocabulary.
3      Q    You use acquisition cost?
4      A    Yes.
5      Q    Okay.  I'll use acquisition cost.
6      A    It's a contract price, basically.
7      Q    A contract price.  Okay.
8      A    Yeah.
9      Q    You'll agree that brands typically increase
10  their prices each year to their customers; true?
11     A    Yes.
12     Q    All right.  And in turn, they raise the AWPs
13  on those drugs?
14     A    That's correct.
15     Q    Right.  And over time, that can cause the
16  brand AWP to become significantly greater than the
17  generic AWP?
18     A    That is correct.
19     Q    But the generic prices charged customers,
20  the acquisition costs, they're not really going up;
21  are they?
22     A    Generally not.

Russillo, Thomas                                    January 8, 2009
                              Irvine, CA

                                                            Page 253

1    Q   Generally, the generic prices are going down

2    because the generic companies are competing with

3    one another?

4    A   Yes.

5    Q   Okay.  Why is it then that the AWPs on the

6    generic can go up and track the brand AWP?

7        MS. RIVERA:  Object to form.

8        THE WITNESS:  This is a -- you know, it's

9    Catch-22.  We've described this a number of times.

10       The AWPs do not normally go up unless

11   competitors raise them.  If they raise them, then

12   you find yourself in a situation where your AWP is

13   not in line with everybody else's.

14   Q   BY MR. ANDERSON:  And that can be a problem

15   when you're selling your drug; correct?

16   A   Yes, of course.

17   Q   And so to sum it all up, a generic company

18   may choose to raise their AWP to better sell their

19   drug?

20       MS. RIVERA:  Object to form.

21       THE WITNESS:  The ultimate result of raising

22   the AWP normally is increased sales.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

                                                        Page 283

1       A    Right, yes.  I do know that.

2       Q    I'm asking about WAC and AWP.

3       A    Yeah.

4       Q    Do you know of any persons on the pricing

5    committee, or part of this pricing approval

6    circulation process, considering anti-kickback

7    laws, Medicare and Medicaid laws, Medicare or

8    Medicaid fraudulent use laws, or anything similar

9    to that?

10           MS. RIVERA:  Object to form.

11           THE WITNESS:  I was not aware of any laws

12   that we would have been in danger of violating.

13   We've talked about AWP.  We were -- we believed we

14   were following all the requirements.

15      Q    BY MR. ANDERSON:  Which were what?

16      A    For AWP.

17      Q    I know.  What was your understanding of

18   those requirements?

19      A    That we were free to set AWP as we saw fit.

20      Q    So it was pretty much a decision that the

21   drug company got to make in a vacuum?

22           MS. RIVERA:  Object to form.

Russillo, Thomas                           January 8, 2009
                          Irvine, CA

                                                    Page 293

1    companies in deciding where to set the Roxane AWP?

2        A    I would have expected her to do that.

3        Q    Do you have any information that the AWP

4    increase that Ms. Waterer recommended on

5    azathioprine was due to the prices charged by

6    Roxane to pharmacies was increasing?

7            MS. RIVERA:   Object to form.

8            THE WITNESS:   Would you try that again,

9    please?

10           MR. ANDERSON:   Yeah.   I think I got a word

11   or two off there.   I'll rephrase it.

12       Q    Do you have any understanding, sir, that

13   Ms. Waterer was recommending the azathioprine AWPs

14   be increased due to the prices increasing between

15   Roxane and its customers?

16       A    I'm still not sure what you're asking me.

17   Would you --

18       Q    Okay.   I'll break it down.   Do you think

19   that the azathioprine AWPs were going up because

20   Geneva had a higher AWP, or because Roxane was

21   going to try to charge pharmacies higher market

22   prices?

Russillo, Thomas                                January 8, 2009
Irvine, CA

Page 294

1       A    No.   I believe we were looking at our market

2    share, and we analyzed the pricing out there.

3            We saw that Geneva had a higher AWP than we

4    did.   We saw that Faro's AWP, Glaxo's Imuran

5    product, had gone up over the years.   We were no

6    longer competitive.

7            And we took that price and took 10 percent

8    off.   And I'll bet the math works out that 131.08

9    is 10 percent less than 145.64.

10      Q    And 131.08 also happens to be higher than

11   Geneva's 130?

12      A    Based on the math, it comes out wherever it

13   comes out.

14      Q    And you'll agree that Roxane having a higher

15   AWP than Geneva, its generic competitor, was a

16   competitive advantage in selling azathioprine?

17      A    Yes.

18           MS. RIVERA:  Object to form.  Jarrett, we've

19   been all over this.

20      Q    BY MR. ANDERSON:  Now, if you could look at

21   Exhibit 21.  You mentioned that Anthony, also known

22   as Tony, Tavolaro was a national account manager

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 315

1        MS. RIVERA:  Object to form.  Argumentative.

2        We've been over the furosemide story.

3   You're putting words in his mouth.  You're being

4   argumentative.  Can you at least change the tone of

5   your questions, or move on to something else?

6        MR. ANDERSON:  Well, I disagree that I'm

7   being argumentative.

8        Q    Sir, you'll agree, won't you, that when

9   Roxane raised the furosemide AWPs about triple,

10  that increased their reimbursement on the

11  furosemide products?

12       A    It increased the difference between the

13  contract price, which was also raised, and the AWP.

14       Q    As we've seen from these Exhibits 24 through

15  29, in fact Roxane began selling more drugs after

16  the AWP increase?

17       A    Yes.

18       Q    And do you have an understanding, sir, that

19  ultimately reimbursers of drugs, like private

20  insurance and Medicaid, paid more money in

21  reimbursement as a result of those AWP increases?

22       A    They probably --

Russillo, Thomas                                        January 8, 2009
                                Irvine, CA

Page 316

1          MS. RIVERA:  Object to form.

2          THE WITNESS:  -- they may have.

3      Q   BY MR. ANDERSON:  And is that okay?

4      A   Yes.

5      Q   Why?

6      A   We have the right to raise our prices.  We

7  raised our prices.

8          MR. ANDERSON:  All right.  I'll pass the

9  witness.

10         MS. RIVERA:  Okay.  Can we take a

11  five-minute break?

12         MR. ANDERSON:  Sure.

13         THE VIDEOGRAPHER:  We're off the record at

14  4:39.

15             (Recess is taken.)

16         THE VIDEOGRAPHER:  We're back on the record

17  at 5:01.

18                     EXAMINATION

19  BY MS. RIVERA:

20     Q   Mr. Russillo, I just wanted to ask you a few

21  followup questions to clarify some of your

22  testimony from earlier today.  I'll try to be short

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd