# Exhibit 20

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

## In The Matter Of:

*THE STATE OF TEXAS v.*
*DEY, INC., ET AL.*

*JUDY WATERER*
October 24, 2001

*FREDERICKS-CARROLL REPORTING*
*Court Reporting-Video Services-Litigation Support*
7719 WOOD HOLLOW DRIVE, SUITE 156
Austin, TX 78731
(512) 477-9911    FAX: (512) 345-1417

Original File 11024JW.V1, 307 Pages
Min-U-Script® File ID: 1319758827

**Word Index included with this Min-U-Script®**

Page 1

[1]     CAUSE NO. GV002327
[2] THE STATE OF TEXAS            ) IN THE DISTRICT COURT
    ex rel.                       )
[3]   VEN-A-CARE OF THE           )
      FLORIDA KEYS, INC.          )
[4]
          Plaintiffs,             )
[5]
    VS.                           ) TRAVIS COUNTY, TEXAS
[6]
    DEY, INC.; ROXANE             )
[7] LABORATORIES, INC. and        )
    WARRICK PHARMACEUTICALS       )
[8] CORPORATION,                  )
[9]     Defendants.               ) 53rd JUDICIAL DISTRICT
[10]
[11]     ORAL AND VIDEOTAPED DEPOSITION OF
[12]             JUDY WATERER
[13]           October 24th, 2001
[14]
[15] ORAL AND VIDEOTAPED DEPOSITION OF JUDY WATERER,
[16] produced as a witness at the instance of the Plaintiff
[17] and duly sworn, was taken in the above-styled and
[18] numbered cause on the 24th of October, 2001, from
[19] 8:20 a.m. to 5:10 p.m., before Debra L. Sietsma, CSR
[20] in and for the State of Texas, reported by machine
[21] shorthand, at Vorys, Sater, Seymore & Pease, LLP,
[22] 52 East Gay Street, Columbus, Ohio, pursuant to the
[23] Texas Rules of Civil Procedure and the provisions as
[24] previously set forth.
[25]

Page 2

[1]
[2]         APPEARANCES
[3]
[4] FOR THE PLAINTIFF:
[5]   MR. JOE CRAWFORD, MR. PATRICK J. O'CONNELL,
      MR. JARRETT ANDERSON
[6]   Office of the Attorney General
      State of Texas
[7]   Post Office Box 12548
      Austin, Texas 78711-2548
[8]
    FOR THE RELATOR:
[9]
      MR. JAMES JOSEPH BREEN
[10]  The Breen Law Firm, P.A.
      8201 Peters Road, Suite 1000
[11]  Plantation, Florida 33324
[12]    - and -
[13]  MS. JOY P. CLAIRMONT
      Berger & Montague, P.C.
[14]  1622 Locust Street
      Philadelphia, Pennsylvania 19103
[15]
        - and -
[16]
      MR. JOHN E. CLARK (Of Counsel)
[17]  Goode Casseb Jones Rikfin
      Choate & Watson, P.C.
[18]  2122 North Main Avenue
      P.O. Box 120480
[19]  San Antonio, Texas 78212-9680
[20] FOR DEFENDANT DEY, INC.:
[21]  MR. STEPHEN M. HUDSPETH
      Coudert Brothers
[22]  1114 Avenue of the Americas
      New York, New York 10036-7703
[23]
[24]
[25]

Page 177

[1] Q: So the price of Lithium in the marketplace
[2] was going up?
[3] A: Yes.
[4] Q: The net final price after all reductions was
[5] going up?
[6] A: Yes.
[7] Q: When was the last time you recall increasing
[8] the bid price for Ipratropium bromide?
[9] A: I don't have a specific recollection of ever
[10] doing that.
[11] Q: Do you have a general recollection of ever
[12] doing that?
[13] A: I think as programs changed, if the — I — I
[14] wouldn't have paid attention to what the bid price was
[15] within a specific offering. If we had a program early
[16] on that offered a large rebate and the customer said,
[17] "I'm tired of waiting for my money. You're holding my
[18] money," and the competitive arena is now different,
[19] then I would change the structure of it. I — I don't
[20] recall specifically increasing prices. It may very
[21] well have happened if they went into a different kind
[22] of rebate program where they had higher rebates.
[23] Q: Do you ever recall a customer saying, "We
[24] want your bid price to be the actual price you're —
[25] you're charging us without chargebacks"?

Page 178

[1] A: A customer wishing us to bill them net?
[2] Q: Yeah.
[3] A: We do that all the time.
[4] Q: How often — I mean is that — is that the
[5] norm that you — you do?
[6] A: With a warehousing chain, yes.
[7] Q: With a warehousing chain?
[8] A: There's no need for a chargeback system.
[9] Q: Okay. So with warehousing chains, the price
[10] that you actually invoice is the price they're
[11] actually paying; is that correct?
[12] A: Yes.
[13] Q: How about with wholesalers like Cardinal, for
[14] example?
[15] A: Okay. What about it?
[16] Q: Has Cardinal ever asked you to bill them what
[17] they're actually paying?
[18] A: Cardinal has a lot of different programs. I
[19] don't recall if they've ever asked for net pricing. I
[20] imagine they would like it; but as a wholesaler,
[21] wholesalers and distributors pretty much by rule get
[22] billed at WAC. That is their invoice price, that is
[23] their acquisition price; and unless they have
[24] something else negotiated with us for a specific
[25] program that has a membership, there's very rarely

Page 179

[1] other adjustments.
[2] Q: Well, let me make this question real
[3] specific.
[4] Did Cardinal ever request that it be
[5] billed at net price for Ipratropium bromide?
[6] A: Not that I recall.
[7] Q: And if I wanted to find out, who in the
[8] company should I ask, in Roxane?
[9] A: Rich Feldman was the head of trade relations
[10] at that time. He would have had more one-on-one
[11] contact or had more contact with feedback from the
[12] individuals that called on the account.
[13] Q: Did a wholesaler ever complain to you that
[14] they didn't like this chargeback arrangement because
[15] it was taking too long to get their money? They'd
[16] rather just be billed at net price?
[17] A: To me personally, no.
[18] Q: To anybody in Roxane, to your knowledge?
[19] A: I think I've heard that mentioned. I don't
[20] recall the circumstances or when.
[21] Q: Well, was it sometime in the last five years?
[22] A: I guess so. It doesn't stick out in my mind
[23] as being related to anything that I can put a date to.
[24] Q: Did DuPont market the spread on its drugs to
[25] its customers?

Page 180

[1] A: I'm not sure I understand what you mean.
[2] Q: Do you know what the — do you know what —
[3] have you ever heard the term "the spread" before?
[4] A: I've heard it used in many different ways.
[5] Q: Well, let us know some of the ways — please
[6] share with us some of the ways you've heard it used.
[7] MR. MCCONNICO: Just for drugs.
[8] THE WITNESS: Just for drugs.
[9] MR. MCCONNICO: Right.
[10] THE WITNESS: A difference between were
[11] acquisition price and whatever it is that they paid
[12] for it.
[13] Q: (BY MR. BREEN) Okay. Let's use that.
[14] A: Or what they could sell it for versus what
[15] they buy it for.
[16] Q: Let's start with that definition.
[17] Did DuPont ever market the spread to any
[18] of its customers, to your knowledge?
[19] A: Not that I recall.
[20] Q: Why not? Wasn't it important to the customer
[21] that it could — how much it could make on a DuPont
[22] product?
[23] A: It's — it's just not something you do.
[24] That's the — I mean I wouldn't know how to begin to
[25] market a spread. The customer determines his own

Page 189

[1] confidential. She said that some state needed it, and
[2] my understanding or my recollection is that I
[3] forwarded the information to Rich, who made a decision
[4] to provide it.
[5]     Q: So WAC pricing is confidential?
[6]     A: WAC pricing is confidential in terms of a
[7] wholesaler would not want his customer to know what
[8] his acquisition price would be.
[9]     Q: But no wholesaler buys at WAC because they —
[10]    A: Every wholesaler buys at WAC.
[11]    Q: Don't you use the same WAC for all the
[12] wholesalers?
[13]    A: Yes.
[14]    Q: So how would — so all the wholesalers know
[15] each other's WAC for Ipratropium bromide bought from
[16] Roxane, correct?
[17]    A: Correct.
[18]    Q: So how is it confidential?
[19]    A: Because the wholesalers sell to retailers. A
[20] car salesman wouldn't want you to know what he paid
[21] for his car. He wants to get a price from you. A car
[22] salesman that sold the same kind of car would know, in
[23] all probability, what the acquisition price for that
[24] car was. The wholesaler doesn't want the retailer to
[25] know what his acquisition price is. That's

Page 190

[1] confidential. I don't want my customers to know what
[2] my costs are.
[3]     Q: But isn't it your testimony that knowing a
[4] wholesaler's WAC doesn't really tell you what the
[5] wholesaler, at the end of the day, pays for the drug?
[6]     MR. MCCONNICO: Objection, form.
[7]     THE WITNESS: I — I'm having trouble
[8] with the way this is going because, to me, a
[9] wholesaler never really buys a drug. He passes it
[10] through. He doesn't use it. So a wholesaler doesn't
[11] really have any price other than WAC.
[12]    MR. BREEN: Could you read back the
[13] witness' response, please?
[14]    (The requested portion was read).
[15]    Q: (BY MR. BREEN) If what you just testified to
[16] is — is — is correct and if the wholesaler really
[17] doesn't have any other price other than WAC and if its
[18] customers are not really paying based on WAC, then why
[19] is WAC confidential?
[20]    A: It's an industry standard.
[21]    Q: If it's an industry standard, why is it
[22] confidential?
[23]    A: It just is. I — most generic companies do
[24] not publish WAC.
[25]    Q: Do you know if a generic company's WAC is

Page 191

[1] published by any price compendia?
[2]     A: I'm sure some of them are. Historically most
[3] have not been.
[4]     THE VIDEOGRAPHER: We need to break to
[5] switch tapes.
[6]     MR. BREEN: Want to take a break?
[7]     MR. MCCONNICO: Sure.
[8]     THE VIDEOGRAPHER: Off the record,
[9] 2:10 p.m.
[10]    (Recess from 2:10 to 2:34).
[11]    THE VIDEOGRAPHER: On the record,
[12] 2:34 p.m.
[13]    Q: (BY MR. BREEN) Okay. We were talking about
[14] WAC when we broke, and I — I went back through my
[15] notes, and earlier in your testimony in answering some
[16] questions you indicated that you want to — the
[17] generic manufacturers are, in your words, quote, "pack
[18] animals," end quote —
[19]    A: Uh-huh.
[20]    Q: — and you want to keep your WAC around where
[21] your competitors have their WAC. Is that correct?
[22]    A: Pretty much with anything, you want to be in
[23] the same range that your competitors are.
[24]    Q: Right now I'm just talking about WAC.
[25]    A: I don't know that we've ever really

Page 192

[1] specifically focused on WAC. It's — it's not —
[2] that's not a real material thing.
[3]     Q: Well —
[4]     A: If I have competitors' information on WAC,
[5] which isn't very common, and I'm in the process of
[6] making a price change, I would look at theirs and
[7] probably target mine to be in the same range.
[8]     Q: I'm trying to find the specific testimony in
[9] my notes.
[10]    I believe you said that you don't want
[11] to differentiate your WAC from the rest of the pack.
[12]    MR. MCCONNICO: Objection, form.
[13]    Q: (BY MR. BREEN) Is — is that a true
[14] statement? Do you want to differentiate your WAC from
[15] the rest of the pack?
[16]    A: No.
[17]    Q: So if WAC is a confidential number, how do
[18] you make sure your WAC is — is within the rest of the
[19] pack?
[20]    A: We don't want to differentiate it. We don't
[21] go to great lengths to not differentiate it. We
[22] determine our WAC based on a variety of things; but
[23] mostly WAC adjustments will occur when we're paying
[24] too much in terms, at which point we would lower our
[25] WACs, because it's to our penalty to have WACs that

Page 193

[1] are high. So when we make WAC changes — I can't
[2] remember any exceptions. There might have been, but I
[3] can't remember any time that we've done anything with
[4] WAC other than take it down.
[5]   When we take it down, if we have any
[6] information around that indicates where other people's
[7] prices are, we would probably look at that and see if
[8] we were targeting in an area that was there. It's not
[9] generally available. It's not generally published.
[10]   Q: Well, how do you know if your prices, your —
[11] your dead net prices are competitive with your
[12] competitors?
[13]   A: Because we win awards.
[14]   Q: How do you know if your WAC prices are
[15] competitive with your competitors?
[16]   A: We don't really focus on that. As I said, if
[17] we are, for reasons unrelated to competition,
[18] assessing or making a decision about changing a WAC,
[19] once we determine that there's a business need to
[20] review the WAC, if we have access to any of that
[21] pricing from pieces of paper that we may have lying
[22] around, we would certainly make an attempt to look at
[23] it.
[24]   Q: So is it your testimony now that, when you
[25] indicated that you're pack animals earlier today, you

Page 194

[1] weren't talking about WAC?
[2]   A: I was talking in a very broad sense. When we
[3] have information in generics, our goal is usually to
[4] be competitive with our competitors. If we have an
[5] opportunity to know the information, it would
[6] generally be desirable to be in the same range.
[7]   Q: Do you want to be competitive with your
[8] competitors' spread, as you used the term earlier
[9] today?
[10]   A: I — I don't really consider spread. I —
[11]   Q: So it's not —
[12]   A: A customer comes to me.
[13]   MR. MCCONNICO: Objection, form.
[14]   Go ahead and finish. That's all I was
[15] objecting to. You get a right to finish your —
[16]   MR. BREEN: You do. I thought you were
[17] finished. I'm sorry.
[18]   THE WITNESS: A customer comes to me and
[19] says, "I need you to lower our price because a
[20] competitor's offered us a better deal and, if you want
[21] to keep the business, this is where you need to be."
[22] Then we go there. I don't — I don't have the
[23] capability of looking into that customer's books to
[24] find out what it means to him. All I see is that my
[25] price is going down.

Page 195

[1]   Q: (BY MR. BREEN) Well, how do third-party
[2] payers decide how much to pay for your product?
[3]   A: I guess you'd have to — everyone does it
[4] differently, to my understanding.
[5]   Q: What are some of the ways that they do it,
[6] basically, in your understanding?
[7]   MR. MCCONNICO: Objection, form.
[8]   THE WITNESS: There are a myriad of
[9] ways. Some of them have a maximum price that they'll
[10] pay. Some of them have different formulas that
[11] they'll pay on, based on whether it's a generic or a
[12] brand. Some of them have negotiations that they've
[13] worked out with individual chains. There's as many
[14] different ways for reimbursement as there are
[15] reimbursers.
[16]   Q: (BY MR. BREEN) What are some of the formulas
[17] that you've heard about for reimbursing generics by
[18] third-party payers?
[19]   A: The one that I'm most familiar with — and I
[20] don't know the specifics of it — but several of them
[21] will use an AWP plus or minus. That's the one that I
[22] most — hear most about. It's the one that, my
[23] understanding is, impacts my customers the most.
[24]   Q: Do your customers tell you that?
[25]   A: Yes.

Page 196

[1]   Q: And when was the last — I mean did — wait.
[2] Let me ask the question this way.
[3]   Apria is a big customer, correct?
[4]   A: Uh-huh.
[5]   Q: Have they told you that the reimbursement
[6] formula that they receive is important to them?
[7]   A: I don't recall ever discussing anything about
[8] reimbursement with Apria.
[9]   Q: So what customers do you recall discussing
[10] reimbursement with?
[11]   A: I don't discuss reimbursement with customers.
[12] I have very limited contact with customers.
[13]   Q: Well, when you said earlier that some of your
[14] customers have told you about this AWP plus or minus a
[15] percentage, what customers told you about that?
[16]   A: It has been — it has been referred in to me
[17] through sales representatives or general discussion.
[18] I don't recall having a discussion with a customer in
[19] particular who came up and said, "This is what
[20] happens."
[21]   Q: Any of your customers reimbursed based upon
[22] WAC plus a percentage?
[23]   A: It is my understanding pursuant to this case.
[24]   MR. MCCONNICO: Okay. Objection, form.
[25] Anything that I have told you or

Case 1:01-cv-12257-PBS   Document 6307-21   Filed 07/24/09   Page 7 of 8

JUDY WATERER                                                THE STATE OF TEXAS v.
October 24, 2001                                            DEY, INC., ET AL.

Page 233

[1] A: I'm not sure if records even still exist on
[2] what the old territories used to be. I don't know.
[3] (Exhibit 47 marked).
[4] MR. ANDERSON: Tons to pass around,
[5] guys.
[6] Q: (BY MR. ANDERSON) Have you ever seen a
[7] document like Exhibit No. 47?
[8] A: I'd be much more comfortable if I could see
[9] the whole document. I think this might be something
[10] that — that went through my group.
[11] Q: Your group, consisting of who?
[12] A: Marketing. I — I don't know the time frame
[13] of it or — '99 it would have been — if this is what
[14] I think it is — and it's incomplete so I'm not
[15] sure — but I believe that this is a subset one page
[16] out of a — a very big document that would have
[17] probably been completed by Lesli and Michelle.
[18] Q: Do you know what is meant by the acronym
[19] WHLNET?
[20] A: I'm looking for it.
[21] Q: It's at the top of the column kind of right
[22] center.
[23] A: We interpret that to be wholesaler
[24] acquisition price.
[25] Q: Who is "we"?

Page 234

[1] A: Roxane.
[2] Q: What do you think WHLNET stands for?
[3] A: I don't know. I think it stands for the
[4] wholesaler acquisition price.
[5] Q: Does it look like it stands for wholesale
[6] net?
[7] A: It could.
[8] Q: Net of what?
[9] A: I don't know. It's not defined.
[10] Q: Why do you interpret that to mean wholesale
[11] acquisition cost?
[12] A: Because that's really the only cost that's
[13] ever gone to First Data Bank; and if they were asking
[14] for us something about a wholesaler cost, that would
[15] be it. But we don't report that for the generics.
[16] That's what this document is about, is striking
[17] incorrect data.
[18] Q: Well, let's get to that.
[19] What does NP stand for?
[20] A: I'm not sure.
[21] Q: Not published?
[22] A: Could be.
[23] Q: No price?
[24] A: I — I don't know.
[25] Q: Do you recall what prompted you to mark out

Page 235

[1] the prices that are marked 25 — I mean — pardon —
[2] 2550 is marked out with the notation NP.
[3] A: Uh-huh. This was not done by me. It was
[4] done by my group, and if this is what I believe it
[5] is — and I'm pretty sure it is — First Data Bank
[6] sends this annually and asks us to verify that the
[7] data that they have is being reflected accurately to
[8] the reporting services.
[9] So we went through — it's a very
[10] exhaustive thing with hundreds and hundreds of SKUs.
[11] And even when we do corrections, they get it wrong and
[12] we go back and forth and back and forth; but we went
[13] and said, "Your pricing information isn't correct," or
[14] "It's not something we report," or "This is the
[15] appropriate pricing, and please change it to this."
[16] We told them that we had discontinued products that
[17] we'd discontinued that they were still listing, just
[18] went through what they told us they had and, to the
[19] best of our ability, went through and made all the
[20] corrections we could find.
[21] Q: Is wholesale acquisition price a net price?
[22] A: Wholesale acquisition price is the price that
[23] the wholesaler pays for the product. It's the invoice
[24] price.
[25] Q: I know that — that you've testified earlier

Page 236

[1] that that's your interpretation of wholesale
[2] acquisition cost or wholesale acquisition price.
[3] A: Well, that's the definition of it in the
[4] industry. It's not Roxane's definition. That's an
[5] industry standard.
[6] MR. ANDERSON: I'll object to that as
[7] nonresponsive.
[8] Q: (BY MR. ANDERSON) I'm not arguing about what
[9] your testimony is. I'm asking: Is wholesale
[10] acquisition cost net of anything?
[11] A: No.
[12] Q: So why is it that you would put a price in
[13] response to the term WHLNET?
[14] A: We didn't. We crossed them out.
[15] Q: At some point you marked them out, but at
[16] some point that information had been provided.
[17] A: I can't respond to who — who provided it or
[18] what. When it became my responsibility, I — and they
[19] sent this to me, I — and my department went through
[20] and corrected any misunderstandings they had.
[21] Q: Just so I'm clear, wholesale acquisition cost
[22] to you is net of nothing?
[23] A: Correct.
[24] MR. MOORE: Object to form.
[25] THE WITNESS: That is their invoice

Page 241

[1] Q: That gives a basic reference point to the
[2] time that this document was created. True?
[3] A: Within a ballpark, yeah.
[4] Q: Okay. I'll draw your attention to the column
[5] titled "Roxane WAC" —
[6] A: Yes.
[7] Q: — specifically the portion that says,
[8] "Pricing formula Atrovent WAC minus 40 percent."
[9] A: Uh-huh.
[10] Q: Who derived that formula?
[11] A: It was just different scenarios.
[12] Q: But how — how did you come to put that
[13] formula in this chart?
[14] A: I believed that they are extremes from what
[15] customers tell us they require for a generic.
[16] Q: This formula would have been derived from
[17] customer requests?
[18] A: Yes. Or — or — or they're letting us —
[19] I'll just say "Yes."
[20] Q: Well, is there anything else that you need to
[21] explain about customers controlling the pricing?
[22] A: If you have specific questions, yeah.
[23] Q: Is it fair to say that the customers were
[24] controlling the pricing?
[25] A: No.

Page 242

[1] Q: The customers make requests, and you act upon
[2] those requests?
[3] A: Customers make their needs known to us. We
[4] evaluate them and determine whether or not we want to
[5] incorporate them into our programs.
[6] Q: Were — were customers asking for a metered
[7] dose inhaler of Ipratropium bromide?
[8] A: No. This was using this — this was using
[9] general information that customers had asked us and
[10] applying it to a hypothetical product to see where the
[11] ranges would — would end up.
[12] Q: So this pricing was taken from another
[13] product?
[14] A: Atrovent.
[15] Q: It was taken from the brand of Ipratropium
[16] bromide?
[17] A: Yes.
[18] Q: How was the WAC — I mean — pardon. Strike
[19] that.
[20]    How was the Roxane portion of this chart
[21] created from Atrovent?
[22] A: Okay. There's unwritten rules, if you will,
[23] in the generic industry that you take 10 percent off
[24] AWP and that's where you place your generic AWP. When
[25] companies that have nothing to do with one another

Page 243

[1] launch, they'll be within a penny or so of each other
[2] on AWP; so that's kind of an unwritten rule of thumb
[3] for how you position your AWP price for a generic.
[4]    So in this I was saying, "Okay.
[5] Assuming Atrovent is at this price, if I was going to
[6] launch it, the scenario that I'd be looking at today
[7] would be most likely pricing AWP at 10 percent off."
[8] My AWP as a generic would be 10 percent less than the
[9] brand's AWP at the time of launch.
[10] Q: How long has that unwritten rule existed, to
[11] your knowledge?
[12] A: I — I'm not aware of any other unwritten
[13] rule, so I would have to say probably in the vicinity
[14] of ten years that I've known about it.
[15] Q: Is there a similar unwritten rule for WAC
[16] minus 40 percent as being a formula for a generic WAC?
[17] A: That one's more all over the place, but
[18] typically 40 percent is a very common number that's
[19] used.
[20] Q: When was it that you first became aware of
[21] the unwritten rule that brand WAC minus 40 percent is
[22] a formula for generic WAC?
[23] A: Actually, it's the difference between —
[24] that's — that's — it's not brand WAC less
[25] 40 percent. It's the generics, that WAC would be

Page 244

[1] 40 percent less than AWP on generics. The AWP is tied
[2] to the brand. The WAC is tied to your own AWP.
[3] Q: Well, I'm looking at the column "Roxane WAC,"
[4] and at the bottom it says, "Pricing formula, Atrovent
[5] WAC minus 40 percent."
[6] A: Uh-huh.
[7] Q: Is that an unwritten rule in the generic
[8] industry?
[9] A: No.
[10] Q: Where did you come up with that formula,
[11] Atrovent WAC minus 40 percent?
[12] A: I expect that I was playing in Excel, and
[13] it's very easy to cut and paste, and the generic
[14] formula would be WAC less 40 percent; so I probably
[15] just cut and pasted, and it ended up there.
[16] Q: So you based it upon what foundation?
[17] A: I'm not sure. There's a lot — in Excel
[18] there's very commonly — at least in the way that I
[19] work with it, it's very common for me to have columns
[20] that I don't utilize that are just there because I cut
[21] and paste.
[22] Q: But —
[23] A: It's just as easy to add that column as not;
[24] so it goes there, and I don't bother deleting it.
[25] There's a lot of click and drag and that kind of