# Exhibit 24

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

```
                      NO. GV3-03079

    THE STATE OF TEXAS              ) IN THE DISTRICT COURT
                                    )
    ex rel.                         )
       VEN-A-CARE OF THE            )
       FLORIDA KEYS, INC.,          )
            Plaintiff(s),           )
                                    )
    VS.                             ) TRAVIS COUNTY, TEXAS
                                    )
    ROXANE LABORATORIES, INC.,      )
    BOEHRINGER INGELHEIM            )
    PHARMACEUTICALS, INC., BEN      )
    VENUE LABORATORIES, INC. and    )
    BOEHRINGER INGELHEIM            )
    CORPORATION,                    )
            Defendant(s).           ) 201ST JUDICIAL DISTRICT
    *****************************************************
              ORAL AND VIDEOTAPED DEPOSITION OF
                       LESLI PAOLETTI
                      November 9, 2004
                         Volume 1
             (ATTORNEYS' EYES ONLY PENDING ENTRY OF
                    CONFIDENTIALITY ORDER)

    *****************************************************
```

   ORAL AND VIDEOTAPED DEPOSITION OF LESLI PAOLETTI,

produced as a witness at the instance of the

Plaintiff(s), and duly sworn, was taken in the

above-styled and numbered cause on the 9th of

November, 2004, from 12:38 p.m. to 4:56 p.m., before

CYNTHIA VOHLKEN, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of

Vorys, Sater, Seymour and Pease, LLP, 52 East Gay

Street, Columbus, Ohio, pursuant to the Texas Rules of

Civil Procedure and the provisions attached

previously.

```
 1              A P P E A R A N C E S
 2    FOR THE PLAINTIFF(S):
 3         Ms. Cynthia O'Keeffe
           Assistant Attorney General
 4         Office of the Attorney General
           State of Texas
 5         Post Office Box 12548  (78711-2548)
           300 W. 15th Street, 9th Floor
 6         Austin, Texas  78701
 7
      FOR THE RELATOR:
 8
           Mr. Jarrett Anderson
 9         Anderson LLC
           1300 Guadalupe, Suite 103
10         Austin, Texas  78703
11
      FOR THE DEFENDANT(S):
12
           Mr. R. Eric Hagenswold
13         Scott, Douglass & McConnico, L.L.P.
           One American Center, Fifteenth Floor
14         600 Congress Avenue
           Austin, Texas 78701
15
           -and-
16
           Mr. Paul Coval
17         Vorys, Sater, Seymore & Pease, LLP
           52 East Gay Street
18         Columbus, Ohio 43216
19         -and-
20         Ms. Sheila Anne Denton
           Senior Counsel, Legal Department
21         Boehringer Ingelheim Pharmaceuticals, Inc.
           900 Ridgebury Road
22         P.O. Box 368
           Ridgefield, Connecticut 06877-0368
23
24
25
```

1   A.   I don't -- I don't recall.  I know that there
2   weren't very many.
3   Q.   Do you recall doing that on meperidine?
4   A.   I don't recall doing that on meperidine.
5   Q.   Do you recall Roxane as a company doing that
6   type of analysis on meperidine?
7   A.   I don't.
8   Q.   Do you recall that -- that same type of
9   analysis going on with hydromorphone?
10  A.   Not clearly.  It's possible.
11  Q.   In your opinion is -- is -- what requirements
12  govern whether or not Roxane can raise its AWP?
13  A.   There are a -- there are numerous reasons we
14  could raise our AWP.
15  Q.   Like what?
16  A.   It depends on the situation and what drug we
17  are talking about.
18  Q.   Well, what types of considerations do you
19  take into account when you, for instance, were
20  participating in the decision to raise furosemide's
21  AWP?
22       MR. HAGENSWOLD:  Objection, form.
23  A.   I'm sorry, can you repeat that?
24  Q.   (BY MR. ANDERSON)  What types of
25  considerations are taken into account by you when you

1   are approving an AWP increase?
2           MR. HAGENSWOLD:  Objection, form.
3       A.  It would depend on a lot of factors.
4       Q.  (BY MR. ANDERSON)  Do you consider the
5   reliance of Medicaid programs upon AWP in setting the
6   reimbursement?
7       A.  No.
8       Q.  Do you consider the fact that third-party
9   reimbursers rely upon AWP in setting their
10  reimbursements?
11          MR. HAGENSWOLD:  Objection, form.
12      A.  Do I -- I'm sorry, say that again.
13      Q.  (BY MR. ANDERSON)  Do you consider the fact
14  in raising an AWP that third-party reimbursers are
15  relying upon AWP in setting their reimbursement?
16          MR. HAGENSWOLD:  Objection, form.
17      A.  I would not necessarily consider that when I
18  was changing my AWP.
19      Q.  (BY MR. ANDERSON)  Well, isn't it true that
20  the documents reflect that Roxane has raised AWPs to
21  increase reimbursement on its drugs?
22          MR. HAGENSWOLD:  Objection, form.
23      A.  I don't think that I would agree with that.
24      Q.  (BY MR. ANDERSON)  Is it true that in your
25  experience Roxane has raised the AWP on some products

Page 79

1   A.   The pleadings.
2   Q.   The filings, the lawsuit.
3   A.   I have seen some documents that have been
4   sent.
5   Q.   Do you know what the basic allegations of the
6   case are?
7   A.   I couldn't reiterate them, no.
8   Q.   Do you know how Roxane sets the AWP on its
9   sole source products?
10  A.   It would depend on the product.
11  Q.   How does Roxane set the AWP on propranolol?
12  A.   I would have to -- are you asking how -- I
13  guess I don't understand what you're looking for.
14  Q.   Well, you said it would depend on the
15  product.  What are some of the different types of
16  methods in setting an AWP on a product?
17          MR. HAGENSWOLD:  Objection, form.
18  A.   For a new launch product generally we set our
19  AWP at the brand AWP less 10 percent.  But that's not
20  necessarily always the case.  It would depend on -- it
21  would depend on the circumstances surrounding the
22  launch.  We might set different products' AWP
23  differently based on the reason that we were doing the
24  price change.
25  Q.   (BY MR. ANDERSON)  Have you ever heard of a

Page 94

1  yesterday).  They are now willing to remove our WAC
2  pricing from their database.  However, there are two
3  glitches she is researching.  They apparently get
4  questions from customers because some of our generics
5  (branded) publish WAC prices while others
6  (multisource) don't.  Did I read that correctly?
7      A.   Yes.
8      Q.   Can you explain why some of the products have
9  WACs published while others don't?
10      A.   Sure.  In -- in Roxane during that time we
11  had essentially two groups of products.  There was the
12  branded products, not all of the branded products, but
13  some of the branded products, that were represented by
14  a field sales force and a branded marketing arm.
15              And then there was the generics
16  multisource side, which is -- it's a little bit
17  confusing in that the multisource side has some
18  products that are branded, that have brand names on
19  them, but that we sell as we -- we consider them
20  generics or we consider them multisource products.  So
21  the branded side of the company was still publishing
22  WAC, to my knowledge, on their products, but we in the
23  generic side, the multisource side were not.
24      Q.   Would it be fair to say that these -- these
25  branded products that you continue to publish WAC for

1    A.    As a company?  Yes.
2    Q.    No.  Okay.  Do you personally do business
3  with CVS on behalf of Roxane?
4    A.    I do not generally meet with the people at
5  CVS directly, no.
6    Q.    Do you know of a woman by the name of Kate
7  Shattuck?
8    A.    No.
9    Q.    Back in '98 were you involved at all in the
10  WAC decrease?
11   A.    Not really.  That would have been prior to my
12  working for Judy.
13   Q.    Well, focusing on Exhibit 44 -- I mean,
14  pardon me, it's Exhibit 37, also known as 654, do
15  you -- do you recall that in essence you were trying
16  to have First DataBank remove old WAC pricing from
17  their database?
18   A.    Yes.
19   Q.    And the old WAC prices were obviously higher
20  than the prices after the decrease in March of '98,
21  correct?
22           MR. HAGENSWOLD:  Objection, form.
23   A.    I don't know that all of the prices were
24  decreased.  There were price changes and how each
25  individual product was in their system versus what the

Page 108

1  A.   I think it is.
2  Q.   And then flipping to the next page, is that
3  your handwriting on that page?
4  A.   I think so.
5  Q.   And on the -- that last page you've circled
6  the field WHLNET; is that right?
7  A.   It's circled.  I don't know who circled it.
8  Q.   What does WHLNET mean?
9  A.   I don't know.  I would have assumed in this
10 that that meant WAC.
11 Q.   Is WAC a net price?
12              MR. HAGENSWOLD:  Objection, form.
13 A.   WAC is the price that our -- that our
14 wholesalers pay for the product that we sell them.
15 What wholesale net is, I don't know how that would be
16 defined.
17 Q.   (BY MR. ANDERSON)  Look at the second to last
18 page.  Did you mark through that wholesale net price
19 for hydroxyurea?
20 A.   I'll assume so.
21 Q.   Did you go through the entire document titled
22 "National Drug Data File Product Update Report" most
23 likely and delete selected wholesale net prices on
24 Roxane products?
25              MR. HAGENSWOLD:  Objection, form.

Page 109

1   A.   I -- I don't recall in specific. I probably
2   did. If I did it on these, I probably did it for all
3   of the multisource products that I was responsible
4   for.
5   Q.   (BY MR. ANDERSON) Was that a type of process
6   you went through on a routine basis?
7   A.   Was what the type of process?
8   Q.   Reviewing the national drug data file annual
9   report?
10  A.   Yes.
11  Q.   So you knew what the prices were that were
12  being published by First DataBank, right?
13  A.   As I would get these I would review all of
14  the data on them for my products and make changes
15  where there were inaccuracies, notify them of
16  discontinue -- discontinuations if they still had them
17  listed as active. And in this case pulled off the --
18  the WAC price saying that it was not published.
19  Q.   Look at the first page. Up in the left-hand
20  corner. Do you see a phrase there starting with the
21  word "Verbal"?
22  A.   Yes.
23  Q.   What -- what does that read?
24  A.   "Verbal to Rowenhorst. No more email."
25  Q.   What did you mean by that note?

Page 147

1  within the last several months that generally in the
2  industry generics did not price their AWPs higher than
3  brand AWP less 10.  It was my understanding that that
4  was the case.
5      Q.   (BY MR. ANDERSON)  And is that so that they
6  would be designated as a generic and be eligible for a
7  generic substitution, for instance?
8      A.   That would be one of the reasons.
9      Q.   And that was a problem that you encountered
10 with Eckerd on prednisone, correct?
11     A.   A generic substitution for prednisone,
12 whatever that one SKU was, was an issue with -- with
13 regard to Eckerd, yes.  Yeah.
14     Q.   So do you think that that same rule about
15 having an AWP so high that it gets classified as a
16 brand is what was preventing this AWP increase from
17 happening on Exhibit 49?
18          MR. HAGENSWOLD:  Object to form.
19     Q.   (BY MR. ANDERSON)  If you know.
20     A.   It has just been our standard to set -- when
21 we set our AWPs our standard has typically been, with
22 a few exceptions, AWP of the brand less 10 percent to
23 set our AWP.  So if that was what they understood at
24 the time to be the case, then that's probably why
25 they're saying this.