# Exhibit 27

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

# Condensed Transcript

# Deposition of Roxane 30(b)(6) Judy Waterer

taken on
May 9, 10 and 11, 2007

**State of Alabama
v.
Abbott Laboratories, Inc., et al.**

**Case No. 2005-219**



**Certified Court Reporters and Certified Legal Video Specialists
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com**

Judy Waterer
May 9, 2007

Page 1

```
 1              IN THE CIRCUIT COURT OF
             MONTGOMERY COUNTY, ALABAMA
 2
    STATE OF ALABAMA,
 3        Plaintiff,
    vs.                CIVIL ACTION NO. 2005-219
 4  ABBOTT LABORATORIES, INC.,
    et al.,
 5        Defendants.
 6  ------------------------------------------
 7   IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
                 STATE OF HAWAII
 8
    STATE OF HAWAII,
 9        Plaintiff,
    vs.                CIVIL NO. 06-1-0720-04 EEH
10  ABBOTT LABORATORIES, INC.,
    et al.,
11        Defendants.
12  ------------------------------------------
13          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
14
    THE COMMONWEALTH OF MASSACHUSETTS,
15        Plaintiff,
    vs.                C.A. NO. 03-11865 PBS
16  MYLAN LABORATORIES, INC.,
    et al.,
17        Defendants.
18      *   *   *   *   *   *   *   *
19                  VOLUME I
20    The videotaped deposition of JUDY WATERER,
    VOLUME I, was taken before Cornelia J.
21  Baker, Certified Court Reporter and
    Certified Shorthand Reporter, as
22  Commissioner, on Wednesday, May 9, 2007,
    commencing at approximately 10:13 a.m., in
23  the law offices of Kirkland & Ellis, 153
    East 53rd Street, New York, New York
24  pursuant to the stipulations set forth
    herein.
25
```

```
                                                              Page 2
 1        *      *      *      *      *      *      *

 2                       APPEARANCES

 3

 4    Representing the State of Alabama:

 5             MR. CLINTON C. CARTER
               Attorney at Law
 6             Beasley, Allen, Crow, Methvin,
                  Portis & Miles, P.C.
 7             272 Commerce Street
               Montgomery, Alabama  36104
 8

 9    Representing the State of Massachusetts:

10             MR. RICHARD C. HEIDLAGE
               MR. ROBERT C. MOLVAR
11             Attorneys at Law
               The Commonwealth of Massachusetts
12             One Ashburton Place
               Boston, Massachusetts  02108
13

14    Representing the State of Hawaii:

15             MR. MICHAEL WINGET-HERNANDEZ
               Attorney at Law
16             Winget-Hernandez, L.L.C.
               3112 Windsor Road, #228
17             Austin, Texas  78703

18

19    Representing Roxane Laboratories, Inc:

20             MS. HELEN E. WITT
               Attorney at Law
21             Kirkland & Ellis, L.L.P.
               200 East Randolph Drive
22             Chicago, Illinois  60601

23

24

25
```

```
 1              A.   I believe so.  And again, we
 2   need to discuss price, not contract price.
 3              Q.   Is it fair to say that since
 4   1991, Roxane has reported prices to First
 5   DataBank?
 6              A.   I believe so.
 7              Q.   These prices reported to First
 8   DataBank are reported electronically,
 9   correct?
10              A.   I'm not sure.  In fact, I am
11   sure, because it -- well, it may be
12   electronic now.  In the '90s, we used to get
13   paper copies to go through and correct and
14   mail back, so it hasn't always been
15   electronic.
16              Q.   Tell me about this process in
17   the '90s where you got copies and you
18   corrected it and sent them back.
19              A.   The pricing compendia would
20   occasionally send us a voluminous report and
21   say, Please check this for accuracy.  And we
22   would go through and verify if their records
23   matched our records.  And if they didn't,
24   we'd cross it out and put in the correct
25   price, as we knew it, and send it back and
```

Page 63

```
 1    hope that they would adjust it.
 2             Q.   These voluminous reports would
 3    have the prices that Roxane reported,
 4    correct?
 5             A.   Yes -- well, it wasn't always
 6    accurate.  But more often than not, yes.
 7             Q.   And these third-party compendia
 8    would send the prices to Roxane and say,
 9    Roxane, verify these prices, tell us if
10    they're correct, and if they're incorrect,
11    change them accordingly; is that right?
12             A.   In the mid '90s, yes.
13             Q.   And Roxane would do that?
14             A.   Yes.
15             Q.   And you were a part of that
16    process?
17             A.   Indirectly, but yes.
18             Q.   Do you know if that
19    specifically happened with First DataBank?
20             A.   I don't remember which one sent
21    it.
22             Q.   Are you familiar with the term
23    "National Drug Data File"?
24             A.   No.
25             Q.   Why does Roxane report prices
```

```
 1    price change, correct?
 2              A.   Yes.
 3              Q.   In fact, the first line says,
 4    Effective March 16, 1998, Roxane
 5    Laboratories, Inc., will be announcing a
 6    broad-line Wholesaler Acquisition (WAC)
 7    change, correct?
 8              A.   Yes.
 9              Q.   Did Roxane make a corresponding
10    change to the AWP prices as well?
11              A.   In conjunction with this
12    particular change, I don't believe so.
13              Q.   Do you think it was appropriate
14    for Roxane to change the WAC and yet leave
15    the AWP the same?
16              MS. WITT:  Object to the form.
17              A.   I think the industry norm is to
18    keep the AWP consistent with the industry
19    norm, so they're unrelated.
20              Q.   And the main thrust between
21    changing the WAC price here was to bring it
22    in line with the WACs of competitors,
23    correct?
24              A.   No.
25              Q.   Well, what was the main thrust
```

Page 153

```
 1   this, we were looking for anyplace that we
 2   would have a significant negative impact to
 3   us.  And it was suggested that that be looked
 4   into.  We looked into it, and it was
 5   basically neutral or not a problem.
 6           Q.  And then on the next pages are
 7   the price listing themselves, correct?
 8           A.  Yes.
 9           Q.  There's a column that says,
10   Current Pricing and a column that says, New
11   Pricing, correct?
12           A.  Yes.
13           Q.  And I haven't looked at all of
14   them, but looks like generally the current
15   AWP price and the new AWP price are the same,
16   correct?
17           A.  I think so.
18               (Witness reviewed document.)
19           A.  Yes.
20           Q.  Do you know whether or not
21   Plaintiffs' Exhibit 7 was given to First
22   DataBank?
23           A.  They would not have had an
24   internal document.  And depending on when it
25   occurred, it may or may not have been
```

Judy Waterer
May 9, 2007

Page 154

1  reported.  We stopped reporting WAC around
2  this time.  So if I'm thinking it through,
3  they may not have gotten this, because this
4  was somewhere around the same time frame when
5  we stopped reporting WAC.  So I would guess
6  not.
7          Q.  It's very possible that these
8  WAC price changes were not reported at all to
9  the third-party compendia, correct?
10         A.  If this occurred after we made
11  a corporate decision to discontinue reporting
12  WAC pricing, we wouldn't have reported any
13  WAC changes to the pricing compendia,
14  correct.
15         Q.  And Roxane would not have
16  reported these WAC price changes directly to
17  state Medicaid agencies, correct?
18         A.  To the extent that it's the
19  three that we're talking about, I do not
20  believe that there were any communications
21  about WAC pricing, period.  So I don't think
22  that there would have been any reason to send
23  them something about WAC pricing.
24         Q.  It's your testimony on behalf
25  of Roxane that the WAC price changes

1   meant.
2           Q.  Well, let's forget what Anthony
3   meant for a second.  Interpret it for me on
4   behalf of Roxane, this term "lower our price
5   to meet the spread."
6           A.  I would have to assume that
7   they were looking for a lower bid price so
8   that our product would end up being equally
9   profitable to whoever else they were bidding
10  with.  And if our AWP was out of line with
11  our competitors, one way to do it might be to
12  lower our bid price.
13          Q.  And by meeting the spread,
14  could that mean the difference between what a
15  pharmacist paid for the drug and what the
16  pharmacist was reimbursed for by a state
17  Medicaid agency?
18          A.  I don't think it specifies any
19  agency in particular.  I would think any
20  reimburser whose program was tied to AWP in
21  some way could be impacted by that.
22          Q.  Which would include state
23  Medicaid agencies, correct?
24          A.  I, I am understanding that some
25  state Medicaid agencies in some cases tie to

```
 1   AWP.
 2          Q.  So the answer to my question is
 3   yes, correct?
 4          A.  With regard to the three here
 5   in particular, I'm not certain if they're
 6   AWP-driven or driven by something else.  So
 7   in a broad general sense, if someone is in
 8   a -- has a reimbursement plan that in some
 9   way is linked to AWP, the answer is yes.  But
10   I don't know which customers -- or I'm sorry,
11   which reimbursers that might be.
12          Q.  All right.  Let me show you
13   what I'm going to mark as Plaintiffs' Exhibit
14   10.  Take a second, please, ma'am, and tell
15   me if you recognize that.
16              (Whereupon Plaintiffs' Roxane
17               Waterer No. 10 was marked for
18               identification and attached
19               hereto.)
20              (Witness reviewed document.)
21          A.  No.
22          Q.  Who is Don Comston?
23          A.  Don Comston was in the finance
24   department at --
25          Q.  And I think you've told me
```

1  correct?
2          A.  Again, I'll have to say that is
3  not what AWP is, so of course, it wouldn't.
4          Q.  And Roxane did nothing to
5  communicate to the state Medicaid agencies
6  that there was a discount of 35 percent or
7  45 percent or 60 percent off of the reported
8  price, correct?
9          MS. WITT:  Object to the form.
10         A.  I don't believe that Roxane
11 reported any pricing to the three state
12 Medicaid groups that we're talking about.  So
13 I would have to say, yes, that's correct.
14         Q.  And whatever this discount
15 ended up being, 35 percent, 45 percent, 60
16 percent, that is a contractual discount that
17 Roxane tries to keep confidential, correct?
18         A.  Yes.
19         Q.  It's not something that's
20 publicly available, and it's not something
21 that the state Medicaid agencies could have
22 ever found out about, correct?
23         A.  I don't know about ever found
24 out about.  I would have to believe that --
25 we've had a general practice of cooperating

Page 213

1  reported WAC was for Roxane drugs from First
2  DataBank after you stopped reporting them,
3  and you said you thought First DataBank
4  reported WAC as a zero, but you weren't sure,
5  correct?
6            A.  I'd have to go back and put
7  that in context.  There was, to the best of
8  my recollection, quite a bit of going back
9  and forth with, I believe it was First
10 DataBank, over the fact that they were not
11 reporting it properly.  And we did our level
12 best to get them to report things accurately.
13           Q.  But, but this e-mail clearly
14 states that if you stopped supplying First
15 DataBank with WACs, that they would publish
16 the old WACs, correct?
17                MS. WITT:  Object to the form.
18           A.  She informed me that the states
19 would use the last published WACs.  So she
20 said the states will use the WAC -- the old
21 WAC, for Medicaid.
22           Q.  Right.  So Roxane knew back in
23 December of 1997 that even though they were
24 not reporting a WAC to First DataBank that
25 First DataBank was publishing the old WACs,

 1    and that state Medicaid agencies were relying
 2    on them, correct?
 3         A.   I didn't know what they were
 4    relying on them for.  It just says that they
 5    are going to continue to report that.
 6              I believe that the later
 7    documents show that we did our level best to
 8    try to have the pricing compendia report
 9    things -- or stop reporting inaccurate data.
10         Q.   Is it really your testimony
11    that Roxane didn't know that states used the
12    reported WAC for their reimbursement system?
13         A.   I didn't know a lot about
14    reimbursement of states.  It just -- Medicaid
15    was a very small percentage of our business.
16    And it -- to me, when somebody said Medicaid,
17    it meant the rebate that we had to pay.
18         Q.   Well, this e-mail is not
19    discussing rebates, is it?
20         A.   It just says that that's what's
21    going to get reported to Medicaid.  I don't
22    know what that means Medicaid's going to do
23    with it.
24         Q.   Well, sitting here today, you
25    understand that state Medicaid agencies, like

```
 1   Marinol, as a branded product, I would expect
 2   that they would take annual price increases
 3   consistent with the pharmaceutical CPI.
 4   However, I don't recall any specific
 5   knowledge of that occurring.
 6          Q.   Okay.  Well, as far as you
 7   personally, your personal knowledge, are you
 8   suggesting, as I think you are, that in the
 9   case of a branded product, the AWP is set
10   differently than the way that the AWP is set
11   in the generic world?
12          A.   I'm not sure what you mean by
13   that.
14          Q.   Can you tell me whether --
15   strike that.
16               Yesterday, I believe you
17   testified that for generic products,
18   typically the AWP is set at about 10 percent
19   of the brand product, correct?
20          A.   Yes.
21          Q.   And that it's not changed
22   thereafter except on the occasion when
23   there's a specific reason to change it?
24          A.   Yes.
25          Q.   Is that also true of the brand
```

```
 1   products, to your knowledge -- to your
 2   personal knowledge?
 3           A.  I believe that it's set.  And
 4   the specific reason for changing it is to
 5   take advantage of -- most companies on the
 6   brand side increased product prices
 7   consistent with the pharmaceutical CPI.  One
 8   of those prices would be AWP, so that would
 9   typically go up.
10           Q.  So in order to just
11   characterize the difference between the way
12   that AWP works on the generic side as opposed
13   to the brand side, would it be fair to say
14   that on the brand side, the AWP is expected
15   to go up on a regular basis, and on the
16   generic side, it's not expected to change
17   unless there's a reason to change it?
18           A.  I mean, I think we're splitting
19   hairs.  I think in both cases there's a
20   reason to change it.  And the reason that I'm
21   saying we're splitting hairs is, on the
22   generic side we take AWP as up when we have
23   an opportunity to participate in the CPI
24   going up.  And that can be routine in the
25   same way that it can be on the brand.
```