# Exhibit 30

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

```
1:1   NO. GV002327
  2    THE STATE OF TEXAS           ) IN THE DISTRICT COURT
  3   ex rel.                       ) VEN-A-CARE OF THE        )
  4       FLORIDA KEYS, INC.,       ) Plaintiff(s),       )
  5                                 ) VS.                      ) TRAVIS COUNTY, TEXAS
  6                                 ) DEY, INC.; ROXANE        )
  7   LABORATORIES, INC., WARRICK   ) PHARMACEUTICALS CORPORATION, )
  8   SCHERING CORPORATION,         ) SCHERING-PLOUGH CORPORATION, )
  9   LIPHA, S.A., MERCK-LIPHA,     ) S.A., MERCK, KGAA, and EMD   )
 10   PHARMACEUTICALS, INC.,        ) Defendant(s).      ) 53RD JUDICIAL DISTRICT
 11
 12       *****************************************
 13   ORAL AND VIDEOTAPED DEPOSITION OF
 14   MARK POPE
 15   April 14th, 2003
 16       *****************************************
 17       ORAL AND VIDEOTAPED DEPOSITION OF MARK POPE,
 18   produced as a witness at the instance of the
 19   Plaintiff(s), and duly sworn, was taken in the
 20   above-styled and numbered cause on April 14th, 2003,
 21   from 9:59 a.m. to 4:24 p.m., before Cynthia Vohlken,
 22   CSR in and for the State of Texas, reported by machine
 23   shorthand, at the Napa Valley Marriott Hotel, 3425
 24   Solano Avenue, Napa, California pursuant to the Texas
 25   Rules of Civil Procedure.
```

Pope, Mark - April 14, 2003 09:59:00 a.m.

```
2:1                A P P E A R A N C E S
  2   FOR THE PLAINTIFF(S):
  3         MR. RAYMOND C. WINTER MS. CYNTHIA O'KEEFFE
  4         Office of the Attorney General State of Texas
  5         Post Office Box 12548 Austin, Texas 78711-2548
  6
  7    FOR THE RELATOR:
  8    MR. JAMES JOSEPH BREEN
  9         The Breen Law Firm, P.A. P. O. Box 297470
 10         Pembroke Pines, Florida 33029-7470
 11
 12   FOR THE DEFENDANT(S) DEY, INC.:
 13         MR. DARRELL PRESCOTT Coudert Brothers, LLP
 14         1114 Avenue of the Americas New York, New York 10036-7703
 15
 16    FOR THE DEFENDANT ROXANE LABORATORIES, INC.:
 17    MR. R. ERIC HAGENSWOLD
 18         Scott, Douglass & McConnico, L.L.P. One American Center, Fifteenth Floor
 19         600 Congress Avenue Austin, Texas 78701
 20
 21    FOR THE DEFENDANTS WARRICK PHARMACEUTICALS
 22   CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
 23    MS. ELIZABETH E. MACK
 24         Locke Liddell & Sapp, LLP 2200 Ross Avenue, Suite 2200
 25         Dallas, Texas 75201-6776
```

Pope, Mark - April 14, 2003 09:59:00 a.m.

```
42:1   Q.   Who recruited you to go to work for Dey?
   2   A.   Duane Young.
   3   Q.   Who recruited you to go work for Roxane as a
   4   consultant?
   5   A.   It was either Tom Via or Ed Tupa.
   6   Q.   And -- and why would they recruit you?  Why
   7   you particularly?
   8   A.   Because I had -- well, probably because I had
   9   worked for Dey.  Dey was a competitor.
  10   Q.   So you had inside information about Dey?
  11   MR. HAGENSWOLD:  Object to form.
  12   A.   I had --
  13   Q.   (BY MR. BREEN)  Is that it?
  14   A.   I had knowledge of the business and was
  15   considered a professional in the business and --
  16   Q.   Did you ever get Roxane a -- a copy of Dey's
  17   contracts?
  18   A.   I don't think so.  I don't think I ever gave
  19   them a copy of any contracts.
  20   Q.   Did you ever represent you were going to try
  21   to get them a copy of Dey's contract?
  22   A.   I don't know, but I wouldn't think so.
  23   Q.   Why not?
  24   A.   Contracts are generally considered
  25   proprietary information.  I suspect that -- and also,
```

```
67:1   A.   I would just like to get through this.  I
  2    have a business to run.
  3    Q.   All right.  Let me show you what's been
  4    marked as Exhibit 641.  It's already been admitted or
  5    attached to depositions in this case.  Take a moment
  6    to look at it.  It purports to be a one-page memo or
  7    agenda dated January 24th, 1996.  And I'll ask if
  8    you've ever seen it before?
  9    A.   I suspect so.  I didn't realize I was doing
 10    consulting there in '96.  I thought it was '95.  Okay.
 11    Q.   And you'll note that -- have you ever seen
 12    this before?  That's my question.
 13    A.   I don't remember, but I see that my name
 14    is -- that they copied me on it, apparently.  I don't
 15    recall.
 16    Q.   And was it common knowledge that you were the
 17    former national sales manager at Dey Labs as this
 18    particular agenda seems to indicate?
 19    MR. HAGENSWOLD:  Object to form.
 20    Q.   (BY MR. BREEN)  Of those that worked at
 21    Roxane at the time?
 22    MR. HAGENSWOLD:  Object to form.
 23    A.   It said that -- yes, that's what it says
 24    here.
 25    Q.   (BY MR. BREEN)  And do you recall attending
```

```
68:1   any meetings with Tom Via, Ed Tupa, John Powers, Jerry
   2   Walsh --
   3   A.   Yes.
   4   Q.   -- in January of '96?
   5   A.   I don't recall if that was the exact date,
   6   but I do recall meetings there.
   7   Q.   And what was the purpose of -- of your going
   8   to -- your going to Roxane and doing consulting work
   9   in 1996?
  10   A.   They wanted to launch Ipratropium bromide and
  11   wanted to have a good outcome.
  12   Q.   And what -- what precisely do you recall they
  13   needed your services for in connection with launching
  14   Ipratropium bromide?
  15   A.   To help them have a successful launch,
  16   probably to understand a bit about the market and who
  17   the players may have been, stuff like that.
  18   Q.   And what knowledge did you have about who the
  19   players would have been?
  20   A.   You know, other than there is -- there were a
  21   list of probably homecare providers that was -- you
  22   could actually have gotten out of any chain drug store
  23   news, other people probably that were maybe applying
  24   for an ANDA on it.
  25   Q.   What's an ANDA?
```

```
117:1    MR. HAGENSWOLD:  Object to form.
   2     A.   No.  It's my understanding that the
   3     consideration was what do we do, how do we attack the
   4     market, what do homecare customers want, what do
   5     homecare customers tell us they have to have in order
   6     to do business with us.  The thing was basically
   7     driven by homecare pharmacies saying this is how we do
   8     business.  Companies then grapple with how do we do
   9     business with these guys.  That's the real game.
  10     Q.   (BY MR. BREEN)  All right.  So what were the
  11     homecare pharmacies telling you in terms of, as you've
  12     now stated, this is how we do business?
  13     A.   Things you've already read in my report.
  14     Simply that, you know, if spread is large we buy in
  15     spread.  Those are guys into making money.  This man
  16     knows it.  That's exactly how that game is played.
  17     That's what the large care home (sic) companies do,
  18     that's what the small homecare companies do.  They try
  19     to maximize their profitability.  Their profitability
  20     is based on what they -- what they pay for an item
  21     versus wholesale acquisition, in the middle is the
  22     spread.  That's it.
  23     Q.   And do you know of any way that Roxane was
  24     able to create a spread that did not involve reporting
  25     AWPs and WACs --
```

```
119:1   A.   I already did.
    2   MR. HAGENSWOLD:  He already answered.
    3   Q.   (BY MR. BREEN)  Other than reporting AWPs and
    4   WACs how was Roxane to, quote, create an attractive
    5   spread as -- as stated in this document?
    6   MR. HAGENSWOLD:  Object to form.
    7   A.   I don't know.  I don't know that they did
    8   because I don't know what they ended up doing because
    9   my work was done.
   10   MR. HAGENSWOLD:  Exactly.
   11   Q.   (BY MR. BREEN)  When you say your work was
   12   done, did your work include encouraging Roxane to set
   13   and report AWPs and WACs that would allow it to create
   14   an attractive spread?
   15   A.   I'm sure it did.
   16   Q.   Now, if you go to the next page --
   17   A.   That would have been the same answer to
   18   anybody in the business that understands the business.
   19   MS. MACK:  Objection, nonresponsive.
   20   Q.   (BY MR. BREEN)  If you go to the next page.
   21   "In a multi-source product launch, one of the most
   22   important keys to success is conversion from the brand
   23   to your first to market generic, as early as possible
   24   during your period of exclusivity.  Again, this is
   25   done through enticing the accounts with an increased
```