# Exhibit 32

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

# In The Matter Of:

## *THE STATE OF TEXAS ex rel. v. DEY, INC., ET AL.*

### THOMAS K. VIA
### April 2, 2003

---

**FREDERICKS-CARROLL REPORTING**
Court Reporting-Video Services-Litigation Support
7719 WOOD HOLLOW DRIVE, SUITE 156
Austin, TX  78731
(512) 477-9911    FAX: (512) 345-1417

Original File 30402TV.V1, 277 Pages
Min-U-Script® File ID: 3499400928

**Word Index included with this Min-U-Script®**

APR 1 7 2003

Page 1

CAUSE NO. GV002327

| | |
|---|---|
| THE STATE OF TEXAS ex rel. | ) IN THE DISTRICT COURT |
| [3] VEN-A-CARE OF THE FLORIDA KEYS, INC., | ) |
| [4] Plaintiffs, | ) |
| [5] VS. | ) TRAVIS COUNTY, TEXAS |
| [6] DEY, INC.; ROXANE LABORATORIES, INC.; WARRICK | ) |
| [7] PHARMACEUTICALS CORPORATION; SCHERING-PLOUGH CORPORATION; | ) |
| [8] SCHERING CORPORATION; LIPHA, S.A.; MERCK-LIPHA, S.A.; | ) |
| [9] MERCK, KGAA; AND EMD PHARMACEUTICALS, INC., | ) |
| [10] Defendants. | ) 53RD JUDICIAL DISTRICT |

[11]
        ORAL AND VIDEOTAPED DEPOSITION OF
[12]                THOMAS K. VIA
[13]              APRIL 2ND, 2003
[14]    ORAL AND VIDEOTAPED DEPOSITION OF
[15] THOMAS K. VIA, produced as a witness at the instance
[16] of the State of Texas and duly sworn, was taken in the
[17] above-styled and numbered cause on the 2nd of April,
[18] 2003, from 9:07 a.m. to 5:05 p.m., before
[19] Debra L. Sietsma, CSR in and for the State of Texas,
[20] reported by machine shorthand, at the offices of
[21] Vorys, Sater, Seymour & Pease, L.L.P., 2100 One
[22] Cleveland Center, Cleveland, Ohio, pursuant to the
[23] Texas Rules of Civil Procedure and the provisions as
[24] previously set forth.
[25]

Page 2

[1]                APPEARANCES
[2]
[3] FOR THE PLAINTIFF, STATE OF TEXAS:
[4]     MS. CYNTHIA O'KEEFFE
        Office of the Attorney General
[5]     State of Texas
        Post Office Box 12548
[6]     Austin, Texas 78711-2548
[7] FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]     MR. JARRETT ANDERSON
        Attorney at Law
[9]     2411 Hartford Road
        Austin, Texas 78703
[10]
    FOR DEFENDANT DEY, INC.:
[11]
    MS. LEILA R. PITTAWAY
[12]    Coudert Brothers
        1114 Avenue of the Americas
[13]    New York, New York 10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]    MR. R. ERIC HAGENSWOLD
        Scott, Douglass & McConnico, L.L.P.
[16]    One American Center, Fifteenth Floor
        600 Congress Avenue
[17]    Austin, Texas 78701
[18]       - and -
[19]    MR. PAUL J. COVAL
        Vorys, Sater, Seymour and Pease, L.L.P.
[20]    52 East Gay Street
        P.O. Box 1008
[21]    Columbus, Ohio 43216-1008
[22] FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
    SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[23]
        MR. JOHN P. MCDONALD
[24]    Locke Liddell & Sapp, L.L.P.
        2200 Ross Avenue, Suite 2200
[25]    Dallas, Texas 75201-6776

Page 121

[1] **Q:** And what would those markets have been?
[2] **A:** Hospital, retail and home health care.
[3] **Q:** Would wholesalers have been a market?
[4] **A:** I — I would kind of lump that in with
[5] retail.
[6] **Q:** Okay. Group purchasing organizations?
[7] **A:** I'd consider that hospital.
[8] **Q:** Okay. What about mail-order pharmacies
[9] and — mail-order pharmacies?
[10] **A:** That's not something that I was familiar
[11] with.
[12] **Q:** Would it be fair to say that Roxane had
[13] experience in all the markets except for home health
[14] care?
[15] **A:** Yes.
[16] **Q:** And did you understand that Dey Labs had
[17] experienced success with the home health care market?
[18] **A:** Yes.
[19] **Q:** Because Boehringer Ingelheim had explained
[20] that to you, correct?
[21] **A:** Yes.
[22] **Q:** And did Mark Pope indicate that he knew that
[23] as well?
[24] **A:** Yes.
[25] **Q:** And was one of the — was it your

Page 122

[1] understanding that one of the reasons Mark Pope was
[2] brought in as a consultant was because of his
[3] experience as an employee at Dey Labs?
[4] **A:** I don't know that that was the — the
[5] overriding factor. I don't know if that was a primary
[6] consideration.
[7] **Q:** You knew that it was a consideration, though,
[8] didn't you?
[9] **A:** I knew it was considered.
[10] **Q:** That he had been an employee of Dey Labs,
[11] correct?
[12] **A:** Yes.
[13] **Q:** And that he had experience in the home health
[14] care market that he attained at Dey Labs; is that
[15] correct?
[16] **MS. PITTAWAY:** Object as to form.
[17] **MR. HAGENSWOLD:** Object to form.
[18] **THE WITNESS:** Yes.
[19] **Q:** (BY MS. O'KEEFFE) Do you know — has
[20] Mr. Pope ever been married to an employee at Dey Labs?
[21] **MS. PITTAWAY:** Objection as to form.
[22] **THE WITNESS:** I have no way of knowing.
[23] **Q:** (BY MS. O'KEEFFE) Do you know whether or not
[24] Mr. Pope had attained any knowledge of the home health
[25] care market as an employee of any other drug

Page 123

[1] manufacturing company?
[2] **A:** No, I don't know.
[3] **Q:** What was your understanding of what Mr. Pope
[4] was supposed to do in his consulting services with
[5] Roxane?
[6] **A:** He was supposed to provide us with insight
[7] into the home health care market as well as provide
[8] introductions and entree into the key accounts of home
[9] health care.
[10] **Q:** Was he supposed to educate your company on
[11] how the home health — health care market worked?
[12] **MR. HAGENSWOLD:** Objection, form.
[13] **THE WITNESS:** It was primarily how best
[14] for us to sell product in the home health care market
[15] and who the key players were.
[16] **Q:** (BY MS. O'KEEFFE) Was one of his roles to
[17] tell you what the key players were interested in?
[18] **MS. PITTAWAY:** Objection, form.
[19] **THE WITNESS:** I don't — I don't recall.
[20] **Q:** (BY MS. O'KEEFFE) Did he give you
[21] information about what these key customers would look
[22] for in selecting a product to purchase?
[23] **A:** Yes.
[24] **Q:** And was that one of the purposes of him being
[25] retained as a consultant?

Page 124

[1] **MR. HAGENSWOLD:** Objection, form.
[2] **THE WITNESS:** Speculation on my part is
[3] "Yes."
[4] **Q:** (BY MS. O'KEEFFE) Did you meet with Ed Tupa
[5] before this meeting took place?
[6] **A:** I don't recall.
[7] Specific to this meeting, or just meet
[8] with him?
[9] **Q:** Specific to this meeting.
[10] **A:** I don't recall.
[11] **Q:** What did Ed Tupa tell you about why he
[12] selected Mark Pope as the consultant?
[13] **MR. HAGENSWOLD:** Objection, form.
[14] **THE WITNESS:** I don't recall specifics.
[15] **Q:** (BY MS. O'KEEFFE) In general what did he
[16] tell you?
[17] **A:** Speculation is — because I can't recall —
[18] is that we hired Mark because he knows the home care
[19] industry and he's going to provide us additional
[20] information so that we can market the product to home
[21] health care.
[22] **Q:** At this point in time was Mark Pope the sole
[23] source of information for you and the others from
[24] Roxane at this meeting about this particular market?
[25] **A:** No.

Page 141

[1] A: Yes.
[2] Q: — and those concerns —
[3] A: Yes.
[4] Q: — so that they could be your customer?
[5] A: Either be my customer or continue to be. I'm
[6] not sure what the time frame of my visit was.
[7] Q: And they became your customer?
[8] A: Yes.
[9] Q: So, obviously, you were able to convince the
[10] people at Apria that you would listen to their
[11] concerns and you would meet them, correct?
[12] A: They were comfortable that we would meet
[13] their concerns. I don't know if it was a direct
[14] result of my visit. Again, I wasn't sure when I
[15] visited. I'm not sure, I should say.
[16] Q: Now, with regard to the last bullet point on
[17] this document —
[18] A: Uh-huh.
[19] Q: — where it talks about reimbursement issues,
[20] were those issues Medicare and Medicaid reimbursement
[21] issues?
[22] MR. MCDONALD: Object to the form.
[23] MR. HAGENSWOLD: Object — object to the
[24] form.
[25] THE WITNESS: I'm not sure exactly what

Page 142

[1] they are. I — I know what I interpreted them to
[2] mean, but I don't know if that's what his intent was.
[3] Q: (BY MS. O'KEEFFE) Well, isn't it true that
[4] Apria would be concerned about how much they were
[5] reimbursed by third-party payers when they dispensed
[6] Roxane's Ipratropium bromide?
[7] MR. HAGENSWOLD: Object to form.
[8] THE WITNESS: I don't know what they
[9] would be concerned with.
[10] Q: (BY MS. O'KEEFFE) Wouldn't they be concerned
[11] whether or not they would make a profit when they were
[12] reimbursed by a third-party payer?
[13] MR. HAGENSWOLD: Object to form.
[14] MR. MCDONALD: Object to the form.
[15] THE WITNESS: I would assume, but I
[16] can't speak for them.
[17] Q: (BY MS. O'KEEFFE) You can't speak, as
[18] someone who had been selling to pharmacy customers for
[19] how many years at this point?
[20] A: When was this? '96? What, 13 years?
[21] Q: Okay.
[22] A: Yeah. I can't speak for what a customer is
[23] thinking or what their motivations are.
[24] Q: That doesn't concern you as a salesperson?
[25] MR. HAGENSWOLD: Object to form.

Page 143

[1] THE WITNESS: No. I mean not in the way
[2] that we're discussing this, no. Price isn't something
[3] that we try to sell on.
[4] Q: (BY MS. O'KEEFFE) In the generic business,
[5] price and profitability are of no concern to you in
[6] selling to your customer; is that correct?
[7] MR. HAGENSWOLD: Object to form.
[8] THE WITNESS: In some regard price is
[9] important, but one of the things that my thought
[10] process is always colored by is that I was a product
[11] manager for branded products and this was a new
[12] experience for me; so it wasn't my primary concern.
[13] Q: (BY MS. O'KEEFFE) Didn't Mr. Pope explain to
[14] you that, with regard to the home health care market,
[15] you needed to be concerned about profitability for the
[16] customer?
[17] MR. MCDONALD: Object to the form.
[18] THE WITNESS: I can't recall that he
[19] ever discussed profitability.
[20] Q: (BY MS. O'KEEFFE) Did he express to you that
[21] they were concerned — these home health care market
[22] customers were concerned about the bottom line?
[23] MR. MCDONALD: Object to the form.
[24] MR. HAGENSWOLD: Object to the form.
[25] THE WITNESS: I don't know that I've

Page 144

[1] ever heard Mr. Pope say "the bottom line."
[2] Q: (BY MS. O'KEEFFE) Well, what did he say they
[3] were concerned about?
[4] A: They were — they were concerned about the
[5] availability of product, about the packaging of the
[6] product. You know, I don't recall Mr. Pope talking
[7] much about pricing issues at all.
[8] Q: Well —
[9] A: And, again, that was an area that I didn't
[10] get involved in.
[11] Q: Well, with regard to this letter that is
[12] Exhibit 645 that you were copied on —
[13] A: Uh-huh.
[14] Q: — doesn't he indicate that Apria was
[15] concerned about reimbursement issues?
[16] A: Yes.
[17] MR. MCDONALD: Object to the form.
[18] MR. HAGENSWOLD: Object to the form.
[19] THE WITNESS: That is one of the
[20] highlights.
[21] Q: (BY MS. O'KEEFFE) And doesn't he also
[22] mention, in the middle of those bullet points or
[23] highlights, that the patient load is 60 percent
[24] Medicare?
[25] A: Yes.