1

# Exhibit 65

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

Carr-Hall, Colin                    December 12, 2008
                    Chicago, IL

Page 1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

---------------------------X

In re:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

---------------------------X

THIS DOCUMENT RELATES TO:     )  Judge Patti B. Saris

United States of America,     )

ex rel. Ven-A-Care of the     )  Magistrate Judge

Florida Keys, Inc., v.        )  Marianne B. Bowler

Boehringer Ingelheim Corp.,   )

et al., Civil Action No.      )

07-10248-PBS                  )

---------------------------X


     Videotaped Deposition of COLIN CARR-HALL,

at 219 South Dearborn Street, Chicago,

Illinois, commencing at 9:08 a.m. on Friday,

December 12, 2008, before Donna M. Kazaitis,

RPR, CSR No. 084-003145.

Carr-Hall, Colin                              December 12, 2008
                        Chicago, IL

1                    A P P E A R A N C E S

2


3      FOR THE UNITED STATES:

4


5                  U.S. DEPARTMENT OF JUSTICE

6                  CIVIL DIVISION

7                  BY:  MS. LAURIE A. OBEREMBT, ESQ.

8                  P.O. Box 261

9                  Ben Franklin Station

10                 Washington, D.C. 20044

11                 tel:  202.514.3345

12                 laurie.oberembt@usdoj.gov

13


14     FOR THE RELATOR VEN-A-CARE OF THE FLORIDA

15     KEYS, INC.:

16


17                 BERGER & MONTAGUE, P.C.

18                 BY:  MS. SHAUNA ITRI, ESQ.

19                 1622 Locust Street

20                 Philadelphia, Pennsylvania 19103-6305

21                 tel:  215.875.3000

22                 sitri@bm.net

Carr-Hall, Colin                                    December 12, 2008
                              Chicago, IL

1    DEA gives various narcotics or other drugs that
2    they want to have tighter control on.
3         Q.   Is that also known as a controlled
4    substance?
5         A.   Yes, it is.
6         Q.   Ipratropium Bromide?
7         A.   Yeah, Ipratropium Bromide is an
8    anticholinergic.
9         Q.   What does that mean in English?
10        A.   Sorry.
11             It's primarily for people who have
12    COPD, chronic obstructive pulmonary disease.
13        Q.   Oramorph SR, what does that do?
14        A.   Oramorph SR is a sustained release
15    morphine-based product.
16        Q.   Is that another controlled substance?
17        A.   Yeah.  I think Oramorph SR was another
18    controlled substance.
19        Q.   What does Roxanol do?
20        A.   Again, Roxanol is in the pain
21    management line.
22             So I guess regarding on the acuteness

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                        December 12, 2008
                    Chicago, IL

Page 121

1   important.

2       Q.   What's your understanding of why they

3   would have looked at that difference between the

4   contract price and the AWP?

5       A.   Contract prices and WAC prices and AWPs

6   are commonly listed prices in our pricing

7   communications.

8            So she could have looked at the AWP

9   again as a reference point to however she's

10  reimbursed.

11      Q.   Well, was it your understanding at this

12  time that this customer would have been

13  reimbursed by, let's say Medicaid program, some

14  Medicaid programs, based on that AWP?

15      A.   I had no knowledge of the mix of

16  business and payors for Safeway/Vons.

17      Q.   Is Safeway/Vons a national company?

18      A.   It's a national company, yes.

19      Q.   Did you understand at the time that

20  they were also a Medicaid provider?

21      A.   It wasn't something that came up in our

22  conversations.  If you had asked me do they

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 122

1    service Medicaid patients, yes.

2         Q.   Do you know whether or not Mr. Feldman

3    approved your proposal to pay $400,000 to

4    Safeway/Vons in order to get the business?

5              MS. EATHERTON:  Objection,

6    mischaracterizes prior testimony.

7              MS. OBEREMBT:  No, actually it doesn't.

8    But you can answer the question.

9              THE WITNESS:  I don't remember whether

10   he approved or not.  I remember we did not get

11   the business.

12   BY MS. OBEREMBT:

13        Q.   Do you remember any conversation with

14   him about this?

15        A.   I don't.

16             I see here, you know, references to

17   Maui, and I think I was there at a sales meeting.

18             But no, I really don't recall a direct

19   conversation with Rich about securing this

20   business.

21        Q.   Did you get in trouble for not securing

22   this business?

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                    Chicago, IL

Page 128

1   what's your understanding of why Ms. Waterer

2   would have sent you this e-mail?

3        A.    Probably because it was related to

4   Bergen.

5        Q.    Is Mary Lowe here discussing a spread?

6        A.    Within the AWP and WAC, there is a

7   spread that's listed.

8        Q.    Does the text of the e-mail state that

9   she's going to tell someone about the larger

10  spread the next time she talks to him?

11       A.    The text states "Will tell him about

12  the larger spread next time I talk to him."

13       Q.    Does it appear to you that she's

14  talking about discussing this with the

15  pharmacist?

16       A.    She states prior to that "Pharmacy was

17  on auto sub."

18             So that would lead me to believe, yes.

19       Q.    Have you ever heard of the term

20  "spread" in the pharmaceutical context?

21       A.    I've heard the term "spread" in the

22  pharmaceutical context.

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                                December 12, 2008
                          Chicago, IL

1        A.    -- would be worth noting here.

2        Q.    Sure.

3        A.    The pharmacist says he's frustrated

4    that every month or so he gets a different

5    product from Bergen.

6              Do you know what that means?  It means

7    that when there are a number of generics out

8    there available and that pharmacist is getting

9    different products, he's getting different sizes

10   and colors of tablets because there's different

11   generic competitors out there.

12             And patients, that tends to bring

13   questions from patients because they think

14   they're getting a different medication, when

15   they're getting the same.

16             That's pretty important to note that

17   that's a key benefit, if you say with one

18   recognized product you get consistency there.

19       Q.    Thank you.  That was helpful to clarify

20   that.

21             It sounds as if though that the person

22   who wrote the e-mail, Mary Lowe, was going to go

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 134

1    talk to him mainly about the spread the next

2    time, not about the benefits of having one

3    particular drug.

4              Is that a fair interpretation of the e-

5    mail?

6         A.   It's a fair interpretation that that

7    was going to be part of her conversation, that he

8    was frustrated.

9         Q.   And that the other part of the

10   conversation was going to be about spread; is

11   that right?

12        A.   Part of that conversation would be

13   about spread.

14             MS. OBEREMBT:  I'd like the Court

15   Reporter to mark as Exhibit No. 8 an e-mail chain

16   that is dated March 12, 1999, at the top.  And

17   the Bates numbers are ROX037-4711 through 4713.

18             (Deposition Exhibit Carr-Hall 008

19   was marked for identification.)

20   BY MS. OBEREMBT:

21        Q.   Mr. Carr-Hall, let me know when you've

22   finished reading the e-mail.  (Document tendered

Carr-Hall, Colin                         December 12, 2008
                        Chicago, IL

Page 151

1              A F T E R N O O N   S E S S I O N

2

3              THE VIDEOGRAPHER:  We are back on the

4    record at 1:25 p.m.

5

6                   COLIN CARR-HALL,

7    having been previously duly sworn, was examined

8    and testified further as follows:

9

10                  EXAMINATION (Continuing)

11   BY MS. OBEREMBT:

12        Q.   Mr. Carr-Hall, do you understand that

13   you're still under oath here?

14        A.   I do.

15        Q.   We're going to focus on Oramorph and

16   your activities with respect to Oramorph.

17             Could you remind me again, is Oramorph

18   one of the pain killing products?

19        A.   Oramorph is one of the pain killing

20   products.

21        Q.   Who was Roxane's main competition in

22   selling Oramorph?

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                                December 12, 2008
                          Chicago, IL

Page 152

1        A.    MS Contin.

2        Q.    Who makes MS Contin?

3        A.    Perdue Frederick.

4        Q.    Was that a pretty intense competition

5   between the two companies with regard to selling

6   the drug?

7        A.    I view all competition as intense.

8        Q.    So you'd say that the competition

9   between Roxane and Perdue Frederick was intense

10  competition for the sale of the drug?

11       A.    Yes.

12       Q.    Was MS Contin the brand drug in the

13  competition?

14       A.    MS Contin is a brand name drug, yes.

15       Q.    Was Oramorph a generic drug?

16       A.    That's where I'm not sure.  It could be

17  a branded generic or it might just be considered

18  a brand.

19             I'm not certain on that designation.

20       Q.    I think you said before that Bergen

21  Brunswig was one of your customers; is that

22  right?

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                        December 12, 2008
                        Chicago, IL

Page 169

1      Q.   Is it logical to assume that RDs does

2  refer to individuals who were going to be selling

3  to retail pharmacies?

4      A.   It is logical to assume that, yes.

5      Q.   Is that what you would assume from

6  reading your own write-up here?

7      A.   Yes.  From reading this, yes.

8      Q.   What do you mean when you say "I am

9  providing targeting lists for Prescription For

10 Profit members"?

11     A.   Prescription For Profit members are

12 retail pharmacies who are in the program.

13          So since they're involved in that

14 program, I'm making the district manager and the

15 sales reps aware of that.

16     Q.   So you're trying to assist their

17 selling efforts in connection with Oramorph SR

18 with retail pharmacies; is that right?

19     A.   That sounds correct.

20     Q.   Well, do you think it is correct?

21     A.   Yes, that's correct.

22          MS. OBEREMBT:  I'd like to mark as

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 170

1    Exhibit 16 a document entitled National Accounts

2    Monthly Report May 1998, and the Bates number is

3    ROX057-1006 through 1015.

4                    (Deposition Exhibit Carr-Hall 016

5    was marked for identification.)

6    BY MS. OBEREMBT:

7        Q.    Does this appear to be another one of

8    these monthly reports that we discussed earlier?

9    (Document tendered to the witness.)

10       A.    Yes.

11       Q.    Would you turn to Bates Page 1011, also

12   known as 19716?

13            Do you see an entry with your name

14   underneath the Wholesale category?

15       A.    I see two entries.

16       Q.    Do you see an entry with your name that

17   has the word Bergen after your name?

18       A.    I do.

19       Q.    Could you read that to yourself,

20   please?

21            Is there a reference to a Sharon Storck

22   in your write-up here?

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

1       A.    There is.

2       Q.    Who is Sharon Storck?

3       A.    I vaguely remember she's in inside

4    sales or telemarketing.

5       Q.    What is inside sales or telemarketing?

6       A.    It was a group of folks used to follow

7    up with pharmacy accounts that our sales force

8    couldn't necessarily reach because we were so

9    small and there are so many pharmacies.

10           And they may have had a host of other

11   responsibilities as well.

12      Q.    But as far as you know, they did try to

13   sell to retail pharmacies; is that right?

14      A.    They created awareness, yes.

15      Q.    Is creating awareness trying to sell --

16      A.    I'm sorry.  Yes, creating awareness,

17   trying to sell.

18      Q.    And it's trying to sell Roxane's

19   products; right?

20      A.    Yes.

21      Q.    The last sentence there refers to you

22   forwarding a "full package of membership and

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                           December 12, 2008
                        Chicago, IL

                                                    Page 172

 1    contract pricing/AWP spread benefits for inside

 2    sales to capitalize on"; is that right?

 3         A.    According to this, that is correct.

 4         Q.    What does that mean?

 5         A.    That, again, I would assume we're

 6    talking about Prescription For Profit members,

 7    and it was to call those members to let them know

 8    that contract prices were loaded into their

 9    program and that there are spread benefits for

10    them that they could capitalize on.

11         Q.    By "spread benefits" did you mean that

12    there was a difference between the AWP and the

13    contract price and the customer would make more

14    money if they used the Oramorph drug as opposed

15    to a competitor's drug?

16         A.    That's my understanding, that with a

17    contract price and AWP that's what the spread

18    would equate to.

19         Q.    Would it be your assumption that Sharon

20    Storck used the package that you forwarded in her

21    inside sales?

22         A.    If she carried through with this

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 173

1   initiative, yes.

2        Q.   Would you have expected her to carry

3   through with this initiative?

4        A.   Yes.

5             MS. OBEREMBT:   I'd like to mark as

6   Exhibit 17 a document entitled National Accounts

7   Monthly Report June 1998, and the Bates number is

8   BOEH01046677 through 46685.

9             (Deposition Exhibit Carr-Hall 017

10  was marked for identification.)

11  BY MS. OBEREMBT:

12       Q.   Does this appear to be another one of

13  the monthly reports that we discussed?   (Document

14  tendered to the witness.)

15       A.   Yes, it does.

16       Q.   Would you turn to Page 682, also known

17  as 19348, please?

18       A.   Yes.

19       Q.   Do you see your name under the

20  Wholesale category with the word Bergen next to

21  it?

22       A.   Yes, I do.

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 174

1        Q.   Why don't you take a minute and read

2    that, please.

3             Does it appear that you followed

4    through on the plan that you had sketched out in

5    your May 1998 report as to putting together a

6    package?

7        A.   As to putting together a package, it

8    does.

9        Q.   Did the package include a "spread

10   analysis grid of the incremental profit

11   pharmacists can realize if they are paying WAC

12   for MS Contin"?

13       A.   That's what it states here.

14       Q.   Do you believe that's what you would

15   have done based on your earlier testimony that

16   you typically provided accurate information in

17   these reports?

18       A.   Yes.

19       Q.   Now, it appears there was a glitch with

20   the inside sales effort; is that right?

21       A.   It looks like it, yes.

22       Q.   Does it appear that the inside sales

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                          Chicago, IL

Page 175

1    folks weren't going to be promoting Oramorph SR?

2         A.   Correct.

3         Q.   So what did you do instead?

4         A.   Reading this, I rolled it out to Glen

5    Burkett, who I earlier mentioned was a district

6    sales manager, for his people to use.  That would

7    be then making physical calls versus

8    telemarketing.

9         Q.   Was he a district manager or a regional

10   manager?

11        A.   I think he was a district manager.

12        Q.   But the idea was that his salespeople

13   were going to be calling on retail pharmacies

14   using the spread analysis grid that you had put

15   together; is that right?

16        A.   That's what the intent when I rolled

17   this out to Glen was.

18        Q.   And is it your expectation that his

19   salespeople would have used what you had

20   provided?

21        A.   It is my expectation, yes.

22        Q.   And the purpose of the spread analysis

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                      December 12, 2008
                    Chicago, IL

Page 176

1    here was to show the pharmacists that they could

2    make more money supplying the Oramorph than they

3    could supplying the competitor's drug; is that

4    right?

5           A.   Yes.

6                MS. OBEREMBT:   I'd like to mark as

7    Exhibit 18 a National Accounts Monthly Report

8    dated September 1998 with a Bates number of

9    BOEH01050859 through 581100.  Let me correct

10   that.  It's through 50859 through 51882.

11               (Deposition Exhibit Carr-Hall 018

12   was marked for identification.)

13   BY MS. OBEREMBT:

14          Q.   Does this appear to be another monthly

15   national accounts report?  (Document tendered to

16   the witness.)

17          A.   Yes, it does.

18          Q.   Could you turn to Bates Page 1050863,

19   please?

20               Do you see an entry under the subtitle

21   Wholesale with your name followed by Bergen?

22          A.   Several entries.

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 206

1   you did sell Azathioprine as part of the products

2   you sold?

3        A.   Azathioprine was part of the products I

4   sold.

5        Q.   Do you ever remember anybody at Roxane

6   raising an issue with Azathioprine AWPs that they

7   were too low in comparison to the competition's

8   AWPs?

9        A.   I don't recall an issue being raised.

10            You know, I might have seen from

11   yesterday, I might have seen a document around

12   that.

13        Q.   Let's go over the documents and see --

14        A.   Okay.

15        Q.   -- what they mean and what you recall.

16            MS. OBEREMBT:  I'd like to mark as

17   Exhibit No. 26 a National Accounts Monthly Report

18   dated December 1998, and the Bates is

19   BOEH01046832 - 46837.

20                 (Deposition Exhibit Carr-Hall 026

21   was marked for identification.)

22   BY MS. OBEREMBT:

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                        Chicago, IL

Page 207

1    Q.   Does this appear to be another one of

2  these monthly reports for national accounts?

3  (Document tendered to the witness.)

4    A.   It does.

5    Q.   Would you look at the entry under Penny

6  Hawthorne's name on the first page of Exhibit 26?

7    A.   Uh-huh.

8    Q.   Do you see a reference in parentheses

9  there to Sykora?

10   A.   I do.

11   Q.   Did Mr. Sykora sometimes add comments

12 to what a national account manager was reporting

13 in on the monthly report?

14   A.   According to this, I would say that

15 yes, he did in this instance.

16   Q.   So you assume that's what that means

17 there, the reference to Sykora and then the

18 comment that follows that, that that's a comment

19 made by Mr. Sykora on the report?

20   A.   Yes.

21   Q.   How do you interpret the comment that

22 he's making here?

Carr-Hall, Colin                           December 12, 2008
                        Chicago, IL

Page 208

1      A.    Okay.   So from what he's gathering,

2   there are the two most common complaints, a lower

3   than usual generic substitution rate.   So that

4   he's talking about from the brand, and, again, I

5   think it's Imuran, from the brand to

6   Azathioprine.   And too small a spread between AWP

7   and price on Azathioprine and too small a spread

8   between Imuran WAC and Azathioprine WAC.   Okay.

9      Q.    So the first spread he's referring to

10  is the difference between reimbursement based on

11  AWP and the actual price a pharmacy pays; is that

12  right?

13     A.    Yes, small spread between AWP and price

14  on Azathioprine.

15          MS. OBEREMBT:   I'd like to mark as

16  Exhibit No. 27 a series of pages Bates marked

17  ROX064-5213, ROX035-0728, and ROX035-0729.

18               (Deposition Exhibit Carr-Hall 027

19  was marked for identification.)

20  BY MS. OBEREMBT:

21     Q.    Let me know when you're done looking

22  through the exhibit.   (Document tendered to the

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                           December 12, 2008
                          Chicago, IL

Page 241

1    sales price.  It's something that I've never

2    referenced.

3         Q.   Can you go in and access average

4    contract price on a product you're selling?

5         A.   I now can go in, I can't access an

6    average contract price, but I can now go in and

7    see certain prices for certain contracts for

8    certain buying groups.

9              MS. EATHERTON:  I just want to object

10   for the record to any questions about BIPI's

11   particular practices because it's Roxane's

12   practices and drugs that are at issue in this

13   case.

14             So I just want to put that on the

15   record.

16   BY MS. OBEREMBT:

17        Q.   Why don't we go back.

18             You said that you began working for

19   BIPI in December of 2000; is that right?

20        A.   I transitioned from Roxane to the

21   Boehringer sales force.

22        Q.   What prompted that?

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                                December 12, 2008
                        Chicago, IL

1       A.    I didn't want to work for the person

2  who would be my new boss at Roxane.

3       Q.    Who was that going to be?

4       A.    Karen Strayla.

5       Q.    And why was she going to be your new

6  boss at Roxane?

7       A.    Because Bob Sykora was moving over to

8  BIPI, and that created an opening.

9       Q.    So what did you do?

10       A.    I approached my boss or my boss' boss,

11  Rich Feldman, and let him know of my desire to

12  move to Boehringer.

13       Q.    And what position did you take with

14  BIPI?

15       A.    National account director.

16       Q.    Did you keep the same accounts you had

17  before?

18       A.    Most of them.  There were some changes.

19       Q.    Were you selling the same drugs you

20  were selling before?

21       A.    No.  The Roxane products were of course

22  not on.  So I didn't promote Roxane products.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                        December 12, 2008
                    Chicago, IL

Page 247

1    acronym I believe is called Committed Provider

2    Services.

3         Q.   Was this a document that was drafted by

4    you?

5         A.   I would say yes.

6         Q.   Would you turn to Page 3 of the

7    document, which is Bates Page 1046411?

8         A.   I'm there.

9         Q.   Do you see the reference to Medicaid

10   reimbursement?

11        A.   "What are the potential Medicaid and

12   other ramifications for having a single multi-

13   source price for all trade classes."

14        Q.   And also do you see above that the

15   reference to Medicaid reimbursement?

16        A.   "Are we in all state Medicaid

17   programs."

18        Q.   Right.

19             Was that important to Roxane, to have

20   its drugs be covered by state Medicaid programs?

21        A.   I would say that it would be important.

22             I don't know about all state Medicaid

9b4d0c83-ac9a-46c6-a86d-ad6891fb33d1

Carr-Hall, Colin                          December 12, 2008
                    Chicago, IL

Page 248

1    programs, but Medicaid was a component of the

2    payors.

3         Q.    So Roxane wanted to have its drugs

4    included for coverage in the Medicaid programs.

5    Is that fair to say

6         A.    That's fair to say.

7         Q.    And does the same hold true for having

8    their drugs, to the extent it was possible, be

9    covered by the Medicare program?

10         A.    That's fair to say.

11         Q.    Did you ever create something called

12    the C2 organizer?

13         A.    Yes, I did.

14         Q.    And what is that?

15         A.    What that was was that DEA narcotic

16    forms need to be filled out when you're ordering

17    Class II drugs.

18              So other than just sending a purchase

19    order, you couldn't do that, you had to also fill

20    out this special form as a wholesaler, and it

21    goes actually as well down the chain when a

22    pharmacy buys Class II drugs they also have to