1

# Exhibit 66

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment



*experience does matter*

## CASE:  In Re: Pharmaceutical Industry Average Wholesale Price Litiagation
## DATE:  December 9, 2008

Enclosed is the Original of the transcript of the testimony of **Deborah B. Kutner** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services


Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Page 1

```
              UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS

------------------------------X

In Re:  PHARMACEUTICAL         )

INDUSTRY AVERAGE WHOLESALE     )  MDL No. 1456

PRICE LITIGATION               )  Civil Action No.

------------------------------X  01-12257-PBS

THIS DOCUMENT RELATES TO:      )

United States of America ex    )

rel. Ven-a-Care of the         )

Florida Keys, Inc., et al.     )

v. Boehringer Ingelheim        )

Corp., et al., Civil Action    )

No. 07-10248-PBS               )

------------------------------X

     (CROSS-CAPTIONS APPEAR ON FOLLOWING PAGE)


           VIDEOTAPED DEPOSITION OF:

              DEBORAH B. KUTNER

           Tuesday, December 9, 2008

              New York, New York
```

Page 2

1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND
2                   FOR LEON COUNTY, FLORIDA
3    --------------------------------X
4    THE STATE OF FLORIDA, ex rel. )  Civil Action No.
5    VEN-A-CARE OF THE FLORIDA      )     98-3032A
6    KEYS, INC.                     )
7         v.                        )
8    BOEHRINGER INGELHEIM           )
9    CORPORATION, et al.,           )
10   --------------------------------X
11        Videotaped Deposition of DEBORAH B. KUTNER,
12   taken in the above-entitled matter before RICH
13   GERMOSEN, Certified Court Reporter, (License No.
14   30XI00184700), Certified Realtime Court Reporter-NJ,
15   (License No. 30XR00016800), NCRA Registered
16   Professional Reporter, NCRA Certified Realtime
17   Reporter, Certified LiveNote Reporter, and a Notary
18   Public within and for the States of New York and New
19   Jersey, taken at the offices of United States
20   Attorney's Office, 86 Chambers Street, 3rd Floor,
21   New York, New York  10007, on Tuesday, December 9,
22   2008, commencing at 9:06 a.m.

Page 15

1    resets.  I was with the McNeil division.
2         Q.   What is a reset?
3         A.   A reset is when you go into a
4    supermarket and they re-do a planogram.
5         Q.   Do you remember who hired you at Roxane
6    Laboratories?
7         A.   Yes, I do.
8         Q.   Who was that?
9         A.   Chris Boneham and then Rich Feldman.
10        Q.   What position were you hired for?
11        A.   Key account.
12        Q.   How long did you serve as a key account
13   represent -- is it key account representative?
14        A.   Yes, I was a key account rep, oh, I
15   would say maybe a year, year and a half and then
16   our titles had changed to national account
17   managers and now has since changed again to
18   national account director.
19        Q.   You say the titles changed.
20             When you became a national account
21   manager, was that a change in your position or
22   was it just a change in the title?

Kutner, Deborah B.                                        December 9, 2008
                            New York, NY

Page 16

1    A.   A change in the title.  Same
2    responsibilities.
3    Q.   Same responsibilities.  Wasn't a
4    promotion?
5    A.   No.
6    Q.   And after a national account manager
7    what was it called?
8    A.   National account director.
9    Q.   And is that change the same, just the
10   change in title?
11   A.   Yes, it is.
12   Q.   So you've been in the same general
13   position at Roxane?
14   A.   I have been in the same --
15           MS. CASAZZA:  Just let him finish the
16   question.
17           THE WITNESS:  Oh, I'm sorry.
18           MS. CASAZZA:  Just let him finish the
19   question.
20           THE WITNESS:  Okay.
21           MR. FAUCI:  Thank you.
22   BY MR. FAUCI:

1    Q.   You've been in the same position at
2  Roxane since 1997?
3    A.   That is correct.
4    Q.   Can you describe in general the
5  business of Roxane circa 1997?  By business I
6  mean among other things the types of products the
7  company was marketing and/or selling?
8         MS. CASAZZA:  Objection to form.
9    Q.   You can answer.
10   A.   We had an extensive product line.
11        Would you like me to name some of the
12 products?
13   Q.   Sure.
14   A.   Back then in 1997 some of the products
15 were Hydroxyurea, Furosemide, Prednisone,
16 Azathioprine.
17        COURT REPORTER:  Nizathioprine?
18        THE WITNESS:  Aza, A-z-a.
19        Would you like me to spell that for
20 you?
21        COURT REPORTER:  Maybe later.
22        THE WITNESS:  Okay.

Page 111

1    A.    '97.
2    Q.    What month?
3    A.    October 13th.
4    Q.    And do you have a recollection of how
5    long you were a key account representative?
6    A.    It could have been three, four years.
7    I don't know.
8    Q.    Let's look at this E-mail.
9          Mr. Tavolaro writes, Judy, could you
10   give me an update on the proposed AWP change for
11   Azathioprine?  Our AWP is lower than Geneva's and
12   I have a mail order pharmacy asking us to raise
13   the AWP or lower our price to meet the spread.
14         Did I read that correctly?
15   A.    Yes.
16   Q.    What does it mean to meet the spread?
17   A.    I would think you would have to ask
18   Anthony those questions.  I didn't write this E-
19   mail.
20   Q.    I know, but I'm asking you here today.
21   A.    I can't make a comment on it.
22   Q.    You've been a national account manager

Page 112

1    or its equivalent for ten years, Ms. Kutner?
2         A.   Yes.
3         Q.   I'm asking you not what Anthony
4    thought, but what do you think it means to meet
5    the spread in this E-mail?
6         A.   I would -- again maybe the difference
7    between the AWP and the WAC pricing, and that's
8    my best answer.
9         Q.   Does this refresh your recollection as
10   to whether Roxane's AWP was lower than Geneva's
11   AWP?
12        A.   Apparently it was.
13        Q.   It seems Mr. Tavolaro is saying that
14   the pharmacy asked to do one of two things, to
15   raise the AWP or lower the price.
16        A.   (Reviews.)
17        Q.   Do you see that?
18        A.   Yes, I do.
19        Q.   And the spread can be increased by
20   raising the AWP, is that correct?
21        A.   I -- that could be correct.
22        Q.   But the spread could also be increased

Kutner, Deborah B.                                      December 9, 2008
                              New York, NY

Page 113

1   by lowering your price, the contract price?
2        A.   Yes.
3        Q.   And so if the spread is the profit to
4   the pharmacy, Roxane could increase that by
5   either lowering the pricing it sold to the
6   pharmacist or raising its AWP, is that right?
7             MS. CASAZZA:  Objection to form.
8        A.   You know, I don't -- again not dealing
9   with the AWP and the spread and I didn't write
10  this E-mail, I think you should, you know,
11  address these questions to Anthony and not me
12  because I didn't write it and I don't get
13  involved and never have asked for an AWP to be
14  raised and I don't discuss spread.
15       Q.   I'm not -- no one is suggesting that
16  you asked for an AWP to be raised.
17            The question here is what do you as a
18  national accounts manager with ten years
19  experience understand Mr. Tavolaro to be talking
20  about?
21            Let me ask another question.
22            It was your job to try and promote

Kutner, Deborah B.  December 9, 2008
New York, NY

Page 116

1  that Mr. Russillo would, would report to at
2  Roxane.
3  BY MR. FAUCI:
4      Q.   Mr. Russillo writes, go ahead and
5  implement the one hundred and thirty-one dollar
6  point zero eight and one hundred and forty-four
7  dollars and eighteen cents AWP change.
8      A.   (Reviews.)
9      Q.   Do you see that?
10     A.   Yes.
11     Q.   Does this refresh your recollection
12  about whether Roxane raised its AWPs for
13  Azathioprine?
14     A.   It's possible that they did, but again
15  not ever seeing this document and not being, not
16  ever sitting in on any meeting, on any meeting
17  that they have with the raise of AWP that I
18  really can't comment.
19     Q.   Directing your attention back to
20  Exhibit 12, I believe this is the document in
21  which you notified a customer of a reduction in
22  the contract price for Azathioprine?

Page 117

1   A.   Yes.

2   Q.   Is that correct?

3   A.   Yes.

4   Q.   Does it strike you as strange that
5   Roxane would raise its AWP for a product at the
6   same time that its sales price for the product
7   was declining?

8        MS. CASAZZA:   Objection to form.

9   A.   Again, we met a competitive offer from
10  Geneva I believe, and that's why the net price,
11  there was a new net price, and I don't have any
12  involvement in the AWP.  I see the AWP is one
13  price and they were raising it.  That's a
14  management decision which I am not privy to.

15  Q.   Can you think of any business reason
16  why the AWP would be increased at a time when the
17  actual price of the product was declining?

18  A.   The price declines when there is
19  competitive competition.  Again, it's a
20  management decision to increase the AWP and not
21  mine.

22  Q.   I believe my question was can you think

Page 118

1  of a legitimate business reason why it would make
2  sense to raise the AWP at a time when the prices
3  were declining?
4      A.   From what I can see and the information
5  that I have, maybe they were just getting closer
6  to Geneva's AWP.
7      Q.   Why would they want to do that?
8      A.   So it would be priced the same.
9      Q.   And what would the real world
10 implications of that be?
11          MS. CASAZZA:  Objection to form.
12     A.   Again, I didn't make that decision, so
13 I don't know.
14     Q.   I understand you didn't make the
15 decision.
16          My question is --
17     A.   I can't speculate.
18     Q.   You can't speculate as to whether or
19 not the AWP increase would have an impact on the
20 product's profitability to pharmacies?
21     A.   Because I did not make that decision I,
22 I -- again, I can't speculate on why they did it.

Page 119

1    Q.   No one is accusing you or suggesting
2  you made the decision.
3         I'm asking you for, what the decision
4  meant on the ground for you as a national
5  accounts representative responsible for selling
6  Roxane's products.
7         Was it true that raising the AWP would
8  make the products more profitable to the
9  pharmacies?
10   A.   That could be.  That is correct.
11        (Whereupon, two-page document
12  entitled National Accounts Price Adjustment
13  Request PAR, bearing Bates stamps RLI-TX42588 and
14  RLI-TX42589, also bearing Bates stamps ROX036-
15  0925 and ROX036-0926, also bearing Bates stamps
16  RLI-AWP-00141940 and RLI-AWP-00141941, is
17  received and marked as Exhibit Kutner 015 for
18  Identification.)
19  BY MR. FAUCI:
20   Q.   Let's look at Exhibit 15.
21   A.   (Reviews.)
22   Q.   Do you recognize this document?