# Exhibit 7

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | : | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : | CIVIL ACTION: |
| PRICE LITIGATION | : | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : | |
| U.S. ex rel. Ven-a-Care of | : | Judge Patti B. Saris |
| the Florida Keys, Inc. v. | : | |
| Abbott Laboratories, Inc., | : | Chief Magistrate |
| No. 06-CV-11337-PBS | : | Judge Marianne B. |

- - - - - - - - - - - - - - -x    Bowler

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| STATE OF ALABAMA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No.: CV-05-219 |
| ABBOTT LABORATORIES, INC., | : | Judge Charles Price |
| et al., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - -x

1    A.    There were at the beginning 54 carriers
2    who processed physician claims, independent
3    laboratory claims, and as they began to get some
4    experience with the Medicare program, they all
5    decided they needed computer systems, and they
6    wanted -- of course, they wanted us to pay for them
7    and the Medicare program to pay for them under the
8    contract. I was part of a group that designed a
9    standard claims processing system for the carriers,
10   which we implemented for the first time during the
11   early part of 1969, and by the early '70s, we had
12   installed that system in approximately 20 carriers.
13   Q.    And that related to the Medicare Part B
14   side, or to both?
15   A.    It was only Part B.
16   Q.    What did you do next?
17   A.    I was asked to take over the supervision
18   of the instruction writing and systems for the Part
19   A side of the program.
20   Q.    When you say instructions writing,
21   computer instructions?
22   A.    Well, they weren't computer instructions

1   per se.  They were claims manual instructions for
2   people to follow in processing claims.  There were
3   computer involvements as well and interactions with
4   the systems in Baltimore.
5       Q.   How long did you do that?
6       A.   I held that position from December of 1973
7   until June of 1979.
8       Q.   And what position did you have beginning
9   in June of 1979?
10      A.   I had responsibility for the procedures
11  and systems for both Part A and for Part B, and in
12  addition, I had some Medicaid responsibilities for
13  systems and procedures.
14      Q.   How long did you hold that position?
15      A.   From June of 1979 until December of 1983.
16      Q.   Now, up until this point in December of
17  1983, did you have any responsibilities for setting
18  payment policies for Medicare or Medicaid?
19      A.   No.
20      Q.   Your curriculum vitae indicates that
21  beginning in 1984 and continuing 'til 1994 you were
22  director of the Office for Payment Policy, and that

1   in that position, you were responsible for setting

2   payment rates for all providers, physicians and

3   suppliers under the Medicare program. Is that

4   correct?

5       A.      Yes.

6       Q.      How did you come to be the director of the

7   Office of Payment Policy, which I understand -- I

8   gather from your biographical sketch was called the

9   Office for Reimbursement Policy in 1984.

10      A.      I was asked to take over that position.

11      Q.      Who asked you?

12      A.      The administrator of HCFA.

13      Q.      Who was that at the time?

14      A.      Carolyne, with an E, K. Davis.

15      Q.      What were your responsibilities as the

16  director of the Office for Payment Policy in 1984?

17      A.      Well, we -- the office was responsible for

18  the procedures for reasonable charge for physicians.

19  At that point we were implementing the newly enacted

20  laboratory fee schedule. We were implementing and

21  writing annual regulations for the newly enacted

22  prospective payments system. We were working on --

1   working out the procedures for the fee schedule for
2   end-stage renal disease, and we were approving
3   portions of Medicare state plans when the states
4   wanted to make changes to their Medicare programs.
5       Q.   The Medicaid programs?
6       A.   Yes.
7       Q.   Did your responsibilities change at all in
8   this position between 1984 and 1994?
9       A.   Some of the substance changed, but the
10  responsibilities did not.
11      Q.   In what ways did the substance change?
12      A.   Well, for example, in 1992, we implemented
13  a fee schedule for physician services. That was a
14  change from the reasonable charge system that we had
15  used in the past. We implemented a regulation to
16  fold capital payments into the prospective payments
17  system. Those were the biggest sort of substantive
18  changes that we made during that ten-year period.
19      Q.   Your biographical sketch indicates that
20  between 1994 and 1997, you were the director of the
21  Office of Hospital Policy, Bureau of Policy
22  Development; is that correct?

1  occasionally manufacturers of prescription drugs

2  competed for sales in 1989?

3      MR. GOBENA: Object to form.

4  **A.    I'm not changing my answer.**

5  Q.    I'm just asking.

6  **A.    I'm still not changing my answer.**

7  Q.    Did you have --

8  **A.    Amgen clearly was not competing with**

9  **anybody with Epogen.**

10 Q.    And you based -- did you -- strike that.

11 Was Epogen the only drug on the market in 1989?

12 **A.    I don't think so.**

13 Q.    There were generic drugs on the market in

14 1989, correct?

15 **A.    Yes, there were.**

16 Q.    Multiple-source drugs?

17 **A.    Yes.**

18 Q.    And manufacturers of those multiple-source

19 drugs did you understand competed for customers?

20     MR. BREEN: Objection, form.

21 **A.    I'm sure some generic drug makers did**

22 **compete on the basis of price for certain drugs in**

 1    1989.  Your other statements are much too general to

 2    answer.

 3        Q.    Take a look to page 11 please.  The first

 4    bullet point --

 5        A.    Uh-huh.

 6        Q.    -- describes the Department of Affairs'

 7    program for purchasing prescription drugs?

 8        A.    Is this a new agency?

 9        Q.    It says right here, the Department of

10    Veterans Affairs.

11        A.    Yeah, but you didn't say "veterans" the

12    last time.

13        Q.    Ah, I apologize.  The Department of

14    Veterans Affairs, in the first bullet point you'll

15    see --

16        A.    Yes.

17        Q.    -- is described as having a program for

18    purchasing drugs.

19        A.    Yes.

20        Q.    Were you familiar in 1989 with how the

21    Department of Veterans Affairs purchased drugs?

22        A.    Yes.

1    Q.    And could you tell me how the Department
2  of Veterans Affairs purchased drugs in 1989?
3    A.    **They bought them.**
4    Q.    How did they price them?
5    A.    **I have no idea.  They negotiated prices**
6  **with the manufacturer, it was my understanding;**
7  **however, they bought the drugs.  They had them**
8  **shipped to their hospitals and they distributed them**
9  **to their patients, and any relationship between that**
10 **and what Medicare is doing is totally coincidental.**
11 **The Veterans Administration has no bearing on what**
12 **pricing is for Medicare, can be or should be.**
13   Q.    Does it have any bearing on what the cost
14 to Medicare providers can be --
15   A.    **No.**
16   Q.    -- of the same drugs?
17   A.    **No, because they buy in much higher**
18 **volumes.**
19   Q.    So is it your understanding the Department
20 of Veterans Affairs is a higher volume purchaser of
21 drugs than any other purchaser in the marketplace?
22         MR. GOBENA:  Object to form.

1      A.    No.

2      Q.    So the Department of Veterans --

3      A.    **But they're certainly -- they're a higher**

4  **purchaser of drugs than any physician or pharmacy.**

5      Q.    Did you have an understanding of whether

6  the Department of Veterans Affairs was a larger or a

7  smaller purchaser of drugs than, say, a group

8  purchasing organization?

9            MR. GOBENA:  Object to form.

10     A.    No.

11     Q.    If you'll see in the first paragraph under

12 the first bullet point at the end, do you see that

13 for multiple-source drugs, the Senate committee

14 reports that the Department of Veterans Affairs

15 purchases multiple-source drugs on average at 67

16 percent off the published AWP?

17     A.    Yes.

18     Q.    Is that consistent with your understanding

19 of the relationship of AWP to acquisition cost in

20 1989?

21           MR. GOBENA:  Object to form.

22     A.    No.

                                                                    215

1       Q.      Did you have any understanding of the
2    relationship of AWP to acquisition cost in 1989?
3               MR. GOBENA:  Object to form, asked and
4    answered.
5       A.      Well, first of all, the Department of
6    Veterans Affairs, according to this, achieves an
7    average discount of 41 percent; not 67 percent.
8       Q.      The 41 percent relates to single-source
9    drugs.
10      A.      Right.
11      Q.      Correct?
12      A.      Right.
13      Q.      It says 67 percent for multiple-source
14   drugs, correct?
15      A.      That's actually higher than they told me.
16      Q.      Who told you?
17      A.      Representatives from the Veterans Affairs
18   Department.
19      Q.      What did they tell you?
20      A.      They told me that they were able to
21   discount or get -- receive discounts of 40 to 50
22   percent depending upon the drug.  Some were far

1    less, some were a little more.

2       Q.    And when did you have this conversation
3    with the Department of Veterans Affairs?

4       A.    Sometime in the late '80s.

5       Q.    And with whom at the Veterans Affairs did
6    you have this recollection?

7       A.    I have no recall of the name.

8       Q.    What was the context of having this
9    conversation?

10      A.    We'd had reports from the Inspector
11   General that we should be paying for what the
12   Veterans Administration was paying.

13      Q.    Do you recall anything else about the
14   conversations with the Department of Veterans
15   Affairs?

16      A.    Not specifically.

17      Q.    Did you have an understanding of how it
18   was the Department of Veterans Affairs was able to
19   get a discount off of list prices?

20      A.    They had a formulary.

21      Q.    And the participation in that formulary
22   was by -- was it by negotiation, by bid?  Do you

1    have an understanding of how the formulary came

2    about?

3        A.    I understood they negotiated with drug

4    manufacturers and if the price wasn't what they

5    wanted, they wouldn't buy from that manufacturer.

6        Q.    And the leverage that the Department of

7    Veterans Affairs had to demand those price

8    concessions was because of the volume they

9    controlled, correct?

10            MR. GOBENA:   Object to the form.

11       A.    It's much more than that.

12       Q.    What is it?

13       A.    If I won't -- if I'm the Veterans Affairs

14   and I won't buy drugs from you because you won't

15   give me a decent price, that's much better leverage

16   than anybody else has.  The Congress won't even give

17   the secretary that authority for Medicare now.

18       Q.    But it was your understanding that the

19   Department of Veterans Affairs had that leverage

20   because they were such a large-volume purchaser,

21   correct?

22       A.    And because they had the authority to

218

1  implement a formulary where they would refuse to buy

2  drugs from a particular manufacturer or refuse to

3  buy certain drugs from a particular manufacturer,

4  yes.

5       Q.    Right, so they would refuse --

6       A.    It's not just one or the other. It's

7  both. Without both, you have nothing.

8       Q.    So it was large volume and the ability not

9  to purchase --

10      A.    Right.

11      Q.    -- the drug.

12      A.    Right.

13      Q.    The same would be true for a large-volume

14 purchaser in the private market, correct?

15      A.    It could be.

16      Q.    Any reason to think that it would not be?

17      A.    I have no knowledge of what large-volume

18 purchasers in the private market do.

19      Q.    Well, let's move down to the last bullet

20 point on page 11. It reads, "Hospitals, health

21 maintenance organizations and nursing homes that

22 contract with wholesalers to purchase prescription

                                                                    219

1    drugs from a predetermined list are able to achieve
2    discounts of up to 99 percent off the manufacturer's
3    published average wholesale price," paren, "AWP,"
4    closed paren, "even for brand name products.  See
5    Appendices H and I."  First of all, do you recall
6    seeing that finding in 1989?
7         A.    No.
8         Q.    Did anyone tell you that HMOs and nursing
9    homes were able to purchase drugs from wholesalers
10   for up to 99 percent off of AWP?
11        A.    No.
12        Q.    You'll agree with me, will you not, that
13   the majority staff report of this special committee
14   on aging was a publicly available document?
15        A.    I assume it was.
16        Q.    So you would agree with me that as of
17   August 1989, it had been publicly disclosed that
18   hospitals, HMOs and nursing homes were able to
19   purchase drugs, according to the Senate at least,
20   for up to 99 percent off the manufacturer's
21   published AWP.
22              MR. GOBENA:  Object to the form.

1    A.   I assume that is for one drug purchase of
2  some drug at some point.  I doubt that that is
3  typical, and if it is, you're representing a very
4  difficult industry to defend.
5    Q.   Would you turn to Appendix I, and then
6  we'll let the poor court reporter take a break.
7  It's Appendix I to the report.
8    A.   G, H, okay.
9    Q.   You'll see that there's a list, it's a
10 chart entitled "Range of Market Prices Paid for
11 Brand Name Prescription Drugs, Spring of 1989," and
12 the fifth drug down is Transderm-Nitro,
13 nitroglycerin, five milligrams, 30 patches?
14   A.   Okay.
15   Q.   You see all of these drugs have a column
16 that states "Published Manufacturer's Average
17 Wholesale Price," and the column reports the
18 published AWP for this drug to be $36?
19   A.   Okay.
20   Q.   And two columns over, it shows the price
21 paid by hospitals to be a penny?
22   A.   Uh-huh.

221

1    Q.   And three columns over from that, it shows
2  the price paid by the Department of Veterans Affairs
3  to be $4.
4    A.   Okay.
5    Q.   And it has similar information for the
6  various other drugs that are listed on the chart.
7  Is this the type of information that you would
8  expect people on your staff to have reviewed with
9  respect to a decision by HCFA to use AWP as a
10 payment basis for Medicare?
11          MR. GOBENA:  Object to the form.
12   A.   **Only if we paid for the drug.**
13   Q.   So if you paid for any of these drugs, you
14 would expect people on your staff to have reviewed
15 this information.
16   A.   **Not necessarily this report.  Again, I --**
17 **this report isn't really relevant.**
18   Q.   And so a report that shows the market
19 prices paid for a drug compared to its AWP is not
20 relevant.
21          MR. GOBENA:  Object to the form.
22   A.   **Again, the report is basically a report**