# Exhibit 11

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

Atlanta, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

IN RE:   PHARMACEUTICAL INDUSTRY       )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

----------------------------------) Civil Action

THIS DOCUMENT RELATES TO:          ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Abbott Laboratories, Inc.,)

Civil Action No. 06-11337-PBS; and )

United States of America, ex. rel. ) VIDEOTAPED

Ven-a-Care of the Florida Keys,    ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil ) THE GEORGIA

Action No. 05-11084-PBS; and United) DEPARTMENT OF

States of America, ex. rel.        ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,    ) by JERRY

Inc., v. Boehringer Ingleheim      ) DUBBERLY

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                  ) DECEMBER 15, 2008

----------------------------------X

Atlanta, GA

Page 2

1        VIDEOTAPED DEPOSITION OF

2             JERRY DUBBERLY

3

4           December 15, 2008

5              8:51 a.m.

6

7          75 Spring Street, SW

8          600 U.S. Courthouse

9            Atlanta, Georgia

10

11   Jennifer D. Hamon, CCR-B-2287, RPR

dd23118e-9e82-4fd1-afbb-155015bf3b99

Page 61

1  for the State of Georgia to get updated
2  information?
3       A.   It is.
4       Q.   Why is that?
5       A.   Well, we need to have current pricing
6  information.  We need to have current clinical
7  information that we purchase from or that the
8  vendor purchases from Medi-Span/First DataBank,
9  depending on the time period we're speaking of,
10 for claims adjudication.
11      Q.   Do -- in your experience, do the prices
12 also change?
13      A.   The prices do change periodically for
14 individual NDCs, yes.
15      Q.   Is that one of the reasons that the
16 State needs updated information as well?
17      A.   Yes, to have current pricing
18 information.
19      Q.   Would it be possible for the State of
20 Georgia's pharmacy program staff to obtain those
21 prices, the same type of price information, on an
22 ongoing basis in order to run the Medicaid

Page 62

1    program?
2            MR. ROBBEN:  Object to the form.
3        A.   So to clarify, are you asking me could
4    we update the prices of all NDCs?
5        Q.   (By Mr. Lavine)  Instead of securing
6    that price information from First DataBank or
7    Medi-Span, would the Georgia employees be able to
8    do that process?
9        A.   No.  It would not be feasible.
10       Q.   Why not?
11       A.   Due to the fact that we previously
12   mentioned there were well over 100,000 active
13   NDCs.  And to try to maintain pricing elements
14   and date-specific and time-specific pricing
15   elements for each NDC would be something that we
16   could not manually accommodate.
17       Q.   Does Georgia Medicaid ever receive drug
18   prices directly from drug companies via
19   correspondence?
20       A.   We do.
21       Q.   Is that common?
22       A.   No.  Those are typically as a result of

GA Department of Community Health (Jerry Dubberly)                December 15, 2008
Atlanta, GA

Page 83

1    A.   Not to my knowledge.
2    Q.   So are the people who handle the rebate
3    program for Georgia Medicaid separate from the
4    people in charge of the reimbursement policy?
5    A.   Yes, they are.
6    Q.   Are they also within the pharmacy
7    division?
8    A.   We have one state employee who works
9    managing a vendor who does all of the intricacies
10   of invoicing and dispute resolution and -- and
11   that sort of effort.
12        So there's one employee at the State.
13   And then we contract with a separate entity from
14   the pharmacy benefit management company to handle
15   rebates for us.
16   Q.   And the one employee you just
17   described, that's in connection with managing the
18   rebate program.
19   A.   Right.
20   Q.   Are you aware -- are you aware of any
21   confidentiality restrictions on the use of the
22   AMP data?

Page 84

1    A.   AMP is a confidential number that we
2 are not allowed to publish.
3    Q.   Do you know if the agreement between
4 the Federal Health and Human Services and the
5 manufacturers includes any language on that, on
6 the confidentiality?
7    A.   I've -- I've never seen the language.
8 I would assume there is, but I have not seen the
9 language.
10   Q.   Does the State of Georgia generally
11 receive the actual AMP data from the federal
12 government?
13        MR. ROBBEN:  Object to the form.
14   A.   The AMP data is submitted to our rebate
15 vendor.  We don't typically receive AMP data at
16 the State, with the exception of the draft data -
17 - the draft AMP data that CMS was publishing
18 subsequent to the DRA.
19   Q.   (By Mr. Lavine)  Has the State of
20 Georgia ever tried to reverse engineer AMP data
21 to help establish an estimated acquisition cost?
22        MR. ROBBEN:  Object to the form.

Page 85

1    A.   No, we have not.
2    Q.   (By Mr. Lavine)  Has the State of
3    Georgia ever used AMP data to establish
4    reimbursement amounts?
5    A.   No, we have not.
6    Q.   Is it the understanding of Georgia that
7    the State would be allowed to use AMP data for
8    establishing reimbursement rates?
9    A.   I know of no explicit restriction.
10   However, operationally it would be very
11   difficult.
12   Q.   What about the confidentiality
13   requirements?
14   A.   That's -- that's where it would be very
15   -- it would be difficult.  You could reimburse.
16   You could -- you could use AMP arguably to
17   reimburse, but you would have to tell the
18   pharmacy you're reimbursing off a price you can't
19   tell them, and then arguably they can reverse
20   engineer in to identify what the AMP is.  So --
21   Q.   The end result being it would violate
22   the confidentiality provisions?

dd23118e-9e82-4fd1-afbb-155015bf3b99

GA Department of Community Health (Jerry Dubberly)                    December 15, 2008
                                  Atlanta, GA

Page 86

1    A.   That's probably where the attorneys --
2  that's probably where the attorneys would end up
3  with it.  But from a -- from a -- from my
4  standpoint, I don't know of anything that says
5  you shall not use AMP in reimbursement
6  methodologies.
7    Q.   You're basing your conclusion on the
8  idea that the data -- the AMP information needs
9  to be maintained confidentially.
10    A.   AMP does need to be maintained
11  confidentiality -- confidential.
12         MR. LAVINE:  What number are we on?
13         THE COURT REPORTER:  15.
14            (Whereupon a document was
15  identified as Exhibit Georgia 015.)
16    Q.   (By Mr. Lavine)  Let me show you what
17  I've marked as Exhibit 15.  It's a letter dated
18  January 1, 2007 on the letterhead of CMS directed
19  to a Gwendolyn Donnell at First Health Service
20  Corporation.
21         Do you know who Gwendolyn Donnell is?
22    A.   Ms. Dunwell is the --