# Exhibit 17

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X

In Re: PHARMACEUTICAL INDUSTRY        )

AVERAGE WHOLESALE PRICE LITIGATION    )

------------------------------------X  MDL No. 1456

THIS DOCUMENT RELATES TO:             )  Master File No.

United States of America ex rel.      )  01-CV-12257-PBS

Ven-A-Care of the Florida Keys, Inc.,)

et al. v. Dey, Inc., et al.,          )

Civil Action No. 05-11084-PBS,        )  Hon. Patti B.

and United States of America ex rel.  )  Saris

Ven-A-Care of the Florida Keys, Inc.,)

et al. v. Boehringer Ingelheim Corp.,)

et al., Civil Action No. 07-10248-PBS)

------------------------------------X


VIDEOTAPED DEPOSITION OF

THE VERMONT DEPARTMENT OF HEALTH by ANN RUGG

Montpelier, Vermont

Monday, December 15, 2008

9:00 a.m.

```
                                                              Page 2
 1                    A P P E A R A N C E S
 2
 3    On behalf of Dey, Inc., Dey L.P., Inc. And
 4    Dey, L.P.:
 5            SUNG W. KIM, ESQ.
 6            Kelley Drye & Warren LLP
 7            101 Park Avenue
 8            New York, NY  10178
 9            212-808-7962
10            sukim@kelleydrye.com
11
12
13    On behalf of the United States of America:
14            JAMES J. FAUCI, ESQ.
15            Assistant United States Attorney
16            United States Courthouse
17            1 Courthouse Way
18            Suite 9200
19            Boston, MA  02210
20            617-748-3298
21            jeff.fauci@usdoj.gov
22
```

VT Department of Health (Ann Rugg)                December 15, 2008
                        Montpelier, VT

                                                        Page 357

1        Q.   The pricing information, is it fair to
2   say that it is dynamic?  Does it change rapidly?
3             MR. KIM:  Objection to form.
4             THE WITNESS:  The reason we, we use, in
5   the case of Medi-span, in the case of First Data
6   Bank, we require of our vendor that they provide
7   weekly updates so that we can be responsive to
8   that dynamic environment.
9   BY MR. FAUCI:
10       Q.   Without subscribing to a system like
11  First Data Bank or Medi-span, would it be
12  possible for OVHA to independently obtain regular
13  pricing information?
14            MR. KIM:  Objection to form.
15            THE WITNESS:  It would be possible to
16  receive pricing information.  But our ability to
17  update the file when you're talking about the
18  fact that we process maybe 15,000 NDCs in 2008,
19  more than 15,000 in 2008, our ability to accept
20  and update as often as weekly would require a
21  significant amount of manpower.
22  BY MR. FAUCI:

1       Q.   More than the program has right now?
2       A.   Oh, absolutely more.
3       Q.   Is it fair to say OVHA needs to rely on
4  receiving accurate pricing information from a
5  third party such as FDB?
6            MR. KIM:  Objection to form.
7            THE WITNESS:  Yes.  Yes.
8  BY MR. FAUCI:
9       Q.   Did you expect that the Average
10 Wholesale Price data you received from FDB would
11 bear predictable and close relationship to what
12 the drugs actually cost?
13           MR. KIM:  Objection to form.
14           THE WITNESS:  Would you repeat that
15 again?
16 BY MR. FAUCI:
17      Q.   Sure.  Did you expect that the average
18 wholesale pricing data you received from FDB
19 would bear a predictable and close relationship
20 to what the drugs actually cost?
21           MR. KIM:  Objection to form.
22           THE WITNESS:  Yes.

1   of actual amount charged or at the Average
2   Wholesale Price on file plus a compounding fee
3   plus a dispensing fee."
4       Q.   Is this consistent with your
5   recollection that for compounded prescriptions
6   OVHA paid a compounding fee in addition to a
7   dispensing fee?
8       A.   Yes.
9       Q.   As a general matter, did OVHA expect
10  that this lower of reimbursement methodology
11  we've seen here would constitute a reasonable
12  estimate of the prices you're generally and
13  currently paid for drugs?
14      A.   I am sorry.  Say that again.
15      Q.   Sure.  As a general matter, throughout
16  your time frame at OVHA, throughout the 1991 to
17  the present time frame, did OVHA expect that the
18  lower of methodology we've seen in these Exhibit
19  6 would constitute a reasonable estimate of the
20  prices generally and currently paid by providers
21  for drugs?
22           MR. KIM:  Objection, form.

VT Department of Health (Ann Rugg)                December 15, 2008
Montpelier, VT

Page 373

1           THE WITNESS:  I don't know that I have
2    sufficient information to know that that's what
3    they were generally paid.
4    BY MR. FAUCI:
5        Q.    Have you ever heard of something called
6    AMP data?
7        A.    I have.
8        Q.    What is that?
9        A.    Average Manufacturer Price.
10       Q.    Are you aware that manufacturers report
11   average manufacturer's pricing data to CMS?
12       A.    I believe they do in relationship to
13   drug rebate.
14       Q.    Are you aware whether or not there are
15   any confidentiality restrictions on the use of
16   such data?
17           MR. KIM:  Objection, form.
18           THE WITNESS:  1927 of the Social
19   Security Act says that any information related to
20   drug rebate is confidential.
21   BY MR. FAUCI:
22       Q.    What is a unit rebate amount?