# Exhibit 19

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE            )

LITIGATION                         )

-------------------------------)

United States of America ex rel.)  MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    )  Civil Action

Inc., Civil Action No. 06-      )  No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   )  Honorable

the Florida Keys, Inc., v. Dey, )  Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                             )

-------------------------------x

                                                                Page 2

1                         December 10, 2008

2                              Volume I

3         VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES

4    Taken on behalf of the Plaintiff, produced, sworn,

5    and examined on the 10th day of December, 2008,

6    between the hours of nine o'clock in the forenoon

7    and six o'clock in the evening of that day, at the

8    offices of United States Attorneys' Office, 425 West

9    Capitol, Suite 500, Metropolitan Building, Little

10   Rock, Arkansas, before BRENDA ORSBORN, a Certified

11   Court Reporter within and for the State of Missouri,

12   in a certain cause now pending before the United

13   States District Court, District of Massachusetts,

14   In re: Pharmaceutical Industry Average Wholesale

15   Price litigation.

16

17

18

19

20

21

22

30(b)(6) Arkansas Dept of HS - Vol. I                December 10, 2008
                      Little Rock, A

Page 43

1   on Exhibit 3?
2       A.   Correct.
3       Q.   Can you turn to Bates Page 3559 in this
4   document?
5       A.   Okay.
6       Q.   When we talked about the usual and
7   customary charges earlier, is what's stated here
8   consistent with your understanding of the
9   definition of "usual and customary" in Arkansas?
10           MR. REALE:  I'm sorry.  What page did
11  you say?
12           MS. OBEREMBT:  3559, Paragraph 219,
13  usual and customary charges.
14           MR. REALE:  Thanks.
15      A.   Yes, ma'am.
16      Q.   (By Ms. Oberembt) All right.  If you
17  could turn to Bates Page No. 3571.  And it's
18  Paragraph 242.2 on Page --
19      A.   Uh-huh.
20      Q.   Would you read that to yourself?
21      A.   Okay.
22      Q.   Does that reflect the department's view

Page 44

1    of the prices that it's obtaining in its
2    reimbursement methodology?
3         A.   That's correct.  We -- our
4    reimbursement formula is set by federal
5    regulation or by federal -- by federal
6    regulation.  So whatever is supported or supplied
7    to First DataBank, we have to assume it's
8    supplied in good faith, and so we base our
9    payment off of that as our best estimate, so yes.
10        Q.   And when you say whatever is supplied
11   to First DataBank, are you talking about pricing
12   information supplied by drug manufacturers --
13        A.   Correct.  For the Pharmacy Program.  I
14   can only speak for the Pharmacy Program, but yes.
15        Q.   And does FDB supply that information to
16   EDS?
17        A.   Yes.
18        Q.   Okay.  Does EDS have a contract with
19   FDB to obtain the pricing information?
20        A.   That's my understanding, that's how
21   that works.  It's not with us.  It's with EDS.
22             MS. OBEREMBT:  I'd like the court

Page 63

1  Multiple Source Drugs"?  Is that what you
2  understand to be the federal upper limit?
3       A.   Yes, ma'am.
4       Q.   And what is the "federal upper limit"?
5       A.   The federal upper limit is a maximum
6  allowable cost that's applied to generically
7  equivalent brands and generics.
8       Q.   Does the State set that amount?
9       A.   Not on the federal upper limits, no.
10      Q.   Who sets the federal upper limits?
11      A.   CMS.
12      Q.   We've looked at the State of Arkansas'
13 reimbursement formula since 1990.  Does -- has
14 the state consistently defined EAC with reference
15 to AWP?
16      A.   Yes.
17      Q.   Have you seen the State define AWP as
18 anything other than the -- the plain meaning of
19 the words, average wholesale price?
20      A.   No, ma'am.
21      Q.   What was the State's -- what is the
22 State's goal in using AWPs for reimbursement

Page 64

1   purposes?
2       A.  Well, the AWP is the benchmark that we
3   use for the reimbursement.  I mean, that's
4   basically what it is, is a benchmark.  And that's
5   why we have to use the AWP minus a percent to --
6   as our best estimate for what the AWP
7   reimbursement would be, just, basically, a
8   benchmark.
9       Q.  And what is -- what is DHS's
10  understanding of where FDB obtains its AWP?
11      A.  It's the State's understanding that
12  they are supplied to First DataBank from the
13  manufacturer.
14      Q.  Does Arkansas' current reimbursement
15  scheme represent its best estimate of estimated
16  acquisition costs?
17      A.  Yes, ma'am.
18      Q.  Does the State set maximum allowable
19  cost for certain drugs?
20      A.  We do.
21      Q.  What is a "maximum allowable cost"?
22      A.  A maximum allowable cost is the maximum

Page 70

1          MR. REALE:  Objection, form.
2     A.   We can't change the -- we have no
3  control over the AWP field.  We can't -- we can't
4  manipulate that.
5     Q.   (By Ms. Oberembt) So whatever AWP is
6  reported by the manufacturer, that's the AWP that
7  you have to use in your system; is that correct?
8     A.   Well, whatever AWP is submitted to us
9  by First DataBank is what we have to use.
10         MR. BERLIN:  Objection to form.  And if
11 we can just have a little bit of room to make
12 objections, if necessary, please.
13         MS. OBEREMBT:  I think John objected to
14 that, Eric.
15         MR. BERLIN:  Okay.  I just didn't hear.
16 Thanks, though.
17    Q.   (By Ms. Oberembt) Have you ever heard
18 the term "AMP"?
19    A.   I've heard the term "AMP".  Yes.
20    Q.   Okay.  What does "AMP" stand for?
21    A.   Average Manufacturer Price.
22    Q.   And what's your understanding of that?

Page 71

1   A.   Basically, the definition, what I
2   picture it to be is an average of the
3   manufacturer's prices to different entities.  But
4   that's really all I know.  I don't -- I'm not
5   that familiar with -- with the actual AMP.  My
6   understanding, too, is that the AMP is not a
7   public -- let me think of the word I'm looking
8   for. Give me a minute.  Published.  The AMP is
9   not a published price, so it's not something we
10  have access to.
11       Q.   Is it your understanding that AMP is --
12  is confidential effectively?
13       A.   Correct.
14       Q.   Prior to 2006, did DHS ever receive AMP
15  data?
16       A.   No, we didn't.  With the -- when the
17  Deficit Reduction Act talked about the changes in
18  calculating the FUL, they began to send us some
19  AMP information, but because of the -- they
20  weren't moving forward on the FUL changes, we
21  really didn't utilize it.  We had no reason to
22  use it.

Page 72

1    Q.    Have you ever heard of the concept of
2 -- of trying to reverse engineer an AMP from
3 something called the unit rebate amount?
4    A.    Not -- I've -- no.  I've never heard of
5 such a thing of trying to go backwards, no.
6    Q.    Has anybody at DHS, to your knowledge,
7 ever attempted to reverse engineer an AMP from a
8 unit rebate amount?
9    A.    Not that I'm aware of, no.  I can't
10 imagine anybody wanting to try to attempt to do
11 that.
12   Q.    In the -- in the preparation you've
13 done today for the deposition, have you seen any
14 evidence that anybody at DHS ever tried to
15 reverse engineer an AMP from a unit rebate
16 amount?
17   A.    No, ma'am.
18   Q.    Is the Rebate Program separate from the
19 -- the Reimbursement Program here?
20   A.    They're two different things.  They're
21 -- the reimbursement and the rebate are not --
22 are two totally separate entities.