# Exhibit 20

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

Baltimore, MD

2

Videotaped deposition of THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND MENTAL HYGIENE BY JOSEPH L. FINE, held at the law offices of Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Room C-111, Baltimore, Maryland, the proceedings being recorded stenographically by Jonathan Wonnell, a Registered Professional Court Reporter and Notary Public of the State of Maryland, and transcribed under his direction.

1    Ven-A-Care of the Florida Keys?

2        A.    No.

3        Q.    Do you have an understanding of what the

4    United States alleges that Abbott Laboratories did

5    wrong in the lawsuit?

6        A.    **I have been told that --**

7            MS. YAVELBERG:  Objection.  I'm not sure --

8    I guess we should give an instruction that you

9    shouldn't reveal communications between counsel and

10   yourself.

11           THE WITNESS:  Okay.

12           MS. YAVELBERG:  If you have an

13   understanding you may testify about it.  But don't

14   testify about conversations with the lawyers.

15       A.    **From the State of Maryland I have not -- I**

16   **was not involved in any understanding as to what the**

17   **issue has been or was.**

18       Q.    Let me ask you in your personal capacity,

19   Mr. Fine.  Are you generally aware of what the United

20   States alleges that Abbott did wrong in the

21   litigation?  I'm not asking for you to tell me about

22   the communications.

1      A.      I'm generally aware, yes.

2      Q.      What is your understanding?

3      A.      What I understand is that there was reported an inflation of price proffered to the compendia that was extremely -- I won't say the word extremely -- but significantly higher than what would normally have been reported from the manufacturer to the compendia for listing as an AWP.

9      Q.      When you used the term extremely higher --

10     A.      I take that back.  Significantly.

11     Q.      What do you mean by that?

12     A.      In working with drug pricing for all these years it was understood that the average wholesale price fell within certain margins above the cost sold to the wholesaler.  The listed price was within a certain percentage of what the wholesaler paid for it.  And as far as reimbursement to providers methodologies were set to address that to estimate acquisition cost to providers.  When a price becomes greater than that understood margin, I call that significant.

21     Q.      What percentage did the department expect to be the discount from AWP?

1           MS. YAVELBERG: Objection, form.

2      A.    I don't understand your question.

3      Q.    You testified that you always understood,

4  the department always understood there was some

5  difference between what providers were paying for

6  drugs and what AWPs were. I'm paraphrasing.

7      A.    Okay.

8      Q.    Is that a fair characterization?

9      A.    Yes.

10     Q.    What was the extent of the difference that

11 the department expected?

12     A.    Generally the department understood that

13 the price was approximately 20 percent higher than

14 that which the wholesaler purchased it for, the listed

15 price.

16     Q.    Is it your testimony on behalf of the

17 department that that 20 percent figure applied to

18 generic drugs?

19     A.    No. It was for single-source drugs.

20     Q.    What did the department expect to be the

21 percentage difference between AWP and provider

22 acquisition cost for generic drugs?

1    A.    We thought it to be higher, perhaps 30 to
2 40 percent above cost.  Uncertain of that amount.
3    Q.    You're what?
4    A.    I was -- we were uncertain of the exact
5 amount which was reported in the compendia.
6    Q.    Why were you uncertain of the amount?
7    A.    Because we weren't certain of the true cost
8 of generic drugs, either purchased by the wholesaler
9 or the provider.
10   Q.    Do you have an understanding that the
11 discounts from AWP could vary considerably from
12 generic drug to generic drug?
13         MS. YAVELBERG:  Objection, form.
14   A.    I was not -- I did not concern myself with
15 that per se.  I never addressed it.
16   Q.    Did you do anything to prepare for today's
17 deposition to investigate the answer to that question?
18   A.    No.
19   Q.    Didn't talk to anybody else in the
20 department --
21   A.    No.
22   Q.    -- correct?

1        Mr. Fine, do you have an understanding of
2   the drug products that are at issue in the United
3   States' case against Abbott?
4        A.   Somewhat, yes.
5        Q.   What is your understanding?
6        A.   There is a list of products that are on the
7   list, some from Roxane, some from Dey, some from
8   Abbott.  And those are the drugs involved in the
9   litigation.
10                   (Exhibit Abbott Maryland 001
11                    was marked for
12                    identification.)
13        MS. MANGIARDI:  For the record, can you
14   read in what that exhibit is?
15        MR. TORBORG:  Once the court reporter gets
16   done, yes.
17        MS. MANGIARDI:  Sure.
18        MR. TORBORG:  Abbott Maryland 1 is a copy
19   of the cross notice of deposition of the State of
20   Maryland Department of Health and Mental Hygiene, and
21   it includes attachments, one of which is the notice
22   that was served by Dey and Roxane.