# Exhibit 21

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

NH Dept of Health and Human Services (Lise C. Farrand)                October 28, 2008
Concord, NH

Page 1

```
         UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X

In Re: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.

---------------------------------- ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:          )

United States of America ex rel.   ) Hon. Patti B.

Ven-A-Care of the Florida Keys,    )    Saris

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,     ) VIDEOTAPED

and United States of America ex    ) DEPOSITION

rel. Ven-A-Care of the Florida     ) OF THE NEW

Keys, Inc., et al. v. Boehringer   ) HAMPSHIRE DEPT.

Ingelheim Corp., et al., Civil     ) OF HEALTH &

Action No. 07-10248-PBS and United ) HUMAN SERVICES

States, ex rel. Ven-A-Care of the  ) BY LISE C.

Florida Keys v. Abbott             ) FARRAND

Laboratories, Inc. Civil Action    )

Nos. 06-CV-11337 and 07-CV-11618   ) OCTOBER 28, 2008

----------------------------------X
```

```
                                                              Page 2
 1      Deposition of THE NEW HAMPSHIRE DEPARTMENT OF HEALTH
 2         AND HUMAN SERVVICES by LISE C. FARRAND
 3                  Concord, New Hampshire
 4                Tuesday, October 28, 2008
 5                       9:00 a.m.
 6
 7
 8
 9                     A P P E A R A N C E S
10
11   On behalf of the United States of America:
12
13         GEORGE B. HENDERSON, ESQ.
14         Assistant United States Attorney
15         United States Courthouse
16         1 Courthouse Way
17         Suite 9200
18         Boston, MA  02210
19         617-748-3272
20         george.henderson2@usdoj.gov
21
22      (CONTINUED)
```

Page 282

1  from 1990 to the present when some court order or
2  budget condition or some other reason existed
3  causing the department to not follow the
4  reimbursement methodology that we've seen
5  described in the exhibits today?
6       A.   No.
7       Q.   Does First Health to your knowledge
8  investigate the published drug pricing
9  information for accuracy?
10      A.   Not that I'm aware of.
11      Q.   Have they ever to your knowledge?
12      A.   I don't know.
13      Q.   Likewise, do you have any information
14 to indicate that EDS investigated the accuracy of
15 the published prices?
16           MR. KATZ:  Objection to form.
17           THE WITNESS:  No.  No.
18 BY MR. HENDERSON:
19      Q.   Do you or other persons in your
20 department have time to investigate the accuracy
21 of published drug prices?
22           MR. KATZ:  Objection, form.

Page 283

1           THE WITNESS:  No.
2      BY MR. HENDERSON:
3           Q.   Would it be difficult to do that given
4      the number of NDCs that are covered by your
5      agency's program?
6           MR. KATZ:  Objection, form.
7           THE WITNESS:  Yes, it would be
8      difficult.
9      BY MR. HENDERSON:
10           Q.   Ms. Farrand, if the prices that
11     manufacturers reported to First Data Bank and
12     that were published had no relation at all to
13     real market prices, would it be appropriate to
14     use that in your view, that type of information
15     for reimbursing for drugs?
16           MR. KATZ:  Objection to form.
17     BY MR. HENDERSON:
18           Q.   Would it be a useful source of
19     information?
20           MR. BERLIN:  Same objection.
21           THE WITNESS:  Repeat your question,
22     please.

Page 284

1  BY MR. HENDERSON:
2      Q.   Let me repeat the question.  If average
3  wholesale prices had no relation whatsoever to
4  real prices, in your opinion would those types of
5  prices be useful for purposes of reimbursement?
6           MR. KATZ:  Objection, form.
7           THE WITNESS:  You're asking my opinion.
8  No, it wouldn't be in my opinion.
9  BY MR. HENDERSON:
10     Q.   Why not?
11     A.   You need to --
12          MR. BERLIN:  Same objection.
13 BY MR. HENDERSON:
14     Q.   He's objecting.
15     A.   Okay.  You need to be able to depend
16 upon the validity of your information that you're
17 basing reimbursement on.
18     Q.   And if AWPs had no relation to real
19 prices, they wouldn't reflect any acquisition
20 cost at all; is that fair to say?
21          MR. KATZ:  Objection to form.
22          THE WITNESS:  Not accurately.

Page 287

1      Q.  Mr. Katz asked you some information
2  about Average Manufacturer Price data.  And this
3  information I think you indicated comes in --
4  actually it is unit rebate amounts that are
5  received by First Health from CMS?
6      A.  Yes.
7      Q.  Do you recall those questions?
8      A.  Uh-hum.
9      MR. KATZ:  Objection to form.
10 BY MR. HENDERSON:
11     Q.  Have department employees such as
12 yourselves ever received unit rebate amount data
13 from CMS directly?
14     MR. KATZ:  Objection, form.
15     THE WITNESS:  No, it goes to the
16 technical contact which has always been whatever
17 fiscal agent or First Health that has handled the
18 rebate.
19 BY MR. HENDERSON:
20     Q.  Do you or any other department employee
21 ever regularly review that URA information?
22     MR. KATZ:  Objection, form.

ff2a09d4-6d96-4138-8ac8-bdac97d50764

1           THE WITNESS:  No.
2    BY MR. HENDERSON:
3         Q.   Have you ever yourself personally
4    reviewed it?
5         A.   No.
6         Q.   The URA information, do you understand
7    that it is submitted for the Medicaid rebate
8    program; is that correct?
9         A.   Correct.
10        Q.   Does your agency ever use it for
11   purposes of determining reimbursement?
12           MR. KATZ:  Objection, form.
13           THE WITNESS:  No.
14   BY MR. HENDERSON:
15        Q.   Do you have an understanding as to
16   whether or not -- let me back up.
17           Mr. Katz asked you some questions about
18   whether it is possible to sort of reverse
19   engineer and calculate, using URA numbers, to
20   calculate the Average Manufacturer Price?
21           MR. KATZ:  Objection, form.
22   BY MR. HENDERSON:

Page 289

```
 1        Q.   Have you ever done that?
 2        A.   No.
 3        Q.   To your knowledge, has any employee in
 4   your agency ever done that?
 5        A.   No.
 6        Q.   Do you have any understanding as to
 7   whether or not the Average Manufacturer Prices
 8   that manufacturers report to CMS, whether or not
 9   those prices are to be considered confidential in
10   any way?
11        A.   All the rebate information I believe is
12   confidential.
13        Q.   Do you have any understanding whether
14   or not that might prohibit you from using Average
15   Manufacturer Price as a basis for determining
16   estimated acquisition costs?
17             MR. KATZ:  Objection, form.
18             THE WITNESS:  I don't believe we can.
19   I'm not sure.
20   BY MR. HENDERSON:
21        Q.   Just to clarify, do I understand that
22   you don't believe you're permitted to use --
```

1    A.   Yes.
2    Q.   -- AMP information for purposes of
3    determining reimbursement?
4    A.   Yes.
5    Q.   I'd like to ask you to look at Dey
6    Exhibit 95, if you can find it, and also Dey
7    Exhibit 96.  Do you have those in front of you?
8    A.   Yes.
9    Q.   Now Dey Exhibit 95 appears, appears to
10   have been produced by the state of New Hampshire
11   according to the numbering in the lower right-
12   hand corner.  If you look at this, do you see
13   there are some parts of this that refer to a
14   Supplemental Rebate Agreement?  And let me back
15   up.
16        Did the state of New Hampshire begin to
17   implement a so-called Supplemental Rebate Program
18   sometime in 2004?
19   A.   Yes, we developed a preferred drug
20   list, and the preferred drug list products are
21   what gives us the supplemental rebate for the
22   most part.

1   Q.   And do you understand that just in
2   general, the agreement provides that in return
3   for -- that if a manufacturer pays a supplemental
4   rebate on a particular drug, in return the state
5   will put that drug on the preferred drug list?
6   Is that part of the, part of the deal, so to
7   speak?
8   A.   It is part of the deal.  You can still
9   put prior authorization requirements -- you can
10  still put utilization management tools on a drug
11  even if the manufacturer does participate in the
12  supplemental.
13  Q.   Okay.  But at least in some sense, if
14  the manufacturer pays a supplemental rebate, some
15  preference will be given to that manufacturer's
16  drug?
17  A.   It could be.
18  Q.   Now, this Exhibit 95 includes some
19  amendments to the Supplemental Rebate Agreement,
20  but I don't see the Supplemental Rebate Agreement
21  itself in its entirety in this exhibit.  Have I
22  described the exhibit in that fashion accurately?

1  A. I believe that this Exhibit A is the
2  actual supplemental agreement.
3  Q. Let's see what page you're referring
4  to.
5  A. NH 00102. Wait a minute, maybe not.
6  Q. It says "participating state
7  amendment."
8  A. You want the agreement between the
9  manufacturer and the state?
10 Q. As I look at this, it has some
11 amendments to the Supplemental Rebate Agreement,
12 but it does not have the entirety of the
13 Supplemental Rebate Agreement itself.
14 A. Amendments are done whenever another
15 manufacturer joins. I don't know where the
16 original agreement lies.
17 Q. Okay. Now, if you turn to page 96,
18 Bates stamped 96 in the lower right-hand corner?
19 A. Yes.
20 Q. This is part of the approved
21 supplemental, I'm sorry, this is part of the
22 approved State Plan Amendment that describes the

NH Dept of Health and Human Services (Lise C. Farrand)                October 28, 2008
Concord, NH

Page 293

1   Supplemental Rebate Agreement.  And is it your
2   understanding that the state of New Hampshire
3   received approval for its -- from the federal
4   government for its Supplemental Rebate Agreement?
5        A.   Yes.
6        Q.   Could you read aloud the last bullet
7   point on this page 96?
8        A.   "The unit rebate amount is confidential
9   and it cannot be disclosed in accordance with
10  Section 1927(b)(3)(d) of the Social Security
11  Act."
12       Q.   And is that consistent with your
13  understanding of unit rebate amounts, whether or
14  not they pertain to a supplemental rebate or
15  whether or not they pertain to the national
16  rebate agreement?
17       A.   Yes, it is.
18       Q.   And looking at Exhibit 96, Dey Exhibit
19  96, do you know whether or not Health and Human
20  Services employees receive these executed copies
21  that have been executed by the manufacturers?
22       A.   I believe the commissioner has to sign