# Exhibit 24
# Part G

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

Attachment 4.19-B
Section 12, Page 1a

MEDICAL ASSISTANCE
State: NORTH CAROLINA

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

1. Other Drugs

    Reimbursement for covered drugs other than the multiple-source drugs with *FN#4*
    HCFA upper limits shall not exceed the lower of:

    (i) The North Carolina estimated acquisition cost (NCEAC) for the drug
    plus a reasonable dispensing fee; or
    (ii) The provider's usual and customary charge to the general public for
    the drug.

    *lowest charge removed*

2. North Carolina Estimated Acquisition Cost (NCEAC)

    NCEAC is defined as the reasonable and best estimate of the price paid by
    providers for a drug as obtained from a manufacturer or other legal
    distributor. As determined by the Division the reasonable and best
    estimate is based on the average wholesale price (AWP) less 10 percent.
    For the AWP information the Division uses the First Databank Price Update *FDB,*
    Service, manufacturer's price list, or other nationally published sources. *FN#3*
    Telephone contact with manufacturer or distributors may be utilized when a
    published source is not available.

3. Dispensing Fees

    Dispensing fees are determined on the basis of surveys that are conducted
    periodically by Division of Medical Assistance (DMA) or other recognized
    sources and takes into account various pharmacy operational costs, such as
    salary, overhead, etc. Between surveys the dispensing fee may be adjusted
    based upon various factors, i.e., Consumer Price Index (CPI). The Division
    reviews the fees of other states and other information (i.e., National
    Pharmacy Surveys). The dispensing fee is paid to all providers for the
    initial dispensing. Refills within the same month are not paid a  *FN#1*
    dispensing fee. The dispensing fee is $5.60.
    *DF*

TN No. 92-24
Supersedes          Approval Date 8/17/92     Eff. Date 7/1/92
TN No. 92-05



PLAINTIFF'S EXHIBIT 10/21/03 MMJ NO. 12

12/1/2001 - Present

Attachment 4.19-B
Section 12, Page 1

MEDICAL ASSISTANCE
State: NORTH CAROLINA

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

12. Prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist.

a. Prescribed drugs.

    Multiple source and other drugs will be reimbursed at the lowest of: the estimated acquisition cost as described below plus a reasonable dispensing fee, the provider's usual and customary charge to the general public, the amount established by the North Carolina State determined upper payment limit plus a reasonable dispensing fee (this provision does not apply when there is only one enrolled pharmacy provider in the county), or the CMS upper limit plus a reasonable dispensing fee. A dispensing fee will not be paid for prescriptions refilled in the same month, whether it is the same drug or generic equivalent drug.

    *[handwritten: * lower of:  SMAC added]*

Multiple Source Drugs - North Carolina has implemented the list of drugs and their prices as published by the CMS and a State determined list of multiple source drugs. All drugs on this list are reimbursed at limits set by CMS or the State unless the physician writes in his own handwriting on the face of the prescription "brand necessary, dispense as written," or words of similar meaning.

*[handwritten: * BMN]*

TN No. 01-25
Supersedes
TN No. 89-09

Approval Date JUN 2 7 2002  Eff. Date 12/01/01

HHD137-0242

Attachment 4.19 – B
Section 12, Page 1a

MEDICAL ASSISTANCE
State: NORTH CAROLINA

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

B. North Carolina Estimated Acquisition Cost (NCEAC)

NCEAC is defined as the reasonable and best estimate of the price paid by providers for a drug as obtained from a manufacturer or other legal distributor. As determined by the Division the reasonable and best estimate is based on the average wholesale price (AWP) less 10 percent. For the AWP information the Division uses the First Databank Price Update Service, manufacturer's price list, or other nationally published sources. Telephone contact with manufacturer or distributors may be utilized when a published source is not available.

*※ EAC*
*※ FDB*

C. Dispensing Fees

Dispensing fees are determined on the basis of surveys that are conducted periodically by Division of Medical Assistance (DMA) or other recognized sources and takes into account various pharmacy operational costs, such as salary, overhead, etc. Between surveys the dispensing fee may be adjusted based upon various factors, i.e., Consumer Price Index (CPI). The Division reviews the fees of the other states and other information (i.e., National Pharmacy Surveys). The dispensing fee is paid to all providers for the initial dispensing. Refills within the same month are not paid a dispensing fee. The dispensing fee is $5.60 for generic drugs and $4.00 for brand name drugs.

*※ Change to DF*

TN No. 01-25
Supersedes
TN No. 92-24

Approval Date JUN 2 7 2002  Eff. Date 12/01/01

HHD137-0245

Attachment 4.19-B
Section 12, Page 1

MEDICAL ASSISTANCE
State: <u>NORTH CAROLINA</u>

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

12. Prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist.

a. Prescribed Drugs

Multiple source and other drugs will be reimbursed at the lowest of the estimated acquisition cost (EAC) as described below plus a reasonable dispensing fee, the provider's usual and customary charge to the general public, the amount established by the North Carolina State determined upper payment limit plus a reasonable dispensing fee (this provision does not apply when there is only one enrolled pharmacy provider in the county), or the CMS upper limit plus a reasonable dispensing fee. A dispensing fee will not be paid for prescriptions refilled in the same month, whether it is the same drug or generic equivalent drug. ※ FN#1

Multiple Source Drugs – North Carolina has implemented the list of drugs and their prices as published by the CMS and a State determined list of multiple source drugs. All drugs on this list are reimbursed at limits set by CMS or the State unless the provider writes in their own handwriting, brand name drug is "medically necessary". ※ BMN

TN No.: <u>06-007A</u>
Supersedes
TN No.: <u>01-25</u>

Approval Date: <u>09/27/06</u>

Effective Date: <u>06/01/06</u>

Attachment 4.19-B
Section 12, Page 1a

MEDICAL ASSISTANCE
State: <u>NORTH CAROLINA</u>

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

b. North Carolina Estimated Acquisition Cost (NCEAC) For Prescribed Drugs

NCEAC is defined as the reasonable and best estimate of the price paid by providers for a drug as obtained from a manufacturer or other legal distributor. As determined by the Division, the reasonable and best estimate is based on the average wholesale price (AWP) less 10 percent. For the AWP information the Division uses the First Databank Price Update Service, manufacturer's price list, or other nationally published sources. Telephone contact with manufacturer or distributors may be utilized when a published source is not available.

c. Dispensing Fee

The dispensing fee for drugs is determined by the North Carolina General Assembly. The dispensing fee is paid to all providers for the initial dispensing and excludes refills within the same month for the same drug or generic equivalent. The dispensing fee is $5.60 for generic drugs and $4.00 for brand name drugs.

*DF Same* [handwritten annotation]

TN No.: <u>06-007A</u>
Supersedes
TN No.: <u>01-25</u>

Approval Date: <u>09/27/06</u>

Effective Date: <u>06/01/06</u>

**42**

1  Carolina define EAC or estimated acquisition
2  costs?
3      A.  **The state defines that as AWP minus ten**
4  **percent.**
5      Q.  And in what year did the state define
6  estimated acquisition cost of AWP minus ten
7  percent?
8          MR. KATZ:  Objection, form.
9      A.  **Early '90s, I think 1990.**
10     Q.  And prior to that time, what was the
11 definition of estimated acquisition cost?
12     A.  **AWP, I believe.**
13     Q.  And was that the first time that North
14 Carolina has defined estimated acquisition cost?
15     A.  **I'm sorry, I don't understand what you**
16 **just asked.**
17     Q.  The AWP minus ten percent was I think
18 you said roughly in 1990?
19         MR. KATZ:  Objection to form.
20     A.  **Yes.**
21     Q.  And prior to that time, North Carolina
22 had defined estimated acquisition cost as AWP?

**43**

1      A.  **Um-hum.**
2          MR. KATZ:  Objection to form.
3      Q.  Do you mean AWP with no discount?
4      A.  **Yes.**
5      Q.  And what does AWP stand for?
6      A.  **Average wholesale price.**
7      Q.  And prior to 1990, when the state first
8  proposed AWP with no discount, was that
9  definition with estimated acquisition cost used?
10         MR. KATZ:  Objection to form.
11     A.  **No, I believe that, if I remember, CMS**
12 **would not approve the state plan without a**
13 **discount.**
14     Q.  A discount to what?
15     A.  **To AWP.**
16     Q.  Where does North Carolina get its AWPs?
17     A.  **From First Data Bank.**
18     Q.  And why would North Carolina use First
19 Data Bank to get average wholesale price
20 information?
21     A.  **Because they provided a file that we**
22 **can use in our claims processing that has that**

**44**

1  information.
2      Q.  Does North Carolina have any other
3  source available for average wholesale prices?
4      A.  **No.**
5          MR. KATZ:  Objection, form.
6      Q.  Why did North Carolina choose average
7  wholesale price minus ten percent as its
8  estimated acquisition cost?
9          MR. KATZ:  Objection, form.
10     A.  **It was the state's best estimate of the**
11 **cost of drugs.**
12     Q.  Why wouldn't the state use actual
13 acquisition cost on every claim that was
14 submitted?
15     A.  **Because we don't have that available.**
16     Q.  What if the pharmacies provided it on
17 every claim that they submitted to the state?
18     A.  **We're not -- our processes would not**
19 **accommodate that.**
20     Q.  Why not?
21     A.  **Because of the volume of claims we**
22 **process.**

**45**

1      Q.  You talked about another component of
2  the formula, the state maximum allowable cost?
3      A.  **Yes.**
4      Q.  Could you describe what that means?
5      A.  **It's a state specific limit on generic**
6  **drugs that have more than two generics available.**
7      Q.  And how does a state maximum allowable
8  cost affect the reimbursement formula?
9          MR. KATZ:  Objection to form.
10     A.  **It's one of the reference prices that**
11 **we use when we process a claim.**
12     Q.  And if you could clarify the formula.
13 You mentioned the various components of the
14 formula.  How do they -- how does the claims
15 processing know which basis to pay a claim?
16     A.  **The claims processing systems selects**
17 **the lower or the lowest of the previously**
18 **mentioned pricing methodology, AWP minus ten**
19 **percent, the federal upper limit, the state**
20 **maximum allowable cost list or usual and**
21 **customary.**
22     Q.  Does the state maximum allowable costs

*handwritten margin note:* *FN#2 (pp. 45-49) Re: SMAC methodology*

NC Department of Health and Human Services (Lisa Weeks)                                October 21, 2008
Raleigh, NC

13 (Pages 46 to 49)

---

Page 46

1  apply to all drugs?
2      A.  No, just generics with more than two
3  generics available.
4      Q.  And how does the state determine the
5  state maximum allowable cost for each drug?
6      A.  Well, to begin with, we have an
7  actuarial services contractor, Mercer, who
8  maintains and monitors it for us. But there's a
9  specific methodology they use to determine the
10 price for these drugs.
11     Q.  And what is that methodology?
12     A.  It is based on 150 percent of the cost
13 of the lowest cost generic. And if that cost is
14 lower than the second lowest cost, then ten
15 percent is added to that.
16     Q.  Added to what?
17     A.  To the cost of that drug.
18     Q.  To the first lowest or the second
19 lowest?
20     A.  The second lowest.
21     Q.  And when you say the lowest cost, what
22 is the source for cost?

Page 47

1      A.  Again, Mercer has a proprietary
2  database that they use that has AWPs.
3      Q.  And so how does that relate -- do they
4  use that in determining the state maximum
5  allowable cost?
6      A.  Yes, they use the AWPs from that
7  database.
8      Q.  In what way do they use the AWPs?
9      A.  They are determining the cost of the
10 drugs so they can develop the cost for the MAC
11 drugs.
12     Q.  When did the State of North Carolina
13 first implement the MAC list?
14     A.  2001.
15     Q.  Has the formula for setting the MAC
16 been the same to the present time?
17     A.  Yes.
18     Q.  Why did the State of North Carolina
19 begin the MAC program?
20     A.  The state developed and implemented
21 that program to -- as a cost containment measure
22 for pharmacy.

Page 48

1      Q.  And I think you said in 2001?
2      A.  Yes.
3      Q.  And why did it begin it in 2001?
4      A.  Because pharmacy had become the number
5  one line item and had been so for the last
6  several years before that time.
7      Q.  And what does that have to do with
8  creating the MAC program?
9      A.  The MAC program reduces expenditures
10 for pharmacy.
11     Q.  And let's talk a little bit about how
12 North Carolina went about developing the MAC
13 program.
14         Did North Carolina do it all by itself?
15     A.  No, again, the state used Mercer.
16     Q.  And what's Mercer?
17     A.  Again, it's the actuarial services
18 contract vendor for the state, and also there was
19 input from pharmacy providers.
20     Q.  And did Mercer, did Mercer make
21 proposals that the state then reviewed?
22     A.  Yes, I believe so.

Page 49

1      Q.  And why did the state turn to Mercer
2  for this work?
3      A.  Because Mercer had the expertise.
4      Q.  And ultimately was the Mercer plan
5  reviewed and approved by the state?
6      A.  Yes.
7      Q.  You mentioned that the formula provides
8  for 150 percent of the lowest priced generic,
9  unless that is lower than the second lowest
10 generic, is that correct?
11     A.  Yes.
12     Q.  In which case you would add ten percent
13 to the second lowest generic. Did I state that
14 correctly?
15     A.  That's right, yes.
16     Q.  Why would North Carolina provide for
17 that second option? Why wouldn't you just use
18 150 percent of the lowest price generic?
19     A.  Because the state tries to cover the
20 cost to the pharmacy provider for the drug.
21     Q.  And why would 150 percent of the lowest
22 price generic not do that?

### Page 94

1  Q. And does the, on the bottom left-hand
2  corner of the form, is there a particular form
3  number that's associated with this form?
4  A. Yes.
5  Q. And what is it?
6  A. It says form HCFA-179, and then in
7  parentheses 07-92.
8  Q. And is this document date stamped?
9  A. Yes.
10  Q. And what is the date stamp on the
11  document?
12  A. Received December 27, 2001, Division of
13  Medicaid and State Operations, Region IV.
14  Q. And did somebody from North Carolina
15  sign this transmittal?
16  A. Yes.
17  Q. And who was that?
18  A. Carmon Hooker Buel.
19  Q. And who was she?
20  A. She was the secretary of Health and
21  Human Services at that time.
22  Q. If you look at the second page of the

### Page 95

1  document that I've handed you, it starts with
2  paragraph 12A prescribed drugs. Do you see that
3  there?
4  A. Yes.
5  Q. Does this paragraph reflect any change
6  in the state's reimbursement formula at this
7  time.
8  A. It looks like it adds the state MAC.
9  Q. And how do you know that?
10  A. Because it has added the amount
11  established by the North Carolina State
12  determined upper payment limit.
13  Q. And that reflects the state maximum
14  allowable costs that you were referring to
15  earlier?
16  A. Yes.
17  Q. And what is the date of this document?
18  A. June -- the approval date is June 27,
19  2002. Effective date December 1, '01.
20  Q. And when did you say that the state MAC
21  program was implemented by the State of North
22  Carolina?

### Page 96

1  A. In 2001.
2  Q. So given that, what is the
3  reimbursement formula for the State of North
4  Carolina, as of the state plan amendment in 2001?
5  A. The reimbursement formula would be the
6  lowest of the estimated acquisition cost, which
7  is AWP minus ten percent at this time, plus a
8  dispensing fee.
9  So, again, the lower of the following,
10  the estimated acquisition cost, which is AWP
11  minus ten percent, the provider's usual and
12  customary charge to the public, the state MAC or
13  the federal upper limit.
14  Q. And where does it refer to the federal
15  upper limit in this reimbursement formula?
16  A. At the end of the paragraph it stays,
17  or the CMS upper limit plus a reasonable
18  dispensing fee.
19  Q. Is that the same thing as the federal
20  upper limit and the HCFA list that we talked
21  about earlier today?
22  A. Yes.

### Page 97

1  Q. If you turn the page there. When you
2  said the estimated acquisition cost as defined in
3  the state plan, what paragraph are you referring
4  to?
5  A. Paragraph B, North Carolina estimated
6  acquisition cost.
7  Q. And does that paragraph -- what does
8  that paragraph define?
9  A. It defines that as AWP less ten
10  percent.
11  Q. And what is the source for AWP
12  information?
13  A. Just as before, from First Data Bank,
14  manufacturer's price list or other nationally
15  published sources, telephone contact with
16  manufacturers or distributors may be utilized.
17  Q. In what circumstance?
18  A. When a published source is not
19  available.
20  Q. And the next paragraph there C,
21  dispensing fees, do you see that there?
22  A. Yes.

*[Handwritten margin note: More SMAC * FN#2 (pp. 95, 263-265, Ex 13)]*

262

1  Q. So we're not talking about an AWP,
2  we're talking about a cost, something other than
3  AWP, right?
4     MS. YAVELBERG: Objection, form.
5  A. I don't know. I don't know.
6  Q. We'll have a document after we're done
7  with this one that will clear that up.
8     That's one way that SMACs are set. But
9  there's another way, right? And if you keep
10 reading through the policy, you'll come to a
11 second way.
12 A. It's the way, it's the methodology for
13 establish generic drugs, is that what you're
14 talking about?
15 Q. Right.
16 A. Okay. Establish generic drugs with
17 only one supplier the MAC price.
18 Q. Let's stop there. Let's figure out,
19 let's tell the jury what that means.
20    So the first way of saying MACs is when
21 you have a brand drug and at least two competing
22 generic drugs, right?

263

1  A. Yes.
2  Q. And this other method now is when you
3  only have one brand and one generic, right?
4     MS. HAYES: Objection, form.
5  A. Actually, my understanding of what an
6  established generic is, there may just be one
7  supplier, so it's a single-source generic.
8  Q. Okay. Let me correct that then.
9     So we have one established generic drug
10 and one brand drug for the second way of saying
11 the MAC?
12    MS. YAVELBERG: Objection, form.
13 A. There may not be a brand. There may be
14 just one generic.
15 Q. Okay. Why don't you tell me how the
16 SMACs are set for this methodology?
17 A. For that methodology, it's the price is
18 established, it says here, between the actual
19 acquisition cost and average wholesale price of
20 the generic drug. It's a minimum reimbursement
21 of 20 percent above actual acquisition is
22 guaranteed for these drugs. Keep going?

264

1  Q. Yeah. Why don't you read the next
2  sentence down?
3  A. In most cases, the MAC pricing is
4  substantially higher than this 20 percent, which
5  allows the state and pharmacies to share in the
6  cost savings of using the generic product.
7  Q. Let's break this down a little.
8     So in the circumstances where there's
9  only one established supplier of the generic
10 drug, you take the AWP of that drug and you take
11 the actual acquisition cost, and then you are
12 going to set the MAC at some point between the
13 two, right?
14    MS. YAVELBERG: Objection, form.
15 A. It says that a minimum reimbursement of
16 20 percent above.
17 Q. Right. I just want to take it one step
18 at time to make it clear for the jury.
19 A. Okay.
20 Q. You take the published AWP you get from
21 First Data Bank, is that right?
22    MS. YAVELBERG: Objection, form.

265

1  A. Again, Mercer monitors this program for
2  us, this list. So they do have their own copy of
3  the First Data Bank.
4     So I would say you're right in that the
5  average wholesale price is something that they
6  have access to.
7  Q. So they have an AWP at one end, and
8  then they get an actual acquisition cost at the
9  other end, right?
10    MS. YAVELBERG: Objection, form.
11 A. Okay.
12 Q. And the MAC is set someplace between
13 the two, right?
14 A. Right.
15 Q. Now, where does the actual acquisition
16 cost come from?
17 A. The actual acquisition cost is, Mercer
18 has a proprietary database of price information,
19 it's confidential.
20 Q. Would that come from surveying
21 pharmacies?
22 A. I don't know where they get it from. I

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>HEALTH CARE FINANCING ADMINISTRATION | | FORM APPROVED<br>OMB NO. 0938-0193 |
|---|---|---|
| TRANSMITTAL AND NOTICE OF APPROVAL OF<br>STATE PLAN MATERIAL<br><br>FOR: HEALTH CARE FINANCING ADMINISTRATION | 1. TRANSMITTAL NUMBER:<br><br>01 – 25 | 2. STATE<br>NC |
| | 3. PROGRAM IDENTIFICATION: TITLE XIX OF THE<br>SOCIAL SECURITY ACT (MEDICAID) | |
| TO: REGIONAL ADMINISTRATOR<br>HEALTH CARE FINANCING ADMINISTRATION<br>DEPARTMENT OF HEALTH AND HUMAN SERVICES | 4. PROPOSED EFFECTIVE DATE<br><br>December 1, 2001 | |

5. TYPE OF PLAN MATERIAL (Check One):

☐ NEW STATE PLAN    ☐ AMENDMENT TO BE CONSIDERED AS NEW PLAN    X  AMENDMENT

COMPLETE BLOCKS 6 THRU 10 IF THIS IS AN AMENDMENT (Separate Transmittal for each amendment)

| 6. FEDERAL STATUTE/REGULATION CITATION:<br><br>42 CFR 447.201 and 42 CFR 447.331 | 7. FEDERAL BUDGET IMPACT:<br>a. FFY   02        $ ($30,181,855)<br>b. FFY   03        $ ($39,534,906) |
|---|---|
| 8. PAGE NUMBER OF THE PLAN SECTION OR ATTACHMENT:<br><br>Attachment 4.19-B, Section 12, Pages 1 and 1a | 9. PAGE NUMBER OF THE SUPERSEDED PLAN SECTION<br>OR ATTACHMENT (If Applicable):<br><br>Attachment 4.19-B, Section 12, Pages 1 and 1a |

10. SUBJECT OF AMENDMENT:

Dispensing Fee for Prescribed Drugs and Payment for Drugs

11. GOVERNOR'S REVIEW (Check One):
☐ GOVERNOR'S OFFICE REPORTED NO COMMENT            X  OTHER, AS SPECIFIED: Not Required
☐ COMMENTS OF GOVERNOR'S OFFICE ENCLOSED
☐ NO REPLY RECEIVED WITHIN 45 DAYS OF SUBMITTAL

| 12. SIGNATURE OF STATE AGENCY OFFICIAL:<br>*[signature]* | 16. RETURN TO: |
|---|---|
| 13. TYPED NAME:<br>Carmen Hooker Buell | Office of the Secretary<br>Department of Health and Human Services<br>2001 Mail Service Center<br>Raleigh, North Carolina 27699-2001 |
| 14. TITLE:<br>Secretary | |
| 15. DATE SUBMITTED:<br>December 20, 2001 | |

FOR REGIONAL OFFICE USE ONLY

| 17. DATE RECEIVED:<br>December 27, 2001 | 18. DATE APPROVED:<br>June 27, 2002 |
|---|---|

PLAN APPROVED – ONE COPY ATTACHED

| 19. EFFECTIVE DATE OF APPROVED MATERIAL:<br>December 1, 2001 | 20. SIGNATURE OF REGIONAL OFFICIAL:<br>*[signature]* |
|---|---|
| 21. TYPED NAME:<br>Eugene A. Grasser | 22. TITLE: Associate Regional Administrator<br>Division of Medicaid and State Operations |

23. REMARKS:

PLAINTIFF'S EXHIBIT 10/21/08 NO. 13 MMV

RECEIVED DEC 27 2001
DIVISION OF MEDICAID & STATE OPERATIONS
REGION IV

FORM HCFA-179 (07-92)

*Reference only - FN # 2, see next page*

Attachment 4.19-B
Section 12, Page 1

MEDICAL ASSISTANCE
State: NORTH CAROLINA

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

12. Prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist.

a. Prescribed drugs.

Multiple source and other drugs will be reimbursed at the lowest of: the estimated acquisition cost as described below plus a reasonable dispensing fee, the provider's usual and customary charge to the general public, the amount established by the North Carolina State determined upper payment limit plus a reasonable dispensing fee (this provision does not apply when there is only one enrolled pharmacy provider in the county), or the CMS upper limit plus a reasonable dispensing fee. A dispensing fee will not be paid for prescriptions refilled in the same month, whether it is the same drug or generic equivalent drug.

Multiple Source Drugs - North Carolina has implemented the list of drugs and their prices as published by the CMS and a State determined list of multiple source drugs. All drugs on this list are reimbursed at limits set by CMS or the State unless the physician writes in his own handwriting on the face of the prescription "brand necessary, dispense as written," or words of similar meaning.

TN No. 01-25
Supersedes      Approval Date **JUN 2 7 2002**      Eff. Date 12/01/01
TN No. 89-09

| | |
|---|---|
| From: | Lisa Weeks <Lisa.Weeks@ncmail.net> |
| To: | Judith Becherer <Jbecherer@MSLC.COM> |
| Date: | Tuesday - October 28, 2008 1:11 PM |
| Subject: | Re: Fwd: Medicaid Pricing Summary Follow-Up |

Here are answers to your questions to the best of my knowledge:
1. Compound drugs have been treated like generics regarding dispensing fee ($5.60) since the 2001 reduction in the brand dispensing fee to $4.00.
2. If these drugs come through pharmacy point-of-sale, then they are reimbursed as other drugs.
3. No
4. No
5. If DOJ pricing is AWP, then we have reimbursed at AWP-10% when a State MAC, Federal Upper Limit or Usual and Customary charge was not available just as your chart shows.
6. No

FN#5 (handwritten annotation bracketing items 1 and 2)

Lisa

Judith Becherer wrote:

> Dear Lisa,
>    I am following up on the email message (below) that I sent to you
> on October 15. Could you please let me know whether you have had a
> chance to review the additional questions and/or provide the answers?
> I have been asked to expedite completion of the summary for your
> state, so I need to know right away whether it is final or whether
> additional changes are required.
>    Thank you again for all of your help.
> Judith
>
>
> Judith E. Becherer
> Health Policy Consultant
> Myers and Stauffer, LC
> Certified Public Accountants
> 9265 Counselors Row, Suite 200
> Indianapolis, Indiana 46240-6419
>
> This message (and attachments) is intended for the use of the
> individual or entity to which it is addressed and may contain

1/1/1992 – 6/30/1992

Attachment 4.19-B
Section 12, Page 1a

MEDICAL ASSISTANCE
State: NORTH CAROLINA

PAYMENTS FOR MEDICAL AND REMEDIAL CARE AND SERVICE

1. **Other Drugs**

   Reimbursement for covered drugs other than the multiple-source drugs with HCFA upper limits shall not exceed the lower of:   *lower of*

   (i) The North Carolina estimated acquisition cost (NCEAC) for the drug plus a reasonable dispensing fee; or
   (ii) The provider's lowest charge to other third party payors; or
   (iii) The provider's usual and customary charge to the general public for the drug.

2. **North Carolina Estimated Acquisition Cost (NCEAC)**

   NCEAC is defined as the reasonable and best estimate of the price paid by providers for a drug as obtained from a manufacturer or other legal distributor. As determined by the Division the reasonable and best estimate is based on the average wholesale price (AWP) less 10 percent. For the AWP information the Division uses the First Databank Price Update Service, manufacturer's price list, or other nationally published sources. Telephone contact with manufacturer or distributors may be utilized when a published source is not available.

   *EAC = AWP-10%*
   *FDB*

3. **Dispensing Fees**

   Dispensing fees are determined on the basis of surveys that are conducted periodically by Division of Medical Assistance (DMA) or other recognized sources and takes into account various pharmacy operational costs, such as salary, overhead, etc. Between surveys the dispensing fee may be adjusted based upon various factors, i.e., Consumer Price Index (CPI). The Division reviews the fees of other states and other information (i.e., National Pharmacy Surveys). The dispensing fee is paid to all providers for the initial dispensing. Refills within the same month are not paid a dispensing fee. The dispensing fee is $5.60.

   *\*FN#1*
   *\*change to DF*

*Superseded by 92-24*

TN No. 92-05
Supersedes
TN No. 89-09

Approval Date  4/27/92    Eff. Date 1/1/92

**42**

1  Carolina define EAC or estimated acquisition
2  costs?
3      A.  The state defines that as AWP minus ten
4  percent.
5      Q.  And in what year did the state define
6  estimated acquisition cost of AWP minus ten
7  percent?
8      MR. KATZ:  Objection, form.
9      A.  Early '90s, I think 1990.
10     Q.  And prior to that time, what was the
11 definition of estimated acquisition cost?
12     A.  AWP, I believe.
13     Q.  And was that the first time that North
14 Carolina has defined estimated acquisition cost?
15     A.  I'm sorry, I don't understand what you
16 just asked.
17     Q.  The AWP minus ten percent was I think
18 you said roughly in 1990?
19     MR. KATZ:  Objection to form.
20     A.  Yes.
21     Q.  And prior to that time, North Carolina
22 had defined estimated acquisition cost as AWP?

**43**

1      A.  Um-hum.
2      MR. KATZ:  Objection to form.
3      Q.  Do you mean AWP with no discount?
4      A.  Yes.
5      Q.  And what does AWP stand for?
6      A.  Average wholesale price.
7      Q.  And prior to 1990, when the state first
8  proposed AWP with no discount, was that
9  definition with estimated acquisition cost used?
10     MR. KATZ:  Objection to form.
11     A.  No, I believe that, if I remember, CMS
12 would not approve the state plan without a
13 discount.
14     Q.  A discount to what?
15     A.  To AWP.
16     Q.  Where does North Carolina get its AWPs?
17     A.  From First Data Bank.
18     Q.  And why would North Carolina use First
19 Data Bank to get average wholesale price
20 information?
21     A.  Because they provided a file that we
22 can use in our claims processing that has that

**44**

1  information.
2      Q.  Does North Carolina have any other
3  source available for average wholesale prices?
4      A.  No.
5      MR. KATZ:  Objection, form.
6      Q.  Why did North Carolina choose average
7  wholesale price minus ten percent as its
8  estimated acquisition cost?
9      MR. KATZ:  Objection, form.
10     A.  It was the state's best estimate of the
11 cost of drugs.
12     Q.  Why wouldn't the state use actual
13 acquisition cost on every claim that was
14 submitted?
15     A.  Because we don't have that available.
16     Q.  What if the pharmacies provided it on
17 every claim that they submitted to the state?
18     A.  We're not -- our processes would not
19 accommodate that.
20     Q.  Why not?
21     A.  Because of the volume of claims we
22 process.

**45**

1      Q.  You talked about another component of
2  the formula, the state maximum allowable cost?
3      A.  Yes.
4      Q.  Could you describe what that means?
5      A.  It's a state specific limit on generic
6  drugs that have more than two generics available.
7      Q.  And how does a state maximum allowable
8  cost affect the reimbursement formula?
9      MR. KATZ:  Objection to form.
10     A.  It's one of the reference prices that
11 we use when we process a claim.
12     Q.  And if you could clarify the formula.
13 You mentioned the various components of the
14 formula.  How do they -- how does the claims
15 processing know which basis to pay a claim?
16     A.  The claims processing systems selects
17 the lower or the lowest of the previously
18 mentioned pricing methodology, AWP minus ten
19 percent, the federal upper limit, the state
20 maximum allowable cost list or usual and
21 customary.
22     Q.  Does the state maximum allowable costs

*FN #3 re: FDB (pp. 43, 91-92)*

NC Department of Health and Human Services (Lisa Weeks)                October 21, 2008

Raleigh, NC

24 (Pages 90 to 93)

Page 90

1   Q. I'd like you to -- and what section of
2   the state plan is it?
3   A. It is regarding reimbursement of drugs.
4   Q. And if you look at that first section,
5   No. 1, other drugs, and you look at that
6   reimbursement formula there?
7   A. Yes.
8   Q. I think you were just discussing that
9   the lowest third-party plan portion of the
10  reimbursement formula was omitted at a certain
11  time, is that correct?
12  A. Yes.
13  Q. And this 1992 plan does not include
14  that language, correct?
15  A. That's correct.
16  Q. Okay. Does this plan reflect the 1992
17  North Carolina reimbursement formula for drugs?
18  A. Yes.
19  Q. And what was the formula as set forth
20  in the state plan?
21  A. Okay. The North Carolina estimated
22  acquisition cost, okay, I'm sorry, I don't

Page 91

1   understand the question.
2   Q. What was the reimbursement formula, as
3   set forth in the state plan in 1992?
4   A. Okay. The state reimbursed based on
5   AWP minus ten percent or the provider's usual and
6   customary charge to the general public at the
7   lower of either of those.
8   Q. And did North Carolina define estimated
9   acquisition cost in the state plan?
10  A. Yes.
11  Q. And where did it do so?
12  A. It does so in this section two, North
13  Carolina estimated acquisition cost. It defines
14  it as AWP less ten percent.
15  Q. And does the state plan say where North
16  Carolina obtained information about average
17  wholesale price?
18  A. Yes.
19  Q. And where is that from? Where does it
20  say it obtained the information?
21  A. It says it obtained it from using the
22  First Data Bank price update service,

Page 92

1   manufacturer's price list or other nationally
2   published sources, telephone contact with
3   manufacturer distributors may be utilized when a
4   published source is not available.
5   Q. Did North Carolina in fact obtain AWP
6   information from the First Data Bank price update
7   service, manufacturer's list price or other
8   nationally published sources?
9   A. Yes.
10  Q. And this document is dated 1992,
11  correct?
12  A. Yes.
13  Q. From 1992 to the present, did North
14  Carolina obtain its AWP information from the
15  First Data Bank price update service,
16  manufacturer's price list or other nationally
17  published sources?
18  A. Yes.
19      MS. YAVELBERG: I'd like to mark this
20  next document as Exhibit 13.
21      (The document referred to was
22  marked Plaintiff's Exhibit Weeks 013 for

Page 93

1   identification.)
2       MS. YAVELBERG: It's three pages.
3   Q. Ms. Weeks, if you can take a minute to
4   look the document over.
5       (Pause.)
6   Q. And do you recognize this document?
7   A. Yes.
8   Q. What is it?
9   A. It is, again North Carolina state plan
10  section for drug reimbursement.
11  Q. And the first page of the document that
12  I've handed you.
13  A. Yes.
14  Q. What is this document? What is this
15  page?
16  A. It looks like the page where the state
17  plan was transmitted to CMS.
18  Q. Is it a specific form?
19  A. Yes.
20  Q. And what is the form?
21  A. It says transmittal and notice of
22  approval of state plan material.

7/1/1992 – 11/30/2001