# Exhibit 30

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

4300 Cox Road
Glen Allen, VA 23060
(804) 965-7400
www.fhsc.com


First Health
Services Corporation



October 23, 2003

RECEIVED
OCT 2 7 2003
MEDICAID

Distributed by:
Jeremy Massett
10/28/03

Mr. Jeremy Masett
Medicaid Analyst
Dey, L.P.
2751 Napa Valley Corporate Drive
Napa, CA 94558

Re: NMPI Pooling Rebate Agreement.

Dear Mr. Masett:

Enclosed please find Dey, L.P.'s original executed copy of the above referenced agreement. Dey, L.P. should expect to receive additional Participating State Addenda in the near future. First Health is most appreciative of Dey, L.P.'s participation in this program, which should be of great assistance to the Participating States in providing quality and cost effective medications to their state Medicaid recipients. First Health has enjoyed working with Dey, L.P. on this matter and looks forward to working with Dey, L.P. in the future.

Best Regards,

David Adams, Pharm. D.
Drug Rebate Programs

EXHIBIT
Dey 94

Enclosures

cc: Dawn Bazzano
Russ Johnston
Nancy Kendall
John Kling
Ann Marie Liu
Scott Maynard

FS64 L001
5/99

HIGHLY CONFIDENTIAL

DEY-LABS-0360178

# SUPPLEMENTAL DRUG-REBATE AGREEMENT
## CONTRACT # NMPI-1150

### PARTIES/PERIOD

1.1   This Supplemental Drug-Rebate Agreement ("Agreement") is made and entered into this __1st__ day of __April__ 2003, by and between the State of Michigan ("State"), represented by the Department of Community Health ("State"), First Health Services Corporation ("First Health"), Dey, L.P.____ ("Manufacturer"), Labeler Code __49502__, and such other states that subsequently join into this Agreement upon the terms hereafter set forth ("Participating State(s)") The parties, in consideration of the covenants, conditions, agreements, and stipulations expressed in this Agreement, do agree as follows:

### PURPOSE

2.1   It is the intent of this Agreement that (i) states and U.S. Territories that have entered into agreements for First Health to provide pharmacy benefit administration services ("PBA Services") to the state Medicaid and other CMS approved state-funded programs (" FH Clients"), including the State, and/or (ii) states that have entered into intergovernmental agreements, with the State for the latter to provide certain PBA Services to the state (" Client States") and/or (iii) states that have entered into intergovernmental agreements with a FH Client, for the FH Client to provide certain PBA Services to the state (FH Client's States) (states in categories (i), (ii), and (iii) often collectively referred to herein as "Participating States"), will receive State Supplemental Rebates, in addition to the rebates received under the CMS Rebate Agreement, pursuant to Section 1927 of the Social Security Act (42 U.S.C. §1396r-8), for the Manufacturer's Supplemental Covered Product(s) quarterly utilization in the Participating States' Medicaid Programs in which there is Medicaid federal financial participation. It is also the intent of this Agreement that State Supplemental Rebates will be paid for utilization of the Manufacturer's Supplemental Covered Product(s) in other state funded programs that have been approved for inclusion by the Secretary of Health and Human Services ("HHS"). The parties also intend for this Agreement to meet the requirements of federal law at Section 1927 of the Social Security Act (42 U.S.C. §1396r-8).

### DEFINITIONS

3.1   'Average Manufacturer Price' (AMP) means Manufacturer's price for the Covered Product(s). AMP will be calculated as specified in Manufacturer's CMS Agreement.

3.2   'Best Price' means, with respect to a Single Source Drug or Innovator Multiple Source Drug of a Manufacturer, the lowest price available from the Manufacturer during the rebate period to any

1

wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or government entity within the United States, excluding: (a) any price charged on or after October 1, 1992, to the Indian Health Services, the Department of Veterans Affairs, a State home receiving funds under Section 1741 of Title 38, United States Code, the Department of Defense, the Public Health Service, or a covered entity described in subsection (a)(5)(B) of Section 1927 of the Social Security Act; (b) any prices charged under the Federal Supply Schedule of the General Services Administration; (c) any prices used under a State Pharmaceutical Assistance Program; and (d) any depot prices and single award contract prices, as defined by the Secretary of any agency of the Federal Government. "Best Price" shall: (a) be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section); (b) be determined without regard to special packaging, labeling, or identifiers on the dosage form or product or package; and (c) not take into account prices that are merely nominal in amount.

3.3   'Client State(s)' means those states who enter into an agreement with the State, with First Health's continuing consent, for the provision of preferred drug list program management and related services.

3.4   'Covered Product(s)' means the pharmaceutical product(s) AccuNeb® (Albuterol Sulfate) Inhalation Solution, 0.63mg and 1.25mg, 3mL, of the Manufacturer pursuant to Section 1927 of the Social Security Act (42 U.S.C. §1396r-8).

3.5   'CMS Agreement' means the Manufacturer's drug rebate contract with the Centers for Medicare & Medicaid Services (CMS), formerly known as the Health Care Financing Administration, entered pursuant to Section 1927 of the Social Security Act (42 U.S.C. §1396r-8).

3.6   'CMS Basic Rebate' means, with respect to the Covered Product(s), the quarterly payment by Manufacturer pursuant to Manufacturer's CMS Agreement, made in accordance with Section 1927(c)(1) or Section 1927(c)(3) of the Social Security Act [42 U.S.C. §1396r-8(c)(1) and 42 U.S.C. §1396r-8(c)(3)].

3.7   'CMS CPI Rebate' means, with respect to the Covered Product(s), the quarterly payment by Manufacturer pursuant to Manufacturer's CMS Agreement, made in accordance with Section 1927(c)(2) of the Social Security Act [42 U.S.C. §1396r-8(c)(2)].

3.8   'CMS Rebate' means, with respect to the Covered Product(s), the quarterly payment by Manufacturer pursuant to Sections 4.1 of this Agreement.

HIGHLY CONFIDENTIAL                                                                                                   DEY-LABS-0360180

3.9 'CMS Unit Rebate Amount' means, the unit amount computed by CMS to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due.

3.10 'Drug Reimbursement Amount' means the total amount per unit allowable as calculated by the Participating States, specific to each drug, that the Participating States reimburse pharmacy providers per unit of drug under their Medicaid (and other state funded, HHS approved) programs, in accordance with applicable state and federal laws and regulations.

3.11 'First Health Client(s)' or 'FH Clients' means those states (including the State) that have entered or subsequently enter into agreements with First Health for the provision of pharmacy benefit administration services ("PBA Services") to the state Medicaid and other HHS approved state-funded programs, subject to the supervision and oversight of such states.

3.12 'First Health Client's States' or 'FH Client's States' means those states who enter into an agreement with a FH Client, with First Health's continuing consent, for the provision of preferred drug list program management and related services.

3.13 'Manufacturer' means, for purposes of this Agreement, the party identified as such in Section 1.1 of this Agreement, which may be a pharmaceutical manufacturer, labeler or other entity not prohibited by law from entering into this Agreement.

3.14 'Participating State(s)' means the State, Client States, FH Clients, and FH Client's States, all as defined herein.

3.15 'Participating States' Net Price Per Unit' or 'Net Price' means the amount(s) agreed upon by the parties to this Agreement in the attached "Supplemental Rebate Matrix, Schedule 2". 'Net Price' will vary in accordance with Schedule 2 and is dependent upon the factors detailed therein, which includes, but may not be limited to, the number of Medicaid (and other state funded, HHS approved) eligible recipient lives and the number of products in a Preferred Drug List's product category. Per the attached "Supplemental Rebate Matrix, Schedule 2", Net Price will be a factor in the equation that is determinative of the Supplemental Rebate Amount.

3.16 'Participation Commencement Date' means the date a Manufacturer's Supplemental Covered Product is effectively placed in a Participating States Preferred Drug List Program by distribution of it

3

HIGHLY CONFIDENTIAL
DEY-LABS_0360181

(via website or otherwise) to providers and prescribers. It is the date when the Participating States entitlement to a rebate from the Manufacturer accrues.

3.17 'Pharmacy Provider' means an entity licensed or permitted by law to dispense legend drugs, and enrolled as a State Medicaid Provider.

3.18 'Rebate Summary' means the individual Participating States' reports itemizing the State Utilization Data supporting each Participating State's invoice for Rebates. The Rebate Summary will comply in all respects with requirements for Medicaid Utilization Information in the CMS Agreement.

3.19 'State Supplemental Rebate' means, with respect to the Supplemental Covered Product(s), the quarterly payment by Manufacturer pursuant to Section 4.2 of this Agreement.

3.20 'State Utilization Data' means the data used by Participating States to reimburse pharmacy providers under Participating States' Medicaid Program (and other state funded, HHS approved programs). State Utilization Data excludes data from covered entities identified in Title 42 U.S.C. §256b(a)(4) in accordance with Title 42 U.S.C. §256b(a)(5)(A) and 1396r-8(a)(5)(C).

3.21 'Supplemental Covered Product' means the pharmaceutical product(s) AccuNeb® (Albuterol Sulfate) Inhalation Solution, 0.63mg and 1.25mg, 3mL of the Manufacturer, as detailed in the attached Supplemental Rebate Matrix, Schedule 2, upon which a State Supplemental Rebate will be paid pursuant to this Agreement.

3.22 'Supplemental Covered Product Category' or 'Product Category' means a defined group of pharmaceutical products considered to compete with one another in the market and that are also thought to be therapeutic alternatives in many situations. First Health Services has determined and defined the Product Categories in which manufacturers will bid. The Product Categories, set forth on the "Product Categories, Schedule 1" hereto, may be changed as deemed appropriate by Participating States.

3.23 'Supplemental Rebate Amount' means, with respect to the Supplemental Covered Product(s), the amount(s) specified in the attached Supplemental Bid Matrix, Schedule 2 and Supplemental Rebate Calculation, Schedule 3 that the Manufacturer has agreed to reimburse Participating States per unit of drug in accordance with the formula detailed in the above Schedules.

3.24 'Wholesale Acquisition Cost' or 'WAC' means the Manufacturer's U.S. Dollar wholesale acquisition price in effect on the last day of a quarter on a unit basis as published by a third party source,

4

such as First Databank, for each product and represents the Manufacturer's published price for a drug product to wholesalers.

**MANUFACTURER'S RESPONSIBILITIES**

4.1  Manufacturer will calculate and provide each Participating State a CMS Rebate for the Covered Product(s), which includes the CMS Basic Rebate and CMS CPI Rebate, as appropriate. The CMS Rebate represents the discount obtained by multiplying the units of the Covered Product(s) reimbursed by each Participating State in the preceding quarter by the per unit rebate amount provided to each Participating State by CMS. CMS will calculate the CMS Rebate amount in accordance with Manufacturer's CMS Agreement. Manufacturer's obligation for CMS Rebates will continue for the duration of the Manufacturer's CMS Agreement.

4.2  In addition to the CMS Rebates described in Section 4.1 of this Agreement, Manufacturer will remit to each Participating State a State Supplemental Rebate for the Supplemental Covered Product(s) that are in each Participating States Preferred Drug List Program. The State Supplemental Rebates will be calculated on a calendar quarter basis and provided via invoices to the Manufacturer's CMS financial contact. The State Supplemental Rebates for the quarter will be determined by multiplying the number of units of the Supplemental Covered Product(s) reimbursed by each Participating State in the preceding quarter by its Supplemental Rebate Amount. The Manufacturer's obligation for State Supplemental Rebates will continue for the duration of this Agreement. The Supplemental Rebate calculation is described in "Supplemental Rebate Calculation, Schedule 3".

4.3  The Manufacturer's obligation for State Supplemental Rebates will begin with the Rebate Billing Period for the second calendar quarter 2003, which begins April 1, 2003 (even if this Agreement is not fully executed by such date) and will continue through the Rebate Billing Period that ends March 31, 2006. Notwithstanding the above, the Participating States reserve the right to solicit annually more favorable State Supplemental Rebates from Manufacturer by giving written notice thereof no less than ninety (90) days prior to the yearly anniversary of the effective date of this Agreement.

4.4  The quarters to be used for calculating the Rebates in Section 4.2 of this Agreement will be those ending on March 31, June 30, September 30, and December 31 of each calendar year during the term of this Agreement.

4.5  The participating Manufacturer will be required to submit each Participating State's State Supplemental Rebate payment within 30 days of the Manufacturer's receipt of the Participating State's

HIGHLY CONFIDENTIAL

Rebate Summary.

4.6     Manufacturer will pay the State Supplemental Rebates, including any applicable interest in accordance with Section 1903 (d)(5) of the Act. Interest on the Rebates payable under Section 4.2 of this Agreement begins accruing 38 calendar days from the postmark date of each Participating State's invoice and supporting Rebate Summary sent to the Manufacturer and interest will continue to accrue until the postmark date of the Manufacturer's payment. For the rebate programs invoiced under this Agreement, if the date of mailing of a Rebate payable under Section 4.2 of this Agreement is 69 days or more from the date of mailing of the invoice, the interest rate will be calculated as required under federal guidelines for rebates described in Section 4.1 but will be increased by ten percentage points or the maximum allowed by that Participating State's state law. If a Participating State has not received the Rebates payable under Section 4.2 of this Agreement, including interest, within 180 days of the postmark date of said Participating State's invoice and supporting Rebate Summary sent to the Manufacturer, such Participating State may deem the Manufacture to be in default and Participating State may terminate its participation in this Agreement by giving Manufacturer and First Health ninety (90) days advance written notice.

4.7     Manufacturer agrees to continue to pay State Supplemental Rebates on the Supplemental Covered Product(s) for as long as this Agreement or any of its Addenda are in force, and State Utilization Data shows that payment was made for that drug, regardless of whether the Manufacturer continues to market that drug.

4.8     Unless notified otherwise, Manufacturer will send Rebate payments by certified mail, return receipt requested, to the address provided to Manufacturer in each individual Participating State's Addendum.

**PARTICIPATING STATE(S)' RESPONSIBILITIES**

5.1     Each Participating State will consider the Manufacturer's Supplemental Covered Product(s) for inclusion in the Participating State's Preferred Drug List Program. Each individual Participating State reserves the right to select the products that will be in its Preferred Drug List Program and will only receive State Supplemental Rebates for Manufacturer's Supplemental Covered Products that are actually included in its Preferred Drug List Program. Each individual Participating State also reserves the right to determine, as a result of a Product Category review, that prior authorization is required for all preferred drugs in a Product Category. If a Participating State determines that prior authorization is required for any Supplemental Covered Product, then the Participating State will comply with all provisions of Section 1927(d) of the Social Security Act applicable to Prior Authorization programs. Each Participating State will notify, within ten (10) business days, First Health and the State when Manufacturer's Supplemental

HIGHLY CONFIDENTIAL

DEY-LABS_0360184

Covered Product is added to the Participating State's Preferred Drug List.

5.2   The State and/or First Health shall notify the Manufacturer whenever a Participating State adds one of Manufacturer's Supplemental Covered Products to its Preferred Drug List.

5.3   Each Participating State will provide aggregate State Utilization Data of Manufacturer's Covered Products to the Manufacturer on a quarterly basis. This data will be based on paid claims data (data used to reimburse pharmacy providers) under each Participating State's Medicaid (and other state funded, HHS approved) Program(s), will be consistent with any applicable Federal or State guidelines, regulations and standards for such data, and will be the basis for the Participating State's calculation of the State Supplemental Rebate. The State Utilization Data provided for in this Section 5.3 will not include individually identifiable patient health information as defined under Section 164.502, of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")..

5.4   Each Participating State will maintain those data systems used to calculate the State Supplemental Rebates. In the event material discrepancies are discovered, the Participating State will promptly justify its data or make an appropriate adjustment, which may include a credit as to the amount of the State Supplemental Rebates, or a refund to Manufacturer as the parties may agree.

5.5   Each Participating State shall maintain electronic claims records for the most recent four quarters that will permit Manufacturer to verify through an audit process the Rebate Summaries provided by the Participating State.

5.6   Upon implementation of this Agreement, and from time to time thereafter, Participating States and Manufacturer will meet to discuss any data or data system improvements which are necessary or desirable to ensure that the data and any information provided by the Participating States to Manufacturer are adequate for the purposes of this Agreement.

5.7   First Health, as the pharmacy benefit administrator, may assist the Participating States in fulfilling its responsibilities hereunder and is a party to this Agreement solely in its capacity as agent for, and subject to the supervision and oversight of, the Participating State(s).

7

HIGHLY CONFIDENTIAL                                                                                                          DEY LABS 0360185

**DISPUTE RESOLUTION**

6.1    In the event that in any quarter a discrepancy in a Participating State's State Utilization Data is questioned by the Manufacturer, which the Manufacturer and the Participating State in good faith are unable to resolve, the Manufacturer will provide written notice of the discrepancy to the Participating State and First Health.

6.2    If the Manufacturer in good faith believes the Participating State's State Utilization Data is erroneous, the Manufacturer shall pay the Participating State that portion of the rebate claimed, that is not in dispute by the required date. The balance in dispute, if any, will be paid by the Manufacturer to the Participating State by the due date of the next quarterly payment after resolution of the dispute.

6.3    The Participating State and the Manufacturer will use their best efforts to resolve the discrepancy within 60 days of receipt of written notification. Should additional information be required to resolve disputes, the Participating State and First Health will cooperate with the Manufacturer in obtaining the additional information.

6.4    In the event that the Participating State and the Manufacturer are not able to resolve a discrepancy regarding State Utilization Data as provided for in Sections 6.1 through 6.3, the Manufacturer may request a reconsideration of the Participating State's determination within 30 days after the end of the 60 day period identified in Section 6.3. The Manufacturer shall submit with its written request its argument in writing, along with any other materials, supporting its position to the Participating State and First Health. The Participating State shall review the written argument and materials and issue a decision in the matter.

**CONFIDENTIALITY PROVISIONS**

7.1    The parties agree that confidential information will not be released to any person or entity not a party to this contract. Confidential information, including trade secrets, will not be disclosed, or used except in connection with this Agreement or as may be required by law or judicial order.

7.2    The Manufacturer will hold Participating State' State Utilization Data confidential. If the Manufacturer audits this information or receives further information on such data, that information shall also be held confidential. The Manufacturer shall have the right to disclose Participating State(s)'s State Utilization Data to auditors who agree to keep such information confidential.

7.3    Pursuant to 42 USC 1396r-8(b)(3)(D), and other applicable state or federal laws, the parties agree

HIGHLY CONFIDENTIAL                                                                                                         DEY-LABS-0360186

that this Agreement and all information provided pursuant to this Agreement will not be disclosed and that the parties will not duplicate or use the information, except in connection with this Agreement or as may be required by judicial process. The parties further agree that any information provided to the State by the Manufacturer pursuant to this Agreement and this Agreement itself constitute trade secrets and/or confidential or proprietary commercial and financial information not subject to public disclosure. If the services of a third party are used to administer any portion of this Agreement, Sections 7.1 through 7.4 of this Agreement shall apply to the third party. In the event a Participating State cannot give satisfactory assurance that rebate pricing data will be exempt from public disclosure under applicable state law, then First Health (without assuming responsibility for any wrongful disclosure by a Participating State) shall limit the amount of such data made available to the Participating State by not disclosing to the Participating State any NDC-level pricing information. For purposes hereof "satisfactory assurance" shall be deemed given when the Participating State enters the statutory cite of the applicable exemption on its Participating State Addendum. In the event that either party is required by law to disclose any provision of this Agreement or pricing information to any person, other than as clearly contemplated by this Agreement, such party shall provide advance written notice to the other party, if possible, sufficiently in advance of the proposed disclosure to allow the other party to seek a protective order or other relief.

7.4     Notwithstanding the non-renewal or termination of this Supplemental Rebate Agreement for any reason, these confidentiality provisions will remain in full force and effect.

NON-RENEWAL or TERMINATION

8.1     This Agreement shall be effective as of April 1, 2003 and shall have the term indicated in Section 4.3, *supra*.

8.2     Any Participating State may terminate its participation in this Agreement by giving Manufacturer and First Health written notice at least (90) days prior to the anniversary date of this Agreement, in which case termination shall become effective on the anniversary date of the date of execution of this Agreement. The termination of this Agreement by one or more Participating States shall not affect the Manufacturer's, First Health's or the other Participating States' obligations under this Agreement, other than any effect the reduction in the number of lives covered by the Agreement may have on the Supplemental Rebate payable hereunder. Manufacturer may terminate this Agreement and all Addenda by giving all Participating States and First Health written notice at least ninety (90) days prior to the anniversary date of this Agreement, in which case termination shall become effective on the anniversary date of the date of execution of this Agreement. Manufacturer's right of termination is limited to the right to terminate the entire Agreement. Manufacturer may not terminate specific addendum/Addenda of less

9

than all Participating State(s). ***[Dey's changes to this section are unacceptable. The minimum term of this Agreement is one year. The logistics of coordinating multiple states' preferred drug lists and their P & T committees mandates that the minimum term not be decreased.]***

8.3    Termination by (i) a FH Client of its PBA Services agreement with First Health, or (ii) by a Client State of its intergovernmental agreement with the State, or (iii) by a FH Client State of its intergovernmental agreement with a FH Client State shall, as of the same termination effective date, terminate this Agreement as to that Participating State.

8.4    Notwithstanding any non-renewal or termination of this Agreement, State Supplemental Rebates will still be due and payable from the Manufacturer under Section 4.2 for any Supplemental Covered Products for which Participating State(s)' obligation to reimburse arose prior to the effective date of termination of this Agreement.

8.5    On at least an annual basis or as mutually agreed upon by Manufacturer and First Health, Manufacturer shall have the opportunity to decrease the Net Price of its Covered Products to provide Participating States and their recipients with competitive and less costly products.

**GENERAL PROVISIONS**

9.1    This Agreement will be governed and construed in accordance with 42 U.S.C. §1396r-8 and all other applicable federal and state law and regulations.

9.2    Any notice required to be given pursuant to the terms and provisions of this Agreement will be in writing and will be sent by certified mail, return receipt requested. Notice will be mailed to the address(es) specified in each individual Participating State's Addendum to this Agreement.

10

HIGHLY CONFIDENTIAL                                                                              DEY-LABS 0360188

Notice to the State shall be sent to:

> State of Michigan
> Department of Community Health
> Medical Services Administration
> Attn: Dave McLaury
> 400 S. Pine Street
> Lansing, MI 48933

Notice to First Health shall be sent to:

> First Health Services Corporation
> Attn: Teresa R. DiMarco, President
> With a copy to: Legal Department
> 4300 Cox Road
> Glen Allen, Virginia 23060

Notice to Manufacturer will be sent to:

| | |
|---|---|
| Accounting Department (For Rebate Payments) | Jeremy Massett, Medicaid Analyst<br>Dey, L.P.<br>2751 Napa Valley Corporate Drive<br>Napa, CA 94558<br>jeremy.massett@dey.com |
| Contracts Department (For Contract/Pricing Issues) | Hema Chandranatha, Contract Analyst<br>Dey, L.P.<br>2751 Napa Valley Corporate Drive<br>Napa, CA 94588<br>hema.chandranatha@dey.com |

9.3   The Manufacturer agrees to be bound by the laws of the United States of America and with respect to each Participating State, the law of that Participating State. Proper venue in any legal action shall be the venue of the Participating State that is party to the proceeding. Any action brought by Manufacturer must be brought separately against individual Participating States or First Health, unless all affected Participating States and First Health consent to joinder of the actions.

11

HIGHLY CONFIDENTIAL

DEY-LABS 0360180

9.4     Nothing herein shall be construed or interpreted as limiting or otherwise affecting First Health, Participating State(s) or Manufacturer's ability to pursue its rights arising out of the terms and conditions of the Agreement in the event that a dispute between the parties is not otherwise resolved.

9.5     Manufacturer and the agents and employees of Manufacturer in the performance of this Agreement, will act in an independent capacity and not as officers, employees or agents of First Health or any Participating State.

9.6     No Party to this Agreement may assign their rights or obligations, either in whole or in part, without the written consent of the other parties, which consent shall not be unreasonable withheld. If the Agreement is assigned pursuant to this Section, the assigning party shall provide the other parties with an update of the information contained in Section 9.2, *supra*.   ***[This amounts to an acceptance of Dey's requested change with the addition of the consent not being unreasonably withheld provision]***

9.7     Nothing in this Agreement will be construed so as to require the commission of any act contrary to law. If any provision of this Agreement is found to be invalid or illegal by a court of law, or inconsistent with federal requirements, this Agreement will be construed in all respects as if any invalid, unenforceable, or inconsistent provision were eliminated, and without any effect on any other provision.

9.8     First Health, Participating State(s) and Manufacturer declare that this Agreement, including attachments, schedules and addenda, contains a total integration of all rights and obligations of the parties. There are no extrinsic conditions, collateral agreements or undertakings of any kind. In regarding this Agreement as the full and final expression of their contract, it is the express intention of the parties that any and all prior or contemporaneous agreements, promises, negotiations or representations, either oral or written, relating to the subject matter and period of time governed by this Agreement which are not expressly set forth herein are to have no force, effect, or legal consequences of any kind.

9.9     This Agreement will not be altered except by an amendment in writing signed by the parties or the addition of Participating State(s) by its execution of the Participating State Addendum, a copy of which is attached hereto. The addition of Participating State(s) by addendum/addenda shall only require the consent of First Health. Manufacturer agrees that any Participating State may be added to this Agreement by addendum and that said Participating State's covered Medicaid (and other state funded, HHS approved) lives shall apply to the provisions of Schedules 2 and 3 and will affect the rebates to all Participating States in accordance with Schedules 2 and 3. The addendum shall be executed by First Health and the new Participating State with a copy provided to Manufacturer for its records. Other than as stated herein, no individual is authorized to alter or vary the terms or make any representation or

HIGHLY CONFIDENTIAL

inducement relative to it, unless the alteration appears by way of a written amendment, signed by duly appointed representatives of the Participating State(s), First Health, and the Manufacturer. ***[Dey's suggested change is unacceptable. If a Participating State has an Agreement in place with Dey, it will be replaced by this Agreement pursuant to Section 9.8 of this Agreement.]***

9.10   The parties do not contemplate any circumstances under which indemnification of the other parties would arise. Nevertheless, should such circumstances arise, Manufacturer agrees to indemnify, defend and hold harmless the Participating States and First Health, their officers, agents and employees from any and all claims and losses accruing or resulting to any person, firm or corporation who may be injured or damaged by Manufacturer's negligence or willful misconduct in the performance of this Agreement, in which event Manufacturer shall have the authority to control the defense of said claim or lawsuit.

9.11   Inasmuch as the State Supplemental Rebates required by this Agreement are state Medicaid (and other state funded) Program beneficiaries, it is agreed that the State Supplemental Rebates do not establish a new 'Best Price' for purposes of participating Manufacturer's CMS Agreement.

9.12   In the event that Participating State(s) require(s) prior authorization of Manufacturer's Supplemental Covered Product(s) as part of a Product Category prior authorization under Section 5.1, State Supplemental Rebates shall nevertheless be payable hereunder. If, however, a Supplemental Covered Product(s) of the Manufacturer should require prior authorization and not the whole Product Category, Manufacturer shall not be required to provide Participating State with State Supplemental Rebates for the product.

9.13   If First Health makes changes to a Product Category that are considered to be a material change in the structure of the supplemental rebates program, Manufacturer may be allowed to re-submit bids for the Product Category/Categories affected.

HIGHLY CONFIDENTIAL

DEY-LABS 0360101

9.14  As evidence of their Agreement to the foregoing terms and conditions, the parties have signed below.

STATE OF MICHIGAN, DEPARTMENT OF COMMUNITY HEALTH:

By: _____   Date: 8/13/03
Name:  David McLaury
Title: Medical Services Administration

DEY, L.P.

By: _____   Date: 8/1/03
Name: Russell R. Johnston
Title: Manager, Sales/Marketing Services

FIRST HEALTH SERVICES CORPORATION

By: _____   Date: 8/15/03
Name:  Teresa R. DiMarco
Title   President

14

HIGHLY CONFIDENTIAL

DEY-LABS-0360192

### Schedule 3
### Supplemental Rebate Calculation

This Schedule 3 to the SUPPLEMENTAL DRUG-REBATE AGREEMENT provides as follows:

The Supplemental Rebate Amount per Unit is calculated for each NDC of a Supplemental Covered Product according to the following formula:

Supplemental Rebate Amount per Unit = WAC per Unit <u>minus</u> CMS Unit Rebate Amount <u>minus</u> Net Price per Unit

Supplemental Rebate Amount per Unit will be greater than or equal to zero.

Supplemental Rebate Amount Due = Supplemental Rebate Amount per Unit times number of units.

> Where units is the total units per NDC of the Covered Product reimbursed to pharmacy providers during the applicable quarter. New NDCs for Supplemental Covered Products will be automatically included in this agreement unless specifically excluded.

The Net Price Per Unit is determined based on the following variables.

1. The number of Eligible Recipients on the last day of the applicable quarter and weighted based on the number of days for which the Preferred Drug List was in effect for each Participating State; "Eligible Recipients" for purposes hereof will be Medicaid lives, as reported by the Participating State, drug prescriptions for whom are eligible for CMS Rebates and such other lives that participate in state pharmaceutical assistance programs that have been approved by CMS for inclusion in the supplemental rebate program.

2. The PDL status of the Supplemental Covered Product will be determined as compared to the PDL status of the other products within the applicable Product Category as of the first day of the calendar quarter or the first day in which the PDL was in effect for the Participating State.

*[handwritten margin notes: "q^nd", "partial quarters"]*

HIGHLY CONFIDENTIAL

DEY-LABS-0360200