# Exhibit 33

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for
Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary
Judgment

1

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

-----------------------------x

IN RE: PHARMACEUTICAL          :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :   CIVIL ACTION

PRICE LITIGATION               :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-A-Care of     :   Judge Patti B.

The Florida Keys, Inc.,        :        Saris

          Plaintiff,           :

     vs.                       :

ABBOTT LABORATORIES, INC.,     :   Chief Magistrate

No. 06-CV-11337-PBS            :   Judge Marianne B.

          Defendants.          :        Bowler

-----------------------------x

VOLUME I

Baltimore, Maryland

Wednesday, September 26, 2007

Videotape Deposition of:

          LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

Reed, Larry                                    September 26, 2007
                        Baltimore, MD

280

1    there could have been other telephone

2    conversations.  I don't recall.

3        Q.   Was it more than one meeting?

4        A.   If I remember correctly, I remember at

5    least two meetings.

6        Q.   And where were those meetings held?

7        A.   Those meetings were held in the

8    previous -- the previous buildings that HCFA had.

9        Q.   In Baltimore?

10       A.   In Baltimore.

11       Q.   How long did those meetings last?

12       A.   Each meeting lasted -- the first

13   meeting lasted at least a day, maybe two days.

14   If I remember correctly, the second meeting, no

15   longer than a day, if I'm remembering correctly

16   about that.

17       Q.   And you recall two meetings, two in-

18   person --

19       A.   Yes.

20       Q.   -- meetings, right?

21       A.   Yeah.

22       Q.   Do you know if there were other

Reed, Larry

September 26, 2007

Baltimore, MD

281

1    meetings that you were in attendance?

2        A.    Not that I remember.

3        Q.    Did you have a personal view on whether

4    or not the AMP information should be shared with

5    the states?

6        A.    At that point in time?

7        Q.    Yes.

8        A.    Not that I recall.

9        Q.    Did you eventually form a view on that

10   issue?

11       A.    Up to the present time?

12       Q.    Yes.

13       A.    Certainly with the passage of the

14   Deficit Reduction Act, I -- it should be shared

15   with the states.

16       Q.    Did you have a personal belief prior to

17   that time that the AMP information should be

18   shared with the states?

19       A.    The information that we would -- that

20   we collected on AMP would have been of limited

21   use to the states.  They couldn't use it for

22   reimbursement.

Reed, Larry                                   September 26, 2007

Baltimore, MD

282

1          They had information that would -- that

2    did allow them to calculate the rebate payment or

3    at least invoice a rebate payment due them, so I

4    guess in that regard it wouldn't have been

5    helpful to them before the Deficit Reduction Act.

6          Q.    What would not have been helpful for

7    them?

8          A.    Having the AMPs.

9          Q.    And why is that?

10         A.    It would not have been helpful for

11   them? Because at that point, there's -- the AMPs

12   couldn't be used for a rebate payment.  They had

13   already the unit rebate amount which allowed them

14   to calculate the rebate payment that they would

15   expect.  They couldn't be used for reimbursement,

16   they couldn't be used for payment.

17         Q.    Why not?

18         A.    Because of the confidentiality

19   provisions.

20         Q.    Is there anything in the statute that

21   specifically says AMP data cannot be used for

22   reimbursement?

Reed, Larry                                                    September 26, 2007

Baltimore, MD

283

1      A.   The confidentiality provisions allow

2   for that data to be used for purposes that that

3   section allow, which are the rebate calculations

4   and payment of rebates.

5      Q.   And one of your responsibilities at

6   HCFA was to approve state plans that set forth

7   methodologies for reimbursing drugs, correct?

8      A.   To be part of that process.  I didn't

9   personally approve those plans.

10      Q.   But the central office would become

11   involved when there was a question about whether

12   or not a particular plan should be approved; is

13   that fair to say?

14      A.   For -- are you talking again for the

15   15-year time period?

16      Q.   Yes.

17      A.   Okay.  For some -- for some of that

18   time period, the central office would become

19   involved, and for some of that time period, the

20   central office would do the approvals.

21      Q.   Do you recall any states expressing an

22   interest in obtaining the AMP data?