# Exhibit 35

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
-------------------------------------X   MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY      :   CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION   :   01-CV-12257-PBS

-------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :   CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :   06-CV-11337-PBS

Laboratories, Inc.                   :

-------------------------------------X
```

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

```
-------------------------------------X

STATE OF ALABAMA,                    :   CASE NO.

        Plaintiff,                   :   CV-05-219

    v.                               :

ABBOTT LABORATORIES, INC.,           :   JUDGE

et al.,                              :   CHARLES PRICE

        Defendants.                  :

-------------------------------------X
```

456

1   understanding that during the time that you ran

2   HCFA, that within HCFA, the AMPs, average

3   manufacturer prices reported by Dey were somewhere

4   within HCFA?

5               MS. BROOKER: Objection. Form.

6       A.      Yes.

7       Q.      And was it your understanding that

8   there were people who were responsible for

9   reviewing the information on AMP that they

10  submitted to HCFA?

11              MS. BROOKER: Objection. Form.

12      A.      Yes.

13      Q.      And was it your understanding that

14  there were people at HCFA whose responsibility it

15  was to make sure that Dey was reporting AMPs and

16  paying rebates?

17              MS. BROOKER: Objection. Form.

18      A.      Yes.

19      Q.      And the information that Dey

20  submitted to -- to HCFA, when you were the head,

21  reporting every quarter the AMPs as required by

22  the agreement, that was information that was

457

1    available to you. Right?

2          A.    No.

3                MS. BROOKER: Objection. Form.

4          Q.    I'm sorry?

5          A.    No.

6          Q.    You -- you, as the head of HCFA,

7    could not see the AMP data?

8          A.    I -- I believe the statutory

9    requirements relative to the data and the use of

10   the data limited its distribution application only

11   for people involved in the direct administration

12   of the rebate program.

13               Had I chosen to be more directly

14   involved in the rebate program I could have been,

15   and, therefore, had access to the data, but it was

16   not routinely made available to anyone in the

17   agency other than those directly involved in

18   administering the rebates.

19         Q.    Well, you were entitled to, Dr.

20   Vladeck, as the person running HCFA, to go into

21   your office one day and say to somebody, Give me

22   the AMPs that Dey is reporting.

1              Isn't that right?
2                   MR. BREEN: Objection. Form.
3                   MS. BROOKER: Objection. Form.
4         Q.   You had the power to do that;
5    didn't you?
6                   MR. BREEN: Objection. Form.
7                   MS. BROOKER: Objection. Form.
8         A.   As I understood the statute, only
9    to the extent that I was interested in -- in
10   reviewing the administration of the rebate
11   program.
12        Q.   Well, for whatever reason, you were
13   entitled to get that information and look at it
14   yourself; weren't you?
15                  MR. BREEN: Objection. Form. Asked
16   and answered.
17                  MS. BROOKER: Objection. Form.
18        A.   I would guess as a -- as a formal
19   legal matter, yes.
20        Q.   Okay. Now, you're -- when you talk
21   about who can see the AMP data, you're referring
22   to the fact that there were confidentiality

```
 1   provisions that explained who could get that

 2   information.   Right?

 3              MS. BROOKER:   Objection.  Form.

 4        A.    Yes.

 5        Q.    Are you aware -- are you saying

 6   that were statutory provisions that stated that

 7   people running Medicaid at HCFA were prohibited

 8   from looking at AMP data?

 9              MS. BROOKER:   Objection.  Form.

10        A.    My understanding of the statutory

11   provision was that people at HCFA who were not

12   involved in running the drug reimbursement program

13   were not supposed to have access to the AMP data.

14        Q.    What is that understanding based

15   on?

16        A.    That's what I was advised by -- by

17   counsel's office.

18        Q.    Which counsel's office?

19        A.    HHF's counsel's office.

20        Q.    Who was the person that advised you

21   of that?

22        A.    I don't recall.
```

1    Q.    Who was the head of the counsel's
2    office while you were there?
3    A.    Well, the head of the counsel's
4    office would have been Harriet Ram, who was
5    general counsel to the agency, but it probably
6    would have been somebody in the branch of the
7    counsel's office that served primarily on HCFA
8    issues.
9    Q.    Who were the people that -- as you
10   understood it, who were the people within HCFA who
11   could look at AMP data?
12         MS. BROOKER:  Objection.  Form.
13   A.    My understanding was that the staff
14   directly involved in administration of the rebate
15   program had access to the AMP data.
16   Q.    Well, it was -- it was actually the
17   understanding of your agency, and your own
18   understanding at the time you were running the
19   agency, that HCFA was not precluded from releasing
20   AMP data to the states.  Isn't that right?
21         MS. BROOKER:  Objection.  Form.
22   A.    Of course not, yes, but under

1   confidentiality restrictions as well, in terms of

2   what the states made -- did with the data.

3           Q.      Okay.  So, with respect to -- just

4   focusing on that, HCFA, under the statutory

5   scheme, was entitled to share AMP data with the

6   states.  Isn't that right?

7           A.      Of course, yes.

8                   MR. BREEN:  Objection.  Form.

9                   MS. BROOKER:  Objection.  Form.

10          Q.      And did HCFA do that?

11          A.      As far as I know.

12          Q.      So, as far as you know, people

13  within HCFA shared AMP data with state Medicaid

14  agencies?

15          A.      That was my understanding.

16          Q.      What was that based on?

17          A.      What was what based on?

18          Q.      Your understanding.  What was your

19  understanding based on?

20          A.      Of the process by which the HCFA

21  staff worked with the states in administering the

22  rebate program.

462

```
 1        Q.      So, based on your understanding
 2   when you were running HCFA, Dr. Vladeck, the state
 3   Medicaid people who were designing and
 4   administering the reimbursement methodology of the
 5   states would have, through HCFA, access to AMP,
 6   average manufacturer price, data.  Right?
 7                MS. BROOKER:  Objection.  Form.
 8                MR. BREEN:  Objection.  Form.
 9        A.      In the generic sense that the
10   agencies -- the state agencies that administered
11   Medicaid would have access to it.  Whether it was
12   the same people in those agencies who administered
13   the rebate program and made policy about
14   reimbursement policy, I wouldn't know.
15        Q.      Okay.  But in terms of -- let's --
16   let's talk in terms of agency, since people might
17   change over time.
18                But the agencies that ran Medicaid
19   in each of the states, which were the agencies
20   responsible for implementing the reimbursement
21   methodologies, those agencies would have access,
22   through HCFA, to AMP data from the states.
```

463

1              Right?
2              MS. BROOKER: Objection. Form.
3      A.      Yes.
4      Q.      So, for example, looking back at
5  Exhibit Dey 022, the one-page sheet that we had
6  that had all the reimbursement basis, the
7  responsible directors of the Medicaid agencies of
8  these -- of each of these states would be able to
9  peruse AMP data and compare that to what they were
10 reimbursing on. Right?
11             MR. BREEN: Objection. Form.
12             MS. BROOKER: Objection. Form.
13             MR. BATES: Objection to form.
14     A.      When you talk about "perusing,"
15 again, I don't -- I don't know if they'd even be
16 aware that their agencies had it. But if they
17 were, depending on how their agencies were
18 organized, they might very well be.
19     Q.      So, it was entirely -- it was
20 entirely possible for the heads of a state
21 Medicaid agency to look at the AMP data on AMP
22 prices and at the same time look at data as to

464

1   what they were reimbursing for those drugs.  That
2   was entirely possible.  Right?
3               MS. BROOKER:  Objection.  Form.
4               MR. BREEN:  Objection.  Form.
5       A.      It's -- I don't know any reason why
6   it wouldn't be possible.
7       Q.      And within your agency, within
8   HCFA, certainly people within HCFA could sit down
9   and compare the AMP data, for example, for Dey's
10  Albuterol, and see what the AMP was and compare
11  what the AWP was.  Right?
12              That was -- that was information
13  that they had in the agency?
14              MS. BROOKER:  Objection.  Form.
15      A.      I believe the -- the way we
16  interpreted the confidentiality provisions of the
17  statute was that the people directly involved in
18  the administration of the Medicaid drug rebate
19  program could have chosen to do so, yes.
20      Q.      Right.  So, somebody in -- in HCFA
21  that was involved with the rebate program could
22  one day look at the AMP for Dey's Albuterol and

465

1  compare it to an AWP for Dey's Albuterol?

2           MS. BROOKER:  Objection.  Form.

3      A.      Presumably, yes.

4      Q.      And based on your understanding of
5  AWP and AMP, as you've indicated in the course of
6  this deposition and your prior session, you would
7  expect that the AWP -- there was a spread between
8  the AMP and the AWP.  Right?

9           MS. BROOKER:  Objection.  Form.

10     A.      Yes.

11     Q.      And that would be because the AMP
12 reported to HCFA would include a number of
13 specified discounts.  Isn't that right?

14          MS. BROOKER:  Objection.  Form.

15     A.      I don't know what you mean by
16 "specified discounts," but it was my impression
17 that, again, on average, the AMPs would have been
18 for single-source drugs in the range of 15 to 20
19 percent below the AWP, on average, and, for
20 generic drugs, as I've learned in the course of
21 this proceeding, as much as 25 to 40 percent below
22 AWP, on average.

1                MS. BROOKER: Objection to form.

2        A.      I don't know what you mean by "on
3    notice." I think it's fair to say that we knew
4    all along we were overpaying for drugs in the
5    Medicare program, which is why we kept trying to
6    change the way we paid for them.

7        Q.      And you knew that the spreads could
8    be as high as 1,000 percent?

9                MS. BROOKER: Objection to form.

10       A.      It didn't matter. It was not a
11   concern of ours.

12       Q.      Well, I understand that.

13       A.      If they were 10 percent or 100
14   percent or 1,000 percent or a million percent we
15   were paying too much, and we were trying to change
16   it.

17       Q.      But if somebody were to say or
18   suggest that HCFA didn't know that there could be
19   spreads as high as 1,000 percent, that would be
20   incorrect. Isn't that correct?

21               MR. BREEN: Objection to form.

22               MS. BROOKER: Objection to form.

583

1       A.      Yes.

2       Q.      And you know I'm Jim Breen. I

3    represent Ven-A-Care of the Florida Keys.

4       A.      I'm aware, yes.

5       Q.      The relator in a whole bunch of

6    these cases, including the one you're probably

7    noticed on.

8               You've spent a lot of time

9    testifying about average manufacturers' price in

10   response to both Mr. Cook's and Mr. Escobar's

11   questions earlier.

12              Do you recall that?

13      A.      Yes.

14      Q.      Now, they asked you about average

15   manufacturers' price, but do you also recall a

16   term "best price"?

17      A.      Yes.

18      Q.      As used in the Medicaid rebate

19   statute?

20      A.      That's correct. Yes.

21      Q.      And that would be OBRA '90.

22              Correct?

584

1       A.      That's -- Yes.

2       Q.      All right. Now, when you were testifying about confidentiality of pricing information provided by the drug companies with respect to the Medicaid rebate obligations, what specific pricing information were you talking about?

8       MR. ESCOBAR: Objection to the form.

10      A.      **Well, I would include all the pricing information that was provided by the manufacturers to HCFA, which would include both average manufacturing price and best price.**

14      Q.      Okay.

15      MR. BREEN: And what's wrong with that question, counselor? I want to clean it up if there's a problem.

18      MR. ESCOBAR: I didn't understand it.

20      MR. BREEN: Okay.

21      Q.      What pricing information were you aware that drug companies provided under their

1  obligations under the Medicaid rebate program and
2  under their Medicaid rebate agreements --
3              MR. ESCOBAR:  Objection to the
4  form.
5       Q.      -- with HHS?
6       A.      **Again, it was my understanding that**
7  **manufacturers provided average manufacturer's**
8  **price and best price.**
9       Q.      And best price, okay.  Now, and was
10 it also your understanding that that information
11 had to be maintained as confidential by -- with
12 the Health Care Financing Administration?
13             Correct?
14      A.      **By the unit in the Health Care**
15 **Financing Administration that administered the**
16 **rebate program.**
17      Q.      Other than specific patient
18 information, can you think of any information that
19 was held to a higher degree of confidentiality by
20 HCFA during your term there?
21             MR. ESCOBAR:  Objection to the
22 form.

586

1       A.      No, I think the restrictions on the
2  information received under the rebate program were
3  quite extraordinary relative to other information
4  we received.
5       Q.      Now, you testified a lot about --
6  about your knowledge or at least your impressions
7  as to some of the political issues that were
8  affecting your job and your -- and your agency's
9  ability to make policy.
10              Do you remember that?
11      A.      Yes.
12      Q.      Well, along that line, when it came
13 to this confidentiality of information, was it --
14 do you have a recollection as to what group or
15 entity wanted to keep this information so
16 confidential?
17              MR. ESCOBAR:  Objection to the form
18 of the question.
19      A.      Again I have no firsthand
20 knowledge, but my understanding was that in the
21 legislative process that produced OBRA '90 the
22 manufacturers were quite insistent on maintenance

1   of confidentiality associated with the mandatory

2   reporting requirements under the rebate

3   provisions.

4       Q.      Are you aware of any patient groups

5   that wanted this information to be kept

6   confidential?

7               MR. ESCOBAR:  Objection to the

8   form.

9       A.      Again, this is second to third-

10  hand, and the only -- the impression that I've

11  reported all I know.

12      Q.      Okay.  That it was the drug

13  manufacturers that wanted to keep this information

14  at an unprecedented level of confidentiality by

15  HCFA.

16              MR. ESCOBAR:  Objection to the

17  form, and you're mischaracterizing the rebate

18  agreement signed by the government on behalf of

19  the states.

20      Q.      Is that correct, Dr. Vladeck?

21      A.      Is what correct?

22      Q.      All right.  Let's go back.