# Exhibit 36

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the July 24, 2009, Declaration of George B. Henderson, II
In Support of United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

250

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

(cross-captions on following pages)

Washington, D.C.

Thursday, February 27, 2007

9:00 a.m.

Videotaped deposition of DEIRDRE DUZOR

Volume II

                                                              367

1   mistake or a misstatement in the report, would

2   you have asked Ms. Wrobel to make changes to it?

3           MS. MARTINEZ:  Objection, form.

4       A.  Yes.  If I saw something I believed was

5   inaccurate I would have.

6       Q.  Do you recall noticing anything that

7   was inaccurate about the report?

8       A.  No, not that I recall.  Your general --

9   my general impression of this report was that,

10  darn it, it was as difficult as people said

11  trying to find out anything about drug pricing

12  and we really did not get very far with this

13  contract.

14      Q.  It was difficult to get information on

15  drug pricing?

16      A.  This contract and this panel were

17  supposed to -- were intended to help us figure

18  out how we could go about getting better pricing

19  information.  And I don't think that at the end

20  of the day it really met those expectations or

21  those -- maybe not expectations.  We knew we were

22  reaching.  But it did not achieve our desired

368

1  outcome.

2       Q.    Now, by the time you had entered CMS,
3  CMS itself had been receiving average
4  manufacturer price data; is that right?

5             MS. MARTINEZ:  Objection, form.  Mr.
6  Torborg, I just want to make sure.  You know she
7  was working for CMS in different areas before.
8  Did you mean when she entered the pharmacy area?

9             MR. TORBORG:  Yes, I did.

10      **A.    I found out.  I knew nothing about this**
11 **area until I started working there.  But I did**
12 **learn pretty quickly that, yes, we received that**
13 **data from manufacturers.**

14      Q.    So CMS at this time of the report you
15 had AMP data already from manufacturers; is that
16 right?

17      **A.    Yes, we did, but it was confidential**
18 **data, not data that we could use in any public**
19 **forum.**

20      Q.    That doesn't mean you couldn't use it
21 in a private forum, does it?

22            MR. WINGET-HERNANDEZ:  Objection, form.

1          MS. MARTINEZ:  Objection, form.
2      A.   I don't know.  In practice we did not.
3  It was used for the rebate program solely and we
4  did not use it for any other purpose.
5      Q.   But there was no restriction on you
6  looking at prices -- AMP prices for a particular
7  drug and AWP prices for a particular drug, right?
8          MS. MARTINEZ:  Objection, form.
9      A.   I can just tell you that we did not do
10 that.
11     Q.   At some point OIG did that, didn't
12 they?
13         MS. MARTINEZ:  Objection, form.
14     A.   I know in recent years the OIG has
15 gotten AMP data.  I don't recall in the earlier
16 years.
17     Q.   I'd like to ask you to go to page 3 of
18 the report, the second paragraph under
19 legislative and regulatory history.  There's a
20 statement that "At the same time that the
21 Medicaid drug program intended to pay the actual
22 or estimated acquisition cost incurred by the

 1   pharmacy for a specific drug, Medicaid

 2   regulations also specified that pharmacies were

 3   to be paid a 'reasonable dispensing fee.'"

 4           My question was how did ABT know that

 5   the Medicaid drug program intended to pay the

 6   actual estimated acquisition cost by the pharmacy

 7   for a specific drug product?  How did they know

 8   that?

 9           MS. MARTINEZ:  Objection, form.

10       A.  I think that they were basing what they

11   wrote here on the regulations and I don't know if

12   the word "intended" is really the most accurate

13   word.

14       Q.  And why do you say that?

15       A.  Well, I mean, intended is just -- is a

16   rather odd word.  "The Medicaid drug program

17   intended to pay," I don't think that's the best

18   choice of words.  I think they should have said

19   that the regulations state that Medicaid is to

20   pay based upon estimated acquisition cost.

21       Q.  And you know that today states that are

22   basing reimbursement on AWP minus a small