# Exhibit 88



experience *does* matter

**CASE:  In re:  Pharmaceutical Industry Average Wholesale Price Litigation**
**DATE:  March 16, 2008**

Enclosed is the Original of the transcript of the testimony of **Michael Sellers** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.

Sincerely,

Henderson Legal Services

Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

_____


                Videotaped Rule 30(b)(6) Deposition

                of MICHAEL SELLERS, at 77 West Wacker

                Drive, Chicago, Illinois, commencing

                at 9:00 a.m. on Sunday, March 16,

                2008, before Donna M. Kazaitis, RPR,

                CSR No. 084-003145.

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                        March 16, 2008

---

Page 2

1   APPEARANCES OF COUNSEL:

2

3       FOR THE UNITED STATES:

4           U.S. DEPARTMENT OF JUSTICE

5           CIVIL DIVISION

6           BY: MS. ANN ST. PETER-GRIFFITH

7           99 N.E. 4th Street

8           Miami, Florida 33132

9           (305) 961-9003

10          ann.st.peter-griffith@usdoj.gov

11

12      FOR ABBOTT LABORATORIES:

13          JONES DAY

14          BY: MS. TINA TABACCHI

15          77 West Wacker Drive

16          Chicago, Illinois 60601-1692

17          (312) 782-3939

18          ttabacchi@jonesday.com

19

20  ALSO PRESENT:

21      Ben Stanson, Videographer

22

---

Page 4

1               INDEX OF EXHIBITS          PAGE

2   Exhibit Sellers 001, Deposition Notice        9

3   Exhibit Sellers 002, First Amended Complaint      51

4   Exhibit Sellers 003, Red Book 334 - 538,

5       745 - 897, 1172-1306, TX ABT 57845-879  109

6   Exhibit Sellers 004, TX ABT 57880 - 913,

7       57998 - 166, CA ABT 4791 - 195       114

8   Exhibit Sellers 005, TX ABT 57667 - 801       116

9   Exhibit Sellers 006, Collection of Documents   117

10  Exhibit Sellers 007, TXABT 38105 - 107       196

11  Exhibit Sellers 008, MHA Corporate Overview   217

12  Exhibit Sellers 009, TXABT 453403 - 413      223

13  Exhibit Sellers 010, TXABT 249852 - 856      225

14  Exhibit Sellers 011, TXABT 15896 - 931       228

15  Exhibit Sellers 012, VTP038-0106 - 145       231

16  Exhibit Sellers 013, TXABT 158775 - 776      235

17  Exhibit Sellers 014, TXABT 674736 - 739      240

18  Exhibit Sellers 015, TXABT 674741 - 742      260

19

20

21

22

---

Page 3

1               I N D E X

2

3   Sunday, March 16, 2008

4

5   WITNESS               EXAMINATION

6

7   MICHAEL SELLERS

8       (By Ms. St. Peter-Griffith)       6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

Page 5

1           THE VIDEOGRAPHER: This is Ben Stanson

2   representing Henderson Legal Services. I am the

3   operator of this camera.

4           This is the videotaped deposition

5   of 30(b)(6) witness Michael Sellers as being taken

6   pursuant to Federal Rules of Civil Procedure on

7   behalf of the plaintiffs.

8           We are on the record on March 16,

9   2008. The time is 9:06 a.m. as indicated on the

10  video screen. We are at the offices of Jones Day

11  at 77 West Wacker Drive in Chicago, Illinois.

12          This case is captioned In Re:

13  Pharmaceutical Industry Average Wholesale Price

14  Litigation, Case No. 01-12257-PBS.

15          Will the attorneys please identify

16  themselves for the video record.

17          MS. ST. PETER-GRIFFITH: Ann

18  St. Peter-Griffith, United States Attorney's

19  Office on behalf of the United States.

20          MS. TABACCHI: Tina Tabacchi on behalf

21  of Abbott Laboratories.

22          THE VIDEOGRAPHER: Thank you.

---

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 6

1        The Court Reporter today is Donna
2   Kazaitis also with Henderson Legal Services of
3   Washington, D.C.
4            Will you please swear in the
5   witness.
6            (Witness sworn.)
7        THE VIDEOGRAPHER:  Thank you.  You may
8   proceed.
9            MICHAEL SELLERS,
10  having been first duly sworn, was examined and
11  testified as follows:
12            EXAMINATION
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   Good morning, Mr. Sellers.
15      A.   Good morning.
16      Q.   I'm not going to ask you if you've been
17  deposed before because I know that you have been,
18  and I know that you understand the ground rules
19  for taking a deposition.
20      A.   Yes.
21      Q.   To sort of streamline this deposition, I
22  took your deposition last November was it?

Page 7

1       A.   Something like that.
2       Q.   And I'm assuming everything you told me
3   about your background and your history was
4   accurate then --
5       A.   Yes.
6       Q.   -- in terms of your employment history
7   and background with Abbott Laboratories?
8       A.   Yes.
9       Q.   Since your retirement have you rejoined
10  Abbott?
11      A.   No.
12      Q.   Since the date that I deposed you, has
13  anything changed in terms of your employment
14  history?
15      A.   No.
16      Q.   Are you still working on a consulting
17  basis for Abbott?
18      A.   Yes.
19      Q.   Approximately how many hours a week do
20  you work on that consulting basis for Abbott?
21      A.   There's no steady state.  It's as
22  needed.

Page 8

1       Q.   Since your retirement approximately how
2   many hours have you worked for Abbott?
3            MS. TABACCHI:  I'm going to just object
4   to these questions as beyond the scope of the
5   Notice.  Mr. Sellers is testifying in his
6   individual capacity obviously.
7            THE WITNESS:  I think around twenty-five
8   hours.
9
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Twenty-five hours, okay.
12           Last time you were deposed you said
13  that you were paid on an hourly rate?
14      A.   Correct.
15      Q.   And you were paid not for time when you
16  appeared for deposition but for time that you
17  prepared for deposition.  Is that still correct?
18      A.   Prepared for deposition or did any kind
19  of preparation aside from with lawyer.
20           MS. TABACCHI:  I'm just going to caution
21  the witness not to reveal the substance of the
22  work that he may have done for counsel on behalf

Page 9

1   of Abbott.
2            MS. ST. PETER-GRIFFITH:  I just want to
3   know generally.
4            THE WITNESS:  Right.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   And what's that hourly rate?
7       A.   $107.20.
8       Q.   So have you been paid approximately
9   $2,600 then to date for those consulting services?
10      A.   Something like that.
11      Q.   What did you do to prepare for today's
12  deposition?
13      A.   I met with counsel and went over some
14  financial documents that I hadn't reviewed before
15  for prior depositions.
16           I also reviewed relevant to the
17  subjects that were defined for this deposition
18  prior depositions by others relevant to that.
19           (WHEREUPON Exhibit Sellers 001 was
20           marked as of 3/16/2008.)
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   When you say the topics for this

3 (Pages 6 to 9)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

```
                                    Page 10
1   deposition, I'm going to show you what's been
2   marked as Sellers 30(b)(6) Exhibit 1. (Document
3   tendered to the witness.)
4            Did you review that Deposition
5   Notice?
6      A.  Yes, I did.
7      Q.  Are you prepared to discuss the topics
8   that are enumerated in that Notice?
9            MS. TABACCHI:  Subject to Abbott's
10  objections that have been stated in connection
11  with that Notice.
12           MS. ST. PETER-GRIFFITH:  Well, it's the
13  United States' position that to the extent that
14  you had objections, you should have moved for
15  protection on them.  We came today to ask about
16  those subjects.
17           MS. TABACCHI:  I would suggest that we
18  not spend Mr. Sellers' time or our own time
19  debating the record on this.  There are a number
20  of objections that we asserted.  We have
21  designated Mr. Sellers to testify with respect to
22  a number of topics.
```

```
                                    Page 11
1            We've had a lot of correspondence
2   back and forth on that.  He's here prepared to
3   testify today in connection with our designations.
4            MS. ST. PETER-GRIFFITH:  Well, I'm
5   trying to find out what he came prepared to
6   testify to.  But I do want to assert our position
7   to the extent that you're asserting your
8   objection.
9   BY MS. ST. PETER-GRIFFITH:
10     Q.  Mr. Sellers, you testified that you
11  reviewed this Deposition Notice?
12     A.  Yes.
13     Q.  Which topics are you prepared today to
14  testify to?
15     A.  All of the topics here.
16           MS. TABACCHI:  Subject to Abbott's
17  objections.
18
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Mr. Sellers --
21           MS. TABACCHI:  In addition, I will note
22  that I don't believe that your Notice contains
```

```
                                    Page 12
1   Topic 5, which is the business operating
2   procedures.  And Mr. Sellers has been designated
3   also on that topic per our conversation,
4   correspondence from this week.
5            MS. ST. PETER-GRIFFITH:  And your Notice
6   of that came out last week after this Notice was
7   sent out.
8            MS. TABACCHI:  Sure.  Understood.
9   BY MS. ST. PETER-GRIFFITH:
10     Q.  Mr. Sellers, what documents, what
11  financial documents, did you review that you
12  hadn't previously reviewed before in preparation
13  for today's deposition?
14     A.  There was a series of annual reports
15  published by Abbott Laboratories I think beginning
16  in the early '90s through early 2000 I think
17  through 2003.
18     Q.  Which portions of the report did you
19  review, reports, did you review?
20     A.  I reviewed the portions relevant to the
21  Hospital Products Division.
22     Q.  Which portions were those?  How were
```

```
                                    Page 13
1   they labeled?  Let me ask you that.
2            MS. TABACCHI:  Object to the form.
3            THE WITNESS:  It depended on the year.
4   But it usually identified a narrative with regard
5   to the Hospital Products segment of the business.
6   And then I think there were some financials that
7   related the hospital and laboratory business in
8   some years.
9            MS. ST. PETER-GRIFFITH:  Just so that we
10  can streamline this, Tina, are these all the
11  public records, 10-Qs, 10-Ks?
12           MS. TABACCHI:  I believe so.  I believe
13  they're either public records or documents that
14  have been produced to you.
15           MS. ST. PETER-GRIFFITH:  I just want to
16  identify what they are.
17           MS. TABACCHI:  Sure.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Sir, were these 10-Qs and 10-Ks?
20     A.  No.  They were the annual reports.
21     Q.  Annual reports.
22           Mr. Sellers, you indicated in
```

4 (Pages 10 to 13)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 14

1  preparation for today's deposition that you
2  reviewed these documents because you hadn't
3  reviewed them before.
4          Were there other documents that you
5  had previously reviewed that could inform your
6  testimony today?
7          MS. TABACCHI: Object to the form.
8          THE WITNESS: Well, as you began this
9  deposition, you recognized the fact that I've been
10 deposed a number of other times and a number of
11 those I have represented the company. So, you
12 know, I bring that with me. So we didn't see any
13 sense in reviewing some of that that I had gone
14 over before.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.   So all of the, I just want to clarify,
17 all the documents that you reviewed for today's
18 deposition were those new financial documents that
19 you hadn't seen before or not new but the
20 documents you hadn't reviewed before?
21         MS. TABACCHI: Object to the form.
22         THE WITNESS: Yes.

Page 15

1          I think I also reviewed some
2  documents from other people's prior depositions.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Okay. So --
5    A.   But I don't recall exactly what those
6  were. It was a mixture of documents with regard
7  to that.
8    Q.   Well, where did you get the documents
9  from?
10   A.   From counsel.
11         MS. ST. PETER-GRIFFITH: Tina, if we
12 could have a list of what those documents were
13 that he reviewed in preparation for today's
14 deposition.
15         MS. TABACCHI: We'll provide you a list
16 of what was provided to Mr. Sellers. That doesn't
17 mean that he looked at every single document.
18         MS. ST. PETER-GRIFFITH: Understood.
19         MS. TABACCHI: There were a lot of
20 depositions and the exhibits to those depositions.
21         MS. ST. PETER-GRIFFITH: Okay. I just
22 want to get the universe of what he may have

Page 16

1  reviewed.
2          MS. TABACCHI: Sure.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Sir, whose deposition transcripts did
5  you review in preparation for today's deposition?
6    A.   There were a number of them. And,
7  again, I reviewed what I considered to be the
8  relevant portions of those depositions. I didn't
9  review them in their entirety.
10   Q.   Stop right there. Let me ask you how
11 did you determine what were the relevant portions
12 to review?
13   A.   I basically used the index and the words
14 that were relevant to the subjects that we were
15 going to talk about today.
16   Q.   Okay.
17   A.   As best I could.
18   Q.   That's a very lawyerly approach.
19 (Laughter.)
20         Mr. Sellers, in reviewing the
21 transcript did you sit down with the entire
22 transcripts, or did you just have sections?

Page 17

1    A.   I had the entire transcript.
2    Q.   I hate to make this a memory game, but
3  can you recall whose deposition transcripts you
4  reviewed?
5    A.   I reviewed Lynn Leone, Peter Baker,
6  Gerald Eikorn, Mark Sebree, Dave Brincks, Bruce
7  Rodman, Jerry Cicerale, and Virginia Tobiason.
8    Q.   Did you write down which sections you
9  reviewed?
10   A.   No. I did not.
11   Q.   Do you recall which sections of each of
12 these that you reviewed?
13   A.   No.
14   Q.   What were the words, key terms, that you
15 were looking for when you scanned the indices?
16   A.   1995, 2001, price change, actually I had
17 to look for "price" and "change," contract,
18 marketing. Those are the ones I remember.
19   Q.   How long did it take you to review these
20 transcripts in total?
21   A.   About eight hours.
22   Q.   And with those did you review any

5 (Pages 14 to 17)

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 18

1  deposition exhibits?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No, nothing other than I
4  had reviewed when sitting with counsel.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   So as part of your prep today, you also
7  sat with counsel.  Is that Ms. Tabacchi?
8     A.   Yes.
9     Q.   How long did you sit with Ms. Tabacchi?
10    A.   It was probably about twelve hours.
11    Q.   When was that?
12    A.   Not straight.  That was last week.
13    Q.   Do you remember which days?
14    A.   Tuesday and Wednesday.
15    Q.   So the 11th and 12th?
16    A.   I believe so.
17    Q.   Sir, what else did you do to prepare for
18 today's deposition?
19    A.   Other than clean myself up and get
20 dressed up and come in, that's about it.
21       MS. TABACCHI:  I did promise Mr. Sellers
22 that I would assist him with this particular part

Page 19

1  of the questioning.  And I don't know if you'd
2  like me not to remind him --
3        MS. ST. PETER-GRIFFITH:  Sure,
4  absolutely.
5        MS. TABACCHI:  -- of two interviews that
6  he conducted.
7        THE WITNESS:  Oh, that's right.
8        I did talk to two people.  I talked
9  to Joe Brundza, B-R-U-N-D-Z-A, and I talked to
10 Rick Gonzalez.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   When did you talk with Mr. Brundza?
13    A.   I talked to Mr. Brundza on I believe the
14 11th.
15    Q.   How long was your -- did you speak with
16 him in person?
17    A.   I spoke to him in person.  I was on the
18 phone.
19    Q.   How long was that phone conversation?
20    A.   Probably about twenty minutes.
21    Q.   And what did you discuss?
22    A.   I'm trying to remember.  It had to do

Page 20

1  with the Basic Operating Procedures document.
2     Q.   What did Mr. Brundza tell you about
3  that?
4     A.   That when he took over the organization
5  that was within Contract Marketing, that basically
6  they had ceased to use the Basic Operating
7  Procedure document.
8     Q.   When was that?
9     A.   I believe that was in August of 2000.
10    Q.   What else did you discuss with
11 Mr. Brundza?
12    A.   That was about it.
13    Q.   What did you discuss -- well, first, let
14 me ask you, you said you also spoke with
15 Mr. Gonzalez?
16    A.   Yes.
17    Q.   Before we get to Mr. Gonzalez, your
18 conversation with him, what was Mr. Brundza's work
19 history with Abbott?
20    A.   He had been in a number of positions,
21 been in market research, he worked for me in
22 Contract Marketing as well as my predecessor in

Page 21

1  Contract Marketing, in a few different positions.
2  I had promoted him to the manager of our
3  injectables business for Contract Marketing.
4        Subsequent to that, he I believe
5  now is the director of --
6        MS. TABACCHI:  I'm just going to ask
7  Mr. Sellers not to testify about Mr. Brundza's
8  employment beyond 2004 other than you can confirm
9  where he works.
10       THE WITNESS:  Okay.  He now works for
11 Hospira.  But he was through the end of his Abbott
12 work experience the manager for injectable
13 Contract Marketing for the hospital side.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   As opposed to the Alternate Site?
16    A.   Yes.
17    Q.   Why did you elect to speak with
18 Mr. Brundza about the Basic Operating Procedures
19 manual?
20    A.   What I was looking for was confirmation
21 that we had in fact ceased to use the Basic
22 Operating Procedures as I had recalled, and I was

6 (Pages 18 to 21)

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 22

1  looking for confirmation from that, and he
2  confirmed that.
3      Q.   Did you two discuss why there were later
4  versions of the Contract Marketing Basic Operating
5  Procedures manual beyond the year 2000?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  No.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Were you aware that there were versions
10 beyond 2000?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  I was aware that there
13 were sections that were updated subsequent to that
14 time period.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.   Did you have an opportunity to review
17 the Contract Marketing Basic Operating Procedures
18 manual that was a 2002 version which we utilized
19 in the Wiebking deposition?
20         MS. TABACCHI:  Object to the form.
21            I'll allow Mr. Sellers to clarify.
22 But if he doesn't, I will.  This is not an

Page 23

1  accurate representation.
2          THE WITNESS:  I saw the document that I
3  believe was used in prior depositions.
4             It did have a 2002 date on the
5  bottom of it.  However, each of the sections had a
6  create date or the majority of them did have a
7  create or update date on the top.
8             That document, and Joe Brundza
9  confirmed this, that document resided on what we
10 call our shared drive in Contract Marketing.
11            So the 2002 date was basically the
12 date it was printed.  It wasn't the date that the
13 document had necessarily existed.  It was on the
14 shared drive.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.   So you confirmed that with Mr. Brundza
17 as well?
18     A.   Yes, uh-huh.
19     Q.   Anything else that you discussed with
20 Mr. Brundza?
21     A.   No.
22     Q.   Now, you testified that you also spoke

Page 24

1  with Rick Gonzalez.
2      A.   Yes.
3      Q.   Who is Mr. Gonzalez?
4      A.   Rick Gonzalez in the early 2000
5  timeframe was the president of the Hospital
6  Products Division.
7             He was subsequently promoted to
8  executive vice president of Medical Products
9  within Abbott Laboratories.  And I think when he
10 retired from Abbott Laboratories, he was the chief
11 operating officer for the corporation.
12     Q.   When did he retire?
13     A.   I believe he retired last September.
14     Q.   What years was he president of HPD?
15     A.   I don't recall.  It was prior to 2000,
16 and I think he was promoted in the fall of 2000.
17         MS. TABACCHI:  These types of questions
18 are obviously of Mr. Sellers in his individual
19 capacity.
20         MS. ST. PETER-GRIFFITH:  Yes.  I just
21 want to --
22         MS. TABACCHI:  Understood.  I don't want

Page 25

1  to get in your way, but this is not corporate
2  testimony.
3          MS. ST. PETER-GRIFFITH:  Understood.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   He was your boss or in your chain of
6  command?
7          MS. TABACCHI:  Object to form.
8          THE WITNESS:  He was the president of
9  the division within which I worked, yes.
10
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Did you speak with Mr. Gonzalez over the
13 phone?
14     A.   Yes.
15     Q.   When was that?
16     A.   I believe that was Thursday, last
17 Thursday, which would have been the 13th.
18     Q.   What did you discuss with Mr. Gonzalez?
19     A.   Discussed the 2001 price change, the
20 change in organization of Contract Marketing for
21 Alternate Site.
22            There was one other subject.  Do

7 (Pages 22 to 25)

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 26

1  you mind if I refer to this?
2      Q.   Absolutely.
3      A.   The other was the decision to close down
4  the Home Infusion Services business.
5      Q.   First of all, how long was your
6  conversation with Mr. Gonzalez?
7      A.   It was probably about twenty to
8  twenty-five minutes.
9      Q.   What did you discuss concerning the 2001
10  price change with him?  Did you ask him questions?
11      A.   I was on there and questions were asked
12  of him by a Jones Day attorney.
13      Q.   What was asked?
14      A.   With regard to?
15      Q.   I'm sorry.  2001 price change.  Let's
16  start there.
17      A.   With regard to the 2001 price change.
18  One of the questions was who was involved in the
19  decision for the 2001 price change.
20      Q.   Did Mr. Gonzalez respond?
21      A.   Yes.
22      Q.   What did he say?

Page 27

1      A.   He said that he was involved, Chris
2  Begley was involved, Guy Wiebking, myself, and
3  Laura Schumacher.
4      Q.   Did he say anything else about that?
5      MS. TABACCHI:  Object to the form.
6      THE WITNESS:  He said that was the team
7  that he had met with and talked about.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   What other questions were asked?
10      A.   The other question was who made the
11  decision for the change, and his answer was that
12  it was a consensus of that team.
13          He was also asked if he consulted
14  with Miles White on that decision, and he said no.
15      Q.   Any other questions?
16      A.   With regard to the price change, no.
17      Q.   Did Mr. Gonzalez say anything else with
18  regard to the price change?
19      A.   No.
20      Q.   Let's go to the decision to change the
21  organization of Contract Marketing for Alternate
22  Site.

Page 28

1      A.   He was asked why that decision, why that
2  decision was made, and what he remembered of it.
3  He didn't have a lot of detailed memory with
4  regard to that, but he did remember that he said
5  it was done to make sure that we had consistency
6  with regard to the management of prices in the
7  division.
8      Q.   Which change in Contract Marketing are
9  you referencing?
10      A.   I'm talking about the change in
11  reporting relationship for the Contract Marketing
12  segment of Alternate Site.
13      Q.   And what was that change?
14      A.   Basically Lynn Leone worked as the
15  manager of Contract Marketing for Alternate Site
16  and she reported to the general manager of Product
17  Sales starting in 2000 and had a dotted line
18  reporting relationship to the general manager of
19  Contract Marketing.
20          Sometime in the first part of 2000,
21  as I recall, her organization began to formally
22  report to the general manager of Contract

Page 29

1  Marketing and subsequently had a dotted line
2  relationship with the general manager of Product
3  Sales.
4      Q.   Now, in 2000 who was the general manager
5  of Product Sales?
6      A.   Peter Baker.
7      Q.   And in 2000 when this change occurred,
8  who was the general manager of Contract Marketing?
9      A.   Mike Sellers.
10      Q.   Did he indicate who made the decision?
11      A.   I don't remember him specifically saying
12  "I made the decision."  I think his statement was
13  the decision was made.  His memory was definitely
14  that he was part of the decision.
15      Q.   As a 30(b)(6) representative here today
16  for Abbott, what is Abbott's testimony as to who
17  made the decision?
18      A.   I think --
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  -- as I remember it and
21  as, you know, as we did it, it was a decision that
22  was a consensus of whether it be Rick Gonzalez,

8 (Pages 26 to 29)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                          March 16, 2008

Page 30

1 Guy Wiebking, myself.
2 BY MS. ST. PETER-GRIFFITH:
3    Q.   At the time the decision was made, was
4 there a concern regarding consistency with regard
5 to management concerning the pricing?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I don't recall a specific
8 concern, no.
9 BY MS. ST. PETER-GRIFFITH:
10   Q.   What else did you discuss with
11 Mr. Gonzalez regarding the change in organization
12 of Contract Marketing for Alternate Site?
13   A.   That was it.
14   Q.   Did Mr. Gonzalez or anyone else discuss
15 anything else concerning that topic, the change in
16 organization for Contract Marketing?
17   A.   No.
18   Q.   Okay.  What about the decision to close
19 down Home Infusion?  What was asked of
20 Mr. Gonzalez and what did he answer?
21   A.   I believe the question was what do you
22 recall about the decision to close down Home

Page 31

1 Infusion Services.  And Mr. Gonzalez answered
2 that, as he remembered it, Home Infusion Services
3 was a small component of the Hospital Products
4 Division, that in the later years as he looked at
5 the business and when it was fully burdened with
6 the full cost of the division and corporate
7 overhead, that it wasn't profitable.  So he made a
8 decision to close it down.
9    Q.   And that was Mr. Gonzalez's decision?
10   A.   Yes.
11   Q.   When was that decision made?
12   A.   I believe it was in 1997.
13   Q.   I appreciate this might be in your
14 personal capacity, but do you know what position
15 Mr. Gonzalez held in 1997?
16   A.   He was the president of the Hospital
17 Products Division.
18   Q.   What else did Mr. Gonzalez discuss
19 concerning closure of Home Infusion?
20   A.   That was it.
21   Q.   Is there anything else that was
22 discussed in this conversation with Mr. Gonzalez?

Page 32

1    A.   No.
2    Q.   Sir, other than what you've testified to
3 so far, did you do anything else to prepare for
4 today's deposition?
5    A.   No.  I don't believe so.
6    Q.   What happened when the change in
7 reporting relationship occurred in 2000 for
8 Alternate Site Contract Marketing?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  What happened?
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   Sure.  Well, let me ask you, from a
13 personnel standpoint what happened?  Was there a
14 change in -- first, what was the change in terms
15 of the reporting relationships?  Who reported to
16 who and what change occurred in that reporting
17 relationship?
18   A.   Lynn Leone and her Contract Marketing
19 organization, which was probably around eight
20 people that reported to her, if I remember right,
21 that organization prior to the change, as I said
22 before, reported to the general manager of Product

Page 33

1 Sales, Pete Baker.  There was no physical movement
2 of people.  So they remained where they were prior
3 to the change.
4        The difference was that Lynn and
5 her group became a part of the overall Contract
6 Marketing group.  And instead of Pete reviewing
7 what Lynn and her folks were doing, I took over
8 that responsibility.
9    Q.   In addition, were there any other
10 changes with regard to the day-to-day
11 responsibilities of the individuals in Contract
12 Marketing and Alternate Site that occurred as a
13 result of this change?
14   A.   Nothing other than, you know, we
15 established periodic meetings between me and Lynn
16 as well as myself meeting with her team so they
17 understood who I was, what we were trying to do.
18   Q.   What did you discuss with them during
19 those meetings?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  Typically, with all of my
22 managers I would have what I would call a

9 (Pages 30 to 33)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

---

Page 34

1  one-on-one monthly where they would update me with
2  what they were doing, and it would give me the
3  opportunity to kind of probe at what was going on
4  and keep in touch with all the different segments
5  of my organization.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Did you discuss anything with regard to
8  pricing in these meetings?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  Most everything we
11 discussed was with regard to pricing.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   What did you discuss with regard to
14 pricing?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Again, these were monthly
17 meetings, they were operational meetings, you
18 know.  Whatever were the operational issues, it
19 was primarily with regard to, obviously with
20 Alternate Site, it was with regard to contract
21 price.
22         Some of our discussions might have

---

Page 35

1  been regarding customers, some of it might have
2  been regarding what the business unit wanted to
3  do, what promotions were coming up.  So it was
4  very much very tactical discussions, day-to-day
5  tactical discussions.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Was there any discussion concerning
8  catalog prices and list pricing?
9      A.   No, not with Lynn.
10     Q.   Prior to this change in structure, were
11 there discussions between Lynn Leone's group and
12 Pete Baker or the other Product Sales manager
13 concerning catalog prices and list pricing?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I can't speak to that.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   You indicated not with Lynn.  Did you
18 discuss catalog prices and list pricing with
19 anyone else in your capacity as manager of
20 Contract Marketing?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  As I've testified before,

---

Page 36

1  the setting of catalog prices was usually an
2  annual process and it was a process led by the
3  Hospital Business Sector part of Contract
4  Marketing in concert with the various marketing
5  teams on the hospital side.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   When you say "marketing teams," do you
8  mean the product line marketing teams?
9      A.   Yes.
10     Q.   With regard to the establishment or
11 setting of catalog prices, where did the final
12 authority to establish the pricing rest?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  Again, I think it was
15 attempted to be as consensus as possible on each
16 particular product price.  The over --
17
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   I'm sorry.  When you say "consensus," I
20 just want to make sure I get this.  Consensus
21 among who?
22     A.   Among Contract Marketing and the various

---

Page 37

1  product marketing teams.
2      Q.   I'm sorry.  Continue.
3      A.   Subsequent to each of the teams or each
4  of everybody coming together and deciding what we
5  wanted to do, the aggregate result was reviewed
6  with the management of the division.
7          So the final okay on what we were
8  going to do on an aggregate point of view was done
9  by both Guy Wiebking, who was the vice president
10 of commercial operations, and, wait a minute, I'm
11 sorry, vice president of commercial services and
12 the division president.
13     Q.   Mr. Gonzalez for a period of time?
14     A.   For a period of time.
15     Q.   Okay.  In prepping for today's
16 deposition, did you do any inquiry to find out
17 what the involvement was of Tom Hodgson in any of
18 the topics that are at issue in today's 30(b)(6)
19 deposition?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  No.
22 BY MS. ST. PETER-GRIFFITH:

10 (Pages 34 to 37)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 38

1    Q.   What about Duane Burnham?
2    A.   No.
3    Q.   That was the same question with regards
4  to Duane Burnham.  You didn't research anything
5  with regard to Mr. Burnham's involvement with
6  regard to any of those subject matters on the
7  topics at issue today?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  No.  I did not.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.   Did you speak to him personally?
12   A.   No.
13   Q.   How come?
14   A.   With regard to the 2001 price change,
15 they were no longer with the corporation, I don't
16 believe, at that time.  I don't believe they were
17 part of the decision, the Home Infusion decision.
18 And I didn't believe them to be part of the
19 Contract Marketing merger decision.
20   Q.   But they did have involvement with both
21 Home Infusion and HPD; didn't they?
22        MS. TABACCHI:  Object to the form.

Page 39

1         THE WITNESS:  They were the corporate
2  leaders in the early part of the 1990s.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   So why didn't you talk to them?
5    A.   I didn't see anything in the subject
6  matter that appeared relevant to them in
7  particular.  We had the financial reports.
8    Q.   Sir, going back when we were talking
9  before about the setting of catalog or list
10 prices, your testimony was that everybody got
11 together and there was an aggregate, there was a
12 consensus decision.
13        Is that true for catalog and list
14 price setting for the HPD products for the time
15 period from 1991 until 2000?
16   A.   Yes.
17        MS. TABACCHI:  Object to the form.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   Before we move on to the individual
20 topics, I want to take a second here.
21        With regard to the decision to
22 close down Home Infusion, you testified that

Page 40

1  Mr. Gonzalez recalled that there was a meeting
2  among various -- let me strike that.
3         Mr. Gonzalez told you that there
4  were several individuals involved in the decision
5  concerning the 2001 pricing; right?  Mr. Gonzalez
6  himself, Mr. Begley -- who was Mr. Begley at that
7  time?
8    A.   At that time he was the president of
9  Hospital Products Division.
10   Q.   Mr. Wiebking?
11   A.   Yes.
12   Q.   You?
13   A.   Yes.
14   Q.   And Laura Schumacher?
15   A.   Yes.
16   Q.   Who is Ms. Schumacher?
17   A.   Laura Schumacher was the head counsel
18 for litigation for Abbott Laboratories.
19   Q.   Did Mr. Gonzalez, Mr. Begley,
20 Mr. Wiebking, Ms. Schumacher, and you meet to
21 discuss this issue?
22   A.   A couple of times that I recall.

Page 41

1    Q.   What occurred during those meetings?
2         MS. TABACCHI:  I'm going to instruct the
3  witness not to reveal the substance of any
4  communications at those meetings.  They're
5  protected by the attorney-client privilege.
6         MS. ST. PETER-GRIFFITH:  They pertain to
7  a change in the business practice.  Why do you
8  maintain that they're subject to attorney-client
9  privilege?
10        MS. TABACCHI:  Mr. Sellers will not be
11 testifying about the communications had at those
12 meetings with the presence of counsel.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   How long did the meetings last?
15   A.   I don't recall.  Probably an hour, maybe
16 more.
17   Q.   When were they?
18   A.   One was either late in 2000 or right in
19 the first week or two of 2001.  The other one was
20 sometime in later March of 2001.
21   Q.   Where were they held?
22   A.   I remember one being in, I believe it

11 (Pages 38 to 41)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

---

Page 42

1  was the president's office of the Hospital
2  Products Division.  And I can't remember where
3  the, the March meeting may have been over in Rick
4  Gonzalez's corporate area.
5      Q.   Did anyone else other than those five
6  individuals have input into the decision to make
7  the 2001 price change?
8      A.   No.
9          MS. TABACCHI:  Object to the form.
10
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   What were your thoughts, and I
13 appreciate you're testifying in your personal
14 capacity, but what were your thoughts on whether
15 the 2001 price change occurred?
16         MS. TABACCHI:  Object to the form,
17 beyond the scope of the Notice, and the witness
18 has already testified about this in a previous
19 deposition taken by you in this case.
20         THE WITNESS:  It was a consensus
21 decision to make the change.
22 BY MS. ST. PETER-GRIFFITH:

---

Page 43

1      Q.   Did you agree with it?
2      A.   Yes.
3      Q.   Did you have any reservations about the
4  2001 price change?
5          MS. TABACCHI:  Object to the form,
6  beyond the scope, asked and answered previous
7  testimony.
8          THE WITNESS:  Early on I probably did,
9  but later in the process I agreed with it.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.   Why early on did you have reservations?
12         MS. TABACCHI:  Again, all of these
13 questions have been posed already to Mr. Sellers
14 in his individual deposition.
15         MS. ST. PETER-GRIFFITH:  No, they
16 haven't.
17         MS. TABACCHI:  I'm going to object to
18 the line of questioning, beyond the scope.
19         THE WITNESS:  I think initially I had
20 some concern with regard to the fact that it might
21 be used against us and seen as agreeing with the
22 claims being made.

---

Page 44

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   What claims being made?
3          MS. TABACCHI:  Objection, same
4  objections.
5          THE WITNESS:  That we had manipulated
6  price.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   And you said eventually you changed your
9  view on that?
10         MS. TABACCHI:  Same objections.
11         THE WITNESS:  As I said, as we went
12 through the analysis I agreed with the end result.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.   Did anyone else have reservations about
15 the 2001 price changes?
16         MS. TABACCHI:  I'm going to caution the
17 witness not to reveal the substance of any
18 communications between anyone at any meeting in
19 which counsel was present.
20         MS. ST. PETER-GRIFFITH:  I'm going to
21 have to ask you, Tina, whether you intend to rely
22 upon advice of counsel.

---

Page 45

1          MS. TABACCHI:  We've been through this
2  before.  Mr. Sellers is not going to waive any
3  privilege today in his testimony.
4          THE WITNESS:  I don't know of anybody
5  else.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Sir, were the two meetings that you
8  testified the only meetings regarding the proposed
9  price change in 2001?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  They were the only
12 meetings with that team.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.   Were other meetings held?
15     A.   I worked with Laura Schumacher on the
16 analysis --
17         MS. TABACCHI:  I'm going to caution the
18 witness not to reveal the substance of any
19 communications with Ms. Schumacher.
20         THE WITNESS:  And there were a number of
21 meetings that I held with her.
22 BY MS. ST. PETER-GRIFFITH:

---

12 (Pages 42 to 45)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                          March 16, 2008

Page 46

1    Q.   What occurred in those meetings?
2         MS. TABACCHI:  Again, I'm going to
3    instruct the witness not to reveal communications
4    between himself and Ms. Schumacher.
5         MS. ST. PETER-GRIFFITH:  Well, I mean
6    the United States objects to this, Tina.  He's
7    talking about a business decision that was made.
8         MS. TABACCHI:  We are not going to
9    change our position on this.
10        I suggest that we not waste time
11   today on a Sunday debating this issue.  We've been
12   clear about this position in the past.  You've
13   asked these questions, we've asserted these
14   objections over and over again.
15        MS. ST. PETER-GRIFFITH:  Well, now I'm
16   asking them of the corporation.
17        MS. TABACCHI:  I will instruct him as a
18   corporate witness not to reveal the substance of
19   communications with Laura Schumacher.
20        MS. ST. PETER-GRIFFITH:  Do you intend
21   to rely upon any advice of counsel?
22        MS. TABACCHI:  We are not waiving the

Page 47

1    privilege to that.
2         MS. ST. PETER-GRIFFITH:  Do you intend
3    to rely upon advice of counsel?
4         MS. TABACCHI:  You're here to ask
5    Mr. Sellers questions, not me.
6         MS. ST. PETER-GRIFFITH:  No.  But I want
7    to make sure that to the extent that each time you
8    instruct him not to answer about advice concerning
9    a business decision, I want to know whether or not
10   you intend to rely upon advice of counsel.
11        MS. TABACCHI:  Well, I suggest that you
12   not ask that question repeatedly, we're going to
13   spend a lot of time on it.  We are not going to
14   discuss communications that Mr. Sellers had with
15   Ms. Schumacher today in this deposition.
16        We can have any other discussions
17   you'd like offline at another time.
18   BY MS. ST. PETER-GRIFFITH:
19   Q.   What did you --
20        MS. ST. PETER-GRIFFITH:  Well, he's here
21   to testify though about meetings and decision
22   making concerning the 2001 price change.

Page 48

1         MS. TABACCHI:  He has provided testimony
2    on that.  He'll continue to answer to the extent
3    that it doesn't implicate privileged
4    communications.
5    BY MS. ST. PETER-GRIFFITH:
6    Q.   Mr. Sellers, what did you do -- let
7    me strike that.
8         Other than the two meetings with
9    the decision makers and your meetings with
10   Ms. Schumacher, did any other meetings occur
11   concerning the 2001 price reporting?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  Not that I recall.
14   BY MS. ST. PETER-GRIFFITH:
15   Q.   How many meetings did you have with
16   Ms. Schumacher?
17   A.   I don't recall specifically.  It was
18   somewhere between three and five.
19   Q.   How long were they?
20   A.   I would say they probably would be
21   scheduled for an hour.
22   Q.   When did they occur?

Page 49

1    A.   In the early part of 2001.
2    Q.   Did you review any documents at these
3    meetings?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  I was doing an analysis
6    that she was leading.  So we would have reviewed
7    the status of that analysis.
8    BY MS. ST. PETER-GRIFFITH:
9    Q.   What type of analysis were you doing?
10        MS. TABACCHI:  I'm going to instruct the
11   witness not to answer on grounds of the
12   attorney-client privilege.
13        An analysis that was directed, to
14   the extent any analysis was done, it was at the
15   direction of Laura Schumacher.  He's not going to
16   testify about the substance of those types of
17   communications.
18        MS. ST. PETER-GRIFFITH:  I'm not asking
19   about the communications.  I'm asking about what
20   he did and what type of analysis he did with
21   regard to the price reporting change.
22        MS. TABACCHI:  Why don't you rephrase

13 (Pages 46 to 49)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 50

1  the question then and perhaps we can avoid the
2  objection.
3         MS. ST. PETER-GRIFFITH:  Okay.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   What did you do with regard to an
6  analysis concerning the 2001 price reporting
7  changes?
8         MS. TABACCHI:  To the extent that you
9  can answer this question without revealing
10  communications with counsel, you may do so.
11        THE WITNESS:  I created an analysis that
12  looked at all of our drug products, what the list
13  price was, what the wholesale acquisition cost
14  was, what our as best we could determine our range
15  of contract prices for those products were, and we
16  did basically a comparison of those numbers.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   And what did the comparison show?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  It varied, it varied by
21  product.
22  BY MS. ST. PETER-GRIFFITH:

Page 51

1     Q.   Sir, you understand that there are a
2  number of products that are at issue in this
3  lawsuit; don't you?  Or do you understand that
4  there are certain products that are at issue in
5  this lawsuit?
6     A.   Yes.
7         (WHEREUPON Exhibit Sellers 002 was
8          marked as of 3/16/2008.)
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   I'm going to show you what's been marked
11  as Exhibit 2.  (Document tendered to the witness.)
12        If you can sort of just follow
13  along with Ms. Tabacchi.  I'm going to have you
14  look at Pages 10 and 11, which is the listing, and
15  then also Page 12, and then the chart at the end.
16        Sir, if I could just have you look
17  at Page 10 and 11 and then Page 12 and the chart
18  at the end.
19     A.   And where?
20     Q.   I'm sorry.  Page 12, which is the JCAHO
21  page, the listing of products there.  And then at
22  the very end there's a chart that's the

Page 52

1  attachment.
2         For the record, Exhibit 2 is the
3  Amended Complaint filed by the United States in
4  this case.
5         I appreciate, sir, that you don't
6  have your analysis in front of you, but I will
7  represent to you that for the drugs that are at
8  issue in this case, Exhibit 1, for the most part
9  for the years 2001 with the exception of two of
10  the sodium chloride entries, this is an analysis
11  of AWP compared to the relator's contract prices
12  and then the estimated dollar spreads between
13  that.  Do you see that?
14     A.   Yes.
15     Q.   In doing your analysis as part of the
16  2001 price change project -- is that a fair, can
17  we characterize it as that, was it a project for
18  you?
19     A.   Yes.
20     Q.   I'm not going to ask you how long the
21  project took you -- well, actually I will ask.
22  Sir, approximately how long did you work on the

Page 53

1  project?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  I think it was around, by
4  the time we did the price change it was five
5  months.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   Did you work on it full time?
8     A.   No.
9     Q.   In putting together your chart, what did
10  you notice about the differences between the list
11  prices and the contract prices for the products
12  that are at issue in this lawsuit?
13        MS. TABACCHI:  Object to the form.  This
14  level of detailed questioning is beyond the scope
15  of the Notice.
16        MS. ST. PETER-GRIFFITH:  I disagree.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   Go ahead, sir.
19     A.   I think in general I can only at this
20  point talk from an aggregate point of view, there
21  were some products where there was a significant
22  difference and there were some products where

14 (Pages 50 to 53)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 54

1  there was very little difference.
2          I can't speak necessarily to these
3  products because, you know, we were looking at
4  about six hundred products, if I remember right.
5     Q.   Do you recall which products had the
6  largest differences?
7     A.   No.
8          MS. TABACCHI: Objection.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Well, do you recall, I mean vancomycin
11 is a stand-out product for Abbott; is it not?
12         MS. TABACCHI: Object to the form,
13 beyond the scope.
14         THE WITNESS: Vancomycin was an
15 important product, yes.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   Do you recall whether the vancomycin,
18 whether the disparities between the list prices or
19 catalog prices and the contract prices for
20 vancomycin, whether there was a large difference?
21         MS. TABACCHI: Object to the form,
22 beyond the scope.

Page 55

1          MS. ST. PETER-GRIFFITH: It's not beyond
2  the scope.
3          THE WITNESS: As I recall, and I
4  couldn't tell you by list number, as I recall
5  there were some that there was a fairly large
6  disparity. There were others, again, within that
7  product family that weren't as disparate.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   Well, looking at Exhibit 1, does Abbott
10 dispute the estimated dollar value of the spreads
11 that are at issue?
12         MS. TABACCHI: I'm going to instruct the
13 witness not to answer this question.
14         You have an Amended Complaint on
15 file. Abbott can respond to the Amended
16 Complaint.
17         Mr. Sellers is not here to respond
18 to your chart. If you wanted that to be a topic
19 in the Notice, you should have specified to that.
20 He cannot testify on an NDC-by-NDC basis and do
21 the math as we sit here today.
22         MS. ST. PETER-GRIFFITH: He's testifying

Page 56

1  about the 2001 price change. I'm trying to get
2  his understanding of the differences for these
3  products that are at issue, the subject drugs, as
4  to the differences in the spreads on those
5  products.
6          MS. TABACCHI: This is beyond the scope
7  of the Notice and at a level of detail that is not
8  appropriate.
9          He can testify to the extent he's
10 able to in his individual capacity.
11         THE WITNESS: No. I don't think our
12 analysis looked at it in this manner.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   How did your analysis look at it?
15    A.   Again, I'm not sure we calculated what
16 you have here as spread. We were looking at an
17 absolute difference, and we were looking at our
18 list price sales as I remember.
19         And, again, I haven't looked at
20 this analysis enough to know how you're
21 calculating the percents that are here. So I
22 really can't talk to it.

Page 57

1     Q.   Well, sir, when you say you were looking
2  at the list price sales, what do you mean?
3     A.   At sales that we had made at catalog
4  price.
5     Q.   What did you learn about sales that you
6  had made at catalog price?
7     A.   Percentage-wise it was a small
8  percentage, but dollar-wise it was still
9  significant.
10    Q.   What did you learn about the percentage
11 of sales?
12         MS. TABACCHI: Object to the form, asked
13 and answered.
14         THE WITNESS: It was small.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.   But what percentage? What was the
17 percentage?
18         MS. TABACCHI: Object to the form.
19         THE WITNESS: I can't remember, I can't
20 remember.
21 BY MS. ST. PETER-GRIFFITH:
22    Q.   Less than ten percent?

15 (Pages 54 to 57)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 58

1   A.  Yes.
2       MS. TABACCHI:  Object to the form.
3   BY MS. ST. PETER-GRIFFITH:
4   Q.  Less than two percent?
5   A.  May have been.
6   Q.  Less than one percent?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  I don't remember.
9   BY MS. ST. PETER-GRIFFITH:
10  Q.  Less than five percent?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  I can say with certainty
13  it was less than ten percent.  I can't give you a
14  definitive number.
15  BY MS. ST. PETER-GRIFFITH:
16  Q.  Why for some of the products, as you
17  testified, was there a big difference between the
18  contract price and the list or catalog price?
19  A.  I think --
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  I think we've said in
22  other testimony as well as I believe in an

Page 59

1   Interrogatory that I responded to last year to the
2   State of Texas that one of the things that we had
3   determined as we looked at prices was that an
4   inadvertent discrepancy or disparity in price had
5   happened starting I'm not sure exactly when, but
6   let's say it starts in 1991.  Because of declines
7   in contract prices over that time period as was
8   needed in the competitive world of generic
9   injectables, generic drugs, which was our market,
10  versus an annual inflationary price increase that
11  was taken on the catalog prices every year up to
12  1999.  So the difference in prices was due to
13  those two dynamics.
14  BY MS. ST. PETER-GRIFFITH:
15  Q.  What do you mean when you say
16  "inadvertent"?
17      MS. TABACCHI:  Object to the form.
18  That's been answered in his questioning.
19      THE WITNESS:  I determine "inadvertent"
20  meaning that it wasn't an intentional price
21  discrepancy or disparity.
22      What we were trying to, we actually

Page 60

1   had two different tactical actions that caused a
2   third result, and that's why I would call it
3   inadvertent.
4   BY MS. ST. PETER-GRIFFITH:
5   Q.  When did Abbott first notice this
6   inadvertent discrepancy --
7       MS. TABACCHI:  Object to the form.
8   BY MS. ST. PETER-GRIFFITH:
9   Q.  -- or these inadvertent discrepancies?
10      MS. TABACCHI:  Object to the form,
11  beyond the scope of the Notice.
12      MS. ST. PETER-GRIFFITH:  It's not beyond
13  the scope of the Notice.
14      THE WITNESS:  I think it became evident
15  in the fall of 2000 as we investigated a few
16  particular drugs trying to understand what had
17  caused the disparity.
18  BY MS. ST. PETER-GRIFFITH:
19  Q.  And what were the particular drugs?
20  A.  They were probably the drugs listed on
21  subpoenas.
22  Q.  Subpoenas from whom?

Page 61

1   A.  At that point in time I believe we may
2   have had subpoenas from the State of Texas, I
3   believe we might have had subpoenas from the DOJ
4   by that time that listed out specific products.
5   Q.  So at the time that subpoenas were
6   received in or around 2000, Abbott started some
7   kind of review of the pricing of certain drug
8   products listed in the subpoenas; is that right?
9       MS. TABACCHI:  Object to the form,
10  beyond the scope of the Notice.
11      MS. ST. PETER-GRIFFITH:  It's not beyond
12  the scope.
13      THE WITNESS:  When Abbott began it, I'm
14  not sure, but I became involved in the fall of
15  2000.
16  BY MS. ST. PETER-GRIFFITH:
17  Q.  And how did you become involved?
18  A.  I don't specifically recall.
19  Q.  Did you have a job change in or around
20  2000?
21      MS. TABACCHI:  Object to the form.
22      THE WITNESS:  I began as the general

16 (Pages 58 to 61)

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 62

1  manager of Contract Marketing in the first part of
2  2000, I think early February.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Did the predecessor general manager of
5  Contract Marketing, had he undertaken or was he
6  involved in a review of this type of information?
7        MS. TABACCHI:  Object to the form,
8  beyond the scope.
9        MS. ST. PETER-GRIFFITH:  It's not beyond
10 the scope.
11       THE WITNESS:  Not that I was made aware
12 of.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   Why wasn't this inadvertent discrepancy
15 evaluated in 1996 when Abbott received a civil
16 investigative demand from the Attorney General?
17       MS. TABACCHI:  Object to the form,
18 beyond the scope of the Notice.
19       MS. ST. PETER-GRIFFITH:  It's not beyond
20 the scope.
21       MS. TABACCHI:  To the extent the witness
22 can answer in his individual capacity, if he

Page 63

1  knows, he can.
2        MS. ST. PETER-GRIFFITH:  And, Tina, it's
3  not beyond the scope.  This goes to the heart of
4  pricing changes and we're entitled to inquire.
5        THE WITNESS:  I don't know.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   What about when the first subpoena from
8  HHSOIG went out in 1997, why wasn't this
9  inadvertent discrepancy investigated or reviewed
10 or evaluated?
11       MS. TABACCHI:  Object to the form,
12 beyond the scope.
13       THE WITNESS:  I don't know how clearly
14 Abbott understood what the issue was at that point
15 in time.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   What about in 1999 when Abbott received
18 a letter from DOJ detailing the allegations in the
19 Qui Tam Complaint, why didn't Abbott investigate
20 or evaluate the inadvertent discrepancy?
21       MS. TABACCHI:  Objection, beyond the
22 scope.

Page 64

1        MS. ST. PETER-GRIFFITH:  It's not beyond
2  the scope.
3        THE WITNESS:  I wasn't in that position,
4  nor was I privy to that.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Who would have been responsible for
7  evaluating the inadvertent discrepancies in '96n
8  '97, or '99?
9        MS. TABACCHI:  Same objections, object
10 to the form, beyond the scope of the Notice.
11       MS. ST. PETER-GRIFFITH:  It's not beyond
12 the scope.
13       THE WITNESS:  Again, because it involved
14 potential litigation, I would assume it would be a
15 legal responsibility.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Did Abbott in '96, '97, or '99 undertake
18 any initiative to evaluate these what you
19 characterize as inadvertent discrepancies between
20 their contract pricing and catalog pricing on
21 certain drugs including the subject drugs at issue
22 in this lawsuit?

Page 65

1        MS. TABACCHI:  Object to the form,
2  objection as beyond the scope.
3        The witness can answer in his
4  individual capacity, if he knows.
5        MS. ST. PETER-GRIFFITH:  It's not beyond
6  the scope.
7        THE WITNESS:  I'm not aware.
8        MS. TABACCHI:  Ann, we can agree that
9  you will disagree with every objection that I make
10 as beyond the scope and we can talk about that
11 later.
12       If you want to take the time today
13 to state that you disagree with my scope
14 objections, you can, but we have a limited amount
15 of time with Mr. Sellers.  So I would propose that
16 we streamline --
17       MS. ST. PETER-GRIFFITH:  Okay.
18       MS. TABACCHI:  -- by stipulating that
19 every time I object as beyond the scope, you
20 disagree with my objection, and we can deal with
21 that later.
22       MS. ST. PETER-GRIFFITH:  That's fine.

17 (Pages 62 to 65)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 66

BY MS. ST. PETER-GRIFFITH:
1
2    Q.   Mr. Sellers, what else did you do in
3  connection with evaluating the inadvertent
4  discrepancies between catalog or list price and
5  contract price in 2001?
6        You did the analysis; right?
7    A.   Right, right.
8    Q.   Anything else?
9    A.   Once the decision was made, we
10 implemented the prices.
11   Q.   Why did Abbott make the decision to
12 lower its prices in 2001?
13       MS. TABACCHI: I'm going to caution the
14 witness not to reveal the substance of any
15 communication with counsel.
16       THE WITNESS: We made a consensus
17 decision to change the prices.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   Why?
20       MS. TABACCHI: Same objection.
21       THE WITNESS: I can't answer that.
22 BY MS. ST. PETER-GRIFFITH:

Page 67

1    Q.   Why can't you answer that?
2    A.   It's relevant to discussions with
3  counsel.
4    Q.   I'm not asking about your discussions
5  with counsel.
6        I'm asking for the fact. Why
7  factually as a matter of fact did Abbott make a
8  decision to change its prices in 2001?
9        MS. TABACCHI: Object to the form, asked
10 and answered.
11       MS. ST. PETER-GRIFFITH: It's not been
12 asked and answered.
13       THE WITNESS: As we've said before, we
14 made the decision to more properly align our list
15 prices with our prevailing contract prices.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Why was that important?
18       MS. TABACCHI: Object to the form,
19 beyond the scope.
20       THE WITNESS: It seemed like the right
21 time and the right thing to do.
22 BY MS. ST. PETER-GRIFFITH:

Page 68

1    Q.   Why didn't Abbott do it much earlier?
2        MS. TABACCHI: Object to the form,
3  beyond the scope of the Notice.
4        THE WITNESS: As I said before, we
5  didn't determine the issue until the fall of 2000.
6        MS. ST. PETER-GRIFFITH: Okay. We've
7  got five minutes left on the tape. Is now a good
8  time to take a break?
9        MS. TABACCHI: Sure.
10       THE VIDEOGRAPHER: We are off the record
11 at 10:22 a.m. with the end of Tape No. 1.
12       (WHEREUPON a recess was taken.)
13       THE VIDEOGRAPHER: We are back on the
14 record at 10:38 a.m. with the beginning of Tape
15 No. 2.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Mr. Sellers, we left off with your
18 testifying that Abbott didn't determine that there
19 was an issue until 2000 concerning what you'd
20 characterize as the inadvertent discrepancies
21 between catalog prices and, or list prices and
22 contract prices.

Page 69

1        In or around 2000 did the letter
2  from Pete Stark, Congressman Pete Stark, in any
3  way cause Abbott to evaluate these discrepancies
4  or at least identify whether there was an issue?
5        MS. TABACCHI: Object to the form.
6        THE WITNESS: There was quite a bit of
7  discourse, noise, whatever you want to call it
8  regarding this issue both in Congress and in the
9  press and so on. So I don't know to what extent
10 Pete Stark's letter contributed.
11       Looking at the issue, in my
12 recollection, had begun prior to us receiving that
13 letter, or me seeing that letter, let's put it
14 that way.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   When did you see that letter?
17   A.   I believe it was like in October or
18 November of 2000.
19   Q.   Did you discuss the letter with anyone?
20   A.   Not that I recall.
21   Q.   How did you receive the letter?
22   A.   I don't remember.

18 (Pages 66 to 69)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 70

1    Q.   Did the decision to change the 2000 or
2  did the decision in 2001 to lower Abbott's catalog
3  or list prices so that they were more in line with
4  the contract prices have anything to do with the
5  decision of the price reporting compendia to lower
6  Abbott's AWPs at the request of the Department of
7  Justice in or around 2001?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  Again, I said that there
10 was a lot of things going on in 2000.  I don't
11 believe that was a contributing factor, but it was
12 one of the things that had happened in 2000.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   But you don't believe that the decision
15 to lower the prices, Abbott's 2001 price change in
16 2001, had any relationship with the or
17 relationship to the lowering of Abbott's AWPs by
18 First Databank?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  I don't believe so.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.   What other pressures or political

Page 71

1  influences contributed to the decision to make the
2  2001 price change in addition to the Pete Stark
3  letter?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  As I said, I think there
6  was a lot of discussion going on in Congress
7  around the fall of 2000 related to a budget update
8  and so on as well as, you know, more and more
9  write-ups about the investigations and so on and
10 so forth.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   More and more write-ups where?
13   A.   In the press.
14   Q.   Any other influences?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  Not any specific ones I
17 can recall, no.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   The meeting among the decision makers
20 who ultimately reached consensus that prices
21 needed to be lowered, what factors were discussed?
22        MS. TABACCHI:  I'm going to instruct the

Page 72

1  witness not to answer on attorney-client privilege
2  grounds meetings we've already established was
3  conducted with counsel, Laura Schumacher.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.   Outside of the meeting, and I'm not
6  asking you about communications, I'm asking about
7  factually what other factors contributed to the
8  decision to lower the catalog prices in 2001 that
9  you haven't already testified about today?
10   A.   I'm not aware of any other specific
11 ones.
12   Q.   So have we exhausted your memory on the
13 factors that contributed to the decision to reduce
14 the catalog list prices in 2001?
15   A.   Yes.
16   Q.   Sir, I'd like for you to describe the
17 steps that you undertook to put together the
18 analysis in connection with the decision making
19 process evaluating the 2001 prices and the
20 decision to make the price changes.
21   A.   Can you give me the first part of that
22 question again?

Page 73

1    Q.   Sure.  You testified earlier that prior
2  to the decision being made you did an analysis;
3  right?
4    A.   Yes.
5    Q.   What steps were involved in your doing
6  an analysis of Abbott's pricing?
7         MS. TABACCHI:  I'm just going to caution
8  the witness not to reveal the substance of
9  communications with counsel.
10         You may testify about your own
11 personal work in this regard, if you can do so
12 without revealing those communications.
13        THE WITNESS:  Basically, it was
14 identifying all of the products which, as I
15 recall, were all of our NDA products.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   When you say "all of our NDA products,"
18 do you mean the entire HPD catalog?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  All of the drug products
21 in our catalog.
22 BY MS. ST. PETER-GRIFFITH:

19 (Pages 70 to 73)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                     March 16, 2008

Page 74

1    Q.   Okay.
2    A.   We did not look at devices.
3    Q.   Okay.
4    A.   So we identified all of those products.
5         We identified historical sales for
6    those products.  We also identified historical
7    sales at specific price levels for those products
8    primarily, as I remember, we looked at list price,
9    or catalog price sales, whatever term you want to
10   use with regard to that.
11   Q.   Are the two synonymous?
12   A.   In my mind they are, yes.
13   Q.   Well, are they for Abbott's purposes?
14   A.   Yes.
15        Then we identified the list price
16   for each product, the WAC price for each product,
17   as well as the contract price range for each
18   product.
19   Q.   Then what did you do with that
20   information?
21   A.   We basically did comparisons of those
22   prices in terms of both absolute dollars as well

Page 75

1    as in terms of percentage.
2    Q.   When you say "percentage," what do you
3    mean?
4    A.   I can't remember exactly which
5    percentage we used but it was either a percent of
6    the list price or a percent of the contract price.
7    I can't remember which.  It was probably a percent
8    of list price.
9    Q.   So you did a percentile evaluation of
10   comparing the contract price with the catalog
11   price to determine what percentage of the catalog
12   price --
13   A.   Catalog price, WAC price, and the
14   contract price.
15   Q.   Okay.  How did you determine the
16   contract price range?
17   A.   As I recall, we pulled the sales history
18   and looked at, and basically sorted it down to
19   find out what the unit prices were.
20   Q.   When you said you pulled the sales
21   history, was that the sales history for any
22   particular clients or for all of Abbott's clients?

Page 76

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  For all contract sales.
3    BY MS. ST. PETER-GRIFFITH:
4    Q.   Where did you pull that information
5    from?
6    A.   I can't remember what the name of the
7    system is, but there's a system that holds the
8    sales history for products.
9    Q.   Did someone with technological, not to
10   suggest that you don't have technological
11   capabilities, Mr. Sellers, but did you rely upon
12   someone's technical support to pull that
13   information from this database?
14   A.   Yeah.  My financial analyst worked with
15   me on that.
16   Q.   Who was that?
17   A.   Maylene Soto.
18   Q.   Did anyone else work with you on this
19   project?  I know you've used the term "we" several
20   times.
21   A.   No.  It was purely me and Maylene.
22   Q.   Where did you obtain the WAC price

Page 77

1    information?
2    A.   It probably came off of the what we call
3    our contract marketing resource file.
4    Q.   What is the contract marketing resource
5    file?
6    A.   It's a database that's built by product
7    that lists relevant prices for a product that can
8    be readily accessed by the Contract Marketing
9    analyst as they need that information.
10        All of the data is pulled from
11   various data files and put into one format that
12   everybody is, everybody in Contract Marketing, is
13   knowledgeable of.
14   Q.   Is access to the resource file limited
15   to individuals within Contract Marketing?
16   A.   Yes.
17   Q.   Where did you pull the list price or the
18   catalog price information from?
19   A.   Same place.
20   Q.   Did you receive a copy of your analysis?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  I've seen copies of the

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 78

1  analysis as part of these proceedings.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   You mean that have been produced --
4    A.   Yes.
5    Q.   -- by Abbott?
6    A.   Yes.
7    Q.   Do you know whether they've been
8  produced in their totality?
9       MS. TABACCHI:  Object to the form.
10      THE WITNESS:  I don't know.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   Did you maintain a file of information
13  or data that you collected as part of your
14  preparation of the analysis?
15      MS. TABACCHI:  Object to the form.
16      THE WITNESS:  No.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   Did you have any workpapers concerning
19  the analysis?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  Nothing other than what's
22  been produced.

Page 79

1       MS. ST. PETER-GRIFFITH:  Do we have his
2  full production?
3       MS. TABACCHI:  As far as I know.
4       MS. ST. PETER-GRIFFITH:  I know you're
5  not the production person, Tina.
6       MS. TABACCHI:  I'm not the production
7  person.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   Did any nonAbbott employee have a role
10  in the decision making or approval of the 2001
11  catalog price changes?
12    A.   No.
13    Q.   Who was consulted before the
14  approval -- strike that.
15       Have we exhausted your memory on
16  all the individuals involved in the decision
17  making?
18    A.   Yes.
19    Q.   Did you have any external communications
20  with anyone at Abbott concerning the decision, I'm
21  not talking about communicating the decision but
22  concerning the decision making, did you have any

Page 80

1  external communications with anyone outside of
2  Abbott?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  No.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   What internal communications were there
7  concerning the 2001 price change decision?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  Once we had decided on
10  making the change, we went through the normal
11  process that we would go through in any catalog
12  price change.
13       We notified the compendia.  We went
14  about printing up the catalog.  We defined the
15  catalog date.  I believe it was in May of sometime
16  of 2001.  We had a letter that we sent to our
17  sales force making them aware that the change was
18  happening.  It was a rather short letter, but I
19  believe it also told them this was a unique
20  change.  And I believe we provided them with some
21  answers for what we'd call frequently asked
22  questions.  And those were purely, they weren't

Page 81

1  really frequently asked those, those were
2  anticipations of frequently asked questions.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   What questions did you anticipate would
5  be asked?  I know you don't have them in front of
6  you, but just what do you recall?
7    A.   I think it was something like well, why
8  did the prices go down.
9    Q.   And what was --
10    A.   Did they go down for all the products,
11  you know.  It was just a little more, a twist, on
12  what data we had already given them in the letter.
13    Q.   What was the explanation given publicly
14  as to why the prices were reduced?
15    A.   To bring our list prices more in line
16  with the prevailing market prices.
17    Q.   Any other communications?
18    A.   Not that I recall.
19    Q.   What communications did third parties
20  have with you concerning the price changes?
21    A.   As far as I know, I wasn't privy to any
22  specific conversation.  Any conversations or

21 (Pages 78 to 81)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                      March 16, 2008

Page 82

1  questions that would have come in from the press
2  would have gone to our public affairs group.
3        I know there was an article written
4  in the Chicago Tribune that appeared sometime in
5  the summer of 2001 that talked about our catalog
6  price change. So I'm sure the reporters were in
7  touch with Abbott with regard to that. But other
8  than that, I wasn't privy to any other
9  conversations.
10    Q.   Did you learn about any dissatisfaction
11  among clients regarding the changes in catalog
12  prices?
13        MS. TABACCHI: I'm going to object as
14  beyond the scope.
15        THE WITNESS: I've been made aware as
16  part of this process of two, I believe two,
17  letters that were sent in by Alternate Site
18  customers with regard to it.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   What letters were those that you became
21  aware of?
22        MS. TABACCHI: Same objection.

Page 83

1        THE WITNESS: I can't remember who
2  they're from. But, again, they're part of this
3  record.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.   Did one concern GeriMed?
6        MS. TABACCHI: Object to the form.
7        THE WITNESS: I don't recall who it was
8  about.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Do you recall a client making a demand
11  for approximately $10 million?
12        MS. TABACCHI: Objection, beyond the
13  scope.
14        THE WITNESS: I recall someone making a
15  demand for a significant amount of money, yes.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   What do you recall about that?
18        MS. TABACCHI: This entire line of
19  questioning is beyond the scope of the Notice.
20        MS. ST. PETER-GRIFFITH: I disagree.
21        THE WITNESS: I only recall that it was
22  a significant amount of money and that he claimed

Page 84

1  that we had disadvantaged him in some way.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Do you recall what Abbott's response
4  was?
5        MS. TABACCHI: Same objection.
6        THE WITNESS: I'm not aware that Abbott
7  responded to the letter.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   Other than the couple of customers that
10  you recall I guess writing to Abbott about this
11  issue --
12    A.   Uh-huh.
13    Q.   -- do you recall any other client
14  reaction or customer reaction to the decision to
15  lower the catalog prices?
16    A.   Not that I recall.
17    Q.   What was the impact of the decision to
18  lower the catalog prices upon Abbott's business?
19        MS. TABACCHI: Object to the form.
20        THE WITNESS: Well, I think as we had
21  looked at it, we had projected that one of the
22  things, one of the direct impacts by reducing your

Page 85

1  list price is that any sales that you make at list
2  price subsequent to that reduction are going to be
3  at a lesser price. Therefore, you might have
4  anticipated sales of a higher value that you
5  wouldn't get.
6        To my knowledge, that's the only
7  impact that we felt from the change.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   Is that because Abbott's AWPs had
10  already been lowered by First Databank?
11        MS. TABACCHI: Object to the form,
12  beyond the scope of the Notice.
13        THE WITNESS: I don't believe that's the
14  case because as I recall none of the payors were
15  using the lowered AWPs as of the beginning of
16  2001.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   Why do you say?
19        MS. TABACCHI: Same objections.
20        THE WITNESS: It's just my recollection.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   If they weren't using the lowered AWPs,

22 (Pages 82 to 85)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 86

1    do you recall what they were using?
2          MS. TABACCHI:  Object to the form and
3    it's beyond the scope.
4          THE WITNESS:  It was my impression they
5    were using the AWPs that were in place prior to
6    the suggested DOJ reductions.
7    BY MS. ST. PETER-GRIFFITH:
8       Q.   Sir, I have a bunch of documents that
9    frankly I'm happy to not lug around anymore, and
10   we've already marked some of them.
11         We were talking earlier about the
12   pricing compendia.  What are the pricing
13   compendia?
14      A.   The pricing compendia are organizations,
15   commercial organizations, who publish either in
16   electronic form or in hard copy books various data
17   components relevant to prescription drugs.  And
18   those databases and books, and/or books, are used
19   as reference by a number of people in the
20   industry.  Retail stores in particular I think was
21   the genesis of the process.
22      Q.   Did you have an understanding as to

Page 87

1    whether or not information contained in the
2    pricing compendia was utilized for Medicaid and
3    Medicare reimbursement purposes?
4          MS. TABACCHI:  Object to the form,
5    beyond the scope of the Notice.
6          THE WITNESS:  I was aware that various
7    price levels as referenced in the book may have
8    been used by any number of payors as an index with
9    regard to their reimbursement formulas for the
10   drugs.
11   BY MS. ST. PETER-GRIFFITH:
12      Q.   Did you have an understanding as to
13   whether the Medicare/Medicaid program were
14   included among those payors?
15         MS. TABACCHI:  Object to the form,
16   beyond the scope of the Notice.
17         To the extent that you're asking
18   whether Abbott knew something, it would be helpful
19   if you could use "Abbott" instead of "you"
20   Because --
21         MS. ST. PETER-GRIFFITH:  Any time I
22   refer to you, unless I specifically say that I'm

Page 88

1    asking in his personal capacity, I'm asking
2    Abbott.
3          THE WITNESS:  Oh, okay.  That's
4    different.
5          MS. TABACCHI:  It's still confusing for
6    the witness.
7          MS. ST. PETER-GRIFFITH:  Okay.  I'll try
8    and reference Abbott then.
9          MS. TABACCHI:  Do you remember what the
10   question is?
11         THE WITNESS:  I think so.
12   BY MS. ST. PETER-GRIFFITH:
13      Q.   Let me rephrase it.
14         Did Abbott have an understanding as
15   to whether or not information contained in the
16   pricing compendia were utilized for purposes of
17   Medicare and Medicaid reimbursement?
18         MS. TABACCHI:  Object to the form,
19   beyond the scope.
20         THE WITNESS:  I think in terms of Abbott
21   Hospital Products Division, again, what I'm here
22   to talk about, the vast majority of the people

Page 89

1    operating within that organization probably did
2    not have an understanding of what the data within
3    the compendia were used for by payors.
4    BY MS. ST. PETER-GRIFFITH:
5       Q.   It's Abbott's testimony that the vast
6    majority of people in HPD did not have an
7    understanding that information contained in the
8    pricing compendia was utilized for purposes of
9    Medicare and Medicaid reimbursement?
10      A.   Yes.
11      Q.   Did the Contract Marketing individuals
12   have that understanding?
13         MS. TABACCHI:  Again, this is beyond the
14   scope of the Notice.
15         THE WITNESS:  There may have been some
16   people within Contract Marketing, not all, that
17   had an understanding that it was a factor in some
18   reimbursement formulas.
19   BY MS. ST. PETER-GRIFFITH:
20      Q.   What about the individuals within
21   Alternate Site?
22         MS. TABACCHI:  Object to the form.

23 (Pages 86 to 89)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 90

1  Again, beyond the scope.
2       THE WITNESS:  Again, there may have been
3  some within Alternate Site that had a better
4  understanding than others.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Did Abbott understand what an AWP spread
7  was?
8       MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10      MS. ST. PETER-GRIFFITH:  It's not beyond
11 the scope.
12      THE WITNESS:  No.  In general, no.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   In general, no, Abbott did not
15 understand what an AWP spread was?
16   A.   Right.
17   Q.   Did Abbott ever at any time inform any
18 clients within HPD about spreads, AWP spreads, on
19 Abbott's drugs?
20      MS. TABACCHI:  Object to form, beyond
21 the scope of the Notice.
22      THE WITNESS:  I am not aware of any of

Page 91

1  that, no.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   What did you do to educate yourself
4  concerning Abbott's utilization of AWP information
5  or AWP spread information in the marketing of its
6  products?
7    A.   I've looked at a number of documents and
8  I've talked to Lynn Leone who was in Contract
9  Marketing at the time.
10   Q.   Did Abbott understand that its Alternate
11 Site Contract Marketing team would routinely
12 prepare proposal analyses that would include AWP
13 or AWP spread information and that information was
14 provided to its Alt. Site clients?
15      MS. TABACCHI:  Object to the form, and I
16 also object to the mischaracterization of the
17 record in posing this question to the witness.
18      THE WITNESS:  No.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.   What did you do today, sir, to prepare
21 and review information recently available to
22 Abbott as a corporation -- strike that.

Page 92

1       In preparing for today's
2  deposition, did you review any information
3  recently available to Abbott as a corporation
4  concerning its Alt. Site Contract Marketing's
5  provision of AWP or AWP spread information to
6  customers?
7       MS. TABACCHI:  Object to the form,
8  beyond the scope of the Notice.
9       MS. ST. PETER-GRIFFITH:  It's not beyond
10 the scope.
11      THE WITNESS:  I reviewed Lynn Leone's
12 testimony.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   Anything else?
15   A.   I reviewed Pete Baker's testimony.
16   Q.   Why didn't you review the testimony of
17 Mr. Heggie, Mr. Walker, Ms. DeYoung, Ms. Longlois
18 concerning that issue?
19      MS. TABACCHI:  I'm sorry.  Could you
20 repeat that list?
21      MS. ST. PETER-GRIFFITH:  Sure.  Heggie,
22 Walker, DeYoung, Longlois.

Page 93

1       MS. TABACCHI:  Object to the form of the
2  question.
3       THE WITNESS:  They weren't provided to
4  me.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Sir, what I'd like you to do right
7  now -- well, first, let me ask this question:
8  What information, you testified earlier that as
9  part of the 2001 price changes Abbott provided
10 information to the price reporting compendia.
11      What information did Abbott
12 provide?  Was it the revised catalog prices?
13   A.   It was the revised catalog and WAC
14 prices.
15   Q.   Why did Abbott provide that information
16 to the compendia?
17   A.   Again, it was the standard information
18 that the compendia asked for in the past.
19   Q.   When you say the standard info that the
20 compendia asked for, what requests were made from
21 the compendia for catalog price information?
22   A.   I don't know.  We had, you know, we had

24 (Pages 90 to 93)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 94

1  been providing information to the compendia for
2  many, many years. At that time we were providing
3  list and WAC prices as I recall.
4      Q.   Do you recall why or is Abbott aware of
5  why historically from '91 through 2003 it provided
6  its catalog or list prices to the pricing
7  compendia as opposed to some other price, for
8  example, its contract pricing?
9          MS. TABACCHI: Object to the form.
10         THE WITNESS: We provided our published
11 price. Our catalog is our published price.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   Why did you provide your published
14 price?
15     A.   As I understand it, it's because that's
16 what the compendia wanted.
17     Q.   I'm not asking as you, Mike Sellers
18 personally. I'm asking why did Abbott provide the
19 compendia with its catalog pricing?
20     A.   I think the answer is the same.
21     Q.   What requests were made from the
22 compendia requesting the catalog pricing as

Page 95

1  opposed to some other pricing?
2      A.   I'm not aware of any specific
3  communication. I am aware of the years that I was
4  involved in it and also having reviewed what
5  Jerrie Cicerale has said in the past, and she was
6  the one that was responsible for it.
7      Q.   She was the one responsible for the
8  actual provision of the information?
9      A.   Yes.
10     Q.   Was she the one responsible for
11 determining which prices would be provided to the
12 pricing compendia?
13         MS. TABACCHI: Object to the form.
14         THE WITNESS: Those were the prices that
15 were provided to her and she provided them to the
16 compendia.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Who provided the prices to her?
19         MS. TABACCHI: Object to the form.
20         THE WITNESS: It would have been the
21 director or general manager of Contract Marketing
22 at the time.

Page 96

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   And for those products for which you
3  identified that there was a, to use your term, an
4  inadvertent discrepancy where there was a large
5  difference between what you're actually selling
6  for and the contract pricing and the catalog
7  pricing, why were such high catalog prices
8  provided to the pricing compendia?
9          MS. TABACCHI: I'm going to object to
10 the form of the question. It's beyond the scope
11 of the Notice.
12         MS. ST. PETER-GRIFFITH: It's not beyond
13 the scope.
14         THE WITNESS: I think the term that I
15 was trying to use was disparity. There was by
16 2001 a disparity in a number of products, not all
17 products, but a number of products.
18         When we looked at that, we realized
19 that the control of list price or catalog price,
20 as I said before, was generally a consensus
21 between Contract Marketing and the product
22 marketing group, the product marketing group on

Page 97

1  the hospital side.
2          The hospital side had little or no
3  information with regard to what Alternate Site
4  payors were doing and had, you know, were just not
5  aware of any other aspect of price. And over that
6  time period we took what I would consider to be
7  inflationary increases in price.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   At what percentage price change would
10 occur from '91 through 2001 on the list prices,
11 the catalog prices? Was there a particular
12 percentage, was it gauged to CPI?
13     A.   Again, it was, yeah, it was probably in
14 line with the CPI. Historical I think was what we
15 had tried to do. So in and around that time
16 period it was probably in the three to five
17 percent range.
18     Q.   And that occurred annually?
19     A.   Yes.
20     Q.   Now, the Hospital Products Division
21 nonAlt. Site folks, so the Hospital Business
22 Sector, am I getting that right?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 98

1     A.   Yes.
2     Q.   They sold to hospitals; right?
3     A.   Yes.
4     Q.   Who generally sought reimbursement on
5  the DRG system basis?
6     A.   DRG from government payors.
7     Q.   Government from Medicare and Medicaid,
8  right.
9     A.   And something that probably over time
10 mirrored that on the commercial side.
11    Q.   Now, these inadvertent disparities that
12 you identified for some products where there was a
13 large gap between the contract prices and the
14 catalog prices --
15    A.   Yes.
16    Q.   -- was there an HBS business reason for
17 the existence of those inadvertent disparities?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  No.
20            What HBS looked at was how much was
21 our sales at list price.  So if you took, if we
22 had inflation coming, we had inflation on our

Page 99

1  costs and everything else, so reflecting our cost
2  increases.  If you reflected that in price, that
3  was a net gain year to year based on the increased
4  price for list price sales.
5            So that's what they were looking at
6  was I've got certain customers that don't want to
7  sign a contract or haven't signed a contract that
8  want to continue to purchase at our catalog price
9  and we should raise the price on them annually.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   And that was made at the HBS level?
12    A.   Yes.
13        MS. TABACCHI:  Object to the form.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   But my question is a little bit
16 different.
17            As part of this wanting to increase
18 the price annually charged to noncontract
19 customers --
20    A.   Yes.
21    Q.   -- was there any reason to have such a
22 large disparity on some products between contract

Page 100

1  price and list price?
2        MS. TABACCHI:  Object to the form,
3  beyond the scope.
4        THE WITNESS:  In the analysis that HBS
5  would typically do, I don't think they looked at
6  it.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Okay.  I need to go back and ask you,
9  when you were doing your analysis what contract
10 pricing were you looking at?  Was it contract
11 pricing for Alt. Site customers solely or contract
12 pricing for all of HPD, so HBS as well as Alt.
13 Site?
14    A.   Again, it was so long ago I don't know
15 specifically, but I would assume it was all
16 contract prices.
17    Q.   We've identified that from '91 through
18 2001 there was a general inflationary price
19 increase for the list prices or catalog prices of
20 around three to five percent; is that fair?
21    A.   Generally.  Products might have varied
22 in there, but that was the general trend, yes.

Page 101

1     Q.   Would the contract prices charged to
2  Alt. Site customers similarly increase at the same
3  increment annually?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  The contract prices
6  charged to whom?
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Alt. Site customers.
9     A.   Not necessarily.
10    Q.   Why not?
11    A.   From a business point of view, I would
12 have loved to have had that happen.  From a market
13 competitive point of view, sometimes you were
14 precluded from that.  And in some cases the
15 contract obligations precluded you from taking
16 increases.
17    Q.   For Alt. Site contracts approximately
18 how long were the terms of the contracts?  Was
19 there any, you know, did they always go for a
20 one-year term, a three-year term?  Was there any
21 fixed term?
22        MS. TABACCHI:  Objection to form.

26 (Pages 98 to 101)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 102

1      THE WITNESS:  There was no fixed term
2  that I'm aware of.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   What was the general range for Alt. Site
5  contracts?
6      MS. TABACCHI:  Object to the form,
7  beyond the scope.
8      THE WITNESS:  I'd say probably around
9  the three-year timeframe.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   So for pricing for Alt. Site contracts,
12  the contract prices would be negotiated, and would
13  they remain static generally for that three-year
14  contract price term, would there be one price, or
15  would the contracts contemplate an annual
16  increase?
17     MS. TABACCHI:  Same objections.
18     THE WITNESS:  It varied.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.   Okay.
21     A.   I think the preference would have been
22  to have an annual price review which would allow

Page 103

1  us to take an increase, but some of the
2  negotiations precluded that.  So I'm sure there
3  existed some agreements that had firm pricing.
4      In addition, if there was a market
5  change, then we often reacted to competitive
6  forces by reducing prices across those terms as
7  well.
8      Q.   Is it possible for some drug products
9  from a '91 to 2001 timeframe while the list prices
10  were going up, the contract prices on the same
11  products remained the same or at times went down?
12     MS. TABACCHI:  Object to the form.
13     THE WITNESS:  Yes.  I think that was
14  what I was trying to portray is that there were
15  really two dynamics going on.
16     You had the list price which was
17  getting inflationary increases which is taking it
18  up like this, and you had contract prices that
19  were either flat or declining across that, again,
20  depending on the product that you look at.  And
21  that just accentuated the disparity in price.
22  BY MS. ST. PETER-GRIFFITH:

Page 104

1      Q.   You testified earlier that for the
2  Contract Marketing HBS group, they took annual
3  list price increases so that they could increase
4  the price for noncontract customers; is that fair,
5  annually?
6      A.   Yes, increase the revenue on noncontract
7  sales.
8      Q.   Is there any other reason why on an
9  annual basis the list prices or catalog prices
10  would increase from a three to five percent range?
11     A.   Again, it reflects our, would have
12  reflected the general costs in the market.
13     Q.   When you did your analysis, what was the
14  impact projected on the noncontract catalog sales?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  I don't recall.  It was
17  less than $5 million if I remember right.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   In total?
20     A.   Yeah.
21     Q.   Was that less than $5 million annually?
22     A.   And, again, I'm trying to recall that

Page 105

1  number.  I don't know it specifically.
2      Q.   Is it fair to say that when the price
3  changes were made in 2001 that that $5 million
4  impact resulting from the lowering of AWP so that
5  the AWP, I'm sorry, lowering of the list prices so
6  the list prices were more in line with the catalog
7  prices, is it fair to say that if you had taken
8  the reduction in list price in earlier years that
9  it likely would have been $5 million or less
10  because of the pricing?
11     MS. TABACCHI:  Object to the form and
12  beyond the scope of the Notice.
13     THE WITNESS:  I'm not sure I can
14  speculate on that.  I don't know which way it
15  would have gone.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   Well, can you think of a reason why it
18  would have gone up, why it would have been more
19  than $5 million?
20     MS. TABACCHI:  Same objections.
21     THE WITNESS:  In earlier years we may
22  have been selling more at catalog price.

27 (Pages 102 to 105)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                     March 16, 2008

Page 106

1   BY MS. ST. PETER-GRIFFITH:
2      Q.   Did you do any kind of analysis of your
3   catalog price sales in earlier years?
4      A.   No.
5      Q.   How would you go about evaluating sales
6   made at the catalog price as opposed to on a
7   contract price?
8          MS. TABACCHI:  Object to the form,
9   beyond the scope.
10         THE WITNESS:  It's not an easy process.
11  What you have to do is go in and look for, pull
12  the sales history, identify what price the sales
13  were made at, and then only pick out the sales
14  that were made at the list price.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Well, you testified earlier that you
17  knew that the sales price, I'm sorry, the catalog
18  sales were generally less than ten percent, but
19  you couldn't say for sure whether it was five
20  percent, two percent, or one percent; right?
21     A.   Right.
22     Q.   Did that percentage of sales at the

Page 107

1   catalog price vary from year to year, from '91
2   through 2001?
3          MS. TABACCHI:  Object to the form,
4   beyond the scope.
5          THE WITNESS:  I've not done any
6   analytics to determine that.
7              I can tell you that I would feel
8   that it would vary, and it would vary by virtue of
9   what was happening in the marketplace for
10  instance.  If one of our competitors had had
11  difficulty in supplying product that we had a
12  similar product for, customers would have bought
13  that product at list price, they would have
14  subsequently charged our competitor for the
15  difference between their contract price and list
16  price but they would have bought it from us at
17  list price.
18             Over that time period, '91 through
19  2001, there were a number of different things
20  happening in the marketplace that could have
21  inflated or deflated that level of sales.
22  BY MS. ST. PETER-GRIFFITH:

Page 108

1      Q.   Sir, what I'd like to do right now is
2   show you a series of composite exhibits, and
3   they're bulky.  As I've already discussed with
4   counsel, I'm not expecting you to sit and go over
5   them line-by-line.  I just want you to generally
6   be able to confirm for me that we're talking about
7   the same thing --
8      A.   Okay.
9      Q.   -- in terms of the catalog pricing, or,
10  I'm sorry, the catalog price reporting to third
11  party compendia.  Okay?
12     A.   Okay.
13     Q.   The first composite stack I'd like to
14  show you appear to be pricing.  And I will
15  represent to you that these came from Red Book.
16  Okay?
17     A.   Right.
18     Q.   But they are documents, I'll direct your
19  attention, I think you've actually seen them
20  before in prior depositions, they appear to be
21  Abbott's product listing verification signed by
22  Jerrie Cicerale who's the Abbott employee that you

Page 109

1   identified before.
2      A.   Right.
3          (WHEREUPON Exhibit Sellers 003 was
4           marked as of 3/16/2008.)
5   BY MS. ST. PETER-GRIFFITH:
6      Q.   So let's start with what we've marked as
7   Composite Exhibit 3 to 30(b)(6) Sellers.
8   (Documents tendered to the witness.)
9              The composite exhibit is made up of
10  the prior deposition exhibits which are numbered
11  using the Texas system, 927, 931, 930, 930 also
12  has a Deposition Exhibit 46, and the last one is
13  932.
14             Sir, if you could just take a look
15  at these documents and confirm for me that when
16  we're talking about catalog pricing and catalog
17  price reporting, these are the types of documents
18  that Abbott would submit to Red Book to confirm
19  its catalog pricing.
20     A.   Do you want me to look at all of them
21  or --
22     Q.   Yes, please, sir.

Henderson Legal Services, Inc.

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                        March 16, 2008

Page 110

1    A.  Okay.
2        MS. TABACCHI:  What is it that you're
3  asking him, to confirm that these documents appear
4  to have been submitted by Jerrie Cicerale?
5        MS. ST. PETER-GRIFFITH:  Yes, and that
6  these are representative of the catalog price
7  reporting that Abbott did to Red Book.
8        MS. TABACCHI:  But some of these are not
9  Abbott documents.
10        MS. ST. PETER-GRIFFITH:  I understand
11  that.  They're Red Book documents.  That's part of
12  the reason why I'm asking him to look at them.
13        MS. TABACCHI:  I guess I don't want to
14  take up too much more time with a detailed review
15  of these documents.  I'm not sure what it is that
16  you're hoping to accomplish.
17        I think we had agreed as to
18  authenticity that we were going to handle that
19  separately.
20        To the extent that some of these
21  documents include communications from Jerrie
22  Cicerale on behalf of Abbott to the compendia,

Page 111

1  that's one thing.  But Mr. Sellers is not going to
2  be in a position to verify anything with respect
3  to particular lines of information on these forms
4  which are not Abbott documents.
5        MS. ST. PETER-GRIFFITH:  That's not my
6  question.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  My question is, well, this is a document
9  signed -- sir, if you can look at 927.  Is that a
10  document that's signed at the bottom by Jerrie
11  Cicerale?
12        THE WITNESS:  Yeah.  That looks like her
13  signature, yes.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Does Abbott dispute that this is a, even
16  though it's in a Red Book form, does Abbott
17  dispute that this is a product listing
18  verification that was executed by Jerrie Cicerale?
19        MS. TABACCHI:  I'm going to object to
20  the form.
21        THE WITNESS:  Attached to the e-mail it
22  does appear that way.  It's not the normal

Page 112

1  communication that I am familiar with that she
2  made to any of the publishing agencies.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Well, is Abbott aware that annually
5  Jerrie Cicerale or another Abbott employee would
6  verify information listed in Red Book?
7        MS. TABACCHI:  Object to the form of the
8  question and object as beyond the scope of the
9  Notice.
10        I'm not sure, if you're simply
11  asking when she signed this form, that's one
12  thing, but I don't understand what you mean by
13  "verification."
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Well, this is a verification that was
16  executed by Jerrie Cicerale on behalf of Abbott.
17  Does Abbott dispute that?
18        MS. TABACCHI:  I'm going to object to
19  the form.
20        THE WITNESS:  Abbott doesn't dispute
21  that Jerrie Cicerale from time to time verified
22  the information that was supplied to the compendia

Page 113

1  on their forms.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  And with regard to Exhibit 3, is that
4  what these documents appear to be?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  It would appear to be that
7  because she has some changes that she had
8  identified that needed to be made to the
9  information that was provided.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.  Is there any reason why Red Book could
12  not trust the accuracy of Jerrie Cicerale's
13  verification of prices?
14        MS. TABACCHI:  Object to the form.  Of
15  Abbott's prices, of the pricing information Abbott
16  supplied?
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  Of the pricing information based upon,
19  yes, I'm sorry, of the pricing information that
20  Abbott supplied.
21    A.  She was Abbott's agent with regard to
22  Hospital Products Division in communication to the

29 (Pages 110 to 113)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 114

1  compendia.
2     Q.   So if Ms. Cicerale provided
3  communications, Red Book or any pricing compendia
4  could trust that the information she was
5  communicating was accurate?
6     A.   Yes.
7          (WHEREUPON Exhibit Sellers 004 was
8          marked as of 3/16/2008.)
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Sir, I have the same questions with
11 regard to what's been marked as Exhibit 4, which I
12 will represent to you are the First Databank
13 documents, not all of them but a sampling.
14 (Documents tendered to the witness.)
15    MS. TABACCHI:  Do you have the same
16 question of Mr. Sellers with respect to these?
17    MS. ST. PETER-GRIFFITH:  Yes.
18    MS. TABACCHI:  Would you mind just
19 posing the question again or repeating the
20 question before Mr. Sellers answers?
21    MS. ST. PETER-GRIFFITH:  Sure.
22 BY MS. ST. PETER-GRIFFITH:

Page 115

1     Q.   Mr. Sellers, Exhibit 4 I will represent
2  to you are documents pertaining to price reporting
3  to First Databank.
4          Are these documents representative
5  of a sampling of price reporting by Abbott to one
6  of the pricing compendia known as First Databank?
7     A.   The first and last section are.
8     Q.   Okay.
9     A.   The middle section appears to be a
10 printout of First Databank data that was sent to
11 Jerrie Cicerale.  There's no verification or
12 anything with regard to that.
13         So the first and last are
14 communications or appear to be communications that
15 Jerrie would have made on price changes, published
16 price changes.
17    Q.   Did Ms. Cicerale or anyone else on
18 behalf of Abbott provide price verification on the
19 National Drug Data file?
20    MS. TABACCHI:  Object to the form.
21    THE WITNESS:  I don't know.
22         I know that periodically we

Page 116

1  verified the price information that Abbott had
2  supplied to the agencies in their formats.
3          (WHEREUPON Exhibit Sellers 005 was
4          marked as of 3/16/2008.)
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Sir, Exhibit 5 I will represent to you
7  is the collection of documents pertaining to the
8  third pricing compendia Medi-Span.  (Documents
9  tendered to the witness.)
10    A.   Okay.  This is the same document that
11 was in this last piece of, who was that, First
12 Databank information.
13    Q.   Except you'll notice on the first page
14 that this particular fax was directed to
15 Medi-Span.
16    A.   Yes.
17    Q.   As opposed to First Databank?
18    A.   Right.
19    Q.   So does this --
20    A.   But it's the same e-mail and the same
21 files.
22    Q.   So it's the same price reporting?

Page 117

1     A.   Yes.
2     Q.   Okay.  By Ms. Cicerale.
3     A.   It's just she probably didn't want to
4  send an e-mail to all three.  She wanted to give
5  them some feeling that maybe they were special.
6     Q.   Understood.
7          So this particular exhibit is
8  representative of the type of price reporting that
9  Ms. Cicerale would send to Medi-Span?
10    A.   Yes.  Price changes, new products that
11 had been introduced during the year because though
12 she had sent updates as the products were
13 introduced, sometimes the price reporting agency
14 didn't include them in the documents or didn't key
15 them in.  So I think one of her practices was she
16 would restate all the products that had changed,
17 both discontinued as well as added to our
18 portfolio.
19         (WHEREUPON Exhibit Sellers 006 was
20         marked as of 3/16/2008.)
21 BY MS. ST. PETER-GRIFFITH:
22    Q.   That leads me to Exhibit 6.  (Documents

30 (Pages 114 to 117)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 118

1    tendered to the witness.)
2           Sir, I'll represent to you, I've
3    tabbed this, it's marked Sellers Exhibit 6 but
4    there are Tabs A through triple lettering,
5    although some of the letters have been taken out.
6    I think the triple lettering goes to III.
7           If I can just have you flip through
8    these.  I will represent to you that some of these
9    came from Abbott and some of these came from the
10   pricing compendia, but I'd like for you to confirm
11   that these are representative of the type of
12   reporting that was done when price changes
13   occurred and Ms. Cicerale or another
14   representative of Abbott needed to notify a or
15   more than one pricing compendia concerning the
16   price changes.
17     A.   Okay.
18          MS. ST. PETER-GRIFFITH:  Why don't we go
19   off the record while he does this.
20          MS. TABACCHI:  Okay.
21          THE VIDEOGRAPHER:  We are off the record
22   at 11:46 with the end of Tape No. 2.

Page 119

1           (WHEREUPON a recess was taken.)
2           THE VIDEOGRAPHER:  We are back on the
3    record at 12:04 p.m. with the beginning of Tape
4    No. 3.
5           MS. TABACCHI:  Can I ask just the Court
6    Reporter to read back the question that was posed
7    to Mr. Sellers before he began reviewing the
8    exhibit.
9           MS. ST. PETER-GRIFFITH:  Sure.
10          (WHEREUPON said record was read
11           back as requested.)
12          MS. TABACCHI:  If I could speak first
13   before he responds.
14          First, I'd like the record to
15   reflect the entire time that we were off the
16   record was spent by Mr. Sellers reviewing this
17   composite exhibit.
18          Also, Ann, I'm all for expedience,
19   but there are a number of documents contained in
20   this composite exhibit that are not, do not fit
21   within your question.
22          MS. ST. PETER-GRIFFITH:  Okay.

Page 120

1           MS. TABACCHI:  So to the extent that
2    you're asking Mr. Sellers to confirm that these
3    are communications from Abbott to the pricing
4    compendia, many of the documents there's no
5    evidence that they were sent to Abbott, they
6    contain handwritten notes from people that do not
7    appear to be Abbott employees, they contain other
8    communications to other third parties.  So I don't
9    know how you'd like to proceed.
10   BY MS. ST. PETER-GRIFFITH:
11     Q.   Well, this is what I would like to do.
12   I would like to confirm first, sir, that to the
13   extent in this composite exhibit you've observed
14   e-mail from Abbott to the pricing compendia.  Can
15   you answer my question?
16     A.   In some of the sections, yes.
17     Q.    So the e-mail that are contained in here
18   that are from Abbott to the pricing compendia,
19   those reflect the types of reports that were made
20   by Abbott when price changes were made?
21     A.    Well, the ones that talk about price
22   change, yes.

Page 121

1           The ones that talk about responding
2    to questions that the price compendia may have
3    had, no.  Those were just responding to queries we
4    might have gotten from someone representing one of
5    these publishing companies.
6      Q.   Fair enough.
7           To the extent that in this
8    composite exhibit that are queries from the
9    pricing compendia and Abbott responded to them,
10   are those reflective of the types of documents
11   that Abbott would send to respond to queries from
12   the pricing compendia?
13          MS. TABACCHI:  Again, you're only
14   talking about the e-mails?
15          MS. ST. PETER-GRIFFITH:  Yes.
16          MS. TABACCHI:  I just also want to note
17   that there are some documents that are stapled
18   together where there's a suggestion that things
19   were attached, and I don't want that to get lost
20   in the process because I'm not sure that they
21   belong together.
22          MS. ST. PETER-GRIFFITH:  Well, I can

31 (Pages 118 to 121)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 122

1  represent to you that these are how they were
2  produced.
3        MS. TABACCHI:  Okay.
4        MS. ST. PETER-GRIFFITH:  That's all I
5  can tell you.
6        MS. TABACCHI:  Okay.
7        MS. ST. PETER-GRIFFITH:  I'm not
8  necessarily looking for Mr. Sellers --
9        MS. TABACCHI:  We can't give corporate
10 testimony on that.
11       MS. ST. PETER-GRIFFITH:  Sure.  I
12 understand that, I understand that.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   And I understand that some of the, I'm
15 not looking for corporate testimony with regard to
16 documents that were not produced by Abbott as well
17 in terms of authenticating them.
18          What I'm interested in are these
19 the types of communications back and forth to and
20 from Abbott and the pricing compendia regarding
21 pricing of certain Abbott products?
22       MS. TABACCHI:  I guess I'll object and

Page 123

1  ask if you want to know if something is an example
2  of such communication, perhaps it would be more
3  helpful to just pick out one and ask if that's an
4  example rather than to ask him to pass on the
5  entire stack.
6        MS. ST. PETER-GRIFFITH:  Well, I'm
7  asking him to pass on the entire stack to the
8  extent that there's price, each item in here has
9  pricing information concerning Abbott products
10 that came from Abbott.
11       MS. TABACCHI:  No.  I would disagree
12 with that.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   Sir, Item A for Exhibit 6, is that an
15 e-mail from Jerrie Cicerale to the pricing
16 compendia?  (Document tendered to the witness.)
17    A.   It's a string of e-mails, but the
18 initial one was to one of the pricing compendia,
19 yes, with two files attached, and it appears to be
20 a printout of the attached files.
21    Q.   Is B a similar document?  (Document
22 tendered to the witness.)

Page 124

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  B is actually, again, a
3  number of e-mails to the pricing compendia and
4  what would appear to be what we would have
5  forwarded as price data changes.
6
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Is the same true for C?  (Document
9  tendered to the witness.)
10    A.   The same is true for C.
11    Q.   And E?  (Document tendered to the
12 witness.)
13    A.   No.
14    Q.   What is E?
15    A.   E is a couple of e-mails.  They have
16 been marked up by someone, I assume someone at the
17 data agency.  The attached file is not what I
18 would think we would have sent.  That's not the
19 usual format that we would have sent to a data
20 agency.
21          I don't know how else they would
22 have gotten it if we hadn't sent it to them,

Page 125

1  unless somebody else gave it to them, but that's
2  not the normal form.
3     Q.   But is it fair to say that --
4     A.   The e-mails represent normal
5  communications.  The file that's on the back does
6  not look like it's the normal form.
7        MS. TABACCHI:  With the exclusion of the
8  handwritten notes.
9        THE WITNESS:  Yes.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Is the same true for -- yeah, I'm not
12 asking you necessarily to authenticate the
13 handwritten notes.
14          Is the same true for Exhibit F?
15       MS. ST. PETER-GRIFFITH:  And, Tina, just
16 to let you know, I've taken off Exhibit 176.  I
17 didn't realize it was attached to that.
18       THE WITNESS:  F does appear to be
19 e-mails.  Again, the handwriting is not something
20 that Abbott would have done.  But the original
21 e-mails do look like a communication we would have
22 made.

32 (Pages 122 to 125)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                      March 16, 2008

Page 126

1   BY MS. ST. PETER-GRIFFITH:
2       Q.   And is G what appears to be an e-mail
3   from Jerrie Cicerale to First Databank identifying
4   HPD trade price change? (Document tendered to the
5   witness.)
6       A.   That's the way she titles it, yes.
7       Q.   Well, do you have any reason to doubt
8   that that's what that is?
9           MS. TABACCHI:  Object to the form.
10          THE WITNESS:  It's not a, it wasn't a
11  naming convention that we used broadly.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   What? "Trade price" you mean?
14      A.   Yeah.
15      Q.   What do you interpret "trade price" to
16  mean?
17      A.   List.
18      Q.   This appears to be an e-mail from Jerrie
19  Cicerale to First Databank -- I'm looking at H,
20  Tina -- and it appears to have wholesale price
21  changes. (Document tendered to the witness.)
22          Is that your understanding of what

Page 127

1   that document is?
2       A.   Yeah.  There's actually two e-mails with
3   attached files that would be that, yes.
4       Q.   And is the same true for I? (Document
5   tendered to the witness.)
6       A.   Yes.  I appears to be where she was
7   responding to a question from Medi-Span.
8           So it wouldn't have necessarily
9   been dictated by a change in price.  It was
10  dictated by some communication she got from
11  Medi-Span, according to what the e-mail says.
12      Q.   So if Jerrie Cicerale would receive an
13  inquiry from Medi-Span, she would respond?
14      A.   Yes.
15      Q.   Now, J appears to be a letter, it says
16  "To Trading Partner," so it's not necessarily
17  directed to any price reporting agency.  It's from
18  Harry Adams. (Document tendered to the witness.)
19          I'm going to ask you, sir, does
20  this appear to be a Harry-gram?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  No.  Well, it's not the

Page 128

1   form of a Harry-gram, though it might have been
2   the early formative stages of the Harry-gram.
3           Again, this is not a communication
4   I would have expected to have been sent to the
5   data agencies.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.   Okay.  Fair enough.
8       A.   It is a communication that I would have
9   expected to be sent to charge-back wholesalers or
10  distributors.
11      Q.   So customers who purchased from Abbott,
12  wholesalers or GPOs that purchased from Abbott?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  No.  Wholesalers or
15  distributors because it says "Please call your
16  charge-back coordinator."
17          So it was a charge-back.  That's
18  basically the acquisition price for charge-backs.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   And it attaches pricing information?
21      A.   Yes.
22      Q.   K is a fax from Michael Heggie to Lisa

Page 129

1   at Red Book. (Document tendered to the witness.)
2           Who is Mr. Heggie?
3       A.   Mr. Heggie used to be employed by Abbott
4   Laboratories.  I believe he was working in some
5   manner with Product Sales and possibly the renal
6   care group within HPD Alt. Site.
7       Q.   Did he have responsibilities for
8   communicating with the pricing compendia?
9       A.   Absolutely not.
10      Q.   He didn't?
11      A.   No.
12      Q.   Do you know why he, why do you say that?
13      A.   Because Jerrie was the only one
14  designated to communicate to the pricing
15  compendia.
16      Q.   Well, is Abbott familiar with the
17  document that has the Item K --
18          MS. TABACCHI:  And I will just object to
19  the extent that the pages that are stapled
20  together as Item K, the suggestion that they are
21  one document or that the attachment has anything
22  to do with, if you want to just ask him about the

Henderson Legal Services, Inc.

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                          March 16, 2008

Page 130

1   front page, that's fine, or ask him separately
2   about them, but the suggestion that these are
3   attachments to the first page is the basis for my
4   objection.
5        MS. ST. PETER-GRIFFITH:  Okay.  I'm not
6   necessarily asking whether Pages 03 through 05 are
7   attachments, but 02 appears to be an attachment.
8   I mean it was produced sequentially by Abbott.
9        MS. TABACCHI:  The fact that it was
10  produced sequentially does not mean it was
11  attached.  The letter doesn't say that there was
12  an attachment.
13       MS. ST. PETER-GRIFFITH:  It says
14  "Enclosed is the information" on a new Abbott
15  product.
16       MS. TABACCHI:  Well, this is not
17  something, I mean you can ask Mr. Sellers in his
18  individual capacity.  But other than that, he's
19  not prepared to provide corporate testimony on
20  whether Page 2 was attached to Page 1.  We'll have
21  to find some other way to figure that out.
22       MS. ST. PETER-GRIFFITH:  Well, if you

Page 131

1   could investigate that, please, because obviously
2   that's how it was produced by Abbott to us.
3        MS. TABACCHI:  You've had an opportunity
4   to depose Mr. Heggie.  I don't know whether you
5   asked him that question or not.
6   BY MS. ST. PETER-GRIFFITH:
7        Q.   Sir, is Abbott familiar with this
8   document?
9        MS. TABACCHI:  Referring now to what
10  pages of it?
11       MS. ST. PETER-GRIFFITH:  1 and 2.
12       MS. TABACCHI:  The first and second
13  page?  I'm going to object to the form and object
14  as beyond the scope of the Notice.
15       THE WITNESS:  I'm not familiar with this
16  page.
17  BY MS. ST. PETER-GRIFFITH:
18       Q.   Does the second page appear to be
19  pricing information concerning vancomycin?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  It does list vancomycin on
22  the page, yes.

Page 132

1   BY MS. ST. PETER-GRIFFITH:
2        Q.   If you could look at L.  (Document
3   tendered to the witness.)
4             And I appreciate that this might
5   not be a communication directly with a third-party
6   pricing compendia, but can you identify whether or
7   not this is an e-mail from Jerrie Cicerale to the
8   addressees communicating pricing information?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  This is of a standard
11  format that Jerrie would communicate typically new
12  products to a variety of people in HPD, not
13  something that would be sent to a pricing
14  compendium.
15  BY MS. ST. PETER-GRIFFITH:
16       Q.   So it wouldn't be sent to a pricing
17  compendia in that form?
18       A.   No.
19       Q.   If you could look at Exhibit M and tell
20  me whether that appears to be a series of e-mail
21  communicating price information or pricing changes
22  by Abbott?  (Document tendered to the witness.)

Page 133

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  It's price communications.
3   Whether they're changes or new products, I can't
4   tell.
5   BY MS. ST. PETER-GRIFFITH:
6        Q.   Okay.  Is the same true for N?
7   (Document tendered to the witness.)
8        A.   The same is true for N.
9        MS. TABACCHI:  Same objection.
10            I assume you're using the term
11  "e-mail" loosely, Ann?
12       MS. ST. PETER-GRIFFITH:  Oh, yeah.
13       MS. TABACCHI:  I just don't want the
14  record to suggest that we were e-mailing in 1994
15  and then --
16       MS. ST. PETER-GRIFFITH:  Sure.  No, I
17  understand.
18       MS. TABACCHI:  Okay.
19       MS. ST. PETER-GRIFFITH:  And you know
20  something, Tina, I just assumed from the format
21  that it might have been from an earlier e-mail
22  format.  When I say "e-mail," I meant, why don't

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 134

```
1   we just say "communication."
2        THE WITNESS: "Communication."
3        MS. TABACCHI: Fine.
4   BY MS. ST. PETER-GRIFFITH:
5    Q.  Is the same true for O? (Document
6   tendered to the witness.)
7        MS. TABACCHI: You'll be asking for the
8   1994 e-mails.
9        MS. ST. PETER-GRIFFITH: I've already
10  asked for them, Tina. (Laughter.)
11       THE WITNESS: And you won't find them.
12       Yes.  This is a communication, this
13  would be a typical communication.
14  BY MS. ST. PETER-GRIFFITH:
15   Q.  Does this appear to be a pricing inquiry
16  from Medi-Span to Jerrie Cicerale? (Document
17  tendered to the witness.)
18       MS. TABACCHI: Are we on O now?
19       THE WITNESS: P.
20       MS. ST. PETER-GRIFFITH: P.
21       THE WITNESS: It would appear to be a,
22  yes, some kind of question.
```

Page 135

```
1   BY MS. ST. PETER-GRIFFITH:
2    Q.  How routine would questions be from the
3   pricing compendia?
4        MS. TABACCHI: Object to the form.
5        THE WITNESS: I don't have any direct
6   knowledge of what that would be.
7   BY MS. ST. PETER-GRIFFITH:
8    Q.  Was Jerrie Cicerale in your chain of
9   command? Was she a subordinate to you?
10   A.  When I ran Contract Marketing, yes.
11   Q.  HBS Contract Marketing?
12   A.  Yes.
13   Q.  Sir, does Q appear to be an e-mail with
14  attached pricing information or a communication, I
15  assume it's an e-mail because it says e-mail,
16  First Databank from Jerrie Cicerale communicating
17  pricing information? (Document tendered to the
18  witness.)
19   A.  Yes.
20   Q.  Is the same true for R? (Document
21  tendered to the witness.)
22   A.  Yes.  Here in fact it was due to the
```

Page 136

```
1   fact that the product had changed configurations.
2   We had gone to a different case size.
3    Q.  Sir, this appears to be an e-mail to
4   Jerrie Cicerale from First Databank requesting, or
5   providing, a current listing of active HPD NDCs
6   listed on the National Drug Data file for First
7   Databank. (Document tendered to the witness.)
8        Is that what that document is?
9        MS. TABACCHI: Object to the --
10       THE WITNESS: Yes.  It appears to be
11  that.  So this is not a communication from Abbott.
12  BY MS. ST. PETER-GRIFFITH:
13   Q.  From Abbott.  It's a communication to
14  Abbott?
15   A.  Yes.  It was sent to Abbott.
16   Q.  Sir, is U a communication from Jerrie
17  Cicerale from Abbott to First Databank identifying
18  list price changes? (Document tendered to the
19  witness.)
20   A.  Yeah.  There's a couple of e-mail copies
21  on the back of it to the other agencies, yes.
22   Q.  Is the same true without the e-mails on
```

Page 137

```
1   the back of Item V? (Document tendered to the
2   witness.)
3    A.  Yes.
4    Q.  And Item W appears to be a fax, although
5   I'm not sure, well, it appears to be an e-mail
6   although it says in the "To" line Red Book (Fax.)
7   So a communication from Jerrie Cicerale to Red
8   Book concerning HPD information and it attaches
9   direct and wholesale prices. (Document tendered
10  to the witness.)
11   A.  Yes.
12   Q.  And X appears to be an e-mail from
13  Jerrie Cicerale to First Data, and this does say
14  e-mail, with an identification of direct and
15  wholesale prices for HPD's Sanofi pharmaceutical
16  line? (Document tendered to the witness.)
17       MS. TABACCHI: Object to the form.
18       THE WITNESS: Yes, it does.
19
20  BY MS. ST. PETER-GRIFFITH:
21   Q.  And Y appears to be a listing of WAC
22  price information that Jan called Jerrie Cicerale
```

35 (Pages 134 to 137)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                     March 16, 2008

Page 138

1  about, at least from the context of the e-mail?
2  (Document tendered to the witness.)
3      A.   Yes.
4      Q.   Now, I appreciate that Z is not a
5  communication to and from the pricing compendia,
6  but does it appear to be a communication from Mike
7  Heggie to Tena Brown regarding the or forwarding
8  information concerning the Texas Drug Vendor
9  Program? (Document tendered to the witness.)
10         MS. TABACCHI:  Object to the form and
11  also as beyond the scope of the Notice.
12         THE WITNESS:  Well, there are e-mails on
13  the back end of this to the pricing compendia.
14  But the first note and the first section would
15  indeed relate to the Texas Drug Vendor Program but
16  would not go to a publisher.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.   And the e-mail at the end appear to be,
19  and I apologize, we can break these out because
20  they probably should have been not stapled
21  together, which are, and I'll read the DOJ Texas
22  Bates numbers, it's Abbott DOJ 0202306 through

Page 139

1  309, and they appear to be a series of e-mail from
2  Red Book --
3      A.   From Jerrie.
4      Q.   I'm sorry.  From Jerrie Cicerale to Red
5  Book and First Databank.  Is that fair, sir?
6      A.   That's what I recall.
7      Q.   Well, here, you're welcome to look at
8  it.
9      A.   No.  That's fine, that's fine.
10      Q.   They appear to report, according to the
11  text of the e-mail, price changes.
12      A.   Yes.
13      Q.   Okay.  AA, a communication from Jerrie
14  Cicerale to Medi-Span addressing an inquiry.
15  (Document tendered to the witness.)
16      A.   Yes.
17      Q.   And I will try and streamline this.  BB,
18  CC, DD, EE, FF, and GG all appear to be
19  communications from Jerrie Cicerale to various
20  drug pricing compendia providing information
21  concerning pricing. (Documents tendered to the
22  witness.)

Page 140

1      A.   Yes.  Of those that you've listed, they
2  look like communications.
3      Q.   Now, for HH and II, is the same true for
4  these two documents? (Documents tendered to the
5  witness.)
6         They appear to be communications
7  with either individuals at the pricing compendia
8  such as Kay Morgan or -- strike that.  I'm going
9  to do these one at a time.
10         Does HH appear to be an e-mail from
11  Jerrie Cicerale to First Databank providing direct
12  and wholesale information?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  There actually are three
15  e-mails in this.  The last one, the attached file,
16  appears to be from a, you know, someone else's
17  format, not an Abbott format.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Does it reflect Abbott pricing
20  information?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  It reflects a response --

Page 141

1         MS. TABACCHI:  Beyond the scope.
2         THE WITNESS:  -- that Jerrie is making
3  to a Ronnie Lane at Red Book.
4         MS. ST. PETER-GRIFFITH:  Okay.
5         THE WITNESS:  Whether she's responding
6  regarding price or whether she's responding
7  regarding product availability.  But it is a
8  response to a query from that person.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.   Would the pricing compendia obtain
11  pricing information concerning Abbott products
12  from anyone other than Abbott?
13         MS. TABACCHI:  Object to beyond the
14  scope, object to the form.
15         THE WITNESS:  I don't know what the
16  price compendia do.
17         I do know that we provided our list
18  price, and at some point in time we started
19  providing our WAC price.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Sir, you testified earlier on behalf of
22  Abbott that you generally described what the

36 (Pages 138 to 141)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

---

Page 142

1  pricing compendia did; right?
2      A.   What I understood them to do, yes.
3      Q.   Well, is that what Abbott understood?
4      A.   Yes.
5          MS. TABACCHI:  Objection.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   I just want to clarify because you just
8  said you didn't know what the pricing compendia
9  did.  Do you mean with regard to collecting price
10  information?
11     A.   I don't know what, beyond what
12  communications we had with them and what they
13  subsequently published of our products, I'm not
14  privy to anything else the data agencies would
15  have done with regard to surveying market prices
16  or whatever else they might be doing.
17     Q.   With regard to II, it appears to be an
18  e-mail from Jerrie Cicerale to Kay Morgan
19  attaching some price changes which were effective
20  May 15, 2000.  (Document tendered to the witness.)
21         Can you tell me, sir, is this an
22  internal e-mail?  Was Kay Morgan still with Abbott

---

Page 143

1  at that time?
2          MS. TABACCHI:  Object to the form,
3  beyond the scope of the Notice.
4          THE WITNESS:  This is information we
5  would typically communicate with one of the
6  compendia.  So I would assume from this that Kay
7  Morgan was no longer with Abbott Laboratories.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Do you know what Kay Morgan did after
10  she left Abbott Laboratories?
11     A.   I know at one point in time she worked
12  for First Databank.  I can't tell you what her
13  title or total role was, no.
14     Q.   Sir, the next communication is JJ.  At
15  the top it has, it appears to be an e-mail with
16  your e-mail information at the top.  I assume that
17  may mean because it was printed from your e-mail
18  but you are one of the addressees, and there's
19  another e-mail below from Kathy Franklin at First
20  Databank. (Document tendered to the witness.)
21         Can you identify this document that
22  is Item JJ?

---

Page 144

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  Again, as you
3  characterized it, it appears to be a file that was
4  sent by this Kathy Franklin to Diane Latz, and
5  Diane Latz subsequently is forwarding it to myself
6  and Bob Lyman.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   For what purpose?
9      A.   I don't recall.
10     Q.   Sir, with regard to the price
11  information, it says "Medicaid AWP Pricing."  Do
12  you see that?
13     A.   Yes.
14     Q.   What is Medicaid AWP pricing?
15         MS. TABACCHI:  Object to the form,
16  beyond the scope.
17         THE WITNESS:  It's not a term that I
18  readily recognize.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.   So when you received this, would you
21  recognize -- strike that.
22         In the text of the e-mail it says,

---

Page 145

1  the e-mail below from Kathy Franklin to Ms. Latz.
2  And I'm assuming Ms. Latz is an Abbott employee?
3      A.   Yes.
4      Q.   Who is she?
5      A.   She was a pricing analyst that worked
6  for Bob Lyman in the government area, government
7  contracts area.
8      Q.   The text of the e-mail reads "Please
9  find attached the Medicaid AWP listing you
10  requested from Cindy Church."  Do you see that?
11     A.   Uh-huh.
12     Q.   Sir, why would Abbott be requesting
13  information concerning Medicaid AWP listings?
14     A.   I don't know.
15         MS. TABACCHI:  Object to the form.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   Do you have any recollection why in May
18  of 2000 Abbott might be requesting this
19  information from First Databank?
20     A.   No.
21     Q.   Sir, does LL appear to be an e-mail from
22  Jerrie Cicerale to Kay Morgan notifying Ms. Morgan

---

37 (Pages 142 to 145)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 146

1  of the ninety-five products that have had
2  wholesale changes effective 2/1/01?  (Document
3  tendered to the witness.)
4     A.  Yes.
5     Q.  And what were those wholesale, why did
6  those wholesale changes occur effective 2/1/01 --
7        MS. TABACCHI:  Object to the form.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  -- on those ninety-five products?
10    A.  As I recall, there was an effort done
11 toward the end of 2000 internally in Contract
12 Marketing to consolidate the prices that we had
13 for charge-back wholesalers and the prices we had
14 for charge-back med/surg distributors.  And I
15 think that was part of the consolidation effort to
16 make both of those prices consistent.
17    Q.  I'm going to identify as MM document
18 Abbott DOJ 0201423.  (Document tendered to the
19 witness.)
20        Sir, does this appear to be a
21 comparable communication from Ms. Cicerale
22 notifying Ronnie Lane at Red Book of those same

Page 147

1  ninety-five product price changes?
2     A.  Yes.
3     Q.  Again, sir, I understand that you can't
4  authenticate the handwriting, but for NN, does it
5  appear to be an e-mail from Jerrie Cicerale to Kay
6  Morgan identifying new products to be added?
7  (Document tendered to the witness.)
8     A.  Yes.  The printed portion looks
9  consistent with that.
10    Q.  And OO looks to be a similar document?
11 (Document tendered to the witness.)
12        I haven't compared them.  They
13 might even be the same document, just in larger
14 print.
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  It's a little different
17 e-mail print format, but I'm not sure why.
18        MS. TABACCHI:  I'm sorry.  We're looking
19 at NN and OO?
20        MS. ST. PETER-GRIFFITH:  And OO.
21        MS. TABACCHI:  Mine are not the same.
22        THE WITNESS:  I didn't compare them.

Page 148

1        No, they don't.  This was in May of
2  2000.
3        MS. ST. PETER-GRIFFITH:  And this is
4  October of 2000.
5        THE WITNESS:  This is October of 2000.
6        MS. ST. PETER-GRIFFITH:  Okay.
7        THE WITNESS:  I use a very scientific
8  approach.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  They look very similar though.
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  On the back of OO is an
13 e-mail chain between Jerrie, Kay Morgan, and a
14 Inna Dimitshteyn or something like that.  But I
15 mean the responses look consistent with what we
16 would be talking to the compendia about.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  And I believe that this may be another
19 e-mail chain between Ms. Dimitshteyn and Ms.
20 Morgan and Ms. Cicerale.  The first page has list
21 price information, and the ensuing pages appear to
22 be e-mails making inquiries.  And that's PP.

Page 149

1  (Document tendered to the witness.)
2     A.  Yes.
3     Q.  QQ appears to be a, I'll withdraw QQ
4  because it appears to be the same document.
5        Now, I understand, sir, that for RR
6  the top page appears to be a First Databank cover
7  sheet.  The remaining pages appear to be an e-mail
8  chain where information is communicated and it is
9  attached from Jerrie Cicerale to Kay Morgan
10 identifying HPD changes effective 51500.
11 (Document tendered to the witness.)
12        Is that what that document
13 reflects?
14        MS. TABACCHI:  Again, you're not asking
15 Mr. Sellers about any handwriting?
16        MS. ST. PETER-GRIFFITH:  No, not
17 handwriting.
18        THE WITNESS:  Yeah.  Again, there's a
19 chain on the back end of this as well.  But aside
20 from the cover sheet, it does appear to be the
21 kind of communications we would have with First
22 Databank.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 150

1   BY MS. ST. PETER-GRIFFITH:
2      Q.   And is the same true for SS?  (Document
3   tendered to the witness.)
4          Again, you don't need to
5   authenticate the handwriting.
6      A.   Yes.  Again SS has e-mails on the back
7   end of it.
8      Q.   Again, sir, not looking at the
9   handwriting, and appreciating that the first page
10  of TT is a cover sheet generated through First
11  Databank, my question to you is for TT is the
12  ensuing three pages where it says 5/7/01 Abbott
13  Labs HPD Price Changes, does that appear to be a
14  pricelist being generated by Abbott?  (Document
15  tendered to the witness.)
16     A.   The printed section for those three
17  pages looks consistent with the format that we
18  would use.
19     Q.   I'm going to ask you, sir, with regard
20  to UU, does this appear to be an e-mail from Kay
21  Morgan to Jerrie Cicerale and attached to it
22  appears to be a format similar to the one that you

Page 151

1   just looked at for HPD price changes for 5/7/01?
2   (Document tendered to the witness.)
3      A.   Yes.
4      Q.   And understanding that you're not here
5   to authenticate the handwriting or the first cover
6   sheet from First Databank, contained in VV appear
7   to be a series of e-mails as well as charts.
8   (Document tendered to the witness.)
9          Sir, if you could identify whether
10  the charts with pricing information appear to be
11  Abbott price information generated by Abbott and
12  if the communications in the e-mail appear to be
13  e-mail that are consistent with the type of
14  communications that Abbott would have with the
15  pricing compendia?
16     A.   Okay.
17          MS. TABACCHI:  Object to the form.
18          Which e-mail are you referring to
19  now?
20          MS. ST. PETER-GRIFFITH:  That e-mail.
21  There are two in there.
22          MS. TABACCHI:  Okay.

Page 152

1          THE WITNESS:  Actually, the e-mails
2   don't look like they ever touched Abbott.  They
3   look like they're internal.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.   Okay.  Fair enough.  I'm not going to
6   ask you to authenticate anything about those.
7      A.   Again, the format of the tables that are
8   there that are printed are consistent with what we
9   would have sent them.
10     Q.   And is the same true for WW, not the
11  first page which is a cover sheet again from First
12  Databank, and again not authenticating the
13  handwriting?  (Document tendered to the witness.)
14     A.   Yes.
15     Q.   I'm going to ask you the same question
16  for XX, YY, for these two documents XX and YY, not
17  looking at the cover page but the --
18          MS. TABACCHI:  But the charts?
19          MS. ST. PETER-GRIFFITH:  The charts,
20  yes, I'm sorry.  (Documents tendered to the
21  witness.)
22          THE WITNESS:  Yes.  The charts are

Page 153

1   consistent.
2   BY MS. ST. PETER-GRIFFITH:
3      Q.   Sir, those last couple of series of
4   charts that we looked at were dated 4/30/01 and
5   they reflect Abbott HPD price changes that
6   occurred on 5/7/01.
7          Was that when the '01 price changes
8   occurred?
9          MS. TABACCHI:  Object to the form.
10          THE WITNESS:  That's when we made the
11  list price changes in 2001, yes.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   Sir, appreciating that you can't
14  identify the first page of Exhibit ZZ -- we're out
15  of double letters now -- or Exhibit 6ZZ, can you
16  identify the last three pages of that exhibit as
17  being a wholesale acquisition, a pricelist from
18  Abbott concerning its wholesale acquisition
19  prices?  (Document tendered to the witness.)
20          MS. TABACCHI:  Again, you're not asking
21  Mr. Sellers about the handwritten notes?
22          MS. ST. PETER-GRIFFITH:  I am not.

39 (Pages 150 to 153)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                        March 16, 2008

Page 154

1       THE WITNESS:  These three pages are
2   consistent with our format for pricelists, but
3   they are not consistent with what I would expect
4   to have been sent to the price compendia.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   Sir, do you see at the top where it says
7   2001?  In the far left-hand corner at the top
8   there's a 2001 and then there appears to be the
9   Abbott logo.
10      A.   Yes.
11      Q.   Do you have any doubt that this
12  document, that Pages 2, 3, and 4 of this exhibit
13  were generated by Abbott?  Again, not
14  authenticating the handwriting.
15      MS. TABACCHI:  Or that Abbott provided
16  this to First Databank?
17      MS. ST. PETER-GRIFFITH:  Yeah.  I'm not
18  looking for him to confirm that.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   I'm just asking you whether it's an
21  Abbott document.
22      A.   It is consistent with our pricelist

Page 155

1   format.  So we would have had the Abbott A up in
2   the top and in this general layout, yes.
3       Q.   And is the same true for the second page
4   of AAA?  (Document tendered to the witness.)
5       A.   Yes.
6       Q.   And is the same true for Pages 2, 3 and
7   4 of Exhibit BBB?  (Document tendered to the
8   witness.)
9       A.   Yes.
10      Q.   Is the same true for the second page of
11  Exhibit CCC?  (Document tendered to the witness.)
12      A.   Yes.
13      Q.   Is the same true for Pages 2, 3, and 4
14  of DDD?  (Document tendered to the witness.)
15      A.   Yes.
16      Q.   Now, sir, again, not looking at the --
17  you know what, I'm not going to ask you to relate
18  the first page of EEE to the attachment because
19  the page numbers are not sequential.  (Document
20  tendered to the witness.)
21          So my question to you, sir, first
22  is does the first page of EEE appear to be a

Page 156

1   communication with the pricing compendia
2   consistent with the types of communications that
3   Abbott would have?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  Yes, the first page.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.   Just the first page.
8       A.   Yes.
9       Q.   Then the next two pages, does it appear
10  to be the wholesale pricelist from Abbott?  Again,
11  not authenticating the handwriting.  The next two
12  pages.
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  The next two pages do.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   And the remainder of the document,
17  again, not -- oh, I'm sorry.  The fourth page,
18  does that appear to be an Abbott format with
19  pricing information concerning its products?
20      A.   It's not a standard format, but it's one
21  I think I've seen used in communications before.
22      Q.   The next page.

Page 157

1       A.   And the same for the next page.
2       Q.   And the final page, what does that
3   appear to be?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  It appears to be a First
6   Databank query of some kind.  It's not a format
7   that Abbott had.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.   Sir, if you could look at FFF.
10  (Document tendered to the witness.)
11          Does that appear to be a
12  communication from Jerrie Cicerale to First
13  Databank?  And I'm not asking you to authenticate
14  anything with regard to the next page, the second
15  page.
16      A.   The first page does appear to be an
17  e-mail string between Jerrie and Kay Morgan.
18      Q.   Sir, with regard to GGG, I'm going to
19  only ask you to look at the second, third, and
20  fourth pages to see if it appears to be, the first
21  appears to be an e-mail from Jerrie Cicerale to
22  Kay Morgan.

40 (Pages 154 to 157)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

---

Page 158

1        The second, I'm not sure whether
2   you can authenticate it as an Abbott document. If
3   you don't think it is, please tell us.
4        And then with regard to the fourth
5   page, can you identify whether it appears to be,
6   again, not authenticating the handwriting, if it
7   appears to be a pricelist from Abbott.
8     A.   Well, the second page is, as you said,
9   it does appear to be an e-mail and a response.
10       The third page, it does not look
11  familiar in terms of format.
12       The fourth page, the printed
13  portion I would say would reflect something that
14  we would produce.
15    Q.   With regard to HHH, again I understand
16  you can't authenticate the first page, but if you
17  could look at the second, third, fourth, and fifth
18  pages, and again, not authenticating the
19  handwriting but can you identify those as
20  appearing to be Abbott pricing information in the
21  format that Abbott used?  (Document tendered to
22  the witness.)

---

Page 159

1     A.   Yes.  They would appear to be
2   consistent.
3     Q.   And finally, III, does this appear to
4   be -- well, do you know who Kathy Voeck is?
5   (Document tendered to the witness.)
6     A.   No.
7     Q.   It appears that she might be with Red
8   Book from Exhibit III.
9        Sir, can you identify whether this
10  appears to be a communication that Jerrie Cicerale
11  on behalf of Abbott would have with someone at the
12  pricing compendia?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  It does appear that she's
15  answering a question from a Kathy Voeck, yes.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   I've got a few more questions, sir, and
18  then we'll take a lunch break.
19       With regard to any reporting done
20  by Jerrie Cicerale as agent on behalf of Abbott to
21  third-party pricing compendia, would there be any
22  reason to doubt the accuracy of the pricing

---

Page 160

1   information reported by Jerrie Cicerale to the
2   pricing compendia?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  No reason to doubt except
5   for, you know, clerical errors that might have
6   happened.  And I'm sure there were clerical errors
7   on both sides throughout this time period.  That
8   happened.
9        Other than that, she was the
10  designated communication agent with all of those
11  agencies.  And if she found something that didn't
12  match, she readily came back to others within
13  Contract Marketing to find the answer.
14       So I would expect her to have been,
15  her communications, to be the authority with
16  regard to those prices.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   With regard to the document Exhibit 6
19  that we just looked at and the documents you were
20  able to identify as being Abbott or Abbott format
21  looking documents --
22    A.   Yes.

---

Page 161

1     Q.   -- would there be any reason to, again
2   I'm not speaking with regard to any handwriting on
3   them, but would there be any reason to distrust
4   the information contained in those particular
5   documents with regard to their accuracy?
6        MS. TABACCHI:  I'm going to object to
7   the form, also to the extent that you're asking
8   the witness to confirm a particular price for a
9   particular NDC on a particular date.  That is
10  beyond the scope of what we're prepared to do
11  today.
12       MS. ST. PETER-GRIFFITH:  I'm not
13  necessarily, I don't want him to confirm
14  line-by-line.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   I'm just saying in general to the extent
17  that forms with Abbott, that are Abbott generated
18  forms with pricing information are communicated to
19  the pricing compendia, other than clerical errors
20  as you indicated before, would there be any reason
21  to distrust that information?
22    A.   Other than the ones that I said were

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 162

1  Abbott forms that I would not have expected to
2  have been in the hands of the compendia, all of
3  the other Abbott, the forms that we looked at that
4  were in what I would have considered the
5  communication format that we made to the
6  compendia, I would have no reason to think that
7  they were erroneous.
8          I think Jerrie was a very diligent
9  employee and took a lot of pride in what she did
10 and what she was responsible for.  And I valued
11 that.
12         MS. ST. PETER-GRIFFITH:  Okay.  Why
13 don't we take a lunch break.
14         THE VIDEOGRAPHER:  We are off the record
15 at 12:58 p.m. with the end of Tape No. 3.
16         (WHEREUPON a lunch recess was
17             taken, and said deposition
18             continued as follows:)
19
20
21
22

Page 163

1          THE VIDEOGRAPHER:  We are back on the
2  record at 1:45 p.m. with the beginning of Tape
3  No. 4.
4          MICHAEL SELLERS,
5  having been previously duly sworn, was examined
6  and testified as follows:
7          EXAMINATION
8          (Continuing)
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   Mr. Sellers, before the break we went
11 through a series of documents concerning Abbott's
12 price reporting of its catalog and list prices to
13 the price reporting compendia.
14         What was Abbott's understanding of
15 what the price reporting compendia would do with
16 the prices that Abbott reported to them?
17   A.   They would publish those products and
18 those prices.  I believe there was some other data
19 that they published with regard to the product.
20 But they would publish that in their database that
21 they sold to various people within the industry as
22 well as within the actual hard copy books that

Page 164

1  they published to subscribers throughout the
2  country.
3    Q.   What was your, what is Abbott's
4  understanding of the correlation between the
5  prices it reported to the pricing compendia and
6  the calculation of average wholesale price or AWP?
7          MS. TABACCHI:  Object to the form.  I
8  have a problem with the lack of timeframe.  What
9  is Abbott's understanding today?
10         MS. ST. PETER-GRIFFITH:  No, I'm sorry.
11 Fair enough.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.   '91 through 2003.
14   A.   I think.
15         MS. TABACCHI:  I still object to the
16 form as just overbroad in that sense.
17         THE WITNESS:  I think in general within
18 Abbott Hospital Products Division, there wasn't an
19 appreciation of a relationship between the prices
20 we reported and AWP that was published by the
21 agencies, nor the importance or significance of
22 AWP to anyone.

Page 165

1          So I think in general there wasn't
2  an appreciation within Abbott for that.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   Well, what did Abbott understand the
5  relationship to be, Abbott, at any portion of
6  Abbott?
7          MS. TABACCHI:  Object to the form.
8          Could you please read back the
9  question.
10         (WHEREUPON said record was read
11             back as requested.)
12 BY MS. ST. PETER-GRIFFITH:
13   Q.   When I say the relationship, I mean the
14 relationship between the calculation of AWP and
15 the prices reported by Abbott.
16   A.   Again, I think there were a very few,
17 especially the early part of the 1990s, there were
18 very few people within Abbott Hospital Products
19 Division that even knew an AWP existed.  And even
20 fewer people had any concept of what kind of
21 relationship AWP may or may not have had with the
22 prices we published.

42 (Pages 162 to 165)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                         March 16, 2008

Page 166

1     Q.   Well, who within Abbott, and I don't
2  want to limit it necessarily to HPD, I'm
3  talking about Abbott-wide, who within Abbott had an
4  understanding of the relationship between the
5  prices reported by Abbott to the pricing compendia
6  and the pricing compendia's calculations of AWP?
7         MS. TABACCHI:  I'm going to object to
8  the form.  Also it's beyond the scope of the
9  Notice.
10        To the extent that Mr. Sellers is
11  aware of communications among divisions on this
12  topic, that would be one thing.  But he's not here
13  to testify with respect to any other division
14  other than the Hospital Products Division.
15        I understand you're seeking
16  corporate testimony, but he can't testify on
17  behalf of the Pharmaceutical Products Division for
18  example.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   Well, if any division, let me ask you
21  this, sir: If any division in Abbott had an
22  understanding of what AWP was, would that

Page 167

1  understanding be different in another division?
2         MS. TABACCHI:  Object to the form.  I
3  don't know how he can answer that.
4         THE WITNESS:  I can't answer it if I
5  don't have any knowledge of what others might have
6  known.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Well, my question to you is what did
9  Abbott as a corporation know about the correlation
10  between prices reported to the pricing compendia
11  and the pricing compendia's calculations of AWP?
12        MS. TABACCHI:  Object to the form,
13  beyond the scope of the Notice.
14        THE WITNESS:  Again, I can only speak to
15  the segment of Abbott which is the Hospital
16  Products Division that I was part of and that as I
17  understood was part of this proceedings.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   Well, you understand that Abbott
20  Corporation is a defendant; don't you, sir?
21    A.   I do.
22    Q.   And it's not Abbott Corporation as

Page 168

1  segmented into the Hospital Products Division,
2  it's Abbott Corporation.
3     A.   Yes.
4         MS. ST. PETER-GRIFFITH:  If you read
5  that prior question back, please.
6         (WHEREUPON said record was read
7             back as requested.)
8         MS. TABACCHI:  Object to the form.
9         Mr. Sellers can provide testimony
10  on behalf of what the Hospital Products Division
11  knew.
12        MS. ST. PETER-GRIFFITH:  He's here as
13  Abbott's corporate rep.
14        MS. TABACCHI:  He is testifying on
15  behalf of the corporation.  But it's overly broad
16  to have expected him to go research fifteen years
17  of history in other divisions that are not related
18  to the issues in this case or the drugs that were
19  named in the Complaint.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Sir, can you answer the question?
22    A.   No.

Page 169

1     Q.   How come?
2     A.   I can talk about the Hospital Products
3  Division.  I can't venture to speculate on what
4  other parts of Abbott knew or didn't know.
5     Q.   Well, if other parts of Abbott knew that
6  there was a correlation between the calculation of
7  AWP and the reporting of prices to the price
8  reporting compendia by Abbott, don't you think
9  that's something that should have been known
10  throughout the corporation?
11        MS. TABACCHI:  Object to the form,
12  beyond the scope.
13        THE WITNESS:  No.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.   Why not?
16        MS. TABACCHI:  Same objections.
17        THE WITNESS:  For one thing, within the
18  Hospital Products Division AWP had no significance
19  to anybody.  So it wasn't something that was
20  relevant to what we did day-to-day.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   Was it relevant to the Home Infusion

43 (Pages 166 to 169)

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 170

1  Business unit?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Remotely.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   How so?
6     A.   Because it didn't necessarily define
7  reimbursement for Home Infusion customers.
8            It was a factor in some cases for
9  some payors for some period of time.  It's a very
10 fragmented component.
11           Even within the Home Infusion
12 Services, I don't think anybody spent a lot of
13 time wondering about whether AWP had any
14 mathematical relationship to other numbers.
15    Q.   For those individuals that did have an
16 understanding of the relationship between the
17 prices reported by Abbott to the pricing compendia
18 and the calculation of AWP by the pricing
19 compendia, what was that understanding?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  As I have been able to
22 piece together from both my working experience as

Page 171

1  well as reviewing depositions and documents, there
2  were maybe a handful of people that understood
3  again beginning in the early 1990s that AWP was
4  some function of our list price.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Who were those individuals?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  Probably Jerrie Cicerale,
9  Harry Adams.  I mean it was a pretty small list
10 that I would think might have known that.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   So it's Abbott's position that it's only
13 aware that Harry Adams and Jerrie Cicerale may
14 have known of the correlation between the list
15 prices reported by Abbott to the pricing compendia
16 and the pricing compendia's calculations of AWP?
17        MS. TABACCHI:  Object to the form,
18 beyond the scope of the Notice.
19        THE WITNESS:  You asked me for some
20 specific people.  I can't, I don't have a roster
21 of people to go through.
22 BY MS. ST. PETER-GRIFFITH:

Page 172

1     Q.   Well, is Abbott aware of anyone else who
2  had this information?
3        MS. TABACCHI:  Object to the form,
4  beyond the scope.
5        THE WITNESS:  Again, I've not talked to
6  either one of those people.  I can't give you a
7  list of people that might have known something.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   Well, sir, what did you do to prepare
10 for today's deposition to educate yourself
11 concerning the company's understanding of the
12 relationship between AWP and the prices reported
13 by Abbott to the pricing compendia?
14        MS. TABACCHI:  What topic are you on,
15 Ann?
16        MS. ST. PETER-GRIFFITH:  I'm on a
17 variety of topics.  I'm on 12, I'm on 11, I'm on
18 9, I'm on 8.
19        MS. TABACCHI:  Object as beyond the
20 scope, object to the form.
21        THE WITNESS:  Again, I've done a number
22 of depositions, this subject has come up before

Page 173

1  I've looked at documents in the past.  I've also
2  looked at, as I said, I've looked at depositions.
3  And I can tell you that I have not seen a
4  prevalence of knowledge with regard to this
5  subject.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   Well, what was Abbott's understanding of
8  the correlation between AWP and Medicare or
9  Medicaid reimbursement?
10        MS. TABACCHI:  Object to the form,
11 beyond the scope.
12        THE WITNESS:  I think Virginia Tobiason
13 and Lynn Leone have both testified that across
14 that time period AWP was one component of the
15 reimbursement for Home Infusion, and it was a
16 factor.  It wasn't absolute.
17           Across that time period the
18 functions of what was getting reimbursed may have
19 gone from AWP plus to AWP minus in terms of
20 percentage.  And it varied by state and it may
21 have even varied by Medicare payor or carrier.  I
22 don't know.  But it definitely varied by

30(b)(6) Abbott (Sellers, Michael)                          March 16, 2008

Page 174

1  commercial payor.
2        So it was one component for a few
3  payors.  And primarily that information resided in
4  the Home Infusion Services reimbursement area.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Is it your testimony that the Alternate
7  Site division did not have any knowledge or
8  awareness of the impact of AWP or the importance
9  of AWP to their customer's reimbursement?
10        MS. TABACCHI:  Object to the form,
11  beyond the scope.
12        THE WITNESS:  No --
13        MS. ST. PETER-GRIFFITH:  It's not beyond
14  the scope.  Tina, it's the bulk of the documents.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Go ahead, sir.
17     A.   No.  I'm not telling you that.
18        I'm telling you that there was a
19  small group of people within Home Infusion
20  Services reimbursement that had regional
21  information with regard to whether AWP or list
22  price or WAC price, any number of which might have

Page 175

1  been the factors that the case managers or the
2  reimbursement agents that they were dealing with
3  were using in the calculation of what they
4  eventually got paid to our clients.
5        So yes, there was a small number of
6  people that had more detailed information, but
7  they did not have national information in any one
8  particular person, other than maybe Ginny Tobiason
9  who everything reported to.  And even hers, as I
10  read her deposition, was somewhat fracture.
11     Q.   Sir, as Abbott sits here today, for the
12  period from 1991 to 2003, and if the understanding
13  changed over time please feel free to tell me
14  that, what was Abbott's understanding of the
15  relationship between AWP and Medicare/Medicaid
16  reimbursement?
17        MS. TABACCHI:  Object to the form,
18  beyond the scope, asked and answered.
19        THE WITNESS:  If you're defining Abbott
20  as any particular person within Abbott --
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   I'm talking about Abbott the

Page 176

1  corporation.  What did Abbott the corporation
2  understand?
3     A.   When I look at Abbott the corporation, I
4  look at seventeen thousand people in the Hospital
5  Products Division, I look at the people that were
6  making operative decisions within the Hospital
7  Products Division.  And if I look at those and
8  give you an objective response, the objective
9  response was AWP was not an important factor to
10  the majority of them.  So they had no need to
11  know, nor do I think they had acquired the
12  knowledge of what the relationship between list
13  price or WAC price and AWP was.
14        Now, it evolved over time because,
15  as you brought up, subpoenas were issued for
16  information in 1996, 1997, and wherever in
17  between, at least another one in 2000, that
18  brought to light a number of issues with regard to
19  AWP.
20        So starting in the late 1990s, AWP
21  for the management of the Hospital Products
22  Division became more of an understanding.  But

Page 177

1  even then prior to say 2000 there was an
2  understanding that there may have been a
3  mathematical formula to calculate AWP.
4        When we entered 2001, we continued
5  to think that that was based on list.  Subsequent
6  later in 2001, we were notified by First Databank
7  that they in fact were driving it off wholesale
8  acquisition costs.
9        So our knowledge may have been
10  erred in some way.  And it just wasn't a number
11  that we kept track of and monitored.
12     Q.   Prior to 2001, did Abbott have an
13  understanding of the relationship between AWP and
14  Medicare and Medicaid reimbursement?
15        MS. TABACCHI:  Objection, asked and
16  answered, beyond the scope.
17        THE WITNESS:  I think specifically in
18  terms of what I have seen, I have seen documents
19  that were in I believe 1996 or 1997 which talked
20  about a mathematical relationship to list price to
21  AWP that was attributed to First Databank.  And I
22  think that became, for the few people that

45 (Pages 174 to 177)

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 178

1  understood it, that was known in the latter part
2  of the 1990s.
3          And, like I said, in 2001 it
4  changed.  And we wouldn't have known it changed.
5  In fact, it changed before we knew it changed, and
6  we were finally notified I believe in May of 2001
7  by First Databank as to what their calculation
8  was.
9          I don't believe I have ever seen
10 anything that tells us what Red Book's calculation
11 was.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.   I'm not asking about the calculation,
14 sir.
15          Is it your testimony that beginning
16 in the early '90s when this information became
17 known to the select few individuals that Abbott
18 understood that there was a relationship between
19 AWP and Medicare/Medicaid reimbursement?
20          MS. TABACCHI:  Object to the form, asked
21 and answered, beyond the scope.
22          THE WITNESS:  Mid '90s there were a few

Page 179

1  people that understood or thought they understood
2  that there was a relationship.
3          That knowledge expanded primarily
4  due to these, the litigation in the late 1990s.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Did Abbott at any time make any inquiry
7  of any government official, state or federal, to
8  seek clarification of the relationship between its
9  price reporting or AWPs and Medicare or Medicaid
10 reimbursement?
11          MS. TABACCHI:  Object to the form.
12          Would you mind reading that back.
13          (WHEREUPON said record was read
14          back as requested.)
15          MS. TABACCHI:  Object to the form,
16 beyond the scope of the Notice.
17          THE WITNESS:  I don't believe that was,
18 I'm not aware of any communication to that effect.
19          I am aware that there was ongoing
20 communication between the reimbursement folks and
21 the carriers to understand what they could about
22 what we were getting paid for our clients, but I

Page 180

1  don't think that's what you're asking about.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   No.  I'm not asking about individual
4  reimbursement questions posed by the reimbursement
5  department within Home Infusion, unless they made
6  the inquiry to Medicare and Medicaid about the
7  relationship between Abbott's AWPs or Abbott's
8  reported pricing and Medicare and Medicaid
9  reimbursement.  Are you aware of any inquiry by
10 Home Infusion to that effect?
11          MS. TABACCHI:  Object to the form.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.   Or is Abbott aware of any -- I want to
14 make clear, sir, that I'm expecting that you're
15 answering on behalf of Abbott.
16   A.   I would expect that to be a natural
17 communication to either the Medicaid agency.  If
18 you had any questions about how you got
19 reimbursed, that would be a natural question to
20 inquire as to why the reimbursement was high, low,
21 in between.
22          So I don't doubt that there were

Page 181

1  communications to Medicaid payors.  I don't think
2  there was, or to Medicare carriers, but I'm not
3  aware of any communications to CMS or HCFA, as it
4  was known back then.
5    Q.   What about to any state officials, are
6  you aware of any communications or any inquiries
7  concerning the relationship between Abbott's, and
8  again, I'm talking from the time period 1991
9  through to 2001, are you aware of any, through to
10 the time of the price change, are you aware of any
11 inquiries to state Medicaid officials concerning
12 the relationship between AWPs or Abbott's price
13 reporting or WACs to Medicaid reimbursement?
14          MS. TABACCHI:  I'll object to that.
15          THE WITNESS:  Again, I would say that it
16 was a natural communications for our reimbursement
17 folks on a claim-by-claim basis or as a general
18 question about claim reimbursement from a
19 particular state or a particular carrier.
20          None of them would necessarily be
21 speaking for Abbott, and it would be mainly, you
22 know, have you changed your formula for

46 (Pages 178 to 181)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 182

1  reimbursement would probably be a common question.
2        Again, as I said, my experience is
3  that the 1990s were a pretty dynamic time period
4  for reimbursement adjustments within terms of case
5  management, in terms of per diem, in terms of plus
6  or minus against whatever price index they wanted
7  to use, list price, WAC, AWP.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   Okay.  You identified the inadvertent
10  disparities before as a basis for the decision in
11  2001 to reduce Abbott's list prices; right?  You
12  had identified that there was noted, you had
13  observed or had identified inadvertent disparities
14  for some drugs between catalog price and list
15  price; is that fair?
16        MS. TABACCHI:  No.
17        THE WITNESS:  No.
18        MS. TABACCHI:  Sorry.  Object to the
19  form.
20        MS. ST. PETER-GRIFFITH:  I'm sorry.
21  Between contract price and list price.
22        THE WITNESS:  Yes.

Page 183

1        MS. ST. PETER-GRIFFITH:  That's okay,
2  Tina.  Any time you can speed things up, please
3  feel free.  (Laughter.)
4        MS. TABACCHI:  I knew that's not what
5  you meant to ask.
6        MS. ST. PETER-GRIFFITH:  That is not
7  what I meant to ask.  Thank you.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   When did Abbott first notice those
10  disparities?
11        MS. TABACCHI:  Objection, asked and
12  answered.
13        THE WITNESS:  I can only tell you that
14  we looked at a number of products in the fall of
15  2000.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   At any time prior to 2001 for the time
18  period from '91 through 2001, did Abbott ever
19  notify any state or federal official about these
20  inadvertent disparities?
21        MS. TABACCHI:  Object to the form,
22  beyond the scope of the Notice.

Page 184

1        MS. ST. PETER-GRIFFITH:  It's not beyond
2  the scope of the Notice.
3        THE WITNESS:  No.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   How come?
6        MS. TABACCHI:  Same objections.
7        THE WITNESS:  We would have seen no
8  reason to involve a government agency in what we
9  considered to be internal issues.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Well, did you have an understanding as
12  to whether what you've called inadvertent
13  disparities caused overpayments or false claims to
14  be submitted, overpayments to be made by or false
15  claims to be submitted by the Medicare and
16  Medicaid programs?
17        MS. TABACCHI:  Object to the form,
18  beyond the scope of the Notice, calls for a legal
19  conclusion.
20        THE WITNESS:  Again, I can't rule on
21  false claims.
22  BY MS. ST. PETER-GRIFFITH:

Page 185

1     Q.   Well, did you have an understanding that
2  for drugs where there was a large disparity, or a
3  larger disparity, let's say a hundred percent or
4  more or fifty percent or more between the list
5  price and the contract price, that Abbott's
6  customers and their provider customers, or I'm
7  sorry, that Abbott's provider customers were being
8  reimbursed by Medicare and Medicaid at a price
9  well above the average wholesale price?
10        MS. TABACCHI:  Object to the form of the
11  question, beyond the scope of the Notice.
12        THE WITNESS:  One, Abbott's major
13  customer, the hospital, AWP was an irrelevant
14  number.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Fair enough.  We'll limit it to
17  Alt. Site customers.
18     A.   And with regard to Alt. Site customers,
19  what the government decided to use as an index for
20  their reimbursement was their decision.
21        I think throughout the 1990s we
22  felt that it was widely known in the industry and

47 (Pages 182 to 185)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 186

1  widely known in the government that AWPs were not
2  reflective of market prices, especially for
3  generic drugs.
4      Q.   When you say "we," who do you mean?
5          MS. TABACCHI:  Same objections.
6          THE WITNESS:  We, Abbott.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   Well, what's the basis of that
9  understanding that it was widely known?
10     A.   Oh, I believe there was an issue in the
11 mid 1990s where the Department of Health & Human
12 Services was asking Congress to allow them to
13 change the reimbursement function, the
14 reimbursement factor.
15     Q.   So Abbott then did have an understanding
16 at some point in the mid 1990s of the relationship
17 between reimbursement by Medicare and Medicaid and
18 AWP?
19         MS. TABACCHI:  Object to the form,
20 beyond the scope.
21         THE WITNESS:  I told you our
22 understanding was that it may have been a factor,

Page 187

1  and that factor changed across the time period.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   Well, did Abbott have an understanding
4  that what you called inadvertent disparities on
5  some of your drug products caused significant
6  reimbursements to be made on drug products well
7  beyond what was actually being paid for the
8  products, for Abbott's products?
9          MS. TABACCHI:  Object to the form.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.   And I'll limit it to by its Alt. Site
12 customers.
13         MS. TABACCHI:  Beyond the scope.
14         THE WITNESS:  No.
15         MS. TABACCHI:  Calls for a legal
16 conclusion.
17         THE WITNESS:  No.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   No, you didn't have that understanding?
20     A.   No.
21     Q.   Did you have an understanding of what
22 AWP spread, did Abbott have an understanding of

Page 188

1  what the term "AWP spread" or "spread" is?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Again, prior to 1997 or
4  whenever some of the subpoenas came out, it was
5  not a term that anyone used nor understood.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   It was not a term that anyone used or
8  understood?
9      A.   Right.
10     Q.   Within Abbott?
11     A.   Right.
12     Q.   Prior to the subpoenas coming out in
13 '97?
14     A.   Yeah, late '90s.
15     Q.   Now, sir, you're getting process from
16 the United States, Abbott's getting process from
17 the United States, it's getting a CID, it's
18 getting subpoenas from HHSOIG, it's getting a
19 letter in '99 from the Department of Justice.
20         Why didn't you go to the federal
21 government and ask questions about whether what
22 you were doing in terms of price reporting created

Page 189

1  problems for the Medicare and Medicaid program?
2          MS. TABACCHI:  Object to the form,
3  beyond the scope of the Notice.
4          THE WITNESS:  I wasn't, I can't answer
5  that.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   You, Abbott, can't answer that question?
8          MS. TABACCHI:  Mr. Sellers is not here
9  to testify about --
10         THE WITNESS:  I do not know the answer
11 to that question.
12         MS. TABACCHI:  -- responses to those
13 subpoenas.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.   I'm not talking about responses to the
16 subpoenas.  I'm talking about going to -- sir,
17 when Abbott received the subpoenas and the other
18 process that it received, didn't a question come
19 up about, wait a minute, is there an issue here
20 between our price reporting and AWPs?
21         MS. TABACCHI:  I'm going to caution the
22 witness not to reveal the substance of any

48 (Pages 186 to 189)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 190

1    communications with counsel.
2           To the extent that he has an
3    understanding of Abbott's consideration of the
4    subpoenas or a response with respect to the
5    subpoenas, object to the question as beyond the
6    scope of the Notice.
7           If you have an understanding that
8    does not reveal privileged communications, you may
9    answer in your individual capacity.
10          MS. ST. PETER-GRIFFITH:  He's here on
11   behalf of Abbott.
12          MS. TABACCHI:  It's beyond the scope of
13   the Notice.
14          MS. ST. PETER-GRIFFITH:  It's not.
15          THE WITNESS:  As far as Abbott is
16   concerned, anything having to do with pending
17   litigation was in the purview of our legal
18   department.
19   BY MS. ST. PETER-GRIFFITH:
20      Q.   Did Abbott have a policy concerning
21   notifying or providing AWP information or spread
22   information to Alt. Site customers?

Page 191

1           MS. TABACCHI:  Object to the form.
2           I'm also going to note for the
3    record that the witness has not been designated
4    with respect to any policies on this issue.  That
5    was the subject of a separate designation made.  I
6    believe Mr. Fishman was designated on this topic.
7           You can answer in your individual
8    capacity if you know.
9           Would you like to read the question
10   back.
11          (WHEREUPON said record was read
12           back as requested.)
13          MS. TABACCHI:  Object to the form, same
14   objections.
15          THE WITNESS:  In general it was a
16   practice not to discuss AWP.
17   BY MS. ST. PETER-GRIFFITH:
18      Q.   How were the Alt. Site employees made
19   aware of this practice?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  At some point in time
22   there was instructions given to the Alt. Site

Page 192

1    Product Sales sales force.
2           I also understand from Lynn Leone's
3    testimony that she had instructions for her
4    Contract Marketing people as well.
5    BY MS. ST. PETER-GRIFFITH:
6       Q.   Did Abbott when requested by customers
7    provide AWP or spread information to its
8    customers?
9           MS. TABACCHI:  Object to the form.
10          THE WITNESS:  As I understand it, the
11   practice was that it was not our practice to
12   provide AWP.  If AWP was required in order to make
13   a complete response for the customer, we may have
14   filled it in.
15   BY MS. ST. PETER-GRIFFITH:
16      Q.   You may have filled it in?  Would that
17   be a violation of this practice that you just
18   discussed?
19          MS. TABACCHI:  Object to the form.
20          THE WITNESS:  That was within the
21   practice that Lynn Leone talked about in her
22   deposition.

Page 193

1    BY MS. ST. PETER-GRIFFITH:
2       Q.   Sir, you're here to testify on behalf of
3    Abbott.  I understand what Lynn Leone has
4    testified to.  And unless you're here to adopt
5    Lynn Leone's testimony as Abbott's testimony, my
6    question to you is the provision of AWP
7    information to customers incident to a bid process
8    consistent with Abbott's practice concerning the
9    nonprovision of AWP or spread information to
10   customers?
11          MS. TABACCHI:  Object to the form.
12          It's inappropriate to expect the
13   witness to answer over a fifteen-year period with
14   a simple answer.  Allow him to answer the best as
15   he can in the way that he's trying to do.
16          THE WITNESS:  As I understood it, that
17   was the practice for Alternate Site Product Sales.
18   BY MS. ST. PETER-GRIFFITH:
19      Q.   So it was Abbott's understanding that if
20   a customer requested AWP information or spread
21   information as part of the bid process, Abbott
22   would provide that information?

49 (Pages 190 to 193)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 194

1       MS. TABACCHI:  Object to the form,
2  mischaracterizes the witness' prior testimony.
3       THE WITNESS:  No.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Okay.  Then clarify for me, sir.
6     A.   If the customer demanded AWP as part of
7  the bid response and only bid responses, our folks
8  had the ability to provide that.
9            There was never an authorization to
10  do any analytics such as defining the spread,
11  because we didn't know what that was, or any other
12  calculations with regard to AWP.
13     Q.   It's your testimony that for the time
14  period from 1991 until 2003 Abbott did not
15  understand what the spread was?
16       MS. TABACCHI:  Object to the form,
17  beyond the scope.
18       THE WITNESS:  As I said before, we did
19  not understand what AWP spread was until the late
20  1990s.  It wasn't an operative number for us.  It
21  wasn't common -- what word am I trying to get to
22  -- vernacular.

Page 195

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Sir, what are proposal analyses?
3       MS. TABACCHI:  Object to the form,
4  beyond the scope.
5       THE WITNESS:  There isn't any formal
6  term "proposal analyses."
7            Whenever a request for proposal
8  came in from or bid, bid request, came in from a
9  customer, we would prepare a proposal for that.
10  So any analysis that was done in developing that
11  proposal response I would suppose would fit under
12  proposal analysis.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.   Would Abbott generate its own documents
15  providing AWP information or spread information to
16  its customers?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Would Abbott create its
19  own documents providing information?  I don't
20  believe that was a practice.
21
22       MS. ST. PETER-GRIFFITH:  If we can mark

Page 196

1  this as Exhibit 7.
2            (WHEREUPON Exhibit Sellers 007 was
3            marked as of 3/16/2008.)
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   The witness has been handed what's been
6  marked previously as Exhibit 360 to the Sellers
7  2/14/07 deposition.  (Document tendered to the
8  witness.)
9            Sir, I'm going to ask you you've
10  been shown this document before in a prior
11  deposition.  Does Abbott have an understanding as
12  to what this document is?
13       MS. TABACCHI:  Objection as beyond the
14  scope.
15       THE WITNESS:  No.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   You don't know, do you know whether this
18  is an Abbott-generated document?
19     A.   It doesn't appear to be in the standard
20  Abbott analysis format, no.
21     Q.   What would be the standard Abbott
22  analysis format?  I mean this was a document

Page 197

1  provided by Abbott.
2       MS. TABACCHI:  Object to the form,
3  beyond the scope.
4       THE WITNESS:  Because we had a document
5  doesn't mean that we created it.
6            But I was not personally familiar
7  with any analyses that had AWP on them.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   Well, you note at the top of this
10  document off to the right-hand side there's an
11  "AWP Spread" column.  Do you see that?
12     A.   Yes.
13     Q.   And on the second and third pages of
14  this document, it appears that AWP spread
15  information is included as part of what is on the
16  front labeled a Proposal Analyses for United
17  Professional Companies.  Do you see that?
18     A.   Yes.
19     Q.   Does Abbott dispute that this was a
20  document generated by an Abbott employee?
21       MS. TABACCHI:  Object to the form,
22  beyond the scope.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 198

1    THE WITNESS:  Yes.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   What's the basis of that dispute?
4    A.   I just gave you the basis of that
5  dispute.  That's not an analysis that we would
6  have done for our products.
7    Q.   Sir, if witnesses have testified that
8  this is exactly the type of document that Alt.
9  Site Contract Marketing individuals provided to
10 Alt. Site customers, would Abbott dispute that?
11   MS. TABACCHI:  If you're going to refer
12 to deposition testimony --
13   MS. ST. PETER-GRIFFITH:  Sure, Debbie
14 Longlois, Michael Heggie.
15   MS. TABACCHI:  Testified that this
16 document was provided to Abbott customers?
17   MS. ST. PETER-GRIFFITH:  No, documents
18 of this type.
19   MS. TABACCHI:  Were provided to Abbott
20 customers?
21   MS. ST. PETER-GRIFFITH:  Yes.
22   THE WITNESS:  I'm not aware of it.

Page 199

1  BY MS. ST. PETER-GRIFFITH:
2    Q.   So would that have been an unauthorized
3  practice or in violation of Abbott's practice if
4  such information was provided by Alt. Site
5  Contract Marketing to Alt. Site customers?
6    MS. TABACCHI:  Object to the form.
7    THE WITNESS:  It would have been not a
8  common practice, no.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   Would it be violative of any policy or
11 practice?
12   MS. TABACCHI:  Object to the form,
13 beyond the scope.
14   THE WITNESS:  It would have been outside
15 the practice of providing just AWP when someone
16 asked for it.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.   If it's outside the practice, does it
19 violate the practice?
20   MS. TABACCHI:  Object to the form,
21 beyond the scope.
22   THE WITNESS:  You can define it however

Page 200

1  you want.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Well, I'm trying to ascertain what you
4  mean by "outside the practice."
5    MS. TABACCHI:  Object to the form.
6    THE WITNESS:  It wouldn't have been in
7  the acceptable range of that practice.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   So it would not have been appropriate
10 for Abbott Alt. Site Contract Marketing personnel
11 to provide AWP spread information to Abbott's
12 Alt. Site customers?
13   MS. TABACCHI:  Object to the form.
14     This witness is not here to testify
15 about his personal opinion on what is appropriate
16 or not appropriate.  He's not designated on this
17 topic on behalf of the corporation.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   The question is whether Abbott permitted
20 such things to happen even though it supposedly
21 had a policy against it.  That's my question.
22   MS. TABACCHI:  Object to the form,

Page 201

1  beyond the scope of the Notice.  The witness has
2  already answered the question.
3    THE WITNESS:  It would have been outside
4  the practice.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Why?
7    MS. TABACCHI:  Same objections.
8    THE WITNESS:  I told you that the
9  practice was not to provide AWP.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.   What was so wrong --
12   A.   The exception to the practice is if a
13 customer demanded it in order to make the bid
14 acceptable, that we would provide AWP only for our
15 products.
16   Q.   So where did Abbott draw the line in
17 terms of its practice?
18     Would Abbott permit the provision
19 of AWP information but not permit the provision of
20 an analysis or spread comparison?
21   MS. TABACCHI:  Object to the form,
22 beyond the scope.

51 (Pages 198 to 201)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 202

1      THE WITNESS:  Would permit on an
2  exception basis the AWP information.  And it was
3  my, I would have expected that to be a fairly rare
4  exception.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   A fairly rare occurrence?
7      A.   Yes.
8      Q.   How would the exception be approved, or
9  would it need to be approved?
10      MS. TABACCHI:  Same objections.
11      THE WITNESS:  As I would understand, it
12  would need to be approved by the manager of
13  Alternate Site Product Sales -- Customer Service
14  -- Contract Marketing, I'll get it right.
15  Alternate Site Contract Marketing.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   So it's Abbott's testimony that in order
18  for -- well, first, it's Abbott's testimony that
19  it was never permissible or a practice within
20  Abbott for Abbott's Alt. Site staff to provide
21  spread information to Abbott customers?
22      A.   Correct.

Page 203

1      Q.   It's also Abbott's testimony that if a
2  customer demanded it, AWP information could be
3  provided to the customer?
4      A.   For our products.
5      MS. TABACCHI:  Object to the form.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   For Abbott's products.
8          But that provision would only be
9  the provision of AWP information and not
10  information concerning the spread?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  Correct.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   And if AWP information was provided by
15  an Alt. Site staff member, it would need to have
16  been approved by the manager of Contract
17  Marketing?
18      A.   I would have expected that, yes.
19      Q.   How many times did Abbott's manager of
20  Contract Marketing approve the provision of AWP
21  information to Abbott's Alt. Site customers for
22  the time period from '91 to 2001?

Page 204

1      MS. TABACCHI:  Object to the form,
2  beyond the scope.
3      THE WITNESS:  I don't know.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   From Abbott's viewpoint, what's wrong
6  with providing AWP information --
7      MS. TABACCHI:  Object to the form.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   -- to the customer?
10      MS. TABACCHI:  Beyond the scope.
11      THE WITNESS:  From Abbott's point of
12  view, it's not a price that Abbott creates.  So we
13  are free and clear to present any price that
14  Abbott controlled.
15          So Abbott controlled list price,
16  Abbott controlled WAC, and Abbott controlled the
17  contract price.  So those were the three prices
18  that could be communicated.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   Any other reason why it's problematic to
21  provide AWP information to Abbott Alt. Site
22  customers?

Page 205

1      MS. TABACCHI:  Object to the form,
2  beyond the scope of the Notice.
3      THE WITNESS:  That was it.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   What's the problem with providing spread
6  information to Abbott's Alt. Site customers?
7      MS. TABACCHI:  Same objections.
8      THE WITNESS:  Again, it's not a number
9  that we control, it's not a number that we operate
10  on.  So it probably would not be appropriate for
11  us to put that number under a document with our
12  name on top of it.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   Any other reason?
15      MS. TABACCHI:  Same objections.
16      THE WITNESS:  No.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.   Sir, was it important to Abbott that its
19  Alt. Site personnel didn't market the spread?
20      MS. TABACCHI:  Object to the form,
21  beyond the scope of the Notice.
22      THE WITNESS:  It wasn't something that

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                     March 16, 2008

Page 206

1   was important to us in terms of that.
2          We marketed our products based on
3   the breadth of the portfolio we had, on the
4   different delivery systems we had.  We were, or
5   are, in the generic drug market, so we weren't
6   trying to create a market for a new chemical
7   entity, we weren't trying to create a new
8   treatment for any malady that patients might have.
9          What we were trying to do was say
10  that we had a product that was equivalent to the
11  innovator's product that could be used
12  interchangeably with the innovator's product, and
13  it was economical to buy and it was efficient to
14  use based on the delivery system, and that we were
15  a quality manufacturer and a dependable
16  manufacturer.  Where as other companies ran in and
17  out of supply difficulties, our record was that we
18  consistently delivered to our customers.  That's
19  how we marketed our products.
20         Spread was not, again it wasn't a
21  number that we generated nor did we control.  So
22  no, it was not part of our marketing approach.

Page 207

1   BY MS. ST. PETER-GRIFFITH:
2      Q.   Well, to the extent that Abbott's AWPs
3   or the AWPs on Abbott's products had a direct
4   correlation to the list prices reported to the
5   pricing compendia, how can Abbott say that it
6   didn't control or have any influence over spreads?
7          MS. TABACCHI:  Object to the form,
8   beyond the scope of the Notice.
9          THE WITNESS:  We had no control over
10  whether it was a factor of list or whether it was
11  a factor of WAC, what factor it was, how those
12  factors might or might not have changed.
13         And the other was we had no
14  knowledge about how the product was going to be
15  used and what kind of patient might receive that
16  product.
17         What we were trying to do was
18  market a generic drug as competitively priced,
19  quality, delivery, dependability.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.   Did Abbott have an understanding of its
22  Alt. Site customers' interest in AWP spread?

Page 208

1          MS. TABACCHI:  Object to the form,
2   beyond the scope.
3          THE WITNESS:  I've seen a number of
4   documents during this process where our customer
5   may have told us things about what was of interest
6   to them.
7          So we're aware of what they were
8   looking for.  Their bid documents stated it quite
9   often as to what they were interested in.  They
10  were interested in low prices.  They were
11  interested in a full breadth of product, they were
12  interested in ability to get that product, did we
13  have delivery points that were close to all the
14  customers.  That was particularly important to
15  Alt. Site customers because they didn't have some
16  of the options that hospitals had at getting these
17  kind of products.
18         So those were the things that were
19  of interest to them, and those are the kind of
20  things that we tried to understand from our
21  customers as we prepared proposals for them.
22  BY MS. ST. PETER-GRIFFITH:

Page 209

1      Q.   So Abbott did have an understanding that
2   AWP spread on its products was important to its
3   Alt. Site customers?
4          MS. TABACCHI:  Object to the form,
5   beyond the scope.
6          THE WITNESS:  I think what I said was
7   that I've seen some documents where our Alt. Site
8   GPOs may have represented that AWP was an
9   important factor, a factor, in their decisions.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Is that a "Yes"?
12         MS. TABACCHI:  Object to the form, asked
13  and answered.
14         THE WITNESS:  Not all of our customers
15  looked at it, no.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   How do you know that not all of your
18  customers looked at it?
19         MS. TABACCHI:  Same objections.
20         THE WITNESS:  Well, at least they didn't
21  represent it, and it wasn't a major topic of
22  conversation when we talked to our customers.

53 (Pages 206 to 209)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 210

1    BY MS. ST. PETER-GRIFFITH:
2       Q.   Is it Abbott's testimony that AWP
3    spreads were not a topic of conversation among its
4    Contract Marketing staff or sales staff and
5    Abbott's customers?
6           MS. TABACCHI:  Object to the form, asked
7    and answered.
8           THE WITNESS:  It wasn't a predominant
9    topic, no.
10   BY MS. ST. PETER-GRIFFITH:
11      Q.   But it was a topic?
12          MS. TABACCHI:  Same objections, beyond
13   the scope.
14          THE WITNESS:  I've seen documents and
15   I've seen reports where the salespeople have said
16   that they were asked or, you know, were party to
17   discussions.  But, again, that's not, it wasn't a
18   predominance of the communications I've seen.  So
19   I would expect it to have been on very much an
20   exception basis.
21   BY MS. ST. PETER-GRIFFITH:
22      Q.   I'm not talking about your expectation.

Page 211

1    I'm talking about Abbott's expectation.
2          What was Abbott's understanding of
3    its Alt. Site customers' interests in AWP spread
4    information?
5          MS. TABACCHI:  Same objections, asked
6    and answered, beyond the scope.
7          THE WITNESS:  Replace "I" with "Abbott"
8    then.
9          MS. ST. PETER-GRIFFITH:  Okay.  Did you
10   want to take a break?
11         MS. TABACCHI:  I'm out of paper also.
12   Whenever you get to a good point.
13         MS. ST. PETER-GRIFFITH:  Why don't we
14   take a break.
15         THE VIDEOGRAPHER:  We are off the record
16   at 2:39 p.m.
17         (WHEREUPON a recess was taken.)
18         THE VIDEOGRAPHER:  We are back on the
19   record at 3:00 o'clock p.m. with the beginning of
20   Tape No. 5.
21   BY MS. ST. PETER-GRIFFITH:
22      Q.   Mr. Sellers, was AWP spread for the 1991

Page 212

1    through 2001 timeframe important to Abbott's Alt.
2    Site business unit?
3          MS. TABACCHI:  Object to the form,
4    beyond the scope.
5          THE WITNESS:  No.
6    BY MS. ST. PETER-GRIFFITH:
7       Q.   Was it important to Abbott, was AWP
8    spread on Abbott's HPD products important to
9    Abbott at all?
10         MS. TABACCHI:  Same objections.
11         THE WITNESS:  No.
12   BY MS. ST. PETER-GRIFFITH:
13      Q.   If you could take the Complaint, sir.
14      A.   Is that the original one?
15      Q.   Yes.  It's Exhibit No. 2.
16      A.   This one?
17      Q.   Yes.
18         If you could turn to page I believe
19   10 and 11.
20         MS. TABACCHI:  You're just looking at
21   the list of products?
22         MS. ST. PETER-GRIFFITH:  Just the list

Page 213

1    of products.  I just want to sort of define the
2    list of drugs.
3    BY MS. ST. PETER-GRIFFITH:
4       Q.   Sir, for those subject drugs listed on
5    Page 10 and 11, vancomycin, sterile water, sodium
6    chloride, dextrose, acyclovir, why for the period
7    from 1991 until 2001 did Abbott permit the
8    maintenance of such high AWP spreads on these
9    products?
10         MS. TABACCHI:  Object to the form,
11   beyond the scope.
12         THE WITNESS:  I can't speak to each of
13   the products, but I can tell you that, as I said
14   before, in a retrospective study of a few
15   products, some of which are on this list, we
16   determined that that disparity had grown over
17   time.  And it was, like I said, the result of
18   probably two distinct and separate tactics as far
19   as business was concerned.  The first being on
20   list price, increasing even at small percentages a
21   year the list price based on CPI or whatever
22   inflationary index there may have been.

54 (Pages 210 to 213)

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 214

1        That was controlled by the Hospital
2   Business Sector product management.  Their
3   customer base was the hospital.  If you asked
4   them, their concept was that that customer was
5   reimbursed by DRGs and what they were interested
6   in was a lower contract price.
7        The marketplace for generic drugs
8   is a very competitive one and much like any other
9   type of generic product where multiple companies
10  are offering the same service or the same product
11  to the marketplace, a lot of how that competition
12  evolves, it evolves into price.
13        And it was especially exacerbated
14  in this market because we were constantly
15  introducing new generic drugs.  And new generic
16  drugs come from an innovator price, which is up
17  here, and go down to a generic market price where
18  it finally stabilizes.  But it usually takes
19  eighteen to twenty-four months for that to happen.
20  So over that eighteen to twenty-four months you
21  see price decline.
22        So those are the kind of things

Page 215

1   that when you look at from 1991 through to 1999
2   contributed to this what we called an inadvertent
3   disparity because people weren't looking and
4   managing that differential.  What they were
5   managing was the top end and they were managing a
6   range at the bottom end.  So it creates that
7   disparity over time.
8        Again, it was not pervasive across
9   the entire product line.  It was across some of
10  the products, a good number of products I admit,
11  but some of the products.  Other products we
12  thought continued to have market relevant list
13  price.  In other words, a list price that was
14  within a reasonable range of what the prevailing
15  market prices were in contracts.
16        So that's what caused the
17  disparity.  And it was from 1991 through 1999.
18  That's when the catalog price increases were done
19  on an annual basis.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Well, for Abbott's HPD products,
22  including the subject drugs which are identified

Page 216

1   in the Amended Complaint, what would be the
2   business purpose of having a list price that was
3   one hundred, two hundred, three hundred, a
4   thousand percent higher than what the contract
5   price was?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  Well, I think as we looked
8   at it in 2001, we said there doesn't appear to be
9   a purpose other than to capture elevated prices on
10  noncontract sales.  So in 2001 that's when we
11  decided that we should bring those prices more in
12  line.
13        But I don't believe that the people
14  that were operating on the prices in that '91
15  through 1999 timeframe were focusing on that.
16  They were focusing on one number here and they
17  were focusing on other numbers down here.  They
18  weren't trying to reconcile the two.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   Well, did the individuals setting prices
21  in HBS have any understanding of the relationship
22  between list price and the AWP-based reimbursement

Page 217

1   of Medicare and Medicaid for the Alt. Site
2   customers?
3      A.   No.
4      Q.   How do you know that?
5      A.   I know it from having dealt with them, I
6   know it from Gerry Eikorn's testimony, Mark
7   Sebree's testimony, both of them being
8   representatives of the Hospital Business Sector.
9      Q.   Sir, previously you testified that you
10  had seen some documents that made you understand
11  or appreciate that some of Abbott's Alt. Site
12  customers requested as part of their bid process
13  or considered as part of their bid process AWP
14  information.
15        I'd like to show you some exhibits
16  now.
17        MS. ST. PETER-GRIFFITH:  Can we mark
18  this as the next exhibit.
19        (WHEREUPON Exhibit Sellers 008 was
20        marked as of 3/16/2008.)
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   As you're flipping through the document,

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 218

1  sir, can I ask you who is MHA? (Document tendered
2  to the witness.)
3      A.   MHA was a purchasing group for Alt. Site
4  entities.
5      Q.   Does Abbott recognize this document?
6  I'm not necessarily going to ask you to
7  authenticate the handwriting.
8          MS. TABACCHI:  Objection, beyond the
9  scope.
10         THE WITNESS:  It does not appear to be
11  an Abbott document.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   Is this one of the documents that you
14  were referencing before?
15         MS. TABACCHI:  Objection.
16         THE WITNESS:  I believe I've seen this
17  or similar documents, yes, in the process.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   I'm only going to focus on Page 8 of
20  this document, sir, and actually the first page
21  which has the Abbott logo on it.  Do you see that?
22     A.   Yes.

Page 219

1      Q.   Do you know, did Abbott authorize the
2  logo on this presentation?
3          MS. TABACCHI:  Objection, beyond the
4  scope.
5          THE WITNESS:  I doubt it.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   This appears to be a corporate MHA
8  overview presentation.  Would you agree with that?
9          MS. TABACCHI:  This line of questioning
10  is beyond the scope.  I won't object to every
11  question for expedience.
12         THE WITNESS:  It would appear to be
13  that, yes.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.   Did Abbott's Alternate Site Product
16  Sales business unit have a contract with MHA?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  At some time during the
19  period I think we did have a contract with MHA.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.   Did Abbott have an understanding as to
22  whether MHA assisted Abbott in marketing its

Page 220

1  products to its members?
2          MS. TABACCHI:  Object to the form,
3  beyond the scope.
4          THE WITNESS:  We never thought that GPOs
5  would market our products.  They provided, they
6  opened doors for us, they provided a negotiated
7  pricelist to their customers that their customers
8  could access.  And for our salespeople they
9  provided, like I said, that key to opening the
10  door when you walked into the individual facility
11  you could say, you know, Abbott's got a contract
12  with MHA and let's start from there.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.   Was the MHA contract a larger contract?
15         MS. TABACCHI:  Object to the form,
16  beyond the scope.
17         THE WITNESS:  It was not a major
18  contract for Alternate Site.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.   Do you see on Page 8, if you can flip to
21  Page 8, under Financial Analysis it says at the
22  top or the title of this particular slide is

Page 221

1  "MHA's Value Proposition, Pharmaceutical
2  Manufacturers."  Do you see that?
3      A.   Yes.
4      Q.   And under Financial Analysis it says
5  "Spreads Reimbursements, Medi-Span, First
6  Databank."  Do you see that?
7      A.   Yes.
8      Q.   Did Abbott have an understanding as to
9  whether MHA provided spread information concerning
10  Abbott products to its customers or to the GPO
11  members?
12         MS. TABACCHI:  Object to the form,
13  beyond the scope.
14         THE WITNESS:  Other than what it would
15  have been stated here, no.
16         As I look at this document, this
17  was kind of a sales pitch to Abbott because
18  they're trying to sell the value that MHA
19  delivers.
20         Quite often when GPOs came in and
21  tried to sell that, they were trying to sell the
22  fact that they could deliver, and therefore, you

56 (Pages 218 to 221)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 222

1  needed to give them the better price.
2          So  the general pitch while it
3  might not have been the same words, the general
4  pitch was fairly common.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Well, did Abbott pay MHA any money under
7  its contractual arrangement with them for services
8  that MHA provided?
9        MS. TABACCHI:  Object to the form,
10 beyond the scope.
11       THE WITNESS:  We only paid GPOs their
12 management fees.  That would have been the only
13 thing that we would have paid to MHA based on an
14 award of products to us and sales of those
15 subsequent products.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   As a component part of MHA's management
18 obligations, did it have an obligation to sell
19 Abbott products to its customers?
20    A.   No.
21    Q.   If you could look at the next --
22       MS. ST. PETER-GRIFFITH: Can you mark

Page 223

1  this next exhibit.
2          (WHEREUPON Exhibit Sellers 009 was
3          marked as of 3/16/2008.)
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Sir, this appears to be a presentation
6  to Abbott Labs by Pharmaceutical Buyers, better
7  known as PBI; is that fair?  (Document tendered to
8  the witness.)
9     A.   Yes.
10    Q.   Can you tell me, sir, did Abbott prepare
11 this or did PBI prepare this, or was it a hybrid?
12       MS. TABACCHI:  Objection, beyond scope
13 object to the form.
14       THE WITNESS:  I would expect it to have
15 been presented and prepared by PBI.  That's who
16 was listed on the first page, their management
17 team.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.   That's who is listed, Mr. Korenblat,
20 Mr. Bulich, Mr. Pelanek?
21    A.   Right.
22    Q.   Sir, if you could turn to the seventh

Page 224

1  page of this document.
2     A.   There are no page numbers on mine.  Do
3  you have a Bates number?
4     Q.   Yes.  It's 453409.
5     A.   Okay.
6     Q.   Sir, did Abbott have an appreciation for
7  or -- strike that.
8          Did Abbott understand that PBI
9  would provide spread information concerning Abbott
10 products to PBI's customers?
11       MS. TABACCHI:  Object to the form,
12 beyond the scope.
13       THE WITNESS:  Again, other than this
14 presentation, I don't know that there was any
15 understanding nor expectation.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   Did Abbott pay PBI a management fee?
18       MS. TABACCHI:  Same objections.
19       THE WITNESS:  Per their contract, yes.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.   Was PBI a large customer?
22    A.   PBI was a large Alternate Site group

Page 225

1  purchasing organization.
2     Q.   Okay.  Thank you for clarifying that.  I
3  meant to say Alt. Site.
4          In terms of the documents that you
5  indicated before that you recollect seeing, is
6  this one of those documents?
7     A.   Yes.  As part of this ongoing process?
8     Q.   Yes.
9     A.   Okay.  Yes.
10    Q.   Well, I believe you testified earlier
11 that your knowledge of the interest of GPOs or
12 other Alt. Site customers in AWP information you
13 learned about through review of documents; is that
14 fair?
15    A.   Right, that's correct.
16    Q.   In reviewing that last PBI document, was
17 that one of the documents you recall reviewing?
18    A.   I recall reviewing, yes.
19       MS. ST. PETER-GRIFFITH:  If you can mark
20 this as Exhibit 10 I believe.
21          (WHEREUPON Exhibit Sellers 010
22          was marked as of 3/16/2008.)

57 (Pages 222 to 225)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

---

Page 226

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Sir, we're not going to spend a lot of
3  time with this document.  My focus is going to be
4  on Page 4, the section where it says "Bid
5  Response," but take as much time as you need.
6  (Document tendered to the witness.)
7      A.   Okay.  You say Page 4?
8      Q.   Page 4, yes.
9           Sir, my question to you is this
10 appears to be an outline in 1994 provided by Coram
11 Healthcare of its RFP to national accounts manager
12 for Abbott Labs, Chris Snead.  Do you see that --
13     A.   Correct.
14     Q.   -- on the first page?
15     A.   Right.
16     Q.   Was Coram one of those Alt. Site
17 customers that you understood requested AWP
18 information as part of their bid process?
19          MS. TABACCHI:  Object to the form.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.   And I refer you to the fourth page of
22 the document where it says "Bid Response."

---

Page 227

1      A.   I didn't remember Coram as asking for
2  that information.
3      Q.   In looking on the fourth page --
4      A.   It's there.
5      Q.   It's there.
6           Does that refresh your recollection
7  at all?
8      A.   No.
9      Q.   Did Abbott have an understanding as to
10 whether or not the general manager for Alt. Site
11 Contract Marketing approved the provision of AWP
12 information for purposes of responding to an RFP
13 to Coram?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  I don't know whether we
16 supplied that information or not.
17
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Was Coram a large account for Alt. Site?
20     A.   Coram was a good size account.  I think
21 it lists here that Coram was formed by the merger
22 of a number of smaller Home Infusion companies.

---

Page 228

1           So when you amass all those
2  together, it formed a, especially at this point in
3  time in 1994, a reasonably big proprietary
4  company.
5           MS. ST. PETER-GRIFFITH:  One more of
6  these types of documents, sir.
7           (WHEREUPON Exhibit Sellers 011
8           was marked as of 3/16/2008.)
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   Sir, I understand this is a thick
11 document.  I'm just going to ask you does it
12 appear to be for the time period '98 through 2000
13 a bid document RFP, request for proposal, from
14 GeriMed?  (Document tendered to the witness.)
15     A.   Yes.
16          It's an interesting collection of
17 documents.  The first two pages appear to be the
18 same letter, one signed by Dennis Walker and one
19 not.  The remainder looks to be a GeriMed RFP,
20 request for proposal --
21     Q.   If you could look on --
22     A.   -- without any proposal response in it

---

Page 229

1  from Abbott.
2      Q.   Okay.  So this is the actual RFP?
3      A.   It does appear to be the RFP, yes.
4      Q.   Did you have an understanding or did
5  Abbott have an understanding in or around '98 to
6  2000 whether it provided a diskette with its RFP
7  to GeriMed?
8           MS. TABACCHI:  Objection, beyond the
9  scope, object to the form.
10          THE WITNESS:  I haven't read through
11 this.  But if GeriMed provided us with a diskette
12 and wanted the diskette back, we would have
13 complied with that.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.   If you could look at the bottom of the
16 page on 18 of 31, do you see how the RFP has page
17 numbers?
18     A.   Yes.
19     Q.   And it's ABT 277701.
20     A.   Right.
21     Q.   Sir, if you could look under Item H.
22     A.   I can barely, there's sections I can't

---

58 (Pages 226 to 229)

00c5aa93-b25b-40ff-b422-e7070d802fa9

Page 230

1  read, but go ahead.
2      Q.   Okay.  That's all right.  I'm just
3  really interested in the first sentence there
4  under H where it says "low price and best
5  spreads."  Do you see that?
6      A.   Uh-huh, uh-huh.
7      Q.   "Contract pricing will be evaluated on
8  the lowest price and/or best spread between AWP on
9  the contract price for multi-source products."  Do
10 you see that?
11     A.   Yes.
12     Q.   What was Abbott's understanding of
13 GeriMed's interest in spreads and lowest price in
14 terms of evaluating the RFP?
15         MS. TABACCHI:  Object to the form,
16 beyond the scope.
17         THE WITNESS:  I think from documents
18 like this, Abbott's understanding is that AWP, an
19 AWP spread, may have been a factor in what they
20 were going to award, and price was a factor.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.   Did Abbott provide AWP spread

Page 231

1  information or AWP information to GeriMed?
2          MS. TABACCHI:  Same objections.
3          THE WITNESS:  I'm not aware.
4
5          (WHEREUPON Exhibit Sellers 012
6          was marked as of 3/16/2008.)
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   Sir, I'm not going to ask you
9  line-by-line on this.  I do want to ask you though
10 whether you recognize this document.  (Document
11 tendered to the witness.)
12     A.   I don't recognize this document
13 specifically.  It appears to be an award notice
14 from GeriMed.
15     Q.   What is an award notice?
16     A.   Well, we would have bid, they would have
17 given us a list of products that they were
18 interested in getting bids on.  We would have
19 given them a bid on the products that we
20 manufactured, that we had available.  And then
21 they would have evaluated that against competitive
22 offers and decided they're going to award certain

Page 232

1  products to Abbott.  We always hoped that it would
2  be more than less.  But certain products to
3  Abbott, certain products to our competitors.
4          We would get these kind of listings
5  back to tell us what we had awarded under this
6  contract.  We could then send that out to our
7  sales force, and they could go into the GeriMed
8  customers and say here's the Abbott products that
9  are under the current GeriMed award.
10     Q.   So this particular document reflects the
11 GeriMed award for 2000 to Abbott?  These are the
12 products that it awarded the contract on?
13     A.   That's the way I read it, yes.
14     Q.   Sir, do you see across the top of the
15 chart there's Generic Name, Brand Name, FDA, NDC
16 number?
17     A.   Yes.
18     Q.   Do you see where I'm reading?  Package
19 Size?
20     A.   Yes.
21     Q.   Contract Price?
22     A.   Yes.

Page 233

1      Q.   AWP?
2      A.   Yes.
3      Q.   And then difference AWP.  Do you see
4  that?
5      A.   Yes.
6      Q.   Was GeriMed a customer that was
7  interested in AWP spread?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope.
10         THE WITNESS:  They told us in that prior
11 document that that was one function, one factor.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   Does it signal to Abbott anything of
14 significance that the actual bid award would
15 reflect the spread between AWP and contract price?
16         MS. TABACCHI:  Objection, beyond the
17 scope, object to the form.
18         THE WITNESS:  It's their document.  So
19 they're free to format it however they want to
20 format it.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.   But doesn't the fact that they include

59 (Pages 230 to 233)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 234

1  that information send a signal that spread
2  information is an important issue?
3       MS. TABACCHI: Same objections.
4       THE WITNESS: It's like I said, they've
5  already told us that it was a factor. So I don't
6  think it reinforces that any more than them coming
7  flat out and saying it.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   For that GeriMed contract, were those
10 the prices, the contract award, were those the
11 prices, where it says Contract Price, were those
12 the contract prices charged by Abbott?
13      MS. TABACCHI: Object to the form.
14      THE WITNESS: I haven't checked it, but
15 I would have expected those to be the contract
16 prices that we had bid.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.   Okay.
19   A.   And that they had awarded. And they
20 were effective through July 31st of 2001.
21   Q.   Sir, did Lynn Leone participate with you
22 in your analysis of the 2001 price change or your

Page 235

1  2001 price change project, as I think we've titled
2  it before?
3       MS. TABACCHI: Object to the form.
4       THE WITNESS: I think Lynn did an
5  analysis at the end of that process for me, yes.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   When was that analysis done by
8  Ms. Leone?
9    A.   Probably late February or early March to
10 mid March, something like that.
11      MS. ST. PETER-GRIFFITH: Mark this as
12 the next exhibit.
13          (WHEREUPON Exhibit Sellers 013
14           was marked as of 3/16/2008 and
15           tendered to the witness.)
16      THE WITNESS: I was off by a month.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.   Sir, do you recognize this document?
19   A.   Yes.
20   Q.   In fact, you've seen it before at a
21 prior deposition too; haven't you?
22   A.   Yes, yes. Aside from the fact that it

Page 236

1  was addressed to me originally, yes.
2    Q.   Do you recall this document?
3    A.   In general I recall this document.
4    Q.   The analysis that's referenced in the
5  e-mail and that's attached, it appears there as an
6  icon at the bottom, was that information that you
7  utilized in your analysis that you undertook?
8       MS. TABACCHI: Object to the form.
9       THE WITNESS: This actually was an
10 analysis that Lynn had done earlier in 2000, and
11 she was just resending it to me in January. I
12 obviously asked her if she could find the analysis
13 she did in 2000 and send it to me. And then she
14 was going through a clarification of what
15 assumptions she made in that analysis.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Why was Lynn Leone doing an analysis in
18 2000?
19      MS. TABACCHI: Object to the form.
20      THE WITNESS: I think it was an exercise
21 that she went through. I don't know. I can't
22 remember whether I asked her to do that or Pete

Page 237

1  Baker asked her to do it, but it was an exercise
2  based on the Department of Justice AWP
3  modifications that were done in May of, or at
4  least we became aware of them in May of 2000.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   So when the DOJ AWPs were made known to
7  you, Ms. Leone, you don't recall whether she was
8  asked to do it or whether she did it on her own
9  initiative?
10      MS. TABACCHI: Object to the form.
11      THE WITNESS: I don't remember whether
12 she did it on her own or whether I asked her or
13 whether Pete Baker asked her. I'm not sure. But
14 it was an analysis that she had done earlier in
15 2000, had either talked to me about it or shown me
16 at that time. So in 2001 I think I asked her to
17 pull it back out and let me look at it.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   If you could turn to Page 2 where it
20 says "Revised AWP Impact Analysis." Do you see
21 that?
22   A.   Yes.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 238

1    Q.   There's a chart and it says Medicare
2  11.7 percent of net sales.  And then there's
3  another figure, it says $2,306,414.  Do you see
4  that?
5    A.   Uh-huh.
6    Q.   What net sales are being referenced
7  there?
8        MS. TABACCHI:  Objection, beyond the
9  scope, object to the form.
10        THE WITNESS:  I think what, and, again,
11  she covers that in the front of her document, she
12  says for Medicare I assumed 11.7 percent of total
13  sales, removed the nutritionals because of the TPN
14  reimbursement, which left an impact of 1.74.
15        Basically to do this analysis we
16  had to make some assumption as to of the products
17  that we sold what percent would end up being used
18  for what patient population.  Because when you
19  sold a product to Coram, for instance, you didn't
20  know whether they were going to use that product
21  on a commercial paying patient, a no-pay patient,
22  a Medicaid or a Medicare patient.  You didn't

Page 239

1  know.  So, again, this was quite a high level
2  analysis.
3        So what she was saying is of the
4  total impacted product sales, and, again, this
5  would be drugs, not devices, the total impacted
6  product sales 11.7 percent of those impacted
7  product sales we were just making that as an
8  assumption of what would be used for a Medicare
9  patient, 12.6 for Medicaid, and thirty percent for
10  managed care.
11        So they were just percentages that
12  she picked out, and I'm not totally sure exactly
13  where she got them from, whether she got them from
14  some old trends that we had in Home Infusion or
15  whether she got them from some other document.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Was Abbott --
18    A.   But the 11.7 and the 12.6 seemed in the
19  ballpark to me.
20    Q.   Well, they also seem pretty precise;
21  don't they?
22        MS. TABACCHI:  Objection, beyond the

Page 240

1  scope, object to the form.
2        THE WITNESS:  They leave the impression
3  of precision, yes.  Whether they were or not, I
4  don't think they were that precise.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   For the time period of 1991 through
7  2001, was Abbott able to identify what percentage
8  of its products that it sold in the Alt. Site unit
9  were reimbursed by Medicare and what percentage
10  were reimbursed by Medicaid?
11    A.   No.
12        MS. TABACCHI:  Objection, beyond the
13  scope.
14        (WHEREUPON Exhibit Sellers 014
15        was marked as of 3/16/2008.)
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Sir, do you recognize this document?
18  (Document tendered to the witness.)
19    A.   It actually looks like it's a couple of
20  different documents, to be honest with you.
21    Q.   Okay.
22    A.   But I recognize the components, yes.

Page 241

1    Q.   Well, let me ask you, this appears to be
2  an interoffice correspondence from you?
3    A.   Yes, the cover is.
4    Q.   It says "To:  Meeting Attendees."
5        Which meeting are you referencing
6  there?
7    A.   It's in Rick Gonzalez's office.  So I
8  believe it was the second of the two meetings that
9  we talked about earlier.
10    Q.   With regard --
11    A.   Which I think I said was over in Rick's
12  corporate area.
13    Q.   That concerned the 2001 price change?
14    A.   Yeah, yeah.
15    Q.   And the attendees were Mr. Gonzalez,
16  yourself, Mr. Wiebking, Ms. Schumacher --
17    A.   Mr. Begley.
18    Q.   And Mr. Begley.
19        Did you distribute this information
20  to the attendees?
21        MS. TABACCHI:  Object to the form.
22  BY MS. ST. PETER-GRIFFITH:

61 (Pages 238 to 241)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 242

1    Q.   I guess let me ask you which page was
2  the actual attachment?
3    A.   This page to the attendees.
4  (Indicating.)
5        The others are pretty much the same
6  document.  And they were prepared for Laura
7  Schumacher to give her some background on --
8        MS. TABACCHI:  I'm going to caution the
9  witness not to reveal any communications between
10  yourself and Ms. Schumacher.
11       THE WITNESS:  -- prices.
12
13  BY MS. ST. PETER-GRIFFITH:
14   Q.   Prices or pricing terms; is that it?
15   A.   Yes.
16   Q.   That's the last page, which appears to
17  also be the second page with a line through it;
18  right?
19   A.   Yeah.  The first page, or the second
20  page, did not have the last paragraph.
21   Q.   The parameter pricing, okay.
22   A.   Yeah.

Page 243

1    Q.   Now, let's go to Page 3.  It says "Per
2  directions from last meeting, discussed price
3  adjustment with other divisions."
4        Who did you talk to?
5    A.   I only recall talking to Joe Fiske in
6  PPD.  I may have talked to Ross and SPD, but
7  that's not in my memory.
8    Q.   Is RPD Ross Products Division?
9    A.   Yes.
10   Q.   And SPD is --
11   A.   At that time it was called Specialty
12  Products Division.  It was animal health and
13  agricultural products.
14   Q.   On your PPD discussion it says "Standard
15  WAC prices at five percent below list."  Do you
16  see that?
17   A.   Uh-huh.
18   Q.   What did that mean?
19   A.   This has been a few years.
20       I think basically that their
21  wholesale acquisition cost was five percent below
22  what they publish as their list price, yes.

Page 244

1    Q.   Then it says "Potential exposure on Ery
2  products which are sold at forty to sixty percent
3  below list."  Do you see that?
4    A.   Yes.
5    Q.   What did that mean?
6        MS. TABACCHI:  Objection, beyond the
7  scope.
8        THE WITNESS:  Erythromycin was a drug
9  that had gone off patent by 2001.  It had been off
10  patent for in fact a number of years prior.
11  Abbott was the innovator of that drug.
12       So because there were other generic
13  companies in competition with our pharmaceutical
14  brethren in Abbott, they had seen a price decline,
15  as we would have expected, on their products in
16  order to remain competitive with the generics.
17       So I think what I was reflecting on
18  there is the same kind of disparity that we were
19  talking about was probably in existence on
20  erythromycin products.  They had not reduced their
21  list price, at least as of this.
22  BY MS. ST. PETER-GRIFFITH:

Page 245

1    Q.   Do you know why they didn't reduce their
2  list price?
3        MS. TABACCHI:  Object to the form,
4  beyond the scope.
5        THE WITNESS:  I was just asked to go
6  find out.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Now, if you could look further down
9  beyond "Proposed Implementation Schedule" where it
10  says "Definite Impact.  Price Lost Due to
11  Reduction."  Do you see that?
12   A.   Yes.
13   Q.   It says "List Price and Special Price
14  Sales," for 2001, $0.9 million.  And is that
15  "Annualized"?
16   A.   Yes.
17   Q.   $1.8 million.
18       What does that line mean?
19   A.   That means that, that goes back to what
20  we were talking about before.  When you reduce
21  your list price, any sales that you would have
22  anticipated making at a noncontract sales are

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 246

1  going to come in at a lower price than what you
2  would have historically seen versus our 2001
3  expectation, making the price adjustments that we
4  were talking about we could expect that we'd get
5  $900,000 less revenue in 2001 than we were
6  planning.  And that was definite because that
7  would happen.
8      Q.   Does that refresh your recollection from
9  before as to the impact analysis that you had
10 referenced?
11     A.   Yeah.  I said it was a few million.  I
12 overstated it slightly originally.
13     Q.   Let me ask you this:  What was wrong
14 with keeping your catalog prices or Abbott keeping
15 its catalog prices where they were, meaning not
16 doing the catalog price reduction, but just
17 reporting lower prices to the pricing compendia
18 that were utilized for AWP purposes?
19         MS. TABACCHI:  Object to the form,
20 beyond the scope of the Notice.
21         THE WITNESS:  As far as we saw it, we
22 had one set of published prices.  So what you give

Page 247

1  to the compendia is what you publish.  So if
2  you're going to report lower prices, you lower the
3  published prices.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   With regard to where it says "Inability
6  to raise FSS prices" --
7      A.   Yes.
8      Q.   -- $0.1 million and then 0.2 million?
9      A.   Yes.
10     Q.   What does that mean?
11     A.   FSS is Federal Supply Schedule.  It's
12 our contract that we had with, it was actually
13 administered by the Veterans' Administration.  It
14 was available for I think all federal government
15 entities to purchase from, both Department of
16 Defense as well as VA as well as a bunch of other
17 agencies.
18         That contract had a provision that
19 said if you raise your catalog prices and you
20 raise your contract prices, you can qualify for
21 raising your FSS prices.
22         It was still a negotiable issue on

Page 248

1  a year-to-year basis with the contracting officer,
2  but per the terms of the agreement we could have
3  increased our FSS prices --
4      Q.   With regard to --
5      A.   -- if we took an inflationary increase
6  on the catalog.
7      Q.   Okay.  Where it says "Potential Impact -
8  Volume Lost Due to Reimbursement Reductions."  Do
9  you see that?
10     A.   Yes.
11     Q.   It says "Alt. Site Product Sales
12 $2.9 million, Annualized $8.8 million."
13     A.   Yes.
14     Q.   First, let me ask you, what do you mean
15 by "volume lost due to reimbursement reductions"?
16     A.   Well, when you're doing something like
17 this, especially if you're reviewing something of
18 a significant change to past practices with
19 management, I always tried to walk in saying these
20 are the impacts, this is what could result from a
21 decision to do this or that, whatever we were
22 talking about at the time.

Page 249

1          What we were saying here is on a
2  worst case basis if in fact the theory that AWP
3  drove product purchase decisions, worst case, this
4  is how Alternate Site Product Sales would be
5  impacted by us reducing our list price.
6      Q.   How did you arrive at that calculation,
7  or those two calculations, of $2.9 million and
8  $8.8 million?
9      A.   Some of it was we looked at a rehash of
10 Lynn Leone's analysis, and by this time we had a
11 little more specific knowledge of what products we
12 were going to change and so on and so forth.  So
13 that's how we did it.
14         We said, okay, if all of a sudden
15 now our list prices are going down significantly
16 and we would assume that we would have the lowest
17 list prices for products, then the theory that the
18 highest list, highest AWP, if in fact was a
19 function of list, we would lose those sales to our
20 competitor.  That's what we did.
21     Q.   So there was a recognition then that the
22 higher AWP in the market would get the business?

                              63 (Pages 246 to 249)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 250

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  No.  This was a worst case
3  analysis.
4         What we said is okay, if you look
5  at it and you say let's assume that everybody
6  makes the decision based on the differential
7  between our AWP and somebody else's AWP or our
8  list price and somebody else's list price, if
9  that's the case what would happen if we reduce our
10 list prices.
11        So it wasn't based on what we
12 thought was going to happen.  It was based on what
13 could happen if, like we said, the worst were to
14 come to be.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   From 1991 to 2001 did Abbott have an
17 appreciation that the higher AWP on products in
18 the Alt. Site market generally meant that the
19 manufacturer with the higher AWP on that generic
20 product got the business?
21        MS. TABACCHI:  Object to the form,
22 beyond the scope.

Page 251

1         THE WITNESS:  No.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Why not?
4         MS. TABACCHI:  Same objections.
5         THE WITNESS:  If that premise had been
6  in place, take vancomycin for instance, we would
7  have had a hundred percent of the vancomycin
8  market.  We didn't.
9         In addition, through any of these
10 bids we didn't get every award.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   As Abbott's AWP for vancomycin
13 increased, did Abbott's market share for the
14 vancomycin market increase?
15        MS. TABACCHI:  Objection, beyond the
16 scope, object to the form.
17        THE WITNESS:  I don't know.  I've never
18 made a comparison to that.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.   Abbott has never evaluated that?
21   A.   Uhn-uhn.
22   Q.   How did you quantify the $2.9 million

Page 252

1  and $8.8 million?  How were you able to come up
2  with those figures?
3         MS. TABACCHI:  Objection, asked and
4  answered.
5         THE WITNESS:  Again, it was very similar
6  to what we just looked at.  It was a very gross
7  analysis of, okay, if in fact we reduce that, how
8  much of those sales that we're getting today will
9  go away.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.   So you just assumed that if you lowered
12 the AWP and someone else had a higher AWP, that
13 you would lose that business?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  That was the analysis we
16 went through.
17
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   The next item says --
20   A.   That's why it still says "Potential."
21 It doesn't say, it doesn't say definite.  It says
22 "Potential."  It says could happen.

Page 253

1    Q.   After the publication of the DOJ AWPs,
2  did Abbott experience a loss in its Alt. Site
3  Product Sales approximating what you estimated?
4    A.   No.
5    Q.   What was the loss?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  We in fact did not take on
8  a loss.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   Then it says "Home Infusion Revenue
11 Sharing."  Do you see that?
12   A.   Yes.
13   Q.   $0.6 million and $1.8 million.
14   A.   Yes.
15   Q.   What did you mean when you put in Home
16 Infusion revenue sharing $0.6 million and
17 $1.8 million?
18   A.   Again, it was a look at potential loss
19 due to the fact that our reimbursement would go
20 down.
21   Q.   When you say your reimbursement, do you
22 mean Abbott Home Infusion's share in its customers

64 (Pages 250 to 253)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 254

1  Medicare and Medicaid reimbursement?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Abbott Home Infusion's
4  customers' reimbursement would go down on
5  products, and therefore, our share would go down.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   So Abbott shared in the higher
8  reimbursements that were caused by Abbott's higher
9  list prices which in turn created higher AWPs?
10         MS. TABACCHI:  Object to the form,
11 beyond the scope.
12         THE WITNESS:  Abbott had a share in the
13 agreements that we had that we would get a share
14 of the collections for those contracts.  That
15 involved risk sharing on both our sides, both the
16 client as well as Abbott.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   What do you mean by "risk sharing"?
19     A.   Well, when you go into a business
20 there's always risk.  When you go into a business,
21 you risk whether you're going to get, especially
22 in a Home Infusion business, whether you're going

Page 255

1  to get the patient load that you need to keep
2  going.  There's risk as to what mix of patients
3  you get, both in terms of therapy and in terms of
4  the payors that are involved.
5          So each of us documented within our
6  agreements with our clients contributed to each of
7  those businesses and got some share of the revenue
8  from both of those businesses.
9      Q.   How did Abbott contribute?
10     A.   Abbott contributed through services,
11 getting the customer started, setting up
12 procedures and practices.
13         We helped the ones that wanted to
14 open their own pharmacy by designing their
15 pharmacy and using our engineers to help them
16 complete the projects.  We trained them in running
17 that pharmacy.  We shared with them the
18 experiences that we had in our own pharmacies.  We
19 also shared with them marketing training for their
20 salespeople.
21         We also had reimbursement services
22 that we offered them.  We had the CHIP system that

Page 256

1  we offered them.  And we had our products that
2  were available to them.
3      Q.   Other than the collection of
4  reimbursement that Abbott shared in for its Home
5  Infusion business all these services that you
6  described and the products that Abbott provided,
7  those were provided free of charge?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  No.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.   Were there individual prices that were
12 charged to the Home Infusion clients for the
13 products that were consigned to them?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  No.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   Were there individual charges for the
18 services that Abbott provided incident to the
19 contractual agreement?
20     A.   No.
21     Q.   Abbott simply shared in the collection
22 of revenues that the Home Infusion partners were

Page 257

1  reimbursed from third-party payors?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Well, I'm not sure I would
4  agree with "simply."
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   Okay.
7      A.   There was a detailed contract between
8  both parties that detailed what each party was
9  going to do to guarantee the success of the
10 business.  And for that there was an agreement by
11 both parties that there would be a revenue split
12 by therapy so that each party was compensated
13 appropriately.
14     Q.   Well, what would Abbott charge as the
15 arm's length transactional price for the products
16 consigned to its revenue share partners?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  We didn't have a price
19 between us.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.   Sir, what would Abbott charge as the
22 arm's length fair market value of the services it

65 (Pages 254 to 257)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 258

1  provide incident to the revenue share agreements?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  We didn't value those
4  services separately.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   How did you come up with the figures of
7  $0.6 million and $1.8 million?
8     A.   I don't recall.  But it was a similar,
9  if the assumption is correct, extending the logic
10 of that assumption, this is the impact we would
11 see.
12    Q.   Well, under Annualized it has
13 $1.8 million.  What did you mean by "Annualized"?
14    A.   For a full year.
15    Q.   So just it was 2001 only that at that
16 point in time in 2001 that you were estimating
17 that?
18        MS. TABACCHI:  Object to form.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   I'm sorry.  Under 2001, you're just
21 talking about that that's the risk for the
22 remainder of 2001?

Page 259

1     A.   That was our estimate of a potential
2  risk for the remainder of the year, yes.
3     Q.   When was the decision made to close the
4  Home Infusion business unit?
5     A.   You've switched gears on me.
6     Q.   It has a relationship.
7        MS. TABACCHI:  Asked and answered.
8        THE WITNESS:  1997 I believe.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   And when was the decision made to
11 finally close the doors?
12        MS. TABACCHI:  Object to the form.
13
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   Meaning what years would the doors be
16 closed on Home Infusion?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  I think it was either, I
19 think it was the end of 2001 or the, it was end of
20 2001 or end of 2002, something in that range.
21        I think we had a five-year
22 agreement in place or more when we made the

Page 260

1  decision to close.  So we planned it to tail out
2  at some point.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   Was the closure expedited because of the
5  projected potential impact of the reductions of
6  list prices contemplated in 2001?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  No.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   How much money did Home Infusion make on
11 an annual basis?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  It depends on the year.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   Well, in 2000 how much did they make?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I don't have those numbers
18 in front of me.
19        MS. TABACCHI:  Beyond the scope of the
20 Notice.
21        THE WITNESS:  Maybe $25 million.
22        (WHEREUPON Exhibit Sellers 015

Page 261

1        was marked as of 3/16/2008.)
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   Sir, do you recognize this document?
4  (Document tendered to the witness.)
5     A.   Yes.
6     Q.   Who drafted it?
7     A.   I believe I did.
8     Q.   Why was this document drafted?
9        MS. TABACCHI:  I'll caution the witness
10 not to reveal communications with counsel.
11        THE WITNESS:  It was documented to, it
12 was intended to document how we intended on
13 managing list price adjustments going forward from
14 2001.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.   So was this sort of a plan of action for
17 what would occur once the 2001 price changes were
18 made?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  Yes.
21 BY MS. ST. PETER-GRIFFITH:
22    Q.   Sir, can you explain under definition of

66 (Pages 258 to 261)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 262

1    "list price" what that definition is?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  It says "the highest price
4    published for a product in the catalog and/or
5    submitted to the industry clearinghouses for
6    general distribution."
7    BY MS. ST. PETER-GRIFFITH:
8         Q.  Was that Abbott's understanding in 2001
9    of the definition or how it defined "list price"?
10        A.  Yes.
11        Q.  How long had it used that definition of
12   "list price"?
13        A.  I think that's always been our
14   definition of "list price."
15        Q.  What about WAC, where it says WAC
16   Wholesaler, or I'm sorry, Wholesale Acquisition
17   Cost, in 2001 was that Abbott's definition of
18   "WAC"?
19        A.  I was just reading this again.  Could
20   you repeat your question?
21        Q.  Sure.
22        MS. ST. PETER-GRIFFITH:  Could you read

Page 263

1    it back.
2         (WHEREUPON said record was read
3          back as requested.)
4         THE WITNESS:  Yes.
5    BY MS. ST. PETER-GRIFFITH:
6         Q.  How long had Abbott maintained that
7    definition of "WAC"?
8         A.  Since the price change.
9         Q.  Since 2001?
10        A.  Yes.
11        Q.  What was Abbott's definition of "WAC"
12   prior to the price change?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  Prior to that, WAC was the
15   noncontract price charged to wholesalers and
16   distributors.
17   BY MS. ST. PETER-GRIFFITH:
18        Q.  How long had Abbott maintained that
19   definition of "WAC"?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  Since the beginning of the
22   term of this.

Page 264

1    BY MS. ST. PETER-GRIFFITH:
2         Q.  Pre '91?
3         A.  1991.
4         Q.  Okay.  So from 1991 to 2001, what you
5    just described was how Abbott defined "WAC"?
6         A.  Yes.
7         Q.  Charge-back.  In 2001 was that Abbott's
8    definition of "charge-back"?
9         A.  Yes.
10        Q.  How long had Abbott maintained this
11   particular definition of "charge-back"?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  That's always been our
14   definition of "charge-back."
15   BY MS. ST. PETER-GRIFFITH:
16        Q.  And ASP, or average selling price, do
17   you see that?
18        A.  Yes.
19        Q.  Was that Abbott's definition of "ASP" in
20   2001?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  It's one definition.  It's

Page 265

1    not, I would not say that that was the predominant
2    definition of "ASP."
3    BY MS. ST. PETER-GRIFFITH:
4         Q.  What was the predominant definition of
5    "ASP"?
6         A.  The predominant definition of "ASP," if
7    you were to look at it from a marketing point of
8    view, would be the sales price net of both
9    charge-backs as well as any rebates or after
10   invoice discounts.
11        Q.  And how long had Abbott maintained that
12   particular definition of "average selling price"?
13        A.  Since 1991.
14        Q.  Why did Abbott have two definitions for
15   "ASP"?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I think what was defined
18   here is this is how ASP is used within this
19   document.
20   BY MS. ST. PETER-GRIFFITH:
21        Q.  Okay.
22        A.  So it's not, it wasn't intended to

67 (Pages 262 to 265)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

1  define "ASP" universally for the Hospital Products
2  Division.
3      Q.   So that second definition of "ASP" that
4  you provided which you said had been maintained
5  since '91, in 2001 was that also the definition of
6  "ASP"?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  The more people you asked
9  within HPD, the second definition is what you
10  would have received rather than the first.  But,
11  again, we were defining the term for use in the
12  document here.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   So outside of the document, this
15  particular definition of "ASP" --
16      A.   Was a little too limited.
17      Q.   Was it used other than in the context of
18  this document?
19          MS. TABACCHI:  Object to the form.
20          THE WITNESS:  It was used when trying to
21  define what your net price after charge-backs was,
22  yes.

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Then it says "Actual Sales Price."
3  Well, let me ask you, was that Abbott's definition
4  of "actual sales price"?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  This was a good definition
7  for the price that a provider paid when they
8  bought product through a wholesaler.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.   Did it have any other significance?
11      A.   No.
12      Q.   How long had it had that particular
13  meaning?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  Again, probably since '91.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   Now, the next item says "Price
18  Guideline," and then it says "The list price
19  should be equal to the WAC plus five percent, or
20  plus $5 per case, whichever adjustment is greater,
21  except for branded products and co-marketed
22  products as noted below under 'Process.'"

1      A.   Right.
2      Q.   Let me ask you, what is that price
3  guideline?
4      A.   It was intended to be a general rule
5  that would be applied for defining list price so
6  that you wouldn't have the list price moving off
7  of our WAC price.  So, you know, we weren't going
8  to be driving any inadvertent discrepancy in the
9  future.
10      Q.   The price guideline that's reflected
11  here, was that what Abbott implemented as its
12  policy for setting list price after the 2001 price
13  change?
14      A.   Yes.
15      Q.   Why didn't Abbott adopt that policy
16  prior to 2001?
17          MS. TABACCHI:  Object to the form,
18  beyond the scope, asked and answered.
19          THE WITNESS:  Again, it was a matter of
20  a different focus for the prior organizations.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   What do you mean by "a different focus"?

1          MS. TABACCHI:  Same objections.
2          THE WITNESS:  As I said before, they
3  were focused on the top end price and they were
4  focused on the bottom end price.  They never
5  looked at comparing the two.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Now, the next definition says or the
8  next item says "Products:  The products included
9  under this policy include all drugs and solution
10  products sold by HPD under NDC, NDA, or ANDA
11  approval."
12      A.   Yes.
13      Q.   What was the purpose of identifying the
14  products for purposes of this policy?
15      A.   Well, in order for the policy to be
16  practical, you have to tell them what it's going
17  to apply to.
18      Q.   So it would apply to all the 00074
19  products?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  Well, it would apply to
22  all drug products.

68 (Pages 266 to 269)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 270

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Okay.
3     A.   That's why NDC, NDA, and ANDA.
4     Q.   Did other divisions within Abbott adopt
5  the same policy?
6          MS. TABACCHI:  Object to the form,
7  beyond the scope.
8          THE WITNESS:  I don't know.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Then the next sentence reads "Efforts
11 will be made to apply this policy to products
12 under co-promotion or co-marketing agreements with
13 other manufacturers based upon mutual agreement of
14 both parties."
15         What does that mean?
16    A.   At the time we had a number of products
17 that were manufactured by other companies that we
18 sold.  Some were manufactured with our label on
19 it, some were manufactured with the other
20 company's label on it.  And some of those, those
21 agreements had varying terms in them.  Some we
22 could determine the price of the product, some the

Page 271

1  manufacturer of the product determined the prices
2  for the products.
3          So basically what we were trying to
4  catch in that sentence is in the first sentence
5  we've controlled everything Abbott makes, all
6  00074s, we've got that under control.  Anything we
7  don't make we will talk to the other companies and
8  try to get them in line with that same
9  arrangement.  But we couldn't say we would
10 definitively do it because we weren't privy to all
11 of the contracts that we might have with those
12 companies.
13         So it was intended to be this is
14 what we ought to try to do, we ought to try to get
15 them in line with what we were doing.
16         MS. ST. PETER-GRIFFITH:  Okay.  We've
17 got five minutes left on the tape.  Can we take a
18 brief break?
19         THE WITNESS:  Sure.
20         THE VIDEOGRAPHER:  We are off the record
21 at 4:16 p.m. with the end of Tape No. 5.
22         (WHEREUPON a recess was taken.)

Page 272

1          THE VIDEOGRAPHER:  We are back on the
2  record at 4:29 p.m. with the beginning of Tape
3  No. 6.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Mr. Sellers, we were looking at Exhibit
6  15, and I'd like to direct your attention to the
7  paragraph that begins with the bolded word
8  "Process," and it extends over to the next page.
9  Do you see that?
10    A.   Yes.
11    Q.   Was this as of 2001 the process that was
12 implemented by Abbott for calculating its HPD list
13 prices?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  This delineates the
16 intended steps that Contract Marketing would go
17 through in defining future changes to list price
18 and WAC.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   So if in the future WAC or list price
21 needed to be changed, this is how the HPD Contract
22 Marketing personnel would go about doing it?

Page 273

1     A.   The intention, though it's not stated
2  here I don't believe, but the intention is that a
3  review of our list prices would remain an annual
4  process.  And as you went through that review,
5  whenever you did it you would go through these
6  steps to assure that the prices remained within a
7  relative proximity of the prevailing market
8  prices.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Prior to 2001 and the implementation of
11 this policy for list price adjustments, did Abbott
12 have such, Abbott's HBS or Contract Marketing,
13 have such a process in place?
14    A.   No.
15    Q.   So this was the first time this process
16 was implemented?
17    A.   Yes.
18    Q.   What process was in place for reviewing
19 list prices from 1991 until the implementation of
20 this policy?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  There wasn't a documented

69 (Pages 270 to 273)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 274

1   process.
2           The practice, as I've said before,
3   was one of looking at inflationary indices and
4   then applying those to the list prices, reviewing
5   those with the marketing folks to make sure that
6   there wasn't something that we had overlooked by
7   just doing a mathematical extension, or something
8   that was happening in the marketplace where the
9   marketing guys didn't want to take an increase for
10  instance.
11          So, you know, that was the prior
12  policy.  Again, we were focusing on one price.  We
13  weren't focusing on everything else.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   So as part of that prior process, there
16  was no consideration of the impact on list price
17  to Alt. Site Product Sales customers?
18      A.   Correct.
19      Q.   You said "we" in your explanation.  Do
20  you mean HBS Contract Marketing?
21      A.   Yes.
22      Q.   Would the process for annual list price

Page 275

1   evaluation initiate within HBS Contract Marketing?
2       A.   Yes.
3       Q.   And then typically there would be, as
4   you indicated, a three to five percent increase?
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  Depending on the year.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.   Depending upon the year.
9       A.   It was purely inflationary, yeah.
10      Q.   But before that went forward, someone
11  within HBS tasked with the responsibility would go
12  to the product line manager and get their okay
13  that that was the appropriate increase?
14      A.   Correct.
15      Q.   Okay.
16      A.   More or less get their consensus that,
17  you know, they were in agreement with us.
18      Q.   Under what circumstances would a product
19  not receive a three to five percent list price
20  increase?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  Though this didn't, I

Page 276

1   don't remember this happening on a large number of
2   products, there were some products periodically
3   that the product manager for instance didn't want
4   to take an increase on.
5           There were other times where the
6   product manager wanted more of an increase than
7   the inflationary increase.  It all depended on how
8   they viewed the market and how they viewed the
9   reaction the market would have to price changes.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   How is it that the policy or the
12  practice in place prior to this policy change
13  that's reflected in this document, how is it that
14  on some products it resulted in differences
15  between the list price and the contract price of
16  multiples of a hundred, two hundred, three hundred
17  percent for some products but for other products
18  it didn't?
19          MS. TABACCHI:  Object to the form.
20          THE WITNESS:  In some cases, and I don't
21  think there was a general rule.  I mean it was, as
22  I remember, it was all over the map.  It wasn't

Page 277

1   necessarily one product line necessarily.  It was
2   some products within a product line, and some
3   varied.
4           Again, it depended on how dynamic
5   the contract market was, the contract price market
6   had been over that ten year period.
7           We didn't go back before 1991, so I
8   don't know, you know, I don't know how much of
9   that was legacy prior to 1991.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   When you say "that," you mean the
12  larger --
13      A.   The disparity.
14      Q.   -- the larger disparities?
15      A.   Yeah.
16      Q.   Okay.
17      A.   So I think it was primarily driven by
18  just how competitive had the market for that
19  product been that might have driven the prevailing
20  market prices down.
21      Q.   Okay.  The next item on the second page
22  says "Administrator," and then it indicates "The

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 278

1  general manager of HPD Contract Marketing will be
2  the administrator of all list price designations
3  for the division."
4         What did that in practical terms
5  mean?
6     A.  It meant that Contract Marketing would
7  be the initiators and the analysts in this
8  process.
9     Q.  Did that represent a change from prior
10 practice?
11    A.  No.  It represented a more formal
12 definition than prior practice.
13    Q.  So it was a memorialization of the prior
14 practice?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  To some extent.
17         It also was a more formal way of
18 saying that the head of Contract Marketing was
19 responsible for published prices because there
20 were some product managers who thought they had
21 that responsibility.
22 BY MS. ST. PETER-GRIFFITH:

Page 279

1     Q.  I see.  And generally who won out if
2  there was this tug of war?
3        MS. TABACCHI:  Object to form.
4        THE WITNESS:  I was not good to deal
5  with in this subject.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  I see.
8         The next sentence says "The
9  incumbent will assure compliance to this policy
10 and review any exceptions with the division
11 president before publication."
12        Does that provide a written
13 memorialization of how to address potential
14 conflicts?
15       MS. TABACCHI:  Object to form.
16       THE WITNESS:  No.  It more is saying
17 that with any guideline or policy, there are
18 always going to be exceptions that are justified
19 by business realities.
20        And all we were intending here was
21 to say this is how we're going to run the list
22 price deal.  There may be, you know, I had had

Page 280

1  enough experience over twenty years in Hospital
2  Products Division, I knew that the, I used to say
3  that the only rule is that there's always an
4  exception.  So you always knew that something was
5  going to come up that you hadn't anticipated.  So
6  you have to leave an ability to do that.
7         What we were trying to say here is
8  that if you made an exception to this, you would
9  identify it when you took it to the division
10 president for his review.  So we would say this is
11 how we did it and for the vast majority this is
12 it.
13        If we varied from that, if we had a
14 new product for some reason that had a different
15 need in the marketplace, we would review that
16 separately on a line item basis.  That's what this
17 was intended to say.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  From the time of the implementation of
20 this policy until the nonexistence of HPD in view
21 of the spin --
22    A.  Yes.

Page 281

1     Q.  -- how often was the exceptions
2  exception implemented?
3        MS. TABACCHI:  Object to the form,
4  beyond the scope.
5        THE WITNESS:  There were a few, maybe,
6  again on a yearly basis probably less than twenty,
7  subsequent to this where we may not have followed
8  it to the letter of the law.  But what we were
9  looking at was, in those cases, was that we
10 thought the prevailing market price was going to
11 change from where it was today, and going by this
12 guidelines it would have limited our ability to
13 change.  So those are where we took exceptions.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Do you remember what some of the
16 products were that were excepted?
17       MS. TABACCHI:  Objection, beyond the
18 scope.
19       THE WITNESS:  No, I don't.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Well, sir, it's nearing the end of the
22 day, and the one document that always seems to

71 (Pages 278 to 281)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 282

1  appear at your depositions near the end of the
2  day, I'm putting before you what's previously been
3  marked as, using the Texas sequence, as Deposition
4  Exhibit 940.  (Document tendered to the witness.)
5     A.   Right.
6     Q.   Do you recognize this document, sir?
7     A.   Yes.
8     Q.   Who drafted this document?
9     A.   I believe I did.
10    Q.   Why did you draft this document?
11         MS. TABACCHI:  I caution the witness not
12  to reveal the substance of any communications with
13  counsel.
14         THE WITNESS:  Actually, looking at this
15  document I may have misspoken before.
16         This is the document, or at least
17  this was a draft, as it says here, of the
18  attachments that I think would have been discussed
19  in the last meeting with Rick Gonzalez.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Okay.  In terms of the --
22    A.   So the other document may have been an

Page 283

1  earlier draft of this, but I think this was the
2  document that would have been attached to that
3  cover letter that we talked about before.
4     Q.   The one that says Rules of the Road?
5     A.   Yes.
6     Q.   Okay.  Who was this document published
7  to?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  It was published to the
10  audience that we had in that Rick Gonzalez
11  meeting.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.   Anyone else?
14    A.   No.
15    Q.   At the top it says "Proposal:  Reduce
16  the catalog price of all Hospital Products
17  Division products to better correlate with the
18  actual national market selling price range."  Do
19  you see that?
20    A.   Yes.
21    Q.   What did you mean by that?
22         MS. TABACCHI:  Objection, asked and

Page 284

1  answered.
2         THE WITNESS:  What we were proposing is
3  to take our list prices down to more relevant
4  position to the prevailing market prices.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   What do you mean by "prevailing market
7  price"?
8     A.   Basically the only measure we had of
9  prevailing market price was our contract prices
10  since we're not privy to our competitor's pricing.
11         So basically it's bringing our list
12  price down to be more in a relevant position to
13  our current contract prices.
14    Q.   And it says the "reduction would be
15  predicated on the current wholesaler acquisition
16  prices plus a fixed differential, plus five
17  percent."
18    A.   Yes.
19    Q.   Is that policy that we just saw
20  before?
21    A.   Yes.  The policy we just saw before was
22  kind of a result of this.

Page 285

1     Q.   Going to where it says Background, if
2  you could look at the second sentence of that
3  paragraph where it says "Since 1986."  Do you see
4  that?
5     A.   Yes.
6     Q.   It says "the HPD net average selling
7  prices have declined year over year due to this
8  highly competitive market environment."
9         Is that accurate?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  I think in aggregate, yes,
12  that's true.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.   The next sentence says "the HPD catalog
15  (a/k/a suggested manufacturer's list price) for
16  these products has remained unadjusted despite
17  significant erosion in the actual selling price."
18  Do you see that?
19    A.   Yes.
20    Q.   When you say "unadjusted," do you mean
21  that they stayed exactly the same?
22         MS. TABACCHI:  Object to the form.

72 (Pages 282 to 285)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 286

1     THE WITNESS:  I think what I was saying
2  here is unadjusted down.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   Okay.  So that doesn't mean that there
5  weren't inflationary increases that were taken, as
6  you've already testified to?
7     A.   No.  I think we cover that in a later
8  sentence.
9     Q.   Okay.  Which sentence?
10    A.   The sentence that says "increases that
11  generally approximated," that it exacerbated the
12  differential.
13    Q.   Just the sentence before that says "due
14  to other considerations related to contractual and
15  government regulatory demands, HPD prior to 2000
16  published annual increases once a year on the
17  catalog prices."  Do you see that?
18    A.   Uh-huh.
19    Q.   What government regulatory demands
20  caused the publication of annual increases of the
21  catalog prices?
22       MS. TABACCHI:  Object to the form,

Page 287

1  beyond the scope.
2       THE WITNESS:  The only thing I can think
3  of is, again, the requirement in the Federal
4  Supply Schedule, that to take an increase you have
5  to take an increase in your published price.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   What were the contractual considerations
8  that led to the published annual increases once a
9  year on catalog prices?
10    A.   Basically a number of our contracts
11  allowed us to take inflationary increases.  It
12  would have been very difficult to justify taking
13  an inflationary increase if I hadn't taken it on
14  my list price.  So that connection is what I was
15  alluding to.
16    Q.   The next sentence reads "increases that
17  generally approximated the change in Consumer
18  Price Index change for the urban market basket
19  exacerbating any differentials to real prices in
20  the marketplace."
21       What are real prices in the market?
22       MS. TABACCHI:  Object to the form.

Page 288

1     THE WITNESS:  Again, I think I was
2  reflecting back on the actual national market
3  selling price ranges that I used up in the first
4  paragraph.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   The next sentence reads "though a
7  majority of eventual sales dollars are processed
8  at steep discounts to the catalog pricing under
9  contractual commitments, there continues to be a
10  small portion of sales, less than one percent,
11  which are processed at these elevated levels."  Do
12  you see that?
13    A.   Yes.
14    Q.   Does that refresh your recollection as
15  to what the annual sales volume was for
16  noncontractual sales at list price?
17       MS. TABACCHI:  Objection, beyond the
18  scope.
19       THE WITNESS:  Yes.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   What's now your recollection?
22    A.   It says less than one percent, so I have

Page 289

1  no reason to doubt that that was true.
2     Q.   Was that true from 1991 through to 2001?
3       MS. TABACCHI:  Same objection.
4       THE WITNESS:  I don't believe so.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   Why not?
7       MS. TABACCHI:  Same objection, asked and
8  answered.
9       THE WITNESS:  I don't have a number but
10  I believe that that number was higher back in
11  1991.
12       Plus, I had said before the
13  quantity of noncontract sales actually could
14  fluctuate annually based on what our competitors
15  did or what they couldn't do that would force
16  their customers to buy products from us.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   The next paragraph concerns the
19  published pricing for wholesalers and
20  distributors, wholesaler acquisition price, WAC.
21       Now, is it "wholesale" acquisition
22  price or "wholesaler" acquisition price?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                        March 16, 2008

Page 290

1      MS. TABACCHI:  I can't even object to
2  the question.
3      THE WITNESS:  I don't know.  Yes.
4  (Laughter.)
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   Well, let me tell you why I ask the
7  question.
8      A.   Okay.
9      Q.   Because if you look at Exhibit 15, your
10 definition that you put on that document is
11 "wholesale" acquisition cost.  That's why I'm --
12     A.   I considered that synonymous.  We only
13 did business with one wholesale function.
14     Q.   So whether it was called "wholesaler" or
15 "wholesale," were the two terms interchangeable?
16     A.   In my mind they are, yeah.
17     MS. TABACCHI:  I'm glad we cleared that
18 up.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.   And were they for Abbott?
21     A.   Yes.
22     Q.   Then it says that, well, "WAC is

Page 291

1  adjusted annually to reflect the erosion of final
2  sales prices independent of the catalog price."
3  What does that mean?
4      A.   Actually, what I'm writing about here,
5  we've come through all of these depositions to
6  redefine that term.  It really was the RxLink
7  acquisition cost that was adjusted annually by a
8  review of market prices between accounting and
9  Contract Marketing.  So that's what I was
10 referring to here.
11     Q.   So in this first sentence when you
12 reference WAC, you're really talking about RxLink
13 acquisition cost?
14     A.   Yes.
15     MS. TABACCHI:  Object to the form.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   What is RxLink acquisition cost?
18     A.   It's a contract price that we gave to
19 wholesalers that signed our RxLink agreement.
20     Our RxLink agreement was introduced
21 in the early 1990s.  For signing an agreement with
22 us and honoring our RxLink program, among other

Page 292

1  things, they got improved payment terms and they
2  got lower acquisition prices on some products, not
3  all products but on some products.
4      Q.   When you published WAC to the pricing
5  compendia, did you publish the RxLink acquisition
6  cost?
7      A.   No.
8      MS. TABACCHI:  Object to the form.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   What did you publish?
11     A.   We published our --
12     MS. TABACCHI:  Object to the form.
13     THE WITNESS:  -- wholesale/wholesaler
14 acquisition cost.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.   Which was the, you had previously
17 testified when we went over these definitions the
18 noncontract price charged by wholesalers --
19     A.   Yes.
20     Q.   -- to wholesalers and distributors?
21     A.   Yes.
22     Q.   Okay.  Now, the next sentence reads "WAC

Page 293

1  is evaluated annually by Accounting and Contract
2  Marketing to adjust for market price trends."
3      Which WAC are you referencing
4  there?
5      A.   RxLink acquisition cost is what was
6  effectively reduced.
7      Q.   Then it says "And once per year new
8  pricing is published to Abbott's trading
9  partners."  What does that mean?
10     A.   For those RxLink contracted wholesalers,
11 we published their acquisition costs too.
12     Q.   What is the difference between the
13 RxLink acquisition cost and the noncontract price
14 charged to wholesalers and distributors?  Is it
15 that RxLink is a contract price?
16     A.   Yes.
17     Q.   So the RxLink price would be published
18 to the trading partners, but the RxLink price
19 would not be published to the pricing compendia?
20     A.   Correct.
21     Q.   That would be, prior to 2001, the
22 noncontract price charged to wholesalers and

74 (Pages 290 to 293)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                          March 16, 2008

Page 294

1  distributors?
2      A.   Yes.
3      Q.   How did you arrive at the noncontract
4  price charged to wholesalers and distributors
5  before the implementation of the policy for list
6  price adjustment?
7      A.   You know, I don't know exactly how that
8  was done.  It appears that it was, that over the
9  years it's been equivalent to some reduction
10 versus the list price.  So if the list price took
11 an inflationary increase, more likely than not the
12 published WAC price took an inflationary increase.
13     Q.   Now, the RxLink acquisition price is the
14 contract price?
15     A.   Yes.
16          MS. TABACCHI:  Object to the form.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   The pre 2001 WAC was the noncontract
19 price to wholesalers and distributors.
20          Was there a price that wholesalers
21 and distributors could buy at that was lower than
22 the RxLink acquisition cost?

Page 295

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  No.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   The next paragraph reads, the first
5  sentence, "a wide disparity in catalog prices and
6  average market prices as currently configured is
7  not supported by sufficient financial or market
8  factors to survive scrutiny of public opinion."
9          What did you mean by that sentence,
10 sir?
11          MS. TABACCHI:  Objection, beyond the
12 scope.
13          THE WITNESS:  Again, as written in 2001,
14 we had identified fairly large discrepancies, or
15 disparities, and there wasn't any justification
16 that we could develop based on less than one
17 percent of the volume for having those kind of
18 disparities.
19          In the past maybe there was a
20 larger contract range in prices, but the contract
21 price ranges had shrunk as well.  So we just
22 didn't think that as you looked at that it was

Page 296

1  something that we wanted to leave out there.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   Well, prior to 2001 what financial or
4  market factors supported or justified the wide
5  disparity?
6          MS. TABACCHI:  Object to the form, asked
7  and answered.
8          THE WITNESS:  I don't know that anybody
9  ever tried to look at it and justify it.  In fact,
10 I would say they probably had not looked at it in
11 its entirety and tried to objectively justify it.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   If someone had looked at it prior to
14 2001 and went through the process that you went
15 through through this analysis prior to 2001, do
16 you think that Abbott would have reduced its, or
17 would have Abbott reduced its list prices?
18          MS. TABACCHI:  Objection to the form.
19 This is an improper hypothetical, beyond the scope
20 of the Notice.
21          THE WITNESS:  I don't know.
22 BY MS. ST. PETER-GRIFFITH:

Page 297

1      Q.   The last phrase of this particular
2  sentence reads "to survive scrutiny of public
3  opinion."
4          What scrutiny of public opinion?
5          MS. TABACCHI:  Objection, beyond the
6  scope.
7          THE WITNESS:  I think what I was
8  referring to is having someone view it that was
9  not familiar with our marketplace, nor our
10 history.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Was there any other public opinion that
13 Abbott was concerned about in making its decision
14 to drop its prices in 2001, list prices in 2001?
15          MS. TABACCHI:  Objection, beyond the
16 scope, object to the form.
17          THE WITNESS:  Again, this was just
18 background with regard to the findings.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.   But was there any other public opinion?
21          MS. TABACCHI:  Same objections.
22          THE WITNESS:  Not that I'm aware.  I

75 (Pages 294 to 297)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 298

1  don't delineate public opinions.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   Well, the next sentence reads "this was
4  voiced in December 2000 in a letter from U.S.
5  Representative Pete Stark to Miles White."  Do you
6  see that?
7     A.   Yes.
8     Q.   Other than Congressman Stark's letter
9  to -- well, let me ask you this:  Did Congressman
10 Stark's letter have any impact upon Abbott's
11 decision to move forward with its list price
12 reductions?
13       MS. TABACCHI:  Objection, asked and
14 answered.
15       THE WITNESS:  I think, as I said before,
16 there was quite a bunch of discourse with regard
17 to the issue both from Congress and from others.
18 It was one specific example that was out there.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   And by "others" do you mean the
21 Department of Justice?
22       MS. TABACCHI:  Object to the form.

Page 299

1        THE WITNESS:  The Department of Justice
2  subpoenas, there was, as I said, I believe in the
3  second half of 2000 there were budget discussions
4  and so on going on in Congress about reimbursement
5  rates and what was equitable and what was not, so
6  on and so forth.
7        So there was any number of
8  discussions with regard to that.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Why would the budget discussions in
11 Congress create a concern for Abbott such that it
12 would make a decision to lower its list price?
13       MS. TABACCHI:  Object to the form,
14 beyond the scope.
15       THE WITNESS:  I think if you've reviewed
16 anything that comes through Congress, anything is
17 fair game in a congressional discussion.
18       So what they talked about was more
19 than just budget.  As you monitor those things,
20 there was a whole list as I remember, and I can't
21 tell you exactly what they were, but I remember a
22 heightened sense of the fact that more and more

Page 300

1  people were talking about the price issue.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   When you say "more and more people," do
4  you mean more and more Congressmen or political
5  figures?
6     A.   Congressmen, cabinet members, press.
7     Q.   What other public opinion can you think
8  of that might have impacted or influenced the
9  decision by Abbott to reduce its list prices in
10 2001?
11       MS. TABACCHI:  Object to the form,
12 beyond the scope.
13       THE WITNESS:  I don't have any specific
14 population to define that we were concerned about.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.   Have we covered your recollection that
17 the public opinion or the pressures that did, or
18 the external pressures, that did drive the
19 decision to make the 2001 price change?
20    A.   Yes.
21    Q.   The next sentence says "the revenue
22 impact of making this change may be affordable by

Page 301

1  the corporation in 2001."
2        What did you mean by that?
3     A.   Meaning that if we make the change, it
4  could be absorbed and we could still make our
5  financial plans.
6     Q.   If the change had been made prior to
7  2001, would that have been true?
8        MS. TABACCHI:  Object to the form,
9  beyond the scope.
10       THE WITNESS:  I don't know.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   Finally, it says "the establishment of a
13 process to annually define changes to the catalog
14 price would avoid this type of public relations
15 exposure in the future."  Do you see that?
16    A.   Yes.
17    Q.   What public relations exposure were you
18 referencing?
19       MS. TABACCHI:  Objection, beyond the
20 scope.
21       THE WITNESS:  Any.
22 BY MS. ST. PETER-GRIFFITH:

76 (Pages 298 to 301)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 302

1    Q.   What types of public -- well, was Abbott
2  experiencing public relations exposure in 2001?
3    A.   No.
4         MS. TABACCHI:  Objection.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Then why was there a concern about
7  public relations exposure?
8         MS. TABACCHI:  Objection, beyond the
9  scope, object to the form, asked and answered.
10        THE WITNESS:  Abbott was very concerned
11 about the image of, Abbott's corporate image.
12        That really, I wasn't thinking of
13 any specific exposure at that point in time, but,
14 you know, anybody could have tried to make an
15 issue out of our prices.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Sir, if we could go down to Division
18 Impact.  The first two sentences, the first begins
19 "Making the proposed adjustment," and the second I
20 believe begins "Additionally, lowering the
21 catalog," can you explain what you meant by those
22 two sentences?

Page 303

1    A.   The first sentence basically is what we
2  talked about before in terms of the definite price
3  impact.  It would reduce the opportunistic sales
4  historically made to list price purchasers, and it
5  would have eliminated an opportunity for price
6  increases on the Federal Supply Schedule that we
7  had planned for later in 2001.  And it would say
8  that on an annual basis that would cost us about
9  $1.7 million.  For 2001 based on I think this
10 proposed, making the change April 1st, the impact
11 would only be $1.2 million.
12   Q.   And the next sentence, what did you mean
13 by that sentence?
14   A.   Here in the next sentence I was talking
15 about the, if you accept the premise that AWP
16 affects customers' decisions in buying products,
17 reducing the list price, and therefore, reducing
18 the AWP may have caused people to move away from
19 our products.
20   Q.   But you didn't predicate the sentence
21 upon "if you accept the premise."  Doesn't it just
22 indicate that by lowering the catalog prices you

Page 304

1  could lose sales?
2    A.   It says may, may result in lost sales.
3    Q.   You may lose sales.
4    A.   Yes.
5         To your point, we knew the AWP
6  would go down.
7    Q.   The sentence after that reads "A pending
8  reduction of AWP proposed by the Department of
9  Justice in several major Alt. Site products would
10 force some portion of this impact for government
11 reimbursed care regardless of Abbott's actions."
12 Do you see that?
13   A.   Yes.
14   Q.   What did you mean by that?
15   A.   Basically if the DOJ AWPs were accepted
16 and put into place, and it would basically have
17 the same impact of us reducing our list prices.
18        So what I was saying there is if
19 they are accepted, we're going to lose those sales
20 anyway if there is a linkage between AWP and
21 product selection by our customers.
22   Q.   So if Abbott didn't make the 2001 price

Page 305

1  reductions, you're saying that this loss of sales
2  would come anyway because of the implementation of
3  the DOJ AWPs?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  Again, if the DOJ AWPs
6  were implemented.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Do you know when the DOJ AWPs were
9  implemented?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  I don't believe they were
12 ever implemented.  By "implemented" I mean used by
13 payors.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.   How did the proposed DOJ AWPs influence
16 Abbott's decision to reduce its list price in
17 2001?
18        MS. TABACCHI:  Objection, asked and
19 answered.
20        THE WITNESS:  I don't believe they did.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.   Well, you included reference to them in

77 (Pages 302 to 305)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 306

1  your memo.
2      MS. TABACCHI:  Object to the form, asked
3  and answered.
4      THE WITNESS:  Again, when I review
5  something with upper management, I try to include
6  everything that I know about that that could
7  happen, and that contributes to the worst case
8  scenario.  It's always good to look at the worst
9  case scenario and then look at what do you think
10 is going to happen.
11     In this case I was trying to define
12 these are the worst things that could happen with
13 regard to this issue.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.   Is it Abbott's testimony that the
16 potential publication, proposed publication, of
17 the DOJ AWPs played no role in its decision to
18 lower its list prices in 2001?
19     MS. TABACCHI:  Asked and answered.
20     THE WITNESS:  I can just tell you it was
21 not part of our analysis.
22 BY MS. ST. PETER-GRIFFITH:

Page 307

1      Q.   When you say "our," who are you
2  referencing?
3      A.   Maylene and I.
4      Q.   But did it factor into the decision
5  making by the senior management who ultimately
6  decided to lower the AWPs?
7      MS. TABACCHI:  Object to the form, asked
8  and answered.
9      THE WITNESS:  As I said before, I don't
10 believe it was a contributing factor.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Why wouldn't it be?
13     I mean if the Department of Justice
14 thought your AWPs on some of your products were so
15 high that they wanted to implement changes,
16 wouldn't that be of concern for Abbott?
17     MS. TABACCHI:  Object to the form,
18 beyond the scope of the Notice.
19     It is ten after 5:00.  You are
20 asking questions now that have been asked
21 repeatedly of this witness.  I suggest that you
22 move on if you intend to complete this deposition

Page 308

1  today.
2      MS. ST. PETER-GRIFFITH:  We're not
3  completing this deposition today.
4      MS. TABACCHI:  There's no reason why it
5  shouldn't be completed today.  You've spent
6  forever reviewing correspondence and e-mails back
7  and forth to the pricing compendia.  You choose to
8  use your time as you wish.  You've asked the same
9  question repeatedly.  I do suggest that you move
10 on.
11     MS. ST. PETER-GRIFFITH:  I have not
12 asked the same question repeatedly.
13     MS. TABACCHI:  Well, the transcript will
14 speak for itself.  You have.  This question has
15 been posed to this witness by you in other
16 depositions repeatedly.  He's been deposed
17 repeatedly.
18     MS. ST. PETER-GRIFFITH:  He's sitting
19 here as Abbott.  He can answer the question.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.   Sir, can you answer the question and
22 then we'll move on.

Page 309

1      MS. TABACCHI:  It's a hypothetical
2  question.  I object to the form, it's beyond the
3  scope of the Notice.
4      If you'd like to read back the
5  question.
6      THE WITNESS:  Would you repeat the
7  question.
8      (WHEREUPON said record was read
9      back as requested.)
10     MS. TABACCHI:  Same objections.
11     THE WITNESS:  Abbott was not singularly
12 selected in the DOJ AWP changes.  And nobody was,
13 within Abbott, understood how they had defined the
14 AWPs they proposed.
15     In fact, their AWPs that they had
16 proposed were inconsistent on the same product for
17 different manufacturers, which seemed at least in
18 my mind that it wasn't well conceived.
19     So after reviewing it we didn't see
20 the need to look at it from that point.  We were
21 looking at it from the point of view of where was
22 our market prices and where should our list price

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 310

1  be.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  If you could move on -- oh, let me ask
4  you, at any time from 1991 until 2001 did Abbott
5  ever notify any state or federal official about
6  what its actual contract prices were that it was
7  charging its customers?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10         MS. ST. PETER-GRIFFITH:  No, it's not.
11         THE WITNESS:  It was not our
12 understanding that that was a requirement of any
13 entity.
14          We thought the government had a
15 good picture of our nonlist price prices.  They
16 had quarterly publications of our AMP, they had
17 our Federal Supply Schedule prices, we had prices
18 negotiated with the DOD.
19          So we thought if a government
20 agency needed it, it was within the government
21 agency's purview already.
22 BY MS. ST. PETER-GRIFFITH:

Page 311

1     Q.  Were the DOD prices or the Federal
2  Supply Schedule prices that you charged to the
3  United States in line with Abbott's Alternate Site
4  catalog prices?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Alternate Site did not
7  have a catalog.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  HPD catalog prices.
10         MS. TABACCHI:  Object to the form,
11 beyond the scope of the Notice.
12         MS. ST. PETER-GRIFFITH:  It is not
13 beyond the scope of the Notice.
14         THE WITNESS:  Federal Supply Schedule
15 prices were contractually negotiated prices that
16 were below our published prices.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  But were they in line with your contract
19 prices that you were charging to your HPD
20 customers, including your Alt. Site customers?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I think if you were to ask

Page 312

1  the VA contracting officers, they would tell you
2  yes, they were, because we actually had to
3  disclose across, whenever we either changed the
4  price or renegotiated prices or negotiated a new
5  contract, we had to disclose actual sales in that
6  negotiation.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  So you disclosed --
9     A.  Our lowest price.
10    Q.  Your lowest price, which is your lowest
11 HPD price that you charged your contractors --
12    A.  Uh-huh.
13    Q.  -- or your customers?
14    A.  Yes.
15    Q.  What indicated to the United States that
16 your Federal Supply Schedule prices or your DOD
17 prices were in line with your actual contract
18 prices that you were charging customers?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I just went through that.
21 BY MS. ST. PETER-GRIFFITH:
22    Q.  Okay.  So it's the fact that DOD and the

Page 313

1  VA received your lowest price?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  And what is it about the quarterly --
6     A.  Well, let me go back.
7          They may or may not have been given
8  on a contract our lowest price, but our disclosure
9  to them had to include the lowest prices that we
10 had billed for the products.
11    Q.  Did Abbott at any time ever go to the
12 United States and say hey, you know, our catalog
13 prices are much higher than the prices that we're
14 charging under the Federal Supply Schedule or the
15 DOD prices?
16         MS. TABACCHI:  Object to the form, asked
17 and answered.  He just testified about
18 communications with the government.
19         MS. ST. PETER-GRIFFITH:  Counsel, don't
20 coach the witness.  If you can just let him answer
21 the question, please.
22         MS. TABACCHI:  If you can stop asking

79 (Pages 310 to 313)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 314

1  the same question that he just answered.
2        MS. ST. PETER-GRIFFITH:  It's a
3  different question.  If the answer is the same,
4  then let him say that.  Don't testify for him,
5  please.
6           Can you read back the question.
7           (WHEREUPON said record was read
8           back as requested.)
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Again, I'm not totally
11 familiar with the submissions that were made with
12 regard to the FSS prices or any special DOD
13 prices, but usually we had to attach a price
14 catalog.
15          I do know that they were on the
16 mailings for any new price catalogs that were
17 published.  So they had in their possession our
18 list prices.  We didn't feel like we needed to do
19 the analysis for them.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.   Was that a conscious decision made by
22 Abbott?

Page 315

1        MS. TABACCHI:  Object to the form,
2  beyond the scope.
3        MS. ST. PETER-GRIFFITH:  It's not beyond
4  the scope.
5        THE WITNESS:  No.  We didn't want to
6  think on behalf of the contracting officer.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Now, with regard to the quarterly
9  publication of the or the quarterly provision of
10 the AMP data --
11   A.   Yes.
12   Q.   -- what is it about that provision of
13 AMP data that leads Abbott to believe that the
14 United States should have known what its contract
15 prices were within HPD?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  The AMP is calculated by a
18 formula that's defined originally by HCFA, now by
19 CMS.  It's a very definitive definition, and it is
20 intended to be the average price, net of
21 discounts, net of charge-backs, for products sold
22 to a nonhospital entity.

Page 316

1        So AMP is the best aggregate view
2  of our contract prices in the Alternate Site
3  market.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.   Didn't Abbott have a problem with its
6  AMPs, that it ultimately went back to the United
7  States and asked for assistance in revising?
8        MS. TABACCHI:  Object to form, beyond
9  the scope of the Notice.
10       THE WITNESS:  AMP was a term that was
11 introduced in I think '91, '92, that's when the
12 reporting started.  It started as a very general
13 definition and it evolved over the years into a
14 more specific definition.
15          It still in a lot of people's minds
16 is not specific enough, and there is a fair amount
17 of interpretation that each company has to go to
18 to fit the general rules into their exact view,
19 their exact market, and how they participate in
20 that market.
21          I believe we may have gone back to
22 them a couple of times saying that we're trying to

Page 317

1  improve the calculation that we're doing, and our
2  market has changed, and therefore, we'd like to
3  make some changes.
4           I know of at least one that we
5  submitted to CMS that was of that nature.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   What was the request made to CMS?
8        MS. TABACCHI:  Object to the form,
9  beyond the scope.
10       THE WITNESS:  It was a pretty complex,
11 but there was one made I believe in the 2000, 2001
12 timeframe.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   Didn't Abbott indicate to CMS that its
15 AMPs might have been incorrect in that it was
16 undercalculating?
17       MS. TABACCHI:  Object to the form,
18 beyond the scope.
19       THE WITNESS:  I'm not aware of that.
20 BY MS. ST. PETER-GRIFFITH:
21   Q.   How could the United States be expected
22 to rely upon Abbott's AMP data to determine its

80 (Pages 314 to 317)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 318

1  actual contract prices that it was charging its
2  HPD Alt. Site customers if its AMP data was
3  inaccurate that it reported to the government?
4         MS. TABACCHI:  Object to the form,
5  beyond the scope of the Notice.
6         MS. ST. PETER-GRIFFITH:  It's not beyond
7  the scope.
8         THE WITNESS:  Your question presumes
9  that the AMP data was erroneous, and I'm not
10 buying into that presumption.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Well, Abbott notified the United States
13 that it was erroneous.
14         MS. TABACCHI:  Objection, beyond the
15 scope of the Notice.
16         THE WITNESS:  Do you have it?  Can I
17 look at it?
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   I don't have that notice, we're not
20 going to look at that notice right now.
21     A.   I can't respond to it then.
22     Q.   Well, we can take that up when we

Page 319

1  reconvene.  Let's go on to Page 2.
2          Sir, the top paragraph with the
3  analysis, is that the analysis that we went
4  through before in the Rules of the Road draft
5  attachment that you referenced earlier?
6     A.   I believe this was the third page.  I
7  think these are the same numbers.
8     Q.   Okay.
9     A.   They look awfully close.
10    Q.   So what we discussed before in terms of
11 your analysis, that's what occurred here?
12    A.   Yes.
13    Q.   The next item down indicates that, or
14 you provide some product examples.
15    A.   Yes.
16    Q.   Why did you choose these examples?
17    A.   The first three I believe we chose
18 because they were on a subpoena, and we wanted to
19 specifically address products that were
20 highlighted on a subpoena.
21         In the others we were just trying
22 to reflect some other product segments.  I mean

Page 320

1  these were six products out of two hundred.
2     Q.   So they were two hundred products that
3  had list prices that you reduced?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  I believe it was two
6  hundred some odd prices were changed in 2001.
7         MS. ST. PETER-GRIFFITH:  We're at the
8  end of this document.  Do you want to end for the
9  day?
10        MS. TABACCHI:  I'd like to finish the
11 deposition today.
12        MS. ST. PETER-GRIFFITH:  We're not going
13 to finish the deposition today.  I mean we can go
14 until midnight if you wanted, but --
15        MS. TABACCHI:  What other topics do you
16 need to address that you don't think --
17        MS. ST. PETER-GRIFFITH:  We have Home
18 Infusion, we have the Vanco price change in 1995.
19        MS. TABACCHI:  Let's finish those topics
20 then.
21        MS. ST. PETER-GRIFFITH:  Do you want to
22 go all night, Tina?

Page 321

1         MS. TABACCHI:  Well, we're not going to
2  go all night.
3         There's no reason why, you have
4  ample testimony on both topics.  I don't know why
5  you need additional testimony on it.  But if you
6  care to ask Mr. Sellers on those topics, I think
7  you can finish those topics in an hour.
8         MS. ST. PETER-GRIFFITH:  Well, I
9  disagree with you.
10        Tina, you've designated Mr. Sellers
11 for three quarters of the topics that the United
12 States has.  We're not going to finish today.  I
13 think it's better to choose another date and to
14 come back another date.
15        MS. TABACCHI:  We can discuss whether we
16 can reconvene the deposition at another time then.
17 I'm not going to agree today that we're going to
18 reconvene.  We can discuss this offline.
19        MS. ST. PETER-GRIFFITH:  We get fourteen
20 hours at least with this witness.  You've
21 designated him for a variety of topics.
22        I mean if you want me to go on

                        81 (Pages 318 to 321)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 322

1  tonight, I'll go on tonight, but we're not going
2  to end this deposition today.  I can tell you
3  that.
4          MS. TABACCHI:  All right.  I understand
5  your position.
6          MS. ST. PETER-GRIFFITH:  So what do you
7  want to do?
8          MS. TABACCHI:  We'll discuss this, we'll
9  discuss whether we reconvene and under what
10  circumstances we reconvene at another time.
11          You're not going to agree to finish
12  today.  I'm not going to agree right now as we sit
13  here that you're getting fourteen hours with
14  Mr. Sellers under these circumstances.  So I
15  suggest --
16          MS. ST. PETER-GRIFFITH:  What do you
17  mean "under these circumstances"?  You've
18  designated him for most of the topics.
19          MS. TABACCHI:  These are topics that the
20  United States has questioned numerous witnesses
21  on.
22          MS. ST. PETER-GRIFFITH:  But we haven't

Page 323

1  questioned Abbott.  We've asked for the 30(b)(6)
2  witness since November.
3          We are entitled to question this
4  witness.  We are entitled to our full time with
5  this witness under the CMO.
6          MS. TABACCHI:  I understand your
7  position.  That doesn't mean I agree with it.  But
8  we don't need to continue to debate it.
9          MS. ST. PETER-GRIFFITH:  Well, what do
10  you want to do, Tina?
11          MS. TABACCHI:  I suggest we resolve this
12  at another time.
13          You're not going to agree to finish
14  the deposition in the next hour, so we should
15  address this offline.
16          MS. ST. PETER-GRIFFITH:  What do you
17  mean "we should address this offline"?
18          Well, what dates is Mr. Sellers
19  available to reconvene the deposition?
20          MS. TABACCHI:  We're not having this
21  conversation now.
22          MS. ST. PETER-GRIFFITH:  Well, when are

Page 324

1  we going to reconvene his deposition, Tina?
2          MS. TABACCHI:  I'm not agreeing as we
3  sit here right now that we're going to reconvene
4  his deposition.
5          MS. ST. PETER-GRIFFITH:  Why not?  I get
6  fourteen hours with this witness.  I've got other
7  topics to go over with him.
8          What's the basis for your telling
9  me that you're not going to agree to reconvene
10  this deposition?  I'm entitled to know that, and
11  I'm entitled to get it on the record.
12          MS. TABACCHI:  The testimony has been
13  duplicative, redundant of other testimony.  The
14  Notice is overbroad.  I'm not sure that you're
15  entitled to fourteen hours with him.
16          We can have all of these
17  discussions at another time.  There's no reason to
18  have this debate on the record.
19          MS. ST. PETER-GRIFFITH:  Tina, you've
20  proffered this witness as a 30(b)(6) witness for
21  most of the topics that the United States has.
22  Jason Winchester represented to the Court that

Page 325

1  this man's testimony was going to substitute some
2  of the 30(b)(6) witness testimony.
3          MS. TABACCHI:  He has been designated as
4  a 30(b)(6) on the topics pursuant to our letter
5  and our objections, yes.
6          MS. ST. PETER-GRIFFITH:  Okay.  We are
7  entitled to our fourteen hours with him, if not
8  more given the number of topics that you've
9  designated him on.
10          Now, I need you to tell me right
11  now that you're going to agree to reconvene.
12          MS. TABACCHI:  I'm not in a position to
13  tell you that right now.  I don't know whether
14  we're going to reconvene or not.  We'll have to
15  discuss this offline.
16          MS. ST. PETER-GRIFFITH:  What would be
17  the basis for not reconvening?
18          MS. TABACCHI:  We can discuss that
19  offline.  I've articulated --
20          MS. ST. PETER-GRIFFITH:  No.  We're
21  going to discuss it on the record, Tina.
22          What would be your basis for not

82 (Pages 322 to 325)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 326

1    reconvening his testimony?
2           MS. TABACCHI:  I've already articulated
3    the basis.  The testimony is duplicative and
4    redundant of other testimony.
5           We offered ways to streamline the
6    deposition.  We have offered a number of different
7    alternatives that you did not choose to pursue.
8           MS. ST. PETER-GRIFFITH:  Which were
9    what?  Which were what?
10          MS. TABACCHI:  We have sat here today --
11          MS. ST. PETER-GRIFFITH:  No, Tina.  The
12   only alternative that you offered, initially Jones
13   Day proposed offering designations of 30(b)(1)
14   testimony.
15          You've never given us those
16   designations.  You've never offered that.  For
17   months we waited for your designations.  We
18   postponed this deposition because you told us they
19   were forthcoming and that's how you wanted to
20   proceed, and then you never offered those
21   designations.
22          MS. TABACCHI:  That's not how I

Page 327

1    understand the discussions have gone, Ann.
2           MS. ST. PETER-GRIFFITH:  Well, that is
3    how the discussions have gone, Tina.  And I want
4    the record to be clear on that.  You've never
5    offered any alternative other than to present this
6    witness as a 30(b)(6) witness.
7           MS. TABACCHI:  It's my understanding
8    that the government would not agree to forego this
9    deposition.
10          So there's no point in debating
11   that at this point.
12          MS. ST. PETER-GRIFFITH:  What do you
13   mean the government would not agree to forego this
14   deposition?
15          MS. TABACCHI:  Ann --
16          MS. ST. PETER-GRIFFITH:  I want your
17   position, Tina.  I want to make the record clear,
18   what is your position that the United States has
19   not done?
20          MS. TABACCHI:  I think the United States
21   could have finished, given all the testimony and
22   all the information that you already have based on

Page 328

1    other discovery you could have finished the
2    deposition today.
3           MS. ST. PETER-GRIFFITH:  Well, you know,
4    we vehemently disagree.
5           MS. TABACCHI:  I understand.
6           MS. ST. PETER-GRIFFITH:  We have a
7    variety of topics that we've got to go over with
8    this witness because you folks have designated him
9    for seventy-five percent of the topics that we've
10   had.
11          MS. TABACCHI:  I understand.
12          MS. ST. PETER-GRIFFITH:  And we're
13   entitled to our time.  So when are we going to
14   reconvene this deposition?
15          MS. TABACCHI:  We'll get back to you on
16   that.
17          Are you going to finish the
18   deposition in the next hour?
19          MS. ST. PETER-GRIFFITH:  I'm not going
20   to finish this deposition in the next hour.
21          MS. TABACCHI:  Okay.  Then I suggest --
22          MS. ST. PETER-GRIFFITH:  Mr. Sellers,

Page 329

1    what are your dates of availability between now
2    and the 31st?
3           MS. TABACCHI:  Mr. Sellers is not going
4    to answer that question.  We're not going to have
5    this debate on the record right now.
6           MS. ST. PETER-GRIFFITH:  I'm not
7    debating it.  I'm just asking him what his
8    availability is.
9           MS. TABACCHI:  We're not going to --
10          MS. ST. PETER-GRIFFITH:  Do you have any
11   conflicts in time, sir, between now and --
12          MS. TABACCHI:  I'm going to instruct the
13   witness not to answer.
14          MS. ST. PETER-GRIFFITH:  Why?
15          MS. TABACCHI:  These are inappropriate
16   questions.
17          Ann, are you going to finish the
18   deposition in the next hour?
19          MS. ST. PETER-GRIFFITH:  No.
20          MS. TABACCHI:  Fine.  Understood.
21          I suggest we conclude the
22   deposition, and we will have this discussion at

83 (Pages 326 to 329)

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                     March 16, 2008

Page 330

1  another time.
2       MS. ST. PETER-GRIFFITH:  We are
3  concluded today subject to this deposition being
4  reconvened before the 31st.
5       THE VIDEOGRAPHER:  We are off the record
6  at 5:32 p.m.
7       (WHEREUPON said deposition was so
8       adjourned.)
9
10
11       _____
12       SIGNATURE OF THE WITNESS
13
14  Subscribed and sworn to and before me
15  this _____ day of _____, 20_____.
16
17
18  _____
19       Notary Public
20
21
22

Page 331

1  STATE OF ILLINOIS )
2  COUNTY OF C O O K )
3       I, Donna M. Kazaitis, RPR, CSR No.
4  084-003145, do hereby certify:
5     That the foregoing deposition of MICHAEL
6  SELLERS was taken before me at the time and place
7  therein set forth, at which time the witness was
8  put under oath by me;
9     That the testimony of the witness and all
10 objections made at the time of the examination
11 were recorded stenographically by me, were
12 thereafter transcribed under my direction and
13 supervision and that the foregoing is a true
14 record of same.
15     I further certify that I am neither counsel
16 for nor related to any party to said action, nor
17 in any way interested in the outcome thereof.
18     IN WITNESS WHEREOF, I have subscribed my name
19 this 18th day of March, 2008.
20
21  _____
22     Donna M. Kazaitis, RPR, CSR 084-003145

84 (Pages 330 to 331)

00c5aa93-b25b-40ff-b422-e7070d802fa9