# Exhibit 90



experience *does* matter

**CASE:  In re:  Pharmaceutical Industry Average Wholesale Price Litigation**
**DATE:  March 12, 2008**

Enclosed is the Original of the transcript of the testimony of **David S. Fishman** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services


Encl.


Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 1

                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )  MDL No. 1456

----------------------------)  Civil Action

This document relates to:       )  No. 01-12257-PBS

United States of America,       )

ex. rel. Ven-a-Care of the      )

Florida Keys, Inc.,             )  Hon. Patti Saris

     vs.                        )

Abbott Laboratories, Inc.,      ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler


          Videotaped 30(b)(6) deposition of DAVID S.

FISHMAN, called by the Plaintiffs for examination,

taken pursuant to notice, agreement and by the

provisions of the Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before DEBORAH HABIAN, a

Notary Public within and for the County of Cook,

State of Illinois, and a Certified Shorthand Reporter

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

|  | Page 2 |
|--|--------|
| 1 | of said State, at the offices of JonesDay, 77 West |
| 2 | Wacker Drive, 35th Floor, Chicago, Illinois, on the |
| 3 | 12th day of March, 2008, at 8:34 a.m. |
| 4 | |
| 5 | APPEARANCES: |
| 6 | |
| 7 | U.S. DEPARTMENT OF JUSTICE |
| 8 | COMMERCIAL LITIGATION, FRAUD |
| 9 | BY: ANN ST. PETER-GRIFFITH, ESQ. |
| 10 | 99 N.E. 4th Street |
| 11 | Miami, Florida 33132 |
| 12 | (305) 961-9001 |
| 13 | on behalf of the United States; |
| 14 | |
| 15 | ANDERSON, LLC |
| 16 | BY: C. JARRETT ANDERSON, ESQ. |
| 17 | 208 West 14th Street, Suite 3-B |
| 18 | Austin, Texas 78701 |
| 19 | (512) 469-4549 |
| 20 | on behalf of the Relator, Ven-a-Care; |
| 21 | |
| 22 | |

|  | Page 4 |
|--|--------|
| 1 | I N D E X   O F   E X A M I N A T I O N S |
| 2 | |
| 3 | WITNESS:                    DX  CX  RDX  RCX |
| 4 | DAVID S. FISHMAN |
| 5 | EXAMINATION BY: |
| 6 | ANN ST. PETER-GRIFFITH, ESQ.    06 |
| 7 | |
| 8 | I N D E X   O F   E X H I B I T S        PAGE |
| 9 | Exhibit Fishman 001, Sub 1 through Sub 40 |
| 10 | ABT-DOJ 0394762 through 0395345       21 |
| 11 | Exhibit Fishman 002, ABT-DOJ 0302503 |
| 12 | Abbott Lab Ethics & Compliance Policy  147 |
| 13 | Exhibit Fishman 003, Notice of Deposition     176 |
| 14 | Exhibit Fishman 004, TXABT 49911 |
| 15 | Proposal Analysis              260 |
| 16 | Exhibit Fishman 005, TXABT 38152 |
| 17 | Proposal Analysis              260 |
| 18 | Exhibit Fishman 006, TXABT 38152 |
| 19 | Injectable Comparison          269 |
| 20 | Exhibit Fishman 007, ABT-DOJ 0233906 |
| 21 | Catalog Price Adjustment        351 |
| 22 | |

|  | Page 3 |
|--|--------|
| 1 | APPEARANCES (continued): |
| 2 | |
| 3 | JONES DAY |
| 4 | BY: TONI-ANN CITERA, ESQ. |
| 5 | 77 West Wacker Drive |
| 6 | Chicago, Illinois 60601-1692 |
| 7 | (312) 782-3939 |
| 8 | on behalf of the Defendants. |
| 9 | |
| 10 | ALSO PRESENT: |
| 11 | STEPHAN HOOG, VIDEOGRAPHER |
| 12 | HENDERSON LEGAL SERVICES |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 5 |
|--|--------|
| 1 | THE VIDEOGRAPHER: This is Stephan Hoog of |
| 2 | Legal Video Services, Inc., 205 West Randolph Street, |
| 3 | Chicago, Illinois. I'm the operator of this camera. |
| 4 | We're on record March 12th, 2008. The time is 8:34, |
| 5 | as indicated on video screen. |
| 6 | This is the videotaped deposition of |
| 7 | David Fishman being taken on behalf of Federal Rules |
| 8 | of Civil Procedure on behalf of the Plaintiff. We are |
| 9 | at 77 West Wacker Drive, Chicago, Illinois. This case |
| 10 | is captioned In Re: Pharmaceutical Industry Inc. AWP, |
| 11 | Case No. 01-12257-PBS. |
| 12 | Will the attorneys please identify |
| 13 | themselves for the video record? |
| 14 | MS. ST. PETER-GRIFFITH: Ann St. Peter-Griffith |
| 15 | from the United States Attorney's Office, Southern |
| 16 | District of Florida on behalf of the United States. |
| 17 | MR. ANDERSON: Jarrett Anderson, counsel for |
| 18 | the lawyer. |
| 19 | MS. CITERA  Toni Citera, counsel for the |
| 20 | witness and for the Defendant from JonesDay. |
| 21 | THE VIDEOGRAPHER: The court reporter today is |
| 22 | Debbie Habian. Would you please swear in the witness? |

2 (Pages 2 to 5)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 6

1      THE REPORTER:  I'm from Henderson Legal
2  Services.  Would you please raise your right hand?
3          (Witness sworn at 8:35 a.m.)
4      THE REPORTER:  Thank you.
5      THE VIDEOGRAPHER:  Please proceed.
6          DAVID S. FISHMAN,
7  called as a witness herein by the Plaintiff, having
8  been first duly sworn, was examined and testified as
9  follows:
10         DIRECT EXAMINATION
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Good morning, Mr. Fishman.
13     A.  Good morning.
14     Q.  Sir, you're here today as the 30(b)(6)
15 designee on behalf of Abbott?
16     A.  Yes.
17     Q.  You understand that?
18     A.  I do.
19     Q.  Okay, do you understand that you're going
20 to be answering questions here today as if you were
21 the corporation?
22     A.  I understand that.

Page 7

1      Q.  Okay.
2      MS. CITERA  Let me say subject to any
3  questions that are outside the scope.
4      MS. ST. PETER-GRIFFITH:  Sure.
5
6
7  BY MS. ST. PETER-GRIFFITH::
8      Q.  Sir, can you give us your full name,
9  please?
10     A.  David -- middle name as well?
11     Q.  Yes, please.
12     A.  David Sander Fishman.
13     Q.  And, sir, what is your current employment?
14     A.  I am in the Legal Department at Abbott
15 Laboratories.
16     Q.  You're in the Legal Department?
17     A.  I am.
18     Q.  And what is your position in the Legal
19 Department?
20     A.  I am Divisional Vice President, Section
21 Head, Corporate Transactions.
22     Q.  Corporate Transactions?

Page 8

1      A.  Corporate Transactions.
2      Q.  And, sir, could you give us your
3  educational background?
4      A.  I went to college at the University of
5  Illinois in Champaign-Urbana, graduated December of
6  '79. I went to law school at Loyola University of
7  Chicago, graduated in 1983.
8      Q.  In '83?
9      A.  '83.
10     Q.  Okay, and how long have you been employed
11 with Abbott?
12     A.  In August this year, it will be twenty
13 years.
14     Q.  So you've been with them since?
15     A.  August 15th, 1988.
16     Q.  '88, okay.  And what did you do for
17 employment in between 1983 and 1988?
18     A.  From '83 through '85, I was a law clerk
19 for the -- a judge in the Illinois Appellate Court,
20 First District, Mel Jiganti, J-I-G-A-N-T-I.
21     Q.  And after your clerkship?
22     A.  After my clerkship, I worked at a lawfirm

Page 9

1  Portes, P-O-R-T-E-S, Sharp, Herbst, H-E-R-B-S-T, &
2  Kravets, K-R-A-V-E-T-S from end of my clerk -- end of
3  the Summer of '85 'til August -- 'til Summer of '88.
4      Q.  Okay, and that's when you went in-house
5  with Abbott?
6      A.  That's correct.
7      Q.  And what positions have you held in-house
8  with Abbott?
9      A.  Titles or responsibilities?
10     Q.  Well, we'll start with titles, and then
11 we'll go over responsibilities.
12     A.  The titles changed.  So the best of my
13 recollection, I started as an Attorney, I was promoted
14 to a Senior Attorney.  They then changed designations
15 and I became a Senior Counsel, which meant that --
16 which, as I recall, was effectively the same as a
17 Senior Attorney, but they just for some reason thought
18 it was better to change the name.
19     Q.  You've answered one of my future
20 questions.
21     A.  I then became Divisional Vice President
22 and then the Divisional Vice President Section Head.

3 (Pages 6 to 9)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

Page 10

1       Q.  Okay, and how long were you an Attorney
2   within -- just how long did you hold that title?
3       A.  I don't -- I won't be able -- don't know
4   for certain.
5       Q.  Do you remember when you were promoted to
6   any of these particular titles?
7       A.  The only title I recall is Divisional Vice
8   President --
9       Q.  Okay.
10      A.  -- which was the fall I remember
11  October/November time frame of 2003.
12      Q.  Okay.  And what were your responsibilities
13  first as an Attorney?
14      A.  If I may qualify, I think the answer is
15  going to be more relevant as to -- as opposed to what
16  my title as what I was doing at different times.
17      Q.  Sure.
18      A.  I had different job, and what the title
19  was less significant.
20      Q.  Okay, that's fine.  Let's start when you
21  started, what were your responsibilities?
22      A.  When I started --

Page 11

1       Q.  In '88.
2       A.  -- in 1988, I was hired as a real estate
3   attorney --
4       Q.  Okay.
5       A.  -- and I managed all of the company's real
6   estate work, I represented our Corporate Purchasing
7   Department, I represented our Corporate Engineering
8   Group and over time started working with on the
9   Commercial side a division that no longer exists, but
10  it was our CAPD, which stood for Chemical Agricultural
11  Products Division.
12      Q.  And do you remember when you moved --
13  well, were the -- were your CAPD responsibilities in
14  conjunction with your real estate --
15      A.  Yes.
16      Q.  -- responsibilities?
17      A.  It was -- it was all additive.
18      Q.  Okay, and did your responsibilities change
19  over time?
20      A.  While I was doing those -- representing
21  those internal clients, no.
22      Q.  Okay, and how long did you work with the

Page 12

1   real estate group in CAPD?
2       A.  I stayed in that position until the fall
3   of 1995.
4       Q.  Okay, and what -- how did your position
5   change in the fall of '95?
6       A.  I took a different job within Abbott
7   within the Legal Division within Abbott.
8       Q.  Okay, and what job was that?
9       A.  I became a Commercial Attorney
10  representing the Diagnostics Division, Hospital
11  Products Division, and Abbott Health Systems, AHD.
12      Q.  Okay, and how is AHD different than HPD?
13      A.  The Abbott Health Systems was an umbrella
14  division helping coordinate and liaison between the
15  various op -- business divisions as they met with
16  clients.  For instance the Diagnostics Division would
17  call on a customer.  The Hospital Division would call
18  on the same customer for different products.  The
19  Health Systems helped coordinate that and tried to put
20  on a -- more of a single face to the customer.
21      Q.  When -- how long did you work with
22  Diagnostics, HPD and AHD?

Page 13

1       A.  I worked -- well, the Health Systems
2   stopped -- the whole corporation changed structure.
3   So I worked with those divisions until they -- the
4   corporate -- the corporate organization changed
5   structures in probably 2004, internal structure.
6       Q.  So -- so when HPD was spun off to Hospira?
7       A.  Right, Hospira -- the HP was spun off.
8   Health Systems kind of spun out of existence.
9       Q.  When did it spin out of existence?
10      A.  I don't -- similar time frame probably.
11      Q.  Okay.  And did you also work with
12  Diagnostics during this '95 through 2004 time frame?
13      A.  I did.
14      Q.  Okay.  When you worked with HPD, which
15  business units within HPD did you work with?
16      A.  All of them.  We -- we -- all of them.
17  Many of them.  I don't know that it was all of them.
18      Q.  Well, did you work with HBS?
19      A.  Yes.
20      Q.  Okay, did you -- what is HBS?
21      A.  Hospital Business Sector, I think, or
22  Section.

4 (Pages 10 to 13)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 14

1      Q.  I just wanted to make sure we were using
2  the same terminology.
3      A.  Yes.
4      Q.  What about Alternate Site?
5      A.  I did a little bit of work with Alternate
6  Site.
7      Q.  What work did you do with Alt Site?
8      MS. CITERA:  I'm just going to caution you to
9  obviously not to reveal any privileged discussions.
10     THE WITNESS:  Okay.
11          I served as legal counsel for Alter
12  Site in the contracting arena.
13
14  BY MS. ST. PETER-GRIFFITH::
15     Q.  And when you say "in the contracting
16  arena," what do you mean?
17     A.  Reviewing contracts.  Providing legal
18  advice with respect to contracts.
19     Q.  Did you provide any legal advice
20  concerning compliance matters to HPD?
21     A.  Yes.
22     Q.  Okay, and what advice did you provide?

Page 15

1      A.  That would be privileged.
2      MS. CITERA:  I'm going to caution the witness
3  that would be privileged.
4      MS. ST. PETER-GRIFFITH:  Okay, I just want to
5  confirm, you're not asserting any advice of counsel
6  defense in this case, right?
7      MS. CITERA:  I'm not going there, but what --
8      MS. ST. PETER-GRIFFITH:  Well, what --
9      MS. CITERA:  His -- I mean if you want to ask
10 what type of compliance activities he did with or if
11 he did any compliance activities with HPD or Alternate
12 Site, that's fine, but what advice he gave, that would
13 be privileged.
14     MS. ST. PETER-GRIFFITH:  What's the distinction
15 between the two?
16     MS. CITERA:  Well, I mean one is his legal
17 advice.  The other is what -- you know, what types of,
18 you know, training or things like that, that that's
19 the distinction.  What types of training he did versus
20 what type of legal advice he may have gave to a -- to
21 his client is not appropriate and is not, you know,
22 what he's here to do.

Page 16

1      MS. ST. PETER-GRIFFITH:  So you're instructing
2  him not to answer?
3      MS. CITERA:  Yes.
4      MS. ST. PETER-GRIFFITH:  Okay.  Well, we
5  disagree with that instruction.  I mean, obviously,
6  you've proffered a lawyer as a 30(b)(6) rep.  I'm
7  entitled to inquire into this area, but you've given
8  your instruction.
9      MS. CITERA:  I mean I just to want add he's
10 here to testify about facts.  He's not here to testify
11 about any legal advice he gave.  He's not here, you
12 know -- any privileged conversations, that's not what
13 he's here for.  He's here to testify about, you know,
14 subject to our limitations and objections, the topics
15 that you've set forth.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Sir, what did you -- oh, did you work with
19 the Home Infusion Business Unit?
20     A.  Yes.
21     Q.  Okay, what work did you do with them?
22     A.  I provided training and legal advice

Page 17

1  regarding contract drafting and consulting on contract
2  matters.
3      Q.  Do you remember which contracts you
4  consulted on?
5      A.  No.
6      Q.  What training did you provide to Home
7  Infusion?
8      A.  I provided a series of training on fraud
9  and abuse -- the fraud and abuse laws and on antitrust
10 laws and generally on the code of conduct, Code of
11 Business Conduct.
12     Q.  Did you participate in the drafting of any
13 materials concerning the Code of Business Conduct or
14 fraud and abuse laws?
15     MS. CITERA:  Objection.
16     THE WITNESS:  That's two questions.  I did not
17 participate in the drafting of the Code of Business
18 Conduct.  I did participate in drafting language on
19 fraud and abuse compliance matters.
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  And is that true for Alt Site as well?

5 (Pages 14 to 17)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 18

1    A.  They wouldn't have been --
2    MS. CITERA:  Objection to form.
3    THE WITNESS:  They wouldn't have been
4  directed -- the types of things that I drafted
5  wouldn't have been directed solely to Alternate Site
6  other than a presentation I may have given.
7
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Okay, do you recall a presentation to Alt
10 Site?
11   A.  Yes.
12   Q.  What presentations did you give to Alt
13 Site?
14   A.  I gave them a presentation on fraud and
15 abuse laws and antitrust laws generally.
16   Q.  And when was that?
17   A.  I don't recall.
18   Q.  Do you recall what decade it was?
19   A.  '90s.
20   Q.  Early '90s, late '90s?
21   A.  It would have been after 9 -- since I
22 didn't support that business until after the fall of

Page 19

1  '95, it would have been between the fall of '95 and
2  when they stopped having a business.
3    Q.  Okay.  Now, the training on fraud and
4  abuse and antitrust, was that the same training that
5  you gave to the Home Infusion Business Unit?
6    MS. CITERA:  Objection to form.
7    THE WITNESS:  That's -- I thought -- I'm
8  confused by the question.  I think that you asked that
9  question already.
10
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Sure.  Did you -- let me break this down.
13 You provided training to both Alt Site and Home
14 Infusion, is that right, on fraud and abuse?
15   A.  No, Alt Site -- Home Infusion was part of
16 Alt Site.
17   Q.  Okay.
18   A.  So and in that regarded, I'd say it
19 limited to Home Infusion for presentations.
20   Q.  So you only gave presentations to Home
21 Infusion?
22   A.  That I recall, yes.

Page 20

1    Q.  Okay.  You didn't -- you don't recall any
2  to the Alt Site group itself?
3    MS. CITERA:  Objection to form.
4    THE WITNESS:  I do not recall.
5
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  What is your experience or what was the
8  bases of your information for your pre -- the
9  presentation that you gave on fraud and abuse and
10 antitrust matters to the Home Infusion Business Unit?
11   A.  What was the basis?
12   Q.  Yes.
13   MS. CITERA:  Objection to form.
14   THE WITNESS:  The antikickback statutes and
15 safe harbor regulations.
16
17 BY MS. ST. PETER-GRIFFITH:
18   Q.  Did you personally review those?
19   A.  Yes.
20   Q.  Did you -- what sources did you use for
21 the presentation, just the stat -- the statutes
22 themselves?

Page 21

1    MS. CITERA:  Objection to the form.
2    THE WITNESS:  The presentations that we have --
3  that are stacked in front of me now, I don't recall
4  being an initial, original drafter of them.  They are
5  very similar in content.  So the -- I think it was
6  more of a template that existed.
7    MS. ST. PETER-GRIFFITH:  Okay, you say that
8  that's in front of you.  Why don't we mark the
9  composite exhibit as Exhibit 1 that's in front of you.
10 That way, the record is clear.
11   THE REPORTER:  Do you want the witness's name
12 on it or just No. 1?
13   MS. ST. PETER-GRIFFITH:  Yeah, I think we
14 need --
15   MS. CITER:  Put the witness's name on.
16   MS. ST. PETER-GRIFFITH:  Yeah.
17   THE REPORTER:  Okay.
18     (Exhibit Fishman 001, containing
19      Sub Nos. 1 through 40 inclusive,
20      was marked for ID)
21
22 BY MS. ST. PETER-GRIFFITH:

6 (Pages 18 to 21)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

Page 22

1      Q.   And, Mr. Fishman, what I have in front of
2  you I will represent is Abbott's production to us of
3  Abbott-DOJ Bates Numbers 0394762 through 0395345, and
4  these are a stack of documents that were produced to
5  our -- my office on March 7th, very recently, and you
6  referenced them.  Are you familiar with these
7  documents, sir?
8      A.   Yes.
9      Q.   Have you reviewed them?
10     A.   I have looked at them, yes.
11     Q.   Did any of these documents come from your
12 file?
13     A.   Several of them did, yes.
14     Q.   Okay, when did you provide them?
15     A.   Earlier -- early this month.  I couldn't
16 tell -- I couldn't give you a specific date.
17     Q.   Early the month of March?
18     A.   Yes.
19     Q.   Prior to your provision of these in the
20 month of March, had you otherwise preserved them and
21 produced them to Abbott legal counsel who was
22 collecting responsive documents --

Page 23

1      MS. CITERA:  Objection to form.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   (Continuing) -- or to Jones Day directly?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  I was not --
7      MS. CITERA:  And I'm just going to object
8  outside the scope.
9          Go ahead.
10     THE WITNESS:  I was not asked to -- I was not
11 asked to produce anything.
12
13 BY MS. ST. PETER-GRIFFITH:
14     Q.   So you never had previously received
15 either a litigation hold memo or a document collection
16 memo concerning these materials?
17     A.   Not to my recollection.
18     MS. CITERA:  Same objection.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.   Okay.  Sir, backing up, were there --
22 other than the -- how many presentations did you give

Page 24

1  to Home Infusion on fraud and abuse and antitrust from
2  this -- after this 1995 time period?
3      A.   I believe two.
4      Q.   Do you know, were they -- it was in the
5  '90s, so somewhat -- sometime in between '95 and '99?
6      A.   I believe that would be correct.
7      Q.   Do you remember who attended these
8  particular presentations?
9      A.   Just the manager of the Contract Marketing
10 Group, Kathy Riddle, and then her staff.  And I -- I
11 don't recall who was on her staff.
12     Q.   Did anyone from the Reimbursement
13 Department within Home Infusion attend?
14     MS. CITERA:  Objection, form.
15     THE WITNESS:  I don't know.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Was there an attendance sheet that was
19 signed?
20     A.   I don't know.
21     Q.   Why did you give the presentations?
22     MS. CITERA:  Objection to the form.

Page 25

1      THE WITNESS:  We gave presen -- we, the Legal
2  Division, the Commercial Attorneys representing the
3  divisions, all of the divisions regularly or
4  periodically gave training to all -- many groups
5  within the legal -- within the business sectors.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   Did your presentation have anything to do
9  with the AWP spread or spread marketing?
10     A.   No.
11     MS. CITERA:  Objection to form.
12
13 BY MS. ST. PETER-GRIFFITH::
14     Q.   Why did you give a presentation on these
15 two particular topics, fraud and abuse and antitrust?
16     MS. CITERA:  Objection to the form.
17     THE WITNESS:  Abbott had compliance -- we also
18 gave presentations on the Code of Business Conduct,
19 and we identified areas that were relevant to the
20 businesses and were important to, you know, obtaining
21 scrutiny within -- within the industry.
22

7 (Pages 22 to 25)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 26

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Who made the decision concerning what
3  presentations would be given to the various business
4  units?
5      A.   I don't know.
6      Q.   Did someone ask you to give this
7  presentation or these two presentations?
8      A.   Yes.
9      Q.   Who did?
10     A.   As part of -- as part of our regular
11 function in the Legal Division, we provided training
12 on a regular basis to all these -- to many of the
13 different businesses, and it would have been my
14 manager who identified areas for training.
15     Q.   And who's your manager?
16     A.   Honey Lynn Goldberg was my manager, is my
17 manager today too, actually.
18     Q.   And do you know why she asked you to give
19 this particular presentation on fraud and abuse --
20     MS. CITERA:  Objection.
21
22 BY MS. ST. PETER-GRIFFITH:

Page 27

1      Q.   (Continuing) -- and antitrust?
2      MS. CITERA:  Objection to form.
3      THE WITNESS:  I don't think she asked me to
4  give this particular presentation.  She would have
5  identified the subject matter.
6
7  BY MS. ST. PETER-GRIFFITH::
8      Q.   Do you know who did -- you said that you
9  predicated your presentation based upon a template.
10 Who created the template?
11     A.   I don't know.
12     Q.   Who drafted the Codes of Business Conduct?
13     A.   I don't know.
14     Q.   As part of your preparation here for your
15 deposition here today on behalf of Abbott, did you do
16 anything to research who authored the Codes of
17 Business Conduct that Abbott has used throughout the
18 years?
19     A.   Talked to a number of people trying to
20 identify when the first Code of Business Conduct could
21 be identified.  My files had a code, a pamphlet that
22 represented the Code of Business Conduct from January

Page 28

1  9 -- January '93, '99 and then 2004.
2          In talking with several people, I was
3  advised that a Code -- the Code of Business Conduct
4  existed as early as '85.  That's as far back as we
5  were able to -- and I've not seen a written Code of
6  Business Conduct dated earlier than '93, but was
7  advised that it existed prior to that time.
8      Q.   Are you aware of whether there was one
9  that was in place from '91 through '93?
10     A.   I'm not personally aware of -- I was
11 advised that it existed in the mid '80s.  So I'd have
12 to assume it existed from '85 to '93.  I'm not aware
13 of a written document.
14     Q.   Who did you speak with?
15     A.   I spoke with Katherine Szazdanoff and
16 Honey Lynn Goldberg and Charlie Brock about that
17 matter.
18     Q.   Do you know what happened to the document
19 that was the Code of Business Conducts that was
20 operational for the period from '91 through '93?
21     MS. CITERA:  Objection to the form.
22     THE WITNESS:  I don't understand the question.

Page 29

1
2  BY MS. ST. PETER-GRIFFITH::
3      Q.   What happened to that physical copy of
4  that document?
5      A.   I just told you I don't know that a -- it
6  was -- I'm not aware of a written Code of Business
7  Conduct from the time it was identified as being
8  that -- there was a code from '85 to '93.  I don't
9  know --
10     Q.   Well, could it have been an oral code?
11     A.   I don't know.
12     Q.   Did anyone do anything to search for the
13 Code of Business Conduct that existed or that was
14 operational from '91 through '93 within Abbott?
15     MS. CITERA:  Objection to the form.
16     THE WITNESS:  There was inquiry to the Office
17 of Ethics and Compliance to check records.
18
19 BY MS. ST. PETER-GRIFFITH:
20     Q.   What about within the Legal Department,
21 any search there?
22     A.   I searched.

8 (Pages 26 to 29)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 30

1       Q.  Where did you search?
2       A.  I searched my files.
3       Q.  Anyone else's files?
4       A.  I talked to people who were -- would have
5   been at Abbott at that time, and nobody had any
6   documents other -- other than what I had.
7       Q.  Do you know why Abbott didn't retain a
8   copy of its Code of Business Conduct --
9       MS. CITERA:  Objection to the form.
10
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  (Continuing) -- for this period from '91
13  through '93?
14      A.  I -- I didn't know that they didn't retain
15  it.
16      Q.  Okay, but your search for that document
17  only involved going to the Office of Ethics and
18  Compliance and going to several people within the
19  Legal Department, right, Miss Goldberg and Miss
20  Sensinoff?
21      A.  Szazdanoff.
22      MS. CITERA:  Szazdanoff.

Page 31

1       MS. ST. PETER-GRIFFITH:  Szazdanoff.
2       THE WITNESS:  That is --
3       MS. CITERA:  Objection to form.
4       THE WITNESS:  That is correct.
5
6   BY MS. ST. PETER-GRIFFITH::
7       Q.  Okay, going back, what other
8   responsibilities did you have for the time period of
9   the fall of '95 through to 2004?
10      A.  As Commercial Attorney for each of those
11  divisions, all the Commercial Attorneys were
12  responsible for providing commercial legal services to
13  those businesses, which ranged from drafting
14  contracts, discussing issues that arose, legal matters
15  that arose, strategic business matters that arose,
16  buying companies, drafting licenses, distribution
17  agreements, whatever -- again, the Commercial demands
18  of the businesses was -- it was providing support for
19  those divisions for the U.S. operations.
20      Q.  Did your responsibilities entail anything
21  pertaining to price reporting or Abbott's relationship
22  with the price reporting compendia?

Page 32

1       MS. CITERA:  Objection to the form.
2       THE WITNESS:  No.
3
4   BY MS. ST. PETER-GRIFFITH:
5       Q.  Did you provide any legal advice
6   concerning price reporting during this time period?
7       MS. CITERA:  Objection to form.  Also I'm
8   obviously going to caution you to reveal any --
9       THE WITNESS:  Right.  To the extent --
10      MS. CITERA:  -- any of your discussions that
11  are privileged.
12      THE WITNESS:  To the extent I did or didn't
13  would be covered by attorney-client privilege.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  You can answer "yes" or "no" though.  I'm
16  not asking you about communication --
17      A.  What's the question?
18      MS. ST. PETER-GRIFFITH:  Can you read the
19  question back, please?
20      THE REPORTER:  Sure.
21          (Record read.)
22      MS. CITERA:  You can answer "yes" or "no."

Page 33

1       THE WITNESS:  Yes.
2
3   BY MS. ST. PETER-GRIFFITH:
4       Q.  What advice did you give?
5       MS. CITERA:  Objection, privileged.
6       THE WITNESS:  That's -- any advice I would have
7   given would be covered by --
8       MS. ST. PETER-GRIFFITH::  Toni, do you intend
9   to -- does Abbott intend to rely upon an advice of
10  counsel defense?
11      MS. CITERA:  I'm not going there.  You ask this
12  question every deposition.
13      MS. ST. PETER-GRIFFITH:  Yes, I did because I
14  want your -- you to answer.
15      MS. CITERA:  I'm not making any stipulations or
16  statements.  You're here to ask questions of the
17  witness.  You're not here to ask questions of me.
18  This -- your question is clearly privileged.  He's not
19  going to answer it.
20
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  What other responsibilities did you have

9 (Pages 30 to 33)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 34

1  during this time frame?
2      A.  I think I've answered that question.
3      Q.  Well, I just want to make sure we've
4  exhausted on your responsibilities.  Is there any
5  more --
6      A.  I've provided broad commercial support to
7  the business -- the divisions that my group that I was
8  in represented for U.S. operations.
9      Q.  Did you personally have any interaction
10  with any price reporting compendia?
11     A.  No.
12     Q.  Did you personally have any interaction
13  with anyone outside of Abbott concerning price
14  reporting --
15     MS. CITERA:  Object to the form.
16
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  -- or AWP?
19     MS. CITERA:  Outside the scope.
20     THE WITNESS:  AWP, no.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 35

1      Q.  What about price reporting?
2      MS. CITERA:  Same objections.
3      THE WITNESS:  I provided -- I was -- I provided
4  counsel -- what time frame are we talking about?
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  This '95 through 2004 time period.
8      A.  I provided counsel for AMP and best price
9  calculations.
10     Q.  Who did you provide that counsel to?
11     A.  HPD.
12     Q.  Who within HPD?
13     A.  Directly, the Contract Marketing
14  organization.
15     Q.  And what advice did you give?
16     MS. CITERA:  I'm going to instruct you not to
17  answer, privileged.
18     THE WITNESS:  Any advice that I would have give
19  would have been privileged.
20
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  But it pertained to the business operation

Page 36

1  of Abbott's HPD, correct?
2      MS. CITERA:  I'm going to instruct you not to
3  answer that.
4      MS. ST. PETER-GRIFFITH:  Why are you going to
5  instruct him not to answer?
6      MS. CITERA:  It's privileged.  You're asking
7  him about what the advice pertained to.  That's
8  privileged.
9      MS. ST. PETER-GRIFFITH:  Well, did it pertain
10  to litigation?  That's not privileged, Toni.
11     THE WITNESS:  I would not be -- I would not
12  provide information regarding litigation.  We had a
13  Litigation Department.
14  MS. ST. PETER-GRIFFITH:
15     Q.  So --
16     A.  So I did not do that.
17     Q.  So everything you provided advice
18  concerning then pertained to transactional matters or
19  business matters within Abbott HPD?
20     MS. CITERA:  Objection, form, outside the
21  scope.
22     THE WITNESS:  It's --

Page 37

1      MS. CITERA:  I'd Also instruct you not to
2  answer that question based on the basis of privilege.
3      MS. ST. PETER-GRIFFITH:  It's -- he can answer
4  "yes" or "no."
5      THE WITNESS:  You have the word "only" in
6  there, and I don't think that's appropriate.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, why not?
10     A.  Because I also provided -- you didn't
11  include legal matters.  You just said "transactional"
12  and "business."
13     Q.  Okay, what do you consider legal matters?
14     A.  Interpretation of the law.
15     Q.  What laws did you interpret on behalf of
16  HPD?
17     MS. CITERA:  Again, I'm going to instruct you
18  not to answer -- or caution you not to reveal any
19  privileged discussions.  If you can answer the
20  question without revealing any privileged discussions,
21  you can answer it.  I'm also going to object it's
22  outside the scope.

10 (Pages 34 to 37)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 38

1    THE WITNESS:  You're asking -- from the period
2  of '95 through 2004 which laws did I give legal advice
3  on?
4
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Right.
7    A.  I think I -- I think the question is too
8  broad to answer.  I don't know every law that I gave
9  legal advice on.
10    Q.  Did you provide advice concerning -- on
11  statutes pertaining to Medicaid or Medicare fraud and
12  abuse?
13    MS. CITERA:  Same objection, same instruction.
14    THE WITNESS:  Yes.
15
16  BY MS. ST. PETER-GRIFFITH::
17    Q.  Okay, did you provide advice concerning
18  the antikick -- federal antikickback statute?
19    MS. CITERA:  Same objection, same instruction.
20    THE WITNESS:  Yes.
21
22

---

Page 39

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Did you provide advice concerning the
3  Federal False Claims Act?
4    MS. CITERA:  Same objection, same instruction.
5    THE WITNESS:  Yes.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Did you provide advice concerning Medicare
9  or Medicaid regulations?
10    MS. CITERA:  Same objection, same instruction.
11    THE WITNESS:  How is that differnt from what
12  you described previously?
13
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Well, now I'm talking about regulations.
16    A.  Some of -- certain of the regulations,
17  safe harbors.
18    Q.  What about State False Claims Act, did you
19  provide any advice concerning any State False Claims
20  Act?
21    A.  Specifically, we --
22    MS. CITERA:  Same objection, same instruction.

---

Page 40

1    THE WITNESS:  We -- I did not.
2
3
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  What about any other state Medicaid fraud
6  or abuse statute?
7    MS. CITERA:  Same objection, same instruction.
8    THE WITNESS:  Specifically any particular
9  state, no.
10
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  How about a grouping of states?
13    MS. CITERA:  Same objection, same instruction.
14    THE WITNESS:  We gave advice from -- on the --
15  I -- I shouldn't say we.  I -- I can't testify as to
16  what my colleagues specifically would have given in
17  any given instance.  I provided advice in the broader
18  framework of the federal statutory scheme.
19
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  And what is -- what in your background
22  provided you with the background to provide that

---

Page 41

1  advice?
2    MS. CITERA:  Object to the form, outside the
3  scope.
4    THE WITNESS:  I learned it while I became part
5  of Abbott in-house counsel.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Okay, and who did you learn it from?
9    A.  My colleagues.
10    Q.  Which colleagues?
11    MS. CITERA:  Again, outside the scope.
12    THE WITNESS:  Honey Lynn Goldberg, Brian
13  Taylor, Mark Habeberger, Maureen McShane, Daphne Pals,
14  'Sil Porembski --
15
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  When you --
18    A.  What time -- what time frame are we
19  talking about?
20    Q.  '95 through 2004.
21    A.  That -- those were just people from in an
22  earlier time frame.  I mean did you want -- we had

---

11 (Pages 38 to 41)

30(b)(6) Abbott (Fishman, David S.)                         March 12, 2008

Page 42

1  dozens of lawyers in Abbott that we worked
2  collaboratively together with.  I would have learned
3  from them as well.  Do you want -- do you want the
4  names of those people as well?
5      Q.  Sure.
6      A.  Tejal Vakaharia, Kate Collins, Peter
7  Petros, Selena Thomas Lisa Edmonds, who got married
8  and became Lisa Lee, Daniel Lawton, Mike Johannasen,
9  Erin Kraft, Brian Smith, Simi Chabria, Shan Bhati,
10 Michael Elm.
11     Q.  Is there a gentleman whose first name
12 began with an A?
13     MS. CITERA:  Whose first name began?
14     MS. ST. PETER-GRIFFITH: Began -- or, I'm sorry,
15 whose second name -- whose last name began with an A.
16     THE WITNESS:  Jim Albrecht, yes.  He retired
17 soon after I got involved.
18
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  Sir, did you participate -- during
21 this '95 through 2004 time period when you were
22 providing legal advice and working on commercial

Page 43

1  matters with HPD and -- commercial and legal matters
2  with HPD, did you help formulate any strategies
3  concerning compliance with -- HPD's compliance with
4  federal or state Medicare or Medicaid statutes --
5      MS. CITERA:  Objection to the form.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  -- or regulations?
9      A.  Indirectly.
10     Q.  How -- what did you do indirectly?
11     MS. CITERA:  And I would just caution you not
12 to reveal any privileged conversations, discussions,
13 et cetera.
14     MS. ST. PETER-GRIFFITH:  I will put on the
15 record that I object to that instruction simply
16 because it's -- you know, it's not privileged for the
17 United -- the United States has every right to
18 discover the business practices and advice concerning
19 business practices within Abbott.
20     MS. CITERA:  You do not have a right to
21 discover legal advice that is given to the
22 corporation.

Page 44

1          Ann, as I said before, he is here to
2  testify about the -- subject to our objections and
3  limitations, the doc -- the topics that you have
4  noticed.  He is not here to testify about legal advice
5  that the -- that was given by lawyers to the company.
6      MS. ST. PETER-GRIFFITH:  And you don't intend
7  to rely upon an advice of counsel defense, right?
8      MS. CITERA:  I am not answering that.
9      MR. ANDERSON:  Well, Toni, regardless, the
10 whole premise of the deposition is to learn of the
11 practices at Abbott regarding the noticed topics.  So
12 we do need that testimony.
13     MS. CITERA:  Well, he is subject to the
14 privilege.  I mean we are not going to disclose
15 privileged matters.  That's -- we said that in our
16 objections, we said that in our limitations.  It's not
17 going to happen.  You're not entitled to it.
18     MR. ANDERSON:  Listen, we're not talking about
19 the advice.  We're saying we need the information
20 about the practices.
21     MS. CITERA:  But she's asking for advice that
22 was given, I believe -- I mean we can reread the

Page 45

1  question, but as I recall, it was something to do with
2  advice given on the strategy.  That's clearly
3  privileged.
4      MR. ANDERSON:  Okay, but --
5      MS. ST. PETER-GRIFFITH:  No, it's not
6  privileged, Toni.
7      MS. CITERA:  I disagree.
8      MS. ST. PETER-GRIFFITH:  It pertains to
9  business --
10     MS. CITERA:  I disagree.
11     MS. ST. PETER-GRIFFITH:  Okay, then we're going
12 to come -- when we come back here, it's going to be at
13 Abbott's expense.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Sir, what --
16     MS. CITERA:  If he can answer it without
17 providing privileged testimony -- because I didn't
18 instruct him not to -- I instructed him not to reveal
19 any privileged testimony.
20         If there are things that you can
21 provide that are not privileged, you can answer that
22 question.  If you need to take a break and ask me, we

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 46

1 can do that.
2          But he's not going to provide
3 privileged discussions, conversation. With that
4 advice.
5      MS. ST. PETER-GRIFFITH: Can you read back the
6 question?
7      MS. CITERA: Want to read back the question.
8      THE WITNESS: Is there an outstanding question?
9      THE REPORTER: Okay, the last question was,
10 "What did you do indirectly?" Would you like me to
11 read the one before just for clarification?
12      THE WITNESS: Please.
13      THE REPORTER: Okay.
14          (Record read.)
15      MS. CITERA: So with that instruction in mind.
16      THE WITNESS: I believe that answering the
17 question would require me to provide privileged
18 information. I did participate. What I did in that
19 participation is asking me to disclose privileged
20 information.
21 BY MS. ST. PETER-GRIFFITH:
22      Q. Well, did you exclusively have

---

Page 47

1 communications?
2      MS. CITERA: What do you mean by that?
3      THE WITNESS: I don't understand that question.
4      MS. ST. PETER-GRIFFITH: Meaning -- I want to
5 know what he did. I'm not -- I don't want to discover
6 necessarily -- I do want to discover the
7 communications, and I think your instruction's
8 improper.
9
10 BY MS. ST. PETER-GRIFFITH:
11      Q. Beyond communications, what did you do?
12      MS. CITERA: I'm going to object to the form.
13      THE WITNESS: I don't understand what would
14 exist beyond communications.
15
16 BY MS. ST. PETER-GRIFFITH:
17      Q. Well, did you formulate or draft any
18 policies or do any -- do any research --
19      A. Yes.
20      Q. -- In furtherance of any policies?
21      A. Yes. There's two questions. To the first
22 one, yes.

---

Page 48

1      Q. Okay, what about the second one?
2      A. We -- I would have -- we were -- the Legal
3 Division was current. We kept current through
4 publications, periodicals, alerts that came through law
5 firms and communications with external counsel on the
6 current state of the law.
7      Q. What law firms did you obtain information
8 from?
9      A. On what subject matter?
10      Q. Medicare/Medicaid fraud abuse.
11      A. I'm sorry, the question is just very
12 broad, so... I personally worked with Reed Smith in
13 Washington, D.C.
14      Q. Any other law firms?
15      A. Mayer, Brown.
16      Q. Any other law firms?
17      A. We're talking '95 to 2004?
18      Q. Yes.
19      A. Arnold & Porter.
20      Q. Anybody else?
21      A. Not that I can think of.
22      Q. In formulating its policies and

---

Page 49

1 procedures, did Abbott rely upon any materials from
2 outside counsel in formulating it -- how it was going
3 to comply with federal and state Medicare and Medicaid
4 fraud and abuse statutes?
5      MS. CITERA: Objection to the form.
6      THE WITNESS: We certainly consulted with
7 outside counsel regarding those matters.
8
9 BY MS. ST. PETER-GRIFFITH:
10      Q. Okay, but you just referenced before that
11 you reviewed materials from them; is that fair?
12      MS. CITERA: Objection to form.
13      THE WITNESS: Your earlier question was which
14 law firms did I consult, and previously the answer was
15 which -- what -- what law -- what did I -- what did we
16 do to keep current with the law basically, and so we
17 would have received publications from law firms that
18 we didn't necessarily do business with as -- probably
19 as part of their marketing program.
20
21 BY MS. ST. PETER-GRIFFITH:
22      Q. Did you consult with them concerning

---

13 (Pages 46 to 49)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 50

1   Abbott?
2        A.   No, I consulted with the law firms that I
3   mentioned.
4        Q.   Okay, did you consult with them concerning
5   compliance with Medicare and Medicaid fraud and abuse?
6        MS. CITERA:  Objection to the form.  Also
7   obviously don't reveal any of the subject matter of
8   your conversations.
9        THE WITNESS:  I believe I answered -- I believe
10  that's the answer to the previous question, which law
11  firms did I consult on the subject matters.  So, yes,
12  I did consult with them.
13
14  BY MS. ST. PETER-GRIFFITH:
15       Q.   Okay, what else did you do in assisting
16  HPD with its Medicare and Medicaid fraud and abuse
17  compliance?
18       A.   We provided regular training and made
19  ourselves available for them to contact whenever there
20  was any questions or concerns they had.
21       Q.   Were you the only one providing assistance
22  to HPD concerning Medicare or Medicaid fraud and abuse

Page 51

1   compliance for this '95 through 2004 time frame?
2        A.   No.
3        Q.   Who else was?
4        A.   About 80% of the names I mentioned
5   previously.  You want a list of all the names that I
6   can recall?
7        Q.   Um-hum.
8        A.   Honey Lynn Goldberg, Jim Albrecht, Mark
9   Habeberger, Priscilla Porembski -- this was '94
10  to 2000 -- '95 to 2004?
11       Q.   Yes.
12       A.   (Continuing) -- Lisa Edmonds, the new name
13  I had mentioned previously, Lynn Boehringer, Kate
14  Collins, Peter Petros, and one other name I forgotten
15  Ngozi, N-g-o-z-i, Watts, Salina Thomas, Simi Chabria.
16  That's -- she may have been after 2004.  I don't know.
17  I don't remember.
18       Q.   Let's round this out.  After 2004, what
19  were your job responsibilities?
20       A.   My job responsibilities from 2004
21  through -- through August of 2006 remained the same,
22  although the -- again, the company structure was

Page 52

1   different.
2        Q.   Well, did -- you weren't working with HPD,
3   right?
4        A.   Well, HPD didn't exist, so no.
5        Q.   Okay, you weren't working with AHD?
6        A.   AHD didn't exist, but I was working with
7   the businesses that the -- the medical products -- the
8   Medical Products Group.
9        Q.   Okay.
10       A.   I supported the Medical Products Group.
11       Q.   Okay, did you work at all with PPD?
12       A.   Not until August of 2 -- August of 2006.
13       Q.   Okay, what were your job responsibilities
14  working with the Medical Products Group from '04 to
15  '06?
16       A.   Provide broad commercial legal services to
17  the businesses that were part of the Medical Products
18  Group.
19       Q.   Anything else?
20       A.   I was in a supervisory role, so managing
21  people.
22       Q.   And after August of 2006?

Page 53

1        A.   I became the sole client in -- on the
2   pharma side was the Business Development Group.  So I
3   did transactions for pharma.
4        Q.   Can you explain that?
5        A.   I did transactional work -- as opposed to
6   providing day-to-day legal services for an ongoing
7   business, I did transactional work.  M & A were -- was
8   lead attorney in the acquisition of Coast
9   Pharmaceuticals.  I did strategic alliance
10  arrangements, licensing deals, larger transactions
11  that came out of our Business Development Group on the
12  pharma side.
13       Q.   Okay, and when you say "pharma," you don't
14  mean the -- you mean -- that's just a term within
15  Abbott.  You're not referencing the -- the lobbying --
16       A.   Oh, no, no, I'm sorry.
17       Q.   Okay.
18       A.   It's -- the pharmaceutical products, P --
19  our Pharmaceutical Products Group.
20       Q.   Okay, I just wanted to clarify that.
21       A.   Yeah, different shades in the Medical
22  Products side.

14  (Pages 50 to 53)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 54

1    Q.  Okay.  Any other responsibilities?
2    A.  When?  In 2006?
3    Q.  Yeah.
4    A.  No.
5    Q.  Sir, what did you do to prepare for
6  today's deposition?
7    A.  I reviewed materials and had conversations
8  with a number of people.
9    Q.  Okay, what materials did you review?
10    A.  I reviewed the Code of Business Conduct
11  from -- the '93, '99 and 2004 Code of Business
12  Conduct, I reviewed the HPD Operating Guidelines from
13  August of '99, I reviewed the Fraud and Abuse Handbook
14  from 2000, I reviewed the Safeguarding Trust CD from
15  2002, I reviewed the Pharma Code, discussion of its
16  interaction with pharm -- with physicians, I reviewed
17  the OIG Guidance from 2003, I reviewed the materials,
18  probably -- I don't know about all -- many of the
19  presentations that were disclosed, I reviewed the
20  Fraud and Abuse Alert from '94.
21    Q.  Was that an internal Abbott document?
22    A.  No, it was the OIG Fraud Alert.  I

Page 55

1  reviewed some testimony, previous witnesses in this
2  matter -- or I don't know about this matter -- in
3  related matters, this and related matters.  I reviewed
4  some policies, I reviewed the corporate pol -- the
5  2003 corporate policy on reimbursement and discounts
6  and other price reductions, I reviewed a 2004
7  procedures from PPD and HPD on reimbursement
8  information.  I'm thinking through my pile of papers.
9    Q.  Okay.
10    A.  And I believe that's what I can -- that's
11  the documents I can recall reviewing.
12    Q.  And do you have those someplace?  Have you
13  segregated those separately?
14    A.  Some of them.
15    Q.  What did you do with the rest?
16    A.  I haven't thrown anything out.  I mean
17  they're, I believe, sitting in my office someplace.
18    MS. ST. PETER-GRIFFITH:  Toni, I'd appreciate
19  that we'd get that stack of records.  I mean to the
20  extent that we've got them here --
21    MS. CITERA:  Yeah, yeah, I mean you have -- I
22  mean, obviously, the Pharma Code, that's a public

Page 56

1  document, the --
2    MS. ST. PETER-GRIFFITH:  Yeah, but I'd like to
3  know which Pharma Code.
4    MS. CITERA:  Okay, It was the 2002, right?
5    THE WITNESS:  It was the summer of '03 --
6    MS. CITERA:  No.
7    THE WITNESS:  Oh, the Pharma -- I'm sorry, the
8  Pharma was an '02 document, publication.
9    MS. CITERA:  Yeah, but the Guidance was '03.
10    THE WITNESS:  The OIG Guidance was summer of
11  '03, I believe.  October '0 -- I don't remember the
12  exact -- July '03, I think.
13
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  What testimony did you review, sir?
16    A.  I reviewed portions of depositions of Mike
17  Sellers, Lynne Leone, Pete Baker, Don Robertson, and
18  somebody I didn't know, Glazer, Blazer?
19    MS. CITERA:  Balzer.
20    THE WITNESS:  Balzer, okay.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 57

1    Q.  Anybody else?
2    A.  No, I think that's it.
3    Q.  Do you recall -- did you read their entire
4  transcripts or portions of their transcripts?
5    A.  Portions of their transcript.
6    Q.  Okay, do you -- which portions of the
7  Balzer transcript did you review?
8    A.  I reviewed discussion -- this was -- it
9  primarily pertained to AWP.
10    Q.  Do you remember what pages they were or
11  what excerpts?
12    A.  I have no recollection at all.
13    Q.  What about Don Robertson?
14    A.  It -- same answer for all of them.
15    Q.  So it was only the sections discussing
16  AWP?
17    A.  Correct.
18    Q.  Now --
19    A.  Section -- I don't know if they were all
20  the sections discussing AWP.  The only sections that I
21  reviewed -- the only material I reviewed pertained
22  predominantly to AWP.

15 (Pages 54 to 57)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 58

1     Q.  Well, how did you choose which sections to
2  read?
3        MS. CITERA:  I'm just going to instruct you not
4  to reveal any conversations you and I had about -- in
5  preparing for your deposition.
6        THE WITNESS:  They were the only sections that
7  were provided to me.
8
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  And they were provided by counsel?
11    A.  Yes.
12       MS. ST. PETER-GRIFFITH:  Toni, I'd like to have
13  those -- those sections identified.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  And which -- do you recall which Sellers
16  deposition?
17    A.  There was several.
18    Q.  I know.  Do you recall which ones?
19    A.  I do not.  I -- I don't know.
20    Q.  In terms of documents that you've
21  reviewed, have we covered every document that you've
22  reviewed in preparation for today's deposition?

Page 59

1     A.  That I can recall, yes.
2     Q.  If you think of anything else, just pipe
3  up, please.
4     A.  Sure.
5     Q.  Who did you speak with in preparation for
6  today's deposition?
7     A.  I spoke with Honey Lynn Goldberg, Tejal
8  Vakaharia, Lara Levitan, Brian Taylor, Melissa
9  Pence-Levy, Cliff Berman, Mike Sellers, Virginia
10  Tobiason, Charlie Brock, Rick Matejh, M-A-T-E-J-H,
11  Katherine Szazdanoff, Matt Fischer.  I think that's it
12  to the best of my recollection.
13    Q.  Okay, what did you discuss with
14  Mr. Sellers?
15       MS. CITERA:  I'm guessing you're going to ask
16  this for every person?
17       MS. ST. PETER-GRIFFITH:  Yes.
18       MS. CITERA:  Okay, so I'm just going to give
19  you an overall caution that if -- I'm not asserting a
20  privilege over these discussions except to the extent
21  that privileged matters were discussed.
22       MS. ST. PETER-GRIFFITH:  Well, I get to

Page 60

1  discover fully what he did in preparation for today's
2  deposition.
3        MS. CITERA:  Well, not if --
4        MS. ST. PETER-GRIFFITH:  He's here as a
5  30(b)(6) witness.
6        MS. CITERA:  I'm just asserting my instruction.
7        THE WITNESS:  I would have talked -- as a
8  30(b)(6) witness, I was talking to Mike about business
9  operations in HPD, Contract Marketing in the time
10  frames that he had familiarity.
11
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  And what did he tell you about them?
14    A.  What did he tell me about them?  He would
15  have -- he described the process within Contract
16  Marketing of how the guidelines from '99 would have
17  been disseminated --
18    Q.  What guidelines?
19    A.  The operating -- the HPD operating
20  guidelines from August of 1999.
21    Q.  And what did he tell you about their
22  dissemination?

Page 61

1     A.  He told me that they -- that the relevant
2  members of the con -- the Contract Marketing
3  organization would have been advised of them.  We
4  talked about -- we've talked about his recollection of
5  AWP that would have been similar to his testimony.
6     Q.  And what did he tell you about AWP?
7     A.  He told me that his recollection was that
8  it was the practice within -- what time -- what are we
9  talking about in the time frames again?
10    Q.  I want to know what he told you about AWP,
11  everything from any time frame -- period, anything
12  that Mike Sellers told you during the course of your
13  preparation for this deposition.
14    A.  Okay, he would have told me that, prior to
15  the OEC, specific policy on reimbursement information
16  that was in Contract Marketing HPD it was the practice
17  not to discuss AWP.
18    Q.  What else did he tell you?
19    A.  That's all.
20    Q.  Those are the entire --
21    A.  Well -- oh, I'm sorry.  I thought you
22  meant about that subject matter.

16  (Pages 58 to 61)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 62

1      Q.  Oh, I'm sorry.  No.  If that's -- okay,
2  for AWP, that's what he told you?
3      A.  That's what he told me about AWP.
4      Q.  Okay.  And in terms of the OEC policy, if
5  you could pull out Tab 38 of Exhibit 1?
6      A.  (Witness so doing).
7      MS. CITERA:  Do you have a copy?  Oh, yeah, I'm
8  sorry.
9      MS. ST. PETER-GRIFFITH:  It's right in front of
10  you, Toni.  I tried to give it to you in advance.
11      MS. CITERA:  But the numbers don't correspond
12  or they do correspond?
13      MS. ST. PETER-GRIFFITH:  They do, they do.  The
14  numbers at the bottom do correspond.
15
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Sir, is that the policy that you're
18  referencing?
19      A.  No.
20      Q.  Okay, what --
21      A.  This is a procedure.
22      Q.  Okay, what OEC policy are you talking

Page 63

1  about?
2      A.  There was a corporate -- the corporate
3  policies and then division procedures, the corporate
4  policy on reimbursement information.
5      Q.  Is that in that stack right there?
6      A.  I don't know.
7      Q.  Is -- was it part of this production that
8  was made to me on the 7th, do you know?
9      A.  I don't know what was pro -- I don't know
10  what was produced.
11      Q.  What did the document look like?
12      A.  Similar to this, smaller print, smaller
13  font.  It is a policy, it had Charlie Brock's name on
14  the bottom, different dates.  It would have --
15      MS. CITERA:  And I'll just interject.  This
16  would have been produced to you previously.
17      MS. ST. PETER-GRIFFITH:  I don't think it was.
18  I've gotten every document, and I haven't seen that
19  document.
20      MS. CITERA:  And I swear I saw a Bates number
21  on it.  I'll --
22      MS. ST. PETER-GRIFFITH:  If you could check?

Page 64

1      MS. CITERA:  Yeah.
2      MS. ST. PETER-GRIFFITH:  And I have to tell
3  you, Toni, that I certainly would have remembered it
4  if Shelly Brock's name was on it.
5      THE WITNESS:  Charlie.
6      MS. CITERA:  Charlie Brock.
7      MS. ST. PETER-GRIFFITH:  Oh, Charlie.  I was
8  going to say that Shelly Brock was a name that I'd
9  never heard of before.
10      THE WITNESS:  I don't even think he has a
11  relative by that name.  These look like all
12  presentations.
13      MS. ST. PETER-GRIFFITH:  Yeah, the earlier ones
14  are presentations.
15      MS. CITERA:  No, I looked through it.  I didn't
16  see it.
17      THE WITNESS:  Oh, you saw it, okay.
18
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Okay, well, we'll go back to that.
21      A.  Okay.
22      Q.  Other than AWP, what additional matters

Page 65

1  did you discuss with Mr. Sellers?
2      A.  We talked about the compliance activities
3  in that time frame that were relevant -- that were
4  provided to -- to the division, and while I was
5  busy -- I was participating in providing a lot of that
6  training activity or would have been one of the
7  attorneys providing that training activity, it was
8  refreshing my recollection and confirming my
9  understandings.
10      Q.  What did he tell you that refreshed your
11  recollection and confirmed your understanding?
12      A.  That we gave presentations to various
13  internal client groups within Abbott, specifically
14  HPD, on fraud and abuse.
15      Q.  To various client groups, did you say?
16      A.  Internal client, my clients.  As an Abbott
17  attorney, it would be my clients.
18      Q.  Okay, not Abbott clients?
19      A.  Not Abbott customers.
20      Q.  Customers, okay.
21      A.  Clients as an attorney.  Mike was my
22  client.

17  (Pages 62 to 65)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 66

1    Q.  Okay, and presen -- what else did Mike
2  Sellers tell you?
3    A.  I'm having difficulty differentiating what
4  he told me versus what I knew.  The purpose of the
5  call was to talk about the compliance activities in
6  HPD in the relevant time frames.  So it would have
7  been -- as a broad matter, it would have been that.
8  So it was fraud and abuse, the guidelines, the
9  operating guidelines, the policy, procedures.  We
10 talked about the handbook that followed the
11 guidelines.
12   Q.  Is that the Handbook For Business
13 Executives?
14   A.  That's the Fraud and Abuse Handbook.  I
15 don't remember the exact -- that's the -- that might
16 be the business -- the proper name, but it was the
17 Fraud and Abuse Handbook from 2000 -- 2000.
18   Q.  From 2000?
19   A.  Yes.
20   Q.  Okay.  Well, we'll go over it later.  What
21 else -- what policies did you discuss with
22 Mr. Sellers?

Page 67

1    A.  We talked about the reimbursement poli --
2  corporate policy and the HPD procedure on
3  reimbursement.
4    Q.  Anything else?
5    A.  Not that I can recall.
6    Q.  Okay, is there anything else -- how long
7  did your conversation with Mr. Sellers last?
8    A.  Between thirty minutes and an -- and an
9  hour.
10   Q.  Is there anything else that you recall him
11 telling you?
12   A.  Retirement wasn't that fun.
13   Q.  Toni keeps him busy?
14   MS. CITERA:  Tina.
15   MS. ST. PETER-GRIFFITH:  Or Tina, okay.
16   MS. CITERA:  Or really you guys.
17   THE WITNESS:  I mean we had personal -- I
18 hadn't -- he had moved to Hospira in 2004.  I hadn't
19 seen him since, so -- I worked with him a long time,
20 so we also spent time just chatting.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 68

1    Q.  Okay, anything else that you can recall
2  that -- other than the personal conversations that
3  educated in preparation for today's deposition?
4    A.  Not that I can recall.
5    Q.  Okay, what about your conversations with
6  Ms. Tobiason?  First, did you speak with her in
7  person?
8    A.  No, it was by phone.
9    Q.  How long was your phone call?
10   A.  They were scheduled an hour, and I
11 don't -- again, I would say a half hour to an hour.  I
12 don't recall any of the -- you know, for all of those,
13 they were all scheduled an hour, and I don't know that
14 we took the full hour for any of them.  We may have.
15   Q.  And what did you discuss with Miss
16 Tobiason?
17   A.  We talked about -- she described -- again,
18 generally she educated -- reeducated me on Medicare
19 pricing -- Medicare/Medicaid pricing arrangements, HIP
20 codes, DRGs, et cetera.
21   Q.  Did you say HIP codes?
22   A.  (Witness nodding).  I think there's -- HPT

Page 69

1  codes?
2    MS. CITERA:  I think he means HICPICs.
3    MS. ST. PETER-GRIFFITH:  HICPICs, okay.
4    THE WITNESS:  HICPICs?  Some -- okay, yeah,
5  I'm --
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  DRGs, okay.
9    A.  So we talked about just the regulatory
10 environment around reimbursement.
11   Q.  What about the regulatory environment
12 abound -- abound -- around reimbursement?
13   A.  Just she would have mentioned -- she would
14 have described the structure of it, like you said,
15 with HIP codes --
16   Q.  HICPICs?
17   A.  HICPICs, sorry.  (Continuing) -- DRGs,
18 billing codes.  We talked about AMP and best pricing.
19 We talked about her recollections of -- which were
20 similar to Mike's on the practice of -- of hand -- of
21 how AWP was handled within the division.
22   Q.  Okay, what did she tell you about how AWP

18 (Pages 66 to 69)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                        March 12, 2008

Page 70

1    was handled within the division?
2        A.  Her recollection was that AWP was not
3    something that they talked to customers about.
4        Q.  Okay, anything else?
5        A.  Talked about the process for her
6    involvement in formulating the -- ultimately the OEC
7    policies and procedures in 2003, in -- in 2004 and
8    beyond.
9        Q.  And what policies did she formulate?
10       A.  She was involved in -- in the
11   reimbursement information and support policy and
12   procedure.
13       Q.  Okay, what did she tell you about that?
14       A.  Just that she -- she was involved in
15   reviewing and pre -- reviewing and revising as
16   appropriate, to -- to reflect their understanding of
17   the policy.
18       Q.  To reflect whose understanding of the
19   policy?
20       A.  Well, hers would have been her
21   understanding of it.  I mean she was one -- she was --
22   there was input -- she was one input.  So it would

Page 71

1    have been hers.
2        Q.  Okay, anybody else that participated in
3    the drafting of that reimbursement policy?
4        A.  I don't know.
5        Q.  Did she mention anybody else?
6        A.  I know in the drafting -- in the
7    implementation -- in the formulation of it, Cliff
8    Berman would have been involved, Katherine Szazdanoff
9    would have been involved.
10       Q.  Okay, anything else?
11       A.  I don't think so.
12       Q.  Other than the OEC policy, was there
13   anything else that she discussed with you?
14       A.  Other than what I've mentioned, no.
15       Q.  Okay, what did she tell you about AMP and
16   best pricing?
17       A.  She would just have described how Abbott
18   would be responsible for providing AMP and best
19   pricing information in periodic reports that it had to
20   submit to the government.
21       Q.  During what period of time was that
22   referencing?

Page 72

1        A.  I don't know what -- I don't -- she -- she
2    left HPD at some point in time and became part of OEC.
3    So I don't -- I don't know what time frame she would
4    have been referring to.
5        Q.  You don't know whether it was her OEC
6    experience or her HPD experience?
7        A.  I don't know that -- how easily those are
8    differentiated.
9        Q.  So you don't know when she was talking
10   about AMP and best pricing whether she was talking
11   about, for example -- well, when was OEC created?
12       A.  OEC?  Charlie was appointed Chief
13   Compliance Officer late 2000.
14       Q.  In late 2000?  Okay.  Do you recall
15   whether or not she was involved with OEC then?
16       A.  Initially, she was -- she advised -- she
17   advised me that she was not.
18       Q.  She was not, okay.  So in --
19       A.  But she also -- she was not with HP -- she
20   had moved over to ADD at some point as well.
21       Q.  Okay, so the information that she gave you
22   concerning AMP and best pricing, you don't know if it

Page 73

1    was, say, post 2002 when she joined OEC or if she was
2    referencing her HPD experience?
3        A.  The information she provided was not --
4    was not year specific.  It was general information
5    about the process.
6        Q.  What about concerning HICPICs codes, DRGs
7    and the structure of the Medicare and Medicaid pricing
8    arrangements?
9        A.  It was a summary of that arrangement -- of
10   those arrangements.  It was not -- it would not have
11   been, In 1995, XY and Z, 1996 only X and Y.  It was
12   only a general summary of those pricing structures --
13       Q.  Do you --
14       A.  -- or coding structures.
15       Q.  Okay.  Did she -- well, what else do you
16   recall about the summaries that she provided?
17       A.  That -- in DRGs, that the vast
18   predominance of HPD's business were tied to DRGs
19   because it was -- it was a hospital
20   institutional-based sales customer base.
21       Q.  Okay, what else did she tell you?
22       A.  That's all that I can recall.

19 (Pages 70 to 73)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 74

1      MS. ST. PETER-GRIFFITH: Okay. Why don't we
2  take a break now? We've got to change the tape and --
3      THE WITNESS: Okay.
4      MS. ST. PETER-GRIFFITH: -- give you a little
5  break.
6      THE VIDEOGRAPHER: Going off the record. It's
7  9:47 a.m.
8           (Recess taken.)
9      THE VIDEOGRAPHER: Beginning Videotape No. 2 in
10  the deposition of Mr. Fishman. We're back on the
11  record as of 10:05 a.m.
12
13  BY MS. ST. PETER-GRIFFITH:
14      Q. Mr. Fishman, is there anything more that
15  you can recall that Virginia Tobiason told you in your
16  conversation with her?
17      A. No.
18      Q. We've covered everything?
19      A. That I can recall, yes.
20      Q. Okay. And we've covered everything that
21  you can recall in your conversations with Mr. Sellers?
22      A. Yes.

Page 75

1      Q. Well, what did you discuss with Mr. Brock
2  in preparation for today's deposition?
3      A. Specifically, we talked about the
4  creation -- his appointment as Chief Compliance
5  Officer, that -- the timing of all the events I'll be
6  describing helped put them in sequential order for
7  me -- the creation of his organization, the OEC,
8  people -- people he brought into the O -- into his
9  organization, the activities that he engaged in
10  establishing a -- not so much a charter, but a -- a
11  work -- a work plan for what the OEC does, his
12  recollections about the creation and timing of the
13  policies and procedures, OEC policies and procedures.
14      Q. Anything else?
15      A. I think that covers -- covers it
16  generally.
17      Q. Do you recall what specifics --
18  specifically he told you about each of these?
19      A. He told me that he was appointed Chief
20  Compliance Officer I want to say December '0 -- 2000,
21  November of 2000, I don't remember exactly which
22  month, late in 2000, that he brought on in some time

Page 76

1  frame of 2001 Katherine Szazdanoff, that originally
2  OEC reported in through the General Counsel, and so
3  Katherine, who's also an attorney, was part of OEC but
4  was in a legal capa -- again as a legal representative
5  of the company, and then the creation of this
6  Safeguarding Trust CD in 2002. They put together a
7  training -- a web-based training program called LERN,
8  L-E-R-N, that was part of a kind of off-the-shelf
9  educational program from a vendor, and so it was a
10  creation -- the creation of that as a company-wide
11  program; talked about his reporting responsibilities,
12  that a -- that he originally reported in to the
13  General Counsel. He also was responsible for
14  reporting to the Board of Directors, both as a full
15  board and then there was a -- I have to admit I don't
16  remember which committee. There was a
17  second committee -- a separate committee within the
18  Board that he reported to. He had -- so he had at
19  least two annual interactions with the Board. There
20  was also a quarterly gathering of the Business Conduct
21  Committee within Abbott. That was an Abbott
22  organization that was comprised of all the business

Page 77

1  Presidents, all the division Presidents and other
2  executives within the organization, and he was
3  responsible for reporting to them on compliance
4  matters broadly.
5      Q. What did he tell you about his reporting
6  to them on compliance matters?
7      A. That they had quarterly meetings and
8  talked about compliance issues within the corporation.
9      Q. Anything else?
10      A. It was broad subject matters. No.
11      Q. Okay, well, what about specifics?
12      A. About which?
13      Q. About any of these.
14      MS. CITERA: Objection, form.
15      THE WITNESS: Can you provide the subject --
16  can you provide the specific?
17
18  BY MS. ST. PETER-GRIFFITH:
19      Q. Sure.
20      A. And then I can talk about it specifically.
21      Q. Well, I mean you've just gone over the
22  broad subject matters.

20  (Pages 74 to 77)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 78

1    A.  Right.
2    Q.  Let's talk about the -- his reporting to
3  the division Presidents on a quarterly basis.  So what
4  did he tell you about that?
5    A.  He told me that the Business Conduct
6  Committee met quarterly and that they -- and he was
7  responsible for identifying issues, trends within --
8  within the industry, within corporate world generally.
9  He talked about various compliance issues again,
10  whether it would be -- he reported in on calls that
11  came in through -- the other thing he talked about is
12  they created a hotline within -- within OEC.
13  Previously within the Code of Business Conduct, there
14  was -- as the pamphlet reflected, there was a number
15  to call in with any report -- any issues that an
16  employee wanted to report.  That was a call that went
17  into the General Counsel's Office, and it would have
18  been triaged from there.  Then it became -- you know,
19  when OEC came into place, one of the things he
20  established was an OEC hotline that a bunch --
21  eventually was manned by a vendor with prepared
22  scripts, and then there's someone within OEC that

Page 79

1  those -- when those calls come in, they get referred
2  to a desk within OEC that then they get triaged to and
3  sent out to the appropriate functional area depending
4  on what a call might come in or about.
5    Q.  Did he discuss any calls that came in
6  concerning AWP or price reporting?
7    A.  He did not.
8    Q.  Okay, what about various matters that he
9  went over with the division Presidents, did he discuss
10  with you AWP --
11    A.  He didn't.
12    Q.  -- WAC or price reporting?
13    A.  He did not.
14    Q.  What about spread or spread marketing?
15    A.  He did not.
16    Q.  What else do you recall about your
17  conversation with him concerning the quarterly
18  gatherings of the Business Conduct Committee?
19    A.  Only that in -- over time, and it may be
20  post 2003, that the composition of the committee was
21  expanded to include head of our Clinical Group,
22  Pharmaceutical Clinical Group, a Global -- GPR, Global

Page 80

1  Pharmaceutical Research & Development organization.
2  That's about it.
3    Q.  What did you learn about the composition
4  of the Business Conduct Committee, just that it
5  contained or was comprised of all the division
6  Presidents?
7    A.  Right.  It was refreshing my memory that
8  it existed.  I did -- in the deep recesses of my mind
9  knew it existed.  I did not have interaction with
10  them.  So he reminded me that it existed and then
11  described the composition, that it would have been all
12  the division Presidents, executives, General Counsel,
13  the Chief Financial Officer, Internal Audit.
14    Q.  Did you do anything to ascertain whether
15  or not the Business Conduct Committee addressed the
16  issue of price reporting, AWPs or spreads or spread
17  marketing?
18    A.  We did not have that conversation.
19    Q.  Did you have that conversation with
20  anybody?
21    A.  No.
22    Q.  Did you research that with anybody?

Page 81

1    A.  No.
2    Q.  Okay.  And did you find out what --
3  from -- either from Mr. Brock or from anyone what was
4  discussed at the Business Conduct Committee meetings?
5    A.  Specifically, no, but generally, it would
6  have been the sub -- the subject matters that I
7  described, the reporting on the type of calls that
8  came in from the hotline, maybe the numbers, how
9  they -- you know, the dispositions of them, other
10  training, you know, FCPA, Federal Corrupt Practices
11  Act, antitrust matters, employment matters, conflicts
12  of interest.  So again, a broad -- a broad compliance
13  agenda as opposed to limited to healthcare compliance.
14    Q.  Okay, did you -- did you discuss the
15  specifics of the various compliance matters that were
16  discussed with the Business Conduct Committee other
17  than what you've just indicated?
18    A.  I did not.
19    Q.  Do you know whether Mr. Hodgeton,
20  Mr. Burnham, Mr. Gonzalez or Mr. White were members of
21  the Business Conduct Committee?
22    MS. CITERA:  Objection to form.

21 (Pages 78 to 81)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 82

1      THE WITNESS: I don't know. I -- I don't know
2  when the Business Conduct Committee was constituted to
3  know whether Hodgson -- Tom Hodgson, was -- he retired
4  at some point in the mid '90s, I don't know exactly
5  when. Mr. Gonzalez certainly would have been as
6  President of AHD and AD -- and HPD, and I believe that
7  the CEO was also -- no, he was not. He -- they
8  reported to him. So Burnham would probably not have
9  been, and White would have been in his capacity as
10 President of ADD prior to becoming CEO.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Did you do anything to research what
14 Mr. White's or Mr. Gonzalez's involvement was with the
15 Business Conduct Committee?
16     A.  No.
17     Q.  Jumping back to your conversation with
18 Mr. Brock, what did he tell you about his reporting
19 responsibilities to the General Counsel?
20     A.  Just that he -- that was the reporting
21 structure and then -- there was not a detailed
22 conversation about it.

Page 83

1      Q.  And then at some point it changed?
2      A.  Correct.
3      Q.  Who -- how did it change?
4      A.  It changed -- he became a direct report to
5  the CEO, which would have been Miles White at the
6  time.
7      Q.  And when did that happen?
8      A.  2003 time frame.
9      Q.  And did he tell you why that happened?
10     A.  It was -- he described two different
11 reasons. It was part of a -- a component of the --
12 and I don't know who issued it. I think it may have
13 been -- actually, it may have been your organization.
14 (Continuing) -- the seven elements of an effective
15 compliance program and it was also something that I
16 believe was specifically agreed to in the Ross CIA.
17     Q.  What did he tell you about the web-based
18 LERN program?
19     A.  Just that they created it and that -- I
20 actually had a more detailed conversation about that
21 with Rick Matejh.
22     Q.  Okay, we'll go over that in a sec, but I

Page 84

1  just want to exhaust your memory of your conversation
2  with Mr. Brock.
3      A.  Okay.
4      Q.  Do you recall anything more?
5      A.  No, I believe we've covered the main
6  subject matters.
7      Q.  Anything more about Safeguarding Trusts
8  you recall about your conversation with Mr. Brock?
9      A.  There wasn't anything really specific
10 about it other than it was part of his -- part of what
11 he accomplished in delivering materials out of OEC.
12 It was a creation of a CD training program that would
13 supplement anything that Legal or OEC did
14 face-to-face.
15     Q.  Did he tell you who -- who was actually
16 responsible for creating it?
17     A.  God, he mentioned -- my recollection is
18 that it was premised off just an existing educational
19 program and that it was tailored -- they were able to
20 tailor some of its components to Abbott's Code of
21 Business Conduct.
22     Q.  Was this a new creation or a new expansion

Page 85

1  of information concerning the Code of Business Conduct
2  or did it just incorporate the --
3      A.  I believe it was --
4      MS. CITERA:  Objection to form.
5      THE WITNESS:  I believe it was a different
6  medium.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  When you say "a different medium,"
10 meaning a different way to --
11     A.  A different pamphlet -- a pamphlet versus
12 a potential -- I don't know if it's inter -- I guess
13 you'd call it interactive in that if you clicked on --
14 if you clicked on an answer "yes," you can -- you
15 know, in working with a vendor, you can take -- you
16 can take -- you can go ahead and have them fly you to
17 Bermuda. If you clicked "yes," there would be
18 something that would then come up and say, no, this is
19 not right for... you know, please look at, and there'd
20 be tabs and you'd look at why -- you know, what's the
21 specific policy that this wouldn't be appropriate
22 under and conduct -- and activities like that. So it

22  (Pages 82 to 85)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

Page 86

1  was interactive in that regard, where the pamphlet
2  itself was, you know, just -- you know,
3  two-dimensional.
4
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Okay, so it was just a different way to
7  essentially deliver --
8      A.  Present the same --
9      Q.  -- and present the same material in the
10 Code of Business Conduct?
11     A.  Correct.
12     MS. CITERA:  Objection to form.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay.  And that was developed on
16 Mr. Brock's watch, and that's what he described to
17 you?
18     A.  Yes.
19     Q.  Okay, what did he tell you about the
20 people who he brought in?  Well, let me ask you this.
21 Did I bring in Virginia Tobiason?
22     A.  Yes.

Page 87

1      MS. CITERA:  Objection to form.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Did he tell you why?
5      A.  He brought her in for her reimbursement
6  experience.
7      Q.  Did he have trust in her reimbursement
8  experience?
9      MS. CITERA:  Objection to form.
10     THE WITNESS:  I -- I -- I can't answer that.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  What did he tell you about bringing her
14 on?
15     A.  Just that he did.  It was not -- there was
16 not a detailed discussion of the hiring considerations
17 of who he brought on, only that he did bring on these
18 certain people.
19     Q.  And who were the other people that he
20 brought on?
21     A.  Katherine Szazdanoff, Rick Matejh.  Those
22 were the people that he would have mentioned that

Page 88

1  he -- that he hired.  They then created staffs as
2  well.
3      Q.  Anything else that you can recall
4  concerning your conversation with Mr. Brock, any other
5  specifics?
6      A.  Well, as part of the structure of OEC,
7  there was also a divisional Ethics Compliance Officer,
8  which were people who were embedded in the divisions
9  reporting to the President -- reporting on a dotted
10 line to the Presidents of the divisions, sitting on
11 the divisions, the President's staff, but were part of
12 OEC.
13     Q.  What were the responsibilities of the
14 divisional Ethics Compliance Officers?
15     A.  To implement OEC's policies and its
16 charter precisely to the division versus at a
17 corporate level.
18     Q.  Were they responsible for enforcing
19 them --
20     MS. CITERA:  Objection to form.
21
22 BY MS. ST. PETER-GRIFFITH:

Page 89

1      Q.  -- enforcing the OEC policies?
2      A.  It's a -- enforcement is a tricky area
3  when you talk about who is responsible for enforcing.
4  They would have had oversight on -- regarding --
5  regarding their -- their activities for the divisions.
6  Enforcement in terms of employment matters wouldn't
7  have come from OEC.  It would have been divisional HR.
8      Q.  Anything else that you can recall about
9  your discussions with Mr. Brock?
10     A.  No, I think that's -- that captures what I
11 recall.
12     Q.  Okay, who's Mr. Matejh?
13     A.  Rick Matejh is -- was brought in to OEC
14 mostly for his IT skills, I believe, and what he was
15 involved in doing was creating -- helping deliver,
16 technically deliver the LERN -- the LERN program.
17     Q.  Okay, and what did you learn from him?
18     A.  I learned -- I learned from him about
19 LERN.
20     Q.  Okay.  Is it "learn" or "just learned," do
21 you recall?  Is it "learn"?
22     A.  There's no "just" -- are you saying "just"

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 90

1  in the title?  There's no "just" in the title.
2      Q.  Oh, okay.
3      A.  It's capital L -- all caps L-E-R-N.
4      Q.  Okay.
5      A.  I learned from Rick kind of how he went
6  about creating the program, identifying the vendors,
7  establishing the wherewithal and the mecha -- the
8  technical aspects of delivering the program.
9          And these were off-the-shelf
10 programs, so they were not tailored to Abbott, and so
11 it -- he wouldn't have been involved in the content.
12 I mean he was involved in technically delivering it.
13     Q.  Okay.  Let me ask you -- I got -- I need
14 to go back and ask you how long your conversation with
15 Mr. Brock was?
16     A.  Same answer.  It was a by phone, scheduled
17 for an hour, and it took somewhere between half to --
18 half hour to an hour.
19     Q.  Thirty to sixty minutes, okay.  How long
20 was your conversation with Mr. Matejh?
21     A.  He was sick, I remember that.  Similar.
22     Q.  Okay.  I got to give you credit.  It would

Page 91

1  take me much longer than sixty minutes to try and
2  learn computer stuff.
3      A.  Well, I didn't -- I can't tell you what
4  systems they used to deliver it.  I -- again, it was
5  just he told me what his roles were.  He did not get
6  into, you know, that they selected this -- this type
7  of server or that type of server.  I'm not going to
8  testify about that today.
9      Q.  Anything that you can recall -- I have to
10 tell you I'm not prepared to answer -- or ask those
11 questions.  Anything else that you can recall about
12 Mr. Matejh and your conversation with him?
13     A.  He identified the audience, the original
14 audience when LERN was first rolled out that were
15 targeted for participation.  He identified the
16 tracking.  He also described the timing and how --
17 when it first rolled out.  And again, some of this is
18 refreshing my memory because I had to take these
19 modulars -- I took these modules.  So it was not
20 teaching me about this.  It was more of a general
21 discussion because I was also a participant.  So I had
22 firsthand knowledge about these modules.

Page 92

1      Q.  Who was the original audience?
2      A.  The original audience was twofold when it
3  first came out in, oh, boy, '01, '02.  I'm not -- if
4  Charlie just came onboard -- it may have taken the
5  full year or most -- a good chunk of '01 to create the
6  program.  So I don't know if it rolled out in '01 or
7  '02.
8          The original audience were -- was
9  field-based sales and managers above grade 18.  Or I
10 shouldn't say managers.  Employees above grade 18.
11     Q.  Okay, and what are field-based sales?
12     A.  People out -- sales reps out in the --
13 out -- not -- you know, out in the field, out --
14     Q.  Okay, and what was the -- you said it
15 was -- probably it took about a year.  So '02, is that
16 when they --
17     A.  I -- I -- sometime in -- well, sometime in
18 '01 and '02.  I don't actually recall the precise
19 timeline.
20     Q.  Did Mr. Matejh discuss the exact content
21 of the LERN program?
22     A.  He described the subject matters of the

Page 93

1  module, and I also have personal recollection of some
2  of those modules, having taken them.
3      Q.  Okay, did -- did these modules that were
4  presented to the field-based sales rep and the
5  managers above grade 18 discuss anything concerning
6  AWP, spreads, spread marketing or pricing?
7      A.  They did not?
8      Q.  Why not?
9      MS. CITERA:  Objection to the form.
10     THE WITNESS:  That wasn't the subject matter
11 of -- of the LERN modules.
12
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  What was the subject matter of the LERN
15 modules?
16     A.  Conflicts of interest, unfair business
17 practices, antitrust, kind of careful communications,
18 confidenti -- I guess that may have been tied to
19 confidentiality, handling trade secrets and know-how,
20 employment interactions, you know, whether it was
21 specifically kind of sexual harassment or -- that was
22 kind of a hot topic for -- in that time frame.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 94

1  Originally, there was a fraud and abuse one.
2      Q.  Okay, and what was contained in the fraud
3  and abuse?
4      A.  It was identified as being particularly
5  relevant to the sales reps in most -- in really their
6  interactions with healthcare professionals when it
7  comes to gifts and entertainment, it dealt with
8  medical, you know, grants and -- yeah, those -- those
9  types of activities.
10     Q.  What was the policy during this pre-2003
11 time period concerning discussions with or
12 presentations of or provision of AWP or spread
13 information by sales reps or National Account Managers
14 or anyone else, for that matter, to Abbott clients?
15     MS. CITERA:  Objection to the form.
16     THE WITNESS:  There was not a specific policy
17 pertaining to AWP.  There was a -- part of the
18 corporate Code of Business Conduct, there was an
19 obligation of employees to comply with the laws.  To
20 the extent the law required or precluded activities to
21 be in compliance, then the employee would be expected
22 to be in compliance.

Page 95

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  How would the employee know whether he was
4  in compliance or not?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  With respect to training, Legal
7  made periodic presentations on the subject matter --
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay, did --
11     A.  -- dealing with fraud and abuse.
12     Q.  And did Legal make any presentations
13 concerning AWPs, the provision of spread information
14 or spread marketing?
15     A.  We did not.  I did not.
16     MS. CITERA:  Objection.
17     THE WITNESS:  I'm not aware of anybody in Legal
18 doing it.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  So prior to the written 2003 policy
22 concerning AWPs and discussions of spreads, there was

Page 96

1  no prior policy that existed at all within Abbott HPD
2  concerning AW -- the provision of AWP information,
3  spreads or spread marketing?
4      A.  There was --
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  There was no specific policy
7  pertaining to that subject matter other than there was
8  a corporate policy to comply with laws.  To the extent
9  the laws defined AWP and spread and activities
10 associated with those terms, then the expectation was
11 that the employees would be in compliance with those
12 laws.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  How were the employees educated about
16 those laws?
17     MS. CITERA:  Objection to form.
18     THE WITNESS:  As I described previously and my
19 understanding is that there was a practice within HPD,
20 and based on Joe Fiske's -- Joe Fiske's a -- I don't
21 think I've mentioned his name -- was one of the
22 deponents that -- whose deposition I reviewed.

Page 97

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.
4      A.  And then with respect to Joe, his comments
5  regarding PPD, it was a practice not to talk about AWP
6  with the exception of PPD, the managed care sales
7  force.
8      Q.  It was a practice, but was it -- was there
9  a policy prohibiting it?
10     MS. CITERA:  Objection to form.
11     THE WITNESS:  There was no specific policy
12 pertaining to AWP.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Was there a specific policy concerning
16 spreads or spread marketing prior to 2003?
17     A.  There was no specific policy --
18     MS. CITERA:  Objection, form.
19     THE WITNESS:  -- pertaining to spread or spread
20 calculation, whatever you said.
21
22 BY MS. ST. PETER-GRIFFITH:

25  (Pages 94 to 97)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 98

1    Q.  So prior to 2003, was it permissible for
2  Abbott sales force members or National Account
3  Managers or Contract Marketing personnel to provide
4  spread or AWP information to Abbott's customers?
5    MS. CITERA:  Objection to form, outside the
6  scope.
7    MS. ST. PETER-GRIFFITH:  Outside the scope?
8    MS. CITERA:  You're asking a hypothetical.  I
9  mean you're --
10    MS. ST. PETER-GRIFFITH:  I'm not asking a
11  hypothetical.  I'm asking him what was the policy.
12    THE WITNESS:  I -- there was no specific
13  policy --
14    MS. CITERA:  That's not the question you asked.
15    THE WITNESS:  I reiterate that there was, as
16  I'm -- I've learned through reading deposition
17  testimony, there was a practice not to provide that
18  information to the customers.
19
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  But was there prohibition?
22    MS. CITERA:  Objection to the form, outside the

Page 99

1  scope.
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Is that something that would have been
5  permissible.
6    MS. CITERA:  Same objections.
7    THE WITNESS:  There was a practice not to do
8  it.  Permissible -- it was not -- there was no policy,
9  specific policy addressing it.  We had a corporate
10  policy to adhere to laws and regulations.  To the
11  extent there was law and regulation that defined those
12  terms and addressed those terms, the expectation was
13  that Abbott employees would not do it.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  How would Abbott employees know that they
16  couldn't do it?
17    MS. CITERA:  Objection to the form.
18    THE WITNESS:  What I'm advised is that there
19  was a practice within those businesses -- within the
20  businesses that I have mentioned, HPD and PPD, not to
21  talk about AWP.
22

Page 100

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  What were the consequences if that
3  practice was not followed?
4    A.  I don't know.
5    MS. CITERA:  Objection to the form, outside the
6  scope.
7
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  How would the practice have been
10  communi -- this particular practice -- how was that
11  practice communicated to the Abbott HPD employees?
12    A.  I don't know that.
13    Q.  Did you consider any testimony from Deb
14  DeYoung concerning the provision of spread materials?
15    A.  I did not see -- I did not see any
16  testimony from Deb DeYoung.
17    Q.  Why not?
18    A.  I wasn't --
19    MS. CITERA:  Objection to the form.
20    THE WITNESS:  -- provided.
21
22  BY MS. ST. PETER-GRIFFITH::

Page 101

1    Q.  Let me ask you this.  In preparing for
2  today's deposition, did you only read testimony
3  provided to you by Jones Day?
4    A.  Yes.
5    Q.  Okay.  What else did you do to seek out
6  other testimony that might inform you concerning the
7  practices or policies within HPD?
8    A.  I talked -- within HPD?  I talked to Mike
9  Sellers and Virginia Tobiason.  It would not have
10  occurred to me to talk to Deb DeYoung because she
11  was in PPD.
12    Q.  Did you -- did Virginia Tobiason or Mike
13  Sellers tell you what the consequence was for -- if
14  someone provided AWP information or spread information
15  to an Abbott client or customer prior to '03?
16    MS. CITERA:  Objection to form.
17    THE WITNESS:  They did not tell me that.
18
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Did you do any research as to what would
21  happen if this practice was violated?
22    A.  No.

                              26 (Pages 98 to 101)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 102

1    Q.  Was it an important practice to Abbott
2 and -- Abbott HPD?
3        MS. CITERA:  Objection to the form, outside the
4 scope.
5        THE WITNESS.  I think you're asking my opinion.
6 This goes to the facts.
7
8 BY MS. ST. PETER-GRIFFITH:
9    Q.  No, I want to know whether Abbott
10 considered it an important practice.
11    A.  They considered -- they --
12       MS. CITERA:  He's not here to testify about
13 opinions of the corporation.
14       THE WITNESS:  "Important" is a word -- it was a
15 practice, and "important" is a relevant term, and I'm
16 not here to give an opinion as to whether it was
17 important or not important.
18
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Was it something that Abbott expected its
21 employees to follow?
22       MS. CITERA:  Objection to the form, outside the

Page 103

1 scope.
2        THE WITNESS:  Abbott expected its employees to
3 follow the -- to be in compliance with laws.  To the
4 extent the law defined these terms and created
5 proscribed and prescribed activities, we would --
6 Abbott would have expected its employees to abide by
7 that.  On top of that, there was a practice within the
8 two organizations that I'm aware of that advised its
9 employees not to talk about AWP.
10
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  And you know about this practice from your
13 review of whose testimony?
14    A.  I know about this for -- from two -- two
15 different sources, my direct conversations with Mike
16 Sellers and Ginny Tobiason and in reviewing the
17 deposition testimony -- portions of the deposition
18 testimony of the people that I mentioned.
19    Q.  Okay.  Prior to 2003, what statutes should
20 Abbott's HPD employees have referred to for
21 information concerning AWP, spread and spread
22 marketing?

Page 104

1        MS. CITERA:  Objection to the form, outside the
2 scope.
3        MS. ST. PETER-GRIFFITH:  It is not outside the
4 scope.
5        MS. CITERA:  I disagree.
6        MS. ST. PETER-GRIFFITH:  It is directly on
7 point.
8        THE WITNESS:  Abbott employees should not have
9 been referring to statutes.  They should have been
10 consulting with the Legal Division if they had
11 questions about -- if there were statutory regulatory
12 questions, they should have consulted Legal.
13
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Okay, did any HPD employees consult Legal
16 concerning AWP, spreads or spread marketing?
17       MS. CITERA:  Objection to the form.
18       THE WITNESS:  I can say nobody consulted me.  I
19 am aware of ongoing investigation and lawsuits that
20 our Litigation Department would have been actively
21 involved in, and any that -- it was the practice
22 within the Legal Division that, if there was any

Page 105

1 questions that arose regarding AWP, that they would be
2 directed to Litigation.
3
4 BY MS. ST. PETER-GRIFFITH:
5    Q.  Who in Litigation?
6    A.  I believe that changed over time, and I
7 have heard names, and I don't -- I don't -- I could
8 not give you timelines of who was responsible.
9 Ultimately -- I mean whoever was in charge of -- the
10 head of the division, of the department would be
11 ultimately responsible for all litigation within
12 Abbott.  Who was assigned to a given AWP piece of
13 litigation, I've heard names and I couldn't give you
14 precise time lines.
15    Q.  What did you do to educate yourself about
16 inquiries from HPD employees concerning AWP spread or
17 spread marketing and compliance with federal and state
18 regulations concerning AWP, spread and spread
19 marketing?
20       MS. CITERA:  Objection to the form.
21       THE WITNESS:  I would not have taken steps to
22 educate myself on that matter because it was something

27 (Pages 102 to 105)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 106

1  I was -- would not have addressed, but rather, would
2  have directed Litigation's involvement.
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay, but I mean for -- in preparing --
6  preparation for today's -- for your 30(b)(6)
7  testimony, you're saying that you didn't do any
8  research on that --
9      MS. CITERA:  Objection to form.
10
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  -- or you didn't take steps to educate
13  yourself as to inquiries from HPD employees?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  I had communications with Mike
16  Sellers and Virginia Tobiason.
17
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Okay, but they're not in the Legal
20  Department, right?
21      A.  No.  They're -- you asked me about HPD
22  inquiries.

Page 107

1      Q.  No, no, no, I mean inquiries to the Legal
2  Department.  Because you testified earlier that
3  they -- that the inquiries would have been made to the
4  Legal Department --
5      A.  Right.
6      Q.  -- right?
7      A.  Correct.
8      Q.  Okay.  What did you do to educate yourself
9  about what inquiries were made to the Legal Department
10  in preparation for today's testimony?
11      A.  I think any inquiries that would -- to the
12  extent they were any inquiries made of the Legal
13  Department, any calls that would have come in would
14  have been privileged.
15      Q.  So what you're saying is that -- well,
16  do -- let me ask you this question.  What did you do
17  to educate yourself about those communications?
18      MS. CITERA:  Objection to form.
19      THE WITNESS:  The question assumes that there
20  were communications.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 108

1      Q.  Were there communications?
2      A.  Not to my knowledge.
3      Q.  Okay, did you do anything to investigate
4  whether there were communications?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  I did not ask that specific
7  question of the people that I talked to.
8
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Okay, why not?
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  I think any communication, to the
13  extent there was any of those types of communications,
14  they would have been privileged.
15
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Well, that's not for you to determine,
18  respectfully, sir.  You're here as -- to testify as
19  the 30(b)(6) witness.
20          Is it your testimony that you did
21  nothing to ascertain whether any communications or any
22  inquiries were made within Abbott, HPD Legal -- or

Page 109

1  within -- by HPD employees within the Legal Department
2  to evaluate whether or not AWP, spread or spread
3  marketing contravened state and federal Medicare and
4  Medicaid statutes and regulations?
5      MS. CITERA:  Objection to the form.
6      THE WITNESS:  That's a different question than
7  you asked before.
8
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  How is it different?
11      A.  You asked me about contravention.  You
12  used the word "contravene," which supposes that the
13  question is you've already violated a law.  The first
14  question was whether or not any inquiries about AWP
15  were raised.
16      Q.  Okay, then let's start with that first
17  question.  What did you do to educate yourself about
18  whether any inquiries were made?
19      MS. CITERA:  Objection to the form.
20      THE WITNESS:  I did not ask other members of
21  the Legal Department whether they obtained -- received
22  calls about it.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 110

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  And you didn't do that, you testified,
4  because you thought they were privileged?
5      A.  Any communi -- I believe any communication
6  that would have subsequently occurred, had a call like
7  that been made, would be privileged.
8      Q.  What advice did Abbott's in-house Legal
9  Department give concerning AWP, spread or spread
10 marketing?
11     MS. CITERA:  Objection to form.
12     THE WITNESS:  That would clearly be --
13     MS. CITERA:  Privileged.
14     THE WITNESS:  -- privileged.
15     MS. ST. PETER-GRIFFITH:  Why is it privileged?
16 It goes to --
17     MS. CITERA:  It's privileged.
18     THE WITNESS:  You asked me about legal advice.
19     MS. CITERA:  Give me a break.  It's privileged.
20     MS. ST. PETER-GRIFFITH:  Okay, are you going to
21 be asserting an advice of counsel defense in this
22 case?

Page 111

1      MS. CITERA:  Oh, God.
2      MS. ST. PETER-GRIFFITH:  Are you, Toni?
3      MS. CITERA:  I'm not going there, Ann.  It's
4  privileged.
5      MS. ST. PETER-GRIFFITH:  I'm asking --
6      MS. CITERA:  I'm not going there.  It's
7  completely privileged.  We're not going there.
8      MS. ST. PETER-GRIFFITH:  Okay, I really think
9  you need to answer the question today because --
10     MS. CITERA:  I'm not answering that question.
11     MS. ST. PETER-GRIFFITH:  Okay, well, when we
12 come back here, it's going to be at Abbott's expense.
13     MS. CITERA:  You know what?  You've already
14 asked for a second day.  So, you know...
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  What else did you learn from Mr. Matejh?
18     A.  We talked about LERN, we talked about the
19 audience, the original audience.  He advised me that
20 as -- as the system became more fulsome and from an
21 operational standpoint they expanded -- they expanded
22 the audience to include all sales and marketing

Page 112

1  people, not just field sales.
2      Q.  Anything else?
3      A.  I talked to him about the -- kind of the
4  administrative operational process that he would have
5  been involved in regarding the OEC policies and then
6  the procedures that followed.
7      Q.  Anything else?
8      A.  I think he talked about the Safeguarding
9  Trust CD as well, and that would have -- I mean I may
10 be implying that that would have been something he was
11 involved in.  I don't recall.
12     Q.  Would that again be more of the technical
13 aspects as opposed to the substantive?
14     A.  Correct.
15     Q.  Okay, what about --
16     A.  Rick is not an attorney.
17     Q.  What about Ms. Szazdanoff, what
18 communications did you have with her?
19     A.  I had a phone conversation with her.  We
20 reviewed her tenure, her varied tenure at Abbott.
21 She'd had several different positions over time, and
22 we talked about those positions and how she landed in

Page 113

1  OEC and what her responsibilities were as Senior
2  Counsel within OEC reporting to Charlie Brock when
3  they reported in through the General Counsel.  We
4  talked about the activities OEC and Legal engaged in
5  when the Pharma Code came out in terms of operating --
6  operating guidelines, operating --
7      Q.  When -- oh, when was that, I'm sorry?
8      A.  Summer of 2002, I believe.
9      Q.  And when you say "Pharma," do you mean --
10     A.  I mean Pharma Research, the organization
11 Pharma.
12     Q.  Okay, just wanted to make sure what --
13     A.  No, I've used it twice.  I've used it
14 differently.  I understand.
15     Q.  Okay.
16     A.  And then I would have talked to her about
17 the specific role she played in marshalling the
18 policies and procedures in 2003, 2004 and beyond.
19     Q.  And what did she tell you about that?
20     A.  Which?  The last -- the last item?
21     Q.  The last -- yeah.
22     A.  She told me that, as Charlie's kind of

29 (Pages 110 to 113)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 114

1  chief lieutenant, she was responsible for working with
2  each of the -- working with -- by -- at this point in
3  time when we were doing policy -- when we were
4  creating policies, the Legal Division had -- Cliff
5  Berman was part of the Legal Division, so he -- as a
6  healthcare compliance attorney, so Cliff and Katherine
7  were actively involved in putting together the
8  policies that ultimately were approved by the
9  corporation.
10     Q.  Okay, and what policies were those?
11     A.  Oh, there were many policies.  There was
12  reimbursement information, there was no charge goods,
13  there was discounts and other price reductions, there
14  were -- there was program funding policies on
15  educational grants and clinical studies and continuing
16  legal education, there was -- there may have
17  actually -- there may have been other policies not
18  pertaining to healthcare compliance that I wouldn't
19  have focused on.
20     Q.  Did you discuss each of these with
21  Ms. Szazdanoff?
22     A.  No.

---

Page 115

1     Q.  Okay.
2     A.  You're asking me generally what policies
3  were there.
4     Q.  Okay.
5     A.  So I'm reciting from my recollection of
6  the policies as opposed to specific conversations I
7  had with Ms. Szazdanoff.
8     Q.  Did you have specific conversations with
9  Ms. Szazdanoff about any of these particular policies
10  that you can recall?
11     A.  We talked about the reimbursement
12  information and support policy.
13     Q.  The -- I'm sorry?
14     A.  The reimbursement information and support
15  policy.  I'm not sure that's the exact name, but
16  that's the general subject matter.
17     Q.  Okay, what did you discuss with her about
18  that?
19     A.  The timing in which the policy would have
20  come into being, who she worked with in helping
21  finalize that policy, and then we talked -- after
22  that, we talked about -- we talked about the process

---

Page 116

1  within the divisions that infrastructure that was
2  created to review policies and procedures.
3     Q.  And what'd she tell you about that?
4     A.  That the divisions create the Steering
5  Committees.  Each division had a Steering Committee
6  that was headed by the division President and
7  basically his or her direct staff that was responsible
8  for the division's implementation of the policy and
9  creation and implementation of -- less so about the
10  creation.  They would have reviewed and then
11  implemented the procedures relevant to the particular
12  division.
13     Q.  Is this like in a post '02 time frame?
14     A.  This is -- yes.
15     Q.  Okay.  And who did she tell you was on
16  the -- or did you discuss with her the HPD Steering
17  Committee?
18     A.  Yes.
19     Q.  What'd she -- what did you discuss with
20  her?
21     A.  We talked about its role, we talked
22  about -- I don't re -- I believe we talked -- we

---

Page 117

1  talked about a few specific names, but we talked about
2  its activities more.
3     Q.  Okay.  And what did you discuss?  What
4  were the particulars?
5     A.  What were the particulars?  We talked
6  about how the draft policies were presented and
7  explained to the Steering Committees for their both
8  edification and confirmation that that's their
9  understanding and that that's -- was something that
10  they would be able to work with.
11     Q.  Okay.  Did you discuss anything with her
12  pertaining to policies concerning AWP, spread or
13  spread marketing or WAC?
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  To the extent -- to the extent
16  the reimbursement information and support policy talks
17  about AWP, yes.
18
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay, would you recall specifically what
21  you discussed with her?
22     A.  There was no specific discussion of that.

---

30 (Pages 114 to 117)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 118

1    Q.  Okay, is there anything else you can
2  recall about your discussions with Ms. Szazdanoff?
3    A.  We talked about the Exceptions Review
4  Committee within the divisions, which addressed
5  something that would have come from -- predominantly
6  from Finance review of expense reports where people,
7  mostly sales reps, submitting sales expense reports
8  would have been raising issues as to whether or not
9  they were adhering to the procedures, policies and
10  procedures.
11    Q.  Anything else?
12    A.  No.
13    Q.  How long did you speak with
14  Ms. Szazdanoff?
15    A.  It was scheduled the same.  I recall we --
16  it didn't last -- it was scheduled late in the day,
17  and it didn't last as long -- I was glad it didn't
18  last until 6:00.
19    Q.  Okay, when you say it was late in the
20  day --
21    A.  5 -- it was a 5 to 6 call, and I was glad
22  it didn't last all the way to 6.  So...

Page 119

1    Q.  Did you just sit down one day and call all
2  these people?
3    A.  No, these were -- these were over periods
4  of time.
5    Q.  Who set up the calls?
6    A.  I believe our Litigation Group.
7    Q.  And did you choose who you were going to
8  speak with or was that -- were these individuals, the
9  list of individuals chosen for you?
10    A.  I'm sure the conversation was privileged.
11  It was conversations with counsel.  It was through
12  counsel.  It was through conversations with counsel
13  identifying people who could fill in areas that I
14  wouldn't necessarily have as much personal knowledge
15  about.
16    Q.  Did you independently request to speak
17  with anybody not suggested by counsel?
18    A.  In reviewing -- in reviewing the subject
19  matter, I would have answered, I don't know that, but
20  so and so probably does.  So the list was probably
21  derived mostly by that.  For instance, you know, when
22  was OEC created, I -- prior to talking to Charlie

Page 120

1  Brock, I couldn't have placed it in time, whether it
2  was 2000 or '99 or 2001.  I could have given
3  general -- general information, but in talking about
4  the subject matter for this deposition would have
5  identified people who could fill in specific gaps that
6  I had in facts.
7    Q.  Do you recall who you identified as people
8  you might want to talk to to fill in those gaps?
9    A.  I would have mentioned Charlie, I would
10  have mentioned Katherine, I would have mentioned
11  Ginny, I would have mentioned Rick Matejh, and I would
12  have mentioned Honey Lynn, I would have mentioned
13  Cliff, I would have mentioned Mike.  I mean I -- I
14  mean all of them.  I mean it's -- it was more of a --
15  it was kind of an interactive process.  So I don't
16  have precise recollection of -- of who I didn't
17  identify.
18    Q.  Okay, is there anyone that you -- in
19  preparation for today's deposition that you thought
20  you should have spoken with but didn't?
21    A.  Nobody that I can think of.
22    Q.  What did you -- what were your

Page 121

1  communications with Mr. Fischer?
2    A.  I spoke with Matt for far less time than
3  an hour.  We probably spoke for ten minutes.
4    Q.  Okay.
5    A.  And it was to ask him about his
6  recollection of conversations and activ -- and a
7  series of conversations and interactions he would have
8  had with Mike Tootell.
9    Q.  Okay, and what were the -- those
10  conversations and communications?
11    A.  It had to do with testimony or --
12  deposition testimony that Mike gave regarding his
13  concern about AWP.
14    Q.  Where did you learn about that testimony?
15    A.  From counsel.
16    Q.  Did you review it?
17    A.  I did not.
18    Q.  Okay.  And what did you learn about that
19  conversation between Mr. Fischer and Mr. Tootell?
20    A.  What I learned from Matt was that Matt did
21  not recall any specific conversation with Mike where
22  the -- a matter about AWP was raised in any alarming,

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 122

1  concerning way.
2         Part of -- Mike reported to Matt, and
3  part of their collective function was -- was the broad
4  pricing aspects for -- for the Ross business. So he
5  said he would have had general conversations about AWP
6  with Matt -- or with Mike, and he also recalled that,
7  to the extent there was ever any thing that was of
8  concern about his area, pricing generally, that he
9  would not -- he, as the manager of the department,
10 would not have made final decisions, he would have
11 consulted Brian Taylor in the Legal Department.
12     Q.  Okay, and what did you learn about
13 consultations with Mr. Taylor, if any?
14     A.  Any conversations they may have had would
15 be privileged.
16     MS. ST. PETER-GRIFFITH: Any conversations
17 about pricing and to business decisions concerning
18 pricing --
19     THE WITNESS: Yes.
20     MS. ST. PETER-GRIFFITH: -- is that your
21 instruction?
22     THE WITNESS: Yes, if they're seeking

Page 123

1  legal counsel --
2      MS. CITERA: If they were seeking legal counsel
3  from Mr. Taylor, absolutely.
4      MS. ST. PETER-GRIFFITH: Are you intending to
5  rely upon advice of counsel in -- as your defense in
6  this case?
7      MS. CITERA: I'm not answering that. I'm not
8  answering that.
9      MR. ANDERSON: In fairness, Toni, I will say
10 that we're here on a 30(b)(6) witness. We're not here
11 in Mr. Fishman's personal capacity as an attorney.
12 And the -- when this privilege is being asserted
13 offensively, it is thwarting our ability to discover
14 the policies and practices and the compliance
15 therewith by Abbott, and the whole premise of the
16 deposition is the compliance efforts by Abbott.
17         If Mr. Tootell, for instance, to make
18 it very specific to this line of questions, posed an
19 inquiry to counsel, which he's testified he did, about
20 AWP and spread concerns that Mr. Tootell had, and that
21 was passed along to Mr. Taylor, if not through this
22 witness, how could we ever discover Abbott's

Page 124

1  information concern that?
2      MS. CITERA: Okay, first of all, he spoke to,
3  you know, Mr. Taylor and asked him the questions. So
4  you can get to that. Not Mr. Taylor. Mr. --
5      MS. ST. PETER-GRIFFITH: Fischer.
6      MS. CITERA: -- Fischer. No, no --
7      THE WITNESS: Mr. Taylor.
8      MS. CITERA: -- Taylor. And he spoke to
9  Ms. Pence-Levy and he spoke to Mr. Berman and asked if
10 Mr. Tootell raised those concerns. So you can ask
11 about that.
12         What he has just said is that any
13 conversations that Mr. Taylor would or would not have
14 had would have been privileged. So I guess, you
15 know -- I don't see where you're not getting what you
16 noticed from -- what you noticed up for, and, you
17 know, obviously, subject to our limitations and
18 objections.
19         You wanted to know whether it was --
20 whether --
21     MR. ANDERSON: Well, we're going to continue
22 this.

Page 125

1      MS. ST. PETER-GRIFFITH: We'll continue.
2      MR. ANDERSON: Yeah.
3      MS. ST. PETER-GRIFFITH: Yeah.
4      MR. ANDERSON: But I'm just saying that, as a
5  general proposition, the witness is not here and in
6  his personal capacity as an attorney.
7      MS. ST. PETER-GRIFFITH: As a lawyer.
8      MR. ANDERSON: He's here as the corporate
9  representative, and merely because he has an attorney
10 background does not make any of his testimony on
11 behalf of an organization more or less privileged.
12     MS. CITERA: I think you're conflating the two
13 because I mean here's the problem. You guys are here
14 to testify -- you're here to talk to him about these
15 topics, okay? And you are now asking about advice
16 that Legal would have gave. It doesn't matter if he
17 was a lawyer or not. That's privileged. It's --
18     MS. ST. PETER-GRIFFITH: And it's our
19 contention that it's not --
20     MS. CINTERA: Well, I disagree.
21     MS. ST. PETER-GRIFFITH: -- because it bears on
22 the business practices.

32 (Pages 122 to 125)

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 126

1       MS. CITERA:  We disagree, and, you know, I
2  don't know what else to say to you or how many ways I
3  can say it, but any conversations or advice that Legal
4  would have given to, you know, Mr. Tootell or Mr.
5  Taylor --
6       THE WITNESS:  Fischer.
7       MS. CITERA:  -- Fischer would have been
8  privileged.  So...
9       MS. ST. PETER-GRIFFITH:  But if it's all
10  within the -- if all this compliance -- all of these
11  compliance issues are within the Legal Department, is
12  it your contention that you are not going to raise and
13  present any defense concerning compliance?  Is it --
14  is that your -- is that your contention?
15      MS. CITERA:  You're conflating the two.
16      MS. ST. PETER-GRIFFITH:  No, I'm not conflating
17  the two because we are entitled to discover this
18  information.
19      MS. CITERA:  We are presenting -- you know, you
20  are entitled to discovery the information about
21  compliance.  He is testifying about compliance.  He's
22  not here to testify about privileged information.  He

Page 127

1  wouldn't testify at trial about privileged
2  information.  That's --
3       MS. ST. PETER-GRIFFITH:  Toni, we have had
4  witness after witness after witness tell us they
5  relied upon the Legal -- the Legal Department.
6       MS. CITERA:  Well, I'm sorry, you don't get to
7  get into that.  I mean you don't get to get into what
8  advice the Legal --
9       MS. ST. PETER-GRIFFITH:  Well, I'm putting you
10  on notice that if it's your -- if it's Abbott's
11  position that we don't get to discover this
12  information, we're going to take it up with the Court
13  and we're going to, you know, seek appropriate
14  instructions concerning limiting your defenses, as a
15  result.  So I'm just putting you on notice of that,
16  you know, now.
17      MS. CITERA:  Obviously, we disagree, and we'll
18  fight it out in court.
19
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Sir, let me return to -- did anyone within
22  HPD -- or, I'm sorry.  Did anyone within the Ross

Page 128

1  Division including either Mr. Tootell or Mr. Fischer
2  have communications with counsel in the Legal
3  Department concerning AWP or concerns about Abbott's
4  spread and spread marketing conduct?
5       MS. CITERA:  Objection to the form, and I would
6  again caution you not to reveal any privileged
7  discussions.
8       THE WITNESS:  I am aware through conversations
9  with Mr. Fischer that he and Mike would have had
10  conversations with Brian Taylor about AWP.
11
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Okay, and what were those conversations?
14      A.  Those conversations are privileged.  It
15  was conversations with counsel.
16      Q.  Well, until you get an instruction, I want
17  you to answer the question.
18      A.  I -- beyond -- I believe that's -- I'm not
19  prepared to respond to that today.
20      MS. CITERA:  Okay, well, I -- I think you
21  should ask a first question, if I can help this matter
22  along.  I think you should ask him whether -- whether

Page 129

1  he discussed with Mr. Fischer whether there were
2  any -- whether they discussed the substance of the
3  conversation.
4       MS. ST. PETER-GRIFFITH:  Okay, that's fine.
5       MS. CITERA:  Because I think that will work.
6       MS. ST. PETER-GRIFFITH:  Fair enough, I will do
7  that.
8
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Mr. -- Mr. Fishman, did you discuss with
11  Mr. Fischer the substance of those communications?
12      A.  Yes.
13      Q.  What did you -- what did Mr. Fischer tell
14  you were the substance of those communications?
15      A.  That he raised -- that they talked to
16  Brian about -- generally about AWP.
17      Q.  And what generally about AWP was
18  discussed?
19      A.  That's -- that's all he advised me of.
20      Q.  That's all Mr. Fischer advised you?
21      A.  Yes.
22      Q.  Okay, in this brief conversation that you

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 130

1  had with Mr. Fischer, did you discuss anything else?
2      A.  No.
3      Q.  What were your discussions with Mr. Taylor
4  in preparation for today's deposition?
5      A.  My discussions with Mr. Taylor centered on
6  two separate matters.
7      Q.  Okay.
8      A.  First, the time frame '91 through '95
9  where I was not providing commercial --
10     Q.  Okay.
11     A.  -- legal advice and he was in -- and I
12  actually replaced him.  He went to Columbus.  So I
13  talked to him about what his recollections were about
14  compliance activities coming -- emanating from the
15  Legal Department.
16         And then separately, I talked -- not
17  separate -- the same conversation, but on a separate
18  subject matter would have talked -- talked with him
19  about conversations that he would have had with Matt
20  and Mike about AWP, whether the -- he had
21  conversations -- whether Mike -- whether he
22  specifically recalled Mike raising a particular

Page 131

1  concern about AWP.
2      Q.  Okay, did he recall having conversations
3  with Matt and Mike?
4      A.  He did not re -- he did not recall having
5  a conversation with Matt or with Mike where AWP was
6  raised in -- in a concerning manner.
7      Q.  Did he recall having any conversations
8  with Matt or Mike about AWP in general?
9      A.  He did not have specific recollection
10  about AWP.
11     Q.  About AWP in the conversation?
12     A.  In the conversation.
13     Q.  Okay.  What else did you discuss with
14  Mr. Taylor about the '91 through '95 commercial
15  advice?
16     A.  I confirmed with him that the practice
17  regarding training for the business divisions was
18  generally consistent with the practice that I was
19  familiar with post '95.
20     Q.  And was it?
21     A.  It was.
22     Q.  Anything else?

Page 132

1      A.  No.
2      Q.  Did you discuss any particular practice?
3      A.  No.
4      Q.  Did you discuss with Mr. Taylor at all the
5  Home Infusion Business Unit and whether that business
6  model complied with Medicare or Medicaid fraud and
7  abuse statutes?
8      A.  I did not talk to him about Home Infusion.
9      Q.  Did you talk to anybody about Home
10  Infusion?
11     A.  I talked with Mike Sellers and Ginny
12  Tobiason.
13     Q.  Ooh.  Okay, we didn't go over that when we
14  discussed Mr. Sellers and Ms. Tobiason.  What did you
15  discuss with Mr. Sellers about Home Infusion?
16     A.  We talked -- he described that there was a
17  separate sales force between HBS and Alternate Site in
18  which -- and that there was a separate Contract
19  Marketing organization within Home Infusion.
20     Q.  Okay, anything else?
21     A.  No.
22     Q.  Did you discuss at all concerns about the

Page 133

1  business model being violative of any federal or state
2  law?
3      A.  No.
4      MS. CITERA:  Objection to the form.
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  What did you discuss with Ms. Tobiason
8  about Home Infusion?
9      A.  We talked about the difference -- we
10  talked about the proportionality between HBS and Alt
11  Site as a -- -- as a structural piece of HPD and how the
12  Alternate Site and Home Infusion business was a
13  significantly small piece of the -- of the overall
14  business.  We talked about how the HBS business sales
15  force called on purchasing and pharmacy purchasing
16  elements within the hospital market and that the
17  billing aspect -- the billing procedures within
18  hospitals was a DRG-based process --
19     Q.  Okay.
20     A.  -- and that AWP would have had no --
21  played no role whatsoever in that.
22     Q.  Anything else that you recall about your

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 134

1   communications with Ms. Tobiason about Home Infusion?
2       A.  No.  She just kind of helped frame the
3   different -- the different business model within HPD
4   and how it inter -- intersected or interacted with the
5   regulatory scheme.
6       Q.  Well, how did she -- did she discuss with
7   you how the business model for Home Infusion and how
8   it intersected with the -- with the regulatory scheme?
9       MS. CITERA:  Objection to the form.
10      THE WITNESS:  Yes.
11
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  What did she tell you?
14      A.  She reminded me that the reimbursement --
15  the reimbursement mechanism within Alternate Site was
16  different than HBS
17      Q.  But how does -- what did -- well, what did
18  she tell you about the reimbursement mechanism for
19  Home Infusion?  And when I say "Home Infusion,"
20  maybe -- maybe we're mixing apples and oranges.  I'm
21  talking about the Home Infusion Business Unit.  Is
22  that what you're talking about?

Page 135

1       A.  Home Infusion is part of Alternate Site.
2       Q.  Okay.  Did you have an understanding as to
3   how Home Infusion or did you obtain an understanding
4   from Ms. Tobiason as to how Home Infusion sought
5   reimbursement for the services that it provided?
6       A.  Home Infusion --
7       MS. CITERA:  Objection to the form.
8       THE WITNESS:  -- wouldn't have obtained
9   reimbursement.  It would have been paid by customers.
10
11  BY MS. ST. PETER-GRIFFITH::
12      Q.  What do you mean it would have been paid
13  by customers?
14      A.  Abbott would not have been reimbursed
15  directly by -- I don't believe Abbott would have been
16  reimbursed directly by the government.
17      Q.  Did you discuss at all with Ms. Tobiason
18  that for approximately twelve years she oversaw a
19  division that submitted claims directly to Medicare or
20  Medicaid both on behalf of Abbott and its pharmacies
21  as well as Abbott's clients?
22      A.  I was aware --

Page 136

1       MS. CITERA:  Object to form.
2       THE WITNESS:  I was aware that they submitted
3   claims on behalf of clients.
4
5   BY MS. ST. PETER-GRIFFITH:
6       Q.  Were you aware that they submitted claims
7   directly on behalf of Abbott?
8       A.  No.
9       Q.  Was anyone within the Legal Department, to
10  your knowledge, on notice of the fact that Abbott's
11  Home Infusion division was submitting claims directly
12  to Medicare or Medicaid on behalf of Abbott?
13      MS. CITERA:  Objection to form, outside the
14  scope.
15      THE WITNESS:  What -- what time frame would
16  this have been?
17
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  For the twelve years -- for -- well,
20  let's -- anytime from '91 through 2002.
21      MS. CITERA:  Same objections.
22      THE WITNESS:  My understanding is that Home

Page 137

1   Infusion stopped conducting business altogether in the
2   late '90s -- stopped -- stopped entering into new
3   contracts sometime in the late '90s and would only
4   have finished the -- performing under existing
5   contracts.  I'm not aware that from '91 until 2004
6   that Abbott would have been submitted claims on its
7   own behalf.
8
9   BY MS. ST. PETER-GRIFFITH:
10      Q.  I didn't say 2004.  I said 2002, which is
11  when the Home Infusion Business Unit closed.
12      A.  Okay, from '91 to 2002, I'm not aware of
13  it then.
14      Q.  Okay, were you aware that Abbott had its
15  own pharmacies, four of them around the country, on
16  whose behalf the Home Infusion business -- the Home
17  Infusion Business Unit submitted claims to Medicare or
18  Medicaid?
19      MS. CITERA:  Objection to the form, outside the
20  scope.
21      THE WITNESS:  I'm -- I am aware that there were
22  pharmacies, Abbott had its pharmacies.  I was not

35 (Pages 134 to 137)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 138

1  aware that they submitted claims on -- in behalf of
2  Abbott itself.
3      MS. ST. PETER-GRIFFITH: And if I could just
4  address, Toni, because I want to make this clear, part
5  of what we're going to go over here today is
6  compliance with Medicare or Medicaid fraud and abuse
7  statutes for claims submitted by Abbott directly.
8          So, you know, it's -- this Home
9  Infusion line of questioning is not outside the scope,
10 and I've got a ton of documents to go over with him
11 concerning it.
12     MS. CITERA: Well, I think his -- his personal
13 knowledge of like what happened I think is outside of
14 the scope.
15     MS. ST. PETER-GRIFFITH: Well, I'm interested
16 in what he did to educate himself concerning the Home
17 Infusion Business practices that implicated Medicare
18 or Medicaid.
19     MR. ANDERSON: And these questions aren't
20 limited to his personal knowledge.
21     MS. CITERA: Okay.
22     MR. ANDERSON: I mean these questions are posed

Page 139

1  to the corporate representative.
2      THE WITNESS: I spoke -- to educate myself
3  about Home Infusion business, I talked with Ginny and
4  Mike Sellers --
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q. And what --
8      A. Ginny Tobiason and Mike Sellers.
9      Q. And what did Ginny tell you about the Home
10 Infusion Business Unit?
11     A. That they provide -- they provided a --
12 they provided both a service and a -- products to
13 customers and that there was a revenue share
14 arrangement in -- as part of the contractual
15 arrangements.
16     Q. And what was your understanding of that
17 revenue share arrangement? Or what -- not your
18 understanding. Meaning "you" as the corporation.
19     A. Is that we -- Abbott would provide both
20 service and product to the customer, and the revenue
21 that the customer would get would be -- the payment
22 for those services and products would be calculated as

Page 140

1  a percent of revenue collected by the customer.
2      Q. And that included reimbursement from
3  Medicare and Medicaid, correct?
4      A. I -- I assume it would include that, yes.
5      Q. Well, but do you assume it or do you know
6  that sitting here today as Abbott?
7      A. If they -- if they -- if the customer
8  submitted -- if the customer submitted claims or if we
9  submitted claims on behalf of the customer for
10 Medicare/Medicaid and they collected revenues, then
11 the revenue share would have included those revenues
12 as well.
13     Q. And you understood that, as part of its
14 services, Abbott would for many of its customers
15 sub -- do the actual billing to Medicare or Medicaid?
16     A. I was aware that they did it for
17 customers.
18     MS. CITERA: Objection to form.
19     THE WITNESS: I didn't know about the "many."
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q. Okay. What was done within Abbott to

Page 141

1  evaluate whether or not its -- these consignment
2  arrangements violated Medicare or Medicaid fraud and
3  abuse statutes?
4      MS. CITERA: Objection to the form.
5      THE WITNESS: What time frame?
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q. Anytime from '91 through 2002 or anytime
9  before that.
10     A. Repeat the question.
11         (Record read.)
12     THE WITNESS: The Legal Department would
13 be working -- would work with all the business units
14 within Hospital Products including Home Infusion, and
15 I -- certain contracts, I can't say for certain that
16 all contracts, would have been presented to Legal for
17 review. The ones that were presented would have been
18 reviewed, and legal advice would have been offered
19 going forward.
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q. What did Abbott's Legal Department do to

36 (Pages 138 to 141)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

Page 142

1 evaluate whether or not the Home Infusion consignment
2 arrangements and revenue share contracts were in
3 compliance with federal and state Medicare and
4 Medicaid fraud and abuse statutes and regulations?
5      MS. CITERA: Objection, asked and answered.
6      THE WITNESS: Abbott would have -- Abbott, the
7 Legal Department, obtained, however, read statutes
8 directly and regulations and would have consulted with
9 outside counsel on a case-by-case basis. We would
10 have educated ourselves through periodicals and other
11 advisory documents that would have been presented from
12 external sources.
13      MS. ST. PETER-GRIFFITH: Okay, we will pick up
14 on this after the break, but there's five minutes left
15 on the tape.
16      MS. CITERA: Okay.
17      MS. ST. PETER-GRIFFITH: So why don't we take a
18 break.
19      THE VIDEOGRAPHER: Going off the record at 1:19
20 a.m. -- 11:19 a.m.
21           (Recess taken.)
22      THE VIDEOGRAPHER: Beginning of Videotape No. 3

Page 143

1 in the deposition of Mr. Fishman. We're back on the
2 record at 11:30 a.m.
3
4 BY MS. ST. PETER-GRIFFITH:
5      Q. Mr. Fishman, I'm going to get back on task
6 here a little bit. I've got a couple of follow-up
7 questions though.
8           Prior to the break, we were
9 discussing what Abbott did to confirm that its Home
10 Infusion Business Unit basically business model of
11 consignment or risk sharing agreements complied with
12 state and federal Medicare and Medicaid laws.
13           Other than work done within the Legal
14 Department, did Abbott's Home Infusion Business Unit
15 do anything else to verify whether or not its Home
16 Infusion business model of consignment arrangements or
17 risk share contracts complied with or violated state
18 and federal Medicare/Medicaid fraud and abuse
19 statutes?
20      MS. CITERA: Objection to the form.
21      THE WITNESS: I'm not sure that was the same
22 question you asked before, but -- or a follow-up to

Page 144

1 the same question, but the business unit would not
2 have -- should not have made -- reached legal
3 conclusions about any of its practices.
4           As a general rule, again, Abbott had
5 business -- a Code of Business Conduct. All Abbott
6 employees were obligated to adhere and comply with all
7 laws including federal healthcare laws, so they had an
8 overriding standard to adhere to.
9           What they would have done to ensure
10 compliance, is that the question?
11
12 BY MS. ST. PETER-GRIFFITH:
13      Q. Yes.
14      A. As managers, managers had responsibility
15 to supervise its employees. So they would have been
16 working with employees, making sure they adhered --
17 they adhered to -- to the laws.
18      Q. Okay, but my question is particular to the
19 Home Infusion Business Unit model of consignment
20 arrangements.
21      A. Yes, my answer would have to be I'm not
22 aware of -- what I described would be applicable to

Page 145

1 all business units.
2      Q. Okay.
3      A. And I'm not aware that the Home
4 Business -- Home Infusion would have done anything
5 over and above that.
6      Q. Okay, so ultimately then, the -- the
7 compliance check, if you will, on whether or not this
8 particular business model was in compliance with
9 federal and state Medicare/Medicaid fraud and abuse
10 statutes, that would rest with the in-house counsel?
11      MS. CITERA: Objection to form.
12      THE WITNESS: The determination of compliance,
13 the legal evaluation of facts as applied against
14 regulations and laws would have been a legal
15 determination. Again, once the legal determination,
16 when given and communicated to the business,
17 compliance with that determination would be everyone's
18 obligation.
19
20 BY MS. ST. PETER-GRIFFITH:
21      Q. Okay. But in terms of doing that initial
22 evaluation, that would be done within the Legal Unit?

37 (Pages 142 to 145)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 146

1    A.  It should have been.
2    Q.  Okay.  And is that -- that's true for all
3  of HPD?
4    A.  That's true for all of Abbott.
5    Q.  Okay.  Another clean-up matter that I want
6  to get to --
7    A.  Okay.
8    Q.  -- is, sir, you referred earlier to an OEC
9  policy with Charles Brock's name on it.  I'd like to
10  mark this as Exhibit 2 and ask you, sir, if this is
11  the policy you were talking about?
12    MS. CITERA:  Do you have my copy?  I mean --
13  oh, I gave you four copies, right.
14    MS. ST. PETER-GRIFFITH:  Here you go.
15    MS. CITERA:  Thank you.
16    THE WITNESS:  This is the policy I was
17  referring to, yes.
18    MS. ST. PETER-GRIFFITH:  Okay, can we mark that
19  as Exhibit 2?
20    THE WITNESS:  Yeah.
21    MS. ST. PETER-GRIFFITH:  Could you just give
22  that to --

Page 147

1    THE WITNESS:  Oh, I'm sorry.  (Tendering
2  document).
3            (Exhibit Fishman 002 was
4            marked for ID)
5
6  BY MS. ST. PETER-GRIFFITH::
7    Q.  Okay, sir, going back to your
8  communications with Mr. Taylor, did you have any other
9  communications with Mr. Taylor?
10    A.  Can you re --
11    Q.  Sure.
12    A.  -- restate what you have so far that I've
13  said I said?
14    Q.  Sure.  You discussed two things with
15  Mr. Taylor, the communications with Mr. Fischer and
16  Mr. Tootell --
17    A.  Right.
18    Q.  -- and the operations or commercial advice
19  for the H -- for HPD when he held the position before
20  you did from '91 through '95?
21    A.  Right.  And then I would add a third
22  thing, which was the operating guidelines.  We worked

Page 148

1  in tandem from the Legal organization to issue the
2  operating guidelines, that each division had its own.
3  We were working to maintain consistency and
4  uniformity, where appropriate.  And he was supporting
5  Ross.  I was tasked with supporting and -- Lynn
6  Boehringer and I were tasked with supporting HPD.  So
7  we worked -- we talked about having worked together to
8  do -- to issue those guidelines back in '99.
9    Q.  Okay, in '99?
10    A.  Correct, August.
11    Q.  And did -- what specifically did Mr.
12  Taylor discuss with you about that?
13    A.  Mostly confirming it, and we joked how we
14  had a deadline and we were up 'til 3 in the morning
15  finishing it.
16    Q.  I see.  Anything else about that you can
17  recall of your conversation with Mr. Taylor?
18    A.  No.
19    Q.  What con -- what conversation did you
20  have -- is it Miss Pence-Leav, Miss Pence-Levy?
21    A.  Miss -- Ms. Pence-Levy, P-E-N-C-E -
22  L-E-V-Y, Melissa.

Page 149

1    Q.  Okay, and what did you --
2    A.  You can tell I've dictated documents
3  before.
4    Q.  What do you recall about your conversation
5  with Ms. Pence-Levy?
6    A.  My conversation with Ms. Pence-Levy
7  pertained to the questions -- the issues that Mike
8  Tootell apparently raised in deposition testimony
9  regarding concerns, specific concerns he had about
10  AWP.
11    Q.  And what did you dis -- what did Miss
12  Pence-Levy discuss with you about that?
13    A.  She reminded me that she came onboard in
14  May time frame of 2003.
15    Q.  Oh.
16    A.  So any conversations that would have been
17  prior to that, she can't talk to at all, but she had
18  no recollection of Mike coming to her regarding that
19  subject -- regarding AWP subject matter in any
20  concerned way.
21    Q.  Do you recall any -- did you discuss
22  anything else with Miss Pence-Levy?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

30(b)(6) Abbott (Fishman, David S.)                March 12, 2008

---

Page 150

1    A.  A little bit general timing and -- because
2  she -- again, she was supporting the Ross Division.
3  So she would have been actively involved in operating
4  procedures and guideline -- more the guideline --
5  again -- not the guidelines, the procedures for Ross
6  that emanated out of OEC.
7    Q.  Okay.
8    A.  So it -- we touched on that briefly.
9    Q.  Okay, anything else?
10   A.  No.
11   Q.  Okay.  What about Mr. Berman?  What did
12  you discuss?  Is it Mr. Berman?
13   A.  It is Mr. Berman, Clifford, Cliff Berman.
14   Q.  Okay.
15   A.  Cliff came onboard in the very end of
16  December of 2002.  He was actively involved in
17  probably all aspects -- that may be an
18  overstatement -- many aspects of reviewing, revising,
19  finalizing, implementing policies and procedures with
20  OEC.
21   Q.  Okay.
22   A.  That we talked --

---

Page 151

1    Q.  That's what you discussed?
2    A.  That's what we discussed.
3    Q.  And was he with Ross?
4    A.  He was corporate.
5    Q.  Corporate, okay.  And what specifically do
6  you recall discussing with him about finalizing --
7    A.  Just activities -- kind of time lines and
8  activities.  Time lines to -- when -- when policy --
9  when policies would have been issued, noted that the
10  procedures had '04 dates and just would have talked --
11  again, would have talked more the operation -- the
12  administration of getting the policies complete.  We
13  talked -- he -- he's a subject matter expert on the
14  field.  So we talked a little bit about the subject
15  matter of legal --
16   Q.  Which subject matter?
17   A.  Oh.  Just fraud and abuse.
18   Q.  Oh, okay.
19   A.  You know, fraud and abuse.  He's -- he is
20  a fraud -- he is a healthcare compliance attorney.
21   Q.  Okay.  And he only came on in December of
22  '02?

---

Page 152

1    A.  That is correct.
2    Q.  Did you discuss with Mr. Berman any
3  discussions with -- concerning Mike Tootell or the
4  concerns that he raised?
5    A.  I -- we did talk to him, but then I
6  asked -- he did not have any recollection of Mike
7  Tootell raising concerns about AWP with him.
8    Q.  Okay.  Are you aware of the time frame
9  that Mr. Tootell testified he -- well, let me ask you
10  this.  Why didn't you read Mr. Tootell's deposition
11  transcript?
12   A.  Wasn't -- it wasn't provided to me, I
13  guess.
14   Q.  Okay.  Well, did you feel that it might
15  have -- it might bear upon your preparation for
16  today's deposition?
17   A.  I understood the -- the nature of his
18  deposition testimony regarding this particular subject
19  matter.
20   Q.  What -- what -- what -- did you actually
21  physically see the testimony?
22   A.  I did not physically see the testimony.

---

Page 153

1    Q.  What was your understanding then of his
2  testimony?
3    A.  My understanding was that in his role in
4  pricing and contracting within Ross, he was concerned
5  with -- with AWP and aspects of the spread and claimed
6  to have raised it in a recognizable way, whether it
7  was -- you know, I don't know how he characterized it,
8  as being urgent or deeply concerned, I don't know, but
9  in a way that he described as having highlighted the
10  issue as being of concern to him.  And I understand he
11  said he talked with counsel.  He talked with Matt and
12  he talked with Cliff and Melissa and Brian.
13   Q.  Okay.  You used the term that he
14  "claimed."  Does Abbott have any reason to doubt the
15  veracity of Mr. Tootell's testimony?
16    MS. CITERA:  Objection.  Objection to form,
17  outside the scope.
18    THE WITNESS:  Other -- I don't have any reason
19  to doubt his veracity.  Personally, I -- there is a
20  difference between what he apparently said in his
21  deposition and what people that I talked to directly
22  recall about the subject matter that he articulated in

---

39 (Pages 150 to 153)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

---

Page 154

1  his deposition.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  What's the difference?
5      A.  That they don't recall him coming to them
6  raising the issue as a -- as a concern.
7      Q.  Did you do any research as to whether
8  anyone within Abbott Legal Department or anyone within
9  Abbott addressed Mr. Tootell's concerns --
10     MS. CITERA:  Objection to form.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  -- that he testified about?
14     A.  Yes, I talked to with Matt Fischer, I
15 talked with Matt Berman, I talked with Melissa
16 Pence-Levy, and I talked with Brian Taylor, who were
17 identified to me as the people he said he talked to
18 about it.  So it went to the other party to whom he's
19 alleging -- or he's stating -- I shouldn't
20 characterize it improperly -- that he's stating he had
21 a conversation with.
22

---

Page 155

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay, and what did they tell you about
3  what was done to address or not address Mr. Tootell's
4  concerns?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  They stated that they did not
7  recall having a conversation with Mr. Tootell where
8  the subject matter was raised in a manner that would
9  give rise to a concern where an action would be taken
10 to address a concern.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  So no action was taken to address any
14 concern that Mr. Tootell raised?
15     A.  That's not what I said.
16     MS. CITERA:  Objection to form.
17     THE WITNESS:  I said they testified -- they
18 told me that there was no conversation that they could
19 recall having taken place where the issue was raised
20 that would give rise to an action to be taken.
21
22 BY MS. ST. PETER-GRIFFITH:

---

Page 156

1      Q.  Okay, that's not my question though, sir.
2  My question is what -- Mr. Tootell has testified that
3  he raised a concern.  And my question is what did
4  Abbott do to address Mr. Tootell's concern?
5      A.  And I'm answering your question --
6      MS. CITERA:  Objection to form.
7      THE WITNESS:  -- because you're assuming --
8  your question assumes that that conversation actually
9  did take place and that there would be something to
10 would occur as a result of that conversation.
11         What I did was I talked to the people
12 that he said he had that conversation with.  Those
13 people do not recall having had that conversation.  So
14 from my knowledge base, which is the people he said he
15 had that conversation with, if those conversations
16 didn't occur, I don't know how you can take action
17 from something that -- that they say didn't occur.
18
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  But what did you do to verify whether or
21 not anyone within Abbott addressed Mr. Tootell's
22 concerns?

---

Page 157

1      MS. CITERA::  Objection to form.
2      THE WITNESS:  I talked to the people who
3  Mr. Tootell said he had those conversations with.  I
4  did not pool every single person in Abbott as to
5  whether they talked to Mr. Tootell about it.  I went I
6  think in a prudent manner to talk to the people who
7  were identified as having participated in this
8  conversation.
9
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Do you think it would have been prudent to
12 talk to Mr. Tootell about this?
13     MS. CITERA:  Objection to form.
14     THE WITNESS:  Are you asking for an opinion?
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  No, I'm asking you, in doing your due
18 diligence to prepare for today's deposition, do you
19 think it would have been prudent to discuss with
20 Mr. Tootell what happened?
21     A.  Since his testimony was -- was already in
22 existence, it -- I relied on what he said previously.

---

40 (Pages 154 to 157)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                        March 12, 2008

Page 158

1    Q.  Okay, but you didn't review his testimony?
2    A.  I did not.
3    Q.  Okay.  So you didn't do -- other than
4  speaking with these individuals, you didn't do --
5  within Abbott Legal, you didn't do anything further to
6  verify whether or not Abbott addressed or did not
7  address Mr. Tootell's concerns that he raised?
8    MS. CITERA:  Objection to form.
9    THE WITNESS:  No.
10
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Okay, did you do anything else with regard
13 to investigating Mr. Tootell's concerns raised in his
14 testimony?
15    MS. CITERA:  Objection to form.
16    THE WITNESS:  Other than having the
17 conversations that I've said I've had, no.
18
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Okay.  Does Abbott believe Mr. Tootell's
21 testimony?
22    MS. CITERA:  Objection to form.  He's not here

Page 159

1  to express those opinions.
2    THE WITNESS:  I have no opinion -- I'm not
3  prepared to answer that.  I have no opinion about
4  that.
5
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Well, did your belief or non-belief of
9  Mr. Tootell's testimony impact how you prepared for
10 today's deposition and the investigation that you
11 undertook?
12    MS. CITERA:  Objection to the form.
13    THE WITNESS:  I spoke directly with the people
14 he says he talked to about a subject matter and
15 questioned them specifically about the subject matter
16 that he said he had a conversation with them about to
17 get what they think happened.
18
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Okay, Mr. Fishman, one of the subtopics of
21 Topic 7 is, "The identification of all measures
22 undertaken by Abbott once Mike Tootell advised his

Page 160

1  supervisors and/or Abbott's in-house legal counsel
2  about his concerns regarding Abbott's AWP pricing and
3  high spreads on Abbott products."
4    Have we exhausted your research into
5  that topic?
6    MS. CITERA:  Objection to the form.
7    THE WITNESS:  Yes.
8
9
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  Did you learn anything else concerning
12 this particular topic?
13    MS. CITERA:  Objection to the form.
14    THE WITNESS:  I did not.
15
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Okay, going back to your prep for today's
18 deposition, we can hopefully get through this by
19 lunch.  Sir, what did you discuss -- is it Mr. or Ms.
20 Levitar?
21    A.  Levitan.
22    Q.  Levitan?

Page 161

1    A.  Lara Levitan.
2    Q.  Okay, what did you discuss with
3  Ms. Levitan?
4    A.  I discussed her recollections of issues
5  pertaining to up-front payments and discounts in the
6  2003 time frame.
7    Q.  Okay, and who's Miss Levitan?
8    A.  Lara Levitan is currently the head of
9  International Legal.  Previous to that, she was
10 supporting our Nutritionals Business in -- worldwide,
11 and previous to that, she was in the Litigation
12 Department.
13    Q.  Okay, when was she in the Litigation
14 Department?
15    A.  I don't know when she started.  Late '90s
16 would be my guess, but I don't know for certain, and
17 she came over to the Commercial side around 2005.
18    Q.  When you say around 2000 -- when you say
19 "came over to the Commercial side," you mean for
20 Nutritionals?
21    A.  That would have been her first Commercial
22 position, correct.  Commercial Legal position.  Let me

41 (Pages 158 to 161)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 162

1  qualify that.
2      Q.   Okay, when you were discussing the
3  recollections about up-front payments for the '03 time
4  frame, that would have been in her capacity as a
5  litigator then or in the Litigation Department?
6      A.   That is correct.
7      Q.   Okay, why were you discussing that with
8  her?
9      A.   That'as --
10     MS. CITERA:  Objection to form.
11     THE WITNESS:  That was a privileged matter.
12
13 BY MS. ST. PETER-GRIFFITH:
14     Q.   Well, I --
15     A.   I was talking to her in her capacity as a
16 lawyer for Abbott --
17     Q.   Okay.
18     A.   -- about legal -- a -- legal issues, legal
19 opinions.
20     Q.   Then maybe I'm confused.  I thought you
21 testified earlier that you spoke with Ms. Levitan in
22 preparation for today's deposition?

Page 163

1      A.   I did.
2      Q.   Okay.  What was your -- what exactly did
3  you discuss with her?
4      A.   I talked to her about --
5      MS. CITERA:  Object to form.
6      THE WITNESS:  -- up-front payments and
7  discounts in HPD.
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   And what did she tell you about up-front
11 payments and discounts within HPD?
12     A.   It would have been more what I told her,
13 and the nature of that conversation and the substance
14 of that conversation are privileged.
15     Q.   How can they be privileged?  You relied
16 upon them in your preparation for today's deposition.
17     A.   I told you that I -- the substance of
18 those conversations are privileged.  The fact that
19 they occurred is not privileged.  And I'm advising you
20 that I had that conversation, I'm advising you of the
21 general subject matter of the conversation, but the
22 content was a privileged conversation.

Page 164

1      MS. ST. PETER-GRIFFITH:  Toni, are you
2  instructing him not to answer about a communication or
3  do you need to talk with him about this?
4      MS. CITERA:  You know, I'd like to talk to him
5  about this.
6      MS. ST. PETER-GRIFFITH:  Sure.  Why don't we
7  take a quick break?
8      THE VIDEOGRAPHER:  Going off the record at
9  11:50 a.m.
10         (Recess taken.)
11     THE VIDEOGRAPHER:  We're back on the record at
12 12:05 p.m.
13     MS. CITERA:  Mr. -- I'm going to instruct him
14 not to answer because Mr. Fishman is not basing any of
15 his testimony here today on that conversation, and,
16 you know, therefore, I'm claiming a privilege over
17 that conversation.  I will also say it was a very
18 short conversation, so...
19     MS. ST. PETER-GRIFFITH:  Okay, well, can I
20 inquire of him a little bit just about that?
21     MS. CITERA:  The time limit?
22     MS. ST. PETER-GRIFFITH:  Yeah.

Page 165

1      MS. CITERA:  Sure.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   How long was your conversation with
5  Miss Levitan?
6      A.   Lara's office is right next to mine, and
7  it was five minutes or less.
8      Q.   Okay, and is what Ms. Citera represented
9  the case, you're not relying upon any portion of your
10 conversation with Miss Levitan?
11     A.   I am not.
12     MS. ST. PETER-GRIFFITH:  Okay.
13     MS. CITERA:  And I will say that if that
14 changes, you know, we can discuss it again.
15     MS. ST. PETER-GRIFFITH:  Okay, why would it
16 change?
17     MS. CITERA:  No, it shouldn't change, but I'm
18 just saying, you kknow, obviously, if he says
19 something, you know, down the line about Lara, we can
20 reconsider that.  But I -- he's not -- that discussion
21 was not used as the basis for any of his testimony
22 that he's prepared to give today.

42 (Pages 162 to 165)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 166

1
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay, well, let me ask the question this
5  way.  Sir, earlier in the day, you gave me a list of
6  folks and were going through them who you spoke with
7  in preparation for today's testimony.
8          Is it fair to say that when you
9  listed Miss Levitan, that was an error and that you
10  did not confer with her in preparation for today's
11  deposition.
12     A.  I have not used anything that I talked
13  with her.  I conferred with her because her office is
14  right next to me, and I talked with people who are
15  generally -- have generally been involved in the
16  compliance arena within Abbott.
17     Q.  When you say "people," do you mean people
18  other than the people who you listed before?
19     A.  Yes.
20     MS. ST. PETER-GRIFFITH: Okay.
21     MR. ANDERSON:  I want to pose an objection to
22  the assertion of the privilege.  It's -- from my

Page 167

1  understanding of the testimony, this conversation
2  occurred in preparation to testify, and whether or not
3  the information is ultimately relied upon by the
4  witness to testify as a 30(b)(6), the fact is the
5  conversation was not one where it was in the
6  furtherance of a rendition of legal advice, and I
7  believe we are entitled to know what the substance of
8  the conversation was.  And I don't think there's any
9  precedent in the 30(b)(6) case law that says we're not
10  entitled to inquire about it simply because the
11  witness says they're not relying upon that
12  conversation.
13     MS. CITERA:  Well, obviously, I disagree.
14     MS. ST. PETER-GRIFFITH:  Well, it's funny,
15  Jarrett, that you should say that because I was just
16  going to -- if he can't answer "no" to that question
17  that he did not -- if he can't testify -- if his
18  testimony is that, in preparation for today's
19  deposition, he spoke with Ms. Levitan, we are entitled
20  to discover that conversation.  And if --
21     MS. CITERA:  You know, I disagree.  I think
22  he -- this is -- the conversation is not being used

Page 168

1  for the basis of anything he's testifying to today,
2  and I don't think you're entitled to discover it, and
3  further, it's privileged.
4      MS. ST. PETER-GRIFFITH:  That doesn't -- that
5  doesn't matter, Tina --
6      MS. CITERA:  Toni.
7      MS. ST. PETER-GRIFFITH:  Or Toni, Toni, I'm
8  sorry.  You know, he testified that he had the
9  conversation in prep for today's deposition.  You
10  know, I gave him the opportunity to change that
11  testimony.  He didn't.  So I'm entitled to discover
12  everything that he did in preparation for today's
13  deposition, especially since it's a 30(b)(6).
14     MS. CITERA:  Well, I'm instructing him not to
15  answer for the reasons I've stated.
16
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Okay, Ms. Vakaharia, is it Miss Vakaria?
19     A.  Va-karia (phonetic).
20     Q.  Va-karia.
21     A.  V-A-K-A-H-A-R-I-A.
22     Q.  Okay, an attorney?

Page 169

1      A.  Tejal, T-E-J-A-L.
2      Q.  And what was your conversations with Ms.
3  Vakaharia?
4      A.  Conversations with Tejal pertained to the
5  the compliance activities within Legal on training
6  activities regarding compliance that we would have
7  taken.
8      Q.  Okay, and how long was your conversation?
9      A.  With Tejal, probably fifteen minutes to a
10  half hour.
11     Q.  And what specifically did she tell you
12  about compliance within Legal or training within
13  Legal?
14     A.  She recalled similarly to what I recalled
15  as well, which is that we gave many presentations to
16  the various internal client groups with -- you know,
17  clients of Abbott Legal, different business
18  organizations within the business divisions on fraud
19  and abuse training.  And Tejal would have been
20  involved in -- I think she started in 2000 -- she
21  probably would have been involved in helping prepare
22  the fraud and abuse handbook that was issued in 2000.

43 (Pages 166 to 169)

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 170

1      Q.  When did she start with Abbott?
2      A.  I believe sometime in '99.  She did tell
3  me, but I have to admit I don't have a precise
4  recollection.
5      Q.  And did you discuss anything else?
6          (Outside noise)
7      MS. ST. PETER-GRIFFITH:  That was just there
8  for dramatic effect.
9      THE WITNESS:  We talked about -- it wouldn't
10 have been in prep -- I mean it was the subject matter
11 of the conversation.  It wouldn't have been about the
12 subject of this deposition, about the least costly
13 alternative matters that Abbott was addressing with --
14 I don't know if it was Calcijex or Zemplar with
15 certain states.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Did you have that discussion with her
19 in -- as preparation for --
20     A.  No.
21     Q.  -- today's deposition?
22     A.  It just -- it was part of -- it was part

Page 171

1  of the conversation.  It kind of flowed from the
2  general compliance discussion to a specific matter
3  that --
4      Q.  Okay.  Well, I appreciate, Mr. Fishman,
5  that these are your colleagues.  So I'm only
6  interested in discovering what conversations you had
7  with them in preparation for --
8      A.  Okay.
9      Q.  -- today's deposition?
10     A.  All right, that -- that helps.
11     Q.  Does that help narrow the field?
12     A.  Sure.
13     Q.  Any other conversations that you had with
14 Ms. Vakaharia in preparation for today's deposition?
15     A.  No.
16     Q.  And did you recall anything else that she
17 discussed with you regarding the training initiatives
18 or the fraud and abuse handbook?
19     A.  Nothing that would have been specific, no.
20     Q.  Okay, what about Ms. Goldberg?  Now, she's
21 your -- is she your -- your superior?
22     A.  She was my superior.  In the year that I

Page 172

1  was in -- on the PPG side, she was not.  And now that
2  I'm in Corporate Transactions Group, she is again.
3      Q.  Okay.  What is her role within Abbott?
4      A.  She is the head of the Medical Products
5  Group and Corporate Transactions For Legal.
6      Q.  And at some point from '91 through 2002,
7  she had involvement with HPD; is that fair?
8      A.  That would be fair.  She -- I don't know
9  from ninety -- from when exactly she started.  She was
10 in the International Legal side.  She came over to the
11 domestic side sometime in the early to mid '90s.  I
12 don't know that it was '91.  But from the time that
13 she made that move through 2002, she would -- or 2004
14 whatever year you -- which year did you say?
15     Q.  '91 through 2002.
16     A.  '91 -- some point when she started in the
17 domestic side of the business through 2002, she would
18 have been involved in providing advice to HPD.
19     Q.  Okay, and what did you discuss with
20 Ms. Goldberg in preparation for today's deposition?
21     A.  I asked her -- since she predated me and
22 the best hard -- earliest hard copy Code of Business

Page 173

1  Conduct I could find was the January '93 -- was dated
2  January '93, I asked her if she recalled or had --
3  whether there -- you know, whether there was any other
4  Code of Business Conduct predating that.  She recalls
5  when she started either in '84 or '85 that there
6  was -- that she recalls there being a business -- Code
7  of Business Conduct.  She did not have a copy of it.
8          So it was for historic purposes
9  dealing with the broad corporate compliance programs'
10 initiatives activities that I asked her that, and then
11 separately, in a separate conversation -- each of
12 these conversations were five minutes or less -- I
13 asked her as my supervisor to confirm the -- I did not
14 believe when -- as we -- you'd asked previously how we
15 educated ourselves on subject matter -- whether she --
16 as the supervisor for the group, she identified a
17 particular person to be responsible providing that
18 information.  She said she did not, that it was a
19 collective -- it was a collective obligation and that,
20 as a smaller group then, the -- any information that
21 would have been learned by one would have been quickly
22 disseminated to the other.  We were physically all in

44 (Pages 170 to 173)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 174

1  a very similar or very tight area.
2      Q.   So that was her recollection.  Is that in
3  fact what happened within Abbott Legal for the
4  operative period from '91 through '02, did the Legal
5  Department advising or those responsible for advising
6  HPD all collectively contribute to compliance matters?
7      A.   With the exception of sometime in 2001
8  when the OEC was created and it reported to the -- to
9  the General Counsel, Katherine, as Senior Counsel
10  reporting to Charlie, was involved in the subject
11  matter, and I think that was another reason I think
12  that her -- yeah, that's -- (gesturing).  So it would
13  have been -- for that period of time, she too would
14  have been involved.
15      Q.   Okay, and did -- what else did you discuss
16  with Ms. Goldberg?
17      A.   Just confirmed with her the -- kind of the
18  operational side of getting the policies and
19  procedures out in 2003 and 2004 time frame.
20      Q.   Okay, and what did you confirm with her,
21  if anything else?
22      A.   Just kind of how we went about doing it,

Page 175

1  just the structural pieces that I described previously
2  between the different divisions, Steering Committees,
3  Operating -- you know, the work that OEC and Cliff
4  Berman did, the involvement that the Commercial
5  Attorneys had in helping shepherd that through the
6  various divisions because it was too much for two
7  people to handle.
8      Q.   Okay, anything else?
9      A.   No.
10      Q.   Sir, we've discussed at length your
11  communications with various individuals in preparation
12  for today's deposition.  We've identified those
13  transcripts or those individuals for whom you've
14  reviewed a portion of the transcript, and we'd like to
15  get either -- the page designations from Miss Citera
16  on those.  We've discussed that you've reviewed some
17  documents, and we have a list of those.
18          What else did you do to prepare for
19  today's deposition?
20      A.   Nothing else formally.
21      Q.   How about informally?
22      A.   Thought about it.  You know, it caused me

Page 176

1  to think about things 13 years ago that I hadn't
2  thought about.
3          MS. ST. PETER-GRIFFITH:  Okay, I'd like to mark
4  this as Deposition Exhibit 3, please.
5          THE REPORTER:  Okay.
6          MS. CITERA:  Just to be clear, he also met with
7  counsel.
8          MS. ST. PETER-GRIFFITH:  Oh, okay.  Well, we'll
9  get that on the record.
10          THE WITNESS:  Oh.  I also worked -- me with
11  counsel.
12              (Exhibit Fishman 003 was
13              marked for ID)
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   Okay.  Sir, how long did you meet with
16  counsel?
17      A.   We had several two-hour calls where we
18  talked and counsel learned what I knew and what I
19  didn't know and given the scope of what the deposition
20  was expecting to entail, where I needed to --
21          MS. CITERA:  I just want to stop you because
22  I --

Page 177

1          THE WITNESS:  Oh.
2          MS. CITERA:  She's not really asking you about
3  the substance of our conversation.  That would be
4  privileged.
5          THE WITNESS:  Sure.
6          MS. CITERA:  I think --
7          MS. ST. PETER-GRIFFITH:  Yeah, I'm -- I am
8  not --
9          THE WITNESS:  Okay.
10          MS. ST. PETER-GRIFFITH:  -- asking about the
11  substance.
12          THE WITNESS:  All right, so you just want a
13  number.  Fifteen hours.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   And was it Miss Citera that you spoke
16  with?
17      A.   Yes.
18      Q.   Were they all telephonic conversations?
19      A.   No.  We met face-to-face yesterday.
20      Q.   And how long did you meet face-to-face?
21      A.   Eight hours.
22      Q.   And did you review any documents other

45 (Pages 174 to 177)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 178

1  than what we've discussed?
2       A.  No.
3       Q.  And how many approximate two-hour
4  conference calls did you have?  You said "several."
5  I assumed --
6       A.  I'd have two.
7       Q.  Okay.  And did you have shorter calls
8  then?  Right now, I'm up to twelve hours.
9       A.  Yeah.  Counsel would have been present on
10  my conversations with the various people I talked with
11  as well.
12       Q.  Okay, so when you were educating yourself
13  in preparation for today's deposition, Counsel was on
14  the call?
15       A.  Yes.
16       Q.  And how much time in total did you spend
17  reviewing transcripts?
18       A.  An hour.  Transcripts?  An hour.
19       Q.  Okay, so all those transcripts that you
20  identified, you spent about an hour reviewing them?
21       A.  (Witness nodding).
22       Q.  Okay, and how much time did you spend on

Page 179

1  the phone with the various individuals that we've
2  discussed here this morning?
3       A.  I mean I -- I'd have to go back to my
4  testimony and see which ones I said lasted the half
5  hour to an hour and -- and add them up.  I mean --
6       Q.  Okay, so if we go ahead back and do that,
7  is that --
8       A.  If we go back, I don't -- I think that
9  would be a fair --
10       Q.  -- would that be accurate?
11       A.  -- a fair reflection of my time.
12       Q.  Okay.  And other than what you've just
13  testified to, have you done anything else to prepare
14  for today's deposition?
15       A.  No.
16       Q.  Sir, if you could look at what's been
17  marked as Exhibit 3?
18       A.  (Witness so doing).
19       Q.  Do you recognize that document?
20       MS. CITERA:  Do you have a copy for me?
21       MS. ST. PETER-GRIFFITH:  Yeah, this is the
22  deposition notice.

Page 180

1       MS. CITERA:  Okay, I mean I have this
2  (indicating).  Is that the same thing?
3       MS. ST. PETER-GRIFFITH:  Yes.  I thought I had
4  slid another copy of it.
5       MS. CITERA:  No, this was my own copy.
6       MS. ST. PETER-GRIFFITH:  Oh, I'm sorry, but no
7  I thought I gave you -- or I thought I had put in
8  front of you?
9       MS. CITERA:  No.
10       MS. ST. PETER-GRIFFITH::  I'm sorry.
11       MS. CITERA:  It doesn't matter.  I mean if
12  it's Exhibit A --
13       MS. ST. PETER-GRIFFITH:  Well, we're going over
14  it.
15       THE WITNESS:  I am familiar with the -- with
16  Exhibit A.
17
18  BY MS. ST. PETER-GRIFFITH:
19       Q.  Okay, have you reviewed it before?
20       A.  I have reviewed Exhibit A, yes.
21       Q.  And, sir, do you feel adequately prepared,
22  based upon what you have testified is your preparation

Page 181

1  here today, to testify to the subject matters
2  identified in Exhibit A?
3       A.  As subject to --
4       MS. CITERA:  Objection.
5       THE WITNESS:  Subject to the limitations and
6  objections already issued, yes, I'm prepared.
7
8  BY MS. ST. PETER-GRIFFITH:
9       Q.  Well, Counsel hasn't moved for
10  protective -- a protective order.  There's no
11  protective order precluding questions concerning the
12  subject matters here today.
13       So are there any areas that -- on
14  Exhibit A that you're not prepared to testify about?
15       MS. CITERA:  I would disa -- we have given you
16  our objections, we've given you our limitations, we've
17  told you what he's going to testify about that we --
18       MS. ST. PETER-GRIFFITH:  Okay, if -- this is
19  the notice.  You should have moved for protection if
20  you weren't going to provide a witness today that
21  would testify --
22       MS. CITERA:  We already -- we already provided

46 (Pages 178 to 181)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 182

1  you with letters that described the objections and
2  limitations.
3       MS. ST. PETER-GRIFFITH:  It's -- you don't get
4  to decide what the limitations are, Toni.
5       MS. CITERA:  Well --
6       MS. ST. PETER-GRIFFITH:  You should have gotten
7  a protective order if you're -- if he's not --
8       MS. CITERA:  Well --
9
10 BY MS. ST. PETER-GRIFFITH:
11      Q.  My question is, sir, are you prepared to
12 testify as to all the topics that are identified under
13 Exhibit A here today?
14      A.  I am not.
15      Q.  What topics are you not prepared to
16 testify about?
17      A.  Topic 7, I.
18      Q.  You're not prepared to testify about that
19 at all?
20      A.  Correct.
21      MS. ST. PETER-GRIFFITH:  And why wasn't this
22 witness prepared to testify about this topic today?

Page 183

1       MS. CITERA:  We have said, and Judge Bowler has
2  agreed, that we are not going to go into the TAP
3  stuff.
4       MS. ST. PETER-GRIFFITH:  Judge Bowler has not
5  issued a protective order with regard to this issue.
6       MS. CITERA:  Yes, she has.
7       MS. ST. PETER-GRIFFITH:  And the issue is not
8  the TAP stuff.  The issue is Abbott's conduct.
9       MS. CITERA:  Well, that's what Judge Bowler has
10 ruled on already.  Not that -- you know, we have said
11 this in our letter that she has already ruled on this
12 subject matter and that we're not going there.
13      MS. ST. PETER-GRIFFITH:  Judge Saris ordered
14 TAP to produce Abbott documents.  This is an issue
15 regarding Abbott and Abbott's compliance.
16      MS. CITERA:  We put in our letter that he's not
17 testifying -- as I said, I think, he's not prepared to
18 testify, and he will not testify as to that subject
19 matter.
20      MS. ST. PETER-GRIFFITH:  Well, the United
21 States vigorously objects, and you should have -- if
22 you had a concern about Topic 7, Sub I, you should

Page 184

1  have obtained a protective order.  We came here today
2  prepared to ask this witness questions about it, and
3  the fact that you do not have him prepared today is
4  inexcusable.
5       MS. CITERA:  I don't think it's --
6
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Sir, are there any other portions of this
9  transcript -- of Exhibit A that you are not prepared
10 to testify about here today?
11      MS. CITERA:  I mean That's a very broad
12 question.  He has said already that he's prepared to
13 testify subject to the objections and limitations.
14 So...
15      MS. ST. PETER-GRIFFITH:  I'm -- no, Toni, I
16 want him to tell me what he's prepared to testify
17 about here today.
18      MS. CITERA:  Okay, well, within each of these
19 topics, there is -- he's prepared to testify as to
20 the -- as subject to our objections and limitations,
21 but you can ask him about it.
22      MS. ST. PETER-GRIFFITH:  It's not -- you don't

Page 185

1  get to decide what a 30(b)(6) does and does not
2  testify about without a protective order, Toni.
3
4  BY MS. ST. PETER-GRIFFITH:
5       Q.  Sir, what are you prepared to testify
6  about here today?
7       A.  At the advice of counsel, I'm prepared to
8  testify subject to the limitations and objections.
9       Q.  Okay, what are you prepared to testify
10 about with regard to Exhibit A?
11      A.  I'm prepared to testify to Exhibit A
12 subject to the objections and limitations.
13      Q.  Okay, what objections and limitations?
14      A.  I defer to counsel.
15      Q.  Okay, sir, do you know what you're here to
16 testify about today?
17      A.  Yes.
18      Q.  Okay, what are you here to testify about
19 today?
20      A.  I'm here to testify about the compliance
21 program within Abbott.
22      Q.  Okay.  What else?

47 (Pages 182 to 185)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

Page 186

1    A.   That generally as to the compliance
2   program about Abbott and specifically within how it
3   applied to HPD.
4    Q.   Okay, sir, this is very important.  Did
5   you prepare today to testify as to any of the topics
6   identified in Exhibit A?
7    A.   Any of them?
8    Q.   Um-hum.
9    A.   Any of them?  Some of them, yes.
10   Q.   Which ones?
11   A.   All the matters in Subpart II.
12   MS. CITERA:  Subject to our objections and
13  limitations.
14   MS. ST. PETER-GRIFFITH:  Well, he's going to
15  have to identify what the subject -- what those
16  limitations are, Toni, because I want to know what he
17  prepared for and what he doesn't.
18   MS. CITERA:  You don't have -- we've put it in
19  our letter.  He doesn't have --
20   MS. ST. PETER-GRIFFITH:  It's not a letter,
21  Toni.  This is the notice.  This is what went out.  If
22  you didn't agree to this, you should have sought a

Page 187

1   protective order.
2    MS. CITERA:  We put --
3    MS. ST. PETER-GRIFFITH:  We came here prepared
4   to ask him today --
5    MS. CITERA:  We put you on notice.
6    MS. ST. PETER-GRIFFITH:  -- these questions.
7    MS. CITERA:  We put you on notice.
8    MR. ANDERSON:  Toni, right now we're not
9   arguing about whose burden it was to get protection or
10  get a motion to compel or -- right now, we're asking
11  the witness what topics and subtopics he's prepared
12  on, that's all.  It's just a matter of fact.
13   MS. CITERA:  And I just want to make clear that
14  within each of these topics that he is prepared to
15  testify about, that it's all -- it's subject to our
16  objections and limitations.  I just want the record to
17  be clear about that.
18   MS. ST. PETER-GRIFFITH:  Well, you know, we
19  disagree, obviously, vigorously.
20
21  BY MS. ST. PETER-GRIFFITH:
22   Q.   But, sir, I want you to tell me which

Page 188

1   topics you are prepared to testify about today.
2    A.   I'm prepared to testify to of Exhibit A
3   subject to the limitations and objections that have
4   been raised.
5    MR. ANDERSON:  We understand that prior
6   testimony, sir, but we're looking for specifics.  Can
7   you enumerate the topics and subtopics for which
8   you're prepared?
9    THE WITNESS:  I'm prepared to talk to
10  Subpart II --
11   MR. ANDERSON:  II?
12   THE WITNESS:  All of II.
13   MR. ANDERSON:  Okay.
14   THE WITNESS:  (Continuing) -- and generally
15  about policies and procedures as they would impact the
16  businesses in -- in Topic 8.
17  BY MS. ST. PETER-GRIFFITH:
18   Q.   Okay, so it's just Topic 1, Sub a through
19  d that you -- that it's your testimony you're not
20  prepared to talk about today?
21   A.   Well, I -- all of it is subject to the
22  objections and limitations that have been voiced --

Page 189

1   that have been raised.
2    Q.   Okay.  Well, what did you do to parse out
3   what you needed to prepare for in terms of these
4   individual topics as opposed to what was subject to an
5   objection?
6    MS. CITERA:  Object to the form.
7    THE WITNESS:  I met with the people that I
8   identified I spoke with, and I read through the
9   documentation that I've described that I reviewed.
10
11  BY MS. ST. PETER-GRIFFITH:
12   Q.   Are there any particular topics here that
13  you are not prepared to testify about because of an
14  objection asserted by Abbott?
15   A.   Topic 7, I, and my understanding is
16  Topic 8.
17   Q.   What do you mean Topic 8?  I'm sorry,
18  you're not prepared to talk about Topic 8 because of
19  an objection asserted?
20   MS. CITERA:  The problem with Topic 8, if I can
21  just interject, is part of it is being covered by
22  Mr. Sellers, as you know.

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 190

1    MS. ST. PETER-GRIFFITH:  I understand.  I mean
2  that was your decision to designate him on the --
3    MS. CITERA:  Well, I understand that, but I'm
4  just -- you know, so -- and as set forth in your own
5  notice, you indicated that --
6    MS. ST. PETER-GRIFFITH:  Yeah, I'm talking
7  about the policies -- I'm not challenging --
8    MS. CITERA:  Okay.
9    MS. ST. PETER-GRIFFITH:  I'm not expecting him
10 to cover what Mike Sellers is covering.
11   MS. CITERA:  Okay, okay, as long as it's clear.
12
13 BY MS. ST. PETER-GRIFFITH:
14   Q.  Sir, did you understand that you're not --
15 do I -- I want to make clear, are you prepared today
16 to testify to the policies identified in Topic 8?
17   A.  Generally, yes.
18   Q.  Sir, did you have any communications or do
19 any research to evaluate the involvement of the
20 following individuals in compliance matters:  Tom
21 Hodgson, Dwayne Burnham, Rick Gonzalez, Miles White?
22   MS. CITERA:  Objection to the form.

---

Page 191

1    MS. ST. PETER-GRIFFITH:  What's the basis of
2  your objection?
3    MS. CITERA:  You're -- it's a compound
4  objection, and I --
5    THE WITNESS:  Through the conversations that
6  I've had, I'm aware that Rick Gonzalez would have
7  been -- as President of HPD and Abbott Health Systems,
8  would have been a member of the Business Conduct
9  Committee, and Miles White, as Chairman of the
10 Board -- prior to being CEO, Chairman of the Board
11 would have been President of the Diagnostics Division,
12 would have been a member of Business Conduct Committee
13 and, as Chairman of the Board, would have received OEC
14 compliance updates.  Charlie -- oh, I guess the
15 additional point, Charlie met monthly --
16
17 BY MS. ST. PETER-GRIFFITH:
18   Q.  When you say:  Charlie, Charlie Brock?
19   A.  Charlie Brock.  (Continuing) -- met
20 monthly with Miles once he reported directly in to the
21 CEO.
22   Q.  Did you do anything else other than

---

Page 192

1  conferring with Mr. Brock to learn about
2  Mr. Hodgson's, Mr. Burnham's, Mr. Gonzalez's, or
3  Mr. White's involvement in compliance matters?
4    MS. CITERA:  Objection to the form.
5    THE WITNESS:  No.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Did you do anything to evaluate
9  Mr. Hodgson's, Mr. Burnham's, Mr. Gonzalez's, or
10 Mr. White's personal knowledge of compliance matters
11 at Abbott?
12   A.  No.
13   Q.  Why not?
14   MS. CITERA:  Objection to the form, outside the
15 scope.
16   MS. ST. PETER-GRIFFITH:  Outside the scope?
17   MS. CITERA:  Why is there personal knowledge?
18   MS. ST. PETER-GRIFFITH:  Because --
19
20 BY MS. ST. PETER-GRIFFITH:
21   Q.  Okay, sir, if you could just answer the
22 question?

---

Page 193

1    A.  I believe my role in testifying today was
2  to identify the general policies, the general
3  compliance initiatives and programs within Abbott
4  in -- on the -- regarding subject matter.
5    Q.  So in testifying here today and in
6  preparing to testify here today, you did not have an
7  understanding that you would be testifying about
8  information that these particular individuals, Mr.
9  Hodgson, Mr. Burnham, Mr. Gonzalez, or Mr. White might
10 have concerning compliance matters?
11   A.  Specifically, that's correct.
12   MS. CITERA:  Objection to form.
13   MS. ST. PETER-GRIFFITH:  Okay, why don't we
14 take a break?
15   MS. CITERA:  Do you want to take lunch now?
16   MS. ST. PETER-GRIFFITH:  Do you want to take a
17 lunch break?
18   MS. CITERA:  Yeah.
19   THE VIDEOGRAPHER:  Going off the record at
20 12:34 p.m.
21      (Lunch recess taken from
22       12:34 p.m. to 1:27 p.m.)

---

49  (Pages 190 to 193)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 194

1          P.M. PROCEEDINGS
2       THE VIDEOGRAPHER: Beginning Videotape No. 4 in
3    the deposition of Mr. Fishman. We're on the record at
4    1:27 p.m.
5          CONTINUING DIRECT EXAMINATION
6    BY MS. ST. PETER-GRIFFITH::
7       Q.  Okay, Mr. Fishman, I'd like to close out a
8    few more prep issues. I'd made a notation that there
9    might have been more compliance people that you spoke
10   with in -- in --
11      A.  No.
12      Q.  No? Okay.
13      A.  I think it was my -- it was an explan --
14   trying to provide an explanation as to why I stopped
15   in Lara's office.
16      Q.  Okay.
17      A.  So it was just she was somebody involved
18   in compliance generally. So that was just triggering
19   that thought.
20      Q.  Okay, so I just want --
21      A.  But there were no further people that I
22   talked to other than what I've identified.

Page 195

1       Q.  That's what I wanted to confirm.
2       A.  Okay.
3       Q.  Okay? Sir, did you do any evaluation of
4    the role of the corporate committees, like the
5    Business -- what were the names of the committees that
6    you had indicated?
7       A.  There was the Business Conduct Committee,
8    which was --
9       Q.  Okay.
10      A.  -- the corporate level executives that
11   Charlie reported to or reported -- not reported
12   formally, but had reports to. And then as part of the
13   OEC policies and procedures infrastructure, divisional
14   Steering Committees were created, and within the
15   division Steering Committees there specifically was an
16   Exceptions Review Committee, which would have been the
17   lower -- not the upper level management of the
18   division on that. That would have been more
19   day-to-day activity.
20      Q.  What is the Business Conduct Committee's
21   involvement in compliance matters?
22      A.  It is being advised of it, it will be

Page 196

1    to -- they would -- they'd -- not would have, they did
2    approve the -- all the corporate policies were
3    approved -- or presented to the Business Conduct
4    Committee and approved.
5       Q.  Can you take out Exhibit 38, please? Or
6    not --
7       A.  No.
8       Q.  I'm sorry, sub item --
9       A.  2?
10      Q.  No, I'm sorry. Sir, in that stack that's
11   in front of you, Exhibit 1, if you could take out Tab
12   38?
13      A.  Oh, 38?
14      Q.  Yes.
15      A.  That's the procedure.
16      MS. CITERA: The pink -- there we go.
17      THE WITNESS:  That's going to be a procedure.
18   Yes.
19
20   BY MS. ST. PETER-GRIFFITH:
21      Q.  Okay, would the procedure be approved
22   that's at Tab 38, would that be approved as -- by the

Page 197

1    Business Conduct Committee?
2       A.  No, this was divisional. So this -- the
3    Business Conduct Committee was a corporate level
4    organization. The divisional Steering Committee is
5    the level that it would have been at for the
6    procedures.
7       Q.  Okay, what about for the policy? Now, if
8    we could turn to Exhibit 2?
9       A.  Okay, for the policies?
10      Q.  For the policy. Would that have been
11   something that would have had to have been approved by
12   the Business Conduct?
13      A.  My understanding, yes.
14      Q.  Okay. Do you know what was presented to
15   the Business Conduct Committee concerning the -- the
16   policy that is reflected in Exhibit 2?
17      MS. CITERA: I'm sorry, can you repeat that
18   question?
19      MS. ST. PETER-GRIFFITH: Sure.
20          Can you read it back?
21          (Record read.)
22      MS. CITERA: What was presented?

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 198

1
2  BY MS. ST. PETER-GRIFFITH:
3       Q.  What information was presented?
4       A.  I don't know for certain.  In talking to
5  Charlie, he said he presented -- he reviewed the
6  policies with them, and they would have approved --
7  they did approve them.
8           What -- more precisely, did they see
9  the policies or did they see a summary of the policies
10  or a detailed summary of the policies?  I don't know
11  the specific answer to that question.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Okay, let me -- rather than doing this
14  sort of policy-by-policy, let me try and short-cut
15  this or let me start first with this question.
16           Did you investigate or do you have an
17  understanding as to any information that was
18  specifically presented to the Business Conduct
19  Committee concerning any policy that they reviewed and
20  approved?
21      MS. CITERA:  Objection to the form.
22      THE WITNESS:  Precisely -- I'd say the same

Page 199

1  answer.  Precisely as to which pieces of paper they
2  saw, I do not know precisely.  In talking with Charlie
3  and having him describe to me his role in
4  presenting -- him -- he and Katherine presented the
5  policies for approval, I did not ask him whether they
6  saw the exact pieces of paper that you have in front
7  of me or a detailed summary of it or at what level
8  they did see it.
9
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Did you research or do you have any
12  information concerning the actual discussions that
13  went on in the -- before the -- within the Business
14  Conduct Committee?
15      A.  I talked -- again, talked with Charlie and
16  Katherine about the subject matter generally.  I did
17  not ask specifically, and nor was I advised
18  specifically as to specific conversations about the
19  policies.
20      Q.  Well, if the Business Conduct Committee is
21  a, you know, corporate level committee of senior
22  officials, why didn't you research what was presented

Page 200

1  to them specifically and what their deliberations were
2  concerning corporate policies?
3      A.  I --
4      MS. CITERA:  Form.
5      THE WITNESS:  It wasn't -- just wasn't part of
6  my diligence review.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, how come?
10      A.  No -- no particular reason.  There's not
11  a -- there's not a reason why it wasn't.  It wasn't.
12      Q.  Did you -- did you research the role of
13  the President's office in evaluating or considering or
14  approving or rejecting policies or procedures
15  pertaining to compliance?
16      MS. CITERA:  I assume you don't mean President
17  Bush.
18      MS. ST. PETER-GRIFFITH:  No, I mean -- no, I
19  mean your boss, not my boss.
20      THE WITNESS:  Specifically -- specifically, no.
21
22  BY MS. ST. PETER-GRIFFITH::

Page 201

1      Q.  Okay, how come?
2      A.  Same answer.  I -- I approached the
3  subject matter generally.  I did not get into the
4  detailed specifics about the individual -- individual
5  role on -- on a given committee.
6      Q.  Do you know what the President's
7  involvement -- or what is the President's involvement
8  in compliance matters?
9      MS. CITERA:  Objection to the form.
10      THE WITNESS:   As -- well, what time frame?
11
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Anytime from '91 to 2003.
14      A.  Different structures.  There would have
15  been a period of time when there was no President.
16      Q.  No President of Abbott Corporation?
17      A.  (Witness nodding).
18      Q.  Okay, just a CEO?
19      A.  Right, right.
20      Q.  Okay.
21      A.  Right, there was -- I mean we weren't
22  headless.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 202

1    Q.   Yeah, thank you for clarifying that.  What
2  was the role -- let me rephrase the question.
3    A.   Yeah.
4    Q.   What was the role -- from '91 through
5  2003, what was the role of either the President or the
6  CEO in compliance matters?
7    A.   Well, as -- as Chief Exec -- as Chief --
8  or as senior management of the corporation, they --
9  they would have been responsible for seeing that the
10  compliance -- you know, everything that happens in the
11  company, ultimately it is -- it would be something
12  that they would be -- you know, take general, you
13  know, responsibility, kind of the buck stops here.
14            In terms of specific activity, as I
15  said before, I don't believe the CEO sat on the
16  Business Conduct Committee.  I believe the Business
17  Conduct Committee made recommendations to the CEO.  I
18  know that Charlie Brock as the newly-constituted Chief
19  Compliance Officer, when he did report directly to the
20  CEO, had regular meetings with him and sat on his
21  senior staff.
22    Q.   Do you have any information about the

Page 203

1  specifics of those meetings?
2    A.   I do not.
3    Q.   Okay.  Do you have any information
4  concerning the specifics of compliance decisions made
5  by the CEO or President from '91 through 2003?
6    MS. CITERA:  Objection to form.
7    THE WITNESS:  Boy, that's a very broad
8  question.  I'm -- by compliance, again, I'm assuming
9  you're referring to fraud and abuse?
10
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   Medicare and Medicaid fraud and abuse,
13  yes.  And when I say that, just to clarify, whenever I
14  say that, you know, all statutes concerning Medicare
15  and Medicaid fraud and abuse, all regulations
16  including the anti-kickback statute, the False Claims
17  Act, Stark, any state False Claims Act, you understand
18  the background?
19    A.   Yes, I understand that --
20    MS. CITERA:  Objection to form.
21    THE WITNESS:  I understand that phrase now.
22    MS. CITERA:  Objection to form.

Page 204

1    MS. ST. PETER-GRIFFITH:  Okay.
2    THE WITNESS:  I am not -- I am not
3  personally -- I'm not aware of any decision that the
4  CEO made specifically about compliance.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Okay, when you say you're not aware,
7  meaning you Mr. Fishman or you Abbott are not aware?
8    A.   Me Abbott through the diligence that I
9  conducted.
10    Q.   And what did you do to determine that?
11    A.   I did not ask that question specifically
12  to anybody.
13    Q.   Then how do you know whether or not the
14  CEO or the President was involved in compliance
15  matters, fraud -- Medicare/Medicaid fraud and abuse?
16    A.   Because I know they were -- they were
17  ad -- they were advised by the organization who was
18  responsible for compliance matters, but then what
19  decisions they made -- and subsequent decisions that
20  were made I can't articulate at what level they were
21  made and by whom and when.
22    Q.   So they may have been made by the

Page 205

1  President or CEO, but you just don't know?
2    A.   That's correct.  I said I didn't -- I'm
3  not aware of any specific decisions that they made.
4    Q.   Okay.  Prior to Mr. Brock serving in his
5  role --
6    A.   Um-hum.
7    Q.   -- how was either the Business Conduct
8  Committee or the CEO or President advised of
9  compliance matters -- on compliance matters?
10    A.   The chief compliance person within the --
11  within Abbott, prior to having a designated Chief
12  Compliance Officer, would have been the General
13  Counsel.
14    Q.   Okay.  And what --
15    A.   And --
16    Q.   What communications did the General
17  Counsel have with the President or CEO concerning
18  Medicare and Medicaid fraud and abuse matters?
19    MS. CITERA:  I'm going to just, obviously,
20  object to the extent --
21    THE WITNESS:  I would say that any
22  conversations --

52 (Pages 202 to 205)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 206

1     MS. CITERA:  Yeah.
2     THE WITNESS:  -- that General Counsel would
3  have had would have been privileged.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Well, I mean I'm asking you he -- how
6  can -- the General Counsel was also the Compliance
7  Officer, right?
8     A.  It was -- not -- it served a compliance
9  function.  I don't know that it was designated a
10  Compliance Officer.  Like I said, Charlie Brock was
11  the first by name compliance officer in -- compliance
12  was a function of Legal.  So it went through -- so it
13  came through the General Counsel's office even after
14  the OEC came into play.
15     Q.  What communications prior to Mr. Brock
16  coming onboard did the Chief Compliance Officer have
17  with the Chief -- CEO or President of the company from
18  '99 to 2003 concerning -- or, yeah, to 2001 concerning
19  Medicare/Medicaid fraud and abuse?
20     MS. CITERA:  I'm just going to object and
21  caution you not to reveal any privileged
22  conversations.

Page 207

1     THE WITNESS:  Yeah.
2
3  BY MS. ST. PETER-GRIFFITH:
4     Q.  Why --
5     A.  First --
6     Q.  Hold on, sir.  Why do you maintain that
7  that is privileged?  It's a communication concerning
8  compliance matters.
9     MS. CITERA:  The General Counsel is advising
10  the CEO on -- it's providing legal advice.  Yes, it
11  has to do with compliance, but it's also legal advice.
12
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  How was the determination made that it was
15  legal advice as opposed to compliance advice
16  concerning policies and practices of the company?
17     MS. CITERA:  Well, I -- again, I have cautioned
18  him -- now, if it's a question of, you know, what
19  policy is in place -- I mean I think he -- he has to
20  testify -- he can only testify as to non-privileged
21  discussions.
22     If there was a non-privileged

Page 208

1  discussion that the General Counsel had with the CEO,
2  then he can testify as to that.  If it's privileged,
3  I'm instructing him not to testify about that.
4     So I'm not saying all conversations
5  are privileged.  I'm saying that if it was a
6  privileged discussion, that he cannot disclose it; if
7  it wasn't a privileged discussion, then he can
8  disclose it.
9     MS. ST. PETER-GRIFFITH:  Okay.
10
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  What communications did the Chief -- the
13  CEO or President of Abbott have from 1991 until 2001
14  with the Corporate Compliance Officer?
15     A.  I don't believe there was -- I believe it
16  was General Counsel serving as the head of the
17  function of compliance within his purview as General
18  Counsel, and I do not know what communications about
19  compliance that they may have had.
20     Q.  Okay, what communications did the CEO or
21  President of the company, Miles White, have with the
22  corporate compliance officer concerning the

Page 209

1  Congressman Stark letter?
2     MS. CITERA:  Object to the form, outside the
3  scope.
4     THE WITNESS:  I don't -- I don't have any
5  knowledge of that.
6
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Are you aware that a letter was sent by
9  Congressman Stark raising Medicare and Medicaid fraud
10  and abuse matters?
11     A.  I am not.
12     MS. CITERA:  Objection to the form, outside the
13  scope.
14     MS. ST. PETER-GRIFFITH:  It is not outside the
15  scope.  It is directly on point.
16
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Sir, what did you do to evaluate the
19  involvement -- strike that.
20     What specific involvement did the
21  Business Conduct Committee have in setting particular
22  policies -- in reviewing and approving particular

53 (Pages 206 to 209)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 210

1  policies concerning Medicare and Medicaid fraud and
2  abuse?
3      A.   They would have been the --
4      MS. CITERA:  Objection to form.
5      THE WITNESS:  They would have been the ultimate
6  decision-making body on the approval of the formal OEC
7  policies.
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   And what policies did they review and
11  approve?
12     A.   All of them, and I have to describe them
13  more from recollection than -- whatever list I give
14  you will not be the complete list of policies and
15  procedures that exist.
16     Q.   What --
17     A.   The policies that exist.
18     Q.   Okay, and what information do you have
19  concerning the internal debates about these policies?
20     MS. CITERA:  Objection to form.
21     THE WITNESS:  Between -- between whom?
22  Internal debates within Abbott?

Page 211

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   With -- no, within the Business Conduct
4  Committee.
5      A.   I have no knowledge of that, of any
6  debates, whether there was or wasn't a debate.
7      Q.   Now, Mr. Gonzalez was a member of this
8  committee?
9      A.   What time frame?
10     Q.   Well, at any time frame.
11     A.   I believe that, as President, he was --
12  prior to becoming President, as Chief Operating
13  Officer of Medical Products Group, he -- I know he was
14  President of HPD, and prior to being President of HPD,
15  he was President of AHD, and it is my understanding
16  that the Presidents of the division sat on the
17  Business Conduct Committee.
18          I actually did not ask specifically
19  of Charlie, when we talked about that, whether -- as a
20  matter of fact, I think Rick was because he talked
21  about Jeff Leyden, who was the co-COO.  He was in
22  charge -- he was the President and Chief Operating

Page 212

1  Officer of the Med -- of the Pharmaceutical Products
2  Group.  So I believe that Rick Gonzalez would have sat
3  on the Business Conduct Committee in his capacity as
4  President of the Medical Products Group.
5      Q.   Okay, did you identify what Mr. Gonzalez's
6  role was or what discussions he had while he was a
7  member of that group?
8      A.   I did not.
9      Q.   Okay.
10     A.   I'm not aware that there was a different
11  role even as -- as -- there was a -- it was a full
12  body of representatives.  I don't know that there was
13  unique roles --
14     Q.   Okay.
15     A.   -- assigned to the committee.
16     Q.   Even if there wasn't unique roles, do you
17  know what Mr. Gonzalez's involvement was or what
18  discussions he had when he was on the Business
19  Committee?
20     A.   I do not.  I do not know what
21  commission -- what conversations he would have had in
22  his role would have been as a member of the committee.

Page 213

1      Q.   With regard to -- let's talk about in his
2  capacity as President of HPD.  Are you aware of or
3  familiar with Mr. Gonzalez's role on -- role in
4  compliance matters in his capacity as President of
5  HPD?
6      A.   I am aware that compliance matters -- that
7  he would have been aware of compliance matters
8  generally.
9      Q.   Do you know what matters he was aware of
10  and what that general knowledge was?
11     MS. CITERA:  Objection to form.
12     THE WITNESS:  He was aware of -- I believe the
13  correct time frame is in '99 when we did the operating
14  guidelines, he would have been -- he would have
15  reviewed those and approved them.
16
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   Do you know for a fact whether he did?
19     A.   I -- I don't -- the President of HPD did.
20  What I don't know for certain is whether Rick was the
21  President of HPD in August of '99.
22     Q.   Do you know why in '99, in reviewing and

54 (Pages 210 to 213)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 214

1   approving the operating guidelines, the President of
2   HPD would not have required a prohibition against
3   spread marketing --
4       MS. CITERA:  Objection to the --
5
6   BY MS. ST. PETER-GRIFFITH:
7       Q.  -- or AWP discussions with clients?
8       MS. CITERA:  Objection to the form, outside the
9   scope.
10      MS. ST. PETER-GRIFFITH:  It's not outside the
11  scope.
12      THE WITNESS:  I don't know why he -- the
13  guidelines were not policies and procedures.  They
14  were guidelines, and the subject matter and focus of
15  those guidelines did not encompass AWP -- specifically
16  AWP or pricing or any -- any aspect of pricing.
17
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Why didn't they?
20      A.  It was --
21      MS. CITERA:  Objection to form, outside the
22  scope.

Page 215

1       MS. ST. PETER-GRIFFITH:  It's not outside the
2   scope.
3       THE WITNESS:  It was -- it wasn't the scope of
4   the guidelines.  The guidelines dealt with program
5   funding.
6
7   BY MS. ST. PETER-GRIFFITH:
8       Q.  Did Mr. Gonzalez ever address the issue of
9   whether or not there should be a formal prohibition
10  against discussions of AWP, spread marketing or spread marketing
11  within Hospital Products Division?
12      A.  I do not know that.
13      MS. CITERA:  Same objections.
14
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Did you do anything to research that?
17      A.  No.
18      Q.  Did you do anything at all to research
19  Mr. Gonzalez's involvement in compliance matters in
20  his capacity as President of HPD?
21      A.  Other than talking with -- talking with
22  Mike Sellers and Ginny Tobiason as members of HPD and

Page 216

1   Charlie Brock in his capacity with working with the
2   Business Conduct Committee, no.
3       Q.  What did they tell you about
4   Mr. Gonzalez's role in compliance matters?
5       A.  Nothing specifically.
6       Q.  What about Mr. Hodgson and Mr. Burnham,
7   they had previously held leadership roles within HPD,
8   didn't they?
9       A.  Whew.
10      Q.  I know I might be taxing your memory.
11      A.  Burnham, no.
12      Q.  Okay.
13      A.  To my knowledge, Burnham became CEO in
14  '89, and prior to that, he was CFO, and I don't that
15  he -- I don't -- I think he came in as CFO.
16      Q.  Okay.
17      A.  But I'm not positive of that.
18      Q.  Do you --
19      A.  I know he succeeded CEO from CFO.
20  Burnham -- or not Burnham.  Hodgson had various
21  responsibilities before becoming President, and
22  immediately prior to being President, he was President

Page 217

1   of the international division, Abbott International,
2   and prior to that, I don't know.
3       The only -- funny story.  The only
4   reason I know he had any connection to HPD was he was
5   Plant Manager in the '60s of Ashland, and he used to
6   go to the country club pool after work and practice
7   rolling his kayak.
8       Q.  Okay.  Did you do anything to research
9   what Mr. Hodgson or Mr. Burnham's role was in
10  compliance matters at any time from '91 through 2003?
11      A.  Neither of them would have been there that
12  long, but in the period of time that they were there,
13  no.
14      Q.  Sir, how did you decide what testimony to
15  review and what witnesses to interview in preparation
16  for your testimony here today?
17      A.  I de --
18      MS. CITERA:  Objection to form.
19      THE WITNESS:  Yeah.
20      I described the witnesses -- why I
21  talked to the people I talked to was as a result of
22  conversations with counsel in identifying pieces of

55 (Pages 214 to 217)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 218

1  information that I was not certain of or didn't know
2  and went to sources of that information I thought
3  would know.  And in terms of the testimony that I
4  reviewed, it was the testimony I was asked to review.
5
6  BY MS. ST. PETER-GRIFFITH:
7       Q.  Did you think it important to do any
8  research about whether or not employees within HPD
9  discussed spreads or presented spread information or
10 AWP information to Abbott's clients?
11      A.  I had those conversations with the people
12 that I interviewed who would have known anything
13 about -- would have known about HPD's practices like
14 Sellers and Ginny Tobiason, in particular.
15      Q.  But are you aware that there are other
16 people that made clear that in fact the practice was
17 going on?
18      MS. CITERA:  Objection to form.
19      THE WITNESS:  No, I'm not aware of that.
20
21 BY MS. ST. PETER-GRIFFITH:
22      Q.  Did you ask or did you do any research to

Page 219

1  evaluate whether or not the practice was actually
2  going on within HPD?
3       A.  Yes.
4       Q.  What did you do?
5       A.  I talked with Mike Sellers and Ginny
6  Tobiason about their knowledge of AWP issues within
7  HPD.
8       Q.  To your knowledge, did Mike Sellers or
9  Ginny Tobiason do marketing within HPD?
10      A.  To my knowledge, Mike Sellers, when I
11 interacted with him, was General Manager of Contract
12 Marketing.
13      Q.  For HBS?
14      A.  Certainly for HBS.  There may have been a
15 point in time when they were no longer separate.  I'm
16 not certain of that.
17         Ginny, to my knowledge, she was more
18 the -- she had specific knowledge about reimbursement.
19 I don't know that she was -- ever served in -- she's
20 been at Abbott a long time, and it's conceivable that
21 she served in a marketing capacity.  I'm not aware of
22 that --

Page 220

1       Q.  Did you --
2       A.  -- and when it was.  I don't know if it's
3  the relevant time frames.
4       Q.  Did you ask about the historical practices
5  in HPD regarding AWP communications or spread
6  communications?
7       MS. CITERA:  Objection to form.
8       THE WITNESS:  What do you mean by "historical"?
9
10 BY MS. ST. PETER-GRIFFITH:
11      Q.  Meaning what they -- what actually took
12 place, what the practices were.
13      A.  I asked --
14      MS. CITERA:  Objection.
15      THE WITNESS:  I asked about what the practice
16 was within HPD regarding AWP and was advised by both
17 Ginny and Mike that it was not the practice of HPD to
18 talk to customers about AWP.
19
20 BY MS. ST. PETER-GRIFFITH:
21      Q.  Well, did -- were -- did you -- did anyone
22 ever tell you that in fact the practice was taking

Page 221

1  place?
2       MS. CITERA:  Objection to the form and to the
3  testifying by Counsel.
4       THE WITNESS:  Nobody told me that it was taking
5  place.
6
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Okay, did you review the testimony of
9  Dennis Walker, Mike Hegge, Ted Lijek, Christine Snead,
10 Debbie Longley, Pete Baker, Cindy Dawson, Greg Lutz,
11 Steve Kipperman, or Dave Brinks?
12      A.  I saw --
13      MS. CITERA:  Objection to form.
14      THE WITNESS:  (Continuing) -- a portion, a
15 limited portion of Pete Baker's testimony.
16
17 BY MS. ST. PETER-GRIFFITH::
18      Q.  Okay, did that pertain to AWP?
19      A.  It did.
20      Q.  What do you recall his testimony was?
21      A.  From what I recall, his testimony was that
22 it was not the practice within HPD to provide AWP

56 (Pages 218 to 221)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 222

1  information to customers.
2      Q.  If HPD employees provided AWP information
3  or AWP spread information to customers, would that
4  have violated any Abbott policy that was in place from
5  1991 to 2000?
6      MS. CITERA:  Objection to the form, outside the
7  scope.
8      MS. ST. PETER-GRIFFITH:  It's not outside the
9  scope.  It's directly on point.
10     THE WITNESS:  '91 to 2000?  What time frame did
11 you --
12
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  '91 to 2000.
15     MS. CITERA:  Same objections.
16     THE WITNESS:  There -- to my knowledge, there
17 was not a formal policy pertaining to AWP.  There was
18 a practice.  And whether or not they violated it, it
19 sounds to me violation is a conclusion of reviewing
20 facts in relation to -- in relation to legal analysis.
21
22 BY MS. ST. PETER-GRIFFITH:

---

Page 223

1      Q.  Well, if some -- if someone within HPD
2  during the time frame from 1991 to 2000 provided
3  spread marketing information, AWP information, AWP
4  spread information to customers, would that violate
5  Medicare and Medicaid fraud and abuse statutes?
6      MS. CITERA:  Objection.
7      THE WITNESS:  You're asking me for a legal
8  conclusion.
9      MS. CITERA:  He's not here to talk -- he's not
10 here to give legal conclusions.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  I want to know, from Abbott's viewpoint,
13 was that -- was that a violation of any statute?
14     A.  That's a legal conclusion --
15     MS. CITERA:  Objection to form, outside the
16 scope.
17     THE WITNESS:  -- that I'm not prepared to
18 answer today.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  Did Abbott have a concern that it
22 might have violated --

---

Page 224

1      MS. CITERA:  Objection.  Are you done?
2
3  BY MS. ST. PETER-GRIFFITH::
4      Q.  -- that it might have violated
5  Medicare/Medicaid fraud and abuse abuse statutes?
6      MS. CITERA:  Objection to the form, outside the
7  scope.
8      THE WITNESS:  Abbott had -- took compliance
9  very seriously and evaluated its -- its activities
10 regularly, and conduct that may have raised concerns
11 or questions about their legality would have caused
12 Abbott to be concerned.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay, was Abbott concerned?
16     MS. CITERA:  Objection to the form, outside the
17 scope.
18     MS. ST. PETER-GRIFFITH:  It's not outside the
19 scope, but go ahead.
20     MS. CITERA:  You're asking him to give
21 opinions.
22     MS. ST. PETER-GRIFFITH:  I am not asking him --

---

Page 225

1  I am asking him about Abbott's concerns.  He is here
2  to testify today on behalf of Abbott.
3      MS. CITERA:  Not as to this area.
4      THE WITNESS:  Abbott was generally con -- was
5  generally concerned and took very -- and worked very
6  hard at addressing fraud and abuse issues.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, what did Abbott do -- let's start
10 there.  You said that Abbott took compliance
11 seriously.
12     A.  (Witness nodding).
13     Q.  What did Abbott do for the time period
14 from 1991 to 2001 to ensure that Medicaid and Medicare
15 statute -- fraud and abuse statutes were not violated
16 and regulations?
17     MS. CITERA:  Objection to, form.
18     THE WITNESS:  Multiple -- what time frame
19 again, '91 to when?
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  2001.

---

57 (Pages 222 to 225)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 226

1    A.  2001.  There were multiple approaches to
2  the subject matter.  From the highest level, there
3  was -- the broadest level, there was the Code of
4  Business Conduct, which required all Abbott employees
5  to comply with laws.  To the extent the fraud and
6  abuse laws were involved in our activities, they would
7  have been expected to adhere to those.
8    Q.  Okay.
9    A.  The way in which they learned of those
10 laws was through Legal Department presentations, which
11 we have multiple copies of, given over a wide range of
12 time.  And as part of that presentation, we always
13 advised the participants, and this would be true
14 generally, if anybody -- and it was certainly part of
15 the legal -- the Business Code of Conduct, if anybody
16 had any questions, there was the General Counsel's
17 number to call and inves -- and if there was something
18 being called in, that would be investigated.
19        Separate from that, all clients --
20 this is internal Abbott clients of the Legal
21 Department, when we spoke with them, would have as
22 part of our presentation advised them, If you ever

Page 227

1  have any -- you know, here's -- here's the law as we
2  see it, here are some issues you should be looking at,
3  if you have any concerns or any questions at any time
4  about any of this or any subject matter, contact us.
5  And so we worked -- we worked closely with those
6  clients across all the businesses.
7        In addition, we prepared the
8  divisional operating guidelines for program funding
9  that addressed subject matters dealing with
10 interactions with healthcare professionals.  We
11 prepared a 2000 a handbook, fraud and abuse handbook.
12        Is that end of the time line you had
13 asked me about?
14    Q.  Through 2001.
15    A.  Through 2001?  I'm losing track.  2001?
16 Pharma came out in 2002.  So that would have been --
17 that would be a summary of the activities taken by the
18 multitude of Commercial Attorneys within the Legal
19 Division.
20    Q.  Was there anything else that was done
21 within the Hospital Products Division other than what
22 you've just testified to?

Page 228

1    A.  Specifically regarding training on
2  compliance?  Not that I'm aware of.
3    Q.  Okay, and when we say "compliance," we're
4  talking about Medicare and Medicaid fraud and abuse on
5  that?
6    A.  I am, yes.
7    Q.  I have deposed a lot of business
8  individuals, and they have a different -- they use a
9  different term for compliance.
10      THE WITNESS:  Yeah.  I would add to that and
11 which I -- I started my -- I started my discussion of
12 compliance, what we would have done, the Code of
13 Business Conduct as -- if you've looked at it, is
14 broader than just -- substantially broader than just
15 compli -- healthcare compliance.
16
17 BY MS. ST. PETER-GRIFFITH::
18    Q.  Sure.  Sure, I understand.
19    A.  So it would have been in that context as
20 well,.
21    Q.  Well --
22    A.  So, you know, we gave the antitrust

Page 229

1  presentations, we gave the insider trading
2  presentations, but I don't think that's the scope of
3  what we're talking about today.
4    Q.  Let's look at Tab 23.  Why don't we start
5  there?
6    A.  Okay.
7    Q.  Sir, if you can turn to Page 16?
8    A.  Yes.
9    Q.  Actually, before you turn, let me ask you
10 what is this document?
11    A.  This is the 1999 -- a copy of the 1999
12 Abbott Laboratories Code of Business Conduct.
13    Q.  And if you -- if you turn to the very last
14 page, it appears to be dated 10/1/99; is that right?
15    A.  That is what it says, yes.
16    Q.  Okay.  If you could turn to Page 16?  And
17 let me ask you, sir, is this the portion of the Code
18 of Business Conduct dealing with Medicare/Medicaid
19 fraud and abuse laws?
20    A.  It is.  Specifically, yes.
21    Q.  When was this added to the Code of
22 Business Conduct?

58  (Pages 226 to 229)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 230

1    A.  To my knowledge, and we spent time trying
2  to investigate this without a satsfactory answer, a
3  certainty, it's almost proving -- again, proving the
4  negative whether there was an interim Code of Business
5  Conduct that was issued between '93 and '99.  To --
6  through a series of inquiries, none exists.  So it
7  would have been added for the October '99 version.
8    Q.  Okay, because the '93 version didn't have
9  one?
10    A.  Correct.
11    Q.  And that's the one signed by Dwayne
12  Burnham?
13    A.  If it was signed by the CEO, then that
14  would be correct.
15    Q.  Okay.  And it's -- I'm trying to get you a
16  copy, but it's substantially shorter than -- probably
17  about half as long; is that fair?
18    A.  Ah --
19    Q.  We'll look at it.
20    A.  -- I can't make that determination.
21    Q.  That's okay, we'll look at it.  Sir, what
22  prompted Abbott to include this section in its Code of

Page 231

1  Business Conduct?
2    A.  I believe that --
3    MS. CITERA:  Objection to form.
4    THE WITNESS:  This is speculation in some
5  regards because I don't have it.  No one told me
6  specifically what it was added.  What appears obvious
7  to me is the difference between 1993 and 1999 was the
8  environment which the subject matter existed.
9
10  BY MS. ST. PETER-GRIFFITH:
11    Q.  When you say the -- what do you mean by
12  that?
13    A.  I mean the enforcement environment, the
14  '93 I think the safe harbors would have just come out,
15  and I think they were even revised, provided a little
16  bit more information.  So there was relatively little
17  formal pronunciation and guidance regarding the
18  statute in '9 -- in 1993, and it became a
19  particularly -- again, in attempting to address
20  compliance matters, as the external environment
21  changes around you, you, you know, address the
22  external environment.

Page 232

1    Q.  Okay, when you say "the external
2  environment," do you mean that there was more
3  enforcement of Medicare?
4    A.  There's more enforcement, there's more
5  attention, there was more resources, there was --
6  again, there was some more settlements, so there was
7  more understanding of what -- how these laws and
8  regulations were being applied and what the concerns
9  of the enforcement agencies were.  I think in '93,
10  there was a lot less known about it than in '99.
11    Q.  Okay, well, could Abbott have done
12  something to clarify -- well, let me ask you -- strike
13  that.
14        Was Abbott confused about how
15  Medicare or Medicaid fraud and abuse statutes applied
16  with regard to AWP pricing, spread and spread
17  marketing?
18    MS. CITERA:  Objection to form, outside the
19  scope.
20    MS. ST. PETER-GRIFFITH:  It's not outside the
21  scope.
22    THE WITNESS:  When?  What time frame are you

Page 233

1  talking about?
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Pre-1999.  Fair question.
5    MS. CITERA:  Same objections.
6    THE WITNESS:  Were we confused?  Abbott --
7  Abbott had a -- an understanding of the law as written
8  and continued to gain insight into the interpretation
9  of the laws and the regulations and the safe -- the
10  safe harbor regulations in particular as more
11  attention was placed on it and more information
12  became -- became available.
13
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Became available from who?
16    A.  Publicly.
17    Q.  Okay.  Well, at any time did Abbott go to
18  either HHS OIG or HCFA and ask for clarification about
19  whether or not it was permissible to maintain
20  excessively high spreads -- when I say "high spreads,"
21  I mean a hundred percent or more to a thousand percent
22  to two thousand percent -- on its drug products or to

59 (Pages 230 to 233)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 234

1  market the spread and provide spread information to
2  its customers?
3       MS. CITERA:  Objection to the form, outside the
4  scope.
5       MS. ST. PETER-GRIFFITH:  It's not outside the
6  scope.
7       THE WITNESS:  You've asked a lot of questions
8  there.
9
10 BY MS. ST. PETER-GRIFFITH:
11      Q.  Okay, well, I can break it down for you,
12 okay?
13      A.  (Witness nodding).
14      Q.  Okay, let's do this.  At any time did
15 Abbott go to HCFA or HHS OIG to ask about its pricing
16 activities and whether or not it was in compliance
17 with health -- Medicaid and Medicare fraud and abuse
18 statutes?
19      MS. CITERA:  Same objections.
20      THE WITNESS:  No, not to my knowledge.
21
22 BY MS. ST. PETER-GRIFFITH:

Page 235

1       Q.  Okay, why not?
2       MS. CITERA:  Same objections.
3       THE WITNESS:  You're asking me to speculate as
4  to why they didn't do something?
5
6  BY MS. ST. PETER-GRIFFITH:
7       Q.  I'm asking -- it's not "they."  You --
8  you're sitting here today as Abbott.  I'm asking why
9  Abbott didn't go to HHS OIG or to HCFA to ask about
10 its compliance in its pricing and its AWP activities?
11      MS. CITERA:  Same objections.
12      THE WITNESS:  I don't -- the premise of this
13 was whether there was any confusion, and I'm not
14 certain it's fair to assume that there was confusion.
15 Perhaps the premise of your question was why was
16 Abbott -- was Abbott confused?
17
18 BY MS. ST. PETER-GRIFFITH:
19      Q.  I'm on a different question now, sir.
20      A.  But it's -- I know, but these questions
21 are -- appeared to me to be following one another.
22      Q.  Well, sir, I just want you to -- trust me,

Page 236

1  if you try to follow me from one question to another,
2  we could all get real confused --
3       A.  Okay.
4       Q.  -- okay?  So don't necessarily believe
5  that it flows.  I just want you to answer the
6  question --
7       A.  Okay.
8       Q.  -- that's pending before you.
9       A.  Okay.  What -- which is?
10      MS. CITERA:  Do you need the question read
11 back?
12      THE WITNESS:  Yeah.  The question is?
13      MS. ST. PETER-GRIFFITH:  Can you read it back,
14 please?
15      THE REPORTER:  Okay.
16          (Record read.)
17      MS. CITERA:  Same objections.
18      THE WITNESS:  Hum?
19      MS. CITERA:  No --
20      THE WITNESS:  Same objections?  Okay.
21      MS. CITERA:  -- I was just saying, "Same
22 objections."

Page 237

1       THE WITNESS:  I hear that question as assuming
2  that we needed clarification.
3  BY MS. ST. PETER-GRIFFITH:
4       Q.  Well, did you need clarifications?
5       A.  Not to my knowledge.
6       MS. CITERA:  Same objections.
7
8  BY MS. ST. PETER-GRIFFITH:
9       Q.  Okay, did you have an understanding as to
10 whether the maintenance of spreads on certain Abbott
11 HPD products of a hundred percent or more to a
12 thousand percent, sometimes two thousand percent was
13 permissible under the federal, state and -- federal
14 and state Medicaid and Medicare fraud and abuse
15 statutes?
16      A.  That -- that clearly --
17      MS. CITERA:  Wait, can I --
18      THE WITNESS:  Oh, sorry.
19      MS. CITERA:  Objection to form, outside the
20 scope.  He's not here to say what's legal or illegal.
21      MS. ST. PETER-GRIFFITH:  I'm not asking him
22 what's legal.

60 (Pages 234 to 237)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 238

1    THE WITNESS: You said "permissible."
2    MS. ST. PETER-GRIFFITH: I'm asking him what
3 Abbott's understanding is.
4    THE WITNESS: But that's a legal conclusion.
5 Whether something is permissible under statute is a
6 legal conclusion.
7
8 BY MS. ST. PETER-GRIFFITH:
9    Q.  Did Abbott believe it?  I'm asking what
10 Abbott understood.
11    MS. CITERA: Same objections.
12    THE WITNESS: But it's a legal conclusion.
13
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  I want -- I want to tell me whether or
16 not Abbott understood that its maintenance of
17 spreads -- whether its maintenance of spreads was
18 violative of the Medicare and Medicaid fraud and abuse
19 statutes?
20    MS. CITERA: Same objections.
21    THE WITNESS: I'm not prepared to respond to
22 that question.  I'm not prepared for that question.  I

Page 239

1 believe it's a -- calling for a legal conclusion.
2    MS. ST. PETER-GRIFFITH: Sir, you need to
3 answer the question.
4    MS. CITERA: He's answered the question.
5    THE WITNESS: I believe you're calling --
6    MS. ST. PETER-GRIFFITH: He -- he hasn't
7 answered the question.
8    MS. CITERA: He cannot -- I mean he's not here
9 to testify about what's legal or illegal.
10    MS. ST. PETER-GRIFFITH: I'm not asking about
11 what --
12    MS. CITERA: I think you are.
13    MS. ST. PETER-GRIFFITH: I'm asking his
14 under -- Abbott's understanding.
15    MS. CITERA: But that -- the premise of the
16 understanding is whether or not it violated the law,
17 and that's a legal conclusion.  He's not here to
18 testify about what's legal or illegal.
19
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Did Abbott undertake any initiative to
22 ascertain whether or not its practices in maintaining

Page 240

1 spreads of a hundred to a thousand percent or more or
2 any excessive spread was permissible?
3    MS. CITERA: Objection to the form, outside the
4 scope.
5    THE WITNESS: To my knowledge, Abbott did not
6 make any inquiry regarding any spread regardless of
7 what the percent was.
8
9 BY MS. ST. PETER-GRIFFITH:
10    Q.  Did Abbott make any inquiry concerning
11 whether it was permissible to provide customers with
12 spread information or AWP information?
13    A.  Inquiry of whom?
14    MS. CITERA: Objection.
15
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Inquiry of any state or federal Medicaid
18 or Medicare official.
19    MS. CITERA: Objection to form, outside the
20 scope.
21    THE WITNESS:  Not to my knowledge, but I would
22 reiterate it was the practice not to do that.

Page 241

1
2 BY MS. ST. PETER-GRIFFITH:
3    Q.  Why was it the practice not to do that?
4    A.  Because that was -- that was the business
5 operating procedure that Abbott elected to adhere to.
6    Q.  And you say it was the practice not to do
7 what?
8    A.  Not to provide AWP information to
9 customers, which is what the nature of the question
10 was.
11    Q.  Okay, but, sir, are you aware that
12 Abbott -- we have testimony from a whole slew of
13 witnesses that they did undertake that activity?
14    MS. CITERA: I Object to that commentary.
15    THE WITNESS: I only know that you've told me
16 that.
17    MS. ST. PETER-GRIFFITH: Okay.
18    THE WITNESS:  I have not seen that testimony.
19 So I can't say that, yes, I'm aware of that.
20
21 BY MS. ST. PETER-GRIFFITH:
22    Q.  So you didn't take -- undertake any

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 242

1  investigation to research whether or not Abbott was
2  actually engaged in that practice?
3      A.  That's not true.
4      MS. CITERA:  He's not here to testify about
5  whether -- this is beyond the scope.
6      MS. ST. PETER-GRIFFITH:  It's not beyond the
7  scope.  It bears upon --
8      THE WITNESS:  Yeah.
9      MS. ST. PETER-GRIFFITH:  -- compliance matters.
10     THE WITNESS:  It's not -- I did -- I took steps
11 to investigate.  So the fact that I took -- you're
12 saying did you took -- I took -- I didn't take any
13 steps, and I say no.
14
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  But your steps included just reading
17 selective testimony by Abbott's counsel, right?
18     A.  And speaking with particular individuals
19 who were involved in the business during that time
20 frame.
21     Q.  How did Abbott ensure insure that that --
22 well, let me ask you.  Was it -- were -- was there any

Page 243

1  express prohibition that you are aware of prior to
2  2001 that prohibited Abbott's HPD employees from
3  discussing spread or AWP or providing spread or AWP
4  information to customers?
5      MS. CITERA:  Objection to the form.
6      THE WITNESS:  What do you mean by "express
7  prohibition"?
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Meaning any prohibition.
11     A.  There was a practice not to do that.
12     Q.  And what was the consequence of violating
13 that practice?
14     MS. CITERA:  We went through this already.
15     MS. ST. PETER-GRIFFITH:  We didn't go through
16 this already.
17     MS. CITERA:  Yes, we did.  We absolutely did
18 this morning.  Object to the form.
19     THE WITNESS:  To the ex -- I mean, again,
20 we're calling for assumptions.  We're talking about
21 hypothetical and assumptions that certain things
22 occurred, not that when they other occured, this is

Page 244

1  what we did.  Because you've -- you're asking a
2  hypothetical question, correct?
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  I'm -- no, I'm not asking a hypothetical
6  question.  I'm asking you what would happen, whether
7  there were any consequences associated within Abbott
8  for violating that policy?
9      A.  First of all, there wasn't that policy.
10     MS. CITERA:  Objection to form.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  -- or practice?
14     A.  I'm not aware that the practice was not
15 adhered to.
16     Q.  Okay, what enforcement mechanisms were
17 there to ensure that from '91 to 2001?
18     A.  In an organization that large, there --
19 again, there were enforcement mechanisms.  The manner
20 in which an organization of that breadth and number to
21 seek to enforce compliance would have to be done at
22 the manager level because they would be the ones

Page 245

1  interacting with their direct reports on a day-to-day
2  basis performing their job descriptions on a
3  day-to-day basis, and to the extent they didn't
4  perform that, whether they were drinking on the job or
5  doing anything that wouldn't have been what was
6  expected of them, I would -- it would have to be --
7  you know, there wasn't -- General Counsel wouldn't
8  know that --
9      Q.  Well --
10     A.  -- unless it was called in on the hotline.
11     Q.  -- I'm not asking you as General Counsel.
12 I'm asking you as Abbott.
13     A.  As Abbott?  It would have been the direct
14 supervisor's role to supervise his or her employees.
15     Q.  And what did the supervisors within HPD do
16 to ensure compliance with this non-policy, but this
17 practice?
18     MS. CITERA:  Objection to the form.
19     THE WITNESS:  It would have -- they would
20 have -- I don't know specifically what they would have
21 done other than their day-to-day job of -- of
22 monitoring their employees' behavior.

62  (Pages 242 to 245)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 246

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay, and was there any formal practice
4  for monitoring employee behavior to evaluate whether
5  or not the employees violated the practice prohibiting
6  the provision of AWP or spread information to
7  customers?
8      MS. CITERA:  Objection to the form.
9      THE WITNESS:  Specifically as to that matter,
10 no, but specifically as to any matter, I also
11 question -- in that -- in an organization of thousands
12 of people, you rely on the proper focus of managers to
13 understand their role and to understand the role of
14 their employees and to see to it that their department
15 does what they're supposed to do in the way they're
16 supposed to do it.
17
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  So it was the expectation of Abbott that
20 its managers would monitor its HPD employees to ensure
21 that they were not violating the practice against
22 providing AWP information?

Page 247

1      A.  On a day-to-day --
2      MS. CITERA:  Objection to form.
3      THE WITNESS:  On a day-to-day basis, I don't
4  know how else one can do that in an organization.
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Well, how -- did the managers know about
8  this practice?
9      A.  I'm advised that they did, that it was
10 understood -- I understood it was understood -- there
11 was -- it was a practice that was communicated to the
12 organization.  So the managers would -- would have
13 known that.
14     Q.  Okay, but how did Abbott verify that the
15 managers knew that?
16     A.  I don't know.
17     Q.  How did Abbott verify that -- that its
18 employees knew that they were not supposed to provide
19 spread or AWP information to customers?
20     A.  How do you verify that?  I don't know how
21 you verify everyone's behavior a hundred percent of
22 the time.  I mean how do you know someone here isn't

Page 248

1  thinking, you know, illegal thoughts right now?  How
2  do you verify that?  I mean --
3      Q.  Well, did Abbott undertake any initiative
4  what -- I'm not asking whether you are able to tell me
5  that there was 100% compliance.  I'm asking whether
6  Abbott undertook any initiative to try and verify.
7      MS. CITERA:  Objection to form.
8      THE WITNESS:  Abbott management -- Abbott
9  managers would have a host of -- a series of matters
10 that they had to drive compliance on, and they would
11 be responsible for seeing to it that their businesses,
12 that their people adhered to the law.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  But how did the managers know about the
16 practice?
17     MS. CITERA:  Objection to the form.
18     THE WITNESS:  The practice was -- it was
19 communi -- it -- I don't know how it was communicated.
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Okay, you would agree with me that it's

Page 249

1  not in the '99 policy, right?  Business -- I'm sorry,
2  Code of Business Conduct --
3      MS. CITERA:  Objection to form.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  -- Exhibit 23.
6      A.  What is not?
7      Q.  This so-called --
8      A.  Practice?
9      Q.  -- practice, right, regarding AWP or
10 spread.
11     MS. CITERA:  Objection to form.
12     THE WITNESS:  Right, it was not a corporate
13 policy.
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  So it would not be reflected in
16 the Code of Business Conduct.
17
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Well, what's the difference between a
20 practice and a corporate business policy?
21     MS. CITERA:  Objection to the form.
22     THE WITNESS:  What's the difference?  A policy

63 (Pages 246 to 249)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 250

1  would be a formal, written, documented statement.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  And what would a practice be?
5      A.  A practice would be how people conducted
6  their -- a particular function on a day-to-day basis.
7      Q.  Were there consequences for violating a
8  practice?
9      MS. CITERA:  Objection to form.
10     THE WITNESS:  Any practice?
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Well, let's talk about this practice, the
14 practice concerning AWP and spread.
15     MS. CITERA:  Objection to form.
16     THE WITNESS:  I don't -- I don't know.
17
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Who would know?
20     A.  Consequences would have -- if any -- if
21 something would have happened to an employee within
22 HPD on a disciplinary matter, it would have gone

Page 251

1  through the HR Department.
2      Q.  So the consequence was possible
3  disciplinary matter?
4      A.  Could be.
5      MS. CITERA:  Objection to form.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Do you know whether any -- let me strike
9  that.
10             Was any HPD employee ever disciplined
11 from '91 through 2001 for violating the practice
12 against providing AWP or spread information?
13     A.  I didn't know that anyone did violate it
14 and the --
15     MS. CITERA:  Objection to form, outside the
16 scope.
17     THE REPORTER:  Wait. I'm sorry, can --
18 objection to form?
19     MS. CITERA:  And outside the scope.
20     THE WITNESS:  I don't know that anyone did
21 violate it. To the extent there was someone that
22 would have violated it, I don't know if there was any

Page 252

1  disciplinary action taken.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Was it improper to provide customers with
5  AWP or spread information from 1991 to 2001?
6      MS. CITERA:  Objection to the form, outside the
7  scope.
8      THE WITNESS:  It was the practice not to do it.
9
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  But was it improper?
12     MS. CITERA:  Objection to the form, outside the
13 scope. He's not here to --
14     THE WITNESS:  What's improper?  That's a --
15 that's the --
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Was it something that Abbott viewed as
19 being a wrong --
20     A.  It was something --
21     Q.  -- wrongful conduct?
22     A.  It was something that Abbott --

Page 253

1      MS. CITERA:  Objection, form, outside the
2  scope.
3      THE WITNESS:  -- had a practice not to do.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay, would it be improper?
6      MS. CITERA:  You got to let me get my objection
7  in too.
8      THE WITNESS:  Okay. I'm sorry, I'm sorry.
9      MS. CITERA:  Objection to the form, outside the
10 scope.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Was it improper?  You can answer the
13 question, sir.
14     MS. CITERA:  Same objections.
15     THE WITNESS:  I answered the question.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  No, you didn't, sir. Was it improper?
19     MS. CITERA:  Same objections. He's not here to
20 talk about what's --
21     MS. ST. PETER-GRIFFITH:  Sir --
22     MS. CITERA:  -- what's legal or illegal.

64 (Pages 250 to 253)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

<table>
<tr><td>

Page 254

1      MS. ST. PETER-GRIFFITH: Toni, quit coaching
2  the witness, please. Let him answer the question.
3      THE WITNESS: No, improper -- a determination
4  of proper or improper is a judgment. It's a --
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q. Okay, in Abbott's judgment, was it not --
8  was it a proper or improper practice to -- or improper
9  conduct if AWP was providing -- or spread information
10 was provided to Abbott's customers?
11     MS. CITERA: Same objections.
12     THE WITNESS: It was a practice that we did
13 not -- that we -- a practice that was stated not to
14 do.
15     MR. ANDERSON: Objection, non-responsive.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q. Was it stated not to do because it was
19 improper?
20     MS. CITERA: Objection
21     THE WITNESS: I don't know.
22     MS. CITERA: It's outside the scope.

</td><td>

Page 256

1      THE WITNESS: You're asking for proper and --
2      MS. CITERA: You're asking him to give
3  judgments.
4      MS. ST. PETER-GRIFFITH: I'm not asking him to
5  give judgments.
6      MS. CITERA: He's not here --
7      MS. ST. PETER-GRIFFITH: Is he here to testify
8  on behalf of Abbott?
9      THE WITNESS: Facts.
10     MS. CITERA: He's not here to testify as to
11 what's proper or improper, legal or illegal.
12     MS. ST. PETER-GRIFFITH: Can you read back the
13 question, please?
14     THE REPORTER: Sure.
15     MR. ANDERSON: I've -- I've got to state for
16 the record too specifically this falls within Topic 8,
17 Subsection IV, "All information concerning Abbott's
18 practices, policies, procedures, concerning or
19 referring or relating to Average Wholesale Price."
20     MS. CITERA: And it also falls within our
21 objections to that.
22     MS. ST. PETER-GRIFFITH: What objections does

</td></tr>
<tr><td>

Page 255

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q. Why was it stated not to do? Why was it
4  a -- why was that practice in place?
5      MS. CITERA: Objection.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q. Is there something wrong with providing
9  AWP or spread information to customers?
10     MS. CITERA: Objection to the form, outside the
11 scope.
12     THE WITNESS: I don't know.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q. Would it be improper to provide AWP or
16 spread information to customers if they asked for it
17 in requests for proposal?
18     MS. CITERA: Objection to the form, outside the
19 scope.
20     MS. ST. PETER-GRIFFITH: It's not outside the
21 scope.
22     MS. CITERA: It is.

</td><td>

Page 257

1  it fall under?
2      MS. CITERA: I mean He's not here to give any
3  kind of analysis. He's here to testify about facts,
4  not what is proper --
5      MS. ST. PETER-GRIFFITH: I'm asking him --
6      MS. CITERA: That's not a fact.
7      MS. ST. PETER-GRIFFITH: Yes, it is.
8      MS. CITERA: It's a judgment.
9      MS. ST. PETER-GRIFFITH: Abbott's position
10 on -- Toni, it is.
11     MS. CITERA: I disagree.
12     MS. ST. PETER-GRIFFITH: Can you read the
13 question back, please.
14     THE WITNESS: Once you've reached -- once
15 you've reached --
16     MS. ST. PETER-GRIFFITH: Sir.
17         Can you read the question back,
18 please?
19         (Record read.)
20     MS. CITERA: Same objections.
21     THE WITNESS: I'm not prepared to testify to
22 that. I think it's not within -- it's asking for an

</td></tr>
</table>

65 (Pages 254 to 257)

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 258

1  opinion about a conclusion.
2      MS. ST. PETER-GRIFFITH: Sir --
3      THE WITNESS: A conclusion about --
4      MS. ST. PETER-GRIFFITH: Sir, unless she
5  instructs you not to answer, you need to answer the
6  question.
7      MS. CITERA: No, that's his answer, he's not
8  prepared to testify about that.
9
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Why aren't you prepared to testify about
12 that?
13     A.  Because you're asking for a conclusion.
14     Q.  Sir, what's the answer to the question?
15     MS. CITERA: No.
16     THE WITNESS: I'm not prepared to testify to
17 that.
18 BY MS. ST. PETER-GRIFFITH::
19     Q.  If Abbott provided in response to requests
20 for proposal information concerning AWPs and spreads,
21 would that violate the so-called practice that you
22 described earlier?

Page 259

1      MS. CITERA: Same objections, also
2  hypothetical.
3      THE WITNESS: It's hypothetical. Depending on
4  who -- who did it, and you're seeking a -- you're
5  seeking a conclusion based on a set of facts under
6  legal analysis of the code.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Sir, do you know what a proposal analysis
10 is?
11     A.  A proposal analysis?
12     Q.  Um-hum.
13     A.  I know what the words mean.
14     Q.  Okay, but within Abbott HPD, do you know
15 what a proposal analysis is?
16     MS. CITERA: Objection, outside the scope.
17     THE WITNESS: Specifically, no.
18     MR. ANDERSON: Don't you want to keep the top
19 one.
20     MS. ST. PETER-GRIFFITH: Would you mark this as
21 the next exhibit?
22     THE REPORTER: Sure. It's 4.

Page 260

1      MS. ST. PETER-GRIFFITH: And this.
2      THE REPORTER: A different one?
3      MS. ST. PETER-GRIFFITH: Um-hum.
4          (Exhibit Fishman 004 and
5           Exhibit Fishman 005
6           was marked for ID)
7      THE REPORTER: Here you go.
8      THE WITNESS: Which one do you want me to look
9  at?
10
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Why don't we start with the one that says
13 "160" at the bottom?
14     A.  Where would it say "160" at the bottom?
15     MS. CITERA: Here.
16     MS. ST. PETER-GRIFFITH: Where it says --
17     MS. CITERA: This one (indicating). This one
18 (indicating).
19     THE WITNESS: Oh.  Oh, okay.
20     MR. ANDERSON:  Ann, why don't you state for
21 the record what it's marked now and what it's
22 previously been marked? Because we have testimony

Page 261

1  from other witnesses about the prior exhibit number.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Sir, I'm showing you -- this has been
5  marked as Exhibit 4?
6      A.  5.
7      Q.  5 in your deposition.  It was previously
8  marked in the Beck deposition as Deposition Exhibit
9  160.  Do you see that at the bottom?
10     A.  I do.
11     Q.  Sir, this is a proposal analysis wherein
12 Abbott provides -- wherein Abbott provided -- and if
13 you could flip to the page down at the bottom where it
14 says "38355"?
15     A.  38355?
16     Q.  It's probably three quarters of the way
17 through the pack.
18     A.  Yes, I've got it.  38355, yes, I have that
19 page.
20     Q.  If you could look at the chart on the --
21 at the end, the last two columns where it says,
22 "Competitive AWP" and "Abbott AWP." Do you see that?

66 (Pages 258 to 261)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 262

1    A.  I do.
2    Q.  Okay, that's a comparison of AWPs, okay?
3    A.  Okay.
4    MS. CITERA:  Objection to the commentary.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  We have heard -- well, I'm just trying to
7  educate the witness on the testimony that we've
8  received on this.
9    MR. ANDERSON:  Ask him, ask him.
10
11  BY MS. ST. PETER-GRIFFITH::
12    Q.  Sir, do you understand what the two
13  columns reflect?
14    A.  I understand --
15    MS. CITERA:  Objection to form.
16    THE WITNESS:  I -- based on the label of the
17  column on the top right, "Abbott AWP," I would assume
18  that those are Abbott's AWP prices.
19         "Abbott's AWP -- Competitive AWP," I
20  wouldn't know whose that was.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 263

1    Q.  Sir, we have received testimony in this
2  case that this is a Olsten Kimberly Quality Care
3  proposal analyses, meaning this was prepared by Abbott
4  and presented to Olsten Kimberly in the context of
5  preparing for negotiations on a contract.
6    A.  Okay.
7    Q.  Does the provision of this information
8  concerning competitive AWPs and Abbott AWPs violate
9  the practice that you described before?
10    MS. CITERA:  Objection to the form, outside the
11  scope.
12    MS. ST. PETER-GRIFFITH:  It's not outside the
13  scope.
14    MS. CITERA:  Again, to the extent you're asking
15  what violates and what's legal or illegal, proper and
16  improper, it's outside the scope.
17    THE WITNESS:  I can state what the practice
18  was, which was not to provide AWP information to
19  customers.
20
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  Okay, well, this -- if this was provided

Page 264

1  to an Abbott customer, would this violate the
2  practice?
3    MS. CITERA:  Objection to the form, outside the
4  scope.
5    THE WITNESS:  I don't know what the
6  circumstances were.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Did you do anything to investigate what
9  the circumstances were?
10    A.  Until you showed me this document two
11  minutes ago, I wasn't aware of its existence.
12    Q.  Okay, would it violate the practice?
13    MS. CITERA:  Objection to the form, outside the
14  scope.
15    THE WITNESS:  I could state what the practice
16  is and the practice was, which was not to provide AWP
17  information to customers.
18
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  So if this AWP information was provided to
21  customers, it would contravene that practice, right?
22    MS. CITERA:  Objection to form, outside the

Page 265

1  scope.
2    THE WITNESS:  Again, you're -- there's no other
3  facts in evidence.  I don't know the circumstances of
4  how this was prepared and who prepared it and why they
5  prepared it.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Okay, if the testimony is that that was
9  prepared and presented to a customer --
10    A.  Okay.
11    Q.  -- would that violate the practice, sir?
12    MS. CITERA:  Objection to the form, outside the
13  scope.
14    THE WITNESS:  You're asking for a conclusion
15  of that violation.
16
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  No, I'm asking about -- you've testified
19  at length that Abbott had this practice.  I want to
20  know whether or not the provision of this information
21  to a customer violates that practice?
22    MS. CITERA:  Objection to the form, outside the

67 (Pages 262 to 265)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 266

1   scope.
2        THE WITNESS:  I think I -- same answer.
3
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  Is that a "yes"?
6        A.  About -- no, violation is -- you're asking
7   for a con -- a legal conclusion.
8        Q.  I'm not asking for a legal conclusion.
9   I'm asking -- I mean it's -- well, let me ask you
10  this.  What is the predicate for Abbott's practice?
11       MS. CITERA:  Objection to the form.
12       THE WITNESS:  It's the manner in which they
13  decided how to do business.
14
15  BY MS. ST. PETER-GRIFFITH:
16       Q.  Okay, so it's an Abbott business decision?
17       A.  To not pro -- business practice not to
18  provide AWP.
19       Q.  Okay.  Did this -- did this partic -- did
20  the provision of this information violate that Abbott
21  business practice?
22       MS. CITERA:  Objection to the form, outside the

Page 267

1   scope.
2        THE WITNESS:  I'm having a problem with the
3   word "violate."
4
5   BY MS. ST. PETER-GRIFFITH:
6        Q.  Was it consistent with Abbott's business
7   practice to provide this information to a customer?
8        A.  On its face --
9        MS. CITERA:  Objection to form.
10       THE WITNESS:  -- I -- I'd say it's not
11  consistent.
12
13  BY MS. ST. PETER-GRIFFITH:
14       Q.  The next one, I'm sorry, has at the bottom
15  493.  Sir, I'm going to represent to you that
16  Exhibit 6 --
17       A.  I'm sorry, which page?
18       Q.  Oh, I'm sorry, just start at -- sorry, I
19  haven't flipped to a page yet.
20       A.  Oh, okay.
21       MR. ANDERSON:  What exhibit number is it?
22       THE WITNESS:  493, witness Kipperman 397.

Page 268

1        MS. ST. PETER-GRIFFITH:  Yeah, I was going to
2   say that.  This is -- sir, I'm representing to you
3   that Exhibit 6 in your deposition --
4        MS. CITERA:  Exhibit 4.
5        MS. ST. PETER-GRIFFITH:  Oh, I'm sorry.
6        THE WITNESS:  Exhibit 4.
7
8   BY MS. ST. PETER-GRIFFITH:
9        Q.  (Continuing) -- Exhibit 4 in your
10  deposition is the -- was previously marked as an
11  exhibit in the Kipperman deposition as 493.  And you
12  see the exhibit sticker at the bottom?
13       A.  I do.
14       Q.  Sir, if you could look over to the
15  columns, and just before the black line --
16       A.  Yes.
17       Q.  -- there's information that says, "AWP
18  from Red Book June '96"?
19       A.  Yes.
20       Q.  Would the provision of this information to
21  a customer -- in this case, it's Chartwell -- be
22  consistent with Abbott's practice prohibiting the

Page 269

1   provision of AWP or spread information to Abbott
2   clients?
3        MS. CITERA:  Objection to the form, outside the
4   scope.
5        THE WITNESS:  On its face, this -- knowing no
6   other information, this would not be inconsistent.
7        MS. ST. PETER-GRIFFITH:  If you could mark this
8   as Exhibit 6, please.
9             Exhibit Fishman 006 was
10            marked for ID)
11
12  BY MS. ST. PETER-GRIFFITH::
13       Q.  Sir, Exhibit 6 was previously marked as
14  Exhibit 364 to the Mike Sellers deposition.  Do you
15  see that?
16       A.  I do.
17       Q.  And I'll represent to you that this is a
18  proposal analyses prepared for Chartwell Home
19  Therapies.  And do you see on the first page where it
20  says "Exhibit F," there is a column that's a double
21  column entitled "AWP Spread"?  Do you see that?
22       A.  I do see that.

68 (Pages 266 to 269)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 270

1    Q.  Would the provision of this AWP spread
2  information to Abbott's client --
3    A.  Customer.
4    Q.  -- or customer, Chartwell, be consistent
5  with the practice that Abbott had from '91 through
6  2001 prohibiting the provision of AWP or spread
7  information to customers?
8    MS. CITERA:  Objection to the form, outside the
9  scope.
10    THE WITNESS:  Assuming -- assuming those facts
11  and knowing no others, it would not be consistent.
12
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Did Mr. Sellers happen to tell you about
15  this --
16    A.  This one?
17    Q.  -- proposal analyses?
18    A.  No, he did not.
19    Q.  Okay.  Sir, did Abbott ever take any
20  disciplinary action against anyone for violating the
21  practice against providing AWP or spread information
22  to customers?

Page 271

1    A.  I don't know.
2    MS. CITERA:  Objection to form, outside the
3  scope.
4    THE WITNESS:  Sorry.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  What -- do you want to take a break?
7    A.  Can we take a break?  Yeah.
8    Q.  Sure, that's fine.
9    A.  I waited about as long as I could.
10    THE VIDEOGRAPHER:  Going off the record at
11  2:34 p.m.
12          (Recess taken.)
13    THE VIDEOGRAPHER:  Beginning Videotape No. 5 in
14  the deposition of Mr. Fishman.  We're back on the
15  record at 2:53 p.m.
16
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  Mr. Fishman --
19    A.  Yes.
20    Q.  -- we -- before the break, we looked at
21  some documents, and I want to ask you whether
22  anyone -- whether you've ever had an opportunity to

Page 272

1  learn information or research information concerning
2  computer information including AWP information
3  provided by Abbott HPD or specifically Alt Site and
4  Home Infusion to Abbott customers?
5    A.  I don't --
6    MS. CITERA:  Ever or in preparation for this
7  deposition?
8    MS. ST. PETER-GRIFFITH:  Well --
9    MR. ANDERSON:  Both.
10    MS. ST. PETER-GRIFFITH:  I mean both, yeah.
11    THE WITNESS:  All right, the answer would be --
12    MS. CITERA:  Objection to form.
13    THE WITNESS:  Okay, the answer would be the
14  same for both.  I'm not aware of any computer --
15  computerized information regarding this subject
16  matter.
17
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Are you familiar with the CHIP system?
20    A.  No.
21    Q.  If Abbott had a proprietary computer
22  program called the CHIP system --

Page 273

1    A.  Okay.
2    Q.  -- that Abbott customers could license
3  that provided to Abbott customers, among other
4  information, AWP information, would that violate or
5  would that be consistent with the practice at Abbott
6  concerning the non-provision of AWP and spread
7  information to customers?
8    MS. CITERA:  Objection to the form, outside the
9  scope.
10    THE WITNESS:  I -- it seems to me there's more
11  facts I need regarding how this computer -- how this
12  software program worked.  Was the information loaded
13  onto the software program?
14
15  BY MS. ST. PETER-GRIFFITH:
16    Q.  Loaded on by who?
17    A.  I don't know.  I don't under -- I don't
18  understand the nature of this software program.
19    Q.  Okay, Abbott licensed the software program
20  to its customers, and based -- and on the software
21  program or from the software program, Abbott's
22  customers could obtain AWP information concerning

69 (Pages 270 to 273)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 274

1  Abbott products.
2       MS. CITERA:  Objection to the -- sorry.
3
4  By MS. ST. PETER-GRIFFITH:
5       Q.  Does that help you,sir?
6       A.  Let me --
7       MS. CITERA:  Same objections.
8       THE WITNESS:  Let me restate what I understand
9  the facts to be.  Abbott had a software program that
10 was capable of loading data which could include AWP
11 information, we licensed that software to customers,
12 and customers then had the ability to use this
13 software program to obtain AWP information and have
14 it?
15      MS. ST. PETER-GRIFFITH:  Right.
16      THE WITNESS:  Input it into the system?
17      MS. CITERA:  Just to be clear, your
18 understanding of what her --
19      THE WITNESS:  What --
20      MS. CITERA:  -- what she said?
21      THE WITNESS:  Right, that's what -- I'm re --
22 kind of restating the facts as you're describing them.

Page 275

1       MS. ST. PETER-GRIFFITH:  Yes, I understand that
2  he doesn't know what CHIPS is.
3       THE WITNESS:  Based on those facts, on its face
4  Abbott is not providing the AWP information.
5  BY MS. ST. PETER-GRIFFITH:
6       Q.  How is it not providing the AWP
7  information?
8       MS. CITERA:  Same objections.
9       THE WITNESS:  Because the customer -- from what
10 I -- yeah, what I under --
11      MS. CITERA:  Sorry.
12      THE WITNESS:  Sorry.
13      MS. CITERA:  Same objections.  Go ahead.
14      THE WITNESS:  From what I understood from the
15 facts that you described to me, the customer would
16 obtain that information and do with that information
17 whatever they were inclinced to do with that.
18      MS. ST. PETER-GRIFFITH:  Okay.
19      THE WITNESS:  Is that -- is --
20      MS. ST. PETER-GRIFFITH:  Well, the --
21      THE WITNESS:  That's my assumption.
22

Page 276

1  BY MS. ST. PETER-GRIFFITH:
2       Q.  But the AWP information was provided by
3  Abbott.  Is that a problem, the provision of the AWP
4  information by Abbott through its licensure of this
5  program?
6       MS. CITERA:  Objection to the form, outside the
7  scope.
8       THE WITNESS:  That wouldn't -- yeah, that would
9  not be consistent -- if Abbott were providing the AWP
10 information, that would not be consistent with the
11 practice, not to provide AWP information.
12
13 BY MS. ST. PETER-GRIFFITH:
14      Q.  Why was the practice never memorialized
15 into a policy until 2003?
16      A.  I don't know.
17      Q.  Was the practice rooted in Abbott's desire
18 to comply with federal and state Medicare and Medicaid
19 statutes, fraud and abuse statutes, or was there some
20 other business purpose behind the practice?
21      MS. CITERA:  Objection to the form.
22      THE WITNESS:  All actions of the corporation

Page 277

1  were rooted in compliance with laws.  It was -- as I
2  stated up front, compliance was something the
3  corporation took seriously.  Can you repeat the second
4  part of the question?
5       MS. ST. PETER-GRIFFITH:  I don't know if I can.
6  Can you read it back?
7       THE WITNESS:  It was a two-part question, and I
8  don't remember the second part.
9            (Record read.)
10      THE WITNESS:  I don't know if there was a
11 specific business practice that it would have been
12 rooted in.
13
14 BY MS. ST. PETER-GRIFFITH:
15      Q.  Okay, is it fair to say though that the
16 practice was developed to help ensure Abbott's
17 compliance with federal and state Medicare and
18 Medicaid fraud and abuse statutes?  And when I say
19 "the practice," I mean the practice prohibiting the
20 provision of AWP and spread information to Abbott
21 customers.
22      A.  Specifically, no.

70 (Pages 274 to 277)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 278

1    MS. CITERA:  Objection, form, outside the
2  scope.
3    THE WITNESS:  I've made a broader statement
4  that Abbott's practices, its behavior as a company
5  would have been rooted in compliance with law.
6  Specifically whether that practice was established and
7  maintained for that purpose, I -- I'm not testifying
8  to that.
9
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  Okay, so you don't know why the practice
12 was established?
13    A.  I don't.
14    Q.  Sir, we've shown you some documents
15 concerning the provision of AWP information.  Did you
16 have reasonably -- or was -- were the transcripts of
17 the depositions taken in this case reasonably
18 available to you, the corporation, in your preparation
19 for today's deposition?
20    MS. CITERA:  Objection to, form.
21    THE WITNESS:  Were the full transcripts
22 available to me?  They were not provided to me.

Page 279

1
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  But were they available to Abbott?
4    MS. CITERA:  Objection to the form.
5    THE WITNESS:  I would -- again, I'm assuming
6  they were -- that the Litigation Department had them.
7
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Okay, so they are something that was
10 reasonably available to you that you could have
11 reviewed in your preparation for today's deposition on
12 behalf of Abbott?
13    A.  I don't know that for a fact.
14    MS. CITERA:  Objection to form.
15
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Well, is there anything prohibiting Abbott
18 from accessing the transcripts of the testimony in
19 this case?
20    A.  Not -- not to my knowledge.
21    Q.  Okay, so Abbott then had reasonably
22 available to it the transcripts of the following

Page 280

1  people:  Dennis Walker, Mike Hegge, Ted Lijek, Chris
2  Snead, Don Robertson, Pete Baker, Debbie Longley,
3  Cindy Dawson, Greg Lutz, Steve Kipperman, Dave Brinks,
4  and Deb DeYoung?
5    MS. CITERA:  Objection to the form.
6    THE WITNESS:  Based on the assumption that they
7  were readily -- that the deposition testimony was
8  available -- readily available, then I have to assume
9  Abbott could have gotten access to it as well.
10
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Now, you indicated earlier that you read
13 Joe Fiske's testimony.  Did you read his entire
14 transcript --
15    A.  No.
16    Q.  -- or a portion?
17    A.  A portion.
18    Q.  Did the portion that you had have to deal
19 with his admission that Abbott as a corporation knew
20 that customers were interested in AWP?
21    MS. CITERA:  Objection to form.
22    THE WITNESS:  I don't remember that specific

Page 281

1  admission.  I remember his testimony pertained to AWP.
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Did anyone ever inform you that Abbott
5  provided retail stocking sheets to customers that
6  contained AWP information?
7    A.  Nobody advised me of that.
8    Q.  Okay.  Would that provision of AWP
9  information on retail stocking sheets violate the
10 practice that Abbott maintained against the provision
11 of AWP information and spread information to
12 customers?
13    MS. CITERA:  Objection to the form, outside the
14 scope.
15    THE WITNESS:  No, I wouldn't conclude about
16 violation.  I don't know what a detailed stocking
17 sheet is to know whether -- in line with the other
18 responses I've given, whether it would be consistent
19 with the practice.  I don't know what a detailed
20 stocking sheet is.
21
22 BY MS. ST. PETER-GRIFFITH:

71 (Pages 278 to 281)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 282

1    Q.  Let's go back to your testimony earlier
2  this afternoon regarding the multiple approaches that
3  Abbott took to ensure its compliance with federal and
4  state Medicare or Medicaid fraud and abuse statutes,
5  okay?
6    A.  Um-hum.
7    Q.  I have listed off here you maintained the
8  Code of Business Conduct, and we're talking about for
9  the time period from '91 through 2001.
10    A.  Okay.
11    Q.  Okay?  Pre --
12    A.  Pre-OEC.
13    Q.  Pre-OEC, exactly.  You maintained the Code
14  of Business Conduct, you learned of laws through the
15  legal -- through Legal Department presentations.
16        Sir, you have Exhibit 1 in front of
17  you.  Can I just ask you to flip through that stack
18  and identify whether or not all of the presentations
19  for the '91 through 2003 period are contained in that
20  stack?
21        MS. CITERA:  Objection to the form, outside the
22  scope.

Page 283

1        THE WITNESS:  Without even looking through
2  them, I would have to assume that they are -- I would
3  not think these would be all of them, I don't.
4        MS. ST. PETER-GRIFFITH:  Okay.
5        THE WITNESS:  The ones that were available.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  What presentations were made?
9    A.  The presentation --
10        MS. CITERA:  Object to form.
11        THE WITNESS:  What presentations were made?
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Yeah, where -- and for presentations, I
14  want to go back to your earlier testimony where you
15  said that Abbott's employees or HPD employees learned
16  of laws through the --
17    A.  Okay.
18    Q.  -- Legal Department presentations.
19    A.  Sure.  We gave presentations on fraud and
20  abuse, we gave presentations on antitrust, we gave
21  presentations on insider trading, we gave
22  presentations broadly on the Code of Business Conduct,

Page 284

1  we gave presentations on contract basics predominantly
2  to the Contract Marketing organization that were
3  handling contracts, we would have given kind of
4  specialized presentations on -- under contract basics
5  to a smaller group or a shorter period of time on
6  warranties, indemnification, particular provisions
7  that the business people that knew enough to be
8  dangerous without fully understanding it, so we better
9  educated them on the legal aspects of these
10  provisions -- insider trading.  We would have given
11  presentations to Business Development folks on M & A
12  activity, M & A structures, stock purchases, mergers,
13  public company, private company, tender offers.  Those
14  are the ones that I'm -- Patent Department, probably
15  talked about patents and trade secrets.
16    Q.  Did Abbott give any pre -- did Abbott's
17  Legal Division give any presentations on Medicare and
18  Medicaid fraud and abuse and the implication of
19  pricing activities on Medicare and Medicaid fraud and
20  abuse?
21        MS. CITERA:  Objection to the form.
22        THE WITNESS:  No.

Page 285

1
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  How come?
4    A.  Hat was not in the scope of the fraud and
5  abuse review that we would have presented to clients.
6    Q.  When you say "clients," you mean --
7    A.  I'm sorry, the business, the business
8  folks.
9    Q.  I just want to clarify for the --
10    A.  I understand.
11    Q.  That you were not talking about
12  traditional outside clients.
13    A.  I'm sorry, they're -- I've been doing it
14  so long, they're traditional clients to me.
15    Q.  Sure, I understand.  But you don't have to
16  submit the time sheets.  That's the best part.
17    A.  I do not have to submit the time sheets in
18  this.
19        MS. CITERA:  You guys do?
20        MS. ST. PETER-GRIFFITH:  Huh?  We do at the end
21  of the month.
22        THE WITNESS:  Oh.  I'm not sure my hours are

72 (Pages 282 to 285)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 286

1  less, but I don't have to document them.
2       MS. ST. PETER-GRIFFITH:  Oh, I -- I don't doubt
3  that.
4
5  BY MS. ST. PETER-GRIFFITH:
6       Q.  Sir, did Abbott -- for purposes of
7  evaluating its HPD Medicaid/Medicare fraud and abuse
8  compliance obligations, did Abbott ever consider
9  whether it's pricing and its decision to report prices
10 that created spreads of fifty, a hundred, a thousand
11 percent or more implicated Medicaid or Medicare fraud
12 and abuse?
13      MS. CITERA:  Objection to the form.
14      THE WITNESS:  In the presen -- in the training
15 environment that I op -- that I operated in and other
16 Commercial Attorneys operated in, AWP and pricing was
17 not something that we addressed.
18          Again, back to -- I think I said
19 earlier, to the extent questions may have come in to
20 me about AWP, we would have referred them to
21 Litigation.
22

Page 287

1  BY MS. ST. PETER-GRIFFITH:
2       Q.  Did Litigation give any presentations
3  concerning pricing or AWP?
4       A.  Not to my knowledge.
5       Q.  Why not?
6       A.  I mean I can't answer why they didn't.
7       Q.  Did anyone within Abbott ever evaluate
8  whether or not its maintenance of spreads between what
9  it was actually selling to customers and its AWPs were
10 violative of Medicare or Medicaid fraud and abuse
11 laws?
12      MS. CITERA:  Objection to the form, outside the
13 scope.
14      THE WITNESS:  Any analysis that would or
15 wouldn't have occurred would be a legal privilege.
16      MS. CITERA:  Also privileged.
17
18 BY MS. ST. PETER-GRIFFITH:
19      Q.  Why would it be a legal privilege?  I'm
20 asking whether Abbott ever undertook that evaluation.
21      A.  I don't know whether they undertook that
22 evaluation.

Page 288

1       Q.  Who would undertake that evaluation on
2  behalf of Abbott?
3       A.  The Legal Department.
4       Q.  Anyone else?
5       A.  They -- no one else should.
6       Q.  Did Abbott's Legal Department ever
7  undertake that evaluation?
8       MS. CITERA:  Objection to form, also objection
9  to the extent it seeks privileged communications,
10 outside the scope.
11      THE WITNESS:  To my knowledge -- to my
12 knowledge, the Commercial -- the Commercial lawyers
13 did not.  I don't know whether the Litigation
14 attorneys did.
15
16 BY MS. ST. PETER-GRIFFITH:
17      Q.  Who would know that?
18      A.  Whoever was the head of Litigation.
19      Q.  Did you do anything to ascertain what
20 steps may have been taken to confirm Abbott's pricing
21 practice -- that confirmed that Abbott's pricing
22 practices were in conformity with Medicare and

Page 289

1  Medicaid fraud and abuse statutes within the
2  Litigation Department?
3       MS. CITERA:  Objection to form.
4       THE WITNESS:  I did not have a conversation
5  with Litigation.
6
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  In 2001, did Abbott reduce its list prices
9  on certain HPD products for any reason pertaining to
10 Medicare or Medicaid fraud and abuse laws?
11      MS. CITERA:  Objection to the form, outside the
12 scope.
13      THE WITNESS:  Not to my knowledge.
14
15 BY MS. ST. PETER-GRIFFITH:
16      Q.  Okay, sir, we left off with you learned
17 laws through -- is there anything else -- other than
18 the presentations that you've described when you said
19 that we do not have all of them in front of us --
20      A.  I have to assume that these are not all of
21 them because most -- many of the -- I don't know if
22 things dated -- things that were given in 1994 would

73 (Pages 286 to 289)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 290

1  have been dated, but I do know that most -- many of
2  these are not dated in the early '90s.
3      Q.  Okay.  Was -- Is there a particular place
4  where these documents were preserved or maintained or,
5  you know, held in files or boxes?
6      MS. CITERA:  Objection to form, outside the
7  scope.
8      THE WITNESS:  There was not a central
9  depository -- depositary -- depository for
10 presentations.  I was able to identify some because I
11 had a back-up drive, a folder with presentation -- old
12 presentations, and I identified the ones that
13 pertained to fraud and abuse.
14
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  And you testified earlier that no one came
17 to collect those from you incident to any lit hold
18 memo or collection memo?
19     A.  I'm not -- I don't believe I was subject
20 to a hold memo.
21     Q.  Do you know whether --
22     A.  I don't know that I'm not.

---

Page 291

1      Q.  I'm sorry.
2      A.  Quite honestly, I'm subject to several,
3  and I don't know whether I am subject to this one.
4      Q.  Pertaining to the AWP litigation, you
5  mean?
6      A.  Pertaining to the AWP litigation.  There's
7  other matters where I just know that my -- my emails
8  stick around forever.
9      Q.  Is there any reason why you wouldn't be
10 subject to the AWP litigation hold?
11     MS. CITERA:  Objection form, outside the scope.
12     THE WITNESS:  I don't know the scope of how
13 they determined who should or shouldn't be included.
14     MS. ST. PETER-GRIFFITH:  Toni, can we get an
15 explanation -- first of all, can we get an explanation
16 as to why these weren't produced until -- and I know
17 you're not responsible for production matters, but,
18 you know, these weren't produced --
19     MS. CITERA:  Thank heavens for that.
20     MS. ST. PETER-GRIFFITH:  -- until March 7th,
21 and they've -- we've had outstanding discovery
22 requests in probably for 18 months.

---

Page 292

1      MS. CITERA:  Because I'm not involved, I'm
2  going to have to defer to the people that are
3  involved.
4      MS. ST. PETER-GRIFFITH:  Okay.  Well, I just
5  wanted to pose the question on the record.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Okay.  You -- the next item that you
9  identified was the division operating guidelines?
10     A.  Yes.
11     Q.  Okay, when were those in place?
12     A.  The HPD operating guidelines were approved
13 at the end of August of '99.
14     Q.  And can I ask you to go through that stack
15 and --
16     A.  To find them?
17     Q.  -- to see whether they're in there?  Yeah.
18     A.  I think I saw them in the back there.
19 There we go.
20     Q.  Okay.
21     MS. CITERA:  What's the tab, 36?
22     THE WITNESS:  Looks like 34 --

---

Page 293

1      MS. CITERA:  Oh, there's a few.
2      THE WITNESS:  Oh, and 36.  They look like the
3  same to me, 34 and 36 --
4      MS. ST. PETER-GRIFFITH:  Oh, that was one of my
5  questions, sir.
6      THE WITNESS:  -- and 37.  Without -- without
7  reading through them word-for-word, they appear to be
8  the same.  One could have been a draft.  There should
9  only be -- there is only -- there was only one
10 operating guideline.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Is that the one that says, "Approved --
14 implemented December 8th"?  Is it No. 35?
15     A.  No, that's probably HD.  Right?
16     MS. CITERA:  Yeah.
17     MS. ST. PETER-GRIFFITH:  Oh, yes it is, right.
18     THE WITNESS:  We got smarter at the end of the
19 year to put dates on the HD ones when they came out
20 after the HPD did.
21
22 BY MS. ST. PETER-GRIFFITH:

---

74 (Pages 290 to 293)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 294

1     Q.  I see, okay.  So 36 then is the Hospital
2  Products Division operating guide?
3     A.  I have 34.
4     Q.  34?
5     A.  I mean that's the one I pulled out.
6     MS. CITERA:  34 and 36 is what he said.
7     MS. ST. PETER-GRIFFITH:  Okay.
8     THE WITNESS:  I can -- and I'm looking at both
9  34 and 36, which --
10    MS. CITERA:  There's also 37.
11    THE WITNESS:  I have 34, 36 and 37 out.
12
13 BY MS. ST. PETER-GRIFFITH:
14    Q.  Okay.  And let me ask you were -- after
15 they were drafted in '99, were they subsequently
16 revised at any time?
17    A.  They were never -- they were not
18 revised -- they were not revised.
19    Q.  Okay.  I'd like you just to take document
20 No. 34 --
21    A.  Yes.
22    Q.  -- and turn to Page 14.

Page 295

1     A.  Okay.
2     Q.  Prior to the implementation of this
3  particular operating guideline for HPD, at any place
4  was there a resource that HPD employees could go to
5  for a discussion of the Federal False Claims Act
6  compliance other than the '99 Code of Business Conduct
7  and this document?
8     A.  An internal document?
9     Q.  Yes.
10    A.  No.  They always were welcome to contact
11 Legal directly and they were encouraged to do so, and
12 there was the -- from the Code of Business Conduct, a
13 central number to call if there was something that
14 they felt was worthy of going that route.
15    Q.  Did anyone ever call the Legal Department
16 with questions concerning the Federal False Claims
17 Act's compliance?
18    MS. CITERA:  Objection to the form, and I would
19 also instruct you not to reveal any privileged
20 conversations.
21    THE WITNESS:  Oh, God, it's such a broad
22 question.

Page 296

1     MS. CITERA:  I'm also going to object to it's
2  outside the scope.
3     MS. ST. PETER-GRIFFITH:  How is it outside the
4  scope, Toni?  It pertains directly to Topic 8 -- I'm
5  sorry, Topic 7, Section II.
6     MS. CITERA:  Whether or not there were calls I
7  see as outside the scope.  The fact that there was a
8  call line is something else.
9     THE WITNESS:  Did -- I'm sorry, was your
10 question did they call the General Counsel's office or
11 did they call Legal?  I heard, Did you call Legal
12 about False Claims Act questions?
13
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Is there a difference between the General
16 Counsel's Office and Legal?
17    A.  The published number in the Code of
18 Business Conduct was for any concerns you had about
19 any of the matters, and it went to the General
20 Counsel's Office.  It was a corporate-wide
21 opportunity.
22    The -- what I heard and what I was

Page 297

1  contemplating was did any of my clients, any of the
2  people I worked with in HPD ever call me or call Legal
3  to ask Federal False Claims Act questions.
4     Q.  That's my question, sir.
5     MS. CITERA:  Same objections and instruction.
6     THE WITNESS:  The -- given the breadth of the
7  question, I'd say yes.
8
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Okay, what particular areas did they
11 inquire about?
12    MS. CITERA:  Again, same objections, same
13 instruction.
14    THE WITNESS:  I believe the content of the
15 inquiry would be privileged conversation.
16    MS. ST. PETER-GRIFFITH:  Well, Toni, do you
17 intend to rely upon an advice of counsel defense in
18 this case?
19    MS. CITERA:  I'm not going to answer that.  I'm
20 instructing him not to answer to the extent that it
21 would reveal privileged conversations.
22

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 298

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Did anyone within -- or let me ask you
3  what's the basis for the information contained on
4  Page 14 of this Divisional Operating Guideline?
5      A.  (Witness reviewing document).
6          I believe the majority of the
7  information is a description of the statute.
8      Q.  Who wrote this description?
9      A.  I was primary draftsperson for this, for
10 the HPD guidelines.  They followed from the PPD
11 guidelines that served as a template, model for the
12 guidelines generally.
13     Q.  Was this contained in the PPD?
14     A.  I don't know that for certain.
15     Q.  Okay, if --
16     A.  I would think it would be, but I don't
17 know for certain.
18     Q.  If it was -- if it wasn't contained in the
19 PP -- if it was contained in the PPD, did you just
20 sort of crib it from there?
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  Most likely.  Again, it was -- in

Page 299

1  reading this, it strikes me as a description of the
2  state of law.
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay.  Did -- do you recall drafting this
6  description?
7      A.  Specifically, no.
8      Q.  Was this particular Operating Guideline a
9  practice or policy that Abbott maintained prior to the
10 publication of this particular document?
11     MS. CITERA:  Objection to the form.
12     THE WITNESS:  In terms of complying with the
13 Federal False Claims Act, it would have been a policy
14 in the context of the corporate -- all employees of
15 the corporation were obligated to comply with laws,
16 and the Federal False Claims Act is a law.  So in that
17 regard, it was a policy.
18         To the extent the infor -- the
19 description is operational in describing the -- the
20 providing of -- of -- (witness reviewing document).
21         When information was provided to
22 customers that would get submitted to the government,

Page 300

1  it would -- again, I think it's a statement of law
2  that the information provided has to be accurate and
3  updated.
4      MS. ST. PETER-GRIFFITH:  Okay.
5      THE WITNESS:  So, again, I think it's mostly a
6  description of the state of law.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, but also under Item 1, do you see
10 where it says -- the first sentence has mandatory
11 language requiring HPD "to verify amounts and figures
12 reported on reports submitted to customers which are
13 used by customers in claiming charges or costs to
14 Medicare or Medicaid or other government payer
15 agencies."  Do you see that?
16     A.  Yes, I do.
17     Q.  Was that -- prior to this publication,
18 this particular policy, was that a practice that HPD
19 engaged in?  Did it verify amounts and figures
20 reported on reports submitted to customers which are
21 used by customers in claiming costs or charges to
22 Medicare or Medicaid?

Page 301

1      MS. CITERA:  Objection to form, outside the
2  scope.
3      THE WITNESS:  I don't know precisely that that
4  was, but in reading what it's describing, it would
5  have -- it's a description of "providing accurate
6  information to your customers," and that would be a
7  practice I think would be something that HPD would
8  adhere to prior to these guidelines.
9
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Okay, is a guideline something that is --
12 was made available to the HPD employees as something
13 that they could use as a reference or was this a
14 mandatory requirement that these guidelines be
15 followed?
16     MS. CITERA:  Objection to the form.
17     THE WITNESS:  The guidelines were provided to
18 the divisions to capture the information contained in
19 here in a broad context and provide clear guidance
20 for -- try to provide uniformity within the
21 corporation so that the different divisions would have
22 similar guidelines and to capture -- capture the --

76 (Pages 298 to 301)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                      March 12, 2008

Page 302

1  the activities in a document.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay.  What was it that HPD was required
5  to verify with customers?
6      A.  In reading this, I -- what comes to mind
7  is when we provided discounts to customers, who then
8  had to report their costs and expenses in whatever
9  cost reports they filed with -- with the government,
10  they would rely on the pricing information and
11  discounting information that we provided them.
12      Q.  Did this particular policy apply only to
13  those customers that did cost report or --
14  reimbursement mechanisms or DRGs with Medicare and
15  Medicaid or did it apply to all HPD customers?
16      MS. CITERA:  Objection to the form.
17      THE WITNESS:  I can only read what the sentence
18  says, which is, "...submitted to customers which are
19  used by customers in claiming costs and -- or charges
20  to Medicare."
21          So it looks by just the words used --
22  I don't have a recollection that we were specifically

Page 303

1  directing this to HBS.  I can tell you again that HBS
2  represented --
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Hospitals?
6      A.  -- the vast majority of the Hospital
7  Products business.  So in addressing a broad
8  guideline, they would have been what was the focal
9  point.
10      Q.  Okay, but did this policy also apply to
11  Alt Site?
12      A.  It applied to all HPD.
13      A.  Okay.
14      A.  It's not policy.  The guideline applied.
15      Q.  Okay.  Well, was it something that Abbott
16  verified was being followed as a guideline?
17      A.  It strikes me that's getting back to how
18  do we ensure compliance, and I -- there was not --
19  there was not spot bed checks by Legal to whether or
20  not people were verifying it.
21          This would be part of their -- again,
22  it's a statement law.  The expectation was the

Page 304

1  employees followed law.  The expectation was the
2  managers managed their department in accordance with
3  their obligations to adhere to the laws and that, at
4  the managerial level, on a day-to-day basis where
5  they're interacting with people who are doing the
6  work -- I wasn't doing the work.  The people who were
7  doing the work would be managed by their managers.
8      Q.  So Abbott Legal didn't verify that this
9  was being done?
10      A.  No.
11      Q.  Okay.  Was there any mechanism for
12  managers to verify that this was being done?
13      MS. CITERA:  Objection to the form.
14      THE WITNESS:  The breadth of the question, I --
15  my response is that as a manager of people, there is
16  always ways to work with your direct reports to better
17  ensure that they're doing their job well and properly.
18
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  What did Abbott do to verify that it
21  didn't have any liability under the Federal False
22  Claims Act concerning its interaction with customers

Page 305

1  and its provision of information utilized by customers
2  for reimbursement?
3      MS. CITERA:  Objection to form.
4      THE WITNESS:  That was pretty -- if you replay
5  that?
6      MS. ST. PETER-GRIFFITH:  Read it back?  Yeah.
7      THE WITNESS:  That was a long, detailed
8  question.
9          (Record read.)
10      MS. CITERA:  I'm just going to object to the
11  form, I'm going to object to outside the scope to the
12  extent it asks about a legal conclusion.  I'm also
13  going to instruct you not to reveal any privileged
14  conversations.
15      THE WITNESS:  God, it's so broad.  I would -- I
16  almost -- I believe I have to give the same answer
17  that I gave to your previous question because it's --
18  you're -- the first question asked, What did Abbott do
19  to verify adherence to it?  And the second question
20  is, What did Abbott do to verify there was no
21  liability?
22          To the extent adherence, if you're --

77 (Pages 302 to 305)

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 306

1  if you're adhering to it, arguably, there's no
2  liability.  To the extent you're not adhering to it,
3  an evaluation of whether you're not and whether
4  there's liability would have been raised to Legal and
5  there would have been a legal analysis.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Okay, my question though, sir, is did you
8  do anything to verify that you didn't -- that, in
9  interacting with customers and providing information
10 to them, Abbott HPD was not violating the False Claims
11 Act?
12     MS. CITERA:  Same objections and same
13 instruction.
14     THE WITNESS:  Right.
15         The conclusion of whether it was
16 violating the False Claims Act would not have been
17 something that a businessperson would have -- any
18 conclusion a businessperson would have reached and to
19 the extent they ever reached a conclusion wouldn't
20 have been meaningful within Abbott or the Legal
21 Department that we would have reached.  We would have
22 done a separate legal analysis as lawyers of whether

Page 307

1  or not there was a violation of the law.
2         Verification that there's no
3  violation of the law, I think gets back to my other
4  answers, How do you verify compliance?  If you believe
5  your people are acting with -- in accordance with the
6  direction and principles that you operate a business
7  by, then -- then that's -- that's how you verify it.
8  If you find someone's messing up and if someone messed
9  up, it would have been brought to the Legal
10 Department --
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  How --
14     A.  -- for evaluation.
15     Q.  How did Abbott verify whether someone was
16 messin' up?
17     MS. CITERA:  Same objections and instruction.
18     THE WITNESS:  To the -- again, I said, to the
19 extent it happened, it would have been -- had to have
20 been determined at the managerial level, at some
21 managerial level or a co-worker raising it.
22

Page 308

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  How would the managers know or how would
3  the co-workers know that there was a violation?
4      A.  Because they had --
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  The managers and co-workers had
7  job descriptions, and they performed their job
8  descriptions in accordance with -- with the law, and
9  they would have been trained on doing their job.
10         How does anyone get trained on the
11 job?  They come into the job, and they learn for --
12 they learn the job by someone instructing them how to
13 do the job.
14
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  What training did Abbott's HPD employees
17 receive concerning Medicare and Medicaid fraud and
18 abuse compliance?
19     MS. CITERA:  Objection to the form.
20     THE WITNESS:  The Legal Department provided
21 training, periodic training to a large number of
22 different business organizations within the HPD

Page 309

1  Business Division regarding fraud and abuse issues.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  If the Legal Department did not provide
5  training on a particular topic, would you expect that
6  the employees within HPD would be familiar with it or
7  would know not to violate a particular provision that
8  they didn't receive instruction on?
9      MS. CITERA:  Objection to form, outside the
10 scope.
11     THE WITNESS:  You're asking for a spec --
12 you're asking me to speculate.
13     MS. ST. PETER-GRIFFITH:  No I'm not.
14     MS. CITERA:  Yes, you are.
15     THE WITNESS:  I think you are.
16     MS. ST. PETER-GRIFFITH:  Can you read the
17 question back, please?
18     THE REPORTER:  Sure.
19         (Record read.)
20     MS. CITERA:  Same objections.
21     THE WITNESS:  I never gave anybody training not
22 to smoke marijuana on this job.  Would I expect them

78 (Pages 306 to 309)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 310

1  to know that?  Yes.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay, but what about -- I'm not --
5      A.  Again, the breadth -- the breadth of your
6  question is there's no --
7      Q.  Sir, I'm talking about -- I'm talking
8  about in the context of Medicare and Medicaid fraud
9  and abuse.  I'm not talking about, you know, smoking
10  drugs.  There's a big difference.
11         You testified earlier that part of
12  your com -- part of Abbott's ensurance of its
13  compliance with Medicare and Medicaid statutes was its
14  training through its Legal Department, right?
15      A.  Yes.
16      Q.  Okay.  If its Legal Department did not
17  give training on a particular Medicaid or Medicare
18  fraud and abuse statute or issue, would you expect
19  that Abbott's HPD employees would be required to
20  comply with that statute, having no training on it?
21      MS. CITERA:  Objection to the form, outside the
22  scope.

---

Page 311

1      THE WITNESS:  I would expect that if the
2  statute required them to provide accurate information
3  in reports they submitted to customers and if that
4  training wasn't provided directly by Legal, that that
5  would be something that was innately part of the job,
6  that would have -- would have been -- and whether that
7  manager ever got that training or the manager's
8  manager or the predecessor to the manager, where that
9  knowledge first became -- where that first
10  knowledge -- where that knowledge first resided, I'm
11  not sure I can answer that.
12
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Well, if Abbott's Legal Department didn't
15  give training on pricing or price reporting and the
16  implications of pricing and price reporting in the
17  Medicare or Medicaid fraud and abuse context, would
18  you expect the HPD employees to comply with federal
19  and state Medicare and Medicaid statutes that
20  implicate -- that were implicated by pricing and price
21  reporting?
22      MS. CITERA:  Same objections.

---

Page 312

1      THE WITNESS:  Yes.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  How would they know and learn the
5  information that they needed to ensure their
6  compliance?
7      MS. CITERA:  Same objections.
8      THE WITNESS:  In certain -- being familiar with
9  AMP and best price calculations, the statute
10  regulates -- I don't know if it's -- the statute
11  regulations describes the manner in which you do a
12  calculation, and it's a detailed calculation that
13  provides a description of things that you include or
14  don't include in your calculation, certain discounts,
15  GPO fees.  I don't know what -- early pay discounts
16  are included.  There's a litany of different things.
17  They -- and part of their job, they would -- they
18  would know -- they would read that and do it.  They
19  wouldn't look to Legal to train them on how to do that
20  calculation.  If there was concerns or questions, they
21  would -- they could come to Legal and would come to
22  Legal and ask questions.

---

Page 313

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay, you're talking about AMP and best
4  price?
5      A.  Yes.
6      Q.  What about AWP and price reporting to
7  pricing compendia that resulted in the creation of
8  spreads on Abbott products in excess of fifty, a
9  hundred, a thousand percent?
10      A.  Okay, like I said --
11      MS. CITERA:  Object to form, outside the scope.
12      THE WITNESS:  Like I said before, there was a
13  practice that the HPD employees were not to provide
14  spread information, and that's how they would know not
15  to do it.
16
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Okay, and let -- let me -- I think you
19  might be confused.  I'm not talking about the
20  provision of spread information or AWP information to
21  customers.  I'm talking about the actual creation of
22  the spread and the reporting of false list price

---

79 (Pages 310 to 313)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

```
                                           Page 314
 1   information to Abbott's -- no, to -- or to the
 2   reporting compendia by Abbott.
 3        MS. CITERA:  I'm just going to object to the
 4   characterization as "false list prices."
 5        THE WITNESS:  To my understanding, Abbott --
 6   the third party created the spread.
 7
 8   BY MS. ST. PETER-GRIFFITH:
 9        Q.  But they created the spread based upon
10   information provided to them by Abbott, right?
11        MS. CITERA:  Objection to the form, outside the
12   scope.
13        THE WITNESS:  To my understanding, we would
14   have provided information to the compendia.
15
16   BY MS. ST. PETER-GRIFFITH:
17        Q.  Okay.  And what did Abbott do to ensure
18   that the information provided to the compendia did not
19   violate the Federal False Claims Act or Medicaid and
20   Medicare fraud and abuse statutes?
21        A.  To the extent --
22        MS. CITERA:  Object, to the form.
```

```
                                           Page 315
 1        THE WITNESS:  To the extent those laws
 2   specifically defined those terms and addressed what
 3   was expected of participants operating under the
 4   statute, they would have complied with the law.
 5   BY MS. ST. PETER-GRIFFITH:
 6        Q.  How do you know that?
 7        A.  Because they're instructed to comply with
 8   the law.
 9        Q.  What instructions were they given?
10        MS. CITERA:  Objection to the form.
11        THE WITNESS:  I don't have a specific
12   instruction.
13
14   BY MS. ST. PETER-GRIFFITH:
15        Q.  Okay.  Because you testified earlier that
16   there was no training on pricing and AWP --
17        A.  Legal training.
18        Q.  No legal training?
19        A.  (Witness nodding).
20        Q.  Okay.  Was there another resource that HPD
21   employees had available to them to -- that they could
22   go to to ensure that their practices concerning
```

```
                                           Page 316
 1   pricing and price reporting didn't violate federal or
 2   state Medicare or Medicaid fraud and abuse laws?
 3        A.  They should not have gone to any source
 4   other than Legal.
 5        Q.  Okay, did they go to Legal with questions
 6   concerning pricing and Medicare or Medicaid fraud and
 7   abuse statutes?
 8        MS. CITERA:  Objection to the form, outside the
 9   scope.  I also caution you not to reveal any
10   privileged discussions.
11        THE WITNESS:  Did they come -- again, the
12   breadth of the question, Did they come to Legal to
13   talk about Medicare or Medicaid pricing questions,
14   yes.
15
16   BY MS. ST. PETER-GRIFFITH:
17        Q.  Okay, who came to Legal and discussed it?
18        MS. CITERA:  Same objections, same instruction.
19        THE WITNESS:  I don't -- I don't -- I don't
20   know specific names.  It would have been part of --
21   anytime that people working within HPD had a question
22   that they felt raised legal questions in their mind or
```

```
                                           Page 317
 1   were uncertain as to what the legal call was as to how
 2   you did something, they would have called Legal.  It
 3   would have been part of everyday, and whether there
 4   was a call everyday on pricing, the answer is no.  Was
 5   there -- well, again, you're describing a time frame
 6   '91 to 2002 or 2001.  The Legal Department served as
 7   the legal advisor to the division and would have
 8   answered questions on a periodic basis.
 9
10   BY MS. ST. PETER-GRIFFITH:
11        Q.  At any time did anyone within the Hospital
12   Products Division raise a question with Abbott Legal
13   Division about its pricing conduct and the compliance
14   of its pricing conduct with Medicare and Medicaid
15   fraud and abuse statutes?
16        MS. CITERA:  Same objections and instructions.
17        THE WITNESS:  Not to my knowledge.  I can't
18   speak to what Litigation might have known.
19
20   BY MS. ST. PETER-GRIFFITH:
21        Q.  What did you do to investigate whether or
22   not any such inquiry was made?
```

80 (Pages 314 to 317)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                      March 12, 2008

Page 318

1     MS. CITERA:  Asked and answered.
2     THE WITNESS:  I have talked to the people that
3  I talked -- I've identified the people that I talked
4  to who were directly -- who were directly involved in
5  a managerial role in the roles that they had.
6
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  But did you do anything to inquire or to
9  research whether or not any inquiry was made to Abbott
10 Legal about whether or not Abbott's HPD pricing
11 activities were in conformity with federal and state
12 Medicare and Medicaid fraud and abuse statutes?
13    A.  That's not --
14    MS. CITERA:  Objection to form.
15    THE WITNESS:  -- what you asked before.
16    MS. ST. PETER-GRIFFITH:  I'm asking it now.
17    THE WITNESS:  Did I do anything to -- please
18 re -- restate the question.
19    MS. ST. PETER-GRIFFITH:  Read it back.
20    THE REPORTER:  Okay, I didn't hear the very
21 last word you said, so youre going to have to help me
22 out.

Page 319

1         (Record read.)
2     MS. ST. PETER-GRIFFITH:  And regulations.
3     THE REPORTER:  And regulations.
4     MS. CITERA:  Same objection, same instruction.
5     THE WITNESS:  No.
6
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Sir, the 2000 handbook, is that in the
9  stack that is composite Exhibit 1?
10    A.  Yes, 24.
11    Q.  Now, sir, earlier, I believe I asked you
12 about whether the -- when you referenced "the
13 handbook," you were referencing the Handbook for
14 Business Executives.  Do you see that now?
15    A.  I see it says that, yes.
16    Q.  So this is the handbook that you were
17 referencing earlier?
18    A.  I'm sorry, yes.
19    Q.  Take your time.
20    A.  Yes.
21    Q.  And it says at the bottom, "Legal Division
22 Abbott."

Page 320

1     A.  Correct.
2     Q.  Okay.  Who was this -- first, let me ask
3  you -- I've got to go back and -- who were the
4  divisional operating guidelines distributed to?
5     A.  The division -- within -- within HPD, they
6  were dis -- they were rolled out -- they were mailed
7  out in I -- I want to say in the end of the year of
8  '99, and then in the beginning of 2000, we met with
9  the head of the division and his staff and then would
10 have had meetings with each of the senior staff
11 members and their staff and people they may have, you
12 know, identified as, Go -- can you talk to so and so
13 within my group.
14    Q.  Were those meetings to discuss the content
15 of the operating guidelines?
16    A.  It was to roll it out and describe it to
17 them and explain -- explain their function and purpose
18 and utility.
19    Q.  Did every employee within Abbott Home --
20 or within Abbott HPD receive the divisional operating
21 guidelines?
22    A.  No.

Page 321

1     Q.  Okay, who didn't receive them?
2     MS. CITERA:  Objection to form.
3
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Or who did, whichever is least cumbersome
6  for you to answer.
7     A.  Recognizing that there's thousands of
8  people at multiple plants, so you had P -- Production
9  people who would have no interaction, you know,
10 their -- they would have no interaction with
11 healthcare professionals, researchers, Quality Control
12 people.  You know, the vast majority -- the majority
13 of the division would not have -- this would -- the
14 operating guidelines would not have an impact on their
15 day-to-day activities.
16    Q.  Okay.
17    A.  So the people that would have an impact
18 would be the Sales force, the Marketing organizations,
19 the Contract Marketing and Finance Groups -- Finance
20 in a more narrow sense, not all of Finance --
21    Q.  Correct.  The Finance within the --
22    A.  -- but the Finance people that

                              81 (Pages 318 to 321)

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 322

1  supported --
2      Q.  Okay.
3      A.  -- the marketing function -- marketing and
4  contracting functions.
5      Q.  Okay, anyone else?
6      A.  I don't recall -- I could see where it
7  might impact HR, but I don't know that we -- I don't
8  have a direct recollection whether HR was included.
9  They -- the head of HR certainly would have heard --
10  seen and heard the information when sitting on the
11  President's staff.
12      Q.  Okay, who was -- who -- to whom did Abbott
13  Legal Division distribute the compliance with Medicare
14  and Medicaid fraud and abuse laws Handbook for
15  Business Executives.
16      A.  (Witness reviewing document).
17          This is 2000, correct?
18      Q.  Well, that was --
19      A.  This came out sometime in --
20      Q.  -- one of my questions for you.
21      A.  I'd say if you look in the back -- you
22  don't have -- I know you don't have the book.  So I

Page 323

1  think it came in the end -- I think it came out in
2  2000.
3      Q.  Okay, is Page 20 the last page of this?
4      A.  18, 19 -- 20 is the last page that I have.
5      Q.  I know it's the last page you have.
6  it's -- that means it's the last page I have.
7      A.  Oh.
8      Q.  I guess --
9      A.  I mean I would have to look at the
10  handbook itself.  I mean I have no reason to think
11  it's not and --
12      Q.  Would the date be at the end like it is
13  for the Code?
14      A.  The date would have been on the back of
15  the pamphlet.
16      Q.  Okay.
17      A.  And I believe it's a 2000 -- I believe
18  it's just 2000.  I don't believe there was a month.
19      MS. CITERA:  We check if we have it, but --
20      MS. ST. PETER-GRIFFITH:  Yeah, if could you.
21  Can you --
22      MS. CITERA:  My guess is, if we have it, the

Page 324

1  phamplet itself, there's a copying error.
2      MS. ST. PETER-GRIFFITH:  Okay.
3      THE WITNESS:  And I think I have it -- if we
4  want it, I believe I have one in my briefcase.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Was there only one?
7      A.  Oh, my copy -- was there only one
8  handbook?
9      Q.  Yes.
10      A.  It was -- it was only created one time,
11  yes.
12      Q.  Okay, and that was you think in 2000?
13      A.  I thought you meant a single pamphlet.
14      Q.  Okay.  No, I'm sorry.  Yeah, everyone
15  passes it around.
16          Do you want to take a quick break?
17      MS. CITERA:  Okay, fine.  Fine, okay.
18      THE VIDEOGRAPHER:  Going off the record at
19  3:48 p.m.
20          (Recess taken.)
21      THE VIDEOGRAPHER:  Beginning Videotape No. 6 in
22  the deposition of Mr. Fishman.  We're on the record at

Page 325

1  4 p.m.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Mr. Fishman, let me -- we left off
5  discussing the Handbook for Business Executives.
6      A.  Yes.
7      Q.  Did you answer the question of who this
8  was distributed to?
9      A.  I did not.
10      Q.  Okay, who was this distributed to?
11      A.  I do not have a clear recollection of how
12  this would have been passed out.  I believe it would
13  have been dis -- it would have been distributed -- I
14  believe it's -- it would have been distributed as part
15  of presentations made.  There would have been an
16  additional -- you know, there would have been a
17  document passed out to the participants of
18  presentations.  What I don't know if there was -- if
19  there was a wider circulation of it.
20      Q.  Okay.  Well, would it -- would those
21  individuals who received the division operating
22  guidelines at least have been recipients?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 326

1    A.  It would have been -- likely would have
2   been the same group of people.  It -- it would not
3   have gone to the Production folks and Quality Control
4   folks and Clinical Researchers and things of that
5   nature.
6    Q.  Why didn't Abbott publish to its HPD
7   Division a handbook like this earlier?
8    MS. CITERA:  Objection to the form, outside the
9   scope.
10   THE WITNESS:  This was H -- this was
11  corporate, not HPD.
12   MS. ST. PETER-GRIFFITH:  Okay.
13   THE WITNESS:  And I think for the same reason I
14  articulated why the '99 Code of Business Conduct had a
15  provision in the policy talking about
16  Medicare/Medicaid fraud and abuse, generally that the
17  guideline -- this all transpired in a period of a year
18  to two years, in a two-year time span in '99 and 2000,
19  that there was a greater recognition and emphasis on
20  the subject matter given the emphasis placed from
21  external sources and the industry focus.
22

Page 327

1   BY MS. ST. PETER-GRIFFITH:
2    Q.  And what are the emphasis placed on
3   external sources?  What do you mean?
4    A.  Again, the additional compliance
5   envi -- the additional compliance environment that was
6   present and the greater emphasis on the subject matter
7   by the regulators, the greater articulation of
8   concerns that -- that the -- OIG had, and thus, a
9   better understanding, a deeper understanding to
10  communicate down into the organization.
11   Q.  Okay, and when you say "regulators," do
12  you mean Medicare and Medicaid or OIG?
13   A.  More OIG, I think.
14   Q.  Okay.
15   A.  I don't know that CMS was --
16   Q.  But those federal officials responsible --
17   A.  Correct.
18   Q.  -- for oversight over Medicaid and
19  Medicare fraud and abuse statutes?
20   A.  Correct, correct.
21   Q.  Okay.  Including DOJ?
22   A.  Presumably, to the extent they articulated

Page 328

1   positions.
2    Q.  Sir, you've testified several times now
3   that Abbott personnel were responsible for compliance
4   with Medicare and Medicaid fraud and abuse statutes,
5   right?
6    A.  All -- all statutes --
7    Q.  All statutes, okay.
8    A.  -- but including Medicare and Medicaid.
9    Q.  Sir, are you prepared to talk about -- if
10  you could go to Exhibit 3, I think it is, the -- your
11  deposition exhibit notice.
12   A.  Oh, Exhibit 3 here (indicating)?
13   Q.  No, no, your deposition notice.
14   A.  Oh.  Exhibit 3 or Bates --
15   Q.  No, real Exhibit 3, not Tab 3, and
16  let's --
17   MS. CITERA:  I think that's the right one.
18   THE WITNESS:  Okay, this is the right one.
19  Yes?
20  BY MS. ST. PETER-GRIFFITH:
21   Q.  I'd like you to turn to Topic 8.
22   A.  Okay.

Page 329

1    Q.  And I'd like to go over an area that
2   touches upon policies and practices concerning
3   Topics 1 and 3.  Are you prepared to testify about
4   those here today?
5    A.  I'd like to read them --
6    Q.  Sure.
7    A.  -- review them.  1 and 3?
8    Q.  Yeah.
9    A.  (Witness reviewing document).
10       I think this was -- subject to the
11  limitations and objectives already raised, I can talk
12  to these matters, provided that I am not prepared to
13  at this -- I'm not prepared at this time to talk about
14  the business practice of setting pricing.
15   Q.  Okay, I'm not as interested -- I'm not
16  necessarily interested in the business practice of
17  setting pricing, but I want to talk about the
18  compliance components in the policies.
19   A.  Okay, in reading -- that's fine.
20   Q.  Sir, were Abbott personnel responsible for
21  setting lists or catalog prices required to follow
22  Medicare and Medicaid fraud and abuse laws?

83 (Pages 326 to 329)

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 330

1       MS. CITERA:  Objection to the form.
2       THE WITNESS:  All people were required to
3   follow Medicare and Medicaid fraud and abuse laws.
4
5   BY MS. ST. PETER-GRIFFITH:
6       Q.  And that's true for those individuals that
7   worked with Abbott's AWPs?
8       A.  That would be --
9       MS. CITERA:  Objection to form.
10      THE WITNESS:  That would be true of all
11  employees.
12
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Okay.  And from any time including from
15  1991 to the 2000?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  It would be as long as the law
18  was in effect, which even predated '91, but yes.
19
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Okay.  If that's the case, how did Abbott
22  as a matter of policy permit its list or catalog

Page 331

1   prices to receive annual price increases on drugs when
2   the market prices decreased?
3       MS. CITERA:  Objection to the form, outside the
4   scope.
5       MS. ST. PETER-GRIFFITH:  It's not outside the
6   scope.
7       THE WITNESS:  That's -- that would be a
8   business decision, and I couldn't address pricing that
9   I'm aware of was tied to CPI.
10
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Okay, pricing -- what pricing?
13      A.  Pricing generally.
14      Q.  List pricing, catalog pricing?
15      A.  Well, price -- the business practice was
16  looking at pricing and considering CPI is what I
17  understand.
18      Q.  Okay, were there any implications
19  concerning Abbott policy and Abbott's policy that
20  employees comply with Medicare and Medicaid fraud and
21  abuse statutes implicated through that business
22  practice of pricing?

Page 332

1       A.  I --
2       MS. CITERA:  Objection to form, outside the
3   scope to the extent you're asking him to give a legal
4   opinion.
5       THE WITNESS:  I believe when you talk about
6   whether a particular activity is implicated by a
7   statute, you're asking me to reach a legal conclusion.
8
9   BY MS. ST. PETER-GRIFFITH:
10      Q.  Well, did Abbott consider Medicaid and
11  Medicare compliance in its decision making concerning
12  the business practice of setting its annual catalog
13  and list prices and decreasing its market product
14  prices?
15      MS. CITERA:  Same objections.
16      THE WITNESS:  Abbott considered compliance with
17  all laws in -- in each of its activities that it would
18  have conducted.
19
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Okay, what did it do to evaluate
22  compliance with Medicaid and Medicare laws in the

Page 333

1   context of its decision to increase annually its
2   listing catalog prices, while at the same time it was
3   decreasing its prices to its customers?
4       MS. CITERA:  The same objections, and also I
5   would caution you not to reveal any privileged
6   discussions.
7       THE WITNESS:  Could you -- I'm not -- what's
8   the -- what the kind of predicate of the question?  I
9   understand -- would you repeat the question?
10      THE REPORTER:  Sure.
11          (Record read.)
12      THE WITNESS:  I believe an evaluation of
13  compliance with laws is what lawyers do, and I think
14  that's privileged, a privileged conclusion.
15
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  I want to know what Abbott did.
18      MS. CITERA:  Same objections, same instruction.
19      THE WITNESS:  Abbott through the conduct of its
20  Legal Department would have been making legal
21  determination of compliance with law, and that
22  conclusion is privileged.

84 (Pages 330 to 333)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 334

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Why is that conclusion privileged?
4      A.  Because it's a legal conclusion.
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  And I --
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, it's not a privileged communication,
10 right?
11     MS. CITERA:  Objection to the form.  He --
12 you're asking him legal questions as to --
13     MS. ST. PETER-GRIFFITH:  I'm not asking him
14 legal questions.  I'm asking him what's the predicate
15 for Abbott's -- its continuing this policy.
16     MS. CITERA:  I don't think that's the question
17 you just asked.
18     THE WITNESS:  That's not the question.
19     MS. ST. PETER-GRIFFITH:  Yes, it is the
20 question.
21     THE WITNESS:  You asked me what evaluation did
22 we do to -- to assure compliance with the laws.

Page 335

1      MS. ST. PETER-GRIFFITH:  Right.
2      THE WITNESS:  And that's a legal conclusion.
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  No, I'm asking you what did you -- what
6  did Abbott do to evaluate whether its pricing
7  practices complied with Medicaid and Medicare fraud
8  and abuse laws?  That's not a legal question.
9      MS. CITERA:  Any evaluation would be
10 privileged.
11     MS. ST. PETER-GRIFFITH:  I want to know what
12 you did.
13     MS. CITERA:  Any evaluation would be privileged
14 that was done by the Legal Department.
15     MS. ST. PETER-GRIFFITH:  All right, the witness
16 can answer for himself, Toni.
17     THE WITNESS:  That -- I thought that's what I
18 said, which is to the extent, we -- there was an -- an
19 evaluation was done, it would have -- it would have
20 been --
21
22 BY MS. ST. PETER-GRIFFITH:

Page 336

1      Q.  Was one done?
2      A.  Whether -- whether Legal -- whether an
3  analysis and evaluation was was done is a legal con --
4  is also legal -- privileged.
5      Q.  No, I want to know, yes or no, was an
6  evaluation done?
7      A.  When, in '91 to 2001?
8      Q.  Yes.
9      MS. CITERA:  Objection to the form and outside
10 the scope.
11     THE WITNESS:  And just so I -- I would
12 appreciate the scope of what we're talking about.
13 What aspect of fraud -- Medicaid fraud and abuse are
14 we talking about?
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Any.
18     A.  Any aspect of Medicare fraud and abuse?
19 Yes, there was evaluations done.
20     Q.  Okay, what evaluations were done with
21 regard to Abbott's compliance with Medicare or
22 Medicaid fraud and abuse statutes in the context of

Page 337

1  its decision to raise on an annual basis its list and
2  catalog prices, while at the same time, it was
3  decreasing its prices to customers?
4      MS. CITERA:  Objection to the form, outside the
5  scope, and also the same caution about not revealing
6  privileged discussions.
7      THE WITNESS:  I've answered the question
8  whether we did an evaluation.  To what extent we did
9  an evaluation, I think is privileged.  You asked me
10 what was the evaluation.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  I'm asking you what was the eval -- I'm
14 asking what Abbott's evaluation was.
15     A.  That, I think is a privileged conclusion.
16     MS. ST. PETER-GRIFFITH:  Do you intend to rely
17 upon an advice of counsel defense?  Do you?  Do you,
18 Toni?
19     MS. CITERA:  I told you that I'm not going to
20 answer that.
21     MS. ST. PETER-GRIFFITH:  Because we're entitled
22 to discover this information.

85 (Pages 334 to 337)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 338

1     MS. CITERA:  You're not -- he's not going to
2  reveal privileged conversations here.  I've said it
3  once.  I've said it several times here.  It's not
4  happening here, Ann.
5     MS. ST. PETER-GRIFFITH:  Toni, we're entitled
6  to inquire what Abbott did to evaluate its compliance.
7     MS. CITERA:  You're not entitled to privileged
8  discussions.
9     MS. ST. PETER-GRIFFITH:  I'm not asking about
10 privileged discussions.
11     MS. CITERA:  You are asking about privileged
12 discussions.
13     MS. ST. PETER-GRIFFITH:  I want to know what
14 Abbott did.
15     MS. CITERA:  You're asking about legal advice,
16 analyses that the Legal Department did.  That's all
17 privileged.
18     MS. ST. PETER-GRIFFITH:  Do you intend to rely
19 upon an advice of counsel defense?
20     MS. CITERA:  I'm not going to answer that.  If
21 you want to spend the next twenty minutes or fifteen
22 minutes asking me that over and over again, go ahead.

Page 339

1  It's your time.
2     MS. ST. PETER-GRIFFITH:  Well, no, it's -- but
3  it's very important because if you intend to even
4  remotely go there, we are entitled to this discovery.
5     MS. CITERA:  I'm not answering that question,
6  okay, Ann.
7     MR. ANDERSON:  And I would also add that,
8  again, as early in the day, this gentleman has been
9  designated as a corporate representative, and as a
10 corporation, if Abbott chooses certain business
11 practices or policies or changes those, particularly
12 those that we're talking about right now, about its
13 pricing practices prior to 2001 and its pricing
14 practices after May of 2001, we're entitled to those
15 business decisions.  And we're simply trying to
16 inquire and discover those business decisions.
17     MS. CITERA:  I disagree with the both of you.
18 I've made my instruction.
19     MS. ST. PETER-GRIFFITH:  Are you instructing
20 him not to answer?
21     MS. CITERA:  I am instructing him not to
22 answer.

Page 340

1
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  What else did Abbott do to evaluate
4  whether or not its practice of annually increasing its
5  list and catalog prices was in compliance with federal
6  and state Medicare and Medicaid fraud and abuse laws?
7     MS. CITERA:  Same objections and instruction.
8     THE WITNESS:  Same answer that we didn't answer
9  what we did initially because it's privileged, and I
10 wouldn't answer what else we did.
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Did you do anything else outside of the
14 Legal Department?
15     A.  Outside the -- any -- any activity that
16 business people would have engaged in evaluating the
17 law would not have -- would not be adhered to within
18 the company.
19     Q.  What do you mean by that?
20     A.  If there was a legal evaluation to be
21 made, it would have come to Legal.
22     Q.  Okay, how did Abbott know that in rise --

Page 341

1  in annually increasing its list and catalog prices it
2  was still complying with federal and state Medicare
3  and Medicaid fraud and abuse statutes?
4     MS. CITERA:  Objection to the form, outside the
5  scope, same caution.
6     THE WITNESS:  When Abbott implemented any
7  business decision, it did so with the understanding
8  and expectation that it was in compliance with laws.
9     MR. ANDERSON:  Objection, non-responsive.
10     MS. ST. PETER-GRIFFITH:  Can you read the
11 question back, please?
12        (Record read.)
13     THE WITNESS:  It requires a conclusion --
14     MS. CITERA:  Same objections, same
15 instructions.
16     THE WITNESS:  -- that we -- that we evaluated
17 and concluded that we were in compliance, which would
18 be a legal conclusion.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Did you do such an evaluation?
22     A.  That's also asking for --

86 (Pages 338 to 341)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

Page 342

1      MS. CITERA:  Same objections.
2      THE WITNESS:  -- a legal con -- a -- privileged
3  information.
4
5  MS. ST. PETER-GRIFFITH:
6      Q.  How is that asking for privileged
7  information?  I'm asking what Abbot did.
8      A.  Whether Legal of -- did a legal evaluation
9  of a particular business practice?
10     Q.  Right.
11     MS. CITERA:  It's privileged.
12     THE WITNESS:  It's privileged.
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Did anyone outside of the Legal Department
16 do that -- make that evaluation?
17     A.  To the extent anybody -- as I stated
18 before, to the extent anybody outside of Legal
19 attempted to make a legal analysis, one, that was
20 outside of their job description and shouldn't be
21 doing it, and I have no reason to believe that anybody
22 would rely on a non-legal -- a non-lawyer's evaluation

Page 343

1  of a legal analysis.
2      Q.  How did Abbott know that in raising its
3  prices, its list and catalog prices on an annual basis
4  it was in compliance with federal and state Medicare
5  and Medicaid fraud and abuse statutes?
6      MS. CITERA:  Same objections and instructions.
7      THE WITNESS:  You're asking me for a legal
8  conclusion.
9      MS. ST. PETER-GRIFFITH:  Do you intend to
10 assert an advice of counsel defense?
11     MS. CITERA:  I'm not going to answer that.
12     MR. ANDERSON:  Well, you know, I've got to
13 interject something.  Are you instructing the witness
14 not to answer because he -- he's not answering the
15 question by just stating that it's a legal conclusion,
16 but I don't hear an instruction not to answer.  Yet
17 he's not --
18     MS. CITERA:  I said, Same objection and same
19 caution.
20     MR. ANDERSON:  Yeah, you're cautioning him not
21 disclose a privilege.  He's not saying it's
22 privileged.  He saying it calls for a legal

Page 344

1  conclusion.  He doesn't get to make that decision.
2      MS. CITERA:  Reveal the -- reveal the -- I mean
3  reveal.  Please reread the question.
4          (Record read.)
5      MS. CITERA:  And -- okay, so how did it know
6  that it was in compliance.  And your question is?
7      MR. ANDERSON:  I don't have a question.  He's
8  repeatedly saying it calls for a legal conclusion and
9  refusing to answer.  There's no bases in the rules for
10 such a --
11     MS. ST. PETER-GRIFFITH:  Are you -- are you
12 instructing him not to answer?
13     MS. CITERA:  Well, A, he's not required to give
14 a legal conclusion.
15     MR. ANDERSON:  We're not asking for a legal
16 conclusion.
17     MS. ST. PETER-GRIFFITH:  We're not asking for a
18 legal conclusion.
19     MS. CITERA:  But I'm just saying, let's get
20 that straight.  Second, to the extent that it's
21 calling for any privileged conversations, he is saying
22 that he's not going to answer that.

Page 345

1      MS. ST. PETER-GRIFFITH:  Okay, I'm not -- what
2  I'm asking is are you instructing him not to answer
3  the question?
4      MS. CITERA:  I am instructing him not to reveal
5  any privileged discussions.
6          If there's any -- any part of that
7  question that you could answer that doesn't deal with
8  privileged communications and discussions, then you
9  can answer it.
10     THE WITNESS:  How we knew whether we were
11 complying with the law is a legal analysis.  How does
12 anyone know that they're complying with the law?  They
13 have to make an illegal analysis and compare facts and
14 law and conclude whether or not the facts fit within
15 the law.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  And what did Abbott do?
19     MS. CITERA:  Same objections, form and outside
20 the scope, same caution.
21     THE WITNESS:  I think I have the same answer.
22 It's the same answer as I --

87 (Pages 342 to 345)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 346

1    MS. ST. PETER-GRIFFITH:  Are you instructing
2  the witness not to answer, Toni?
3    MS. CITERA:  I'm instructing him -- I'm
4  instructing him not to reveal any privileged
5  discussions or analyses.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Was the analysis conducted, yes or no?
9    MS. CITERA:  Was the analysis -- can you please
10 clarify what analysis?
11   MS. ST. PETER-GRIFFITH:  The analysis that
12 we've been discussing, whether or not --
13   MS. CITERA:  Well, I want the question to be
14 clear.
15   MS. ST. PETER-GRIFFITH:  -- whether or not the
16 annual increases of list and catalog prices complied
17 with the federal and state Medicare and Medicaid fraud
18 and abuse laws.
19   MS. CITERA:  Same objections, same instruction.
20   THE WITNESS:  I don't know -- I don't
21 believe that -- I don't know that Commercial Legal did
22 it.  I don't know whether Litigation would have been

Page 347

1  involved.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  What did you do to evaluate whether or not
4  it was done, the analysis was done as the 30(b)(6)
5  designee sitting here today to prepare your testimony?
6    MS. CITERA:  Objection to form.
7    THE WITNESS:  I identified the people that I
8  talked with.
9    MR. ANDERSON:  But you can't answer the
10 question?  I was a little unclear on your answer.
11   THE WITNESS:  I don't -- I don't know that --
12 whether Lit -- I don't -- I am not aware that the
13 Commercial Lawyers would have made that -- you said,
14 Was an evaluation done?  I'm not aware that the
15 Commercial Lawyers would have made that evaluation.  I
16 am also testifying I don't know whether Litigation
17 made that evaluation.
18
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  Who would know that question, the answer
21 to that question?
22   A.  Someone within Litigation.

Page 348

1    Q.  Anyone else within the corporation?
2    A.  I can't answer -- if it -- if it was
3  contained within Litigation, I don't know who they
4  would have communicated with.
5    Q.  What about the President or COO of the
6  company?
7    A.  I don't know who they would have
8  communicated with.
9    Q.  Was the decision in 2001 of Abbott to
10 change its policy concerning price setting done for
11 any reasons pertaining to Medicare and Medicaid fraud
12 and abuse --
13   MS. CITERA:  Objection.
14
15 BY MS. ST. PETER-GRIFFITH:
16   Q.  (Continuing) -- statutes and regulations?
17   MS. CITERA:  Objection to the form, outside the
18 scope.
19   THE WITNESS:  I am not aware of what pricing
20 change occurred in May of 2001.
21
22 BY MS. ST. PETER-GRIFFITH:

Page 349

1    Q.  But Abbott is aware of it, right?  Abbott
2  is aware that it decreased its prices in 2001?
3    MS. CITERA:  Objection to the form, outside the
4  scope.
5    THE WITNESS:  I don't -- I don't know.
6  someone -- someone in Abbott who was responsible for
7  pricing presumably knows.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  So you didn't educate yourself concerning
10 policies and practices pertaining to particular
11 pricing activities within Abbott during the relevant
12 time period of this -- of this litigation --
13   MS. CITERA:  Ojbection.
14
15 BY MS. ST. PETER-GRIFFITH:
16   Q.  (Continuing) -- in preparing for your
17 deposition here today?
18   MS. CITERA:  Objection to the form.
19   THE WITNESS:  No, I did.
20
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  What did you do?

88 (Pages 346 to 349)

Henderson Legal Services, Inc.

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 350

1       A.  I talked -- I talked with the people that
2    I identified and made inquiries about policies and
3    procedures and practices --
4       Q.   What did --
5       A.   -- with respect to AWP.
6       Q.   What did you discuss with them concerning
7    the policy behind the 2001 pricing change?
8       MS. CITERA:  Objection to the form, outside the
9    scope.
10      THE WITNESS:  I did not --
11      MS. ST. PETER-GRIFFITH:  It's not outside the
12   scope.
13      THE WITNESS:  I did not raise a question
14   about -- I did not ask them anything about it, and
15   they did not tell me anything about it.  And I don't
16   know if it was a policy or not, but the -- if in fact
17   there was a price change in May of 2001, it did not
18   come up in any conversation that I had.
19
20   BY MS. ST. PETER-GRIFFITH:
21      Q.   You're unaware -- have you ever heard of
22   the DOJ price changes or DOJ prices or Ven-a-care

Page 351

1    prices?
2       MS. CITERA:  Objection to the form, outside the
3    scope.
4       THE WITNESS:  No.
5    BY MS. ST. PETER-GRIFFITH:
6       Q.   Why would an attorney in the Litigation
7    Department look at list prices --
8       MS. CITERA:  Objection to the --
9
10   BY MS. ST. PETER-GRIFFITH:
11      Q.   (Continuing) -- and policies concerning
12   list prices?
13      A.   I don't know that they did.
14      MS. CITERA   Objection to the form, outside the
15   scope.
16      MS. ST. PETER-GRIFFITH:  If we can mark this as
17   the next exhibit?
18      THE REPORTER:  Okay.  This is No. 7.
19              (Exhibit Fishman 007 was
20               marked for ID)
21      THE REPORTER:  There you go.
22      THE WITNESS:  Thank you.

Page 352

1       THE REPORTER:  Um-hum.
2
3    BY MS. ST. PETER-GRIFFITH:
4       Q.   I'm going to represent to you that this
5    was previously marked as Exhibit 940 in the Sellers
6    deposition, and unfortunately, it has my
7    handwriting -- it was copied with my handwriting at
8    the top.
9       A.   Okay.
10      Q.   I will represent to you, sir, that
11   Mr. Sellers testified that he drafted this particular
12   document.
13      A.   Okay.
14      Q.   And I'm going to look at the first page of
15   it.  So, first, have you ever seen this document
16   before?
17      A.   I have not.
18      Q.   Okay, do you want to take a minute and
19   review it, please?
20      A.   Sure.  (Witness reviewing document).
21      Q.   Sir, I'm just going to ask you about the
22   front page, actually.

Page 353

1       A.   Okay.
2       Q.   I only meant to give you the front page,
3    I'm sorry.
4       A.   Okay.
5       Q.   Sir, did you discuss the content of this
6    memo when you had your approximate thirty to --
7    thirty-minute to sixty-minute conversation with Mike
8    Sellers?
9       A.   No, I did not.
10      Q.   Did Mr. Sellers ever discuss with you
11   increased scrutiny from Congress and from the
12   Department of Justice concerning Abbott's pricing
13   practices?
14      A.   No, he did not.
15      Q.   Were you aware of any government or
16   regulatory demands or was Abbott aware of any
17   government or regulatory demands that caused it to
18   reconsider its decision to increase its catalog and
19   list prices annually?
20      MS. CITERA:  Objection to the form, outside the
21   scope.
22      THE WITNESS:  Based on the content of this

89 (Pages 350 to 353)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 354

1   letter, to the extent it's accurate, I'd have to say
2   Abbott knew about it if there was a letter in December
3   of 2000 to Miles White. And the fact that this
4   document exists, I'd have to say Abbott knew about it.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   Okay. Well, in terms of the accuracy of
7   this document, I'd -- I will represent to you that
8   Mr. Sellers testified that he drafted it.
9       A.   Okay.
10      Q.   And do you find Mr. Sellers to be a
11  trustworthy source for information?
12      MS. CITERA: Objection to the form, outside the
13  scope.
14      THE WITNESS: I -- I have no reason to doubt
15  Mike.
16
17  BY MS. ST. PETER-GRIFFITH:
18      Q.   Okay. Sir, did the -- did Medicare and
19  Medicaid fraud and abuse considerations impact or
20  influence Abbott's decision in 2001 to reduce its
21  catalog and list prices?
22      MS. CITERA: Objection to the form, outside the

Page 355

1   scope.
2       MS. ST. PETER-GRIFFITH: It's not outside the
3   scope.
4       MS. CITERA: I also counsel you not to reveal
5   any discussions with counsel.
6       THE WITNESS: (Witness reviewing document).
7       MS. CITERA: I should say any discussions --
8   any discussions with counsel --
9       THE WITNESS: Yeah.
10      MS. CITERA: -- or analysis that was done by
11  counsel.
12      THE WITNESS: I mean I also note this is an
13  attorney work product. So I don't know that Mike --
14  did Mike --
15      MS. ST. PETER-GRIFFITH: The privilege was
16  waived, sir.
17      THE WITNESS: Okay, okay, I'm just asking.
18      MS. CITERA: Well, I think --
19      THE WITNESS: Is there an argument still on the
20  table?
21      MS. CITERA: -- if I recall correctly, this was
22  ordered to be produced. I don't think we waived it.

Page 356

1       MR. ANDERSON: It was ordered to be produced in
2   Texas. It was voluntarily produced in the federal
3   case, but let's move on because we're short on time.
4       THE WITNESS: Okay.
5           In reading this, I can't conclude
6   that it was -- it was a direct -- you know, there
7   was -- what was the question again? I want to --
8       MS. ST. PETER-GRIFFITH: Can you read the
9   question back?
10      THE REPORTER: Sure.
11      THE WITNESS: "Influence" or there was some
12  word there I don't --
13          (Record read.)
14      MS. CITERA: Same objection, same caution.
15      THE WITNESS: I don't know.
16
17  BY MS. ST. PETER-GRIFFITH:
18      Q.   Okay, sir, we -- I told Miss Citera that
19  there's no problem with you getting out at 4:30, but I
20  would like to find out what your schedule is before
21  March 31st so we can see if we can find a day to
22  reconvene this deposition.

Page 357

1       A.   All right. I am leaving for spring break
2   family vacation on March 23rd.
3       Q.   And when are you returning?
4       A.   I am returning Sunday night, the 30th.
5   And next week, I have two transactions that are --
6   that I have to respond to. At this moment, I can't
7   tell you which days are going to be best. I don't
8   think the beginning of the week is likely to be
9   better -- more likely to -- and towards the end of the
10  week is going to be better than the beginning of the
11  week, but I have -- I have to confirm that because
12  things are happening today as we -- as I sit here,
13  things are happening back at the ranch.
14      Q.   Okay, and you're not available on Friday I
15  understand?
16      A.   I am not available on Friday.
17      MS. ST. PETER-GRIFFITH: Okay, we'll try and
18  figure something out.
19      THE VIDEOGRAPHER: Going off the record at
20  4:31 p.m. This concludes the March 12th deposition of
21  David Fishman.
22      (WHEREUPON, FURTHER DEPONENT SAYETH NOT)

90 (Pages 354 to 357)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                                    March 12, 2008

Page 358

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   IN RE: PHARMACEUTICAL      )
 5   INDUSTRY AVERAGE WHOLESALE )
 6   PRICE LITIGATION      ) MDL No. 1456
 7   ----------------------------) Civil Action
 8   This document relates to:   ) No. 01-12257-PBS
 9   United States of America,   )
10   ex. rel. Ven-a-Care of the  )
11   Florida Keys, Inc.,      ) Hon. Patti Saris
12      vs.             )
13   Abbott Laboratories, Inc.,  ) Magistrate Judge
14   CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler
15
16        I hereby certify that I have read the
17   foregoing transcript of my deposition given at the
18   time and place aforesaid, consisting of pages 1 to
19   357, inclusive, and I do again subscribe and make oath
20   that the same is a true, correct, and complete
21   transcript of my deposition so given as aforesaid and
22   includes changes, if any, so made by me.
```

Page 359

```
 1
 2
 3   _____
 4        DAVID S. FISHMAN
 5
 6
 7   SUBSCRIBED AND SWORN TO
 8   before me this _____ day
 9   of _____, A.D. _____.
10
11   _____
12      Notary Public
13
14
15
16
17
18
19
20
21
22
```

Page 360

```
 1   STATE OF ILLINOIS   )
 2              )  ss:
 3   COUNTY OF C O O K   )
 4
 5        I, Deborah Habian, a Certified Shorthand
 6   Reporter within and for the State of Illinois, do
 7   hereby certify:
 8
 9        That previous to the commencement of the
10   examination of the witness, the witness was duly sworn
11   to testify the whole truth concerning the matters
12   herein;
13        That the foregoing deposition was reported
14   stenographically by me, was thereafter reduced to
15   printed transcript by me, and constitutes a true
16   record of the testimony given and the proceedings had;
17
18        That the said deposition was taken before
19   me at the time and place specified;
20        That the reading and signing by the
21   witness of the deposition transcript was agreed upon
22   as stated herein;
```

Page 361

```
 1        That I am not a relative or employee of
 2   attorney or counsel, nor a relative or employee of
 3   such attorney or counsel for any of the parties
 4   hereto, nor interested directly or indirectly in
 5   the outcome of this action.
 6        IN WITNESS WHEREOF, I do hereunto set my
 7   hand this _____ day of _____, 2008.
 8
 9
10
11
12        DEBORAH HABIAN, CSR, RMR, CRR, CBC
13        Notary Public
14        CSR No. 084-022432
15
16
17
18
19
20
21
22
```

91 (Pages 358 to 361)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3