# Exhibit 91



experience *does* matter

**CASE:  In Re: Pharmaceutical Industry AWP**
**DATE:  March 20, 2008**

Enclosed is the Original of the transcript of the testimony of **David Fishman** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services


Encl.


Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Chicago, IL

Page 362

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


--------------------------------x

In re:  PHARMACEUTICAL INDUSTRY    )  MDL DOCKET NO.

                                   )

AVERAGE WHOLESALE PRICE            )  CIVIL ACTION

                                   )

LITIGATION.                        )  01CV12257-PBS

------------------------------  x

VOLUME II


        The videotaped 30(b)(6) deposition of ABBOTT

(DAVID FISHMAN), called by the United States for

examination, taken pursuant to subpoena and pursuant

to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before Rachel F. Gard,

Certified Shorthand Reporter, at 77 West Wacker

Drive, Suite 3500, Chicago, Illinois, commencing at

8:35 a.m. on the 20th day of March, A.D., 2008.

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 363

```
1  APPEARANCES:
2
3     U.S. DEPARTMENT OF JUSTICE
4     CIVIL DIVISION
5     MS. ANN ST. PETER-GRIFFITH
6     99 N.E. 4th Street
7     Miami, Florida  33132
8     Phone: (305) 961-9003
9     Email: ann.st.peter-griffith@usdoj.gov
10       On behalf of the United States;
11
12    ANDERSON, LLC
13    MR. C. JARRETT ANDERSON
14    208 West 14th Street
15    Suite 3-B
16    Austin, Texas  78701
17    Phone: (512) 469-9191
18    Email: jarrett@anderson-llc.com
19       On behalf of the Relator Ven-A-Care of the
20       Florida Keys, Inc.;
21
22
```

Page 364

```
1  JONES DAY
2  MS. TONI-ANN CITERA
3  222 East 41st Street
4  New York, New York  10017
5  Phone: (212) 326-3939
6  Email: tcitera@jonesday.com
7     On behalf of Abbott Laboratories and the
8     deponent.
9
10
11 ALSO PRESENT:  Stephan Hoog
12       (Legal Visual Services)
13
14
15          *  *  *  *  *  *
16
17
18
19
20
21
22
```

Page 365

```
1              I N D E X
2  WITNESS                           PAGE
3  DAVID FISHMAN
4     Examination by Ms. St. Peter-Griffith   370
5     Examination by Mr. Anderson          676
6
7            E X H I B I T S
8  FISHMAN EXHIBIT                      PAGE
9  Exhibit Fishman 008 ABT-DOJ 0395435 - ABT-DOJ
10                0395586        370
11 Exhibit Fishman 009 Additional Abbott-produced
12                compliance documents with
13                no Bates numbers    372
14 Exhibit Fishman 010 ABT-DOJ 0397104 - ABT-DOJ
15                0397214 and ABT-DOJ
16                0398240 - ABT-DOJ 0398285  374
17 Exhibit Fishman 011 Letter to Abbott from the
18                United States Department
19                of Justice dated September
20                30, 1999         444
21 Exhibit Fishman 012 AR 00887 - AR 01013    487
22 Exhibit Fishman 013 ABT-DOJ 316016         552
```

Page 366

```
1            E X H I B I T S
2  FISHMAN EXHIBIT                      PAGE
3  Exhibit Fishman 014 ABT-DOJ 351271 - ABT-DOJ
4                351270         570
5  Exhibit Fishman 015 ABT-DOJ 335485 - ABT-DOJ
6                335487         585
7  Exhibit Fishman 016 ABT-DOJ 307075         595
8  Exhibit Fishman 017 Document retained by
9                Ms. Citera based on
10               privilege        599
11 Exhibit Fishman 018 ABT-DOJ 340984 - ABT-DOJ
12               340985          601
13 Exhibit Fishman 019 ABT-DOJ 340986 - ABT-DOJ
14               340987          606
15
16          CERTIFIED QUESTION
17 QUESTION                            PAGE
18
19    Q.  Okay.  Outside of the kind
20       of big-sky picture that Abbott
21       complies with laws, does
22       Abbott have a position on
```

                                    2 (Pages 363 to 366)

# Chicago, IL

Page 367

```
1        whether or not those laws
2        require Abbott to publish
3        catalog or list prices that
4        reflect the prices paid by
5        providers?                692
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 368

```
1      THE VIDEOGRAPHER:  This is Stephan Hoog
2  representing Henderson Legal Services.  I'm the
3  operator of this camera.
4        This is the videotaped deposition of
5  David Fishman.  It's being taken pursuant to the
6  Federal Rules of Civil Procedure on behalf of the
7  plaintiffs.  We are on record March 20th, 2008.
8  The time is 8:34 a.m. as indicated on the video
9  screen.  We are at the offices of Jones Day, 77
10 West Wacker Drive, Chicago, Illinois?
11       This case is captioned, Re:
12 Pharmaceutical Industry Average Wholesale Price
13 Litigation, Case No. 01-12257-PBS.
14       Will the attorneys please identify
15 themselves for the video record.
16     MS. ST. PETER-GRIFFITH:  Ann St.
17 Peter-Griffith, United States Attorney's Office for
18 the Southern District of Florida on behalf of the
19 Unites States.
20     MS. CITERA:  Toni Citera from Jones Day on
21 behalf of the defendant and the witness.
22     THE VIDEOGRAPHER:  The court reporter today is
```

Page 369

```
1  Rachel Gard from Henderson Legal Services.  Can you
2  please swear in the witness.
3        (Witness sworn.)
4     MS. ST. PETER-GRIFFITH:  Before we get
5  started, Mr. Fishman, I have some statements to put
6  on the record.  First, the United States at the end
7  of this deposition on Wednesday, the 12th,
8  requested time for a second day with this witness.
9        The United States was not notified until
10 Tuesday of this week, less than two days ago, via
11 email, while she was -- counsel was notified while
12 she was in a deposition that Jones Day knew she was
13 going to be in that the only day that was going to
14 be offered for Day 2 of Mr. Fishman was the 20th,
15 which has caused considerable problems for the
16 United States given the short notice of this date.
17       We are here today, but it has been very
18 difficult to get here; and it has been at
19 considerable expense to the United States given the
20 short notice.
21       Additionally, documents were furnished
22 after Mr. Fishman's original deposition date that
```

Page 370

```
1  are additional compliance documents.  And what I'd
2  like to do is have the court reporter mark this
3  next, this stack of exhibits as the next exhibit.
4  And the next number in order is 8.
5        (Exhibit Fishman 008
6        marked as requested.)
7
8
9  WHEREUPON:
10       DAVID FISHMAN, called as a witness
11 herein, having been first duly sworn, was examined
12 and testified as follows:
13       EXAMINATION
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  If I could have the -- Good morning, Mr.
16 Fishman.  I'm sorry.
17   A.  Good morning.  Sorry.
18   Q.  Mr. Fishman, I'll represent to you that
19 those are exhibits that were FedEx'd to my office
20 on Monday of this week.  And if I could just have
21 you look at them, they've been represented as
22 additional Abbott compliance documents.  If you
```

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

Page 371

1  could just briefly look them over and see if that's
2  your understanding of what these documents are.
3      A.  This is not part of this (indicating).
4  It looks like a stand-alone document.
5      Q.  I believe it is.  Mr. Fishman, I will
6  have to tell you, they produced it to me so --
7      A.  Okay.
8      Q.  And each blue sheet represents a separate
9  document that was produced to us.
10     A.  Okay.  Could you repeat the question?
11     Q.  Sure.  Do those all appear to be
12 documents either memorializing compliance policies
13 or practices or issues or representing
14 presentations concerning the same?
15     A.  Yes.
16     Q.  And, Mr. Fishman, I'll represent to you
17 that also a DVD was produced together with these --
18 with those documents.  And I'm going to have this
19 marked, this file --
20     MS. ST. PETER-GRIFFITH:  I'll just represent,
21 Toni, it's just what we printed off the disk.
22 Could I have this file folder, which does not have

Page 372

1  Bates labels on them --
2      MS. CITERA:  The disk did.
3      MS. ST. PETER-GRIFFITH:  The disk did, yes.
4  And I'm sorry.  I don't have that.  And if I could
5  --
6      MS. CITERA:  We can get a Bates number on the
7  break?
8      MS. ST. PETER-GRIFFITH:  Okay.  Why don't we
9  do that.  If I could just represent that Exhibit --
10 what's to soon-to-be-marked as Exhibit 9
11 represents our print-off of the documents that were
12 on that disk.
13     MS. CITERA:  Do you have a copy of that for
14 me?
15     MS. ST. PETER-GRIFFITH:  I don't.
16     MS. CITERA:  Okay.
17     (Exhibit Fishman 009
18     marked as requested.)
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Mr. Fishman, if I could just have you
21 flip through those pages and see if you can
22 identify what they might be and confirm that they

Page 373

1  are additional compliance-related materials from
2  Abbott or within Abbott.
3      A.  Without going -- Yes, generally it
4  appears to be a compliance document.
5      Q.  Okay.
6      A.  Or documents reflecting compliance on a
7  disk.
8      Q.  Well, I'll tell you that that's what they
9  were represented to us as being.  So I just wanted
10 you to confirm.  And, sir, for Exhibit 10, which is
11 soon to be marked --
12     A.  Excuse me.
13     Q.  -- which have a Bates range of 039704 --
14 104, I'm sorry -- through 0398285.  I'm going to
15 represent to you that these are what was identified
16 to me as being additional compliance documents
17 produced by Abbott.  They were produced to the
18 United States via hand delivery at about 10:00
19 o'clock last night to my hotel.  Oh, she's got to
20 mark it, sir.
21     MS. CITERA:  Is that this pile?
22     MS. ST. PETER-GRIFFITH:  Yes.

Page 374

1      (Exhibit Fishman 010
2      marked as requested.)
3  BY THE WITNESS:
4      A.  Yes, these appear to be additional
5  compliance, generally compliance documents.
6      Q.  Sir, can you tell me from your exhibits
7  which I will put in front of you, these are not the
8  originals that were marked but I'll represent to
9  you they were copied, from the materials that we
10 went over at your last deposition and then
11 including these materials, can you today represent
12 that all of the documents that are compliance
13 materials, Exhibits 1, that have been produced to
14 the United States, Exhibit 1 from last week's
15 deposition, and Exhibits 8, 9, and 10, do those
16 represent for the period from 1991 until 2003 the
17 sum total of Abbott's compliance policies and
18 materials?
19     MS. CITERA:  Objection to the form, outside
20 the scope.
21 BY THE WITNESS:
22     A.  I can't say with certainty that it's the

4 (Pages 371 to 374)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

| Page 375 | Page 377 |
|---|---|

Page 375

1    sum total.
2        Q.  What additional documents do you think
3    might be out there?
4        MS. CITERA:  Objection to the form, outside
5    the scope.
6    BY THE WITNESS:
7        A.  I wouldn't -- I wouldn't know which
8    additional documents existed.
9        Q.  What has Abbott done to undertake a
10   search for its compliance materials?
11       MS. CITERA:  Same objections.
12   BY THE WITNESS:
13       A.  I understand there was -- there was a
14   document hold through litigation as part of this
15   litigation.  And people, numerous people were
16   identified through that and files were reviewed and
17   documents like this were identified through the
18   file, through reviewing the files.
19       Q.  How can the United States know what
20   additional compliance materials are out there?  Is
21   there a way to identify that?
22       MS. CITERA:  Objection to the form, outside

Page 376

1    the scope.
2    BY THE WITNESS:
3        A.  Not to my knowledge.
4        MS. ST. PETER-GRIFFITH:  Toni, another matter
5    that I need to take up with you and I'd like to do
6    it on the record and ask you to follow up on it so
7    that we can hopefully make a record of it at some
8    point today, but I notice that for all of the
9    compliance materials that have been produced, they
10   were identified as being highly confidential.  And,
11   you know, consistent with Magistrate Judge Bowler's
12   most recent order, it was my understanding that
13   Jones Day had previously indicated that it was not
14   going to be designating items highly confidential
15   unless they fell within the parameters of what
16   Judge Saris had previously held was appropriate.
17       Can you find out at some point today
18   whether or not we can de-designate -- you know, I
19   don't know whether it was inadvertent, you know,
20   someone just had the stamp or what the situation
21   was.  But can you identify so we can find out by
22   the end of the day and put on the record as to

Page 377

1    whether or not Abbott still considers these to be
2    highly confidential documents.
3        MS. CITERA:  Okay.
4    BY MS. ST. PETER-GRIFFITH:
5        Q.  Okay.  Now, Mr. Fishman, preliminary
6    matters out of the way, can you tell me what you've
7    done in between now and your -- and the last time
8    we were here, last Wednesday, to prepare for
9    today's deposition?
10       A.  I had three additional brief
11   conversations. The first was with Brian Taylor,
12   with Rick Matea, and with Virginia Tobiason.
13       Q.  Okay.  And what did you discuss with Mr.
14   Taylor?
15       A.  I had a brief conversation over the phone
16   that lasted less than ten minutes --
17       Q.  Okay.  You're anticipating my questions.
18       A.  Should I not?
19       (Continuing.) -- pertaining to the
20   compliance activities that he would have known
21   about or been involved in from '91 through '95
22   specifically with respect to the Home Infusion

Page 378

1    business within HPD.
2        Q.  Okay.
3        A.  He advised me that either in '91 or '92,
4    he recalled specifically in Arizona giving a fraud
5    and abuse presentation to the combined Alternate
6    Site/Home Infusion businesses, thought there were
7    roughly 40 people there, a large audience.  He was
8    estimating the numbers in that he did not have a
9    copy of that presentation but recalled that it, as
10   we discussed, is consistent with the general
11   subject matter and format of the multiple
12   presentations that have already been produced.
13       Q.  Sir, can you tell me whether or not --
14   You said it was in '91 or '92?
15       A.  Correct.
16       Q.  Scrap that question.  Did he tell you who
17   might have those presentations?
18       A.  He did not.
19       Q.  Did he tell you what the substance was in
20   more detail?
21       A.  In more detail, no.  It was generally
22   fraud and abuse.  And, again, it was consistent

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 379

1  with the type of information that is contained in
2  many of the -- or if not most of the presentations
3  that have already been produced.
4      Q.  Was there anything -- is there anything
5  unique about fraud and abuse compliance with regard
6  to Home Infusion given their slightly different
7  business model than, say, the rest of Abbott or
8  HPD?
9      A.  No, we --
10     MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12     A.  We gave fraud and abuse presentations to
13  many of the businesses, including Home Infusion.
14     Q.  Okay.  But my question is, are there --
15  given Home Infusion's business model, were there
16  additional fraud and abuse issues that perhaps
17  touched upon them that might not be applicable for,
18  you know, HBS's DRG reimbursement model or even Alt
19  Site's?
20     A.  They would be --
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  Sorry.

Page 380

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Go ahead.
3      A.  They would be -- they would be -- Their
4  business model and activities would be subject to
5  the same compliance regulations and rules and laws
6  that all the other businesses would be subject to.
7      Q.  Would the fact that Abbott's Home
8  Infusion business unit actually submitted claims,
9  either on behalf of Abbott's pharmacies or on
10  behalf of customers or consignment partners, would
11  that fact necessitate a need to look at additional
12  compliance measures?
13     MS. CITERA:  Objection to form.
14  BY THE WITNESS:
15     A.  As I stated last time, I was not and am
16  not aware that Abbott submitted reimbursement
17  claims in its own name for itself.  I'm aware that
18  as part of the services it provided to certain Home
19  Infusion customers, it would have -- it would have
20  done billing.  It would have compiled billing
21  information and submitted it on behalf of
22  customers.

Page 381

1      Q.  In your sort of additional research for
2  today's deposition, nobody told you that Abbott's
3  reimbursement department submitted claims on behalf
4  of Abbott's pharmacies?
5      A.  No.
6      Q.  Did anyone tell you that Abbott's
7  pharmacies -- well, actually Abbott itself had a
8  provider number with -- or provider numbers with
9  Medicaid and Medicare for purposes of submitting
10  claims on behalf of its pharmacies?
11     MS. CITERA:  Objection to the form, outside
12  the scope.
13  BY THE WITNESS:
14     A.  I'm not aware of that.
15     Q.  Do you think if Abbott -- or is it
16  Abbott's position if it did submit claims to
17  Medicaid and Medicare on its own behalf, that that
18  would create a situation where they would need to
19  have heightened scrutiny on Medicaid and Medicare
20  fraud and abuse?
21     MS. CITERA:  Objection to the form, outside
22  the scope.

Page 382

1  BY THE WITNESS:
2      A.  To the extent they filed claims for --
3  under its own provider number and in its own name,
4  they would have to comply with the regulations in
5  the -- to the same extent they would comply with
6  regulations as a service provider or product
7  provider.
8      Q.  For their consignment partners?
9      A.  For their consignment partners or any of
10  their businesses, quite frankly.
11     Q.  Okay.  Did you discuss anything else with
12  Mr. Taylor?
13     A.  I did not.
14     Q.  What about Mr. Matea?
15     A.  With Mr. Matea, I had a phone
16  conversation that was less than five minutes.  And
17  he confirmed my testimony the first -- on last
18  Wednesday.  I speculated or assumed that in the
19  composition of the business conduct committee, that
20  Rick Gonzalez, in his capacity as president of
21  Abbott, was, in fact, on the business conduct
22  committee but, in fact, as I suggested in that

6 (Pages 379 to 382)

Chicago, IL

Page 383

1  testimony, he did not sit on that committee in his
2  capacity or as a president of the committee.  It
3  was a -- There was no hierarchy.  It was Charlie
4  Brock's committee.  So he, Rick Gonzalez, as
5  president, was a member of that committee equally
6  as a president of the division or the internal
7  auditor of the general counsel.
8      Q.  Did he tell you about Mr. Gonzalez's
9  participation on that committee?
10     A.  He did not.
11     Q.  Did you discuss anything else with Mr.
12  Matea?
13     A.  That's all I discussed with him.
14     Q.  Now, Ms. Tobiason, what did you discuss
15  with her?  Well, first, how long did you talk to
16  her?
17     A.  To her, less than 5 minutes.
18     Q.  Okay.
19     A.  Which was this morning in response to a
20  document that, while you saw it at 10:00 o'clock
21  last night, I saw it at 8:00 o'clock this morning.
22  The -- I don't recall the name of it.  The Home

Page 384

1  Infusion --
2      Q.  Is it this, sir?
3      A.  Quite correct.
4      Q.  Why don't you pull it out?
5      A.  Which pile is it in?
6      MS. CITERA:  Exhibit 10.
7      MS. ST. PETER-GRIFFITH:  That, yeah, No. 10.
8  Or No. 9.
9      MS. CITERA:  It's the last document.
10     BY MS. ST. PETER-GRIFFITH:
11     Q.  If you could just read the Bates range at
12  the bottom, sir, so we have a record of what
13  document you're referring.  See where it says
14  ABT-DOJ?
15     A.  Oh, 0398240 through 0398249.
16     Q.  Okay.
17     A.  It's titled, "Abbott Laboratories, Inc.,"
18  it shouldn't have a comma there, "Home Infusions
19  Services, Reimbursement Operations, Compliance
20  Program."
21     Q.  Curiously, should there not be a comma?
22     A.  There should not be a comma.

Page 385

1      Q.  Okay.  Sir, what did you learn from Ms.
2  Tobiason?
3      A.  I learned that -- we asked -- talked with
4  her, asked her if she was familiar with this
5  document.  She was not.  I indicated that it had a
6  date of July 15th, 1999.  She indicated that in
7  July of '99, she was no longer with HPD but rather
8  with ADD and that she had no familiarity with this
9  document.
10     Q.  Okay.
11     A.  We also tried to reach Daju Vicarria who
12  had found the document yesterday.  She -- We could
13  not locate her this morning.  We will try to reach
14  her during the break.
15     Q.  Sounds good.
16         Sir, have you had a chance to look at
17  these documents if you just saw them this morning
18  at 8:00?
19     A.  I am familiar with some of these
20  documents generally, yes, some.
21     Q.  Okay.  We're going to get into them a
22  little bit later.  Did you do anything else to

Page 386

1  prepare for today's deposition?
2      A.  I did.  I reviewed the full deposition
3  transcript of the depositions that I had indicated
4  previously that I had seen excerpts from.
5      Q.  So you read the entire transcripts?
6      A.  I reviewed them.  I actually -- I was not
7  -- like you, was not aware that the deposition
8  would be going forward today.  So between late
9  Tuesday and this morning, I reviewed as many -- as
10  much of the testimony as I could.  I did not get to
11  Don Robertson's testimony or Ginnie Tobiason.
12     Q.  Okay.  Are those the only two that you
13  didn't get to?
14     A.  My recollection, yes, of the ones I had
15  seen excerpts from, yes.
16     Q.  Okay.  Did you review any other
17  deposition transcripts?
18     A.  I did not.
19     Q.  How about your own from Day 1?
20     A.  Oh, I did.  I reviewed that quickly as
21  well.
22     Q.  Probably not as quickly as I did, sir.

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 387

1        Sir, when we last were here, we ended
2  with a series of questions concerning some
3  documents that I showed you which had spread
4  information.  You indicated that you hadn't -- that
5  you weren't -- were not aware of the existence of
6  those documents?
7        A.  Correct.
8        Q.  Have you done anything to follow up and
9  learn more about whether or not Abbott HPD or
10  employees therein provided AWP or spread
11  information to Abbott customers?
12       A.  I did not.
13       MS. CITERA:  Objection, outside the scope.
14  BY THE WITNESS:
15       A.  I did not.
16       MS. ST. PETER-GRIFFITH:  Toni, I'll just have
17  -- I mean, I know you want to make the record of
18  outside the scope.
19       MS. CITERA:  I know you disagree.
20       MS. ST. PETER-GRIFFITH:  I disagree.  So we'll
21  just agree to disagree.
22       MS. CITERA:  We can agree to disagree.  I was

Page 388

1  actually going to suggest that the last time, I
2  guess, since you don't agree with me.
3  BY MS. ST. PETER-GRIFFITH:
4        Q.  Sir, as a matter of policy, why didn't
5  Abbott lower its list prices reported to the
6  pricing compendia?
7        MS. CITERA:  Objection, outside the scope.
8        MS. ST. PETER-GRIFFITH:  Hold up.  That one, I
9  will tell you, I asked that question of Mr. Sellers
10  and they told me to ask it of Mr. Fishman.  So
11  that's why we're asking this series of questions
12  that were raised at the Sellers' deposition.  I was
13  told Mr. Fishman is here to discuss the policy, the
14  policies.
15  BY THE WITNESS:
16       A.  Okay.  Could you repeat the question,
17  please?
18       Q.  Sure.  Why, as a matter of policy --
19  Well, first, let me ask you, Abbott was aware, was
20  it not, that it had on the products that are at
21  issue in this lawsuit, the subject drugs, which we
22  saw the list at the last deposition, right --

Page 389

1  sodium chloride, acyclovir, Vancomycin, sterile
2  water, and dextrose -- Abbott knew, did it not,
3  that it was reporting list prices to the price
4  reporting compendia for those particular drug
5  products that most of the time or almost nearly all
6  the time from the '91 through 2001 time period
7  exceeded the actual contract prices by a hundred
8  percent or more?
9        MS. CITERA:  Objection to the form.
10  BY MS. ST. PETER-GRIFFITH:
11       Q.  Correct?
12       MS. CITERA:  Outside the scope.
13  BY THE WITNESS:
14       A.  I don't know that -- the detail with
15  which you phrased the question, I can say I don't
16  know.
17       Q.  Okay.
18       MS. CITERA:  Just for the record, I don't
19  think we did give him a list of the drugs.
20       MS. ST. PETER-GRIFFITH:  They were in the
21  first amended complaint.
22       MS. CITERA:  I don't think we marked the first

Page 390

1  amended complaint.
2        MS. ST. PETER-GRIFFITH:  You know what?  Maybe
3  we didn't.  I'm sorry.
4        MS. CITERA:  We've been at a lot of
5  depositions.
6  BY MS. ST. PETER-GRIFFITH:
7        Q.  Let me, sir, I mean, I can write up a
8  list of the subject drugs we're talking about
9  whenever I say "subject drugs."  I was going to
10  say, I did have a copy of the amended complaint.
11  But I gave it to Chris Cook to use at his
12  deposition.
13       MS. CITERA:  I'm just going to object that
14  acyclovir is a subject drug.  As I understand it,
15  the judge didn't allow it to relate back and --
16       MS. ST. PETER-GRIFFITH:  It's still the
17  subject of this case.  She's ruled that you folks
18  need to produce discovery on it, so ...
19  BY MS. ST. PETER-GRIFFITH:
20       Q.  Mr. Fishman, when I refer to the subject
21  drugs, those are the drugs that are at issue in the
22  federal lawsuit, okay?

8 (Pages 387 to 390)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 391

1      A.  Okay.  I understand that now.
2      Q.  And, you know, I'll represent to you as
3  pled in the complaint that from '91 through 2001,
4  Abbott reported list prices -- and we went over
5  this, in part, at the Sellers' deposition -- Abbott
6  reported list prices to the price reporting
7  compendia for these products that were 50, 75, a
8  hundred percent to a thousand percent in excess of
9  the contract prices that it was charging its
10  customers, okay?
11      MS. CITERA:  Objection to the form.
12      MS. ST. PETER-GRIFFITH:  That's the predicate
13  for the following series of questions, okay?
14      MS. CITERA:  Okay.
15      MS. ST. PETER-GRIFFITH:  And, Toni, I'll
16  represent to you that, you know, Mike Sellers, we
17  went through a whole series of documents and he
18  represented that they're accurate and that's what
19  those documents reflect, okay.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Why as a matter of policy did Abbott not,
22  from the '91 through 2001 time period, why as a

Page 392

1  matter of policy did Abbott not lower its list
2  prices reporting to the pricing compendia for the
3  subject drugs?
4      MS. CITERA:  Object to the form, outside the
5  scope.
6  BY THE WITNESS:
7      A.  I do not know that Abbott's actions with
8  respect to providing list price information to the
9  compendia, regardless of what the percentage
10  increase may have been over a contract price -- and
11  there probably were multiple contract prices would
12  be my expectation -- that it was done as a matter
13  of policy.
14      Q.  Okay.  Are you prepared, sir, to testify
15  today or did you prepare to testify today about
16  Abbott's -- the policies concerning Abbott's
17  creation or setting of list prices or the reporting
18  of list prices to the pricing compendia?
19      A.  To my knowledge, Abbott did not have a
20  policy pertaining to reporting price information to
21  the compendia.
22      Q.  Well, were there any checks and balances

Page 393

1  placed upon Abbott's price reporting activities to
2  the compendia to ensure compliance with state and
3  federal Medicaid and Medicare fraud and abuse
4  statutes?
5      MS. CITERA:  Object to the form.
6  BY THE WITNESS:
7      A.  What do you mean by -- "checks and
8  balances" is kind of a broad, vague term.  What do
9  you mean by "checks and balances"?
10      Q.  Well, were there any policies governing
11  the -- how Abbott went about reporting its prices
12  to the price reporting compendia to ensure that
13  when it did, it was in compliance with federal and
14  state Medicaid and Medicare fraud and abuse
15  statutes?
16      MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18      A.  As a -- as a general position of policy
19  and compliance, Abbott had as a policy, a stated
20  policy within its code of business conduct, to
21  comply with all laws and regulations and statutes,
22  which would have included and did include the

Page 394

1  Medicare and Medicaid fraud and abuse, False Claims
2  Act, and other Medicare-related compliance
3  statutes.
4      So as a policy, they would have complied
5  with that.  They would have been expected -- they,
6  Abbott, its employees would have been expected to
7  comply with those statutes and regulations.
8      Q.  What did Abbott's employees do to ensure
9  that their price reporting to the pricing compendia
10  or their price reporting to the state Medicaid
11  agencies complied with those statutes?
12      MS. CITERA:  Object to the form.
13  BY THE WITNESS:
14      A.  Excuse me.  With respect to the price
15  compendia, to the extent the statute identified and
16  defined what the standards for providing such
17  information was, they would have complied with it.
18  We talked about ensuring compliance in some detail
19  in my last deposition.  And my answer, I can repeat
20  my answer. But my answer is effectively the same as
21  what I gave last time.
22      Q.  Okay.  And, sir, we're going to go over

9 (Pages 391 to 394)

Chicago, IL

Page 395

1  various, you know, different policies.  So to the
2  extent that it is the same as to what you testified
3  before, just let me know that.  Okay?
4      A.  Okay.
5      Q.  Fair enough?
6      A.  Certainly.
7      Q.  Did Abbott have a particular procedure to
8  ensure that when reporting its prices to the
9  pricing compendia, it was in compliance with
10  federal and state Medicare and Medicaid fraud and
11  abuse statutes?
12      MS. CITERA:  Objection to form.
13  BY THE WITNESS:
14      A.  I am not aware of any procedure, written
15  procedure.
16      Q.  How about just like you had testified
17  earlier, there was a practice about not providing
18  AWP information, right?
19      A.  To customers.
20      Q.  To customers, okay.  Was there -- Even
21  though there wasn't a written policy, was there a
22  practice with regard -- at Abbott with regard to

Page 396

1  its price reporting to the price compendia that
2  Abbott, you know, expected its employees to follow
3  to ensure that when they reported prices, they were
4  in compliance?
5      MS. CITERA:  Objection to the form.
6  BY THE WITNESS:
7      A.  Compliance with what?
8      Q.  Federal and state Medicare and Medicaid
9  fraud and abuse statutes and regulations.
10      A.  Okay.  Again, to the extent those -- that
11  that body of law defined what the -- our
12  requirements were for reporting, they would have
13  been in compliance.  In terms of a practice, I
14  learned through reading Mike Sellers' deposition
15  testimony that the expectation of the compendia,
16  compendium or compendia, was that we provide -- the
17  information they sought was list price.
18      Q.  But you know that only from reading Mike
19  Sellers' deposition transcript?
20      A.  That's correct.
21      Q.  And just to be clear, which transcript
22  are we talking about?  Let me --

Page 397

1      A.  I believe --
2      Q.  Let me clarify.
3      A.  Okay.
4      Q.  Is it -- Was it -- Did you read his
5  transcript from Sunday's deposition?
6      A.  No, I did not.
7      Q.  Okay.  So it was from a prior deposition?
8      A.  It was from a prior deposition.  I
9  understand it was the deposition he was a 30(b)(6)
10  witness.
11      MS. CITERA:  Texas.
12      MS. ST. PETER-GRIFFITH:  It's Texas?  Okay.
13  BY THE WITNESS:
14      A.  I don't remember the date.
15      MS. CITERA:  It was February '07.
16      MS. ST. PETER-GRIFFITH:  February of last
17  year.
18  BY THE WITNESS:
19      A.  Okay.
20      Q.  How did Abbott know that its employees
21  who reported prices complied with federal and state
22  Medicare and Medicaid fraud and abuse statutes?

Page 398

1      MS. CITERA:  Objection to form.
2  BY THE WITNESS:
3      A.  I would give the same answer regarding
4  compliance, a broad answer I gave regarding how
5  Abbott provided, you know, training information to
6  employees through the legal department and that as
7  a very large, multiple-thousand-person operation
8  and business, it relied on its managers to
9  supervise its direct reports.
10      Q.  Now, you testified last time that Abbott
11  did not undertake any initiative to contact federal
12  officials or state officials concerning its
13  compliance with Medicare and Medicaid fraud and
14  abuse statutes; is that right?
15      MS. CITERA:  Objection to the form.
16  BY THE WITNESS:
17      A.  I said to my knowledge, they did not.
18      Q.  Okay.  Did you do anything to research
19  between your deposition and this deposition whether
20  Abbott did?
21      A.  I did not.
22      Q.  Did Abbott do anything to verify with any

10 (Pages 395 to 398)

Chicago, IL

---

Page 399

1  state or federal Medicaid or Medicare official
2  whether or not its practices regarding list prices
3  were in compliance with federal and state Medicare
4  and Medicare fraud and abuse statutes?
5      A.  Not to my knowledge.
6      MS. CITERA:  Objection to form.
7      THE WITNESS:  Sorry.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  When you say "not to my knowledge,"
10  you're speaking on behalf of Abbott, right?
11      A.  I have no -- I have no personal knowledge
12  as well as in talking with the people that I spoke
13  with in preparation of the deposition, did not
14  learn that information.
15      Q.  Can you, as you sit here today, tell us
16  whether or not Abbott undertook any initiative to
17  contact a state or federal official to ensure that
18  their price reporting practices were in compliance
19  with federal and state Medicare and Medicaid fraud
20  and abuse statutes?
21      MS. CITERA:  Objection to form.
22  BY THE WITNESS:

---

Page 400

1      A.  I cannot.
2      Q.  As a matter of policy, did Abbott do
3  anything to reduce its spread between the contract
4  prices and list prices for the subject drugs?
5      MS. CITERA:  Objection to the form.
6  BY THE WITNESS:
7      A.  In what time?
8      MS. CITERA:  Outside the scope.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  '91 through 2000.
11      A.  '91 to 2000?
12      Q.  I'm sorry, to 2001.
13      A.  I don't know that they did as a matter of
14  policy.  Whether it happened, I don't have -- did
15  not review records to be able to state
16  categorically that it did not happen.  I'm not
17  aware of any policy to not do that.
18      Q.  Are you aware of a policy to do that?
19      A.  No.
20      Q.  So you're just not aware of any policy?
21      A.  I'm not aware of a policy with respect to
22  that.

---

Page 401

1      Q.  Who would know whether or not there was
2  such a policy?
3      MS. CITERA:  Objection to the form.
4  BY THE WITNESS:
5      A.  Are we talking corporate or HPD?
6      Q.  Frankly, sir, you could tell me.  Either,
7  anyone within Abbott?
8      A.  Between 1991 and 2000?
9      Q.  And '1?
10      A.  2001.  In 2000, the creation of the
11  Office of Ethics and Compliance, Charlie Brock,
12  would have been a central point person for
13  corporate compliance.  So that would be one person.
14  In terms of the actual pricing decision, each
15  division -- I'm speculating.  But I believe,
16  knowing how the divisions were operating, the
17  division set pricing -- you know, ran somewhat
18  autonomously in its business operations and would
19  have set pricing within its organization.  And who
20  within the organizations were involved in the
21  pricing, I do not know.  In '91 through 2001 it
22  probably would have been a very long list of people

---

Page 402

1  given the changing responsibilities within
2  organizations.
3      Q.  Was there anyone tasked with the
4  responsibility of ensuring that in reporting its
5  prices Abbott was in -- for this time period, '91
6  through 2000, let's say, pre-OEC, was anyone
7  responsible for ensuring that in its price
8  reporting activities, Abbott was in compliance with
9  federal and state Medicare and Medicaid fraud and
10  abuse statutes?
11      MS. CITERA:  Objection to the form.
12  BY THE WITNESS:
13      A.  The people who were -- had within their
14  job -- job description responsibilities government
15  contracting, government pricing would have been
16  tasked with that responsibility.
17      Q.  Okay.  Do you know how or does Abbott
18  know how they went about implementing overseeing
19  that responsibility or -- well, overseeing
20  compliance or ensuring compliance?
21      MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

---

11 (Pages 399 to 402)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 403

1     A.  I think my same answer would -- back from
2  before, that people who were direct reports of
3  managers, managers would be responsible for -- for
4  seeing that their direct reports complied with all
5  laws and all policies and all standards of
6  behavior.
7     Q.  How -- How would -- Did Abbott give them
8  the tools to understand how to do that with regard
9  to price reporting?
10    MS. CITERA:  Objection to the form, outside
11  the scope.
12  BY THE WITNESS:
13    A.  I believe that Abbott had, through
14  practice and through involvement in the industry,
15  gained that knowledge.  And in reading through
16  testimony, people participated in trade
17  associations.  And there was, again, general
18  industry information and practice of adhering to
19  that, plus, again to the extent there was specific
20  instructions on how to prepare certain pricing,
21  they would have followed the specific instructions.
22    Q.  From who?

Page 404

1     A.  From the regulations.
2     Q.  What about from states?  If states
3  provided -- Like, if the State of Texas, for
4  example, provided an instruction on what it
5  expected for its price reporting, would Abbott
6  expect that its employees would follow those
7  directions from that state Medicaid program?
8     A.  Yes.
9     MS. CITERA:  Objection to form.
10    THE WITNESS:  Sorry.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  What would happen if the employees did
13  not?
14    MS. CITERA:  Objection to form, outside the
15  scope.
16  BY THE WITNESS:
17    A.  Hypothetically, if they did not and the
18  organization became aware of it, they would
19  investigate the reasons behind -- assuming they did
20  not and assuming that it was a failure to comply,
21  the organization would evaluate, look into the
22  circumstances as to why they failed to comply and

Page 405

1  make a determination on a case-by-case basis as to
2  what to do.
3     Q.  To Abbott's knowledge, did that ever
4  happen?
5     MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7     A.  Not to my knowledge.
8     Q.  But what about to Abbott's knowledge?
9  You're here to testify as Abbott today.
10    A.  In reviewing -- in becoming -- gaining
11  Abbott's knowledge through the course of the
12  materials I reviewed and the people that I
13  discussed, I am not -- I, Abbott, am not aware of
14  that.
15    Q.  Were you ever made aware that there was
16  -- that the State of Texas provided specific
17  instructions concerning price reporting and that
18  Abbott did not follow those instructions?
19    MS. CITERA:  Objection to the form.
20  BY THE WITNESS:
21    A.  I was not made aware of that.
22    Q.  Sir, Abbott -- you testified at some

Page 406

1  length last time we were here about Abbott's
2  practice concerning not providing AWP or spread
3  information to customers.
4     A.  Yes.
5     Q.  In light of the -- What's the reason
6  behind that policy or practice?  I'm sorry.
7     MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9     A.  I don't have a specific -- I'm not aware
10  of a specific articulated reason.  From reviewing
11  the materials and understanding how Abbott conducts
12  business, Abbott's focus has always been on, and
13  especially within HPD, the breadth of its portfolio
14  and on the efficacy and quality of its products.
15  It was a business -- it was a way in which Abbott
16  conducted business.
17    Q.  By maintaining this practice, which was
18  not formalized until much later, we established
19  last time, was Abbott trying to prevent its
20  employees from doing something that contravened
21  federal and state Medicare and Medicaid fraud and
22  abuse statutes?

12 (Pages 403 to 406)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Page 407

1      MS. CITERA:  Objection to the form, outside
2    the scope.
3    BY THE WITNESS:
4      A.  Not to my knowledge.
5      Q.  Why have it?  Why have this practice,
6    then?
7      MS. CITERA:  Objection to the form.
8    BY THE WITNESS:
9      A.  As I understand, it was not the way in
10    which Abbott chose to conduct its business.
11      Q.  How come?
12      MS. CITERA:  Objection to the form.
13    BY THE WITNESS:
14      A.  The focus was on quality of the product,
15    the service it provided its customers, the breadth
16    of -- especially in HPD, the breadth of its
17    portfolio across all the different product lines.
18      Q.  So in having this practice, or
19    maintaining this practice that you testified to
20    from '91 -- from least '91 until 2001, Abbott was
21    not trying to undertake steps or preventive
22    measures to ensure that its employees, its sales

Page 408

1    employees were in compliance with federal and state
2    Medicare and Medicaid fraud and abuse statutes?
3      MS. CITERA:  Objection to the form, outside
4    the scope.
5    BY THE WITNESS:
6      A.  Could you repeat it?  There was some
7    double negatives in there.
8      Q.  Sure.
9      MS. ST. PETER-GRIFFITH:  Can you read that
10    back? And if I listen to it, I might try and
11    clarify it myself.
12      (Record read as requested.)
13    BY MS. ST. PETER-GRIFFITH:
14      Q.  Let me try and clarify it, okay.  For
15    this time period, that Abbott maintained the
16    practice, okay, pre-policy -- How does that sound?
17      A.  I understand.
18      Q.  For the time period that Abbott
19    maintained the practice, was it doing so to prevent
20    its employees from violating federal or state
21    Medicare and Medicaid fraud and abuse compliance
22    regulations and statutes?

Page 409

1      MS. CITERA:  Same objections.
2    BY THE WITNESS:
3      A.  Specifically, no.  But in the broadest
4    sense, every -- all practices -- any policy, even
5    policies and rules that you adhere to would be to
6    maintain compliance.  So it would have to have been
7    a factor.  I mean, it's a factor in all activities
8    that you undertake.  If you're seeking to comply
9    with laws, then everything you do is in furtherance
10    of that goal.
11      Q.  Okay.  Well, if Abbott maintained the
12    practice in part during this time period, in part
13    to comply with federal and state Medicare Medicaid
14    fraud and abuse statutes, is that fair?
15      MS. CITERA:  Objection.
16    BY MS. ST. PETER-GRIFFITH:
17      Q.  That it did it at least in part?
18      MS. CITERA:  Objection to form, outside of the
19    scope.
20    BY THE WITNESS:
21      A.  As I said, all activities would have been
22    to be in compliance with laws.

Page 410

1      Q.  Okay.  If that's the case, sir, why did
2    Abbott permit for the subject drugs, the
3    maintenance of spreads between its list price and
4    its contract price of 50 percent, 75 percent, a
5    hundred percent, up to a thousand percent or more
6    on the subject drugs?
7      MS. CITERA:  Objection to form, outside the
8    scope.
9    BY THE WITNESS:
10      A.  I can't testify as to why they did it.
11    But it assumes that the -- again, to the extent the
12    statute defined -- provided guidance as to what
13    activities were proscribed by statute, Abbott would
14    have -- Abbott would expect -- Abbott would and
15    would expect its employees to adhere to that.
16      Q.  Well, if there's something wrong with
17    Abbott's sales staff or its employees, if there's
18    something wrong with them providing AWP or spread
19    information to customers, is there something wrong
20    with Abbott maintaining high spreads on the subject
21    drugs?
22      MS. CITERA:  Objection to the form, outside

13 (Pages 407 to 410)

Chicago, IL

Page 411

1  the scope.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  And when I say "high spreads," I mean a
4  spread that's 50 percent up to a thousand percent.
5      A.  I understand.
6      MS. CITERA:  Same objections.
7  BY THE WITNESS:
8      A.  First, I didn't say it was wrong.  I said
9  it was practice not to do that.  You're placing a
10 value judgment to that decision.
11     Q.  Then let me -- Before you answer this
12 question, let me go back.
13         Did Abbott as a matter of policy believe
14 that it was wrong for employees to provide AWP or
15 spread information to its customers?
16     MS. CITERA:  Objection to the form, outside
17 the scope.
18 BY THE WITNESS:
19     A.  As a matter of policy, it did not have a
20 policy with respect to that.  Its practice was not
21 to do it.
22     Q.  But in maintaining that practice -- or

Page 412

1  did Abbott maintain that practice because it
2  somehow believed that the provision of AWP or
3  spread information to customers was wrong?
4      MS. CITERA:  Objection to the form, outside
5  the scope.
6  BY THE WITNESS:
7      A.  As I stated before, the reason why Abbott
8  did that is its business practice was to emphasize
9  other aspects of Abbott's business and product
10 portfolio and company capabilities, and the
11 emphasis with respect to customers was
12 product-focused.
13     Q.  But as a matter of policy, does Abbott
14 believe for the '91 through 2000, the pre-written
15 policy time frame, did Abbott believe that the
16 provision of AWP or spread information was wrong?
17     MS. CITERA:  Objection to the form, outside
18 the scope.
19 BY THE WITNESS:
20     A.  As I stated before, there was no policy.
21     Q.  Okay.  As a matter of practice, then?
22     MS. CITERA:  Same objections.

Page 413

1  BY THE WITNESS:
2      A.  It -- It chose not to emphasize that
3  information and elected to emphasize other
4  information.
5      Q.  But would it have been wrong during this
6  '91 through 2001 policy for Abbott's customers or
7  Abbott's sales employees or any employee to provide
8  spread or AWP information to customers?
9      MS. CITERA:  Objection to the form.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Was that wrong?
12     MS. CITERA:  Outside the scope.
13 BY THE WITNESS:
14     A.  "Wrong" is -- I don't know how to address
15 "wrong."
16     Q.  Well, did Abbott perceive that there was
17 something incorrect or inappropriate about
18 providing that information?
19     MS. CITERA:  Objection to the form, outside
20 the scope.
21 BY THE WITNESS:
22     A.  Abbott elected -- It's not a zero sum --

Page 414

1  It's not one or the other.  Abbott elected to
2  pursue its business practice for reasons that did
3  not involve AWP, providing AWP information.  It had
4  to do with emphasizing the services that Abbott
5  could provide, the quality of the product, the
6  breadth of the portfolio, and the overall business
7  relationship that Abbott maintained with its
8  customers.
9      Q.  Sir, do you -- When we were last here, I
10 showed you some exhibits where Abbott provided AWP
11 or spread information to customers.
12     A.  Yes.
13     MS. CITERA:  Objection to the form.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  From Abbott's view, as a matter of
16 practice or as a matter of policy, prior to the
17 implementation of the written policy, was there
18 something wrong with Abbott's employees providing
19 that information?
20     MS. CITERA:  Objection to the form, outside
21 the scope.
22 BY THE WITNESS:

14 (Pages 411 to 414)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 415

1      A.  As I stated in my deposition testimony
2  last week with respect to the series of documents
3  that you showed me that reflected information
4  regarding AWP and/or spread, I stand by my
5  testimony that that was not consistent with the
6  practice that Abbott maintained.
7      Q.  I understand it's not consistent with the
8  practice.  But was it wrong?
9      MS. CITERA:  Objection to the form, outside
10  the scope.
11  BY THE WITNESS:
12      A.  I -- I believe asking whether it was
13  wrong is an opinion.
14      Q.  No.  I want to know whether Abbott
15  believed it was wrong.  I'm not asking for your
16  opinion.  I'm asking for Abbott's position as to
17  whether or not that was wrongful conduct.
18      MS. CITERA:  You're asking for the company's
19  opinion, and the witness is not here to testify as
20  to opinions.  He's here to testify as to facts.
21  Objection to form, outside the scope.
22  BY MS. ST. PETER-GRIFFITH:

Page 416

1      Q.  Sir, you can answer the question.
2      A.  I reiterate my previous statement that it
3  was inconsistent.  Asking me whether it was wrong,
4  the word "wrong" has many, many connotations; and I
5  think you're requesting an opinion.
6      Q.  Well, did Abbott think that there was --
7  that the provision of the information was
8  acceptable?
9      MS. CITERA:  Objection to the form, outside
10  the scope.
11  BY THE WITNESS:
12      A.  They elected not to -- as a practice,
13  elected not to do it.
14      Q.  In electing that practice, did the
15  consideration of whether or not the provision of
16  that AWP or spread information to customers was
17  right or wrong enter into the equation?
18      MS. CITERA:  Objection to the form, outside
19  the scope.
20  BY THE WITNESS:
21      A.  I don't know.
22      Q.  Who would know?

Page 417

1      A.  Who would know?
2      MS. CITERA:  Object to the form, outside the
3  scope.
4  BY THE WITNESS:
5      A.  Time frame '91 to 2001 again?
6      Q.  Uh-huh, pre-written policy.
7      A.  Pre-written policy.
8      Q.  We'll get to the written policy shortly.
9      A.  I would think the people who were
10  directly involved in pricing and reimbursement
11  information and decisions within the divisions
12  would be the ones who, to the extent there was a
13  value judgment placed on doing it or not doing it,
14  other than what I've stated, which is there was not
15  a business objective in doing it, they would be the
16  ones who could answer that.
17      Q.  Let's go to the -- switch from when the
18  practice became a policy.
19      A.  Okay.
20      Q.  Did Abbott implement its written policy,
21  its formalized policy, against providing spread or
22  AWP information because it believed that the

Page 418

1  practice was wrong?
2      MS. CITERA:  Objection to the form, outside
3  the scope.
4  BY THE WITNESS:
5      A.  In 2003, by the time policies came into
6  being in the 2003/2004 time frame, I believe that
7  there was sufficient public information and
8  sufficient guidance from the government as to how
9  it viewed these practices that influenced the
10  decision.
11      Q.  Okay.  What do you mean by that?  Are you
12  saying that because it was more clear to Abbott
13  that the United States did not condone this
14  practice, that Abbott as of the time that it
15  adopted the written policy believed that the
16  provision of AWP or spread information to customers
17  was wrong?
18      MS. CITERA:  Object to the form, outside the
19  scope.
20  BY THE WITNESS:
21      A.  Because there was more information with
22  which to evaluate at that time, Abbott would

15 (Pages 415 to 418)

Chicago, IL

Page 419

1 clearly have taken those opinions and information
2 that was available into consideration into
3 identifying which policies to implement.
4     Q.  Okay.  But did it believe it was the --
5 the practice was wrong?
6     MS. CITERA:  Object to the form, outside the
7 scope.
8 BY THE WITNESS:
9     A.  It elected -- in -- with the creation and
10 passage and issuance of the policy, it elected to
11 formally state that Abbott would not conduct --
12 would not conduct its business in that way.
13     Q.  Is that because Abbott believed it was
14 wrong?
15     MS. CITERA:  Same objections.
16 BY THE WITNESS:
17     A.  Same answer to the statement about wrong,
18 right or wrong.
19     Q.  Sir, I understand that you want to give
20 your, you know, or Abbott's position on this.  And
21 counsel for Abbott is free to elicit this testimony
22 from you at a later point in time.

Page 420

1     My question just calls for a simple yes
2 or no. At the time that Abbott implemented its
3 written policy concerning the provision of AWP or
4 spread information to customers, did Abbott believe
5 that such a practice was wrong?
6     MS. CITERA:  I'm just going to object.  He's
7 not here to testify as to what's right or wrong.
8 He doesn't have to answer yes or no to that
9 question because it's not an appropriate subject
10 for this deposition.
11     MS. ST. PETER-GRIFFITH:  Unless you're
12 instructing him not to answer --
13     MS. CITERA:  It requires a legal conclusion as
14 to right and wrong, and who's to say what's right
15 and wrong?  He doesn't have to answer that
16 question.  He's tried to answer it.  He's not going
17 to answer whether something is right or wrong.
18 He's not here --
19     MS. ST. PETER-GRIFFITH:  Toni, first, I don't
20 appreciate the speaking objections.
21     MS. CITERA:  Well, you give a speaking
22 instruction.

Page 421

1     MS. ST. PETER-GRIFFITH:  I am entitled to an
2 answer to this question.
3 BY MS. ST. PETER-GRIFFITH:
4     Q.  Did Abbott believe the practice was right
5 or wrong at the time that it implemented the
6 written policy?
7     MS. CITERA:  Same objections, object to the
8 form, outside the scope.
9 BY THE WITNESS:
10     A.  Same answer as I provided before, which
11 is Abbott believed that formalizing this policy
12 reflected the way in which it elected to do
13 business.
14     Q.  Can you answer the question yes or no?
15     A.  I believe --
16     MS. CITERA:  Objection to the form, outside
17 the scope.
18 BY THE WITNESS:
19     A.  I believe that asking for an opinion as
20 to right or wrong is not -- is not -- I'm not
21 prepared to testify to that today.
22     Q.  Sir, I'm not here to ask your opinion as

Page 422

1 to whether it's right or wrong.  I'm -- What my
2 question is, and let me make it clear, when Abbott
3 implemented the policy, the written policy as
4 opposed to when it had the practice before to
5 prohibit its employees from providing AWP or spread
6 information to customers, did Abbott implement that
7 policy because it believed that the practice of
8 providing such information to customers was wrong?
9     MS. CITERA:  Same objections.
10 BY THE WITNESS:
11     A.  I don't know.
12     Q.  Sir, didn't Abbott, in fact, prior to
13 2003 have an understanding or did Abbott have an
14 understanding as to whether or not the maintenance
15 of high spreads -- I'm sorry.  Strike that
16 question.
17     Let me ask you, did Abbott see anything
18 wrong -- Strike that too.
19     Did Abbott view the maintenance of high
20 spreads on the subject drugs -- and when I say
21 "high," I mean 50 percent or more -- as being
22 violative of any federal or state Medicaid or

16 (Pages 419 to 422)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 423

1  Medicare fraud and abuse statute or regulation?
2      MS. CITERA:  Objection to the form, outside
3  the scope.
4  BY THE WITNESS:
5      A.  As I understand reading deposition
6  testimony and talking with people, that Abbott did
7  not create spread.
8      Q.  How -- Why do you say that?
9      A.  My understanding is that Abbott would
10  have provided pricing information to the compendia,
11  and the compendia then ultimately issued -- issued
12  the pricing information.  To the extent the spread
13  would have been created, that would have created
14  the spread.
15      Q.  But Abbott understood that there was a
16  correlation between the provision of its list price
17  information to the price reporting compendia and
18  the calculation of AWP, correct?
19      MS. CITERA:  Objection, form, outside the
20  scope.
21  BY THE WITNESS:
22      A.  In reading deposition testimony, it

Page 424

1  appears that there were people within Abbott who
2  understood what the compendia did with list price
3  information; so understood the relationship.
4  "Relationship" is a very broad term.  In all
5  aspects of a relationship, I can't answer that.
6  Generally did they understand that that list
7  information was involved in creating AWP?
8  Deposition testimony suggests that there were
9  people within Abbott who understood that.
10      Q.  Did anyone within Abbott evaluate whether
11  or not the maintenance of high spreads or high
12  differentials between contract price and reported
13  list price implicated Medicare and Medicaid fraud
14  and abuse statutes?
15      MS. CITERA:  Objection to the form, outside
16  the scope.  I'm going to also caution you not to
17  reveal any legal information.
18  BY THE WITNESS:
19      A.  To the extent there was a legal analysis
20  prepared, that would be privileged.
21      Q.  Was there a legal analysis prepared?
22      MS. CITERA:  Same objections and instructions.

Page 425

1  BY THE WITNESS:
2      A.  To the extent there was one, it would be
3  privileged.
4      Q.  My question, sir -- You can answer
5  whether or not there was one prepared at a minimum
6  and listen to the instruction as to the content.
7  My question right now is, was there one prepared?
8      MS. CITERA:  I don't think he has to answer
9  that because I think that is privileged in and of
10  itself.
11      MS. ST. PETER-GRIFFITH:  No, it's not
12  privileged in and of itself.  The existence of a
13  document -- I mean, you folks haven't, I don't
14  think, given us a complete privilege log yet.  I
15  want to know whether or not there was such an
16  analysis done or document created.  That I'm
17  entitled to find out, Toni.
18      MS. CITERA:  Anything that would have been
19  done would have been subject to the privilege,
20  would have been subject to the work product.  By
21  the time we're speaking about, Abbott was obviously
22  being investigated and/or sued.  That all would

Page 426

1  have been privileged.
2      MS. ST. PETER-GRIFFITH:  Let me be clear.  I'm
3  not just talking about the 2003 time period.
4  I'm talking about any time from '91 to 2003.
5      MS. CITERA:  And --
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Was any analysis done?
8      A.  To my --
9      MS. CITERA:  Objection to the form, outside
10  the scope.  Same caution to you.
11  BY THE WITNESS:
12      A.  To my knowledge, both personal knowledge
13  and speaking on behalf of Abbott, any questions
14  with respect to AWP would have been handled through
15  our litigation department.
16      Q.  Okay.  Well, did your litigation
17  department do an analysis?
18      MS. CITERA:  Same objections, same
19  instruction.
20  BY THE WITNESS:
21      A.  I don't know.
22      Q.  Who would know?

17 (Pages 423 to 426)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 427

1     MS. CITERA:  Same objections.
2 BY THE WITNESS:
3     A.  People within the litigation department.
4     Q.  Anyone in particular?
5     MS. CITERA:  Same objections.
6 BY THE WITNESS:
7     A.  Time frames?
8     Q.  '91 through 2003, entire period of this
9 case.
10     A.  Presumably the head of the department at
11 whichever time frame was involved would have likely
12 been aware of what matters were being evaluated
13 within his or her department.
14     Q.  Does Abbott recognize as a matter of
15 policy that high spreads may cause customers to
16 submit false claims?
17     MS. CITERA:  Objection to the form, outside
18 the scope.
19 BY THE WITNESS:
20     A.  I don't think Abbott is able to evaluate
21 motivations and what causes customers to do what
22 they do.

Page 428

1     Q.  Okay.  Well, let's go to Abbott itself.
2 Did Abbott itself submit claims or false claims to
3 Medicaid and Medicare?
4     MS. CITERA:  Objection to the form, outside
5 the scope, asking for a legal analysis.
6 BY THE WITNESS:
7     A.  Can you repeat the question?
8     Q.  Sure.
9     MS. ST. PETER-GRIFFITH:  Can you read it back?
10        (Record read as requested.)
11     MS. CITERA:  Same objections.
12 BY THE WITNESS:
13     A.  I testified that I was unaware that
14 Abbott submitted any claims in its own name.  To
15 the extent it did submit claims in its own name and
16 to the extent it submitted claims as part of a
17 contractual service for a customer, it would have
18 submitted the claims.  To determine whether they
19 are false is a legal conclusion.
20     Q.  Well, did Abbott -- what measures did
21 Abbott undertake to ensure that it complied when it
22 submitted claims either on its own behalf or on

Page 429

1 behalf of its consignment partners, what did Abbott
2 do to ensure that the claims it's submitting did
3 not contravene the False Claims Act or Antikickback
4 Statute?
5     MS. CITERA:  Objection to the form.
6 BY THE WITNESS:
7     A.  Back to my other answer, which is there
8 were many people involved in providing these
9 day-to-day services within the pricing and
10 reimbursement departments within Abbott, that they
11 would have had as their objective, compliance with
12 all laws and rules and regulations and that
13 managers would supervise them to seek to ensure
14 that compliance.
15     Q.  Well, I understand that that might have
16 been the objective.  My question, though, to you,
17 sir, is you're here to testify as to what Abbott
18 did.  What did Abbott do?
19     MS. CITERA:  Objection, form.
20 BY THE WITNESS:
21     A.  To my knowledge, they adhered to that
22 practice.

Page 430

1     Q.  How do you know that, or how does Abbott
2 know that?
3     MS. CITERA:  Objection to the form, outside
4 the scope.
5 BY THE WITNESS:
6     A.  It appears that the question is almost
7 asking me to prove the negative.
8     Q.  No.  My question to you is, what did
9 Abbott do to ensure that its Home Infusion business
10 unit on behalf of its consignment partners or on
11 behalf of Abbott itself complied with federal and
12 state Medicare and Medicaid fraud and abuse
13 statutes including the False Claims Act and
14 Antikickback Statute?
15     MS. CITERA:  Object to form.
16 BY THE WITNESS:
17     A.  The employees were given presentations
18 from legal on the Medicare Medicaid fraud and abuse
19 laws generally.  They would be familiar with the
20 specific requests of -- the forms themselves would
21 have had instructions and they would read them
22 carefully and would seek to comply with the

Henderson Legal Services, Inc.

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 431

1   requirements of the forms. My -- I suspect as -- I
2   don't know when and if this occurred, but there was
3   an internal audit organization within Abbott that
4   would perform audits of businesses.
5           And to the extent -- I can't state with
6   any certainty that that occurred within Home
7   Infusion and, if it did, when it did.  But there
8   was regular auditing functions within Abbott for
9   broad compliance matters, certainly not limited to
10  Medicare matters.
11      Q.  Okay.  What were they?
12      A.  I just described it.  The internal audit
13  function within Abbott was to see that its books
14  and records and activities were complying with law.
15      Q.  What did Abbott do to ensure that the
16  claims submitted by its Home Infusion business unit
17  complied with federal and state Medicare and
18  Medicaid fraud and abuse statutes?  Did it review
19  the claims that were submitted for such compliance?
20      MS. CITERA:  Objection to the form.
21  BY THE WITNESS:
22      A.  Who is "they"?

Page 432

1       Q.  Abbott.
2       A.  You speak about Abbott as if it's a
3   person, meaning the people who were preparing the
4   forms is Abbott.  The person to whom that person
5   reported is Abbott.  The person whom they sat next
6   to and may have asked a question of, "Does this --
7   am I reading this instruction correctly?" is
8   Abbott.  So, again, you're talking about tens of
9   thousands of people.  I don't know how I can answer
10  that question to assure you that everybody within
11  Abbott was in full compliance with all laws or
12  specifically with the Medicare/Medicaid laws at any
13  given moment.
14      Q.  Sir, sir --
15      MS. CITERA:  Can you let him finish?
16  BY THE WITNESS:
17      A.  I'm done.
18      Q.  What did Abbott do?  I'm not talking
19  about tens of thousands of people.  I'm talking
20  about Abbott. It had its Home Infusion business
21  unit, right?
22      A.  Correct.

Page 433

1       Q.  And Abbott knew that its Home Infusion
2   business unit was submitting claims on behalf of
3   its consignment customers, correct?
4       MS. CITERA:  Objection to form, outside the
5   scope.
6   BY THE WITNESS:
7       A.  That was -- that was a -- in certain
8   contracts, that would have been a contractual
9   service being provided, yes.
10      Q.  And Abbott also knew that its Home
11  Infusion business unit was submitting claims to
12  Medicare and Medicaid on behalf of Abbott's
13  pharmacies, correct?
14      MS. CITERA:  Same objections.
15  BY THE WITNESS:
16      A.  I testified previously that I'm not aware
17  of that.
18      Q.  You might not personally be aware of
19  that. But Abbott certainly knew that it had a
20  provider number and was submitting claims, didn't
21  it?
22      MS. CITERA:  Same objections.

Page 434

1   BY THE WITNESS:
2       A.  I can't -- I'm not prepared to answer
3   that today because I don't have knowledge to say
4   yes. I can accept your statement as being true to
5   the extent I'll assume your statement to be true.
6   Then I'll say yes.  I don't know -- I can't sit
7   here, sitting now in my individual capacity or in
8   my capacity as a witness for Abbott that that's
9   true. I don't have that information.
10      Q.  What did you do, sir, to prepare for
11  today's deposition to review information reasonably
12  available to Abbott to determine whether or not
13  Abbott itself maintained a provider number and
14  submitted claims to Medicare or Medicaid?
15      A.  I did not --
16      MS. CITERA:  Objection to form.
17  BY THE WITNESS:
18      A.  I did not ask anybody that specific
19  question.
20      Q.  Do you review any of the thousands of
21  HCFA-1500 forms that have been produced in this
22  case?

19 (Pages 431 to 434)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

| Page 435 |
|---|

1    A.  No.
2    Q.  What -- Well, let me -- Just for purposes
3  of these questions, sir, assume that we've had
4  testimony in this case and Abbott has produced
5  documents demonstrating that it submitted claims on
6  behalf of Abbott itself --
7    A.  Okay.
8    Q.  -- through its Home Infusion business
9  unit, okay?  Fair enough.  For claims submitted on
10  behalf of its consignment partners or on behalf of
11  Abbott's pharmacies, what did Abbott personnel
12  within the Home Infusion business unit do to ensure
13  that when they submitted those claims, they were in
14  compliance with federal and state Medicare and
15  Medicaid fraud and abuse statutes?
16    MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18    A.  They would have performed their job
19  responsibilities to the best of their abilities
20  seeking to comply with the laws and instructions of
21  any given state or federal statute and would have
22  worked to provide that information in compliance

| Page 436 |
|---|

1  with those laws.
2    Q.  Anything else?
3    A.  Other than the broader topics which I've
4  addressed in terms of the compliance training and
5  supervision of managers and the opportunity to the
6  extent an employee was uncomfortable and thought he
7  or she or Abbott was acting out of compliance with
8  whatever regulation or statute they were involved
9  in complying with, there was the opportunity to
10  raise questions within his or her organization or
11  if there was discomfort doing that, there was hot
12  line information.
13    Q.  Okay.  Other than what you just testified
14  to, did Abbott undertake any other measures to
15  either provide guidance to its Home Infusion
16  reimbursement, you know, staff who was submitting
17  claims to Medicare or Medicaid; or did they do any
18  other compliance check, for lack of a better term
19  --
20    MS. CITERA:  Objection.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  -- on their reimbursement staff?

| Page 437 |
|---|

1    MS. CITERA:  Object to the form.
2  BY THE WITNESS:
3    A.  Not to my knowledge.
4    MS. ST. PETER-GRIFFITH:  Okay.  We've got five
5  minutes left on the tape.  Why don't we take a
6  break now.
7    MS. CITERA:  Okay.
8    THE VIDEOGRAPHER:  Going off the record at
9  9:49 a.m.
10    (A short break was had.)
11    THE VIDEOGRAPHER:  Beginning of Videotape No.
12  2 in the deposition of Mr. Fishman.  We're back on
13  the record at 10:01 a.m.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Mr. Fishman, you testified earlier that
16  the reason behind the written -- the establishment
17  of the written policy concerning the non-provision
18  of spread or AWP information to Abbott's customers
19  was predicated in part upon Abbott's better
20  understanding of the government's view of such
21  conduct; is that fair?
22    MS. CITERA:  Object to the form.

| Page 438 |
|---|

1  BY THE WITNESS:
2    A.  I think I stated it was in response --
3  partly in response to that, yes.
4    Q.  Okay.  Certainly by 2003, Abbott knew
5  that a Qui Tam action was pending; is that fair?
6    A.  Yes.
7    Q.  Why didn't Abbott in 1999 when it was
8  notified about the qui tam action that is the
9  predicate for this case undertake to change or
10  undertake to implement a formal written policy
11  concerning the provision of spread or AWP
12  information to customers?
13    MS. CITERA:  Objection to the form, outside
14  the scope.
15  BY THE WITNESS:
16    A.  Specifically as to that policy, I don't
17  know.  But there was not at that time -- there were
18  not formal policies in that general arena at that
19  time.
20    Q.  There weren't formal policies pertaining
21  to Medicare and Medicaid fraud and abuse -- what do
22  you mean by "general arena"?

                                    20  (Pages 435 to 438)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 439

1    A.  Healthcare compliance.  There were
2  guidelines issued in 1999, and it evolved to the
3  policy stage in 2003.
4    Q.  Okay.  What guidelines?
5    A.  Each division had operating guidelines
6  for program funding.
7    Q.  Okay.  And those were some of the
8  documents that we looked at at your last
9  deposition?
10    A.  I don't recall when we looked at them or
11  if we looked at them at deposition or I had seen
12  them before, I helped draft them, I'm generally
13  aware of them.
14    Q.  Sir, are you aware of where -- I didn't
15  ask you this question before the break.  The
16  exhibits that we have now, 8, 9, and 10 --
17    A.  Correct.
18    Q.  -- for any of these exhibits, are you
19  aware of where they came from, the source of these
20  particular documents?
21    A.  Boy, that's a broad -- I mean, these
22  documents come from all over.  I mean, I'd go to go

Page 440

1  through -- If you want, I can go through each
2  document and identify where I think it sourced
3  from.
4    Q.  No, I just want to know as you sit here
5  today, do you know where this particular stack of
6  documents came from?
7    MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9    A.  I'm not sure I understand your question.
10    Q.  Okay.  Who provided these documents, do
11  you know, for production today?
12    MS. CITERA:  Objection to form, outside the
13  scope.
14  BY THE WITNESS:
15    A.  I only know about several of them.  I
16  don't know.  I don't know each -- I don't know who
17  was the source for each document.
18    Q.  Which documents do you know who the
19  source was for?  Well, were you the source for any
20  of them?
21    A.  I was.
22    Q.  Okay.  Which ones?  You're looking now at

Page 441

1  composite Exhibit --
2    A.  I'm now in Exhibit 8.
3    Q.  -- 8, okay.
4    A.  Nothing in Exhibit 8.
5    Q.  Okay.
6    A.  Document 039711 -- starting with 0397110
7  and ending 0397111, I was the source of that
8  document.  I believe I was the source of the
9  document 0397112, ending 0397114.  I was the source
10  of the document starting 0397115, ending 0397157.
11  I believe I was the source of the document starting
12  0397158 ending 0397214.  And I was not --
13    Q.  But were you the source of the disk?
14    A.  The "Safeguarding Trust" disk?
15    Q.  Yes.
16    A.  I provided one, whether -- I mean, I
17  provided the "Safeguarding Trust" disk, yes.
18    Q.  Okay.  Sir, why didn't you bring those to
19  the deposition we had on your first day or provide
20  them before that day?
21    A.  I can't answer that.
22    MS. CITERA:  Object to the form.

Page 442

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  How come?
3    A.  I don't know when the documents were
4  discovered -- I don't know when the documents were
5  provided.
6    Q.  Did you provide -- The documents that you
7  just listed off, did you provide them to Jones Day
8  or to Abbott legal prior to your deposition, the
9  first day of your deposition last Wednesday?  Let
10  me ask it a different way.
11    Since the date of your last deposition,
12  have you provided any documents to Jones Day or
13  Abbott for production?
14    A.  Since that date, no.
15    Q.  Okay.  So any documents that you
16  provided, you provided prior to your deposition?
17    A.  The information regarding the Code of
18  Business Conduct, which is all of the documents I
19  -- from Exhibit 10 that I recited the numbers of --
20    Q.  Yes.
21    A.  -- those were all identified in -- what
22  -- Tuesday, the Tuesday afternoon prior to my

21 (Pages 439 to 442)

Page 443

1  testimony on Wednesday.
2      MS. ST. PETER-GRIFFITH: Toni, do we know why
3  we didn't get those before now?
4      MS. CITERA: I don't. I mean, I can't say
5  anything more than they were provided to us. I
6  don't know why they didn't get out before that. I
7  have no idea.
8  BY MS. ST. PETER-GRIFFITH:
9      Q. Abbott received a letter from the
10 Department of Justice in September of 1999
11 notifying it of the qui tam action, right? Do you
12 recall that?
13     MS. CITERA: Objection to the form, beyond the
14 scope.
15 BY THE WITNESS:
16     A. I have not seen that letter. I have not
17 seen that letter.
18     Q. I'm going to mark this as the next
19 exhibit. It's rather lengthy. Sir, we're not
20 necessarily going to get into the substance of it.
21 I just want to put on the record and discuss your
22 -- Abbott's awareness of the fact of it.

Page 444

1      A. Okay.
2          (Exhibit Fishman 011
3          marked as requested.)
4  BY MS. ST. PETER-GRIFFITH:
5      Q. Sir, Exhibit 11 has been marked and it's
6  a letter from the United States Department of
7  Justice, Civil Division, signed by T. Reed Stephens
8  and Mark Lavine; do you see that?
9      A. I do. I do.
10     Q. And it's addressed to Dan Reidy at Jones
11 Day?
12     A. Correct.
13     Q. Did Abbott receive a copy of this
14 document?
15     MS. CITERA: Objection to the form, outside
16 the scope.
17 BY THE WITNESS:
18     A. I have no personal knowledge if they did.
19 But given where we are today, I have to assume that
20 they did.
21     Q. Why in 1999 didn't Abbott, when it
22 received this letter from the Department of Justice

Page 445

1  as a matter of policy reduce the list prices that
2  it reported to the pricing compendia on the subject
3  drugs?
4      MS. CITERA: Objection to the form, outside
5  the scope.
6  BY THE WITNESS:
7      A. I don't know.
8      Q. Sir, if we could take your Deposition
9  Exhibit 3, we're going to go through -- before we
10 jump -- Hold on.
11     MS. CITERA: I have letters, but --
12     MS. ST. PETER-GRIFFITH: No, this is --
13     MS. CITERA: It's the notice. No, I know what
14 it is. I just don't seem to have it. Okay,
15 thanks.
16     MS. ST. PETER-GRIFFITH: Let me know if I
17 wrote on that. Thanks.
18 BY MS. ST. PETER-GRIFFITH:
19     Q. Sir, what I'd like to do, before we jump
20 into the documents because I have a number of
21 documents to go over with you today --
22     A. Okay.

Page 446

1      Q. -- what I'd like to do is sort of round
2  out Abbott's testimony concerning the existence of
3  policies and procedures and the implementation of
4  them pursuant to the categories that are outlined
5  in your -- the deposition notice, okay?
6      A. Fine.
7      Q. Let's start with Topic 8. And, sir, I
8  will represent to you and Ms. Citera that it was
9  made very clear to me that Mr. Fishman and not Mr.
10 Sellers is here to talk about the policy. I
11 understand that implementation might be something
12 else in terms of the day-to-day practice, but I
13 just want you to know that.
14     MS. CITERA: I mean, I would just say "policy"
15 is a very broad term. He's here to talk about
16 compliance policies, so that's what he's here to
17 testify about.
18     MS. ST. PETER-GRIFFITH: I understand that.
19 But I'm just telling you what your partner
20 represented to me on Sunday, okay.
21 BY MS. ST. PETER-GRIFFITH:
22     Q. Sir, if you could look under -- on Page

22 (Pages 443 to 446)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 447

1    3, if you could look under Topic 1?
2        A.  Okay.
3        Q.  What policies are you aware of concerning
4    the areas talked about in Topic 1?
5        A.  I'm not aware of any policies.
6        Q.  Did you do anything to prepare today to
7    come to speak about these policies?
8        A.  To the extent there were -- there are --
9    were or are policies pertaining to these specific
10   pricing categories and descriptions of pricing, I
11   did not do anything to look into that.  I prepared
12   to talk about compliance policies and procedures.
13       Q.  Okay.  Let's go to compliance policies
14   and procedures.  Are you aware of any compliance
15   policies and procedures that respond to the Topic,
16   that Roman Numeral I?
17       A.  I am aware of the OEC policy pertaining
18   to reimbursement information and support.
19       Q.  And is that the policy you've already
20   testified about, the '03 policy?
21       A.  I believe we looked at -- that's the
22   policy we looked at last time, yes.

Page 448

1        Q.  Is there anything else you can think of
2    other than what you testified about that policy
3    earlier that you either augment or -- I want to
4    sort of round out and make sure we've got all of
5    your information and testimony concerning this
6    particular topic.
7        A.  Just the broader policy from the Code of
8    Business Conduct to comply with all laws and
9    regulations, which would include federal healthcare
10   compliance laws.
11       MS. ST. PETER-GRIFFITH:  Toni, to the extent
12   that there's sort of a disconnect as to which
13   witness is going to testify about policies, I
14   understand -- and we're going to go through each of
15   these topics.  If Mr. Fishman is only prepared to
16   talk about compliance, I ask that when we reconvene
17   Mr. Sellers or if you're going to designate
18   somebody else, let us know.  But we obviously want
19   a witness to talk about the policies.
20       MS. CITERA:  Well, I would just -- you know,
21   because I know you're going to go through each of
22   these topics.  As I said, Mr. Fishman is here to

Page 449

1    talk about compliance policies and that's what he's
2    prepared to testify about.  And I understand there
3    are -- you're saying there's a disconnect, and I
4    will look into that.
5    BY MS. ST. PETER-GRIFFITH:
6        Q.  Sir, with regard to Topic 1, have you
7    provided your full testimony as to what you know
8    about that, at least with regard to compliance --
9    compliance policies and procedures?
10       A.  Yes.
11       Q.  Okay.  And you're not aware -- you
12   weren't prepared to testify about any other
13   policies, right?
14       A.  That is correct.
15       Q.  Okay.  Can you go on to Topic 2, and I'm
16   going to ask you if you could just describe the
17   same -- or respond to the same questions, I guess.
18       A.  Item 2 seems to talk about the impact of
19   activity as opposed to any policies and procedures
20   at all, whether they're within my gamut or not.
21   I'm not prepared to testify to the items in No. 2.
22       Q.  Okay.  Are there any policies or

Page 450

1    procedures in the compliance area that you're aware
2    of concerning the pricing impact of Abbott's
3    pricing of its HPD products or evaluating the
4    pricing impact?
5        A.  I am not aware -- I don't believe that
6    the policies, the 2003 policy that we just
7    referenced dealing with reimbursement information
8    support -- addresses impact.  It is a policy about
9    how to go about conducting business.  It doesn't
10   talk about consequences.
11       Q.  What about any other policies or
12   procedures pertaining to compliance that may
13   implicate the pricing impact of Abbott's pricing of
14   its HPD products?
15       MS. CITERA:  Can I just get a clarification
16   for you -- from you?
17       MS. ST. PETER-GRIFFITH:  Sure.
18       MS. CITERA:  Are you asking in addition to
19   what he's already testified to?
20       MS. ST. PETER-GRIFFITH:  Yeah.  If he's
21   already testified to his full knowledge, you're
22   free to state that, Mr. Fishman.

## Chicago, IL

Page 451

1    THE WITNESS:  Okay.
2    MS. ST. PETER-GRIFFITH:  What I want to do is
3  close out the --
4    THE WITNESS:  Okay.
5    MS. CITERA:  I wanted to be clear that when he
6  says "nothing else," that we're clear that's in
7  addition to what he already said.
8    MS. ST. PETER-GRIFFITH:  Sure, sure.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  But I need you to tell me that, Mr.
11  Fishman --
12    A.  I understand.
13    Q.  -- because -- I also need you to tell me
14  if you look at that topic and say, "My prior
15  testimony didn't pertain to that topic," I want to
16  know that as well.  Or if you have no information
17  whatsoever, I want to know that as well, okay?
18        So with regard to Topic 2, you're not
19  aware of any -- other than what you've -- Well,
20  with regard to the policies and procedures that you
21  testified to earlier, do any of those policies and
22  procedures from '91 through 2003 pertain to the

Page 452

1  pricing impact of Abbott's pricing on HPD drug
2  products as identified in Subject 2?
3    A.  To my knowledge, they do not deal with
4  impact.
5    Q.  Okay.
6    A.  Do not pertain to impact.
7    Q.  The impact upon Abbott's markets, do you
8  see that?
9    A.  Correct.
10    Q.  Okay.  So your prior testimony concerning
11  policies and procedures really don't pertain to
12  this topic?
13    A.  I believe they do not, correct.
14    Q.  Okay.  Is there anything else that you
15  are -- that Abbott, as you sit here today, is aware
16  of with regard to its compliance policies,
17  practices, and procedures that pertain to or relate
18  to the pricing impact of Abbott's pricing on HPD
19  drug products upon Abbott's markets and sales as
20  identified in Topic 2?
21    A.  Nothing further.
22    MS. CITERA:  Objection to form.

Page 453

1  BY THE WITNESS:
2    A.  Sorry.  Nothing further.
3    Q.  Nothing further or nothing at all?  I
4  want to make sure because your testimony is your
5  prior testimony doesn't pertain to this topic; is
6  that fair?
7    A.  Yes.
8    Q.  So you're not aware of anything with
9  regard to compliance that pertains to this topic?
10    A.  Correct.  I was responding to the
11  conversation that the two of you had previously
12  where my testimony -- I have nothing further to add
13  in terms of policies and procedures with which --
14  other than what I've already said.  But I can still
15  maintain that what I said about those policies and
16  procedures don't pertain to impact on markets.
17    Q.  Got you.  Okay.  Just so we're all on the
18  same page.
19        And you're not here -- You're not
20  prepared to testify generally about policies
21  concerning this topic, right?
22    A.  I'm not aware of any policies that

Page 454

1  pertain to this subject.
2    Q.  With regard to Topic 3, if you could
3  review that topic, sir, and I'm going to ask you
4  the same questions.
5    A.  If I understand the question, the answer
6  would be that I rely on the testimony I've given so
7  far.
8    Q.  Okay.  And is that the testimony
9  concerning the 2003 policy --
10    A.  Policy.
11    Q.  -- and the practice that you testified
12  about at the first day?
13    A.  And the Code of Business Conduct.
14    Q.  The Code of Business Conduct, okay.
15  Anything else that you can think of, or have we
16  rounded out that topic?
17    A.  I believe we've rounded out that topic.
18    Q.  Okay.  And you're not familiar of any --
19  outside of the compliance area, you're not here to
20  testify today about any other policies concerning
21  this topic?
22    A.  No.

24 (Pages 451 to 454)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                                    March 20, 2008

Chicago, IL

Page 455

1    Q.  Okay.  With regard to Topic 4, same
2  questions.
3    A.  Same answer.
4    Q.  Same answer, okay.  You're not here to
5  testify generally about the policies other than
6  compliance, right?
7    A.  Correct.
8    Q.  And then for compliance, when you say
9  "same answer," do you mean that you stand on your
10  testimony concerning the -- I'm sorry -- the 2003
11  policy, the Code of Business Conduct, and the
12  practice from '91 through 2001?
13    A.  Correct.
14    Q.  Anything else?
15    A.  Not to my knowledge.
16    Q.  Have we exhausted your knowledge on
17  compliance matters pertaining to this topic?
18    A.  Yes, you have.
19    Q.  Let's go on to Topic 5.
20    A.  Based on the wording of No. 5, I would
21  give the same answer as I gave to No. 2, which is
22  the testimony I gave previously about policies and

Page 456

1  procedures, the three that we've reiterated, don't
2  address impact.
3    Q.  Okay.  So your answers to No. 5 are the
4  same as your answers to No. 2?
5    A.  Correct.
6    Q.  You're not otherwise aware of any other
7  policies -- Well, you're not aware of any policies
8  and you're not prepared to testify about
9  noncompliance policies pertaining to Topic 5?
10    A.  Correct.
11    Q.  What about Topic 6?
12    A.  I am not aware that divisions -- other
13  divisions beyond HPD had formalized -- stated or
14  formalized policies concerning AWP when HPD did
15  not.
16    Q.  Okay.  So if Ross had one, HPD had one?
17    A.  I'm not aware that the other divisions --
18  Ross, PPD, AI, or CPD -- had -- or ADD had
19  policies, stated or formalized policies concerning
20  AWP when HPD did not.
21    Q.  Does that include PPD?  Did you --
22    A.  If I didn't, I would have included PPD.

Page 457

1    Q.  I'm sorry.  You may have; I just didn't
2  hear it.
3    A.  Okay.
4    Q.  And did you include AHD?
5    A.  I did not, but I would add AHD.  I'm
6  sorry.
7    Q.  Okay.  That's all right.  I just want to
8  make sure I cover all my -- all the letters that I
9  am aware of?
10    A.  All your D's.
11    Q.  So is it fair to say, then, that prior to
12  the implementation of the 2003 written policies, if
13  Abbott HPD only had a practice, that the other
14  divisions only had a practice as well?
15    MS. CITERA:  Objection to the form.
16  BY THE WITNESS:
17    A.  I can state from reading through -- the
18  conversations I've had and the testimony I've read
19  from prior depositions that both Ross and -- that
20  PPD had the same practice of not providing AWP or
21  AWP information to customers.
22    And I read -- I forgot to mention, I read

Page 458

1  Mike Tutell's, which I did not -- previously did
2  not see his excerpts?  It was described to me, so
3  -- and if you match up my testimony from the last
4  deposition, Tutell's what would not have been a
5  deposition excerpt that I saw.  But in preparing
6  for today, I did read his deposition testimony.
7    And it strikes me that Ross also had that
8  -- my recollection from reading his testimony is
9  that Ross also had that practice of not providing
10  AWP information.
11    Q.  Did PPD?
12    A.  PPD, in reading through Fiske's, that
13  would be correct.
14    Q.  And AHD?
15    A.  I did not read any information or talk to
16  anybody about AHD.  I can't answer that.
17    Q.  Other than speaking to the compliance
18  policies and the policies and practices concerning
19  the provision of AWP and spread information, are
20  you aware of or are you prepared to testify about
21  any other policies pertaining to Topic 6?
22    A.  I am not.

25 (Pages 455 to 458)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 459

1      Q.   Moving on to Topic 7, which spills over
2  to the next page, and then with regard to Topic 8,
3  we'll go over documents in a minute.  So this is
4  the last topic we're going to talk about under
5  Topic -- the last subtopic we're going to talk
6  about under Topic 8.
7      A.   My interpretation of Item 7 on the bottom
8  of Page 3 to the top of Page 4 is that it is not
9  calling for policies or procedures or practices.
10     Q.   Well, were there any policies concerning
11 Abbott's price setting that related to compliance
12 with federal or state Medicare and Medicaid fraud
13 and abuse statutes, other than what you've already
14 testified --
15     A.   Other than what I testified to, I'm not
16 aware of any.
17     Q.   I know you testified about this already
18 this morning.  I just wanted to make sure that we
19 round out your knowledge on this.
20     A.   I understand.
21     Q.   So with regard to Topic 8, have we
22 exhausted your knowledge or information pertaining

Page 460

1  to the enumerated subtopics therein?
2      A.   Yes.
3      Q.   Flip the page to Topic 1.  And we're
4  going to go over in more detail, sir, once we start
5  looking at the documents, different applications of
6  policies and issues identified in Topic 7.  But I
7  want to make sure that just in terms of discussing
8  things, we round out your knowledge without looking
9  at the particular documents.
10     A.   I understand.
11     Q.   Okay.  Under Topic 7, Sub 2, sir, if you
12 could look under Item A, and the topic generally
13 deals with compliance with all Medicare or Medicaid
14 statutes, regulations, policies, and procedures,
15 requests from any CMS officials, intermediary or
16 state Medicaid programs for information from
17 Abbott, evaluation and analysis of government
18 regulations and statutes; do you see that?  Under A
19 have we identified or have you already testified
20 about all measures undertaken by Abbott to ensure
21 that its HPD was in compliance with all state and
22 federal Medicare and Medicaid laws and regulations

Page 461

1  for the operative period of this case, which is '91
2  to 2003?
3      MS. CITERA:  Object to form.
4  BY THE WITNESS:
5      A.   My recollection in answering this at
6  length on last Wednesday was I mentioned briefly
7  AMP and best price, and that was not something you
8  were interested in.
9      Q.   Well, sir, I don't think it's fair to
10 characterize that that's not something I was
11 interested in.  What do you mean AMP and best
12 price?
13     A.   Regarding -- regarding activities in
14 preparing and evaluating AMP and best price
15 calculations, which is part of the overall
16 regulatory scheme but has not been the subject
17 matter of our discussions.
18     Q.   Okay.  Well, explain what you mean by
19 that.
20     A.   I -- regarding the CMS official, I had
21 conversations with CMS involving the AMP and best
22 price calculations for Calcijex dating back through

Page 462

1  the '90s.
2      Q.   Okay.  So you're saying that Abbott had a
3  conversation with CMS officials about Calcijex
4  pricing, AMP, and best price?
5      A.   Correct.
6      Q.   Okay.  Any other communications that
7  you're aware of?
8      A.   There were --
9      MS. CITERA:  Objection to form.  Sorry.
10 BY THE WITNESS:
11     A.   There were in the 2000 to 2002 time
12 frame, maybe later, I don't remember exactly when
13 it started, considerable interaction with CMS and
14 intermediaries involving least costly -- least
15 costly alternative involving our renal franchise.
16     Q.   Okay.  Anything else?
17     A.   Not that I'm aware of.
18     Q.   Okay.  Have we exhausted Abbott's
19 testimony of all measures taken by Abbott to ensure
20 that its HPD was in compliance with all state and
21 federal Medicare and Medicaid fraud -- laws,
22 regulations -- laws and regulations for the

26 (Pages 459 to 462)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Page 463

1  operative period of this case?
2      MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4      A.  We're assuming all my previous testimony,
5  right?
6      Q.  Yes, yes.
7      A.  Yes.
8      Q.  I'm sorry, yes.
9      A.  Yes.
10     Q.  With regard to Item B, I believe you
11 testified that there were no measures undertaken;
12 is that accurate under Item B?
13     MS. CITERA:  Objection to the form.
14 BY THE WITNESS:
15     A.  My recollection of that testimony is that
16 the question assumed that there were concerns
17 raised.  My answer was the people that I talked
18 with to whom Mr. Tutell said he raised concerns,
19 they did not recall those concerns having been
20 raised.  So we couldn't take action in regard to a
21 concern that the people I talked to said was never
22 raised.

Page 464

1      Q.  Well, did you talk with everyone who Mr.
2  Tutell may have spoken with?
3      A.  I can't answer that because I don't know
4  -- Everyone he said he talked to, yes.  I spoke --
5  I testified I spoke with Matt Fisher.  I spoke with
6  Melissa Penslavey.  I spoke with Cliff Berman.  And
7  while Brian Taylor's name was not specifically
8  mentioned, in his deposition testimony, Brian was
9  legal counsel to Ross in the time frame that he
10 appeared to be discussing.
11     Q.  Does Abbott doubt that -- Mr. Tutell's
12 testimony concerning his raising concerns about
13 AWP?
14     MS. CITERA:  Object to the form, outside the
15 scope.
16 BY THE WITNESS:
17     A.  Factually, Abbott believes that the
18 people that he stated in his deposition testimony
19 that he raised concerns, those folks -- those
20 people's testimony or those people's descriptions
21 of any activities surrounding that is that the --
22 any concerns he may have raised were not of the

Page 465

1  type that would have given them reason to consider
2  his inquiry any different than a general inquiry.
3  So it would not have been a memorable matter where
4  a concern would have been raised in such a way that
5  action would likely have followed.
6      Q.  So Abbott doesn't necessarily doubt that
7  the conversations may have taken place; it's just
8  it doesn't believe that it was a major issue that
9  was raised?
10     MS. CITERA:  Object to the form, outside the
11 scope.
12 BY THE WITNESS:
13     A.  It appears to be a difference between how
14 the message was communicated and how the message
15 was received.
16     Q.  Okay.  What do you mean by that?
17     A.  In reading Mr. Tutell's testimony, he
18 suggested or stated that he raised concerns about
19 the AWP matter.  The people to whom he said he
20 raised those concerns, in specifically asking them
21 those questions and having that precise discussion,
22 their recollection was that there was nothing --

Page 466

1  there was no concerns that he raised that they can
2  recall.  It doesn't mean they didn't have the
3  conversation.  But when you have multiple
4  conversations with people over a long period of
5  time, you don't recall every conversation.  And his
6  conversation with them, to them, was not memorable.
7      Q.  And through your investigation, you were
8  able to determine that no affirmative action was
9  taken based upon the communication then?
10     MS. CITERA:  Objection to the form, outside
11 the scope.
12 BY THE WITNESS:
13     A.  I feel like the question is, "When did
14 you stop beating your wife?" in some ways.
15     Q.  Well, no.  I don't -- The question is
16 simply, you were able to ascertain that while Mr.
17 Tutell may have had the conversation, it didn't
18 raise any -- it wasn't a conversation that sort of
19 raised a fire alarm; is that fair?
20     MS. CITERA:  Objection to form.
21 BY THE WITNESS:
22     A.  It wasn't perceived as raising fire

27 (Pages 463 to 466)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 467

1  alarms. Whether he thought he was, it was not
2  perceived as having done so. So no action was
3  taken regarding what was perceived as a typical
4  conversation.
5      Q.  That answers my question.
6      A.  Okay.
7      Q.  Is there anything else that you're aware
8  of or have we rounded out and exhausted your
9  testimony concerning the measures undertaken by
10 Abbott regarding Mr. Tutell's conversations with
11 his supervisor, in-house counsel?
12     A.  We've rounded out my knowledge on that
13 subject, yes.
14     Q.  Let's look at Item C.
15     A.  My testimony generally is completely
16 responsive to that. I would say all training
17 undertaken, I did not and cannot articulate every
18 single presentation was made. But I described the
19 practice over the long period of time, that
20 multiple presentations were made to multiple
21 business units. So yes, it's consistent with -- I
22 have responded to this question in the best of my

Page 468

1  ability.
2      Q.  And fully to the best of your ability?
3      A.  Fully to the best of my ability.
4      Q.  And to the extent that you -- there's
5  some presentations that you can't recall, you --
6  your testimony is you've testified to everything
7  you can recall?
8      A.  Correct.
9      Q.  Or that you're aware of?
10     A.  That's correct.
11     Q.  We're going to get into the specifics of
12 some of those presentations once we look at the
13 documents. But I want to make sure there isn't
14 anything else that you recall or want to testify
15 about in general --
16     A.  No.
17     Q.  -- about the training?
18     A.  No, there's nothing further.
19     Q.  Let's go on to Item D.
20     A.  I believe my testimony both yesterday --
21 or yesterday -- seems like yesterday.
22     MS. CITERA:  Feels like yesterday.

Page 469

1      MS. ST. PETER-GRIFFITH:  Seems like yesterday
2  to you. I've had three intervening depositions
3  since then. Four, actually.
4  BY THE WITNESS:
5      A.  I've had two transactions die, so ... I
6  believe my testimony from last Wednesday and today
7  is fully responsive to this item, to the best of my
8  knowledge.
9      Q.  Okay. And, again, we'll get into some of
10 the specifics as we look at the documents. But I
11 just wanted to generally, we've exhausted your
12 knowledge --
13     A.  Knowledge.
14     Q.  -- of the policies and procedures?
15     A.  We have.
16     Q.  Under Item E, if you could take a look at
17 that.
18     A.  Same answer. We've exhausted my
19 knowledge on this subject and that my testimony is
20 responsive to this.
21     Q.  To this question?
22     A.  To this question.

Page 470

1      Q.  Okay. I did have a question, actually a
2  follow-up question on this. With the onset of
3  "Safeguarding Trust" and the more formalized
4  procedures concerning reporting, I know that as
5  part of the Ross CIA, Abbott did its own reporting
6  and monitored either calls into the hot line or
7  reports that were made; is that fair?
8      A.  Yes.
9      Q.  Prior to the '01 through '03 time period
10 when those procedures were being implemented
11 incident to the Ross settlement and Ross CIA and
12 formalized, prior to that point in time, did Abbott
13 have a way of tracking either hot line complaints
14 or reports concerning noncompliance? Was there a
15 log someplace, or was there a way to track historic
16 complaints?
17     MS. CITERA:  Objection to form.
18 BY THE WITNESS:
19     A.  My recollection is that in discussing the
20 matter with Charlie Brock, was prior to the
21 institution of a specific compliance hot line that
22 -- as reflected in presentations and in the Code of

28 (Pages 467 to 470)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Page 471

1  Business Conduct, calls were to -- directed to the
2  Office of General Counsel and then triaged from
3  there.  I am not aware that there are formal logs
4  reflecting that.  I would not be surprised if there
5  are, but I don't know that there are.
6      Q.  What was done to triage the calls?  What
7  do you mean by "triage"?
8      A.  Triage, if a call comes in and someone is
9  complaining that my boss isn't being fair to me --
10     Q.  Okay.
11     A.  -- and it's somebody on the factory floor
12 in Austin, Texas, then general counsel wouldn't
13 address that matter.  The call would be directed to
14 an HR person Austin, Texas, to investigate the
15 matter and find out does this person have a
16 legitimate complaint or are they just unhappy with
17 they didn't get a promotion and someone else did.
18 Again, any number -- it could be any number of
19 matters.  Again, it's a broad compliance matter.
20 So it certainly was not limited to only calls that
21 people had and concerns people had about healthcare
22 compliance matters.

Page 472

1      Q.  Prior to the implementation of the OEC
2  policies, was there a way to monitor compliance
3  complaints about violations of the practice that
4  we've -- that you've testified to at length
5  concerning Abbott's prohibition against the
6  provision of AWP or spread information to
7  customers?
8      MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.  The manner in which it could be monitored
11 would be the two manners in which I've described
12 already, which would be as a direct supervisor, you
13 see that your direct report is not complying with
14 the practice and identify that act at that time or
15 subsequent to it having occurred.  Secondly would
16 be through the hot line.
17     Q.  Okay.  Now, do managers go out into the
18 field with sales reps, for example?
19     A.  Managers is a -- I'm a manager.  I don't
20 know what --
21     Q.  Okay.  For the sales force, their
22 superiors are the district managers, is that --

Page 473

1      A.  Correct.
2      Q.  Okay.  Do the district managers have a
3  way of monitoring compliance with the practice if
4  their field sales reps were sort of, you know,
5  spread out all over the country doing individual
6  sales calls?
7      MS. CITERA:  Object to the form.
8  BY THE WITNESS:
9      A.  I have not had a specific conversation
10 with anyone precisely about that.  My
11 understanding, historic understanding of just
12 having worked with the business is that district
13 managers would work with sales reps.  And I don't
14 -- I'm not aware of any procedure or policy or
15 practice that it was, but it would just be
16 managerial support and that they would -- they
17 would be out in the field with sales reps.  Whether
18 it was every sales rep and how often, my guess is
19 it probably would depend on the size of the
20 territory, the number of sales reps, and the
21 practice of that particular manager.
22     Q.  Well, if -- for those sales calls that

Page 474

1  the managers were not in attendance, how
2  practically could the district managers monitor and
3  enforce the practice?
4      MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6      A.  There were detail logs that sales reps
7  prepared demonstrating who they called on and what
8  they did.  The only way that I can think of that
9  would provide the blanket assurance that you're
10 asking about would be to tape-record every single
11 conversation.  Otherwise, there's no way of assuring
12 compliance with thousands of sales reps out on the
13 street talking with doctors and healthcare
14 professionals.
15     Q.  Okay.  Are you aware of any monitoring
16 initiative other than what you've testified about
17 concerning the district managers, you know, working
18 with their sales reps?
19     A.  Other than what I -- there were the
20 guidelines, operating guidelines that went into
21 greater detail and provided -- attempted to provide
22 clear guidance to the Abbott employees as to how to

29 (Pages 471 to 474)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 475

1  manage the -- those issues when it comes to dealing
2  with professionals, gifts and entertainment, and
3  clinical study grants and medical education grants
4  and continuing medical education, and matters of
5  that sort, program funding.  So there were those
6  types of efforts made to provide greater guidance
7  to the people who were responsible for submitting
8  -- would be interacting with the healthcare
9  professions and then submitting expense reports
10 reflecting their interactions.
11     Q.  So we rounded out your familiar with Item
12 E?
13     A.  Correct.
14     Q.  Okay.  Item F, other than the policies
15 that we discussed, the implementation of the '03
16 policy and the practice and your testimony
17 concerning that, do you have any other testimony
18 concerning -- or familiarity or awareness on behalf
19 of Abbott concerning all policies, procedures that
20 Abbott maintained concerning spreads and spread
21 marketing and the implementation of those policies
22 and procedures?

Page 476

1     MS. CITERA:  Objection to the form.
2  BY THE WITNESS:
3     A.  I have no further testimony.
4     Q.  Let's move on to Item G.  Do you have any
5  other -- Or have we discussed -- Have you testified
6  to Abbott's complete knowledge of the
7  identification of all individuals responsible for
8  developing and enforcing compliance programs,
9  initiatives, policies and procedures that refer,
10 relate, pertain -- refer, relate, or pertain to
11 Medicare or Medicaid?
12     MS. CITERA:  Objection to form.
13 BY THE WITNESS:
14     A.  I think I testified fully with respect to
15 individuals in a broader -- at times in a broader
16 category as opposed to specific individuals over a
17 longer period of time.
18     Q.  So you might not have -- You've
19 identified the sort of categories of employees and
20 may not have identified each and every employee?
21     A.  Correct.
22     Q.  But have we covered your -- Abbott's full

Page 477

1  knowledge of the types of employees?
2     A.  Yes.
3     Q.  Moving on to -- And we've exhausted that
4  testimony on that?
5     A.  Correct.
6     Q.  Okay.  Moving on to Item H.  This I don't
7  think we've testified about.
8     A.  To my knowledge, there were no actions
9  taken within HPD pertaining to -- incident to the
10 CIA with respect to HPD's distribution of Ross
11 products, and I did ascertain that there were no
12 HPD employees as covered persons under the Ross
13 CIA.
14     Q.  Okay.
15     A.  And those conversations, I should have --
16 could have identified that last Wednesday, was
17 through Kathy Faulter, who was the director of
18 efficacy and compliance of Ross during -- during
19 and after the CIA. I don't know what her position
20 is today.  I believe she's still in the compliance
21 arena at Abbott.
22     Q.  Well, Abbott was aware that its HPD

Page 478

1  division provided on a consignment basis Ross
2  products, right?
3     MS. CITERA:  Objection to form, outside the
4  scope.
5  BY THE WITNESS:
6     A.  I have not talked to anybody that was
7  aware that Ross products were part of the
8  consignment of -- through HPD distribution.  And
9  the time frame is '91 through 2003?
10     Q.  '91 through the closure of Home Infusion.
11     A.  Home Infusion?
12     Q.  Yeah.  Well, did you talk to Ms. Tobiason
13 about it?  I will submit to you, sir, I took Ms.
14 Tobiason's testimony over three days --
15     A.  Okay.
16     Q.  And she did testify to that.
17     A.  I did not -- It's a really different
18 question, which is incident to the Ross CIA, I'm
19 not aware of any actions taken.  I --
20     Q.  I --
21     A.  I -- I wouldn't doubt that as part of the
22 Home Infusion business that there were nutritional

30 (Pages 475 to 478)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 479

1  products that ultimately came through Ross that
2  were part of the compounding efforts of Home
3  Infusion.
4      Q.  Usually through total parenteral
5  nutrition or enteral nutrition?
6      A.  Uh-huh.
7      Q.  Okay.  In part because of the nature and,
8  you know, the prior testimony on it is because of
9  the nature of the client base and patients who are
10 in the home infusion arena.
11         Sir, if Abbott is providing -- the reason
12 why I asked the predicate question is as a
13 predicate to this question, if Abbott is providing
14 on a consignment basis Ross products, why didn't
15 Abbott undertake any actions concerning identifying
16 and reporting HPD's conduct in selling and
17 distributing Ross products?
18     MS. CITERA:  Objection to the form, outside
19 the scope.
20 BY THE WITNESS:
21     A.  There seemed to be several pieces of
22 that.  Piecing -- As I understand that question,

Page 480

1  piecing that question together, my first thought is
2  when the Ross CIA was entered into in July 2003,
3  the Home Infusion business had been closed down.
4  So there wouldn't be the connection between the CIA
5  and Home Infusion, regardless of what -- the
6  products having gone through that distribution
7  network previously.
8      Q.  Well, in terms of identifying conduct or
9  through -- specified in the CIA on an ongoing
10 basis, perhaps that's the case.  But do you
11 understand that the CIA pertained to covered
12 conduct that predated 2003?
13     MS. CITERA:  Objection to the form.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  I mean, it was about -- Ross CIA was
16 about Ross' conduct within a particular time frame;
17 is that fair?
18     MS. CITERA:  Objection to form, outside the
19 scope.
20 BY THE WITNESS:
21     A.  That is -- That's a fair statement, yes.
22     Q.  What did Abbott do to ascertain whether

Page 481

1  or not the same problems that existed in the Ross
2  products division for that time period similarly
3  existed in the HPD Home Infusion arena --
4      MS. CITERA:  Objection.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  -- for that same time period?
7      MS. CITERA:  Objection to form.
8  BY THE WITNESS:
9      A.  I'm not prepared to testify as to what
10 Abbott did in -- reviewing and negotiating the
11 CIA for Ross, who it may have spoken to and what it
12 may have done, what inquiries it may have made of
13 the Home Infusion business with respect to the Ross
14 products that went through the HPD distribution
15 network.
16     Q.  Well, was there an evaluation done?
17     MS. CITERA:  Objection to form.
18 BY THE WITNESS:
19     A.  I'm not -- I don't know.
20     Q.  Okay.  I can submit to you, sir, that
21 I've reviewed all the Ross CIA submissions by
22 Abbott.  And I have seen absolutely no disclosure

Page 482

1  of the fact that the Hospital Products Division was
2  distributing Ross pumps, Ross, you know, enteral
3  products as part of the Home Infusion business.
4  And, you know, my first question is why not?  Why
5  didn't you disclose that?
6      MS. CITERA:  Objection to the form, outside
7  the scope.
8  BY THE WITNESS:
9      A.  I don't have enough familiarity with the
10 Ross CIA to know about the scope of the Ross CIA
11 that it would or would not have directed that type
12 of disclosure.
13     Q.  Okay.  Did you do anything in evaluating
14 information reasonably available to Abbott in
15 preparing for Item H?
16     A.  Can you restate the question?
17     Q.  Sure.  Let me state it this way:  What
18 did you do to prepare for Abbott's deposition here
19 today concerning the topic in -- or the Subtopic H
20 of Item 7?
21     A.  I specifically ascertained from a source
22 that was most able to respond whether there was any

31 (Pages 479 to 482)

# Chicago, IL

Page 483

1  HPD employees that were covered persons under the
2  CIA.
3      Q.  Other than evaluating whether or not
4  there were any HPD employees who were covered
5  persons, did you do anything else?
6      A.  I had conversations with Brian Taylor as
7  counsel of Ross at that time.  I had conversations
8  with Ginnie Tobiason and Mike Sellers, but this
9  subject was not addressed.
10     Q.  Okay.  Other than talking with someone
11 about the identity of possible covered persons, did
12 you do anything else to prepare for this topic?
13     A.  No.
14     Q.  Okay.  Do you have any other information
15 or testimony concerning the subject matter of Topic
16 7, Subtopic H?
17     A.  I have no further information regarding
18 Abbott HPD incident -- action incident to the CIA
19 regarding the distribution of HPD products, Ross'
20 products through HPD's distribution.
21     MS. ST. PETER-GRIFFITH:  And is it still
22 Abbott's position that Mr. Fishman is not here to

Page 484

1  talk about topic 7, Item 1?
2      MS. CITERA:  It is.
3      MS. ST. PETER-GRIFFITH:  Okay.  The United
4  States submits its, you know, vigorous objection to
5  that because this entire topic seeks to identify
6  Abbott's conduct -- not TAP's conduct, Abbott's
7  conduct.
8      MS. CITERA:  And as stated previously, this
9  goes to impact from TAP.  And we believe that is
10 something that Judge Bowler has already ruled on.
11 And as a result, we will not be providing -- I also
12 don't think it's relevant.  But we will not be
13 providing testimony on this subject.
14     MS. ST. PETER-GRIFFITH:  Okay.  I will tell
15 you, this deposition is going to remain open until
16 we resolve this issue.  So, you know, we don't
17 necessarily have to burn a lot of time on it.  If
18 you're telling me he's not going to testify on it,
19 then we will state our objection and we'll deal
20 with it at another point in time.  But we cannot
21 close this deposition until that issue is resolved.
22     I think we're at a good breaking point.

Page 485

1  Do you want to take a break?
2      MS. CITERA:  Okay.  Sure.
3      THE WITNESS:  That would be fine.
4      THE VIDEOGRAPHER:  Going off the record at
5  10:57 a.m.
6      (A short break was had.)
7      THE VIDEOGRAPHER:  Beginning Videotape No. 3,
8  the deposition of Mr. Fishman.  We're back on the
9  record at 11:11 a.m.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Mr. Fishman --
12     MS. ST. PETER-GRIFFITH:  If we can mark this
13 as the next exhibit.
14 BY THE WITNESS:
15     A.  Can I advise you -- I'm sorry.
16     Q.  No, go right ahead.  Go ahead.  Go right
17 ahead before she marks.
18     A.  During the break, we were able to reach
19 the person who found the Abbott Laboratories Inc.
20 Home Infusion Services Reimbursement Operations
21 Compliance Program, but she could not shed any
22 light as to its source or history.  She just was

Page 486

1  able to find it.  She found it in a file, came
2  across it -- more by happenstance, I believe.
3      Q.  Okay.
4      A.  So we're still looking.
5      MS. ST. PETER-GRIFFITH:  Oh.  Toni, if I could
6  ask wherever that -- they found that file drawer
7  quite by happenstance, if they could search for
8  other Home Infusion documents.  I know you're not
9  the document person.
10     MS. CITERA:  Why do you think I moved to New
11 York?
12     MS. ST. PETER-GRIFFITH:  But for Home
13 Infusion, we've had testimony that -- Bruce Rodman
14 especially produced a whole bunch of documents, and
15 Abbott did not.  Apparently there was at one point
16 in time an initiative to kind of clean out the
17 files of Home Infusion.  So if there's a file
18 drawer somewhere, we would ask it be searched
19 because there are a whole bunch of documents which
20 are even referenced in this particular compliance
21 plan that we've never received.  And we were told
22 it's likely they may not exist, so ...  Now, if we

0f08cf8d-8dfa-4007-81db-29f9710803e3

## Chicago, IL

| Page 487 |
| --- |

1    could mark this as Exhibit 13.
2         Any time, sir, that you need to clarify
3    anything, just let us know.
4             (Exhibit Fishman 012
5             marked as requested.)
6    BY MS. ST. PETER-GRIFFITH:
7         Q.  Sir, Exhibit 13? -- 12, a document that I
8    will represent was produced pursuant to a subpoena
9    by former Abbott employee Anne Renick whose
10   deposition I took on Monday.  And she identified it
11   as a handbook she received from Abbott.  We're not
12   going to go into it in detail, but there are --
13   There is a discussion on Page 945 and 957.
14        MS. CITERA:  She's referring to the Bates
15   numbers.
16   BY MS. ST. PETER-GRIFFITH:
17        Q.  And I'm referring to the Bates numbers.
18        A.  I got it.  AMA guidelines?
19        Q.  Actually, I think, yes, the AMA
20   guidelines. And then if you flip to the next page,
21   that's on -- Yes, I'm sorry.  Let's start on 946.
22        A.  Under Medicare fraud and abuse?

| Page 488 |
| --- |

1         Q.  Correct.  We'll start above that.
2    There's compliance issue pertaining to gifts to
3    government officials.  And then there's the
4    Medicare and Medicaid fraud and abuse; do you see
5    that?
6         A.  Yes, I see that.
7         Q.  Do these appear to be policies that for
8    the May 1998, if we look at the front time period,
9    were in place at Abbott?
10        A.  You mentioned before the Item B, we're
11   talking about Medicare fraud and abuse, Item A.
12        Q.  Item A through --
13        A.  A through --
14        Q.  948 where it says -- where it discusses
15   the summary.
16        A.  I need to read it, please.
17        Q.  Sure.  Take your time.
18        A.  Okay.  I have generally reviewed it.
19        Q.  Okay.  Does this appear to be another
20   source that may have been available to Abbott
21   employees within the Hospital Products Division
22   concerning compliance matters and federal Medicare

| Page 489 |
| --- |

1    -- I'm sorry -- and Medicare fraud and abuse?
2         MS. CITERA:  Objection to form.
3    BY THE WITNESS:
4         A.  I would say yes, it appears to emanate
5    from the regulatory affairs department within
6    Abbott, within HPD; so if it was available outside
7    that group, I don't know.
8         Q.  Okay.  What is the regulatory affirms
9    department within HPD?
10        A.  Regulatory affairs would have been --
11        Q.  Okay, sure.
12        A.  -- predominantly, I'm not certain,
13   absolutely certain, predominantly would have been
14   FDA-related regulatory matters.
15        Q.  Would they have any oversight -- I mean,
16   obviously they published a section dealing with
17   Medicare fraud and abuse?
18        A.  Right.
19        Q.  Would they have any responsibility -- and
20   when I say "they" I mean the regulatory affairs
21   department within the HPD -- would they have any
22   responsibility for establishing policies,

| Page 490 |
| --- |

1    practices, or procedures concerning Medicare and
2    Medicaid fraud and abuse or monitoring or
3    implementing compliance with those policies,
4    practices, and procedures?
5         MS. CITERA:  Objection to form.
6    BY THE WITNESS:
7         A.  I would not have expected them to play
8    that role.
9         Q.  Okay.  You testified, I believe, on
10   Wednesday, that that was -- that that type of -- in
11   terms of dealing with Medicare and Medicaid fraud
12   and abuse statutes and regulations, that compliance
13   matters and policies and practices, at least until
14   the creation of the Office of Ethics and Compliance
15   fell within the purview of the legal department; is
16   that fair?
17        A.  That's fair.
18        Q.  Okay.  Do you know whether the regulatory
19   affairs department conferred with or consulted with
20   the legal department concerning the contents of
21   this particular document?
22        A.  I do not know for certain that they did.

33 (Pages 487 to 490)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 491

1  But in reviewing -- reviewing its text and
2  inferring what I know about non-lawyers' writing
3  and lawyer writing, this is a -- this is a concise
4  statement of the law.
5      MS. CITERA:  I just want to make clear that
6  he's referring to the fraud and abuse section.
7  BY THE WITNESS:
8      A.  Fraud and abuse section, correct.
9      Q.  Starting on 946?
10     A.  Correct, 946 through 948, those
11 provisions, I would say at a minimum were edited by
12 a lawyer, whether they were initially prepared by
13 one.  And I do note that on 945, the legal
14 department is identified as a contact under the
15 previous subject matter dealing with AMA
16 guidelines, which Medicare fraud and abuse seems to
17 be part of.
18     Q.  So from your review of the content, you
19 would conclude that it likely was reviewed by
20 someone in the legal department?
21     A.  I would believe that to be true, yes.
22     Q.  Mr. Fishman, for that particular document

Page 492

1  produced by former Abbott employee Ms. Renick, for
2  the production that was made concerning compliance
3  documents, which is Exhibit 1 and its subcomponents
4  and then the exhibits that we have today, Exhibit
5  -- Composite Exhibit 8 -- is it 8, 9, 10?
6      A.  8, 9, 10 here, yes.  And whatever this
7  is.
8      MS. CITERA:  I don't think 9 is.
9      THE WITNESS:  9 is the "Safeguarding Trust."
10     MS. CITERA:  Oh, okay.  Sorry.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  With regard to those materials, and I
13 know you've testified there might be other
14 presentations or other compliance documents out
15 there, that this might not be the full universe of
16 compliance materials, but for what has been
17 produced today and what we've discussed and you've
18 identified at your deposition here today, for
19 Abbott's production as well as that document
20 produced by Ms. Renick, is it fair to say that for
21 whatever time period a presentation is made in or a
22 policy is published, that for that period of time,

Page 493

1  the documents that were produced here today
2  accurately reflect Abbott's position or its view as
3  expressed in those particular documents?
4      MS. CITERA:  Objection to the form, outside
5  the scope.
6  BY THE WITNESS:
7      A.  The breadth of that statement is such
8  that I have to qualify my answer because that's --
9  that is -- your question assumes that every word on
10 every page reflects Abbott's position, and I don't
11 know that for certain.
12     Q.  Well, okay.  Let me go back.  To the
13 extent that Abbott has produced or Ms. Renick has
14 produced materials that were submitted to or that
15 were disseminated to Abbott employees, is it fair
16 to say that for -- as of the date of whatever
17 particular document, that whatever the content of
18 the presentation is or the document is, that that
19 reflects what Abbott intended to communicate to the
20 audience about the subject matter?
21     MS. CITERA:  Same objections.  And I just also
22 want to note that one of these presentations was

Page 494

1  given by an outside firm.  I'm referring to 39 and
2  40, Tab 39 and 40 of Exhibit 1.
3      MS. ST. PETER-GRIFFITH:  Okay.  So we can
4  exclude them.  For the Abbott-generated material.
5  BY THE WITNESS:
6      A.  As a general rule, I'd say yes.  The only
7  caveat I'd have to answer is knowing that many of
8  these presentations were prepared by individuals,
9  that an individual's perspective on a subject
10 matter may -- may have had a slight -- there was a
11 lot of interpretation of Safe Harbor regulations
12 and other areas that were not abundantly clear to
13 the world -- continue to not be abundantly clear --
14 that there would have been some interpretation.  So
15 I suspect there may even be some inconsistencies in
16 certain wording choices in other provisions.  But
17 as a general rule, I'd say yes.
18     Q.  Okay.  Before we start looking at some of
19 the documents, some additional documents, sir, I'm
20 going to ask you, we've talked about today and a
21 little bit on your first day of deposition, the
22 Home Infusion business unit and its submission of

34 (Pages 491 to 494)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 495

1  claims to Medicare and Medicaid, right?
2      A.  Yes.
3      Q.  Setting aside what you've testified to
4  about compliance concerning that -- their business
5  practices with regard to the submission, I have a
6  more general series of questions about the Home
7  Infusion business model itself in terms of its --
8  the -- whether or not it complies with federal and
9  state Medicare and Medicaid fraud and abuse
10 statutes.  And I'd like to kind of go back to the
11 inception of Home Infusion.
12         Do you have an understanding as to what
13 was done or what is Abbott's understanding as to
14 what was done at the time that the Home Infusion
15 department was created to evaluate what
16 relationships with its customers were permissible
17 or impermissible under federal and state Medicare
18 and Medicaid fraud and abuse statutes?
19     MS. CITERA:  Object to the form, outside the
20 scope. I'm just going to cause you not to reveal
21 any privileged information.
22 BY THE WITNESS:

Page 496

1      A.  I don't have any.  First, I can't -- I
2  don't know when it was initiated historically to
3  know whether -- what laws were in effect that it
4  was initiated.  So I can't answer that question.
5      Q.  Did Abbott obtain any opinions concerning
6  whether or not the consignment arrangements and the
7  consignment contracts that it entered into with its
8  Home Infusion consignment partners complied with
9  federal and state Medicare and Medicaid fraud and
10 abuse statutes?
11     MS. CITERA:  Same objections and instruction.
12 BY THE WITNESS:
13     A.  '91 to 2003?
14     Q.  Yes.
15     A.  I am aware that outside counsel was
16 consulted regarding the subject matter.
17     Q.  And who was that outside counsel?
18     A.  Without -- not being absolutely certain,
19 I have heard Gardner Carton.
20     Q.  Where have you heard that?
21     A.  Oh, was it Hogan?  You know what, it may
22 have been Hogan & Hartson.  I take that back.

Page 497

1  Brian Taylor thought that he either directly or was
2  aware of consultation with Hogan & Hartson
3  regarding Home Infusion generally.  I don't know
4  that it's specifically about -- you've asked the
5  question specifically about consignment.
6      Q.  Okay.  Well, what generally was discussed
7  with Gardner Carton or Hogan & Hartson?
8      MS. CITERA:  Object to the form.  I'm going to
9  instruct you not to answer that.
10 BY THE WITNESS:
11     A.  Any conversation with counsel would have
12 been privileged.
13     MS. ST. PETER-GRIFFITH:  Do you intend to rely
14 upon any advice of counsel defense?
15     MS. CITERA:  As I stated in the deposition on
16 Wednesday, I'm not going to answer that question.
17     MS. ST. PETER-GRIFFITH:  Okay.  Well, to the
18 extent -- And we will get into it because this
19 privilege was waived in some of the documents we're
20 going to see.  We'll have to revisit this.  And to
21 the extent that Abbott intends to rely upon an
22 advice of counsel defense, this line of questioning

Page 498

1  is completely inappropriate and we object to your
2  instruction.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  What did you learn from Mr. Taylor about
5  the nature of the issues that Gardner Carton was
6  asked to address?
7      MS. CITERA:  I can give you the same
8  instruction.
9  BY THE WITNESS:
10     A.  Conversation I had with Mr. Taylor
11 pertained to whether he was aware that Abbott
12 utilized outside counsel with respect to Home
13 Infusion, and he said yes.
14     Q.  Okay.  When was -- When did Abbott
15 utilize Gardner, the Gardner firm, or Hogan &
16 Hartson?
17     A.  I believe it would be Hogan & Hartson.
18     Q.  Before you testify to that, sir, I will
19 tell you that we're going to look at opinions from
20 Gardner, the Gardner firm, so --
21     A.  My knowledge, I had heard Gardner; but I
22 didn't have direct information about that.  The

35 (Pages 495 to 498)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

| Page 499 | Page 501 |

Page 499

1  knowledge I gained through my direct conversation
2  with Mr. Taylor was Hogan & Hartson.
3      Q.  Okay.  So Mr. Taylor told you that he
4  thought it was Hogan & Hartson?
5      A.  He thought it was Hogan & Hartson,
6  correct.
7      Q.  Did he tell you who he consulted with, or
8  who he thought they consulted at Hogan & Hartson?
9      A.  Oh, he did say a name.  Does it matter?
10  I think that's --
11      MS. CITERA:  You can reveal the name.
12  BY THE WITNESS:
13      A.  Liz, Liz Dunst.  Liz -- that name, it
14  might be someone I went to school with.  A name
15  popped into my head.  I think Liz Dunst.  You can
16  check whether she was ever an attorney at Hogan &
17  Hartson.
18      Q.  Okay.  Other than Hogan & Hartson and
19  possibly Gardner Carton, is there any other outside
20  firm that Abbott consulted with concerning its Home
21  Infusion business unit or the business model for
22  it's Home Infusion business unit?

Page 501

1      Q.  Okay.  What about Arnold & Porter?
2      A.  Talking about this the other day or
3  previous that we couldn't think of the name.  It
4  was a big shot there.
5      Q.  Okay.
6      A.  If you ask them, that probably doesn't
7  narrow the list very much but ... I don't recall.
8      Q.  Okay.  Any other outside legal counsel
9  that the legal department within Abbott may have
10  consulted or that HPD -- Well, let me ask you,
11  could anyone at HPD contact outside counsel without
12  contacting the legal department?
13      A.  They should not have.  They could clearly
14  do it because they could pick up the phone and make
15  a call, but that would not have been viewed very
16  favorably.
17      Q.  Are you familiar with the Medicare
18  Working Group?
19      A.  If my recollection is correct from this
20  morning, it's referenced in this document, this
21  compliance program from '99.  But that's the first
22  time I have heard that term used.

Page 500

1      A.  Not to my knowledge about Home Infusion.
2  As I stated Wednesday, we worked with Reed Smith in
3  the time frame that I was actively involved in the
4  practice on general compliance, healthcare
5  compliance matters.
6      Q.  Actually, thank you for reminding me of
7  that because I did have a follow-up question.
8  Other than Reed Smith, was there any other law firm
9  that Abbott HPD worked with on general compliance
10  matters?
11      A.  It wouldn't have been HPD.  It would have
12  been the legal department.
13      Q.  Okay.  Then the legal department.
14      A.  I testified Wednesday that Reed Smith,
15  Mayer Brown, and Arnold & Porter.
16      Q.  And who did you work with at Reed Smith?
17      A.  Gordon Schatz and Joe Metro.
18      Q.  Who did you work with at Mayer Brown?
19  And when I say "you," I mean Abbott.
20      A.  Abbott.  It probably is not an exhaustive
21  list.  Rob Jenkins and Katherine Kusske, K U S S K
22  E.

Page 502

1      Q.  Is Abbott aware of any lawyers who served
2  on the Medicare Working Group?
3      MS. CITERA:  Object to the form, outside the
4  scope.
5  BY THE WITNESS:
6      A.  I can't answer that because I wasn't --
7  having not been aware of the existence of it, I
8  don't know who the membership would have been.
9      Q.  Sir, what -- And I understand this might
10  be in your personal capacity.
11      A.  Okay.
12      Q.  What was your understanding of the nature
13  of the business model for Home Infusion?
14      MS. CITERA:  Object to the form, outside the
15  scope.
16  BY THE WITNESS:
17      A.  Boy, that's a very broad question.  What
18  was -- I don't know how to even start to answer
19  that question.
20      Q.  Okay.  Well, what did you understand was
21  the nature of how the Home Infusion business model
22  operated in terms of its contracts with its

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 503

1  customers?
2      MS. CITERA:  Object to the form, beyond the
3  scope.
4  BY THE WITNESS:
5      A.  I'm aware of several different
6  contractual structures that existed, both direct
7  sales of products and services to -- to a customer
8  where they would pay a contract price, say, some
9  price had been negotiated between the parties for
10 those products and/or services. And I'm aware of a
11 revenue-sharing arrangement where Abbott provided
12 -- and it probably came in all flavors of what
13 services and which products were provided to any
14 given customer; but it provided services and
15 products to customers for a negotiated -- at the
16 time of the contract, a negotiated percentage of
17 revenue received by the customer.
18     Q.  Okay. And are those the only two models
19 that you're familiar with?
20     A.  Yes.
21     MS. CITERA:  Same objections, instructions.
22 Same objections, sorry.

Page 504

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Well, I'm trying to lay the foundation
3  for the discussion of the -- you know, of
4  compliance in this area.
5          Did Abbott ever -- Did Abbott Home
6  Infusion ever enter into any joint venture
7  arrangements with its Home Infusion customers?
8      MS. CITERA:  Object to the form. Object to
9  the scope, outside the scope.
10 BY THE WITNESS:
11     A.  I have seen documentation that referred
12 to that term. I believe it's used by -- It's used
13 by businesspeople in a non-legal way, and I'm not
14 certain that the arrangements that it refers to
15 necessarily qualify from a legal perspective as a
16 joint venture.
17     Q.  Well, could the Home Infusion unit enter
18 into a joint venture arrangement without the
19 involvement of the legal department?
20     A.  Could.
21     Q.  It could? Should it have?
22     A.  I mean --

Page 505

1      MS. CITERA:  Objection to form, outside the
2  scope.
3  BY THE WITNESS:
4      A.  The scope, the breadth of the question,
5  anything is possible. The practice was that
6  contractual -- there were templates, contract
7  templates that existed that, in all of the
8  businesses, that the Contract Marketing would work
9  with. And to the extent they were -- contracts
10 were consistent with contract templates that had
11 been reviewed and approved by legal in the past, we
12 -- contracts could be entered into that we wouldn't
13 know were entered into because they were consistent
14 with templates that had been provided. Again, there
15 were thousands of contracts that Contract Marketing
16 -- not necessarily in Home Infusion, but --
17     Q.  Okay. I understand. And I want to
18 differentiate. Right now I'd just like to talk
19 about Home Infusion.
20     A.  Okay. Same answer regarding templates.
21 Templates were provided -- I'm sorry, did you want
22 to object?

Page 506

1      MS. CITERA:  No.
2      THE WITNESS:  I talked over you previously.
3  BY THE WITNESS:
4      A.  Templates were provided to Home Infusion.
5  It is conceivable that contracts were entered into
6  that were consistent with those templates that
7  would not have been reviewed by legal.
8      Q.  Okay.
9      A.  The expectation would be if the contracts
10 deviated from those templates -- and I qualify
11 that, meaningfully deviate -- if, you know, it was
12 a choice of law provision, someone wanted New York
13 and it said Illinois, that they wouldn't
14 necessarily come to legal to resolve that
15 difference. But business folks were -- understood
16 that material deviations from the template needed
17 to be reviewed by legal.
18     Q.  Is it Abbott's position that it could
19 enter into joint venture arrangements -- and I'm
20 just talking about joint venture arrangements right
21 now. We're going to move on to the other types of
22 business models. But is it Abbott's position that

37 (Pages 503 to 506)

Chicago, IL

Page 507

1 it could enter into joint venture arrangements with
2 its Home Infusion customers and still comply with
3 federal and state Medicare and Medicaid fraud and
4 abuse laws?
5     MS. CITERA:  Object to the form, outside the
6 scope.
7 BY THE WITNESS:
8     A.  I believe you're asking me for a legal
9 conclusion.
10     Q.  No, I'm asking for Abbott's position.
11     A.  But whether something was legal?
12     Q.  No, I'm asking for Abbott's position
13 whether or not -- You've testified repeatedly
14 Abbott always complied with Medicare and Medicaid
15 fraud and abuse laws.
16     A.  Right.
17     Q.  If Abbott always complied with Medicare
18 and Medicaid fraud and abuse laws, if it entered
19 into joint venture arrangements, is it fair to say
20 that Abbott viewed joint venture arrangements
21 between Abbott's Home Infusion business unit and
22 those customers as being in compliance with federal

Page 508

1 and state Medicare and Medicaid fraud and abuse
2 laws?
3     MS. CITERA:  Objection to the form, outside
4 the scope.
5 BY THE WITNESS:
6     A.  I believe you're asking me to evaluate
7 whether a factual pattern, fact pattern of Abbott
8 entering into a contract with a customer that is
9 being described as a joint venture, whether that
10 structure violates the statute.  And I believe
11 that's asking me to apply a fact pattern against a
12 set of laws and reach a legal conclusion whether
13 it's in compliance or not in compliance.
14     Q.  Is it possible that a joint venture
15 arrangement between the -- Well, let me ask you,
16 would Abbott enter into a joint venture arrangement
17 with its Home Infusion customers or a Home Infusion
18 customer if such arrangement violated federal and
19 state Medicare and Medicaid fraud and abuse
20 statutes?
21     MS. CITERA:  Object to the form.  Object to
22 the scope, outside the scope.

Page 509

1 BY THE WITNESS:
2     A.  As I understand the assumptions made in
3 the question, we're assuming that a joint venture
4 arrangement and a legal joint venture versus a
5 marketing description of a joint venture, assuming
6 that a legal joint venture would violate the fraud
7 and abuse statutes, it would not be Abbott's
8 practice to violate the statutes.
9     Q.  Did anyone at Abbott ever do an
10 evaluation as to whether or not joint venture
11 arrangements that it entered into with its Home
12 Infusion clients were in compliance with federal
13 and state Medicare and Medicaid fraud and abuse
14 statutes?
15     MS. CITERA:  Objection to the form.  I also
16 caution you not to reveal any privileged
17 information.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  And I include -- I'm sorry.
20     MS. ST. PETER-GRIFFITH:  Were you finished,
21 Toni.
22     MS. CITERA:  Yeah.

Page 510

1 BY MS. ST. PETER-GRIFFITH:
2     Q.  I include within that also the Stark
3 statutes as well.
4     MS. CITERA:  Same objections.  Are you done?
5     MS. ST. PETER-GRIFFITH:  Yeah.  I'm sorry.
6     MS. CITERA:  Same objection, same instruction.
7 BY THE WITNESS:
8     A.  I believe the -- your question again is
9 assuming a legal conclusion that arrangements that
10 Abbott entered into were, in fact, joint -- legal
11 joint ventures --
12     Q.  Okay.
13     A.  -- to the extent -- I am aware that the
14 subject matter was reviewed in the context of a
15 particular customer in relationship to a tax
16 matter. And in reviewing the letter, it strikes me
17 that an analysis would likely have been made to
18 reach the conclusions that are reached in the
19 letter.
20     Q.  Okay.  What letter are you talking about?
21     A.  Ingalls.
22     Q.  Okay.

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 511

1      A.  I don't know the -- There was a letter
2  involving that customer.  I don't remember the time
3  line, mid '90s.
4      Q.  When did you review this letter?
5      A.  I reviewed this before my testimony on
6  Wednesday.
7      Q.  Are there any other documents that you
8  reviewed in preparation for your testimony that we
9  haven't talked about?
10      A.  I reviewed a letter from a customer to
11  Abbott and a response from Abbott to that customer
12  that may have been a follow-up from the -- I don't
13  remember if there was a third letter in that
14  series.
15      Q.  Who was the customer?
16      A.  Ingalls.
17      Q.  Okay.  So all these documents pertain to
18  Ingalls?
19      A.  All these documents, right, pertain to
20  that issue raised by Ingalls.
21      Q.  Well, so Ingalls raised an issue about --
22  a legal issue, about the relationship with -- about

Page 512

1  its contractual relationship with Abbott?
2      A.  Its concern about a legal issue that they
3  understood to exist.
4      Q.  And it was your understanding that that
5  pertained only to a tax matter?
6      A.  The predicate -- The underlying concern
7  that they had was the -- as I -- and my
8  recollection of the content of that letter was they
9  were concerned that -- that the 501(c)(3) tax
10  exempt laws were -- had changed, the regulations
11  had changed.  There was some interpretation.  I
12  don't remember what happened or they became aware
13  of -- I don't know, something with regard to that
14  tax scheme that suggested that joint ventures that
15  a 501(c)(3), not-for-profit corporation entered
16  into, to the extent that they had entered into a
17  joint venture and there was a failure to comply
18  with law, broad, general -- to my knowledge, it did
19  not -- I did not read the tax issue, the tax laws
20  that were supporting this position, that failure to
21  comply with laws in that joint venture could cause
22  the not-for-profit to lose its 503 -- 501(c)(3)

Page 513

1  status.
2      Q.  501(c)(3)?
3      A.  501(c)(3).
4      Q.  Okay.
5      A.  Which -- however the numbers go.
6      Q.  With regard -- Are you aware of any other
7  evaluation of whether or not the Home Infusion
8  arrangements that were joint venture arrangements
9  were in compliance with federal and state Medicare
10  and Medicaid fraud and abuse statutes?
11      MS. CITERA:  I'm sorry.  Could you re-read
12  that question?
13      (Record read as requested.)
14      MS. CITERA:  Objection to the form, outside
15  the scope.  I'm going to caution you not to reveal
16  any privileged communications.
17  BY THE WITNESS:
18      A.  Again, I think your question is assuming
19  that the relationships were, in fact, joint
20  ventures.  You're stating a legal conclusion in
21  your question, so I ...
22      Q.  Well, sir, I'll represent to you that

Page 514

1  there are clearly documents that Abbott has
2  produced that state that they are joint venture
3  arrangements.  Is it your testimony that Abbott
4  never -- Abbott's Home Infusion department never
5  entered into a legal joint venture with one of its
6  customers?
7      MS. CITERA:  Objection to the form, outside
8  the scope.
9  BY THE WITNESS:
10      A.  I can't say that they never did.  But
11  you're stating they did, and that's a different --
12  those are different conclusions.
13      Q.  Well, if on the face of the document it
14  says this arrangement is a joint venture
15  arrangement --
16      A.  Which document would that --
17      MS. CITERA:  Well, is there a question?
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Well, yeah.  I'm representing to you that
20  Abbott has produced and we have volumes of
21  different varying contracts to various contracts
22  from Home Infusion, some of which say that they are

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 515

1   joint venture arrangements.
2       MS. CITERA:  Object to the form, outside the
3   scope.
4   BY THE WITNESS:
5       A.  Okay.  I have not reviewed those
6   contracts. If there was a -- if there was a
7   contract on its face that described the
8   relationship between a customer and Abbott as a
9   joint venture, I would -- I can't state today that
10  that would not be accurate.
11      Q.  Let's talk about the -- Well, what was
12  done to evaluate, if anything at all at Abbott,
13  what was done to evaluate whether joint venture
14  arrangements between Home Infusion and Home
15  Infusion's customers were in compliance with
16  federal and state Medicare and Medicaid fraud and
17  abuse statutes?
18      MS. CITERA:  Objection to the form.  I caution
19  you not to reveal any privileged communications.
20  BY THE WITNESS:
21      A.  Other than the communication with Hogan &
22  Hartson on the Ingalls matter or whichever outside

Page 516

1   counsel ended up providing legal counsel on that
2   matter, I'm not aware specifically of any
3   evaluation that was made to determine whether a
4   joint venture -- whether the relationships were
5   joint ventures and whether a joint venture would
6   violate healthcare compliance statutes.
7       Q.  Did Abbott act upon the advice of its
8   counsel?
9       MS. CITERA:  Objection to the form.  You're
10  asking for a legal conclusion here.
11      MS. ST. PETER-GRIFFITH:  No.  I'm -- Let me
12  rephrase the question then.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  After Hogan & Hartson or whichever law
15  firm it was that provided the legal advice provided
16  legal advice to Abbott, what did it do with regard
17  to its arrangement or contractual relationship with
18  Ingalls?
19      MS. CITERA:  Object to the form, outside the
20  same. Same caution with regard to the privilege.
21  BY THE WITNESS:
22      A.  Without disclosing what the conversations

Page 517

1   were and what the advice was, Abbott responded to
2   the letter from Ingalls with a response that
3   challenged its conclusions.
4       Q.  Challenged whose conclusions?
5       A.  Ingalls' conclusions.
6       Q.  What was the ultimate result of that
7   series of communications with Ingalls?
8       MS. CITERA:  Same objections and instruction.
9   BY THE WITNESS:
10      A.  The last -- There must have been a third
11  communication because the last communication I
12  recall seeing was a letter from Ingalls terminating
13  the contract.
14      Q.  Did that particular exchange with Ingalls
15  raise any concerns within Abbott that maybe it
16  should evaluate its Home Infusion operation to see
17  whether or not it may violate federal and state
18  Medicare and Medicaid fraud and abuse statutes?
19      MS. CITERA:  Objection to the form, outside
20  the scope.  And I caution you not to reveal any
21  privileged communications or analysis.
22  BY THE WITNESS:

Page 518

1       A.  As I stated, I believe as I've been
2   advised through conversations, that we did consult
3   outside counsel as a result or in -- or directly as
4   a result and in real time to the issue being raised
5   by Ingalls. The subject matters of those
6   conversations and any advice or opinions given
7   during those conversations would be privileged.
8       Q.  Okay.  But my question is, after Ingalls
9   terminated the contract, did Abbott say, "Hey, we
10  need to evaluate whether or not our -- these
11  arrangements that we have are in compliance with
12  federal and state Medicare and Medicaid fraud and
13  abuse statutes"?
14      MS. CITERA:  Same objections, same
15  instruction.
16  BY THE WITNESS:
17      A.  I don't know that -- having a --
18  responded to Ingalls assertions stating that we did
19  not agree with their legal conclusions, the fact
20  that Ingalls was concerned, I don't know that it --
21  and for whatever reasons it was concerned, stated
22  or otherwise, to cause it to terminate the

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 519

1  contract, that we took further action or further
2  evaluation after their response terminating.
3      Q.   Well, did -- Let me ask you this: What
4  is your understanding of Abbott's revenue-share
5  arrangements?
6      MS. CITERA:  Object to the form, outside the
7  scope.
8  BY THE WITNESS:
9      A.   In Home Infusion?
10     Q.   In Home Infusion, yeah.  All these
11  questions pertain to Home Infusion.
12     MS. CITERA:  Same objections.
13  BY THE WITNESS:
14     A.   I believe I testified to this last
15  Wednesday. My understanding of the revenue-share
16  structure was that Abbott would provide products
17  and/or services to a customer and, in compensation
18  for those products and/or services, Abbott would be
19  compensated a pre-negotiated percentage, varying
20  percentages, as I recall, depending on what the
21  therapies were involved, the percentage of revenue
22  collected by the customer.

Page 520

1      Q.   When Abbott provided the services to its
2  revenue-share customers, how did it identify the
3  fair market value for each service provided with
4  regard to each patient?
5      MS. CITERA:  Objection.
6  BY THE WITNESS:
7      A.   I don't know the answer --
8      MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.   I'm sorry.  Sorry, sorry.  I don't know
11  the answer.  Were you done?
12     MS. CITERA:  Go ahead.
13  BY THE WITNESS:
14     A.   Yes, I don't know the answer to that.
15     Q.   Well, did Abbott undertake any
16  methodology for identifying the fair market value
17  of the individual services provided pursuant to the
18  revenue-share contracts?
19     MS. CITERA:  Objection to the form, outside
20  the scope.  I also caution you not to reveal any
21  privileged communications or analysis.
22  BY THE WITNESS:

Page 521

1      A.   I have no direct knowledge that any --
2  any activity did or did not occur.  I don't know
3  that they didn't, but I don't know that they did.
4      Q.   What did you do to review materials
5  reasonably available to Abbott to make that inquiry
6  in preparation for your testimony here today?
7      A.   I had conversations with Mike Sellers and
8  Ginnie Tobiason and Brian Taylor more broadly about
9  Home Infusion business.  I did not ask that
10  particular -- I did not ask a question along the
11  lines you're asking that would have elicited a
12  response.
13     Q.   Why didn't you investigate that?
14     MS. CITERA:  Object to the form.
15  BY THE WITNESS:
16     A.   No, I don't have an answer to that.
17     Q.   What did Abbott -- With regard to its
18  revenue-share -- I'm getting away from joint
19  venture arrangements, possible joint venture
20  arrangements.  With regard to its revenue-share
21  arrangements -- First, let me ask you, are the
22  revenue-share arrangements distinguishable from the

Page 522

1  direct sales because Abbott consigns the products
2  under the revenue-share arrangements as opposed to
3  just charging a price and selling them under the
4  direct sales arrangements?
5      MS. CITERA:  Object to the form, outside the
6  scope.
7  BY THE WITNESS:
8      A.   Without getting into specific contracts,
9  generally I'd say that would be one distinction.
10     Q.   Are there any other distinctions between
11  the direct sale arrangements and the revenue-share
12  arrangements?
13     MS. CITERA:  Same objections.
14  BY THE WITNESS:
15     A.   There could be in terms of payment
16  timing. There could be in terms of documentation
17  produced, in terms of -- if there was audit rights.
18  You know, there's any number of provisions that
19  could be different.
20     Q.   Okay.  Well, under the direct sales
21  arrangements, would Abbott identify a price for its
22  product?

41 (Pages 519 to 522)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Page 523

1    A.  Presumably --
2    MS. CITERA:  Objection to form, outside the
3  scope.
4  BY THE WITNESS:
5    A.  Presumably, yes.
6    Q.  Under the revenue-share arrangements,
7  would Abbott contractually identify a price that it
8  was charging for the products that it was
9  consigning to the revenue-share contracts, other
10 than the percentage of collections?
11    MS. CITERA:  Same objections.
12 BY THE WITNESS:
13    A.  To my understanding, there would -- there
14 would not be a specific -- I don't know whether
15 percentages, whether this was back-up data provided
16 with an agreed-upon percentage that demonstrated
17 how you got to that percentage.  But the payment,
18 to my knowledge of revenue share, would have
19 reflected a percentage of revenue collected by the
20 customer and not a -- necessarily a direct cost of
21 -- it wouldn't have been -- wouldn't have been
22 recited in terms of direct cost of the product.

Page 524

1    Q.  Okay.  And in terms of how the revenue
2  consignments worked, Abbott would provide at its
3  cost product to the revenue-share partner, right?
4    MS. CITERA:  Objection to the form, outside
5  the scope.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  It would deliver product to the
8  revenue-share partner?
9    A.  You said revenue consignment.  You mean
10 product consignment?
11    Q.  I'm sorry.  Product consignment, yes.
12    MS. CITERA:  Same objections.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.  It would, you know --
15    A.  Revenue consignment would be a bank.
16    Q.  Abbott to its revenue-share partners or
17 can we call them consignment partners?  Other
18 witnesses is that fair?
19    A.  That's fine.
20    Q.  For its consignment partners, as I
21 understand the --
22    A.  When you say customers, is that partners?

Page 525

1    Q.  They're called partners, that's why.  And
2  that's what --
3    A.  Other businesspeople --
4    Q.  That's not my term.
5    A.  Those are businesspeople talking in
6  marketing terms.
7    Q.  Okay.  In terms of its consignment
8  partners, Abbott would provide product at its cost
9  to the partners; that's the first step, right?
10    MS. CITERA:  Object to the form, outside the
11 scope.
12 BY THE WITNESS:
13    A.  As I understand it, they would provide --
14 they would provide product to these customers on a
15 consignment basis, yes.
16    Q.  How would Abbott track the fair market
17 value of the individual product provided to the
18 consignment partners and communicate that
19 information to the consignment partners, if at all?
20    MS. CITERA:  Objection to the form, outside
21 the scope.
22 BY THE WITNESS:

Page 526

1    A.  I do not know whether they communicated a
2  fair market value to the customers on a
3  product-by-product, service-by-service basis.  The
4  contract -- Again, I don't know whether the
5  contract, when there was the percentage agreed to
6  between the parties would have reflected back-up
7  information, pricing, and other information that
8  demonstrates why the percentage is what it is.  In
9  terms of identifying how would they know what fair
10 market value is, my opinion is that if you're in
11 the market selling these products and it's your
12 business, that someone in that business has an
13 appreciation of fair market value.
14    Q.  Well, did the contractual -- did the
15 contracts, did the revenue-share contracts in any
16 way establish a fair market value price for the
17 individual product given to the consignment
18 partners on a consignment basis?
19    MS. CITERA:  Objection to the form, outside
20 the scope.
21 BY THE WITNESS:
22    A.  Again, I'm -- All my testimony is about

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                     March 20, 2008

Chicago, IL

Page 527

1  my understanding of the structure.  It is not about
2  a given contract.  So this question seems to be
3  more specific about the contracts, and I can't
4  answer that.  I don't know.
5      Q.  Abbott under its consignment
6  partnerships, for its revenue, would only collect a
7  percentage of revenue that was collected from the
8  consignment partner, right?
9      MS. CITERA:  Objection to form.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Collected by the consignment party from
12 third-party payors; is that fair?
13     MS. CITERA:  Objection to the form, outside
14 the scope.
15 BY THE WITNESS:
16     A.  My understanding is that -- I object to
17 the term.  So the consignment customer would pay --
18 would be obligated to pay Abbott a pre-negotiated
19 overall percentage of revenue collected by that
20 customer.
21     Q.  And when you say "overall percentage," do
22 you mean that it would not be on a

Page 528

1  patient-by-patient basis; it would just be
2  collections based on particular therapies?
3      MS. CITERA:  Object to the form, outside the
4  scope.
5  BY THE WITNESS:
6      A.  That is my understanding, that it was --
7  the percentage of revenue share was -- may have
8  been differentiated on a therapies basis.
9      Q.  How did Abbott track and communicate the
10 fair market value that it charged for that
11 consigned product on an individual patient basis,
12 if at all?
13     MS. CITERA:  Objection to the form, outside
14 the scope.
15 BY THE WITNESS:
16     A.  I don't know whether the contracts
17 reflected individual pricing calculations that
18 would have been back-up in support of a
19 revenue-share percentage.
20     Q.  Okay.  If Abbott -- or until the point in
21 time that Abbott receives a collection back from
22 the -- or a percentage back from the revenue-share

Page 529

1  partner, up to that point in time, Abbott would
2  provide under the revenue share agreements its
3  product basically for free, meaning the
4  revenue-share partner would not have to pay for it
5  until such time as the revenue was collected; is
6  that fair?
7      MS. CITERA:  Object to the form, outside the
8  scope.
9  BY THE WITNESS:
10     A.  I would not describe it as a "provided
11 for free."  It was provided with an accrued
12 obligation.
13     Q.  Okay.  But until that obligation accrued
14 and the reimbursement was made and Abbott collected
15 a percentage of that reimbursement, they -- the
16 consignment partner would not have any obligation
17 to pay for the product that was -- that was
18 consigned to it; is that fair?
19     MS. CITERA:  Objection to the form, outside
20 the scope.
21 BY THE WITNESS:
22     A.  My understanding of the hypothetical fact

Page 530

1  pattern that you described is that that product
2  would sill be sitting in somebody's warehouse not
3  having been used yet, so there would be no
4  obligation to pay for it.
5      Q.  Okay.  What about at the point in time
6  that it is utilized by the revenue-share partner
7  for therapies provided to clients?  Let's say you
8  know, you've got ten bags of saline solution; you
9  use them with a particular patient.  At what point
10 in time does the consignment partner pay the price
11 that Abbott is charging for those particular bags
12 of saline, for example?
13     MS. CITERA:  Object to the form.  I think this
14 whole line of questioning is asking for him to do a
15 legal analysis.  I'm also objecting it's outside
16 the scope.
17     MS. ST. PETER-GRIFFITH:  I'm just asking when
18 Abbott is providing -- I'm sorry.  Were you done
19 with your objection?
20     MS. CITERA:  Yeah.  You got it all, right?
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  I'm just asking at what point in the

43 (Pages 527 to 530)

Chicago, IL

Page 531

1    consignment relationship does Abbott, if at all,
2    does Abbott charge for the individual product
3    dispensed to the revenue-share's partner's clients.
4       MS. CITERA:  Same objections.
5    BY THE WITNESS:
6       A.  Could you -- I'm sorry.  Could you repeat
7    that question?
8          (Record read as requested.)
9       MS. CITERA:  Same objections.
10   BY THE WITNESS:
11      A.  If I'm hearing your question correctly,
12   Abbott would not charge the end user of the
13   product.
14      Q.  Okay.  When Abbott -- When the
15   consignment partner utilizes Abbott product for
16   providing therapies to its patients, at that point
17   in time -- so they go in, they provide the therapy,
18   the saline is used -- at that point in time has --
19   does the revenue-share partner pay for the product?
20      MS. CITERA:  Objection to the form, outside
21   the scope.
22   BY THE WITNESS:

Page 532

1       A.  And without -- Any number of the
2    contracts could be different.  Without having read
3    the contracts, my understanding of the -- of the
4    structure is that Abbott would not be paid upon the
5    use; it would be paid upon the collection.
6       Q.  That's my question.  Now, is it paid upon
7    the individual -- the collection from individual
8    patients once -- from -- once their third-party
9    payors -- or is it just in the aggregate, the total
10   collections received by the revenue-share partners?
11      MS. CITERA:  Object to the form, outside the
12   scope.
13   BY THE WITNESS:
14      A.  I'm going to have to speculate on that,
15   because that's -- I have no recollection of how the
16   contract provided, from a timing mechanism, whether
17   it was on a quarterly basis of all revenues
18   collected, whether it was monthly.  I don't know
19   the answer to that specifically.
20      Q.  Okay.  Well, let me ask it a different
21   way:  If the reimbursement department on behalf of
22   Abbott Home Infusion submits a bill for its

Page 533

1    revenue-share contract for a particular patient for
2    particular therapy with a third-party payor,
3    whether it be Medicare, Medicaid -- well, let's say
4    it's a Medicaid patient, okay, and Medicaid does
5    not pay for the product, meaning they reject the
6    claim, what is the price charged, if there is a
7    price charged?  What is the price charged for that
8    product that is used by that patient if
9    reimbursement is denied?
10      MS. CITERA:  Object to the form, outside the
11   scope. I mean, I just want to get on the record
12   that he is not here to testify about the Home
13   Infusion business and business practices or to
14   interpret the agreements.
15   BY THE WITNESS:
16      A.  Especially since I have not seen the
17   agreements.  Again, I think the answer to that
18   question could vary depending on the individual
19   contract provided.
20      Q.  Well, isn't the risk that Abbott helps
21   bear in these revenue-share agreements the risk of
22   nonpayment so Abbott will provide -- will say,

Page 534

1    "We're not going to charge you for those patients
2    for whom you don't receive reimbursement for
3    whatever reason"?
4       MS. CITERA:  Same objections.
5    BY THE WITNESS:
6       A.  I'm recalling testimony from somebody's
7    deposition, it may have been Mike Sellers', that in
8    that scenario, nobody has paid for anything.
9       Q.  Okay.
10      A.  The reimbursement -- Medicare, in your
11   example Medicare has not paid, they denied
12   coverage.  So they did not pay for the product that
13   they, Medicare/Medicaid recipient used.
14      Q.  Okay.  And the --
15      MS. CITERA:  Were you done with your answer?
16      THE WITNESS:  Nodding.
17   BY MS. ST. PETER-GRIFFITH:
18      Q.  And would then Abbott sort of -- Would
19   Abbott have to then eat the cost of the product
20   that it provided for that patient?
21      MS. CITERA:  Same objections.
22   BY THE WITNESS:

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 535

1      A.  Based on my recollection of the testimony
2   that I'm recalling, in that fact pattern, if there
3   was no reimbursement -- if reimbursement was
4   denied, there would be no revenue to share; so
5   Abbott would be out the cost of that product.
6      Q.  Okay.
7      MS. ST. PETER-GRIFFITH:  Is now a good time to
8   break for lunch?
9      MS. CITERA:  Sure.  I'm hungry.
10     THE VIDEOGRAPHER:  Going off the record at
11  12:07 p.m.
12         (A lunch break was had.)
13     THE VIDEOGRAPHER:  Beginning Videotape No. 4
14  in the deposition of Mr. Fishman.  We're back on
15  the record at 12:59 p.m.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Welcome back, Mr. Fishman.
18     A.  Thank you.
19     Q.  What I'd like to do is you've already
20  segregated out the compliance program, a component
21  part of what I believe is Exhibit -- is it 9 or 8?
22     A.  You know, I don't know which pile it came

Page 536

1   from honestly.
2      Q.  I think it came from that pile.
3      A.  This would be 10 if it came from this
4   pile.
5      Q.  Yeah.
6      MS. CITERA:  Did you, Ann, get on the record
7   the Bates numbers, just so we --
8      MS. ST. PETER-GRIFFITH:  Sure.
9   BY MS. ST. PETER-GRIFFITH:
10     Q.  You know, why don't we do that, sir.
11     A.  I think I did.  But it's 0 -- this is the
12  Abbott Laboratories Inc., Home Infusions Services,
13  Reimbursement Operations.
14     Q.  That one you did.  I'm talking about the
15  general Bates ranges of each of these packages.
16     A.  Oh, I'm sorry.
17     Q.  I think Ms. Citera is right.  I don't
18  think we did that before.
19     A.  Okay.  Exhibit 8 would be 0395435 through
20  0395586.
21     Q.  Okay.
22     A.  Exhibit 9 would be --

Page 537

1      Q.  There are no Bates numbers on that.  It's
2   just the Bates numbers on the disk.
3      A.  And then Exhibit 10 is 0397104, 0398285.
4      Q.  Okay.  If you could take the compliance,
5   what you've got in your hand -- There you go.  Sir,
6   have you had an opportunity to read this document?
7      A.  I read it this morning briefly before our
8   -- my deposition started.
9      Q.  Okay.  What I'd like to do is ask you a
10  few questions about some of the representations in
11  here?
12     A.  Okay.
13     Q.  With an understanding that none of us in
14  this room may be familiar with this document.  If
15  you could turn to the introduction page where it
16  says, "Compliance Program," I believe it's the
17  third page.
18     A.  Yes.  Page 1.
19     Q.  Says Page 1 at the bottom?
20     A.  Yes.
21     Q.  Sir, if you could flip to, flip to -- if
22  you could refer to the second paragraph?

Page 538

1      A.  The relationship?
2      Q.  The relationship, yes.  It says it's
3   deeper than merely providing a billing service.  Do
4   you see that?
5      A.  I do.
6      Q.  There's a sentence in the middle of that
7   paragraph that begins, "It is essential that Home
8   Infusion Services staff operate in strict
9   compliance with all federal and state laws,
10  regulations, and guidelines to obtain the maximum
11  legally allowable reimbursement for their clients."
12  Do you see that?
13     A.  I do.
14     Q.  What does that mean?
15     MS. CITERA:  Objection to the form, outside
16  the scope.
17  BY THE WITNESS:
18     A.  Reading -- Reading the words and taking
19  them at their face value, it's -- it says that Home
20  Infusion Services is to operate in strict
21  compliance with laws and that we should work to
22  provide clients with the most reimbursement that

Henderson Legal Services, Inc.

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 539

1  they can without violating laws.
2      Q.  Okay.  How did the Home Infusion
3  reimbursement department do that?
4      MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6      A.  I don't know.
7      Q.  Other than what you've testified to
8  earlier today, because I know that we touched upon
9  this topic, are you aware of any particular -- or
10  is Abbott aware of any particular procedures or
11  programs that Abbott Home Infusion reimbursement
12  implemented to ensure that in submitting claims to
13  Medicare and Medicaid, its reimbursement department
14  was acting in full compliance with federal and
15  state Medicare and Medicaid fraud and abuse laws?
16     MS. CITERA:  Objection to the form.
17  BY THE WITNESS:
18     A.  I have nothing to add to my prior
19  testimony.
20     Q.  If Abbott's Home Infusion reimbursement
21  department submitted claims to Medicare and
22  Medicaid based on inflated AWPs -- when I say

Page 540

1  "inflated," I mean AWPs that exceed the -- that
2  exceed the contract price for the product by 50 to
3  a thousand percent -- would that be in compliance
4  with federal and state Medicare and Medicaid fraud
5  and abuse statutes?
6      MS. CITERA:  Objection to the form, outside
7  the scope.
8  BY THE WITNESS:
9      A.  I believe the form of your question asks
10  me to reach a legal conclusion, which is to apply a
11  set of facts about how we go about doing
12  reimbursement and what the content of the claim is
13  and then apply it against the laws, healthcare
14  compliance laws and reach a conclusion about being
15  in compliance.
16     Q.  Well, I mean it says -- This document
17  says that Home Infusion is supposed to operate in
18  strict compliance.
19     A.  Correct.
20     Q.  And my question is, if it submits claims
21  to Medicare and Medicaid based upon an inflated AWP
22  spread, how is that consistent with what is

Page 541

1  required for strict compliance as set forth in this
2  document?
3      MS. CITERA:  Same objections.
4  BY THE WITNESS:
5      A.  I believe the basis of your question is
6  for me to conclude -- would be for me to conclude
7  -- make a legal conclusion that providing AWP
8  prices in a reimbursement claim would not be in
9  strict compliance with the federal laws, and that's
10  a legal conclusion.
11     Q.  Well, my question is how -- Well, how
12  does Abbott know it was following the laws if it
13  submitted reimbursement claims based upon inflated
14  AWPs?
15     MS. CITERA:  Objection to the form, outside
16  the scope.
17  BY THE WITNESS:
18     A.  Same answer as I've given before in terms
19  of how they -- how they work to adhere to be in
20  compliance with laws.
21     Q.  If Abbott did not disclose on the claim
22  reimbursement forms that it stated to Medicare and

Page 542

1  Medicaid that the product it was providing to its
2  Home Infusion revenue-share customers was on a
3  consignment basis, did Abbott have a concern about
4  compliance?
5      MS. CITERA:  Objection to the form, outside
6  the scope.
7  BY THE WITNESS:
8      A.  Abbott -- Abbott always had a concern
9  about being in compliance, and it sought to be in
10  compliance. I think that was the question you
11  asked, so yeah.  They would be -- They would be
12  concerned and would want to be in compliance with
13  laws generally.
14     Q.  Would they -- In Abbott's view, is it
15  acceptable and within its compliance requirements,
16  it's own internal compliance standards and
17  requirements, that all federal and state laws be
18  adhered to if Abbott failed to disclose on claims
19  it submitted to Medicare and Medicaid that product
20  for which it was billing was provided to the Home
21  Infusion revenue-share client on a consignment
22  basis?

Henderson Legal Services, Inc.

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 543

1      MS. CITERA:  Objection to the form, outside
2  the scope.
3  BY THE WITNESS:
4      A.  I believe the question you're asking me
5  requires me to reach a legal conclusion as to
6  whether the contractual structure of -- that you're
7  referring to would be in compliance with healthcare
8  compliance laws.
9      Q.  That's not the question that I'm asking.
10  I'm not asking about the contractual arrangement.
11  I'm asking about the claim submission.
12      In order to adhere to what is identified
13  here as the strict compliance requirement, should
14  Abbott's Home Infusion department disclose on the
15  Medicare and Medicaid reimbursement claim forms
16  that it is providing product to its customer on a
17  consignment basis?
18      MS. CITERA:  Objection to the form, outside
19  the scope.
20  BY THE WITNESS:
21      A.  I hear that question as asking me to
22  determine if Abbott should do something to be in

Page 544

1  compliance with the law is a legal conclusion.  And
2  if they should do it, they would be or wouldn't be.
3  And if they didn't do it they would or wouldn't be
4  is a legal conclusion.
5      Q.  But Abbott's own -- I'm talking about
6  complying with this particular policy that's laid
7  out here within Abbott.
8      A.  But the predicate --
9      MS. CITERA:  Same objections.
10  BY THE WITNESS:
11      A.  Sorry.  The predicate to the compliance
12  program is being in compliance with the laws.  And
13  to be outside the compliance program, you have to
14  conclude that you're not in compliance with the
15  law.  And the question you're asking me essentially
16  is, was Abbott in compliance with the law in this
17  particular practice.  And I have the same answer to
18  that, which is that is a legal conclusion which I'm
19  not prepared to address.
20      Q.  Well, did Abbott have any doubts that by
21  failing to disclose -- did Abbott have any doubts
22  about whether, if it failed to disclose -- Strike

Page 545

1  that.
2      Did Abbott have any concerns about not
3  disclosing the consignment relationships on the
4  Medicare and Medicaid claim forms?
5      MS. CITERA:  Same objections.
6  BY THE WITNESS:
7      A.  I don't know.
8      Q.  Who would know?
9      MS. CITERA:  Same objections.
10  BY THE WITNESS:
11      A.  It would be the departments that were
12  involved in preparing and submitting that
13  information.
14      Q.  Would that be the reimbursement
15  department within Home Infusion?
16      MS. CITERA:  Same objections.
17  BY THE WITNESS:
18      A.  Without -- Presumably, yes.  I don't know
19  exactly how they operated and their organizational
20  structure.  But that seems the likely place for it
21  to have occurred.
22      Q.  Did Abbott ever evaluate whether it

Page 546

1  should have, pursuant to Medicare and Medicaid
2  fraud and abuse laws, disclosed the consignment
3  relationships or the provision of product on
4  consignment on its Medicare and Medicaid claim
5  forms that it submitted for its clients?
6      MS. CITERA:  Objection to the form, outside
7  the scope.  And I'd also caution you not to reveal
8  any privileged communications or analysis.
9  BY THE WITNESS:
10      A.  As I testified previously, Abbott did
11  seek counsel, external counsel's advice on the
12  subject matter of the Home Infusion business to --
13  I'm not prepared to discuss the subject matter of
14  those discussions.
15      Q.  Other than those legal discussions that
16  you're talking about, were there any other
17  discussions?
18      A.  I'm sorry.  Other discussions regarding?
19      Q.  Regarding the -- whether or not Abbott's
20  Home Infusion reimbursement department should
21  disclose on claim forms submitted on behalf of
22  clients that the clients received product on

47 (Pages 543 to 546)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 547

1  consignment.
2      MS. CITERA:  Same objections and instruction.
3  BY THE WITNESS:
4      A.  Seemed like a very broad question.  Can
5  you repeat the question?
6          (Record read as requested.)
7      MS. CITERA:  Same objections, obviously.
8  BY THE WITNESS:
9      A.  Specifically I don't know.  It strikes me
10 that the letters that we referred to previously
11 where Ingalls raised the general subject matter,
12 this may be part of that general subject matter.
13 So the businesspeople would have been aware of it
14 since a letter went into the business; so they may
15 have had discussions -- likely had discussions or
16 they called legal right away.  I don't know.
17     Q.  Did any other clients raise questions
18 about the legalities or compliance with Medicare
19 and Medicaid fraud and abuse laws -- Strike that.
20         Did any other clients or customers raise
21 any concerns about whether the revenue-share
22 arrangements or consignment arrangements were in

Page 548

1  compliance with federal and state Medicare and
2  Medicaid fraud and abuse laws?
3      MS. CITERA:  Objection to the form, outside
4  the scope.
5  BY THE WITNESS:
6      A.  Not to my knowledge.
7      Q.  If you could go to the second-to-last
8  page of this document --
9      A.  Page 7?
10     Q.  Yes, I'm sorry, Page 7 at the bottom.  Do
11 you see where it says, "Auditing and monitoring"?
12     A.  Yes.
13     Q.  The one, two, three, four -- Well, first
14 of all, are you familiar with an external audit
15 familiar with the external audit of Home Infusion's
16 reimbursement department that's referenced here?
17     A.  I am not.  I recall a conversation with
18 Ginnie Tobiason who indicated that -- by this, I
19 don't know if "external audit" is referring to a
20 third party auditor or whether it was an audit
21 function within the government, but she relayed to
22 me at least one of the state Medicaid organizations

Page 549

1  did an audit of Abbott Home Infusion and it came
2  out clean.
3      Q.  Did she say what state?
4      A.  I don't know that she said.  I don't know
5  that she recalled.
6      Q.  Do you see the sentence that begins, "In
7  addition the reimbursement department performs" --
8      A.  Yes.
9      Q.  -- "quarterly audits that focus on
10 compliance with all federal and state laws and
11 regulations."  What compliance initiative is
12 described there?
13     MS. CITERA:  Objection to the form.
14 BY THE WITNESS:
15     A.  Again, having just received this and not
16 having done any diligence regarding this document,
17 reading the words that are printed, that they
18 performed and that they would have -- the program
19 recites they perform quarterly audits to determine
20 they properly coded -- they prepared documentation
21 properly.
22     Q.  Do you know what was involved in terms of

Page 550

1  what actually was performed for purposes of those
2  audits?
3      A.  I do not.
4      MS. ST. PETER-GRIFFITH:  Toni, I understand
5  that we're all receiving these documents, you know,
6  with very short notice.  If I could request that
7  research be done and so that Mr. Fishman's answer
8  augmented once we're able to discover that
9  information.
10     MS. CITERA:  And, you know, I will say that,
11 you know, we are doing what we can to try and
12 figure this out.  As he testified to, we talked to
13 Ginnie.  We talked to Tajal, and I'm still looking
14 into it.
15     MS. ST. PETER-GRIFFITH:  Okay.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Do you see the last sentence where it
18 says, "Semi-annual risk analysis by the
19 reimbursement department financial analysts serve
20 to help monitor reimbursement activities for
21 compliance"?
22     A.  I do see that.

48 (Pages 547 to 550)

30(b)(6) Abbott (Fishman, David) - Vol II                          March 20, 2008

## Chicago, IL

Page 551

1      Q.   How does -- How did the semi-annual risk
2  analysis help monitor reimbursement activities for
3  compliance?
4      A.   I don't know.
5      MS. ST. PETER-GRIFFITH:  Toni, that's another
6  one of those questions that if we could learn more,
7  if you could augment Mr. Fishman's answer -- I
8  mean, I'll take a written letter augmenting it.
9      MS. CITERA:  Sure.
10     MS. ST. PETER-GRIFFITH:  That's fine.
11     MS. CITERA:  I can also do it on the errata
12 sheet.
13     MS. ST. PETER-GRIFFITH:  Yeah, that's fine.
14 Toni, the other thing I would like to point out in
15 this document is that on Page 3, that first
16 paragraph, there are a whole series of documents
17 where it says, "Further, these policies and
18 procedures conform to all corporate and individual
19 policies of the company."  And then there's
20 reference to the basic operating procedures for
21 Home Infusion Services.  I'll tell you, we've never
22 received that document.

Page 552

1      MS. CITERA:  Where are you looking?
2      MS. ST. PETER-GRIFFITH:  I'm looking in the
3  middle of the top paragraph.
4      THE WITNESS:  Top paragraph.
5      MS. CITERA:  Oh.
6      MS. ST. PETER-GRIFFITH:  And then the sentence
7  that reads, "These policies and procedures are
8  contained in several sources," we also don't have
9  any of those sources, other than I believe that Mr.
10 Rodman may have produced one or two of them and
11 Trudi Burchieri may have produced one of them.  But
12 we don't have any Abbott production on that.  If
13 you could check into those documents as well.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.   Sir, I think we're going to move onto a
16 new document.
17     A.   Okay.
18     MS. CITERA:  I have the Bates number for the
19 CD.  It is ABT-DOJ 0395587.
20          (Exhibit Fishman 013
21           marked as requested.)
22 BY MS. ST. PETER-GRIFFITH:

Page 553

1      Q.   Sir, if you'd take a moment and read this
2  document.
3      A.   Okay.
4      Q.   Okay.  Sir, do you see -- First of all,
5  do you recognize this document?
6      A.   No.
7      Q.   Have you ever seen it before?
8      A.   I have not.
9      Q.   Sir, this appears to be a letter dated
10 April 2nd, 1990, from Robert Mulcahey -- I'm sorry,
11 to Robert Mulcahey from James Albrecht; do you see
12 that?
13     A.   I do.
14     Q.   Who is James Albrecht?
15     A.   Jim was an attorney, commercial attorney
16 in the legal department.
17     Q.   Do you know whether this letter was ever
18 sent?
19     A.   I have no knowledge.
20     Q.   The letter appears to concern an inquiry
21 from Ingalls to Abbott about compliance with or the
22 -- whether the -- I guess regarding Medicare fraud

Page 554

1  and abuse pertaining to Abbott's Home Infusion
2  ventures; do you see that in the first paragraph?
3      A.   I'm sorry.  We're talking about -- I'm
4  not sure I understood a question to be there.
5      Q.   Okay.  Do you agree with me that this
6  appears to be a response to an inquiry from Ingalls
7  concerning Medicare fraud and abuse compliance
8  questions; is that fair?
9      A.   Yes.
10     MS. CITERA:  Objection to form.
11 BY THE WITNESS:
12     A.   I'm sorry.  Yes.
13     Q.   And in the middle of -- there's an
14 indented two paragraphs in the middle of this
15 letter that purports to be, according to the
16 letter, an excerpt from an opinion given by Gardner
17 Carton.  Do you see that?
18     A.   I do.  It doesn't say opinion.  It says
19 memorandum.
20     Q.   Okay.
21     A.   I don't know whether it was an opinion or
22 not.

49  (Pages 551 to 554)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 555

1    Q.  Well, do you see in the sentence before
2  where it says, "Therefore, we don't think it
3  appropriate to release the opinion to Ingalls"?
4    A.  Yes.
5    Q.  Does that suggest to you that perhaps
6  Gardner Carton provided legal opinion to Abbott?
7    MS. CITERA:  Objection to the form, outside
8  the scope.
9  BY THE WITNESS:
10    A.  It suggests that Gardner provided a legal
11  opinion, yes.
12    Q.  And the next sentence reads, "However,
13  Ms. Riddle asks that I provide you the following
14  quote from the Gardner Carton memorandum regarding
15  proposed contracts relationships."  Do you see
16  that?
17    A.  I do.
18    Q.  Does that suggest to you that the content
19  of this particular excerpted quotation from the
20  Gardner Carton memorandum may be part of their
21  legal opinion?
22    MS. CITERA:  Objection to the form, outside

Page 556

1  the scope.
2  BY THE WITNESS:
3    A.  I don't know whether it was part of the
4  legal opinion.  It -- It clearly uses a different
5  word.  It doesn't say, quote, from Gardner Carton's
6  legal opinion. It says memorandum.  Whether this
7  was part of the legal opinion, back-up support for
8  the opinion, the opinion itself, I don't know.
9    Q.  Okay.  Fair enough.  But do you have any
10  doubt that the quoted language in there came from
11  Gardner Carton and pertained to advice regarding
12  the consignment arrangements or the revenue-share
13  agreements?
14    MS. CITERA:  Objection to form, outside the
15  scope.
16  BY THE WITNESS:
17    A.  They have a lot of facts in that.  I was
18  agreeing with some of what you said and not
19  agreeing with -- you reached some conclusions in
20  your question that I'm not sure I agreed with.
21    Q.  Okay.  What don't you agree with?
22    A.  Can you repeat -- There was multiple

Page 557

1  parts to that question.  Can you repeat the
2  question, please?
3       (Record read as requested.)
4    MS. CITERA:  Objection, same objections.
5  BY THE WITNESS:
6    A.  I believe it states that it came from a
7  Gardner memorandum, so I don't question that.  It
8  talks back to the joint Home Infusion therapy
9  agreement and what I don't know is on April 2nd,
10  1990, what the structure of that Home Infusion,
11  joint Home Infusion therapy agreement was to know
12  whether it pertained specifically to consignment
13  and a revenue share.
14    Q.  Okay.  I can look at the break and see if
15  I have that but --
16    A.  Okay.  On the face of this document, I
17  can't say that for certain.
18    Q.  But on the face of this document,
19  whatever the relationship is between Ingalls and
20  Abbott, you would presume from the content of the
21  language that that's the type of relationship
22  that's being referenced?

Page 558

1    MS. CITERA:  Objection to the form, outside
2  the scope.
3  BY THE WITNESS:
4    A.  It's referencing a joint -- some kind of
5  proposed joint relationship between the parties,
6  yes.
7    Q.  Now, the information from the Gardner
8  Carton memorandum reads, "It should be noted that
9  these contracts which the provider, not Abbott,
10  accepts assignments," excuse me, "then Abbott pays
11  for goods and services -- then pays Abbott for
12  goods and services according to a fixed-fee
13  schedule will be unlikely to be found to violate
14  the Medicare and Medicaid fraud and abuse laws."
15  Do you see that?
16    A.  I do.
17    Q.  The next sentence reads, "This statement
18  assumes that Abbott charges each provider an amount
19  which reflects the fair market value for goods and
20  services rendered."  Do you see that?
21    A.  I do.
22    Q.  Did Abbott document the fair market value

Chicago, IL

Page 559

1  for goods and services that it rendered to its Home
2  Infusion customers?
3      MS. CITERA:  Objection to the form, outside
4  the scope.
5  BY THE WITNESS:
6      A.  I believe in describing previously before
7  lunch and describing the revenue-share arrangements
8  generally without talking specifically about a
9  given contract, I stated that not knowing which
10  contract we were talking about, whether there was
11  back-up information provided that reflected detail
12  with respect to percentages of revenue share.
13     Q.  Okay.  But if Abbott's -- you know, I'll
14  tell you, sir, I've deposed most of the Home
15  Infusion witnesses in this case.  And they've never
16  -- no one has ever testified nor has Abbott
17  produced any documents reflecting that there's
18  back-up documentation to delineate the bases of the
19  percentages that are collected by Abbott other than
20  just in general as a percentage of particular
21  therapies.
22     So if no such back-up documentation

Page 560

1  exists, how did Abbott reflect the fair market
2  value for the goods and services rendered?
3      MS. CITERA:  Objection to the form, outside
4  the scope.
5  BY THE WITNESS:
6      A.  You're -- I believe you're relying on the
7  word "reflect" to mean that Abbott has to provide
8  the customer the information about fair market
9  value versus having information internally that
10  substantiates the percentage agreed to that would
11  be that back-up as to how you get to that
12  percentage.
13     Q.  Well, I'm not necessarily saying that it
14  has to reflect it to the customer, although I want
15  to know whether it reflects it to the customer.  I
16  just want to know what documents Abbott maintained
17  --
18     A.  I don't know.
19     Q.  If Abbott didn't -- is not able to
20  document the fair market value for the goods and
21  services rendered, doesn't that defeat the
22  assumption that is the predicate for the opinion in

Page 561

1  the first sentence?
2      MS. CITERA:  Object to the form, outside the
3  scope.
4  BY THE WITNESS:
5      A.  I don't think it's fair to conclude that
6  because you don't document it, that it isn't
7  necessarily a fair market value reflection.
8      Q.  Well, how would Abbott prove it's the
9  fair market value?
10     MS. CITERA:  Object to the form, outside the
11  scope.
12  BY THE WITNESS:
13     A.  Abbott would have to evaluate market fair
14  value based on what the goods and services in
15  question are being charged in the market at that
16  point in time.
17     Q.  And how did Abbott do that to ensure that
18  its fixed-fee schedule did not violate the Medicare
19  fraud and abuse laws as delineated in that first
20  sentence by the -- from the Gardner Carton
21  memorandum?
22     MS. CITERA:  Objection to the form.  Outside

Page 562

1  the scope.
2  BY THE WITNESS:
3      A.  I don't know how Abbott arrived at its
4  percentage calculation for a fixed-fee arrangement.
5      Q.  Okay.  Did you know how it documented or
6  demonstrated the fair market value for the goods
7  and services rendered?
8      MS. CITERA:  Same objections.
9  BY THE WITNESS:
10     A.  I do not.
11     Q.  The next sentence reads, "It is important
12  to recall that any unreasonably deep discount
13  offered by Abbott would indicate a lack of arm's
14  length negotiation and would cause further scrutiny
15  under this arrangement."  Do you see that?
16     A.  "Could cause."
17     Q.  "Could cause," I'm sorry.
18     Do you see that sentence?
19     A.  I do.
20     Q.  What did Abbott consider to be an
21  unreasonably deep discount?
22     MS. CITERA:  Object to the form, outside the

51 (Pages 559 to 562)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 563

1    scope.
2    BY THE WITNESS:
3         A.  I don't know.
4         Q.  Would the provision of products for free
5    subject to some future possible reimbursement,
6    percentage of reimbursement share at a later point
7    in time constitute an unreasonably deep discount?
8         MS. CITERA:  Object to the form, outside the
9    scope.
10   BY THE WITNESS:
11        A.  As I testified earlier, providing product
12   to a customer on consignment, when that customer
13   ultimately never gets paid for it, as between
14   Abbott and the customer, it's as if that
15   transaction never occurred because there's no --
16   they're not -- there's no benefit obtained by
17   anybody.
18        Q.  Well, other than Abbott provided them
19   product for free that they used for the therapies
20   for their patients, right?  That's consideration.
21        MS. CITERA:  Objection to the form, outside
22   the scope.

Page 564

1    BY THE WITNESS:
2         A.  As I stated earlier, I don't believe it's
3    fair to characterize the arrangement on its face as
4    for-free product.
5         Q.  Well, if the patient -- if there's no
6    reimbursement for the patient and the customer
7    doesn't have to pay for the Abbott product that it
8    utilized in providing the therapy to the patient,
9    how is that not free?
10        MS. CITERA:  Objection to the form, outside
11   the scope.
12   BY THE WITNESS:
13        A.  For free to whom?
14        Q.  Free to the consignment partner who is
15   providing the therapy to the patient.
16        MS. CITERA:  Same objections.
17   BY MS. ST. PETER-GRIFFITH:
18        Q.  And free to the patient.
19        MS. CITERA:  Same objections.
20   BY THE WITNESS:
21        A.  There's so many variables in this fact
22   pattern, I don't even know how to start to address

Page 565

1    them.  Again, the question assumes that if the
2    coverage was denied, that there wasn't an attempt
3    to collect -- collect payment by the customer some
4    other way.
5         Q.  Is that what Abbott did?
6         A.  We weren't the customer.
7         MS. CITERA:  Object to the form, outside the
8    scope.
9    BY MS. ST. PETER-GRIFFITH:
10        Q.  But you were collecting on behalf of the
11   customer, weren't you?
12        MS. CITERA:  Same objections.
13   BY MS. ST. PETER-GRIFFITH:
14        Q.  Isn't that part of the services provided
15   by the reimbursement department?
16        MS. CITERA:  Same objections.
17   BY THE WITNESS:
18        A.  I understand in certain arrangements, we
19   were providing billing services.  Whether we were
20   providing collection services, I don't know.
21        Q.  Okay.  Who pays for the product, then, if
22   in the fact pattern we used before, Medicaid denies

Page 566

1    reimbursement?  Who pays Abbott for the product?
2         MS. CITERA:  Objection to the form, outside
3    the scope.
4    BY THE WITNESS:
5         A.  Again, we're talking about a hypothetical
6    contract because I haven't seen the details of a
7    specific contract that has this type of arrangement
8    in place to know whether there was any additional
9    language that addressed denial of reimbursement,
10   nor do I know what the customer did with a given
11   patient if there was a denial of reimbursement,
12   whether they sought payment through another means
13   and obtained that payment through another means.
14        Q.  But if countless of these proposals that
15   are made through the Home Infusion Contract
16   Marketing and the contracts themselves say "Abbott
17   shares in your risk.  If you're not paid for a
18   patient, we're not paid" and if that's the
19   representation that's made and the Home Infusion
20   revenue-share partner is not paid for a particular
21   therapy for a patient and Abbott doesn't get paid,
22   doesn't Abbott provide the product, then, for free?

52 (Pages 563 to 566)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 567

1      MS. CITERA:  Object to the form, outside the
2  scope.
3  BY THE WITNESS:
4      A.  I don't accept the premise that it's free
5  product because it's being provided with -- on the
6  condition of getting paid, so there's an
7  expectation of payment.  So it's not being provided
8  for free.
9      Q.  Then where's the risk to Abbott in these
10 risk-share arrangements?
11     MS. CITERA:  Object to the form, outside the
12 scope. I'm just going to state again that he is not
13 here to provide any legal analysis.
14 BY THE WITNESS:
15     A.  I -- I'm asked to comment on an
16 arrangement that I don't have the contractual terms
17 in front of me to know what the arrangement is.
18     Q.  Well, you know generally about these
19 revenue-share arrangements, right?
20     A.  I know that one aspect of it.
21     MS. CITERA:  Same objections.
22 BY MS. ST. PETER-GRIFFITH:

Page 568

1      Q.  Okay.  But in untold numbers of these
2  presentations that are made, it is made very clear
3  that if the Home Infusion revenue-share partner
4  doesn't get paid, Abbott doesn't get paid.  That's
5  almost a verbatim quote, sir.
6          And my question is, if there's no
7  reimbursement that the revenue-share partner
8  collects on behalf of a particular -- or from a
9  particular patient, doesn't Abbott then provide the
10 product utilized for services to that patient for
11 free?
12     MS. CITERA:  Same objections.
13 BY THE WITNESS:
14     A.  Abbott is not providing that product to
15 the user, so ...
16     Q.  No, it's providing it to the
17 revenue-share partner who in turn provides it to
18 the user, right?
19     MS. CITERA:  Objection, same objections.
20 BY THE WITNESS:
21     A.  Correct, that's correct.
22     Q.  Okay.  So if the revenue-share partner

Page 569

1  does not collect reimbursement from the patient,
2  who bears the risk of Abbott's cost for the product
3  that it gives to the revenue-share partner that the
4  revenue-share partner, in turn, utilizes for the
5  patient?
6      MS. CITERA:  Objection to the form, outside
7  the scope.
8  BY THE WITNESS:
9      A.  It strikes -- it strikes me as you're
10 asking for a legal conclusion.
11     Q.  I'm not asking for a legal conclusion.
12 I'm asking who pays.
13     MS. CITERA:  I think you're asking for a legal
14 conclusion.
15 BY THE WITNESS:
16     A.  You asked me who bears the risk.
17     Q.  In terms of who's -- who's out the cost
18 of the product?
19     MS. CITERA:  Same objections.
20 BY THE WITNESS:
21     A.  Assuming there are no other contractual
22 terms that provide any other alternative than what

Page 570

1  you're describing, Abbott would be out the cost of
2  that product.
3      Q.  Okay.  With regard to this particular
4  quotation from the Gardner Carton memorandum, what
5  did Abbott do -- what did Abbott or Abbott's Home
6  Infusion or its legal department or anyone within
7  Abbott do to ensure that Abbott's Home Infusion
8  business arrangements complied with the provisions
9  or the advice that is set forth from Gardner Carton
10 in those two paragraphs?
11     MS. CITERA:  Object to the form.
12 BY THE WITNESS:
13     A.  Can you repeat the question, please?
14         (Record read as requested.)
15     MS. CITERA:  Same objection.
16 BY THE WITNESS:
17     A.  I don't know.
18     Q.  Move on to a new document.
19         (Exhibit Fishman 014
20         marked as requested.)
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Sir, if you could take a moment, I'm just

53 (Pages 567 to 570)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 571

1  going to focus on the first page of this agreement,
2  although I just want to note, the second page, this
3  is produced -- this is actually the third page, but
4  I put it first because that's what we're going to
5  concentrate on. It's Abbott-DOJ 351271. The
6  following two pages are 351269 and 351270, which I
7  will represent that's the consequence they were
8  produced to the United States by Abbott. The
9  second page appears to be a cover sheet to
10  Northwestern Memorial Hospital, Office of the
11  General Counsel. And it's --
12      A. To or from?
13      MS. CITERA: To or from?
14  BY MS. ST. PETER-GRIFFITH:
15      Q. I'm sorry, from. Gee. From Jackie
16  Darral to Carla Kreklow. And I'm not going to ask
17  you whether the documents relate to each other.
18  That's how they were produced to us.
19      A. Okay. I'm sorry, do you want me to read
20  all of them?
21      Q. No, no, no, I just want you to read the
22  first page.

Page 572

1      A. Okay. Dated -- titled "Abbott Home
2  Infusion Services Program and Medicare Law."
3      Q. Correct. First, let me ask you, sir, do
4  you recognize that document? Or do you want to
5  read it first?
6      A. Let me read it first.
7      Q. Sure.
8      A. Okay.
9      Q. Sir, have you had a chance to read this?
10      A. I did.
11      Q. Do you recognize this document?
12      A. I do not.
13      Q. Have you ever seen it before?
14      A. Not to my recollection.
15      Q. Do you know why Abbott would create such
16  a document discussing Abbott's Home Infusion
17  Services program and Medicare law?
18      MS. CITERA: Objection to the form, outside
19  the scope.
20  BY THE WITNESS:
21      A. No.
22      Q. Who was this distributed to?

Page 573

1      MS. CITERA: Objection to the form.
2  BY THE WITNESS:
3      A. I don't know.
4      Q. Sir, I'm going to go through certain
5  statements in here, okay. I'm going to start with
6  the second paragraph. It reads, "Abbott is
7  compensated for services and products it provides
8  through a payment of a percentage of collections by
9  client." Do you see that?
10      A. I do.
11      Q. And it says, "The percentage is
12  negotiated through arm's length discussions and is
13  based upon various services and products Abbott may
14  be asked to provide by the client." Do you see
15  that?
16      A. "May provide their clients."
17      Q. I'm sorry, "asked to provide the client."
18  Sir, what is the nature of the arm's length
19  discussions that are undertaken in negotiating the
20  percentage?
21      MS. CITERA: Object to the form, outside the
22  scope.

Page 574

1  BY THE WITNESS:
2      A. I don't know. I don't know.
3      Q. Okay. The next paragraph reads, "In a
4  few instances, Abbott has been asked whether this
5  percentage of collection approach is consistent
6  with Medicare laws and Safe Harbors." Do you see
7  that?
8      A. I do.
9      Q. Who asked that?
10      A. I don't know.
11      Q. The next sentence says, "Abbott believes
12  this percentage approach is sound under the law."
13  Do you see that?
14      A. I do.
15      Q. What's the basis for that statement?
16      MS. CITERA: Object to the form, outside the
17  scope.
18  BY THE WITNESS:
19      A. Based on the next sentence, it appears
20  that Abbott consulted with outside counsel and
21  obtained an opinion that helped it get comfortable
22  with this statement.

54 (Pages 571 to 574)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 575

1    Q.  What was that opinion?
2    MS. CITERA:  I'm going to instruct you not to
3  answer.  And, obviously, I mean, you can ask him if
4  he even knows, but ...
5  BY THE WITNESS:
6    A.  Right.
7    Q.  Well, do you even know what the opinion
8  is?
9    A.  Based on the information here talking
10 about a Washington, D.C., counsel, I would believe
11 it would have been the discussions with Hogan &
12 Hartson.  But I don't know what the opinion was;
13 and if I did -- and the opinion, having been made
14 would be -- is privileged regardless of whether I
15 know it.
16   MS. ST. PETER-GRIFFITH:  Does Abbott intend to
17 rely upon an advice of counsel defense?
18   MS. CITERA:  As previously stated, I'm not
19 going to answer that question.
20   MS. ST. PETER-GRIFFITH:  Well, Abbott has not
21 identified advice of counsel as an affirmative
22 defense in this case.  So I think I'm entitled to

Page 576

1  an answer.
2    MS. CITERA:  I'm not going to answer that
3  question.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  The next reads, "Medicare Safe Harbors do
6  not provide automatic protections for all
7  percentage arrangements, nor do they declare that
8  percentage arrangements are improper," and then
9  there's a footnote. Do you see that?
10   A.  I do.
11   Q.  First of all, what's the relationship
12 between the IRS Safe Harbors and Medicare Safe
13 Harbors?
14   MS. CITERA:  Objection to the form, outside
15 the scope.
16 BY THE WITNESS:
17   A.  I don't know.  Plus you're asking me to
18 reach a legal conclusion, state a legal opinion
19 about two sets of laws.
20   Q.  I'm not asking you a legal opinion.  What
21 I'm asking you is why does Abbott in this doc- --
22 Let me ask it this way:  Why does Abbott in this

Page 577

1  document identify some kind of nexus through this
2  footnote between Medicare Safe Harbors and IRS
3  guidelines?
4    MS. CITERA:  Same objections.
5  BY THE WITNESS:
6    A.  I don't know.
7    Q.  Okay.  Did Abbott have a concern that its
8  Home Infusion -- Home Infusion -- Home Infusion
9  arrangements may not have satisfied the Medicare
10 Safe Harbors?
11   MS. CITERA:  Object to the form, outside the
12 scope. I'm also going to instruct you not to reveal
13 any privileged communications or analysis.
14 BY THE WITNESS:
15   A.  Not to my knowledge.
16   Q.  The last sentence reads, "Instead the
17 Safe Harbors provide that even though a large
18 majority of percentage arrangements may represent
19 legitimate compensation to a supplier, percentage
20 arrangement is inappropriate if it is intended to
21 disguise the payment of patient referrals."
22   A.  "As a disguise."

Page 578

1    Q.  I'm sorry, "as a disguise for patient
2  referrals."  Do you see that?
3    A.  I do.
4    Q.  Why did Abbott include that in this
5  sentence or in this memorandum?
6    MS. CITERA:  Same objections and caution.
7  BY THE WITNESS:
8    A.  I don't know.
9    Q.  The next paragraph indicates that the
10 percentage compensation negotiated by Abbott is
11 wholly attributable to the delivery of services and
12 product to the client.  Do you see that?
13   A.  I do.
14   Q.  What's the basis for that statement?
15   MS. CITERA:  Same objections.
16 BY THE WITNESS:
17   A.  Not knowing anything about this document,
18 I don't know.
19   Q.  Okay.  I understand, sir, that you might
20 not have seen this before.  And to the extent that
21 you can, you know, identify an answer and
22 supplement it at a later point in time, I'd

55 (Pages 575 to 578)

Page 579

1  appreciate that.
2     MS. ST. PETER-GRIFFITH:  If that's okay, Toni.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.  The second-to-last sentence in this
5  paragraph reads, "Again, the percentage rate
6  charged by Abbott is a competitive one falling
7  within reasonable commercial range but does not
8  take into account any value of any business
9  referral."  Do you see that?
10    A.  I do.
11    Q.  How did Abbott's -- how are -- were
12 Abbott's percentage rates charged to its Home
13 Infusion revenue-share customers competitive?
14    MS. CITERA:  Objection to the form, outside
15 the scope.
16 BY THE WITNESS:
17    A.  I don't know how Home Infusion reached
18 their negotiated percentages.
19    Q.  For Medicare and Medicaid compliance, did
20 Abbott believe that maintaining competitive
21 percentage rates was important?
22    MS. CITERA:  Objection to the form, outside

Page 580

1  the scope.
2  BY THE WITNESS:
3     A.  I don't know what Abbott believed
4  important. They would believe important to comply
5  with the laws.
6     Q.  Okay.  And did they ensure that they
7  maintained a competitive rate to comply with the
8  laws?
9     MS. CITERA:  Same objections.
10 BY THE WITNESS:
11    A.  I don't know.
12    Q.  In addition to services and products, did
13 Abbott provide design build-out services as some of
14 its contractual arrangements?
15    MS. CITERA:  Object to the form, outside the
16 scope.
17 BY THE WITNESS:
18    A.  Do you know what you mean by design
19 build-out services?
20    Q.  Of pharmacies.  I'm sorry, of external
21 pharmacies.  If you could look to the
22 second-to-last paragraph, it's referenced there.

Page 581

1     A.  Oh, design services.
2     Q.  For, for example, clean rooms and
3  buildings designed for Home Infusion pharmacies.
4     MS. CITERA:  Same objections.
5  BY THE WITNESS:
6     A.  I don't know.  It states it as an example
7  of services.
8     Q.  Did they charge for that separately?
9     MS. CITERA:  Objection to the form, outside
10 the scope.
11 BY THE WITNESS:
12    A.  Don't know.
13    Q.  If Abbott provided build-out -- if Abbott
14 helped its Home Infusion customers bear the upfront
15 cost of expenditures for facility design build-out
16 in exchange for, in part, Abbott's Home Infusion
17 partners entering into the Home Infusion
18 arrangements with Abbott, would that be a kickback?
19    MS. CITERA:  Objection to the form, outside
20 the scope.  He's not here to testify as to what the
21 law is.
22 BY THE WITNESS:

Page 582

1     A.  I believe that question clearly asks for
2  a legal conclusion.
3     Q.  Did Abbott have concern that it
4  constituted a kickback?
5     A.  I don't know.
6     MS. CITERA:  Same objections.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Did Abbott ever evaluate whether or not
9  providing at no cost design build-out services for
10 its Home Infusion revenue-share partners was in
11 compliance with federal and state Medicare and
12 Medicaid laws?
13    MS. CITERA:  Object to the form, outside the
14 scope. I also would instruct you not to reveal any
15 privileged communications or analysis.
16 BY THE WITNESS:
17    A.  As stated previously -- As I stated
18 previously from my own knowledge and also as
19 reflected in the third paragraph of this document,
20 Abbott did consult outside legal counsel.  I do not
21 know the scope of the arrangement in which the
22 consultation occurred.  And if I did, any

Chicago, IL

Page 583

1  communication would have been privileged.
2     Q.  Well, Abbott's providing -- well, it says
3  at the bottom that this document is not a legal
4  opinion. It's providing an explanation of Abbott's
5  intent and view.  Do you see that?
6     A.  I do.
7     Q.  What's the predicate for Abbott's intent
8  or factual basis for Abbott's intent and view as
9  set forth in this document?
10    MS. CITERA:  Objection to form, outside the
11 scope.
12 BY THE WITNESS:
13    A.  Can you repeat the question, please?
14    MS. ST. PETER-GRIFFITH:  Sure.  Can you read
15 it back?
16       (Record read as requested.)
17    MS. CITERA:  Same objections.
18    THE WITNESS:  Huh?
19    MS. CITERA:  Same objections.
20 BY THE WITNESS:
21    A.  I'm not sure -- I'm not sure I understand
22 how I can answer what their factual basis was for

Page 584

1  an intent.
2     Q.  Well, then, what's the basis for
3  describing this as Abbott's intent and view?
4     MS. CITERA:  Same objections.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Let me ask the question a different way.
7  From Abbott's intentions and viewpoint, from what's
8  set forth in this memorandum, did it believe that
9  its Home Infusion Services program was in
10 compliance with Medicare and Medicaid fraud and
11 abuse laws?
12    MS. CITERA:  Same objections.
13 BY THE WITNESS:
14    A.  Did it believe?  I believe this document
15 reflects Abbott's understanding of the law.
16    Q.  Okay.  And what is the bases for Abbott's
17 understanding of the law set forth in this
18 memorandum?
19    MS. CITERA:  Same objections.
20 BY THE WITNESS:
21    A.  Any basis on that would have been a
22 discussion with legal counsel, which would have

Page 585

1  been a privileged communication.
2     Q.  Which -- When was the communication?
3     A.  Prior to whenever this document was
4  created, but I don't know when.  I don't know when
5  the document was created.
6     Q.  And who was -- who was the legal counsel
7  in D. C.?
8     A.  To my knowledge, it was Hogan & Hartson.
9     Q.  Who at Hogan & Hartson?
10    A.  The same woman I said before, Liz Dunst.
11 I don't think that's D U N C E.
12    Q.  I think it might be D U N S T, actually.
13    MS. CITERA:  S T.
14    MS. ST. PETER-GRIFFITH:  We can move on to the
15 next document.
16       (Exhibit Fishman 015
17        marked as requested.)
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  Sir, I'm going to focus on Page 2 of this
20 document.  And primarily just at the top, but feel
21 free to take your time.
22    A.  Okay.

Page 586

1     Q.  Okay.  Sir, do you recognize this
2  document?
3     A.  I do not.
4     Q.  Okay.  It appears on the front page to be
5  to Kathy Riddle from James Albrecht.  Is that the
6  attorney that we discussed before?
7     A.  Right.  On 5/15/1990.
8     Q.  1990.  And then the contract structure
9  options on Page 2, do you see that?
10    A.  I do.
11    Q.  Okay.  It appears to be a -- at least a
12 -- I am not a transactional lawyer as you are, Mr.
13 -- so I don't want to identify this as a term
14 sheet.  But at least it is -- it identifies options
15 for a fee-for-service arrangement with Healthcare
16 Services of New England.  Do you see that?
17    A.  I do.
18    Q.  Okay.
19    A.  Was there a question or just --
20    Q.  No, I just wanted to confirm.  Is that
21 your --
22    A.  I wouldn't describe it as a term sheet,

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

Page 587

1  no.
2      Q.  What would you describe it as?
3      A.  It looks like it could be kind of a
4  cafeteria-style statement of items that could serve
5  as a basis for a contractual relationship.
6      Q.  Okay.  The first --
7      A.  I don't know -- I don't know that this
8  was provided to Healthcare Services or whether this
9  was purely an internal evaluation between Abbott
10 counsel and Home Infusion.
11     Q.  Okay.  Well, do you know -- did Abbott
12 ever enter into a contract with Health Services of
13 New England?
14     A.  I have no idea.
15     MS. CITERA:  Objection to form.
16 BY THE WITNESS:
17     A.  Sorry.  I have no idea.
18     Q.  The first item at the top says, "Abbott
19 accepts assignment of benefits on patients."  Do
20 you see that?
21     A.  I do.
22     Q.  What does that mean?

Page 588

1      MS. CITERA:  Object to the form, outside the
2  scope.
3  BY THE WITNESS:
4      A.  My understanding of those terms is that
5  Abbott would -- would bill on behalf of the
6  patients and take payment.
7      Q.  Under Abbott's own provider number?
8      MS. CITERA:  Objection to form, outside the
9  scope.
10 BY THE WITNESS:
11     A.  I don't know about under its own provider
12 number.  But, I mean, this also doesn't talk about
13 Medicare patients.  This talks about patients
14 generally.
15     Q.  Okay.  Well, would that be -- would it be
16 a problem for Medicare and Medicaid compliance if
17 Abbott accepted assignments of benefits on patients
18 of its -- patients who are treated by its
19 revenue-share partners or Home Infusion clients?
20     MS. CITERA:  Object to the form, outside the
21 scope.
22 BY THE WITNESS:

Page 589

1      A.  I believe you're asking me to reach a
2  legal conclusion.
3      Q.  Well, I want to know whether it was
4  Abbott's understanding that it could engage in that
5  practice and still comply with federal and state
6  law.
7      MS. CITERA:  Object to the form, outside the
8  scope.
9  BY THE WITNESS:
10     A.  You're asking me to reach a legal
11 conclusion.
12     Q.  Was it permissible -- Let me ask you
13 this: Did Abbott engage in this conduct where it
14 accepted assignment of benefits on behalf of its
15 Home Infusion customers' patients?
16     MS. CITERA:  Object to the form, outside the
17 scope.
18 BY THE WITNESS:
19     A.  I've stated previously that, to my
20 knowledge, we did not.  This first bullet point
21 suggests otherwise.
22     Q.  Would that be a problem for Abbott?

Page 590

1      MS. CITERA:  Object to the form, outside the
2  scope.
3  BY THE WITNESS:
4      A.  You're asking me to reach a legal
5  conclusion.
6      Q.  No, I'm just asking generally, would that
7  be a problem for Abbott?
8      MS. CITERA:  Same objections.
9  BY THE WITNESS:
10     A.  Problem -- Again, "problem" is, did they
11 have the space to do the work?  "Problem" is too
12 broad of a term for me to adequately answer that
13 question.
14     Q.  Okay.  Let me ask it this way: You've
15 testified repeatedly and we've looked at a number
16 of documents that maintained that Abbott -- Abbott
17 personnel, including within their Home Infusion
18 unit, were required to comply with all federal and
19 state Medicare and Medicaid fraud and abuse laws?
20     A.  Yes.
21     Q.  If Abbott accepts assignment of benefits
22 on patients, could its Home Infusion reimbursement

58 (Pages 587 to 590)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Page 591

1   employees do that?
2       MS. CITERA:  Object to the form, outside the
3   scope.
4   BY THE WITNESS:
5       A.  The response to that requires a legal
6   conclusion.
7       Q.  How so?
8       A.  Because it's the same -- it's the same
9   question worded differently in the last two times,
10  which is you've given me a fact pattern, which is
11  Abbott is accepting assignment of benefits on
12  patients, and does that -- does that adhere -- does
13  -- the employee that allows that, are they
14  complying with the law; if Abbott does it, are they
15  complying with the law.  Whomever the party is in
16  between, you're asking me to evaluate a set of
17  facts against the terms of the healthcare
18  compliance laws and reach a conclusion as to
19  whether or not they've been violated or whether the
20  acts are in compliance with it, which is a legal
21  conclusion.
22      Q.  Well, set aside legal conclusion.  How

Page 592

1   about just Abbott's policy you needed to comply
2   with the law?
3       MS. CITERA:  Same objections.
4   BY THE WITNESS:
5       A.  But the policy is predicated on complying
6   with the law.  So if I said it didn't -- it did or
7   didn't adhere to the policy, I'd be reaching a
8   legal conclusion that the law -- that the act was
9   in compliance or not in compliance.  So the bottom
10  line is, you're evaluating the underlying act in
11  relationship to a set of laws.  And that's -- to
12  reach a conclusion, you're reaching a legal
13  conclusion.
14      Q.  Did Abbott do any kind of evaluation as
15  to whether if it entered into arrangements whereby
16  Abbott would accept the assignment of benefits on
17  behalf of its Home Infusion clients' patients --
18  Strike that.
19          If Abbott entered into these types of
20  arrangements where it accepted assignment of
21  benefits on behalf of its Home Infusion clients'
22  patients, did it -- did Abbott consider or evaluate

Page 593

1   whether or not it would comply with federal and
2   state Medicare and Medicaid fraud and abuse laws?
3       MS. CITERA:  Same objection.  I'm also going
4   to caution you not to reveal any privileged
5   communications or analysis.
6   BY THE WITNESS:
7       A.  I don't know if they did because until
8   this -- I saw this document with this first bullet,
9   I was not aware that Abbott was directly accepting
10  assignment of benefits.
11      Q.  Okay.  Are you aware of any other
12  evaluations or compliance initiatives to monitor
13  what billing Abbott did utilizing its provider
14  number?
15      MS. CITERA:  Object to the form.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  And when I say "its," I mean Abbott's own
18  provider number.
19      MS. CITERA:  Object to the form.
20  BY THE WITNESS:
21      A.  Same answer, which is to answer that, I
22  had to know that they were using their own number,

Page 594

1   meaning they were accepting assignment of benefits
2   and billing under its own name, which I, until at
3   least until the first bullet, I wasn't aware of.
4   The second bullet doesn't necessarily reach that
5   same conclusion.
6       Q.  Okay.  Well, I'm not asking about
7   necessarily the second bullet.  I'm just asking
8   whether Abbott did any kind of evaluation regarding
9   how the Home Infusion reimbursement department
10  utilized Abbott's own provider number?
11      A.  I don't know the answer to that.
12      Q.  Okay.  Do you see under the -- under --
13  hold on -- the seventh bullet point down, the
14  seventh little O down, do you see that?
15      A.  "Healthcare Services of New England
16  assumes"?
17      Q.  Yes.  Oh, I'm sorry, no, eighth bullet
18  point down, "Abbott pays Healthcare Services of New
19  England a management fee of 2 percent of the net
20  revenue collected."
21      A.  Yes.
22      Q.  Did Abbott undertake any kind of

59 (Pages 591 to 594)

Page 595

1  evaluation whether or not the payment of a
2  management fee to its Home Infusion clients or
3  revenue-share partners complied with federal and
4  state Medicare and Medicaid fraud and abuse
5  statutes?
6      MS. CITERA:  Object to the form.  I also
7  caution you not to reveal any privileged
8  communications or analysis.
9  BY THE WITNESS:
10     A.  I don't know.  This is 1990 time frame as
11 well, right?
12     Q.  Right, it is.  It's early on.
13     A.  Okay.
14         (Exhibit Fishman 016
15         marked as requested.)
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Sir, do you recognize this document?
18     A.  Nope.  No, I do not.
19     Q.  It appears to be a personal and
20 confidential memorandum to Dave Brincks from Jeff
21 Shaw.  Do you see that?
22     A.  I do.

Page 596

1      Q.  Who is Mr. Shaw --
2      A.  In 19- -- Abbott employee, or I assume in
3  1993 he was an Abbott employee.  I did not know
4  Jeff in 1993 to know what his position was.  I knew
5  him much later when he was in AHD.
6      Q.  Do you see that this pertains to Leahy
7  Clinic and an inquiry from Carol McCarthy; do you
8  see that?
9      A.  I do.
10     Q.  Do you know who Carol McCarthy is?
11     A.  I do not.  And quite honestly, I was
12 wondering if she was an Abbott person or Leahy
13 Clinic person.
14     Q.  That's part of the reason why I asked the
15 question.  The -- Jeff Shaw at the end of the first
16 paragraph says, "I expressed to Carol my personal
17 reservations regarding this request" and the
18 enumerated request is a request, do you see,
19 seeking a memorandum from an Abbott attorney
20 stating that in his or her judgment Abbott's
21 revenue-share structure for Home Infusion service
22 was not in violation of Medicare Safe Harbors.  Do

Page 597

1  you see that?
2      A.  Yes, I do.
3      Q.  Now, Mr. Shaw, the memo indicates, agreed
4  to make an inquiry of Brian Taylor.  Do you see
5  that?
6      A.  I do.
7      Q.  Did you discuss with -- this issue with
8  Mr. Taylor?
9      A.  I did not.
10     Q.  The third-to-the-last paragraph reads,
11 "Brian said that Carol should tell the client that
12 Abbott legal counsel is comfortable with the
13 legality of these relationships."  Do you see that?
14     A.  I do.
15     Q.  What is the basis for asserting that
16 Abbott's legal counsel is comfortable with the
17 legality of these relationships?
18     MS. CITERA:  Objection to the form, outside
19 the scope, and also counsel you not to reveal any
20 privileged conversations or analysis.
21 BY THE WITNESS:
22     A.  I don't know specifically in 199- -- July

Page 598

1  of 1993 what the basis of that was.  This
2  post-dates the inquiry made previously to the
3  Washington law -- or the Hogan & Hartson -- I think
4  it predates.  If I recall the Ingalls communication
5  was in '92.  So sometime in '92, an inquiry was
6  made to discuss with legal counsel -- outside legal
7  counsel about relationships generally.  I don't
8  know if that served as further foundation for that
9  or not.
10     Q.  You anticipated one of my next questions,
11 which is, do you know which legal counsel is being
12 referenced here?  Is it outside legal counsel, or
13 is it in-house?
14     A.  Abbott legal counsel would be in-house.
15     Q.  Okay.
16     A.  My use of that term, I would not describe
17 an outside attorney as Abbott legal counsel.  I
18 don't know how Jeff was using those terms, if he --
19 as a non-lawyer, he could have used it, you know,
20 all lawyers are the same, kind of interchangeably.
21 I would not interpret that, but I don't know what
22 he meant.

0f08cf8d-8dfa-4007-81db-29f9710803e3

Page 599

1     MS. ST. PETER-GRIFFITH:  We have less than
2  five minutes left on the tape.  I'm done with this
3  document.  Why don't we take a break.
4     THE VIDEOGRAPHER:  Going off the record at
5  2:15 p.m.
6        (A short break was had.)
7        (Exhibit Fishman 017
8        marked as requested.)
9     THE VIDEOGRAPHER:  Beginning of Videotape No.
10  5, the deposition of Mr. Fishman.  We're back on
11  the record at 2:29 p.m.
12  BY THE WITNESS:
13     A.  They look like they're both the same
14  document.
15     Q.  Oh, yes, they are.  I'm sorry.  I think
16  that -- I'm only interested in the first page.
17     A.  Oh, I'm sorry.  I should keep both of
18  them?
19     Q.  Because they're two different versions
20  the same --
21     A.  One is a copy, one is the sendee.
22     Q.  Correct.

Page 600

1     MS. CITERA:  You know, this to me seems to be
2  privileged.  And so I'm just wondering if -- I
3  don't know why it was produced.
4     MS. ST. PETER-GRIFFITH:  Do you want -- Do you
5  want to make an inquiry, and I'll defer it to a
6  later point in time?
7     MS. CITERA:  Sure.  Has this been used as an
8  exhibit in another deposition?  Can you tell me
9  that?
10     MS. ST. PETER-GRIFFITH:  I don't think so
11  because I'm pretty sure the only person we would
12  have used it for would have been Tobiason, and this
13  wasn't produced then.  We didn't have this
14  production then.  I'm assuming, Toni, that Gorman
15  -- I know Riddle is internal.  Is Gorman internal
16  as well?
17     THE WITNESS:  Yes.
18     MS. CITERA:  I'm assuming by the number, yeah.
19     THE WITNESS:  Yes, he's an internal -- he was
20  an internal Abbott person.
21     MS. ST. PETER-GRIFFITH:  Okay.  We can -- why
22  don't we --

Page 601

1     MS. CITERA:  Table this.  I'm going to send
2  this email.
3     THE WITNESS:  Give it back?
4     MS. ST. PETER-GRIFFITH:  Hold it in front of
5  you because it's already been marked, but we will
6  --
7        (Exhibit Fishman 018
8        marked as requested.)
9     MS. ST. PETER-GRIFFITH:  I believe, Toni, that
10  those are the only two versions that we found of
11  that document.
12     MS. CITERA:  Okay.
13  BY THE WITNESS:
14     A.  I'm assuming you would like me to read
15  this?
16     Q.  Yes, please.  Yes.  That will give Toni
17  time to text, too.
18     MS. CITERA:  I'm done typing, so ... Are we
19  on?
20     MS. ST. PETER-GRIFFITH:  Yes.
21     MS. CITERA:  Sorry.
22     MS. ST. PETER-GRIFFITH:  That's Exhibit 18,

Page 602

1  Toni.
2  BY THE WITNESS:
3     A.  Okay.
4     Q.  Sir, Exhibit 18, is a May 19th, 1993
5  letter from Christopher Herden, Contract Marketing
6  analyst, within Abbott Home Infusion to Gerald
7  Clouse, executive director of Kettering Healthcare.
8  Do you see that?
9     A.  I do.
10     Q.  In the general -- We're not necessarily
11  going to go line by line of this letter.  But the
12  general substance of the letter seems to be that
13  Midwest Home Infusion Services has a concern about
14  -- or apparently raised by Midwest legal counsel's
15  concern about percentage of collections and the
16  possible implication under Safe Harbor rules.  Do
17  you see that in the second paragraph?
18     A.  I do.
19     Q.  The next -- First of all, approximately
20  how many of Abbott's Home Infusion partners raised
21  concerns about the legality or the compliance
22  implications of the percentage of collection

61 (Pages 599 to 602)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 603

1  arrangements?
2       A.  I don't know.
3       MS. CITERA:  Object to the form, outside the
4  scope.
5       THE WITNESS:  Sorry.
6  BY MS. ST. PETER-GRIFFITH:
7       Q.  The second sentence in that second
8  paragraph reads, "Although Abbott is very
9  comfortable with the structure of a percentage of
10  collections agreement, Abbott nonetheless was
11  willing to modify our agreement to follow a
12  fee-for-service approach as requested by Midwest
13  counsel."  Do you see that?
14      A.  I do.
15      Q.  What's the difference between a
16  percentage of collection and fee-for-service
17  approach?
18      MS. CITERA:  Object to form, outside the
19  scope.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Well, let me ask it this way:  Is
22  fee-for-service a particular type of arrangement

Page 604

1  that Abbott Home Infusion was willing to offer to
2  customers?
3       MS. CITERA:  Same objections.
4       THE WITNESS:  I'm sorry.  Did you get your
5  objection?
6       MS. CITERA:  She got it.
7  BY THE WITNESS:
8       A.  Okay.  I don't have personal knowledge.
9  The term "fee-for-service" suggests that a payment,
10  there's a negotiated payment for a -- for a service
11  provided.
12      Q.  Okay.  Going back to when we earlier on
13  in the day discussed your understanding of the
14  different structures, would that be the type of
15  arrangement which you indicated was one of the
16  possible Home Infusion arrangements whereby the
17  customer would buy the product and then pay for
18  services --
19      MS. CITERA:  Same objections.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  -- as opposed to receiving it on a
22  consignment basis?

Page 605

1       A.  Correct.  I think there might be -- I had
2  provided products and/or services.  This seems to
3  differentiate products versus services.  It looks
4  at the end of this document, they're talking about
5  a product sales agreement, which may mean -- again,
6  I don't know, in this particular instance -- may
7  mean just the sale of products versus a
8  fee-for-service, appears to talk about payment for
9  services.
10      Q.  Okay.
11      A.  And I suppose you could have four, you
12  know, just fees, just products, just services, or
13  both.
14      Q.  Got you.
15      A.  And the other one, and the percentage of
16  collections.
17      Q.  In terms of this second sentence where it
18  says although Abbott was very comfortable with the
19  structure of a fee-for -- or percentage of
20  collections agreement, other than what you've
21  testified today, do you understand why Abbott was
22  very comfortable with the percentage of collections

Page 606

1  agreements?  And if you want to rely upon your
2  prior testimony, that's fine.
3       MS. CITERA:  Objection to form, outside the
4  scope.
5  BY THE WITNESS:
6       A.  I don't have anything to add to my prior
7  testimony.
8       Q.  Okay.
9           (Exhibit Fishman 019
10           marked as requested.)
11      MS. CITERA:  I'm sorry.  I'm going to have to
12  do the same thing.  I don't understand why this was
13  produced.  I'm going to have to ask about it.
14  We're going to have to table it as well.
15      MS. ST. PETER-GRIFFITH:  Okay.  Toni, I just
16  want to point out that -- just the -- its Bates
17  numbers are sequential.  So I believe this may have
18  been the memorandum that was sent out to Gerald
19  Clouse, or at least this set is sequential.
20      MS. CITERA:  Yeah, I understand what you're
21  saying.  18 and 19?
22      MS. ST. PETER-GRIFFITH:  Yeah.

62 (Pages 603 to 606)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
                           Chicago, IL

Page 607

1      MS. CITERA:  Let me just read this in more
2  detail, but you may be correct.
3      MS. ST. PETER-GRIFFITH:  Sure.
4      MS. CITERA:  I'm going to let you go into it
5  because it appears that you may be right.  I'm
6  going to obviously reserve my right to snap it back
7  once I'm able to do further analysis and also to --
8  I mean, I don't know that I can snap back the
9  testimony -- but, you know, to assert a privilege
10  over this.  But, you know, based on the Bates range
11  and the date of the memo that is written by Mr.
12  Taylor and the date of the letter that is written
13  by Mr. Herden, and the fact it's Mr. Herden on both
14  memos, it would appear to be the same as the one
15  referred to in 18.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Mr. Fishman, have you had an opportunity
18  to review this document?
19      A.  Yes, I have.
20      Q.  And as we've just discussed, it appears
21  to be the memorandum that was attached to Exhibit
22  18.  Sir, I'd like to go over some of what is

Page 608

1  contained in Mr. -- this appears to be a memo from
2  the Office of General Counsel signed by Brian S.
3  Taylor.  Do you see that?
4      A.  I do.
5      Q.  -- attorney, dated May 18, 1993 to C.
6  Herden regarding Midwest Home Infusion Services,
7  right?
8      A.  Correct.
9      Q.  Did you discuss any of these memoranda
10  with Mr. Taylor when you spoke with him?
11      A.  I did not.
12      Q.  The first paragraph appears to sort of
13  discuss the issue with --
14      A.  Can I add, I didn't because I didn't know
15  they existed.
16      Q.  Okay.  The first sentence of the second
17  paragraph indicates as background, Abbott used a
18  percentage of collections approach in a number of
19  contracts and is comfortable with the legality of
20  the structure.
21      Again, I'm going to ask you the same
22  question I asked you about a similar statement in

Page 609

1  the letter. Other than what you've testified, are
2  you -- to already, are you aware of any other bases
3  for Abbott's comfort level with the legality of the
4  structure.
5      A.  I am not.
6      Q.  The next sentence reads, "After the Safe
7  Harbor was issued in 1991, we had a more complex
8  percentage of calculations contract reviewed by
9  Washington, D.C., counsel, specializing in the
10  Medicare area."  Right?
11      A.  I see that.
12      Q.  Why did Abbott undertake such a review
13  after the publication of the Medicare Safe Harbors
14  issued in 1991?
15      MS. CITERA:  Objection to the form, outside
16  the scope.  I also would caution you not to reveal
17  any privileged communications.
18  BY THE WITNESS:
19      A.  I don't know precisely, but I also don't
20  know that the reference to review by Washington
21  counsel was also part of the Ingalls analysis.  And
22  it talks about a more complex percentage of

Page 610

1  collections contract which might have been that
2  contract.
3      Q.  Okay.
4      A.  So the clause after the Medicare Safe
5  Harbors issued in 1991 might be just a reference
6  point for where in the regulatory world an analysis
7  occurred.
8      Q.  Okay.  Who was that Washington, D.C.
9  counsel?
10      A.  I understand it to be Hogan & Hartson.
11      Q.  Who were the two partners who were former
12  senior staff to OIG, Office of Inspector General?
13      A.  I can't answer that, nor do I know the
14  name I mentioned is one of those two.  I don't know
15  her background to know whether Liz Dunst was a
16  senior staff -- prior senior staffer on OIG.
17      Q.  Why did these lawyers or did these
18  counsel provide a basis for their conclusion that
19  they saw no basis for the transaction under
20  Medicare law?
21      MS. CITERA:  Objection to the form, outside
22  the scope.

                              63 (Pages 607 to 610)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 611

1   BY THE WITNESS:
2       A.  I'm sorry.  Can you repeat the question?
3       MS. ST. PETER-GRIFFITH:  Sure.  Can you read
4   it back.
5           (Record read as requested.)
6       MS. CITERA:  Same objections, and I also
7   caution you not to reveal any privilege.
8   BY THE WITNESS:
9       A.  Any basis -- any basis for their
10  conclusion and any conclusion they reached would
11  have been privileged.
12      MS. ST. PETER-GRIFFITH:  Are you instructing
13  him not to answer?
14      MS. CITERA:  I am.
15      MS. ST. PETER-GRIFFITH:  Okay.  I mean, it's
16  our position that this issue is waived.  I'd like
17  to discover the predicate for the statement that
18  they saw no problem for this transaction under the
19  Medicare law.
20      MS. CITERA:  Obviously we disagree with that
21  statement, and I'm instructing him not to answer.
22  BY MS. ST. PETER-GRIFFITH:

Page 612

1       Q.  The next sentence reads, "The Safe
2   Harbors recognize percentage arrangements have a
3   place in healthcare -- in healthcare business; but
4   from a concern that a percentage arrangement could
5   be devised to mask referral payments, the Safe
6   Harbors require more than a superficial review to
7   substantiate the legitimacy of the percentage
8   figure."  Do you see that?
9       A.  I do.
10      Q.  What measures did Abbott undertake, did
11  Abbott Home Infusion undertake to ensure that it
12  did more than a superficial review to substantiate
13  the legitimacy of the percentage figure?
14      MS. CITERA:  Objection to form, outside the
15  scope. I also caution you not to reveal any
16  privileged communications.
17  BY THE WITNESS:
18      A.  Yeah, I don't know what efforts the Home
19  Infusion business took to establish their
20  contractual terms, financial contractual terms.
21      Q.  Did -- For purposes of ensuring
22  compliance with the Safe Harbors, did Abbott Home

Page 613

1   Infusion undertake routine or regular reviews to
2   ensure that it did more than a superficial --
3   superficial review to substantiate the legitimacy
4   of the percentage figure?
5       MS. CITERA:  Same objections, caution.
6   BY THE WITNESS:
7       A.  I don't know.
8       Q.  The next sentence reads, "The attorneys
9   asked questions concerning the elements that went
10  into the percentage figures and were satisfied with
11  answers and rationale for this approach."  Do you
12  see that?
13      A.  I do.
14      Q.  What questions were asked?
15      MS. CITERA:  Same objections, same caution.
16  BY THE WITNESS:
17      A.  I don't know what the questions asked
18  were or the answers given, but I think any
19  communication with counsel would have been
20  privileged.
21      MS. ST. PETER-GRIFFITH:  Well, Toni, I know he
22  doesn't know.  But it's our position that this is

Page 614

1   discoverable and has been waived.  And also to the
2   extent that Abbott intends to rely upon an advice
3   of counsel, we're entitled to get into it.
4       MS. CITERA:  Obviously we disagree.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.  Now, in the third paragraph, the second
7   sentence reads, "First, in this uncertain
8   environment of collection payments, this approach
9   fosters a sense of partnership and commitment
10  between companies through a risk -- through a
11  sharing of risk."  Do you see that?
12      A.  I do.
13      Q.  The next sentence reads, "It lets the
14  other company know that Abbott is prepared to
15  accept a portion of risk of nonpayment."  Do you
16  see that?
17      A.  I do.
18      Q.  Is that the risk of nonpayment that we
19  were discussing before?
20      MS. CITERA:  Same objections and instruction.
21  BY THE WITNESS:
22      A.  I don't know precisely what they're

64 (Pages 611 to 614)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 615

1  referring to; but it would be in a collection of
2  payments agreement, it would be nonpayment from any
3  patient.
4      Q.  Okay.
5      A.  Medicare or otherwise.
6      Q.  Okay.
7      MS. CITERA:  Ann, I'm just going to stop you
8  here because I think I want to take a break.  I
9  appreciate you're asserting there was a waiver.  I
10  don't think there was.  I'd like to try to get a
11  little more information about this document before
12  we proceed.
13      MS. ST. PETER-GRIFFITH:  Okay.  Well, we're
14  running a little short on time if you want to
15  finish before 4:30.  Can we make it quick?
16      MS. CITERA:  At least let me make the inquiry
17  and see what I can do.
18      MS. ST. PETER-GRIFFITH:  Okay.  Why don't we
19  go off the record briefly then.
20      THE VIDEOGRAPHER:  Going off the record at
21  2:51 p.m.
22          (A short break was had.)

Page 616

1          (Enter Mr. Anderson.)
2      THE VIDEOGRAPHER:  We're back on the record at
3  3:00 p.m.
4      MS. CITERA:  I'm going to let the deposition
5  and the questioning continue.  You know, obviously
6  as I said before, we reserve the right to snap this
7  document back at a later time.  Right now it
8  appears that it is a memo that was sent along with
9  the letter, Exhibit 18.  But we are reserving our
10  rights.  We obviously do not agree with you that
11  any privilege was waived.  But we will continue
12  with the deposition.
13          I will also add on a separate note that
14  Exhibit 17, we are snapping back.
15      MS. ST. PETER-GRIFFITH:  Okay.  Toni, do you
16  just want to take custody, then, of the actual
17  marked exhibit?
18      MS. CITERA:  Uh-huh.
19      MS. ST. PETER-GRIFFITH:  We'll just let the
20  record reflect counsel for Abbott has possession of
21  that document.
22      MS. CITERA:  And then we would obviously ask

Page 617

1  for Exhibit 17 back.
2      MR. ANDERSON:  That's got some notes on it.
3  We'll destroy that one.
4      MS. CITERA:  Sure.
5      MR. ANDERSON:  Here's a clean copy.
6      MS. ST. PETER-GRIFFITH:  That's Page 2.
7      MR. ANDERSON:  You can do that just state
8  you'll destroy it.
9      MS. ST. PETER-GRIFFITH:  There we go, Toni.
10      MS. CITERA:  Obviously any other copies that
11  are at either of your offices, we would ask that
12  you destroy.
13      MS. ST. PETER-GRIFFITH:  You know what?  At
14  the end of the day, I need to get the Bates numbers
15  of that.
16      MS. CITERA:  Okay.  Okay.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Sir, if we could -- Where did we leave
19  off on this document?
20      A.  Are we on Exhibit 19 still?
21      Q.  Yes.
22      A.  Okay.

Page 618

1      Q.  We were discussing the portion, I
2  believe, of this memorandum concerning the
3  uncertainty of collection of payments and the risk
4  of nonpayment, right?
5      A.  Oh, the second -- you were reading the
6  second sentence in the third paragraph?
7      Q.  Yes.
8      A.  Okay.  I'm sorry.  Was there an
9  outstanding question pending?
10      Q.  Sure, sure.  I just wanted to first say,
11  was that your recollection of where we left off?
12      A.  Yeah.  I was reading -- I don't know if
13  it was the second and third sentence or just the
14  second sentence?
15      Q.  Well, I'd like to direct your attention
16  to the third sentence.  I mean, we spent some time
17  earlier today going over Abbott's risk of
18  nonpayment.
19          Is the risk of nonpayment to Abbott
20  two-fold: First, the cost of its product and,
21  second, the cost of the services provided with
22  regard to a particular patient who may not be

65  (Pages 615 to 618)

Chicago, IL

Page 619

1  reimbursed by a third-party provider?
2      MS. CITERA:  Objection to the form, outside
3  the scope.  I also caution you not to reveal any
4  privileged discussions.
5  BY THE WITNESS:
6      A.  Yeah, without knowing the terms of the
7  contract on its face, a product and services
8  arrangement on a collection of payments basis, the
9  risk would be with respect to products and
10 services.
11     Q.  Okay.  And in terms of the risk on the
12 products, it would be Abbott's cost associated with
13 providing that product to the consignment partner,
14 correct?
15     MS. CITERA:  Same objections.
16 BY THE WITNESS:
17     A.  Same comment that without knowing the
18 terms in which the contract reads but on its face,
19 without any other terms, the risk of collection of
20 payments, that would be true.
21     Q.  The next sentence -- the next sentence
22 reads, "Second, Abbott invests significant funds

Page 620

1  and efforts in establishing a comprehensive program
2  offered in its entirety to customers."  Do you see
3  that?
4      A.  I do.
5      Q.  What investments were made in ensuring
6  that Abbott's comprehensive program complied with
7  federal and state Medicare and Medicaid fraud and
8  abuse statutes?
9      MS. CITERA:  Objection to the form.
10 BY THE WITNESS:
11     A.  I don't know what the comprehensive
12 program would have been.
13     Q.  Okay.  Do you know what the significant
14 investment of funds is?
15     A.  I don't have knowledge.  I'd have to
16 speculate.
17     Q.  The next -- The next sentence which goes
18 over to the next page says, "We avoid breaking out
19 separate charges because, one, the broader program
20 investments -- i.e., facility, equipment, and
21 services, facility design services -- provided
22 initially by Abbott represent substantial

Page 621

1  expenditures some customers would find difficult to
2  manage if they had to bear them up front." Do you
3  see that?
4      A.  I do.
5      Q.  In entering into some of these risk-share
6  arrangements, did Abbott provide upfront
7  expenditures so that its risk-share clients would
8  not have to?
9      MS. CITERA:  Objection to the form, outside
10 the scope.
11 BY THE WITNESS:
12     A.  Repeat the question.
13         (Record read as requested.)
14 BY THE WITNESS:
15     A.  I don't know that I can reach that
16 conclusion. I'm also -- I'm realizing terminology
17 is different, that we have to assume the collection
18 of payments arrangement and risk share are one and
19 the same.  I think we have been using them
20 interchangeably.
21     Q.  Okay.
22     A.  And so assuming that to be true, I don't

Page 622

1  know. It sounds like the way this is written, that
2  Abbott made investments in its own operations and
3  own capabilities of providing Home Infusion
4  Services and that that's part of the services it's
5  providing.  And if they didn't provide those
6  services, they would be -- a customer would have to
7  provide them themselves.  And it's like buying a
8  product.  If you didn't buy product from me, you'd
9  have to make it yourself.  And you'd have to have a
10 plant and production equipment and people to do it.
11 I've already made that investment.  I have the
12 capabilities of providing it to you.  If you don't
13 -- we don't do this together in this way, you'll
14 have to do it yourself.  Then you'll have to buy
15 your factory and equipment and have all your people
16 to make it.
17     Q.  Would that be a basis for not breaking
18 out separate charges to demonstrate the fair market
19 value of the goods and services provided?
20     MS. CITERA:  Objection to the form, outside
21 the scope.
22 BY THE WITNESS:

66 (Pages 619 to 622)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 623

1    A.  I don't know.
2    Q.  If you could look under Item 2 on the
3  second page, do you see where it says, "The broader
4  program investments"?
5    A.  Footnote 2?
6    Q.  No, no, no, I'm sorry.  Under -- In the
7  first paragraph, continuing from the last page --
8    A.  Oh, okay, "The case-by-case mix" --
9    Q.  "Mix of products and services makes
10  establishing separate charges administratively
11  difficult."  Do you see that?
12    A.  I do.
13    Q.  Is that a reason why Abbott did not
14  provide a separate breakout of charges for its
15  consigned products and its services to demonstrate
16  the fair market value for those products and
17  services?
18    MS. CITERA:  Objection to the form, outside
19  the scope.  And I caution you not to reveal any
20  privileged communications or analysis.
21  BY THE WITNESS:
22    A.  Based on the language that Mr. Taylor

Page 624

1  provided, there's no correlation between that
2  explanation and not providing fair market value.
3    Q.  Okay.  But, I mean, you see that Mr.
4  Taylor's providing -- appears to be providing a
5  reason why Abbott does not break out separate
6  charges for product and services, is that fair, in
7  that paragraph?
8    MS. CITERA:  Object to the form, outside the
9  scope.
10  BY THE WITNESS:
11    A.  I believe the words state that we avoid
12  breaking out because of 1 and 2.
13    Q.  Okay.  Are those Abbott's -- Are those
14  two reasons the reasons why Abbott does not break
15  out the fair market value of services and the cost
16  of services and products to its consignment
17  partners?
18    MS. CITERA:  Objection to the form, outside
19  the scope, same caution regarding privilege.
20  BY THE WITNESS:
21    A.  I don't -- Again, I don't believe the
22  language addresses in the context of providing or

Page 625

1  not providing fair market value information.
2    Q.  Well, I understand.  But it says, "We
3  avoid breaking out separate charges."  What charges
4  does Abbott avoid breaking out?
5    MS. CITERA:  Same objections and caution.
6  BY THE WITNESS:
7    A.  Not having written this, it would be the
8  charges associated with providing products and
9  services.
10    Q.  Okay.  And from the Gardner Carton
11  opinion before, we learned that it was important
12  for purposes of demonstrating Medicare and Medicaid
13  compliance to be able to demonstrate the fair
14  market value for services and product; is that
15  fair?
16    MS. CITERA:  Object to the form, outside the
17  scope.
18  BY THE WITNESS:
19    A.  In this whole line of question, I guess I
20  would look at the penultimate paragraph to respond
21  to your questions.
22    Q.  Okay.  The penultimate paragraph meaning

Page 626

1  the one in the prior exhibit concerning --
2    A.  No, the penultimate paragraph on Exhibit
3  19.
4    Q.  Okay.
5    A.  "Finally."
6    Q.  Okay.  It says, "Finally, if there be any
7  concern of ensuring compliance with Medicare laws
8  from a cost reporting standpoint, we are always
9  willing to assist clients in providing any
10  information needed to prepare accurate cost
11  reports."
12    A.  Correct.
13    Q.  What does cost reporting have to do --
14  Well, let me ask you this:  What information did
15  Abbott Home Infusion provide to its clients to
16  assist them in preparing accurate cost reports?
17    MS. CITERA:  Objection to the form, outside
18  the scope.
19  BY THE WITNESS:
20    A.  I don't know that they were ever asked to
21  provide; and if they were asked to provide, what
22  they arguably would have provided would have been

67 (Pages 623 to 626)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                          March 20, 2008

## Chicago, IL

Page 627

1  the information requested. It's an offer to
2  provide the information. Whether it happened with
3  this customer or any other customer, I do not know.
4      Q.  Sir, I think we're done with our Home
5  Infusion documents. There is one relatively newly
6  produced document that I would like to go over, and
7  it is in that stack.
8      A.  Exhibit 8?
9      Q.  Exhibit 8. And it is the Cliff Berman
10  presentation. We're going to start there?
11     A.  Okay.
12     Q.  Sir, have you had an opportunity to
13  review this document?
14     A.  I saw it. I reviewed it yesterday.
15     Q.  I'm going to start --
16     A.  Or last night, actually.
17     Q.  All right. Didn't we all review it last
18  night.
19         I have a variety of questions to go over.
20  But I'd like to start, sir, sort of in the middle
21  of the document at Page Abbott DOJ 0395561.
22     A.  Okay.

Page 628

1      Q.  Sir, if you could take a look at that
2  page, please?
3      A.  Okay.
4      Q.  First, what does "risk areas" mean?
5  Well, let me ask you, let's start out, what is this
6  presentation or document?
7      A.  This document is a presentation that
8  Cliff Berman provided. I'm not certain of the
9  audience. In talking with Cliff, he indicated that
10  he pretty much lifted it from a presentation that
11  was provided to him by Joe Savage at Testa,
12  Hurwitz.
13     Q.  Okay. We need to go back, Mr. Fishman.
14     A.  Okay.
15     Q.  I don't think Mr. Berman was one of those
16  -- Well, let me ask you this. When did you discuss
17  this with Mr. Berman?
18     A.  Before my original deposition. When did
19  I discuss this document?
20     Q.  Yes, this document. I know you talked
21  with Mr. Berman before your deposition. I guess,
22  this is my confusion, sir.

Page 629

1      A.  I did not talk to him about this specific
2  -- Let me think about this. The Tuesday before my
3  deposition; so last Tuesday, I met with Cliff.
4      Q.  Did you have this document then?
5      A.  I did not have this document.
6      Q.  Okay. Did you discuss this document with
7  Mr. Berman?
8      A.  We discussed presentations he made. I
9  don't know that he -- he must have specifically
10  mentioned -- he must have been referring to this
11  because he talked about Testa, Hurwitz.
12     Q.  Do you know whether -- Well, do you know
13  how many presentations Mr. Berman made that he
14  might have been referencing?
15     A.  He made many presentations. As a
16  healthcare compliance lawyer, that was one of his
17  primary functions.
18     Q.  Okay. And you testified earlier, Mr.
19  Berman is the subject matter expert that was
20  brought into Abbott's legal?
21     A.  Yes.
22     Q.  At or around the time of --

Page 630

1      A.  December '02.
2      Q.  December '02, okay. Was he brought in
3  after the Ross settlement or around that time?
4      A.  It would have been prior to the Ross
5  settlement because the Ross settlement was July of
6  '03.
7      Q.  Was he brought on after TAP, after the
8  TAP settlement and criminal pleas?
9      MS. CITERA:  Objection to the form.
10  BY THE WITNESS:
11     A.  That's kind of factual. I don't know the
12  chronology exactly when the TAP criminal plea and
13  payments were. It's just a fact he started the
14  last week of December of '02. So if TAP occurred
15  prior to that, it would have been yes. If TAP
16  occurred after that, the answer is no.
17     Q.  Well, we're going to -- We'll get into
18  that a little bit more because I think there are
19  TAP references in here.
20     A.  Oh, okay.
21     Q.  Sir, how do you know that it's this
22  particular presentation that he was -- that Mr.

68 (Pages 627 to 630)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 631

1 Berman was referring to that he lifted from Joe
2 Savage?
3     A.  There is at least one page in here that
4 has Testa, Hurwitz's name on it.
5     MS. CITERA:  If I can assist --
6     MS. ST. PETER-GRIFFITH:  Sure.
7     MS. CITERA:  It's Abbott-DOJ 03 -- well, at
8 least this is one, 0395554.
9 BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay.  Okay.  If we could flip to 5561 --
11     A.  Okay.
12     Q.  Sir, this particular slide of the
13 presentation deals with risk areas.  Do you see
14 that?
15     A.  I do.
16     Q.  What is meant by "risk areas"?
17     A.  I believe you'd have to read it in
18 context with the Document 0395559, which is OIG
19 Compliance Guidance For Pharmaceutical
20 Manufacturers.
21     Q.  Okay.
22     A.  And then the next page which is 0395560,

Page 632

1 which identifies three risk areas identified by
2 OIG.
3     Q.  Okay.
4     A.  Then next document gets into No. 1 of the
5 three areas identified.
6     Q.  Okay.  And it says, "Guidance asserts
7 that a manufacturer may be liable under the False
8 Claims Act if the government reimbursement for a
9 product depends partly on information it reported
10 directly or indirectly."  Do you see that?
11     A.  "Pricing information."
12     Q.  "Pricing information," okay.
13     A.  Yes.
14     Q.  What pricing information did Abbott
15 directly or indirectly report that it understood
16 may implicate the False Claims Act?
17     MS. CITERA:  Objection to the form, outside
18 the scope.
19 BY THE WITNESS:
20     A.  Well, you have to repeat that, please.
21     MS. ST. PETER-GRIFFITH:  Can you read that
22 question back, please?

Page 633

1     (Record read as requested.)
2     MS. CITERA:  Same objection.
3 BY THE WITNESS:
4     A.  Are we talking about after the OIG
5 guidance on this?
6     Q.  At any time.
7     A.  At any time.
8     MS. CITERA:  Same objections.
9 BY THE WITNESS:
10     A.  I think the question assumes a conclusion
11 that we provided pricing information directly or
12 indirectly that would have implicated the statute.
13 You've reached a conclusion through your question
14 and asking me which -- what information fits into
15 that conclusion.
16     Q.  Well, I'm asking about Abbott's -- I
17 mean, well, let me ask you, did this particular
18 paragraph apply to Abbott?
19     A.  It applied to everybody.
20     Q.  Okay.  So what -- what price information
21 that Abbott reported, if any, may have been
22 implicated -- may have implicated the False Claims

Page 634

1 Act?
2     MS. CITERA:  Object to the form, outside the
3 scope.
4 BY THE WITNESS:
5     A.  It's -- The question -- The form of the
6 question I find to be assuming a conclusion.
7 Again, I can read what the guidance from OIG --
8 This is a recitation, which it's in quotes.  I
9 mean, it's a recitation of what OIG is advising the
10 industry.  And it's asserting in 1993 that
11 manufacturer, Abbott, may be liable under False
12 Claims Act if they did this.
13     Q.  Okay.
14     A.  And, and there's a number two.  So by
15 itself, a manufacturer may be liable if they
16 provide pricing -- if government reimbursement
17 depends on pricing information it provided.
18     Q.  Okay.  So --
19     A.  They may be liable.
20     Q.  Abbott understood that it may be liable
21 if it failed to report accurate and complete
22 information that was utilized by the government for

69 (Pages 631 to 634)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 635

1 reimbursement?
2      MS. CITERA:  Object to the form, outside the
3 scope. I also caution you not to reveal anything --
4 any privileged communications or analysis.
5 BY THE WITNESS:
6      A.  I mean, you're not reading the entire
7 phrase here.  It's -- Again, this is -- this is
8 assertion -- this is guidance provided by the
9 government on information that otherwise hadn't
10 provided guidance on or it wouldn't be current
11 guidance.
12      Q.  Okay.  Let me ask it this way:  The
13 statement reflected on this page, was this Abbott's
14 understanding of its obligation under the False
15 Claims Act with regard to price reporting that it
16 directly or indirectly made?
17      MS. CITERA:  Objection to the form, outside
18 the scope.  I also caution you not to reveal any
19 privileged communications or analysis.
20 BY THE WITNESS:
21      A.  I think it's a reflection of what OIG is
22 stating the requirements to be.

Page 636

1      Q.  Okay.  But did Abbott follow the
2 requirements set forth on this page?
3      MS. CITERA:  Same objections.
4 BY THE WITNESS:
5      A.  I don't know that they didn't.
6      Q.  Okay.  Well, do you know that they did?
7      A.  Back to the testimony I gave last
8 Wednesday, which is, this was an evolving
9 environment.  And once there was clearer guidance
10 as to how particular provisions within a statute or
11 regulations were being interpreted, Abbott would
12 have taken that very seriously and would have
13 evaluated its operations in connection with that
14 guidance.
15      Q.  From 1991 through 2003, did Abbott comply
16 with what is identified here as a manufacturer's
17 obligations under the False Claims Act?
18      A.  Identifies it as a possible obligation.
19      MS. CITERA:  Objection to form, outside the
20 scope.
21 BY MS. ST. PETER-GRIFFITH:
22      Q.  I'm sorry?

Page 637

1      A.  It identifies it as may be liable.
2      Q.  Well, did Abbott think that it wasn't
3 liable?
4      MS. CITERA:  Same objections.
5 BY THE WITNESS:
6      A.  You're asking for a legal conclusion.
7      Q.  What I'm asking for, sir, is did Abbott
8 believe or understand that it was required to
9 follow what is set forth on this page as a -- an
10 obligation of a manufacturer under the False Claims
11 Act?
12      MS. CITERA:  Objection to the form, outside
13 the scope.
14 BY THE WITNESS:
15      A.  Abbott absolutely believed that it was
16 obligated to follow the federal False Claims Act
17 and any other healthcare compliance obligations.
18      Q.  Okay.  And from 1991 through 2003, did
19 Abbott follow this guidance that is set forth on
20 this page as to its obligations under the False
21 Claims Act?
22      MS. CITERA:  Same objections.

Page 638

1 BY THE WITNESS:
2      A.  That answer requires a legal conclusion,
3 now applying the facts of how Abbott did its --
4 conducted its business against the Act, federal
5 False Claims Act and reaching a conclusion whether
6 or not it complied.
7      Q.  I'm asking whether what is outlined here
8 -- Well, let me ask you, did Abbott with regard to
9 prices that it directly or indirectly reported, did
10 it ever knowingly or recklessly fail to report
11 accurate and complete information concerning its
12 discounts, rebates, free goods, upfront payments,
13 coupons, goods in kind, free or reduced prices or
14 services, grants, or other price concessions or
15 similar benefits?
16      MS. CITERA:  I'm going to object to the form.
17 It's clearly asking for a legal conclusion and
18 beyond the scope.
19 BY MS. ST. PETER-GRIFFITH:
20      Q.  I'm not asking -- I'm asking for Abbott's
21 practice.
22      A.  No, you're asking me did Abbott fail to

70 (Pages 635 to 638)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 639

1  do this.  And if we failed to do it, I'd be
2  evaluating the actions that we took against the
3  scope of the statute and reaching a conclusion that
4  we failed to adhere to the statute.  If we did do
5  it, I'd be taking the same evaluations of a
6  different set of facts, applying it against the
7  same set of statutes, and saying yes, we complied.
8  So it's absolutely reaching a legal conclusion.
9      Q.  As a factual matter, did Abbott undertake
10  the reporting obligations set forth on this page?
11      MS. CITERA:  Same objections.
12  BY THE WITNESS:
13      A.  As a factual matter, Abbott conducted its
14  business in compliance with healthcare compliance
15  laws and regulations.
16      Q.  But did it follow what is set forth on
17  this page?
18      A.  Whether you follow or --
19      MS. CITERA:  Object to the form, outside the
20  scope.
21  BY THE WITNESS:
22      A.  I'm sorry.  I continue to believe whether

Page 640

1  we followed it, whether we adhered to it, whether
2  we complied with it, whether we violated it, to get
3  to that conclusion, I continue to have to reach a
4  legal conclusion.
5      Q.  As Abbott sits here today, it is refusing
6  to answer and identify whether or not it undertook
7  what is set forth on this page?
8      MS. CITERA:  You're asking him for a legal
9  conclusion.
10      MS. ST. PETER-GRIFFITH:  I am not, Toni.  And
11  quit coaching the witness.
12      MS. CITERA:  He said it long before I said it.
13  Outside the scope.
14  BY THE WITNESS:
15      A.  We assert -- My two statements which I
16  believe are the two statements I can make regarding
17  the question you've asked, Abbott complied, sought
18  to comply, Abbott complied with the federal -- all
19  laws, but specifically the healthcare compliance
20  laws.  But to make a determination of whether in
21  its actual practice it lived up to that effort is a
22  legal conclusion.

Page 641

1      Q.  Well, Abbott understood that the
2  government -- that Medicare and Medicaid programs
3  utilized AWP and, for Medicaid programs in some
4  instances, WAC information for government
5  reimbursement, correct?
6      MS. CITERA:  Objection to form, outside the
7  scope.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Correct?
10      A.  I have read testimony where people within
11  Abbott understood that AWP information was used in
12  reimbursement.
13      Q.  And Abbott understood that list price
14  information it reported to the price reporting
15  compendia influenced how AWP was calculated,
16  correct?
17      MS. CITERA:  Objection to the form, outside
18  the scope.
19  BY THE WITNESS:
20      A.  Abbott -- Again, reading the testimony
21  that I did read, Abbott understood that the list
22  information is the information that the compendia

Page 642

1  requested.
2      Q.  Did Abbott at all times from 1991 through
3  2003 report accurate and complete information
4  concerning its list prices?
5      MS. CITERA:  Object to the form, outside the
6  scope.
7  BY THE WITNESS:
8      A.  The answer to that requires a legal
9  conclusion as to whether or not we did it
10  completely and accurately.
11      Q.  In reporting its list prices, did Abbott
12  ever identify to the pricing compendia the
13  differences between its actual contract prices and
14  its list prices?
15      MS. CITERA:  Objection to the form, outside
16  the scope.
17  BY THE WITNESS:
18      A.  I don't have personal knowledge that they
19  did that.  I'm trying to recall the deposition
20  testimony that I read, whether somebody within
21  Abbott would have testified to that having
22  occurred.  And I don't -- I don't recall it at this

71 (Pages 639 to 642)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 643

1  moment.
2      Q.  Did Abbott ever report to the government
3  the differences between its contract prices and its
4  list prices from 1993 through 2003 for the subject
5  drugs?
6      MS. CITERA:  Objection to the form, outside
7  the scope.
8  BY THE WITNESS:
9      A.  I don't know that they did that.
10     Q.  Sir, did Abbott understand that its
11  obligations under the False Claims Act and to
12  comply with the false claims were not just
13  obligations concerning what it -- concerning
14  knowing violations of the False Claims Act but also
15  reckless or inadvertent conduct in its price
16  reporting?
17     MS. CITERA:  Object to the form, outside the
18  scope. Also I'd caution you not to reveal any
19  privileged communications or analysis.
20  BY THE WITNESS:
21     A.  Without being able to recite the OIG
22  guidance in 2003, I would suggest that in 2003,

Page 644

1  Abbott would have had that understanding.
2      Q.  What about prior to 2003?
3      MS. CITERA:  Same objections and instruction.
4  BY THE WITNESS:
5      A.  Repeat, without knowing precisely what --
6  specifically what that guidance was, if the
7  guidance was not provided in the terms that you've
8  described to me, they may not have understood that
9  to be the interpretation of the federal False
10  Claims Act.
11     Q.  Did Abbott ever seek clarification from
12  the federal government concerning the federal False
13  Claims Act?
14     A.  Not to my knowledge.
15     MS. CITERA:  Same objections.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Is there any pricing published directly
18  or indirectly by Abbott from 1991 to 2003 upon
19  which the reimbursement of Abbott's products was
20  partly based?
21     MS. CITERA:  Objection to the form, outside
22  the scope.

Page 645

1  BY THE WITNESS:
2      A.  What does that have to do with
3  compliance? Can you read the question again,
4  please?
5          (Record read as requested.)
6      MS. CITERA:  Same objections.
7  BY THE WITNESS:
8      A.  Which pricing, the list pricing?  What
9  were the categories of pricing in the question?
10         (Record read as requested.)
11  BY THE WITNESS:
12     A.  To the extent a hospital purchased a
13  product at a published price, that would have gone
14  into a hospital's cost reporting for its cost
15  report.
16     Q.  Okay.  What about in the Alt Site market?
17     MS. CITERA:  Same objections.
18  BY THE WITNESS:
19     A.  It would be true to the extent Alt Site
20  market was reimbursed on a DRG basis.
21     Q.  What about for non-DRG-based
22  reimbursements?

Page 646

1      MS. CITERA:  Same objections.
2  BY THE WITNESS:
3      A.  Reading deposition testimony, my
4  understanding is that reimbursement was not tied to
5  list price but rather AWP.
6      Q.  Okay.  But Abbott had an understanding
7  AWP was tied to list price, correct?
8      MS. CITERA:  Objection to form, outside the
9  scope.
10  BY THE WITNESS:
11     A.  There were people in Abbott who
12  understood that, yes.
13     Q.  How did Abbott go about satisfying the
14  False Claims Act in publishing its catalog or list
15  prices? And let's start from 1991 to 2000.
16     MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18     A.  A similar answer to what I've given
19  before, which is that the series of employees from
20  managers to direct reports who were responsible for
21  providing this information would be subject to
22  complying with laws and they would attempt to

72 (Pages 643 to 646)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                          March 20, 2008

Chicago, IL

Page 647

1  comply with laws.
2      Q.  Did Abbott -- What about from 2002 to
3  present?
4      MS. CITERA:  Same objection.
5  BY THE WITNESS:
6      A.  I think that's true in all instances.
7      Q.  Did Abbott take any steps to make sure
8  that its catalog prices reflected the prices to
9  providers?
10     MS. CITERA:  Object to the form.
11 BY THE WITNESS:
12     A.  You have brought to my attention a
13 previous deposition, and it may not be relating to
14 this question. But I'm understanding it to relate
15 to this question, that Abbott took some action to
16 -- HPD took some action to change its list price in
17 the 2000/2001 time frame.
18     Q.  Okay.  Other than that change in 2001 or
19 prior to 2001 or the time period of that change in
20 2001, did Abbott take any steps to make sure that
21 its catalog prices reflected the prices paid by
22 providers?

Page 648

1      MS. CITERA:  Objection to the form.
2  BY THE WITNESS:
3      A.  All providers?
4      Q.  Well, Alt Site providers.
5      A.  Catalog prices reflect the price paid by
6  Alt Site providers? I would assume that some Alt
7  Site providers paid a contract price.
8      MR. ANDERSON:  Objection, nonresponsive.
9      MS. ST. PETER-GRIFFITH:  Can you read back
10 that answer?
11         (Record read as requested.)
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Okay.  So if Alt Site providers paid a
14 contract price, what did Abbott do in trying to
15 assure its complying with federal and state
16 Medicare and Medicaid fraud and abuse statutes,
17 what did Abbott do to ensure that its catalog
18 prices reflected prices paid by providers?
19     MS. CITERA:  Object to the form.
20 BY THE WITNESS:
21     A.  I don't know what they did to ensure
22 that.

Page 649

1      Q.  Sir, if you could flip to Page 0395568 --
2      A.  55.
3      Q.  68?
4      A.  68.  Okay.
5      MS. ST. PETER-GRIFFITH:  Hold on just a
6  second, please.  Okay.  If we could go back to that
7  last question, and could you read back his answer
8  to the last question?
9      MS. CITERA:  Can we just read the question and
10 answer?
11     MS. ST. PETER-GRIFFITH:  Sure, that's fine.
12         (Record read as requested.)
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Do you know if they did anything?
15     MS. CITERA:  Object to the form.
16 BY THE WITNESS:
17     A.  Go back two questions before that.  It's
18 assuming that all Alt Site providers paid a catalog
19 price, which I don't know to be true.  But I don't
20 know specifically what they did, no.
21     Q.  Well, I don't think it is assuming they
22 all paid a catalog price.  That's the point of the

Page 650

1  question, sir, is what did Abbott do to ensure that
2  its reported prices, which are its list or catalog
3  prices, correlated or related to the prices
4  actually paid by providers?
5      MS. CITERA:  Object to the form, outside the
6  scope.
7  BY THE WITNESS:
8      A.  The answer to the question is, I don't
9  know. But I also don't know that the providers --
10 the providers actually bought the product directly
11 from Abbott. It's a complex distribution and
12 distribution system within the healthcare world
13 with wholesalers and distributors, so they may not
14 have bought the product directly from Abbott at
15 all.
16     Q.  Okay.  Well, if they didn't buy the
17 product directly from Abbott, did Abbott have an
18 understanding that in order to comply with federal
19 and state Medicare and Medicaid fraud and abuse
20 laws that its direct or indirect reported prices
21 needed to bear some relation to the prices paid by
22 providers?

73 (Pages 647 to 650)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 651

1       MS. CITERA:  Object to the form, outside the
2   scope.
3   BY THE WITNESS:
4       A.  Abbott had an understanding of the
5   healthcare compliance laws, yes.
6       Q.  But did it have an understanding that in
7   order to comply with federal and state Medicare and
8   Medicaid laws, that its direct or indirect reported
9   prices needed to bear some relation to the prices
10  paid by providers?
11      MS. CITERA:  Object to the form.  You're
12  testifying now.
13      MS. ST. PETER-GRIFFITH:  No, I'm not.  I'm
14  asking him the question.
15      MS. CITERA:  Well, you're reaching legal
16  conclusions and you're saying -- outside the scope.
17      MR. ANDERSON:  I move to strike the sidebar
18  comments.
19  BY THE WITNESS:
20      A.  There's an outstanding question.  Can you
21  please repeat it?
22          (Record read as requested.)

Page 652

1       MS. CITERA:  Same objections.
2   BY THE WITNESS:
3       A.  The difference between that question and
4   other questions is you've asked previously did
5   Abbott understand there was a relationship between
6   list price and AWP.  This is asking for a legal
7   conclusion.
8       Q.  Oh, I don't think it is.
9       MS. ST. PETER-GRIFFITH:  If you could go back
10  and reread the question, please.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  And, sir, I'd like you to answer the
13  question.
14          (Record read as requested.)
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  I'm asking about Abbott's understanding.
17      A.  Abbott's understanding in order --
18      MS. CITERA:  Same objections, object to the
19  form and outside the scope.
20  BY THE WITNESS:
21      A.  Abbott's understanding in order to comply
22  with laws is to reach a legal conclusion because

Page 653

1   you're evaluating its evaluation of its activities
2   in relationship with what the law requires and
3   reaching a conclusion whether or not it complied.
4       Q.  Well, did Abbott do anything to ensure
5   that it was complying with the federal False Claims
6   Act?
7       MS. CITERA:  Objection to the form.
8   BY THE WITNESS:
9       A.  I rest on the testimony I've given
10  previously.
11      Q.  Well, what did Abbott do to ensure, if
12  anything, if it did anything, what did Abbott do to
13  ensure that in complying with the federal False
14  Claims Act, that its published list or catalog
15  prices reflected prices paid by providers?
16      MS. CITERA:  Objection to the form, outside
17  the scope.
18  BY THE WITNESS:
19      A.  I previously stated Abbott complied with
20  laws. Abbott provided -- Abbott legal provided
21  legal presentations on reviewing the federal False
22  Claims Act and Medicare fraud and abuse laws and

Page 654

1   Safe Harbors, and it relied on its management
2   structure from manager to direct reports to adhere
3   to the requirements that were expected of it.
4       Q.  As you sit here today, as Abbott, what
5   can you tell the jury Abbott did in order to ensure
6   that its published list and catalog prices
7   reflected prices paid by providers?
8       MS. CITERA:  Objection to the form, outside
9   the scope.
10  BY THE WITNESS:
11      A.  To the extent those provisions were
12  understood and provided guidance to the industry,
13  Abbott would have adhered to that guidance.
14      Q.  Well, at any time from 1991 until the
15  publication of the OIG guidance, was Abbott at all
16  confused about its obligations under the False
17  Claims Act?
18      A.  Not to --
19      MS. CITERA:  Object to the form, outside the
20  scope.
21  BY THE WITNESS:
22      A.  Not to my knowledge.

74 (Pages 651 to 654)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 655

1     Q.  Did Abbott ever seek clarification as to
2  its obligations under the False Claims Act?
3     MS. CITERA:  Objection to the form, beyond the
4  scope.
5  BY THE WITNESS:
6     A.  Clarification from whom?
7     Q.  From the federal government.
8     A.  Not to my knowledge.
9     MS. CITERA:  Same objections.
10    THE WITNESS:  Sorry.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Then if Abbott wasn't confused as to its
13  obligations and Abbott didn't need to seek guidance
14  as to its obligations, what did Abbott do to ensure
15  it complied with the federal False Claims Act with
16  regard to publishing list and catalog prices that
17  reflected prices paid by providers?
18    MS. CITERA:  Same objections.
19  BY THE WITNESS:
20    A.  I rely on my existing testimony.
21    Q.  Which testimony is that, sir?
22    A.  Of the compliance efforts that Abbott

Page 656

1  went through as an organization.
2     Q.  Well, I don't think you've testified as
3  to what it did with regard to ensuring the
4  correlation between its catalog prices and its
5  prices paid by providers.  So I'd like for you to
6  explain to the jury what Abbott did in order to
7  ensure such compliance.
8     MS. CITERA:  Object to the form, outside the
9  scope to the extent you're asking for a legal
10  conclusion.
11  BY THE WITNESS:
12    A.  I don't have anything to add to my
13  testimony.
14    Q.  Well, did you review the testimony of
15  Pete Karas in preparing for today's testimony?
16    A.  I did not.
17    Q.  Was Mr. Karas' testimony reasonably
18  available to Abbott?
19    MS. CITERA:  Objection to the form.
20  BY THE WITNESS:
21    A.  I don't have a reason to believe it
22  wasn't.

Page 657

1     Q.  Well, did you have any understanding that
2  Abbott executives have testified that catalog
3  prices were unintended -- were unattended and were
4  not set based upon prices paid by providers?
5     MS. CITERA:  Objection to the form.
6  BY THE WITNESS:
7     A.  I have not seen that testimony.
8     Q.  As you sit here today, other than what
9  you've testified to already, can you tell us
10  anything about what Abbott did to ensure compliance
11  with the federal False Claims Act from 1991 until
12  2003?
13    MS. CITERA:  Objection to the form.
14  BY THE WITNESS:
15    A.  I continue to rely on my existing
16  testimony.
17    Q.  If we could turn to Page 0395568.
18    A.  Okay.
19    Q.  And this page concerns average wholesale
20  price.  Do you see that?
21    A.  I do.
22    Q.  And it's also a continuation, it appears,

Page 658

1  of the risk areas previously identified?
2     A.  I see that.
3     Q.  Do you see the first bullet?  It says,
4  "The guidance states it is illegal for a
5  manufacturer knowingly to establish or maintain a
6  particular AWP if one purpose is to manipulate the
7  spread to induce customers to purchase its
8  products."  Do you see that?
9     A.  I do.
10    Q.  At any time from 1991 to 2003, what did
11  Abbott do to ensure compliance and verify that it
12  did not knowingly establish or maintain a
13  particular AWP for the purpose of manipulating the
14  spread?
15    MS. CITERA:  Objection to the form.
16  BY THE WITNESS:
17    A.  Same round of responses from before.
18  Abbott -- I rely on the testimony previously as to
19  what we did to ensure compliance.  My understanding
20  of this guidance is that this was fresh information
21  as of 2003 provided for the first time by OIG.
22    Q.  Well, did Abbott -- was Abbott, prior to

75 (Pages 655 to 658)

Chicago, IL

Page 659

1  the issuance of this guidance, at any time confused
2  about what its obligations were with regard to AWP?
3      MS. CITERA:  Objection to the form.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  From 1991 until the publication of the
6  guidance?
7      A.  Not to my knowledge.
8      MS. CITERA:  Objection to the form, outside
9  the scope.
10  BY THE WITNESS:
11      A.  Sorry.  Not to my knowledge.
12      Q.  What did Abbott do to review its AWP
13  reporting practices and methodologies to confirm
14  that marketing considerations did not influence
15  that process?
16      MS. CITERA:  Objection to the form.  I would
17  also caution you not to reveal any privileged
18  discussions or analysis.
19  BY THE WITNESS:
20      A.  My understanding from reading deposition
21  testimony is that Abbott did not provide AWP
22  information, and it did not publish AWPs.

Page 660

1      Q.  But Abbott had an understanding that its
2  list prices had a correlation to the AWPs as they
3  were calculated by the pricing compendia, correct?
4      MS. CITERA:  Objection to the form, outside
5  the scope.
6  BY THE WITNESS:
7      A.  Reading the deposition testimony that I
8  read, there were people within Abbott who
9  understood that list price was utilized by the
10  compendia in preparing or publishing AWP.
11      Q.  From 1991 until 2003, what steps, if any,
12  did Abbott undertake to review their AWP reporting
13  practices and methodologies to confirm that
14  marketing considerations did not influence the
15  process?
16      MS. CITERA:  Object to the form, same caution
17  regarding privilege.
18  BY THE WITNESS:
19      A.  Reiterate that they didn't have AWP
20  reporting. They provided list price.
21      Q.  Okay.  Then list price reporting.  What
22  did Abbott do from 1991 until 2003 to review -- to

Page 661

1  review its list price reporting practices and
2  methodologies to confirm that marketing
3  considerations did not influence the process?
4      MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6      A.  I don't know.
7      Q.  The next bullet reads, "The guidance
8  states that pharmaceutical manufacturers generally
9  report either AWP or pricing information used by
10  commercial price reporting services to determine
11  AWP."  Do you see that?
12      A.  I do.
13      Q.  And have we established that Abbott fits
14  into that latter category, correct, from 1991 to
15  2003?
16      MS. CITERA:  Objection to the form, outside
17  the scope.
18  BY THE WITNESS:
19      A.  Based on testimony I read, I would
20  believe -- I believe it's the latter category,
21  providing information to commercial price reporting
22  services.

Page 662

1      Q.  Did Abbott also report WAC prices?
2      MS. CITERA:  Objection to the form -- well,
3  it's outside the scope.
4  BY THE WITNESS:
5      A.  I don't know.
6      Q.  If Abbott reported WAC prices to the
7  price reporting compendia, would Abbott expect that
8  its WAC prices would be accurate and consistent?
9      MS. CITERA:  Objection to the form, outside
10  the scope.
11      MS. ST. PETER-GRIFFITH:  I'll just say
12  "accurate" and leave off the "consistent."
13      MS. CITERA:  Same objections.
14  BY THE WITNESS:
15      A.  Abbott would expect that any pricing
16  information it provided would be accurate.
17      Q.  Okay.  What did Abbott do to verify that
18  the pricing that it reported to the price reporting
19  compendia that in turn may have been relied upon by
20  government payors in providing reimbursement was
21  accurate?
22      MS. CITERA:  Objection to the form and outside

76 (Pages 659 to 662)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 663

1  the scope.
2  BY THE WITNESS:
3      A.  In terms of compliance efforts, I don't
4  have any additional information beyond what I've
5  already provided that I am aware of.
6      Q.  Sir, if you could flip to Page 0395579 --
7      A.  Okay.
8      Q.  Okay.  This is a hypothetical that
9  presumably during the course of the presentation
10  was discussed; is that fair?
11      A.  That seems fair.
12      Q.  Okay.  At the bottom where it says
13  Hypothetical No. 3, it says, "Contact Ginnie," with
14  a J, "Tobiason in the ethics and compliance with
15  questions on reimbursement."  Do you see that?
16      A.  I do.
17      Q.  Was Ms. Tobiason also the contact person
18  to answer questions concerning whether or not
19  certain conduct constituted spread marketing?
20      MS. CITERA:  Objection to the form.
21  BY THE WITNESS:
22      A.  At this time in 2003?

Page 664

1      Q.  Yes.
2      A.  I'm not certain of the scope of her
3  responsibilities.
4      Q.  Well, from the context of this page,
5  could that be inferred?
6      MS. CITERA:  Object to the form.
7  BY THE WITNESS:
8      A.  She had -- She had responsibility from
9  OEC on reimbursement matters generally, so it's
10  conceivable that it included spread and marketing
11  the spread.
12      Q.  Well, would you expect that Ginnie
13  Tobiason in her capacity as a reimbursement ethics
14  and compliance contact person, that she would be
15  familiar with what conduct is acceptable and not
16  acceptable in terms of spread marketing?
17      MS. CITERA:  Objection to the form, outside
18  the scope.
19  BY THE WITNESS:
20      A.  I can't state what she knew.  But I think
21  it's reasonable to assume that she had familiarity
22  or if didn't have personal knowledge, knew where to

Page 665

1  go to get it.
2      MS. ST. PETER-GRIFFITH:  Before I move on to
3  my next question, we have less than five minutes on
4  the tape.  So why don't we take a very brief break.
5      THE VIDEOGRAPHER:  Going off the record at
6  3:54 p.m.
7          (A short break was had.)
8      THE VIDEOGRAPHER:  Beginning of Videotape No.
9  6 in the deposition of Mr. Fishman.  Back on the
10  record at 4:00 p.m.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Mr. Fishman, my counsel for the realtor
13  does have some questions for you.  I know we're
14  winding down on our last probably 30 minutes of
15  your testimony.
16          I'd like to refer you, though, to
17  0395579.
18      A.  Hypothetical 3?
19      Q.  Yeah, Hypothetical 3?
20      A.  Yes.
21      Q.  What was Abbott's understanding of the
22  Antikickback Statute implications associated with

Page 666

1  spread or spread marketing?
2      MS. CITERA:  Objection to the form, outside
3  the scope.  I also caution you not to reveal any
4  privileged communications or analysis.
5  BY THE WITNESS:
6      A.  Having not prepared this, I have to -- I
7  don't know precisely what issues they would have
8  been considered by raising this point.
9      Q.  Did you -- What information did you
10  review that was reasonably available to Abbott to
11  understand what the Antikickback -- to understand
12  what Abbott's understanding of the Antikickback
13  implications of marketing the spread?
14      A.  Having not seen this document until last
15  night, from last night until today, I did not ask
16  anybody as a representative of Abbott what they may
17  have been concerned with, also adding that Cliff
18  cribbed this mostly from Testa, Hurwitz.  I don't
19  know that he personally was concerned.  He was
20  presenting a presentation that pretty much was
21  provided to him.
22      Q.  Well, but the presentation was made to

77 (Pages 663 to 666)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 667

1   presumably within Abbott, correct?
2       A.  Correct.
3       Q.  And well, if it was -- and if this
4   hypothetical was presented, what concern did Abbott
5   discuss with its employees about the spread
6   marketing and the Antikickback implications of
7   spread marketing?
8       A.  I did not --
9       MS. CITERA:  Object to the form.
10  BY THE WITNESS:
11      A.  I did not speak with Cliff subsequent to
12  reading this last night to know what he may have
13  said on this slide.
14      Q.  Do you think you can do a little further
15  investigation to respond to the question?
16      MS. ST. PETER-GRIFFITH:  Toni, I know we've
17  given Mr. Fishman some research assignments, but
18  we're all operating on short notice of these
19  documents.  So if I could ask that that be done.
20  BY THE WITNESS:
21      A.  Cliff left Abbott Friday.  I can still
22  reach him.  I should be able to reach him.  He left

Page 668

1   Abbott to take a position as general counsel at a
2   small company.
3       Q.  What conduct did Abbott understood -- I'm
4   Sorry.  Strike that.
5           Abbott understood that there were spread
6   marketing implications between the amount of
7   reimbursement and cost of the product, right --
8       MS. CITERA:  Object to the form.
9   BY MS. ST. PETER-GRIFFITH:
10      Q.  -- to providers?
11      MS. CITERA:  Object to the form.
12  BY THE WITNESS:
13      A.  Spread implications regarding?
14      Q.  Marketing the spread.
15      A.  Implications under the --
16      Q.  I'm sorry.  Under the Antikickback
17  Statute.
18      MS. CITERA:  The question has been really
19  broken up.  I'm wondering if you could read it or
20  repeat it.
21      MS. ST. PETER-GRIFFITH:  Sure.  Why don't I
22  try and rephrase it.

Page 669

1   BY MS. ST. PETER-GRIFFITH:
2       Q.  Did Abbott have an understanding that
3   there were Antikickback Statute implications with
4   regard to the spread which is defined here as the
5   amount of reimbursement as compared to the cost of
6   the product to providers?
7       MS. CITERA:  Object to the form, outside the
8   scope.
9   BY THE WITNESS:
10      A.  I would have to ask -- I would have to
11  ask Cliff about this, but I don't know -- I don't
12  necessarily -- I don't necessarily equate issues
13  with implication.
14      Q.  Well, do you know why the Antikickback
15  Statute is discussed here?
16      A.  No.  That refers back to my answer
17  previously.
18      Q.  What was Abbott's understanding from 1991
19  to 2003 of what market the spread -- what conduct
20  constituted marketing the spread?
21      MS. CITERA:  Objection to the form, outside
22  the scope.

Page 670

1   BY THE WITNESS:
2       A.  Based on the -- some of the deposition
3   testimony that I read, I believe certain Abbott
4   employees understood that marketing the spread
5   meant talking to customers about the difference
6   between the reimbursement amounts of products in
7   relationship to the cost.
8       Q.  Okay.  Did that include providing AWP
9   information?  Did the provision of AWP information
10  by Abbott employees to various Abbott customers, be
11  they through the sales force or to GPOs, did Abbott
12  have an understanding that that could constitute
13  marketing the spread?
14      MS. CITERA:  Object to the form, outside the
15  scope.
16  BY THE WITNESS:
17      A.  I wouldn't reach that conclusion.  I
18  think Abbott recognized and had a practice not to
19  provide AWP information and, as testified, people
20  recognized -- certain people recognized a
21  relationship between the list price information
22  provided and AWP.

78 (Pages 667 to 670)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 671

1    Q.  Well, if certain people understood that,
2   Abbott then understood that there was that
3   relationship, correct?
4        MS. CITERA:  Object to the form, outside the
5   scope.
6   BY THE WITNESS:
7        A.  The relationship between list price and
8   AWP?
9        Q.  Yes.
10       A.  Yes.
11       Q.  Okay.  And did Abbott also have an
12  understanding that spread marketing -- I'm sorry.
13  Did Abbott also understand that the provision of
14  AWP information to Abbott customers may constitute
15  spread marketing?
16       MS. CITERA:  Objection to the form, outside
17  the scope.
18  BY THE WITNESS:
19       A.  Recalling deposition testimony, I think
20  there were people who understood that providing --
21  by providing AWP information to customers, that
22  customers could obtain the spread information.

Page 672

1        Q.  Okay.  So is that a yes, that Abbott had
2   an understanding that the provision of AWP
3   information to customers may constitute spread
4   marketing?
5        MS. CITERA:  Objection to the form, outside
6   the scope.
7   BY THE WITNESS:
8        A.  I didn't reach that conclusion.  You're
9   taking it one step further, which ...
10       Q.  Okay.  Well, why didn't Abbott have that
11  understanding, then?
12       MS. CITERA:  Objection to the form, outside
13  the scope.
14  BY THE WITNESS:
15       A.  Because what they -- by providing AWP
16  information to customers, again, which was against
17  the understood practice and ultimately against the
18  written policy, we provide one tool to a
19  customer.  And what that customer did with that
20  tool, they wouldn't necessarily know.
21       Q.  Well, why would spread -- or why would
22  the discussion of AWP information under the -- I'm

Page 673

1   sorry. Strike that.
2        Why, if the practice prohibited the
3   discussion of AWP information -- Strike that.  Let
4   me see if I can do this.
5        Why would Abbott's practice, why would
6   Abbott prohibit the discussion of AWP information
7   if that discussion did not constitute spread
8   marketing?
9        MS. CITERA:  Object to the form, outside the
10  scope.
11  BY THE WITNESS:
12       A.  That's a conclusion that I did not read
13  testimony about.  And, again, as I reiterated
14  Wednesday and today was, it was not Abbott's
15  practice to provide AWP information but rather to
16  talk about the attributes and qualities of Abbott
17  and its products.
18       Q.  Could, from Abbott's viewpoint, the
19  provision of AWP information to customers
20  constitute spread marketing?
21       MS. CITERA:  Objection to the form, outside
22  the scope.

Page 674

1   BY THE WITNESS:
2        A.  It could provide -- It could provide, if
3   it were provided, could provide a component to what
4   is needed to establish spread.
5        Q.  So is that a yes?
6        MS. CITERA:  Object to the form, outside the
7   scope.
8   BY THE WITNESS:
9        A.  It's not a straightforward yes-or-no
10  answer. I gave you the answer that I think is
11  appropriate.
12       Q.  Well, then, was it Abbott's understanding
13  that the provision of AWP information could in part
14  be considered spread marketing because it provides
15  a component of the information that the client
16  could use to calculate the spread?
17       MS. CITERA:  Object to the form, outside the
18  scope.
19  BY THE WITNESS:
20       A.  It was one essential component of spread
21  marketing.
22       Q.  Okay.  So the provision of AWP

79 (Pages 671 to 674)

Chicago, IL

Page 675

1  information, Abbott understood was one of the
2  essential components of spread marketing?
3      MS. CITERA:  Objection to the form, outside
4  the scope.
5  BY THE WITNESS:
6      A.  To my knowledge, yes.
7      Q.  Okay.
8      MS. ST. PETER-GRIFFITH:  Toni, I'm going to
9  pass the witness in just a second, but I just need
10  to establish the record.  Are you instructing the
11  witness not to answer any questions concerning
12  Topic 7, Sub I?
13      MS. CITERA:  Yeah.  I thought we went through
14  that already.
15      MS. ST. PETER-GRIFFITH:  I didn't -- I wanted
16  to make clear, I don't think that we established
17  you were instructing him not to answer.  But you're
18  instructing him not to answer any questions --
19      MS. CITERA:  He's not prepared to testify
20  about that area, and he hasn't been designated for
21  that area.  So yes.
22      MS. ST. PETER-GRIFFITH:  Well, I'm talking

Page 676

1  about -- Can you look at 7(I) and make sure we're
2  talking about the same --
3      MS. CITERA:  The TAP one?
4      MS. ST. PETER-GRIFFITH:  The TAP one, yeah.
5      MS. CITERA:  Yeah.
6      MS. ST. PETER-GRIFFITH:  I just wanted to make
7  the record so that's preserved.
8      At this time, subject to the outstanding
9  issues that we've discussed here today, subject to
10  the subsequent production of additional compliance
11  materials and the resolution of Topic 7, at this
12  time, Topic 7, Sub 1, at the time the United States
13  passes the witness to Realtor's counsel.
14      EXAMINATION
15  BY MR. ANDERSON:
16      Q.  Mr. Fishman, my name is Jarrett Anderson.
17  I represent the Realtor in this case.  I'll try to
18  move quickly.  I realize it's late in the day.
19      Does Abbott publish list prices that are
20  also known as catalog prices?
21      MS. CITERA:  Object to the form, outside the
22  scope.

Page 677

1  BY THE WITNESS:
2      A.  What time frame are we talking about?
3      Q.  From 1991 to 2003.
4      MS. CITERA:  Same objections.
5  BY THE WITNESS:
6      A.  My understanding is Abbott has a catalog
7  price, yes.
8      Q.  And those are published by Abbott,
9  correct?
10      MS. CITERA:  Same objections.
11  BY THE WITNESS:
12      A.  To my knowledge, yes.
13      Q.  Does Abbott set its catalog a/k/a list
14  prices based on analysis of prices paid by
15  providers?
16      MS. CITERA:  Object to the form, outside of
17  scope.
18  BY THE WITNESS:
19      A.  I have no knowledge regarding that
20  matter.
21      Q.  I think just a few moments ago you
22  testified that through the course of preparing to

Page 678

1  testify and reading transcripts and what have you,
2  you've become aware that there is now, in fact, a
3  policy in place regarding the setting of catalog
4  prices, correct?
5      MS. CITERA:  Objection to the form.
6  BY THE WITNESS:
7      A.  There is a policy regarding
8  reimbursement, yes, reimbursement pricing
9  information and support.
10      Q.  Right.  And specifically there's a policy
11  in place about how the catalog or list price will
12  be set by Abbott, correct?
13      MS. CITERA:  Object to the form.
14  BY THE WITNESS:
15      A.  To answer that precisely, I'd request to
16  review that policy again.
17      Q.  Well, I'm not actually going to ask you
18  about the details of the policy.  I'm just asking,
19  do you understand there is a policy?
20      MS. CITERA:  Object to the form.
21  BY THE WITNESS:
22      A.  To state categorically, I would need to

80 (Pages 675 to 678)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 679

1  see that policy again to confirm that that's true.
2      Q.  All right.  Do we have a copy of that
3  policy in a prior deposition exhibit, the list
4  price setting policy?
5      MS. ST. PETER-GRIFFITH:  Yes.
6      THE WITNESS:  Reimbursement policy.
7      MS. ST. PETER-GRIFFITH:  It's this one.
8      THE WITNESS:  It was a six-, eight-page
9  document.
10     MS. ST. PETER-GRIFFITH:  It was the last one,
11 and unfortunately they didn't ship the original
12 exhibits back here.
13     MS. CITERA:  The last -- This is HPD
14 procedure.
15     MS. ST. PETER-GRIFFITH:  Yeah.
16     MS. CITERA:  No, no, no, that's not it.
17     MS. ST. PETER-GRIFFITH:  It's not part of
18 Exhibit 1, though.
19     MR. ANDERSON:  That's about the disclosure of
20 reimbursement information.
21     MS. CITERA:  Well, that's the one he's talking
22 about.

Page 680

1      MR. ANDERSON:  No, I'm talking about the --
2      MS. ST. PETER-GRIFFITH:  I don't think we have
3  it here, Jarrett.
4  BY MR. ANDERSON:
5      Q.  Okay.  Well, if you don't know, I guess I
6  can deal with that.  But I'm asking about the
7  setting of list prices.  I'm not necessarily
8  talking about the disclosure of reimbursement
9  information, okay?
10     A.  I'm not -- I'm not certain that there is
11 a specific -- a separate policy dealing with
12 setting of list prices.  What I was thinking was
13 that it was part of a pricing policy contained --
14 having several subsections within it, and that's
15 the part that I can't recall.  If it's a separate
16 policy, I can't specifically recall that.  But I'd
17 be happy to review it.
18     Q.  I will tell you that there is a separate
19 policy, and we've seen it.  And we've had questions
20 of witnesses about it.  But I think we can maneuver
21 around this.
22     You mentioned that in your preparation to

Page 681

1  testify on behalf of the corporation, that you've
2  gained an understanding that in 2001, roughly,
3  there was a change in the way that Abbott set and
4  published catalog a/k/a list prices, correct?
5      A.  I didn't say that.  I stated that I
6  learned that through questioning in my deposition
7  last Wednesday.
8      Q.  Right.  Did you follow up on that since,
9  you know, the past few days?
10     A.  I did not.
11     Q.  Okay.  Do you know why Abbott changed its
12 list or catalog price policies?
13     A.  I do not.
14     Q.  Do you know whether or not the change in
15 Abbott's setting and publication of catalog a/k/a
16 list prices in 2001 was any kind of remedial
17 measure?
18     MS. CITERA:  Object to the form, outside the
19 scope.
20 BY THE WITNESS:
21     A.  Remedial measure regarding?  I mean,
22 "remedial measure," that's a very broad question.

Page 682

1  Remedial in how?
2      Q.  Well, I'm asking you.  Do you have any
3  understanding of the nature of the change in how
4  catalog a/k/a list prices were set and published?
5      A.  I do not have any personal knowledge.
6      Q.  But do you have any corporate knowledge?
7      A.  Based on the review of the testimony and
8  review of people I spoke with, I do not have any
9  knowledge.
10     Q.  Okay.  And to the extent there has been
11 testimony in this case as well as persons working
12 at Abbott that know about the reasoning behind the
13 price changes in 2001, that information was
14 reasonably available to the corporation, correct?
15     MS. CITERA:  Object to the form.
16 BY THE WITNESS:
17     A.  To the extent that information -- to the
18 extent there was a specific reasoning for it that's
19 in line with what you're asking, it would be
20 available to the corporation because someone within
21 the corporation would know it.
22     Q.  You understand that you're here on behalf

81 (Pages 679 to 682)

0f08cf8d-8dfa-4007-81db-29f9710803e3

Chicago, IL

Page 683

1  of the corporation concerning compliance matters,
2  correct?
3      A.  I do understand that.
4      Q.  From your perspective as the corporate
5  designee of Abbott on compliance matters, what is a
6  catalog or list price?
7      MS. CITERA:  Objection to the form, outside
8  the scope.
9  BY THE WITNESS:
10     A.  I'm not sure how answering that question
11 is in my scope of a compliance deponent.  My
12 general understanding is that catalog price is the
13 price that's published in Abbott's product catalog.
14     Q.  From your perspective as the designee
15 concerning compliance matters, what duties, if any,
16 as a corporation does Abbott owe in setting and
17 publishing catalog also known as list prices?
18     MS. CITERA:  Object to the form, outside the
19 scope. I'd also caution you not to reveal any
20 privileged communications or analysis.
21 BY THE WITNESS:
22     A.  I think answering that question duty,

Page 684

1  duty to whom?  If it's a duty under a statute, then
2  you're asking me to reach a legal conclusion.
3      Q.  Are you taking the position that you're
4  not required to answer the question?
5      A.  I'm -- You've objected to so many, I'm
6  waiting for you.
7      MS. CITERA:  Yeah.
8  BY THE WITNESS:
9      A.  I'm taking the position that the response
10 in answer to your question would require me to
11 offer a legal opinion, which I think is privileged.
12     Q.  Well, let me say that I'm not asking you
13 for some type of privileged communication, nor am I
14 asking for core attorney work product.  I'm asking
15 for corporate testimony from Abbott's designee
16 concerning compliance matters.
17         And my simple question to you is, sir,
18 does Abbott owe any duties with respect to its
19 setting and publication of catalog, also known as
20 list, prices?
21     MS. CITERA:  I mean, I would just object that
22 he is not being offered to testify as to legal --

Page 685

1  or to make any type of legal conclusions or
2  analyses here.  Whether or not -- it seems to me
3  you're asking him prospectively to make that legal
4  analysis.  He's not here to do that.
5      MR. ANDERSON:  Well, the Court can take that
6  up at a later date.  Your objection has been noted
7  and preserved.
8  BY THE WITNESS:
9      A.  I believe Abbott had a duty to comply
10 with healthcare compliance laws in all respects.
11     Q.  Okay.  Do those duties with respect to
12 the setting and publication of catalog or list
13 prices in connection with healthcare laws require
14 Abbott to publish catalog a/k/a list prices that
15 are at least in part based on the prices being paid
16 by providers?
17     MS. CITERA:  Object to the form, outside the
18 scope.
19 BY THE WITNESS:
20     A.  I believe that question is requiring me
21 to render a legal opinion.
22     Q.  Well, let's -- Your counsel's rendered an

Page 686

1  objection, and the Court can rule on that at a
2  later date.  But for now I do need your testimony
3  to that question.
4      MS. CITERA:  He doesn't have to provide a
5  legal opinion.
6      MR. ANDERSON:  But there's no finding it is a
7  legal opinion, Toni; hence the reason why we need
8  the testimony.  We'll let the judge decide.
9      MS. CITERA:  He's not here to testify as to
10 duties. I mean, that's a legal analysis.  He's not
11 here to do that.  He's here to testify about facts.
12     MR. ANDERSON:  Okay.  I can address this.
13 BY MR. ANDERSON:
14     Q.  Sir, as the designee on compliance
15 matters for the corporation, can you explain to the
16 judge and jury Abbott's view, not your personal
17 legal analysis, rather, Abbott's corporate view of
18 the duties, if any, that it owes with respect to
19 the setting and publication of catalog also known
20 as list prices?
21     MS. CITERA:  Same objections, outside the
22 scope, object to the form.

82 (Pages 683 to 686)

Chicago, IL

Page 687

1 BY THE WITNESS:
2     A.  Pretty much the same answer, which is
3 Abbott, personally or as Abbott, Abbott has an
4 obligation to comply with all healthcare compliance
5 laws.  A determination, whether it's me speaking as
6 an attorney or Abbott speaking, a statement as to
7 whether Abbott's actions under a set of statutes
8 adhere to that duty is a legal conclusion.
9     Q.  Sir, does Abbott believe that any laws
10 cause Abbott to have a duty to publish catalog or
11 list prices which reflect the prices paid by
12 providers purchasing Abbott drugs?
13     MS. CITERA:  Same objections.
14 BY THE WITNESS:
15     A.  I think it's the same question phrased a
16 different way.  You're asking me at the back end,
17 asked to evaluate what laws would apply to that set
18 of conduct.  Again, whether it applies and is
19 adhered to is a legal conclusion.
20     Q.  Sir, I'm asking you Abbott's view.  I'm
21 not asking you for your legal conclusion.
22     Are you telling me -- Are you telling me

Page 688

1 that Abbott's only view as a corporation on this
2 issue is a legal conclusion reached by counsel?
3     A.  On what issue?
4     MS. CITERA:  Object to the form, outside the
5 scope.
6 BY MR. ANDERSON:
7     Q.  Does Abbott have a corporate position on
8 whether or not any law requires it to publish
9 catalog also known as list prices which reflect the
10 prices actually paid by providers purchasing Abbott
11 drugs?
12     MS. CITERA:  Object to the form, outside the
13 scope.
14 BY THE WITNESS:
15     A.  You're asking me to evaluate an infinite
16 set of laws and answer the question as to whether
17 any of those laws, one, applies to Abbott; two,
18 applies to Abbott in its pricing information; and,
19 three, whether the actions that Abbott would or
20 wouldn't do follow those laws.
21     Q.  Does Abbott have a position on whether or
22 not it has duties to publish catalog prices that

Page 689

1 reflect prices paid by providers?
2     MS. CITERA:  Same objections.
3 BY THE WITNESS:
4     A.  Abbott has an obligation to comply with
5 all laws.
6     Q.  That's not my question.  Objection,
7 nonresponsive.
8     Does Abbott believe that it has a duty to
9 publish catalog or list prices that reflect the
10 prices paid by providers?
11     MS. CITERA:  Objection to the form, outside
12 the scope.
13 BY THE WITNESS:
14     A.  To the extent there are laws regarding
15 publishing list price and catalog price, Abbott
16 would have an obligation to adhere to those laws.
17     Q.  Does Abbott believe those laws require
18 such an obligation?
19     MS. CITERA:  Objection to form, outside the
20 scope.
21 BY THE WITNESS:
22     A.  That's the part I -- That's the part I

Page 690

1 believe you're now asking me to connect dots and
2 reach a legal conclusion.
3     Q.  Okay.
4     A.  Whether in my own capacity or as Abbott.
5     Q.  Whether or not that is a legal
6 conclusion, the judge will rule upon that at a
7 later date.  I would like to know whether Abbott
8 has a position.  Can you answer the question?
9     MS. CITERA:  Same objections.
10 BY THE WITNESS:
11     A.  I stand by my existing testimony.
12     Q.  So you're refusing to answer the
13 question? You realize you haven't been instructed
14 by your counsel not to answer.  But you, as Joe
15 Fishman, corporate designee, are choosing not to
16 answer.
17     A.  I'm not choosing not to answer.  I'm
18 answering in a way that's not satisfying you.
19     Q.  No, sir, you're not answering.  You're
20 openly saying you're not answering.  You're saying
21 it calls for a legal conclusion.
22     Absent an instruction from your counsel

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 691

1  Ms. Citera, can you answer the question?
2      MS. CITERA:  He is not being tendered here to
3  provide a legal analysis.  A duty -- whether
4  someone has a duty is inherently a legal analysis.
5  He's not here to provide that kind of testimony.
6      MR. ANDERSON:  I'm not asking him to do the
7  analysis.  I'm asking him if Abbott's understanding
8  of the duty is it must publish prices that are
9  based on prices paid.  That's all I'm asking.  It's
10  a very straightforward question.  Either Abbott has
11  the position or they don't.
12  BY MR. ANDERSON:
13      Q.  Sir, does Abbott have a position about
14  the publication of catalog or list prices being
15  based on prices paid?
16      MS. CITERA:  Objection to the form, outside
17  the --
18  BY MR. ANDERSON:
19      Q.  It's matter of a fact.  You either as a
20  corporation do have it or you don't.  Do you have
21  that position?
22      MS. CITERA:  Same objection.

Page 692

1  BY THE WITNESS:
2      A.  To the -- same answer, one of the same
3  answers I've given previously, which is one of the
4  angles which you're asking the questions, to the
5  extent the laws address publishing list price and
6  catalog information, Abbott would have an
7  obligation to adhere to those laws.
8      Q.  Okay.  Outside of the kind of big-sky
9  picture that Abbott complies with laws, does Abbott
10  have a position on whether or not those laws
11  require Abbott to publish catalog or list prices
12  that reflect the prices paid by providers?
13      MS. CITERA:  Same objections.
14  BY THE WITNESS:
15      A.  To state Abbott's position would be to
16  state a legal conclusion.
17      Q.  All right.  Well, you haven't received an
18  instruction not to answer.  Would you please answer
19  the question, sir?
20      MS. CITERA:  He doesn't have to.  He's not
21  here to testify about this, and so he doesn't have
22  to.  He's not being tendered to provide a legal

Page 693

1  analysis.  You're clearly asking for a legal
2  analysis.
3      MS. ST. PETER-GRIFFITH:  Are you going to
4  provide an instruction, Toni, for him not to
5  answer?
6      MS. CITERA:  Don't answer it.  He doesn't have
7  to answer it.
8      MR. ANDERSON:  Okay.  I want that question and
9  that instruction certified, and we will be taking
10  that up at the appropriate time with the Court.
11  BY MR. ANDERSON:
12      Q.  Mr. Fishman, do you -- does it stand to
13  reason to you as the corporate designee that the
14  reason Abbott changed the way it set and published
15  catalog prices in 2001 and based those prices on
16  prices paid by providers is the way they had
17  published them for years and years before was
18  misleading?
19      MS. CITERA:  Object to the form, outside the
20  scope.
21  BY THE WITNESS:
22      A.  Does it stand to reason?  I can't state

Page 694

1  that as a company, that the -- providing
2  information prior to 2001 would have led to
3  misleading information.
4      Q.  Will you agree that the corporation
5  recognized in 2001 that the way it had previously
6  set and published prices would not pass public
7  scrutiny?
8      MS. CITERA:  Object to the form, outside the
9  scope.
10  BY THE WITNESS:
11      A.  From the testimony that I read and have
12  heard about this matter, I believe the company made
13  a decision in 2001 to conduct its business
14  differently.
15      Q.  Do you believe that recognition in 2001
16  about the nature of Abbott's past publication of
17  catalog prices raises a compliance issue?
18      MS. CITERA:  Object to the form.
19  BY THE WITNESS:
20      A.  I believe the question -- to say that it
21  raises a compliance issue, compliance under our
22  policies?  Compliance under law?

84 (Pages 691 to 694)

30(b)(6) Abbott (Fishman, David) - Vol II                                    March 20, 2008

Chicago, IL

Page 695

1    Q.  A compliance under law, yes, sir.  That's
2  why you're here.
3    A.  I believe to state --
4    MS. CITERA:  Object to the form.
5  BY THE WITNESS:
6    A.  -- that an issue raises a compliance
7  issue under law is stating a legal opinion.
8    Q.  Okay.  So that again is a situation where
9  as the corporate designee, you're unwilling to
10  testify?
11    A.  I'm testifying in the manner in which I
12  am and apparently not to your satisfaction.
13    Q.  Well, you know, leave me out of it, sir.
14  It's not about me.  I promise, okay.  It's about
15  the United States getting answers to their
16  questions.  It's about this case being able to be
17  tried fairly.
18        All I'm asking are the questions of you
19  as the corporate designee under oath.  And if
20  you're willing to answer those, I would like your
21  answers.  If you're unwilling to answer, then we'll
22  deal with that at the appropriate time.

Page 696

1    A.  I stand by the answers I've provided.
2    Q.  Okay.  Which in this instance is a
3  refusal to answer because you believe it calls for
4  a legal conclusion, correct?
5    A.  I believe that's an answer, though.
6    Q.  Okay.  Now --
7    MS. CITERA:  Jarrett, are you almost done?
8    MR. ANDERSON:  Yeah.  I've got one more line
9  of questions.
10  BY MR. ANDERSON:
11    Q.  Do you know of any steps that Abbott took
12  in reporting WAC prices to comply with all
13  pertinent laws?
14    MS. CITERA:  Object to the form.
15  BY THE WITNESS:
16    A.  The specific question is similar to
17  broader questions asked previously, and I'd state
18  that the compliance efforts were those adhered to
19  in a manager -- in a report/reporting relationship
20  and broader compliance advice and presentations and
21  -- that would be -- and response, opportunity to
22  respond to any questions asked.

Page 697

1    Q.  As the corporate designee, what steps, if
2  any, did you take to gather all information
3  reasonably available to the corporation as to the
4  compliance efforts of Abbott in publishing WAC
5  prices?
6    A.  I spoke with the people identified, the
7  numerous people that I identified previously.  I
8  read through the documentation.
9    Q.  Did any of that information provide you
10  with guidance on the steps that Abbott took to
11  comply with all pertinent laws in its publication
12  of WAC prices?
13    A.  Not directly.
14    Q.  Indirectly?
15    A.  Other than efforts to comply with laws
16  generally.
17    Q.  Do you know anything about the
18  publication of WAC prices by Abbott?
19    MS. CITERA:  Object to the form, outside the
20  scope.
21  BY THE WITNESS:
22    A.  Generally, just generally.  I don't have

Page 698

1  --
2    Q.  What do you know?
3    A.  What do I know?
4    Q.  Yes, sir.
5    MS. CITERA:  Same objections.
6  BY THE WITNESS:
7    A.  Based on the -- based on the testimony I
8  read from previous deposition testimony where that
9  question would have been asked of the deponents --
10    Q.  Yeah.
11    A.  -- I understand Abbott provided list
12  price on catalog price, published it, and would
13  have provided it to pricing compendia.
14    Q.  Well, I'm not talking about the list and
15  the catalog prices now, mind you.  I'm talking
16  about the WAC, W A C.  What do you know about
17  Abbott's publication of W A C prices?
18    MS. CITERA:  Objection to form, outside the
19  scope.
20  BY THE WITNESS:
21    A.  I don't know.  I can't answer that.
22    Q.  Do you know anything about it?

85 (Pages 695 to 698)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

Page 699

1      A.  To my knowledge, no.
2      Q.  All right.  And you didn't take any steps
3  as the corporate designee to learn anything about
4  it, did you?
5      A.  Other than what I described, no.
6      Q.  Other than what you've described didn't
7  have anything to do with WAC prices, did it?
8      A.  Didn't learn anything in the
9  communications I had.
10     Q.  Okay.  Do you consider it to be a
11  compliance if, on the one hand, prior to 2001,
12  every single wholesaler that Abbott did business
13  with was buying at one wholesale acquisition cost
14  price, day in and day out but, on the other hand,
15  the price that Abbott's publishing to the
16  compendia, called WAC, is higher and different?
17     MS. CITERA:  I object to the form, outside the
18  scope.
19  BY THE WITNESS:
20     A.  Not knowing -- not knowing very much
21  about WAC, I think I'm not prepared to answer that
22  question because I don't know enough about the one

Page 700

1  component of the two-piece question that you're
2  asking.
3      Q.  Well, take my representation to be true.
4  And that is, the evidence will show that day in and
5  day out, from 1994 through 2001, May of 2001 to be
6  precise -- Well, I'm going to rephrase this to get
7  it just right.
8          Assume with me, sir, that the evidence in
9  this case will show that from 1994 through January
10  of 2001, every single wholesale transaction between
11  Abbott and wholesalers occurred at WAC prices that
12  were lower and different than the published WAC
13  prices that Abbott sent to First DataBank and Red
14  Book.  If those -- Assume with me those
15  representations are true, in your mind as the
16  corporate designee on compliance issues, does that
17  raise a compliance problem?
18     MS. CITERA:  Object to the form, outside the
19  scope.
20  BY THE WITNESS:
21     A.  I have not -- In the information that I
22  have gathered, I've not seen that in the

Page 701

1  information that was provided.  And based on the
2  question you've asked previously, you asked about
3  list price and catalog price and now you're stating
4  WAC price, I don't know that the three of those are
5  necessarily synonymous.  If they're not synonymous,
6  then I wouldn't agree we provided WAC prices to the
7  compendia.  We provided list price.
8      Q.  Well, as I said before -- And I really do
9  want to get through this.  And we can stop for the
10  day.  Assume with me that you can set aside list
11  price and catalog price for a moment, okay.  I'm
12  talking about a different pricing term.  I'm
13  talking about WAC, W A C, all right.  Assume with
14  me, sir, that Abbott did publish WAC prices to
15  First DataBank and Red Book from time to time.
16     A.  Okay.
17     Q.  And assume with me that those prices were
18  higher than the WAC prices that Abbott was actually
19  charging wholesalers day in and day out from 1994
20  through January of 2001.
21     A.  Okay.
22     Q.  Based on those assumptions, in your

Page 702

1  opinion, as the corporate designee on compliance
2  matters for Abbott, does that raise a compliance
3  problem?
4      MS. CITERA:  Objection to the form, outside
5  the scope.
6  BY THE WITNESS:
7      A.  Assuming no other facts because you've
8  given me a very limited set of facts, I don't know
9  under what circumstances we were providing WAC
10  prices to customers, contract, noncontract,
11  different types of contracts, different commitments
12  versus the WAC price provided to First Data and
13  what was expected of that, if they were exactly the
14  same and no other facts other than the set you've
15  given me, that would raise a compliance issue.
16     Q.  Okay.  Now, do you understand that the --
17  currently that -- and since 2001, that the WAC
18  price is the foundation for the list price at
19  Abbott?
20     A.  I don't know that to be true.
21     Q.  Do you have any understanding that
22  typically list prices on Abbott drugs are set at 5

86 (Pages 699 to 702)

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

## Chicago, IL

Page 703

1   percent above WAC?
2       A.  I don't know the pricing policies of
3   Abbott.
4       Q.  Do you have any understanding that WAC,
5   since back in 1995 or so, was optimized from year
6   to year and set based on the prevailing market
7   prices?
8       MS. CITERA:  Object to the form, outside the
9   scope.
10  BY THE WITNESS:
11      A.  I don't know.  I don't have information
12  that I can testify to regarding Abbott pricing
13  policies.
14      Q.  Okay.  And you didn't make any steps to
15  learn of these pricing practices in your
16  preparation to testify about Abbott's compliance in
17  pricing, correct?
18      A.  Not specifically.
19      Q.  Okay.  And would it surprise you to learn
20  that although Abbott was optimizing these WACs from
21  the mid '90s up to today, that those WACs didn't
22  get published until 2001 miraculously?

Page 704

1       MS. CITERA:  Object to the form, outside the
2   scope.
3   BY THE WITNESS:
4       A.  Published to whom?
5       Q.  To the pricing services such as First
6   DataBank and Red Book.
7       MS. CITERA:  Same objections.
8   BY THE WITNESS:
9       A.  I'm not surprised or not -- I'm neither
10  surprised nor not surprised because I don't know
11  enough about the information of WAC pricing to know
12  what expectation for me to react to that comment.
13      MS. CITERA:  Jarrett, Jarrett, Jarrett --
14  BY MR. ANDERSON:
15      Q.  From a compliance perspective --
16      MR. ANDERSON:  I'll finish up on this.
17  BY MR. ANDERSON:
18      Q.  From a compliance perspective, sir, would
19  you agree that it's difficult to know whether or
20  not Abbott's complied with laws unless you
21  understand the historical pricing practices?
22      MS. CITERA:  Objection to the form, outside

Page 705

1   the scope.
2   BY THE WITNESS:
3       A.  What's the question?  I want to make sure
4   I answer the right question.
5           (Record read as requested.)
6       MS. CITERA:  Objection, same objections.
7   BY THE WITNESS:
8       A.  I think that historical pricing practices
9   would be a component of compliance.
10      Q.  But you, to prepare to testify, really
11  haven't undertaken any efforts to learn what the
12  historical pricing practices were, did you?
13      MS. CITERA:  Objection to the form.
14  BY THE WITNESS:
15      A.  I did not gain a lot of information on
16  that subject, no.
17      Q.  I didn't hear you.
18      A.  I did not gain a lot of information on
19  that subject, no.
20      Q.  You really didn't gain any information on
21  the subject, did you?
22      MS. CITERA:  Objection to the form.

Page 706

1   BY THE WITNESS:
2       A.  I wouldn't say -- I testified to what I
3   understood and know.
4       Q.  Okay.  And you'll agree that's very
5   limited?
6       MS. CITERA:  Objection to the form.  This is
7   it, Jarrett.  This is your last question.
8   BY THE WITNESS:
9       A.  It's more limited than information, the
10  questions you were asking me.
11      MR. ANDERSON:  All right.  I guess we'll
12  conclude for the day.  I'm reserving my time and
13  questions for the time of trial or appropriate
14  continuation of this deposition.
15      Ann?
16      MS. ST. PETER-GRIFFITH:  And, again, the
17  United States when it passed the witness set forth
18  its reservations.
19          Thank you for your time, Mr. Fishman.
20      THE WITNESS:  Okay.  Thank you.
21      THE VIDEOGRAPHER:  Going off the record at
22  4:42 p.m.  This ends the deposition of David

87 (Pages 703 to 706)

0f08cf8d-8dfa-4007-81db-29f9710803e3

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

# Chicago, IL

|  | Page 707 |
|---|---|
| 1 | Fishman. |
| 2 | (WHEREUPON, the deposition was |
| 3 | adjourned.) |
| 4 | |
| 5 | |
| 6 | |
| 7 | _____ |
| 8 | DAVID FISHMAN |
| 9 | |
| 10 | SUBSCRIBED AND SWORN to before me this |
| 11 | _____ day of _____, 2008. |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | _____ |
| 19 | NOTARY PUBLIC |
| 20 | |
| 21 | |
| 22 | My Commission expires: |

**Page 708**

1   UNITED STATES OF AMERICA         )
2   NORTHERN DISTRICT OF ILLINOIS  )
3   EASTERN DIVISION                )  SS.
4   STATE OF ILLINOIS               )
5   COUNTY OF COOK                  )
6        I, Rachel F. Gard, Certified Shorthand
7   Reporter, do hereby certify that DAVID FISHMAN was first
8   duly sworn by me to testify to the whole truth and that
9   the above videotaped deposition was reported
10  stenographically by me and reduced to typewriting under
11  my personal direction.
12       I further certify that the said videotaped
13  deposition was taken at the time and place specified and
14  that the taking of said videotaped deposition commenced
15  on the 20th day of March, A.D., 2008, at 8:35 a.m. at
16  the offices of Jones Day, 77 West Wacker Drive, Suite
17  3500, Chicago, Illinois.
18       I further certify that I am not a relative or
19  employee or attorney or counsel of any of the parties,
20  nor a relative or employee of such attorney or counsel,
21  nor financially interested directly or indirectly in
22  this action.

**Page 709**

1
2        In witness whereof, I have hereunto set my
3   hand and affixed my seal of office this 27th day of
4   March, A.D., 2008.
5
6
7
8
9        _____
10       RACHEL F. GARD, CSR
11       CSR No. 084-003324
12
13
14
15
16
17
18
19
20
21
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

0f08cf8d-8dfa-4007-81db-29f9710803e3