# Exhibit 95

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3      * * * * * * * * * * * * * * * * *
                                        *
 4      UNITED STATES OF AMERICA        *
                       Plaintiff        *
 5                                       *
                VERSUS                   *  CR-01-10350-DPW
 6                                       *
        ALAN MACKENZIE, JANICE SWIRSKI,  *
 7       HENRY VAN MOURIK, DONNA TOM,    *
         DAVID GUIDO, DONALD PATTON,     *
 8       DONALD MEEK, ERIC OTTERBEIN,    *
         RITA JOKIAHO, CAREY SMITH,      *
 9       MARK SMITH                      *
                       Defendants        *
10                                       *
        * * * * * * * * * * * * * * * * *
11

12              BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

13              UNITED STATES DISTRICT COURT JUDGE

14                   JURY TRIAL - DAY 13

15                      May 6, 2004

16

17

18                              Courtroom No. 1 - 3rd
Floor
                                1 Courthouse Way
19                              Boston, Massachusetts
02210
                                9:00 a.m.
20

21

22              Lee A. Marzilli -- Harold M. Hagopian
                     Official Court Reporters
23          John Joseph Moakley District Courthouse
                 1 Courthouse Way - Room 3200
24              Boston, Massachusetts    02210
```

1 that all grant requests had to be in writing in order for them

2 to be approved, isn't that fair?

3 A.   Yes, that's correct.

4 Q.   So, it couldn't be a handshake agreement, could it?

5 A.   I don't think so.  I --

6         MS. MINER:  Thank you.

7         THE COURT:  All right.  You may step down.  Thank

8 you.

9         (The witness withdrew.)

10         MR. VIEN:  Call the next witness, your Honor?

11         THE COURT:  Yes.

12         MR. VIEN:  Your Honor, the United States calls Mark

13 Haberberger, please.

14         THE COURT:  You may call, Mr. Vien, but I'm not sure

15 he will come, unless someone else assists you in finding him.

16                 MARK HABERBERGER, SWORN

17                 DIRECT EXAMINATION

18 BY MR. VIEN:

19 Q.   Please state your name and spell your last name for the

20 record?

21 A.   Mark with a K, last name is Haberberger,

22 H-A-B-E-R-B-E-R-G-E-R.

23 Q.   Mr. Haberberger, you understand you're testifying today

24 pursuant to an order of immunity; is that correct?

25 A.    That's correct.

1 Q.   Can you briefly tell us what your understanding of that

2 order is?

3 A.   My understanding of that order is that any testimony I

4 give today cannot be used against me.

5 Q.   And do you have an attorney?

6 A.   Pardon?

7 Q.   Do you have an attorney?

8 A.   Yes, I do.

9 Q.   And who's paying for your attorney?

10 A.   TAP.

11 Q.   What I'd like to do is briefly go through your educational

12 background.  Could you tell us where you went to college?

13 A.   I went to college at Marquette University.

14 Q.   And where is that?

15 A.   I'm sorry, where is it?

16 Q.   Where is it?

17 A.   Milwaukee, Wisconsin.

18 Q.   And did you graduate?

19 A.   I did.  I received a B.A. degree in 1981.

20 Q.   What was your degree in?

21 A.   Political science.

22 Q.   What did you do after college?

23 A.   After college I went to law school.  I took one year off

24 before heading to law school.

25 Q.    Where did you go to law school?

 1 A.    Cornell University, in Ithica, New York.

 2 Q.    Did you graduate?

 3 A.    Yes, I did.

 4 Q.    Did you pass the bar exam?

 5 A.    I passed the bar exam in Wisconsin and subsequently in

 6 Illinois.

 7 Q.    So, you're a lawyer?

 8 A.    I am a lawyer.

 9 Q.    Would you briefly describe your legal work history for us,

10 please?

11 A.    After graduating from law school in 1985, I began working

12 in a private law firm known as Whyte & Hirschboeck at that

13 time.  That's W-H-Y-T-E, and Hirschboeck,

14 H-I-R-S-C-H-B-O-E-C-K.  I was there approximately four years

15 doing real estate commercial finance, general corporate work.

16 Q.    Where was that law film?

17 A.    I'm sorry, in Milwaukee.

18 Q.    So, that was about 1985 through in or about 1989?

19 A.    That's correct.

20 Q.    And did you go to another job at that point?

21 A.    I did.  At that time I had joined the in-house legal

22 department at Abbott Laboratories.

23 Q.    How long did you stay at Abbott Laboratories?

24 A.    Approximately ten years.

25 Q.   We'll get back to that, but I just wanted to know what you

1 did after Abbott Laboratories and what are you doing now?

2 A.   I'm currently working for the in-house legal department at

3 GE Healthcare formerly known as GE Medical Systems.

4 Q.   And when did you go there, and I'll just call it GE?

5 A.   1999.

6 Q.   Okay.  Let me talk about your time at Abbott.  When you

7 started there, about how many lawyers were there?

8 A.   I believe in our whole department I want to say

9 approximately 40 -- 40 to 45, perhaps.

10 Q.   How about when you left in '99?

11 A.   The department had grown somewhat.  Again, I don't know

12 the exact number, but I want to say maybe 50 to 55.

13 Q.   Were you assigned to any particular group there?

14 A.   I was part of the domestic operations group, which is a

15 subset.

16 Q.   What does that mean?

17 A.   We handled U.S. transactions and matters primarily.  There

18 were four different groups at that time.  There was an

19 international group that, as the name suggests, handled

20 primarily matters outside the United States; the domestic

21 operations group that I was a part of; the patent and trademark

22 department that handled intellectual property matters; and the

23 litigation group.

24 Q.   And who else was in your group?

25 A.    In my group, my manager, when I started, was a gentleman

1 named Brian Smith.  And when I joined there were three other

2 attorneys reporting to Mr. Smith.

3 Q.    And who were they?

4 A.    Maureen Houlihan was her name at the time.  She later got

5 married and changed her name to Maureen McShane; Jim Albrecht

6 and Brian Taylor were the other two lawyers.

7 Q.    What type of work did you personally and generally do in

8 that group?

9 A.    I generally handled contracts and transactional matters of

10 various sorts, research and development, some sales and

11 marketing, some business development things, such as licensing

12 agreements and marketing agreements.

13 Q.    And what was the relationship between Abbott legal and

14 TAP?

15 A.    At that time Abbott legal did the legal work for TAP.

16 There were, to my knowledge, no lawyers at that time who were

17 specifically assigned solely to do work for TAP.  So, TAP was

18 one client group for the Abbott legal department.

19 Q.    Did TAP have a primary contact?  Did they work primarily

20 with one of the lawyers in your group?

21 A.    At the time I joined, I believe Maureen Houlihan was the

22 primary contact -- not the only contact, but the primary

23 contact.

24 Q.    And did someone else take over as the primary contact at

25 some point?

1 A.    At some point I became more involved in TAP matters.

2 Ms. Houlihan went out on I believe it was maternity leave, and

3 didn't come back, at least not while I was with Abbott legal.

4 So, to some extent, I inherited, you might say, part of her

5 responsibilities.

6 Q.    Did you know a woman named Daphne Pals?

7 A.    Yes.  Daphne Pals was also part of the Abbott legal

8 department.  I'm not sure when she joined.  She was

9 initially -- I believe she joined after I did, though.  She was

10 initially part of the international group within Abbott legal.

11 Subsequently, she became one of the lawyers with at least part

12 of the responsibilities for handling TAP matters.

13 Q.    And have you been interviewed or testified regarding your

14 work for TAP while you were employed by Abbott?  Not were you

15 interviewed while you were at Abbott, but were you interviewed

16 about the time you were at Abbott?

17 A.    Yes.  I have been deposed in a civil case.  I've also

18 spoken informally with some government lawyers, as well as some

19 counsel for the defendants in this case and counsel for the

20 companies, TAP, Takeda and Abbott.

21 Q.    And as far as the government goes, did you speak with

22 Mr. Loucks?

23 A.    Yes, I did.

24 Q.    And have you spoken with me?

25 A.    Yes.

1 Q.   And was there anyone else present when we spoke?

2 A.   My own counsel.  And was there an FBI agent there, too.

3 At the initial meeting, I believe there was at least one FBI

4 agent.  I'm not sure who -- when I meet with you, I'm not sure

5 who the other person.

6 Q.   Does the name Rachelle Smith spur any memories of

7 anything?

8 A.   Yes, it sounds vaguely familiar.

9 Q.   And you met with defense attorneys, as well?

10 A.   Yes, I did.

11 Q.   And I'd like to show you what's been entered into

12 evidence, I believe, as Government's Exhibit 11.3.

13       MR. VIEN:  And if I could just pull up the address

14 line and down to the "dear" line.  Or the first paragraph.

15 BY MR. VIEN:

16 Q.   Are you familiar with that letter?

17 A.   Yes, I am.

18 Q.   And how are you familiar with it?

19 A.   It's a letter I wrote to the general counsel of Zeneca

20 Pharmaceuticals back in 1995.  I had been asked about it

21 several times before during my deposition that I mentioned and

22 at other meetings.

23       MR. VIEN:  If I could ask that the second paragraph

24 of the letter be blown up?

25 BY MR. VIEN:

1 Q.   Can you see that okay, Mr. Haberberger?

2 A.   I can.

3 Q.   Everybody can read it, but what are you doing with that

4 paragraph?  What are you trying to convey?

5 A.   I'm conveying, as best I can recall, some concerns that I,

6 personally, and my business clients at TAP had about sales and

7 marketing activities of Zeneca in relation to their product,

8 Zoladex, which was a competitive product for Lupron.

9 Q.   And there's some -- some language in that capitalized.

10 Could you read the sentence that includes the capitalized

11 language?

12 A.    "In a written proposal for Zoladex Depot submitted by

13 Zeneca sales representative Randy Payne dated July 17, 1995, a

14 copy of which is attached here to as Exhibit A, it is stated,

15 'As an added incentive, Zeneca will provide you with 50 free

16 depots (over $11,900 worth of product) for the initial

17 conversion to Zoladex.'"

18 Q.   And who did you send this letter to?

19 A.   I sent the letter to a person that I believed to be the

20 general counsel of Zeneca.  I didn't know him personally.

21 Q.   And you indicated that it was based on your concerns and

22 some concerns of your business clients?

23 A.   Yes.

24 Q.   And do you remember who they were, specifically?

25 A.    I don't remember specifically the initial conversation.    I

1 know that I was contacted by someone at TAP, and I know that I

2 copied a number of individuals on this letter.  I believe that

3 one of those individuals was the person who contacted me

4 originally, but I can't remember with 100% certainty.

5 Q.    Okay.  Do you remember who you sent it to?

6 A.    I copied Yasu Hasegawa who was then president of TAP.  I'm

7 fairly certain he wasn't the one who originally contacted me,

8 because, as the president of TAP, I did not deal with him

9 frequently, and I think that would have stood out in my memory.

10 So, it was most likely one of the other two individuals.  I

11 believe it was Dean Sundberg and Jim Salanty.

12 Q.    Okay.  Let me -- I've put a document there on your right.

13 You can turn it over without reading it.  It's Defendants'

14 Exhibit 299.  Take a look at that and then let me ask you, does

15 that refresh your recollection?

16 A.    Somewhat.  I know this is my writing.

17 Q.    I don't think you're supposed to say that?

18 A.    I'm sorry.

19 Q.    Does it --

20 A.    Perhaps somewhat.  I don't remember the exact time I took

21 these notes.

22 Q.    Okay.  All right.  But Defendants' Exhibit 299 are your

23 notes; is that right?

24 A.    Yes.

25 Q.    And what are they notes of?

119

1 A.    From a meeting with Jim Salanty and Dean Sundberg.

2 There's a date at the top, August 31, 1995.

3 Q.    Okay.  And other than reading the notes, do you have an

4 independent recollection of the notes?

5 A.    Not independent of these notes, no.

6 Q.    Okay.  All right.

7          MR. VIEN:  Your Honor, I've learned we had some

8 discussions about this, but I understand there's no objection.

9          MR. STETLER:  There is not, if he wants to put it in.

10          THE COURT:  All right.

11          MR. VIEN:  Defendants' Exhibit 299.

12          THE COURT:  Okay.

13 BY MR. VIEN:

14 Q.    So, these are the meetings you had with the business

15 people at TAP?

16 A.    Right.

17 Q.    These are notes of that meeting, I'm sorry?

18 A.    Right.

19 Q.    And could you read the -- I call it a paragraph, but you

20 know what I'm talking about, the first blurb, if you will.

21 A.    Underneath the title, which is Meeting of J. Salanty, D.

22 Sundberg and the date, it says Zeneca Campaign.  You want me to

23 go ahead?

24          MR. VIEN:  Your Honor, it might be easier.  I know

25 that Mr. Pulse has this.   Perhaps I could ask him to put it up.

120

1          THE COURT:  All right.

2          MR. VIEN:  Thank you.  And if you could go in on the

3  first quarter of the document, please?

4  BY MR. VIEN:

5  Q.   Now, let's try it again, Mr. Haberberger.  I'm sorry.

6  Could you read the first quarter of the document, please?

7  A.   Sure.  In the center of the document it says, "Zeneca

8  Campaign," and then there are three numbered points.  The first

9  one is "Z," which I believe I was abbreviating for Zeneca,

10  "uses free goods -- suggesting physicians charge for."

11          Number 2, again, it's an abbreviation, but it's for

12  "statements on new products."

13          And number 3 is, "Return to practice of their

14  products."

15  Q.   And this is what the letter you wrote was based on, the

16  meeting you had with Mr. Salanty and Mr. Sundberg; is that

17  right?

18  A.   Yes I believe so.

19  Q.   Okay.  Did you receive a response back from Zeneca to that

20  letter?

21  A.   I did.

22  Q.   And let me ask you to turn over those documents I've put

23  on your left and ask you if you see Government's Exhibit 47.1?

24  A.   I have it.

25 Q.    What is Government's Exhibit 47.1?

1 A.   This looks to be the response that I received to my

2 original letter from Zeneca Pharmaceuticals.

3 Q.   And did you share this response from Zeneca with anyone at

4 TAP?

5 A.   Yes.  I shared it with the individuals I had been asked to

6 originally investigate the matter involving Zeneca.  I don't

7 remember which specific individual, but my understanding is if

8 I sent it to one individual, they would share it as appropriate

9 within TAP.

10 Q.   I'd like you --

11         MR. VIEN:  Well, first, your Honor, I'll offer

12 Government's Exhibit 47.1.

13         MR. STETLER:  I don't think we'll be objecting to any

14 of these, Judge.

15         THE COURT:  All right, 47.1 is received.

16         MR. VIEN:  And there's only one more after this.

17 BY MR. VIEN:

18 Q.   Let me turn your attention to page 2 of the document.

19         MR. VIEN:  And what I'm going to have to do, with

20 Mr. Pulse's help, is use the document camera, because it's not

21 scanned?

22         THE COURT:  All right.

23 BY MR. VIEN:

24 Q.   Could you read the one, two, three -- the third and fourth

25 paragraphs of that, please, under -- you know, what's up on the

122

1 screen under allegation number 1.

2          The third paragraph begins, "Our proposal is that you

3 buy a month of Lupron (35 kits) for your patients.  We will

4 then supply your office with three months of therapy free for

5 these 35 patients.  This equals 105 free kits to your office."

6          "It is Zeneca's understanding that these 105 kits,

7 at the time, correlate to a value of over $32,000 provided to a

8 practice group with one-third fewer patients than in the case

9 of the referenced activity by Zeneca."

10 Q.    I'm sorry, I know I didn't ask you, but could you just

11 read that final paragraph under allegation number 1?

12 A.    Sure.  "If one is comparing the possibility of improper

13 inducements, the activity of your representative is manifestly

14 more pernicious than the conduct you complain of, (1), because

15 of the far longer temporal duration involved, (2), the gross

16 dollar amounts offered, and (3), the clear tying of free goods

17 to the physician's purchase of Lupron."

18 Q.    What did you understand him to be saying to you under

19 allegation number 1?

20 A.    Well, in general terms, my recollection of the letter was

21 that Zeneca was essentially denying any wrongdoing and trying

22 to turn things around to suggest that TAP was doing many of the

23 same things that we had originally complained about.

24 Q.    Well, what had you originally complained about?

25 A.    Activities -- among other things, activities that we

.

123

1 thought were questionable, if not illegal, under the Medicare

2 and Medicaid fraud and abuse laws.  Various other things.  I'd

3 have to look at the letter to refresh my memory.

4 Q.    You say Zeneca is suggesting.  It seems pretty clear,

5 doesn't it, to you?

6 A.    Yes, perhaps too mild a term.  Accusing.

7 Q.    Okay.  So, you were accusing Zeneca.  They were accusing

8 you?

9 A.    Right.

10 Q.   Did you write a response back to Zeneca?

11 A.    Yes, I did.

12 Q.   And I think the other document on your left there should

13 be Government's Exhibit Number 47.2?

14 A.    Yes, I have it.

15 Q.   What is it?

16 A.    It's a letter, a copy of a letter that I wrote dated

17 December 18, 1995, to William C. Lucas, Zeneca Pharmaceuticals.

18 It's in response to the letter that I just read from.

19 Q.   And did you share this letter with anyone internally at

20 TAP?

21 A.    The December 19th letter?

22 Q.   Yes.

23 A.    Yes, I --

24 Q.   Is it December 19th or 18th?

25 A.   I'm sorry, December 18th.

1 Q.    Okay.

2 A.    Yes, before I sent the letter out, I shared it internally

3 with personnel from TAP.   Again, I'm not sure specifically who.

4 But I did send them a draft for review.   I may have also shared

5 a copy of the draft with my then manager for TAP matters, who

6 was Brian Smith.   I'm not positive, though.

7           MR. VIEN:   Your Honor, at this point I offer

8 Government's Exhibit 47.2.

9           THE COURT:   That will be received without objection.

10          MR. STETLER:   Your Honor, I think it's already in as

11 another exhibit number.

12          THE COURT:   It's my recollection that it is, but

13 we'll sort through.

14 BY MR. VIEN:

15 Q.   Now, did you personally do any investigation into the

16 allegations that Zeneca made against TAP in its October 13,

17 1995, letter?

18 A.    I don't recall whether I personally did anything other

19 than I shared the letter immediately with personnel from TAP.

20 I didn't have any personal knowledge of these matters, so I was

21 relying primarily, if not entirely, on TAP to do the -- TAP

22 personnel to do the factual investigation of the matters

23 alleged.

24 Q.    And the allegations, the factual allegations you make in

25 your letter of December 18, 1995, were those, as well, based on

1 the information you received from the people at TAP?

2 A.    Yes, they were.

3            MR. VIEN:  And I'd like to put this up on the

4 document camera.

5 BY MR. VIEN:

6 Q.    And I'll ask you just to read your response.  It says,

7 "Comments on Zeneca Responses to TAP allegations."

8            And could you read what it says underneath that?

9 A.    Under "Comments on Zeneca responses to TAP allegations" is

10 a subheading, "TAP allegation number 1."  "We have no way of

11 knowing whether the 50 sample depots of Zoladex provided to

12 Drs. River and Oyer were 'appropriately marked and labeled' and

13 whether, 'it was understood by the practice that the samples

14 were not subject to reimbursement by Medicare.'  In the absence

15 of any direct evidence to the contrary, we will accept your

16 explanation, though we still have concerns about the language

17 in the Zeneca sales promotion aid referring to the 50 free

18 depots being 'an added incentive... for the initial conversion

19 to Zoladex."

20 Q.    So, you sent the letter to Zeneca and you shared it

21 internally at TAP; is that correct?

22 A.    Yes.

23 Q.    Did you get any more correspondence from Zeneca on this

24 issue, do you remember?

25 A.    I'm sorry, I don't remember.   I know there was exchange of

126

1 correspondence.   I can't remember offhand if -- I don't

2 specifically remember one coming after this.

3 Q.    Did anyone at TAP seek legal advice from you about the

4 propriety of giving free samples contingent on business?

5 A.    Not that I recall.

6           MR. VIEN:  Your Honor, I don't have anything else.

7           THE COURT:  All right.

8           MR. STETLER:  I'm first, I think, Judge.

9           THE COURT:  Mr. Stetler.

10                          CROSS-EXAMINATION

11 BY MR. STETLER:

12 Q.   Mr. Haberberger, there's no way you're not going --

13 there's no way you will not be finished today; okay?

14 A.    Thank you.

15           MR. MONICO:  I might have some questions.

16           MR. STETLER:  There's no way --

17 BY MR. STETLER:

18 Q.    I want to ask you a question or two about organization.

19 You never were employed by TAP Pharmaceuticals; is that right?

20 A.    Correct.  I was always an Abbott employee.

21 Q.    And I don't know if you can see this from where you are.

22 If this is okay for me to --

23 A.    I can see it, but whether I can read it is another

24 question.

25 Q.    Do you have any opera glasses under the -- no.

.

1             MR. STETLER:  Your Honor, maybe if I went up there

2 near the screen?

3             THE COURT:  Yes.

4             MR. STETLER:  (Placing chart before the Court and

5 jury.)  As they say, a long way to go for a short story.

6 BY MR. STETLER:

7 Q.   If you accept this as Abbott Pharmaceuticals and it's

8 organization down here --

9             MR. MONICO:  You said Abbott.

10 BY MR. STETLER:

11 Q.   TAP Pharmaceuticals down here, Abbott Laboratories was

12 your employer up here; is that right?

13 A.   That's correct.

14 Q.   And under the Abbott chairmen, and so forth, we have over

15 here the legal department; is that right?

16 A.   Right.

17 Q.   And that was a team of about 40 lawyers when you started?

18 A.   Something like that.

19 Q.   And about 60 when you left?

20 A.   More or less.

21 Q.   And they provided not only services to Abbott

22 Laboratories, but to other divisions of Abbott, like Ross

23 Products; is that right?

24 A.   That's correct.

25 Q.    And specifically to TAP Pharmaceuticals and their

128

1 individuals; is that right?

2 A.    Yes, that is correct.

3 Q.    And I'm going to show you briefly an organizational chart

4 to see if you recognize it, which I believe is from

5 approximately 1995.  It's hard to read.  But let me just ask

6 you if you recognize what I've marked for identification as

7 Defendant Exhibit 797-A?

8 A.    It does look vaguely familiar as an Abbott legal

9 organizational chart.

10 Q.    Does that just generally show where you were and where

11 your boss was organizationally within the legal department in

12 approximately '95?

13 A.    Yes, it does.  I'm just trying to find my name here,

14 actually.

15 Q.    Maybe, if you looked at the third from the right -- excuse

16 me, the fourth from the right column?

17 A.    Yes.

18 Q.    Okay.

19          MR. STETLER:  Your Honor, I'd offer 797-A

20          MR. VIEN:  No objection, your Honor.

21          THE COURT:  All right.  It's received.

22 BY MR. STETLER:

23 Q.    And if you could take a quick look at that.

24          MR. STETLER:  I'm going to try, your Honor -- it's

25 really small print.  And if we could just go to maybe the one,

129

1  two, three -- that actually helps a bit.  I'm sorry, if we
2  could have it just a little bit higher so we see the divisions.
3          That's great.  Thank you.
4  BY MR. STETLER:
5  Q.   We can find you here, Mr. Haberberger, by looking at what
6  is the second column from the right, and you're listed as
7  counsel M.J. Haberberger under H.L. Goldberg; is that right?
8  A.   That's correct.
9  Q.   Is that Honey Lynn Goldberg?
10 A.   That's correct.
11 Q.   And Honey Lynn Goldberg is your boss, in 1995, in this
12 portion of the domestic legal operations branch?
13 A.   She was my manager.  I'm still doing some work for TAP,
14 essentially, and reported to Brian Smith for the TAP matters.
15 Q.   And from time to time did Ms. Goldberg work on TAP-related
16 matters?
17 A.   I don't believe so, but I'm not 100% sure of that.  There
18 was a division of responsibilities between Ms. Goldberg and
19 Mr. Smith after another lawyer retired and the divisions were
20 essentially split up in the domestic operations group of Abbott
21 legal.
22 Q.   Okay.  If we look directly to the right of your little box
23 we see -- is that M.M. McShane?
24 A.   Yes.

25 Q.   And that's Maureen McShane, the woman you described as

130

1 having gone on maternity leave, and then stayed out a little

2 longer for family-related reasons?

3 A.    Right.

4 Q.    And at one point in time -- in fact, I believe around the

5 time of this correspondence, formally she was the point person

6 assigned to TAP, if I have that right?

7 A.    I believe so, yes.

8 Q.    But she, again, was out and you were pinch-hitting for

9 her; do I have that right?

10 A.    In essence, yes.

11 Q.    And when you received this assignment would it be fair to

12 say you thought it was going to be briefer than it wound up

13 being?

14 A.    Yes, that's fair to say.

15 Q.    And that's because she went on maternity leave, and when

16 she didn't come back for -- what was it, a number of years?

17 A.    I think at the time I left in 1999 she had not come back.

18 I don't know if she's subsequently come back.

19 Q.    Okay.  And before you were in the pinch-hitting role, she

20 actually was the lawyer who dealt more hands-on with TAP; is

21 that right?

22 A.    Yes, at least from the time I joined Abbott legal.

23 Q.    And then if we go up to the top of that column, her boss

24 is Brian Smith?

25 A.    Correct.

1 Q.    And Brian Smith, then, in effect, became your supervisor

2 with respect to various TAP matters?

3 A.    That's correct.  He was also originally my supervisor for

4 all matters when I joined Abbott.

5 Q.    And is it accurate that while you or Ms. McShane from time

6 to time were the point persons, other lawyers within the Abbott

7 legal division did provide legal services to TAP?

8 A.    Yes, that's correct.

9 Q.    And do you know a fellow by the name of Ken Gritesman?

10 A.    Yes, I do.

11 Q.    And was he a colleague of yours in the Abbott legal

12 department back in 1995?

13 A.    He was a colleague of mine in the Abbott legal department,

14 although in a different group within the legal department.

15 Q.    And do you recall that he worked on various TAP-related

16 matters from time to time?

17 A.    I believe he did, yes.

18 Q.    Okay.  If you remember, did he work with you somewhat on

19 this what I'm going to call the Zeneca correspondence?

20 A.    I believe at some point I spoke with him to get his

21 perspective, since he was in the litigation group, from a

22 litigation perspective.  I don't remember exactly when I spoke

23 to him.  I have a vague recollection, though, at some point

24 during this letter-writing campaign I did speak with him.

25 Q.   And I should ask you this.  This was a number of years

1 ago; is that right?

2 A.    That's right.  It was nine years ago or so.

3 Q.    And some of these events are a little vague in your mind

4 in terms of who did what?

5 A.    That's correct.

6 Q.    Do you have -- well, let me finish with the chart here.

7 If we go over and we look in that left-hand column -- and not

8 to mislead you, there's parts that are out on the fringes here.

9 But I think you mentioned the international division and a

10 Daphne Pals?

11 A.    Yes.

12 Q.    Do you see her on the far left up at the top?

13 A.    Yes.

14 Q.    She's senior counsel; is that right?

15 A.    Yes, I do.

16 Q.    Did from come a point -- and at a point in time she picked

17 up the ball from you; is that right?

18 A.    Yes.

19 Q.    Was there a time when you actually spent any time out at

20 TAP Pharmaceuticals?

21 A.    I did go there from time to time.

22 Q.    Okay.  And with what frequency, and maybe if you could

23 give us the time frame, that will help us?

24 A.    I believe the first time I went over there was perhaps

25 1993 or '94, that general time frame.  I didn't go there very

1 often.  You know, during the entire time I was at Abbott legal,

2 maybe 10 to 12 times spread out over a number of years.

3 Q.   At the time Ms. Pals took over for you, if you know --

4 you, yourself, know, did she go to the TAP facility from time

5 to time?

6 A.   I didn't personally know.  I would have believed she did,

7 but I did not have personal knowledge of that.

8 Q.   Okay.  If you don't have personal knowledge I don't want

9 to ask you about it.

10        You, from your description of your experience, you

11 were a little bit of a generalist; is that right?

12 A.   A corporate and commercial generalist, yes.

13 Q.   Not a trial lawyer; is that right?

14 A.   No.

15 Q.   And from time to time as an Abbott lawyer did you get

16 training or notification with respect to various fraud and

17 abuse issues?

18 A.   There was some degree of training.  I believe there was an

19 internal seminar, perhaps, with some outside speakers at some

20 point for our entire group within the legal department of

21 commercial generalists.  And I may have gone to one or two

22 outside seminars.

23 Q.   Could we have a rough time frame on that, please?

24 A.   I think the internal seminar that I attended was organized

25 by Honey Lynn Goldberg, my then manager, after she and Brian

1 Smith were promoted and split various responsibilities.  I

2 would say -- I don't know exactly, '93, '94, perhaps.

3 Q.   And one of the reasons you needed to be up to date on

4 fraud and abuse issues is because, as an Abbott lawyer, you had

5 fraud and abuse issues not merely with respect to TAP, but with

6 respect to all of Abbott Laboratories; is that right?

7 A.   That's correct.

8 Q.   In addition to the Abbott legal department, you are aware

9 that various people at TAP utilized what was called as outside

10 counsel?

11 A.   I was generally aware of that, yes.

12 Q.   And from time to time even the Abbott lawyers would look

13 outside of the Abbott legal department for guidance from

14 outside counsel; is that right?

15 A.   Yes, that's correct.

16 Q.   And with respect to issues pertaining to TAP, the people

17 within the legal department generally tended to go to a

18 Washington, D.C., law firm by the name of Reed Smith; is that

19 right?

20 A.   That's correct.

21 Q.   Do you remember who at Reed Smith was the main contact?

22 A.   The principal contact, I believe, was Gordon Schatz.  I

23 spoke with him a number of times on various issues.

24 Q.   Do you understand him to be concentrating or specializing

25 his practice to Medicare fraud and abuse issues?