# Exhibit 96

Luka, Gail                                    June 14, 2007
New York, NY

STATE OF WISCONSIN CIRCUIT COURT

DANE COUNTY, BRANCH 7

Case No. 04-CV-1709

Unclassified Civil: 30703

---------------------------------x

STATE OF WISCONSIN,

   Plaintiff,


  - against -


AMGEN, INC., et al.,

   Defendants.

  (CAPTION CONTINUED)

---------------------------------x

     June 14, 2007

     9:38 a.m.

  Deposition of GAIL LUKA, taken by

Plaintiffs, pursuant to Notice, held at the

offices of Saterlee Stephens Burke & Burke, LLP,

230 Park Avenue, New York, New York, before Todd

DeSimone, a Registered Professional Reporter and

Notary Public of the State of New York.

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                  June 14, 2007
                              New York, NY

| Page 2 | Page 4 |
|---|---|

Page 2

```
 1  COMMONWEALTH OF KENTUCKY
 2  FRANKLIN CIRCUIT COURT - DIV. II
 3  Civil Action No. 03-CI-1134
 4
 5  -----------------------------------x
 6  COMMONWEALTH OF KENTUCKY ex rel. GREGORY
 7  D. STUMBO, ATTORNEY GENERAL,
 8
 9       Plaintiff,
10
11    - against -
12
13  ABBOTT LABORATORIES, INC., et al.,
14
15       Defendants.
16  -----------------------------------x
17
18
19
20
21
22    (CAPTION CONTINUED)
```

Page 4

```
 1  UNITED STATES DISTRICT COURT
 2  DISTRICT OF MASSACHUSETTS
 3  MDL No. 1456
 4  Civil Action No. 01-12257-PBS
 5  Hon. Patti B. Saris
 6
 7  -----------------------------------x
 8  IN RE: PHARMACEUTICAL INDUSTRY AVERAGE
 9  WHOLESALE PRICE LITIGATION
10
11  THIS DOCUMENT RELATES TO:
12  United States of America ex rel. Ven-a-Care of
13  the Florida Keys, Inc., et al. v. Abbott
14  Laboratories, Inc., Civil Action No.
15  06-11337-PBS; United States of America ex rel.
16  Ven-a-Care of the Florida Keys, Inc., et al. v.
17  Dey, Inc., et al., Civil Action No. 05-11084-PBS;
18  and United States of America ex rel. Ven-a-Care
19  of the Florida Keys, Inc., et al. v. Boehringer
20  Ingelheim Corp., Civil Action No. 07-10248
21  -----------------------------------x
22    (CAPTION CONTINUED)
```

Page 3

```
 1  COMMONWEALTH OF KENTUCKY
 2  FRANKLIN CIRCUIT COURT - DIV. I
 3  Civil Action No. 04-CI-1487
 4
 5  -----------------------------------x
 6  COMMONWEALTH OF KENTUCKY ex rel. GREGORY
 7  D. STUMBO, ATTORNEY GENERAL,
 8
 9       Plaintiff,
10
11    - against -
12
13  ALPHARMA USPD, INC., et al.,
14
15       Defendants.
16  -----------------------------------x
17
18
19
20
21
22    (CAPTION CONTINUED)
```

Page 5

```
 1
 2  IN THE COURT OF COMMON PLEAS
 3  FOR THE FIFTH JUDICIAL CIRCUIT
 4  STATE OF SOUTH CAROLINA
 5  COUNTY OF RICHLAND
 6  Civil Action Number 06-CP-40-4394
 7
 8  -----------------------------------x
 9  STATE OF SOUTH CAROLINA, and
10  HENRY D. McMASTER, in his official
11  capacity as Attorney General for the
12  State of South Carolina,
13
14       Plaintiff,
15
16    - against -
17
18  ABBOTT LABORATORIES, INC.
19
20       Defendant.
21  -----------------------------------x
22    (CAPTION CONTINUED)
```

2 (Pages 2 to 5)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
                        New York, NY

---

Page 6

```
 1   IN THE COURT OF COMMON PLEAS
 2   FOR THE FIFTH JUDICIAL CIRCUIT
 3   STATE OF SOUTH CAROLINA
 4   COUNTY OF RICHLAND
 5   Civil Action Number 06-CP-40-7158
 6   ---------------------------------x
 7   STATE OF SOUTH CAROLINA, and
 8   HENRY D. McMASTER, in his official
 9   capacity as Attorney General for the
10   State of South Carolina
11
12        Plaintiff,
13
14     - against -
15
16   ALPHARMA BRANDED PRODUCTS DIVISION INC.,
17   ALPHARMA USPD INC., and PUREPAC PHARMACEUTICAL
18   CO.,
19
20        Defendants.
21   ---------------------------------x
22     (CAPTION CONTINUED)
```

Page 8

```
 1   IN THE COURT OF COMMON PLEAS
 2   FOR THE FIFTH JUDICIAL CIRCUIT
 3   STATE OF SOUTH CAROLINA
 4   COUNTY OF RICHLAND
 5   Civil Action Numbers 06-CP-40-4396
 6            06-CP-40-4393
 7
 8   ---------------------------------x
 9   STATE OF SOUTH CAROLINA, and
10   HENRY D. McMASTER, in his official
11   capacity as Attorney General for the
12   State of South Carolina
13        Plaintiff,
14
15     - against -
16
17   BAXTER INTERNATIONAL, INC. and
18   BAXTER HEALTHCARE CORPORATION,
19
20        Defendants.
21   ---------------------------------x
22     (CAPTION CONTINUED)
```

---

Page 7

```
 1   IN THE COURT OF COMMON PLEAS
 2   FOR THE FIFTH JUDICIAL CIRCUIT
 3   STATE OF SOUTH CAROLINA
 4   COUNTY OF RICHLAND
 5   Civil Action Numbers 07-CP-40-0286
 6            07-CP-40-0280
 7
 8   ---------------------------------x
 9   STATE OF SOUTH CAROLINA, and
10   HENRY D. McMASTER, in his official
11   capacity as Attorney General for the
12   State of South Carolina
13        Plaintiff,
14
15     - against -
16
17   BARR PHARMACEUTICALS, INC.,
18        Defendant.
19   ---------------------------------x
20
21
22     (CAPTION CONTINUED)
```

Page 9

```
 1   IN THE COURT OF COMMON PLEAS
 2   FOR THE FIFTH JUDICIAL CIRCUIT
 3   STATE OF SOUTH CAROLINA
 4   COUNTY OF RICHLAND
 5   Civil Action Numbers 07-CP-40-0281
 6            07-CP-40-0284
 7
 8   ---------------------------------x
 9   STATE OF SOUTH CAROLINA, and
10   HENRY D. McMASTER, in his official
11   capacity as Attorney General for the
12   State of South Carolina
13        Plaintiff,
14
15     - against -
16
17   BRISTOL-MYERS SQUIBB COMPANY,
18        Defendant.
19   ---------------------------------x
20
21
22     (CAPTION CONTINUED)
```

3 (Pages 6 to 9)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                              June 14, 2007
                              New York, NY

| | Page 10 |
|---|---|
| 1 | IN THE COURT OF COMMON PLEAS |
| 2 | FOR THE FIFTH JUDICIAL CIRCUIT |
| 3 | STATE OF SOUTH CAROLINA |
| 4 | COUNTY OF RICHLAND |
| 5 | Civil Action Numbers 07-CP-40-0287 |
| 6 | 07-CP-40-0285 |
| 7 | |
| 8 | -----------------------------------x |
| 9 | STATE OF SOUTH CAROLINA, and |
| 10 | HENRY D. McMASTER, in his official |
| 11 | capacity as Attorney General for the |
| 12 | State of South Carolina |
| 13 | Plaintiff, |
| 14 | |
| 15 | - against - |
| 16 | |
| 17 | SANDOZ, INC., |
| 18 | Defendant. |
| 19 | -----------------------------------x |
| 20 | |
| 21 | |
| 22 | (CAPTION CONTINUED) |

| | Page 12 |
|---|---|
| 1 | IN THE COURT OF COMMON PLEAS |
| 2 | FOR THE FIFTH JUDICIAL CIRCUIT |
| 3 | STATE OF SOUTH CAROLINA |
| 4 | COUNTY OF RICHLAND |
| 5 | Civil Action Numbers 06-CP-40-7151 |
| 6 | 06-CP-40-7153 |
| 7 | |
| 8 | -----------------------------------x |
| 9 | STATE OF SOUTH CAROLINA, and |
| 10 | HENRY D. McMASTER, in his official |
| 11 | capacity as Attorney General for the |
| 12 | State of South Carolina |
| 13 | |
| 14 | Plaintiff, |
| 15 | - against - |
| 16 | |
| 17 | PAR PHARMACEUTICALS COMPANIES, INC., |
| 18 | Defendant. |
| 19 | -----------------------------------x |
| 20 | |
| 21 | (CAPTION CONTINUED) |
| 22 | |

| | Page 11 |
|---|---|
| 1 | IN THE COURT OF COMMON PLEAS |
| 2 | FOR THE FIFTH JUDICIAL CIRCUIT |
| 3 | STATE OF SOUTH CAROLINA |
| 4 | COUNTY OF RICHLAND |
| 5 | Civil Action Numbers 06-CP-40-4391 |
| 6 | 06-CP-40-4398 |
| 7 | -----------------------------------x |
| 8 | STATE OF SOUTH CAROLINA, and |
| 9 | HENRY D. McMASTER, in his official |
| 10 | capacity as Attorney General for the |
| 11 | State of South Carolina |
| 12 | Plaintiff, |
| 13 | |
| 14 | - against - |
| 15 | |
| 16 | BOEHRINGER INGELHEIM ROXANE, INC., |
| 17 | ROXANE LABORATORIES, INC. and |
| 18 | BEN VENUE LABORATORIES, INC. |
| 19 | Defendants. |
| 20 | -----------------------------------x |
| 21 | |
| 22 | (CAPTION CONTINUED) |

| | Page 13 |
|---|---|
| 1 | IN THE COURT OF COMMON PLEAS |
| 2 | FOR THE FIFTH JUDICIAL CIRCUIT |
| 3 | STATE OF SOUTH CAROLINA |
| 4 | COUNTY OF RICHLAND |
| 5 | Civil Action Numbers 07-CP-40-0591 |
| 6 | 07-CP-40-0592 |
| 7 | |
| 8 | -----------------------------------x |
| 9 | STATE OF SOUTH CAROLINA, and |
| 10 | HENRY D. McMASTER, in his official |
| 11 | capacity as Attorney General for the |
| 12 | State of South Carolina |
| 13 | Plaintiff, |
| 14 | |
| 15 | - against - |
| 16 | |
| 17 | NOVARTIS PHARMACEUTICALS CORPORATION, |
| 18 | Defendant. |
| 19 | -----------------------------------x |
| 20 | |
| 21 | |
| 22 | (CAPTION CONTINUED) |

4 (Pages 10 to 13)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                June 14, 2007
                              New York, NY

|                                          Page 14 |                                          Page 16 |
| 1  IN THE COURT OF COMMON PLEAS | 1  IN THE COURT OF COMMON PLEAS |

Page 14

1  IN THE COURT OF COMMON PLEAS
2  FOR THE FIFTH JUDICIAL CIRCUIT
3  STATE OF SOUTH CAROLINA
4  COUNTY OF RICHLAND
5  Civil Action Numbers 07-CP-40-0282
6            07-CP-40-0283
7
8  -----------------------------------x
9  STATE OF SOUTH CAROLINA, and
10 HENRY D. McMASTER, in his official
11 capacity as Attorney General for the
12 State of South Carolina
13          Plaintiff,
14
15   - against -
16
17 MYLAN LABORATORIES, INC.
18      Defendant.
19 -----------------------------------x
20
21
22    (CAPTION CONTINUED)

Page 16

1  IN THE COURT OF COMMON PLEAS
2  FOR THE FIFTH JUDICIAL CIRCUIT
3  STATE OF SOUTH CAROLINA
4  COUNTY OF RICHLAND
5  Civil Action Number 06-CP-40-4399
6            06-CP-404390
7
8  -----------------------------------x
9  STATE OF SOUTH CAROLINA, and
10 HENRY D. McMASTER, in his official
11 capacity as Attorney General for the
12 State of South Carolina
13          Plaintiff,
14
15   - against -
16
17 WARRICK PHARMACEUTICALS CORPORATION,
18 SCHERING-PLOUGH CORPORATION, and SCHERING
19 CORPORATION,
20      Defendants.
21 -----------------------------------x
22    (CAPTION CONTINUED)

Page 15

1  IN THE COURT OF COMMON PLEAS
2  FOR THE FIFTH JUDICIAL CIRCUIT
3  STATE OF SOUTH CAROLINA
4  COUNTY OF RICHLAND
5  Civil Action Number 06-CP-40-7154
6            06-CP-40-7156
7
8  -----------------------------------x
9  STATE OF SOUTH CAROLINA, and
10 HENRY D. McMASTER, in his official
11 capacity as Attorney General for the
12 State of South Carolina
13          Plaintiff,
14
15   - against -
16
17 TEVA PHARMACEUTICALS USA, INC. and
18 IVAX CORPORATION,
19      Defendants.
20 -----------------------------------x
21
22    (CAPTION CONTINUED)

Page 17

1  IN THE COURT OF COMMON PLEAS
2  FOR THE FIFTH JUDICIAL CIRCUIT
3  STATE OF SOUTH CAROLINA
4  COUNTY OF RICHLAND
5  Civil Action Number 06-CP-40-7152
6            06-CP-40-7155
7
8  -----------------------------------x
9  STATE OF SOUTH CAROLINA, and
10 HENRY D. McMASTER, in his official
11 capacity as Attorney General for the
12 State of South Carolina
13          Plaintiff,
14
15   - against -
16
17 WATSON PHARMA, INC., and WATSON
18 PHARMACEUTICALS, INC.,
19      Defendants.
20 -----------------------------------x
21
22    (CAPTION CONTINUED)

                                          5 (Pages 14 to 17)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
                           New York, NY

---

Page 18

```
 1   IN THE CIRCUIT COURT OF
 2   MONTGOMERY COUNTY, ALABAMA
 3   Civil Action No. 2005-219
 4
 5   -----------------------------------x
 6   STATE OF ALABAMA,
 7
 8           Plaintiff,
 9
10      - against -
11
12   ABBOTT LABORATORIES, INC., et al.,
13
14           Defendants.
15   -----------------------------------x
16
17
18
19
20
21
22       (CAPTION CONTINUED)
```

Page 20

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF MASSACHUSETTS
 3   MDL No. 1456
 4   Master File No. 01-12257-PBS
 5   Judge Patti B. Saris
 6   Chief Magistrate Judge Marianne B. Bowler
 7
 8   -----------------------------------x
 9   IN RE: PHARMACEUTICAL INDUSTRY AVERAGE
10   WHOLESALE PRICE LITIGATION
11
12   THIS DOCUMENT RELATES TO:
13   State of California, ex rel.
14   Ven-A-Care v. Abbott Laboratories,
15   et al.
16   Case No. 03-cv-11226-PBS
17
18   -----------------------------------x
19
20
21
22       (CAPTION CONTINUED)
```

---

Page 19

```
 1   IN THE DISTRICT COURT OF TRAVIS COUNTY, TEXAS
 2   201st JUDICIAL DISTRICT
 3   Cause No. D-1-GV-04-001286
 4
 5   -----------------------------------x
 6   THE STATE OF TEXAS
 7   ex rel.
 8
 9   VEN-A-CARE OF THE FLORIDA
10   KEYS, INC.,
11           Plaintiffs,
12
13      - against -
14
15
16   ABBOTT LABORATORIES INC.,
17   ABBOTT LABORATORIES,
18   and HOSPIRA, INC.,
19           Defendants.
20   -----------------------------------x
21
22       (CAPTION CONTINUED)
```

Page 21

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF MASSACHUSETTS
 3   MDL No. 1456
 4   C.A. No. 01-12257-PBS
 5   Honorable Patti B. Saris
 6
 7   -----------------------------------x
 8   IN RE: PHARMACEUTICAL INDUSTRY AVERAGE
 9   WHOLESALE PRICE LITIGATION
10
11   THIS DOCUMENT RELATES TO:
12   State of Mississippi v. Abbott
13   Laboratories, Inc., et al.,
14   No. 3:06-566(S.D. Miss.)
15   -----------------------------------x
16
17
18
19
20
21
22       (CAPTION CONTINUED)
```

                                        6 (Pages 18 to 21)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                          June 14, 2007
                                    New York, NY

| Page 22 |
|---|
|  1   IN THE CIRCUIT COURT OF THE FIRST CIRCUIT |
|  2   STATE OF HAWAI'I |
|  3   Civil No. 06-1-0720-04-EEH |
|  4   (Complex Litigation) |
|  5 |
|  6   -----------------------------------x |
|  7   STATE OF HAWAII, |
|  8 |
|  9        Plaintiff, |
| 10 |
| 11        Vs. |
| 12 |
| 13   ABOTT LABORATORIES, |
| 14   INC., et al., |
| 15 |
| 16        Defendants. |
| 17   -----------------------------------x |
| 18 |
| 19 |
| 20 |
| 21 |
| 22        (CAPTION CONTINUED) |

| Page 24 |
|---|
|  1   IN THE COURT OF THE SECOND JUDICIAL CIRCUIT |
|  2   IN AND FOR LEON COUNTY, FLORIDA |
|  3   Civil Action No. 98-3032G |
|  4 |
|  5   -----------------------------------x |
|  6   THE STATE OF FLORIDA, |
|  7   EX REL. VEN-A-CARE OF THE |
|  8   FLORIDA KEYS, INC., ET AL., |
|  9 |
| 10      Plaintiffs, |
| 11 |
| 12      vs. |
| 13 |
| 14   MYLAN LABORATORIES, |
| 15   INC., ET AL., |
| 16 |
| 17      Defendants. |
| 18   -----------------------------------x |
| 19 |
| 20 |
| 21 |
| 22        (CAPTION CONTINUED) |

| Page 23 |
|---|
|  1   IN THE DISTRICT COURT OF THE FOURTH JUDICIAL |
|  2   DISTRICT OF THE STATE OF IDAHO, |
|  3   IN AND FOR THE COUNTY OF ADA |
|  4   Case No. CVOC07-01847 |
|  5   -----------------------------------x |
|  6   STATE OF IDAHO, |
|  7         Plaintiff, |
|  8      Vs. |
|  9   ALPHARMA USPD, INC.; ASTRAZENECA PHARMACEUTICALS |
| 10   LP; ASTRAZENECA LP; BARR LABORATORIES, INC.; |
| 11   CENTOCOR, INC.; IVAX CORP.; IVAX PHARMACEUTICALS, |
| 12   INC.; JANSSEN PHARMACEUTICAL PRODUCTS, LP; JOHNSON |
| 13   & JOHNSON; McNEIL-PPC, INC., MERCK & CO., INC.; |
| 14   ORTHO BIOTECH PRODUCTS, LP; ORTHO-McNEIL |
| 15   PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COS, |
| 16   INC.; PUREPAC PHARMACEUTICAL CO.; SANDOZ, INC., |
| 17   f/k/a GENEVA PHARMACEUTICALS, INC.; TEVA |
| 18   PHARMACEUTICALS USA, INC., WATSON PHARMA, INC., |
| 19   f/k/a SCHEIN PHARMACEUTICALS, INC.; And WATSON |
| 20   PHARMACEUTICALS, INC., |
| 21         Defendants. |
| 22   -----------------------------------x |

| Page 25 |
|---|
|  1   UNITED STATES DISTRICT COURT |
|  2   FOR THE DISTRICT OF MASSACHUSETTS |
|  3   MDL No. 1456 |
|  4   Civil Action No. 01-12257-PBS |
|  5 |
|  6   -----------------------------------x |
|  7   IN RE: PHARMACEUTICAL |
|  8   INDUSTRY AVERAGE WHOLESALE |
|  9   PRICE LITIGATION |
| 10 |
| 11   THIS DOCUMENT RELATES TO: |
| 12 |
| 13   THE PEOPLE OF THE STATE |
| 14   OF ILLINOIS VS. ABBOTT |
| 15   LABORATORIES, INC., ET AL. |
| 16   -----------------------------------x |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |

7 (Pages 22 to 25)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                              New York, NY

---

Page 26

1   A P P E A R A N C E S :
2
3           ARCHIBALD CONSUMER LAW OFFICE
4           1914 Monroe Street
5           Madison, Wisconsin 53711
6               Attorneys for State of Wisconsin;
7               State of Hawaii; State of
8               Illinois; State of Kentucky;
9               State of Alaska; State of Idaho
10          BY:  P. JEFFREY ARCHIBALD, ESQ.
11              archibaldlaw@tds.net
12
13          HAND ARENDALL, LLC
14          1200 Park Place Tower
15          2001 Park Place North
16          Birmingham, Alabama 35203
17              Attorneys for the State of Alabama
18          BY:  TRACY R. DAVIS, ESQ.
19              tdavis@handarendall.com
20
21
22   (CONTINUED)

---

Page 28

1   A P P E A R A N C E S : (CONTINUED)
2
3           SATTERLEE STEPHENS BURKE & BURKE LLP
4           230 Park Avenue
5           11th Floor
6           New York, New York 10169
7               Attorneys for Thomson
8               Healthcare, Inc.
9           BY:  THOMAS J. CAHILL, ESQ.
10              tcahill@ssbb.com
11
12          SIDLEY AUSTIN LLP
13          One South Dearborn
14          Chicago, Illinois 60603
15              Attorneys for Bayer Corporation
16          BY:  JESSICA S. ROBINSON, ESQ.
17              jrobinson@sidley.com
18
19
20
21
22   (CONTINUED)

---

Page 27

1   A P P E A R A N C E S : (CONTINUED)
2
3           HOGAN & HARTSON LLP
4           875 Third Avenue
5           New York, New York 10022
6               Attorneys for Bristol-Myers
7               Squibb Company
8           BY:  STEVEN M. EDWARDS, ESQ.
9               smedwards@hhlaw.com
10              SANDHYA P. KAWATRA, ESQ.
11              spkawatra@hhlaw.com
12
13          LOCKE LIDDELL & SAPP LLP
14          2200 Ross Avenue
15          Suite 2200
16          Dallas, Texas 75201
17              Attorneys for Schering-Plough
18              Corporation; Warrick
19              Pharmaceuticals Corporation;
20              B. Braun Medical, Inc.
21          BY:  KARIN B. TORGERSON, ESQ.
22              ktorgerson@lockeliddell.com

---

Page 29

1   A P P E A R A N C E S : (CONTINUED)
2
3           KAYE SCHOLER LLP
4           425 Park Avenue
5           New York, New York 10022-3598
6               Attorneys for Novartis
7               Pharmaceuticals Corporation
8           BY:  ELISABETH C. KANN, ESQ.
9               ekann@kayescholer.com
10
11          KELLEY DRYE & WARREN LLP
12          101 Park Avenue
13          New York, New York 10178-0002
14              Attorneys for Mylan
15              Pharmaceuticals, Inc. and
16              DEY, L.P.
17          BY:  CLIFFORD KATZ, ESQ.
18              ckatz@kelleydrye.com
19
20
21
22   (CONTINUED)

8 (Pages 26 to 29)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                            New York, NY

| | |
|---|---|
| Page 30 | Page 32 |

**Page 30**

1  A P P E A R A N C E S : (CONTINUED)
2
3  TELEPHONIC APPEARANCES:
4
5       OFFICE OF THE ATTORNEY GENERAL
6       BUREAU OF MEDI-CAL FRAUD AND
7       ELDER ABUSE
8       1455 Frazee Road
9       Suite 315
10      San Diego, California 92108
11         Attorneys for the State of
12         California
13      BY:  MATTHEW C. KILMAN, ESQ.
14         matt.kilman@doj.ca.gov
15
16      HUGHES HUBBARD & REED LLP
17      1775 I Street, N.W.
18      Washington, D.C. 20006-2401
19         Attorneys for Merck &
20         Company, Inc.
21      BY:  JAMES A. GRAFFAM, ESQ.
22         graffam@hugheshubbard.com

**Page 31**

1  A P P E A R A N C E S : (CONTINUED)
2
3       DAVIS POLK & WARDWELL LLP
4       450 Lexington Avenue
5       New York, New York 10017
6          Attorneys for AstraZeneca
7          Pharmaceuticals LP, AstraZeneca
8          LP, AstraZeneca PLC and
9          Zeneca, Inc.
10      BY:  BROOKE A. TUCKER, ESQ.
11         brooke.tucker@dpw.com
12
13      JONES DAY
14      77 West Wacker Drive
15      Chicago, Illinois 60601-1692
16         Attorneys for Abbott Laboratories,
17         Inc.; Hospira, Inc.
18      BY:  TARA A. FUMERTON, ESQ.
19         tfumerton@jonesday.com
20
21
22  (CONTINUED)

**Page 32**

1  A P P E A R A N C E S : (CONTINUED)
2
3       MICHAEL J. SULLIVAN
4       UNITED STATES ATTORNEY
5       John Joseph Moakley U.S. Courthouse
6       Suite 9200
7       1 Courthouse Way
8       Boston, Massachusetts 02210
9          Attorneys for United States
10         of America
11      BY:  GEORGE B. HENDERSON, II, ESQ.
12         Assistant United States Attorney
13
14
15
16
17
18
19
20
21
22

**Page 33**

1            I N D E X
2  WITNESS: GAIL LUKA                    PAGE
3  EXAMINATION BY MR. ARCHIBALD.......... 038, 144
4  EXAMINATION BY MS. TORGERSON.......... 064, 147
5  EXAMINATION BY MS. ROBINSON............... 110
6  EXAMINATION BY MR. EDWARDS............ 132, 147
7  EXAMINATION BY MS. DAVIS.................. 143
8
9            E X H I B I T S
10  NUMBER      DESCRIPTION           PAGE
11  Exhibit Luka 001 - Subpoena.................. 036
12  Exhibit Luka 002 - Notice of Deposition...... 036
13  Exhibit Luka 003 - Notice of Deposition...... 036
14  Exhibit Luka 004 - Notice of Deposition...... 036
15  Exhibit Luka 005 - Notice of Deposition...... 036
16  Exhibit Luka 006 - Notice of Deposition...... 036
17  Exhibit Luka 007 - Notice of Deposition...... 036
18  Exhibit Luka 008 - Notice of Deposition...... 036
19  Exhibit Luka 009 - Notice of Deposition...... 036
20  Exhibit Luka 010 - Notice of Deposition...... 036
21  Exhibit Luka 011 - Notice of Deposition...... 036
22  Exhibit Luka 012 - Notice of Deposition...... 036

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                    June 14, 2007
                        New York, NY

---

Page 34

```
1        E X H I B I T S  (CONTINUED)
2   NUMBER         DESCRIPTION         PAGE
3   Exhibit Luka 013 - Notice of Deposition...... 036
4   Exhibit Luka 014 - Notice of Deposition...... 036
5   Exhibit Luka 015 - Notice of Deposition...... 036
6   Exhibit Luka 016 - Notice of Deposition...... 036
7   Exhibit Luka 017 - Notice of Deposition...... 036
8   Exhibit Luka 018 - Notice of Deposition...... 036
9   Exhibit Luka 019 - Notice of Deposition...... 036
10  Exhibit Luka 020 - Notice of Deposition...... 036
11  Exhibit Luka 021 - Notice of Deposition...... 036
12  Exhibit Luka 022 - Notice of Deposition...... 036
13  Exhibit Luka 023 - DVD-R Disk labeled
14        "Red Book"................ 057
15  Exhibit Luka 024 - Subpoena Duces Tecum...... 124
16  Exhibit Luka 025 - Red Book 06496............ 138
17
18
19
20
21
22
```

Page 35

```
1           P R O C E E D I N G S
2
3        MR. ARCHIBALD:  Let's do the
4   introductions.
5        My name is Jeff Archibald.  I
6   represent the Attorneys General for seven states,
7   which are Kentucky, South Carolina, Alaska,
8   Hawaii, Illinois, Wisconsin and Idaho.
9        MS. DAVIS:  Tracey Davis representing
10  the State of Alabama.
11       MS. TORGERSON:  Karin Torgerson on
12  behalf of Schering, Warrick and B. Braun Medical.
13       MR. KATZ:  Cliff Katz on behalf of
14  DEY and Mylan.
15       MS. KANN:  Elisabeth Kann on behalf
16  of Novartis Pharmaceuticals Corporation.
17       MS. KAWATRA:  Sandhya Kawatra on
18  behalf of Bristol-Myers Squibb Company.
19       MS. ROBINSON:  Jessica Robinson from
20  Sidley Austin on behalf of Bayer Corporation in
21  the matter of Alabama versus Abbott Labs.
22       MR. CAHILL:  I'm Tom Cahill from
```

Page 36

```
1   Satterlee Stephens.  We represent the witness and
2   Thomson Healthcare.
3        MR. HENDERSON:  George Henderson for
4   the United States of America.
5        MR. KILMAN:  Matt Kilman, Deputy
6   Attorney General for the State of California
7   appearing on behalf of the State of California.
8        MS. FUMERTON:  Tara Fumerton
9   appearing on behalf of defendants Abbott
10  Laboratories, Abbott Laboratories, Inc. and
11  Hospira, Inc.
12       MR. GRAFFAM:  James Graffam of
13  Hughes, Hubbard & Reed appearing on behalf of
14  Merck & Company, Inc.
15       MS: TUCKER:  Brooke Tucker on behalf
16  of AstraZeneca.
17        (Exhibit Luka 001, Exhibit Luka
18  002, Exhibit Luka 003, Exhibit Luka 004, Exhibit
19  Luka 005, Exhibit Luka 006, Exhibit Luka 007,
20  Exhibit Luka 008, Exhibit Luka 009, Exhibit Luka
21  010, Exhibit Luka 011, Exhibit Luka 012, Exhibit
22  Luka 013, Exhibit Luka 014, Exhibit Luka 015,
```

Page 37

```
1   Exhibit Luka 016, Exhibit Luka 017, Exhibit Luka
2   018, Exhibit Luka 019, Exhibit Luka 020, Exhibit
3   Luka 021, and Exhibit Luka 022 premarked for
4   identification.)
5        MR. ARCHIBALD:  While we are waiting,
6   and we will wait another three or four minutes,
7   we might as well spend the time fruitfully by
8   identifying deposition exhibits which I will not
9   be asking the witness about.
10        Exhibit Luka 002 is the Notice of
11  Deposition of Gail Luka by the State of
12  Wisconsin.  Exhibit Luka 003 through Exhibit Luka
13  022 are cross-notices to take the deposition of
14  Gail Luka.  Those cross-notices include the
15  United States Department of Justice, California,
16  Texas, Kentucky, South Carolina, I think Hawaii,
17  Illinois, Idaho, Alabama, Mississippi, and if I
18  didn't say it, Florida.
19        If anybody is aware of any other
20  state or entity that is cross-noticed that I
21  missed, please speak up now.  In any event, the
22  record speaks for itself.
```

10 (Pages 34 to 37)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
New York, NY

---

Page 38

1
2          G A I L   L U K A, called as a
3  witness, having been first duly sworn, was
4  examined and testified as follows:
5
6                EXAMINATION
7  BY MR. ARCHIBALD:
8      Q.    State your full name for the  record,
9  please.
10     A.    Gail Lynn Luka.
11     Q.    As I indicated a little earlier, my
12  name is Jeff Archibald.  I'm a specially-
13  appointed Attorney General for seven states;
14  Wisconsin, Illinois, Kentucky, South Carolina,
15  Idaho, Hawaii and Alaska.  I'm going to be asking
16  you some questions about Red Book documents this
17  morning.  But before I do, I would like to ask
18  you some background.
19         First, how old a woman are you?
20     A.    I'm 45.
21     Q.    What is your business address?
22     A.    6200 South Syracuse Way, Suite 300,

---

Page 39

1  Greenwood Village, Colorado 80111.
2      Q.    What is your educational background?
3      A.    I have a bachelor of science in
4  accounting from Colorado University.
5      Q.    When did you receive that?
6      A.    1986.
7      Q.    Have you been in Colorado your entire
8  adult life?
9      A.    Yes.
10     Q.    Your entire life?
11     A.    Yes.
12     Q.    Very briefly, give us your work
13  history starting with post-college.
14     A.    My first job was actually a
15  continuation before college.  Beginning in 1985,
16  I worked for a company called Betcher & Company
17  until 1992.  It is a securities firm.  I did
18  cashiering functions and wire operator functions
19  and assisted in operations manager functions.
20     Q.    After that?
21     A.    I did in-house daycare from '91 to
22  '92, because of the birth of my daughter.  Then I

---

Page 40

1  went to Piper Jaffray -- no, I'm sorry, D.E. Frey
2  first and that was in '93 to '94.  I helped
3  maintain licensing of securities brokers.
4      Q.    Next?
5      A.    Then Piper Jaffray for approximately
6  a year.
7      Q.    What did you do for those folks?
8      A.    I, at that point, had my Series 7
9  securities license and I was a broker's
10  assistant.
11     Q.    Next?
12     A.    Same thing for Dane Bosworth.
13     Q.    From when to when?
14     A.    '94 to '95.
15     Q.    Next?
16     A.    Then my father passed away, so in '96
17  I took about six months off.  In 1996 through
18  2001 I was a real estate appraiser, licensed, and
19  decided to go back into the workforce and went to
20  Merrill Lynch until 2002 for a year.  Then they
21  closed the service center.  I was a broker
22  transfer representative.  Then I started with

---

Page 41

1  Micromedex in 2002.  I've been with them ever
2  since.
3      Q.    Is that Thomson Micromedex?
4      A.    Yes, now referred to as Thomson
5  Healthcare.  Micromedex is a business of Thomson
6  Healthcare.
7      Q.    Technically, who is your current
8  employer?
9      A.    Thomson Healthcare.
10     Q.    Does Thomson Healthcare own an entity
11  called Red Book?
12     A.    Yes.
13     Q.    What is Red Book?
14     A.    It is a drug information book that
15  contains pricing information and other valuable
16  drug information.
17     Q.    You are not here to testify about any
18  of the business activities of Red Book, are you?
19     A.    No.
20     Q.    Is it your understanding that you are
21  here to simply authenticate or tell us whether
22  certain Red Book documents are in fact Red Book

11 (Pages 38 to 41)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                June 14, 2007
New York, NY

Page 42

1  documents?
2      A.    Correct.
3      Q.    Let's talk about your job duties and
4  responsibilities at Thomson Healthcare.  If I
5  refer to Red Book, do you understand that I'm
6  referring to Thomson Healthcare?
7      A.    Correct.
8      Q.    At Red Book, what are your duties and
9  responsibilities, starting with the year 2002?
10     A.    When I began, my first nine months
11 there I was a customer service representative
12 helping sales representatives to book and process
13 incoming orders for Micromedex.
14     Q.    What type of orders?
15     A.    Subscription orders for different
16 medical databases.
17     Q.    What did you do next for Red Book?
18     A.    In 2002 I moved to the Legal
19 Department and I've been there ever since.  My
20 functions include assisting in contract
21 preparation, assisting in accumulating and
22 gathering documents for other subpoena requests.

Page 43

1      Q.    Is that part of your normal duties
2  and responsibilities at Red Book?
3      A.    Yes.
4      Q.    Has that been the case since 2002?
5      A.    Yes.
6      Q.    Has that changed in any way from 2002
7  to the present?
8      A.    No.  I also do various assisting of
9  attorneys, general legal processing.
10     Q.    What is your formal title?
11     A.    Senior contract specialist.
12     Q.    Are there any other duties and
13 responsibilities you have at Red Book as a senior
14 contract specialist?
15     A.    I think that covers it.
16     Q.    If Red Book receives a subpoena such
17 as the one that is in front of you and has been
18 marked as Exhibit Luka 001, are you the person
19 that Red Book turns to to gather the documents
20 requested, if they are requested in the subpoena?
21     MR. CAHILL:  Generally speaking.
22     MS. TORGERSON:  Objection to form.

Page 44

1      A.    I receive instructions from our in-
2  house counsel on how to proceed with the
3  documents once they are received from them.
4      Q.    Forgive me for being dense here, are
5  you a paralegal?
6      A.    I've been referred to as a paralegal,
7  but I'm simply a senior contract specialist.
8      Q.    So you have no formal training as a
9  paralegal?
10     A.    Correct.
11     Q.    Are you familiar with the types of
12 documents that Red Book maintains in the ordinary
13 course of its business?
14     A.    Yes.
15     Q.    What type of documents does Red Book
16 retain in the ordinary course of its business?
17     A.    Any price verification lists that
18 transpire between the manufacturers and Red Book.
19     Q.    Are those separate files?
20     A.    All maintained as a part of the
21 manufacturer file.  And any communications that
22 happen between Red Book and the manufacturers.

Page 45

1      Q.    What are those files called?
2      A.    Manufacturer files.
3      Q.    Are those the documents that are
4  being produced here today?
5      MS. TORGERSON:  Objection to form.
6      A.    Yes.
7      Q.    I want to probe that a little more
8  before we talk about the documents themselves.
9          How are the manufacturer files kept?
10 By how are they kept, I mean are they in
11 alphabetical order?  Chronological order?  That
12 sort of thing.
13     A.    There are two separate sets of files
14 in regards to the manufacturer files. Prior to
15 2002, they were kept in Montvale, New Jersey.
16 Those files are maintained to some degree in
17 alphabetical order, but if there was any change
18 in ownership as far as the manufacturers, they
19 were pulled and placed into the new owner's file.
20 So someone reviewing the documents may see one
21 out of sequence alphabetically, but it is all
22 basically on who owns those manufacturing drugs

12 (Pages 42 to 45)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
New York, NY

Page 46

1  pricing information at that point.
2          Moving forward from August of 2002
3  when the files moved to Denver and we handled
4  maintaining the files, we changed the procedure
5  and kept it solely in alphabetical order, not
6  taking into account any shifting or movement in
7  ownership.  So the files as it lived is how it is
8  maintained.  Those are kept from 2002 through
9  2004 and then separate files on a yearly basis
10 after that point.
11     Q.    Give me an example of a situation,
12 let's use Pfizer, has purchased Pharmacia, how
13 are the records kept for the Pharmacia documents
14 after the purchase?
15     A.    They will stay in alphabetical order
16 under Pharmacia.  The file will just not receive
17 any current documentation after the point that
18 Pfizer buys them.  The information would then be
19 in Pfizer's files moving forward.
20     Q.    Tell me what types of documents other
21 than those you have already mentioned are kept in
22 the manufacturer files.

Page 47

1      A.    To the best of my knowledge, that's
2  all it is, is communications between us and the
3  manufacturers, pricing information, verifications
4  going between the two parties.
5      Q.    Do you know why this information is
6  kept?  And if you don't, that's fine.
7      A.    To the best of my knowledge, to have
8  an historical record.
9      Q.    Regardless of whether any litigation
10 occurs, such as this litigation here, would Red
11 Book have kept these type of records in its
12 ordinary course of business?
13     A.    Yes.
14     Q.    How far back do these records go?
15     A.    To the best of my knowledge, at least
16 until 1991.  There were files that were
17 maintained in Montvale that, depending on the
18 size of the files, documents could have been
19 extracted with no rhyme or reason as far as basis
20 in prior years, in order to shorten the space of
21 what they were keeping.
22     Q.    By "extracted," you mean discarded?

Page 48

1      A.    Yes.
2      Q.    So we just wouldn't see those,
3  correct?
4      A.    And moving forward at this point - -
5  correct -- and moving forward from the time
6  Denver became responsible for the files, nothing
7  has left the files.  They are there as they are
8  and nothing has been removed or changed.
9      Q.    Just to pin down an exact date, that
10 occurred in August of 2002, correct?
11     A.    Yes, the files moved August of 2002
12 and everything was up and running as far as
13 Denver's responsibility to monitor the processes
14 as of September of '02.
15     Q.    Prior to your being employed by Red
16 Book in 2002, you obviously wouldn't have any
17 firsthand knowledge of how the records were kept
18 from 1991 up until 2002, correct?
19     A.    Correct.
20     Q.    But did you, however, talk to people
21 who had firsthand knowledge of how the documents
22 were stored?

Page 49

1      A.    Yes.
2      Q.    During that period of time?
3      A.    Yes, that were present at the time of
4  the move, not any individuals from the Montvale
5  location.
6      Q.    Did they represent to you that these
7  were the documents, these manufacturer files,
8  that were kept from 1991 through 2002 by Red
9  Book?
10     A.    Yes.
11     Q.    Are we talking about hard copy
12 documents?
13     A.    Yes.
14     Q.    Up until what point did Red Book only
15 keep hard copy documents?
16     A.    I don't know.
17     Q.    Let's ask it a little differently.
18 When did Red Book start keeping records
19 electronically?
20     A.    It is my understanding that pricing
21 information was maintained at the Montvale
22 location.  To what degree, to what the rules

13  (Pages 46 to 49)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
New York, NY

---

Page 50

1  were, I'm unclear.
2      Q.    I'm sorry, I'm unclear because I'm
3  confusing you.  I don't want to limit it now to
4  the New Jersey --
5      A.    Correct.  We began with the Sybase
6  system in Montvale.
7      Q.    What's that?
8      A.    It is an electronic system where they
9  maintained all the pricing information. When the
10 files came to Denver, we shifted over from the
11 Sybase moving all electronic data into our CRM
12 system where it is kept now, and those history
13 notes are then printed and documented in hard
14 copy in the files as they are now.  You will
15 notice in the records under historical
16 information, the pricing histories will go not
17 only from the time that Denver started
18 maintaining the files but it picks up any
19 notations that happened electronically prior to
20 that in the Montvale location.
21     Q.    If I'm hearing you and understanding
22 you correctly, any price verifications that are

Page 51

1  received from a manufacturer in an electronic
2  format are reduced to hard copy and then stored?
3      A.    They are kept simultaneous.
4      Q.    So you keep both?
5      A.    Yes.
6      Q.    The records that you produced to us
7  in Colorado earlier this year, a subset of which
8  is being produced in a CD today, was created from
9  hard copies, correct?
10     A.    Correct.
11     Q.    Is it true that even today Red Book
12 makes hard copies of electronic price
13 verifications received from manufacturers?
14     A.    Yes.
15     Q.    Again, I don't mean to belabor this,
16 but those are kept in the ordinary course of
17 business, correct?
18     A.    Yes.
19     Q.    You don't create these hard copies
20 for litigation purposes?
21     A.    No.
22     Q.    I'm correct in that?

Page 52

1      A.    Yes.
2      Q.    After August of 2002, exactly where
3  physically are the documents stored?
4      A.    In a locked file room.
5      Q.    I think you have answered my next
6  question.  What security measures are taken to
7  prevent tampering with these type of documents?
8      A.    The file room is locked, but I do not
9  know who is allowed access to them.  I don't know
10 how many employees actually have access to the
11 file room.  But I know it is locked.
12     Q.    Do any persons other than Thomson
13 employees have access?
14     A.    No.
15     Q.    If I'm hearing you correctly, while
16 you don't know the exact number, there are a
17 limited number of people who have access to these
18 documents?
19     A.    Correct.
20     Q.    I want to be certain I understand how
21 a document, a hard copy, is created.  Let me use
22 an example and then you walk me through it.

Page 53

1          Let's say that Red Book receives a
2  product or price verification sheet from Pfizer.
3  What happens to that product or price
4  verification sheet from the moment Red Book
5  receives it?
6          MR. KATZ:  Objection as to form.
7      Q.    You can answer.  These are only for
8  the record.
9      A.    I don't know the specific editorial
10 functions of how the pricing gets changed.  I can
11 only talk directly to what I saw in the documents
12 and how they were marked.
13     Q.    That's what I want to hear.
14     A.    From what I'm understanding is the
15 documents come back with handwritten changes of
16 any changes the manufacturers themselves need to
17 make to the pricing that we send them on an
18 annual basis.  We then take that information and
19 we also mark on the face of the document once
20 we've either changed it or we have deactivated it
21 based on the instructions from the manufacturer.
22 And that hard copy is retained in the file.

14 (Pages 50 to 53)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
New York, NY

Page 54

1    Q.    Again, your job is to make sure the
2  hard copy is retained in the file?
3         MS. TORGERSON:  Objection to form.
4    A.    Correct.
5    Q.    You don't ascertain who made the
6  change, whether it was the manufacturer, Red
7  Book, or somebody else, correct?
8    A.    Correct.
9    Q.    Are you personally familiar with all
10 of the systems at Red Book that have been used to
11 record and store documents at Red Book from
12 August 2002 through the present?
13        MR. CAHILL:  For pricing information?
14        MR. ARCHIBALD:  Yes.
15    Q.    I'm sorry, I want to limit my
16 questions to the manufacturer files.
17    A.    To the best of my knowledge, yes.
18    Q.    If you know, does Red Book make
19 changes to the product or price verification
20 sheets without direction from the manufacturer?
21        MR. EDWARDS:  I object to the form.
22    Q.    You can answer.  Those objections are

Page 55

1  just for the record.  Your lawyer is the only one
2  that can instruct you not to answer.
3    A.    To the best of my knowledge, no, we
4  do not make any movements without instructions
5  from the manufacturer.  But, again, it is not my
6  daily job to work with the editorial team so I
7  can't speak on behalf of the people who actually
8  process.
9    Q.    I assume that's above your pay grade?
10    A.    Yeah.
11    Q.    One way to look at it?
12    A.    Yeah.
13    Q.    Again, I'm going to repeat some
14 things here.  Forgive me.
15        Has it always been the regular
16 business practice of Red Book to compile and
17 store the manufacturer files that are being
18 produced here today?
19    A.    Yes.
20    Q.    Was it the normal business practice
21 of Red Book to maintain over time the documents
22 being produced here today?

Page 56

1    A.    Yes.
2    Q.    We talked about changes being made to
3  the manufacturer files.  Are all of the documents
4  stored in the same form as when you received
5  them?
6    A.    Yes.
7    Q.    In other words, no changes are made
8  by Red Book or by your department and then they
9  are stored, correct?
10        MR. CAHILL:  Do you know what he
11 means by "changes"?
12        THE WITNESS:  I was just going to
13 say, as I explained with the price verification
14 lists, once they come in, then we make notations
15 on the changes that we have input.  So I can't
16 very well say that our documents are not marked.
17    Q.    That was a dumb question and I'm
18 going to retract it even though you have answered
19 it.
20        What I was trying to get at is these
21 documents are stored at the time they are
22 received, correct?

Page 57

1    A.    Yes.
2    Q.    You don't go back a year or two later
3  and recreate documents and then store them?
4    A.    No.
5    Q.    How do you know that the documents
6  that you are giving us here today are the same
7  documents that were originally stored by Red
8  Book?
9         MS. TORGERSON:  Objection to form.
10    A.    I did an initial scan of the disk
11 that I received from Tom.
12        (Exhibit Luka 023 marked for
13 identification.)
14    Q.    Is that what has been marked as
15 Exhibit Luka 023?
16    A.    Yes.  As I did not verify each
17 individual sheet, I did scan through the
18 documents and they do exist -- they do appear to
19 exist in the files that live in Denver.
20    Q.    Is there any evidence that you can
21 tell of any tampering or changes?
22        MS. TORGERSON:  Objection to form.

15  (Pages 54 to 57)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                        June 14, 2007
                         New York, NY

---

Page 58

1     A.    No.
2     Q.    Did you scan, at least scan, each and
3  every document in the exhibit?
4     A.    Yes.
5     Q.    Exhibit Luka 023?
6     A.    Yes.
7     Q.    To the best of your knowledge, are
8  all of the documents contained in Exhibit Luka
9  023 historical manufacturer files, documents kept
10 in the historical manufacturer files of Red Book
11 in the ordinary course of Red Book's business?
12    A.    Yes.
13    Q.    Let me show you what has been marked
14 as Exhibit Luka 001.  That is the subpoena from
15 Wisconsin; is it not?
16    A.    Yes.
17    Q.    Have you reviewed the subpoena?
18    A.    Yes.
19    Q.    It asked you to bring the CDs
20 containing images of all Red Book documents
21 produced to the State of Wisconsin and others in
22 Denver, Colorado on January 16th through 18th,

Page 59

1  2007.  These documents include, but are not
2  limited to, communications to and from Red Book
3  and most, if not all, defendants in this action.
4         Did you bring those documents?
5     A.    Not the entire set.
6     Q.    That's what I want to talk to you
7  about.  It was a poorly-worded subpoena and that
8  is my fault.
9         First, tell us what documents are
10 contained on Exhibit Luka 023.
11    A.    To the best of my knowledge, on
12 January 16th, all documents left Denver to the
13 Colorado Attorney General's office, at which time
14 it was your decision and your discretion as far
15 as which copies you wanted to obtain and make.
16 From that, that disk was prepared and returned to
17 our counsel who in turn sent us a copy for our
18 archive.
19    Q.    And for your review?
20    A.    Yes.
21    Q.    When you say "that disk," you are
22 referring to Exhibit Luka 023?

Page 60

1     A.    Correct.
2     Q.    Let me see if I can summarize this so
3  there is no misunderstanding.  Exhibit Luka 023 is
4  a subset of a larger set of documents which was
5  produced to the Attorney General's office in
6  Colorado on January 16th, 2007?
7     A.    They were actually sent on January
8  11th and reviewed from the 16th to the 18th and
9  then returned to Denver.  Yes, you are correct.
10    Q.    Were you involved with the process of
11 sending those documents to the Colorado Attorney
12 General's office?
13    A.    Yes.
14    Q.    Tell us what you did.
15    A.    I was present at the time that we had
16 an outside service come and box all of the
17 documents.  We maintained what files were going
18 into what boxes and made sure everything was sent
19 the way that it was maintained in our files.
20    Q.    By "everything" --
21    A.    All manufacturer files, all
22 information, in the same order in which they were

Page 61

1  kept in our file room.
2     Q.    These are all of the Red Book
3  manufacturing files from 1991 through the end of
4  2005?
5     A.    Correct.
6     Q.    What did you do next?
7     A.    Monitor the process of them loading
8  them onto the trucks, documented the number of
9  boxes.
10    Q.    How many were there?
11    A.    220 approximately.  Then they left
12 Denver.  When they came back, I was on the
13 receiving end when they were returned to Thomson
14 Healthcare and I myself verified all files from
15 2002 to 2005 to make sure that the files did come
16 back that were sent and everything was intact.
17 They were slightly out of order, but they were
18 there.
19    Q.    Did you detect any evidence
20 whatsoever of any tampering?
21    A.    No.
22    Q.    Any changes made in the documents?

16 (Pages 58 to 61)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
                          New York, NY

Page 62

1     A.    No.  Just file position was slightly
2  off, but that's it.
3     Q.    Did you confirm that the documents
4  from 1991 through August of 2002 also came back?
5     A.    The boxes, the number of boxes
6  themselves were verified that we received all of
7  the boxes.  But due to an internal process we
8  have yet to verify every single file.  We are in
9  the process of developing an archive system for
10 those older files.  So each file has not been
11 verified.
12    Q.    Are all of the files kept by Red Book
13 today under lock and key?
14    A.    Yes.
15    Q.    If a court wanted to verify whether
16 any of the documents on Exhibit Luka 023 had been
17 altered or changed, could that court come to Red
18 Book and ask to look at originals?
19    A.    Yes.
20    Q.    I'm going to, again, repeat myself,
21 and I want to make sure that all the I's are
22 dotted and the T's crossed before we leave here

Page 63

1  today.
2     A.    That is fine.
3     Q.    Have you personally reviewed the
4  subset that is being produced here today as
5  Exhibit Luka 023, subset of documents?
6          MS. TORGERSON:  Objection to form.
7     A.    I have scanned each of the pages
8  given to me on the disk.
9     Q.    Are you able to confirm that the
10 documents contained in Exhibit Luka 023 were in
11 fact Red Book documents that Red Book kept in the
12 ordinary course of its business?
13    A.    Yes.
14          MR. EDWARDS:  I object to the form.
15    Q.    Can you testify to a reasonable
16 degree of certainty that Exhibit Luka 023 contains
17 Red Book documents kept in the ordinary course of
18 business that have not been altered from the
19 originals kept by Red Book?
20          MR. EDWARDS:  I object to the form.
21 Assumes facts not in evidence.
22    A.    Yes.

Page 64

1          MR. ARCHIBALD:  Thank you very much.
2
3               EXAMINATION
4  BY MS. TORGERSON:
5     Q.    My name is Karin Torgerson.  We met
6  just briefly before the deposition began.  I just
7  want to go over a couple of things with you.
8          MR. EDWARDS:  Who do you represent?
9          MS. TORGERSON:  I represent Schering,
10 Warrick and B. Braun Medical.
11    Q.    Have you ever heard of those
12 companies?
13    A.    I've seen their names.
14    Q.    Have you ever talked with any
15 individuals that represented that they worked for
16 Schering?
17    A.    No.
18    Q.    Have you ever talked with any
19 individuals who represented to you that they
20 worked for Warrick?
21    A.    No.
22    Q.    Have you ever talked to any

Page 65

1  individuals who represented to you that they
2  worked for B. Braun Medical?
3     A.    No.
4     Q.    My understanding of your career path,
5  you never worked directly with any state Medicaid
6  agencies; is that right?
7     A.    That's correct.
8     Q.    Other than the communications you had
9  in relation to this subpoena, you have never
10 dealt with any state Medicaid agencies; is that
11 correct?
12    A.    That's correct.
13    Q.    Is it also correct that in doing the
14 job that you have been doing for Thomson, that
15 you have never worked directly with any
16 representatives of any drug companies; is that
17 right?
18    A.    That's correct.
19    Q.    What is your understanding of how --
20 was it the Colorado Attorney General that first
21 requested documents from Red Book?
22    A.    I don't know the specifics.

                              17 (Pages 62 to 65)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
                        New York, NY

---

Page 66

1    Q.   Are you aware of what was contained
2  in the request that led to the production of
3  documents to the various Attorneys General?
4    A.   I was given just the information that
5  I needed to proceed from in-house counsel.
6    Q.   What information did in-house counsel
7  give you?
8       MR. CAHILL:  I just want to clarify
9  what you are asking.  You are obviously not
10 asking for something privileged.
11      MS. TORGERSON:  I'm asking for the
12 instructions she was given as to what she was
13 asked to gather.
14   Q.   What instructions were you given as
15 to what was being requested by the various
16 Attorneys General?
17   A.   To prepare the manufacturer files to
18 be delivered for review intact and to be able to
19 verify that all files were returned in the same
20 order.
21   Q.   I just want to make sure, the only
22 thing you were asked to gather were the

---

Page 67

1  manufacturer files; is that correct?
2    A.   Correct.
3    Q.   Would those manufacturer files have
4  contained any e-mails?
5    A.   Yes.
6    Q.   Who would those e-mails have been to
7  and from?
8    A.   Between Red Book and the manufacturer
9  and back.
10   Q.   What about internal e-mails to Red
11 Book -- from one Red Book representative to
12 another Red Book representative discussing the
13 pricing issue?
14   A.   I won't be able to answer that.
15   Q.   You weren't asked to gather that; is
16 that right?
17   A.   If it wasn't a part of the files, I
18 wouldn't have gotten it.
19   Q.   So if it wasn't already in the
20 manufacturer files you were not asked to gather
21 anything additional other than what was already
22 in the manufacturer files?

---

Page 68

1    A.   We were asked to produce all
2  manufacturer information.
3    Q.   When you say "all manufacturer
4  information," is that every drug manufacturer
5  that Red Book maintained a file on?
6    A.   Correct.
7    Q.   Do you know who -- which particular
8  states made that request of Red Book?
9    A.   I don't know.
10   Q.   Did you ever see a copy of that
11 request from those various Attorneys General?
12   A.   I may have seen it briefly, but it is
13 not something I would have been able to recall.
14   Q.   Do you still have a copy of that
15 request?
16   A.   The attorneys, in-house attorneys do;
17 I do not.
18   Q.   As I understand it, is it correct
19 that the documents that eventually were produced
20 to the States' Attorneys General were gathered
21 from Red Book's office in Colorado; is that
22 correct?

---

Page 69

1    A.   Correct.
2    Q.   That office is in Denver, Colorado?
3    A.   Greenwood Village, Colorado.
4    Q.   That is a suburb of Denver?
5    A.   Yes, suburb of Denver.
6    Q.   Are there documents that may exist in
7  any other locations of Red Book that were not
8  gathered?
9    A.   Not to the best of my knowledge.
10   Q.   So it is your understanding all the
11 manufacturer files are maintained in the
12 Greenwood Village location of Colorado?
13   A.   Yes.
14   Q.   What other documents are maintained
15 in the file room from which these documents were
16 pulled, these manufacturer files?
17   A.   There are other editorial referential
18 material that our editorial team may want to
19 house or use in the process of developing our
20 healthcare databases.  To be specific, because I
21 don't work in that department, I can't go there.
22   Q.   Regardless, no other files other than

---

18 (Pages 66 to 69)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                            New York, NY

Page 70

1   the manufacturing files were produced to the
2   States' Attorneys General?
3       A.    That's correct.
4       Q.    Can you give us any description of
5   what these other editorial documents may be in
6   that file room?
7       A.    Referential tools, magazines,
8   articles.  That's the only things that I could
9   see visibly.  I don't function in the department.
10  I don't know what they keep.  And I did not spend
11  any time digging through the file cabinets as
12  they exist to see what was in there.
13      Q.    So this file room that exists, is it
14  a file room dedicated solely to the Editorial
15  Services Department of Red Book?
16      A.    Correct.  I wanted to clarify that
17  last answer.  It may not necessarily be Red Book
18  editorial materials kept in that reference file
19  room.
20      Q.    But they are nonetheless materials
21  used by Red Book editorial staff in the
22  functioning of their jobs?

Page 71

1       A.    The editorial staff could work
2   outside of Red Book's materials; but our
3   editorial team, yes.
4       Q.    That file room is maintained by the
5   Red Book editorial staff for the purpose of doing
6   the work that they do for Red Book?
7       A.    Yes.
8       Q.    And the manufacturer files are a
9   subset of the material that is kept in that file
10  room?
11      A.    Correct.
12      Q.    I know Mr. Archibald asked you about
13  some of the people who may have access to that
14  room.  Is it your understanding that outside the
15  Editorial Services Group, do other people have
16  access to those files other than that group?
17      A.    I can't answer the question.  I don't
18  know who has access.  I know that it is under
19  lock and key, but I do not know which employees
20  of Thomson Healthcare have been given the
21  privilege to access it.
22      Q.    Who did you -- do you have access to

Page 72

1   that room?
2       A.    No, no longer.
3       Q.    Do you have a key?
4       A.    No longer.
5       Q.    You did at some point?
6       A.    When I was doing my file review work,
7   yes.
8       Q.    File review work for this subpoena?
9       A.    Yes.
10      Q.    How long did you have access to that
11  room during that time?
12      A.    Only for the purposes of what I
13  needed to get done.  I think we were probably up
14  there about two and a half weeks.  Then when the
15  documents came back I also had access to make
16  sure that they got back in the order in which
17  they came.
18      Q.    Who did you turn over your key to?
19      A.    Facilities.
20      Q.    So certainly Facilities has access to
21  the room?
22      A.    Correct.

Page 73

1       Q.    Are you aware of anyone else by name
2   who has access to that room?
3       A.    One employee, but she is not even on
4   the Red Book team.  I know there is others, but
5   she is just the one I know has access.
6       Q.    Who is that?
7       A.    Stella Martinez.
8       Q.    What is Ms. Martinez's role?
9       A.    She is an editorial employee.  I
10  don't know her specific functions.
11      Q.    I just want to make sure I understand
12  exactly how these documents were produced.  Red
13  Book actually gave up physical control of these
14  files to the Colorado Attorney General's office?
15      A.    Correct.
16      Q.    Did anyone from Red Book travel with
17  the files?
18      A.    No.
19      Q.    For some period of days, three or so
20  days, those files were outside Red Book's
21  control; is that right?
22      A.    Correct.

19 (Pages 70 to 73)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                              New York, NY

Page 74

1    Q.    Has anyone ever done a page by page -
2  - did anyone review the files to count the number
3  of pages that existed before they were given to
4  the Colorado Attorney General's office?
5    A.    No.
6    Q.    Do you know who reviewed the files at
7  the Colorado Attorney General's office?
8    A.    I know Mr. Archibald and his team,
9  but that's as best as I can give you.  I know
10 there was others involved, but I don't know
11 names.
12   Q.    Do you know who was on his team?
13   A.    No.
14   Q.    Do you know if the files were
15 maintained solely at the Colorado Attorney
16 General's office?
17   A.    Yes.
18   Q.    How do you know that?
19   A.    Just from what I was told.  That's
20 the best I can do.
21   Q.    So Mr. Archibald may have represented
22 to you that they never left the Colorado Attorney

Page 75

1  General's office?
2    A.    Correct.
3    Q.    It is true, isn't it, that no one
4  with Red Book was there to ascertain whether
5  those files ever left?
6    A.    Correct.
7    Q.    Since there was never a page-by- page
8  review before the files were shipped out, is it
9  fair to say that Red Book doesn't know at this
10 point whether if a page got misplaced or wasn't
11 put back in the file, Red Book would have no
12 idea, would they?
13   A.    On a page-by-page basis, probably
14 not.
15   Q.    And you personally have done a
16 comparison of the files from 2002 to 2005 to see
17 if the files were returned; is that right?
18   A.    Correct.
19   Q.    But, again, you have not -- you
20 cannot do a page-by-page analysis to know if any
21 pages were taken out of that?
22   A.    Correct.

Page 76

1    Q.    And no one to date has done a file-
2  by-file analysis of the materials produced from
3  1991 to 2002; is that right?
4    A.    Correct.
5    Q.    And, therefore, because you haven't
6  done even the file analysis you can't do a page-
7  by-page analysis?
8    A.    Exactly.
9    Q.    Do you know the criteria by which the
10 various States' Attorneys General selected
11 documents to be made part of the subset that is
12 marked as Exhibit Luka 023?
13   A.    No.
14   Q.    You don't know what files they
15 selected, do you?
16   A.    No.
17   Q.    You don't know why they selected
18 them?
19   A.    No.
20   Q.    Do you know the volume of documents
21 that are on Exhibit Luka 023?
22   A.    About 18,000 pages, a little shy.

Page 77

1    Q.    How many pages were produced total in
2  your estimate to the Colorado Attorney General
3  initially?
4    A.    The best I can offer you is 4,600
5  files.  I have no idea of a page count.  I can't
6  even guess.
7    Q.    Do you know how many files exist on
8  Exhibit Luka 023?
9    A.    No.
10   Q.    So you can't tell us how much of the
11 documents produced to the Attorneys General ended
12 up on this subset?
13   A.    Correct.
14   Q.    And "this subset" being Exhibit Luka
15 023?
16   A.    Yes.
17   Q.    Now, after the -- is it your
18 understanding that the various Attorneys General
19 made a decision as to what documents they wanted
20 to have copied?
21   A.    Correct.
22   Q.    And put on to Exhibit Luka 023.

                                  20  (Pages 74 to 77)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                              June 14, 2007
New York, NY

---

Page 78

1        Is it your understanding at that
2   point that Red Book then did a privilege review
3   of the documents that were selected by the
4   Attorneys General?
5        A.   It is my understanding that the disk
6   was made available to our outside counsel prior
7   to them coming to me.
8        Q.   Do you know if any documents were
9   removed from the subset that was selected by the
10  Attorneys General on the basis of privilege?
11       A.   To the best of my knowledge, one or
12  two maybe.
13       Q.   Do you know if a privilege log was
14  created for those documents that were removed
15  after the Colorado Attorneys General selected the
16  subset they wanted?
17       A.   I don't know.
18       Q.   Do you know what those documents that
19  were removed contained?
20       A.   No.
21       Q.   Do you know what they discussed?
22       A.   No.

---

Page 79

1        Q.   How is it that you have an
2   understanding that some documents were removed
3   after the initial subset was selected by the
4   various Attorneys General?
5        MR. CAHILL:  Other than
6   communications with counsel?
7        Q.   Did counsel tell you?  I don't want
8   to know the details, but did counsel tell you
9   some documents were removed on the basis of
10  privilege?
11       A.   Yes.
12       Q.   There was no privilege review
13  conducted prior to the documents being given to
14  the Colorado Attorney General; is that correct?
15       A.   There was a general review at the
16  time when we prepared the documents to go to the
17  Attorney General's office.
18       Q.   Was that review to look for
19  privilege?
20       MR. CAHILL:  You are asking for
21  information other than communications with
22  counsel?  Obviously our communications --

---

Page 80

1        Q.   I just want to know was there a
2   review of the files for privilege undertaken
3   before the documents were turned over to the
4   Colorado Attorney General?
5        A.   In general terms, yes.
6        Q.   And who did that review?
7        A.   Myself -- there were several parties
8   coming in and out of the file room.  One person
9   did not do it all is what I'm trying to say.  It
10  was me, there was an attorney, another employee
11  of our Legal Department, and several members of
12  our outside counsel team.
13       Q.   Did you review every single file
14  maintained in the file room?
15       A.   Yes.
16       Q.   You did?
17       A.   Yes.
18       Q.   But, nonetheless, there was a
19  subsequent privilege review done once the
20  Attorneys General had the ability to come in and
21  look at the documents they wanted to select?
22       A.   Yes.

---

Page 81

1        Q.   To your knowledge, have the 220 boxes
2   that were made available to the Attorneys General
3   been made available to any of the defendants in
4   any of the actions where this deposition has been
5   cross-noticed?
6        A.   I wouldn't know.
7        Q.   You are only aware of gathering these
8   documents one time; is that right?
9        A.   Yes.
10       Q.   Would there be anybody else who would
11  have knowledge as to whether these documents had
12  been made available to the defendants other than
13  you?
14       A.   In-house counsel.  Well, I probably
15  would have been involved if I needed to go back
16  into the files to pull anything else. But if this
17  information were to be sufficient, I may or may
18  not have known about it.  In-house counsel and
19  outside counsel would know.
20       Q.   I guess let me make sure my question
21  is clear.  220 boxes of materials were gathered
22  up out of the Greenwood, Colorado facility; is

---

21 (Pages 78 to 81)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
New York, NY

Page 82

1    that right?
2        A.    Yes.
3        Q.    To your knowledge, that only ever
4    happened one time?
5        A.    Correct.
6        Q.    Do you know whether any of the
7    defendants were given access to those documents
8    at the time they were with the Colorado Attorney
9    General's office?
10       A.    I don't know.
11       Q.    If they didn't happen that one time,
12   they have never left Red Book's facility after
13   that?
14       A.    Correct.
15       Q.    This production of the 220 boxes,
16   approximately 220 boxes, that occurred in January
17   of '07?
18       A.    Yes.
19       Q.    To your knowledge, have any documents
20   been produced to any States' Attorneys General
21   prior to January of 2007?
22       A.    Not to the best of my knowledge.

Page 83

1        Q.    These documents were produced, as you
2    understand it, to the Colorado Attorney General's
3    office?
4        A.    Uh-huh.
5        Q.    Do you know what other states had
6    access to them while they were maintained by the
7    Colorado Attorney General's office?
8        A.    I do not know.
9        Q.    You understand that Mr. Archibald
10   represents a number of states, including the
11   State of Wisconsin?
12       A.    Correct.
13       Q.    Do you know whether any Attorneys
14   General other than the states that Mr. Archibald
15   represents had access to these documents?
16       A.    I don't know.
17       Q.    Do you know what the terms were of
18   the agreement between Red Book and the States'
19   Attorneys General as to whether or not Red Book
20   would receive a copy of anything the States'
21   Attorneys General selected?
22       A.    I don't know the terms.

Page 84

1        Q.    Do you believe it is possible that
2    the States' Attorneys General received copies of
3    documents -- or made copies of documents that
4    they did not put on Exhibit Luka 023?
5        A.    I wouldn't know.
6        Q.    Are you aware of a confidentiality
7    agreement that exists between Red Book and the
8    various States' Attorneys General?
9        A.    I know that one exists, but the
10   terms, I have no clue.
11       Q.    Have you ever seen it?
12       A.    No.
13       Q.    Do you know what states are party to
14   that confidentiality agreement?
15       A.    No.
16       Q.    Do you know the date of that
17   confidentiality agreement?
18       A.    No.
19       Q.    When was it that you received -- let
20   me make sure I make the question clear.
21            Documents were released to the
22   Colorado Attorney General on January 16th, 2007?

Page 85

1        A.    January 11th is when they left us.
2        Q.    So the documents were within the
3    control of the Colorado Attorney General from
4    January 11th until what day?
5        A.    They started on their route back to
6    us on the 18th of January.  We had a blizzard in
7    Denver so they could not finish the delivery
8    until the 19th.  They were housed at Iron
9    Mountain who is our document file retainer.  I
10   don't know what you want to call them.  But they
11   were there at Iron Mountain overnight and then
12   came to us totally palletized.  The pallets were
13   not unsealed.  Everything was just stored there
14   overnight and then came to Denver.
15       Q.    Was any sort of index given to the
16   Colorado Attorney General along with the
17   documents?
18       A.    No.
19       Q.    Was there a shipping, bill of lading
20   I guess it is called, of "There are X many
21   boxes"?
22       A.    Yes.

22 (Pages 82 to 85)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                              New York, NY

---

Page 86

1    Q.    Do you have a copy of that still?
2    A.    We might.  I don't personally, but
3  I'm sure that there is one retained in our files.
4    Q.    Other than that bill of lading there
5  was no index given to the Colorado Attorney
6  General to say "In box one you will find certain
7  documents"?
8    A.    Correct.
9    Q.    No index ever created?
10   A.    No.
11   Q.    So the documents, they are maintained
12  generally, the 220 boxes worth of documents are
13  maintained generally in your facility at Red
14  Book?
15   A.    Yes.
16   Q.    Then they were sent to the Colorado
17  Attorney General?
18   A.    Yes.
19   Q.    What office were they sent to?
20   A.    I don't know the actual physical
21  location.
22   Q.    What city were they sent to?

Page 87

1    A.    Denver.
2    Q.    So they are sent to Denver and they
3  were physically maintained at the Colorado
4  Attorney General's office?
5    A.    To the best of my knowledge, yes.
6    Q.    And then on the way back to you they
7  had to stay for a night in Iron Mountain because
8  of the blizzard?
9    A.    Yes.
10   Q.    As far as you know, the review
11  conducted by the various States' Attorneys
12  General was not conducted at Iron Mountain?
13   A.    Correct.
14   Q.    Those documents were just merely held
15  there during that blizzard?
16   A.    Correct.  They were palletized prior
17  to leaving the Attorney General's office and
18  nothing changed as a form when it made the
19  overnight stay before it came back to us.
20   Q.    While the documents were at the
21  Colorado Attorney General's office, you don't
22  know the circumstances under which they were

Page 88

1  kept, do you?
2    A.    I do not.
3    Q.    You don't know if they were kept
4  under lock and key?
5    A.    I do not.
6    Q.    You don't know who had access to
7  them?
8    A.    I do not.
9    Q.    After the documents were returned to
10  Red Book, how long was it before you received the
11  CD that has been marked Exhibit Luka 023?
12   A.    The CD that we received -- Exhibit
13  Luka 023 is a copy of the disk that I retained
14  after the deposition request for my review.  The
15  original CD that came to us was documented, I
16  can't give a specific date, I want to say no
17  longer than a month from, and that was received
18  and archived at our facility.
19   Q.    Sometime in February?
20   A.    I can't say for sure.  I honestly
21  don't recall.  I want to say within a month, but
22  I can't verify the date.

Page 89

1        MR. CAHILL:  If you don't know, you
2  don't have to guess.
3    Q.    And I'm just looking for an
4  approximate.  So the documents came back to Red
5  Book on approximately January 19th and you think
6  it was probably about a month after that that you
7  received a disk from the Attorneys General of the
8  documents they had selected?
9    A.    We received it from outside counsel.
10   Q.    You received it from outside counsel?
11   A.    Uh-huh.
12   Q.    Were there any changes made from the
13  disk you received from outside counsel to Exhibit
14  Luka 023?  Were there differences?
15   A.    To the best of my knowledge, no. But
16  I don't know if there is a difference in the two
17  privileged documents that they found in the first
18  disk versus the second.
19   Q.    Have you ever done a comparison of
20  the disk that you received from your counsel to
21  the disk that is marked as Exhibit Luka 023?
22   A.    No.

                                    23 (Pages 86 to 89)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                         June 14, 2007
                        New York, NY

Page 90

1    Q.    So you don't know what differences
2    there may be between those two disks?
3    A.    Correct.
4    Q.    When you say the disk you received
5    from outside counsel is archived, does that mean
6    it is maintained in your facility in Colorado?
7    A.    It is archived off site in a storage
8    facility.
9    Q.    It is just one disk; is that right?
10   A.    I think so.
11   Q.    Whose decision was it to send it off
12   site?
13   A.    It is just how we archive records, so
14   in-house counsel.
15   Q.    If Red Book wanted to pull that disk
16   back so that everyone could review it, you could
17   do that; is that right?
18   A.    Yes.
19   Q.    You don't have any intentions of
20   destroying that disk at this point?
21   A.    No.
22   Q.    Do you know whether the

Page 91

1    confidentiality agreement that exists between Red
2    Book and the various States' Attorneys General
3    was signed before or after the document review
4    began by the various Attorneys General?
5    A.    I know of no specifics on the
6    confidentiality agreement other than it exists.
7    Q.    But your understanding is that the
8    documents were released to the Attorneys General
9    on January 11th?
10   A.    Yes.
11   Q.    And if the confidentiality agreement
12   is dated January 16th, then that postdates their
13   beginning the review of those documents?
14   A.    Yes. I don't know any specifics on
15   the agreement.
16   Q.    I want to make sure I understand, you
17   have done some review of the documents or the
18   images that exist on Exhibit Luka 023; is that
19   right?
20   A.    Correct.
21   Q.    When you say "scan," describe for us
22   what you did to scan the documents on Exhibit

Page 92

1    Luka 023?
2    A.    Opened up every file on the disk and
3    scanned it, an on-screen review, to ensure that
4    the documents appeared to be coming out of our
5    Red Book manufacturer files.
6    Q.    How long did it take you to open up
7    every file?
8    A.    Approximately ten hours, ten to
9    twelve hours.
10   Q.    Did you do that over the course of
11   one day or several days?
12   A.    Several.
13   Q.    How many days did it take you to
14   review?
15   A.    Three.
16   Q.    I want to make sure I understand, you
17   never compared the documents that exist or the
18   images that exist on Exhibit Luka 023 with the
19   actual files; is that right?
20   A.    Correct.
21   Q.    Do you know whether the States'
22   Attorneys General copied entire files,

Page 93

1    manufacturer files, or whether they cherry-picked
2    documents out of those manufacturer files?
3    A.    To the best of my knowledge, they are
4    not entire files.
5    Q.    So they cherry-picked, they took like
6    one manufacturer's file and took a couple of
7    documents?
8    MR. CAHILL: If you know.
9    A.    To the best of my knowledge. Because
10   of my general review, I cannot verify full
11   complete manufacturer files against the files
12   that are on the disk.
13   Q.    And you've never undertaken to do
14   that?
15   A.    Correct.
16   Q.    To review the images that are on
17   Exhibit Luka 023 versus a particular
18   manufacturer's file?
19   A.    Correct.
20   Q.    I want to make sure that I understand
21   your testimony. You are not claiming to have
22   personal knowledge of whether the documents that

24 (Pages 90 to 93)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
New York, NY

---

Page 94

1  exist on Exhibit Luka 023 were created at or near
2  the time of the event that is recorded?
3          MS. DAVIS:  Objection to form.
4      A.  Correct.
5      Q.  You are not saying you have personal
6  knowledge that the documents that exist on
7  Exhibit Luka 023 were created by someone with
8  knowledge of the events or information contained
9  in those documents?
10         MS. DAVIS:  I object to the form.
11     A.  Could you rephrase that?
12     Q.  Sure.
13         You don't know when the documents on
14 Exhibit Luka 023 were created?
15         MS. DAVIS:  I object to the form.
16     A.  Correct.
17     Q.  You don't know the circumstances
18 under which they were created?
19         MS. DAVIS:  I object to the form.
20     A.  Correct.
21     Q.  You don't know who created the
22 documents that are maintained right now as

---

Page 95

1  Exhibit Luka 023?
2          MS. DAVIS:  I object to the form.
3      A.  Correct.
4      Q.  You don't know whether the person who
5  made that document had personal knowledge of the
6  events recorded on those documents?
7      A.  Correct.
8      Q.  And you don't know if the documents
9  that are contained in Exhibit Luka 023 were
10 created at or near the event that is recorded in
11 the document?
12         MS. DAVIS:  I object to the form.
13         MR. CAHILL:  Do you understand what
14 she means?
15         THE WITNESS:  That last one I don't
16 quite get.
17     Q.  These documents go back to 1991, some
18 of them; is that right?
19     A.  Yes.
20     Q.  You started your work with Red Book
21 in 2002; is that correct?
22     A.  Uh-huh.

---

Page 96

1      Q.  You don't have any information,
2  personal or otherwise, as to how documents from
3  1991 to 2002 were created, because you weren't
4  there?
5      A.  Correct.
6      Q.  Is that right?
7      A.  I have talked to people that were
8  present at the time when the files moved and I
9  have some idea of how the overall practice
10 worked, but I do not have working knowledge.
11     Q.  Let's explore that a little bit.
12         You think you have some understanding
13 as to how the documents were maintained; is that
14 right?
15     A.  That's correct.
16     Q.  You don't have any information as to
17 how the documents were created?
18     A.  Correct.
19     Q.  You don't know who created them?
20     A.  Correct.
21     Q.  You don't know what information that
22 person had when they created the documents that

---

Page 97

1  were later maintained by Red Book?
2      A.  Correct.
3      Q.  I want to understand, you say you
4  talked to someone -- you talked to people who
5  were present when the documents moved from New
6  Jersey to Colorado?
7      A.  Correct.
8      Q.  Those people did not create the
9  documents that were moved; is that right?
10     A.  That's correct.
11     Q.  They were file custodians much like
12 yourself; is that right?
13     A.  That's correct.
14     Q.  So they didn't tell you, for example,
15 I know that this document or this manufacturer
16 file was created by someone who had knowledge of
17 the information that's contained in that file?
18     A.  That's correct.
19     Q.  All they could tell you was the
20 circumstances under which those documents, once
21 they hit a file, how they had been maintained?
22     A.  That's correct.

25  (Pages 94 to 97)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                           June 14, 2007
                          New York, NY

Page 98

1    Q.   Are you aware of Red Book receiving a
2 subpoena from the State -- or in a case involving
3 the State of Alabama?
4    A.   To the best of my knowledge, I think
5 we have received one, but I don't know the
6 specifics on it.
7    Q.   Have you ever seen that subpoena?
8    A.   If I have, it was only briefly.  I
9 could not give you any specifics on it.
10    Q.   At this point in time has anyone
11 asked you to search for documents in response to
12 that subpoena served out of the State of Alabama
13 case?
14    A.   Not at this point.
15    Q.   Would it be be fair to say no
16 documents have been produced by Red Book in
17 response to that subpoena out of the State of
18 Alabama case?
19    A.   I wouldn't know.
20       MR. CAHILL:  You can only answer that
21 to the extent you have information one way or the
22 other.

Page 99

1    A.   I wouldn't know.
2    Q.   You are not aware of that.
3       Are there other paralegal contract
4 and document specialists within Red Book?
5    A.   Yes.
6    Q.   How many of them?
7    A.   We just hired her.  Honestly, she
8 just started a week and a half ago.
9    Q.   You wouldn't expect she would be
10 involved in producing documents in response to a
11 subpoena out of the State of Alabama case?
12    A.   No.
13    Q.   That subpoena that was issued out of
14 the State of Alabama case was issued in May of
15 '07.  These documents were produced in January of
16 '07.  The documents that were produced to the
17 Colorado Attorneys General, those documents by
18 definition were not produced in response to the
19 Alabama subpoena?
20    A.   I would not know.  As far as I know,
21 no.
22    Q.   To your knowledge, has Red Book ever

Page 100

1 represented to anyone that AWP -- that the AWP
2 reports is an actual acquisition price?
3       MR. ARCHIBALD:  Objection.  That goes
4 well beyond the scope.
5    A.   I wouldn't know.
6    Q.   Do you have an understanding of what
7 AWP means?
8       MR. ARCHIBALD:  Objection.
9    A.   It is not my job.  I don't know.
10       MR. CAHILL:  I should really state at
11 this point obviously Ms. Luka is here to
12 authenticate documents.  I think those questions
13 are beyond what she is able to answer.
14       MS. TORGERSON:  It may be.  I think
15 I'm entitled to ask.  She is not here as a
16 corporate rep.  She is here under a deposition
17 notice.  I'm entitled to know what information
18 she has.  It will go quickly if she doesn't have
19 any.
20       MR. CAHILL:  I'm stating for the
21 record that she was brought here to authenticate
22 documents.  I don't want to create a

Page 101

1 misperception as to the extent of her knowledge
2 on it.
3       MS. TORGERSON:  I'm not saying she
4 has knowledge.  Because she is here as a
5 corporate rep, I think I'm entitled to explore
6 what knowledge she may have.
7    Q.   Do you have any understanding of the
8 term WAC?
9       MR. ARCHIBALD:  Objection.  Beyond
10 the scope.
11    A.   I've heard it.  That's about it.
12    Q.   Do you know what WAC means?
13       MR. ARCHIBALD:  Objection.  Beyond
14 the scope.
15    A.   Wholesale acquisition cost.  What
16 that means is out of my scope.
17    Q.   Do you know how Red Book determines
18 what it will publish as a WAC price?
19       MR. ARCHIBALD:  Objection.  Beyond
20 the scope.
21    A.   No.
22    Q.   Do you know how Red Book determines

26 (Pages 98 to 101)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                              New York, NY

Page 102

1  what it will publish as an AWP price?
2        MR. ARCHIBALD: Objection. Beyond
3  the scope.
4     A.    I know we have a policy in place, but
5  how that is defined and determined I would not
6  know.
7     Q.    And the policy that you have
8  knowledge of is the policy that existed from 2002
9  forward; is that right?
10    A.    2003.
11    Q.    2003, okay.
12    A.    March of 2003.
13    Q.    You have no knowledge as to what Red
14 Book's policies may have been prior to 2003?
15    A.    Correct.
16    Q.    And what is your understanding of Red
17 Book's policy with regard to the AWP it will
18 publish post-2003?
19       MR. ARCHIBALD: Objection, beyond the
20 scope, foundation and form.
21    A.    It is my understanding that AWP is
22 determined by -- manufacturers set AWP that they

Page 103

1  report to us. If they do not supply AWP then we
2  provide a 20 percent markup.
3     Q.    And from whom did you gain this
4  understanding of Red Book's post-2003 policy?
5     A.    The policy is stated in the files, in
6  the manufacturer files.
7     Q.    And you've reviewed that information
8  in the manufacturer files?
9     A.    I've seen it in the files.
10    Q.    Do you know how many manufacturers do
11 not represent or do not provide to Red Book an
12 AWP figure?
13    A.    I have no idea.
14    Q.    But it is your understanding for
15 those manufacturers that did not provide an AWP
16 number that Red Book will generate one by putting
17 a 20 percent markup on another price?
18       MR. ARCHIBALD: Objection to scope,
19 form and foundation.
20    A.    To the best of my knowledge, after
21 the policy went into place and was documented in
22 writing we would proceed with the 20 percent

Page 104

1  markup.
2     Q.    Do you know what the 20 percent
3  markup is applied to to generate the WAC or the
4  AWP in that circumstance?
5        MR. ARCHIBALD: I'm going to object
6  on form, foundation and scope.
7        MR. CAHILL: I will have a continuing
8  objection with respect to these type of questions
9  for Ms. Luka. She is here to authenticate
10 documents. I think the questions you are asking
11 her is going beyond any foundation she has to
12 answer these questions.
13       MS. TORGERSON: You can have a
14 running objection as you want. I'm going to keep
15 asking the questions.
16    Q.    Do you have an understanding as to
17 what price Red Book applies the 20 percent markup
18 on to generate an AWP?
19       MR. ARCHIBALD: Same objections.
20    A.    Not for certain.
21    Q.    Do you have any understanding of what
22 that price is that is used?

Page 105

1        MR. ARCHIBALD: Same objections.
2     A.    I only can speculate. I want to say
3  no.
4     Q.    What is the USPDI, have you ever
5  heard that term?
6        MS. DAVIS: I object to form.
7     A.    It is one of our databases.
8     Q.    What does USPDI stand for?
9     A.    I'm not even sure if I can give you a
10 complete -- I can't. I'm sorry, I can't.
11    Q.    Do you know the information that is
12 contained in the USPDI?
13    A.    Not enough to be able to give any
14 kind of reference to it, no. I only know it
15 exists and I may incorporate it into contracts,
16 but I do not know.
17    Q.    The contracts that you write, who are
18 those contracts -- what type of contracts are
19 they?
20    A.    I only assist in the preparation.
21 They are usually between vendors who want to
22 incorporate our medical databases into their

27 (Pages 102 to 105)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                              New York, NY

| Page 106 | Page 108 |
|---|---|

Page 106

1  software package and combine them and resell them
2  to vendors.
3      Q.    So help me understand, is that like -
4  - who are some of the parties I might know that
5  you work on contracts with for Red Book?
6      A.    ParWeb. They may want to put our
7  content onto their web site and make it available
8  to their end users.
9      Q.    But you've never prepared a contract
10 with any state Medicaid agencies?
11     A.    No.
12     Q.    So you may be preparing a contract or
13 helping to prepare a contract between Red Book
14 and a third party facilitator for reimbursement;
15 is that right?
16     A.    Correct.
17     Q.    And the terms of your contracts, do
18 they state that that entity will have access to
19 Red Book's data for a certain amount of time for
20 a certain price?
21     A.    Correct.
22     Q.    With the updates; is that right?

Page 107

1      A.    Correct.
2      Q.    Do you have any knowledge as to
3  ReadyPrice and what ReadyPrice is?
4      A.    I know they exist, but I do not know
5  what kind of specific data it contains.
6      Q.    Do you know who any of the
7  subscribers are to ReadyPrice?
8      A.    I wouldn't know off the top of my
9  head.
10     Q.    Would you agree that ReadyPrice
11 provides fast, flexible access to accurate,
12 updated pharmaceutical pricing?
13         MR. ARCHIBALD: Objection, form,
14 foundation.
15         MR. CAHILL: Objection.
16     A.    I can't answer the question.
17     Q.    And you are familiar, of course, with
18 the Red Book publication; is that right?
19     A.    Correct, generally.
20     Q.    To your understanding, what does the
21 Red Book publication contain?
22     A.    Drug information involving pricing,

Page 108

1  and that's about as good as I know. It is very
2  general.
3      Q.    Do you know what pricing is contained
4  in the Red Book database?
5      A.    It depends on what the manufacturers
6  give us from my understanding. I don't know if
7  it is a set course for every one.
8      Q.    You don't know if it is consistent
9  manufacturer to manufacturer?
10     A.    Correct.
11     Q.    Do you know if there is an AWP
12 published by Red Book for each manufacturer?
13         MR. ARCHIBALD: Objection,
14 foundation.
15     A.    I don't know. I couldn't honestly
16 say yes or no.
17     Q.    Do you know what Red Book's document
18 retention policy is?
19     A.    We don't destroy anything. It is
20 there. Everything that is in the file is there.
21     Q.    In the manufacturer files; is that
22 right?

Page 109

1      A.    Yes.
2      Q.    Do you know what Red Book's document
3  retention policy is with regard to e- mails to
4  and between Red Book employees?
5      A.    That I would not know.
6      Q.    Do you know how long those are
7  maintained?
8      A.    I do not know. I'm not a member of
9  the editorial team.
10     Q.    I understand. Anywhere within Red
11 Book do you know how long those e-mails would be
12 maintained?
13     A.    No. I know that if it is
14 communication between the manufacturer and Red
15 Book they are printed and it is kept in the file,
16 at which time they would never leave the file.
17 But that's the best I can tell you.
18     Q.    And that deals with communications to
19 and from a manufacturer?
20     A.    Correct.
21     Q.    But as far as internal communications
22 within Red Book, you don't have knowledge as to

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                              June 14, 2007
                          New York, NY

Page 110

1  that?
2      A.    Correct.
3            MS. TORGERSON:  Thank you.  I'm going
4  to pass the witness and see if anybody else has
5  any questions.
6
7            EXAMINATION
8  BY MS. ROBINSON:
9      Q.    I'm Jessica Robinson from Sidley
10 Austin and I represent Bayer Corporation in the
11 Alabama AWP case, Alabama versus Abbott Labs.
12           I would like to get a better
13 understanding of how Red Book came to produce the
14 documents that are on Exhibit Luka 023.  You said
15 that you might have seen the request that
16 prompted the production?
17     A.    Normally if I'm to receive any
18 preliminary information, it is very sketchy, only
19 in terms of receiving instructions from in-house
20 counsel on what we need to proceed to do in order
21 to fulfill it.
22     Q.    Is it your understanding that there

Page 111

1  was some sort of formal request like a subpoena
2  or a CID that Red Book received?
3      A.    I think it was a request for
4  documents, but I don't know for sure.
5      Q.    Do you have any sense of who sent
6  that request?
7      A.    No.
8      Q.    Or when it was received?
9      A.    No.
10     Q.    Do you understand that there were any
11 informal communications between Red Book and the
12 counsel for plaintiffs in AWP -- in any AWP case?
13 And by that I mean any litigation involving
14 pharmaceutical pricing, including AWPs.
15           MR. CAHILL:  Objection to form. When
16 you say "informal communications," I should state
17 for the record, so it is clear, we get calls from
18 plaintiffs' lawyers about subpoenas.
19     Q.    Did you have any communications, not
20 related to a specific subpoena or CID, in which
21 Red Book might discuss with plaintiffs' counsel
22 things such as Red Book's communications with

Page 112

1  manufacturers or how Red Book provides pricing
2  data to state Medicaid agencies, any
3  communications of that nature?
4            MR. ARCHIBALD:  Objection to form.
5      A.    I don't think I understand the
6  question, I'm sorry.
7      Q.    Other than communications with
8  parties in AWP cases related to subpoenas, are
9  you aware of any communications with parties in
10 AWP cases about the cases generally?
11           MR. CAHILL:  Objection to form.
12     A.    Not to my knowledge, no.
13     Q.    If there were such communications,
14 would you be in a position to know about them?
15     A.    Not necessarily.
16     Q.    When Red Book sent the documents to
17 the Colorado Attorney General, do you understand
18 who Red Book was allowing to review those
19 documents?
20     A.    I know it was Jeff Archibald and his
21 group, but I don't know the definition of
22 "group."

Page 113

1      Q.    Were those physically located at the
2  Colorado Attorney General's office?
3      A.    They were sent there.  To the best of
4  my knowledge they were maintained there.  But
5  that's the best of my knowledge.  We did not have
6  a representative physically stay with the
7  documents.
8      Q.    Were there any electronic  documents
9  that were made available to the Colorado Attorney
10 General?
11     A.    If any electronic information was
12 kept, it was printed and put into the
13 manufacturer file in the normal course of
14 business.  So it would have been a part of that.
15     Q.    So there wouldn't have been a disk or
16 something in the manufacturer file?
17     A.    Correct.
18     Q.    Who at Red Book coordinated that
19 process; was it you?
20     A.    What process?
21     Q.    Sending the documents.
22     A.    Yes, that was me.

29 (Pages 110 to 113)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
                            New York, NY

---

Page 114

1    Q.    Were your contacts with anyone other
2  than Mr. Archibald?
3    A.    I did not physically meet Mr.
4  Archibald until this morning.
5    Q.    Who did you coordinate the process
6  with?
7    A.    In-house counsel.
8    Q.    Did you speak with anyone at any of
9  the plaintiffs in AWP cases?
10   A.    No.
11   Q.    To your understanding, was Alabama, a
12 representative from Alabama, involved in the
13 review of the documents?
14   A.    I do not know.
15   Q.    Are you aware of any criteria that
16 the reviewers referenced in deciding which
17 documents to have copied and put on Exhibit Luka
18 023?
19   A.    I do not know.
20   Q.    To your knowledge, has Red Book
21 produced the documents contained on Exhibit Luka
22 023 to any other person besides Mr. Archibald?

---

Page 115

1    A.    Not in its entirety.
2    Q.    Has some subset of Exhibit Luka 023
3  been produced to someone other than Mr.
4  Archibald?
5    A.    It could be, based on prior subpoena
6  requests that we pulled individual manufacturer
7  files.  But to be specific, I couldn't tell you.
8  Nothing of this magnitude of the entire file
9  system has ever, to the best of my knowledge,
10 taken place prior to this or after.
11   Q.    Have the documents that were made
12 available to Mr. Archibald for review ever been
13 made available to anyone else for review in any
14 other litigation?
15   A.    Possibly.  I don't know specifics
16 because I'm only at the point where I help gather
17 the information needed based on the requirements
18 of the individual subpoena and we get them
19 gathered and copied and sent.  Usually it is not
20 on the magnitude of this level.
21   Q.    You are not aware of that ever
22 happening before?

---

Page 116

1    A.    Correct.
2    Q.    I would like to talk about the larger
3  set of documents sent to the Colorado Attorney
4  General now.
5    A.    Sure.
6    Q.    You have testified that those were
7  manufacturer files?
8    A.    Correct.
9    Q.    What are manufacturer files?
10   A.    Pricing information, any
11 correspondence that happens between the
12 manufacturer and Red Book, back and forth.
13   Q.    Who maintains the manufacturer files?
14   A.    The editorial team.
15   Q.    How does a piece of paper get into
16 the manufacturer files?
17   A.    I wouldn't know.
18   Q.    Do you know the source, like the
19 custodians of the documents when they first come
20 into Red Book who add the documents to the
21 manufacturer files?
22   A.    It would be the editorial team as

---

Page 117

1  well.
2    Q.    The entire editorial team?
3    A.    There is approximately -- there may
4  be 11 members of the team, and I cannot give you
5  specifics on each individual member's function.
6  So I can't say there is only one person that
7  handles maintaining all incoming documents.  I
8  don't know the answer to that.
9    Q.    If a manufacturer had a communication
10 with someone at Red Book that was not on the
11 editorial team, would that document make it into
12 the manufacturer file?
13   A.    I would not know.  I don't know the
14 process.
15   Q.    Other than the manufacturer files,
16 was there an effort to collect any other
17 documents to send them to the Colorado Attorney
18 General's office?
19   A.    Everything was looked at as far as
20 what was contained in the manufacturer files.
21   Q.    So no Red Book-wide e-mail went out
22 saying "We need to collect documents"?

---

30 (Pages 114 to 117)

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
                        New York, NY

Page 118

1     A.   Correct.
2     Q.   Would general manufacturer
3   communications, by that I mean not a
4   communication between Red Book and Pfizer, but
5   between Red Book and manufacturers generally, be
6   included in a manufacturer file?
7          MR. CAHILL:  Objection to form.
8     A.   I wouldn't know the answer to that.
9     Q.   Would a presentation or some sort of
10   marketing material that was sent from Red Book to
11   manufacturers generally be included in the
12   manufacturer file?
13     A.   I wouldn't know the answer.  Now, I
14   know on the other end if we were to receive any
15   information directly from the manufacturer it
16   would be put in there.  Whatever they send to us
17   gets documented into the file.
18     Q.   Are there individuals at Red Book
19   other than the editorial staff -- I'm sorry, is
20   that what you called that department?
21     A.   Yes.
22     Q.   -- editorial staff that have

Page 119

1   communications with manufacturers?
2     A.   I wouldn't know the answer.
3     Q.   Are there individuals at Red Book
4   other than the editorial staff that have
5   communications with state or federal agencies?
6     A.   I wouldn't know the answer.
7     Q.   Have you been the only senior
8   contract specialist since 2002 until this person
9   was hired recently?
10     A.   Actually, the position was created in
11   2003.  Before that I was a contract specialist.
12   There wasn't anyone before me, but there is other
13   people that did my type of functionality.  It
14   just wasn't under the title of senior contract
15   specialist.
16     Q.   Before you or concurrent with your
17   duties?
18     A.   Before me.
19     Q.   So any subpoena that Red Book would
20   have responded to since you took that position in
21   2002 would have been your responsibility to
22   collect -- it would have been your responsibility

Page 120

1   to collect the documents?
2     A.   I would have been involved in the
3   document retrieval, yes.
4     Q.   Were you involved with the document
5   retrieval for those documents that were produced
6   in the MDL, the multi-district litigation related
7   to the AWP litigation?
8     A.   I don't know what drugs were
9   involved.  I don't think I can answer it.
10     Q.   Are you aware that there is a multi-
11   district litigation pending in Boston that
12   includes a class action and several state
13   actions, among other actions, that have been
14   consolidated and relate to AWP?
15     A.   Not that I'm aware of.
16     Q.   Do you recall making a large
17   production related to AWP in the time period from
18   about 2004 to about 2006?
19          MR. CAHILL:  Objection to form. We've
20   gotten subpoenas and we've produced documents to
21   subpoenas.  I'm just not sure she can answer the
22   question the way it is asked there.

Page 121

1     A.   Are you talking about size?
2     Q.   Do you recall collecting documents
3   pursuant to subpoenas that related to AWP in that
4   time period?
5          MR. CAHILL:  Before this production
6   in 2007, were you involved in collecting AWP
7   documents before then?
8          THE WITNESS:  One or two maybe.
9          MR. CAHILL:  By "AWP documents" we
10   are referring to I guess collecting documents
11   from the manufacturer files?
12          THE WITNESS:  From the manufacturer
13   files, one or two.
14     Q.   Are your duties to collect documents
15   limited to the manufacturer files?
16     A.   No.  It could be to whatever the
17   subpoena request is.  It could be asking for
18   information out of other databases.
19     Q.   Can you tell me to the best of your
20   recollection about those other subpoenas that you
21   responded to that related to AWP prior to this
22   2007 collection?

31 (Pages 118 to 121)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                      June 14, 2007
                        New York, NY

| Page 122 |
| --- |

1    A.    It was in regards to just specific
2  drugs.  I was instructed to pull the
3  corresponding manufacturer's files for a certain
4  time period and to get them ready; but very small
5  in scope, maybe 32 drugs, and off the top of my
6  head I can't recollect which ones they were.
7          Realize at that point I would also
8  work with the editorial team to get the files put
9  together.  I would oversee the process of making
10 sure that everything was there to go.
11   Q.    How does the 2007 production compare
12 to those earlier productions, are there going to
13 be a lot of overlapping documents?  Do they all
14 come from the same files?
15   A.    All the same files.  So what was
16 given for one set probably would be the same
17 thing that you would get in the overall scope of
18 the larger picture.  Nothing changes.  The files
19 are there.
20   Q.    So the documents that are contained
21 on Exhibit Luka 023, is it your understanding that
22 these documents have been produced before?

| Page 123 |
| --- |

1          MR. CAHILL:  Objection to form.  I
2  should say for the record, so we don't get
3  confused here, the documents on Exhibit Luka 023
4  are documents that were selected for copying from
5  a much larger set of documents.  I think the
6  witness testified that in the past, with respect
7  to particular drugs that were identified,
8  documents were produced from the manufacturer
9  files.
10   Q.    I want to understand if these are new
11 documents or these are documents --
12   A.    It would probably be the same
13 information that is in the manufacturer file, but
14 I can't say page by page that what is here could
15 have been produced for someone else.  I can't
16 verify that.
17   Q.    You have testified that you can
18 recall two productions that related to AWP and
19 this 2007 production.  Are there any other
20 productions related to AWP that you recall
21 participating in?
22   A.    Not to the best of my knowledge.

| Page 124 |
| --- |

1          MR. CAHILL:  Objection to form.  I
2  think the witness was approximating.
3    Q.    I would like to show you the subpoena
4  issued in the Alabama case.
5          (Exhibit Luka 024 marked for
6  identification.)
7    Q.    I would like you to take a moment
8  just to look at the document that I've handed
9  you.
10         (Witness perusing document.)
11         MR. CAHILL:  Is there something
12 specific you want her to focus on?
13         MS. ROBINSON:  I just wanted to give
14 her a chance to look at the document.
15   Q.    Generally, do you recognize the
16 document as one you have seen before?
17   A.    I know I've seen one similar, but I
18 don't know looking at the drug lists that this is
19 actually specifically the one that I saw.
20   Q.    Do you recall seeing a subpoena in
21 the Alabama case before or just a subpoena
22 generally?

| Page 125 |
| --- |

1    A.    You have to understand when I see
2  these, what normally comes to me is what I need
3  to do in order to produce the documents.  So
4  where I'm going to go is what drugs are going to
5  be produced and how we need to go about doing
6  that.  The specifics on the actual case aren't as
7  imperative to me as what may be to an attorney at
8  our office.
9    Q.    So you are unsure if you have seen
10 this particular subpoena before?
11   A.    Correct.
12   Q.    You will note on page 2 that the
13 subpoena was issued in May of 2007.
14   A.    Okay.
15   Q.    Is it your testimony that the
16 production in Exhibit Luka 023 was completed in
17 January of 2007?
18   A.    I'm sorry, can you ask it again?
19   Q.    Yes.  Is it your testimony that the
20 production that is included on Exhibit Luka 023
21 was completed in January of 2007?
22   A.    Yes.

                              32 (Pages 122 to 125)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
New York, NY

Page 126

1    Q.    So is it possible that Red Book
2  considered the requests included in this, which
3  I'm going to refer to as the Alabama subpoena, in
4  gathering the documents on Exhibit Luka 023?
5    A.   I'm unsure of their process, how they
6  decided if that is what they would go off of.
7    Q.   I'm not sure that I understand your
8  answer.
9        Is it possible that this May 2007
10 subpoena was considered in gathering the
11 documents?
12   A.   Not to my knowledge.
13       MR. CAHILL:  Is that your question,
14 you know, a May 2007 subpoena couldn't have been
15 considered in gathering January 2007 documents?
16 Is that the question?
17       MS. ROBINSON:  That was the question.
18   Q.   Were the documents produced on
19 Exhibit Luka 023 produced in order to satisfy Red
20 Book's obligation with regard to this May 2007
21 subpoena?
22   A.   Not that I'm aware of.

Page 127

1    Q.    I would like to go through some of
2  the requests included in the Alabama subpoena.
3  You will see the text of the subpoena starts at
4  Exhibit A.  Seven pages in, the page that is
5  titled Requests, I would like you to take a look
6  at the first request, "All documents made
7  available for the review or otherwise produced to
8  the State of Alabama."
9        Are you aware of any documents that
10 were available for the review or produced to the
11 State of Alabama?
12   A.   Not to my knowledge.
13       MR. CAHILL:  Again, I think I'm going
14 to have to have a continuing objection to this
15 line of questioning.  I don't think she is going
16 to be able to answer a question like that.
17       We have been working with your office
18 to try to respond to the subpoena.  As I
19 understand it, our time to respond has been put
20 off without date.  I hope we don't have to go
21 through the subpoena with this witness.  We are
22 in the course of trying to work with you to get

Page 128

1  you the documents you are seeking from us.
2        MS. ROBINSON:  I would like to
3  understand if the Exhibit Luka 023 production
4  relates in any way to these requests.  Maybe we
5  could go through a few.  If we see she doesn't
6  have knowledge to that, we can have more general
7  questions to verify that.
8    Q.   How does the production on Exhibit
9  Luka 023 relate to request number 1, if you know?
10   A.   I don't know.  I won't be able to
11 make a direct correlation.
12   Q.   Let's just move to request 2, "Red
13 Book publications."  Are documents responsive to
14 number 2 going to be included on Exhibit Luka 023?
15       MS. DAVIS:  I object to the form.
16   A.   It may or may not.
17   Q.   Would all of the documents responsive
18 to request 2 be included on Exhibit Luka 023?
19       MS. DAVIS:  I object to the form.
20   A.   To the best of my knowledge, no.
21 Exhibit Luka 023 is a sampling.
22   Q.   I think we can take requests 3, 4 and

Page 129

1  11 together.  They all deal with communications
2  between Red Book and the State of Alabama,
3  manufacturers, and trade associations.
4        What's your understanding as to the
5  relationship between these requests and those
6  documents produced on Exhibit Luka 023?
7        MS. DAVIS:  I object to the form.
8    A.   I'm not going to be able to answer
9  the question.
10   Q.   Is it because you are not certain
11 whether the documents included in Exhibit Luka 023
12 are responsive to these requests?
13       MS. DAVIS:  Objection to form.
14   A.   I'm not going to know all the
15 communications that may or may not have happened.
16 I can only verify what is on the disk -- I can
17 only state what I know is on the disk.
18   Q.   Are documents responsive to these
19 requests on the disk?
20   A.   Because of the general review of the
21 disk, I cannot say for sure.
22   Q.   If you would like to take a moment

Henderson Legal Services
202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
New York, NY

Page 130

1  and look through the remainder of the requests in
2  this Alabama subpoena and let me know whether or
3  not the documents on Exhibit Luka 023 are
4  responsive in full to the requests.
5       MS. DAVIS:  Objection to form.
6       MR. CAHILL:  For each of the 26
7  requests, other than the handful you talked about
8  so far, you want her to say whether the documents
9  on Exhibit Luka 023 are responsive to that item?
10     Q.   I can go through them each
11  individually or if you want to look at them as a
12  whole and tell me whether or not you can say that
13  the documents on Exhibit Luka 023 are fully
14  responsive to this subpoena.
15      MR. CAHILL:  She has testified and
16  she can testify again if there is anything
17  further to clarify what she understands to be on
18  Exhibit Luka 023.  I don't understand trying to
19  have her compare the requests against Exhibit
20  Luka 023.  If there is something you are looking
21  for, we can certainly address it.  I just don't
22  understand how she can do that.

Page 131

1      Q.    The purpose of my question is to
2  understand that the documents contained on
3  Exhibit Luka 023 are not the documents that you
4  would produce to respond to these specific
5  requests, that they are different.
6       MS. DAVIS:  Objection to form.
7       A.    Let me explain.  The general review
8  that I did of the sampling information that is on
9  Exhibit Luka 023 is just that.  I cannot give you
10  specific document for document detail as far as
11  what is contained on Exhibit Luka 023.
12       So to answer your question, because
13  of the brief review and summary I made of Exhibit
14  Luka 023, I can't give you any specifics.  So I
15  cannot answer whether or not they are going to
16  relate specifically to any of the requests asked
17  in the subpoena.
18      Q.    Your understanding of Exhibit Luka 023
19  is that it is a sampling of documents?
20      A.    Correct.
21      Q.    For the requests contained in the
22  Alabama subpoena, would all of the documents

Page 132

1  responsive to each request be included on Exhibit
2  Luka 023?
3       A.    One more time.
4       Q.    Would all of the documents responsive
5  to the requests in the Alabama subpoena be
6  included on Exhibit Luka 023?
7       A.    There is no way for me to tell.
8       MS. ROBINSON:  That's all I have for
9  now.
10
11          EXAMINATION
12  BY MR. EDWARDS:
13      Q.    I'm Steve Edwards.  I represent
14  Bristol-Myers Squibb in this case.
15       I take it you were personally
16  involved in the search for documents in response
17  to the subpoena?
18      A.    In the collection of the documents,
19  yes.
20      Q.    Did you attempt to separate out
21  documents maintained in the ordinary course of
22  business from documents not maintained in the

Page 133

1  ordinary course of business?
2       A.    No.
3       Q.    What did you understand "ordinary
4  course of business" to mean?
5       MS. DAVIS:  I object to the form.
6       A.    All files that contained pricing
7  information, correspondence between the
8  manufacturers and Red Book, are retained in the
9  files as manufacturer files.  Nothing was taken
10  out.  Nothing was removed.  Files were produced
11  as they are kept.
12      Q.    You mentioned that you received some
13  instructions from counsel?
14      A.    Correct.
15      Q.    Did those instructions include a
16  definition of documents created in the ordinary
17  course of business?
18      A.    No.  It was simply to go through the
19  files to document what we had and the order in
20  which we were keeping them, to be able to respond
21  when they came back so we could ensure we had the
22  same files that came back once they left the

34 (Pages 130 to 133)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                              June 14, 2007
                        New York, NY

Page 134

1  office.
2      Q.   So what you are saying is you simply
3  produced all of the manufacturer files to the
4  Attorney General's office?
5      A.   Correct.
6      Q.   And then they picked and chose which
7  documents they wanted?
8      A.   Correct.
9      Q.   You did not personally keep those
10 records, correct?
11     A.   Correct.  You mean the ones that they
12 picked and chose?  Maybe I'm not understanding
13 the question.
14     Q.   Well, you don't know what criteria
15 the Attorney General's office used to pick and
16 choose the documents they selected, correct?
17         MS. DAVIS:  I object to the form.
18 Asked and answered.
19     A.   Correct.
20     Q.   Of those documents that they
21 selected, these were not documents that you
22 personally kept, correct?

Page 135

1      A.   They are maintained in the
2  manufacturer files but I did not -- we don't have
3  the hand-selected documents separated out.  Is
4  that what you mean?
5      Q.   You don't personally maintain the
6  manufacturer files?
7      A.   No.  I'm sorry, I just didn't
8  understand.
9      Q.   You did not create any of those
10 documents, correct?
11     A.   Correct.
12     Q.   And you don't have any personal
13 knowledge of how those documents were created?
14     A.   Correct.
15     Q.   Or when those documents were created?
16     A.   Correct.
17     Q.   Is it fair to say that some of the
18 documents that we are talking about here were not
19 created by people who are employed by Red Book,
20 correct?
21         MS. DAVIS:  I object to the form.
22     A.   I don't understand the question.

Page 136

1      Q.   Is it fair to say that some of the
2  documents in those files were created by people
3  who are not employees of Red Book?
4          MS. DAVIS:  I object to the form.
5      A.   I don't think I can answer the
6  question.
7          MR. CAHILL:  Maybe an example might
8  help.
9      Q.   Some of the documents in the files
10 come from manufacturers, right?
11     A.   Correct.
12     Q.   So those are documents that were not
13 created by people who are employed by Red Book,
14 correct?
15     A.   Yes.  The files contain all
16 correspondence between manufacturers and Red
17 Book, going both directions.  So anything the
18 manufacturer were to supply to us would be in the
19 file.
20     Q.   And you don't know what Red Book does
21 with the documents in those files?
22     A.   In the ordinary course of daily

Page 137

1  maintenance, no.
2      Q.   Now, you testified on direct that Red
3  Book did not make any changes to those documents?
4      A.   That's correct.
5      Q.   Did you know that Bristol-Myers
6  Squibb does not report AWPs to Red Book?
7          MS. DAVIS:  I object to form.
8      A.   I wouldn't have known that
9  specifically.
10     Q.   Did you know that Red Book creates
11 the AWPs that it publishes for the Bristol-Myers
12 Squibb drugs?
13         MS. DAVIS:  I object to form.  Asked
14 and answered.
15         MR. ARCHIBALD:  Objection to form.
16     A.   The only way I can respond is I know
17 of the AWP policy that exists due to what I've
18 seen in the manufacturer files beginning in March
19 of 2003.  So I know that the policy exists as of
20 that date.
21     Q.   Pursuant to that policy where
22 Bristol-Myers Squibb does not report an AWP to

35 (Pages 134 to 137)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Page 138

1   Red Book, then Red Book would create the AWP?
2           MR. ARCHIBALD: Objection to form,
3   foundation.
4       Q.   That's your understanding?
5           MR. ARCHIBALD: Same objection.
6           MR. CAHILL: I have a continuing
7   objection to the substantive type questions for
8   Ms. Luka. I believe it is beyond the type of
9   questions she could answer.
10      A.   I would only be able to tell you what
11  was living in the file. How the process went,
12  correspondence or discussions that happened
13  between the manufacturers, I don't daily work in
14  the database. I can't answer the question.
15          MR. EDWARDS: Let me mark as Exhibit
16  Luka 025 a copy of a communication from Bristol-
17  Myers Squibb to Red Book dated June 5th, 2003.
18  It bears the Bates stamp Red Book 06496.
19          (Exhibit Luka 025 marked for
20  identification.)
21      Q.   Do you know whether this document was
22  among the documents that were produced to the

Page 139

1   State?
2       A.   I can't verify for sure. But I can
3   tell you that it looks like a sampling that would
4   be something that would be documented in the
5   manufacturer files.
6       Q.   You see that there is a list price
7   from Bristol-Myers Squibb in this document,
8   correct?
9       A.   Yes.
10      Q.   And there is no AWP identified in
11  this document, correct?
12          MR. ARCHIBALD: I object to form, it
13  goes beyond the scope, and foundation.
14      A.   I don't see anything. To the best of
15  my knowledge, no.
16      Q.   You see there is handwriting adjacent
17  to the list price?
18      A.   Correct.
19      Q.   Do you know who put that handwriting
20  there?
21      A.   I do not.
22      Q.   Do you know what it means?

Page 140

1       A.   I do not.
2       Q.   Since this document came from Red
3   Book's files, is it fair to say that someone from
4   Red Book would have put that handwriting on the
5   document?
6           MR. ARCHIBALD: Same objection.
7           MS. DAVIS: Objection to form.
8       A.   I do not know.
9       Q.   If you look below the information
10  about the product description and the list price,
11  you will see it says "List prices for the
12  products listed herein may not reflect actual
13  Bristol-Myers Squibb sale prices. Certain
14  multisource products are only sold at lower
15  special offered prices. All products may be
16  subject to negotiated discounts, rebates and
17  chargebacks."
18          Do you know what impact, if any, that
19  language had on what Red Book did with this
20  information?
21          MR. ARCHIBALD: Objection, same three
22  objections.

Page 141

1           MR. CAHILL: And the continuing
2   objection.
3       A.   Again, I don't work in the editorial
4   team. I do not know their daily processes. I
5   would not know how this affects how they would
6   take that information and handle it.
7       Q.   I believe you testified at the outset
8   that Red Book is owned by Thomson?
9       A.   Yes.
10      Q.   And Thomson is a large publishing
11  company?
12      A.   Yes.
13      Q.   I take it Thomson is not owned by any
14  of the pharmaceutical manufacturers; is that
15  correct?
16      A.   To the best of my knowledge, that's
17  correct. It is owned by Thomson Corporation who
18  is a publicly-traded entity.
19      Q.   To the best of your knowledge, is it
20  fair to say that neither Thomson nor Red Book is
21  controlled by any pharmaceutical manufacturer?
22          MR. ARCHIBALD: Objection to

36 (Pages 138 to 141)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                                    June 14, 2007
New York, NY

Page 142

1  foundation, to form, and to scope.
2      A.    I don't believe that I could answer
3  that question fairly to say yes or no.
4      Q.    Do you have any reason to believe
5  that Thomson, which is a publicly-traded company,
6  is controlled by any of the pharmaceutical
7  manufacturers?
8          MR. ARCHIBALD:  Same three
9  objections.
10     A.    I would have no reason.
11     Q.    And, to the best of your knowledge,
12  does Red Book get to decide what it wants to
13  publish?
14         MR. ARCHIBALD:  Same three
15  objections.
16     A.    Again, I'm not a member of the
17  editorial team.  I don't make decisions on what
18  they decide to publish and what they don't.
19         MR. EDWARDS:  I have no further
20  questions at this time.
21         MR. ARCHIBALD:  Does the federal
22  government have any questions, Mr. Henderson?

Page 143

1          MR. HENDERSON:  No questions, thank
2  you.
3          MR. ARCHIBALD:  You're welcome.
4          MS. DAVIS:  I have a couple.
5
6              EXAMINATION
7  BY MS. DAVIS:
8      Q.    I'm Tracey Davis here on behalf of
9  the State of Alabama.  It is nice to meet you
10  today.
11         MR. EDWARDS:  Let me just object to
12  this procedure.  My understanding is that this
13  deposition was noticed by the states.  The states
14  should have conducted a direct examination so
15  that we would have an opportunity to conduct a
16  cross.  It appears that we have gotten out of
17  order here.  Obviously I can't stop you, but I'm
18  going to object to that procedure.
19     Q.    Is it your testimony here today that
20  every document contained on the disk marked as
21  Exhibit Luka 023 is a document maintained in the
22  ordinary course of business at Red Book?

Page 144

1          MR. EDWARDS:  I object to the form.
2      A.    In my general review, the information
3  contained on Exhibit Luka 023, yes.
4          MS. TORGERSON:  Are we operating
5  under the same rule that one objection serves for
6  everybody at the table?
7          MS. DAVIS:  Certainly.
8      Q.    Any court, if it desired, could come
9  to Red Book and see the original of the documents
10  contained on the disk marked as Exhibit Luka 023?
11     A.    Yes.
12     Q.    And if any defendant manufacturer
13  wanted Red Book's manufacturer files, that it
14  could subpoena those files from Red Book,
15  couldn't it?
16     A.    Yes.
17         MS. DAVIS:  That's all I have.
18         MR. ARCHIBALD:  I have one cleanup
19  question.
20
21             EXAMINATION
22  BY MR. ARCHIBALD:

Page 145

1      Q.    You were just asked a bunch of
2  questions by a bunch of drug company lawyers.
3  Keeping in mind all of those questions, is there
4  any doubt in your mind that the documents
5  contained on Exhibit Luka 023 are Red Book
6  documents kept in the ordinary course of business
7  in Red Book's manufacturer files?
8          MR. EDWARDS:  I object to the form.
9      A.    No doubt.
10         MR. EDWARDS:  It mischaracterizes the
11  witness' prior testimony.  The witness has
12  already testified that some of these documents
13  are not Red Book documents.  Some of the
14  documents were created by manufacturers.  So it
15  is a trick question.  That's what is happening
16  here.
17         MR. ARCHIBALD:  Counsel, make your
18  objection.
19         MR. EDWARDS:  The documents were
20  produced by Red Book and some of the documents
21  were created by manufacturers.
22         MR. ARCHIBALD:  Counsel, you don't

37 (Pages 142 to 145)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                              June 14, 2007
New York, NY

Page 146

1  need a speech.
2      Q.    Do you want me to read the question
3  again, or did you understand it?
4      A.    Yes, please.
5          MR. EDWARDS:  So don't be tricked
6  BY his question.
7          MR. ARCHIBALD:  Counsel, she is
8  perfectly capable of answering any of the
9  questions, and she has proven that already.
10     Q.    I will repeat the question, Ms. Luka.
11     A.    Thank you.
12     Q.    You were just asked a bunch of
13  questions by a bunch of drug company lawyers.
14  Keeping in mind all of those questions, is there
15  any doubt in your mind that the documents
16  contained on Exhibit Luka 023 are Red Book
17  documents kept in the ordinary course of business
18  in Red Book's manufacturer files?
19         MR. EDWARDS:  Same objection.
20     A.    From the general scanning of my
21  review of the documents contained in Exhibit Luka
22  023, they are Red Book documents.

Page 147

1          MR. ARCHIBALD:  That's all I have,
2  thank you.
3          EXAMINATION
4  BY MR. EDWARDS:
5      Q.    You didn't change your testimony, you
6  still agree that some of the documents in these
7  files, many of the documents in these files, were
8  not created by employees at Red Book, correct?
9          MR. ARCHIBALD:  Objection to the
10  form.
11     A.    It may have been they came directly
12  from the manufacturer.  What I'm saying is the
13  documents are maintained in the manufacturer
14  files.
15         MS. TORGERSON:  Just a couple of
16  questions for cleanup.
17
18         EXAMINATION
19  BY MS. TORGERSON:
20     Q.    Exhibit Luka 023 does not contain the
21  entire universe of documents made available to
22  the States' Attorneys General in January of 2007;

Page 148

1  is that right?
2      A.    Yes.
3      Q.    And, in fact, Exhibit Luka 023, based
4  on your review, does not even contain an entire
5  manufacturer's file, it is subparts of particular
6  manufacturers' files produced to the States'
7  Attorneys General, right?
8      A.    Based on my general review, that is
9  correct.
10     Q.    So you can't say for certain that any
11  particular drug manufacturer's file is contained
12  in its entirety on that Exhibit Luka 023; is that
13  right?
14     A.    I cannot agree to that.
15     Q.    And you don't know the circumstances
16  under which any of those documents maintained in
17  Exhibit Luka 023 were created?
18         MR. ARCHIBALD:  Objection.  Asked and
19  answered.
20     A.    Correct.
21     Q.    You don't know who created them?
22         MR. ARCHIBALD:  Same objection.

Page 149

1      A.    Correct.
2      Q.    You don't know when they were
3  created?
4          MR. ARCHIBALD:  Same objection.  Asked
5  and answered.
6      A.    I know a time period.
7      Q.    You know a time period based on the
8  date of the documents; is that right?
9      A.    Yes.
10     Q.    But you don't know if a document was
11  post or backdated?
12     A.    Right.
13     Q.    You don't know what information the
14  people who made the documents had at the time
15  they made the documents?
16         MR. ARCHIBALD:  Objection.  Asked and
17  answered.
18     A.    Right.
19         MS. TORGERSON:  That's all I have.
20         MR. ARCHIBALD:  One thing on the
21  record before we adjourn, that is that I will not
22  be taking possession of Exhibit Luka 023.  That

38  (Pages 146 to 149)

9c039dea-43ab-4e71-b124-9f7f2fbf25f2

Luka, Gail                                          June 14, 2007
                        New York, NY

Page 150

1  will go directly to the court reporter who will,
2  in turn, turn that over to Henderson Legal.
3  Anybody who wishes a copy of that is free to
4  obtain it from Henderson Legal, as we will.
5
6          (TIME NOTED:  11:24 a.m.)
7
8
9
10
11
12
13  _____
14          GAIL LUKA
15
16  Subscribed and sworn to
17  before me this _____
18  day of _____, 2007.
19
20
21  _____
22     Notary Public

Page 151

1      CERTIFICATION
2
3    I,  TODD DeSIMONE, a Notary Public for and
4  within the State of New York, do hereby certify:
5    That the witness whose testimony as herein set
6  forth, was duly sworn by me; and that the within
7  transcript is a true record of the testimony
8  given by said witness.
9    I further certify that I am not related to any
10  of the parties to this action by blood or
11  marriage, and that I am in no way interested in
12  the outcome of this matter.
13    IN WITNESS WHEREOF, I have hereunto set my hand
14  this 15th day of June, 2007.
15
16
17
18
19      TODD DESIMONE
20
21
22

                        39 (Pages 150 to 151)

Henderson Legal Services
        202-220-4158

9c039dea-43ab-4e71-b124-9f7f2fbf25f2