# Exhibit 89



experience *does* matter

**CASE:  In re:  Pharmaceutical Industry Average Wholesale Price Litigation**
**DATE:  March 31, 2008**

Enclosed is the Original of the transcript of the testimony of **Michael Sellers** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services


Encl.

Page 332

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

_____    Volume II


            Continued Videotaped Rule 30(b)(6)

            Deposition of MICHAEL SELLERS, at

            77 West Wacker Drive, Chicago,

            Illinois, commencing at 9:00 a.m.

            On Monday, March 31, 2008, before

            Donna M. Kazaitis, RPR, CSR

            No. 084-003145.

30(b)(6) Abbott (Sellers, Michael) - Vol II                          March 31, 2008

Page 333

1  APPEARANCES OF COUNSEL:
2
3     FOR THE UNITED STATES:
4        U.S. DEPARTMENT OF JUSTICE
5        CIVIL DIVISION
6        BY: MS. ANN ST. PETER-GRIFFITH
7        99 N.E. 4th Street
8        Miami, Florida 33132
9        (305) 961-9003
10       ann.st.peter-griffith@usdoj.gov
11
12    FOR THE RELATOR VEN-A-CARE OF THE FLORIDA
13    KEYS, INC.:
14       ANDERSON LLC
15       BY: MR. C. JARRETT ANDERSON
16       208 West 14th Street, Suite 3-B
17       Austin, Texas 78701
18       (512) 469-9191
19       jarrett@anderson-llc.com
20
21
22

Page 334

1  APPEARANCES OF COUNSEL:
2
3     FOR ABBOTT LABORATORIES:
4        JONES DAY
5        BY: MS. TINA TABACCHI
6        77 West Wacker Drive
7        Chicago, Illinois 60601-1692
8        (312) 782-3939
9        ttabacchi@jonesday.com
10
11 ALSO PRESENT:
12    Anthony Micheletto, Videographer
13
14
15
16
17
18
19
20
21
22

Page 335

1                I N D E X
2
3  Monday, March 31, 2008
4
5  WITNESS                    EXAMINATION
6
7  MICHAEL SELLERS
8     (By Ms. St. Peter-Griffith)    339
9     (By Mr. Anderson)              505
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 336

1            INDEX OF EXHIBITS       PAGE
2  Exhibit Sellers 016, 9/30/99 DOJ letter    355
3  Exhibit Sellers 017, ABT 212051 - 055      357
4  Exhibit Sellers 018, ABT 212056 - 076      367
5  Exhibit Sellers 019, ABT-DOJ-E 0048483        377
6  Exhibit Sellers 020, MHA007852 - 859       380
7  Exhibit Sellers 021, TXABT 38667           386
8  Exhibit Sellers 022, ABT 001002 - 010      389
9  Exhibit Sellers 023, BR 02391 - 440        391
10 Exhibit Sellers 024, ABT-DOJ 0150044       449
11 Exhibit Sellers 025, ABT 00661             450
12 Exhibit Sellers 026, TXABT 675824 - 112    497
13 Exhibit Sellers 027, ABT-DOJ-E 0396008 - 011 525
14 Exhibit Sellers 028, TXTABT-E 0621602 - 604  527
15 Exhibit Sellers 029, ABT-DOJ 0233994       530
16 Exhibit Sellers 030, ABT 006248            543
17 Exhibit Sellers 031, TXABT 50057           548
18 Exhibit Sellers 032, TXABT 158513          620
19 Exhibit Sellers 033, TXABT 674736, 741, 742,
20       738              630
21 Exhibit Sellers 034, TXABT 674725 - 726    658
22 Exhibit Sellers 035, TXABT 674744          662

2 (Pages 333 to 336)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

| | |
|---|---|
| Page 337 | Page 339 |

**Page 337**

INDEX OF EXHIBITS          PAGE

2  Exhibit Sellers 036, TXABT 61252 - 254      662

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 338**

1         THE VIDEOGRAPHER:  This is Anthony
2  Micheletto representing Henderson Legal Services.
3  I am the operator of this camera.  This is the
4  videotaped deposition of Mike Sellers as being
5  taken pursuant to Federal Rules of Civil Procedure
6  on behalf of the plaintiffs.
7         We are on the record on March 31,
8  2008.  The time is 9:08 a.m. as indicated on the
9  video screen.
10         We are at the offices of Jones Day,
11  77 West Wacker Drive, Chicago, Illinois.  The case
12  is captioned In Re: Pharmaceutical Industry
13  Average Wholesale Price Litigation, Case No.
14  01-12257-PBS.
15         Will the attorneys please identify
16  themselves for the video record.
17         MS. ST. PETER-GRIFFITH:  Ann
18  St. Peter-Griffith, United States Attorney's
19  Office on behalf of the United States.
20         MS. TABACCHI:  Tina Tabacchi on behalf
21  of the defendant.
22         MS. ST. PETER-GRIFFITH:  And I'd just

**Page 339**

1  like to put on the record that Jarrett Anderson
2  will be here for the realtor.  He's flying in this
3  morning and he'll be a little late.
4         THE VIDEOGRAPHER:  The Court Reporter
5  today is Donna Kazaitis from Henderson Legal
6  Services of Washington, D.C.
7         Please swear in the witness.
8         MICHAEL SELLERS,
9  having been duly resworn, was examined and
10  testified as further follows:
11         EXAMINATION
12         (Resumed)
13  BY MS. ST. PETER-GRIFFITH:
14    Q.   Good morning, Mr. Sellers.
15    A.   Good morning.
16    Q.   On this fine March 31st day.
17    A.   Always the best weather for these.
18    Q.   Mr. Sellers, since we were here the last
19  time, have you done anything to prepare for your
20  30(b)(6) testimony?
21    A.   I did review a few of the transcripts of
22  other depositions, and I spent some time preparing

**Page 340**

1  with my attorney.
2    Q.   How long did you prepare -- is that
3  Ms. Tabacchi?
4    A.   Yes.
5    Q.   How long did you spend preparing with
6  her?
7    A.   A couple of hours.
8    Q.   When was that?
9    A.   I believe it was last Thursday.
10    Q.   Did you confer with anyone other than
11  Ms. Tabacchi?
12    A.   No.
13    Q.   Which deposition transcripts did you
14  review?
15    A.   Well, I take that back.  Carol Geisler
16  from Jones Day was also in there for a short
17  period of time.
18         I'm sorry.  Your question was?
19    Q.   You indicated that you also reviewed a
20  few transcripts.
21    A.   Yes.
22    Q.   Whose transcripts did you review?

3 (Pages 337 to 340)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 341

1    A.   Harry Adams, Mike Heggie, Deborah
2  Longley.  There was one other one.
3        MS. ST. PETER-GRIFFITH:  Go ahead, if
4  you want to help him out, Tina.
5        MS. TABACCHI:  Dennis Walker.
6        THE WITNESS:  Dennis Walker, yes.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Did you review the entire transcripts?
9    A.   I went through sections of them, yes.
10 But I had the whole transcripts available to me.
11   Q.   Why did you choose to go through the
12 sections that you went through?
13   A.   Again, I was trying to touch on all the
14 subjects that were listed for my corporate
15 testimony.
16   Q.   Did you do that by going back to the
17 index, as you testified before you did with prior
18 transcripts?
19   A.   Yes.  I began with the index, and then I
20 may have read on beyond just the specific
21 paragraphs that had the keywords in them.
22   Q.   Understood.

Page 342

1        Did you review any exhibits to
2  these transcripts?
3    A.   I reviewed a few documents, but I don't
4  recall exactly which ones they were.
5    Q.   Were they exhibits to these transcripts?
6    A.   Yes, yes.
7    Q.   Do you remember whose transcripts they
8  were exhibits to?
9    A.   No, because I jumped around as we were
10 looking at exhibits.
11   Q.   When did you do these reviews?
12   A.   I looked at some of the documents last
13 Thursday with the attorneys and then I reviewed
14 the transcripts this past weekend.
15   Q.   Did you review your transcript of the
16 first day of this deposition?
17   A.   No.  I did not.
18   Q.   As you sit here today, sir, is there any
19 testimony that you gave on the first day of your
20 30(b)(6) deposition that you would like to clarify
21 or change or expand upon?
22   A.   There is one thing, that is we talked

Page 343

1  about my conversation with Rick Gonzalez.
2    Q.   Okay.
3    A.   And I believe I talked about covering
4  three subjects.  There were in fact four subjects
5  covered in that conversation that I was reminded
6  of as I went through this process.
7        The fourth subject was did Rick
8  have any recollection of the DOJ AWPs, and his
9  response was no, he had no recollection of those
10 at all.
11   Q.   Was that a question that you asked him
12 or that Ms. Tabacchi asked him?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  It was a question asked by
15 a Jones Day attorney.  It was not Ms. Tabacchi.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Who was the Jones Day lawyer?
18   A.   Jim Daly.
19   Q.   When you were on the phone with
20 Mr. Gonzalez, who was present?
21   A.   Rick Gonzalez, myself --
22   Q.   On the phone?

Page 344

1        MS. TABACCHI:  Object to the form.  Go
2  ahead.
3        THE WITNESS:  Yeah, on the phone.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.   Okay.
6    A.   Myself, Rick Gonzalez, Jim Daly from
7  Jones Day, and Sara Lyke from Abbott Laboratories.
8    Q.   Anybody else?
9    A.   No.
10   Q.   Did you personally ask any questions of
11 Mr. Gonzalez?
12   A.   I did not.
13       Jim Daly asked me at the end of the
14 conversation if I had any questions for Rick, I
15 said I did not.
16   Q.   Why didn't you have any questions?
17   A.   Because I thought he had answered all of
18 the issues that were relevant to this, my
19 testimony.
20   Q.   So you didn't see any need to ask any
21 further questions of him?
22   A.   No.

4 (Pages 341 to 344)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 345

1      Q.   Do you know what Mr. Gonzalez's role was
2  in setting prices, either contract prices or
3  catalog list prices?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  Starting in I believe '97,
6  '98, I'm not sure when he took over as the
7  president of Hospital Products Division, he was
8  responsible for the whole division.  He was
9  responsible for approving any catalog price
10 changes, but he wasn't involved in the actual
11 setting of the prices themselves.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   Did you see the need to discuss with
14 Mr. Gonzalez anything else concerning his
15 involvement with the Hospital Products Division?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  No.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Why not?
20         MS. TABACCHI:  Objection, asked and
21 answered.
22         THE WITNESS:  I had personal knowledge

Page 346

1  of a number of things.  And what I was looking for
2  in the conversation with Mr. Gonzalez was his
3  perspective on a few items, not necessarily the
4  details of the transactions that were going on or
5  whatever.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Well, how about just the subject matters
8  that are at issue in today's deposition, did you
9  feel the need to review with him the various
10 topics set forth in your deposition Notice?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Again, I thought the
13 questions that were asked touched on the subjects
14 that we needed to talk about.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.   Do you think it would have been
17 important as the president of HPD to get
18 Mr. Gonzalez's perspective on the topics that are
19 at issue in this 30(b)(6) lawsuit?
20         MS. TABACCHI:  Object to the form,
21 beyond the scope of the Notice.
22         THE WITNESS:  Again, I thought we

Page 347

1  covered the topics adequately with him.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Sir, when we left off at your last
5  deposition, we were still working through Topic 8
6  and pricing.
7      A.   Okay.
8      Q.   I'd like to go back to that.
9          Before I show you some documents,
10 I'd like to ask in terms of setting of pricing,
11 either list pricing or contract pricing, either
12 or, okay, so any pricing that impacted the
13 Alternate Site customers or the nonDRG reimbursed
14 customers.
15     A.   Okay.  For Alternate Site.
16     Q.   For HPD customers who are not DRG
17 reimbursed.  Does that make sense?
18     A.   Okay.
19     Q.   What role, if any, did factors like
20 dispensing fees or copays or other risks that the
21 provider might have impact Abbott's pricing
22 decisions?

Page 348

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  I don't believe that any
3  of those affected or were factors in our pricing
4  decisions.
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Why not?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  Again, as I think I said
10 the last time, we marketed our products on the
11 basis of quality, breadth of portfolio, breadth of
12 delivery systems available, dependability of
13 supply, and on competitive prices.
14         So we were more intent on looking
15 at what our competitors were offering, not
16 necessarily what happened with the drugs after
17 they were procured.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Well, as part of the competitive
20 pricing, would it have been important to
21 understand for those end users, those end
22 providers, would it have been important for Abbott

5 (Pages 345 to 348)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 349

1   to understand what costs they had to consider as
2   through their business?
3          MS. TABACCHI:  Object to the form,
4   beyond the scope.
5          THE WITNESS:  Well, while it's always
6   important to understand your customer and what
7   drives their or what gives them motivation,
8   whatever they did to process our products was the
9   same they were going to do when they processed
10  somebody else's products.  Ours were no different.
11         The only place where there was a
12  difference was where we had a delivery system that
13  would have obviated a certain process that they
14  would have had to do.
15         For instance, if we were selling a
16  pre-filled syringe product, that product could be
17  priced higher than just a vial or ampule product
18  because it eliminated steps that the provider had
19  to go through to draw up the syringe and so on.
20         So from that standpoint, it was
21  important to understand.  But if they bought a
22  vial of a certain drug from us and they bought a

Page 350

1   vial of a certain drug, of that same drug, from
2   one of our competitors, they'd have to go through
3   the same processes to prepare the drug, administer
4   the drug, whatever else needed to go on.
5          So we really didn't take that into
6   consideration because it was really what did we
7   need to remain competitive with other drug
8   suppliers on that drug.
9      Q.   Did dispensing fees for the end
10  providers ever factor into Abbott's pricing
11  decisions?
12     A.   No.
13     Q.   What about inventory carrying costs for
14  the end user providers, did that ever factor into
15  Abbott's pricing decisions?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  No.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   Other than just the competitive price of
20  the actual product itself, was there any other
21  factor pertaining to the provider that factored
22  into Abbott's pricing decisions?

Page 351

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  The only other factor that
3   plays here is the size of the customer in terms of
4   what does the customer buy from Abbott or what
5   could the customer buy from Abbott.
6          So if, for instance, it was a large
7   GPO that brought to us two thousand members that
8   would then buy our products, they might be
9   eligible for a lower price than an individual
10  coming to us with two or three, four, or five
11  locations that might buy our drugs.
12         So the critical mass of the
13  customer may have played some role in the price
14  considerations at times.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Would it have been the contract price
17  considerations or the list price considerations or
18  both?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Purely contract.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   How did Abbott's marketing of product

Page 352

1   lines, meaning packaging more than just one
2   individual product, how did that impact pricing
3   for Abbott's individual products, if at all?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  Usually not in the subject
6   drugs that we're talking about here.
7   BY MS. ST. PETER-GRIFFITH:
8      Q.   Okay.
9      A.   Primarily because the awards that would
10  be made by a GPO for instance often times ended up
11  being line item awards.  They weren't we're going
12  to give you every product that you bid, we're
13  going to give you, you know, instead they'd come
14  back and say no, we're going to give you a hundred
15  twenty out of the three hundred fifty products
16  that you bid we're going to give those to you and
17  we're going to give somebody else the other two
18  hundred some odd.
19         So it never was a practice to try
20  to link them together because we knew that our
21  customers, which were primarily pharmacists, not
22  professional purchasers, they liked to do a pick

6 (Pages 349 to 352)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 353

1  and choose across the awards.  So you really had
2  to price each one so it would stand alone.
3      Q.  So, for example, in the example that you
4  just gave for those a hundred twenty or so line
5  items, would it be price that would be the
6  determining factor as to whether or not Abbott
7  would receive the contract from the GPO with
8  regard to those items?
9          MS. TABACCHI:  Object to the form,
10 beyond the scope.
11         THE WITNESS:  It was one of the factors.
12 I mean all things I said before in terms of
13 dependability, in terms of quality, in terms of
14 delivery mode would contribute to their decision.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Let me ask you a slightly different way.
17         Would it be the prices on the
18 individual line items that would be awarded, for
19 example the hundred twenty that you referenced, as
20 opposed to the entire package or portfolio of the
21 product line that would be the driving factor?
22         MS. TABACCHI:  Object to the form,

Page 354

1  beyond the scope.
2          THE WITNESS:  My experience is that it
3  was the individual price for that individual line
4  item that was awarded.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Were there any other factors that
7  factored other than what you already testified to
8  this morning and earlier that factored into
9  Abbott's pricing decisions?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  No.  The one other one, I
12 guess I back, the one other one we talked about
13 before is inflationary environment of the year
14 that we were in.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  What do you mean by that?
17     A.  Well, we monitored the CPI bundle for
18 urban, CPIU is what we called it, I think that's
19 what it's called on the government website.
20         We monitored CPIU.  So we were
21 aware whether we were in a high inflationary
22 environment or we were in a low inflationary

Page 355

1  environment.  So if CPIU, a lot of our contracts
2  are geared to whatever the CPIU does in terms of
3  our ability to increase prices.  So that would be
4  another factor in determining contract price.  And
5  as I've said before, in the 1990s it was a factor
6  for list price changes as well.
7          (WHEREUPON Exhibit Sellers 016
8          was marked as of 3/31/2008.)
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Sir, I'm not going to ask you detailed
11 questions about this document.  I'm going to ask
12 Abbott whether it recognizes the document, but
13 we're not going to go line-by-line.  (Document
14 tendered to the witness.)
15         MS. TABACCHI:  Object to the question as
16 beyond the scope of the Notice.
17         THE WITNESS:  I don't remember reviewing
18 this particular document.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Sir, previously we had discussed in the
21 first day of your deposition various pressures
22 that may have influenced Abbott's decision making

Page 356

1  with regard to lowering its list pricing.  Do you
2  recall that?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  Yeah.  I believe we talked
5  about a number of environmental factors that were
6  going on at the time.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  In 1999 I'll represent to you this is a
9  letter that was sent to by the Department of
10 Justice to Abbott's counsel, Daniel Reidy.
11         Did Abbott see a copy of this
12 document?
13         MS. TABACCHI:  Object to the form,
14 object as beyond the scope of the Notice.
15         THE WITNESS:  I can't comment because I
16 didn't see it.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Why didn't Abbott consider lowering its
19 list prices upon receipt of this letter?
20         MS. TABACCHI:  Object to the form,
21 beyond the scope of the Notice.  This is an
22 improper hypothetical.

Henderson Legal Services, Inc.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 357

1      MS. ST. PETER-GRIFFITH: It's not a
2  hypothetical. I'm asking why it didn't do it.
3      MS. TABACCHI: Same objections.
4      THE WITNESS: Again, I'm not familiar
5  with when this came out and who saw it.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Did you do anything in preparation for
8  today's deposition to evaluate DOJ communications
9  with Abbott?
10     A.  No.
11         (WHEREUPON Exhibit Sellers 017
12         was marked as of 3/31/2008.)
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Sir, what has been marked as Exhibit 17
15  I'll represent to you was previously used at the
16  deposition of Don Robertson.  (Document tendered
17  to the witness.)
18         We're going to focus on the first
19  two pages of this document.  My first question to
20  you is do you recognize this document?
21     A.  Can I read it?
22     Q.  Sure.

Page 358

1      MS. TABACCHI:  Can I ask what topic you
2  see this as falling into?
3      MS. ST. PETER-GRIFFITH:  Sure, a variety
4  of them.  Certainly 8, 11, 9, 4, and it follows on
5  his prior testimony too as well pertaining to
6  Topic 8.
7      MS. TABACCHI:  Object to the question as
8  beyond the scope.  This letter has also been
9  addressed by a separate 30(b)(6) witness.
10     MS. ST. PETER-GRIFFITH:  Which 30(b)(6)
11  witness?
12     MS. TABACCHI:  This fell into the Cindy
13  Sensibaugh lobbying testimony.
14         I'm just having trouble seeing how
15  it fits into the topics for Mr. Sellers, but he
16  can answer in his individual capacity if he's
17  familiar with it.
18     MS. ST. PETER-GRIFFITH:  Well, I need
19  him to answer on behalf of Abbott because he made
20  representations on behalf of Abbott and I'm going
21  to follow up.
22     MS. TABACCHI:  Why don't you articulate

Page 359

1  what it is so that we can reach some agreement.
2  Because just simply putting this letter in front
3  of him I don't see how it fits into the topics.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Well, I'll ask the questions.
6      A.  I've read the first two pages.
7      Q.  Does this refresh your recollection as
8  to whether or not Abbott had an understanding
9  about how AWP factored into Medicare and Medicaid
10  reimbursement?
11     MS. TABACCHI: Object to the form,
12  beyond the scope.
13     MS. ST. PETER-GRIFFITH:  It's not beyond
14  the scope.
15     THE WITNESS:  No, not really.
16         I think in my response originally
17  about the understanding of AWP and reimbursement,
18  I said as a matter of course and in general HPD
19  part of Abbott Laboratories was not aware of a
20  relationship of AWP to reimbursement.
21         There were a few people that may
22  have been aware of it at points in time, but as a

Page 360

1  general course, no, there weren't, there wasn't a
2  widespread understanding of AWP and reimbursement,
3  especially on the hospital side.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Well, who's Mr. Dempsey?
6      A.  Bill Dempsey at this time was the
7  general manager for Home Infusion Services.
8      Q.  And Mr. Robertson?
9      A.  Don Robertson was vice president of
10  Alternate Site.
11     Q.  So certainly someone within Alternate
12  Site had this understanding; is that fair?
13     MS. TABACCHI:  Object to the form.
14     THE WITNESS:  There were some people
15  within Alternate Site that had some understanding
16  of AWP and a general relationship it may have had
17  to reimbursement.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Did Abbott Alt. Site or anyone within
20  Abbott HPD have a concern in 1991 about changes to
21  Medicare or Medicaid reimbursement formulas?
22     MS. TABACCHI:  Object to the form,

8 (Pages 357 to 360)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 361

1  beyond the scope.
2       THE WITNESS: I don't read this into
3  that letter, I don't read this in here.
4       What I see and what I remember of
5  Virginia Tobiason's testimony, and I believe she
6  testified with regard to this document because I
7  remember some quotes being used in the, I didn't
8  review the document but I remember some quotes
9  being used in the deposition, this was more a
10 review of hey, these things are being talked about
11 and here are the effects it could have on the
12 industry in general and that HCFA was seeking
13 comments on a proposed rule, which they did all
14 the time, or quite often, and a contemplation of
15 what kind of comments we might support going back
16 through any industry groups we were in at the time
17 and/or possibly support on a correct basis if we
18 wanted to.
19      So I don't see anything in here
20 that says there's concern. It's more of as a
21 participant in the industry how can we help and
22 provide constructive input.

Page 362

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Did Abbott provide constructive input?
3          MS. TABACCHI: Object to the form,
4  beyond the scope of the Notice.
5          Again, this is duplicative of
6  testimony that's already been provided on behalf
7  of the corporation as to this particular document
8  and this particular regulation.
9          THE WITNESS: I don't know.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  If you can turn to Page 2, at the top
12 there's a bullet that says "Actual drug costs are
13 not the only cost to be considered when
14 establishing a drug fee screen." Do you see that?
15    A.  Yes.
16    Q.  "Others include waste, breakage,
17 inventory costs, and drug procurement costs. Also
18 bad debt needs to be considered since Medicare
19 only covers eighty percent of the drug cost." Do
20 you see that?
21    A.  Yes.
22    Q.  In making its pricing decisions, did

Page 363

1  Abbott Hospital Products Division with regard to
2  the subject drugs ever consider waste, breakage,
3  inventory costs, drug procurement costs, or bad
4  debt as part of its pricing considerations?
5          MS. TABACCHI: Object to the form.
6          THE WITNESS: No.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Why would Abbott care about that?
9          MS. TABACCHI: Object to the form,
10 beyond the scope of the Notice.
11         THE WITNESS: Again, the context of this
12 is these are some comments that we might use or
13 might support. So it was really a statement of
14 looking at it from, at this issue, from a provider
15 point of view, this is some things that we might
16 want to represent.
17         It had nothing to do with this is
18 something that we ought to include in our pricing.
19 It had nothing to do with this is something that
20 we ought to go out and talk to our customers
21 about.
22         It was purely a discussion of hey,

Page 364

1  these are some points that in this case Virginia
2  did not see in the proposed rule that might be
3  worthwhile to bring forward.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Why would the methodology by which
6  Medicare and Medicaid reimbursed providers have
7  any significance to Abbott Alternate Site?
8          MS. TABACCHI: Object to the form,
9  beyond the scope, asked and answered.
10         THE WITNESS: Again, we were a member of
11 the general industry, the healthcare industry.
12 Whether we went forward with these thoughts or any
13 of these, I don't know. But we saw ourselves as
14 members of the industry.
15         So if CMS or HCFA was asking for
16 comments, often times they wanted to hear from
17 every stakeholder in the industry. They didn't
18 just want to hear from the stakeholders that were
19 affected.
20         So we saw ourselves as a
21 responsible member of that community, and in
22 particular in representing or as participating

9 (Pages 361 to 364)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbot (Sellers, Michael) - Vol II                        March 31, 2008

Page 365

1   with our industry group's we saw that as a
2   responsibility we had to at least put our thoughts
3   out there.
4   BY MS. ST. PETER-GRIFFITH:
5       Q.   Other than the individuals listed on
6   this memorandum, are you aware of anyone else
7   within the Hospital Products Division who had
8   familiarity with AWP as a basis for Medicare and
9   Medicaid reimbursement?
10          MS. TABACCHI:  Object to the form,
11  beyond the scope.
12          THE WITNESS:  I think, again, as I've
13  said before, I think that the folks that were in
14  Home Infusion reimbursement on a state-by-state
15  basis were aware of what some of the carriers or
16  payors were using as a factor, but that was only
17  thirty or forty people out of seventeen thousand.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Did Abbott have an understanding about
20  whether or not AWP was an indicator of actual, a
21  good indicator, of actual acquisition cost?
22          MS. TABACCHI:  Object to the form,

Page 366

1   beyond the scope of the Notice.
2           MS. ST. PETER-GRIFFITH:  It's not beyond
3   the scope.
4           THE WITNESS:  When a noncontracted
5   entity, noncontracted, someone that did not have a
6   contract with Abbott, bought product through a
7   wholesaler, we had no way of knowing what the
8   wholesaler sold our product for.  We didn't know
9   whether they sold it for the price they acquired
10  it, whether they sold it for list price, or
11  whether they sold it for some markup above list
12  price.
13          So the only place where we knew
14  where what the acquisition price was for somebody
15  buying something through the wholesaler was where
16  we had a contract with that end provider and we
17  had some assurance, though not perfect knowledge,
18  but some assurance, that they were paying our
19  contracted price and we were getting a charge-back
20  from that wholesaler to make that price real.
21          We weren't aware of what they were
22  paying in terms of wholesaler fees.  So we knew on

Page 367

1   a contract basis what the baseline was.  Whether
2   it was up or down from that baseline when the
3   final product was sold to the provider we didn't
4   know.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   But did Abbott have an understanding as
7   to whether or not AWP was reflective of the actual
8   prices in the marketplace?
9           MS. TABACCHI:  Object to the form,
10  beyond the scope of the Notice.
11          THE WITNESS:  No.
12          (WHEREUPON Exhibit Sellers 018
13          was marked as of 3/31/2008.)
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   Sir, I'm only going to ask you about the
16  first page of this particular document.  (Document
17  tendered to the witness.)
18      A.   Okay.
19      Q.   Sir, do you recognize this document?
20          MS. TABACCHI:  Object to the form of the
21  question, beyond the scope of the Notice.
22          This document and this area has

Page 368

1   already been the subject of corporate testimony by
2   another witness.
3           THE WITNESS:  No.  I'm not familiar with
4   this document.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   In 1991 -- first of all, who is
7   Mr. Kringel?
8       A.   He was the president of our Hospital
9   Products Division.
10      Q.   In 1991 did Abbott's Hospital Products
11  Division have an understanding as to whether AWP
12  was a poor indicator of actual drug acquisition
13  costs?
14          MS. TABACCHI:  Object to the form,
15  beyond the scope of the Notice.
16          THE WITNESS:  I would say from this it
17  doesn't sound like something Don Robertson would
18  say, but it is under his signature, so I would say
19  maybe Don Robertson had that feeling.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Well, he's communicating it to
22  Mr. Kringel, isn't he, in this memo?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 369

1        MS. TABACCHI:  I'm going to object to
2   this entire line of questioning as beyond the
3   scope of the Notice.
4        THE WITNESS:  It is a communication to
5   Mr. Kringel.  But whether Mr. Kringel felt that
6   way or not I can't tell by this.
7   BY MS. ST. PETER-GRIFFITH:
8     Q.   Well, what was Abbott's position in 1991
9   as to whether AWP was a poor indicator of actual
10  drug acquisition cost?
11       MS. TABACCHI:  Object to the form,
12  beyond the scope of the Notice.
13       THE WITNESS:  As we've said before,
14  Abbott never set AWP, does not set AWP.  And so
15  it's something that was out of our control.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Well, Abbott did understand that its
18  list price reporting impacted AWP; didn't it?
19       MS. TABACCHI:  Object to the form,
20  beyond the scope, mischaracterizes the witness'
21  prior testimony.
22       THE WITNESS:  There may have been a few

Page 370

1   people within the division that understood that,
2   but in general they did not, Abbott did not.
3   BY MS. ST. PETER-GRIFFITH:
4     Q.   Why if in 1991 Abbott had an
5   understanding that AWP was a poor indicator of
6   actual drug costs, did it continue to report its
7   list prices at the levels that it did for the
8   subject drugs?
9        MS. TABACCHI:  Object to the form,
10  beyond the scope of the Notice.
11       THE WITNESS:  As I've said before, from
12  this time period through, you know, 1999 AWP and
13  reimbursement was not a consideration in terms of
14  what we did with our list prices.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   Sir, if you could go to the second
17  paragraph, the second sentence from the bottom
18  beginning "The abandonment of AWP," do you see
19  that, "as a good indicator"?
20    A.   Uh-huh.
21    Q.   In 1991 did Abbott believe that AWP was
22  a good indicator of product acquisition cost?

Page 371

1        MS. TABACCHI:  Object to the form,
2   beyond the scope of the Notice, asked and
3   answered.
4        THE WITNESS:  I think in 1991 and
5   forward Abbott did not have necessarily an opinion
6   on what AWP was represented to be.  We didn't set
7   it, we weren't responsible for it.
8   BY MS. ST. PETER-GRIFFITH:
9     Q.   Did Abbott have any concerns that
10  changes to the AWP based reimbursement system
11  would impact its business?
12       MS. TABACCHI:  Object to the form,
13  beyond the scope of the Notice.
14       THE WITNESS:  I think the concern here
15  is not necessarily, as stated by Don Robertson, is
16  not necessarily one of AWP as much as it is of
17  looking at a national drug fee schedule and
18  looking ahead and saying a national fee schedule
19  was talked about a number of times in the 1990s,
20  and this may have been just the beginning of it,
21  but a number of times by both HCFA and Congress,
22  especially for generic drugs, had the potential of

Page 372

1   what's represented here is a continual downward
2   spiral of drug prices.
3   BY MS. ST. PETER-GRIFFITH:
4     Q.   Why would that impact, why would a
5   national drug fee schedule have a downward spiral
6   for Abbott's drug prices?
7        MS. TABACCHI:  Object to the form,
8   beyond the scope.
9        THE WITNESS:  Again, I can't speak
10  specifically to this because I haven't read what
11  all the rules were in the attachment, but many
12  times in government programs when they went to
13  look at price controls, there was a constant
14  update that would have driven prices lower in the
15  marketplace.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Would changes to Medicare and Medicaid
18  reimbursement and the methodology for Medicare and
19  Medicaid reimbursement have an impact on Abbott's
20  contract prices?
21       MS. TABACCHI:  Object to the form,
22  beyond the scope.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 373

1    THE WITNESS:  Not directly.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Then why would there be a concern?
4    MS. TABACCHI:  Same objections.
5    THE WITNESS:  Again, what I said a
6  primary component of our pricing was to remain
7  competitive with other drug companies.  So
8  anything pushing down on price in any segment of
9  the industry could have an effect on what prices
10  would be acceptable in the marketplace.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   Well, how could Medicare or Medicaid
13  reimbursement structures have a downward pressure
14  on Abbott's contract prices?
15    MS. TABACCHI:  Object to the form,
16  beyond the scope of the Notice.
17    THE WITNESS:  There are normal market
18  forces in play in every market.  Whenever you
19  introduce a new force and by virtue of a
20  reimbursement change, you would be talking about a
21  new force entering the marketplace.  You can't
22  really anticipate what the market is going to do

Page 374

1  to react to that.
2    I think an interesting sidelight to
3  this was, and this is really based on reducing the
4  physician fee schedules I think is where this
5  first started, and CMS, or HCFA at that time,
6  reduced the physician fee schedules in the early
7  '90s and they expected to save money.
8    Years later in retrospect as they
9  look back, physicians reacted by seeing more
10  patients, not by charging less.  So they saw more
11  patients for less time and charged the reduced
12  fee.
13    So I don't think anybody, CMS
14  included, anticipated that kind of reaction, but
15  that's, you know, you change anything in a market
16  equilibrium and something else has to change.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   Well, is it fair to say that if there
19  were changes or anticipated changes in Medicare or
20  Medicaid reimbursement, that would factor into
21  Abbott's pricing considerations for its contract
22  pricing?

Page 375

1    MS. TABACCHI:  Object to the form,
2  beyond the scope of the Notice.
3    THE WITNESS:  I think as this, and as
4  Virginia's original statement, we couldn't really
5  tell what kind of effect it would have.  We knew
6  it would have some effect someplace.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Setting aside these two memorandums, I
9  just want to ask you in general from the time
10  period from 1991 until 2003 we discussed earlier
11  what factors factored into Abbott's pricing.  I
12  want to ask did Medicare or Medicaid reimbursement
13  and impacts to Medicaid or changes to Medicaid and
14  Medicare reimbursement, did that in any way
15  influence Abbott's pricing decisions, either its
16  catalog pricing decisions or its list pricing
17  decisions?
18    MS. TABACCHI:  Object to the form,
19  beyond the scope, asked and answered.
20    THE WITNESS:  No.
21    MS. ST. PETER-GRIFFITH:  Tina, this is
22  No. 29 in hopefully your numbered --

Page 376

1    MS. TABACCHI:  Are you skipping?
2    MS. ST. PETER-GRIFFITH:  No, no.  In
3  terms of --
4    MS. TABACCHI:  Oh, in here?
5    MS. ST. PETER-GRIFFITH:  Yes.
6    What I gave you before had numbers
7  on it.  Well, why don't you take a look at that
8  before it's marked.  And while you're doing that,
9  why don't we have Mr. Anderson enter his
10  appearance now that he's arrived from Texas.
11    MR. ANDERSON:  Good morning.  Jarrett
12  Anderson for the realtor.
13    MS. TABACCHI:  I'm sorry.  So this you
14  think is in here or in my stack of stuff from
15  before?
16    MS. ST. PETER-GRIFFITH:  Well, if those
17  are just the exhibits that we premarked, then no.
18  But I had a stack that had little stickies on it
19  with numbers at the bottom.
20    You know what, Tina, I'll just try
21  to give you the copies that I have.
22    MS. TABACCHI:  So is this being marked

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 377

1 as Exhibit 19?
2      MS. ST. PETER-GRIFFITH:  19.
3         (WHEREUPON Exhibit Sellers 019
4         was marked as of 3/31/2008.)
5 BY MS. ST. PETER-GRIFFITH:
6   Q.  Mr. Sellers, have you ever seen this
7 document before?  (Document tendered to the
8 witness.)
9   A.  No.
10  Q.   The document, is it fair to say, makes
11 certain representations about corporate
12 positioning regarding the topic of AWP.  Do you
13 see that?
14  A.  Yes.
15  Q.  My question for you pertains to the
16 second bullet.  Do you see that?  "The pricing
17 structure of Abbott products is based on the
18 investment made in those products and the needs of
19 our customers."  Do you see that?
20  A.  Yes.
21  Q.   Is that a fair statement of Abbott's
22 pricing structure for its, HPD products?

Page 378

1      MS. TABACCHI:  Object to the form,
2 beyond the scope of the Notice.
3      THE WITNESS:  I think it's fair.  I
4 think it's a bit short when we talk about all of
5 the products within the Hospital Products
6 Division, namely because the vast majority of
7 products in the Hospital Products Division were
8 generic products.  And so it was also a matter of
9 competitiveness.
10 BY MS. ST. PETER-GRIFFITH:
11  Q.   And the products that we're talking
12 about in this lawsuit, and I'll put the Complaint
13 in front of you, in terms of the subject drugs
14 those are all generic drugs; right?
15  A.  Yes.
16  Q.   For the subject drugs that are at issue
17 in this lawsuit, did investment into products or
18 needs of the customer factor into Abbott's pricing
19 decisions?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  Definitely.  What it costs
22 us to produce the product, what it costs us to

Page 379

1 gain approval for the ability to produce and
2 market the product were all considerations in what
3 price we put on the table.
4      The needs of the customer, whenever
5 you look at serving a marketplace you have to
6 consider the needs of your customer.  And often
7 times, as I said before, the drug delivery methods
8 were in consideration.
9      So, again, if we offered them a
10 drug delivery system that was more easy to use,
11 required less labor on their part, that was a
12 consideration in terms of how we priced our
13 product.
14 BY MS. ST. PETER-GRIFFITH:
15  Q.   Is it fair to say that those needs that
16 you just articulated or the investments, you know,
17 what it costs to bring the generic to market, were
18 those factors in setting the initial price of the
19 product?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  No.  They were factors
22 whenever we adjusted the price of the product.

Page 380

1 BY MS. ST. PETER-GRIFFITH:
2   Q.   Other than what you've testified to
3 today and earlier, have we covered every factor
4 that factored into Abbott's pricing for the
5 products that are at issue in this lawsuit?
6      MS. TABACCHI:  Object to the form.
7      THE WITNESS:  Well, I can't speak to
8 every factor, but I can say that the vast majority
9 of what we've talked about today were the primary
10 factors.
11        (WHEREUPON Exhibit Sellers 020
12        was marked as of 3/31/2008.)
13 BY MS. ST. PETER-GRIFFITH:
14  Q.   Sir, I'm only going to focus on the
15 front page.  We're not going to do a detailed
16 review of the other pages.  (Document tendered to
17 the witness.)
18  A.  Okay.
19  Q.   Sir, have you seen this document before?
20  A.  No.
21  Q.   The document appears to be a letter from
22 Dennis Walker.  Who is Mr. Walker?

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 381

1    A.   He was a national accounts manager in
2  our Alternate Site Product Sales business at the
3  time.
4    Q.   And it's a letter to the manager of bids
5  and contracts for Managed Health Associates.  Do
6  you see that?
7    A.   Yes.
8    Q.   Was that better known as MHA?
9    A.   It has been MHA on some documents, yes.
10   Q.   What is MHA?
11   A.   As I understood it, MHA was a group
12 purchasing organization primarily serving
13 Alternate Site facilities.  I'm not sure exactly
14 what Alt. Site facilities, whether they were
15 ambulatory surgery centers or whether they were
16 close pharmacies or nursing homes, but it was
17 primarily an Alt. Site GPO.
18   Q.   Sir, does Abbott see anything improper
19 with this letter that Mr. Walker sent to MHA?
20        MS. TABACCHI:  Object to the form of the
21 question, beyond the scope of the Notice.
22        Mr. Sellers has not been designated

Page 382

1  to testify on whether Abbott thinks something is
2  improper in this letter.
3        If you have a personal opinion,
4  Mr. Sellers, you can express it.  He's not
5  testifying on behalf of the corporation.  We've
6  put a compliance witness and other witnesses.
7        THE WITNESS:  Personally if I would have
8  written this letter, and in hindsight, I would
9  have stricken the first phrase in the second
10 paragraph.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   The "due to the heightened sensitivity
13 to the subject of AWPs"?
14   A.   Yes.
15   Q.   Why would you have done that?
16        MS. TABACCHI:  Beyond the scope.
17        THE WITNESS:  Because I don't think it
18 needs that kind of emphasis.  I think we could
19 basically just say we don't provide AWPs, and give
20 them a reference of where they could get them.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.   Well, this reference says "We are unable

Page 383

1  to provide that information at the current time."
2  Do you see that?
3    A.   Yes.
4    Q.   Would it have been permissible under
5  Abbott's practice to provide AWP information to a
6  GPO customer like MHA at any time?
7        MS. TABACCHI:  Objection, beyond the
8  scope.
9        THE WITNESS:  That wasn't within our
10 practice, no.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   In 1998 did Abbott have a concern about
13 heightened sensitivity to the subject of AWPs?
14        MS. TABACCHI:  Objection, beyond the
15 scope.
16        THE WITNESS:  No.  It was never within
17 our practice to provide AWPs to customers.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.   Was it permissible under Abbott's
20 practice to refer customers to Red Book or
21 Medi-Span for AWP information?
22   A.   Yes.

Page 384

1    Q.   Why wouldn't that be prohibited by the
2  practice?
3        MS. TABACCHI:  Objection, beyond the
4  scope.
5        THE WITNESS:  We've never had a practice
6  to say that AWPs never existed.  Our practice has
7  always been that AWPs were not set by Abbott, were
8  not controlled by Abbott, and that if any requests
9  came through they were available from the
10 publishers, and that's who we should refer people
11 to if they wanted to get the AWPs.
12
13 BY MS. ST. PETER-GRIFFITH:
14   Q.   Sir, who is Mr. Heggie?
15   A.   Mike Heggie was an employee within
16 Alternate Site during the stated period in a
17 variety of positions I believe.
18   Q.   Was he a subordinate to you when you
19 were in Alternate Site?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  He never reported to me,
22 no.

14 (Pages 381 to 384)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 385

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   But was he in your chain of command?
3      A.   No.
4      Q.   Or were you in his chain of command?
5      A.   No.
6      Q.   Sir, you testified last time that we
7  were here that Abbott did not have an
8  understanding as to how AWPs were calculated, at
9  least until much later in the time period that's
10 at issue in this lawsuit; is that fair?
11     A.   Yes.
12     Q.   Why didn't Abbott prior to 2001, 2002
13 take an interest in how AWPs were calculated?
14         MS. TABACCHI:  Object to the form,
15 beyond the scope.
16         THE WITNESS:  Our practice was not to
17 use, monitor, or control AWPs.  So AWP was not a
18 relevant number for the vast majority of the
19 Hospital Products Division.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.   Would there be any reason why Abbott
22 would care about how AWPs are calculated?

Page 386

1          MS. TABACCHI:  Objection, beyond the
2  scope, object to the form.
3          THE WITNESS:  No.
4          (WHEREUPON Exhibit Sellers 021
5                was marked as of 3/31/2008.)
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Sir, what's just been marked as Exhibit
8  21 was previously used in the Michael Heggie
9  deposition and marked as Exhibit 68, the Heggie
10 deposition in Texas.  If you want to take a few
11 minutes to look at this document.  (Document
12 tendered to the witness.)
13         MR. ANDERSON:  It's, for the record,
14 also part of the Heggie transcripts in the federal
15 case.
16         THE WITNESS:  Okay.  I've read it.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Sir, does Abbott recognize this
19 document?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I've seen it before prior
22 to one of my depositions.

Page 387

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Was this one of the documents that you
3  reviewed, one of the exhibits that you reviewed,
4  to the transcripts that you reviewed over the
5  weekend?
6      A.   I didn't review in detail the
7  attachments.  I'm not even sure I had the
8  attachments in what I reviewed over the weekend.
9      Q.   This letter is dated 1993 and it's
10 directed to Lisa at Red Book from Michael Heggie.
11 Do you see that?
12     A.   Yes.
13     Q.   In the middle paragraph that begins "As
14 you told me on the phone, Abbott has a policy of
15 allowing Red Book to establish AWP."  Do you see
16 that?
17     A.   Yes.
18     Q.   Then the next sentence reads "The
19 formula as I understand it is minus five percent
20 plus twenty-five percent."  Do you see that?
21     A.   Yes.
22     Q.   Why would Abbott care about what the

Page 388

1  formula is?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  In general, Abbott doesn't
4  care, didn't care.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.   Why would Mr. Heggie care?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  I'm not sure why he would
9  be that specific.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.   Do you know why it would be important
12 for Red Book to call back Karla Kreklow and to
13 give her a verified AWP?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  No, because I don't know
16 what product this was attached to.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Well, irrespective of what product it's
19 attached to, for any product would it have been
20 important for Abbott to receive verified AWP
21 information from Red Book?
22         MS. TABACCHI:  Object to the form.

15 (Pages 385 to 388)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 389

1        THE WITNESS:  No.
2
3   BY MS. ST. PETER-GRIFFITH:
4     Q.   How come?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  It wasn't an operative
7   number for us.
8          (WHEREUPON Exhibit Sellers 022
9           was marked as of 3/31/2008.)
10  BY MS. ST. PETER-GRIFFITH:
11    Q.   Actually, sir, I think that last page,
12  is this the last page?
13    A.   Uh-huh.
14    Q.   Why don't we take that off because that
15  was inadvertently stapled.
16    A.   Okay.  All right.
17    Q.   Sir, does Abbott recognize this
18  document?
19        MS. TABACCHI:  Objection, beyond the
20  scope of the Notice.
21        THE WITNESS:  I don't recall seeing this
22  document before.

Page 390

1   BY MS. ST. PETER-GRIFFITH:
2     Q.   Why in 1996 in response to the Civil
3   Investigative Demand served by the United States
4   didn't Abbott lower or consider lowering its list
5   prices on the drugs that were referenced in the
6   Civil Investigative Demand?
7        MS. TABACCHI:  Objection, beyond the
8   scope, object to the form.
9        THE WITNESS:  When we originally got the
10  investigative demands, outside of maybe someone in
11  our legal department, I'm not sure we understood
12  what the issues were.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.   Why didn't you go to the United States
15  and ask what the issues were?
16        MS. TABACCHI:  Objection, beyond the
17  scope, object to the form.
18        THE WITNESS:  We depended on our legal
19  counsel, and it was a matter of litigation.  So
20  that would have been their responsibility if they
21  felt it was needed.
22  BY MS. ST. PETER-GRIFFITH:

Page 391

1     Q.   Is it fair to say that as early as 1996
2   Abbott had some indication that there was a
3   correlation between its list prices on the subject
4   drugs and the high spreads that were being paid as
5   part of Medicare and Medicaid reimbursement on the
6   subject drugs?
7        MS. TABACCHI:  Object to the form,
8   beyond the scope of the Notice.
9        THE WITNESS:  Again, I don't think
10  within the operating division that there was that
11  understanding or any understanding with regard to
12  that.
13          (WHEREUPON Exhibit Sellers 023
14           was marked as of 3/31/2008.)
15        MS. ST. PETER-GRIFFITH:  Tina, I'll
16  represent to you that those are a bunch of loose
17  documents that were produced as part of the Bruce
18  Rodman production.
19        MS. TABACCHI:  So they're stapled
20  together, but they don't all go together?
21        MS. ST. PETER-GRIFFITH:  Well, they're
22  stapled together because frankly that's sort of

Page 392

1   how they were produced to us.
2        MS. TABACCHI:  Okay.
3        MS. ST. PETER-GRIFFITH:  But in going
4   through the original box with Mr. Rodman, they
5   were all over the place and they were stamped all
6   over the place.  Believe, me I was equally
7   surprised.
8        MS. TABACCHI:  You're not representing
9   that it's one document?
10        MS. ST. PETER-GRIFFITH:  No, I'm not.
11        MS. TABACCHI:  It's just what Bruce
12  Rodman gave you?
13        MS. ST. PETER-GRIFFITH:  Right.
14        MS. TABACCHI:  Got it.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   Sir, we're going to get into Home
17  Infusion a little bit more in a minute.  But
18  before I leave the pricing topic, I want to get
19  Abbott's understanding, I want you to testify as
20  to Abbott's understanding of how AWP factored into
21  usual and customary pricing or other pricing
22  utilized by the Home Infusion business unit.

16  (Pages 389 to 392)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 393

1     A.   I can tell you I'm not familiar with any
2  convention with regard to usual and customary.
3          Usual and customary rates for
4  therapies were set by each of our clients as we
5  worked through those.  Home Infusion had some
6  usual and customary rates for any services that we
7  provided directly, but that was a minority of the
8  work that we did from '92 on when I was involved
9  with it.
10    Q.   As part of its services that it provided
11 to clients, did Abbott assist them in helping set
12 their usual and customary rates?
13    A.   There were discussions between as we set
14 up a new client, particularly those clients that
15 had no experience in the home infusion business,
16 there were discussions between our reimbursement
17 folks and their operating personnel talking about
18 what things they might want to consider in the
19 U&Cs.
20    Q.   Well, were you aware of any manuals that
21 were put together that were utilized by Abbott's
22 Home Infusion business unit and its customers in

Page 394

1  helping establish what the usual and customaries
2  were?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  I'm not familiar with the
5  details of a manual.  We did have a reimbursement
6  implementation manual, if I remember right.  What
7  in specifics were covered within that manual I'm
8  not familiar with.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   How important was AWP to Abbott's Home
11 Infusion business unit pricing?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  It wasn't important.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   How was it utilized by Abbott's Home
16 Infusion business unit in its pricing?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  The only place AWP was
19 used was when it was requested by either a case
20 manager or a payor, whether they requested that on
21 the claim form or whether they requested it in the
22 per diem negotiations that we went through.  Those

Page 395

1  are the only times that I'm familiar that AWP came
2  into play.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   What about for pricing for therapies
5  that were going to be provided or drugs that were
6  going to be provided as part of therapies, did AWP
7  factor into that pricing?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  I don't know.
10         MS. ST. PETER-GRIFFITH:  Before we jump
11 into the document, we've got five minutes left on
12 the tape.  Why don't we take a quick break.
13         THE WITNESS:  Okay.
14         THE VIDEOGRAPHER:  We are off the record
15 at 10:23 a.m. with the end of Tape 1.
16         (WHEREUPON a recess was taken.)
17         THE VIDEOGRAPHER:  We are back on the
18 record at 10:37 a.m. with the start of Tape No. 2.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   Mr. Sellers, before we dive into the
21 document that's in front of you, did Abbott's Home
22 Infusion business unit provide to its consignment

Page 396

1  partners Ross products and TAP products such as
2  Lupron?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  In our consignment
5  program, we included Ross enteral solutions as
6  well as enteral feeding products or devices.  We
7  did not include any products from TAP.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   What's the basis for your statement that
10 you didn't include any products from TAP?
11    A.   TAP is a joint venture between Takada
12 and Abbott Laboratories, Takada Abbott
13 Pharmaceuticals, that's where the "TAP" came from.
14 And as such, TAP operated at an arm's length
15 relationship with Abbott and Takada.  So we did
16 not have access to the TAP products.
17    Q.   But did Abbott Home Infusion dispense
18 Lupron to its consignment partners?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Typically, Lupron is, as I
21 understand it, is not dispensed at home.  It's
22 primarily dispensed in a physician's office.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 397

1         However, we may have dispensed
2   Lupron based on physician prescriptions.
3   BY MS. ST. PETER-GRIFFITH:
4     Q.   Through the Home Infusion business unit?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  Through the Home Infusion
7   pharmacies, or any of our clients may have
8   dispensed Lupron as well.
9   BY MS. ST. PETER-GRIFFITH:
10    Q.   And when they dispensed Lupron, would
11  Abbott Home Infusion be responsible for providing
12  the Lupron product to either the Home Infusion
13  pharmacies or to the clients, Home Infusion
14  clients?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  When our clients dispensed
17  Lupron, they would be responsible for purchasing
18  the Lupron.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   I'm sorry.  I misspoke.
21        In terms of distributing the Lupron
22  to the Home Infusion clients for dispensation,

Page 398

1   would Abbott do that?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  It was not included in any
4   of our consignment programs with our clients.  So
5   if they needed Lupron, they would have to purchase
6   Lupron from a wholesaler or directly from TAP.
7   BY MS. ST. PETER-GRIFFITH:
8     Q.   Did Abbott Home Infusion have a group
9   purchasing organization that it worked with to
10  assist its consignment partners in procuring
11  product?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  We were a member of an
14  Alternate Site group purchasing organization
15  called Purchase Connection.  That GPO was used by,
16  used nationally, by a number of Alternate Site
17  companies and facilities.  And we were a member
18  just like Coram would be a member.  I don't know
19  whether Coram was, but if they were --
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   I understand.
22    A.   As an example.

Page 399

1     Q.   Sir, if former Home Infusion business
2   unit employees such as Bruce Rodman or Karla
3   Kreklow or Lynn Leone has testified in this case
4   that Abbott's Home Infusion division did in fact
5   dispense or provide Lupron to its clients, Home
6   Infusion clients to dispense, would that surprise
7   Abbott?
8         MS. TABACCHI:  Object to the form,
9   beyond the scope.
10        THE WITNESS:  It was not within our
11  consignment program.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.   Is there some stated policy or document
14  that reflects that that you're aware of?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  Not that I could produce,
17  no.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   If Abbott Home Infusion was dispensing
20  Lupron, would that be violative of any Abbott
21  policy or procedure?
22        MS. TABACCHI:  Object to the form.

Page 400

1         THE WITNESS:  No.
2   BY MS. ST. PETER-GRIFFITH:
3     Q.   How come?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  We dispensed drugs
6   manufactured by whatever drug company was needed,
7   not just Abbott Labs.  And we, just like Walgreens
8   or any other retail pharmacy, were dictated by the
9   physician's prescription.  So if the physician
10  prescribed a particular gentamicin for instance,
11  that wasn't our gentamicin, we were required to
12  dispense that gentamicin.  We would go out and
13  procure that gentamicin and dispense that drug.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.   You're talking about Abbott's Home
16  Infusion pharmacies themselves; right?
17    A.   Yes.
18    Q.   With regard to its consignment partners,
19  was there any policy or procedure that prohibited
20  Abbott's Home Infusion department from consigning
21  Lupron to them?
22        MS. TABACCHI:  Object to the form.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 401

1        THE WITNESS:  We did not have an
2  agreement with TAP for an access of products.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   But did the fact that you didn't have an
5  agreement with TAP for an access of products,
6  would that have precluded Abbott's Home Infusion
7  business unit from consigning Lupron to its
8  revenue share partners?
9        MS. TABACCHI:  Object to the form, asked
10 and answered.
11       THE WITNESS:  I am not aware of any
12 products that were not Abbott Laboratories
13 products that were in the consignment program.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   Sir, if you could take a look at what's
16 been marked as the next exhibit.
17       There are only a few documents that
18 I would like to look at.  The first is that if you
19 flip the page, 2392.
20    A.   Okay.
21    Q.   If you could look down to where it says
22 "TPN Miscellaneous Nutrients Trace Elements CPD

Page 402

1  Drugs."  Do you see that at the top?
2     A.   Number one?
3     Q.   Yes, Roman Numeral I.
4     A.   Yes.
5     Q.   Do you see where it says "Upcharge AWP
6  By 1.4"?
7     A.   Yes.
8     Q.   Does that refresh your recollection as
9  to whether or not AWP was a factor that factored
10 into pricing for Abbott's Home Infusion business
11 unit?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I wasn't familiar with the
14 absolute details of what went into the U&C
15 definition.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   Well, is it possible that AWP factored
18 into that then and Abbott just wasn't aware of it?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  Well, you've got a
21 document that talks to it.  I don't know where
22 this document came from.

Page 403

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   I'll represent to you where it came
3  from.  It came from Bruce Rodman who rescued it
4  from the trash, as according to his testimony.
5  And he verified that it is an Abbott Home Infusion
6  document.
7     A.   Okay.
8     Q.   If you look down under Roman Numeral II
9  where there's an underlined section that says
10 "Upcharge Any Single Dose Multi-dose Vial At AWP
11 x2."  Do you see that?
12    A.   Yes.
13    Q.   And then the next sentence says "If
14 there are multiple manufacturers with the same
15 vial size, use the most expensive AWP and upcharge
16 by 2.0."
17    A.   Yes.
18    Q.   Why would Abbott in calculating its Home
19 Infusion pricing choose the most expensive AWP and
20 upcharge it by double?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I assume that this is a

Page 404

1  document that is talking about usual and customary
2  charges.  Usual and customary charges are the
3  charges that would go on the claim.
4        Usual and customary charges we did
5  not anticipate getting paid that level.  And the
6  guideline here was I think set to make sure that
7  usual and customary would never be below what any
8  payor would pay.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Well, do you know how Abbott did that?
11       MS. TABACCHI:  Object to the form,
12 beyond the scope.
13       THE WITNESS:  How it did what?
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   How it determined what the usual and
16 customary -- strike that.
17       Let's just go on to Page 2394.
18 This pertains to at the top it says "Establish
19 Pricing Parameters."  Do you see that?
20    A.   Yes.
21    Q.   And it does say "Draft" at the top.
22    A.   Yes.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 405

1    Q.   In establishing its pricing parameters
2  for usual and customaries for compounded
3  antibiotics, including vancomycin, would Abbott
4  utilize AWP pricing?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  I can only comment on this
7  draft form, and it does have AWP as a factor
8  listed.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   How important was AWP for Abbott's
11  products to Abbott's Home Infusion business unit's
12  pricing?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  This really had nothing to
15  do with Abbott in particular.
16            Of the drugs that are listed there,
17  none of those were Abbott products.  This I would
18  assume, and again, it's a draft document so I
19  don't know whether it was actually used or not,
20  but, again, it was setting a baseline price for a
21  therapy.
22  BY MS. ST. PETER-GRIFFITH:

Page 406

1    Q.   How would Abbott's AWPs factor into its
2  Home Infusion pricing?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Well, for instance, if
5  they were pricing fluconazole, it wouldn't factor
6  in at all because Abbott didn't make fluconazole
7  whenever this time period was.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   What about vancomycin?
10   A.   Huh?
11       MS. TABACCHI:  Object to the form.
12  BY MS. ST. PETER-GRIFFITH:
13   Q.   What about if it was vancomycin?
14   A.   It may or may not have.
15   Q.   Was AWP important to Abbott's Home
16  Infusion business unit?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  AWP was a factor that some
19  people knew may or may not have been used in the
20  calculation of what was going to be ultimately
21  reimbursed.
22            From the standpoint of HPD, there

Page 407

1  were very, very few people that even had an
2  understanding of this kind of document, probably
3  even less people that understood this kind of
4  document versus people that might have understood
5  what a healthcare payor would pay in the state of
6  Washington or the state of Utah.  And the vast
7  majority of the Hospital Products Division could
8  care less about it.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   But was AWP important to the Home
11  Infusion business unit?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  No.  It wasn't critical.
14  BY MS. ST. PETER-GRIFFITH:
15   Q.   Well, if it factored into their pricing
16  for their therapies and pricing for products that
17  were billed to Medicare and Medicaid by the
18  reimbursement department, why wouldn't that be
19  important to Abbott Home Infusion?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I think if you look across
22  the time period as I recall it, I heard any number

Page 408

1  of factors used for reimbursement, AWP, mean AWP,
2  minimum AWP, a different meaning for AMP, it
3  wasn't really the federal AMP, list price, any
4  number of factors that could have been used for
5  that.
6            Again, this kind of document looks
7  at usual and customary charges for the entire
8  therapy.  And it was intended to be high because
9  we knew we'd never get paid that.
10            If you look at most of the analyses
11  that we did and we've submitted those, and I've
12  seen those in a number of documents that are
13  already in this litigation with regard to
14  proposals to Home Infusion, U&C was nothing more
15  than a benchmark with which we measured where we
16  actually got paid.  We got paid a percent of U&C
17  on a variety of therapies.
18  BY MS. ST. PETER-GRIFFITH:
19   Q.   Why would Abbott use average wholesale
20  price then as part of its determination for its
21  usual and customary charges?
22       MS. TABACCHI:  Object to the form.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 409

1      THE WITNESS:  I don't know.  I don't
2  know whether Bruce Rodman answered that question
3  or not.  It was, again, just an index.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.   Well, I want to know why Abbott felt the
6  need to utilize not just AWP but multiples of AWP,
7  two to three times the AWP number and the highest
8  reported AWP, why did Abbott feel the need to
9  utilize AWP in that regard in setting its usual
10  and customary?
11      MS. TABACCHI:  Object to the form,
12  beyond the scope of the Notice.
13      THE WITNESS:  I think in terms of the
14  Home Infusion area, we were not dealing with just
15  Abbott products, we were dealing with Abbott
16  products, Roesch Products, Merck products,
17  Pharmacia products, Bristol Meyers, whatever.
18      So I think they probably chose an
19  index that they could use for any drug regardless
20  of whether it was Abbott or not.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   If you could turn towards the fifth page

Page 410

1  from the end, BR02436.  Do you see at the top it's
2  an 11/03/97 memorandum from Shelley Bronson --
3      A.   Yes.
4      Q.   To Suzie Dale and Chris Alex.
5      A.   Yes.
6      Q.   Do you know who they are?
7      A.   They were within our reimbursement
8  department.
9      Q.   Who is Shelley Bronson?
10      A.   She was at this time a managed care
11  specialist that was actually working in our
12  contracting department within Home Infusion.
13      Q.   Did she also do some training?
14      A.   Yes.  Both she and Lynn Leone, who I
15  believe was the other managed care specialist at
16  some point during this time, or actually prior to
17  this.  Case management was an evolving reality for
18  our clients, so yes.
19      Q.   If you could look at the first sentence
20  of this e-mail, it says "Per our pricing
21  methodology, which is AWP driven, we take the
22  highest AWP to compute the pricing for compounded

Page 411

1  and noncompounded drugs."  Do you see that?
2      A.   Uh-huh.
3      Q.   Is that a fair statement of what, from
4  Abbott's viewpoint, of what Abbott did in terms of
5  its pricing for compounded and noncompounded drugs
6  in the Home Infusion arena?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  Just give me a second.
9      MS. ST. PETER-GRIFFITH:  Sure.
10      THE WITNESS:  Okay.  I'm sorry.  Your
11  question again?
12      MS. ST. PETER-GRIFFITH:  Sure.  Can you
13  read it back.
14      (WHEREUPON said record was read
15           back as requested.)
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  I'm not familiar with that
18  detail.  I don't know the context of this memo, so
19  I can't really say.  With regard to Home Infusion
20  services it may have been in some cases.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   Well, let me take it outside the context

Page 412

1  of this memo and just ask directly.  To compute
2  its pricing for compounded and noncompounded drugs
3  in the Home Infusion business unit, was Abbott's
4  pricing methodology AWP driven?
5      MS. TABACCHI:  Object to the form.
6      THE WITNESS:  I don't know.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   In setting the pricing, did Abbott's
9  Home Infusion business unit take the highest AWP?
10      MS. TABACCHI:  Object to the form.
11      THE WITNESS:  I don't know.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   If Abbott's Home Infusion business
14  unit's compounded and noncompounded drug pricing
15  was driven by AWP, is it fair to say that AWP was
16  important to the Home Infusion business unit?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  No.  I don't think that's
19  fair.
20
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   Why not?

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 413

1    A.   Because, again, the context of
2  everything I see here is with regard to usual and
3  customary.
4            Usual and customary was, again, a
5  price put on the claim, and in my experience
6  payment for a claim wasn't based on usual and
7  customary, it was based on whatever the formula
8  was that the payor was going to use.
9    Q.   Well, then why would Abbott utilize AWP
10  or multiples of the highest AWP for purposes of
11  setting its pricing for compounded and
12  noncompounded Home Infusion products?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  It was, again, I believe
15  the convention was to set a price that would be
16  above whatever you would get reimbursed.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   Did Abbott have an understanding as to
19  whether its other Home Infusion customers or
20  whether the Home Infusion marketplace similarly
21  relied upon AWP as part of its pricing and billing
22  for reimbursement?

Page 414

1        MS. TABACCHI:  Object to the form,
2  beyond the scope.
3        THE WITNESS:  I'm not aware of what
4  Virginia Tobiason or anybody in her department may
5  have known about what other people were billing.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   Well, let's go outside Virginia
8  Tobiason.
9            The Alt. Site Product Sales sold
10  products to purchasing organizations that
11  ultimately distributed to the Home Infusion
12  market; is that fair?
13    A.   Yes, one segment.
14    Q.   Would it be fair to say that Abbott had
15  an understanding of how that Home Infusion
16  business sector was reimbursed?
17        MS. TABACCHI:  Object to the form,
18  beyond the scope.
19        THE WITNESS:  No.  I don't believe that
20  there was an understanding by the Product Sales
21  people of the ins and outs of reimbursement for
22  Home Infusion.

Page 415

1            I think you've shown documents that
2  there were some GPOs that have requested AWP and
3  may have talked to our people about AWP.  So they
4  obviously knew something of that.  But in general,
5  no, I don't believe that there was a prevalent
6  knowledge of how Home Infusion was reimbursed.
7            For one thing, Home Infusion was
8  one segment of our Product Sales people's
9  responsibility.  They marketed our products to
10  home infusion companies, they marketed our
11  products to what we called closed-door consultant
12  pharmacists who eventually dispensed the product
13  to nursing homes, which was on a completely
14  different reimbursement schedule, and they sold
15  the products to ambulatory surgery centers.
16            So, again, this was one piece of a
17  broad array of customers that they sold products
18  to.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   So it wouldn't have been important to
21  understand how this particular consumer segment
22  was reimbursed?

Page 416

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  No, because I believe if
3  I'm a Product Sales person, the more important
4  thing is what are my competitors doing, not
5  necessarily what happens regardless of where they
6  buy the drug for the provider.
7
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   Well, would it have been important to
10  understand what the competitors' AWPs or list
11  prices were?
12        MS. TABACCHI:  Object to the form,
13  beyond the scope.
14        THE WITNESS:  No.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   What did you as the Abbott corporate
17  representative do to educate yourself before
18  coming to testify here today about the
19  significance of pricing and AWP in the Home
20  Infusion business unit?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  Well, I ran the business

22 (Pages 413 to 416)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 417

1    for a period of time.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.   So you have that firsthand experience.
4        A.   I have some knowledge.  Though, again, I
5    didn't process claims.  So I do have that bit of
6    knowledge.  I have testified with regard to these
7    subjects before.  So I've got that background.
8            But specifically for this, other
9    than reading Lynn Leone's testimony and reading
10   Shelley Bronson's testimony, which I think we
11   talked about last time, and I believe I went
12   through Bruce Rodman's testimony in pieces.
13       Q.   What is the 50?
14       A.   We had a couple of AS/400 computers.
15   One we processed our pharmacies through, the other
16   one we used as a timeshare for a lot of our
17   clients.  So I don't know which one, but the 50
18   refers to one of them.
19       Q.   So it's one of the computer databases --
20       A.   Yes.
21       Q.   -- essentially?
22       A.   Yes.

Page 418

1        Q.   Sir, if you could flip a few pages
2    before that to BR02430.  It's the June 13th
3    memorandum from Lynn Leone to all reimbursement
4    personnel.  Do you see that?
5        A.   Uh-huh.
6        Q.   Can you take a few minutes and look at
7    this, please.
8        A.   Okay.
9        Q.   Sir, do you recognize this document?
10       A.   No.
11       Q.   Does it refresh Abbott's recollection as
12   to whether or not it distributed to its revenue
13   share partners in the Home Infusion business unit
14   Lupron?
15           MS. TABACCHI:  Object to the form.
16           THE WITNESS:  No.  It does indicate that
17   we dispensed Lupron to patients, but it doesn't
18   have any statement in here that we consigned
19   Lupron to our --
20   BY MS. ST. PETER-GRIFFITH:
21       Q.   Revenue share partners?
22       A.   -- contract partners.

Page 419

1        Q.   So when Abbott billed Lupron to Medicare
2    and Medicaid or third-party providers, would it do
3    so utilizing the Lupron AWP?
4            MS. TABACCHI:  Object to the form.
5            THE WITNESS:  Again, I think this is
6    talking about our list price which in terms of
7    Home Infusion it's not the list price we've been
8    talking about in terms of catalog.  So I want to
9    make sure that's the difference.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.   Oh, okay.  Can you clarify what you mean
12   by that, sir?  So list price for Home Infusion was
13   different than list price for HPD?
14           MS. TABACCHI:  Object to the form.
15           THE WITNESS:  I think the context of
16   this is list price is our usual and customary
17   price.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.   Okay.
20       A.   So for Home Infusion dispensing a drug
21   per a prescription, our usual and customary was
22   referred to as our list price.  So that's what

Page 420

1    this is talking about is the definition of our
2    usual and customary.
3        Q.   Okay.  Well, let me ask you this:  In
4    the middle of the first paragraph it says "Because
5    of these increases, our list price on the 50
6    should be adjusted."  Do you see that?
7        A.   Yes.
8        Q.   Was Abbott's Home Infusion list price
9    for the products that its pharmacies dispensed on
10   the 50?
11           MS. TABACCHI:  Object to the form.
12   BY MS. ST. PETER-GRIFFITH:
13       Q.   Is that where it was kept or maintained?
14       A.   I would infer that from here.
15       Q.   Well, do you know based upon your
16   experience from running Home Infusion?
17       A.   I remember there were two.  I don't
18   remember the terminology between them and which
19   one housed what.  But I would infer that since
20   she's talking about the 50 and it's going to our
21   pharmacists as well as our reimbursement
22   personnel, that was where we housed anything that

23 (Pages 417 to 420)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                              March 31, 2008

Page 421

1  was done through our pharmacies.
2      Q.   What was the correlation, if any,
3  between the list price for Abbott Home Infusion on
4  the 50, we'll just assume that it was on the 50 --
5      A.   Okay.
6      Q.   -- and the catalog price or list price
7  published by AWP?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10         THE WITNESS:  I'm not sure that there
11  was any functional equivalent.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   Do you know what the relationship was
14  between AWP and Abbott Home Infusion list price
15  that's referenced here in this document?
16         MS. TABACCHI:  Object to the form,
17  beyond the scope of the Notice.
18         THE WITNESS:  Other than what this
19  document says, that's the extent of my knowledge.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.   Was AWP important to calculating the
22  list price for Abbott's Home Infusion -- strike

Page 422

1  that.
2          Was AWP important for calculating
3  the Abbott Home Infusion list price?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  It may have been.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Do you know whether there was a
8  particular formula that was utilized utilizing AWP
9  in calculating the list price?
10     A.   I'm not familiar with that detail.
11     Q.   But it's your testimony that Abbott
12  never consigned Lupron; is that fair?
13     A.   Yes.
14     Q.   If you could flip a few pages, maybe
15  eight or nine pages earlier, to BR02422.
16         Sir, this appears to be the same
17  memo we were just looking at, except there's some
18  handwriting under Product, do you see that, where
19  it says "AWP" --
20     A.   Yes.
21     Q.   -- "x 1.15"?
22     A.   Yes.

Page 423

1      Q.   Does that refresh Abbott's recollection
2  as to what the formula might have been between
3  Abbott's Home Infusion list price calculation and
4  AWP?
5          MS. TABACCHI:  Objection, beyond the
6  scope.
7          THE WITNESS:  I can only say that's what
8  it says on this memo.  I haven't done the
9  calculation.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   I think it would be mean at this stage,
12  sir, to have you do math in your head on the
13  record.
14     A.   Thank you.
15     Q.   Sir, are you familiar, is Abbott
16  familiar, with the 1995 change in the reporting of
17  its pricing for vancomycin?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Familiar with a 1995 price
20  change done on vancomycin, yes.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   What can you tell me about that price

Page 424

1  change?
2          MS. TABACCHI:  Object to the form.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Well, let's start with this:  Why was it
5  done?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Well, you'll have to share
8  with me some specifics.  I know that vancomycin
9  was part of a catalog price change in 1995.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Why was it part of a catalog -- well,
12  let me ask you this:  How many other products had
13  catalog price changes in 1995?
14     A.   I'm not sure, but I think probably a
15  good majority of the --
16     Q.   Well, are you familiar with any --
17     A.   -- drugs that were in our catalog at the
18  time.
19     Q.   So let me ask you this:  When you talk
20  about the 1995 catalog price change, are you
21  talking about a change in Abbott's vancomycin
22  catalog price along with a whole bunch of other

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 425

1  price changes for Abbott products?
2        MS. TABACCHI: Object to the form.
3        THE WITNESS: Yes.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Are you aware of any individual price
6  change for vancomycin that occurred in 1995?
7        MS. TABACCHI: Object to the form.
8        THE WITNESS: I think there was a change
9  to the vancomycin prices for a short period of
10 time in the spring of 1995.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   What were the circumstances concerning
13 that spring of '95 brief vanco price change?
14       MS. TABACCHI: Object to the form.
15       THE WITNESS: I believe that someone
16 from Home Infusion Services had requested of the
17 Hospital Business Sector a consideration to reduce
18 list price for a few versions of vancomycin.  By
19 "versions" I'm talking about concentrations,
20 delivery forms.
21          There was an agreement to reduce
22 the prices per that request.  That was

Page 426

1  subsequently rescinded.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   Why was it rescinded?
4     A.   I believe in referencing testimony by
5  Gerry Eichhorn, that it was rescinded primarily
6  because we did not have funds reserved to do a
7  price reduction for wholesalers.
8     Q.   What do you mean by that?
9     A.   If we were to reduce an acquisition
10 price for a wholesaler, we had a practice of
11 giving the wholesaler what we called shelf
12 adjustment payment.
13          So any of the product that we
14 reduced the acquisition cost on, whatever stocks
15 they had at the time we reduced the acquisition
16 cost, we would value the differential in the
17 reduction and pay the wholesaler that
18 differential.
19          The reason we did that was
20 otherwise the wholesaler would be penalized by our
21 price reduction because their charge-backs from
22 the point that we adjusted the price onward would

Page 427

1  be versus the lower acquisition cost, when in
2  reality they paid more for the product.
3          So it was an understanding that if
4  we took a reduction, we needed to make sure that
5  they were compensated for that reduction on the
6  stock they had on their shelves.  They should not
7  have been penalized because we decided to take a
8  reduction.
9     Q.   Would that occur any time that Abbott
10 made a decrease in their list prices?
11       MS. TABACCHI: Object to the form.
12       THE WITNESS: In the acquisition cost
13 for the wholesaler.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   Did Abbott have a particular policy or
16 procedure regarding ensuring that there were the
17 necessary reserves to cover those situations
18 whenever it reduced a price, a list price for a
19 product?
20       MS. TABACCHI: Object to the form,
21 beyond the scope.
22       THE WITNESS: It was something that was

Page 428

1  comprehended on any adjustment that we made.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   What testimony from Gerry Eichhorn were
4  you referencing that you can recall reviewing?
5     A.   I believe Gerry Eichhorn testified that
6  he had agreed to the price reduction, he had
7  communicated the price reduction on the HBS side,
8  he had communicated the price reduction to the
9  individual in Home Infusion.  And subsequent to
10 that communication, Harry Adams came in and talked
11 to him and instructed him that we couldn't reduce
12 the prices because we only did it once a year and
13 that it wasn't in the plans.
14    Q.   Why wasn't it in the plans?
15       MS. TABACCHI: Object to the form.
16       THE WITNESS: At that time price
17 reductions were not something that were
18 comprehended in our annual plans.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   Okay.  You're talking about the August
21 or April update plans?
22       MS. TABACCHI: Object to the form.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 429

1      THE WITNESS: Any of our budget plans.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   Well, how would it affect your budget?
4      A.   It's a payout to the wholesalers.
5      Q.   So it's the payout to the wholesalers
6  that was not contemplated?
7      A.   Yes.
8      Q.   Why did Home Infusion initially ask for
9  the reduction?
10     A.   As I recall, there was an issue raised
11  by one or two of our clients that they had gotten
12  some pushback from case managers with regard to
13  using Abbott vancomycin versus using some other
14  company's vancomycin, and that filtered back
15  through into the Home Infusion organization.
16         So I think the organization was
17  trying to address a concern that the organization
18  thought the clients had.
19     Q.   And what was that concern?
20         MS. TABACCHI: Object to the form.
21         THE WITNESS: As I said before, they had
22  gotten some pushback from case managers.

Page 430

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Let me ask a different way. Did Abbott
3  know why the case managers were given pushback?
4         MS. TABACCHI: Object to the form.
5         THE WITNESS: From my recollection, it
6  was regarding our list price. What that had to do
7  with the case manager, I'm not sure.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Well, could it have been the higher list
10  price meant that there would be a higher AWP on
11  the product?
12         MS. TABACCHI: Object to the form.
13         THE WITNESS: It may or may not have been.
14         My experience with case managers is
15  they decided what number they were going to pay
16  anyway. Whether they had a formula that related
17  to that, I'm not familiar.
18         So regardless of where, what price
19  was where, at that point in time it was the
20  beginning of the case management per se in the
21  industry. So, you know, it was just one pushback
22  that we were trying to I think address.

Page 431

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Well, what did Abbott do to address the
3  pushback?
4         MS. TABACCHI: Object to the form.
5         THE WITNESS: As I said, one person from
6  Home Infusion went to the people that controlled
7  list price, which was the Hospital Business
8  Sector, and asked if they could get a
9  consideration to reduce the list price on I
10  believe three two or three --
11  BY MS. ST. PETER-GRIFFITH:
12     Q.   Vanco products?
13     A.   -- list numbers of vanco.
14     Q.   Was the concerns raised by the case
15  managers of concern to Abbott?
16         MS. TABACCHI: Object to the form.
17         THE WITNESS: It was only a concern from
18  the standpoint that if we could eliminate an
19  objection for our clients, that was something that
20  we ought to look at doing.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   You testified that the charge-back issue

Page 432

1  was the reason why the price went back, was raised
2  again; is that fair?
3      A.   The shelf protection issue.
4      Q.   Did the price when it went back up, did
5  it go back to the same price that it was prior to
6  the reduction, or did it go up further?
7         MS. TABACCHI: Object to the form.
8         THE WITNESS: It went back to the
9  catalog increase price.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Other than the reason that you just
12  articulated as to taking it back to the catalog,
13  the prior catalog price, is there any other reason
14  whatsoever why Abbott elected to not keep that
15  brief reduction in place?
16         MS. TABACCHI: Object to the form.
17         THE WITNESS: Not that I've been able to
18  uncover.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.   Well, did Abbott have any concerns that
21  by raising the price back to the level that it was
22  before, that there would be further pushback from

26 (Pages 429 to 432)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 433

1   case managers on the Home Infusion side?
2        MS. TABACCHI:  Object to the form,
3   beyond the scope.
4        THE WITNESS:  I think that would have
5   been an obvious concern for anybody in Home
6   Infusion.  I mean that's why we went forward.  So
7   to say that we didn't get what we asked for, you
8   know, would have left some amount of concern.
9   BY MS. ST. PETER-GRIFFITH:
10    Q.   How was that concern, that residual
11  concern, addressed?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  It wasn't.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.   What was your involvement, you, Mike
16  Sellers, what was your involvement in the decision
17  to reduce the list price or raise the list price?
18       MS. TABACCHI:  Object as beyond the
19  scope.
20       THE WITNESS:  I didn't have any
21  involvement other than I was made aware by Dave
22  Brincks, who was my manager of contracting at the

Page 434

1   time, of the objection.  Virginia Tobiason may
2   have been part of that communication, I'm not
3   sure.  And I understood that he was going to go
4   and talk to the HBS side to see if we could get
5   some consideration on that.
6   BY MS. ST. PETER-GRIFFITH:
7     Q.   Putting on your Abbott hat again, why
8   when Abbott after that point in time looked at its
9   catalog pricing, why didn't it reduce the
10  vancomycin pricing?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  I think as we've said all
13  along, the list price control was on the hospital
14  side and it remained on the hospital side, which
15  is where it should have been.  That's where the
16  vast majority of the business for the products
17  were.
18       I'm not sure.  It fell off of our
19  radar scope in Home Infusion at some point in
20  time, and I'm not sure what tenure Gerry Eichhorn
21  had beyond that in Contract Marketing.  I'm not
22  familiar with the ins and outs of his career

Page 435

1   movement, but I know he held a number of positions
2   on the HBS side, and he was the one that was
3   originally aware of it.  So whether he was aware
4   of it the next time we had a catalog change, I
5   don't know.
6   BY MS. ST. PETER-GRIFFITH:
7     Q.   Well, who within HBS would have needed
8   to approve the initial reduction that was
9   reported?
10    A.   From what I understand, Gerry Eichhorn
11  was one.  He was in HBS Contract Marketing at the
12  time.  He was a manager within HBS Contract
13  Marketing.
14       He reviewed it with Mark Sebree,
15  who was the marketing manager for that segment of
16  products on the HBS side.  I believe those were
17  the two that made the decision.
18    Q.   Would they have needed to receive
19  approval from anyone else to do that?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  Obviously Harry Adams felt
22  that he had to approve it.

Page 436

1   BY MS. ST. PETER-GRIFFITH:
2     Q.   And then is it fair to say that they
3   didn't consult with Harry Adams?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  In reading the testimony,
6   it doesn't sound like they consulted with Harry
7   Adams.
8   BY MS. ST. PETER-GRIFFITH:
9     Q.   Because Mr. Adams was the one who --
10    A.   Objected.
11    Q.   -- objected and saw to it that the
12  pricing was reversed back to what the prior
13  catalog pricing was.
14    A.   Yes.
15    Q.   Why did Mr. Adams do that?
16       MS. TABACCHI:  Objection, asked and
17  answered.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   Other than what you've already testified
20  to.  Any other reason?
21    A.   Nothing other than Harry Adams was
22  responsible for relationships with wholesalers.

27 (Pages 433 to 436)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 437

1  So he had infinite knowledge with regard to what
2  was an obligation that we might have to our
3  wholesalers that Gerry Eichhorn probably was not
4  privy to, nor would he necessarily have to know.
5     Q.   What communications did Abbott have with
6  wholesalers once the reduction was made?
7        MS. TABACCHI:  Object to the form,
8  beyond the scope.
9        THE WITNESS:  I'm not sure what
10  communications were sent out with regard to that.
11        Typically, when a price is changed
12  or was changed for a product, there was a
13  communication sent out to all wholesalers so they
14  could update their systems.  And Harry Adams
15  usually was the person that was responsible for
16  that.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   Are those Harry-grams?
19     A.   They have become known in the industry
20  as Harry-grams, yes.
21     Q.   Did Abbott receive any communication
22  back from wholesalers concerning this decision to

Page 438

1  briefly, for a brief period of time, to reduce the
2  vancomycin list price?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  I'm not aware of any
5  communication.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   Did the fact that case managers were
8  raising concerns about Abbott's list pricing on
9  the vancomycin in 1995 raise a question with
10  Abbott about the relationship between its list
11  pricing and Medicare or Medicaid or third-party
12  reimbursement?
13        MS. TABACCHI:  Object to the form,
14  beyond the scope.
15        THE WITNESS:  With regard to Abbott, no.
16  With regard to Home Infusion, not a major concern
17  primarily because payors paid what they wanted to
18  pay, and there was no way to anticipate what a
19  case manager would propose or say their limit of
20  payment would be.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   Well, for vancomycin when it was billed

Page 439

1  in 1995 to Medicare, Abbott was aware that
2  vancomycin was reimbursed by Medicare in 1995;
3  correct?
4        MS. TABACCHI:  Objection, beyond the
5  scope.
6        THE WITNESS:  There was some time period
7  that vanco was reimbursed under Medicare Part B,
8  sometime in early '90s to around I believe in '95
9  where Medicare ceased to reimburse for vancomycin,
10  or covered that therapy, let me put it that way,
11  they ceased to cover that therapy.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   And Abbott Home Infusion would bill
14  Medicare for vancomycin that it dispensed;
15  wouldn't it?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  They may have.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   What reimbursement did Abbott seek on
20  the vancomycin that it billed to Medicare?
21        MS. TABACCHI:  Object to the form,
22  beyond the scope of the Notice.

Page 440

1        THE WITNESS:  On any of our claims, I
2  would have expected to see our usual and customary
3  charge.  But that wasn't necessarily what we
4  expected to be reimbursed.  I mean we expected it
5  to be something less than that.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.   Well, did you have an understanding or
8  did Abbott have an understanding as to whether
9  Abbott's Home Infusion billed AWP under J-codes
10  for vancomycin?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I can't comment on the
13  detail of what we billed in terms of a J-code.  I
14  would assume you've got billing claims that would
15  tell you that.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   Well, would it surprise you to learn
18  that Abbott billed for vancomycin seeking
19  reimbursement from Medicare at AWP?
20     A.   Again, I don't have that kind of detail
21  to be expecting or surprised.
22     Q.   Other than who you testified to to date,

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 441

1  were there any other individuals involved in the
2  1995 vancomycin brief price reduction?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  The only name I recall
5  seeing in documents and in testimony would be
6  Jerrie Cicerale.  I believe there was a
7  communication from Gerry Eichhorn to Jerrie
8  telling her to reduce the prices and to report
9  those prices, which would have been her normal job
10 regardless of whether the prices had gone up or
11 down.  Any change in our published prices would
12 have caused her to report those published price
13 changes.
14 BY MS. ST. PETER-GRIFFITH:
15      Q.   Other than doing the actual reporting of
16 the price changes, was Jerrie Cicerale involved in
17 the deliberations concerning either the reduction
18 of the vancomycin pricing or the decision to raise
19 it again?
20      A.   No.
21      Q.   Was there anyone else involved in the
22 deliberations either to drop the vancomycin list

Page 442

1  price or to raise it up?
2       A.   Not that I recall.
3       Q.   Now, in 2003 just prior to the spin of
4  Hospira, Abbott HPD executives made a decision to
5  make price adjustments to certain products; is
6  that fair?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  Hospira spun in 2004.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.   Okay.  Fair enough.  In late 2003 or
11 early 2004 just prior to the Hospira spin, I
12 believe you testified, sir, back in November that
13 there were some decision making with regard to
14 making price adjustments to certain Hospital
15 Product Division products, either prior to or at
16 the time of the Hospira spin.
17      MS. TABACCHI:  Object to the form.
18 BY MS. ST. PETER-GRIFFITH:
19      Q.   Is that fair?
20      A.   We published a new catalog effective
21 April 3rd I believe of 2004 which was the first
22 workday of spin for Hospira.

Page 443

1       That catalog included some price
2  changes that had been reviewed, developed and
3  reviewed, with HPD management at the time, soon to
4  be Hospira management, prior to the spin obviously
5  because we had to have the prices ready and a
6  presentation of changes and so on available so we
7  could on the first day of spin communicate them.
8       Q.   Why was the decision made to make those
9  price changes on the first day of the Hospira spin
10 as opposed to prior to that point in time?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  Ordinarily our catalog
13 price change that we, price changes that we went
14 through, throughout the time period were typically
15 done in the spring, but we tried not to be
16 predictable.  So the date of catalog price
17 changes, I think if you look at our published
18 catalogs throughout that time period, the date
19 moves back and forth.  It may have been in March,
20 some may have been in April, some may have been in
21 May.
22      While that fluctuation wasn't

Page 444

1  programmed, I mean we didn't decide that we're
2  going to change it in May this year and next year
3  we're going to, it was intended not to be
4  predictable, primarily due to the fact that
5  wholesalers have a tendency, or had a tendency at
6  the time, to anticipate price changes and buy a
7  lot of stock and stock up and thereby benefit from
8  any price changes.  We always tried to discourage
9  wholesalers from anticipating and stocking because
10 our inventory plans never contemplated a load of
11 product being at one wholesaler or another and
12 therefore not being available to all of our
13 customers.  So we tried not to be predictable.
14      In the case of 2004, we had done a
15 catalog adjustment in 2003, we had also done a
16 catalog adjustment in 2002.  The 2004 adjustment
17 was just intended to be the same type of
18 adjustment that we had done in the prior two
19 years.  And because we were spinning and because
20 we had to come out with a catalog that said
21 "Hospira" instead of "Abbott," it just made sense
22 to have the two coincide.

29 (Pages 441 to 444)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 445

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Well, is it fair to say that at least
3  for the subject drugs, or some of the subject
4  drugs, including vancomycin, sodium chloride, and
5  dextrose, that the price adjustment that occurred
6  on the first day of the spin that Abbott's HPD
7  employees were involved with, you know, prior to
8  that point in time, that there were some pretty
9  substantial reductions in list pricing, wasn't
10 there, or catalog pricing?
11        MS. TABACCHI:  Object to the form,
12 beyond the scope of the Notice.
13        THE WITNESS:  I don't have the details
14 of those adjustments.
15        Again, those adjustments I believe
16 were consistent with changes that we made in 2002
17 and 2003.  After 2001 we had a policy of making
18 sure that our WAC prices were set more relevant to
19 our contract price ranges for all products.  And
20 so implementing that policy caused some prices to
21 go up, some prices to go down, in all three of
22 those years.  In none of those three years is it

Page 446

1  my recollection that there was an across the board
2  either increase or decrease.  It was list number
3  specific throughout the whole catalog.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Would there be any reason why given the
6  pricing policy that we went over at the last time
7  you were deposed, why in 2004 Abbott's HPD
8  executives -- well, let me ask you this.  Strike
9  that.
10        Before we get to that, who was
11 involved in late 2003, early 2004, in the decision
12 making regarding the list price changes that were
13 ultimately published on the first day of the
14 Hospira spin?
15    A.   We used our normal process, which
16 included representatives from our finance
17 department, it included representatives from
18 Contract Marketing, and it included a review with
19 the relevant marketing managers depending on the
20 product and so on.
21        Once a price was defined that was a
22 consensus of that group, then the consolidated

Page 447

1  proposal was reviewed with our legal department as
2  well as HPD management, and so they signed off on,
3  as well as the controllership, again, going back
4  to the finance department.
5     Q.   Would Rick Gonzalez have signed off on
6  these price changes that were implemented the
7  first day of the Hospira spin?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  No.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Who was the president?  Was it Chris
12 Begley?
13    A.   Chris Begley was the president of
14 Hospital Products Division and was slated to be
15 the CEO of Hospira.
16    Q.   Would he sign off or did he sign off on
17 those price changes?
18    A.   In aggregate they were reviewed with
19 Chris, yes.
20    Q.   Given the price change list price policy
21 that we went over in your first deposition, why
22 for certain Abbott HPD products, including some of

Page 448

1  the subject drugs in this case, were there price
2  reductions in the list price of more than thirty
3  percent from the 2003 catalog price to the 2004
4  price that was ultimately published on the first
5  day of the Hospira spin?
6        MS. TABACCHI:  Object to the form,
7  beyond the scope.
8        THE WITNESS:  I can't comment with
9  regard to the detail.
10        I can tell you that we went through
11 the same strict process of looking at our contract
12 ranges.  If we had a decline in our contract
13 prices over the prior year or the prior year and a
14 half for instance, if you had a brand new product
15 introduced prior to the last catalog change, that
16 may or may not have been comprehended in the last
17 contract change.
18        So basically we looked at what had
19 changed in our contract ranges and adjusted based
20 on that.  So if it was ten percent, if it was
21 twenty percent, thirty percent, whatever, I mean
22 it was what it was.

30 (Pages 445 to 448)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                         March 31, 2008

Page 449

1            As I recall, there were some
2  products that took increases, there were some
3  products that took decreases in all three of those
4  years.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.   What I'd like to do, sir, is go over
7  some documents pertaining to Topic 9.
8            (WHEREUPON Exhibit Sellers 024
9            was marked as of 3/31/2008.)
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Sir, do you recognize this document?
12 (Document tendered to the witness.)
13    A.   I don't believe I've seen this document
14 before.
15    Q.   Do you know what it is?
16    A.   It appears to be the subsequent raising
17 of the price of vancomycin.
18    Q.   So this is the direction.  And Harry
19 Adams is cc'd on it, so does that clue you in as
20 to what it might be?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  There's no singe marks.

Page 450

1  So I know it wasn't in Harry's file.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   So this is notification to Jerrie
4  Cicerale that the catalog prices need to go back
5  to what they were?
6     A.   It's actually an instruction to
7  increase, to move the prices to what they were in
8  the April 3, 1995 catalog.
9     Q.   Prior to the reduction?
10    A.   Yes.
11        (WHEREUPON Exhibit Sellers 025
12        was marked as of 3/31/2008.)
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   Sir, do you recognize this memo?
15 (Document tendered to the witness.)
16    A.   I've seen it before.
17    Q.   You're listed on the cc?
18    A.   Yeah, I am.
19    Q.   Do you recall receiving this memo?
20    A.   No, I don't.  I'm not doubting that I
21 did, but I don't recall it.
22    Q.   What is this document?

Page 451

1     A.   I believe this is the document where
2  Gerry Eichhorn is communicating to Jerrie Cicerale
3  the price reductions that he had agreed with Dave
4  Brincks on.  And it was an informational to Mark
5  Sebree as well, who was the product manager or
6  marketing manager for the product.
7     Q.   Did this particular version of this
8  e-mail come from your computer?
9        MS. TABACCHI:  Object to the form,
10 beyond the scope.
11        THE WITNESS:  It looks like it did, I
12 guess.  My name is on the top.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.   Okay.  Sir, this memo from, or this
15 e-mail from Mr. Eichhorn to Ms. Cicerale,
16 indicates that it is important to make the changes
17 for Alt. Site due to rebate issues as soon as
18 possible.  Do you see that?
19    A.   Yes.
20    Q.   What were the rebate issues that were
21 important to Alt. Site that served as the basis
22 for the changes?

Page 452

1        MS. TABACCHI:  Object to the form,
2  beyond the scope.
3        THE WITNESS:  There were no rebate
4  issues.  I think that was what Gerry thought, he's
5  the author of this, that was just a way that he
6  characterized the changes.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Well, did you ever ask Mr. Eichhorn what
9  he meant by that?
10    A.   No.
11        MS. TABACCHI:  Objection, as beyond the
12 scope.
13        THE WITNESS:  I believe in testimony he
14 said that he wasn't sure what he meant by it.
15
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   The request is made that Ms. Cicerale
18 notify Red Book and Medi-Span of the changes ASAP,
19 and then there's an indication that they are
20 sources for creating the AWP that is important to
21 Alt. Site.
22        Why was AWP important to Alt. Site?

31 (Pages 449 to 452)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 453

1          MS. TABACCHI:  Object to the form,
2   beyond the scope.
3          THE WITNESS:  Again, this is a Gerry
4   Eichhorn.  So how Gerry characterized it --
5          MR. ANDERSON:  Tina, I object to beyond
6   the scope limitation that you're interposing,
7   specifically these questions all fall squarely
8   within Topic 9, and I believe the witness is
9   required to testify on behalf of the corporation
10  with respect to these questions.
11          He appears to be limiting his
12  responses to personal knowledge.  You're
13  interposing this objection to scope.  Am I missing
14  something here?
15          MS. ST. PETER-GRIFFITH:  Just to let you
16  know, we had an agreement that Tina is going to
17  interpose objections, we had this on Day One, to
18  beyond the scope.
19          My position is that they are not
20  beyond the scope.
21          MS. TABACCHI:  I won't take silence to
22  my objection as you agreeing with me.  But in

Page 454

1   response to your particular question, Mr. Sellers
2   has provided testimony on behalf of the
3   corporation on this issue.  When you get into the
4   details of a very specific e-mail that was
5   authored by somebody else and what a particular
6   person meant by something that was in their
7   e-mail, it's not proper for his corporate
8   testimony.
9          He's testifying about what, you
10  know, he can tell you what Mr. Eichhorn said in
11  his deposition about what he meant by this.
12          MR. ANDERSON:  Well, I have some
13  comments about that too as well.
14          MS. ST. PETER-GRIFFITH:  Well, let me
15  tell you, Jarrett, we're going to clarify this
16  with my next question.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.   Sir, was AWP important to Alt. Site?
19          MS. TABACCHI:  Object to the form.  It's
20  been asked and answered I believe.
21          THE WITNESS:  No.
22  BY MS. ST. PETER-GRIFFITH:

Page 455

1      Q.   Why would an employee like Mr. Eichhorn
2   have the impression that AWP was important to
3   Alternate Site?
4          MS. TABACCHI:  Object to the form,
5   beyond the scope.
6          THE WITNESS:  I think it further
7   emphasizes the fact that the Hospital Business
8   Sector side did not understand at all the Alt.
9   Site or Home Infusion side.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Why does Abbott believe that AWP was not
12  important to Alternate Site?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  It wasn't a key factor in
15  anything, to be honest with you.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   Why do you say it wasn't a key factor in
18  anything?
19          MS. TABACCHI:  Same objection.
20          THE WITNESS:  It wasn't a number we
21  controlled.  What we got reimbursed was not a
22  number that we controlled.

Page 456

1          It was a baseline.  If you were to
2   go back to these other documents, if I were to say
3   that these other documents were true, and in fact
4   the process, which I haven't said, but if they
5   were, it was no more than a baseline on products
6   for us as well as products manufactured by other
7   companies.
8   BY MS. ST. PETER-GRIFFITH:
9      Q.   Sir, you just testified that what Abbott
10  was reimbursed was not within Abbott's control.
11  We're going to take a break here because we've got
12  to change the tape, but before we do is it
13  Abbott's testimony that it did not understand that
14  there was a correlation between the list prices
15  that it reported and the reimbursement sought by
16  its Home Infusion business unit for product billed
17  to Medicare and Medicaid?
18          MS. TABACCHI:  Object to the form.  This
19  has been asked and answered.
20          THE WITNESS:  As I've said before,
21  Abbott HPD in its entirety, no, did not understand
22  that.

32 (Pages 453 to 456)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

---

Page 457

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Did anyone within Abbott understand
3  that?
4          MS. TABACCHI:  Objection, asked and
5  answered.
6          THE WITNESS:  There may have been a few
7  people within Home Infusion reimbursement that had
8  an understanding of how AWP might or might not
9  have been a factor, either plus or minus or an
10 average AWP, whatever, for a specific payor to a
11 specific provider.  But as far as Abbott and as
12 far as Abbott HPD is concerned, there wasn't
13 necessarily that understanding.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.   Well, someone within Abbott -- well,
16 Home Infusion is within Abbott HPD; is it not?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  Home Infusion was a very
19 small discreet business unit within HPD.  It
20 operated differently than any other business
21 segment.  So the vast majority of the HPD sales
22 were to hospitals.

---

Page 458

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   But Abbott --
3      A.   So the vast majority of Abbott HPD
4  personnel understood hospitals.  Very, very few
5  even were aware that we were selling to anybody
6  other than hospitals.
7          MS. ST. PETER-GRIFFITH:  Why don't we
8  take a break at this point in time.  Why don't we
9  take a brief lunch break.
10         MS. TABACCHI:  Sure.  What time do you
11 want to come back?
12         MS. ST. PETER-GRIFFITH:  If we can come
13 back at 12:30, that would be great.
14         MS. TABACCHI:  Okay.
15         THE VIDEOGRAPHER:  We are off the record
16 at 11:55 with the end of Tape 2.
17         (WHEREUPON a lunch recess was
18           taken, and said deposition
19           continued as follows:)
20
21
22

---

Page 459

1          THE VIDEOGRAPHER:  We are back on the
2  record at 12:34 p.m. with the start of Tape No. 3.
3              MICHAEL SELLERS,
4  having been previously duly sworn, was examined
5  and testified further as follows:
6              EXAMINATION
7              (Continuing)
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Mr. Sellers, I'd like to move on to the
10 Home Infusion operations.
11     A.   Okay.
12     Q.   Just in your personal capacity, how long
13 were you involved with Abbott's Home Infusion?
14     A.   I was the general manager from sometime
15 in 1992, I believe probably May or June, I can't
16 remember which, through to February of 2000.  And
17 then subsequent to Don Robertson retiring, I
18 picked up Home Infusion again I think sometime in
19 2001 through to its shutdown.
20     Q.   What were the business models for
21 Abbott's Home Infusion business unit from 1991
22 until its closure?

---

Page 460

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  Our predominant business
3  model was a contract with hospitals which helped
4  them get into the Home Infusion business.  It was
5  intended to be an evolutionary program where
6  upfront we might have provided more services
7  because of the novelty of the program to the
8  hospital entity, and then over time the hospital
9  would gradually take on more and more of those
10 services, and we would take a lesser and lesser
11 role.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   Was that the revenue share business
14 model?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  I've heard it referred to
17 as revenue share.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Under the revenue share business model,
20 what would Abbott provide as part of the
21 contractual relationship?
22     A.   I believe that we offered a pretty broad

---

33 (Pages 457 to 460)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                          March 31, 2008

Page 461

1 menu of services and options that could be
2 negotiated into those arrangements.
3          Again, since we were talking about
4 in a number of cases taking an organization who
5 wasn't really familiar with what we called
6 high-tech home care or the running of a pharmacy
7 for home care, we might begin by offering our
8 pharmacy services out of our own pharmacies. We
9 would definitely offer training using our pharmacy
10 managers or our pharmacy staff to train our
11 hospital clients on the operation, the
12 development, and the procedures needed to operate
13 a pharmacy that was JCAHO accredited.
14          We provided engineering assistance
15 in the development of their home infusion
16 facility, if they were going to build a home
17 infusion facility.
18    Q.   Let me stop you right there.  Would
19 Abbott ever build out the home infusion facility
20 for them?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  No.

Page 462

1 BY MS. ST. PETER-GRIFFITH:
2    Q.   Okay.  Go ahead.
3    A.   We would have, you know, we might be
4 the, might provide the lead engineering interface
5 for building it out, but it wasn't our practice to
6 fund the build-out of a pharmacy.
7          We provided reimbursement services,
8 we provided training with regard to reimbursement,
9 with regard to case management handling, with
10 regard to contracting with payors.  We offered
11 them an ability to come together with other
12 clients so that they could share their experiences
13 with one another and give them some peer
14 relationships in the industry.
15          We provided consigned inventory of
16 Abbott product.  And we provided the CHIP system
17 which they could operate in a number of ways in
18 terms of a timeshare, in terms of if they wanted
19 to run it on their own computers, whatever.
20          So it was quite a flexible menu of
21 services that all had to be comprehended in the
22 arrangement.

Page 463

1    Q.   In providing the consigned inventory
2 that Abbott provided under this particular
3 business model, how did it document or reflect the
4 fair market value for the inventory that it
5 consigned?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  We never communicated to
8 our clients, to my knowledge, a valuation of the
9 inventory.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Would Abbott provide the consigned
12 inventory at Abbott's factory cost and delivery
13 cost, factory and delivery cost, to the revenue
14 share partner?
15          MS. TABACCHI:  Object to the form.
16          THE WITNESS:  It was consigned
17 inventory.  So it was comprehended in the
18 arrangement.
19          So the product was moved into the
20 warehouse, into the client's warehouse, as they
21 needed it.  We inventoried it annually, and any
22 shrinkage that was not explainable by pharmacy

Page 464

1 utilization would be reconciled with the client,
2 and --
3 BY MS. ST. PETER-GRIFFITH:
4    Q.   In that reconciliation what charge would
5 be paid?
6          MS. TABACCHI:  Object to the form.
7 BY MS. ST. PETER-GRIFFITH:
8    Q.   Or what charge would be charged?
9          MS. TABACCHI:  Same objection.
10          THE WITNESS:  I believe it was a
11 negotiable process, as I remember it, but our
12 baseline, we would have chosen a GPO agreement
13 that we would have called representative.  And
14 that may have varied year to year, but we would
15 have picked a known market price.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   At any time for the consigned
18 inventory -- let me ask you this:  For the
19 consigned inventory, did that also include Ross
20 and Abbott devices?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  Yes.

34 (Pages 461 to 464)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 465

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   When the revenue share partner utilized
3  the consigned product or device, would there be a
4  separate charge for that particular product item
5  or particular device that would be charged
6  separately to the revenue share partner, or would
7  there just be an aggregate collection of a
8  percentage of revenue?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  There was no line item
11  charge to the client.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   For the services that were provided that
14  you described, engineering, pharmacy, training
15  procedures, reimbursement systems, access to the
16  CHIP system, would Abbott document or reflect the
17  fair market value for those services that it
18  rendered to the revenue share partner?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I'm not aware that we ever
21  did.
22  BY MS. ST. PETER-GRIFFITH:

Page 466

1      Q.   What would the compensation be for those
2  services?
3      A.   It was all comprehended in the total
4  agreement.  So whatever our percentage of
5  collections on each of the therapies would
6  comprehend what other services we provided.
7      Q.   Would you charge separately for the
8  engineering services that I presume would be --
9  well, let me ask you this.  Strike that.
10         Would the engineering services
11  generally be an upfront service because you're
12  getting the revenue share partner a facility and
13  up to speed, is that fair to say?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  Yeah.  There were a number
16  of startup costs, and that was one of them, that
17  would be one of them.  It would be an upfront
18  cost, but it was figured into the overall revenue
19  share for the term of the agreement that we
20  signed, whether it was a three-year contract or a
21  five-year contract, it amortized those upfront
22  charges across the full term.

Page 467

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   What other upfront charges would there
3  be?
4      A.   Training, warehouse setup, those kind of
5  things.
6      Q.   Would Abbott have any mechanism for
7  tracking the value of those upfront services that
8  were provided?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  We had an ability to
11  identify what our costs were for all of those
12  upfront, and we used that in determining what our
13  revenue share would be on future agreements.
14         So we did go back and look at some
15  of our startups to validate that we were
16  adequately burdening future agreements.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   Would the individual files for the
19  revenue share partners reflect the tracking of
20  those costs?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  Typically not, no.

Page 468

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Under the revenue share model would
3  Abbott Home Infusion share in revenues collected
4  from Medicare and Medicaid?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  In all the cases that I
7  recall it was every payor.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Would the payors be broken down on a per
10  patient basis?  For example, would you take a,
11  would Abbott be able to document that it's taking
12  a forty percent share, for example, in the
13  Medicare reimbursement attributable to Patient
14  John Smith?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  The system, the CHIP
17  system, kept track of whatever services and claims
18  were delivered on a patient.  That patient would
19  have been classified to a particular therapy or
20  multiple therapies because in a lot of cases a
21  nutritional patient got nutritional therapy, but
22  they also might have had times when they got

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 469

1  antibiotic therapy, or there might have been times
2  when they got hydration therapy.
3          So it was really, it was less
4  patient specific, it was more payor therapy
5  definition within the system which would then
6  define, the therapy would then define the revenue
7  share percentage.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   If a particular patient was denied
10  reimbursement by Medicare or Medicaid, how would
11  Abbott, if at all, charge its revenue share
12  partner for the product that was utilized but for
13  which reimbursement was not paid by Medicare or
14  Medicaid?
15          MS. TABACCHI:  Object to the form.
16          THE WITNESS:  We wouldn't get, we would
17  get basically our revenue share of that collection
18  which was --
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   Zero percent?
21      A.   -- our revenue share of zero would be
22  zero.

Page 470

1      Q.   Did the revenue share business model
2  change over time?
3      A.   Well, it changed per client.
4          Every client, as I said, might have
5  evolved from a more comprehensive array of
6  services and products that we delivered originally
7  to something less later on, or clients decided
8  early up that they wanted to do more, and so their
9  arrangement, the arrangements by client were
10  different.
11          The contract or the risk share
12  contract that we had, that general format, general
13  structure, didn't change.
14      Q.   When was this revenue share business
15  model first put into place?
16      A.   My recollection is '83 or '84.
17      Q.   From '91 to 2003 can you give a broad
18  overview, I'm not asking you for particular, you
19  know, to the penny dollar amounts, but a broad
20  overview of the profits and profit margins enjoyed
21  by the Home Infusion business unit?
22          MS. TABACCHI:  Object to the form,

Page 471

1  beyond the scope.
2          THE WITNESS:  You know, I don't have
3  specific numbers.  I think in general in the,
4  again, I can speak from '92 on, in general
5  division margin basis we were in the eighteen to
6  twenty percent division margin.  And that's prior
7  to corporate burdening.  So all the corporate
8  costs aren't put on that.  So net at the end of
9  the day, it was less whatever we paid for the big
10  corporate offices and so on.
11          That's what we reported to the
12  division was somewhere in the eighteen to
13  twenty-two percent range.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   How did the reimbursement department
16  work?
17      A.   Very hard.
18      Q.   Can you describe the mechanics of how it
19  operated?
20      A.   Typically, our reimbursement team was
21  broken into subteams, and those teams were aligned
22  with our clients.  So our clients, when they were

Page 472

1  operating, had particular people that they could
2  get used to and our people could get used to our
3  clients, could understand our clients and our
4  clients could understand us.
5          So basically we were trying to work
6  as hand-in-hand as we could, and one way to do
7  that was to establish a small team that could work
8  with each of our clients and be responsible for
9  that.
10          Again, depending on what the client
11  wanted us to do, we might handle verification of
12  insurance, we definitely had to get assignment of
13  benefit paperwork in our hands --
14      Q.   Let me stop you right there.  Would
15  Abbott ever accept assignment of benefits on
16  behalf of its revenue share partners itself under
17  Abbott's name?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  It may have.  When we were
20  operating through our pharmacies, it may have.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   What about when you weren't operating

36 (Pages 469 to 472)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 473

1  through your pharmacies?
2     A.  No.  But you had to have via AOB.  So in
3  some cases the clients did all that.  In some
4  cases it was part of the services we offered.
5         Once the prescription was filled,
6  shipped, and accepted, then that team would
7  develop the claim and file the claim.  They would
8  be the contact person for the payor in the name
9  of, in most cases, in the name of our client, and
10 they would follow up on that claim.
11        So there was in general a timeframe
12 where we would expect a claim to be processed.  If
13 we had not gotten a response in that timeframe,
14 someone from that team would call the payor and
15 follow up on the claim, when, where is it, when do
16 you expect to pay it.
17        We would get data from our client's
18 lockbox as to payments that were made as well as
19 any documentation on claim payment.  Once we'd get
20 that back, we would bill for copays because then
21 we would know what the allowable was.  There would
22 be follow up on the copays.  And then if there was

Page 474

1  any adjudication of the claim itself, they would
2  handle that.  In other words, if we didn't agree
3  with payment for one reason or another, perhaps we
4  suspected they had not interpreted our claim data
5  correctly, that kind of follow up would be done as
6  well.
7     Q.  In terms of, I want to go back over
8  something you just said.  You said that you billed
9  for copays once you received the data from the
10 lockbox because at that point Abbott would know
11 what the allowable was.  What do you mean by that?
12    A.  Well, we could only bill customers, or
13 patients, once we knew what the allowable charge
14 was.  We couldn't bill the copays on what our
15 original claim was because the payor would come
16 back inevitably and say you're only allowed to
17 charge "X" amount, we're going to pay
18 seventy-five percent of it, or we're going to pay
19 eighty percent of it, whatever, and then they
20 would say the patient is liable for the
21 difference.
22        So you couldn't bill it early

Page 475

1  because you didn't know what your allowable was
2  going to be.
3     Q.  In terms of the claim process that you
4  described where you said you developed the claim,
5  filed the claim, followed up on the claim, did
6  that include claims submitted to Medicare and
7  Medicaid?
8     A.  Yes, all payors.
9     Q.  So you bill the patient, you follow up.
10        Now, if claims were disallowed,
11 would Abbott get involved with the process of
12 claims dispute, for lack of a better term?
13    A.  Yes.  If we didn't accept the
14 disallowance, or whatever you want to call it, we
15 would do the appeal.  And in some cases we'd do
16 it, we'd consult with the client before we did an
17 appeal.  And they may or may not support it, or we
18 might not support it and they would want us to do
19 it.  So it was really quite a close working
20 relationship between us and our clients.
21    Q.  If there was a dispute over whether or
22 not to pursue a disallowed claim, if there was a

Page 476

1  dispute between Abbott and the revenue share
2  partner, was there a contractual provision as to
3  whose opinion won out?
4     A.  No.
5     Q.  How would that dispute be resolved?
6     A.  Well, we'd continue to talk about it
7  until we came up with an agreement.
8         I would say that if it really came
9  down to a point of absolute disagreement, we would
10 operate under the same retail rule that everybody
11 else does, and that is the customer is always
12 right.
13    Q.  Okay.  Did the reimbursement staff have
14 any particular special handling that it utilized
15 for processing claims to Medicare or Medicaid?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  Not that I'm aware of.
18 Handling of every payor was unique, and, in fact,
19 handling each Medicaid state was unique, and in a
20 lot of cases handling each Medicare carrier was
21 unique.
22        And since we were operating

37 (Pages 473 to 476)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 477

1  nationally, we weren't just operating in one
2  specific region, each of the teams may have had
3  different processes for handling payor claims
4  regardless of whether it was other third parties
5  or Medicare/Medicaid.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   Who within the reimbursement -- let
8  me strike that.
9         Who within Abbott Home Infusion
10 understood how Medicare and Medicaid reimbursed?
11     MS. TABACCHI:  Object to the form.
12     THE WITNESS:  Well, again, across this
13 whole time period it was the responsibility of the
14 reimbursement department to understand, for our
15 clients and for the regions we were billing in it
16 was their responsibility to understand how to
17 bill.
18         They may have also attempted to
19 understand how we got paid, but I can tell you it
20 varied across that time period and it varied by
21 carrier.
22         So I'm not sure there was any one

Page 478

1  person that knew what all the things we were
2  doing.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   But certainly the reimbursement staff
5  understood the mechanics of the Medicare/Medicaid
6  reimbursement; is that fair?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  They understood the
9  mechanics of reimbursement and the claims, that
10 kind of process.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   In your role with Home Infusion, did you
13 have an understanding as to how Medicare or
14 Medicaid reimbursed?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  Not specifically.  You
17 know, I may have been told.  I had monthly reviews
18 where the leaders of each team came in and
19 presented how things were going, what they
20 collected, what they billed, what their bad debt
21 percentage was, where they were running into
22 difficulties, and it was my attempt to understand

Page 479

1  at that time what kind of impacts were affecting
2  them.
3         So from that standpoint, I may have
4  been told in that time period.  But I didn't have
5  a detailed understanding of what specifically each
6  area was doing with regard to Medicare and
7  Medicaid.
8         My main management process at that
9  time was to look at the percentage of collections
10 that or percentage of U&Cs that we were getting
11 and was that going up or was that going down, were
12 we getting better reimbursement or were we getting
13 worse.  And that was really one of the metrics
14 that I remember talking to reimbursement about.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   Over the period from 1991 until the time
17 of the Home Infusion business unit's closure, what
18 were the annual revenues?  We talked about profit
19 a little while ago, but what were the annual
20 revenues?
21     MS. TABACCHI:  Object to the form,
22 beyond the scope.

Page 480

1      THE WITNESS:  I believe that when I
2  started in '92, as I recall, we were about 32 to
3  $34 million, either around $32 million in
4  billings.  In or around '95 or '96, we hit our
5  maximum of I believe a little over $42 million in
6  revenue, and then it kind of plateaued.  And then
7  after we made the decision to close down, it
8  started to tail off because we didn't renew
9  agreements.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.   When was the decision made to close the
12 business unit?
13   A.   I recall it being made sometime in late
14 1997.
15   Q.   Who made the decision?
16   A.   It was a, Don Robertson and I consulted
17 on the recommendation, we took the recommendation
18 forward to Rick Gonzalez, who was the president of
19 HPD at the time, and then it was reviewed with
20 corporate, and then we were given the go-ahead.
21   Q.   Who within corporate reviewed it?
22   A.   It was reviewed in a meeting with Miles

38 (Pages 477 to 480)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 481

1  White and Bob Parkinson.
2      Q.   What were the reasons behind the
3  decision to close the business unit?
4      A.   As I said, our revenue had plateaued,
5  the market for new clients was drying up.  We
6  started to use this business model in, as I said,
7  '84 I believe is what I told you before.
8          So by 1997 it had been thirteen
9  years.  In that time period, hospitals that wanted
10 to get into the business had gotten into the
11 business.  So we were seeing fewer and fewer
12 prospects for future businesses.  And those that
13 had gotten into the business wanted a more
14 independent approach.
15         So we saw as we looked at the
16 contracts that we had with our existing clients
17 that they were going to start that evolution, as I
18 said, of ticking away and taking more and more of
19 the responsibility.  So we were forecasting that
20 our sales were going to at best hold and most
21 probably decline and that the profitability of
22 business would decline.  So it didn't make sense

Page 482

1  to continue it.
2      Q.   Why didn't it just close in '97?  Why
3  the phased process?
4      A.   We talked about that, but to shut it
5  down clean, cold, cold turkey shutdown as I would
6  call it in '97, we would have had to have gone to
7  our clients and said hey, all of these services
8  that we're giving you, they're gone tomorrow.
9          In light of the fact that the
10 majority of our clients, in fact all of our
11 clients, were hospitals, hospitals were our
12 biggest customer.  The Hospital Products Division,
13 that's why we were called the Hospital Products
14 Division because ninety percent of what we sold
15 went to hospitals.  We didn't feel that leaving
16 our clients in a lurch by just saying we're
17 closing down, we're shutting down, was the right
18 thing to do.
19         So we made the decision that we
20 would live out the agreements we had.  There were
21 some that would expire across the next five years.
22 So we made that decision that we would work with

Page 483

1  our clients.  If they wanted to transition earlier
2  than the end of their agreement, we would help
3  them do that.  But if they wanted to live out
4  their agreement, we would live out the agreement
5  that we had in place.
6      Q.   From '84 until the closure, was the
7  revenue share model the only business model within
8  Abbott Home Infusion?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  No, but it was the
11 predominant one.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   What other business models were there?
14     A.   Well, we had an agreement in our New
15 Jersey pharmacy for a while.  We were dealing with
16 the Health Insurance Plan of New York, and we were
17 delivering for them daily doses of chemotherapy
18 for their physician clinics all throughout the New
19 York metropolitan area.  That wasn't a revenue
20 share, it was a purely fee-for-service type of
21 arrangement operating out of our pharmacy.
22         There were also some handful of

Page 484

1  what I call holdover patients from back when home
2  care was purely a direct provider.
3      Q.   A direct pharmacy?
4      A.   Right.  And by a handful I mean probably
5  less than ten patients across the country that we
6  had not transitioned to our clients for one reason
7  or another.
8          Normally, for instance if we had a
9  patient in Michigan and we signed the agreement
10 with the University of Michigan, normally we would
11 transfer that patient and have the University of
12 Michigan handle them, they were much closer to the
13 patient, and it would make much more sense.  But,
14 like I said, there was some residual of long-term
15 infusion patients that we were still dealing with,
16 a handful, eight to ten at the most.
17     Q.   Other than the limited fee-for-service
18 arrangements that you had and the direct
19 pharmacies of less than ten patients, were there
20 any other business models for Home Infusion?
21     A.   The only other one we had was introduced
22 probably in '97.  And that was with a, again, a

                              39 (Pages 481 to 484)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 485

1   very few number of customers, we had a licensing
2   agreement on the CHIP system that didn't include a
3   revenue share, it was a fixed price.
4       Q.   When did Abbott pharmacies -- let me ask
5   you this:  Did the Abbott pharmacies also close
6   down?
7       A.   Yes.
8           MS. TABACCHI:  Object to the form.
9   BY MS. ST. PETER-GRIFFITH:
10      Q.   When did they close down?
11      A.   Variety of time.  I believe we closed
12  the New Jersey pharmacy in 1996, and that
13  coincided with our loss of the Health Insurance
14  Plan contract.  It was either '96 or early '97,
15  but it was pre-shutdown decision.
16          LA, our pharmacy in LA, was shut
17  down in '98, '99.  And I believe our Chicago
18  pharmacy was shut down in 2001.
19      Q.   Was there an Atlanta pharmacy?
20      A.   The Atlanta pharmacy was shut down prior
21  to 1992 because it was not in operation when I
22  took over.

Page 486

1       Q.   Did Abbott continue to maintain its
2   pharmacy licenses?
3           MS. TABACCHI:  Objection, beyond the
4   scope.
5           THE WITNESS:  No.
6
7   BY MS. ST. PETER-GRIFFITH:
8       Q.   Do you know when Abbott surrendered its
9   pharmacy licenses?
10          MS. TABACCHI:  Same objection.
11          THE WITNESS:  I would assume it to be at
12  or close proximity to the closure.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   To the closure of Home Infusion?
15      A.   No, to the closure of whatever specific
16  pharmacy.
17      Q.   Is there anything else that you can
18  think of about the Home Infusion business models
19  that we haven't discussed here today?
20          MS. TABACCHI:  Objection to the form and
21  beyond the scope.
22          THE WITNESS:  No.

Page 487

1   BY MS. ST. PETER-GRIFFITH:
2       Q.   We talked earlier at your first day of
3   deposition about communications that Abbott had
4   with state or federal Medicare and Medicaid
5   officials about its pricing.  And you testified
6   that Abbott did not have any communications with
7   state or federal Medicare or Medicaid officials
8   about questions concerning how Medicare or
9   Medicaid reimbursement worked, is that fair, other
10  than the individual questions raised by the
11  reimbursement staff?
12          MS. TABACCHI:  Object to the form,
13  beyond the scope of the Notice.
14          THE WITNESS:  I believe that's the case.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   Is there any other communication that
17  Abbott is aware of that it had with Medicare or
18  Medicaid officials concerning pricing of the
19  subject drugs or AWP related issues associated
20  with the subject drugs?
21          MS. TABACCHI:  Objection, beyond the
22  scope, object to the form.

Page 488

1           THE WITNESS:  Other than the required
2   communication for the State of Texas, I'm not
3   aware of any communications with regard to price
4   or AWP.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   What information is Abbott aware of that
7   provides the basis for its statement that it never
8   provided false or misleading information to any
9   state or federal Medicare or Medicaid official?
10          MS. TABACCHI:  Object to the form,
11  beyond the scope of the Notice.
12          Can you refer me to what topic do
13  you think it falls within?
14          MS. ST. PETER-GRIFFITH:  Sure.  It falls
15  within Topic 12, Items 1, 2, or 3.
16          MS. TABACCHI:  It's my understanding
17  that those topics were withdrawn.
18          MS. ST. PETER-GRIFFITH:  That they were
19  withdrawn?
20          MS. TABACCHI:  Yes, based on the
21  communications and the correspondence back and
22  forth with you, I believe, on these topics that

40 (Pages 485 to 488)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 489

1  those topics have been withdrawn.
2         MS. ST. PETER-GRIFFITH:  I have never
3  said this topic was withdrawn.  It's part of the
4  Notice.
5         MS. TABACCHI:  Well, the Notice was sent
6  after we had back and forth negotiations on the
7  topics.  So we asserted a number of objections to
8  the Notice.  I understand that you served it
9  later.  You served it later when you had a
10  particular date, but our objections that we had
11  asserted stand as to the Notice regardless of
12  whatever date you sent it to us.
13         MS. ST. PETER-GRIFFITH:  Well, this
14  Notice was sent to you, Tina, this week though,
15  the Notice to reconvene.
16         MS. TABACCHI:  Right.  Did you expect us
17  to resend you our letter that had already asserted
18  all of our objections?
19         MS. ST. PETER-GRIFFITH:  No.
20         MS. TABACCHI:  Okay.
21         MS. ST. PETER-GRIFFITH:  I expected you
22  to move for protection if you had an objection to

Page 490

1  the topic.  I mean if you're telling me he's not
2  prepared to address -- are you telling me he's not
3  prepared to address Topic 12?
4         MS. TABACCHI:  He has addressed Topic
5  12.  He's provided testimony on Topic 12 subject
6  to our objections and subject to the negotiations
7  between the parties on this topic.
8         MS. ST. PETER-GRIFFITH:  Well, I didn't
9  withdraw items for No. 12.  I can check on that.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.   Let me ask you this then:  Sir, with
12  regard to Topic 12 have we covered everything that
13  you're prepared to testify about?
14         MS. TABACCHI:  How's the witness
15  supposed to answer that?  The question that you
16  just asked he's not prepared to answer.
17         MS. ST. PETER-GRIFFITH:  Well, you're
18  telling me, Tina, that he's not prepared to talk
19  about a question that is squarely within Topic 12.
20         MS. TABACCHI:  Can you read back just
21  the last question before we began this discussion.
22         (WHEREUPON said record was read

Page 491

1         back as requested.)
2         MS. TABACCHI:  I would object to that as
3  beyond the scope.
4         MS. ST. PETER-GRIFFITH:  Sub 3, Topic
5  12.
6         MS. TABACCHI:  It's my understanding
7  that that was withdrawn.  But we don't need to
8  spend more time today debating that.  I will
9  object as beyond the scope.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.   Sir, if you can answer the question.
12    A.   It's not something that I'm prepared to
13  talk about.
14    Q.   Are there any other communications that
15  you're aware of with any state or federal Medicaid
16  or Medicare official concerning Abbott's pricing
17  its list prices or its AWPs?
18         MS. TABACCHI:  I assume you're
19  incorporating his first day of testimony?
20         MS. ST. PETER-GRIFFITH:  Yes, I am.  I'm
21  just trying to round out this topic.
22         MS. TABACCHI:  Sure.  I understand.

Page 492

1         THE WITNESS:  There were a number of
2  prices that were communicated to federal in terms
3  of AMP and in terms of 340(b) prices, in terms of
4  Federal Supply Schedule prices, and so on and so
5  forth.  But as far as list and AWP, no.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   For the period from 1991 through 2004,
8  what were the revenues for the Hospital Products
9  Division?
10         MS. TABACCHI:  We're switching topics
11  now?
12         MS. ST. PETER-GRIFFITH:  Yes.
13         MS. TABACCHI:  I'm going to object to
14  the form.
15         THE WITNESS:  I don't have those numbers
16  at my fingertips here.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   Can you give me any sense as to the
19  overall financial performance of Abbott's Hospital
20  Products Division from 1991 until the time of the
21  Hospira spin?
22         MS. TABACCHI:  Object to the form.  For

41 (Pages 489 to 492)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 493

1  this particular topic, we did state in our
2  objections that Mr. Sellers would not be prepared
3  to testify as to specifics.
4            We understand those financial
5  documents have been provided to you.  If you want
6  to assist him with those, but he has not memorized
7  the financials.
8        MS. ST. PETER-GRIFFITH:  I'm not asking
9  him to memorize the financials.  I'm asking broad
10  brush.
11       THE WITNESS:  Broad brush over that time
12  period, I think the Hospital Products Division
13  performed in concert with what the overall
14  corporation performed.
15       I believe starting from 1991
16  through 2000 I believe that our revenue went up
17  every year, and I think the percentages varied.
18  And I believe our margin or profitability went up
19  every year.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.   Were the operational goals for Alt. Site
22  and Home Infusion met each year from '91 through

Page 494

1  2003?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Again, on a year-to-year
4  basis I can't say.
5        My general impression is that
6  product sales grew and grew in double digit
7  numbers annually through most of that period, and
8  the renal care division did well.  As I've said,
9  the Home Infusion business we grew it, we kind of
10  hit a ceiling and then started to drop off.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   How were marketing plans, the plans and
13  then the updates, for Alternate Site formulated?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  Each of the business units
16  would define what their proposed plan was for the
17  coming year.  That would be consolidated by the
18  Alternate Site controller.
19       We would then have meeting or
20  meetings with the vice president of Alternate
21  Site.  It was Don Robertson at the time.  He may
22  or may not be in agreement with everything that we

Page 495

1  put in the plan.  So then it would be a matter of
2  a discussion of any differences of opinion.
3        We would then come out with a
4  consensus opinion as to what the Alternate Site
5  plan would be, and then that was presented to
6  division management, again at the business unit
7  level but then consolidated at the Alternate Site
8  level.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   Where would the marketing plans be
11  maintained or stored?  Would there be a particular
12  protocol for maintaining them as business records?
13       MS. TABACCHI:  Object to the form,
14  beyond the scope.
15       THE WITNESS:  Not really.  There was no
16  retention.  They were contemporary documents.
17  Once the plan was together or the update was
18  together, we had agreed with what we thought we
19  were going to do from a revenue standpoint and
20  from a profitability standpoint, in a lot of cases
21  by month for the remainder of the reporting
22  period, and so we would monitor to those numbers

Page 496

1  But the rest of the document we really didn't try
2  to maintain.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   In developing the marketing plans or
5  plan updates, what consideration, if any, did
6  Abbott include about Medicare or Medicaid
7  reimbursed shares of the market?
8        MS. TABACCHI:  Object to the form,
9  beyond the scope.
10       THE WITNESS:  It was not a number that I
11  remember us reporting.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.   Did Medicare or Medicaid reimbursement
14  factor into the marketing plans or plan updates?
15       MS. TABACCHI:  Object to the form,
16  beyond the scope.
17       THE WITNESS:  No.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   Did reimbursement by any third-party
20  payor factor into the marketing plan or plan
21  updates?
22       MS. TABACCHI:  Same objections.

42 (Pages 493 to 496)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 497

1        THE WITNESS:  Not that I recall.
2        MS. ST. PETER-GRIFFITH:  If we could
3   just take a minute, I might be ready to pass the
4   witness to Jarrett.
5        MS. TABACCHI:  Sure.  If you're going
6   to pass, we'll take a break.
7        MS. ST. PETER-GRIFFITH:  Oh, I'm sorry,
8   no.  I still have one more topic.
9            (WHEREUPON Exhibit Sellers 026
10               was marked as of 3/31/2008.)
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   Okay.  Mr. Sellers, Contract Marketing
13  Basic Operating Procedures manual.  (Document
14  tendered to the witness.)
15           Before we start looking at specific
16  sections, sir, I'd like to ask you when did
17  Abbott's Contract Marketing, first of
18  all -- strike that.
19           What is this document?  Let's start
20  there?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  This document is an

Page 498

1   accumulation of miscellaneous facts and figures
2   put together by one manager in Contract Marketing
3   I assume for the benefit of his team.  And it was
4   contributed to by members of his team over several
5   years I believe.  It was kept on the what we
6   called our shared drive in Contract Marketing.
7   But it was primarily used by the HBS Contract
8   Marketing team that was specific to that manager.
9   BY MS. ST. PETER-GRIFFITH:
10    Q.   And who was the manager?
11    A.   Bob Brian.
12    Q.   How long was Mr. Brian a manager?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I'm not sure.  He left
15  Abbott in 2000.  I suspect he was a manager from
16  sometime around the middle of the 1990s until the
17  time he left.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   When was the first version of the
20  Contract Marketing Basic Operating Procedure
21  manual created?
22        MS. TABACCHI:  Objection, beyond the

Page 499

1   scope.
2        THE WITNESS:  I don't have any direct
3   knowledge with regard to when that happened.
4   BY MS. ST. PETER-GRIFFITH:
5    Q.   Because it was maintained on the shared
6   drive, could anyone who could access the HPD
7   shared drive access the Contract Marketing Basic
8   Operating Procedures manual?
9        MS. TABACCHI:  Object to the form,
10  beyond the scope.
11        THE WITNESS:  They could have.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.   Was this particular manual published to
14  everyone within Contract Marketing, HBS Contract
15  Marketing?
16    A.   No.
17    Q.   Is it your understanding that it was
18  only marketed to the individuals who fell under
19  Bob Brian's leadership?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  Yes.
22  BY MS. ST. PETER-GRIFFITH:

Page 500

1    Q.   How is the accuracy of the information
2   contained in the Contract Marketing Basic
3   Operating Procedures manual verified?
4    A.   I don't believe it was other than Bob
5   Brian may have read it.
6    Q.   How long was this -- or let me ask you,
7   when was this procedure manual no longer utilized?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  A short period after Bob
10  Brian left.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   Why?
13    A.   Because as the new general manager of
14  Contract Marketing, I came in and looked at it and
15  said, one, it's misnamed, two, it wasn't vetted
16  appropriately, and three, I felt that it wasn't
17  applicable to Contract Marketing as a whole.
18    Q.   Prior to your coming on, do you know how
19  it was utilized within Contract Marketing?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  As I remember and as I've
22  been told, it was purely a reference document for

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                     March 31, 2008

Page 501

1  that team.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   Was the team required to follow the
4  guidance that was set forth in this manual?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  I don't believe so.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   Why did you feel it was misnamed?
9      A.   Because it's called "Basic Operating
10 Procedure," but it's got a myriad of sections in
11 here which are not procedures.  They're meant to
12 be informational reference points.  But, to me, a
13 procedure tells you how you should operate, what
14 your practice should be, something like that.  And
15 in many cases this doesn't do that.
16     Q.   Well, did this manual play a role at all
17 in providing guidance as to what procedures at
18 least Mr. Brian's staff should have been
19 following?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Maybe in his mind, yes.  I
22 don't know.

Page 502

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Well, do you know whether he required
3  his Contract Marketing personnel to follow the
4  procedures that are set forth in this manual?
5          MS. TABACCHI:  Object to the form,
6  beyond the scope.
7          THE WITNESS:  I don't have any knowledge
8  to that.  I do believe he asked anybody new coming
9  into his organization to.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.   Would his staff have any reason to doubt
12 the accuracy of the procedures or information
13 contained in the manual?
14         MS. TABACCHI:  Object to the form,
15 beyond the scope.
16         THE WITNESS:  Knowing Bob Brian, I would
17 say they were probably told not to challenge it.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.   Not to challenge it.  Why do you say
20 that?
21     A.   Just the way he ran his unit.
22     Q.   You also said that in addition to it

Page 503

1  being misnamed and not vetted that it wasn't
2  applicable.  What did you mean?
3      A.   I can't pick a specific.  But having
4  gone through this when I originally started, there
5  were some dated documents in here.  "Dated"
6  meaning past, the practice had changed.
7      Q.   Okay.
8      A.   And there were things in here that his
9  group may have been doing, but other groups
10 weren't doing, mainly because it was a different
11 product, you know, they were different product
12 segments and we had different practices for
13 different product segments.
14     Q.   Which product segment did Mr. Brian
15 oversee?
16     A.   He had what we called our small volume
17 injectables.
18     Q.   Did the small volume injectables include
19 any of the products set forth in the Complaint as
20 being the subject drugs?
21     A.   Some of them.
22     Q.   Which ones?  Do you know?

Page 504

1      A.   Do you want me to go through them?
2      Q.   Yeah, if you could just identify.
3      A.   Do you want me to give the NDC number?
4      Q.   Or just the name of the product.
5      A.   Well, some of them are misleading.
6          Sodium chloride for injection,
7  there were a number of, this number is 4196, 4888,
8  4887.  Those were small volume.  Sodium chloride
9  for irrigation was not.
10         Water for injection, I think I said
11 4887, was.  3977 water for injection was.
12 Vancomycin was.  Dextrose five percent in 50 ml.
13 100 ml was not.  Nor were the Add-vantage bags
14 7101, 7100.
15         The majority on the second page are
16 what I'd call large volume.
17     Q.   Okay.
18     A.   Acyclovir would have been, I don't know
19 when we ceased marketing acyclovir, but I think it
20 was around the middle of the 1990s.
21         MS. ST. PETER-GRIFFITH:  Okay.  If we
22 could take a break, is now a good time to take a

44 (Pages 501 to 504)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 505

1    break?
2         MS. TABACCHI:  Sure.
3         MS. ST. PETER-GRIFFITH:  I want to
4    confer with Jarrett.
5         THE VIDEOGRAPHER:  We are off the record
6    at 1:38 p.m.
7         (WHEREUPON a recess was taken.)
8         THE VIDEOGRAPHER:  We are back on the
9    record at 1:57 p.m. with the start of Tape No. 4.
10        MS. ST. PETER-GRIFFITH:  At this time
11   the United States is going to pass the witness to
12   relator's counsel.
13
14             EXAMINATION
15   BY MR. ANDERSON:
16        Q.   Good afternoon, Mr. Sellers.  How are
17   you?
18        A.   Fine.
19        Q.   Just picking up where we left off
20   briefly on this Basic Operating Procedures manual,
21   Exhibit 26.  What did you do to learn about that
22   document in preparing to testify?

Page 506

1         A.   Specifically for the last deposition
2    that we did, I believe I had said at that time I
3    talked to Joe Brundza because Joe Brundza was the
4    person who took over this area, the Bob Brian area
5    of responsibility, once Bob Brian left.
6         Q.   Other than talking with Mr. Brundza, did
7    you do any other work to prepare to testify about
8    Exhibit 26?
9         A.   No, other than doing a quick scan of the
10   document itself.
11        Q.   And you realize you've been designated
12   as the corporate representative to testify on
13   behalf of Abbott as to Exhibit 26; correct?
14        MS. TABACCHI:  Subject to Abbott's
15   objections which limited his testimony to the use
16   of this document by Contract Marketing Alternate
17   Site.
18        THE WITNESS:  Yes.
19   BY MR. ANDERSON:
20        Q.   How many people reported to Bob Brian
21   roughly?
22        MS. TABACCHI:  Object to the form,

Page 507

1    beyond the scope.
2         THE WITNESS:  Probably three to five
3    depending on the time.
4    BY MR. ANDERSON:
5         Q.   Is it your testimony that this document
6    was only circulated to three or five people?
7         MS. TABACCHI:  Same objections.
8         THE WITNESS:  I don't believe it was
9    circulated.  It was used as a reference for that
10   department segment within HBS Contract Marketing,
11   and within that was Bob Brian and probably three
12   to five people that reported to him.
13   BY MR. ANDERSON:
14        Q.   Do you understand that this document was
15   known in the Contract Marketing department as the
16   BOP?
17        MS. TABACCHI:  Object to the form.
18   BY MR. ANDERSON:
19        Q.   The B-O-P?
20        A.   I've heard it referred to as the BOP,
21   yes.
22        Q.   By whom?

Page 508

1         A.   I can't recall at this point in time.
2         Q.   When you testified a moment ago that it
3    wasn't circulated, on what do you base that
4    testimony?
5         A.   That's my recollection of the time.
6         Q.   What time?
7         A.   When I joined Contract Marketing in
8    February of 2000.
9         Q.   Have you ever gained an understanding
10   that the BOP, what's known as Exhibit 26 in this
11   deposition, was a document kept in a three-ring
12   binder that each Contract Marketing analyst had a
13   copy of?
14        MS. TABACCHI:  Object to the form,
15   beyond the scope.
16        THE WITNESS:  I've not seen any
17   documentation to that effect.
18   BY MR. ANDERSON:
19        Q.   Have you read any of the sworn testimony
20   in this case by Contract Marketing analysts about
21   the BOP being a three-ring binder that they had
22   kept a copy of?

Page 509

1        MS. TABACCHI: Object to the form,
2  beyond the scope.
3        THE WITNESS:  I believe I've either read
4  or talked about a deposition of one person who
5  talked about it being somewhere in Contract
6  Marketing in a three-ring binder.
7  BY MR. ANDERSON:
8     Q.   What person is that?
9     A.   I think it was Mark Sucheck.
10    Q.   Did you read the testimony of any other
11 sales personnel or Contract Marketing analyst
12 about the use of a BOP binder?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS: No.
15 BY MR. ANDERSON:
16    Q.   Are you aware that other Abbott
17 employees have testified under oath other than
18 Mr. Sucheck that they kept a copy of a three-ring
19 binder known as the BOP?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I'm not aware of any of
22 that.

Page 510

1  BY MR. ANDERSON:
2     Q.   Is there anything that makes the
3  testimony of Mr. Sucheck more reasonably available
4  to Abbott as an organization than other testimony
5  provided in this case?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  No.
8  BY MR. ANDERSON:
9     Q.   How did you go about choosing the
10 testimony of Mr. Sucheck to review?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  I can't remember how it
13 came up in prep, but it somehow came up in prep.
14 BY MR. ANDERSON:
15    Q.   Prep for --
16    A.   Whether I was scanning depositions or
17 discussing it with counsel.
18    Q.   What significance, if any, do you place
19 upon the purported limited circulation of the BOP
20 that you've testified to here today?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I'm not sure I understood

Page 511

1  the question.
2  BY MR. ANDERSON:
3     Q.   Is it important to you in evaluating the
4  use of the Contract Marketing Basic Operating
5  Procedure manual to know whether or not it was
6  circulated beyond the three to five people in Bob
7  Brian's group?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  It's not important to me.
10 It's just I know, for instance, from Lynn Leone's
11 testimony that it was not used in Alternate Site.
12 I think in her testimony she said she reviewed it
13 to see if it would be applicable and decided it
14 was not.
15       But it's just my personal knowledge
16 that others outside of Bob Brian's group, while
17 they may have been aware of the BOP, hadn't read
18 it and did not feel any pressing need to read it.
19       So I just don't think it was an
20 active piece for anything other than those
21 individuals.
22 BY MR. ANDERSON:

Page 512

1     Q.   You just mentioned the Alternate Site
2  Contract Marketing group.
3        For clarity of the record though,
4  this Contract Marketing BOP, or Basic Operating
5  Procedure manual, was created within the HBS,
6  Hospital Business Sector, Contract Marketing
7  department; correct?
8     A.   Yes.
9        MS. TABACCHI:  Object to the form.
10 BY MR. ANDERSON:
11    Q.   So this was used within the same
12 department that published the list prices on
13 behalf of Abbott; correct?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  It was a document that was
16 in existence and purportedly used by that group,
17 and they would have been one of the contributing
18 members to defining list price, yes.
19 BY MR. ANDERSON:
20    Q.   And from the very limited discussions
21 that you had with Mr. Brundza, you learned that it
22 was indeed used at least by Bob Brian's personnel;

46 (Pages 509 to 512)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 513

1  correct?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No.  That wasn't the
4  conversation I had.
5            Though I think Joe shared that his
6  understanding was that it was solely used by that
7  group, my discussion with him was more relevant to
8  the fact of as the new manager did we cease using
9  the document, and his understanding was yes, that
10 we had ceased using the document, and in fact had
11 moved it.
12
13 BY MR. ANDERSON:
14    Q.   And along those lines, one of the
15 reasons why sometime after 2000 Abbott ceased
16 using the BOP in the Contract Marketing group
17 within the Hospital Business Sector was that some
18 of the sections were outdated; is that correct?
19    A.   May have been.  That wasn't the
20 predominant reason.  The predominant reason was
21 that it wasn't an applicable document.
22    Q.   And you mentioned just a few moments ago

Page 514

1  today under oath that there were some sections
2  that were not applicable; is that correct?
3    A.   That were not applicable beyond Bob
4  Brian's area, yes.
5    Q.   Take a look, if you could, at the page
6  in the BOP titled Reference Books.  It's Page 247
7  of 290.
8    A.   It's the number at the bottom of the
9  page?
10   Q.   Yes, sir.
11   A.   Yes.
12   Q.   Is this page about the calculation of
13 AWP?
14   A.   I think in fact this is a page that
15 identifies various reference books that might be
16 available within Contract Marketing.
17   Q.   And part of the description of Red Book
18 is a formula for the calculation of AWP; correct?
19   A.   Yes.  There's a formula in there.
20   Q.   Do you consider that information to be
21 applicable to the Hospital Business Sector
22 Contract Marketing department?

Page 515

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  No.
3  BY MR. ANDERSON:
4    Q.   Why was it part of the BOP?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  You'd have to ask Bob
7  Brian that.
8  BY MR. ANDERSON:
9    Q.   Did you as a corporate rep take any
10 steps to learn why information such as this
11 reference book section was included in the BOP?
12       MS. TABACCHI:  Objection, beyond the
13 scope.
14       THE WITNESS:  No.  I took steps to move
15 this document to where it wasn't in an operating
16 section of the shared drive.
17 BY MR. ANDERSON:
18    Q.   Would you agree that personnel working
19 in the Contract Marketing Hospital Business Sector
20 group knew what the formula was for the
21 calculation of Abbott AWPs?
22       MS. TABACCHI:  Object to the form.

Page 516

1        THE WITNESS:  No.  I don't think in
2  general that they knew.
3  BY MR. ANDERSON:
4    Q.   Would you agree that someone knew enough
5  to write a section of the BOP titled Reference
6  Books shown on Page 247 of Exhibit 26?
7        MS. TABACCHI:  Objection, beyond the
8  scope.
9        THE WITNESS:  I know at this revision I
10 don't know whether it was Bob Brian or whether it
11 was Kristen Berg, but someone put in something
12 with regard to the calculation of AWP.
13 BY MR. ANDERSON:
14    Q.   So to the extent this information was
15 contained in a binder available to personnel
16 working in the HBS Contract Marketing department,
17 there was no mystery as to how an AWP was
18 calculated for Abbott drugs; was there?
19       MS. TABACCHI:  Object to the form,
20 beyond the scope.
21       THE WITNESS:  I don't think we've ever
22 said that there was a mystery with regard to AWP.

47 (Pages 513 to 516)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 517

1  I think what we've always said is that AWP wasn't
2  set by Abbott, and what formula they used may have
3  changed over time.
4         Over time there were a variety of
5  people that may or may not have thought they
6  understood how AWP was set. I don't think being
7  in the BOP is inconsistent with that.
8  BY MR. ANDERSON:
9     Q.   So you'll agree that the inclusion of
10  the AWP calculation formula in the BOP was
11  consistent with Abbott Contract Marketing
12  personnel's knowledge about the calculation of
13  AWP?
14        MS. TABACCHI: Object to the form,
15  beyond the scope.
16        THE WITNESS: I will only agree that
17  whether it was Kristen Berg or Bob Brian, it was
18  consistent hopefully with what they thought.
19  BY MR. ANDERSON:
20     Q.   But you're unwilling to agree that
21  others within Contract Marketing were aware of the
22  formula?

Page 518

1        MS. TABACCHI: Object to the form.
2        THE WITNESS: No. It wasn't an
3  operative formula for them.
4  BY MR. ANDERSON:
5     Q.   How do you know that, sir? Did you
6  undertake any effort as the corporate
7  representative to learn what the knowledge was
8  within the Contract Marketing?
9     A.   I've read a number of depositions.
10     Q.   Other than Mr. Sucheck's testimony,
11  which you stated might have been something you
12  learned in a discussion with an attorney, can you
13  name any other testimony that you've read about
14  the BOP?
15     A.   Sure.
16        MS. TABACCHI: Object to form.
17  BY MR. ANDERSON:
18     Q.   Ms. Leone?
19     A.   Gerry Eichhorn.
20     Q.   Gerry Eichhorn?
21     A.   Mark Sebree.
22     Q.   What did you learn from Mr. Eichhorn

Page 519

1  about the BOP?
2     A.   You were asking about the AWP.
3     Q.   No. I'm asking, sir, about the
4  circulation of this formula of AWP contained in
5  the BOP. What information did you learn from
6  Mr. Eichhorn's testimony about that?
7        MS. TABACCHI: Object to the form. It's
8  argumentative.
9        THE WITNESS: None.
10  BY MR. ANDERSON:
11     Q.   What information have you learned other
12  than the --
13     A.   I must have misunderstood your first
14  question then.
15     Q.   Okay. I'll rephrase it.
16        What information have you learned
17  about the AWP formula contained in the BOP other
18  than what you might have heard from an attorney or
19  from Mr. Sucheck?
20        MS. TABACCHI: Object to the form.
21        THE WITNESS: I talked in general terms
22  about the whole BOP with Joe Brundza. And I

Page 520

1  believe in Lynn Leone's testimony she talks about
2  the BOP and it solely being used by Bob Brian's
3  group.
4        Other than those, I'm not aware of
5  any specific testimony that I can point you to.
6  BY MR. ANDERSON:
7     Q.   You understand, don't you, sir, that
8  you're here today on behalf of the corporation
9  Abbott to testify about the reasons why vancomycin
10  catalog or list prices were increased in May of
11  '95 after they had been decreased in April of '95?
12        MS. TABACCHI: Subject to Abbott's
13  objections.
14        THE WITNESS: I understand that I am the
15  designated representative for Abbott Laboratories
16  with regard to questions of vancomycin price
17  changes in '95 and 2003.
18  BY MR. ANDERSON:
19     Q.   This morning with respect to the 1995
20  vancomycin --
21     A.   Can I put this away?
22     Q.   For the moment, yes, sir.

48 (Pages 517 to 520)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 521

1        This morning I believe you
2  testified that the only reason Abbott has for
3  reversing the April vanco price decreases and
4  increasing those prices to levels above the
5  initial price was a shelf stock adjustment
6  problem; is that correct?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  That's currently my
9  inference from reading both the Harry Adams
10 testimony and Gerry Eichhorn's testimony, as well
11 as what I remember from the time period.
12 BY MR. ANDERSON:
13    Q.   Other than reading the testimony of
14 Mr. Eichhorn and Mr. Adams, what other steps, if
15 any, did you take to learn of the reasons why
16 Abbott reversed the initial April price decreases?
17    A.   I didn't take any other steps because
18 they were the, both Sebree, Eichhorn, Brincks,
19 Jerrie Cicerale, Harry Adams, they were all asked
20 about this, they all responded to it.  I tried to
21 make sure I was aware of what they said.
22    Q.   In any of the testimony of Dave Brincks,

Page 522

1  Jerrie Cicerale, Harry Adams, Mark Sebree, or
2  Gerry Eichhorn are you testifying under oath, sir,
3  that any of them testified that a shelf stock
4  adjustment was the cause for the reversal of the
5  list price decrease?
6     A.   None of them specifically talked about
7  that.
8     Q.   So why are you testifying now under oath
9  today on behalf of the corporation that a shelf
10 stock adjustment was the reason for the reversal?
11    A.   Gerry Eichhorn in his testimony talks
12 about making the decision to lower the price of
13 vancomycin.  In his testimony he talks about
14 communicating that change.  Later on he testifies
15 that that change was going in, it was handled by
16 Jerrie Cicerale or was in the process of being
17 handled by Jerrie Cicerale, and Harry Adams came
18 back to him and said that we only do changes in
19 prices once a year.  And, in fact, we had just or
20 in the intervening time period we had published a
21 new catalog which would have had catalog price
22 increases per the standard practice that we had

Page 523

1  during that timeframe.
2        As part of that, as my knowledge of
3  that process, as we go through, as we went through
4  all of the price changes, there was a review of
5  what we intended the financial impact for that to
6  be, and it was in the normal plan.  I'm looking at
7  that and saying that Harry would have had no other
8  leverage on Gerry Eichhorn to change that except
9  the fact that since he was responsible for the
10 relationship with wholesalers, that he did not
11 have a shelf stock adjustment budgeted for that
12 change, and therefore, override what Gerry
13 Eichhorn had done.
14    Q.   Do you have any personal knowledge of
15 that, sir?
16    A.   No.  I'm saying I inferred that from
17 what I read in both Harry's and Gerry Eichhorn's
18 testimony.
19    Q.   You'll agree with me, won't you, that
20 Mr. Adams didn't remember a darn thing about the
21 1995 decreases or increases on vanco?
22    A.   He didn't have any general recollection,

Page 524

1  no.
2     Q.   He didn't have a specific recollection
3  either; did he?
4     A.   Right.
5     Q.   So you're reading the tea leaves on what
6  you think might have been the reason for the vanco
7  price increase in May of 1995; correct?
8        MS. TABACCHI:  Object to the form,
9  mischaracterizes testimony.
10       THE WITNESS:  No.  I'm applying what was
11 standard practice to what I read as an interaction
12 between Gerry Eichhorn and Harry Adams.
13 BY MR. ANDERSON:
14    Q.   Which you're testifying here today on
15 behalf of the corporation was something that
16 Mr. Adams had control over?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Harry would have been the
19 intervening agent in terms of any shelf protection
20 that would have been given to wholesalers.
21 BY MR. ANDERSON:
22    Q.   Other than reviewing the testimony that

49 (Pages 521 to 524)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 525

1    you have divined some meaning from by Mr. Adams
2    and Mr. Eichhorn, is there any other document or
3    other source of information that you're relying
4    upon in testifying here today as the Abbott
5    corporate representative about the reasons for the
6    May 1995 vanco price increase?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  Nothing other than the
9    fact that Gerry Eichhorn as a manager in Contract
10   Marketing had made a pricing decision, and it was
11   reversed by Harry Adams who was not direct in line
12   to do that.
13       (WHEREUPON Exhibit Sellers 027
14       was marked as of 3/31/2008.)
15   BY MR. ANDERSON:
16   Q.   All right.  Now, if you could, take a
17   look at what's been marked as Sellers Exhibit 27.
18   (Document tendered to the witness.)
19       MR. ANDERSON:  The first page of Exhibit
20   27 is not on that courtesy copy I'm giving you,
21   Tina, so you may want to look at the first page of
22   it, but the rest of the document, which is what I

Page 526

1    really have questions about, is the same.
2        MS. ST. PETER-GRIFFITH:  Hold on.
3        MR. ANDERSON:  We might have it.  We do.
4    Just in the nick of time.
5    BY MS. ST. PETER-GRIFFITH:
6    Q.   Have you finished reviewing what's been
7    marked as Exhibit 27, sir?
8    A.   Yes.
9    Q.   Does this appear to be an e-mail
10   announcing a meeting along with an attached memo
11   titled "Issue:  Vancomycin"?
12   A.   It does appear to be a meeting
13   announcement for January 8, 2003.  It doesn't say
14   who it's with.  I would assume the Bob referenced
15   here is Bob Lyman.  And it appears to be the
16   attachment is in marked up version.
17   Q.   Do you believe you had any input
18   whatsoever into the creation of the memo titled
19   "Issue:  Vancomycin"?
20       MS. TABACCHI:  Objection, beyond the
21   scope.
22       THE WITNESS:  I don't recall.

Page 527

1    BY MR. ANDERSON:
2    Q.   Have you seen the document before?
3    A.   I've seen it before.
4    Q.   You think you participated in a meeting
5    discussing this document?
6    A.   I don't recall a meeting.
7    Q.   Back in 2003 was Bob Lyman working with
8    you?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Yes.
11   BY MR. ANDERSON:
12   Q.   Now, if you could, sir -- hold on,
13   before I move on.  Look at the bottom of the
14   document, which is the memo attached to Exhibit
15   27, and you see a file name there
16   "vancomycinCPA.doc"?
17   A.   Yes.
18       (WHEREUPON Exhibit Sellers 028
19       was marked as of 3/31/2008.)
20   BY MR. ANDERSON:
21   Q.   Now, if you could, contrast that with
22   what's been marked as Exhibit 28.  (Document

Page 528

1    tendered to the witness.)
2    A.   I haven't compared it word for word, but
3    it appears to be the same or similar document.
4    Q.   They're similar.
5        Looking at Exhibit 28, do you see
6    that the file name on that one is different?
7    A.   Yes.
8    Q.   Do you see that the file path reads
9    "issues, issues briefs, project Miles,
10   vancomycin - updated October 23, 2000"?
11   A.   Yes.
12   Q.   Were you involved in any way whatsoever
13   with the creation of information that was provided
14   to Miles White about vancomycin?
15       MS. TABACCHI:  Objection, beyond the
16   scope.
17       THE WITNESS:  I don't recall.
18   BY MR. ANDERSON:
19   Q.   Do you know if information about
20   vancomycin was provided to Miles White?
21       MS. TABACCHI:  Same objection.
22       THE WITNESS:  No.  I'm not familiar with

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 529

1  what may or may not have been provided to Miles
2  White.
3  BY MR. ANDERSON:
4      Q.   Did you provide information to anybody
5  in Abbott's Public Affairs group about information
6  from Miles White concerning vancomycin?
7          MS. TABACCHI:  Objection, beyond the
8  scope, object to the form.
9          THE WITNESS:  There were a lot of
10 conversations going on in 2000.  I don't know of
11 any specific information that I gave to anyone
12 that was targeted to Miles White.
13 BY MR. ANDERSON:
14     Q.   Do you recall sharing any information
15 with anybody at the Abbott corporate offices about
16 vancomycin?
17         MS. TABACCHI:  Object to the form,
18 beyond the scope.
19         THE WITNESS:  Legal counsel.
20 BY MR. ANDERSON:
21     Q.   Other than attorneys.
22     A.   No.

Page 530

1          (WHEREUPON Exhibit Sellers 029
2              was marked as of 3/31/2008.)
3  BY MR. ANDERSON:
4      Q.   Let's take a look, if we could, at
5  Sellers Exhibit 29.  (Document tendered to the
6  witness.)
7          Keep all three of those together,
8  sir.  I'm going to have questions about them in
9  conjunction with one another.
10     A.   Okay.
11     Q.   Exhibit 29 appears to be an e-mail
12 printed off of your computer that you sent to Ann
13 Fahey Windham with copies to Teretta Lewis and Bob
14 Lyman back in October of 2000; correct?
15     A.   Correct.
16     Q.   And the subject is vancomycin; correct?
17     A.   Correct.
18     Q.   And you'll agree that Ann Fahey Windham
19 was in the corporate affairs office; right?
20         MS. TABACCHI:  Objection, beyond the
21 scope.
22         THE WITNESS:  Corporate Public Affairs,

Page 531

1  yes.
2  BY MR. ANDERSON:
3      Q.   Does this refresh your memory that you
4  did share information with the corporate offices
5  at Abbott about vanco?
6          MS. TABACCHI:  Objection, beyond the
7  scope.
8          THE WITNESS:  Apparently I did to
9  corporate affairs, yes.
10 BY MR. ANDERSON:
11     Q.   And they're in the corporate offices
12 along with the CEO; correct?
13         MS. TABACCHI:  Objection, beyond the
14 scope.
15         THE WITNESS:  They're a corporate
16 function, correct.
17 BY MR. ANDERSON:
18     Q.   And one of their primary jobs is to
19 brief the CEO about different things going on in
20 the corporation; correct?
21         MS. TABACCHI:  Object to the form,
22 beyond the scope.

Page 532

1          THE WITNESS:  I don't believe so.
2  BY MR. ANDERSON:
3      Q.   Well, we'll leave that to Ms. Babington
4  and her testimony.
5          Sir, if you could, take a look at
6  the vanco reimbursement dollars --
7      A.   Yes.
8      Q.   -- and compare those to the dollars that
9  are shown in Exhibits 27 and 28.
10     A.   They seem to be in the same ballpark.
11     Q.   They're identical; aren't they?
12     A.   I can compare them if you want me.
13     Q.   They're dollar for dollar the same, but
14 I want you to check.
15     A.   You want me to verify that?
16     Q.   Please.
17         MS. TABACCHI:  Object to the question as
18 beyond the scope.
19         MR. ANDERSON:  This falls squarely
20 within the vanco prices change.
21         MS. TABACCHI:  I disagree.
22         MR. ANDERSON:  All right.  Well, you're

51 (Pages 529 to 532)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 533

1  entitled to that.
2      THE WITNESS:  Yes.  They appear to be
3  identical in all three documents.
4  BY MR. ANDERSON:
5      Q.   Yes, sir.
6          Why were you researching the amount
7  of dollars Medicare had reimbursed for vancomycin?
8      A.   Because I was asked to.
9      Q.   But did you have any understanding of
10 the underlying rationale for the project?
11         MS. TABACCHI:  Objection, beyond the
12 scope, object to the form.  I'm also going to
13 caution the witness not to reveal any
14 communications with counsel.
15         THE WITNESS:  No.  In October I did not.
16 There had been an article in the Chicago Tribune
17 following the Department of Justice AWPs.  So I
18 don't know whether more questions were going to be
19 coming from that or not.  But in my mind I was
20 reacting to the fact that they said that the
21 Chicago Tribune was doing a story and they needed
22 that information.

Page 534

1  BY MR. ANDERSON:
2      Q.   As the Abbott corporate representative
3  concerning changes in vanco prices, can you
4  explain why Abbott would care about the total
5  dollars spent by Medicare in reimbursing for
6  vancomycin?
7          MS. TABACCHI:  Object to the form,
8  beyond the scope of the Notice.
9          THE WITNESS:  No.
10 BY MR. ANDERSON:
11     Q.   You mentioned this morning that you
12 thought vancomycin was no longer covered by
13 Medicare after 1995.  Is that your testimony this
14 morning?
15     A.   It was '95, '96, something like that.
16     Q.   In looking at Exhibit 29, is your memory
17 refreshed that in '96 vanco was covered by
18 Medicare?
19         MS. TABACCHI:  Objection, beyond the
20 scope.
21         THE WITNESS:  Actually, it's one of
22 these documents that say that the coverage ceased

Page 535

1  in June of 1996, and I think the numbers are
2  consistent with that.
3
4  BY MR. ANDERSON:
5      Q.   Right.
6          For instance, in '96 there was over
7  $8 million spent in Medicare money to reimburse
8  for vancomycin; correct?
9          MS. TABACCHI:  Objection.
10         THE WITNESS:  For vancomycin therapy,
11 yes.
12 BY MR. ANDERSON:
13     Q.   And then in '97, '98, and '99 there's
14 still some significant dollars spent in
15 reimbursement for vanco by Medicare; correct?
16         MS. TABACCHI:  Object to the form,
17 beyond the scope.
18         THE WITNESS:  Significantly less.
19 BY MR. ANDERSON:
20     Q.   Significantly less, but nonetheless for
21 instance '97 approaches $900,000; correct?
22         MS. TABACCHI:  Same objections.

Page 536

1          THE WITNESS:  Yes.
2  BY MR. ANDERSON:
3      Q.   So it's not as if the Medicare
4  reimbursement ceased altogether?
5          MS. TABACCHI:  Same objections.
6          THE WITNESS:  No.  Again, I think this
7  draft background talks about the fact that
8  physicians could specifically enter in a request
9  to Medicare, and they were periodically granted,
10 which I would assume that's what that is.
11 BY MR. ANDERSON:
12     Q.   And you're referencing Exhibit 27 for
13 that rationale; correct?
14     A.   27, and 28, yes.
15     Q.   Now, looking back at Exhibit 27, other
16 than providing the vancomycin utilization dollars,
17 did you have any role in pulling together
18 information that you find and made a part of
19 Exhibit 27?
20     A.   Again, I don't recall.  I didn't recall
21 until you showed me this that I even contributed
22 to the numbers.

52 (Pages 533 to 536)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 537

1     Q.   Do you agree that Exhibits 27 and 28 and
2  29 all pertain to the pricing of vancomycin over
3  the years, including the price changes in 1995?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  I would characterize this
6  to be, I think the way Bob had it, as a background
7  with some history or our interpretation of history
8  with regard to vancomycin.
9
10  BY MR. ANDERSON:
11    Q.   Why didn't you review these documents in
12  preparing to testify as the Abbott corporate
13  representative concerning price changes on vanco?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I don't think this
16  document would have changed what I've testified
17  to.
18  BY MR. ANDERSON:
19    Q.   Why not?
20    A.   There's nothing in here that is
21  fundamentally different from what I've said.
22    Q.   Do you see one mention of a shelf stock

Page 538

1  adjustment in Exhibits 27, 28, or 29?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  No.  The only thing I see
4  here is an unexplained increase in vancomycin
5  price in '95.
6  BY MR. ANDERSON:
7     Q.   Why do you say it's unexplained?
8     A.   Because it's one sentence.
9     Q.   Pardon?
10    A.   It's one sentence.
11    Q.   What's one sentence?
12    A.   It's one sentence, "In June 1995 we
13  reinstated the price to its original catalog
14  price."  That's it.
15    Q.   You're referencing the very last
16  sentence of Exhibit 27 or 28?
17    A.   Yes.
18    Q.   Look at that paragraph that immediately
19  precedes the closing paragraph.  Do you see a
20  paragraph that starts with the word
21  "Subsequently"?
22         I'll read for the benefit of the

Page 539

1  record, quote "Subsequently, we received
2  complaints from state insurance carriers that the
3  AWP for vanco was too high for Medicaid
4  state-issued reimbursements.  So in May 1995 we
5  lowered vancomycin's catalog price for a month."
6          Did I read that correctly?
7     A.   Yes.
8     Q.   Is that consistent with Abbott's
9  corporate view of why the vancomycin prices were
10  lowered in or about April of 1995?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  It's not consistent with
13  my recollection.
14  BY MR. ANDERSON:
15    Q.   What's your recollection?  Are you
16  talking about your personal recollection, sir, or
17  are you talking about Abbott's corporate
18  recollection?
19         MS. TABACCHI:  Object to the form.  This
20  question has been asked and answered.
21         THE WITNESS:  I can only speak to what
22  I'm knowledgeable of, and I was close to this but

Page 540

1  not intimate with it, but my recollection was it
2  had to do with list price, it did not have to do
3  or I wasn't aware of any specific payor, whether
4  it was Medicaid or not, my recollection is it was
5  not Medicaid.  So I would have had some
6  disagreements with that statement had I reviewed
7  this document.
8  BY MR. ANDERSON:
9     Q.   I understand that's your personal
10  disagreement.
11         As the corporate representative of
12  Abbott today, are you testifying that the
13  statement that I've just read contained in the
14  second to last paragraph of Exhibit 28 is
15  incorrect?
16    A.   I believe it's inconsistent with what I
17  remember happening.
18    Q.   And, therefore, inconsistent with
19  Abbott's position?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Yes.
22  BY MR. ANDERSON:

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Page 541

1    Q.   Okay.  Reading the next paragraph from
2  Exhibit 28, quote "Our carriers responded by
3  saying that this reduction interfered with their
4  ability to provide care.  During this brief
5  period, physicians stated that they were unable to
6  recoup provider costs associated with vancomycin
7  such as nursing labor to administer the drug and
8  pharmacy overhead and labor to mix and label the
9  product.  In June 1995 we reinstated the price to
10 its original catalog price."
11          Did I read that correctly?
12    A.   Yes.
13          MS. TABACCHI:  No.
14          THE WITNESS:  Well, no, you didn't.  You
15 said "carriers" instead of "customers."
16          MR. ANDERSON:  All right.  Well, I need
17 to clear that up then.  Let me take it from the
18 top.
19          THE WITNESS:  Okay.
20 BY MR. ANDERSON:
21    Q.   I'm going to read the last paragraph of
22 Exhibit 28.  Quote "Our customers responded by

Page 542

1  saying that this reduction interfered with their
2  ability to provide care.  During this brief
3  period, physicians stated that they were unable to
4  recoup provider costs associated with vancomycin,
5  such as nursing labor to administer the drug and
6  pharmacy overhead and labor to mix and label the
7  product.  In June 1995 we reinstated the price to
8  its original catalog price."
9          Did I read that correctly?
10    A.   Yes.
11    Q.   As the corporate representative of
12 Abbott concerning changes in vancomycin prices in
13 1995, is it true that customers complained to
14 Abbott about lower reimbursement sometime around
15 April of 1995?
16          MS. TABACCHI:  Object to the form.
17          THE WITNESS:  I don't know of any
18 timing.  I'm only aware of a couple of documents
19 that reference, no, in fact, I'm not aware of any
20 documents that reference this price change.  I'm
21 aware of a couple of documents that reference the
22 price change we made in 2001, not in 1995.

Page 543

1  BY MR. ANDERSON:
2    Q.   Did you take steps to review any
3  documents concerning the vancomycin 1995 price
4  changes?
5    A.   I've been through a number of these
6  depositions and the same documents have come up in
7  a number of them.  I'm reasonably familiar with
8  the documents, so I didn't feel I needed to review
9  them again.
10    Q.   Well, you just testified that you're not
11 aware of any documents concerning customer
12 complaints regarding decreased AWPs or list prices
13 on vanco in 1995; is that correct?
14    A.   That's correct.
15    Q.   Do you believe that any such documents
16 exist that you've simply not reviewed, or is it
17 your testimony they don't exist?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  I have no reason to
20 believe they exist.
21          (WHEREUPON Exhibit Sellers 030
22          was marked as of 3/31/2008.)

Page 544

1  BY MR. ANDERSON:
2    Q.   If you could take a look at Exhibit 30.
3  (Document tendered to the witness.)
4    A.   Yes.
5    Q.   Do you agree this is a memo dated
6  April 26, 1995, concerning vanco price change?
7    A.   Yes.
8    Q.   Did you review this document, sir, in
9  preparing to testify as the Abbott corporate
10 representative concerning the 1995 vanco price
11 changes?
12    A.   I've seen this document before.
13    Q.   Why did you not mention this document
14 just a moment ago?
15    A.   Because I don't think it states what
16 you're asking.
17    Q.   Is it your testimony, sir, that this
18 document doesn't pertain to the vanco price
19 changes?
20    A.   It does.
21    Q.   Why did you not consider this document
22 in preparing to testify as Abbott's corporate

Page 545

1  representative?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  This document doesn't
4  state an objection by providers.
5  BY MR. ANDERSON:
6    Q.   All right.  Let's read the document and
7  see where I'm missing something.  Quote "In the
8  last several days, we have received calls
9  regarding the price change on vancomycin
10 products."  And then there's some prices listed
11 where previously they were about triple what they
12 are now, double in some cases.  "These price
13 changes will affect reimbursement, and so
14 customers may question us.  This change will
15 affect three types of payors or insurers, and I
16 will outline the effect.  The reimbursement effect
17 is probably why customers will bring this issue
18 up."
19       Did I read that correctly?
20   A.   Yes.
21   Q.   Does that indicate to you, sir, that
22 customers were complaining or were expected to

Page 546

1  complain about decreased reimbursement on
2  vancomycin in or about April of 1995?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  It doesn't tell me that
5  the customers were complaining.  It says that
6  there may have been a few calls asking about the
7  price change.  It didn't say that they had an
8  opinion one way or another.
9       I think what Mike Heggie was
10 attempting to do here was frame it for our sales
11 representatives.  He said they may question us.
12 BY MR. ANDERSON:
13   Q.   Is it Abbott's position today through
14 you, its corporate representative, that customers
15 did not complain at all about decreased
16 reimbursement as a result of decreased AWPs on
17 vancomycin in or about April of 1995?
18       MS. TABACCHI:  Object to the form,
19 beyond the scope.
20       THE WITNESS:  I can tell you that as the
21 corporate representative, I'm not aware of
22 specific complaints with regard to this.

Page 547

1  BY MR. ANDERSON:
2    Q.   Are you aware of general complaints?
3    A.   No.
4    Q.   Do you have any corporate knowledge
5  about general complaints from customers about
6  decreased reimbursement on vanco in or about April
7  of '95?
8    A.   No.
9    Q.   Have you taken any steps to learn
10 whether or not such complaints ever existed?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  I've read the testimony of
13 the relevant people, including Mike Heggie.
14
15 BY MR. ANDERSON:
16   Q.   And you don't believe that Mike Heggie
17 testified there were complaints?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  I don't recall a piece of
20 his testimony that talked to that.
21 BY MR. ANDERSON:
22   Q.   Do you recall your own testimony, sir,

Page 548

1  under oath as the corporate representative for
2  Abbott in the Texas case that you do recall
3  complaints?
4       MS. TABACCHI:  Object to the form,
5  mischaracterizes the witness' testimony.  If
6  you're going to ask him about his testimony,
7  please put the transcript in front of him.
8  BY MR. ANDERSON:
9    Q.   Do you recall that?
10   A.   I'd like to see it.
11   Q.   But do you recall it?
12   A.   No.
13       MS. TABACCHI:  Object to the form.
14       (WHEREUPON Exhibit Sellers 031
15       was marked as of 3/31/2008.)
16 BY MR. ANDERSON:
17   Q.   All right.  If you could, take a look at
18 what's been marked as Exhibit 31.  (Document
19 tendered to the witness.)
20       Do you believe you testified that
21 you recall complaints from customers about
22 decreased reimbursement under oath previously?

55 (Pages 545 to 548)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 549

1    MS. TABACCHI:  Object to the form.
2    THE WITNESS:  I don't believe so.
3  BY MR. ANDERSON:
4    Q.   So any testimony today about failing to
5  remember any customer complaints would necessarily
6  be inconsistent with any testimony previously
7  where you did testify you remembered complaints;
8  correct?
9    MS. TABACCHI:  Object to the form,
10  argumentative.  Please put the transcript in front
11  of the witness if you're going to challenge him on
12  this.
13    MR. ANDERSON:  Pull out the transcript.
14  It's Page 505.  Pull it out, let's read it.  Page
15  505.
16    MS. TABACCHI:  Go ahead.  Do you have an
17  exhibit?
18    MR. ANDERSON:  Yeah.  I've got it on my
19  computer right here.  I'll even show you my
20  password.
21    THE WITNESS:  Please don't.
22    MR. ANDERSON:  Start, sir, at Page 505,

Page 550

1  Line 4, and read through Line 12 on Page 505.
2    MS. TABACCHI:  For the record, you've
3  questioned this witness in the Department of
4  Justice deposition on this particular paragraph,
5  and he's already explained this to you.
6    MR. ANDERSON:  It wasn't corporate
7  testimony.
8    MS. TABACCHI:  Fine.
9    MR. ANDERSON:  I've got to redo it all.
10  I mean if we're going to have inconsistent
11  testimony, we've got to redo it.
12    MS. TABACCHI:  It's not inconsistent.
13  Look at his other testimony.  You've already asked
14  him about this.  Go ahead.
15    THE WITNESS:  What am I supposed to be
16  reading?
17    MR. ANDERSON:  Page 505, Line 4 through
18  12, please.
19    MS. TABACCHI:  Do you have his November
20  deposition as well, Jarrett?
21    MR. ANDERSON:  I have all of them on my
22  computer.  Do you want to read them all?

Page 551

1    THE WITNESS:  4 through 12?
2    MR. ANDERSON:  Page 505, Line 4 through
3  Line 12.  Is that the end of your answer?
4    MS. TABACCHI:  I'll object to this line
5  of questioning as beyond the scope to the extent
6  you're asking Mr. Sellers about his individual
7  testimony in prior depositions.
8    THE WITNESS:  Okay.  I'm at a loss to
9  see the relevance to the point you just made.
10  BY MR. ANDERSON:
11    Q.   Do you believe, sir, that you previously
12  testified -- strike that.
13        If you could for the benefit of the
14  record and the jury that may watch this tape,
15  please read the question and answer at Page 505,
16  Line 4 through Line 12.
17    A.   "By Mr. Anderson:  And to sum it all up,
18  the ultimate decision on the vancomycin price
19  changes in 1995 was to keep the list prices higher
20  rather than lower to appease customer complaints
21  about reimbursement; correct?"  And my answer was
22  "A decision was made to reinstate the prices that

Page 552

1  were before the reduction."
2        I said yes, meaning that we did
3  take the prices back up.  I did not say yes, that
4  we appeased customer complaints.
5    Q.   Sir, did you say "No"?
6    MS. TABACCHI:  Object to the form.
7    THE WITNESS:  You asked me to interpret
8  it.  I interpreted it.
9  BY MR. ANDERSON:
10    Q.   No.  I asked you to read it first.  You
11  chose to interpret it.  But did you say "No"?
12    MS. TABACCHI:  Jarrett, Mr. Sellers has
13  already been through this with you in November.
14  You did this already in November in his prior
15  testimony.
16    MR. ANDERSON:  As a fact witness.  Now
17  we're talking as a corporate rep in his ability to
18  prepare and present testimony of all reasonably
19  available information, Tina, including his own
20  testimony.
21  BY MR. ANDERSON:
22    Q.   Sir, did you say "No" in response to my

56 (Pages 549 to 552)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 553

1  question at Page 505 of your prior deposition?
2       MS. TABACCHI:  Object to the form of the
3  question, harassing.
4       THE WITNESS:  No.  I gave you a
5  qualified "Yes."
6  BY MR. ANDERSON:
7   Q.  Sir, do you agree that you were under
8  oath when you provided that testimony?
9       MS. TABACCHI:  Object to the form.
10      THE WITNESS:  Yes.
11 BY MR. ANDERSON:
12  Q.  Was that testimony truthful?
13  A.  Yes.
14  Q.  But you didn't consider that testimony
15 with respect to providing your opinions or
16 statements today on behalf of the corporation; did
17 you?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  No.  I don't consider it
20 inconsistent.
21 BY MR. ANDERSON:
22  Q.  Now, if you could, take a look at what's

Page 554

1  been marked as Exhibit 31.
2   A.  Okay.
3   Q.  Did you review this document in
4  preparing to testify today as the Abbott corporate
5  representative concerning the vancomycin price
6  changes in 1995?
7   A.  No.  I've seen this document before.
8   Q.  But you didn't consider it in providing
9  your corporate testimony today; did you?
10      MS. TABACCHI:  Object to the form.
11      THE WITNESS:  No.
12 BY MR. ANDERSON:
13  Q.  Why not?
14  A.  I don't think it necessarily reveals
15 anything that's different from what I've talked
16 about.
17  Q.  Have you talked at all, sir, about how
18 Medicaid reimbursement impacted the vanco price
19 changes in '95?
20      MS. TABACCHI:  Object to the form,
21 argumentative.
22      THE WITNESS:  No.

Page 555

1  BY MR. ANDERSON:
2   Q.  Do you agree that Ms. Cicerale states
3  quote "Just to let you know, these are some of the
4  items Gerry Eichhorn tried to adjust a few years
5  ago and it caused all kinds of issues with
6  Medicaid reimbursements, i.e., Red Book, First
7  Databank, Medi-Span."
8       Did I read that correctly?
9   A.  You read it correctly.
10  Q.  Does that statement by Ms. Cicerale seem
11 consistent with your corporate testimony here
12 today?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  No, but it's Jerrie
15 Cicerale's recollection.
16 BY MR. ANDERSON:
17  Q.  Yeah.  And did you read her sworn
18 testimony under oath in this case?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  I read some of it.
21 BY MR. ANDERSON:
22  Q.  Did you read how she testified that she

Page 556

1  recalled there were complaints about
2  reimbursement?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  I don't recall that.
5  BY MR. ANDERSON:
6   Q.  Do you agree Mr. Adams apparently got
7  this e-mail from Jerrie Cicerale?
8       MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10      THE WITNESS:  It was originally sent to
11 Harry Adams.
12 BY MR. ANDERSON:
13  Q.  Did you ask Mr. Adams if he recalls any
14 complaints about Medicaid reimbursement with
15 respect to the 1995 price changes?
16  A.  I didn't talk to Harry about any of
17 this.  I've read his testimony.
18  Q.  Do you have Mr. Adams' phone number?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  Do I have his phone
21 number?
22 BY MR. ANDERSON:

57 (Pages 553 to 556)

Page 557

1     Q.   Yes, sir.
2     A.   I don't know.
3     Q.   When you were at Hospira about a year
4  ago, Mr. Adams was a coworker of yours; right?
5     A.   Yes.
6     Q.   Do you think it would be difficult for
7  you to call Mr. Adams?
8         MS. TABACCHI:  Object to the form.  This
9  is harassing.
10        THE WITNESS:  No.
11        MS. TABACCHI:  The witness read his
12 testimony.  He told you that.
13 BY MR. ANDERSON:
14    Q.   But just for the clarity of the record,
15 you haven't made any effort to learn from
16 Mr. Adams his memory of the 1995 vanco price
17 changes; have you?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  No.
20 BY MR. ANDERSON:
21    Q.   And for that matter, you haven't
22 contacted any witnesses to try to gather

Page 558

1  information reasonably available to Abbott
2  concerning the vanco 1995 price changes; have you?
3         MS. TABACCHI:  Object to the form,
4  mischaracterizes the witness' testimony.  He's
5  reviewed many depositions.
6         THE WITNESS:  I don't recall.
7  BY MR. ANDERSON:
8     Q.   Now, if you could, go back to 27, sir.
9     A.   Okay.
10    Q.   Is it possible that you participated in
11 meetings concerning looking back at the history of
12 the pricing on vancomycin?
13        MS. TABACCHI:  Objection, beyond the
14 scope.
15        THE WITNESS:  I was in Contract
16 Marketing, I was working with Bob, it's possible.
17 I don't recall.
18 BY MR. ANDERSON:
19    Q.   Looking at the very first sentence in
20 the second page of Exhibit 27, which is the first
21 page of the memo titled "Issue:  Vancomycin," it
22 reads quote "Abbott has come under recent fire

Page 559

1  from the media, Congress, and the Justice
2  Department for alleged price spread marketing with
3  vancomycin taking advantage of the spread between
4  the catalog price and the average wholesale price
5  (AWP)."
6         Did I have read that correctly?
7     A.   Yes.
8     Q.   Do you recall Abbott coming under any
9  fire about the pricing of its drugs?
10        MS. TABACCHI:  Object to the form,
11 beyond the scope.
12        THE WITNESS:  Again, I think this
13 document originated in 2000 as per this
14 presentation over here which is Exhibit 28.
15        The thing I do recall that happened
16 was DOJ AWPs were published in May of 2000.  I
17 believe in June or July there was a Chicago
18 Tribune article relative to that.  What it said I
19 can't remember, but I do remember one being
20 published.  So I don't know whether that's what
21 they're referring to, whether they're referring to
22 subpoenas or what.  I don't know.

Page 560

1  BY MR. ANDERSON:
2     Q.   Do you believe that the media
3  publication such as the Chicago Tribune article
4  that you mentioned from the year 2000 constituted
5  some type of criticism or fire regarding Abbott's
6  pricing practices?
7         MS. TABACCHI:  Objection, beyond the
8  scope.
9         THE WITNESS:  I think it was a
10 relatively one-sided presentation as I recall.
11 BY MR. ANDERSON:
12    Q.   Whether it was one-sided or not, do you
13 believe it was critical?
14        MS. TABACCHI:  Object to the form,
15 beyond the scope.
16        THE WITNESS:  I believe it was intended
17 to be critical of the whole pharmaceutical
18 industry.
19 BY MR. ANDERSON:
20    Q.   Including Abbott?
21    A.   Or pharmaceutical manufacturers, let me
22 put it that way.

58 (Pages 557 to 560)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 561

1        MS. TABACCHI:  Same objections.
2   BY MR. ANDERSON:
3     Q.   Including Abbott; correct?
4     A.   Abbott being an Illinois corporation, it
5   was always fair game for the Chicago Tribune.
6     Q.   And the Tribune article specifically
7   named Abbott and discussed Abbott at length;
8   correct?
9        MS. TABACCHI:  Objection, beyond the
10  scope.
11       THE WITNESS:  I believe it talked about
12  vancomycin in particular.
13  BY MR. ANDERSON:
14    Q.   Why did it take a Chicago Tribune
15  article for Abbott to create a memo like this
16  describing the vancomycin price history?
17       MS. TABACCHI:  Object to the form,
18  beyond the scope, mischaracterizes the testimony.
19       THE WITNESS:  I don't know.  It would be
20  a good question for Kathy Babington.
21  BY MR. ANDERSON:
22    Q.   Did the '97 CID from the Department of

Page 562

1   Justice cause Abbott to analyze its vanco price
2   history?
3        MS. TABACCHI:  Objection to form, beyond
4   the scope.
5        MS. ST. PETER-GRIFFITH:  '96.
6        MR. ANDERSON:  Okay, '96.
7        MS. TABACCHI:  Same objections.
8   BY MR. ANDERSON:
9     Q.   I'll rephrase to clear up the record.
10            Did the 1996 CID from the
11  Department of Justice cause Abbott to analyze its
12  vanco pricing in any way?
13       MS. TABACCHI:  Object to the form,
14  beyond the scope of the Notice.
15       THE WITNESS:  I can't speak to what our
16  legal counsel was doing subsequent to the '96 CID.
17  BY MR. ANDERSON:
18    Q.   To your knowledge, did any Abbott
19  personnel, whether legal or operational as you've
20  characterized them, conduct any review of Abbott's
21  pricing practices after receipt of the 1996 Civil
22  Investigative Demand from the Department of

Page 563

1   Justice?
2        MS. TABACCHI:  Object to the form,
3   beyond the scope of the Notice.
4        THE WITNESS:  I can't recall any
5   specifics.  There were a number of conversations
6   that we had with legal counsel.
7   BY MR. ANDERSON:
8     Q.   Why were media reports more important
9   than the Department of Justice?
10       MS. TABACCHI:  Object to the form,
11  mischaracterizes the testimony, beyond the scope
12  of the Notice.
13       THE WITNESS:  I don't think that
14  necessarily prioritizes one over the other.
15  BY MR. ANDERSON:
16    Q.   Did Abbott view the media reports to be
17  more troubling than CIDs received from the federal
18  government?
19       MS. TABACCHI:  Object to the form,
20  beyond the scope of the Notice.
21       THE WITNESS:  Again, all I can refer to
22  is this document.  I think it puts even weight to

Page 564

1   media, Congress, and the Department of Justice.
2   BY MR. ANDERSON:
3     Q.   It took the trifecta to analyze the
4   prices?  It took a media report, it took Congress
5   through Pete Stark's letter, and it took the
6   Department of Justice sending subpoenas and CIDs
7   in order for Abbott to review its prices; is that
8   correct?
9        MS. TABACCHI:  Object to the form,
10  beyond the scope of the Notice.
11       THE WITNESS:  I don't know that Abbott
12  began reviewing its prices in 2000.  I don't know
13  that.
14  BY MR. ANDERSON:
15    Q.   You mean that this memo that was created
16  on or about October and November of 2000 doesn't
17  indicate to you that there were some analysis of
18  the vanco prices?
19       MS. TABACCHI:  Objection, beyond the
20  scope, object to the form.
21       THE WITNESS:  Well, obviously there was
22  some construction of the historical position of

Page 565

1  vanco that was done.
2  BY MR. ANDERSON:
3     Q.   Right.  Why wasn't that done earlier?
4        MS. TABACCHI:  Objection, beyond the
5  scope, object to the form.
6        THE WITNESS:  I don't know.
7  BY MR. ANDERSON:
8     Q.   As Abbott's corporate representative,
9  why was an analysis of Abbott's pricing of
10 vancomycin not conducted in 1995 when the prices
11 were decreased and then subsequently re-increased?
12       MS. TABACCHI:  Objection, beyond the
13 scope, object to the form.
14       THE WITNESS:  That activity was purely
15 between two business segments within HPD.  It did
16 not have a broad involvement of others in the
17 division --
18
19 BY MR. ANDERSON:
20    Q.   The two organizations --
21    A.   -- in 1995.
22    Q.   The two groups you're referring to

Page 566

1  within the HPD organization are Alternate Site on
2  the one hand and HBS Contract Marketing on the
3  other hand; correct?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  Home Infusion on one hand.
6  BY MR. ANDERSON:
7     Q.   Which is part of the Alternate Site?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  But it's not Alternate
10 Site in its entirety.
11 BY MR. ANDERSON:
12    Q.   Right.
13    A.   But Home Infusion and a manager in HBS
14 Contract Marketing, yes.
15    Q.   So when it came to publishing list
16 prices back in 1995 on vanco, those two groups
17 were working together; correct?
18       MS. TABACCHI:  Object to the form,
19 mischaracterizes the testimony, beyond the scope.
20       THE WITNESS:  No.  There was a request,
21 as I've said before, there was a request submitted
22 by Home Infusion Services to evaluate a lower

Page 567

1  price on vancomycin.  There was no price setting
2  by Home Infusion Services.  It was purely
3  recognition of the fact that all price setting was
4  done by HBS.
5  BY MR. ANDERSON:
6     Q.   And upon the request of Home Infusion,
7  Contract Marketing within the Hospital Business
8  Sector did in fact lower the vanco list price;
9  correct?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  They consented to the
12 request for a period of time.
13 BY MR. ANDERSON:
14    Q.   Which caused the AWP to come down for a
15 period of time; correct?
16       MS. TABACCHI:  Object to the form,
17 beyond the scope.
18       THE WITNESS:  I don't know whether the
19 announcement of reduction and increase, whether
20 that hit a reporting cycle for one of the agencies
21 or not.  I have no information on that.
22 BY MR. ANDERSON:

Page 568

1     Q.   Well, let's go ahead and look at Exhibit
2  28 some more, or 27 as well.
3        Looking at that paragraph that we
4  looked at before --
5     A.   The last one?  Is that the one you're
6  referring to?
7     Q.   I'm actually referring to the second to
8  last one.
9     A.   Okay.
10    Q.   Do you see there that an AWP is
11 described?
12       MS. TABACCHI:  Object to the form.
13 BY MR. ANDERSON:
14    Q.   I'll rephrase.
15       Do you see, sir, a reference to the
16 vancomycin AWP?
17    A.   Yes.
18    Q.   So there was some awareness at Abbott
19 that the changes in list prices, a/k/a catalog
20 prices, in 1995 impacted the AWP on vanco;
21 correct?
22       MS. TABACCHI:  Object to the form,

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 569

1 beyond the scope.
2      THE WITNESS:  This summary done in
3 retrospect could be inferred to see that.
4 BY MR. ANDERSON:
5    Q.   And that's consistent with, for
6 instance, Exhibit 25 that's written back in March
7 of 1995 that references changes in AWP; correct?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  It's consistent with Gerry
10 Eichhorn's opinion that was expressed in 25.
11 BY MR. ANDERSON:
12    Q.   Okay.  Now, looking back at Exhibit 27,
13 reading from the second paragraph of the summary,
14 quote "Vancomycin's price is based on the product,
15 its uses, and the cost of," and then there's some
16 stricken language that read "patent-protected
17 compound" and there's some new underlined language
18 that reads "branded product."
19      Did I read that correctly?
20      MS. TABACCHI:  Objection, beyond the
21 scope.
22      THE WITNESS:  I'm sorry.  Could you --

Page 570

1 BY MR. ANDERSON:
2    Q.   I'm reading from the second paragraph in
3 the Summary section.
4    A.   Oh, okay.  I was down a little too low
5 on that.  Okay.
6    Q.   Is that a true statement?
7      MS. TABACCHI:  Object to the form,
8 beyond the scope.
9      THE WITNESS:  It's a confusing statement
10 to me.
11 BY MR. ANDERSON:
12    Q.   Has Abbott ever set the price of its
13 vanco based on the price of Lily's brand product?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  When we introduced the
16 product, when Lily's patent expired.
17 BY MR. ANDERSON:
18    Q.   And how do you know that?
19    A.   I was in the Product Sales component of
20 home care at the time.
21    Q.   Were you involved in setting the list
22 price on vanco when it was launched?

Page 571

1    A.   No.
2    Q.   But you just know how it was done?
3    A.   Yes.
4    Q.   Who did you learn that from?
5    A.   I don't recall.
6    Q.   Do you recall that after Abbott had
7 launched its vanco that the next year the list
8 price, and accordingly the AWP, roughly doubled?
9      MS. TABACCHI:  Object to the form,
10 beyond the scope.
11      THE WITNESS:  No.  I don't recall that.
12 BY MR. ANDERSON:
13    Q.   Do you have any reason to dispute the
14 historical Red Books that reflect Abbott's
15 vancomycin having a list price and in turn an AWP
16 that roughly doubled --
17      MS. TABACCHI:  Object to the form.
18 BY MR. ANDERSON:
19    Q.   -- between '88 and '89?
20      MS. TABACCHI:  Beyond the scope of the
21 Notice.
22      THE WITNESS:  It would be inconsistent

Page 572

1 with my recollection.
2 BY MR. ANDERSON:
3    Q.   Can you think of any reason why Abbott's
4 vancomycin would have a list price and in turn an
5 AWP that would double?
6      MS. TABACCHI:  Same objections.
7      THE WITNESS:  I do not remember a change
8 in, and it would be inconsistent with Abbott
9 taking a price increase on a new generic that soon
10 after introduction, number one.
11      Number two, I do remember some
12 point after our introduction after Lily's patent
13 expired, Lily made some adjustment to their list
14 price down.  I don't remember the magnitude of
15 that adjustment, but I do remember that they took
16 their list price down.  And I remember some
17 discussion of trying to figure out why they did
18 that, but that's all I recall.
19 BY MR. ANDERSON:
20    Q.   When did that discussion occur?
21      MS. TABACCHI:  Objection, beyond the
22 scope.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 573

1         THE WITNESS:  Like I said, it was after
2  our introduction of vancomycin.  It was not years,
3  it was, you know, six to twelve months afterwards.
4  BY MR. ANDERSON:
5     Q.   So back in the late '80s you were
6  involved in discussions about Abbott's vanco AWP
7  being higher than the Lily brand AWP?
8         MS. TABACCHI:  Object to the form,
9  beyond the scope.
10        THE WITNESS:  The discussions that I
11  vaguely remember relate to trying to understand
12  what tactical plan Lily had for reducing
13  their prices.
14  BY MR. ANDERSON:
15     Q.   What tactical plan did Abbott have with
16  respect to its AWP and list price being higher
17  than the brand Lily list price and AWP?
18        MS. TABACCHI:  Object to the form,
19  beyond the scope.
20        THE WITNESS:  Our practice for new
21  generics at that point in time and probably up
22  through the middle of 1995 for any new products

Page 574

1  that we introduced where the branded product lost
2  patent protection, we would price our drug on a
3  list price basis at or near where the innovator
4  was, never over, but equal to or a little less
5  than, knowing full well that after our
6  introduction that contract prices would plummet.
7         So, again, the list price was just
8  a placeholder as far as we were concerned, and the
9  contract prices would go down.  That's what we had
10  traditionally seen with any product that we
11  introduced.
12        So it wasn't until 2001 that we
13  instituted the practice of adjusting WAC and list
14  price to be commensurate with that reduction that
15  would happen invariably on a generic item.
16  BY MR. ANDERSON:
17     Q.   Objection, nonresponsive.
18        Sir, I'm asking a specific question
19  about Abbott's strategy with respect to Abbott
20  having an AWP and list price that are doubling in
21  quantity while around the same timeframe Lily's
22  brand list price and AWP are coming significantly

Page 575

1  down.
2     A.   Again, I don't accept, or I don't have a
3  recollection of our list price doubling on that
4  product.
5         The only explanation I have is that
6  in comparison to the Lily prices, it would look
7  like ours were a larger factor than they were when
8  we originally introduced, mainly because Lily
9  reduced their price.
10     Q.   Well, I understand, sir, that if the
11  Lily list and AWP come down below the Abbott
12  generic list and AWP, that that could look
13  strange.  But I'm asking a slightly different
14  question, and that is not only is Lily decreasing
15  their brand list and AWP, but around the same
16  timeframe in the late '80s Abbott is actually
17  roughly doubling its list and in turn AWP on its
18  vancomycin.  Can you explain that?
19     A.   You've said that a number of times.
20        MS. TABACCHI:  Object to the form,
21  beyond the scope.
22        THE WITNESS:  That isn't my

Page 576

1  recollection.  You want to show me some numbers?
2  BY MR. ANDERSON:
3     Q.   But you do recall, don't you, sir, that
4  from the early '90s all the way through 2000 what
5  Abbott typically did on vancomycin was each year
6  they just took some kind of standard increase on
7  the list price and reported that to the compendia?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I've said multiple times
10  that in looking back over this time period, and in
11  particular with vancomycin, vancomycin appears to
12  have taken inflationary increases on an annual
13  basis on list price throughout '91 through '99, or
14  '92, whenever we actually increased prices on
15  vanco.  That was not in coordination with where
16  our contract prices were going at the same time,
17  which I've said before, you know, has been a
18  disparity in place that we called inadvertent
19  because we believed that they were going due to
20  two different and discreet actions were taking
21  place and neither of the two were looked at
22  together.

62 (Pages 573 to 576)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                          March 31, 2008

Page 577

1   BY MR. ANDERSON:
2      Q.   You just mentioned the word
3   "inadvertent," and in your testimony a couple
4   weeks ago in this case as a 30(b)(6) witness I
5   think you used the word about ten times.
6      A.   Thank you.
7      Q.   Was anything inadvertent about the vanco
8   price decrease and subsequent price increase in
9   1995?
10        MS. TABACCHI:  Object to the form.
11  BY MR. ANDERSON:
12     Q.   Was it a mistake?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  It wasn't what I wanted to
15  happen as the general manager of Home Infusion
16  Services, but it happened.
17  BY MR. ANDERSON:
18     Q.   But was it inadvertent?
19     A.   No.  It was not inadvertent.
20     Q.   It was done purposefully; wasn't it?
21        MS. TABACCHI:  Object to form.
22        THE WITNESS:  There were discreet

Page 578

1   decisions made.
2   BY MR. ANDERSON:
3      Q.   And in turn implemented?
4      A.   Yes.
5      Q.   And that could have been done, or
6   rectified rather, from 1995, '96, '97, '98, '99,
7   2000, all the way up until it finally was
8   corrected in 2001; correct?
9        MS. TABACCHI:  Object to the form,
10  beyond the scope of the Notice.
11        THE WITNESS:  Could have been.
12  BY MR. ANDERSON:
13     Q.   But it wasn't --
14        MS. TABACCHI:  Same objections.
15  BY MR. ANDERSON:
16     Q.   -- was it?
17     A.   No, it wasn't, because the people that
18  control that price didn't look at it that way.
19        We've talked about that before.  It
20  was not seen as a discreet product when it came to
21  catalog increases.
22        MR. ANDERSON:  Let's switch the tape.

Page 579

1        MS. TABACCHI:  Let's take a break while
2   we're switching the tape.
3        THE VIDEOGRAPHER:  We are off the record
4   at 3:15 p.m. with the end of Tape No. 4.
5        (WHEREUPON a recess was taken.)
6        THE VIDEOGRAPHER:  We are back on the
7   record at 3:30 p.m. with the start of Tape No. 5.
8   BY MR. ANDERSON:
9      Q.   Continuing on where we were,
10  Mr. Sellers, in looking at the footer for the
11  Exhibit 27 memo titled "VancomycinCPA.doc."
12     A.   Yes.
13     Q.   Do you believe that the initials "CPA"
14  in that context stand for catalog price
15  adjustment?
16        MS. TABACCHI:  Objection, beyond the
17  scope, object to the form.
18        THE WITNESS:  I don't know exactly what
19  it refers to.
20  BY MR. ANDERSON:
21     Q.   Does it seem reasonable to infer that
22  "CPA" in that context stands for catalog price

Page 580

1   adjustment?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  It wouldn't be my first
4   assumption.
5   BY MR. ANDERSON:
6      Q.   You don't think it stands for certified
7   public accountant; do you?
8      A.   No.
9      Q.   What do you think "CPA" stands for?
10        MS. TABACCHI:  Object to the form,
11  beyond the scope.
12        THE WITNESS:  Based on the two
13  documents, I would infer it to be Corporate Public
14  Affairs.
15  BY MR. ANDERSON:
16     Q.   Do you think that Corporate Public
17  Affairs was involved in creating what's marked as
18  Exhibits 27 and 28?
19        MS. TABACCHI:  Objection, beyond the
20  scope, object to the form.
21        THE WITNESS:  Yes, I believe so.
22  BY MR. ANDERSON:

63 (Pages 577 to 580)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 581

1    Q.   Was this vancomycin analysis performed
2  in or about the same time period that you were
3  conducting your catalog price adjustment analysis?
4        MS. TABACCHI:  Object to the form,
5  beyond the scope.
6        THE WITNESS:  It was preceding it
7  slightly.
8          Again, I'm going from the date
9  here.  Since I don't recall the document, I can't
10  give you anything more than the timing that's on
11  the document itself.
12  BY MR. ANDERSON:
13    Q.   Yeah.  We'll get to the catalog price
14  adjustment memo that you wrote.  I'll tell you I
15  think it's dated like January 18, '01.  So that's
16  a few months after obviously October and November
17  of 2000; correct?
18    A.   Right.  I think I've testified before
19  that my recollection of the catalog price
20  adjustment project was December through the first
21  quarter of 2001, December 2000 through the first
22  quarter of 2001.

Page 582

1    Q.   Now, in looking at the second paragraph
2  again of Exhibits 27 and 28, I'm going to read the
3  next sentence.  Quote "Abbott has made price
4  adjustments in response to the common market
5  factors, customer commitments, competitive
6  environment."
7          Did I read that correctly?
8    A.   That's on No. 27; right?
9    Q.   It's the second sentence in the second
10  paragraph in the Summary section from both 27 and
11  28.
12    A.   Oh, I was looking at the wrong page on
13  28.  Sorry about that.
14    Q.   It's all right.
15    A.   Yes.
16    Q.   Is that a true statement?
17        MS. TABACCHI:  Object to the form,
18  beyond the scope.
19        THE WITNESS:  I believe so.
20  BY MR. ANDERSON:
21    Q.   What vancomycin prices were adjusted in
22  response to common market factors from 1991

Page 583

1  through 2000?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  If you're talking about
4  published prices, our published prices as I
5  remember looking at it reflected general
6  inflationary increases.  That is, inflation
7  applies to the whole market.
8          If you're talking about contract
9  prices, which this doesn't contemplate a
10  difference between the two, our contract prices
11  were definitely in response to the competitive
12  environment and the commitments the customers were
13  willing to give us.
14  BY MR. ANDERSON:
15    Q.   All right.  Let's set aside the contract
16  prices and focus for a moment on the published
17  catalog, a/k/a list price.
18          What market factors did Abbott
19  consider in taking inflationary price increases on
20  those published prices from 1991 through 2000?
21        MS. TABACCHI:  Object to the form, asked
22  and answered.

Page 584

1        THE WITNESS:  Again, inflation covers
2  every part of the market.  It covers our labor
3  cost, it also covers our raw material cost, and
4  our manufacturing process costs.
5  BY MR. ANDERSON:
6    Q.   In order to recover those costs that may
7  be increasing with inflation, doesn't a
8  manufacturer actually have to receive payment at
9  that price?
10        MS. TABACCHI:  Object to the form,
11  beyond the scope of the Notice.
12        THE WITNESS:  Yes.
13  BY MR. ANDERSON:
14    Q.   If Abbott's taking inflationary
15  increases that are not actually being paid by
16  customers, how can Abbott in turn recover
17  inflationary cost such as labor?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  All of our prices were
20  looked at in terms of a component of our overall
21  revenue.
22          There were some sales at list

64 (Pages 581 to 584)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 585

1  price.  And whether there were sales at list price
2  for vancomycin or not, I'm sure you guys have
3  looked at our sales data more than I have to
4  identify that.  But in general across all of our
5  catalog items, there were some sales.  So we
6  expected to recoup those on those sales.
7      Also, as I said the last time,
8  about a week ago, some of those CPIU values were
9  used for us to take increases on our contracts as
10  well.  So we did get ultimately paid some portion
11  of the price increases that we took.
12 BY MR. ANDERSON:
13     Q.   Do you recall analyzing the catalog
14 prices and writing a conclusion that less than one
15 percent of the sales were at list or catalog
16 price?
17     A.   In 2001, yes.
18     Q.   How can Abbott go about recovering labor
19 expenses that are increasing due to inflation, for
20 instance, if it's only charging its increased list
21 prices less than one percent of the time?
22     MS. TABACCHI:  Object to the form, asked

Page 586

1  and answered, beyond the scope.
2      THE WITNESS:  I didn't say that that was
3  the sole attempt that we had at recovering
4  increased costs.  It was one component.
5  BY MR. ANDERSON:
6      Q.   All right.  Other than sales at list or
7  catalog price at less than one percent of the
8  transactions, what other market factors did Abbott
9  consider in adjusting the prices of vancomycin
10 from 1991 through 2000?
11     A.   For the list price, which is what you've
12 tried to narrow this statement to, for the list
13 price that's the primary factor.
14     Q.   All right.  Now, continuing on, the last
15 paragraph of the first page of the memo titled
16 "Issue:  Vancomycin," which is part of Exhibits 27
17 and 28, I'm reading for the benefit of the record,
18 quote "The Medicare laws were designed to provide
19 healthcare providers with reimbursement for the
20 product and the cost associated with administering
21 them.  Vancomycin's pricing structure has been in
22 line with these laws."

Page 587

1      Did I read that correctly?
2      A.   Yes.
3      Q.   Is that a true statement?
4      MS. TABACCHI:  Object to the form,
5  beyond the scope.
6      THE WITNESS:  Yes, I believe it is.
7  BY MR. ANDERSON:
8      Q.   Was Abbott's pricing of vancomycin in
9  line with Medicare and Medicaid laws in May of
10 1995 when the price was increased?
11     MS. TABACCHI:  Object to the form,
12 beyond the scope of the Notice.
13     THE WITNESS:  The price ultimately took
14 an inflationary increase --
15 BY MR. ANDERSON:
16     Q.   And was that increase --
17     A.   -- in 1995.
18     Q.   And was that increase in Abbott's view
19 in line with laws?
20     MS. TABACCHI:  Object to the form,
21 beyond the scope of the Notice.
22     THE WITNESS:  Yes.

Page 588

1      MS. TABACCHI:  The witness is not here
2  to testify about the law.
3  BY MR. ANDERSON:
4      Q.   Why?  On what do you make that
5  statement?
6      MS. TABACCHI:  Same objections.
7      THE WITNESS:  To my knowledge, there
8  were no laws specifying how you could price drugs.
9  BY MR. ANDERSON:
10     Q.   What efforts have you made to understand
11 any issues surrounding the legality of Abbott's
12 price changes on vancomycin in 1995?
13     MS. TABACCHI:  Object to the form,
14 beyond the scope of the Notice.  The witness is
15 not here to testify about the legality.
16     THE WITNESS:  That issue is not
17 pertinent to vancomycin on its own.
18 BY MR. ANDERSON:
19     Q.   So is the answer to my question "None"?
20     MS. TABACCHI:  Object to the form,
21 argumentative, same objections.
22     THE WITNESS:  The answer is vancomycin

65 (Pages 585 to 588)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 589

1  is not singled out in any law that I know of.
2  BY MR. ANDERSON:
3      Q.   Well, I didn't ask if it was singled
4  out, sir.  I asked if there was any effort on your
5  part as the corporate representative testifying
6  about the vanco price changes in 1995 to ascertain
7  whether those changes were in compliance with
8  laws?
9          MS. TABACCHI:  Object to the form,
10 beyond the scope of the Notice.
11         THE WITNESS:  I ran the Contract
12 Marketing department from 1990 to 1992.  I also
13 ran it from 2000 up through 2004.  I was never
14 made aware of any price restriction on a product
15 for list price.
16 BY MR. ANDERSON:
17     Q.   Objection, nonresponsive.
18         Sir, as the corporate
19 representative, are you aware of any effort that
20 Abbott undertook to ascertain whether the price
21 manipulation that it undertook in and around April
22 and May of 1995 on vancomycin complied with laws?

Page 590

1          MS. TABACCHI:  Object to the form,
2  beyond the scope of the Notice.  This is
3  argumentative and improper.
4          THE WITNESS:  Not as an individual
5  action, no.
6  BY MR. ANDERSON:
7      Q.   Why didn't Abbott reduce its vancomycin
8  catalog and in turn AWP price when Lily decreased
9  the brand list and AWP price?
10         MS. TABACCHI:  Object to the form,
11 beyond the scope of the Notice.
12         THE WITNESS:  We didn't see a need to.
13 Nothing that we were selling in the hospital
14 environment, again, the hospital was our primary
15 market and has been our primary market for
16 vancomycin, saw no need to make an adjustment.
17 BY MR. ANDERSON:
18     Q.   Looking at the second page of the memo
19 titled "Issue:  Vancomycin," which is Exhibits 27
20 and 28, do you see in the middle of the page under
21 Sales and Marketing a paragraph that states "The
22 market share for hospital was thirty-seven percent

Page 591

1  for Abbott's vanco while it was sixty percent in
2  Alternate Site"?
3          MS. TABACCHI:  Object to the form,
4  beyond the scope of the Notice.
5          THE WITNESS:  In 1996.
6  BY MR. ANDERSON:
7      Q.   Yes, sir.
8      A.   Yes.
9      Q.   So Abbott did a lot better in the
10 Alternate Site arena where AWP was important
11 versus the hospital arena; didn't it?
12         MS. TABACCHI:  Object to the form,
13 beyond the scope of the Notice, mischaracterizes
14 the testimony and the document.
15         THE WITNESS:  I think if you look at
16 this timeframe, that the overall gross utilization
17 of vancomycin was higher in Alternate Site across
18 the board for the market than in the hospitals.
19         What caused HCFA to go and take
20 vanco off was because of the accelerated use of
21 vancomycin in Alternate Site.  And the fear that
22 was being forwarded by the pharmacists societies

Page 592

1  that continuing to support vancomycin utilization
2  would endanger its status as a product or an
3  antibiotic of last resort.
4  BY MR. ANDERSON:
5      Q.   Objection, nonresponsive.
6          Sir, this is a market share
7  percentage; correct?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope.
10         THE WITNESS:  No.  As I understand it,
11 the way it's written, it is a split of our sales
12 of our vancomycin.
13         So as I understand the statement,
14 they're saying thirty-seven percent of the
15 vancomycin we sold went into hospitals in 1996,
16 sixty percent went into Alternate Site.
17 BY MR. ANDERSON:
18     Q.   Why do you say that, sir?
19         MS. TABACCHI:  Same objections.
20         THE WITNESS:  It's just the way I read
21 that sentence.
22 BY MR. ANDERSON:

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 593

1    Q.   Did Abbott succeed in selling more
2 drugs, more vancomycin products, in the Alternate
3 Site arena in comparison to its competitors than
4 it did in the hospital arena?
5        MS. TABACCHI:  Object to the form,
6 beyond the scope.
7        THE WITNESS:  It may have.
8 BY MR. ANDERSON:
9    Q.   Do you know that it did?
10       MS. TABACCHI:  Same objections.
11       THE WITNESS:  I don't know that it did.
12 BY MR. ANDERSON:
13   Q.   Why do you say that it may have?
14       MS. TABACCHI:  Now you're asking the
15 witness to speculate.  It's beyond the scope.
16       MR. ANDERSON:  No, I'm not.  He
17 testified that it may have.  I'm just trying to
18 understand the process.
19       THE WITNESS:  Overall we were successful
20 with vancomycin.  We were successful with
21 vancomycin primarily because vancomycin is a very
22 hard drug to manufacture and manufacture

Page 594

1 consistently.
2        It is a freeze-dried powdered
3 product.  For one thing there are very few
4 manufactures in the United States, or even the
5 world, that have adequate freeze-drying capacity
6 for pharmaceuticals.  And throughout this time
7 period we were successful because others stumbled
8 in their ability to consistently provide quality
9 product through this process.
10       And so, as I said before, what
11 we've marketed all along is we've marketed
12 competitive prices, contract prices, a broad
13 portfolio of products, quality products, and
14 dependability of delivery.  And I think
15 vancomycin, if you look at this timeframe, is a
16 perfect example of how dependability of delivery
17 garnered business from our competitors.
18 BY MR. ANDERSON:
19   Q.   Objection, nonresponsive.
20       Sir, my question was why did you
21 testify Abbott may have been more successful in
22 selling in the Alternate Site arena in comparison

Page 595

1 to its competitors on vancomycin than it was in
2 the hospital arena?
3        MS. TABACCHI:  Objection, beyond the
4 scope, asked and answered.
5        THE WITNESS:  I think I answered that
6 question.
7 BY MR. ANDERSON:
8    Q.   The same dynamics, sir, that you've just
9 described about the making of vanco would apply in
10 the hospital arena and in the Alternate Site
11 arena.
12   A.   Uh-huh.
13   Q.   Am I right?
14   A.   Uh-huh.
15   Q.   So setting aside manufacturing
16 capability, I'm asking why did you say Abbott may
17 have been more successful in the Alternate Site
18 arena in comparison to its competitors on vanco
19 than it was in the hospital arena?
20       MS. TABACCHI:  Object to the form,
21 beyond the scope.
22       THE WITNESS:  Again, I've explained the

Page 596

1 reason I believe so.  I don't have any other facts
2 to tell you.
3 BY MR. ANDERSON:
4    Q.   Did it have anything to do with the
5 reimbursement in the Alternate Site arena as to
6 why Abbott may have been more successful against
7 its competitors there as opposed to the hospital
8 arena?
9        MS. TABACCHI:  Object to the form,
10 beyond the scope.
11       THE WITNESS:  I don't have any facts to
12 tell me that's the case.
13 BY MR. ANDERSON:
14   Q.   Do you have some general understanding
15 that that's the case?
16   A.   No.
17       MS. TABACCHI:  Same objections.
18 BY MR. ANDERSON:
19   Q.   Do you know that some sales reps of
20 Abbott Alternate Site have sworn under oath in
21 this case that that was the situation?
22       MS. TABACCHI:  Same objections.

67 (Pages 593 to 596)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                                    March 31, 2008

Page 597

1        THE WITNESS:  I'm not familiar with
2   that.
3   BY MR. ANDERSON:
4      Q.   You haven't read the testimony of Ted
5   Lyjak?
6        MS. TABACCHI:  Object to the form,
7   beyond the scope of the Notice.
8        THE WITNESS:  No, I haven't.
9   BY MR. ANDERSON:
10     Q.   Have you read the testimony of Cliff
11  Krajewski?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  No.
14
15  BY MR. ANDERSON:
16     Q.   Back to my original question.  Why when
17  Lily decreased its list price -- no, strike that.
18  I'll ask a predicate question.
19            Sir, is it true that you've
20  testified that the reason Abbott set its vanco
21  list price initially was predicated on Lily's
22  brand price?

Page 598

1        MS. TABACCHI:  Objection, beyond the
2   scope.
3        THE WITNESS:  At the time of
4   introduction, yes.
5   BY MR. ANDERSON:
6      Q.   Okay.  Knowing that, why when Lily
7   decreased its list price that Abbott had
8   previously worked off of did Abbott not follow
9   suit and likewise decrease its list price?
10       MS. TABACCHI:  Objection, beyond the
11  scope, asked and answered.
12       THE WITNESS:  I don't have a specific
13  reason other than the people that were controlling
14  that price, it was a quandary to them as to why
15  Lily reduced their price.
16  BY MR. ANDERSON:
17     Q.   If Abbott is interested in following the
18  corresponding brand list price, wouldn't it stand
19  to reason that Abbott would decrease its list
20  price when the brand is decreased?
21       MS. TABACCHI:  Object to the form,
22  beyond the scope.

Page 599

1        THE WITNESS:  I don't think our tactic
2   has ever been to follow the brand.  Our tactic has
3   been to be better or equivalent to the brand at
4   the point of patent expiration.  And I think
5   that's consistent with what we did.
6   BY MR. ANDERSON:
7      Q.   I'm not talking about quality of product
8   here, sir.  I'm talking about pricing.
9      A.   I was referring to pricing.
10     Q.   It's Abbott's strategy historically to
11  price above the brand --
12       MS. TABACCHI:  Object.
13  BY MR. ANDERSON:
14     Q.   -- with respect to published list
15  prices?
16       MS. TABACCHI:  Object to the form,
17  beyond the scope.
18       THE WITNESS:  No.  I said that it was
19  not the practice to I think your term was to
20  follow the brand, it was not the practice to
21  follow the brand.
22            The practice was to make sure at

Page 600

1   introduction we had a price that was equal to or
2   better than the innovator.
3   BY MR. ANDERSON:
4      Q.   What do you mean "better"?
5      A.   Lower.
6      Q.   Lower.  How much lower?
7        MS. TABACCHI:  Object to the form,
8   beyond the scope.
9        THE WITNESS:  It depended upon the
10  continuum.
11            I think vancomycin was one of the
12  early products that came off patent.  I think it
13  came off patent in 1988 or '89, something like
14  that.  In later years, in the late 1990s, our
15  practice might have been to price the Abbott drug
16  that was coming in following the innovator a
17  little below the innovator but never over the
18  innovator, at introduction.
19  BY MR. ANDERSON:
20     Q.   So given Abbott's awareness back in the
21  late '80s that its list price was greater than the
22  Lily innovator vanco, why did Abbott allow that

                              68 (Pages 597 to 600)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 601

1  situation to continue?
2       MS. TABACCHI:  Object to the form,
3  beyond the scope.
4       THE WITNESS:  Again, I think it
5  highlights the "inadvertent" that I used before.
6  It highlights the fact that the people that were
7  controlling the list price had no knowledge of
8  what relationship list price had to anything.  So
9  when Lily reduced its price, they wondered what
10 tactic Lily was using, they couldn't figure out
11 one, we were continuing to sell our product, so
12 they just let, it got dropped.
13 BY MR. ANDERSON:
14   Q.   And that's your testimony on behalf of
15 the corporation despite the analysis that was
16 conducted and the actions that were taken in
17 decreasing list prices on vanco in 1995 and then
18 subsequently re-increasing those list prices?
19       MS. TABACCHI:  Object to the form,
20 beyond the scope.
21       THE WITNESS:  Again, they were discreet
22 separate actions, probably handled by different

Page 602

1  people.
2  BY MR. ANDERSON:
3    Q.   Why do you say "probably"?
4       MS. TABACCHI:  Object to the form,
5  beyond the scope.
6       THE WITNESS:  Because we typically moved
7  managers through Contract Marketing pretty
8  regularly.  Contract Marketing was a management
9  training position.
10 BY MR. ANDERSON:
11   Q.   Harry Adams never left; did he?
12       MS. TABACCHI:  Objection, beyond the
13 scope.
14       THE WITNESS:  No.
15 BY MR. ANDERSON:
16   Q.   Jerrie Cicerale never left; did she?
17   A.   No.
18   Q.   They were there for well over a decade;
19 weren't they?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  Yes.
22 BY MR. ANDERSON:

Page 603

1    Q.   They were there from 1991 all the way
2  through 2003?
3    A.   Yes.
4    Q.   So there was some continuity there;
5  wasn't there?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  There was.  They weren't
8  price decision making decisions.
9  BY MR. ANDERSON:
10   Q.   Harry wasn't a price decision maker?
11   A.   No.
12   Q.   Jerrie was the point of contact when all
13 of the catalog and list prices were published;
14 wasn't she?
15   A.   Yes.
16   Q.   Sir, is it your testimony that Abbott's
17 reason for the list prices was to garner some
18 incremental sales albeit less than one percent
19 list price?
20       MS. TABACCHI:  Object to the form, asked
21 and answered.
22       THE WITNESS:  I'm not sure I understand

Page 604

1  your question.
2  BY MR. ANDERSON:
3    Q.   Well, is Abbott's purpose in having list
4  prices to sell at list price?
5       MS. TABACCHI:  Object to the form.
6       THE WITNESS:  Our list price was
7  intended for customers who did not have a contract
8  with Abbott who bought directly from Abbott.  So
9  that was the purpose of our list price, yes.
10
11 BY MR. ANDERSON:
12   Q.   And you quantified it as less than one
13 percent of the sales; correct?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  In 2001.  I qualified it
16 as saying that was in a document that I authored
17 in 2001.
18       I also said in past testimony that
19 I believe that percentage changed.  If you look at
20 the period 1991 on, I believe it was higher in
21 around 1991.
22       It also changed year to year based

69 (Pages 601 to 604)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 605

1   on problems that our competitors had.
2   BY MR. ANDERSON:
3       Q.   If Abbott's purpose was to sell product
4   at list price and be competitive with its
5   competitors, why when Lily decreased its list
6   price would Abbott not also decrease its list
7   price in order to be competitive?
8           MS. TABACCHI:  Object to the form,
9   beyond the scope.
10          THE WITNESS:  Our experience is that our
11  primary customer, the hospital, was being serviced
12  by contract for the most part, and so the list
13  price, again, was for a small portion, I believe
14  that back in 1991 it was larger than one percent,
15  but a small portion of the sales that we would
16  make.
17  BY MR. ANDERSON:
18      Q.   Would you agree with the basic premise
19  that if Abbott's list price is significantly
20  higher than Lily's list price, that Abbott will be
21  at a disadvantage when it sells to customers at
22  list price?

Page 606

1           MS. TABACCHI:  Object to the form,
2   beyond the scope.
3           THE WITNESS:  For a noncontract customer
4   who wants to buy vancomycin, or who wanted to buy
5   vancomycin at that point in time, if they had the
6   ability to buy it from Lily and the ability to buy
7   it from Abbott, Lily's price on some of the forms
8   was better than what Abbott had.
9           But as I said before, a lot of or a
10  number of our list price sales happened because
11  there wasn't other product available.  So in that
12  case we wouldn't have been at a disadvantage
13  because there wasn't competitive product
14  available.
15  BY MR. ANDERSON:
16      Q.   Objection, nonresponsive.
17          Mr. Sellers, is there any
18  justification in your view for Abbott, and when I
19  say "your" I mean as the corporate designee, for
20  Abbott to set published list prices or catalog
21  prices at a certain level in consideration of
22  provider dispensing fees?

Page 607

1           MS. TABACCHI:  Object to the form,
2   beyond the scope of the Notice.
3           THE WITNESS:  As I said earlier this
4   morning, provider dispensing fees are the same
5   regardless of whose vancomycin you use.  So it
6   would make no sense for us to try to accommodate
7   those in our pricing.
8   BY MR. ANDERSON:
9       Q.   In looking at the last page of Exhibits
10  27 and 28, specifically the last paragraph, do you
11  agree that there's a commentary there discussing
12  providers' complaints about inability to dispense
13  and recover nursing labor?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  I agree that in this
16  document they appear to be trying to explain why
17  some of our customers might have had a problem
18  with a reduced reimbursement.
19
20  BY MR. ANDERSON:
21      Q.   In Abbott's view is any complaint about
22  provider dispensing fees or administration fees

Page 608

1   somehow a justification for inflated list prices
2   or catalog prices or AWP prices that set
3   reimbursement for drug cost?
4           MS. TABACCHI:  Object to the form,
5   beyond the scope of the Notice.
6           THE WITNESS:  It was never considered.
7   BY MR. ANDERSON:
8       Q.   Never considered by whom?
9           MS. TABACCHI:  Same objections.
10          THE WITNESS:  It was never considered by
11  anyone setting the prices, the list prices.
12  BY MR. ANDERSON:
13      Q.   Was it ever considered by anyone at
14  Abbott, to your knowledge, as the corporate
15  designee?
16          MS. TABACCHI:  Object to the form,
17  beyond the scope.
18          THE WITNESS:  Well, I mean we saw a
19  document earlier today that Virginia Tobiason
20  wrote that kind of talked about issues that
21  providers would face.
22          Other than that, no, in terms of

Henderson Legal Services, Inc.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                     March 31, 2008

Page 609

1  pricing our product, it wasn't considered.
2  BY MR. ANDERSON:
3     Q.   Do you believe as the corporate
4  representative that Abbott would have been
5  justified in raising its list prices on vanco in
6  May of 1995 because providers complained about
7  inability to recover dispensing fees or
8  administration fees?
9        MS. TABACCHI:  Object to the form,
10 beyond the scope.
11       THE WITNESS:  As I sit here today, I
12 don't believe that's an issue, that was the issue.
13       I've postulated for you what I
14 believe the motivation was for raising the prices
15 back up.  It was between two people that were
16 primarily focused on the hospital market.  It did
17 not involve a confab with Alternate Site and
18 everybody else to decide hey, we're going to take
19 the prices up.
20 BY MR. ANDERSON:
21    Q.   To sum it up, what you're saying is the
22 sole reason for the vanco price increase in or

Page 610

1  about May of '95 was some kind of wholesaler shelf
2  stock adjustment; correct?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  It was the budget impact
5  that would have been caused by that reduction to
6  the Hospital Business Sector.
7  BY MR. ANDERSON:
8     Q.   Yet you can't point to a single shred of
9  testimony, witness interview, or documentation
10 that supports that position; can you?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  Again, I told you I looked
13 at Gerry Eichhorn's deposition, and I believe he
14 talks about a discussion with Harry Adams where
15 they talk about hey, we only do this once a year.
16 The only reason Harry would have a problem with
17 that is that kind of issue.
18 BY MR. ANDERSON:
19    Q.   Are you aware as Abbott's corporate
20 representative of any overutilization concerns
21 related to vancomycin over the years?
22       MS. TABACCHI:  Objection, beyond the

Page 611

1  scope.
2        THE WITNESS:  By whom?
3  BY MR. ANDERSON:
4     Q.   By providers.
5        MS. TABACCHI:  Object to the form,
6  beyond the scope.
7        THE WITNESS:  Not by providers, no.
8  BY MR. ANDERSON:
9     Q.   By physicians?
10       MS. TABACCHI:  Same objections.
11       THE WITNESS:  As I said before, in and
12 around '95 or '94, I can't remember which,
13 preceding the decision by HCFA to hault
14 reimbursement on their Plan B of, or under Part B,
15 for vancomycin, there was a number of articles and
16 letters to Congress, letters to HCFA, from
17 pharmacy societies, the American Hospital Society
18 of Pharmacists, I can't remember what the retail
19 pharmacists is.  But anyway, there was basically a
20 call by clinical pharmacists saying that vanco was
21 being overutilized or used when other antibiotics
22 should have been used first.  So that's what I

Page 612

1  remember.
2  BY MR. ANDERSON:
3     Q.   Was any medical concern regarding
4  overuse of vancomycin considered by Abbott in
5  Abbott's decision to raise the list prices in or
6  about May of 1995?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  No.
9
10 BY MR. ANDERSON:
11    Q.   But you do recall that Abbott had an
12 awareness that there were concerns about
13 overutilization of vanco prior to May of '95;
14 correct?
15       MS. TABACCHI:  Object to the form,
16 beyond the scope.
17       THE WITNESS:  I can't remember when
18 those issues were raised.  There were a few people
19 that may have been aware of those issues being
20 raised.  But in general it wasn't, I don't think
21 it was an issue across the board that everybody in
22 HPD would have been aware of.

71 (Pages 609 to 612)

Page 613

1  BY MR. ANDERSON:
2      Q.   The memo titled "Issue:  Vancomycin"
3  that's part of Exhibits 27 and 28 --
4      A.   Yes.
5      Q.   -- that we've look at extensively today,
6  do you feel like there's portions of that memo
7  that are incorrect?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10         THE WITNESS:  Again, in retrospect
11 knowing what I know today and what I've been able
12 to piece together from the depositions, I don't
13 think it's as complete a representation as I think
14 I would have wanted it to be.
15 BY MR. ANDERSON:
16     Q.   Why would Corporate Public Affairs
17 personnel or anyone else at Abbott for that matter
18 provide incorrect information to the CEO Miles
19 White?
20         MS. TABACCHI:  Object to the form,
21 beyond the scope, lack of foundation.
22         THE WITNESS:  I would doubt that they

Page 614

1  felt it was incorrect.  It was correct to the best
2  of their knowledge at the time.  If you were to
3  ask somebody from Corporate Public Affairs, I
4  think they would tell you that.
5  BY MR. ANDERSON:
6      Q.   So back in 2000 when the issue
7  vancomycin memo was written, that was the best
8  information available to Abbott?
9          MS. TABACCHI:  Object to the form,
10 beyond the scope.
11         Mr. Sellers did not create this.
12 This is beyond the scope of the question.  There's
13 no foundation for this at all.  We've spent hours
14 on it.
15         MR. ANDERSON:  He is the corporate
16 designee on vanco price changes.
17         MS. TABACCHI:  He's not the designee on
18 what this document means.
19         MR. ANDERSON:  The entire document is
20 about vanco price changes.
21         You can grandstand all you want,
22 Tina, but I'm going to keep asking my questions.

Page 615

1  You can filibuster if you want, I'm going to keep
2  asking my questions.  And we'll ask these
3  questions at trial, and they will continue to be
4  asked.
5          MS. TABACCHI:  That's fine.  You use
6  your time as you wish, but I have already
7  explained to Ann that the deposition needs to
8  conclude by 5:00 p.m. today.  If this is what you
9  want to do with your time --
10         MR. ANDERSON:  I want to get answers.
11         MS. TABACCHI:  The questions that you've
12 posed have been answered.
13         MR. ANDERSON:  No.  They have not.  I
14 have a question pending now that you interrupted.
15         Please read it back.
16         (WHEREUPON said record was read
17          back as requested.)
18         MS. TABACCHI:  Object to the form,
19 beyond the scope, lack of foundation.
20         THE WITNESS:  Again, I don't know
21 whether I participated in that or not.  I don't
22 know whether Bob participated in it or not.

Page 616

1  Again, would I say it was probably the best
2  representation that Corporate Public Affairs had
3  at the time.
4  BY MR. ANDERSON:
5      Q.   But now in 2008 you sit here as a
6  corporate rep and you have read Harry Adams'
7  testimony and Gerry Eichhorn's testimony and you
8  have come up with a new explanation for the
9  pricing of vancomycin; correct?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  While I don't know that
12 it's new, I think it's I believe a little more
13 educated attempt at trying to explain why the
14 prices went up than that memo would have
15 portrayed.  So, again, it's the best I could put
16 together from what I've been able to piece
17 together.  There's a lot of the 1995 in those
18 testimonies where they didn't recall.
19         So sitting here today thirteen
20 years later, I'm trying to give you the best
21 interpretation of what I believe may have happened
22 in 1995.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 617

1        I've given you I believe a very
2  discreet definition of what happened in terms of
3  the price reductions.  There's a lack of
4  recollection in the participants of why it went
5  back up.  I'm trying to give you one potential
6  answer as to why it went up, and I believe that
7  it's based on the practices of the Hospital
8  Products Division in that time and since that
9  would make it consistent with that action being
10 taken.
11 BY MR. ANDERSON:
12    Q.   Would it stand to reason that Abbott's
13 ability to analyze the pricing history on vanco
14 would be more accurate in 2000 than eight years
15 later in 2008?
16       MS. TABACCHI:  Object to the form,
17 beyond the scope.
18       THE WITNESS:  Again, I don't know who
19 worked to put that document together.
20 BY MR. ANDERSON:
21    Q.   I didn't ask you who worked to put it
22 together, sir.

Page 618

1    A.   Well, you're putting everything, you're
2  putting everything --
3    Q.   I would like you to answer my question.
4    A.   You're putting everything on this
5  document --
6    Q.   No, I'm not.
7    A.   -- as being this document is the Bible,
8  and that is not, I'm saying I don't believe that
9  this document may, I'm not sure who the author of
10 this document is.
11       So what pre --
12    Q.   Sir, I'm asking you to answer my
13 questions.
14       MS. TABACCHI:  If you can please allow
15 the witness --
16       MR. ANDERSON:  No.
17       MS. TABACCHI:  -- to complete his
18 answer.
19       MR. ANDERSON:  He cannot just get on a
20 soapbox.
21       You have to answer my questions,
22 sir.  Objection, nonresponsive.  I will rephrase

Page 619

1  my question.
2        THE WITNESS:  Okay.
3        MS. TABACCHI:  Jarrett, if you continue
4  to interrupt the witness and talk over him, we
5  will stop the deposition.  You allow him to finish
6  his answer, then you pose the next question.
7        MR. ANDERSON:  If you want to stop the
8  deposition, you do so at your own peril.
9        MS. TABACCHI:  If you continue to
10 interrupt the witness in the middle of an answer,
11 we will stop.  I would ask you not to do that.
12       MR. ANDERSON:  Well, I would ask the
13 witness to answer the questions.
14       MS. TABACCHI:  Allow him to answer the
15 question and you pose your next question.
16       MR. ANDERSON:  He won't answer, hence we
17 don't get anywhere.
18       MS. TABACCHI:  Don't interrupt him.
19 He's providing the best answers he can.
20 BY MR. ANDERSON:
21    Q.   Mr. Sellers, will you agree that
22 Abbott's ability to understand what it did on the

Page 620

1  pricing of vancomycin would be more accurate in
2  2000 than it would eight years later in 2008?
3        MS. TABACCHI:  Object to the form, asked
4  and answered, beyond the scope.
5        THE WITNESS:  It would be more likely
6  that we had better recollections of the process in
7  2000 than we do in 2008.  However, the depositions
8  that have been done on this go all the way from
9  2002 to 2007, if not only into 2008.
10       (WHEREUPON Exhibit Sellers 032
11        was marked as of 3/31/2008.)
12 BY MR. ANDERSON:
13    Q.   If you could, take a look at what's been
14 marked as Exhibit 32.  (Document tendered to the
15 witness.)
16       Is this an e-mail you were wrote,
17 sir?
18    A.   Yes.
19    Q.   And you wrote to Rich Gonzalez back
20 around May 22, 2000; correct?
21    A.   Correct.
22    Q.   And this is concerning what's known as

Henderson Legal Services, Inc.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 621

1  the FDB or DOJ AWPs; correct?
2    A.  What subsequently became called the DOJ
3  AWPs, yes.
4    Q.  And the gist of those was that DOJ had
5  coordinated with First Databank and had lower AWPs
6  be published for certain drugs including many of
7  Abbott's drugs; correct?
8        MS. TABACCHI:  Objection, beyond the
9  scope.
10       THE WITNESS:  My recollection of that is
11 that the DOJ had done an independent study and had
12 instructed First Databank to change their AWPs.  I
13 don't know that there was a, I don't remember a
14 hand-holding between DOJ and First Databank that
15 was inferred in your question.
16 BY MR. ANDERSON:
17   Q.  You know that the AWPs came down; don't
18 you?
19       MS. TABACCHI:  Object to the form,
20 beyond the scope.
21       THE WITNESS:  I know the proposed AWPs
22 were lower than the current existing AWPs that

Page 622

1  were published by First Databank.
2  BY MR. ANDERSON:
3    Q.  And toward the end of the second
4  paragraph you write, quote "We are still
5  evaluating the value of the reductions."
6        How did Abbott go about evaluating
7  the value of the AWP reductions?
8        MS. TABACCHI:  Objection, beyond the
9  scope.
10       THE WITNESS:  What I was referring to
11 was the magnitude of the reductions, not
12 necessarily a value, but the magnitude of the
13 reductions.
14
15 BY MR. ANDERSON:
16   Q.  Why were you writing Rich Gonzalez and
17 notifying him of these changes?
18       MS. TABACCHI:  Same objection.
19       THE WITNESS:  Rick Gonzalez was the
20 president of the Hospital Products Division.  I
21 was copying Pete Baker who was the general manager
22 for Alternate Site Product Sales, copying Guy

Page 623

1  Wiebking who was my boss, and Lynn Leone who was
2  the manager of Contract Marketing in Alternate
3  Site at the time.  Though she reported to me, she
4  was the, that was her responsibility.  Bob Lyman
5  was the manager of government pricing at the time.
6        So the intent was just to make Rick
7  and the others aware that this had been stated at
8  a conference.  And there were some changes.  We
9  didn't know if those changes were going to have
10 any impact.  We didn't know where it was going to
11 go from here.
12 BY MR. ANDERSON:
13   Q.  Why did you think the president of HPD,
14 Mr. Gonzalez, would care about AWP decreases?
15       MS. TABACCHI:  Object to the form,
16 beyond the scope.
17       THE WITNESS:  I was the general manager
18 of Contract Marketing, which had the ultimate
19 responsibility for contract prices and list prices
20 in concert with others, but I was the one that was
21 responsible for publishing list prices.
22 BY MR. ANDERSON:

Page 624

1    Q.  Which led to the AWPs?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  I was responsible
4  publishing list prices.
5  BY MR. ANDERSON:
6    Q.  Which you knew and others knew at
7  Contract Marketing led to the publication of AWP?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I know now that that's the
10 case.  Was that in the top of my mind in 2000, I
11 don't know.
12       What I was saying was that I felt I
13 had a responsibility if I knew or identified
14 something that was in the marketplace that was
15 changing, to make my management aware of those.
16 BY MR. ANDERSON:
17   Q.  I think you've testified repeatedly that
18 ninety percent of Abbott HPD was in the hospital
19 arena; correct?
20   A.  Correct.
21   Q.  And it's been your testimony that AWP
22 has got nothing to do with the hospital arena;

Henderson Legal Services, Inc.

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 625

1    correct?
2        A.   Correct.
3        Q.   And Rich Gonzalez is the president of
4    HPD of which ninety percent is hospitals; right?
5        A.   Yes.
6        Q.   So why would you send him something
7    about AWPs that only pertains to ten percent of
8    the business, i.e., Alternate Site?
9            MS. TABACCHI:  Objection, asked and
10   answered.
11           THE WITNESS:  It wasn't my position to
12   judge the importance of information.  It was my
13   position to communicate information.  He could
14   then qualify it, whether he wanted to pay
15   attention to it, whether he wanted to ask more
16   questions about it based on it only being ten
17   percent of his sales.
18               We would have been in bad shape if
19   lower levels within the organization made
20   decisions based on what they thought was important
21   and never sent it up the chain of command.
22   BY MR. ANDERSON:

Page 626

1        Q.   Well, you've got to screen it out
2    somehow; don't you?
3            MS. TABACCHI:  Object to the form,
4    beyond the scope.
5            THE WITNESS:  I kept it to two
6    paragraphs.
7    BY MR. ANDERSON:
8        Q.   But it wasn't your habit to send
9    unimportant information to the president of HPD;
10   was it?
11           MS. TABACCHI:  Object to the form,
12   beyond the scope.
13           THE WITNESS:  If it was in the normal
14   process of doing business, no.  I communicate all
15   of the ups and downs that happened in the normal
16   business operations.  When it was something that
17   the government was doing and it was some new
18   factor in the marketplace, I felt responsibility
19   to at least make him aware that we had found out
20   this information and that we were going to be
21   looking into it further.  If he wanted further
22   information, he could have gotten back to me.

Page 627

1    Otherwise, he could have said well, it's nice to
2    know.
3    BY MR. ANDERSON:
4        Q.   Did you think that the AWP changes were
5    worthy of Mr. Gonzalez's consideration?
6            MS. TABACCHI:  Object to the form,
7    beyond the scope.
8            THE WITNESS:  I didn't expect him to
9    lose any sleep over this, but I --
10   BY MR. ANDERSON:
11       Q.   But you sent it to him nonetheless?
12           MS. TABACCHI:  If you could stop
13   interrupting the witness, please.
14           THE WITNESS:  But I wanted to make sure
15   that somebody had put it on the table for him.
16   BY MR. ANDERSON:
17       Q.   In the second paragraph, I'm reading
18   from the second to last sentence, quote "A
19   typographical error on our vancomycin has already
20   caused a number of calls from providers asking for
21   a clarification."
22               Did I read that correctly?

Page 628

1        A.   Yes.
2        Q.   Are you referencing there calls made by
3    pharmacies and other providers directly to Abbott?
4            MS. TABACCHI:  Objection, beyond the
5    scope.
6            THE WITNESS:  I believe they were to
7    Abbott.  Where specifically I'm not sure.
8    BY MR. ANDERSON:
9        Q.   Probably the reimbursement hotline;
10   correct?
11           MS. TABACCHI:  Object to the form,
12   beyond the scope.
13   BY MR. ANDERSON:
14       Q.   You know Abbott had a reimbursement
15   hotline --
16       A.   I don't believe so.
17       Q.   Who do you think the calls were made to?
18           MS. TABACCHI:  Beyond the scope.
19           THE WITNESS:  I don't know whether they
20   came in to Pete Baker's area or whether they came
21   in on the hospital side just questioning what was
22   happening.

Henderson Legal Services, Inc.

202-220-4158                         www.hendersonlegalservices.com

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 629

1  BY MR. ANDERSON:
2      Q.   Why would they come in on the hospital
3  side if AWPs are irrelevant?
4          MS. TABACCHI:  Object to the form,
5  beyond the scope.
6          THE WITNESS:  My experience is that
7  hospital pharmacists like to know.  So they see
8  anything that's in the press or they may question
9  it.
10         So I really didn't have, I really
11 can't tell you, as I sit here today, where the
12 questions were coming from.
13 BY MR. ANDERSON:
14     Q.   You mentioned Pete Baker's Alternate
15 Site sales group.  Is it likely, sir, that
16 customers of the Alternate Site sales group would
17 complain about AWP decreases to Abbott personnel?
18         MS. TABACCHI:  Object to the form,
19 beyond the scope.
20         THE WITNESS:  Again, I didn't talk about
21 complaints.  I said for clarification.  Might we
22 have gotten some calls through Pete's

Page 630

1  organization, yes, we might have.  I don't know.
2  I don't recall.
3  BY MR. ANDERSON:
4      Q.   Was Mr. Gonzalez involved in the
5  analysis of list price and related AWP issues in
6  light of the trifecta of the DOJ, the media, and
7  Congress scrutinizing Abbott's pricing practices?
8      A.   No.
9          MS. TABACCHI:  Object to the form.
10 BY MR. ANDERSON:
11     Q.   Not at all?
12         MS. TABACCHI:  Object to the form.
13
14 BY MR. ANDERSON:
15     Q.   Was Mr. Gonzalez involved at all, sir?
16     A.   No.
17         (WHEREUPON Exhibit Sellers 033
18         was marked as of 3/31/2008.)
19 BY MR. ANDERSON:
20     Q.   If you could, take a look at what's been
21 marked Exhibit 33.  (Document tendered to the
22 witness.)

Page 631

1      A.   Yes.
2          MS. TABACCHI:  This was marked already
3  on Day One.  It doesn't matter.  We can use 33.
4          MS. ST. PETER-GRIFFITH:  Yes, it was.
5  BY MR. ANDERSON:
6      Q.   In looking at Exhibit 33, sir, does that
7  appear to be a cover memo and some attachments
8  that you sent?
9      A.   You know, I've seen this before.  I've
10 never been sure what was attached to this, but the
11 attachment might have been possible, they're both
12 dated the same, could well be.  It addresses what
13 I believe we may have discussed in and around that
14 timeframe.
15     Q.   And do you believe you wrote Exhibit 33?
16         MS. TABACCHI:  Object to the form, asked
17 and answered.
18         THE WITNESS:  I originally authored,
19 yes.
20 BY MR. ANDERSON:
21     Q.   In the cover memo or correspondence, you
22 reference a 10:00 a.m. meeting in Rick Gonzalez's

Page 632

1  office; correct?
2      A.   Yes.
3      Q.   Does that refresh your memory that
4  Mr. Gonzalez was involved in any price publication
5  changes that Abbott was considering in 2000 and
6  2001?
7          MS. TABACCHI:  Object to the form, asked
8  and answered.
9          THE WITNESS:  I've testified before that
10 there was a small number of people involved in the
11 2001 price adjustment project, which this was part
12 of.  And I've testified that Rick Gonzalez was
13 part of that.
14         What I was answering before was
15 Rick Gonzalez was not involved in evaluating the
16 DOJ AWPs or any response to the DOJ AWPs.
17         He was involved in a couple of
18 meetings with regard to the 2001 price adjustment
19 project.
20 BY MR. ANDERSON:
21     Q.   Did Mr. Gonzalez ultimately approve as
22 president of HPD the price changes that were

76 (Pages 629 to 632)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 633

1    implemented by Abbott in 2001?
2        MS. TABACCHI:  Object to the form, asked
3    and answered.
4        THE WITNESS:  He and I have the same
5    recollection of that and that it was a consensus
6    of the management team as well as the
7    representative from corporate counsel that we make
8    these price changes.
9    BY MR. ANDERSON:
10   Q.    You mentioned that it was a consensus of
11   the team.  And I don't want to belabor your prior
12   testimony, but I think you've testified previously
13   that you were involved, Mr. Baker was likely
14   involved, Mr. Wiebking, and Mr. Gonzalez; correct?
15       MS. TABACCHI:  Object to the form,
16   mischaracterizes his testimony.
17       THE WITNESS:  Mr. Baker was not
18   involved.
19   BY MR. ANDERSON:
20   Q.    All right.  Just the three of you,
21   Mr. Gonzalez, Mr. Wiebking, and yourself?
22       MS. TABACCHI:  Object to the form,

Page 634

1    mischaracterizes prior testimony, asked and
2    answered.
3        THE WITNESS:  I remember Mr. Gonzalez,
4    Mr. Begley, Mr. Wiebking, and Ms. Schumacher, as
5    well as myself.
6    BY MR. ANDERSON:
7    Q.    And that group reached a decision to
8    change the way Abbott published prices; is that
9    correct?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  It made a decision to
12   institute our catalog price policy and to accept
13   the prices that the price adjustment project had
14   come up with.
15   BY MR. ANDERSON:
16   Q.    And that decision ultimately resulted in
17   a change in the way Abbott published prices;
18   correct?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  It resulted in a change in
21   the way that Abbott HPD developed list and WAC
22   prices from our prior practices, yes.

Page 635

1    BY MR. ANDERSON:
2    Q.    I wasn't asking about the development,
3    sir.  I was asking about the publication.
4        Did the pricing decision that was
5    ultimately reached by you, Mr. Begley,
6    Mr. Gonzalez, Mr. Wiebking, and Ms. Schumacher
7    result in a change in the way Abbott published
8    prices?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  No.
11   BY MR. ANDERSON:
12   Q.    Why do you say that?
13   A.    Because we went through the same process
14   in 2001 we had gone through in any prior year.  We
15   printed a catalog, we reported those prices to the
16   compendia, we sent our WAC prices to our
17   wholesalers.  That's entirely consistent with what
18   we had done before.
19   Q.    You mentioned the sending of the WAC
20   prices to the wholesaler.  Those are what's known
21   as the WACs on the Harry-grams; correct?
22       MS. TABACCHI:  Object to the form.

Page 636

1        THE WITNESS:  Yes.
2    BY MR. ANDERSON:
3    Q.    So in '95, '96, '97, '98, Mr. Adams is
4    sending out these Harry-grams notifying the
5    wholesalers of the new WACs; correct?
6        MS. TABACCHI:  Object to the form,
7    beyond the scope.
8        THE WITNESS:  I'm not totally familiar
9    with everything that was on the Harry-gram, but I
10   believe he would have informed our wholesalers if
11   our WACs had changed.
12   BY MR. ANDERSON:
13   Q.    And those are the WACs that are
14   optimized back in '93, '94, '95 that go down in
15   relation to decreases in the market prices;
16   correct?
17       MS. TABACCHI:  Object to the form,
18   beyond the scope.
19       THE WITNESS:  No.  The WAC I'm referring
20   to is the WAC that was for noncontract
21   wholesalers.
22   BY MR. ANDERSON:

77 (Pages 633 to 636)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 637

1    Q.   Do you know which WAC was on the
2  Harry-gram?
3        MS. TABACCHI:  Object to the form,
4  beyond the scope.
5        THE WITNESS:  I would have expected to
6  be our published WAC.
7  BY MR. ANDERSON:
8    Q.   What if it was the WAC that was actually
9  invoiced to each and every wholesaler throughout
10 the years?
11       MS. TABACCHI:  Object to the form,
12 beyond the scope.
13       THE WITNESS:  I would have expected that
14 to go out on a contract pricelist, not on a
15 Harry-gram.
16 BY MR. ANDERSON:
17   Q.   Does that uncertainty on your part have
18 any impact on your opinion that the way Abbott
19 chose to publish prices did or didn't change?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  No.  The way we published
22 prices in 2001 was exactly consistent with the way

Page 638

1  we published prices years before and years after.
2  BY MR. ANDERSON:
3    Q.   Do you feel like the way Abbott created
4  its wholesale invoices changed from how it did it
5  in 1995 to how it did it in 1991?
6        MS. TABACCHI:  Object to the form, asked
7  answered.
8        THE WITNESS:  The definition, the
9  development of WAC did change between 2001 and
10 1995.
11 BY MR. ANDERSON:
12   Q.   And in turn those prices were published
13 for the first time; correct?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  Which prices were
16 published for the first time?
17 BY MR. ANDERSON:
18   Q.   The actual wholesale invoice prices.
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  I believe in Jerrie
21 Cicerale's testimony she talks about WAC being
22 published as early as 1996 to the compendia.

Page 639

1  BY MR. ANDERSON:
2    Q.   Sir, I was asking about the actual
3  wholesale invoice prices.
4        Isn't it true that the way Abbott
5  chose to publish the actual wholesale invoice
6  prices changed between 1995 and 2001?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  The wholesale acquisition
9  cost, WAC, was published the same way throughout
10 the years.
11 BY MR. ANDERSON:
12   Q.   Published to whom?
13   A.   In 1996 I believe it was, some of them
14 were transmitted to the compendia.  I don't know
15 whether they were consistently across that time
16 period, but I remember, I seem to remember
17 testimony by Jerrie Cicerale talking about that.
18       So the fact that we informed the
19 compendia that our WACs were different from what
20 they were before, we did publish lower WACs on a
21 number of products.  How many, I can't tell you,
22 but a number of products in 2001.

Page 640

1    Q.   Back to the WACs that you say were
2  published in 1996.  Is it your testimony that
3  those were actual wholesale invoice prices that
4  were charged to any wholesaler at any time?
5        MS. TABACCHI:  Object to the form,
6  beyond the scope.
7        THE WITNESS:  Any noncontract wholesaler
8  would have been charged those prices.
9  BY MR. ANDERSON:
10   Q.   But there was no so-called noncontract
11 wholesaler that did business with Abbott; was
12 there?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I think I've testified in
15 the past that our biggest wholesalers and probably
16 our mid-size wholesalers were on contract with us
17 sometime by '94, '95.  I don't remember exactly
18 what that was.
19 BY MR. ANDERSON:
20   Q.   As the corporate representative on
21 pricing, particularly wholesale pricing, do you
22 know of any information that in 1996 any

78 (Pages 637 to 640)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 641

1  wholesaler at any time was billed the wholesale
2  price reported by Abbott to Red Book or First
3  Databank?
4         MS. TABACCHI: Object to the form,
5  beyond the scope.
6         THE WITNESS: I have not looked.
7  BY MR. ANDERSON:
8    Q.  And since you haven't looked, you can't
9  testify that you know that occurred; can you?
10        MS. TABACCHI: Same objections.
11        THE WITNESS: I can't testify that I
12 know it occurred. I can't testify that I know it
13 didn't occur.
14 BY MR. ANDERSON:
15   Q.  Well, you know that it didn't occur for
16 mid-size and large wholesalers and you're just a
17 little uncertain about whether or not there were
18 small wholesalers; is that correct?
19        MS. TABACCHI: Object to the form,
20 beyond the scope.
21        THE WITNESS: Your question was very
22 definitive. So I can't agree with your question.

Page 642

1  I agree that I don't know.
2  BY MR. ANDERSON:
3    Q.  In 1996 were there any small wholesalers
4  that did business with Abbott?
5         MS. TABACCHI: Object to the form.
6         THE WITNESS: I haven't gone back and
7  looked.
8  BY MR. ANDERSON:
9    Q.  Why would Abbott choose to report
10 wholesale prices to Red Book and First Databank in
11 1996 if they weren't actually charging those
12 wholesale prices to any customers?
13        MS. TABACCHI: Object to the form,
14 beyond the scope.
15        THE WITNESS: Those were our published
16 WAC and list prices.
17 BY MR. ANDERSON:
18   Q.  What about the WAC prices that were
19 actually being charged to wholesalers such as
20 those that were contained on the Harry-grams --
21        MS. TABACCHI: Object to the form.
22 BY MR. ANDERSON:

Page 643

1    Q.  -- why weren't those published?
2    A.  Again, you're making a logic step that
3  I'm not sure I agree with. I don't know exactly
4  what was and was not included in the Harry-grams.
5    Q.  You've read Mr. Adams' testimony;
6  haven't you?
7         MS. TABACCHI: If you could please allow
8  the witness to finish.
9         THE WITNESS: I've read segments of
10 Harry Adams' testimony.
11 BY MR. ANDERSON:
12   Q.  What did Mr. Adams say about the
13 Harry-grams?
14        MS. TABACCHI: Object to the form.
15        THE WITNESS: I probably did not read
16 that section.
17 BY MR. ANDERSON:
18   Q.  Did counsel only give you certain
19 portions of these transcripts that you've
20 referenced that you reviewed, such as Mr. Adams'
21 testimony?
22   A.  No. I was given, to the best of my

Page 644

1  knowledge, the entire transcript. I may or may
2  not have been given the documents.
3    Q.  When you were provided the entire
4  transcript, were you told to only read certain
5  portions?
6    A.  It was my decision to use the index to
7  address the subjects that were to be discussed.
8         I said earlier today and I said
9  last Sunday that in going through those, those
10 were kind of the beginning points and I may have
11 read beyond to understand the context of what was
12 being said, I may have gone back a little before
13 where those keywords existed. But I tried to pick
14 out of those testimonies the portions of them that
15 were relevant to the topics that we were
16 discussing.
17   Q.  Did you use the index of Mr. Adams'
18 testimony to assist you in understanding how
19 wholesalers were billed for product at all?
20   A.  No.
21   Q.  Do you realize that you've been
22 designated on behalf of Abbott to testify about

79 (Pages 641 to 644)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 645

1  the pricing that Abbott had with wholesalers?
2       MS. TABACCHI:  Subject to Abbott's
3  objections.
4       THE WITNESS:  Yes.
5  BY MR. ANDERSON:
6    Q.   Why didn't you take any steps to learn
7  from Mr. Adams' testimony about how Abbott priced
8  wholesalers?
9    A.   I felt I had adequate knowledge
10 beforehand.
11   Q.   Did you take any steps at all to learn
12 how Abbott priced its products to wholesalers?
13   A.   I think in prior depositions --
14      MS. TABACCHI:  Object to form.
15      THE WITNESS:  -- I've talked about the
16 fact that I did talk to Harry Adams on one or two
17 subjects with regard to that.  I can't recall
18 exactly what that was, but it was in prior
19 depositions.
20 BY MR. ANDERSON:
21   Q.   You recall you talked to him, but you
22 don't recall that it had anything to do with how

Page 646

1  Abbott prices wholesalers?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  I do believe I think it
4  had to do with the subject.
5  BY MR. ANDERSON:
6    Q.   What subject?
7    A.   The question of WAC versus RxLink
8  acquisition cost is where your questions are
9  focused.
10   Q.   What did you learn from Mr. Adams in
11 that regard?
12   A.   I don't recall.
13   Q.   Looking at the attachment to Exhibit 33,
14 it's titled "Policy for List Price Adjustments";
15 correct?
16   A.   Yes.
17   Q.   Other than yourself, did anyone else
18 have a role in drafting this?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  I'm not sure I can answer
21 that question.
22 BY MR. ANDERSON:

Page 647

1    Q.   Well, I appreciate, sir, if you can't
2  recall anyone else, but I'm asking for the best
3  testimony that you have here today.
4       Do you know of anyone else other
5  than yourself that was involved in drafting the
6  attachment titled "Policy for List Price
7  Adjustments" marked as a part of Exhibit 33?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  I go back to this form.
10 It is titled up at the top as an attorney work
11 product.  So I can tell you that I made the
12 initial draft to this.
13 BY MR. ANDERSON:
14   Q.   You referenced the top and it says
15 "Developed at the direction of Laura Schumacher";
16 correct?
17   A.   Yes.
18   Q.   Did Laura Schumacher ask you to draft
19 this document?
20      MS. TABACCHI:  I'm going to caution the
21 witness not to reveal the substance of any
22 communications with counsel.

Page 648

1       MR. ANDERSON:  Well, that's a "Yes" or
2  "No" answer.
3  BY MR. ANDERSON:
4    Q.   Without getting into the substance of
5  the communication, sir, did Laura Schumacher ask
6  you to draft this document?
7       MS. TABACCHI:  I'm not sure it's that
8  simple.
9       THE WITNESS:  I don't recall exactly the
10 genesis of the idea for this document.
11 BY MR. ANDERSON:
12   Q.   Are you able to testify that as a matter
13 of fact you did create this document at the
14 direction of legal counsel?
15      MS. TABACCHI:  Object to the form,
16 beyond the scope of the Notice.
17      THE WITNESS:  I am telling you that I
18 created the initial draft of this document.
19 BY MR. ANDERSON:
20   Q.   I understand your testimony on that.
21 I'm asking can you testify that you did so at the
22 direction of counsel?

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 649

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  It was part and parcel of
3   the price adjustment project that was run at the
4   direction of counsel.
5   BY MR. ANDERSON:
6     Q.   I'm asking a specific question, sir,
7   about this document.
8            Can you testify that as a matter of
9   fact you recall that you created this document at
10  the direction of legal counsel --
11       MS. TABACCHI:  Object to the form, asked
12  answered, beyond the scope of the Notice.  The
13  witness is not going to testify about his
14  communications with counsel.
15           He's answered this question.
16       MR. ANDERSON:  No, he hasn't.
17       MS. TABACCHI:  He has answered.
18       THE WITNESS:  I can't answer the
19  question without revealing communication with
20  counsel.
21  BY MR. ANDERSON:
22     Q.   Without revealing the substance of any

Page 650

1   communication, you can answer "Yes" or "No," can
2   you testify as a matter of fact that you created
3   the policy for list price adjustments at the
4   direction of counsel?
5     A.   I've said before I don't recall the
6   genesis of this document or the idea for this
7   document.
8     Q.   Looking at the definitions, do you see a
9   definition of WAC, wholesale acquisition cost?
10    A.   Yes.
11    Q.   Do you see any reference to -- strike
12  that.
13           Looking at the first sentence, I'll
14  read for the benefit of the record, quote "WAC,
15  wholesale acquisition cost, the price of a product
16  when sold to a drug wholesaler who is eligible for
17  charge-back processing after the end sale to a
18  healthcare provider."
19           Did I read that correctly?
20    A.   I believe so.
21    Q.   Would wholesalers doing business with
22  Abbott who are part of the RxLink program be

Page 651

1   eligible for charge-back processing?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Definitely.
4   BY MR. ANDERSON:
5     Q.   Would any other wholesalers be eligible
6   for charge-back processing other than the ones
7   that chose to participate in Abbott's RxLink
8   program?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Yes.
11  BY MR. ANDERSON:
12    Q.   Who?
13    A.   Well, I don't have a specific, but --
14    Q.   Well, are there any?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  -- us handling
17  charge-backs was not precluded by a wholesaler
18  deciding not to participate in the RxLink program.
19  BY MR. ANDERSON:
20    Q.   As the corporate representative
21  designated to testify about Abbott's pricing to
22  wholesalers, do you know of any wholesaler who was

Page 652

1   eligible for charge-back processing who was not
2   participating in Abbott's RxLink program from 1994
3   through 2000?
4        MS. TABACCHI:  Object to the form, asked
5   and answered.
6        THE WITNESS:  I don't know, I can't
7   recall any that were.  I can't recall that we
8   precluded or excluded anyone because they wouldn't
9   sign it either.
10  BY MR. ANDERSON:
11    Q.   In looking at the lower middle portion
12  of this page, sir, do you see a section titled
13  "Price Guideline"?
14    A.   Yes.
15    Q.   And I'll read for the benefit of the
16  record.  Quote "Price guideline, the list price
17  should be equal to the WAC plus five percent, or
18  plus $5 per case, whichever adjustment is greater,
19  except for branded products and comarketed
20  products as noted below under Process."
21           Did I read that correctly?
22    A.   Yes.

81 (Pages 649 to 652)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 653

1    Q.   Is that an accurate depiction of
2  Abbott's list price policy?
3        MS. TABACCHI: Object to the form.
4        THE WITNESS: That's an accurate
5  description of the policy we were proposing to the
6  management.
7
8  BY MR. ANDERSON:
9    Q.   And is that the policy that was
10  ultimately implemented?
11    A.   I believe that was the policy that was
12  implemented in the 2001 price change.
13    Q.   As Abbott's corporate representative
14  designated to testify about list pricing from 1991
15  through 2001, can you explain to the jury or the
16  judge why Abbott didn't follow that same policy
17  prior to 2001?
18        MS. TABACCHI: Object to the form.
19        THE WITNESS: I think I've gone over
20  this a number of times. There wasn't a policy
21  prior to 2001. The practice was to look at list
22  prices annually and contemplate increasing them by

Page 654

1  an inflationary factor.
2        Again, in retrospect, back in 2000
3  and 2001 as we looked back at the history, and
4  vanco is a perfect example of it, that caused a
5  disparity in pricing between list price and where
6  our general contract price range was.
7        So this wasn't a policy that
8  applied prior to that, it didn't necessarily make
9  the practice wrong prior to that either.
10
11  BY MR. ANDERSON:
12    Q.   Objection, nonresponsive.
13        Sir, I was asking why. All of the
14  information you just provided I understand. But
15  I'm asking why did Abbott not follow this price
16  guideline for setting list prices prior to the
17  year 2001?
18    A.   It didn't exist.
19    Q.   Other than the fact that it didn't
20  exist, why didn't Abbott price the list prices in
21  accordance with this guideline?
22        MS. TABACCHI: Object to the form,

Page 655

1  beyond the scope.
2        THE WITNESS: If a guideline doesn't
3  exist, there isn't any way to follow a guideline.
4  BY MR. ANDERSON:
5    Q.   Prior to 2001 why wasn't a guideline
6  similar to the pricing guideline of list equals
7  WAC plus five percent utilized?
8        MS. TABACCHI: Object to the form,
9  beyond the scope.
10        THE WITNESS: You know, I can't give you
11  a revisionist's history picture. I can tell you
12  what the motivations were that caused certain
13  actions.
14        There was not a guideline. There
15  was a practice. We followed that practice until
16  2001. In 2001 you can't look back and go boom,
17  change the last ten years.
18        MR. ANDERSON: Let's change tapes
19  quickly.
20        THE VIDEOGRAPHER: We are off the record
21  at 4:49 p.m. with the end of Tape No. 5.
22        (WHEREUPON a recess was taken.)

Page 656

1        THE VIDEOGRAPHER: We are back on the
2  record at 4:51 p.m. with the start of Tape No. 6.
3  BY MR. ANDERSON:
4    Q.   Sir, with respect to your last answer,
5  you've mentioned that you read some testimony of
6  Mr. Brincks and Mr. Eichhorn concerning the vanco
7  price changes in '95; is that right?
8    A.   Yes.
9    Q.   And did you appreciate from their
10  testimony in this case that initially Mr. Eichhorn
11  lowered the list prices on vanco to a level of WAC
12  plus five percent?
13        MS. TABACCHI: Object to the form.
14        THE WITNESS: I don't recall the formula
15  that was used. I do know he proposed reducing the
16  prices.
17  BY MR. ANDERSON:
18    Q.   Can you explain why a formula such as
19  WAC or RxLink WAC plus five percent would have
20  been used to set the decreased vanco list price in
21  or about April of '95?
22        MS. TABACCHI: Object to the form,

82 (Pages 653 to 656)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 657

1  beyond the scope.
2      THE WITNESS:  As I recall the documents
3  and as I recall the testimony, there was some
4  discussion between Dave Brincks and Gerry Eichhorn
5  with regard to the subject, and they agreed to
6  that level of reduction.
7  BY MR. ANDERSON:
8      Q.   Isn't it true that WAC --
9      A.   How they came up with that, I don't
10  know.
11      Q.   Isn't it true that WAC plus five percent
12  is a standard formula used by Abbott in setting
13  list prices for many drugs, including virtually
14  all PPD drugs?
15      MS. TABACCHI:  Object to the form,
16  beyond the scope of the Notice.
17      THE WITNESS:  I'm not familiar with the
18  pharmaceutical products guidelines.  So five
19  percent is a nice round number.  Am I surprised
20  that it was used prior to that, no.
21  BY MR. ANDERSON:
22      Q.   Why hadn't HPD always used the same list

Page 658

1  price guideline of WAC plus five percent that
2  other units within the corporation of Abbott were
3  using prior to 2000?
4      MS. TABACCHI:  Object to the form,
5  beyond the scope, asked and answered.
6      THE WITNESS:  We never tried to parallel
7  HPD with the Pharmaceutical Products Division.
8  The Pharmaceutical Products Division was a totally
9  different market than we were.  We were marketing
10  generic drugs.  So there was no attempt to
11  baseline ourselves against PPD.
12      (WHEREUPON Exhibit Sellers 034
13      was marked as of 3/31/2008.)
14  BY MR. ANDERSON:
15      Q.   If you could, sir, take a look at
16  Exhibit 34, which has also been marked as Exhibit
17  940, and confirm that that's the memo you drafted
18  titled "Catalog Price Adjustment."  (Document
19  tendered to the witness.)
20      A.   I believe somewhere in the process this
21  was a predecessor document to this.
22      Q.   And you're indicating exhibit what, sir?

Page 659

1      A.   Exhibit 33.
2      Q.   So 34 was a predecessor to Exhibit 33?
3      A.   That's my recollection.
4      Q.   Can you testify that as a matter of fact
5  you created Exhibit 34 at the request and
6  direction of legal counsel?
7      MS. TABACCHI:  Object to the form,
8  beyond the scope.
9  BY MR. ANDERSON:
10      Q.   Without disclosing the substance of any
11  communications.
12      MS. TABACCHI:  Asked and answered.
13      THE WITNESS:  That's impossible.
14  BY MR. ANDERSON:
15      Q.   Just "Yes" or "No," can you testify that
16  you were directed to create Exhibit 34 by an
17  attorney?
18      MS. TABACCHI:  Object to the form,
19  beyond the scope.
20      THE WITNESS:  As I said, that's
21  impossible.  By answering "Yes" or "No," I reveal
22  communications.

Page 660

1      MR. ANDERSON:  Tina, there's no way for
2  me to test any potential later claim of privilege,
3  although I certainly contend it's been waived,
4  unless the witness answers this question "Yes" or
5  "No."
6      MS. TABACCHI:  Well, I disagree with
7  you.  We've been through this before, Jarrett.  A
8  claim of privilege with respect to what?
9      MR. ANDERSON:  The document.  He keeps
10  pointing out, you know, some kind of work product
11  privilege.  I'm simply asking --
12      MS. TABACCHI:  The document you have.
13  We've already turned the document over.  He's
14  testified about the document many times.  His
15  communications with counsel he will not testify
16  about.
17      MR. ANDERSON:  Are you claiming any
18  privilege on Exhibit 34?
19      MS. TABACCHI:  We're claiming a
20  privilege as to communications with counsel with
21  respect to the entire project and to certain
22  discussions with counsel in connection with this

                              83 (Pages 657 to 660)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 661

1  price adjustment project.
2        MR. ANDERSON: But I'm talking about the
3  substance of the information contained in Exhibit
4  34, is there any claim of privilege on that
5  document?
6        MS. TABACCHI: We don't have a claim of
7  privilege on the document.
8        MR. ANDERSON: All right.
9        MS. TABACCHI: I don't understand your
10 question beyond that.
11 BY MR. ANDERSON:
12    Q.  Sir, do you believe that the information
13 that you've provided in Exhibit 34 is true and
14 correct?
15       MS. TABACCHI: Object to the form.
16       THE WITNESS: I believe at the time I
17 drafted that it was as accurate a representation
18 as I knew at the time.
19 BY MR. ANDERSON:
20    Q.  Do you have any reason to distrust the
21 accuracy of Exhibit 34?
22       MS. TABACCHI: Object to the form.

Page 662

1        THE WITNESS: No, I don't.
2        (WHEREUPON Exhibit Sellers 035
3          and Exhibit Sellers 036 were
4          marked as of 3/31/2008.)
5  BY MR. ANDERSON:
6     Q.  Now, if you could, take a look at what's
7  been marked as Exhibit 35 and Exhibit 36.
8  (Documents tendered to the witness.)
9        MS. ST. PETER-GRIFFITH: While the
10 witness is reviewing that, I'd just like to note
11 that Exhibit 34 is the same document that we
12 discussed the last time around beginning on
13 Page 282 of his transcript.
14       MS. TABACCHI: Did you identify it in
15 some way for the record?
16       MS. ST. PETER-GRIFFITH: I did. I gave
17 the Texas deposition Exhibit 940.
18       MS. TABACCHI: Okay.
19       MS. ST. PETER-GRIFFITH: I have the
20 Texas number. I didn't have it marked.
21       MS. TABACCHI: Okay.
22 BY MR. ANDERSON:

Page 663

1     Q.  Did you write Exhibit 35, sir?
2        MS. TABACCHI: Objection, beyond the
3  scope.
4        THE WITNESS: I believe I did author 35.
5  I believe it was sent out as a voicemail, not as a
6  hard copy document.
7  BY MR. ANDERSON:
8     Q.  In the second paragraph you write
9  "Yesterday we were made aware by several customer
10 calls into Alternate Site that First Databank
11 recently published revised AWPs for HPD drugs."
12       Did I read that correctly?
13    A.  Correct.
14    Q.  Is that a true statement?
15       MS. TABACCHI: Object to the form,
16 beyond the scope.
17       THE WITNESS: Yes.
18 BY MR. ANDERSON:
19    Q.  Why were you as the head of HBS Contract
20 Marketing interested in calls concerning AWP to
21 Alternate Site?
22       MS. TABACCHI: Objection, beyond the

Page 664

1  scope.
2        THE WITNESS: This was in 2001. This
3  was, as the message goes on and talks about, this
4  was at a time where we were preparing the price
5  adjustments to be published. We were looking at I
6  believe a May date. May 7th, if my memory serves
7  me right, was the date that the prices were to be
8  official.
9        So we were, you know, what I was
10 saying here to the addressees was that First
11 Databank had published the prices sooner than we
12 had anticipated. Back at that time it was the
13 practice to give the compendia a forty-five day
14 notice on price changes, and we expected them to
15 take forty-five days to update their system, which
16 is what they told us that they needed.
17       This was just a heads-up saying
18 they're out there earlier. And we were notified
19 by some customers who had seen it on their latest
20 update.
21 BY MR. ANDERSON:
22    Q.  Why would customers care about decreased

84 (Pages 661 to 664)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Page 665

1  AWPs?
2        MS. TABACCHI:  Object to the form,
3  beyond the scope.
4        THE WITNESS:  I don't necessarily think
5  we talked about cared here.  We were just, there
6  were some questions that came in with regard to
7  gee, the AWPs went down, is that what you intended
8  to do.
9  BY MR. ANDERSON:
10   Q.  And what was the response?
11       MS. TABACCHI:  Same objections.
12       THE WITNESS:  I think by virtue of this
13  letter what I was, or this voicemail, I was
14  telling people hey, be aware of it, these are the
15  prices that are going to be effective May 7th.  So
16  don't choke on it, respond that yes, we have
17  planned, we have changed prices and those are the
18  prices that are out there.
19  BY MR. ANDERSON:
20   Q.  And is Exhibit 36 the kind of follow-up
21  question and answer, or what's known as
22  "Frequently Asked Questions" that you created to

Page 666

1  help address customer concerns about decreased
2  reimbursement?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Yes, I believe.  And this
5  was published May 1st, a week before the catalog
6  went out, and was intended to arm our people with
7  information.
8        It's always good that your
9  salespeople know something before the customers
10  know it.  So that's why we tried to do that.  The
11  catalog, as I said, came out May 7th, the official
12  prices would become effective May 7th.
13       I don't know what date this was
14  done, I can't tell from here, but it was before
15  the May 1st notice.
16       MR. ANDERSON:  I could go a long time.
17       MS. TABACCHI:  You could go forever, I
18  appreciate that, but it is after 5:00.  So do you
19  want to make a speech or --
20       MR. ANDERSON:  No.  If you want to stop
21  the deposition, that's your prerogative.
22       MS. TABACCHI:  We advised you this

Page 667

1  morning that we were going to end at 5:00, we took
2  a short lunch, and it's after 5:00.
3        MR. ANDERSON:  Well, we are reserving
4  all rights.
5        MS. TABACCHI:  Of course you are.
6        MR. ANDERSON:  We're not agreeing that
7  the deposition is concluded.
8        THE VIDEOGRAPHER:  We are off the record
9  at 5:04 p.m. with the conclusion of today's
10  deposition of Mike Sellers.
11        (WHEREUPON said deposition was so
12         adjourned.)
13
14
15  _____
16        SIGNATURE OF THE WITNESS
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20____.
19
20
21  _____
22     Notary Public

Page 668

1  STATE OF ILLINOIS )
2  COUNTY OF C O O K )
3        I, Donna M. Kazaitis, RPR, CSR No.
4  084-003145, do hereby certify:
5     That the foregoing deposition of MICHAEL
6  SELLERS was taken before me at the time and place
7  therein set forth, at which time the witness was
8  put under oath by me;
9     That the testimony of the witness and all
10  objections made at the time of the examination
11  were recorded stenographically by me, were
12  thereafter transcribed under my direction and
13  supervision and that the foregoing is a true
14  record of same.
15     I further certify that I am neither counsel
16  for nor related to any party to said action, nor
17  in any way interested in the outcome thereof.
18     IN WITNESS WHEREOF, I have subscribed my name
19  this 4th day of April, 2008.
20
21  _____
22     Donna M. Kazaitis, RPR, CSR 084-003145

85 (Pages 665 to 668)

e038b3c0-d0a3-46fc-babc-a9296c2d1018