# Exhibit 128

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

# In The Matter Of:

*THE STATE OF TEXAS  v.*
*DEY, INC., ET AL.*

---

*JAMES A. ROWENHORST*
*April 3, 2003*

---

**FREDERICKS-CARROLL REPORTING**
*Court Reporting-Video Services-Litigation Support*
*7719 WOOD HOLLOW DRIVE, SUITE 156*
*Austin, TX  78731*
*(512) 477-9911     FAX: (512) 345-1417*

*Original File 30403JR.V1, 224 Pages*
*Min-U-Script® File ID: 2224958285*

**Word Index included with this Min-U-Script®**

APR 2 1 2003

THE STATE OF TEXAS vs.
DEY, INC., ET AL.

Case 1:01-cv-12257-PBS   Document 6313-49   Filed 07/24/09   Page 3 of 8

JAMES A. ROWENHORST
April 3, 2003

Page 1

[1]         CAUSE NO. GV002327
[2] THE STATE OF TEXAS              )IN THE DISTRICT COURT
    ex rel.                         )
[3]     VEN-A-CARE OF THE           )
        FLORIDA KEYS, INC.,         )
[4]         Plaintiffs,             )
[5] VS.                             )TRAVIS COUNTY, TEXAS
[6] DEY, INC.; ROXANE               )
    LABORATORIES, INC.; WARRICK     )
[7] PHARMACEUTICALS CORPORATION;    )
    SCHERING-PLOUGH CORPORATION;    )
[8] SCHERING CORPORATION;           )
    LIPHA, S.A.; MERCK-LIPHA, S.A.;)
[9] MERCK, KGAA; AND EMD            )
    PHARMACEUTICALS, INC.,          )
[10]        Defendants.             )53RD JUDICIAL DISTRICT
[11]
          ORAL AND VIDEOTAPED DEPOSITION OF
[12]
              JAMES ALLEN ROWENHORST
[13]             APRIL 3RD, 2003
[14]      ORAL AND VIDEOTAPED DEPOSITION OF
[15] JAMES ALLEN ROWENHORST, produced as a witness at the
[16] instance of the State of Texas and duly sworn, was
[17] taken in the above-styled and numbered cause on the
[18] 3rd of April, 2003, from 8:08 a.m. to 3:31 p.m.,
[19] before Debra L. Sietsma, CSR in and for the State of
[20] Texas, reported by machine shorthand, at the offices
[21] of Vorys, Sater, Seymour & Pease, L.L.P.,
[22] 2100 One Cleveland Center, Cleveland, Ohio, pursuant
[23] to the Texas Rules of Civil Procedure and the
[24] provisions as previously set forth.
[25]

Page 2

[1]           APPEARANCES
[2]
[3] FOR THE PLAINTIFF, STATE OF TEXAS:
[4]     MS. CYNTHIA O'KEEFFE
        Office of the Attorney General
[5]     State of Texas
        Post Office Box 12548
[6]     Austin, Texas 78711-2548
[7] FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
[8]     MR. JARRETT ANDERSON
        Attorney at Law
[9]     2411 Hartford Road
        Austin, Texas 78703
[10]
    FOR DEFENDANT DEY, INC.:
[11]
        MS. LEILA R. PITTAWAY
[12]    Coudert Brothers
        1114 Avenue of the Americas
[13]    New York, New York 10036-7703
[14] FOR DEFENDANT ROXANE LABORATORIES, INC.:
[15]    MR. R. ERIC HAGENSWOLD
        Scott, Douglass & McConnico, L.L.P.
[16]    One American Center, Fifteenth Floor
        600 Congress Avenue
[17]    Austin, Texas 78701
[18]       - and -
[19]    MR. PAUL J. COVAL
        Vorys, Sater, Seymour and Pease, L.L.P.
[20]    52 East Gay Street
        P.O. Box 1008
[21]    Columbus, Ohio 43216-1008
[22] FOR DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION,
     SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
[23]
        MR. JOHN P. MCDONALD
[24]    Locke Liddell & Sapp, L.L.P.
        2200 Ross Avenue, Suite 2200
[25]    Dallas, Texas 75201-6776

Page 29

[1] A: My understanding was there were related
[2] parties with the Boehringer name that established
[3] themselves as separate companies back in the 1800's.
[4] Q: Thank you. I appreciate you clarifying that.
[5] Okay. So — but at the time that you
[6] went from Boehringer Mannheim to Boehringer Ingelheim,
[7] to your knowledge, there was no relationship between
[8] those two companies, correct?
[9] A: Correct.
[10] Q: And there had not been any relationship for
[11] many years, correct?
[12] A: Correct.
[13] Q: Okay. Was it pure coincidence that you went
[14] from a company with the name "Boehringer Ingelheim"
[15] to a company named — I mean a company named
[16] "Boehringer Mannheim" to a company that was named
[17] "Boehringer Ingelheim"?
[18] A: Yes, that was coincidence.
[19] Q: How did you hear about the position at
[20] Boehringer Ingelheim?
[21] A: I was recruited.
[22] Q: By a recruiting firm?
[23] A: Yes.
[24] Q: And what position were you recruited for at
[25] Boehringer Ingelheim?

Page 30

[1] A: The manager of reimbursements.
[2] Q: And when did you take that position?
[3] A: Approximately early in 1998.
[4] Q: When you were contacted about that job, what
[5] were you told that the job duties were?
[6] A: The job duties were to include looking at
[7] reimbursement as a matter of selling and distributing
[8] our products in the marketplace.
[9] Q: And when you say "reimbursement," do you mean
[10] reimbursement from third-party payers?
[11] A: That could be one form of reimbursement, yes.
[12] Q: And who would those third-party payers be?
[13] A: They could be insurance companies, pharmacy
[14] benefit managers, HMOs, employer groups, Medicaid
[15] entities, Medicare entities. Those are the ones I can
[16] recall.
[17] Q: You indicated that third-party payers could
[18] be one form of reimbursement.
[19] In your job as — that you were applying
[20] for or being recruited for at Boehringer Ingelheim as
[21] manager of reimbursements, was there any other kind of
[22] reimbursement that you understood the job entailed?
[23] A: It could have also been cash reimbursement.
[24] Q: From whom?
[25] A: Directly from the patients.

Page 31

[1] Q: Patients who had —
[2] A: Purchased —
[3] Q: — purchased —
[4] A: — drugs.
[5] Q: — drugs that were manufactured by Boehringer
[6] Ingelheim. Is that correct?
[7] A: Restate the question, please.
[8] Q: Who would have manufactured the drugs that
[9] these patients were —
[10] A: Boehringer Ingelheim would have manufactured
[11] the drugs.
[12] Q: Okay. And how long did you have that title,
[13] manager of reimbursements?
[14] A: Approximately three years.
[15] Q: And can you tell me again what time period
[16] that was from 1998 —
[17] A: '98 till 2001, as best I can recall.
[18] Q: And what happened in 2001 with regard to your
[19] career?
[20] A: I was employed at Boehringer Ingelheim.
[21] Q: Did you receive a promotion or a job change?
[22] A: I received a job change.
[23] Q: That was not a promotion?
[24] A: Correct.
[25] Q: It would have been more a lateral move within

Page 32

[1] the company; is that correct?
[2] A: Correct.
[3] Q: And what was that lateral move?
[4] A: To manager of managed markets.
[5] Q: And what did that mean? What does "manager
[6] of managed markets" mean?
[7] A: Means looking — the manager position
[8] included looking at the managed markets for potential
[9] marketing opportunities.
[10] Q: What are managed markets?
[11] A: Those are those — those are markets that
[12] manage pharmaceutical benefits.
[13] Q: Can you give me some examples?
[14] A: Pharmacy benefit manager, health maintenance
[15] organization.
[16] Q: Any others?
[17] A: Medicaid.
[18] Q: And so your job was to manage the market —
[19] marketing opportunities to those different markets
[20] that you just described. Is that correct?
[21] A: Partially correct.
[22] Q: Okay. Tell me how I'm right, tell me how I'm
[23] wrong.
[24] A: The job included looking at marketing
[25] opportunities specific to the — the managed markets

Page 33

[1] in which I was evaluating market opportunities within
[2] pharmacy benefit managers.
[3]   **Q:** How long did you have that job?
[4]   **A:** Approximately one year.
[5]   **Q:** And then did you receive a promotion?
[6]   **A:** Yes.
[7]   **Q:** To what?
[8]   **A:** Director of state government affairs.
[9]   **Q:** For Boehringer Ingelheim, still?
[10]  **A:** Yes.
[11]  **Q:** Is that your current title?
[12]  **A:** Yes.
[13]  **MS. O'KEEFFE:** At this time,
[14] Mr. Rowenhorst, I'm going to give my coparty,
[15] Ven-A-Care of the Florida Keys, as represented here
[16] today by their attorney, Jarrett Anderson, an
[17] opportunity to ask you some questions.
[18]  **THE WITNESS:** Okay.
[19]
[20]              **EXAMINATION**
[21]           **BY MR. ANDERSON:**
[22]  **Q:** Good morning, Mr. Rowenhorst.
[23]  **A:** Good morning.
[24]  **Q:** Previously in this litigation we've had some
[25] exhibits admitted that, I believe, came from your

Page 34

[1] employment file. Ciarelli Deposition Exhibit 258 is a
[2] copy of your resume, and Ciarelli Deposition
[3] Exhibit 259 was a performance worksheet from — that
[4] was created sometime in January of 2001 pertaining to
[5] your performance in the year 2000. I'm going to be
[6] asking you some questions about those.
[7]   But before I do that, Eric, one
[8] housekeeping matter. It looks like a page of the year
[9] 2000 evaluation —
[10]  **MR. HAGENSWOLD:** Uh-huh.
[11]  **MR. ANDERSON:** — ROX-TX-02999 needs to
[12] be added.
[13]  **MR. HAGENSWOLD:** Do you mean there's a
[14] Bates number missing?
[15]  **MR. ANDERSON:** Well, it — for some
[16] reason, yeah. It's part of the —
[17]  **MR. HAGENSWOLD:** Do you mind if I see
[18] it?
[19]  **MR. ANDERSON:** No, not at all. And —
[20] and take a look at the original and see that it — it
[21] is the very next page in this sequence.
[22]  **MR. HAGENSWOLD:** Okay.
[23]  **MR. ANDERSON:** Take a look at that, and
[24] we may need to add that to that exhibit.
[25]  **MR. HAGENSWOLD:** It must be too early in

Page 35

[1] the morning, Jarrett. I'm not understanding what
[2] you're saying. Tell me again.
[3]  **MR. ANDERSON:** Ciarelli Deposition
[4] Exhibit 259 is an evaluation that was created sometime
[5] in January of 2001 pertaining to Mr. Rowenhorst's
[6] performance —
[7]  **MR. HAGENSWOLD:** Right.
[8]  **MR. ANDERSON:** — during 2000. It's
[9] ROX-TX-2989 through 2998.
[10]  **MR. HAGENSWOLD:** Right.
[11]  **MR. ANDERSON:** And I believe this one
[12] page, ROX-TX-02999, actually is part of this package.
[13] It just wasn't attached to 259.
[14]  **MR. HAGENSWOLD:** Okay.
[15]  **MR. ANDERSON:** And what I would like to
[16] do is supplement 259 now by attaching this page, which
[17] appear to be the handwritten comments of
[18] Mr. Rowenhorst's supervisor back then, Gary Ellexson.
[19]  **MR. HAGENSWOLD:** Okay. So — I — I'm
[20] not — I mean are we — what's your basis for thinking
[21] that they were definitely part of the same document?
[22]  **MR. ANDERSON:** Well, I'd like to
[23] question him on that and —
[24]  **MR. HAGENSWOLD:** That's fine.
[25]  **MR. ANDERSON:** — and we might be able

Page 36

[1] to establish that. I just wanted to give you a
[2] heads-up.
[3]  **MR. HAGENSWOLD:** And — and if you
[4] establish that, that's fine.
[5]  **MR. ANDERSON:** Yeah.
[6]  **MR. HAGENSWOLD:** If not, we can do it as
[7] a composite exhibit and deal with that later. That's
[8] fine.
[9]  **MR. ANDERSON:** And if they need to be
[10] separated because they don't go together, we'll
[11] certainly separate them.
[12]  **MR. HAGENSWOLD:** That's fine. You can
[13] show them to him together. I don't care.
[14]  **MR. ANDERSON:** Okay.
[15]  **Q:** (BY MR. ANDERSON) Mr. Rowenhorst, if you
[16] could, please review what was previously marked as
[17] Deposition Exhibit 259; and, in conjunction with that,
[18] please review this one page, ROX-TX-02999. And after
[19] you've had a chance to review those documents, let me
[20] know, please.
[21]   Thank you.
[22]  **A:** Okay. I've reviewed them.
[23]  **Q:** Okay. That last sheet of paper, sir, that's
[24] not currently stapled with 259, is your signature on
[25] that document?

Page 97

[1] Roxane's generic drug?
[2] **A:** That could be — that could be a
[3] consideration as — as an obstacle.
[4] **Q:** Okay. Do you know whether or not Roxane took
[5] steps to overcome such a reimbursement obstacle?
[6] **A:** In such a reimbursement obstacle as a
[7] differential between AWPs with like chemical entities
[8] within the generic market?
[9] **Q:** Yes.
[10] **A:** I'm not aware.
[11] **Q:** Do you know whether or not Roxane took steps
[12] to address reimbursement obstacles as it pertained to
[13] the publication of their WAC pricing within a generic
[14] multisource environment?
[15] **A:** I'm not aware of any specific steps that they
[16] would have taken with respect to WAC in the
[17] reimbursement market.
[18] **Q:** Would a reimbursement obstacle also include,
[19] sir, a situation where Roxane had published a WAC
[20] price which was lower than a competitive generic
[21] product's AWP price?
[22] **A:** It — it would depend on the reimbursement
[23] method used.
[24] **Q:** Do you remember having some e-mail
[25] communications with Judy Waterer regarding the Florida

Page 98

[1] Medicaid program?
[2] **A:** I am aware of some of those communications.
[3] **Q:** Have you reviewed some of those
[4] communications recently with your attorneys?
[5]      You can say that — well —
[6] **MR. HAGENSWOLD:** Just lay the
[7] foundation.
[8] **MR. ANDERSON:** Okay.
[9] **Q:** (BY MR. ANDERSON) Recently you reviewed some
[10] documents pertaining to communications you had with
[11] Ms. Waterer about Florida Medicaid reimbursement; is
[12] that correct?
[13] **MR. HAGENSWOLD:** You can answer that
[14] question.
[15] **THE WITNESS:** I have — I have reviewed
[16] some of those documents, yes.
[17] **Q:** (BY MR. ANDERSON) All right. And did you
[18] review those in preparation for your deposition here
[19] today?
[20] **A:** Yes.
[21] **Q:** All right. Is it your understanding, sir,
[22] from the review of those documents, that Roxane was at
[23] a disadvantage in the Florida Medicaid program because
[24] the Florida Medicaid program was using some WAC and
[25] direct pricing that had been historically published by

Page 99

[1] Roxane to set the reimbursement on Roxane's drugs?
[2] **A:** Those historical prices appeared to be a
[3] obstacle to reimbursement yes.
[4] **Q:** Were those historical prices an obstacle to
[5] reimbursement because generic competitors of Roxane's
[6] did not have WAC prices or direct prices on file with
[7] the Florida Medicaid program?
[8] **MR. MCDONALD:** Object to the form.
[9] **THE WITNESS:** I'm not aware of that
[10] being the — the — the — the essence of the
[11] obstacle, no.
[12] **Q:** (BY MR. ANDERSON) Was the essence of the
[13] obstacle, sir, that the — given the historical
[14] pricing information that Florida Medicaid was
[15] utilizing, that the reimbursement that a customer was
[16] receiving on Roxane's drug was lower than it would
[17] have been if the reimbursement had been based off AWP?
[18] **MR. HAGENSWOLD:** Object to form.
[19]      And let me just state one thing. It's
[20] your right to question the witness the way you want
[21] to, Jarrett; but it might refresh his recollection
[22] to let him look at the document since we have it here,
[23] and it's not like he did a thorough review of it
[24] before this deposition.
[25] **MR. ANDERSON:** Okay. That's — that's a

Page 100

[1] point well-taken, Eric. And I — it came up in the
[2] context of the — this discussion of reimbursement
[3] obstacles.
[4]      If you would like to review the
[5] document, sir, you're welcome to.
[6] **THE WITNESS:** If — that would be great.
[7] Thank you.
[8] **Q:** (BY MR. ANDERSON) Okay. Okay. I believe
[9] that — it's a two-page exhibit marked Tupa
[10] Exhibit 654. Take a look at that, if you could, and
[11] let me know when you're finished reviewing it.
[12] **MR. HAGENSWOLD:** Go ahead and read the
[13] whole thing.
[14]      (Discussion off the record).
[15] **THE WITNESS:** Okay. I've reviewed the
[16] document.
[17] **Q:** (BY MR. ANDERSON) All right. Now that
[18] you've read that document, do you recall that the —
[19] one of the reimbursement obstacles regarding this
[20] Florida Medicaid issue back in October and
[21] November of '99 was that a customer of Roxane's wanted
[22] to receive a higher reimbursement on a Roxane product?
[23] **MR. HAGENSWOLD:** Object to form.
[24] **THE WITNESS:** I recall that the
[25] pharmacist was looking for a higher reimbursement than

Page 109

[1] MR. HAGENSWOLD: Object to form.
[2] MR. MCDONALD: Same objection.
[3] THE WITNESS: It's — it's a price used
[4] in the marketplace. I'm not sure what you're
[5] referring to by "net price."
[6] Q: (BY MR. ANDERSON) You don't have, given
[7] your years of experience in the pharmaceutical
[8] industry, an opinion that WAC is an undiscounted
[9] number, do you?
[10] MR. MCDONALD: Object to the form.
[11] MR. HAGENSWOLD: Same objection.
[12] THE WITNESS: Please restate the
[13] question.
[14] Q: (BY MR. ANDERSON) Do you have an
[15] understanding, given your experience in the
[16] pharmaceutical industry, that WAC is known as an
[17] undiscounted number?
[18] MR. HAGENSWOLD: Object to form.
[19] MR. MCDONALD: Object to form.
[20] THE WITNESS: My understanding is that
[21] WAC reflects, on the branded side of the business, a
[22] price that is charged to wholesale customers.
[23] Q: (BY MR. ANDERSON) Well, in the context of
[24] generic products specifically, do you understand that
[25] WAC is known as an undiscounted number or an — or a

Page 110

[1] discounted number?
[2] MR. MCDONALD: Object to the form.
[3] THE WITNESS: I am not sure, in the
[4] generic market, whether WAC refers to a discounted
[5] figure or not.
[6] Q: (BY MR. ANDERSON) Now, I'm going to read
[7] the — the next paragraph of this e-mail.
[8] "Since their reimbursement system now
[9] looks for the lowest price, the direct price is used
[10] for the calculation. I spoke with Lesli Paoletti
[11] regarding this issue and asked her to follow up on all
[12] Roxane NDCs to validate that the most current prices
[13] are entered into First DataBank and that old WHN and
[14] direct prices are removed or updated."
[15] Did I read that correctly?
[16] A: You read that correctly.
[17] Q: Do you know what the effect would be of
[18] removing the old WHN and direct prices regarding
[19] Roxane's NDC numbers?
[20] A: The effect on what?
[21] Q: The effect on the amount of reimbursement on
[22] Roxane's drugs.
[23] MR. HAGENSWOLD: Object to the form.
[24] THE WITNESS: In — in terms of
[25] reimbursement within the Florida Medicaid system in

Page 111

[1] this specific example, removing those prices —
[2] removing the WHN and the direct price would likely
[3] result in higher reimbursement to the pharmacist.
[4] Q: (BY MR. ANDERSON) And would that higher
[5] reimbursement on Roxane's drugs assist Roxane in
[6] selling more products?
[7] A: In this particular example — in this
[8] particular example, it would potentially modify the —
[9] would potentially increase the uptake of this product
[10] within the marketplace — again, based on this
[11] specific example.
[12] Q: And when you say "increase the uptake," you
[13] mean it would increase the sales of this product,
[14] correct?
[15] A: It would remove a reimbursement obstacle that
[16] would increase the likelihood that this product would
[17] be reimbursed. Whether that resulted in additional
[18] sales above and beyond is dependent on how often the
[19] drug was prescribed.
[20] Q: Why is it that you were taking steps to make
[21] sure that the old WHN and direct prices were removed
[22] from the First DataBank database as it pertains to
[23] Florida Medicaid's reimbursement on this product?
[24] A: My recommendation to remove those products —
[25] or the prices of WHN and direct price for this

Page 112

[1] particular product, what — the recommendation was a
[2] result of making sure that the pharmacist achieved
[3] adequate reimbursement for this product.
[4] Q: And when you say "achieved adequate
[5] reimbursement," you mean achieved an increased
[6] reimbursement, correct?
[7] A: When I refer to "adequate reimbursement," it
[8] would be reflective of the acquisition cost of the
[9] product versus the level of reimbursement that he was
[10] receiving.
[11] Q: And given the deletion of the WAC and the
[12] direct prices, in effect, the level of reimbursement
[13] would increase, correct?
[14] A: Yes. We established that, yeah —
[15] Q: Okay.
[16] A: — as an example.
[17] Q: Now, this is an example of you having
[18] communications with Roxane personnel regarding
[19] pharmacy concerns; is that correct?
[20] A: Yes.
[21] Q: And now, if you could, take a look at what's
[22] been marked as Rowenhorst 259A, which I believe
[23] earlier we established corresponds with your 2000
[24] performance evaluation.
[25] A: Correct.

Page 157

[1] typically utilized by Boehringer Ingelheim off of that
[2] WAC?
[3] **MR. MCDONALD:** Objection, form.
[4] **MS. PITTAWAY:** Objection, form.
[5] **MR. HAGENSWOLD:** Objection to form.
[6] **MR. ANDERSON:** Yeah. Let me rephrase
[7] it.
[8] **Q:** (BY MR. ANDERSON) Have you ever heard of
[9] markups that are added to WAC prices on various brand
[10] manufacturers' drugs?
[11] **MR. HAGENSWOLD:** Object to form.
[12] **THE WITNESS:** I — I'm not sure that —
[13] I'm not aware — I'm not sure of what markups would
[14] be. It — it would be in relationship to a particular
[15] price and —
[16] **Q:** (BY MR. ANDERSON) Well, are some brand
[17] companies known as 20 percent-markup companies, to
[18] your knowledge?
[19] **A:** I'm — I'm not sure — you know, again, in
[20] terms of the context in which markup refers to, it
[21] would have to be — there would have to be some basis
[22] for a price point.
[23] **Q:** Okay. Well, let's focus very specifically on
[24] the WAC price point.
[25]     In your experience, are some brand

Page 158

[1] manufacturers known as 20 percent-markup companies?
[2] **A:** Again, I'm not sure that I'm clear in the
[3] terminology of — of calling them a "20 percent-markup
[4] company." It's — can you restate for me?
[5] **Q:** Well, conceptually, have you ever heard of
[6] the concept of brand manufacturers having a standard
[7] markup that's applied to their respective WACs on
[8] various brand drugs?
[9] **MS. PITTAWAY:** Objection, form.
[10] **THE WITNESS:** There's — there's clearly
[11] manufacturers that have a difference between WAC and
[12] AWP that may be 20 percent. It may be less than that.
[13] It may be more than that.
[14] **Q:** (BY MR. ANDERSON) Are — other than — other
[15] than 20 percent, are there some other standard markups
[16] that are applied to brand manufacturers' WAC pricing?
[17] **MR. HAGENSWOLD:** Object to form.
[18] **MR. MCDONALD:** Objection, form.
[19] **THE WITNESS:** I'm not aware of any
[20] standards associated with differences between a WAC
[21] price and an AWP price in the industry.
[22] **Q:** (BY MR. ANDERSON) Have you ever become aware
[23] that oftentimes a brand product's WAC is 16 and
[24] two-thirds percent less than that product's AWP?
[25] **A:** Again, there may be some manufacturers that

Page 159

[1] the difference between WAC and AWP is — is 16 and
[2] two-thirds.
[3] **Q:** And you've heard of that situation, haven't
[4] you, sir, in the industry, where there's a 16 and
[5] two-thirds percent discount off AWP to get to WAC?
[6] **A:** There's a — there's a 16 and two-thirds
[7] difference between AWP and WAC, yes.
[8] **Q:** And in that situation, the WAC's always lower
[9] than the AWP, correct?
[10] **A:** If your — if the difference between a higher
[11] AWP and a lower WAC is 16 and two-thirds, yes, the WAC
[12] would be lower than the AWP.
[13] **Q:** Okay. And if, then, a manufacturer published
[14] a WAC price and you added 20 percent to that price to
[15] derive AWP, do you understand that that would be the
[16] same correlation?
[17] **MR. HAGENSWOLD:** Object to form.
[18] **MR. MCDONALD:** Object to the form.
[19] **THE WITNESS:** I think the correlations
[20] would be different because one would be 16 and
[21] two-thirds, the other one would be 20. So the
[22] correlations are — are different.
[23] **Q:** (BY MR. ANDERSON) But that whole concept of
[24] there being a standard relationship between AWP and
[25] WAC prices in the brand industry is foreign to you?

Page 160

[1] Is that what you're going to tell the jury?
[2] **MR. HAGENSWOLD:** Object to form.
[3] **MR. MCDONALD:** Object to the form.
[4] **THE WITNESS:** Again, I — there's not a
[5] standard that I'm aware of that — from an industry
[6] perspective, that I'm aware of that — that is
[7] documented somewhere. I'm not aware of any standard
[8] around that.
[9] **Q:** (BY MR. ANDERSON) Well, whether it's
[10] documented or undocumented, are you aware of that
[11] basic standard relationship on brand products?
[12] **MR. MCDONALD:** Object to the form.
[13] **THE WITNESS:** Again, it's the — what we
[14] talked about was having a difference between a
[15] wholesale acquisition cost and an AWP price, and there
[16] are variances within the market in terms of the — the
[17] amount of difference between those two price points.
[18] So I — in terms of it being a standard, I can't —
[19] wouldn't consider it to be a standard.
[20] **Q:** (BY MR. ANDERSON) Looking back at
[21] Exhibit 861, at least by June of 2000 when you pasted
[22] this Wall Street Journal article to your e-mail, you
[23] were aware that the government was investigating some
[24] drug reimbursement issues, correct?
[25] **A:** It was — there's no date on The Wall Street