# Exhibit 130

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment



experience *does* matter

**CASE:  In Re: Pharmaceutical Industry Average Wholesale Price Litiagation**
**DATE:  December 12, 2008**

Enclosed is the Original of the transcript of the testimony of **Judy Waterer** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services


Encl.

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008

# Chicago, IL

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------X

In Re:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )  MDL No. 1456

PRICE LITIGATION                ) Civil Action No.

----------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:       )

United States of America ex     )

rel. Ven-a-Care of the          )

Florida Keys, Inc., et al.      )

v. Boehringer Ingelheim         )

Corp., et al., Civil Action     )

No. 07-10248-PBS                )

----------------------------X

          (CROSS-CAPTIONS APPEAR ON FOLLOWING PAGE)

        VIDEOTAPED 30(b)(6) DEPOSITION OF ROXANE

     LABORATORIES, INC., ROXANE LABORATORIES, INC.

        n/k/a BOEHRINGER INGELHEIM ROXANE, INC.,

   BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., and

   BOEHRINGER INGELHEIM CORPORATION by JUDY WATERER

                   DECEMBER 12, 2008

## Henderson Legal Services, Inc.

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
Chicago, IL

Page 2

1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND

2              FOR LEON COUNTY, FLORIDA

3    -----------------------------X

4    THE STATE OF FLORIDA, ex rel. )  Civil Action No.

5    VEN-A-CARE OF THE FLORIDA      )      98-3032A

6    KEYS, INC.                     )

7         v.                        )

8    BOEHRINGER INGELHEIM           )

9    CORPORATION, et al.,           )

10   -----------------------------X

11            The videotaped 30(b)(6) deposition of

12   Roxane Laboratories, Inc., Roxane Laboratories, Inc.

13   n/k/a Boehringer Ingelheim Roxane, Inc., Boehringer

14   Ingelheim Pharmaceuticals, Inc., and Boehringer

15   Ingelheim Corporation by JUDY WATERER, called as a

16   witness for examination, taken pursuant to the

17   Federal Rules of Civil Procedure of the United

18   States District Courts pertaining to the taking of

19   depositions, taken before KELLY M. FITZGERALD, a

20   Certified Shorthand Reporter of said state, at Suite

21   500, 219 South Dearborn Street, Chicago, Illinois,

22   on 12th day of December, A.D. 2008, at 9:08 a.m.

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                              Chicago, IL

                                                              Page 30

1    understanding, Ms. Waterer, as to whether or not

2    the Medicaid program as -- or the Medicaid -- let

3    me rephrase the question.

4           Do you have an understanding that state

5    Medicaid programs seek to determine to estimate

6    an acquisition cost as part of their methodology

7    for reimbursing pharmacists?

8        A.    No.  And if they wanted to get that, it

9    wouldn't be very difficult for them to have that

10   information.

11       Q.    Okay.  So it's your belief that states

12   do not seek to use estimated acquisition costs as

13   part of their reimbursement objective?

14       A.    I think that's not exactly what my

15   understanding of your question was.

16       Q.    Okay.

17       A.    Your question was do I have knowledge

18   that the states are trying to use acquisition

19   costs as the basis of their reimbursement.  I

20   don't have enough information or knowledge about

21   what the states are doing.  I sell products.  I

22   don't get reimbursed for products.  So I don't

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
## Chicago, IL

Page 31

1    have a lot of focus on reimbursement programs,

2    and they're a minor part of even our customers'

3    business.  So for me to have an understanding of

4    the rationale of how states and government decide

5    to set their reimbursement and what their

6    rationale and reasoning and thought process or

7    how they set it is something that I would

8    understand is -- is not reasonable.

9         Q.   I think in response to an earlier

10   question, you yourself mentioned the term

11   "acquisition cost."

12        A.   Mm-hmm.

13        Q.   And how -- I can't remember the --

14   exactly what you said, but it was a term that you

15   yourself used, wasn't part of my question.  You

16   used it in connection with describing

17   reimbursement efforts by certain third-party

18   payers.  Do you recall that?

19        A.   You -- in trying to -- in trying to tie

20   this together and the reason that I use that, is

21   it was going back to a statement that AWP in some

22   way was supposed to be representative of the sell

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                            Chicago, IL

                                                              Page 32

1    price, which to me is the same.  If it's a sell

2    price to somebody, it's their acquisition price.

3    So I was just taking it to the next step.

4         Q.    Okay.

5         A.    So I wasn't trying to introduce a new

6    concept.

7         Q.    So is it your testimony that Roxane has

8    no knowledge that state Medicaid programs seek to

9    determine the acquisition costs of products as

10   one part of their reimbursement methodologies?

11        A.    I don't think it's our knowledge as a

12   corporation of what the Medicaid rationale for

13   setting their pricing is.  And based on

14   information that we provide to the government, if

15   that was something that they wanted to know, we

16   feel they would have access to that information.

17        Q.    Have you ever looked at the federal

18   regulations that relate to Medicaid reimbursement

19   for covered drugs?

20        A.    Certainly not.  I would have no reason

21   to.

22        Q.    No --

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                          Chicago, IL

                                                            Page 33

1        A.    I don't deal with reimbursement.   Our
2   company does not deal with reimbursement.
3        Q.    So -- okay.   And if -- if average
4   wholesale prices have no -- is it your testimony
5   that average wholesale price is a term that has
6   no meaning other than something that people use
7   as a benchmark for payment?
8        A.    It's a reference price used in the
9   industry.   It's commonly used, our understanding
10  is by a number of different organizations to tie
11  their reimbursement to.
12       Q.    All right.   And is it -- is it your
13  view, Ms. Waterer, that Roxane or any other
14  company is free to report whatever figure they
15  wish as an average wholesale price?
16       A.    Wow.   I don't -- I don't -- I don't
17  even know how to respond to that.   I can tell you
18  how we do set our AWP and that we set it
19  consistent to the industry.   I don't think that
20  we're out there trying to come up with some kind
21  of low pricing or reinvent the term.   We know on
22  our multisource products that other companies use

                  Henderson Legal Services, Inc.
202-220-4158                www.hendersonlegalservices.com

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
Chicago, IL

Page 140

1    different pricing compendia reported AWPs.

2        Q.   Is it -- was it -- has it been Roxane's

3    understanding that the different publishing

4    compendia would report the AWPs that Roxane --

5    I'm sorry.  Let me state that again.

6            Has it been your understanding as a

7    representative of Roxane that the AWPs that

8    Roxane reported to the publishers would be, in

9    fact, published by them?

10       A.   That was our understanding, yes.

11       Q.   And has Roxane reported its AWPs with

12   the expectation that those would be the AWPs that

13   would be published?

14       A.   Yes.

15       Q.   And with regard to the government

16   knowledge, what -- are there -- are there any

17   documents that you believe show that the

18   government has approved or acquiesced in the

19   practice of having AWPs published that are higher

20   than any actual market prices?

21       A.   Okay.  I don't believe that the

22   government has ever told us that they approve or

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
Chicago, IL

Page 141

1    disapprove or that we've had discussions with the

2    government about whether AWP was an actual

3    calculated average of some kind of wholesale

4    prices, no.

5         Q.   Have you -- you perhaps are aware of

6    some reports of the office -- HHS Office of

7    Inspector's General investigating prices,

8    including AWP prices of various drugs over time?

9         A.   Maybe vaguely.  I'm not sure.

10        Q.   Okay.  Have you ever read any HHS OIG

11   reports about inflated average wholesale prices?

12        A.   I don't believe so.

13        Q.   Are you aware of anybody at Roxane who

14   has read HHS OIG reports relating to the subject

15   of inflated AWPs?

16        A.   I don't recall ever having a

17   conversation and being told by somebody that they

18   were reading whatever that report is you just

19   mentioned.

20        Q.   Have you read any reports by other

21   federal agencies concerning AWP price inflation?

22             MS. RIVERA:  Object to form.

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                              Chicago, IL

Page 142

1    BY MR. HENDERSON:

2         Q.    And I use that term a little loosely to

3    mean inflated AWPs.

4         A.    Well, I -- again, I don't believe that

5    I've ever read any government reports specific to

6    AWP.

7         Q.    Okay.

8         A.    And again, when you said you're using

9    the term loosely AWP inflation, the industry

10   understands what AWP is.  It's a term that has

11   been around for many, many, many years.  And

12   people in the industry and people that are

13   familiar with AWP don't believe that AWP is an

14   actual calculated average of some sort of pricing

15   that wholesalers have to some sort of somebody

16   else, and we don't believe that the government

17   thinks that either.  And there's a myriad of

18   reasons why it would be irrational to believe

19   that.

20        Q.    You indicated you haven't read any

21   government reports on the subject.  And you're

22   not specifically aware of any -- anybody else at

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
Chicago, IL

Page 143

1  Roxane having read any government reports on

2  that.  Have -- has Roxane ever undertaken to

3  contact any federal employees or representatives

4  to find out whether they approve of or acquiesce

5  in the reporting by Roxane in the subsequent

6  publication of AWPs that are in excess of any

7  actual price at which Roxane's drugs are sold in

8  the marketplace?

9       A.   I'm not aware of any communication

10  we've had with the government regarding that, nor

11  am I aware of the government asking us about it

12  with the exception of this case, nor am I aware

13  of anybody that thinks that an AWP means

14  something that is an actual wholesale acquisition

15  -- oh, no, that's A -- that's -- an actual actual

16  average.

17       Q.   Average?

18       A.   Wholesale price of whom to whom, what's

19  in here isn't even clearly defined what that

20  would mean.

21       Q.   Have --

22       A.   So it's not what AWP is.  It's not what

Roxane Laboratories, Inc (Judy Waterer)                December 12, 2008
                              Chicago, IL

                                                              Page 144

1    it's ever been.  And no, we haven't asked anybody

2    about it or if they understood that AWP was what

3    AWP has always meant, no.

4         Q.   It's not my purpose to engage in an

5    extensive debate over this.

6         A.   Yeah.

7         Q.   But as an aside, are you aware of the

8    opinion of Judge Saris who is presiding over this

9    case, that the words average wholesale price as

10   used in the Medicare context should be

11   interpreted according to its plain meaning and

12   that that term means an average, an actual

13   average of wholesale prices?  Are you aware of

14   that decision?

15        A.   I'm not --

16             MS. RIVERA:  Object to form.

17   BY THE WITNESS:

18        A.   I'm not aware of specific decisions on

19   that.  And I'm a little bit bewildered because I

20   wouldn't even know how to begin to come up with

21   that kind of number.

22   BY MR. HENDERSON:

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                            Chicago, IL

                                                            Page 158

1    disproportionate share hospital pricing.

2         A.    Mm-hmm.

3         Q.    Any other information that you think

4    the states have access to?

5         A.    That's what's coming to mind right now

6    --

7         Q.    Okay.

8         A.    -- as most directly, I think AMP being

9    the most clearly obvious.

10        Q.    All right.

11             MR. HENDERSON:  The -- I'll have this

12   marked as Exhibit 2, Waterer U.S. Exhibit 2.

13             And counsel on the phone, this is --

14   and for the record, this Exhibit 2 is a Federal

15   Register publication -- let me pause while it's

16   marked.

17                  (WHEREUPON, discussion was had off

18   the record.)

19                  (Exhibit Waterer US 002, marked as

20   requested.)

21   BY MR. HENDERSON:

22        Q.    Okay.  Ms. Waterer, as I acknowledged,

                    Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008

Chicago, IL

Page 159

1    I lied when I said we only had one exhibit.  I

2    now have a second exhibit for you.  And this

3    exhibit that's been marked as Exhibit 2 is a copy

4    of a publication from the Federal Register dated

5    July 31, 1987 at 52 Federal Register 28657 and

6    28658.  And this sets forth certain federal

7    regulations concerning federal payment -- I'm

8    sorry -- the federal assistance for state

9    Medicaid payments for drugs.  And it describes

10   the limits of the Federal Government's

11   contribution to those state payments for drugs.

12           And if you look at Section 447.331, it

13   -- first, this describes aggregate upper limits

14   of payments, and I'll try to explain in my own

15   words since this is legal language to a certain

16   extent.  Paragraph A essentially cross-references

17   to Section 447.332, which concerns federal upper

18   limits, FULs.  Have you heard of FULs?

19       A.   I've heard the term.

20       Q.   And do you understand generally

21   speaking that they're upper limits set by the

22   Federal Government on payments for certain drugs?

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                              Chicago, IL

                                                              Page 160

 1        A.    Possibly.  I don't really have a lot of

 2   dealings with them, but I believe I've heard it

 3   described as a federal upper limit.

 4        Q.    Okay.  And have you heard it described

 5   generally speaking as a limit on reimbursements

 6   sometimes that takes effect for particular drugs?

 7        A.    I'm not really familiar with FUL in

 8   that term so I have not heard a lot of language

 9   about it.

10        Q.    Okay.  And then subparagraph B of

11   Section 447.331 describes payments either for

12   certain brand name drugs that are certified or --

13   or other drugs for which an FUL has not been

14   established, and this includes generics.  And it

15   in essence says, "The agency payments for such

16   drugs shall not exceed in the aggregate payment

17   levels that the agency has determined by applying

18   the lower of, one, estimated acquisition costs

19   plus a reasonable" -- I'm sorry -- "estimated

20   acquisition costs plus reasonable dispensing fees

21   established by the agency, or two, provider's

22   usual and customary charges to the general

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                              Chicago, IL

Page 161

1    public."

2             Did I read that correctly?

3        A.   Yes.

4        Q.   Does that concept of paying no more

5    than the estimated acquisition costs of drugs

6    plus a reasonable dispensing fee or the

7    provider's usual and customary charges, is that

8    concept familiar to you?

9        A.   I haven't read this before, so no.

10       Q.   Has this regulation or the concept of

11   it ever been brought to your attention?

12       A.   I don't believe so.  Again, we focus on

13   selling drugs to pharmacy, not getting

14   reimbursement from the Federal Government.  So I

15   don't know that we would or would not have even

16   seen this.

17       Q.   Mm-hmm.

18       A.   Was it -- was it mailed to the company

19   or --

20       Q.   It was published in the Federal

21   Register, which is a publication that the Federal

22   Government issues for --

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                              Chicago, IL

Page 162

1        A.   Okay.  I don't know corporately that we

2    would have had reason to look at how the

3    government sets their reimbursement because it

4    would not be relevant to our sales of product to

5    our customers.

6        Q.   Okay.  And so -- so it's your testimony

7    that reimbursement generally is not relevant to -

8    - reimbursement to providers is not relevant to

9    Roxane's business?

10            MS. RIVERA:  Object to form.

11   BY THE WITNESS:

12        A.   It is not something that is generally

13   considered.  In the event, as I -- and I think I

14   mentioned one example on Furosemide, where it was

15   brought to our attention that it was making them

16   unable to sell the product, then we had to

17   consider the fact that the AWP had to change.

18   But nobody at that point said that it was

19   specific to any federal program or any federal

20   reimbursement.  They were talking about third-

21   party reimbursers.  And I believe that the third-

22   party reimbursers, that the government is very

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                            Chicago, IL

Page 165

1    third-party payer in the United States.

2    BY THE WITNESS:

3        A.   All right.  What I can say is my

4    personal experience with when I have gotten

5    reports, and it's only based I guess when you

6    were saying on Medicaid, is that the proportion

7    of products, because we have to track that, we

8    get reports because we have to pay rebates based

9    on that.  And it has been a very insignificant

10   portion of our business.

11   BY MR. HENDERSON:

12       Q.   The Medicaid piece?

13       A.   The part for which we have to pay

14   rebates.

15       Q.   Okay.  Which would be the Medicaid

16   program?

17       A.   Right.

18       Q.   What about Medicare?

19       A.   I'm not real familiar with that.

20       Q.   Okay.  And I'll represent to you that

21   this Section 447.331 generally describes the

22   Federal Government's approach towards Medicaid

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                          Chicago, IL

                                                          Page 166

1    reimbursement for drugs.

2         A.    Okay.

3         Q.    And consequently, states generally

4    follow the same approach --

5         A.    Mm-hmm.

6         Q.    -- because they need to get their share

7    of this federal money and they have to comply

8    with these rules in order do that.

9              I'm going to draw your attention to the

10   definition at the top right-hand corner of

11   Exhibit 2 in Section 447.301, and the definition

12   of estimated acquisition costs, which says that

13   that term means "The agency's best estimate of

14   the price generally and currently paid by

15   providers for a drug marketed or sold by a

16   particular manufacturer or labeler in the package

17   size of drug most frequently purchased by

18   providers."

19             Have you ever heard that definition?

20        A.    No.

21        Q.    Do you know whether Roxane is familiar

22   with that definition in the context of Medicaid

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
Chicago, IL

Page 167

1    reimbursement?

2          A.    I -- again, in preparing for this

3    deposition, this wasn't a question that I

4    specifically asked anyone so I'm unaware.  To my

5    knowledge, I'm not aware of any group in the

6    company that tracks government reimbursement

7    programs and how they're implemented and what

8    they're tied to and what their definitions are

9    and monitors this publication to see if there's

10   changes or if anything happens with regard to how

11   federal programs reimburse pharmacies or other

12   people for products that pharmacies sell.  So I

13   don't know.  In preparation for this, I can say I

14   don't know.

15         Q.    With regard to topic No. 5.

16         A.    Mm-hmm.

17         Q.    I think I asked you about

18   documentation, that -- well, let me ask you just

19   to make sure.

20              Is there -- are there any documents

21   that provide -- that you can think of or that you

22   have identified that inform Roxane's belief with

Henderson Legal Services, Inc.

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
Chicago, IL

Page 206

1          MS. RIVERA:  Object to form.

2     BY THE WITNESS:

3          A.    To -- to even get anything about it.

4     It's not...

5     BY MR. HENDERSON:

6          Q.    Turning to topic No. 7 --

7          A.    Mm-hmm.

8          Q.    -- which focuses on the Medicare

9     program.  Is there anything specific about the

10    Medicare program, and in particular defendants'

11    belief that the -- in the context of the Medicare

12    program that the United States approved of or

13    acquiesced in Roxane's price reporting practices

14    --

15          MS. RIVERA:  Object to --

16    BY MR. HENDERSON:

17          Q.    -- is there anything specific that

18    would be in addition to what you've already

19    testified about that would relate to that

20    subject?

21          MS. RIVERA:  Object to form.

22    BY THE WITNESS:

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Roxane Laboratories, Inc (Judy Waterer)                December 12, 2008
Chicago, IL

Page 207

1        A.    Other than the fact that I think I've

2    testified that we had every reason to believe, if

3    we looked into it, that the U.S. government,

4    regardless of what program they were applying to,

5    understood what the terms were, what the industry

6    practice was and what it meant.  I would apply

7    that to whatever government programs there were.

8    BY MR. HENDERSON:

9        Q.    Okay.  So you're not aware of, for

10   example, any specific written communications

11   with, for example, Medicare carriers about

12   Roxane's interpretation of AWP?

13       A.    I don't believe that we have any

14   communications with Medicare, period.  I am not

15   aware of any request from Medicare to define

16   terms.  So I would not expect that we would have

17   any documents with Medicare that you're talking

18   about.

19       Q.    And is that also true with regard to

20   any oral communications between Roxane and any

21   representative of the Federal Government insofar

22   as it concerns Medicare program?

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008

Chicago, IL

Page 208

1          MS. RIVERA:  Object to form.

2     BY THE WITNESS:

3          A.   I'm -- I didn't specifically

4     investigate what any oral communications might

5     have been.  To my knowledge, we don't write to or

6     talk to Medicare as a general business practice.

7     BY MR. HENDERSON:

8          Q.   And just to be clear, you haven't --

9     you in particular, have you read any government

10    reports on Medicare -- Medicare's use of AWPs?

11         A.   Not that I recall.

12         Q.   Okay.  And are you aware of any Roxane

13    employee who has read such reports?

14         MS. RIVERA:  Object to form.

15    BY THE WITNESS:

16         A.   I'm not specifically aware of someone

17    that's read those reports, any reports that may

18    or -- may exist.

19         MR. HENDERSON:  And just for the

20    record, I would ask the same questions as to BIP

21    or -- BIC or BIPI except that it's my

22    understanding that you would object and instruct

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008

Chicago, IL

Page 217

1    significantly in excess of the providers'

2    acquiesce -- acquisition costs?

3             MS. RIVERA:  Object to form.

4    BY THE WITNESS:

5         A.   I don't know how to know -- how to say

6    yes, they acquiesced or approved or whatever.

7    The fact of the matter is they -- they chose that

8    reimbursement.  They've continued to use that

9    reimbursement model for years and years.  There's

10   no indication that they didn't know what it

11   meant, what AWP meant or its relationship to

12   actual pricing in the market.  In fact, there's

13   every indication that they absolutely knew,

14   particularly in the case of the Federal

15   Government, because they actually get sent our

16   AMPs on a regular basis.

17            So the only conclusion that I can have

18   is that they knowingly engaged in that --

19   BY MR. HENDERSON:

20        Q.   And I think I --

21        A.   -- and they willingly did that.

22        Q.   I think I understand that argument.

66ec5398-c731-48a7-90fb-e1d7007cd66b

Roxane Laboratories, Inc (Judy Waterer)                    December 12, 2008
                              Chicago, IL

                                                              Page 218

1        A.    Yeah.

2        Q.    Is there a particular document that

3    you're aware of that you've seen or that you're

4    aware of some Roxane employee seeing that says in

5    essence, we want to pay providers, we want to

6    have the Medicaid program reimbursed in amounts

7    that are significantly in excess of the

8    providers' acquisition costs?

9        A.    I can't recall ever seeing that.  I

10   don't --

11       Q.    Are you aware of any oral communication

12   in which a federal employee has said such a

13   thing?

14            MS. RIVERA:  Object to form.

15   BY THE WITNESS:

16       A.    I'm not aware of any communication, but

17   I don't think we ever have those types of

18   discussions or the federal employees have called

19   up and asked us one way or the other.

20   BY MR. HENDERSON:

21       Q.    Okay.  Briefly, topic 11.

22       A.    Mm-hmm.

66ec5398-c731-48a7-90fb-e1d7007cd66b