# Exhibit USAbt-C

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------x

In re: PHARMACEUTICAL INDUSTRY    )
AVERAGE WHOLESALE PRICE           )
LITIGATION                        )
----------------------------------)
United States of America ex rel.) MDL No. 1456
Ven-A-Care of the Florida Keys,  )
Inc. v. Abbott Laboratories,     ) Civil Action
Inc., Civil Action No. 06-       ) No. 01-12257-PBS
11337-PBS; and United States of  )
America ex rel. Ven-A-Care of    ) Honorable
the Florida Keys, Inc., v. Dey,  ) Patti B. Saris
Inc., et al., Civil Action No.   )
05-11084-PBS; and United States  )
of America ex rel. Ven-A-Care    )
of the Florida Keys, Inc., v.    )
Boehringer Ingelheim Corp., et   )
al., Civil Action No. 07-10248-  )
PBS                              )
----------------------------------x

                                                              Page 2
1                                              December 10, 2008
2                                                    Volume I
3           VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES
4       Taken on behalf of the Plaintiff, produced, sworn,
5       and examined on the 10th day of December, 2008,
6       between the hours of nine o'clock in the forenoon
7       and six o'clock in the evening of that day, at the
8       offices of United States Attorneys' Office, 425 West
9       Capitol, Suite 500, Metropolitan Building, Little
10      Rock, Arkansas, before BRENDA ORSBORN, a Certified
11      Court Reporter within and for the State of Missouri,
12      in a certain cause now pending before the United
13      States District Court, District of Massachusetts,
14      In re: Pharmaceutical Industry Average Wholesale
15      Price litigation.
16
17
18
19
20
21
22

1    plaintiffs and defendants.
2            MR. BERLIN:  Okay.  Thank you.
3            MS. OBEREMBT:  You're welcome.
4        Q.  (By Ms. Oberembt) I'd like to spend
5    some time talking about the reimbursement
6    methodology that Arkansas has used over the years
7    to pay for drugs.
8        A.  Okay.
9            MS. OBEREMBT:  I'm going to mark as
10   Exhibit 2 the federal regulation regarding the
11   payment for prescription drugs in Medicaid.
12           [Marked Exhibit Bridges 002]
13       Q.  (By Ms. Oberembt) Would -- would you
14   take a look at Exhibit 2, please?  Does this
15   appear to be the federal regulation regarding the
16   payment for prescription drugs and state Medicaid
17   Programs?
18       A.  Yes, ma'am.
19       Q.  If I could direct your attention to
20   Section 447.331B entitled "Other Drugs".
21       A.  Yes, ma'am.
22       Q.  Would you take a minute and just read

Page 30

1    that to yourself?  Do you -- do you see where it
2    says that it refers to payment levels that the
3    agency has determined by applying the lower of,
4    one, estimated acquisition cost, plus reasonable
5    expense and fees established by the agency, or,
6    two, the provider's usual and customary charges
7    to the general public?
8         A.   Yes.
9         Q.   Has your agency established a
10   reimbursement methodology that applies these
11   elements?
12        A.   Yes, ma'am.
13        Q.   How does the State define the usual and
14   customary charges to the general public?
15        A.   Based on -- we base it based on cash
16   reimbursements by -- by that -- the usual and
17   customary is determined on an audit.  When the --
18   when the auditors go in, they look at what cash
19   payers have paid on prescription drugs, is how we
20   look at a usual and customary charge.
21        Q.   If you could look at Section 447.301
22   which is the definition section.  It's in the

```
 1    second column --
 2         A.    Okay.
 3         Q.    -- about three-quarters of the way
 4    down. Actually, it's in the third column.  I'm
 5    sorry.  Do you see where that second definition
 6    says "estimated acquisition costs"?
 7         A.    Yes, ma'am.
 8         Q.    Are you familiar with that definition?
 9         A.    Yes, ma'am.
10         Q.    Has the State tried to determine
11    estimated acquisition costs in accordance with
12    that definition?
13         A.    To our best estimate, yes, we do.
14              MS. OBEREMBT:  I'd like to mark as
15    Exhibit 3 a chart that tries to summarize
16    Arkansas' reimbursement formulas and dispensing
17    fees since 1990.
18              [Marked Exhibit Bridges 003]
19         A.    Thank you.
20         Q.    (By Ms. Oberembt) Would you take a
21    second to look over that chart, please?  Is this
22    chart familiar to you?
```

1    Q.   Why not?
2    A.   If the brand is going -- if we're going
3    to -- if the ingredient cost on the brand is less
4    than the -- the generic, then that defeats the
5    purpose of why you're setting a MAC.  Because
6    you're setting a MAC because you've got a
7    high-price brand out there, and you've got
8    generic equivalents.  So you want to make sure
9    that the pharmacies will dispense the more
10   cost-effective product.  So if you would set a
11   MAC on a brand, you would force use of a
12   higher-cost generic, if such a thing existed.  So
13   that wouldn't make any sense.
14   Q.   We've also gone over the dispensing
15   fees that Arkansas has paid over the years.  Has
16   Arkansas ever faced any type of access issue
17   caused by an allegedly too-low dispensing fee?
18   A.   No.
19   Q.   When -- when you said earlier that the
20   pharmacist complained about the State's proposed
21   change to AWP minus 25 percent, did -- did DHS
22   receive any information from a pharmacist saying

1   that -- that "My dispensing fee is too low, and
2   so you need to make it up for me on the
3   ingredient cost"?
4        A.   Oh, no.  I mean, no.  They wouldn't
5   have said -- no.  Our -- our dispensing fee has
6   generally been claimed to be some -- at one time
7   we were higher than most of the other states on
8   our dispensing fee, so we've never really had
9   pharmacists complain about our dispensing fee.
10       Q.   On the chart that's Exhibit 3, there's
11  a reflection that beginning in March of 2002, an
12  additional differential dispensing fee of $2
13  shall be given to pharmacy providers when a
14  generic that does not have a State or Federal
15  upper limit is dispensed, and I'm reading from
16  Footnote 8 on Exhibit 3, if you want to pull that
17  out.  What was the purpose of -- of that change
18  to the reimbursement formula?
19       A.   We had some generics that didn't have
20  upper limits on them, and so as an incentive for
21  the pharmacist to -- to dispense those, rather
22  than trying to dispense a

1  therapeutically-equivalent brand, we -- that was
2  an incentive for the pharmacist to dispense the
3  therapeutically-equivalent generic.
4      Q.   Say in fast ten times.
5      A.   No, thank you.  No, thank you.
6      Q.   Is it -- is it your understanding that
7  the State is supposed to make its dispensing fee
8  determination separate from its determination of
9  ingredient cost?
10     A.   We've always considered them a separate
11 entity, separate -- two separate things.
12     Q.   Has Arkansas ever had any practice or
13 policy of paying increasing ingredient costs to
14 make up for inadequate dispensing fees?
15     A.   No.
16     Q.   Does the State itself operate the MAC
17 Program?
18     A.   We do, yes, our state MAC Program.
19     Q.   And does the State have any assistance
20 from an outside contractor on that?
21     A.   We have a -- an individual that works
22 strictly for us through an outside contract, yes.

1    Q.   And you have no reason to doubt that
2  pharmacies are submitting you accurate and
3  truthful information?
4    A.   I have no reason to doubt.
5    Q.   Now, when we looked at the 1997 report,
6  which we marked as Roxane Exhibit 12, and in
7  particular, the finding that pharmacies, on
8  average, paid 42.5 percent less than AWP for
9  drugs sold to Medicaid beneficiaries, you
10 referenced the State's MAC Program in the context
11 that -- of our discussion.  Do you recall that?
12   A.   Yes.
13   Q.   Is it your testimony that the State's
14 MAC Program achieved savings of 42.5 percent less
15 than AWP on most drugs?
16   A.   I really can't answer that.  I don't --
17 I can't be definite on that.
18   Q.   Why wouldn't Arkansas' Medicaid Program
19 adopt a definition of estimated acquisition cost
20 for generic drugs of AWP minus 40 percent?
21   A.   If we knew that the AWPs that were
22 being provided to us were accurate, then we could

Page 252

1   have an accurate percent off of AWP, but I mean,
2   based on this, we're -- again, this is an
3   average.  Not every pharmacy might be able to
4   accommodate that average. So we just can't do
5   that.
6       Q.   Right.  I mean, that's precisely how
7   averages work.  Some receive discounts off of AWP
8   much greater than 40 percent, correct?
9            MS. OBEREMBT:   Objection.
10      A.   I don't know the answer to that.  I
11  know that there are discounts off of AWP for
12  generics that may be greater than 40 percent, but
13  I don't know about much greater.  And I don't
14  know that -- again, I don't know the spread of --
15  and the quantities of each percent off of AWP.
16      Q.   (By Mr. Reale) Well, why not then adopt
17  a definition of estimated acquisition cost for
18  generic drugs of AWP minus 30 percent if, on
19  average, pharmacies were acquiring those drugs at
20  discounts of over 40 percent off of AWP?
21      A.   I can't answer why.  I -- I don't have
22  a direct answer for that.  Again, we -- we