# Exhibit USAbt-E

GA Department of Community Health (Jerry Dubberly)　　　　　　　　　　　　December 15, 2008
Atlanta, GA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X

IN RE:  PHARMACEUTICAL INDUSTRY       )

AVERAGE WHOLESALE PRICE LITIGATION    ) MDL No. 1456

------------------------------------) Civil Action

THIS DOCUMENT RELATES TO:             ) No. 01-12257-PBS

United States of America, ex. rel.    ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,       )

Inc., v. Abbott Laboratories, Inc.,   )

Civil Action No. 06-11337-PBS; and    )

United States of America, ex. rel.    ) VIDEOTAPED

Ven-a-Care of the Florida Keys,       ) DEPOSITION OF

Inc., v. Dey, Inc., et. al., Civil    ) THE GEORGIA

Action No. 05-11084-PBS; and United   ) DEPARTMENT OF

States of America, ex. rel.           ) COMMUNITY HEALTH

Ven-a-Care of the Florida Keys,       ) by JERRY

Inc., v. Boehringer Ingleheim         ) DUBBERLY

Corp. et. al., Civil Action           )

No. 07-10248-PBS.                     ) DECEMBER 15, 2008

------------------------------------X

1   effort across those pharmacists.
2       Q.   Would it have been possible for the
3   pharmacy employees of the Georgia Medicaid
4   program to perform the services that were
5   delegated out to EDS, Express Scripts, or SXC?
6       A.   No.
7       Q.   Why not?
8       A.   The enormity of administering the
9   pharmacy benefit is something that requires a
10  much larger group to -- to handle and systems and
11  infrastructure and call centers and et cetera.
12  So that's not something that we could do with
13  that -- that number of staff.
14      Q.   Are you generally familiar with the
15  federal regulations regarding payments for
16  prescription drugs?
17      A.   I am.
18              (Whereupon a document was
19  identified as Exhibit Georgia 002.)
20      Q.   (By Mr. Lavine)  Let me show you what
21  we've premarked as Georgia Exhibit 2, which is a
22  two-page document.  On the top, it states:

GA Department of Community Health (Jerry Dubberly)                December 15, 2008
Atlanta, GA

Page 40

1    Federal Register/Volume 52, No. 147, dated July
2    31, 1987.
3              I'll just ask you to take a quick look
4    at that.
5              In particular, on the first page,
6    there's section 447.331, subparagraph b.
7              Do you see where there's two -- two
8    parts to subsection b there?
9              Item one states -- I should go back a
10   little bit.
11             The, "Payment levels that the agency
12   has determined by applying the lower of the --
13   (1) Estimated acquisition costs plus reasonable
14   dispensing fees established by the agency; or (2)
15   Providers' usual and customary charges to the
16   general public."
17             Are you generally familiar with that
18   language?
19        A.   I am.
20        Q.   And has the Georgia Medicaid program
21   established a reimbursement methodology that
22   applies to those requirements?

1   A.   Yes, we have.
2   Q.   Can you just explain that a little bit.
3   A.   The requirement is that the agency
4   develop their best estimate of the price
5   generally and currently paid by providers, as you
6   see.
7         We have a mechanism in place where the
8   reimbursement is the lower of or lesser of our
9   estimated acquisition cost, which is AWP minus 11
10  percent currently, or the providers' usual and
11  customary cost or the providers' submitted
12  ingredient cost plus their dispensing fee, or the
13  federal MAC or the state MAC or the -- or the
14  providers' most favored nation, or MFN, rate.
15        Then a dispensing fee applies for those
16  -- for, you know, each of those as well.
17  Q.   Can you take a look also on -- on
18  Exhibit 2 -- I'm sorry -- yes.
19        Is that 2?
20  A.   Yes.
21  Q.   Exhibit 2, 447.301, the definition of
22  "estimated acquisition cost."

Page 42

1    A.    Okay.

2    Q.    "'Estimated acquisition cost' means the
3    agency's best estimate of the price generally and
4    currently paid by providers for a drug marketed
5    or sold by a particular manufacturer," do you see
6    that language?

7    A.    I do.

8    Q.    Has the Georgia Medicaid program also
9    attempted to determine estimated acquisition
10   costs in accordance with that definition?

11   A.    We have.

12   Q.    And that's consistent with the -- the
13   general approach you described just a moment ago?

14   A.    It is.

15   Q.    In order to qualify for federal
16   Medicaid funding, does your state need to have a
17   state plan that's approved by the federal
18   government?

19   A.    Yes, we do.

20   Q.    Does that get amended from time to
21   time?

22   A.    It does.

Page 76

1   Q. Is it feasible to just set
2   reimbursement for all NDCs at AWP minus 65
3   percent?
4   A. No. The MAC rate typically applies to
5   generics, and generics are typically based upon
6   pricing studies that some of the government
7   entities have done. There's a wider margin
8   between the published AWP and the actual
9   acquisition cost for those drugs.
10          (Whereupon a document was
11  identified as Exhibit Georgia 014.)
12  Q. (By Mr. Lavine) I just marked as
13  Exhibit 14 a two-page document. It reflects at
14  the top "Department of Health and Human Services"
15  with a date of April 12th, 1994, with a document
16  number at the lower right-hand side of HHC902-
17  0878.
18          I'll just ask you to take a look at
19  that and then tell me if you recognize that
20  document.
21  A. I have seen it before.
22  Q. Can you take a look at the next-to-last

Page 77

1    paragraph on page 2 starting with, We would also
2    clarify our policy that a dispensing fee
3    determination must be separate and distinct from
4    the estimated acquisition cost determination --
5          A.    Yes.
6          Q.    -- and unrelated to the cost of the
7    drug product.
8          A.    Yes.
9          Q.    Is -- is the state plan for Georgia
10   Medicaid program consistent with that statement?
11         MR. COLE:  Object to the form.
12         A.    The acquisition cost and the dispensing
13   fee are separately approved by CMS and our state
14   plan.
15         Q.    (By Mr. Lavine)  And does Georgia also
16   have a policy known as a "most favored nation"
17   regarding -- that applies to dispensing fees?
18         A.    We do.
19         Q.    Can you explain that.
20         A.    The most favored nation requirement is
21   that a pharmacy must pass along to the department
22   the lowest reimbursement methodology that it

1    $283.20. Do you see that?

2        A.   Yes.

3        Q.   And then the price available to at

4   least some pharmacists was $25.56. Do you see

5   that?

6        A.   Yes.

7             MR. REALE: Objection.

8   BY MS. FORD:

9        Q.   And the estimated dollar value of the

10  spread was $257.69, with a spread percentage of

11  over 1000%. Do you see that?

12       A.   I see that.

13       Q.   And would Washington Medicaid have

14  expected manufacturers to provide information to

15  pricing compendia that would reflect that large

16  of a spread between the price available to

17  providers and the price, the AWP price?

18       A.   No.

19            MS. RAMSEY: Objection.

20  BY MS. FORD:

21       Q.   Prior to learning of the lawsuits which

22  we're taking your deposition in today, did

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                November 24, 2008
Olympia, WA

Page 158

1  Washington become aware -- Washington Medicaid
2  become aware of differences between the Average
3  Wholesale Price and the price at which providers
4  in Washington State were actually paying for
5  drugs?
6      A.   I can't speak for other people, but
7  certainly we have heard about -- about the, you
8  know, allegations that there were price
9  discrepancies or that there was this inflation or
10 artificial inflation of prices.
11     Q.   And did you or did Washington State
12 have any understanding of the -- the amount of
13 that inflation?
14     A.   No.
15     Q.   Did Washington Medicaid intend for
16 providers to be able to make a profit between the
17 difference on reimbursement for a drug and what
18 they were actually paying for a drug?
19     A.   I can't say that we intended to.  We
20 certainly I would think rec -- recognized that
21 there's usually a profit factor in what some
22 people, you know, what providers and suppliers in

1     A.     Not at all.

2            MR. ROBBEN:  Object to the form.

3     Q.     (By Mr. Lavine)  How did it come about,
4     then, that the dispensing fee -- well, clarify
5     for me what -- what you were saying before.

6     A.     The -- the charge to the Medicaid
7     agency is to estimate, to the best of its
8     ability, the actual acquisition cost of the drug
9     or the estimated acquisition of a cost and pay a
10    fair dispensing fee.

11           Knowing that there is no source other
12    than each individual's -- provider's invoice of
13    what the acquisition cost of a drug is, the
14    department has used average wholesale price and a
15    discounted rate off of that to approximate some
16    form of estimated acquisition cost.

17           There -- the dispensing fees are
18    reflective of -- of the effect of not having that
19    actual acquisition cost in that they are
20    artificially lower than what it actually costs to
21    dispense a drug, again because there's margin in
22    the ingredient cost.

1      Q.    So in part, it's a side effect of the
2  spread between AWP and actual cost?
3            MR. COLE:  Object to the form.
4      A.    Yes, it is.
5      Q.    (By Mr. Lavine)  Now, the state plan
6  for Georgia -- let me ask you to look at Exhibit
7  3.
8            Am I correct that the state plan
9  provides that the dispensing fee is based upon
10 periodic surveys of pharmacy operating costs
11 including professional salaries and fees,
12 overhead costs, and reasonable profit?
13     A.    Yes.  That is correct.
14     Q.    And in general, that was the policy of
15 the Georgia Medicaid program?
16     A.    Yes.
17     Q.    And is it your expectation that CMS
18 would have approved a divergence from that
19 policy?
20     A.    No.
21           MR. ROBBEN:  Object to the form.
22           MR. COLE:  Object to the form.

Page 357

1    Q.    (By Mr. Lavine)  Do you remember
2  Exhibit 14 -- or can you pull out Exhibit 14,
3  please.
4          The very -- the next-to-last paragraph,
5  "We would also clarify our policy that a
6  dispensing fee determination must be separate and
7  distinct from the EAC determination and unrelated
8  to the cost of the drug product."
9          Has it been the understanding of the
10 Georgia Medicaid program that that is the
11 directive of the federal -- the federal program
12 that runs Medicaid?
13     A.    Yes.
14          MR. COLE:  Object to the form.
15     A.    Yes.
16          MR. LAVINE:  Let me just mark two more
17 exhibits real quick.
18          MR. COLE:  Was there an answer to the
19 last question?
20          THE COURT REPORTER:  It was, "Yes."
21          MR. COLE:  Thank you.
22                    (Whereupon a document was

1   identified as Exhibit Georgia 034.)
2           MR. ROBBEN: What number is the first
3   one?
4           MS. TOWNES: 34.
5           MR. ROBBEN: Thank you.
6       Q.  (By Mr. Lavine) We just marked as
7   Exhibit 34 a two-page document on the letterhead
8   of the Department of Health and Human Services
9   dated November 30th, 1993, directed to Russell
10  Toal, commissioner, Georgia Department of Medical
11  Assistance.
12          And although there's no actual
13  signature there, it reflects that it was sent by
14  Eugene Grasser.
15          MR. ROBBEN: Mr. Lavine, could you
16  clarify where this document is from. Is it -- is
17  it from the U.S. production or Florida
18  production? It doesn't have a Bates number on
19  it.
20          MR. LAVINE: It's from the Georgia
21  production.
22          MR. ROBBEN: From the Georgia? Thank

1          MR. ROBBEN:  Object to the form.
2          MR. COLE:  Object to the form.
3     A.   Yes.  The practice is frowned upon by
4  CMS.  However, subsequent state plans have been
5  approved that do the same thing.
6     Q.   (By Mr. Lavine)  Is there --
7          MR. COLE:  I'm sorry.  Could I have
8  that answer read back, please.
9               (The record was read by the
10 reporter.)
11         MR. COLE:  Thank you.
12    Q.   (By Mr. Lavine)  You're referring to
13 the particular situation in Exhibit 34 that
14 describes that a -- a dispensing fee based upon
15 the ingredient as a percentage of the ingredient
16 cost?
17    A.   No.
18    Q.   What do you mean?
19    A.   Subsequent state plans, for example,
20 moving the reimbursement to AWP minus 11 percent
21 plus the 4.63 --
22    Q.   Is there a provision in the state plan

1   that specifies that the ingredient cost is higher
2   than it otherwise would be --
3        A.   No.
4        Q.   -- and, therefore, the dispensing fee
5   is lower than it would be?
6             MR. ROBBEN:  Object to the form.
7        A.   No.
8             MR. COLE:  Object to form.
9        A.   No.
10       Q.   (By Mr. Lavine)  That's not something
11  that would be approved by CMS, is it?
12            MR. ROBBEN:  Object to the form.
13            MR. COLE:  Object to the form.
14       A.   Can you clarify what the question is
15  again.
16       Q.   (By Mr. Lavine)  If -- if the State of
17  Georgia explained to CMS that it wanted to
18  implement a policy of purposely overpaying
19  ingredient costs so that it could underpay the
20  dispensing fee, would you expect that to be
21  approved by CMS?
22            MR. ROBBEN:  Object to the form.

1  MR. COLE: Object to the form.
2  A. No.
3  Q. (By Mr. Lavine) Georgia -- Georgia's
4  Medicaid program understands that a directive
5  from the federal end of the Medicaid program was
6  to keep those two items separate.
7  MR. COLE: Object to the form.
8  A. Yes.
9  Q. (By Mr. Lavine) Look at Exhibit 18
10  quickly. It's the Deloitte & Touche exhibit.
11  Look at page 8.
12  The average total cost to dispense a
13  prescription in the state of Georgia at a 95
14  percent confidence rate is $5.01 plus or minus 44
15  cents.
16  So would you agree that that would lead
17  to a dispensing fee of between $5.45 and -- I
18  need to do the math so I get it right -- $4.77?
19  MR. ROBBEN: Object to the form.
20  Q. (By Mr. Lavine) Did I get my math
21  wrong?
22  A. I'm very tired, but I think it's 4.57.

1    Q.    I think you're right.
2          So the Deloitte & Touche report
3    commissioned by the Georgia Department of Health
4    dated June 30th, 2000 concluded that the average
5    cost to dispense a prescription in the state of
6    Georgia is between $4.50 and $5.45.
7          Would you agree with that?
8     A.   Yes.
9     Q.   And what was the actual dispensing fee
10   in the state of Georgia at that time?
11         And Exhibit 4 might be a good
12   reference.
13    A.   $4.63 and $4.33.
14    Q.   Would you agree that there is not a
15   substantial difference between the actual
16   dispensing fee and the results of the Deloitte
17   study?
18         MR. ROBBEN:  Object to the form.
19         MR. COLE:  Object to the form.
20    A.   There's not a substantial difference,
21   in my opinion.
22    Q.   (By Mr. Lavine)  Can you look at

GA Department of Community Health (Jerry Dubberly) December 15, 2008
Atlanta, GA

Page 372

1        MR. COLE: Object to the form.
2    A.   I do not.
3    Q.   (By Mr. Lavine) And the -- and you
4 talked about the State of Georgia having
5 knowledge about there being discounts from --
6 between the AWP and the actual acquisition cost.
7        Do you remember that?
8    A.   Yes.
9    Q.   And you agree that that's information
10 that over the years came into the -- or was that
11 information that was accumulated by the State of
12 Georgia over the years?
13       MR. ROBBEN: Object to the form.
14   A.   Yes.
15   Q.   (By Mr. Lavine) I mean, slowly it
16 picked up more and more information about the
17 details of the spread; is that right?
18       MR. ROBBEN: Object to the form.
19   A.   Yes.
20   Q.   (By Mr. Lavine) Are you aware of any
21 information about the size of the spread and a
22 reason that some spreads continue to get larger

GA Department of Community Health (Jerry Dubberly)   December 15, 2008
Atlanta, GA

Page 373

1    on the part of the State of Georgia being derived
2    from any kind of a disclosure from a drug
3    company?
4             MR. ROBBEN:  Object to the form.
5         A.   No.
6         Q.   (By Mr. Lavine)  So it's information
7    that the State of Georgia figured out on its own?
8         A.   Yes, and in conjunction with
9    conversations with other payers in the industry.
10        Q.   But not because any drug company came
11   to the State of Georgia and explained any of this
12   information?
13        A.   No.
14            MR. ROBBEN:  Object to the form.
15        Q.   (By Mr. Lavine)  Can you look at
16   Exhibit 13 quickly, please.  That's the one with
17   the prices of some of the Dey products followed
18   by a paragraph stating, "the AWP listed here does
19   not represent any actual price."
20        A.   Yes.
21        Q.   Do you remember that exhibit?
22        A.   Yes.

Henderson Legal Services, Inc.
202-220-4158                               www.hendersonlegalservices.com
dd23118e-9e82-4fd1-afbb-155015bf3b99