# Exhibit USAbt-G

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

| | |
|---|---|
| IN RE: PHARMACEUTICAL ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE ) | CIVIL ACTION |
| PRICE LITIGATION ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ) | |
| U.S. ex rel. Ven-a-Care of ) | Judge Patti B. Saris |
| the Florida Keys, Inc. ) | |
| v. ) | Chief Magistrate |
| Abbott Laboratories, Inc., ) | Judge Marianne B. |
| No. 06-CV-11337-PBS ) | Bowler |

- - - - - - - - - - - - - - - - -


Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

MENTAL HYGIENE BY JOSEPH L. FINE


Baltimore, Maryland

Tuesday, December 9, 2008

9:00 a.m.

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                    December 9, 2008
Baltimore, MD

Page 48

1   A.   I'm generally aware, yes.

2   Q.   What is your understanding?

3   A.   What I understand is that there was
4   reported an inflation of price proffered to the
5   compendia that was extremely -- I won't say the word
6   extremely -- but significantly higher than what would
7   normally have been reported from the manufacturer to
8   the compendia for listing as an AWP.

9   Q.   When you used the term extremely higher --

10  A.   I take that back. Significantly.

11  Q.   What do you mean by that?

12  A.   In working with drug pricing for all these
13  years it was understood that the average wholesale
14  price fell within certain margins above the cost sold
15  to the wholesaler. The listed price was within a
16  certain percentage of what the wholesaler paid for it.
17  And as far as reimbursement to providers methodologies
18  were set to address that to estimate acquisition cost
19  to providers. When a price becomes greater than that
20  understood margin, I call that significant.

21  Q.   What percentage did the department expect
22  to be the discount from AWP?

MD Dept of Health and Mental Hygiene (Fine, Joseph L.)                December 9, 2008
Baltimore, MD

Page 49

1        MS. YAVELBERG:  Objection, form.

2    A.   I don't understand your question.

3    Q.   You testified that you always understood, the department always understood there was some difference between what providers were paying for drugs and what AWPs were.  I'm paraphrasing.

7    A.   Okay.

8    Q.   Is that a fair characterization?

9    A.   Yes.

10   Q.   What was the extent of the difference that the department expected?

12   A.   Generally the department understood that the price was approximately 20 percent higher than that which the wholesaler purchased it for, the listed price.

16   Q.   Is it your testimony on behalf of the department that that 20 percent figure applied to generic drugs?

19   A.   No.  It was for single-source drugs.

20   Q.   What did the department expect to be the percentage difference between AWP and provider acquisition cost for generic drugs?

Henderson Legal Services, Inc.
202-220-4158                                    www.hendersonlegalservices.com

0bd2b054-a753-4e97-a066-e37ff7ee308f

Page 50

1   A.   We thought it to be higher, perhaps 30 to
2   40 percent above cost.  Uncertain of that amount.
3   Q.   You're what?
4   A.   I was -- we were uncertain of the exact
5   amount which was reported in the compendia.
6   Q.   Why were you uncertain of the amount?
7   A.   Because we weren't certain of the true cost
8   of generic drugs, either purchased by the wholesaler
9   or the provider.
10  Q.   Do you have an understanding that the
11  discounts from AWP could vary considerably from
12  generic drug to generic drug?
13       MS. YAVELBERG:  Objection, form.
14  A.   I was not -- I did not concern myself with
15  that per se.  I never addressed it.
16  Q.   Did you do anything to prepare for today's
17  deposition to investigate the answer to that question?
18  A.   No.
19  Q.   Didn't talk to anybody else in the
20  department --
21  A.   No.
22  Q.   -- correct?

1    A.    Yes.

2    Q.    And what you recall is the 1985 --

3    A.    Right.  And this was -- we read it.  We
4 understood it.  But HCFA's responsibility -- we held
5 out that it was a reference point.  It wasn't
6 necessarily adamant that we take what came out as
7 results.  And we held a $3.70 dispensing fee even
8 though it was four dollars and change for the results
9 that came out.  And we held that line.

10   Q.    Who made the decision to hold that line?

11   A.    The department.  It wasn't me personally.
12 It was the department.

13   Q.    Why did the department decide to hold the
14 line?

15   A.    Because we felt that the $3.70 dispensing
16 fee was adequate.

17   Q.    And under what basis did it have for that?

18   A.    Because we also felt that an average
19 dispensing fee is a misnomer.  A very efficient
20 pharmacy can process and handle drug product, whether
21 it be a system by which they can dispense drugs less
22 expensively, a smaller pharmacy or a less efficient

Page 142

1  pharmacy would have a higher cost.  And we didn't
2  believe that averaging it out was necessarily the
3  right answer to that because why pay for -- why give
4  the bonus to the efficient for the inefficiencies of
5  the other.  And we felt that 3.70 was appropriate.
6       Q.    And the department never updated its
7  findings on dispensing costs?
8       A.    No.  We changed our dispensing fees as time
9  went on.
10      Q.    Sorry.  You never updated your survey
11 findings of what it cost to dispense a drug --
12            MS. YAVELBERG:  Objection, form.
13      Q.    -- correct?
14      A.    Are you saying did we go through another
15 survey?
16      Q.    Correct.
17      A.    I don't recall another survey.
18      Q.    Do you recall a survey that's been done in
19 the last two years in Maryland?  Are you familiar with
20 that?
21      A.    Yes.  I've heard of it.  I wasn't part of
22 that.  And that was a result of the Thornton study.

1    been involved?
2       A.   Because whatever policy change there is it
3    indirectly or directly affects how operations works,
4    operates.  That's redundant.
5       Q.   I'm going to skip around a little bit.
6    Now, in terms of dispensing fees -- we talked about
7    that some this morning.  Do you remember?
8       A.   Mm-hmm.
9       Q.   Was Maryland familiar with the dispensing
10   fees that commercial customers paid to pharmacies?
11      A.   Yes.
12      Q.   And did you know them to be higher or lower
13   than the dispensing fee paid by Maryland?
14      A.   Categorically lower.
15      Q.   And did that play any role in Maryland's
16   evaluation of its own dispensing fees?
17      A.   No.
18           MR. TORBORG:  Objection.
19      Q.   I'm going to ask you to dig and find Abbott
20   458, which is the GAO report from 1993.
21      A.   Okay.
22      Q.   Have you got it?