# Exhibit USAbt-K

David L Campana and State of Alaska 30(b)(6)	August 19, 2008
Anchorage, AK

Page 1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT OF ANCHORAGE

------------------------------------X
STATE OF ALASKA,                     )
      Plaintiff,                     )
vs.                                  )
ALPHARMA BRANDED PRODUCTS DIVISION,  )
INC., et al.,                        )
      Defendants.                    )
------------------------------------X
Case No. 3AN-06-12026 Civil          )
------------------------------------X

CAPTIONS CONTINUED ON FOLLOWING PAGE


VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

and STATE OF ALASKA 30(b)(6)

Taken August 19, 2008

Taken by the Defendants at

Captain Cook Hotel, Whitby Room

939 West 5th Avenue

Anchorage, Alaska

Reported by:  Mary A. Vavrik, RMR

David L Campana and State of Alaska 30(b)(6)                August 19, 2008
Anchorage, AK

Page 266

1           MR. BURNHAM:  Objection, form.
2           THE WITNESS:  Yes.
3    BY MR. MANGI:
4       Q.   And what they are talking about here is
5    the need for, as we discussed this morning,
6    careful language when addressing these issues
7    with HCFA, correct?
8           MR. BURNHAM:  Objection, form.
9           MR. HENDERSON:  Objection.
10          THE WITNESS:  Yes.
11   BY MR. MANGI:
12      Q.   And of course, one way in which
13   ultimately one would have to demonstrate Alaska
14   is different is by pointing to the particular and
15   unique access issues that exist in Alaska, as we
16   discussed this morning, correct?
17          MR. BURNHAM:  Objection, form.
18          THE WITNESS:  Yes.
19   BY MR. MANGI:
20      Q.   Like to show you the next document,
21   sir.  This is going to be Exhibit 16 to the
22   deposition.

Page 267

1                    (Exhibit Campana 016 marked.)
2       BY MR. MANGI:
3            Q.   And this bears Bates Nos. 1241 to 42.
4       Now, this is a December 30, 1988 letter from Mr.
5       Hansen, correct, sir?
6                 MR. BURNHAM:  Objection, form.
7                 THE WITNESS:  Yes.
8       BY MR. MANGI:
9            Q.   And it's going to someone at HCFA, a
10      Mr. Bob Grauman, correct?
11           A.   Yes.
12           Q.   Do you know Mr. Grauman?
13           A.   No.
14           Q.   And Mr. Hansen, as it points out in the
15      first paragraph of the letter, is summarizing
16      meetings that were had in Baltimore and then in
17      Seattle in December of 1988 between folks working
18      for Alaska Medicaid and the folks working for
19      HCFA, correct?
20                MR. BURNHAM:  Objection, form.
21                THE WITNESS:  As I read it, yes.
22      BY MR. MANGI:

1  Q.  Now, he says, "Two crucial points were
2  made abundantly clear to us" in the meetings, and
3  then he lists them.  First he says, "Any attempt
4  to tie any portion or component of a dispensing
5  fee for pharmacies to the cost of ingredients
6  would be disapproved ... at the regional and the
7  central office level."  So now, we spoke a little
8  earlier today about this issue of the dispensing
9  fee being tied to acquisition costs.  And this is
10 consistent, isn't it, sir, with your
11 understanding that HCFA rejected that as a
12 possibility, correct?
13           MR. BURNHAM:  Objection, form.
14           THE WITNESS:  Yes.
15 BY MR. MANGI:
16  Q.  Although that's a possibility that the
17 State had initially been desirous of pursuing,
18 correct?
19           MR. BURNHAM:  Objection, form.
20           THE WITNESS:  It's my understanding
21 that the State had originally pursued that.
22 BY MR. MANGI:

Page 269

1      Q. And the State had pursued it as part of
2  its goal and its mandate to try and set up a
3  reimbursement system that changed as little as
4  possible in terms of reimbursement from the GRM
5  program and ensure maximum access, correct?
6      MR. BURNHAM: Objection, form.
7      THE WITNESS: Correct.
8  BY MR. MANGI:
9      Q. Then going to the next paragraph, Mr.
10 Hansen says, "Secondly, we understand that
11 average wholesale price, or AWP, data is
12 considered discredited and an unacceptable method
13 for reimbursement of drug costs." You see that,
14 sir?
15     A. Yes.
16     Q. And again, you understand, don't you,
17 sir, that's referring to the fact where it was
18 generally understood by this time that AWP did
19 not reflect the price pharmacists were paying to
20 purchase drugs, correct?
21     MR. BURNHAM: Objection, form.
22     THE WITNESS: Yes.

1  BY MR. MANGI:
2      Q.   And this is something that was a topic
3  of discussion at these meetings in December of
4  '88 between Alaska Medicaid and the folks working
5  for HCFA, right?
6          MR. BURNHAM:  Objection, form.
7          THE WITNESS:  At least from what I can
8  see here.
9  BY MR. MANGI:
10     Q.   Right.  That's what Mr. Hansen says in
11 this letter, correct?
12         MR. BURNHAM:  Objection, form.
13         THE WITNESS:  Yes.
14 BY MR. MANGI:
15     Q.   Let me ask you to turn, sir, to the
16 next page of the document.  Mr. Hansen says in
17 the second full paragraph of page 2, "Alaska also
18 now faces the task of conducting and implementing
19 an ingredient cost survey prior to plan
20 submission.  Absent any other feasible method,
21 this survey will attempt to link to a percentage
22 of AWP."  You see that, sir?

David L Campana and State of Alaska 30(b)(6)                August 19, 2008
                          Anchorage, AK

Page 271

1    A.   Yes.
2    Q.   And is it your understanding that this
3    process led to the Verme study that you mentioned
4    this morning?
5    A.   Yes.
6    Q.   And in the second to last paragraph
7    there, Mr. Hansen says, "While we are naturally
8    disappointed in the rejection of our two primary
9    proposals in this program, we appreciate the
10   decisiveness and candor of the federal government
11   on these issues."  You see that, sir?
12   A.   Yes.
13   Q.   And when he refers to "two primary
14   proposals," what he's talking about there is,
15   number one, a dispensing fee tied to ingredient
16   cost and, two, reimbursement at or above AWP,
17   correct?
18             MR. BURNHAM:  Objection, form.
19             THE WITNESS:  That's what the -- the --
20   this appears to say.
21   BY MR. MANGI:
22   Q.   Those were the original proposals that

David L Campana and State of Alaska 30(b)(6)                August 19, 2008
                              Anchorage, AK

Page 272

1    the State had put forward in its goals to try and
2    ensure access was maintained and the letter of
3    intent from the Senate Committee on Finance was
4    adhered to, correct?
5              MR. BURNHAM:  Objection, form.
6              MR. HENDERSON:  Objection.
7              THE WITNESS:  Correct.
8    BY MR. MANGI:
9         Q.   Next document, sir, is Exhibit 17 to
10   the deposition.
11             (Exhibit Campana 017 marked.)
12   BY MR. MANGI:
13        Q.   This bears Bates Nos. 630 to 635.  Is
14   this a document, sir, that you have ever seen
15   before?
16        A.   I can't remember this.
17        Q.   There is handwriting on this document.
18   Do you know whose handwriting that is?
19        A.   No.
20        Q.   Part of what this document does is look
21   at the difference between AWPs and actual drug
22   prices, right?

David L Campana and State of Alaska 30(b)(6)                August 19, 2008
                             Anchorage, AK

Page 273

1           MR. BURNHAM:  Objection.  Did Bunker
2   get the Bates numbers for this?
3           MR. MANGI:  Yes.
4           THE WITNESS:  Yes.  It appears to
5   compare the actual acquisition cost and
6   difference in AWP.
7   BY MR. MANGI:
8       Q.   Now, this is referring to information
9   from OIG studies, among other things.  Are you
10  familiar, sir, with the OIG?
11      A.   Yes.
12      Q.   What is that?
13      A.   Office of Inspector General.
14      Q.   And what's the Office of the Inspector
15  General?
16      A.   It's an agency under the CMS or under
17  the HCFA.
18      Q.   And part of what the OIG does is put
19  out studies pertaining to issues relevant to
20  Medicaid, correct?
21      A.   Yes.
22      Q.   Some of those studies over the years

 1    have related to reimbursement methodologies and
 2    AWP, correct?
 3         A.   Yes.
 4         Q.   And indeed, they detailed the
 5    relationship between AWP and actual prices
 6    pharmacies are paying to purchase drugs, correct?
 7              MR. BURNHAM:  Objection, form.
 8              THE WITNESS:  Yes.
 9    BY MR. MANGI:
10         Q.   And they have reflected, consistent
11    with what we have been discussing today, the
12    discount off of AWP at which pharmacists are
13    purchasing drugs, if indeed you were to express
14    those prices by reference to AWP, correct?
15              MR. BURNHAM:  Objection, form.
16              THE WITNESS:  Yes.
17    BY MR. MANGI:
18         Q.   And you are aware, aren't you, sir,
19    that there are various reports of that kind that
20    the OIG has put out over the years?
21         A.   Yes.
22         Q.   Have you had occasion to look at those

David L Campana and State of Alaska 30(b)(6)                August 19, 2008
Anchorage, AK

Page 312

1       A.   No.

2       Q.   Do you know his company?  Have you ever
3    dealt with them?

4       A.   No.

5       Q.   Now, he says that they have finished
6    the field work portion of the survey and is
7    attempting to set up some appointments in Seattle
8    and Everett to get wholesaler information, and
9    then he provides a quick summary of stores
10   contacted and reviewed, correct?

11      A.   Yes.

12      Q.   Now, where is Everett?

13      A.   It's -- if we are talking about
14   Everett, Washington --

15      Q.   Is it your understanding that the scope
16   of Verme Associates' task was to not just survey
17   pharmacies, but also to talk to wholesalers to
18   look at both sides of the transaction?

19           MR. BURNHAM:  Objection, form.
20           THE WITNESS:  If I read this, I would
21   surmise that that's -- that's what they were
22   going to do.

1   BY MR. MANGI:
2       Q.   Did you know that prior to looking at
3   this document?
4       A.   I've read this document before, so at
5   one point I knew that.
6       Q.   Is this a document that's in your files
7   at the Medicaid agency?
8       A.   Yes.
9       Q.   And it's been in your files, I dare
10  say, since you started, since it's from 1989?
11      A.   Yes.
12      Q.   Now, starting with the next page, there
13  is a series of little squigs about particular
14  pharmacies, correct?
15      A.   Yes.
16      Q.   Now, some of them reference the drug
17  purchase prices that pharmacies are paying as
18  expressed by reference to AWP, correct?
19      A.   They give a percentage of Medicaid.
20      Q.   Well, for example --
21      A.   And then some give at percentage of
22  AWP, below AWP.

1    Q.   Well, for example, if you look at
2 Foodland Super Drug in Juneau, which is the third
3 entrance -- I'm sorry -- the third entry, do you
4 see that, sir?
5    A.   Yes.
6    Q.   And they say -- Richard Verme
7 Associates say they buy -- that pharmacy buys
8 from McKesson, and they say that the December '88
9 month-end data from McKesson indicates their
10 purchases were 21.25 percent below AWP, correct?
11    A.   I see that.
12    Q.   And further down the page there is an
13 entry for Long's Drugstore 103 in Anchorage. And
14 they were purchasing at 20.34 percent below AWP.
15 And it says there was similar purchasing for
16 other Anchorage store, correct?
17    A.   Yes.
18    Q.   Okay. And then if you turn to the next
19 page, there is an entry for the Fairbanks Medical
20 Center pharmacy in Fairbanks. Incidentally,
21 what's the Fairbanks Medical Center?
22    A.   What is --

1     Q.    Yeah.  Is it a hospital?
2     A.    No.  It's a clinic building.
3     Q.    When you say "clinic," is that like a
4  physician's office?
5     A.    Physician office building.
6     Q.    Is there -- is there a pharmacy in that
7  building that this is referring to?
8     A.    Yes.
9     Q.    Again, they are saying they buy from
10 McKesson and a few purchases from Drake, and they
11 say those McKesson invoices show their purchases
12 were 13 percent or lower off of AWP, correct?
13    A.    Yes.
14    Q.    So this information showing that some
15 pharmacies are paying, some of them up to 21 --
16 in excess of 21 percent off of AWP to purchase
17 drugs, this has been in your files since you
18 first started at the agency in 1990, correct?
19    A.    Yes.
20    Q.    Let me show you the next document, sir.
21 This is marked as Exhibit 29 to your deposition.
22              (Exhibit Campana 029 marked.)

1  BY MR. MANGI:
2      Q.  This bears Bates Nos. 794 to 796.  At
3  the top of this document it says, "Goal:  To
4  determine the average actual cost for a unit of
5  medication and to establish the unit price which
6  will be paid for that product."  Are you familiar
7  with this document, sir?
8      A.  It looks like a document that I have in
9  my files.
10     Q.  What generally is this document
11 referring to or relating to?
12     A.  I don't know.
13     Q.  Well, it appears to be referencing
14 another study of the prices pharmacies are paying
15 to purchase drugs, correct?
16     A.  I have to read it here a little bit.
17     Q.  Sure.
18     A.  This simply looks like a list.
19     Q.  Yeah, but if you look at the goals
20 section, what it's laying out is a -- what looks
21 like a program analysis or methodology for
22 carrying out an analysis to get to actual costs,

1   correct?
2       A.   It looks like it has features that
3   arrive at some kind of cost.
4       Q.   Is this -- when you say this is
5   something that's in your files, is it something
6   that was generated before you came to the agency
7   or is it something that was generated during your
8   time there?
9       A.   I don't remember generating this, so it
10  would have to be before I got there.
11      Q.   Do you know whether or not, looking at
12  this, this refers to a Verme study or whether
13  this relates to some other contemplated study?
14      A.   I don't know.
15      Q.   Are you aware of any studies that were
16  actually carried out of acquisition costs in
17  Alaska in this '89 to '90 period other than the
18  Verme & Associates study?
19      A.   I don't know.
20      Q.   You are not aware of any others?
21      A.   I'm not aware of any.
22      Q.   Are you aware of any studies of

1    acquisition costs that have been done subsequent
2    to that time in Alaska?
3         A.   Not any coordinated studies.
4         Q.   Are you aware of periods of time when
5    particular pieces of anecdotal evidence were
6    received reflecting the prices pharmacies were
7    paying?
8              MR. BURNHAM:  Objection, form.
9              THE WITNESS:  I remember over the years
10   that there were pieces of anecdotal information
11   received.
12   BY MR. MANGI:
13        Q.   Did those ever -- did you ever relate
14   the prices that you heard about anecdotally to
15   AWP to get a sense of what generally pharmacies
16   were paying?
17        A.   I saw those, and they were on an
18   individual basis, individual pharmacy basis.
19        Q.   When you say you received reports, were
20   you getting the dollar sums of what pharmacies
21   were paying for particular drugs, or were you
22   getting reports that pharmacy X is paying Y

1  percentage below AWP?
2       A.  I received actual invoices showing what
3  a particular pharmacy was paying for a particular
4  drug.
5       Q.  Did you ever then take that information
6  and use it as a basis for determining what they
7  were paying by reference to AWP?
8       A.  I did an anecdotal study, I guess.  As
9  far as looking at it, maybe writing it down,
10 maybe typing it up, but not necessarily saved
11 that.
12      Q.  I'm sorry.  Not necessarily what?
13      A.  Not necessarily save it, so I wouldn't
14 have a -- a file of it.
15      Q.  Do you recall, is this something you
16 did on a regular basis, or is it something you
17 did once?
18      A.  Maybe a couple times.
19      Q.  Do you have a sense of when you would
20 have done that?
21      A.  In the period when we were using the
22 DOJ pricing.