# Exhibit USAbt-R

NC Department of Health and Human Services (Lisa Weeks)                October 21, 2008
Raleigh, NC

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------x

| | |
|---|---|
| In Re:  PHARMACEUTICAL INDUSTRY   ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE LITIGATION ) | Civil Action |
| ----------------------------------x | 01-12257-PBS |
| THIS DOCUMENT RELATES TO:           ) | |
| United States of America, ex rel.   ) | Hon. Patti B. |
| Ven-A-Care of the Florida Keys,     ) | Saris |
| Inc., v. Abbott Laboratories, Inc.,) | |
| Civil Action No. 06-11337-PBS       ) | |
| and United States of America ex     ) | Video 30(b)(6) |
| rel. Ven-a-Care of the Florida      ) | Deposition of |
| Keys, Inc., v. Dey, Inc., et al.,   ) | State of North |
| Civil Action No. 05-11084-PBS       ) | Carolina Dept. |
| and United States of America ex     ) | of Health & |
| rel. Ven-a-Care of the Florida      ) | Human Services |
| Keys, Inc., v. Boehringer           ) | by Lisa Weeks |
| Ingelheim Corp., et al., Civil      ) | |
| Action No. 07-10248-PBS             ) | Raleigh, NC |
| ----------------------------------x | October 21, 2008 |

Reporter: Marisa Munoz-Vourakis-RMR, CRR, Notary Public

Henderson Legal Services, Inc.
202-220-4158                           www.hendersonlegalservices.com
e9d4b181-38e8-4b10-b632-ab9063ece5ef

NC Department of Health and Human Services (Lisa Weeks)  October 21, 2008
Raleigh, NC

Page 32

1    A.    Okay.

2    Q.    I have handed Ms. Weeks a copy of 52
3    Federal Register 28657, year 1987.  It is a two-
4    sided page from the Federal Register, and it
5    announces amendments to 42 CFR Part 413.

6          Ms. Weeks, if I could -- let's see, the
7    date on the regulation you see at the top is
8    1987.  Do you see that there?

9    A.    Yes.

10   Q.    If I could direct your attention to
11   Section 447.331(b), other drugs.  If you take a
12   minute to read that paragraph.

13         (Pause.)

14   A.    Okay.

15   Q.    Do you see where it says that it refers
16   to payment levels, that the agency has determined
17   by a applying the lower of one, estimated
18   acquisition costs plus reasonable expense and
19   fees established by the agency; or two,
20   provider's usual and customary charges to the
21   general public?

22         Do you see that there?

NC Department of Health and Human Services (Lisa Weeks)　　　　　　　　October 21, 2008
Raleigh, NC

Page 33

1　　　A.　Yes.

2　　　Q.　Has your agency established a
3　reimbursement methodology that applies these
4　elements?

5　　　A.　Yes.

6　　　Q.　And how has it done so?

7　　　A.　It has determined that the estimated
8　acquisition costs we base -- we use the AWP, the
9　Average Wholesale Price plus a dispensing fee.

10　　　Q.　And what about the usual and customary
11　charges to the general public, does your state
12　provide for that as well?

13　　　A.　Yes. If the usual and customary charge
14　provided to the general public is less, than we
15　would reimburse at that rate.

16　　　Q.　I'd like to refer you to just above
17　that at the top of the right-hand side of the
18　page, Section 447.301 definitions. Do you see
19　that there? And the second definition says
20　estimated acquisition costs. Can you take a
21　minute to read that?

22　　　　　　　(Pause.)

NC Department of Health and Human Services (Lisa Weeks)                October 21, 2008
Raleigh, NC

Page 34

1   A.   Okay.
2   Q.   Are you familiar with that definition?
3   A.   Yes.
4   Q.   And has the state endeavored to
5   determine estimated acquisition costs in
6   accordance with that definition?
7   A.   Yes.
8   Q.   And how has it done so?
9   A.   We, again, use the average wholesale
10  price minus a discount to determine the estimated
11  acquisition cost.
12  Q.   Does the state have a formula for
13  reimbursing for the drug ingredient portion of
14  pharmacy claims?
15  A.   Yes.
16  Q.   And what is that formula as of today?
17  You can put that aside.
18  A.   Okay.  We use AWP minus ten percent or
19  the federal upper limits or the state maximum
20  allowable cost, or the usual and customary, the
21  lesser of those, plus a dispensing fee and minus
22  the copayment.

1   A.   Yes.

2   Q.   I'd like to read that sentence.

3        We would also clarify our policy that a
4   dispensing fee determination must be separate and
5   distinct from the EAC determination and unrelated
6   to the cost of the drug product.

7        Do you see that there?

8   A.   Yes.

9   Q.   Is your state's reimbursement formula
10  and state plan consistent or inconsistent with
11  this policy?

12       MR. KATZ:  Objection, form.

13  A.   It's consistent.

14  Q.   Does the state have any practice or
15  policy of paying increased ingredient costs in
16  order to make up for inadequate dispensing fees?

17       MR. KATZ:  Objection, form.

18  A.   No.

19  Q.   Did North Carolina increase its
20  dispensing fees in response, for example, to the
21  Deficit Reduction Act?

22       MR. KATZ:  Objection, form.

1   A.   No.

2   Q.   Thank you, Ms. Weeks.

3        I'd like to go back to the state plans
4   for a minute and go through some of those over
5   time, okay?

6   A.   Okay.

7        MS. YAVELBERG:  I'd like to mark this
8   as Exhibit 9.

9        (The document referred to was
10  marked Plaintiff's Exhibit Weeks 009 for
11  identification.)

12  Q.   Ms. Weeks, do you recognize this
13  document?

14  A.   Yes.

15  Q.   And what is it?

16  A.   It's a portion of our state plan from
17  1984, I believe, 1985.

18  Q.   I'm sorry?

19  A.   Or 1985, I'm not sure.

20  Q.   And if you could take a look at that
21  first paragraph there.  Could you read that out
22  loud for me?

1  Data Bank with the intention of causing the
2  Medicaid program to pay inflated reimbursements
3  to Dey's customers, and Dey did this for the
4  purpose of increasing the sales of its drugs to
5  Dey's market and Dey's market shares for the
6  drugs.
7           Has the State of North Carolina ever
8  approved of that sort of conduct?
9           MR. KATZ:  Objection, form.
10     A.   No.
11     Q.   Did Dey ever inform the State of North
12 Carolina that it was engaging in this conduct?
13          MR. KATZ:  Objection, form.
14     A.   No.
15     Q.   Did Dey come to your agency and ask
16 whether the conduct was permissible?
17     A.   No.
18     Q.   If you look at this last page here, and
19 we take, for instance, the first drug dosage
20 listed, Albuterol Inhalation Solution .5 percent
21 20 mils with NDC.  If you note there the AWP,
22 could you tell me what's listed for the AWP

Page 120

1    across all three, both Red Book, First Data Bank
2    and MediSpan?
3        A.    $14.99.
4        Q.    And what is the price that is listed
5    for the pharmacy customer?
6        A.    $3.73.
7        Q.    And the difference between those two as
8    listed on the spreadsheet?
9        A.    $11.26.
10       Q.    And what is the spread represented as a
11   percentage on this spreadsheet?
12       A.    302 percent.
13       Q.    And did North Carolina know that Dey
14   was reporting an AWP of $14.99 for the drug
15   Albuterol Inhalation Solution .5 percent but
16   actually was selling it to customers for $3.73?
17              MR. KATZ:  Objection, form.
18       A.    No.
19       Q.    Did North Carolina approve of these
20   AWPs as reflected on this spreadsheet?
21              MR. KATZ:  Objection, form.
22       A.    No.

NC Department of Health and Human Services (Lisa Weeks)　　　October 21, 2008
Raleigh, NC

Page 123

1   conduct was permissible?
2           MS. LIEBERMAN:  Objection, form.
3       A.   No.
4       Q.   If you flip to the last page of the
5   document or actually Exhibit A to the document,
6   which I think is maybe the fourth to the last
7   page.
8           Sorry, if you will flip to the second
9   to last page of the document of the exhibit and
10  the title of it is schedule of prices and
11  reimbursement for selected Roxane drugs.  Do you
12  have that page?
13      A.   Yes.
14      Q.   And if you look at the first drug that
15  is listed there, which I'm going to spell and not
16  try to pronounce A-Z-A-T-H-I-O-P-R-I-N-E-U-S-P.
17  Do you see that there?
18      A.   Yes.
19      Q.   Do you see that the -- what is the
20  First Data Bank AWP that's recorded on this
21  document?
22      A.   $131.08.

NC Department of Health and Human Services (Lisa Weeks)                October 21, 2008
Raleigh, NC

Page 124

1   Q.   And what is the price that's reflected
2   on this spreadsheet to the pharmacy customer?
3   A.   $42.60.
4   Q.   And what is the difference between the
5   AWP and the price the pharmacy paid?
6        MS. LIEBERMAN:  Objection, form.
7   A.   $88.48.
8   Q.   And what is the spread represented as a
9   percentage on this spreadsheet?
10  A.   208 percent.
11  Q.   Did North Carolina know that the
12  Boehringer Ingelheim companies were reporting an
13  AWP of $131.08 --
14       MS. LIEBERMAN:  Objection, form.
15  Q.   -- for the drug, but actually selling
16  it to customers for $42.60?
17  A.   No.
18       MS. LIEBERMAN:  Same objection.
19  Q.   Did North Carolina approve of this AWP?
20       MS. LIEBERMAN:  Objection, form.
21  A.   No.
22  Q.   If you take a minute to look over this

NC Department of Health and Human Services (Lisa Weeks)                    October 21, 2008
Raleigh, NC

Page 386

1    Q.   Has anyone communicated with anyone in
2    Abbott about the allegations in the complaint
3    that you reviewed?
4         MS. YAVELBERG:  Objection, form.
5    A.   No, not that I'm aware of, no.
6    Q.   And to your knowledge, do you or anyone
7    else in the program have any knowledge about
8    Abbott marketing the spread between what it was
9    charging providers and what providers were
10   receiving from your program?
11        MS. YAVELBERG:  Objection, form.
12   A.   No, not outside of what we have been
13   going through here today.
14   Q.   Well I don't think you were provided
15   any information today that related to Abbott
16   marketing the spread.
17        So my question stands with respect to
18   what you testified here today or otherwise, to
19   your knowledge, does anyone have any information
20   about Abbott marketing the spread?
21        MS. YAVELBERG:  Objection, form.
22   A.   No, not outside of what, you know, the