# Exhibit USAbt-T

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) Civil Action No. |
| LITIGATION | ) 01-12257-PBS |

---------------------------------X

| | |
|---|---|
| THIS DOCUMENT RELATES TO: | ) Hon. Patti B. |
| United States of America ex rel. | ) Saris |
| Ven-A-Care of the Florida Keys, | ) |
| Inc. v. Abbott Laboratories, Inc., | ) Chief Magistrate |
| Civil Action No. 06-11337-PBS; | ) Judge Marianne |
| United States of America ex rel. | ) B. Bowler |
| Ven-A-Care of the Florida Keys, | ) |
| Inc. v. Dey, Inc., et al., Civil | ) DEPOSITION OF |
| Action No. 05-11084-PBS; and | ) WA DEPT. OF |
| United States of America ex rel. | ) SOCIAL AND HEALTH |
| Ven-A-Care of the Florida Keys, | ) SERVICES by |
| Inc. v. Boehringer Ingelheim | ) MYRA DAVIS |
| Corp., et al., Civil Action No. | ) |
| 07-10248-PBS | ) DECEMBER 3, 2008 |

---------------------------------X

1   the ingredient cost?

2           THE WITNESS:  Yes.

3           MR. REALE:  Objection to form.

4           MS. MANGIARDI:  Objection.

5           MS. FORD:  When Washington Medicaid
6   established a new Estimated Acquisition Cost, did
7   -- did it determine or did it base that
8   determination in any way on what the dispensing
9   fee was?

10          MR. REALE:  Objection to form.

11          THE WITNESS:  No.

12          MS. FORD:  Does Washington Medicaid
13  have any practice or policy of paying an inflated
14  acquisition cost in order to make up for an
15  inadequate dispensing fee?

16          MR. REALE:  Objection to form.

17          MS. MANGIARDI:  Objection.

18          THE WITNESS:  No, the one -- the one
19  issue -- the one time, the instance and when that
20  might be a little confused is with regards to
21  hemophilia products through specialty providers.
22  For all other drugs, no, there's no confusion

1   about it.

2   BY MS. FORD:

3       Q.   And what is the confusion with respect
4   to hemophilia products?

5       A.   Hemophilia products are extremely
6   expensive.  A single dispense could be $40,000 or
7   $50,000 and the dispensing fee of $4.20 does not
8   at all cover their ability to even hold the money
9   you need to make payment on the product they're
10  purchasing.  So in that instance we pay them one-
11  half of a penny above their cost, but it's only
12  for those products and we require an invoice
13  every single time.

14      Q.   And Washington Medicaid pays, I'm
15  sorry, one-half of a penny?

16      A.   One-half of a penny on the per unit
17  price above their acquisition -- above their
18  invoice documented acquisition cost for
19  hemophilia products, for HF products, that's all.
20  That's the only instance I'm aware of in where --
21  at all other times, in all of my communications
22  with providers who -- who call and want to know

1  something about the payment rates, it's very
2  clear that we are trying to get as close to the
3  acquisition cost as possible.  And I cite the WAC
4  language and -- and that it's Estimated
5  Acquisition Cost and the professional services
6  are paid through the dispensing fee.
7        Q.   And what is that one-half of a penny
8  payment for?
9        A.   That is the fact that in order to keep
10 them operating as a provider, to provide that
11 critical service to our client.  And so if they -
12 - they are using $40,000 worth of product on a
13 client, that we will -- there is one-half of a
14 penny added which may be $400, $450 or something,
15 that helps them offset the cost of the money, the
16 value of the money that was expended to purchase
17 the product.  So it's truly tied to the
18 acquisition cost of the drug, not to the -- not
19 to the professional services related to it.
20       Q.   So that one-half of a penny is actually
21 the formula, is the dispensing fee formula for
22 that class of product?

1    A.   It's not a dispensing fee formula.  It
2  is -- it is a -- it's an arrangement we have come
3  to in order to continue to have those services be
4  available to our critically ill hemophilia
5  clients for -- and there's like only three
6  providers that it happens to, it's only for AHF
7  products, but it is that the cost of the product
8  itself is so expensive that if we get a
9  documented invoice that it's 96 cents a unit and
10 they're saying I can't even expend the money for
11 that product without having something to offset
12 the value of the money itself.  So that's what
13 that -- the one-half cent of the penny is still
14 tied to the acquisition cost of the drug, the
15 one-half cent, yeah.
16    Q.   And do they also receive the dispensing
17 fee?
18    A.   $4.20 or yeah.
19    Q.   Okay.
20    A.   Or $5.28, whatever it is right now,
21 yeah.
22    Q.   Okay.  You indicated earlier in looking

1  allegations in this case, no.  I'm generally
2  familiar with what's at issue in most of the
3  cases.
4      Q.  Were you aware or are you aware that
5  the United States has sued these Defendants for
6  artificially inflating Average Wholesale Prices?
7      A.  Yes.
8      Q.  Between the period of 2003 and present
9  have any pharmaceutical manufacturers ever come
10 to your agency and suggested that it was
11 reporting inflated Average Wholesale Prices to
12 make up for the State's low dispensing fee?
13     A.  No.
14         MR. REALE:  Objection; form.
15         MS. MANGIARDI:  Objection.
16         MS. FORD:  If a drug manufacturer had
17 done that, would your agency have approved of
18 that method of increasing reimbursement?
19         THE WITNESS:  No.
20         MR. REALE:  Objection to form.
21         MS. MANGIARDI:  Objection.
22         THE WITNESS:  May I ask a

1   clarification?

2   BY MS. FORD:

3       Q.   Yes.

4       A.   I may have to ask you to repeat that,
5   the question immediately before about how they --
6   have any manufacturers come to complain about the
7   -- that separation or the distinction between --
8   the manufacturers of the hemophilia products have
9   done that, they, in the same situation I was
10  talking about before, but only -- it's only the
11  manufacturers of the hemophilia products.

12      Q.   Okay.  Have you ever been contacted by
13  representatives of Abbott asking whether
14  Washington Medicaid approved of reporting
15  inflated AWPs --

16      A.   No.

17      Q.   -- based upon the --

18      A.   No.

19      Q.   -- the State's low dispensing fees?

20      A.   No.

21      Q.   How about from Dey?

22      A.   No.

WA Dept of Social and Health Services (Myra Davis)                December 3, 2008
Olympia, WA

Page 70

1      Q.    Roxane?

2      A.    No.

3      Q.    Has Washington Medicaid ever approved
4  of manufacturers engaging in marketing strategies
5  designed to sell their products based upon the
6  difference between the Average Wholesale Price
7  and the provider's cost of the drug?

8      A.    Have we ever approved of that?

9            MR. REALE:  Objection.

10           MS. MANGIARDI:  Objection.

11           MS. FORD:  Correct.

12           THE WITNESS:  No.

13           MR. REALE:  Objection to form.

14           MS. FORD:  I have no further questions
15  at this time, and I'll pass the witness.

16           MR. REALE:  Okay.  Why don't we take a,
17  say a 10-minute break, I'll get my thoughts
18  together, and folks can stretch their legs, and
19  then we'll start up again.

20           THE VIDEOGRAPHER:  The time is 10:12
21  a.m.  We are off the record.

22                (Short break taken)