# Exhibit USAbt-U

Olympia, WA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE            ) Civil Action No.

LITIGATION                         ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:          ) Hon. Patti B.

United States of America ex rel.   ) Saris

Ven-A-Care of the Florida Keys,    )

Inc. v. Abbott Laboratories, Inc.,) Chief Magistrate

Civil Action No. 06-11337-PBS;     ) Judge Marianne

United States of America ex rel.   ) B. Bowler

Ven-A-Care of the Florida Keys,    )

Inc. v. Dey, Inc., et al., Civil   ) DEPOSITION OF

Action No. 05-11084-PBS; and       ) WA DEPT. OF

United States of America ex rel.   ) SOCIAL AND HEALTH

Ven-A-Care of the Florida Keys,    ) SERVICES by AYUNI

Inc. v. Boehringer Ingelheim       ) HAUTEA-WIMPEE

Corp., et al., Civil Action No.    )

07-10248-PBS                       ) NOVEMBER 24, 2008

--------------------------------X

Olympia, WA

Page 69

1        A.    Yes.

2        Q.    And is that a source that Washington

3   Medicaid looked to in developing its drug program

4   or the reimbursement for its drug program?

5        A.    It is something that we heed,

6   definitely.

7        Q.    That you heed?

8        A.    (Nodding head up and down).

9        Q.    Yes, okay.  I'm going to hand you what

10  we'll mark as Exhibit No. 5.

11              (Exhibit Hautea-Wimpee 005 marked

12   for identification)

13              And for the record this is U.S. v.

14   Abbott, WA-00001224 through 1235.  And it's a

15   Federal Register dated Friday, July 31st, 1987.

16              Are you familiar with 42 CFR, Section

17   447, 301 through 333?

18        A.    I believe so.  I don't remember the

19   exact numbers on the CFR that we use but, yes,

20   that -- that sounds about right.

21        Q.    Okay.  And if you look at the second

22   page of the exhibit which is the Bates No. 1225.

9ee0c979-f127-403d-9cab-f60504868883

Olympia, WA

Page 70

1          A.    Um hum.

2          Q.    Do you see where it says at the top

3    Healthcare Financing Administration, Medicare and

4    Medicaid Programs; Limits on Payments for Drugs?

5          A.    Yes.

6          Q.    And then the Action:   Final rule?

7          A.    Yes.

8          Q.    And then under the effective date it

9    says the regulations are effective October 29th,

10   1987.  Do you see that?

11         A.    Yes.

12         Q.    Okay.  Now, if you could turn to the

13   page, it's the second page from the back, and the

14   last four Bates numbers are 1234.

15         A.    (Witness complies).

16         Q.    And at the bottom where it says Subpart

17   D - Payment Methods for Other Institutional and

18   Noninstitutional Services; do you see that?

19         A.    Subpart D?

20         Q.    It's the middle column near the bottom.

21         A.    Yes, um hum.

22         Q.    Okay.  And then the next column over

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com
9ee0c979-f127-403d-9cab-f60504868883

Olympia, WA

Page 71

1    where it provides a definition for estimated

2    acquisition cost; do you see that?

3          A.    Yes.

4          Q.    Now, Estimated Acquisition Cost is one

5    of the components of Washington Medicaid's

6    reimbursement for drugs; is that correct?

7          A.    Yes.

8          Q.    And if you could read that definition

9    and let me know if that's consistent with how

10   Washington interprets or defines Estimated

11   Acquisition Cost?

12         A.    "Estimated Acquisition Cost" means the

13   agency's best estimate of the price generally and

14   currently paid by providers for a drug marketed

15   or sold by a particular manufacturer or labeler

16   in the package size of drug most frequently

17   purchased by providers.  Yes, that is how we

18   understand it.

19         Q.    Okay.  And that's consistent with how

20   Washington Medicaid applies estimated acquisition

21   costs in its reimbursement methodology?

22         A.    Yes.

9ee0c979-f127-403d-9cab-f60504868883

Page 127

1  this date, you know, this is the current price,

2  that would be the -- the one on top, and then the

3  previous ones would be listed underneath and it

4  would show from what date to what date it was --

5  that price was effective.

6        Q.    And so my question is in that listing,

7  the pricing listing for that NDC, if there are

8  old AWPs listed but for the current time period,

9  the date on which that reimbursement claim was

10 being processed there was no AWP listed, would

11 the -- and --

12       A.    It would use whatever was the prior

13 segment because, again, it would not change

14 anything unless there's a termination date for

15 that segment and -- and something else, you know,

16 overrode it.

17       Q.    Okay.   Now, going back to our

18 discussion of the dispensing fees, were the

19 dispensing fees determined separate and apart

20 from the drug ingredient cost?

21       A.    Yes.

22       Q.    I'm going to hand you what we'll mark

9ee0c979-f127-403d-9cab-f60504868883

Olympia, WA

Page 128

1    as Exhibit No. 12 -- excuse me, number 13.

2                    (Exhibit Hautea-Wimpee 013 marked

3    for identification)

4            For the record it has a Bates range of

5    HHC006-428 through 429, and it is a State

6    Medicaid Agency Regional Bulletin, No. 94-25,

7    from the Healthcare Financing Administration to

8    all Medicaid State Agencies, dated September 6,

9    1994.

10           During the course of your duties in the

11   Rate Section, did you from time to time receive

12   State Medicaid Agency Bulletins?

13        A.    Yes.

14        Q.    And you received those from -- from

15   HCFA?

16        A.    Yes.

17        Q.    And did you understand that these State

18   Medicaid Agency Regional Bulletins provided

19   Washington State Medicaid's program updates about

20   federal regulations or policies relating to the

21   Medicaid program?

22        A.    Yes.

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                November 24, 2008

Olympia, WA

Page 129

1      Q.   If you could look to the second page

2   which is ending in Bates No. 0429, towards the

3   bottom of the page.  Do you see the sentence that

4   begins:  We would like to clarify HCFA policy

5   that a dispensing fee determination must be

6   separate and distinct from the EAC determination

7   and unrelated to the cost of the drug product.

8   Do you see that?

9      A.   Yes.

10     Q.   Was that consistent with Washington

11  Medicaid's understanding of the dispensing fee

12  determination?

13     A.   Yes.

14         MR. REALE:  Objection; foundation.

15         MS. FORD:  And you -- during your time

16  with MAA you were -- were you involved in

17  determining the dispensing fee for the Washington

18  Medicaid program?

19         MR. REALE:  Objection; form.

20         THE WITNESS:  Yes.

21         MS. FORD:  And is it your testimony

22  that the State of Washington determined the

Olympia, WA

Page 130

1    dispensing fee separate and distinct from the

2    Estimated Acquisition Cost?

3                    THE WITNESS:  Yes.

4                    MR. REALE:  Objection; form.

5                    MS. RAMSEY:  Objection.

6                    MS. FORD:  And did Washington State

7    Medicaid determine the fee separate and apart

8    from the ingredient cost?

9                    MS. RAMSEY:  Objection.

10                   MR. REALE:  Objection to form.

11                   MS. MANGIARDI:  Objection.

12                   MS. FORD:  What's the basis of the

13   objection?

14                   MR. REALE:  Her prior testimony wasn't

15   that Washington Medicaid set the dispensing fee,

16   for one.

17                   MS. FORD:  I disagree with you, but the

18   record will speak for itself.

19   BY MS. FORD:

20       Q.   Ayuni, did the Rate Section have

21   involvement with setting the dispensing fee for

22   the Washington Medicaid drug program?

9ee0c979-f127-403d-9cab-f60504868883

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 131

1        A.    Yes, we updated the dispensing fees.

2    They were set previously, but like I said, most

3    of the dispensing fees that we gave were based on

4    Legislative vendor rate increases.

5        Q.    And do you know how the dispensing fee

6    was originally determined?

7        A.    No.

8        Q.    Do you understand that the dispensing

9    fee was determined by the Washington Medicaid

10   program?

11           MR. REALE:  Objection; leading.

12           THE WITNESS:  There was a dis -- there

13   was a two- tiered dispensing fee system in place

14   when I came to the program in '79.  And as I

15   said, all we did basically from that point on was

16   update those rates with the approved vendor rate

17   increases.

18   BY MS. FORD:

19       Q.    And during your time with MAA, between

20   1991 -- let's just start -- I know you were with

21   the program -- well, actually, you -- you joined

22   MAA in 1979; is that correct?

Olympia, WA

Page 132

1      A.    Yes.

2      Q.    And are you still employed by MAA?

3      A.    Yes.

4      Q.    And during the time that you've been

5   employed by MAA, have you seen any documentation

6   that indicates that the dispensing fee is set by

7   anyone other than Washington Medicaid?

8      A.    No.

9      Q.    For example, have you seen any

10  correspondence or regulations or legislation

11  indicating that the Centers for Medicare and

12  Medicaid Services sets the dispensing fee for

13  Washington Medicaid?

14     A.    No.

15     Q.    And who do you understand to be the

16  entity responsible for setting the dispensing

17  fee?

18     A.    The Rates Unit sets the dispensing fee,

19  or I should say updates the dispensing fee,

20  depending on the circumstances or, you know,

21  whenever the Legislature authorizes a vendor rate

22  increase.

Henderson Legal Services, Inc.
202-220-4158                           www.hendersonlegalservices.com
9ee0c979-f127-403d-9cab-f60504868883

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 133

1          Q.    Was the dispensing fee intended to

2    reimburse pharmacists the cost for dispensing the

3    drug?

4          A.    Yes, it's supposed to reimburse them

5    for their administrative costs.

6          Q.    Was the dispensing fee intended to

7    provide pharmacists a profit?

8          A.    Profit was not part of the equation.

9          Q.    Did Washington Medicaid have a practice

10   or policy of paying an inflated drug ingredient

11   cost to make up for a dispensing fee?

12         A.    No.

13               MR. REALE:  Objection to form.

14               MS. RAMSEY:  Objection.

15   BY MS. FORD:

16         Q.    Going back to the State Medicaid

17   program's determination of the Estimated

18   Acquisition Cost, I believe you testified that

19   from '91 to 2002 Estimated Acquisition Cost was

20   determined to be AWP minus 11%; is that correct?

21         A.    Yes.

22         Q.    And then in 2003 it changed to AWP

9ee0c979-f127-403d-9cab-f60504868883

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 139

1          Q.   If you could turn to Exhibit No. 15,

2     which is the United States' Complaint against the

3     Roxane Defendants.

4          A.   (Witness complies).

5          Q.   If you could turn to the last page

6     which is part of Exhibit B.  Actually, the

7     second-to-the-last page.  Do you see the -- going

8     down the left-hand column to the seventh drug

9     listed there, Furosemide, 20 milligrams, with an

10    NDC of 00054429731.  Do you see that listing?

11         A.   29731?

12         Q.   Yes.  It should be the seventh from the

13    top on the second-to-the-last page.

14         A.   Oh, second-to-the-last page.  All

15    right.  Yes.

16         Q.   And going across, do you see where the

17    -- the AWP reported by First DataBank is $139.90?

18         A.   Yes.

19         Q.   And the price available to pharmacy

20    customers is $9.82?

21              MR. REALE:  Objection to form.

22              THE WITNESS:  Yes.

Olympia, WA

Page 140

1          MS. FORD:  Do you see that listed on

2     the schedule here?  And the spread --

3          MR. REALE:  Objection to form.

4     BY MS. FORD:

5          Q.    The spread is $130.08.  Do you see

6     that?

7          A.    Yes.

8          Q.    Or a spread of 1325%?

9          A.    Yes.

10          Q.    First of all, have you heard the term

11     the spread before?

12          A.    I don't remember.

13          Q.    Okay.  If I referenced the spread as

14     the difference between the AWP and the price paid

15     by a pharmacy, will you understand what I mean?

16          A.    Yes.

17          Q.    Okay.  Would Washington Medicaid have

18     expected manufacturers such as Roxane to report

19     the Average Wholesale Price of $139.90 when it

20     was actually -- the price of that drug available

21     to pharmacies was $9.82?

22          MR. REALE:  Objection to form,

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                                    November 24, 2008

Olympia, WA

Page 141

1    foundation.

2              MS. MANGIARDI:  Objection.

3              THE WITNESS:  That would have been

4    surprising.

5    BY MS. FORD:

6         Q.    And we talked a few minutes ago about

7    how -- and effective July 1st, 2002 Washington

8    Medicaid reduced or changed its formula for

9    Estimated Acquisition Cost to be AWP minus 14%;

10   is that correct?

11        A.    Yes.

12        Q.    And I believe you testified that that

13   was because that was Washington Medicaid's

14   estimate of the acquisition cost of that drug to

15   pharmacies in Washington State; is that correct?

16        A.    Yes.

17        Q.    If you could look at Exhibit No. 16

18   now, the United States' Complaint against Dey,

19   and this time turn to the last page.

20        A.    (Witness complies).

21        Q.    I believe it's -- if you could look at

22   the sixth item down which is Albuterol Sulfate

Olympia, WA

Page 142

1    0.083%, 3-milliliter 25s; do you see that?

2        A.    Yes.

3        Q.    And going across, do you see where the

4    AWP listed by First DataBank was $30.25?

5        A.    Yes.

6        Q.    And then the price to the pharmacy

7    customer of $4.10?

8        A.    Yes.

9        Q.    And the spread of $26.15?

10       A.    Yes.

11       Q.    And then the percentage of spread being

12   a 638% spread between what a pharmacy would pay

13   for the drug and what the AWP for that drug was?

14            MR. REALE:   Objection to form.

15            THE WITNESS:   Yes.

16   BY MS. FORD:

17       Q.    Would that exceed what Washington

18   Medicaid would assume manufacturers would report

19   as an AWP?

20       A.    Yes.

21            MR. REALE:   Could you please read the

22   last question or the last answer back, please,

9ee0c979-f127-403d-9cab-f60504868883

Olympia, WA

Page 143

1    the whole Q&A?

2              (The Reporter read back the

3    portion contained on lines 22-24 of page 108)

4         Q.    And if Defendant Abbott Laboratories

5    similarly reported AWPs that were in excess of a

6    500% spread, would that exceed what Washington

7    Medicaid believed manufacturers should report as

8    an Average Wholesale Price for those drugs?

9         A.    Yes.

10              MS. RAMSEY:  Objection.

11              MS. FORD:  Has Washington Medicaid ever

12   approved of manufacturers reporting falsely

13   inflated A -- Average Wholesale Prices to pricing

14   compendia?

15              MR. REALE:  Objection.

16              MS. MANGIARDI:  Objection.

17              MS. RAMSEY:  Objection.

18              THE WITNESS:  No.

19   BY MS. FORD:

20        Q.    To your knowledge did any of those drug

21   companies, Abbott, the Dey Defendants, or the

22   Roxane Defendants, ever ask Washington whether

9ee0c979-f127-403d-9cab-f60504868883

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                November 24, 2008

## Olympia, WA

Page 144

1    its conduct was permissible?

2         A.    No.

3              MS. RAMSEY:  Objection.

4              MS. FORD:  Did Washington Medicaid ever

5    approve of the AWPs that we've seen in Exhibits

6    15 and 16?

7              MR. REALE:  Objection.

8              MS. RAMSEY:  Objection.

9              MS. MANGIARDI:  Objection.

10             THE WITNESS:  Not knowingly, no.

11   BY MS. FORD:

12        Q.    I'll hand you what we'll mark as

13   Exhibit No. 17.

14                 (Exhibit Hautea-Wimpee 017 marked

15   for identification)

16             And for the record, this is an exhibit

17   to the United States expert re -- one of the

18   United States' expert reports --

19             MR. REALE:  Which one?

20             MS. FORD:  -- relating to Abbott.

21             MR. REALE:  Which one?

22             MS. FORD:  Dr. Dugan's report.

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                                      November 24, 2008

## Olympia, WA

Page 147

1    you can -- you can obtain it then.  I think that

2    would be a more efficient use of everyone's time.

3              MS. RAMSEY:  Whatever you prefer.

4    BY MS. FORD:

5         Q.   I'll hand you what we'll mark as

6    Exhibit No. 18.

7                   (Exhibit Hautea-Wimpee 018 marked

8    for identification)

9              For the record this is DL-TX-0090851

10   and it's titled Dey Laboratories, Inc.,

11   Memorandum to Pam Harris from Robert Mozak, dated

12   February 24th, 1992.

13             Ayuni, this document was produced to

14   the United States in its -- in the course of

15   discovery with the Dey Defendant and it is a

16   Pricing Strategy Memorandum used by Dey

17   Laboratories.  If you could turn to the second

18   page of the exhibit.

19        A.   (Witness complies).

20        Q.   You see under the subheading

21   Objectives, and then the third objective down is:

22   To provide incentive to retail/chain providers to

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                November 24, 2008

Olympia, WA

Page 148

1    use Dey's Albuterol UD by increasing the spread

2    on Medicare/Medicaid reimbursements?

3          A.    Yes.

4          Q.    Did Washington Medicaid approve of

5    manufacturers purposely setting their AWPs high

6    so that providers, including pharmacists, could

7    benefit from the spread between the acquisition

8    cost and Washington Medicaid's reimbursement for

9    a product such as Albuterol?

10              MR. REALE:   Objection.

11              MS. MANGIARDI:   Objection.

12              THE WITNESS:   No.

13              MS. COATS:   Is that marked as Exhibit

14   No. 18?

15   BY MS. FORD:

16         Q.    Yes, it is.   I'm going to hand you what

17   we'll mark now as Exhibit No. 19.

18              (Exhibit Hautea-Wimpee 019 marked

19   for identification)

20              For the record, this has a Bates label

21   of DL-TX-0091591 and also DEY057-0686.   And it is

22   a January 2nd, 2001, Notice of Price Change to

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                November 24, 2008

Olympia, WA

Page 155

1    information -- all of the answers you've provided

2    have been accurate?

3            A.    Yes.

4            Q.    Very good.   Before we begin --

5                  MR. REALE:   There's like some feedback

6    going on with the microphone.   Sorry.

7                         (Discussion held off the record)

8    BY MS. FORD:

9            Q.    Prior to taking a break we were looking

10   at some of the United States' Complaints against

11   drug manufacturers.   Do you recall that?

12           A.    Yes.

13           Q.    And with respect to Exhibits 15 and 16,

14   we looked at attachments to those Complaints that

15   were appended to the Complaint, and now I'm going

16   to show you what I've marked as Exhibit 20 --

17   excuse me, what will be marked as Exhibit No. 20.

18                      (Exhibit Hautea-Wimpee 020 marked

19   for identification)

20                  And this is Exhibit 1 to the United

21   States' Complaint against Abbott Laboratories.

22                  MS. RAMSEY:   Becky, if you could give

Henderson Legal Services, Inc.

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 156

1    me just a moment to pull up that document.

2                MS. FORD:  Just let me know when you're

3    ready.

4                MS. RAMSEY:  Okay.  You're referencing

5    the First Amended Complaint?

6                MS. FORD:  Correct.

7                MS. RAMSEY:  Okay.  I'm ready.

8    BY MS. FORD:

9         Q.    Do you have that exhibit in front of

10   you?

11        A.    Twenty?

12        Q.    Yes.

13        A.    Yes.

14        Q.    Very good.  Okay.  And if you could

15   look at the fifth drug on this list, Dex --

16   excuse me, Dextrose Solution, 5%, 79; do you see

17   that?

18        A.    Yes.

19        Q.    With an NDC of 00074792202?

20        A.    Yes.

21        Q.    And during the 2001 time period the AWP

22   listed for this drug by First DataBank was

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

## Olympia, WA

Page 157

1    $283.20.  Do you see that?

2         A.   Yes.

3         Q.   And then the price available to at

4    least some pharmacists was $25.56.  Do you see

5    that?

6         A.   Yes.

7              MR. REALE:  Objection.

8    BY MS. FORD:

9         Q.   And the estimated dollar value of the

10   spread was $257.69, with a spread percentage of

11   over 1000%.  Do you see that?

12        A.   I see that.

13        Q.   And would Washington Medicaid have

14   expected manufacturers to provide information to

15   pricing compendia that would reflect that large

16   of a spread between the price available to

17   providers and the price, the AWP price?

18        A.   No.

19             MS. RAMSEY:  Objection.

20   BY MS. FORD:

21        Q.   Prior to learning of the lawsuits which

22   we're taking your deposition in today, did

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 158

1  Washington become aware -- Washington Medicaid

2  become aware of differences between the Average

3  Wholesale Price and the price at which providers

4  in Washington State were actually paying for

5  drugs?

6       A.    I can't speak for other people, but

7  certainly we have heard about -- about the, you

8  know, allegations that there were price

9  discrepancies or that there was this inflation or

10 artificial inflation of prices.

11      Q.    And did you or did Washington State

12 have any understanding of the -- the amount of

13 that inflation?

14      A.    No.

15      Q.    Did Washington Medicaid intend for

16 providers to be able to make a profit between the

17 difference on reimbursement for a drug and what

18 they were actually paying for a drug?

19      A.    I can't say that we intended to.  We

20 certainly I would think rec -- recognized that

21 there's usually a profit factor in what some

22 people, you know, what providers and suppliers in

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                November 24, 2008

## Olympia, WA

Page 159

1    general charge consumers for that.  I would

2    expect that we would have -- our understanding

3    would have been that it would be reasonable.

4         Q.    Would Washington Medicaid have expected

5    some providers to be making millions of dollars

6    based upon the spread between the acquisition

7    cost of a drug and the reimbursement for that

8    drug?

9         A.    No.

10           MR. REALE:  Objection.

11           MS. MANGIARDI:  Objection.

12           MS. RAMSEY:  Objection.

13           MS. FORD:  Would you consider that type

14   of conduct an abuse of the Medicaid system?

15           MR. REALE:  Objection.

16           THE WITNESS:  Yes.

17           MS. MANGIARDI:  Objection.

18           MS. RAMSEY:  Objection.

19           MS. FORD:  Did Washington Medicaid know

20   that the AWP prices in the drug file provided to

21   it by First DataBank for some manufacturers had

22   no basis in market prices?

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 160

1              MS. MANGIARDI:  Objection.

2              MS. RAMSEY:  Objection.

3              MR. REALE:  Objection.

4              THE WITNESS:  I can't say that we had

5       knowledge of that.  We may have suspected

6       something, but no.

7              MS. FORD:  And would Washington

8       Medicaid have had any way of knowing which

9       manufacturers were reporting accurate prices and

10      which manufacturers were not?

11             THE WITNESS:  No.

12             MR. REALE:  Objection.

13             MS. RAMSEY:  Objection.

14             MS. MANGIARDI:  Objection.

15             MS. FORD:  Did Washington Medicaid know

16      that some drug manufacturers intentionally set

17      high AWPs to create a financial incentive for

18      pharmacists to purchase their drugs?

19             MS. RAMSEY:  Objection.

20             MR. REALE:  Objection.

21             MS. MANGIARDI:  Objection.

22             THE WITNESS:  No.

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008

Olympia, WA

Page 161

1          MS. FORD:  Did Washington Medicaid know

2     that some drug manufacturers marketed the spread

3     on their drugs as an inducement for pharmacists

4     to purchase that manufacturer's drug over another

5     manufacturer's drug?

6               MS. MANGIARDI:  Objection.

7               MS. RAMSEY:  Objection.

8               THE WITNESS:  We would have had

9     suspicions, but we wouldn't know for sure, no.

10    BY MS. FORD:

11        Q.   Did Washington Medicaid approve of that

12    conduct?

13        A.   No.

14        Q.   I'm going to take a quick break to

15    change the tape.

16               THE VIDEOGRAPHER:  This is the end of

17    tape number three of the deposition of Ayuni

18    Hautea-Wimpee.  The time is now 1:15 p.m.  We are

19    off the record.

20               (Short break taken)

21               THE VIDEOGRAPHER:  This is the

22    beginning of tape number four of the deposition