# Exhibit 139

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

| | |
|---|---|
| Vladeck, Ph.D., Bruce C.<br>New York, NY | May 4, 2007 |

Page 1

```
        UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS

Laboratories, Inc.                :

---------------------------------X


          IN THE CIRCUIT COURT OF

        MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                 :  CASE NO.

         Plaintiff,               :  CV-05-219

    v.                            :

ABBOTT LABORATORIES, INC.,        :  JUDGE

et al.,                           :  CHARLES PRICE

         Defendants.              :

---------------------------------X
```

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                       May 4, 2007
                            New York, NY

```
                                                              Page 2
 1    STATE OF WISCONSIN      CIRCUIT COURT    DANE COUNTY
 2    ------------------------------------X
 3    STATE OF WISCONSIN,                 :    CASE NO.
 4             Plaintiff,                 :    04-CV-1709
 5        v.                              :
 6    AMGEN INC., et al.,                 :
 7             Defendants.                :
 8    ------------------------------------X
 9
10           IN THE COURT OF COMMON PLEAS
11              FIFTH JUDICIAL CIRCUIT
12    ------------------------------------X
13    STATE OF SOUTH CAROLINA, and         :    STATE OF
14    HENRY D. McMASTER, in his official   :   SOUTH CAROLINA
15    capacity as Attorney General for     :    COUNTY OF
16    the State of South Carolina,         :    RICHLAND
17             Plaintiff,                  :
18        v.                               :  CIVIL ACTION:
19    MYLAN LABORATORIES, INC.             :  07-CP-40-0283
20             Defendant.                  :
21    ------------------------------------X
22
```

Vladeck, Ph.D., Bruce C.                                May 4, 2007
                        New York, NY

Page 138

1    A.   No.

2    Q.   You'll notice that in 1989, one of your
3 predecessors, Acting Administrator Hays, referred
4 to average wholesale price as a sticker price, as
5 did Secretary Shalala in 1997, and President
6 Clinton again in 1997.

7         While you were administrator of HCFA
8 between 1993 and 1997, did you understand average
9 wholesale price to be the sticker price for
10 drugs?

11        MS. BROOKER:  Objection.  Form.

12   A.   That would have been one of the
13 metaphors or analogies we used to describe it,
14 yes.

15   Q.   Turning to Exhibit Abbott 156, the
16 radio address by President Clinton, is there any
17 aspect of President Clinton's statement that I've
18 read into the record with which you disagree?

19        MR. BREEN:  Objection.  Form.

20        MS. BROOKER:  Objection.  Form.

21   A.   The -- had I been engaged in the
22 process of preparing this speech or whatever, the

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                    May 4, 2007
                          New York, NY

Page 139

1  sentence on the -- that concludes the paragraph
2  carrying over on to Page 2, "in fact, some pay
3  just one-tenth of the published price," I would
4  have raised concerns about because I would not
5  have been aware, at the time, of any gap between
6  actual acquisition cost and AWP and the compendia
7  of -- of that magnitude.
8        Q.   So, it's your recollection that as of
9  December 1997, you personally were not aware of a
10 gap of one to ten between provider acquisition
11 cost and published average wholesale price?
12       A.   That's correct.  My understanding at
13 the time was that there was not a constant, but a
14 pretty systematic spread of the kind one might
15 find in the apparel or automobile industries
16 between sticker or list price and the price to
17 the -- the final seller.
18       Q.   And when you described your
19 understanding of the difference between
20 acquisition cost and published average wholesale
21 prices, did you distinguish, in your mind, in
22 1997, between brand name drugs and generic drugs?

Page 140

1    A.   No.  I would -- I would say that most
2  of my focus in that period of time was on brand
3  name drugs, that the issues we were most
4  concerned about, in terms of Medicare drug
5  payments and drug policies primarily involved
6  brand name drugs.
7            And out of naivete, or for whatever
8  reason, I believe that the -- the market for
9  generic was more truly competitive in that
10 transaction prices in the market were probably
11 more constrained or limited than they were for --
12 for brand name drugs.
13   Q.   How do you mean that the prices in the
14 marketplace would be constrained or limited for
15 generics?
16   A.   Just in the sense of classic economic
17 theory, in which a patent creates a monopoly
18 pricing power on the part of the patent holder
19 that essentially permits substantially greater
20 latitude or discretion in setting the price.
21 Whereas a product that has identical competitors
22 in the market, producers, would have less freedom

Vladeck, Ph.D., Bruce C.                                    May 4, 2007
                          New York, NY

Page 154

1              MS. BROOKER:  Objection.  Form.
2              MR. COOK:  That's a bad question. I can
3     ask a better question.
4         Q.   What did you mean when you said that
5     you understood that there was, on average, a
6     percentage difference between AWP and the price
7     to providers?
8         A.   Again, I would have been very much
9     influenced by my perception of the relationship
10    of sticker price to transaction prices in other
11    sectors or other industries.  And, again, it was
12    my belief that, on average, the actual
13    acquisition price for brand drugs was somewhere
14    in the range of 15 percent below average
15    wholesale price, as we understood it, but that,
16    again, the buyers or the providers with the least
17    market power were probably paying amounts closest
18    to the average wholesale price, and that the most
19    powerful purchasers might well be paying less
20    than 85 percent or so of the -- of the average
21    wholesale price.
22        Q.   And so, your understanding, do I have

Vladeck, Ph.D., Bruce C.                                    May 4, 2007
                         New York, NY

Page 156

1             MS. BROOKER:  Objection.  Form.
2        A.   Absolutely.
3        Q.   And so, it would certainly be possible
4   that for one drug there would be a different
5   variation in a different range of market prices
6   than for another drug.
7             Right?
8             MR. BREEN:  Objection.  Form.
9        A.   Again, to the extent I was -- you know,
10  I was thinking about these issues in this detail,
11  I would say that at the time, my perception was
12  there was a pretty standard relationship between
13  AWP and average prices in the market.  I could
14  have -- had you posed that question then, I
15  probably could have envisioned particular drugs
16  that might have been different, but that was not
17  how I understood the issue at the time, I don't
18  believe.
19       Q.   And, again, we're talking about brand
20  name drugs.  Correct?
21       A.   That's correct.
22            MR. COOK:  I'd like to show you a