# Exhibit 140

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment



*experience does matter*

**CASE:  In Re: Pharmaceutical Industry Average Wholesale Price Litigation**
**DATE:  December 5, 2007**

Enclosed is the Original of the transcript of the testimony of **Nancy-Ann Min DeParle** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services



Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

DeParle, Nancy-Ann Min - Vol. II                    December 5, 2007
                          Washington, DC

Page 328

```
             UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -
IN RE:  PHARMACEUTICAL         )  MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION
PRICE LITIGATION               )  01-CV-12257-PBS
THIS DOCUMENT RELATES TO       )
U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris
the Florida Keys, Inc.         )
     v.                        )  Chief Magistrate
Abbott Laboratories, Inc.,     )  Judge Marianne B.
No. 06-CV-11337-PBS            )  Bowler
- - - - - - - - - - - - - - - -
        (captions continue on following pages)



     Videotaped deposition of NANCY-ANN MIN DEPARLE
                        Volume 2
```

Page 399

1   my desk looking at all these things.  I don't
2   recall knowing that some pay just one-tenth of
3   the published price.  So I'm sorry.  I can't make
4   that statement.
5        Q.   You would agree with me that on January
6   1, 1998 the agency issued a program memorandum
7   that it felt faithfully executed the statutory
8   command to it to pay based upon average wholesale
9   price, correct?
10            MS. YAVELBERG:  Objection, form.
11       A.   Well, average wholesale price minus 5
12  percent.
13       Q.   Correct.
14       A.   This was the new -- the law had been
15  enacted which changed the payment formula from
16  average wholesale price to 95 percent of average
17  wholesale price.  And that's what this January
18  1998 program memorandum was trying to put into
19  effect.
20       Q.   And it was the agency's interpretation
21  of that statute that Congress had required it to
22  pay 95 percent of the average wholesale price

1   even if the average wholesale price was ten times
2   higher than the amount that an individual
3   physician had purchased the drug for, correct?
4           MS. YAVELBERG:  Objection, form.
5       A.  I agree with the first part of your
6   sentence.  But the "even if," I don't think
7   anyone was sitting there thinking about even if.
8   The law said do this and that's what we were
9   doing.
10      Q.  And the fact that a physician's
11  acquisition cost was greater, lesser or
12  dramatically below average wholesale price had no
13  effect on what your statutory obligation was to
14  pay the AWP, right?
15      A.  Now, that I agree with.  I don't think
16  we knew one aware or the other, greater, lower,
17  different or the same.  That's what the law said
18  and that's what we were doing.
19      Q.  And you would agree with me that if
20  what President Clinton stated in his radio
21  address was accurate that after January of 1998
22  presumably at least one physician would submit a

1  obligation to do that, but I believe the agency--
2  but I would have wanted to do that and I believe
3  the agency would have tried to do that.
4      Q.  Do you know whether in any instance the
5  agency either stopped payment for a claim or
6  attempted to administratively recoup payment to a
7  physician or a provider because the provider's
8  acquisition cost was one-tenth of the submitted
9  charge and 95 percent of the AWP?
10     A.  I don't know.
11     Q.  Would you expect that that occurred
12  given Exhibit Abbott 202, the program memorandum,
13  laying out the agency's policy?
14          MS. YAVELBERG:  Objection, form.
15     A.  I didn't know anything about claims pay
16  payment one aware or the other, except in the
17  broadest of terms that we had a billion claims a
18  year.  Those kind of abstract concepts.  I don't
19  know sitting here today anything more about the
20  process than that.
21     Q.  If the statutory command instead of
22  being to pay average wholesale price had been to

Page 411

1    pay an actual average of prices in the
2    marketplace, a mathematical average of prices in
3    the marketplace, you would have expected Medicare
4    carriers to pay lower payable amounts than they
5    actually did pay under Balanced Budget Act of
6    1997, correct?
7            MS. YAVELBERG:  Objection to form.
8            MS. ALBEE:  Objection to form.
9        A.   Well, I think to answer that question
10   you'd have to go back to what I thought average
11   wholesale price was.  And I did think that was a
12   reference to the Ave. ranch wholesale prices in
13   the marketplace.  At the time this was enacted
14   that's what I thought it was.
15       Q.   You would agree with me that the Office
16   of Inspector General report marked as Exhibit
17   Abbott 002, or at least the 22 drugs representing
18   67 percent of the Medicare Part B spend,
19   indicated that for all of those drugs average
20   wholesale price was not a mathematical average,
21   correct?
22           MS. YAVELBERG:  Objection, form.

1   drug companies advised physicians.
2       Q.   Okay.  And were you aware, ma'am, that
3   in their promotional materials to doctors that
4   they were saying to doctors to bill at AWP even
5   though the acquisition cost was far less than
6   that?
7            MR. GORTNER:  Objection, form.
8            MS. REID:  Objection, form.
9       A.   I have heard that since I was
10  administrator, but at the time I was
11  administrator, no, I did not know that.
12      Q.   And to be clear, when you say since you
13  were the administrator, at the time you were in
14  charge of HCFA you did not know that?
15      A.   No, I didn't.
16      Q.   Okay.  And are you aware if anyone at
17  HCFA knew that?
18           MS. TORGERSON:  Objection to form.
19      A.   No.
20      Q.   Okay.  And you're also not aware, I
21  take it, Ms. DeParle, that the drug companies
22  were routinely creating spreads by which they