# Exhibit 146

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

```
287:1                UNITED STATES DISTRICT COURT

   2              FOR THE DISTRICT OF MASSACHUSETTS

   3    - - - - - - - - - - - - - - -

   4    IN RE:  PHARMACEUTICAL          )   MDL NO. 1456

   5    INDUSTRY AVERAGE WHOLESALE      )   CIVIL ACTION

   6    PRICE LITIGATION                )   01-CV-12257-PBS

   7    THIS DOCUMENT RELATES TO        )

   8    U.S. ex rel. Ven-a-Care of      )   Judge Patti B. Saris

   9    the Florida Keys, Inc.          )

  10          v.                        )   Chief Magistrate

  11    Abbott Laboratories, Inc.,      )   Judge Marianne B.

  12    No. 06-CV-11337-PBS             )   Bowler

  13    - - - - - - - - - - - - - - -

  14          (cross captions appear on following pages)

  15

  16          Videotaped deposition of SUE GASTON

  17

  18                       Volume II

  19

  20                       Washington, D.C.

  21                       Wednesday, March 19, 2008

  22                       9:00 a.m.
```

Gaston, Sue - March 19, 2008 09:00:00 a.m.

```
288:1                UNITED STATES DISTRICT COURT
   2              FOR THE DISTRICT OF MASSACHUSETTS
   3    - - - - - - - - - - - - - - -
   4    IN RE:  PHARMACEUTICAL        )  MDL NO. 1456
   5    INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION
   6    PRICE LITIGATION              )  01-CV-12257-PBS
   7                                  )  Judge Patti B. Saris
   8    THIS DOCUMENT RELATES TO      )  Chief Magistrate
   9    ALL CASES IN MDL NO. 1456     )  Judge Marianne B.
  10    - - - - - - - - - - - - - - -    Bowler
  11
  12
  13      IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
  14             THIRD JUDICIAL DISTRICT AT ANCHORAGE
  15    - - - - - - - - - - - - - - -
  16    STATE OF ALASKA,              )
  17             Plaintiff,           )
  18       vs.                        )  Case No.
  19    ALPHARMA BRANDED PRODUCTS     )  3AN-06-12026 CI
  20    DIVISION, INC., et al.        )
  21             Defendants.          )
  22    - - - - - - - - - - - - - - -
```

```
322:1    what type of drugs and the criteria basically was
    2    drugs that were considered outpatient drugs,
    3    generally dispensed at the pharmacy level.
    4         Q.   And we talked about this last time.
    5    But you were aware that you specifically took
    6    steps to exclude infusion and injectable drugs
    7    from the mechanism by which the FULs were
    8    calculated, correct?
    9              MS. MARTINEZ:  Objection, form.
   10         A.   Correct.
   11         Q.   Do you recall any discussions about
   12    perhaps changing the HCFA policy or criteria not
   13    to establish FULs for injectable and infusion
   14    drugs at any point in time?
   15         A.   I know that the conversation was
   16    probably discussed.  I don't know when.  But no
   17    steps were taken to do that.
   18         Q.   Can you tell me why not steps were
   19    taken to do that?
   20         A.   It's my understanding that the criteria
   21    we were using is to set federal upper limit
   22    prices on drugs that were most commonly used.
```

```
323:1    When we stepped into the arena of injectable
    2    drugs or other drugs that weren't most commonly
    3    used, I think it was a little more difficult to
    4    capture those drugs for various reasons.  So
    5    that's why we stuck with the basic criteria that
    6    we used.
    7         Q.   But you believe that there were
    8    discussions about possibly moving injectable
    9    infusion drugs into the FUL program; is that fair
   10    to say?
   11         A.   I wouldn't say that specifically.
   12    There could have been conversations.  I wouldn't
   13    say that the conversations went as far as to say
   14    let's move them into the FUL arena.  But the
   15    conversations were there.  And I can only answer
   16    that generally, because I only remember short
   17    conversations maybe discussing the issue.
   18         Q.   If there has been testimony from Mr.
   19    Bentley that he -- his best recollection is that
   20    he advised you of the large differences between
   21    acquisition cost and AWPs for certain injectable
   22    infusion drugs at least as early as 1990, could
```

Gaston, Sue - March 19, 2008 09:00:00 a.m.

```
456:1       Q.   And Ms. Bergin's note indicates that in
    2   this instance CMS did not set a FUL because the
    3   FUL price would have been equal to Major's AWP;
    4   is that correct?
    5       A.   Correct.
    6       Q.   Are you familiar with making that kind
    7   of a decision not to set a FUL when it was equal
    8   to an AWP?
    9       A.   Yes.
   10       Q.   Why would CMS decline to set a FUL when
   11   the FUL was equal to an AWP?
   12       A.   Because states have other methodologies
   13   they can use for reimbursement.  And their
   14   regular reimbursement methodology would be a
   15   percentage off of AWP.  That would be a
   16   reasonable reimbursement rate for other drugs.
   17   So the purpose of setting the FUL price is to try
   18   to set reasonable reimbursement.  And that would
   19   kind of counter what the states were doing with
   20   their other reimbursement methodology.
   21       Q.   I see.  So just like we talked about
   22   there morning, one of the objectives of the FUL
```

Gaston, Sue - March 19, 2008 09:00:00 a.m.

```
457:1    program is cost savings?
    2         A.   Correct.
    3         Q.   And so if you set a FUL that was equal
    4    to an AWP it wouldn't really result in any cost
    5    savings to the state?
    6         A.   Correct.
    7         Q.   And so in this case, if I understand
    8    what's going on here with cefadroxil in 2001,
    9    basing a FUL on the lowest published price seemed
   10    to result in a FUL that was too low, right?
   11         A.   It appeared that way because of the
   12    compendia information that we have.
   13         Q.   And setting a FUL -- not using that
   14    lowest published price but moving up to the next
   15    seemed to result in a FUL that was too high?
   16         A.   Correct.
   17         Q.   And so CMS declined to set a FUL given
   18    the published prices that were out there?
   19         A.   Correct.
   20         Q.   Let me just digress here for a second.
   21    What role if any did AWP play in setting FULs?
   22         A.   Generally, it did not.
```

Gaston, Sue - March 19, 2008 09:00:00 a.m.

```
528:1      Q.   Would you have had access to that AMP
    2   information?
    3      A.   Yes.
    4      Q.   Did you ever use that AMP information
    5   in setting FULs?
    6      A.   No.
    7      Q.   Did you ever use that AMP information
    8   in terms of evaluating and the approval of state
    9   Medicaid plans?
   10      A.   State Medicaid plans are for the
   11   states.  So we really wouldn't use AMPs.
   12      Q.   Well, as I understand it, one of your
   13   responsibilities -- one of your other
   14   responsibilities was approving state Medicaid
   15   plans, right?
   16      A.   Correct.
   17      Q.   And to get approval, one of the things
   18   a state had to demonstrate was the reasonableness
   19   of its reimbursement rates?
   20      A.   Correct.  Their methodology.
   21      Q.   Their methodology.
   22      A.   Correct.
```

Gaston, Sue - March 19, 2008 09:00:00 a.m.

```
529:1        Q.   And I guess what I'm wondering is in
     2   examining the reasonableness of the methodology,
     3   the reasonableness of the reimbursement rates the
     4   state was proposing to pay, if you ever looked at
     5   AMP information.
     6        A.   No.
     7        Q.   Switching back to putting your FUL hat
     8   back on, what if anything did CMS do to monitor
     9   when drugs were coming off patents and therefore
    10   going generic?
    11        A.   Well, when I was doing the FUL program
    12   basically I just waited to get notification if
    13   somebody would let me know.  I really didn't do
    14   anything proactively, because I just didn't have
    15   the capability of doing it or the time.
    16        Q.   Is it different today?  Do you know?
    17        A.   I don't know.
    18        Q.   And who typically will let you know
    19   that something came off patent and therefore went
    20   generic?
    21        A.   Industry folks.  I can't say
    22   specifically.  But sometimes pharmacies might
```