# Exhibit 149

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

Page 1

```
              UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

     Civil Action No. 03-CV-11865-PBS

     - - - - - - - - - - - - - - - - - - - - - - - - -x

     THE COMMONWEALTH OF MASSACHUSETTS,

                 Plaintiff,

         v.

     MYLAN LABORATORIES, INC.; BARR LABORATORIES, INC.;

     DURAMED PHARMACEUTICALS, INC.; IVAX CORPORATION;

     WARRICK PHARMACEUTICALS CORPORATION; WATSON

     PHARMACEUTICALS, INC.; SCHEIN PHARMACEUTICAL; INC.;

     TEVA PHARMACEUTICALS USA, INC.; PAR PHARMACEUTICAL,

     INC.; DEY, INC.; ETHEX CORPORATION; PUREPAC

     PHARMACEUTICAL CO.; and ROXANE LABORATORIES, INC.,

                 Defendants.

     - - - - - - - - - - - - - - - - - - - - - - - - -x


      VIDEOTAPED DEPOSITION OF PAUL L. JEFFREY, Pharm.D.

        Thursday, June 14, 2007  9:50 a.m. to 4:26 p.m.

                     Ropes & Gray,

        One International Place, Boston, Massachusetts

              Reporter:  Lisa A. Moreira, RDR/CRR
```

5a3b446f-d196-4aeb-9357-81740e13a6d6

                                                                 Page 2

1    A P P E A R A N C E S

2              THE COMMONWEALTH OF MASSACHUSETTS

3              OFFICE OF THE ATTORNEY GENERAL

4              (BY: ROBERT PATTEN, ESQ., and

5                   COLLEEN A. McCARTHY, ESQ.)

6              One Ashburton Place

7              Boston, Massachusetts 02114

8              617.727.2200

9              robert.patten@ago.state.ma.us

10             colleen.mccarthy@ago.state.ma.us

11                  Counsel for the Plaintiff

12

13             ROPES & GRAY LLP

14             (BY: JOHN T. MONTGOMERY, ESQ., and

15                  CARISA A. KLEMEYER, ESQ.)

16             One International Place

17             Boston, Massachusetts 02110-2624

18             617.951.7000

19             john.montgomery@ropesgray.com

20             carisa.klemeyer@ropesgray.com

21                  Counsel for the Defendant, Warrick

22                  Pharmaceuticals Corporation

5a3b446f-d196-4aeb-9357-81740e13a6d6

Jeffrey, Pharm.D., Paul L.  June 14, 2007
Boston, MA

Page 112

1 notes?
2    A.  I just don't remember what that was
3 about. Let me think about it for a second or two
4 more here. I was probably just beginning to
5 understand what AMP was or what its purpose was.
6 I may not have understood what it is.  But this
7 recalculation point, I don't know what that was
8 about.  I really don't recall.
9    Q.  Okay.  And what is your understanding
10 of AMP?
11    A.  Well, by definition it's the average
12 manufacturer price, and I would hesitate to
13 define exactly what that means because I've
14 already miscalculated one definition in this
15 deposition, but I do know it to be a reference
16 price that CMS uses for the purposes of
17 calculating a rebate.
18    Q.  A rebate paid to states?
19    A.  A rebate paid to the state, yes.
20    Q.  And have you ever participated in any
21 discussions about methods that could be used by
22 states to determine the amount of the AMP for a

5a3b446f-d196-4aeb-9357-81740e13a6d6

Jeffrey, Pharm.D., Paul L.                              June 14, 2007
                              Boston, MA

Page 113

1    particular drug?
2         A.    Yes.
3         Q.    And do you have an understanding about
4    how that calculation would work?
5         A.    Okay.  Well, why don't you restate the
6    question so I answer it accurately.
7         Q.    Well, let's take this in stages.
8         A.    Yes.
9         Q.    The AMP data is submitted by
10   manufacturers to CMS, correct?
11        A.    Yes.
12        Q.    And the submissions made by
13   manufacturers are not provided by the federal
14   government to the states, correct?
15        A.    They are now, but they weren't then.
16        Q.    But they weren't then?
17        A.    Yes.
18        Q.    So prior to the amendment to the
19   statute you didn't get any update.  But you did
20   get a calculation based on AMP that was used to
21   determine the amount of rebate paid by each
22   manufacturer to the state, correct?

202-220-4158

5a3b446f-d196-4aeb-9357-81740e13a6d6

Page 114

1    A.   That's correct.
2    Q.   And what I'm trying to determine is
3  whether you have an understanding of how you
4  might use that rebate information from CMS to
5  determine, at least approximately, the amount of
6  the average manufacturer's price submitted by the
7  manufacturer to CMS?
8    A.   Yes.  Yes, we could have done that,
9  yes.
10   Q.   How could you have done it?
11   A.   Well, to the -- well, we could have,
12 you know, backed into the formula, so, you know,
13 start at this point and work backward.
14   Q.   That's right, by taking the rate?
15   A.   The rebate amount, the rebate rate, and
16 backing into what the AMP would have been to get
17 us to that, yes.
18   Q.   Through your total reimbursement for
19 each drug?
20   A.   Correct.
21   Q.   And did MassHealth do that from time to
22 time?

5a3b446f-d196-4aeb-9357-81740e13a6d6

Jeffrey, Pharm.D., Paul L.                                June 14, 2007
                              Boston, MA

Page 115

1   A. I recall at least one effort made to do
2   that.
3   Q. And who did that?
4   A. Well, it might have been a -- it might
5   have been a bigger effort, because I remember
6   something from, you know, the Attorney General's
7   office doing that kind of work, but also somebody
8   on my staff might have done a -- I don't know if
9   we did -- it would have been under Gary's -- Mr.
10  Gilmore's purview. I don't know if we did a
11  robust analysis or a back-of-the-envelope
12  calculation, but I know we had these
13  conversations about it.
14  Q. And do you know if that was in 2001 or
15  2002?
16  A. No.
17  Q. Do you know if it was relatively early?
18  A. I'm thinking it was probably 2002. I
19  may not have had enough -- we may not have had
20  enough awareness to think about doing that in
21  2001.
22  Q. And now the note that we were just

Jeffrey, Pharm.D., Paul L.                             June 14, 2007
                            Boston, MA

Page 220

1   disclose actual prices?
2        A.   No, I didn't think I had that
3   authority.
4        Q.   So you concluded you didn't have it?
5        A.   I did.
6        Q.   And what was the basis for that
7   conclusion?
8        A.   I don't know how rightful it was, but
9   it had to do with the provision that prohibited
10  me from using an average manufacturer price and
11  setting a rate.  So if the -- if the feds said
12  that I couldn't use an average manufacturer price
13  to set a rate for reimbursement, then it became
14  somewhat challenging to decide what it would be
15  that I would ask a manufacturer for, on the one
16  hand, and whether or not I had the authority to
17  do that at all.
18       Q.   And that's because federal law kept
19  average manufacturers' prices secret?
20       A.   Confidential, yes.
21       Q.   Or confidential until there was a
22  statutory change eventually?

Jeffrey, Pharm.D., Paul L.                                June 14, 2007
                              Boston, MA

Page 221

1      A.   Correct.
2      Q.   And if the federal government
3  considered average manufacturer prices to be
4  confidential, do you think it's reasonable to
5  expect that the pharmaceutical companies would
6  provide that information to First Data Bank?
7      A.   Do I -- if I -- well, I think it's
8  reasonable.
9      Q.   You didn't -- but you didn't think you
10 could ask for it, right?
11     A.   Right.
12     Q.   Did you think First Data Bank had any
13 legal authority to obtain such information from
14 manufacturers?
15     A.   Until this moment I hadn't thought
16 about it, but it makes sense that they wouldn't
17 be able to ask for the AMP.
18     Q.   And...?
19     A.   I don't know, you know, what -- could
20 there have been a different pricing index that
21 would more accurately reflect what pharmacies
22 pay?  It's possible.

Jeffrey, Pharm.D., Paul L.                                June 14, 2007
                              Boston, MA

Page 222

1  Q. So as you sit here today can you
2  actually articulate specifically the precise
3  price that you allege pharmaceutical
4  manufacturers should have been reporting to First
5  Data Bank?
6  A. Not without giving it some further
7  thought. I mean, should it -- you know, maybe the
8  AMP is the right number, and certainly we're
9  going to see that.
10      So the feds have come to the conclusion
11 that we can see that number, but they're still
12 not allowing the use of that number for
13 reimbursement purposes other than under the
14 federal upper limit pricing going forward. So I
15 might have come to the conclusion that AMP was
16 the right number, but I don't know that at this --
17
18  Q. Right. But in connection with the
19 commencement of this lawsuit did you reach that
20 conclusion?
21  A. No.
22  Q. And so in connection with the