# Exhibit 165

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

AdminaStar Federal (Cheryl Eiler)                          August 26, 2008
                         Indianapolis, IN

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE:  PHARMACEUTICAL         ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION:

PRICE LITIGATION               ) 01-CV-12257-PBS

----------------------------X Judge Patti B. Saris

U.S. ex re. Ven-A-Care of      )

the Florida Keys, Inc., v.     )

Abbott Laboratories, Inc.,     )

et al. No. 06-CV-11337-PBS    )

----------------------------X

VIDEOTAPED DEPOSITION OF ADMINASTAR FEDERAL

by CHERYL EILER

The videotaped deposition of ADMINASTAR FEDERAL by

CHERYL EILER, produced and sworn before me, Aprille

Lucas, RPR, Notary Public in and for the County of

Hamilton, State of Indiana, taken on behalf of the

Defendant Dey at the offices of National Government

Services, 8115 Knue Road, Indianapolis, Indiana, on

August 26, 2008, at 1:02 p.m., pursuant to the

Federal Rules of Civil Procedure.

AdminaStar Federal (Cheryl Eiler)                           August 26, 2008
                        Indianapolis, IN

                                                                    Page 2

1                        A P P E A R A N C E S

2

3    FOR THE UNITED STATES OF AMERICA:

4

5         George B. Henderson, Asst. US Attorney

6         Katherine McAllister, Esq.

7         U.S. DEPARTMENT OF JUSTICE

8         United States Courthouse

9         1 Courthouse Way

10        Ste. 200

11        Boston, MA  02210

12

13

14   FOR THE DEPONENT:

15

16        Robert M. Squier, Jr., Esq.

17        Senior Counsel

18        National Government Services, Inc.

19        8115 Knue Road

20        Indianapolis, IN  46250

21

22        (CONTINUED)

1    A.   If I had questions, I would ask Dr.
2  Oleck, our medical director.
3    Q.   Did Mr. Oleck ever have any feedback
4  for you with respect to prices that you set?
5    A.   What I would do is I would set the fees
6  with his direction.  Then we would go over them
7  together, and we would also go over with the
8  other DMERCs to make sure we were all consistent.
9  So it was a collaboration between.
10   Q.   And I just want to talk for a few
11 minutes about some of the, what looked like to me
12 different pricing benchmarks described in
13 document Number 2.  The first one is AWP fees.
14 How are AWP fees calculated by AdminaStar?
15   A.   We followed the directions given to us
16 by Medicare, by CMS, as far as to use the AWP out
17 of the RedBook, and at different times it's
18 changed.  We have used the median of the
19 generics.  We have used the brands.  It depended
20 on the instructions at the time that we were
21 calculating them.
22   Q.   And the source of the information that

Page 28

1   you would use to calculate AWP would be RedBook?
2        A.   Yes.
3        Q.   And AWP, that's a benchmark that was
4   used to calculate reimbursement for inhalation
5   drugs?
6        A.   Yes.
7        Q.   Were there any other benchmarks that
8   AdminaStar used to calculate reimbursement for
9   inhalation drugs?
10       A.   As far as when you state benchmark, are
11  you talking different calculations or --
12       Q.   Well, for example, on document Number 2
13  it refers to something called reasonable charge
14  fees, also the prevailing charge, customary fees
15  --
16       A.   Okay, those are not for drugs.  Those
17  are used for the end stage renal disease and
18  supplies.  Those were not used for the drugs.
19       Q.   Let's go through each of those.  Let's
20  go to fee schedule.  Was a fee schedule a
21  reimbursement benchmark that AdminaStar used to
22  calculate reimbursement for inhalation drugs?

1           MR. SQUIER:  Objection.
2       A.  Yes.
3   BY MR. HECK:
4       Q.  Now, you indicated earlier that, when
5   you were talking with Ms. Guiliana, there were
6   certain times where there were prices that you
7   would not consider in an array, is that correct?
8       A.  Yes.
9       Q.  Now, what types of situations, if you
10  could just list them for me, would you not list a
11  given price in the array?
12      A.  I can't give you all of them because I
13  have them listed, and it would be like
14  preservative-free.  It would be if it was in a
15  pre-vial, as far as a single vial.  You would
16  look at the -- you would not use all the
17  strengths.  Sometimes you would try to -- you
18  only use the strengths that would accommodate
19  your code, as far as the code, and I think that's
20  one of their instructions, also.
21          But there was several, I would say a
22  half a dozen different things that we asked CMS

1    if it was okay to not include, and they gave us
2    the okay on those.
3        Q.   Now, you indicated you listed them out.
4    Where did you list these out?
5        A.   They were listed in my SOP, my standard
6    operation procedures, and --
7        Q.   I'm sorry, and you're not sure if that
8    was produced, is that correct?
9        A.   Correct.
10       Q.   Other than you indicating that there
11   were single vial drugs and preservative-free
12   drugs, I believe, do you recall any others right
13   now that you would not consider in an array?
14       A.   No.  And to clarify, the preservative-
15   free was only used if that was part of the
16   narrative description of the code.
17       Q.   Now, it indicates down here, at least
18   for Palmetto, in the second to last sentence of
19   this bullet point, it says consult with medical
20   director to assist in determining the most
21   frequently administered dosage.
22            Do you see that?

Page 153

1   Just so I understand perfectly clear, when you
2   indicated that the four DMERCs started to
3   coordinate, what exactly did you coordinate on?
4        A.   We would make sure that our, once we
5   did our calculations, we were consistent as far
6   as, you know, to make sure that I wasn't, um, I
7   missed maybe an update.  That's how we checked to
8   make sure we didn't miss something, was by, we
9   send out a check that has all the codes that he
10  we would allow and then the pricing that we, as a
11  region, would be using.
12            Then we would have, we have a call to
13  say, okay, this is why I'm using this B; yours is
14  different.  Why?  So that way we are consistent.
15  You know, we may have been a penny off here and
16  there, as far as the rounding, and that's how we
17  know, you know, what we was doing.
18       Q.   I think you got a little bit ahead of
19  me.  I'm just talking specifically about the
20  design, the implementation of the spreadsheets
21  that you used.
22       A.   The spreadsheets, we didn't say this is