# Exhibit 166

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v.  Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment

## Department of Health and Human Services

# OFFICE OF
# INSPECTOR GENERAL

## Durable Medical Equipment Regional Carriers

## Meeting HCFA's Objectives



**JUNE GIBBS BROWN**
Inspector General

**FEBRUARY 2000**
**OEI-04-97-00330**

# OFFICE OF INSPECTOR GENERAL

Public Law 95-452, as amended by Public Law 100-504, mandated the mission of the Office of Inspector General (OIG). That mission is to protect the integrity of the Department of Health and Human Services programs as well as the health and welfare of beneficiaries served by them. This statutory mission is carried out through a nationwide program of audits, investigations, inspections, sanctions, and fraud alerts. The Inspector General informs the Secretary of program and management problems and recommends legislative, regulatory, and operational approaches to correct them.

## Office of Evaluation and Inspections

The Office of Evaluation and Inspections (OEI) is one of several components of the Office of Inspector General. It conducts short-term management and program evaluations (called inspections) that focus on issues of concern to the Department, the Congress, and the public. The inspection reports provide findings and recommendations on the efficiency, vulnerability, and effectiveness of departmental programs.

OEI's Atlanta Regional Office prepared this report under the direction of Jesse J. Flowers, Regional Inspector General, and Christopher H. Koehler, Deputy Regional Inspector General. Principal OEI staff included:

|  |  |
|---|---|
| Lisa Keating, *Lead Analyst* | Brian Ritchie, *Program Analyst* |
| Tricia Davis, *Program Specialist* | Bambi Straw, *Program Specialist* |
| Scott Horning, *Program Analyst* | Barbara Tedesco, *Mathematical Statistician* |
| Graham Rawsthorn, *Team Leader* | Stuart Wright, *Associate Director* |

To obtain copies of this report, please call the Atlanta Regional Office at 404-562-7723. Reports are also available on the World Wide Web at our home page address:

http://www.dhhs.gov/progorg/oei

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**FINDINGS**

    Medical Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Fraud Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Processing Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Carrier Shopping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Positive Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

**COMMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

**APPENDIX**

    Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# EXECUTIVE SUMMARY

## PURPOSE

To determine if Durable Medical Equipment Regional Carriers met the Health Care Financing Administration's implementation objectives.

## BACKGROUND

On October 1, 1993, the Health Care Financing Administration (HCFA) began using four Durable Medical Equipment Regional Carriers (DMERCs) to process Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) claims for Medicare payment. Prior to the DMERCs, HCFA used 34 carriers to process all Part B claims, including those for DMEPOS.

The change to four DMERCs was an effort by HCFA to improve ineffective and costly claims processing under the 34 carrier system. Specifically, HCFA was concerned with ineffective education and outreach efforts, a lack of basic data for fraud prevention, a lack of claims processing expertise for medical equipment and supplies, a lack of standardized forms for claims processing, and "carrier shopping" by suppliers for the highest reimbursement rates among carriers.

HCFA charged the DMERCs with establishing medical policies for the 100 items that had the highest allowed charges, developing aggressive education and fraud prevention programs, and reducing claims processing costs. At the same time, HCFA required all Medicare carriers to use a standard claims form and changed its claims jurisdiction policy. HCFA designed these initiatives to reduce both administrative costs and costs to the Medicare Trust Fund.

## FINDINGS

### DMERCs Established Most Medical Policies as Required

By October 1, 1993, the DMERCs were to establish medical policies defining the circumstances under which the 100 DMEPOS items that had the highest allowed charges were to be paid. They did so for 87 of the targeted DMEPOS items. Eight of the remaining policies were finalized in 1995 and two were finalized in 1997. An additional two items were dropped from consideration, and a policy for the remaining item has yet to be developed.

## DMERCs are Providing Education as Required

HCFA charged the DMERCs with developing an aggressive educational component, with the purpose of reducing incorrect claims submission, as well as reducing fraud. DMERCs have responded with a series of educational seminars directed at suppliers, physicians and beneficiaries, as well as a focused effort to educate particular suppliers that have a history of billing problems.

## DMERC Fraud Units Experienced Excellent Outcomes on Individual Fraud Cases, but Their Overall Effectiveness is Unclear

HCFA charged the DMERCs to make a concerted effort to reduce fraud in DMEPOS billing and payments.  DMERCs are attacking fraud in many specific cases; however, a lack of complete information precluded us from determining the effectiveness of DMERC fraud unit activities.  While we obtained some workload data that quantifies their fraud efforts, the DMERCs did not provide needed data that documented the quality and result of their efforts.

## DMERCs Succeeded in Decreasing Claims Processing Costs

Claims processing costs for DMEPOS claims have declined by 15 percent since the DMERCs were established, from $1.17 per claim in 1995 to $1.00 per claim in 1998. Accordingly, the DMERCs have saved an estimated $37 million per year compared to pre-DMERC costs.  This was done largely through HCFA's initiative to standardize claims forms and increase use of electronic claims submission.  In addition, DMERC medical expertise has contributed substantially to Medicare Trust Fund savings.

## HCFA's Claims Jurisdiction Policy Stopped Carrier Shopping

To prevent carrier shopping, HCFA dropped its point of sale billing policy and adopted a beneficiary residence jurisdiction policy. This action prevented suppliers from shopping for specific carriers that would give the most favorable reimbursement.  Under the new policy, carriers were predetermined, based on where the beneficiary who received DMEPOS lived.

## DMERC Activities Produced Positive Results

Concurrent with implementing the activities described above, the DMERCs worked cooperatively with the HCFA, the Statistical Analysis Durable Medical Equipment Regional Carrier, the Office of Inspector General, and others to improve Medicare claims processing and prevent fraud, waste, and abuse.  Such cooperative efforts led to development and revision of various policies, and changes in claims processing practices. The changes in policies and practices led to financial savings in several operational areas, including wound care supplies, lymphedema pumps, incontinence supplies, and orthotics.

## RECOMMENDATION

Overall, the DMERCs generally met HCFA's objectives.  However, one area of uncertainty is the effectiveness of their fraud units.  To facilitate measurement of fraud unit effectiveness, we recommend that HCFA require the DMERCs to maintain needed data in their automated fraud information systems.  This data should include complete and accurate documentation on the sources of opened cases and detailed financial information on fraud cases in overpayment status.  Such data would facilitate an analysis of not only the quantity of the fraud units' efforts, but also the quality.

## COMMENTS

The HCFA concurred with our recommendation that the DMERCs maintain additional data in their automated fraud information systems.  HCFA is currently developing a Program Integrity Management Reporting system which will require Medicare contractors to report data on fraud and abuse overpayments status.  The new system is scheduled for implementation during Fiscal Year 2000.  The full text of their comments is in appendix A.

# INTRODUCTION

## PURPOSE

To determine if Durable Medical Equipment Regional Carriers met the Health Care Financing Administration's implementation objectives.

## BACKGROUND

On October 1, 1993, the Health Care Financing Administration (HCFA) began using four Durable Medical Equipment Regional Carriers (DMERCs) to process Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) claims for Medicare payment. Prior to the DMERCs, HCFA used 34 carriers to process all Part B claims, including DMEPOS. The change to four DMERCs for processing DMEPOS claims was a HCFA effort to improve ineffective and costly claims processing under the 34 carrier system.

### Claims Processing and Payment Problems

By the late 1980s, the number of complaints received by HCFA on processing and payment of DMEPOS claims had increased substantially. The complaints were coming from beneficiaries, suppliers, and carriers. Also, HCFA, the Department of Health and Human Services, Office of Inspector General, and the U.S. General Accounting Office issued numerous reports highlighting the following problems with DMEPOS claims.

**Carriers were not sufficiently educating suppliers and beneficiaries on Medicare requirements.** Under the 34 carrier system, suppliers often claimed to be unaware of, or not to understand, Medicare claims requirements. Hence, many claims were denied for technical and coverage errors, which ultimately added to Medicare administrative costs and increased claims processing time, and effort by beneficiaries and suppliers.

Additionally, Medicare beneficiaries were easy targets for unscrupulous DMEPOS suppliers. Educating Medicare beneficiaries would help them recognize and report improper services and claims.

**Carriers lacked basic data for fraud prevention.** Unusual billing patterns may be the first indication of fraud. Further, early discovery of billing trends allows for development of new or revised policies before a costly large scale problem arises. However, DMEPOS claims analysis for potential fraud was difficult under the 34 Part B carrier system. The carriers used their own electronic claims processing forms and systems. Establishing billing patterns and trends on a large scale for identifying potential fraud was seldom done.

**Carriers lacked expertise for processing DMEPOS claims.** The 34 carriers generally had not developed staff expertise to efficiently and effectively review and approve DMEPOS claims, which were often more complicated than other Medicare Part B claims. In addition, DMEPOS claims comprised only about 5 percent of each carrier's workload. Logically, Part B carriers gave low priority to them.

**Carriers used different claims forms.** HCFA determined that processing DME claims electronically was more cost effective than processing hard copy claims -- $2 per claim versus $4.[1] However, the 34 carriers used over 30 different electronic claims formats. The multiple formats created confusion among suppliers. Therefore, many suppliers submitted claims manually rather than electronically, not realizing the potential savings.

**Suppliers shopped for favorable carrier practices.** Prior to creation of DMERCs, the carrier responsible for claims processing was determined by where a sale took place, e.g., a point of sale jurisdiction policy. However, differences existed among the 34 carriers in their review and approval of DMEPOS. Reimbursement rates, quantities allowed, and medical policies and their enforcement varied among carriers. This allowed national suppliers to manipulate the point of sale policy for excessive financial gain -- referred to as "carrier shopping." Carrier shopping cost the Medicare program $22 million in 1989.[2]

## Policy Solutions for Claims Processing Problems

In response to the processing and payment problems of the 34 carrier system highlighted above, HCFA established the DMERCs as part of a larger re-engineering effort. HCFA required the DMERCs to

- ◄ Establish standardized medical policies for the 100 DMEPOS items that had the highest allowed charges,
- ◄ Implement comprehensive educational outreach programs,
- ◄ Develop aggressive fraud detection and prevention programs, and
- ◄ Improve claims processing expertise and efficiency.

To support DMERCs and improve their ability to accomplish their objectives, HCFA also

- ◄ Developed a standardized claims submission form, and
- ◄ Changed the point of sale jurisdiction policy to a beneficiary residence policy.

Finally, HCFA established a Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) to perform large scale analysis for all four DMERCs and a National Supplier Clearinghouse as a central issuer and repository of supplier numbers.

---

[1] 1989 HCFA Industrial Engineering study

[2] Carrier Shopping, A Management Advisory Report (OEI-05-91-00043)

**Prior Studies of DMERC Operations**

The DHHS Office of Inspector General and the U.S. General Accounting Office have reported on DMERC operations, including payment for DMEPOS items. Often, the reports depicted potential fraud, waste, and abuse. Typically, the reports were narrowly focused on claims processing and payment for discrete DMEPOS items.

# METHODOLOGY

Our report provides a "big picture" view on how the DMERCs have instituted changes HCFA deemed necessary to protect the Medicare Trust Fund and reduce administrative costs for claims processing. Specifically, we determined if the DMERCs had established medical policies, education programs, fraud detection and prevention programs, and improved claims processing expertise and efficiency as required by HCFA.

We focused our analysis on DMERC operations and data for fiscal years 1995 through 1998. We excluded fiscal year 1994 as it was a transition period.

We collected data on expectations for the DMERCs and their actual operations through interviews, database analysis, and document searches. To illustrate, we interviewed headquarters and regional HCFA staff to determine DMERC performance expectations. We also obtained HCFA's Contractor Accounting and Financial Management (CAFM) data for each DMERC. Further, we used HCFA's Contractor Reporting of Operational and Workload Data (CROWD) system to obtain DMERC workload statistics.

We made site visits to the four DMERCs. At each DMERC, we interviewed key officials and staff, including the DMERC directors, medical directors, medical review staff, claims processing staff, fraud unit staff, and outreach staff. In some instances, the DMERCs were unable to provide systemic data that we could use to measure their program effectiveness. This was particularly true for the fraud control units. In this instance, we used case examples and changes in workload data as an indication of performance.

In comparing what DMERCs were expected to do with what they actually did, we aggregated and summarized data collected. Our data showed wide variation in performance by the four DMERCs. However, for the purposes of this report, we based our findings on the aggregate performance of all the DMERCs unless otherwise noted.

We recognize that both the Statistical Analysis Durable Medical Equipment Regional Carrier and the National Supplier Clearinghouse could contribute to improvements in propriety of Medicare services and claims. However, we limited the scope of our study to DMERC activities, and generally excluded other components from our analysis.

_____    _____    _____    _____

We did our study between May 1997 and May 1999. We conducted our review in accordance with the *Quality Standards for Inspections* issued by the President's Council on Integrity and Efficiency.

# FINDINGS

Most indicators show that restructuring DMEPOS claims processing into specialized, regional carriers was on the whole a successful effort.  The DMERCs

▸ Established most of the medical policies covering the 100 mandated items,
▸ Educated suppliers, beneficiaries, and others,
▸ Identified and processed fraud cases,
▸ Reduced claims processing costs,
▸ Halted carrier shopping, and
▸ Produced positive results.

## DMERCs established most medical policies as required

The medical directors established medical review policies that defined circumstances under which particular DMEPOS items would be allowed.  The policies are used by all DMERCs, thus making claims processing more uniform and reliable.  Based on the policies, computer edits are incorporated into automated processing systems that accept or reject claims, with the expectation of saving Trust Fund dollars. HCFA targeted the top 100 codes, based on 1991 allowed charges, for DMERCS to finalize medical policies by October 1, 1993.

### The DMERCs finalized medical policies for 87 of the targeted 100 DMEPOS items by the October 1, 1993 deadline

The DMERC medical directors established medical policies for 87 of the 100 DMEPOS items.  The policies were finalized and implemented by the October 1, 1993 deadline.

Not only did the medical directors establish policies for the 87 items, they expanded the scope of those policies.  Foreseeing that unscrupulous suppliers may manipulate the system by code shifting for similar items, the medical directors established medical review policies for a wider spectrum of related DMEPOS items.  For example, the medical directors constructed an "ostomy supply" policy that covered relevant items from the list of 100 as well as other ostomy items not on the original list.  By creating this broader policy from the start, the directors eliminated or minimized costly code shifting that could have occurred had the policies been developed piecemeal.

### The DMERCs did not finalize policies for 13 of the 100 DMEPOS items by the October 1, 1993 deadline

HCFA and the DMERCs discontinued using two of the 13 codes, and delayed finalizing policy for ten codes.  Policy for the remaining code has not yet been developed.

**HCFA discontinued using codes for two of the remaining 13 DMEPOS items.**
Because the codes were no longer used, no medical policy was needed or developed.

**HCFA and DMERCs delayed final medical policies for 10 items.** The DMERCs had
drafted polices for 10 items prior to the October 1, 1993 deadline. However, HCFA staff
and the DMERC medical directors delayed finalizing the policies because of pressure from
industry groups, suppliers, and beneficiaries who saw the policies as too restrictive.
HCFA staff and DMERC medical directors, with input from the industry groups, finalized
8 of the 10 policies in 1995 and the remaining 2 in 1997.

The financial impact of the delay was minimal. Overall, our analysis of HCFA claims data
for the 10 DMEPOS items showed a slight net increase in allowed charges following
policy implementation. Allowed charges for three items decreased, but increased for the
remaining seven items. In effect, the increases for the seven items offset the decreases and
produced a small net increase. One medical director attributed some of the increase to
expanded benefits under the codes.

**DMERCs did not develop a policy for one item.** As of February 2000, the DMERCs
had not developed a policy for one item from the original list of 100 codes. This item, a
ventilator, accounted for $8.4 million in allowed charges in 1991. The allowed charges
increased to $44.4 million in 1999.

The DMERCs issued a Respiratory Assist Device policy in October, 1999. Included in
this policy were two ventilator codes. According to a DMERC medical director, the
specific code identified as a top 100 code in 1991 was not included as it was no longer the
top billed ventilator code. The two codes included in the Respiratory Assist Device policy
had allowed charges of $152.8 million in 1999.

# DMERCs are providing education as required

In establishing the DMERCs, HCFA required them to provide education and training,
primarily to suppliers, physicians, and beneficiaries. The objective was to reduce fraud
and abuse and improve claims processing efficiency.

HCFA's Contractor Performance Evaluations[3] indicate that DMERCs consistently provide
education. Our analysis tended to corroborate HCFA's evaluations. To illustrate,
DMERC educational efforts seem to have led to increased beneficiary complaints. This
indicates that beneficiaries are better educated on Medicare benefits and the propriety of
claims. In fact, while the overall number of fraud cases that the DMERCs opened actually
declined, the number that they opened as a result of beneficiary complaints increased from

---

[3]HCFA's primary oversight mechanism for DMERC performance is the Contractor Performance Evaluation (CPE).
HCFA staff evaluate the DMERCs on four criterion, each of which include ten to twelve individual activities. The criterion are
quality (accurate claims processing and program effectiveness), efficiency (timely claims processing, electronic claims
processing), service (accurate reviews and hearings, responsive to inquiries), and fraud and abuse (program integrity
effectiveness). The evaluation includes some quantified measures as well as some qualitative assessments by review staff.

7,474 in 1995 to 8,192 in 1998. Further, the number of beneficiary calls to the OIG hotline regarding DMEPOS increased from 86 in 1995 to 757 in 1998.

Education is carried out several ways. Much of the supplier education program is carried out through quarterly or biannual seminars. Topics generally include recent changes in policy and areas in which internal operations indicate billing problems exist. Additionally, DMERC representatives have increasingly attended trade shows, participated in industry meetings, and visited suppliers to enhance their knowledge of supplier operations and products. Further, each region produces a quarterly newsletter to suppliers. It notifies them of policy changes, provides answers to supplier questions, and provides information on various special interest topics.

Another important method is focused education on targeted suppliers to address individual billing issues. One DMERC director reported that such targeted efforts were very effective. He said that as targeted suppliers were educated, their billing problems declined.

In addition, the DMERCs provide information and education to members of Congress, their staff, and special interest groups.

# DMERC fraud units experienced excellent outcomes on individual fraud cases, but their overall effectiveness is unclear

To protect the Medicare Trust Fund and reduce Medicare costs, HCFA charged the DMERCs to make a concerted effort to reduce fraud in DMEPOS billing and payments.

DMERCs are successfully attacking fraud in many specific cases, however, a lack of complete information precluded us from determining effectiveness of fraud unit activities. While we obtained some workload data that quantifies their fraud efforts, the DMERCs did not provide various other data that was needed to document the quality of their efforts. For example, they all did not provide systemic data documenting proactive case development, or the volume and value of identified overpayments and collections. In the absence of complete information for all four DMERCs, we are unable to fully evaluate DMERC effectiveness as a whole. However, we do provide some insights on the three DMERCs that provided the necessary data.

### Individual DMERC fraud unit efforts have saved millions

The DMERCs have assisted Federal agents from various agencies in developing fraud cases involving DMEPOS. OIG agents involved in the following cases said that the DMERC fraud unit's assistance was timely and responsive.

In one example, a DMERC assisted in an extensive undercover operation by educating Federal agents on claims processing and identifying problem areas in the industry. Fraud

unit staff identified suppliers to target. They also posed as office workers, and helped with investigations of questionable suppliers. The FBI, IRS, USPS, and the OIG were involved in this investigation. It resulted in five arrests for upcoding, kickbacks, mail fraud, and tax violations involving over $500,000.

Another DMERC used data analysis to identify suppliers that were fraudulently billing for orthotics. The DMERC fraud staff analyzed data on supplier billing, including products sold, referring physicians, geographic areas, beneficiaries, and sales staff. This analysis linked suppliers together and identified a ring that was perpetrating fraud. One hundred ninety-four suppliers are identified with the ring. Thirty seven have been referred to other law enforcement organizations. The estimated impact of the orthotics crime ring on the Medicare Trust Fund exceeds $87 million.

## DMERC fraud units are not proactively identifying fraud

In establishing the four DMERCs, HCFA instructed them to use all available data to identify trends and patterns that might suggest fraudulent activity. However, DMERCs rarely used proactive analysis to identify fraud cases.

The significance of proactive data analysis is best reflected by HCFA's previous conclusion that the 34 carriers were vulnerable to fraudulent and abusive billing practices. With so many carriers, it was difficult for them to identify aberrant billing patterns by suppliers that billed multiple carriers. According to HCFA, the consolidation of DMEPOS claims processing to four DMERCs would facilitate early detection of abusive and fraudulent billing practices through data analysis.

Only one DMERC fraud unit used data analysis, to any significant extent, to identify potential fraudulent activities. Based on fiscal year 1997 and 1998 data, this DMERC identified 39 percent of its fraud cases through proactive data analysis.

By comparison, in the other two DMERCs that provided such data, only about 1 percent of fraud cases were opened as a result of proactive data analysis. Although the DMERCs are not required to meet any numerical proactive analysis standard, we believe that 1 percent is low. Considering the significance of such analysis as a foundation in establishing the DMERCs, we would expect to see a larger proportion of fraud cases resulting from data analysis.

## Overpayment collection efforts are not quantified

All investigations do not result in fraud identification and referral to the OIG. Another outcome, as defined by HCFA, includes identification and recovery of Medicare overpayments. Although the DMERCs provided us the number of fraud cases that resulted in the identification of overpayments, they did not all provide data on the total overpayment dollars or the extent that overpayments were collected, written off, or were pending. Such information is essential for establishing the magnitude of the overpayments and measuring the effectiveness of DMERC fraud units.

**Workload measures indicate fraud activity**

We recognize that the workload data documents the quantity of DMERC fraud detection and prevention activities, but these data are inadequate for determining the quality of such activities.  Workload data include cases opened, closed, and referrals as shown below.

- ▸ The number of cases DMERC fraud units opened declined 14 percent from 1995 through 1998, from 15,112 to 12,975.  A case is opened for investigation of potential wrongdoing, and to determine if Medicare overpayments exist.

- ▸ The DMERCs closed between 10,158 and 13,505 fraud cases per year.  We saw no consistent increasing or decreasing trend.

- ▸ The DMERCs referred 1,398 cases to the OIG in 1995.  By 1998, this number had increased to 1,742 cases — an increase of 25 percent.  We observed that the number of referrals more than doubled from 1995 through 1997, reaching a high of 3,336 referred cases in 1997 and then dropped back to 1,742 referrals in 1998.

In addition, the DMERCs inherited a large backlog of pending fraud cases from the 34 Part B carriers.  Working the inherited cases dominated much of the fraud units efforts in the initial years.  Overall, the DMERCs have reduced the number of pending cases by 9 percent.

# DMERCs succeeded in decreasing claims processing costs

By establishing the DMERCs, HCFA expected to reduce administrative costs. The DMERCs would develop needed expertise for more cost effective processing of claims. To aid in cutting claims processing costs, HCFA also standardized the claim form for all Part B services, including DMEPOS.

**DMERCs reduced claims processing cost by 15 percent from 1995 through 1998**

Nationally, the DMERC cost of processing claims decreased from $1.17 per claim in 1995 to $1.00 in 1998 -- a 15 percent reduction in unit cost per claim over the 4 year period. During the same time period, the volume of claims processed increased nearly 20 percent.

The claims processing costs and workload were not uniform among the DMERCs.  Each of the four DMERCs achieved a decline in the cost of claims processing since 1995. However, the cost of claims processing and workload varied widely among the four DMERCs.  To illustrate, in 1995 the cost ranged from $1.00 per claim in one DMERC to $1.38 in another DMERC.  In 1998 the cost ranged from $0.89 per claim in one DMERC to $1.12 in another.  Table 1 shows cost per claim processed and workload statistics for each DMERC for fiscal year 1995 through fiscal year 1998.

| | FY 1995 | | FY 1996 | | FY 1997 | | FY 1998 | |
|---|---|---|---|---|---|---|---|---|
| Region | Claims | Unit Cost | Claims | Unit Cost | Claims | Unit Cost | Claims | Unit Cost |
| **A** | 7,363,555 | $1.14 | 7,546,380 | $1.05 | 7,909,635 | $0.93 | 7,728,909 | $0.98 |
| **B** | 8,291,664 | $1.38 | 8,775,683 | $1.28 | 9,464,583 | $1.23 | 9,809,398 | $1.11 |
| **C** | 14,255,413 | $1.00 | 15,513,246 | $1.06 | 16,615,815 | $0.94 | 17,904,946 | $0.89 |
| **D** | 6,865,857 | $1.31 | 7,346,080 | $1.31 | 7,927,125 | $1.12 | 8,242,774 | $1.12 |
| | | | | | | | | |
| **Total** | 36,776,489 | **$1.17** | 39,481,389 | **$1.14** | 41,917,158 | **$1.04** | 43,686,027 | **$1.00** |

**TABLE 1**
**CLAIMS PROCESSING WORKLOAD AND COSTS**[4]

## Decreased claims processing costs resulted in annual estimated savings of $37 million

HCFA reported that prior to establishing the DMERCs, DME claims processing costs were $2 for electronic claims and $4 for hard copy claims.  In 1998, HCFA reported that DMERC claims processing unit cost for DMEPOS averaged $1.00 per claim. This includes cost for both electronic and manual processing.

To provide a conservative estimate on potential savings in claims processing, we compared the DMERC claims processing cost for DMEPOS to the cost of  processing DME claims electronically prior to establishing the DMERCs.  To illustrate, we compared the 1998 DMERC claims processing cost of $1 (see Table 1) to the $2 cost of processing DME claims electronically prior to establishing the DMERCs.  Our comparison showed a conservative savings estimate of almost $44 million for the nearly 44 million claims (see Table 1) processed in 1998.

Similarly, we calculated estimated annual savings for 1995, 1996, and 1997.  Table 2 shows that estimated savings steadily increased from about $30 million in 1995 to about $44 million in 1998.  The average annual savings was about $37 million.

| | TABLE 2 | | | |
|---|---|---|---|---|
| | **ESTIMATED CLAIMS PROCESSING SAVINGS** | | | |
| Region | FY 1995 Estimated Savings | FY 1996 Estimated Savings | FY 1997 Estimated Savings | FY 1998 Estimated Savings |
| **A** | $6,332,657 | $7,169,061 | $8,463,309 | $7,883,487 |
| **B** | $5,140,832 | $6,318,491 | $7,287,728 | $8,730,364 |
| **C** | $14,255,413 | $14,582,451 | $17,612,763 | $19,874,490 |
| **D** | $4,737,441 | $5,068,795 | $6,975,870 | $7,253,641 |
| | | | | |
| **Total** | $30,466,343 | $33,138,798 | $40,339,670 | $43,741,982 |

---

[4]Data extracted from HCFA's Contractor Accounting and Financial Management system.

---

**Standardization of claim forms was an important factor in decreasing claims processing costs**

Logically, many factors could have contributed to claims processing cost reductions. For example, staff expertise, economies of scale, supplier and beneficiary populations and management practices may all contribute to declining costs. Such factors are typically so intertwined and co-dependant that segregating and quantifying their individual impacts was not feasible or desirable given the objectives and scope of this study. However, HCFA and DMERC officials highlighted standardization of claims forms as a major contributor to the cost reductions.

HCFA officials said that a lack of standard claims forms was a major influence on the high cost of processing claims prior to establishing the four DMERCs. To illustrate, before the DMERCs, the 34 Part B carriers used their own claims processing forms. According to HCFA officials, the multiple electronic forms used by the carriers discouraged many suppliers from submitting claims electronically.

Therefore, concurrent with establishing the DMERCs, the HCFA established a requirement that all Part B carriers use a standard claims processing form. According to HCFA and DMERC staff, the standardized form streamlined claims processing, and therefore reduced processing costs.

According to HCFA data on the 34 carriers, the cost of processing electronically submitted DME claims was half that of processing hard copy claims -- $2 versus $4. The cost of processing DMEPOS claims is even less under the DMERC system. As shown in Table 1, consolidating both electronic claims processing and hard copy claims processing, the cost per claim was about $1 in 1998 - a substantial reduction over the 34 carrier system.

# HCFA's claims jurisdiction policy stopped carrier shopping

In establishing the DMERC system, HCFA dropped its point of sale billing policy and adopted a beneficiary residence claims jurisdiction policy to resolve carrier shopping problems. Under the point of sale policy, a carrier that processed any given DMEPOS claim was identified as the carrier with jurisdiction where the sale took place.

Under this policy, suppliers could control which carrier would pay their claims. They could shop for the carrier with the most favorable reimbursement, review, and payment policy, then establish a billing office in the jurisdiction of the carrier that offered the most favorable reimbursement.

By changing to a beneficiary residence jurisdiction policy, HCFA prevented suppliers from determining who would pay the claim. This proactive effort closed the loophole that had allowed abusive billing activities. Suppliers could no longer shop for the most profitable reimbursement because carriers were predetermined, based on where the beneficiary who received DMEPOS lived.

Our analysis showed that 1998 claims were processed by the appropriate DMERC. We reviewed a sample of claims to determine if more than one DMERC had paid different claims for the same beneficiary. The extent that claims for the same beneficiary are paid by different DMERCs would suggest the size of the carrier shopping problem, however, the absence of this does not definitively rule out carrier shopping. If carrier shopping continued to exist, we would expect to see a higher percentage of claims paid by two or more DMERCs. We determined that only 0.39 percent of beneficiaries had claims processed by two different DMERCs. This may be explained by the "snowbird" populations that maintained residences in different regions and the beneficiaries who moved during the year.

# DMERC activities produced positive results

Concurrent with implementing the activities described above, the DMERCs worked cooperatively with the HCFA, the Statistical Analysis Durable Medical Equipment Regional Carrier, the Office of Inspector General, and others to improve Medicare claims processing and prevent fraud, waste, and abuse. Such cooperative efforts led to development and revision of various policies, and changes in claims processing practices. The net effect of such DMERC activities produced important Medicare Part B claims processing improvements--leading to considerable savings to the Medicare Trust Fund.

To illustrate, DMERC data analysis, in conjunction with SADMERC analysis, has led to several medical policy revisions. These revisions resulted in substantial savings to the Medicare Trust Fund. For example, we reported that implementation of the October 1995 DMERC wound care supply policy resulted in savings of $58 million in 1996.[5]

In another example, we reported Medicare savings of $76.2 million in the allowance for lymphedema pumps in 1996.[6] These savings were a result of a concerted OIG, HCFA, and DMERC effort to curb abusive billings for lymphedema pumps. The DMERC medical directors revised the lymphedema policy in December 1995, and monitored its implementation by examining claims to ensure appropriate payments.

DMERCs have also partnered with HCFA, OIG, and other law enforcement agencies to produce payment and coverage policies, fraud alerts, reports, and prosecutions. Such efforts contributed to declines in Medicare allowances. In 1997 we reported that about $49 million was recovered through seizures and restitutions from abusive incontinence suppliers.[7] Additionally, DMERC medical policy revisions made billing for questionable supplies more difficult. We estimated that declines in questionable billings saved the Medicare program $85 million in 1995.

---

[5] Medicare Part B Allowances for Wound Care Supplies  (OEI-03-94-00793)

[6] Medicare Allowances for Lymphedema Pumps  (OEI-04-97-00130)

[7] Medicare Allowances for Incontinence Supplies (OEI-03-94-00773)

Finally, 1991 Medicare payments for non-legitimate orthotics devices exceeded $7 million.[8]  Subsequent to this identified problem, the DMERCs were established and implemented an orthotics policy.  We conducted a follow-up review and concluded that the DMERCs' implementation of the policy had precluded continued payments for non-legitimate orthotics.[9]

We presented the above examples not as an exhaustive list of the DMERC's accomplishments, but rather to illustrate the substantial role DMERCs have played in saving the Medicare program millions of dollars.

---

[8]Medicare Payments for Orthotic Body Jackets (OEI-04-92-01080)

[9]Medicare Payments for Orthotic Body Jackets (OEI-04-97-00390)

# RECOMMENDATION

Although HCFA's establishment of the DMERCs has generally been a success and resulted in program efficiencies and financial savings, we identified an opportunity for improvement.  Specifically, HCFA should require the DMERCs to maintain additional data in their automated fraud information systems.  This additional data should include complete and accurate data documenting

▸ The sources of opened cases (i.e., proactive data analysis, medical review referrals), and

▸ Detailed financial information on fraud cases in overpayment status (i.e., how much was collected, is pending, and was determined uncollectible).

Such data would facilitate an analysis of not only the quantity of the fraud units' efforts, but also the quality.

# AGENCY  COMMENTS

The HCFA concurred with our recommendation that the DMERCs maintain additional data in their automated fraud information systems.  HCFA is currently developing a Program Integrity Management Reporting system which will require Medicare contractors to report data on fraud and abuse overpayments status.  The new system is scheduled for implementation during Fiscal Year 2000.  The full text of their comments is in appendix A.

**APPENDIX A**



DEPARTMENT OF HEALTH & HUMAN SERVICES ~~FILE COPY~~   Health Care Financing Administration

Rec'd 1/3/00
@ 11:19 AM *spw*

The Administrator
Washington, D.C.   20201

**DATE:**   DEC 2 8 1999

**TO:**   June Gibbs Brown
Inspector General

**FROM:**   Nancy-Ann Min DeParle   *Nancy-A. DeParle*
Administrator

IG
EAIG
PDIG
DIG-AS     ✓
DIG-EI
DIG-OI
DIG-MP
OCIG
ExecSec    ✓
Date Sent  1/3/00

**SUBJECT:**   Office of the Inspector General (OIG) Draft Report: "Durable Medical Equipment Regional Carriers:  Meeting HCFA's Objectives," (OEI-04-97-00330)

We appreciate the opportunity to comment on the above-referenced report.  The study was conducted to determine if durable medical equipment regional carriers (DMERCs) met the Health Care Financing Administration's (HCFA's) implementation objectives.  Such objectives included establishing medical policies for the 100 items that had the highest allowed charges, developing education and fraud prevention programs, reducing claims processing costs, and changing DMERCs claims jurisdiction.

OIG found DMERCs reduced claims processing costs by 15 percent, established medical policies for 87 of the top 100 utilized codes by the October 1993 deadline, and developed education and fraud components.  Overall, HCFA's implementation objectives produced positive results that reduced fraud, and reduced both administrative costs and costs to the Medicare Trust Fund.

HCFA concurs with the report recommendation.

<u>OIG Recommendation</u>
HCFA should require the DMERCs to maintain needed data in their automated fraud information systems.  This data should include complete and accurate documentation on the sources of opened cases and detailed financial information on fraud cases in overpayment status.

<u>HCFA Response</u>
We concur.  The DMERCs currently report data on open cases to HCFA via the Physician and Supplier Overpayment Recovery Report.  In addition, HCFA is currently developing a Program Integrity Management Reporting System (PIMR) which will require Medicare contractors to report data on fraud and abuse overpayments status.  The PIMR is scheduled for implementation during Fiscal Year 2000.