# Exhibit 168

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS

Exhibit to the July 24, 2009, Declaration of James J. Fauci
In Support of Plaintiff's Motion for Partial Summary Judgment and
In Opposition to the Roxane Defendants' Motion For Partial Summary Judgment



*experience does matter*

**CASE:  In Re: Pharmaceutical Industry AWP**
**DATE:  March 13, 2008**

Enclosed is the Original of the transcript of the testimony of **Carolyn Helton** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.

Sincerely,

Henderson Legal Services

Encl.

Page 1

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

    -----------------------x

    IN RE:  PHARMACEUTICAL   )MDL NO. 1456

    INDUSTRY AVERAGE         )

    WHOLESALE PRICE          )CIVIL ACTION:

    LITIGATION               )01-CV-12257-PBS

                             )

    THIS DOCUMENT RELATES TO)

    U.S. ex rel. Ven-A-Care )

    of the Florida Keys,    )

    Inc. v. Abbott          )

    Laboratories, Inc., et  )

    al. No. 06-CV-11337-PBS )

    -----------------------x

                    March 13, 2008



       VIDEOTAPED 30(b)(6) DEPOSITION OF

            CIGNA (CAROLYN HELTON)

       Taken on Behalf of the Defendants
```

Page 2

1    APPEARANCES:

2            FOR THE PLAINTIFF:

3                 U.S. DEPARTMENT OF JUSTICE

4                 U.S. ATTORNEY'S OFFICE

5                 BY GEORGE B. HENDERSON, ESQ.

6                 United States Courthouse

7                 1 Courthouse Way

8                 Suite 9200

9                 Boston, Massachusetts  02210

10                (617) 748-3272

11                george.henderson2@usdoj.gov

12           FOR THE DEFENDANT ABBOTT LABORATORIES,

13           INC.:

14

15                REED WEITKAMP SCHELL & VICE, PLLC

16                BY DAVID J. HALE, ESQ.

17                500 West Jefferson Street

18                Suite 2400

19                Louisville, Kentucky  40202-2812

20                (502) 589-1000

21                dhale@rwsvlaw.com

22                - and -

1   region went to another contractor.  So that
2   contract was transitioned to that other
3   contractor.
4            In May 2007, we received a DME
5   contract, were transitioned back in for the DME
6   MAC Jurisdiction C, so I was transferred back to
7   the DME.
8   Q    So you currently then work on the DME for
9   Jurisdiction C?
10  A    Correct.
11  Q    And also for Jurisdiction D?
12  A    Not currently for Jurisdiction D.  The
13  Jurisdiction D contract I worked on from 1993 to
14  2006, September 2006.
15  Q    Does Jursidiction C include any of the
16  states that were part of Region D?
17  A    No.
18  Q    Okay.  Does Cigna currently handle the DME
19  contract for Jurisdiction D?
20  A    No.
21  Q    Okay.  I just want to go back to your
22  responsibilities as a pricing analyst from the

Page 22

1   end of 1994 to 1999.
2              During that time, did you ever have
3   to calculate prices for any of the J-Codes for
4   inhalation drugs?
5   A    Yes.
6   Q    And how would you go about doing that?
7              MR. HENDERSON:  Objection.
8              THE WITNESS:  The -- we would first
9   determine the description of the HCPCS code,
10  which J-Code it was, determine what coverage
11  benefit it would fall under for the DME.  If the
12  drug was payable, then we would follow our
13  instructions from CMS, we would array the
14  products using compendia, for us we used Red
15  Book, we would array the products that met the
16  description of the HCPCS code.  Depending upon
17  the time frame, originally you would use only
18  the generic products and you would take the
19  median of the generics, and that would be
20  your -- you picked up the average wholesale
21  price or AWP from Red Book.  That AWP, once
22  you'd have all of the AWPs for all the ones that

1    met the description, array them, determine which
2    one was the median, and that would be the
3    allowable that you would use.
4                 For subsequent dates as we received
5    different instructions, 1998, it went to 95
6    percent of the AWP.  We were also to include --
7    we arrayed the brand names, if there was a lower
8    brand name, then we would include that brand
9    name in the array of the generics, re-array it
10   to find the median.
11                Subsequent to that, it was changed
12   and we had to array the generics, find the
13   median, array the brand names, find the lowest,
14   whichever of those was lower, the lowest brand
15   or the median of your generics, became your AWP,
16   and then you would reduce that -- you would pay
17   95 percent of the AWP.
18   Q    Okay.  And do you recall the general time
19   frames when you used each of those three
20   methods?
21                So let's go to the first method
22   where you would take the median of all of the

Page 147

1   drug first, find all of the products that meet,
2   we would fill out or take the AWP from the Red
3   Book, pull that back to our array.
4        Q    Okay.  I'm sorry.  Let me stop you there
5   real quick.
6        A    Okay.
7        Q    You indicated that you would use the paper
8   Red Book at times.  And would you also use an
9   electronic version of the Red Book at times?
10       A    We went to the electronic version, I
11  believe, in 1999.
12       Q    Do you know when in 1999 you started using
13  the electronic version?
14       A    I do not.  I was trying to look in here
15  because I thought it actually --
16       Q    If you don't recall, that's fine.
17       A    I don't recall.
18       Q    Okay.  And when you switched to the
19  electronic version of Red Book, did you maintain
20  the old paper copies of the Red Book that you
21  would use?
22       A    Yes.

Page 150

1    A     Yes.
2    Q     And so you would personally price each
3    individual code; is that correct?
4    A     Yes.
5    Q     And how often would you do this?
6    A     Quarterly in '99.
7    Q     Okay.  So every three months or so you
8    would go through each code and then go through
9    the Red Book to find the prices for that code?
10   A     Correct.
11   Q     Okay.  Now, what factors would you
12   consider when you would decide to include a
13   price under a specific code?
14   A     We would check to see if the drug matched
15   the description of the HCPCS code.  If the drug
16   being picked up was inhalation, we were looking
17   for inhalation forms of the drug.  You would not
18   use things like Carpujets that would indicate
19   that it's more of an injectable form, not
20   inhalation.
21              You looked at the percentage of --
22   and the dosage of the drug.  If it was a 3

Page 151

1    milliliter, then you're going to pick up the 3
2    milliliter only unless you have no 3
3    milliliters.
4              Then you would also look at the brand
5    names.  So you'd have to cross-reference to look
6    at the brand names and pull those in as well.
7    Q     In reviewing the prices in the Red Book,
8    would you ever have to use your discretion on
9    whether to decide whether to add a price or not
10   to that particular code?
11   A     To include a drug in the array?
12   Q     Yes.
13   A     Yes.
14   Q     Okay.  And you would use that discretion
15   based upon the factors you just discussed; is
16   that right?
17   A     Yes.
18   Q     Now, I'd like to turn your attention to
19   No. 2 which is a little past halfway down the
20   front page of this document, and that would be
21   Roxane Exhibit 51.
22              It indicates you maintain a