# Exhibit 3

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*,
Civil Action No. 01-12257-PBS

Exhibit to the United States' Common Memorandum of Law in Support of Cross-Motions for Partial Summary Judgment and in Opposition to the Defendants' Motions for Summary Judgment

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d).





UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. CHARLENE FERGUSON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL DYNAMICS CORPORATION <br><br> Defendant. | CASE NO. CV 90-4703 MRP <br><br> STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW |

Plaintiff United States of America's ("USA") Motion for Partial Summary Judgment, the USA's Motion for Summary Judgment on Certain of Defendant's Affirmative Defenses and the Relators' Motion for Summary Adjudication of Certain Issues came on for hearing on April 11, 1994. After considering the papers filed by the parties and the arguments of counsel, the Court determines that the following uncontroverted facts and conclusions of law have been established.

### UNCONTROVERTED FACTS

1. General Dynamics was the prime contractor on the Air Force's F-16 jet aircraft program during the period covered by the complaint and manufactured the aircraft during that time.

2. During the time period at issue in this litigation, from the start of 1982 until early 1986, the contracts governing the F-16 program were numbered F33657-75-C-0310 and F33657-82-C-2034.

3. During the period at issue in this litigation, General Dynamics continued to develop modifications for and incorporate new subsystems into the F-16 which required testing. Accordingly, General Dynamics contracted with the government on a yearly basis to test a fleet of designated F-16 aircraft to determine how these engineering changes affected the aircraft's electronic, mechanical and hydraulic, systems, as well as the F-16's overall performance. Under the flight test contracts, General Dynamics personnel performed the engineering changes, conducted the test flights, recorded the test results, and conducted other necessary maintenance on the test aircraft. General Dynamics maintained a flight test facility at Edwards Air Force Base in California.

4. The flight test contracts were negotiated under the "changes" clause of the primary contracts, and the contract price for each flight test contract was negotiated separately. General Dynamics was the sole source for the flight test contract and had no competition for the work.

5. The flight test contracts took the form of separately negotiated modifications to the primary contract which were issued in response to Contract Change Proposals submitted by General Dynamics. Until 1986, the F-16 flight testing at Edwards was performed by General Dynamics under Fixed Price Incentive contract modifications. Since 1986, the flight testing has been conducted under Cost Plus Fixed Fee contract modifications.

6. General Dynamics employees assigned to the F-16 flight test program at Edwards Air Force Base worked in shifts. The hours of the second shift were from 3:30 PM until midnight.

7. Every week during the period at issue in this case, second shift employees at General Dynamics Edwards facility manually filled out time cards which recorded the hours during which the workers were purportedly present at the Edwards facility and available for work. On some occasions, the employees' supervisors filled out the time cards and presented completed cards to the employees for signature. The manually prepared time cards were entered into General Dynamics' computer system. The data from the cards was then used both to determine the appropriate pay for the employees and to bill the government for General Dynamics' labor costs.

8. Second shift flight test employees were divided into crews who were assigned to specific aircraft and other employees who provided logistical support for the crews. All of the second shift crews left early on a regular basis although some crews left earlier or more often than others. The support personnel left a few minutes after the departure of the last crew personnel.

9. General Dynamics supervisors and crew chiefs affirmatively instructed the second shift hourly workers to go home early but to complete time records which showed that they had worked a full eight hours.

10. From 1982 until early in 1986, General Dynamics' second shift crew members (or their supervisors on their behalf) regularly completed time cards that showed that the employees had worked a full eight hours every day, when in fact they had gone home early on one or more days represented by the record. General dynamics would then send

3

1 the records to its accounting department, where the cards were entered
2 into a computer system. General Dynamics' computerized labor records,
3 which were based on the time cards, were in turn used to make claims
4 for payment to the government in the form of vouchers, invoices, and
5 progress payments.

6   11. The USA filed its Third Amended Complaint for Violations of
7 the False Claims Act on December 9, 1994.

8   12. On January 10, 1994, General Dynamics filed an answer to the
9 Third Amended Complaint which alleged several affirmative defenses,
10 including, "Government Knowledge," "Unclean Hands," "Estoppel," and
11 "Failure to Mitigate Damages."

12   13. General Dynamics' unclean hands, estoppel, and failure to
13 mitigate defenses are based on allegations that (1) variations in the
14 sortie rates at Edwards caused General Dynamics to experience excess
15 labor capacity upon occasion; (2) flight test employees therefore
16 sometimes experienced idle time; (3) the government knew that the
17 flight test personnel were sometimes idle; (4) the government
18 destroyed certain documents that might have shown that the government
19 knew that General Dynamics' flight test workers were leaving early;
20 and (5) the government delayed bringing this action.

21                        CONCLUSIONS OF LAW

22   1. An invoice, voucher, or request for progress payment
23 submitted by General Dynamics to the government based on time cards
24 that state that employees worked for eight hours when in fact they
25 were not actually working or present at the work site and available
26 for work for eight hours is a false claim within the meaning of 31
27 U.S.C. § 3729(a)(1).
28

4

2. An invoice, voucher, or request for progress payment submitted by General Dynamics to the government based on time cards that state that employees worked for eight hours when in fact they were not actually working or present at the worksite and available for work for eight hours, is a claim based on a false record within the meaning of 31 U.S.C. 3729(a)(2).

3. The time cards themselves are not false claims in violation of 31 U.S.C. § 3729(a)(1) or claims based on false statements in violation of 31 U.S.C. § 3729(a)(2). United States v. Bornstein, 423 U.S. 303 (1976); United States ex rel. Marcus v. Hess, 317 U.S. 537, 552 (1943) (rejecting argument that a statutory forfeiture should be applied to every form submitted by a contractor in the course of a contract obtained by collusion).

4. Falsity is a simple inquiry into whether the claim made to the government is objectively not true. Accordingly, any claim by General Dynamics that includes a request for reimbursement for labor hours during which the relevant employees were neither actually working nor present and available for work is indisputably false. Whether or not the costs could reasonably be allocable to the contract, although relevant to both scienter and causation, is not relevant to falsity. See United States v. Barker, 942 F.2d 585 (9th Cir. 1991), superseded on other grounds, 967 F.2d 1275 (9th Cir. 1991) ("When a claim is made to the government, the government must be able to verify the claim by scrutinizing the information that the claimant has supplied. Willfully false statements obviously frustrate that function."). Likewise, whether or not General Dynamics actually incurred the cost, although perhaps relevant to scienter or causation, is not relevant to whether the claim is false. Peterson v.

5

1  Weinberger, 508 F.2d 45 (5th Cir. 1975), cert. denied, 423 U.S. 830
2  (1975) (holding that requests for medicare payments by doctor who
3  certified that he performed work himself when the work was actually
4  performed by others were false claims even though the work was
5  actually performed by a qualified provider).
6      5.   Government knowledge is not relevant to whether a claim is
7  false. United States ex rel. Haygood v. Sonoma County Water Agency,
8  929 F.2d 1416 (9th Cir. 1991).
9      6.   Government knowledge, although relevant to the issues of
10 scienter and causation, is not itself an affirmative defense to a
11 false claims act violation. United States ex rel. Haygood v. Sonoma
12 County Water Agency, 929 F.2d 1416 (9th Cir. 1991). Moreover, to the
13 extent that General Dynamics government knowledge defense is based on
14 a contention that the 1986 amendments to the False Claims Act are
15 prospective only, the defense is meritless. Haygood, 929 F.2d at
16 1420. General Dynamic's Third Affirmative Defense of "government
17 knowledge" has no legal basis.
18     7.   General Dynamics affirmative defenses denominated unclean
19 hands and estoppel, as alleged, resemble the traditional conception of
20 laches more closely than either unclean hands or estoppel. To the
21 extent that General Dynamics' unclean hands and estoppel defenses are
22 actually an attempt to assert the defense of laches they are not
23 valid. Laches may not be raised as a defense against the government
24 when the government is enforcing its rights. United States v.
25 Summerlin, 310 U.S. 414, 416 (1940); United States v. Menatos, 925
26 F.2d 333, 335 (9th Cir. 1991).
27     8.   Estoppel arising from government knowledge is not a valid
28 affirmative defense to a False Claims Act action. Haygood, 929 F.2d

at 1416; also see, Office of Personnel Management v. Richmond, 496 U.S. 414 (1990). Estoppel against the government might be appropriate is some sort of affirmative misconduct on the part of the government is shown. TRW, Inc. v. F.T.C., 647 F.2d 942, 950-51 (9th Cir. 1981). General Dynamic's contentions regarding discovery abuse, however, do not allege the type of misconduct that would give rise to an affirmative defense to a cause of action. If, indeed, the government did commit some form of discovery abuse, the Court has discretion to impose sanctions to punish the misconduct. However, the government's conduct of this litigation should not have any bearing on the applicability of substantive rules of law to the analysis of the False Claims Act. Likewise, General Dynamics' unclean hands defense, which is identical to its estoppel defense is not a valid defense to the government's allegations under the False Claims Act. Under the facts of this case, General Dynamics' Fifth Affirmative Defense of "unclean hands" and Sixth Affirmative Defense of "estoppel" may not be asserted against the government as a matter of law.

9. To the extent that General Dynamics mitigation of damages defense is based on the government's knowledge of General Dynamics' claims, it is not a valid defense. United States ex rel. Haygood v. Sonoma County Water Agency, 929 F.2d 1416 (9th Cir. 1991). Moreover, to the extent that General Dynamics actually claims that the government failed to mitigate its damages, the defense is precluded because to allow mitigation as a defense to an action brought under the qui tam provisions of the False Claims Act would be inconsistent with the function of the qui tam provisions of the False Claims Act. As a matter of law, General Dynamics may not assert its Seventh Affirmative Defense of "failure to mitigate damages" against the

7

government's claims brought under the False Claims Act.

DATED: April 28, 1994

Mariana R. Pfaelzer
United States District Judge