# Exhibit 100

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )   MDL No. 1456
LITIGATION                     )   Civil Action No. 01-12257
_____)
THIS DOCUMENT RELATES TO:      )   Judge Patti B. Saris
_____)
                               )
United States of America,      )
ex rel. Ven-A-Care of the      )
Florida Keys, Inc. v. Abbott   )
Laboratories, Inc.             )
CIVIL ACTION NO. 06-11337-PBS  )
                               )

VIDEO DEPOSITION OF DONALD C. ROBERTSON

DATE TAKEN:   Thursday, September 13, 2007

TIME:         8:54 a.m. to 4:28 p.m.

BEHALF OF:    The United States

PLACE TAKEN:  United States Attorney's Office
              2110 First Street,
              Fort Myers, Florida

REPORTER:     Lisa L. Rios, Court Reporter,
              and Notary Public, State of
              Florida at Large

MARTINA REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street
Fort Myers, Florida  33901
(239) 334-6545
FAX (239) 332-2913

---

Page 2

1
2                    A P P E A R A N C E S
3
4   ANN ST. PETER-GRIFFITH, Attorney at Law,
    Special Attorney for the Attorney General
5   99 N.E. 4th Street, 3rd Floor,
    Miami, Florida  33132
6   representing the United States Attorney,
    Southern District of Florida
7
8   DONALD E. HAVILAND, JR., Attorney at Law,
    The Haviland Law Firm, LLC,
9   740 S. Third Street, Third Floor
    Philadelphia, Pennsylvania  19147
10  representing the Commonwealth of Pennsylvania
11
    TONI-ANN CITERA, Attorney at Law,
12  Jones Day,
    222 East 41st Street
13  New York, New York  10017-6702
    representing Abbott Laboratories, Inc.
14
15  DAVID J. STETLER, Attorney at Law,
    Stetler & Duffy, Ltd.,
16  11 South LaSalle Street, Suite 1200
    Chicago, Illinois  60603;
17  representing the Witness, Donald C. Robertson
18
    C. JARRETT ANDERSON, Attorney at Law,
19  Anderson, LLC
    1300 Guadalupe, Suite 103
20  Austin, Texas  78701
    representing the Relator, Ven-A-Care of the Florida
21                                    Keys, Inc.
22
23  ELISEO SISNEROS, Deputy Attorney General,
    State of California Department of Justice
24  110 West A Street, #1100
    San Diego, California  92101
25

---

Page 3

1
2         A P P E A R A N C E S  (Continued)
3
4   Appearing via Telephone:
5
6       Gejaa T. Gobena, Attorney at Law,
7       Department of Justice,
        P.O. Box 261
8       Ben Franklin Station
        Washington, D.C.  20044;
9       representing the United States
10      AMBER NESBITT, Attorney at Law,
        Wexler, Toriseva, Wallace,
11      55 West Monroe Street, Suite 3300
        Chicago, Illinois  60603;
12      representing MDL and the State of Arizona
13
14  Also Present:
15
16  Mike Sturdevant, Videographer
17  John Lockwood, Ven-A-Care of the Florida
    Keys, Inc., Relator
18
19
20  _____
21                 I N D E X
22                                    PAGE
23
24  Direct Examination by Ms. St. Peter-Griffith    6
25

---

Page 4

1
2              I N D E X  (Continued)
3                 E X H I B I T S
4   ROBERTSON    DESCRIPTION                    PAGE
5   1    One-page Interoffice Correspondence
         dated March 21, 1991 from Mark Gorman
6        stamped ABT22027                        165
7   2    23-page document with first page being an
         Interoffice Correspondence dated June 1,
8        1991 from Donald C. Robertson stamped
         ABT212056                               169
9
10  3    Five-page document with first page being an
         Interoffice Correspondence dated June 11,
11       1991 from Virginia Tobiason stamped
         ABT212051                               177
12  4    32-page document with first page being an
         Interoffice Correspondence dated June 13,
13       1996 from Lynn E. Leone stamped BR 02430  245
14  5    One-page Interoffice Correspondence dated
         December 22, 1994 from Chris Snead stamped
15       TXABT249849                             248
16  6    One-page Interoffice Correspondence dated
         February 9, 1995 from Tim Harris previously
17       marked as Sebree Exhibit No. 2 stamped
         CA ABT 07895                            251
18
19  7    Four-page document previously marked
         Sellers #362 stamped CA ABT 08044       255
20  8    One-page memo from dated May 26, 1994 from
         Steve Kipperman previously marked Lotz
21       Exhibit No. 61 stamped ABT006333        273
22  9    44-page document with first page being a
         memo dated May 26, 1994 from Steve Kipperman
23       previously marked Kipperman Exhibit No. #480
         stamped ABT006333                       280
24
25  10   51-page document with first page being a
         memo dated July 14, 1995 from John V. Ward
         stamped ABT 278110                      282

Page 5

1    VIDEOGRAPHER:  We are here today, September 13,
2    2007, at 8:54 a.m. for the videotape deposition of Don
3    Robertson, located at the United States Attorney's
4    Office, 2110 First Street, Fort Myers, Florida, in the
5    case styled, United States of America versus Abbott
6    Laboratories.
7        The videographer is Mike Sturdevant; the reporter is
8    Lisa Rios, both from Martina Reporting.
9        Would counsel please state their appearances for the
10   record.
11       MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith from
12   the United States Attorney's Office, Southern District
13   of Florida on behalf of the United States.
14       MR. ANDERSON:  Jarrett Anderson, counsel for the
15   Relator.
16       MR. SISNEROS:  Eliseo Sisneros, Deputy Attorney
17   General, State of California.
18       MR. LOCKWOOD:  John Lockwood with Ven-A-Care of the
19   Florida Keys, and I'm not an attorney.
20       MR. HAVILAND:  Don Haviland, the Haviland Law Firm,
21   for the Commonwealth of Pennsylvania.
22       MS. CITERA:  Toni Citera for the Defendants from
23   Jones Day.
24       MR. STETLER:  Dave Stetler for the Witness.
25       MR. GOBENA:  Gejaa Gobena, Department of Justice on

Page 6

1    behalf of the United States.
2        MS. NESBITT:  Amber Nesbitt of Wexler, Toriseva,
3    Wallace on behalf of the MDL and the State of Arizona.
4        THE WITNESS:  I'm Don Robertson, the Witness.
5        VIDEOGRAPHER:  And would the court reporter swear in
6    the witness.
7        MS. CITERA:  Just before we start, I just want to
8    get my objection on the record to Miss Nesbitt's
9    appearance at the deposition and the fact that the MDL
10   discovery is closed.
11       MS. NESBITT:  And we obviously disagree.
12       MR. STETLER:  Ignore all that stuff.
13       THE WITNESS:  Okay.
14   Thereupon,
15           DONALD C. ROBERTSON,
16   called as a witness by the United States, having been
17   first duly sworn, was examined and testified as
18   follows:
19           DIRECT EXAMINATION
20   BY MS. ST. PETER-GRIFFITH:
21   Q    Good morning, Mr. Robertson.
22   A    Good morning.
23   Q    My name is Ann St. Peter-Griffith and, as I just
24   said, I'm from the United States Attorney's Office for the
25   Southern District of Florida in Miami, and I'm here today on

Page 7

1    behalf of the United States in the matter of the AWP, MDL
2    litigation in the federal lawsuit that has been filed by the
3    United States against Abbott.
4        Sir, can you state your full name, please, for the
5    record?
6    A    Donald C. Robertson.
7    Q    And Mr. Robertson, where do you live?
8    A    Fort Myers, Florida.
9    Q    How long have you lived in Fort Myers, Florida?
10   A    Since 2001.
11   Q    I hope by now, you're a Red Sox fan.
12   A    Never.
13   Q    Oh, dear.
14       Sir, where did you live prior to moving to Fort
15   Myers in 2001?
16   A    Libertyville, Illinois.
17   Q    And how long were you in Libertyville, Illinois?
18   A    From 1988 until 2001.
19   Q    And where did you live prior to Libertyville,
20   Illinois in '88?
21   A    In Kronberg, West Germany - at that time it was
22   West Germany.
23   Q    Okay.
24       And how long did you live in West Germany?
25   A    Two and a half years.

Page 8

1    Q    And where did you live prior to that?
2    A    Libertyville, Illinois.
3    Q    And how long did you live in Libertyville?
4    A    At that time - oh, gosh - from '79 to '85.
5    Q    Okay.
6        Sir, have you ever had your deposition taken
7    before?
8    A    No.
9    Q    What I'd like to do is go through a few ground
10   rules on the process just so that we - everyone understands.
11   A    Sure.
12   Q    The first is that when I ask a question and when
13   you give an answer, we need to try to avoid talking over
14   each other because we have a court reporter over there who's
15   taking down everything we say, and if you're talking and I'm
16   talking at the same time, she can only take down one of us.
17       Okay?
18   A    Yes.
19   Q    If there's a question that I ask that you don't
20   understand, if you could let me know that because,
21   otherwise, what happens is she's taking down the question
22   and you're giving a response and it appears that your
23   response is responsive to my question.  Okay?  Fair enough?
24   A    Yes.
25   Q    If there's anything you don't understand, just stop

Page 9

1  me and let me know.

2  A   Mm-hmm.

3  Q   If you need to take a break, you can also let us

4  know that, as well.  My only request is if that if there's a

5  question pending, I would like for you to answer the

6  question before we take the break.  Fair enough?

7  A   Yes.

8  Q   Okay.

9  Sir, have you ever given any sworn testimony at all

10 before?

11 A   No.

12 Q   Have you ever been involved in litigation?

13 A   Not to my knowledge.

14 Q   Okay.

15 Sir, what did you do to prepare for today's

16 deposition?

17 A   I read the Subpoena and, other than that, nothing

18 more than that - other than a discussion with Mr. Stetler,

19 nothing more.

20 Q   Okay.

21 How long did you meet with Mr. Stetler?

22 A   I met with him yesterday from nine o'clock to about

23 two o'clock.

24 Q   Did you do anything else to prepare for today's

25 deposition?

Page 10

1  A   Nothing.

2  Q   Now, as you just stated, you received a Subpoena,

3  correct?

4  A   I received an e-mail copy of the Subpoena.

5  Q   Of the Subpoena which Mr. Stetler had accepted for

6  you.

7  A   Right.

8  Q   Okay.

9  Sir, did you look for any documents in response to

10 the Subpoena?

11 A   Yes; to see if I had any of the documents that were

12 requested.

13 Q   Did you?

14 A   I have none.

15 Q   Okay.

16 So you have no documents that you brought with you

17 here today.

18 A   No, ma'am.

19 Q   In preparing for today's deposition, did you review

20 any documents?

21 A   Other than my discussions with Mr. Stetler, I

22 didn't do any other preparation for today's testimony.

23 Q   Okay.

24 Did Mr. Stetler show you any documents?

25 A   No.

Page 11

1  Q   Okay.

2  Did Mr. Stetler read you any documents?

3  A   No.

4  Q   Sir, could you take us through your educational

5  background starting with when you graduated from high

6  school?

7  A   I graduated from high school in 1963; attended

8  Adelphi University in Garden City, New York, graduated in

9  1967 with a degree in business.

10 Q   And where's Delphi?

11 A   Adelphi's in Garden City, New York.

12 Q   Okay.

13 And did you receive a BA?

14 A   Bachelor's in Business - a BBA.

15 Q   BBA.

16 A   Mm-hmm.

17 Q   Okay.

18 Any post-graduate work?

19 A   I started at the University of Buffalo on a

20 master's degree and didn't finish.

21 Q   On a master's degree?

22 A   In business, and did not finish.

23 Q   And when was that?

24 A   Oh, golly, that was in the early 70's.  Between '71

25 and '73; that's when I lived in Buffalo.

Page 12

1  Q   Any other course work that you've taken?

2  A   At a university or college?  No.

3  Q   Okay.

4  Sir, starting with your graduation from college,

5  can you take us through your employment history?

6  A   Yes.

7  From 1967 to 1971, I was in the United States

8  Marine Corps; went through infantry and officer school,

9  artillery officer school, served in the Republic of Vietnam.

10 When I returned I was on recruiting duty; I recruited for

11 officer programs for the Marine Corps in my final two years,

12 and was released from active duty a captain in 1971.

13 Q   Okay.

14 And after you were released from active duty in

15 '71, what was your next position?

16 A   I went to work for Xerox Corporation in Buffalo.

17 Q   For Xerox?

18 A   Yes, ma'am.

19 Q   And what was position there?

20 A   I was a salesperson.  My final job there was

21 manager of major accounts for Western New York in 1971 -

22 correction, 1974, I left Xerox.  I joined them in '71.

23 Q   So you were with Xerox for three years.

24 A   Yes ma'am.

25 Q   Okay.

Page 13

1    And why did you leave Xerox?

2    A    I liked the opportunity that had been presented and

3    I thought it would be a better fit for me.

4    Q    Okay.

5    I assume that your next position then was with

6    Abbott?

7    A    I was a salesperson with Abbott in Manhattan.

8    Q    And what products did you sell?

9    A    I worked for the Diagnostics Division and sold

10   diagnostic products to clinical laboratories to diagnose

11   such states as hepatitis, thyroid function, infectious

12   diseases, that sort of thing.

13   Q    Prior to joining Abbott, did you have any

14   background in either medicine or pharmaceuticals?

15   A    No, ma'am.

16   Q    Okay.

17   Did you receive any training when you assumed the

18   salesperson position?

19   A    Yes.  I was trained for a number of weeks - three

20   or four - I can't recall - in Chicago on these diagnostic

21   products, and then ongoing training with the sales force

22   over the course of the time I had that responsibility.

23   Q    And how long were you a salesperson in Manhattan

24   for the diagnostic products?

25   A    From 19- - let's see, this is long time ago - 1974

---

Page 14

1    to 1975; about 15 months, I believe.

2    Q    Okay.

3    And first let me ask, did you stay with Abbott from

4    approximately '74 through to your departure --

5    A    Yes, I did.

6    Q    -- in about 2000?

7    A    Yes.

8    Q    Okay.

9    A    Twenty-six years.

10   Q    And after you were a salesperson, what was your

11   next position at Abbott?

12   A    I was a sales manager in Chicago handling sales of

13   diagnostic products in six midwestern states.

14   Q    And what were the states?

15   A    Illinois, Indiana, Minnesota, Iowa, North and South

16   Dakota.

17   Q    And who was your supervisor?

18   A    At that time, a gentleman named Bob Heeble.

19   Q    And was he -- How long were you a sales manager?

20   A    About a year, 14 months.

21   Q    So approximately until mid '76?

22   A    At the beginning of '76; in that time frame

23   someplace.

24   Q    And did you supervise anyone?

25   A    There were 11 sales reps and one technician.

---

Page 15

1    Q    Do you remember who the sales reps were?

2    A    No, ma'am.

3    Q    Do you remember who the technician was?

4    A    Mary Jo Larr was a technician; Ralph Stever was one

5    of the technicians; Jim Jones was one of the salesmen;

6    Dennis McConnell; Carrie Garner - that's - it's been a long

7    time, that's the best I can do.

8    Q    And what were your job responsibilities as a sales

9    manager of the diagnostic products in Chicago?

10   A    To make sure that our people represented Abbott in

11   a professional way and achieved their sales numbers.

12   Q    And how would you determine whether people achieved

13   their sales numbers?

14   A    We were given goals and objectives and then we were

15   given actual numbers related to those goals and objectives.

16   Q    Who would set the goals and objectives?

17   A    Generally the upper level of management within the

18   corporation.

19   Q    Okay.

20   Which division --

21   A    Well, within the division - excuse me.

22   Q    I'm sorry.

23   Okay.

24   Which division were you in when you were the sales

25   manager?

---

Page 16

1    A    Diagnostics.

2    Q    Was that a separate division?

3    A    Yes, ma'am.

4    Q    Okay.

5    There was a division of Abbott just called

6    Diagnostics.

7    A    That's correct.

8    Q    Okay.

9    And how long was there --

10   A    It exists through -- It exists today.

11   Q    It exists today.

12   And in '76, did you transition to another position?

13   A    Yes.

14   Q    What was that position?

15   A    I became country manager of Brazil.

16   Q    Contract manager of --

17   A    Country manager, Brazil.

18   Q    Oh, country manager.

19   A    I was a general manager of the Diagnostic Division

20   in Brazil.

21   Q    Did you live in Brazil?

22   A    Yes.

23   Q    How long were you in that position?

24   A    From February, '76 to September, '79.

25   Q    And who was your superior?

Page 17

1    A    First one was a gentleman named Jaime Ocampo and

2 the seconds boss I had was named Alain Gilbert.

3    Q    Can you spell those names?

4    A    J-a-i-m-e, new word, O-c-a-m-p-o, and the second

5 gentleman's name is Alain, A-l-a-i-n, Gilbert,

6 G-i-l-b-e-r-t.

7    Q    And what products were you responsible for --

8    A    The diagnostic products.

9    Q    Same products that you were responsible for when

10 you were a sales manager in Chicago?

11    A    Yes, ma'am.

12    Q    What types of products are those?

13    A    As I said, they were products that were used to

14 diagnose various clinical conditions; cancer, thyroid

15 function, thetical chemistry conditions; infectious

16 diseases, and we sold the reagents and chemicals and devices

17 used to measure these clinical conditions.

18    Q    Do you remember what some of the names of the

19 reagents and the devices were?

20    A    Names of the devices?  Yes.  Clinical chemistry

21 device, one was named the ABA 100; one was the VP; the - oh

22 gosh - Logic was a counter of gamma radiation which was used

23 to measure the various chemicals; CEA was one of the

24 carcinomemoryonic (sp.) antigen determined the level of that

25 substance in a person's serum; thyroid function, Thyroxin,

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 18

1 T3, TSH - those sorts of products.

2    Q    Okay.

3         When you were the general manager in Brazil - or

4 the country manager in Brazil, did you have any subordinates

5 who worked under you?

6    A    I think that in our group there were 30 some-odd

7 individuals.

8    Q    Do you remember who they were?

9    A    Oh, my --

10    Q    I don't mean this to be a memory game, but I'm just

11 trying to find out who worked you under you.

12    A    Well, they were all nationals - Brazilian

13 nationals.

14    Q    Okay.

15         So no - no --

16    A    There were no --

17    Q    -- Americans?

18    A    There were no Americans --

19    Q    Okay.

20    A    -- there.

21         I don't know if the names would be useful, but I

22 can try to recall, if you wish.

23    Q    Okay.  Why don't we come back to that at a later

24 point in time.

25    A    Okay.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 19

1    Q    When you returned -- I assume you returned to the

2 United States in '79?

3    A    Yes.

4    Q    What position did you assume in Abbott?

5    A    I became general manager of the Physiological

6 Diagnostics Business Unit.

7    Q    And how long did you hold that position?

8    A    Until 1980 - oh, correction - from 1983 -- 1979 to

9 1983 I was in Physiological Diag- -- I'm trying -- Wait a

10 minute - hold on now --

11    Q    Take your time.

12    A    I came -- No - I'm sorry, I left out a step -

13 forgive me.

14         From '79 to '83 I was area manager of Latin America

15 for Abbott Laboratories Diagnostics Division.

16         Forgive me; I skipped a three-and-a-half-year

17 period in there.

18    Q    And where was that position based, the area

19 manager --

20    A    In Chicago.

21    Q    -- for Latin America?

22    A    In North Chicago, Illinois.

23    Q    And was that still with the Diagnostics Unit?

24    A    Yes, ma'am.

25    Q    Or Diagnostics Division?

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 20

1    A    Mm-hmm.

2    Q    And who was your supervisor?

3    A    Jack Schuler, who was my first one, division

4 president - and he was my supervisor most of the time I was

5 there; I think Jack Davis - another gentleman named Jack

6 Davis for a time Mr. Schuler was promoted, and then a person

7 named Tom Vogel, V-o-g-e-l.

8    Q    Okay.

9         And what were your responsibilities?

10    A    In the area manager --

11    Q    As the area manager for Latin America.

12    A    I had P and O responsibility for the sales and

13 profitability of Abbott diagnostic products in Latin America

14 and the Caribbean.

15    Q    Did you have any responsibility with regard to

16 developing products?

17    A    No, ma'am.

18    Q    And who were your subordinates?

19    A    The country managers of - we had one in the

20 Caribbean; one in Mexico; one in Venezuela; one in Colombia;

21 one in Brazil, and one in Argentina.

22    Q    And do you remember what their names were?

23    A    They changed over time, but the - I remember in

24 Caribbean, Mark Miller was one of the gentleman; in Mexico,

25 Pat Shannon - I think the gentleman's name; in Argentina,

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 21

1   gentleman's name was Raul Mazzolla; in Brazil, gentleman's
2   name was Luiz Antonio Cosmo, and in Venezuela, his name was
3   Enrique Pazmino.
4       Q   Are you fluent in Spanish, sir?
5       A   I can defend myself in Spanish.
6       Q   Okay.
7           What about Portuguese, Brazilian Portuguese.
8       A   I'm fluent in Brazilian Portuguese.
9       Q   Okay.
10          Is that something you developed while you worked
11  for Abbott?
12      A   I don't miss many meals, and if you didn't want to
13  starve, you learned the language.
14      Q   Sir, what was your next position?
15      A   I became general manager of the Physiological
16  Diagnostics Business Unit.
17      Q   And was that still under the Diagnostic's Division?
18      A   Yes, ma'am, it was.
19      Q   Okay.
20          And how long did you hold that position?
21      A   Until 1986.
22      Q   Why did you leave the area manager for Latin
23  America position?
24      A   The general manager of the Physiological
25  Diagnostics Business Unit was a promotion.

Page 22

1       Q   Okay.
2           And what were your job responsibilities in that
3   position?
4       A   To supervise the development and marketing programs
5   for Physiological Diagnostics that included thyroid
6   function, it included fertility - those sorts of diagnostics
7   states; to supervise the development of those products with
8   R and D group; to supervise the manufacturing of those
9   products in our own little factories, and to supervise the
10  marketing crew that was responsible for their successful
11  marketing.
12      Q   Did you have a marketing plan or did you develop
13  marketing plans?
14      A   Yes, ma'am.
15      Q   What was the nature of that business?
16          Who was your market?
17      MS. CITERA:  Objection to form.
18      THE WITNESS:  Pardon?
19      MS. CITERA:  I'm going, from time to time, interpose
20  objections to her questions.
21          If you understand the question, you can answer it.
22      MR. STETLER:  Let me just say this:  If she makes an
23  objection, unless I say something afterwards, just
24  ignore it and go on.
25      THE WITNESS:  Very well.

Page 23

1       MS. ST. PETER-GRIFFITH:  And I would ask that
2   Counsel limit her objections to form objections.
3   BY MS. ST. PETER-GRIFFITH:
4       Q   Sir, what was the nature of your business?
5           Who were your clients?
6       MS. CITERA:  Same objection.
7       THE WITNESS:  Clinical laboratories and hospitals
8   and independent or private clinical laboratories.
9       Q   Were you all involved with either Medicare or
10  Medicaid reimbursement, or Medicaid or Medicare issues when
11  you held that position?
12      MS. CITERA:  Objection to form.
13      THE WITNESS:  No.
14      Q   And who were your subordinates?
15      A   It's -- We had a marketing manager named Joe Martin
16  and various product managers - I'm sorry, I can't recall all
17  the names.
18      Q   Approximately how many people worked under you?
19      A   In the Business Unit, if one were to count the R
20  and D and manufacturing, perhaps 110, 120, something like
21  that.
22      Q   And do you recall what some of the products were?
23      A   I thought we just discussed that matter.
24      Q   Well, the names of them, though.
25      A   Oh, the trade names, I'm afraid I don't recall.  I

Page 24

1   can describe the clinical states that they were meant to
2   detect --
3       Q   Which you just did.
4       A   -- thyroid function, either elevated or depressed
5   thyroid function; pregnancy - let's see - fertility; LH,
6   FSH, HCG - a little of acronyms in industry, as well, I
7   think --
8       Q   Okay.
9       A   -- Americans like acronyms.
10      Q   Sir, what position did you hold after you were the
11  general manager of the Physiological Drug Unit?
12      A   I was director of Marketing and Strategic Planning
13  for Europe, Africa and the Middle East for the Diagnostics
14  Division.
15      Q   Is that when you were in Germany?
16      A   Yes, ma'am.
17      Q   And how long did you have that position?
18      A   From the beginning of '86 'til the end of '88.
19      Q   Okay.
20          And who was your supervisor?
21      A   The gentleman's name was Eric Hornaess,
22  H-o-r-n-a-e-s-s.
23      Q   And was he your supervisor during that entire time?
24      A   Yes, he was.
25      Q   And - I'm sorry - I might need to go back.

Page 25

1    Did I ask you who your supervisor was when you were
2  in the general manager of the Physiological?
3    A    No, you didn't.
4    Q    Okay.
5         Who were or who were your supervisors?
6    A    The gentleman's name was Harry Hixson, H-i-x-s-o-n.
7    Q    Okay.
8         And you returned to the United States in '88?
9    A    Late '88; yes, ma'am.
10   Q    And did you have any subordinates when you were the
11 director of marketing for Europe and Africa?
12   A    Yes; I had people who did the -- A gentleman named
13 James Jones; a gentleman named Ad, A-d, Habraken,
14 H-a-b-r-a-k-e-n - oh, boy, I just can't recall the names
15 now.
16        Were I to sit down and think about it for a while,
17 I could probably make a list for you, if you wish.
18   Q    Okay.
19        When you returned to the United States in late '88,
20 what position did you assume with Abbott?
21   A    I was responsible for what was called a Business
22 Unit Group general manager, which comprehended multiple
23 business units; Physiological Diagnostics, I regained as one
24 of those; Cancer Diagnostics was another of those; Abused
25 Drug Diagnostics was another of those; I don't know if I

Page 26

1  mentioned Cancer Diagnostics was another of those, and
2  mental illness and neurological disease, we were going to
3  find a diagnostic for Alzheimer's.  Unfortunately, it proved
4  to be a dry hole, we weren't able to help people.
5    Q    Okay.
6         And was that still within the Diagnostics Unit?
7    A    Yes.
8    Q    Okay.
9         And so you were responsible then for overseeing
10 development of product or --
11   A    The individual --
12   Q    -- diagnostic product?
13   A    The individuals who developed the products reported
14 to me.
15   Q    Okay.
16        And when you headed were -- When you headed that
17 business unit, who was your supervisor?
18   A    That was Art Collins.
19   Q    Okay.
20        And how long did you hold that position?
21   A    Perhaps two years.
22   Q    So '88 --
23   A    In 1990, I changed again.
24   Q    Okay.
25        And who were your subordinates in that business

Page 27

1  unit, do you recall?
2    A    Yeah.  The business unit general managers, a man
3  named Freddie Richard, R-i-c-h-a-r-d, Richard; a gentleman
4  named Isao Ikeda, I-s-a-o, I-k-e-d-a; a person named Carol
5  Cox; a person named Jim Koziarz, K-o-z-i-a-r-z, and a woman
6  named Victoria Bannister, two N's.
7    Q    Okay.
8         And what were your primary responsibilities in that
9  position?
10   A    To supervise the development, manufacture and
11 marketing of the products included in those responsibilities
12 - Cancer; Physiological Diagnostics; Mental Illness;
13 Neurological Disease; Phys- - those various business units.
14   Q    And you said you changed jobs in - or changed
15 positions in '90.
16   A    Yes, ma'am.
17   Q    To what?
18   A    Vice president and general manager of Alternate
19 Site Products, Hospital Products Division.
20   Q    Had you ever worked in the Hospital Products
21 Division up until that point in time?
22   A    No, ma'am.
23   Q    Okay.
24        Why the switch?
25   A    It was a promotion.

Page 28

1    Q    And you ever worked with the Alt Site products
2  before?
3         MS. CITERA:  Objection --
4         THE WITNESS:  No, ma'am.
5         MS. CITERA:  -- to form.
6    Q    Do you understand what I mean when I say, "Alt
7  Site"?
8    A    I never worked with any hospital product before.
9    Q    Is it fair to say you had a learning curve?
10        MS. CITERA:  Objection to form.
11        THE WITNESS:  It's fair to say I had a very steep
12 learning curve.
13   Q    And how did you go about learning the position?
14   A    Brute force and awkwardness.  I studied as hard as
15 I could.  Did anybody help you?
16   Q    Did anybody help you?
17   A    Yes; the individuals in marketing, the
18 manufacturing people, the research and development people
19 were very kind in terms of their extension of help to me.
20   Q    Did you work with anybody in the Reimbursement
21 Department?
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  No.
24   Q    Okay.
25        Did you work with anyone in terms of learning --

Page 29

1    A    To learn the products, did I work with anybody in

2  the reimbursement department; is that your question?

3    Q    No; that's not my question.

4    A    Okay.

5    Q    Just, in general, did you work with anybody in the

6  reimbursement department to learn about reimbursement?

7    A    No --

8    Q    Okay.

9         Did you --

10   A    -- not that I recall.

11   Q    The individuals who you worked with in the

12 marketing department, do you remember who they were?

13   A    I worked with the general managers of the three

14 businesses that were involved in Alternate Site; Renal Care,

15 Alternate Site Product Sales and Home Infusion Services.

16   Q    Okay.

17        And who were they?

18   A    The first general manager of Home Infusion Services

19 was Bill Dempsey; the first general manager of Alternate

20 Site Product Sales was John Ward; the first general manager

21 of Renal Care was Mike King.

22   Q    And did they help you learn the business?

23   A    Yes.

24   Q    What did they teach you about the Alt Site market?

25        MS. CITERA:  Objection to form.

Page 30

1         THE WITNESS:  They taught me the various aspects in

2    market segments.  They taught me about distributors,

3    home infusion companies, renal dialysis centers; what

4    services they provided for their customers and what

5    products they used.

6    Q    Okay.

7         And what did they teach you about the distributors?

8    A    Well, how we dealt with them; we contracted with

9  them; we - many of the customers in Alternate Site are very

10 small, so they buy their products through distributors

11 rather than through manufacturers.

12        So I had never dealt -- Diagnostics never dealt

13 with distributors, so it was new - it was something new for

14 me.

15   Q    Okay.

16        What about home infusion companies, what did you

17 learn about them?

18   A    Various products that they provided; the services

19 they provided; some things about the clinical states of the

20 patients; how Abbott products fulfilled the needs of these

21 various and sundry market segments for total parenteral

22 nutrition, I.V. antibiotics, chemotherapy - that kind of

23 thing.

24   Q    Okay.

25        And what about renal dialysis centers, what did you

Page 31

1  learn about them?

2    A    I learned about the various conditions that caused

3  end-stage renal disease.  I learned about a specific

4  product - we really only had one product that we sold to

5  them; we sold peritoneal dialysis solutions to renal

6  dialysis centers.  There were others who were more

7  competent.  We had no specific technical advantage, so we

8  sold the business, which left us with one product - a very

9  important product, however.

10        When people's kidneys shut down they are unable to

11 make bone and if their phosphorus levels get too high, their

12 bones will fill with phosphorus instead of calcium and that

13 will cause a state known as renal osteodystrophy - it's a

14 terrible state; fundamentally, their skeletons collapse.

15        Well, we had a drug that enabled them to make bone,

16 replace the natural calcitriol in their bodies, enable them

17 to make bone and prevented the skeletal collapse.  It was

18 really a terrific drug.

19   Q    And what was the name of that drug?

20   A    Calcijex.

21   Q    Okay.

22        And what did you learn about the products used in

23 the Alt Site or by Alt Site customers?

24   A    What did I learn about the products?

25   Q    Yes.

Page 32

1         MS. CITERA:  Objection to form.

2         THE WITNESS:  How they were used and what they did.

3    Q    Okay.

4         Do you remember specifically what you learned?

5    A    I remember --

6         MS. CITERA:  Objection to form.

7         THE WITNESS:  I remember reading about why one would

8    use Rocephin, you know which is a Roche drug for - that

9    was used in Lyme's disease, why - you know, just

10   fundamentally what it was about, what did we do, what

11   was our business.

12   Q    Did you understand that there was a difference

13 between branded drugs and generic drugs?

14   A    Yes, ma'am.

15   Q    Okay.

16        What was your understanding of that difference?

17   A    The difference?  A branded drug is a drug

18 fundamentally which I assume to be proprietary where there

19 are no others available; a generic drug is multi-source.

20   Q    And what did you learn about the nature of the

21 products sold in the Alt Site unit?

22        MS. CITERA:  Objection to form.

23        THE WITNESS:  I don't understand your question.

24   Q    Okay.

25        Did you have an understanding as to whether Alt

Page 33

1  Site sold proprietary drugs, generic multi-source drugs or
2  both?
3     A     Yes.  There -- Some companies sold proprietary
4  drugs.  I mentioned the drug Rocephin, that was proprietary,
5  it was a third-generation cephalous-borne, a great drug for
6  Lyme's disease, a good drug for bone infections - that was
7  proprietary.
8        The drugs that we sold - Abbott, specifically in
9  that milieu were multi-source - a lot of people had those
10 drugs.
11       Calcijex was sole source --
12    Q     Was that a branded product?
13    A     Would you define the term "branded"?
14    Q     Well, was it a proprietary product --
15    A     Yes, ma'am.
16    Q     -- that Abbott had?
17    A     Yes, ma'am.
18    Q     Okay.
19       Sir, during this initial phase when you were
20 learning about the Alt Site Business Unit, were you given
21 any information about our education concerning the pricing
22 for Abbott products sold by the Alt Site Unit?
23       MS. CITERA:  Objection to form.
24       THE WITNESS:  I - I saw documents indicating the
25    average unit price of our various products - what we

Page 34

1     were selling products for, if that's - if that --
2     Q     Well, did you --
3        THE WITNESS:  -- answers your question.
4     Q     Let me ask a more specific question.
5        Did you have an understanding as to how Alternate
6  Site products - products sold by the Alternate Site Unit
7  were priced?
8     A     Yes, ma'am.
9     Q     Okay.
10       What was that understanding?
11    A     They were priced based upon negotiations which we
12 had with the distributors, wholesalers; those who sold the
13 products.
14       Home infusion services was priced in a different
15 way.  We provided not only product, but we provided
16 pharmacies, we provided billing and reimbursement, and we
17 were reimbursed - or our price to go them - excuse me - was
18 a function of how much we did and it would be a percent of
19 collections.
20       The --
21    Q     Percent of whose collections?
22    A     Percent of the money that we collected for them -
23 we did billing and reimbursement for them, so a percent of
24 what we collected - we would provide pharmacy; we would
25 provide billing and reimbursement; we would provide

Page 35

1  training; we would ship - we would compound the product in
2  our pharmacies and we would ship the product.  They would
3  provide the nursing care and they would provide the
4  patients.
5        And Abbott was compensated by receiving a
6  percentage of collections.
7     Q     Did Abbott have its own pharmacies?
8     A     Yes, ma'am.
9     Q     Okay.
10       For how long?
11    A     I don't -- I can't answer that.  They were there
12 when I got there in 1990, they were there when I left in 19-
13 in -- 2000.
14    Q     Okay.
15       Did you have an understanding that at some point in
16 time the Abbott pharmacies were phased out?
17    A     Ma'am, I tried to close that business the day I got
18 there.
19    Q     Okay.
20       Why?
21    A     It was a horrible business.
22    Q     How so?
23    A     We're manufacturers of product; we are not patient
24 care providers.
25       And, also, when we provided compounding and billing

Page 36

1  and reimbursement services, some of our customers would
2  believe that we were competing against them.  Competing
3  against your customers is not a good way to make a living.
4  So they became angry by that.  The business was not
5  profitable.
6        We have a -- We have a responsibility, a fiduciary
7  responsibility to our shareholders to invest their money to
8  provide them with the best possible reasonable return.  Home
9  infusion services didn't do that, and I wanted out of the
10 business.
11    Q     When you say, "the business," and when you said it
12 was a horrible business, you mean the Home Infusion Unit,
13 itself.
14    A     Home Infusion Services.
15    Q     Home Infusion Services.
16    A     Yes, ma'am.
17    Q     And what did you do in terms of your efforts to try
18 and close the home infusion business?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  We just didn't renew contra -- You
21    know, we'd try not no renew contracts.  We tried to get
22    the customer to take over billing and reimbursement for
23    themselves.  We tried to get the customer to take over
24    pharmacy for themselves.  And we would try to get out of
25    the business of competing with our own customers.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 37

1      We -- Abbott is a manufacturing company, a provider
2   of product; that's what we do best.
3      This was thought to be initially a good outlet for
4   Abbott product; it proved not to be.
5   Q   Who initially thought that it was a good outlet for
6   business for Abbott product?
7   A   I don't know that specifically.
8      I know who was there when the business started and
9   I know who ran the business initially.
10  Q   And who was that?
11  A   A gentleman named Kris Kringel, K-r-i-s,
12  K-r-i-n-g-e-l, who was president of the Hospital Products
13  Division, and the first general manager of Home Infusion
14  Services was - I will recall --
15  Q   Okay.
16  A   -- the lady's name.
17  Q   Now, was Mr. Kringel your boss?
18  A   Yes, he was.
19  Q   Okay.
20     Did you have any other -- I assume that you held
21  this position until your retirement.
22  A   Ten years; yes, ma'am.
23  Q   And who were your supervisors during this period of
24  time?
25  A   I had two.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 38

1   Q   Okay.
2   A   Mr. Kringel retired, I believe in '97, and then a
3   gentleman named Rick Gonzalez became my supervisor.  He was
4   president of the Hospital Products Division.
5   Q   And did you talk with them about closing the Home
6   Infusion Unit?
7   A   Yes, I did.  There was no graceful exit.
8      Okay.
9   A   It was very difficult to get out of the business,
10  but we continued to try to do that and we ultimately did - I
11  think it's closed down now - I don't know - I have not
12  spoken to him.
13  Q   And were Mr. Kringel and Mr. Gonzalez receptive
14  towards closing that business unit?
15     MS. CITERA:  Objection to form.
16     THE WITNESS:  Yes.  I mean, they were receptive
17     to -- I mean, they were good business people, they
18     understood the argument.  The argument was rationale, it
19     was logical and based on fact.
20  Q   Did you receive any resistance to closing the
21  business unit?
22     THE WITNESS:  From the customers.
23     MS. CITERA:  Objection to form.
24  Q   From the customers?
25  A   Mm-hmm.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 39

1   Q   What about within Abbott?
2      MS. CITERA:  Objection to form.
3      THE WITNESS:  Within Abbott, people objected to
4      closing the business?
5      No.  I mean the people who were in the business were
6      going to be redeployed, they were not going to be
7      dismissed.
8      This was a bad decision by the chiefs, the Indian
9      shouldn't pay for it.  The people would be redeployed to
10     different areas of the corporation.
11  Q   And who were the chiefs, to your knowledge, that
12  made the bad decision?
13     MS. CITERA:  Objection to form.
14     THE WITNESS:  They made it -- You know, hindsight is
15     20/20 --
16     MS. ST. PETER-GRIFFITH:  I know.
17     THE WITNESS:  -- it probably looked like a good
18     decision 1987 or '86, when they went into it.
19     But I guess the people - Mr. Kringel and - decided
20     to get in it and thought it would be a good outlet for
21     Abbott product.
22  BY MS. ST. PETER-GRIFFITH:
23  Q   Are you familiar with the name Virginia Tobiason?
24  A   Yes.
25  Q   Okay.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 40

1      Who is Miss Tobiason?
2   A   She was an employee in Home Infusion Services.
3   Q   Do you know whether she had any opinions regarding
4   the continuation of the Home Infusion Business Unit?
5      MS. CITERA:  Objection to form.
6      THE WITNESS:  Miss Tobiason left that business in
7      about 1997, I believe - I would have to check.  She went
8      to work in a corporate function.
9      So I wouldn't want to speculate on her feelings.
10  Q   Okay.
11     Do you know of anyone who articulated any concerns
12  about closing the Hospital - about closing the Home Infusion
13  Business Unit?
14     MS. CITERA:  Objection to form.
15     THE WITNESS:  Some people may have felt threatened,
16     but we obviously did our best to redeploy the people so
17     they were doing something else.
18     But some people may have had an apostolate and
19     thought this was a great business, when, in fact, it was
20     a bad business.
21     I don't - I don't know how to respond to your
22     question.  Some may have thought it was a good idea.
23  Q   But are you aware of anyone making --
24  A   No.
25  Q   -- any comments either to you personally or

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 41

1  otherwise voicing objection to closing the Home Infusion

2  Business Unit?

3      A    No, ma'am.

4      MS. CITERA:  Objection to form.

5      Q    Are you familiar with the CHIPS product?

6      A    Yes, ma'am, I am.

7      Q    What is it?

8      A    Once again, in our love for acronyms, that stands

9  for Customer Home Infusion - the P confounds me - I don't

10  remember.

11      Q    Okay.

12      A    That was a device that did billing and

13  reimbursement and set up orders and kind of cued things up

14  in pharmacy for a home infusion company.

15      Q    Was it proprietary software developed by Abbott?

16      A    We paid for the development; yes, ma'am.

17      Q    Okay.

18      In your contemplation of closing the Home Infusion

19  Business Unit, did you have any opinions as to whether

20  licensure of the CHIPS software should continue?

21      MS. CITERA:  Objection to the form.

22      THE WITNESS:  I recall conversa- -- Part of your job

23  in business is to make lemonade out of lemons.  If we

24  had anything that was a viable product and those

25  customers who were Home Infusion Services customers

Page 42

1  could use that system and found value in that system, we

2  would have a financial responsibility to our

3  shareholders to sell that system.

4      Q    Okay.

5      And was there such a market?

6      A    I don't know that.  I mean, I don't think we had

7  sold any by the time I left.

8      Q    Okay.

9      Sir, going back to your initial training, or your

10  initial learning curve concerning the Alt Site Business

11  Unit, did you receive any formal or informal instruction or

12  training concerning either Medicare or Medicaid billing,

13  pricing or reimbursement?

14      MS. CITERA:  Objection to form.

15      THE WITNESS:  We must have had discus- -- I don't

16  recall specific discussions or training on that, but

17  reimbursement is an important part of the business so we

18  must have had conversations on that.

19      Q    Did you have an understanding as to how Medicaid

20  and Medicare reimbursement worked?

21      MS. CITERA:  Objection to form.

22      THE WITNESS:  I would characterize my knowledge as

23  vague.

24      I mean, it's a very complex system.  As I understand

25  it, people make careers out of this, billing and

Page 43

1  reimbursement systems.  I was, you know, a neophyte.

2      Q    What was your understanding?

3      A    My understanding of - although incomplete, was that

4  was that Medicare in the hospital reimbursed based upon a

5  system called DRGs - that may still be around, I don't know

6  - and that in the Alternate Site it reimbursed based upon a

7  percentage of charges or something like that - I don't

8  recall, it was a long time ago.

9      Q    Any other understanding as regarding Medicare

10  reimbursement?

11      A    No, ma'am.  That's my understanding.

12      Q    Okay.

13      What about Medicaid reimbursement?

14      A    I have no knowledge of Medicaid reimbursement.

15      My only knowledge of Medicaid reimbursement is that

16  the State of Illinois would pay you in 187 days, no matter

17  how clean your bill was, no matter how well the patient was,

18  but it took a long time to get your money and that's my

19  recollection of - my only recollection of Medicaid; it was

20  tough to collect.

21      Q    Who would you go to if a question arose concerning

22  either Medicaid or Medicare reimbursement or billing?

23      MS. CITERA:  Objection to form.

24      THE WITNESS:  I would ask the general manager; those

25  were the people with whom I dealt --

Page 44

1      Q    Okay.

2      THE WITNESS:  -- if I had a question.  I'm not

3  saying I had any questions, but if I had a question,

4  that's the person to whom I'd go.

5      Q    Would you deal with any other subordinates?

6      A    Oh, I may have had conversations with subordinates

7  like - you know, you mentioned Miss Tobiason, she was

8  involved in reimbursement.  I spoke to her - I mean, I know

9  I spoke to her on numerous occasions, reimbursement was

10  probably the subject of one or more of those conversations.

11  I don't recall.

12      Q    Do you remember any conversations that you had with

13  Miss Tobiason concerning reimbursement?

14      A    Specifically?

15      Q    Yes.

16      A    No.

17      Q    Do you remember any - receiving - either receiving

18  any correspondence or generating any correspondence

19  concerning Medicare or Medicaid reimbursement?

20      MS. CITERA:  Objection to form.

21      THE WITNESS:  I may have, but I don't recall

22  specifically.

23      I --

24      Q    Okay.

25      Before --

Page 45

1    THE WITNESS:  If there were going to be changes in

2    Medicare or Medicaid reimbursement, it would be

3    incumbent upon our group to communicate those changes.

4    Q    Who within your group was responsible for ensuring

5    compliance with Medicare and Medicaid statute and

6    regulations?

7    MS. CITERA:  Objection to form.

8    Q    Hold on just a second.

9    MS. ST. PETER-GRIFFITH:  What's wrong with that

10   form?

11   MS. CITERA:  First of all, it's a compound question

12   because you're asking about Medicare and Medicaid.

13   Second of all, I think it's over broad, vague.

14   MS. ST. PETER-GRIFFITH:  Okay.

15   Sir, can you answer the question?

16   THE WITNESS:  Would you repeat it, please.

17   MS. ST. PETER-GRIFFITH:  Sure.

18   Can you read it back?

19   (The question was read back as previously recorded

20   by the court reporter)

21   MS. CITERA:  Let me just add also it asks for

22   speculation.

23   BY MS. ST. PETER-GRIFFITH:

24   Q    Who would you go to if you had a question about

25   Medicare or Medicaid reimbursement compliance?

---

Page 46

1    MS. CITERA:  Same objections.

2    THE WITNESS:  I would go to the general manager,

3    probably.  And if there were -- Our objective was to

4    comply with all regulations.

5    Q    And how would you ensure that that was done?

6    A    Continue -- You'd just have to continue to

7    reinforce this with people, you know?

8    Q    Who would you reinforce it with?

9    A    The general managers.  I mean, you were just there

10   to comply with the regulation.  You have to do it.  If you

11   vary from that...

12   Q    Would the general managers be responsible for

13   ensuring compliance with Medicare and Medicaid statutes and

14   regulations?

15   A    Yes - Yeah.

16   They had day-to-day contact with the people who

17   were involved in these affairs.

18   Q    Would the buck stop with any particular person with

19   regard to who was responsible for compliance with Medicare

20   or Medicaid regulations?

21   MS. CITERA:  Objection to form.

22   THE WITNESS:  Ma'am, our responsibility was to

23   comply with appropriate regulations.  If we didn't,

24   there was enough powder to blow everybody up.

25   I mean, we were all responsible, but I guess at the

---

Page 47

1    end of the day the general managers and I were the ones

2    responsible to make sure that that was done.

3    Q    Okay.

4    Would you consult with anyone in particular to

5    ensure that that was done?

6    A    I would consult my reports; general managers.

7    Q    Anybody else?

8    A    No -- I -- I -- Miss Tobiason was responsible for

9    reimbursement.  It's doubtful that I would not have, at one

10   time, mentioned to her that, Hey, you know, you've got to

11   follow the regs, but I don't remember specific conversation

12   in that regard.

13   Q    What about outside of the Alternate Site Business

14   Unit, do you recall discussing compliance with anyone -

15   compliance with Medicare or Medicaid statutes and

16   regulations with anybody outside of Alt Site?

17   MS. CITERA:  Objection to form.

18   THE WITNESS:  Specifically, no.

19   Q    Okay.

20   What were your -- You indicated the general

21   memories of conversations concerning reimbursement.

22   Do you remember --

23   A    I have no general memory.

24   I indicated that it would be doubtful that I would

25   not have had such a conversation because the individual's

---

Page 48

1    responsible for that.

2    Q    Would you -- Okay.

3    Which general manager would you go to on

4    reimbursement issues?

5    MS. CITERA:  Objection to form.

6    THE WITNESS:  There were two general managers who

7    dealt with the service business; one would be Bill

8    Dempsey, who was responsible for Home Infusion Services,

9    and the other, John Ward, who was responsible for

10   Alternate Site Product Sales - we called it - those were

11   sales of Alternate Site products that anyone who did not

12   have a business development agreement with us.

13   Q    Let me go back.

14   Who were your -- During your entire tenure, can you

15   just take us through historically who were the general

16   managers of the three components?

17   A    Certainly.

18   The general managers for the Renal Business Unit

19   were Mike King, Rich Ganz, G-a-n-z, Laurie Mershimer,

20   M-e-r-s-h-i-m-e-r, and Susan Rodriguez.

21   The general managers for Alternate Site Product

22   Sales were - hold on - Mike Sellers, John Ward and Peter

23   Baker.

24   The general managers for Home Infusion Services

25   were Bill Dempsey and then Mike Sellers.  Sellers was GM -

Page 49

1  the final name of GM when I left.

2      Q    Were there any non-GM subordinates who you would

3  deal with on a regular basis in your position as vice

4  president?

5      A    Many.

6      Q    Who would they be?

7      A    I would go in and discuss sales with the sales

8  managers; I would discuss, you know, contracting for the

9  customers - when are we going to get this business - from

10 the national account managers.

11         I think every manager has an informal group of

12 contacts with which one deals to see where the business is

13 going or how things are progressing.

14     Q    Okay.

15         MS. ST. PETER-GRIFFITH:  Is now a good time to take

16 a break?

17         MR. HAVILAND:  It would be for me just --

18         MS. ST. PETER-GRIFFITH:  Okay.

19         MR. HAVILAND:  -- for calling the office.

20         VIDEOGRAPHER:  Okay.

21         We're going off the record.

22         (Whereupon, a brief recess was taken)

23         VIDEOGRAPHER:  We're back on the record.

24 BY MS. ST. PETER-GRIFFITH:

25     Q    Sir, what I'd like to do is go back to the Alt Site

Page 50

1  Business Unit.  But before we do that, I'd like to kind of

2  take you through what you did after your retirement in 2000.

3         Did you retire in 2000?

4      A    Yes.

5      Q    Okay.

6         After 26 years with Abbott?

7      A    Yes.

8      Q    And what have you been doing since your retirement?

9      A    I moved out of Chicago.

10     Q    Okay.  It's a little cold; understandable.

11     A    And all our children --

12         MR. STETLER:  I object.

13         MS. ST. PETER-GRIFFITH:  I would just like to note

14 for the record that Mr. Stetler requested that we take

15 this deposition in January.

16         MR. STETLER:  Yes, I did.

17     A    All of our children moved away from Chicago.  So in

18 January of 2001, I said to my wife, Sweetheart - we had a

19 condo here in Fort Myers - I said, Sweetheart, I'm leaving

20 and I'm not coming back.

21         And she sold our house, packed it up and we've been

22 down here ever since.

23     Q    Now, are some of your former colleagues down here

24 from Abbott?

25     A    No.  I don't see any colleague -- I know that there

Page 51

1  are one specifically, Barry Gerber, whom I knew from Abbott,

2  he lives in Sarasota; a person named Ray Earl lives in

3  Sarasota.  That's about it.  No one locally whom I see or

4  who I'm in contact with.

5      Q    I need to round back to a question that I forgot to

6  ask you before which is have you - other than speaking with

7  Mr. Stetler, have you had any other conversations with

8  anybody about your deposition here today?

9      A    No.

10     Q    Okay.

11         Do you have much contact with other Abbott

12 employees?

13     A    I told my wife I would be here --

14     Q    Okay.

15     A    -- to give a deposition, so I misspoke.

16     Q    That's fine.

17         Have you spoken with any other Abbott employees?

18     A    No.

19     Q    Okay.

20         And since your retirement, have you been completely

21 retired or are you involved in any other, either employment

22 or business ventures?

23     A    No, ma'am.  I'd had enough fun.

24     Q    Oh, you're a smart man.

25     A    I do charity work, I play golf and I fish.

Page 52

1      Q    Fantastic.  What kind of charity work do you do?

2      A    I work with the Slough - the Six Mile Cypress

3  Slough, which is a sort of, it filters water that goes out

4  in Estero Bay and try and stop people from paving it, and I

5  work with my church.

6      Q    Okay.

7         Sir, if we could go back to where we started our

8  discussion in terms of your taking over as vice president --

9      A    Yes, ma'am.

10     Q    -- back in '90.

11     A    Mm-hmm.

12     Q    Can you just walk me through the three different

13 business units of Alt Site and what, generally, their

14 products were, their marketing plan, their market?

15     A    Okay.

16         MS. CITERA:  Objection to form.

17         THE WITNESS:  There were three.

18         One was Alternate Site Product Sales.  That was the

19 sales of everything that the hos- - well, the products

20 that Hospital Products produced and anything that was

21 not a hospital; home infusion companies, physicians'

22 offices, cancer treatment centers, nursing homes,

23 anything that was not a hospital.

24         Home Infusion Services entered into business

25 development agreements with hospitals to help them get

Page 53

1  into the home infusion services business.  We would do
2  pharmacy for them; we would bill for them; we would do
3  reimbursement for them.  The patients came from those
4  hospitals and went home and they would do the nursing
5  and whatever other services were required.
6      In Renal Care, initially we sold peritoneal dialysis
7  solutions - peritoneal dialysis is an alternative to,
8  you know, using blood where solutions are injected into
9  the peritoneal cavity and detoxify the person.  We had
10  no specific advantage of competence there, so we sold
11  that business to Frazaneous (sp.) in, perhaps, '93.  And
12  our sole business there was Calcijex, which I've
13  articulated earlier the usefulness of that in helping
14  the people in end-stage renal disease make bone.  It's a
15  great drug.
16  Q    Was the Renal Department also responsible for
17  developing another product?
18  A    Yes.  There's a - one of the -- Yes, ma'am - the
19  answer to your question is yes.
20  Q    Okay.
21      What was that?  Can you explain that?
22  A    The name of the product was Zemplar.
23      There are people who don't respond well to Calcijex
24  - it can me idiopathic - they just don't respond, and there
25  are people who come in with very elevated levels of

Page 54

1  phosphorus that you want to get down quickly.
2      In conjunction with the University of Wisconsin,
3  which is world-renowned in these renal osteodystrophy drugs,
4  they had another drug which they felt would bring down the
5  levels of phosphorus faster so that bone deterioration
6  wouldn't go on as long and that the people would respond
7  better to.  We licensed that drug.  Our experience in
8  clinicals and post-approval studies indicate that it is a
9  much better drug, so we've - Zemplar is replacing Calcijex
10  as the drug of choice for renal osteodystrophy.
11  Q    Okay.
12      So is it fair to say that that was a successful
13  then project or product development R and D-wise?
14  MS. CITERA:  Objection to form.
15  THE WITNESS:  You're asking for my opinion.
16  Q    You were the vice president, so, yeah, I'd like
17  your thoughts.
18  A    The drug works better.
19  MS. CITERA:  Objection.
20  Q    Okay.
21  THE WITNESS:  But based upon data that I saw, which
22  are old data now, being seven years, since the drug -
23  Zemplar is still out there and, as I understand it,
24  continue to perform well, it's a good second-generation
25  drug.

Page 55

1  Q    When you -- For the ten years that you were the
2  vice president of the division, were you actively marketing
3  Zemplar or were you still in the development stage?
4  A    We were developing the product.
5      The product wasn't launched until, perhaps, late
6  '99 maybe.
7  Q    Okay.
8      So it was launched on your tenure then.
9  A    It was launched while I was there; yes, ma'am.
10  Q    Other than Zemplar and Calcijex did the Renal
11  Department have any other either products or business other
12  than the sale of Calcijex?
13  A    Yes, they did.
14      They promoted nutritionals for -- They promoted
15  nutritionals for Ross Division.  They would show the
16  benefits --
17  Q    I believe that's yours (handing).
18  A    Thank you very much.
19      (Continuing) They would show the benefits of Ross
20  nutritional products to the people involved in nutrition at
21  the various renal care centers.
22      And one of the problems with people in end-stage
23  renal disease is malnutrition, so Ross nutritional products
24  were useful.
25  Q    How did the Renal Department interact with the Ross

Page 56

1  Division; how was that -- How did that relationship develop
2  and how was it presented to customers?
3  MS. CITERA:  Objection to form.
4  THE WITNESS:  How was it presented to customers?
5  Really, to a customer, Abbott is Abbott, I think in
6  large part.
7  Abbott has a Ross Division and Abbott had a Renal
8  Division, that's how it was presented to our --
9  Q    Did the Renal Division have a sales force dedicated
10  to promoting Ross products?
11  A    No.
12  Q    Okay.
13      How would the introduction of Ross products occur
14  to the renal clients?
15  A    Our sales force would provide them literature.  And
16  if they wanted to speak to an expert, they had to speak to
17  someone in Ross.
18      Merely we were trying to provide entree -- We
19  thought that these nutritional products would be useful -
20  that it was a marketing opportunity and it was an
21  opportunity for better patient care.
22      And we would provide the nutritionists in the renal
23  care centers with literature.
24  Q    Okay.
25      And was that literature that was developed by --

Page 57

```
1        A      By Ross.
2        Q      -- Ross?
3               Okay.
4               Other than the sale or other than the promotion of
5    the Ross products and the sale of Calcijex and development
6    of Zemplar, did the Renal Department have any other either
7    business or did it serve any other business function?
8        A      No; not to my knowledge.
9        Q      Okay.
10              Was it a relatively small unit?
11       A      I think, as I recall, in sales it may have been
12   100, $120M, something like that.
13       Q      Annually?
14       A      Yes, ma'am.
15       Q      Was that during the entire ten-year tenure that you
16   were there?
17       A      No.  It grew significantly.
18       Q      Okay.
19              When did it grow?
20       A      During the entire time I was there.
21       Q      Do you know what the reason for the growth was?
22       A      Lamentably, more people with end-stage renal
23   disease who could use the drug --
24       Q      Okay.
25       A      -- longer survival.
```

Page 58

```
1               Obviously, if -- I don't want to -- We don't have
2    to get into great detail; people were living longer because
3    they were getting better care.
4        Q      Okay.
5               In part, because of the Calcijex?
6        A      We like to think so; yes, ma'am.
7               So they're living longer.  Then, lamentably, there
8    are more people coming on to - diabetics and hypertensives
9    who now need renal dialysis.  Well, when you get a faster
10   growth rate and you get people living longer, you get more
11   utilization of the drug.
12       Q      Do you recall what the renal - how much renal - the
13   Renal Department was taking in when you first started?
14       A      No.  No, ma'am.  Renal pro- -- No, ma'am, I don't
15   recall specifically.
16       Q      Do you remember when it reached approximately the
17   100 to $120M mark?
18       A      Probably toward the end of my tenure.
19       Q      And is it fair to say that most of that revenue was
20   generated from the sale of Calcijex?
21       A      Yes, ma'am.  Mm-hmm.
22       Q      Okay.
23       A      There are some great drugs out there.  Epo (sp.) is
24   a really terrific drug for --
25       Q      Was that something that was sold by the Hospital --
```

Page 59

```
1        A      No.  No.  No.
2        Q      -- by Alt Site?
3        A      No.  No.  No.
4        Q      Okay.
5        A      That's sold by Amgen.
6        Q      Okay.
7        A      But there have been a lot of -- My point is these
8    people were living longer because of a lot of good drugs to
9    help them.
10       Q      What I'd like to do is circle back to the Alt
11   Site -- Oh, let me ask you first.  For Renal Care, were
12   there marketing plans for Renal Care?
13       A      How would you -- What do you mean by marketing
14   plan?
15       Q      Meaning did the Alt Site Business Unit have written
16   marketing plans for the Renal - for its renal operation?
17       A      We had sales plans which articulated how much we
18   expected them to sell; we had marketing plans to the extent
19   we told them how do you - you know, how one would use the
20   data to approach a customer where clinical conditions were
21   useful; when to put people on the drug; when to take them
22   off the drug.
23       Q      And can you take me through how you, as sort of the
24   head, the vice president, understood the sales force did
25   that; how they would implement that sales plan?
```

Page 60

```
1        A      Well, how they would implement the sales plan.
2               As one implements a sales plan, you articulate the
3    benefits and usefulness of your drug; you find out the
4    numbers of patients, and you talk -- They really were the
5    only ones in our groups that talked to practitioners - they
6    talked to nephrologists - the other folks talked to business
7    people mostly, contracted for -- But they talked to
8    practitioners and they convince - what pharmaceutical reps
9    do, they convinced the physician based upon data of the
10   utility of the drug.  Many of them had -- Many of the
11   physicians obviously had experience with the drug, they knew
12   what patients could benefit from it.
13              That's what we did.
14       Q      Did you have an understanding as to how the pricing
15   worked for Calcijex?
16              And when I say, "pricing," I mean how Abbott
17   determined how it would price Calcijex.
18              MS. CITERA:  Objection to form.
19              THE WITNESS:  How would you price it?
20              I guess it's as one prices anything; what clinical
21       benefit does it provide to the patient, what is that
22       clinical benefit worth, and price it as a function of
23       that.
24       Q      Did you have an understanding as to whether
25   Calcijex was a drug that was reimbursed by Medicaid or
```

Page 61

1  Medicare?
2      A   My -- As I recall, Calcijex is reimbursed by
3  Medicare --
4      Q   Is that because it's a renal product?
5      A   -- in the end-stage --
6      MS. CITERA:   Objection to form.
7      A   -- renal disease program.  That's my understanding.
8      Q   Okay.
9          Sir, I'd like to take you back to -- We've talked a
10 little bit about Home Infusion, but we haven't talked that
11 much about Alt Site --
12     A   Product Sales.
13     Q   -- Product Sales.
14         I guess I'd just like for you to give me, as sort
15 of the vice president, what was Alt Site Product Sales?
16     MS. CITERA:   Objection to form.
17     THE WITNESS:   It was the sales of the products that
18 Hospital Products Division produced in non-hospital
19 settings.
20         There was -- There was and it continues to be a
21 trend in this country to send people out of hospital
22 quicker, to want to treat people at home, if possible.
23 There -- People say there are data - and this
24 information may not be true, that people recover better
25 at home.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 62

1      We do now that there are large numbers of nosocomial
2  infections that people who go into hospitals to get
3  their tonsils out end up with catastrophic staph
4  infections - we know that.
5      So if we can get people out of the hospital, treat
6  them home, it's felt that they'll recover better and
7  it's less costly - it's a less costly environment than
8  having them in the hospital.
9      So taking advantage of this trend and the products
10 in Abbott's portfolio, we said, Well, why can't these -
11 You know, these people can be infused by antibiotics at
12 home.  Others saw this, they opened home infusion
13 companies and then that's how the industry evolved.
14     Q   Who generally were the clients that you sold to or
15 that the Alt Site Products Sales sold to?
16     A   Wholesalers and distributors of -- Well, one has to
17 be aware that this was a line of nondifferentiable generic
18 drugs.
19         You -- You --
20     Q   Can you explain that to me?
21     A   Well, that they were multi-source, that they were
22 off-patent.
23         As I understand, the patent is intended to teach
24 you how to make something, and if it doesn't teach you how
25 to make it, the patent's no good.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 63

1      So many, many people could make this drug; many,
2  many people could marketed it.
3      It was felt that we had a position where we had a
4  broad array of these products which we used in hospitals, so
5  we would have an opportunity as these procedures moved out
6  of the hospital to sell them in the home market.
7      Q   And was there a marketing plan for Alt Site Product
8  Sales, or were there marketing plans that were developed for
9  Alt Site Product Sales?
10     A   You know, one man's marketing is another man's
11 sales --
12     Q   Okay.
13     A   -- the terms, by some, are interchangeable.
14         Were there plans for these business units?  Yes,
15 they were.  There were marketing plans for products; there
16 were marketing plans for product lines, and there are sales
17 and income plans for businesses.
18         And we had those.
19     Q   And how were the sales and income plans developed
20 for Alt Site Product Sales?
21     MS. CITERA:   Objection to form.
22     THE WITNESS:   You know, the same way everyone
23 develops the first plan.  You have a market of a
24 specific size; you have capture versus losses; you have
25 new customers; you have new products; you have the

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 64

1      effect of customers you lost last year.
2          You throw this all up in a hat, a number comes out
3  and that's your plan.
4      Q   Who was responsible for developing the sales and
5  income plans for Alt Site Product Sales?
6      A   The marketing managers and general managers of the
7  individual business, and then we would confer and - we would
8  confer and then we would present these numbers to the
9  division --
10     Q   Okay.
11     A   - for their approval.
12     Q   Okay.
13         When you say the marketing manager --
14     A   The marketing managers and the general managers
15 within the business units; they conferred, they came up with
16 a number or they came up with a plan, you know, and then I
17 talked to them, we'd reach an agreement, we'd go to the
18 division, ask to the division's agreement and then that was
19 our plan.
20     Q   Okay.
21         When you say the individual businesses, do you mean
22 the individual businesses within the Alt Site?
23     A   That's correct.
24     Q   Okay.
25         So would the general managers then develop the

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 65

```
1   sales plan?
2       A    I'd meet with Mike King and we would talk about
3   what his plan's going to be for next year, we'd come to a
4   agreement on what it would be: I'd meet with Bill Dempsey
5   and his staff and we would discuss it and come to an
6   agreement, and I'd meet with Mike Sellers or John Ward and
7   their staff and they would go through the logic of the new
8   plan.
9       Q    Okay.
10           Would these be written proposals?
11      A    Sales plans for subsequent year are written; yes,
12  ma'am.
13      Q    And who would maintain the sales plans?
14      A    I don't understand the word "maintain."
15      Q    Where would they been kept?  Would they be
16  physically --
17      A    They would be kept --
18      Q    -- filed somewhere?
19      A    -- by the division, they would be kept by the
20  individual business and they would be kept by me.
21           MR. STETLER:  Dan, make sure you let her finish her
22  question.  You're cutting her off quite a bit.
23      A    I'm sorry.  I apologize for that.
24      Q    That's okay.
25           When you say, "kept by me" --
```

Page 66

```
1            MR. STETLER:  Apologize to her (indicating).
2            THE WITNESS:  Excuse me, ma'am.
3            COURT REPORTER:  It's okay.  Thank you.
4   BY MS. ST. PETER-GRIFFITH:
5       Q    When you say, "kept by me," did you have a file or
6   file cabinets where you -- Well, I want to find out,
7   understand where you physically maintained the records or
8   kept the records --
9       A    Oh --
10      Q    -- of the sales plans.
11      A    -- they would be in a file cabinet in my office.
12      Q    And when you retired, do you know what happened to
13  the file cabinet?
14      A    No, ma'am.
15      Q    Okay.
16           Let me ask you.  As -- Did you -- I understand that
17  as the chief you probably had a wide variety of
18  responsibilities, but can you identify what your
19  responsibilities were as the divisional vice president?
20      A    To supervise each of the three individual
21  businesses and to ensure that we maximized the opportunity
22  that those businesses provided to Abbott shareholders, and
23  to do it, you know, obviously in a forthright and with
24  integrity -- In a forthright way and with integrity.
25      Q    Did you have any direct responsibility for pricing
```

Page 67

```
1   of products either - well, within any of the three business
2   units in Alt Site.
3       A    Direct responsibility?
4            MS. CITERA:  Objection to form.
5            THE WITNESS:  We would look -- I would look at
6   pricing.
7            My concern was -- When you talk about pricing there
8   are large numbers of what does pricing mean.
9            My concern was the prices to end customers because
10  that's what comes on the check, what the customer paid
11  you for the product; to ensure that they were fair, that
12  they were within the limits of our competitive
13  environment and that they would allow us to gain share.
14      Q    How would you gauge what was within the limits of
15  your competitive environment?
16      A    Well, people would tell me what competitors - you
17  know, we'd have some competitive pricing and customers were
18  forthcoming, generally, with prices that our competitors
19  were charging them.
20      Q    How would the sales of Alt Site products --
21           MS. ST. PETER-GRIFFITH:  Strike that.
22      Q    How would you compete with your competitors in
23  terms of pricing Alt Site products?
24           MS. CITERA:  Objection to form.
25           THE WITNESS:  We had a wide variety or a wide array
```

Page 68

```
1   of products.  We had a very high quality product line
2   and we tried to take advantage of the high quality of
3   our products and the broad array of our line to make it
4   beneficial for a customer to do business with us.
5       Q    You mentioned before that Renal sold - actually
6   sold directly to physicians.
7            MS. CITERA:  Object to the form.
8            THE WITNESS:  Renal Care salespeople called on
9   physicians --
10           MS. ST. PETER-GRIFFITH:  Okay.
11           THE WITNESS:  -- and, you know, who the ultimate
12  decision maker was - you may have eight physicians in a
13  practice, only one of them decides.
14           MS. ST. PETER-GRIFFITH:  Okay.
15           THE WITNESS:  So, yes, we called on physicians, but
16  we may not have always called on decision makers.
17  BY MS. ST. PETER-GRIFFITH:
18      Q    For Alt Site Product Sales, who would your sales
19  folks call upon?
20      A    Well, hopefully, decision makers, people within
21  the --
22      Q    Okay.
23      A    -- distributors or wholesalers who resolved with
24  whom they were going to have contracts - that sort of thing.
25           We -- We didn't call on practitioners or
```

Page 69

1  physicians.

2     Q   How did the relationships with the distributors and

the wholesalers work in terms of sales?

4       MS. CITERA: Objection to form.

5       THE WITNESS:  Once again, we would take array --

6     We'd try to take advantage of our broad array of

7     products and present a whole package to the distributor

8     or wholesaler or pharmaceutic benefit manager, which our

9     competitors couldn't do because we had a broad array of

10    products.

11     Now, these products are generic, and you need to

12    understand that wholesalers don't create demand --

13     MS. ST. PETER-GRIFFITH:  Okay.

14     THE WITNESS:  -- distributors don't create demand.

The demand is there - these are generic products.  A

16    doctor knows why amoxicillin is used; we didn't go out

17    and call on doctors and tell them why amoxicillin is a

18    good drug.

19     We just -- We merely provided these

20    well-characterized, well-known products in a broad array

21    to distributors and wholesalers who then sold to

22    physicians in this milieu.

23  BY MS. ST. PETER-GRIFFITH:

24     Q   How would you go about creating then demand for

25  Abbott products - Abbott generic products?

Page 70

1     A   We did not create demand for Abbott generic

2  products.

3     Q   Would pricing of products by Abbott impact the

demand for an Abbott product?

5       MS. CITERA:  Objection to form.

6       Q   Demand for an Abbott product?

7       MS. ST. PETER-GRIFFITH:  Yes; as opposed to, for

8    example, a Baxter comparable product.

9       MS. CITERA:  Objection to form.

10      THE WITNESS:  An individual product, I don't know.

11  I don't know that - I don't know the answer to that.

12     That was not our strength.  It was not our desire to

13  sell very low prices.

14  BY MS. ST. PETER-GRIFFITH:

15     Q   Okay.

16     What do you mean by that?

17     A   Well, our products were costly to make, they were

18  of quality, and, sometimes, you have to get out there and

19  sell that quality and sell better patient care as averse to

20  selling price.

21     I didn't want to sell price.  We didn't have to.

22  We had good products.

23     Q   Okay.

24     Sir, in Alt Site, as I understand it - and I'm

25  still learning this and you know that's why I'm looking to

Page 71

1  you a little bit to teach me - how was the sales force

2  divided up; were there national accounts and then regional

3  accounts?

4     A   We did have national accounts and we had local

5  salespeople.

6     Q   And how was the sales force division of labor

7  broken up?

8     A   National accounts managers were responsible for

9  contracting with national accounts; the local sales reps

10  were responsible for going in and implementing these

11  contracts.

12     Now, an account could have had contracts with

13  multiple companies --

14     Q   Okay.

15     A   -- for example, we had a line of ambulatory

16  infusion pumps which were really great - you know, the

17  patient don't have to have this big old pole and, you

18  know, a pump the size of this desk (indicating) and be stuck

19  to a hospital bed; they can clip it on their belt and be

20  ambulatory and walk around with a little bag - it's really

21  great for them, and we had a line of those pumps.

22     But these home infusion companies had contracts

23  with many companies, so it was the local rep's

24  responsibility to go in and make sure they articulated the

25  benefits of our product and that we - they used our pump

Page 72

1  instead of somebody else's.

2     Q   Okay.

3     Can you remember what some of the large national

4  accounts were?

5     A   Oh, golly.

6     Q   I don't mean this to be a memory exercise, but to

7  the extent you remember.

8     A   You know, the names specifically - and what happens

9  is they tend to - this industry tended to consolidate and

10  the customers were getting bigger - but if I recall some of

11  the names, Coram was a big customer of ours - golly, I don't

12  - Cardinal, Medco - you know these sorts of companies, PBMs

13  - they're a lot of them.

14     I'm sorry.  I can't remember them by name.

15     Q   Would Alt Site products sell to GPOs?

16     A   Group Purchasing Organizations; yes, they were

17  customers.

18     Q   Okay.

19     And do you remember what some of the GPOs were?

20     A   No, ma'am, I don't.

21     I remember one was in Little Rock, Arkansas - gosh,

22  it was a big one, I wish I could remember the name of it.

23     I don't remember the names of the GPOs.

24     Q   And I'd like to circle back to the explanation --

25     A   Now, once again, the customer could be a member of

Page 73

1  multiple GPOs - a customer could be a customer of multiple
2  GPOs, too.
3      Q    Okay.
4           And so that actually leads into my next question.
5           For the local sales force, was it their
6  responsibility to ensure that Abbott's products were being
7  purchased over other products because these local customers
8  might be involved in several GPOs?
9      MS. CITERA:  Objection to form.
10      THE WITNESS:  Yes; that is job for a salesman --
11      MS. ST. PETER-GRIFFITH:  Okay.
12      THE WITNESS:  -- yes, ma'am.
13  BY MS. ST. PETER-GRIFFITH:
14      Q    And that's -- Those were the responsibilities for
15  the regional sales force?
16      A    For the local salespeople, yeah; to ensure that
17  they bought off our contract first versus the contract that
18  they may have had with another.
19      Q    Were there any just regional sales contracts as
20  opposed to national accounts?
21      A    There may have been, but I don't recall
22  specifically.
23      Q    Was it a large segments of the business, do you
24  recall?
25      A    I don't know.  I don't remember.

---

Page 74

1      Q    Okay.
2           Is it fair to say that primarily Abbott Alt Site
3  Product Sales sold on to national accounts?
4      A    That if one were to add up the sales to national
5  accounts versus local accounts, I don't have those data -
6  I'm sure this data could be made available to you.
7           But I don't specifically recall what the split was
8  national accounts versus local accounts versus regional
9  accounts.  I don't recall that.
10      Q    Do you recall in general how much the annual
11  revenue was for Alt Site Product Sales during your tenure?
12      A    It may have gotten to 150 million when I left - not
13  big numbers by Abbott's standards of a $20B corporation, but
14  we were kind of proud of it.
15      Q    Okay.
16           When you came on do you recall approximately what
17  the annual dollar volume was for Alt Site Product Sales?
18      A    Maybe 20 million, if I remember.
19      Q    Wow.  So that's a pretty big jump then --
20      A    Well --
21      Q    -- while you were --
22      A    Well, DRGs were very helpful.
23      MS. CITERA:  Objection to the form.
24      Q    When you say, "DRGs were very helpful," what do you
25  mean?

---

Page 75

1      A    Well, people left the hospital early and needed
2  treatment at home.  And then this became their regardant;
3  let people out of the hospital earlier, get them out of
4  here.
5           So the treatment at home became important, so
6  therefore, the market for high quality, reliable products
7  outside the hospital grew significantly.
8      Q    Other than a shift from hospital markets to more of
9  an in-home care arrangement or alt sites, can you provide
10  any explanation as to how in ten years a $20M business can
11  grow into a $150M?
12      A    New products, ma'am.
13      Q    New products?  Okay.
14      A    Yes.
15           And, once again, I don't remember the break out
16  specifically.
17      Q    Was vancomycin a new product?
18      A    Vancomycin?  No, that was one of our generics, I
19  believe, one of our generic products.
20      Q    Okay.
21           Do you recall whether the vancomycin market grew in
22  Alt Site Product Sales during your tenure?
23      A    Vancomycin market grew.
24           For a specific drug, without going back and
25  reviewing the clinic- -- What you've got to do is review the

---

Page 76

1  clinical states, ma'am.  If those clinical states increased
2  or if the claims for the drug increased -- In other words,
3  if you don't have a claim for a drug, you don't sell
4  anything for that disease.  If you go out and do the
5  clinical study and get a claim for that drug, the sales of
6  the drug can grow significantly, although it's the same -
7  you know, you have to have a claim.
8      Q    Okay.
9           What do you mean by that, "you have to have a
10  claim"?
11      A    If, for example, you get - let's use some
12  ridiculous example - that vancomycin works again- -- You
13  don't have a claim that it works against E. coli, it will
14  not be used for that.
15      Q    Okay.
16      A    You don't sell off-label claims.
17           So if we go out and do the clinicals and suddenly
18  we get a claim that vancomycin works against E. coli and now
19  we have a new claim for that, we can go out and sell that
20  and sales will increase for the same product because you
21  have a new market fundamentally.
22      Q    Do you remember what some of the claims were for
23  the utility of vancomycin?
24      A    No, ma'am.
25      Q    Do you remember vancomycin being an important

Page 77

1    product for the Alt Site Product Sales?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  I remember it being one of them.
4    Q    Okay.
5        What were some of the other products that were
6    important?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  You know, once again, I apologize.
9    After so many years and clinical medicine's not my
10   deal --
11       MS. ST. PETER-GRIFFITH:  Okay.
12       THE WITNESS:  -- If one were to artic -- I have a
13   latent memory of these things.  If you mention a drug
14   like vanco, sure, I remember; if - some of the others,
15   if you were to mention them, I'm sure I'd remember them.
16   BY MS. ST. PETER-GRIFFITH:
17   Q    Okay.
18       Were sales of -- Well, we've already established
19   that sales of Calcijex were very important to the Renal
20   Department --
21       MS. CITERA:  Objection to form.
22       THE WITNESS:  But that was all they sold.
23   Q    Huh?  That's all they sold.  Yeah.
24   A    Yes, ma'am.
25   Q    But they did so successfully, it sounds like.

Page 78

1        MS. CITERA:  Objection to form.
2    Q    I mean, you developed a market and by the end, you
3    said --
4    A    No, ma'am.  No, ma'am.  We didn't develop a market.
5        This is a good drug.  Renal osteodystrophy is a
6    dreadful disease.  We spent the money.  We got the claim.
7    We marketed the drug.
8    Q    And I misspoke.  I apologize.
9        You were very successful in developing a product to
10   meet a need.
11   A    Right.  The need was there and we met it with a
12   good drug.
13       I don't mean to be a nitpicker, but --
14   Q    No.  No.
15   A    -- that's what happens.
16   Q    Believe me, I want you to clarify my questions for
17   me.  Okay?
18       Were there large volume products that you can
19   recall that Alt Site Product Sales sold?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  Individual products, no, ma'am.
22   Q    What about dextrose solutions, do you recall those?
23   A    Yes, ma'am; the bane of my existence.
24   Q    Oh, how so?
25   A    Did you ever try to go out and sell sugar water?

Page 79

1    Q    Well, Starbucks does it pretty successfully?
2    A    They do.
3        We were selling -- You know, we'd sell a litre of
4    sodium chloride sterile solution for less than a liter of
5    Perrier, and Perrier had benzene in it, and our stuff was
6    less expensive.
7        Yes, ma'am, I'm familiar with dextrose and I'm
8    familiar with sodium chloride.
9    Q    Were dextrose and sodium chloride large volume
10   sales --
11   A    They're diluents.
12   Q    -- for Alt Site products?
13   A    They're diluents.
14       These are injectable drugs.  You inject the drug
15   into the I.V. bag, and then in the diluted form, the drug is
16   infused in the individual.
17   Q    Okay.
18       So they were important for that dilutent purpose.
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  As I understand it, ma'am, clinically
21   the drug has to be diluted in the solution.
22   Q    And it was something that the Alt Site market or
23   the Alt Site customers would use with some frequency?
24   A    To my --
25       MS. CITERA:  Objection to form.

Page 80

1        THE WITNESS:  -- In my -- As I recall, yes.
2    Q    Okay.
3        And is it fair to say that Abbott Alt Site had
4    competitors in the alt site market for dextrose and sodium
5    chloride?
6    A    Yes, ma'am.
7    Q    Okay.
8        How would Abbott go about or how would the Alt Site
9    Unit go about determining how it was going to compete for
10   the dextrose or sodium chloride market?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  The products are undifferentiable.
13   You try to take advantage of your relationship with the
14   customer - if you have a good relationship; if your
15   service has been good and you've always performed well
16   for them in that regard; if your product line is broad
17   and they can satisfy many of their requirements with
18   you, and you just try to satisfy that customer as best
19   you can with service and quality product.
20       MS. ST. PETER-GRIFFITH:  Okay.
21       THE WITNESS:  And you had to keep your service
22   levels up and you had to provide quality product all the
23   time, you know.
24       In this life, if you want loyalty, buy a cocker
25   spaniel.  Customers left if you had a product problems,

Page 81

1  customers left if you had supply issues, so you had to
2  make sure that you did a better job than your
3  competitors of these - especially with these
4  multi-source, undifferentiated drugs of doing a good job
5  of service and availability.
6  BY MS. ST. PETER-GRIFFITH:
7      Q    And I'm assuming doing that good job, you always
8  did that with an aim towards your responsibility to the
9  shareholders to try and maximize as best you could the
10  profits for your units?
11     A    Well, ma'am, there are a lot of people who are
12  stakeholders at Abbott; the patient who receives the drug,
13  the customer that buys this drug, the people who make the
14  product - there are a lot of stakeholders.
15         Our goal is high quality health care and to provide
16  a reasonable return to our shareholders, and I don't think
17  you have to apologize for that - that's what we do - --
18     Q    Okay.
19     A    -- otherwise, they'd invest someplace else and our
20  company, you know, doesn't do well.
21     Q    Other than the --
22     MS. ST. PETER-GRIFFITH:  Strike that.
23     Q    Let me go on a different route.
24         We've talked a little about Alt Site Product Sales.
25  What was your understanding of the business model for the

Page 82

1  Home Infusion Unit; can you explain in a little bit more
2  detail than what we've discussed already how that worked?
3      A    There were hospitals who were releasing patients to
4  third-party home infusion companies - in other words,
5  Children's Hospital in Chicago would release a young patient
6  to a home infusion company - and Children's is maybe an
7  extreme example because they get really sick kids - and
8  they'd do the best they could and then they'd turn them over
9  to this third party.
10         Well, it was their desire to treat this patient to
11  make sure that the clinical progress of this patient was
12  steady and that they were treated well, so they decided they
13  wanted to be in the home infusion business, but they didn't
14  have a pharmacy, they didn't know how to bill or reimburse
15  for it, they didn't have contracts for product.
16         So we would go to them and say, Well, we'll
17  compound the product for you; we'll do the billing and
18  reimbursement for you; we'll provide all the products you
19  need, including non-Abbott product, and you do what you do
20  best, provide clinical care to these sick kids.  So that
21  model developed.
22         And then, as I articulated to you before, this
23  business is - this is bad business, so we would try to
24  off-load, as soon as it was practical, some of the other
25  responsibilities - some of the responsibilities back onto

Page 83

1  Children's Hospital.
2          They opened up their pharmacy - their own pharmacy
3  - thank God - in the northwest suburbs and we're able to
4  compound and provide these drugs to the kids.  We still gave
5  them all the drugs.  And then what would happen when they
6  started doing the compounding, our percentage of the
7  collections would go down and then, hopefully, at some point
8  in time they would take over billing and reimbursement and
9  then we would merely provide them product.
10         So our goals were to wean them off our services
11  because these are very unprofitable and just get them using
12  our product and, perhaps, the CHIP system that I mentioned
13  before, if there were an opportunity to sell that.
14     Q    Why was this business model unprofitable?
15     A    The business model was unprofitable because it was
16  a very easy-in business so that people -- You know, you
17  could set up a pharmacy - it's a service business so it
18  wasn't very costly.  And many very good organizations got
19  into it because since it was so easy to get in, there may
20  have been more schlak (sp.) artists in this business than
21  others.  So you'd want -- If you wanted quality patient care
22  you either did it yourself or signed up with an organization
23  that you knew provided quality.  So that's how it happened.
24     Q    And --
25     A    And once you let them out, you don't want them --

Page 84

1  The hospitals, once they let them out, they don't want them
2  back - they don't want them getting infected by the port
3  sites or their I.V.s, especially, as an example, like
4  children, you've worked so hard to get these kids well; if
5  they're on chemo at home, you don't want them back with
6  infections and those sorts of things.
7      Q    Okay.
8          Now, you said that the Home Infusion Business Unit
9  sold even products that were not Abbott products?
10     A    Yes, ma'am.
11     Q    How would that work?
12     A    Our agreement was to get a percentage of
13  collections.
14         So we would buy, for example, Rocephin; if a person
15  had Lyme's disease, it was required that they be infused
16  with Rocephin.  We didn't buy that -- We didn't manufacture
17  that product, it was a proprietary product of Roche, we
18  would buy it.
19     Q    Would you buy it as part of a group purchasing
20  organization?
21     A    Yeah; I mean I'm sure we were part of various group
22  purchasing organizations where we bought the drug.
23     Q    Okay.
24         What about other products from Abbott -
25  manufactured by Abbott affiliates, like TAP and Lupron;

Page 85

1  would the Home Infusion Unit provide Lupron?
2       MS. CITERA:  Objection to form.
3       THE WITNESS:  I don't ever recall having provided
4  Lupron.
5       Q   Do you recall whether the Alt Site Business Unit
6  ever priced or sold Lupron?
7       MS. CITERA:  Objection to form.
8       THE WITNESS:  To my -- No, we never sold -- To my
9  knowledge, we never sold Lupron.  It's been a long time,
10  but I don't ever recall selling Lupron.
11      We didn't -- They did that themselves.
12      Q   Who's they?
13      A   TAP.
14      Q   Oh, TAP.  Okay.
15      How would the customer, the home infusion customers
16  be approached by Home Infusion; did --
17      MS. ST. PETER-GRIFFITH:  Let me strike that.
18      Q   Did Home Infusion have a sales force?
19      A   A very small sales force; yes.
20      Q   And did they have a contract marketing division?
21      A   Not contract marketing; no, ma'am.  There were
22  individuals responsible for working out the contracts, you
23  know, to make sure they were viable.
24      I mean, we made proposals to these folks.
25      Q   Did Alt Site Products Sales have a contract

Page 86

1  marketing department?
2       A   Yes; we had a small contracting group.  I don't
3  remember how many people were there.
4       One of the things that was important was that the
5  pricing would be proper for customers or you couldn't get
6  business - as I said before - with multi-source injectable
7  pharmaceuticals.
8       Q   Okay.
9       In terms of the Home Infusion sales force, would
10  they just make cold calls upon hospitals to discuss
11  developing the home infusion --
12      A   Home infusion services?
13      Q   Yes.
14      A   No.  They -- How they prospected, I don't really
15  recall.  You know, obviously you go to the big dogs, the big
16  hospitals that don't have their own home infusion business
17  and they're sending out to others and approach them on it.
18      Q   Do you recall whether there were some clients that
19  were like that?
20      A   Oh, yeah.  We did that.
21      Q   Do you remember the names of the hospitals?
22      A   I don't -- I'm sure many of the large hospitals.  I
23  remember going on calls - Lahey Clinic in Boston was in, you
24  know, many large customers wanted to do this.
25      But, once again, my concern was getting the

Page 87

1  profitability, that business up, and getting our customers
2  to do their own stuff - you know, their own ancillary
3  services.
4       Q   Let me circle back to an issue that we just touched
5  upon.
6       Do you recall whether Abbott either Home Infusion
7  or Abbott's Home Infusion pharmacies would dispense Lupron?
8       MS. CITERA: Objection to form.
9       THE WITNESS: I believe TAP had an organization
10  named TAP Care which did that.  We didn't do that.
11      Q   Okay.
12      Would Abbott Home Infusion work with TAP Care?
13      A   Not my knowledge.
14      Q   Do you know whether Abbott Home Infusion would seek
15  reimbursement for Lupron?
16      MS. CITER:  Objection to form.
17      THE WITNESS:  Seek reimbursement for Lupron?  I
18  can't imagine a reason why.
19      No, ma'am; I don't think so.
20      Q   Okay.
21      With regard to the Alt Site pharmacies - the
22  pharmacies, themselves, who were the Home Infusion Services
23  clients for those pharmacies?
24      A   Hospitals.
25      Q   Okay.

Page 88

1       Just hospitals?
2       A   Generally just hospitals; yes, ma'am.
3       Q   Would you ever have a situation where physicians
4  would, you know, have patients work directly with Abbott's
5  pharmacies?
6       A   The only patients I recall dealing directly with
7  were those whose lifetime benefit had expired, and we had
8  several of those.  Specifically, those were total parenteral
9  nutrition patients; their lifetime benefits had expired and
10  we couldn't get paid any longer, so we continued to do it
11  pro bono, and we dealt directly with them.
12      Q   When you say, "lifetime benefits had expired," what
13  do you mean?
14      A   That means a lifetime benefit, what their insurance
15  companies would pay - it may be $200,000, it may be $250,000
16  and their lifetime benefit expired - they had surpassed that
17  number and the insurance company would no longer pay; well,
18  we would deal directly with the patient and continue to
19  provide the product.
20      Q   Okay.
21      Do you recall whether there were sales plans or
22  marketing plans for the Alt Site Home Infusion business?
23      A   Yes, ma'am, there were.
24      Q   There were?
25      Were those similarly reviewed by you - developed by

Page 89

1  the general manager and then reviewed by you?

2      A    The sales plans?  Yes; that would be how we would

3  do it.

4      Q    Did you keep copies in your office?

5      A    Of their sales plans?

6      Q    Yes.

7      A    Yeah.

8      Q    Okay.

9          Sir, do you ever remember receiving memoranda,

10 either a memorandum or memoranda asking you to retain

11 documents because litigation was ongoing?

12     A    I may have - I don't specifically remember, but I

13 may have.

14     Q    If you did receive that, what would you do with

15 your records or documents?

16         MS. CITERA:  Objection to form.

17         THE WITNESS:  If I had received that?

18         MS. ST. PETER-GRIFFITH:  Yeah.

19         THE WITNESS:  I'd retain them.

20         MS. ST. PETER-GRIFFITH:  Okay.

21         THE WITNESS:  Compliance with the requests of my

22     supervisor at Abbott was not optional.

23         MS. ST. PETER-GRIFFITH:  Okay.

24         THE WITNESS:  If they were to be retained, they were

25     retained.

---

Page 90

1  BY MS. ST. PETER-GRIFFITH:

2      Q    Okay.

3          What about do you recall as you sit here today

4  furnishing any documents to - incident to one of those

5  memos?

6      A    Any -- No, ma'am, I don't.  But any document that I

7  had with regard to a sales plan are - my supervisor would

8  also have had.

9      Q    Oh, okay.

10         So do you send all the sales plans up to the

11 president?

12     A    Well, he would have had copies of those; yes,

13 ma'am.

14     Q    Okay.

15         So Mr. Kringel, initially, and then Mr. Gonzalez?

16     A    Yes; they would have copies of our sales plans.

17     Q    Would you discuss the sales plans with either

18 Mr. Kringel or Mr. Gonzalez?

19     A    Either Mr. Kringel or Mr. Gonzalez would approve

20 our sales plan and then we would present it to the

21 corporation, and after corporate approval it would become

22 cast in stone as our sales plan.

23     Q    Okay.

24         Who would -- And would this be done on an annual

25 basis?

---

Page 91

1      A    The sales plan would be done on an annual basis and

2  it would be updated.

3      Q    How frequently would it be updated?

4      A    In April and August.

5      Q    In April and August?

6          And who in corporate would sign off on the sales

7  plans for your business units?

8      A    As I recall, Hodgson, the president of the

9  corporation.

10     Q    Mr. Hodgson would?

11     A    Mr. Hodgson, yes.

12     Q    Okay.

13         And who else was the president of the corporation

14 while you were there?

15     A    While I worked for the corporation?  Boy, there

16 must have been - there were a lot of them; Kirk Robb, Jim

17 Vincent, Jack Schuler - there were at least four.

18     Q    Okay.

19         Did you ever work with Miles White?

20     A    No.

21     Q    Okay.

22         Did you work with Mr. White when you were in

23 Diagnostics at all?

24     A    No -- Oh - hold on - yes; I made a sales call with

25 Mr. White probably in 1983 on the largest customer we had -

---

Page 92

1  he was in national accounts then and I had Physiological

2  Diagnostics - we made a sales call on MetPath in Teterboro,

3  New Jersey, and Mr. White accompanied me on that call.

4      Q    Okay.

5          Do you recall when Mr. White took over as president

6  of the company?

7      A    Probably in 1999 or --

8      Q    Okay.

9      A    -- 2000.

10     Q    Do you remember who preceded him?

11     A    Who preceded him as president?  It may have been

12 Jack Schuler - I don't even remember - Mr. Schuler as

13 president?

14     Q    Okay.

15         So when Mr. White --

16     A    No - excuse me - Tom Hodgson was president.

17     Q    Tom Hodgson; okay.

18     A    Yeah.

19     Q    So when Mr. White took over in '99 and 2- --

20     A    Mr. White is CEO.

21     Q    Is CEO.

22     A    Right.

23     Q    Okay.

24         Would he sign off on the plans?

25     A    I don't know if he dealt in the level of detail

Page 93

1    that would include a business like Alternate Site Product

2    Sales or Home Infusion Services.

3         I am sure that, as president -- Well, the president

4    was a gentleman named Bob Parkinson - Mr. White was

5    chairman.  Mr. Parkinson, I'm sure would -- But whether

6    Mr. White as chairman would sign off at that level of

7    detail, I doubt -- I don't know.

8        Q    Okay.

9         What about you talked earlier about trying to phase

10   out of the Home Infusion Business Unit --

11       A    Yes, ma'am.

12       Q    -- would that be a decision that would need to be

13   made above you?

14       A    Yes, it would.

15       Q    Who would you expect would need to be consulted and

16   conferred with and ultimately make that decision?

17       A    Mr. Kringel or Mr. Gonzalez, and then probably

18   Mr. Hodgson or Mr. Parkinson.

19       COURT REPORTER:  Give me one second.

20       MS. ST. PETER-GRIFFITH:  Okay.

21       Why don't we take a brief break.

22       VIDEOGRAPHER:  Going off the record.

23       (Whereupon, a brief recess was taken)

24       VIDEOGRAPHER:  We're back on the record.

25   BY MS. ST. PETER-GRIFFITH:

Page 94

1        Q    Mr. Robertson, I'd like to talk with you about

2    different folks that you worked with, but before I did that,

3    I have to tell you, I don't have a business background, and

4    you've sold product all over the world on behalf of Abbott.

5         I wanted to understand a little bit more about how

6    Alt Site went about differentiating its product - its

7    hospital products from those of its competitors - are you

8    with me?

9        A    Mm-hmm.

10       Q    You mentioned earlier that, you know, dextrose is -

11   I think you used the word loss leader?

12       A    No, ma'am -

13       Q    Oh, I'm sorry.

14       A    -- I didn't use that word.

15       It's sugar water.

16       Q    Okay.  It's sugar water.

17       A    Yes, ma'am.

18       Q    I mean, are there different qualities of sugar

19   water?

20       MS. CITERA:  Objection to form.

21       Q    You know, like is Abbott's product that different

22   from, say, you know Baxter's product on sodium chloride or

23   dextrose?

24       A    Not highly different; no, ma'am.

25       Q    Okay.

Page 95

1         How do you go about then sort of as the head or how

2    did Alt Site as a business unit go about differentiating its

3    product so that it was competitive?

4        MS. CITERA:  Objection to the form.

5        THE WITNESS:  Well, the product was always

6    competitive.  It's a good product; it's just difficult

7    to differentiate.

8        Once again, we tried to accentuate the quality of

9    our product, the constant availability of our product,

10   our service and the breadth of product line.

11       Q    Okay.

12       So you've got service.

13       A    Mm-hmm.

14       Q    Now, was the profitability to the customer an

15   important factor in how Abbott went about selling these sort

16   of large volume hospital products?

17       MS. CITERA:  Objection to form.

18       THE WITNESS:  Profitability to the customer was - we

19   couldn't do anything about that.  I mean, our

20   profitability was - that's a competitive milieu there,

21   and our concern was our profitability versus our

22   competitors.

23       MS. ST. PETER-GRIFFITH:  Okay, I got you.  Okay.

24       THE WITNESS:  If we're out there -- If we're out

25   there trying to sell a liter of dextrose for two bucks

Page 96

1    and our competitor's out there for 40 cents, there will

2    be no profitability --

3        MS. ST. PETER-GRIFFITH:  I got you.  I got you.

4        THE WITNESS:  -- we have to be competitive with

5    them.

6    BY MS. ST. PETER-GRIFFITH:

7        Q    Is it fair to say that sort of the -- But -- Was

8    the benefit of using your product to the customer an

9    important consideration for Alt Site Product Sales?

10       MS. CITERA:  Objection to the form.

11       THE WITNESS:  The benefit of using our product was

12   the service and breadth of product line.

13       You know, these products are very inexpensive --

14       MS. ST. PETER-GRIFFITH:  Okay.

15       THE WITNESS:  -- right?

16       In a home infusion environment, if you've got a

17   nurse whose fully burdened cost is $60 an hour, whether

18   you're paying a dollar and a quarter or a dollar-forty

19   for an injectable pharmaceutical is not going to make or

20   break.

21       What could make or break is the fact that when that

22   I.V. being gets to the customer's house, it hasn't

23   broken; when the vial of injectable drug gets there, it

24   opens properly and doesn't snap; that the person that

25   you order this from is pleasant and professional -

Page 97

1  that's what matters.  And we couldn't impact the
2  profitability of our customers.  These drugs are -
3  indiluents are trivial --
4       MS. ST. PETER-GRIFFITH:  Okay.
5       THE WITNESS:  -- in their overall situation.
6  BY MS. ST. PETER-GRIFFITH:
7       Q    But in terms of differentiating your product from,
8  say, Baxter's product for sodium chloride or dextrose, for
9  example, you mentioned that price --
10      A    We --
11      Q    -- was one way --
12      A    -- we --
13      Q    -- to differentiate.
14      A    We would not do that, ma'am.
15      Q    Oh, you wouldn't.  Okay.
16      A    Baxter doesn't have a line of injectable
17  pharmaceuticals.
18           We'd say, We're a one-stop shop here.  Why would
19  you do business with Baxter and have to make two orders when
20  you can call us and make one?
21      Q    Oh, okay.
22           So it was the nature of the product line?
23      A    Nature of the product line, the breadth of the
24  product line and our ability to fulfill more of the
25  customer's needs their our competitors.

Page 98

1       Q    Okay.
2       A    We tended to use those specific competences and
3  advantages to gain business.
4       Q    Well, then would there then be a direct price
5  competition between, say, sodium chloride bags or dextrose
6  bags that Abbott sold as compared to those that Baxter sold
7  or were they just completely different products?
8       MS. CITERA:  Object to the form.
9       THE WITNESS:  Well, would there be a direct --
10  Customers would want to say, Well, Baxter will charge me
11  this and you're charging me that.
12       And we would have to say, Yeah, but if you do
13  business with Baxter, you're going to get two delivery
14  charges; it's costing you 11 bucks to cut an invoice;
15  it's costing you another 15 bucks to cut the check.
16  Those charges go away if you do it with us because
17  you've got one bill, you know, one purchase order, one
18  invoice, and our service tended to be superior because
19  we paid a lot of attention to that.  So we tried to
20  differentiate in that regard.
21       THE WITNESS:  Price -- I'm not trying to downgrade
22  price - price is important - but our products were
23  trivial in the total cost picture of these companies.
24  We were not -- If someone was inefficiently dealing with
25  a $60.00 an hour fully-loaded nurse, whether he was

Page 99

1  paying a buck-forty or a buck-twenty-five for an
2  injectable was not going to solve his problem of
3  profitability.
4       Q    Well, would reimbursement for Abbott products be
5  something that factored into an Abbott customer's analysis
6  of whether to go with an Abbott product as opposed to a
7  Baxter product?
8       MS. CITERA:  Objection to the form.
9       THE WITNESS:  Would reimbur-- I -- There would be
10  many issues that would lead them to one product or
11  another - I don't know -- I don't know.  I don't believe
12  that a customer would say that -- I don't know the
13  answer to your question.  Perhaps, perhaps not; I --
14      Q    Well, let me ask it more generally.
15           In developing marketing plans for initiatives or
16  sales plans for initiatives overall for Alt Site --
17      A    Mm-hmm.
18      Q    -- would reimbursement at all be a factor - would
19  reimbursement to the customer at all be a factor in how Alt
20  Site developed its plans?
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  Well, we would have to have
23  reimbursement.  I mean, there would have to be reimburse
24  for the --
25      Q    So it would have to be a reimbursable product.

Page 100

1       A    Reimbursable product.
2       Q    What about the level of reimbursement, was that a
3  consideration?
4       A    I don't -- I don't think we considered that a
5  market based upon a level of reimbursement.
6            I mean, our problem was what our competitors
7  charged versus what we charged and whether or not we could,
8  you know, get the business.
9            I -- They had to be reimbursed for the product.
10      Q    Okay.
11           So reimbursement was important if that regard.
12      MS. CITERA:  Objection to form.
13      THE WITNESS:  Well, if the customer didn't get
14  reimbursed for the product there would be no utilization
15  of the products so the problem goes away.
16      Q    Do you know whether there were different
17  reimbursement levels between Abbott products and comparable
18  Baxter products?
19      A    No.  It was the same product.
20      Q    Do you know whether there were different
21  reimbursement rates, though, by other third-party payors or
22  states or the Medicare program?
23      A    There -- As I re-- -- There may have been - I mean,
24  I'm sure there were.  There were probably different levels
25  of reimbursement for product.  If product is a function of

Page 101

1  cost or charges - if there are different charges for
2  different product, there's going to be different levels of
3  reimbursement
4      Q   Okay.
5      Do you know whether that was - the different levels
6  of reimbursement factored into the Alt Site's customer base
7  in terms of making a decision as to whether to go with
8  Abbott products as compared to Baxter products?
9      MS. CITERA:  Objection to form.
10      THE WITNESS:  I -- Ma'am, you'd have to ask the
11     customers that.  We marketed based on our -- You know, I
12     don't know what the customers are thinking.  We market a
13     product based upon a competitive environment.
14      MS. ST. PETER-GRIFFITH:  Well --
15      THE WITNESS:  We never marketed to a customer by
16     saying, You'd make more money with this product - is
17     that your question?
18  BY MS. ST. PETER-GRIFFITH:
19      Q   In part.
20      Did, you know, the reimbursement to the customer
21  factor into the sales plans developed by Alt Site?
22      MS. CITERA:  Objection to form.
23      THE WITNESS:  No.
24      Q   Not at all?
25      A   The reimbursement to the customer --

Page 102

1      MS. CITERA:  Objection to form.
2      THE WITNESS:  -- we never discussed that.
3      We marketed based upon the quality of our products.
4      Q   You never discussed reimbursement?
5      A   I never did --
6      MS. CITERA:  Objection to form.
7      THE WITNESS:  -- personally.  I don't know if others
8     did, but I didn't.
9      Q   Do you know whether the sales forces at all did?
10      A   Not -- Not to my knowledge.
11      Q   Do you know whether Medicaid or Medicare
12  reimbursement at all was considered by Alt Site customers in
13  making decisions about whether to go with Abbott products as
14  compared to a competitor's generic?
15      MS. CITERA:  Objection to form.
16      THE WITNESS:  It may have been; I don't know.  I
17     can't speak for them.
18      Q   Did anyone bring reimbursement issues to your
19  attention as being a factor that customers considered?
20      A   No --
21      MS. CITERA:  Objection to form.
22      THE WITNESS:  -- not that I remember.
23      But, once again, these drugs are trivial in their
24     total cost picture.  It may very well -- You know, it
25     may very well have been, I just don't recall.

Page 103

1      Q   Do you whether other -- We're talking about
2  sodium -- When you say, "trivial," I take it you're talking
3  about the sodium chloride and dextrose?
4      A   And I'm talking about the drugs.
5      Q   Okay.
6      Including like, for example, vancomycin?
7      A   The drugs aren't a big -- I don't recall what the
8  pricing was.  But these drugs, based upon their total cost
9  basis for providing patient care, were trivial.
10      Q   Okay.
11      A   I mean --
12      Q   Do you know --
13      A   -- do you access to those data?  I don't know.
14      Q   Well, do you know whether --
15      MS. CITERA:  Could you guys not speak over each
16     other?
17      You're both doing it.
18      MS. ST. PETER-GRIFFITH:  I'm sorry.
19      MS. CITERA:  Thank you.
20      MR. STETLER:  Wait for her to finish her question.
21      THE WITNESS:  Okay.
22  BY MS. ST. PETER-GRIFFITH:
23      Q   Do you know whether reimbursement, for example, of
24  vancomycin - reimbursement levels of vancomycin was an
25  important consideration to Abbott Alt Site customers who

Page 104

1  were purchasing vancomycin?
2      MS. CITERA:  Objection to form.
3      THE WITNESS:  It may have been.  Reimbursement is a
4     critical issue, so I assume that reimbursement for vanco
5     was important to the customer.
6      Q   Okay.
7      When you say, "reimbursement was a critical issue,"
8     what do you mean?
9      A   I didn't say it was a critical issue, ma'am, I said
10     it was important --
11      Q   Okay.
12      A   -- to a customer because they want to recover their
13     cost, I assume.
14      Q   Okay.
15      Do you know whether they want to recover more than
16     their cost?
17      MS. CITERA:  Objection to form.
18      THE WITNESS:  Once again, I can't speak for them.
19     I mean, they want to make money - I know - I would
20     know that; yes, they would.
21      Q   Do you know whether the Alt Site sales force when
22  working with customers would discuss levels of reimbursement
23  for Abbott products?
24      MS. CITERA:  Objection to form.
25      THE WITNESS:  Levels of reimbursement for Abbott

Page 105

1   products were never a way we sold - were not a way we

2   sold.  No one of told them to sell that way, to my

3   knowledge.  They were told to sell based upon the

4   quality of our products.

5       Q   But do you know whether they may have used

6   reimbursement levels as a way to market Abbott products?

7       MS. CITERA:  Objection to form.

8       THE WITNESS:  I have -- I don't know that.  They

9   were never instructed to do that.

10      I don't know that, that anybody did.

11      Q   They could have but you just don't know?

12      MS. CITERA:  Objection to form.

13      THE WITNESS:  I don't know whether they - whether

14  they ever did that.  I mean, I don't know.

15      Q   Okay.

16      Sir, you testified earlier -- I'd like to go over

17  sort of a list of names of folks to see if you've worked

18  with them or are familiar with them.

19      Did you work with Mr. White at all when he - after

20  he assumed the helm in '99?

21      A   No.

22      Q   Do you know whether the Home Infusion Business Unit

23  was ever formally shut down?

24      A   No --

25      Q   Okay.

Page 106

1       A   -- I have not spoken to anybody in that business,

2   you know?

3       Q   Okay.

4       Are you aware that the Hospital Products Division

5   spun off to another company called Hospira?

6       A   Hospira; yes, ma'am.

7       Q   Okay.

8       How are you familiar with that?

9       A   I read it in the newspaper.

10      Q   Mr. Gonzalez; what was your day-to-day interaction

11  with him?

12      A   Mr. Gonzalez --

13      MS. CITERA:  Objection to form.

14      THE WITNESS:  -- I reported to Mr. Gonzalez.

15      Q   Okay.

16      How much -- What would you -- What would reporting

17  to go him involve?

18      A   I would submit plans and updates on my business to

19  Mr. Gonzalez.  I would see him infrequently.

20      Q   Okay.

21      A   If he had any questions, he would ask them of me -

22  I had an occasional one-on-one conversation with him.  And

23  we would run the business based on the numbers.  If I had a

24  problem and needed his help, I would contact him.

25      Q   What do you mean when you say you ran the business

Page 107

1   based upon the numbers?

2       A   He looked at my numbers and if they were according

3   to the plan and there were no questions provoked by these

4   numbers or by my commentary on the numbers on a monthly

5   basis, then if he had questions - which was pretty frequent,

6   he would call me and ask me or I'd have a one-on-one with

7   him and I would talk to him about that.

8       Q   So Mr. Gonzalez reviewed numbers for the Alt Site

9   Products Division on a - or Alt Site Product Sales on a -

10  I'm sorry.

11      For Alt Site, would Mr. Gonzalez receive numbers

12  concerning your sales on a monthly basis?

13      A   Sure.  Yes.

14      Q   Would he ever come to you with questions about

15  those?

16      A   Yes.

17      Q   How frequently?

18      A   Whenever there was a discrepancy between what I had

19  agreed to and what the numbers came in at.

20      Q   How would those discrepancies arise?

21      A   He, seldom, if ever called me if they exceeded his

22  expectation --

23      Q   Okay.

24      A   -- if they did not achieve his expectation, I heard

25  from him every time.

Page 108

1       Q   How frequently would you hear from him on numbers

2   that didn't exceed - that failed to meet his expectations?

3       A   We reported monthly.  If they meet his

4   expectations, I'd hear from him monthly.

5       Q   Okay.

6       Did you hear from him every month?

7       A   No, ma'am.  We made our numbers pretty well.  We

8   had to -- We made our numbers pretty well.  If there was a

9   good opportunity, we made the numbers pretty well.

10      Q   Did you take any problems to Mr. Gonzalez seeking

11  his assistance?

12      MS. CITERA:  Objection to form.

13      THE WITNESS:  Specific problems that we had that we

14  weren't able to solve, no.  But we'd come to him and ask

15  him for -- If there was a product opportunity, we'd ask

16  him to fund it so that the manufacturing group would do

17  it.  But specific -- That's a problem - if you need a

18  product and you don't have it, it's a problem - I would

19  define it as a problem - so we'd do that.

20      Q   Okay.

21      So when you say "product opportunity," what do you

22  mean?

23      A   If there was line extension - a product line

24  extension; a new product; a new drug; a change in a current

25  product that would make it better suited to Alt Site - that

Page 109

1  kind of thing.

2  Q    Other than the Zemplar sort of R and D that you

3  discussed earlier, what other products would Alt Site be

4  involved with developing?

5  A    I think we requested a line of injectable

6  pharmaceuticals be developed - you know, once again, it was

7  a long time ago.  I can recall going to him and asking him

8  to develop some specific product for us.

9  Q    Do you recall which those were?

10  A    No, ma'am, I don't.  I'm sorry.

11  Q    Does the Advantage line, does that ring a bell?

12  A    The Advantage line was developed for the hospitals.

13  That is in place well before Alternate Site Product Sales

14  became -- The Advantage line, I don't know how much of that

15  we used in Alternate Site.  We may have sold some to

16  distributors, I don't know - I don't remember specifically.

17       That's the little gizmo you'd dial into the

18  diluent --

19  Q    Okay.

20  A    -- Advantage, I guess that's -- You'd dial it into

21  the diluent and it makes pharmacy operations more efficient

22  - is that the product line you're discussing?

23  Q    You know, I'm not sure.

24  MR. STETLER:  If I could interrupt a minute.

25       Keep your voice up all the way through your answer -

Page 110

1       she's having a real hard time hearing you.

2  THE WITNESS:  Oh, I'm sorry.

3  MR. STETLER:  You tend to drop your voice at the

4  end and kind of go like this (indicating).

5       So just all the way through, keep it up.

6  Q    Any other -- Other than for sales - the monthly

7  sales reports, sales plans and going to Mr. Gonzalez for his

8  assistance with problems, did you have any other interaction

9  with Mr. Gonzalez?

10  MS. CITERA:  Objection to form.

11  THE WITNESS:  Not really.

12       I mean, he was my supervisor; he would review my

13  performance with me and I saw him on annual reviews, and

14  that was our relationship - I mean, he was my boss.

15  Q    Did you have a good relationship with Mr. Gonzalez?

16  A    Yes.

17  Q    Okay.

18  A    He's a good guy.

19  Q    What about Mr. Kringel, what was your --

20  A    He was my supervisor.

21  Q    -- involvement with him?

22  A    He preceded Mr. Gonzalez as my supervisor.

23  Q    And would your interaction with Mr. Kringel be

24  comparable to your interaction with Mr. Gonzalez?

25  A    We had the same reporting relationship; yes, ma'am.

Page 111

1  Q    Okay.

2       Did you have any other relationship with

3  Mr. Kringel?

4  A    Other than professional?

5  Q    Well, yeah - I'm sorry, that was poorly-phrased

6  question.

7       Other than what you described in terms of your

8  interaction with Mr. Gonzalez, with Mr. Kringel, would you

9  have more interaction with him than you would with

10  Mr. Gonzalez?

11  A    In the beginning I had more because I was new to

12  the job and he was - wanted to make sure I could do it, but

13  then he let me do my job and Mr. Gonzalez would let me do my

14  job.

15       So did I see them every week and discuss plans and

16  activities?  No.

17       I reported to them.  If there were discrepancies, I

18  would explain them.  If we were - and that was our

19  relationship, just a professional relationship.

20  Q    What about Mr. Begley?

21  A    Mr. Begley, as I recall, he worked in Hospital

22  Products Division.  He had - his responsibility was the

23  large solutions business.  And I also worked with Mr. Begley

24  and he was one of the people that worked out in San Diego

25  and had a line of ambulatory infusion pumps - that was his

Page 112

1  responsibility and I - we sold those pumps.

2       And I guess he's currently CEO of Hospira.

3  Q    Okay.

4       Where did you learn that?

5  A    From the newspaper.

6  Q    Tom Hodgson; what was your involvement with

7  Mr. Hodgson?

8  A    He was president of the corporation.

9  Q    Okay.

10       Did you interact with him?

11  A    We presented plans and updates to him.

12  Q    Would you do that in a meeting?

13  A    Yes, ma'am.

14  Q    How often?

15  A    Three times a year.

16  Q    And you would also -- Would you also present

17  written plans?

18  A    They were always written.

19  Q    Okay.

20       And what was his interaction with the plans?

21  A    He would challenge our reasoning, challenge the

22  numbers.  We would explain how we got there.  If he agreed

23  with our explanation, if he agreed with our assumptions for

24  coming year, he would approve the plan.  If not, he would

25  change them.

Page 113

1    Q    And how would he -- How frequently would he change

2    plans?

3    A    Well, I mean, there's so many issues, he's bound to

4    change one issue or another.

5    Q    In each plan?

6    A    Oh, yeah; absolutely.  I mean, that's - that's his

7    job --

8    Q    How would he --

9    A    -- to challenge our reasoning, and numbers change

10   from time to time based upon his input.

11   Q    How would he know how to change the plan?

12   MS. CITERA:  Objection to form.

13   THE WITNESS:  We would discuss assumptions and he

14   would either agree or disagree with those assumptions.

15   Numbers are generated by assumptions; growth rates

16   of markets, volume increases, new customers coming on

17   board - that sort of things.

18   Q    Would you have any of these comparable

19   presentations with Mr. White at all?

20   A    I never --

21   MS. CITERA:  Objection to form.

22   THE WITNESS:  -- did that with Mr. White.

23   Q    Would you have any other action - interaction with

24   Mr. Hodgson?

25   A    No.  I'd see him at the plan and update meetings

Page 114

1    and that was all.

2    Q    Okay.

3    Mr. Heggie, does that name ring a bell?

4    A    Michael Heggie?

5    Q    Yes.

6    A    Mm-hmm.

7    Q    Who is Mr. Heggie?

8    A    He - Mr. Heggie worked in our Renal Care area.

9    Q    Okay.

10   Other than working in your Renal Care area, did you

11   interact with Mr. Heggie?

12   A    Yeah; I knew him.  I -- You know, I've -- I -- I

13   mean, we'd go to meetings and I'd see him in there and, you

14   know, he'd be there.

15   And I remember going out for a couple martinis one

16   night with Mr. Heggie.  He's a martini connoisseur --

17   Q    Okay.

18   A    -- I am not.  I regret the experience.

19   Q    I'd like to go back to the meetings that you

20   discussed having with Mr. Hodgson.

21   Who would be present at those meetings?

22   A    Mr. Kringel; all of the accounting and finance

23   people in the division and the manufacturing people would be

24   there; all of our group would be there; sometimes

25   representatives of other business groups; the large Hospital

Page 115

1    Solutions business would be there; the marketing people from

2    the division whose products we sold would be there.  The

3    room would be occupied by, perhaps, 30 to 40 people.

4    Q    Okay.

5    Would you ever discuss pricing at these meetings?

6    MS. CITERA:  Objection to form.

7    THE WITNESS:  Yes, we did.

8    Q    Okay.

9    What would the discussions about pricing be?

10   A    Averaging and selling prices.

11   Q    Okay.

12   Any other pricing discussions?

13   MS. CITERA:  Objection to form.

14   THE WITNESS:  No.

15   Q    Do you recall whether a decision was made to add

16   acyclovir to the Generic Hospital Products Division?

17   A    Acyclovir?

18   Q    Acyclovir, it begins with an A- --

19   A    Yeah.

20   Q    -- c-y- --

21   A    To Hospital Products Division?

22   Q    Yeah.

23   A    I've heard that word before.  I don't know what the

24   product does, I don't know what claims it has or what it's

25   intended to do --

Page 116

1    Q    Do you know --

2    A    -- but I have heard the name before.  I --

3    Q    Do you what do you about the product?

4    A    I've heard the name before; that's all I can tell

5    you --

6    Q    That's it?

7    A    -- I don't --

8    Q    Do you know whether it was generic or branded?

9    A    I have no idea - I'm sorry.  And I don't know in

10   what context I've heard the name, but I know I've heard the

11   word "acyclovir" before.

12   Q    At these meetings with Mr. Hodgson, would there be

13   any discussions about adding generic products to the

14   Hospital Products Division listing of products?

15   A    In those discussions with Mr. Hodgson, most of the

16   time the - we would ask for funding to develop a new product

17   and he would have to approve that funding.

18   Q    Okay.

19   What about -- Well, let ask you this.

20   Who within the Hospital Products Division would

21   have to sign off on a decision to add a new generic product?

22   A    Mr. Kringel, the division president, because he was

23   the one that divided up the R and D resources.

24   Q    Okay.

25   What about Mr. Gonzalez; would he -- When he

1  succeeded Mr. Kringel, would he have to sign off --

2      A    Mr. Gonzalez had identical responsibilities to

3  Mr. Kringel, so, yes, he would.

4      Q    Okay.

5          Would anyone else be involved in the decision

6  making about whether to approve a generic product?

7      A    Approve a generic product --

8          MS. CITERA:  Objection to form.

9          THE WITNESS:  -- for research and development; is

10  that your question?

11      Q    Well, yeah, to make -- To make and ultimately sell

12  a generic product.

13      A    No.  If it was proposed by the --

14          MS. CITERA:  Objection to form.

15          THE WITNESS:  If it was proposed by our organization

16      and we had the R and D resources available and we were

17      willing to pay for it, Mr. Kringel would approve it and

18      then it would be done.

19      Q    Okay.

20          Mr. Kringel or Mr. Gonzalez after him?

21      A    If the funds were available, Mr. Kringel divvied up

22  the funds.  If we're asking for incremental funds, then

23  Mr. Gonzalez or Mr. Hodgson would have to approve that

24  increment.

25      Q    Okay.

1          Mike Sellers --

2      A    Yes, ma'am.

3      Q    -- do you know who Mike Sellers is?

4      A    Yes, ma'am.

5      Q    Who is Mr. Sellers?

6      A    He was general manager of Alternate Site Product

7  Sales when it started, then he went over to the division and

8  worked as director of contract marketing for the division,

9  then he came back as general manager of Home Infusion

10  Services, and now, I believe, Mr. Sellers works for

11  Hospira - I don't know.

12      Q    Do you know -- Were you -- Did you bring

13  Mr. Sellers back to work in - to be the general manager of

14  Home Infusion?

15      A    Yes; that would have been my decision.

16      Q    Why did you decide to do that?

17      A    He's a good guy, he's professional, he works hard,

18  he works with integrity, he's smart, and I thought he was a

19  good person to have that responsibility to try to figure out

20  some way to help us extricate ourselves from the business.

21      Q    Well, was he tasked with the responsibility of

22  trying to figure out how to close down the Home Infusion

23  business?

24      A    Specifically, yes.

25          I mean, we got to get out of this business.  I

1  mean, he knew that it was not gaining resources.  We just -

2  ma'am, we just wanted out.

3      Q    Who did he succeed as the general manager of

4  Home --

5      A    I believe --

6      Q    -- Infusion?

7      A    -- Bill Dempsey was in there before him.

8      Q    Okay.

9          Why did you make the change?

10      A    Mr. Dempsey was promoted.

11      Q    Okay.

12          Did Mr. Dempsey similarly have the responsibility

13  of trying to figure out how to extricate Abbott from the

14  home infusion business?

15      A    Mr. Dempsey's a bulldog, and he tried very hard.

16          Toward the end of his tenure, I believe he was

17  coming around to my way of thinking.

18      Q    Okay.

19          When you say, "he tried very hard," you mean he

20  tried very hard to keep the business unit?

21      A    He tried very hard to make it successful.

22          You know, he's a hard worker, he was also very

23  smart and he had good people that were working.  It was

24  just -- I don't think the model -- I don't think there was a

25  stainable business model - no matter how we tried to manage

1  it, I don't think it would have been successful, so.

2      Q    Okay.

3          What about David Brinks, does that name ring a

4  bell?

5      A    I think he was a contract analyst in that business,

6  David Brinks.  As I recall, he was a contract analyst in

7  that business.

8      Q    Okay.  Let me go back to Mr. Sellers.

9          What was your day-to-day interaction with

10  Mr. Sellers when he was the general manager of Alt Site

11  Product Sales or the general manager of Home Infusion?

12      A    Day-to-day?

13          MS. CITERA:  Objection to form.

14          THE WITNESS:  They reported to me.  I would see them

15      as needed.

16      Q    Okay.

17          Would they -- What would their job responsibilities

18  be as -- What would --

19          MS. ST. PETER-GRIFFITH:  Strike that.

20      Q    What were Mike Sellers' job responsibilities as the

21  general manager of Alt Site Product Sales?

22      A    After we had discussed the plans and updates, his

23  responsibility was to direct his people in the achievement

24  of those plans and updates.

25      Q    What about as the general manager of Home Infusion?

Page 121

1    A    It's the same job; once you've come to an agreement
2  with the people to whom you report, your job is to manage
3  your resources to the accomplishment of those goals.
4    Q    Okay.
5         And one of the goals for Home Infusion was to
6  figure out a way to extricate Abbott from home infusion?
7         MS. CITERA:  Objection to form.
8         THE WITNESS:  Initially, it's how can we --
9         Initially, the goals are, Is this a proper business for
10  us; Can we be useful; Can we be helpful; Can we be
11  profitable; Is there a future?
12         And when it became obvious that we should have been
13  out of that business, we just sort of denied it
14  resources and it went its way.
15    Q    Cynthia Sensibaugh or Cindy Sensibaugh, did you
16  interaction with her?
17    A    You know, I can't remember if she -- Is that the
18  name she used for the entire tenure of our - of her work
19  there?
20    Q    I'm not sure.  I don't know.
21         I'm just asking you if that's a name you're
22  familiar with.
23    A    No, ma'am, I don't remember that person.
24    Q    Okay.
25         David Landsidle, is that a name familiar to you?

Page 122

1    A    Oh, the name is familiar, but the person I can't
2  picture.
3    Q    Okay.
4         You gave a sigh.  Do you have a specific
5  recollection of Mr. Landsidle?
6    A    No.  No.  No.
7         I mean, when you hear a name that you recall and
8  the name comes to mind and you can't picture the face or the
9  person's responsibility - I mean, you know, I'm here to
10  answer your questions --
11    Q    Sure.
12    A    -- I just can't answer that question.
13    Q    Sure.
14         MR. STETLER:  We just thought there was a good story
15  behind it.
16         THE WITNESS:  There's a good story behind everybody.
17         MR. STETLER:  Well, forget I said anything.
18  BY MS. ST. PETER-GRIFFITH:
19    Q    Do you have any recollection whatsoever of
20  Mr. Landsidle?
21    A    Landsidle, if you could tell me what he did I might
22  be able to.
23    Q    Well, do you recall interacting with any government
24  relations folks or lobbying folks?
25    A    Oh, we had a group in Washington, D.C., as I

Page 123

1  recall.
2    Q    Okay.
3         What do you recall about that group?
4    A    That they were - you know, the major responsibility
5  seemed to be to take people to lunch - I don't know what
6  they did.  You know, to report to us on government
7  activities and actions and that sort of thing.
8         I don't think it was anything you couldn't read in
9  the Federal Register - I don't know.  I remember those - we
10  had a group there.
11    Q    As part of your responsibilities, would you review
12  the Federal Register?
13    A    Not my responsibilities; no, ma'am.
14    Q    Okay.
15         Would you review state or federal regulations or
16  statutes?
17    A    No, ma'am.
18    Q    Who within Alt Site would do that?
19    A    I don't think we had anybody --
20         MS. CITERA:  Objection to form.
21         THE WITNESS:  We didn't have anybody with that
22  specific responsibility.
23         That was sort of - since it impacted the whole
24  corporation, that may have been a corporate
25  responsibility, I don't know.  But we didn't have

Page 124

1  anybody to do that.
2    Q    Do you recall if a question arose concerning state
3  or federal statutes or regulations who the question would be
4  directed to from Alt Site?
5         MS. CITERA:  Objection to form.
6         THE WITNESS:  No -- State or federal regulation?
7  No, I don't think we had anybody -- I know we didn't
8  have anybody specifically responsible for regulation.
9  We could ask the corporation - I'm sure they had great
10  interest in that and somebody there would have done
11  that.
12    Q    Do you recall who within the corporation you would
13  go to?
14    A    I'm sure there's a regulatory affairs organization
15  within the corporation would have been the people.  I don't
16  recall specifically.
17    Q    Okay.
18         What about Jerry Eikorn, is that a name that rings
19  a bell?
20    A    Jerry Eikorn I thought was a national accounts
21  person - Jerry Eikorn - Jerry Eikorn - Oh, I think he worked
22  in HPD - big, robust fellow worked in HPD, and I don't
23  recall what his specific responsibilities were.
24    Q    Okay.
25         Let me ask you just physically where was Alt Site's

Page 125

1  office?

2      A    Initially we were in a commercial office building

3  about two miles away from Abbott Park.  Subsequent to that

4  we moved onto the Abbott facility but were in a building

5  about 500 yards south of where the Hospital Products

6  Division was located.  We were in a separate building.

7      Q    Okay.

8           So Alt Site was contained in one building and the

9  other components of the Hospital Products division was in

10  another building?

11     A    That's correct.

12     Q    Okay.

13          Trudy Bucheri, does that name ring a bell?

14     A    Yes, ma'am.

15     Q    Okay.  Who is Miss Bucheri?

16     A    She was originally sort of a technical person in

17  our Alternate Site Products Sales Group in California, I

18  believe - yeah, it is - it's California.  That's what I

19  remember of Miss --

20     Q    Do you recall any other responsibilities that Miss

21  Bucheri would have?

22     A    Not in the -- No.

23     Q    Let me ask you, as part of Alt Site would there be

24  a formal training program for the different components of

25  Alt Site?

Page 126

1      A    Yes.  We hired -- We hired people to come in and

2  they'd have to be trained.

3      Q    Okay.

4           And who would do the training?

5      A    Someone within each of the individual business

6  units - maybe that's Miss Bucheri's responsibility - that's

7  where we're going - maybe she was a trainer.

8      Q    Okay.

9           Do you know what component like, for example, in

10  Alt Site Product Sales, what would the training programs be?

11     A    Selling skills and how the products worked and the

12  technical aspects of the product performance and function.

13     Q    Any other training programs?

14     A    No; just how to sell and what our products did.

15     Q    Were there manuals?

16     A    There may have been training in planning and

17  organization, as well.

18     Q    Okay.

19          Would there be manuals that would be used to assist

20  in the training?

21     A    I don't know that specifically, but it's reasonable

22  to assume that there were.

23     Q    Are you familiar with any manuals that discussed in

24  Alt Site Product Sales selling or marketing concerning the

25  Alt Site Product Sales product lines?

Page 127

1      A    No, ma'am; not specifically.

2      Q    What about for Home Infusion, do you recall what

3  the training program was there, if there was one?

4      A    I believe there it was -- Training is very

5  expensive unless - and in that business, probably not

6  affordable, so we hired people who were experienced in the

7  business.

8      Q    Do you recall who you hired?

9      A    Oh, wow.

10          We had a young woman from California - that was

11  early on.  As the - and the others -- We didn't hire very

12  many people.

13          Once again, the business was not that profitable,

14  so I don't think we were anxious - I know we weren't anxious

15  to hire a bunch more people to be in that business.

16     Q    What about Don- - is it Donald Buell, B-u-e-l-l, do

17  you recall that name?

18     A    Buell, B-u-e-l-l?

19     Q    Or B-e-u-l-l, but I believe it's B-u-e-l-l.

20     A    No, ma'am.

21     Q    Okay.

22          Mike Trutel, does that name ring a bell?

23     A    No.

24     Q    Kathy Babington.

25     A    The name is very familiar, but I - not in the

Page 128

1  context of working for Alternate Site, I thought she worked

2  for the corporation in some public affairs or some kind

3  of --

4      Q    Did you have interaction with her at all that you

5  can recall?

6      A    I know the name and I'm sure I've met the person.

7  I know the name - Babington's not a common name, so I've

8  heard the name and I - and it's reasonable to assume that

9  some point in the past I met her, but I don't know this

10  person.  If the person were to walk in, I might recognize

11  her, I might not.  I don't know.

12     Q    Do you recall working with Public Affairs at all?

13     A    Seldom, if ever, did I personally work with Public

14  Affairs.

15     Q    Do you remember those occasions when you might have

16  had occasion to work with Public Affairs?

17     A    No, I can't remember specifically any occasion when

18  I worked with them.

19     Q    What about Guy Wiebking?

20     A    Oh, yes, I know Guy Wiebking; yeah.

21     Q    How do you know Mr. Wiebking?

22     A    He was the vice president of sales of Hospital

23  Products Division when I joined HPD.  And then he was -

24  worked in contract marketing, I believe, after that.  And

25  subsequent to that, I don't know what Guy did.  I think he

Page 129

1   retired in like 2002, 2003.

2       Q    Did you have interact with Mr. Wiebking?

3       A    Yes.

4       Q    How?  What would that interaction be?

5       A    He was part of our update and plan process.  He was

6   also part of our plan reviews, so I would see him at those

7   meetings.

8       Q    Would Alt Site Product Sales or Alt Site, the

9   business unit, in general, have interaction with his

10  business unit?

11      A    We had a --

12           MS. CITERA:  Objection to form.

13           THE WITNESS:  -- That was a very large corporate - I

14      mean hospital marketing group - contract marketing -

15      pardon me - group within hospital products and we would

16      - they would approve our contracts to ensure that the

17      pricing that we provided, the terms and conditions we

18      provided made sense in the larger context of the

19      division.

20      Q    So would all Alt Site Product Sales contracts have

21  to be approved by HBS?

22      A    That doesn't seem rationale because I'm sure there

23  were certain parameters we were allowed to do.  And --

24      Q    Okay.

25           Do you remember what they were?

---

Page 130

1       A    No, ma'am.

2           (Continuing) -- and it wouldn't make sense just to

3   go every time if there were certain parameters we could

4   arrange, so.  But I'm sure that they would have copies of

5   our contracts and that they would have to grant their

6   blessing to these contracts before we could implement them,

7   I mean.

8       Q    Are you aware of anyone else who would need to

9   review the contr- - the Alt Site contracts?

10      A    Not to my knowledge.

11      Q    Would the general counsel's office need to review

12  them?

13      A    Oh, absolutely.

14      Q    Was there someone in particular that you worked

15  with in Alt Site for contract review?

16      A    Each of the business units was assigned an

17  individual, and I can see the faces but can't recall the

18  names.

19      Q    Okay.

20           Do you have any recollection whatsoever as to

21  identifying information?

22      A    I don't know --

23           MS. CITERA:  Wait a second.

24           I just want to instruct you to the extent - I'm not

25      sure about your question, but not to reveal any

---

Page 131

1   conversations that you had with counsel.

2           I'm not sure that that what you're asking, but I

3   just want to make that clear.

4           THE WITNESS:  Yes, ma'am.

5           MS. CITERA:  Okay.

6   BY MS. ST. PETER-GRIFFITH:

7       Q    Do you recall any identifying features about the --

8       A    There was a young -- Is that -- There's a young,

9   curly-haired fellow who was very cooperative and hard

10  working and - I mean, the division had a person and her name

11  was Honey Lynn Goldberg - I remember that - I remember her -

12  she also worked in Diagnostics for a year, so I remembered

13  name, we'd work with her all the time.  I can't remember the

14  name of the young man who - with whom we dealt.

15           But, yeah, it was important to us that the

16  contracts have the approval of our legal department.

17      Q    Lorene Mershimer --

18      A    Yes, ma'am.

19      Q    Who is Miss Mershimer?

20      A    Miss Mershimer is - oh, I don't know what she does

21  now.  Miss Mershimer was general manager of the renal

22  business.

23      Q    Okay.

24           And she succeeded Mr. Sellers?

25      A    She succeeded --

---

Page 132

1           MS. CITERA:  Objection to form.

2           THE WITNESS:  -- Mike King.

3       Q    Oh, Mike King.  I'm sorry.

4       A    Mr. Sellers was never involved in Renal.

5       Q    Right.  Okay.

6           And so you were her direct supervisor?

7       A    Yes, ma'am.

8       Q    For how many years?

9       A    Two or three; I can't recall.

10      Q    And did Miss Mershimer then move on to something

11  else after?

12      A    She was promoted into the Hospital Products

13  Division in responsibility there.

14      Q    How was your interaction with Miss Mershimer?

15      A    She reported to me.

16      Q    Okay.

17           How often would she report to you?

18      A    I saw Miss Mershimer daily.  We would have

19  conversations probably weekly.

20      Q    How was she as an employee?

21      A    As an employee?

22           MS. CITERA:  Objection to form.

23           MS. ST. PETER-GRIFFITH:  Yes.

24           THE WITNESS:  As a colleague -- Do you -- I cannot

25      answer, you know, as an employee.

Page 133

1       As a colleague --
2       MS. ST. PETER-GRIFFITH:  Okay.
3       THE WITNESS:  -- she was bright, articulate,
4    aggressive, smart, and I believe she did very well in
5    the Renal Care business.
6  BY MS. ST. PETER-GRIFFITH:
7       Q    Virginia Tobiason, is that a name that rings a
8  bell?
9       We had already talked about her earlier.
10      A    Yeah, I know Miss Tobiason.
11      Q    How do you know Miss Tobiason?
12      A    She worked in Home Infusion Services.
13      Q    Okay.
14      And did she work there during part of your tenure?
15      A    Oh, yes.
16      Q    Okay.
17      For how many years, do you recall?
18      A    It may have been five or six.  It was quite a
19  while.
20      Q    What was her role in Home Infusion?
21      A    She administrative (sp.) the part of Home Infusion
22  that did the billing and reimbursement piece, I believe.
23      Q    Did Miss Tobiason have any other responsibilities
24  beyond that reimbursement area in Home Infusion?
25      A    She may have, but I don't recall them.

Page 134

1       Q    Okay.
2       Do you recall whether she had any particular
3  expertise with regard to reimbursement issues?
4       MS. CITERA:  Objection to form.
5       THE WITNESS:  She was in charge of the department.
6    I would have to assume that she was competent.
7       Q    Okay.
8       Was she consulted on reimbursement issues that
9  transcended or that went beyond the Home Infusion area?
10      MS. CITERA:  Objection to form.
11      THE WITNESS:  I think she may have been; yes.
12      Q    Okay.
13      Did you rely upon her for those, for reimbursement
14  issues --
15      A    I personally -- I relied on her --
16      COURT REPORTER:  Did you rely on her --
17      MS. ST. PETER-GRIFFITH:  For reimbursement issues
18  beyond or outside of Home Infusion?
19      MS. CITERA:  Object to the form.
20      THE WITNESS:  I personally do not recall ever having
21  done that; no.
22  BY MS. ST. PETER-GRIFFITH:
23      Q    Okay.
24      How was Miss Tobiason as an employee?
25      MS. CITERA:  Objection to form.

Page 135

1       THE WITNESS:  As a colleague, as a person that
2    worked there, I saw her infrequently but I heard no
3    complaints about her competence, her performance.
4       Q    How about her interaction with her colleagues or
5    subordinates, were there any problems?
6       A    Any problems?
7       Serious problems that I recall, no.  But that
8    doesn't mean they didn't exist but I just don't know of
9    them.
10      Q    Do you know whether she was well liked by her
11  staff?
12      MS. CITERA:  Object to the form.
13      THE WITNESS:  I don't know that.  I don't know
14    whether she was or was not.
15      I know that no one came to complain to me about
16    her - I don't believe anybody came - I don't recall
17    anybody ever coming to me to complain, so.
18      Q    Did you hear any complaints about her at all?
19      A    No.
20      Q    Okay.
21      A    No.
22      Q    We touched upon a little bit earlier litigation
23    hold memos.
24      Do you recall that I asked you whether you received
25  memos?

Page 136

1       A    And I think my answer was I may have received them;
2    if I received them I would have complied.
3       I have no specific recollection of having received
4    them.
5       Q    If the memo directed you to distribute the memo to
6    others within your business unit, would you have done that?
7       MS. CITERA:  Objection to form.
8       THE WITNESS:  Yes, ma'am.  I believe we've covered
9    this ground; that compliance with directives of my
10    superior was not optional.
11      Q    Okay.
12      Do you recall for Alt Site - for products that Alt
13  Site sold whether annual price increases were taken?
14      MS. CITERA:  Objection to form.
15      THE WITNESS:  Whether annual price increases were
16    taken.
17      Our objective was, once again, to fulfill our
18    responsibility to the shareholders and get as high an
19    average unit selling price for the product as we could;
20    that was our responsibility --
21      MS. ST. PETER-GRIFFITH:  Okay.
22      THE WITNESS:  -- similar to anyone's responsibility
23    to be as productive as possible for their employer.
24  BY MS. ST. PETER-GRIFFITH:
25      Q    Do you recall whether average unit selling prices

Page 137

1  would go down?

2      A   It would depend upon the level of competition.

3      Do I remember specific products going down?  No,

4  but it would depend upon the level of competition, the

5  numbers of competitors.

6      I do have a specific example; isoflorane, we went

7  from one competitor to four and the prices in that one

8  specifically went down.

9      When you get generic competition, the prices

10  invariably go down.

11     Q   Sir, how much interaction did you have with

12  Abbott's legal department?

13     A   As needed.

14     Q   Okay.

15     And what --

16     A   I mean, they --

17     Q   -- would be the nature - I don't want you to

18  discuss with me the discussions you had with the legal

19  department, but what were the general natures of your

20  interaction with --

21     A   As I recall, the legal department at Abbott wanted

22  to make sure our contracts were correctly written, that we

23  followed all legal requirements.

24     I found them to be cooperative, I found them to be

25  professional, and my relationship to them is what they said

---

Page 138

1  went - there really was no discussion after a decision was

2  made; they made a decision, this is the way it's going to be

3  done, end of story --

4      Q   Okay.

5      A   -- and I have no complaints with that.  I mean, we

6  want to comply.

7      Q   What Abbott - the Abbott corporate office, what

8  would your interaction with them be?

9      MS. CITERA:  Objection to form.

10     THE WITNESS:  The corporate -- Do you mean Mr. -- Do

11  you mean specific individuals, which specific functions?

12     Q   Well, let me ask you this:  Would there be an area

13  in Abbott called Abbott Corporate?

14     A   No, ma'am.

15     Q   No?

16     Okay.

17     A   Not -- Not to -- Abbott Corporate, someone may use

18  that term.  To me, the term is meaningless.

19     Does it mean that all the chiefs sitting around in

20  their offices up in AP6?  Does it mean everyone in that

21  building?  Does it comprehend everybody who works for a

22  corporate department?  It's sort of a - to me, a meaningless

23  term.

24     If you'd talk about a specific department, I'd be

25  happy to relate my relationship with that department.

---

Page 139

1      Q   Okay.

2      Well, I wanted to ask you whether you had an

3  understanding as to whether there was a corporate

4  department.

5      A   Oh, there was corporate.  We used to get the

6  allocations.

7      Q   Okay.

8      And would you interact with anyone in what you

9  perceive to be the corporate department?

10     A   As needed.

11     For example, Mr. Hodgson, who would approve our

12  plans and updates was corporate --

13     Q   Okay.

14     A   -- corporate is - let's use for this context anyone

15  who's not part of a division, does that work?

16     Q   Okay.

17     A   Sure.  Our contacts would be frequent.  The legal

18  people were corporate - they may assigned to a division, but

19  they were corporate.

20     So in that context, yes, ma'am.

21     Q   What about Hospital HBS; that was another division

22  within the Hospital Products Division or Business Unit?

23     A   HBS, is that the acronym that you were given, HBS?

24     Q   Yeah.

25     A   Do you know what the words are?

---

Page 140

1      Does that mean --

2      Q   The Hospital Business Sector.

3      A   Okay.  That would be - yeah.  That would be

4  Mr. Begly's responsibility --

5      Q   Okay.

6      A   -- HBS.

7      Q   Did you have interaction with HBS?

8      A   Sure.  They were part of our division.  We were in

9  their updates, they were in ours.  We knew their results,

10  their activities and their plans.

11     Q   Go ahead.

12     A   But I just remembered the name of the person whom I

13  replaced - and this was very early on in the conversation -

14  the person's name is Joy Amundson.

15     Q   Okay.

16     A   That's why it's so frustrating to have these

17  conversations after such a long time; you can't remember the

18  names of some people.

19     Q   Sir, what I'd like to do right now is go over with

20  you some terms that have come up in this litigation --

21     A   Mm-hmm.

22     Q   -- and I'd like to get your understanding of the

23  terms.

24     A   Mm-hmm.

25     Q   They're primarily related to pricing, okay?

Page 141

1    MS. CITERA:  Objection to the form.

2    Q    What --

3        MS. ST. PETER-GRIFFITH:  Well, I haven't asked the

4    question.

5        MS. CITERA:  Well, I mean or objection to the

6    commentary, I should say.

7        MR. STETLER:  Object to what you're thinking about

8    asking.

9  BY MS. ST. PETER-GRIFFITH:

10   Q    Sir, have you ever heard the term "WAC"?

11   A    I've heard the term WAC, yes, ma'am.

12   Q    What is WAC?

13   A    The term, as I understand it, mean Wholesale

14   Acquisition Cost.

15   Q    And how did that -- What did you understand the

16   purpose of WAC?

17   A    I have absolutely no idea.

18   Q    Would it be something that you would be familiar

19   with or interact with on a day-to-day basis?

20   A    No.

21   Q    Do you know whether WAC was important to Alt Site

22   at all?

23   A    No --

24       MS. CITERA:  Objection to form.

25       THE WITNESS:  -- I don't remember it as being

---

Page 142

1    important.

2    Q    Rx link.

3    A    Rx link?

4    Q    Mm-hmm.

5    A    I've heard that term before, and it maybe involved

6    the Hospital Business Sector.

7        I don't remember its connection to Alternate Site,

8    though.

9    Q    Catalog price.

10   A    Catalog price is, I assume, a list price for a

11   product.

12   Q    And what is a list price?  That was my next term.

13   A    Catalog price.

14       It's the price that appears in published material

15   from a company or organization of the list price that they

16   charge or --

17   Q    That who charges?

18   A    The company publishing the pricing charges.  That's

19   their list price.

20   Q    Would Abbott have list prices?

21   A    Yes, ma'am.

22   Q    What would be the purpose of the list price?

23       MS. CITERA:  Objection to form.

24       THE WITNESS:  Well, list price is sort of a

25   negotiating - a start of a negotiating position with a

---

Page 143

1    customer - not sort of, it is --

2        MS. ST. PETER-GRIFFITH:  Okay.

3        THE WITNESS:  -- the start of a negotiating position

4    with a customer.

5  BY MS. ST. PETER-GRIFFITH:

6    Q    Would Alt Site charge list price to anybody?

7        MS. CITERA:  Objection to form.

8        THE WITNESS:  Very few, if any, people paid list

9    price for product.

10   Q    How come?

11   A    It was very -- It was highly competitive and

12   people, through buying groups, or -- You know, we sold

13   mainly through contracts - buying groups or distributors or

14   wholesalers - and they would negotiate a price and people

15   would become members of those buying groups and have

16   privilege to access those prices.

17       Very few people part were part of no group, and

18   therefore, coming up and paying list price.  It was

19   infrequent.  I'm sure it happened, but just not very

20   frequent.

21   Q    Okay.

22       Do you understand under what circumstances it might

23   happen?

24   A    If I wanted to -- I don't -- No, I can't -- I don't

25   know what circumstances it might happen.  Someone just -

---

Page 144

1    someone is starting a business who has no affiliation or an

2    individual wants a solution for a specific reason - I don't

3    know.

4        Certainly, and individuals, if they didn't have the

5    proper licenses wouldn't be able to acquire drugs.

6        But very few, if any, people bought off list price.

7        Just, once again, it was a start of a negotiating

8    position with customers.

9    Q    Other than being the start of a negotiating

10   position, did you have any understanding as to what purpose

11   a list price might have served?

12   A    Well, I mean --

13       MS. CITERA:  Object to form.

14       THE WITNESS:  -- it's part of the start of a

15   negotiation.

16   Q    Do you know why Abbott published a catalog that

17   listed these prices?

18       MS. CITERA:  Objection to form.

19       THE WITNESS:  To give our customers a starting point

20   for negotiation.

21   Q    Okay.

22       Resource file, is that a term you've ever heard?

23   A    I have no idea what that term means.

24   Q    Okay.

25       Direct price.

Page 145

1    A    I don't know what that term means.

2         It may have been used, I may have heard it in the

3    past but I don't recall what it means.

4    Q    ASP.

5    A    Is Average Selling Price.

6    Q    And what is Average Selling Price?

7    A    Average Selling Price is the total units shipped

8    out the door, divided by the total revenue received for

9    those products - oh, excuse me - the total revenue received

10   divided by the number of units that went out the door -

11   pardon me, I had that backwards, didn't I?

12        What I gave you was the Reciprocal of Average

13   Selling Price.

14   Q    I got you.

15        What would the purpose of an Average Selling Price

16   be or why would Abbott be concerned or Abbott Alt Site be

17   concerned about Average Selling Price?

18        MS. CITERA:  Objection to form.

19        THE WITNESS:  Well, directionally, it tells you many

20   things.  It's not always bad news to have an average

21   unit selling price go down.  That mean - That may mean

22   you're getting larger customers who may pay less per

23   unit but buy a potload of units and so the Average

24   Selling Price will go down.

25        It allows you, by examining that, to challenge your

Page 146

1    assumptions on the plan of who is going to buy it, how

2    much they're going to pay for it and where the market's

3    going directionally or where you're going in the market

4    directionally.

5    Q    You'd referenced before in your earlier testimony

6    average unit selling price.

7    A    Right.

8    Q    Is ASP what you're talking about?

9    A    Average unit selling price, I -- The difference

10   between Average Selling Price and average unit selling price

11   is Average Selling Price to me is how many units you - the

12   revenue received divided by the units you sold.

13        Average unit selling price is all the revenue

14   received divided by the units you sold plus any samples or

15   free goods you send out the door.

16   Q    Let's discuss that.

17        Under what circumstances would you provide samples

18   or free goods?

19   A    Samples, you would -- Samples just to make sure

20   that people knew how to use the drug or knew how to use the

21   product --

22   Q    Okay.

23   A    -- free goods and samples is sort of identical.  As

24   I recall, they weren't big numbers in our business because

25   people knew how to use these, these were commonly used

Page 147

1    things.

2    Q    Do you know whether Abbott customers were permitted

3    to seek reimbursement from third-party payors for free

4    goods?

5    A    Permitted, no.

6         MS. CITERA:  Objection to form.

7         THE WITNESS:  No.  I -- No.

8    Q    Okay.

9         How else would Abbott Alt Site use Average Selling

10   Price?

11   A    Oh, pardon me, you have to give me one more --

12   Q    Sure.

13   A    -- one more common use of free goods or samples; if

14   we had shipped product and it was damaged in transit and the

15   product was not suitable for the function which the customer

16   intended, we would replace it and that would be free - we

17   would not bill them again --

18   Q    Okay.

19   A    -- or --

20   Q    But that's just fulfilling a contract obligation,

21   isn't it?

22   A    Yeah.  I mean, if you send somebody a product that

23   they can't use, you can't make them pay for it.  So we'd

24   send them the product.

25   Q    AMP.

Page 148

1    A    AMP, you mean ampule?

2    Q    No.  A-M-P.

3    A    I don't know what that term means.

4    Q    Okay.

5         Best price.

6    A    It should mean what it says; best price.

7    Q    Was it a term that was used --

8    A    In our context --

9    Q    Yes.

10   A    -- of Alternate Site?

11   Q    In Alt Site.

12   A    I may have heard the term but it was not a term

13   that I recall hearing frequently.

14   Q    AWP.

15   A    I bel- -- That's Average Wholesale Price.

16   Q    And what is the purpose of Average Wholesale Price?

17   A    I believe that was - Average Wholesale Price was

18   used to determine reimbursement in certain market segments.

19   Q    Okay.

20        Do you remember which market segments?

21   A    I believe it was used to determine - I think

22   Medicare used Average Wholesale Price.

23   Q    Okay.

24        What about Medicaid program?

25   A    I have no knowledge of that.  I don't know.

Page 149

1    Q    Do you know whether the Medicaid programs or some
2  of them would use WAC?
3    A    I'm sorry --
4    Q    Does that refresh your recollection at all on what
5  WAC might mean?
6    A    I'm sorry.  No, I don't.
7    Q    Okay.
8         How would Average Wholesale Price be determined?
9    A    Once again, we sold to distributors and wholesalers
10  and they sold - they to the end-user through buying
11  contracts that they had.
12        So my knowledge of how these terms would be used is
13  limited.
14    Q    Okay.
15        Well, did Average Wholesale Price have a
16  significance to Alt Site?
17        MS. CITERA:  Objection to form.
18        THE WITNESS:  Well, as we discussed before, there's
19  a reimbursement responsibility.  You asked me if,
20  before, I believe, if Miss Tobiason know that - did you
21  not?
22        MS. ST. PETER-GRIFFITH:  Yeah.
23        THE WITNESS:  Yeah.
24        So if it's part of reimbursement and she were
25  competent in reimbursement, she would have to know what

Page 150

1   that term meant.
2  BY MS. ST. PETER-GRIFFITH:
3    Q    Outside of -- Well, did you understand what the
4  term meant?
5    A    No.  I knew that it was part of reimbursement and
6  that it was a component of reimbursement.
7    Q    Outside of Home Infusion was AWP important, for
8  example, to Alt Site Product Sales?
9        MS. CITERA:  Objection to the form.
10        THE WITNESS:  Well, we had no way of knowing where
11  the products were going.  But I don't know; may have.  I
12  mean, we've talked -- You know, this reimbursement issue
13  has recurred --
14        MS. ST. PETER-GRIFFITH:  Okay.
15        THE WITNESS:  -- so it may have been important to
16  our customers.
17  BY MS. ST. PETER-GRIFFITH:
18    Q    Do you know how it was important to your customers?
19        MS. CITERA:  Objection to the form.
20        THE WITNESS:  Well, the reimbursement's import- -- I
21  mean, they get paid, it's important.
22        But, once again, I'd like to reiterate that the cost
23  of these drugs is trivial and the overall profitability
24  wasn't impacted by these drugs.
25    Q    By which drugs?

Page 151

1    A    By the drugs that we sold.
2    Q    Including vancomycin?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  I don't think vancomycin was a very
5  expensive drug.
6    Q    What about the term "spread," have you heard that
7  term?
8    A    Spread is -- Spread is the difference between
9  Average Wholesale Price and reimbursement level; am I right?
10    Q    Well, was spread a term that was used in Alt Site?
11    A    Seldom.  I mean, I know what the term means, but
12  not a term that we would use frequently.
13    Q    How do you know what the term means?
14    A    Because I've heard it.
15    Q    Okay.
16        In what context have you heard it?
17    A    I mean, I don't recall.
18        Over the years, this term has come up, spread, the
19  difference between reimbursement and the price of a drug.
20    Q    Did you have an understanding as to whether spread
21  was important to Abbott customers?
22        MS. CITERA:  Objection to form.
23        THE WITNESS:  It may have been.  But that's not how
24  we marketed it; we marketed that drug based on the
25  quality of the drug.

Page 152

1    Q    Do you know whether the spread differ- -- The
2  spread between an Abbott product and as compared to a Baxter
3  product factored into decision making for some of Abbott's
4  customers as to whether to purchase a product?
5        MS. CITERA:  Objection to the form.
6        THE WITNESS:  I don't know that.  It may have; I
7  don't know.
8        I mean, I guess if you -- I don't know.  I don't
9  know that.
10    Q    Do you know whether Abbott Alt Site Product Sales
11  customers considered spread in evaluating whether to award
12  contracts --
13        MS. CITERA:  Object- --
14    Q    -- to Abbott Alt Site?
15        MS. CITERA:  Objection to form.
16        THE WITNESS:  You mean the broad contract?
17    Q    Any contract.
18        MS. CITERA:  Same objection.
19        THE WITNESS:  They may have, I -- You know, once
20  again, they may have, I don't know.
21        That's one product out of 4,000 in the catalog.
22  Whether that would tip the contract, I don't know.
23    Q    Do you know whether, for example, an organization
24  like Gerimed evaluated AWP and spread in considering who to
25  award a contract to?

Page 153

1    MS. CITERA:  Objection to the form.

2    THE WITNESS:  They could have.  They may have.

3    Q    If AWP and spread was important to a customer like

4  Gerimed, would that be something that Abbott Alt Site would

5  carefully evaluate in putting together its proposal to

6  Gerimed?

7    MS. CITERA:  Objection to form.

8    THE WITNESS:  That would be marketing on spread.

9    We never marketed on spread, to my knowledge.

10   Q    Okay.

11        What do you consider marketing on spread?

12   A    Going out and promoting that with customers.

13   Q    Were there any policies concerning marketing on

14  spread?

15       MS. CITERA:  Objection to form.

16       THE WITNESS:  I don't know.  I -- You know, this

17       isn't -- Not to my knowledge.  I mean, other than we

18       didn't market that, we didn't market on the total

19       product line.

20   Q    Was there any formal policy that say said that you

21  didn't market on spread?

22   A    I think I've had this discussion with Ward and Ward

23  never marketed on spread.  We did not market on spread.

24  That's not the way we did it.

25        Is there a written policy that I can find?  I doubt

---

Page 154

1  it.

2    Q    In what context -- When you say "Ward," do you

3  mean --

4    A    John Ward.

5    Q    -- John Ward?

6    A    Mm-hmm.

7    Q    In what context did you have a discussion about

8  this issue with Mr. Ward?

9    A    Well, you just -- You know, they would -- This

10  issue of spread, I think we had discussed -- I mean, if you

11  wanted to do that, you'd end up with 100 percent market

12  share - you wouldn't do that.

13        We didn't want to do that.  We wanted to market

14  based upon the quality of our products and keep marketing

15  that way.

16   Q    Okay.

17        When you say you would have, "100 percent market

18  share," what do you mean?

19   A    Well, that might gain you a competitive advantage,

20  as you've articulated what it means.

21        We didn't want to do that.  We wanted to market

22  based upon the quality of our product.

23        I don't remember anybody ever marketing on - or

24  gaining market share on the basis of - on that basis.

25        It's a small product, I think.  It's just one of a

---

Page 155

1  number.

2    Q    What do you mean, "it's just one of a number,"

3  which product?

4    A    You were talking about vancomycin.

5    Q    I'm talking about at any time.  I'm sorry, I should

6  have clarified.  Not just for vancomycin.

7        Was spread for any Abbott product that Alt Site

8  sold --

9    A    Not to my -- No; not to my knowledge.

10       MS. CITERA:  You need to let her finish her

11       question.

12       THE WITNESS:  I thought the question was finished.

13   A    Did you have more to ask?

14   Q    That's okay.  You answered my question.

15        But let me go back and make sure.

16        For any product that Alt Site sold --

17   A    Mm-hmm.

18   Q    -- was AWP or spread ever a consideration in how

19  Abbott Alt Site marketed the product?

20   A    Ever.  You used the word "ever."

21   Q    Ever.

22       MS. CITERA:  Objection to form.

23       THE WITNESS:  Our policy was not to market on the

24       basis of spread.  We didn't discuss spread.

25        If there were an aberration in the pricing, I

---

Page 156

1        can't -- I can't ex- -- We did not market on the basis

2        of spread.  We'd market on the basis of being

3        competitive with the selling prices of individual

4        competitors.

5    Q    If customers would has you for spread information

6  or AWP information, how would you respond?

7    A    No one ever asked me for that personally.

8    Q    What about your sales force that you were

9  responsible for?

10   A    We had a sales force within the organization.  I

11  don't know of anybody asking for information on that --

12   Q    You're not aware --

13   A    -- I personally -- I personally don't know about

14  that.

15        I mean, once again, I may have been -- This is a

16  long time ago, they may have been asked, I may have gotten

17  the information, but to the best of my recollection, I don't

18  recall it.

19   Q    Do you know whether spread or differentials between

20  AWP and contract prices is one way to differentiate between

21  generic products that otherwise are, for the most part, the

22  same product --

23       MS. CITERA:  Objection to form.

24   Q    -- as between competitors?

25       MS. CITERA:  Objection to the form.

Page 157

```
1       THE WITNESS:  It may be.  I mean, if they make more
2   money, it may be.  That may have tipped it.
3       We just didn't market in that fashion.
4   Q   Are you aware of any government investigations into
5   Average Wholesale Price or spread during your tenure at --
6   A   Not that I --
7   Q   -- Abbott?
8   A   Not during my tenure.  Not during my tenure.
9       I wasn't -- Not that I remember.
10  Q   Okay.
11      Do you recall in 1996 Abbott being served with an
12  Investigative Demand from the Department of Justice?
13  A   No.  I mean, it may well have happened, but I don't
14  recall.
15  Q   What about any litigation concerning AWP and
16  Lupron; do you recall any issues associated with that?
17  A   I remember that -- I remember that there was a suit
18  involving the marketing of Lupron and that I believe Abbott
19  was fined and Takeda, the joint venture partner, was fined.
20  Q   What's the basis of your information?  Where did
21  you learn that?
22  A   Newspaper.
23  Q   Anyplace else?
24  A   Well, I know some people over there.
25  Q   Over where?
```

Page 158

```
1   A   I know people at TAP.
2   Q   Oh, that actually takes me back to a question.
3       What was your interaction with TAP or TAP
4   employees?
5   A   Well, we -- I know several of the individuals who
6   were there who worked there, and my son worked there.
7   Q   Okay.
8       And who's your son?
9   A   His name is Don Robertson.
10  Q   And what was his role at TAP?
11  A   He was a salesperson, then he managed TAP Care, he
12  was a sales manager.
13  Q   Did you discuss the TAP litigation with him at all?
14  A   I must have, but not in any detail.
15  Q   Do you know whether he was at all involved in --
16  A   No.
17  Q   -- the litigation?
18  A   No; not to my knowledge.
19  Q   Okay.
20  A   He was well down in the organization.
21  Q   Did he have a particular sales region?
22  A   He was a salesperson in Illinois and then he moved
23  to Des Moines, Iowa and he was a sales manager there, I
24  believe.
25  Q   How long did he work for TAP?
```

Page 159

```
1   A   Twelve years.
2   Q   From what period to what period, do you recall?
3   A   You know, I -- He left there three or four years
4   ago.
5   Q   Okay.
6       And now what's he doing?
7   A   He works for Sepricore in Boston.
8   Q   And you're still not a Red Sox fan?
9   A   Well, they play the Yankees, so I like them to that
10  point.
11  Q   Oh, okay.
12  A   I'm a Mets fan.
13  Q   Not only do they play the Yankees, they beat the
14  Yankees.
15  A   Yes, ma'am.
16      MS. ST. PETER-GRIFFITH:  Why don't we take a lunch
17  break.
18      VIDEOGRAPHER:  We're going off the record.
19      (Whereupon, a lunch recess was taken from 12:15 p.m.
20  until 1:06 p.m.)
21      VIDEOGRAPHER:  We're back on the record.
22  BY MS. ST. PETER-GRIFFITH:  (Continued.)
23  Q   Mr. Robertson, before the break, there were a
24  couple of areas that we were talking about that I want to
25  kind of revisit.
```

Page 160

```
1       First, you indicated that your son is at TAP?
2   A   No; he was at TAP.
3   Q   Oh, he was at TAP --
4   A   Yes, ma'am.
5   Q   -- I'm sorry.  He was at TAP.
6       Now he's in Boston and you're still not a Red Sox
7   fan.  That's right.
8       Sir, are you conversant with or friendly with other
9   either current or former employees of TAP?
10  A   I know many former or current employees of TAP.
11  Q   Do you speak with them on a regular basis?
12  A   No.
13  Q   Are there some TAP employees that have retired to
14  the Naples/Fort Myers that you're aware of?
15  A   No.
16  Q   No?  Okay.
17      Sir, the other more substantive issue that we were
18  discussing before - although, that's not to say the Red Sox
19  aren't substantive because they are - was marketing the
20  spread, and what I'd like to find out from you is, first,
21  the policy that you were talking about, was that something
22  that was implemented when you came onto Alt Site?
23      MS. CITERA:  Object to the form.
24      THE WITNESS:  I don't know that.
25  Q   Do you know what the origin of the policy was?
```

Page 161

1    A    The origin of the policy when it began, I don't

2    know that.

3    Q    And do you know whether it's written down anywhere?

4    A    It may be, but I don't know of anywhere that it's

5    written down.

6    Q    How are you aware of the policy?

7    A    We didn't market the spread.  We knew that that

8    existed.  We didn't market our products in that way.

9    Q    So --

10    A    It was brought to my attention by someone.

11    Q    What I'm trying to ascertain is is this a formal

12    corporate Abbott policy or is this more of an informal

13    practice?

14    MS. CITERA:  Objection to form.

15    THE WITNESS:  I can't comment on whether or not it

16    was an Abbott policy.  I don't recall ever having seen a

17    document that said it was.  I don't know that.

18    Q    Okay.

19    What -- How do you define marketing the spread or

20    what activities do you consider to be marketing the spread

21    activities?

22    A    If you're talking to a doctor about - or an

23    organization that - and due to the reimbursement the doctor,

24    would make more money using your product than someone else's

25    product and you'd talk to them about that, that would be

Page 162

1    marketing the spread.

2    Q    What's wrong with that?

3    MS. CITERA:  Object to the form.

4    THE WITNESS:  It's just not the way we marketed our

5    products.  We chose not to do it in that fashion; we

6    chose to market on our own merits.

7    Q    Is there anything wrong with doing that?

8    A    I -- I don't -- I don't know because that's -- Is

9    there anything wrong with doing that?  I don't -- You know,

10    I don't know - I don't have a moral judgment on that.  I

11    know we didn't do it.

12    Q    Okay.

13    A    Other organizations may have done it.  We didn't do

14    it.

15    Q    Are there any other activities other than talking

16    to physicians comparing, you know, spreads that you would

17    consider marketing the spread?

18    A    Talking to them about other marketing activities;

19    do you have an examples?

20    I --

21    Q    Sure.

22    Do you consider or would you consider discussing

23    with Abbott customers Abbott's AWPs as a marketing the

24    spread activity?

25    MS. CITERA:  Objection to form.

Page 163

1    THE WITNESS:  You know, I -- I don't know.  It

2    may -- All of these things are context - you know, what

3    the objectives of the people are.

4    It may be marketing the spread.  I mean, people may

5    have spoken - within my organization, people may have

6    spoken to other about the spread, there may have been

7    information about the spread.  But it was our policy not

8    to market our products in that fashion.  We didn't do

9    it.

10    Q    Okay.

11    And did you -- Was that policy something that you

12    instituted?

13    MS. CITERA:  Objection to form.

14    THE WITNESS:  Well, the general manager would

15    probably institute the - you know, the policy.

16    I have no specific knowledge of any communications

17    with the sales force.  But that would be something the

18    general manager instituted.

19    Q    So that wasn't a policy that you would institute.

20    A    That I did institute.

21    MS. CITERA:  Objection to form.

22    Q    Or that you did institute.

23    A    No; I don't remember ever communicating to the

24    sales force regarding that.

25    Q    Do you whether that was a policy that your

Page 164

1    predecessor instituted?

2    A    I have no knowledge of that.

3    Q    Okay.

4    Why were you talking with Mr. Ward about the

5    marketing the spread issue?

6    MS. CITERA:  Objection to form.

7    THE WITNESS:  We talked about marketing all the

8    time; how we, you know, market our product contracts all

9    the time.

10    This issue may have come up, or probably did come

11    up, and I didn't consider it a huge issue at that - you

12    know, at the time, as I recall, but it evidently has

13    become a big issue.

14    I can't remember the context.

15    Q    What I'm trying to ascertain from you is is or are

16    spread marketing activities a prohibited activity, at least

17    with regard to Abbott's Alt Site, or is it just not a

18    marketing tool that you would use?

19    A    It's something that -- It's something that we

20    didn't really want to do.

21    If you look back seven or eight years ago it wasn't

22    a huge issue.

23    Because something that comes can go away.  If

24    you're not marketing based upon the quality and utility of

25    your products, things like that can go away, and it's just

Page 165

1    not a good marketing tool.  Things can change.
2        Q    Sir, I'd like to show you what's been previously
3    marked in another Texas deposition as Exhibit --
4        MS. ST. PETER-GRIFFITH:  Is it 766?
5        MR. ANDERSON:  Yes.
6        Q    And what I'd like to do is mark it as the first
7    exhibit in your deposition.
8        A    Mm-hmm.
9        Q    First, I'm going to have the court reporter mark
10   it.
11       (Whereupon, Robertson Exhibit No. 1 was marked for
12       identification.)
13       Q    Sir, if you could take a look at this document --
14   Actually before you do, can I ask a question?
15       How would spreads potentially go away?
16       MS. CITERA:  Objection to form.
17       THE WITNESS:  Spread would go away if reimbursement
18       changed.
19       MS. ST. PETER-GRIFFITH:  Okay.
20       THE WITNESS:  And if you remember the era 1991,
21       1992, there was an awful lot of talk about changing the
22       health care delivery system in this country - I believe
23       it was about that time the DRGs came in for Medicare and
24       hospitals.  And that may be why it gained greater
25       attention on, you know -- And it's - doing that is not a

Page 166

1        substantial advantage of your product.  It's just not a
2        long-term good thing.
3        (Referring.)
4        Okay.
5        Q    Sir, do you recognize this document?
6        A    No.
7        Q    It says, Interoffice Correspondence, Abbott, do you
8    see that at the top?
9        A    Mm-hmm.
10       Q    Do you know who Mr. Gorman is?
11       A    Yeah.  Mark Gorman was a fellow who worked in Home
12   Infusion Services, and I believe he was one of the
13   salespeople over there.
14       Q    Okay.
15       And you notice there are several people who this
16   memo is directed to --
17       A    Mm-hmm.
18       Q    -- from Mr. Gorman?
19       A    Mm-hmm.
20       Q    Including Mr. Dempsey and Mr. Ward?
21       A    Mm-hmm.
22       Q    And Mr. Karas and Miss Tobiason?
23       A    Mm-hmm.
24       Q    And there's a cc listed that says, D. Robertson.
25       A    Mm-hmm.

Page 167

1        Q    Do you have any reason to doubt that that's
2    referencing you?
3        A    No.  That's me.
4        Q    Okay.
5        Do you have any reason to doubt that you received
6    this memorandum?
7        A    No, I don't doubt that I received this.
8        Q    Okay.
9        Sir, if you could look at the second paragraph --
10       A    Mm-hmm.
11       Q    -- it says, Conspicuous in its absence from the
12   list is Baxter.
13       Do you see that?
14       A    Mm-hmm.
15       Q    What significance does that have?
16       A    Well, if it --
17       MS. CITERA:  Objection to the form.
18       THE WITNESS:  I mean, if you look at the first
19       paragraph, it says if they didn't sign up for the rebate
20       program they wouldn't be eligible to sell the drugs to
21       organizations who were billing Medicaid.
22       Q    Would that put Abbott in a better position for the
23   products that it competes with Baxter?
24       MS. CITERA:  Objection to form.
25       THE WITNESS:  It would certainly put Baxter at a

Page 168

1        disadvantage.
2        Q    Okay.
3        Would it put Abbott at an advantage?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  It would put everybody who competed
6        with Baxter at an advantage.
7        Q    Do you see the last sentence of that paragraph, We
8    certainly can use this as a competitive selling advantage,
9    do you see that?
10       A    Yes, ma'am.
11       Q    How would Abbott's sales force use the fact that
12   Baxter was not listed for Medicaid reimbursement as a
13   competitive selling advantage?
14       MS. CITERA:  Objection to the form.
15       THE WITNESS:  Well, I don't think we would have to
16       use it, ma'am.
17       When people tried to bill for Baxter products and
18       didn't get paid, they would convert.  It wouldn't be up
19       to us.  We wouldn't have to do anything.
20       Q    Okay.
21       Well, do you know whether your sales force used the
22   fact that Baxter was not listed to their selling advantage?
23       A    No, I don't specifically know.
24       Q    Do you recall anything about this issue?
25       A    No, ma'am.

Page 169

1  I also have to be honest; I received a lot of

2  documents every day, and if I was not an addressee or cc'd,

3  chances are it went -- I didn't read it.

4  But I did receive it.  Whether I read it or not is

5  not - you know, is another issue.

6  MS. ST. PETER-GRIFFITH:  Mark the next exhibit,

7  please.

8  (Whereupon, Robertson Exhibit No. 2 was marked for

9  identification.)

10  A  (Referring.)

11  Mm-hmm.

12  MR. HAVILAND:  Could you identify it for the record,

13  please?

14  MS. ST. PETER-GRIFFITH:  Sure.

15  What we've marked as Robertson Exhibit 2 is the June

16  14th, 1991 memorandum from Mr. Robertson to Kris Kringel

17  with cc's to Virginia Tobiason; Chris Begley; Bill

18  Dempsey; Mike King and John Ward.

19  BY MS. ST. PETER-GRIFFITH:

20  Q  Sir, do you recognize this document?

21  A  No, I don't.  But I assume I wrote it and sent it

22  to them.

23  Q  Why do you assume that?

24  A  Because my name's on the top of it.

25  Q  Do you have any doubt that you sent this memorandum

Page 170

1  out?

2  A  No, ma'am.  That's my signature on the bottom.

3  Q  Okay.

4  And, sir, did you draft this memoranda?

5  MS. CITERA:  Objection to form.

6  THE WITNESS:  I don't -- I don't know that.  I

7  know -- I don't know that.

8  Q  Well, if you didn't draft this memorandum, who

9  would have?

10  MS. CITERA:  Objection to form.

11  THE WITNESS:  I don't know.  You know, I really

12  don't know.

13  Q  When you sent out memoranda as the vice president

14  and general manager of Alt Site, would you generally draft

15  the memoranda that you sent out?

16  A  Most of the time -- Now, I didn't say I disagreed

17  with what this said --

18  Q  Okay.

19  A  -- you know, because I sent it out.  But I'm saying

20  did I write the thing, and I'm saying I don't remember

21  writing the thing.

22  Q  But you could have?

23  A  Oh, yes, I could.

24  Q  Okay.

25  This is a memorandum from you; correct --

Page 171

1  A  Mm-hmm.

2  Q  -- at the top?

3  And Mr. Kringel, we've already established, was at

4  the time the president of the Hospital Products Division?

5  A  Mm-hmm.

6  Q  And, sir, in June of '91 you testified earlier that

7  you assumed the position of vice president and general

8  manager in 1990 --

9  A  Mm-hmm.

10  Q  -- were you still, so to speak, learning the ropes

11  in '91?

12  A  Hopefully we always continue learn.

13  I assume I was still learning; yes, ma'am.

14  Q  Okay.

15  Do you see where it says, Proposed rules changes

16  published by HCFA, do you see that in the Re: line?

17  A  Right.

18  Q  Do you know why you were - or can you tell us why

19  you were writing concerning proposed rule changes published

20  by HCFA?

21  MS. CITERA:  Objection to the form.

22  THE WITNESS:  Well, I think it -- My job would be to

23  inform my supervisor of any change which would impact or

24  affect our group, and proposed reimbursement changes

25  would impact and affect our group, so.

Page 172

1  Q  Who would proposed reimbursement changes impact and

2  affect your group?

3  A  Well, if they were to go down significantly - if

4  reimbursement went down significantly, that would impact our

5  group.

6  Q  How so?

7  A  The market would probably shrink or we would have

8  to make significant price reductions or the products

9  wouldn't be used.

10  Physicians don't like to lose money --

11  Q  Okay.

12  A  -- so they would -- The price would come out of

13  someplace - you know, the money would come out of someplace.

14  Q  Sir, do you see that first sentence attached here,

15  The proposed rule changes published by HCFA regarding the

16  reimbursement for drugs incident to patient treatment in

17  physician's offices or dialysis center?

18  A  I see that.

19  Q  Sir, can you look at the attachment to this

20  document?

21  A  (Witness complies.)

22  Q  Can you tell me is that the attachment that was

23  attached to your memorandum?

24  A  Probably.  Undoubtedly.  I mean, I have no reason

25  to doubt that it is.

Page 173

1   Q   Okay.

2       MS. ST. PETER-GRIFFITH:  And I will just represent

3   that this document was produced in this sequence by

4   Abbott.

5   A   I guess it was Victoria Shain?

6       No one claims authorship, do they?

7       MR. STETLER:  She's really supposed to be asking you

8   the questions.

9   Q   Sir, let me ask you, do you know what the

10  Reimbursement Task Force is?

11  A   Based -- No.

12  Q   Okay.

13  A   For sure, no.

14  Q   If you could turn to the very last page of this

15  document at ABT21078, do you see your name where it says,

16  Home Care, at the top?

17  A   (Referring.)

18      Yeah.

19  Q   Do you know what that means?

20  A   I assume it's a department -- Let me look at the

21  (referring).  It makes me part of a distribution list of the

22  Federal Health Issues Report.

23  Q   Okay.

24      Do you have any doubt that the D. C. Robertson

25  listed there is you?

Page 174

1   A   No.

2   Q   You received a copy of this, it appears.

3   A   Yeah.

4   Q   Okay.

5       Sir, that first sentence, what did you mean by that

6   sentence?

7       MS. CITERA:  Objection to form.

8       THE WITNESS:  Well, it refers to this document

9   (indicating).

10  Q   Okay.

11      Hold on just a second.

12      (Discussion off the record.)

13  Q   Sir, do you recall in '91 proposed changes to HCFA

14  rules concerning reimbursement for inpatient - for drugs

15  incident to patient treatment in a physician's office or

16  dialysis center?

17  A   Well, that's what this document deals with.

18  Q   Okay.  I'm just asking you without looking at the

19  document --

20  A   Oh, do I recall --

21  Q   Yeah.  Do you recall that?

22  A   No.

23  Q   Do you know why you would have sent this memorandum

24  to Mr. Kringel?

25      MS. CITERA:  Objection to form.

Page 175

1       THE WITNESS:  Just to keep him informed.  It was

2   something that was generated evidently by our Washington

3   office because that's where Victoria Shain worked.

4   Q   Okay.

5       Who is Miss Shain?

6   A   She was a person who worked in Abbott Washington, I

7   guess.  Once again, we talked about that group earlier and

8   what they did and what they were responsible for.

9       I guess she was keeping her ear to the ground on

10  all issues of health care for Abbott.

11  Q   Now, it says, These rules are being published

12  within the larger context of a re-examination of the entire

13  system and allocation of physician reimbursement, do you see

14  that as your second sentence?

15  A   Yes.

16  Q   What did you mean by that?

17      MS. CITERA:  Objection to form.

18      THE WITNESS:  I remember that in the early 90s,

19  there was - people were looking - or the federal

20  government, specifically, was dealing with the subject

21  of how health care was provided, how it was billed for

22  and reimbursed specifically at the federal level - their

23  Medicare responsibility.

24      And I remember DRGs, I think, came out about that

25  point in time and there was a relook at the whole issue

Page 176

1   of reimbursement.

2       And of forwarding this, I thought it might be of

3   interest to Mr. Kringel what our Washington office

4   thought, so I forwarded it.

5   Q   Okay.

6       What do you recall about these rules?

7   A   About the rules?  As I recall, not much happened.

8   Q   Okay.

9       Why do you have that recollection?

10  A   Because I can't remember -- I can't remember

11  anything happening now.  I can't remember any specific

12  change that occurred, you know, as a function of this relook

13  by the government and others at this.  I don't remember

14  anything important or big issues happening.

15      We don't have national health care now.

16  Q   Okay.

17      I'm going to mark ask that this be marked as the

18  second exhibit, and, sir, I'd like you to --

19      MR. ANDERSON:  Third.

20  Q   Oh, third - I'm sorry, the third exhibit, and it is

21  a memorandum dated June 11th, '91.

22      And, sir, I'd like you to flip to the last two

23  pages, okay --

24  A   Sure.

25  Q   -- first because we're going to talk about Exhibit

Page 177

1   2.

2       (Whereupon, Robertson Exhibit No. 3 was marked for

3   identification.)

4       Q   But we're going to talk about the last two pages

5   and the context of Exhibit 2.

6       If you could just flip to the last two pages first.

7       A   (Witness complies.)

8       Q   Sir, I'll represent to you that sequentially this

9   is how these documents were produced to us and these -- No,

10  just if you could look at the last two pages, please.

11      A   Okay.

12      Q   And the pages are labeled ABT212053, 212054 and

13  then there's the final page that is - that doesn't have a

14  label on it --

15      A   Mm-hmm.

16      Q   -- with an ABT prefix.

17      And then there's 212056.

18      And, sir, I'm going to ask you to look at these two

19  pages which, at the top, are proposed rules and ask you

20  whether --

21      A   The first two pages.

22      Q   No.  The last two pages --

23      A   I don't have --

24      Q   I'm sorry.  The last three pages.

25      A   I don't have a 2056 --

Page 178

1       Q   No.  Down here (indicating).

2       A   I have 54, 53.

3       Q   53 and 54, okay?

4       A   Right.

5       Q   And then do you see the 212056.

6       My question concerns these two pages --

7       A   Oh, okay.

8       Q   -- okay?

9       MS. CITERA:  I think you're talking about another

10  document.  I think that's his confusion.

11      MR. HAVILAND:  I think you're talking about Exhibit

12  2.

13      MS. CITERA:  Yeah.

14      A   Oh, this one (indicating).

15      Q   Yes, I'm talking about - yes - Exhibit 2.

16      A   Okay.

17      Q   My question to you is, sir, could these two pages

18  have been the regulations that you attached to this memo --

19      MS. CITERA:  Objection to the form.

20      Q   -- because it references, These rules are being

21  published.

22      MS. CITERA:  Objection to form.

23      THE WITNESS:  I have no idea.

24      Q   Okay.

25      Well, for Exhibit 2, if you flip the next page, do

Page 179

1   these appear to be proposed rules or is this a report?

2       MS. CITERA:  Objection to form.

3       THE WITNESS:  This seems to be a report

4   (indicating).

5       Q   Okay.

6       Is it fair to infer that from the context of the

7   second sentence of your June 14th, '91 memorandum that you

8   attach rules published?

9       MS. CITERA:  Objection to form.

10      THE WITNESS:  Are these rules attached?

11      (Referring.)

12      Well, I may have misspoken in the memo because the

13  rules don't appear to be attached.

14      The summary of the rules may be attached, but the

15  rules are not attached.

16      Q   Okay.

17      Then my next question to you is if you could turn

18  again --

19      A   Yes, ma'am.

20      Q   -- and we're going to leave these open because I

21  have questions for you about this.

22      A   Okay.

23      Q   For 212053 and 54, sir, are those the proposed

24  rules that were being published that you are referencing in

25  that second sentence?

Page 180

1       MS. CITERA:  Objection to form.

2       THE WITNESS:  They may be; I don't know.

3       Q   Well, take a look --

4       A   If you look at chronologically, they're pretty

5   close in time.  They may be.

6       (Referring.)

7       Q   Sir, if you could move on to the next sentence, the

8   third sentence in the June 14th, '91 memorandum --

9       A   Yes, ma'am.

10      Q   -- it says, Changes are intended to effect drugs

11  administered by injection or infusion, do you see that?

12      A   Yes, ma'am.

13      Q   Where did you get that information from?

14      MS. CITERA:  Objection to form.

15      THE WITNESS:  Oh, probably from -- If -- Probably

16  from -- If it's a drug incident to treatment, probably

17  from that sentence, I don't know where I got that.

18      Q   Okay.

19      Then it says, This would include pain management

20  drugs, Oncolytics - do you see that - Lupron and Calcijex?

21      A   Oncolytics.

22      Q   Oncolytics; thank you.

23      A   Those are cancer drugs.

24      Q   Okay.

25      Lupron and Calcijex?

Page 181

1   A   Mm-hmm.

2   Q   Where did you get that information from?

3       MS. CITERA:  Objection to form.

4       THE WITNESS:  Because those are injection or

5   infusion.

6   Q   Okay.

7       Do the regulations specifically speak to those

8   drugs?

9       MS. CITERA:  Objection to form.

10      THE WITNESS:  I would have to reread the regulation

11  to find out --

12  Q   Why don't you take some time to do that.

13  A   -- if they're drugs incident to treatment.

14      Okay.  Then I'll take the time and look through

15  here.  It may take a while for me to find that, but I will

16  give it my best shot.

17      MS. STETLER:  Wouldn't it be easier for us to agree

18  whether it's in there or not?

19      MS. ST. PETER-GRIFFITH:  Okay.  I mean, we're

20  welcome to.  I don't think it is in there and I want him

21  to feel comfortable as to that.

22      MS. CITERA:  Well, I would object --

23      MR. STETLER:  And I would like to know -- It looks

24  like Jones Day may have just produced the documents out

25  of sequence, the way I read it, but I'd like to

---

Page 182

1   establish whether or not the memo's referring to the

2   document that the Witness is looking at just so we don't

3   have an issue down the road about it.

4       MS. CITERA:  Well, first of all, there's zero

5   foundation for the memo because he doesn't remember it.

6   So whether or not he's going to remember --

7       MS. ST. PETER-GRIFFITH:  He admitted to publishing

8   it.

9       MS. CITERA:  He admitted that he must have sent it

10  around but he doesn't recall the document or the issue,

11  so there's no foundation for this document nor could

12  there be any foundation as to whether this (indicating)

13  was attached to this document.

14      MR. STETLER:  Maybe I could back to what I -- The

15  only thing I suggested - and I realize you guys have a

16  purpose and a right to inquire, but it ought to be easy

17  between the two sides to say whether or not there's a

18  reference to those drugs in that very small print that

19  is going to take him about ten minutes to go through.

20      MR. HAVILAND:  It should be except Jones Day just

21  said they're not going to stipulate to the authenticity

22  and admissibility that this is a document authored by

23  the Witness here, we've got a problem for using this at

24  trial.  And if we can't do it with this witness, who are

25  we going to do it with?  That's my problem.

---

Page 183

1       MS. ST. PETER-GRIFFITH:  That's my problem, too.

2       MR. HAVILAND:  So if it's a foundation objection and

3   foundation has to be laid, you know how that is, is,

4   Counsel, sometimes it takes a long time to establish

5   that.

6       I, for one, would like to have a foundation for this

7   document.

8       MR. SISNEROS:  Well, maybe we can take a five-minute

9   break and you review all three documents.

10      THE WITNESS:  Do you want me to read this

11  (indicating) and read this?

12      MS. ST. PETER-GRIFFITH:  These two pages and that,

13  yes.

14      THE WITNESS:  I'm afraid it will take me more than

15  five minutes, and I'd like Mr. Stetler to read it, too,

16  and I'd like to review it in detail if this is very

17  important.

18      MR. HAVILAND:  Ann, what is 55 - let me ask on the

19  record.  The document that breaks between the memo and

20  the rules is one document.

21      MS. ST. PETER-GRIFFITH:  I don't have that.

22      MR. HAVILAND:  Isn't there a 55?

23      MS. ST. PETER-GRIFFITH:  No, I don't have that.

24      MR. HAVILAND:  Sometimes documents get produced out

25  of sequence.

---

Page 184

1       MS. ST. PETER-GRIFFITH:  Why don't we take a few

2   minutes so you can look at that.

3       I don't want to confuse the issue.  We could start

4   here.

5       THE WITNESS:  This starts in mid-sentence.  I don't

6   know what -- This page starts in mid-sentence.

7       Do you have a specific part of this page you want me

8   to look at?  I mean --

9       MS. CITERA:  Are we still on the record?

10      MR. SISNEROS:  Yes.

11      MS. CITERA:  Okay.  Good.

12      THE WITNESS:  This starts in mid-sentence.  What --

13  Should I just read this and then what do I do then?

14      MS. ST. PETER-GRIFFITH:  Why don't we go off the

15  record for a few minutes.

16      VIDEOGRAPHER:  Off the record.

17      (Whereupon, a brief recess was taken)

18      VIDEOGRAPHER:  We're back on the record.

19  BY MS. ST. PETER-GRIFFITH:

20  Q   Sir, can you identify whether or not the

21  regulations that you were referencing in the first paragraph

22  of this memo imparted information concerning the page, Pain

23  Management Drugs, that are listed?

24      MS. CITERA:  Objection to the form.

25      THE WITNESS:  No.  I look at the drugs specifically

Page 185

1    mentioned here, I can't find them in here (indicating).

2    Q    Okay.

3         If you could look at that next sentence, Rationale

4    for a 15% reduction, do you see that?

5    A    Yeah.

6    Q    What did you mean by that?

7         MS. CITERA:  Objection to form.

8         THE WITNESS:  Someone may have communicated to me

9    that that was why it was going to happen.

10   Q    Do you know who would have communicated that to

11   you?

12   A    I have no idea.

13   Q    Okay.

14        What do you mean by the phrase, And that AWP is a

15   poor indicator of actual drug acquisition cost?

16        MS. CITERA:  Objection to form.

17        THE WITNESS:  AWP is an average.  An average is

18   wrong 100 percent of the time.

19   Q    Okay.

20        Is that what you meant by that phrase?

21        MS. CITERA:  Objection to form.

22        THE WITNESS:  Well, that's what I was told and that

23   seems to me -- You know, I have no idea.  If I look at

24   it 16 years after the fact it seems a reasonable -

25   reasonable to me, but I don't - I don't remember.

Page 186

1    Q    Do you have any recollection as to why you wrote

2    that phrase?

3    A    No.

4    Q    Okay.

5         The next sentence in the second paragraph reads,

6    Several professional groups have vested interests in

7    resisting these changes, do you see that?

8    A    Mm-hmm.

9    Q    And then the following sentence is, They include

10   ASCO, PMA, ASN and the Alliance for Infusion Therapy, do you

11   see that sentence?

12   A    Mm-hmm.

13   Q    Sir, how do you know that several professional

14   groups had a invested interest in resisting the proposed

15   changes?

16   A    I must --

17        MS. CITERA:  Objection to the form.

18        THE WITNESS:  -- have believed it at the time, but I

19   don't remember why.

20   Q    Did you confer with any of these professional

21   groups?

22   A    No.

23   Q    What is the American Society of Clinical Oncology?

24   A    A professional organization.

25   Q    Did you interact with them in your capacity as vice

Page 187

1    president and general manager of Alt Site?

2    A    No.

3    Q    Do you know whether anyone at Alt Site did interact

4    with them?

5    A    No.

6    Q    Do you have any knowledge of how Alt Site would

7    have learned that ASCO had an interest in resisting the HCFA

8    changes?

9    A    No.

10   Q    What about PMA, what's PMA?

11   A    Pharmaceutical Manufacturers Association.

12   Q    Did you interact with the Pharmaceutical

13   Manufacturers Association when you were the vice president

14   and general manager of Alt Site?

15   A    I didn't personally; no.

16   Q    Do you know if someone in Alt Site did?

17   A    No.  I don't remember.

18   Q    Do you know what the basis of the assertion is that

19   PMA had an interest in resisting the published HCFA changes?

20        MS. CITERA:  Objection to form.

21        THE WITNESS:  I can conjecture, but I don't know

22   specifically.

23   Q    What's your conjecture?

24   A    They have an interest in drug pricing.  But I don't

25   know specifically.

Page 188

1    Q    What about the American Society of Nephrology, ASN,

2    do you see that?

3    A    Mm-hmm.

4    Q    Did you interact with ASN when you were the vice

5    president and general manager of Alt Site?

6    A    I knew people at the ASN.

7    Q    Who did you know at ASN?

8    A    I don't remember their names.

9    Q    Did you confer with them concerning the proposed

10   changes --

11   A    No.

12   Q    -- published by HCFA?

13        COURT REPORTER:  Let her finish for me.

14        THE WITNESS:  Oh, I'm sorry.

15   Q    What about the Alliance -- Do you know if anyone

16   else within Alt Site interacted with the American Society of

17   Nephrology?

18   A    Not my knowledge.

19   Q    And the Alliance for Infusion Therapy, did you

20   interact with them when you were the vice president and

21   general manager of Alt Site?

22   A    No.

23   Q    Do you have any knowledge as to whether anyone else

24   in Alt Site would have interacted with them?

25   A    They may have, but I don't have specific knowledge

Page 189

1   of that.

2       Q    Okay.

3            Do you know in what context they would have

4   interacted with them?

5       A    It was a trade group that may have interacted, but

6   I have no specific knowledge.

7       Q    How did you learn that these particular groups may

8   have had an interest in resisting the HCFA changes proposed

9   in '91?

10      A    I think these --

11           MS. CITERA:  Objection to form.

12           THE WITNESS:  These may be -- These appear to be

13      groups that are incident to patient treatment, but I

14      don't -- That would be the only thing I could think of.

15      They used drugs instead of the patient treatment.

16      Q    Sir, the next sentence reads, These groups are

17  being contacted by appropriate Alt Site and Abbott

18  Washington personnel to determine a response to the proposed

19  rule changes, do you see that?

20      A    Mm-hmm.

21      Q    What do you mean by that sentence?

22           MS. CITERA:  Objection to form.

23           THE WITNESS:  Once again, it would be conjecture.  I

24      have no specific knowledge of what we would have done or

25      told them.

Page 190

1       Q    Did you direct anybody to determine --

2       A    I don't recall that.

3            MR. STETLER:  You've got to let her finish.

4            She really wasn't done.

5       A    Pardon me again.

6       Q    Okay.

7            Did you direct anyone to determine whether a

8   response was necessary to the proposed rule changes?

9       A    I don't remember --

10           MS. CITERA:  Objection to form.

11           THE WITNESS:  -- doing that.

12      Q    In that sentence, who are the appropriate Alternate

13  Site and Abbott Washington personnel?

14           MS. CITERA:  Objection to form.

15           THE WITNESS:  The Alternate Site people would be the

16      Home Infusion GM, the Alternate Site Product Sales GM,

17      and Washington would be these individuals who were in

18      the Abbott Washington office who were charged with

19      acting in our behalf, whatever they did.

20      Q    I asked you a name before and you couldn't quite

21  place it, David Landside.

22           Do you know whether Mr. Landside was based in

23  Washington?

24      A    As -- Yes, I -- Yes.

25      Q    And would he have been some of the Abbott

Page 191

1   Washington personnel - one of the Abbott Washington

2   personnel that you were referencing in this memo?

3       A    As I recall now, yeah.  Yes.  He, and the other

4   name is Miss Shaine here (indicating).

5       Q    Okay.

6            And, sir, are the general managers of Alt Site and

7   Home Infusion that you referenced addressed as cc's on this

8   memorandum?

9       A    (Referring.)

10           Yes, ma'am.

11      Q    Was this letter -- Was this memorandum directing

12  them to make those inquiries --

13           MS. CITERA:  Objection to form.

14      Q    -- or intended to direct them to make these

15  inquiries?

16      A    It doesn't appears so, does it?  It appears that

17  this merely an informational copy for them and we may have

18  had a separate conversation directing them to do that; I

19  don't recall.

20      Q    Do you have any recollection of having such a

21  conversation?

22      A    No, ma'am.

23      Q    Do you know why you would have had such a

24  conversation?

25      A    I think --

Page 192

1            MS. CITERA:  Objection to form.

2            THE WITNESS:  -- reimbursement was an issue that

3       everyone was interested in; health care reform was an

4       issue that everybody was interested in.  We were in the

5       health care business; it seems to me natural that we

6       would be interested in that.

7       Q    As these responses take shape, we will discuss them

8   with you, do you see that, it's the next sentence?

9       A    (Referring.)

10           Yes, ma'am.

11      Q    What responses are you talking about?

12           MS. CITERA:  Objection to form.

13           THE WITNESS:  It appears the responses from our

14      Washington group; what they came up with, I don't know.

15      Q    Do you recall any discussions with either

16  Mr. Kringel or any of the cc's concerning any responses?

17      A    No, ma'am.

18      Q    The next sentence reads, The HCFA proposal has

19  significant momentum and we believe that some form of

20  reimbursement reduction has a high probability of occurring,

21  do you see that?

22      A    Mm-hmm.

23      Q    What did you mean by that?

24           MS. CITERA:  Objection to form.

25           THE WITNESS:  My assumption is that I meant what I

Page 193

1  said in there.

2  Q   What do you recall about the HCFA proposal having

3  specific momentum?

4      MS. CITERA:  Objection to form.

5      THE WITNESS:  Nothing.

6  Q   Why did Abbott care whether the HCFA proposal had

7  significant momentum?

8      MS. CITERA:  Objection to form.

9      THE WITNESS:  As I said before, we were in the

10     health care business.  Health care reform was a very hot

11     topic and, being in the health care business, such an

12     interest would have been appropriate.

13  Q   Well, do you know whether your interest was in

14  support of or against the proposed changes?

15     MS. CITERA:  Objection to form.

16     THE WITNESS:  I don't know specifically; no.  I'd

17     have to read the - once again, the changes that are

18     proposed.  I don't have much memory what - you know,

19     this was 16 years ago.  I'm sorry.

20  Q   The next part of this sentence says, And we believe

21  that some form of reimbursement reduction has a high

22  probability of occurring, do you see that?

23  A   Mm-hmm.

24  Q   Do you know why you believed that?

25     MS. CITERA:  Objection to form.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 194

1  Q   Or why you wrote, We believe that?

2      MS. CITERA:  Objection to form.

3      THE WITNESS:  Once again, it would be conjecture on

4  my part.  Because I have no specific recollection, it

5  would be conjecture because we believed it because we

6  believed it.

7      The environment - the health care environment may

8  have been such that we believed it but I have no

9  specific recollection of facts or reasons why.

10  Q   Why would Abbott care about reimbursement

11  reduction?

12     MS. CITERA:  Objection to form.

13     THE WITNESS:  Reimbursement reduction reduces the

14  utilization of drugs.

15  Q   Why does it?

16  A   Why does it?

17  Q   Mm-hmm.

18  A   Because physicians will use less drug if the

19  reimbursement's inadequate, I assume.

20  Q   How do you define inadequate?

21  A   If they lose a lot of money in - in - in - in

22  treating patients, I mean, they might lower the level of

23  patient care.

24  Q   Is it would that occur only if they lost money?

25     MS. CITERA:  Objection to form.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 195

1      THE WITNESS:  You know, I don't - I don't know - I

2  don't know specifically.

3      I know that - that it's evident here -- I don't

4  recall specific facts.  It was evident here that

5  lowering of reimbursement would have a negative impact

6  on patient care, so.

7  Q   And do you have any recollection as to why that is

8  or why you conclude that?

9  A   No, ma'am.

10     MS. CITERA:  Objection to form.

11     THE WITNESS:  I mean...

12  Q   The next sentence reads, Our efforts are to ensure

13  these changes are as small as possible, do you see that?

14  A   Mm-hmm.

15  Q   Do you recall what efforts you were talking about?

16     MS. CITERA:  Objection to form.

17     THE WITNESS:  Our efforts were generally to try to

18     explain - although, I haven't - to explain what the

19     impact might be to appropriate individuals not within -

20     within our organization.  We didn't deal with people

21     outside our organization.

22  Q   Well, do you know whether any lobbying efforts were

23  undertaken with regard to the proposed HCFA changes in 1991?

24  A   They may have been by our Washington group - I

25  assume they got paid for something, but I don't know

9d08c905-4985-4985-b6be-b8c9e568b1fc

Page 196

1  specific actions that they took.

2  Q   Do you recall discussing lobbying efforts

3  concerning the '91 HCFA changes with anyone?

4  A   No, ma'am.

5  Q   Why would Abbott have an interest in seeing that

6  the changes are as small as possible?

7      MS. CITERA:  Objection to form.

8      THE WITNESS:  Once again, I have no specific

9  recollection but I do know that disruption and change

10  muddies the waters, slows the market and just is

11  disruptive to businesses - change is disruptive to

12  businesses.  But I can't remember specific facts in that

13  regard.

14  Q   But can change at times be for the good?

15     MS. CITERA:  Objection to the form.

16     THE WITNESS:  I can only speak experientially.

17     MS. ST. PETER-GRIFFITH:  Okay.

18     THE WITNESS:  That -- I just know that it's

19  disruptive.  Over the long period of time change

20  certainly has to be positive or people wouldn't make it

21  but it can be very disruptive.

22     But I have no specific recollection of the facts of

23  these issues here (indicating).

24  BY MS. ST. PETER-GRIFFITH:

25  Q   The next sentence, which is a longer one, reads,

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 197

1  The abandonment of AWP as a good indicator of product
2  acquisition cost and the statement in the proposal that
3  wholesale price guidelines substantially overstate the true
4  cost of drugs, as well as the statement that ultimately
5  there should be a national drug fee schedule have
6  significant implications for our business, do you see that?
7      A   Mm-hmm.
8      Q   What did you mean by that?
9          MS. CITERA:  Objection to form.
10         THE WITNESS:  My assumption is that I meant what I
11     said; that they were using AWP and they were going --
12         COURT REPORTER:  I'm sorry.  They were --
13         THE WITNESS:  -- using AWP here and they -- The
14     sentence says that the - whoever's making these changes
15     was dissatisfied with it.
16     Q   Did you believe in your capacity as vice president
17  and general manager of Alt Site that AWP was a good
18  indicator of product acquisition cost?
19     A   No; probably not a good at product acquisition
20  cost.  No; there were differences between acquisition cost
21  and AWP.
22     Q   Okay.
23         And what were those differences?
24     A   Once again, an average is always wrong - you know,
25  by definition an average is always wrong.  So it can change

Page 198

1  and it would probably discriminate against small customers
2  and customers who didn't have access or a membership in the
3  large buying groups.
4      Q   Do you know why you wrote that, The abandonment of
5  AWP is a good indicator product acquisition cost would have
6  significant implications --
7          MS. CITERA:  Objection.
8      Q   -- on Abbott's outside business?
9          MS. CITERA:  Objection to form.
10         THE WITNESS:  Because that's -- Although I don't
11     remember specifically, I do know that there would be -
12     if you abandon one system and go to another it causes
13     change and it would be a bureaucratic change, it would
14     take a long time and it would be disruptive to our
15     business.
16     Q   How would it be disruptive to your business?
17     A   Because would have to understand it, understand the
18  changes, and changes in our system are always disruptive.
19     Q   But if the change proposed was to base
20  reimbursement upon a more reliable indicator of product
21  acquisition cost, wouldn't that, in the long run, be more
22  beneficial to the overall reimbursement scheme?
23         MS. CITERA:  Objection to form.
24         THE WITNESS:  Forgive me, ma'am, but in my
25     experience, federal government would create a

Page 199

1  bureaucracy that would take everybody 16 months to get
2  paid for and half the places would be out of business by
3  the time it got done.
4      I was concerned about disruption in the business,
5  not the level of reimbursement.
6      Q   Were you at all concerned about the possibility
7  that a reduction in reimbursement could impact the interests
8  of Abbott's customers in purchasing product from Alt Site?
9      A   A reduction in reimbursement --
10         MS. CITERA:  Objection to form.
11         THE WITNESS:  -- could impact the interest of our
12     customers; I believe that to be correct.
13     Q   Okay.
14         Why do you believe that to be correct?
15     A   Because, once again, it's a change.
16         If the reimbursement went up, it would have one
17  change; if the reimbursement went down, it would have
18  another change.  It would just be disruptive.
19         Does that answer your question?
20     Q   Okay.  Let me ask this -- Let me move on to the
21  next part of the sentence.
22         You wrote, And the statement in the proposal that
23  wholesale price guidelines substantially overstate the true
24  cost of drugs.
25         Do you think that that was an inaccurate statement?

Page 200

1      A   I don't know where I got the -- It's in quotes.
2  Does the quote come out of here?
3      If that's true, I quote someone else's opinion.  I
4  have no specific knowledge of where I got that from.
5      Q   Well, do you think that AWP -- When you served in
6  your capacity as vice president and general manager of
7  Alternate Site, did you have any understanding as to whether
8  the AWP reimbursement scheme or the wholesale price
9  guidelines caused a substantial overstatement of true drug
10  costs?
11     A   They could.  I believe they could.
12         But I don't -- Once again, in my memory, I believe
13  they could, I don't have any specific facts in that regard.
14         I don't have any numbers or specific facts in that
15  regard.
16     Q   As an average, did AWP sometimes underestimate
17  provider acquisition cost while it sometimes also
18  overestimated provider acquisition cost?
19     A   That's a computed number, and I don't know how the
20  number was computed.  We didn't -- We didn't compute it, I
21  don't think.
22         I would just have to take a look at the formula
23  that was used to compute AWP and we could tell whether it
24  did or it did not, and also the -- There were probably
25  invoices available from the period of time that would tell

Page 201

1   you whether it did or did not.

2   Q    Other than the overall business disruption that you

3   described as being a concern, were there any other

4   significant implications for Abbott's Alt Site business that

5   you were concerned about?

6        MS. CITERA:  Objection to form.

7        THE WITNESS:  Well, I was probably concerned that

8   the reimbursement rate would be significantly lowered so

9   that the drug might not be used, but I have no specific

10   regulation of - recollection of that.

11        A prudent person might be concerned that the

12   government would make a decision that was ill-based and

13   impact the health care of the patient and the

14   utilization of the drug.

15   Q    But if the drug reimbursement was lowered so that

16   physicians were still recovering their cost and, perhaps, a

17   little bit more, why would that have an impact on

18   utilization?

19        MS. CITERA:  Objection to form.

20        THE WITNESS:  I -- Once again, I'm -- I -- I don't

21   know.  I don't recall the specific -- There are more

22   costs that are incremental to drug acquisition cost that

23   are associated with treating patients which makes -

24   which dwarf the drug cost - someone has - you know, a

25   nurse or someone - someone who is highly paid on an

Page 202

1   hourly basis has to inject the drug.  There are all

2   sorts of costs that are associated with that, so - and

3   in addition to records keeping, so the drug is a portion

4   of the issue.

5        But I don't remember specifically why I did that.

6   Q    Do you know whether the HCFA 15 -- the HCFA

7   proposed rule changes impacted anything other than physician

8   reimbursement for actual drugs?

9        MS. CITERA:  Objection to form.

10        THE WITNESS:  I don't remember what the proposed

11   HCFA rule changes impacted; sorry.

12        I mean, I don't remember any of this.  This is a

13   long time ago.

14   Q    Well, let me ask you this:  If the proposed

15   regulations reduced reimbursement but the physicians were

16   made whole, would there be any concern with the physicians

17   being made whole and not losing any money and being able to

18   recover what they needed to recover to continue to maintain

19   their practices, would there still be a concern in your mind

20   that drug utilization would be reduced?

21        MS. CITERA:  Objection to form.

22        THE WITNESS:  I don't -- You know, I don't -- I

23   don't know what the impact would be on them.  I just was

24   concerned - you know, we were concerned about

25   disruption.

Page 203

1        Whether or not the physicians make money or not was

2   not my concern; my concern was whether or not we could

3   market these drugs effectively in the appropriate

4   markets.  I'm not -- A physician's income is - they get

5   paid for treating patients, not for drugs.

6   Q    Well, how would a change --

7        MR. SISNEROS:  Excuse me.  I think that speaker's

8   on.

9        COURT REPORTER:  No.  It's the person next door.

10        MS. CITERA:  Are you having trouble hearing, because

11   I see you leaning.

12        MS. ST. PETER-GRIFFITH:  If we could hold on just a

13   second, I'm going to go outside and make sure that

14   they're not outside.

15        Let's take a quick break.

16        VIDEOGRAPHER:  Off the record.

17        (Whereupon, a brief recess was taken.)

18        VIDEOGRAPHER:  We're back on the record.

19        THE WITNESS:  Okay.  These issues were a long time

20   ago, and I apologize if I can't be more helpful, but I,

21   frankly, don't remember.

22   BY MS. ST. PETER-GRIFFITH:

23   Q    Okay.

24        Was AWP or government reimbursement by HCFA rooted

25   in an AWP formula important to Alt Site marketing?

Page 204

1        MS. CITERA:  Objection to form.

2        THE WITNESS:  How -- How the cost of the drug was

3   recovered by a physician or a physician group, or how

4   health care was paid for - how cancer patients or

5   Medicare patients or whomever, how they got care and

6   whether or not this care was adequate, yes, was a

7   concern to us.

8   Q    Well, did physicians make money by providing drugs

9   or treating patients?

10        MS. CITERA:  Objection to form.

11        THE WITNESS:  As I recall, they're in business for

12   treating patients.

13        I don't know how much money they made -- I don't --

14   You know, I understand, I've heard of instances where

15   physicians have made money selling drugs.

16   Q    Well, can we agree that it's probably not a good

17   health care practice overall for physicians to be making

18   their money selling drugs?

19        MS. CITERA:  Objection to form.

20        THE WITNESS:  I'm not a commenter on health care

21   policy, but in some countries, that's how they make most

22   of their money.

23   Q    Okay.

24        Do you think that that's a fair practice or are

25   there problems with that practice?

Page 205

1    MS. CITERA:  Objection to form.

2    THE WITNESS:  There are problems with every

3  practice, but I'm not qualified to comment on the health

4  care delivery systems of other countries.

5    Q    If you look at the final sentence of that second

6  paragraph --

7    A    Yes, ma'am.

8    Q    -- - do you see that - The framework for a downward

9  spiral of drug prices is laid through these rules, do you

10  see that?

11    A    Mm-hmm.

12    Q    What did you mean by that statement?

13    MS. CITERA:  Objection to form.

14    THE WITNESS:  As I recall, if you -- If this

15  elaborate bureaucracy were set up to find out what the

16  actual cost of drugs were, and if they were low - now,

17  it could be an upward spiral, too, but the upward spiral

18  - for the upward spiral to happen, doctors would have to

19  lose money for two or three years on buying these drugs.

20  But if the prices went downward, then they would take a

21  look at the actuals and then it would be a downward

22  spiral - they'd replace it with new actuals and new

23  actuals if physicians refused to - maybe to ultimately

24  refuse to use the drugs, I believe.  So that was what I

25  - that was kind of the thing.

Page 206

1    And, once again, this is all conjecture and things

2  that are going to happen in the future and things we

3  were discussing 16 years ago.  I wish it could be more

4  helpful with regard to specifics.

5    Q    The final sentence of this memorandum say, We will

6  keep you informed of progress regarding the industry

7  responses and our response, both as supplier and

8  manufacturer, do you see that?

9    A    Mm-hmm.

10    Q    What did you mean by that?

11    A    I believe --

12    MS. CITERA:  Objection to the form.

13    THE WITNESS:  -- that we had the opportunity to give

14  input into the PMA, which is the lobbying

15  organization --

16    Q    Sir, I can tell you, I'm going to have to ask you

17  to slow down because I can barely --

18    A    Oh, okay.

19    Q    -- hear you and I know the court reporter is --

20    COURT REPORTER:  If you could just take a breath

21  because she keeps objecting and I can't - it's three

22  people I'm trying to get, so.

23    THE WITNESS:  Okay.  It's that New York upbringing.

24  I will slow down.

25    MR. STETLER:  You can tell when the machine starts

Page 207

1  to smoke like this, (indicating) you're going too fast.

2    THE WITNESS:  I apologize.  Forgive me.

3    MR. STETLER:  Slow down.

4    THE WITNESS:  Your question again?

5    MS. ST. PETER-GRIFFITH:  If you could read it back.

6  Okay.  Why don't I just re-ask it.

7    COURT REPORTER:  You were asking if he saw the last

8  sentence and then --

9    A    The last sentence --

10    COURT REPORTER:  -- What do you mean by that?

11  BY MS. ST. PETER-GRIFFITH:

12    Q    Yeah.  What do you mean by the last --

13    MS. CITERA:  Same objection.

14    THE WITNESS:  (Referring.)

15    We will keep you informed of progress to the

16  industry; the -- There's - The PMA would respond to

17  proposed changes - would probably be asked to respond to

18  proposed changes, our lobbying group in Washington would

19  probably be given the opportunity through the PMA to

20  respond to these.

21    And I was -- It appears to me that I meant what I

22  said; that I would keep Mr. Kringel and those copied on

23  this memo informed of anything that I knew regarding the

24  potential of health care reimbursement reform or --

25  Yeah, I mean, that's --

Page 208

1    Q    Okay.

2    Do --

3    THE WITNESS:  -- what I appear to be saying, ma'am.

4    Q    Go ahead.

5    THE WITNESS:  That's what I appear to be saying.

6    Q    Sir, do you recall what you did to keep Mr. Kringel

7  or the others informed of the progress regarding industry

8  responses?

9    A    No, I --

10    MS. CITERA:  Objection to form.

11    THE WITNESS:  No, I don't.

12    Q    And you write at the very end, And our response,

13  both as supplier and manufacturer, do you see that?

14    A    Mm-hmm.

15    Q    Did Abbott -- Would Abbott have had different

16  responses as a supplier as compared to as a manufacturer?

17    A    I don't know why I wrote that.  Perhaps it was one

18  was going to go through the PMA and one was going - one

19  response was going to go through an industry organization.

20    Q    Okay.

21    Well, do you know whether Abbott, itself, made any

22  response to the proposed published HCFA changes?

23    A    I don't -- I don't know and I have no knowledge of

24  that.  I don't remember that.

25    Q    Sir, what I'd like you to do is turn to Exhibit -

Page 209

1    what we've marked as Exhibit 3, the first two pages.

2          I've had you concentrate on --

3    A    This is 2; this is 3.

4    Q    Right there (indicating).

5          MS. ST. PETER-GRIFFITH:  And, for the record, this

6    is a June 11, '91 memo from Virginia Tobiason,

7    Interoffice Correspondence to Mr. Dempsey, Mr. Heggie,

8    Mr. King, D. Robertson and J. Ward.

9    A    Mm-hmm.

10         (Referring.)

11   BY MS. ST. PETER-GRIFFITH:

12   Q    Sir, do you recall seeing this memorandum?

13   A    No, ma'am.

14   Q    It says at the top that it's from Virginia

15   Tobiason, Manager of Reimbursement?

16   A    Yes.

17   Q    And then on the To list, do you see the D.

18   Robertson?

19   A    Mm-hmm.

20   Q    Do you have any doubt that that's you?

21   A    Oh, no, ma'am.

22   Q    And do you have any doubt that you received this

23   memorandum?

24   A    I probably received this; yes, ma'am.

25   Q    Let me ask you, based upon the content of this

Page 210

1    memorandum, do you believe that you might have obtained

2    information from Miss Tobiason that informed your June 14th,

3    '91 memorandum?

4    A    That --

5          MS. CITERA:  Objection to form.

6          THE WITNESS:  That may be; I don't know.  You know,

7    once again, it may be; I don't know.

8    Q    Okay.

9          Well, if you see the first sentence of Miss

10   Tobiason's memorandum, it says, On June 5th, HCFA

11   published --

12   A    Right.

13   Q    -- the proposed --

14   A    Right.

15   Q    -- rule on physician payment reform, do you see

16   that?

17   A    Yes, ma'am.

18   Q    Was that June 5th HCFA publication the proposed

19   rule changes that you're referencing in your June 14th, '91?

20   A    I don't --

21         MS. CITERA:  Objection to form.

22         THE WITNESS:  -- know that, ma'am.  I don't know

23   that.

24         They talk about renal care here.  I don't -- I don't

25   know that.  I'm sorry.

Page 211

1    Q    Okay.

2          The second sentence reads, This rule included a

3    proposal to lower the payment for drugs incident to a

4    physician's services to Average Wholesale Price, AWP minus

5    15%, do you see that?

6    A    Yes, ma'am.

7    Q    Do you understand what Miss Tobiason was

8    referencing there?

9          MS. CITERA:  Objection to form.

10         THE WITNESS:  She was probably referencing these

11   pages here, (indicating) but I - once again, I have not

12   read them in detail and don't know whether that's what

13   she's articulating in this memo.

14   Q    Well, what does AWP minus 15% mean to you?

15   A    It means Average Wholesale Price minus 15%.

16         But this rule -- the published rule - I don't know

17   where it says in here what she notes in front; I don't see

18   that in the back here (indicating).

19         Once again, I haven't had an opportunity to read

20   it.

21   Q    Well, why don't we do this.  Why don't we go off

22   the record so that you've got an opportunity to do read

23   it, okay?

24         And what I can try and do, sir, is, if you want me

25   to, I can try and blow that up on our copier if that would

Page 212

1    be easier for you.

2    A    I'll do my best to read this.

3          And you could be helpful; the question you asked me

4    on AWP minus 15%, are you talking about a specific place in

5    here where it says that that you can show me or send me to?

6    Q    Let me see if I can find it.

7    A    Thank you.

8          MR. HAVILAND:  Third column, carry-over paragraph.

9          THE WITNESS:  Third column.

10         (Referring.)

11   Q    Right here, (indicating) 85%.

12         MS. CITERA:  What page are you looking on?

13         MS. ST. PETER-GRIFFITH:  53.

14         MS. CITERA:  Are we on the record?

15         COURT REPORTER:  Yes.

16   A    Okay.  And it says here -- (referring) Yeah, that's

17   the same statement, Average Wholesale Price minus 15%.

18         You know, I mean is there a reason for me to doubt

19   that that's what she's referencing is Column 3?  I don't

20   know.

21   Q    Well, what -- What significance would that have for

22   Abbott's Alternate Site if the AWP reimbursement-based

23   system was changed to AWP minus 15%?

24         MS. CITERA:  Objection to form.

25         THE WITNESS:  What impact would it have?

Page 213

```
1        Well, if it was based on AWP and then it's going to
2   be based on AWP minus 15%, it could go down, stay the same
3   or remain.
4        And the memo here articulates some reimbursement on
5   AWP, some reimbursement on AWP plus, some reimbursement on
6   AWP minus - I mean, I don't know what -- Does it talk about
7   a specific impact?  I don't know.
8   Q    Well, what I'm asking, sir, is does it have any
9   significance for you as the former vice president and
10  general manager of Alternate Site?
11  A    It would appear here that the proposed rule would
12  reduce reimbursement
13  Q    Okay.
14       And if physicians are still made whole, why would
15  Abbott care about a transition to an AWP minus 15%
16  reimbursement?
17  A    The biggest --
18       MS. CITERA:  Objection to form.
19       THE WITNESS:  Excuse me, ma'am.
20       The biggest word in the English language, "if."
21       As I articulated earlier, we are always concerned
22       about the disruption due to reimbursement.  If
23       physicians are made whole; we had no way of knowing
24       that, we had no way of knowing how any of these rules
25       changed proposed could impact the business.
```

Page 214

```
1        So if you were to ask me to make a determination,
2   certainly based on this memo, Miss Tobiason isn't much
3   of a prophet.  This was definitely the start of a
4   national drug pricing control policy - well, it's 16
5   years later and that hasn't happened.
6        So as a prophet, she doesn't have much credibility.
7   I don't know if this memo has much more credibility.
8   Q    Well, let me ask you this:  Do you know whether
9   Abbott could determine whether physicians were made whole
10  based upon an AWP minus 15% reimbursement?
11  A    I don't know if -- We could -- We probably could
12  take an effort at it, but I don't know if we could do that
13  definitively.
14  Q    Well, you knew, didn't you, how much they were
15  paying for Abbott drugs, didn't you?
16  A    Right.
17  Q    And AWP was a published figure, wasn't it?
18  A    I guess it was; yes, ma'am.  I never -- Personally,
19  I never looked at the Red Book and saw it.  I'm taking on
20  faith that it was a published number.
21  Q    What is the Red Book?
22  A    It's some -- I guess it's a book where you send in
23  prices and it's some sort of published book of pricing.
24  Q    And how do you know that?
25  A    I've heard the term.
```

Page 215

```
1   Q    Have you ever reviewed a Red Book?
2   A    Never.
3   Q    Well, if Abbott knew how much it was selling or how
4   much physicians were paying for its products and Abbott was
5   able to ascertain how much the AWP was, couldn't you
6   determine whether or not physicians would be made whole on
7   Abbott products?
8        MS. CITERA:  Objection to form.
9        THE WITNESS:  A reasonable person could assume that.
10  I don't know for a fact.
11  Q    Okay.
12       Sir, do you see the third sentence of the first
13  paragraph, In effect, this rule will change reimbursement
14  for all Medicare Part B injectable drugs including renal,
15  pain management and chemotherapy?
16  A    Yes, I do.
17  Q    Do you know what Miss Tobiason meant when she said
18  that?
19       MS. CITERA:  Objection to form.
20       THE WITNESS:  Well, evidently, this AWP minus 15% is
21       not the rule that's being followed - was not the rule
22       that was being followed at the time this memo was
23       published.  So if it went from something to this, it
24       would change the reimbursement.
25  Q    Okay.
```

Page 216

```
1        And would that be -- Why would that be of
2   significance to Abbott's Alternate Site?
3        MS. CITERA:  Object to the form.
4        THE WITNESS:  As I said before, all reimbursement
5        changes, all conditions of client, customer practice are
6        of interest to providers of drugs.
7   Q    If we could move down to the next paragraph where
8   it says, Current policy, if you could just read those two
9   sentences, please, sir?
10  A    (Referring.)
11       Medicare currently reimburses drugs either based --
12       THE WITNESS:  Oh, excuse me, ma'am.  I'll slow down.
13  A    Medicare currently reimburses drugs either based on
14  reasonable charges or the drug cost based on AWP as
15  published in the Red Book.  Each Medicare intermediary
16  carrier has discretion to determine the reimbursement level
17  with some paying below AWP and others paying above AWP
18  Q    Sir, did you understand that in June of 1991 that
19  was the current Medicare reimbursement policy?
20  A    I don't remember.
21  Q    Let me just ask you this general question:  Do you
22  know how AWP was calculated?
23  A    No.
24       MS. CITERA:  Objection.
25  Q    Do you know whether there was a formula for
```

Page 217

1  determining AWP?

2      A   One would assume there was a formula, but I don't

3  know it.

4      Q   Do you know who calculated AWP?

5      A   No.

6      Q   Sir, do you know how Medicare knew to reimburse

7  either at a reasonable charge or the drug cost based upon

8  AWP as published in the Red Book?

9      A   Frankly, I don't know how they did that.

10     Q   Do you know whether it was determined by the amount

11 of charge reported to Medicare on the HCFA 1500 Form?

12     MS. CITERA:  Objection to form.

13     THE WITNESS:  I'm not familiar with the HCFA 1500

14     Form.  Is that is a cost report?

15     Q   No.

16     A   Well, then I don't know how they would know what it

17 cost if that's not a cost report.

18     Q   Okay.

19         Are you aware that charges for drugs administered

20 by physicians could be billed to Medicare if they were

21 Medicare reimbursable on a HCFA 1500 Form using a J code?

22     A   I have no idea what had a 1500 Form or a J code is.

23     Q   Okay.

24         Do you know whether Abbott's reimbursement

25 department would have handled that?

Page 218

1      MS. CITERA:  Objection to form.

2      THE WITNESS:  Anything that had to do with, you

3      know, reimbursement - dealing with Medicare, dealing

4      with any reimbursement would be done by -- Now, there

5      was only - please realize there was only one department

6      in my little bailiwick that had a reimbursement

7      department, and that was Home Infusion Services.

8          How the corporation or how Hospital Products would

9          have dealt with government reimbursement, you'd have to

10         speak to people more qualified than I who were in that

11         department, and I don't know who they are.

12     Q   Okay.

13     Sir, the next sentence reads, Major Issues, do you

14     see that --

15     A   Yes, ma'am.

16     Q   -- the next section?

17         The first bullet point reads, There is a question

18 whether HCFA has authority to limit reimbursement for these

19 drugs through regulation, do you see that?

20     A   Yes, ma'am.

21     Q   Were you aware of any question concerning HCFA's

22 authority to limit reimbursement through regulation?

23     A   No, ma'am.

24     Q   Are you aware of any initiative or effort by Abbott

25 or Abbott's Washington unit to challenge the authority of

Page 219

1  HCFA to limit reimbursement through regulation?

2      MS. CITERA:  Objection to form.

3      THE WITNESS:  I personally never saw Abbott's

4      Washington organization challenge anybody.

5      Q   Do you know whether they lobbied anybody?

6      A   I don't know if they spoke to anybody in that

7  regard.

8      Q   The next bullet point reads, that, In the proposed

9  rule, HCFA indicates that they are going to consider

10 establishing national drug fee screens in the future.  This

11 is definitely a start towards national drug pricing

12 controls, do you see that?

13     A   Yes, ma'am.

14     Q   Was that of concern to Abbott?

15     MS. CITERA:  Objection to form.

16     THE WITNESS:  Evidently it was a concern to the

17     author of this memo, but I don't know -- Drug control,

18     would it be -- Would it impact the organization?  Yes,

19     it would.

20         What was the likelihood that that was going to

21     happen?  Probably small.

22         And was it a concern of the corporation - a large

23     concern of the corporation?  Probably not.

24     Q   Okay.

25         It was a concern to Alt Site?

Page 220

1      A   Once again, it was -- I guess it was a concern to

2  this person.  But she was so far off the mark in terms of

3  where things were going - she talks about this is definitely

4  the start of national drug policy; a person could not have

5  been more incorrect from the standpoint of what happens, or

6  the standpoint of what happened over the course of the last

7  16 years, at least.

8      Q   Okay.

9          Why do you see that?

10     A   We don't have national drug controls -- National

11 controls on prices in this country.

12         And this individual indicated this is definitely

13 the start of national drug control.  That is -- That is --

14 That's totally incorrect.

15     Q   The next bullet point reads, Also included in this

16 rule is a proposal to reduce even further the payment for

17 very high volume drugs, do you see that?

18     A   Yes, ma'am.

19     Q   What were the high volume drugs that you can recall

20 for Alt Site?

21     A   For us?  Well, they would probably be - Calcijex

22 was a high one because, you know, most renal care - renal

23 dialysis patients are on Calcijex; that was a high volume

24 drug.  And, I apologize, I can't remember specifically, I'd

25 have to see some documents from this point of time that had

Page 221

1  volumes on them.

2      Q    Well, if you could -- Okay.

3           What about vancomycin, was that a high volume drug

4  to your recollection?

5      MS. CITERA:  Objection to form.

6      THE WITNESS:  Vancomycin, as I recall, was a pretty

7      commonly used - commonly used antibiotic, but I don't

8      have any specific numbers for you.

9      Q    Okay.

10          Sir, the next bullet point reads, HCFA is seeking

11  comments on the level of discount, do you see that?

12     A    Mm-hmm.

13     Q    And then Miss Tobiason writes, I believe there are

14  a number of arguments we can use in response?

15     A    Mm-hmm.

16     Q    Do you know whether Abbott made any arguments in

17  response or made any comments to HCFA concerning these

18  proposed rule changes.

19     A    Not that I -- No, I don't know of any responses

20  made formally to HCFA.

21     Q    The next sort of sub-bullet point is an example of

22  an argument that Miss Tobiason is proposing could be made

23  and it reads, Discounts counts vary among purchasers.  Some

24  providers may pay full AWP and others may get discount but

25  not a full 15% due to manufacturer discounting practices, do

Page 222

1  you see that?

2      A    Yes, I do.

3      Q    Do you know which Abbott Alt Site customers paid

4  full AWP for their products?

5      A    No, I don't.

6      Q    Okay.

7           Do you know what Miss Tobiason - or how did you

8  interpret Miss Tobiason's comment that others may get a

9  discount but not a full 15% due to manufacturers discounting

10  practices?

11     MS. CITERA:  Objection to form.

12     THE WITNESS:  Some people may belong to small

13     purchasing groups, others may belong to larger

14     purchasing groups, and volume generally drives -- Volume

15     drives the discount level.

16          So there may be differences in pricing there, or at

17     least that was industry practice.  I can only assume

18     that that's what she means.

19     Q    Okay.

20          It says, Manufacturers discounting practices.

21          Did Abbott Alt Site have any, or did Abbott,

22  itself, have any discount practices with regard to products

23  sold by Abbott Alt Site?

24     A    I'm sure we had --

25     MS. CITERA:  Objection to form.

Page 223

1      THE WITNESS:  -- guidelines with regard to

2      discounting, but I don't remember what they were

3      specifically.

4      Q    Do you know who would have been responsible for

5  developing those guidelines?

6      A    The discounting guidelines would be the contract

7  marketing people in the division, our fellows in Alternate

8  Site Product Sales and - yeah, those would be the people.

9  They're working together to try to make sure that across the

10  customer segments and market segments that the pricing made

11  sense.

12     Q    When you say contract marketing within the

13  division, which contract marketing do you mean?

14     A    We have a big con- -- the Hospital Products

15  Division had a huge contract marketing organization.

16     Q    Okay.

17     A    We had a very small Hospital -- We had a very small

18  contract marketing organization, so we would go to the

19  Division to make sure that any actions we took in terms of

20  discounting and pricing would make sense versus the large

21  Hospital Products division that was -- Well, we were a

22  smaller business, they were the larger business so we

23  wouldn't -- This is my sense, I don't remember this

24  specifically, but a reasonable person would not let the tail

25  wag the dog and we would go to them and make sure that our

Page 224

1  discounting practices made sense.

2      Q    Are you aware of any Alt Site customer who paid

3  full AWP price for any products?

4      A    List -- AWP price --

5      Q    As published in the Red Book or another comparable

6  compendia?

7      A    I don't know of any; no.  I don't know of any.

8      Q    Okay.

9      A    It's been a long time and I don't have the

10  customers list.  But I'm sorry.

11     Q    If you could flip to the next page.

12     A    Yes, ma'am.

13     Q    Okay.

14          The next bullet point is a proposed argument by

15  Miss Tobiason which is, Actual drug costs are not the only

16  costs to be considered when establishing drug fee screen, do

17  you see that?

18     A    Yes.

19     Q    What is a drug fee screen?

20     A    One would assume, based upon reading this memo or

21  based upon reading this bullet point, that a drug fee

22  screen, which would be an attempt at saying how much should

23  we pay for this and we're talking about other costs -

24  wastes, breakage, inventory cost, drug procurement cost, bad

25  debts; that these are other things that should be considered

Page 225

1    when considering the cost of a drug to a provider of health
2    care.
3        Q    So if a provider of health care was reimbursed for
4    drug costs plus a little extra that covered these
5    contingencies concerning bad debt and possible waste and
6    breakage, would there be any concern to Alt Site as to a
7    loss in either physician utilization or market share?
8        MS. CITERA:  Objection to the form.
9        THE WITNESS:  You know, it's hard to come up with an
10   answer for that.
11       If physicians are adequately reimbursed for what
12   they do and what their costs are, one would assume
13   that -- But I - once again, I can't do that, I can't
14   speak for the physicians, I'm not a physician.
15       Q    Okay.
16       The next argument says, There are disincentives to
17   higher cost, more effective drugs because of
18   reimbursement limits, do you see that?
19       A    Mm-hmm.
20       Q    Do you understand what Miss Tobiason was - meant
21   there?
22       MS. CITERA:  Objection to form.
23       THE WITNESS:  It appears to me that Miss Tobiason is
24   saying that if you lose money per unit you don't make it
25   up in volume, and if you lose money per unit in high

Page 226

1       volume drugs you specifically don't get whole in volume
2       - that's what it says to me, just reading it here today.
3           Perhaps Miss Tobiason could explain better than I.
4       Q    Okay.
5           And then it says, This could have a serious impact
6    on patient care, do you see that?
7       A    Mm-hmm.
8       Q    I think TAP or Renal could use this argument
9    effectively, do you see that?
10      A    Mm-hmm.
11      Q    Do you know why TAP - or she was arguing that TAP
12   or Renal could use that argument effectively?
13      MS. CITERA:  Objection to form.
14      THE WITNESS:  That it would have been an impact on
15   patient care?
16      If physicians lost money - if they change the
17   reimbursement and physicians lost money on drugs - --
18      MS. ST. PETER-GRIFFITH:  Okay.
19      THE WITNESS:  -- is that your question?
20      Q    No.  My question is a little bit simpler than that.
21      Do you know why Miss Tobiason believed that or
22   did --
23      MS. ST. PETER-GRIFFITH:  Strike that.
24      Q    Did you think that TAP or Renal could use that
25   argument effectively?

Page 227

1       MS. CITERA:  Objection to form.
2       THE WITNESS:  I believe that if providers lose large
3    amounts of money treating patients that patient care
4    will suffer.
5       I believe that, suddenly, a phosphorus level in
6    bone, which was - which was unacceptable yesterday may
7    be acceptable today and that patient care will suffer if
8    physicians lose money on drugs.
9       These patients can benefit from these drugs.  The
10   physicians will not go out of business extending them to
11   patients.  And I believe if they lose money on drugs - I
12   know this was a concern, they begin to lose large
13   amounts of money or a drug that patient care would
14   suffer.
15      Q    Well, was the concern that they would lose,
16   actually lose money or was the concern that they wouldn't
17   make as much as money?
18      A    Oh, that they would lose money.
19      MS. CITERA:  Objection to form.
20      Q    That was the concern, that they would actually come
21   out of pocket money for drugs that they distributed to their
22   clients.
23      A    That was --
24      MS. CITERA:  Objection to form.
25      THE WITNESS:  -- the problem that was articulated to

Page 228

1    me, as I recall.
2       COURT REPORTER:  I'm sorry.  She keeps objecting and
3    it's hard to hear all three of you at once.
4       THE WITNESS:  Yes, ma'am.  I'm sorry.
5       COURT REPORTER:  "That they would lose money; that
6    was the concern, that they would actually" --
7       MR. STETLER:  You know, it may help her if we took a
8    break.
9       MS. ST. PETER-GRIFFITH:  Yeah.  Why don't we take a
10   break.
11      MR. HAVILAND:  Why don't you just do the question so
12   we don't have to come back to it.  You want to do that
13   again; question, objection, answer and...
14      COURT REPORTER:  "Or they wouldn't make as much
15   money"; you said, "They would lose money," and you said,
16   "That is the concern, that they would" --
17      MS. CITERA:  And I said, "Objection," and then --
18      MR. STETLER:  "They would lose money," she said --
19      MS. ST. PETER-GRIFFITH:  That they would lose money.
20      MR. STETLER:  -- Objection.
21      COURT REPORTER:  Okay.  Thank you.
22      THE WITNESS:  If physicians, especially with high
23   cost drugs, lose money that patient care will suffer.
24   BY MS. ST. PETER-GRIFFITH:
25      Q    Okay.

Page 229

1  And did you interpret lose money to mean that they
2  would actually be out of pocket money?
3  A   Yes, ma'am.
4  MS. CITERA:  Objection to form.
5  Q   Okay.
6  And not that they would not receive as high of a
7  profit above their cost.
8  MS. CITERA:  Objection to form.
9  THE WITNESS:  I don't recall the specific
10  conversations.  The conversations centered around losing
11  money and the impact that that would have on patient
12  care.
13  Q   Okay.
14  MS. ST. PETER-GRIFFITH:  Why don't we take a break.
15  VIDEOGRAPHER:  Okay.  We're going off the record.
16  (Whereupon, a brief recess was taken)
17  VIDEOGRAPHER:  We're back on the record.
18  BY MS. ST. PETER-GRIFFITH:
19  Q   Sir, we just got back from a break.
20  Before I ask you a few more questions - and I'm
21  going to try and move away a little bit from the documents
22  so that we can have a dialogue here.
23  MS. ST. PETER-GRIFFITH:  I just want to state I've
24  got some 82 documents, and as I predicted, somewhat
25  accurately, I think, to Mr. Stetler, I don't think that

Page 230

1  the government is going to finish its examination today
2  and I just wanted, for planning purposes, for everybody
3  to know that and I know that the Relator has questions
4  and I believe that Mr. Haviland may have questions after
5  that, so I just wanted to put that on the record,
6  because we've got probably, maybe at best, another two
7  hours to go.
8  MR. SISNEROS:  Well, California probably has some
9  questions.
10  MS. ST. PETER-GRIFFITH:  Okay.  And California does,
11  as well.
12  MS. CITERA:  And then just before we start with your
13  questioning, I just want to get our agreement on the
14  record which is, in order to assist the court reporter,
15  going forward, if I have an objection to form, I will
16  simply say, Objection.  If anyone has a problem with
17  that and does not agree to that deal, please speak up or
18  else I will assume that my objection counts for
19  objection to form.
20  MS. ST. PETER-GRIFFITH:  The government has no
21  problem with that.
22  MR. STETLER:  Agreed.
23  MR. SISNEROS:  Agreed.
24  MR. HAVILAND:  Is there a - I don't want to belabor
25  the topic but given the timing that was just laid out,

Page 231

1  we're not coming back tomorrow?
2  MS. ST. PETER-GRIFFITH:  Yes; we are not because --
3  MR. HAVILAND:  We're going to try to get another
4  date that may work for the Witness and everybody else.
5  MS. ST. PETER-GRIFFITH:  And we just ask Mr. Stetler
6  to work with Mr. Robertson.  I know we kind of want to
7  close this out as quickly as possible.
8  MR. STETLER:  December.
9  MR. HAVILAND:  The snowbirds are back.
10  MR. STETLER:  Oh.
11  MS. ST. PETER-GRIFFITH:  Yeah.  The traffic will be
12  much heavier then.
13  BY MS. ST. PETER-GRIFFITH:  (Continued.)
14  Q   Sir, we've talked a little bit about the content of
15  Miss Tobiason's document.
16  As the former vice president responsible for
17  Alternate Site, I'd like to come at my questions this way:
18  You have an understanding that with regard to reimbursement,
19  if physicians lose money they're not going to utilize Abbott
20  products or drugs, in, general right?
21  A   My impression -- Yes, and that patients who could
22  benefit the drugs - for the use of the drugs won't get that
23  drug.
24  Q   Because the doctors lose money on it.
25  A   Yes.

Page 232

1  Q   Okay.
2  What I'd like to ask you is what -- How should
3  doctors be made whole under a reimbursement scheme --
4  MS. CITERA:  Objection.
5  Q   -- should they been paid for the cost of the
6  product?
7  MS. CITERA:  Objection.
8  THE WITNESS:  I'm unqualified to answer that.  I'm
9  not a health care planner.
10  But I know that no ideal system exists, but I'm not
11  a health care planner.  I don't know how they should be
12  reimbursed.
13  A lot smarter people than I have tackled that issue
14  and broken their pick on it.
15  Q   But, sir, as when you were the vice president of
16  Alt Site, for Abbott's marketing purposes, what level of
17  reimbursement impacted Abbott's ability to sell its
18  products --
19  MS. CITERA:  Objection.
20  Q   -- in Alt Site?
21  MS. CITERA:  Objection.
22  THE WITNESS:  I -- You know, specific recollection,
23  I don't have.
24  But would you -- I mean, you're asking the
25  questions.  It would seem intuitively correct that if

Page 233

1  physicians lost money, they wouldn't use the drug.

2  Q   Okay.

3  How would physicians lose money?

4  A   If -- Physicians would lose money if the costs of

5  administering - of buying, storing, administering,

6  accounting for and notating, including nursing notes, were

7  significantly higher than what they get paid for.

8  I mean, physicians are human beings.  A marginal

9  loss, fine.  But if they're going to bleed money, I don't

10  think they'd use the drug.  I have no data to support this.

11  It was a hypothetical question and I answered it

12  hypothetically.

13  Q   Okay.

14  Well, did Abbott, when it was pricing its drugs,

15  factor in the possibility of physician losses?

16  MS. CITERA:  Objection.

17  THE WITNESS:  We priced our drugs -- We're talking

18  about two different prices.  We priced our drugs based

19  upon competitive environment - now - you know, what our

20  competitors charge versus what we charge.  There's a

21  difference between reimbursement and pricing.

22  MS. ST. PETER-GRIFFITH:  Okay.

23  THE WITNESS:  We based our pricing on competitive

24  environment, as I recall.

25  BY MS. ST. PETER-GRIFFITH:

Page 234

1  Q   Well, do you know whether Abbott had any ability to

2  influence reimbursement?

3  MS. CITERA:  Objection to the form -- Oh, objection.

4  THE WITNESS:  I have no knowledge of that.

5  Q   Do you know whether Abbott's reporting of list

6  prices impacted reimbursement?

7  MS. CITERA:  Objection.

8  THE WITNESS:  You know, I don't know.

9  If - If - If AWP is a calculated number off list

10  price, it would affect it.

11  MS. ST. PETER-GRIFFITH:  Okay.

12  THE WITNESS:  I didn't -- I didn't determine those

13  prices; I don't know how that whole process worked.

14  BY MS. ST. PETER-GRIFFITH:

15  Q   Do you know who did?

16  A   The division.

17  Q   When you say, "the division," who do you mean?

18  A   Hospital Products Division.

19  Q   Any particular unit within the Hospital Products

20  Division?

21  A   The contract marketing people seemed to do

22  everything else - they did all the contracting, so I assume

23  it would be their responsibility to establish list prices.

24  Q   In terms of making physicians whole for their

25  administration of drugs, should the overall reimbursement

Page 235

1  received by physicians take into account bad debt and the

2  possibility that Medicare patients might not be able to pay

3  their 20% co-pay?

4  MS. CITERA:  Objection.

5  THE WITNESS:  I think what -- If you're talking

6  about in the context of this memo, I think what Miss

7  Tobiason was trying to articulate was that cost

8  transcends just what you pay for this vial, and that the

9  presentation of an inclusive versus a narrow view of

10  cost should be considered when dealing with authorities

11  that reimburse, be they private or governmental.

12  MS. ST. PETER-GRIFFITH:  Can you repeat that?  Can

13  you read back that answer, please.

14  (The question was read back as previously recorded

15  by the court reporter)

16  BY MS. ST. PETER-GRIFFITH:

17  Q   Well, what would be inclusive?

18  As the former divisional vice president for Alt

19  Sites, what would be inclusive?

20  MS. CITERA:  Objection to form.

21  THE WITNESS:  Well, I don't know what else should be

22  included.  But cost would comprehend the - there are

23  some other costs included in here.  And the fact that

24  sometimes things break there's administrative

25  responsibilities, et cetera, some sort of attempt should

Page 236

1  be made to determine what those costs are.

2  Q   Well, would those total inclusive costs be more

3  than 100% of the actual drug cost, do you anticipate?

4  MS. CITERA:  Objection to form.

5  THE WITNESS:  It's impossible for it to be less.

6  Q   What do you mean it's impossible for it to be less?

7  A   I'm having trouble articulating.

8  If you have -- If you're paying for a vial and you

9  have more costs associated with that vial, how it could be

10  less than the cost of the vial.

11  Q   And I'm sorry, I misspoke.

12  Let's say -- I meant to say 200% of the drug cost.

13  Do you think that if physicians were reimbursed for

14  200% of the drug cost that that would be inclusive?

15  A   I'm sorry --

16  MS. CITERA:  Objection.

17  THE WITNESS:  -- I have no way of knowing what would

18  be adequate to cover physician's cost.  A worthy

19  objective would be for somebody to try to find out,

20  though.

21  Q   Well, do you think there becomes a point in time

22  when reimbursement above the cost of the product plus the

23  other, you know, intangibles such as breakage that are

24  inclusive in the physician's cost, do you think that there

25  reaches a point that reimbursement might be higher than

Page 237

1 those inclusive costs plus the cost of the product?

2    MS. CITERA:  Objection.

3    THE WITNESS:  It could be.  Could be.

4    Q   Do you know, for example, if a physician were

5 reimbursed at a 1000% of the drug cost, that would be

6 unreasonable?

7    MS. CITERA:  Objection.

8    THE WITNESS:  You know, I'm sorry, I have no way of

9    knowing that, it's all conjecture, but tools exist to be

10   able to examine cost and determine what would be fair

11   and adequate for reimbursement.

12   Q   Did Alt Site ever employ those tools to make that

13 evaluation?

14   A   I think we probably had some informal efforts to

15 determine that because - but I can't produce documentation

16 that articulates what we did or how we tried to do it.

17   Q   Why do you think that there were informal efforts?

18   A   We had a lot of things to do and that may not have

19 been one of the highest priorities.  I don't know.  I don't

20 recall.

21   Q   If physicians were making money above their cost of

22 the product plus the inclusive costs that you described,

23 would that surprise you if they were being reimbursed at an

24 amount higher than the inclusive costs plus --

25   A   If --

Page 238

1    MS. CITERA:  Objection.

2    THE WITNESS:  -- If the physicians -- Could you

3    repeat it?

4    I don't -- I'm sorry.  Please forgive me.

5    Q   Sure.

6    If the physician were reimbursed at an amount that

7 exceeded the cost of the product plus the inclusive costs

8 that you just described, do you think that that's

9 reasonable?

10   MS. CITERA:  Objection.

11   THE WITNESS:  Is your question -- Is your question

12   should physicians make money on drugs as a philosophical

13   question or --

14   MS. ST. PETER-GRIFFITH:  That's one way to ask it,

15   so, yes --

16   MS. CITERA:  Objection.

17   MS. ST. PETER-GRIFFITH:  -- that's my question.

18   THE WITNESS:  That's your question.

19   I don't believe that the use of drugs should be an

20   incentive for any physician to use it.  They should use

21   it based upon specific care plans and patient status, I

22   mean --

23 BY MS. ST. PETER-GRIFFITH:

24   Q   Do you know whether, as a matter of policy,

25 physicians -- Or do you have an opinion as to whether as a

Page 239

1 matter of policy physicians should be making money on the

2 drugs that they are prescribing that they purchase from

3 Abbott?

4    MS. CITERA:  Objection.

5    THE WITNESS:  As a -- You know, once again, that's a

6    health care planning issue.

7    They -- You know, they should make the majority of

8    their money treating patients; that's what they should

9    do.

10   Q   Okay.

11   Sir, I want to read a statement that Virginia

12 Tobiason wrote in here, and I want to ask you if you believe

13 as the former vice president - as the former divisional vice

14 president of Alt Site if you believe this statement is true,

15 and the statement is, Discounts vary among purchasers.  Some

16 providers may pay full AWP and others get a discount but not

17 the full 15% due to manufacturers discounting practices.

18   Is that a true statement?

19   MS. CITERA:  Objection.

20   THE WITNESS:  That's probably correct.

21   Q   Why do you say that?

22   A   Because if manufacturers won't discount more than

23 50% -- 15%, they're not going to be able to buy the drug.

24 In other words, if a manufacturer's discounts stop at 85% of

25 list price and you want to pay 80% of list price and the

Page 240

1 manufacturer refuses to sell it at that price?

2    I don't get it.

3    Q   Sir, earlier you made reference to the HPD contract

4 marketing and not wanting to have the tail wag the dog.  Do

5 you remember that?

6    A   What I meant by that - and let me please

7 explain - --

8    Q   Okay.

9    A   -- we were a smaller organization, the Hospital

10 Products Division - significantly smaller.  So it's prudent

11 to ensure that a smaller organization doesn't take pricing,

12 credit decisions, terms and conditions of delivery decisions

13 that the larger organization cannot live with or don't make

14 sense strategically, economically or from doing a good job

15 for your customers.

16   Q   Do you know whether reimbursement issues that were

17 important to the Alternate Site Division influenced or

18 impacted list pricing that was determined by the Hospital

19 Products Division contract marketing?

20   A   I have no knowledge of that.

21   MS. CITERA:  Objection.

22   Q   What was your understanding as to how list prices

23 were arrived at?

24   A   I had no curiosity about list prices.  They were

25 set by the division.

Page 241

1    Q    When you say, "they were set by the division," who
2  do you mean?
3    A    I assume they were set by the contract marketing
4  people.
5         Once again, I had no curiosity.  I don't know how
6  they were set.
7    Q    Sir, I'd like to go to the home - to ask you some
8  questions about the home infusion business, which you've
9  articulated earlier was not probably your favorite.
10   A    No, ma'am.
11   Q    Was it important for Abbott's Home Infusion Unit
12 that reimbursement for Abbott products be at a particular
13 level?
14        MS. CITERA:  Objection.
15        THE WITNESS:  That reimbursement be at a particular
16   level?
17        We were getting a percentage of collections and to
18   say that that impacted the percentage of -- That the
19   price of the drug would impact, that's just arithmetic.
20        So the answer to your question is yes; and had you
21   Q    Is it fair to say that if reimbursement on Abbott
22 products was higher and Abbott's consignment partners or
23 revenue share partners in home infusion business collected
24 higher reimbursement for Abbott product that then Abbott
25 would share in that higher reimbursement?

Page 242

1        MS. CITERA:  Objection.
2        THE WITNESS:  That meant that -- Yes.  That also is
3    just arithmetic.
4        It would mean that -- It would even be worse - that
5    would mean we would lose less money and get out of the
6    business more slowly.
7        It would be a catastrophe if the reimbursement
8    increased.
9    Q    Sir, let me ask you, we discussed Lupron a little
10   bit earlier.
11   A    Mm-hmm.
12   Q    You indicated that you learned about the TAP Lupron
13   litigation from the newspapers?
14   A    Mm-hmm.
15   Q    Did you have any concern about Lupron distribution
16   by Alt Site?
17        MS. CITERA:  Objection.
18        THE WITNESS:  I don't know whether they used our
19   pharmacies or not.  I know they had their own
20   pharmacies.  I don't know if we ever distributed the
21   material for them.
22        If it needed compounding, we may have compounded for
23   them on a fee for service basis - I don't recall - until
24   they built their own pharmacies, because I understand
25   they had their own pharmacies - I know they had their

Page 243

1    own pharmacies.
2    Q    What was your understanding of the TAP litigation?
3    A    My understanding of the TAP litigation, very
4  frankly, was that doctors who had been to medical school
5  through their formal training in urology and had practiced
6  for many years were convinced by a 28-year-old Phys. Ed.
7  major to charge for a drug that the doctor didn't pay for.
8  I -- That's my understanding; I thought the doctors -- That
9  was my understanding of the litigation, that they said that
10 the doctors were billing for a drug they didn't pay for or
11 something like that, and I couldn't believe that a doctor
12 would do that.
13   Q    Who was the 28-year-old that --
14   A    A salesperson --
15   Q    Okay.
16   A    -- would go in and convince a man who had been to
17 university, to medical school, through urology training and
18 establish a successful practice, and this 28-year-old Phys.
19 ED. major walks in and says, You can bill Medicare for
20 products you didn't pay for?  And the person was wrong.
21        And I don't -- I can't believe a physician would
22 bill for -- That's just incomprehensible to me.
23   Q    Did you have an understanding as to whether or not
24 Abbott was criminally charged with regard to --
25   A    I understand that several individuals were charged;

Page 244

1    yes.
2    Q    Okay.
3         Do you know whether TAP pled guilty to any criminal
4  charges?
5    A    No; I'm unaware of that.  I don't know.
6    Q    As the divisional vice president for Alt Site,
7  would it be important to you to ensure that if Abbott or an
8  affiliated joint venture like TAP engaged in criminal
9  conduct that your division not be tainted by that criminal
10 conduct?
11        MS. CITERA:  Objection.
12        THE WITNESS:  That's -- We would not want to be
13   tainted in any way by any conduct - negative conduct or
14   unprofessional contact by TAP or anyone else.
15   Q    Did you have an understanding as to whether or not
16 your division engaged in increased pricing for Lupron
17 product that was sold by the Alternate Site Unit?
18        MS. CITERA:  Objection.
19        THE WITNESS:  Once again, the sales of Lupron by the
20   Alternate Site Unit, I don't even remember being in that
21   business.  I'm sorry.
22        MS. ST. PETER-GRIFFITH:  Let's mark this as the next
23   exhibit.
24        And I'm just going to ask him about the first page
25   for right now.

Page 245

1    (Whereupon, Robertson Exhibit No. 4 was marked for

2    identification.)

3    MS. CITERA:  I'm just going to object because these

4    are not sequential; they're stapled together but they're

5    not sequential.

6    MS. ST. PETER-GRIFFITH:  Okay.  Well, you can state

7    your objection.

8    MS. CITERA:  Okay.

9    MS. ST. PETER-GRIFFITH:  I mean, 48,000 pages that

10   Mr. Rodman produced, so.

11   I'm just asking him about the first page.

12   BY MS. ST. PETER-GRIFFITH:

13   Q    Sir, all I need you to do is look at the first

14   (indicating).

15   A    Mm-hmm.

16   Q    Sir, does this -- Are you familiar with this

17   document?

18   A    No.

19   Q    Who is Miss Lynn Leone?

20   A    She was one of the administrative people in Home

21   Infusion Services.

22   Q    Does this refresh your recollection as to whether

23   or not Lupron may have been a product that was sold by the

24   Home Infusion Services?

25   A    The product was not sold by anybody in Home

---

Page 246

1    Infusion Services.  We didn't sell Lupron.

2    Somebody who sold it had to turn the order over to

3    us, and if they turned the order over to us we would fill

4    the order because there was some problem with a pharmacy

5    marketing it.

6    But we didn't -- Nobody in our organization sold

7    Lupron.

8    I mean this is the -- If they want -- If people

9    came and wanted -- I guess what I'm telling you, ma'am, is

10   we didn't have any salesman out there pitching Lupron.

11   Q    Okay.

12   But was Lupron distributed by Abbott pharmacies?

13   A    Evidently, based upon this document --

14   MS. CITERA:  Objection.

15   THE WITNESS:  -- it was.

16   (Referring.)

17   I don't know how large the sales were or how many of

18   these things were done.

19   Q    Sir, if you could just look at the first page.

20   A    Sure.

21   Q    I don't want you to be distracted by the other

22   pages.

23   A    Right.

24   Q    Sir, if you can look at this memorandum, in the

25   third sentence it says, Because of these increases - Because

---

Page 247

1    of these increases our list price on the 50 should be

2    adjusted, do you see that?

3    A    Yeah.

4    Q    Do you know what list prices are being referenced

5    as our least prices?

6    A    No.

7    Q    Do you remember any issues arising concerning

8    Lupron pricing through the Home Infusion Services?

9    A    No, ma'am.  I don't even remember ever selling

10   Lupron or having anything to do with it.  I apologize.

11   Q    Do you know whether - why list prices would be

12   impacted by increases in AWPs?

13   MS. CITERA:  Objection.

14   THE WITNESS:  No.

15   Q    Sir, did you have an understanding as to whether

16   there was a formula for AWP that was at 25% markup on drug

17   costs?

18   MS. CITERA:  Objection.

19   THE WITNESS:  No.

20   Q    Did you have an understanding with regard to any

21   product sold by Alt Site that there was a standard industry

22   markup?

23   A    No.

24   MS. ST. PETER-GRIFFITH:  Mark this as the next

25   exhibit.

---

Page 248

1    (Whereupon, Robertson Exhibit No. 5 was marked for

2    identification.)

3    MS. ST. PETER-GRIFFITH:  And just for the record,

4    this is a December 22nd, 1994 memorandum from Chris

5    Snead to Don Carson, cc, John Ward.

6    BY MS. ST. PETER-GRIFFITH:

7    Q    Sir, do you recognize this document?

8    A    No.

9    Q    Have you had a chance to review it?

10   A    Yes.

11   Q    This appears to be a memorandum from Chris Snead to

12   Don Carson, do you see that?

13   A    Yes.

14   Q    With a cc to John Ward?

15   A    Mm-hmm.

16   Q    Who is Don Carson?

17   A    I have no idea.

18   Q    Who is John Ward?

19   A    John Ward's a former general manager of Alternate

20   Site Product Sales.

21   Q    Now, this says, Interoffice Correspondence.  Do you

22   have any reason to doubt that Mr. Carson was within the

23   Alternate Site Product Sales?

24   MS. CITERA:  Objection.

25   THE WITNESS:  I don't know who the individual is;

Page 249

1      I'm sorry.

2      Q    Okay.

3           Is it possible that he could have been an employee

4  of Alt Site Product Sales?

5      A    I couldn't tell you --

6      MS. CITERA:  Objection.

7      THE WITNESS:  -- I don't know the individual.

8      Q    Okay.

9           And it's dated December 22nd, 1994?

10     A    Mm-hmm.

11     Q    Do you remember a Coram RFP coming out in or about

12 December or November of '94?

13     A    No.  But it's referenced here, so it probably

14 happened.

15     Q    And I believe you referenced Coram earlier.  Can

16 you remind us again, what is Coram?

17     A    Coram is a company that provided home infusion

18 services - a home infusion service provider, and we would

19 sell them product.

20     Q    Okay.

21          And what is a Coram RFP?

22     A    RFP is a common term indicating request for

23 proposal.

24     Q    Okay.

25          And what is a request for proposal?

---

Page 250

1      A    It's a request to quote on business.

2      Q    Okay.

3           In the second paragraph, Miss Snead notes, you'll

4  note that they are asking for WAC, AWP, price if line item

5  award and price for bundled award, do you see that?

6      A    Mm-hmm.

7      Q    What does that sentence tell you?

8      A    That sentence tells me -- You know, again, it's

9  tough to know - Miss Snead is a very nice young lady - it's

10 another gentleman - that they wanted to know what the

11 wholesale acquisition cost for each drug was, but they

12 wanted to know what the AWP for each drug was; they wanted

13 to know what the price would be if a specific line item was

14 the only drug they ordered for us, and they wanted to know

15 what the price would be for each drug if they gave us all of

16 their business.

17     Q    Was there any policy at Abbott that you're aware of

18 or within Abbott Alt Site prohibiting the distribution of

19 AWP information for RFPs from potential customers?

20     A    The AWPs were, as I understand it, were available

21 to the customers, themselves.

22          Why they would ask us to do it would mean we're

23 doing the work that they don't have to do.

24     Q    Would Abbott provide that information?

25     MS. CITERA:  Objection.

---

Page 251

1      THE WITNESS:  I don't know.  Here -- It doesn't say

2  we wouldn't, here.

3           If it's public information - the average wholesale

4  price of the drug is public information, I don't know

5  why we wouldn't provide it.

6           But I have no specific knowledge of having provided

7  and not providing - I mean having not provided the

8  information in this instance.

9      Q    Okay.

10     THE WITNESS:  Am I slowing down enough?

11     COURT REPORTER:  Yes.  Thank you.

12     THE WITNESS:  Thank you, ma'am.

13     MR. STETLER:  You're doing fine.

14     Since I yelled at you when you were bad, I'll tell

15 you you're doing good.

16     MS. ST. PETER-GRIFFITH:  If you could mark this as

17 the next exhibit.

18     (Whereupon, Robertson Exhibit No. 6 was marked for

19 identification.)

20     MS. ST. PETER-GRIFFITH:  For the record, this is a

21 February 9th, 1995 memorandum from Tim Harris regarding

22 catalog price increases.

23 BY MS. ST. PETER-GRIFFITH:

24     Q    Sir, do you recognize this document?

25     A    No.

---

Page 252

1      Q    It appears to be a memorandum from Tim Harris --

2      A    Mm-hmm.

3      Q    -- and it lists on the, To, list Ed Hayman, Pete

4  Karas, Chris Kolber, Sean Murphy, Randy Prozeller and Bill

5  Welch, do you see that?

6      A    Mm-hmm.

7      Q    and then listed on the cc, among others, is D.

8  Robertson, do you see that?

9      A    Mm-hmm.

10     Q    Do you have any reason to doubt that's you?

11     A    No.

12     Q    Do you have any reason to doubt that you received

13 this memorandum?

14     A    No.

15     Q    Sir, the Re: indicates that this memorandum

16 concerns catalog price increases and then the first sentence

17 indicates that attached to the memorandum is the first pass

18 of the '95 catalog price increase worksheets, do you see

19 that?

20     A    Yes.

21     Q    Do you recall receiving catalog price increase

22 worksheets in the normal course as your - in your - hold on,

23 let me finish - in your capacity --

24     MS. STETLER:  Just when you were getting good.

25     Q    -- as the divisional vice president of Alt Site?

Page 253

1    A    No.
2    Q    Do you know why you received this memo?
3         MS. CITERA:   Objection.
4         THE WITNESS:  I -- No.
5    Q    Do you know whether -- Do you recall receiving
6    either this memo or any memo like for forwarding catalog
7    price increase worksheets?
8    A    No, ma'am.
9         That was not my responsibility to do the catalog
10   pricing worksheets.
11   Q    Do you know whether Abbott took a catalog price
12   increase on its products each year?
13        MS. CITERA:   Objection.
14        THE WITNESS:  No, I don't know that specifically,
15        whether catalog prices were increased -- Well, no, I
16        don't know.
17   Q    Do you know whether Pete Baker would comment upon
18   the catalog price increase worksheets?
19        MS. CITERA:   Objection.
20        THE WITNESS:  Yeah; it would probably be Pete's
21        responsibility to do that.  I mean, in '96, was he
22        general manager?  John Ward was.
23        You know, these are the names down here of the
24        people who have to submit them, and Pete Baker's name is
25        on there, isn't it?

Page 254

1         MS. ST. PETER-GRIFFITH:  Mm-hmm.
2         THE WITNESS:  So I guess Pete would be the guy that
3         would fill them out.
4    BY MS. ST. PETER-GRIFFITH:
5    Q    Would Abbott's Alternate Site personnel have
6    influence over the catalog price increases on list price
7    that Abbott made?
8         MS. CITERA:   Objection.
9         THE WITNESS:  In the HPD catalog?
10   Q    Yes.
11   A    I don't know that, but probably not.
12   Q    Why do you say, probably not?
13   A    Because as I've articulated before, the division
14   was much larger and things were done there that suited the
15   division, not that suited our organization.
16        Yes, I mean, I - that's my recollection.  I mean, I
17   don't know - I don't know the -- I remember getting that as
18   an objection a lot of times when we tried do things.
19   Q    What do you mean by that?
20   A    Well, I was told to make sure that everything we
21   did made sense from a divisional standpoint.  I didn't do
22   things solely of my organization.  I was encouraged to do
23   that; mm-hmm, and that's appropriate.
24        MS. ST. PETER-GRIFFITH:  If we can mark this next
25        exhibit.

Page 255

1         (Whereupon, Robertson Exhibit No. 7 was marked for
2         identification.)
3    BY MS. ST. PETER-GRIFFITH:
4    Q    First, sir, before we move on to this document, can
5    I ask how were the annual list price increases determined?
6         MS. CITERA:   Objection.
7         THE WITNESS:  I have no idea.
8    Q    Do you know whether they were routinely taken?
9    A    No.
10   Q    Do you know whether when list price increases were
11   taken whether there was a corresponding increase in contract
12   prices?
13   A    I know that price increases were very important to
14   us and that we took price increases every chance we got, and
15   I think price increases we did take whenever we had the
16   opportunity.
17        Was it routine?  I don't know.
18        Once again, you can have a -- The truth is
19   difficult to come by, because if you take price increases
20   and sign one monstrous customer your Average Selling Price
21   is going to go down, but you have, in fact -- And that's
22   customer mix, having a larger customer.
23        Our goal was to take price increases whenever we
24   could.
25   Q    When you say, "price increases," do you mean list

Page 256

1    price increases --
2    A    Oh, no, ma'am.
3    Q    -- or contract --
4    A    No, ma'am.
5    Q    -- price increases?
6    A    List price increases don't feed the cat.  You need
7    to get the customer to buy at a higher price.
8    Q    Why do you say, "list price increases don't feed
9    the cat"?
10   A    Well, as I've said before, that this is a place
11   where you start your negotiation - okay - the list price is
12   where you start your negotiation.
13        Our costs went up consistently - plastics for
14   resins, for cardboard, for labor, and we changed the
15   starting point for our negotiation and attempted to get
16   price increases as much as we could because our costs were
17   increasing, as well.
18   Q    Sir, if you could just take a look at this document
19   that's been marked as Exhibit 7 - Robertson Exhibit 7,
20   A    7?  Oh, okay.
21        Because it's Sellers 362 also.
22   Q    Yes.  And I will note that that's the Exhibit 362
23   from the Texas litigation, and we are, as was pointed out
24   before, we're not in Texas anymore.
25        MS. STETLER:  Or Kansas.

Page 257

```
1    A    Okay.
2    Q    Sir, do you - and I will ask you the question as
3  you flip through the document.  Do you recognize any of the
4  pages of this document?
5    A    No.
6    Q    If you could flip first to the third page which has
7  the PostIt fax note?
8    A    This one here, (indicating) Page 1?
9    Q    Yes.
10   A    Okay.
11   Q    And do you see where it says on the PostIt fax note
12 Dave Brinks?
13   A    Mm-hmm.
14   Q    And it says, From G - and it looks like an
15 ampersand, E or GTE, do you see that?
16   A    Mm-hmm.
17   Q    And do you know who GTE or G, ampersand, E might
18 be?
19   A    No.
20   MS. CITERA:  Objection.
21   Q    Sir, this appears to be --
22   THE WITNESS:  You can find out by looking at the
23   phone extension, though.
24   Q    Okay.
25   So is it fair to say that's probably someone within
```

Page 258

```
1  Abbott?
2    A    Most of the phone extensions ended with 7, or
3  started with 7, so it might be, yeah.
4    Q    If you could go up to the chart, do you see at the
5  top of the page?
6    A    Yes, ma'am.
7    Q    Sir, do you see where it says, List Price?
8    A    Mm-hmm.
9    Q    And, Rx link acquisition price?
10   A    Mm-hmm.
11   Q    Do you know what Rx link acquisition price is?
12   A    No.
13   Q    Do you know what Rx link customer price is?
14   A    No.
15   Q    Do you know what Old awp is?
16   A    No.
17   Q    What about awp/gram?
18   A    That would -- If this is -- This is evidently a 500
19 milligrams (referring) - yeah, this is a 500 mg. vial.   So
20 the AWP per gram - if this is a 500 mg. vial, will be double
21 the old AWP.
22   Q    Okay.
23   And awp/gram?
24   A    Yes, ma'am.  This is a 500 mg. vial --
25   Q    Oh, I see.  I got you.
```

Page 259

```
1    A    -- so to get to a gram, you'd double the 500 mg.
2  price.
3    Q    Got you.
4    And then there's awp as percentage of list, do you
5  see that?
6    A    Yes, ma'am.
7    Q    Do you understand what that means?
8    A    Well, if you've got -- It's just, once again,
9  arithmetic; AWP as a percentage of list.
10   It means AWP is 1.1875 x list.
11   Q    Okay.
12   A    It would appear to me.  I don't know.  I don't have
13 a calculator.
14   Q    Let me ask you this:  First of all, do you know
15 whether GTE could mean Gerry Eikorn?
16   MS. CITERA:  Objection to form.
17   THE WITNESS:  I have no -- I don't know.
18   Q    Were you ever aware of a request that was made from
19 Home Infusion Contract Marketing to Gerry Eikorn to lower
20 the vancomycin price - list price?
21   A    No, I'm not aware of that.
22   Q    Were you aware of any changes in vancomycin that
23 were requested - in vancomycin pricing that were requested
24 by Home Infusion or anyone else at Alternate Site?
25   A    No.
```

Page 260

```
1    Q    Would that have been something -- If such a request
2  had been made, would that have been something that you would
3  have expected to have been advised about concerning?
4    MS. CITERA:  Objection.
5    THE WITNESS:  No, ma'am.  My concern was the selling
6    price and what we sold it for.
7    If they requested a price reduction, that would be a
8    marketing decision that they would make.
9    My concern was what we sold it to the customer for.
10   Q    But when you say, "they," who are they?
11   A    The Alternate Site Home Infusion Services people or
12 the Alternate Site Product Sales people.  That's something
13 the general managers there would do.
14   Q    Okay.
15   So you would defer to the general managers as to
16 whether requests should be made --
17   A    Well --
18   Q    -- for changing in pricing?
19   A    -- they knew the marketing -- They knew the markets
20 much better than I did.
21   Q    Okay.
22   Do you see there's a text that says, Dave, my
23 suggested list price is 5% over Rx link?  Do you see that?
24   A    Dave - (referring) --
25   Q    Right here (indicating).
```

Page 261

```
1        A    Right here?
2             Oh, yeah.  Excuse me.
3             (Referring.)
4             I see that.
5        Q    Does this refresh your recollection as to what Rx
6   link might mean?
7        A    No.
8        Q    Did you have any understanding at all --
9        A    I've heard the term before - I've heard the term Rx
10  link before.
11            It's obviously a customer pricing - a customer
12  pricing mechanism, but I don't remember what it was or - I
13  do remember hearing the term now.
14       Q    The next text line says, I will copy Jerry C. and
15  ask her to make the change, do you see that?
16       A    Yes, ma'am.
17       Q    Do you know what that means?
18            MS. CITERA:  Objection.
19            THE WITNESS:  I don't know who Jerry C. is.
20       Q    Okay.
21            Had you ever heard the name Jerry Ciserali?
22       A    No.
23       Q    Do you know whether rebate issues impacted the
24  Alternate Site or Home Infusion market?
25            MS. CITERA:  Objection.
```

Page 262

```
1        THE WITNESS:  Is your question did we provide
2   rebates to customers; is that your question?
3        Q    You know, what I'm going to withdraw my question
4   for right now.  We'll get into that in a second.
5             If you could go to the page that preceded this
6   page.
7        A    Mm-hmm.
8        Q    It says, NDC Information, Product Name, and then,
9   Manufacturer, Strength, AWP, and AWP gram, do you see that?
10       A    Mm-hmm.
11       Q    Sir, what does this appear to you to be?
12            MS. CITERA:  Objection.
13            THE WITNESS:  What it appeared to me to be?
14            MS. ST. PETER-GRIFFITH:  Mm-hmm.
15            MS. CITERA:  Objection.
16            THE WITNESS:  It appears to me to be a comparison of
17  average unit prices per gram among various competitors
18  within this business.
19       Q    And do you know whether Abbott Alternate Site
20  routinely would compare pricing among its competitors?
21            MS. CITERA:  Objection.
22            THE WITNESS:  I don't know -- Pricing, yeah, but I
23  don't recall if they ever did comparisons with AWP.
24            I sense they compared selling prices with their
25  various competitors, but not AWP.  This is -- This is
```

Page 263

```
1   news -- I mean, this is something I have not seen.
2   BY MS. ST. PETER-GRIFFITH:
3        Q    Did you have an understanding as to whether, for
4   example, Eli Lilly's AWP price for vancomycin was
5   substantially less than Abbott's AWP price for vancomycin?
6            MS. CITERA:  Objection.
7            THE WITNESS:  I didn't know that.  I mean, it is
8   here.
9        Q    It is substantially lower here --
10       A    Mm-hmm.
11            MS. CITERA:  Objection.
12       Q    -- on this chart?
13            And it's also -- Abbott's vancomycin AWP is also
14  higher than the vancomycin for Schein and Elkins-Sinn, do
15  you see that?
16       A    Mm-hmm.
17            MS. CITERA:  Objection.
18       Q    Do you know why that is?
19       A    No.
20       Q    Had you ever heard that Abbott's vancomycin AWP was
21  much higher than its competitors?
22       A    I have now.  It's a lot higher than competitors.
23            I mean, I -- We've always tried to get - I mean, I
24  tried to get a premium for our products.  But I don't
25  understand; this is way different.
```

Page 264

```
1        Q    Do you have any understanding as to why it might be
2   way different?
3        A    Well, the AWP -- If you take a look at the AWP per
4   gram, it's still significantly different.
5        Q    Is this the first time that you're learning that --
6        A    No.  It's the first time I've ever seen data like
7   this.  I've heard in the past, but I've never seen -- I
8   can't recall having seen the data.
9        Q    Sir, would comparisons of AWP for an Abbott product
10  versus a competitor's product be inappropriate?
11            MS. CITERA:  Objection.
12            THE WITNESS:  For -- Be inappropriate?  I don't
13  know.
14            This is some kind of pricing aberration, I mean -- I
15  don't know.
16       Q    Can you explain the pricing aberration?
17       A    No.
18       Q    Were you aware at all prior to today of that
19  pricing aberration?
20       A    I was aware that it was higher.  I was aware that
21  it was higher, I believe - that our AWP was high.
22       Q    Do you know how much higher?
23       A    No, I didn't how much higher.
24       Q    Okay.
25            Would a comparison between Abbott's AWP versus a
```

Page 265

1  competitor's AWP constitute spread marketing activity?

2      MS. CITERA:  Objection.

3      THE WITNESS:  No, I don't believe so.  You're

4  just -- You're reviewing it.

5      Q   Do you know why --

6      A   I don't know why it's so much higher.  I can't

7  explain that.  I don't know.

8      Q   Was there any either official or unofficial policy

9  prohibiting the comparisons of Abbott's AWPs versus a

10  competitor's AWPs?

11     A   I don't recall having a policy printed making any

12  comparison we made of our competitors.  I don't remember

13  that.

14     Q   What would be the purpose of comparing AWPs?

15     MS. CITERA:  Objection.

16     THE WITNESS:  To determine -- You know, to determine

17  where you were in the market, I assume.

18     Q   Sir, were you aware that Eli Lilly's vancomycin was

19  a brand drug?

20     A   A brand drug?

21     Q   Mm-hmm.  That it was proprietary?

22     A   I don't understand how vancomycin can be

23  proprietary.

24         You can have a delivery system that's proprietary,

25  but I don't understand how you can have a generic drug,

Page 266

1  vancomycin - that's of the chemical structure of vancomycin

2  and have a proprietary.  That would have to be explained to

3  me.

4      Q   Well, if Abbott was the first to develop vancomycin

5  and then it went off patent and became a generic --

6      A   Mm-hmm.

7      Q   -- okay, if Eli Lilly had the - you know,

8  originally had the patent --

9      A   Mm-hmm.  That means they were the innovator; yeah.

10     Q   Okay.

11         And then do you have an explanation as to why

12  Abbott's AWP might be so much higher than the vancomycin

13  that Lilly was selling that was the original - you know,

14  that was the original innovated product?

15     MS. CITERA:  Objection.

16     THE WITNESS:  I don't know why.

17     Q   Do you know when Abbott became aware that the its

18  vanco AWPs were substantially higher?

19     A   No.

20     MS. CITERA:  Objection.

21     Q   Do you recall when you learned that the AWPs were

22  higher?

23     MS. CITERA:  Objection.

24     THE WITNESS:  No.  I did know that the AWP was

25  higher, but I didn't know how much.

Page 267

1      Once again -- Okay.

2      Q   What time is it?

3      A   Quarter to four.

4      MS. ST. PETER-GRIFFITH:  Is now a time for a quick

5  break before we round out the day?

6      VIDEOGRAPHER:  Okay.  We're going off the record.

7      (Whereupon, a brief recess was taken)

8      VIDEOGRAPHER:  We're back on the record.

9  BY MS. ST. PETER-GRIFFITH:

10     Q   Sir, do you have any recollection as to who might

11  have told you about the difference between the vancomycin

12  AWPs for Abbott's generic product as compared to its

13  competitors?

14     A   The only person I would have conversed with on this

15  subject would have been either been John Ward or Peter

16  Baker.

17         So I don't know who told me that there was a

18  difference.  I don't remember if I was ever told about the

19  magnitude of the difference.

20     Q   Do you remember whether there was any -- Do you

21  remember the context in which it was discussed?

22     A   No.

23     Q   Do you know whether Abbott's contract price for

24  vancomycin was substantially higher than that of its

25  competitors?

Page 268

1      A   I don't remember pricing on specific product; no.

2      Q   Is it fair to say that if Abbott's contract price

3  was significantly higher than its competitors that Abbott

4  likely wouldn't get the market on that, that customers would

5  go to its competitors at the lower contract price?

6      MS. CITERA:  Objection.

7      THE WITNESS:  That would depend on availability and

8  many other things.

9      But being higher priced is not always -- It's not a

10  always an advantage with a generic drug.

11     Q   What do you mean?

12     A   Well, being higher priced, you know, you'd have to

13  defend it in some way --

14     Q   Okay.

15     A   -- so - or, you know, explain to the customer why

16  your value is greater than someone.

17     Q   If, say, Abbott's contract price for its vancomycin

18  was at or about the same as Eli Lilly's contract price for

19  vancomycin, if you were a customer would the fact that

20  Abbott's AWPs are substantially higher than Eli Lilly's

21  influence, do you think, your decision making with regard to

22  which product you're going to purchase?

23     MS. CITERA:  Objection.

24     THE WITNESS:  That's kind of contextual.

25     How many products does Eli Lilly have to compete

Page 269

1    with the Abbott injectable line?
2       Q    All I wanted to find out about is just for the
3    vancomycin product.
4          MS. CITERA:  Objection.
5          THE WITNESS:  And I'm telling you I can't answer
6    your question because I don't know how many products Eli
7    Lilly has to compete in this product line, why people
8    would - whether there would be such great differences,
9    why one company would choose to trash a product line,
10   which is not unknown.
11         The question really can't be asked in a vacuum.  The
12   question is if this is the only product that Eli Lilly
13   has and they don't provide any support for it, they just
14   fired out there at bargain basement prices and see what
15   happens.
16         If we are -- If this product is part of an
17   80-product portfolio that we have, that we support, the
18   market dynamics are different.  I'm not trying to be,
19   you know, offuscate, I'm just saying in a vacuum, that's
20   difficult for me to answer that question.
21      Q    Well, let's --
22         THE WITNESS:  Is cheap better than expensive in
23   life?
24         Not always.
25      Q    Well, let me ask you this:  If reimbursement for a

Page 270

1    particular vancomycin product is tied to its AWP, and if AWP
2    for Abbott's vancomycin product is much higher than its
3    competitors, don't you think it would be attractive to
4    Abbott's customers to purchase the Abbott product over the
5    Eli Lilly product if the reimbursement is higher?
6       A    If you just do the --
7          MS. CITERA:  Objection.
8          THE WITNESS:  Once again, ma'am - excuse me - but if
9    you just do the arithmetic, sure --
10         MS. ST. PETER-GRIFFITH:  Okay.
11         THE WITNESS:  -- if you just do the arithmetic.
12         Here are so many more things that enter into
13   customer relations and product lines and product
14   offerings and contractual relationships that, in a
15   vacuum, it's really hard to say.
16      Q    Well, did reimbursement differences between
17   Abbott's products and its competitors products factor into
18   Abbott's Alternate Site customer's decision making?
19         MS. CITERA:  Objection.
20         THE WITNESS:  We didn't market it in that way,
21   ma'am.
22      Q    Well, I'm not asking whether you marketed in that
23   way, what I'm asking is would it factor into their decision.
24      A    I don't know that.
25         MS. CITERA:  Objection.

Page 271

1          THE WITNESS:  I mean, you know, once again, I can't
2    tell that.
3       Q    Did you ever learn -- Go ahead.
4          THE WITNESS:  You know, what leads me to believe
5    it's an aberration or it's a mistake, is if you had
6    higher AWPs on all your - or higher AWPs, you'd have
7    100% market share, if that were our objective.  I don't
8    think that was our objective.  This looks like some sort
9    of aberration to me.
10      Q    Is there something wrong -- Would there be
11   something wrong with having a higher AWP --
12         MS. CITERA:  Objection.
13      Q    -- which would afford you to get 100% of the market
14   share?
15         MS. CITERA:  Objection.
16         THE WITNESS:  Well, what I'm talking about, we've
17   got 20 products.  Why would the AWP be higher on this
18   one and not higher on others?  I don't understand.  It
19   seems to be an aberration.  I don't know and I can't
20   explain it.  I apologize.
21      Q    Do you have any sense as to what the root cause of
22   that aberration would be?
23         THE WITNESS:  No.
24         MS. CITERA:  Objection.
25      Q    Do you know whether this aberration coincided with

Page 272

1    a significant increase in utilization of Abbott's vancomycin
2    products by its Alt Site customers?
3          MS. CITERA:  Objection.
4          THE WITNESS:  On byproduct sales, no, ma'am, I don't
5    know.  I don't know.
6       Q    Did you ever learn at any time that vancomycin
7    utilization increased among Abbott's Alt Site customers?
8       A    We -- I don't know if I remember looking at it on a
9    line-by-line basis.  These were reported as injectables.  If
10   you want me to go back to our records, I think these are
11   reported as injectables.  I don't know if I got line item
12   reporting.  I don't remember.  And this would require line
13   item reporting for - to notice one significant spike in a
14   particular product.
15      Q    Well, would -- If Abbott's Alternate Site personnel
16   were making requests concerning vancomycin pricing one way
17   or another, other seeking higher AWP or list price or lower
18   list price reporting, would that be something that you would
19   learn about if that was - if the genesis for that request
20   came from Alt Site?
21      A    If it were just --
22         MS. CITERA:  Objection.
23         THE WITNESS:  -- one product, probably not.  I don't
24   know.
25      Q    How come?

Page 273

1    A   Once again, I didn't -- I don't -- This tells you
2  what the AWP is.
3        What the magnitude of the sales are, I don't know -
4  I mean, how big the sales are, what the numbers are, I don't
5  know.
6    Q   Do you recall whether in or around the mid- to
7  late-90s vancomycin represented a significant product that
8  constituted a chunk of Alt Site business?
9        MS. CITERA:  Objection.
10       THE WITNESS:  I don't remember specifically the
11   sales of vancomycin - what the specific sales of
12   vancomycin were.
13       I know that injectable pharmaceuticals were -- And I
14   know that vancomycin is a commonly used one, injectable
15   pharmaceutical.
16   Q   Okay.
17       MS. ST. PETER-GRIFFITH:  Mark the next exhibit.
18       (Whereupon, Robertson Exhibit No. 8 was marked for
19   identification.)
20   Q   Sir, do you recognize this document?
21   A   No.
22   Q   It appears to be a memo from Alternate Site
23  Contract Marketing, do you see that?
24   A   (Referring.)
25       It's from Steve Kipperman; yeah.

Page 274

1    Q   Okay.
2        And who's Mr. Kipperman?
3    A   Kipperman used to work in Alternate Site in this
4  organization.
5    Q   Okay.
6        And it's a memo directed to the field sales force,
7  is it not?
8    A   Yes.
9    Q   As well as the district managers?
10   A   Mm-hmm.
11   Q   And who is Cindy Dawson?
12   A   She's one of the administrative people.
13       The other people (indicating) were national account
14  people, as I recall.
15   Q   Okay.
16       And the memo concerns current Red Book AWPs, do you
17  see that?
18   A   Mm-hmm.
19   Q   It was previously marked as Exhibit 61 in the Lotz,
20  Texas deposition at the bottom.
21   A   Mm-hmm.
22   Q   Sir, do you recall in or around May of 1994 Abbott
23  taking a list price increase?
24   A   No.
25   Q   No?

Page 275

1        The second sentence of this paragraph reads, This
2  also has an effect on our AWP, Average Wholesale Price,
3  which Red Book quotes for reimbursement purposes, do you see
4  that?
5    A   Mm-hmm.
6    Q   Therefore, Mike Heggie was able to get Red Book to
7  send a listing of all new AWPs for all of our products which
8  would be effective through next April, do you see that?
9    A   Yes.
10   Q   And the last sentence says, I hope this information
11  is helpful and if you have any questions feel free to
12  contact me.
13   A   Mm-hmm.
14   Q   What was the point of sending out this memorandum
15  to the field sales force?
16       MS. CITERA:  Objection.
17       THE WITNESS:  I don't know.
18   Q   Do you know whether it was appropriate for the
19  field sales force to discuss with customers AWP increases?
20       MS. CITERA:  Objection.
21       THE WITNESS:  Well, this was sent for their
22   information, but they may have discussed it with
23   customers; I don't know.
24       Why they would need AWP information or changes in
25   AWP?  I don't know, but they don't need that.

Page 276

1    Q   Who doesn't need that?
2        MR. ANDERSON:  Objection.  Nonresponsive.
3    A   The field sales force doesn't need that.
4    Q   The field sales force doesn't need AWP information.
5    A   Why would they?  No.
6    Q   Okay.
7        Now, all these individuals that are on the cc list
8  and the To list, are they within your chain of command?
9    A   Yeah.
10   Q   Is Mr. Kipperman within your chain of command?
11   A   Mm-hmm.
12   Q   Do you have any idea why Mr. Kipperman would be
13  sending this information to the field sales reps?
14       MS. CITERA:  Objection.
15       THE WITNESS:  No.
16   Q   At this point in time, was Mr. Heggie in Alt Site,
17  as well?
18   A   He was -- He was in the Renal Care area, Michael
19  Heggie.
20   Q   Was it -- Would it have been improper for the field
21  sales force to discuss AWP increases with their customers?
22       MS. CITERA:  Objection.
23       THE WITNESS:  They may have discussed that, but
24   that's not part -- They may have discussed it; I don't
25   know -- Improper?  I don't know.

Page 277

1    Q    Well, was there any policy against it?

2    A    Well, what I guess we're trying to lash up here is

3  AWP and spread, we didn't sell on spread.

4    Q    Would it have been improper for the field sales

5  force to discuss spread with Abbott customers?

6    MS. CITERA:  Objection.

7    THE WITNESS:  I don't know that the field sales

8    force had to do that.  I mean, the customers had access

9    to these data, as well, without our -- Without our --

10    Why would we be doing this?  These customers had access

11    to these data.

12    Q    Well, would the customers have access to the data

13  if they didn't subscribe to Red Book or one of the other

14  pricing compendia?

15    MS. CITERA:  Objection.

16    THE WITNESS:  I don't know if there were other

17    sources other than Red Book.

18    Q    Do you know whether the field sales force or

19  members of the field sales force discussed spread with

20  Abbott customers?

21    MS. CITERA:  Objection.

22    THE WITNESS:  I don't know that, whether they did or

23    didn't.

24    Q    Is it possible that they could have?

25    MS. CITERA:  Objection.

Page 278

1    THE WITNESS:  I imagine, but I have no knowledge of

2    them doing that.

3    Q    If Abbott's reimbursement for its drugs was

4  advantageous, would it be an appropriate sales tool or

5  practice for field sales reps to discuss Abbott's AWP

6  pricing or spread with Abbott customers?

7    MS. CITERA:  Objection.

8    THE WITNESS:  You're asking -- Is that my opinion,

9    you'd like, whether -- We didn't sell on spread.  We

10    were -- And I received assurances from Ward we didn't

11    sell on spread.  So why would they be discussing AWPs?

12    Q    When you say you received assurances from Ward on

13  spread, what do you mean?

14    A    That we didn't sell on spread; that that issue

15  didn't, you know, didn't arise.  It never arose with me and

16  - between me and John that this would be a marketing tool.

17  We didn't do that.

18    Q    Did Mr. Ward affirmatively tell you, We don't sell

19  on spread?

20    A    I don't recall any specific conversation in that

21  regard.  We just tried to sell the whole package.  I

22  never recall that we sold on anything other than that.

23    Q    Would it have been of concern to you if Abbott's

24  Alternate Site field sales force sold product based upon

25  spread in part?

Page 279

1    MS. CITERA:  Objection.

2    THE WITNESS:  Once again, I don't recall having had

3    to confront this issue.

4    I think we sold on the base -- The way to sell is on

5    the basis on the value and the quality of your products,

6    not on spread.

7    What they did, if they sold in other ways, it would

8    be inappropriate.

9    Q    It would be inappropriate?

10    A    We sell on the -- It would be against our marketing

11  or how the way we market our products.

12    Q    Is there a policy written out any where?

13    MS. CITERA:  Objection.

14    THE WITNESS:  As we discussed earlier, that policy

15    isn't written.

16    Q    Then why would it be wrong?

17    MS. CITERA:  Objection.

18    THE WITNESS:  Because we had a marketing plan to

19    market based upon breadth of product line quality and

20    availability; that's how we sold our products.

21    Q    Sir, do you condone Mr. Kipperman's efforts to

22  advise the field sales force of AWPs?

23    MS. CITERA:  Objection.

24    THE WITNESS:  I don't think -- I just think it's

25    unnecessary.

Page 280

1    Q    But do you condone his sending out a memorandum

2  like this?

3    A    Well, I don't --

4    MS. CITERA:  Objection.

5    THE WITNESS:  I don't think this is a great idea.

6    Do you have the same data available on other of

7    Abbott products?  Because I believe this vanco thing may

8    be an aberration - I don't know why and I can't explain

9    it.

10    Q    Well, do you believe that that memorandum is

11  limited to vancomycin?

12    MS. CITERA:  Objection.

13    THE WITNESS:  Oh, no.  No.  No.  No.

14    What I'm talking about is the difference.

15    And once again --

16    Q    Hold on just a second, sir.

17    A    Mm-hmm.

18    MS. ST. PETER-GRIFFITH:  Okay.

19    What I'd like to do is show this to Counsel first,

20    and this is the complete exhibit from the Kipperman

21    deposition (handing).

22    MS. CITERA:  That's 9?

23    MS. ST. PETER-GRIFFITH:  Why don't we mark this as

24    the next Robertson exhibit.

25    (Whereupon, Robertson Exhibit No. 9 was marked for

Page 281

1      identification.)

2    BY MS. ST. PETER-GRIFFITH:

3      Q    Before I have you look at that, I just want to get

4    an answer to my question concerning Mr. Kipperman's

5    memorandum.

6           Would you condone Mr. Kipperman sending out a

7    memorandum like this to the field sales force?

8         MS. CITERA:  Objection.

9         THE WITNESS:  I think that if Mr. Kipperman came to

10    me and asked me, Should I send it to the fields sales

11    force, the answer would be no.

12     Q    Did you ever prohibit him from sending that

13    information to the field sales force?

14        MS. CITERA:  Objection.

15        THE WITNESS:  I never knew anything about him

16    sending this to the field sales force.

17     Q    Sir, if you could take a look at that complete

18    document --

19     A    Mm-hmm.

20     Q    -- does that appear to be a listing for the entire

21    Hospital Products Division catalog?

22        MS. CITERA:  Objection.

23        THE WITNESS:  (Referring.)

24        I don't know.  I don't -- I don't know.  It doesn't

25    even -- It doesn't say what the drugs are, it's just

Page 282

1    some number here.

2     Q    Well, are there NDC numbers listed?

3     A    Yeah.

4     Q    Okay.

5         So don't NDC numbers indicate what the drugs are?

6     A    Not to me, ma'am.

7     Q    Okay.

8     A    You'll have to have a name on them.

9     Q    I understand.

10     A    Yeah; this is a pretty complete list, though.

11     Q    Okay.

12         So does it appear to you that Mr. Kipperman sent

13    the entire catalog to the field sales force identifying what

14    the AWPs were?

15        MS. CITERA:  Objection.

16        THE WITNESS:  He sent a large number of AWPs to the

17    field.  Whether or not this is the entire catalog, I

18    don't know, but he sent a potload of these to the field.

19     Q    Okay.

20        MS. ST. PETER-GRIFFITH:  Let's mark this document.

21        (Whereupon, Robertson Exhibit No. 10 was marked for

22    identification.)

23     Q    Sir, I'm going to ask you to look at the first

24    memorandum, and then there are certain pages that I'll point

25    you to.  You don't have to flip through each and every page

Page 283

1    of the exhibit.

2     A    Mm-hmm.  Okay.

3     Q    Sir, do you remember who Gerimed is?

4     A    It's a -- Here, it says it's a closed-door pharmacy

5    and long term care nursing home.

6     Q    And do you remember who MedEcon is?

7     A    MedEcon's a buying group, I believe.

8     Q    Sir, do you recall receiving the first two pages of

9    this exhibit, the memorandum which is a July 14th memorandum

10    from D. Walker, it appears, to you?

11        MS. CITERA:  Objection.

12        THE WITNESS:  From Ward to me?

13        Do I remember receiving this?  No.

14     Q    I'm sorry, from John Ward.  I apologize.

15     A    No, ma'am.

16        Your question is do I remember receiving it on

17    Bastille Day in '95?  No, ma'am.

18     Q    Sir, do you remember an issue concerning Gerimed

19    and MedEcon's possible merger?

20     A    No.

21     Q    Do you recall whether Gerimed and MedEcon were -

22    either had contracts with Alternate Site or were customers

23    of Alternate Site Product Sales?

24     A    Gerimed probably was.  MedEcon was a GPO in the

25    acute care market.  That's hospital, GPO's -- the acute care

Page 284

1    was Hospital.

2         So that wouldn't be in our area.  If they'd merge,

3    we'd have to make some sort of accommodation, I guess.

4     Q    Well, is that, in part, what this memorandum is

5    about?

6     A    Mm-hmm.

7        MS. CITERA:  Objection.

8        THE WITNESS:  Although, I haven't, you know, studied

9    it, gone through the number if they (referring) - yeah,

10    all right, you know, what do we do?

11        Isn't that what it says?

12        (Referring.)

13        Same market - right - as the PBI, mm-hmm.

14     Q    Now, does it appear that in the middle of the memo

15    it says, Additional information on Gerimed, do you see that?

16     A    Mm-hmm.

17     Q    And it says, 1994 Abbott sales to Gerimed $600,

18    could that be 600 million?

19     A    No.  That's dollars in thousands.

20     Q    Dollars in thousands.  Okay.

21        And 1995 projected 650, is that thousands?

22     A    Yes.

23     Q    Okay.

24        And then it appears that Baxter sales to Gerimed

25    excluding med-surg were $3.4M --

Page 285

1    A    That's correct.
2    Q    -- in '94.
3    A    Mm-hmm.
4    Q    Is it fair to say that Gerimed may have been a
5    customer that Abbott wanted to lure more business from?
6         MS. CITERA:  Objection.
7         THE WITNESS:  It may have been, yes; depends on what
8    the sales were if we had products in competing areas.
9         If they were selling products which we didn't
10   compete in, we would have no way of knowing that.
11   Q    Sir, if I could have you flip to one, two, three,
12   four, five pages into this packet, and hopefully it says,
13   ABT 278115.
14   A    Yes.
15   Q    And it says -- And I'll represent to you that this
16   was produced - if you look at the page before it - as part
17   of a Gerimed file, and I don't seem to have the 278114 page.
18   A    Well, I don't have it, either.
19   Q    Okay.
20        I don't think any of us do.
21   A    13 is blank.
22   Q    13 says - it has a file folder at the top, do you
23   see that?
24   A    Oh, yes; I see.  Okay.
25   Q    Sir, do you recognize this document that's 278115?

Page 286

1    A    No.
2    Q    It says at the top, A Cost Containment Program for
3    Home Infusion Therapy Providers, do you see that?
4    A    Mm-hmm.
5    Q    And at the bottom, there's an address 9707
6    Shelbyville Road, Louisville, Kentucky?
7    A    Mm-hmm.
8    Q    Do you know whether that is a Gerimed address?
9    A    I don't -- I'm sorry, I don't remember.
10   Q    Do you know whether Gerimed made its awards of
11   contracts to manufacturers based upon the consideration of
12   low bids and AWP spreads which reflect reimbursement
13   potential?
14        MS. CITERA:  Objection.
15        THE WITNESS:  I have no knowledge that have.
16   Q    Did you ever hear of that?
17   A    No.
18   Q    If I could have you flip to page 278131, and,
19   actually, to the next page, 278132.
20        (Witness complies.)
21        Yes, ma'am.
22   Q    Do you see where it says, Reimbursement Assistance?
23   A    (Referring.)
24        Reimbursement Assistance, yes.
25   Q    Did you ever hear of a product that was either

Page 287

1    developed or maintained by Gerimed called the Gerimed Binder
2    and also the EmphaSys system?
3    A    No, ma'am.
4    Q    Were you at all familiar as to whether Gerimed had
5    a way to identify the lowest cost product and the best
6    spread for any particular state?
7    A    I was not aware of that.
8    Q    Sir, if you could go next to page, 278136.
9    A    (Witness complies.)
10        Mm-hmm.
11   Q    Do you see where it says, Gerimed Request for Quote
12   Instructions?
13   A    Mm-hmm.
14   Q    Would it have been your expectation as the
15   divisional vice president for Alternate Site that when
16   submitting a quote Abbott's Alternate Site division would
17   follow the instructions of the customer concerning that
18   proposal?
19        MS. CITERA:  Objection.
20        THE WITNESS:  I'm sorry, I didn't understand your
21   question.  Forgive me.
22   Q    Sure.
23        If you have a customer like Gerimed --
24   A    Right.
25   Q    -- who's putting out an RFP or an RFQ, a request

Page 288

1    for a quote, and you anticipated that Alternate Site would
2    respond to that Request for Quote --
3    A    Right.
4    Q    -- would you expect that the Alternate Site
5    personnel putting together the quote would follow the
6    instructions?
7         MS. CITERA:  Objection.
8         THE WITNESS:  If they could.
9    Q    What do you mean by, if they could?
10   A    If they were capable of following the instructions
11   or if they were permitted to follow the instructions.
12   Q    Okay.
13        Why wouldn't they be permitted to follow the
14   instructions?
15   A    If the instructions asked them for a manufacturing
16   cost on a product-by-product basis, we would not provide
17   that.
18   Q    Okay.
19        If you could flip to page 278142, which I'll
20   represent to you is still part of this Requirement for Bid
21   submission from Gerimed --
22   A    42?
23        (Witness complies.)
24   Q    42.
25   A    Okay.

Page 289

1    Q    And I'd like you to look at and read Section H, if
2  you could.
3    A    (Referring.)
4         Okay.
5    Q    Sir, the first sentence of Section H reads, Low
6  price and best spreads contract pricing will be evaluated on
7  lowest price and/or best spread --
8    A    Mm-hmm.
9    Q    -- between AWP and the contract price for
10  multisource products, do you see that?
11    A    Mm-hmm.
12    Q    Does this inform you as to whether Gerimed, as an
13  Abbott customer, was concerned about spreads?
14         MS. CITERA:  Objection.
15         THE WITNESS:  Yes.
16    Q    Okay.
17         What does it tell you?
18         MS. CITERA:  Objection.
19         THE WITNESS:  Well, I think the language is plain in
20    black lettering that's what they were interested in.
21    Q    Were you aware of any other customers of Abbott's
22  Alt Site that were concerned about spread or interested in
23  spread?
24    A    No.
25    Q    No?

Page 290

1    A    (Shaking head.)
2    Q    If Abbott's customers, as part of their RFQ
3  required Abbott Alt Site to provide information so that
4  spread could be calculated, would there be any prohibition
5  for the Alt Site personnel - or would there be any
6  prohibition prohibiting the Alt Site personnel from
7  furnishing that information?
8         MS. CITERA:  Objection.
9         THE WITNESS:  Would there be any prohibition?
10         That would rest with the general managers, and I
11    don't know what their response would be.  But I would
12    rather not be -- I would rather not do that.
13    Q    Okay.
14         You would rather not do that, but do you know
15  whether your general managers would have prohibited it?
16    A    In this particular case --
17         MS. CITERA:  Objection.
18         THE WITNESS:  -- I don't know what happened to it.
19    Q    Okay.
20         Well, would it be fair to say that if you're
21  looking to get the contract and Gerimed is requiring the
22  information that it's likely that the Alt Site person not
23  provided the information?
24         MS. CITERA:  Objection.
25         THE WITNESS:  That may be; I have no way of knowing

Page 291

1    that.  I mean, I don't know that.
2    Q    Did you ever express to anyone that you would
3  prefer that Alt Site personnel not provide information so
4  that customers could calculate spread?
5         MS. CITERA:  Objection.
6         THE WITNESS:  Once again, spread was not something
7    which we commonly discussed.  I mean, I -- It's just not
8    how we marketed our product.
9    Q    But if your customers were asking for the
10  information, would you provide it to them?
11         MS. CITERA:  Objection.
12         THE WITNESS:  If they asked for information on this,
13    I don't know.  I'd prefer not to and I probably would
14    not.
15         It's $3.4M - that's a lot of money, but our sales
16    were only $600,000; there's not a lot of downside there.
17    Q    Okay.
18         So would it be then your opinion that Alt Site
19  should forego bidding on the Gerimed project?
20         MS. CITERA:  Objection.
21         THE WITNESS:  I don't know.  I don't know.  This
22    seems to be if they're asking to market products through
23    spread and that was not our orientation, that was not
24    our goal, that was not the way we wanted to do it.
25    Q    But you think it's possible that the Alt Site

Page 292

1  personnel may have provided that information.
2         MS. CITERA:  Objection.
3         THE WITNESS:  When I see this information, it's
4    poss-- -- If all the information's been provided, it's
5    possible.
6         MS. ST. PETER-GRIFFITH:  What time do we have?
7         MS. CITERA:  4:25.
8         MS. ST. PETER-GRIFFITH:  You know what, why don't we
9    stop here for the day.  We've got to pack up.
10         And then if we could get another date from you,
11    Mr. Robertson, as to when you might be available,
12    perhaps in early October, if everyone could check their
13    schedules, that would be great.
14         MR. STETLER:  Yeah.  I'll check.
15         VIDEOGRAPHER:  That includes the deposition.
16         The time is 4:28 p.m.
17         (Whereupon, at about 4:28 p.m., the deposition was
18    adjourned.)
19         (The Witness waived reading and signing the
20    transcript.)
21
22
23
24
25

Page 293

1    STATE OF FLORIDA    )

2    COUNTY OF LEE       )

3

4        I, Lisa L. Rios, Court Reporter, and Notary Public,

5    State of Florida at Large, do certify that I was authorized

6    to and did stenographically report the foregoing deposition

7    of DONALD C. ROBERTSON, and that the foregoing typewritten

8    transcript, consisting of pages 1 through 292, is a true

9    record of the testimony given by the witness.

10       I further certify that I am not a relative, employee,

11   attorney or counsel of any of the parties, nor am I a

12   relative or employee of any of the parties' attorney or

13   counsel connected with the action, nor am I financially

14   interested in the action.

15

16

17           Dated this 19th day of September, 2007.

18

19

20           _____
             Lisa L. Rios
21           Court Reporter
             Notary Public
22           State of Florida at Large

23

24

25

9d08c905-b265-4985-b6be-b8c9e568b1fc

---

Page 294

1

2                  CERTIFICATE OF OATH

3

4    STATE OF FLORIDA    )

5    COUNTY OF LEE       )

6        I, Lisa L. Rios, Court Reporter, and Notary Public,

7    State of Florida at Large, certify that DONALD C. ROBERTSON

8    appeared before me and was duly sworn.

9        WITNESS my hand and official seal this 19th day of

10   September, 2007.

11

12

13           _____
             Lisa L. Rios
14           Court Reporter
             Notary Public
15           State of Florida at Large

16

17

18

19

20

21

22

23

24

25

9d08c905-b265-4985-b6be-b8c9e568b1fc