# Exhibit 101

```
                    NO. D-1-GV-04-001286

THE STATE OF TEXAS          ) IN THE DISTRICT COURT
                            )
ex rel.                     )
   VEN-A-CARE OF THE        )
   FLORIDA KEYS, INC.,      )
        Plaintiffs,         )
                            )
VS.                         ) TRAVIS COUNTY, TEXAS
                            )
ABBOTT LABORATORIES INC.,   )
ABBOTT LABORATORIES, and    )
HOSPIRA, INC.,              )
        Defendant(s).       ) 201ST JUDICIAL DISTRICT



*******************************************************

          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL        )
INDUSTRY AVERAGE WHOLESALE    ) MDL No. 1456
PRICE LITIGATION             ) Civil Action No.
                              )     01-12257-PBS
                              )
THIS DOCUMENT RELATES TO:     )
                              )
United States of America,     ) Hon. Patti Saris
ex rel. Ven-a-Care of the     )
Florida Keys, Inc., v.        )
Abbott Laboratories, Inc.,    )
and Hospira, Inc.             )
CIVIL ACTION NO. 06-11337-PBS )



*******************************************************

          ORAL AND VIDEOTAPED DEPOSITION OF
                  STEVE KIPPERMAN
                   March 7, 2007

*******************************************************
```

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 2

```
 1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
 2
     IN RE:  PHARMACEUTICAL          )
 3   INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
     PRICE LITIGATION                ) Civil Action No.
 4                                   )  01-CV-12257-PBS
                                     )
 5   THIS DOCUMENT RELATES TO:       )
                                     ) Judge Patti B. Saris
 6   State of Arizona v. Abbott      )
     Labs., et al.                   )
 7   Civil Action No. 06-CV-11069-PBS )
 8
     *********************************************
 9
            UNITED STATES DISTRICT COURT
10          DISTRICT OF MASSACHUSETTS
11   IN RE:  PHARMACEUTICAL          )
     INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
12   PRICE LITIGATION                ) Civil Action No.
                                     )  01-CV-12257-PBS
13                                   )
     THIS DOCUMENT RELATES TO:       ) Judge Patti B. Saris
14   ALL CASES                       )
15   *********************************************
16      ORAL AND VIDEOTAPED DEPOSITION OF STEVE KIPPERMAN,
17   produced as a witness at the instance of the
18   Plaintiff(s), and duly sworn, was taken in the
19   above-styled and numbered cause on the 7th of March,
20   2007, from 10:01 a.m. to 5:52 p.m., before CYNTHIA
21   VOHLKEN, CSR in and for the State of Texas, reported
22   by machine shorthand, at the offices of Jones Day, 77
23   W. Wacker, Suite 3500, Chicago, Illinois, pursuant to
24   the Texas Rules of Civil Procedure and the provisions
25   attached previously.
```

Page 3

```
 1          A P P E A R A N C E S
 2   FOR THE PLAINTIFF THE STATE OF TEXAS:
 3      Mr. Raymond C. Winter
        Ms. Margaret Moore
 4      Assistant Attorney General
        Office of the Attorney General
 5      State of Texas
        Post Office Box 12548  (78711-2548)
 6      300 W. 15th Floor, 9th Floor
        Austin, Texas  78701
 7
 8   FOR THE RELATOR:
 9      Mr. James Joseph Breen
        The Breen Law Firm, P.A.
10      P. O. Box 297470
        Pembroke Pines, Florida 33029-7470
11
12   FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
     HOSPIRA, INC.:
13
        Ms. Tina M. Tabacchi
14      Jones Day
        77 West Wacker, Suite 3500
15      Chicago, Illinois  60601-1692
16
     FOR THE PLAINTIFF UNITED STATES OF AMERICA:
17
        Mr. Gejaa Gobena
18      Ms. Rebecca A. Ford
        Trial Attorneys
19      Commercial Litigation, Fraud
        U.S. Department of Justice
20      Civil Division
        601 D Street, N.W.
21      Patrick Henry Building - 9133
        Washington, D.C.  20004
22
23
24
25
```

Page 4

```
 1   FOR THE PLAINTIFF STATE OF ARIZONA AND MDL PLAINTIFFS:
 2      Ms. Jennifer Fountain Connolly
        Wexler Toriseva Wallace LLP
 3      One North LaSalle Street, Suite 2000
        Chicago, Illinois  60602
 4
 5   FOR THE DEFENDANTS ROXANE LABORATORIES INC. AS WELL AS
     SEVERAL INDEPENDENT BOEHRINGER ENTITIES:
 6
        Mr. Jared T. Heck
 7      Kirkland & Ellis LLP
        200 East Randolph Drive
 8      Chicago, Illinois  60601
 9
     ALSO PRESENT:
10
        John Maloy Lockwood, M.D.
11      Ven-A-Care of the Florida Keys
        Mr. Hank Wisrodt, Videographer
12
13
14
            *-*-*-*-*
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            INDEX
 2   Appearances...........................  3
     STEVE KIPPERMAN
 3      Examination by Mr. Winter.............  10
 4      Examination by Mr. Breen.............. 163
        Examination by Mr. Gobena............. 311
 5
        Signature and Changes................. 326
 6   Reporter's Certificate................. 328
 7
     VIDEOTAPE NUMBER
 8
        1 ...........................     9
 9      2 ...........................    83
        3 ...........................   163
10      4 ...........................   218
        5 ...........................   272
11
12            EXHIBITS
13   NO.  DESCRIPTION                PAGE
14      (Previous Exhibits)
15   61 .................................   69
        64 ..............................  263
16   65 ..............................   266
        67 ..............................  160
17   160 ..............................   280
        169 ..............................  233
18   247 ..............................   214
        288 ..............................  263
19   289 ..............................   254
        291 ..............................  204
20   308 ..............................   275
        360 ..............................  283
21   364 ..............................   273
22      (New Exhibits)
23   474 ..............................    29
        February 8, 1993 Interoffice Memorandum
24      from Phil Elliott to Mary Michalak,
        Subject:  Provider List Price Catalog
25      Increase (AB 0017564) (TXABT35677)
```

2 (Pages 2 to 5)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 6

NO. DESCRIPTION                                    PAGE
475............................................. 37
   June 9, 1993 Amendment to the Subagreement
   between PBI and Abbott from Steve Kipperman
   to Florida Infusion (TXABT 408636-408637)
   Highly Confidential
476............................................. 42
   October 5, 1993 Interoffice Correspondence
   from Jeffrey Hamlin to John Ward, Re:  Trip
   Report:  Aventric Medical Instrument -
   Madison Heights, MI (09/29/93) (AB 0016959)
   (TXABT35067) Highly Confidential
477............................................. 46
   October 21, 1993 InterOffice Memo from
   Janet Gray to Steve Kipperman, Doug McGill,
   Subject:  Pricing on injectables for
   Biomedical Homecare (AB 0008021)
   Confidential (TXABT26613) Highly
   Confidential
478............................................. 51
   11/16/93 Fax from Janet Gray to Steve
   Kipperman; November 16, 1993 InterOffice
   Memo from Janet Gray to Steve Kipperman,
   Subject:  Solutions Bid for Biomedical
   Homecare (AB 0008022-8028) Confidential
   (TXABT26614-26620) Highly Confidential
479............................................. 60
   November 24, 1993 Interoffice
   Correspondence from Jeffrey Hamlin to Pete
   Strasburg, Re:  Sun Belt Medical's
   Gut-Buster Order (AB 0015858) (TXABT33973)
   Highly Confidential
480............................................. 71
   May 26, 1994 Memorandum from Steve
   Kipperman to Field Sales Force District
   Managers, Re:  Current Red Book AWP's,
   Attached 05/18/94 Red Book - Product Price
   Listing Report (ABT006333-6376)
   (AB0019135-19178) Confidential
481............................................. 99
   Notes From Meeting With Karla Krecklow
   on Reimbursement (7/12/01) (TXABT 131263)
   Highly Confidential

Page 7

NO. DESCRIPTION                                    PAGE
482............................................. 110
   October 6, 1994 Memorandum from Steve
   Kipperman to Harry Adams, James Jackson,
   Re:  Rx Link Customer Price Recommendations
   (AB 0018385-18388) (TXABT36435-36438)
   Highly Confidential
483............................................. 132
   Excerpt from the Deposition of Dennis Walker
   taken June 30, 2005 in State of West
   Virginia, et al. -against- Warrick
   Pharmaceuticals Corporation, et al.
   (TX ABT 60673-60674, 60709-60718) Highly
   Confidential
484............................................. 139
   September 11, 1995 Letter from Steve
   Kipperman to Paul Pelanek (TXABT 410011)
   Highly Confidential
485............................................. 145
   Pharmaceutical Buyers, Inc., Contract
   # AM2000, Starts:  11/01/200, Ends:
   10/31/2001 (CA ABT 007511-7529)
   (TXABT42558-42576) Highly Confidential
486............................................. 153
   June 23, 1995 Memorandum from Steve
   Kipperman to Chris Snead, Re:  Coram
   Analysis Request (ABT006589-006590)
   (AB0019995-19996) Confidential
   (TXABT38533-38534) Highly Confidential
487............................................. 197
   June 11, 1997 Memo from Steve Kipperman
   to Field Sales Force District Sales
   Managers, Re:  Coram Injectables -
   Additions and Price Reductions Effective
   July 1st (TXABT 155582-155583) Highly
   Confidential
488............................................. 218
   National Account Strategy
   (TXABT-E 0008657-8659) Confidential
489............................................. 225
   November 13, 1997 Memo from Steve Kipperman
   to Pete Baker, Re:  November Monthly
   Significant Events (TXABT-E 0008035-36)
   Confidential
490............................................. 244
   Alternate Site Sales Structure (TXABT-E
   0007905-7911) Confidential

Page 8

NO. DESCRIPTION                                     PAGE
491........................................... 252
   January 23, 1998 Letter from Steve
   Kipperman to Joe Bane, Nations Healthcare,
   Re:  Tazicef (Ceftazidime) Addition
   (TXABT 499178) Highly Confidential
492........................................... 260
   Quarterly Goals 1st Quarter 1998 Alternate
   Site Product Sales Peter Baker
   (TXABT-E 0007744-7745) Confidential
493........................................... 294
   Chartwell-Nations Abbott Laboratories
   Proposal Analysis (TXABT 499111-499124)
   Highly Confidential

Page 9

1              THE VIDEOGRAPHER:  Stand by, please.
2     We're on the record March 7, 2007.  The time is 10:01
3     a.m.  This is the beginning of Tape Number 1.
4              Will counsel please identify themselves
5     for the record.
6              MR. WINTER:  Raymond Winter for the
7     State of Texas.
8              MR. BREEN:  Jim Breen.  I represent the
9     Relator, Ven-A-Care of the Florida Keys.  With me is
10    Ven-A-Care's representative, Dr. John Lockwood.
11             MR. GOBENA:  Gejaa Gobena on behalf of
12    the United States, the United States Department of
13    Justice.
14             MS. MOORE:  Margaret Moore, Texas OAG.
15             MS. FORD:  Rebecca Ford, United States
16    Department of Justice.
17             MR. HECK:  Jared Heck with Kirkland &
18    Ellis, LLP representing Roxanne Laboratories, Inc. and
19    several other independent Boehringer Entities.
20             MS. TABACCHI:  Tina Tabacchi from Jones
21    Day on behalf of the defendants.
22             MS. CONNOLLY:  On the phone this is
23    Jennifer Connolly on behalf of the MDL plaintiffs and
24    the State of Arizona.
25             THE WITNESS:  And Steve Kipperman from

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 10

1 Abbott Laboratories, the guest star.
2        THE VIDEOGRAPHER:  Will the court
3 reporter please swear in the witness.
4        STEVE KIPPERMAN,
5 having been first duly sworn, testified as follows:
6        EXAMINATION
7 BY MR. WINTER:
8    Q.  Good morning, Mr. Kipperman.  My name is Ray
9 Winter and we met today for the very first time just a
10 few minutes ago, correct?
11   A.  Yes.
12   Q.  And we've never spoken before, have we?
13   A.  No.
14   Q.  Have you ever been deposed before?
15   A.  Once.
16   Q.  And what litigation was that?
17   A.  It was some IP litigation that Abbott was not
18 a party to, but called in on.
19   Q.  Intellectual property litigation?
20   A.  Yeah.
21   Q.  Were you called as a witness or a party?
22   A.  Not a party.  I guess it would be a witness.
23   Q.  How long ago was that deposition?
24   A.  Earlier this year.
25   Q.  Earlier 2007?

Page 11

1    A.  Yeah.
2    Q.  So just a matter of a few weeks ago?
3    A.  Few weeks ago.
4    Q.  Okay.
5    A.  Month, few weeks ago here.
6    Q.  Very good.  I assume that when you went
7 through that experience, you kind of learned the rules
8 of the road on depositions, but it might be helpful if
9 I go through them again.
10   A.  Sure.
11   Q.  And the number one rule is that you and I
12 don't talk at the same time because it's real
13 difficult for Cindy here to take down the testimony,
14 which is very important.  So I'm going to be asking
15 you some questions today, as will Mr. Breen, and if
16 you will let us get our questions out first before you
17 start to answer, even if you think you know where
18 we're going, then it's going to be real helpful
19 because we are not all talking at the same time.  Is
20 that a fair rule of the road?
21   A.  Yes.
22   Q.  Very good.  Also, I need you to give us a yes
23 or a no or a narrative answer as appropriate and not
24 just an "uh-huh" or a "huh-uh" or a nod or a shake of
25 the head because it's kind of difficult for her to

Page 12

1 understand sometimes whether that's an affirmative or
2 a negative or what you're trying to convey.  So can we
3 have that understanding as well?
4    A.  Yes.
5    Q.  Very good.  And if you need to take a break,
6 if you would like to speak with Ms. Tabacchi or just
7 stretch your legs, or whatever, let us know and we'll
8 be happy to take a break.  Fair enough?
9    A.  Yes.
10   Q.  Fantastic.  Well, let's get started.  Do you
11 understand that you're here today as a representative
12 of Abbott Laboratories and the defendants in this
13 litigation?
14        MS. TABACCHI:  Object to the form of the
15 question.  Mr. Kipperman is not here as a 30(b)(6)
16 representative.
17   Q.  (BY MR. WINTER)  Didn't mean to convey that.
18 Mr. Kipperman, we've asked you to -- we've notified
19 your counsel that we would like to speak to you in
20 connection with litigation pending in the state of
21 Texas against Abbott Laboratories.  Do you understand
22 that?
23   A.  Yes.
24   Q.  Very good.  Okay.  And you've been -- are you
25 currently an Abbott employee or a Hospira employee?

Page 13

1    A.  Abbott.
2    Q.  Okay.  And what is your current position at
3 Abbott?
4    A.  Current position is director of licensing and
5 new business development in the corporate group that
6 supports the Abbott vascular device organization.
7    Q.  I'm sorry.  You said the Abbott what device?
8    A.  Vascular devices.
9    Q.  Vascular.  Okay.
10   A.  The --
11   Q.  And it's the -- vascular device organization,
12 is that something different than PPD or HPD?
13   A.  Yes.
14   Q.  Can you explain for me where that
15 organization sits in the Abbott Laboratories
16 organization, sir?
17   A.  It's under the medical products group, which
18 is all devices, and it covers the stents and
19 angioplasty balloons, things like that.  It's coronary
20 vascular devices.
21   Q.  What division does that department belong in?
22   A.  Its own division.
23   Q.  And the name again is what?
24   A.  Abbott Vascular Devices.
25   Q.  Abbott Vascular Devices.  So that's a

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 14

1 separate division just like PPD is a separate
2 division?
3    A.  Correct.
4    Q.  Just like HPD is a separate division?
5        MS. TABACCHI:  Object to the form.
6    Q.  (BY MR. WINTER)  Is that correct?
7    A.  Yes.
8    Q.  Okay.  And how long have you been in that
9 division?
10    A.  Well, I've been in the corporate function
11 where business development resides since late 2001.
12    Q.  Immediately prior to moving into your
13 corporate function, were you in that division in a
14 different capacity?
15    A.  No.
16        MS. TABACCHI:  Object to the form.
17    Q.  (BY MR. WINTER)  Where -- where were you
18 immediately prior to moving into the corporate
19 function that you just described?
20    A.  Prior to this position I was doing new
21 business development for the Alternate Site
22 organization.
23    Q.  Is this prior to the spinoff of 2004?
24    A.  Yes.
25    Q.  Okay.  So what month in 2001 did you move

Page 15

1 into the vascular --
2    A.  It would have been the fall, October/
3 November time frame.
4    Q.  October/November of 2001?
5    A.  2001.
6    Q.  Okay.  So prior to October/November of 2001
7 you were in the Abbott Hospital Products Division
8 Alternate Site organization; is that true?
9    A.  Correct.
10    Q.  Okay.  Were you a national account manager up
11 until your transition in October/November 2001?
12    A.  No.
13    Q.  Where --
14    A.  I was in new business development.
15    Q.  New business development.  Okay.  And did you
16 work for Mr. Robertson --
17    A.  Correct.
18    Q.  -- in that capacity?
19    A.  Correct.
20    Q.  Okay.  So you weren't within one of the silos
21 underneath Alternate Site, such as Alternate Site
22 Product Sales, Renal Care, Home Infusion or -- or the
23 computer system silo, you were directly reporting to
24 Mr. Robertson, do I understand that correctly?
25        MS. TABACCHI:  Object to the form.

Page 16

1    A.  Correct.
2    Q.  (BY MR. WINTER)  Okay.  And the position you
3 were in was new business development?
4    A.  Correct.
5    Q.  And what was your title?
6    A.  Manager of new business development.
7    Q.  Okay.  And did you have a staff that reported
8 to you?
9    A.  No.
10    Q.  So you were -- you were it?
11    A.  I was it.
12    Q.  Okay.  And how long did you hold that
13 position as the manager of new business development?
14    A.  I believe that would have been the '98 time
15 frame to 2001.  It would be easier to go --
16    Q.  Forward as opposed to backwards?
17    A.  Yeah.  From where I started because it was --
18    Q.  Sure.
19    A.  -- two years, three years kind of a thing and
20 then put the back end but --
21    Q.  Well, if that's easier, why don't we do that.
22 Let me kind of reverse course here a little bit.
23 Let's start --
24    A.  Okay.
25    Q.  -- at the beginning.  Where did you grow up?

Page 17

1    A.  Wisconsin.
2    Q.  And --
3    A.  Or rural Wisconsin.
4    Q.  I'm sorry?
5    A.  Rural Wisconsin.
6    Q.  Rural Wisconsin.  And did you take college in
7 Wisconsin?
8    A.  Yes.
9    Q.  Where?
10    A.  University of Wisconsin-Whitewater.
11    Q.  Okay.  And after you left the University of
12 Wisconsin-Whitewater did you go into the workforce?
13    A.  Immediately into Abbott.
14    Q.  Immediately into Abbott.  First job out of
15 college?
16    A.  First job out of college.
17    Q.  Great.  And what year was that?
18    A.  It would have been '86.  June of '86.
19    Q.  1986.  Good year.  Okay.  So you went
20 immediately to Abbott and in what capacity, sir?
21    A.  As a junior accountant financial analyst
22 within the corporate materials management group.
23    Q.  Corporate materials management group?
24    A.  (Nodded head affirmatively).  Yes.
25    Q.  And was that in HPD?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 18

1     A.  No.  Once again, that's a corporate
2  function --
3     Q.  Okay.
4     A.  -- that has all the distribution centers and
5  public warehousing.
6     Q.  Gotcha.  And is your education in finance or
7  accounting?
8     A.  Finance.
9     Q.  Okay.  You have a finance degree?
10    A.  Yes.  BBA Finance and a Master's in Finance.
11    Q.  Did you get your Master's in '86 or was
12  that --
13    A.  That was -- yeah.  Yes, it was '86.
14    Q.  Okay.  And so from 1986 until what year did
15  you serve in the corporate materials management group
16  at Abbott Laboratories?
17    A.  It would have been the '86-'87 window that I
18  was in that group.
19    Q.  For a short time, approximately a year?
20    A.  Two.
21    Q.  Two years.
22    A.  Yeah.
23    Q.  And in approximately 1987 you moved to a new
24  position?
25    A.  Correct.

Page 19

1     Q.  Which was where?
2     A.  Moved over to the Hospital Products Division
3  as a financial analyst in the financial planning and
4  analysis group.
5     Q.  And was this -- excuse me.  Was this a
6  position that was within the hospital business
7  sector --
8     A.  Yes.  It was --
9     Q.  -- at Hospital Products Division?
10    A.  It was solely on the hospital side.
11    Q.  Was this within a larger department within
12  the hospital business sector, such as contract
13  marketing or something of that nature?
14    A.  No.  There was --
15         MS. TABACCHI:  Object to the form.
16    A.  There was a separate financial planning and
17  analysis finance group.
18    Q.  (BY MR. WINTER)  Okay.  And who did you
19  report to in that capacity?
20    A.  Manager of financial analysis, Ken Babikan.
21    Q.  Okay.  Can you spell his last name?
22    A.  B-a-b-i-k-a-n, I believe.
23    Q.  And what were your duties and functions as a
24  financial analyst in the financial planning group
25  there at -- in --

Page 20

1     A.  The --
2     Q.  -- Hospital Products Division?
3         MS. TABACCHI:  If you could let
4  Mr. Winter please finish his question.
5     A.  Sorry.  The area I had was fluid systems and
6  IV equipment, which would have been the LVPs, large
7  volume parenterals, anything -- I think was defined
8  anything 250 mLs or larger, for the planning and
9  monthly reporting of that.
10    Q.  (BY MR. WINTER)  Monthly reporting to whom?
11    A.  The financials.  To the controllership.
12    Q.  Up -- up through the corporate hierarchy?
13    A.  Yeah.
14    Q.  Okay.  And did you have any responsibility
15  for setting prices or were you --
16    A.  No.  No.  We -- just purely forecasting off
17  trend lines and reporting against the forecasts.
18    Q.  And you held this position from 1987 until
19  approximately when?
20    A.  '87 until about '90.  That was about a
21  three-year stint there.
22    Q.  Approximately 1990?
23    A.  Yes.
24    Q.  And in approximately 1990 did you take a new
25  position?

Page 21

1     A.  In, I believe, late '90, early '91 is when I
2  moved over to the Alternate Site product group.
3     Q.  Is that when you became the manager of
4  Alternate Site contract marketing?
5         MS. TABACCHI:  Object to the form.
6     A.  That's when I became a -- it was a contract
7  marketing specialist.
8     Q.  (BY MR. WINTER)  Okay.  Who was the manager
9  of contract marketing at that time --
10    A.  There was --
11    Q.  -- in Alternate Site?
12    A.  There was none.  It was a new organization.
13    Q.  There -- there was none.  So you became an
14  Alternate Site contract marketing specialist, is that
15  the word you used?
16    A.  Correct.
17    Q.  Did you have a boss?
18    A.  Yes.
19    Q.  Who was your boss?
20    A.  John Ward.
21    Q.  Okay.  Were you the only contract marketing
22  analyst within Alternate Site?
23    A.  There was myself and one other.
24    Q.  Who was the one other?
25    A.  Cindy Dawson.

6  (Pages 18 to 21)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 22

1    Q.  Okay.  Between you and Ms. Dawson, was one of
2  you the boss or were you peers?
3    A.  We were more -- well, I had a higher grade
4  level than her, but we were more peers.
5    Q.  But it wasn't defined as a section per se
6  where there was a section manager?
7    A.  No.  It was a small organization.
8    Q.  But later you actually became a section
9  manager in Alternate Site contract marketing, true?
10         MS. TABACCHI:  Object to the form.
11    A.  Contract marketing manager, not a section
12  manager.  We didn't have sections.
13    Q.  (BY MR. WINTER)  Okay.  And in addition to
14  Ms. Dawson you had other contract marketing analysts
15  that worked for you in Alternate Site, true?
16    A.  When I became a manager --
17    Q.  Right.
18    A.  -- a number of years later.
19    Q.  Okay.  And approximately when did you become
20  the manager of Alternate Site contract marketing?
21    A.  It would have been about two or three years
22  after I was there.
23    Q.  Approximately 1992 or 1993?
24    A.  '92-ish, yeah,
25    Q.  Okay.  So when you got then -- strike that.

Page 23

1  Let me rephrase.
2         In approximately 1990 when you came over
3  to Alternate Site as an Alternate Site contract
4  marketing analyst or specialist I think is the word
5  you used, correct?
6    A.  Uh-huh.
7    Q.  Was Ms. Dawson already there or did you both
8  transfer in at the same time?
9    A.  We both transferred in about the same time.
10    Q.  Did she come from the same place you did or
11  was she a new hire?
12    A.  No.
13         MS. TABACCHI:  Object to the form.
14    A.  No.  She came from -- from HPD contract
15  marketing.
16    Q.  (BY MR. WINTER)  Okay.  When you were in the
17  Alternate Site -- and it was actually Alternate Site
18  Product Sales to be specific, wasn't it?  Wasn't it --
19  true?
20    A.  Correct.
21    Q.  Okay.  When you were in Alternate Site
22  Product Sales you reported to Mr. Ward and Mr. Ward in
23  turn reported to Mr. Robertson at that time; is that
24  true?
25    A.  Correct.

Page 24

1    Q.  Okay.  Did you also have a dotted line to
2  Mr. Sellers in the hospital business sector contract
3  marketing?
4         MS. TABACCHI:  Object to the form.
5    A.  No, not really.
6    Q.  (BY MR. WINTER)  Did you have connection or
7  communications with the folks in the hospital business
8  sector contract marketing in 1990 time frame?
9         MS. TABACCHI:  Object to the form.
10    A.  We -- we would talk and we would work
11  together.
12    Q.  (BY MR. WINTER)  Were you housed in the same
13  building?
14    A.  No.
15    Q.  Were you housed in the same complex at Abbott
16  Park?
17    A.  Not initially.  We were off-site down in Lake
18  Bluff initially.
19    Q.  I'm sorry.  Down where?
20    A.  Lake Bluff, Illinois.
21    Q.  And that's at some distance away from Abbott
22  Park?
23    A.  Yes.  South of Abbott Park.
24    Q.  Approximately how far?
25    A.  Oh, a few miles.

Page 25

1    Q.  So it's a short drive?
2    A.  Yes.
3    Q.  Okay.  And you-all had telephone and computer
4  access so you could communicate with one another?
5         MS. TABACCHI:  Object to the form.
6    A.  Yeah.  We typically hopped in the car and
7  went back and forth.
8         THE REPORTER:  I'm sorry, could you say
9  that again?
10    A.  Hopped in the car and went back and forth.
11  I'm sorry.
12    Q.  (BY MR. WINTER)  Okay.  So approximately in
13  1992 or '93 you became the manager of Alternate Site
14  contract marketing; is that true?
15    A.  Correct.
16    Q.  Okay.  And in addition to Ms. Dawson you had
17  some other contract marketing analysts that came to
18  work for you in that capacity?
19    A.  One other.
20    Q.  Who was the one other?
21    A.  Debbie Longley.
22    Q.  Okay.  Did you ultimately staff up before you
23  left the position of manager of Alternate Site
24  contract marketing, did you hire on additional
25  analysts besides Ms. Longley and Ms. Dawson?

7 (Pages 22 to 25)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 26

1         MS. TABACCHI:  Object to the form.
2     A.  No.  There was just the two when I left that
3  job.
4     Q.  (BY MR. WINTER)  Okay.  And you were
5  succeeded in that capacity as the manager of Alternate
6  Site contract marketing by Ms. Leone; is that true?
7     A.  There was a gentleman in between Lynn Leone
8  and I.  I can't recall his name off the top of my
9  head.  He came from HPD contract marketing.
10     Q.  Do you recall approximately how long this
11  gentleman was in that capacity as the manager of Alt
12  Site contract marketing?
13     A.  No.  No.  He ended up -- he came into the
14  position and then ended up leaving the company and I
15  don't recall when he left the company.
16     Q.  When you left the position of Alternate Site
17  contract marketing, was your next position as a
18  national account manager within Alternate Site?
19     A.  Correct.
20     Q.  Okay.  What year was that?
21     A.  Where are we at on a timeline for --
22     Q.  Approximately '93, I believe you --
23     A.  '93.  So it would have been -- would have
24  left -- for NAM, I was a NAM for two years.  So I
25  think it was '97-'98 that I was a NAM.

Page 27

1     Q.  So approximately '97 you left Alternate Site
2  contract marketing and became a national account
3  manager within Alternate Site Product Sales; is that
4  true?
5     A.  Correct.
6     Q.  Okay.  And you held that position
7  approximately two years and so was it '98 or '99 that
8  you left the position as a NAM?
9     A.  It would have been the end of '98.
10     Q.  End of '98 --
11     A.  As I recall.
12     Q.  Okay.  And what was your next position after
13  you left being a NAM?
14     A.  The new business development for -- working
15  for Don Robertson.
16     Q.  Okay.  Great.  So we've kind of closed the
17  loop now.  And when you were a NAM in Alternate Site
18  Product Sales, which was approximately '97 to the end
19  of '98, you would have reported to the national sales
20  director?
21         MS. TABACCHI:  Object to the form.
22     Q.  (BY MR. WINTER)  Is that true?
23     A.  No.  We reported to John Robert -- or John
24  Ward at the time.
25     Q.  Oh, you guys didn't go through the national

Page 28

1  sales director.  He was only in charge of the field
2  sales staff --
3         MS. TABACCHI:  Object to the --
4     Q.  (BY MR. WINTER)  -- is that true?
5         MS. TABACCHI:  -- form.
6     A.  Yes.
7     Q.  (BY MR. WINTER)  Okay.  So you reported
8  directly to Mr. Ward and then subsequently to
9  Mr. Baker?
10     A.  Yes.
11     Q.  Okay.  Was -- was there -- there were several
12  NAMs, weren't there, three or four?
13     A.  Three of us at that time.
14     Q.  Okay.  And was there, you know, a head NAM or
15  were you guys all -- men and women all independently
16  reporting to -- to Mr. Ward and then later Mr. Baker
17  without there being an intermediary?
18         MS. TABACCHI:  Object to the form.
19     A.  Yeah.  We were all independent and all of us
20  reported into John.
21     Q.  (BY MR. WINTER)  Directly to John?
22     A.  Directly to John.
23     Q.  Or subsequently Mr. Baker, correct?
24     A.  Yes.
25     Q.  Okay.  Do you recall when Mr. Ward left the

Page 29

1  position as the general manager of Alternate Site
2  Product Sales?
3     A.  I don't remember the time, no.  He went over
4  to become the vice-president of sales in the hospital
5  sector.
6     Q.  Do you remember approximately how long you
7  were directly reporting to Mr. Baker before you left
8  and moved up to reporting to Mr. Robertson?
9     A.  I believe it was a short time period.
10     Q.  And I'm just trying to kind of get an idea on
11  that.  You think it was six months or less?
12     A.  Yes.
13     Q.  Okay.  Can you think of any position you've
14  held at Abbott Labs that we haven't talked about so
15  far?
16     A.  You've got it covered.
17     Q.  Have we got it covered?  Good.
18         All right.  What I would like to do now,
19  sir, is show you some documents and ask you about some
20  of your experiences and we are going to rewind and go
21  back to some of the early days.  And the first one
22  that I'm going to show you is marked as -- or going to
23  be marked very shortly as Exhibit 474.  And this is a
24  document which has a Bates label TXABT35677.  It also
25  has another Bates label AB 0017564.  And it purports

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 30

1  to be a memorandum on Abbott Laboratories' letterhead,
2  interoffice memo from Phil Elliott to Mary Michalak.
3  I apologize if I mispronounced her name.  Dated
4  February 8, 1993.  Do you see that, sir?
5      A.  Yes, sir.
6      Q.  And --
7          MS. TABACCHI:  Ray, I'm sorry to
8  interrupt.  Can we agree for purposes of the
9  deposition, I understand we've had an issue in the
10  past because there are different protective orders
11  governing different parties to the case, that all
12  parties will treat all documents used today in the
13  deposition as highly confidential if they're so
14  designated under the protective order that the party
15  has signed?
16         MR. WINTER:  So -- Texas so agrees.
17         MR. GOBENA:  Justice Department agrees.
18         MS. TABACCHI:  Jennifer?
19         MS. CONNOLLY:  Yeah.  No problem.
20         MS. TABACCHI:  Very good.
21     Q.  (BY MR. WINTER)  Okay.  Mister --
22         MR. BREEN:  I understand that the
23  Relator is subject to all kinds of protection.
24         MS. TABACCHI:  Of course.  And we'll
25  abide by them all.

Page 31

1          MR. BREEN:  And we comply with them all
2  to the last letter of the last protective order to the
3  last case.
4      Q.  (BY MR. WINTER)  Okay.  And tell me what
5  number I put on the bottom of that so I don't lose
6  track, if you -- 474?
7      A.  Yes, sir.
8      Q.  Thank you.  Okay.  Mr. Kipperman, first of
9  all, do you see that you're copied on this memorandum?
10     A.  Yes, sir.
11     Q.  Okay.  Do you believe that you received this
12  in the ordinary course of business?
13     A.  Yes.
14     Q.  Okay.  And the date on that, February 8,
15  1993, and the title that's given next to your name,
16  does that mean anything to you as far as fixing the
17  time period in which you actually became the manager
18  of Alt Site contract marketing?
19     A.  It would have been when I was the manager.
20     Q.  Does that help you narrow down, given that's
21  early in the year of 1993, does that help you as far
22  as fixing the specific time that you were elevated
23  from being one of Cindy Dawson's peers to actually
24  being her boss?
25     A.  I'm --

Page 32

1          MS. TABACCHI:  Object to the form.
2      A.  -- not sure if it was much earlier than this
3  or right about here.
4      Q.  (BY MR. WINTER)  Doesn't help you much.
5  Okay.  Who was Phil Elliott?
6      A.  Phil Elliott was the marketing manager for
7  the Provider pumps.
8      Q.  The Provider was a pump?
9      A.  Yes.  Infusion -- ambulatory infusion device.
10     Q.  And what -- what kinds of products were used
11  in conjunction with the Provider pumps?
12         MS. TABACCHI:  Object to the form.
13     A.  You would have the pump itself.  You would
14  have proprietary infusion sets that only would work in
15  that pump.  You would have power cords and bags and
16  things like that.
17     Q.  (BY MR. WINTER)  And when you speak of bags,
18  are you talking about bags of fluid, such as sodium
19  chloride and Dextrose?
20         MS. TABACCHI:  Object to the form.
21     A.  Those are the types of things the pump would
22  deliver.
23     Q.  (BY MR. WINTER)  Okay.
24     A.  Bags would be carry bags.  These are to make
25  people ambulatory --

Page 33

1      Q.  I see.
2      A.  -- when they're out of the hospital.
3      Q.  And so the Provider pump -- is it fair to
4  characterize that as a delivery system?
5          MS. TABACCHI:  Object to the form.
6      A.  Yeah.
7      Q.  (BY MR. WINTER)  Is that accurate?
8      A.  Yeah.
9      Q.  Okay.
10     A.  It's an electronic delivery system.
11     Q.  And what you're delivering is drug which is
12  being infused into the patient; is that true?
13         MS. TABACCHI:  Object to the form.
14     A.  Drugs, fluids, pain medication.
15     Q.  (BY MR. WINTER)  Okay.
16     A.  A myriad of things.
17     Q.  Pain medication would -- what types of pain
18  medications would be delivered with the Provider pump?
19         MS. TABACCHI:  Object to the form.
20     A.  IV, intravenous.  The names of the products I
21  don't have off the top of my head.
22     Q.  (BY MR. WINTER)  You can't recall any of them
23  right now?
24     A.  No.
25     Q.  Okay.  Who was Mary Michalak?

Page 34

1    A.  That name I don't remember.
2    Q.  That -- that just -- you're drawing a blank
3  on that name right now?
4    A.  That name, yeah, it's not -- she wasn't in
5  our group, so I don't know who she was.
6    Q.  Well, based on -- do you see that Mr. Elliott
7  is recommending a five percent increase across the
8  board with two exceptions?  Do you see that?  On the
9  first bullet point or the only bullet point on the
10  document.
11    A.  Yes, sir.
12    Q.  And do you see the subject line is "PROVIDER
13  List Price catalog increase"?  Do you see that?
14    A.  Yes, sir.
15    Q.  So it looks like he's suggesting or
16  telling -- well, recommending to Ms. Michalak that --
17  that she take a list price catalog increase across the
18  board for the Provider -- I guess for the Provider
19  products.  Do you see that?
20       MS. TABACCHI:  Object to the form.
21    A.  Yes, sir.
22    Q.  (BY MR. WINTER)  Who would be in charge of
23  making list price increases for Abbott?
24       MS. TABACCHI:  Object to the form.
25    A.  For the ambulatory infusion pumps it would

Page 35

1  have been Phil.
2    Q.  (BY MR. WINTER)  I'm sorry?
3    A.  It would have been Phil for the ambulatory
4  infusion pumps.
5    Q.  It would have been Phil Elliott.  Okay.
6  Was -- was he in the Alternate Site business unit?
7       MS. TABACCHI:  Object to the form.
8    A.  Yes.
9    Q.  (BY MR. WINTER)  And so he is making the
10  decision that there be a list price increase, is that
11  how you interpret this document?
12       MS. TABACCHI:  Object to the form.
13    A.  Yes.
14    Q.  (BY MR. WINTER)  Okay.  And who actually --
15  does -- does -- did Mr. Elliott at this time actually
16  control the price setting, the list price setting, or
17  was he telling somebody else to actually make the
18  price change?
19       MS. TABACCHI:  Object to the form.
20    A.  That I don't know.
21    Q.  (BY MR. WINTER)  You mentioned that Mary
22  Michalak was not in your -- in your department.  Do
23  you believe --
24    A.  No.
25    Q.  -- that she was in the hospital business

Page 36

1  sector?
2       MS. TABACCHI:  Object to the form.
3    A.  That's what I would assume.
4    Q.  (BY MR. WINTER)  Okay.  Do you know who in
5  the hospital business sector was responsible for
6  setting list prices?
7       MS. TABACCHI:  Object to the form.
8    A.  No.  The list prices for all the other
9  products were set over in that organization.
10    Q.  (BY MR. WINTER)  Did you say -- did you say
11  for all the other products?
12    A.  Correct.
13    Q.  Okay.  But for the Alternate Site products
14  they were set within Alternate Site?
15    A.  Incorrect.
16       MS. TABACCHI:  Object to the form.
17    Q.  (BY MR. WINTER)  Incorrect.  Okay.
18    A.  Only the ambulatory pumps.
19    Q.  Only the ambulatory pumps were set within
20  Alternate Site.
21    A.  Correct.
22    Q.  Okay.
23    A.  The ambulatory pumps for the business, a
24  large portion of the ambulatory pumps were sold in the
25  Alternate Site market.  They were not sold in the

Page 37

1  hospital market.
2    Q.  And that's why Alternate Site had the
3  responsibility for setting list prices?
4    A.  Correct.
5       MS. TABACCHI:  Object to the form.
6    Q.  (BY MR. WINTER)  Okay.  But for the other
7  products that were sold both within the Alternate Site
8  department, as well as the hospital business sector,
9  the hospital business sector was responsible for
10  setting list prices?
11    A.  Correct.
12    Q.  Okay.  Do you know which department within
13  the hospital business sector would have been
14  responsible for setting those list prices?
15    A.  It would have been in the hospital sector
16  contract marketing organization.
17    Q.  Okay.  I'm going to show you another document
18  which we're going to mark as Exhibit 475.  And,
19  Mr. Kipperman, this purports to be a two-page -- I
20  guess I would characterize it as a letter, but perhaps
21  you can correct me if I mischaracterize it.  It's
22  signed by you.  It's on Abbott Laboratories' Abbott
23  Site -- Alternate Site Product Sales letterhead dated
24  June 9th, 1993 and it says, "Dear Customer."  The
25  customer is identified as Florida Infusion.  The Bates

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 38

1  label is TXABT 408636 and 637.  Do you see this
2  document, sir?
3     A.  Yes.
4     Q.  And I characterized it as a letter, but is
5  that accurate in your estimation?
6        MS. TABACCHI:  Object to the form.
7     A.  I need to read it first.
8     Q.  (BY MR. WINTER)  Sure.
9     A.  (Witness reviewing document).  Okay.
10    Q.  So my question is, I characterize this as a
11 letter, Mr. Kipperman.  Would -- is that how you would
12 characterize it?
13    A.  It would be an amendment to their
14 subagreement with PBI and Abbott.
15    Q.  Okay.  Who was PBI?
16    A.  Alternate Site buying group.
17    Q.  And the entity to whom this amendment is
18 addressed is, pardon me, Florida Infusion and they're
19 identified in a parenthetical as a distributor.  Do
20 you see that, sir?
21    A.  Yes.
22    Q.  So tell me, what is a distributor?
23        MS. TABACCHI:  Object to the form.
24    A.  Distributor would have been somebody who
25 would warehouse product and sell it to end users.

Page 39

1     Q.  (BY MR. WINTER)  So was Abbott selling
2  product to Florida Infusion through the PBI buying
3  group?
4        MS. TABACCHI:  Object to the form.
5     A.  Florida Infusion would have been a member of
6  the PBI buying group, correct.
7     Q.  (BY MR. WINTER)  And as such Florida Infusion
8  would have been entitled to purchase Abbott product on
9  the PBI contract; is that true?
10    A.  The PBI distributor contract, correct.
11    Q.  Okay.  And did you have direct interaction
12 with folks at PBI to negotiate contracts such as the
13 one that's being amended with this letter?
14    A.  No.
15        MS. TABACCHI:  Object to the form.
16    A.  The national account managers typically did
17 the direct interface.  The contract marketing group
18 would interface with the national account managers and
19 then the field sales reps.  We rarely had direct
20 contact with customers.
21    Q.  (BY MR. WINTER)  And as I understand it from
22 some of the other testimony that -- that we've
23 received in this case, there was a -- I guess a team
24 that would be working together that would negotiate
25 with the GPOs and that team would include a national

Page 40

1  account manager, as you've described, as well as a
2  contract marketing analyst who would work with the NAM
3  to negotiate pricing with the customer, is that --
4     A.  Working directly with the NAM typically.
5     Q.  Okay.  So as -- on the contract marketing
6  side, you and the folks that worked underneath you
7  when you became the manager, didn't typically have
8  direct one-on-one contract with the customer, is that
9  what I understand you're saying?
10    A.  Typically we didn't go on airplanes and go
11 visit them and things like that.  That was the
12 salespeople's job.
13    Q.  I see.  Did you ever get on conference calls
14 with the customers?
15        MS. TABACCHI:  Object to the form.
16    Q.  (BY MR. WINTER)  With you and the NAM and --
17    A.  Not that I recall at the time I had.
18    Q.  Well, was it -- was it typical in your -- in
19 your experience that you just didn't communicate at
20 all with the customer and the communications always
21 flowed through the NAM?
22        MS. TABACCHI:  Object to the form.
23    A.  That would have been typical.
24    Q.  (BY MR. WINTER)  Typical.  Not necessarily
25 exclusively, but typical?

Page 41

1     A.  Correct.
2     Q.  Okay.  Do you recall who the national account
3  manager was in the early 1990s that was responsible
4  for PBI?
5     A.  It would have been Chris Snead.  She's copied
6  on the back here.
7     Q.  Okay.  Do you know if Ms. Snead is still an
8  Abbott employee?
9     A.  No.  She's retired.
10    Q.  Do you know where she lives when she retired?
11    A.  No.  I haven't kept in touch with any of
12 those people.
13    Q.  Okay.  Do you recall approximately when
14 Ms. Snead retired?
15    A.  No.  It was after I left the organization.
16    Q.  Did she retire from Abbott?
17        MS. TABACCHI:  Object to the form.
18    A.  I don't know.
19    Q.  (BY MR. WINTER)  You just knew -- or
20 understood anecdotally that she had retired?
21    A.  Yeah.
22    Q.  What about Mr. Hamlin?  He's identified as
23 the manager of distributor relationships -- relations,
24 excuse me here, is he still an Abbott employee?
25    A.  No.  He's down in Hospira.

11 (Pages 38 to 41)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 42

1    Q.   He is now a Hospira employee?
2    A.   Correct.
3    Q.   Okay.  In -- in 1993, June of '93, were
4  distributors purchasing Abbott product on the RxLink
5  system or were they on a different pricing system, do
6  you recall?
7    A.   That --
8         MS. TABACCHI:  Object to the form.
9    A.   That I don't know.
10   Q.   (BY MR. WINTER)  You don't -- you don't --
11 you don't know because you never knew or you don't
12 know because you don't recall?
13   A.   No.  I don't -- the RxLink thing I had
14 limited exposure to.
15   Q.   You had limited exposure to RxLink?
16   A.   Correct.
17   Q.   Okay.  Next document, Mr. Kipperman, is
18 Exhibit 476 and this purports to be a memorandum on
19 interoffice correspondence letterhead from Mr. Hamlin
20 dated October 5, 1993 to Mr. Ward and the Bates label
21 here is TXABT35067 and it also bears a Bates label
22 AB 0016959.  And --
23        MS. TABACCHI:  Is this 476?
24        MR. WINTER:  Sorry?
25        MS. TABACCHI:  476?

Page 43

1         MR. WINTER:  Yes.  476 is the -- is the
2  deposition number.
3    Q.   (BY MR. WINTER)  And why don't you take a
4  moment to look at that, sir, and just look up when you
5  get a chance -- when you finish, please.
6    A.   (Witness reviewing document).  Okay.
7    Q.   You ready?
8    A.   Yes.
9    Q.   Okay.  Do you recall attending a meeting with
10 some individuals from a company called Aventric?
11   A.   I don't recall the specific meeting.  No, I
12 don't.
13   Q.   Well, after having read over the
14 memorandum -- did you read the whole thing?
15   A.   Yes, sir.
16   Q.   Does it kind of ring a bell with you that
17 there was a meeting with some folks at Aventric, even
18 if you don't recall the specific meeting, the text and
19 the subject matter ring a bell?
20   A.   Yeah.
21        MS. TABACCHI:  Object to the form.
22   A.   Yes.
23   Q.   (BY MR. WINTER)  Okay.  And can you tell me
24 what -- what the purpose of this meeting was?
25   A.   It appeared Aventric was forming

Page 44

1  Infu-Systems, which was going to be a provider for
2  oncologists for products for the oncology offices and
3  taking care of the patients and this is around a new
4  Provider agreement.  There was a new device, a new
5  pump, that was coming and I believe we ended up
6  selling Infu-Systems a bunch of pumps.
7    Q.   Was it just pumps or were you selling
8  product, also?
9    A.   I think -- from my recollection Aventric was
10 only a pump distributor.
11   Q.   In the third sentence in the second -- excuse
12 me, in the first paragraph it says, "Aventric and PRN
13 are principle owners in a company called
14 Infu-Systems."  Did I read that accurately?
15   A.   Yes, sir.
16   Q.   Is PRN Physician Reliance Network?
17   A.   That I don't recall what the acronym is.
18   Q.   The next sentence says, "Infu-Systems
19 provides specialized services to the oncology office
20 market which among other things, involves
21 reimbursement consultation, distribution of products,
22 and biomedical support for infusion" services.
23   A.   "Devices."
24   Q.   Excuse me.  I misread that.  "Infusion
25 devices."  Okay.  What did you understand the

Page 45

1  reimbursement consultation reference in that sentence
2  to mean?
3         MS. TABACCHI:  Object to the form.
4    A.   That would have been a service they were
5  offering the oncology offices.
6    Q.   (BY MR. WINTER)  What kind of service?
7         MS. TABACCHI:  Object to the form.
8    A.   I don't know.  We didn't get involved in
9  that.  We sold them pumps.
10   Q.   (BY MR. WINTER)  That wasn't anything that
11 was discussed at the meeting.
12   A.   No.  We don't do those things.
13   Q.   When you say, "We don't do those things,"
14 what do you -- what do you mean?
15   A.   Reimbursement services.
16   Q.   Well, who's the "we" in that sentence?
17   A.   Alternate Site Product Sales here.
18   Q.   You were aware from your long tenure at
19 Abbott Laboratories that Abbott did reimbursement
20 services through its Home Infusion Services unit
21 underneath Alternate Site, you're aware of that,
22 aren't you?
23        MS. TABACCHI:  Object to the form.
24   A.   Correct.
25   Q.   (BY MR. WINTER)  Okay.  So you knew that

12  (Pages 42 to 45)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 46

1 Abbott actually operated its own home infusion
2 pharmacy for some period of time and also assisted
3 hospitals to set up home infusion pharmacies and as
4 part of that arrangement would perform billing and
5 collection services involving reimbursement by third
6 parties, you knew that as well, didn't you?
7    A.  Yes.  I'm aware of that.
8    Q.  Okay.  But in this context you're saying
9 that's a separate situation?
10    A.  Correct.
11    Q.  In this exhibit.  Okay.
12    A.  This is around Provider agreement pumps.
13    Q.  Let's look at the next exhibit, which is
14 going to be 477.  I'm sorry about that.  And this
15 appears to be an interoffice memorandum addressed to
16 you and Doug McGill dated October 21st, 1993 from
17 Janet E. Gray.  Bates label is TXABT26613.  Also bears
18 the Bates label AB 0008021.
19        Who was Janet Gray, sir?
20    A.  Janet Gray was a sales rep in the southeast.
21 I don't remember the exact state.
22    Q.  A sales rep who -- who was out in the
23 Alternate Site Product Sales field sales force?
24    A.  Correct.
25    Q.  Okay.  And it looks like she's talking to you

Page 47

1 about a company called Biomedical Homecare.  Do you
2 see that?
3    A.  Yes, sir.
4    Q.  And is that a home infusion pharmacy?
5        MS. TABACCHI:  Object to the form.
6    A.  By the name I would assume so, although I
7 don't know this account.
8    Q.  (BY MR. WINTER)  Okay.  Would it be typical
9 for the field sales reps to communicate with you in
10 this manner such as she's doing here, giving you a --
11 it looks to me like she's giving you a heads-up that
12 she's going to want to negotiate some pricing for
13 Biomedical Homecare; is that -- is that accurate?
14        MS. TABACCHI:  Object to the form.
15        Can you please repeat the -- re-read the
16 question?
17        MR. WINTER:  I'll rephrase.
18    Q.  (BY MR. WINTER)  Did you get a chance to read
19 over -- 
20    A.  I'm reading it.
21    Q.  Why don't you just look up when you're ready.
22    A.  (Witness reviewing document.)  Okay.
23    Q.  Okay.  Can you -- after you read over this
24 memorandum, can you give me an idea as to what -- what
25 and why Ms. Gray is communicating to you?

Page 48

1    A.  It appears Ms. Gray has a copy of their
2 pricing and she's looking to do a request for contract
3 and possibly get a contract with this customer.
4    Q.  Okay.  Well, let's parse that now.  When you
5 say she's got a copy of their pricing, what pricing is
6 it that she has a copy of, if you can tell from
7 reading this?
8        MS. TABACCHI:  Object to the form.
9    A.  I can't tell from reading this.
10    Q.  (BY MR. WINTER)  Well, in your experience
11 would that be their pricing with some other provider
12 that she's providing to you so you can evaluate it
13 to see if Abbott can -- can beat it or do you think
14 it's something different?
15    A.  Can't -- 
16        MS. TABACCHI:  Object to the form.
17    A.  Can't tell from this without -- without more.
18    Q.  (BY MR. WINTER)  Okay.  In your experience
19 would it be typical that a sales rep in the field
20 would provide you pricing that a potential customer
21 has with some other pharmaceutical manufacturer in
22 trying to see if -- if you and the decision makers in
23 headquarters could get them a better deal so that
24 Abbott could gain that customer?
25        MS. TABACCHI:  Object to the form.

Page 49

1    A.  It wasn't typical in getting full price
2 lists, if you're asking that question.
3    Q.  (BY MR. WINTER)  Well, really I'm trying to
4 get an idea if -- if the field sales staff would
5 communicate with you from time to time to say, "Hey,
6 I've got this customer -- this potential Customer X
7 that I want to sell to" -- 
8    A.  Uh-huh.
9    Q.  -- "and I've got a copy of the prices that
10 they're being -- that they're able to purchase product
11 from, McGaw or Baxter or somebody else, and here it
12 is.  Can we beat these prices?"  Would that be a
13 typical description of -- of the kind of situation
14 that you would encounter as the Alternate Site
15 contract marketing manager?
16        MS. TABACCHI:  Object to the form.
17    A.  Of getting copies of pricing from customers
18 was not typical.  Typically a rep, if they were trying
19 to start a new account, or whatnot, would be able to
20 tell you the accounts -- the McGaw account was a
21 direct contract, some ballpark figures and things like
22 that.  Typically the small companies we referred over
23 to buying groups because we could not do a direct
24 contract that would be good pricing for them.
25    Q.  (BY MR. WINTER)  The smaller accounts you

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 50

1  would refer over to a buying group because you could
2  not contract with them directly, did I understand you
3  to say that?
4          MS. TABACCHI:  Object to the form.
5      A.  They would be better served by contacting
6  buying groups.
7      Q.  (BY MR. WINTER)  So you would refer them to a
8  GPO?
9          MS. TABACCHI:  Object to the form.
10     A.  Give them -- give them a number of options
11  that they can contact and go -- go do their own work.
12     Q.  (BY MR. WINTER)  Who was Doug McGill?
13     A.  Doug, I'm not sure during this time period.
14  He might have been her district manager.  I'm assuming
15  so.  He -- Doug was -- he's been around Abbott or was
16  around Abbott for a long time and had numerous jobs,
17  but I'm assuming that she -- he was probably the
18  district manager at the time.
19     Q.  Do you know if Ms. Gray is still an Abbott
20  employee?
21     A.  No.
22     Q.  You don't know or she's not?
23     A.  I don't know.
24     Q.  What about Mr. McGill?
25     A.  I don't know.  This whole organization was

Page 51

1  part of Hospira, so I've lost touch with all those
2  people.
3      Q.  Okay.  Let me hand you now what's marked as
4  Exhibit 478, but keep 477, if you would, handy.
5      A.  Okay.
6      Q.  And I'll ask you to take a look at 478 now,
7  which is a multipage document beginning at Bates label
8  TXABT26614 and running through TXABT26620 and it
9  appears to be a fax to you, seven pages, from
10  Ms. Gray.  Why don't you read over that first page and
11  then look up when you're ready.
12     A.  (Witness reviewing document).  Uh-huh.  Yes.
13     Q.  Okay.  And I leapt to the brilliant
14  conclusion that 477 and 478 go together.  Do you
15  concur?
16          MS. TABACCHI:  Object to the form.
17     Q.  (BY MR. WINTER)  As far as they deal with the
18  same situation?
19          MS. TABACCHI:  Object to the form.
20     A.  I'm assuming so.
21     Q.  (BY MR. WINTER)  Pardon me?
22     A.  I'm assuming so.  It just says Biomedical
23  here and then Biomedical.  Biomedical could be
24  something else, but I don't know that --
25     Q.  If you look at the next page --

Page 52

1      A.  Second page?
2      Q.  Yes, sir.
3      A.  Yes.
4      Q.  You see the subject line is "Solutions Bid
5  for Biomedical Homecare"?
6      A.  Yes.
7      Q.  So it does appear they pertain to the same
8  customer, same account?
9          MS. TABACCHI:  Object to the form.
10     A.  Yes.
11     Q.  (BY MR. WINTER)  Okay.  In the first page
12  there's the message to you from Ms. Gray.  "Steve, I
13  know this is on short notice, but I tried to give you
14  as much information as possible to help with your
15  analysis.  As you can see by the numbers, this is a
16  great opportunity.  Doug has some additional info that
17  he is bringing up to Chicago and will discuss with
18  you."  Did I read that accurately?
19     A.  Yes.
20     Q.  Bold print means high usage, and italics
21  means there's not an exact cross-reference, but that
22  item is recommended.  Did I read that accurately?
23     A.  Yes.
24     Q.  Okay.  "Could you please include in the
25  package to me a copy of the report that shows the

Page 53

1  total value of the bid to Biomedical.  That report is
2  a tremendous help, and it refocuses the customer away
3  from line item pricing.  The report I am referring to
4  is like the one you did for Southern Anesthesia."  Did
5  I read that accurately?
6      A.  Yes.
7      Q.  What is she referring to, do you know, as far
8  as this report that you did for Southern Anesthesia
9  that she would like you to do for Biomedical?
10     A.  I don't recall what the analysis is.
11     Q.  You've used the word "analysis."  Was it your
12  function as the manager of Alt Site contract marketing
13  to perform analyses for potential accounts?
14     A.  On a limited basis.  Primarily I had my
15  analysts do that.
16     Q.  So when you were the manager folks like Cindy
17  Dawson and Debbie Delong would be actually doing
18  the -- the legwork or grunt work, so to speak, of
19  doing the analyses, is that what you're saying?
20     A.  Yes, Debbie Longley.
21     Q.  Okay.  Debbie Longley?
22     A.  Longley, not Delong.
23     Q.  I apologize if I misspoke.  I meant to say
24  Longley.
25     A.  Yeah.

14  (Pages 50 to 53)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 54

```
 1    Q.  What about Cindy Dawson, did she do these
 2  analyses as well?
 3    A.  Yes.
 4    Q.  Okay.  Did they run their work product
 5  through you?  Did you sign off on it?
 6        MS. TABACCHI:  Object to the form.
 7    A.  Sometimes, sometimes not.  I kind of made --
 8  I was hoping they would do their own job.
 9    Q.  (BY MR. WINTER)  Did you -- you said that
10  they typically did the analyses and that you typically
11  were sort of just supervising, but did you sometimes
12  do them yourself?
13    A.  Sometimes.
14    Q.  Okay.  Was there a -- an SOP within your
15  department, standard operating procedure, or a -- let
16  me try and rephrase that question to make it better.
17  Strike that.
18        Initially when it was just you and
19  Ms. Dawson before you became the manager, were you
20  performing the analyses yourself on a great -- to a
21  greater frequency than when you became the manager?
22        MS. TABACCHI:  Object to the form.
23    A.  I don't know if on a greater frequency.  I
24  don't think we had as many analyses at that time.  The
25  primary role back then was the Provider pumps.  We had
```

Page 55

```
 1  just acquired the company and there was far more pump
 2  specialists than there were infusion specialists.
 3    Q.  (BY MR. WINTER)  When you or your department
 4  would prepare an analysis, was that analysis typically
 5  provided to the account, to the customer, or was it
 6  delivered to the NAM or both?
 7        MS. TABACCHI:  Object to the form.
 8    A.  Depending on where it came from.  Like in
 9  this case say Janet Gray, who would take -- do an
10  analysis to see where their pricing is and, you know,
11  is it a big enough account, which I don't know if this
12  is or not, to do a direct proposal or to refer them
13  over to a GPO.
14    Q.  (BY MR. WINTER)  And if you were going to do
15  a direct proposal, would that be a situation where the
16  NAM, the national account manager, would be
17  interfacing directly with the account and delivering
18  the proposal?
19        MS. TABACCHI:  Object to the form.
20    A.  It depends on -- well, if it's a small
21  account, no, the rep would handle that.  The national
22  account managers handled the national accounts.
23    Q.  (BY MR. WINTER)  Okay.  So it could have been
24  either the NAM or the field sales rep, such as
25  Ms. Gray, who was interfacing directly with the
```

Page 56

```
 1  account depending upon the size of the account?
 2    A.  Correct.
 3    Q.  Okay.  And you've just a moment ago told me
 4  that the national account managers handled the
 5  national accounts.  How did Abbott define the national
 6  accounts?
 7        MS. TABACCHI:  Object to the form.
 8    A.  Large accounts with more than one -- I mean,
 9  multi-state facilities, GPOs, which are national,
10  things like that, not a -- just an individual account.
11    Q.  (BY MR. WINTER)  Not just an individual
12  stand-alone infusion pharmacy?
13    A.  Correct.
14    Q.  Did you --
15    A.  Unless it was a member of one of the GPOs.
16    Q.  Okay.  Was -- was there a threshold, you
17  know, like volume, the amount of product they
18  purchased dollar-wise that was the dividing line
19  between a national account?
20    A.  No.
21        MS. TABACCHI:  Object to the form.
22    A.  It would be more along the lines of
23  geography.
24    Q.  (BY MR. WINTER)  Okay.
25    A.  Did it have a corporate office someplace with
```

Page 57

```
 1  like a corporate materials management person --
 2    Q.  I see.
 3    A.  -- making the decisions for the company.
 4    Q.  I gotcha.  You said that it was rare.  I want
 5  to just go back to this real quick.  I think what you
 6  told me was it was very rare that you would interface
 7  directly.  During the time period that you were in
 8  Alternate Site contract marketing it would have been
 9  very rare that you would have interfaced with the
10  account personnel --
11        MS. TABACCHI:  Object --
12    Q.  (BY MR. WINTER)  -- that that was primarily
13  the function of the NAM?
14    A.  Correct.
15        MS. TABACCHI:  Object to the form.
16    Q.  (BY MR. WINTER)  Can you recall of any
17  instance, any episode or example, where you actually
18  did sit down face to face with any of the account
19  representatives?
20        MS. TABACCHI:  Object to the form.
21    A.  Just a handful of times.
22    Q.  (BY MR. WINTER)  Does any ring a bell?  You
23  say you've got a handful of times, so --
24    A.  Yeah.  One that comes to mind was when Coram
25  came together.  They merged from four or five, six
```

15 (Pages 54 to 57)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 58

1  companies, and they were going to do an RFP that I
2  remember Don Robertson, John, Chris Snead and I went
3  out to meet with them.
4     Q.  And you say you went out to meet with them.
5  Where did you go?
6     A.  It was Denver.
7     Q.  In Denver?
8     A.  Yes.
9     Q.  Does Coram still exist?
10    A.  I don't know.  I haven't followed this market
11  since I left it.
12    Q.  And Coram was a -- was a GPO or was it a home
13  infusion company?
14       MS. TABACCHI:  Object to the form.
15    A.  It was a national chain, homecare chain.
16    Q.  (BY MR. WINTER) I'm sorry, national chain
17  what?
18    A.  National homecare chain, all self-owned.
19    Q.  Okay.  And did -- did Coram belong to a group
20  purchasing organization or did it have enough
21  purchasing clout since it was a large national chain
22  that it didn't need to belong to a GPO?
23       MS. TABACCHI:  Object to the form.
24    A.  I believe they did all their contracting
25  direct.

Page 59

1     Q.  (BY MR. WINTER) I'm sorry?
2     A.  I believe they did all of their contracting
3  directly with the companies.
4     Q.  Including Abbott and they did not --
5     A.  Including Abbott.
6     Q.  -- go through a GPO.
7     A.  Yes.
8     Q.  Okay.  Gotcha.  On this exhibit that we're
9  looking at, which I think was 478 --
10    A.  Uh-huh.
11    Q.  -- that last paragraph, "Could you please
12  include in the package to me a copy of the report that
13  shows the total value of the bid to Biomedical."  What
14  does that mean?
15    A.  I don't know.  Let's see if there's any more
16  detail.  I'm assuming Janet's referring to having us
17  put the Abbott list numbers in with our product
18  descriptions, which she's done a lot of the work here,
19  with their annual usage and then dropping in what we
20  could possibly do for pricing for them to show them on
21  a bottom line how much it would cost for them to do
22  business with us.  Which should be the reference of
23  the total value of the bid.
24       MR. WINTER:  Can you read that answer
25  back for me?

Page 60

1       (Requested portion was read)
2     Q.  (BY MR. WINTER) So it was merely a function,
3  you believe, of identifying for the customer what
4  their bottom line pricing was?
5       MS. TABACCHI:  Object to the form.
6     Q.  (BY MR. WINTER) Did I --
7     A.  Bottom line purchases would be.
8     Q.  Let me hand you now what's marked as Exhibit
9  479, which, again, is a memorandum from Mr. Hamlin
10  dated -- dated November 24, 1993 Bates labeled TXABT
11  33973 and AB 0015858.  And this is Exhibit 479.
12       Why don't you take a moment and read
13  over that and look up when you're ready, please.
14    A.  (Witness reviewing document).  Okay.
15    Q.  Okay.  We've already talked about Mr. Hamlin.
16  He was manager of distributor relations as it says
17  here.  Who was Pete Strasburg?
18    A.  He was a representative out of Georgia, I
19  believe.  I don't recall if he was -- at that time if
20  we had distributor reps or if he was a home -- an
21  infusion rep at the time.
22    Q.  And the cc's on this are Karla Kreklow, Chris
23  Snead, Doug McGill and Steve Kipperman.  Did I read
24  that accurately?
25    A.  Yes.

Page 61

1     Q.  Who was Karla Kreklow?
2     A.  The marketing manager for all the products
3  that were not pumps.
4     Q.  Was she within Alternate Site or was she
5  within hospital business sector?
6     A.  Yeah.  Alternate Site Product Sales.
7     Q.  She was within Alternate Site Product Sales?
8     A.  Correct.
9     Q.  And she was the marketing manager for all the
10  nonpump products that Alternate Site Product Sales
11  sold?
12    A.  Correct.
13    Q.  Which would include the fluids and the
14  antibiotics and the other drugs.
15    A.  Yeah.
16    Q.  Okay.  And, in fact, on this particular
17  document she's making reference to the injectable drug
18  Vancomycin, correct?
19    A.  Yes.
20    Q.  Who was Sun Belt Medical?
21    A.  They are, as I recall, a large distributor in
22  the southeast.  I think it may have even been Florida.
23    Q.  How many marketing managers were there within
24  Alternate Site Product Sales?
25       MS. TABACCHI:  Object to the form.

16 (Pages 58 to 61)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 62

1    A.   We just had two.
2    Q.   (BY MR. WINTER)  Karla --
3    A.   Karla and Phil.
4    Q.   And Phil Elliott.
5    A.   Yes.
6    Q.   Okay.  Phil was for the pumps and Karla was
7  for the products.
8    A.   Correct.
9    Q.   Okay.  Do you know if Ms. Kreklow is still an
10 Abbott or a Hospira employee?
11   A.   I believe Karla is an Abbott employee.
12   Q.   You believe she is a current Abbott employee?
13   A.   I believe so.
14   Q.   Do you know what department she is employed
15 in currently?
16   A.   No, not the exact department, but I believe
17 she's in PPD as a division.
18   Q.   Do you have any idea when she left HPD and
19 went over to PP?
20        MS. TABACCHI:  Object to the form.
21   A.   I think when Hospira spun off, that the group
22 she was in didn't go with the spinoff, so she would
23 have retained and stayed in --
24   Q.   (BY MR. WINTER)  Approximately in --
25   A.   -- Abbott.

Page 63

1    Q.   -- May, May of 2004?
2    A.   Yeah.  If that's when the spinoff occurred.
3    Q.   Okay.  Chris Snead you've identified as a
4  national account manager, true?
5    A.   Correct.
6    Q.   And Doug McGill you believe was a district
7  manager?
8    A.   At this time I believe he probably was Pete's
9  boss, Strasburg.
10   Q.   What is the Profit Assurance Team van?
11        MS. TABACCHI:  Object to the form.
12   Q.   (BY MR. WINTER)  Do you see that reference on
13 the bottom of the page?
14   A.   No, I don't recall what the Profit Assurance
15 Team van was.  Sorry.
16   Q.   It says on the bottom of the page, "Pete,
17 again thanks for all your help.  Keep the profit
18 Assurance Team Van a rollin'!!!"  Did I read that
19 accurately?
20   A.   Yes.
21   Q.   You have no recollection as you read that
22 right now what the Profit Assurance Team van was?
23        MS. TABACCHI:  Object to the form.
24   A.   No, I don't.  All I'm assuming with the date
25 is it's a year-end push to make our numbers.

Page 64

1    Q.   (BY MR. WINTER)  Say that again.
2    A.   All I can assume is from the year-end date
3  here, that it's looking at something to assure that we
4  make the sales figures for the year.
5    Q.   That the field sales staff are -- are hitting
6  their number that's projected for them --
7        MS. TABACCHI:  Object to the form.
8    Q.   (BY MR. WINTER)  -- is that what you're
9  saying?
10   A.   Yeah.  Possibly.
11   Q.   Mr. Kipperman, do you know what the
12 reimbursement spread is?
13        MS. TABACCHI:  Object to the form.
14   A.   Explain more, please.
15   Q.   (BY MR. WINTER)  Do you understand -- do you
16 have an understanding what the phrase "reimbursement
17 spread" means?
18        MS. TABACCHI:  Object to the form.
19   A.   My understanding of spread is difference
20 between AWP and what a customer would pay for a
21 product.
22   Q.   (BY MR. WINTER)  And what the customer will
23 pay for the product?  Okay.  And you understood, and
24 from your experience working with Abbott in the early
25 1990s as the Alternate Site contract manager and then

Page 65

1  later as national account manager in Alternate Site,
2  that some of Alternate Site's customers were concerned
3  with and made purchasing decisions based upon their
4  reimbursement spread, you knew that, didn't you?
5        MS. TABACCHI:  Object to the form of the
6  question.
7    A.   I don't know that for a fact.
8    Q.   (BY MR. WINTER)  Well, did you have an
9  assumption that that was true?
10        MS. TABACCHI:  Object to the form of the
11 question.
12   A.   I -- I --
13        MS. TABACCHI:  Can you please repeat
14 the -- re-read the entire question for the witness.
15        (Requested portion was read)
16   A.   I don't think that was necessarily the case.
17 I think they bought from us of our breadth of
18 product, the numbers of products we had to offer.  We
19 weren't the cheapest on every single line item,
20 somewhat what Janet Gray refers to in that letter.  So
21 I don't think customers on the broad lines of products
22 made the decisions based upon that -- just that.
23   Q.   (BY MR. WINTER)  On just that?
24   A.   Correct.
25   Q.   Okay.  But let's -- let's be specific here.

17 (Pages 62 to 65)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 66

1  You knew and understood that Abbott's Alternate Site
2  customers, and I want to narrow the focus of the
3  discussion to Alternate Site customers, not the
4  hospital business sector customers, okay?  Fair
5  enough?
6      A.  Sure.
7      Q.  Okay.  And you knew and understood based on
8  your experience that Abbott's Alternate Site customers
9  would evaluate the reimbursement spread in making
10 purchasing decisions?
11         MS. TABACCHI:  Object to the form of the
12 question.
13     A.  Once again, I don't know that for a fact.
14     Q.  (BY MR. WINTER)  You didn't know that?
15     A.  We -- in my time there I didn't have
16 conversations with customers asking those kinds of
17 questions, so I don't know that for a fact.
18     Q.  Well, you say -- when you say you don't know
19 that for a fact, did you have an understanding,
20 whether it was from your direct knowledge or
21 anecdotally from discussions around the office, that
22 customers, among other things, would evaluate the
23 spread on reimbursement on Abbott products?
24         MS. TABACCHI:  Object to the form of the
25 question.

Page 67

1      A.  I would assume that they would analyze that.
2      Q.  (BY MR. WINTER)  Okay.  And you make that
3  assumption based upon the knowledge that you gained in
4  the ordinary course of business when you were the
5  Alternate Site contract manager --
6         MS. TABACCHI:  Object --
7      Q.  (BY MR. WINTER)  -- correct?
8         MS. TABACCHI:  Object to the form.
9      A.  Possibly.
10     Q.  (BY MR. WINTER)  Possibly?
11     A.  I don't recall when I came to that
12 conclusion.
13     Q.  Okay.  You knew that for the -- let's set the
14 pumps aside for a moment and let's talk about the
15 product that was delivered through the pumps --
16     A.  Okay.
17     Q.  -- and the products that were sold by
18 Alternate Site, such as the fluids, such as
19 Vancomycin, okay?  You knew that Abbott published list
20 prices for those products, true?
21         MS. TABACCHI:  Object to the form.
22     A.  The Hospital Products Division did, correct.
23     Q.  (BY MR. WINTER)  Okay.  And you were also
24 aware that those list prices that Abbott published for
25 the products that Alternate Site sold had a

Page 68

1  relationship with AWP, you knew that as well, didn't
2  you?
3         MS. TABACCHI:  Object to the form.
4      A.  Correct.
5      Q.  (BY MR. WINTER)  Okay.  And you understand
6  AWP to stand for average wholesale price?
7         MS. TABACCHI:  Object to the form.
8      A.  Yes.
9      Q.  (BY MR. WINTER)  Okay.  You also understood
10 that third-party payers, including government such as
11 Medicare and Medicaid, would use AWP as a basis or a
12 factor in calculating reimbursement to providers?
13         MS. TABACCHI:  Object to the form.
14         MR. BREEN:  Counsel, what's wrong with
15 that question?
16         MS. TABACCHI:  What's the foundation?
17         MR. WINTER:  That's your objection,
18 foundation?
19         MR. BREEN:  That's your only -- only
20 basis for the objection?  Under the Texas rules we are
21 entitled to know so we can cure it, otherwise we'll
22 proceed and you'll waive any other basis.
23         MS. TABACCHI:  Sure.  What's the
24 foundation for the question?
25         MR. BREEN:  Would you please read the

Page 69

1  question back?
2         MS. TABACCHI:  Go ahead.
3         (Requested portion was read)
4         MS. TABACCHI:  It's also a leading
5  question, but go ahead.
6      A.  Okay.
7      Q.  (BY MR. WINTER)  Did you understand that?
8      A.  Yes.
9      Q.  Okay.  Let me hand you what's been marked in
10 these depositions as Exhibit 61.
11     A.  (Witness reviewing document).
12     Q.  Which purports to be a memorandum from you
13 dated May 26, 1994 to the field sales force and
14 district managers cc'ing several people.  Reference:
15 Current Redbook AWPs.  Bates label is ABT006333 and
16 also AB0019135.
17         So, Mr. Kipperman, do you recognize this
18 as a memorandum that you prepared in the ordinary
19 course of business at Abbott Laboratories?
20         MS. TABACCHI:  Object to the form.
21     A.  I don't know if it was in the ordinary
22 course.  I don't recall doing this often.  I mean, but
23 I see it's signed by me.
24     Q.  (BY MR. WINTER)  Okay.  So you recognize that
25 as your signature?

18  (Pages 66 to 69)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 70

1    A.  Yes.
2    Q.  Okay.  And it's on Alternate Site contract
3  marketing letterhead.  So this is a -- this memorandum
4  memorializes an event which you're communicating to
5  the field sales force, correct?
6    A.  I don't know what it's memorializing.
7    Q.  Well, let's read it.  "As you are aware, on
8  at the beginning of April, Abbott took a list price
9  increase.  This also has an effect AWP (Average
10  Wholesale Price) which Red Book quotes for
11  reimbursement purposes.  Therefore, Mike Heggie was
12  able to get Red Book to send a listing of the 'new'
13  AWPs for all of our products, which will be effective
14  through next April.  I hope this information is
15  helpful and if you have any questions, please feel
16  free to contact me.
17       "Best regards, Steve Kipperman."
18       Did I read that accurately?
19    A.  Yes, sir.
20    Q.  Okay.  So does that help you understand the
21  event that you're communicating to the field sales
22  force?
23    A.  No, I don't recall sending this document.
24    Q.  You don't recall it, but you can read the
25  words --

Page 71

1    A.  I can read --
2    Q.  -- and understand it?
3    A.  -- the words, yes.
4    Q.  Okay.  And, in fact, it appears from the text
5  of the memorandum and from documents that were
6  produced by Abbott Laboratories to the State of Texas
7  in conjunction with that document that, in fact, you
8  did provide to the field sales force a list of the
9  Redbook AWPs.  Would you conclude that from reading
10  that?
11    A.  If you've got the rest of it, I guess.
12    Q.  Well, I do.  I've got -- I'll go ahead and --
13    A.  I would assume so.
14    Q.  I've only got one copy of this, so you and
15  your counsel will have to share, but we'll go ahead
16  and mark this as 480.
17       And for the record, 480 includes Exhibit
18  61, which is the very first page memo, as well as the
19  attachment --
20    A.  Okay.
21    Q.  -- which is the Redbook listing that you've
22  asked to look at.  And it begins with the next Bates
23  number in sequence, which is 37183, you have 182 in
24  front of you, and ends with 37225.  So ... And this
25  is 480 is the combined exhibit that includes 61 as the

Page 72

1  first page.
2    A.  (Witness reviewing document).
3    Q.  Okay, sir.  Does that refresh your
4  recollection that, in fact, you did provide to the
5  sales -- field sales force the Redbook listing of
6  AWPs?
7    A.  I don't recall sending this, but I see that
8  my signature is on this.
9    Q.  Okay.  You see that Abbott certainly has
10  produced to the State of Texas in this litigation
11  documents that would indicate that that's, in fact,
12  what you did?
13    A.  Yes, sir.
14    Q.  Okay.  In your cover memorandum you -- you
15  notify the field sales force that this list price
16  increase has an effect on AWP, which is used for
17  reimbursement purposes, and you go on to state to the
18  field sales force and the district managers that you
19  hope this information is going to be helpful to them.
20  Why is that going to helpful to the field sales force?
21    A.  I don't know.  I don't recall why I sent
22  this.
23    Q.  Well, is that because you knew then, as
24  you've told me that you had some inkling of today,
25  that Abbott's Alternate Site customers in part

Page 73

1  evaluated the reimbursement spread in making
2  purchasing decisions?
3       MS. TABACCHI:  Object to the form of the
4  question.
5    A.  I don't recall.
6    Q.  (BY MR. WINTER)  You knew, didn't you, that
7  Abbott had greater spreads than Baxter and McGaw and
8  Lilly and some of its other competitors on some of the
9  Alternate Site products?
10       MS. TABACCHI:  Object to the form of the
11  question.
12    A.  I don't know that.
13    Q.  (BY MR. WINTER)  You didn't know that?
14    A.  I -- no.  No.
15    Q.  That's information that -- that you just
16  don't know or you disagree with?
17    A.  I don't know for a fact --
18       MS. TABACCHI:  Object to the form.
19    A.  -- by company where the AWPs fell.  We
20  didn't -- that's not something we looked at.
21    Q.  (BY MR. WINTER)  It's not something -- you
22  say "we looked at" --
23    A.  Myself.  I'm just talking for myself here.
24    Q.  Well, do you mean we just me, Steve
25  Kipperman, or do you mean we in the Alternate Site

19 (Pages 70 to 73)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 74

1  contract marketing department?
2        MS. TABACCHI:  Object to the form.
3     A.  I speak -- I'm speaking on behalf of Steve
4  Kipperman and I don't recall seeing any analyses from
5  my people to that effect analyzing everybody else's
6  AWPs.  We didn't have access to AWPs.
7     Q.  (BY MR. WINTER)  Well, let's --
8     A.  As you can tell from the memo here, I had to
9  go to Michael Heggie to get them.
10    Q.  We'll talk about --
11    A.  So it's not information that would have
12 readily been available.
13    Q.  Okay.  And we'll talk about that here in just
14 a second.
15    A.  Okay.
16    Q.  When you say you didn't analyze everybody
17 else's AWPs, is it your testimony that you didn't
18 analyze Abbott's AWPs?
19       MS. TABACCHI:  Object to the form.
20    A.  No.  You just asked me about Baxter, McGaw
21 and somebody else's and I responded to that question.
22    Q.  (BY MR. WINTER)  Okay.  Now my question is:
23 Did you analyze Abbott's AWPs?
24       MS. TABACCHI:  Object to the form.
25    A.  I don't recall having any analysis around

Page 75

1  AWPs.
2     Q.  (BY MR. WINTER)  You state here in this memo
3  that you had to get the Redbook list from Mr. Heggie.
4  Mr. Heggie's testimony, and we've deposed him -- by
5  the way, let me -- strike that question.  Let me ask
6  you this.
7        In preparing for your deposition today,
8  I assume you met with counsel and talked about topics
9  that we're going to be discussing this morning.
10    A.  Yes.
11       MS. TABACCHI:  Object to the form.
12    Q.  (BY MR. WINTER)  Did you review any
13 documents?
14    A.  Just this one.
15    Q.  That's the only document you looked at to
16 prepare for your deposition today?
17    A.  Correct.
18    Q.  Okay.  Were you aware that Mr. Heggie has
19 been deposed in this litigation?
20       MS. TABACCHI:  Object to the question.
21    A.  You just told me that.
22       MS. TABACCHI:  I caution the witness --
23    Q.  (BY MR. WINTER)  Other than me --
24       MS. TABACCHI:  -- not to reveal
25 communications with counsel.

Page 76

1     Q.  (BY MR. WINTER)  Other than my statement,
2  were you aware of the fact that Mr. Heggie has been
3  deposed in this litigation?
4        MS. TABACCHI:  Caution the witness not
5  to reveal any communications with counsel.
6        If you want to ask the witness if he
7  reviewed deposition transcripts, you may.
8     Q.  (BY MR. WINTER)  Can you answer my question
9  without revealing communications to counsel?
10    A.  No.
11    Q.  Did you look at any deposition transcripts?
12    A.  No.
13    Q.  Do you recall the events that are described
14 in this memo from May of 1994 where you're providing
15 the Redbook AWPs that you got from Mr. Heggie to the
16 field sales force?
17       MS. TABACCHI:  Object to the form.
18 Asked and answered.
19    A.  I don't recall this.
20    Q.  (BY MR. WINTER)  You don't recall the act of
21 preparing the memo and --
22    A.  I don't recall this, correct.
23    Q.  You don't recall any of it?
24    A.  I don't -- I don't -- yeah.  This isn't
25 something that we did like on a quarterly basis or,

Page 77

1  you know, something that was a frequent type of report
2  that you would kind of go, "Oh, yeah.  That's
3  something we did normally."  This is something that I
4  don't recall why I sent it and it was something
5  atypical.
6     Q.  Given that it was atypical and given that you
7  didn't have that information readily available and you
8  had to go obtain it from Mr. Heggie, that doesn't
9  stand out in your mind as something that was unusual
10 and, therefore, you have a more vivid memory of it?
11       MS. TABACCHI:  Object to the question.
12 The witness has answered your question several times.
13    A.  Yeah.  No.  This doesn't jump out at me as to
14 why I sent this out.
15       MR. WINTER:  That was a coaching
16 objection, Tina, and I object to your coaching
17 objection.  I think that your objections need to be
18 limited under the Texas rules to "objection, form."
19       MS. TABACCHI:  I understand.  I'm here
20 today on behalf of the defendants in several different
21 cases.  I've been making an effort to follow the Texas
22 rules in light of your previous objections, but you
23 have asked the witness now several times and he's told
24 you that he does not recall.  It's asked and answered
25 and bordering on harassment.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 78

1      MR. WINTER:  Well, Tina, you can make
2  your record, but your objection, if I ask for an
3  explanation, you can explain it, but it needs to be
4  under the Texas rules.  I'm asking these questions in
5  the Texas case.  If some other counsel is asking
6  questions in another case, you can make objections as
7  permitted under those rules.
8      Q.  (BY MR. WINTER)  Mr. Kipperman, Mr. Heggie
9  testified that -- that you hounded him, essentially,
10  to get that Redbook AWP list.
11     A.  Okay.
12         MS. TABACCHI:  Is there a question
13  pending?
14         MR. WINTER:  Yeah, there is.  I'm
15  getting to it.
16         MS. TABACCHI:  Can you please let
17  Mr. Winter --
18         THE WITNESS:  Oh, I'm sorry.
19         MS. TABACCHI:  -- complete his question
20  before you respond?
21         THE WITNESS:  He -- he paused.
22         MS. TABACCHI:  Okay.
23     Q.  (BY MR. WINTER)  Here's my question.  In 1994
24  Mr. Heggie was in what department within Alternate
25  Site?

Page 79

1      A.  I believe the renal group.
2      Q.  And his title was manager of reimbursement,
3  wasn't it?
4      A.  I believe so.
5      Q.  Did you interact with Mr. Heggie on a regular
6  basis?
7      A.  No.
8      Q.  Was it rare for you to interact with
9  Mr. Heggie?
10     A.  He was around the corner.  We'd see each
11  other.  But for interaction, no.
12     Q.  Were you in offices or cubes?
13     A.  I think at this time I was in an office.  I
14  don't recall if he had an office or a cube.
15     Q.  So you would -- because of the proximity from
16  where you were -- of where you were housed, you would
17  see each other on a regular basis?
18     A.  Yeah.  Walking around the halls and whatnot,
19  correct.
20     Q.  Okay.  But is it your testimony that you did
21  not -- that -- that your business duties did not
22  require you to interact with one another on a regular
23  basis?
24     A.  Correct.  We -- it was a separate group.
25     Q.  Okay.  Well, do you have any sense of whether

Page 80

1  Mr. Heggie suggested to you that you should
2  disseminate the AWP information to the field sales
3  force?
4          MS. TABACCHI:  Object to the form.
5      A.  I don't recall why I sent the document to the
6  sales force.
7      Q.  (BY MR. WINTER)  Would it be typical for you
8  on your own initiative to disseminate information to
9  the field sales force?
10     A.  Possibly.
11     Q.  Okay.  You can't recall now whether somebody
12  instructed you to make this informational
13  dissemination to the field sales force; is that true?
14     A.  No, I don't recall.
15     Q.  Did you receive instructions from time to
16  time from any of your superiors to provide information
17  to the field sales force?
18         MS. TABACCHI:  Object to the form.
19     A.  No, not with the contract marketing group.
20  Typically the things we gave to the field sales force
21  were contract anniversary pricing, things like that,
22  that would be routine stuff.
23     Q.  (BY MR. WINTER)  So being that they were
24  routine, you didn't need to get an instruction from
25  your chain of command, it was something that you knew

Page 81

1  you had to do on a regular basis?
2      A.  Correct.
3      Q.  Okay.  Do you recall any other instances
4  where you provided AWP information to the field sales
5  force besides this one?
6      A.  No.  No, I -- I -- I don't.
7      Q.  Is it your testimony that you believe this is
8  the only instance where this happened or alternatively
9  are you saying you simply don't recall any other
10  instances?
11         MS. TABACCHI:  Object to the form.
12     A.  I believe this is the only time this
13  happened.
14     Q.  (BY MR. WINTER)  Do you recall receiving any
15  admonishment from your chain of command -- strike that
16  question.  Let me back up for a minute.
17         When you were in Alternate Site contract
18  marketing from 1990 until approximately 1997, did you
19  have an understanding that it was inappropriate for
20  Abbott personnel to discuss reimbursement issues and
21  spreads with accounts?
22         MS. TABACCHI:  Object to the form.
23     A.  I don't recall any conversations around that.
24     Q.  (BY MR. WINTER)  Okay.  So that -- you don't
25  recall ever receiving any instruction or direction

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 82

1 that it would be inappropriate for the Abbott
2 personnel, whether they were in headquarters or in the
3 field, to discuss reimbursement and spread with
4 accounts?
5    A. Yeah.  I don't recall myself getting that.
6       MR. WINTER:  Can you read the answer
7 back?
8       (Requested portion was read)
9    Q. (BY MR. WINTER)  Okay.  So you don't recall
10 receiving that instruction yourself.
11   A. Correct.
12   Q. Do you recall that such an instruction was
13 disseminated within the company, if not to you
14 specifically?
15   A. I don't know.  I don't recall seeing
16 something of that nature.
17   Q. Okay.
18      MS. TABACCHI:  Ray, let me know when
19 it's a good time to take a quick break.
20      MR. WINTER:  Break?  Sure.  We can take
21 one now.  That's fine.
22      THE VIDEOGRAPHER:  Off the record at
23 11:17.  This concludes Tape 1.
24      (Recess from 11:17 to 11:37)
25      THE VIDEOGRAPHER:  We are back on the

Page 83

1 record at 11:37.  This is the beginning of Tape Number
2 2.
3    Q. (BY MR. WINTER)  Okay, Mr. Kipperman.  Before
4 we took a break we were looking at this document
5 that's marked as Exhibit 61.  And let's go back and
6 look at the text of what you wrote there again.
7       "As you are aware, on at the beginning
8 of April, Abbott took a list price increase."  Now
9 Abbott at the same time wasn't actually increasing its
10 prevailing market prices to its customers, was it?
11      MS. TABACCHI:  Object to the form of the
12 question.
13   A. Explain that to me.
14   Q. (BY MR. WINTER)  At the same time that Abbott
15 took a list price increase, it wasn't also raising its
16 selling price to its customers.
17      MS. TABACCHI:  Object to the form.
18   Q. (BY MR. WINTER)  True?
19   A. The customers have contracts with different
20 dates in April.
21   Q. Okay.
22   A. So they typically would take a price increase
23 on the anniversaries.
24   Q. Is it your testimony that typically in
25 Abbott's negotiated contract pricing that Abbott would

Page 84

1 raise its prices with its customers?
2      MS. TABACCHI:  Object to the form.
3    A. There were provisions for price increases on
4 an annual basis.
5      MR. WINTER:  Objection, nonresponsive.
6    Q. (BY MR. WINTER)  Is it your testimony that
7 typically on an annual basis Abbott would raise the
8 prices that it was actually selling its product to
9 customers?
10      MS. TABACCHI:  Object to the form.
11   A. It varied.  Some prices came down, some
12 prices came up, some prices stayed the same.
13   Q. (BY MR. WINTER)  Well, in your best
14 estimation, based on your experience, did Abbott's
15 prices that were routinely available to its customers,
16 I'm talking about the contract prices that customers
17 actually were purchasing product at, did those
18 typically go up or down over time?
19      MS. TABACCHI:  Object to the form of the
20 question.
21   A. It varied by line item.  I mean, some
22 contracts the whole thing would go down, some of them
23 would go up.  It varied.
24   Q. (BY MR. WINTER)  You can't characterize
25 predominantly that the prices that were available to

Page 85

1 customers routinely went down or up, it just varied
2 depending upon what the product was.
3      MS. TABACCHI:  Object to the form.
4    Q. (BY MR. WINTER)  Is that your testimony?
5    A. It varied, yes.
6    Q. Okay.  So if it varied, then it's true to say
7 that when Abbott is taking a list price increase
8 across the board, Abbott is not taking an increase
9 across the board on all of its contract pricing.
10      MS. TABACCHI:  Object --
11   Q. (BY MR. WINTER)  That would be a true
12 statement, correct?
13      MS. TABACCHI:  Object to the form of the
14 question.
15   A. Abbott as a whole?
16   Q. (BY MR. WINTER)  Well, we are talking
17 about -- yeah.
18   A. Or Alternate Site Product Sales?
19   Q. Let's talk -- okay.  Fair enough.  Let's
20 talk --
21   A. I mean, I'm confused where you're going here.
22   Q. Sure.  Well, let's look at the memo --
23   A. Uh-huh.
24   Q. -- which is Exhibit 61.  Now, at the time
25 that Abbott is taking a list price increase, it's

Page 86

1  taking a list price increase here across the board on
2  the products that are marketed by Alternate Site,
3  correct?
4           MS. TABACCHI:  Object to the form.
5      A.  I'm not -- I don't know for certain that all
6  the prices across the board, as you're stating, were
7  increased.
8      Q.  (BY MR. WINTER)  Well, if you look at the
9  exhibit, which I think was 481, will you agree with me
10 that it is a multipage document that lists certainly a
11 great number of Abbott products.  Would you agree with
12 that characterization?
13     A.  Yes.
14     Q.  Okay.  And these are products that were
15 marketed and sold through Abbott's Alternate Site
16 Product Sales unit, correct?
17          MS. TABACCHI:  Object to the form.
18     A.  They appear to be.
19     Q.  (BY MR. WINTER)  Okay.  And so, again, what
20 you're communicating is that Abbott has taken a list
21 price increase for these products, correct?
22          MS. TABACCHI:  Object to the form.
23     A.  I don't know that every price on here went
24 up.  I don't know that without knowing what it was
25 before, being able to see it.

Page 87

1      Q.  (BY MR. WINTER)  So your testimony is you
2  don't know whether these all went up or not.
3      A.  Correct.
4      Q.  Okay.  Do you know whether when Abbott took a
5  list price increase there was a commensurate increase
6  in the contract pricing for the product which got a
7  list price increase?
8           MS. TABACCHI:  Object --
9      Q.  (BY MR. WINTER)  Do you know the answer to
10 that?
11          MS. TABACCHI:  Object to the form.
12     A.  No, not --
13     Q.  (BY MR. WINTER)  Well, let's talk about --
14     A.  I don't know that.
15     Q.  You say you don't know.  Let's talk about
16 Vancomycin.  Over time did Abbott's market price for
17 Vancomycin go up or down?
18          MS. TABACCHI:  Object to the form of the
19 question.
20     A.  I don't recall over the top of my head -- off
21 the top of my head from that far back the pricing.
22     Q.  (BY MR. WINTER)  Well, and my question,
23 though, it goes back to the early 1990s, certainly,
24 but it extends -- and your tenure in Alternate Site
25 extended through October or November of 2001, correct?

Page 88

1  So October/November --
2      A.  2001 while I was in business development.
3      Q.  Okay.
4      A.  I didn't have anything to do with products at
5  that time that they were selling.
6      Q.  Business development was part of Alternate
7  Site, though, wasn't it?
8      A.  It was higher up the food chain.  I covered
9  Renal and Alternate Site.  I looked -- I went out and
10 looked for new opportunities.
11     Q.  So it was the Alternate Site business unit
12 which had underneath it Alternate Site Product Sales,
13 Renal Care and Home Infusion Services?
14     A.  Correct.
15     Q.  Okay.  And you reported to Don Robertson,
16 right?
17     A.  Yes.
18     Q.  Who was the vice-president for Alternate
19 Site?
20     A.  Yes.
21     Q.  Okay.
22     A.  Yes.  So after I left the national account
23 manager's position I no longer had any involvement in
24 this stuff.
25     Q.  After you left the national account manager's

Page 89

1  position in 1998 you no longer had any involvement in
2  what?
3      A.  In the Product Sales group.
4      Q.  Okay.  In your experience over time between
5  1990 and 1998, did the market prices that Abbott
6  charged customers for Vancomycin generally go up or
7  down, do you recall?
8           MS. TABACCHI:  Object to the form.
9      A.  I don't recall the specific numbers.
10     Q.  (BY MR. WINTER)  You just don't have any
11 recollection one way or another?
12     A.  I don't recall off the top of my head what
13 the numbers were.
14     Q.  Well, I'm not asking you --
15     A.  You know.
16     Q.  Let me make sure my question is clear.
17 Because I'm not asking you to give me, you know,
18 dollars and cents and -- and tell me, "Well, you know,
19 on October 5th, 1994 it went from 6.50 to 5.53."  I'm
20 not asking you that level of detail.  I'm asking you
21 generally --
22     A.  Yeah.
23     Q.  -- do you know whether Abbott's pricing for
24 Vancomycin that it was charging Alternate Site
25 customers went up or down over time?

23  (Pages 86 to 89)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

1    A.  I don't know for a fact if it went down or
2  stayed flat.
3    Q.  Okay.  And when you say you don't know for a
4  fact, do you have a sense?  Do you have -- based upon
5  your experience, do you have a general recollection or
6  a sense as to whether those -- those prices went up or
7  down or stayed flat?
8        MS. TABACCHI:  I object to the form.
9    A.  I -- I don't know.
10   Q.  (BY MR. WINTER)  You don't know.  You just
11 don't know at all?
12   A.  No.
13   Q.  Okay.
14   A.  It's been a long time ago and, I mean, the
15 products we sold, we had over 3,000 list numbers.  I
16 mean, it's a lot of products to know.
17   Q.  Well, I appreciate that.  Were there -- were
18 there any products in particular that -- that were on
19 your radar screen, so to speak, as products that --
20 that Abbott sold a lot of and were heavy hitters, so
21 to speak, for Abbott?
22       MS. TABACCHI:  Object to the form.
23   A.  The biggest area I had to work on was the
24 pumps because it was most labor intensive.
25   Q.  (BY MR. WINTER)  So is it your testimony that

1  you focused on the pumps and that your subordinates,
2  Cindy Dawson and -- and Debbie Longley, were focused
3  more on the product?
4    A.  They would have more activity in that area.
5  I -- you know.  On the other products as well, yeah, I
6  had involvement, but my primary role was the pumps all
7  the way through when I was the specialist and working
8  with creative programs and whatnot for establishing
9  installment sales and things like that for the pumps.
10   Q.  So when you became a NAM, were you focused on
11 pumps as well and not product?
12   A.  Yeah.  Actually, the two years I did that
13 job, the big things I accomplished was a large pump
14 placement, it was over 12 or 1300 ambulatory pumps, to
15 Nations Healthcare, as well as getting their solutions
16 and equipment business awarded, worked on the Coram
17 solutions and equipment bid and we were not -- we did
18 not win that business.  We were not awarded that
19 business.
20   Q.  When you mentioned Nations, is that a -- a --
21 is that a GPO or is that a homecare --
22   A.  It's a homecare chain.
23   Q.  Homecare chain.  And it was affiliated at one
24 time with a company called Chartwell; is that true?
25       MS. TABACCHI:  Object to the form.

1    A.  I believe that was part of the merger.
2  They -- they merged with some companies together.
3    Q.  (BY MR. WINTER)  Chartwell and Nations
4  merged?
5    A.  I don't remember if it was Nations.  I don't
6  know if Nations became the name or who.  It was a
7  number of other smaller entities.
8    Q.  Okay.  And as a NAM you sold the pumps and
9  also the solutions and equipment.
10   A.  Yes.
11   Q.  So the solutions would be the fluids.
12   A.  The I -- this is fluid -- fluid systems.  The
13 business you kind of got broken into three pieces.
14 Injectables, injectable drugs that you're talking
15 about like --
16   Q.  Like Vanco?
17   A.  -- Vancomycin are on a separate contract.
18   Q.  Okay.
19   A.  The fluid systems, the IV solutions, the big
20 liter bags of solution that you hang for hydrating a
21 patient, the nutritional products, the Aminosyn,
22 Liposyn, heavy Dextrose, things that would give you
23 nutrients.  And then you've got the pump contracts.
24   Q.  Okay.  Now, when you say the S&E, solution
25 and equipment --

1    A.  Solutions and equipment.
2    Q.  -- which of those three categories do you
3  place that in?
4    A.  That would be the large volume solutions, the
5  nutritionals, the IV bags, the IV sets --
6    Q.  Okay.  So --
7    A.  -- the equipment.
8    Q.  So -- so solutions and equipment is distinct
9  from the third category, which is just the pumps?
10   A.  Correct.
11   Q.  Okay.
12   A.  Yes.
13   Q.  Okay.  So when you say that you -- you landed
14 the account with Nations, which we've identified as --
15 as having merged with Chartwell, correct?
16   A.  (Nodded head affirmatively.)  Yes.
17   Q.  The account that you landed with them was --
18 was a contract for the purchase of the pumps as well
19 as the solutions and equipment?
20       MS. TABACCHI:  Object to the form.
21   A.  We -- it was -- wasn't simultaneous.  We got
22 the pumps -- it was -- it would have been my last year
23 as a national account manager.  We got the pumps
24 earlier in the year and the solutions and equipment
25 conversation came later.

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 94

1    Q.  (BY MR. WINTER)  Okay.
2    A.  I think -- I think right as I was leaving the
3  job they were converting the account.
4    Q.  Gotcha.  And you sold them both then, both
5  the pumps and the S&E?
6            MS. TABACCHI:  Object to the form.
7    A.  Correct.
8    Q.  (BY MR. WINTER)  Okay.  Looking here at
9  Exhibit 4 -- 61 and 481 (sic), I want to see if we can
10  refresh your memory any and see if this rings a bell.
11  Mr. Heggie testified in one of his prior depositions
12  that -- that he would have questioned the fact that
13  these list prices were increasing and that he would
14  have raised that with you or talked to you about it.
15  Does that ring a bell?
16    A.  No.
17            MS. TABACCHI:  Object to the form.
18    A.  No.  I don't recall any conversations around
19  that.
20    Q.  (BY MR. WINTER)  You don't recall any
21  discussions with Mr. Heggie about this event?
22    A.  No.  Especially since the Alternate Site
23  Product Sales group did not have anything to do with
24  any of the changes for list prices.  That was a
25  separate -- that resided in the hospital business

Page 95

1  sector.
2    Q.  So let me make sure I understand that.
3  You're saying that apart from the Provider pumps that
4  Mr. Elliott was responsible for -- for list price
5  increases on, that for the other products, the
6  responsibility for making adjustments to the list
7  price resided within the hospital business sector
8  contract marketing department; is that true?
9    A.  Correct.
10    Q.  Okay.  And so the fact that these list prices
11  had increased would have been communicated to you by
12  the hospital business sector contract marketing?
13            MS. TABACCHI:  Object to the form.
14    A.  Possibly.  Yeah, possibly that's where it
15  came from.  Possibly came from our marketing manager.
16  Marketing manager could have gotten it from them.
17    Q.  (BY MR. WINTER)  Marketing manager would have
18  been Karla Kreklow?
19    A.  Yes.
20    Q.  Okay.  And do you recall during the many
21  years that you worked with Karla Kreklow that -- that
22  reimbursement was something that was of concern to her
23  and that she discussed around the office?
24            MS. TABACCHI:  Object to the form.
25    A.  Not that I recall.  I don't recall any

Page 96

1  conversations around the office about this kind of
2  stuff.  Sorry.
3    Q.  (BY MR. WINTER)  After you distributed this
4  memorandum May 26, 1994, did anyone pull you aside and
5  say, "Steve, you shouldn't have done that.  That's
6  inappropriate"?
7    A.  Not that I recall.
8    Q.  Do you recall any kind of feedback
9  whatsoever, either positive or negative, with respect
10  to this -- this event in May of 1994 where you
11  communicated these increased list prices to the
12  customers -- excuse me, to the -- to the field sales
13  force?
14    A.  No, I don't.  I don't recall anybody talking
15  to me about it after I did it and I don't remember any
16  calls about it.  It was a nonevent.
17    Q.  It was a nonevent?  You're not suggesting and
18  you're not testifying today that this didn't happen,
19  are you?
20    A.  No, no.  Not that it did not happen, it's
21  just that you're asking if, you know, questions came
22  up and --
23    Q.  Right.
24    A.  -- conversations.  I --
25    Q.  You just don't recall any -- any feedback

Page 97

1  from your chain of command after this?
2    A.  No.
3    Q.  Okay.
4    A.  No.
5    Q.  Do you recall any feedback from the field
6  sales force where they said, "Hey, you know, thanks
7  for sending those AWPs out, Steve.  They really helped
8  us out"?
9    A.  No.  That's what I just mentioned.  I don't
10  recall getting any feedback from anybody.
11    Q.  Either from -- either from your chain
12  command --
13    A.  Internally --
14    Q.  -- or from --
15    A.  -- externally, correct.
16    Q.  Okay.  I asked you a minute ago if
17  Ms. Kreklow was somebody who you knew to have been
18  interested in AWP.  Let me ask you -- I didn't say
19  that.  Let me rephrase my question.
20           I asked you if she was somebody that you
21  knew to be concerned with reimbursement issues.
22    A.  I don't know that.
23    Q.  You don't know that?
24    A.  No.
25    Q.  Okay.  You did have an understanding, as

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 98

1  demonstrated by the document that we just looked at,
2  that AWP, which was connected to Abbott's list price,
3  was used for reimbursement purposes.  You knew that,
4  correct?
5      A.  I understood it was used for reimbursement
6  purposes.  How it was used, no, I did not understand
7  that.  I didn't have appreciation for that.
8      Q.  When you say "how it was used" and your
9  caveat being you didn't know the specific calculation
10  that a third-party payer, such as Medicare or
11  Medicaid, applied to the AWP in order to come up with
12  the reimbursement.
13     A.  Correct.  Or --
14         MS. TABACCHI:  Object to the form.
15     A.  Or how the customers got paid with it.
16     Q.  (BY MR. WINTER)  You did understand, didn't
17  you, that Abbott's Alternate Site customers, the
18  accounts that the Alternate Site field sales force was
19  selling product to, did receive reimbursement from
20  third-party payers, you knew that, didn't you?
21         MS. TABACCHI:  Object to the form.
22     A.  Third-party payers as in --
23     Q.  (BY MR. WINTER)  Such as private insurance.
24     A.  I would assume.
25     Q.  And such as --

Page 99

1      A.  They're -- they're healthcare facilities.
2  They're getting paid from some insurance carrier.
3      Q.  And you also knew that -- that they got
4  reimbursed by government programs such as Medicaid and
5  Medicare, you knew that as well, didn't you?
6      A.  I would assume so.
7         MS. TABACCHI:  Object.
8      Q.  (BY MR. WINTER)  Okay.  Let me hand you
9  what's been marked now as Exhibit 481, which is TXABT
10  131263, which purports to be a document entitled
11  "Notes From Meeting With Karla Krecklow on
12  Reimbursement (7/12/01)."  This is Exhibit Number 481,
13  I believe.  Is that right, 481?
14     A.  481, correct.
15     Q.  Thank you.  Now, in July of 2001,
16  Mr. Kipperman, were you working for Mr. Robertson?
17     A.  Yes.  So I would not have been in the
18  organization with this -- at this time.
19     Q.  Well, in July of 2001 where was Ms. Kreklow
20  within Abbott?
21     A.  She was in Product Sales.
22     Q.  And when you say "Product Sales," do you mean
23  Alternate Site Product --
24     A.  Alternate Site Product Sales.
25     Q.  Okay.  And was she still a marketing manager

Page 100

1  within Alternate Site Product Sales?
2         MS. TABACCHI:  Object to the form.
3      A.  I believe so.  Once again, I'm not with that
4  organization anymore.  I'm up with Don down the hall
5  looking for other stuff, so I wasn't in this
6  organization at this time.
7      Q.  (BY MR. WINTER)  I understood that you had
8  moved from Alternate Site Product Sales up to work
9  directly for Mr. Robertson in the Alternate Site
10  business unit, correct?
11     A.  Correct.
12     Q.  Okay.  How big was Alternate Site total?  How
13  many employees within the Alternate Site business unit
14  that were reporting to Don Robertson?
15         MS. TABACCHI:  Object to the form.
16     A.  I don't know off the top of my head.
17     Q.  (BY MR. WINTER)  What's your best guesstimate
18  based upon your experience?
19     A.  Between Home Infusion, Renal and Alternate
20  Site Product Sales, a couple hundred.
21     Q.  A couple hundred?
22     A.  Couple hundred.  300, maybe.
23     Q.  Save the field sales staff, who were
24  obviously out in the field and scattered around the
25  country --

Page 101

1      A.  Uh-huh.
2      Q.  -- how many were housed at Abbott Park?
3         MS. TABACCHI:  Object to the form.
4      A.  Would have to be a hundred or so.  I don't
5  know off the top of my head an accurate number.
6      Q.  (BY MR. WINTER)  Were -- was the Alternate --
7  were the personnel who worked in the Alternate Site
8  business unit, which included Alternate Site Product
9  Sales, Renal Care, Home Infusion Services, as well as
10  the computer people, right?
11     A.  Yeah.  I don't even know where the computer
12  people were.
13     Q.  Okay.  Well, let's talk about the three units
14  that were, you know, doing the business, the business
15  units:  Alternate Site Product Sales, Home Infusion
16  Services and Renal Care.  Were they all housed
17  together?
18     A.  On two floors in a building.
19     Q.  And -- and the folks that reported directly
20  to Mr. Robertson, such as yourself, who was in new
21  business development, where were you housed?
22     A.  I was down the hall by Don's office.
23     Q.  Okay.  In the same building as the Alternate
24  Site Product Sales?
25     A.  Yeah.  They were in the other wing.

26 (Pages 98 to 101)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 102

1     Q.  Okay.  It was the same building though?
2     A.  Yes.
3     Q.  Okay.  And there were a couple hundred people
4  housed in that building?
5     A.  Yeah.  Yeah.  There was a number of groups in
6  that building.
7     Q.  Was there a regular business meeting that
8  Mr. Robertson would hold on any fixed basis with his
9  three principal subordinates?
10        MS. TABACCHI:  Object to the form.
11    A.  He would do a monthly staff meeting.
12    Q.  (BY MR. WINTER)  Okay.  And when I say "three
13  principal subordinates," let me clarify what I'm
14  talking about.  Make sure you and I are on the same
15  page.  I'm talking about the general managers of
16  Alternate Site Product Sales, Renal Care and Home
17  Infusion Services.
18    A.  Uh-huh.
19    Q.  Does that make sense to you?
20    A.  Yes.
21    Q.  Okay.  And those would have been John Ward
22  initially, followed by Pete Baker for Alternate Site
23  Product Sales, Loreen Mershimer for Renal Care and
24  Mike Sellers for Home Infusion Services, correct?
25        MS. TABACCHI:  Object to the form.

Page 103

1     A.  Not when I was in this role.
2     Q.  (BY MR. WINTER)  When you were in that role
3  tell me where -- where I have made a mistake.
4     A.  When I was working for Don, John was no
5  longer the general manager.  It would have been Pete
6  Baker.  He was over in the Hospital Products
7  Division as VP of sales.  I don't recall if Loreen was
8  heading up Renal when I was doing this.  Susan
9  Rodriguez took it over as the general manager.
10    Q.  She succeed Loreen Mershimer?
11    A.  Correct.
12    Q.  Okay.
13    A.  And then for Home Infusion it would have been
14  Mike.
15    Q.  I believe Mike testified to us just a couple
16  of weeks ago that he actually left Home Infusion
17  Services and went over to contract marketing in the
18  hospital business sector around February of 2000.
19    A.  He may have been over there at that point
20  then.  And then I don't recall who was running Home
21  Infusion off the top of my head.
22    Q.  Do you recall a time where he was wearing
23  both hats, he was doing hospital business sector
24  contract marketing and Home Infusion?
25        MS. TABACCHI:  Object to the form of the

Page 104

1  question.
2     A.  No.  He would have transitioned over.  The
3  time line I may have screwed up, but I don't recall
4  who -- who was running that at that time.
5     Q.  (BY MR. WINTER)  You mentioned monthly staff
6  meetings that Mr. Robertson held, correct?
7        MS. TABACCHI:  Object to the form.
8     A.  Infrequent monthly staff meetings.  They're
9  supposed to be monthly, but they didn't occur on a
10  monthly basis.
11    Q.  (BY MR. WINTER)  Well, when the monthly staff
12  meetings that didn't really occur on a monthly basis
13  happen, who attended?
14    A.  The GMs, the controller and the HR person and
15  myself occasionally.
16    Q.  Other than you as the manager of new business
17  development --
18    A.  Uh-huh.
19    Q.  -- who were the other direct reports that
20  reported to Mr. Robertson other than the folks that
21  we've talked about who were the GMs?
22    A.  It would have been the controller and the
23  manager of HR.
24    Q.  Anyone else?
25    A.  I think that's it.

Page 105

1     Q.  There was no other department or unit that
2  reported directly to Mr. Robertson besides yours and
3  the ones we've mentioned?
4        MS. TABACCHI:  Form.
5     A.  I really didn't have a department.  I was
6  just an individual.
7     Q.  (BY MR. WINTER)  Okay.  Were there any other
8  individuals that had a portfolio such as yours that --
9     A.  No.  No.
10    Q.  You understand my question?
11    A.  Yes.
12    Q.  Okay.
13        MS. TABACCHI:  Good.
14    Q.  (BY MR. WINTER)  Pete Baker at this time
15  would have been the general manager of Alternate Site
16  Product Sales.  You testified to that.  Were Jeff
17  Balzer and Ted Lyjak national account managers?
18    A.  I don't recall.  I don't know if Balzer was a
19  district manager at the time or what -- what his role
20  is.
21    Q.  Do you know Mr. Balzer?
22    A.  Yeah, I recall him.
23    Q.  Did you ever work -- when you were a national
24  account manager, was he one of your colleagues?
25    A.  No.  He was -- I think he was an HPD district

Page 106

1  manager out east someplace at that time.  I believe he
2  came in after I moved on.
3      Q.   Sometime after 1998?
4      A.   Yeah.  Yeah.
5      Q.   What about Mr. Lyjak, do you know him?
6      A.   Yeah.  Ted came in -- I don't recall the
7  exact time frame, but he came in -- I believe he was
8  the manager at distributor relations for Baker.
9      Q.   In your job as the new business development
10 manager --
11     A.   Uh-huh.
12     Q.   -- working for Don Robertson, what -- what
13 did that entail?
14     A.   Go find products to license or acquire to add
15 to the portfolio of the businesses we had.  Primarily
16 focused on the Renal group and then the Product Sales
17 group for additional product lines which Abbott did
18 not make.
19     Q.   So do I understand that you're -- let me
20 rephrase that.
21           I think what you're telling me is that
22 your job involved looking for products that were
23 manufactured by other manufacturers that Abbott would
24 then market to its customers in Renal Care?
25           MS. TABACCHI:  Object to the form.

Page 107

1      A.   Yeah.  That was -- license -- and licensing
2  and acquiring products.
3      Q.   (BY MR. WINTER)  Okay.  So this would require
4  you to interface with not only your customers,
5  understand what their needs were, but also with other
6  manufacturers?
7           MS. TABACCHI:  Object to the form.
8      A.   Actually, not with customers at all in this
9  position.
10     Q.   (BY MR. WINTER)  How did you understand what
11 the -- what the needs of the customers were in order
12 to meet those needs?
13     A.   We went looking for things like generic
14 oncolytics.  You don't need to go talk to customers to
15 understand you need a portfolio of generic oncolytics.
16     Q.   And tell me what generic oncolytics are,
17 please.
18     A.   Oncolytic drugs that are generics.
19     Q.   Well --
20     A.   We --
21     Q.   -- forgive my -- my being a layman here, but
22 is that oncology for cancer treatment?
23     A.   Yes, cancer treatment drugs.  We had an
24 agreement with Pharmacia, and I can't remember what
25 merger they went through.  They went through multiple

Page 108

1  mergers and acquisitions and they terminated our
2  agreement, so we lost a generic oncolytic product
3  line.  So one of my jobs was to go out and find a
4  smaller company that needed more people on the street
5  to sell and market their generic oncolytics.  And in
6  that job -- in that specific transaction we found
7  Gensia and we began distributing Gensia's products.
8      Q.   What were the Gensia products that you began
9  to distribute?
10     A.   Generic oncolytics.
11     Q.   Which particular ones that you recall?
12     A.   Boy, it's a list about this long
13 (indicating).  I don't know the names off the top of
14 my head.  I'm sorry.
15     Q.   Any of them?
16     A.   The Pharmacia name was like Adriamycin.  I
17 don't know what -- I don't know the generic names off
18 the top of my head.  I'm sorry.
19     Q.   I believe you told me earlier that when you
20 were a -- you were within the Alt Site contract
21 marketing department, that you didn't have much
22 involvement with RxLink -- RxLink program.
23     A.   Uh-huh.  Yes.
24     Q.   But your testimony is certainly not that you
25 had no involvement with the RxLink program, is it?

Page 109

1           MS. TABACCHI:  Object to the form.
2      A.   Do you want to ask the question?
3      Q.   (BY MR. WINTER)  Yeah.  I did.
4      A.   I'm sorry.
5           MR. WINTER:  Can you repeat it?
6           (Requested portion was read)
7           MS. TABACCHI:  Object to the form of the
8  question.
9      A.   RxLink was something that resided over in the
10 hospital products main division, the contract
11 marketing group there.  We, on occasion, I can't
12 recall the number of times, but were asked to review
13 it just to make sure, you know, what the pricing
14 looked like for -- for our customers compared to the
15 RxLink.
16     Q.   (BY MR. WINTER)  Well, did you ever make
17 recommendations to folks in the hospital business
18 sector contract marketing department who were
19 responsible to -- for the RxLink program, did you ever
20 make recommendations to those individuals with respect
21 to prices that should be included in the RxLink
22 program?
23           MS. TABACCHI:  Object to the form of the
24 question.
25     A.   Not for things that would be included.  We

28 (Pages 106 to 109)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 110

1  would review it and give them adjustments upwards and
2  downwards recommendation.
3      Q.  (BY MR. WINTER)  Okay.  So you would review
4  the existing pricing in the RxLink program and make
5  recommendations just how that existing pricing should
6  be adjusted upwards or downwards?
7          MS. TABACCHI:  Object to the form of the
8  question.
9      Q.  (BY MR. WINTER)  Is that correct?
10     A.  Not on a frequent basis, correct.
11     Q.  Not on a frequent basis, but you did several
12  times?
13     A.  Yeah, a couple of times, as I recall.
14     Q.  All right.  Let me hand you now what's been
15  marked as Exhibit 482, which is a four-page document
16  beginning with Bates label TXABT36435 and also
17  includes AB 0018385.
18          Please take a look at that and look up
19  when you're finished.
20     A.  (Witness reviewing document).  Uh-huh.
21     Q.  Okay, Mr. Kipperman.  Does this document
22  relate to one of those instances that you've just
23  described for us where you made some recommendations
24  as far as adjustments to the existing RxLink pricing?
25     A.  Yes, it does.

Page 111

1      Q.  Okay.  Who was Harry Adams?
2      A.  He was in the HPD contract marketing group.
3      Q.  And was he --
4      A.  He was a manager.
5      Q.  Pardon me?
6      A.  He was a manager.
7      Q.  Was he in charge of the RxLink program?
8          MS. TABACCHI:  Object to the form.
9      A.  I don't know if he was or not.  We -- our
10  communications all went to him for that stuff.
11     Q.  (BY MR. WINTER)  Your communications all did
12  what?
13     A.  Went to him for this stuff.  So I don't know
14  if he was ultimately responsible for it or if someone
15  else was.  I don't know --
16     Q.  When you say --
17     A.  -- how it was handled over there.
18     Q.  When you say "went to him for this stuff," do
19  you mean your communications with respect to the
20  RxLink program went to Mr. Adams?
21     A.  Correct.
22     Q.  Okay.  Who was James Jackson?
23     A.  He was an analyst.
24     Q.  An analyst where?
25     A.  In the HPD contract marketing group.

Page 112

1      Q.  Okay.  Tell me, if you will, please, what
2  your understanding is of the RxLink program.
3      A.  It's a program that the wholesalers can offer
4  to end-user customers without any contract so that
5  they're not being charged list prices.
6      Q.  Mr. Sellers testified that all of Abbott's
7  largest wholesaler customers were enrolled in the
8  RxLink program by 1993.  Do you have any reason to
9  disagree with that testimony?
10          MS. TABACCHI:  Object to the form.
11     A.  I don't have any basis to judge that.  I
12  didn't deal with wholesalers.
13     Q.  (BY MR. WINTER)  Okay.  So you certainly
14  don't disagree with it, do you?
15     A.  I don't know.  I don't have a basis for fact.
16     Q.  Okay.  He also testified that all of Abbott's
17  wholesaler customers were enrolled in the program by
18  2000.  You don't have any basis to disagree with that
19  either, do you?
20          MS. TABACCHI:  Same objection.
21     A.  I don't have any basis.
22     Q.  (BY MR. WINTER)  Do you see the spreadsheet
23  that is attached to your memorandum?
24     A.  Yes, sir.
25     Q.  This is a memo that you wrote, isn't it?

Page 113

1      A.  Yes.  It appears so.
2      Q.  Okay.  And that's your initials by the name
3  "From:  Steve Kipperman"?
4      A.  Yes.  That's my first name, yes.  Steve.
5      Q.  Right.  Does it say Steve or does it just
6  say --
7      A.  Yes, it's Steve.
8      Q.  The e-v-e just faded out?
9      A.  Kind of my signature.  Sorry.
10     Q.  Okay.  In the upper right-hand side do you
11  see the handwritten notes?
12     A.  Something from Harry about seeing -- can't
13  read the writing.  By the 24th.
14     Q.  Does that say, "Mark FYI"?
15     A.  I don't --
16          MS. TABACCHI:  Object to the form.
17     A.  I can't read it myself.
18     Q.  (BY MR. WINTER)  Okay.  And then as best as
19  you can, what do you believe the handwriting to
20  indicate underneath the -- what I thought was "Mark
21  FYI"?
22          MS. TABACCHI:  Object to the form.
23     A.  As you can read it, I can just see that "I
24  would like to see" CRM, CRN "on this by the 24th.
25  Thanks Harry."

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 114

1    Q.  (BY MR. WINTER)  And then does that say 10/10
2  underneath the word "Harry"?
3         MS. TABACCHI:  Object.
4    A.  Appears so.
5    Q.  (BY MR. WINTER)  Okay.  And do you believe
6  that to be a handwritten note from Harry Adams?
7    A.  I would assume so, since it's on the note
8  from me to him.
9    Q.  Did you prepare the spreadsheet that is
10  attached to your memorandum?
11    A.  I don't recall, but it appears so.
12    Q.  Does this appear to be in the format of the
13  kind of spreadsheet that you typically would prepare?
14         MS. TABACCHI:  Object to the form.
15    A.  For looking at these RxLink recommendations?
16    Q.  (BY MR. WINTER)  Yes, sir.
17    A.  Yeah.
18    Q.  So you had an Excel program or some other
19  spreadsheet generating program on your desktop
20  computer that you would have used to generate this
21  table?
22    A.  It would have been --
23         MS. TABACCHI:  Object to the form.
24    A.  -- either Lotus or Excel.  I don't recall
25  it -- Lotus or Excel.  I don't recall the program we

Page 115

1  had.
2    Q.  (BY MR. WINTER)  And that would have been
3  your typical practice to prepare a spreadsheet that
4  looked like this --
5         MS. TABACCHI:  Object --
6    Q.  (BY MR. WINTER)  -- correct?
7         MS. TABACCHI:  Object to the form.
8    A.  For looking at these RxLink recommendations?
9    Q.  (BY MR. WINTER)  Yes, sir.
10    A.  Yeah, possibly.
11    Q.  Okay.  Well, possibly or is that typically
12  what you did?
13    A.  I don't know.  Do you have another one to see
14  if I changed format two years later?  I don't know.
15    Q.  I don't.  This is the one I've got.
16    A.  I don't know if I had a format I stuck with
17  all the time.  I -- you know.
18    Q.  Well, do you recall whether you ever changed
19  the font or the format on your Lotus or your Excel
20  spreadsheet?
21         MS. TABACCHI:  Object to the form.
22    A.  I don't know that.
23    Q.  (BY MR. WINTER)  Well, I'm not -- let me --
24  let me try another question.
25    A.  Okay.

Page 116

1    Q.  Rephrase the question here.
2         Do you recall whether you ever changed
3  the format of your Lotus or Excel spreadsheet in doing
4  your analyses?
5         MS. TABACCHI:  Object to the form.
6    A.  I don't know for a fact if I did or didn't.
7    Q.  (BY MR. WINTER)  You just have no
8  recollection of it?
9    A.  No.  I -- I don't know.
10    Q.  Well --
11    A.  I don't know if I used Times Roman versus
12  Helvetica or what format I used, you know.  I --
13    Q.  Well, typically in your job today when you go
14  into -- did you prepare spreadsheets in your job
15  currently?
16    A.  Yeah.
17    Q.  Okay.  When you walk into the office today,
18  generally speaking, and you're preparing a
19  spreadsheet, do you change the format or the font size
20  on your spreadsheet?
21    A.  Actually, today, frequently.
22    Q.  You change it all the time?
23    A.  Yeah.  The problem is a lot of my analyses I
24  do today the spreadsheets are so big or small that I'm
25  changing font sizes all the time.

Page 117

1    Q.  Are you changing just the size from like 12
2  point to 13 or 11 or 10, something like that?
3    A.  It can -- it can vary.  It can vary from font
4  size to the font itself.
5    Q.  To the font itself?
6    A.  Oh, yeah.
7    Q.  So you just -- whatever strikes you as
8  appropriate, you'll change it up?
9    A.  Whatever will work and fit.
10    Q.  Okay.  Now, this particular one you think is
11  one that you actually did on your computer --
12    A.  I don't know if it was on my computer or if
13  one of the analysts did it.
14    Q.  Was it your --
15    A.  I don't know.
16    Q.  In preparing the spreadsheets that you would
17  submit to contract marketing in the hospital business
18  sector relating to proposed changes to RxLink pricing,
19  is that a task that you would delegate down to your
20  two subordinates or is that something you would have
21  done yourself?
22    A.  No.  It's likely that I would have asked
23  Cindy to -- to run the numbers for me and then have me
24  go over it.
25    Q.  Cindy Dawson?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 118

1    A.  Yeah.
2    Q.  Is the RxLink program and the adjustments to
3  the recommended pricing in the RxLink program an area
4  that was within her purview specifically or could it
5  have been Cindy or Debbie?
6    A.  This --
7        MS. TABACCHI:  Object to the form.
8    A.  This is one that could have floated around of
9  whoever was available to work on it at the time.
10   Q.  (BY MR. WINTER) And -- and your answer is
11  "it could have floated around."  I'm asking for your
12  best recollection.  Did it float around between Cindy
13  or Debbie?
14   A.  I don't recall.
15   Q.  You don't know.  Okay.
16   A.  Yeah.
17       MS. TABACCHI:  Let me know when a good
18  time is to break for lunch.
19       MR. WINTER:  Well, why don't we -- let's
20  go off the record real quick and talk logistics.
21       THE VIDEOGRAPHER:  Off the record at
22  12:13.
23       (Lunch recess from 12:13 to 1:11)
24       THE VIDEOGRAPHER:  Stand by, please.
25  Back on the record at 1:11.

Page 119

1    Q.  (BY MR. WINTER) Good afternoon,
2  Mr. Kipperman.  Would you please take a look at
3  Exhibit 482.  We were looking at it shortly before
4  lunch.
5    A.  Sure.
6    Q.  And if you look at the spreadsheet on the
7  attached, can you kind of navigate me around this,
8  what you're -- what you're presenting to Mr. Adams?
9    A.  Would have shown our list number, the product
10  description, case size, and then the RxLink to
11  customer price that's proposed, Amerinet, which is a
12  large hospital GPO.  It looks like it appears plus 15
13  percent.  And then the recommended RxLink to customer
14  price.
15   Q.  So the column that's headed 2 -- 2 -- excuse
16  me, "2565 Current Rx Link Cust," that would be the
17  price that was currently in the Rx system for the
18  RxLink customer price, correct?
19       MS. TABACCHI:  Object to the form.
20   A.  Appears so.
21   Q.  (BY MR. WINTER) And then you have a column
22  that says, "Amerinet +15%."  And on that first entry
23  15 percent added to zero is still zero, right?
24   A.  Uh-huh.
25   Q.  And then you've got a recommended RxLink

Page 120

1  customer.  So that first entry, the "LTA II Kit," you
2  were recommending a price of $6; is that right?
3    A.  Yes.
4    Q.  Okay.  Why do you have the column for
5  Amerinet plus 15 percent?
6    A.  That was a large hospital-based group that
7  you kind of use that as a benchmark.
8    Q.  So let's look at the next entry for Aminosyn
9  II three and a half percent 1,000 milliliters.  Do you
10  see that?
11   A.  Yes.
12   Q.  Size is six.  That means there's six vials in
13  a package?
14   A.  Six bags, yeah.
15   Q.  Six bags.  Okay.  And the current RxLink
16  customer price was $13.86; is that right?
17   A.  Correct.
18   Q.  The Amerinet price plus 15 percent would be
19  $13.62?
20   A.  Yes.
21   Q.  And you're not recommending any change there
22  because your recommendation is, again, $13.86, right?
23   A.  Okay.
24       MS. TABACCHI:  Object --
25   Q.  (BY MR. WINTER) Is that true?

Page 121

1    A.  That's what it appears.
2    Q.  Okay.  And you said that the Amerinet pricing
3  was used as a benchmark.  A benchmark for what?
4    A.  Pricing in the Alternate Site.
5    Q.  Pricing analogy?
6    A.  Pricing in the Alternate Site.
7    Q.  Pricing in the Alternate Site.  So can you
8  flush that out for me?  What do you mean as a
9  benchmark for pricing in the Alternate Site?
10   A.  It was a large hospital -- large contract on
11  the hospital side.  So you would utilize that plus a
12  proxy to arrive at pricing for the smaller Alternate
13  Site customers, possibly.
14   Q.  You were trying to get into the ballpark for
15  the sales through Alternate Site to get -- be in the
16  same ballpark as the sales in the hospital business
17  sector?
18   A.  No.
19       MS. TABACCHI:  Object to the form.
20   Q.  (BY MR. WINTER) No?
21   A.  No.  No.  The thing you were trying to do is
22  gauge based upon -- the pricing was determined volume,
23  Amerinet, big contract.
24   Q.  Okay.
25   A.  Contract term.  Typically these contracts for

31 (Pages 118 to 121)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 122

1  the solutions and equipment, the injectables, were for
2  three to five years with price, you know, changes
3  within that -- within the contracts. Breadth of
4  product the people were committing to, things like
5  that. So this is just a -- this was a proxy.
6      Q. Okay. But what use is it as a proxy? Are
7  you trying to get close to or somewhere in the range
8  of what Amerinet was able to purchase?
9      A. Plus 15 percent.
10     Q. Plus 15 percent. Okay.
11     A. Yeah. With RxLink anybody without a contract
12  could get that price.
13     Q. Okay.
14     A. Which that's what RxLink was set up for.
15     Q. Pardon me?
16     A. RxLink was set up just for that purpose for
17  people without contracts.
18     Q. RxLink -- the RxLink system included the
19  RxLink customer price, correct?
20     A. That I knew of, correct.
21     Q. And it also included RxLink WAC price,
22  correct?
23          MS. TABACCHI: Object to the form.
24     A. That I don't have any familiarity with.
25     Q. (BY MR. WINTER) Do you have any idea what

Page 123

1  RxLink WAC pricing was?
2      A. No, I'm sorry. I didn't deal with the
3  hospital side for that stuff.
4      Q. Did you know what RxLink acquisition price
5  was?
6      A. No.
7      Q. The distributors that your Alternate Site
8  Product Sales sold to purchased at what price?
9          MS. TABACCHI: Object to the form.
10     A. Which distributors?
11     Q. (BY MR. WINTER) The Alternate Site
12  distributors.
13     A. Ones that were on chargebacks or ones that
14  were not on chargebacks?
15     Q. Well, let's take them both. Is it your
16  testimony that -- that Alternate Site sold to
17  distributors, some of whom were on chargeback and some
18  of whom were not?
19     A. I believe, I don't recall specifics, but I
20  believe some were on chargebacks and some were not.
21     Q. Okay. For the distributors who were on
22  chargeback, what was the price that Alternate Site
23  sold to those distributors at?
24          MS. TABACCHI: Object to the form.
25     A. Whatever that distributor would be able to

Page 124

1  sell it to them for. They bought it -- as a
2  distributor they bought Product A, took possession of
3  it, warehoused it, and they had the independent
4  decision on what to sell it for.
5      Q. But when -- when the distributor purchased
6  the product from Abbott, did it purchase the product
7  from Abbott at a negotiated price between the
8  distributor and Abbott?
9          MS. TABACCHI: Object to the form.
10     A. From Abbott to the distributor depending on
11  what contract they're on.
12     Q. (BY MR. WINTER) Okay. And that was
13  called --
14     A. Like -- like that other distributor you
15  showed me earlier, that would have been a PBI
16  distributor contract.
17     Q. Right.
18     A. He would have bought it at that contract
19  price --
20     Q. Okay.
21     A. -- and sold it for whatever the customer
22  agreed to with them.
23     Q. So --
24     A. And that was -- you know, Abbott didn't
25  dictate those prices.

Page 125

1      Q. When you say "Abbott didn't dictate those
2  prices" in your sentence just now, you're referring to
3  the prices at which the distributor sold the product,
4  correct?
5      A. Correct.
6      Q. Okay. I'm focusing right now on the
7  transaction where the distributor purchases the
8  product from Abbott. Okay?
9      A. Okay.
10     Q. So in the scenario that you're describing,
11  you're talking about, I believe the example that we
12  first looked at was a distributor, Florida Infusion,
13  that was a member of PBI; is that correct?
14     A. Correct.
15     Q. Okay.
16     A. That's what I'm referring to.
17     Q. So that distributor, Florida Infusion, would
18  have purchased Abbott product under the PBI contract,
19  correct?
20     A. The PBI distributor contract.
21     Q. Are you differentiating between a PBI
22  distributor contract and some other PBI contract?
23     A. Yes. There were multiple PBI contracts.
24     Q. Okay. Explain that for me, please. What do
25  you mean by that?

32 (Pages 122 to 125)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 126

1    A.  I believe there was an all member kind of a
2  contract, a committed contract where the customers
3  committed that they would get better pricing and/or
4  performance rebate of some sort.  I don't recall the
5  details.  And then you had a distributor contract.
6    Q.  Did you work on the PBI account when you were
7  in Alternate Site contract marketing?
8        MS. TABACCHI:  Object to the form.
9    A.  Not a lot.  I was familiar with it.  A lot of
10  that, the national account manager, obviously, worked
11  on it, but I don't recall a lot of detail around
12  working on that.
13    Q.  (BY MR. WINTER) Who was the national account
14  manager responsible for PBI?
15    A.  Varied while -- the time I was there.  Chris
16  Snead was initially and then Jack Miller, Mary Beth
17  Manso was at one point.
18    Q.  I'm sorry, Mary Beth who?
19    A.  Mary Beth Manso.
20    Q.  How do you spell the last name?
21    A.  M-a-n-s-o.
22    Q.  M-a-n-a-s-o?
23    A.  M-a-n, Manso.
24    Q.  M-a-n-s-o.  Is Mary Beth Manso still an
25  Abbott employee?

Page 127

1    A.  I don't have an idea on that one.
2        MS. CONNOLLY:  I'm sorry.  I'm having a
3  harder time hearing the witness after lunch.  Would
4  you guys adjust the phone a little bit?
5        MS. TABACCHI:  Is that better?  Does
6  that make any difference?
7        THE WITNESS:  Is that better?
8        MS. CONNOLLY:  Yeah, that seems a little
9  bit better.  Thank you.
10        THE WITNESS:  All right.
11    Q.  (BY MR. WINTER) Mr. Kipperman, in your
12  interaction with PBI during the time period that you
13  were a -- in the Alternate Site contract marketing
14  department, do I understand accurately that you would
15  interface with PBI through your NAM?
16    A.  Correct.
17    Q.  Okay.  So would you prepare, for example, an
18  analysis of the PBI contract that you would share
19  with -- with the NAM, that the NAM could use in
20  negotiating the pricing with PBI?
21        MS. TABACCHI:  Object to the form.
22    A.  It would vary.  The NAM would do it, I would
23  do it, an analyst would do it.
24    Q.  (BY MR. WINTER) Was there one of your
25  analysts that was devoted to PBI?

Page 128

1    A.  I don't recall how -- who got what accounts
2  off the top of my head.  It's been a number of years
3  ago.
4    Q.  Well, let me ask you this question:  Was it
5  your practice to assign certain accounts to Debbie
6  Longley and certain other accounts to Cindy Dawson?
7    A.  Yes.
8    Q.  Okay.  But you --
9    A.  I tried splitting the workload up.
10    Q.  Okay.  But you just don't recall which one of
11  those individuals, Debbie or Cindy, was responsible
12  for PBI; is that --
13    A.  Correct.
14    Q.  Okay.
15    A.  Correct.
16    Q.  And you mentioned that Christine Snead was
17  the NAM at one time for PBI, correct?
18    A.  Yes.
19    Q.  And Jack Miller was also a NAM for PBI?
20    A.  Yes.
21    Q.  And Mary Beth Manso.
22    A.  Yes.  I believe she also had them, too, yes.
23    Q.  Do you recall any other national account
24  managers who had responsibility for PBI during the
25  time period you worked at Abbott?

Page 129

1    A.  Not during the time period I worked in the
2  department.
3    Q.  When you say "the department," you mean
4  Alternate Site Product Sales?
5    A.  Correct.  After that I lost touch with who
6  did what.
7    Q.  In your discussions with Chris Snead relating
8  to the PBI account, did you ever gain an understanding
9  that PBI was one of those customers who would evaluate
10  pricing and make purchasing decisions in part based
11  upon the spread?
12        MS. TABACCHI:  Object to the form.
13    A.  That I don't know.  I don't recall any
14  conversations with Chris to that effect.
15    Q.  (BY MR. WINTER) Do you recall any
16  discussions with Chris regarding AWPs, reimbursement
17  or spreads?
18    A.  No, sir.
19    Q.  None whatsoever?
20    A.  No, sir.
21    Q.  You don't recall those -- is it your
22  testimony that -- that such discussions could have
23  occurred and you just don't recall them, or
24  alternatively is it your testimony today that you
25  simply had no such discussions with Chris Snead?

33 (Pages 126 to 129)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 130

1    A.  I don't --
2         MS. TABACCHI:  Object to the form.
3    A.  I don't recall those conversations, if they
4    occurred.
5    Q.  (BY MR. WINTER)  So they could have occurred,
6    you just don't have any recollection of them?
7         MS. TABACCHI:  Object to the form.
8    A.  Correct.
9    Q.  (BY MR. WINTER)  Okay.  Dennis Walker gave
10   testimony which -- are you aware of that?
11        MS. TABACCHI:  Object to the form.
12   Q.  (BY MR. WINTER)  That Mr. Walker has given
13   testimony in pricing litigation?
14        MS. TABACCHI:  Caution the witness not
15   to reveal any attorney-client communications.
16   A.  Other than the conversations I've had with my
17   attorneys, no.
18   Q.  (BY MR. WINTER)  Well, I'm not asking you
19   about the substance of any conversations that you had
20   with your attorneys.  I'm not asking you to tell me
21   anything that your attorney told you.  I'm just simply
22   asking you do you know that Dennis Walker gave
23   testimony in pricing litigation?
24   A.  Outside of that conversation, no.
25   Q.  Okay.  I'll represent to you --

Page 131

1    A.  Okay.
2    Q.  -- that Mr. Walker has given testimony in
3    pricing litigation in West Virginia.  There was a
4    lawsuit filed by the State of West Virginia.  And
5    Mr. Walker has testified that he discussed AWPs and
6    reimbursement with you.
7    A.  Uh-huh.
8    Q.  Do you have any recollection of the
9    conversations that you had with Mr. Walker regarding
10   average wholesale price or reimbursement issues?
11   A.  No.  I don't recall a conversation with
12   Dennis.
13   Q.  And is your answer, again, similar to the
14   answer you gave me with respect to conversations with
15   Chris Snead, in that such conversations could have
16   occurred between you and Dennis Walker, you just
17   simply don't recall them?
18   A.  Could have.  I don't recall.  It's a long
19   time ago.
20   Q.  Long time ago when you were in Alternate Site
21   contract marketing?
22   A.  Long time ago when I -- it's 13 years ago
23   when I was there, 14 years ago.  Yes, it's a long time
24   ago.
25   Q.  Since you've started as the manager of

Page 132

1    Alternate Site contract marketing?
2         MS. TABACCHI:  Object to the form.
3    A.  Yes, since I was there.
4    Q.  (BY MR. WINTER)  And it's been -- let me --
5    let me just go ahead and hand you what we're going to
6    now mark as Exhibit 483.  And this is an excerpt from
7    a deposition that -- excerpt from a deposition given
8    by Mr. Walker in litigation brought by the State of
9    West Virginia.  The testimony was given on Thursday,
10   June 30th, 2005 and it begins at Bates label TX ABT
11   60673 is the first page.  And this is not the entirety
12   of the deposition, but it's an excerpt.
13        And I'll refer you to -- in the upper
14   right-hand corner it says Page 37 and in the lower
15   right-hand corner is Bates label 60709, which is the
16   third page of the excerpt.  Do you see that?
17   A.  37.
18   Q.  Upper right-hand corner is 37.
19   A.  Yes.
20   Q.  Yes, sir.  And on Line 18 is a question from
21   the counsel who was taking the deposition.
22        "Question:  Did any customers ever ask
23   you what the AWPs were for Abbott products?"
24        "Answer:  Yes."
25        And then moving on to Page 38.

Page 133

1    A.  Line 13?
2    Q.  Line 18.
3    A.  Oh.  You said 13.  I'm sorry.
4    Q.  Did I say 13?
5    A.  Yeah.
6    Q.  I misspoke.  Line 18.
7         "Question:  Did any customers ever ask
8    you what the AWPs were for Abbott products?"
9         And the answer given by Mr. Walker is
10   "Yes" on Line 20.  Do you see that?
11   A.  Yes.
12   Q.  Okay.  And if you go on to the next page,
13   Page 38, Line 14.
14        "Question:  Did you talk about -- did
15   you ever have a conversation about AWPs with any other
16   Abbott" employee?
17        And Ms. Tabacchi, who was defending
18   Mr. Walker's deposition, said, "I object to the form."
19        And then the witness says, "Yes" on Line
20   17.  Do you see that?
21   A.  Yes.
22   Q.  Okay on Line 19.  "Who did you talk to within
23   Abbott about AWP or AWPs?
24        "Answer:  It would have been Steve
25   Kipperman."  Do you see that?

34  (Pages 130 to 133)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 134

1    A.  Yes, sir.
2    Q.  Okay.  On the bottom of the page at Line 24.
3        "Question:  Did you talk to
4  Mr. Kipperman, have a conversation with him concerning
5  AWPs ... on more than one occasion?"
6        Again there's an objection and then the
7  witness answered at Line 4, "I would have to say yes."
8  Do you see that?
9    A.  Yes.
10   Q.  Okay.  It -- it indicates that Mr. Walker had
11 certainly more than one conversation with you about
12 AWPs.  Do you -- does that refresh your recollection
13 that you had multiple conversations with Mr. Walker
14 about AWPs?
15       MS. TABACCHI:  Object to the form.
16   A.  No, it doesn't.
17   Q.  (BY MR. WINTER)  Do you -- Mr. Walker goes on
18 in the rest of this document on Line -- on Page 39,
19 question on Line 6.
20       "What do you recall" --
21   A.  Excuse me.
22   Q.  -- "talking to Mr. Kipperman about" --
23       MS. TABACCHI:  Hang on.
24   A.  I lost you.  Where are you?
25   Q.  (BY MR. WINTER)  Page 39.

Page 135

1    A.  Okay.
2    Q.  Line 6.
3    A.  Okay.
4    Q.  "Question:  What do you recall talking to
5  Mr. Kipperman about in terms of -- on the subject of
6  AWPs?
7        "Answer:  Well, there was information
8  that our representatives were periodically asked for
9  by their customers.
10       "Question:  So did you just mention to
11 him that this AWP information was requested by a
12 customer or did you ask Mr. Kipperman for information
13 regarding the AWPs?  I didn't quite understand your
14 last answer."
15       Again there's an objection and
16 Mr. Walker answers at Line 16.
17       "It was an observation that he and I
18 both made that there was information our
19 representatives were periodically" asking "for."
20       Do you see that?
21   A.  Yes, sir.
22   Q.  Okay.  Did you -- do you recall observing and
23 experiencing the fact that your field representatives
24 were asking for AWP information?
25   A.  I --

Page 136

1        MS. TABACCHI:  Object to the form.
2    A.  I don't recall those kinds of questions.
3    Q.  (BY MR. WINTER)  You don't recall what?
4    A.  I don't recall those kinds of questions from
5  the field sales force.
6    Q.  So you don't recall ever discussing AWPs or
7  reimbursement issues with the field sales
8  representatives?
9    A.  I don't recall having any conversations.
10   Q.  And you don't recall any conversations you
11 had about AWPs or reimbursement with Dennis Walker?
12   A.  No.
13       MS. TABACCHI:  Object to the form.
14   Q.  (BY MR. WINTER)  No?
15   A.  No, sir.
16   Q.  Do you have any reason to believe that
17 Mr. Walker was testifying untruthfully when he
18 testified under oath about these discussions?
19       MS. TABACCHI:  Object to the form.
20   A.  No.  Just my memory might not be as good as
21 his.
22   Q.  (BY MR. WINTER)  Okay.
23   A.  I don't recall having many, you know.
24   Q.  So you're not saying these discussions didn't
25 occur, you're just saying you don't remember them?

Page 137

1        MS. TABACCHI:  Object to the form.
2    A.  Correct.
3    Q.  (BY MR. WINTER)  Okay.
4    A.  I don't recall having these conversations.
5    Q.  Now, with respect to PBI and the PBI
6  contract, part of your duties and responsibilities as
7  the director of -- excuse me, the manager of Alternate
8  Site contract marketing would be to communicate the
9  actual negotiated pricing to the account, to the
10 customer, in this case PBI; is that true?
11   A.  No.
12       MS. TABACCHI:  Object to the form.
13   Q.  (BY MR. WINTER)  No?
14   A.  No.  PBI would do that.
15   Q.  PBI would do that.
16   A.  PBI would notify their membership of their
17 pricing.
18   Q.  Okay.  Maybe my question includes some words
19 that -- that -- that cause you to misunderstand my
20 question --
21   A.  Okay.
22   Q.  -- so let me take another crack at it.
23       As part of this process of negotiating
24 pricing with GPOs, as I understand it, your shop, the
25 Alternate Site contract marketing department, would

35 (Pages 134 to 137)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 138

1   work with the national account manager and, among
2   other things, would prepare proposal analyses for the
3   NAMs, which the NAMs would use in their negotiation
4   with the customer, the GPO; is that correct?
5          MS. TABACCHI:  Object to the form.
6      A.  Correct.
7      Q.  (BY MR. WINTER)  And when that discussion
8   between the NAM and the GPO, and let's use PBI as the
9   GPO for our example, okay?
10     A.  Okay.
11     Q.  When that discussion between PBI and the NAM
12  results in an agreement that we're going to have a
13  contract, then there's a price that the PBI members
14  are entitled to buy the Abbott products at under the
15  contract, correct?
16     A.  Correct.
17     Q.  Okay.  And is it part of your responsibility
18  as the manager of Alternate Site contract marketing to
19  communicate that price to PBI?
20         MS. TABACCHI:  Object to the form.
21     Q.  (BY MR. WINTER)  That agreed upon pricing?
22     A.  To PBI?
23     Q.  Yeah.
24     A.  The GPO, the headquarters, correct.
25     Q.  Right.  That's my question.

Page 139

1      A.  Yes.  Yes.
2      Q.  Okay.  And, in fact, here at Exhibit 484, I
3   think we have an example of one of those
4   communications from you to PBI, is that true?  And
5   I'll state for the record, this is a letter from you
6   to Mr. Paul Pelanek dated September 11, 1995 regarding
7   Vancomycin and it is Bates labeled TXABT 410011.
8      A.  (Witness reviewing document).  Okay.
9      Q.  And my question to you, sir, is this -- is
10  this an example of a situation where you're
11  communicating to the GPO the negotiated contract
12  pricing that's available to those -- to the members of
13  that GPO?
14     A.  Correct.
15     Q.  Okay.  And in particular the pricing here is
16  for Vancomycin, which is a drug we've talked about
17  somewhat this morning, correct?
18     A.  Yes, sir.
19     Q.  Okay.  And there are three different package
20  sizes of the Vanco that are listed on this letter.
21  There's the 500 milligram, 4332-01, the one gram,
22  6533-01, and the five gram, 6509-01.  Do you see that?
23     A.  Yes.
24     Q.  And the one in the middle there, the one gram
25  Vanco 6533-01, that's the Vancomycin flip-top vial,

Page 140

1   isn't it?
2          MS. TABACCHI:  Object to the form.
3      A.  It's a one gram.  I don't know if it's a
4   flip-top or what the packaging format is.
5      Q.  (BY MR. WINTER)  You don't know whether
6   that's the flip-top or the ADD-Vantage?
7      A.  I don't know off the top of my head.
8      Q.  Okay.  The price that's available there, that
9   $6.04 per unit, that would be the price that's
10  available to PBI's customers, correct, when they're
11  buying on the PBI -- excuse me.  Let me rephrase.
12         That's the price, isn't it, that's
13  available to the members of PBI who were purchasing
14  under the PBI contract, correct?
15     A.  Correct.
16     Q.  And who are PBI's members?
17         MS. TABACCHI:  Object to the form.
18     A.  All kinds of Alternate Site customers.
19     Q.  (BY MR. WINTER)  Are they home infusion
20  pharmacies?
21         MS. TABACCHI:  Object to the form.
22     A.  There's all kinds.  I mean, there's home
23  infusion pharmacies.  I mean, I don't recall off the
24  top of my head all the different customers.
25     Q.  (BY MR. WINTER)  Well, do you recall

Page 141

1   generally the times -- the kinds of customers that --
2   let me rephrase the question.  Strike that.
3          It's true that Abbott was selling
4   through its Alternate Site sales force, the Alternate
5   Site Product Sales, to customers who purchased Abbott
6   products in a setting that was alternative to the
7   hospital setting, hence the name Alternate Site,
8   correct?
9      A.  Correct.
10     Q.  Okay.  And those Alternate Site customers
11  generally included infusion pharmacies, surgery
12  centers, long-term-care facilities, correct?
13     A.  Yes.
14     Q.  Did I leave anybody out as a -- as far as a
15  general description of the kinds of customers you had
16  in Alternate Site?
17         MS. TABACCHI:  Object to the form.
18     A.  No.  Those would have been -- PBI would have
19  had all those kinds of members.
20     Q.  (BY MR. WINTER)  Okay.  Thanks.  So this is
21  the price at which long-term-care facilities, home
22  infusion pharmacies and surgery centers who were
23  members of PBI could purchase these drugs?
24     A.  Correct.
25     Q.  Okay.  Now, you knew, didn't you, that the

36 (Pages 138 to 141)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 142

1  list price that Abbott was reporting for Vancomycin
2  was dramatically higher than the contract pricing that
3  was available to PBI customers?
4        MS. TABACCHI:  Object to the form.
5  A.  I don't know what the list price was, but
6  sure.  I mean, I --
7  Q.  (BY MR. WINTER)  You didn't know what it was
8  precisely --
9  A.  No.
10  Q.  -- at the time you wrote this letter?
11  A.  No.  You know --
12  Q.  But you knew it was dramaticallily higher
13  than $6.04 for this one gram Vanco, didn't you?
14        MS. TABACCHI:  Object to the form.
15  A.  Define dramatically.  You know.
16  Q.  (BY MR. WINTER)  Significant.
17  A.  Quantify that.
18  Q.  Did you know it was higher?
19  A.  Yes.
20  Q.  Okay.
21  A.  It would have been.
22  Q.  Would it surprise you for the same time
23  period that Abbott was reporting a $62.80 AWP and a
24  $52.94 direct price to First DataBank --
25        MS. TABACCHI:  Object to the form of --

Page 143

1  Q.  (BY MR. WINTER)  -- same time period?
2        MS. TABACCHI:  -- of the question.
3  Object to the form.
4  A.  You're saying we reported to them?
5  Q.  (BY MR. WINTER)  To First DataBank, yes, sir.
6  A.  I don't think we did the calculation to them.
7  Q.  You don't think you did what calculation?
8  A.  AWP.
9  Q.  Okay.  Well, let's talk about the list price.
10  Would it surprise you that Abbott was reporting a list
11  price for this same product of $52.94 during this same
12  time period to First DataBank?
13        MS. TABACCHI:  Object to the form.
14  Q.  (BY MR. WINTER)  Would that surprise you?
15  A.  Once again -- well, no, I don't know because
16  that's not an area that our group handled.
17  Q.  But you're not surprised, are you?
18  A.  I don't --
19        MS. TABACCHI:  Object to the form.
20  A.  I don't know.
21  Q.  (BY MR. WINTER)  You don't know whether
22  you're surprised?
23  A.  No, I don't --
24        MS. TABACCHI:  Now you're harassing the
25  witness.

Page 144

1  A.  I don't know.
2  Q.  (BY MR. WINTER)  You just don't know?
3  A.  No.  I don't know the order of magnitude of
4  the delta.
5  Q.  Okay.  Would it surprise you that Abbott was
6  reporting a direct price to the Texas Medicaid program
7  during the same time period for the same product of
8  $49.42?
9        MS. TABACCHI:  Object to the form of the
10  question.
11  A.  I don't know.
12  Q.  (BY MR. WINTER)  Again, you don't know
13  whether you're surprised or not?
14  A.  No.  I --
15        MS. TABACCHI:  Object to the form.
16  Q.  (BY MR. WINTER)  For -- would it surprise you
17  if the price for this particular Vancomycin product
18  that Abbott was reporting up until mid-1997 at $49.42
19  actually went up in 1997 to $58.37 --
20        MS. TABACCHI:  Object to the form.
21  Q.  (BY MR. WINTER)  -- would that surprise you?
22  A.  Once again, in my experience I had no
23  interaction with that, so I would not know.  So you
24  keep asking me if it surprised me.  I don't know.
25  Q.  In your interaction with Ms. Snead and with

Page 145

1  Ms. Manso and Mr. Miller, did they ever share with you
2  any materials, printed materials, that PBI prepared?
3        MS. TABACCHI:  Object to the form.
4  A.  I don't recall.
5  Q.  (BY MR. WINTER)  You don't recall?
6  A.  I don't recall.
7  Q.  Do you ever recall after -- once a contract
8  was entered, do you ever recall seeing the contract
9  pricing that was disseminated by PBI to its members?
10  A.  No.
11  Q.  Is that something that would have been
12  provided to the national account managers?
13  A.  I don't know.
14        MS. TABACCHI:  Object to the form.
15  A.  When I was a national account manager I
16  didn't see what they were sending out.
17  Q.  (BY MR. WINTER)  When you were a national
18  account manager, did you have responsibility for PBI
19  as one of your accounts?
20  A.  No, I didn't.
21  Q.  I'm going to show you what's marked as
22  Exhibit 485, and it is a multipage document which
23  begins with Bates label TXABT42558 and runs all the
24  way through Bates label TXABT42576.  I want you to
25  take a minute and flip through it, please.  And if

37 (Pages 142 to 145)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 146

1 you'll look up when you've reviewed the document.
2     A.  (Witness reviewing document).
3     Q.  You ready?
4     A.  Sure.
5     Q.  Okay.  Great.  First of all, Mr. Kipperman,
6 I'll represent to you that this is a document that was
7 produced to the State of Texas in this litigation as
8 having come from Abbott's business records.  And my
9 question to you is, first of all, have you ever seen
10 this particular document or one that looks like it?
11     A.  I don't recall this document.
12     Q.  You don't recall this document?
13     A.  No.
14     Q.  Okay.  Given that it came from Abbott's
15 business records and was produced in this litigation,
16 would it be your best educated presumption that it
17 would have come from the files of the national account
18 managers or somebody else?
19         MS. TABACCHI:  Object to the form of the
20 question.
21     A.  I don't know where you found it.  I don't
22 know.
23     Q.  (BY MR. WINTER)  Do you know who the national
24 account manager was for PBI in 2000?
25     A.  No.  That was after my time there.

Page 147

1     Q.  That was after you had left your --
2     A.  Contract marketing.
3     Q.  -- position as a NAM?  Okay.
4     A.  Yeah.  Contract marketing and the NAM.
5     Q.  Pardon me?
6     A.  Contract marketing and the NAM.  I would have
7 been doing business development in this time frame.
8     Q.  Do you see on the second page of the
9 document -- let me go back to the first page.  At the
10 top in handwriting in the upper right-hand corner it's
11 got -- somebody has written "All Member" and put a
12 circle around that.  Do you see that?
13     A.  Uh-huh.  Yes.
14     Q.  What does "all member" mean in your
15 vernacular?
16     A.  That would have been that any PBI member
17 could access these prices without any commitment.
18     Q.  As to -- without any commitment as to the
19 numbers of units they'd have to buy?
20     A.  Along those lines, correct.
21     Q.  Okay.
22     A.  Dollar volume.
23     Q.  Okay.  They didn't have to -- they could buy
24 one unit at this price, basically?
25     A.  Yes.

Page 148

1     Q.  Okay.
2     A.  If they were a member of PBI.
3     Q.  If they were a PBI member.  I see.
4         And on that first page after the cover
5 sheet, you've got a column for the generic name of the
6 product.  Do you see that?
7     A.  Yes, sir.
8     Q.  And the next column says "Str."  I can't make
9 that out.
10     A.  Probably strength.
11     Q.  Strength.  Okay.  And then it says 100.  Is
12 that a hundred milliliter vial in the hydrocortisone
13 sodium succinate?
14         MS. TABACCHI:  Object to the form.
15     A.  It would be milligram.  If you look next to
16 it, the product name has got the milligram.
17     Q.  (BY MR. WINTER)  That's a 100 milligram vial?
18     A.  Yeah.
19     Q.  And then you've got a product name and then
20 an NDC number, right?
21     A.  Yes.
22     Q.  And then you have a case.  So that means
23 there are 10 of these 100 milligram vials in a case of
24 this first entry --
25         MS. TABACCHI:  Object to the form.

Page 149

1     Q.  (BY MR. WINTER)  -- of the hydrocortisone; is
2 that correct?
3     A.  I would assume.
4     Q.  Okay.  And you've got a package size.  Do you
5 know what "OBC" stands for?
6         MS. TABACCHI:  Object to the form.
7     A.  No.
8     Q.  (BY MR. WINTER)  Then you have a column that
9 says "HCFA FFP/MAC."  Do you understand what that
10 means?
11     A.  No.
12         MS. TABACCHI:  Object to the form.
13     Q.  (BY MR. WINTER)  Then you have a spread
14 column.  Do you see that?
15     A.  Yes.
16         MS. TABACCHI:  Object to the form.
17     Q.  (BY MR. WINTER)  And then an AWP column and
18 then a contract price.  Do you see that?
19     A.  I see that.
20     Q.  Okay.  Is it your testimony that you saw --
21 that you never saw any kinds of spreadsheets or
22 contract list prices such as are depicted here on this
23 exhibit that would depict the spread on Abbott
24 products that were available to GPOs?
25         MS. TABACCHI:  Object to the form of the

38 (Pages 146 to 149)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 150

1  question.
2     A.  I didn't see this document.  I was not there
3  in 2000.
4     Q.  (BY MR. WINTER)  Okay.  But before you left
5  your position as a NAM in 1998 and went up to become
6  the manager for new business development, did you see
7  documents similar to this --
8        MS. TABACCHI:  Object --
9     Q.  (BY MR. WINTER)  -- not this particular one,
10  but did you see documents that juxtaposed the contract
11  pricing available to the GPOs up against the AWP and
12  had a column for spread?
13        MS. TABACCHI:  Object to the form.
14     A.  I don't recall for my accounts something like
15  this.
16     Q.  (BY MR. WINTER)  You don't recall that.  Is
17  it possible that you saw such documents, but you just
18  don't remember it today?
19        MS. TABACCHI:  Object to the form.
20     A.  I don't recall for the customers I had that
21  they had something like this.
22     Q.  (BY MR. WINTER)  I understand that you don't
23  recall that.  What I'm trying to nail down is whether
24  they just didn't have documents like this or you
25  simply don't recall, but they could have?

Page 151

1        MS. TABACCHI:  Object to the form of the
2  question.  The witness answered the question.
3     A.  I don't recall seeing something like
4  this while --
5     Q.  (BY MR. WINTER)  So --
6     A.  -- while I was in a national account role.
7     Q.  So you could have seen it, but you just don't
8  remember today?
9        MS. TABACCHI:  Now you're harassing the
10  witness.  Object to the form.
11        MR. BREEN:  I object to the objection.
12  It's not a proper objection.  I don't think he's
13  harassing.  We are entitled to an answer to the
14  question.
15        MR. WINTER:  Absolutely.
16        MR. BREEN:  Read the last question back,
17  please.
18        (Requested portion was read)
19        MS. TABACCHI:  Same objections.
20     A.  I don't recall.
21        MR. WINTER:  Well, again, objection,
22  nonresponsive.
23     Q.  (BY MR. WINTER)  I understand that you don't
24  recall.  My question is whether it's possible that you
25  saw documents similar in format that included a column

Page 152

1  for the pricing that was available to the GPO members
2  and a column for AWP and a column for spread?
3        MS. TABACCHI:  Same objections.
4     Q.  (BY MR. WINTER)  Is it possible that you saw
5  documents such as I've just described, but you just
6  don't remember any of them today?
7        MS. TABACCHI:  Same objections.  The
8  witness has answered this question.
9     A.  I don't recall seeing this stuff.
10     Q.  (BY MR. WINTER)  Okay.  So, again, my
11  question is -- I understand you don't recall it.  Is
12  it possible that you saw documents such as I've
13  described, you just don't remember any of them today?
14        MS. TABACCHI:  Objection.
15     Q.  (BY MR. WINTER)  Is that possible?
16     A.  I don't know.
17     Q.  You just don't have any idea?
18     A.  I don't know.  Yeah.  I'm sorry.
19     Q.  You mentioned this morning that Coram was one
20  of the accounts that you called on when you were a
21  NAM; is that true?
22     A.  Correct.
23     Q.  But you were not successful in obtaining and
24  negotiating a contract?
25     A.  The solutions and equipment business we did

Page 153

1  not get.  I think -- I can't remember if it was McGaw
2  or Baxter retained that business.
3     Q.  Let me show you what's going to be marked
4  here as our next exhibit, which is 486.  Which appears
5  to be a memorandum from you to Ms. Snead, who I think
6  you've told us was a national account manager,
7  correct?
8     A.  Correct.
9     Q.  Okay.  And this is dated June 23rd, 1995 and
10  it's a memo from you to Chris Snead and cc's Kris
11  Kringel, Charlie Mitchell, Don Robertson and John
12  Ward.  Do you see that?
13     A.  Yes.
14     Q.  And the Bates number is TXABT38553 and it
15  also has Bates numbers ABT006589 and AB0019995.  And
16  then the very next number for all those Bates ranges.
17  Two-page document.
18        In the narrative it says, "Attached you
19  will find the analysis of the current Coram proposal
20  vs. VHA and Sunhealth, which you requested for your
21  meeting with Rick Gonzalez and Tom Hodgson."  Did I
22  read that accurately?
23     A.  Yes.
24     Q.  Do you recall preparing an analysis for Chris
25  Snead at her request for a meeting that she was going

Page 154

1  to have with Rick Gonzalez and Tom Hodgson?
2      A.  I don't remember the specific request for
3  that meeting.  I remember doing a number of analyses
4  for Coram when Chris was negotiating that.
5      Q.  And would these analyses be such as what is
6  depicted on this two-page document?
7      A.  Yes.
8          MS. TABACCHI:  Object to the form.
9      Q.  (BY MR. WINTER)  Did you also do proposal
10  analyses for Ms. Snead in her negotiations with Coram?
11          MS. TABACCHI:  Object to the form.
12      A.  I don't recall the detail of it.  There would
13  have been detail behind this.
14      Q.  (BY MR. WINTER)  Okay.  And my question is
15  not whether there was detail behind this, but did you
16  do a proposal analysis for Coram on behalf of Chris
17  Snead?
18      A.  Well, that's what this would have been, yes.
19      Q.  So if this is a proposal analysis, then you
20  also did -- there was more detail behind this
21  that's --
22      A.  Yes.
23      Q.  -- not depicted on this document?
24      A.  Yes.
25      Q.  Okay.  Who was Kris Kringel?

Page 155

1      A.  He was the division president for HPD.
2      Q.  And who was Rick Gonzalez at this time?
3      A.  Rick Gonzalez would have been coming in to
4  be -- hold on.  He was in -- Rick would have been in
5  AHD.  The president of AHD, the vice-president of AHD,
6  Abbott Health Systems.
7      Q.  Abbott Health Systems?
8      A.  Yes.
9      Q.  And the "D" stands for division?
10      A.  Abbott -- yeah.  I think so.
11      Q.  So was Abbott Health Systems on the org chart
12  a unit that was similar to PPD and HPD, just a
13  separate division?
14      A.  Yeah.  It was a separate division that helped
15  coordinate contracting across divisions.
16      Q.  Okay.  And so is it your best recollection
17  then in June of '95 Mr. Kringel was the president of
18  Hospital Products Division and Mr. Gonzalez was the
19  product of AHD?
20      A.  Correct.
21          MS. TABACCHI:  Object to the form.
22      Q.  (BY MR. WINTER)  What was wrong with that
23          MR. WINTER:  What was wrong with that
24  question?
25          MS. TABACCHI:  Mr. Gonzalez was the

Page 156

1  product of AHD?
2          MR. WINTER:  Did I say product or
3  president?
4          THE REPORTER:  You said product.
5          MR. WINTER:  I'll rephrase.
6          MS. TABACCHI:  I'm just making my
7  objections, Ray.
8      Q.  (BY MR. WINTER)  Well, let me clear that one
9  up.
10      A.  He's a product.
11      Q.  In June of 1995 it's your best recollection
12  that Mr. Kringel was the president of HPD, correct?
13      A.  Correct.
14      Q.  And Mr. Gonzalez was the president of AHD,
15  correct?
16      A.  Correct.
17      Q.  Did you have a recollection that Mr. Gonzalez
18  then at some point in time succeeded Mr. Kringel as
19  the president of HPD?
20      A.  Yes, he did.
21      Q.  Do you recall when that happened?
22      A.  Not off the top of my head, no.  Sorry.
23      Q.  Is Mr. Kringel now retired from Abbott?
24      A.  Yeah.  When he retired, Rick took his job.
25      Q.  And is Mr. Gonzalez now retired from Abbott?

Page 157

1      A.  No.  He's -- I don't know his exact title
2  these days.  He's the president of Abbott.
3      Q.  He's in the Abbott hierarchy now --
4      A.  Yeah.
5      Q.  -- today?
6      A.  Yeah.
7      Q.  Who was Tom Hodgson or Hodgson in June of
8  1995, do you know?
9      A.  Hodgson, his title, I think it would have
10  been president.  There was two top guys, Tom Hodgson
11  and Duane Burnham.
12      Q.  Do you know which --
13      A.  So I don't know which was CEO and which was
14  president.
15      Q.  Okay.  So you don't recall which one was
16  the --
17      A.  The boss's boss?
18      Q.  -- top guy on the totem pole?
19      A.  Yeah.  No, I don't.
20      Q.  Okay.
21      A.  I'm not sure if it was Tom or if it was
22  Duane.
23      Q.  Is -- would it be true that Mr. Kringel and
24  Mr. Gonzalez both would have been reporting to
25  Mr. Hodgson at this time?

40  (Pages 154 to 157)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 158

1          MS. TABACCHI:  Object to the form.
2     A.  I don't know the reporting structure that
3 high up, those --
4     Q.  (BY MR. WINTER)  Yeah.
5     A.  I was lower on the food chain.
6          THE VIDEOGRAPHER:  We have five minutes
7 on the video.
8          MR. WINTER:  Okay.  Thanks.
9     Q.  (BY MR. WINTER)  At the time that you
10 prepared this analysis, you were still the manager of
11 Alternate Site contract marketing, correct?
12     A.  Must have been.
13     Q.  But when you became a NAM, you took over the
14 Coram account as one of yours and you succeeded
15 Ms. Snead --
16     A.  Yes.
17     Q.  -- in that capacity?
18     A.  Yes.
19     Q.  And what -- what did Ms. Snead do?  Did she
20 retire at that time?
21     A.  I don't know what she -- I can't recall what
22 she went on to do, if it was another position at
23 Abbott or if she moved or what happened.
24     Q.  Your testimony earlier today, though, was
25 that she has retired from Abbott?

Page 159

1     A.  Yes.  She's no longer ...
2     Q.  In your interaction with -- with Coram both
3 as a -- strike that.  Let me rephrase here.
4          In your capacity as an Alternate Site
5 contract marketing manager did you become familiar
6 with the Coram account?
7     A.  Yes.
8     Q.  Okay.  And, in fact, you also took it over as
9 a NAM, right?
10     A.  Correct.
11     Q.  So you have some familiarity with Coram,
12 correct?
13     A.  Yes.
14     Q.  Okay.  As a basis of that familiarity that
15 you had with Coram, did you come to understand that
16 Coram was an account that was interested in analyzing
17 AWPs and reimbursement as part of its purchasing
18 decisions?
19          MS. TABACCHI:  Object to the form.
20     A.  That I don't know.  I don't -- I don't recall
21 ever having a conversation with Joe at Coram on
22 something along these lines.
23     Q.  (BY MR. WINTER)  You don't recall ever having
24 a conversation with Joe at Coram along those lines?
25     A.  Correct.

Page 160

1     Q.  Who's Joe?
2     A.  Joe Bane.
3     Q.  Joe who?
4     A.  Joe Bane, the vice-president of materials.
5     Q.  B-a-n-e?
6     A.  Yes.
7     Q.  Did you ever deal with somebody at Coram
8 named Roger?
9     A.  No.
10     Q.  I'll show you what's been marked - we'll do
11 one more exhibit before we take a short break to
12 change the page - as 67 in Mr. Heggie's deposition.
13 And this purports to be a letter TXABT50361 dated July
14 25, 1995 from Mr. Heggie to Roger at Coram.  Do you
15 see that, sir?
16     A.  Yes, sir.
17     Q.  "Dear Roger, Bobbette Green has asked that I
18 write to you and confirm the correct AWP for our
19 Vancomycin product ... 6533-01.  The current AWP is
20 $628.66 per case.  The published price in the 1995
21 issue of Redbook is not reflective of the price
22 increase we took on April 4th of this year."
23          Did I read that accurately?
24     A.  Yes, sir.
25     Q.  "I hope this information helps.  If I can be

Page 161

1 of further help please do not hesitate to contact me.
2 Sincerely, Michael Heggie."
3          Did I read that accurately?
4     A.  Yes, sir.
5     Q.  Okay.  Now, you recall looking at a PBI
6 document just a few documents ago.  Let's look at --
7 if you wouldn't mind, please, going back to the letter
8 from you to Paul Pelanek, which may be just
9 underneath.  I think maybe you've got it buried in
10 your pile that's directly in front of you.  Two back.
11 Before that one.  485 I think is the correct number.
12     A.  483.  485 is the PBI --
13     Q.  How about 484?
14     A.  Here, 484.  Yes, sir.
15     Q.  All right.  There we go.  484, please.  And I
16 had asked you if it would surprise you to learn that
17 the pricing on Vanco 6533-01 that was being reported,
18 the list pricing, was substantially higher than the
19 $6.04 a unit that was available to PBI members.  Do
20 you recall that question?
21     A.  Yes.
22     Q.  Okay.  And you've also acknowledged today
23 that there was a relationship between AWP and Abbott's
24 reported list prices, correct?
25     A.  Okay.

41 (Pages 158 to 161)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 162

1          MS. TABACCHI:  Object to the form.
2      Q.  (BY MR. WINTER)  And here you have on the
3  document we're looking at now, Exhibit 67, an AWP
4  which is calculated off of Abbott's reported list
5  prices of $628.66.  So I ask you, in your mind is
6  $628.66 substantially higher than $6.04?
7          MS. TABACCHI:  Object to the form.
8      A.  That's a case and is the case 10?  If a case
9  is 10, it's 84 cents higher.  I don't know what a case
10  is.
11     Q.  (BY MR. WINTER)  Well, this is a case.  This
12  is -- the current AWP is $628.66.  Is it your
13  testimony that you believe that should be divided by
14  something?
15     A.  It says per case.
16         MS. TABACCHI:  Object to the form.
17     Q.  (BY MR. WINTER)  That's what I just read.
18     A.  I don't know.  It says per case and this says
19  per unit, so you're marrying two documents up that
20  don't seem similar.
21     Q.  So you can't make a judgment as to whether
22  this list price -- you think that that $628 should be
23  divided by something?
24         MS. TABACCHI:  Object to the form.
25     A.  I would assume since it says per case, yes.

Page 163

1      Q.  (BY MR. WINTER)  Okay.  So you think that
2  this is in line?  You think these prices are similar?
3      A.  I don't know if it's in line --
4          MS. TABACCHI:  Object to the form.
5      A.  -- or out of line.  I don't know how many
6  units are in a case.  That's what I'm asking you.
7      Q.  (BY MR. WINTER)  You don't -- you just
8  don't know?
9      A.  I don't know how many units are in a case.
10         MR. WINTER:  All right.  Let's go ahead
11  and take a break and change the tape.
12         THE VIDEOGRAPHER:  Off the record at
13  1:55.  This concludes Tape 2.
14         (Recess from 1:55 to 2:04)
15         THE VIDEOGRAPHER:  Stand by, please.
16  We're back on the record at 2:04.  This is the
17  beginning of Tape Number 3.
18         MR. WINTER:  Mr. Kipperman, I'm going to
19  let Mr. Breen ask you some questions now.  Thank you
20  for your responses this morning.
21         THE WITNESS:  Okay.  Thank you.
22              EXAMINATION
23  BY MR. BREEN:
24     Q.  Good afternoon, Mr. Kipperman.
25     A.  Hi.

Page 164

1      Q.  I'm Jim Breen.  I represent the Relator in
2  two of the cases here today, Ven-A-Care of the Florida
3  Keys.  We've met before, have we --
4      A.  No.
5      Q.  -- before today?
6      A.  No.
7      Q.  Okay.  Are you familiar with Ven-A-Care of
8  the Florida Keys?
9      A.  Doesn't sound familiar.  I'm sorry.
10     Q.  Ever heard that name before?
11     A.  Not before today.
12     Q.  Not before today?
13     A.  No, sir.
14     Q.  Okay.  How long have you known that you were
15  going to be giving a deposition in this case?
16     A.  On and off.  It's been years.  We got called
17  up or mentioned about it years ago, so I don't know.
18  I don't know the exact date.
19     Q.  Ever read anything in the newspaper about
20  these issues involving drug company price reports used
21  by government programs?
22         MS. TABACCHI:  Object to the form of the
23  question.
24     A.  I've only read a couple of Wall Street
25  Journal articles.  That's been about the extent of it.

Page 165

1      Q.  And do you recall when that was?
2      A.  No.  No, I'm sorry.
3      Q.  Would it have been the article written in
4  2000 that was on the front page of the Wall Street
5  Journal?
6          MS. TABACCHI:  Object to the form.
7      A.  I don't recall when it was.
8      Q.  (BY MR. BREEN)  Was it before or after the
9  TAP settlement?
10         MS. TABACCHI:  Object to the form.
11     A.  I don't recall when it was.
12     Q.  (BY MR. BREEN)  Mr. Kipperman, I'm going to
13  ask you some questions that are designed to assist you
14  in recalling.
15     A.  Okay.
16     Q.  So you may not recall certain things and I
17  may ask you some things that happened at different
18  points in time to try to refresh your recollection.
19  So I'm going to expect a truthful response after each
20  question.  Is that -- is that agreeable?
21     A.  Yes.
22     Q.  Okay.  Let's now go back to this Wall Street
23  Journal article.  Do you recall what it was about?
24     A.  No.  Just about some litigation against
25  Abbott.  The only newspaper I read, and I don't read

42 (Pages 162 to 165)

Page 166

1  it frequently, is The Wall Street Journal.  I don't
2  have a local home newspaper, magazine subscriptions,
3  things like that.
4      Q.  You don't recall what the litigation was
5  about that the article was talking about?
6      A.  Actually, no.  Not off the top of my head I
7  don't.
8      Q.  So why did you associate it with the drug
9  pricing issues?
10     A.  Well, it was something to the effect of AWP.
11     Q.  AWP.  Okay.  Now, have you ever become aware
12  that there have been congressional investigations into
13  drug company price reports that are used by government
14  reimbursement programs, including those made by
15  Abbott?
16         MS. TABACCHI:  Object to the form.
17     A.  I'm not familiar with congressional -- what
18  did you call it, hearings?
19     Q.  (BY MR. BREEN)  You're familiar with
20  Congress, correct?
21     A.  Yeah, I'm familiar with Congress, but I'm not
22  familiar -- I haven't heard that there were
23  congressional hearings.
24     Q.  Never heard about congressional hearings?
25     A.  Not to this -- not on this stuff.

Page 167

1      Q.  Not on this stuff.  Where did you get your
2  Master's in finance from?
3      A.  Whitewater, Wisconsin.
4      Q.  Is that an MBA?
5      A.  Yes.
6      Q.  How long did it take you to get it?
7      A.  One year.
8      Q.  Let's clear something up before we move on.
9  You were responding to some questions that Mr. Winter
10  asked you about Exhibit 67 and Exhibit -- I'm sorry,
11  correction.  Exhibit 484 --
12         MR. WINTER:  Well, both.
13     Q.  (BY MR. BREEN)  -- and Exhibit 67.
14     A.  These two (indicating), sir?
15     Q.  Those two there, correct.  And he pointed to
16  Exhibit 67 and we were -- this AWP for Vancomycin on
17  July 25th, '95 is $626.66 per case.  Do you see that?
18     A.  Yes.
19     Q.  And then he compared that with the $6.04
20  price on Exhibit 484 that was being provided to PBI's
21  members.  Do you see that?
22     A.  Yes.
23     Q.  And you said it was only about 84 cents
24  difference since --
25     A.  Yeah.

Page 168

1      Q.  -- it was a case.  Do you recall that?
2      A.  No.  I said if it's 10 in a case, it's
3  actually 24 cents.  I'm sorry.
4      Q.  Okay.  Well, let's talk about that math then.
5  If it's 10 in a case and it's $628.66, what's the AWP
6  per each item in the case?
7      A.  I'm sorry.  It's $62 versus six.
8      Q.  All right.  Now, is that 84 cents difference
9  from $6.04?
10     A.  No, sir.
11         MS. TABACCHI:  Object to the form.
12     Q.  (BY MR. BREEN)  How much is the difference?
13     A.  62 less 6.04.
14     Q.  What's that come to?
15         MS. TABACCHI:  Object to the form.  We
16  are not here to do math.
17     A.  62 minus -- 56 bucks --
18     Q.  (BY MR. BREEN)  All right.  So --
19     A.  -- some change.
20     Q.  So $56 difference between the price that
21  Abbott is providing to every member of PBI and the
22  price that AWP is being reported at based upon
23  Abbott's own reports of its list price --
24         MS. TABACCHI:  Object to the --
25     Q.  (BY MR. BREEN)  -- is that correct?

Page 169

1         MS. TABACCHI:  What's the question?
2      A.  Could you ask me the question again.  I
3  didn't get --
4         MR. BREEN:  Please read the question
5  back.  It was a question.  Just listen.
6         (Requested portion was read)
7      Q.  (BY MR. BREEN)  Let me break it down.  I'll
8  break it down.
9      A.  Thank you.
10     Q.  You testified that you were aware that
11  Abbott's AWP was based upon list prices that Abbott
12  reported, correct?
13     A.  List prices, correct.
14     Q.  And so -- but you don't know what formula was
15  applied to take the list price and convert it to an
16  AWP, do you?
17     A.  No.  I wasn't responsible for doing any of
18  that, so I would not know how that worked out.
19     Q.  Okay.  And have you ever had any
20  comprehension whatsoever about how AWPs are calculated
21  for Abbott's products?
22     A.  It's some gross up from list price, as you
23  guys are alluding to.  I don't know the calculation.
24     Q.  How do you know it's a gross up from list
25  price?

43 (Pages 166 to 169)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 170

1     A.  You guys have been mentioning things like
2 that today.
3     Q.  Oh.  So until you heard it today, you
4 never --
5     A.  No.
6     Q.  -- you never knew it was a gross up, is that
7 your testimony?
8     A.  That's what you're saying.  No.  I -- over
9 the years I became aware of that.  I don't know when I
10 became aware of that.
11     Q.  So it's not based upon what you heard today,
12 you knew it over the years, correct, it was a gross
13 up?
14     A.  Some --
15         MS. TABACCHI:  Object to the form.
16     A.  Somewhere in the -- in the realm of life,
17 yes.
18     Q.  (BY MR. BREEN)  Somewhere in the realm of
19 life.  Okay.  And you don't know -- you have no idea
20 whatsoever what percentages this gross up is applied;
21 is that correct?
22         MS. TABACCHI:  Object to the form.
23     A.  I don't know how the outside agencies do
24 their calculations.
25     Q.  (BY MR. BREEN)  So you've never had any

Page 171

1 information whatsoever about what percentages apply to
2 Abbott's list price to get to AWP?
3         MS. TABACCHI:  Object to the form.
4     Q.  (BY MR. BREEN)  Is that your testimony?
5     A.  Not that I recall.
6     Q.  Could be --
7     A.  Could be two X, could be one and a half X,
8 could be five X, you know.
9     Q.  Okay.
10     A.  If you give me a number for list price, I
11 could calculate it if I had a calculator.
12     Q.  All right.  So it could be two X, it could
13 be -- two X means two times whatever Abbott reports
14 when you say "X," correct?
15     A.  Yes.
16     Q.  It could be one X, which would be one time
17 whatever Abbott reports, correct?
18     A.  Which would equal list price.
19     Q.  Right.  It could be five X, which would be
20 five times whatever Abbott reports.
21     A.  (Nodded head affirmatively).
22     Q.  You have no idea, do you?
23     A.  No.  I don't know the realm of that.
24     Q.  So you have no idea whether there is any
25 material difference between the prices Abbott provides

Page 172

1 to its customers like PBI and what gets reported for
2 AWP, do you?
3         MS. TABACCHI:  Object to the form.
4     A.  Today?  No.
5     Q.  (BY MR. BREEN)  And you didn't know it back
6 then, back in 1995, did you?
7     A.  All I knew is there's some calculation done
8 on it.
9     Q.  You had no idea whether -- remember that
10 question Mr. Winter was asking you about whether there
11 was some kind of a significant difference between the
12 prices that PBI customers got and what AWP is being
13 reported, remember those questions?
14     A.  Yes.
15     Q.  Okay.  You had no idea back in 1995 whether
16 there was a significant difference between what
17 customers were charged and what was reported as AWP,
18 did you?
19         MS. TABACCHI:  Object to the form.
20     A.  Okay.
21     Q.  (BY MR. BREEN)  Is that true?
22     A.  Sure.
23     Q.  You agree with that?
24     A.  Yes.
25     Q.  And you've been in the -- you worked for

Page 173

1 Abbott for 20 years, didn't you?
2     A.  20 years now.
3     Q.  20 years now.
4     A.  Yeah.
5     Q.  Okay.  And -- and when -- when did you reach
6 your twentieth anniversary?
7     A.  Last year.
8     Q.  And up until last year --
9     A.  Now I understand things.
10     Q.  You understand what?
11     A.  How this AWP thing, it's there.
12     Q.  You -- well, how -- explain to me then how --
13 you understand now that you didn't understand back in
14 1985?
15         MS. TABACCHI:  I'm going to caution the
16 witness not to reveal any communications with counsel.
17 To the extent that you can answer the question without
18 revealing communications with counsel, you may do so.
19     A.  I don't recall when I became -- got an
20 understanding of that.  I mean, when I -- the initial
21 jobs at Abbott had nothing -- I didn't deal with these
22 kinds of things.  During the contract marketing time,
23 I don't recall activities and things with AWPs.  I
24 mean, you know, we didn't deal with that on a regular
25 basis that I recall.

44 (Pages 170 to 173)

Page 174

1    Then after the suits popped up, you
2  know, read the newspaper about that, and I think
3  that's when I really kind of got an appreciation for
4  it.  But prior to that I don't think I had an
5  appreciation or understanding.  I don't think I still
6  have a true understanding of how everybody gets paid.
7    Q.  (BY MR. BREEN)  All right.  Let's -- let's
8  just break this down.  I don't want to know what your
9  lawyer has told you, so just -- as far as I'm
10  concerned, don't include any of that.  Okay.  I want
11  to talk to Mr. Kipperman, the 20-plus year Abbott
12  employee with a Master's in Finance.  Okay?  The guy
13  that's been working in contract marketing most of his
14  career.
15    A.  No, I have not.
16      MS. TABACCHI:  Object to the form.
17    A.  Only four years out of 20.
18    Q.  (BY MR. BREEN)  All right.  Four years.  The
19  guy that worked in contract marketing for four years.
20  You worked in -- some form of financial analysis for
21  how many years?
22    A.  Three.  Before that I didn't have anything to
23  do with this kind of stuff.
24    Q.  All right.  That's who I want to talk to.
25    A.  Okay.

Page 175

1    Q.  When did you first begin to comprehend that
2  there might be a material difference between the
3  prices being reported for some of Abbott's drugs as
4  AWPs and the prices that it was charging its
5  customers?
6      MS. TABACCHI:  Object to the form.
7    Q.  (BY MR. BREEN)  Like the PBI members, the all
8  members contract, for example.
9    A.  Well, that -- that was after my time, so I
10  don't know and can't comment on that document.
11    Q.  Let me restate the question.
12    A.  Let me finish.
13    Q.  All right.  Well, go ahead.
14    A.  I must have come prior to the '94 document
15  where I sent the document out to the field.  But the
16  exact time frame when I became aware of that, I can't
17  place that as, you know, January 31st, 19 -- '02, or
18  whatever the date is.  I'm sorry.
19    Q.  All right.  Help me out here.  You said you
20  must have come -- become aware of it prior to the 1994
21  document?
22    A.  I must have because I said -- it talks about
23  the AWP and list price connection.
24    Q.  Okay.  So you will agree, then, that by the
25  time you sent this document, which is now Exhibit

Page 176

1  61 --
2    A.  408.
3      MR. WINTER:  408 has the attachment.
4    A.  Or 480.  I'm sorry.
5    Q.  (BY MR. BREEN)  Okay.  It's Exhibit -- the
6  first -- front page is 61, the entire is 480.
7      By the time you sent this document
8  around dated May 26, 1994, by then you had a -- you
9  understood that there was a material difference
10  between the price that Abbott was charging for its
11  drugs and what it was -- what was being reported as
12  its AWPs.
13      MS. TABACCHI:  Object to the form.
14    A.  I don't know that I knew that there was a
15  material delta.  I understood that there was a
16  relationship, but the materiality of that delta, you
17  know.  Can I tell you it was the delta 20 percent, 50
18  percent, a hundred -- that I can't tell you that I
19  knew specifically.
20    Q.  (BY MR. BREEN)  All right.  So for the jury,
21  when you say the term "delta," "I knew there was a
22  delta," what do you mean by "delta"?
23    A.  That there was some increase off of list
24  price for AWP that these outside agencies arbitrarily,
25  however they did what they did to calculate AWPs, came

Page 177

1  up with.
2    Q.  Okay.
3    A.  It's not something that I know.  Well, we
4  didn't set list prices in our organization either, so
5  it's not something that I know that Abbott told them
6  to go mark it up X percent.
7    Q.  All right.
8    A.  So --
9    Q.  When did you first comprehend that for
10  certain drugs, for example, Vancomycin, there was a
11  material difference between the price that Abbott was
12  reporting as its list price and the price it was
13  actually charging to its customers?
14    A.  Once again, I don't recall a time frame.
15    Q.  Well, did you know it by the time you sent
16  the May 26, 1994 memo with the attachment that's now
17  Exhibit 480?
18      MS. TABACCHI:  Object to the form.
19    A.  On a specific line item?  I don't know.
20    Q.  (BY MR. BREEN)  How about in general?
21      MS. TABACCHI:  Same objections.
22    A.  Must have with this memo.
23    Q.  (BY MR. BREEN)  Okay.  So you must have.  So
24  when we go back to this Vancomycin with a $62.86 AWP
25  and a $6.04 price charged to all PBI members, do you

45  (Pages 174 to 177)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 178

1  consider that to be a material difference --
2       MS. TABACCHI: Object --
3    Q. (BY MR. BREEN) -- a material delta as you've
4  used the term?
5       MS. TABACCHI: Object to the form.
6    A. I don't know. I don't know what the AWP is
7  being used for here. Is that all that they get for
8  compounding the product sent into the patient's home,
9  all those other costs? I don't know. The thing is, I
10 don't know how this is being used. It's something, as
11 we said, around reimbursement. But is that all the
12 homecare gets for compounding the product, putting it
13 into a bag, sending it to the patient's home, is that
14 material? I don't know. I don't know what their
15 costs are. So, you know, can I make a statement to
16 that? I don't think I'm qualified to.
17   Q. What did you mean in Exhibit 480 --
18   A. 480.
19   Q. -- and Exhibit 61 when you talk about current
20 Redbook AWPs? What did you mean by the word "AWP"?
21   A. Average wholesale price.
22   Q. And what did you mean by the word "average
23 wholesale" -- the words "average wholesale price?
24   A. It's whatever Redbook is publishing here.
25   Q. Whatever Redbook is publishing.

Page 179

1    A. Correct.
2    Q. Okay. And was that the Abbott -- did you
3  have any comprehension whatsoever when you wrote this
4  May 26, 1994 memo about what average wholesale price
5  meant?
6    A. I don't recall.
7    Q. You don't recall if you comprehended anything
8  when you wrote it down on this exhibit?
9    A. Yeah. I --
10       MS. TABACCHI: Object to the form.
11   A. I don't recall what I knew at the time.
12 I don't -- you know, what my understanding of
13 reimbursement was at the time.
14   Q. (BY MR. BREEN) Well, you're talking about
15 you don't know whether it includes payment for the
16 compounding and things like that. Okay. You just
17 testified to that, correct?
18   A. Asking that question, yes.
19   Q. Right. Is -- is that information that --
20 that you were -- that you knew that you lacked back in
21 1994 when you sent this memo around?
22       MS. TABACCHI: Object to the form.
23   A. I don't know.
24   Q. (BY MR. BREEN) Don't know?
25   A. Don't know.

Page 180

1    Q. You don't know?
2    A. Don't know.
3    Q. So you -- is it true then that when you use
4  the term "average wholesale price" on May 26, 1994,
5  you really had no comprehension what it meant?
6       MS. TABACCHI: Object to the form.
7    A. Other than the relationship here and that it
8  was used for some form of reimbursement.
9    Q. (BY MR. BREEN) You knew it was used for
10 reimbursement. So you knew -- and you knew that
11 whatever it was, it was based upon prices that your
12 company was reporting?
13       MS. TABACCHI: Object to the form.
14   A. It was based on list price that a third --
15 independent third party calculated --
16   Q. (BY MR. BREEN) Independent third party.
17   A. -- is what -- was what I knew.
18   Q. So who -- who gave the independent third
19 party the list price?
20   A. We did.
21   Q. All right.
22   A. But what did the third party do with it? I
23 don't know.
24   Q. You don't know. Okay. So why were you
25 hounding Michael Heggie to give you these AWPs --

Page 181

1       MS. TABACCHI: Object to the form.
2    Q. (BY MR. BREEN) -- back in 1995?
3    A. I don't know that I was hounding him. I
4  don't --
5    Q. Well, let me represent to you that he's
6  testified --
7    A. Yeah.
8    Q. -- specifically - and I can read you the
9  testimony, if you like - that you were hounding him
10 back in 1995 to give him (sic) these prices. Now, do
11 you recall at all having to press Mr. Heggie to give
12 you these prices?
13   A. No, I don't. I'm sorry.
14   Q. Do you recall asking him more than once?
15   A. I don't recall asking him more than once.
16 Now, my personality, I rub people wrong all the time.
17 It's just kind of my personality. I don't know if I
18 offended him or what, you know. I don't know how
19 Michael took it.
20   Q. Well, let me just -- I'll just read you what
21 he said. Maybe this will refresh your recollection.
22 Ms. Citera defended this deposition. It was given in
23 the West Virginia case.
24       This is on Page 45, Line 25.
25       "Question: Why -- why did you ask

Page 182

1 Redbook for the -- for a listing of the new AWP
2 suggested in or as indicated on the top of this?
3           "Answer: Because Kipperman was hounding
4 me.
5           "Okay. You say he was hounding you.
6 How was he hounding you?
7           "Answer: He wanted it.
8           "Question: All right. Did he tell you
9 why he wanted it?
10           "Answer: I don't believe so.
11           "Can you -- what other possible use
12 would -- would these have been -- would there have
13 been for the AWPs other than for reimbursement
14 purposes?"
15           Ms. Citera objects to form.
16           "Answer: I don't know. This was
17 Kipperman's project.
18           "Okay.
19           "Answer: This -- this was something
20 Kipperman wanted to do. I disagreed with it."
21           Now, do you have any recollection
22 whatsoever as to Mr. Heggie alerting you, warning you
23 that he disagreed with what you were trying to do back
24 in May of 1994?
25      A. No. I don't recall. I don't recall hounding

Page 183

1 him either.
2      Q. Now, I think you testified in response to
3 Mr. Winter's questions that your -- your -- this memo
4 and the spreadsheet and this whole listing of AWPs was
5 I think you used the term "atypical"?
6      A. Yes. It's something I didn't do. It was --
7      Q. But sitting here today, you don't even have
8 any present recollection that you did it back in May
9 1994, do you?
10      A. Well, if it was a standardized mailing, I
11 would have recalled that. I don't recall doing this.
12      Q. Listen to my question. Let's make sure we
13 get this clear.
14           Sitting here today do you have any
15 present recollection whatsoever of sending out the May
16 26, 1994 memo that is now Exhibits 67 and then the
17 attachment is Exhibit 480?
18      MR. BREEN: I'm sorry. What?
19      MR. WINTER: 61.
20      Q. (BY MR. BREEN) I'm looking at the wrong one.
21 Exhibit 61 is the front memo. You see that's in front
22 of you right now, right?
23      A. 480.
24      Q. 61. And 480 is the memo with the attachment.
25      A. 480 is what I have in front of me. Up until

Page 184

1 seeing this?
2      Q. Right.
3      A. No, I don't recall doing this.
4      Q. And when was -- before walking into this
5 deposition today, when was the last time you saw this
6 document?
7      A. Yesterday.
8      Q. Okay. Was that the first time you've seen
9 that document that you have any recollection of was
10 yesterday?
11      A. Yes.
12      Q. Okay. So in all the other time you've been
13 preparing for these -- aware of these cases, nobody
14 showed you this document --
15      A. No.
16           MS. TABACCHI: Object to the form.
17      Q. (BY MR. BREEN) -- until yesterday?
18      A. No.
19      Q. All right. Now, seeing this document first
20 yesterday and now again today, did it in any way
21 whatsoever refresh your recollection about creating it
22 back in May of 1994?
23      A. No. I'm sorry.
24      Q. So you have no recollection whatsoever?
25      A. Correct.

Page 185

1      Q. So if Mr. Heggie -- let me ask this question.
2 Do you have any reason to believe that Mr. Heggie
3 would lie about anything you did or said to him back
4 in May of 1994?
5           MS. TABACCHI: Object to the form.
6      A. No. It says here that I got it from Michael,
7 so assuming I had to go to Michael to get it.
8      Q. (BY MR. BREEN) All right. So but you don't
9 have any -- there's no disagreements or issues between
10 you and Mr. Heggie where you would be concerned he
11 might lie about you?
12      A. No. I don't think he would.
13      Q. All right. So if you don't have any
14 recollection whatsoever about this May 26, 1994
15 document, preparing it or otherwise, would you agree
16 that Mr. Heggie's recollection, if he recalls
17 something, it's better than yours?
18           MS. TABACCHI: Object to the form.
19      A. Possibly, yeah. Now, hounding, it could be
20 perception.
21      Q. (BY MR. BREEN) Okay. Now, I believe in
22 response to some of Mr. Winter's earlier questions
23 today you testified that you do not believe that
24 spread on reimbursement is important to Abbott's
25 customers; is that correct?

47 (Pages 182 to 185)

Page 186

1    A.  In the analysis of how they did these
2  businesses with these contracts, no.
3    Q.  And is it your testimony that you never
4  became aware of any information whatsoever which would
5  indicate that spread may be important to some of
6  Abbott's customers?
7    A.  I don't recall having any conversations with
8  customers or the GPOs I covered that brought this up.
9  Now, I covered the hospital-based GPOs when I was a
10  NAM, like VHA and Amerinet.  So AWP for a
11  hospital-based buying group, I don't -- I think it's
12  an oxymoron that they probably didn't even understand
13  or hear of.
14    Q.  That's because they're reimbursed on DRGs,
15  correct?
16    A.  It's different reimbursement system somewhere
17  for the hospital side, correct.
18    Q.  What's the -- what's the difference?
19    A.  I don't know.  I'm not a reimbursement
20  expert.
21    Q.  Well, how do you know there's a different
22  reimbursement system then?
23    A.  It's a hospital.  They don't do line item
24  stuff is what I understand.
25    Q.  Okay.  What is your understanding of how

Page 187

1  hospitals get reimbursed?
2    A.  Well, for a cardiac case, because I'm in the
3  cardiac area now, it's basically a fee, flat fee.  You
4  go get a stent put in, there's X paid to the hospital
5  and it covers all the supplies needed to put a stent
6  in.  That's my understanding.
7    Q.  And how did you gather that understanding?
8    A.  With that?  Talking to the doctors in the
9  cath labs these days.
10    Q.  Okay.  Now, back when you were involved in
11  contract marketing and your customers included
12  homecare companies --
13    A.  Uh-huh.
14    Q.  -- did you have any comprehension as to how
15  they were reimbursed?
16    A.  I didn't have interface with them.  The NAMs
17  and the reps did.
18    Q.  Okay.  Now, when I asked this question if you
19  had any comprehension of any information whatsoever
20  that would indicate that spread might be important to
21  your customers back when you were working in contract
22  marketing for Alternate Site, I'm not just asking you
23  about information your customers provided you, I'm
24  asking about any information whatsoever, including
25  information you may have gotten from a co-worker or

Page 188

1  including information you might have read, any
2  information whatsoever.
3    A.  I don't --
4        MS. TABACCHI:  Object to the form.
5    A.  I don't recall -- we didn't deal with AWP.  I
6  mean, it wasn't a topic that came up every day around
7  the office, that I recall.
8    Q.  (BY MR. BREEN)  Well, when you say you didn't
9  deal with AWP, then how do you explain Exhibit 61?
10    A.  I don't recall why I sent this out.
11    Q.  Well, would you --
12    A.  Yes.
13    Q.  -- agree that Exhibit 61 certainly indicates
14  that you were dealing with AWP?
15        MS. TABACCHI:  Object to the form.
16    A.  No.
17    Q.  (BY MR. BREEN)  It doesn't?
18    A.  No.
19    Q.  Okay.  So it says, "As you are aware, on at
20  the beginning of April, Abbott took a list price
21  increase.  This also has an effect on our AWP (Average
22  Wholesale Price) which Red Book quotes for
23  reimbursement purposes.  Therefore, Michael Heggie was
24  able to get Red Book to send a listing of the 'new'
25  AWPs for all our products."  And then you attach them

Page 189

1  all to this memo.
2    A.  Yes.
3    Q.  That's not dealing with AWPs?
4        MS. TABACCHI:  Object to the form.
5    A.  No.  Define "dealing."
6    Q.  (BY MR. BREEN)  What were you doing -- what
7  do you define what you were doing here?  What was
8  this?
9    A.  I don't know.  The Hospital Products Division
10  took a list price change which impacted -- changed
11  these AWPs and for some reason, and I don't know why,
12  I asked Heggie to generate a report and send it to the
13  field sales force.  That's the extent that I can tell
14  you of --
15        Now, dealing with AWPs?  Dealing with
16  AWPs to me means working with them, working on
17  reimbursement, doing stuff like that is the
18  connotation dealing with AWPs.  Did our group deal
19  with AWPs?  No, we did not.
20    Q.  Do you know who the -- was Abbott the -- the
21  innovator of Vancomycin?
22        MS. TABACCHI:  Object to the form.
23    A.  No, I don't think so.
24    Q.  (BY MR. BREEN)  Who was?
25    A.  I don't recall.

48  (Pages 186 to 189)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 190

1    Q.  How would you know that Abbott was -- why is
2  it that you think that Abbott was not the innovator
3  for Vancomycin?
4    A.  All of our products were generics.
5    Q.  All of the Alternate Site's products were
6  generics?
7    A.  Yes.  Well, Alternate Site Product Sales,
8  yes.  The Renal Group had some proprietary products.
9  But otherwise, all of the stuff for Alternate Site was
10  generics.  That's what we did.  We were a generic
11  house.  We weren't a proprietary company.
12    Q.  Did you ever become aware that some state
13  Medicaid programs, including Texas, were establishing
14  Medicaid reimbursement based upon the cost to the
15  wholesaler?
16    A.  No.  I wasn't aware of what State of Texas
17  was doing.
18    Q.  Did you ever become aware that any state
19  Medicaid program was considering cost to wholesalers
20  the basis for Medicaid reimbursement?
21    A.  No.  I was not aware of that.
22    Q.  Have you ever become aware of that?
23    A.  No.  Actually not.
24    Q.  I saw Mr. Thomas Hodgson's name in a -- in
25  this report regarding the Coram efforts that you

Page 191

1  participated in.  Did you ever have any dealings with
2  Mr. Hodgson?
3    A.  No.  Those were higher meetings.  We didn't
4  get to go, at my level, to those kinds of meetings.
5    Q.  Do you know where he went after he left
6  Abbott?
7    A.  No.  He retired, I think.
8    Q.  Do you know if he was ever involved with TAP?
9        MS. TABACCHI:  Object to the form.
10    A.  That I don't know.
11    Q.  (BY MR. BREEN)  What was TAP?
12    A.  Pardon?
13    Q.  What was TAP?
14    A.  TAP is --
15        MS. TABACCHI:  Object to the form.
16    A.  -- the joint venture between Abbott and
17  Takeda.
18    Q.  (BY MR. BREEN)  And do you know what drug was
19  involved or drugs were involved?
20        MS. TABACCHI:  Object to the form.
21    A.  Of what products they had?  The only one that
22  I'm aware of was Lupron.
23    Q.  (BY MR. BREEN)  What was Lupron?
24    A.  Prostate cancer drug.
25    Q.  Okay.  And did you ever become aware of an

Page 192

1  issue involving the price representations that Abbott
2  was providing for the drug Lupron?
3        MS. TABACCHI:  Object to the form of the
4  question.
5    A.  I don't know the details.
6    Q.  (BY MR. BREEN)  I'm not asking you for the
7  details.
8        MR. BREEN:  Please read the question
9  back.
10        (Requested portion was read)
11    A.  I don't know of --
12        MS. TABACCHI:  Object to the form of the
13  question.  This is an inappropriate question for this
14  witness, Jim.
15    A.  I didn't work in the TAP area, nor was I -- I
16  didn't know or understand what they were doing with
17  price representations.
18    Q.  (BY MR. BREEN)  All right.  Just so I
19  understand it, it's your testimony that you've never
20  become aware that there became an issue relating to
21  TAP's representations of its price for Lupron?
22        MS. TABACCHI:  Object to the form of the
23  question.  It's not the same question you asked before
24  either.
25    A.  All I know is TAP had issues or -- around

Page 193

1  Lupron.  Do I know -- I don't know if it was marketing
2  practices, pricing practices or whatnot.  That detail
3  I don't -- I'm not aware of.
4    Q.  (BY MR. BREEN)  So you never read anything
5  about it then in the newspapers?
6    A.  No, not really.  As you can tell, I don't
7  read the newspaper very often.
8    Q.  So you didn't read anything in The Wall
9  Street Journal about TAP paying a settlement in excess
10  of 870 million dollars relating to its marketing
11  practices for Lupron, correct?
12        MS. TABACCHI:  Object to the form.
13    A.  I remember a press release something to that
14  effect, but I don't remember reading it in The Wall
15  Street Journal.
16    Q.  (BY MR. BREEN)  Okay.  Now, let's go back to
17  that Exhibit 486 again that you were discussing with
18  Mr. Winter earlier, please.  I just want to try to
19  understand some of the -- the information that you've
20  got in this chart which begins about halfway down the
21  page.  Do you see where it says, "Net of Rebates" on
22  the left-hand side?
23    A.  Uh-huh.
24    Q.  Then it has "S&E" under that.  What is S&E?
25    A.  Solutions and equipment.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 194

1    Q.  And then it's got "Awarded Injectables."
2   What is that?
3    A.  That would have been whatever injectables we
4   had awarded to us.
5    Q.  All right.  And then if we go to the right,
6   you've got VHA levels.  Do you see that?
7    A.  Yes.
8    Q.  What is VHA?
9    A.  VHA was the largest group purchasing
10  organization for the division.
11   Q.  Is that Voluntary Hospitals of America?
12   A.  Yes.
13   Q.  All right.  Now, do they only purchase for
14  in-patient hospitals or do they also purchase for
15  outpatient clinics and outpatient facilities?
16   A.  They had Alternate Site facilities as well,
17  hospital based.
18   Q.  All right.  So they were both?
19   A.  Yes.
20   Q.  All right.  And then Coram, Coram was all
21  Alternate Site, right?
22   A.  Home infusion.
23   Q.  Home infusion.  And then you've got "VHA Mix"
24  next to it.  Why are these two being compared side by
25  side?

Page 195

1    A.  To analyze the proposals.
2    Q.  And what does the 21.5 percent in parentheses
3   mean?
4    A.  I don't know if that's favorable or
5   unfavorable.  I would have to see the rest of the
6   analysis.
7    Q.  Favorable to who?
8    A.  Levels to the VHA pricing overall.
9    Q.  So does that mean that -- that Coram was
10  getting a better deal than VHA pricing or a worse
11  deal?
12   A.  No.  It would have been -- it says here that
13  there's a proposal and where the proposal pricing is
14  versus VHA, I don't know if that is 21 percent higher
15  or 21 percent lower --
16   Q.  And then you go across --
17   A.  -- without looking at the context.
18   Q.  -- one more, "Sunhealth Levels."
19   A.  At Coram mix, yes.
20   Q.  And, again, is the Coram being compared with
21  Sun Health?
22   A.  Coram would be compared to Sun Health pricing
23  at Coram's unit volumes.
24   Q.  So what does the 4.5 percent under "Sunhealth
25  Mix" mean?

Page 196

1    A.  That I don't know if it's 4.5 percent higher
2   or 4.5 percent lower.  I don't know the favorability
3   or unfavorability complexion here.
4    Q.  All right.  Go to the next page.  See the
5   bottom there where it says, "Our proposal is based
6   upon Coram's commitment to 95% compliance, total
7   volume, product mix, standardization programs," do you
8   see that?
9    A.  Yes, sir.
10   Q.  I mean, would it make sense that -- that
11  Abbott was offering Coram a deal that was
12  significantly less favorable than it was providing to
13  Sun Health?
14       MS. TABACCHI:  Object to the form.
15   A.  I don't know that we actually proposed
16  anything to them.  This was an analysis of the
17  potential proposal.  I don't know what was proposed.
18   Q.  (BY MR. BREEN)  Okay.
19   A.  I think possibly based upon this analysis we
20  did not propose this to them.
21   Q.  All right.  Now, do you -- when -- when --
22  when you would do an analysis like we're looking at as
23  Exhibit 486, did you actually sit down at a computer
24  and do this yourself?
25       MS. TABACCHI:  Object to the form.

Page 197

1    A.  It would have been myself or an analyst.
2    Q.  (BY MR. BREEN)  That would be either Cindy
3   Dawson or --
4    A.  Or Debbie Longley.
5    Q.  Debbie Longley?
6    A.  Or if it was a hospital-based GPO, one of the
7   hospital analysts.
8    Q.  And where do they -- where do they work?
9    A.  In the Hospital Products Division.
10   Q.  Okay.  All right.  Now, when you were doing
11  this deal for Coram, this proposal, or working on the
12  potential proposal for Coram, were you aware that
13  Coram's contract pricing was significantly lower than
14  the list prices Abbott was reporting for -- for the --
15  for the fluids and for Vancomycin?
16       MS. TABACCHI:  Object to the form.
17   A.  I would assume they were lower.
18   Q.  (BY MR. BREEN)  All right.  Let's have this
19  one marked.  Let me mark as the next exhibit Exhibit
20  487.  Ask you to take a look at that.
21   A.  Uh-huh.  (Witness reviewing document).
22   Q.  And -- just let me know when you're done.
23   A.  Okay.
24   Q.  Now, what was your position on July -- on
25  June 11th, 1997?

50 (Pages 194 to 197)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 198

1    A.  That would have been national account
2  manager.
3    Q.  And was Coram one of your accounts?
4    A.  Yes, sir.
5    Q.  So would this particular memo, is that your
6  signature at the second page?
7    A.  Yes.
8    Q.  Do you recall preparing this?
9    A.  Not off the top of my head.  It looks like
10  something I would have done.
11    Q.  And see that Pete Baker is cc'd, but so is
12  Bobette Green.  Do you see that?
13    A.  Yes.
14    Q.  Who is Bobette Green?
15    A.  She was a customer service support person.
16    Q.  And why -- what did she have to do with
17  Coram?
18    A.  She would get phone calls from the field and
19  customers, so this way she would be knowledgeable of
20  what was going on.
21    Q.  Now, why is it that you are notifying the
22  field sales force about the awards of a number of new
23  items by Coram Healthcare Preferred Product Contract?
24    A.  Because we just got these products awarded to
25  us by Coram on the contract for injectables and

Page 199

1  letting the reps know, by the way, this is on contract
2  now.
3    Q.  Now, you see on the first page you go down --
4  you see where there's etoposide about a third of the
5  way down?
6    A.  Uh-huh.
7    Q.  Did Abbott manufacture etoposide or is that a
8  drug that was --
9    A.  No.  That was -- I can't remember the
10  manufacturer.
11    MS. TABACCHI:  If you could please let
12  Mr. Breen finish --
13    THE WITNESS:  Oh, I'm sorry.
14    MS. TABACCHI:  -- his question before
15  you answer.
16    THE WITNESS:  Sorry.
17    Q.  (BY MR. BREEN)  Was that a drug that was
18  manufactured by Pharmacia or Gensia or one of these
19  other companies?
20    MS. TABACCHI:  Object to the form.
21    A.  It would be somebody else.  I don't know if
22  it was Gensia, Pharmacia or SKB.
23    Q.  (BY MR. BREEN)  All right.  Now, if you go to
24  the second page.  And if you'll look at the Vancomycin
25  one gram ADD-Vantage.  Do you see that?

Page 200

1    A.  Yes.
2    Q.  And it's -- the price is $59 for 10.  Do you
3  see that?
4    A.  Yes.
5    Q.  So that would be $5.90 each, correct?
6    A.  Yes.
7    Q.  And then if you'll go back to Exhibit 67.
8    A.  67.
9    Q.  You see that Bobette Green was the one that
10  apparently asked Mr. Michael Heggie to write to Coram
11  and confirm the AWP for the Vancomycin.  Do you see
12  that?
13    A.  On Document 67, yes.
14    Q.  And that AWP was $68 -- we figured $62.86
15  per --
16    A.  Uh-huh.
17    Q.  -- item, per each, correct?
18    MS. TABACCHI:  Object to the form.
19    Q.  (BY MR. BREEN)  Now, who at Alternate Site
20  would likely field phone calls from customers about
21  the AWP for Vancomycin between July of 1995 and June
22  of 1997?
23    MS. TABACCHI:  Object to the form.
24    A.  It could be anybody from a representative in
25  the field to a national account manager to Bobette

Page 201

1  Green on the phone.
2    Q.  And if it was somebody in the field, who
3  would they ordinarily call?
4    A.  They would call into the customer service
5  number.
6    Q.  And that would be -- who would answer that?
7    A.  It would have been Bobette Green.
8    Q.  Bobette Green.  So if people wanted to know
9  about the AWPs for Abbott's Vancomycin, that inquiry
10  would most likely be routed through Bobette Green; is
11  that correct?
12    MS. TABACCHI:  Object to the form.
13    A.  It would come -- unless the rep called an
14  analyst, called the national account manager, called
15  Mike Heggie directly.
16    Q.  (BY MR. BREEN)  Okay.
17    A.  You know.  Just one question I have.
18    Q.  Yes.
19    A.  You're referring to this.  These two products
20  are different ones.
21    Q.  All right.  What's the difference between the
22  two?
23    A.  Look at the list number, 6533.
24    Q.  Okay.
25    A.  6535-1 is an ADD-Vantage vial, one is a

51 (Pages 198 to 201)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 202

1  non-ADD-Vantage vial.
2     Q.  All right.  And which one is the ADD-Vantage
3  vial?
4     A.  In your document -- this document that you're
5  talking to?
6     Q.  Correct.  And what's the -- what's the
7  product number?
8     A.  6535-01-13.
9     Q.  Okay.
10    A.  So it may be -- you know, if you -- if you're
11  trying to make a correlation, but they're different
12  products.
13    Q.  All right.  So let's look at Exhibit 484
14  then.
15    A.  484.
16    Q.  You've already got it in front of you.
17    A.  In a stack.  Hold on.  Yes.
18    Q.  All right.  What's the product number on the
19  one gram Vancomycin referred to in that exhibit?
20    A.  6533.  Those -- that matches up.
21    Q.  01.  And that matches up with the -- with the
22  product on Exhibit 67, correct?
23    A.  Yes.
24    Q.  All right.  Have you ever heard of the term
25  "marketing the spread"?

Page 203

1        MS. TABACCHI:  Object to the form.
2  Caution the witness not to reveal communications with
3  counsel.
4     A.  Over the years --
5     Q.  (BY MR. BREEN)  Yes.
6     A.  -- I've heard the term.
7     Q.  And in what context have you heard the term
8  over the years?
9     A.  Around this litigation, or whatever, that's
10  going on.
11    Q.  Did you ever hear of the term in your
12  performance of your duties with Abbott other than in
13  the context of this litigation?
14    A.  No.
15    Q.  Okay.  So when you heard the term in the
16  context of this litigation at Abbott, and I don't want
17  you to discuss what your attorneys told you, but
18  please explain the context you heard it in.
19        MS. TABACCHI:  I'm going to caution the
20  witness not to reveal communications with counsel.  If
21  you can answer the question without revealing
22  communications with counsel, you may do so.  If your
23  only understanding, however, is based on
24  communications with counsel, I'm going to instruct you
25  not to answer the question.

Page 204

1     A.  Yeah.  It would have come from communications
2  from counsel because that's the only place I --
3     Q.  (BY MR. BREEN)  So it's your testimony, then,
4  that you've never heard any -- other than lawyers, and
5  I'll just keep the lawyers out of this question, other
6  than the lawyers, you've never heard the term
7  "marketing the spread" --
8     A.  Correct.
9     Q.  -- at all?
10    A.  Correct.
11        MR. BREEN:  Okay.  All right.  Let's
12  mark this one as the next exhibit.  It's already been
13  marked as Exhibit 291.  Do we have a copy of it?
14        MR. WINTER:  There's an extra copy right
15  here (indicating).
16        MR. BREEN:  All right.  Why don't you
17  hand -- we've got to hand the witness something
18  though.  It's going to be marked.
19        MR. WINTER:  Well --
20        THE WITNESS:  Just write it on?
21        MR. WINTER:  -- it already has a sticker
22  on it.
23        MR. BREEN:  All right.
24        MR. WINTER:  This is previously marked
25  as 291.

Page 205

1     A.  (Witness reviewing document).
2     Q.  (BY MR. BREEN)  Let me know when you're
3  finished.
4     A.  Yes.
5     Q.  Now, was Lincare one of your customers?
6     A.  Lincare was.
7     Q.  How about Olsten or OptionCare?
8     A.  No.
9     Q.  Who handled Olsten and OptionCare?
10    A.  I don't recall Olsten.  And OptionCare, I
11  don't recall -- recall if it was either Jack or
12  Dennis.
13    Q.  Who did you deal with at Lincare?
14    A.  A woman in upstate New York.
15    Q.  Do you know anybody by the name of Charles or
16  Chuck Brown?
17    A.  No.
18    Q.  Ever hear the name before?
19    A.  No.  No.  It was the pharmacy manager up
20  in -- God, I had to fly to Buffalo or Syracuse, I
21  don't recall which airport up there, and then drive.
22  I think it was Utica.  Utica, New York.
23    Q.  Now, in September of 1997 you were a national
24  account manager?
25    A.  I believe I was handling it.  I don't recall

Page 206

1  if that's when I transitioned over, or whatnot, but I
2  was handling Lincare at that point, yes.
3      Q.   Okay.  Now, it says here that you gained
4  commitment for an additional 65 -- A-a-m -- Aim Plus
5  devices at Lincare.  Do you see that?
6      A.   Yes.
7      Q.   Now, those are pumps?
8      A.   Ambulatory infusion pumps.
9      Q.   Ambulatory infusion pumps.  Now, would --
10 would those pumps, just so we understand them, these
11 are pumps that are -- you can either wear them on a
12 belt or you can somehow carry them around with a
13 patient, correct?
14     A.   Yeah.  Put them in a bag and --
15     Q.   In a bag.
16     A.   -- walk around.
17     Q.   All right.  And would the -- would the
18 patient or the -- or the healthcare worker be able to
19 use anybody's fluids with that pump?
20     A.   Anybody's products.
21     Q.   Anybody's products can be used in that pump.
22     A.   Correct.  The only thing that was proprietary
23 was the -- the IV set --
24     Q.   The IV set.
25     A.   -- that would connect to the patient and then

Page 207

1  connect to the bag.
2      Q.   Okay.  But part of Alternate Site's goal was
3  to sell its -- sell its fluids and its pharmaceutical
4  products to be used with those pumps, correct?
5           MS. TABACCHI:  Object to the form.
6      A.   You would hope to have the breadth of
7  product.
8      Q.   (BY MR. BREEN)  And that was -- that was what
9  you were trying to do, sell pumps and sell fluids
10 and -- and -- and other pharmaceutical products to be
11 used with those pumps, correct?
12     A.   Sure.
13     Q.   All right.  Now, and Alternate Site was --
14 was -- was trying to sell the pumps and the fluids and
15 the pharmaceutical products used in those pumps to
16 Lincare, correct?
17          MS. TABACCHI:  Object to the form.
18     A.   Well, I don't know if we were talking fluids
19 and the other products at the same time.  These
20 contracts, as I mentioned earlier, they are three- to
21 five-year terms.  So in my tenure, say the two years
22 in national accounts, many of the accounts I would
23 have never gotten a chance to even give a proposal for
24 injectables or solutions and equipment if their
25 contracts went five years.  So, I mean, these are

Page 208

1  long-term supply contracts.
2      Q.   (BY MR. BREEN)  All right.
3      A.   The pumps are capital equipment that break.
4  Innovation comes along.  You basically -- it's like --
5  more like a car.  When the engine dies, you've got to
6  go buy another one and you would upgrade and -- and
7  trade out and things like that.
8           So I don't recall with Lincare -- you
9  know, you didn't just come in with 3,000 list numbers
10 with your coat open saying, "Here's everything we've
11 got.  Do you want to buy this?"  You know, you had to
12 find out where they stood on their various
13 opportunities.
14     Q.   And you don't have any present recollection
15 of ever trying to sell fluids or pharmaceutical
16 products to Lincare?
17     A.   With Lincare, I think later on I got a
18 solutions and equipment agreement with them and then I
19 actually believe they ended up joining PBI and killing
20 our direct contract is what they did.
21     Q.   It means that they joined PBI.  They became a
22 PBI member and your -- and whatever sales you made to
23 Lincare was based upon the PBI contract at that point?
24     A.   Yeah.  I believe that's where it ended up
25 going to.

Page 209

1      Q.   Okay.  Now, let's go down to the bottom of
2  this exhibit that you've got in front of you right
3  now, 291.  And, first off, what is this document?
4  It's to Don Robertson from Pete Baker/Mike Novak.
5      A.   I don't know.  I didn't get a copy of it,
6  obviously.
7      Q.   Have you ever seen anything like this before?
8      A.   No, but --
9           MS. TABACCHI:  Object to the form.
10     A.   It says "monthly highlights," so it appears
11 to Pete Baker and Mike Novak sending Don monthly
12 highlights.
13     Q.   (BY MR. BREEN)  All right.  So Don was the
14 boss, correct?
15     A.   Yeah.
16     Q.   And Baker reports to Don, correct?
17     A.   Yes.
18     Q.   And you reported to Baker, correct?
19     A.   Yes.
20          MS. TABACCHI:  Object to the form.
21     Q.   (BY MR. BREEN)  At this time; is that right?
22     A.   Yes.
23     Q.   All right.  And then go down to the bottom
24 where it says "Next 30 Days."
25     A.   Uh-huh.

53  (Pages 206 to 209)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 210

1    Q.  Can you read that paragraph?  It's only two
2  lines plus a word.
3    A.  "S&E RFP's anticipated from Olsten Health
4  Services and Optioncare.  Payment terms and the spread
5  between contract price and AWP are identified as
6  important decision variables in the Optioncare bid."
7    Q.  All right.  Now, remember when I asked you
8  earlier if you had ever become conscious of any
9  information whatsoever while you were working at
10  Abbott which would indicate that spread might be
11  important to a customer in deciding whether to buy the
12  Alternate Site products, remember that question?
13    A.  Yes.
14    Q.  And you said you had never become conscious
15  of any such information, correct?
16    A.  I don't recall having those kinds of
17  conversations.
18    Q.  All right.  Would you agree with me that --
19  that the information you just read from the September
20  19 -- 29th, 1997 September monthly highlights report
21  indicates that spread was -- was important to
22  OptionCare?
23        MS. TABACCHI:  Object to the form.
24    A.  From reading that statement for OptionCare,
25  this statement, yeah.

Page 211

1    Q.  (BY MR. BREEN)  Is that correct?
2    A.  Yeah.
3    Q.  So is it your testimony that during your time
4  at Abbott, you never saw any document like the one
5  you're looking at right now which indicated that
6  spread was important to a customer?
7        MS. TABACCHI:  Object to the form.
8    A.  No.
9    Q.  (BY MR. BREEN)  Is that correct?
10    A.  Correct.
11    Q.  All right.  Does this -- do you find this to
12  be in any way in -- this -- this entry in the
13  September monthly highlights report, which is now
14  Exhibit 291, do you find this to be in any way
15  inconsistent with your experience at Abbott?
16        MS. TABACCHI:  Object to the form.
17    A.  With my experience to what?
18    Q.  (BY MR. BREEN)  As to what customers were
19  interested in.
20        MS. TABACCHI:  Object to the form of the
21  question.
22    A.  This one, no.  This doesn't strike me as
23  jumping out good or bad here.  It's not something
24  that -- OptionCare that I covered, wasn't one of my
25  accounts, so I -- I can't comment on what they said.

Page 212

1    Q.  (BY MR. BREEN)  Now, when did you stop being
2  a national account manager?
3    A.  Wasn't it end of '98?
4    Q.  End of '98.  And then at the end of '98 you
5  went into what to now?
6    A.  New business development.
7    Q.  New business development.  And is it your
8  testimony that spread has never been an issue in
9  connection with your duties in new business
10  development?
11        MS. TABACCHI:  Object to the form.
12    A.  No, not at all.  The things I did in that job
13  were identified new product lines.  Got a new product
14  internal generic program started that took a long time
15  for an iron chelating agent that was specific for
16  Alternate Site.  Went out and struck a deal with a
17  company by the name of SuperGen for a pancreatic
18  cancer compound that was in development that never
19  made it.  Ran around and talked to a lot of oncology
20  companies trying to figure out how to get a foothold
21  in oncology and never did a transaction there.
22        But as far as talking to customers in my
23  new business development job, no.  This was talking to
24  companies.
25    Q.  So up until '98, before you went into new

Page 213

1  business development, did you ever deal with any
2  surgery centers?
3        MS. TABACCHI:  Object to the form.
4    A.  Surgery centers via sending communications
5  from the national account manager in HPD out to the
6  Alternate Site sales force.
7    Q.  (BY MR. BREEN)  And were there any particular
8  products that you recall being important in dealing --
9  in surgery centers?
10    A.  Well, the -- would be the anesthesia products
11  and the -- the -- what do you call them, the
12  anesthesia trays.
13    Q.  How about antiemetics?
14    A.  Anzemet as well.
15    Q.  When did you start -- when did Abbott start
16  selling Anzemet?
17        MS. TABACCHI:  Object to the form.
18    A.  That I don't recall the date.  It was a
19  co-promotion distribution deal with -- and I can't
20  remember the name of the company.
21    Q.  (BY MR. BREEN)  Okay.  Did --
22    A.  But that was -- I didn't do that deal.
23    Q.  Who did?
24    A.  It would have been somebody in HPD.
25    Q.  Now, let me now show you what's been marked

54 (Pages 210 to 213)

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 214

1   as Exhibit 247.  Mr. Winter will hand you a copy.
2       A.  Do you need this back?
3       Q.  Now, do you know who Jeff Balzer is?
4       A.  Yes.
5       Q.  Did he succeed you as a --
6       A.  I don't know where in the succession plan he
7   was.  This is well after my time.
8       Q.  All right.  Do you see he's -- it's something
9   called a significant events for April 2003 and on the
10  first page he references PBI and Lincare.  Do you see
11  that?
12      A.  Yes.
13      Q.  And those are two of your -- your customers
14  when you were a national account manager, right?
15          MS. TABACCHI:  Object to the form.
16      A.  No, they were not.  PBI was not mine.
17      Q.  (BY MR. BREEN)  Lincare was though?
18      A.  Lincare when I was in national accounts in
19  1997 and '98, correct.
20      Q.  And PBI was a customer you dealt with in
21  contract marketing, correct?
22      A.  Correct.
23      Q.  All right.  Now, if you'll read for me the
24  second paragraph under "Lincare."
25      A.  "I was informed that, as a matter of

Page 215

1   corporate policy, Lincare does an RFP on all large
2   contracts prior to their expiration.  We should
3   receive an RFP document in May.  Lincare's contract
4   covers S&E, injectables and ambulatory pump
5   disposables.  Chuck has indicated that as part of the
6   analysis, he will be looking" for -- "looking" --
7   "will be looking as reimbursement and spread as well
8   as price and service.  I did communicate that I could
9   not discuss issues related to AWP and that he
10  understood that, but, did want me to be aware that
11  that would be part of his analysis.  It will be key
12  for us to get as many of their AIM Plus devices
13  replaced with GemStars as soon as possible."
14      Q.  All right.  Thank you.  So do you see here
15  where Jeff Balzer is reporting that the Lincare
16  representatives said that they will be looking at
17  spread and reimbursement --
18      A.  Yes.
19      Q.  -- as well as pricing service?
20      A.  Yes, sir.
21      Q.  And did you ever have any conversations with
22  anybody at Lincare where they informed you that
23  reimbursement and spread were important issues in
24  their determination of whether or not to purchase
25  Alternate Site's products?

Page 216

1       A.  Back in '97, '98, no.
2       Q.  Now, have you ever met Jeff Balzer?
3       A.  Yeah.
4       Q.  Do you have any reason to believe that Jeff
5   Balzer would put in a report in April of 2003 that
6   Lincare's representatives said that reimbursement and
7   spread were important in their purchasing decisions if
8   that was not the case?
9           MS. TABACCHI:  Object to the form.
10      A.  I wouldn't have any reason to believe that
11  Jeff would not write something that wasn't true.
12      Q.  (BY MR. BREEN)  So if -- if Lincare is -- is
13  concerned about reimbursement and spread in
14  determining whether to buy Alternate Site's products
15  in April of 2003, would you find that to be different
16  from their concerns when you dealt with them directly
17  in '97 and 1998?
18          MS. TABACCHI:  Object to the form.
19      A.  Yeah.  The person I dealt with up in Utica
20  was a pharmacy manager and I don't recall having any
21  conversations with her about that.  I don't know how
22  Lincare developed from '97 to '98.  They only had a
23  handful of pharmacies when I dealt with them.  They
24  could have been one of these growth stories that went
25  from five pharmacies to a hundred pharmacies by 2003

Page 217

1   and they've got a whole different person running the
2   program here.  So could it be different?  Absolutely.
3       Q.  (BY MR. BREEN)  But why would spread be
4   important to them when they got bigger if it wasn't
5   important to them when they were smaller?
6           MS. TABACCHI:  Object to the form of the
7   question.  It calls for speculation.
8       A.  Yeah.  I don't know.  But all I can tell you
9   is the woman up in Utica never brought it up with me.
10      Q.  (BY MR. BREEN)  Okay.  So, again, you're
11  looking at an Abbott document from one of your --
12  another Abbott employee which indicates that spread is
13  important to a customer.  And I'll ask you again.  Is
14  this -- is this inconsistent with your experience when
15  you were working in contract marketing as a national
16  account manager at Abbott?
17          MS. TABACCHI:  Object to the form.
18  Asked and answered.
19      A.  In those days when I was there, I don't
20  recall hearing a lot of talk about AWP.  Could that
21  have developed after I left as the markets got bigger,
22  as the markets changed, I don't know.
23      Q.  (BY MR. BREEN)  Well, did you ever become
24  aware of any information regarding customer reactions
25  when Abbott lowered its list prices and caused a

55 (Pages 214 to 217)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 218

1   result in decrease in AWPs?
2           MS. TABACCHI: Object to the form of the
3   question.
4       A. I don't recall something to that effect.
5           MR. BREEN: Okay. Let's take a break.
6           THE VIDEOGRAPHER: Off the record at
7   3:05.
8           (Recess from 3:05 to 3:24)
9           THE VIDEOGRAPHER: Stand by. Back on
10  the record at 3:24. This is the beginning of Tape
11  Number 4.
12          MR. BREEN: All right. You got the
13  exhibit stickers, Ray? Ray.
14          MR. WINTER: Yeah, I've got the exhibit
15  stickers.
16          MR. BREEN: Let's mark this one as the
17  next one. This is exhibit what?
18          MR. WINTER: 488.
19      Q. (BY MR. BREEN) All right. We are going to
20  hand you Exhibit 488. And the Bates number is TXABT-E
21  0008657 through 8659.
22          And I'll ask the witness, have you ever
23  seen this before?
24      A. (Witness reviewing document). I don't recall
25  seeing this and there's names of customers on here I

Page 219

1   don't recall.
2       Q. All right. Well, if you go to the second
3   page, you'll see it's got five groups, National
4   Account I, II, III, IV and V. Do you see that?
5       A. Uh-huh. Yes, I do.
6       Q. And what does -- what does that mean?
7           MS. TABACCHI: Object to the form of the
8   question.
9       Q. (BY MR. BREEN) If you know.
10      A. I don't know.
11      Q. Have you ever heard about -- or experienced a
12  situation where customers were grouped under national
13  account categories?
14          MS. TABACCHI: Object to the form.
15      A. We had where we were grouped under a national
16  account manager and responsibilities, but this, unless
17  you've got a date to it, I'm not familiar with like
18  companies here of GM Long Term Care, Transworld, Red
19  Line. Teamcare I've not heard of. Care Tenders.
20  There are - HIS - stuff on here that I don't recognize
21  as a customer at all, so I'm hesitant to say this may
22  have been after my time.
23      Q. (BY MR. BREEN) Well, let's look at this and
24  see if we can identify any of the customers that you
25  had responsibility for either as a national account

Page 220

1   manager or otherwise --
2       A. Uh-huh.
3       Q. -- during your time at Abbott. And if you
4   just -- let's first look on the left-hand side. See
5   where the first one on there is VHA/HPPI?
6       A. Yes.
7       Q. Were you ever responsible for any of the
8   customers in that group --
9           MS. TABACCHI: Object to the form.
10      Q. (BY MR. BREEN) -- under "Existing?"
11      A. VHA/HPPI, Amerinet. I think, actually, this
12  comment Premier -- well, there's Purchase Connection.
13  I thought Premier and Purchase Connection merged
14  together, but I had Purchase Connection.
15      Q. Okay. Is that PCA?
16      A. No. It's under the other center column,
17  Purchase Connection, which lends me to believe this
18  was after I left national accounts.
19      Q. Okay. And then under there, "Prospects," do
20  you see that? Are there any of those companies that
21  you've ever had any responsible for?
22          MS. TABACCHI: Object to the form.
23      A. Columbia/HCA, I'm familiar with it. Sun
24  Health, I'm familiar with it, never called on them.
25  You just want me to go -- keep going by account number

Page 221

1   one, two, three or how do you want me to do this?
2       Q. Yeah. Let's just go down. Look where it
3   says "National Accounts IV."
4       A. Yes. Okay.
5       Q. It says, "Existing, GeriMed, MHA and
6   Omnicare."
7       A. No, those were not my accounts.
8       Q. Did you ever have any interface at all with
9   anybody responsible for those accounts?
10          MS. TABACCHI: Object to the form.
11      A. Those would have been not during my time
12  frame. Long-term care would have been Dennis.
13      Q. (BY MR. BREEN) Dennis Walker?
14      A. Yes. But, once again, these stacks of how
15  these are set up, I don't know that --
16      Q. All right.
17      A. -- this is during my time frame.
18      Q. All right. I believe you said OptionCare was
19  never one of your responsibilities?
20      A. No.
21      Q. All right. Let's go to the next column,
22  "National Account" -- starts at the top there. It's
23  got "Homecare/Oncology." Do you see that?
24      A. Yeah. I think that's a market segment that
25  they're trying to divvy up the -- the areas.

56 (Pages 218 to 221)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 222

1    Q.  All right.  "Existing, Nations/Chartwell"?
2    A.  Nations, yes.
3    Q.  You responsible for Nations at one point?
4    A.  Yes.  When I was in national accounts.
5    Q.  How about Coram?
6    A.  Coram, correct.
7    Q.  How about PBI?
8    A.  No.
9    Q.  Apria?
10   A.  Apria, no.
11   Q.  Okay.  Then "Prospects."  You mentioned
12  Purchase Connection.  Transworld?
13   A.  Transworld, I'm not familiar with that
14  company.
15   Q.  GM Long Term Care?
16   A.  Not familiar with that one.
17   Q.  PRN Topa?
18   A.  Not familiar.  I only can speculate that that
19  was to the prior document you showed me about
20  Michigan.
21   Q.  How about AOR?
22   A.  AOR, I believe, is the acronym for American
23  Oncology Resources, or something to that effect.  I
24  don't recall anyone in our group calling on them.
25   Q.  Okay.  Now, then we have Lincare.  You've

Page 223

1  already testified --
2    A.  Uh-huh.
3    Q.  -- about them, correct?
4    A.  Yes.
5    Q.  Vitallink/Teamcare?
6    A.  That one I'm not familiar with.
7    Q.  How about NMC?
8    A.  NMC was an acronym for National -- National
9  Medical Care and that -- that was not one of my
10  accounts either.
11   Q.  Okay.  How about Genisis/Neighbor Care?
12   A.  Genisis/Neighbor Care, I'm familiar with
13  those were two long-term care companies that merged,
14  but I -- I did not have responsibility for those.
15   Q.  Greater New York?
16   A.  Greater New York was a GPO.  Once again,
17  not -- not one of my accounts.
18   Q.  Walgreens?
19   A.  Walgreens, I called on them for a short time
20  period at the end of my tenure in national accounts.
21   Q.  Okay.  How about Pediatric Services of
22  America?
23   A.  That one, no.  No, not one of mine that I'm
24  familiar with.
25   Q.  And then the last column, "National Account

Page 224

1  III," "Distributors," do you see that?
2    A.  Yes.
3    Q.  "General Medical"?
4    A.  Yeah.  That column appears to be all
5  distributors.
6    Q.  And did you ever have any responsibility for
7  these customers?
8    A.  No.
9    Q.  Any of these?
10   A.  No.
11   Q.  So none of these customers were ever your
12  responsibility?
13   A.  No.  That would have been a distributor
14  manager.
15   Q.  All right.  Now, we went past PBI in the
16  middle column there.
17   A.  Uh-huh.
18   Q.  Now, you did have some responsibility when
19  you were with contract management, correct?
20       MS. TABACCHI:  Object to the form.
21   A.  Supported the national account manager.
22   Q.  (BY MR. BREEN)  You supported the national
23  account manager.
24   A.  Yeah.
25   Q.  Okay.

Page 225

1    A.  Yeah.
2    Q.  All right.  Now, I'm sorry, I said contract
3  management, I meant contract marketing.
4    A.  Contract marketing.
5    Q.  But you supported the national account
6  manager at that time for PBI, correct?
7    A.  Yeah.  It would have been myself and/or one
8  of my staff.
9    Q.  All right.  Now, let's go to --
10       MR. BREEN:  All right.  Let's mark this
11  one as the next exhibit.
12       MR. WINTER:  489.
13   Q.  (BY MR. BREEN)  And this is Bates number
14  TXABT-E 0008035 and 36.
15       MS. TABACCHI:  I'm sorry.  It's Exhibit
16  489?
17       MR. WINTER:  Yes, 489.
18   Q.  (BY MR. BREEN)  Now, you had a chance to look
19  this over?
20   A.  I'm just reading it.  (Witness reviewing
21  document).  Okay.
22   Q.  All right.  This appears to be a memo dated
23  November 13th, 1997 from you to Pete Baker regarding
24  "November Monthly Significant Events."  Do you see
25  that?

57 (Pages 222 to 225)

Page 226

1   A.  Yes.
2   Q.  Do you recall preparing reports like this
3   when you were a national account manager?
4   A.  Yes.
5   Q.  And do you recall preparing this particular
6   report?
7   A.  No.
8   Q.  How often did you prepare these reports?
9   A.  Monthly.
10   Q.  And where -- where were they kept when you
11   prepared them?
12       MS. TABACCHI:  Object to the form.
13   Q.  (BY MR. BREEN)  Where did they go?  What did
14   you do with them?
15   A.  Sent them to Pete Baker.
16   Q.  And did you keep copies?
17   A.  It would have been in my computer.  I didn't
18   keep hard -- I didn't keep hard copies.
19   Q.  All right.  And what kind of -- what computer
20   did you have at the time?
21   A.  Compaq desktop.
22   Q.  And have you since changed computers since
23   then?
24   A.  God, multiple times.  I'm sorry.
25   Q.  All right.  Well, we all have.  And what do

Page 227

1   you -- what did you do with the monthly significant
2   events reports whenever you would change computers?
3   A.  Well, when I left the job I left the computer
4   there.
5   Q.  Okay.  But --
6   A.  I didn't take anything with me.
7   Q.  But whenever you went up -- changed your
8   computer, did you copy over all the old files?
9   A.  Well, I only had one computer when I was
10   in -- over in HPD, in this group.
11   Q.  All right.  So you -- you left the computer,
12   this Compaq desktop?
13   A.  Yes.
14   Q.  And on that computer was a copy of every one
15   of your monthly significant event reports?
16       MS. TABACCHI:  Object to the form.
17   A.  Would have been.
18   Q.  (BY MR. BREEN)  Did you keep copies anywhere
19   else?
20   A.  No.
21   Q.  Okay.  Did you keep backup copies anywhere?
22   A.  No.  Actually, I had a problem with that with
23   my hard drive crashing one time.
24   Q.  And when did your hard drive crash?
25   A.  I don't recall the date, but -- I don't

Page 228

1   remember which job at Abbott, but I had a -- had a
2   computer blow up on me one time.
3   Q.  So when you left in 1998, up until the time
4   you left in 1998, did anybody at Abbott or at any time
5   ask you to -- or give you any -- any instructions or
6   information about saving your information that was on
7   computer -- a computer that you had had on your
8   desktop?
9       MS. TABACCHI:  Object to the form of the
10   question.  Can you please read the question?
11       MR. BREEN:  I'll restate the question.
12       MS. TABACCHI:  Okay.
13   Q.  (BY MR. BREEN)  Up until the time you left
14   your national account management position, did anybody
15   at Abbott give you any instructions or guidance about
16   retaining information on your computer?
17       MS. TABACCHI:  Object to the form.
18   A.  I'm confused.  Retaining -- retaining
19   information in regard to this we were told, you know,
20   leaving everything as is.  But when I got that notice,
21   I was -- I believe I was already gone from the job.
22   Q.  (BY MR. BREEN)  When you say "this," what do
23   you mean by "this"?
24   A.  This -- this -- what we're here -- sitting
25   here today about AWPs.

Page 229

1   Q.  All right.  And when you got that notice, you
2   were gone from which job?
3   A.  I think I was over in -- in the business
4   development job by then.
5   Q.  Okay.
6   A.  So I had a new -- by then I had a laptop
7   finally.
8   Q.  You had a laptop.  And the old information
9   that was on your old computer, when you got the notice
10   to -- to keep anything relating to this, did you do --
11   did you alert anybody to the fact that you had this
12   old computer that might have some information on it?
13       MS. TABACCHI:  Object to the form.
14   A.  I don't recall running down to do that, but
15   that whole group got the same notice.
16   Q.  (BY MR. BREEN)  So it was sometime after 1998
17   that you got this notice?
18   A.  I don't know the exact date, but I'm thinking
19   it's around that time frame.
20   Q.  Because you know you were in your new job in
21   business development when you got the notice, correct?
22   A.  I believe so.
23   Q.  And did you ever become aware that the --
24   that Abbott was served with a civil investigative
25   demand by the Department of Justice sometime in 1996?

Page 230

1    MS. TABACCHI:  Object to the form.
2  Caution the witness not to reveal any attorney-client
3  communications.
4    A.  Not -- not off the top of my head, no.
5    Q.  (BY MR. BREEN)  Did anybody ask you to search
6  your files or your computer for information relating
7  to an investigation being conducted by the Department
8  of Justice or the HHS Office of Inspector General
9  related to Abbott's price reporting --
10    MS. TABACCHI:  Object to the form of the
11  question.
12    Q.  (BY MR. BREEN)  -- at any time?
13    A.  I don't recall that specifically.  I recall
14  somebody saying to retain everything.
15    Q.  Well --
16    A.  It may have been '98, it may have been '96.
17  I don't recall the date.  I'm sorry.
18    Q.  All right.  Other than being --
19    A.  So --
20    Q.  -- told to retain everything, do you recall
21  anybody ever asking you to produce anything?
22    A.  I think we went through our files and also
23  had paralegals come over and go through our files.
24    Q.  So this may have been as early as 1996 you
25  said?

Page 231

1    A.  Could have been.
2    Q.  Okay.  So what did you do then to -- if you
3  were told to keep everything, what did you do to
4  retain and safeguard the information that was on your
5  Compaq computer that you had when you were a national
6  account manager?
7    A.  Whatever was there, I didn't touch.
8    Q.  So you just left it in the office that you
9  vacated?
10    A.  Whoever took my job would have it.
11    Q.  And you don't know who took your job?
12    A.  It was a guy out of HPD.  I think his last
13  name was Radovan, Radigan, and I don't recall how long
14  he was there, but he was Lynn Leone's immediate
15  predecessor.
16    Q.  Do you know why he left the company?
17    A.  No.
18    MS. TABACCHI:  Object to the form.
19    A.  No.  And I don't know where he went to.
20    Q.  (BY MR. BREEN)  All right.  Well, let's go to
21  Exhibit 489, which is in front of you here.
22    A.  Okay.
23    Q.  And at the end there you've got an entry for
24  Walgreens where you say, I scheduled an introductory
25  meeting the week of December 15th to review our

Page 232

1  capabilities and begin the ball rolling to gain
2  incremental business early 1998.  Do you see that?
3    A.  Uh-huh.
4    Q.  Did you ever attend the meeting in December
5  with Walgreens?
6    A.  I believe I did.  I don't --
7    Q.  Do you recall --
8    A.  -- recall specifically.
9    Q.  -- who you went with, if anybody?
10    A.  I don't recall if anybody did go with me.
11    Q.  Now, who would you have reported to after
12  your -- after meeting with Walgreens?
13    A.  That would have been Pete Baker, my boss.
14    Q.  Would that have been an important account?
15    MS. TABACCHI:  Object to the form.
16    A.  Actually, no.
17    Q.  (BY MR. BREEN)  It wouldn't have been?
18    A.  Not big volume.  Small account.
19    Q.  Okay.  And why is that?  Why is it a small
20  account?  Walgreens we all know to be a large national
21  chain --
22    A.  They --
23    MS. TABACCHI:  Object to the form.
24    Q.  (BY MR. BREEN)  -- of drug stores.
25    A.  They didn't have a large home infusion

Page 233

1  program at the time when I called on them.
2    Q.  (BY MR. BREEN)  Okay.  Any reason why Don
3  Robertson would have been interested in the Walgreens
4  business that you were attempting to develop in
5  December of 1997?
6    MS. TABACCHI:  Object to the form.
7    A.  I don't know.  Where is Don on here?
8    Q.  (BY MR. BREEN)  Now, let me show you what's
9  been marked as Exhibit 169 previously in these
10  depositions.  It purports to be a memo from Pete Baker
11  to Don Robertson dated March 31st, 1998.  Do you see
12  that?
13    A.  Yes.
14    Q.  And if you go to the second page at the end
15  there's an entry in there about Walgreens.
16    A.  Yes.
17    Q.  It says, "Working on capturing" an "S&E
18  contract."  Do you see that?
19    A.  Yes.
20    Q.  If you were the one that had been meeting
21  with Walgreens, why would Pete Baker be reporting to
22  Don Robertson about that?
23    MS. TABACCHI:  Object to the form.
24    A.  Because Pete Baker was my boss and for this,
25  I believe I had the meeting with them.  They were

59 (Pages 230 to 233)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 234

1  looking for something more and the Home Infusion group
2  went and met with them.
3      Q.  (BY MR. BREEN)  Okay.  And who did you
4  report -- did you report to Mr. Baker what --
5      A.  Yeah.
6      Q.  -- you had discovered with -- with Walgreens?
7      A.  I suppose I would have.
8      Q.  Now, if you read -- continue to read here,
9  "Walgreen's is currently purchasing from MHA-Baxter."
10 Do you see that?
11     A.  Yes.
12     Q.  MHA being what?
13     A.  That's a buying group.
14     Q.  So it's a buying group that Baxter had a
15 contract with?
16     A.  Yes.
17     Q.  And it says, "The account has 15 Home
18 Infusion Pharmacies and they rent all devices."
19     A.  Yes.
20     Q.  "Annual potential is approximately $500,000."
21 You would consider that a small account --
22         MS. TABACCHI:  Object to the form.
23     Q.  (BY MR. BREEN)  -- it's $500,000?
24     A.  Well, I believe that was when the Home
25 Infusion guys went over there and they charged for all

Page 235

1  these services and whatnot.  For a product deal, it's
2  smaller.  15 accounts is not a $500,000 account for
3  just product.
4      Q.  All right.  Then you go on and say --
5  Mr. Baker goes on and says, "A VIP visit has been set
6  for April 28th."  Do you recall going on a visit in
7  April?
8      A.  I -- at that point Home Infusion took over on
9  that and I did not attend that.
10     Q.  And then it says, "There is interest in the
11 Chips System, Chart, reimbursement programs and JCAHO
12 policy and procedures."  Do you see that?
13     A.  Yes.
14     Q.  What was the CHIP system?
15         MS. TABACCHI:  Object to the form.
16     A.  That, I'm not real familiar with it.  It was
17 something in the Home Infusion organization that I was
18 not part of that.
19     Q.  (BY MR. BREEN)  How about Chart, what was
20 that?
21         MS. TABACCHI:  Same objection.
22     A.  That I don't have any idea.
23     Q.  (BY MR. BREEN)  What about reimbursement
24 programs?
25         MS. TABACCHI:  Object to the form.

Page 236

1      A.  Once again, not the area I was in.
2      Q.  (BY MR. BREEN)  I believe you testified
3  earlier, though, you were aware that at some point
4  Home Infusion had -- was involved in reimbursement
5  with customers, correct?
6      A.  Yeah.  Yeah.
7      Q.  And actually sharing in reimbursement at
8  times, correct?
9         MS. TABACCHI:  Object to the form of the
10 question.
11     A.  I don't know how they billed and charged and
12 what they did with that program.
13     Q.  (BY MR. BREEN)  What's JCAHO policies and
14 procedures?
15         MS. TABACCHI:  Object to the form.
16     A.  JCAHO is some accreditation for clinical.
17 Some clinical accreditation.  I don't know if that's a
18 pharmacy -- you know, that your pharmacy is sterile
19 and you're using good practices or whatnot, but it's
20 some -- it's some accreditation.
21     Q.  (BY MR. BREEN)  Now, if you can, explain to
22 us why -- the differences between an account that
23 would be one that Alternate Sites Product Sales would
24 be primarily interested in and Home Infusion would be
25 primarily interested in.

Page 237

1         MS. TABACCHI:  Object to the form of the
2  question.
3      A.  Well, it would -- it would vary for just a
4  product deal where they're just looking to buy
5  products from us, it would be Product Sales group.  If
6  they're looking for all these kinds of services and
7  things like that, that would have been the home
8  infusion organization.
9      Q.  (BY MR. BREEN)  All right.  What about Renal
10 Care?  When would Renal Care be the primary --
11     A.  If some -- at --
12         MS. TABACCHI:  Object to the form of the
13 question.
14     A.  At that time they only had a Calcijex product
15 and I don't think -- that was nephrologist.  That's
16 not even this market that I know of.
17     Q.  (BY MR. BREEN)  So Renal Care was only
18 selling one product?
19         MS. TABACCHI:  Object to the form.
20     A.  Yeah.  From what I recall it was just
21 Calcijex.
22     Q.  (BY MR. BREEN)  Do you recall when you went
23 to Mr. Heggie to get these AWPs that related to your
24 1994 memo we were looking at earlier, was he working
25 in the Renal Care division at that time?

60 (Pages 234 to 237)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 238

1    A.  Yes.
2    Q.  So why would you go to a guy in Renal Care to
3  get AWPs?
4         MS. TABACCHI:  Object to the form.
5    A.  Because he's the only reimbursement guy
6  around.  We didn't have anybody covering
7  reimbursement, nor do we have access to that stuff.
8    Q.  (BY MR. BREEN)  So --
9    A.  And so --
10   Q.  So the reimbursement person happened to be in
11 Renal Care, which was a division that only had one
12 drug?
13   A.  Yeah.
14        MS. TABACCHI:  Object to the form.
15   A.  I'm assuming he was working on reimbursement
16 for -- I don't know what his job responsibility is,
17 but I would assume it would have been working for
18 Calcijex for getting reimbursement.  You would have to
19 ask him.
20   Q.  (BY MR. BREEN)  And then -- I'm just trying
21 to understand why it was then that somebody from
22 Alternate Sites Product Sales would go to somebody in
23 Renal Care to get AWP information for all these
24 drugs --
25        MS. TABACCHI:  Object to the form.

Page 239

1    Q.  (BY MR. BREEN) -- when the Renal Care
2  division was not even selling those drugs.
3         MS. TABACCHI:  Object to the form.
4    Q.  (BY MR. BREEN)  Can you explain that?
5    A.  I assumed he had access to get the data and
6  he did.
7    Q.  And why did you assume he had access to get
8  the data?
9    A.  Because he's a reimbursement guy.
10   Q.  Working with one drug?
11   A.  It doesn't matter.  He's a reimbursement guy.
12 He knew a hell of a lot more than I did.
13   Q.  Okay.  But according to Mr. Baker's memo in
14 March of 1998, the whole -- this reimbursement
15 programs service or function is being made available
16 through the Home Infusion section, correct?
17        MS. TABACCHI:  Object to the form of the
18 question.
19   A.  Apparently so.
20   Q.  (BY MR. BREEN)  So did you -- were you aware
21 that Home Infusion had reimbursement expertise --
22   A.  There --
23        MS. TABACCHI:  Object to the form.
24   Q.  (BY MR. BREEN) -- available in Home
25 Infusion?

Page 240

1    A.  There was a woman over there in charge of
2  reimbursement, too.
3    Q.  So why didn't you go to her to get your AWP
4  information?
5    A.  I think they were in a different location.
6    Q.  In 1994?
7    A.  Yeah.  I think they were not in our building.
8    Q.  Because they were physically located
9  someplace else?
10   A.  Michael was right around the corner.
11   Q.  So you knew Michael had something to do with
12 reimbursement, you needed AWP information, so you went
13 to Michael?
14   A.  Yeah.
15   Q.  You recall that sitting here today?
16   A.  Well, no.  It said in the memo where I got
17 the information from and Michael Heggie was right
18 around -- I mean, around the corner on the same floor.
19   Q.  So you're assuming that's why you went to
20 him, because he was just available?
21   A.  Yeah.  I --
22        MS. TABACCHI:  Object to the form.
23   A.  I'm assuming that.
24   Q.  (BY MR. BREEN)  But you don't recall going to
25 him, so you're not sure?

Page 241

1    A.  But the letter says that's where I got the
2  information from, so ...
3    Q.  Okay.  But my point is -- my question is:
4  Why would you go to a reimbursement person that is
5  involved with one drug in Renal Care when the Home
6  Infusion group had reimbursement -- a reimbursement
7  product they were making available to customers?
8         MS. TABACCHI:  Object to the form of the
9  question.  This question has been asked repeatedly.
10   Q.  (BY MR. BREEN)  And you indicated it was
11 because Heggie was close, but I'm just trying to find
12 out is that based upon your present recollection
13 sitting here today as to why you went to Heggie or
14 are you just assuming that?
15        MS. TABACCHI:  Object to the form.
16   A.  I would assume that.  The letter said I got
17 it from Heggie, so -- and our group was right here,
18 their group was right here, so it's proximity.
19   Q.  (BY MR. BREEN)  Who was the reimbursement
20 specialist at Home Infusion?
21        MS. TABACCHI:  Object to the form.
22   A.  It was Ginny Tobiason.
23        MR. BREEN:  What's wrong with that
24 question, Counsel?
25        MS. TABACCHI:  What -- he doesn't have

61 (Pages 238 to 241)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 242

1  the basis to testify about Home Infusion.  He didn't
2  work in Home Infusion.
3          MR. BREEN:  That's the basis for an
4  objection to form?
5          MS. TABACCHI:  Yes.
6          MR. BREEN:  Okay.
7          MS. TABACCHI:  All of these questions
8  lack foundation.  This whole line of questioning.
9          MR. BREEN:  All right.  So it's
10 foundation.
11         MS. TABACCHI:  You're asking about a
12 document he didn't prepare.  You're asking a lot of
13 questions about Home Infusion.  Those are my
14 objections.
15         MR. BREEN:  I'm only asking the basis
16 for your objection to my last question, which I'm
17 entitled to do under the rules.  And the basis for
18 your objection is lack of foundation, correct?
19         MS. TABACCHI:  Yes.
20   Q.  (BY MR. BREEN)  All right.  This -- Ginny
21 Tobiason.
22   A.  Yes.
23   Q.  How long have you known Ginny Tobiason?
24   A.  I knew of her back in that time frame.  They
25 were in a different building.

Page 243

1    Q.  And have you ever met Ginny Tobiason?
2    A.  Yeah.
3    Q.  And sitting here today you have a present
4  recollection of being aware that Ginny Tobiason was
5  the reimbursement specialist over in infusion services
6  when you were working for Abbott in 1994 and 1995,
7  correct?
8    A.  Okay.
9    Q.  Is that correct?
10   A.  Yes.
11   Q.  Okay.  Do you know what -- ever heard of
12 something called a Medicare working group?
13   A.  No, sir.
14   Q.  This instruction to retain information that
15 you say that you got at some point, I believe you said
16 it was after you went over to business development,
17 then again, it might have been as early as 1996,
18 correct?
19   A.  Yeah.  I believe so.
20   Q.  Was it in writing?
21   A.  I don't recall.
22   Q.  And --
23   A.  I don't recall.
24   Q.  And --
25   A.  I don't recall -- recall if it was specific

Page 244

1  to me, a letter addressed to me or the department that
2  was read to me or how it was disseminated.
3    Q.  Do you know what the Abbott corporate
4  planning and development group is?
5    A.  You've got to help me with context.
6    Q.  Pardon me?
7    A.  You have to help me with context.
8    Q.  Have you ever heard of something called the
9  corporate planning and development group?
10   A.  Not by that acronym.  There's a corporate
11 strategic group that did acquisitions prior to --
12 prior to the centralization of BD, of business
13 development.
14   Q.  Okay.  And that was known as what?
15   A.  I think it was just corporate planning and
16 strategy.  Now, is that corporate planning and
17 development finance, I don't know.  That's why I'm
18 asking for the context.
19   Q.  Okay.  Do you know somebody by the name of
20 Rich Rieger?
21   A.  No, that name's not familiar.
22   Q.  Okay.  Let's go to the next one.  Let's mark
23 this one as our next exhibit.
24         MR. WINTER:  490.
25         MS. TABACCHI:  Jennifer.

Page 245

1          MS. CONNOLLY:  Yes.
2          MS. TABACCHI:  Okay.  Just checking.
3    A.  (Witness reviewing document.)
4    Q.  (BY MR. BREEN)  Okay.  This has been marked
5  as Exhibit -- or Bates stamped Exhibit TXABT-E 0007905
6  through 7911.
7          Have you ever seen this before?
8    A.  I'm looking at it.  Hold on.  It appears to
9  be a document that was produced while I was in
10 national accounts.  I don't recall seeing this
11 document.
12   Q.  And what tells you that it was -- appears to
13 have been produced when you were in national accounts?
14   A.  On Page 1, 2, 3 -- on the fourth page it has
15 my name listed as national accounts.
16   Q.  Along with Dennis Walker and Jack Miller,
17 correct?
18   A.  Yes.
19   Q.  That's when you were a national account
20 manager?
21   A.  Yes.  Which would have been the '97-'98 time
22 frame, I believe.
23   Q.  All right.  And if we go to the first page.
24   A.  Uh-huh.
25   Q.  Under "Training."  Do you see it's got a name

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 246

1  Trudi Stanley Burchieri?
2      A.  Yes.
3      Q.  Did you know Trudi Burchieri?
4      A.  She was a training person.  I believe she
5  lived in California and kind of came back and forth to
6  Abbott Park.
7      Q.  Do you know if she still works for Abbott?
8      A.  I don't know.
9      Q.  How about Dave Rotz?
10     A.  Dave Rotz was at Abbott Park.
11     Q.  And does he still work for Abbott?
12     A.  I don't know.
13     Q.  Now, if I look at this, it's got, "New Hires,
14 Selling Skills, New Product" Trudy Burchieri and then
15 under that "Product Training, Clinical, Training
16 Program Outline Dave Rotz."  Do you see that?
17     A.  Yes.
18     Q.  And do you have a present recollection of
19 their training topic responsibilities being broken
20 down into different areas like we see here?
21     A.  No, I don't recall that.  The -- they took
22 care of all the new -- new hire training where they
23 brought the reps in for -- it was a number of weeks
24 that these guys would come in for.
25     Q.  Okay.  Now if we go to the next page,

Page 247

1  "Training (1997)."  Do you see that?
2      A.  Yes.
3      Q.  And then it -- you see pain management,
4  customer base, Actiq.  Do you see that?
5      A.  ACTIQ.
6      Q.  What is that?
7      A.  I believe it was a fentanyl lollypop for pain
8  management and I'm not sure if that product ever got
9  launched.
10     Q.  Okay.  Now, go to the next page.  About
11 two-thirds of the way down it says "Key Product
12 Groups."  Do you see that?
13     A.  Yeah.
14     Q.  "Infusion" and then something called "EDDS."
15 What is that?
16     A.  Electronic drug delivery systems.
17     Q.  Those are our pumps, correct?
18     A.  Pumps, correct.
19     Q.  And what is infusion?
20     A.  That in the context here looks like the
21 solutions and equipment and the admin equipment.  It's
22 got it listed below.
23     Q.  Okay.  And then you see the word
24 "Injectables" there?
25     A.  Yes.

Page 248

1      Q.  What -- what would cause -- how would an
2  injectable be described by you?
3      A.  That would have been the first choice
4  injectable generic products.
5      Q.  Such as what?
6      A.  Like Vancomycin you guys keep talking about.
7      Q.  Like Vancomycin?  Okay.  Now, did you ever
8  hear of anything called a selling module?
9      A.  Don't recall that.
10     Q.  Don't recall that?
11     A.  Don't recall that.  It sounds like something
12 marketing would have done.
13     Q.  Go to the next page where you see
14 "Distributor Relations Ted Lyjak."  Do you see that?
15     A.  Yeah.
16     Q.  Do you know him?
17     A.  Yeah.  He was in our group.  Handled the
18 distributors.
19     Q.  And when you say handled distributors, did he
20 negotiate contracts with distributors?
21     A.  Yeah.
22     Q.  So was he similar to a national account
23 manager but for distributors?
24     A.  Yes.  Yeah.  You would -- you could make that
25 analogy.

Page 249

1      Q.  Now, if you go up above the national accounts
2  you'll see Bobette Green's name there.
3      A.  Uh-huh.
4      Q.  Inside sales and sales administration.  Of
5  the names there, do you know if any of these folks are
6  still with Abbott?
7      A.  No.  Do you just want me to go through them
8  of what I know?
9      Q.  Sure.
10     A.  Sherry May left the company.
11     Q.  Okay.
12     A.  Dennis Montgomery, he left the company.
13 Linda Ozark is -- is at Abbott.
14     Q.  Abbott or Hospira?
15     A.  Abbott.
16     Q.  In PPD?
17     A.  I believe that's where she resides now.
18     Q.  Okay.
19     A.  Sally Young, I don't recall her.  Bobette
20 Green and Sherry Burke are retired and Tanya Bergman,
21 I believe, is at Abbott.
22     Q.  All right.  Thank you.  And then drop down to
23 contract marketing.  Do you see Lynn Leone --
24     A.  Uh-huh.
25     Q.  -- Cindy Dawson --

63 (Pages 246 to 249)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 250

1    A.  Yeah.
2    Q.  -- Dave Harling and Angie Massaro.
3    A.  Yes.
4    Q.  Who was in charge of contract marketing?
5    A.  At this time period it would have been Lynn.
6    Q.  This would be -- so she would be your second
7  successor, then, basically?
8    A.  Yeah.
9    Q.  Okay.  And do you recall ever having
10 discussions with Lynn Leone or Cindy Dawson about the
11 importance of spread -- reimbursement spread to any of
12 the customers?
13   A.  No.  I don't recall having any specific
14 conversations.
15   Q.  Go to the next page, "Compensation."  Do you
16 see that?
17   A.  Yes.
18   Q.  Have you ever had any information regarding
19 the methods by which or the formulas by which
20 customer -- or salesmen people were compensated at
21 Abbott?
22        MS. TABACCHI:  Object to the form.
23   A.  This wasn't in my area.  I didn't get to see
24 their compensation.
25   Q.  (BY MR. BREEN) So you never did any kind of

Page 251

1  analysis or anything like that based upon
2  compensation?
3    A.  No.  That wasn't in our area.
4    Q.  When you were a national account manager were
5  you paid on a commission?
6    A.  I had a base salary and a small bonus plan.
7    Q.  Was the bonus plan based upon sales?
8    A.  Quota -- quota and goals.
9    Q.  When you say "goals," were they all goals in
10 terms of dollars or goals in terms of new accounts
11 or --
12   A.  Goals of activity of, you know, working on
13 closing the pump contract kind of a thing --
14   Q.  Okay.
15   A.  -- and then getting it implemented.  It
16 wasn't just get it done, but actually go out and do
17 the implementation and whatnot.
18   Q.  Now, were any of the activities ever
19 specific, such as making a specific kind of
20 presentation to a customer or something like that?
21   A.  No, not for goals because the goals were four
22 or five, six goals, something that easy.  It would be
23 great if you could get paid off of doing just one
24 thing.
25   Q.  Okay.  What are "Spiffs"?

Page 252

1    A.  In what context here?
2    Q.  Well, I'm looking at it on the page here on
3  "Money/Recognition" under "Compensation."
4    A.  Once again, I didn't have privy to that
5  stuff, but I would assume that they would have done
6  short-term SPIFs for the reps and based upon whatever
7  results or whatever came out of it, they would get
8  paid off of.
9    Q.  On the next page is "Actiq Deployment
10 Excitations."  Do you see that?
11   A.  Yeah.
12   Q.  Did that involve you?
13   A.  No.  That's that fentanyl lollypop I was
14 telling you about.
15        MR. BREEN:  Okay.  All right.  Let's
16 mark the next one, Mr. Winter.
17        MR. WINTER:  491.
18        MS. TABACCHI:  Thanks, Jim.
19        MR. BREEN:  You're welcome.
20   A.  (Witness reviewing document).
21   Q.  (BY MR. BREEN) Ever seen this before?
22   A.  I don't recall it, but it appears to be a
23 letter that I wrote to Joe Bane at Nations Healthcare.
24   Q.  Dated January 23rd, 1998?
25   A.  Yes.

Page 253

1    Q.  And who was Joe Bane?
2    A.  He was the vice-president of materials
3  management at Nations Healthcare.
4    Q.  And what drug -- what drug is this about?
5    A.  Tazicef.  It's some -- it's some
6  anti-infective Cephalosporin.
7    Q.  So it's an -- it's an antibiotic?
8        MS. TABACCHI:  Object to the form.
9    A.  I don't know if it's -- it's an
10 anti-infective, but I'm not sure if it's an
11 antibiotic.
12   Q.  (BY MR. BREEN) All right.  And Nations
13 Healthcare was a homecare company?
14   A.  Yes.
15   Q.  And one of your customers?
16   A.  Yes.
17   Q.  So you successfully sold Tazicef to Nations
18 Healthcare, correct?
19   A.  They requested me from this memo to add it to
20 contract, and we did.
21   Q.  Now, you cc'd Angie Iwan-Massaro down there
22 at the bottom.  Do you see that?
23   A.  Yes.
24   Q.  Who's that?
25   A.  I believe at that time she would have been

64 (Pages 250 to 253)

Page 254

1  the analyst that would have covered this for me and
2  where I would have gotten the pricing from.
3      Q.  Did it ever come to your attention that
4  customers of Abbott were deciding to purchase Abbott's
5  Tazicef because they believed it had a better
6  reimbursement spread than Abbott's competitors?
7      A.  No, I don't recall that coming up.
8      Q.  Okay.  Let me show you what's been marked as
9  Exhibit 289 in these depositions.  This purports to be
10  a memo with Omnicare, Inc. on the top from a Dan
11  Maloney dated October 28, 1996.  Cc'ing Tim Bien,
12  Karen Konkus, operations managers, Tom Ludeke.  Do you
13  see that?
14     A.  Yes, sir.
15     Q.  Ever see this document before?
16     A.  No, I have not.  It appears to be an Omnicare
17  memo.
18     Q.  It's also Bates labeled TXABT 482131.
19         And back in October of 1996 did you know
20  Omnicare was a customer of Abbott?
21     A.  They were -- they were a customer of Abbott,
22  I believe.
23     Q.  And did you have any understanding as to
24  whether or not they were a significant customer?
25         MS. TABACCHI:  Object to the form.

Page 255

1      A.  Was not one of my customers, so I didn't pay
2  much attention to them.
3      Q.  And you really never got involved in the
4  long-term care business?
5      A.  No.  No.  We kind of, as I mentioned before,
6  we got broken down by areas.  I had the hospital-based
7  buying groups like VHA, Amerinet, Purchase Connection.
8      Q.  And just so the record is clear on that, when
9  you say you had the hospital buying groups, your
10  focus, though, was on those hospital buying groups to
11  the extent that they were buying for Alternate Site
12  customers?
13     A.  The programs that the national account
14  manager in HPD would have set up with them.  I
15  basically worked as a conduit for communication of
16  that stuff, yes.
17     Q.  Right.  For their Alternate Sites --
18     A.  Alternate Site business, yes.
19     Q.  -- business.
20     A.  Yeah.
21     Q.  Okay.  Because I'm just trying to make sure
22  it's clear that you weren't selling to hospitals that
23  were buying the product for use in the hospital
24  in-patient setting.
25     A.  No.  No.

Page 256

1      Q.  All right.  Now, if you'll look -- go back to
2  Exhibit 289.
3      A.  Is that this?  There's no number on this one.
4      Q.  Yes, sir.  And about two-thirds of the way
5  down it says, "The highlights of the contract are
6  hospital pricing on Vancomycin and Tazicef.  Switch
7  immediately all Tazidime (Lilly) to Tazicef.  The
8  spread differential per vial is significant (see
9  attached).  Most pharmacies have already made the
10  switch on Vancomycin where cost and spread are
11  significant."  Do you see that?
12     A.  Yes, sir.
13     Q.  And then at the top it says, "Omnicare has
14  signed an agreement with Abbott Pharmaceuticals for
15  Alternate Site Product Sales."  Do you see that?
16     A.  Where was that?
17     Q.  At the very top of this memo.
18     A.  Okay.  Back to the top.  Okay.
19     Q.  Now, do you have any idea why a memo such as
20  the one you're looking at here would have been in
21  Abbott's files, Abbott's business record files?
22         MS. TABACCHI:  Object to the form.
23     A.  Possibly whoever the national account manager
24  was that covered it, it was in their files.  The
25  account may have given it to them.

Page 257

1      Q.  (BY MR. BREEN)  And based upon all of your
2  knowledge and experience, including your training as a
3  Master's in Business Administration with a specialty
4  in finance, do you have any idea why an Abbott
5  customer would be stating that the spread on
6  Vancomycin and Tazicef was significant and advising
7  its pharmacies to switch to Abbott's Tazicef as they
8  had already switched to Abbott's Vancomycin based upon
9  the spread?
10         MS. TABACCHI:  Object to the form.
11     A.  It's communication from a customer to their
12  people.  I -- I wouldn't know.
13     Q.  (BY MR. BREEN)  You wouldn't know?
14     A.  No.
15     Q.  So is this the first time you've ever seen a
16  document where an Abbott customer is communicating to
17  its own personnel that it needs to switch to certain
18  Abbott drugs based upon the better reimbursement
19  spread?
20         MS. TABACCHI:  Object to the form.
21     A.  I don't recall seeing communications from
22  customers to that effect in, you know, letter format
23  here.
24     Q.  (BY MR. BREEN)  Well, was it common to have
25  customer communications that were internal customer

65 (Pages 254 to 257)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 258

1  communications in Abbott's business files --
2         MS. TABACCHI: Object to the form.
3     Q.  (BY MR. BREEN) -- based upon your
4  experience?
5     A.  I would have letters from my customers.
6     Q.  Well, to you, correct?
7     A.  To me and then --
8     Q.  But how about letters to their own people?
9     A.  Typically I didn't get that stuff.
10    Q.  All right.
11    A.  But that was me.
12    Q.  Do you know whether or not Abbott had a -- or
13 were you ever aware that Abbott Tazicef had a
14 significant reimbursement spread associated with it
15 back in 1996?
16        MS. TABACCHI: Object to the form.
17    A.  No.  Once again, those list prices were set
18 outside of our group, so, you know.  I didn't spend
19 time running around worrying about this.  I had all
20 kinds of other things to worry about.
21    Q.  (BY MR. BREEN) You didn't worry about this.
22 Okay.
23    A.  I'm sorry.
24    Q.  Whose job was it to worry about this?
25        MS. TABACCHI: Object to the form.

Page 259

1     A.  I don't think anybody had a job to worry
2  about this.  There wasn't a specific person, you know,
3  Bob or Sue, to worry about such a thing.
4     Q.  (BY MR. BREEN) Well, let me ask the question
5  this way:  Whose job was it to worry about reporting
6  prices to the Texas Medicaid program for Abbott's
7  Alternate Site's products?
8         MS. TABACCHI: Object to the form.
9     A.  I don't know who did that.
10    Q.  (BY MR. BREEN) Did anybody that ever worked
11 for you ever do that?
12        MS. TABACCHI: Object to the form.
13    A.  I don't recall who did that.
14    Q.  (BY MR. BREEN) Okay.  Have you ever heard
15 about -- of something called the Alternate Sites
16 advisory panel?
17    A.  I don't know what context that's from.
18    Q.  Alternate Site advisory panel.  Ever hear
19 about -- ever hear of that before in any context
20 whatsoever?
21    A.  The only thing I can think of is some
22 clinician things that marketing did.
23    Q.  Would you have been involved in that?
24    A.  No.  Not that I recall.
25        MR. WINTER: 492.

Page 260

1     Q.  (BY MR. BREEN) Let me show you what's been
2  marked as Exhibit 492.  Have you ever seen this
3  before?
4     A.  I don't recall.  This appears to be Pete
5  Baker's '98 goals.
6     Q.  And it's Bates labeled TXABT-E 0007744 and
7  45.  Now, Pete Baker in -- in the beginning of 1998
8  was your boss, correct?
9     A.  Yes.
10    Q.  And if you go to the second page under
11 "Product Development," can you read the third bullet
12 point under "Product Development"?
13    A.  Yes.
14    Q.  Go ahead.
15    A.  "Put together an Alternate Site Advisory
16 panel to support market definition and gap analysis.
17 Panel has been developed and participants approached.
18 Steve Kipperman will head this with input from
19 marketing."
20    Q.  Does that refresh your recollection as to
21 something called the Alternate Site advisory panel?
22    A.  I believe this is the board that I mentioned
23 to you of clinicians.  I don't believe that I ever did
24 head it up.  I believe the marketing people ended up
25 doing that and having various clinicians come in and

Page 261

1  basically talk about product needs.
2     Q.  So there was -- then why was this even a
3  function that -- that a national account manager would
4  be involved in?
5         MS. TABACCHI: Object to the form.
6     A.  This appears that this is when I was -- see
7  where it talks about the manager of new business
8  development?
9     Q.  Right.
10    A.  I was the first one there, so that would have
11 been when I was in that job.
12    Q.  So this would be --
13    A.  So --
14    Q.  -- a time when they were -- they were trying
15 to get their arms around what your job description
16 would be?
17    A.  I believe so.  And basically try determining,
18 you know, what should I be looking at.
19    Q.  Okay.  All right.  Before you leave that,
20 let's go back to the first page and the final bullet
21 point under "Administrative" on the first page --
22    A.  Uh-huh.
23    Q.  -- talks about "Support the interviewing and
24 hiring of a Reimbursement Manager and develop
25 expectations for divisional Medicaid rebate analysis

66 (Pages 258 to 261)

Page 262

1  and tracking." Do you see that?
2      A.  Yes.
3      Q.  Were you ever aware that Pete Baker was
4  attempting to hire a reimbursement manager?
5      A.  No.  This was after what I was doing.
6      Q.  Do you know if a reimbursement manager was
7  ever hired?
8      A.  I don't know.  I don't know what happened
9  with that.
10     Q.  Were you ever involved in Medicaid
11 reimbursement analysis or tracking?
12     A.  No.
13     Q.  Do you know what Medicaid rebates are?
14     A.  I understand there's money that Abbott pays
15 back to Medicaid based upon some rebate calculations.
16     Q.  Now, we may have a misunderstanding here, but
17 when is it that you recall actually moving to business
18 development?
19     A.  It would have been in that -- well, would
20 have been in the '98 window.  '98 --
21     Q.  Early or late?
22     A.  I don't recall.  From this it appears it was
23 early because it looks like first quarter.  Because
24 the stuff on the second page talks about going and
25 taking a look at this wound healing product and some

Page 263

1  other things, which would be business development
2  opportunities.  And there was no business development
3  people in this group at that time.
4      Q.  Now, do you recall testifying earlier today
5  that your recollection was it was toward the end of --
6  latter part of '98 that you moved?
7      A.  We would have to get a timeline out, I mean,
8  but -- or find out exactly when I moved jobs, but we
9  were talking kind of windows of time.
10     Q.  Okay.
11     A.  With the reference of the new business
12 development manager, that was a newly created position
13 and I was the first one into that position.
14     Q.  All right.  Let's have this one -- this has
15 already been marked as Exhibit 288.  It's been marked
16 twice.  It's also been marked as Exhibit 64 and we are
17 going to carry forward the Exhibit 64 number.
18     A.  (Witness reviewing document).
19     Q.  Now, this is a two-page document dated
20 December 28, 1995 (sic), at least it appears to be
21 stamped 29, 1995, and it's a trip report with a type
22 date of December 20th, 1995 and it's TXABT 38980 and
23 81.  Have you ever seen this before?
24     A.  No, sir.
25     Q.  Now, this appears to be directed to John Ward

Page 264

1  from Dennis Walker, correct?
2      A.  Appears so.
3      Q.  And at this particular point in time,
4  December of '95, you're still a contract -- in
5  contract marketing analysis, correct?
6      A.  I believe so.
7      Q.  Now, John Ward, though, is in charge of
8  Alternate Sites; is that right?
9      A.  He's the general manager, director of Product
10 Sales.
11     Q.  Of Product Sales.
12     A.  Yes.
13     Q.  Alternate Site Product Sales.
14     A.  Correct.
15     Q.  All right.  Now, and they're talking about an
16 account known as GeriMed.  Have you ever heard of
17 GeriMed before?
18     A.  Yes.
19     Q.  What is GeriMed?
20     A.  It's a long-term care group.
21     Q.  Ever heard of a product that is referred to
22 in this memo -- under "Results" it said, "GeriMed has
23 developed two new programs for their members.  The
24 first one, EmphaSys, is a DOS based system that allows
25 members to access up to date contract pricing, state

Page 265

1  reimbursement, federal reimbursement, and wholesaler
2  item numbers for easy ordering."  Do you see that?
3      A.  Yes.
4      Q.  Had you ever heard of the system known as
5  EmphaSys before?
6      A.  No, sir.
7      Q.  It goes on to say, "The system" is -- "lets
8  members see lowest unit cost, best spread difference,
9  incentive based contracts and preferred products under
10 contracts."  Do you see that?
11     A.  Yes, sir.
12     Q.  And if we go down to the third paragraph it
13 says, "One of GeriMed's goals in obtaining maximum
14 profitability for its members presents an opportunity
15 for our injectables.  They think there is about an 18
16 month window of opportunity to promote our injectables
17 as more profitable for their members to use because of
18 the" higher "spread between AWP and cost."  Do you see
19 that?
20     A.  Yes, sir.
21     Q.  Now, did it ever come to your attention that
22 GeriMed was promoting Abbott's products based upon the
23 better reimbursement spread?
24     A.  Not to my knowledge.
25     Q.  Did you ever have any discussions with Dennis

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 266

1  Walker about AWP and reimbursement spread in the
2  context of GeriMed?
3      A.  No.  GeriMed was a long-term care account of
4  Dennis's and one of my analysts would have handled
5  Dennis.
6      Q.  One of your analysts would?
7      A.  One of -- yeah.  It would have been Debbie
8  Longley or Cindy.
9      Q.  Who would have handled that?
10     A.  Either Debbie Longley or Cindy Dawson.
11     Q.  Okay.  But they were working for you?
12     A.  Yeah.
13     Q.  And you were responsible for them?
14     A.  Yeah.
15         MS. TABACCHI:  Object to the form.
16     Q.  (BY MR. BREEN)  Well, let me -- let me
17  restate the question.  Were you their boss or not?
18     A.  Yeah.  I was their supervisor.
19     Q.  Okay.  Now, which of those persons were
20  assigned to the GeriMed account?
21     A.  I don't recall.
22     Q.  Now, let me now show you what's been
23  previously marked Exhibit 65.  This appears to be a
24  letter from Dennis Walker to John -- correction, to
25  the infusion systems specialist district managers with

Page 267

1  a copy to John Ward, Pete Baker and Mike Novack
2  regarding GeriMed bid award.  It is TXABT 60852.  Do
3  you see this?
4      A.  Yes, sir.
5      Q.  Have you ever seen this document before?
6      A.  I don't recall this document.
7      Q.  It states that, "Enclosed is" our -- "your
8  copy of the new GeriMed bid award and membership
9  listing.  I am pleased to announce that we were
10  awarded more products this year than ever before."  Do
11  you see that?
12     A.  Yes.
13     Q.  And this appears to be dated August the 7th,
14  1996.  Are you aware of any reason why Dennis Walker
15  would be sending a letter like this to the infusion
16  system specialists and district managers?
17         MS. TABACCHI:  Object to the form.
18     A.  It appears the form of the letter is that
19  Dennis received a bid award and was notifying the
20  field sales force of what that bid award was.
21     Q.  (BY MR. BREEN)  And was that a common thing
22  for a national account manager to do?
23     A.  Yes.
24     Q.  That was his job, right?
25     A.  Yeah.  Let the field reps know where they've

Page 268

1  got business.
2      Q.  Now, if you go down to the third paragraph in
3  the middle it says, "GeriMed usually recommends that
4  our products be included on a members formulary
5  because of the higher spread between the contract
6  price and our average wholesale price."  Do you see
7  that?
8      A.  Yes, sir.
9      Q.  "This means that your customers will be eager
10  to know" that "they now have additional Abbott
11  products available to them on" the "GeriMed contract,
12  because in most cases, they will make more money using
13  our products."  Do you see that?
14     A.  Yes.
15     Q.  Now, did you ever become aware while you were
16  working at Abbott that national account managers were
17  informing the sales force that customers were picking
18  the Abbott product because of a higher reimbursement
19  spread and the greater profitability?
20     A.  I don't recall that activity.
21     Q.  So would this letter be inconsistent with
22  your experience while you were at Abbott?
23     A.  Yes.  This would be inconsistent with what --
24     Q.  Now, did you ever see -- were you able to
25  recognize John Ward's handwriting?

Page 269

1      A.  Yeah.  The handwriting up top looks like his
2  scribble.
3      Q.  Where he says "good news"?
4      A.  Yeah.
5      Q.  He's got like three points.  Do you see that?
6  One, two, three.
7      A.  Uh-huh.
8      Q.  One says, "Good news!  I'd like to see the
9  comparison list."  Do you see that?
10     A.  Yes.
11     Q.  And then Number 2, "Congratulations."  Do you
12  see that?
13     A.  Yes.
14     Q.  Then Number 3, can you read what Number 3
15  says?
16     A.  "Don't" something "this" something.
17     Q.  "Don't mention this anymore," is that what it
18  says?
19         MS. TABACCHI:  Object to the form.
20     A.  It could.
21     Q.  (BY MR. BREEN)  You see he's got an arrow
22  pointing to something.
23     A.  Uh-huh.
24     Q.  And then something is circled.  Do you see
25  that?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 270

1    A.  Yes, sir.
2    Q.  Can you read what is circled?
3    A.  The paragraph you just read.
4    Q.  The one that says, "GeriMed usually
5  recommends that our product be included on a members
6  formulary because of the higher spread between the
7  contract price and our average wholesale price" --
8    A.  Yes.
9    Q.  -- is that what was circled?
10        Any idea why John Ward would be telling
11  Dennis Walker not to mention that kind of information?
12        MS. TABACCHI:  Object to the form.
13    A.  No.  I know I never did this kind of
14  communication, so I don't know.
15    Q.  (BY MR. BREEN)  Is there anything wrong with
16  this kind of communication?
17        MS. TABACCHI:  Object to the form.
18    A.  I don't know.
19    Q.  (BY MR. BREEN)  You don't know?
20    A.  I -- I didn't do something like this and
21  Dennis -- you know, this is Dennis talking here.  I
22  can't talk for Dennis.
23    Q.  Well, but you were a national sales --
24  national account manager for two years --
25    A.  Two years.

Page 271

1    Q.  -- right?  So based upon your experience as a
2  national account manager, is there anything wrong with
3  informing the sales force that a customer is going to
4  be ordering Abbott's product because of the better
5  spread on reimbursement?
6        MS. TABACCHI:  Object to the form.
7    Q.  (BY MR. BREEN)  Or the higher spread between
8  contract price and Abbott's average wholesale price?
9        MS. TABACCHI:  Same objection.
10    A.  I wouldn't have done something along these
11  lines.  I just sent out contract price lists.
12    Q.  (BY MR. BREEN)  You wouldn't have done this?
13    A.  (Shakes head negatively).  Huh-uh.  Not one.
14  My customers did not talk about this kind of stuff to
15  me, so I -- once again, it's not an area that there
16  was a lot of discussion from me around.
17    Q.  My question is:  Would you have felt there
18  was anything wrong with this when you were a national
19  account manager?
20        MS. TABACCHI:  Object to the form of the
21  question.
22    A.  I don't know.
23    Q.  (BY MR. BREEN)  Don't know?
24    A.  Don't know.
25        MS. TABACCHI:  How much longer do you

Page 272

1  think you guys have?
2        MR. BREEN:  Well, probably going to take
3  until 6 o'clock.  Do you want to take a break?
4        MS. TABACCHI:  Sure.
5        MR. BREEN:  Okay.
6        THE VIDEOGRAPHER:  Off the record at
7  4:25.  This concludes Tape 4.
8        (Recess from 4:25 to 4:38)
9        THE VIDEOGRAPHER:  Stand by, please.  We
10  are back on the record at 4:38.
11        MS. CONNOLLY:  This is Jennifer
12  Connolly.  I am going to be getting off this call
13  because I need to catch a plane.
14        For the time being I don't have any
15  questions for this witness, although I will tell you,
16  Tina, that I'm going to do the thing with you about
17  the reasons why some of the documents that have been
18  used in this deposition weren't produced in the MDL,
19  but we will keep that dispute to another day and won't
20  have it on the record.
21        MS. TABACCHI:  Wonderful.  I don't know
22  what the reaction is to that.  Great.  I can't wait,
23  Jennifer.
24        MS. CONNOLLY:  Okay.  Thanks you guys.
25        MR. BREEN:  Thank you.  Have a safe trip

Page 273

1  back or here.
2        THE WITNESS:  Have a good night.
3        MS. CONNOLLY:  Right.  Bye.
4        MR. BREEN:  All right.  Are we ready?
5  Okay.  Let's get this over with here.
6    Q.  (BY MR. BREEN)  Now, just before I move into
7  this next issue, remember I asked you before we took a
8  break about reports of Abbott Alternate Site's
9  products to Texas Medicaid?
10    A.  Yes.
11    Q.  And did you ever become aware that -- well,
12  do you know who Christine Snead is?
13    A.  Yes.  She was a national account manager in
14  our group.
15    Q.  Nadine Hanson?
16    A.  That name I'm not familiar with.
17    Q.  Any reason why Christine Snead would be
18  signing reports of Alternate Site's drug -- or
19  products prices to Texas Medicaid?
20        MS. TABACCHI:  Object to the form.
21    A.  I don't know.  I don't know who did the
22  submissions.
23    Q.  (BY MR. BREEN)  All right.  Let me show you
24  what's been marked as Exhibit 364 already in these
25  exhibits.  This is a multipage document.  It's

69 (Pages 270 to 273)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 274

1  spreadsheet TXABT 38152 through 38156. It purports to
2  relate to Chartwell Home Therapies. Do you see that?
3      A. Yes.
4      Q. Called an injectable comparison?
5      A. Yes.
6      Q. Is this the kind of proposal analysis that
7  your folks would ordinarily do when you were with
8  contract market?
9          MS. TABACCHI: Object to the form.
10     A. I'm not familiar with the format and
11  Medi-Span I'm not familiar with, so I don't know if
12  this is an analysis that was derived off of a proposal
13  to us or to -- to Chartwell from us.
14     Q. (BY MR. BREEN) Who -- well, you ever had --
15  did you ever have any responsibility for Chartwell?
16     A. Later when I was a national account manager,
17  yes. That would have been Nations Healthcare when it
18  was Chartwell. That's when I was in contract
19  marketing.
20     Q. Now, other than contract -- the contract
21  marketing group that you work with with Alternate
22  Sites Product Sales, was there any other contract
23  marketing that would do proposal analyses for
24  Alternate Site's products?
25     A. No. No.

Page 275

1      Q. All right. So if anybody inside Abbott did a
2  proposal analysis for Alternate Site products, it
3  would be the contract marketing group you worked with,
4  correct?
5      A. Yes.
6      Q. All right. Now, let's see.
7          MR. BREEN: You have got another one?
8      Q. (BY MR. BREEN) Okay. Hang on to that.
9  Don't put it away. Just hang on to it. We are now
10  going to show you what's been marked as Exhibit 308.
11         Now, before you get to 308, let me ask
12  you a question. Did Chartwell ever have anything to
13  do with Omnicare?
14         MS. TABACCHI: Object to the form.
15     Q. (BY MR. BREEN) Let me ask the question this
16  way. They are two different companies, right?
17     A. I believe so, yeah.
18     Q. Chartwell is a homecare company?
19     A. Homecare company and Omnicare is a long-term
20  care company.
21     Q. All right. Long-term care company. Okay.
22         Now, also -- also, if you'll look at
23  Exhibit 364, you'll see the time frame --
24     A. Which -- sir, which one is that?
25     Q. Chartwell.

Page 276

1      A. Okay. I don't have 364 on my document.
2      Q. Oh, you don't?
3          MS. TABACCHI: His are not numbered.
4      A. No, I don't. These aren't numbered.
5      Q. (BY MR. BREEN) Give those back to Mr. Winter
6  and let him number them so we're not --
7      A. I'm sorry.
8      Q. -- there's no confusion here. They won't let
9  me do it because nobody can read my writing.
10         MR. WINTER: There you go.
11         THE WITNESS: Thank you. Thanks.
12         MR. WINTER: You bet.
13     A. Which one are we on?
14     Q. (BY MR. BREEN) Well, let's look at 364 first
15  and you see up there, in the middle there where it's
16  got unit purchases May of '93 through May of '94?
17     A. Yes.
18     Q. Now, you were with -- you were the head of
19  contract marketing during that time frame, correct?
20         MS. TABACCHI: Object to the form.
21     A. Let's back up to -- I was either an analyst
22  or a -- or a manager.
23     Q. (BY MR. BREEN) Okay. Now, if you go to the
24  last page of Exhibit 308, "Assumptions," Bullet Point
25  Number 3 there.

Page 277

1          MS. TABACCHI: I'm sorry.
2          MR. BREEN: Last page of Exhibit 308.
3          MS. TABACCHI: Oh, I'm sorry. We
4  switched. Okay.
5          MR. BREEN: That's okay. We are doing
6  both at the same time here.
7      Q. (BY MR. BREEN) Go to -- go to --
8          MS. TABACCHI: I'm sorry. I was on the
9  wrong one.
10     Q. (BY MR. BREEN) -- Assumption Number 3,
11  "Competitive prices from MHA/GeriMed price lists
12  November 1994." Do you see that?
13     A. Yes.
14     Q. So, again, 1994 you're in contract marketing,
15  correct?
16     A. Yes.
17     Q. Now, look at the far -- now go to the front
18  page of both of these documents --
19     A. Yes.
20     Q. -- and look at the information in the far
21  right column. Do you see where it says "AWP Spread"?
22  Units times the difference between each price and AWP?
23     A. Yes.
24     Q. And that's -- that's 364. And then on 308
25  it's got "AWP Spread," AWP minus unit or cost times

70  (Pages 274 to 277)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

---

Page 278, 279, 280, 281 below.

**Page 278**

1  units. Do you see that?
2     A.  Yes.
3     Q.  So these two spreadsheets, at least from my
4  looking at them, don't appear to be identical, but
5  they appear to be basically communicating the same
6  information, and that is comparing these different AWP
7  spreads. Do you see that?
8         MS. TABACCHI: Object to the form.
9     Q.  (BY MR. BREEN) Between Abbott's proposal and
10 a competitor?
11        MS. TABACCHI: Object to the form.
12    Q.  (BY MR. BREEN) For example, look on 364.
13 It's Lyphomed versus Abbott. Do you see that?
14    A.  Yes. All the Lyphomed prices are zero.
15    Q.  Now, can you explain to us -- well, let's go
16 to 308 first. And do you see on this one this one
17 competitive comparison is the MHA/GeriMed? Do you see
18 that in those columns there?
19    A.  Yes.
20    Q.  And if you --
21    A.  On Page 3?
22    Q.  Right. If you flip through it --
23        MS. TABACCHI: I'm sorry. What page are
24 you on, Jim?
25    Q.  (BY MR. BREEN) Well, I'm starting on the

**Page 279**

1  first page of 308 --
2         MS. TABACCHI: Okay.
3     Q.  (BY MR. BREEN) -- just to -- just to get the
4  columns. I'm looking at the columns where it says, in
5  the middle there, "Competitive MHA/GeriMed." Do you
6  see that?
7     A.  Uh-huh.
8     Q.  And then if you flip through like three or
9  four pages, you'll start seeing prices under the
10 "Competitive MHA/GeriMed" column. Do you see that?
11 Go three or four pages and you'll start seeing prices.
12    A.  It's on the top of Page 3 and then 4, 5, 6.
13    Q.  My point is, there are prices loaded in this
14 spreadsheet for the competitive analysis of
15 MHA/GeriMed, correct?
16    A.  Yes.
17    Q.  All right. So have you ever seen
18 spreadsheets like this before where an Abbott proposal
19 is compared with a competitive proposal and then
20 there's some comparison of the respective AWP spreads
21 at the -- on the far right?
22        MS. TABACCHI: Object to the form.
23    A.  I don't recall analyses with AWP spreads on
24 them.
25    Q.  (BY MR. BREEN) Well --

**Page 280**

1         MR. BREEN: Do you have another one?
2     Q.  (BY MR. BREEN) Let's do another one. Do you
3  recall which one of your -- the contract marketing
4  folks was responsible for Omnicare?
5     A.  Omnicare national account-wise was Dennis and
6  that would have been one of the girls.
7     Q.  Do you know which one?
8     A.  No, I don't.
9     Q.  All right. Let's look at Exhibit 160.
10        MR. WINTER: That's the only copy I've
11 got.
12        MS. TABACCHI: Okay. Are you going
13 to -- how much time are you going to spend on this,
14 Jim? Do I need to make a copy?
15        MR. BREEN: Oh, that's the only one
16 you've got?
17        MS. TABACCHI: Uh-huh.
18        MR. WINTER: We've got another one on
19 the computer.
20        MR. BREEN: Hold on. Which depo tab is
21 this?
22        MR. WINTER: 208.
23        MR. BREEN: I'll -- use mine. Give her
24 mine.
25        MS. TABACCHI: Thank you. I'll give it

**Page 281**

1  back. What number is this exhibit?
2         MR. WINTER: 160.
3         MS. TABACCHI: Okay.
4     Q.  (BY MR. BREEN) Now, if you -- if you start
5  thumbing through the pages, again, you'll see where
6  there's a comparison done between Abbott's AWP spreads
7  and the competitor's AWP spreads. Do you see that?
8         MS. TABACCHI: Object to the form.
9     Q.  (BY MR. BREEN) Specifically go to page --
10 and I'm going --
11    A.  Like Page 4?
12    Q.  Yeah. Start at four.
13        MS. TABACCHI: Going with Page 4 at the
14 bottom?
15    Q.  (BY MR. BREEN) Let's look at the columns.
16 Look at the column headings.
17    A.  On Page 4.
18    Q.  On Page 4 you've got the competitive AWP and
19 you've got the Abbott AWP.
20        MS. TABACCHI: Oh, I see.
21    Q.  (BY MR. BREEN) Do you see that,
22 Mr. Kipperman?
23    A.  Yes.
24    Q.  And then keep -- keep scrolling down or I'm
25 scrolling, you go through the pages, and when you get

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 282

1  down to the very bottom --
2      A.  The last page?
3      Q.  -- the last page, you'll see that you got
4  these competitive AWPs versus the Abbott AWPs
5  throughout the entire -- throughout the entire
6  document comparing them for each product.
7      A.  Uh-huh.
8      Q.  Now, have you ever seen a proposal -- go to
9  the first page again and you'll see this is called an
10 "Olsten Kimberly Quality Care Proposal Analysis." Do
11 you see that?
12     A.  Yes.
13     Q.  And was Olsten a homecare company?
14     A.  I believe they were.
15     Q.  Ever see a proposal analysis like this done
16 for a customer like Olsten or another customer
17 comparing Abbott's AWPs with competitors' AWPs?
18         MS. TABACCHI:  Object to the form.
19     A.  I don't recall seeing these kinds --
20     Q.  (BY MR. BREEN)  Who --
21     A.  -- off the top of my head here.  The document
22 toward the back --
23     Q.  Yes.
24     A.  -- where it has locations, that appears to be
25 customer generated because how would we know that in

Page 283

1  Marietta, Georgia they ordered amikacin sulfate by --
2  from Apothecon.  The second half.
3      Q.  Well, is the page customer generated or was
4  the information customer generated?
5      A.  That I don't know.
6      Q.  All right.
7      A.  That I don't know.
8      Q.  Now --
9          MR. BREEN:  You got another one?
10         MR. WINTER:  Yeah.  360.
11     Q.  (BY MR. BREEN)  All right.  Let me show you
12 Exhibit 360.  This appears to be a proposal analysis
13 or part of one for United Professional Companies, Inc.
14         MR. WINTER:  Here's another one.
15         MS. TABACCHI:  360?
16         MR. WINTER:  360.
17     Q.  (BY MR. BREEN)  And, again, if you look at
18 the far right, it's got the columns for the comparison
19 of the AWP spreads.
20     A.  Uh-huh.
21     Q.  Do you see that?
22     A.  Yes, sir.
23     Q.  Have you ever seen a proposal analysis done
24 by the contract marketing folks for United
25 Professional Companies where you had the comparison of

Page 284

1  the AWP spreads?
2      A.  I don't recall this document and I don't
3  recall United Professional Companies as a -- you know,
4  I don't recall this company.
5      Q.  Now, now that we've looked at several of
6  these things, though, three of which have these AWP
7  spread columns on the far right all called "Proposal
8  Analysis," all coming out of Abbott's business
9  records, do you think that it's likely that these were
10 created by Abbott or created by these divergent
11 customers?
12         MS. TABACCHI:  Object to the form of the
13 question.  Object to the form of the question.
14 Caution the witness not to speculate.
15         MR. WINTER:  Again, Tina, we didn't ask
16 for an explanation as to your form objection, so I
17 object to the coaching objection.
18         MS. TABACCHI:  Well, the question lacks
19 foundation.
20     Q.  (BY MR. BREEN)  All right.  Let me ask this
21 question then.
22     A.  Sure.
23     Q.  I'm sorry to have to do it this way, but
24 let's just do it this way.
25     A.  Okay.

Page 285

1      Q.  I withdraw my question.
2          MS. TABACCHI:  Okay.
3      Q.  (BY MR. BREEN)  And you were in charge of
4  contract marketing from when to when, sir?
5      A.  I would need to get the dates down right.  Do
6  you have the chart for when I moved around?  We kind
7  of figured it out it was two years as a junior
8  accountant, two to three years in HPD and then from
9  there two years or so in being the analyst and then
10 two or three years as being the -- do you have a piece
11 of paper that I can jot down --
12     Q.  Take your time.
13     A.  If you want to --
14         MR. WINTER:  You want me to give you a
15 piece of paper?
16         THE WITNESS:  Oh, or if you just want
17 to --
18         MR. WINTER:  Here you go.
19     A.  Sorry.  '86, '87.  Okay.  I've got -- I've
20 got a rough timeline now.
21     Q.  (BY MR. BREEN)  I mean, you were at least in
22 contract marketing as early as February of '93,
23 correct?
24     A.  Yeah.  '90 -- '91 -- '91 to '97-ish.
25     Q.  And by February of '93 you were the manager

72 (Pages 282 to 285)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 286

1  of contract marketing, correct?
2      A.  It would be right in that time frame.  I
3  think maybe that I was still the analyst at that
4  point.
5      Q.  Well, again, let's look at Exhibit 474.
6  Interoffice memorandum from Phil Elliott --
7      A.  Oh.
8          MR. WINTER:  It's in your stack to your
9  left hand.
10     A.  That was '94, wasn't it?
11         MR. WINTER:  It's in the stack of papers
12  at your left hand.
13         MR. BREEN:  Show the witness Exhibit
14  474, please.
15     A.  Okay.  February '93.  Okay.
16     Q.  (BY MR. BREEN)  So in February of '93 you
17  were already the manager of contract marketing,
18  correct?
19     A.  Okay.  Yes.
20     Q.  And you were there until -- through '97,
21  correct?
22     A.  Yes.
23     Q.  All right.  So based upon your experience in
24  contract marketing from '91 to '97 and being the
25  manager of contract marketing from at least February

Page 287

1  of '93 through 1997 and based upon your testimony --
2          MS. TABACCHI:  Objection.
3      Q.  (BY MR. BREEN)  -- that only contract
4  marketing did proposal analyses for Alternate Site's
5  products, I'm going to ask that you look at
6  Exhibits -- look again at Exhibit 364, 360 and 308,
7  all of which are either -- appear to be proposal
8  analyses, one for Chartwell, one for United Preferred
9  and one for Omnicare.  Do you see those?
10     A.  Yes.
11     Q.  And they all have these AWP spread
12  comparisons on them.  Do you see that?
13         MS. TABACCHI:  Object.
14     A.  Yes.
15     Q.  (BY MR. BREEN)  And I'm going to ask the
16  question again.  Are you aware of any information
17  which would indicate that these were prepared by
18  customers as opposed to contract marketing?
19         MS. TABACCHI:  Object to the form.
20     A.  I don't recall these documents.  And do I
21  recall doing these documents, not off the top of my
22  head I don't.
23     Q.  (BY MR. BREEN)  My question, sir --
24     A.  So --
25     Q.  -- is are you aware of any information which

Page 288

1  would indicate that these documents were prepared by
2  customers rather than contract marketing?
3          MS. TABACCHI:  Object to the form and
4  the tone.
5      A.  I don't know if they were prepared by Abbott
6  or customers.  They are all appear to be requests for
7  proposal analyses.  This one where it's 160, the top
8  pages, where it talks cost, that appears to be an
9  Abbott document.
10     Q.  (BY MR. BREEN)  Okay.  But I'm asking you to
11  look at 364, 360 and 308.
12     A.  Yes, sir.
13     Q.  All of which to be -- all of which have this
14  AWP spread comparison on the far right and all of --
15  each of which is for a different customer.
16     A.  Yes, sir.
17     Q.  So I'm asking you, based upon all the
18  information you've got with your experience with
19  contract marketing, if you're aware of any information
20  that would indicate that these proposal analyses were
21  prepared by customers?
22         MS. TABACCHI:  Object to the form.
23     A.  I -- I don't know definitively who did these.
24     Q.  (BY MR. BREEN)  Well, did you -- did it ever
25  come to your attention that customers were doing

Page 289

1  proposal analyses and giving them to Abbott using
2  virtually the identical format when the customers were
3  not in any way related?
4          MS. TABACCHI:  Object to the form.
5      A.  We would get templates from customers.  These
6  two could be --
7      Q.  (BY MR. BREEN)  What are you pointing to?
8      A.  I'm sorry.  360 and 308.
9      Q.  Okay.
10     A.  This is speculation.  I don't know.
11         MS. TABACCHI:  Can we not have the
12  witness speculate, please?
13     Q.  (BY MR. BREEN)  Well, look at 308.  It says,
14  "Omnicare Proposal Analysis."  Do you see that?
15     A.  Yes.
16     Q.  Let me ask you this question then.  How would
17  you determine whether or not this was prepared by an
18  Abbott person or by Omnicare?
19         MS. TABACCHI:  Object to the form.
20     Q.  (BY MR. BREEN)  If it came out of Abbott's
21  files.
22     A.  If it came out of Abbott's files.
23         MS. TABACCHI:  Object.  Can you please
24  repeat the question for the witness?
25     Q.  (BY MR. BREEN)  Sure.  What would you do,

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 290

1  based upon all of your experience at Abbott, to figure
2  out whether Exhibit 308 came -- was prepared by the
3  customer Omnicare or by Abbott contract marketing if
4  you knew that this particular copy came out of
5  Abbott's files?
6       MS. TABACCHI:  Object to the form.
7       A.  I would want to know if it's part of a
8  proposal anal -- request for RFP that came -- the form
9  and format came from the customer.
10      Q.  (BY MR. BREEN)  Okay.
11      A.  That's what I would want to know.
12      Q.  Now, go to 360, which says "United
13  Professional Companies, Inc. Proposal Analysis."
14  Looks like the same font, the same -- looks like the
15  same format.  Do you see that?
16      A.  Yes.  It appears they're an MHA member,
17  GeriMed member, the same as the Omnicare.
18      Q.  Okay.  And then go to the one that's
19  Chartwell, 364.
20      A.  Uh-huh.
21      Q.  It's got the same AWP spread on the far
22  right-hand columns.  Looks like a different font,
23  doesn't it?
24      A.  Yeah.
25      Q.  But you testified that you used different

Page 291

1  fonts at different times in contract marketing,
2  correct?
3       A.  I don't know if it was when I was in contract
4  marketing.  I know today I -- I don't -- I don't watch
5  my computer etiquette.
6       Q.  All right.  Let's try this one.  Let me show
7  you Exhibit 482.
8            MR. WINTER:  You've already seen it.
9  It's in your stack at your left hand.
10           THE WITNESS:  482.
11           MR. WINTER:  482.
12           THE WITNESS:  Oh, it's over here?
13           THE REPORTER:  No, it's --
14           THE WITNESS:  Oh, you've got them in
15  number sequence.
16      Q.  (BY MR. BREEN)  Exhibit 482.  Now, do you --
17  did you create this document when you were in contract
18  marketing?
19      A.  Either I or one of my analysts.
20      Q.  And if you look at the chart on it, and you
21  look at the font, and compare this with Exhibit 364 --
22      A.  Okay.
23      Q.  -- does it appear to you that 364 was also
24  prepared by contract marketing when you compare the
25  setup and the fonts of these two documents?

Page 292

1            MS. TABACCHI:  Object to the form of the
2  question.
3       A.  Just because these fonts look similar, what's
4  the default font to a Lotus Notes and Excel
5  spreadsheet?  I mean, how many millions of people
6  would have the same font?
7       Q.  (BY MR. BREEN)  Okay.  All right.  Well,
8  then --
9       A.  That's just kind of --
10      Q.  Well, you know --
11      A.  I mean, I'm just -- I'm sorry.
12      Q.  I am, too.  I am, too, because I'm trying to
13  figure out, since your -- your -- your employer
14  provided these through counsel and represented that
15  these three exhibits came out of Abbott business
16  records --
17      A.  Uh-huh.
18      Q.  -- and you were the man in charge of the
19  department that created proposal analyses when it
20  appears that these were prepared, I'm doing the best I
21  can to figure out where they came from through my
22  questioning of you.  So let me ask this question.
23      A.  Okay.
24      Q.  Do you have any recollection whatsoever of
25  ever receiving a proposal analyses spreadsheet from a

Page 293

1  customer that looked anything like Exhibit 364, 360 or
2  308?
3       A.  I don't recall the specifics of request for
4  proposal during my tenure here.
5       Q.  That's not my question.  My question is:  Do
6  you recall ever receiving a proposal analysis prepared
7  by a customer that looked anything like 364, 360 or
8  308?
9       A.  I don't recall.
10           MS. TABACCHI:  Object to the question.
11      Q.  (BY MR. BREEN)  All right.  Now --
12      A.  I'm sorry.
13      Q.  Do you have any recollection that contract
14  marketing prepared proposal analyses on spreadsheets
15  when you were the manager of contract marketing?
16      A.  While I was the manager of contract
17  marketing, yes.
18      Q.  Now, when you were with contract marketing,
19  was there any kind of filing protocols that you-all
20  had to follow when you got a spreadsheet from a
21  customer?  Did you have to put it in a file, keep it
22  anywhere, log it anywhere?
23      A.  No.
24           MS. TABACCHI:  Object to the form.
25      A.  Not necessarily.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 294

1   Q.  (BY MR. BREEN)  Well, who would ordinarily
2  maintain something like this that you got from a
3  customer?
4   A.  Probably whoever received it.
5   Q.  And when you --
6   A.  Or it could have possibly gotten put in the
7  central filing.
8   Q.  And when you prepare a proposal analysis, was
9  there any protocols for how you should document that
10 you prepared a proposal analysis for a customer?
11     MS. TABACCHI:  Object to the form.
12  A.  No.  There wasn't really any set format
13 analyses of a set like procedure on how you do this,
14 no.
15  Q.  (BY MR. BREEN)  So based upon your best
16 recollection, then, you didn't have any procedures in
17 place whatsoever so anybody could determine today
18 whether Abbott prepared 360, 364 and 308 or whether a
19 customer prepared them, correct?
20     MS. TABACCHI:  Object to the form.
21  A.  Correct.
22  Q.  (BY MR. BREEN)  Let me show you what's been
23 marked as Exhibit --
24     MR. WINTER:  493.
25  Q.  (BY MR. BREEN)  -- 493.

Page 295

1   A.  (Witness reviewing document).
2   Q.  Ever seen a document like this before?
3   A.  I don't recall this one.
4   Q.  On the top left-hand corner it says,
5  "Chartwell/Nations Abbott Laboratories Proposal
6  Analysis."  Bates labeled TXABT 49911 (sic) through
7  499124.
8   A.  Yes.
9   Q.  And if you'll look on this column, the
10 columns at the top, you'll see "Chartwell Current Unit
11 Prices."  Do you see that?
12  A.  Yes.
13  Q.  Right before that you've got something called
14 an "Abbott Description."  Do you see that?
15  A.  Yes.
16  Q.  Does that indicate to you, since there's an
17 Abbott description on here, that this was an Abbott
18 document?
19     MS. TABACCHI:  Object to the form.
20  A.  Don't know.
21  Q.  (BY MR. BREEN)  Don't know.  All right.  And
22 then go over several columns you see "AWP - from
23 Redbook."  Do you see that?
24  A.  Yes.
25  Q.  June 1996.

Page 296

1   A.  Yes.
2   Q.  Who was the manager of contract marketing for
3  Alternate Sites Product Sales in June of 1996?
4     MS. TABACCHI:  Object to the form.
5     MR. BREEN:  What's wrong with that
6  question, Counsel?
7     MS. TABACCHI:  How do you know that he
8  knows the answer to that?  I mean, it's foundation.
9     MR. BREEN:  Foundation.
10  Q.  (BY MR. BREEN)  Were you the manager of
11 contract marketing in June of 1996?
12  A.  I don't believe so.
13     MS. TABACCHI:  I don't believe he was.
14  A.  I believe I was in national accounts at that
15 point.
16  Q.  (BY MR. BREEN)  National accounts at that
17 time.  Okay.  So who was in June of 1996?
18  A.  It would have either been the Stratevin guy
19 or Lynn Leone.
20  Q.  All right.  Now, let's -- let's go back over
21 this then because this morning I believe you testified
22 you became a national account manager sometime in
23 1997.
24  A.  Well, we've got -- my dates, you know, this
25 is a long time ago.  I'm remembering windows of time

Page 297

1  frames here when I just wrote them down like we just
2  talked about.
3   Q.  Right.
4   A.  If you go -- when I was in account, '86, '87,
5  about a two-year window.  When I was in the HPD
6  finance and analysis group, it would have been '88 to
7  '90 time frame.  About three years.  As the analyst
8  for contract marketing in Alternate Site, it was a
9  two -- two-, three-year window as well.  All the jobs
10 were two-, three-year windows.  Would be '91, '92.
11 And you've got a document that shows in '93, early '93
12 I was the manager.  With -- have that being a two-,
13 three-year window as well, '93, '95, then it would
14 have been the national account manager slot in that
15 window.  And then '98 to '01 would have been the
16 business development for Alternate Site window.  So
17 this would have been in the realm when I was in the
18 national account role.
19  Q.  Do you recall while you were involved with
20 contract marketing ever preparing a proposal analysis,
21 or supervising somebody that did, when AWP information
22 was put in the proposal analysis?
23  A.  I recall doing proposal analyses.  I don't
24 recall the AWP component and how they -- on how each
25 of the proposals were done.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 298

1    Q.  And you don't recall ever receiving one from
2  a customer with AWP information in it, do you?
3    A.  I don't recall that.
4    Q.  So can you explain, then, why Exhibit 364 has
5  AWP comparisons in it, 360 has AWP comparisons in it,
6  308 has AWP comparisons in it and now 493 has AWP
7  information from the Redbook in it --
8        MS. TABACCHI:  Object to the form of the
9  question.
10    Q.  (BY MR. BREEN)  -- all out of Abbott files
11  and all appearing to be proposal analyses that somehow
12  found their way into Abbott files?
13        MS. TABACCHI:  Object --
14    Q.  (BY MR. BREEN)  Can you explain why all these
15  documents refer to AWP information?
16        MS. TABACCHI:  Object to form of the
17  question.
18    A.  I don't know why the AWP information is in
19  there in each of these proposals.  This is -- you
20  know, I don't know how many proposals we did during
21  the time frame you're talking about.
22    Q.  (BY MR. BREEN)  I'm just asking since you did
23  so many proposals and since you have no recollection
24  of AWP ever being involved in the proposals, either
25  that you did or that you may have got from a customer,

Page 299

1  if you have any explanation as to why we see AWP
2  comparisons and AWP information in each and every one
3  of the proposals I've shown you today?
4        MS. TABACCHI:  Object to the question.
5  Asked and answered.
6    A.  I don't recall this stuff.  I'm sorry.
7    Q.  (BY MR. BREEN)  You don't recall?
8    A.  I don't recall this, no.  Sorry.
9    Q.  Do you know Michael Beck?
10    A.  Rep out of Texas.
11    Q.  Pardon me?
12    A.  A representative out of Texas, I believe, at
13  that -- at one point in his life and then he came from
14  Texas up to Abbott Park as a contract analyst in HPD.
15    Q.  Did he ever work as a contract analyst over
16  in ASP -- Alternate Sites Product Sales?
17    A.  No, not while I was there.
18    Q.  All right.  Did you ever instruct the people
19  working for you in contract marketing that they should
20  not include comparative AWP spread analyses in their
21  proposal analyses?
22    A.  No, I don't --
23        MS. TABACCHI:  Object to the form.
24    A.  I don't recall telling people to not or -- to
25  not or to include.

Page 300

1    Q.  (BY MR. BREEN)  And do you ever recall being
2  instructed by anybody at Abbott that Abbott personnel
3  should not discuss average wholesale price or
4  reimbursement spreads with customers?
5        MS. TABACCHI:  Object to the form.
6  Asked and answered.
7    A.  I don't recall a communication to that.
8        MR. BREEN:  Well, let's take a brief
9  break and I'll see if I have any more questions.  And
10  if I don't, I'll turn him over for -- to Mr. Gobena.
11        THE VIDEOGRAPHER:  Off the record at
12  5:15.
13        (Recess from 5:15 to 5:27)
14        THE VIDEOGRAPHER:  Stand by, please.
15  We're back on the record at 5:27.
16    Q.  (BY MR. BREEN)  Let's go back to Exhibit 160,
17  which is the Olsten Kimberly Quality Care proposal
18  analysis.
19        MR. BREEN:  Could you show him your
20  copy, and then I will -- I will pass this over really
21  quickly, but I need to ask him a question from this
22  document.
23        MS. TABACCHI:  He has a copy.
24        THE WITNESS:  I don't have the Olsten
25  one.  Is that the one we had to share?

Page 301

1    Q.  (BY MR. BREEN)  Now, if you look at the top
2  of this thing, you see it's got -- after the
3  description of the drug it's got the "Baxter Price."
4  Do you see that?
5    A.  Yes.
6    Q.  And then "Annualized Baxter Purchases."  Do
7  you see that?
8    A.  Yes.
9    Q.  So that would be the amount of purchases that
10  Olsten Kimberly is making from Baxter.
11    A.  Yes.
12    Q.  Then you go over to the next one and you've
13  got "Coram."
14    A.  Yes.
15    Q.  How would -- why would Abbott give Olsten the
16  proprietary Coram prices of a competitor?
17        MS. TABACCHI:  Object to the form.
18    A.  I don't know.
19    Q.  (BY MR. BREEN)  Was that your practice to --
20  to give one competitor the prices of another
21  competitor?
22    A.  No.
23    Q.  Wasn't that proprietary, confidential
24  information?
25        MS. TABACCHI:  Object to the form.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 302

1    Q.  (BY MR. BREEN)  Do you see those Coram
2  prices?  You've got a Coram price for --
3    A.  I see.
4    Q.  -- for every drug.  Why would you -- Abbott
5  have -- Alternate Sites Product provided that to one
6  of Coram's competitors?
7        MS. TABACCHI:  Object to the form.
8    A.  I don't believe -- I don't know.  To me this
9  appears a mixed document.
10    Q.  (BY MR. BREEN)  Well, let me ask you this
11  question:  Is it -- again, going back to Page 1.
12    A.  Yes.
13    Q.  Is it likely that this was an Abbott proposal
14  analysis prepared in-house by Abbott for consideration
15  by Abbott personnel?
16        MS. TABACCHI:  Object to the form.
17    Q.  (BY MR. BREEN)  Or is it more likely that you
18  were given a competitor its competitor's prices?
19        MS. TABACCHI:  Object to the form.
20    Q.  (BY MR. BREEN)  I mean a customer's
21  competitor's prices?
22        MS. TABACCHI:  Same objection.
23    Q.  (BY MR. BREEN)  Let's just go back and set
24  the foundation here.  Coram is in the home healthcare
25  business, right?

Page 303

1    A.  Yes.
2    Q.  So is Olsten Kimberly Quality Care, correct?
3    A.  Yes.
4    Q.  And Abbott Alternate Site sells drugs to both
5  of those companies, meanwhile they compete against one
6  another, right?
7    A.  I don't know if we sold to Olsten or not.
8  Coram, this was my account later on.  I know that we
9  sold to Coram.
10    Q.  Right.  So why -- is it likely that you
11  were -- that Abbott prepared this report to give to
12  Kimberly -- Olsten Kimberly or is it likely that it
13  prepared the report for internal use?
14        MS. TABACCHI:  Object to the form of the
15  question.
16    A.  That's unclear.  The first few pages up to
17  Page 4.
18        MS. TABACCHI:  Jim, can I get a copy of
19  this if we're going to --
20        MR. BREEN:  You may.  I'm going to --
21        MS. TABACCHI:  Okay.
22    Q.  (BY MR. BREEN)  The first few pages up to
23  Page 4.
24    A.  Appear to be different -- a different
25  analyses than the rest.

Page 304

1    Q.  Well, let's talk about the first four pages
2  up to Page 4.
3    A.  Because there you've got, as you said Coram's
4  price and Abbott proposed price, a VHA price.  You've
5  got a cost and a margin.
6    Q.  So if this was a proposal analysis done with
7  respect to potential business with Kimberly, who would
8  have Coram's prices, Kimberly or Abbott?
9    A.  Abbott would.
10        MS. TABACCHI:  Object to the form.
11    Q.  (BY MR. BREEN)  Okay.  So who -- who prepared
12  the first four -- at least the first four pages of
13  Exhibit 160?
14        MS. TABACCHI:  Object to the form.
15    A.  I don't know specifically who.
16    Q.  (BY MR. BREEN)  I mean, did Abbott prepare it
17  or did Kimberly prepare it?
18        MS. TABACCHI:  Object to the form.
19    A.  The first four to me would appear an Abbott
20  person.
21    Q.  (BY MR. BREEN)  Okay.  Now, what's the last
22  column on the first four pages say?
23    A.  Margin.
24    Q.  Pardon me?
25    A.  Margin.

Page 305

1    Q.  Whose margin?
2        MS. TABACCHI:  Object to the form.
3    A.  If you have a calculator, we can calculate
4  it.  I believe it's off the cost number.
5    Q.  (BY MR. BREEN)  All right.  And what's the --
6  what is the column directly before "Margin"?
7    A.  VHA.
8    Q.  And what's the column directly before that?
9    A.  Abbott proposed.
10    Q.  Now, if you'll keep going through -- go past
11  the first four pages and look at the top left-hand
12  column or corner, "Olsten Kimberly Quality Care
13  Proposal Analysis."  Do you see that?
14    A.  Yes, sir.
15    Q.  That's identical to what's on the first four
16  pages, correct?
17    A.  Appears.
18    Q.  Now, how many proposal -- you said you looked
19  at lots of proposal analyses when you were in contract
20  marketing, correct?
21    A.  Yes.
22    Q.  This information in the top left-hand corner
23  of every page where it says "Olsten Kimberly Quality
24  Care Proposal Analysis," it's on every page, correct?
25    A.  It looks different toward the back, but kind

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 306

1  of goes back and forth, yes.  Commentary "Olsten
2  Kimberly Quality Care Proposal Analysis" --
3     Q.  Including the pages --
4     A.  -- commentary.
5     Q.  Including the pages where -- where there's
6  comparisons between Abbott's AWP and the competitive
7  AWPs.  That also has the same "Olsten Kimberly Quality
8  Care Proposal Analysis" on the top left-hand corner of
9  every page, correct?
10    A.  Yes.
11    Q.  Now, based upon all of your knowledge having
12 been with contract marketing for all those years,
13 would you agree that it's likely that this report was
14 prepared by Abbott?
15       MS. TABACCHI:  Object to the form of the
16 question.  Asked and answered.
17    A.  I don't know that it's likely.  It's
18 possible.
19    Q.  (BY MR. BREEN)  It's possible.  And so it's
20 also possible that Kimberly had the Coram proprietary
21 prices, is that what you're saying?
22       MS. TABACCHI:  Object to the form of the
23 question.  This mischaracterizes the witness's
24 testimony.
25    A.  It's possible they also had --

Page 307

1     Q.  (BY MR. BREEN)  It's possible.
2     A.  -- competitive pricing.
3     Q.  That's possible.  Okay.
4     A.  Yeah.  I don't know if a materials manager
5  from Coram went to Olsten KQC.
6     Q.  Did you ever authorize any of your employees
7  in contract marketing to give to Kimberly the Coram
8  Alternate Site's prices?
9     A.  No.
10    Q.  Would that have been an authorized act if
11 they had done that?
12    A.  They would have --
13       MS. TABACCHI:  Object to the form.
14    A.  They would have known not to.
15    Q.  (BY MR. BREEN)  Okay.  Did you ever authorize
16 any of your employees when you were the manager of
17 contract marketing to do an AWP spread analysis where
18 they compared the spread on Abbott's products with a
19 competitor's products?
20       MS. TABACCHI:  Object to the form.
21    A.  I don't recall that kind of a request.
22    Q.  (BY MR. BREEN)  If they did that, would that
23 have been an authorized act or it would have been
24 unauthorized?
25       MS. TABACCHI:  Object to the form.

Page 308

1     A.  I don't know.  What do you mean by
2  "authorized"?  Authorized to me means I would have
3  asked them to do it.  Is that what you're asking?
4     Q.  I'm asking would you have prohibited -- if
5  they had come to you and said, "We would like to do
6  this spread analysis so we can show a customer that
7  they can make more money on our AWP spread than on a
8  competitor's," would you have said, "Okay.  Go do it"?
9        MS. TABACCHI:  Object to the form of the
10 question.  Calls for speculation.
11    A.  I -- I don't know one way or the other.
12    Q.  (BY MR. BREEN)  You don't know one way or the
13 other?
14    A.  No.
15    Q.  Well, you saw that document I showed you
16 earlier when John Ward told Dennis Miller to stop
17 talking about reimbursement and AWP spread with
18 customers, correct?
19       MS. TABACCHI:  Object to the form.
20    A.  Dennis Walker.
21    Q.  (BY MR. BREEN)  Dennis Walker, correct?
22    A.  Yeah.  Yeah.
23       MS. TABACCHI:  Object to the form.
24    A.  I didn't see that memo.
25    Q.  (BY MR. BREEN)  Pardon me?

Page 309

1     A.  I didn't see that memo.  I was not copied on
2  that memo.
3     Q.  I showed it to you --
4     A.  You showed it to me, correct.
5     Q.  If John Ward would have told you not to talk
6  about AWP reimbursement spreads with customers, would
7  you have then prohibited your employees from doing the
8  kind of AWP --
9     A.  Yeah.
10    Q.  -- reimbursement analysis we've seen on these
11 documents?
12       MS. TABACCHI:  Object to the form of the
13 question.  Please let --
14       MR. BREEN:  You object to form.  I'm not
15 asking what the basis is.
16       MS. TABACCHI:  I just want the witness
17 to let you finish asking your question before he jumps
18 in.
19       MR. BREEN:  Okay.  Read the question
20 back, please.
21       (Requested portion was read)
22       MS. TABACCHI:  Object to the form.
23    A.  If John asked me not to do that, yes, I would
24 have listened to my boss.  I don't recall him asking
25 me to do that though.

78 (Pages 306 to 309)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 310

1    Q.  (BY MR. BREEN)  Okay.  Just one final point.
2    These -- the proposal analyses that were -- that
3    contract marketing did when you were there, were they
4    prepared for the customers or prepared for the
5    national account managers to use in their discussions
6    with customers?
7            MS. TABACCHI:  Object to the form.
8    Q.  (BY MR. BREEN)  Or for some other reason?
9    A.  The analyses would be for internal purposes.
10   Q.  Internal purposes being what?
11   A.  To review what pricing that you're going to
12   give a customer.
13   Q.  Okay.  So why would the national account
14   managers want to see AWP comparisons?
15           MS. TABACCHI:  Object to the form of the
16   question.
17   A.  That I don't know.
18   Q.  (BY MR. BREEN)  Don't know.
19           MR. BREEN:  All right.  At this point
20   and in the interest of time, although I'm not finished
21   with this witness because we don't have all the
22   documents in this case yet, I am going to pass the
23   witness to the Department of Justice because they've
24   got some questions they want to ask and we want to
25   finish by 6 o'clock.

Page 311

1            EXAMINATION
2    BY MR. GOBENA:
3    Q.  All right.  Good evening, Mr. Kipperman.
4    A.  Hi.  How are you?
5    Q.  I'm going to try and be brief here because I
6    know that we're trying to wrap up here by 6 o'clock
7    today.  It's about 20 minutes to 6:00 right now.
8            Let's start first by saying I'm starting
9    the deposition in connection with the United States,
10   ex rel., Ven-A-Care versus Abbott Labs.
11           I'm going to start off first by
12   incorporating all the testimony and questioning that
13   was done earlier today for the sake of efficiency so
14   you don't have to have me go through everything all
15   over again.  And so I'll do that.
16           First of all, what I wanted to do is
17   start off by asking you, now, you're aware, obviously,
18   that there's a lawsuit that's been filed by the United
19   States government against Abbott Labs; is that
20   correct?
21   A.  Apparently, yes.
22   Q.  When did you first become aware that there
23   was a lawsuit filed by the United States against
24   Abbott Laboratories?
25           MS. TABACCHI:  I'm going to caution the

Page 312

1    witness not to --
2            MR. GOBENA:  Okay.
3            MS. TABACCHI:  -- reveal any
4    attorney-client communications.
5            MR. GOBENA:  Okay.  Fair enough.
6    A.  Is that the DOJ?
7    Q.  (BY MR. GOBENA)  Yes.
8    A.  Yeah.  There was some blurb in the -- the
9    Yahoo financing not too long ago I can remember.
10   Q.  Okay.  So you saw it in a news account,
11   basically?
12   A.  Yeah.  I believe it was on Yahoo finance.
13           MR. BREEN:  On Yahoo what?
14           THE WITNESS:  Yahoo finance.
15   Q.  (BY MR. GOBENA)  Were you aware that the
16   United States Department of Justice has been
17   investigating Abbott Labs prior to seeing that news
18   account about the lawsuit?
19   A.  No.
20   Q.  Okay.  Now, Mr. Breen earlier today was
21   asking you about some documents that you had in your
22   possession and document -- whether or not you produced
23   documents in this case.  Do you recall that -- that
24   testimony?
25   A.  Yeah.  The questions.

Page 313

1    Q.  Were you aware or not aware that in February
2    of 1996 the Department of Justice issued what's called
3    a civil investigative demand asking for documents from
4    Abbott Laboratories?
5    A.  I don't --
6    Q.  That's what happened in February of '96.
7    A.  I don't recall if that was the request that
8    we got.
9    Q.  Okay.  Now, I realize it was a little bit --
10   it's almost 11 years now --
11   A.  Yeah.
12   Q.  -- from that request, but do you recall ever
13   being asked sometime in February '96, which I guess
14   you would have transitioned to the national account
15   manager position at that stage, do you recall ever
16   getting a request from anyone to collect any documents
17   that you had in your possession in response to an
18   investigative demand from the Department of Justice?
19   A.  I don't --
20           MS. TABACCHI:  Object to the form.
21   A.  I don't recall it being the Department of
22   Justice.  I remember getting a request to hold
23   everything.
24   Q.  (BY MR. GOBENA)  What's your best
25   recollection in terms of when you got a request to --

79 (Pages 310 to 313)

Page 314

1  you said hold everything, is that what you just said?
2      A.  Yeah.
3      Q.  What do you mean by "hold everything"?
4      A.  For AWP related stuff and -- and whatnot,
5  that there's an investigation and we are not to do
6  anything with our files.  Everything was to be held
7  and paralegals were -- we had paralegals come through
8  and go through our files.
9      Q.  Okay.  So you were instructed to preserve
10 your documents?
11     A.  Yes.
12     Q.  Okay.  And you were told that there would be
13 people coming to go through your documents and, what,
14 collect document -- collect things from your -- from
15 your records, is that --
16     A.  Correct.
17     Q.  Okay.  And, again, what -- what's your best
18 estimate as to when that instruction came down?
19     A.  I really don't know the time specifically and
20 I was guessing '98 earlier.  Is it '96?  You know,
21 whenever you guys asked us to do it and whenever the
22 paralegals came.
23     Q.  So the request to preserve the documents and
24 the paralegals coming all happened at approximately
25 the same time?

Page 315

1      A.  Yeah.  It was fairly right back to back.
2      Q.  Okay.  And did you personally go through any
3  of your own documents and collect them and provide
4  them to anyone at Abbott to produce in response to any
5  investigative demands from the United States?
6          MS. TABACCHI:  Object to the form.
7      A.  I don't recall if I personally did.  If I
8  was -- moved on to the job, it was whoever was in that
9  office.
10     Q.  Did you actually personally observe the
11 paralegals or -- who came to go through your files as
12 they related to AWP pricing issues?
13     A.  I believe I saw the individuals swing by, but
14 I don't remember who it was.
15     Q.  Okay.  You saw them swing by.  Where did they
16 swing by?  Into your actual office?
17     A.  Down -- down the hall, yeah, when they were
18 there.
19     Q.  Okay.  And when you say, "down the hall,"
20 what do you mean?  Is there a document storage area
21 that was down the hall from your office?
22     A.  There was a bank of file cabinets that we had
23 out there and I think I said kind of, you know,
24 "What's she doing?"
25     Q.  So when -- you mentioned earlier that you

Page 316

1  kept certain documents, I guess these were the
2  significant incident reports, on your computer; is
3  that correct?
4          MS. TABACCHI:  Object to the form.
5      A.  The highlights?
6      Q.  (BY MR. GOBENA)  The highlights.  Okay.
7      A.  Yeah.  That stuff, I believe, would have just
8  been on the PC.
9      Q.  Okay.  And any other print documents that you
10 had, would you have kept them in your -- stored them
11 in your office or would you have stored them, let's
12 say, in this bank of cabinets that you're referring
13 to?
14         MS. TABACCHI:  Object to the form.
15     A.  It would have varied.  There was the big bank
16 of cabinets outside and then you had two drawers in
17 your office or three drawer -- file drawers in your
18 office, so ... it would have varied what, you know,
19 what was there.
20     Q.  Okay.  And let's -- let's focus in particular
21 on your period as the -- when you were first an
22 analyst, I guess, in the contract marketing and then
23 Alt Site Product Services group and then became a
24 manager.  During the course of that time period do you
25 recall whether or not you preserved all your documents

Page 317

1  or whether or not you threw some documents away?  What
2  do you recall about your document retention practices
3  in that period?
4          MS. TABACCHI:  Object to the form.
5      A.  When I was down in Lake Bluff, that was the
6  early days when I was doing primarily Provider pump
7  stuff.  I don't recall if I saved paper copies or --
8  paper copies.  I had a cubicle back then.  It was very
9  small.
10     Q.  (BY MR. GOBENA)  Okay.  Let me ask you --
11     A.  So --
12     Q.  -- did -- I'm sorry.  I didn't mean to
13 interrupt you.
14     A.  No.  Go ahead.
15     Q.  Okay.  Did your group have a document
16 retention policy that was in effect in that time
17 period, again, when you were the -- in the contract
18 marketing and Alt Site Product Services?
19     A.  Well, there was --
20         MS. TABACCHI:  Object to the form.
21     A.  There was no specific retain old documents
22 for X time period.
23     Q.  (BY MR. GOBENA)  So it was basically up to
24 the individual employee in terms of what they need at
25 any point in time to keep in their possession?

80  (Pages 314 to 317)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 318

1    A.  Yes, sir.
2    Q.  Okay.  And was that also true when you moved
3  on to your position as a national account manager
4  subsequent?
5    A.  Yes.  There wasn't an official, you know, you
6  keep every correspondence from a customer or there was
7  no rules --
8    Q.  Okay.  Until --
9    A.  -- as to what you retained.
10    Q.  Until that preservation request came down you
11  said sometime when you were in business development, I
12  guess, in Alt Site.
13    A.  There was a request to preserve documents.
14    Q.  Okay.  I'm going to ask you a little bit
15  about these significant events reports.  Is that the
16  correct term for it, significant --
17    A.  What, the highlights?
18    Q.  Yeah, the highlights.  Is that what they're
19  called?
20        Did you regularly -- did you always
21  do -- you said you did -- you produced those reports
22  or you drafted them monthly; is that correct?
23    A.  Yes.
24    Q.  Okay.  And were you -- did you do that
25  regularly then?  You actually did it -- every month

Page 319

1  you generated one of those significant events reports?
2    A.  There was a --
3        MS. TABACCHI:  Object to the form.
4    A.  There was a due date, I don't recall what it
5  was, but for your significant highlights.
6    Q.  (BY MR. GOBENA)  Now, do you know whether the
7  other national account managers who were -- were at
8  Abbott Alternate Site at the same time period, do you
9  know whether they were generating monthly significant
10  events reports as well?
11    A.  I don't know for a fact, but I would assume
12  since the boss requested it from all of us that they
13  were as well.  But I don't have any knowledge per se.
14    Q.  So it wasn't a specific reference to you to
15  have a significant events report, it was just
16  something -- you believe it's something that your boss
17  requested just generally from --
18    A.  Yeah.
19    Q.  -- the national account managers?
20    A.  From, I think, everybody in the group that
21  reported to him.
22    Q.  And do you -- do you know whether or not that
23  practice of generating significant events reports was
24  in place prior you becoming a national accounts
25  manager?

Page 320

1        MS. TABACCHI:  Object to the form.
2    A.  That -- that I'm not sure.  I'm not sure of
3  the timing of that.
4    Q.  (BY MR. GOBENA)  I want to ask you about --
5  just a little follow-up here on a couple of points
6  from Mr. Winter's and Mr. Breen's questioning from
7  earlier today.
8        At one point you testified that you
9  don't -- let me make sure I've got this right.  You
10  don't recall ever talking about the spread with the
11  customers that you were interacting with as a national
12  account manager; is that correct?
13    A.  Correct.
14    Q.  Okay.  So is it that you -- I know this is
15  getting really specific, but is it that you don't
16  recall or that you never did actually discuss
17  reimbursement spreads with your -- with the customers
18  that you interacted with as a national account
19  manager?
20        MS. TABACCHI:  Object to the form.
21    A.  I don't recall those kinds of conversations
22  with my customers.
23    Q.  (BY MR. GOBENA)  Okay.  Could you identify
24  some of the -- to the best of your recollection, some
25  of the people that you interacted with at -- some of

Page 321

1  your customer reps that you interacted with when you
2  were the national account manager?
3    A.  Well, primarily I had two homecares, which
4  would have been Coram --
5    Q.  Uh-huh.
6    A.  -- and Nations.  And Coram was Joe Bane, who
7  moved over to Nations.  There was the woman in Utica
8  for Lincare.  And then there were GPO guys on the
9  hospital side and there were so many of those guys, I
10  can't remember the names off the top of my head, but
11  typically, like with the VHA, I would go down with the
12  HPD/VHA national account manager and had meetings.
13  And down there they had, you know, staffs of people
14  kind of a thing.
15        It's not that -- it's not like a sales
16  rep where you call on these guys all the time.  It was
17  more of a role where you go down once a year kind of a
18  thing.  So with the VHA guys and those big GPOs, like
19  a Doug Johnson, who had VHA, or the other NAMs that
20  were the lead person on those accounts, they -- they
21  took the lead on them.
22    Q.  Okay.  So insofar as names that you can
23  remember of these customer reps that you interacted
24  with when you were a national account manager, you
25  said Joe Bane at Coram and later National Healthcare

81 (Pages 318 to 321)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 322

1  and then Doug Johnson at VHA?
2      A.  Doug Johnson was the Abbott guy --
3      Q.  I see.
4      A.  -- at VHA.  VHA had -- you know, if you pull
5  up their Web site they've got 30, 40 people doing
6  things there.  So I don't recall specific names.
7      Q.  Okay.  So you don't remember any other names
8  of any of the customer reps you would have interacted
9  with when you were a national account manager at Alt
10  Site Product Services?
11      A.  On the product services, those three guys are
12  the -- the woman at Lincare, Joe --
13      Q.  Sorry.  Joe Bane and the woman in Utica at
14  Lincare and then who's the third one --
15      A.  Well, whoever replaced Joe at Coram.  I don't
16  recall the guy's name off the top of my head.
17      Q.  Okay.  Let me direct your attention back
18  to -- I think -- it was marked as Exhibit 61 in the
19  Texas case and also I think it's marked as 480 because
20  it's this May 26th, 1994 memorandum --
21      A.  Yes.
22      Q.  -- of the current Redbook AWPs.
23          As we -- when Mr. Breen, I think, was
24  questioning you earlier, there was reference to
25  deposition testimony that was given by Michael Heggie

Page 323

1  in West Virginia.  Do you recall him reading some
2  excerpts from that testimony?
3      A.  Yes.
4      Q.  Okay.
5      A.  He said I was hounding him.
6      Q.  Right.  That's right.  You were hounding him.
7  You know, who knows what the basis is for that -- is
8  for that characterization.
9          But I guess more importantly, one of the
10  things he says that this was a, quote, Steve
11  Kipperman project.  It's on Page 46 of the deposition.
12      A.  Okay.
13      Q.  Do you agree with him that this was a Steve
14  Kipperman project, this AWP endeavor that's listed
15  here on this -- on this memorandum?
16          MS. TABACCHI:  Object to the form.
17      A.  Yeah.  I don't know how Michael would
18  characterize it and I -- you know, I don't recall why
19  I sent it out, but I sent it out, so it would have
20  been whatever, my doing.
21      Q.  (BY MR. GOBENA)  Okay.  Do you -- do you
22  recall being asked by anyone to send out this
23  memorandum or -- let's leave it at that first.
24          MS. TABACCHI:  Object --
25      A.  Yeah.

Page 324

1          MS. TABACCHI:  Go ahead.  You may
2  answer.
3          Object to the form.  Asked and answered.
4      A.  Yeah.  I don't recall.
5      Q.  (BY MR. GOBENA)  Okay.  Who was your direct
6  supervisor at Alt Site contract -- who was overseeing
7  you as the contracting manager at Alt Site --
8      A.  That --
9      Q.  -- during this time period?
10      A.  That would have been John Ward.
11      Q.  Okay.  Did you talk to John Ward about --
12  about this memorandum that you sent out?
13      A.  I don't recall that.
14          MR. GOBENA:  For right now I'm going to
15  end the deposition for the time being.  We -- as you
16  know, we have a -- Tina, we have a back and forth
17  going on about documents and --
18          MS. TABACCHI:  Sure.
19          MR. GOBENA:  -- what documents should be
20  produced.  And so reserve the right to call
21  Mr. Kipperman again.  But at this stage, you know,
22  incorporating both what Mr. Winter and Mr. Breen,
23  their questioning and my own, I think we are done for
24  right now.
25          MS. TABACCHI:  Very good.  Thank you.

Page 325

1  Anyone else?
2          THE VIDEOGRAPHER:  Off the record at
3  5:52.
4          (Deposition adjourned at 5:52)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82  (Pages 322 to 325)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 326

1                CHANGES AND SIGNATURE
2   PAGE    LINE        CHANGE        REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 328

1                        NO. D-1-GV-04-001286
2   THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                              )
3   ex rel.                   )
      VEN-A-CARE OF THE       )
4    FLORIDA KEYS, INC.,      )
          Plaintiffs,         )
5                             )
    VS.                       ) TRAVIS COUNTY, TEXAS
6                             )
    ABBOTT LABORATORIES INC.,  )
7   ABBOTT LABORATORIES, and  )
    HOSPIRA, INC.,            )
8       Defendant(s).         ) 201ST JUDICIAL DISTRICT
9
                 REPORTER'S CERTIFICATION
10            DEPOSITION OF STEVE KIPPERMAN
                     March 7, 2007
11
12      I, Cynthia Vohlken, Certified Shorthand Reporter
13  in and for the State of Texas, hereby certify to the
14  following:
15      That the witness, STEVE KIPPERMAN, was duly sworn
16  by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19      That the deposition transcript was submitted on
20  March 16, 2007, to the witness or to the attorney for
21  the witness for examination, signature and return to
22  me by April 11, 2007;
23
24
25

Page 327

1      I, STEVE KIPPERMAN, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5
6              STEVE KIPPERMAN
7
8
9   THE STATE OF              )
10  COUNTY OF                 )
11    Before me,               , on this day
12  personally appeared STEVE KIPPERMAN, known to me (or
13  proved to me under oath or through
14                   ) (description of identity
15  card or other document) to be the person whose name is
16  subscribed to the foregoing instrument and
17  acknowledged to me that they executed the same for the
18  purposes and consideration therein expressed.
19    Given under my hand and seal of office this
20       day of            , 2007.
21
22
23
               NOTARY PUBLIC IN AND FOR
24             THE STATE OF
25

Page 329

1      That the amount of time used by each party at the
2   deposition is as follows:
3         Mr. Raymond Winter - 02:32
          Mr. James Breen - 03:03
4         Mr. Gejaa Gobena - 00:12
5      That pursuant to information given to the
6   deposition officer at the time said testimony was
7   taken, the following includes counsel for all parties
8   of record:
9         MR. RAYMOND WINTER,
             Attorney for Plaintiff The State of Texas;
10        MR. JAMES JOSEPH BREEN,
             Attorney for the Relator;
11     MS. TINA TABACCHI
             Attorney for Defendants Abbott
12        Laboratories, Inc. and Hospira, Inc.
          MR. GEJAA GOBENA and MS. REBECCA FORD,
13           Attorneys for Plaintiff United States of
             America
14     MS. JENNIFER CONNOLLY,
             Attorney for Plaintiff State of Arizona
15           and MDL Plaintiffs
          MR. JARED T. HECK,
16           Attorney for Defendants Roxane Laboratories
             Inc. As well as Several Independent
17           Boehringer Entities
18     I further certify that I am neither counsel for,
19  related to, nor employed by any of the parties or
20  attorneys in the action in which this proceeding was
21  taken, and further that I am not financially or
22  otherwise interested in the outcome of the action.
23
24
25

                              83  (Pages 326 to 329)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c

Page 330

```
1     Further certification requirements pursuant to
2  Rule 203 of TRCP will be certified to after they have
3  occurred.
4     Certified to by me this 16th day of March, 2007.
5
6
7
              Cynthia Vohlken, Texas CSR 1059
8             Expiration Date:  12/31/2008
              Firm Registration No. 82
9             Fredericks-Carroll Reporting
              7800 Shoal Creek Boulevard
10            Suite 200 W
              Austin, Texas 78757
11            Telephone: (512) 477-9911
                    (800) 234-3376
12            Fax:    (512) 345-1417
13 JOB NO. 2209
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 331

```
1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned to
3  the deposition officer on          , 2007;
4     If returned, the attached Changes and Signature
5  page contains any changes and the reasons therefor;
6     If returned, the original deposition was delivered
7  to Mr. Raymond Winter, Custodial Attorney;
8     That $    is the deposition officer's
9  charges to the Plaintiff State of Texas for preparing
10 the original deposition transcript and any copies of
11 exhibits;
12    That the deposition was delivered in accordance
13 with Rule 203.3, and that a copy of this certificate
14 was served on all parties shown herein on and filed
15 with the Clerk.
16    Certified to by me this       day of
17        , 2007.
18
19
              Cynthia Vohlken, Texas CSR 1059
20            Expiration Date:  12/31/2008
              Firm Registration No. 82
21            Fredericks-Carroll Reporting
              7800 Shoal Creek Boulevard
22            Suite 200 W
              Austin, Texas 78757
23            Telephone: (512) 477-9911
                    (800) 234-3376
24            Fax:    (512) 345-1417
   JOB NO. 2209
25
```

84 (Pages 330 to 331)

d29bc6aa-15f9-4dd5-9aec-05b3d2d29b7c