# Exhibit 102

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 1

                    IN THE UNITED STATES

                  DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

                                ) Civil Action No.

THIS DOCUMENT RELATES TO:       ) 01-CV-12257-PBS

                                )

ALL CASES                       )

                                ) Judge Patti B. Saris

**************************************************

          ORAL AND VIDEOTAPED DEPOSITION

           OF RICHARD A. GONZALEZ

                June 3, 2008

              HIGHLY CONFIDENTIAL

**************************************************

     ORAL AND VIDEOTAPED DEPOSITION OF RICHARD A.

GONZALEZ, taken in the above-entitled cause pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts, pertaining to the taking of

depositions, taken before ROBIN M. CHIMNIAK, a Notary

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 2

1  Public within and for the County of DuPage, and the
2  State of Illinois, and a Certified Shorthand Reporter,
3  taken at 77 West Wacker Drive, Suite 3500, Room C,
4  Chicago, Illinois, on the 3rd day of June, 2008, at
5  the hour of 9:09 a.m.
6
7              A P P E A R A N C E S
8  FOR THE PLAINTIFF UNITED STATES OF AMERICA:
9       GEJAA T. GOBENA
10      United States Department of Justice, Civil Division
11      601 D Street NW
12      PHB-9028/P.O. Box 261
13      Washington, D.C. 20044
14      202.307.1088
15
16   MS. ANN ST. PETER-GRIFFITH
17      United States Attorney's Office
18      Southern District of Florida
19      Assistant Attorney General
20      99 N.E. 4th Street, 3rd Floor
21      Miami, Florida 33132
22      305.961.9419

Page 3

1              A P P E A R A N C E S
2  FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
3      MR. ELISEO SISNEROS
4      Deputy Attorney General
5      BMFEA - Bureau of Medi-Cal Fraud & Elder Abuse
6      State of California Department of Justice
7      110 West A Street #1100
8      San Diego, California 92101
9      619.688.6043
10  FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS, INC.:
11      MR. JAMES J. BREEN
12      5755 North Point Parkway
13      Suite 39
14      Alpharetta, Georgia 30022
15      770.740.0008
16  FOR THE COMMONWEALTH OF PENNSYLVANIA:
17      MR. DONALD E. HAVILAND, JR.
18      The Haviland Law Firm, LLC
19      740 S. Third Street
20      Third Floor
21      Philadelphia, Pennsylvania 19147
22      215.609.4661

Page 4

1              A P P E A R A N C E S
2  FOR THE DEFENDANTS ABBOTT LABORATORIES, INC., AND
3  HOSPIRA, INC.:
4      MR. DANIEL E. REIDY
5      Jones Day
6      77 West Wacker Drive
7      Chicago, Illinois 60601-1692
8      312.782.3939
9
10  FOR THE DEFENDANT ABBOTT LABORATORIES, INC.:
11      MS. LAURA J. SCHUMACHER
12      Dept. 364, Bldg. AP6D
13      100 Abbott Park Road
14      Abbott Park, Illinois 60064-6020
15      847.937.5726
16
17  ALSO PRESENT:
18      Mr. Anthony Micheletto, Videographer
19
20
21
22

Page 5

1              I N D E X
2  WITNESS                        PAGE
3  RICHARD A. GONZALEZ
4      Examination by Ms. St. Peter-Griffith      9
5
6              E X H I B I T S
7  NUMBER                          PAGE
8  Exhibit Gonzalez 001   Work History          12
9  Exhibit Gonzalez 002   ABT086-0001           54
10 Exhibit Gonzalez 003   ABT-DOJ 0228272       54
11 Exhibit Gonzalez 004   9/30/99 letter from   207
12      Lavine to Reidy
13 Exhibit Gonzalez 005   TXABT 158513          208
14 Exhibit Gonzalez 006   TXABT 674744          210
15 Exhibit Gonzalez 007   TXABT 674736          212
16 Exhibit Gonzalez 008   ABT-DOJ-E 0612745     247
17 Exhibit Gonzalez 009   7/25/00 letter from   248
18      Hillier to Abbott
19 Exhibit Gonzalez 010   ABT-DOJ 0006692       249
20 Exhibit Gonzalez 011   TXABT38105            252
21 Exhibit Gonzalez 012   Abbott Corporate Overview  255
22      Sellers 8, Smith 250

2 (Pages 2 to 5)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

---

Page 6

1            E X H I B I T S
2    NUMBER                          PAGE
3    Exhibit Gonzalez 013   TXABT 453403      257
4    Exhibit Gonzalez 014   ABT 277679        260
5    Exhibit Gonzalez 015   ABT-DOJ 0055272      273
6    Exhibit Gonzalez 016   MHA007852        278
7    Exhibit Gonzalez 017   ABT-DOJ 0173355      280
8    Exhibit Gonzalez 018   VTP038-0106        283
9    Exhibit Gonzalez 019   TXABT-E 0621602      287
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 8

1   Department of Justice on behalf of the United States.
2        MR. SISNEROS:  Eliseo Sisneros, Deputy
3   Attorney General on behalf of the State of California.
4        MR. HAVILAND:  This is Don Haviland for the
5   Commonwealth of Pennsylvania.
6        THE VIDEOGRAPHER:  Counsel, can you
7   introduce yourself?
8        MS. SCHUMACHER:  Laura Schumacher, Abbott
9   Laboratories.
10       MR. REIDY:  Dan Reidy on behalf of Jones Day.
11       THE VIDEOGRAPHER:  The court reporter today
12   is Robin Chimniak from Henderson Legal Services of
13   Washington, D.C.
14       Please swear in the witness.
15            (Witness sworn.)
16       THE VIDEOGRAPHER:  You may proceed.
17       MS. ST. PETER-GRIFFITH:  Good morning,
18   Mr. Gonzalez.
19       THE WITNESS:  Good morning.
20       RICHARD A. GONZALEZ,
21   called as a witness herein, having been first duly
22   sworn, was examined and testified as follows:

---

Page 7

1        THE VIDEOGRAPHER:  This is Anthony
2   Micheletto representing Henderson Legal Services.  I
3   am the operator of this camera.
4        This is the videotaped deposition of
5   Richard Gonzalez, being taken pursuant to Federal
6   Rules of Civil Procedure on behalf of plaintiff.
7        We are on the record on June 3rd, 2008.
8   The time is 9:09 a.m., as indicated on the video
9   screen.
10       We are at the offices of Jones Day, 77 West
11   Wacker Drive, Chicago, Illinois.  This deposition is
12   being taken In Re Pharmaceutical Industry Average
13   Wholesale Price Litigation, Case No. 01 12257-PBS.
14       Will the attorneys please identify
15   themselves for the video record.
16       MS. ST. PETER-GRIFFITH:  Ann St.
17   Peter-Griffith from the United States Attorney's
18   Office, Southern District of Florida, on behalf of the
19   United States.
20       MR. BREEN:  Jim Breen.  I represent the
21   Relator, Ven-A-Care of the Florida Keys.
22       MR. GOBENA:  Gejaa Gobena, United States

---

Page 9

1            EXAMINATION
2   BY MS. ST. PETER-GRIFFITH:
3        Q.  Sir, can you state your full name, please,
4   for the record and spell it?
5        A.  Richard A. Gonzalez, G-o-n-z-a-l-e-z.
6        Q.  Mr. Gonzalez, where do you reside?
7        A.  4011 South Ocean Boulevard, Highland Beach,
8   Florida 33487.
9        Q.  Have you lived in Florida long?
10       A.  Just about seven or eight months.
11       Q.  Okay.  And where did you reside before you
12   moved to Florida?
13       A.  800 North Michigan Avenue, Chicago --
14   No. 5303, Chicago, Illinois 60611.
15       Q.  Okay.  Sir, have you ever had your
16   deposition taken before?
17       A.  Yes, once.
18       Q.  When was that?
19       A.  Sometime in the early to mid-'80s.
20       Q.  And in connection with what litigation; do
21   you recall?
22       A.  It was in connection with litigation

---

3 (Pages 6 to 9)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 10

1  between Genetic Systems and Abbott Diagnostics.
2      Q.  Well, what I'd like to do is sort of go
3  through a few deposition ground rules just -- the '80s
4  was a little while ago.
5          The first ground rule is that in order for
6  the -- for the transcript to be clear, you need to --
7  to answer audibly, okay?
8      A.  Yes.
9      Q.  If at any time you don't understand a
10  question that I'm asking or you think I'm confused or
11  you're confused by it, stop me, tell me that, and I'll
12  try and -- and rework my question so that we're both
13  on the same page, okay?
14      A.  Yes.
15      Q.  Because otherwise what happens is I'm
16  asking a question and you're giving an answer and we
17  might not be in sync, okay?
18      A.  I understand.
19      Q.  If at any time you need to take a break,
20  just let me know.  We're happy to do that.
21          We have a whole series of documents to show
22  you.  Take as much time as you need to review them.

Page 11

1          And if at any time you have any questions,
2  just, you know, let us know.  If you feel that at any
3  time you need to respond and your response might
4  involve privilege, just let us know as well and
5  certainly we'll let you confer with Mr. Reidy.  My
6  only request is that if other than for privilege
7  reasons, you need to take a -- if you need to take a
8  break, what I'd like to do is not have that during the
9  pendency of a question, okay?
10      A.  I understand.
11      Q.  Sir, what I'd like to do is -- is go back,
12  is have you describe your educational background,
13  starting with your -- your high school.  Where did you
14  go to high school?
15      A.  Sure.  I attended Miramar High School in
16  Miramar, Florida, and then I attended the University
17  of Houston, University of Miami, Florida International
18  University.  And then I joined Abbott in June of 1977
19  as a technical sales specialist.
20      MR. REIDY:  I should interject.  I
21  apologize.
22      MS. ST. PETER-GRIFFITH:  Sure.

Page 12

1      MR. REIDY:  I forgot to do this.
2      I brought along a work history document for
3  all the jobs he's had with Abbott.  So I thought that
4  might be useful to you.
5      THE WITNESS:  Am I allowed to have one?
6      MS. ST. PETER-GRIFFITH:  Sure.  Why don't
7  we mark this as the first exhibit, if we could.
8      MR. BREEN:  I went to Miramar High School
9  for a brief period of time.  This is the first time I
10  ran into anybody that did also.
11          (Whereupon Deposition
12           Exhibit Gonzalez 001 was
13           marked as requested.)
14      MS. ST. PETER-GRIFFITH:  Tony, are we
15  ready?
16      THE VIDEOGRAPHER:  Yes.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Sir, let's back up a little bit.  Are you
19  from Florida originally?
20      A.  Yes.
21      Q.  Were you born in South Florida?
22      A.  I was born in Ohio but moved to South

Page 13

1  Florida when I was two and a half.
2      Q.  What years did you attend -- is it
3  University of Houston?
4      A.  Yes.  1972 through 1974.
5      Q.  Okay.  And did you obtain a degree from
6  University of Houston?
7      A.  No.
8      Q.  Then you went to University of Miami?
9      A.  Yes.
10      Q.  Fine institution, as Mr. Breen and I can
11  attest as alums.
12          When did you attend University of Miami?
13      A.  Right after that for approximately a year.
14      Q.  So in '75?
15      A.  Yeah, roughly.
16      Q.  And did you obtain a degree?
17      A.  No.
18      Q.  You were there as an undergraduate though?
19      A.  Yes.
20      Q.  And then you went to FIU?
21      A.  Yes.
22      Q.  What years did you attend FIU?

4 (Pages 10 to 13)

Henderson Legal Services, Inc.

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 14

1    A.  Approximately a year after that.
2    Q.  So '76 to '77?
3    A.  Roughly.
4    Q.  And did you obtain a degree from FIU?
5    A.  No.
6    Q.  Do you have -- hold any postsecondary
7  degrees?
8    A.  No.
9    Q.  What were your areas of concentration or
10  major in -- in college?
11    A.  Biology and chemistry.
12    Q.  Okay.  And then from FIU you went straight
13  to Abbott; is that fair?
14    A.  I worked in a research lab at the
15  University of Miami for approximately a year, and I
16  worked at various other places in between, if that's
17  important.
18    Q.  Just generally can you give us the names of
19  the other places that you worked?
20    A.  I worked on construction during the
21  summers.
22    Q.  Oh, okay.

Page 15

1    A.  I worked as a pathology assistant at
2  Variety Children's Hospital, which I think is now
3  called Miami Children's Hospital, assisting in
4  autopsies.
5       I worked at Dade Diagnostics in their
6  coagulation laboratory.
7       That's all I recall.
8    Q.  Okay.  When you worked in a research lab at
9  University of Miami, was it for a particular
10  department?
11    A.  Department of immunology.
12    Q.  Okay. Sir, what I'd like to do is go
13  through your work history with Abbott.  Okay?
14    A.  Yes.
15    Q.  Beginning in 06 of 1997, it appears from
16  your work history you were sales representative.  What
17  is ADD?
18    A.  Abbott Diagnostics Division.
19    Q.  Okay.  And you were a representative, it
20  appears, for three years?
21    A.  Probably more like two-and-a-half years,
22  two-and-a-quarter years.  There is probably a little

Page 16

1  bit of rounding here.
2    Q.  Sir, what was your -- what were the
3  products that you were responsible for as a sales
4  representative?
5    A.  The diagnostics division basically sells in
6  vitro diagnostics tests.  And what I was responsible
7  for was the installation and training of capital
8  equipment, clinical chemistry equipment, and then the
9  sale of the reagents on those systems.
10      So I would train the customer once a system
11  was sold on how to operate the system, how to run the
12  various tests on the system, and it was my
13  responsibility also to try to sell them the reagents
14  on the system because they could use other people's
15  reagents as well.
16    Q.  Okay.  Who was your supervisor?
17    A.  I believe it was a person named Buzz
18  Gaines.
19    Q.  Okay.  And --
20    A.  That was a long time ago though.
21    Q.  Okay.  Were you then promoted to the sales
22  trainer position?

Page 17

1    A.  I was.
2    Q.  Okay.  What were your job responsibilities
3  as a sales trainer?
4    A.  Essentially it's the same division.  So my
5  responsibility at that point was to train new
6  representatives on how to do what I did before.  So
7  install equipment, do training, sell reagents.
8    Q.  Okay.  And was Mr. Gaines your supervisor
9  at that time?
10    A.  No.
11    Q.  Who was your supervisor?
12    A.  I don't recall.
13    Q.  Do you recall whether you supervised anyone
14  in this position?
15    A.  No.
16    Q.  No, you didn't?  Or no, you don't recall?
17    A.  No.  No, I didn't.  I'm sorry.
18    Q.  That's okay.
19      Then you became a product manager.  Well,
20  actually before I get to that, let me ask you.
21  Where -- when you were sales rep, where did you live?
22    A.  I lived in Florida as a sales rep.

Henderson Legal Services, Inc.

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 18

1    Q. Okay. Was that your territory?
2    A. It was the four states around Florida. So
3  it was Florida, Georgia, Alabama, Mississippi, and
4  half of Louisiana.
5    Q. And what about when you were a sales
6  trainer?
7    A. When I was a sales trainer, I lived in
8  Dallas, Texas.
9    Q. Okay. And then you became a product
10 manager?
11   A. Yeah.
12       I just realized there's one job in here
13 that's missing, and I apologize because they showed
14 this to me earlier and I just didn't notice it.
15       So in between the sales trainer and the
16 product manager position, I would have been promoted
17 to a capital equipment salesman in Los Angeles,
18 California. And I did that for about 12 months.
19   Q. Okay.
20   A. And essentially what that -- what that job
21 did was, I described to you before about how the first
22 position trained people on the equipment. A different

Page 19

1  person had responsibility for actually selling the
2  equipment. So this job was selling the equipment.
3    Q. Do you remember approximately when that
4  was? Was it in between when you were a sales trainer
5  and a product manager?
6    A. Yes, it is in between there.
7    Q. Okay. And then you became the product
8  manager?
9    A. Correct.
10   Q. Okay. What is TDX system?
11   A. TDX stands for therapeutic drug monitoring
12 system. So it's a diagnostic instrument that
13 primarily at that time was utilized to measure various
14 therapeutic drugs, drugs that you needed to be able to
15 operate in a very tight level, the patient's response.
16       So an example would be digoxin, a cardiac
17 drug, where if it's too high, the patient can get
18 injured. So you monitored and determined that that
19 drug is in a certain level.
20   Q. Who's your supervisor in this position?
21   A. Jim Danehy.
22   Q. And where -- where was it located?

Page 20

1    A. Dallas, Texas.
2    Q. Then you became a district sales manager in
3  January of '83?
4    A. I believe so.
5    Q. Okay. Who was your supervisor in that
6  position?
7    A. A fellow by the name of Ray Ford.
8    Q. And were you similarly in Dallas at that
9  point in time?
10   A. No, I was back in Florida at that point.
11   Q. Okay. When did you relocate back to
12 Florida?
13   A. Right after I accepted that position. So
14 January of '83.
15   Q. And what was the district?
16   A. The district would have been -- to the best
17 of my recollection, it would have been -- it was the
18 entire state of Florida. To the best of my
19 recollection, it was the entire state of Florida.
20   Q. What products were you the district sales
21 manager?
22   A. Same products; it was -- it was a series of

Page 21

1  diagnostic equipment, both clinical chemistry,
2  therapeutic drug monitoring, drugs of abuse testing
3  systems we had at that point, and I believe that was
4  it.
5    Q. Then you transitioned in 1986 to U.S.
6  marketing manager?
7    A. Yes.
8    Q. Okay. Is it just for the two areas that
9  are described, hepatitis and retrovirus?
10   A. Correct.
11   Q. Were there any particular products that you
12 were responsible for?
13   A. Yeah. Again, I'm still in the diagnostics
14 division. So I'm responsible for all of the in vitro
15 diagnostic tests that Abbott makes for both hepatitis
16 and retrovirus. So it would be things like HIV, which
17 are used in blood banks to screen the blood supply;
18 HTLV, another marker that's used to screen the blood
19 supply; various hepatitis markers that are used to
20 diagnose patients in the stage of hepatitis that they
21 have; diagnostic tests to be able to diagnose whether
22 or not a patient is HIV-positive and what stage they

6 (Pages 18 to 21)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 22

1  are of HIV disease.  It's those kinds of assays.
2      Q.  Okay.  Where was the position located, the
3  U.S. marketing manager?  Where did you reside?
4      A.  That was located in Abbott Park in North
5  Chicago.
6      Q.  Is it at this point in time when you
7  relocated to Chicago?
8      A.  Yes.
9      Q.  And who was your supervisor?
10         I'm sorry this is such a memory test.
11     A.  Yeah.  I actually don't recall who, who I
12  reported to.
13     Q.  Do you recall what the position was?
14     A.  It would have been the director of
15  marketing at the time.
16     Q.  In AHD -- in ADD?
17     A.  In ADD; correct.
18     Q.  Yeah.
19         Then in 12 of -- I'm sorry, was that a
20  promotion, I assume?
21     A.  To the marketing position?
22     Q.  To the marketing position.

Page 23

1      A.  Yes, it was.
2      Q.  And then you transitioned to the southeast
3  regional manager -- sales manager for ADD?
4      A.  Correct.
5      Q.  Okay.  Who was your supervisor in that
6  position?
7      A.  I would have reported to the national sales
8  manager, who I believe at the time was Sam Fisher.
9      Q.  Okay.  And was this similarly a promotion?
10     A.  Yes.
11     Q.  And then in 1990 you became the director of
12  U.S. marketing for ADD?
13     A.  Yes.
14     Q.  I take it that's a different position than
15  the U.S. marketing manager that you had in --
16     A.  Yes.  Yes, it is.  That's the position I
17  reported to when I was the U.S. marketing manager.
18     Q.  I see.  And when you were the director,
19  who's your supervisor?
20     A.  Tom Brown.
21     Q.  Okay.  And then you became -- in '92, the
22  divisional vice president and general manager of ADD?

Page 24

1      A.  Of the U.S. and Canada.
2      Q.  Okay.  And again I assume that's a
3  promotion?
4      A.  Yes.
5      Q.  And who did you report to?
6      A.  I reported to Tom Brown.
7      Q.  Okay.  And then it appears that in --
8  sometime in '95 you -- you switched divisions.
9      A.  Correct.
10     Q.  Okay.  Did you hold the divisional vice
11  presidency for ADD from '92 until 6 of -- until June
12  of '95?
13     A.  Correct.
14     Q.  Was the corporate vice presidency switch to
15  AHD a promotion?
16     A.  Yes.
17     Q.  Okay.  Had you previously had -- had
18  interaction or conduct -- or contact -- well, let me
19  ask you this.  What is AHD?
20     A.  AHD stands for Abbott Health Systems
21  Division.  And essentially it's the division within
22  Abbott that had the responsibility for being the

Page 25

1  liaison between the operating divisions and primarily
2  the group purchasing organizations.
3         So it didn't have specific products, but
4  its role was to provide those customers, as best we
5  could, a single point of contact for a customer to
6  Abbott across the divisions.
7      Q.  Was this your first -- was this the first
8  time that you had some responsibility or interaction
9  with Hospital Products Division products?
10     A.  It was the first time I had any interaction
11  with any Hospital Products, yes.
12     Q.  Okay.  Who did you report to as the
13  corporate vice president for AHD?
14     A.  I reported to Tom Hodgson.
15     Q.  And, sir, then in '98 you assumed the
16  senior vice presidency for HPD?
17     A.  Correct.
18     Q.  Okay.  Oh, I'm sorry.  Well, can you
19  explain that, senior VP, HPD, and then president, HPD?
20     A.  Yeah, the corporate title that I had was
21  senior vice president.
22     Q.  Okay.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 26

1     A.  And the divisional title was president.
2  That's how we designate all of our president --
3  divisional president positions.
4     Q.  Okay.  So in '98 you emerged as the head of
5  the Hospital Products Division?
6     A.  Correct.
7     Q.  And who did you report to in that position?
8     A.  Well, for a short period of time I would
9  have reported to Tom Hodgson, and then I would have
10 reported to Miles White.
11    Q.  Then you became in 2000 -- I'm assuming
12 that was a promotion?
13    A.  That was.
14    Q.  Okay.  Then you became the executive vice
15 president for Medical Products?
16    A.  Correct.
17    Q.  Was that a new role or a new title?
18    A.  It was.
19    Q.  Okay.  How did -- how did that come about,
20 that you -- you emerged into that role?
21    A.  How did the role come about?
22    Q.  Well, let's start with the role first, and

Page 27

1  then how you assumed it.
2     A.  Yeah.  I mean, the role essentially was
3  taking the prior chief operating role, chief operating
4  officer role, and splitting it up into two functions;
5  one that had primarily responsibility for
6  pharmaceuticals, which was my counterpart who had the
7  job, and then one that primarily had responsibility
8  for Medical Products.  It wasn't a perfectly clean
9  definition, but approximately that's how we divided
10 it.
11    Q.  Who was your counterpart that you
12 referenced?
13    A.  Dr. Jeffrey Leiden.
14    Q.  Do you know why at that point in time, in
15 2000, the decision was made to come up with that
16 structure?
17    A.  I think the primary objective was to give
18 the organization the ability to focus on both sides of
19 the business in a more strategic way than we had in
20 the past.
21    Q.  Did you -- was this -- was your -- your
22 transition to executive vice president for Medical

Page 28

1  Products, did that entail additional responsibilities
2  that you had beyond what you had when you were the
3  president of HPD?
4     A.  Yes.
5     Q.  Okay.  We're going to go through your
6  responsibilities in a few minutes, but what I'd like
7  to do -- well, first, who did you report to when you
8  were the executive vice president for Medical
9  Products?
10    A.  Mr. White.
11    Q.  And did someone assume the presidency of
12 HPD when you ascended to the role of executive vice
13 president?
14    A.  Yes.
15    Q.  Who was that?
16    A.  Chris Begley.
17    Q.  Did you have any direct reporting
18 responsibility to the board of directors either in
19 your role as president of HPD or as executive vice
20 president for Medical Products?
21    A.  No.
22    Q.  Then in 2001, in December of 2001, you

Page 29

1  became the president and COO of Medical Products?
2     A.  Correct.
3     Q.  Again, was that a new position?
4     A.  Essentially from a responsibility
5  standpoint it was the same position.
6     Q.  Okay.  Was it just a title change?
7     A.  Yes, basically.
8     Q.  And did you continue to report to
9  Mr. White?
10    A.  I did.
11    Q.  Did someone else assume the executive vice
12 presidency of Medical Products?
13    A.  No.
14    Q.  Did that position essentially fade away?
15    A.  That title was eliminated.
16    Q.  Then in 2006 you became the president and
17 COO of Abbott overall, the entire corporation?
18    A.  Right.
19    Q.  And who did you report to when you were
20 president and COO of Abbott?
21    A.  Mr. White.
22    Q.  At any time from 2001 to 2006, did you have

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 30

1  any reporting responsibilities to the board of
2  directors?
3      A.  I did become a member of the board of
4  directors at some point in that period.  I don't
5  recall the specific date.
6      Q.  Was there something that triggered your --
7  your becoming a member of the board of directors, or
8  were you just named to the board?
9      A.  I was just named to the board.
10     Q.  Did you being named to the board have
11  anything to do with your transitioning from a
12  position, or was it just an event that happened
13  independent of your assuming either the presidency of
14  Medical Products or the presidency of Abbott?
15     A.  Actually, I don't recall any triggering
16  event.  I'm sure we can verify the date.  It may have
17  been when that title change occurred, but I'm not --
18  I'm not certain of that.
19     Q.  We're going to delve more into your job
20  responsibilities.
21     A.  All right.
22     Q.  But first I want to find out a little bit

Page 31

1  more about what you did to prepare for today's
2  deposition.
3      A.  Sure.
4      Q.  We've had some -- well, first of all,
5  your -- are you represented here today?
6      A.  Yes.
7      Q.  Okay.  By Mr. Reidy.
8      A.  Yes.
9      Q.  By Jones Day.
10         When did Jones Day undertake your
11  representation?
12     A.  Prior to this deposition.
13     Q.  Do you remember when?
14     A.  I don't recall the specific date.
15     Q.  Would it have been prior to your receiving
16  the first subpoena in March?
17     A.  I believe so.
18     Q.  What did you do in terms of your
19  preparation for today's deposition?  Did you review
20  any documents?
21     A.  We did review some documents.
22     Q.  Which documents did you review?

Page 32

1      A.  I don't know that I can recall specifically
2  all of them.  We reviewed a records retention document
3  that I had received, we reviewed an untitled
4  spreadsheet that was in -- in the files, and we
5  reviewed a couple of trip reports.  We reviewed other
6  documents that I can't recall specifically.
7      Q.  Do you remember what -- what they -- what
8  form they took?  Were they spreadsheets, memos?
9      A.  The only spreadsheet I recall is -- is the
10  one I referenced.
11     Q.  Do you -- do you remember those documents
12  you can't recall their content, but do you remember
13  what form they took?
14     A.  I think they were memos and e-mails, I
15  believe, in addition to what I just got.
16     Q.  Do you remember approximately how many
17  documents you reviewed?
18     A.  Half a dozen.
19     Q.  Did you meet with counsel in prep for
20  today's deposition?
21     A.  I did.
22     Q.  Who did you meet with?

Page 33

1      A.  Mr. Reidy, Jason, and Ms. Schumacher.
2      Q.  When you say "Jason," you mean Jason
3  Winchester?
4      A.  Yes.
5      Q.  And when did you meet with Ms. Schumacher,
6  Mr. Reidy, and Mr. Winchester?
7      A.  We met three times.  So once in Boca Raton,
8  would have been Friday, the 10th, I believe; Friday,
9  May 10th.  And then we met two days here in Chicago.
10     Q.  When were the days that you met in Chicago?
11     A.  This past Friday and Monday.
12     Q.  Approximately how many hours was your
13  meeting in Boca?
14     A.  Maybe five.
15     Q.  And was that in prep for the -- for the
16  original date that we scheduled this in May?
17     A.  That is correct.
18     Q.  And then unfortunately you weren't feeling
19  well.
20     A.  Correct.
21     Q.  And then approximately how many hours did
22  you meet with counsel on Friday?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 34

1    A.   About the same; six, maybe seven hours,
2  something like that.
3    Q.   And on Monday?
4    A.   Five or six.
5    Q.   Sir, did you do anything to search for
6  documents responsive, that you -- that you might
7  personally have responsive to the subpoena that was
8  served along with your deposition notice?
9    A.   I did.
10   Q.   Did you find any?
11   A.   No.
12   Q.   Okay.  Do you have any Abbott records or
13 information that you retain in your personal
14 residence?
15   A.   No.
16   Q.   What else did you do in prep for today's
17 deposition?
18   A.   That's all I recall.
19   Q.   Was there anyone else who was present at
20 your meeting with counsel?
21   A.   Not that I recall.
22   Q.   Did you speak with anyone at Abbott

Page 35

1  concerning your deposition?
2    A.   No.
3    Q.   Did you speak with anyone at Abbott
4  concerning this lawsuit?
5    A.   No.
6    Q.   Do you recall having a conversation, a
7  telephonic conversation, with Mr. Daly and
8  Mr. Sellers?
9    A.   Mr. Daly and Mr. Sellers?
10   Q.   Jim Daly and Mike Sellers, in approximately
11 March.
12   A.   I recall having a conversation that was set
13 up through the lawyers with Mr. Sellers.
14   Q.   Okay.
15   A.   I don't know that it was in March.  But no,
16 I don't recall Mr. Daly.
17   Q.   Do you recall Mr. Daly asking you
18 questions?
19   A.   Not that I recall.
20   Q.   Do you recall what occurred during that
21 conversation with Mr. Sellers?
22   A.   I was asked some questions concerning, I

Page 36

1  think, some questions that you had.
2    Q.   Okay.  Do you remember what they were?
3    A.   Not specifically.
4    Q.   Do you remember what your responses were?
5    A.   No.
6    Q.   Do you remember anything else that occurred
7  during that conversation?
8    A.   No.
9    Q.   Do you recall approximately how long it
10 was?
11   A.   It was relatively short.  About 10 minutes,
12 maybe 15 minutes, something like that.
13   Q.   What was your understanding of the reason
14 for the conversation?
15   A.   I -- the attorneys were trying to get
16 clarity around the issues that you had requested and
17 my knowledge of those issues.
18   Q.   Do you recall anything else about the
19 conversation?
20   A.   No.
21   Q.   Did they just call you up, or did someone
22 arrange for the -- for the call, if you can recall?

Page 37

1    A.   Okay, I don't specifically recall.  I mean,
2  obviously someone called me, but I don't specifically
3  recall that part of it.
4    Q.   Do you recall who may have called you?
5    A.   No.
6    Q.   Did you have any conversations with anyone
7  at Abbott concerning scheduling your deposition?
8    A.   Yes.
9    Q.   Who did you speak with?
10   A.   Laura Schumacher.
11   Q.   And when did you speak with Ms. Schumacher?
12   A.   Sometime prior to the original deposition
13 dates, several weeks before that.
14   Q.   And what did you discuss?
15   A.   She basically told me that we were trying
16 to arrange dates for a deposition, and then she asked
17 me what dates might be available in my schedule, and I
18 gave her a number of dates that she could choose from.
19   Q.   Did you discuss anything substantive about
20 the deposition?
21   A.   No.
22   Q.   Did you discuss anything substantive about

10 (Pages 34 to 37)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                     June 3, 2008

Page 38

1  the law -- about the lawsuit that's at issue in this
2  case?
3      A.  No.
4      Q.  Are you familiar with the lawsuit?
5      A.  I'm familiar with what I've been prepped
6  on.
7      Q.  Okay.  When you say "been prepped on," do
8  you mean your meetings with counsel?
9      A.  Correct.
10      Q.  Have you discussed with anyone at Abbott
11  the AWP litigation?
12      A.  Not that I recall.
13      Q.  Do you recall receiving any information
14  concerning the AWP litigation?
15      A.  Other than the request for the depositions?
16      Q.  Mm-hmm.
17      A.  No.
18      Q.  What's your understanding of what this
19  lawsuit is about?
20      A.  My understanding is what is at issue is the
21  reimbursement structure that was in place or is in
22  place and how Abbott participated in that

Page 39

1  reimbursement structure from a pricing standpoint.
2      Q.  And how -- how did you learn that
3  information, what you just described about the --
4  the -- what this lawsuit is about?
5      A.  Well, I think I read the bulk of it in the
6  document that you sent.
7      Q.  Prior to receiving the subpoena from the
8  United States, had you heard of this lawsuit?
9      A.  Yes.
10      Q.  In what context?
11      A.  I heard about it in my -- in my role at
12  Abbott.
13      Q.  And you referenced earlier that you had
14  reviewed a litigation hold memoranda?  Does that sound
15  right?
16      A.  Correct.
17      Q.  Is that when you first learned about this
18  litigation or the potential for litigation concerning
19  AWP pricing?
20      A.  That's when I learned about subpoenas that
21  existed.
22      Q.  Okay.

Page 40

1      A.  I'm not certain those were the precursors
2  to the litigation, but they were subpoenas that were
3  associated with this hold order.
4      Q.  Did you assist at all in searching your
5  former files, the ones that you left at retirement,
6  for documents responsive to any litigation requests in
7  this case?
8      A.  Would you repeat the question?
9      Q.  Sure.  Let me -- let me see if I can
10  rephrase it.  Let me back up.
11         You received the litigation hold memo.  Do
12  you remember when that was?
13      A.  In late '99.
14      Q.  What did you do when you received it?
15      A.  Well, actually, one of the attorneys came
16  over and delivered it to me.
17      Q.  Okay.
18      A.  And so we had a discussion about how we
19  would deal with it, and -- and we agreed that he would
20  send a paralegal over to go through our files to look
21  for anything that was in those files that was
22  pertinent.

Page 41

1      Q.  Okay.  And then what happened?
2      A.  And that occurred.
3      Q.  That occurred?  Okay.
4         Did you do anything -- did you or someone
5  at your direction, an assistant, a secretary, do
6  anything thereafter to preserve your records or
7  information?
8      A.  We instructed -- I instructed my
9  administrative assistant to assist with the
10  paralegal's search of the records and to adhere and
11  maintain the records that -- in place going forward.
12      Q.  Did you -- are you familiar with plans and
13  plan updates?
14      A.  I am.
15      Q.  Okay.  Did you receive them in your role
16  as -- as president of HPD?
17      A.  Yes.
18      Q.  Did you retain or save plans and plan
19  updates?
20      A.  I would have left them in the -- the office
21  that I vacated when I moved out of that role.
22      Q.  But did you keep them when you received

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 42

1  them?
2       Let me see if I can rephrase this.
3       Did you have a place in your office where
4  you stored historic plans and plan updates?
5       A.  Yes.
6       Q.  And how far back did you retain them?  For
7  what period of time?
8       A.  In the normal course of business, we
9  retained them typically a couple of years.
10      Q.  To your knowledge, was anything done to
11 affirmatively retain plan and plan update information
12 incident to litigation hold memoranda?
13      A.  Not to my knowledge.
14      Q.  Did you do so?
15      A.  I didn't do anything other than what I
16 described earlier.
17      Q.  Do you know whether your assistant retained
18 plan and plan update information incident to the
19 litigation hold memoranda that -- that you were
20 subject to?
21      A.  I think my testimony was I left those
22 documents in my office when I moved to my new role.

Page 43

1       Q.  Okay.
2       A.  And so it -- my assistant moved with me.
3  So it would have been the new person who assumed that
4  role would have had possession of those documents.
5       Q.  Okay.  But -- but if you were the one who
6  was the subject of one of the lit hold memoranda, what
7  did you do to ensure that those documents were
8  retained once you left the office?
9       A.  As I said, I did exactly what I described
10 to you so far.
11      Q.  So you didn't -- did you give any
12 instructions when you left the office that, "Hey,
13 those documents might be subject to a lit hold
14 memoranda.  Don't do anything with them, or hold on to
15 them"?
16      A.  I don't recall doing that, no.
17      Q.  Did you do anything else in response to the
18 '99 litigation hold memoranda?
19      A.  I did ask for a legal review of the
20 situation, because it was the first time I had heard
21 about these subpoenas.
22      Q.  But when you received the lit hold

Page 44

1  memoranda, that was the first time you had heard of
2  the subpoenas?
3       A.  Yes.
4       Q.  Were you -- do you -- were you aware, in
5  '99, that a civil investigative demand had been
6  served -- signed by the Attorney General of the United
7  States had been served upon Abbott in 1996?
8       A.  No.
9       Q.  What about -- were you made aware that a
10 subpoena had been served from HHS-OIG in 1997?
11      A.  No.
12      Q.  When you say you asked for a legal review,
13 can you describe what you did?
14      A.  Well --
15      MR. REIDY:  Is this a conversation that you
16 had with a lawyer at Abbott who was in a position to
17 render advice to you?
18      THE WITNESS:  Yes.
19      MR. REIDY:  You can't do it.  You can't
20 answer the question.
21      MS. ST. PETER-GRIFFITH:  Well, can I just
22 ask who he directed his inquiry to?

Page 45

1       MR. REIDY:  Sure.  You can ask for the name
2  of the person.
3       THE WITNESS:  Jose Rivera.
4  BY MS. ST. PETER-GRIFFITH:
5       Q.  Was Mr. Rivera the one who provided you the
6  lit hold memoranda?
7       A.  Yes.
8       Q.  Was it at that point in time, when he
9  delivered the lit hold memoranda, that you asked for
10 the legal review?
11      A.  Yes, I believe so.
12      Q.  Did you receive anything in writing
13 incident to your request?  Don't tell me the substance
14 or the content.
15      A.  No.
16      Q.  Did you receive an oral response in
17 response to your inquiry?  Again, don't tell me the
18 substance or the content.
19      A.  Could you clarify the question for me?
20      Q.  Sure.
21      A.  Of the time frame that you're referring to.
22      Q.  Fair enough.  Let me ask you.  When did you

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 46

1   ask for the -- for this -- Mr. Rivera for this review?
2   Was it at that time that you received the lit hold
3   memoranda?
4      A.   Yes, or shortly thereafter.
5      Q.   And you spoke with him verbally?
6      A.   Yes.
7      Q.   Did you receive a response from him
8   verbally?
9      A.   Yes.
10     Q.   When did you receive the verbal response
11  from him?
12     A.   I believe when I requested the review.
13     Q.   And how long -- what was the span of time
14  between the request and when you received the response
15  from Mr. Rivera?
16     A.   I want to make sure I'm answering this
17  correctly, because I want to make sure what I'm not
18  providing is privileged information that he gave me.
19     Q.   Okay.  I'm just looking for a time frame.
20     A.   The rough time frames were, we asked for a
21  review, and then after a period of time a review was
22  conducted, and I was giving -- given a debrief on that

Page 47

1   review, okay?
2      Q.   And my question is geared towards not
3   necessarily the contents of the debrief, but how long
4   it took.
5      A.   I don't recall.  It was months.  It wasn't
6   days.
7      Q.   Do you know who undertook the legal review?
8      A.   I don't know specifically who undertook it.
9      Q.   And did you do anything after you received
10  the debriefing?  And when I say "anything," I'm not
11  talking about information -- you know, taking conduct
12  incident to the lit hold memoranda.  I'm talking about
13  once you received the debriefing, in response to your
14  request for the legal review.
15     A.   Did I take any action specific to that?
16     Q.   Yes.
17     A.   No.
18     Q.   Did you have any concerns after you were
19  debriefed?
20          MR. REIDY:  Don't talk about what were you
21  told in the debriefing.
22          THE WITNESS:  Mm-hmm.

Page 48

1          MR. REIDY:  You can answer what your
2   understanding was, if you recall, if you had one, as
3   to whether you had one.
4          THE WITNESS:  Yeah, I don't -- I don't
5   think I can answer that question.
6   BY MS. ST. PETER-GRIFFITH:
7      Q.   Okay.  Was -- then is your understanding
8   predicated upon your communications with counsel?
9      A.   Correct.
10     Q.   And were those communications your -- well,
11  let me ask you this.  Who did the debriefing?
12     A.   I recall specifically Laura Schumacher.
13     Q.   Anyone else?
14     A.   No.  I mean, there were others, but I don't
15  recall specifically who they were.
16     Q.   Were there any nonlegal individuals?
17     A.   Not that I recall.
18     Q.   Was the matter pertain- -- was the -- I'm
19  sorry, what?
20          MR. HAVILAND:  Sorry.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   Was the subject matter at issue purely

Page 49

1   legal, or was there business information that was also
2   imparted?
3      A.   It was pertinent to the review that I
4   requested.
5      Q.   Did you meet with Ms. Schumacher in
6   receiving the debriefing?
7      A.   Yes.
8      Q.   How long did you meet with her?
9      A.   I don't recall specifically.
10     Q.   Was it an hour?  A day?
11     A.   No, I would say it was more like an hour.
12     Q.   And -- and you indicated earlier you didn't
13  receive anything written.  It was just an oral --
14     A.   Not that I recall.
15     Q.   Did you have any follow-up on this
16  briefing?
17     A.   You know, again, you're not asking me for
18  follow-up I would have had directly with counsel;
19  right?
20     Q.   Right.
21     A.   Then no.
22     Q.   Did any policies, practices, or procedures,

13 (Pages 46 to 49)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL               June 3, 2008

Page 50

1  from a business standpoint within the Hospital
2  Products Division, change as a result of this
3  briefing?
4       A.  No.
5       Q.  Were there any other similar requests for
6  briefing that you received pertaining to either the
7  subpoenas or the subject matter of this litigation
8  that you affirmatively initiated?
9       A.  Not that I recall.
10      Q.  Sir, what is your current relationship with
11 Abbott?
12      A.  I'm retired.
13      Q.  Okay.  Sounds like a good spot to be in.
14          Are you -- do you hold any shares in
15 Abbott?
16      A.  I do.
17      Q.  Okay.  How many shares do you hold?
18      A.  I -- I didn't look it up before we came, so --
19      Q.  An approximation is fine.
20      A.  Something in the neighborhood of
21 $10 million.
22      Q.  And do you still hold a position on the

Page 51

1  board?
2       A.  No.
3       Q.  When did you resign from the board?  Was it
4  at the time --
5       A.  Upon my retirement.
6       Q.  Do you hold any position at all with Abbott
7  currently?
8       A.  No.
9       Q.  When you left, did you receive a retirement
10 package?
11      A.  Clarify what you mean by "retirement
12 package."
13      Q.  Okay.  Well let me ask you, when you left,
14 were you still -- did you still draw any remuneration
15 or salary from Abbott?
16      A.  I mean, as part of my employment with
17 Abbott, there was a pension program that I
18 participated in, and I receive a pension from Abbott
19 that I contributed to and Abbott contributed to, yes.
20      Q.  Okay.
21      A.  But nothing beyond that.
22      Q.  Okay.  So you -- so you have your stock

Page 52

1  ownership in Abbott and your pension from Abbott.
2       A.  Correct.
3       Q.  Other than those two financial interests,
4  do you have any other relationship with Abbott?
5       A.  No.
6       Q.  Is Abbott paying your lawyers' fees here
7  today?
8       A.  Yes.
9       Q.  Going back to the subpoena question again,
10 when you received it, did you actually physically
11 search for documents, or did you know you didn't have
12 any?
13      A.  No, what I said was I -- I received the
14 document -- the request for the hold, and Jose Rivera
15 and I sat down --
16      Q.  Oh, no, no, no.
17          MR. REIDY:  She's asking about the subpoena
18 you received.
19 BY MS. ST. PETER-GRIFFITH:
20      Q.  No, I should clarify.  The subpoena to you.
21      A.  Ask your question again.
22      Q.  What initiated your coming here today.

Page 53

1       A.  Okay.
2       Q.  The subpoena, I sort of need to close out
3  that line of questioning, and I don't think I asked
4  you.
5          Did you know you didn't have any documents,
6  responsive documents, when you read the request, or
7  did you search for some and didn't find any?
8       A.  Well, some of the requests were obvious.  I
9  knew I didn't have them.  I did go through other
10 documents to make sure I was responsive to your
11 request and determined I didn't have any.
12      Q.  About how much time did you spend doing
13 that; do you recall?
14      A.  Maybe an hour.
15      Q.  And was that at your -- do you have a home
16 office or home records?
17      A.  Yes.
18      Q.  Did you do anything -- going -- now I'm
19 going back to Mr. Rivera's request.  In fact, why
20 don't we do this, and mark this as the next exhibit --
21 actually, the next two exhibits.
22          MS. ST. PETER-GRIFFITH:  The lit hold

14  (Pages 50 to 53)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 54

1    request, just so we know we're all on the same page.
2        Dan, I apologize.  The only other
3    additional copy I have has some additional marking on
4    it, so . . .
5            (Whereupon Deposition
6            Exhibit Gonzalez 002 and
7            Exhibit Gonzalez 003 were
8            marked as requested.)
9    BY MS. ST. PETER-GRIFFITH:
10       Q.  Sir, what's -- sorry.
11       Sir, what's been marked as Exhibit 2, I'm
12   not sure -- well, can you tell me, did you review
13   Exhibit 2 in preparation for today's deposition?
14       A.  No.
15       Q.  Okay.  I'll represent to you that this is a
16   document that was generated by Abbott's counsel that
17   they gave to us which reflects that you were the
18   recipient of a 10/25/99 document hold memo.  And if
19   you could look at Exhibit 3, does that look more
20   familiar to you?  You can flip through the pages.
21       A.  Yes.
22       Q.  Is this a litigation hold memoranda that

Page 55

1    you reviewed in preparation for today's deposition?
2        A.  Yes.
3        Q.  Okay.  Is this the litigation hold
4    memoranda that you recall seeing?
5        A.  Yes.
6        Q.  Okay.  Did you have any discussions -- I
7    see on the CC list that Miles White is listed.  Did
8    you have any discussions with Mr. White about this
9    request?
10       A.  No.
11       Q.  Did you have any discussions with Mr. White
12   about the -- any subpoena that was received?
13       A.  No.
14       Q.  Did you have any discussions with Mr. White
15   at all about the AWP litigation?
16       A.  No.
17       Q.  In terms of your instructions to your
18   assistant, do you recall any computer -- anything that
19   you did with regard to your computer or your computer
20   records to either find responsive documents or
21   preserve responsive documents?
22       A.  As I indicated, what we agreed we would do

Page 56

1    is that legal would send over a paralegal who was
2    knowledgeable about the -- what the request was, and
3    she was -- assuming it was a she -- would work with my
4    assistant to recover whatever documents were
5    appropriate.
6        Q.  Did you work a lot on your computer?
7        A.  I did e-mails on my computer.  I'd say
8    basically that was it.
9        Q.  Did you personally do anything to re- -- to
10   retain or save e-mail or segregate them on your
11   computer that might have been responsive to this lit
12   hold memo?
13       A.  Not that I recall.
14       Q.  Oh, my.
15       Do you recall receiving any other either
16   written or oral request to hold or retain documents or
17   information incident to AWP litigation?
18       A.  Not that I recall.
19       Q.  How long did your assistant undertake
20   measures to ensure that your information was being
21   preserved?
22       A.  I would assume she was responsive to my

Page 57

1    request.
2        Q.  Okay.  At any time did you have an
3    understanding that the -- that the parameters of the
4    lit hold memoranda and your need to retain documents
5    ceased or stopped?
6        A.  No.
7        Q.  Okay.  So is it fair to say that until your
8    retirement, responsive documents -- it was your
9    understanding that your assistant was retaining and
10   preserving all appropriate documents pursuant to the
11   request here?
12       A.  Yes.
13       Q.  Okay.  Who was your assistant?
14       A.  My assistant.  Her name is Thea Nix.
15       Q.  And was Ms. Dix your assistant --
16       A.  Nix.
17       Q.  Nix, I'm sorry.  Was Ms. Nix your assistant
18   during this entire period of time from '99 through to
19   your retirement?
20       A.  No.
21       Q.  Okay.  Did you have another assistant?
22       A.  Yes.

15  (Pages 54 to 57)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 58

1    Q.  Who was that?
2    A.  Her name was Natalie Trepanair (phonetic).
3    Q.  And when did Ms. Trepanair become your
4  assistant?
5    A.  It would have been somewhere around 1996.
6    Q.  Oh, okay.  So it -- I should have
7  clarified.
8        During the time period that you were
9  subject to this particular lit hold memorandum,
10  Exhibit 3, was Ms. Nix your assistant from that point
11  in time to your retirement?
12    A.  This would have been right at the
13  transition period, so I'm not a hundred percent sure.
14  So it would have been either Natalie Trepanair or Thea
15  Nix.
16    Q.  Well, if it was initially Ms. Trepanair, do
17  you know what -- did you communicate with both of
18  them?  Let me ask you that first, if there was a
19  transition, concerning the requirements of the lit
20  hold memo.
21    A.  And maybe I wasn't clear the first time
22  when I described it.

Page 59

1        I actually didn't communicate directly with
2  my assistant.  I told Jose Rivera to have the
3  paralegal sit down with my assistant and go through
4  what documents we needed.
5    Q.  Okay.  Did you at all, at any time with
6  your assistant the need to preserve documents --
7    A.  No.
8    Q.  (Continuing) -- on a going-forward basis?
9    A.  I don't specifically remember telling her
10  that, but the paralegal and legal would have told her
11  that.
12    Q.  Do you know whether, in fact, they did have
13  that conversation?
14    A.  No, I don't.
15    Q.  Is it possible, then, that your assistant
16  might not have understood that she needed to retain
17  documents?
18    A.  I think that's unlikely.
19    Q.  Why do you think it's unlikely?
20    A.  Because this is a practice that we have at
21  Abbott across many different issues beyond this issue.
22  And so it's not -- it's not a practice that an

Page 60

1  assistant at this level would be unaccustomed to.
2    Q.  Other than relying upon your assistant, did
3  you do anything else to either locate or preserve
4  documents responsive to this request?
5    A.  Not that I recall.
6        (Discussion off the record.)
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  I'm about to jump into another area.  But
9  before we do, sir, do you want to take a break now?
10  Can you go a little longer?
11    A.  I can go a little longer.
12    Q.  Okay.  What I'd like to do is go back to
13  Exhibit 1, and starting with your position -- your --
14  well, let's start with -- with 1986.  What were your
15  job responsibilities when you were the marketing
16  manager?
17    A.  Essentially that role had the
18  responsibility for strategic marketing between the R&D
19  organization and the commercial organization to
20  develop the appropriate products for that particular
21  market and then to implement marketing strategies to
22  commercialize those products into the marketplace.

Page 61

1    Q.  And in terms of your day-to-day
2  responsibilities, is that what you did?
3    A.  That is what I did.
4    Q.  Did you do anything else?  Did you have any
5  other responsibilities?
6    A.  I mean, generally those were the primary
7  responsibilities.
8    Q.  What about when you were the southeastern
9  regional sales manager for ADD?  What were your job
10  responsibilities?
11    A.  Essentially in that position I had
12  responsibility for an eight- or nine-state area of the
13  Diagnostics business, and I had both sales
14  representatives, field-based product managers, and
15  technical service representatives that reported in
16  through district managers who reported to me, who had
17  responsibility for commercializing products --
18  Diagnostics products within those markets within that
19  geographic area.
20    Q.  Approximately how many people reported to
21  you when you were in this role?
22    A.  Directly reported to me?  Approximately 13

16  (Pages 58 to 61)

Henderson Legal Services, Inc.

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 62

1  or 14.
2      Q.  And what were the positions that directly
3  reported to you?
4      A.  District sales managers, probably eight or
5  nine of those; field product managers; administrative
6  assistant.  That's all I recall.
7      Q.  Did you have any other responsibilities
8  when you were in that role of southeastern regional
9  sales manager?
10     A.  No.
11     Q.  What were your job responsibilities when
12 you were the director of U.S. marketing?
13     A.  Essentially the director of U.S. marketing
14 had all of the marketing functions consistent with the
15 hepatitis and retrovirus function for all of the other
16 areas of business that Abbott Diagnostics was in,
17 reporting in to that position.  So the
18 responsibilities I described about bringing new
19 products to the marketplace, working with R&D,
20 creating commercial plans, what I was describing was
21 specific to hepatitis and retrovirus, but there were
22 multiple business units that had other product lines,

Page 63

1  six or seven other product lines.  Those all reported
2  into this U.S. marketing position.
3      Q.  Okay.  So -- so basically it was an
4  expansion of the marketing manager position that you
5  had to all of the other lines?
6      A.  Yeah.  Essentially all of those marketing
7  manager positions then reported into this position --
8      Q.  I see.
9      A.  (Continuing) -- is what I'm describing.
10     Q.  Did you have any other responsibilities
11 when you were the director of U.S. marketing for ADD?
12     A.  Pricing would have reported to me.
13     Q.  Was this the first time that you had any
14 oversight over pricing responsibilities?
15     A.  I believe so.
16     Q.  And what was your interaction with pricing
17 for the ADD products?
18     A.  We had -- we had a contract marketing
19 pricing group that had responsibility for implementing
20 contracts and ensuring that those contracts stayed in
21 compliance.  Service reported in through that
22 function.  So that's the actual technical servicing of

Page 64

1  equipment, when it actually would -- would -- would
2  break.
3      Q.  Okay.  Now you just used a term, sir, and I
4  want to make sure that I'm on the same page that -- as
5  you are.  Because I understand that "compliance" might
6  mean something that is a little different than, say,
7  we at the federal government -- how we use the term.
8      A.  Right.
9      Q.  What did you mean when you said "ensuring
10 that they stayed in compliance"?
11     A.  Meaning that they bought the amount of
12 product that they said they were going to buy.
13     Q.  Throughout the day, sir, and tomorrow, I
14 might use the term "compliance."  When I use it, I'm
15 generally talking about compliance with federal and
16 state Medicare, Medicaid?
17     A.  Yes, I understand.
18     Q.  Okay.  Did you have any responsibilities
19 with regard to ensuring ADD's compliance with federal
20 and state Medicare and Medicaid?
21     A.  No.
22     Q.  Okay.  Did ADD have -- have products that

Page 65

1  were reimbursed by Medicare and Medicaid?
2      A.  The majority of ADD products were sold in
3  the acute-care hospital setting.  And so throughout
4  the time of -- I don't recall specifically, but DRGs
5  came into effect, like, the early to mid-'90s,
6  somewhere in that time frame.  All of the
7  reimbursement was really driven off of DRGs.  So there
8  wasn't really any kind of direct reimbursement at an
9  assay level.
10     Q.  In terms of pricing, as the director, is it
11 fair to say that the buck stopped with you in terms of
12 pricing decisions?
13     A.  I would say the bulk of pricing decisions
14 would be made at -- at that level, correct.
15     Q.  How did you go about making pricing
16 decisions?  Were you an active participant in terms of
17 setting the price, or -- or did someone else do that,
18 and then you approved it?
19     A.  The mechanism we utilized in that
20 organization was that as you brought new products to
21 the marketplace, an assessment was done of the value
22 that that product could deliver to the market.  And so

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 66

1    we would look at things like competitive performance
2    of the product that we were bringing to the market
3    versus the products that were on the market for that
4    same -- that same type of assay; other kinds of
5    benefits that it might bring to the customer; labor
6    savings, things of that nature.
7         And so we would price the product upon
8    launch with a list price that essentially was set by
9    these marketing groups, and then the function of the
10   pricing department was to basically provide not
11   pricing per se, but more what I described before --
12   although I used a bad term, I guess -- more compliance
13   with the contract from a purchasing standpoint; the
14   customers were buying the amount of product that they
15   said they were going to buy.
16        Q.  Sir, I don't want to suggest to you that
17   you change your vernacular, because I understand that
18   Abbott used that term "compliance."  So I just want to
19   tell you when I use it --
20        A.  No, I'm using it in a different
21   perspective, and I understand that.  So I will try to
22   make sure I'm clear.

Page 67

1         Q.  Okay.  Did you have any other
2    responsibilities for pricing in that role as director
3    of U.S. marketing?
4         A.  No.
5         Q.  Then when you transitioned to the -- or did
6    you have any other job responsibilities in that
7    position?
8         A.  Not that I recall.
9         Q.  When you transitioned in '92 to become the
10   divisional vice president and general manager for the
11   U.S. and Canada of ADD, what were your job
12   responsibilities there?
13        A.  Essentially in that role I had financial
14   and performance responsibility for that business in
15   those geographic areas.  So all of the commercial
16   functions reported in through, you know, various
17   layers of management into that position; all of the
18   marketing functions reported directly in, all of the
19   service functions reported directly in through a layer
20   of management.
21        Essentially everything except for R&D and
22   manufacturing for the U.S. and Canada would have

Page 68

1    reported in to this position is probably the simplest
2    way to think about it.
3         Q.  Okay.  So other than -- we've got
4    marketing.
5         A.  Mm-hmm.
6         Q.  When you say "the service functions," what
7    do you mean by that?
8         A.  That's that group I described before that
9    if the instrument breaks down, there was a relatively
10   large organization that was designed to be dispatched
11   at a field level -- because these are instruments that
12   can't stay down for long periods of time -- to go to a
13   hospital and get the system back up and running.
14        Q.  So we have marketing, the service
15   functions.  What other general areas other than R&D
16   and manufacturing?
17        A.  Well, I said R&D and manufacturing aren't
18   in -- reporting to this position.
19        Q.  That's what I meant, are not in.
20        A.  You know, divisional, HR, all of the staff
21   functions wouldn't report in to this position.
22        There would be HR that was associated

Page 69

1    directly with that organization that reported in; you
2    know, public affairs, those kinds of things did not
3    report in.  They reported directly to the president of
4    the division.
5         So essentially the staff-related functions
6    reported directly up through the division.  The R&D
7    organization reported directly up and the operations
8    functions reported directly up to the president of the
9    division.
10        All of the commercial functions essentially
11   reported through these four area vice president
12   positions, and I had responsibility for one of those
13   four; the U.S. and Canada.
14        Q.  I see.  Any other job responsibilities in
15   this position?
16        A.  No.
17        Q.  When you transitioned in June of '95 to the
18   AHD position -- oh, let me ask you, before we jump
19   there.  When you were the divisional vice president,
20   approximately how many people were in your line of --
21   chain of command, down, downward?
22        A.  I know.  I know.  Several thousand.

18  (Pages 66 to 69)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 70

1    Q.  How many direct reports?
2    A.  Again, around 13, 14.
3    Q.  Okay.  When you transitioned to Abbott
4  Health Systems, what components -- let me ask you this
5  first.
6         What components of Abbott's business were
7  affected by or were incorporated into this AHD group?
8    A.  I'm not sure I understand the question.
9    Q.  Okay.  Let me rephrase this.  It's my
10  understanding, from what you testified to, that the
11  objective of Abbott Health Systems is to have a point
12  of contact for all of the different GPOs and larger
13  buying organizations to come to for the various
14  product lines that Abbott has; is that fair?
15    A.  That's accurate.
16    Q.  Okay.  Which product lines were included as
17  part of that?
18    A.  The primary product lines would have been
19  Diagnostics, Hospital Products, Ross Nutritionals, and
20  a small amount of -- of PBD oral solid
21  pharmaceuticals, because they were not primarily a
22  hospital-based business.  But they had a few products

Page 71

1  that were hospital-based businesses.
2    Q.  Anything else?
3    A.  Not that I recall.
4    Q.  Okay.  What -- had you, prior to assuming
5  this position, had you had any prior experience with
6  Ross Nutritionals?
7    A.  No.
8    Q.  Okay.  What about HPD?
9    A.  No.
10    Q.  Diagnostics obviously is ADD; you had.
11    A.  Yes.
12    Q.  Okay.  Did the divisional vice presidents
13  for these various areas -- HPD, Ross, Diagnostics --
14  report to you?
15    A.  No.
16    Q.  Okay.  So this is a separate structure,
17  then, outside of the reporting structure for the
18  divisional vice presidents; is that fair?
19    A.  That is correct.
20    Q.  Okay.  What were your job responsibilities
21  then, as the corporate vice president for Abbott HPD?
22    A.  I mean, my job responsibilities were to try

Page 72

1  to develop relationships between those large GPOs
2  primarily and the Abbott divisions.  But there was a
3  very clear separation in the way we operated, that the
4  divisions, the operating divisions, HPD as an example,
5  ADD as an example, the operating division --
6  maintaining their own autonomy as it related to
7  participating.  That's why I smiled a little bit when
8  I said they didn't report.  That would have been out
9  of the question.
10        And so basically this organization tried to
11  bring together the divisions as one face to a GPO in
12  an effort to see whether or not it made sense for that
13  GPO to do business with more than one organization
14  within Abbott.  And if it did, then the division had
15  the responsibility of developing a contract,
16  determining all of the -- the commercial aspects of
17  that contract, and it was kind of a relationship role,
18  I guess is probably the simplest way to think about
19  it.
20    Q.  When you say "relationship," do you mean a
21  relationship between Abbott and these larger
22  customers?

Page 73

1    A.  Were the executives within those larger
2  customers to give them a conduit into the divisions
3  that was easier for them to operate than having to
4  call up many different people to try to get the
5  information that they might desire.
6    Q.  Sir, through the course of this litigation
7  we've come -- become familiar with the term -- or we
8  think we have -- known as a VIP visit.
9    A.  Yes.
10    Q.  Would AHD be involved in -- first of all,
11  what is a VIP visit?
12    A.  I mean, essentially it's bringing in a
13  customer.  That could be anything from a large
14  hospital like Northwestern Memorial Hospital would
15  come in, to a purchasing organization like Novation or
16  Premier would come in, and they took various forms.
17  But I'd say the bulk of them were brought in in order
18  to show them what kind of product offerings we might
19  have, either on the market today or we'd spend a fair
20  amount of time talking to them about projects that we
21  had in development so that they had a future look at
22  what we may be coming out with as they thought about

19 (Pages 70 to 73)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 74

1  contracting going forward.
2      Q.  Did you participate in any VIP visits?
3      A.  I did.
4      Q.  Okay.  Let's -- let's start with when you
5  were with AHD.  Did you participate in any VIP visits?
6      A.  Yes.
7      Q.  Okay.  Who did -- what VIP visits did you
8  participate in?
9      A.  I clearly participated in Novation;
10  Premier; Consorta; Columbia/HCA, it is called
11  something else now; Tenet.  Those are the ones I
12  recall.
13      Q.  Quorum?
14      A.  No, not that I recall.
15      Q.  When you were -- well, what other job
16  responsibilities did you have when you were the
17  corporate vice president for AHD?
18      A.  I mean, that was the primary
19  responsibility.
20      Q.  Did you have any responsibility for
21  pricing, for understanding pricing?
22      A.  No.

Page 75

1      Q.  What about for compliance with Medicare and
2  Medicaid or state or federal regulations?
3      A.  No.
4      Q.  When you were the corporate vice president
5  for AHD, did you have an understanding as to how the
6  Hospital Products Division priced its products that
7  were not sold for the DRG market?
8      A.  No.
9      Q.  Did you have any responsibilities
10  associated with the publication of pricing information
11  when you were the divisional vice president for ADD?
12      A.  ADD?
13      Q.  I'm sorry, AHD.  I'm sorry.  The corporate
14  vice presidency.  We've moved on here.
15      A.  No.
16      Q.  Did you have anything to do, when you
17  were -- when you were the corporate vice president for
18  AHD, did you have any responsibility for pricing at
19  all?
20      A.  No.
21      Q.  Any other responsibilities we haven't
22  discussed in your corporate vice presidency for AHD?

Page 76

1      A.  We had a small program where we were
2  evaluating disease management programs; turned out not
3  to be very successful, so it didn't last long.  But it
4  was essentially designed to try to see are there added
5  value kinds of things that we could bring to hospitals
6  to better treat certain kinds of conditions like
7  diabetes.  And we had a small medical group that was
8  associated with that to try to develop those kinds of
9  programs.
10      Q.  Approximately how many people reported to
11  you when you were the corporate vice president for
12  AHD?
13      A.  Approximately eight or nine.
14      Q.  And how large was AHD?
15      A.  It had in it, this addition to -- you just
16  jogged my memory on something.
17          It had in it -- in addition to the
18  functions I've described to you, AHD also had
19  responsibility for freight and distribution of certain
20  products at Abbott.  So I had the responsibility for
21  the warehouses and the freight organizations.  So
22  there were a number of employees in there, probably

Page 77

1  something in the neighborhood of 50, 60 employees.  So
2  I'd say in total I probably had -- and I'm speculating
3  to some extent -- you know, maybe 75 employees.
4          MS. ST. PETER-GRIFFITH:  We've got -- we've
5  got less than five minutes left on the tape.  Why
6  don't we take a break here so Tony can change the
7  tape, and we'll come back in about 10 minutes.
8          Is that good, Dan?
9          MR. REIDY:  Sure.
10          THE VIDEOGRAPHER:  We are off the record at
11  10:25 a.m. with the end of Tape No. 1.
12              (Brief pause.)
13          THE VIDEOGRAPHER:  We are back on the
14  record at 10:39 a.m. with the start of Tape No. 2.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Mr. Gonzalez, I want to backtrack a little
17  bit.
18          You indicated that you participated in VIP
19  visits with Novation, Premier, Consorta, Columbia/HCA,
20  and Tenet.  I should have clarified.
21          Was that when you were in the role as
22  corporate vice president of AHD?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 78

1      A.  I would have participated in all of those
2  in the role in AHD and participated in some of those
3  when I was in my role in ADD --
4      Q.  Okay.
5      A.  (Continuing) -- as a participant.
6      Q.  When you participated in VIP visits, was
7  the pricing of Abbott products discussed during the
8  course of any component of the visit?
9      A.  Not as I recall.
10     Q.  If a pricing issue had been important to a
11 particular large group purchasing organization or
12 client that AHD worked with, would you have expected
13 to have heard about it?
14     A.  I -- I think the difficulty in talking
15 about pricing in these kinds of meetings is there is
16 such a large portfolio of products that are being
17 reviewed that individual pricing is just not a
18 practical discussion point in what these meetings were
19 structured to do.  These meetings were structured to
20 inform the senior management of those organizations.
21     Any contracting, where -- which is where
22 pricing would be discussed, typically was down inside

Page 79

1  their organization at their contracting level, and
2  that would be inside the divisions, however they
3  handled their own contracting and pricing.
4      Q.  Were you aware of any or were you made
5  aware of any larger pricing issues, such as AWP
6  spread, during the course of your tenure with AHD or
7  ADD?
8      A.  No.
9      Q.  Do you know what -- what AWP spread is?
10     A.  I know what it is now.
11     Q.  Okay.  What is it?
12     A.  Well, this is another area where I need to
13 make sure that I understand the boundaries.
14     Everything that I learned about AWP was
15 learned through these legal meetings.  So I want to be
16 careful about what you're asking me.
17     Q.  Is it your testimony, sir, that at no time
18 in any of your roles with Abbott, did you have an
19 understanding of what AWP was, outside of your
20 communications with counsel?
21     A.  It's my testimony that prior to 1999 when I
22 had that meeting, AWP was not an issue that was

Page 80

1  brought forward to me.
2      Q.  Okay.  What about after 1999?  Did you have
3  an understanding of what AWP was?
4      A.  I had a general understanding of it, yes.
5      Q.  Okay.  Did anyone outside of legal
6  counsel's office discuss AWP issues with you?
7      A.  Outside the presence of the legal team?
8      Q.  Outside -- yes, I'm talking about
9  communications that were not directly from counsel.
10     A.  I don't recall having any meetings after
11 '99 that didn't have counsel involved.
12     Q.  Okay.  But I'm talking about communications
13 with your business people about AWP.
14     A.  Yeah, and I don't recall any outside
15 meetings that we would have had with counsel.
16     Q.  Okay.  When you met with counsel, were you
17 going over -- well, what meetings with counsel are you
18 referencing?
19     A.  Well, the meetings I was describing to you.
20     Q.  The ones in prep for today's deposition?
21     A.  No, the ones after 1999.
22     Q.  I see.  The legal review --

Page 81

1      A.  Correct.
2      Q.  (Continuing) -- issue that you raised.
3      A.  Correct.
4      Q.  Jumping back to your -- I want to round out
5  your job responsibilities for AHD.  Did you have any
6  other job responsibilities that we haven't discussed?
7      A.  Well, the one that I didn't reference until
8  you jogged my memory on the number of employees is we
9  did have responsibility for freight and transportation
10 and distribution.
11     Q.  Okay.  Let's jump to your job
12 responsibilities for -- well, let me ask this before
13 we do that.
14     If in 1996 a civil investigative demand had
15 been served upon Abbott concerning pricing that could
16 have impacted pricing for the larger contracts for
17 which AHD had responsibility, would you have expected
18 in your role to have learned about that?
19     A.  I'm not sure I understand your question
20 clearly.  Is your question specific to AWP, or is your
21 question more generally towards pricing period?
22     Q.  Well, fair enough.

21 (Pages 78 to 81)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 82

1        I'll represent to you that a civil
2   investigative demand pertaining to Abbott's pricing,
3   including AWP and its pricing structure, was served
4   upon Abbott. Would you have expected, in your
5   capacity as corporate vice president, to have learned
6   about that?
7        A.  I think something that would relate to --
8   to the nonhospital side of the business probably was
9   not very relevant to the role I had, so no.
10       Q.  Well, let me ask you. For AHD, did
11  alternate site product sales factor into your job
12  responsibilities when you were corporate vice
13  president of AHD?
14       A.  Not that I recall.
15       Q.  What about the setting of list price by
16  Hospital Products Division?
17       A.  No.
18       Q.  Okay. Jumping to your -- have we exhausted
19  your memory as to your job responsibilities for AHD?
20       A.  Yes.
21       Q.  Okay. In March of 1998, when you assumed
22  the senior vice presidency for Hospital Products

Page 83

1   Division, what were your job responsibilities?
2        A.  Well, essentially I had the operating
3   responsibility for the entire business. So I had
4   reporting in to me manufacturing, R&D, the commercial
5   functions as they were structured, IT, medical,
6   regulatory, HR. You know, basically all the functions
7   that you would -- you would need to run an independent
8   operating division of Abbott.
9        Q.  Did you have -- well, let me ask you more
10  directly.
11          In terms of any decision-making with Abbott
12  Hospital Products Division -- be it pricing,
13  compliance with federal and state regulations,
14  marketing activities and practices -- did the buck
15  stop with you?
16       A.  Essentially I was the highest-ranking
17  person in that division. And like in any of these
18  roles, you may have 10-, 12,000 people in HPD that
19  reported through a structure of management that
20  reported to me.
21       Q.  If there was a problem with a particular
22  component of the business -- for example, Abbott's

Page 84

1   Hospital Products Division pricing -- that resulted in
2   an investigation by the federal government, would you
3   have expected to learn about it?
4        A.  I would have.
5        Q.  Who -- whose responsibility would it have
6   been to bring that to your attention?
7        A.  I think it depends upon where it evolved
8   from.
9        Q.  In your -- well, what were your -- what --
10  did you have any other job responsibilities when you
11  were the senior vice president for the Hospital
12  Products Division?
13       A.  I'm certain I've forgotten a function or
14  two, but generally I think I've given you the bulk of
15  the functions.
16       Q.  And I should have told you at the outset,
17  sir, if you think of anything that amplifies a
18  question that we've gone over before --
19       A.  Mm-hmm.
20       Q.  (Continuing) -- feel free to shout it out;
21  okay?
22       A.  Okay.

Page 85

1        Q.  What was your role with regard to setting
2   prices in the Hospital Products Division in your
3   capacity as senior vice president for HPD?
4        A.  Well, pricing function in HPD worked very
5   similar to the function I described in -- in ADD;
6   slightly different organizational structure, where ADD
7   had more business units associated with it. But in
8   the case of HPD you had what would -- I recall being
9   the hospital business sector, and that hospital
10  business sector had responsibility for essentially all
11  of the commercial functions within Hospital Products.
12  And so it was that organization's responsibility to
13  essentially set price.
14       Q.  Which price?
15       A.  List price, and essentially they'd be
16  responsible for determining contract pricing.
17       Q.  Is that true -- well, let me ask you.
18          Was there a separate list price for the
19  Hospital Products business sector and the alternate
20  site product sales?
21       A.  Not to my knowledge.
22       Q.  What is the list price, when we're talking

22  (Pages 82 to 85)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 86

1   about the Hospital Products Division?
2      A.  Well, typically the list price is -- is
3   similar, again, to what I described to you to be the
4   Diagnostics experience.  Is when you bring a product
5   to the marketplace, you determine what that -- what
6   that price should be, based on a number of different
7   factors.  Number of competitors; if there is a
8   competitive product on the market, where is it priced;
9   what kind of value can we bring that's above and
10  beyond what the competitor can bring.  And if there is
11  any of that, then obviously we believe we could
12  offer -- get a premium.
13      And so you look at all those parameters,
14  and you set a price.  And then from that point forward
15  that is typically the list price that you would make
16  adjustments off of.
17      Q.  When you say "adjustments," do you mean for
18  a contract price?
19      A.  For both contract, CPI increases.
20      Q.  Did -- was it your understanding that for
21  the Hospital Products Division, that the -- well, let
22  me ask you this.  Let me ask you this first.

Page 87

1      Did you have any responsibility for either
2   setting, reviewing, or approving list price?
3      A.  No.
4      Q.  Whose responsibility was that?
5      A.  Well, it would have gone up through that
6   hospital business sector and, you know, typically it
7   would be the senior person in that sector, depending
8   upon the products.
9      Q.  In your role as senior vice president of
10  HPD or president of HPD, did you have an understanding
11  as to the relationship between list price and what
12  actually was -- Abbott was selling the product for in
13  the market, or the contract price?
14      A.  Repeat the question one more time.
15      Q.  Sure.  Let me see if I can streamline it.
16      Did you have an understanding as to the
17  relationship between list price, an HPD products list
18  price, and the contract price, what Abbott was selling
19  it in the marketplace.
20      A.  I'd say the bulk of what I reviewed in our
21  financials would have been actual net revenue for the
22  division.  So it would primarily have been contract

Page 88

1   prices.  Although there were some list price sales
2   that were -- that were in that.
3      But the way we operated our financial
4   planning process, you'd roll all that in.  And
5   remember this is a division where 90-plus percent of
6   the revenues come out of the hospital market, and
7   probably 90-plus percent of those revenues come from,
8   you know, five or six major group purchasing
9   organizations.  And so -- but it's -- it's a broad
10  portfolio of products.
11      And so we typically -- I typically didn't
12  look at list price or individual prices, frankly, very
13  often.  You know, there is just too many of them to
14  focus on.
15      Q.  Did you have an understanding as to the
16  volume of sales that Abbott made at list price?
17      A.  I had a general understanding.
18      Q.  What percentage of sales did the Hospital
19  Products division make at list price?
20      A.  It was a relatively low percent.  I'd say
21  something less than a couple of percent.  Now, it
22  varied from time to time because if someone would go

Page 89

1   off the market on a certain product, then list price
2   sales in that product might rise because someone had
3   to buy, you know, from the competitor.
4      If the competitor was off the market, so
5   someone had to go in and buy your product at list
6   price, so it probably had little ebbs and flows in it
7   over a period of time, but in general I would say a
8   couple of percent.
9      Q.  Now for that approximate 2 percent market,
10  if you had a competitor, like, for example, for
11  vancomycin, Eli Lilly.
12      A.  Mm-hmm.
13      Q.  And Eli Lilly's list price was 25 or 50
14  percent lower than Abbott's list price, would you
15  expect that that -- that individuals or -- or entities
16  buying at the list price level, meaning they didn't
17  have a contract with Abbott, that they would be more
18  likely to purchase from the competitor with the lower
19  list price?
20      A.  All things being equal, I would say yes.
21  But there could be some differentiation between the
22  two products in way of delivery system, the purity of

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 90

1    the product.  You know, lots of different aspects go
2    into the pricing of the product.  Not just, you know,
3    the absolute price of two stand- -- stand-alone
4    products side by side.  They're not identical.
5        Q.  Did you have an understanding as to -- for
6    the Hospital Products, the percentage difference
7    between list price and the contract prices, or the
8    range as to -- as to what it -- what it was?
9        A.  Yeah.  I mean, consistent with what I said
10   a moment ago, in the way I reviewed the business, I
11   didn't look at individual products.  So, no.
12       Q.  When you were the president of HPD, did you
13   have any understanding that there were some list
14   prices that were 2-, 3-, 4-, 500 or up to a thousand
15   percent higher than contract price?
16       A.  Can I go back and clarify one thing I just
17   told you --
18       Q.  Absolutely.
19       A.  (Continuing) -- a second ago?  Because I
20   want to make sure I didn't misspeak.
21           When you asked me that question, I was
22   viewing the broad range of generic drugs, sort of what

Page 91

1    we describe as core Hospital Products.  We had -- we
2    had proprietary pharmaceuticals, and we had certain
3    devices within HPD that we looked at as standalone
4    products, like sevoflurane, for example; relatively
5    large product.  And so there I would have had some
6    visibility to not necessarily list versus contract
7    price, but certainly what the price of sevoflurane was
8    in the marketplace.  And there are other products,
9    examples like that.  So I wanted to make sure I
10   didn't -- you didn't misinterpret what I said.
11       Q.  Sure.  And just to clarify, when you say
12   examples, those were products for which Abbott was the
13   innovator or developed the patent.
14       A.  Correct, correct.  You know, as an example,
15   we had cardiovascular devices.  Those were a
16   stand-alone individual product in our planning
17   documents that I would have seen the individual price
18   of that product, the net price at which we sold it.
19       Q.  In your capacity as the president of the
20   Hospital Products Division, can you think of any
21   reason why Abbott's Hospital Products Division, on
22   some of its products -- most notably sodium chloride,

Page 92

1    vancomycin, dextrose, sterile water -- why the
2    Hospital Products Division would have a list price on
3    those products that were anywhere from a hundred to a
4    thousand percent higher than what they were selling
5    them for in the market?
6        A.  Well, as -- as I indicated to you before,
7    it's not anything I would have focused my attention
8    on.
9            The mechanism by which we set list price is
10   what I described to you before.  When you bring the
11   product out into the market, you set a certain price.
12   Over time you can see that -- that list price change
13   based on typical CPI kinds of increases.  And, you
14   know, it varied to some extent, but part of the reason
15   why we would -- we would do that is, one, our costs
16   would go up in some cases.  So obviously we were
17   trying to pass some of that along to the -- to the
18   purchaser of the product.
19           But more importantly, the way a lot of our
20   hospital contracts were structured, they were
21   triggered off of a percentage off of list price, okay?
22   But yet those contracts allowed for an aggregate

Page 93

1    portfolio increase that we could do across the whole
2    portfolio.  And so -- in order for you to pass in
3    certain kinds of contracts in order for you to pass
4    that along, you'd increase list price, and that would
5    ultimately increase the contract, the net price in the
6    contract.  And so to some extent that drove some of
7    the list price changes.
8        Q.  Did Abbott Hospital Products Division sell
9    its products based upon a marketing theory whereby --
10   or marketing strategy whereby it compared the list
11   price to what it actually sold to its customers?
12       A.  I don't understand the question.
13       Q.  Let me rephrase that.
14           As a marketing strategy, did Abbott
15   Hospital Products Division sell or use as a marketing
16   tool the difference between list price and the
17   contract price, meaning --
18       A.  No.  I don't believe so.
19       Q.  Okay.  Can you think of any reason why for
20   some of its products there would be such a large
21   disparity between list price and what was actually
22   being sold in the marketplace, and the price --

24  (Pages 90 to 93)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 94

1    A.  I think as I was describing to you, over
2   time you would see, as contract prices go down, okay,
3   because of competitive factors, and list price was
4   being nominally increased, you would actually -- in
5   the hospital market you would actually see some sort
6   of a widening gap between those two.
7        And -- and that, in this particular
8   business, sometimes happened at a faster pace because
9   in the generic injectable business, as new competitors
10  enter, sometimes prices, contract prices, can go down
11  more quickly.
12   Q.  If contract price is going down, why would
13  list price continue to go up?
14   A.  Well, I told you two reasons.  One is there
15  is a certain amount of sales that do exist at list.
16  So at the end of the day if someone has to buy our
17  product and they're not going to go on contract, you
18  know, we don't necessarily want to give them a better
19  deal.
20       Number 2, some contracts had this mechanism
21  built into them where list price actually helped you
22  get to that aggregate bundled increase that you were

Page 95

1   allowed to take in those contracts.
2    Q.  Okay.  At any time in your -- well, let me
3   ask you this.  Let's round this out.
4        Did you review the catalog list prices
5   before they were published in your capacity as Abbott
6   -- as senior vice president for HPD?
7    A.  No.
8    Q.  Did you review any contract pricing?
9    A.  Individual product pricing?
10   Q.  Or, you know, product lines.
11   A.  I would have reviewed, as an example, the
12  aggregate proposal to a large GPO, as an example.  Not
13  the individual pricing, but I would look at, you know,
14  if we sold X millions of dollars to the GPO last year,
15  what is the contract that we're offering this year and
16  what's the relative difference between those.  Not
17  individual prices, but it would actually be what the
18  overall contract was being offered, the value of that
19  contract.  I would have reviewed that.
20   Q.  I don't think I asked you this question
21  before.  What GPOs did you work with when you were
22  with AHD?

Page 96

1    A.  Essentially it was the ones I described.
2   You know, the big hospital ones are Premier, Novation,
3   Consorta, Catholic Group, Tenet, and Columbia/HCA.
4    Q.  Do you know whether they had alt site
5   components?
6    A.  If they did, they were relatively small.
7    Q.  Do you recall ever dealing with them or
8   discussing with them their alternate site components?
9    A.  No.
10   Q.  Same question for in your role as senior
11  vice president of HPD.  What GPOs did you work with?
12   A.  It roughly would have been the same group.
13  I'd say more emphasis on Novation and -- Novation and
14  Premier.
15   Q.  Did you work with any or deal with any GPOs
16  on their alternate site needs or market?
17   A.  No.
18   Q.  In your role either with HP- -- AHD or HPD,
19  did you work with Baylor?
20   A.  Can you be more specific?
21   Q.  Sure.
22   A.  I want to make sure I answer it accurately.

Page 97

1    Q.  Did -- Baylor is in Texas; right?
2    A.  I know where it's at.
3    Q.  Okay.  Well, did you sell to Baylor when
4   you -- earlier in your career, when you were --
5    A.  No.  No.
6    Q.  Okay.  Had a large -- it has a large health
7   system in Texas; is that fair?
8    A.  Mm-hmm.
9    Q.  Did you work with Baylor or the Baylor
10  account or any component of the Baylor account?
11   A.  I mean, I visited Baylor in some capacity.
12  I'm trying to remember where.
13       And the reason why I was being a little
14  more cautious is you probably know Boone Powell was on
15  our board, who was the CEO of Baylor for a period of
16  time.  So obviously I interacted with Boone.
17   Q.  Okay.
18   A.  But did -- did I actually do any kind of
19  contract negotiations?  Is that what you're asking?
20   Q.  Yeah.
21   A.  The answer is no.
22   Q.  Okay.  What about -- maybe not necessarily

25 (Pages 94 to 97)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 98

1  contract negotiations, but sort of contract
2  maintenance, where you work with --
3      A.  No.
4      Q.  Okay.  What about GeriMed?  Are you
5  familiar with GeriMed?
6      A.  No.
7      Q.  What other job responsibilities did you
8  have when you were the senior vice president for HPD?
9      A.  As I -- as I described, okay?  I spent a
10  fair amount of time as the president of HPD on two
11  areas of the business; one is trying to improve our
12  R&D productivity, and two, trying to focus on business
13  development efforts that would change the -- the --
14  the mix of products that we had in the portfolio.  And
15  so I spent a considerable amount of time on those two
16  areas.
17      Q.  What was your interaction with the
18  alternate site product sales business unit?
19      A.  Very little.
20      Q.  What about the home infusion business unit?
21      A.  Relatively little.
22      Q.  When you say "relatively little," was it

Page 99

1  more or less than the alt site product sales?
2      A.  I'd say it's about the same, except I -- I
3  made a decision to shut down the home infusion
4  business.  So that's why I referenced it a little
5  differently.
6      Q.  We'll talk about that in a little while,
7  okay?
8          Did you deal with any pricing issues with
9  either the home infusion business unit or alt site
10  product sales?
11      A.  No.
12      Q.  What about the development of the CHIP
13  system?  Did you have any involvement with that?
14      A.  No.
15      Q.  Do you know what the CHIP system is?
16      A.  I do.
17      Q.  Okay, what is it?
18      A.  It is a -- a reimbursement and inventory
19  management system that home infusion had developed.
20      Q.  Any other job responsibilities for Hospital
21  Products Division?
22      A.  I mean, like I said, I obviously had

Page 100

1  manufacturing responsibility to make sure that, you
2  know, our plants were operating efficiently; you know,
3  all the typical operating functions that you'd have in
4  a division.
5          Certain regulatory; and what I mean by
6  regulatory is FDA regulatory responsibilities.  And,
7  you know, I spent a fair amount of time on that;
8  oversight of medical affairs, pharmacovigilance.
9      Q.  Did you have any responsibility for
10  overseeing compliance of the federal and state
11  Medicare, Medicaid fraud and abuse statute and
12  regulations and guidance?
13      A.  I mean, that was a -- depending upon the
14  time frame, that was a -- a program that was developed
15  at corporate and implemented at corporate.
16      Q.  When was that?
17      A.  With the creation of the office of ethics
18  and compliance.  I don't recall a specific date.
19      Q.  Do you recall in or around late 2001, early
20  2002?
21      A.  As bad as I've been at guessing the dates
22  here, I'd be afraid to tell you the dates.

Page 101

1      Q.  Okay, that's fine.
2          Prior to the implementation of the office
3  of ethics and compliance, how did you, as the man who
4  stood -- "the buck stopped with me" for Hospital
5  Products Division, how did you know that your
6  employees within the Hospital Products Division were
7  complying with Medicare and Medicaid fraud and abuse
8  statutes?
9      A.  We had a system in place where lawyers were
10  available to provide guidance to all of the
11  businesses, in the business units within those
12  businesses, and, you know, the senior commercial
13  managers in those areas had oversight responsibility
14  to ensure that -- you know, that that mechanism was in
15  place to utilize, you know, attorneys when they felt
16  it was necessary to review various ideas or issues
17  that came up.
18      Q.  What issues compliance -- when I say
19  compliance, I mean Medicaid and Medicare --
20      A.  I understand.
21      Q.  (Continuing) -- or federal and state
22  regulatory and statutory compliance.  What issues came

26 (Pages 98 to 101)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 102

1  up when you were serving in your role as senior vice
2  president of Hospital Products Division that you can
3  recall?
4      A.  Well, the only one I specifically recall is
5  this meeting that I had in 1999 with the legal team
6  around this issue or the precursor of this issue
7  maybe.
8      Q.  And was that spawned by the lit hold memo
9  that you received?
10     A.  Yes.
11     Q.  Okay.  Do you recall receiving -- or do you
12  recall that Abbott received a letter from the
13  Department of Justice in 1999 authored by Mark Lavine
14  or T. Reed Stephens?
15     A.  No.
16     Q.  Did anyone bring that to your attention?
17     A.  Not that I recall.
18     Q.  If regulatory or -- if significant
19  compliance with Medicare and Medicaid matters were
20  being raised in a letter from the Department of
21  Justice concerning the Hospital Products Division's
22  practices, would you, in your capacity as vice

Page 103

1  president -- senior vice president for HPD, have
2  expected to have learned of it?
3      A.  I'm going to have to know what was in the
4  letter and whether it was relevant or not.  So I -- I
5  can't answer your question.
6      Q.  Any other responsibilities that we haven't
7  discussed in your role as president of HPD?
8      A.  No.
9      Q.  Okay.  Jumping to your role as executive
10  vice present for the Medical Products Division, what
11  were your job responsibilities?
12     A.  Essentially in that role I just moved up
13  into a level where multiple divisions reported in
14  to -- in to me.  And so in addition to the Hospital
15  Products Division, the Diagnostics Division reported
16  in to me, and then ultimately Ross reported in to me.
17     Q.  When did Ross start reporting in to you?
18     A.  I don't recall the specific day.
19     Q.  Do you recall whether it was before or
20  after Ross entered into a criminal plea?
21     A.  I recall it was before.
22     Q.  Did you have any responsibilities for

Page 104

1  interaction with TAP?
2      A.  No.
3      Q.  What other responsibilities did you have in
4  your role as executive vice president for Medical
5  Products?
6      A.  Well, I mean, essentially I had operating
7  responsibility and financial operating responsibility
8  for those divisions.  So the division presidents and
9  senior VPs of each of those units reported to me.
10         I had a -- I had a Medical Products
11  business development group that reported to me.  I had
12  a Medical Products quality and compliance organization
13  that reported to me.  And again, compliance in this
14  definition is GMP compliance, regulatory compliance
15  under the -- under the FDA regulatory regulations.  HR
16  function reported in to me.  A finance function
17  reported in to me, controller essentially for the
18  Medical Products area and his organization.  That's
19  all I recall.
20     Q.  Did you have any oversight over the office
21  of ethics and compliance?
22     A.  No.

Page 105

1      Q.  What was your interaction with the office
2  of ethics and compliance?
3      A.  We would have periodic meetings, and
4  obviously we would -- we would comply with the --
5  the -- the training programs that were put in place
6  and ensure that those were implemented across the
7  divisions.
8      Q.  How would you ensure that they were
9  implemented?
10     A.  We actually tracked it.  We'd track what
11  percentage of people took the modules, and how they
12  scored, and --
13     Q.  Okay.  So you tracked the training.
14     A.  We tracked the training, correct.
15     Q.  What did Abbott do to -- or what did --
16  yeah.  What did Abbott do to ensure that the subject
17  matter of the training was actually being conducted
18  or -- or was actually taking place in the field?
19     A.  That is what I'm describing.  I'm
20  describing that we would track -- let's say it was a
21  quarterly module that had to be done.  We would
22  actually track how many people took it, and we would

27 (Pages 102 to 105)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 106

1    instruct management to go back and get to a hundred
2    percent, if it wasn't at a hundred percent. So we
3    actually monitored how many people took it.
4         The system was automated in a way that you
5    could tell who took it, who didn't, who passed, who
6    did not.
7         Q.   So you tracked and made sure that everybody
8    had the training, okay? Is that fair?
9         A.   Yeah, I hesitate to use the word
10   "everybody," but --
11        Q.   Okay, but you tried to?
12        A.   The great majority of people, correct.
13        Q.   Okay. And my question is a little
14   different though.
15        There's -- you had training directed by the
16   office of ethics and compliance concerning you need to
17   do X, Y, and Z to make sure that you complied with
18   certain statutes and regulations; is that fair?
19        A.   I think -- I think that's accurate.
20        Q.   Okay. After the training was conducted,
21   what was your understanding of Abbott's practice in
22   making sure that the employees who had the training

Page 107

1    were following through on it and were actually doing
2    what they were trained to do?
3         A.   Well, there were a variety of mechanisms to
4    monitor the performance.
5         Q.   Okay. What were they?
6         A.   There was a hotline for people to feel like
7    they could raise issues. I believe they could do it
8    anonymously if they chose to. There were various
9    tracking mechanisms that were put in place to evaluate
10   expense reporting to ensure that, you know,
11   inappropriate gifts weren't -- weren't being given
12   out. So it was a whole variety -- I'm certainly not
13   an expert on it. There were a whole variety of
14   mechanisms to -- to track compliance.
15        Q.   In your role as executive vice president
16   for Medical Products, did you have any
17   responsibilities for pricing for the Hospital Products
18   Division?
19        A.   No.
20        Q.   What other responsibilities did you have
21   that we haven't discussed in your capacity as
22   executive vice president for Medical Products?

Page 108

1         A.   I think we've covered all of them.
2         Q.   Okay. What about your job responsibilities
3    when you assumed the presidency and COO position?
4         A.   Essentially the responsibilities were
5    identical.
6         Q.   Same thing?
7         A.   It was just really a change in title.
8         Q.   And what about when you assumed the
9    responsibility as president and COO of Abbott? What
10   were your job responsibilities?
11        A.   They were essentially the same as I've just
12   described, except the -- the two pharmaceutical
13   divisions reported to me, in addition to the Medical
14   Products Divisions, through an executive vice
15   president who had responsibility for those areas.
16        So PPD and the international affiliate of
17   PPD, called AI, ended up reported in to me.
18        Q.   Somewhere in between 2001 and 2004 a
19   decision was made that the Hospital Products Division
20   was, for lack of a better phrase, not going to exist;
21   is that fair? Or that it was going to be spun into a
22   separate company, a portion of it?

Page 109

1         A.   Yes.
2         Q.   Okay. Were you involved in that decision?
3         A.   I was.
4         Q.   Who was responsible for suggesting -- or --
5    strike that.
6         Who was responsible for that decision?
7         A.   I was responsible for suggesting the
8    decision.
9         Q.   Why did you suggest the decision?
10        A.   We were going through a process of trying
11   to understand how we could improve the overall
12   performance of the Medical Products business, and we
13   had done a -- we had done a thorough analysis to look
14   at each of the components within Medical Products to
15   determine what we thought the future growth potential
16   was and how that fit into our overall strategic plan
17   for the -- for the company going forward.
18        And ultimately what we decided is, at least
19   for certain parts of the HPD business, what we
20   typically described as core HPD, we were moving the
21   company in a direction of highly innovative, highly
22   clinically innovative proprietary products, and --

28 (Pages 106 to 109)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 110

1  that you could differentiate in the marketplace, and
2  the core products of HPD weren't that way for the most
3  part, I'd say.
4        And so we just determined as we looked at
5  that fit to where we were going strategically was not
6  a good fit for that part of the business, yet it was a
7  good business, and there were certain parts within HPD
8  that did fit that model, like our cardiovascular
9  business was still part of HPD at that point, our
10 spinal implant business was still part of that -- HPD
11 at that point. The proprietary pharmaceuticals that
12 were within HPD clearly fit that strategy.
13       And so what we ultimately decided is we
14 were better off taking those proprietary pieces,
15 making them stand-alone businesses, with the exception
16 of the proprietary pharmaceuticals that fit into our
17 proprietary pharmaceutical business, PPD and AI, and
18 then taking the remaining part of core HPD and
19 spinning it off.
20  Q.   And that include -- the spin-off included
21 the alt site product sales components of the former
22 HPD?

Page 111

1   A.  It included all of those products where the
2  sales came from.
3   Q.  Did the government investigation of
4  Abbott's pricing in its Hospital Products Division
5  have -- play any part in the decision to spin HPD?
6   A.  No.
7   Q.  Any other job responsibilities that you did
8  that we haven't covered already here today?
9   A.  Not that I can recall.
10  Q.  Okay. Like I said before, if you remember
11 something, just speak up.
12  A.  I will.
13  Q.  Okay.
14      Sir, I'd like to go back to an area
15 regarding AWP and Abbott's Hospital Products Division
16 list pricing.
17      Did you have an understanding as to the
18 relationship between list price and AWP?
19  A.  Prior to my meeting with the lawyers?
20  Q.  Which meeting with the lawyers? The one
21 I --
22  A.  The 1999 meeting.

Page 112

1   Q.  Okay, prior to the meeting with the
2  lawyers.
3   A.  No.
4   Q.  At any point prior to 1999 and the meeting
5  with the lawyers, did you have any understanding that
6  the government, the United States government, was
7  investigating Abbott with regard to its pricing?
8   A.  Not that I recall.
9   Q.  Do you think that would have been something
10 that would have been important to bring to your
11 attention?
12  A.  I think it depends upon what it was and
13 what the relevance of it was and what the material
14 facts were around it.
15  Q.  Before you actually jump into this area,
16 there is a line of questioning I wanted to ask you
17 about, which is, how would you characterize your
18 management style?
19  A.  I'd characterize it, I guess, as
20 participative.
21  Q.  Do you delegate a lot of responsibilities?
22  A.  I delegate what I think is a reasonable

Page 113

1  amount of responsibilities, yes.
2   Q.  Would you have expected that if the United
3  States and the Department of Justice was investigating
4  the Hospital Products Division, that your subordinate
5  employees should have brought that to your attention?
6   A.  That presumes they were aware of it.
7   Q.  Okay. Can you think of any reason why a
8  civil investigative demand and a 1997 subpoena from
9  the HHS-OIG would not have been brought to the
10 attention of the Hospital Products Division?
11  A.  Like I said, I'm not familiar with it, so
12 it's difficult for me to have a -- a point of view on
13 it.
14  Q.  Well, would you, in your capacity as the
15 president of HPD, have expected that if there was a
16 problem, it should have been brought to the attention
17 of the Hospital Products Division?
18  A.  I mean, again, that assumes there -- there
19 is a problem, and it assumes that it was properly
20 vetted right through the legal department to determine
21 whether or not it was relevant at the time.
22      I mean, it assumes a lot of things that are

29 (Pages 110 to 113)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 114

1  difficult for me to -- to answer the question in a
2  very black-and-white way.
3      Q.  Well, setting aside whether Abbott agreed
4  or disagreed with the subject matter of the
5  investigation, just the very fact that the Department
6  of Justice is investigating Abbott's Hospital Products
7  Division pricing, do you think that that fact is
8  something that should have been made known -- made
9  known to the Hospital Products Division?
10     A.  Well, again -- and -- and I just want to
11  make sure I'm careful about how I answer your
12  questions.  But it depends upon -- first of all,
13  depends upon who knows, and then it depends upon what
14  they're trying to do to validate the information.
15         I mean, I could -- I could theorize a
16  scenario, and it's nothing more than a theory, where
17  if the legal department wanted to do an investigation
18  of the Hospital Products Division, they probably
19  wouldn't want to inform everybody.
20     Q.  Okay.  But do you think they would have --
21  or should have informed management at least?
22     A.  They may not want to in certain instances.

Page 115

1      Q.  Do you know how the legal department could
2  get information incident to its review without
3  contacting the Hospital Products Division?
4      A.  Well, they could gather information.
5         But, again, I'm -- I'm doing what I'm not
6  supposed to do, speculate.
7      Q.  I don't want you to speculate.
8      A.  And so --
9      Q.  Okay.  My question is more to what your
10  expectations would be --
11     A.  Mm-hmm.
12     Q.  (Continuing) -- first with regard to your
13  subordinates.  If your subordinates were aware of the
14  investigation, would you have expected them to bring
15  it to your attention?
16     A.  Yeah.  I think if -- if they were aware and
17  they believed it was -- it was an issue that had it
18  been surfaced to them as a significant issue, yes, I
19  would have expected them to bring it to my attention.
20     Q.  Were you aware that in -- strike that.
21         Were you ever involved in decision-making
22  concerning the setting of list price with regard to

Page 116

1  the Hospital Products Division?
2      A.  No.
3      Q.  What about the decision to change list
4  pricing or reported list pricing that was made by
5  Abbott Hospital Products Division in 2001?  Were you
6  involved in that?
7      A.  Yes.
8      Q.  Okay.  What was your involvement?
9      A.  My involvement was part of a team of legal
10  and business people that were evaluating the situation
11  and asked to come back with recommendations -- review
12  the situation, asked to come back with
13  recommendations.
14     Q.  Okay.  Who -- who did -- who did the
15  asking?  Who initiated this team?
16     A.  I did the asking.
17     Q.  Okay.  Why?
18     A.  Well, it was really an evolutionary process
19  out of that 1999 request.  That late 1999 request.
20     Q.  Why did it take so long for Abbott to
21  decide to change its list prices, from 1999 until
22  2001?

Page 117

1      A.  Well, as I said, it was an evolutionary
2  process where we had a series of interactions to
3  evaluate the situation and then to determine what
4  would be the right course of action.  And, I mean,
5  when you say it took a long time, it was probably,
6  what, about a year?
7      Q.  Okay.  What -- well, why -- why didn't
8  Abbott change its list pricing -- Abbott Hospital
9  Products Division -- strike that, jeez.
10         Why didn't Abbott Hospital Products
11  Division change its list pricing prior to 2001?
12     A.  Now you're getting into an area where I'm
13  not sure I can answer you because of privilege.
14     Q.  Well, I don't want to -- I don't want you
15  to tell me what your communications were --
16     A.  Mm-hmm.
17     Q.  (Continuing) -- with counsel, at least not
18  at this point in time.  And I will put on the record
19  that this is an issue that we are reserving to come
20  back on because the United States does challenge some
21  of the privilege assertions.
22         But I want you, Mr. Gonzalez -- what was

30 (Pages 114 to 117)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 118

1   your understanding as to why it did not -- why, prior
2   to 2001, Abbott did not change its list prices?
3           MR. REIDY:  Is that decision based on the
4   legal advice you received?
5           THE WITNESS:  It is.
6           MR. REIDY:  Then you shouldn't answer.
7           THE WITNESS:  Okay.
8           MS. ST. PETER-GRIFFITH:  Are you
9   instructing him not to answer?
10          MR. REIDY:  Yes.
11          MS. ST. PETER-GRIFFITH:  Okay.  Well, I
12  want to know what the decision was though.  I mean,
13  that that's the business decision.
14          MR. REIDY:  You're asking -- you're
15  asking -- you're asking about a nondecision.
16          MS. ST. PETER-GRIFFITH:  Well, I'm asking --
17          MR. REIDY:  If you want to ask about the
18  decision, go ahead.
19          MS. ST. PETER-GRIFFITH:  Fair enough.
20          MR. REIDY:  But you're asking -- you're
21  asking during the entire time period.
22          MS. ST. PETER-GRIFFITH:  Let me ask --

Page 119

1           MR. REIDY:  Let me finish, as long as you
2   asked me, you're asking about a nondecision; during an
3   entire time period when you did nothing, what was your
4   reason for doing nothing?  He's indicated he had a
5   certain amount of legal advice with respect to that,
6   and that's what he said.  So that's what you're asking
7   about.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.  Prior to 1999 and your -- your interaction
10  with the legal division, why didn't Abbott change --
11  Abbott Hospital Products Division change its list
12  pricing?
13      A.  Well, it's for all the reasons I described
14  to you before.
15          One, I don't think we thought there was an
16  issue, okay?  Not -- not to say we thought there was
17  an issue going forward.
18          And No. 2, the mechanism by which we were
19  operating, particularly the hospital side of the
20  business, there was a rational approach to why we
21  would increase slightly list price.
22      Q.  Do you think a civil investigative demand

Page 120

1   from the Attorney General or a subpoena from HHS-OIG
2   in 1997 would have at least triggered a consideration
3   as to whether or not list pricing should take place?
4       A.  In 1997 I wasn't even in HPD, so I can't
5   answer your question.
6       Q.  What was the evolutionary -- what were the
7   steps of the evolutionary process that you just
8   testified about?
9       A.  Well, as I said, there was a -- we
10  initiated a review in late '99, early 2000.  And that
11  review had several steps associated with it, with the
12  end result being we made the determination to take
13  down list price.
14      Q.  Who is -- who is "we"?  Who was -- who was
15  involved in that?
16      A.  Myself, Laura Schumacher.  There may have
17  been other lawyers involved.  I don't recall.  And in
18  the final meeting that included -- in addition to
19  myself and Laura Schumacher, it included Chris Begley
20  and, I believe, Mike Sellers.  And again, there may
21  have been others that I just don't recall, but --
22      Q.  What were the steps?

Page 121

1       A.  When you say "steps," try to clarify for
2   me, because I want to make sure I answer this
3   appropriately.
4       Q.  Sure.  You just -- I thought you testified
5   that there were -- there were -- that you initiated
6   the review, and there were several steps and an end
7   result.
8       A.  Mm-hmm.
9       Q.  I'm trying to use your words.  What were
10  those steps?
11      A.  Well, there was an initial review where
12  legal came back with -- with some feedback to me that
13  I believe is privileged, because it was just feedback
14  directly around a legal interpretation of certain sets
15  of -- of issues related to the subpoenas.
16          And then at another point into the future
17  we took another look at it that involved both legal
18  and a group of business people.
19      Q.  And -- and what was that -- what was
20  involved in that other look?
21      A.  It relooked at some of the same -- same
22  activities, and it also looked at were there any

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 122

1  recommended changes that we might implement, and if
2  so, what -- what were those changes.
3      Q.  When you say "some activities," what do you
4  mean -- or the same -- I'm sorry, you said "the same
5  activities."  What activities are you talking about?
6      A.  Well, sales and marketing practices and the
7  pricing.
8      Q.  Who were the business people?
9      A.  I don't recall who was on the specific
10  teams.  I recall who was in the meeting, as I
11  indicated.
12         The two business people in addition to me
13  would have been Chris Begley and Mike Sellers.  There
14  may have been others, but I just don't recall anybody
15  else.
16      Q.  Was Mike Sellers afforded any particular
17  responsibilities in terms of -- or -- or assigned any
18  particular responsibilities in terms of looking at
19  this issue?
20      A.  Well, the legal team may have assigned some
21  responsibilities.  I didn't assign -- assign many
22  responsibilities.

Page 123

1      Q.  And you said you looked at whether there
2  were any recommendation changes.
3      A.  (Shakes head.)
4      Q.  Were there any recommendation changes?
5      MR. REIDY:  Did you get recommendations
6  from the lawyers in connection with that?
7      THE WITNESS:  We did.
8      MR. REIDY:  Okay.  So stay away from the
9  recommending -- whatever recommendations came out of
10  the lawyers that were specific.  And if there are
11  other -- if there are recommendations that came to you
12  as far as changes and procedures, you can describe
13  those.
14      THE WITNESS:  Okay.
15         Well, maybe the best way to characterize it
16  is this.  Is I came to understand through this process
17  four or five key pieces of information.
18         One was as we looked at the practices, was
19  there any -- was there any legal issue that we believe
20  was problematic for us.  And I came to the
21  understanding out of that review that the answer was
22  no.  I -- I came to the understanding that sales and

Page 124

1  marketing practices, or activities I should say, that
2  those that were looked at also didn't appear to be
3  anything that had a legal concern associated with it.
4         I came to understand that this is the
5  practice that basically the entire industry was using
6  in this marketplace.  And I came to understand through
7  this process that the government was fully aware of
8  how this system worked.
9         And so based on all of that, we had to look
10  at it also in the backdrop of the environment that was
11  out there.  And I'd say the environment, over the
12  period of, let's say, late '99 to 2001, particularly
13  in the press and to some extent at the congressional
14  level, there continued to be a lot of -- a lot of
15  angst around this reimbursement system.
16         And, you know, there were some articles
17  that were published.  We had received a letter from
18  Congressman Stark in and around that same period of
19  time.
20         And so as you step back and you looked at
21  it, the conclusion and the recommendation, but the
22  conclusion that we ultimately came to is, look, we

Page 125

1  never set this up in a way to create any kind of a
2  reimbursement issue, No. 1.
3         Number 2, it's a very small piece of our
4  business compared to the rest of the Hospital Products
5  business.  You know, represents 5 percent, 6 percent
6  of our total revenues in the business.
7         And in the backdrop of, you know, negative
8  publicity that ultimately could have -- whether
9  correct or not -- an impact on Abbott's image, it
10  might be easier to just make the problem go away.  And
11  the way to make the problem go away, at least the most
12  practical way I think the team came back was to take
13  down the prices.  And that was the recommendation that
14  came back, and I ultimately approved it.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Who made the recommendation?
17      A.  This team made the recommendation.
18      Q.  So Mr. Begley, Mr. Sellers, Ms. Schumacher,
19  and other lawyers?
20      A.  Correct.
21      Q.  How was that communicated to you?
22      A.  In a meeting.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 126

1    Q.  With who?
2    A.  Well, that's what I was describing in the
3 group that I described a moment ago.
4    Q.  Okay.
5    A.  All right.
6    Q.  Did -- did you have one or two meetings
7 with this group; do you know?
8    A.  I only recall one.
9    Q.  Let's go back to -- over these key pieces
10 of information you described.
11       In terms of the legal issues that -- you
12 said that the issue was raised as to whether there
13 were legal issues that Abbott believed was
14 problematic, and the conclusion was no.  Why?
15       MR. REIDY:  No, is -- did your
16 understanding of that analysis come from the legal
17 advice you received?
18       THE WITNESS:  Yes.
19       MR. REIDY:  Then don't answer the question.
20       MS. ST. PETER-GRIFFITH:  Well, just to let
21 you know, Dan, and I understand that you might give a
22 series of instructions, we do object to that because

Page 127

1 we believe there has been a subject matter waiver on
2 that.
3 BY MS. ST. PETER-GRIFFITH:
4    Q.  Was there any business component to that
5 suggestion that there were no legal issues?
6    A.  No.
7    Q.  With regard to the decision or the
8 suggestion that there was no legal concern over
9 Abbott's sales and marketing practices, was there
10 any -- why did you reach that conclusion?
11    A.  It's the same reason.  It was legal advice
12 that I received.
13    Q.  And just to be clear, was it Ms. Schumacher
14 who was communicating the legal advice?
15       MR. REIDY:  Yes, you've already identified
16 who was present in the meeting from the legal
17 department; right?
18       THE WITNESS:  Yes.
19       MR. REIDY:  And so any communications you
20 had about legal matters were with Ms. Schumacher, as
21 far as you recall?
22       THE WITNESS:  Yes.

Page 128

1       MR. REIDY:  I just don't want to have him
2 stumble into --
3       MS. ST. PETER-GRIFFITH:  Sure.  I
4 understand.
5 BY MS. ST. PETER-GRIFFITH:
6    Q.  Was there any business component to the
7 evaluation as to whether or not there was a legal
8 concern about the sales and marketing practices?
9    A.  No.
10    Q.  The decision -- or the -- the key piece --
11 one of the key pieces of information that you
12 indicated was that it was the industry practice in the
13 marketplace.  What did you understand about that?
14    A.  Well, my understanding was that basically
15 the majority of the companies who operated in this
16 market had a similar situation, where their list price
17 was above their contract prices.  That's what I
18 generally understood.
19    Q.  Did you have an understanding as to whether
20 there were others in the marketplace that had
21 differences in their list price and their market price
22 that exceeded a hundred, two hundred, three hundred, a

Page 129

1 thousand percent?
2       MR. REIDY:  Object to the form of the
3 question.
4       Go ahead.
5       THE WITNESS:  Yeah, I don't recall that.
6 BY MS. ST. PETER-GRIFFITH:
7    Q.  Were you aware that Abbott, on some of its
8 products, had had differences in their list price as
9 compared to the market price that exceeded 100
10 percent, 200 percent, or up to 1,000 percent or more?
11    A.  I didn't go through any individual products
12 as part of this review, so no.
13    Q.  Was it a lawyer who described to you that
14 this was the industry practice?
15    A.  As far as I can recall, yes.
16    Q.  Did Mr. Sellers have any commentary with
17 regard to the industry practice at all?
18    A.  There was some commentary from Mr. Sellers
19 and Mr. Begley.
20    Q.  Okay.  What was their commentary?
21    A.  Well, I think they both voiced some level
22 of concern around, as I recall, two primary issues.

33 (Pages 126 to 129)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 130

1  One is our ability to implement it, you know, just the
2  practical implementation and a mechanism to implement
3  it.
4         And, number 2, they voiced some concern
5  that, you know, we would be the outlier.
6     Q.  What do you mean by "we would be the
7  outlier"?  Or what did they mean?  What did you
8  interpret them to mean?
9     A.  I interpreted them to mean the rest of the
10  industry would not -- would not follow our, you know,
11  our response here.  That basically the rest of the
12  industry would continue the practice that they had in
13  place, and we'll have, you know, as a single
14  organization have decided to make this change.  That's
15  all.
16    Q.  Was there ever any dissent that was
17  expressed based upon the -- the concern that by
18  lowering the list prices, the government's concerns
19  might somehow be legitimized?
20    A.  I don't recall that specifically, no.
21    Q.  Did Mr. Begley and -- did Mr. Begley or
22  Mr. Sellers voice any other concerns?

Page 131

1     A.  I can't recall which one of them voiced a
2  concern, but if there was any finan- -- financial
3  impact, there would be some level of -- of adjustment
4  to their goals and objectives to adjust for the
5  change.
6     Q.  With regard to the fourth item, the
7  government was fully aware of how the system worked,
8  how did you come to have that understanding?
9     A.  That was part of that same review.
10         That I don't specifically recall who
11  described it to me.
12    Q.  Okay.  Was it described to you in this
13  meeting?
14    A.  Yes.
15    Q.  Okay.  What was your understanding of what
16  the government knew?
17    A.  Well, it was described to me that the
18  government was fully aware of how this reimbursement
19  mechanism worked.  There was a reference to -- I think
20  it was President Clinton had made an acknowledgment of
21  this in some speech that -- that he had made.  So, you
22  know, I came to the understanding that -- that it was

Page 132

1  something at least many in the government understood.
2  I won't say all, but many in the government understood
3  how -- how the reimbursement mechanism in this
4  particular area was working.
5     Q.  Did -- did you have an understanding as to
6  whether or not Abbott knew or had a perception that
7  the government was aware of spreads on Abbott Hospital
8  Products Division products that were anywhere from a
9  hundred to a thousand percent?
10    A.  I don't recall that.
11    Q.  Was there any discussion of that?
12    A.  No, I don't recall that.
13    Q.  Was there any discussion of the
14  government's knowledge of what Abbott's Hospital
15  Products Division spreads were?
16    A.  Just repeat the question one more time.
17    Q.  Sure.  Was there any discussion about
18  whether the government knew about what Abbott's actual
19  spreads were?
20    A.  No, I don't recall that.
21    Q.  Sir, did you have an understanding as to
22  whether this system was going to change anyway,

Page 133

1  whether or not Abbott lowered its list prices, because
2  First DataBank was already going to lower Abbott's --
3     A.  No.
4     Q.  (Continuing) -- AWP?
5         Are you familiar with the term "DOJ AWPs"?
6     A.  No.
7     Q.  Did anyone ever raise with you, incident to
8  this particular review, the fact that whether or not
9  Abbott lowered its list prices, the Department of
10  Justice had -- was working to lower Abbott's AWPs?
11    A.  No.
12    Q.  Was Mr. White consulted in this decision?
13    A.  No.
14    Q.  Was this the type of decision that would
15  have been delegated to you without the need to go to
16  Mr. White?
17    A.  Yes.
18    Q.  Was anyone on the board of directors
19  consulted concerning this decision?
20    A.  No.
21    Q.  Was anyone else, outside of the group that
22  you were referencing, consulted concerning this

34 (Pages 130 to 133)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 134

1  decision?
2      A.  Not to my knowledge.
3      Q.  What did Abbott perceive would happen?  Or
4  what did your team perceive would happen once the list
5  prices were lowered?
6      A.  Well, I think the hope was that that would
7  eliminate the controversy.
8      Q.  Okay.  Why did you think that that would
9  eliminate the controversy?
10     A.  Because it basically would reduce the
11  difference.
12     Q.  Did Abbott do anything in terms of seeking
13  out advice or consultation with either HHS-OIG or CMS
14  concerning its decision?
15     A.  Not that I'm aware of.
16     Q.  Did Abbott have an understanding that if it
17  changed its list price, its AWPs would be lower?
18         MR. REIDY:  I object to Abbott's
19  understanding.
20         MS. ST. PETER-GRIFFITH:  I'm sorry.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Did this group that you have -- that you

Page 135

1  worked with have an understanding as to whether -- as
2  to the impact of lowering Abbott's list price and
3  whether or not that would have a corresponding effect
4  of lowering Abbott's AWPs?
5         MR. REIDY:  Again, I'm just going to object
6  to the understanding of the group.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Go ahead.  You can answer the question,
9  sir.
10     A.  Just say it to me one more time, make sure
11  I can answer it properly.
12     Q.  Sure.  Let's start with you.
13     A.  Mm-hmm.
14     Q.  Did you have an understanding that when
15  this list price change took place, that Abbott's
16  Hospital Products Division AWPs would be lowered?
17     A.  There was some discussion around what the
18  right mechanism is.  And I will tell you even after
19  this review, this is -- this is more complicated than
20  I give it credit for.  So I want to be careful how I
21  answer the question about did I know how the mechanism
22  works, because I think honestly I didn't know how the

Page 136

1  mechanism works.
2         But the objective was to -- to minimize
3  the -- the amount of difference.  And there was a
4  discussion around several ways to do that, and we
5  ultimately decided on one we thought was the most
6  appropriate.  And I'm certainly not the guy to answer
7  that question for you.
8      Q.  Well, did you have an understanding as to
9  the relationship between list price and AWP?
10     A.  I mean, I have a vague understanding that
11  there is some correlation between the two.
12     Q.  What's your understanding of how AWP is
13  determined?
14     A.  Well, some calculation between list price
15  and AWP, I think.
16     Q.  Okay.  Did you have an understanding as to
17  how -- how the calculation of AWPs came about?
18     A.  What do you mean?
19     Q.  Meaning how -- who -- who did the
20  calculation?
21     A.  Well, this working team did the
22  calculations to come back with a recommendation.

Page 137

1         I mean, again, we didn't look at individual
2  products.  That's not what we ultimately did.
3      Q.  Okay.  So you looked -- you looked at this
4  group of, say, a hundred NDCs that were at issue.
5      A.  Yeah.  Whatever the numbers were, yes.
6      Q.  Okay.
7      A.  Yeah, we looked at the whole portfolio.
8      Q.  Did Abbott lower its list price on the
9  whole portfolio?
10     A.  I -- I couldn't answer that question for
11  you.
12     Q.  What was your recollection of the reaction
13  in the marketplace to Abbott's decision to lower its
14  list prices?
15     A.  I didn't hear any significant reaction.
16     Q.  Did any specific customers complain?  Or
17  were you weighed -- made aware of any specific
18  customer complaints?
19     A.  Yes.
20     Q.  What customer complaints were you made
21  aware of?
22     A.  I was made aware of a complaint through

35 (Pages 134 to 137)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 138

1  legal, so I don't -- I don't know whether or not
2  that's something --
3         MR. REIDY:  You -- I think you can go ahead
4  and say what complaint you were made aware of.
5         THE WITNESS:  I don't recall a customer,
6  but I was made aware some customer sent a letter in.
7  Never actually saw the letter, but some customer sent
8  a letter in asking for some compensation or
9  reimbursement.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Do you recall whether that was from
12 GeriMed, and it was a demand for $10 million?
13     A.  Like I said, I don't recall who the
14 customer was.
15     Q.  Okay.  Does a demand for approximately
16 $10 million ring a bell?
17     A.  I actually don't remember the dollar
18 amount.  I mean, it was -- it was -- it could have
19 been in that range, but I don't recall.
20     Q.  And I might have misspoke; Omnicare.  Does
21 that ring a bell?
22     A.  No.  Like I said, I don't remember the

Page 139

1  customer.  I may not even have paid much attention to
2  who the customer was.
3      Q.  As a -- either as an outgrowth of -- of
4  this project, or for any other reason, did you feel
5  that it was important to go back and review Abbott's
6  historic list price reporting to see if there were any
7  areas of either exposure or problems that you might
8  want to address?
9      A.  No, I don't believe so.
10     Q.  Sir, as a -- one of the considerations that
11 you testified to as sort of factoring into this whole
12 analysis, you indicated that there was an
13 environmental backdrop with the press and Congress.
14 And what I'd like to do is have you describe each and
15 every factor, public factor that you can recall,
16 either a press report, congressional inquiry, DOJ
17 inquiry that may have impacted your decision-making
18 with regard to the lowering of the list prices.
19     A.  I mean, I don't recall specifically a lot
20 of detail around it.  I recall something in the -- in
21 the normal press around the issue and then a reference
22 to the letter that Congressman Stark had sent.

Page 140

1         There could have been other things.  I just
2  don't recall.
3      Q.  How did you learn about the Stark letter?
4      A.  It was one of the items that was brought up
5  in this meeting.
6         MR. BREEN:  I'm sorry?
7         THE WITNESS:  It was one of the items that
8  was brought up in this meeting.
9         Am I not speaking loud enough?
10        MR. BREEN:  You are.  I was just --
11        THE WITNESS:  Okay, I'm sorry.
12        MR. BREEN:  My ears are a little plugged up
13 from the plane yesterday.  So I just didn't hear that
14 one.  Sorry.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Let me clarify.  When was the timing of
17 this meeting?  Was it at the end of this invest- --
18 evaluation process?  The middle?  The beginning?
19     A.  When was the meeting I'm describing to you?
20     Q.  Yes.
21     A.  It was near the -- near -- you know,
22 sometime prior to when we did the price change.  I

Page 141

1  don't recall the specific date.
2      Q.  Who brought the Stark letter to your
3  attention?
4      A.  It came up in the dialogue of this meeting.
5  I didn't see the Stark letter, but it came up in the
6  dialogue of this meeting.
7      Q.  Have you ever seen the Stark letter?
8      A.  Not to my knowledge.
9      Q.  Did Mr. White ever discuss the Stark letter
10 with you?
11     A.  No.
12     Q.  Do you recall whether it was Mr. Begley or
13 Mr. Sellers that brought it to your attention?
14     A.  I don't recall.
15     Q.  What was your understanding of what the
16 Stark -- the content of the Stark letter?
17     A.  I mean, my general understanding was that
18 it raised the same types of issues.
19     Q.  Okay.  Concerning AWP reimbursement?
20     A.  Yes.
21     Q.  Do you know whether Abbott ever responded
22 to the Stark letter?

36 (Pages 138 to 141)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 142

1    A. I don't.
2         MS. ST. PETER-GRIFFITH:  Okay.  We've got
3    five minutes left on the tape.  What time do we have?
4         MR. SISNEROS:  It's noon here.
5         MS. ST. PETER-GRIFFITH:  Is now a good time
6    for lunch?
7         THE WITNESS:  Sure.
8         MS. ST. PETER-GRIFFITH:  Okay.
9         THE VIDEOGRAPHER:  We're off the record at
10   11:56 a.m. with the end of Tape No. 2.
11
12
13
14
15
16
17
18
19
20
21
22

Page 143

1         A F T E R N O O N   S E S S I O N
2         THE VIDEOGRAPHER:  We are back on the
3    record at 12:45 p.m. with the start of Tape No. 3.
4         RICHARD A. GONZALEZ,
5    called as a witness herein, having been previously
6    duly sworn, was examined and testified further as
7    follows:
8         EXAMINATION (Continued)
9    BY MS. ST. PETER-GRIFFITH:
10        Q.  Mr. Gonzalez, going back to the decision in
11   '01 to change Abbott's hospital list prices for
12   certain of its products, when you referenced counsel
13   and legal counsel, do you know whether outside counsel
14   was brought into the analysis?
15        A.  I don't know that.
16        Q.  As part of the analysis, do you know
17   whether the team, be it the business folks or the
18   legal folks, had access to documents reflecting
19   Abbott's Hospital Products Division's provision of AWP
20   information to its clients?
21        A.  I don't.
22        Q.  I'd like to kind of take you through the

Page 144

1    timing of the sequence of the decision and the
2    announcements.
3         Does it -- do you recall whether the
4    meeting that you were referencing took place in March
5    of '01?
6         A.  I -- I don't recall the specific date.
7         Q.  Okay.  Prior to lowering -- well, do you
8    recall what the formula was that was implemented for
9    the new list price calculations?
10        A.  I recall a discussion, but I don't recall
11   what the formula was.
12        Q.  Do you recall whether it was WAC plus 5
13   percent?
14        A.  No, I don't recall.  I'm sorry.
15        Q.  Sure.  I understand.
16        Do you know whether the formula that was
17   adopted for the new list price calculations, was that
18   consistent with what other divisions were doing?
19        A.  I don't know that.
20        Q.  Prior to lowering Abbott's Hospital
21   Products Division list prices, do you recall whether
22   there was a lowering of Abbott's HPD WAC prices?

Page 145

1         A.  No, I don't recall that.
2         Q.  Okay.  Could it have taken place, you just
3    don't recall?
4         A.  I don't recall.
5         Q.  Okay.  Was there any discussion that you
6    recall about lowering WAC prices?
7         A.  Not that I recall.
8         Q.  Do you recall any discussion concerning
9    reporting lowered WAC prices in or around the first
10   couple of months of '01 and -- to the price reporting
11   compendia?
12        A.  No, I don't recall that.
13        Q.  As part of the decision-making process to
14   lower the list price, do you recall whether the issue
15   of lowering list price was discussed at any plan or
16   plan update meetings?
17        A.  No.
18        Q.  How was the -- no, you don't recall, or no,
19   it didn't take place?
20        A.  No.  No, I don't recall it being --
21        Q.  Okay.  Would it have been -- would lowering
22   of list price on the products that were at issue have

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 146

1   implicated marketing plans or -- or plans or plans
2   updates?
3       A.  Can you maybe rephrase your question, make
4   sure I understand it?
5       Q.  Sure.
6           The decision to lower Abbott's list prices,
7   would that have had an impact on Abbott's plan or plan
8   updates?
9       A.  Yes.
10      Q.  How so?
11      A.  Well, whatever sales we had at list price
12  obviously would come down --
13      Q.  Okay.
14      A.  (Continuing) -- by definition if you're
15  lowering the list price.
16          And then if there was any -- any customers
17  that you lost through the process, there would be that
18  impact as well.
19      Q.  Do you recall what the discussion was
20  before the -- before the price -- the lowering of the
21  price occurred about that impact?
22      A.  There was a discussion in the meeting

Page 147

1   around that impact.
2       Q.  Do you recall seeing a presentation on
3   that, or a memo on that?
4       A.  I don't recall seeing a memo, and I don't
5   specifically recall a presentation.
6       Q.  What about -- well, do you recall Mike
7   Sellers doing an analysis on this issue?
8       A.  I recall Mike Sellers being in the meeting
9   talking through it.  I don't recall specifically the
10  analysis.
11      Q.  Do you recall what the general dollar
12  amount of the impact was -- was thought to be or
13  projected to be?
14      A.  It was one of the areas where there was
15  some debate, conversation -- however you elect to
16  describe it -- and -- as to whether or not there'd be
17  no impact, a minor impact.  But the number I recall
18  was in around the $10 million range.
19      Q.  Okay.  Do you know whether that was just
20  for the HPD alt site business, or did that also
21  include home infusion?
22      A.  I don't recall home infusion being part of

Page 148

1   the discussion.
2       Q.  You don't?
3       A.  No.
4       Q.  Do you recall what the impact -- any
5   discussion about what the impact may have been on loss
6   of revenue that Abbott could share in with its
7   consignment partners?
8       A.  No, I don't recall that.
9       Q.  Did you know -- were you aware that Mike
10  Sellers did an evaluation where he estimated up to a
11  million to $1.8 million in lost revenue in home
12  infusion due to the lowering of the list price?
13      A.  No, I wasn't aware of that.
14      Q.  What -- what was your understanding of the
15  link between the lowering of the list price and the
16  potential for losing customers?
17      A.  I think the -- the question was would it
18  have any impact on any customers, if we were the
19  company that took the lead and no one else did.  There
20  was some debate around that, and this was an
21  analysis -- like we do many analyses where we look at
22  sort of here is -- here is an identifiable change to

Page 149

1   our financial plan, as best we can estimate it what do
2   we think that could be, and it was that kind of an
3   analysis that was done to target a dollar amount.
4       Q.  Okay.
5       A.  So that's what I recall about it.
6       Q.  Was there any consideration made to the
7   possible increase of sales that were made at the lower
8   list prices, meaning the noncontract sales?
9       A.  Not that I recall.
10      Q.  Was that a market segment that Abbott was
11  focused on, on HPD?
12      A.  What segment?
13      Q.  The off-contract market that bought at list
14  price, that sort of 2 percent range that you were
15  talking about earlier?
16      A.  Yeah.  I wouldn't say that was an area of
17  -- of significant focus.
18      Q.  What else do you recall about the decision
19  that we haven't discussed already to lower list price?
20      A.  I think we've pretty much covered what I
21  recall.
22      Q.  Okay.  After the list price was lowered, do

38 (Pages 146 to 149)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 150

1  you recall whether there was any financial analysis
2  done as to the actual impact after the fact?
3      A.  I do recall that there was an analysis done
4  at the -- at the end of the year to look at whether or
5  not there was any impact, and what I recall was that
6  there was no material impact.
7      Q.  Okay.  I'd like to go back to the external
8  pressures that might have impacted, like the
9  congressional investigations and the Stark letter.
10         After the list price prices were lowered,
11  do you recall whether there was any change in this
12  environment that created either congressional concern
13  or press coverage?
14     A.  Not that I recall.
15     Q.  Do you recall what press coverage the
16  decision to lower the list prices in HPD received?
17     A.  I do recall there was one article in, I
18  think, the "Tribune."
19     Q.  After the list prices were changed, do you
20  recall having any conversations with anyone outside of
21  this group about the impact?
22     A.  No.

Page 151

1      Q.  In lowering the list prices, did -- did
2  Abbott have a -- strike that.
3         As part of its decision to lower list
4  prices, did the corresponding impact on -- okay,
5  strike that, too.  Let me try and rephrase this
6  better.
7         At the time that the decision was made to
8  lower list prices, did Abbott have -- did you have an
9  understanding that Abbott was under investigation by
10  the Department of Justice?
11     A.  I was aware of the subpoenas.  I don't know
12  that I had an understanding of the investigation
13  itself.  Those may be one in the same.  I'm not a
14  hundred percent certain.
15     Q.  Okay.  Did -- did Abbott believe that the
16  subject matter of the subpoenas or the -- the issue
17  create -- presented in the subpoena might be resolved
18  through its lowering of its list prices?
19     MR. REIDY:  I object to what Abbott
20  believed.
21         THE WITNESS:  That -- that is not one of
22  the things that we talked about.

Page 152

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay.  Did you have a concern, after the
3  list prices were lowered, about the subject matter of
4  the subpoenas?
5      A.  Are you asking me did I have a concern?
6      Q.  Did you?
7      A.  No.
8      Q.  Were you aware of any concern within
9  Abbott?
10     A.  Not that I was aware of.
11     Q.  Sir, what is your understanding of what WAC
12  is?
13     A.  I mean, I know what it means.
14     Q.  Okay.
15     A.  It means wholesale acquisition price.  But,
16  again, it's one of these areas that I tell you I'm
17  clearly not an expert.
18     Q.  Did you understand what price within Abbott
19  HPD was charged to wholesalers?
20     A.  Just repeat the question once more.
21     Q.  Sure.  Did you have an understanding as to,
22  when a price -- when a wholesale acquisition price

Page 153

1  was -- was charged to a wholesaler, did you -- did you
2  understand what price that was?
3      A.  Are you referring to, like, an individual
4  product, or are you referring to --
5      Q.  Just in general.  What -- what was the WAC
6  price?
7      A.  I mean, I'm aware that there is a WAC
8  price.
9      Q.  Okay.
10     A.  Okay?
11     Q.  Was it the price charged to wholesalers?
12     A.  There again, I'll tell you I'm not -- I'm
13  not familiar enough with the mechanism of how those
14  are calculated to -- to give you an accurate answer.
15     Q.  Okay.  Have you heard the term "DAQ"?
16     A.  No, I've never heard the term "DAQ."
17     Q.  Distributor acquisition?
18     A.  No.
19     Q.  Contract price; what -- how would you
20  define contract price, or what was your understanding
21  of how that term was used within Hospital Products
22  Division?

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 154

1    A.  My understanding of that term is that
2    that's the price that the end user would pay.
3    Typically it was used in the backdrop of one of these
4    group purchasing contracts.
5        Q.  Catalog price; same question.
6        A.  Catalog price, it was my understanding, is
7    the list price.
8        Q.  What was the utility of the pricing
9    information contained in Abbott's catalog pricing --
10   I'm sorry.  Let me strike that.
11           What was your understanding of the utility
12   of Abbott's catalog?
13       A.  It was a resource that customers could go
14   to to understand what products we had available
15   primarily.
16       Q.  Did you have an understanding as to the
17   utility of the pricing information contained in the
18   catalog?
19       A.  Well, it gave someone a reference point if
20   they were going to buy off contract what a product
21   might be -- might cost.
22       Q.  Let me ask you, if a customer came to

Page 155

1    Abbott and said, "I'd like to buy vancomycin," or,
2    "I'd like to buy your Advantage line of products" --
3        A.  Mm-hmm.
4        Q.  (Continuing) -- would Abbott try and get
5    them on contract?
6        A.  Yes.
7        Q.  Okay.  Is that -- were you successful in
8    doing that?
9        A.  I don't know what percentage we were
10   successful, but clearly it was in our best interest to
11   try to get them on contract than to just have them buy
12   off contract.
13       Q.  In terms -- or have you ever heard the term
14   "director trade price"?
15       A.  No.
16       Q.  Sir, what is your understanding of spread?
17   I've used that term a couple of times, but I don't
18   think I've asked you what your understanding of it is.
19       A.  You know, here again, I'd say the knowledge
20   that I gained about spread clearly came out of the
21   interactions that I had with the lawyers after '99.
22   So you're obviously not asking me to tell you what I

Page 156

1    learned in that meeting; right?
2        Q.  If -- again, reserving all of the
3    government's rights to pursue this --
4        A.  Right.
5        Q.  (Continuing) -- outside of this deposition,
6    which would -- may or may not mean you'll return.  But
7    in terms of -- I don't want you to say, you know,
8    in-house counsel said this is what spread is.  I want
9    to know what yours, Mr. Gonzalez's understanding of
10   spread is.
11           First let me ask you this question.  Did
12   you ever hear that term prior to '99?
13       A.  No.
14       Q.  Is it fair to say that the first time you
15   heard the term "spread" was incident to this review
16   process that you initiated upon receiving the lit hold
17   memo?
18       A.  That is correct.
19       Q.  Did you have any understanding as to what
20   spread meant that was independent of what -- how
21   counsel described it to you?
22       A.  Well, because one of the things I asked

Page 157

1    counsel to do is to walk me through not only what the
2    subpoena said, but also --
3        MR. REIDY:  Don't go into any more what you
4    asked counsel to do and what counsel did.
5        THE WITNESS:  Mm-hmm.
6        MR. REIDY:  So if your answer -- the
7    question is no, you didn't have any independent
8    understanding of spread; is that right?
9        THE WITNESS:  Yes, it is.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.  Did you do anything to ascertain what
12   spread meant to Abbott HPD alt site marketing?
13       A.  Other than that, that I did to the legal
14   process, no.
15       Q.  Have you heard the term "marketing the
16   spread"?
17       A.  Through that same process.
18       Q.  Do you know whether Abbott engaged in the
19   practice of marketing the spread, Abbott HPD?
20       A.  Not to my knowledge.
21       Q.  Do you know what types of acts would
22   constitute marketing the spread?

40 (Pages 154 to 157)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 158

1    A.  I mean, again, not that I didn't learn
2  through this process.
3    Q.  Well, did you -- do you have an independent
4  understanding as to whether the provision of AWP
5  information incident to, for example, a bid would
6  constitute marketing the spread?
7    A.  Ask the question again.
8    Q.  Sure.  Incident to providing information in
9  response to a -- an RFP or some kind of bid, if Abbott
10 provided AWP or spread information, do you have an
11 understanding as to whether that constitutes marketing
12 the spread or not?
13   A.  I mean, again, other than what I discussed
14 with counsel, no.
15   Q.  If Abbott HPD was engaged in marketing the
16 spread, do you think that's something that you should
17 have known about as the president of HPD?
18   A.  It's a hypothetical answer -- question I
19 can't answer.  I mean --
20   Q.  Well, I'll represent to you, sir, that it's
21 the government's position that Abbott HPD, prior to
22 '99 and thereafter, was engaged in marketing the

Page 159

1  spread conduct.
2        If it was engaged in marketing the spread
3  conduct, do you think that's something that you should
4  have known as the president of HPD?
5    A.  Well, I've already testified that as part
6  of the legal process, I was educated on the issue.
7    Q.  No, but I mean outside of the legal process
8  --
9    A.  Mm-hmm.
10   Q.  (Continuing) -- do you think that you
11 should have been made aware of the spread activities
12 that Abbott HPD employees were engaging in?
13       MR. REIDY:  Object to the hypothetical.
14       THE WITNESS:  What I'm having difficulty
15 separating is I learned much about this as part of the
16 legal process.  So I don't need to learn it twice.
17 It's how I learned it that's the issue, not -- not
18 necessarily whether I learned it or not.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  Okay.  And what I'm trying to separate out,
21 sir, is independent of the legal process, if -- if
22 Abbott's employees were engaging in marketing the

Page 160

1  spread, if they were giving customers spread
2  information --
3    A.  Mm-hmm.
4    Q.  (Continuing) -- my question is, as the
5  president of HPD, do you think that you should have
6  known about that?
7    A.  I don't know.  It would depend upon the
8  circumstances, the validity.  I mean, it would depend
9  on lots and lots of things.
10       So I don't know whether I should have or
11 not.
12   Q.  Well, would marketing the -- if HPD
13 employees were engaged in marketing the spread, do you
14 think that that's something that you should have been
15 made aware of if the federal government was looking
16 into Abbott's conduct in that regard?
17       MR. REIDY:  Object to the form of the
18 question.  It's two questions.
19       THE WITNESS:  I mean, I think I was made
20 aware of the government's questions as part of the
21 legal review process.
22 BY MS. ST. PETER-GRIFFITH:

Page 161

1    Q.  But that wasn't until '99?
2    A.  That's correct.
3    Q.  What about prior to '99?  Do you think that
4  you should have been made aware of Abbott's employees'
5  spread marketing conduct?
6        MR. REIDY:  Object to the question,
7  assuming a fact not in evidence.
8        THE WITNESS:  It assumes that there -- that
9  there was some conduct that was at issue.  And so I
10 don't know.  I can't answer that hypothetical.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Well, if Abbott HPD marketing employees, in
13 soliciting alt site contracts, would present
14 spreadsheets that included spread information, do you
15 think that that's information that you should have
16 known about?
17   A.  Well, it also assumes that that happened;
18 correct?  The basis for your question?
19   Q.  We have documents that show that it
20 happened, sir.
21   A.  Mm-hmm.  I don't know.
22   Q.  Okay.  Have you ever seen any documents

41 (Pages 158 to 161)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 162

1  reflecting Abbott's employees providing spread
2  information to clients or customers?
3      A.  Only potentially documents that we went
4  through as part of the preparation for this.
5          MR. BREEN:  When?
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  When?
8      A.  In the review process leading up to this
9  deposition.
10     Q.  So you -- so you didn't see them prior to
11  your prep for this deposition?
12     A.  No.
13     Q.  Okay.  And you didn't see them in '99?
14     A.  No, not that I'm aware of.
15     Q.  What part of the review process did you
16  yourself direct?  And when I say "the review process,"
17  I mean the review list prices?
18     A.  Well, I asked for the original review.  And
19  as I said, that was an evolutionary process that
20  ultimately culminated in -- in this other action.  So
21  I guess in the beginning I asked for it.
22     Q.  And then did you give any instructions as

Page 163

1  to what you expected should be done?  Or did you just
2  say, "I want someone to look into this"?
3      A.  You know, again, that was directly between
4  me and counsel.  Am I in a position to answer that?
5      Q.  Well --
6          MR. REIDY:  If -- if -- if you -- if you
7  gave a directive and you recall specifically what the
8  directive was, you can indicate that.
9          THE WITNESS:  I don't recall the specifics
10  of the directive.  I basically asked for this to be
11  looked at.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Okay, "this" meaning the -- the pricing
14  information or the subject matter of the subpoena?
15     A.  Subject matter of the subpoenas.
16     Q.  Did you give any direction as to where you
17  thought they should look, or did you just assume that
18  whoever you gave the direction to would go about
19  finding out the information, however they felt
20  necessary?
21     A.  The legal team that, you know, worked on
22  this was familiar with how HPD was structured.

Page 164

1      Q.  Other than Ms. Schumacher, do you recall
2  who else was on the legal team --
3      A.  No.
4      Q.  (Continuing) -- that might have reviewed
5  this?  Okay.
6          Sir, I'd like to jump to the utility of --
7  well, let me ask you this.
8          What is a marketing plan within the context
9  of HPD?
10     A.  I mean, that term is used for a lot of
11  different things.
12     Q.  Okay.
13     A.  Can you be a little more specific?
14     Q.  Sure.
15     A.  Okay.
16     Q.  What is -- it's my understanding that
17  they -- that annually there was a plan and a plan
18  update.
19     A.  Mm-hmm.
20     Q.  What is a plan?
21     A.  A plan is a -- typically a financial
22  exercise that we go through that is designed to set

Page 165

1  the financial objectives for the upcoming year.
2      Q.  Okay.  And how would you go about -- excuse
3  me -- setting those financial objectives?  What was
4  the process for the development of the plan I guess?
5      A.  Yeah.  I mean, it started within these --
6  within these units I described before, these
7  commercial units for commercial aspects of the plan,
8  and, you know, within operations and R&D and all these
9  other functional organizations, they would basically
10  develop a plan for the following year of what they
11  thought their sales would be, what they thought their
12  expenses would be, and we'd roll that up at a
13  financial level to a P&L for the business.
14     Q.  What is a plan update?
15     A.  Plan update is essentially a -- a relook at
16  that plan once you're into the year and you can
17  actually see some level of performance against it.  So
18  it allows you to make an adjustment if you were off.
19     Q.  Would each of the business units have to
20  contribute to the -- within the Hospital Products
21  Division have to contribute their information to the
22  plan or the plan update?

Henderson Legal Services, Inc.

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 166

1    A.  I'm not a hundred percent sure if every
2  single unit contributed or there was some roll-up that
3  occurred within a unit.
4    Q.  What about the alt site product sales?
5  Would alt site product sales be involved in developing
6  or providing information to contribute to the plan
7  concerning that market segment?
8    A.  There would be some level of -- of alt site
9  detail in the plan.  I'm not sure whether they
10  contributed to it or it was done at the business unit
11  level.
12    Q.  What about the home infusion business unit?
13  Were they included, or was their information -- was
14  the home infusion business unit's information included
15  as part of the plan or plan update?
16    A.  As far as I can recall, yes.
17    Q.  What -- what is your understanding of the
18  home infusion business unit structure?  What was the
19  business model I guess?
20    A.  I mean, essentially it was taking products
21  that we had to be able to commercialize into the
22  home-care model -- or the home-care market.

Page 167

1    Q.  Okay.  What was your understanding of the
2  alt site product sales business model?
3    A.  Essentially it was a similar kind of
4  existing products that were designed and developed for
5  the hospital market into the alternate site channel,
6  which is, you know, a small fringe channel that
7  basically in some cases uses similar products.
8    Q.  Was -- was there a difference between the
9  alt site product sales and the home infusion business
10  model?
11    A.  Was there a difference between the two
12  models?
13    Q.  Yes; how -- how each went about, you know,
14  contracting for business.
15    A.  Not that I recall.  But I'd say -- I mean,
16  neither one of those businesses were a very large
17  business for us.  I didn't spend a whole lot of time
18  on those two businesses specifically.
19    Q.  Did you -- were you aware of any
20  consignment arrangements that the home infusion
21  business unit entered into?
22    A.  No.

Page 168

1    Q.  Were you ever made aware that the home
2  infusion business unit provided product as well as
3  devices on a consignment basis to its contracting
4  entities, to the entities that it contracted with, in
5  exchange for receiving a percentage share of their
6  gross revenues?
7    A.  No.
8    Q.  That -- that was never made known to you?
9    A.  Mm-hmm.
10    THE REPORTER:  I'm sorry.  Was that a yes
11  or no; that was never made known to you?
12    THE WITNESS:  That was never made known to
13  me.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Do you think that such a business model
16  would have been problematic?
17    A.  I can't -- I can't tell you that without
18  knowing a lot more about it.
19    Q.  Okay.  Well, you were the head of the -- of
20  the Hospital Products Division; right?
21    A.  Yes.
22    Q.  If there was a problem with the home

Page 169

1  infusion business unit, do you think you should have
2  been made aware of it?
3    A.  Yeah, my question -- or my statement is I'd
4  have to know a lot more about it to know it's a
5  problem.
6    Q.  Okay.  Sir, you -- you testified that the
7  Ross settlement occurred on your -- during your
8  presidency, or during your role as executive vice
9  president -- I'm sorry -- as president and COO of
10  Medical Products; is that right?
11    A.  Correct.
12    Q.  Okay.  What was the conduct that was at
13  issue in Ross?
14    MR. REIDY:  What's -- what's the relevance
15  of that?
16    MS. ST. PETER-GRIFFITH:  Well, I want --
17  are you objecting on relevance grounds or instructing
18  him not to answer?
19    MR. REIDY:  I'm asking you a question.
20    MS. ST. PETER-GRIFFITH:  I'm not here to
21  answer questions, Dan.  I'm asking him --
22    MR. REIDY:  Okay, let's see what happens.

43 (Pages 166 to 169)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 170

1  You can go ahead and answer that if you have an
2  answer.
3      THE WITNESS:  My basic understanding of the
4  Ross issue was one around bundling the disposable and
5  the device together.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Do you -- did you have an understanding as
9  to whether or not Ross was providing free devices to
10 entities?
11     A.  I think that is the bundling issue --
12     Q.  Okay.
13     A.  (Continuing) -- in and of itself.
14     Q.  If Abbott home infusion was providing
15 product basically free of charge, without -- without
16 charging fair market value for the product, for the
17 devices, do you see a parallel between the two -- you
18 know, the two conduct -- the conduct between Ross and
19 home infusion?
20     A.  No.
21     Q.  How come?
22     A.  Because in the Ross situation, at least as

Page 171

1  I understand it, we were charging for the disposable
2  and capturing a portion of that disposable cost to
3  offset the cost of the pump.  That has nothing to do
4  with consignment.
5      Q.  Okay.  But if no fair market value was
6  charged under these consignment arrangements, how does
7  Abbott's -- how would Abbott's home infusion
8  department identify what they actually charged for the
9  product, or whether or not they were actually charging
10 anything for the product?
11     A.  I -- unless I looked at the detail of it, I
12 can't answer your question.
13     Q.  Did anyone raise -- ever raise any concerns
14 about -- with you or anyone, to your knowledge, within
15 Hospital Products Division with the legality of the
16 home infusion business model?
17     A.  No.
18     Q.  Did you ever hear of any customers raising
19 legal concerns about the home infusion business model?
20     A.  No.
21     Q.  If customers had raised concerns about the
22 legality of the home infusion business model, as

Page 172

1  president of HPD would you expect that that's
2  something that you would learn about?
3      A.  I would expect that either I'd learn about
4  it or get some level of legal review to determine the
5  validity of it.
6      Q.  Do you know whether that ever took place?
7      A.  I've already testified I didn't know that
8  there were any.
9      Q.  Why did you make the decision to close the
10 home infusion business unit?
11     A.  We did an analysis of -- of that particular
12 business to look at whether or not it -- it fit in the
13 portfolio for where we wanted to take HPD, and, No. 2,
14 whether or not it was a reasonable business to be in
15 the portfolio.  And this happened relatively early on
16 in my tenure as the president of HPD.  So sometime I'd
17 say late '98, early '99 kind of time frame.
18     And we made the determination that if you
19 looked at the business and you fully burdened it,
20 it -- it had at best marginal profitability.  I think
21 you could probably argue it lost money.  But at best
22 probably marginal profitability.

Page 173

1      It clearly was more of a service-oriented
2  business than a product business, and we were -- we
3  were trying to take the business with us into more
4  differentiated kinds of products.  So it didn't fit
5  strategically where we wanted to go.  And so I made
6  the decision we should -- we should shut it down.
7      Q.  Do you know what Don Robertson's position
8  was with regard to whether or not the business should
9  be shut down?
10     A.  I don't recall specifically Don Robertson's
11 position, but there were -- there were people within
12 the group that had a different point of view.
13     Q.  Who?  Who?
14     A.  Well, I think Mike Sellers to some extent
15 had a different point of view.  They were typically
16 the people who were involved in the business.
17     Q.  Do you recall what Mike Sellers' objections
18 was to closing?
19     A.  Well, the areas that he agreed were
20 obviously the profitability side of it.
21     I think the concern was some of these
22 customers were large hospital customers who we were

44 (Pages 170 to 173)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 174

1  supporting from a home infusion standpoint, and so we
2  had substantial sales on the hospital side of the
3  business with those customers.  So that was one issue
4  that was raised.
5       A second issue that was raised was if we
6  were going to exit the market, the speed at which we
7  could do that because they had signed some longer-term
8  contracts, and we wouldn't want to put those customers
9  in a position where we didn't follow through on the
10 contract.
11      And then the third issue was around this
12 computer system; whether or not there was a reasonable
13 alternative that these customers could have to replace
14 that computer system.
15      So as I recall it, those were the three
16 significant issues that we discussed.
17     Q.   And did any of those -- clearly none of
18 those issues sort of countervailed the business
19 decision or the business reason to close the unit.
20 How did you address each one of these concerns?
21     A.   Well, on the -- on the contract side what
22 we ultimately decided was that -- that we clearly

Page 175

1  weren't going to not honor any contract that we had,
2  okay?  But we would look for ways to help the customer
3  transition more quickly.  But in the event the
4  customer couldn't transition more quickly, we would
5  sustain or support through whatever the contract
6  period was that we had.
7       At the same time we wouldn't take on any
8  more customers.  So we didn't continue to build
9  this -- this inevitable issue of trying to exit.
10      On the computer side what we explored was
11 whether or not there were any alternatives out there.
12 And then the second alternative that we explored was
13 whether or not we could somehow provide CHIPs to these
14 customers so that they could just use it directly.
15      And for whatever reason that didn't seem to
16 work.  I don't recall specifically what the challenge
17 was, but I think it had something to do with the
18 obsolescence of the software that was the operating
19 model for CHIPs.  But I don't remember the details
20 behind it.
21      And I think on the first issue, you know,
22 that was one of perception.  If you dealt with their

Page 176

1  ability to transition to somebody else effectively,
2  you shouldn't alienate any customers along the way.
3  And so I think we thought if we could accomplish two
4  and three, we probably didn't have to worry very much
5  about one.
6       Q.   So then was a decision made -- made to sort
7  of phase out the existing contracts and not take on
8  any more?
9       A.   Correct.
10      Q.   At any time during this process, did you
11 have any understanding that there may be a Medicare,
12 Medicaid compliance problem associated with the
13 business model?
14      A.   No.
15      Q.   Did you understand that the home infusion
16 business had a reimbursement department that actually
17 submitted claims to Medicare and Medicaid?
18      A.   I did know about a reimbursement
19 department.  I don't know that I knew specifically how
20 that mechanism worked.  In fact, as I recall, at least
21 my impression would have been that we did that as a
22 support on behalf of the customer.

Page 177

1       Q.   Okay.  Did you have an understanding that
2  Abbott's home infusion business unit would collect
3  as -- as its compensation under the agreement a
4  percentage of the gross revenues of reimbursement
5  collected by a particular client?
6       A.   I mean, I learned that through the process
7  preparing for these depositions.  I didn't know it
8  prior to that.
9       Q.   Who had responsibility for overseeing the
10 home infusion business unit?
11      A.   I thought at that time it would have been
12 Mike Sellers and -- I don't recall who he reported to.
13      Q.   If there was a problem with Medicare,
14 Medicaid compliance within the home infusion business
15 unit, who would have been responsible for, you know,
16 ensuring compliance or resolving any compliance
17 problems?
18      A.   Well, it would have been within that unit
19 or the level of the unit reporting above that.
20      Q.   Okay.  Which is who?
21      A.   I just can't recall.
22      Q.   Okay.  Would it have been Don Robertson?

45 (Pages 174 to 177)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 178

1    A.  I was going to say I think it was Don
2 Robertson, but I'm not a hundred percent certain of
3 that.
4    Q.  But someone within the reporting structure
5 of home infusion and then alt site; is that fair?
6    A.  I don't know for sure where it was
7 connected at that time.
8    Q.  But it would have been your expectation, as
9 the president of Hospital Products Division, that if
10 there were Medicaid and Medicare compliance issues,
11 they should have been dealt with and resolved at that
12 level?
13    A.  Well, they should be analyzed, you know, go
14 through a normal process of analyzing them, try to
15 understand them, and, if necessary, resolving them,
16 yes.
17    Q.  If there was a compliance problem, as the
18 president of HPD, would you have expected it would
19 have been brought to your attention?
20    A.  Well, again, it would depend upon what the
21 issue was and if there really was an issue and the
22 magnitude of the issue.

Page 179

1    Q.  I'd like to jump to the alternate site
2 product sales business model.
3    A.  Mm-hmm.
4    Q.  Did you have an understanding as to the
5 reimbursement considerations that factored into the
6 market segments, meaning alt site product sales
7 customers' decision-making in terms of whether or not
8 to buy Abbott's products?
9    A.  No, I wouldn't say I'd have a close
10 understanding of that.
11    Q.  Did you have any understanding?
12    A.  No.
13    Q.  Did you have -- do you have any
14 understanding, for that particular market segment, as
15 to how reimbursement worked, the non-DRG
16 reimbursement?
17    A.  Yeah.  I mean, again, this is this issue of
18 prior to '99 the answer is no.  After '99 through this
19 process, the answer is yes.
20    Q.  Okay.  So prior to the subpoena issue and
21 everything that -- that resulted after that, prior to
22 that point in time you had no understanding as to how

Page 180

1 the customers for the alt site product sales business
2 segment were reimbursed by third-party payers?
3    A.  That is correct.
4    Q.  What was your understanding after '99?
5    A.  Well, as part of this legal review process,
6 I was walked through how the mechanism worked, and so
7 I certainly had a high-level understanding of how it
8 worked.
9    Q.  And what was that understanding?
10    A.  Well, again, I'm not sure I can walk you
11 through that, based on where I received the
12 information.
13        MR. REIDY:  If you have an understanding on
14 how reimbursement worked, if you have a present
15 understanding of it, you can answer.
16        THE WITNESS:  Okay.
17        I mean, it's basically what I described to
18 you earlier.  That there is some relationship between
19 list price and AWP, and the customer is compensated at
20 some level of AWP.  And I can't tell you much more
21 than that.
22 BY MS. ST. PETER-GRIFFITH:

Page 181

1    Q.  Okay.
2        As part of the plan and plan review, or
3 plan -- the plan and plan update process --
4    A.  Mm-hmm.
5    Q.  (Continuing) -- would it have been
6 important for you, as the president of HPD, to
7 understand how the alt site product sales market
8 segment was reimbursed?
9    A.  I'd say typically no.
10    Q.  Okay.  Is that just because it's -- or why
11 do you say that?
12    A.  Well, because as we do financial planning,
13 what we're really measuring is net sales.  And so at
14 the end of the day what the customer is reimbursed or
15 anything else doesn't really matter, because what
16 we're really tracking is what the revenue coming into
17 the business is, and that's net.  So I don't
18 believe -- and I don't recall -- any reimbursement
19 information in any of our plan books --
20    Q.  Well, as --
21    A.  (Continuing) -- you know, on the financial
22 planning process.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 182

1    Q.  If the non-DRG reimbursement mechanism was
2  a market force or a driving force between -- driving
3  customer decisions in the alt site area, do you think
4  that that would have come into play in terms of the --
5  the plan or plan updates?
6    A.  I mean, I think it would only come into
7  play if there was some event that was going to change
8  it which would materially impact the financials.
9  That's the only way that process would have of looking
10  at it.
11    Q.  When I used the term "marketing plan"
12  earlier, you said that -- that could mean a lot of
13  different things.
14    A.  Yeah.
15    Q.  Within the Hospital Products Division, was
16  there something called a marketing plan, or within
17  these business units --
18    A.  Mm-hmm.
19    Q.  (Continuing) -- individually?
20    A.  I mean, typically my recollection of
21  marketing plans in HPD were product-specific.  In
22  other words, any new product that we were developing,

Page 183

1  we would go through and do a marketing plan for the
2  product.
3    Q.  Would the marketing plan for the product be
4  geared towards the traditional hospital DRG reimbursed
5  segment, or would it also include a plan for the
6  product line sales in the alt site market?
7    A.  If there was an applicable market within
8  alt site, it would include those sales either as part
9  of a projection, so it might be buried down inside it
10  so you can't actually see it, or if it was significant
11  enough it might be separated out.
12        I'd say typically the kinds of products we
13  developed that were proprietary kinds of products,
14  there wasn't necessarily a market in alt site for
15  those products.
16    Q.  Well, for the nonproprietary -- for the
17  generics.
18    A.  Right.
19    Q.  Would there be a marketing plan for a
20  generic product line?
21    A.  Typically not.
22    Q.  Okay.  What about for a -- for lack of

Page 184

1  better term -- a sort of bundled product line, like
2  the Advantage product line which might have included
3  components that were generic and proprietary.  Would
4  there be a marketing plan for product lines like that?
5    A.  I mean, Advantage was a long, long time
6  ago.  Long before I ever got to HPD.  So I can't speak
7  directly to it, to Advantage.
8    Q.  Well, and other product lines, if you want
9  to give an example as to you -- as to the product
10  lines you were more familiar with.
11    A.  I can't recall a product line like that
12  when I was there that we did a marketing plan for.
13    Q.  Okay.  Where would marketing plans
14  originate?  Is there a particular, you know, area
15  within HPD that was -- had that responsibility?
16    A.  Yeah, they would -- they would be
17  developed.  As I described earlier, they would be
18  developed within that hospital business sector that
19  had marketing responsibility for new products.
20    Q.  Okay.  Is there any other use of the term
21  "marketing plan" that you're familiar with from the
22  Hospital Products Division?

Page 185

1    A.  Not that I'm familiar with.
2    Q.  Are there any other types of plans
3  pertaining to, you know, the sale of -- of products
4  that were developed within the Hospital Products
5  Division, either not -- that are -- not the financial
6  plans or the marketing plans, but other types of
7  strategic plans for the sale of products?
8    A.  We would typically do a long-range
9  strategic plan for financial planning purposes.  It's
10  actually called the LRP, long-range plan.
11    Q.  Okay.
12    A.  That's the only other planning tool that I
13  can think of.
14    Q.  Sir, I'm going to represent to you that
15  I've seen the term "plan" used in another context, and
16  it's with the -- the initials RAG before it; RAG plan.
17    A.  All right.
18    Q.  Do you know what a -- what an RAG plan
19  might reference?
20    A.  It's probably my initials.
21    Q.  Okay.
22    A.  Yes.

47 (Pages 182 to 185)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 186

1    Q.  Do you know what an RAG plan is?  Was that
2  something that you were familiar with?
3    A.  My guess would be it was the financial plan
4  that you described earlier.
5    Q.  Okay.
6    A.  Yeah.  But I'd have to see a document to be
7  able to clarify it, but . . .
8    Q.  Okay.  What about an S-T -- a S-T-R-A-T,
9  STRAT?  Have you ever heard --
10    A.  S-T-R-A-T.
11    Q.  Right.  Have you ever seen the term "STRAT"
12  or "RAG STRAT," R-A-G S-T-R-A-T?
13    A.  No, I can't say I have.
14    Q.  Are you familiar with the contract
15  marketing operating procedures manual?
16    A.  No.
17    Q.  Sir, what was your involvement in lobbying
18  matters?
19    A.  No involvement.
20    Q.  Were you ever updated on HPD -- lobbying
21  matters that impacted HPD?
22    A.  Not that I recall.

Page 187

1    Q.  Sir, what was your familiarity with TAP?
2    A.  I didn't have any operating responsibility
3  for TAP.  You know, I obviously knew it was a joint
4  venture that Abbott was involved in with Takeda
5  Pharmaceuticals.
6    Q.  Were you aware that the home infusion
7  business unit would distribute Lupron?
8    A.  No.
9    Q.  Were you aware that the home infusion
10  business unit, as part of its consignment
11  arrangements, would consign Ross products?
12    A.  No.
13    Q.  Were you aware that the home infusion
14  business unit would consign Ross pumps?
15    A.  No.
16    Q.  At the time of the Ross criminal plea and
17  settlement, did you undertake any initiative to
18  evaluate whether the conduct that was at issue in the
19  Ross case may have permeated to other areas -- or to
20  areas within the Hospital Products Division?
21    A.  I don't recall doing that.
22    Q.  Do you think that would have been a prudent

Page 188

1  thing to do?
2    A.  I think if there were parallels to it, it
3  would be, but I don't see the parallels.
4    Q.  Well, did you do anything to determine
5  whether there were any parallels?
6    A.  I mean, I think we understand how the
7  business operates well enough that we would have
8  probably been able to see parallels.
9    Q.  But just to be clear, you didn't do
10  anything to say, "Hold on.  This other business unit
11  had this problem.  Maybe I should implement some steps
12  to make sure we don't have this problem in the
13  Hospital Products Division"?
14    A.  No.
15    Q.  Okay.  What about -- are you familiar with
16  the TAP criminal plea?
17    A.  Not really.
18    Q.  Were you aware that certain TAP executives
19  were subjected to a criminal trial?
20    A.  I was aware of that.
21    Q.  Did you know any of them, any of the
22  criminal defendants in TAP?

Page 189

1    A.  I knew one of them.
2    Q.  Who?
3    A.  Don Patton.
4    Q.  Did you discuss the TAP case with
5  Mr. Patton?
6    A.  No.
7    Q.  Do you know Mr. Pietraszek?
8    A.  I do know Mr. Pietraszek.
9    Q.  Did you at any time discuss TAP's marketing
10  strategy with Mr. Pietraszek?
11    A.  No.
12    Q.  After the TAP criminal plea, did you
13  undertake or request that someone undertake a review
14  of the Hospital Products Division to see if it had
15  possible exposure to the same types of issues that
16  were presented in the TAP case?
17    A.  I did not.
18    Q.  How come?
19    A.  First of all, I wouldn't be very familiar
20  with what those are to begin with.
21    Q.  Well, the TAP -- TAP is a joint venture
22  between Abbott and Takeda; right?

48 (Pages 186 to 189)

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 190

1    A.  Yes.
2    Q.  Okay.  If a joint-venture arrangement had
3 the type of criminal exposure that TAP was exposed to,
4 as the president of Hospital Products Division,
5 wouldn't you have a concern or -- or want to make
6 absolutely sure that your division didn't have similar
7 problems?
8    A.  As the president of the Hospital Products
9 business, if there were similarities between the
10 issues at TAP -- I mean, the typical mechanism that I
11 would have relied upon is that, you know, the legal
12 department would have identified that for me as an
13 issue.
14    Q.  So you -- you would have expected that
15 legal would have come to you and said, "We might have
16 an issue here"?
17    A.  If there was an issue.
18    Q.  Did the legal department ever come to you?
19    A.  Not that I recall.  I'm trying to recall
20 the date of the settlement.
21    Q.  September 2001?
22    A.  Okay.

Page 191

1    Q.  Okay?  Does that -- wait, let me ask you
2 this.  When did you first learn about the TAP
3 investigation?
4    A.  I don't recall.  It would have been at some
5 point when the investigation was ongoing.
6       No, the reason I asked you the question
7 about the date is I wanted to make sure it was within
8 the time frame I was the president of HPD.
9    Q.  Understood.
10       Did you do anything to assess -- would it
11 have been important to you to -- to evaluate whether
12 or not there were any similarities between the
13 business practices in the Hospital Products Division
14 and TAP?
15       MR. REIDY:  I'm just going to object, asked
16 and answered.
17       Go ahead if you've got an answer.
18       THE WITNESS:  No, I mean, I think -- I
19 think it's the same position I had a moment ago.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Sir, do you recall any interaction or
22 involvement with Cardinal?

Page 192

1    A.  You're referring to personal interaction
2 with Cardinal?
3    Q.  Yes, or Cardinal contracts.  You know,
4 Cardinal matters, either directly in terms of working
5 with or negotiating with Cardinal individuals, or
6 working on Cardinal contracts.
7    A.  No.
8    Q.  What about Novation?
9    A.  Yes.
10    Q.  Okay.  What's your recollection of your
11 involvement with Novation?
12    A.  Well, I would have had to review the
13 Novation contract that went in place sometime during
14 my tenure in HPD.  I don't recall the specific year,
15 but there -- there was a contract that had a renewal
16 that occurred while I was the president of HPD, and I
17 would have reviewed at least the macrofinancials of
18 that to determine whether or not that was acceptable
19 to us.
20    Q.  Did you review all of the -- the contracts
21 that went through HPD?
22    A.  When you're referring to "contract," let me

Page 193

1 make sure I'm answering your question accurately.
2    Q.  Okay.
3    A.  I never reviewed the actual contract.
4    Q.  Okay.
5    A.  We had people who looked at the contract.
6 But we were making a financial proposal to Novation.
7 I would have looked at -- the finance department would
8 have built a financial model to show what the
9 performance of that new contract would be, versus the
10 contract that we had already in place.  That's what
11 I'm referring to.
12    Q.  Okay.  Did you review the financial model
13 for all contractual arrangements within the Hospital
14 Products Division?
15    A.  Just large ones; Novation was probably our
16 single biggest customer.
17    Q.  Okay.  What about Premier?
18    A.  Premier I would have reviewed.
19    Q.  GeriMed?
20    A.  Never heard of GeriMed.
21    Q.  Omnicare?
22    A.  No.

49  (Pages 190 to 193)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 194

1    Q.  Okay.  Did you review Quorum?
2    A.  No.
3    Q.  You testified earlier about Tenet and
4  Columbia/HCA.
5    A.  Yeah; I would have spent time with them,
6  but those contracts are not nearly as significant, so
7  I can't even say for sure that I would have reviewed
8  those two contracts.
9    Q.  Was there sort of a -- either a dollar
10 volume or a business volume threshold for the types of
11 contracts whose business -- whose financial models you
12 would look at as opposed to those you wouldn't need to
13 review?
14   A.  I wouldn't say there was a -- you know, an
15 absolute model that we had in place that had dollar
16 thresholds.  But, I mean, when you look at Premier and
17 Novation, you're probably talking about combined sales
18 between those two organizations in HPD of over a
19 billion dollars.  So I would have looked at those.
20       You know, something less than 50 to a
21 hundred million dollars, typically that would be
22 reviewed at a lower level.

Page 195

1    Q.  Okay.  Did you review, to your
2  recollection, any alternate site contracts?
3    A.  No.  The whole alternate site business was
4  somewhere around 120 to $140 million, the whole
5  portfolio.
6    Q.  So the aggregate didn't even rise to the
7  level of the contracts that you would review?
8    A.  Right.
9    Q.  What about Owens or Owens Cardinal?
10   A.  Sure.
11   Q.  Do you recall that name?
12   A.  I do recall the name.  I was never involved
13 with any contracting with them.
14   Q.  Do you recall being involved with a home
15 infusion contractual arrangement or business
16 arrangement concerning Benchmark or Benchmark Chart?
17   A.  No, not that I recall.
18   Q.  What about PSS?
19   A.  PSS I had involvement in.
20   Q.  What is PSS?
21   A.  Physician Sales & Service.
22   Q.  Okay.  And what was your involvement?

Page 196

1    A.  When I was in ADD -- I don't remember what
2  job I had -- I believe when I was in ADD, as the
3  director of marketing, I negotiated an arrangement
4  with PSS to become our distributor for certain parts
5  of the Diagnostics business.
6    Q.  Okay.
7    A.  That's the only involvement I had with
8  them.  Hopefully it's the same PSS.  These are located
9  in Jacksonville, Florida, the PSS that I'm referring
10 to.
11   Q.  Do you recall any other contracts that you
12 were involved with in the Hospital Products Division
13 that we haven't talked about?
14   A.  Consorta may have been one that I --
15 certainly one that I had a -- a relationship meeting
16 with on a couple of occasions, and I may have looked
17 at their contract.
18   Q.  What is McKinsey, the McKinsey report?
19   A.  You mean McKinsey, the consulting group.
20   Q.  McKinsey Consulting, okay.
21   A.  Or do you mean McKesson?
22   Q.  No, McKinsey.

Page 197

1    A.  Okay, McKinsey.
2    Q.  Before we get to McKinsey, what do you know
3  about McKesson?  Or did you have interaction with
4  McKesson?
5    A.  They are a distributor.
6    Q.  Okay.
7    A.  That's all I know about them.
8    Q.  Did you work with any --
9    A.  No.
10   Q.  Okay.  Jumping to McKinsey or McKinsey
11 Consulting, what is McKinsey Consulting?
12   A.  McKinsey Consulting is a well-known
13 consulting group that has done work for Abbott.
14   Q.  Okay.  Did you commission any work by them?
15   A.  I probably have.
16   Q.  Do you recall what that was?
17   A.  Not specifically.
18   Q.  Do you know what the reimbursement task
19 force is?
20   A.  No.
21   Q.  Were you aware that Abbott had an entity
22 which included some HPD employees called the

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 198

1    reimbursement task force?
2        A.  No.
3        Q.  Sir, I'll represent to you that
4    Mr. Sellers -- I took Mr. Sellers' deposition, and he
5    indicated that as part of the conversation that he
6    had, you were asked about the change in the reporting
7    relationship within alternate site.
8            Do you recall a decision being made about
9    the change in the reporting relationship for alternate
10   site?
11       A.  What I recall talking about was the -- the
12   contract marketing reporting relationship.
13       Q.  Okay.  What do you recall about that?
14       A.  We made a decision at one point to
15   essentially consolidate the two organizations into
16   one.
17       Q.  Okay, why was that decision made?
18       A.  I think it was primarily made around -- it
19   was just a more efficient model going forward.  We did
20   a number of things to try to make the business more
21   efficient.
22       Q.  Do you remember when the decision was made?

Page 199

1        A.  No, I don't.
2        Q.  Do you know whether the decisions regarding
3    list prices either coincided with or impacted the
4    decision?
5        A.  I don't recall them impacting the decision,
6    and I don't know whether they coincided or not.  It's
7    unlikely that they coincided.
8        Q.  Sir, do you know what the Gonzalez book is?
9    Have you ever heard that term?
10       A.  Lots of people put my name on a lot of
11   things, I can tell.
12       Q.  I understand that.
13       A.  Most of these RAG, Gonzalez documents are
14   financial review documents, because, remember, we have
15   multiple levels of review of how we build up our
16   financial plan.  And so one of the ways they were
17   characterized is who they were developed for review.
18           So when you're the head of HPD, in this
19   case, they would have called it the RAG review, for
20   lack of a better way of describing it, and then there
21   is obviously a review above that.  Then they become
22   more summarized as you go higher and higher.  Down in

Page 200

1    the organization there are levels of review that would
2    occur as they built it up, you know.
3            As an example, the hospital business sector
4    would do their own review before they'd compile a
5    divisional review for me to look at.
6        Q.  Okay.  So there would be at the -- at the
7    different sort of business levels, there would be a
8    review that initially took place, and then there would
9    be -- that information would be kicked up to a larger --
10       A.  Right.
11       Q.  (Continuing) -- review?
12           Sir, do you have an understanding or were
13   you aware of any issues associated with the pricing of
14   vancomycin?
15       A.  No.
16       Q.  In undertaking its pricing decisions,
17   during your tenure within either AHD or thereafter,
18   when you -- when you had supervisory responsibilities
19   over the Hospital Products Division, did you have an
20   understanding as to whether the Hospital Products
21   Division factored into its pricing considerations
22   about public health consequences associated with its

Page 201

1    pricing?
2        A.  Not that I recall.
3        Q.  Do you recall an issue coming -- what's
4    your understanding of what vancomycin is?
5        A.  It's an antibiotic.
6        Q.  Okay.  Do you know whether it's an
7    antibiotic of -- of last resort?
8        A.  I think it depends upon the -- the
9    condition.  It could be.
10       Q.  Do you know whether there were any health
11   concerns associated with overutilization of
12   vancomycin?
13       A.  Not that I'm aware of.
14       Q.  Do you believe that Abbott had a
15   responsibility in connection with its price reporting?
16       A.  I --
17       Q.  Meaning an ethical --
18       A.  I don't know what that means, no.
19       Q.  Let me rephrase this.
20           In doing -- in -- in making its price
21   reporting to the -- strike that.
22           Do you understand what the pricing

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 202

1 compendia are?
2      A.  No, not really.
3      Q.  Had you ever heard the term First DataBank,
4 Red Book, Medi-Span?
5      A.  I've heard the terms.
6      Q.  What's your understanding of Medi-Span,
7 First DataBank, and Red Book are?
8      A.  Again, I learned this information through
9 this process that we've talked about, this legal
10 process.
11      Q.  But do you have -- do you have an
12 independent understanding as to what that is?
13      A.  That I didn't gain through that?
14      Q.  No, just do you have an independent
15 understanding?
16      MR. REIDY:  If -- if you have an
17 understanding not associated with preparation for this
18 deposition of pricing compendia, you can give it.
19      THE WITNESS:  No.
20 BY MS. ST. PETER-GRIFFITH:
21      Q.  If Abbott's price-reporting conduct caused
22 Medicare or Medicaid to overpay substantially for

Page 203

1 reimbursement on products that were Abbott products,
2 do you think that Abbott had a responsibility to
3 factor into those -- factor in those overpayments into
4 its pricing?
5      MR. REIDY:  Object to the question.
6      THE WITNESS:  I mean, I'd have to
7 understand a lot more about the details to be able to
8 answer that question.  I don't know.
9 BY MS. ST. PETER-GRIFFITH:
10      Q.  Well, if -- if Abbott's price reporting
11 caused Medicare or Medicaid to pay for a particular
12 Abbott product a thousand percent more than what was
13 actually charged for the product, do you think that
14 Abbott had a responsibility to ensure that its pricing
15 did not cause such a substantial overpayment?
16      A.  I mean, it causes me to make a series of
17 assumptions that I don't know that are even valid.
18 So, I mean, you're asking me to speculate on
19 something -- a hypothetical that I don't even know how
20 it works, whether or not it's real, you know, what
21 other circumstances could play into it.  I --
22      MR. REIDY:  Do you have an answer to the

Page 204

1 question?
2      THE WITNESS:  No.
3 BY MS. ST. PETER-GRIFFITH:
4      Q.  If Abbott's price reporting caused Medicare
5 or Medicaid to pay a thousand times more for a
6 particular product -- I'm sorry, a thousand percent
7 more for a particular product than what was actually
8 being charged the customer, do you see any social
9 responsibility that Abbott had for that overpayment?
10      MR. REIDY:  You just asked that question.
11      THE WITNESS:  Yeah, and I can't -- I can't
12 answer your question.  I don't have enough information
13 to be able to answer it accurately.
14 BY MS. ST. PETER-GRIFFITH:
15      Q.  What additional information do you think
16 you need?
17      A.  Well, first I'd have to understand, is your
18 premise accurate, okay?
19      Q.  Okay.
20      A.  I'd have to understand all the other
21 circumstances about how the reporting is defined to be
22 done.  I'd have to understand whether or not that

Page 205

1 reimbursement was just for the product.  I mean, there
2 is lots and lots of circumstances here.
3      Q.  If the reimbursement was just for the
4 product --
5      A.  Mm-hmm.
6      Q.  (Continuing) -- would that change your
7 decision?  Do you think you could answer the question?
8      A.  No, I don't think I can answer the question
9 just based on that.
10      Q.  Sir, at the time of the Hospira spin, was
11 any consideration made to what should happen to the
12 records and information concerning the Hospital
13 Products Division for litigation preservation
14 purposes?
15      A.  Not that I'm aware of.
16      Q.  Well, if there was a litigation hold in
17 place for certain documents, would you have expected
18 that they would have stayed at -- with Abbott, or that
19 they would have gone with Hospira?
20      A.  I'm just not familiar enough with how
21 the -- how the procedure works to know the answer to
22 that question.

52 (Pages 202 to 205)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 206

1      MS. ST. PETER-GRIFFITH:  Okay.  Why don't
2  we -- is now a good time to take a break?  Why don't
3  we take a break.
4      MR. REIDY:  Sure.
5      THE VIDEOGRAPHER:  We are off the record at
6  1:57 p.m. with the end of Tape No. 3.
7          (Brief pause.)
8      THE VIDEOGRAPHER:  We are back on the
9  record at 2:14 p.m. with the start of Tape No. 4.
10      MS. ST. PETER-GRIFFITH:  Welcome back,
11  Mr. Gonzalez.  We are, as I just indicated off the
12  record, we are entering into the document phase of the
13  deposition.
14      THE WITNESS:  Very good.
15      MS. ST. PETER-GRIFFITH:  Which -- which
16  presents a bit of a housekeeping task.  What I'd like
17  to do is we're going to put a series of documents in
18  front of you which are going to be marked; whatever
19  time you need to review them.  I will tell you
20  generally the areas that I'm going to focus on.
21      THE WITNESS:  All right.
22      MS. ST. PETER-GRIFFITH:  Okay.  And this is

Page 207

1  Exhibit 4.
2          (Whereupon Deposition
3           Exhibit Gonzalez 004 was
4           marked as requested.)
5      MS. ST. PETER-GRIFFITH:  Dan -- oh, that's
6  Exhibit 4.
7      MR. REIDY:  Thank you.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Sir, my first question to you is -- and
10  we're not necessarily going to get into the
11  substantive content of this letter.  My first question
12  to you is have you ever seen this document before?
13      A.  Not that I recall.
14      Q.  Do you ever remember hearing about Mr.
15  Reidy's receiving a letter from the Department of
16  Justice concerning Abbott's pricing practices and
17  putting Abbott on notice of a qui tam that had been
18  filed against it?
19      A.  No.
20      Q.  If the conduct that the United States
21  Department of Justice is putting Abbott through its
22  counsel on notice of concerned or impacted the

Page 208

1  Hospital Products Division, would you have expected to
2  learn about it?
3      A.  Again, it would depend on a lot of factors.
4  I don't know.  I was looking at the other document to
5  see was this what triggered the document you provided
6  me earlier, which is the one that legal came and
7  reviewed with me.  It's roughly a month or two later.
8  Yeah, it's roughly a little less than a month later.
9      Q.  Okay.
10      A.  So it could be this document triggered this
11  (indicating).
12      Q.  But you -- you were unfamiliar with the
13  fact that Mr. Reidy had received this letter?
14      A.  Correct.
15      MS. ST. PETER-GRIFFITH:  Mark this as next.
16          (Whereupon Deposition
17           Exhibit Gonzalez 005 was
18           marked as requested.)
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  This one, sir, I am going to ask you to
21  take a look at and review.
22          (Witness examines document.)

Page 209

1      THE WITNESS:  Okay, I've read it.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  This appears to be an e-mail from Mike
4  Sellers, and the addressee on the "to" line is you.
5  Do you see that?
6      A.  Yes.
7      Q.  Do you recall receiving this e-mail?
8      A.  No.
9      Q.  Do you have any doubt that you received the
10  e-mail?
11      A.  I don't recall getting it, but I have no
12  reason to doubt I didn't get it.
13      Q.  Okay.  The subject matter of the e-mail
14  concerns AWP changes, and from the body of the e-mail
15  it appears that Mr. Sellers is putting you on notice
16  that at a Medicaid rebate seminar two employees
17  learned that FDB, or First DataBank, was announcing
18  that it was lowering AWPs on 437 products.
19      A.  Mm-hmm.
20      Q.  Do you recall that issue?  Even if you
21  don't recall the specific e-mail, do you recall that
22  issue being presented to you?

Henderson Legal Services, Inc.
202-220-4158               www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 210

1     A.  No.
2     Q.  Would that have -- if -- if Abbott products
3  were included as some of the 437 drug products, would
4  that have been important to you in your role as
5  president of HPD?
6     A.  I mean, obviously depend on the magnitude.
7     Q.  Do you recall whether any evaluation or
8  study arose from the subject matter of Mr. Sellers'
9  e-mail?
10    A.  No, not that I recall.
11    Q.  Do you recall this topic coming up at all?
12    A.  No.
13         (Whereupon Deposition
14          Exhibit Gonzalez 006 was
15          marked for identification.)
16    THE WITNESS:  Thank you.
17         (Witness examines document.)
18    MR. SISNEROS:  And, for the record, what is
19  the date on 6?
20    MS. ST. PETER-GRIFFITH:  There is no date.
21  It's Sellers Exhibit 35, and it's TXABT 674744.
22    THE WITNESS:  I've read it.

Page 211

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Sir, do you recognize this document?
3     A.  No.
4     Q.  You are not an addressee on it, although
5  there is -- the name -- the name Schumacher and
6  Chronis.  Do you see that?
7     A.  Yes.
8     Q.  Do you recall whether Stacey Chronis was
9  involved in -- as part of the legal department with
10  the '01 price changes?
11    A.  I don't recall Stacey being involved, but
12  as I said, there were other people there.  I don't
13  recall everyone who was there.
14    Q.  Are you familiar at all with the subject
15  matter of the content of this memo?
16    A.  It appears it's referencing this e-mail.
17    Q.  But you weren't -- you weren't -- I'm
18  trying to see if this document helps refresh your
19  recollection --
20    A.  No.
21    Q.  (Continuing) -- as to your knowledge of
22  this.

Page 212

1         Do you recall an issue coming up where
2  before Abbott could change its list prices, First
3  DataBank went ahead and did it for them -- I'm sorry.
4  First DataBank went ahead and changed the AWPs?
5     A.  No, I don't recall that.
6     Q.  Do you recall an issue with First DataBank
7  changing WAC pricing?
8     A.  No.
9     Q.  Do you recall anything else about the
10  subject matter of this particular document?
11    A.  No.
12         (Whereupon Deposition
13          Exhibit Gonzalez 007 was
14          marked for identification.)
15    THE WITNESS:  Thank you.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  Sir, what's been marked as Exhibit 7 is a
18  composite of a series of documents, which I will
19  represent are sort of roughly in packets as they were
20  presented to us.  There are certain pages that we're
21  going to spend a fair amount of time on, and I'll tell
22  you which ones they are as we go through them.

Page 213

1     A.  Okay.
2     Q.  Okay?
3         I'd like to start with actually the first
4  page, which at the bottom says -- well, it says
5  Deposition Exhibit 1144.  Do you see that?
6     A.  I do.
7     Q.  This appears to be an e-mail from Mike
8  Sellers to meeting attendees.  Do you see that?
9     A.  It doesn't appear to be an e-mail to me.
10    Q.  Oh, I'm sorry.  It's a memo then?
11    A.  Yes.
12    Q.  It would have come hard copy?
13    A.  It doesn't appear to be an e-mail.  I don't
14  see any e-mail addresses on it.
15    Q.  Okay.  You know, my mistake.  And it's
16  dated March 7, 2001.  Do you see that?
17    A.  Mm-hmm.
18    Q.  Do you know whether you received this?
19    A.  Can I look at the rest of it?
20    Q.  Sure.
21         (Witness examines document.)
22  BY MS. ST. PETER-GRIFFITH:

54 (Pages 210 to 213)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 214

1     Q.   And, sir, I'm not representing to you that
2  all of this -- I'm just representing that this sort
3  of -- these packages are as they were produced to us.
4  So I can't represent that what was attached was
5  necessarily attached on March 7th.
6     A.   I understand.
7          (Witness examines document.)
8          THE WITNESS:  You want me to look at
9  everything else in here, or just that first --
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Just the first.  We're going to start with
12 the first.
13    A.   All right.
14    Q.   Sir, do you recall -- let me ask you this.
15         Does this refresh your recollection as to
16 the possible time frame of the meeting that you had
17 concerning the '01 price changes?
18    A.   I mean, it doesn't necessarily refresh my
19 recollection, but I think it's the meeting he's
20 referencing.
21    Q.   Okay.  So the meeting approximately took
22 place in or around March of 2001?

Page 215

1     A.   I mean, that's what the document says.
2     Q.   Are you familiar with -- it says, "RE:
3  Rules of The Road."
4     A.   Mm-hmm.
5     Q.   Is that a term that Mr. Sellers used, or
6  was that part of the conversation for the '01 price
7  changes?
8     A.   I don't recall that being part of the
9  conversation.
10    Q.   Do you remember receiving the information
11 in this initial package?
12    A.   No.
13    Q.   If you could flip to the third page of this
14 document, it says at the top 03/07/01.
15    A.   Mm-hmm.  Yes.
16    Q.   "POLICY IMPLEMENTATION"; do you see that?
17    A.   I do.
18    Q.   If you could review this document, because
19 I'm going to have some specific questions about its
20 content.
21         (Witness examines document.)
22         THE WITNESS:  Okay, I've read it.

Page 216

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Sir, do you recall this document?
3     A.   I don't recall this specific document, no.
4     Q.   Do you recall some of the information
5  that's contained in it?
6     A.   I do.
7     Q.   Okay.  Do you recall learning that other
8  than for its Ery products, Abbott PPD in -- for its
9  list price used the standard WAC price plus 5 percent?
10    A.   I don't specifically recall talking about
11 PPD.
12    Q.   Okay.  Do you know why Abbott's HPD might
13 have used a different list -- different formula for
14 setting its list price than PPD did?
15    A.   No.
16    Q.   Was that ever discussed?
17    A.   I don't recall PPD being discussed at all
18 in the meeting I was in.
19    Q.   Okay.  Then beneath the -- the initial
20 section at the top where it's 1, 2, 3, it says,
21 "Proposed Implementation Schedule"?
22    A.   Yes.

Page 217

1     Q.   The first it says (reading):
2          "First 45 Days - Finalize WAC prices with
3  Accounting verification and Business Unit approvals."
4          Do you see that?
5     A.   Yes.
6     Q.   Does that refresh your recollection as to
7  whether or not there were any WAC price changes that
8  took place prior to setting list price in '01?
9     A.   As I said before, there was a mechanism by
10 which we were going to lower list price, and it may
11 have been WAC-driven, but I don't recall specifically.
12    Q.   Okay.  Down at the bottom there is a --
13 there's a definite impact and a potential impact
14 that's -- that's identified.  Do you know how -- let's
15 start with definite impact.  It says, "List Price &
16 Special Price Sales."
17         Do you know how the team that was
18 responsible for the list price adjustments arrived at
19 this particular calculation?
20    A.   No.
21    Q.   Was that something that was discussed, or
22 did you just leave it to them to come up with the

55 (Pages 214 to 217)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 218

1  calculation?
2      A.  I recall discussing the mechanism they used
3  to come up with it, but not the actual, you know,
4  analytical methodology.  We didn't go through the
5  analytical methodology.
6      Q.  What was the mechanism?
7      A.  Well, I mean, I don't recall specifically
8  each and every one of them, but they went through a --
9  an analysis of what the change -- in the first one as
10  an example, the change in list price, what the
11  analyzed impact would be.  I mean, that's a relatively
12  straightforward one.
13     Q.  Okay.  The next bullet point after "List
14 Price & Special Price" says, "Inability to Raise FSS
15 Prices."  Do you see that?
16     A.  Yes.
17     Q.  Do you know what that means?
18     A.  No, I don't know what that means.
19     Q.  Okay.  Did you ever hear of the term "FSS"
20 price -- pricing?
21     A.  I think it stands for federal supply
22 schedule; right?

Page 220

1  team, for lack of a better term, undertook to do this
2  projection?
3      A.  No, I don't recall the specific analytical
4  method they used.
5      Q.  Okay.  Were you advised of it at one point
6  in time?
7      A.  I'm sure I asked in the meeting how they
8  came up with the analysis.
9      Q.  The next bullet says, "Home Infusion
10 Revenue Sharing."  Do you see that?
11     A.  I do.
12     Q.  Does that refresh your recollection as to
13 whether in making the decision to lower list prices
14 the impact on home infusion was considered?
15     A.  I still don't recall home infusion being
16 part of the -- of the analysis, although the number is
17 very close to the number I remember.
18     Q.  What do you mean by that?
19     A.  I mean the total amount of around
20 $10 million, as I testified earlier.  This comes out
21 to $12.6 million.  So it's relatively close to the
22 amount that I originally identified.

Page 219

1      Q.  Did you understand that there was a
2  correlation between list prices or the list price
3  adjustment and -- and federal supply schedule pricing?
4      A.  I'm not familiar with the correlation
5  between the two.
6      Q.  Do you know why inability to raise FSS
7  prices impacted or -- would have had a financial
8  impact on --
9      A.  No.
10     Q.  (Continuing) -- Abbott?
11         The next item says, "Potential Impact -
12 Volume Lost Due to Reimbursement Reductions."  Do you
13 see that?
14     A.  Yes.
15     Q.  The first bullet point says, "Alt Site
16 Product Sales."  Do you see that?
17     A.  Yes.
18     Q.  And it appears that this is -- at least
19 this projected potential number is -- is the largest
20 number; is that fair?
21     A.  Yes.
22     Q.  Okay.  Do you know how the price adjustment

Page 221

1      Q.  Okay.  In terms of the overall impact of
2  the price adjustment?
3      A.  Correct.
4      Q.  And then at the bottom it says, "Assuming
5  July 1, 2001 catalog price date."  Do you see that?
6      A.  Yes.
7      Q.  When did the catalog price actually --
8      A.  I don't know.
9      Q.  Do you recall whether there was any
10 consideration as to pending contractual negotiations
11 that might be impacted by a lowering of the list
12 prices that factored into your decision?
13     A.  I don't recall that as a topic.
14     Q.  If you could go on to the next page, which
15 says, "PUBLISHED PRICES FOR HPD," and take a look at
16 that.
17     A.  Page 4?
18     Q.  Page 4, yes.  At the bottom it says TXABT
19 674739.
20     A.  Correct.
21         (Witness examines document.)
22         THE WITNESS:  Okay, I've read it.

56 (Pages 218 to 221)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 222

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Okay.  Sir, do you recall reviewing this
3  document?
4     A.  No.
5     Q.  Under "CATALOG LIST PRICE," do you see
6  where it says (reading):
7         "Manufacturer's suggested list price" --
8  or, I'm sorry -- "list price last published in a
9  catalog dated April 19, 1999"?
10    A.  I do see that.
11    Q.  Did you have an understanding as to, for
12 the -- in March of 2001, what list pricing was the --
13 was the bases for Abbott's reported HPD pricing?
14    A.  Can you --
15    Q.  Sure.
16    A.  (Continuing) -- rephrase the question?
17    Q.  Let me see if I can be more direct.
18        Did you have an understanding that the last
19 time Abbott published its list prices was in 1999,
20 prior to 3/2/01?
21    A.  Yeah, I don't recall us talking about that.
22    Q.  Would it have been relevant or germane, the

Page 223

1  date?  Meaning --
2     A.  Not to my knowledge.
3     Q.  Do you know if there was any list price
4  catalogs for 2000?
5     A.  Not that I'm aware of.
6     Q.  The next item says, "WHOLESALER ACQUISITION
7  COST."  Does that help refresh your recollection as to
8  what WAC might mean?
9     A.  Yes.
10    Q.  Okay.  The second sentence reads (reading):
11        "This price is the basis for chargebacks."
12    A.  Mm-hmm.
13    Q.  Do you know what that means?
14    A.  I generally know what chargebacks mean.
15    Q.  Okay.  What -- what is your understanding
16 of what chargebacks mean?
17    A.  Chargebacks were a mechanism by which we
18 could work with distributors in order to fulfill
19 contract prices that were different at the end user
20 level.  So a wholesaler would sell to a whole
21 different group of customers.  Some would have lower
22 prices, some would have higher prices.  You don't know

Page 224

1  when you ship them the inventory who they're going to
2  sell it to.  So you ship it to them at a certain
3  price, and then you chargeback, once they do actually
4  sell the product, to the right price.
5     Q.  Okay.
6     A.  That's my general understanding of it.
7     Q.  Okay.  Did you have an understanding as to
8  how the price changes might have impacted the
9  chargeback system?
10    A.  No.
11    Q.  Sir, prior to -- let me ask you.
12        At any time did you have an understanding
13 as to what RxLink was?
14    A.  No.
15    Q.  What about parameter prices?
16    A.  No.
17    Q.  Does this document help refresh your
18 recollection as to what DAQ might mean?
19    A.  I've read the definition.  It still doesn't
20 necessarily refresh my recollection though.
21    Q.  Okay.  What about JIT price, or
22 just-in-time?

Page 225

1     A.  I don't -- I don't recall JIT pricing being
2  one of the parameters we looked at.  I mean, I know
3  what the word -- or JIT means, just-in-time.  But I
4  don't recall anything to -- related to pricing around
5  that.
6     Q.  Do you recall what impact the '01 price
7  changes might have had on just-in-time, or JIT,
8  pricing?
9     A.  No.
10    Q.  If you could flip to the next page.
11    A.  Is it a different document?
12    Q.  Oh, I'm sorry.  Yes, we're -- I am
13 connected, and you --
14    A.  No, I took the clip off of it.  All right.
15    Q.  Which says, "Catalog Price Change."
16    A.  Mm-hmm.
17    Q.  And first of all, do you recall there being
18 a PowerPoint presentation or some kind of presentation
19 on April 30, 2001?
20    A.  I don't recall a PowerPoint presentation.
21    Q.  Do you recall what this might have been, or
22 do you recall this document?

57 (Pages 222 to 225)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL              June 3, 2008

Page 226

1    A.  Can I look at it for a moment?
2    Q.  Sure.  Absolutely.
3         (Witness examines document.)
4         THE WITNESS:  No, not specifically I don't
5  recall it.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  If you go to the next page, where it says
8  "Project Schedule," the first bullet point says:
9         "Align WAC, DAQ and JIT Prices - Lowest."
10        Do you see that?
11   A.  Yes.
12   Q.  Do you have any idea what that means?
13   A.  No.
14   Q.  The next line says, "Evaluate Unchanged WAC
15 Prices - 150 items."
16        Do you know what that means?
17   A.  No.
18   Q.  Then there is a 3/16, or it indicates a
19 3/16 deadline to notify wholesalers.  Do you see that?
20   A.  Yes.
21   Q.  Do you know what that is referencing?
22   A.  No.

Page 227

1    Q.  Was that a notification sent out to
2  Abbott's wholesaler customers concerning the price
3  changes?
4    A.  Not that I'm aware of.
5    Q.  The next item says:
6         "Define Revised List & RxLink Prices."
7         And then under it there is a dash with
8  "WAC + 5% or $5/case."
9         Do you see that?
10   A.  Yes.
11   Q.  Do you know what that is referencing?
12   A.  No.
13   Q.  In adjusting its list prices or changing
14 its formula for the list prices, do you recall whether
15 this formula of WAC plus 5 percent was the -- was the
16 new formula that was adopted for list price
17 calculation?
18   A.  I do recall something close to that range.
19 I don't recall specifically if it was that number or
20 not.
21   Q.  Do you know why that particular formula was
22 decided upon as being the formula for HPD list price?

Page 228

1    A.  No.  I think the group felt, in the
2  discussion that we had around what was the best
3  mechanism to make the price change, this was the most
4  predictable metric to do it by.
5    Q.  Do you know why it was WAC plus 5 percent,
6  as opposed to, you know, WAC plus 10 percent or 50
7  percent or a hundred percent?
8    A.  No, I don't -- I don't recall the
9  discussion around that.
10   Q.  Do you know whether there was any
11 discussion about whether this particular formula was
12 in line with what other divisions were doing?
13   A.  No, I don't recall any discussion around
14 that.
15   Q.  The next item says:
16        "Business Item Review - 3/23 Deadline."
17        Do you know what that's referencing?
18   A.  No.
19   Q.  And then:
20        "List Price Change Effective April 30,
21 2001."
22        Do you recall whether that was the -- the

Page 229

1  date that was used to implement the list price change?
2    A.  I don't recall specifically, no.
3    Q.  Do you know how the list price change was
4  communicated to Abbott's customers?
5    A.  No.
6    Q.  Sir, do you know why Abbott HPD did not
7  undertake to adopt a WAC plus 5 percent formula for
8  its list prices prior to this point in time?
9    A.  I mean, it's consistent with what we've
10 talked about before.  We engaged in this evaluation,
11 the environmental circumstances changed, and we
12 decided that we wanted to make this change then.  We
13 didn't feel it was necessary or appropriate before.
14   Q.  Sir, the next item is another packet with
15 the same -- it appears to be the same cover memo.  Do
16 you see that?
17   A.  I do.
18   Q.  If I could direct your attention to the
19 last page of this particular packet, which says at the
20 bottom ABT-DOJ 0233903.
21   A.  Okay.
22   Q.  Do you see that?  And I hate to strain both

58 (Pages 226 to 229)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 230

1  your eyes and mine, but I'm going to ask you about a
2  few of the line items on this document.
3      A.  Sure.
4      Q.  Okay.  If you could go down to where it
5  says -- the List-Tuc number is 0798309.
6      A.  0798309?
7      Q.  Yes, do you see that?
8      A.  Sodium chloride?
9      Q.  Sodium chloride, right.
10     A.  Okay.
11     Q.  Do you see -- if you could go to the very
12 last column, where it says Percentage Change in List
13 Price.
14     A.  Correct.
15     Q.  Okay.  And if you'll notice, other than the
16 lactated ringers, for this particular block, which
17 includes sodium chloride and dextrose, generally the
18 percentage change in list price is above 84 percent.
19 Do you see that?
20     A.  "Above" being less than you mean?
21     Q.  Meaning -- yes, meaning -- meaning that it
22 was a -- it was --

Page 231

1      A.  A smaller number?
2      Q.  A smaller number, right.
3      A.  Mm-hmm.
4      Q.  But the fluctuation was, you know, in the
5  84 or above percent.
6      A.  Mm-hmm.
7      Q.  Do you see that?
8      A.  I do.
9      Q.  Did you review this document; do you
10 recall?
11     A.  No, I don't recall reviewing this level of
12 detail.
13     Q.  Did you have an understanding that in
14 changing the list prices, there would be a fluctuation
15 of up to 80 percent or more of the price?
16     A.  We didn't talk about the percentage change
17 that occurred across all the products, no.
18     Q.  So as you're going through this process,
19 you, in your role as president of HPD, who has
20 requested that this review be undertaken, did you have
21 any idea that there would be fluctuations in price as
22 much as 84 percent or higher?

Page 232

1      A.  I think at this point I probably was not
2  the president of HPD.
3      Q.  Okay.  You -- you were, then, in your --
4      A.  EVP role.
5      Q.  Yes.
6          Did you have that understanding, or did you
7  have an appreciation that the percentage change in
8  list price would be as high as 84 percent or higher?
9      A.  No, I can't say I had that appreciation.
10     Q.  Would it surprise you?
11     A.  Not necessarily.
12     Q.  Well, would you think that's a large
13 fluctuation?
14     A.  Not necessarily.
15     Q.  How come?
16     A.  Well, I think it goes back to the -- you
17 know, this is sodium chloride you're referring to;
18 correct?
19     Q.  Yes.
20     A.  It goes back to one of the premises we
21 talked about very early on in our discussion.  And
22 that is that list price was kept at a certain level

Page 233

1  for customers that wouldn't buy on contract.  And if
2  you take a product like IV solutions, which is what
3  this is, it's a very costly, labor-intensive kind of
4  product to make.  And if you're going to sell to
5  people off contract where you have to bring on more
6  capacity to be able to sell it, you'd obviously want
7  them to pay a very high premium for that product.
8          And so I think part of our rationale was to
9  make sure that anyone that -- and we were near
10 capacity on IV solutions.  So anything -- in other
11 words, our plants were almost fully loaded on capacity
12 on IV solutions.  So we didn't have a lot of flex
13 capacity, other than -- other than overtime and
14 working seven days a week to put out any more volume.
15         And so I think part of our rationale was on
16 certain products, if someone was going to buy at list
17 price, we wanted to make sure we recouped a sufficient
18 profit margin on those products.
19     Q.  Do you know for a fact that what you just
20 described factored into the decision-making for
21 setting list price prior to this point in time within
22 HPD?

59 (Pages 230 to 233)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 234

1    A.  I know when I was the president of HPD, we
2  had a discussion around certain products where Baxter
3  had gone off of capacity, and customers needed to
4  purchase those products from us -- hospital customers
5  needed to purchase those products from us, and that's
6  the exact example I just gave you.
7    Q.  Do you recall whether prior to this Baxter
8  issue arising, what you described in terms of the
9  capacity to make the product factored into the setting
10 of list price within HPD?
11   A.  Well, I want to be careful how you
12 characterize it.  I didn't say that's what created the
13 setting.  Initially the setting would have been
14 created as part of the initial launch plan for the
15 product, et cetera.  That was done on these particular
16 products long before I ever was involved in HPD, so I
17 can't speak to how the list price was set.
18      But reducing list price on certain products
19 or the gap that existed between contract price and
20 list price on certain products, when I actually asked
21 about this particular event, that was one of the
22 explanations that I was given for why customers were

Page 235

1  going to pay such a high price for this particular
2  volume.
3    Q.  Do you recall whether at the time the
4  Baxter issue came up, Abbott changed its list prices
5  and increased them on the particular sodium -- these
6  -- this family of sodium chloride products?
7    A.  Well, no.  I was not describing an event
8  that triggered a change in pricing.
9    Q.  Okay.  That's what I wanted to clarify.
10   A.  I was describing why certain products might
11 have a much larger gap than other products.
12   Q.  Okay.  But in -- whether -- what did you
13 base that understanding on?  Did you have a
14 conversation with someone?
15   A.  Yeah.  We had this event occur, and one of
16 the things I wanted to understand was how were we
17 going to supply the market with these products and
18 then how were we going to price those products.  And
19 the business unit actually was the one that -- and
20 operations were the ones that walked me through it.
21   Q.  Do you recall who within the business unit
22 and operations?

Page 236

1    A.  Well, it would have been the head of
2  operations.  So at the time that was Jack Aiden
3  (phonetic).  I don't recall specifically who it would
4  have been in the -- in the hospital business sector.
5    Q.  Did anyone ever tell you that the
6  complexity associated with manufacturing the product
7  factored into the decision to have such a -- a big
8  disparity between list price and contract price on
9  this particular family of products?
10   A.  No.  As I described, they were talking
11 specifically about this event.
12   Q.  Okay.
13   A.  And why -- my question was why wouldn't we
14 basically sell at somewhere between contract price and
15 list price to be able to gain more volume from these
16 customers.  And the rationale that was laid out was
17 logical and made sense to me that at the end of the
18 day we have to bring on this capacity.  It's expensive
19 capacity because it's overtime.  Typically these
20 customers won't contract with you because they're
21 already under contract with somebody else, so they
22 won't break that contract even if the other supplier

Page 237

1  can't supply the product for some reasonable period of
2  time.
3      So the prudent thing to do is to charge as
4  much as we can to make sure that we're recovering all
5  of our cost and a reasonable profit margin.
6    Q.  But you didn't have any understanding that
7  those considerations factored into the actual setting
8  of the list price?
9    A.  No, and I don't think that's what I said.
10   Q.  If you could jump down to -- getting out of
11 sort of the family of large volume injectable or
12 saline products, about three-quarters of the way
13 through the page there is 06533 List-Tuc for
14 vancomycin, and there is another vancomycin underneath
15 it.  Do you see that?
16   A.  I do see that.
17   Q.  And if you look over to the last column,
18 you'll see that the percentage change for the
19 vancomycin was 76 percent and 68 percent.
20   A.  Mm-hmm.
21   Q.  Did you have any appreciation that there
22 would be such a large change in the pricing for

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 238

1  vancomycin?
2     A.  No.
3     Q.  In making the '01 price changes, was there
4  ever anything that factored into -- was there ever any
5  health consideration that factored into the pricing of
6  vancomycin?  And when I say "health consideration," I
7  mean public health in terms of overutilization of the
8  product.
9     A.  Not that I recall.
10    Q.  Do you recall whether just prior to the
11 Hospira spin a decision was made that on the first day
12 of Hospira's existence there would be further
13 adjustments to the list prices on these particular
14 products?
15    A.  No.
16    Q.  And just to clarify, you had mentioned
17 earlier -- and I wasn't keeping my time periods
18 straight -- at this point in time at least, decisions
19 were being made, as to Hospital Products -- you were
20 Hospital Products; right?  Chris Begley was?
21    A.  I was -- I was the EVP, correct.
22    Q.  Why were you still involved?

Page 239

1     A.  Because I had initialized this -- this
2  discussion earlier on, and I wanted to be involved in
3  whatever the final recommendation was.
4     Q.  Sir, if we could go to the next document in
5  this packet, which hopefully says "ABBOTT
6  LABORATORIES," "Hospital Products Division POLICY FOR
7  LIST PRICE ADJUSTMENTS."
8     A.  It's 904, the last three digits?
9     Q.  Yes, 904.
10    A.  Okay.
11    Q.  If you could take a few minutes and look at
12 both pages of this document.
13       (Witness examines document.)
14       THE WITNESS:  Okay, I've read it.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  We're going to start at the -- first of
17 all, do you recognize this document?
18    A.  No.
19    Q.  Do you recall being consulted on the
20 establishment of a policy from this price adjustment?
21    A.  No.
22    Q.  Under "OBJECTIVE," do you see that?

Page 240

1     A.  Mm-hmm.
2     Q.  Was that your understanding of the
3  objective behind the 2001 price change?
4     A.  I mean, the objective that I described to
5  you earlier was the objective I understood.
6     Q.  Okay.  Do you understand why or do you have
7  any understanding as to why Abbott HPD was concerned
8  with having a relationship between the actual market
9  prices for its product and its published list prices?
10    A.  Well, I mean, this is the same issue we
11 talked about before, about the public issue around
12 this and trying to eliminate that.
13    Q.  Okay.  So the resolution, then, to resolve
14 that was to bring your -- Abbott's list -- HPD list
15 prices more in line with their market prices?
16    A.  Correct.
17    Q.  Prior to the establishment of this policy,
18 did you have an understanding as to whether Abbott HPD
19 had a standard policy in place for how it calculated
20 list price?
21    A.  No.
22    Q.  Did you have an understanding as to whether

Page 241

1  it was sort of a hodgepodge of how the list price was
2  calculated?
3     A.  My understanding is what I described to you
4  earlier.  The list price gets set very early on
5  in the process of launching the product, and then
6  there are a series of CPI adjustments that occur over
7  time that may change that.
8     Q.  Other than the external pressures that you
9  described before, would there be any other reason why
10 Abbott HPD would want to keep its -- or make its
11 published list prices in line with actual market
12 prices?
13    A.  No, not that I'm aware of.
14    Q.  And then under the definition section there
15 are -- there are a series of definitions.  I'd like
16 to -- to bring your attention to the section of this,
17 the first page where it says "PRICE GUIDELINE."
18    A.  Mm-hmm.  Yes.
19    Q.  That's the policy that we discussed before
20 as being the new policy or standard policy for setting
21 list price; is that fair?
22    A.  It looks the same, yes.

61 (Pages 238 to 241)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 242

1     Q.  Okay.  Why were branded products or
2  comarketed products excluded?
3     A.  Well, in the case of comarketed products,
4  in many cases we didn't have the right to set price.
5     Q.  Okay.
6     A.  And I'm not -- I'm not familiar with the
7  branded product aspect of it.
8     Q.  If you could go down to the process, do you
9  see where the heading says "process"?
10    A.  Yes.
11    Q.  It says (reading):
12        "Annually HPD Finance and Contract
13  Marketing functions will be responsible for evaluating
14  all drug list prices for possible adjustment."
15        Do you see that?
16    A.  I do see that.
17    Q.  Did you have an understanding as to how
18  they would go about doing that?
19    A.  No.
20    Q.  Was this a change in terms of HPD finance
21  and contract marketing both participating in the
22  setting of list price, or was this -- was that

Page 243

1  particular procedure in place before?
2     A.  I don't know.
3     Q.  Okay.  Do you know who within HPD, prior to
4  the establishment of this policy, was responsible for
5  setting the list price?
6     A.  As I indicated before, the business unit
7  would have been responsible for setting list price.
8     Q.  Would that be either H- -- is that HPD
9  finance?
10    A.  Well, it's hard to tell from this
11  particular definition what they're referring to.  I
12  mean, there is a finance group within each business
13  unit.  And so if that's what they mean by this, then
14  it's one in the same.
15    Q.  Okay.
16    A.  There is also a divisional level of
17  finance, and they could be referring to that.
18    Q.  Okay.  If you could go to the next page,
19  where it says "ADMINISTRATOR," the first sentence
20  reads (reading):
21        "The general manager of HPD Contract
22  Marketing will be the administrator of all list price

Page 244

1  designations for the Division."
2        Do you see that?
3     A.  I do.
4     Q.  Prior to the establishment of this policy,
5  did the general manager have that responsibility?
6     A.  I don't know.
7     Q.  Do you know what the intersection was
8  between contract marketing and the business unit in
9  terms of the establishment of list price prior to this
10  -- prior to this policy?
11    A.  I mean, typically the contract -- my
12  understanding of the contract marketing would be that
13  it would provide the analytical support to the
14  business unit to do the analysis.
15    Q.  Do you know where the buck stopped as to
16  who was ultimately responsible for signing off on the
17  list price prior to the establishment of this policy?
18    A.  The head of that particular business unit
19  sector.
20    Q.  How did you learn that information?
21    A.  That was the operating model that was in
22  place when I took over in HPD.

Page 245

1     Q.  Was that published someplace?
2     A.  I don't know that it was published
3  anyplace.  It was the practice that we used.
4     Q.  Now that you've used the term "practice,"
5  that raises a question for me outside of the
6  documents.
7        Did you have an understanding as to whether
8  or not Abbott, prior to 200- -- Abbott HPD, prior to
9  2003, had an established policy prohibiting its
10  employees from providing AWP or spread marketing
11  information to customers?
12    A.  Was I aware of a policy prohibiting that?
13    Q.  Yes.
14    A.  No, I was not aware of that.
15    Q.  Were you aware of a practice prohibiting
16  that?
17    A.  No.
18    Q.  Did you have an understanding as to whether
19  there was anything wrong with Abbott's HPD employees
20  providing AWP or spread information to customers?
21    A.  Could you repeat the question so I can
22  answer it correctly?

62 (Pages 242 to 245)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 246

1    Q.  Sure.  Did you have an understanding as to
2  whether there was anything wrong or prohibited about
3  Abbott HPD employees providing spread or -- spread or
4  AWP information to customers?
5    A.  Over any time period?
6    Q.  Over any time period.
7    A.  Not that I'm aware of.
8    Q.  Okay.  Are you aware of a practice, custom,
9  or policy that prohibited HPD employees from providing
10 AWP or spread information to HPD customers?
11   A.  I'm not aware of any policy that was in
12 place for that.
13       MS. ST. PETER-GRIFFITH:  The next
14 document -- and I'm very sorry, Jim, because I've only
15 got a couple copies of these.
16       THE WITNESS:  Should I put this one back
17 together then?
18       MS. ST. PETER-GRIFFITH:  Yes, please.
19       You can mark this as the next.
20       And Dan, if you could read on -- I'm sorry.
21 I've only got one copy of this.  We're just going to
22 briefly discuss it.

Page 247

1        (Whereupon Deposition
2            Exhibit Gonzalez 008 was
3            marked for identification.)
4       MR. REIDY:  Is this No. 7 -- oh, No. 8.
5  Okay.
6       What do you want the witness to do with
7  that?
8       MS. ST. PETER-GRIFFITH:  Just review the
9  first couple of pages.  I mean, you're happy to review
10 whatever you feel comfortable with, but I'm just going
11 to ask whether he recognizes the document.
12       (Witness examines document.)
13       THE WITNESS:  Okay.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  Sir, do you recognize this document?
16   A.  No.
17   Q.  Does it appear to be -- do you recall
18 receiving information similar to this, incident to the
19 '01 price change?
20   A.  No.
21   Q.  And I'm sorry, sir, but this is an example
22 of where you're going to have to bear with me as we

Page 248

1  work through some documents that were produced after
2  the last deposition, like this one.
3    A.  I see that.
4       MS. ST. PETER-GRIFFITH:  Mark this as the
5  next one.
6       (Whereupon Deposition
7            Exhibit Gonzalez 009 was
8            marked as requested.)
9       THE WITNESS:  Thank you.
10      It's that document right there.
11      MR. REIDY:  So can we -- I guess that one I
12 have numbers on.  We can find them probably.
13      (Witness examines document.)
14      THE WITNESS:  Okay.
15
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Sir, do you recognize this document?
18   A.  No.
19   Q.  Do you ever remember hearing of Abbott
20 receiving a subpoena in 2000 from the Office of the
21 Inspector General, Department of Health and Human
22 Services?

Page 249

1    A.  I don't recall hearing of it.
2    Q.  Do you know whether the receipt of the
3  subpoena impacted the decision to move forward on the
4  '01 price changes?
5    A.  Not to my knowledge.
6       (Whereupon Deposition
7            Exhibit Gonzalez 010 was
8            marked for identification.)
9       THE WITNESS:  Thank you.
10      (Witness examines document.)
11      THE WITNESS:  Okay, I've read it.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.  So do you recognize this document?
14   A.  No.
15   Q.  You're not one of the addressees, but the
16 re line says "Coram Analysis," and it references you
17 in the first sentence.  Do you see that?
18   A.  I do see that.
19   Q.  Was any -- let me ask you -- I probably
20 should have asked you this before.
21      Were there any other Rick Gonzalezes at
22 Abbott?

63 (Pages 246 to 249)

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                 June 3, 2008

Page 250

1    A.  Not that I'm aware of.
2    Q.  Okay.  Did you have any doubt that this
3  might be referencing a meeting with you and Tom
4  Hodgson?
5    A.  No.  I think the Rick Gonzalez associated
6  with Tom Hodgson is more than likely me.
7    Q.  Okay.  And this appears to have been
8  published in June of 1995, it appears, less than a
9  month into your tenure as the corporate vice president
10  for AHD.
11    A.  Correct.
12    Q.  Now, do you recall a meeting, having a
13  meeting concerning -- well, first let me ask you this.
14  Do you know what Coram is?
15    A.  I mean, I generally know they're an
16  alternate site customer of some sort.
17    Q.  Do you know what VHA and SunHealth are?
18    A.  Yes.
19    Q.  What are they?
20    A.  Well, VHA and SunHealth came together to
21  create what I've been describing as Novation.
22    Q.  Okay.

Page 251

1    A.  They were two GPOs that formed one.
2    Q.  Do you recall having a meeting about a
3  Coram proposal?
4    A.  No.
5    Q.  Do you remember anything about that?
6    A.  No.
7    Q.  How many meetings do you recall -- or let
8  me ask you this.  How many alternate site contracts do
9  you recall being involved in?
10    A.  I don't recall being involved in any
11  alternate site contracts.
12    Q.  Okay.  Do you have any doubt that you had a
13  meeting?
14    A.  Well, it says "requested a meeting."
15    Q.  Okay.  So it might not have taken place?
16    A.  Might not have taken place.  It might have
17  been nothing more than -- if it did take place, which
18  I don't recall, nothing more than a VIP, where it was
19  common in these things to sort of walk the senior
20  executives through to shake hands and say hello.  And
21  I can't tell you that didn't happen.
22    Q.  Okay.

Page 252

1    A.  But the fact that Tom Hodgson is on here
2  with me, if I had to speculate, that's what I would
3  speculate.
4    Q.  Okay.  Do you know who Mr. Kipperman is?
5    A.  I do know who Steve Kipperman is; not in
6  this capacity.  I don't know what he was doing back in
7  1995, but I knew what he was doing when I left Abbott.
8    Q.  What was he doing when you left Abbott?
9    A.  Business development.
10    Q.  For which division?
11    A.  Corporate.
12    Q.  Did you have an understanding as to
13  Mr. Kipperman's involvement with alternate site?
14    A.  No.
15    Q.  Were you ever made aware that Mr. Kipperman
16  widely distributed AWP information to the sales force?
17    A.  No.
18       (Whereupon Deposition
19        Exhibit Gonzalez 011 was
20        marked for identification.)
21    THE WITNESS:  Thank you.
22  BY MS. ST. PETER-GRIFFITH:

Page 253

1    Q.  Again, sorry to strain your eyes here.
2  It's TXABT 38105, and Sellers Exhibit 360.
3    MR. BREEN:  It's 11 in this deposition?
4    MS. ST. PETER-GRIFFITH:  Yes.
5
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Sir, I'm only going to direct your
8  attention to sort of the top lines.
9    A.  Okay.
10    Q.  Which we can all sort of struggle to try
11  and review.
12    MR. REIDY:  Okay.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Do you see at the top of this particular
15  spreadsheet where it says -- it looks like "United
16  Professional Companies," "Proposal Analyses"?
17    A.  It says United something companies.
18    Q.  Okay, fair enough.  I am speculating that
19  that's "Professional."  Do you know what a proposal
20  analyses was, or analysis?
21    A.  No, I mean, other than what the words mean.
22    Q.  Okay.  Were you aware that there was a -- a

64 (Pages 250 to 253)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 254

1  term for a particular document that was prepared
2  within the alternate site business unit called a
3  proposal analyses and presented -- that was presented
4  to customers?
5      A.  No.
6      Q.  Sir, do you see at the very end where it
7  says "AWP spread"?
8      A.  I do.
9      Q.  And there is a calculation.  Were you ever
10 made -- made aware at any time, either in your role
11 with AHD or in any capacity where you had supervisory
12 responsibility over HPD, were you ever made aware that
13 employees within HPD provided spread information or
14 AWP information to customers, such as what's reflected
15 here in this document?
16     MR. REIDY:  Object to the form.
17     THE WITNESS:  No.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Would that have been important to know?
20     A.  I -- I don't know whether it would be
21 important.
22     We are done with this document?

Page 255

1      Q.  Yes.
2      A.  That's good, because I can't read much
3  more.
4      Q.  I was going to say, all of our eyes need a
5  break after that, right?
6          (Whereupon Deposition
7          Exhibit Gonzalez 012 was
8          marked for identification.)
9      THE WITNESS:  Thank you.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  And, sir, I can tell you that we are going
12 to focus on page 8 of this document.
13     A.  Can I scan through it first though?
14     Q.  Sure.  Absolutely.
15         (Witness examines document.)
16     THE WITNESS:  Okay.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Sir, do you recognize this document?
19     A.  No.
20     Q.  What is MHA?
21     A.  I don't know.
22     Q.  Have you ever heard of the term "MHA"

Page 256

1  before?
2      A.  No.
3      Q.  If you could look to page 8 of this
4  document, at the -- at the bottom, underneath -- well,
5  at the top it says, "MHA's Value Proposition -
6  Pharmaceutical Manufacturers."  Do you see that?
7      A.  Yes, I do.
8      Q.  At the bottom under "Web Based Tools," it
9  says (reading):
10         "Financial analysis," "State/Member,"
11     "Spreads," "Reimbursements," "Medi-Span," and "'First
12     DataBank.'"
13         Do you see that?
14     A.  I do.
15     Q.  Do you know what that references?
16     A.  No.
17     Q.  Did anyone at Abbott discuss with you a
18 relationship that Abbott had with MHA?
19     A.  No.
20     MS. ST. PETER-GRIFFITH:  Mark the next
21 document.
22         (Whereupon Deposition

Page 257

1          Exhibit Gonzalez 013 was
2          marked as requested.)
3      THE WITNESS:  Thank you.
4      MS. ST. PETER-GRIFFITH:  sir, feel free to
5  flip through this.  And while we're doing that, why
6  don't we go off the record and take a brief break,
7  because I believe you need to change the tape.
8      THE VIDEOGRAPHER:  You can go a couple more
9  minutes.
10     MS. ST. PETER-GRIFFITH:  Okay.
11         (Witness examines document.)
12     THE WITNESS:  Okay, I've had a chance to
13 scan it.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Sir, what is PBI?
16     A.  I'm not sure.
17     Q.  Do you know what Pharmaceutical Buyers,
18 Inc., is?
19     A.  No.
20     Q.  Had you ever heard of PBI?
21     A.  No.
22     Q.  Had you ever heard of Mr. Korenblat?

65 (Pages 254 to 257)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 258

1    A.  No.
2    Q.  Do you recall a meeting between Abbott
3  alternate site product sales and PBI?
4    A.  No, I don't recall a meeting.
5    Q.  Sir, if you could look at the -- and it's
6  unnumbered -- page 7 of this particular report?
7    A.  It says "Missed Opportunity" at the top?
8  That one.
9    Q.  Yes, it does.
10      Do you see that this is a sample savings
11  report for PBI members?
12    A.  It appears to be some kind of a spreadsheet
13  put together.
14    Q.  Right.  And at the top it says -- at the
15  top of the spreadsheet it says, "PBI Member Savings
16  Report."  Do you see that?
17    A.  Correct.
18    Q.  Do you see in the middle where it says
19  "AWP" and "Spread"?
20    A.  Yes.
21    Q.  Do you know whether Abbott alternate site
22  product sales communicated with organizations like PBI

Page 259

1  concerning their members -- or concerning AWP and
2  spread?
3    A.  Not that I'm aware of.
4    Q.  If you could turn to the second-to-last
5  page of this document --
6    A.  Mm-hmm.
7    Q.  (Continuing) -- it says, "Key Issues Facing
8  PBI/Abbott."  Then it says "AWP Impact" at the top.
9    A.  Yes.
10    Q.  Were you ever made aware that AWP impact
11  was an issue facing Abbott alternate site and its
12  relationship with customers like PBI?
13    A.  No.
14    Q.  Would that have been something that would
15  have risen to your level at -- within -- as president
16  of Hospital Products Division?
17    A.  I'm not sure.
18    Q.  Do you know how large PBI was in terms of
19  its relationship as a client to alternate site?
20    A.  No.
21      MS. ST. PETER-GRIFFITH:  Now why don't we
22  take a brief break.

Page 260

1      MR. REIDY:  Okay.
2      THE VIDEOGRAPHER:  We're off the record at
3  3:26 p.m. with the end of Tape No. 4.
4      (Brief pause.)
5      (Whereupon Deposition
6      Exhibit Gonzalez 014 was
7      marked for identification.)
8      THE VIDEOGRAPHER:  We're back on the record
9  at 3:49 p.m. with the start of Tape No. 5.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.  Sir, you have in front of you what has just
12  been marked as Exhibit 14?
13    A.  Yes.
14    Q.  If you could take a few minutes and flip
15  through this document.  We're not going to study it in
16  detail.  I will tell you that my focus is going to be
17  on the first page, and then the page marked ABT
18  277701, which is right here.  It's 18 of 31.
19    A.  Okay, thank you.
20      (Witness examines document.)
21      THE WITNESS:  Page 15 of 31 did you say, or
22  18?

Page 261

1      MS. ST. PETER-GRIFFITH:  18.
2      (Witness examines document further.)
3      THE WITNESS:  Your copy is the same way
4  that you can't read some of the words?
5      MS. ST. PETER-GRIFFITH:  Yes, it is,
6  unfortunately.
7      (Witness examines document further.)
8      THE WITNESS:  Okay, I've read it.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Sir, do you -- have you seen this document
11  before?
12    A.  No.
13    Q.  Do you know who Dennis Walker is?
14    A.  No.
15    Q.  Do you know what GeriMed is?
16    A.  No.
17    Q.  Okay.  Sir, on page 18 of 31, I'll
18  represent to you that this is a request for proposal
19  for a bid document for 1998 to 2000 for GeriMed that
20  Abbott, you know, at least from the appearances of the
21  record, responded to.
22      On page 18 it reflects that (reading):

66 (Pages 258 to 261)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 262

1      "Contract pricing will be evaluated on" --
2  under Item H -- "on the lowest price or the best
3  spread between AWP and the contract price for
4  multisource products."
5      Do you see that?
6      A.  I do.
7      Q.  Do you have an understanding as to whether
8  Abbott's Hospital Products Division provided
9  information concerning its AWP or information from
10 which its AWP could be derived to customers?
11     A.  I don't know.
12     Q.  Would there have been a problem with
13 providing AWP information to customers as part of the
14 bid process?
15     A.  I don't know.
16     Q.  Was there any problem associated with
17 Abbott HPD actively marketing its AWP spread?
18     A.  Well, I don't know that HPD was marketing
19 its AWP spread.
20     MR. BREEN:  Sorry, I couldn't understand
21 that.
22     THE WITNESS:  I said I don't know -- I'm

Page 263

1  not agreeing with the premise that HPD was marketing
2  its spread.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Well, why aren't you agreeing with that
5  premise?
6      A.  Because I have no facts to base that on.
7      Q.  Well, you were the president of the
8  company -- of the division, weren't you, sir?
9      A.  Yes.
10     Q.  If Abbott was marketing its AWP spread, if
11 Abbott HPD was marketing its AWP spread, was that
12 something that you should have known about?
13     A.  No, I said I'm not agreeing with the
14 premise that HPD was marketing its spread.
15     Q.  I understand.  And my question, sir, is if
16 they were, if employees within HPD were marketing the
17 spread, is that something that you should have known
18 about?
19     A.  Well, this was 24 days into my tenure as
20 president of HPD.  I'm not sure I would have been
21 aware of this.
22     Q.  Okay.  Well, at any time during your

Page 264

1  tenure, with supervisory responsibility within HPD, if
2  an employee within HPD was marketing the spread, is
3  that something you should have known about?
4      A.  Literally you have 10,000-plus employees in
5  HPD.  It's -- it's not realistic to assume I'm going
6  to know what every single employee does.
7      Q.  Well, if as a matter of practice and policy
8  Abbott's alternate site product sales or its hospital
9  business sector marketed the spread, would that have
10 been a problem for you as president of HPD?
11     MR. REIDY:  Object to the question.
12     THE WITNESS:  I mean, I already testified
13 to the fact that we evaluated the sales and marketing
14 activities.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Who is "we"?
17     A.  The legal team and the business team.
18     Q.  And you didn't see any problem with it,
19 with Abbott's practices and policies?
20     A.  We didn't see any issue with the activities
21 that we monitored.
22     Q.  What activities was it that we monitored?

Page 265

1      A.  Again, I don't know that I can speak
2  specifically to those activities, can I?
3      Q.  Sir, Abbott has not asserted an advice to
4  counsel defense here?
5      MR. REIDY:  Excuse me.  If he asks me a
6  question, you don't have to answer it.
7      I'm sorry.  What was your question?
8      THE WITNESS:  I said if that information
9  came from meetings with counsel, can I answer that
10 question?
11     MR. REIDY:  You can describe your
12 understanding of a situation.  Don't describe any
13 communications from the lawyer.
14     THE WITNESS:  Okay, I'm sorry.  Could you
15 repeat the question one more time?
16     MS. ST. PETER-GRIFFITH:  Sure.
17     Could you read it back?
18     THE REPORTER:  "Question:  And you didn't
19 see any problem with it, with Abbott's practices and
20 policies?
21     "Answer:  We didn't see any issue with the
22 activities that we monitored.

67 (Pages 262 to 265)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 266

1       "Question:  What activities was it that you
2    monitored?"
3       THE WITNESS:  As part of this evaluation,
4    we looked at sales and marketing activities in this
5    area.
6    BY MS. ST. PETER-GRIFFITH:
7       Q.  When you say "in this area," what do you
8    mean?
9       A.  Alternate site.
10      Q.  Did you evaluate whether or not Abbott
11   alternate site employees were marketing the spread?
12      A.  I don't recall if we specifically evaluated
13   that parameter.
14      Q.  Well, what parameters did you evaluate for
15   alternate site?
16      A.  The team that was assigned to look at this
17   looked at all of the activities in our sales and
18   marketing practices.
19      Q.  Okay.  And what was the conclusion?
20      A.  Well, I told you earlier, my understanding
21   was that those activities were not -- were not
22   illegal.

Page 267

1       Q.  Okay.  So if Abbott -- there was nothing
2    illegal about Abbott's alternate site product sales
3    employees' marketing spread?
4       A.  Well --
5       MR. REIDY:  Object to the question.  That's
6    not what he said.
7       Go ahead and answer, if you can.
8       THE WITNESS:  I mean, I didn't say they
9    were marketing the spread.  I said we looked at the
10   activities and we were -- we basically said we were
11   comfortable with the activities.
12   BY MS. ST. PETER-GRIFFITH:
13      Q.  Okay.  Well, what activities were you
14   comfortable with?
15      A.  Well, I don't -- without going through the
16   specific information that was provided to me by
17   counsel, I don't think I can tell you the specific
18   activity.
19      MR. REIDY:  Do you know all the activities
20   that were looked at by the team?
21      THE WITNESS:  No, I don't know all of them.
22

Page 268

1    BY MS. ST. PETER-GRIFFITH:
2       Q.  Do you know some of them?
3       A.  I know some of them.
4       Q.  What were they?
5       MR. REIDY:  If you know what some things
6    were looked at, go ahead and tell her.
7       THE WITNESS:  I mean, we looked at sales
8    and marketing practices, how we were selling the
9    product, and to my knowledge we looked at marketing
10   the spread; whether or not that was occurring.
11   BY MS. ST. PETER-GRIFFITH:
12      Q.  And did you reach any conclusions as to
13   whether that was occurring?
14      A.  My understanding would be it wasn't
15   occurring in any significant way.
16      Q.  Was it occurring at all?
17      A.  I don't recall specific instances being
18   laid out to me at that time.
19      Q.  In terms of your defining whether or not
20   marketing the spread had occurred, or identifying
21   whether marketing the spread had occurred, how did you
22   define marketing the spread?  What activities were

Page 269

1    looked at in terms of evaluating whether spread
2    marketing occurred?
3       A.  Yeah, that I -- I don't recall, what
4    activities specifically were monitored.
5       Q.  Would there have been anything -- if Abbott
6    alternate site product sales was engaged in marketing
7    the spread, would there have been something wrong with
8    that?
9       A.  Based on everything I knew at the time, I
10   don't know that there would be.
11      Q.  Okay.  What does "marketing the spread"
12   mean to you?
13      A.  Well, I think your definition of marketing
14   the spread, I think, as you've laid it out, is selling
15   the difference between reimbursement and the contract
16   price.
17      Q.  Okay.
18      MR. SISNEROS:  Objection, nonresponsive.
19   BY MS. ST. PETER-GRIFFITH:
20      Q.  What -- what is your definition though?
21      A.  Well, that's the definition by which I was
22   describing my position.

68 (Pages 266 to 269)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 270

1    Q.  Okay.  But I want to know what your
2  understanding and definition of marketing the spread
3  is?
4    A.  In what time frame?
5    Q.  At any time frame.  And if it changed,
6  please identify that as well.
7    A.  I mean, that essentially is my
8  understanding of marketing the spread.
9    Q.  Okay.  What type of conduct would you
10 consider as marketing the spread?
11   A.  I think it would be positioning that there
12 would be an advantage in that reimbursement
13 difference.
14   Q.  Would the -- just the mere provision of AWP
15 information to a particular customer or group
16 purchasing organization constitute marketing the
17 spread?
18   A.  Could you repeat the question?  I'm sorry.
19     MS. ST. PETER-GRIFFITH:  Sure.
20     Can you read it back?
21     THE REPORTER:  Question:  Would just the
22 mere provision of AWP information to a particular

Page 271

1  customer or group purchasing organization constitute
2  marketing the spread?"
3     THE WITNESS:  I mean, I don't know that I
4  can answer it that way, because it would require other
5  information.  So I don't know.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  What about maintaining list prices at
8  extremely high levels so that the difference between
9  the contract price and what's reimbursed by Medicare
10 and Medicaid is substantial?  Would that be a problem,
11 in your view?
12   A.  Again, I don't know.  That's a -- a legal
13 call in my mind.
14   Q.  Well, I mean, what's -- what's your -- you,
15 Mr. Gonzalez, sitting here, do you think that if
16 Abbott is charging its customers a certain price and
17 Medicaid is reimbursing or Medicare is reimbursing at
18 an amount that's anywhere from a hundred to a thousand
19 percent more than that price, do you think that's a
20 problem?
21     MR. REIDY:  That question is asked and
22 answered.  You went all through that this morning,

Page 272

1  very same question almost word for word.  He said he
2  didn't know then --
3     MS. ST. PETER-GRIFFITH:  Go ahead and
4  answer.
5     MR. REIDY:  Answer the question whatever
6  way you want.
7     THE WITNESS:  I mean, that's not my area of
8  expertise.  I can't answer the question.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Well, you -- you were the president of the
11 Hospital Products Division, weren't you?
12   A.  Sure.
13     MR. REIDY:  That's asked and answered a
14 thousand times.
15     MS. ST. PETER-GRIFFITH:  Okay.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Did you have any sense as to whether or not
18 that would be a problem --
19     MR. REIDY:  Object.
20 BY MS. ST. PETER-GRIFFITH:
21   Q.  (Continuing) -- for you --
22     MR. REIDY:  I'm sorry.  Go ahead and finish

Page 273

1  your question.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  (Continuing) -- to you as the president of
4  Hospital Products Division?
5     MR. REIDY:  Object to "any sense."
6     THE WITNESS:  I don't know.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Do you know whether Abbott in general, the
9  corporate culture, disfavored marketing the spread?
10   A.  I -- I don't know whether the corporate
11 culture disfavored marketing the spread or even --
12 well, I'll leave it at that.
13   Q.  Were you aware of marketing-the-spread
14 issues outside of the Hospital Products Division?
15   A.  No.
16   Q.  None at all?
17   A.  None that I'm aware of.
18     MS. ST. PETER-GRIFFITH:  We'll move to the
19 next document.
20     (Whereupon Deposition
21     Exhibit Gonzalez 015 was
22     marked as requested.)

69 (Pages 270 to 273)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 274

1        THE WITNESS:  Thank you.
2            (Witness examines document.)
3        THE WITNESS:  Okay, I've read it.
4   BY MS. ST. PETER-GRIFFITH:
5    Q.  Do you recognize this document?
6    A.  No.
7    Q.  It says at the top it's to John Ward, and
8   there's a CC to Don Robertson and Jeff Yablon.  Do you
9   see that?
10   A.  I do.
11   Q.  Who is Mr. Robertson?  I think we touched
12  upon his name before, but I don't think we defined who
13  he is.
14   A.  Don Robertson was a divisional vice
15  president who, at least at one time, had
16  responsibility for alternate site and potentially some
17  other areas.  I don't recall.
18   Q.  Do you know who Mr. Ward is?
19   A.  John Ward was -- I'm not sure what John
20  Ward did in 1995, but he was in HPD as the national
21  sales manager for the hospital group, and then he
22  passed away about halfway through my -- my tenure.

Page 275

1    Q.  Sir, is this one of the documents that you
2   reviewed -- that you reviewed in preparation for
3   today's deposition?
4    A.  It is.
5    Q.  If you notice on the last page -- and all I
6   can do, sir, is represent to you this sequence and how
7   they were presented.  But I can't necessarily
8   represent that this third page was attached to the
9   first two.
10       But do you see where under the CC you are
11  identified?
12   A.  I do.
13   Q.  Okay.  Do you have any recollection as to
14  receiving either the third page or the first couple of
15  pages of this document?
16   A.  No, I don't.
17   Q.  Okay.  Sir, I'd like to turn your attention
18  to the third paragraph.
19   A.  Mm-hmm.
20   Q.  The second sentence where it says
21  (reading):
22       "They think there is about an 18 month

Page 276

1   window of opportunity to promote our injectables as
2   more profitable for their members to use because of
3   the bigger spread between AWP and cost."
4        Do you see that?
5    A.  I do see that.
6    Q.  Would Abbott's promotion of its injectable
7   line to GeriMed or GeriMed customers based upon
8   this -- its spread between its AWP and cost constitute
9   marketing the spread?
10   A.  I guess -- I don't know the premise that
11  Abbott did agree to do that.
12   Q.  Well, if it did.
13   A.  I have no idea.  I mean, it's also
14  important to recognize this -- this -- trivial words
15  in 1995, I wasn't in HPD in 1995.
16   Q.  Well, if Abbott engaged in this conduct
17  that's described in that sentence that we just read,
18  during your tenure when you were in HPD, would you
19  have thought that conduct problematic?
20   A.  Well, it requires me to speculate on:  1)
21  Abbott would have participated in it; 2) exactly what
22  they mean by it, and I know none of those things.  So

Page 277

1   I don't know.
2    Q.  But let's -- if Abbott did do that, if
3   Abbott -- if Dennis Walker or other individuals within
4   the alternate site product system -- product sales
5   promoted its -- the injectable line to GeriMed or its
6   customers based upon its spread, would that be
7   marketing the spread?
8    A.  I don't know.  In 1995 I don't know.
9    Q.  What about in 1998?
10   A.  I don't even know in 1998.
11   Q.  If you knew about this conduct in 1998, is
12  it something that you would have put a stop to?
13   A.  I'd have to understand a lot more about it
14  than I understand from this memo.
15   Q.  What additional information would you need
16  to understand?
17   A.  I'd have to understand exactly what they
18  wanted to do, and I'd probably send it out for legal
19  review.  But I don't know.  I don't know -- I can only
20  read this just like you can read it.  And I can't draw
21  that conclusion from what I'm reading here.
22   Q.  You can't draw what conclusion?  That there

                              70 (Pages 274 to 277)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 278

1    was anything wrong with it?
2        A.  That there was anything wrong or exactly
3    what they wanted done or anything.
4            MS. ST. PETER-GRIFFITH:  This is the next
5    exhibit.
6                (Whereupon Deposition
7                 Exhibit Gonzalez 016 was
8                 marked as requested.)
9            THE WITNESS:  Thank you.
10           (Witness examines document.)
11           THE WITNESS:  Would you like me to read
12   this entire document or just --
13   BY MS. ST. PETER-GRIFFITH:
14       Q.  Just -- I'm sorry.  Just the initial page.
15       A.  Cover page?
16       Q.  Yeah.
17           (Witness examines document.)
18   BY MS. ST. PETER-GRIFFITH:
19       Q.  Sir, have you read the --
20       A.  I have.
21       Q.  (Continuing) -- page?
22           Have you ever seen this document before?

Page 279

1        A.  No.
2        Q.  This document is dated February 17th, 1998,
3    which is just prior to your term within HPD?
4        A.  Correct.
5        Q.  Okay.  Did you have any interaction with
6    Managed Health Associates?
7        A.  No.
8        Q.  Okay.  Had you ever heard of them?
9        A.  No.
10       Q.  I assume they weren't part of your AHD
11   group of customers that you were working with?
12       A.  Not that I recall.
13       Q.  The second paragraph in this letter on the
14   top reflects:
15           "Due to a heightened sensitivity to the
16   subject of AWPs, we are unable to provide that
17   information at the current time."
18           Do you see that?
19       A.  I do.
20       Q.  Were you ever made aware of a shift in
21   policy within Abbott concerning the provision of AWP
22   information concerning heightened sensitivity about

Page 280

1    the subject?
2        A.  No.
3        Q.  Do you have any idea what heightened
4    sensitivity Mr. Walker's referencing here?
5        A.  No.
6                (Whereupon Deposition
7                 Exhibit Gonzalez 017 was
8                 marked for identification.)
9            THE WITNESS:  Thank you.
10               Would you like me to read this whole
11   document?
12   BY MS. ST. PETER-GRIFFITH:
13       Q.  Yes, please.  And I'll just direct your
14   attention to the end, that you're referenced at the
15   end.
16       A.  All right.
17           (Witness examines document.)
18           THE WITNESS:  Okay.
19   BY MS. ST. PETER-GRIFFITH:
20       Q.  Sir, do you recognize this document?
21       A.  I don't recognize the document.
22       Q.  You're not one of the addressees on it, but

Page 281

1    you are -- there is a reference to you at the -- on
2    the second page.
3        A.  Yes.
4        Q.  Do you notice that this is a memo to a
5    series of addressees from Marianne Sutcliffe?  Do you
6    see that?
7        A.  Correct.
8        Q.  Who is Guy Wiebking?
9        A.  Guy Wiebking was a direct report of mine
10   who had responsibility for national accounts, I
11   believe.
12       Q.  And who's Loreen Mershimer?
13       A.  Loreen Mershimer is the vice president in
14   charge of the hospital business sector.
15       Q.  And Chris Begley?  Who was Mr. Begley at
16   this point in time, in 1999, or what position did he
17   have?
18       A.  I don't recall what position Chris had at
19   the time.
20       Q.  Okay.  Do you know Mr. Baker?
21       A.  I do know Pete Baker.
22       Q.  Who is Mr. Baker?

71 (Pages 278 to 281)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 282

1      A.  Pete Baker had responsibility for the
2   alternate site sales force.
3      Q.  And this particular document references an
4   Owen Cardinal access pricing.  Do you see that?
5      A.  Yes.
6      Q.  What is an Owen Cardinal access pricing?
7      A.  I think what it is referring to is there
8   are two wholesalers.  One was call Owens & Minor and
9   one was called Cardinal.
10     Q.  Okay.  And were they connected in any way,
11  to your knowledge?
12     A.  Not that -- not that I recall.
13     Q.  At the end of this memo, Ms. Sutcliffe
14  references a meeting being scheduled with Rick
15  Gonzalez for the week of March 22nd "to discuss our
16  response."  Do you see that?
17     A.  I do.
18     Q.  Do you recall a meeting in or around March
19  of 1999 concerning the issue of Owen Cardinal access
20  pricing?
21     A.  No.
22     Q.  Okay.  Do you remember your having any

Page 283

1   interaction or relationship with either the Owen
2   pricing or contracts or the Cardinal pricing or
3   contracts?
4      A.  No.
5              (Whereupon Deposition
6              Exhibit Gonzalez 018 was
7              marked as requested.)
8         THE WITNESS:  Thank you.
9         Would you like me to read through this?
10  BY MS. ST. PETER-GRIFFITH:
11     Q.  You know, sir, if you just focus on the
12  first page and the second page.
13     A.  All right.
14            (Witness examines document.)
15  BY MS. ST. PETER-GRIFFITH:
16     Q.  And, sir, I am going to draw your attention
17  to that first -- the top?
18     A.  Right, okay.
19     Q.  We're not going to necessarily try and
20  squint to see the numbers again.
21         Sir, do you recognize this document?
22     A.  No.

Page 284

1      Q.  Are you familiar with alternate site
2   product sales providing to GeriMed -- incident to a
3   GeriMed award its manufacturers listing of
4   pharmaceuticals -- of -- I'm sorry.  Do you recall an
5   issue or do you recall Abbott being awarded a GeriMed
6   contract?
7      A.  No.
8      Q.  Okay.  If you note on the second page,
9   which I'll represent to you other witnesses have
10  testified is the award, is the notice of the award, do
11  you see where along the top it says "Generic Name" --
12  the top of the chart -- "Generic Name,"
13  "Brand Name," "FDA," "NDC," "Package Size," "Contract
14  Price," "AWP," and then difference AWP or "Diff AWP"?
15     A.  Yes.
16     Q.  Okay.  Did Abbott HPD have an understanding
17  as to whether GeriMed awarded contracts based upon
18  Abbott's AWPs?
19     A.  I don't know, because I didn't know about
20  the award to begin with.
21     Q.  Okay.
22     A.  Can I ask a clarifying question?

Page 285

1      Q.  Sure.
2      A.  This is a GeriMed document; correct?
3      Q.  Yes.
4      A.  Okay.  No, I mean this -- this spreadsheet
5   was generated by GeriMed; correct?
6      Q.  Correct.
7      A.  Okay.
8      Q.  And do you know whether Abbott alternate
9   site would provide information to customers so that
10  they could make the calculations that are reflected in
11  a document like this?
12     A.  I don't know.
13     Q.  Sir, in terms of making a determination as
14  to whether or not a provision of AWP information or
15  spread information to Abbott's customers complied with
16  Medicare, Medicaid fraud and abuse statutes, who would
17  have responsibility for making that determination?
18     A.  Well, the evaluation of that would -- would
19  typically be a legal call.  So it would be the legal
20  department's interpretation of that.
21     Q.  Do you know whether the legal department
22  ever made such an evaluation?

72 (Pages 282 to 285)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 286

1       A.  Can you read back the question once more,
2   make sure I answer it accurately?
3       THE REPORTER:  "Question:  Do you know
4   whether the legal department ever made such an
5   evaluation?"
6       THE WITNESS:  No, the one before that.
7       THE REPORTER:  "Question:  Sir, in terms of
8   making a determination as to whether or not a
9   provision of AWP information or spread information to
10  Abbott's customers complied with Medicare, Medicaid
11  fraud and abuse statutes, who would have
12  responsibility for making that determination?"
13      THE WITNESS:  I don't know the answer to
14  the second question.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Sir, I believe you testified earlier that
17  you were unaware of any pricing issues associated with
18  vancomycin, is that --
19      A.  Yes.
20      Q.  But were you aware that vancomycin was in
21  the family of products that was marketed by the
22  Hospital Products Division?

Page 287

1       A.  Yes.
2          (Whereupon Deposition
3           Exhibit Gonzalez 019 was
4           marked for identification.)
5       MS. ST. PETER-GRIFFITH:  Dan, I'm sorry
6   yours is all folded.
7       MR. REIDY:  No problem.
8       THE WITNESS:  Thank you.
9          Would you like me to read the whole
10  document?
11      MS. ST. PETER-GRIFFITH:  Yes, I would, sir.
12         (Witness examines document.)
13      THE WITNESS:  Okay, I've read it.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Okay.  Sir, do you recognize this document?
16      A.  No.
17      Q.  Was this one of the documents you reviewed
18  incident to preparing for today's deposition?
19      A.  No.
20      Q.  Do you see at the bottom of this document
21  it says -- there is a legend that appears to be a
22  computer file name.  It says, "K:/Issues/Issues

Page 288

1   Briefs/Project Miles/Vancomycin-Updated 10/23/02" --
2       A.  I do see that.
3       Q.  Or '00.  I'm sorry.
4          Sir, do you know what Project Miles is?
5       A.  No.
6       Q.  If the Hospital Products Division employees
7   or if someone was commenting upon -- someone outside
8   the division was commenting on an Abbott HPD product
9   to Miles White, would that have been something that
10  you would have been made aware of?
11      A.  I would say typically.
12      Q.  Okay.  Were you made aware of a
13  presentation made to Miles White concerning vancomycin
14  pricing in or around late 2000?
15      A.  Not that I recall.
16      Q.  Do you recall whether the issues associated
17  with vancomycin factored into any of the
18  decision-making concerning the decision to lower --
19  lower list prices in 2001?
20      A.  Not that I recall.
21      Q.  Okay.  Sir, I'd like go through some
22  components of this document.

Page 289

1          At the top it says (reading):
2          "Abbott has come under recent fire from the
3   media, Congress and the Justice Department for alleged
4   'price spread marketing' . . . ."
5          Do you see that?
6       A.  I do see that.
7       Q.  Were you aware of that?
8       A.  I can't say I'm specifically aware of that.
9       Q.  Okay.  Do you know whether media attention
10  to the vancomycin issue or congressional attention or
11  Department of Justice information to the vancomycin
12  issue was part of the pressure that was -- that you
13  had discussed before that helped contribute to the
14  decision to change the '01 prices?
15      A.  That's what I don't specifically recall is
16  the article associated directly with vancomycin, was
17  it more general.  My recollection was it was more
18  general, and so I don't want to say it was associated
19  directly with vancomycin.
20      Q.  The next paragraph reads (reading):
21         "Vancomycin" -- in that same block where it
22  says "Summary:"

73 (Pages 286 to 289)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 290

1      "Vancomycin's price is based on the
2  product, its uses and the cost of the" -- and then
3  there is a strike out -- "branded product."
4      Did Abbott have a branded product for
5  vancomycin, or was vancomycin a generic?
6    A.  To my knowledge, Abbott did not have a
7  branded product for vancomycin.
8    Q.  Do you know why there would be reference in
9  this document to vancomycin's price being based upon
10 the product, its uses, and the cost of the branded
11 product?
12   A.  I mean, this appears to me to be a draft,
13 by the way.  Things are struck from it.  And that
14 particular sentence appears to me someone just changed
15 their -- the way they wanted to characterize it from
16 "patent protected" to "branded."
17     It's consistent with what I've described to
18 you how we typically set price the first time out.  We
19 look at the innovator's product, and if we're the
20 second product to market, we would set a certain price
21 in the marketplace for that generic.
22   Q.  Okay.

Page 291

1    A.  I mean, that's basically what that part of
2  it says.
3    Q.  If you could flip to page 2, then, at the
4  very bottom, where it says "History."
5    A.  Mm-hmm.
6    Q.  Under the second bullet (reading):
7      "Vancocin's manufacturer, Lilly, decreased
8  its catalog price" -- with a strike out of list --
9  "approximately 50% soon after Abbott's generic
10 vancomycin was approved."
11     Do you see that?
12   A.  I do.
13   Q.  If Abbott's vancomycin enters the market,
14 and Lilly, in turn, drops its catalog price 50
15 percent, how does Abbott's -- or I'm sorry, how does
16 the brand pricing inform Abbott's pricing of
17 vancomycin?
18   A.  As I said, it's evaluated on the front end
19 of the process in setting the price.  I mean, I don't
20 recall when vancomycin came to market, but -- so --
21 but I do believe vancomycin was in the marketplace
22 long before I arrived in HPD, so I wouldn't have been

Page 292

1  directly involved in the setting of this price.  So I
2  can't answer your question very easily.
3    Q.  Well, based upon just your general
4  experience in the pharmaceutical industry, and
5  obviously in HPD with these types of products, would
6  it make sense that if Lilly drops its Vancocin price,
7  catalog price, by 50 percent, it will make sense for
8  Abbott to similarly drop its list price on vancomycin?
9    A.  I have to say I've never seen a branded
10 company drop their price after a generic comes in.
11 It's -- it's unusual in my experience.  So I don't
12 know.
13   Q.  Well, if this had happened, you know,
14 during your tenure at HPD, and the issue was presented
15 to you, do you think it would make business sense for
16 Abbott to drop its vancomycin price to be -- its
17 catalog price to be in line with Vancocin?
18   A.  I mean, I don't know.  I'd have to
19 understand at a minimum why Lilly dropped their price.
20   Q.  Okay.  Well, would there be any advantage
21 to Abbott having a catalog price that's 50 percent
22 higher than Lilly's?

Page 293

1    A.  I don't know that there would be any
2  advantage, but there could be reasons.  Let's say our
3  cost was significantly higher, our capacity was
4  significantly limited.  It didn't make any difference
5  that, you know, you were only going to be able to
6  supply a certain amount of product to the marketplace,
7  then you probably wouldn't, in kind, drop your price.
8    Q.  Would -- would it make sense to have a high
9  vancomycin list catalog price and a very competitive
10 contract price for vancomycin?
11   A.  I don't know what the contract price was in
12 this time frame.  And this time frame sounds to me
13 like it happened right after the launch of Abbott's
14 vancomycin.  And so contract price may have been very
15 close to the innovator's price; you know, 10, 15
16 percent difference.  I don't know.
17   Q.  If you could flip back to the first page --
18   A.  Mm-hmm.
19   Q.  (Continuing) -- if you could look to the
20 fifth bullet point, where it says (reading):
21     "Vancomycin's price structure is based on
22 the investment made in this product and the needs of

74 (Pages 290 to 293)

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                 June 3, 2008

Page 294

1  our customers."
2       Do you see that?
3       A.  Yes.
4       Q.  Are you familiar with the investment that
5  was made into formulating the vancomycin as a generic
6  product?
7       A.  No, because that would have happened long
8  before I was in HPD.
9       Q.  Do you know whether vancomycin was an
10  important product to -- to continue to maintain in the
11  Abbott Hospital Products Division catalog, or
12  inventory of products available to its customers?
13      A.  I'm not aware of any uniqueness to it more
14  than some other generic, so -- but I'm also not an
15  expert in that area.
16      Q.  The next sentence in that same bullet point
17  reads:
18          "Abbott does not market products as having
19  a 'price-spread' advantage."
20          Do you see that?
21      A.  I do.
22      Q.  Was that your understanding during your

Page 295

1  tenure with HPD?
2       A.  That was consistent with my understanding.
3       Q.  Was that as a matter of practice or policy
4  or just the way things turned out?
5       A.  I don't know.
6       Q.  If you could turn to -- actually, the last
7  page.  Sir, were you aware of any customer complaints
8  that were ever received concerning vancomycin pricing?
9       A.  Not that were raised to my level.
10      Q.  Would it be -- if you could look at the
11  first bullet point, it says (reading):
12          "Subsequently, we received complaints from
13  state insurance carriers that the AWP for vancomycin
14  was too high for Medicaid (state-issued)
15  reimbursements."
16          Do you see that?
17      A.  I do.
18      Q.  And then the next sentence reads (reading):
19          "So, in May of 1995, we lowered
20  vancomycin's catalog price for a month."
21          Do you see that?
22      A.  I do.

Page 296

1       Q.  Would Abbott typically engage in pricing
2  decisions based upon complaints from state insurance
3  carriers?
4       A.  Not to my knowledge.
5       Q.  Was that -- you know, would -- strike that.
6          If we could go on to the next bullet point.
7       A.  Important to recognize in 1995, that was
8  three years before I was in HPD.
9       Q.  I understand.  Based upon your experience,
10  I guess, I was trying to find out whether you had an
11  understanding as to whether complaints from state
12  insurance carriers might impact pricing decisions.
13          Were you ever aware of that happening,
14  based upon your knowledge of HPD?
15      A.  No, not that I'm aware of.
16      Q.  If you could look to the next bullet point,
17  it says (reading):
18          "Our customers responded by saying this
19  reduction interfered with their ability to provide
20  care.  During this brief period, physicians stated
21  that they were unable to recoup provider costs
22  associated with vancomycin, such as nursing labor to

Page 297

1  administer the drug and pharmacy overhead and labor to
2  mix and label the product."
3       Do you see that?
4       A.  I do.
5       Q.  And then the next sentence reflects that in
6  June of '95 the price was reinstated.
7          Did you ever have an understanding with any
8  of your experience with -- within HPD, or Abbott in
9  general, that considerations such as provider costs
10  like nursing labor, pharmacy overhead, labor to mix
11  products factored into pricing decisions made by
12  Abbott?
13      A.  Not to my knowledge.
14      Q.  Do you think that would have been a sound
15  business decision?
16      A.  I don't know.
17      Q.  What is your understanding of the factors
18  that did factor into Abbott's pricing for its HPD
19  catalog, non-DRG?  I'll clarify non-DRG.
20      A.  It's what I addressed earlier in the day.
21          Essentially the way we set list price is
22  when we launched the product -- prior to launching the

75 (Pages 294 to 297)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 298

1  product I should say, we would look at all different
2  kinds of factors.  And let's use a generic as an
3  example, because those are the examples that I think
4  you're looking at most often.
5        We would look at the cost of the product to
6  manufacture; we would look at things like the
7  difficulty in manufacturing the product, because that
8  would give us some indication as to how many
9  competitors were likely to enter the field in addition
10 to us; where we were versus the proprietary product;
11 any kind of unique advantage we might have in the
12 product, like an advantage as it related to delivery
13 system, maybe we offered it five different delivery
14 systems and no one else offered it in certain kinds of
15 delivery systems.  So we factor all of those in, and
16 then we determine where we thought the appropriate
17 launch price would be for that product, and then we
18 would start to discount off of that, both based on
19 need, okay, to gain share in the marketplace, and then
20 discount off of it as other competitors or other
21 competitive factors would start to enter into the
22 marketplace.

Page 299

1        And so if you ended up having in the very
2  beginning you and the proprietary player, you would
3  have a certain level of discount, much more modest
4  than if, okay, a year later or two years later or ten
5  years later you have seven generic competitors in the
6  marketplace.  You're generally going to have pricing
7  that's significantly lower because of the competitive
8  factors.  But that's how it's set typically.
9     Q.   For Abbott's Hospital Products Division
10 solutions -- for example, sodium chloride, sterile
11 water, sort of the high volume --
12    A.   Right.
13    Q.   (Continuing) -- fluids, dextrose -- was
14 there a lot of competition for that market?
15    A.   There was not a lot of competitors, but it
16 was a highly competitive market.
17    Q.   Okay.  How so?
18    A.   Well, there were two very large players in
19 the market, us and Baxter, for most of the products
20 that you've described, and a third player that had,
21 you know, some level of capacity to supply the market.
22 There typically was a fair amount of competition that

Page 300

1  occurred, particularly between the two large players,
2  at least to get to a level of -- of certain capacity
3  use, and then the third player ended up being
4  competitive in a certain portion of it.
5        So unlike the generic model I described,
6  where you could have seven competitors, it's a highly
7  capital-intensive business to get into.  So it's just
8  not affordable for a large number of competitors to
9  get into that business.
10       But it -- it remained a very competitive
11 market because of the larger players having a fair
12 amount of capacity.
13    Q.   And what were the factors -- how were you
14 able to compete with Baxter and the other large
15 players in that market?
16    A.   Well, we typically competed on the quality
17 of the product -- I'm talking in the acute-care
18 setting now, because that's where the bulk of the
19 volume is.  We typically competed on the quality of
20 the product and the portfolio of products that we
21 could offer to a hospital.
22       Now, it was much more difficult to

Page 301

1  differentiate your IV bag versus a Baxter IV bag, but
2  you could differentiate a whole portfolio of products
3  that you could offer that hospital that might make a
4  difference that they would, you know, use your IV
5  solutions at the same time.
6     Q.   If you competed -- or how -- how would you
7  compete for those same products in the alt site arena?
8     A.   The alt site arena was just as I described
9  a couple of times now.  It was another channel where
10 we could sell product into that we had designed and
11 manufactured originally for the acute-care setting.  I
12 don't ever recall manufacturing a product or
13 developing a product that was solely made for the
14 alternate site market.
15    Q.   Is it fair to say, then, that in terms of
16 your marketing of the solutions that we discussed, or
17 the fluids that we discussed, vancomy- -- I'm sorry,
18 sodium chloride, sterile water, dextrose, that you
19 didn't have a particular marketing plan for those
20 products in the alt site area?
21    A.   You lost me somewhere along the connection.
22    Q.   Okay.  Let me -- let me see if I can

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 302

1   clarify.  Actually, let me back up.
2        When was the product launch for sterile
3   water, sodium chloride, dextrose?  I'm assuming it was
4   potentially decades ago?  Is that fair?
5      A.  Yeah, I would guess.  I don't know, but it
6   was a long time ago.
7      Q.  In terms of what you described as the
8   product launch providing the initial bases for
9   determining list price, was that applicable to sodium
10  chloride, dextrose, and sterile water?
11     A.  I don't know.
12     Q.  Would there be any reason to have -- for
13  the hospital market to have a list price for those
14  fluids that is multiple times higher than what the
15  actual contract price is?
16       MR. REIDY:  Asked and answered at least
17  twice this morning.
18       THE WITNESS:  Yeah, I -- I answered it in
19  this capacity issue that we -- that we've talked about
20  a couple of times about if somebody is going to use
21  your product off contract, the way you have to
22  manufacture it, typically you need overtime and other

Page 303

1   kinds of things, and therefore you want to recoup a
2   much higher investment.  And a high list price, if
3   someone is only going to buy it for a short period of
4   time, is a reasonable business approach.
5        MS. ST. PETER-GRIFFITH:  We are at -- we've
6   got approximately 10 minutes left.  Why don't we call
7   it a day for the day, and then we can move on to
8   another area in the morning, okay?  Thank you.
9        MR. REIDY:  9:00 a.m., everybody?
10       MS. ST. PETER-GRIFFITH:  That sounds good.
11       THE WITNESS:  Do you leave these documents
12  here?
13       MR. REIDY:  They'll take care of them.
14       MS. ST. PETER-GRIFFITH:  Yes.
15       THE VIDEOGRAPHER:  We're off the record at
16  4:48 p.m. with the conclusion of Part 1 deposition of
17  Richard Gonzalez.
18            (Whereupon this matter was
19             continued to Wednesday, June 4,
20             2008, at 9:00 o'clock a.m.)
21
22

Page 304

1
2
3
4
5
6
7
8
9
10  _____
11        SIGNATURE OF THE WITNESS
12
13  Subscribed and sworn to and before me
14  this _____ day of _____, 20____.
15
16
17  _____
18      Notary Public
19
20
21
22

Page 305

1   STATE OF ILLINOIS   )
2                       ) SS:
3   COUNTY OF DuPAGE    )
4        I, ROBIN M. CHIMNIAK, a notary public
5   within and for the County of DuPage and State of
6   Illinois, do hereby certify that heretofore, to wit,
7   on the 3rd day of June, 2008, personally appeared
8   before me RICHARD A. GONZALEZ, a witness in a certain
9   cause now pending and undetermined in the United
10  States District Court, For the District of
11  Massachusetts, In re:  Pharmaceutical Industry Average
12  Wholesale Price Litigation.
13        I further certify that the witness was by
14  me first duly sworn to testify the truth, the whole
15  truth and nothing but the truth in the cause
16  aforesaid; that the testimony then given by the said
17  witness was reported stenographically by me in the
18  presence of said witness and was thereafter
19  transcribed under my personal direction, and the
20  foregoing is a true and complete transcript of the
21  testimony so given by the said witness as aforesaid.
22        The signature of the witness to the

77 (Pages 302 to 305)

28366c10-d754-41d3-a790-f79f7b99fd30

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                     June 3, 2008

Page 306

1   foregoing deposition was not waived.
2           I further certify that the taking of this
3   deposition was pursuant to notice and that there were
4   present at the taking of said deposition the
5   appearances as heretofore noted.
6           I further certify that I am not a relative
7   or employee or attorney or counsel, nor a relative or
8   employee of such attorney or counsel for any of the
9   parties hereto, nor interested directly or indirectly
10  in the outcome of this action.
11          IN TESTIMONY WHEREOF, I have hereunto set
12  my hand and affixed my notarial seal this _____
13  day of _____, 2008.
14
15
16
17          _____
18          ROBIN M. CHIMNIAK, CSR
19          License No. 084-001999
20
21
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

28366c10-d754-41d3-a790-f79f7b99fd30