# Exhibit 103

Heggie, Michael            CONFIDENTIAL            May 17, 2007
                        Philadelphia, PA

Page 1

                UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

                        - - -

IN RE: PHARMACEUTICAL    : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION

PRICE LITIGATION         : 01-CV-12257-PBS

            vs.          :

THIS DOCUMENT RELATES TO  : CONFIDENTIAL

U.S. ex rel. Ven-A-Care of :

The Florida Keys, Inc.   :

v. Abbott Laboratories,  :

Inc., No. 06-CV-11337-PBS :

            And          :

State of California, ex  :

Rel. Ven-A-Care vs. Abbott :

Laboratories, Inc., et al :

Case No. 1:03-cv-11226-PBS :

            And          :

State of Texas ex rel.   :

Ven-A-Care of the Florida :

Keys, Inc. vs. Abbott    :

Laboratories, et al,     :

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

| | Page 2 | | Page 4 |
|---|---|---|---|

Page 2

1   Case No. GV401286        :
2              - - -
3          Video Tape Deposition of
4   MICHAEL HEGGIE, was taken pursuant to notice
5   at the Law Offices of Berger & Montague, 1622
6   Locust Street, Philadelphia, Pennsylvania, on
7   Thursday, May 17, 2007, beginning at 3:00
8   p.m., before Jeanne Christian, Court
9   Reporter-Notary Public and Michael Mullen,
10  Video Tape Operator, there being present.
11             - - -
12
13
14
15
16
17
18
19
20
21
22

Page 4

1   APPEARANCES CONTINUED:
2          BERGER & MONTAGUE, P.C.
3          BY:  SUSAN THOMAS, ESQUIRE
4          1622 Locust Street
5          Philadelphia, Pennsylvania
6          19103
7          Phone: (215) 875-3000
8          Representing Ven-A-Care of the
9          Florida Keys
10
11         WEXLER TORISEVA WALLACE
12         BY:  AMBER M. NESBITT, ESQUIRE
13         One North LaSalle Street
14         Suite 2000
15         Chicago, Illinois 60602
16         Phone: (312) 346-2222
17         Representing the State of
18         Arizona
19
20
21
22

Page 3

1   APPEARANCES:
2          JONES DAY
3          BY:  TONI-ANN CITERA, ESQUIRE
4          222 East 41st Street
5          New York, New York 10017
6          Phone:  (212) 326-3939
7          Representing Abbott
8          Laboratories
9
10         US DEPARTMENT OF JUSTICE
11         BY:  GEJAA T. GOBENA, ESQUIRE
12         Civil Division, Fraud Section
13         601 D Street, N.W.
14         Washington, D.C. 20004
15         Phone:  (202) 307-1088
16         Representing United States
17
18
19
20
21
22

Page 5

1   APPEARANCES CONTINUED:
2          STETLER & DUFFY, INC.
3          BY:  DAVID J. STETLER, ESQUIRE
4          Suite 1200
5          11 South LaSalle Street
6          Chicago, Illinois 60603
7          Phone: (312) 338-0202
8          Representing the Witness
9
10         DEPUTY ATTORNEY GENERAL
11         BY:  ELISEO SISNEROS, ESQUIRE
12         110 West A Street #1100
13         San Diego, California 92101
14         Phone: (619) 688-6043
15         Representing the State of
16         California
17
18
19
20
21
22

2 (Pages 2 to 5)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL            May 17, 2007
                          Philadelphia, PA

---

Page 6

1   APPEARANCES CONTINUED:
2          ANDERSON LLC
3          BY: C. JARRETT ANDERSON,
4          ESQUIRE
5          1300 Guadalupe, Suite 103
6          Austin, Texas 78701
7          Phone: (512) 469-9191
8          Representing the Relator
9
10  APPEARANCE TELEPHONICALLY:
11         DICKSTEIN SHAPIRO
12         BY: LISA HALL, ESQUIRE
13         1825 Eye Street NW
14         Washington, DC 20006
15         Phone: (202) 420-4129
16         Representing Baxter
17
18
19
20
21
22

---

Page 8

1              E X H I B I T S (continued)
2                        - - -
3   EXHIBIT NO.        DESCRIPTION          PAGE
4   Exhibit Heggie 796 ABT214131          85
5   Exhibit Heggie 797 ABT214129-30       90
6   Exhibit Heggie 798 ABT52839           99
7   Exhibit Heggie 799 TXABT 673919       111
8   Exhibit Heggie 900 TXABT 674281-293   122
9   Exhibit Heggie 901 TXABT 673827-28    170
10  Exhibit Heggie 902 TXABT 673818-19    175
11  Exhibit Heggie 903 ABT212051-52       213
12  Exhibit Heggie 904 TXABT 179882       259
13  Exhibit Heggie 905 TXABT 42025-26     291
14
15
16
17
18
19
20
21
22

---

Page 7

1                 I N D E X
2                    - - -
3   MICHAEL HEGGIE
4   EXAMINATION          PAGE
5
6      BY MR. GOBENA        13
7      BY MR. ANDERSON      184
8      BY MS. CITERA        295
9                 - - -
10         E X H I B I T S
11                 - - -
12  EXHIBIT NO.      DESCRIPTION      PAGE
13  Exhibit Heggie 786 Deposition        12
14  Exhibit Heggie 787 TXABT 59204-59377    12
15  Exhibit Heggie 788 Subpoena          12
16  Exhibit Heggie 789 ABT-DOJ 0142329-331   18
17  Exhibit Heggie 790 ABT-DOJ 042335-336    28
18  Exhibit Heggie 791 ABT-DOJ 0142333-334   42
19  Exhibit Heggie 792 ABT214133-134     54
20  Exhibit Heggie 793 ABT214140         65
21  Exhibit Heggie 794 ABT214137         67
22  Exhibit Heggie 795 ABT214165         76

---

Page 9

1              THE VIDEO TAPE OPERATOR:  We are now
2   on the video record.  The following is a video tape
3   deposition.  My name is Michael Mullen from
4   Knipes-Cohen.  The court reporter is Jeanne
5   Christian.
6              This deposition is in the matter of
7   Pharmaceutical Industry Average Wholesale Price
8   Litigation, Civil Action Number 01-12257-PBS.
9              This deposition is taking place at
10  1622 Locust Street, Philadelphia, Pennsylvania.
11  All counsel will be reflected on the stenographic
12  record.
13             The deponent for today is Michael
14  Heggie.  Today's date is Thursday, May 17, 2007,
15  and the time is 3:02.
16             Will the court reporter please swear
17  in the witness?
18                 - - -
19             MICHAEL HEGGIE, after having been
20  duly sworn, was examined and testified as follows:
21             MS. CITERA:  Before we begin, I just
22  want to interpose an objection to the MDL Plaintiff

3 (Pages 6 to 9)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

Page 10

1  being here and that discovery is closed in that
2  particular case.
3          MS. NESBITT:  We obviously disagree
4  with that objection.
5          MR. GOBENA:  Before we get started,
6  counsel, we talked previous to the Mark Sebree
7  deposition about incorporating the prior deposition
8  testimony that was given.  I know you have given a
9  deposition in the West Virginia case, I believe,
10  and also another deposition in connection with the
11  same text as this case against Abbott Labs.
12          What we are going to do is
13  incorporate that testimony into this testimony,
14  into this deposition, in its entirety, the
15  transcript, as well as the exhibits.
16          And just to be on the safe side and
17  be clear, we are going to introduce the transcripts
18  as exhibits to this deposition.
19          Unfortunately, the only transcript I
20  have in hand right now is the one from the Texas
21  case, so I'm going to have that marked right now as
22  Exhibit Heggie 786.  I will have the court reporter

Page 11

1  mark that, and I will provide copies to counsel.  I'm
2  not anticipating asking any questions about this
3  exhibit right now, but maybe later on.
4          MR. STETLER:  You want a copy of
5  West Virginia?
6          MR. GOBENA:  Do you have a copy?
7          MR. STETLER:  I think I have a clean
8  copy.
9          MR. GOBENA:  It is a clean copy --
10  we are having copies made.
11          MR. ANDERSON:  And that will replace
12  that copy, thank you, Dave.
13          So the record is clear, just to
14  help, hopefully, streamline this process, these
15  transcripts are being incorporated as if taken in
16  this case.
17          MR. STETLER:  That means nobody will
18  ask you a single duplicative question.
19          MR. GOBENA:  I can't guarantee that.
20  We will endeavor our best to try and focus in on
21  some areas that weren't covered, really, in those
22  last two depositions.

Page 12

1          THE WITNESS:  Wonderful. That would
2  be very, very good.
3          MR. GOBENA:  That is what our plan
4  is today.
5          THE WITNESS:  Terrific. Thank you.
6  - - -
7          (Whereupon the court reporter marked
8  documents as Exhibit Heggie 786, Exhibit Heggie 787
9  and Exhibit Heggie 788 for identification.)
10  - - -
11          MR. GOBENA:  I'm going to have now
12  this document marked as Exhibit Heggie 788.  The
13  document I'm having marked as Exhibit Heggie 788 is a
14  subpoena duces tecum that was issued to --
15          MR. STETLER:  I will give him a
16  copy.
17          THE WITNESS:  I don't need it, if
18  you get it.
19          MR. STETLER:  He is going to ask you
20  a question about it.
21          THE WITNESS:  Oh, okay, then I need
22  a copy.

Page 13

1          MR. STETLER:  She is going to mark
2  it, I think.
3          MR. GOBENA:  That's correct. I will
4  have that marked as 788, I believe.
5          - - -
6          EXAMINATION
7          - - -
8  BY MR. GOBENA:
9     Q.  Mr. Heggie, why don't you take a moment
10  to look over the subpoena that's been placed in
11  front of you?
12     A.  (Witness complies.)
13     Q.  Do you recognize this document?
14     A.  I recognize the front page.
15     Q.  So do you recall receiving at least the
16  front page of this document?
17     A.  Um-hum.
18     Q.  Why don't you take a look at the
19  subsequent pages?
20          MR. STETLER:  And say yes or no,
21  because if you start with the uh-huh's, it is going
22  to drive everybody crazy.

4 (Pages 10 to 13)

Henderson Legal Services
202-220-4158

Heggie, Michael            CONFIDENTIAL            May 17, 2007
Philadelphia, PA

Page 14

1  BY MR. GOBENA:
2      Q.  That's correct.  You have been deposed
3  so many times, I skipped over the instructions.  I
4  can go ahead and do them anyway, just to be on the
5  safe side.
6          MR. STETLER:  You think he might
7  remember.
8          THE WITNESS:  No, I don't remember.
9  BY MR. GOBENA:
10     Q.  Let me just give you a real quick primer
11 on the instructions.
12         The most important thing is for you
13 to give an audible response, not an um-hum, but a
14 yes or no to a yes or no question, or if it calls
15 for a narrative, to give a narrative and not to try
16 and communicate through body language, because it
17 doesn't come across on the transcript.
18         The other thing that is important is
19 for you to speak as slowly and as clearly as
20 possible.  I am a low talker, and I am a fast
21 talker, so I have this problem, where I tend to go
22 too fast and speak too low, and it is very

Page 15

1  difficult for court reporters to keep up, so if you
2  can speak as slowly and clearly as possible, it
3  would help the court reporter greatly.
4          The other thing that is important is
5  to pause a beat before you answer, because I have
6  defended depositions, and you always want to have a
7  chance to object if you want to object, and Ms.
8  Citera and Mr. Stetler may have reason that they
9  want to object and want to lodge their objections,
10 so if you can give them an opportunity to do that
11 before you answer, that would be useful as well.
12         Another important thing is, I'm
13 trying to get factual testimony here, so if there
14 is anything unclear about my questions, feel free
15 to ask for clarification, and I will give it to
16 you, okay?
17     A.  Fine.  Do you actually want me to read
18 this?
19     Q.  No, I don't want you to read it.  I just
20 want you to thumb through it and see -- and tell me
21 whether or not you received a copy of this complete
22 subpoena, including the attachments.

Page 16

1      A.  I don't know.  I got this front page
2  electronically.  I happened to look at it today,
3  and I don't know what was behind it.
4      Q.  You got it electronically.  Did you
5  print it out?
6      A.  No.
7      Q.  So -- well, I probably know the answer
8  to this already, but I will ask you anyway.
9          If you go to the third page of the
10 attachment or Page 3 of the attachment, so the page
11 numbers are indicated on the bottom?
12     A.  Yes.
13     Q.  There are a bunch of requests for
14 documents there.
15         Did you look at this part of the
16 subpoena?
17     A.  No, I did not.
18     Q.  So you haven't done any search for any
19 documents related to any of these topics here that
20 you see here in your personal possession prior to
21 arriving at this deposition today?
22     A.  No, not regarding this subpoena.  I have

Page 17

1  done that for the others.
2      Q.  For the other subpoenas?  Which other
3  subpoenas are you referencing?
4      A.  I did it for West Virginia, and I did it
5  for Texas.
6      Q.  So in connection with those subpoenas,
7  you went and looked at your personal records to see
8  if you had any documents that related to the
9  subject matter of those litigations; is that fair
10 to say?
11     A.  Yes.
12     Q.  Did you find any documents in your
13 possession upon doing that search?
14     A.  No.
15     Q.  Since you have been deposed previously,
16 did you come into possession of any documents
17 relating to the subject matter of your testimony in
18 the West Virginia or Texas case?
19     A.  No.
20         MR. GOBENA:  That notwithstanding, I
21 would ask Mr. Stetler if he can look with your
22 client to see if he could check his files --

5  (Pages 14 to 17)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL              May 17, 2007
                      Philadelphia, PA

Page 18

1          MR. STETLER:  I will reconfirm with
2    him.
3          MR. GOBENA:  I appreciate it.
4          MR. STETLER:  What that means is,
5    you are going to read the attachment and be able to
6    verify that you don't have any documents.  I mean,
7    I realize we have been through this before, but --
8          THE WITNESS:  Okay, I will do that.
9    BY MR. GOBENA:
10       Q.  Let's go on to the next exhibit here.
11   This is going to be Exhibit Heggie 789, I believe.
12   I will let the court reporter mark that and then
13   provide copies for counsel.
14                     - - -
15          (Whereupon the court reporter marked
16   document as Exhibit Heggie 789 for identification.)
17                     - - -
18   BY MR. GOBENA:
19       Q.  Why don't you take a moment just to look
20   at this three-page document real quickly?  I will
21   ask you about specific parts of it, so you don't
22   have to read it in detail.

Page 19

1          If you go to the first page of the
2    document, which is -- at the top, it says Michael
3    Heggie, manager, reimbursement interoffice memo.
4          After looking at this document, does
5    this -- does this refresh your recollection as to
6    whether or not you prepared this memo?
7       A.  I would assume I did, since my name is
8    on there.
9       Q.  The memo is addressed to a J. Ward.
10          Who is the J. Ward to whom this is
11   addressed?
12      A.  John Ward is his name.  He is -- was the
13   general manager of -- oh, I forget -- Ward was
14   general manager of -- it is like -- I can't
15   remember the title is what I'm struggling for. It
16   was part of the Home Infusion Group, part of the --
17   we even had another name for it. Alternate site,
18   and Ward was general manager of some part of that.
19      Q.  Are you familiar with a group within
20   Abbott Labs' former -- it is the former now
21   Hospital Products Division called the Alt Site
22   Product Sales Group?

Page 20

1       A.  That was Ward.  Ward was Alternate Site
2    Product Sales.
3       Q.  And what was his title?
4       A.  General manager.
5       Q.  This document is dated September 26,
6    1994, and if you go to the second page of the
7    document, there is a section titled Pricing.
8          Do you see that there?
9       A.  Um-hum.
10      Q.  It says -- and this is you, I guess,
11   writing this memo.  You say:  I believe we could
12   save some money by tightening up the procedure on
13   the average selling price of the drug versus the
14   list price.
15      A.  Actual selling price.
16      Q.  Actual, good, thank you.  I appreciate
17   that.
18          What did you mean in that sentence?
19      A.  The actual selling price -- and you will
20   have to forgive me on this.  I haven't dealt with
21   Medicaid drug rebates since -- well, this was '94.
22   I probably last dealt with them in '98 or '99, so

Page 21

1    we are going back what?  10, 14 years here.
2          So my recollection is that we,
3    Abbott, sent in this -- created the selling price
4    by having in the selling price things that did not
5    need to be there by the Medicaid drug rebate rules.
6    We had not set up the system properly is my
7    recollection.
8       Q.  You said you had things -- let me see if
9    I can unpackage that, because there is a lot there.
10          What is it that you thought that you
11   had within the price that you were purporting for
12   the Medicaid Drug Rebate Program that shouldn't
13   have been there?
14      A.  I don't remember.
15      Q.  If we go through these documents, that
16   might help refresh your recollection, so let's go
17   to the next sentence.
18      A.  Sure.
19      Q.  You say that:  PPD calculates that AMP,
20   average manufacturers price, for reporting
21   services.
22          Let me ask you, did PPD at this time

6 (Pages 18 to 21)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 22

1  calculate the AMP for Hospital Product Division
2  products?
3     A.  Yes.
4     Q.  It says:  If we list the drug at $500,
5  but in reality, sell it for $250 because of
6  contracts, we are paying the rebate based partly
7  upon the $500 list price.
8           Is that consistent with your
9  understanding of what was happening at the time you
10  drafted this memorandum?
11     A.  Yes, to the best of my knowledge, to the
12  best of my recollection.
13     Q.  I want to go back to your answer
14  earlier, when you said the price that was being
15  reported as AMP for HPD products included some
16  things that it didn't mean to include.
17           Does that sentence refresh your
18  recollection as what you are getting at in that
19  statement earlier?
20     A.  I think some -- yes, some of it.
21     Q.  Okay, well, how?
22     A.  Well, because what I think was the way

Page 23

1  in which PPD calculated the price -- this is all I
2  can tell you -- the way in which PPD calculated the
3  price, I believed at the time was improperly
4  calculated, in my -- from my reading of the reg.
5     Q.  Was it because PPD was using a list
6  price as -- in reporting those prices AMP?
7           MS. CITERA:  Objection to the form.
8           THE WITNESS:  I don't remember.
9  BY MR. GOBENA:
10     Q.  Well, you say early on in that paragraph
11  -- the first sentence we read is that you thought
12  you could save money by tightening up the procedure
13  on actual selling price versus list price.
14           Is what you are getting at there
15  that list price was being used as part of the AMP
16  calculations, and now, that was the issue that you
17  wanted to address?
18           MS. CITERA:  Objection to form.
19           THE WITNESS:  There was something in
20  the calculation that I felt at the time was
21  incorrect.  That's the best I can help you with at
22  this point.

Page 24

1  BY MR. GOBENA:
2     Q.  Let's go back to that.  I guess it is
3  the third sentence there.  It says:  We are paying
4  the rebate based partly upon $500 list price.
5           That would suggest to me that you
6  are saying there that the list price was being used
7  as the basis -- was being used as the AMP upon
8  which rebates were being paid.
9           MS. CITERA:  Objection to form.
10           THE WITNESS:  Based partly upon the
11  $500 list price.  I don't know what I meant by
12  partly.  Now, at this point, I don't remember what
13  I meant by partly upon the $500 list price.
14  BY MR. GOBENA:
15     Q.  But -- okay.
16           This certainly reflects a concern on
17  your part that Abbott was paying too much in
18  rebates on Hospital Product Division drugs at that
19  time; isn't that correct?
20           MS. CITERA:  Objection to form.
21           THE WITNESS:  That's incorrect.
22  BY MR. GOBENA:

Page 25

1     Q.  What's incorrect about it?
2     A.  You are saying Abbott was paying too
3  much.
4     Q.  In rebates.
5     A.  Yeah, I didn't say that at all.  What I
6  said was Abbott was calculating the rebate
7  incorrectly, I thought.  Now, whether it was too
8  much or too little would have come out in the
9  calculations, in the redesign of the calculation or
10  the redoing of the calculation.
11     Q.  I see.
12           So what you are saying here is that
13  -- what you are proposing here is a way of saving
14  Abbott money in terms of finding a way to pay lower
15  rebates, as opposed to making a value judgment as
16  to whether or not the rebates that were being paid
17  were too much or too little?
18           MS. CITERA:  Objection to form.
19           THE WITNESS:  No.  Again, you are
20  misunderstanding.
21  BY MR. GOBENA:
22     Q.  Help me.

7 (Pages 22 to 25)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 26

```
 1      A.  Okay.  There is a calculation for
 2  Medicaid drug rebate, okay?  Are you familiar with
 3  that?  Are you familiar with the calculation?
 4          MR. STETLER:  He gets to ask the
 5  questions.
 6          THE WITNESS:  Oh, he gets to ask the
 7  questions.  I have done this before.  I'm sorry.
 8  I'm sorry.  I have done that before.  I apologize.
 9          There is a Medicaid drug rebate
10  calculation.  That calculation has, to the best of
11  my recollection, changed a few times.  The Feds
12  have changed it a few times.  In the calculation, it
13  is a rather complex formula, and what I was saying
14  was, I believed that we were calculating --
15  miscalculating based on the formula.
16  BY MR. GOBENA:
17      Q.  Okay.
18      A.  And that is all I was saying.
19      Q.  So you are saying the formula for
20  calculating rebates for drugs by the Medicaid drug
21  rebate was complicated?  That's your testimony?
22          MS. CITERA:  Objection to form.
```

Page 27

```
 1          THE WITNESS:  Yes.
 2  BY MR. GOBENA:
 3      Q.  What is the formula for calculating a
 4  rebate for a generic drug under the Medicaid Drug
 5  Rebate Program?
 6          MS. CITERA:  Objection to form.
 7          THE WITNESS:  I couldn't tell you.
 8  BY MR. GOBENA:
 9      Q.  Would you have known it back in 1994,
10  when you were generating this memorandum?
11      A.  No, I would not have known it off the
12  top of my head.  I would have had to have gone to
13  the reg and looked at the reg.
14      Q.  You were the manager for reimbursement
15  for Abbott's Hospital Products Division at the
16  time; isn't that correct?
17      A.  No, that is not correct.
18      Q.  Correct me again.
19      A.  Alternate Site.
20      Q.  For Alternate Site?
21      A.  Alternate Site, and only two divisions
22  within Alternate Site, not all of Alternate Site.
```

Page 28

```
 1  I was -- I had a dotted line to Ward, but my real
 2  responsibility was in the renal group.
 3      Q.  And who within Alternate Site would have
 4  been responsible for following or tracking issues
 5  related to the Medicaid Drug Rebate Program while
 6  you worked at Abbott?
 7      A.  Well, there would have been -- it would
 8  have started in PPD, and then there was a lady who
 9  worked directly in Ward's group, Cindy something.
10  And she followed them.  She reconciled them every
11  month or every quarter, every quarter, every
12  quarter.  And then I came along and got involved in
13  it.
14      Q.  The Cindy you referred to, is that Cindy
15  Dawson?
16      A.  Yes, it is.
17      Q.  All right.  Let's go on to the next
18  document.  Let's mark this as Exhibit Heggie 790.
19          - - -
20          (Whereupon the court reporter marked
21  document as Exhibit Heggie 790 for identification.)
22          - - -
```

Page 29

```
 1  BY MR. GOBENA:
 2      Q.  Why don't you take a moment to look over
 3  this one-page document?
 4      A.  (Witness complies.)
 5      Q.  Mr. Heggie, do you recognize this
 6  document?
 7      A.  Um-hum.  Yes, I do.  Sorry.
 8      Q.  Sure, I appreciate that.  You followed
 9  the instructions well there, giving a verbal
10  response.
11          The document is dated October 26,
12  1994.  That was a month after the last memorandum
13  we looked at; isn't that correct?
14      A.  Yes, correct.
15      Q.  And in the re line, it says Medicaid
16  rebates.
17          Do you see that there?
18      A.  Yes.
19      Q.  Did you report monthly to Mr. Ward about
20  Medicaid rebates or was this just a coincidence
21  that this memorandum came a month later?
22      A.  No, it is a complete coincidence.
```

8 (Pages 26 to 29)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 30

1    Q.  It says:  To J. Ward, which is John
2  Ward, I assume; is that correct?
3    A.  That's correct.
4    Q.  And a cc, D. Longley.  Who is D.
5  Longley?
6    A.  Debbie Longley worked along with Cindy
7  Dawson.  The two of them were the financial -- I
8  don't know how you would call them financial,
9  because there was a guy who did financial, but they
10  were sort of -- watched pricing and watched sales.
11    Q.  Sales by Alt Site?
12    A.  No, by Ward's group.
13    Q.  Ward's group, which was the Alt Site
14  Product Sales?
15    A.  Product.
16    Q.  By product, what do you mean?
17    A.  Product was -- the big thing was pumps,
18  actually, an ambulatory infusion pump, that was a
19  big thing for Ward, and then the other part of it
20  was the drugs that were outside of the hospital, so
21  the packaged drugs, things that could be -- there
22  was an Abbott system that I can't even remember the

Page 31

1  name of, where drugs were prepackaged, and they
2  could be delivered by ambulatory pump.
3    Q.  So the products covered both pumps and
4  certain drug packages; is that correct?
5    A.  Yes.
6    Q.  If you look at this memo that you
7  drafted, if you go down to the fourth item, it says
8  you needed to coordinate with respect to the
9  calculation of AMP and BP.
10        Do you see that there?
11    A.  Um-hum.  I'm sorry, yes, yes.
12    Q.  Your first sentence you write:  We must
13  have coordination with HPD and pricing of items on
14  the HCFA list, coordination between HPD?
15    A.  We must have -- we being Alternate Site.
16    Q.  Who at HPD did you feel like you needed
17  to coordinate with respect to the calculation of
18  AMP and BP?
19    A.  Oh, there were a bunch of people over
20  there.  Let's see.  The names that we have used in
21  the past two depositions are Jerry Eichhorn was
22  over there.  I will think of somebody else.  There

Page 32

1  were like two -- Charlie Mitchell.
2    Q.  How about Harry Adams?
3    A.  Oh, Harry Adams, yes, Harry Adams, to
4  some degree.
5    Q.  You say to some degree.
6        What do you mean by that?
7    A.  Well, I never understood what Harry did,
8  so I never had a lot of interaction with Harry.
9    Q.  What about Jerrie Cicerale?  Did you
10  interact with her?
11    A.  Yes, Jerrie Cicerale, however, was not a
12  decision maker.  Jerrie Cicerale was a -- it would
13  be unkind to call her a clerk, but she was a person
14  who put information into the system.
15    Q.  So when you are talking about
16  coordination with HPD between Alt Site and HPD,
17  what you are referring is coordination with Mr.
18  Eichhorn, Mr. Mitchell, maybe Mr. Adams; is that
19  correct?
20    A.  Yes.
21    Q.  And it says on the -- the rest of the
22  sentence reads:  On pricing of items on the HCFA

Page 33

1  list.
2        What did you mean by that last part
3  of the sentence, items on the HCFA list?
4    A.  Items that were subject to rebate.
5    Q.  So it is a clear record, HCFA is
6  H-C-F-A, which stands for the Health Care Finance
7  Administration.
8        Is that your recollection of what
9  that acronym stood for there?
10    A.  That's correct.
11    Q.  In that sentence, you say:  We must
12  adjust the prices we use for the AMP in particular,
13  so that there is not this huge discrepancy between
14  list price and sale price, thus forcing us to
15  rebate more than we need to.
16        Do you see that there?
17    A.  I do.
18    Q.  Let me try and break up that sentence
19  and ask you about parts of it.  When you say that
20  you -- you mention a huge discrepancy between list
21  price and sale price.
22        What were you getting at there?

9 (Pages 30 to 33)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 34

1          MS. CITERA:  Objection to form.
2          THE WITNESS:  Well, I don't recall a
3    discrepancy.  Huge is probably a bad word.  I don't
4    recall.  There was a discrepancy, to the best of my
5    recollection, it was a discrepancy, again, going
6    back to how the formula was calculated.
7    BY MR. GOBENA:
8          Q.  But I'm trying to understand which
9    discrepancy you are talking about here.
10          Are you saying that there is -- is
11    it your testimony -- are you talking about
12    discrepancy between the AMP and the rebates or are
13    you talking about a discrepancy between list price
14    and sales price?
15          MS. CITERA:  I object to the form.
16          THE WITNESS:  I believe that I was
17    referring to list price and sales price.
18    BY MR. GOBENA:
19          Q.  This document reflects your
20    understanding that there was, at the time, you
21    thought a huge discrepancy between list price and
22    sales price; isn't that correct?

Page 35

1          MS. CITERA:  Objection to form.
2          THE WITNESS:  At the time, I thought
3    there was a discrepancy, yes, whether huge -- huge
4    is a -- yes, I thought there was a
5    discrepancy.
6    BY MR. GOBENA:
7          Q.  It says huge, though, in the document?
8          A.  It does say huge in the document.
9          Q.  The rest of the sentence reads:  Thus,
10    forcing us to rebate more than we need to.
11          Does that part of the sentence or
12    this sentence reading it in total refresh your
13    recollection as to whether or not list price was
14    being reported as the AMP for HPD products around
15    in this time period, 1994?
16          MS. CITERA:  Objection to form.
17          THE WITNESS:  No, it does not.
18    BY MR. GOBENA:
19          Q.  Just closing up on this document, your
20    last deposition, some of your previous depositions,
21    you testified that you know what the term AWP
22    stands for; correct?

Page 36

1          A.  That's correct.
2          Q.  And in your previous depositions, you
3    also testified that you knew that the list price
4    was used in part to -- by the price compendia to
5    set AWP; is that correct?
6          MS. CITERA:  Objection to form.
7          THE WITNESS:  Yes, correct.
8    BY MR. GOBENA:
9          Q.  And you also testified that you were
10    familiar with the term spread.
11          Do you recall that testimony?
12          A.  Yes.
13          Q.  And the spread, as you testified, was
14    the difference between the AWP and the acquisition
15    cost for the drug; isn't that right?
16          MS. CITERA:  Objection to form.
17          THE WITNESS:  The spread is the
18    difference between the selling price and the
19    reimbursement price or the AWP that is used for
20    payment.
21    BY MR. GOBENA:
22          Q.  So in some respects, this discrepancy

Page 37

1    that you are talking about in this memo also is --
2    when you are talking about discrepancy between list
3    price and sales price, if there is -- I'm sorry.
4    Let me strike that whole question.
5          You are familiar with the formula,
6    too, that the price reporting compendia used to set
7    AWP for Abbott products off list price; correct?
8          A.  Correct.
9          Q.  So this discrepancy that you are talking
10    about here is, in effect, the spread minus the
11    percentage markup that was used by the price
12    reporting compendia; isn't that correct?
13          MS. CITERA:  Objection to form.
14          THE WITNESS:  Absolutely not.
15    BY MR. GOBENA:
16          Q.  How is it not?
17          A.  What I was referring to here was our
18    list price and the price that we were reporting in
19    the Medicaid drug rebate program.  AWP is no part
20    of this, and there is no way it can be brought into
21    this, from my perspective.
22          Q.  Sure, I understand your perspective.  I

10 (Pages 34 to 37)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL              May 17, 2007
                     Philadelphia, PA

Page 38

1  guess I'm just still a little confused, because you
2  used the word -- you talk about discrepancies
3  between list price and sale price.  Maybe you can
4  clarify what you mean by sale price in this
5  memorandum.
6      A.  Okay, sale price to me, when we would
7  talk about sale price, was every year, Abbott put
8  out a list price.  It was sheets of paper like this
9            (indicating).  In those days, it
10 was, anyway. And there was a list price.  Let's say
11 -- I can't think of anything right now, but let's
12 say a bag of saline.  It had a list price of -- I
13 don't know, $10.  Pick a number.  The sales price,
14 the selling price on it was not $10 overall.  Some
15 people may have paid $10, but not the majority of
16 clients.  So there was a sales price of, let's say,
17 $5.  That's what I'm talking about here.
18     Q.  Do you recall what the formula was that
19 the price reporting compendia -- pick one, Redbook,
20 Bluebook, whichever, what percentage they applied
21 to the list price to come up with Abbott's --
22 sorry, AWPs for the HPD drugs that you are familiar

Page 39

1  with?
2            MS. CITERA:  Objection to form.
3            THE WITNESS:  Yes.  To the best of
4  my recollection, it was 18.75 percent was how it
5  worked out, but there was a formula that Redbook
6  used, and I -- to the best of my recollection, it
7  was -- they did something where it was 25 percent,
8  and then you backed off part of the number, and you
9  got to what everyone -- most people thought was 20
10 percent, but it actually, in reality, when you did
11 it, became 18.75.  That's the best of my
12 recollection of that formula and how Redbook did
13 that.
14 BY MR. GOBENA:
15     Q.  So in this memo, again, to close the
16 loop on this memo, you talked about a discrepancy
17 between list price and sale price.
18         So sales price is closer to, I
19 guess, a contract price that you would have?
20         MS. CITERA:  Objection to form.
21         THE WITNESS:  Yes, correct, exactly.
22 BY MR. GOBENA:

Page 40

1      Q.  So when you say discrepancy between list
2  price and sales price, if the list price was -- if
3  the AWP was list plus 18.75 percent; is that
4  correct?
5      A.  Yes, yes.
6      Q.  So the spread would be the difference
7  between the reimbursement amount, whether it is
8  Medicare or Medicaid reimbursing and the sale
9  price; correct?
10         MS. CITERA:  Objection to form.
11         THE WITNESS:  Well, yes, but you are
12 way off in what you are trying to do.  Medicaid
13 rebates here have nothing to do with AWP.
14 BY MR. GOBENA:
15     Q.  Mr. Heggie, I understand that.  I
16 realize that, but in this document, you are
17 describing a discrepancy between list price and
18 sales price.
19     A.  For the purpose of calculating a
20 Medicaid rebate, correct.
21     Q.  So what you are suggesting here is that
22 Abbott should have been using something that

Page 41

1  reflected sales prices to be reported to the
2  Medicaid drug rebate program to then be used to
3  determine the rebate amount that Abbott should be
4  paying for the HPD drugs; isn't that right?
5         MS. CITERA:  Objection to form.
6         THE WITNESS:  No, I'm suggesting
7  that in the calculation for Medicaid drug rebates,
8  we were not doing it correctly.  That's all there is
9  here.  There is nothing more.
10 BY MR. GOBENA:
11     Q.  And just for clarity, why were you guys
12 -- why was Abbott HPD not doing it correctly in
13 terms of the price they were reporting for the
14 rebate program?
15     A.  I don't know.  I believe, when it was
16 set up, when the program was initially set up in
17 1990, the formula was changed a number of times,
18 and there were companies that didn't even -- people
19 -- I would talk to people at meetings where people
20 had a tough time understanding it. So I believe
21 that it was just prudent to look at it and make
22 sure we were doing it correctly.

11 (Pages 38 to 41)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 42

1    Q.  I will have this document marked as
2  Exhibit Heggie 791.
3          - - -
4          (Whereupon the court reporter marked
5  document as Exhibit Heggie 791 for identification.)
6          - - -
7  BY MR. GOBENA:
8    Q.  Take a look at that document.
9    A.  We have done this.
10   Q.  Okay, I understand.  This document is
11  dated November 23, 1994.  It is a letter to Mr. Al
12  Beachley.  Who is Mr. Beachley?
13   A.  Beachley.  Al Beachley was the guy who
14  ran the Medicaid drug rebate program.
15   Q.  In your first sentence, you say: Last
16  week, when we spoke on the phone, I told you that
17  Abbott was going to recalculate some of its AMPs.
18      What do you recall, if anything, of
19  the conversation you are referencing here in this
20  letter?
21   A.  I called him to tell him that I thought
22  we were doing this incorrectly, and I wanted him to

Page 43

1  appreciate that we wanted to get it right.  And
2  that was the whole point of the conversation.
3    Q.  What did you tell him about why you
4  thought Abbott was incorrectly reporting its AMP to
5  the Medicaid drug rebate program?
6          MS. CITERA:  Objection to form.
7          THE WITNESS:  I don't remember what
8  the conversation was.  I remember saying that we
9  were going to recalculate, because we thought we
10  had miscalculated.  That's all.
11  BY MR. GOBENA:
12   Q.  In this first sentence of the second
13  paragraph, you say: As you can appreciate, I do
14  not want to do anything that is either incorrect or
15  could cause the participation of Abbott
16  Laboratories to be in jeopardy.
17      What did you mean by that sentence?
18   A.  I meant that we want to make sure that
19  we are following the law, we are following the
20  Medicaid regs.
21   Q.  Did you have any concern, when you were
22  starting to look into this issue, that there might

Page 44

1  have been violations of Medicaid regs in terms of
2  what you were proposing to do to the AMPs that were
3  going to be reported?
4    A.  No.
5          MS. CITERA:  Let me stop for a
6  second.  To the extent any of your conversations
7  were with legal, I would instruct you not to
8  discuss any of those conversations that you had
9  with Abbott's legal department.  I don't know if
10  you did, but I'm just saying if you did.
11  BY MR. GOBENA:
12   Q.  I don't want to get into your
13  attorney-client communications, but I do want to
14  know, did you have any discussions with the legal
15  department of Abbott about this issue of
16  recalculating the AMPs for HPD products?  Just did
17  you?  I don't want to know the substance.
18   A.  I don't recall.  I'm trying to recall.
19  I don't know.  I don't recall.
20   Q.  It appears here that you reached out to
21  Mr. Beachley to discuss this issue before restating
22  any AMPs; isn't that correct?

Page 45

1    A.  Yes, correct.
2    Q.  And why did you reach out to him first
3  before Abbott just restating the AMPs for the HPD
4  products that you were concerned about?
5    A.  Because we wanted to put ourselves in
6  full compliance with the program, and if we were
7  doing anything wrong, we wanted to make sure that
8  we weren't, and we wanted to recalculate to the
9  best of our ability to understand the program and
10  understand the calculations.
11   Q.  But the ultimate goal of restating the
12  AMPs was to save Abbott money in terms of rebate
13  payments; isn't that correct?
14          MS. CITERA:  Objection to form.
15          THE WITNESS:  No.  Your
16  characterization is incorrect.  The intent was that
17  we were doing the calculations wrong.  Because of
18  the fact that we were doing it wrong, I thought we
19  could save money, if we were doing it correctly.
20  But I could have been wrong.  I don't know.  We had
21  to redo the calculations to be sure.  That was the
22  intent at the time.

12 (Pages 42 to 45)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

---

Page 46

1  BY MR. GOBENA:
2      Q.  So your testimony is that the intent of
3  the recalculation, proposed recalculation, was to
4  come into compliance with existing regs, and it
5  wasn't to save money, in terms of rebate payments?
6          MS. CITERA:  Objection to the form.
7          THE WITNESS:  Yes, the overall
8  intent would simply have been to make sure we were
9  doing it correctly.
10 BY MR. GOBENA:
11     Q.  Let me go back to an exhibit that was
12 previously marked as -- I have a bad habit
13 sometimes of not marking my own copy with exhibit
14 numbers.  It is the September 26, 1994 memorandum.
15     A.  It is Exhibit Heggie 789.
16     Q.  Back to that section where you talk
17 about pricing, you say:  I believe we could save
18 some money by tightening up the procedure on actual
19 selling price of a drug versus list price.
20         Do you see that there?
21     A.  I do.
22     Q.  So you are saying you think that

---

Page 47

1  recalculating the AMPs could save money, right?
2          MS. CITERA:  Objection to the form.
3          THE WITNESS:  I am saying that if I
4  understand the formula correctly, that's probably
5  the result.
6  BY MR. GOBENA:
7      Q.  There is nothing in this memorandum that
8  talks about regulatory compliance, is there?
9      A.  No, there is not; however, regulatory
10 compliance at Abbott was --
11         MR. STETLER:  He is going to tell
12 you to answer the question.
13         MR. ANDERSON:  Objection, move to
14 strike the side bar.
15         MR. STETLER:  I'm trying to help you
16 guys.  You want him to explain away, you are on
17 your own.
18         THE WITNESS:  I won't explain.
19 BY MR. GOBENA:
20     Q.  Let's go to -- let's go back to the
21 exhibit we were just looking at, this November
22 23rd, 1994 letter.

---

Page 48

1          You said:  As I studied the program,
2  I realized that the Hospital Products Division had
3  miscalculated the AMPs from the beginning.
4          When did you first start looking
5  into this issue of whether Abbott was
6  miscalculating the AMPs properly?
7      A.  I don't know.  It had to be prior to
8  this time, prior to September 26th, so I really --
9  but I don't really know.
10     Q.  Can you remind me again when you became
11 a manager of reimbursement within Alt Site?
12     A.  No, I don't know.  I don't remember.
13 But it was -- all of my time was in Alternate Site,
14 from the time I started at Abbott, so when I became
15 a manager, I don't really remember. Probably '93,
16 maybe.
17     Q.  In the second sentence, you say:  We
18 believe we have stated AMPs based upon the list
19 price.
20         Do you see that there?
21     A.  Um-hum.
22     Q.  Does this now refresh your recollection

---

Page 49

1  as to whether or not the issue with regard to the
2  calculation of the AMPs related to the fact that
3  Abbott was reporting for the Hospital Products
4  Division list price as AMP?
5      A.  Um-hum.
6          MS. CITERA:  Objection to the form.
7          THE WITNESS:  Yes.
8  BY MR. GOBENA:
9      Q.  In the next sentence, you say:  We have
10 not taken discounts into our calculation, and we
11 have not restricted the computations to the retail
12 class of trade.
13         Can you explain what you meant in
14 that sentence?
15     A.  Well, my recollection is that discounts
16 could be taken in the calculation and that there
17 are classes of trade that go into the calculation.
18 And I believe -- let me think about this for a
19 moment.
20     Q.  Take your time.
21     A.  I believe that it is only the retail
22 class of trade that you have to pick up in the

13 (Pages 46 to 49)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL               May 17, 2007
                         Philadelphia, PA

---

Page 50

1  calculation, and if I recall correctly, Abbott was
2  picking up more than just the retail class of
3  trade.
4      Q.  You just said that you understood that
5  discounts could be taken into the calculation of
6  the AMP.
7          Did I understand you correctly?
8      A.  Yes.
9      Q.  Where did you get that understanding
10  from?
11      A.  I don't know, probably the reg, more
12  than likely, reading the reg.
13      Q.  Do you recall whether or not you got
14  that understanding based on the conversation that
15  you had with Mr. Beachley that's referenced in the
16  first paragraph?
17      A.  No, I do not.
18      Q.  You next go on to say:  Our AMPs are
19  overstated, and we are paying higher rebates than
20  the law mandates.
21          I guess that reflects what you just
22  told me; is that correct?

---

Page 51

1      A.  Yes.
2      Q.  You then go on to say:  I want to make
3  perfectly clear that when I refer -- when I say we,
4  I refer to the Hospital Products Division.  The
5  Pharmaceutical Products Division has calculated
6  their products correctly.
7          Why is it that you say in this
8  letter that the Pharmaceutical Products Division
9  calculated their products correctly?
10          MS. CITERA:  Objection to the form.
11          THE WITNESS:  Because to the best of
12  my understanding, at the time, when we looked at
13  the formulas, their formula was calculated
14  differently from the formula for HPD.
15  BY MR. GOBENA:
16      Q.  So is it your testimony that PPD, we
17  will call it, did not base its AMP on list price?
18          MS. CITERA:  Objection to the form.
19          THE WITNESS:  No, I couldn't say
20  that at this point.  I couldn't -- my memory is not
21  that good.  What I'm saying is, to the best of my
22  recollection, Hospital Products was calculating it

---

Page 52

1  correctly to the reg, and the calculation they were
2  using for HPD was not correct.
3  BY MR. GOBENA:
4      Q.  Who is the -- which entity at Abbott was
5  it that was actually reporting the AMP to the
6  Medicaid Drug Rebate Program?
7      A.  PPD.
8      Q.  And so you are saying that PPD
9  calculated an AMP for its products one way, and HPD
10  calculated its AMPs for -- AMPs for HPD products
11  were calculated a different way?  Is that your
12  testimony, at this time, in 1994?
13      A.  Yeah, that's the best of my
14  recollection, yes.
15      Q.  On the second page, third paragraph, you
16  say:  If you would -- if you could, would you
17  please respond to this letter, I guess, so that we
18  can be assured that we are operating within the
19  program rules.
20          Do you see that there?
21      A.  Um-hum, I do.
22      Q.  So is it fair to say before any changes

---

Page 53

1  were going to be made to HPD AMPs, you wanted
2  preapproval from the Medicaid program to allow you
3  to make those -- to restate your AMPs?
4          MS. CITERA:  Objection to form.
5          THE WITNESS:  Yes, we were looking
6  -- we were looking for some sort of notification
7  from them that we had told them what was happening.
8  BY MR. GOBENA:
9      Q.  Had you restated the AMPs the way you
10  wanted to, it would have led to Abbott paying less
11  in rebates; isn't that correct?
12          MS. CITERA:  Objection to form.
13          THE WITNESS:  Yes, correct, it would
14  have.
15  BY MR. GOBENA:
16      Q.  I don't have a signed copy of this
17  letter.  There is no signature on this letter.
18          Do you know whether this letter was
19  just kept as a draft or whether it was actually
20  sent to Mr. Beachley, this November 23rd, '94
21  letter, to be specific?
22      A.  To the best of my knowledge, it went.

14  (Pages 50 to 53)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

Page 54

1     Q.  Let's go on to the next exhibit here,
2  which is Exhibit Heggie 792 now.  I will have the
3  court reporter mark that first, and here is a copy.
4          - - -
5          (Whereupon the court reporter marked
6  document as Exhibit Heggie 792 for identification.)
7          - - -
8  BY MR. GOBENA:
9     Q.  Take a moment to look that over, Mr.
10 Heggie.
11    A.  (Witness complies.)
12    Q.  This is a January 12, 1995 letter.  If
13 you go to the second page, your name is on there.
14 It is not a signed copy.
15          Do you recognize the letter?
16    A.  Yes, I do.
17    Q.  There seems to be some handwriting in
18 the -- sort of after the third paragraph.
19          Do you see that there?
20    A.  I do.
21    Q.  Do you recognize the handwriting?
22    A.  No.

Page 55

1     Q.  And there are also -- and there is also
2  that same handwriting at the bottom there.
3          The sentence where there is
4  handwriting next to it in the middle there says:
5  We are going to restate AMPs for the Hospital
6  Products Division.  And then there is that comment
7  there.
8          Do you recall discussing this letter
9  with any of your colleagues at Alt Site?
10    A.  Ward.
11    Q.  Did you give him a copy of the letter
12 before it went out?
13    A.  I'm sure I did.  I don't recall, but --
14    Q.  I mean, I know it is difficult, but
15 sitting here today, would you be able to recognize
16 Mr. Ward's handwriting, if you saw it?
17    A.  No.
18    Q.  So you don't know if that's Mr. Ward's
19 handwriting there or not?
20    A.  Correct, I do not.  And Mr. Ward, as you
21 probably know, is dead.
22    Q.  I understand that, yes.

Page 56

1          In your fourth paragraph, in this
2  draft, you say:  We must recalculate the AMPs for
3  the Hospital Products Division, because in some
4  cases, we are paying more in rebate than we are
5  being paid for the drug.
6          Do you see that there?
7     A.  Yes.
8     Q.  Do you remember which cases that
9  occurred, where you are paying in more rebate than
10 Abbott was actually being paid for the drug?
11    A.  No, not at all.
12    Q.  Would you have done the analysis of
13 whether, you know, comparing the rebate amounts
14 paid and the sales amount paid that would have
15 allowed you to make that statement?
16    A.  Would I have done the analysis?
17    Q.  Yes.
18    A.  No.
19    Q.  Who would have done the analysis of
20 comparing -- gathering the amount of rebate paid
21 and the amount that was actually being -- Abbott
22 was being paid for the drug?  Who would have

Page 57

1  collected that information?
2     A.  I don't know.  It would have come from
3  any of those people that we mentioned earlier.  It
4  would have come from Eichhorn, Harry, Cicerale,
5  Dawson.  What was the other one's name?
6     Q.  Longley?
7     A.  Longley.  It could have come from
8  anybody.
9     Q.  But someone just provided you
10 information that in some instances, rebate amounts
11 were higher than the actual sales amount, sales
12 price that Abbott was getting for the drug; is that
13 correct?
14    A.  Correct.
15    Q.  And you say in the next sentence:  This
16 is our error in our initial programming of the
17 software used to calculate the AMP for the products
18 coming from Hospital Products Division.
19          Do you see that there?
20    A.  Yes.
21    Q.  Sorry.  Let me reread that sentence:
22 This is our error in our initial programming of the

15  (Pages 54 to 57)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael              CONFIDENTIAL              May 17, 2007
                         Philadelphia, PA

Page 58

1   software utilized to calculate the AMP for the
2   products coming from the Hospital Products
3   Division.
4          Do you see that sentence there?
5      A.  I do.
6      Q.  It references software.
7          Do you remember what software was
8   used to calculate the AMPs for Abbott's Hospital
9   Products Division drugs?
10     A.  No, I do not.
11     Q.  Did you have personal knowledge of the
12  errors in the programming that's referenced in this
13  paragraph of the letter?  Did you know what the
14  error was referring to?
15     A.  Well, I don't know how to actually
16  answer that.  Did I know there was -- at the time,
17  yes, probably, probably, I knew what it was.
18     Q.  Well, there is a mention of a program
19  error.
20         Do you know now what that error was?
21     A.  No, but I would -- no.
22     Q.  What is your best guess as to what the

Page 59

1   programming error is that is referenced in this
2   paragraph?
3          MS. CITERA:  Objection to the form.
4          THE WITNESS:  The programming error
5   would have been the things that were being
6   captured; i.e., retail class of trade, other
7   classes of trade.  That would have been what I --
8   to the best of my recollection, I mean, that would
9   be the types of things that would spring into my
10  mind now, so I'm sure that's what was going on
11  there.
12  BY MR. GOBENA:
13     Q.  Was the fact that certain discounts were
14  being -- not being taken out of the list price that
15  was used as the basis for determining AMP one of
16  the errors that is being referenced here in this
17  sentence?
18         MS. CITERA:  Objection to the form.
19         THE WITNESS:  It may have been, yes,
20  probably so.
21  BY MR. GOBENA:
22     Q.  You go on to say that the error can be

Page 60

1   explained simply.  You say:  We misunderstood the
2   definition of average manufacturer price as it
3   appears on the original legislation.  We intend to
4   correct this past error immediately.
5          I think you have already given some
6   testimony now on how you believed you misunderstood
7   it.
8          Did your gaining of a proper
9   understanding come from your own research of the
10  Medicaid regulations?
11     A.  Yeah.  Yes.
12     Q.  Did you talk to anyone at Abbott, other
13  than Mr. Ward, about the issue of restating these
14  AMPs?
15     A.  Yes.
16     Q.  Who else besides Mr. Ward did you talk
17  about -- talk to about the restatement of the AMPs
18  that was being discussed here in '94 and '95?
19     A.  Well, specifically, I don't -- I
20  couldn't tell you, but it would have come from that
21  group of names.
22     Q.  So specifically, you remember discussing

Page 61

1   with Mr. Ward the restatement of the AMP issues, I
2   will call it?
3      A.  Yes, yes.  And I would have discussed it
4   more than likely with Dawson as well.
5      Q.  When it came -- did you have discussions
6   with Mr. Ward about the meaning of the term average
7   manufacturer price as it appeared in the
8   legislation as you referred to here in your letter?
9      A.  I can't recall.  It would seem as
10  though, yes, I would have, but I can't recall.
11     Q.  Would Mr. Ward have had to sign off on a
12  letter like this before it went out to --
13     A.  Yes.
14     Q.  Mr. Beachley?
15     A.  Yes, he would have.
16     Q.  And so if this letter went out, it would
17  have been with the approval of John Ward; correct?
18     A.  Correct.
19     Q.  And John Ward, again, was the general
20  manager for Alt Site Product Sales; correct?
21     A.  Correct.
22     Q.  If you go to the second page, you say

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL                May 17, 2007
Philadelphia, PA

Page 62

1  that -- if you go to the last paragraph before you
2  say, sincerely, Michael Heggie, the first sentence
3  reads:  It was a pleasure to meet both you and Sue
4  Gaston in Washington last week.
5        Do you see that?
6     A.  I do.
7     Q.  This letter is dated January 12, 1995.
8        Do you recall having a meeting with
9  Mr. Beachley and Ms. Gaston in Washington regarding
10  this issue in January of 1995?
11     A.  Well, I recall going to, at the time,
12  HCFA, and if you are asking -- rephrase the
13  question.  I mean, did I meet them in Washington?
14  No.  I don't know if I met them in Washington or if
15  I met them in Baltimore.  Now, if you are asking
16  me, I may have met them at a conference.
17     Q.  But to the best of your recollection,
18  you recall having a meeting with Sue Gaston and Mr.
19  Beachley in January of 1995, an in-person meeting?
20        MS. CITERA:  Objection to form.
21        THE WITNESS:  No.  I can tell you
22  what I recall.  I recall going to the Medicaid Drug

Page 63

1  Rebate Program once at one time. Now, whether
2  that's the time that I am referring to here or not,
3  I could not say.  And if I met them together, my
4  inclination is that I met them at a meeting, rather
5  than at HCFA in Baltimore.
6  BY MR. GOBENA:
7     Q.  What do you mean when you say you met
8  them at a meeting, as opposed to in HCFA in
9  Baltimore?
10     A.  Well, in the reimbursement world, in
11  lots of things in the medical world, there are
12  these conferences where people speak. I'm going to
13  one in July, a guy named Furro, Furro, who is head
14  of the -- at CMS, head of the coverage division.
15  He is going to be there.  You meet people.  There
16  is lots of these types of things where somebody
17  from DOJ will come and speak. And they may have
18  been there. I'm not sure.
19     Q.  You say in the paragraph above that: As
20  I mentioned to both you and Sue Gaston, I also
21  believe that Abbott products -- Hospital Products
22  Division is paying rebates for products which are

Page 64

1  not meant to be captured in this legislation.
2        Does that sentence refresh your
3  recollection as to whether or not you discussed
4  this rebate or AMP restatement issue with Ms.
5  Gaston and Mr. Beachley around the time this letter
6  was drafted?
7     A.  Well, there were several discussions,
8  and there was a discussion with Al Beachley and Sue
9  Gaston, telephone discussions, so --
10     Q.  To the best of your recollection, what
11  do you remember telling Sue Gaston about this
12  rebate AMP restatement issue?
13     A.  I would have said to Sue Gaston the same
14  things that I said to Beachley, which was that we
15  miscalculated, misstated. That's all.  And there
16  would have been elaboration on that, but at this
17  point, I cannot remember.
18     Q.  Do you have any recollection of what Sue
19  Gaston may have told you about what to do going
20  forward based on your statements to her about the
21  miscalculations of the rebates or the AMPs?
22     A.  No.  I mean, there was no -- there was

Page 65

1  no push-back from either of them that I recall.
2  They were appreciative that we were so up front.
3  They were appreciative that we put them on notice.
4  And we went forward.
5     Q.  Do you recall them ever approving like
6  affirmatively Abbott's specific plan to restate the
7  AMPs for the Hospital Products Division products at
8  issue?
9     A.  No.  What I recall that would be the
10  most affirmative from them would be that I told
11  them that we were then going to have credits in
12  this restatement, and either one of them said,
13  well, that's fine, if the calculation is wrong, and
14  you have got the credits coming, then the credits
15  are yours.
16     Q.  One more exhibit here.  I am only going
17  to spend a few seconds on this one.  It is very
18  short.
19        ---
20        (Whereupon the court reporter marked
21  document as Exhibit Heggie 793 for identification.)
22        ---

17 (Pages 62 to 65)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

---

Page 66

1  BY MR. GOBENA:
2      Q.  I actually was torn as to introduce this
3  as an exhibit or not.  The reason why I put it in
4  there, there is a reference to -- well, it is sent
5  first to Brian Taylor.
6              Who is Brian Taylor?
7      A.  Brian Taylor is legal.  He was one of
8  the lawyers.
9      Q.  So without getting into the substance of
10  the discussions, does this refresh your
11  recollection as to whether or not you had
12  discussions with legal about this proposed
13  restatement of AMPs?
14      A.  No, it does not.  What it does is, it
15  tells me that I sent the letter to Brian for him to
16  look at.
17      Q.  You said Brian was legal.
18          Do you know, was he an attorney?
19      A.  Yes, yes.  I believe he is maybe even
20  still there.
21      Q.  So you enclose a letter -- it says here:
22  Enclosed is the letter I intend to send to HCFA --

---

Page 67

1  sorry.  It says:  Brian, enclosed is the letter I
2  intend to send to HCFA on Friday, January 27.  You
3  said:  Could you comment or make corrections as you
4  see fit?  If I don't hear from you, I will send it
5  as is.
6              I don't want to know the substance
7  of the comments or corrections, but did you get any
8  comments or corrections back from Mr. Taylor
9  regarding this letter that is referenced in this
10  e-mail?
11      A.  I don't recall.
12      Q.  I will have this one marked as Exhibit
13  Heggie 794.
14          - - -
15          (Whereupon the court reporter marked
16  document as Exhibit Heggie 794 for identification.)
17          - - -
18  BY MR. GOBENA:
19      Q.  Just look it over.  It is a one-page
20  letter.  Why don't you look over it real quickly
21  here?  Dated February 7, 1995.  It is not signed.
22  So I'm not sure if it is a draft or if it was sent

---

Page 68

1  out.
2              What I want to first direct your
3  attention to, Mr. Heggie, is, there is a note in
4  the top right corner there.
5              Do you see that?
6      A.  Yes, I do.
7      Q.  And in the middle of that note, it says
8  J.W.
9              Do you see that?
10      A.  That's John Ward's signatures.
11      Q.  Okay, so does this -- based on that
12  signature, does this refresh your recollection as
13  to whether or not this may be his handwriting on
14  this draft letter here?
15      A.  Yes, I would assume it is.
16      Q.  So let's go to the substance of the
17  letter.  It says -- it is a letter that is
18  addressed to Al Beachley of the Medicaid Drug
19  Rebate Program.
20              You say:  Dear Al, I want to thank
21  you and Larry Reed for talking to me this
22  afternoon.

---

Page 69

1              Do you recall the conversation
2  that's being reflected in that sentence of this
3  letter?
4      A.  No, not the specific conversation, but
5  that goes back -- that references back to where I
6  also said to Sue Gaston that they were telling us
7  to do what we believed was correct.
8      Q.  You never clarified.  Who was Sue Gaston
9  again?
10      A.  To the best of my knowledge, she was
11  Beachley's deputy.
12      Q.  You mention in this letter Larry Reed.
13              Who is Larry Reed?
14      A.  I don't know.  Worked for Al Beachley.
15  Larry Reed, to the best of my recollection, had
16  something to do with calculations.  That's why he
17  was on that call, I think, but I don't recall for
18  sure.
19      Q.  You say:  I would like to restart --
20  start the restatement as soon as possible.
21              So at this stage, in February 1995,
22  Abbott hadn't actually restated the AMPs for the

---

18 (Pages 66 to 69)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL            May 17, 2007
Philadelphia, PA

---

Page 70

1   Hospital Product Division drugs; correct?  Restated
2   the AMPs for the Hospital Products Division drugs;
3   is that correct?
4        A.   It would appear so from this letter.
5        Q.   Now, if we go to the third paragraph, I
6   realize there is some notes and edits here, but
7   looking at the text, the printed text, it says: The
8   number of products for which we are restating is
9   small.
10            Do you remember approximately how
11  many products Abbott was going to be restating the
12  AMPs for?
13       A.   No, no idea.
14       Q.   You say: Therefore, I believe the
15  restatement of the AMP will -- originally, you have
16  cause a decrease, and it was stricken out there by
17  someone's handwritten notes -- that will -- sorry.
18  The restatement of the AMP will to the program --
19  will cause a decrease to the program of 200,000 to
20  $300,000 over the course of the year.
21            Did you do the calculations
22  underlying this sentence reflecting the impact of

---

Page 71

1   the restated AMPs?
2        A.   No, I did not.
3        Q.   Who would have done those calculations?
4        A.   The same group.
5        Q.   When you say same group, you are talking
6   about either Mr. Eichhorn or Mr. Adams or Ms.
7   Dawson or Ms. Longley?  One of those people?
8        A.   One or all.
9        Q.   Or all.
10            Do you recall having any meetings
11  where you discussed the financial impact of the
12  restatement of the AMPs, for the Hospital Product
13  drugs at issue?
14       A.   An actual meeting?
15       Q.   Yes.
16       A.   No, I don't recall an actual meeting.
17       Q.   Did you use e-mail in 1994, '95, when
18  you were working at Abbott Labs?
19       A.   Not a lot.  We used it, but not a lot.
20  Voice mail was used more.
21       Q.   Do you recall whether there were e-mails
22  about this issue that were sent, the restatement of

---

Page 72

1   the AMP issue?
2        A.   No, I do not recall specifically, no, I
3   don't know, if there were or not.  Very well could
4   be.
5        Q.   You go on in the rest of this draft to
6   say:  Again, thanks for the help.  I look forward
7   to your response, so that I can go forward with
8   this recalculation.  I would like to see the
9   transmission for the first quarter of 1995 reflect
10  these changes.
11            What kind of a response were you
12  looking for from Mr. Beachley?
13       A.   We were looking for a letter of
14  confirmation of some sort.
15       Q.   Confirmation?  Confirming what would
16  this letter confirm?
17       A.   Just confirming the conversation that we
18  were -- that we had told them what we were doing,
19  and that we were going forward with it.
20       Q.   Let's go to the comments on the top
21  right corner.  It says:  Mike, looks good.
22            Do you recall discussing this draft

---

Page 73

1   letter with Mr. Ward, who I believe you said you
2   think this is his handwritten comments here on the
3   letter?  So do you recall discussing this draft
4   letter with him?
5        A.   No, not specifically, this particular
6   letter, no, I don't.
7        Q.   So when he says looks good, what do you
8   think he meant by that?
9        A.   I don't know.  I would think he thought
10  the letter looked fine.
11       Q.   He goes on to say:  Can we get a more
12  detailed analysis of the impact?
13            Do you see that there?
14       A.   I do.
15       Q.   If he asked you to do that, who would
16  have gone to to get that kind of detailed analysis
17  of the impact of restating the AMPs for these
18  Hospital Products Division drugs?
19            MS. CITERA:  Objection to form.
20            THE WITNESS:  Same group. I'm sorry.
21  BY MR. GOBENA:
22       Q.   When you say same group, are you talking

19 (Pages 70 to 73)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL                May 17, 2007
                          Philadelphia, PA

Page 74

1   about --
2      A.  Eichhorn, Adams, Charlie Mitchell,
3   Cicerale, Dawson, Longley.
4      Q.  In his next sentence, he says:  I would
5   like 80 percent plus assurance that the 200 to 300,
6   I guess thousand figure is correct.
7           Do you see that there?
8      A.  I do.
9      Q.  Do you know what he meant by the 80
10  percent assurance of the accuracy of that estimate?
11          MS. CITERA:  Objection to form.
12          THE WITNESS:  He was looking for
13  some assurance that that was what it was going to
14  be.
15  BY MR. GOBENA:
16     Q.  Did you go and collect the information
17  -- collect the detailed analysis that he asked for
18  here of the impact the restatement of the AMPs?
19          MS. CITERA:  Objection to the form.
20          THE WITNESS:  I don't recall.
21  BY MR. GOBENA:
22     Q.  Do you recall whether you were ever able

Page 75

1   to give him the kind of assurance he was looking
2   for in terms of comfort in that impact to Abbott of
3   the restatement of the AMPs in this time period?
4           MS. CITERA:  Objection to form.
5           THE WITNESS:  No, I do not recall.
6   BY MR. GOBENA:
7      Q.  In the PS, right beneath his initials
8   there, you see it says:  You should also let PPD
9   know where we stand.
10          Do you see that there?
11     A.  I do.
12     Q.  Do you know what he meant by that
13  statement?
14          MS. CITERA:  Objection to form.
15  BY MR. GOBENA:
16     Q.  Did PPD know what you were proposing to
17  do in terms of a restatement of Abbott's Hospital
18  Product Division drugs' AMPs?
19     A.  Yes.
20          MS. CITERA:  Objection to form.
21  BY MR. GOBENA:
22     Q.  Did they know that before you started

Page 76

1   having these conversations with Mr. Beachley and
2   his colleagues at the Medicaid Drug Rebate Program?
3           MS. CITERA:  Objection.
4           THE WITNESS:  Well, they would have
5   known, because they were the keeper of the formula,
6   and they were the keeper of the software.  So they
7   would have known, yes.
8           MR. GOBENA:  I will have this
9   document marked as Exhibit Heggie 795.
10          - - -
11          (Whereupon the court reporter marked
12  document as Exhibit Heggie 795 for identification.)
13          - - -
14  BY MR. GOBENA:
15     Q.  Mr. Heggie, what I want you to do is
16  compare Exhibit Heggie 794 to Exhibit Heggie 795.
17  And then, if you could, could you tell me whether or
18  not Exhibit Heggie 795 is the final version of the
19  letter we looked at that was Exhibit Heggie 794?
20     A.  No, I cannot tell you that.
21     Q.  Well, you see that Exhibit Heggie 795 is
22  signed.

Page 77

1           Do you see that there?
2      A.  Yes, I do.
3      Q.  So is it fair to say this letter was
4   sent to Mr. Beachley then?
5           MS. CITERA:  Objection to form.
6           THE WITNESS:  At this point, I don't
7   know.  I mean, it is fair to say I signed it.
8   BY MR. GOBENA:
9      Q.  Did you ever sign letters that you
10  didn't send out?
11          MS. CITERA:  Objection to the form.
12          THE WITNESS:  I don't recall.  I
13  mean, I may have.  I don't --
14  BY MR. GOBENA:
15     Q.  Why don't we read the first paragraph of
16  Exhibit Heggie 794, where you say -- this is February
17  7, 1995 unsigned letter, the handwritten comments on
18  there.
19          You say:  I want to thank you and
20  Larry Reed for talking to me this afternoon.  I
21  would like to start the restatement as soon as
22  possible.

20 (Pages 74 to 77)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL              May 17, 2007
                        Philadelphia, PA

Page 78

1        Do you see that there in Exhibit
2    Heggie 794?
3        A.  I do.
4        Q.  And on Exhibit Heggie 795, which is dated
5    February 9, 1995, two days later -- let's go off
6    the record.
7        THE VIDEO TAPE OPERATOR:  Off the
8    video, 4:13.
9        ---
10       (Whereupon a short break was taken
11   at this time.)
12       ---
13       THE VIDEO TAPE OPERATOR: Back on the
14   video, 4:29.
15   BY MR. GOBENA:
16       Q.  I believe, before we got interrupted
17   earlier, there was a question pending.  So if we
18   can have the court reporter read back the last
19   thing that was recorded prior to us going of the
20   record?
21       MS. CITERA:  And I also think we
22   should determine if they want to make an

Page 79

1    appearance.
2        MR. GOBENA:  That's a good point.
3    Thank you, Tony.
4        Before we get to the question, I
5    would like to ask the counsel who is on the phone,
6    I believe it is an attorney for Dickstein Shapiro
7    representing Baxter to make an appearance, identify
8    herself for the record.
9        MS. HALL:  Certainly.  This is Lisa,
10   L-I-S-A, last name Hall, H-A-L-L, for Dickstein
11   Shapiro.
12       MR. GOBENA:  And Ms. Hall, you are
13   representing Baxter; isn't that correct?
14       MS. HALL:  That's correct, we
15   represent Baxter.
16       MR. ANDERSON:  And this is Jarrett
17   Anderson.  I am counsel for the relator.  I have
18   been here since the beginning of this deposition,
19   but I was not here earlier today for the other
20   deposition, and I'm here on behalf of the relator
21   in the context of the federal Abbott case and the
22   California case.

Page 80

1        MR. SISNEROS:  I am Eliseo Sisneros
2    for the State of California also, and I would just
3    like to comment that while I don't have an
4    objection to Baxter's counsel making the telephonic
5    appearance at this Abbott deposition, I would not
6    in any way want it construed that Baxter counsel
7    appearing by telephone here in any way is a waiver
8    of California's right to depose Mr. Heggie at a
9    later date on the Baxter case.  California will not
10   be putting forth any questions regarding Mr.
11   Heggie's activities while employed with Baxter.
12   Our interest in this deposition is solely with his
13   employment at Abbott.
14       MR. ANDERSON:  And I join in that
15   position.
16       MS. NESBITT:  The MDL Plaintiffs for
17   the State of Arizona join as well.
18       MS. HALL:  Noted.
19       MR. ANDERSON:  Okay, let's forge
20   ahead.
21       MR. GOBENA:  Now, if we could have
22   the court reporter read back the last question,

Page 81

1    which I believe was pending, before we got
2    interrupted a few minutes ago?
3        ---
4        (Whereupon the court reporter read
5    back the pending question.)
6        ---
7    BY MR. GOBENA:
8        Q.  Let me start from the beginning, that
9    line of questioning, it got, I think, garbled up by
10   the interruption we had.
11       Let's go to Exhibit Heggie 794, okay?
12   Which is the letter, dated February 7, 1995, with
13   handwritten notes on it.
14       Do you see that there?
15       A.  I do.
16       Q.  If you read the first sentence,
17   underneath Dear Al, where it says:  I want to thank
18   you and Larry Reed for talking to me this
19   afternoon.  I would like to start the restatement
20   as soon as possible.
21       Do you see that?
22       A.  I do.

21 (Pages 78 to 81)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL              May 17, 2007
                          Philadelphia, PA

Page 82

1    Q.   If you go to Exhibit Heggie 795, it says:
2  I want to thank you and Larry Reed for talking to me
3  this afternoon -- talking to me yesterday
4  afternoon.  I would like to start the restatement
5  as soon as possible.
6        Do you see that?
7    A.   Yes, I do.
8    Q.   The only difference between these two
9  sentences and these two exhibits is the word this
10 being changed to yesterday; isn't that correct?
11   A.   Yes.
12   Q.   Does this refresh your recollection as
13 to whether or not Exhibit Heggie 794 was a previous
14 draft of Exhibit Heggie 795?  Notwithstanding --
15   A.   No.  I mean, I think it speaks for
16 itself.  They are the same letter or similar
17 letter.
18   Q.   Is there any reason to believe that you
19 sent two letters out to Mr. Beachley, one on the
20 7th and one on the 9th, regarding the restatement
21 of Abbott's AMPs for its Hospital Products Division
22 products?

Page 83

1    A.   No.
2    Q.   If you go to the third paragraph of
3  Exhibit Heggie 795, the signed letter?
4    A.   Yes.
5    Q.   If you read the second -- sorry.  If you
6  read the first sentence, let's do that first, you
7  say:  The overall number of products on which we
8  are restating is small; therefore, I believe the
9  restatement of the AMP will have an impact on the
10 program of 200 to $300,000 over the course of the
11 year.
12       Do you see that language there?
13   A.   I do.
14   Q.   That's similar to what's reflected in
15 Abbott -- I'm sorry, what was reflected in Exhibit
16 Heggie 794 in terms of the impact on Abbott of
17 restating the AMPs; isn't that correct?
18   A.   The impact is to the program.
19   Q.   The impact -- there is an impact on
20 Abbott, too.  It is going to be paying less rebates
21 in an amount that reflects that 200 to $300,000 in
22 that sentence; correct?

Page 84

1        MS. CITERA:  I object to the form.
2        THE WITNESS:  Yes.
3  BY MR. GOBENA:
4    Q.   In Exhibit Heggie 795, continuing with that
5  one, it says:  However, without going all the way
6  through the entire recalculations, you cannot be
7  certain.
8        Are you saying that you cannot be
9  certain about the 200,000 to $300,000 potential
10 impact that would come from restating Abbott's
11 Hospital Product Division AMPs?
12   A.   Yes.
13   Q.   So then, in the next clause of that
14 sentence, you say:  The impact could be as much as
15 $500,000.
16       Do you see that there?
17   A.   I do.
18   Q.   On what did you base that sentence in
19 this letter?
20   A.   I don't recall at this point.
21   Q.   But you wouldn't have done the analysis
22 in terms of -- the impact analysis that would

Page 85

1  relate to this AMP restatement; correct?  You would
2  not have done it yourself?
3    A.   I would not have done that, correct.
4    Q.   One of the members of the group that you
5  testified about earlier; correct?
6    A.   Yes, if there is this number, yes, this
7  number was done by someone other than me.
8    Q.   Let's have this marked as Exhibit Heggie
9  796.
10       - - -
11       (Whereupon the court reporter marked
12 document as Exhibit Heggie 796 for identification.)
13       - - -
14 BY MR. GOBENA:
15   Q.   Do you recognize this document, Mr.
16 Heggie?
17   A.   Yes, I do.
18   Q.   It appears to be a letter, dated
19 February 4, 1995, and the addressee on the letter
20 is Mike Keogh, K-E-O-G-H.
21       Do you see that there?
22   A.   I do.

22  (Pages 82 to 85)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 86

1    Q.  Who was Mr. Keogh?
2    A.  He worked for Beachley.  Mike Keogh,
3  Larry Reed, Sue Gaston, all those people worked for
4  Beachley.
5    Q.  And you go down further in the letter,
6  underneath the greeting part of the letter, and you
7  say:  As per our conversation this morning, I
8  understand that I have your approval to proceed
9  with the restatement of the AMPs for the Hospital
10  Products Division at Abbott Laboratories.
11    Do you see that there?
12    A.  I do.
13    Q.  Do you recall that conversation that you
14  had with Mr. Keogh, apparently, on February 24,
15  1995?
16    A.  No, I do not.
17    Q.  But do you recall at some point, though,
18  that Abbott got a response from the Medicaid Drug
19  Rebate Program, saying that -- acknowledging that
20  it was going to be doing a restatement of its AMPs?
21  You remember some sort of response from the agency?
22    A.  No, we were always looking for a

Page 87

1  response.  This -- I remember Mike Keogh now,
2  seeing this letter, but I couldn't tell you what
3  the conversation was, but it obviously was good
4  from our perspective, anyway.
5    Q.  You are saying in this letter:  I
6  understand that I have your approval to proceed.
7    Do you see that there?
8    A.  Right.
9    Q.  Is there any reason to doubt, sitting
10  here today, that you thought you had the approval
11  in 1995 when you drafted this letter?
12    A.  No, no, absolutely not.
13    Q.  At the top, you see there is some
14  handwritten notes, or actually, there is two sets
15  of handwritten notes.
16    Do you see that?
17    A.  I do.
18    Q.  Going to the one -- going to the
19  handwritten notes that seem to be larger sort of
20  script there?
21    A.  Right.
22    Q.  "John, FYI, now, the fun starts."

Page 88

1    Do you know who wrote that note here
2  on this draft letter?
3    A.  That looks like my handwriting.
4    Q.  So does that reflect the fact that you
5  had forwarded this draft letter to John Ward to
6  review?
7    MS. CITERA:  Objection to form.
8    THE WITNESS:  It reflects that I was
9  notifying Ward in some way.
10  BY MR. GOBENA:
11    Q.  When you say that now, the fun starts,
12  what did you mean?
13    A.  I meant the craziness of having to do
14  this, the difficulty of this.
15    Q.  And who is actually going to be doing
16  the mechanical work related to the restatement of
17  the AMPs for Abbott's Hospital Products Division?
18    A.  Somebody in PPD or Dawson or Longly.
19    Q.  At the top of this document, it says:
20  Mike, congratulations and thanks.  Can you help me
21  estimate impact on 1995 (credits) and it has a J.W.
22  underneath that.  Underneath that, it has initials

Page 89

1  J.W.
2    Do you recognize that note as
3  reflecting John Ward's handwriting?
4    A.  Yes, that would be John Ward's.
5    Q.  He asked you to help him estimate the
6  impact in 1995.
7    Do you recall what impact he is
8  referring to?
9    A.  Sure.  The program -- you have to accrue
10  for the rebates within your own budgets.  And so if
11  he was accruing, let's say, a million dollars, and
12  we were going to save 200,000, that's what he wants
13  to know.  Does he not -- can he now approve 800,000
14  or some number, X.
15    Q.  Do you recall today -- you said that --
16  if I believe I understood your testimony correctly,
17  you said that someone in PPD would have done the
18  mechanical processes involved in restating the
19  AMPs; is that correct?
20    A.  Yes.
21    Q.  Do you recall who in PPD it was who
22  actually did that?

23  (Pages 86 to 89)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 90

1    A.  No, I do not.
2    Q.  I will have this document marked as
3  Sebree -- I'm sorry, Plaintiff's Exhibit -- long
4  day. I am losing my mind here.  I believe it is
5  Exhibit Heggie 797.
6              - - -
7        (Whereupon the court reporter marked
8  document as Exhibit Heggie 797 for identification.)
9              - - -
10 BY MR. GOBENA:
11   Q.  Why don't you take a moment to review
12 this interoffice correspondence?
13   A.  (Witness complies.)
14   Q.  I won't ask you a whole lot of questions
15 about this document, so why don't I just go ahead,
16 so we don't spend too much time on it.
17        It says in the front line at the top
18 right, it is from Chris Hogan.
19        Who is Chris Hogan?
20   A.  Well, Chris Hogan, it was a lady that
21 worked for Ward.  I don't remember what Chris Hogan
22 did.

Page 91

1    Q.  And this memorandum is to you.  And
2  beneath the to line, there is a cc to Bob Stellar
3  and Mike Carlin.
4        Who is Bob Stellar?
5    A.  No idea.  Don't recall.  I at least
6  don't recall now.  Or Mike Carlin, either.
7    Q.  If you read the first sentence, it says:
8  Michael, in our meeting last Wednesday, May 29th,
9  we discussed two issues, including changes to the
10 class of trade for eligible sales that were
11 included in the calculation of --
12   A.  Yes.
13   Q.  Do you recall that?
14   A.  I do.
15   Q.  Does looking at this document refresh
16 your recollection as to who may have worked on the
17 mechanical process restating the AMPs?
18   A.  No, it does not.
19   Q.  You don't know whether Chris Hogan was
20 actually involved in the process of mechanically
21 restating the AMPs for Abbott's Hospital Products
22 Division drugs?

Page 92

1        MS. CITERA:  I object to the form.
2        THE WITNESS:  No, I do not.
3  BY MR. GOBENA:
4    Q.  Mr. Heggie, if I understood your prior
5  testimony in the West Virginia and Texas cases, it
6  was -- one of your responsibilities was to track
7  legislation and regulations related to the
8  reimbursement for Abbott's drug products, at least
9  for Alt Site; is that correct?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  Yes, correct.
12 BY MR. GOBENA:
13   Q.  And you would -- in the process of doing
14 that job, would you make sure you kept abreast of
15 all the regulations that came down relating to,
16 let's say, Medicare reimbursement for drugs?
17       MS. CITERA:  Objection to the form.
18       THE WITNESS:  Yes, I would try to.
19 BY MR. GOBENA:
20   Q.  And would you try and keep track of all
21 -- any legislative initiatives that were going
22 forward with respect to Medicare reimbursement for

Page 93

1  drugs?
2    A.  Yes.
3    Q.  Would the same be true for Medicaid
4  reimbursement for drugs?
5    A.  No.
6    Q.  So you didn't -- none of the research or
7  work that you did as a manager for reimbursement
8  related to tracking Medicaid reimbursement for
9  drugs?
10       MS. CITERA:  Objection to the form.
11       THE WITNESS:  No.
12 BY MR. GOBENA:
13   Q.  Purely Medicare?
14   A.  Of the research -- your question was on
15 research and legislation?
16   Q.  Sure.
17   A.  Yes, it would be Medicare.
18   Q.  But you had an aware of necessary of how
19 Medicaid programs reimbursed, though, for drugs;
20 isn't that correct?
21   A.  I had a general awareness of how
22 Medicaid programs -- yes.

24  (Pages 90 to 93)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 94

1    Q.  But let's stick with Medicare for right
2  now.
3         Did you -- were you involved in any
4  discussions within Abbott involving people from
5  other divisions regarding Medicare reimbursement at
6  any point when you were employed by Abbott Labs?
7         MS. CITERA:  Objection to the form.
8         THE WITNESS:  I -- yes, yes, yes.
9  Now, I -- yes, yes, yes.
10 BY MR. GOBENA:
11   Q.  You say yes.  Can you please describe
12 those discussions that you were involved in with
13 people from other divisions at Abbott relating to
14 Medicare reimbursement?
15        MS. CITERA:  Objection to the form.
16        THE WITNESS:  No, I can't, not at
17 all.  Your question to me -- and the reason I was
18 waiting was, you said did you have discussions.
19 Yes, I did have discussions.  What those
20 discussions were, I couldn't remember, but I do
21 remember talking to a lady in PPD, two ladies in
22 PPD, about Medicare issues.

Page 95

1  BY MR. GOBENA:
2    Q.  Do you recall who those two ladies in
3  PPD were?
4    A.  No.  I can see both of them, but I can't
5  remember their names at all, but I can actually
6  picture them.
7    Q.  Were one of those ladies that you
8  referred to, was one of them Deb DeYoung?
9    A.  Yes, Deb DeYoung, the blonde, right.
10 Yes.  There is a blonde and there is a brunette in
11 my picture.
12   Q.  So did you have regular discussions with
13 them about Medicare reimbursement issues or did you
14 just have sporadic conversations -- discussions
15 with them about Medicare reimbursement issues?
16        MS. CITERA:  Objection to the form.
17        THE WITNESS:  You know, sporadic, if
18 something was affecting both sides of the
19 corporation, you know, we'd discuss it.  And your
20 characterization of meetings would be -- I cannot
21 recall a formal meeting.  Some of the conversations
22 could have been like, I would walk over to her

Page 96

1  office, that kind of thing.
2  BY MR. GOBENA:
3    Q.  Where were your offices located relative
4  to Deb DeYoung?  Was it in the same building?
5    A.  No, no.
6    Q.  So if you walked over to her office, you
7  would have to go to another --
8    A.  I had to go to another office.  I had to
9  go downstairs, through a tunnel, and back upstairs.
10   Q.  So when you had discussions in her
11 office -- let me strike that.
12        Did the discussions that you had
13 with Ms. DeYoung, for example, did they take place
14 in her office, her physical office?
15   A.  Yes.
16   Q.  How is it that you ended up in her
17 office having discussions about Medicare
18 reimbursement?  Did you actually go over there for
19 the express purpose of discussing Medicare
20 reimbursement with her?
21        MS. CITERA:  Objection to form.
22        THE WITNESS:  I don't know.  I don't

Page 97

1  recall.  I may have.
2  BY MR. GOBENA:
3    Q.  So if I understood correctly, you said
4  you had discussions with two ladies from PPD about
5  Medicare reimbursement issues.
6         Do you recall any discussions with
7  anyone else at Abbott regarding -- at any Abbott
8  divisions, other than HPD, regarding Medicare
9  reimbursement issues?
10        MS. CITERA:  Objection to form.
11        THE WITNESS:  Well, yeah, early on,
12 very early on, but it wasn't Abbott.  It was a
13 division of Abbott.  It was Tacada, it was Tacada
14 Abbott.
15 BY MR. GOBENA:
16   Q.  Okay, Tacada Abbott.
17        And what specifically are you
18 referring to in terms of discussions about Medicare
19 reimbursement with someone at Tacada Abbott?
20   A.  We were discussing Medicare
21 reimbursement, how Medicare reimbursement worked.
22   Q.  So explain that to me a little bit

25  (Pages 94 to 97)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

---

Page 98

1  further.
2        You were discussing how Medicare
3  reimbursement worked.  What did you say in the
4  context of that conversation with the Tacada Abbott
5  person about how Medicare reimbursement worked?
6      A.  I couldn't tell you now, I mean, exactly
7  what I said.
8      Q.  And approximately when did this
9  conversation with the Tacada Abbott person take
10  place regarding Medicare reimbursement?
11     A.  I don't know.  Maybe in the early '90s,
12  perhaps.  I think, by the late '90s, Tacada had
13  their own people.
14     Q.  Are you familiar with an entity at
15  Abbott called the Medicare Working Group?
16            MS. CITERA:  Objection to the form.
17            THE WITNESS:  No.
18  BY MR. GOBENA:
19     Q.  That name is totally unfamiliar to you?
20     A.  The Medicare Working Group?
21     Q.  Yes.
22     A.  At Abbott?

---

Page 99

1      Q.  Yes.
2            MS. CITERA:  Objection.
3            THE WITNESS:  No, it doesn't ring
4  any bells for me.
5            - - -
6            (Whereupon the court reporter marked
7  document as Exhibit Heggie 798 for identification.)
8            - - -
9            MR. GOBENA:  I had this document
10  marked as Abbott -- not Abbott, Plaintiff's Exhibit
11  Heggie 798.
12            I will just note for the record real
13  quickly, it does have a Texas Abbott number on it,
14  but these documents were produced to us in the
15  federal case, and just as a practical matter, the
16  copy I had of these document came from an exhibit
17  at a deposition where we had gotten the copy of the
18  exhibit, which included -- sorry.
19            The copy of the document that I have
20  here is a copy we got from a set of documents that
21  were included as an exhibit in one of the other
22  depositions, so I don't have a copy here with the

---

Page 100

1  federal Abbott case Bates number, but we do have
2  the same document in our possession.
3  BY MR. GOBENA:
4      Q.  Mr. Heggie, while I was clarifying that
5  on the record, have you had a chance to look at
6  this document?
7      A.  I have.
8      Q.  At the top there is something -- there
9  is a title indicated there, and it says:  Abbott's
10  Medicare Working Group distribution list.
11            Do you see that there?
12     A.  I do.
13     Q.  And about two-thirds of the way down --
14     A.  There I am.
15     Q.  Your name is listed?
16     A.  I'm there.
17     Q.  Does this refresh your recollection as
18  to whether or not there was an entity called the
19  Medicare Working Group that you participated in at
20  Abbott?
21            MS. CITERA:  Objection to form.
22            THE WITNESS:  No, it does not.  I

---

Page 101

1  don't even know who some of these people are.
2  BY MR. GOBENA:
3      Q.  Let's go through each of these people
4  and see if you know or don't know them.  And I will
5  go one by one.
6      A.  Sure.
7      Q.  There is a name at the top, Jim Miller.
8            Do you know who Jim Miller was?
9      A.  I do not.
10     Q.  The name below that, Rich Rieger,
11  R-I-E-G-E-R, do you know who Rich Rieger was?
12     A.  No, I do not.
13     Q.  There is a name, Cathy Babington, listed
14  there.
15            Do you know who Cathy Babington is?
16     A.  I don't know who Cathy Babington is;
17  although, I know the name.  The name rings a bell
18  for me.
19     Q.  Do you recall what position she held at
20  Abbott?
21     A.  No idea, none.  I just recall the name.
22     Q.  Next, we have Hank Doyle listed there.

---

26 (Pages 98 to 101)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL                May 17, 2007
                      Philadelphia, PA

Page 102

1        Do you know who Hank Doyle is?
2     A.  No idea.
3     Q.  Next, we have Don Buell listed there?
4     A.  Don Buell also rings a bell, same thing
5  as Cathy Babington.  I know he is a person.  I
6  don't know who he is or where he was or what
7  division or what he did.
8     Q.  We have a Dr. Don Conway listed next.
9        Do you know who that is?
10    A.  I do not know at all.
11    Q.  Next is Paul Landauer, L-A-N-D-A-U-E-R.
12       Do you recognize that name?
13    A.  I do know Paul Landauer.
14    Q.  Who is Paul Landauer?
15    A.  He did -- he was a director of something
16 for ADD, Abbott Diagnostics Division, and Landauer
17 -- ADD did not have a real dedicated reimbursement
18 person, and Landauer sort of was the person, the
19 go-to person, for any ADD Medicare -- Medicaid --
20 Medicare issues.  Sorry.
21    Q.  Do you know who headed Abbott's
22 Diagnostic Division at the time?  And this is -- or

Page 103

1  actually, strike that.  There is no time indicated
2  on here.
3        Do you know who headed Abbott's
4  Diagnostic Division in, let's say, 1995?
5     A.  No.
6     Q.  '96?
7     A.  No, I do not know.  '96, I don't know.
8     Q.  What about '97?  Do you know who headed
9  Abbott's Diagnostic Division in 1997?
10    A.  I could speculate, but it is
11 speculation.
12    Q.  I understand.  Speculate away.
13       MS. CITERA:  Objection to the form.
14       THE WITNESS:  Miles came along at some
15 point, Miles White came along at some point
16 and was running ADD at some point.
17 BY MR. GOBENA:
18    Q.  So it is your understanding, at some
19 point during your tenure at Abbott, Miles White was
20 the head of the Abbott Diagnostic Division; is that
21 correct?
22    A.  Yes, at some point, he was.

Page 104

1     Q.  And Mr. Landauer was someone who was
2  tasked at the Abbott Diagnostic Division with
3  dealing with reimbursement issues to the extent
4  they came up at that particular division; is that
5  correct?
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  Correct.
8  BY MR. GOBENA:
9     Q.  Now, below your name, the next name is
10 Dave Olson.
11       Do you know who Dave Olson is?
12    A.  I know the name.  Again, it is the same
13 as the Cathy Badington and the Don Buell thing,
14 Dave Olson -- and I can do better than that,
15 actually, because Dave Olson, I believe, was in
16 HPD.
17    Q.  Do you know whether Dave Olson was the
18 Director of Strategic Planning for HPD?
19    A.  No, I do not.
20    Q.  The next name is Ginny Tobiason.
21       I take it, from my review of your
22 prior deposition transcripts, you know who Ms.

Page 105

1  Tobiason is?
2     A.  I do.
3     Q.  The next name listed here is Bill Dwyer.
4        Do you know who Bill Dwyer is?
5     A.  No, I do not.
6     Q.  The next name listed here is Mike
7  Tootell, do you know who Mike Tootell is,
8  T-O-O-T-E-L-L?
9     A.  I do know Mike Tootell.
10    Q.  Who is Mike Tootell?
11    A.  He was the reimbursement manager or
12 director for Ross products.
13    Q.  In the course of your work as the
14 manager for reimbursement at Alt Site, did you have
15 reason to interact with Mr. Tootell on any
16 reimbursement issues?
17    A.  No, I don't think so.  I don't think we
18 ever had anything to do with Ross.  Well, the only
19 thing I could say is, Ward sold some Ross products,
20 I think.  So -- I'm not even sure of that, but I
21 believe Ward did sell as part of his bag of
22 products, I believe Ward sold Ross products.  So it

27 (Pages 102 to 105)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                       Philadelphia, PA

Page 106

1  is possible that Tootell and I -- no, I don't think
2  so.  I just don't think Tootell and I really
3  interacted on Medicare issues.
4      Q.  So when you say Ward sold Ross products,
5  you are saying that Abbott's Alt Site products
6  sales group sold Ross products, among other
7  products?
8      A.  He might have.  That's the only
9  connection I can give you for Tootell, if you are
10 looking for a connection between me and Tootell, if
11 there was one.  I don't remember anything specific.
12     Q.  There is a person here listed, John
13 Campbell.
14         Do you see that?
15     A.  Yes.
16     Q.  Do you know who Mr. Campbell is?
17     A.  No, but it says he worked for TAP, so --
18     Q.  I guess my next question was whether or
19 not he was the person that you talked to at TAP
20 related to -- actually, you called it Tacada
21 Abbott.
22         Did you mean TAP when you said

Page 107

1  Tacada Abbott?
2      A.  I did.
3      Q.  So you don't -- do you recall whether
4  Mr. Campbell was the person that you talked to at
5  TAP on any Medicare reimbursement issues?
6      A.  No.  This -- no, I do not recall
7  speaking to John Campbell.  When I spoke with the
8  people at TAP, it was real early on.  And I think
9  they got a person later, so that is too bad we
10 don't have a date on this.  So --
11     Q.  You said real early on.  You mean --
12 that you talked to a TAP person.  You mean early on
13 in your tenure as a manager for reimbursement at
14 Alt Site?
15     A.  Yes, correct, very early on, and very
16 early on in TAP's existence, too.
17     Q.  Do you recall when TAP came into
18 existence?
19     A.  No.  It was there when I got there.
20     Q.  And you got there in 1989?
21     A.  '89.
22     Q.  Let's go down to the next three names

Page 108

1  there.
2          Do you know who Cindy Sensibaugh is?
3      A.  I do.
4      Q.  Who is she?
5      A.  She is one of the people in the
6  Washington office.  She came from the hill and is
7  one of the lobbyists in Washington.
8      Q.  In the course of your work as a manager
9  for reimbursement at Alt Site, did you have
10 occasion to interact with Ms. Sensibaugh?
11     A.  Yes.
12     Q.  And did you interact with Ms. Sensibaugh
13 on Medicare reimbursement issues?
14     A.  Yes.
15     Q.  Do you recall any specific Medicare
16 reimbursement issues that you interacted with Ms.
17 Sensibaugh on while you were a manager of
18 reimbursement at Alt Site?
19     A.  Specific ones?  No.
20     Q.  Did you interact with Ms. Sensibaugh on
21 any Medicaid reimbursement issues in the course of
22 your duties as manager for reimbursement for

Page 109

1  Abbott's Alt Site?
2      A.  I wouldn't think so.  I could have, but
3  I don't think so.  These people were all dealing
4  with the Feds, all of three of these, Landsidle and
5  Rosemary Haas, so it could be that I asked her some
6  questions at some point, but I don't recall.
7      Q.  Let's go through some more of these
8  names here.
9          David Landsidle, who was he?
10     A.  Landsidle was -- at the time that I was
11 there Landsidle was the second in command in the
12 Washington office and a lobbyist.
13     Q.  What title would the person who was the
14 first in command of the Washington office have?
15     A.  Probably vice-president of government
16 affairs, it was a guy named Joe Jenks, and it was
17 probably -- I don't know.  I am assuming
18 vice-president of government affairs.
19     Q.  You mentioned that Ms. Sensibaugh acted
20 as a lobbyist for Abbott in Washington.
21         Do you recall what her exact title
22 was?

28  (Pages 106 to 109)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                         Philadelphia, PA

Page 110

1     A.  Director of Government Affairs.
2     Q.  She worked for Mr. Jennings?
3     A.  Yes, yes.
4     Q.  And you said Mr. Landsidle worked as Mr.
5  Jenks' deputy, in effect; is that correct?
6     A.  Yes.
7     Q.  Rosemary Haas, who is she?
8     A.  Rosemary Haas, at this point, I don't
9  know what she was.  She worked in the Washington
10  office.  She started out as a secretary, and she
11  became, at some point, and I don't know if it is
12  here or where it is, but at some point, she became
13  a lobbyist as well.
14     Q.  Just so the record is clear, Mr. Heggie,
15  is it your testimony that you don't recall ever
16  being a part of an entity at Abbott known as the
17  Medicare Working Group?
18         MS. CITERA:  Objection to form.
19         THE WITNESS:  Well, I mean, now that
20  this is here, and you see this, I mean, no, I do
21  not recall being part of this working group, but
22  obviously, I was, or obviously, somebody put us on

Page 111

1  here, but I don't remember any specific meetings
2  that the working group went to.  I mean, I don't
3  remember going into a room with all these people
4  and saying, you know, hi, Hank Doyle, I am Michael
5  Heggie or anything like that.  No, I don't remember
6  anything like that.
7         MR. GOBENA:  Let me have the next
8  exhibit marked as Exhibit Heggie 799.
9             ---
10         (Whereupon the court reporter marked
11  document as Exhibit Heggie 799 for identification.)
12             ---
13  BY MR. GOBENA:
14     Q.  Take a moment to review that document,
15  Mr. Heggie.
16     A.  (Witness complies.)  That's where I know
17  Cathy Babington's name.
18     Q.  As you will see, this document has
19  titles attached with some names here.
20         Does this help refresh your
21  recollection as to who some of the folks were on
22  the previous exhibit we looked at?

Page 112

1     A.  No.  I mean, Hank Doyle, I still have no
2  idea who Hank Doyle is.  Cathy Babington, I know
3  because of the name.
4     Q.  But you don't know her because you
5  recall her being the Vice-President of Public
6  Affairs for Abbott?
7     A.  No, no, no, no, no.  Now that you tell
8  me that's what she was, yes, now, I remember that's
9  what Cathy Babington did.
10     Q.  Look at the top of this document here.
11  It says Abbott's Medicare Working Group.
12         Do you see that there?
13     A.  I do.
14     Q.  And it says key participants?
15     A.  I see that.
16     Q.  If you go halfway down the page from
17  HPD, there are three people listed there as key
18  participants?
19     A.  Right.
20     Q.  You are one of them?
21     A.  Yes.
22     Q.  Does this refresh your recollection any

Page 113

1  further as to whether or not -- as to any
2  participation you had in the Medicare Working
3  Group?
4     A.  No, absolutely not.
5     Q.  Staying on this document, if you go to
6  the bottom, it says Washington, D.C.
7         You said you interacted with people
8  in the Washington, D.C. office from time to time on
9  various reimbursement issues.
10         Do you recall that testimony?
11         MS. CITERA:  Objection to form.
12         THE WITNESS:  I do.
13  BY MR. GOBENA:
14     Q.  It says here that Cindy Sensibaugh was
15  the Director of Washington Affairs.
16         Do you see that?
17     A.  Yes.
18     Q.  Do you have any understanding, just
19  based on your interactions with her, what her job
20  responsibilities were?  I mean, you mentioned
21  lobbyist, but do you have any further explanation
22  of what her job responsibilities were?

29 (Pages 110 to 113)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

Page 114

1     A.  No, that would be speculation on my
2   part. I know what she did, but I do not know what
3   her job responsibilities were.
4     Q.  And what is it that you recall that Ms.
5   Sensibaugh did?
6         MS. CITERA:  Objection to form.
7         THE WITNESS:  Well, she would take
8   -- she, first of all, would follow legislations,
9   alert us if there was something that we should look
10  at that she thought might impact our businesses.
11  Then we would bounce things off her, ask her if she
12  thought a particular piece of legislation was going
13  to move or not move, that kind of stuff.
14  BY MR. GOBENA:
15    Q.  Is it fair to say, based on your
16  conversations with Ms. Sensibaugh, that she had
17  some familiarity as to how Medicare reimbursed Alt
18  Site customers?
19        MS. CITERA:  Objection to form.
20        THE WITNESS:  I never had that
21  conversation with her that I can recall, so I mean,
22  you know --

Page 115

1   BY MR. GOBENA:
2     Q.  So the record is clear, it is your
3   testimony, then, that you have -- you didn't have
4   any -- you don't recall any conversations with Ms.
5   Sensibaugh about how Medicare reimburses Alt Site
6   customers?  Is that your testimony?
7     A.  No, that would not be my testimony.  My
8   testimony would be that -- your question was, does
9   Cindy Sensibaugh know how Medicare reimburses Alt
10  Site customers.  I don't know that.  I definitely
11  could have had conversations with Cindy Sensibaugh
12  about reimbursement for Alt Site customers that
13  would have been included in a piece of legislation,
14  yes.
15    Q.  Do you recall having any conversations
16  with Mr. Landsdile regarding Medicare reimbursement
17  issues as it affects Alt Site customers you were
18  responsible for?
19        MS. CITERA:  Objection.
20        THE WITNESS:  Could be the same
21  thing; although, I didn't react -- I didn't
22  interact with Landsidle to the degree that I did

Page 116

1   with Cindy Sensibaugh.
2   BY MR. GOBENA:
3     Q.  How frequently did you interact with Ms.
4   Sensibaugh on reimbursement issues?
5     A.  Not often.  Twice a year, maybe.  I
6   don't know.  Once a year.  Whenever -- if there was
7   legislation proposed or moving, we would have
8   talked or --
9     Q.  Do you recall any specific discussions
10  that you had with Ms. Sensibaugh regarding Medicare
11  reimbursement issues as it affects Alt Site
12  customers that you had?
13        MS. CITERA:  Objection to form.
14        THE WITNESS:  Do I recall any
15  specific conversations with her?  No, I do not.
16        MR. GOBENA:  Why don't we go off the
17  record?  We have five minutes left on this tape.
18        THE VIDEO TAPE OPERATOR:  This
19  completes Video Tape Number 1 in the video tape
20  deposition of Michael Heggie.  We are now going off
21  the video record.  The time is 5:11.
22          - - -

Page 117

1         (Whereupon a short break was taken
2   at this time.)
3           - - -
4         THE VIDEO TAPE OPERATOR:  We are
5   back on the video.  This is Video Tape Number 2 in
6   the video tape deposition of Michael Heggie.  The
7   time is 5:23.
8   BY MR. GOBENA:
9     Q.  Mr. Heggie, are you familiar with the
10  Department of Health and Human Services Office of
11  Inspector General?
12    A.  Yes, I am.
13    Q.  Do you know -- and again, I'm focused in
14  on the time period at Abbott to be very specific?
15    A.  Yes.
16    Q.  While you are the manager of
17  reimbursement at Alt Site, were you familiar with
18  the fact that the Office of Inspector General
19  issued reports discussing Medicare reimbursement of
20  drugs?
21    A.  Issued reports?
22    Q.  Yes, reports.

30 (Pages 114 to 117)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                     Philadelphia, PA

Page 118

1          MS. CITERA:  Objection to form.
2          THE WITNESS:  Well, there would be
3    advisories, advisory opinions that would come out
4    of DOJ.  Reports?  I don't -- no, I don't know what
5    -- I mean, there is stuff that came out of DOJ,
6    yes, I am familiar with stuff coming out of DOJ.
7    What they were called, I mean, a report or what it
8    was, I mean --
9    BY MR. GOBENA:
10         Q.   Let me clarify, because you are
11   mentioning DOJ.  I was asking about the Department
12   of Health and Human Services Office of Inspector
13   General, OIG for short.
14         A.   Okay, the OIG.
15         Q.   Yes.
16         A.   Yes, things would come out of OIG as
17   well, sure.
18         Q.   Do you remember any reports being issued
19   by OIG relating to Medicare reimbursement for
20   drugs?
21         A.   No, not specifically.
22         MS. CITERA:  Objection to form.

Page 119

1          THE WITNESS:  If you show it to me,
2    I will remember, but --
3    BY MR. GOBENA:
4          Q.   And do you know whether the Office of
5    the Inspector General or HHS issued any reports
6    relating to Medicaid reimbursement for drugs?
7          MS. CITERA:  Objection to form.
8          THE WITNESS:  No, again, not
9    specifically, but I mean, that's their job, so
10   something probably came out of there.
11   BY MR. GOBENA:
12         Q.   Was it -- as the manager for
13   reimbursement for Alt Site, was it your
14   responsibility to keep track of OIG reports about
15   Medicare drug reimbursement?
16         A.   Well, yes, if -- yeah, sure, if we knew
17   about them, yes, things came out.  We would try to
18   track.  It wasn't then as easy as it is to track
19   now.  We used to have to track things through the
20   Federal Register, and now, we have the internet, we
21   track.  So I mean, yes, when things came to our
22   attention, yes, we looked at them.

Page 120

1          Q.   And the things you are talking about are
2    OIG reports about Medicare reimbursement?  I just
3    want to make sure we are on the same page when you
4    say things.
5          Is that what you are talking about?
6          MS. CITERA:  Objection to form.
7          THE WITNESS:  Yeah, if something
8    would come from the OIG, yeah, we would look -- I
9    mean, we would look at it.  I'm trying to think --
10   now, I'm trying to think.  I haven't looked at
11   anything from OIG in ages, but if OIG put something
12   out, and we knew about it, we would read it, and
13   act on it, I guess, if it required action.
14   BY MR. GOBENA:
15         Q.   You said we would look at it.  Who,
16   other than you, would be reviewing OIG reports
17   relating to Medicare or Medicaid reimbursement
18   issues?
19         MS. CITERA:  Objection to form.
20         THE WITNESS:  The other people that
21   would have looked at these are -- the people that I
22   know that might have seen these would be Virginia

Page 121

1    Tobiason and Tootell. Those would be the two people
2    that I would know for sure would do similar work to
3    what I did. The rest of these people on here may
4    have or may not have.
5    BY MR. GOBENA:
6          Q.   What about Ms. Sensibaugh?  Based on
7    your conversations with her, do you know whether or
8    not she was reviewing OIG reports relating to
9    Medicare and Medicaid drug reimbursement?
10         A.   I do not know if she specifically was,
11   no, I do not know, but if something came across her
12   desk, she would review it and probably send it on
13   to us, on to me or somebody.
14         Q.   You said if you got -- when you got
15   these reports, you review them, and then I think
16   you said take whatever action you thought was
17   appropriate.
18         Did I understand your testimony
19   correctly?
20         A.   Yes.  If there was something that we
21   needed to do, or if we needed to write something
22   about it or explain it or whatever, yeah.

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 122

1    Q.  Let me have this document marked as
2  Exhibit Heggie 900.
3          - - -
4          (Whereupon the court reporter marked
5  document as Exhibit Heggie 900 for identification.)
6          - - -
7          MR. STETLER:  I think we are at 800.
8          MR. GOBENA:  No, we are skipping.
9          MS. CITERA:  It is 800, right?
10         MR. GOBENA:  No, it is Exhibit Heggie
11  900. We are skipping, because there were a set of
12  exhibits that started at 800.
13         MS. CITERA:  I'm sorry.
14         MR. STETLER:  It is beyond you, too.
15         MS. CITERA:  Apparently.
16  BY MR. GOBENA:
17     Q.  The document dated December 20, 1996
18  from a Richard Rieger to a distribution group.
19         Now, I realize you are not on this
20  distribution group here, but do you recall whether
21  ever received this document?
22     A.  No, no.  There is something screwy about

Page 123

1  this Medicare Working Group.  I don't understand
2  it.
3     Q.  Have you ever seen any documents similar
4  to this memorandum with the attachment?
5         MS. CITERA:  Objection to form.
6         THE WITNESS:  Have I ever seen
7  documents -- I don't know.  You have to rephrase
8  that question.  I mean, yeah, there is a lot of
9  report type things like this that go around in a
10  corporation the size of Abbott, but you mean have I
11  seen anything as comprehensive as this, for
12  example?
13         MR. GOBENA:  Sure, let's go with
14  that.
15         MS. CITERA:  Objection to form.
16         THE WITNESS:  No, I don't think so.
17  This one is --
18  BY MR. GOBENA:
19     Q.  Let's sort of walk through this document
20  structurally, and I may ask you some questions
21  about the substance of it.
22         If you go to the first paragraph, I

Page 124

1  guess Mr. Rieger, who drafted this memo, says:
2  Attached is the information that Mike Tootell
3  referenced in our most recent Medicare Working
4  Group meeting, and which he asked me to circulate.
5         Do you see that there?
6     A.  Yes, I do.
7     Q.  And I believe you testified earlier that
8  Mike Tootell was one of the people with whom you
9  would have discussions about Medicare reimbursement
10  issues; is that correct?
11         MS. CITERA:  Objection to form.
12         THE WITNESS:  Well, your
13  characterization of it and mine are different. If I
14  had to discuss something, Tootell and Tobiason
15  would be the two people that I might have had small
16  discussions or large discussions with, whatever,
17  but Tootell and I did not interact on a daily,
18  weekly or monthly basis at all.
19  BY MR. GOBENA:
20     Q.  But you had some interactions with Mike
21  Tootell regarding Medicare reimbursement issues;
22  correct?

Page 125

1     A.  I did, correct, absolutely.
2     Q.  And if you read the next sentence, it
3  says:  This information that Mr. Tootell referenced
4  in the recent meeting addresses the topics of
5  average wholesale prices and competitive bidding?
6     A.  Correct.
7     Q.  If you turn to the next page, you see
8  there is some information attached there.  I
9  represent to you, these are documents we got from
10  Abbott from -- they were supposed to be Medicare
11  Working Group files.  Their Bates numbers are
12  sequential.  I can't represent that this is
13  necessarily the attachment, but it appears to be.
14     A.  Okay.
15     Q.  I want you to go to the document that's
16  Bates numbered -- these are a bunch of different
17  position papers collected together.  The Bates
18  number is ABT 53269.
19     A.  268, 269, got it.
20     Q.  If you look there in the sort of top
21  center of the page, there is an organization
22  referenced there and it is called The Coalition to

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL              May 17, 2007
                         Philadelphia, PA

---

Page 126

1  Preserve Health Care Quality and Competition, and
2  below that, it says The National Association of
3  Medical Equipment Services and has an address in
4  Alexandria, Virginia.
5         Are you familiar with that
6  organization?
7     A.  No.
8     Q.  Let's go back to the second page.  There
9  is a two-page memorandum that's first here among
10 the information with this memorandum.
11    A.  This two-pager on AWP?
12    Q.  Yes.
13         Have you ever seen this before?
14    A.  Not that I recall, no.
15    Q.  Why don't you take a close look at it
16 and then confirm that, if you have ever seen this
17 before?
18    A.  Okay.
19    Q.  Why don't we do this?  I'm actually
20 going to want to walk you through a chunk of this
21 paper.  I just wanted you to look at it to confirm
22 whether or not you have ever seen this particular

Page 127

1  document before.
2     A.  I can't confirm or deny it.  I mean, I
3  might have.  If I was supposed to be on this
4  working group, it might have -- I don't know.
5     Q.  Let's go through this paper.
6     A.  Sure.
7     Q.  There is various statements made, and I
8  just wanted to get your recollections and
9  understandings and how it relates to what's in
10 here.
11    A.  Sure.
12    Q.  In this paper, which I understand you
13 haven't drafted, someone else did, but it says:
14 Currently, Medicare pays for those drugs that are
15 not reimbursed on a prospective payment system or
16 on a cost basis at the lesser of the average
17 wholesale price or the actual acquisition cost of
18 the drug.
19         Did I read that correctly?
20    A.  You read it correctly.
21    Q.  Is that statement consistent with your
22 understanding of how Medicare reimbursed for drugs

Page 128

1  that were not reimbursed on a prospective payment
2  basis or on a cost basis?
3     A.  Currently, Medicare pays for those drugs
4  that are not reimbursed on a prospective payment
5  basis or a cost basis at the lesser of the average
6  wholesale price, AWP, the lesser of the AWP or the
7  actual acquisition cost of the drug. I don't know
8  that Medicare ever paid on a cost basis.  At the
9  lesser -- and either, so let's change that to
10 either.  Average wholesale price or the actual
11 acquisition cost -- it is making it, I think, from
12 my -- if I'm reading this correctly, they pay it
13 the lesser, so they are saying there is one of two
14 ways, either the AWP or the actual acquisition cost
15 of the drug. I don't know.  There could have been
16 some instances where they paid actual acquisition
17 costs.  I don't know.  I couldn't tell you.
18    Q.  The cover memo that we looked at
19 previously was dated December 20, 1996, so I guess,
20 let me make sure I understand your answer.
21         Is this -- what you just said
22 reflective of what your understanding was of how

Page 129

1  Medicare reimbursed for drugs in 1996 or are you
2  talking about a different time frame?
3     A.  I'm saying that there are things that
4  maybe I don't know.  Maybe there were drugs out
5  there that somebody else knew about, because my
6  understanding -- I'm not sure that Medicare
7  actually paid actual acquisition costs.  I'm --
8     Q.  Is it that you just don't know of an
9  instance when it happened or you don't know that
10 there may have been something in the legislation
11 that talked about that as an optional way of paying
12 for drugs?
13    A.  No, it is saying -- it is not saying
14 anything about legislation here.  It is saying
15 currently, that Medicare -- drugs that are not
16 reimbursed on a prospective payment basis or a cost
17 basis.  So that sort of sentence kind of
18 contradicts, if it is not reimbursed on a
19 prospective payment basis or a cost basis, then
20 they actually pay on the actual acquisition cost,
21 which would be a cost basis.  So the sentence to me
22 is convoluted.

33 (Pages 126 to 129)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 130

1            I'm not trying to be difficult.  I'm
2     really not.  I don't understand what they are
3     trying to get at here.
4         Q.  I'm just trying to get an understanding.
5     You were the manager for reimbursement for Alt
6     Site, and you testified earlier that you had some
7     knowledge about how Medicare reimbursed for drugs?
8         A.  Correct, I do.
9         Q.  So I'm just trying to see how your
10    knowledge of how Medicare reimbursed for drugs
11    during the time that you were at Alt Site matches
12    up with that statement.
13        A.  Well, I have difficulty with the actual
14    acquisition cost of a drug, the statement or the
15    actual acquisition cost of a drug.  I have
16    difficulty with that, because I do not know that
17    Medicare paid actual acquisition cost of a drug.
18        Q.  Let's go to the next sentence.  It says:
19    In actuality, however, Medicare pays at the average
20    wholesale price level, because the program has not
21    acquired actual -- has not acquisition cost
22    information sufficient to establish the

Page 131

1     reimbursement rates.
2         A.  Right.  That makes sense to me.  That
3     sentence makes sense to me.
4         Q.  So that's consistent with your
5     understanding of how Medicare reimbursed --
6         A.  Yes, the average wholesale price,
7     correct.
8         Q.  In the next sentence, it reads, "There
9     have been several studies and investigations into
10    the appropriateness of using AWP as a determining
11    factor for payment."
12           Do you see that there?
13        A.  I do.
14        Q.  Were you aware of any studies that were
15    conducted into the appropriateness of using AWP as
16    a determining factor for payment for Medicare?
17           MS. CITERA:  Objection to the form.
18           THE WITNESS:  I'm aware of lots of
19    activity around AWP, lots of -- you may call them
20    studies, you could call them investigations.  You
21    will see from my earlier testimony about this AWP
22    issue, I mean, everybody knew about -- everybody

Page 132

1     talked about AWP in these days, the Feds, us,
2     everybody.
3     BY MR. GOBENA:
4         Q.  You said us.  You mean Abbott?
5         A.  No.
6            MS. CITERA:  Objection.
7            THE WITNESS:  Manufacturing.
8     BY MR. GOBENA:
9         Q.  Manufacturing, so pharmaceutical
10    manufacturers?
11        A.  Pharmaceutical.
12        Q.  Why were pharmaceutical manufacturers
13    talking about average wholesale price?
14           MS. CITERA:  Objection to form.
15    BY MR. GOBENA:
16        Q.  To your knowledge?
17           MS. CITERA:  Objection to form.
18           THE WITNESS:  Because it was a
19    strange form of payment.  It was a weird form of
20    payment.
21    BY MR. GOBENA:
22        Q.  What was weird about it?

Page 133

1         A.  The fact that AWP was a system that had
2     carried over from the '50s and '60s.  It was a
3     system that the Feds knew was not the best way to
4     buy drugs, but yet, they would make noise about it
5     being a system that was broken, but they didn't do
6     anything to fix it, that kind of thing.  It was
7     just -- it was a bad -- it is a bad system, and
8     everybody talked about it being a bad system.
9            MR. ANDERSON:  Objection,
10    non-responsive.
11    BY MR. GOBENA:
12        Q.  When you say everybody talked about it
13    being a bad system, who is the everybody that you
14    are talking about?
15        A.  Well, in my world, it would have been
16    other manufacturers and people within Abbott as
17    well.
18        Q.  Did you interact with other sort of
19    people and other pharmaceutical companies that had
20    a similar title to you as a sort of reimbursement
21    person or a manager for reimbursement about
22    Medicare reimbursement issues?

34 (Pages 130 to 133)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 134

1    A.  Only to the extent that we would maybe
2  meet at a place like Advomet, which is now Advomet,
3  which, in those days, was HIMA, the Health Industry
4  Manufacturers Association, Trade Association.  Only
5  to that degree.
6    Q.  When you were at these trade association
7  meetings, did you have discussions about AWP
8  reimbursement?
9    A.  I don't think, per se, no, I don't
10  think, per se.  Although, we would say, you know,
11  somebody is doing -- like, I can remember one time
12  in the Clinton administration, he was going to
13  change AWP, and people would say, you know, have
14  you seen the proposal in the budget about AWP?  And
15  somebody would say, yeah, we have seen that
16  proposal.
17    Q.  I think you are talking about the
18  Balanced Budget Act of 1997 and the proposed
19  changes to drug reimbursement included within that
20  act?  Is that what you are referring to?
21    A.  Could be.  I thought there was an
22  earlier one than '97, though.  I'm not sure.

Page 135

1    Q.  We will go through that act a little bit
2  later.
3        In that same first sentence in the
4  second paragraph, there is a mention of
5  investigations as to the appropriateness of using
6  AWP as a determining factor for payment, presumably
7  by Medicare --
8    A.  Where are you?
9    Q.  First sentence, second paragraph?
10    A.  Several studies and investigations into
11  the appropriateness?
12    Q.  Yes.
13        Were you aware of any investigations
14  into the appropriateness of using AWP as a
15  determining factor for payment?
16    A.  Investigations?
17        MS. CITERA:  Objection to form.
18        THE WITNESS:  I mean, it is kind of
19  -- you would have to decide what investigation
20  meant.  There have been several studies and
21  investigations into the appropriateness.  What do
22  they mean by investigation?  Do they mean like

Page 136

1  legal investigation?  Do they mean some kind of --
2  people are investigating whether or not one would
3  want to use AWP, that kind of thing.
4  BY MR. GOBENA:
5    Q.  Let's go with the legal investigations.
6        Were you aware of any legal
7  investigations that are being conducted into the
8  issue of the use of AWP as a determining factor for
9  payment in December of 1996?
10    A.  No, not really, not per se, not, you
11  know, specific investigations.  I know they were --
12  in the legal sense, there were issues surrounding
13  it, yes, certainly.  Was XYZ company being
14  investigated?  Do I know that?  No, I don't recall
15  it, but as part of my working knowledge, yeah, I
16  believe there were.
17    Q.  Well, obviously, when you received a
18  copy of the subpoena in this case, you became aware
19  that the United States had sued Abbott Labs for
20  drug pricing related issues; is that correct?
21    A.  Yes.
22    Q.  Did you know of that lawsuit, the

Page 137

1  federal lawsuit against Abbott, prior to receiving
2  the subpoena that was issued to you?
3    A.  No.
4    Q.  So you hadn't read anywhere in any --
5        MR. STETLER:  You are excluding any
6  conversations he may have had with his lawyer?
7        MR. GOBENA:  Absolutely.
8  BY MR. GOBENA:
9    Q.  Outside of conversations with your
10  counsel, did you have -- prior to receiving that
11  subpoena, did you have any knowledge of the United
12  States' lawsuit against Abbott Labs?
13    A.  No.
14    Q.  Related to drug pricing issues.
15        You left Abbott Labs, I believe, at
16  the end of 1997; is that correct?
17    A.  Was it the end of '97 or the end of '96?
18  The end of '97, you are right, yes, '97, December
19  of '97.
20    Q.  At any time between January 1996 and
21  December of 1997, were you made aware of the
22  Federal Government investigation of Abbott Labs

35  (Pages 134 to 137)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 138

1   related to AWP pricing issues outside of
2   conversations you may have had with counsel?
3       A.  No, I don't think so.  I don't recall
4   any.  I mean, no, I don't.  I mean, I would think
5   that would have gotten some attention, but no, I
6   don't think so.
7       Q.  At any time between January 1st, 1996
8   and December 31st, 1997, were you ever asked to
9   gather and collect documents related to AWP at all?
10      A.  Yes, yes, I was, I was.  I absolutely
11  was.  Yes, you are right, I was.
12      Q.  And what were you told to collect
13  specifically?
14          MS. CITERA:  I would just instruct
15  you not to again -- you can testify as to what you
16  were told to collect, but not reveal any of the
17  substance of any conversations you may have had
18  with the Abbott Legal Department or outside
19  attorneys.
20          THE WITNESS:  Okay.  I don't know
21  what I was told to collect.  I collected whatever I
22  was told to collect.

Page 139

1   BY MR. GOBENA:
2       Q.  Were you given -- were you told early to
3   collect documents -- first of all, let's take a
4   step back.
5           When do you recall that directive
6   coming to you in terms of collecting documents
7   relating to AWP?
8       A.  I don't recall it at all.  What I
9   recall, now that you brought it up, is I recall
10  being in my office and thinking, I got to go
11  through all these documents.  And that was it.
12  When it was, I don't know.
13      Q.  So you went through certain documents;
14  correct?
15      A.  I went -- I guess I went through a lot
16  of documents.  I probably went through every
17  document.  I probably went through a lot of
18  whatever I had.
19      Q.  And you went through those documents,
20  and did you pull certain documents out of all your
21  documents in connection with this directive to
22  collect -- to gather some documents?

Page 140

1       A.  Well, I guess I would have pulled out
2   whatever I thought was appropriate with whatever
3   direction I had, if I had it orally or verbally --
4   I mean orally or written, I would have pulled out
5   whatever I thought I had.
6       Q.  You don't remember, sitting here today,
7   whether it was an oral directive or written
8   directive to get documents?
9       A.  No, I don't remember.
10      Q.  And you don't remember what you were
11  asked to collect?
12      A.  No.
13      Q.  Were you told to --
14      A.  In fact, I didn't even remember until
15  you -- just truthfully, I didn't even remember it,
16  so --
17      Q.  And were you told to not destroy any of
18  your documents at a certain point between January
19  1st, '96 and December 31st, 1997?
20      A.  I don't know.  I would assume so.  I
21  don't know.
22      Q.  You have no basis, though, for saying --

Page 141

1   you are just assuming; correct?
2       A.  Yeah, I am assuming that we were told
3   not to destroy documents.
4       Q.  Why are you making that assumption?
5       A.  I don't know, because you hear in things
6   -- investigations like Enron and whatever else, you
7   hear you are not supposed to destroy documents, so
8   I would not destroy documents, I guess.  And in
9   those days, I didn't know about investigations or
10  anything.  I would have done what I was told.
11      Q.  But you can't recall whether you were
12  specifically told to preserve documents; is that
13  correct?
14          MS. CITERA:  Objection to the form,
15  asked and answered.
16          THE WITNESS:  No, I can't recall
17  whether I was specifically told, but I'm sure the
18  law hasn't changed that much.  I'm sure they told
19  us.
20  BY MR. GOBENA:
21      Q.  In the ordinary course of business, did
22  you routinely discard some documents that you

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 142

1  didn't feel were necessary to keep?
2          MS. CITERA: Objection to form.
3          THE WITNESS: Well, yeah, sure. I
4  mean --
5  BY MR. GOBENA:
6      Q. Otherwise, your office would be
7  overwhelmed, right, with paper?
8      A. Absolutely, yeah. I wrote a memo, and
9  if they didn't like the memo, I would write it
10 again and throw it out or whatever, yeah, sure.
11     Q. So whenever it was that you thought you
12 got this, you know -- whenever it was you became
13 notified of the investigation, was it -- did you
14 preserve all of your documents or only documents
15 that you thought were related to the investigation?
16         MS. CITERA: Objection to form.
17         THE WITNESS: Well, you are implying
18 that I would have destroyed some documents once I
19 got that notice, and that's absolutely not the case
20 at all. I mean, if I was told to gather up
21 documents, I would have gathered up documents and
22 put them in a box, I guess, and they would have

Page 143

1  gone somewhere, probably to legal. I mean, I don't
2  get where you are going.
3  BY MR. GOBENA:
4      Q. I'm not going anywhere. I'm just asking
5  you a question factually as to what happened with
6  respect to your documents.
7          In other words, were you asked --
8  were you told to collect certain types of documents
9  when you were notified as to the investigation,
10 asked to produce, to gather your documents?
11         MS. CITERA: Objection to form.
12         THE WITNESS: I do not recall what
13 the directions were, but I'm sure they were
14 specific documents. They probably said, you know,
15 if you have anything relating to AWP, gather it up.
16 BY MR. GOBENA:
17     Q. Is it your recollection that if you have
18 any documents that related to AWP, for example,
19 that after you got that directive to gather those
20 documents, that you then preserved and maintained
21 all your AWP documents at that point going forward?
22     A. Yeah, sure.

Page 144

1      Q. If there were some documents that didn't
2  relate to AWP, you might have discarded them,
3  because you didn't need them, right?
4          MS. CITERA: Objection to form.
5          THE WITNESS: As I was going through
6  the process of looking for the documents of AWP,
7  are you asking me if I would have destroyed
8  irrelevant documents? Like, if I found a bill from
9  my vet, would I have destroyed that bill from my
10 vet, maybe, while I was going through those
11 records? Probably. I don't know.
12 BY MR. GOBENA:
13     Q. I'm not asking about destruction,
14 because I think there is a negative connotation to
15 destruction. I think you testified earlier that in
16 the ordinary course of business, if you had some
17 documents, you didn't need them, you might discard
18 them, you might throw them away. And I'm not
19 asking you that outside of the documents -- the
20 categories of documents that you collected in
21 connection with the investigation when you were
22 told to gather documents, did you with the rest of

Page 145

1  your documents just treat them as you would have in
2  the ordinary course of business, as you described
3  to me that you did earlier?
4          MS. CITERA: Objection to form.
5          THE WITNESS: I think, and I'm
6  trying to recall what I would do, would be I would
7  be looking for specific documents. So I believe my
8  work habits would be that I would go through the
9  documents, looking for what I was to take out. You
10 know, this one comes out, this one comes out, this
11 one comes out, and that would have been my focus.
12 I would not have been focused on, oh, here is a
13 letter from my cousin, and I'm throwing it out. I
14 would have left it wherever it was, more than
15 likely, because all I was doing was focused on
16 gathering. So I wouldn't have probably done two
17 things at one time, probably.
18 BY MR. GOBENA:
19     Q. Was it your understanding -- again, I
20 don't want to get into conversations that you had
21 with counsel at the time, but independent of those
22 conversations, was it your understanding that the

37 (Pages 142 to 145)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL              May 17, 2007
                        Philadelphia, PA

Page 146

1  investigation was focused on AWP only or did you
2  understand that investigation would be about
3  government reimbursement for drugs generally?
4        MS. CITERA: Objection to form.
5        THE WITNESS: I don't recall.  I
6  don't recall.  It was an investigation, to me.
7  BY MR. GOBENA:
8     Q.  Did you produce to your lawyers or
9  whoever it was that was collecting the information
10  all your documents related to Medicare
11  reimbursement issues that were in your possession?
12        MS. CITERA: Objection to form.
13        THE WITNESS: Well, I would have
14  tried, certainly, I would have made every effort.
15  If I missed anything, I missed it, but to the best
16  of my knowledge, yeah, if I was asked to do it, I
17  would have done it.  It is serious stuff.  You do
18  it.
19  BY MR. GOBENA:
20     Q.  You said if you were asked to, you would
21  have.  It sounds like you are guessing.  I'm asking
22  you a specific question.  Did you, back in the time

Page 147

1  period when you were asked to collect your
2  documents, did you collect and produce to, whether
3  it is in-house or outside counsel, all of your
4  documents that related -- that were in your files
5  that related to Medicare reimbursement?
6        MS. CITERA: Objection to form.
7        THE WITNESS: To tell you the truth,
8  it is very -- the fact that there was this
9  investigation is very vague to me, honestly.  I
10  honestly didn't even -- I don't think it came up in
11  any of the other discussions, so I have not even
12  thought of it. And I would have done whatever I was
13  asked to do.  I mean, you are asking me if I
14  specifically recall being in my office and going
15  through the -- I do not -- I honestly do not.
16  BY MR. GOBENA:
17     Q.  Let's continue on with this document we
18  are looking at.
19     A.  Sure.
20     Q.  Let's go to the second sentence here, in
21  the second paragraph on Bates Number ABT 53264, the
22  second sentence reads: The common conclusion of

Page 148

1  these efforts, efforts being the studies and
2  investigations, is that the use of AWP as a payment
3  measure results in excessive reimbursement that is
4  far out of line with the estimated acquisition cost
5  of the drug, and that AWP has little meaning to the
6  drug manufacturer or the pharmacy to which it sells
7  the drug.
8        Let's focus on the first part of
9  that sentence, where it says:  The common
10  conclusion of these studies and investigations is
11  that use of AWP as a payment measure results in
12  excessive reimbursement that's far out of line with
13  estimated acquisition cost of the drug.
14        Do you agree or disagree with that
15  part of the sentence?
16     A.  I can't speak what the common
17  conclusions are.  I mean, that was -- there was --
18  there is -- when anyone talks about AWP, that is
19  always something that comes up.
20     Q.  When you were the manager for
21  reimbursement at Alt Site, you were familiar with
22  Abbott's AWPs; isn't that correct?

Page 149

1        MS. CITERA:  Objection to form.
2  BY MR. GOBENA:
3     Q.  For the drugs in the Hospital Products
4  Division; isn't that correct?
5        MS. CITERA:  Same objection.
6        THE WITNESS:  You mean, like, did I
7  know that the AWP for a bag of saline was such and
8  such?
9        MR. GOBENA:  Yes.
10        THE WITNESS:  No, I did not
11  BY MR. GOBENA:
12     Q.  You didn't know that?
13     A.  No.
14     Q.  You never went once to, let's say,
15  Redbook and looked at up the AWP for the Abbott
16  Hospital Product Division drugs?
17     A.  Yes, many times, many times, but did I
18  know it?  No, I did not know it.  Did I have it
19  memorized?  No.  If somebody wanted to know it, I
20  had to go look it up, but I knew where to get it,
21  and I knew what it was.
22     Q.  And you were familiar, were you not,

                              38  (Pages 146 to 149)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

Page 150

1   with some of the contract prices for some of the
2   hospital product drugs at least sold to Alt Site;
3   is that correct?
4       A.   Absolutely not.  I never -- I knew there
5   were contracts, but I did not know the price.  I
6   did not know that your price for a bag of saline
7   was different from her price for a bag of saline.
8   I could not tell you that you were paying a dollar,
9   and she was paying a dollar and a quarter or
10  something.  That, I never knew.  It was not part of
11  what I did.
12      Q.   We talked earlier about your work on
13  this AMP restatement project?
14      A.   Yes.
15      Q.   After that project commenced, and -- the
16  AMPs were restated; isn't that correct, ultimately?
17      A.   Yes, I believe so.
18      Q.   And going forward, is it your belief
19  that the AMPs that Abbott was reporting were more
20  in line with what you thought the legislation
21  called for?
22      A.   Yeah.  Yes.

Page 151

1       Q.   And when AMPs were being reported to
2   what used to be known as HCFA, now CMS, did you get
3   -- were you aware of what AMPs were being reported
4   after the restatement to HCFA or what's now known
5   as CMS?
6       A.   I got a report.  I could ask for a
7   report at any time, and I could look at the AMPs,
8   yes.
9       Q.   So did you routinely get copies of these
10  types of reports that had the AMPs, Abbott's AMPs
11  listed in them?
12      A.   Yeah, I think we got one every quarter.
13  Yes, I'm quite sure we got one every quarter.
14      Q.   So is it fair to say, then, up to the
15  time you left Abbott, that you had access to
16  Abbott's AMP data?
17          MS. CITERA:  Objection to form.
18          THE WITNESS:  AMP data, I had access
19  to what the AMPs were, yes.
20  BY MR. GOBENA:
21      Q.   Thanks for the clarification.  You had
22  access to the AMPs?  You knew what the AMPs were?

Page 152

1       A.   Correct, yes, I would have known.
2   Again, clarification, I would have been able to
3   find out.  I would have been able to look at the
4   report and know.  I did not know them.
5       Q.   So if I understand what you are saying,
6   you are saying that you didn't know all the
7   specific AMPs for the drugs?
8       A.   Correct.
9       Q.   However, if you wanted to know what the
10  AMP was?
11      A.   I would just look at the report and find
12  it out.
13      Q.   Were there times that you went and
14  looked at these report to find -- to see what the
15  AMP was for a particular Hospital Products Division
16  drug?
17      A.   Probably not afterward.  I mean, I
18  wouldn't have gone -- once we started the
19  recalculations, and everybody felt the
20  recalculations were correct, I probably would not
21  have -- well, we did, although, we did -- there was
22  a function that we had to perform every month --

Page 153

1   every quarter, in which we looked at the auditing
2   of the states -- this goes back a long time now,
3   but the states would ask for -- would send in their
4   bill.  The states would send in some sort of a
5   form, and the form had to be bounced up against
6   what I believe -- what I think, what I remember is
7   our AMP, and you sort of audited the state claims,
8   as I recall it, and you would get false things,
9   like the one that sticks out in my mind I can still
10  remember is one time, we got a claim from the State
11  of Connecticut for $3 million, I believe for one
12  drug, and they had calculated it -- you calculated
13  it -- again, I have not dealt with this program in
14  ages, but you calculated the drug in certain
15  numbers, and you could either calculated it like as
16  a leader or you could calculate it as a thousand
17  milliliters.  And somehow or other, Connecticut and
18  several of the states would do this.  They would
19  screw it up, and they would charge -- they would
20  say that you owed them more than you did or less
21  than you did because of the way in which they
22  calculated it. But that's what I remember about the

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 154

1  reporting mechanism for it.
2      Q.  And would -- this issue, did that come
3  up before or after the restatement of the AMPs in
4  1995?
5      A.  I think it came up both before and
6  after. I think it was a function of quarterly
7  auditing. I think we audited the quarterly, now
8  that I think about it.  I think Tina Brown worked
9  for me, and I believe that's what Tina did, she
10  audited.
11      Q.  Let's go to the second clause of that
12  sentence we were looking at.  The one that starts,
13  the common conclusion of these efforts?
14      A.  Yes.
15      Q.  Again, that's the studies and
16  investigations reference to the sentence above,
17  found that AWP has little meaning to the drug
18  manufacturer or pharmacy to which it sells the
19  drug.
20          Do you agree or disagree with that
21  statement?
22          MS. CITERA:  Objection to form.

Page 155

1          THE WITNESS:  AWP has little meaning
2  to the drug manufacturer or the pharmacy to which
3  it sells the drug.  Well, I disagree with that.
4  BY MR. GOBENA:
5      Q.  You disagree with that?
6      A.  Um-hum.
7      Q.  Why?
8      A.  Sure, because for the pharmacy, it has
9  great meaning.
10      Q.  Why does it have great meaning for the
11  pharmacy?
12      A.  Well, because they want to have a -- a
13  pharmacy would want to have, more than likely, an
14  AWP that was high and a cost that was low.
15      Q.  Because that would have enabled them to
16  get a larger spread on the drug?
17      A.  Correct.
18          MS. CITERA:  Objection to form.
19          THE WITNESS:  Sure.
20  BY MR. GOBENA:
21      Q.  Let's read the next sentence.  It says:
22  In other words, there is some evidence that, often,

Page 156

1  the AWP for a drug is set at a particular level to
2  establish third-party reimbursement, but has no
3  relevance to any party beyond the third-party
4  payor.
5          Do you agree or disagree with that
6  statement?
7      A.  In other words, there is some evidence
8  that, often, the AWP for a drug is set at a
9  particular level to establish third-party
10  reimbursement --
11          MS. CITERA:  I'm going to object to
12  the form.  Sorry.
13          THE WITNESS:  But has no relevance
14  to any party beyond the third party payor.
15          Well, I would have trouble with the
16  fact that AWP is set.  For example, I don't believe
17  that AWP -- and you can see this from my other
18  testimony.  I don't believe that AWP is set.  AWP
19  is a function of list.
20  BY MR. GOBENA:
21      Q.  Isn't it possible that lists can be set
22  to affect the AWP, so that it ultimately affects

Page 157

1  reimbursement levels based off of AWP?
2          MS. CITERA:  Objection to form.
3          THE WITNESS:  Absolutely, it is a
4  possibility.
5  BY MR. GOBENA:
6      Q.  So your problem with this sentence is
7  the implication that Abbott might have been setting
8  the AWP?  Is that your principal problem with it?
9      A.  Oh, absolutely, yes.  Well, that's one
10  of my problems with it.
11      Q.  Okay, what's another problem you have
12  with it?
13      A.  Often, the AWP for a drug is set -- I
14  don't believe it is set, and if you are -- if
15  anybody is trying to imply that Abbott set the list
16  to AWP, that was not my experience, and particular
17  level to establish third-party reimbursement, but
18  has no relevance to any party beyond the
19  third-party payor, well, again, I would question
20  that, because it does have relevance to someone who
21  is going to bill the program.  So it has relevance
22  to somebody beyond the third-party payor.

40  (Pages 154 to 157)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 158

1    Q.  What do you understand the term
2  third-party payor to mean there?
3          MS. CITERA:  Objection to form.
4          THE WITNESS:  An insurance company,
5  a carrier, an insurance company, somebody who is
6  paying the bill, administering the claim.
7  BY MR. GOBENA:
8    Q.  That would include Medicare?
9    A.  That would include Medicare.
10   Q.  And that would include Medicaid programs
11 as well; correct?
12   A.  Absolutely, it would.
13   Q.  So would you agree, then, that the AWP
14 for a drug is relevant to the pharmacies, to
15 insurance companies, to Medicare and the Medicaid
16 programs?
17   A.  Sure.
18         MR. ANDERSON:  A lot of feedback, I
19 don't know where that is coming from.  Is that
20 Blackberry feedback?
21         MR. STETLER:  Are they still here?
22         MR. ANDERSON:  Is the Baxter

Page 159

1  attorney still on the line?
2          MS. HALL;  Yes, I am still present.
3          MR. ANDERSON:  Just in the past few
4  seconds, there has been a lot of feedback off the
5  line for some reason.
6          MS. HALL:  I'm not getting it over
7  here.  I have it on mute on this end.
8          MR. ANDERSON:  We are going to go
9  forward.
10 BY MR. GOBENA:
11   Q.  If you go down to the second section
12 here on the same page, industry options, it says:
13 Industry can, of course, attempt to maintain the
14 AWP measure for Medicare covered drugs and resist
15 all effort within Congress and HCFA to change the
16 current formula and practice.  Other than industry
17 there, it is not specifying what particular
18 industry.
19         Based on your knowledge and tracking
20 of these Medicare reimbursement issues, do you know
21 whether, during the time period you were the
22 manager for reimbursement at Alt Site, there were

Page 160

1  efforts made by the pharmaceutical industry to
2  resist any efforts to change Medicare reimbursement
3  to go away from AWP based reimbursement?
4          MS. CITERA:  Objection to form.
5  BY MR. GOBENA:
6    Q.  I'm talking about the pharmaceutical
7  industry.
8    A.  Yes, you are talking about Pharma,
9  basically, is where it would have come from.  It
10 would have come from Pharma, if it was coming.  I
11 don't recall.  I do not recall.  I mean, from my
12 perspective, whether or not we, at my level, worked
13 on that, we would have fed that to Washington, so I
14 --
15   Q.  Do you remember conversations with Cindy
16 Sensibaugh, where you discussed --
17   A.  Yeah, we probably would have talked
18 about this.
19         MR. STETLER:  Why don't you wait
20 until he finishes?
21         THE WITNESS:  I'm sorry.
22         MR. STETLER:  He could say the Super

Page 161

1  Bowl.
2          THE WITNESS:  Yes, he could have
3  said it.
4          MR. STETLER:  You will find out now.
5  BY MR. GOBENA:
6    Q.  Sir, do you recall conversations with
7  Cindy Sensibaugh where you discussed any
8  legislative efforts to change AWP-based
9  reimbursement for the Medicare program for drugs?
10   A.  Yes and no.  If we were working on this
11 at the time, yes, I would have had conversations
12 with her.  Do I remember specifically speaking to
13 Cindy about this?  No, I do not.
14   Q.  If you go down to the -- first of all,
15 in the second sentence, it reads:  In all
16 likelihood, this is not a sustainable position,
17 especially, in light of fraud and waste
18 connotations the investigators have brought to the
19 issue.  And then it says:  In addition, numerous
20 people from within the industry have conceded
21 publicly that AWP makes little sense as a basis for
22 reimbursement.

41 (Pages 158 to 161)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 162

1           Would you agree with whoever these
2    unnamed people are within the industry that said
3    AWP makes little sense as a basis for reimbursement
4    as of 1996?
5           MS. CITERA:  Objection to form.
6           THE WITNESS:  Sure.
7    BY MR. GOBENA:
8       Q.  Why?
9       A.  Because it is senseless.  It was an
10   antequated system that made no sense for anybody to
11   be working off.
12      Q.  Did you interact -- we saw from earlier
13   testimony and from documents that you interacted
14   with Mr. Beachley in connection with the Medicaid
15   drug rebate program issues.
16          Do you remember that?
17      A.  Um-hum.
18      Q.  Do you recall interacting with anyone
19   else at what was then called HCFA relating to any
20   of these AWP drug reimbursement issues for
21   Medicare?
22          MS. CITERA:  Objection to form.

Page 163

1           THE WITNESS:  HCFA?  AWP, no, I
2    don't -- no, I don't think so.  I don't -- it
3    doesn't sound like I would have talked to HCFA
4    about the AWP.  I just -- I don't know what we
5    would have done.  I don't know what the
6    conversation would have been, you know.  I would
7    have said your system is squirrely?  I don't know.
8    I don't think so.  I can't recall.  I honestly
9    can't recall.
10   BY MR. GOBENA:
11      Q.  Well, I mean, you are aware there were
12   studies out that there that called into question
13   AWP-based reimbursements for Medicare and Medicaid;
14   correct?
15      A.  Yeah, there were a number of things.  If
16   I can recall -- if I recall it correctly, it goes
17   back forever.  I think it goes back to the
18   beginning -- I think the first one was in 1983.  I
19   don't know why that sticks in my mind, but -- and I
20   believe I said this in the other depositions.  The
21   Feds themselves called it into question in 1983, I
22   believe.  So it was the kind of thing, before I

Page 164

1    even knew what HCFA was, it was out there, people
2    were talking about it, and it was --
3       Q.  And Abbott was reporting list price to
4    price reporting compendia while you were the
5    manager -- sorry.
6           Abbott was reporting list price to
7    the price compendia, reporting compendia, when you
8    were the manager for reimbursement at Alt Site;
9    correct?
10          MS. CITERA:  Objection to form.
11          THE WITNESS:  Right.  But I wasn't
12   sending it.
13   BY MR. GOBENA:
14      Q.  You weren't sending them, okay.  Who do
15   you remember --
16      A.  Cicerale.  Cicerale sent a list -- a
17   list, a paper list of prices to Redbook.
18      Q.  So a list price is sent in to Redbook.
19          Do you remember a price reporting
20   compendia called the BlueBook?
21      A.  Yes, sure do.
22      Q.  Those prices were sent to BlueBook as

Page 165

1    well?
2       A.  BlueBook, MediSpan.  Those were the
3    three.
4       Q.  And you talked earlier about how you
5    understood that the price reporting compendia added
6    on an 18.75 percent markup to the list to publish
7    -- and then published an AWP that reflected that.
8           Do you recall that testimony?
9       A.  I do, and that was -- it was Redbook who
10   had that formula.  We were talking at that point
11   about Redbook.  I don't know the formula for
12   MediSpan and BlueBook, which I think BlueBook later
13   became First DataBank, I think, but I don't recall.
14   I don't know that I ever knew their formulas.  The
15   only formula I actually -- but it was basically
16   about 20 percent.  When theirs came out, theirs was
17   basically about 20 percent.
18      Q.  And you recall in one of the documents
19   that we looked at earlier about this Medicaid Drug
20   Rebate Program AMP restatement issue.  There is a
21   sentence in a memo that you wrote that said there
22   is a discrepancy between list price and sales

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                   Philadelphia, PA

Page 166

1  price.
2        Do you remember that?
3     A.  Yeah.
4     Q.  So you knew there was a discrepancy
5  between list price and sales price; correct?
6        MS. CITERA:  Objection, form.
7        THE WITNESS:  There was an internal
8  discrepancy, yes, I knew it was in the calculation.
9  BY MR. GOBENA:
10    Q.  List price was one thing, and the sales
11 price was another thing; correct?
12    A.  Correct, right.
13    Q.  And the list price -- did you know that
14 the list price was higher than the sales price?
15    A.  Well, of course.
16    Q.  Of course it was, right?
17    A.  Yeah.
18    Q.  And the list price was then being used
19 -- was then being used by the price reporting
20 compendia to come up with the published AWP; is
21 that correct?
22    A.  That's correct.

Page 167

1     Q.  So knowing that there is this
2  discrepancy between list price and sales price and
3  Abbott's AWPs, whatever is being published as an
4  Abbott AWP was being informed by the list price, it
5  never occurred to you to consult with someone at
6  HCFA to determine whether or not reporting the list
7  price was the appropriate price to the price
8  reporting compendia when they were using
9  those prices to then publish an AWP?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  No, I don't think so.
12 I mean, I don't -- I'm not sure I understand the
13 question, but no, what would I have reported to
14 HCFA?  What would I have asked HCFA?  The
15 regulations stated certain parameters that you had
16 to use, if we are going back to the Medicaid
17 program, and we wanted to be within whatever those
18 parameters were.
19 BY MR. GOBENA:
20    Q.  I'm not talking about the AMP
21 restatement best price, per se.
22       You testified earlier that you

Page 168

1  thought that the AWP-based reimbursement was
2  senseless, in effect, or a system based on that was
3  senseless, because you thought it was antequated.
4        Do you remember that?
5     A.  Yes.
6     Q.  So why did you think it was senseless?
7     A.  I thought it was senseless because
8  everyone knew that it was not the most economical
9  way to pay for drugs or to pay for whatever they
10 were marking up.
11    Q.  And why was it not the most economical
12 way for, let's take Medicare, to be paying for
13 drugs that used AWP as a basis for reimbursement
14 for drugs?
15    A.  Because of the way the calculation came
16 about for the AWP.
17    Q.  And that calculation was based on list
18 price; correct?
19    A.  Correct.
20    Q.  And list price was significantly higher
21 than sales price for these drugs; correct?
22       MS. CITERA:  Objection to form.

Page 169

1        THE WITNESS:  Correct.
2  BY MR. GOBENA:
3     Q.  So it was senseless because AWP-based
4  reimbursement was based in part on certain prices
5  being reported by manufacturers; correct?
6        MS. CITERA:  Objection to form.
7        THE WITNESS:  Yes, correct.
8  BY MR. GOBENA:
9     Q.  And I guess my question is, did you
10 ever, at any time, contact anyone at HCFA to ask
11 them about whether or not Abbott should -- at least
12 Abbott Hospital Products Division should continue
13 to be using list price, catalog price, list price,
14 as the price being reported to the price reporting
15 compendia that was later -- ended up being
16 published as --
17       MS. CITERA:  Objection to form.
18       THE WITNESS:  No, I didn't.
19 BY MR. GOBENA:
20    Q.  I will have this document marked as
21 Exhibit Heggie 901.
22       - - -

43 (Pages 166 to 169)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                       Philadelphia, PA

Page 170

1          (Whereupon the court reporter marked
2    document as Exhibit Heggie 901 for identification.)
3              - - -
4    BY MR. GOBENA:
5       Q.  It is a memoranda from Richard Rieger,
6    dated January 15, 1997, to a bunch of addressees.
7       I know you are not one of the
8    addressees listed here, but do you recognize this
9    document?
10      A.  No, I don't think so, no.
11      Q.  If you read the first paragraph there,
12   it says:  The next Medicare Working Group meeting
13   will be held on Tuesday, 1/21/97, from 8:00 a.m. to
14   9:30 a.m. in APD6D-1B Center Conference Room?
15      A.  Yes.
16      Q.  And next, it says:  Based upon input
17   from several of you, I am proposing the following
18   agenda for the meeting.  And the first bullet point
19   is:  Discuss average wholesale price versus actual
20   cost issue.
21          Do you see that there?
22      A.  I do.

Page 171

1       Q.  Do you recall whether you participated
2    in the -- in any meeting that was held on January
3    21, 1997 at 8:00 a.m., where -- involving
4    participants from the Medicare Working Group?
5       A.  No.
6           MS. CITERA:  Objection, form.
7           THE WITNESS:  I don't recall this
8    group.  I mean, I might have gone at some point,
9    but I don't think so.  So, no, I don't recall.
10   Now, we added Mary Quinn Boyd in here, who I also
11   do not know.
12   BY MR. GOBENA:
13      Q.  You do not know her?
14      A.  Mary Quinn Boyd?  She is added up here
15   on the top.
16      Q.  Yes.  I didn't understand what you said.
17   You said that's another person you don't know?
18      A.  Another person who I do not know.
19      Q.  In this January '97 memorandum, it says
20   that one of the topics to be discussed in this
21   meeting was average wholesale price versus actual
22   cost issue.

Page 172

1           Do you recall in January of '97 any
2    discussions you might have had with, let's say, Deb
3    DeYoung regarding average wholesale price versus
4    actual cost?
5           MS. CITERA:  Objection to form.
6           THE WITNESS:  No, I don't recall it.
7    I could have, but I don't recall it.  If all this
8    was going on, it is possible that Deb DeYoung and I
9    had passing conversations about it, but I don't
10   recall meeting or anything.
11   BY MR. GOBENA:
12      Q.  One of the people listed here is Ginny
13   Tobiason.  Do you see that there?
14      A.  I do.
15      Q.  What was Ginny Tobiason's title again at
16   Abbott's Hospital Products Division Alt Site?
17      A.  Well, I'm not sure.  In this last one,
18   or in one of these, this working group, she was
19   listed as manager, client services, but I don't
20   know what her title was.  She had something to do
21   with reimbursement, too.
22      Q.  I believe you gave some testimony

Page 173

1    previously about that, so I won't get into that in
2    any detail.
3           Do you recall any discussions with
4    Ms. Tobiason about the issue of this average
5    wholesale price versus actual cost issue as it is
6    called in this memo?
7           MS. CITERA:  Objection to form.
8           THE WITNESS:  Specific
9    conversations, no, I do not recall any specific
10   conversations with Virginia.
11   BY MR. GOBENA:
12      Q.  I notice there is, beneath that bullet
13   point, a few items listed there; one being Lupron?
14      A.  Yes.
15      Q.  Medical Nutritionals and Calcijex?
16      A.  Right.
17      Q.  I believe you gave previous testimony
18   that you were involved in -- or that you did some
19   work related to Calcijex when you were the manager
20   for reimbursement?
21      A.  That's correct, I did.
22      Q.  In fact, you were reporting an AWP for

44  (Pages 170 to 173)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 174

1  Calcijex?
2      A.  I did.
3          MS. CITERA:  I object to form.
4  BY MR. GOBENA:
5      Q.  Do you recall whether that AWP that you
6  were reporting -- how did you go about calculating
7  it for Calcijex?  Do you remember?
8      A.  We calculated it off the list.
9      Q.  Would you -- let's say -- let's use the
10  formula you said was in place for Redbook.
11         Did you use that formula when you
12  were calculating AWP markup of 18.75 percent?
13     A.  To tell you the truth, I don't know what
14  the actual formula was.  Now, that doesn't -- I
15  don't want to say that I wasn't involved in it.  To
16  some degree, I was, but I was given a number to
17  report to Redbook, and I reported that number.
18     Q.  So you didn't do the actual calculation
19  yourself?
20     A.  No.
21     Q.  You were given a number, and you sent
22  that number along?

Page 175

1      A.  Right, but I might have been asked how
2  to do the calculation.  They might have asked me
3  that.
4      Q.  I think there was some testimony in
5  documents about that in the previous depoes, which
6  we might need to get into again, but it is your
7  testimony, though, that Calcijex was based on --
8  the AWP that was being purported through you,
9  anyway, was based on list price, not actual?
10     A.  Correct.
11         MS. CITERA:  Objection to form.
12  BY MR. GOBENA:
13     Q.  Cost, I should say.
14     A.  Right.
15     Q.  I will have this document marked as
16  Exhibit 909.  Exhibit Heggie 902, sorry.
17         - - -
18         (Whereupon the court reporter marked
19  document as Exhibit Heggie 902 for identification.)
20         - - -
21  BY MR. GOBENA:
22     Q.  This is a document that I got from a

Page 176

1  collection of documents that were identified to us
2  as being part of the -- this document is a document
3  that was produced to us as part of a set of
4  documents that I recall, Medicare Working Group
5  documents.  It is an article of some sort from --
6  well, I will let you take a look at it and review
7  it, and then I have a couple of questions about it.
8      A.  Okay.
9      Q.  Are you ready?
10     A.  Sure.
11     Q.  If you go to the second paragraph, there
12  is a sort of underlined sentence there that says:
13  Clinton administration expected to propose Medicare
14  outpatient drug coverage be based on actual cost,
15  rather than AWP as part of the president's budget
16  request for fiscal year 1998.
17         Do you see that there?
18     A.  I do.
19     Q.  Did this issue of this Clinton proposal
20  to peg reimbursement off actual cost arise while
21  you were the manager for reimbursement at Abbott's
22  Alt Site?

Page 177

1          MS. CITERA:  Objection to form.
2          THE WITNESS:  Yeah, I think so, as I
3  recall.  I mean, I was there in '97, so the budget
4  would have been proposed in June, July, May, June,
5  July, '97.
6  BY MR. GOBENA:
7      Q.  Do you recall discussing with Cindy
8  Sensibaugh this proposed change to Medicare AWP --
9  Medicare reimbursement for drugs to peg off the
10  actual cost, as opposed to AWP?
11     A.  Not specifically, no.  As I said, I very
12  well may have, but I don't have a specific
13  recommendation of --
14     Q.  Did you talk to anyone about this
15  proposed -- this Clinton administration proposal to
16  peg Medicare drug reimbursements off of actual
17  costs, as opposed to AWP?
18     A.  Yeah, I'm sure.  I mean, this was big
19  news.  I probably talked to a lot of people, yeah.
20     Q.  Do you recall any of the people that you
21  talked to?
22     A.  No.

45 (Pages 174 to 177)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 178

1    Q.  You said it is big news.
2        Why was it big news?
3    A.  Because they were going to change AWP,
4  which has had this history with it, and so it was
5  big news that they were finally going to do
6  something about it.
7    Q.  Did you have a personal view as to this
8  proposed legislation while you were the manager for
9  reimbursement at Abbott?
10   A.  A personal view or a corporate view?
11   Q.  Let me ask you your personal view first.
12       What was your personal view of the
13 proposed legislative change to Medicare drug
14 reimbursement?
15   A.  Well, that it is about time.
16   Q.  Was there a corporate view at Abbott
17 that you were aware of about this proposed
18 legislation changing the way that Medicare
19 reimbursed for drugs?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  I couldn't really say
22 a corporate view.  You know, in a large

Page 179

1  corporation, change is always scary.  You know, I
2  don't know that there was a corporate view,
3  corporate being in the sense of -- and also, I
4  wouldn't have known those people, anyway.  I was
5  down here, and they were up there, so I mean,
6  corporate -- you know, there was concern within the
7  corporation, I think.
8  BY MR. GOBENA:
9    Q.  What was that concern?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  I don't know.
12 BY MR. GOBENA:
13   Q.  You don't know?
14   A.  Well, I mean, concern, again, is another
15 word.  I mean, I don't want to be a semanticist,
16 but there was -- around the proposal, there was,
17 you know, what's it going to do, how is it going to
18 affect our business, what will happen, that kind of
19 thing.  That is the type of concern you get in a
20 corporation, you know, is it going to affect our
21 business, how will it affect our business, what
22 will it do?  That's the kind of concern.

Page 180

1    Q.  Did you do any sort of analysis of how
2  this proposed legislation would affect Alt Site's
3  business?
4    A.  Did I?  I don't think so, but I don't
5  know.  If I were asked to, I probably -- I would
6  have done something.  Obviously, I would have done
7  something, but do I recall it?  No, not yet.
8    Q.  Do you recall whether any other -- you
9  said you interacted with Mike Tootell.  Do you
10 remember that?
11   A.  Yes.
12   Q.  And you said it would happen
13 periodically, but not routinely; is that correct?
14   A.  Correct.
15   Q.  Do you recall having any conversations
16 with him about the Clinton Administration's
17 proposal to peg Medicare drug reimbursements to
18 actual costs?
19   A.  No, no specific recall of talking to
20 Mike Tootell.
21   Q.  Do you recall -- I mean, I know you
22 don't recall the specifics of who you talked to,

Page 181

1  but it seems that you recall having some
2  discussions about this proposed legislation.
3        Is my understanding correct?
4    A.  Yes, yes, that's fair.
5    Q.  And did any of the people, persons or --
6  the person or people that you talked to about this
7  proposed legislative change, did any of them
8  disagree with your view that the change was
9  appropriate?  Because I believe you said it is
10 about time, right, that this change was made?
11       MS. CITERA:  Objection to form.
12 BY MR. GOBENA:
13   Q.  Did anyone disagree with your
14 perspective that this change was welcome?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  I don't recall anybody
17 saying, you know, Heggie, you are nuts or you know,
18 where did that come from or -- no, I don't recall
19 anything like that.  I -- no, no, nothing that was
20 -- that stands out that somebody said, you know --
21 BY MR. GOBENA:
22   Q.  No one said, it is going to make it

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                         Philadelphia, PA

Page 182

1  really difficult for us to sell our product going
2  forward?
3            MS. CITERA:  Objection to form.
4            THE WITNESS:  No, no, no.
5  BY MR. GOBENA:
6     Q.  You don't remember or no, you know for a
7  fact that no one --
8     A.  No, I don't remember.  I don't remember
9  anybody saying anything like that, no.
10    Q.  If we go to sort of the second to last
11 paragraph on the first page, the article notes say:
12 If the President's budget does include a proposal
13 for reimbursement at cost of acquisition, it is
14 likely to provoke strong opposition from
15 pharmacists.
16           Do you see that there?
17    A.  I do.
18    Q.  Do you agree with that statement?
19    A.  Sure.
20    Q.  And that's because the pharmacists rely
21 on reimbursement spreads as part of their income;
22 correct?

Page 183

1            MS. CITERA:  Objection to form.
2            THE WITNESS:  Yes, correct. Clinton
3  was one of several governors who sued the Federal
4  Government when the Regan Administration attempted
5  to remove AWP as a means of calculating Medicaid
6  reimbursements.
7            MR. ANDERSON:  Objection,
8  non-responsive.
9            THE WITNESS:  I was reading a
10 sentence in here that I got a kick out of.
11           MR. GOBENA:  Why don't we take a
12 break at this time?  Off the record.
13           THE VIDEO TAPE OPERATOR:  Off the
14 video, 6:32.
15           ---
16           (Whereupon a short break was taken
17 at this time.)
18           ---
19           THE VIDEO TAPE OPERATOR: Back on the
20 video, 6:55.
21           MR. GOBENA:  At this time, the
22 United States is done with its questioning of Mr.

Page 184

1  Heggie and is going to be passing the witness to
2  Mr. Anderson, who represents Ven-A-Care of the
3  Florida Keys which is relator in the federal case
4  and the California case.
5            ---
6            EXAMINATION
7            ---
8  BY MR. ANDERSON:
9     Q.  Mr. Heggie, I'm going to try to move
10 quickly and cover several different topics, so bear
11 with me.
12           First, I want to go back to this
13 topic concerning your search for documents.
14    A.  Um-hum.
15    Q.  When was it that you believe you were
16 asked to search your files for documents pertaining
17 to a possible AWP investigation?
18    A.  I don't know.
19           MS. CITERA:  Objection to form.
20 BY MR. ANDERSON:
21    Q.  Can you place any type of time period
22 whatsoever?

Page 185

1     A.  No.
2     Q.  Was it most likely close to when you
3  left the employment of Abbott?
4            MS. CITERA:  Objection to form.
5            THE WITNESS:  No, I don't know.  I
6  don't know.
7  BY MR. ANDERSON:
8     Q.  Is there any way that you can place it
9  on where you were physically officed?
10           For instance, you mentioned you
11 remember sitting in your office, thinking, oh, my,
12 I'm going to have to go through all these files?
13    A.  Yes.
14    Q.  Did you change offices?
15    A.  No.
16    Q.  So you can't place it in any way?
17    A.  No, I cannot.  I'm sorry.
18    Q.  To the extent you searched for
19 documents, how did you know what to search for?
20    A.  I did not.  I'm assuming that I had some
21 sort of instruction, either written or verbal.
22    Q.  What did you search for? Was there some

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL              May 17, 2007
                        Philadelphia, PA

Page 186

1  parameter?
2      A.  I don't know.  I don't remember.  I
3  vaguely remember this entire issue.
4      Q.  You vaguely remember that it had
5  something to do with an AWP investigation, and
6  that's about it?
7          MS. CITERA:  Objection to form.
8          THE WITNESS:  Yes.
9  BY MR. ANDERSON:
10     Q.  After you performed this search, did you
11 have some mechanism by which you preserved other
12 documents that were created subsequently that
13 pertained to AWP or reimbursement?
14         MS. CITERA:  Objection to form.
15         THE WITNESS:  No, not that I recall.
16     Q.  And the reason you didn't have such a
17 procedure in place is because nobody asked you to
18 preserve documents going forward; correct?
19         MS. CITERA:  Objection to form.
20         THE WITNESS:  No, I don't -- I don't
21 know that.  I mean, I don't recall.  I don't recall
22 at all.

Page 187

1  BY MR. ANDERSON:
2      Q.  You don't recall preserving the
3  documents going forward; correct?
4          MS. CITERA:  Objection to form.
5          THE WITNESS:  No, but -- no, I -- I
6  mean -- no, I don't.
7  BY MR. ANDERSON:
8      Q.  Okay.
9          And as of the date that you left
10 Abbott, did you physically transfer your files to
11 someone else or did you just leave your office?
12     A.  Pretty much left my office, just walked
13 out pretty much.
14     Q.  Other than searching the files that were
15 physically within the confines of your office, did
16 you go out into other file drawers and search other
17 files that you knew might contain documents
18 pertaining to AWP or reimbursement?
19         MS. CITERA:  Objection.
20         THE WITNESS:  I don't recall doing
21 that, no.
22 BY MR. ANDERSON:

Page 188

1      Q.  Were there such files?
2      A.  I don't know.  I don't think so.  I
3  don't know.
4      Q.  Well, you were the manager of
5  reimbursement?
6      A.  Correct.
7      Q.  And you maintained files, I take it, in
8  your office; correct?
9      A.  Yes, I did.
10     Q.  I take it, you had like a file cabinet
11 within your office; correct?
12     A.  Yeah, it was a typical office in which
13 there were -- everything is built in, and there
14 were files all along -- underneath the desk and all
15 along the walls.
16     Q.  Did you know of any other files that
17 were kept in other areas outside of your office
18 that pertained to your job?
19         MS. CITERA:  Objection to form.
20         THE WITNESS:  That pertained to my
21 job?  No.  There would have been a job description
22 somewhere, but--

Page 189

1  BY MR. ANDERSON:
2      Q.  Right, but I mean pertained to your job
3  as manager of reimbursement.
4          MS. CITERA:  Same objection.
5          THE WITNESS:  No, no, no, I don't
6  think so.  I mean -- no.
7  BY MR. ANDERSON:
8      Q.  It was your understanding that -- well,
9  strike that.  I will rephrase.
10         Tina Brown worked for you; correct?
11     A.  Correct.
12     Q.  And I take it, she had a cube like
13 outside of your office, right?
14     A.  Yes.
15     Q.  Did she maintain files?
16     A.  Sure, she would have maintained like the
17 Medicaid reports, those quarterly things.
18     Q.  And Virginia Tobiason also had
19 reimbursement responsibilities at Abbott; correct?
20     A.  Correct.
21     Q.  I take it, she had an office; correct?
22     A.  Yes, she did.

48 (Pages 186 to 189)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

Page 190

1    Q.  And she maintained files, obviously;
2  correct?
3    A.  Correct.
4    Q.  Do you know if there was any effort made
5  to search Tina Brown's files or Virginia Tobiason's
6  files?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  I can't speak for
9  Virginia at all.  I can speak for Tina.  We would
10 have automatically gone through whatever Tina had
11 as part of me going through it.
12 BY MR. ANDERSON:
13   Q.  And those were files that were
14 physically located in Tina's cube?
15   A.  It could have been in Tina's cube, could
16 have been right outside.
17   Q.  So there was a file cabinet next to
18 Tina's cube, I take it?
19   A.  I don't know.  There could have been.  I
20 mean, there was a file cabinet somewhere, yes.
21   Q.  Would it be fair to say that outside of
22 the files that you were aware of in your office

Page 191

1  around Tina's cube, there were not other files that
2  pertained to all of your job duties as manager of
3  reimbursement?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  There would have been
6  other stuff, but no, no, I mean --
7  BY MR. ANDERSON:
8    Q.  What type of other stuff?
9    A.  I don't know.  I can't think of
10 anything. I mean, there might have been something
11 that might have talked about -- I don't know,
12 reimbursement in some way.  I really don't know.
13 No, really, there wasn't.  It was whatever I had
14 and whatever Tina had would be the important things
15 that had to do with reimbursement.
16   Q.  I will give you a specific example of a
17 type of document that may be fairly voluminous.
18        You mentioned that, quarterly, Tina
19 would conduct some type of check of each state
20 Medicaid's program submission of utilization of
21 Abbott products; correct?
22   A.  Correct.

Page 192

1    Q.  So I take it, then, that you are getting
2  these forms from the various state Medicaid
3  programs?
4    A.  Correct.
5    Q.  Of which there is 49 or 50, depending on
6  the time; correct?
7    A.  Correct.
8    Q.  And you are getting those quarterly;
9  correct?
10   A.  Correct.
11   Q.  So that kind of documentation could add
12 up over time; correct?
13   A.  Sure.
14   Q.  Where were those files kept?
15   A.  Well, when we started taking over the
16 program, we being Tina and I, we kept them. Now,
17 previously, prior to that, I think they resided
18 with Cindy Dawson.
19   Q.  Was there somebody who held a position
20 similar to yours prior to you being named manager
21 of reimbursement?
22   A.  Well, yes, Tobiason, to some degree.

Page 193

1    Q.  Did Tobiason transfer to you any files
2  that she had kept in her job duties as manager of
3  reimbursement?
4    A.  No, not that I recall.
5    Q.  Now, since we have touched on this
6  quarterly evaluation of Medicaid utilization, did
7  you understand that the basic thrust of Abbott's
8  efforts to audit that information received from the
9  Medicaid programs was to make sure that the
10 Medicaid programs had quantified properly the
11 number of units that they had reimbursed of Abbott
12 drug?
13   A.  Yes.
14        MS. CITERA:  Objection to form.
15 BY MR. ANDERSON:
16   Q.  So I take it, then, that over the years,
17 Abbott sought to make sure that the units had been
18 properly documented by the Medicaid programs, and
19 that they were the same as what Abbott expected the
20 number of units to be?
21        MS. CITERA:  Objection.
22        THE WITNESS:  It wasn't so much what

49 (Pages 190 to 193)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 194

1  you expected them to be.  It was what they would
2  report, and then what you would look at and see if
3  it was way out of whack.  So I guess it is what you
4  expected it to be, in a way, yeah.
5  BY MR. ANDERSON:
6      Q.  So to the extent a Medicaid program had
7  some errors in the way it was reimbursing on a unit
8  basis, for instance, you mentioned per milliliter
9  versus per liter, that would have been caught in
10  these quarterly verifications and rectified;
11  correct?
12     A.  We would hope so.
13     Q.  Right.  That was the whole purpose of
14  doing the quarterly checks?
15     A.  That was the whole purpose of looking at
16  it, right, and doing the quarterly checks and
17  looking at the program, correct.
18     Q.  To the extent there was any discrepancy,
19  Abbott worked with the Medicaid program to make
20  sure that the utilization units were corrected?
21     A.  Yes.
22         MS. CITERA:  Objection to form.

Page 195

1  BY MR. ANDERSON:
2      Q.  So at this point, Medicaid programs that
3  keep records of the number of units that they have
4  reimbursed of Abbott products should have some
5  confidence that those units are correct?
6         MS. CITERA:  Objection to form.
7         THE WITNESS:  The State should have
8  confidence?
9         MR. ANDERSON:  Yes, sir.
10        MS. CITERA:  Objection to form.
11        THE WITNESS:  Yeah, they should be
12  able to administer their program.
13  BY MR. ANDERSON:
14     Q.  Right, and in fact, Abbott has over the
15  years believed that those were done correctly, and
16  to the extent Abbott identified utilization amounts
17  that seemed high, Abbott has sought to correct that
18  with the Medicaid programs?
19        MS. CITERA:  Objection to form.
20        THE WITNESS:  Prior to my coming, I
21  don't know if that's the case or not, but when I
22  got that responsibility, then we started to look at

Page 196

1  that.
2  BY MR. ANDERSON:
3      Q.  Right, okay.
4                Switching topics, how did Abbott
5  perceive that the movement that was proposed in the
6  '97 Balanced Budget Act from AWP to actual
7  acquisition drug reimbursement would impact
8  Abbott's business?
9         MS. CITERA:  Objection to form.
10        THE WITNESS:  I don't know.  I don't
11  recall.
12  BY MR. ANDERSON:
13     Q.  Well, you mentioned that there was some
14  corporate concern about how it may affect Abbott's
15  business; correct?
16        MS. CITERA:  Objection to form.
17        THE WITNESS:  I think -- I'm not
18  sure, but what I think I said was that we would
19  look at things like that.  We would look at
20  analyzing whether or not it would have an effect.
21  BY MR. ANDERSON:
22     Q.  And do you know that Abbott did, in

Page 197

1  fact, analyze that?
2         MS. CITERA:  Objection to form.
3         THE WITNESS:  No, I do not know
4  that.
5  BY MR. ANDERSON:
6      Q.  Do you have any general memory at all if
7  Abbott had an impression that movement from an
8  AWP-based reimbursement system to actual
9  acquisition would harm Abbott's business?
10        MS. CITERA:  Objection.
11        THE WITNESS:  No.  What I would --
12  well, it was something new, so it might have been
13  good.  It very well could have been good, too.  I
14  mean, this was going to affect everybody.  It
15  wasn't just going to affect Abbott.  It was going
16  to affect the entire industry.  So it could have
17  been good, could have been bad.
18  BY MR. ANDERSON:
19     Q.  How could it have been good for Abbott's
20  business?
21     A.  Well, you don't know.  We never knew,
22  because it never happened.

50 (Pages 194 to 197)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                     Philadelphia, PA

Page 198

1    Q.  And likewise, how could it have been bad
2  for Abbott's business?
3    A.  Well, you don't know -- again, you -- if
4  you stayed with the status quo, the status quo
5  would be the status quo.  So you just --
6    Q.  Well, for instance, I believe you have
7  testified that you and others at Abbott recognized
8  that Abbott had higher AWPs than its competitors;
9  correct?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  I testified to that?
12  I did?
13       MR. ANDERSON:  I will --
14       MR. STETLER:  I guess we all missed
15  it.
16  BY MR. ANDERSON:
17    Q.  If you believe that I am
18  mischaracterizing, let me know.
19       MR. STETLER:  I would appreciate it
20  if you don't mischaracterize it. That would be
21  better.
22  BY MR. ANDERSON:

Page 199

1    Q.  I will start over and just take it from
2  the top.
3       Sir, do you recall that Abbott had
4  AWPs on certain HPD products that were higher than
5  competitive AWPs?
6       MS. CITERA:  Objection to form.
7       THE WITNESS:  No.
8  BY MR. ANDERSON:
9    Q.  You don't?
10       To the extent Abbott had AWPs on its
11  products that were higher than competitive AWPs,
12  can you see how that would be a marketing advantage
13  for Abbott?
14       MS. CITERA:  Objection to form.
15       THE WITNESS:  Well, I mean, if you
16  are asking me to speculate on something like that,
17  yes, it would be, I guess.  But I --
18  BY MR. ANDERSON:
19    Q.  And the reason that could be a marketing
20  advantage is because you and others at Abbott knew
21  that the AWPs were a mechanism by which pharmacies
22  gauged their reimbursement; correct?

Page 200

1       MS. CITERA:  Objection to the form.
2       THE WITNESS:  We knew that AWP was a
3  mechanism off which pharmacies, physicians, got
4  reimbursed.
5  BY MR. ANDERSON:
6    Q.  Yes, sir, and to the extent Abbott had
7  AWPs which were higher than competitive products,
8  that would have been something that a pharmacy
9  would have found to be beneficial, and it could
10  have been a marketing advantage for Abbott;
11  correct?
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  Well, yes, yeah.
14  BY MR. ANDERSON:
15    Q.  And so to the extent the Balanced Budget
16  Act of '97 was seeking to move away from AWP-based
17  reimbursement to actual acquisition cost, that
18  could have actually been a negative for Abbott's
19  business; correct?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  No, we don't know
22  that.

Page 201

1  BY MR. ANDERSON:
2    Q.  You don't know it, but you see how it
3  could have been a negative, don't you?
4       MS. CITERA:  Objection to form.
5       THE WITNESS:  No.  I mean, I don't
6  want to answer that question, because we don't know
7  how it could have affected it, how -- Abbott's
8  business overall.
9  BY MR. ANDERSON:
10    Q.  And you don't remember if Abbott did, in
11  fact, have an impression about whether it would or
12  wouldn't impact the business; correct?
13    A.  No, I do not, because what I'm -- what I
14  think is this working group may have had some
15  information there, but obviously, I wasn't part of
16  that working group.
17    Q.  When you say this working group, you are
18  talking about Abbott's Medicare Working Group?
19    A.  Yes, correct.
20    Q.  You mentioned this morning that -- or
21  this afternoon, rather, that John Ward, as the
22  general manager of Alternate Site product sales had

51 (Pages 198 to 201)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL              May 17, 2007
                          Philadelphia, PA

Page 202

1    ultimate authority and control over the Medicaid
2    rebate submissions for HPD products; correct?
3           MS. CITERA:  Objection to form.
4           THE WITNESS:  Yes.
5    BY MR. ANDERSON:
6       Q.  Likewise, did Mr. Ward or other general
7    managers of Alternate Site product sales have
8    ultimate control and authority over the list prices
9    that were reported for HPD products to the
10   compendia?
11          MS. CITERA:  Objection to form.
12          THE WITNESS:  To my knowledge, no,
13   they did not.
14   BY MR. ANDERSON:
15      Q.  Why not?
16      A.  Because -- we have actually gone over
17   this before.  The list prices were established at a
18   corporate level.
19      Q.  Why were the rebate submissions not
20   approved at the corporate level?
21      A.  Approved?  The rebate submissions
22   approved?  I don't understand what you mean by

Page 203

1    approved.
2       Q.  You said John Ward had control and
3    authority as the general manager of Alternate Site
4    product sales for the HDP rebate submissions;
5    correct?
6           MS. CITERA:  Objection to form.
7           THE WITNESS:  He had responsibility
8    for that program, I mean, yes, and it was charged
9    to his budget, yes.
10   BY MR. ANDERSON:
11      Q.  So why was that control and authority
12   located in Alternate Site when these were products
13   that were being sold to hospitals as well as
14   Alternate Site customers?
15          MS. CITERA:  Objection to form.
16          THE WITNESS:  But they weren't, the
17   Medicaid program, that Medicaid Drug Rebate Program
18   is not a hospital program at all.  It has nothing
19   to do with hospitals.
20   BY MR. ANDERSON:
21      Q.  Well, you understand that hospitals also
22   have outpatient pharmacies, don't you?

Page 204

1       A.  Yes.
2       Q.  And in fact, over the years, Abbott has
3    actively partnered with such pharmacies and sought
4    to help them in filing reimbursement claims;
5    correct?
6           MS. CITERA:  Objection to form.
7           THE WITNESS:  Correct.
8    BY MR. ANDERSON:
9       Q.  And shared in the proceeds of those
10   claims, including claims that were submitted to
11   Medicare and Medicaid; correct?
12      A.  Yes, correct.
13      Q.  So why was it that if these products
14   were being sold through hospitals, as well as
15   Alternate Site customers, that John Ward was given
16   the authority and control over the Medicaid rebate
17   submissions?
18          MS. CITERA:  Objection to form.
19          THE WITNESS:  Because hospitals are
20   hospitals, and they are inpatient entities.
21   Outpatient entities came over to Alternate Site.
22   So anything that was outpatient was over in

Page 205

1    Alternate Site.  That's how Ward got it.
2    BY MR. ANDERSON:
3       Q.  And were those outpatient pharmacies
4    purchasing under contracts that they had obtained
5    from the hospital business sector?
6       A.  I don't know.  I don't know anything
7    about the contracting.  I knew contracts exist,
8    existed, and I knew there were discounts in
9    contracts, and I knew the contracts went for
10   periods of time, and that's my total knowledge of
11   contracts.
12      Q.  You mentioned that you have attended
13   industry meetings concerning reimbursement; is that
14   correct?
15      A.  Sure, yes.
16      Q.  And you said that you would attend,
17   what, a couple of those per year?
18      A.  In the early days, when I was learning,
19   I went to several.  I would go to maybe three a
20   year.  Lately, I don't go to very many.
21      Q.  And the audience of these industry
22   meetings are fellow drug company personnel and

52  (Pages 202 to 205)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL            May 17, 2007
Philadelphia, PA

Page 206

1  executives, such as yourself; correct?
2      A.  Drug companies, device companies.
3  Sometimes, in the early days, they would be home
4  care companies that would be there when the home
5  care business was going.
6      Q.  Oh, so it wouldn't just be drug
7  companies, but it would also be some providers?
8      A.  Yes, yes.
9      Q.  And in any of these meetings, were you
10  aware of anyone from Abbott ever disclosing to CMS
11  or HCFA officials that there were large spreads on
12  Abbott drugs?
13          MS. CITERA:  Objection to the form.
14          THE WITNESS:  No.
15  BY MR. ANDERSON:
16      Q.  You have mentioned in your testimony
17  that you felt like the AWP-based reimbursement was
18  senseless; correct?
19      A.  Correct.
20      Q.  If it was senseless, why did Abbott
21  personnel not disclose to CMS and HCFA that it was
22  senseless and that it was based on prices that were

Page 207

1  not being offered any customers?
2          MS. CITERA:  Objection to the form.
3          THE WITNESS:  Because it wasn't our
4  program.  It was the Feds' program.  It wasn't our
5  program.
6  BY MR. ANDERSON:
7      Q.  You said list prices.  You knew that
8  much?
9      A.  All companies set the list price.
10      Q.  And you, in turn, report the list prices
11  that trigger the AWP; correct?
12      A.  Correct.
13      Q.  So why didn't you go to CMS and HCFA and
14  say, listen, guys, these list prices that we are
15  reporting that trigger the AWP are nowhere close to
16  our market prices?
17          MS. CITERA:  Objection to form.
18          THE WITNESS:  Just because the
19  program was as squirrely as it was, and so many
20  people were looking at it, no one asked anybody if
21  anybody went to HCFA and did that.  No one did.  The
22  program was the program, and you lived with what it

Page 208

1  was.
2  BY MR. ANDERSON:
3      Q.  When you say squirrely, what do you
4  mean?
5      A.  It was an odd program.  It was just
6  something that was not based in reality.
7      Q.  Well, how did the program know that it
8  is not based in reality if --
9      A.  By their own -- I'm sorry, I jumped
10  over.
11      Q.  If Abbott is not coming forward
12  disclosing the real prices?
13          MS. CITERA:  Objection to form.
14          THE WITNESS:  Well, the program knew
15  itself from -- the OIG would tell it, in the days
16  before there was Med Pak, there was something --
17  there was another committee before Med Pak.  That
18  told them that it was -- that committee told the --
19  either Congress or CMS or HCFA that it was a
20  squirrely program, so they knew themselves.  They
21  didn't need us to tell them.
22  BY MR. ANDERSON:

Page 209

1      Q.  If you and others at Abbott felt like
2  these OIG reports were so forthcoming in describing
3  the reimbursement discrepancies, why wouldn't
4  Abbott at that point come forward and explain to
5  CMS and HCFA the spreads on HPD drugs?
6          MS. CITERA:  Objection to the form.
7          THE WITNESS:  Well, because the Feds
8  already knew the spread was there.  They knew it.
9  That's why they were trying to fix it.  That's why
10  they themselves would issue reports that would say,
11  we are paying too much for drugs.
12  BY MR. ANDERSON:
13      Q.  You know, don't you, that AWP is an
14  accurate benchmark for PPD drugs?
15          MS. CITERA:  Objection, form.
16          THE WITNESS:  I don't understand the
17  question, but I don't know --
18  BY MR. ANDERSON:
19      Q.  You know, don't you, that AWPs are
20  accurate benchmarks of market pricing for brand
21  drugs?
22          MS. CITERA:  Objection to the form.

53 (Pages 206 to 209)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL               May 17, 2007
                         Philadelphia, PA

Page 210

1        THE WITNESS: I'm not trying to be
2  difficult. I don't understand the question. I
3  know that -- rephrase the question, so I can
4  understand it better.
5  BY MR. ANDERSON:
6     Q.  Do you know that AWP is an accurate
7  benchmark of the market pricing for brand drugs?
8  Specifically, AWP is roughly 20 percent greater
9  than the market pricing on most brand drugs?
10    A.  What do you mean by market pricing?
11       MS. CITERA: Objection to form.
12       THE WITNESS: You mean list pricing?
13 BY MR. ANDERSON:
14    Q.  I mean the pricing the customers
15 actually pay in the marketplace, such as
16 pharmacies.
17       MS. CITERA: Objection to form.
18       THE WITNESS: Do I know that AWP is
19 what in relation to what a pharmacy pays?
20 BY MR. ANDERSON:
21    Q.  That AWP is an accurate benchmark,
22 specifically, that AWP is roughly 20 percent

Page 211

1  greater than the actual prices pharmacies are
2  paying to obtain brand drugs?
3        MS. CITERA: Objection to form.
4        THE WITNESS: Yes.
5  BY MR. ANDERSON:
6     Q.  And you have known that for many years;
7  correct?
8     A.  Yes.
9     Q.  And so AWP-based reimbursement does work
10 for brand drugs; correct?
11       MS. CITERA: Objection to form.
12       THE WITNESS: You have to define
13 does work.
14 BY MR. ANDERSON:
15    Q.  I will be more specific. AWP-based
16 reimbursement accurately estimates acquisition
17 costs for drug reimbursement purposes for brand
18 drugs; correct?
19       MS. CITERA: Objection to form.
20       THE WITNESS: AWP -- I'm not
21 following you. I'm sorry. I'm really not. What do
22 you mean by brand drugs? You mean as opposed to

Page 212

1  generics? Is that where you are going? Or just
2  drugs, do you mean drugs?
3  BY MR. ANDERSON:
4     Q.  I will rephrase, sir.
5        MR. STETLER: That would be good,
6  because I will tell you, I'm totally lost, too.
7  Maybe you know what you are talking about. I think
8  all he is trying to say is he can't follow the
9  question.
10       MR. ANDERSON: That's why I am going
11 to rephrase, but I move to strike the side bar.
12       MR. STETLER: Strike whatever you
13 want, but he has got to understand the question.
14 You are looking at him like he is crazy. He just
15 doesn't understand.
16       THE WITNESS: I truly don't
17 understand it. That's all.
18 BY MR. ANDERSON:
19    Q.  I have said I will rephrase. I move to
20 strike.
21       Mr. Heggie, you recognize that AWP
22 is an accurate benchmark for market pricing of

Page 213

1  brand drugs; correct?
2        MS. CITERA: Objection to the form.
3        THE WITNESS: That's the same
4  question. I still don't understand what you are
5  saying, when you say AWP is an accurate benchmark,
6  what do you mean by accurate benchmark? I don't
7  get it. I really don't.
8  BY MR. ANDERSON:
9     Q.  Why don't we take a look at a document
10 that may refresh your memory?
11    A.  Okay.
12       ---
13       (Whereupon the court reporter marked
14 document as Exhibit Heggie 903 for identification.)
15       ---
16 BY MR. ANDERSON:
17    Q.  Please review what's marked as Exhibit
18 Heggie 903, Mr. Heggie, Bates labeled ABT 212051
19 through 52.
20    A.  (Witness complies.) Okay.
21    Q.  Does this appear to be a memo or
22 interoffice correspondence written by Virginia

54 (Pages 210 to 213)

5afab192-6713-4ee2-bafb-e982083564b2

Page 214

1  Tobiason, manager of reimbursement at Abbott, on or
2  about June 11, '91?
3      A.  Yes, it does.
4      Q.  And you are shown as receiving a copy of
5  this; correct?
6      A.  Correct.
7      Q.  And there is other individuals, B.
8  Dempsey, M. King, D. Robertson and J. Ward;
9  correct?
10     A.  Correct.
11     Q.  Back in '91, what was Don Robertson's
12 position at Abbott?
13     A.  He was the Vice-President of Alternate
14 Site.
15     Q.  What was John Ward's position?
16     A.  General Manager, Product Sales.
17     Q.  What was your position?
18     A.  I don't know at that point.  I don't
19 think I was a manager yet.
20     Q.  Were you working under Virginia Tobiason
21 at or about June of 1991?
22     A.  Yeah, I think so.  I think I was still.

Page 215

1      Q.  What about B. Dempsey and M. King, what
2  were their positions?
3      A.  Bill Dempsey was the General Manager of
4  Home Care.
5      Q.  And what about M. King?
6      A.  Mike King was the General Manager of
7  Renal.
8      Q.  So would it be fair to say that the
9  recipients of this interoffice correspondence were
10 all high level managers in Abbott HPD, except for
11 yourself, who was working under Virginia Tobiason?
12         MS. CITERA:  Objection, form.
13         THE WITNESS:  Except for me.
14 BY MR. ANDERSON:
15     Q.  And were you beginning to work under
16 Virginia in reimbursement -- in the reimbursement
17 area back in '91?
18     A.  Yes.
19     Q.  Do you recall receiving this memo?
20     A.  No, not -- no, not specifically.
21     Q.  Do you recall Virginia from time to time
22 circulating memos, such as Exhibit Heggie 903, where

Page 216

1  AWP-based reimbursement was discussed?
2      A.  No.  As a standard operating procedure,
3  no, I do not.
4      Q.  Whether it was a standard operating
5  procedure or not, do you recall that from time to
6  time, she would circulate memos analyzing AWP-based
7  reimbursement?
8          MS. CITERA:  Objection, form.
9          THE WITNESS:  No, I will go back to
10 my earlier testimony when I said that when
11 something like this came up, we either, in this
12 particular case, in the early years, Virginia sent
13 something, would do something.  In the later years,
14 I would have done something, but --
15 BY MR. ANDERSON:
16     Q.  You had a chance to read Exhibit Heggie
17 903; correct?
18     A.  I read most of it.  I didn't read the
19 second page.
20     Q.  Would you agree that, basically, she is
21 describing a proposed change in the reimbursement
22 by Medicare for Part B drugs from AWP to AWP minus

Page 217

1  15 percent?
2          MS. CITERA:  Objection to form.
3          THE WITNESS:  That's the proposal.
4  The rule included a proposal to lower the payment
5  for drugs incident to physician services to AWP
6  minus 15.  So that was the proposal that was on the
7  table.
8  BY MR. ANDERSON:
9      Q.  Why would people who were in management
10 positions at Abbott care whether reimbursement was
11 at AWP or AWP minus 15 percent?
12         MS. CITERA:  Objection to form.
13         THE WITNESS:  Because it was a
14 change.
15 BY MR. ANDERSON:
16     Q.  And how would that change impact
17 Abbott's business?
18         MS. CITERA:  Objection to form.
19         THE WITNESS:  I don't know.
20 BY MR. ANDERSON:
21     Q.  I'm sorry.  I didn't mean to cut you
22 off.

55 (Pages 214 to 217)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                         Philadelphia, PA

Page 218

1    A.  That's all right.  You just don't know
2  until it happened.
3    Q.  Was it your experience that Virginia
4  Tobiason would send around memos to the decision
5  makers at Abbott Hospital Products to help them
6  understand potential changes in the business
7  environment?
8         MS. CITERA:  Objection to form.
9         THE WITNESS:  Yes.
10 BY MR. ANDERSON:
11   Q.  And does Exhibit Heggie 903 look like an
12 example of that?
13   A.  I can't say it looks like an example.
14 It is what it is.  It is a memo that Virginia sent
15 out, telling about HCFA's proposed rule.
16   Q.  I'm going to read from the first
17 sentence of the section titled Current Policy
18 toward the top?
19   A.  Sure.
20   Q.  "Medicare currently reimburses drugs
21 either based on reasonable charges or the drug cost
22 based on AWP as published in Redbook."

Page 219

1         Did I read that correctly?
2    A.  You did.
3    Q.  And that's consistent with your
4  testimony that Abbott knew Redbook information,
5  including AWPs, was transmitted to Medicaid and
6  Medicare programs; correct?
7         MS. CITERA:  I object to the form.
8         THE WITNESS:  Yes, correct.
9  BY MR. ANDERSON:
10   Q.  I'm also going to focus your attention,
11 sir, on the fourth bullet under Major Issues.
12        Are you there?
13   A.  I am.
14   Q.  "HCFA is seeking comments on the level of
15 discount.  I believe there are a number of
16 arguments we can use in response.  Some of these
17 are as follows."
18        Did I read that correctly?
19   A.  You did.
20   Q.  With whom would Abbott be making
21 arguments concerning the level of discount off of
22 AWP?

Page 220

1         MS. CITERA:  Objection to form.
2         THE WITNESS:  It would have been
3  making arguments to HCFA at that time in the
4  comments, in your comments.
5  BY MR. ANDERSON:
6    Q.  So Abbott would have been actually
7  arguing for a discount of of a smaller amount than 15
8  percent off AWP?
9         MS. CITERA:  Objection to form.
10        THE WITNESS:  I would have to read
11 this, if that's what she was advocating.  I don't
12 know.
13        MR. GOBENA:  If you are going to be
14 reading out loud, the court reporter is
15 transcribing, and you are going really fast --
16        THE WITNESS:  All right.  I won't
17 read out loud.  I just go faster if I read out
18 loud.  Okay, yes.
19 BY MR. ANDERSON:
20   Q.  My question was, sir, was Abbott arguing
21 to HCFA that the discount off of AWP should be less
22 than 15 percent in setting Medicare drug

Page 221

1  reimbursement?
2         MS. CITERA:  Objection to the form.
3         THE WITNESS:  No.  What this is
4  saying is, she is proposing arguments here. What
5  the comments were, I don't know, what finally went
6  --
7  BY MR. ANDERSON:
8    Q.  But to the extent in June of '91,
9  Virginia Tobiason was setting forth the arguments,
10 she was setting forth arguments that could be made
11 to HCFA where Abbott was seeking a smaller discount
12 off of AWP than 15 percent in setting Medicare drug
13 reimbursement; correct?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  I would say that she
16 is making arguments that the proposed rule is --
17 has some flaws, has some issues. That is what I
18 would take out of this.
19 BY MR. ANDERSON:
20   Q.  In other words, the proposed rule of
21 setting reimbursement for Medicare drug
22 reimbursement at AWP less 15 percent would be too

56 (Pages 218 to 221)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

|  |  |
|---|---|
| **Page 222** | **Page 224** |

**Page 222**

1  great a discount; correct?
2          MS. CITERA:  Objection to form.
3          THE WITNESS:  No, I don't think so.
4          MR. STETLER:  I'm going to object to
5  these characterizations, too.  It is not a
6  reduction of AWP.  It is a reduction for physicians
7  in the office of AWP, which is entirely different.
8  You are asking him a different question than what
9  he is looking at on the piece of paper.
10          MR. ANDERSON:  You are in violation
11  of the Texas rules.  I move to strike all the side
12  bar comments.
13          MR. STETLER:  We are not in Texas.
14  We are in America today.
15          MR. ANDERSON:  You are in violation
16  of the federal rules.  The Texas rules are just
17  patterned after the federal rules.  You can object,
18  form.
19          MR. STETLER:  I am aware of the
20  federal rules, and I think that the witness
21  deserves to be treated fairly, and the questions
22  should be asked fairly.

**Page 223**

1          MR. ANDERSON:  These are fair
2  questions.
3          MS. CITERA:  I'm going to
4  incorporate his objections.
5          MR. ANDERSON:  I move to strike all
6  the side bar comments.
7  BY MR. ANDERSON:
8      Q.  Mr. Heggie, will you agree that Virginia
9  Tobiason was advocating or proposing arguments that
10  the discount off of AWP in setting Medicare drug
11  reimbursements be less than 15 percent?
12          MS. CITERA:  Objection to form.
13          THE WITNESS:  No, I would not agree
14  with that at all.
15  BY MR. ANDERSON:
16      Q.  Why not?
17      A.  Because what she is doing here is, she
18  is setting forth some ideas that we might use,
19  Abbott might use, to comment on the rule.  And
20  these things would need to be looked at.  Discounts
21  vary among purchasers, for example, the first
22  bullet point, you would have to look at that, you

**Page 224**

1  would have to look at the second and the third.  I
2  don't believe that she is advocating anything.  She
3  is suggesting here that these are things that we
4  should look at in our comments.
5      Q.  What do you take from her sentence,
6  quote:  I believe there are a number of arguments
7  we can use in response?  Who is we?
8          MS. CITERA:  Objection to form.
9          THE WITNESS:  Abbott.
10  BY MR. ANDERSON:
11      Q.  Let's read some of those arguments.  The
12  first one reads, quote:  Discounts vary among
13  purchasers.  Some providers may pay full AWP, and
14  others may get a discount, but not a full 15
15  percent due to manufacturers' discounting
16  practices.
17          Did I read that correctly?
18      A.  You did.
19      Q.  Does that sentence indicate to you that
20  AWP is a good benchmark that indicates prices paid
21  by pharmacies and other providers such as
22  physicians?

**Page 225**

1          MS. CITERA:  Objection to the form.
2          THE WITNESS:  No, it does not at
3  all.
4  BY MR. ANDERSON:
5      Q.  What does that bullet indicate to you,
6  sir?
7      A.  Prices paid by pharmacies and other
8  physicians is what you said.  That is not -- has
9  nothing to do with AWP.  They pay list or some
10  discounted price off list.
11      Q.  What do you take from her statement,
12  quote:  Some providers may pay full AWP?
13          MS. CITERA:  Objection to form.
14          THE WITNESS:  I don't know.
15  BY MR. ANDERSON:
16      Q.  Was that a true statement in June of
17  '91, that providers were paying full AWP?
18      A.  Discounts vary among purchasers.  Some
19  providers may pay full AWP.  Sorry.  I don't know.
20  I don't know.  I would question the statement that
21  providers pay AWP.
22      Q.  Would you -- so it was untruthful?

57 (Pages 222 to 225)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 226

1         MS. CITERA:  Objection to form.
2         THE WITNESS:  No, no.  This woman
3  would hardly be untruthful.
4  BY MR. ANDERSON:
5     Q.  You are saying she just made a mistake?
6         MS. CITERA:  Objection to form.
7         THE WITNESS:  I'm saying I don't
8  understand it.  This is Virginia's memo, not mine.
9  BY MR. ANDERSON:
10    Q.  Well, you received it, didn't you?
11    A.  Sure.
12    Q.  You, along with other key personnel in
13  Abbott Hospital Products; correct?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  Right, correct.
16  BY MR. ANDERSON:
17    Q.  What do you make of her statement that
18  others may get a discount, but not a full 15
19  percent?
20        MS. CITERA:  Objection to the form.
21        THE WITNESS:  I don't make anything
22  out of that.  I don't make anything out of it.

Page 227

1  BY MR. ANDERSON:
2     Q.  Does that indicate to you that customers
3  were buying drugs at AWP less 15 percent at a
4  minimum?
5         MS. CITERA:  Objection to the form.
6         THE WITNESS:  No, I don't know that.
7  BY MR. ANDERSON:
8     Q.  Do you see any mention in this memo of
9  providers paying AWP less 30 percent?
10    A.  No.
11    Q.  Do you see any mention in this memo
12  marked Exhibit Heggie 903 of providers purchasing
13  drugs for AWP less 90 percent?
14    A.  No.
15    Q.  If, in 1991, the AWP-based reimbursement
16  system was senseless, as you have testified, don't
17  you think Abbott could have told HCFA that the
18  discount actually needed to be far greater than 15
19  percent?
20        MS. CITERA:  Objection to form.
21        THE WITNESS:  Yes, certainly.
22  BY MR. ANDERSON:

Page 228

1     Q.  Why didn't Abbott do that?
2         MS. CITERA:  Objection to form.
3         THE WITNESS:  Because it wasn't --
4  it wasn't what we were responding to.  Indeed, if
5  there was a comment, the comment would have had to
6  respond to what HCFA was proposing, which was the
7  average wholesale price, minus 15 percent.  You
8  respond to the rule.
9  BY MR. ANDERSON:
10    Q.  And in responding, Abbott sought to
11  actually have a smaller discount than 15 percent
12  taken from AWP in setting Medicare drug
13  reimbursement; correct?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  You may know that.  I
16  do not know that.  I do not know what the comment
17  was.  You may have the comments in your stuff
18  there.  I do not know that.
19  BY MR. ANDERSON:
20    Q.  At least from Exhibit Heggie 903, you know
21  Abbott was contemplating making a comment that the
22  discount off of AWP should be less than 15 percent

Page 229

1  in setting Medicare drug reimbursement; correct?
2         MS. CITERA:  Objection to form.
3         THE WITNESS:  No, incorrect.
4  BY MR. ANDERSON:
5     Q.  Exhibit Heggie 903 doesn't indicate to you
6  that that was at least contemplated?
7         MS. CITERA:  Objection to form.
8         THE WITNESS:  It does not.
9  BY MR. ANDERSON:
10    Q.  Why not?
11    A.  Because it indicates to me that this was
12  a memo from Virginia to a number of people, and
13  these were arguments that she was suggesting we, as
14  a company, could make.  What you are doing is
15  leaping to saying that Abbott was contemplating
16  this.  That is not -- to my knowledge that is not
17  what this says.  We don't know what Abbott did.
18    Q.  Well, I will try to address that.
19    A.  Okay.
20    Q.  At least in her role as manager of
21  reimbursement, Virginia Tobiason is contemplating
22  commenting to HCFA that the discount off of AWP for

                              58  (Pages 226 to 229)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 230

1   setting Medicare drug reimbursement should be less
2   than 15 percent; correct?
3          MS. CITERA:  Objection, form.
4          THE WITNESS:  No, again, not
5   correct.
6   BY MR. ANDERSON:
7      Q.  Why not?
8      A.  Because she doesn't say it in here.  To
9   me, from my reading of this.  All she says is
10  discounts vary among purchasers.  Some providers
11  may pay full AWP, and others may get a discount,
12  but not a full 15 percent discount, due to
13  manufacturers' discounting practices.  It doesn't
14  say anything about that, nor do the others say
15  anything about --
16     Q.  Mr. Heggie, do you believe it was a true
17  statement by Virginia Tobiason in June of '91 that
18  providers may get a discount, but not a full 15
19  percent in buying drugs off AWP?
20     A.  Yeah, I think so.  At the time she wrote
21  that, I think she may have -- yeah, yeah -- may
22  have believed that.

Page 231

1      Q.  So if, in 1991, providers were only
2   paying somewhere between 15 to 0 percent off AWP to
3   purchase drugs, does that indicate to you that AWP
4   was senseless?
5          MS. CITERA:  Objection to form.
6          THE WITNESS:  Ask me that again.
7   Say that again.
8   BY MR. ANDERSON:
9      Q.  You have testified repeatedly today that
10  AWP was senseless; correct?
11     A.  Yes, correct, I do believe it is
12  senseless program.
13     Q.  Well, if Virginia Tobiason was telling
14  the truth in June of 1991 in stating that providers
15  were paying somewhere between 15 to 0 percent in
16  purchasing drugs off AWP, does that indicate to you
17  that AWP was senseless?
18         MS. CITERA:  Same objection.
19         THE WITNESS:  I don't get the
20  linkage.  First of all, I disagree with some
21  providers may pay full AWP, okay?  I totally
22  disagree with that sentence.  Providers in my

Page 232

1   experience never paid AWP.  No one paid AWP.  The
2   person that pays AWP is the third-party payor.
3   BY MR. ANDERSON:
4      Q.  So to the extent Abbott represented to
5   HCFA that providers pay full AWP, that would be a
6   misrepresentation?
7          MS. CITERA:  Objection to form.
8          THE WITNESS:  It wouldn't have been
9   a misrepresentation.  It would have been a --
10  something that in the comment, if the comment -- I
11  mean, we are speculating on whether there was a
12  comment or not.  None of this ever went to HCFA.
13  None of this that I know of.  So I don't know.  I
14  can't answer the question.
15  BY MR. ANDERSON:
16     Q.  How do you know none of it went to HCFA?
17     A.  Well, I don't, but you are not telling
18  me, so --
19     Q.  So you don't have any personal knowledge
20  that Virginia Tobiason or others at Abbott never
21  made these arguments to HCFA, do you?
22     A.  No, none whatsoever.

Page 233

1      Q.  Now, looking at the next bullet, sir, at
2   the top of the second page of Exhibit Heggie 903?
3      A.  Sure.
4      Q.  It reads:  Actual drug costs are not the
5   only costs to be considered when establishing a
6   drug fee screen.  Others include waste, breakage,
7   inventory cost and drug procurement costs.  Also,
8   bad debt needs to be considered, since Medicare
9   only covers 80 percent of the drug cost.
10         Did I read that correctly?
11     A.  You did.
12     Q.  What do you take from Virginia
13  Tobiason's statement that bad debt needs to be
14  considered, since Medicare only covers 80 percent
15  of drug costs?
16         MS. CITERA:  Objection to form.
17         THE WITNESS:  Many providers have
18  bad debt.  Many.  Home care companies sometimes
19  cannot collect for the 20 percent.  She is referring
20  to the 20 percent that a home care company couldn't
21  collect or a hospital can't collect.
22  BY MR. ANDERSON:

59 (Pages 230 to 233)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL            May 17, 2007
                     Philadelphia, PA

Page 234

1    Q.  And that 20 percent is the co-pay from
2  the person; correct?
3    A.  It can be from the person, it can be
4  from a Medi-Gap policy, it could be from a Medicaid
5  agency.  You try to collect from a state Medicaid
6  agency the 20 percent co-pay.  Good luck.
7    Q.  So in other words, she is advocating
8  that the 20 percent co-pay that's paid on behalf of
9  a patient or by a patient needs to be recovered in
10 the 80 percent Medicare drug reimbursement;
11 correct?
12       MS. CITERA:  Objection to form.
13       THE WITNESS:  I don't know what she
14 is advocating.  What she is saying is that as part
15 of this argument, bad debt needs to be considered.
16 BY MR. ANDERSON:
17   Q.  And is that a situation where Abbott
18 would consider the 20 percent co-pay in setting
19 prices akin to what you did on Calcijex?
20       MS. CITERA:  Objection to form.
21       THE WITNESS:  I'm sorry.  Phrase the
22 question again.  I don't understand that.

Page 235

1  BY MR. ANDERSON:
2    Q.  You recall changing the markup on
3  Calcijex from 20 percent to 25 percent, don't you?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  From changing the
6  markup?  Yes, we did at one point.  I think we did
7  at one point.
8  BY MR. ANDERSON:
9    Q.  And didn't you give the rationale for
10 that change because the 20 percent co-pay of the
11 kidney dialysis patients needed to be covered in
12 the initial payment under Medicare?
13       MS. CITERA:  Objection, form.
14       THE WITNESS:  I don't recall.  I
15 might.
16 BY MR. ANDERSON:
17   Q.  Well, we are going to take a break to
18 switch tapes, and I will have an exhibit for you on
19 that.
20   A.  Okay, great.
21       THE VIDEO TAPE OPERATOR:  This
22 concludes Video Tape Number 2 in the video tape

Page 236

1  deposition of Michael Heggie.  The time is 7:43.
2        THE VIDEO TAPE OPERATOR:  We are
3  back on the video.  This is Video Tape Number 3 in
4  the deposition of Michael Heggie. The time is 7:47.
5  BY MR. ANDERSON:
6    Q.  Mr. Heggie, during the break, were you
7  able to review the one-page exhibit marked in this
8  case as Exhibit 70?
9    A.  Yes, I was.
10   Q.  And does this appear to be an e-mail
11 conversation that you were a part of back in 1996?
12   A.  Yes.
13   Q.  And specifically, it has to do with
14 Calcijex, which is a drug that was sold by HPD;
15 correct?
16   A.  Correct.
17   Q.  And does this document, Exhibit 70,
18 refresh your memory that you had set the AWP markup
19 differently on Calcijex in order to cover the 20
20 percent co-pay?
21       MS. CITERA:  Objection, form.
22       THE WITNESS:  I don't read that, but

Page 237

1  I will read it again.  Hang on.  Do you want me to
2  read it again?  Um-hum.
3  BY MR. ANDERSON:
4    Q.  Is that a yes to my question, sir?
5    A.  Yes, yes.
6    Q.  And so that, what you did in '96 with
7  Calcijex, as reflected in --
8    A.  I didn't do this.
9    Q.  It wasn't your authority, ultimately?
10       MS. CITERA:  Objection to form.
11       THE WITNESS:  It was never my
12 authority, period, ever.
13 BY MR. ANDERSON:
14   Q.  But you were involved in the process,
15 and you were explaining the process in Exhibit 70;
16 correct?
17   A.  I was explaining the process, absolutely
18 correct.
19   Q.  But who did you understand had the
20 ultimate decision-making authority on setting the
21 markup differently for Calcijex in causing AWPs to
22 be published?

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael            CONFIDENTIAL              May 17, 2007
                        Philadelphia, PA

Page 238

1        MS. CITERA:  Objection to form.
2        THE WITNESS:  Whoever was the
3 general manager at the time, Mike King or Loreen
4 Mershimer.
5 BY MR. ANDERSON:
6    Q.   And those were Abbott employees,
7 obviously; correct?
8    A.   Yes, that's correct, general managers of
9 the Renal Group.
10    Q.   So this issue with Calcijex is similar
11 to the bad debt issue that Virginia Tobiason was
12 advocating in her June 1991 memo that's marked as
13 Exhibit Heggie 903; correct?
14        MS. CITERA:  Objection to form.
15        THE WITNESS:  Yes, they are similar
16 -- they are the same issue.  They are linked, bad
17 debt, bad debt, correct.
18 BY MR. ANDERSON:
19    Q.   Do you consider it appropriate for
20 Abbott to cause to be reported prices for
21 reimbursement purposes that are intended to cover
22 co-pays by Medicare patients or paid on behalf of

Page 239

1 Medicare patients?
2        MS. CITERA:  Objection to form.
3        THE WITNESS:  Do I consider it
4 appropriate?  Is that what you are asking?
5        MR. ANDERSON:  Yes, sir.
6        MS. CITERA:  Objection.
7        THE WITNESS:  I don't know that I
8 considered it appropriate or inappropriate.  It was
9 a fact.  It was just what there was, that bad debt
10 was out there.
11 BY MR. ANDERSON:
12    Q.   Yes, sir, and given that there was bad
13 debt out there, was it appropriate for Abbott to
14 try to address that by causing prices to be
15 reported that would allow providers to receive
16 greater reimbursement under the Medicare 80 percent
17 drug benefit?
18        MS. CITERA:  Objection to the form.
19        THE WITNESS:  Well, it was a -- I
20 don't know.  I would have to actually think about
21 that.  Was it appropriate for Abbott to take that
22 into consideration is your question, really; is

Page 240

1 that correct?
2        MR. ANDERSON:  Yes, sir.
3        THE WITNESS:  I would say that
4 within the program, we knew all of those things,
5 yeah, it probably was.
6 BY MR. ANDERSON:
7    Q.   It probably was appropriate?
8    A.   Yeah.
9    Q.   Would it -- you know who Mike Sellers
10 is, don't you?
11    A.   Yes.  Sellers replaced Dempsey, correct.
12    Q.   And to the extent Sellers replaced
13 Dempsey, he was a manager of home infusion within
14 Abbott HPD; correct?
15    A.   Correct.
16    Q.   And he has gone on to have other
17 management positions at Abbott; correct?
18    A.   I don't know.  Sellers was there when I
19 was there.  I don't follow Sellers.
20    Q.   I apologize.  I cut you off.  That was
21 my fault.
22        At least while you knew -- what you

Page 241

1 knew while you were there was that Mike Sellers was
2 in a position of authority; correct?
3    A.   Correct.
4    Q.   Would it surprise you that Mike Sellers
5 has condemned the practice of manipulating prices
6 to cover 20 percent Medicare co-pays?
7        MS. CITERA:  Objection to form.
8        THE WITNESS:  I don't know. No, it
9 -- I don't know.  Sellers would have his opinion.
10 BY MR. ANDERSON:
11    Q.   At the minimum, you will agree with me,
12 won't you, that if the 80 percent that Medicare is
13 paying in a drug benefit is increased in amount, in
14 dollar amount, that that's causing Medicare to pay
15 more money; correct?
16        MS. CITERA:  Objection to form.
17        THE WITNESS:  Say it again. If
18 Medicare is --
19 BY MR. ANDERSON:
20    Q.   You will agree with me that to the
21 extent, specifically, for instance, Abbott caused
22 the AWPs on Calcijex to be published in greater

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Page 242

1 amounts than previously published, that, in turn,
2 caused Medicare to pay a greater dollar amount for
3 its drug benefit, which was intended to cover 80
4 percent of the drug costs?
5           MS. CITERA: Objection to form.
6           THE WITNESS: I think Calcijex was
7 always reported at this 125, I believe, from the
8 beginning of time, from the beginning of the
9 introduction of the drug, I believe it was always
10 reported that way.
11 BY MR. ANDERSON:
12    Q. All right, I will try to address that.
13           You will agree with me, won't you,
14 that to the extent Calcijex had an AWP that was
15 reported 25 percent greater than direct price or
16 list price, while other Abbott drugs had AWPs that
17 were only 20 percent greater, that that, in turn,
18 would cause Medicare to pay greater amounts in drug
19 reimbursement on Calcijex?
20    A. Yes, correct.
21    Q. And that was actually the intention, so
22 that, in turn, the providers would not have to

Page 243

1 absorb so much bad debt on the co-pays; correct?
2           MS. CITERA: Objection to form.
3           THE WITNESS: I believe it was.
4 BY MR. ANDERSON:
5    Q. And that was something that was done, as
6 you understand it, by management at Abbott?
7           MS. CITERA: Objection to form.
8           THE WITNESS: Yeah. Well, yes, yes.
9 BY MR. ANDERSON:
10    Q. All right, now, changing topics
11 slightly, you mentioned that you recall having some
12 communications with TAP personnel and PPD personnel
13 in the early '90s concerning Medicare
14 reimbursement; correct?
15    A. Correct.
16    Q. You don't recall the Medicare Working
17 Group, per se, but you do recall these discussions
18 with TAP and PPD, right?
19           MS. CITERA: Objection to form.
20           THE WITNESS: Yes, early on.
21 BY MR. ANDERSON:
22    Q. Yes. Back in the early '90s, why were

Page 244

1 TAP and PPD personnel interested in Medicare
2 reimbursement?
3           MS. CITERA: Objection to form.
4           THE WITNESS: Lupron, which was
5 their only drug at the time, TAP, was going to be
6 all Medicare reimbursement.
7 BY MR. ANDERSON:
8    Q. So the entire marketplace, as you
9 understood it for Lupron, was Medicare patients?
10    A. Pretty much, pretty much.
11    Q. So Medicare reimbursement was going to
12 be critical to the success in selling Lupron?
13           MS. CITERA: Objection to form.
14           THE WITNESS: Yes, sure.
15 BY MR. ANDERSON:
16    Q. Why was PPD interested in Medicare
17 reimbursement back in the early '90s?
18           MS. CITERA: Objection to form.
19           THE WITNESS: That, I really can't
20 -- I can answer a little. There were so much HMO
21 activity in those days. That's why. The HMOs were
22 coming along, and there was so much activity on the

Page 245

1 drug side from the HMOs.
2 BY MR. ANDERSON:
3    Q. How were the -- I apologize.
4    A. Go ahead.
5    Q. How would the expansion of Health
6 Maintenance Organizations or HMOs impact PPD's view
7 of Medicare reimbursement?
8           MS. CITERA: Objection to form.
9           THE WITNESS: Oh, Medicare
10 reimbursement, you were specifically asking about
11 Medicare. Sorry, I thought you said drugs. I
12 couldn't tell you why they would specifically be
13 interested in Medicare.
14 BY MR. ANDERSON:
15    Q. So despite remembering participating in
16 discussions with PPD personnel about Medicare
17 reimbursements, you don't remember what they were
18 interested in?
19    A. Well, it would have been the same types
20 of things, like this issue that we were talking
21 about earlier, this published rule, potential rule,
22 for changing the AWP calculation. It might have

62 (Pages 242 to 245)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 246

1   been something like that.  It could have been
2   anything.
3       Q.  And for the record, you are indicating
4   Exhibit Heggie 903; correct?
5       A.  I am, correct.
6       Q.  And so it is your understanding and
7   experience, in fact, that PPD personnel at Abbott
8   were equally interested in AWP-based reimbursement
9   analysis such as that reflected in Exhibit Heggie
10  903?
11          MS. CITERA:  Objection to form.
12          THE WITNESS:  No, not even close,
13  not even close to what I'm saying.
14  BY MR. ANDERSON:
15      Q.  Okay, what are you saying, sir?
16      A.  What I am saying is, you asked me about
17  what types of things I would talk to PPD about, and
18  I said to you, it is things like this, perhaps
19  this, that's all I'm saying.
20      Q.  And this being Exhibit Heggie 903?
21      A.  This being Exhibit Heggie 903, like things
22  like this.

Page 247

1       Q.  So when you say like this, you mean PPD
2   personnel would discuss with you AWP-based
3   reimbursement?
4           MS. CITERA:  Objection to form.
5           THE WITNESS:  No, I'm not saying
6   that at all.  You did this to me last time as well,
7   and so I want to be very clear with you.
8   BY MR. ANDERSON:
9       Q.  Tell me what you are saying, sir.
10      A.  What I'm saying is, there were certain
11  things that I would discuss with PPD.  I do not --
12  you cannot characterize it as saying that I went
13  over to PPD, and I discussed AWP with PPD. I don't
14  know if I did that, but it is very possible.
15      Q.  Okay, I think I understand the
16  distinction.
17          You are saying you believe that's
18  the type of discussion you would have had, it is
19  possible that you had those discussions, but you
20  just don't remember specifically?
21      A.  Exactly.
22      Q.  All right.

Page 248

1           Did you also discuss with PPD
2   personnel Medicaid drug reimbursement?
3       A.  Sure.
4       Q.  And while you don't remember specifics,
5   you remember that that would have been a topic of
6   conversation; correct?
7       A.  Yes.
8       Q.  And specifically, you remember Deb
9   DeYoung participating in these conversations;
10  correct?
11          MS. CITERA:  Objection to form.
12          THE WITNESS:  Correct.
13  BY MR. ANDERSON:
14      Q.  And there was another woman who had dark
15  hair, but you can't recall her name?
16      A.  Exactly.  I cannot.
17      Q.  Was there any other PPD personnel that
18  you recall being involved in these discussions of
19  Medicare and Medicaid reimbursement?
20          MS. CITERA:  Objection to form.
21          THE WITNESS:  Jerrie Cicerale.  She
22  was over there.  No, Cicerale was not in PPD.

Page 249

1   Cicerale was in HPD.  She worked in Eichhorn's
2   area.  Who else in PPD -- no, no, the only one
3   would be Debbie DeYoung.  Cicerale was in HPD.
4   BY MR. ANDERSON:
5       Q.  You mentioned dark hair.
6           Does the name Kay Morgan ring a
7   bell?
8       A.  I know Kay Morgan, but it wasn't Kay
9   Morgan, but yes, I know Kay Morgan.  Kay and I had
10  a few discussions.
11      Q.  Did you ever discuss anything pertaining
12  to drug reimbursement with Kay Morgan?
13      A.  Not that I recall.
14      Q.  Did you discuss anything pertaining to
15  drug price reporting to price publishing services
16  or Medicaid programs with Kay Morgan?
17      A.  I don't recall.  I don't think so.  I
18  don't think so. I don't even know what Kay's
19  function was over there.
20      Q.  Outside of some type of personal contact
21  with Kay Morgan, you seem to recall some
22  discussions with her.

63  (Pages 246 to 249)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 250

1          What were those, generally?
2     A.  I don't know.  Kay didn't like me, so I
3  just remember that Kay didn't like me.  That's all
4  I remember.  And she -- we would -- when I would
5  try to interact with her for something, and I don't
6  know even what she did, she would shut me down.  So
7  I never had any substantive discussions with Kay of
8  any sort.
9     Q.  In these meetings that you would have
10  back in the early '90s with PPD personnel, were
11  there minutes or memos or any type of documentation
12  of the meetings?
13     A.  No.
14     Q.  It was all just done verbally?
15     A.  Yes.
16     Q.  And I take it, at some point, the
17  meetings stopped; is that correct?
18          MS. CITERA:  Objection to form.
19  BY MR. ANDERSON:
20     Q.  I will be more specific, sir.
21          Prior to your departure from Abbott
22  in or about '97, had you stopped having meetings

Page 251

1  with PPD or TAP personnel concerning Medicare and
2  Medicaid reimbursement?
3          MS. CITERA:  Objection to form.
4          THE WITNESS:  TAP stopped in the
5  early, early '90s, because they got their own
6  person.  They used me early on, and I would say --
7  I don't know.  I would be guessing, but by '92 or
8  so, they were done with us.
9  BY MR. ANDERSON:
10     Q.  Because they had their own manager of
11  reimbursement?
12     A.  Yes, they had hired somebody.
13     Q.  What about PPD?
14     A.  Again, it would have been ongoing, you
15  know, if issues came up, somebody might have said
16  something about what's PPD think of this or what's
17  going on at PPD about it?
18     Q.  So discussions continued on an ad hoc
19  basis?
20     A.  Yes, correct.
21     Q.  Did you understand that this type of
22  effort to stay abreast of Medicare and Medicaid

Page 252

1  drug reimbursement was important to the sales of
2  the drugs?
3          MS. CITERA:  Objection to the form.
4          THE WITNESS:  Well, to the extent
5  that it was important to the business, yes, because
6  the business was to sell the drugs, so yes.
7  BY MR. ANDERSON:
8     Q.  I don't think we have ever done this,
9  and I apologize.  We probably should have.  I'm
10  going to ask you to define or at least provide the
11  meaning that you understand different pricing terms
12  to have, okay?
13     A.  Sure.
14     Q.  What is list price?
15     A.  The list price is a published price that
16  the company wants to put out as its price, as its
17  retail price, if you will.
18     Q.  And when you say published, what do you
19  mean?
20     A.  The published would mean that that is
21  the price that you have established in the public
22  domain.

Page 253

1     Q.  Would you consider the price list that
2  Abbott submitted to customers to be list price?
3          MS. CITERA:  Objection, form.
4  BY MR. ANDERSON:
5     Q.  I will rephrase.
6     A.  I don't know.  I am guessing.  I think
7  so.  Yeah, I think customers got a list price.  I
8  think they did.
9     Q.  Let me rephrase slightly, sir.  Would
10  you consider the price list that Abbott sent to
11  customers to contain list price?
12          MS. CITERA:  Objection to form.
13          THE WITNESS:  Well, there were a
14  bunch of price lists, so there was like -- there
15  was a price list.  I can remember a list price, and
16  then there were some -- there was another price
17  list that was for, I believe, contracts.  I'm not
18  sure, but there was -- there was one thing that was
19  a list price.  That, I'm sure of.  It was a
20  document, it was about this thick, and it laid out
21  every product, and it had a list price over here.
22  I remember seeing it.

64 (Pages 250 to 253)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 254

1  BY MR. ANDERSON:
2     Q.  And other than that, were there other
3  price lists that were transmitted to customers?
4     A.  Oh, I don't know if they were
5  transmitted to customers.  There were other price
6  lists. Obviously, I would assume they went to
7  customers, but yes, there were other price lists.
8     Q.  You understood that the intent behind
9  having other price lists was to send it to
10 customers?
11        MS. CITERA:  Objection to form.
12        THE WITNESS:  I understood it was to
13 be used in different situations, yes.
14 BY MR. ANDERSON:
15    Q.  What is your understanding of the
16 meaning of the term wholesale price?
17    A.  Wholesale price was the price that we
18 would charge to a distributor, like McKesson, let's
19 say, for example, or there is another one up there.
20 Was it maybe American Hospital Supply?  Maybe I'm
21 vague on my names, but a distributor.
22    Q.  When you say the price you would charge

Page 255

1  distributors, do you mean to say the price that you
2  would invoice the distributors?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  I don't know. You are
5  way out of my territory.  I just know that there
6  was a wholesale price, and I believed the wholesale
7  price was the pricing that went to people who had
8  warehouses and who took possession of the product
9  and then turned around and sold it.
10 BY MR. ANDERSON:
11    Q.  Do you have an understanding of the term
12 wholesale acquisition cost or the acronym WAC?
13    A.  Yes.
14    Q.  What's that mean?
15    A.  Same thing.
16    Q.  Do you have an understanding of the term
17 trade price?
18    A.  No, not really.
19    Q.  Do you have an understanding of the term
20 direct price?
21    A.  Yes.
22    Q.  What does it mean?

Page 256

1     A.  Direct price was for the people -- to
2  the best of my knowledge, direct price was for the
3  people who had a contract with you and bought on
4  direct price.
5     Q.  Do you have an understanding of the term
6  RxLink, acquisition cost?
7     A.  No, RxLink sounds like a -- to me,
8  sounds like a drug supplier or something.
9     Q.  So you never even heard of the term
10 RxLink; is that correct?
11    A.  No, not that I can --
12    Q.  Now, were you involved in the
13 circulation of printed materials, such as catalogs
14 or other documentation?
15        MS. CITERA:  Objection to form.
16        THE WITNESS:  You mean to go to
17 customers?  Not that I can recall; although, we
18 could have sent communications to customers -- it
19 was mostly internal, what I did.  Like, I explained
20 things for the sales force, that kind of stuff.
21 BY MR. ANDERSON:
22    Q.  So you do remember having involvement in

Page 257

1  having printed and circulated materials for the
2  Abbott sales force?
3        MS. CITERA:  Objection to form.
4        THE WITNESS:  Yes.
5  BY MR. ANDERSON:
6     Q.  Can you describe what those types of
7  materials generally were?
8     A.  Well, they would have tried to explain
9  the programs, for example.  They might have tried
10 to explain the Medicare program or the Medicaid
11 program.  They might have tried to do that, so they
12 would be better informed salespeople.  I would do
13 internal documents on -- well, one, I remember
14 clearly was when we were launching a pump, and I
15 did a number of things to explain how pumps were
16 paid and the drugs that were used in the pump and
17 then some of the drug codes that went with it and
18 that kind of thing.
19    Q.  Were these pumps also known as the AIM
20 system?
21    A.  Yep, it was the AIM pump, it was.
22    Q.  You mentioned materials explaining

65 (Pages 254 to 257)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL               May 17, 2007
                         Philadelphia, PA

---

Page 258

1   Medicare and Medicaid.
2          Do you remember sending those types
3   of materials to the Abbott sales force?
4       A.  I don't remember sending them.  I mean,
5   I remember preparing them from time to time, and
6   yeah, so then I would send them, yes, so I
7   remember, yes, I guess -- I mean --
8       Q.  You didn't physically lick all the
9   envelopes and stick the stamps?
10      A.  Exactly.
11      Q.  But you ordered them to be sent, and to
12  your knowledge, they were circulated?
13          MS. CITERA:  Objection to form.
14          THE WITNESS:  Right, exactly.
15  BY MR. ANDERSON:
16      Q.  And this would have been in a primer, so
17  to speak, of Medicaid and Medicare reimbursement,
18  right?
19          MS. CITERA:  Objection to form.
20          THE WITNESS:  There could have been,
21  at some point, there could have been one developed.
22  I'm trying to think if I did one.  I can't recall,

---

Page 259

1   but yes, that would be the type of thing I would
2   do, I would do it.
3   BY MR. ANDERSON:
4       Q.  And did you also have any involvement in
5   having circulated selling pieces also maybe known
6   as selling modules?
7           MS. CITERA:  Objection to form.
8           THE WITNESS:  No, that I don't
9   recall, unless you are calling it something
10  different from what I would call it.
11  BY MR. ANDERSON:
12      Q.  I will show you some specifics.
13      A.  Okay.
14          ---
15          (Whereupon the court reporter marked
16  document as Exhibit Heggie 904 for identification.)
17          ---
18  BY MR. ANDERSON:
19      Q.  Mr. Heggie, please review what's been
20  marked as Exhibit Heggie 904.  It is a one-page
21  exhibit, TXABT 179882.
22      A.  Right, okay.

---

Page 260

1       Q.  Can you describe what this document is?
2       A.  No, I cannot.
3       Q.  Are you familiar with any type of
4   requisition system that Abbott had?
5       A.  No, not like this.
6       Q.  Do you see in the middle of the page --
7   well, first of all, at the top of the page, you see
8   it is dated July 26, 1995?
9       A.  Yes.
10      Q.  And then, within the box, which appears
11  to be a screen shot, you see a requisition date of
12  June 13, '95?
13      A.  I do.
14      Q.  Then, reading from the middle of the
15  page, it says:  Additional printing and collating,
16  the Abbott AIM reimbursement guide description per
17  estimate dated June 12, 1995 (Mike Heggie).
18          Did I read that correctly?
19      A.  You did.
20      Q.  Does this refresh your memory that you
21  created and circulated a reimbursement guide --
22      A.  I already told you I did.

---

Page 261

1           MS. CITERA:  Objection to form.
2           THE WITNESS:  This doesn't refresh
3   my memory.  It was the biggest project I did for
4   John Ward for the AIM pump, and yes, I told you
5   that before I even saw this.  This is a requisition
6   that somebody had to put forward to get this thing
7   paid.  That's all it is.
8   BY MR. ANDERSON:
9       Q.  Yes, sir.
10          What was the basic reimbursement on
11  the AIM system?
12          MS. CITERA:  Objection to form.
13          THE WITNESS:  What was the
14  reimbursement?  You want to know the dollar amount?
15  Is that what you mean?
16  BY MR. ANDERSON:
17      Q.  No, I want to know the mechanism.  You
18  create -- I will back up a step.
19      A.  Sure.
20      Q.  Can you just describe generally what the
21  contents of -- were of your Abbott AIM
22  reimbursement guide?

66 (Pages 258 to 261)

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 262

1     A.  Yes.  We talked about pumps, how pumps
2  are paid for by third-party payors.  We might have
3  talked about the competition.  I don't recall.  The
4  biggest thing that was in there was a chart, a
5  table.  And there was a table in there with drugs,
6  J codes, because drugs are J codes.  And I can't
7  think of what else was in there.  It was about ten
8  pages long, maybe, had tabs, was a looseleaf
9  binder.  We would have talked about the various
10 payors, probably.  We would have talked about
11 Medicare, how Medicare pays.  We probably would
12 have talked about how Medicaid pays, and we would
13 have talked about private payment.
14    Q.  When you say talked about, you mean that
15 this roughly ten-page document would have explained
16 to the Abbott field sales force the different
17 reimbursements pertinent to this AIM system;
18 correct?
19         MS. CITERA:  Objection to form.
20         THE WITNESS:  It would have told
21 them how it worked, sure, yeah, how they paid for
22 pumps, how third-party payors paid for pumps.

Page 263

1  BY MR. ANDERSON:
2     Q.  Including not only the durable medical
3  equipment, but the actual products, the drugs, that
4  were dispensed?
5         MS. CITERA:  Objection to form.
6         THE WITNESS:  Yes, it did.
7  BY MR. ANDERSON:
8     Q.  And so, for instance, you mentioned J
9  codes.  It would have explained J code
10 reimbursement?
11    A.  I can't be sure, but more than likely.
12    Q.  And to the extent these pumps were --
13 well, let's back up a step.
14         Just explain, if you could, in
15 laymen's terms the types of products that were
16 dispensed through these pumps.
17    A.  They were drugs, all kinds of drugs,
18 antibiotics.  I'm not sure if oncolytics, but I
19 think oncolytics as well.  So it would have been
20 the two, really.
21    Q.  And the antibiotics were often referred
22 to as injectables; correct?

Page 264

1     A.  Um-hum.
2     Q.  For instance, you would have a syringe
3  of antibiotics, such as Vancomycin, that would be
4  injected into a bag of saline or dextrose, and that
5  that would be dispensed through the pump; correct?
6     A.  Yes, but the salespeople didn't do that.
7  That was done somewhere else.  I wouldn't have
8  bothered to tell them that.  What they would have
9  known was that they got a bag of solution, and the
10 bag of solution hooked to the pump and --
11    Q.  Right, the medical services provider
12 would actually do the administration, but you would
13 explain to the salesmen of Abbott that these
14 products were part of the pump system, these drug
15 products; correct?
16         MS. CITERA:  Objection to form.
17         THE WITNESS:  No, I wouldn't have
18 explained that.  They knew that.  What I would have
19 explained was only the payment mechanism.
20 BY MR. ANDERSON:
21    Q.  Only the payment, but the payment would
22 be specific to not only the durable medical

Page 265

1  equipment, but also the drug products?
2     A.  Correct, yes, it would have.
3     Q.  And can you describe basically what you
4  understood while you were at Abbott was the J code
5  reimbursement mechanism?
6         MS. CITERA:  Objection to form.
7         THE WITNESS:  Yes.  I mean, how a
8  provider would get paid?
9         MR. ANDERSON:  Yes.
10        THE WITNESS:  Sure.  He would bill
11 based on mostly the AWP.  Sometimes, some other
12 number, but mostly, AWP.
13 BY MR. ANDERSON:
14    Q.  When you say the AWP, you mean the AWP
15 for Abbott's products?
16    A.  For any products used in the pump, any
17 drugs.
18        MS. CITERA:  Objection to form.
19        THE WITNESS:  You could have used
20 Baxter products with it.  You could have used
21 anybody's product with it.
22 BY MR. ANDERSON:

67 (Pages 262 to 265)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                      Philadelphia, PA

Page 266

1    Q.  But at least as far as you understood
2  when you were the manager of reimbursement at
3  Abbott, you understood that when a provider would
4  dispense an Abbott product attended to a physician
5  service, that they would -- the provider would be
6  paid based on Abbott's AWP?
7          MS. CITERA:  Objection to form.
8          THE WITNESS:  If they were using an
9  Abbott product, yes, sure.
10 BY MR. ANDERSON:
11   Q.  And that was your understanding of J
12 code reimbursement?
13         MS. CITERA:  Objection to form.
14         THE WITNESS:  Yes, yes.
15 BY MR. ANDERSON:
16   Q.  And so to the extent Abbott caused an
17 AWP to be published on a given drug, such as
18 Vancomycin, that would allow a provider to be
19 reimbursed under a J code for that AWP for Vanco?
20         MS. CITERA:  Objection to form.
21         THE WITNESS:  Again, I will go back
22 to Abbott caused an AWP.  Abbott didn't cause the

Page 267

1  AWP at all.  Abbott published a list price, the
2  AWP, however it got there, through that system,
3  caused itself to get there.  Abbott had no causal
4  effect.
5  BY MR. ANDERSON:
6    Q.  Well, I understood your testimony this
7  morning when you said Abbott did not create AWP.
8    A.  Correct.
9    Q.  And that's why I'm trying to phrase it
10 as cause, because you have testified repeatedly,
11 sir, that the list price was known to trigger an
12 AWP to be published; correct?
13         MS. CITERA:  Objection to form.
14         THE WITNESS:  Absolutely.
15 BY MR. ANDERSON:
16   Q.  So when I say cause, I'm just merely
17 trying to reflect this triggering mechanism.
18         Do you take issue with the word
19 cause?
20   A.  I do.
21   Q.  How would you describe it?
22   A.  Abbott published an AWP and let the

Page 268

1  system do its thing.
2    Q.  Abbott published a list price and let
3  the system do its thing?
4    A.  That is exactly the way I see it.
5    Q.  And so to the extent the system does its
6  thing and applies the formula that Abbott
7  understood and generates an AWP, Abbott was aware
8  of that?
9          MS. CITERA:  Objection to the form.
10         THE WITNESS:  Correct, absolutely.
11 BY MR. ANDERSON:
12   Q.  When did you leave Abbott exactly or
13 what month?
14   A.  December of '97.
15   Q.  We don't need this marked.  This has
16 been marked in this case as Exhibit 60.
17         Just to streamline matters, Mr.
18 Heggie, I will tell you, I'm going to have some
19 questions for you about the address information of
20 this memo and the date, and then I'm also going to
21 have some questions about the section on the second
22 to the last page, titled Field Selling Modules.

Page 269

1    A.  Okay.  Do you want me to read this whole
2  thing?
3    Q.  No, sir.  I will allow you to read it,
4  if you'd like, after you hear my question, but I
5  think, as long as you are familiar with those two
6  areas.
7    A.  Sure.
8    Q.  You will agree, won't you, that this
9  appears to be a memo from Pete Baker, dated
10 November 24, '97?
11   A.  Yes.
12   Q.  And it is addressed to Don Robertson
13 with copies to Bill Burris, Loreen Mershimer, Mike
14 Sellers and Ginger Green Willis; correct?
15   A.  Correct.
16   Q.  At this point, in November of '97,
17 Loreen Mershimer was your boss in Renal Care;
18 correct?
19   A.  Correct.
20   Q.  Did you ever become familiar with
21 anything known as a field selling module?
22   A.  No, not really.  The name -- the thing

68 (Pages 266 to 269)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                        Philadelphia, PA

Page 270

1  may be slightly familiar, but no, not really.
2      Q.  Were you involved at all in the creation
3  of the field selling modules?
4          MS. CITERA:  Objection to form.
5          THE WITNESS:  I could have been and
6  not known what it was called.
7  BY MR. ANDERSON:
8      Q.  Do you recall, toward the end of your
9  tenure at Abbott in '97, working on any kind of
10 field material?
11     A.  No, not specifically.
12         MS. CITERA:  Objection, form.
13 BY MR. ANDERSON:
14     Q.  Did you ever work with a woman named
15 Trudy Bucieri?
16     A.  Trudy Bucieri?  It has got a familiar
17 ring, but I don't know.
18     Q.  What about a gentleman named Paul
19 Lazano?
20     A.  No, that one doesn't ring.
21     Q.  What about a gentleman named Greg Lotts?
22     A.  Greg Lotts, yes.

Page 271

1      Q.  Do you recall working with Greg Lotts on
2  any kind of field selling materials?
3      A.  No.
4      Q.  Do you recall working with Greg Lotts on
5  some Texas Medicaid drug reimbursement eligibility
6  issues?
7      A.  No, I do not.  What I would recall about
8  Greg Lotts, if that's where Greg Lotts was -- I
9  recall working on Texas Medicaid issues, as we
10 discussed in the other two depositions.  If Greg
11 Lotts was there, yes, I probably talked to Greg
12 Lotts about it.
13     Q.  I really don't want to retread the other
14 depositions.
15         What is it that you recall
16 discussing with Greg Lotts, other than the Texas
17 Medicaid issues?
18     A.  Nothing.
19     Q.  Okay, that's what I thought you were
20 getting at.
21     A.  No.
22     Q.  All right.

Page 272

1          Do you -- in looking at this section
2  titled Field Selling Modules, the second to the
3  last page of Exhibit 60, I will read, quote:  The
4  field management sales team has initiated the
5  development of specific selling modules that will
6  be targeted to generate more sales.  Eight key
7  areas have been targeted for development.  These
8  include selling injectables in the home care
9  pharmacies, handling reimbursement, selling synovy
10 products, financial sell of the AIM versus
11 competition and how to effectively sell our entire
12 product line.
13         Did I read that correctly?
14     A.  You did.
15     Q.  What did you take away from this
16 statement, financial sell of the AIM versus
17 competition?
18         MS. CITERA:  Objection to the form.
19         THE WITNESS:  The financial sell of
20 the AIM?  No idea where Peter is going. Obviously,
21 they were --
22 BY MR. ANDERSON:

Page 273

1      Q.  You mentioned earlier in your testimony
2  a few minutes ago that it is possible your AIM
3  reimbursement materials that you circulated
4  included competition information; is that correct?
5      A.  Yes.  No, it could have included other
6  drugs.  It could have included drugs that were not
7  -- could have been used in the pump and -- yeah, we
8  could have done competition, yes, you are right, I
9  did say that, and we could have done competition.
10 We could have said something about other pumps.  I
11 don't recall.
12     Q.  So, for instance, comparing the Abbott
13 fluid injectable AWPs versus the Baxter AWPs?
14         MS. CITERA:  Objection to form.
15         THE WITNESS:  Never, not in a
16 million, trillion years.
17 BY MR. ANDERSON:
18     Q.  Well, when you say compare against the
19 competition, what do you mean?
20     A.  It was done probably what the features
21 were, the features and benefits of it, of the pump.
22     Q.  Well, how is that a financial sell?

69 (Pages 270 to 273)

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 274

1        MS. CITERA:  Objection to form.
2        THE WITNESS:  I don't know if that's
3  a financial sell.  I wasn't -- I thought we got off
4  the financial sell.
5  BY MR. ANDERSON:
6    Q.  So you are not familiar with any of the
7  materials you created concerning the AIM system and
8  the drugs dispensed through the AIM system,
9  comparing financial attributes of competitive drugs
10  with Abbott drugs?
11    A.  No.  To the best of my knowledge, that
12  was never, ever done.
13    Q.  But you are familiar with the fact that
14  at least the reimbursement was explained?
15    A.  Yes, absolutely.
16        MS. CITERA:  Objection to form.
17  BY MR. ANDERSON:
18    Q.  Now, toward that end, one of these
19  selling modules are described as, quote, handling
20  reimbursement.
21        Do you see that?
22    A.  I do.

Page 275

1    Q.  Is it true that Abbott circulated
2  materials to the field sales force about how to
3  handle reimbursement?
4        MS. CITERA:  Objection to form.
5        THE WITNESS:  You would have to
6  define handling.  I don't know what that means.  I
7  don't know what Peter had here, what he was
8  thinking.  Handling reimbursement could have meant
9  knowledge of reimbursement.  It could have meant a
10  lot of things.  I don't know.
11        No, we did not circulate things that
12  told them how to handle, if you will, in a bad
13  sense.  What we did was, we always tried to educate
14  them as to what reimbursement was about and how it
15  worked.
16  BY MR. ANDERSON:
17    Q.  So I understand your distinction.  I
18  will try to address that.
19        You do recall Abbott circulating
20  materials to the field sales personnel that was
21  seeking to educate the customers on reimbursement
22  issues?

Page 276

1        MS. CITERA:  Objection to form.
2        THE WITNESS:  No, seeking to educate
3  the sales force.
4  BY MR. ANDERSON:
5    Q.  Oh, seeking to educate the sales force?
6        MS. CITERA:  Same objection.
7        THE WITNESS:  Right.
8  BY MR. ANDERSON:
9    Q.  And I think you have discussed this in
10  your prior testimony.
11        And the reason Abbott would seek to
12  educate its sales force about reimbursement is so
13  they could answer questions from customers;
14  correct?
15        MS. CITERA:  Objection to form.
16        THE WITNESS:  Yes, so they would
17  look intelligent.
18  BY MR. ANDERSON:
19    Q.  If you could, Mr. Heggie, please review
20  what's been marked in this case as Exhibit 239.
21    A.  Sure, okay.
22    Q.  Are you familiar at all with the outline

Page 277

1  set forth in the second page of Exhibit 239?
2    A.  No.  I don't think I have seen this
3  before.
4    Q.  Do you think you had any type of
5  involvement in any of the substance of Exhibit 239?
6        MS. CITERA:  Objection, form.
7  BY MR. ANDERSON:
8    Q.  I will rephrase.  That's a bad question.
9        Did you have any type of involvement
10  in the creation of any of the substance of the
11  information contained in the second page of Exhibit
12  239?
13    A.  Not that I recall, no.  I mean -- no,
14  not that I recall.
15    Q.  Now, you mentioned, Mr. Heggie, that
16  these materials to educate salesmen on
17  reimbursement issues would be circulated.
18        Where were the originals kept at
19  Abbott?
20        MS. CITERA:  Objection to form.
21        THE WITNESS:  I don't know. If I
22  made them, they would have been in my files.  If

70 (Pages 274 to 277)

Henderson Legal Services
202-220-4158

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 278

1  somebody else made them, they would have been in
2  their files.
3  BY MR. ANDERSON:
4      Q.  When you say if somebody else created
5  them, who else would have been possibly creating
6  reimbursement materials to educate the Abbott sales
7  force?
8          MS. CITERA:  Objection to form.
9          THE WITNESS:  The only other person
10  would have been -- well, in my area would have been
11  Virginia Tobiason.  Over in the other areas, I
12  couldn't say.
13  BY MR. ANDERSON:
14      Q.  When you searched your files at the
15  request of attorneys, did you recall finding any
16  materials that you created concerning reimbursement
17  and circulated to the sales force?
18          MS. CITERA:  Objection to form.
19          THE WITNESS:  No, not that I recall,
20  but it was a long time ago we searched, ten years
21  ago.  No, I don't recall.
22  BY MR. ANDERSON:

Page 279

1      Q.  You are certain that you created
2  documents pertaining to reimbursement; correct?
3          MS. CITERA:  Objection to form.
4          THE WITNESS:  No, I'm not certain.
5  I'm saying I think I probably did, I'm sure I did,
6  but I cannot say for certain that, yes, I created
7  such and such a document.
8  BY MR. ANDERSON:
9      Q.  At least with respect to the AIM
10  reimbursement, you recall that, don't you?
11      A.  Absolutely, one hundred percent, big
12  project.
13      Q.  That was, as you said, a big project,
14  right?
15      A.  Right.
16      Q.  And would you expect that you would have
17  kept a copy of the original that you created in
18  your files?
19      A.  Yeah, I would think so.
20      Q.  You certainly didn't discard that or
21  anything, did you?
22      A.  No.

Page 280

1      Q.  So as far as you know, when you left
2  your files at Abbott in December of 1997, there
3  would have been a copy of this roughly ten-page AIM
4  reimbursement guide contained therein; correct?
5          MS. CITERA:  Objection, form.
6          THE WITNESS:  No, not correct.  I
7  don't know where they went.  They were put into --
8  they were in binders.  They were put in binders,
9  and we took them to the hotel, I think was in
10  Texas, where we were introducing the pump.  And I
11  don't know if I kept one or not.
12  BY MR. ANDERSON:
13      Q.  When you say we took it in binders, you
14  mean Abbott corporate personnel, including
15  yourself, flew down to Texas and physically handed
16  these out to Abbott sales personnel?
17          MS. CITERA:  Objection to form.
18          THE WITNESS:  I think that's where
19  the meeting was.  I think that's where the launch
20  was.  I think it was in Texas, yes.
21  BY MR. ANDERSON:
22      Q.  What city?

Page 281

1      A.  Dallas, I think.
2      Q.  And so it would be your belief that
3  numerous Abbott's field sales personnel would have
4  received these binders; correct?
5          MS. CITERA:  Objection to form
6          THE WITNESS:  Everyone.
7  BY MR. ANDERSON:
8      Q.  We are talking about over, what, a
9  couple of hundred sales persons --
10      A.  No, only Ward sales force.  It would
11  have been like 34, 35.
12      Q.  Only the Alternate Site product sales?
13      A.  Absolutely correct, yeah.  And we
14  probably made maybe 40 of these things.  I don't
15  know, I don't know.  Whatever the number was,
16  however many salespeople there were, we made
17  extras.  Where the extras went, I don't know.
18      Q.  Do you believe that it is most likely
19  that you kept one binder for yourself to put in
20  your files back at Abbott?
21          MS. CITERA:  Objection to form.
22          THE WITNESS:  I don't know.  I don't

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 282

1  think so.
2  BY MR. ANDERSON:
3      Q.  You don't think so?
4      A.  No, I think I would have kept it
5  probably on my computer, but it may have been in my
6  files.
7      Q.  Let's talk about your computer.
8          Do you believe that you when you
9  left Abbott in December of 1997, there would have
10 been an electronic version of your AIM
11 reimbursement guide on your computer?
12     A.  Yeah, there could have been, sure.  The
13 pages probably were all there.
14     Q.  You never took any steps to delete it,
15 did you?
16     A.  Not that I know of.  I would have saved
17 it as a file, I think.
18     Q.  And would that have been on your local
19 hard drive or would that have been on a shared
20 server?
21     A.  In 1995, I couldn't even spell local
22 hard drive.  I just knew -- I could spell computer.

Page 283

1  That was it.  So it was somewhere on the computer.
2  I think.  I don't know.
3      Q.  I have got a document here that we did
4  use with you previously, and I have some additional
5  questions concerning this.  It has been marked in
6  this case as Exhibit 63.
7      A.  Um-hum.
8      Q.  You recall this memo, don't you, sir?
9      A.  I do.
10     Q.  And it is a memo that you wrote on April
11 26th of '95 concerning the Vanco price change;
12 correct?
13     A.  Correct.
14     Q.  Big picture, Mr. Heggie, how did you
15 learn of the Vanco price change back in or about
16 April of '95?
17     A.  I don't know.  We went over this last
18 time.  It was the same thing.  I have no idea how I
19 learned about the price change.  Vanco became a big
20 issue.
21     Q.  With whom?
22     A.  With Ward's group.

Page 284

1      Q.  Ward's group being the Alternate Site
2  products sales force?
3      A.  Correct.
4      Q.  Did you understand that the Vanco issues
5  in '95 were important to the customers that Ward's
6  sales personnel were calling on?
7          MS. CITERA:  Objection to form.
8          THE WITNESS:  Yes.
9  BY MR. ANDERSON:
10     Q.  And how did you gain that understanding?
11     A.  Because it became such an issue.
12     Q.  Is there any one person that you recall
13 explaining this to you?
14     A.  No.
15     Q.  What was Carla Kreklow's position at
16 Alternate Site?
17     A.  Carla was -- they had a division of
18 labor, and Pete Baker did something, did one thing,
19 and Carla did another.  I think Carla maybe did
20 national accounts, maybe.  I don't know.  I'm not
21 sure, but I think national accounts.
22     Q.  Do you recall that Carla was heavily

Page 285

1  involved in the Vanco price issues and the customer
2  complaints about that from Alternate Site products
3  sales back in 1995?
4          MS. CITERA:  Objection to form.
5          THE WITNESS:  Not specifically.
6  BY MR. ANDERSON:
7      Q.  Was Carla considered a person who was
8  attuned to customers' interest in reimbursement
9  issues?
10         MS. CITERA:  Objection to form.
11         THE WITNESS:  Carla, as part of her
12 job, yes, sure, would have been interested in
13 reimbursement issues.
14 BY MR. ANDERSON:
15     Q.  And that's because she was a NAM, and
16 most of the NAMs were aware of the reimbursement
17 issues that your customers were interested in;
18 correct?
19         MS. CITERA:  Objection to form.
20         THE WITNESS:  Yes, yes.  I'm sorry,
21 I was having trouble with NAMs, national accounts
22 manager.  Sorry.

72 (Pages 282 to 285)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 286

BY MR. ANDERSON:
1  Q.   That's all right.
3        This is a document that we used
4  previously.  It is Exhibit 68, Mr. Heggie. And I
5  don't want to retread the issues we have addressed
6  with you on Exhibit 68, but I do have one specific
7  question for you, and that is, why did you copy
8  Carla Kreklow on this letter you wrote?
9  A.   Carla must have been the point person on
10 it.
11 Q.   Does that refresh your memory at all
12 that --
13 A.   No, not at all.
14       MR. STETLER:  Let him finish,
15 though.  You are probably guessing right, but you
16 are guessing.  He is entitled to ask his whole
17 question.
18 BY MR. ANDERSON:
19 Q.   Does that refresh your memory at all,
20 Mr. Heggie, that Carla was heavily involved in
21 reimbursement complaints from customers?
22       MS. CITERA:  Objection to form.

Page 287

1        THE WITNESS:  No.  What would
2  refresh my memory is that Carla must have been the
3  point person to work on this with me.  Ward might
4  have said, Carla, you work with Heggie on this.
5  BY MR. ANDERSON:
6  Q.   And when you say this, you are talking
7  about the reporting of pricing information for
8  inclusion in the '94 Redbook; correct?
9  A.   Yes, correct, in this particular one.
10 Q.   And I notice --
11 A.   As you very well know, there is a great
12 deal more to Vanco than just this, from the other
13 two depositions.
14 Q.   Well, you are pointing to Exhibit 68,
15 sir?
16 A.   I am pointing to Exhibit 68.
17 Q.   Does Exhibit 68 focus upon Vanco?
18 A.   Okay, sorry.  You were asking me about
19 Carla Kreklow with Vanco over here, and then you
20 switched over here, so I got confused.  I'm sorry.
21 This is about AWP.
22       Now, your question is Carla Kreklow

Page 288

1  and AWP?
2  Q.   I apologize.  There was a little
3  miscommunication there.  I'm trying to move fast.
4  I will start back fresh with Exhibit 68.
5  A.   Okay, great.
6  Q.   Have you had a chance now to read
7  Exhibit 68?
8  A.   I did.
9        MR. STETLER:  It is an advantage.
10 BY MR. ANDERSON:
11 Q.   Does reviewing Exhibit 68 and
12 appreciating the subject matter of Exhibit 68 and
13 noticing that you mentioned Carla Kreklow in the
14 body of your letter and you copied her refresh your
15 memory that Carla was more involved in
16 reimbursement issues than others at Alternate Site?
17       MS. CITERA:  Objection to form.
18       THE WITNESS:  No, it does not.  I
19 mean, Carla was one of the people I dealt with a
20 lot, but I dealt with Baker a lot, too.
21 BY MR. ANDERSON:
22 Q.   Did you discuss reimbursement related

Page 289

1  issues with Pete Baker?
2  A.   Sure.
3  Q.   Why was it that back in December of '93,
4  you were setting forth the -- your understanding of
5  Abbott's formula for calculating -- let me
6  rephrase.
7        Why was it, Mr. Heggie, that back in
8  December '93, you were writing Redbook and setting
9  forth Abbott's understanding of Redbook's formula
10 for calculating AWP?
11       MS. CITERA:  Objection to form.
12       THE WITNESS:  Because if I'm right
13 with the time frame for all of this, there was a
14 big push to establish what the formula was.  There
15 was one guy there that wanted to know what the
16 formula was.  If this ties into that, I'm not sure,
17 but there was a big brew-ha-ha around the formula
18 at one point.
19 BY MR. ANDERSON:
20 Q.   When you say one guy there, you mean
21 somebody in Alternate Site product sales?
22 A.   Yes, correct.

73  (Pages 286 to 289)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                    Philadelphia, PA

Page 290

1    Q.  Can you recall who that person was?
2    A.  Sure, Kipperman.
3    Q.  Steve Kipperman, who was in contract
4  marketing?
5    A.  Correct.
6    Q.  Is the formula that is set forth in
7  Exhibit 68 same formula that you have
8  understood has always been utilized by Redbook to
9  calculate AWPs on added products?
10       MS. CITERA:  Objection.
11       THE WITNESS:  Yeah, remember we
12  started off this afternoon with that, where I said
13  the Redbook formula was a little different, and it
14  came out to be 18.75 or something? That's the
15  formula, I believe.  If you do that, I think that's
16  what you will come out with.
17  BY MR. ANDERSON:
18    Q.  Yes, sir.  And what you are describing
19  is that if you take the reported list price by
20  Abbott and subtract 5 percent and then mark it up
21  25 percent, it results in the equivalent of an
22  18.75 percent markup off of list?

Page 291

1    A.  Yes, I believe so.
2    Q.  And that was Abbott's consistent
3  understanding over the years as to how Redbook
4  created the AWP?
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  Yes, yes.
7  BY MR. ANDERSON:
8    Q.  This is a new document that will need to
9  be marked.
10       - - -
11       (Whereupon the court reporter marked
12  document as Exhibit Heggie 905 for identification.)
13       - - -
14  BY MR. ANDERSON:
15    Q.  Mr. Heggie, if you could take a moment
16  and review what's been marked as Exhibit Heggie 905,
17  Bates labeled TXABT 42025 through 26.
18    A.  (Witness complies.)  Okay.
19    Q.  When you were at Abbott, did you know a
20  person named Bruce Rodman?
21    A.  I did.
22    Q.  Was Bruce in the Home Infusion Group?

Page 292

1    A.  Correct, he was.
2    Q.  That's where you started your career at
3  Abbott; correct?
4    A.  Yes, correct.
5    Q.  You are familiar with the CHIP system,
6  aren't you?
7    A.  No.  I mean, I'm familiar with the name
8  of it.  How to operate it, no, not a clue.
9    Q.  When you were in the Home Infusion Group
10  at Abbott, you didn't have any reason to work with
11  the CHIP system?
12    A.  No.
13    Q.  Are you aware generally that the CHIP
14  system contained AWP information?
15       MS. CITERA:  Objection to form.
16       THE WITNESS:  No.
17  BY MR. ANDERSON:
18    Q.  What was Bruce Rodman's job when you
19  were in Home Infusion?
20    A.  He did something that managed claims.
21  He was part of the claims processing that worked
22  for Virginia Tobiason.

Page 293

1    Q.  And you were part of that group, too,
2  weren't you?
3    A.  Yeah, but not when the CHIP system was
4  there.
5    Q.  You were there back in the late '80s;
6  correct?
7    A.  Late '80s, early '90s, but mid '90 -- I
8  mean by '91, '92, somebody asked me -- I think you
9  asked me the question this morning when I became a
10  manager.  I don't know, but by that point, I was no
11  longer working for Virginia Tobiason.
12    Q.  Was the CHIP system part of the Home
13  Infusion reimbursement system in the late '80s,
14  early '90s?
15    A.  Not that I know of.  We had a very
16  basic, rudimentary system that produced claims on
17  Wang processors.
18    Q.  And you distinguished that rudimentary
19  system from the CHIP system; correct?
20    A.  Yeah, I don't think the CHIP system -- I
21  don't know.  You would have to ask Rodman and
22  Virginia when the CHIP system came along as with

74 (Pages 290 to 293)

5afab192-6713-4ee2-bafb-e982083564b2

Heggie, Michael          CONFIDENTIAL          May 17, 2007
                       Philadelphia, PA

Page 294

1  the CHIP acronym.  I don't know.
2     Q.  Earlier today, you mentioned that if you
3  wanted to find AWPs, you knew where to look;
4  correct?
5          MS. CITERA:  Objection to form.
6          THE WITNESS:  Well, yes, I would
7  know where to find an AWP.
8  BY MR. ANDERSON:
9     Q.  And I believe your testimony has been
10 that you would physically go to a printed Redbook
11 that was kept in the Abbott offices; correct?
12    A.  Correct.
13    Q.  Did you ever go to the CHIP system or
14 ask anybody to go to the CHIP system?
15    A.  Not that I recall.  I might have at some
16 point later on -- I don't know.  I don't know when
17 the CHIP system came along.  So you are asking me
18 if I went to a CHIP system.  I don't know.  I don't
19 know when CHIP came along.  There was a time that
20 CHIP was born.  I don't know when that was.
21    Q.  I appreciate, sir, you may not remember
22 when it was born.  I'm just asking a bigger

Page 295

1  question, and that is, did you ever receive AWP
2  information electronically from CHIP or --
3     A.  No, not that I know of, no.
4     Q.  All right.  Let me review my notes for a
5  moment.
6     A.  Sure.
7          THE VIDEO TAPE OPERATOR:  Off the
8  video, 8:47.
9          THE VIDEO TAPE OPERATOR:  Back on the
10 video, 8:49.
11         MR. ANDERSON:  Mr. Heggie, at this
12 time, I will pass the witness.
13         MS. NESBITT:  I have no questions.
14         MR. SISNEROS:  No questions.
15         - - -
16         EXAMINATION
17         - - -
18 BY MS. CITERA:
19    Q.  Mr. Heggie, in your Texas deposition,
20 you indicated that at some point, you were
21 contacted by the Texas AG's office, Ray Winter.
22         Do you remember that?

Page 296

1     A.  Yes.
2     Q.  And you also indicated that there was
3  someone from the DOJ on the line.
4          Do you recall that?
5     A.  I do.
6     Q.  Do you know if it was Mr. Gobena?
7     A.  No.  As I testified before, it was a
8  gentleman with a name that was not easily
9  remembered.
10         MR. GOBENA:  I will stipulate for
11 the record it was me.
12         MS. CITERA:  It was you?
13         MR. GOBENA:  Yes.
14 BY MS. CITERA:
15    Q.  Now that Mr. Gobena has indicated it was
16 him, do you remember anything that he said in that
17 conversation?
18    A.  No.  I remember what I said.
19    Q.  And I think you testified as to that in
20 your previous deposition; correct?
21    A.  Yes.
22    Q.  But you don't remember anything that Mr.

Page 297

1  Gobena said?
2     A.  He asked me -- no, I don't remember
3  which of the two guys asked me what.  I do not
4  remember.
5     Q.  Well, what do you remember them asking
6  you?
7     A.  They asked me a couple of questions like
8  about AWP, and of course, then I volunteered that I
9  thought it was a squirrely system, and I told them
10 they were barking up the wrong tree -- yeah, and I
11 told them they were barking up the wrong tree.
12 They should be spending their efforts looking at
13 something other than AWP.  It was silly to look at
14 this and waste their time doing this.
15         And then, somehow, they asked me a
16 few pertinent questions about the drugs, about
17 something specific, and somehow, I mentioned issues
18 with -- I said that really wasn't my call.  It was
19 more Mike King's call or Loreen Mershimer's.  And
20 that was pretty much it, I think.  Is that the way
21 you -- I can't, I'm sorry.
22    Q.  You are asking questions.

75 (Pages 294 to 297)

Heggie, Michael          CONFIDENTIAL          May 17, 2007
Philadelphia, PA

Page 298

1        Have you had any other discussions
2   with the Department of Justice or the State of
3   Texas, since then other than in the deposition
4   context?
5      A.  No.
6           MS. CITERA:  Okay, that's all I
7   have.
8           THE VIDEO TAPE OPERATOR:  This
9   concludes the video tape deposition of Michael
10  Heggie.  We are now going off the video record.
11  The time is 8:51.
12          - - -
13          MR. ANDERSON:  I just want to state
14  for the record that we have searched high and low
15  for selling materials, and to my knowledge, the AIM
16  reimbursement guide or related selling materials
17  have not been produced in this case, and to the
18  extent they are subsequently produced, I reserve
19  the right to question Mr. Heggie about those, as he
20  is the author of that, and I certainly contend that
21  those materials should have been produced by now,
22  alleviating the need to recall Mr. Heggie.

Page 299

1           MS. CITERA:  I object to your
2   characterization or that we are going to come back
3   here again.
4           MR. GOBENA:  Do you think it would
5   be possible maybe to identify whether it is federal
6   production or California or Texas where that module
7   might be?  Are you saying it was produced?
8           MS. CITERA:  I thought it was, but I
9   have been looking at these documents for --
10          THE WITNESS:  It was a looseleaf
11  binder.
12          - - -
13          (Whereupon the deposition was
14  concluded at 8:52 p.m.)
15          - - -
16          _____
17          MICHAEL HEGGIE
18  Subscribed and sworn to and before me
19  this _____ day of _____, 20_____.
20
21  _____
22      Notary Public

Page 300

1          C E R T I F I C A T E
2               - - -
3   STATE OF NEW JERSEY      :
4                           :  SS
5   COUNTY OF BURLINGTON        :
6           I, Jeanne Christian, Court
7   Reporter-Notary Public within and for Burlington
8   County, Commonwealth of New Jersey, do hereby
9   certify that the foregoing testimony of Michael
10  Heggie was taken before me at 1622 Locust
11  Street, Philadelphia, Pennsylvania on Thursday,
12  May 17, 2007; that the foregoing testimony was
13  taken in shorthand by myself and reduced to
14  typing under my direction and control, that the
15  foregoing pages contain a true and correct
16  transcription of all of the testimony of said
17  witness.
18          .....................
19          JEANNE CHRISTIAN
20          Notary Public
21          My Commission expires
22          May 21, 2007

Henderson Legal Services
202-220-4158

5afab192-6713-4ee2-bafb-e982083564b2