# Exhibit 104

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL           )
INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
PRICE LITIGATION                 ) Civil Action No.
                                 )     01-12257-PBS
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
United States of America,        ) Hon. Patti Saris
ex rel. Ven-a-Care of the        )
Florida Keys, Inc., v.           )
Abbott Laboratories, Inc.,       )
and Hospira, Inc.                )
CIVIL ACTION NO. 06-11337-PBS    )


*******************************************************

                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL           )
INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
PRICE LITIGATION                 ) Civil Action No.
                                 ) 01-CV-12257-PBS
                                 )
THIS DOCUMENT RELATES TO:        )
                                 ) Judge Patti B.
                                 ) Saris
State of Arizona v. Abbott       )
Labs., et al.                    )
Civil Action No. 06-CV-11069-PBS )


*******************************************************

     ORAL AND VIDEOTAPED CONFIDENTIAL DEPOSITION OF

                    DAVID E. BRINCKS

                    JUNE 12, 2007

*******************************************************
```

## Page 2

```
 1        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 2
   IN RE:  PHARMACEUTICAL        )
 3 INDUSTRY AVERAGE WHOLESALE    ) MDL No. 1456
   PRICE LITIGATION              ) Civil Action No.
 4                               ) 01-CV-12257-PBS
                                 )
 5 THIS DOCUMENT RELATES TO:     ) Judge Patti B.
                                 ) Saris
 6 ALL CASES                     )
 7 ***********************************************
 8      UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 9
   IN RE:  PHARMACEUTICAL        )
10 INDUSTRY AVERAGE WHOLESALE    ) MDL No. 1456
   PRICE LITIGATION              ) Civil Action No.
11                               )  01-CV-12257-PBS
                                 )
12 THIS DOCUMENT RELATES TO:     )
                                 ) Judge Patti B. Saris
13 State of California, ex rel.  )
   Ven-A-Care v. Abbott          ) Magistrate
14 Laboratories, et al.          ) Judge Marianne Bowler
   Cause Nos. 03-cv-11226-PBS    )
15
   ***********************************************
16
            NO. D-1-GV-04-001286
17
   THE STATE OF TEXAS       ) IN THE DISTRICT COURT
18                          )
   ex rel.                  )
19  VEN-A-CARE OF THE       )
    FLORIDA KEYS, INC.,     )
20   Plaintiffs,            )
                            )
21 VS.                      ) TRAVIS COUNTY, TEXAS
                            )
22 ABBOTT LABORATORIES INC.,   )
   ABBOTT LABORATORIES, and   )
23 HOSPIRA, INC.,              )
      Defendant(s).         ) 201ST JUDICIAL
24                          ) DISTRICT
25 ***********************************************
```

## Page 3

```
 1        A P P E A R A N C E S
 2 FOR THE PLAINTIFF THE STATE OF TEXAS:
 3   Ms. Margaret Moore
     Assistant Attorney General
 4   Office of the Attorney General
     State of Texas
 5   Post Office Box 12548  (78711-2548)
     300 W. 15th Street, 9th Floor
 6   Austin, Texas  78701
 7 FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 8   Ms. Ann M. St. Peter-Griffith
     Assistant U.S. Attorney
 9   United States Attorney's Office
     Southern District of Florida
10   99 N.E. Fourth Street
     Miami, Florida  33132
11
   FOR THE PLAINTIFF THE STATE OF ARIZONA AND MDL
12 PLAINTIFFS:
13   Ms. Amber M. Nesbitt
     Wexler Toriseva Wallace LLP
14   One North LaSalle Street, Suite 2000
     Chicago, Illinois  60602
15
   FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
16
     Mr. Eliseo Sisneros
17   Deputy Attorney General
     BMFEA
18   Bureau of Medi-Cal Fraud & Elder Abuse
     State of California Department of Justice
19   110 West A Street #1100
     San Diego, California  92101
20
   FOR THE RELATOR:
21
     Mr. C. Jarrett Anderson
22   Anderson LLC
     1300 Guadalupe, Suite 103
23   Austin, Texas  78703
24
25
```

## Page 4

```
 1 FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
   HOSPIRA, INC.:
 2
     Ms. Toni-Ann Citera
 3   Jones Day
     222 East 41st Street
 4   New York, New York  10017-6702
 5 FOR THE WITNESS:
 6   Mr. David J. Stetler
     Stetler & Duffy, Ltd.
 7   11 South LaSalle Street, Suite 1200
     Chicago, Illinois  60603
 8
 9 ALSO PRESENT:
10   KRISTEN COLOMBO, Action Video, Videographer
     TIFFANY BILLUPS, Action Video
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1             INDEX
 2 Appearances.....................  03
 3 DAVID E. BRINCKS
     Examination by Ms. St. Peter-Griffith   07
 4   Examination by Mr. Anderson      126
     Examination by Ms. Citera        260
 5
 6 Reporter's Certificate.................  270
 7        EXHIBITS
 8 NO.  DESCRIPTION              PAGE
 9      (NEW EXHIBITS)
10 1100 ..........................   12
      (Mr. Brincks' Curriculum Vitae
11
12 1101 ..........................  129
      (Profit and Loss Statements)
13 1102 ..........................  185
      (Newsletter)
14
15 1103 ..........................  191
      (Home Infusion Services Agreement Addendum)
16 1104 ..........................  197
      (Page from CHIP User's Manual)
17
18 1105 ..........................  205
      (Mr. Brincks' Handwritten Document)
19 1106 ..........................  219
      (RxLink Letter and Attachments)
20
21
22
23
24
25
```

2 (Pages 2 to 5)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 6

```
1            P R O C E E D I N G S
2                   - - -
3         THE VIDEOGRAPHER:  This is the videotape
4  deposition of David Brincks taken in the matter of
5  the United States of America v. Abbott -- Abbott
6  Laboratories, et al., for the United States District
7  Court, District of Massachusetts, Civil Action
8  No. 01-12257-PBS.
9         This deposition is being held at 325 John
10 H. McConnell Boulevard in Columbus, Ohio, on June 12,
11 2007.  My name is Kristen Colombo.  I am the
12 videographer.  The reporter is Jody Theado.
13        Counsel will now introduce themselves.
14        MS. ST. PETER-GRIFFITH:  On behalf of the
15 United States of America, Ann St. Peter-Griffith,
16 Assistant United States Attorney from the Southern
17 District of Florida.
18        MS. NESBITT:  Amber Nesbitt of Wexler,
19 Toriseva & Wallace on behalf of the MDL plaintiffs
20 and that State of Arizona.
21        MR. SISNEROS:  Eliseo Sisneros, State of
22 California.
23        MR. STETLER:  Dave Stetler for the
24 witness.
25        MS. CITERA:  Toni Citera for the
```

Page 7

```
1  defendants.
2         THE VIDEOGRAPHER:  The reporter will now
3  swear in the witness.
4                   - - -
5         DAVID E. BRINCKS,
6  being by me first duly sworn, as hereinafter
7  certified, deposes and says as follows:
8                   - - -
9            EXAMINATION
10                  - - -
11 BY MS. ST. PETER-GRIFFITH:
12    Q.    Mr. Brincks, good morning.  My name is, as
13 I just said, Ann St. Peter-Griffith and I'm -- I'm an
14 assistant United States Attorney.  I'm here today on
15 behalf of the United States in what's called the MDL
16 litigation which is pending in Massachusetts.
17        First, sir, can I have you state your full
18 name and address?
19    A.    Sure.  David Eugene Brincks and I'm at
20 7350 Hamstead Square North in New Albany, Ohio,
21 43054.
22    Q.    Sir, is there any reason why you can't
23 give testimony here today that you can think of?
24    A.    No.  I'm here.
25    Q.    Okay.  Are you feeling okay?
```

Page 8

```
1  A.    I'm feeling just fine.
2  Q.    Are you taking any medications?
3  A.    No.
4  Q.    Okay.  What I'd like to do is just go over
5  a bit of your background with you as well.
6  A.    Sure.
7  Q.    Now, you indicated that you currently live
8  in Ohio?
9  A.    Uh-huh.
10 Q.    How long have you been living at that
11 address?
12 A.    Seven years.  I moved here in 2000.
13 Q.    Where did you live prior to that?
14 A.    I was in Boston.
15 Q.    What was your address in Boston?
16 A.    Oh, boy.
17 Q.    If you recall?
18 A.    3 William Street in Andover.
19 Q.    Okay.  And how long did you live there?
20 A.    Three years.
21 Q.    And prior to living in Boston, where did
22 you live?
23 A.    I lived in Gurney, Illinois.
24 Q.    In where?
25 A.    Gurnee.
```

Page 9

```
1  Q.    Gurnee, Illinois.
2         And how long did you live in Gurnee,
3  Illinois?
4  A.    From 1989 until we moved in '97.
5  Q.    Okay.  And did you live at the same
6  address?
7  A.    No.  We lived in a small ranch for about
8  three years and then moved right within the same
9  neighborhood, but within Gurnee both times.
10 Q.    Within Gurnee, Illinois.  Okay.
11        And prior to '89, where did you live?
12 A.    Prior to '89?  Louisville, Kentucky.
13 Q.    Okay.  And how long were you in
14 Louisville, Kentucky?
15 A.    Actually, we were in Baltimore.  I started
16 in Louisville and then was in Baltimore for about 11
17 months with General Electric.
18 Q.    Okay.  And prior -- Did you live in
19 Kentucky before or after you lived in Baltimore?
20 A.    Kentucky was right out of college.
21 Q.    Yeah.
22 A.    Louisville.
23 Q.    Which leads to my next question.
24        Sir, can you just give us a history of
25 your educational background?
```

3 (Pages 6 to 9)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 10

1    A.      Oh, sure.
2            Undergraduate degree in finance at the
3    university of Illinois, graduated in 1984.  And then
4    I have an MBA after that from Lake Forest College
5    which I completed in 1997.  I did that in the
6    evenings while I was living in Chicago.
7    Q.      Okay.
8            (Brief interruption.)
9            MS. ST. PETER-GRIFFITH:  Come on in.
10           Why don't we take a brief break.
11           THE VIDEOGRAPHER:  One moment.
12           Off the record at 9:22.
13           (Recess taken.)
14           - - -
15           THE VIDEOGRAPHER:  On the record at 9:24.
16           MS. CITERA:  Do you guys want to just
17   identify yourselves for the record?
18           MR. ANDERSON:  Sure.
19           Jarrett Anderson for the relator.
20           MS. MOORE:  Margaret Moore for the State
21   of Texas.
22   BY MS. ST. PETER-GRIFFITH:
23   Q.      Okay.  Sir, you -- You indicated that you
24   have an MBA from Wake Forest?  Was -- was That the --
25   A.      Lake -- Lake Forest.

Page 11

1    Q.      Lake Forest?
2    A.      (Witness nods.)
3    Q.      Okay.
4    A.      Graduate school of management.
5    Q.      And where is Lake Forest?
6    A.      It's a northern suburb of Chicago.
7    Q.      And did you have a colleague that you went
8    to Lake -- or that was in your MBA program with you?
9            MS. CITERA:  Objection to form.
10   A.      Pardon?
11   Q.      Do you -- Was -- Did you have any
12   colleagues who were in your MBA program with you?
13   A.      Oh, a lot of Abbott folks went to Lake
14   Forest.
15   Q.      Okay.  Do you remember who they were?
16   A.      Some of them.
17   Q.      Okay.  Who were they?
18   A.      Dorie Class comes to mind.  Doug -- I
19   don't remember Doug's last name.  Gerry Eichhorn.
20   Q.      Okay.
21   A.      And if I think long enough, I can remember
22   more.
23   Q.      Okay.
24   A.      But it was fairly close in proximity to
25   Abbott.  So there were a lot of us.

Page 12

1    Q.      Sir, I'd like to go back a little bit.
2    You have what we're going to mark as the next exhibit
3    provided to us, a CV.  Is this your current CV?
4    A.      Yes.
5    Q.      Okay.
6            MS. ST. PETER-GRIFFITH:  Why don't we mark
7    that as the next exhibit?
8            MS. CITERA:  That's exhibit 1100?
9            THE COURT REPORTER:  Yes.
10           - - -
11           And, thereupon, Exhibit No. 1100 was
12   marked for purposes of identification.
13           - - -
14   BY MS. ST. PETER-GRIFFITH:
15   Q.      Now, Mr. Brincks, before we go through
16   your CV, did you receive a subpoena in this matter?
17   A.      I did.
18   Q.      Okay.  And you produced this document here
19   this morning.
20   A.      Uh-huh.
21   Q.      Was it responsive to the subpoena?
22   A.      Yes.  It was requested.
23   Q.      Did you search for any other documents
24   responsive to the subpoena?
25   A.      I did, but I've moved a number of times.

Page 13

1    And, you know, no other documents or information
2    other than really the CV --
3    Q.      Okay.
4    A.      -- I wouldn't have kept in all the moves.
5    Q.      Were there -- Were -- Did there -- Did you
6    at one point in your personal residence have
7    documents responsive to the subpoena, but you just
8    don't anymore?
9            MS. CITERA:  Object to form.
10           THE WITNESS:  Pardon?
11           MS. ST. PETER-GRIFFITH:  Go ahead.  You
12   can answer the question.
13   A.      No.  I did -- I did -- I did not keep as a
14   matter of fact a retained set of documents that I
15   moved with me.
16   Q.      Okay.
17   A.      I mean, I had office facilities to do
18   that.  So I just didn't move them.
19   Q.      And I apologize, Mr. Brincks.  I should
20   have told you as -- as we started this process, from
21   time to time, Ms. Citera or Mr. Stetler might
22   insert -- interject an objection.  Before you respond
23   to my questions, it might be best just to give a
24   pause to see if they have -- are going to assert an
25   objection.

Page 14

1    A.      Okay.
2    Q.      The lawyers will work it out.  And unless
3    you're instructed not to answer, I anticipate that
4    you'll be answering the question.
5    A.      Absolutely.
6    Q.      Additionally, if there is a question that
7    you don't understand that I've posed, please tell
8    me --
9    A.      Sure.
10   Q.      -- because I want to make sure that the
11   question -- that when you give an answer responding
12   to the question, it's responsive to the questions
13   that I'm asking.
14   A.      Good.
15   Q.      Okay?
16   A.      Yeah.
17   Q.      So you weren't able -- Other than your CV,
18   you were not able to identify any other documents
19   responsive to the subpoena?
20   A.      Correct.
21   Q.      Is this your most recent CV?  Oh, I'm
22   sorry. Let me put this in front of you.
23   A.      Yes, it is.
24   Q.      Did you do anything else to prepare?
25   Other than look for documents, did you do anything

Page 15

1    else to prepare for today's deposition?
2    A.      Other than meeting with my attorney, no.
3    Q.      Okay.  And your attorney is Mr. Stetler?
4    A.      It is.
5    Q.      How long did you meet with him for?
6    A.      Several hours, three hours, four hours
7    yesterday.
8    Q.      Yesterday?
9    A.      Uh-huh.
10   Q.      How did Mr. Stetler come to represent you?
11   Now, I don't want to know any conversations that you
12   had with Mr. Stetler.
13   A.      Sure.
14   Q.      I just want to know how he came to
15   represent you.
16   A.      As I was informed with the subpoena, I
17   spoke with -- Toni Citera had informed me of the
18   litigation, shared with me the option to secure
19   representation and David's name was brought up.  I
20   believe there may have been another attorney.  I went
21   and spoke with my personal attorney, but also then
22   did a phone interview with David, felt comfortable at
23   the conclusion of that that David was the best choice
24   for my representation.
25   Q.      Okay.  And are you aware that Mr. Stetler

Page 16

1    represents other former Abbott employees?
2    A.      I am.
3    Q.      Okay.  And just can you identify who your
4    personal attorney is?
5    A.      Jeffrey Poth.
6    Q.      And where is he located?
7    A.      Columbus, Ohio.
8    Q.      And can you indicate or can you go over
9    exactly what your conversation was with Ms. Citera?
10   MS. CITERA:  Objection to form.
11   THE WITNESS:  Pardon?
12   MR. STETLER:  You're going to learn to
13   ignore that.
14   MS. ST. PETER-GRIFFITH:  She's going --
15   MR. STETLER:  Unless somebody says
16   something more --
17   THE WITNESS:  I'm sorry.  It is very
18   distracting for me.
19   MR. STETLER:  You'll get used to it.
20   THE WITNESS:  Okay.
21   A.      The discussion was there's this matter in
22   place.  I remember it being just general description
23   of the action and that I was likely to receive a
24   subpoena, which I did.  That's the extent of the
25   conversation.

Page 17

1    Q.      What was the general description of the
2    action that she provided to you?
3    A.      That it was related to AWP and that's
4    really the extent of what I recall.
5    Q.      Okay.  Do you recall anything else about
6    the conversation?
7    A.      That there may have been multiple states
8    and the federal government involved and that's --
9    that's what I remember.
10   Q.      Anything else?
11   A.      No.
12   Q.      Okay.  I just -- I -- I will follow-up
13   with anything else just to exhaust your recollection.
14   A.      Hey, that's fair.  That's okay.
15   Q.      And, sir, who is paying Mr. Stetler's
16   fees?
17   A.      Not me.  I --
18   Q.      Okay.  Do you know who is other than not
19   you?
20   A.      I think maybe Abbott.  I'm not absolutely
21   certain.
22   MR. STETLER:  Neither am I, but that's the
23   plan.
24   THE WITNESS:  Okay.
25   BY MS. ST. PETER-GRIFFITH:

5  (Pages 14 to 17)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 18

1    Q.    Sir, what I'd like to do is go over your
2    employment history, if we could.
3    A.    Sure.
4    Q.    And I assume from looking at your CV that
5    in starting with your history and moving forward in
6    time --
7    A.    Okay.
8    Q.    -- that we're going to start on Page 2.
9    Is that fair enough?
10   A.    Yeah.  I mean, that's fine.
11   Q.    Okay.
12   A.    Okay.
13   Q.    And, sir, can you just take me through
14   your employment history prior to your employment with
15   Abbott or an Abbott related entity?
16   A.    Sure.
17         Well, I came out of school at the
18   University of Illinois and went directly -- joined
19   with General Electric, went on their financial
20   management program, was located in Louisville,
21   Kentucky, and just provided a variety of different
22   financial analysis and accounting-related
23   responsibilities and roles.  I then moved -- as a
24   part of that organization was promoted to become a
25   controller and moved to Baltimore where I was for

Page 19

1    approximately 11 months.  I think it was about 11 in
2    the transitions.
3          Then there was a group of gentlemen who
4    left General Electric to go to Tennneco/Case, which
5    is a division located in Racine.  I was asked to
6    consider joining in coming with them.  I had the
7    opportunity to do some international financial
8    analysis as part of that move.  I elected to move to
9    Gurnee.  I commuted up to Racine, Wisconsin, for that
10   two-year period of time.  And so that's highlight
11   wise what I did with -- in those roles.
12   Q.    And, sir, I can't remember whether you
13   told us this or not.  I know you went to the
14   University of Illinois, but what was your -- You were
15   a finance major?
16   A.    Uh-huh.
17   Q.    Is that what your degree is in?
18   A.    Undergraduate degree in finance, yes.
19   Q.    Okay.  Do you have any other majors or
20   minors that you have an undergraduate?
21   A.    No.  I received a bachelor of science in
22   finance.
23   Q.    Okay.  So you -- You're -- You're in
24   Racine.  How long were you in Racine?
25   A.    A couple years.

Page 20

1    Q.    Okay.  Is that from -- Is that at --
2    represented on your --
3    A.    Yeah.
4    Q.    -- resume as from 2-89 to 3-91?
5    A.    Uh-huh.
6    Q.    And then after Tenneco, Inc. -- Well, let
7    me ask you:  With any of those positions, were you at
8    all involved with the pharmaceutical industry or with
9    drugs?
10   A.    Absolutely not.
11   Q.    What about with the pricing of products;
12   were you involved at all with that?
13   A.    No, not in any of those roles.
14   Q.    Okay.
15   A.    Reporting of sales, looking at operations.
16   So to that extent perhaps.
17   Q.    And sometime after March of '91, is it
18   fair to say that you came to be employed by Abbott?
19   A.    Yes, that would be true.
20   Q.    How did that come about?
21   A.    An opportunity for a position in their
22   contract marketing area -- I just learned that they
23   were looking for people.  My wife was employed with
24   Abbott at the time and learned of the position, and I
25   got my resume into that mix and was hired.

Page 21

1    Q.    Okay.  Now, what was your wife's role with
2    Abbott in '91?
3    A.    Oh, jeez.  In '91, she would have been in
4    the finance area, I believe, because she had then
5    went into field sales as a field sales
6    representative.
7    Q.    And who is your wife?
8    A.    Linda Brincks.
9    Q.    And how long -- What -- During what period
10   of time did she work for Abbott?
11   A.    Well, I know she left when my second
12   daughter -- when my daughter was on the way.  So that
13   would have been -- let's see -- '91 -- '92 or so.
14   Q.    Okay.  And prior to '92 -- And did she
15   ever come back to Abbott after that?
16   A.    No.
17   Q.    And prior to '92, how long did your wife
18   work with Abbott?
19   A.    I think -- Well, it would have been when
20   we moved in -- I think it was in 1990 or so.
21   Q.    So she worked --
22   A.    Because I was working at Case and then she
23   found the job with Abbott during that period of time.
24   Q.    So she worked with Abbott from '90 to '92?
25   A.    It seems like it would have been longer

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 22

1  than that. It might have been in late '89 then.
2  Q.     Okay. And where did she work first; in
3  the field sales area or in the finance area?
4  A.     Finance area. She was at Abbott Park.
5  Q.     At Abbott Park?
6  A.     (Witness nods.)
7  Q.     And how long did she work in the finance
8  area?
9  A.     Not for long because she didn't like it
10  very much. I think it was about a year and a half
11  and then she went into field sales.
12  Q.     Okay. And what were her responsibilities
13  in the finance area?
14  A.     Supporting the marketing area.
15  Q.     Was it a clerical --
16  A.     She was pretty junior at that stage. It
17  was more analytics and reporting. They might do
18  certain presentations on how the business or a brand
19  was doing, and it was support in that regard.
20  Q.     Okay. And she transitioned to a field
21  sales rep then?
22  A.     Uh-huh.
23  Q.     And how long did she -- was she in the
24  field sales area?
25  A.     I'd say a couple years.

Page 23

1  Q.     So that brings up to about four years
2  by -- or three-and-a-half years. Does that sound
3  about right?
4  A.     That seems about right.
5  Q.     Okay. And what did she sell in the field
6  sales area -- what products?
7  A.     Hospital products.
8  Q.     So was she in the hospital products
9  division?
10  A.     Correct.
11  Q.     And do you know who her supervisors were?
12  A.     Oh, boy. I remember one. Randy Stillman.
13  Q.     Okay. Anybody else?
14  A.     That's all I remember.
15  Q.     And do you remember what area she worked
16  in in HPD? Was there a subdivision or department?
17  A.     She was in the large -- the broader HPD,
18  not a subset of it.
19  Q.     Well --
20  A.     I'm not sure I understand your question.
21  Q.     Well, was it -- Was it the hospital
22  business sector or was it alternate site? Do those
23  names ring a bell?
24  A.     Yeah. It would have been the business
25  sector, the larger piece.

Page 24

1  Q.     And do you know what her area was?
2  A.     If you could, clarify what you mean by
3  "area."
4  Q.     Sure. Let -- Let -- Let me -- Fair
5  enough.
6          Did she have a particular area where --
7  that she was responsible for as a field sales rep?
8  A.     Oh, geographic area?
9  Q.     Geographic area.
10  A.     Oh, okay.
11          More western suburbs.
12  Q.     Of?
13  A.     Chicago.
14  Q.     And why did she leave Abbott?
15  A.     Children.
16  Q.     So you testified that your wife learned
17  about this position and you applied for it?
18  A.     Correct.
19  Q.     At that point in time, did you have any
20  experience whatsoever in the pharmaceutical field?
21  A.     None.
22  Q.     What about in the sales field?
23  A.     None.
24  Q.     Okay. And what was your understanding of
25  the qualifications needed for the contract marketing

Page 25

1  position?
2          MS. CITERA: Objection to form.
3  A.     The qualifications?
4  Q.     Uh-huh.
5  A.     Business acumen and background and a
6  willingness and ability to learn.
7  Q.     Okay. Did you have an understanding as to
8  whether any knowledge of the pharmaceutical industry
9  was -- was important?
10          MS. CITERA: Objection to form.
11  A.     I just don't -- I don't recall it being a
12  part of it. If it was important, I wouldn't have
13  gotten the job.
14  Q.     Okay. How did -- How did you come to --
15  Strike that.
16          So you -- You got the job?
17  A.     Yes.
18  Q.     Okay. Did you apply for it?
19  A.     I submitted a resume and went through an
20  interview process.
21  Q.     Okay. And what was your first position at
22  Abbott?
23  A.     I was a contract marketing analyst.
24  Q.     And what is a contract marketing analyst?
25  A.     Contract marketing analyst -- We were

7 (Pages 22 to 25)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 26

1  involved in home infusion services, which is the
2  subset of the hospital products division that that
3  was a part of.  We were involved and created -- A lot
4  of hospitals were in the process of creating home
5  infusion businesses at that stage, and the
6  fundamental principle behind home infusion was to
7  work with those hospitals that had such an interest
8  but wanted support, and we created what I would term
9  consulting product agreements that we based on a
10  revenue share typically, and that was the business
11  model for home infusion.  And so that analyst role
12  was involved in supporting the structure of those
13  agreements.
14  Q.      And were you assigned particular clients
15  as a contract analyst -- contract marketing analyst?
16          MS. CITERA:  Objection to form.
17  A.      No.  I don't recall it being -- I mean, we
18  just covered what came in and were assigned on the
19  basis of a project.
20  Q.      Do you remember what projects you worked
21  on during that period?
22  A.      What projects I worked on?
23  Q.      Or what contracts you worked on.
24  A.      That's a very broad question.  I'd -- I --
25  You'd have to give me something perhaps to respond

Page 27

1  to.
2  Q.      Okay.  When you -- When you were a
3  contract marketing analyst, do you remember which
4  clients of Abbott you worked with?
5          MS. CITERA:  Objection to form.
6  A.      Which clients?  I might be able to form a
7  few names that I recall.  Baylor was, I know, a
8  client.  Boy oh, boy.  I can't remember if we ever
9  signed an agreement with M.D. Anderson in Houston or
10  not.  University of Chicago.  That's just going back
11  into the memoirs quite a bit.  I don't -- Beyond
12  that -- I mean, if you gave me some other names, I
13  might be able to tell you if I recall.
14  Q.      Children's Hospital?
15  A.      Which Children's?
16  Q.      Of Chicago.
17  A.      Yes, that would have been one.
18  Q.      University of Michigan?
19  A.      Definitely that one.
20  Q.      Care Partners?
21  A.      I do not remember that one.  Where --
22  Where were they located?
23  Q.      I just want your memory.
24  A.      I don't remember that one.
25  Q.      Okay.  Anybody else?  Any others that you

Page 28

1  can remember?
2  A.      I mean, I know we had an account in
3  Tennessee that was a large -- I just don't remember
4  the name of it.  There would have been some business
5  we had in Florida.  I don't recall the names of the
6  operation.  And I know there were some in California.
7  I just don't remember the names.  I can't remember if
8  UCLA became an account or not.  I don't remember
9  discussions.
10  Q.      Any others that you can recall?
11  A.      That's it.
12  Q.      Okay.  Now, did you work on these accounts
13  do you recall when you were a contract marketing
14  analyst?
15  A.      Versus when I was manager?
16  Q.      Versus when you were manager.
17  A.      I could not begin to break it down that
18  way.
19  Q.      Okay.  So let me exhaust your memory on
20  this.
21          When you were in the home infusion
22  contract marketing area --
23  A.      Yeah.
24  Q.      -- other than the names that you've
25  identified, do you remember any other contract

Page 29

1  accounts that you worked on?
2          MS. CITERA:  Objection to form.
3  A.      Well, I've shared with you what just based
4  off straight recall I can remember.
5  Q.      Okay.  Do you remember how many contracts
6  in total home infusion had during your period with
7  home infusion?
8          MS. CITERA:  Objection to form.
9  A.      Yeah.  I remember our rough number of
10  being between 25 and 30 accounts that we -- that we
11  had.  That's just a real -- that's a rough ballpark.
12  Q.      Okay.  Do you remember how much or -- or
13  what the value to the company was of those contracts?
14          MS. CITERA:  Objection; calls for
15  speculation.
16  A.      Of the total home infusion business unit?
17  Q.      Yes.
18  A.      I think -- I think we were in the
19  $20 million range in general.  I don't recall -- And
20  that may not be an accurate recall.  That's a rough
21  projection, but it was a smaller piece of the home
22  infusion or the hospital products division.
23  Q.      Was that $20 million annually?
24  A.      Yeah.
25  Q.      Who -- In your role -- In the role as a

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 30

1 contract marketing either analyst or manager, would
2 you have responsibility with regard to monitoring
3 the -- the value of these contracts?
4 A.      The value of the contracts?
5          MS. CITERA: Objection to form.
6 A.      Tracking sales yes.
7 Q.      Let's jump back a little bit.
8          What were your responsibilities before
9 we -- before you were bumped up to manager, which I
10 assume was a promotion; is that fair?
11 A.      Uh-huh.
12 Q.      Okay. So you were in contract marketing
13 as a -- according to your resume, as a senior
14 contract marketing analyst?
15 A.      Uh-huh.
16 Q.      Did you always hold that title when you
17 were a marketing analyst?
18 A.      I do not recall. I believe so, yes.
19 Q.      Okay. So when you came into the company
20 you came in as a seen or contract marketing analyst?
21 A.      Correct.
22 Q.      And you held that position from April '91
23 through October of '92?
24 A.      Uh-huh.
25 Q.      So a little under two years?

Page 31

1 A.      (Witness nods.)
2 Q.      What were your responsibilities as a
3 contract marketing analyst?
4 A.      Again, as I recall, what we were doing was
5 evaluating those contract agreements. So as we would
6 be in discussion, say, with the University of
7 Michigan, we would create just some type of a model
8 and support the field sales force in the discussions
9 with the client.
10 Q.      Okay. When you say create a model, what
11 do you mean?
12 A.      Well, we created a revenue share agreement
13 as I described earlier. So you -- In order to set
14 the pricing in the revenue share, you assumed a buy
15 therapy percentage revenue share. And so that model
16 both depicted it for the overall business as well as
17 for a projection of -- of revenues for Abbott.
18 Q.      Okay. Can you -- I'd like you to take me
19 through how working up that model worked.
20 A.      Uh-huh.
21          MS. CITERA: Objection to form.
22 BY MS. ST. PETER-GRIFFITH:
23 Q.      Okay. You would work with a field sales
24 rep?
25 A.      (Witness nods.)

Page 32

1 Q.      Would you always work with a field sales
2 rep?
3 A.      Yes.
4 Q.      Okay. And how would that work? Would
5 they bring a customer to you?
6 A.      Yes.
7 Q.      Okay. And do you know how the field sales
8 rep obtained the customer?
9 A.      Obtained the customer?
10 Q.      Or -- or --
11 A.      Describe what you mean by "obtained."
12 Q.      Well, how is it that the customer came to
13 the field sales rep?
14 A.      Well, in the true sense of sales, they
15 were out touching base with the hospitals to
16 determine who would have an interest in a support
17 agreement; and those that expressed an interest would
18 then begin discussions and negotiations.
19 Q.      Would they make sort of cold calls to
20 hospitals?
21          MS. CITERA: Objection to form.
22 A.      Boy -- I -- I don't -- I don't -- I would
23 imagine, but I don't remember.
24 Q.      What was the relationship between the
25 field sales rep and the contract analyst in terms of

Page 33

1 a supervisory relationship? Did you supervise them?
2 A.      Absolutely not.
3 Q.      Were there separate supervisors for the
4 field sales reps?
5 A.      Correct.
6 Q.      Okay. Who were the field sales reps
7 during that time?
8          MS. CITERA: Objection to form.
9 A.      Who were the field sales reps? I -- You
10 could give me some names, and I could respond. I can
11 probably --
12 Q.      I'm interested in who you remember.
13 A.      Yeah. Okay. And I'm going to try -- try
14 to give you the best shot I've got here. Let me
15 think. Well, I do remember some supervisors; Pete
16 Baker, Craig George. Boy, field sales reps. I'm
17 going to start -- I don't -- I don't remember.
18 Q.      Okay. What would happen after the field
19 sales reps sort of identified someone who was
20 interested? What would -- What would happen?
21 A.      Well, they would come in and say we're
22 interested in a relationship. They want to see an
23 overall program proposal. So you would craft a
24 document highlighting what the capabilities were for
25 home infusion services, determine what types of

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 34

1   services they'd be interested in.
2           In addition to you, you know, providing
3   products that would be used, which Abbott made a
4   number of them, there was also the potential for them
5   to utilize a computer system that we had created to
6   support the home infusion business. There were also
7   reimbursement services. So we would determine what
8   degree of support they were interested in. And so
9   from that, we would then create that proposal that
10  would include ultimately in the back and forth
11  process a -- a revenue share from a pricing
12  standpoint.
13  Q.      Okay. And when you say "revenue share,"
14  what do you mean by that?
15  A.      Because the types of products that Abbott
16  could provide, say, for total parenteral nutrition,
17  which is one therapy that was delivered in the home,
18  was different than what we could provide for
19  chemotherapy delivered in the home, the pricing would
20  be different. So the percentage would be higher for
21  total parenteral nutrition than for chemotherapy.
22  That's the broad example.
23  Q.      Okay. What revenue would be shared?
24  A.      What was -- The billings that were
25  generated by the operation, that's where we would

Page 35

1   take a percent -- we would take a percentage of that.
2   Q.      Okay. Would you take a percentage under
3   the contract of revenues generated from billing to
4   Medicaid?
5           MS. CITERA: Objection to form.
6   A.      Yes.
7   Q.      What about to Medicare?
8           MS. CITERA: Same objection.
9   A.      Yes.
10  Q.      What about to third-party insurers?
11          MS. CITERA: Objection to form.
12  A.      It was billing for the entire operation.
13  Q.      Okay. Do you know how these types of
14  arrangements came about, how this form of revenue
15  sharing contract came about?
16  A.      It was in place when I arrived. So I
17  don't know how it came about.
18  Q.      Okay. Did you work with any compliance or
19  ethics individuals with regard to the structure of
20  the revenue share contracts?
21          MS. CITERA: Objection to form.
22  A.      Certainly there was -- I don't remember --
23  There was a gentleman who was involved in quality. I
24  don't recall his name. And then we would have worked
25  with Abbott legal counsel.

Page 36

1   Q.      When you say someone involved in quality,
2   what did that person do?
3   A.      It was mostly in the area of
4   pharmaceutical compliance mixing -- You know, home
5   infusion required the mixing of bags of products and
6   different things where you wanted to ensure that the
7   mixing was in line with accreditation standards. So
8   there was an organization called J- --
9   Q.      JCAHO?
10  A.      JCH -- Yeah, JACHO.
11  Q.      Okay.
12  A.      J-A-C-H-O. So it was in that regard.
13  Q.      Okay. What about in terms of compliance
14  with federal or state Medicare or Medicaid
15  regulations; did you work with anyone on that?
16          MS. CITERA: And I'm just going to
17  instruct you to the extent you had conversations with
18  legal, you can answer the question as a yes or no but
19  not reveal -- I would instruct you not to reveal any
20  conversations -- the substance of your conversations.
21          THE WITNESS: Okay.
22          Can you repeat the question?
23          MS. ST. PETER-GRIFFITH: Sure.
24          Can you read it back, please?
25          (Question read back.)

Page 37

1   A.      We had a reimbursement operation that in
2   the cases where we did do billing on behalf of a
3   client, it went through that reimbursement operation.
4   Q.      Okay. Do you remember which clients you
5   did reimbursement billing for?
6   A.      I don't remember which ones of that
7   list -- which ones had reimbursement, which ones -- I
8   don't remember specifically.
9   Q.      Okay. Is if fair or did you expect that
10  the reimbursement operation or the reimbursement
11  department would be responsible for monitoring
12  compliance with federal or state Medicaid or Medicare
13  regulations and laws?
14          MS. CITERA: Objection to form.
15  A.      Yes.
16  Q.      Okay. And do you remember who was in that
17  reimbursement operation?
18  A.      The one name Virginia Tobiason would have
19  been the head of the organization.
20  Q.      Anybody else?
21  A.      Lynn Leone, who eventually also came to
22  work for me in a different but related case
23  management role; Shellie Bronson. And I don't -- I
24  don't remember beyond that.
25  Q.      Okay. Did you -- Do you recall having any

10 (Pages 34 to 37)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 38

1    discussions with any of these individuals regarding
2    compliance with federal or state Medicaid or Medicare
3    regulations?
4    A.        I do not recall specific conversations.
5    I'm -- I'm certain that -- I don't recall.
6    Q.        Do you recall what -- Under these revenue
7    share agreements what Abbott's range of share was in
8    Medicare or Medicaid funds?
9              MS. CITERA:  Objection to form.
10   A.        Could you -- You need to perhaps get a
11   little -- I'm not sure I follow.
12   Q.        Okay.  Let me ask you a different way.
13             Do you recall how much of these contracts
14   involved reimbursement by Medicaid or Medicare?
15             MS. CITERA:  Objection to form.
16   A.        I do not recall what the mix was of that
17   business.
18   Q.        Can you characterize it as a small or
19   large amount?
20             MS. CITERA:  Objection to form.
21   A.        Small or large?  What is small or large?
22   Q.        Well, for your revenue share customers,
23   what is -- do you know whether they relied heavily
24   upon Medicaid or Medicare reimbursement?
25             MS. CITERA:  Objection.  You're asking him

Page 39

1    to speculate.
2    A.        I think it varied a lot by every client.
3    I mean, every situation, where they were located,
4    what -- who their client base was would have been
5    very different.
6    Q.        Okay.
7              MS. ST. PETER-GRIFFITH:  Ms. Citera, I'm
8    going to ask you if you have a form objection, please
9    state it as a form objection.
10   BY MS. ST. PETER-GRIFFITH:
11   Q.        Did you have any -- Do you know what
12   dollar amounts in Medicaid or Medicare reimbursement
13   any of your clients took in?
14             MS. CITERA:  Objection to form.
15   A.        I do not recall that detail.
16   Q.        Do you recall whether Medicaid or Medicare
17   reimbursement was important to your revenue share
18   clients?
19             MS. CITERA:  Objection to form.
20   A.        Important?  I'm certain it was important
21   for them.
22   Q.        Do you -- Do you -- Why do you think it
23   was important for them?
24             MS. CITERA:  Objection to form.
25   A.        Why do I think it was important to them?

Page 40

1    With -- With their client base, I'm certain they had
2    some level of Medicare/Medicaid coming through.
3    Q.        Do you know whether some of them had
4    significant levels of Medicaid or Medicare coming
5    through?
6              MS. CITERA:  Objection to form.
7    A.        I'm certain some of them did.
8    Q.        And I know I -- I asked you to sort of put
9    your thinking cap on a little while back, and you
10   identified that you thought perhaps the home infusion
11   unit under these reimbursement contracts -- or under
12   these revenue share contracts took in about
13   $20 million annually during the period of time that
14   you worked on them.  Do you know what percentage of
15   that came from Medicare or Medicaid dollars?
16             MS. CITERA:  Objection to form.
17   A.        I -- I really don't recall the percentage.
18   Again, it was enough to be a factor.  You can't serve
19   medical practice and not have it be a component of
20   the business.
21   Q.        Okay.  And for Abbott's share from the
22   reimbursement, was that related to the level of
23   service that Abbott provided?
24             MS. CITERA:  Objection to form.
25   A.        Yes.

Page 41

1    Q.        Okay.  And how -- Can you -- Can you sort
2    of describe how that worked?
3    A.        Sure.
4              Building on what I -- what I said earlier,
5    if you look at -- Product would have been one
6    component.  So in total parenteral nutrition, which
7    was actually feeding nutrition for people who could
8    no longer typically consume at least enough calories
9    direct through their normal feeding, we would provide
10   a substantial portion of those products.  In other
11   therapies, like I said before, chemo, where our
12   ability to deliver the products and the -- all of the
13   ancillaries that were required for that home infusion
14   operation to deliver chemotherapy in the home, it was
15   lower.
16             So then you would layer on top of that if
17   they used the computer system, if they used our
18   reimbursement services, if we would sometimes go in
19   and help them design their compounding pharmacy.  And
20   there were -- there was -- For a period of time we
21   actually operated three pharmacies in the United
22   States -- one in Chicago, one on the east coast and
23   one on the west coast -- where we would actually
24   compound the product for them if they simply didn't
25   want to build out the home infusion purpose.  So

11 (Pages 38 to 41)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 42

1  you'd layer on all of those components and that's
2  where you would build it from.
3  Q.      You mentioned product. How was the
4  product provided to your revenue share customers?
5  A.      Basically, I think the closest word I
6  could use would be consignment.
7  Q.      Okay.
8  A.      Because, again, our compensation for the
9  use of that product was paid back through that
10 revenue share.
11 Q.      So would your revenue share clients
12 actually pay for the product at any point prior to
13 the distribution of the revenue share?
14        MS. CITERA: Objection to form.
15 A.      No, not -- not that I recall the way that
16 we structured the agreements when I was there. It
17 was revenue share.
18 Q.      Who were the prices of the products
19 identified to your customers?
20        MS. CITERA: Objection to form.
21 A.      Prices of the product? Revenue share.
22 Q.      Okay. So Abbott would provide the
23 products --
24 A.      Yeah.
25 Q.      -- essentially free of charge until such

Page 43

1  point in time as you collected your revenue share
2  portion under the consigned -- under the revenue
3  share agreement?
4         MS. CITERA: Objection to form.
5  A.      Correct.
6  Q.      Would there be any discussion of the
7  price -- prices of the products or the individual
8  costs of the products that would be consigned to the
9  revenue share partners or revenue share contractors?
10        MS. CITERA: Objection to form.
11 A.      Individual price? Describe what you mean.
12 Q.      Would you say, okay, we're delivering, you
13 know, ten boxes of Vancomycin.
14 A.      Sure.
15 Q.      They cost X amount per vial. Would --
16 Would there be any kind of breakdown of price
17 to your -- to the customers under these revenue share
18 agreements?
19        MS. CITERA: Objection to form.
20 A.      There was a typical therapy. So a typical
21 total parenteral nutrition patient would require X,
22 X, X and X in supplies. So this is the rough value
23 of what that would be. So you would describe that as
24 a way of describing what types of products were used
25 in supporting and treating that patient.

Page 44

1  Q.      Were there any pricing lists ever
2  distributed under -- to your -- to the customers
3  under these revenue share agreements that you can
4  recall?
5  A.      I -- I do not remember how we described
6  that component in our proposals. I don't remember
7  the specifics. I believe it was at a -- a list price
8  description of here's -- here's what we do, here's
9  the typical price -- and I can't remember what --
10 what we would have used -- that, you know, we would
11 provide for you in the provision of that service.
12 Q.      When you say you can't remember what we
13 would have used, what do you mean by that?
14 A.      I don't -- If it was a list price or if it
15 was AWP. I can't recall.
16 Q.      Okay. That leads to my next question.
17        What -- What is AWP?
18 A.      Average whole sale price.
19 Q.      Okay. And do you know how average whole
20 sale price was -- would be arrived at by Abbott?
21        MS. CITERA: Objection to form.
22 A.      By Abbott? I was not involved in actually
23 setting the AWP or sending it in. I remember AWP for
24 us in home infusion was the Red Book or Blue Book
25 that we would take the AWP pricing off of and that's

Page 45

1  what we would -- we would use. The process for
2  setting AWP with those parties -- We were not
3  involved in actually setting that in home infusion,
4  although our clients would, you know, ask questions.
5  Q.      What -- What questions would your clients
6  ask?
7  A.      Just, you know, there's the Blue Book. Is
8  that what we use? Is that the process?
9  Q.      Okay. Do you remember which clients asked
10 that?
11 A.      It was pretty common practice. It
12 really -- AWP was very recognized in the medical
13 industry as a vehicle for pricing products and
14 services.
15 Q.      And do you recall what your responses were
16 to the clients with regard to their questions?
17        MS. CITERA: Objection to form.
18 A.      What the response -- It was standard Blue
19 Book, Red Book, here is where it is, this is the
20 process that we use. I don't recall any broad type
21 of question that would regularly come. I'm not sure
22 I'm following your question.
23 Q.      Okay. What were the types of questions
24 that clients would ask about Red Book, Blue Book or
25 AWP?

12 (Pages 42 to 45)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 46

1         MS. CITERA: Objection to form.
2    A.      Let's see. On occasion -- on occasion,
3    there might be a large shift or a change and they
4    might say, well, you know, what's the dynamic with
5    that. But I don't recall it being a frequent
6    question.
7    Q.      Okay. Do you know -- Did Abbott have any
8    policies with regard to discussing pricing or AWP
9    with clients?
10        MS. CITERA: Objection to form.
11   A.      A policy? I don't recall one.
12   Q.      Okay. If there had been a policy, do you
13   think that's something that you would have been
14   familiar with?
15        MS. CITERA: Objection to form.
16   A.      If they had one? I imagine I would have
17   been.
18   Q.      Okay. Do you know who Mike Heggie is?
19   A.      Mike Heggie? The name -- Yes, I remember
20   the name.
21   Q.      And what do you remember about him?
22        MS. CITERA: Objection to form.
23   A.      What do I remember about him? He was in
24   alternate site.
25   Q.      Do you remember what his role was in

Page 47

1    alternate site?
2    A.      He would have been in contract marketing.
3    Q.      Now, were you in alt site contract
4    marketing?
5    A.      I was in home infusion services contract
6    site marketing.
7    Q.      What's the difference between the two?
8    A.      Home infusion was a -- this revenue
9    sharing consulting agreement focused on the home
10   infusion market. So you would literally compound and
11   deliver and support and provide products within the
12   home. Alternate site was a product seller into
13   alternate site marketplaces. But that was a
14   strict -- you know, more in the traditional Abbott we
15   have product, we sell product and they just targeted
16   it into a different market arena.
17   Q.      What was your interaction with contract --
18   with that contract marketing alt site unit?
19        MS. CITERA: Objection to form.
20   A.      Minimal. We just -- There wasn't much for
21   us to interact on because we were so focused in a --
22   in a unique business model with it being a consultive
23   agreement. We did not interact much.
24   Q.      What about the name Karla Kreklow; are you
25   familiar with that name?

Page 48

1    A.      I remember the name.
2    Q.      Okay. Do you -- Do you remember why or
3    who she was?
4    A.      I -- What I recall of Karla was she was in
5    sales.
6    Q.      Okay. Do you know whether she was a
7    manager in sales?
8    A.      She was definitely a manager in the
9    organization, yes. I don't know if it was in sales
10   at the time or if it was in a marketing role. I
11   don't recall.
12   Q.      The field sales reps that you
13   referenced -- before I had asked you a question
14   about -- about the supervisory interaction -- do you
15   recall whether she might have supervised them?
16        MS. CITERA: Objection to form.
17   A.      Yeah. I believe she may have at some
18   point.
19   Q.      Okay. Do you remember for what period?
20        MS. CITERA: Objection to form.
21   A.      No. I don't remember that.
22   Q.      Did you have interaction with Karla
23   Kreklow?
24   A.      I don't recall how much.
25   Q.      Okay.

Page 49

1    A.      I know her.
2    Q.      We're -- We touched upon a little bit
3    of -- of AWP and you've defined it. I'd like to ask
4    you about another term, "list price." What's -- What
5    is your understanding of list price?
6    A.      List price? It's like the sticker price.
7    Q.      Okay. And do you know how it was used?
8        MS. CITERA: Objection to form.
9    A.      How it was used?
10   Q.      By Abbott.
11   A.      By Abbott?
12   Q.      Uh-huh.
13        MS. CITERA: Objection to form.
14   A.      I think literally as a sticker price, but
15   I don't -- You know, what happened then is the -- is
16   the individual hospital contracts were negotiated.
17   I'm not familiar with what -- what they did.
18   Q.      Okay. When you say "sticker price," can
19   you sort of define what you mean by that?
20   A.      Kind of like a suggested list. I mean,
21   like you would see in -- on the back of a book or
22   it's just the -- the starting price, the sticker
23   price.
24   Q.      Do you know whether it was the price that
25   Abbott customers paid for a particular product or

13 (Pages 46 to 49)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 50

1   drug?
2          MS. CITERA:  Objection to form.
3   A.      Do I know?  I don't know absolutely, but
4   given that the vast majority of contracts to my
5   recollection were negotiated, I -- I don't think that
6   many people just paid straight out list price, but I
7   don't know.
8   Q.      What about the term "direct price"?
9   A.      I'm not familiar with that term.
10  Q.      What about the term "whack"?
11  A.      Whack?  I saw it in the subpoena document.
12  Q.      Okay.
13  A.      But I don't remember us using that a
14  lot -- I don't remember that a lot.
15  Q.      I'd like to go back to AWP.  Your earlier
16  testimony was that home infusion was not involved
17  in -- in AWP; is that fair -- or in setting AWP?
18  A.      Uh-huh.
19  Q.      Who was at Abbott?
20         MS. CITERA:  Objection to form.
21  A.      Who was?  Contract marketing would have
22  been the organization that I believe were the ones
23  that coordinated and submitted -- submitted the
24  information to the organizations that then turned
25  around and created the Blue Book and the Red Book

Page 51

1   that I referenced earlier.
2   Q.      Okay.  And when you say "contract
3   marketing," I'm assuming you're not talking about
4   home infusion contract marketing?
5   A.      Correct.
6   Q.      Okay.  Which contract marketing?
7   A.      Hospital products, the HBS sector.  I --
8   Q.      Okay.  Just so that we can have a clear
9   record and so we all know what we're talking about,
10  when I -- why don't we try and refer to contract
11  marketing as you've just identified as alternate site
12  contract marketing, which is distinguishable from
13  your unit, which was home infusion contract
14  marketing.  Is that fair?
15  A.      And also -- Sure.
16         MS. CITERA:  Objection.
17         MS. ST. PETER-GRIFFITH:  Go ahead.
18  A.      But HBS contract marketing is who I'm
19  talking about.
20  Q.      Okay.
21  A.      So they're -- And remember there's a life
22  cycle in organizations.  So when I started with HPD,
23  it was all one, then it separated.  So I'm -- I'm
24  trying to piece together variations.  So if the point
25  in time that we're referencing -- it's -- it would

Page 52

1   have been hospital business sector, which would have
2   been the -- the largest piece of the hospital
3   products division, and then alternate site and then
4   home infusion.
5   Q.      Okay.  And did each of those components
6   have a contract marketing?
7   A.      Yes.
8   Q.      Okay.  And which contract marketing was
9   responsible for reporting the information for AWP?
10         MS. CITERA:  Objection to form.
11  A.      HBS.
12  Q.      And do you remember -- Do you know who
13  that would have been in HBS that would have done
14  that?
15  A.      No, I don't -- I don't recall that.
16  Q.      In terms of AWP, for the contracts that
17  you were discussing, the -- the revenue share
18  contracts that you worked with, because there was a
19  revenue share -- And that's how the products
20  essentially were paid for; is that fair?
21  A.      Yes.
22  Q.      Do you know whether Abbott customers ever
23  paid an AWP?
24         MS. CITERA:  Objection to form.
25  A.      Paid an AWP?

Page 53

1   Q.      Or paid the -- paid an AWP price.
2          MS. CITERA:  Objection to form.
3   A.      To whom?
4   Q.      To Abbott when it purchased product.
5          MS. CITERA:  Objection to form.
6   A.      In home infusion?
7   Q.      In home infusion?
8   A.      No.
9   Q.      Okay.  Do you know why your customers
10  would care about AWP --
11         MS. CITERA:  Objection to form.
12  BY MS. ST. PETER-GRIFFITH:
13  Q.      -- the home infusion customers?
14         MS. CITERA:  Objection to form.
15  A.      Because that's the standard process that
16  was used to actually bill in the industry.  AWP was a
17  common reference point accepted and used in --
18  broadly in the home infusion market to bill patients
19  and insurance companies.
20  Q.      Then why would AWP have been important to
21  them?
22         MS. CITERA:  Objection to form.
23  A.      Because of what I just said.
24  Q.      Okay.  Did it impact their reimbursement?
25         MS. CITERA:  Objection to form.

14  (Pages 50 to 53)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 54

1   A.      Impact their reimbursement?  You'll have
2   to break that down for me a little more.  AWP would
3   have been involved in what was billed.
4   Q.      Okay.
5   A.      So dependent on how the payer responded to
6   that bill was -- would have been based on the payer
7   and that bill.
8   Q.      Okay.  What was your understanding of how
9   the reimbursement department worked for these home
10  infusion contracts?
11  A.      So in the cases where Abbott Home Infusion
12  provided reimbursement services?
13  Q.      Right.  Yes.
14  A.      They would interact with the operation,
15  determine what services were provided for a patient
16  and then put it into the system to actually generate
17  the claims and then they would provide -- and that --
18  So that's what I recall that they did.
19  Q.      Okay.  Were you at all involved with
20  reimbursement services?
21  A.      No.
22  Q.      Okay.  Did you interact with the
23  reimbursement department?
24  A.      Oh, sure.
25  Q.      Okay.  Why would you -- What would be

Page 55

1   reasons why you interacted with the reimbursement
2   department?
3   A.      Because we would have been creating these
4   revenue share agreements and because if client issues
5   or questions came up, sometimes we would hear about
6   them and say, "Hey, Virginia, what -- you know,
7   what's going on with the client and -- we've heard
8   through the sales force that you need to touch base
9   with them."
10  Q.      Okay.
11  A.      That type of interaction as a team.
12  Q.      What types of concerns from the client or
13  issues from the client would you typically discuss
14  with the reimbursement department?
15         MS. CITERA:  Objection to form.
16  A.      Well, as I recall, probably the biggest
17  issue was because the reimbursement process was very
18  time consuming, there could be a lot of cash tied up
19  in receivables.  So there would be -- you know, if
20  you would get delays of 120 days payment or things
21  kept getting pushed out, that -- that could be a bit
22  of I challenge for everybody.
23  Q.      Did you have an understanding as to
24  whether or not the reimbursement department under
25  the -- those contracts where your -- your clients

Page 56

1   contracted for reimbursement services whether the
2   reimbursement department would be responsible for
3   collecting the reimbursements?
4   A.      That I -- That part I don't remember.
5   I -- They had to be involved because they were
6   billing.  So they would have been following up on the
7   payment; but the process for application of cash,
8   et cetera, I don't recall that piece.
9   Q.      Do you recall how the actual percentage
10  shares were paid to Abbott -- how Abbott collected
11  that money?
12  A.      Oh, good question.  I don't -- I don't
13  recall.  I -- I know that we would have had a monthly
14  reporting that was submitted in and that it would
15  have been paid off of that monthly report that
16  would -- that would come in.
17  Q.      Who would generate the monthly report?
18  A.      The client.
19  Q.      Okay.  Would reimbursement services be
20  involved in that if they contracted for reimbursement
21  services?
22         MS. CITERA:  Objection to form.
23  A.      I -- I don't recall.
24  Q.      Okay.  What were the types of -- Let me go
25  back on my notes here.

Page 57

1         What were the -- Other than reimbursement
2   services, can you describe a little bit more in
3   detail what were the other types of services that you
4   could provide these revenue share customers?
5   A.      Okay.  So beyond the product that we
6   talked about?
7   Q.      Beyond the product.
8   A.      The computer system.
9   Q.      The computer -- What is -- Is that -- What
10  computer system is that?
11  A.      I remember -- The acronym was CHIP.
12  Q.      Okay.  Do you remember what it means?
13  A.      Client home infusion -- I -- CHIP is what
14  I really remember.  I'm guessing to remember the
15  acronym.
16  Q.      Okay.  And what did Abbott provide in that
17  relationship?
18  A.      It was basically a custom software
19  program.
20  Q.      And would they license that software
21  program?
22  A.      Effectively through the revenue share.
23  Q.      And would that software assist in the
24  claims submission process?
25         MS. CITERA:  Objection to form.

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 58

1   A.      Yes.
2   Q.      Okay.  Do you -- Do you know how -- how it
3   would?
4   A.      No.
5   Q.      Do you know whether or not the
6   reimbursement department used that same system when
7   it was providing its contract reimbursement services?
8          MS. CITERA:  Objection to form.
9   A.      I don't recall, but I believe so.
10  Q.      When the reimbursement department provided
11  reimbursement services under these revenue share
12  agreements, whose name did they submit the claims in?
13         MS. CITERA:  Objection to form.
14  A.      I don't recall.
15  Q.      Do you remember whether it was something
16  that was contractually, you know, required or
17  identified?
18  A.      I -- I just -- I do not recall that --
19  that level of detail on that.
20  Q.      Okay.  Was that something that you would
21  have been involved with?
22  A.      Would have been involved with?  Perhaps.
23  Q.      Okay.  But you just can't recall right
24  now?
25  A.      I just -- I don't remember.

Page 59

1   Q.      Okay.  So we've got the -- the custom
2   software.  What other services would -- would Abbott
3   provide under the revenue share agreement?
4   A.      Well, there was -- would have been --
5   either consulting on the buildout of the pharmacy or
6   there would have been the actual provision of the
7   pharmacy services if they wanted to use one of the
8   three compounding pharmacies that had been built.
9   Those were the main pieces.
10  Q.      Okay.  Do you know -- Did Abbott have its
11  own customers for its pharmacies?
12         MS. CITERA:  Objection to form.
13  A.      What do you mean?
14  Q.      Meaning outside of the revenue share
15  agreements, did Abbott provide pharmacy services to
16  any other customers?
17  A.      I don't -- I don't recall that being the
18  case, because it was very specific to home infusion.
19  I mean, it was clearly committed to that end.  But I
20  don't -- If we did have other clients, I don't
21  remember them.
22  Q.      Okay.  Did you -- How long did these
23  pharmacies operate?
24  A.      They were open the time I was there.  I
25  believe we -- Well, we may have closed one at the

Page 60

1   tail end of my time; and then shortly after that -- I
2   don't know the timing -- they would have all been
3   closed.
4   Q.      When they closed, does that -- would that
5   mean that Abbott would no longer provide pharmacy
6   services under its revenue share agreements?
7   A.      Correct.  I'm assuming -- There must have
8   been some transition to either third-party
9   pharmaceutical compounding operations or perhaps
10  moving it into the hospital.
11  Q.      Under these revenue share agreements,
12  would Abbott provide products or drugs that were not
13  Abbott product or drugs?
14  A.      In the case where they were compounding,
15  yes.
16  Q.      Are you familiar with whether under these
17  revenue share agreements Abbott or the revenue share
18  contract partner participated in group purchasing
19  organizations for non-Abbott products or drugs?
20         MS. CITERA:  Objection to form.
21  A.      I -- I don't recall that.
22  Q.      Were there any other -- I'm just trying to
23  exhaust your memory.
24         Were there any other services that -- that
25  could have been or either contracted for or provided

Page 61

1   under the revenue share contracts?
2   A.      Those -- Those are the ones I -- I recall.
3   Q.      Okay.  What about the duration of these
4   contracts; do you recall how long they typically
5   lasted?
6   A.      It varied contract to contract.  I think
7   the range was typically three to four years would
8   have been a rough estimate.
9   Q.      Do you know whether they were renewable?
10  A.      Oh, I'm certain we would have renewed
11  them.
12  Q.      Okay.  And how were these contracts
13  modified or could they be modified?
14         MS. CITERA:  Objection to form.
15  A.      Boy, I do not recall us modifying -- once
16  the contracts were established modifying these.  I
17  don't recall us doing that.
18  Q.      Okay.  Have we exhausted your -- your
19  memory -- the memory -- your memory on your
20  understanding of what reimbursement services were
21  involved under these contracts?
22         MS. CITERA:  Objection to form.
23  A.      Exhausted my memory?  Yeah.
24  Q.      Okay.  I just wanted to close that out --
25  close out that issue.

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 62

1  A.      Okay.
2         MS. ST. PETER-GRIFFITH: Do we want to
3  take a quick break? Is now a good time? Is now a
4  good time to take a ten-minute break?
5         THE WITNESS: That would be fine with me.
6         THE VIDEOGRAPHER: Off the record at
7  10:26.
8         (Recess taken.)
9              - - -
10        THE VIDEOGRAPHER: On the record at 10:42.
11 BY MS. ST. PETER-GRIFFITH:
12 Q.      Mr. Brincks, I'd like to just confirm that
13 we've sort of exhausted your recollection of what
14 your responsibilities were as a contract marketing
15 analyst.
16 A.      Okay.
17 Q.      Have we discussed all of your
18 responsibilities?
19 A.      Based on my recollection, yeah.  I -- I
20 don't recall anything substantive that we left out.
21 Q.      Okay. And at some point were -- did you
22 receive a promotion when you were involved with
23 Abbott's alternate site home infusion services?
24        MS. CITERA: Objection to form.
25 A.      Yes.

Page 63

1  Q.      Okay. And what was that promotion?
2  A.      It was to the manager, right.
3  Q.      Okay.
4  A.      Yeah.
5  Q.      I told you you could keep that in front of
6  you.
7         The contract marketing manager role, were
8  you -- In that role, were you a supervisor?
9  A.      Yes.
10 Q.      Okay. How many people did you supervise?
11 A.      I would have had an administrative
12 assistant and two analysts for most of the time.  And
13 then there were case -- two case managers that were
14 there for a portion of time -- not the entire window
15 of -- of the three years there -- Lynn Leone and
16 Shellie Bronson would have been doing case management
17 services.
18 Q.      And what are case management services?
19 A.      There was a period when case management --
20 the term was every time a client went under care --
21 and in this example, home infusion care -- some
22 payers would actually assign a case manager who would
23 negotiate the therapy rates for all treatment
24 directly with the -- the providers.
25 Q.      Okay. And do you know how they went about

Page 64

1  doing those negotiations?
2  A.      Yeah. It would have -- Typically the
3  format was a -- per diem rate plus AWP.
4  Q.      Okay. Plus AWP on product or drugs?
5  A.      Yes.
6  Q.      Okay. But your -- Would your --
7  A.      Drugs.
8  Q.      Would your revenue share contract partners
9  ever pay the AWP?
10        MS. CITERA: Objection to form.
11 A.      The revenue share partners pay the AWP?
12 No.
13 Q.      Why were they negotiating a per diem then
14 that, in part, included an AWP rate?
15        MS. CITERA: Objection to form.
16 A.      Because that's what the payers -- how the
17 payers wanted to negotiate price.
18 Q.      Okay. How -- What would the cost to
19 Abbott under those revenue share contracts of
20 providing products or -- products or drugs?
21        MS. CITERA: Objection to form.
22 A.      What would be the cost?
23 Q.      Yes.
24 A.      The cost of the products and the drugs
25 that would have been provided.

Page 65

1  Q.      Okay. Would that be Abbott's cost?
2  A.      To -- To Abbott, yes.
3  Q.      To Abbott. Okay.
4         And that -- Would those costs be higher
5  than the AWP rates or lower?
6  A.      Costs are -- are internal costs.
7  Q.      Okay.
8  A.      So they're not prices.
9  Q.      Okay. Would the costs be lower or higher
10 than the AWP prices?
11        MS. CITERA: Objection to form.
12 A.      Pricing inherently is higher than cost.
13 Q.      Okay.
14 A.      Yeah.
15 Q.      You're the finance major.
16 A.      Yeah.
17 Q.      And I assume that there's a component of
18 this where there had to be a financial benefit for
19 both the revenue share partner and Abbott; is that
20 fair to say?
21        MS. CITERA: Objection to form.
22 A.      Any business arrangement -- Yes, that
23 would be true.
24 Q.      Okay. So the reimbursement that was
25 provided at the AWP rate from Medicaid, Medicare or a

17 (Pages 62 to 65)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 66

1  third-party payer, Abbott would share in that
2  reimbursement, right, as part of the revenue share?
3          MS. CITERA:  Objection to form.
4  A.      Yes.
5  Q.      Okay.  Do you know what the range of
6  percentage of the share was?  Was it 15 percent,
7  70 percent?
8  A.      Again, it varied by therapy.
9  Q.      Okay.
10 A.      And I don't -- Again, in the total
11 parenteral nutrition -- in that arena, it would have
12 been on the higher end of what you described.  So
13 50 percent.  I -- I don't remember the specifics, but
14 it would have been more like 50 or 60.  And in
15 chemotherapy, it might have been 15.  It -- It would
16 have ranged.
17 Q.      And why -- What was -- would be the reason
18 for such the -- a large range?
19 A.      The variation in product that could be
20 provided.
21 Q.      Okay.  So the more product that was
22 provided by Abbott, is it fair to say the higher the
23 reimbursement percentage?
24 A.      Correct.  That would be fair to say.
25 Q.      Okay.  And would that higher reimbursement

Page 67

1  percentage be triggered by a higher cost to Abbott or
2  a higher reimbursement?
3          MS. CITERA:  Objection to form.
4  A.      It's all based on value of what you're
5  providing to the supportive price to a client.  So it
6  was based on between a combination of the products
7  and the services was taking 50 percent of total
8  parenteral nutrition a reasonable value.  And that's
9  how that process would go.
10 Q.      As part of the total parenteral nutrition,
11 what were the types of products that were provided on
12 a consignment basis by Abbott to its consignment
13 partners?
14 A.      Well, you have the bags.  There would be
15 tubes.  There might be poles.  There might be the
16 variety of the things that you had to do as well as
17 the actual solution itself.  So you would have to
18 send them -- They'd have the bag.  So they would hang
19 the bag and then it would be all the other stuff that
20 would be required to actually get the site prepared
21 and then deliver the total parenteral nutrition.
22 Q.      Okay.  Would Ross products be involved?
23 A.      Ross?  I don't recall Ross being directly
24 involved.  The parenteral nutrition -- You know, I
25 don't remember how that -- how that process went.

Page 68

1  But I don't recall any direct relationship with Ross
2  at all in home infusion.
3  Q.      Do you recall whether under these revenue
4  share agreements there was a contractual provision
5  for the consignment of Ross products in addition to
6  Abbott Home Infusion products?
7  A.      Some of the pumps may have been Ross
8  pumps, but they were all Abbott products.  So in that
9  regard, it was a more corporate view of the pump.  So
10 the actual total parenteral pumps would have been
11 part of this consignment arrangement.
12 Q.      Okay.  What about the fluid products that
13 were provided; do you remember which fluid products
14 were provided?
15 A.      Fluid products?  Can you --
16 Q.      Dextrose, sodium chloride.
17 A.      I don't -- I don't recall the specifics,
18 but there would have been -- because you're
19 delivering home infusion, there would have been
20 diluents and other IV solutions that would have been
21 part of it.
22 Q.      Okay.  I'd like to go back to an earlier
23 question about what your responsibilities were as
24 the -- Actually, I'm not even sure I've asked this
25 question.

Page 69

1          What were your responsibilities as the
2  manager of contract marketing?
3  A.      Well, I had, again, the -- the
4  administrative assistant, the two analysts working
5  for me and the case -- the case managers.  The
6  primary focus was in working with the analysts and
7  ensuring that we were supporting the -- A lot of our
8  time was in supporting the proposals and working with
9  the field sales force and putting them together
10 properly, highlighting what our -- our service
11 capabilities were and then supporting them in the
12 process of that negotiation.
13 Q.      Okay.  As the contract manager, did you
14 work with the legal department?
15 A.      Yes.
16 Q.      What was your involvement with the legal
17 department?
18         MS. CITERA:  And, again, I'm just going to
19 instruct you not to reveal any substance of the
20 conversations with the legal department.
21         THE WITNESS:  Sure.
22 A.      I'll just characterize the nature of what
23 we did.  We had a standard agreement that was used as
24 a structure for these revenue share agreements.  We
25 made certain in working with our legal department

18  (Pages 66 to 69)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 70

1  that that was appropriate legal structure to use and
2  if we -- therefore, had a standard in place and if
3  there were any adjustments made to it in a
4  negotiation, we also went through that process every
5  step of the way.
6      Q.      Would you generate any documents
7  concerning this process?
8      A.      Documents concerning the process?
9      Q.      Like memoranda or discussions.  How -- How
10 would the -- Let me backtrack.
11          How would your -- How would you interact
12 with the legal department?  Would it be in writing?
13 Would you meet with them?
14     A.      It was -- Face-to-face is what --
15 predominantly what -- what we did.
16     Q.      And who were the lawyers that you met with
17 face-to-face?
18     A.      The one for sure that I remember was Brian
19 Taylor.  There may have been some others, but I don't
20 recall the names.  Brian for sure.  In the time
21 period that I was there, it would have been Brian
22 Taylor.
23     Q.      Okay.  What were the types of documents
24 that you would generate when you were in your role as
25 a contract marketing analyst?

Page 71

1      A.      What were the documents?  Again, it was --
2  A lot of those were the proposals that we talked
3  about where we would create actual documents
4  highlighting what services we could provide.  Part of
5  it was a -- a projection of the home infusion
6  operation.  So there was also a financial projection
7  of what the operation was based on projected patient
8  demographics that the clients would provide.  And so
9  that would -- that would lay out a rough idea of what
10 the operation might look like for them.  So those
11 were the -- the key pieces.
12     Q.      Okay.  How were those documents
13 maintained?
14     A.      What do you mean by "maintained"?
15     Q.      Well, did you -- Did you keep those
16 contracts in files -- in hard copy files, on
17 computers?
18     A.      Yes.  It probably would have been a
19 combination of those things.
20     Q.      Do you have a recollection of how that
21 worked?
22     A.      Beside just the -- You know, having a file
23 with, you know, the information and perhaps keeping
24 some electronic copies, there was not anything more
25 elaborate than that.

Page 72

1      Q.      What about correspondence with your
2  clients?
3      A.      Like a retention policy?  Is that what
4  you're --
5      Q.      Yeah.
6      A.      I don't -- I don't recall having --
7  Documents I'm sure would have gone into the file if
8  they were appropriate, but there -- there was not any
9  process beyond that.
10     Q.      Okay.  And did each individual analyst
11 maintain his or her own files or was there a central
12 file area?
13     A.      I don't -- I don't recall.  I believe we
14 had a centralized file, but I don't remember how we
15 would do that.  Obviously we would each have certain
16 files as we were working on them, but there would
17 have been a central file.  I don't recall the details
18 of it, though.
19     Q.      What about when you were an analyst; did
20 you have your own files?
21     A.      Certainly work papers, things you would
22 have been working on.
23     Q.      And when you were promoted, what happened
24 to those files?
25     A.      Typically we left them where they were for

Page 73

1  the person that was coming in behind and you might
2  just come alongside and talk with them and train them
3  and walk them through what they needed to know.
4      Q.      Okay.  So you wouldn't take those files
5  with you; you'd leave them for the person who assumed
6  your role after your promotion?
7      A.      Oh, yeah.  I was glad to leave most of the
8  files behind.
9      Q.      Okay.  What about did you have a computer
10 when you were a contract marketing analyst?
11     A.      Yes.
12     Q.      Okay.  And what about -- What -- What
13 documents did you maintain on the computer?
14     A.      What documents?  I'm -- Just the -- some
15 of the proposal documents perhaps for a period of
16 time.  I mean, we would get to a point where you
17 would run out of space on your computer and might
18 clean it off, but I -- I don't -- I don't recall, I
19 mean, beyond the -- the -- the analysis documents and
20 the things that were part of the proposals.  That
21 would have been what was on the computer.
22     Q.      Okay.  Do you -- Did you take your
23 computer with you when you were promoted, or did you
24 get a new computer?
25     A.      New computer.

19  (Pages 70 to 73)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 74

1   Q.      Okay.  What happened to your information
2   that was on the computer that you had as a contract
3   analyst?
4   A.      It would have stayed on the other
5   computer.
6   Q.      Okay.  Would you have downloaded it or
7   kept copies?
8   A.      I -- No, I don't recall going to, you
9   know, elaborate steps to -- to do that.
10  Q.      Okay.  Now, you discussed preparing
11  projections.
12  A.      Uh-huh.
13  Q.      Is that the -- Is that the right term?
14  A.      (Witness nods.)
15  Q.      As part of your projections, did you
16  evaluate the cost associated with the provision of
17  Abbott services and compare it to the anticipated
18  revenue which, in part, was based upon AWP
19  reimbursement?
20          MS. CITERA:  Objection to form.
21  A.      Good business analysis.  Yes.
22  Q.      Okay.  And -- And how would that work?
23  How would you do that analysis?
24  A.      You would look -- Obviously -- It was all
25  based on averages, because you couldn't -- every --

Page 75

1   every actual delivery was slightly different based on
2   the patient requirements or what the physician might
3   require.  But based on experience with our
4   pharmacy -- our -- our -- actual compounding
5   pharmacies, we would have a -- a -- a general
6   description of the types of things that I described
7   earlier -- the pumps, the bags, the different things
8   you might need to actually take care of a patient.
9           So a total parenteral nutrition patient
10  was one.  Chemotherapy being another.  And so you
11  would take those regimens, so to speak, and you would
12  play -- lay out what -- what the value to provide
13  that service would be.  So you were able to then
14  anticipate our internal costs in that environment.
15  Q.      Okay.  And -- And how would you get the
16  numbers for -- for Abbott's internal costs?
17  A.      Internal documents.
18  Q.      Okay.  Who would provide those to you?
19  A.      Computer system access through -- You
20  know, I don't remember exactly.  I'm -- I'm certain
21  it would have been through the contract marketing
22  area.
23  Q.      And is that HBS contract marketing?
24  A.      HBS.
25  Q.      Okay.  Would there be a computer program

Page 76

1   that would reflect that or a spreadsheet or
2   something?  How would you -- Where would you look for
3   that information?
4   A.      There would have been an internal
5   spreadsheet that --
6   Q.      Okay.  Do you --
7   A.      -- that would have transferred some of
8   that cost information for us to understand what --
9   what Abbott costs would be to -- to provide that
10  product and service.
11  Q.      And do you know who generated that --
12  those internal spreadsheets?
13  A.      That would have been in contract
14  marketing.
15  Q.      Okay.  HBS?
16  A.      That's that -- When we talk about the
17  model, that's the model I'm talking about.
18  Q.      The model.  Okay.
19          Was that a commonly accepted term at
20  Abbott?
21          MS. CITERA:  Objection to form.
22  A.      Abbott -- Which part of Abbott and I'll --
23  Q.      Abbott Home Infusion.
24  A.      Yes.
25  Q.      Okay.  What about Abbott HBS?

Page 77

1           MS. CITERA:  Objection to form.
2   A.      I don't know what HBS did for -- for their
3   particular modeling and how they structured things,
4   but the -- how broadly they understood home infusion
5   services, I -- I couldn't project.
6   Q.      Okay.  So you -- You -- Just as part of
7   this projection, you would ascertain what the costs
8   would be to Abbott from these internal spreadsheets;
9   is that fair?
10  A.      We would estimate, yeah.
11  Q.      Okay.  And how would you estimate
12  anticipated revenue?
13  A.      Typically you would look at a rough per
14  diem plus AWP.
15  Q.      Would list price at all factor into it?
16  A.      No.  It -- Again, the commonly accepted
17  approach was this per diem plus AWP.  So we -- We
18  used that as a -- as a benchmark that our clients
19  could understand as well.
20  Q.      Okay.  And would -- Would it be presented
21  to the clients as per diem plus AWP?
22  A.      I -- I don't recall if we split it per
23  diem plus AWP or if you put them together and just
24  said here is the -- here is the average range for a
25  typical TPN billing rate, for instance, per day.

20  (Pages 74 to 77)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 78

1    Q.       Okay.  But when you folks did the
2    analysis, whether you shared with your clients or not
3    that it was per diem plus AWP, you at Abbott
4    understood that it was per diem plus AWP?
5          MS. CITERA:  Objection to form.
6    A.       I'm not certain I recall at that level of
7    detail.  Just to be exactly accurate, I'm not sure I
8    recall at that level of detail exactly that
9    component.
10   Q.       Okay.  Did you have an understanding of
11   the term "spread"?
12   A.       In what context?
13   Q.       In the context of AWP reimbursement.
14   A.       As an employee of Abbott, yes, because of
15   TAP.
16   Q.       Okay.  What was your understanding?
17   A.       Spread is a differential between two
18   prices, I guess would be a way to describe it.
19   Q.       Okay.  Do you know which two prices?
20   A.       I don't -- I don't remember that detail.
21   Q.       And what was your understanding of "TAP"?
22         MS. CITERA:  Objection to form.
23   A.       TAP?  Just that it cost us a lot of money
24   and that there was something involved with the
25   spread.

Page 79

1    Q.       Okay.  As you're putting together these
2    projections, is it fair to say that Abbott had an
3    understanding that there was a difference between
4    their costs in the provision of products and drugs
5    and the AWP reimbursement?
6          MS. CITERA:  Objection to form.
7    A.       Based just on pure business principles,
8    cost and price will be different.  They're not the
9    same.
10   Q.       Okay.
11   A.       So, yeah, I -- I think they -- Yes.
12   Q.       Why were your projections based upon AWP
13   reimbursement -- or per diem plus AWP reimbursement?
14   A.       Standard acknowledged understanding of how
15   payers were billed for home infusion services.
16   Standard -- It's really standard protocol.
17   Q.       Okay.  Did it ever occur to anyone in the
18   contract marketing home infusion that perhaps AWP was
19   not an accurate reflection of what the costs of the
20   provision of the drugs was?
21         MS. CITERA:  Objection to form.
22   A.       Again, cost and price being different, we
23   knew that.
24   Q.       Okay.  So you just used AWP because that
25   was the industry standard?

Page 80

1          MS. CITERA:  Objection to form.
2    A.       (Witness nods.)
3    Q.       Is that -- I'm sorry.  I should have gone
4    over the ground rules early on.
5    A.       Yes.
6    Q.       I need you to say -- give an audible
7    response.  Okay.
8    A.       Yes.
9    Q.       Okay.  Did you have other responsibilities
10   as a contract marketing manager?
11   A.       Again, those are the ones I recall.
12   Q.       Okay.  Anything else?
13   A.       No.
14   Q.       Did you ever have any discussions when you
15   were in the contract marketing in home infusion about
16   AWP pricing or reporting that you can recall?
17   A.       Specific -- You know, I -- I do remember a
18   question coming in that I would have forwarded on to
19   our contract marketing area, yeah.
20   Q.       Okay.  And do you remember what that
21   question pertained to?
22   A.       And I mentioned it earlier as well.  That
23   there was something that -- I don't recall if it was
24   a change or some dynamic where the Blue Book or Red
25   Book AWP on something was -- there was a question --

Page 81

1    they -- the client had a question about what it was.
2    Q.       Do you -- Do you remember who the client
3    was?
4    A.       I don't remember the client.
5    Q.       Do you remember why you referred it to --
6    Is it HBS contract marketing?
7    A.       Yes.  Because they were responsible for
8    submitting whatever got submitted to Red Book and
9    Blue Book.
10   Q.       Okay.  Let me ask you:  For -- For home
11   infusion -- When you were in home infusion, was there
12   any training with regard to AWP or the use of AWP and
13   reimbursement?
14   A.       No.  Not that I recall.
15   Q.       Okay.  Did your employees have an
16   understanding of AWP in home infusion?
17         MS. CITERA:  Objection to form.
18   A.       An understanding?  Really what we did was
19   used Red Book and Blue Book because it was just a
20   very -- It was a data source that was, again,
21   recognized in the industry as the place to pull that
22   information.  And so to that extent, yes.  And they
23   would have known that HBS contract marketing was
24   responsible for submitting whatever data they needed
25   to submit.

21 (Pages 78 to 81)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 82

1  Q.      Okay.  Are there any other employees that
2  you can recall during your time frame in contract
3  marketing home infusion that you worked with?
4  A.      Again, analyst wise Chris Heardin
5  (phonetic), Jeff Shaw, Michael Calsin, Lynn Leone and
6  Shellie Bronson.  And then Sarah Strain was the
7  administrative assistant.  Those are the -- Those are
8  the people that I would have worked with during
9  that -- that time period.
10 Q.      And after you left home infusion, who took
11 your place?
12 A.      To my recollection, it was Mike Calsin.
13 There may have been a bit of a transition period in
14 there, but I believe it was Michael.
15 Q.      And when you were in home infusion
16 contract marketing, who was your supervisor?
17 A.      At which point?
18 Q.      At -- Let's start when -- when you started
19 as an analyst.
20 A.      From an analyst standpoint, I would have
21 reported to a gentleman by the name of Mark Gorman
22 (phonetic).  And when Mark left, I would have
23 reported through to -- Well, then I was promoted and
24 then would have reported to Mike Sellers.
25 Q.      And what was your interaction with Mike

Page 83

1  Sellers?
2  A.      Well, he was the general manager of home
3  infusion, so...
4  Q.      Did you have frequent contact with him?
5  A.      Oh, yeah.
6  Q.      Okay.  Did you discuss with him these
7  project analyses or proposals?
8  A.      Yes.
9  Q.      Okay.  Was he involved in that?
10        MS. CITERA:  Objection to form.
11 A.      Involved in what way?
12 Q.      In putting together the projections.
13 A.      Not putting them together.  He might have
14 had awareness of what the proposals were.  He -- He
15 seldom got too involved in the details, but he
16 might -- he might look at the proposal package and
17 the model.
18 Q.      On what occasions would he do that?
19        MS. CITERA:  Objection to form.
20 A.      Just if -- In a major negotiation, he
21 might be interested in understanding a bit more of
22 the status of discussions.
23 Q.      Who would ultimately sign off on the
24 contracts?
25 A.      Good question.

Page 84

1        MR. STETLER:  That's why she asked it.
2  A.      I think Mike.  I believe it was Mike.
3  Q.      Did he sign off on each of the contracts?
4  A.      Well, early when I was there Bill Dempsey
5  was the -- boy, that was very early, though.  And
6  then Mike came in.  I think so.
7  Q.      Okay.  And as part of that review, what
8  information would you need to provide to him?
9  A.      Again, the proposal and those documents we
10 talked about.
11 Q.      Okay.  So the projection.  And would that
12 also include the cost information?
13 A.      Yeah.  Typically that model included both.
14 Q.      Would there ever be any discussions about
15 modifying contract proposals because they weren't as
16 profitable for Abbott?
17        MS. CITERA:  Objection to form.
18 A.      Well, any general manager would, you know,
19 ask questions to -- from a profitability standpoint.
20 I don't remember specific conversations, but
21 certainly we were in a negotiation to try to
22 provide value and there might be a question of the
23 starting percentage point on certain revenue shares,
24 sure.
25 Q.      As you go through the negotiation process,

Page 85

1  would Abbott typically start with a higher percentage
2  share proposal in anticipation that it would get
3  negotiated down at some point?
4        MS. CITERA:  Objection to form.
5  A.      Certainly that's a typical negotiation.
6  But, you know, there wasn't -- there might have been
7  a standard starting point and then it -- the
8  conversation went from there.
9  Q.      Okay.  And did percentages vary --
10 Percentages in terms of reimbursement percentages
11 that ultimately Abbott would collect for various
12 services, would it vary widely from customer to
13 customer?
14        MS. CITERA:  Objection to form.
15 A.      You mean the revenue share rates?
16 Q.      Yes.
17 A.      Very significantly.  It would vary.  I
18 don't recall -- I guess it depends on significant.
19 There was a range.
20 Q.      And what would dictate the range?  Would
21 it be the volume that was anticipated to be generated
22 in terms of reimbursement or usage?
23 A.      Sure.  Overall -- Overall volume.  The
24 overall -- Just the model itself would -- would
25 highlight just the range that you have.  So you might

22  (Pages 82 to 85)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 86

1    have a very large account in the University of
2    Michigan where you were able to -- you -- larger
3    volume gave you more latitude to -- to price your
4    revenue share.
5    Q.      To price in terms of give a more
6    competitive revenue share rate?
7    A.      Correct.
8    Q.      Okay.  Speaking in terms of competition,
9    were there any other pharmaceutical companies out
10   there doing these types of arrangements that you're
11   aware of?
12   A.      Pharmaceutical companies?  I don't
13   remember if Baxter Caremark was a -- not a
14   pharmaceutical company, but a provider in this space
15   that was involved in similar provision of services.
16   But I think it was more a direct provision.  So they
17   had their own pharmacies and they would do that type
18   of thing for the -- this home infusion market as
19   well.
20   Q.      Who were Abbott's competitors in the home
21   infusion market?
22   A.      Oh, boy.  I can't recall -- You know,
23   Baxter was competitive with us on so many fronts.  I
24   don't recall if they were playing in the home
25   infusion market.  It would have mostly been Caremark

Page 87

1    and some other national home infusion service
2    providers that would have been the primary
3    competition here as well as hospital systems in
4    particular that elected to simply do this on their
5    own.
6    Q.      How do you know that they were your
7    competition?
8    A.      You mean like Caremark and the others?
9    Q.      Yeah.  You just --
10   A.      Caremark Home Infusion Service.
11   Q.      Okay.  Would your clients directly work
12   with them in terms of trying to negotiate
13   arrangements to your knowledge?
14           MS. CITERA:  Objection to form.
15   A.      My recollection is they might have
16   highlighted that they were having conversations to
17   leverage our discussions, but they typically wouldn't
18   share a whole lot of that information.
19   Q.      Okay.  Were there any other
20   responsibilities that you had as a -- as the manager
21   of contract marketing that we haven't gone over?
22   A.      No.
23   Q.      Okay.  Have we exhausted on that?
24   A.      Yes.
25   Q.      Okay.  I'm going to get back -- go back to

Page 88

1    this time frame, but what I'd like to do is read
2    Page 1 of your resume.  Okay?
3            What -- After you -- There came a point in
4    time in November of '95 when you stopped being the
5    manager of contract marketing?
6    A.      Yes.
7    Q.      How did that come to be?
8    A.      Promotional opportunity.
9    Q.      Okay.  And how were you promoted?
10   A.      I went -- I was asked to move into this
11   manager of resource deployment and integrated
12   systems.
13   Q.      In -- Where?
14   A.      H -- Hospital business sector.
15   Q.      Hospital business sector of Abbott's
16   hospital --
17   A.      Hospital products division.
18   Q.      Okay.  And what were your responsibilities
19   there?
20   A.      Predominantly what was happening at that
21   point in time is that many hospitals were beginning
22   to form integrated systems, meaning they were buying
23   up other hospitals, they were adding -- whether it
24   was home care, home infusion care, wellness centers,
25   rehab centers -- and beginning to coalesce that into

Page 89

1    an overall integrated system of care.  And in
2    response that that, Abbott -- we had so many people
3    sales people out calling on each of these venues,
4    that the integrated systems were asking for us to
5    interact with them in a different way.
6            So in response to that, we created
7    integrated sales teams that brought those sales
8    forces together as a combined team.  So there were
9    integrated sales executives that were created.  And
10   part of my role in this deployment was in redeploying
11   sales forces to address that change in the market.
12           So I would go in and analyze, for
13   instance, the Detroit market and look at what was
14   happening with Henry Ford and say, well, clearly any
15   emerging integrated system we need to make sure that
16   we have them as one of our integrated system clients.
17   And so that was my role.
18   Q.      Did you deal with sales in that role?
19   A.      Sales only from a sales reporting
20   standpoint, because we would then -- we would just do
21   reporting by the teams.  So how much of all the
22   various sales came through on the Henry Ford team,
23   and we would aggregate that and then report that to
24   the integrated sales teams and then management.
25   Q.      Did you have an understanding as to how

23  (Pages 86 to 89)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 90

1  the sales mechanism at the H- -- for HPD worked?
2  A.    The sales mechanism? Could you --
3  Q.    Meaning -- Meaning how -- how the sales
4  teams went out and sold Abbott products -- Abbott
5  hospital product division products?
6  A.    No. I -- I was not that direct -- that
7  directly or closely involved in the actual sales
8  process. It was much more back-end resource
9  deployment and reporting.
10 Q.    Okay. Who was involved with the sales
11 team during this period of time that you were in this
12 role?
13 A.    The integrated sales executive would have
14 been a gentleman by the name of George Skunz
15 (phonetic). And then I reported through to Guy
16 Weebking (phonetic).
17 Q.    Okay. Did you -- Were you at all involved
18 in pricing?
19 A.    No. Just -- Just reporting at this point.
20 Q.    You're now on -- in the HBS area, right?
21 A.    Correct.
22 Q.    Did you have an understanding as to how
23 the HBS contract marketing folks reported pricing or
24 were involved with AWP pricing?
25 A.    No.

Page 91

1  Q.    Okay. Did your -- Did your sphere in HPD
2  as the resource and deployment integrated systems
3  manager at all interact with the contract marketing
4  division?
5  A.    Only in the tracking of their expenses for
6  their personnel in their department. So I would do
7  that for Guy just if they were over budget.
8  Q.    Okay.
9  A.    Just expense.
10 Q.    Okay. Did you ever come to understand
11 how -- while you were in HBS how the HBS contract
12 marketing team reporting pricing or was involved with
13 AWP pricing?
14 A.    No.
15 Q.    Okay. In February of '97, you
16 transitioned to a new job?
17 A.    Yeah.
18 Q.    You can flip to Page 1, I think.
19      And what was that position? How did that
20 come about?
21 A.    I was the worldwide marketing manager for
22 consumer products. Abbott purchased Medisense, which
23 makes blood glucose monitors and test strips, in
24 1996. And as a part of that, we're in -- trying to
25 integrate them into Abbott. And I was asked to come

Page 92

1  out and be involved in the worldwide marketing of
2  those Medisense products. And so I worked a lot with
3  our research and development teams at looking at what
4  technologies we had, where we were spending money for
5  next generation glucose testing systems. And that
6  was -- That was my role.
7  Q.    Is that the diabetes unit?
8  A.    Yes.
9  Q.    Okay.
10 A.    Blood glucose testing.
11 Q.    Was this something that was new to Abbott?
12 A.    Oh, yeah. Medisense was an acquisition to
13 get Abbott into that marketing.
14 Q.    Into the diabetes market?
15 A.    Correct. There may have been some other
16 applications in the diagnostic market over blood
17 tests that might have been relevant, but this was
18 monitoring actually right with the patient, portable
19 units. So that was new.
20 Q.    Okay. Was this a promotion for you?
21 A.    Yes.
22 Q.    Okay. The -- What were your job
23 responsibilities in this role?
24 A.    Well, the R&D that I described. So we --
25 We had -- were really focused on trying to -- The

Page 93

1  technology when we bought it was viewed as being on
2  the front edge, but there was a lot of competition in
3  the market. And we knew we had to continue to invest
4  in innovation and R&D to continue to progress that
5  from a test strip technology as well as glucose
6  monitors and computer technologies.
7       So my primary role was to determine where
8  we were going to focus those research and development
9  dollars and then to try to orchestrate that across a
10 global organization to get agreement as to how we
11 should allocate those -- those expenditures.
12 Q.    Okay. Now, were you still in Illinois at
13 this point in time?
14 A.    No. Moved to Boston, Massachusetts.
15 Q.    Boston.
16      For -- Because -- Did you move to Boston
17 because that's where Medisense was?
18 A.    Absolutely.
19 Q.    Okay. Now, you were still an Abbott
20 employee at this time?
21 A.    Yes.
22 Q.    And then in March of -- of 2000, you had
23 another transition?
24 A.    Yes.
25 Q.    To Ross?

24 (Pages 90 to 93)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 94

1   A.      Correct.
2   Q.      Okay.  And where is the Ross division?
3   A.      Columbus.
4   Q.      So it's based here?
5   A.      Uh-huh.
6   Q.      And are you currently a Ross employee?
7   A.      No.
8   Q.      Okay.  During what period of time did you
9   work with Ross?
10   A.      From April of 2000 until I left in August
11   of '06.
12   Q.      Okay.  Let's go through what your -- what
13   your roles were with Ross.
14   A.      Sure.
15   Q.      What was your first position with the Ross
16   division?
17   A.      In this role as a senior manager of
18   business development, it was working with our various
19   commercial operations to determine what types of new
20   technologies and new types of research we wanted to
21   focus on and then negotiating agreements for --
22   typically it was for leading edge ingredients that
23   could be incorporated into nutritional products,
24   which is what Ross focuses on.
25          So whether it was for fish oils that could

Page 95

1   be used in adult nutrition applications or -- We were
2   exploring potentially moving into supplement markets.
3   So I spent a lot of time evaluating that market,
4   laying out business plans and then determining if it
5   made sense to proceed there.
6   Q.      Okay.  Was this a promotion or you?
7   A.      Yes.
8   Q.      And then not that long thereafter -- it
9   appears in July of '01 -- you transitioned to another
10   position within Ross?
11   A.      Uh-huh.
12   Q.      How did that come about?
13   A.      The organization was struggling with
14   gaining alignment and a real good long-term plan for
15   nutritional technology.  Part of the thinking was to
16   assign more senior level position to focus on
17   basically the next generation of products and to --
18   to get a very clear strategic picture there.
19          So I was added as a director of marketing
20   to focus in that area.  There was one other, perhaps
21   two other people assigned in a similar role.  Then we
22   had a transition at our senior management level who
23   had a different perspective of where this type of
24   activity should be done.  And so that did not gain a
25   whole lot of traction.

Page 96

1   Q.      Okay.  Was this a promotion for you?
2   A.      Uh-huh.
3   Q.      Okay.  And then what?  You transitioned
4   out in December of 2003 to another position?
5   A.      Yeah.  We had a new president come in.
6   And the idea was to bring me on to help steward some
7   broader strategic planning initiatives, the first of
8   which was the R&D funding process that was being
9   basically run out of Abbott Laboratories.  So I would
10   work with -- We had three -- two different business
11   units; adult nutrition and then pediatric nutrition.
12   And so I worked with each of those teams in an
13   elaborate process for submission in to corporate
14   Chicago for rationale -- business rationale behind
15   research and development expenditures again.
16          And so I spent a lot of time doing that,
17   focused on long-range business plans with the senior
18   leadership teams; so the president and each of the
19   business unit general managers.  We would have laid
20   out as a part of Abbott's LRP process the
21   presentations and documents to describe what we were
22   going to do in the long term, including R&D and
23   business initiatives.
24          And then in December, I was asked to take
25   on responsibility -- We acquired a company in Denver,

Page 97

1   Colorado, called EAS.  They made sports nutritional
2   products, which was a new space for Abbott, because
3   we had infant nutrition on the one side and adult
4   nutrition with Ensure and more medically related
5   products.  This was a good fit in the middle.  And I
6   was asked to actually steward the integration of that
7   acquisition on behalf of the division.  So I could go
8   into more detail if you want, but --
9   Q.      No.  Okay.
10          When you worked with the Ross products
11   division at Abbott, you at all -- were you at all
12   involved in the pricing of drugs?
13   A.      No.
14   Q.      What about sales?
15   A.      No.
16   Q.      Okay.  Did you integrate -- As -- Did you
17   ever integrate with or work with other divisions
18   within Abbott when you were with Ross products
19   division?
20   A.      Certainly with corporate as a part of the
21   R&D funding process.
22   Q.      What about HPD or alt site?
23   A.      No.
24   Q.      Okay.  When you were in the -- When you
25   were back in HPD with research and deployment

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 98

1  integrated systems, did you work with alt site at
2  all?
3  A.      Did I work with -- Yeah.  Alt site would
4  have had a sales representative on those integrated
5  selling teams.
6  Q.      Okay.
7  A.      So to that extent, yeah.
8  Q.      Are you familiar with the term "catalog
9  price"?
10  A.      Catalog price?  No, I'm not.
11  Q.      Okay.  You mentioned earlier -- Well, let
12  me ask you:  When -- When you were with Medisense,
13  did you -- were you at all involved with pricing?
14  A.      No.
15  Q.      Okay.  Is it fair to say that after you
16  left the hospital business sector that your primary
17  focus was research and development?
18  A.      And strategic planning, yeah.
19  Q.      You mentioned earlier the word "TAP" or
20  the term "TAP" and indicated that it cost Abbott a
21  lot of money.
22          During this period of time that you worked
23  for the Ross products division, were you familiar
24  with any litigation that the Ross products division
25  was involved with involving the United States

Page 99

1  government?
2  A.      Yeah, you'd have to -- You had to pay
3  attention, of course.  Yeah, there was something with
4  a settlement that was -- that was made.
5  Q.      How about a criminal plea agreement; are
6  you familiar with that?
7  A.      What's the difference between a settlement
8  and criminal plea agreement?
9  Q.      Well, there's a civil settlement and a --
10  and a criminal component.
11  A.      I -- All I know is --
12  Q.      You're not familiar with --
13  A.      All I know is we settled.
14  Q.      Okay.
15  A.      I -- The distinction I don't recall.
16  Q.      Okay.  Did you have an understanding as to
17  what that case was about?
18  A.      Other than that it was involved with the
19  pump business, no.
20  Q.      Okay.  Were you ever familiar with what
21  the TAP litigation was about?
22  A.      To the extent that I described to you
23  earlier is really the extent of how deeply involved I
24  got.
25  Q.      Did you have an understanding as to

Page 100

1  whether any Abbott divisions had a computer -- a
2  laptop computer program?
3          MS. CITERA:  Objection to form.
4  A.      No.
5  Q.      Did alternate -- Did alternate site have
6  any laptop computer programs?
7          MS. CITERA:  Objection to form.
8  A.      Laptop computer programs?  Can you be a
9  little more specific?
10  Q.      Did they have any programs involving the
11  dissemination of laptop computers?
12          MS. CITERA:  Objection to form.
13  A.      No, not to my knowledge.
14  Q.      Okay.  In August of '06, you left Abbott?
15  A.      Yeah.
16  Q.      How did -- Why did you leave Abbott?
17  A.      As -- In the final parts of my career, one
18  of the things that I found is that I enjoyed doing
19  mentoring internally with -- with Abbott emerging
20  talent as well as with MBA students and just became
21  aware of an opportunity for a business coaching
22  franchise which lined up with that passion and a
23  desire not to continue moving my family, whether it
24  was overseas or back to Chicago, and decided that I
25  was going to follow a desire to do coaching full time

Page 101

1  and to acquire this franchise and open my business
2  and keep my family here.
3  Q.      Okay.  Was it your decision to leave?
4  A.      Oh, absolutely.
5  Q.      Okay.  And what is your current
6  employment?
7  A.      I am a self-employed owner of a business
8  coaching franchise.
9  Q.      And what's the name of your business?
10  A.      Action Coach.
11  Q.      Okay.  Did you -- Is it -- Do you feel
12  that you left Abbott on good terms?
13  A.      Yes.
14  Q.      Okay.  Do you still have contact with
15  Abbott employees?
16  A.      Personal relationships, yeah.
17  Q.      Okay.  Have you ever discussed with anyone
18  other than with counsel this litigation or the AWP
19  litigation?
20  A.      No.
21  Q.      I'd like to go back to your -- your tenure
22  as an Abbott employee.
23          First, let me ask you:  Have you ever been
24  deposed before?
25  A.      No.

26 (Pages 98 to 101)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 102

1  Q.     Okay.  This is the first time at it, huh?
2  A.     (Witness nods.)
3  Q.     Did you ever receive a litigation hold
4  memorandum to your knowledge?
5        MS. CITERA:  Objection to form.
6  A.     No.
7  Q.     Okay.  Do you know what a litigation hold
8  memorandum is?
9  A.     No.
10  Q.     Okay.  Did you ever receive any either
11  oral instruction or written instruction that you need
12  to retain and save documents or computer records
13  because litigation is pending?
14  A.     No.
15  Q.     Okay.  No, you don't have a recollection;
16  or, no, you didn't receive one?
17  A.     No, I did not receive one.
18  Q.     Did you ever hear any discussions
19  about holding onto documents for litigation purposes?
20  A.     No.
21        MS. ST. PETER-GRIFFITH:  If just bear with
22  me, I'm trying to condense this down a little bit.
23        THE WITNESS:  Okay.
24  BY MS. ST. PETER-GRIFFITH:
25  Q.     Who -- Who were -- You mentioned earlier

Page 103

1  when we were talking about contract negotiations some
2  of the larger contracts.  Do you recall who some of
3  the larger home infusion contracts were?
4  A.     Let's see.  The one in Tennessee I was
5  telling you about and, again, I don't recall the
6  name.  University of Michigan.  Children's in Chicago
7  was a bigger one.  There was one in California.  I
8  can't -- I don't recall which -- which -- It was a
9  university-based hospital system, but I don't
10  remember which -- which one.  There would have
11  been -- That was a large west coast account as well.
12  Q.     After you left home infusion, did you have
13  an understanding or did you keep up with what
14  happened with these contracts, whether this was a
15  business model that -- that Abbott continued?
16  A.     I didn't keep real close contact.
17  Certainly I was pretty busy with the new
18  responsibilities, but I did know that it was not
19  growing.  It wasn't necessarily strategically viewed
20  as a -- real good long-term play.  And that's about
21  what I remember.  Obviously it -- eventually it was
22  shot.
23  Q.     Do you remember when it was shot?
24  A.     I -- I'd have to speculate.  I -- I don't
25  remember.

Page 104

1  Q.     Okay.
2  A.     But it was -- I don't know -- five years
3  ago maybe.
4  Q.     Five years ago.
5        Do you have an understanding as to whether
6  or not that -- that business model was one of the
7  business models that was acquired or transitioned to
8  Hospira?
9  A.     I don't have personal knowledge of that.
10  Q.     Okay.  Do you know what Hospira is?
11  A.     Yeah.  It would have been predominantly
12  that hospital business sector.  At -- What pieces
13  went with Hospira, I don't recall; but it was
14  effectively that hospital products division that was
15  spun off.
16  Q.     What was your understanding of the -- of
17  why that -- why portions of the hospital business
18  sector were spun off?
19        MS. CITERA:  Objection to form.
20  A.     Why?  Obviously a strategic decision about
21  business growth.  Clearly the hospital markets'
22  growth rates were slower than some other markets such
23  as diabetes might have been.  So they just made a
24  choice about how to allocate and focus strategically.
25  Q.     Okay.  Why would a decision be made to

Page 105

1  spin it off then if it's less profitable?
2        MS. CITERA:  Objection to form.
3  A.     Do you want my opinion on this?
4  Q.     Sure.
5        MS. CITERA:  Objection to form.
6  A.     Why would you spin it off?  Believing that
7  by putting a team that was focused on nothing but
8  that sector that you could better serve clients,
9  better direct your research and development and add
10  value to shareholders and clients alike.
11  Q.     Okay.  Were you familiar with the
12  RxLink --
13  A.     RxLink?
14  Q.     -- computer program?
15        MS. CITERA:  Objection to form.
16  A.     RxLink?
17  Q.     Or price.  Does that ring a bell?
18  A.     It sounds familiar, but I don't -- I don't
19  have a specific recollection.
20  Q.     Taking you back to when you were involved
21  with home infusion, do you recall an issue coming up
22  concerning the pricing of Vancomycin?
23  A.     Yes.
24  Q.     What's your recollection?
25  A.     I don't remember who the -- who the client

27 (Pages 102 to 105)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 106

1    was, but a question came in about Vancomycin and AWP?
2    Q.      Okay.  And who did that question come in
3    to?
4    A.      Ultimately, it got my desk.  I know that.
5    I don't remember specifically where it came in to
6    first.
7    Q.      And so the -- The -- Do you understand
8    what the -- what the question was?
9    A.      Detail level, no.  Just I know there was a
10   question that came in on AWP and Vancomycin, and
11   that's about what I recall specifically.
12   Q.      And when the question came in, what did
13   you do?
14   A.      I forwarded the question on to contract
15   marketing and --
16   Q.      Who -- Who at contract marketing?
17   A.      It would have been Gerry Eichhorn, because
18   I was -- I knew him from our graduate school and...
19   Q.      And when you say "contract marketing," is
20   this HBS?
21   A.      HBS, yes.
22   Q.      Okay.
23   A.      I'm sorry again.
24   Q.      No, that's okay.  You're keeping me on my
25   tows.

Page 107

1    A.      Likewise.
2    Q.      And then what happened?
3    A.      Boy, oh, boy.  I -- I know that there was
4    some back and forth discussion about the question,
5    and I don't recall specifically exactly the -- I just
6    remember this coming in.  I remember forwarding it.
7    I remember there being some discussion.  And I -- I
8    don't remember the resolution or the -- you know, the
9    details in the -- in that process.
10   Q.      Do you remember any conversations you had
11   with Mr. Eichhorn?
12   A.      Specifically, no.  I remember forwarding
13   it to Gerry and that -- again, that there was some
14   interaction; but specific discussions I don't just
15   recall.
16   Q.      Did you forward it to him with a
17   memorandum?
18   A.      Likely e-mail would have been involved in
19   that.
20   Q.      Okay.  Do you remember whether this was a
21   big deal, a not big deal?
22           MS. CITERA:  Objection to form.
23   A.      I remember it being a concern of a client,
24   but it never stuck out as being a huge issue.
25   Q.      Did you have any involvement or did -- was

Page 108

1    Ms. Kreklow involved with regard to this Vancomycin
2    issue?
3    A.      She may have been, but I don't recall her
4    being specifically involved.
5    Q.      What about Ms. Tobiason?
6    A.      Again, I don't recall.  It's quite likely
7    that it her role I may have asked her some questions
8    in this process, though; but I don't specifically
9    recall that.
10   Q.      Do you recall whether anyone else other
11   than Mr. Eichhorn or possibly Ms. Kreklow or
12   Ms. Tobiason were involved?
13   A.      I'm not sure who else in contract
14   marketing may have -- I don't remember who else may
15   have touched it or been involved in conversations.  I
16   don't remember specific names.
17   Q.      Do you remember whether Mr. Sellers or
18   Mr. Heggie was involved?
19   A.      I'm trying to remember.  I -- Mr. Heggie
20   probably not.  I don't think he would have been
21   involved in this.  And I don't recall Mike being
22   involved either.
23   Q.      Okay.  Do you recall whether anyone else
24   was consulted?  I'm just trying to exhaust your
25   memory.

Page 109

1    A.      No.
2    Q.      Okay.  Do you recall what happened?
3    A.      I do not remember the final resolution of
4    the question.
5    Q.      Okay.  Do you remember whether a pricing
6    change was made with regard to Vancomycin?
7           MS. CITERA:  Objection to form.
8    A.      Again, I -- I don't recall if it was a
9    clarification or if there was a price change made.
10   Q.      Did -- Let me ask you:  Did you have an
11   understanding as to what the question was or was this
12   something that -- a question that was raised and you
13   identified it as an -- as an HBS contract marketing
14   question?
15          MS. CITERA:  Objection to form.
16   A.      I mean, again, because -- In the -- In the
17   area of AWP, we used AWP, but we went and referenced
18   the question about AWP to the contract -- HBS
19   contract marketing area because they -- whatever they
20   did specifically, they were responsible for that
21   submission into those organizations.  And so, yeah,
22   we would have referred the question, which is what I
23   recall doing.
24   Q.      Okay.  Do you recall being involved at all
25   in the lowering of the reported price?

28 (Pages 106 to 109)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 110

1        MS. CITERA:  Objection to form.
2   A.      The lowering?  Again, I don't recall the
3   resolution being an explanation or an adjustment in
4   price.  I don't recall.
5   Q.      Do you know whether Jerry Cicarale was
6   involved?
7   A.      Jerry Cicarale?  That name does not ring a
8   bell with me.  No.
9   Q.      Okay.  Do you have any recollection as to
10  who Jerry Cicerale might be?
11  A.      I'd have to -- I don't remember
12  specifically.
13  Q.      Okay.
14        MS. ST. PETER-GRIFFITH:  Is now a good
15  time for a break?
16        MS. CITERA:  Sure.
17        MR. STETLER:  Whatever you'd like.
18        MS. ST. PETER-GRIFFITH:  What time is it?
19        MS. CITERA:  Were you thinking lunch break
20  or -- It's a quarter to 12:00.
21        MS. ST. PETER-GRIFFITH:  Why don't we take
22  a lunch break.  I know it's a little bit early, but
23  I -- this is a good juncture for me.  And hopefully I
24  can wrap things up and pass you -- pass you along.
25        MS. CITERA:  I mean, if that's fine with

Page 111

1   you guys.
2        MR. STETLER:  It's your dep.
3        THE VIDEOGRAPHER:  One moment.  Off the
4   record at 11:46.
5     (Lunch recess taken 11:46 a.m. to 12:30 p.m.)
6                    - - -
7        THE VIDEOGRAPHER:  On the record at 12:35.
8        MS. ST. PETER-GRIFFITH:  Welcome back,
9   Mr. Brincks.  I've got just a few more lines of
10  questions for you, and then I'm going to turn you
11  over to Mr. Anderson.
12        THE WITNESS:  Okay.
13                    - - -
14           CONTINUED EXAMINATION
15                    - - -
16  BY MS. ST. PETER-GRIFFITH:
17  Q.      I didn't ask you at the beginning and I
18  should have whether in your prep for today's
19  deposition did you review any documents?
20  A.      No.
21  Q.      No?  Okay.
22  A.      Well, wait.  This subpoena.
23  Q.      The -- Okay.
24  A.      Other than that, no.
25  Q.      Other than that -- Okay.

Page 112

1        And you testified earlier that you looked,
2   but you don't have any documents?
3   A.      Correct.
4   Q.      Okay.  Mr. Brincks, did you have any
5   contact with any of the Abbott presidents during your
6   tenure?
7   A.      Abbott presidents?
8   Q.      Yes.
9   A.      As in like Dwayne Bernum and Miles?
10  Q.      Yes.
11  A.      Contact in very large meetings; but
12  one-on-one contact, never.
13  Q.      Okay.  Did you have any contact with them
14  with regard to home infusion?
15  A.      No.
16  Q.      What about Mr. Robertson?
17  A.      Don Robertson?
18  Q.      Yeah.
19  A.      Sure.  Yes.
20  Q.      And did you have contacts with him with
21  regard to home infusion?
22  A.      Yes.  He would have been the general
23  manager over alternate site, renal and home infusion.
24  Q.      And what were your discussions with
25  Mr. Robertson?

Page 113

1   A.      General business discussions about how the
2   business was going, sales versus budget, expenses in
3   my department.
4   Q.      Did Mr. Robertson have an understanding of
5   how the contracts worked in home infusion?
6        MS. CITERA:  Objection to form.
7   A.      Certainly he at a certain level understood
8   they were revenue share agreements and the basic
9   structures, but...
10  Q.      Did he have to approve any agreements?
11  A.      I don't recall Don signing those
12  agreements.  He could have certainly, but I believe
13  Mike Sellers, as I indicated earlier, signed most of
14  those agreements or Mark Gorman would have.
15  Q.      Now, did Mr. Sellers report to
16  Mr. Robertson?
17  A.      Correct.
18  Q.      Okay.  Do you know whether Mr. Robertson
19  would have been involved with major clients in home
20  infusion?
21        MS. CITERA:  Objection to form.
22  A.      Certainly at times when representation of
23  senior management was appropriate, yeah.
24  Q.      Do you recall any of those times?
25  A.      Not specifically, no.

29 (Pages 110 to 113)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 114

1  Q.      Did you -- Do you recall discussing with
2  Mr. Robertson any issues associated with AWP?
3  A.      Not specifically, no.
4  Q.      What about the difference between the
5  costs associated with Abbott's provision of drugs and
6  products under the revenue share agreements as
7  opposed to the -- the percentage of revenue that
8  Abbott acquired?
9  A.      Only in the sense that when you modeled
10 out what the business was, that that would highlight
11 what the profitability was for the arrangement.
12 Q.      And did Mr. Robertson to your knowledge
13 have an understanding of how that worked?
14        MS. CITERA:  Objection to form.
15 A.      Again, at a very high level.
16 Q.      Okay.
17 A.      I -- I don't -- I don't recall sitting
18 down and having very detailed conversations with Don
19 Robertson in his role.
20 Q.      What about receiving any memos or anything
21 like that?
22 A.      I don't recall specifically.
23 Q.      Now, you referenced at some point the
24 company made a decision that perhaps home infusion
25 wasn't as profitable as -- as potentially it could

Page 115

1  be.
2  A.      Uh-huh.
3  Q.      Did you have any discussions with anyone
4  about that?
5  A.      No.
6  Q.      Okay.
7  A.      Because by the time I transitioned, we
8  were still fully in the business.
9  Q.      Did anybody seek your opinion on sort of
10 the future business model for home infusion?
11 A.      No.
12 Q.      What about Mr. Kringel; did you have --
13 did you work with Mr. Kringel or have any discussions
14 with him?
15 A.      Related to home infusion?
16 Q.      Yes.
17 A.      I don't recall specifically talking
18 with -- There may have been a plan review meeting
19 where we were sitting in and talking about sales, but
20 no specific meetings one on one with Kris.  It would
21 have been part of our broader budgeting process I may
22 have been in those meetings.
23 Q.      Okay.  What -- What types of meetings or
24 plan review meetings?
25        MS. CITERA:  Objection to form.

Page 116

1  A.      Abbott has a discipline of establishing an
2  annual budget and then would do updates to that; and
3  as a part of it, each of the businesses would project
4  sales and expenses as a part of that business
5  discipline.
6  Q.      And were -- Were you involved in that
7  process?
8  A.      Yeah.
9  Q.      Okay.  How were you involved?
10 A.      Typically in getting just a perspective
11 on -- Well, first of all, I had expenses for my
12 department; so I was involved in that regard.  And
13 then just might have been asked my opinion about the
14 overall business projection and growth versus some of
15 the market trends.
16 Q.      And did you share anything with regard to
17 home infusion concerning the -- the market trends or
18 the projection of growth?
19 A.      Certainly.
20 Q.      Okay.  What were those?
21 A.      I don't recall specific.  It might have
22 been here -- here is the overall market, the growth,
23 here's what's going on in some trends or items to
24 highlight in home infusion; but I don't recall the
25 details of those types of conversations.

Page 117

1  Q.      What was your view of home infusion -- the
2  home infusion business model?
3        MS. CITERA:  Objection to form.
4  A.      My view?  Could -- Could you --
5  Q.      Sure.
6        Did you think it was -- Did you think it
7  was an area that the company should keep going with,
8  that it should explore more of, less, you know,
9  should is cut back?
10 A.      In the time I was there, I thought that we
11 provided a valuable product and service for clients
12 that were looking to enter into the business.
13 Clearly as the years progressed, there was more
14 sophistication on behalf of -- Many clients were able
15 to do some of the things that we were doing.  So they
16 had more options.  So in my view, the market was
17 maturing and there were more options available to --
18 to them to use.  So I saw competition doing what it
19 is supposed to do.
20 Q.      Okay.  If -- If reimbursements were --
21 were to decrease for these revenue share partners,
22 would that be something that would impact the overall
23 business model for home infusion?
24        MS. CITERA:  Objection to form.
25 A.      Certainly.

30 (Pages 114 to 117)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 118

1    Q.      Okay.  How so?
2    A.      You take a percentage of revenues.  If
3    the -- If the revenue goes down, you receive less
4    compensation.
5    Q.      So it would be potentially less profitable
6    for Abbott?
7            MS. CITERA:  Objection to form.
8    A.      Correct.
9    Q.      Did you have any interaction with
10   Mr. Adams -- Harry Adams?
11   A.      Harry Adams?  I knew Harry, but I did not
12   interact with Harry on a -- No, I didn't interact
13   with Harry.
14   Q.      What about Charles Mitchell?
15   A.      Charlie Mitchell?  I -- When I was in the
16   resource deployment area, I would have, again, worked
17   with him as it related to the expenses of his
18   department.  And that would have been my primary
19   interaction with Charlie.
20   Q.      Other than what you've testified to -- and
21   I don't -- I don't mean to tax your memory, but did
22   you have much interaction with Virginia Tobiason?
23   A.      Well, Virginia was on the home infusion
24   team and reported to Mike Sellers as I did.  So,
25   yeah, we were on the team together.

Page 119

1    Q.      Were you familiar at all with the issues
2    that she had in her department concerning
3    reimbursement?
4            MS. CITERA:  Objection to form.
5    A.      Just in trying to stay current and
6    interpret them.  I knew she had a very specific
7    expertise in understanding reimbursement related
8    issues.  That's why she was in the role she was in,
9    but that's also why she was in that role.  I didn't
10   get into the -- real intimate details with --
11   with Virginia on some of those things.
12   Q.      Okay.  Did you understand her
13   reimbursement expertise to include expertise with
14   regard to Medicare and Medicaid reimbursement?
15           MS. CITERA:  Objection to form.
16   A.      Yes.
17   Q.      Now, you testified earlier and I asked you
18   some questions about the documents that you
19   maintained.  Was there a formal document retention
20   policy with regard to the documents generated for
21   home infusion?
22   A.      No, other than the broader -- And I don't
23   remember the specifics, but Abbott had a document
24   retention broader policy.  So we would go through
25   file clean out days at various stages in accordance

Page 120

1    with that policy.
2    Q.      Okay.  What are file clean out days?
3    A.      If something was past a date that was
4    recommended, then the policy -- I don't remember the
5    details of how it was then disposed of.
6    Q.      Okay.  But the documents would be disposed
7    of somehow?
8            MS. CITERA:  Objection to form.
9    A.      Yeah.  I believe we put them in to bins.
10   And I -- I don't recall specifically what -- what
11   happened with them then.
12   Q.      Okay.  Would you keep them in file drawers
13   or just like trash bins or shredding bins or --
14   A.      I -- I can't remember if they were, you
15   know, file boxes or if we just brought in those big
16   tubs.  I can't recall.
17   Q.      What was the document retention policy?
18   Do you recall?
19   A.      I -- There was a certain date.  There were
20   certain categories of types of documents that had
21   various aging on it, but I couldn't begin to recite
22   the specifics of that policy.
23   Q.      Was it Abbott wide or was it specific to
24   division or department?
25           MS. CITERA:  Objection to form.

Page 121

1    A.      Abbott wide.
2    Q.      Okay.  What about for contracts like the
3    revenue share contracts; would those -- would there
4    be a policy with regard to the retention of those
5    documents?
6    A.      They certainly would have been subject to
7    the policy.  I don't recall a specific provision for
8    them being any different than other contracts that
9    the division or the corporation would keep.
10   Q.      Okay.  Would it be fair to say that you
11   would at least retain those contracts for the life
12   the contract?
13   A.      Absolutely.
14   Q.      Okay.  What about the -- the projection
15   data and materials that you would put together as
16   part of the proposal?
17   A.      Typically that would have been retained in
18   the file.
19   Q.      Okay.  With the contract?
20   A.      Yeah.
21   Q.      Okay.
22   A.      Or in the general vicinity of the
23   contract, you know.
24   Q.      Sure.  I understand.
25           Would there be any -- Would there be any

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 122

1  reason if they retained the contract to toss that
2  information?
3         MS. CITERA: Objection to form.
4  A.     Any reason for -- Who is "they"?
5  Q.     Anybody at Abbott.
6  A.     Again, there was no specific provision to
7  retain pieces or not. It was generally a contract
8  and a file and we would keep it in an area, but there
9  was not a specific provision about pieces of it.
10 Q.     Okay. If -- If you were going to
11 renegotiate that contract, would it be fair to say
12 that it would be helpful to keep that information?
13 A.     Typically.
14 Q.     Okay. While you were in home infusion
15 contract marketing, do you recall whether any
16 contracts or the underlying data -- the projections,
17 the cost information -- whether -- whether any
18 information like that was ever not retained or
19 destroyed during your tenure?
20        MS. CITERA: Objection to form.
21 A.     No. I mean, outside of the retention
22 policy, those file clean out kind of days, that would
23 have been -- that was it.
24 Q.     Okay. Would anyone else have a copy of
25 the contract or the underlying material?

Page 123

1  A.     Besides from a home infusion contract?
2  Q.     Yes, for the revenue share contracts.
3  A.     I wouldn't think -- Typically it would
4  have been retained in contract marketing -- in our
5  contract area. The sales reps may have had a copy of
6  the proposal and certain documents that you went
7  through as a part of that process.
8  Q.     Okay. What about the legal department;
9  would you furnish a copy to the legal department?
10 A.     The contract specifically, yes.
11 Q.     And do you know whether the legal
12 department had any specific document retention
13 policy?
14        MS. CITERA: Objection to form.
15 A.     Beyond what I've described already -- I
16 think we were all subject to it. If there were
17 distinctions in other departments and things, I'm not
18 aware of them.
19 Q.     What about the corporate department?
20 Would the corporate department have any reason to
21 hold onto the copies of the contracts or the
22 underlying data?
23        MS. CITERA: Objection to form.
24 A.     Typically not.
25 Q.     Okay.

Page 124

1  A.     To try to aggregate that up throughout the
2  corporation would have been tough. I don't -- I
3  don't believe so.
4  Q.     Now, you mentioned sales reps. How are
5  the home infusion sales reps compensated?
6  A.     Salary and there would have been a -- a
7  bonus program based on clients signed. I can't
8  remember what other components of that bonus program
9  might have included. Typically, like many sales
10 folks, you get a base salary and then there's some
11 incentive for bringing on more new clients.
12 Q.     Okay. What about you; were you a salaried
13 employee?
14 A.     Salary.
15 Q.     Okay. Were any of -- Was any of your
16 compensation tied to contracts generated by the home
17 infusion contract marketing?
18 A.     No. Part of a bonus program, but not a
19 sales bonus program.
20 Q.     Okay. Was there a distinction between the
21 two?
22 A.     Oh, yeah.
23 Q.     Okay. Was it a significant distinction?
24        MS. CITERA: Objection to form.
25 A.     A distinction in that I wasn't eligible

Page 125

1  and they were.
2  Q.     Okay. Would the -- The sales bonus
3  program, do you know whether that -- what percentage
4  of a salesperson's salary or overall compensation
5  that might have been?
6  A.     I -- I don't remember that.
7  Q.     Okay. And do you recall who the
8  salespersons were in home infusion?
9  A.     This is going back to the question -- This
10 is a repeat?
11 Q.     Wait. I don't think I asked you about the
12 sales force. I asked you about your employees.
13 A.     Oh, okay. Well, we did talk about sales
14 management because I couldn't remember the names of
15 specific sales reps.
16 Q.     Okay.
17 A.     But I'll see if I can remember any. I'm
18 really having to guess. So I just don't remember.
19 Q.     Okay.
20        MS. ST. PETER-GRIFFITH: I think at this
21 point in time I'm going to pass the witness to
22 Mr. Anderson.
23        MS. CITERA: I just need to -- one minute.
24        MS. ST. PETER-GRIFFITH: Sure.
25        MS. CITERA: And I'll be right back.

32 (Pages 122 to 125)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 126

1      THE VIDEOGRAPHER:  Off the record at
2  12:52.
3           (Recess taken.)
4              ---
5      THE VIDEOGRAPHER:  On the record at 12:53.
6              ---
7           EXAMINATION
8              ---
9  BY MR. ANDERSON:
10  Q.     Good afternoon, Mr. Brincks.
11      If I understand your testimony correctly
12  this morning, you've been employed with Abbott since
13  1991 through 2006, correct?
14  A.     That's correct.
15  Q.     And during that time, you worked for
16  several different divisions, such as hospital
17  products, business systems and Ross, correct?
18  A.     Correct.  And Abbott Diagnostics --
19  Q.     And Abbott --
20  A.     -- which was the Medisense piece.
21  Q.     All right.  And it was your understanding
22  during that entire time period that Abbott was your
23  employer, correct?
24  A.     Correct.
25  Q.     And did you actually receive paychecks

Page 127

1  from Abbott?
2  A.     Correct.
3  Q.     Which Abbott corporation did you perceive
4  to be your employer?
5  A.     Which Abbott?  Which Abbott?
6  Q.     Was the name of the corporation that you
7  perceived to be your employer over those years?
8  A.     Abbott Laboratories.
9  Q.     Did I understand you correctly this
10  morning that throughout your employment with the home
11  infusion reimbursement services section you reported
12  to Mike Sellers?
13  A.     Well, early in my initial senior role I
14  reported to a gentleman by the name of Mark Gorman.
15  So when I was an analyst, I reported to him; and at
16  the time, he was the manager.  When he was promoted,
17  I filled his role and at that point began to report
18  to Mike Sellers.
19  Q.     Okay.  Thank you for that clarification.
20      So in '91 when you started in the
21  alternate site home infusion reimbursement services
22  group, you reported to Mike Gorman -- Mark Gorman,
23  who in turn reported to --
24  A.     Mike Sellers.
25  Q.     -- Mike Sellers?

Page 128

1  A.     Correct.
2  Q.     Okay.  Now, the predecessor of -- as the
3  general manager of alternate site home infusion
4  reimbursement services was -- to Mike Sellers was a
5  gentleman named -- What was his name?
6  A.     I'm confused by which entity you're
7  talking about.
8      MS. CITERA:  Objection to form.
9  A.     Home infusion services or --
10  Q.     I misspoke.  Thank you.
11  A.     Reimbursement is a -- is a department of
12  home infusion.
13  Q.     Who -- Who was the predecessor -- I'll
14  rephrase to clear this up.
15      Who was the predecessor general manager of
16  alternate site home infusion to Mike Sellers?
17  A.     To Mike Sellers.  Okay.  So alternate site
18  would have been Don Robertson through the entire
19  period I was there.
20  Q.     Uh-huh.
21  A.     Mike Sellers was the general manager of
22  home infusion.  And prior to him, it would have been
23  Bill Dempsey.
24  Q.     All right.  Thank you.
25  A.     Yeah.

Page 129

1  Q.     Now --
2  A.     It was hard for us to keep it all straight
3  too sometimes.  So, I mean --
4  Q.     Good.
5      Now, this morning you testified that
6  roughly the home infusion services section brought in
7  about $20 million a year; is that correct?
8  A.     Yeah.  Tapping back into those old files
9  that -- roughly.
10  Q.     And was that a gross revenue or a net
11  revenue?
12  A.     That would have been top line reported
13  revenue.
14  Q.     And when you say "top line," you mean
15  gross?
16  A.     Yes.
17              ---
18      And, thereupon, Exhibit No. 1101 was
19  marked for purposes of identification.
20              ---
21  BY MR. ANDERSON:
22  Q.     Please take a moment, Mr. Brincks, and
23  review what's been marked as Exhibit 1101.
24  A.     Boy, oh, boy.  Okay.
25  Q.     Are you familiar with documents similar to

33 (Pages 126 to 129)

Page 130

1  Exhibit 1101?
2  A.      This has jogged my memory.  Yes, I've seen
3  these before.
4  Q.      Were you involved in the creation of
5  documents similar to Exhibit 1101?
6  A.      Certainly in an indirect way but not in
7  compiling this entire submission.
8  Q.      You were in the contract marketing group
9  within alternate site home infusion and then in turn
10 would pass along financial information to the
11 corporate finance department that would create
12 documents similar to Exhibit 1101; is that correct?
13         MS. CITERA:  Objection to form.
14 A.      Certainly that makes sense.
15 Q.      And is that, in fact, consistent with your
16 experience?
17         MS. CITERA:  Objection to form.
18 A.      Yes.
19 Q.      And that's what you meant when you said I
20 would have an indirect role in the creation of
21 documents similar to Exhibit 1101?
22 A.      Sure.
23 Q.      Looking at the top line for 1995, do you
24 see in the net sales column -- row, rather, a column
25 titled "Last Year"?

Page 131

1  A.      I do.
2  Q.      And then three to the right of that is a
3  column titled "Actual," correct?
4  A.      I see that.
5  Q.      Am I correct in understanding that that
6  would mean the net sales in 1995 for alternate site
7  home infusion services was roughly $41 million?
8         MS. CITERA:  Objection to form.
9  A.      Yes.  That would be on this document, yes.
10 Q.      And is that consistent with your memory of
11 the annual revenues of the alternate site home
12 infusion services?
13 A.      It's certainly consistent now that I see
14 it with my recall.  Apparently I'm seeing the number.
15 Q.      Yes, sir.
16         And to the extent there was a number there
17 for last year of roughly $38 million, do you
18 interpret that to mean the net revenues generated by
19 alternate site home infusion services in 1994?
20 A.      Yes.  Year over year.
21 Q.      And then if you look at the pages -- the
22 other pages that are made a part of 1101, will you
23 agree that it appears in '96, the revenues generated
24 by alternate site home infusion were roughly
25 $42-and-a-half million; and then in '97, $41 million;

Page 132

1  and then in '98, $39 million; and then in '99, $31
2  million; and then in 2000, $23 million?
3         MS. CITERA:  Objection to form.
4  A.      Yes.
5  Q.      And is that decline in revenue
6  specifically in the years 1999 and 2000 consistent
7  with your memory that the alternate site home
8  infusion services section was phased out?
9         MS. CITERA:  Objection to form.
10 A.      Again, I was removed from the business for
11 quite a while by then and not very attentive to the
12 specifics of what was happening.  I knew there was
13 discussion about exiting the business; but, you know,
14 I was not beyond '95 following these figures at all.
15 Q.      Looking at the first page of Exhibit 1101,
16 do you interpret net sales to mean gross revenues or
17 net revenues?
18 A.      Is there a distinction that you have,
19 because obviously -- This is what we're actually
20 booking.  So our revenue share -- The combination of
21 all the revenue shares would have added up to this.
22 Q.      Okay.  And then "standard cost of sales,"
23 what does that term mean?
24 A.      That -- When we were speaking about costs
25 earlier, when you look at all of the products and

Page 133

1  things that were supplied through the revenue share
2  agreements, that would have been the cost of those
3  products that were provided under those home infusion
4  agreements.  That is my understanding.
5  Q.      And when you say "products," you're not
6  limiting that to pharmaceutical products; but you're
7  including all of the different services that were
8  marketed as products, correct?
9  A.      I'd have to look -- I can't recall if we
10 actually kept the -- The reimbursement and other
11 organizations, I believe, were split out separately.
12 And I don't recall the specifics on that.  But this
13 should have been predominantly the costs of the
14 products themselves that were provided to the -- to
15 the clients.
16 Q.      So if I understand the pages that are
17 marked as Exhibit 1101 correctly, Abbott's share of
18 the revenues generated through the dispensing of
19 drugs actually significantly exceeded the actual cost
20 of those drugs and potentially the cost of those
21 drugs plus the cost of some of the services, correct?
22         MS. CITERA:  Objection to form.
23 A.      Yes.  That's a pretty standard business
24 practice.  But yes.
25 Q.      And then if you look at the other pages,

34 (Pages 130 to 133)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 134

1  you'll see, and won't you agree with me, sir, that
2  roughly half of the net sales -- Or let me rephrase.
3          You'll agree with me, won't you, sir, that
4  typically the revenues that Abbott received in its
5  sharing arrangements with pharmacies were about
6  double the actual cost of the products to Abbott?
7          MS. CITERA: Objection to form.
8  A.      With pharmacies? What do you mean?
9  Q.      Well, in this revenue sharing that you've
10 described through home infusion --
11 A.      So with the hospitals or whoever the
12 clients might be.
13 Q.      Right.
14 A.      Not specifically pharmacies.
15 Q.      Well, I -- I didn't mean to throw a
16 curveball there.  I'll rephrase.
17         You'll agree with me, won't you, sir, that
18 home infusion services clients, which would have
19 included pharmacies and hospital clinics, et cetera,
20 the revenues that Abbott received through those
21 revenue-sharing arrangements roughly doubled the cost
22 of the products and other services to Abbott,
23 correct?
24         MS. CITERA: Objection to form.
25 A.      That's what that manufacturing margin as a

Page 135

1  percent to sales would represent.
2  Q.      Yes, sir.
3          And so, for instance, on the first page of
4  Exhibit 1101, that's 41 percent for actual in 1995;
5  43-and-a-half percent for '96; 50 percent for '97;
6  53-and-a-half percent for '98; 52 percent for '99;
7  46 percent for 2000, correct?
8  A.      Correct.
9  Q.      And if I understood your testimony
10 correctly this morning, Abbott shared in these
11 revenues with clients of the home infusion services
12 group anywhere from roughly 15 percent to 50 or
13 60 percent, correct?
14 A.      That's a fair range.
15 Q.      So despite the fact that Abbott was only
16 receiving a minority share in the reimbursements that
17 were generated, Abbott was still generating
18 significant profit margins, correct?
19         MS. CITERA: Objection to form.
20 A.      Significant?  I look down at 12 percent on
21 the bottom and actually that's a pretty modest return
22 in a -- in a business setting in general.
23 Q.      Well --
24 A.      Once you -- Once you cover all of the
25 other expenses.  Because this was a gross

Page 136

1  contribution margin to then cover the costs for sales
2  force, for having the home infusion systems
3  available, for having contracting and covering other
4  overheads that the overall profitability was closer
5  down into this -- in the first page, 10 percent.
6  Q.      Okay.  I'll try to address that.
7          You'll agree with me, won't you, sir, that
8  over the years that Abbott offered home infusion
9  services to clients such as pharmacies and hospital
10 clinics, despite the fact that Abbott was receiving a
11 minority share of the reimbursements, Abbott was
12 generating reasonable net profits?
13         MS. CITERA: Objection to form.
14 A.      That -- That was the business model, yes.
15 Q.      And -- And depending on the level of
16 service that Abbott provided, whether it be simply
17 the products on consignment and some moderate
18 assistance in the reimbursement or whether it be the
19 actual dispensing of the products through Abbott's
20 pharmacies and the actual filing of the reimbursement
21 claims and the use of the computer system, the
22 percentage of revenue share would increase, correct?
23 A.      Correct.
24 Q.      And, in turn, then Abbott could generate
25 even greater net profits through its home infusion

Page 137

1  services group?
2          MS. CITERA: Objection to form.
3  A.      Again, it would vary by arrangement; but
4  in the aggregate -- that's the profile you have
5  here -- is how -- When you take the sum of all of
6  those agreements, this is how the overall business --
7  this is the profile essentially.
8  Q.      Right.
9          And the reason Abbott was offering these
10 services and actually involving itself in this home
11 infusion business was because Abbott was able to be
12 successful and generate profits, correct?
13         MS. CITERA: Objection to form.
14 A.      That's -- That's a good assumption.
15 Q.      And did you ever gain an understanding of
16 how it was that Abbott could generate profits through
17 sharing typically a minority of the total
18 reimbursement?
19         MS. CITERA: Objection to form.
20 A.      Again, a revenue share means that a
21 portion of the -- the billed rate would come to
22 Abbott in response to the value and the services that
23 it provided.  The balance were retained with the
24 organization that also had various responsibilities
25 dependent on that arrangement.  So it was a revenue

35 (Pages 134 to 137)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 138

1   share with a portion going to each for their role and
2   responsibility that in providing ultimately the
3   client and patient care.
4   Q.      Right.
5           And what I was asking, sir, is:  Did you
6   under- -- ever come to understand how it was that
7   Abbott could make profits by sharing only in a
8   minority of the total reimbursement, and presumably
9   the client pharmacies or hospital clinics could also
10  continue to make profits?
11          MS. CITERA:  Objection to form.
12  A.      The less we provided them, the less we
13  got.  It was a very reasonable economic assumption to
14  make.  If -- Because typically if we only received
15  15 percent, they were doing a whole lot more.  So
16  they used that higher revenue to cover their
17  additional costs because they were having to do more
18  of the ultimate business operation in the provision
19  of patient care and running the home infusion
20  operation.  So, you know, economically the fact that
21  we received 15 percent on chemotherapy, for instance,
22  and provided far less of the products and the unique
23  things that they needed there made very plain sense
24  to us -- to me.
25  Q.      Let me address this example that you've

Page 139

1   raised that -- For instance, with the chemotherapy
2   products where typically Abbott Home Infusion
3   Services only shared in roughly 15 percent of the
4   total reimbursement, did you understand and did
5   others at Abbott Home Infusion understand that that
6   15 percent was going to be profitable to Abbott?
7   A.      We generally didn't elect to consistently
8   generate business that wasn't going to generate a
9   return for our shareholders.  That would be true.
10  Q.      I understand.
11          And, accordingly, Abbott understood that
12  at least for the chemotherapy products where you were
13  sharing in 15 percent of the reimbursements, that
14  15 percent obviously had to cover the actual cost of
15  the chemotherapy product that Abbott had loaned on
16  consignment to the client, correct?
17          MS. CITERA:  Objection to form.
18  A.      If they were doing the pharmaceutical
19  compounding, then that would vary quite a bit because
20  they may have procured a sizeable portion of the
21  product.  In some cases, that 15 percent could have
22  been a very small product percentage and it could
23  have been much more representative of compensation
24  for other services provided as a part of that
25  arrangement.

Page 140

1   Q.      Well, isn't it true that Abbott through
2   its home infusion services group strove to push the
3   Abbott products so that Abbott fluids or Abbott
4   injectables or Abbott oncology products, for
5   instance, were dispensed?
6           MS. CITERA:  Objection to form.
7   A.      Certainly they -- Many clients were --
8   responded favorably to having product on consignment
9   giving -- given the reimbursement in -- in the
10  market.  So, yeah, they responded quite favorably to
11  that opportunity.
12  Q.      And what you mean by that is Abbott -- one
13  of the mechanisms by which Abbott could entice home
14  infusion clients to actually dispense Abbott product
15  was Abbott would not ask them to pay for it up front
16  but would rather consign the physical product to them
17  and -- and the payment would not be received until
18  after the reimbursement was received, correct?
19          MS. CITERA:  Objection to form.
20  A.      It was benefit, but that was their
21  treatment protocol and physician preference that
22  would dictate ultimately what they actually
23  dispensed.
24  Q.      In your experience as a general matter,
25  isn't it true that Abbott Home Infusion client --

Page 141

1   customers such as pharmacies and hospital clinics did
2   prefer Abbott products and did dispense Abbott
3   products more than competitive products?
4           MS. CITERA:  Objection to form.
5   A.      I would say that's a reasonable assumption
6   to make, but...
7   Q.      So in a situation where an Abbott product
8   is being dispensed and yet Abbott is only receiving
9   15 percent of the total reimbursement, did you come
10  to understand that that 15 percent was still enough
11  to cover the actual cost of the drug product?
12          MS. CITERA:  Objection to form.
13  A.      The drug product?  Explain -- Explain
14  again.
15  Q.      Abbott's -- For instance, Abbott's drug
16  product -- for instance, to the extent Vancomycin was
17  being used to treat cancer, did you come to
18  understand that 15 percent of the reimbursement on
19  Vancomycin would still be enough to cover the cost
20  that Abbott had for that product and Abbott charged
21  to the client pharmacy?
22          MS. CITERA:  Objection to form.
23  A.      Sure.  I mean, in order to make a
24  reasonable economic decision for the corporation, we
25  had to estimate what we believed the -- both the

36 (Pages 138 to 141)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 142

1    revenue and then the corresponding cost would be,
2    yes.
3    Q.    Why was the reimbursement revenue share of
4    only 15 percent still enough to cover the cost that
5    Abbott charged the client pharmacies for those drug
6    products?
7           MS. CITERA:  Objection to form.
8    A.    Again, it depends completely on the array
9    of products and services that that client elected to
10   incorporate into the revenue share agreement.  So if
11   they were interested in pharmacy compounding, that
12   rate would be much higher because clearly we would
13   have procured all of that product and all of that
14   information.  In cases where they were doing the
15   compounding and we were providing other types of
16   support, whether it was the computer system or
17   others, we would price it accordingly to reflect the
18   value that we were bringing into that business
19   proposition.
20   Q.    Well, I understand that.  I'm asking a
21   more specific question, Mr. Brincks.
22          And that is:  In a situation where Abbott
23   is consigning drug products -- actual NDC numbers to
24   home infusion clients, how is it that only sharing in
25   roughly 15 percent of the reimbursement for that drug

Page 143

1    product was sufficient to allow Abbott to make a
2    profit on the sale of that product to the client home
3    infusion customer?
4           MS. CITERA:  Objection to form.
5    A.    Well, part -- In order to make a revenue
6    share a -- a reasonable approach, you had to estimate
7    a therapy in a category and determine that, you know,
8    on average, here are the top five aid -- chemotherapy
9    agents that are being administered in the home.  So
10   we would work with those.  Here is our assumption of
11   the top chemotherapy agents and then correspondingly
12   we would -- we would price out the value.
13          So there -- You typically had to assume
14   15 percent in aggregate given an overall industry
15   trend and standard to use these types of
16   chemotherapeutic agents in the home infusion setting.
17   Is 15 percent a reasonable value back to Abbott for
18   its provision of those services and product?  Given
19   those assumptions, then that was part of the
20   negotiation.
21   Q.    Okay.  So this was an analysis that Abbott
22   undertook -- and I think you've described this
23   earlier today --
24   A.    Yeah.
25   Q.    -- which would -- these projections that

Page 144

1    Abbott would create and provide to the customers
2    and -- and Abbott would make those projections in an
3    effort to not only get the home infusion business,
4    but also make a profit on those products and
5    services, correct?
6           MS. CITERA:  Objection to form.
7    A.    Yes.  We would attempt to establish
8    assumptions that were used in -- common assumptions
9    used in those different settings.
10   Q.    Okay.  And in the context of making those
11   projections and conducting that analysis, did you
12   come to understand why only receiving 15 percent of
13   the reimbursement for a drug was still sufficient to
14   allow Abbott to make a profit on both the sale of the
15   drug and potentially on some incremental services
16   that were rendered as well?
17          MS. CITERA:  Objection to form.
18   A.    I mean, we would -- We would look at how
19   it was flowing back in through and determine that
20   it -- it appeared in the aggregate of the overall
21   operation that indeed there was reasonable
22   compensation and it was a reasonable assumption and a
23   business model.
24   Q.    So as a broad matter, you and others at
25   Abbott were aware that there were large reimbursement

Page 145

1    spreads between the actual reimbursement received by
2    home infusion clients and the actual cost of the
3    underlying products?
4           MS. CITERA:  Objection to form.
5    A.    Could you describe what -- what you mean
6    again?
7    Q.    Well, just in laymen's terms, you and
8    others at Abbott knew that only getting 15 percent
9    was still sufficient to cover both the cost of the
10   product and some incremental services if any were
11   rendered, correct?
12   A.    Correct.
13   Q.    Okay.  So knowing that 15 percent was
14   enough to cover the actual drug product charge and
15   possibly some incremental expenses, you and others at
16   Abbott had to be aware that there were very
17   significant spreads between the actual cost of the
18   products and the reimbursement that was generated on
19   those products, correct?
20          MS. CITERA:  Objection to form.
21   A.    That would be a -- In any business, in any
22   operation, there's a difference between price and
23   cost.  So yeah.
24   Q.    How did you -- Strike that.
25          What did you understand was the mechanism

37 (Pages 142 to 145)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 146

1 by which there was a very significant difference
2 between the reimbursement on a given drug and the
3 actual cost of the drug?
4         MS. CITERA:  Objection to form.
5 A.    We've -- We've -- I'll reiterate again.
6 Typically in the home infusion market, per diem plus
7 AWP was a way of recognizing a standard billing
8 technique that was used with multiple payers.  Then
9 we as a provider of certain services in a home
10 infusion agreement would understand our costs as a
11 part of supporting an arrangement, and we would make
12 estimates.  Sometimes we were right.  Sometimes we
13 were wrong.  But in the aggregate, we were mostly in
14 the ballpark.  So that's how we did it.
15 Q.    And so in simple terms, you and others at
16 Abbott knew that AWP was a key component of
17 estimating reimbursement in creating these
18 projections and you knew that AWP and the per diem
19 significantly exceeded the actual cost Abbott charged
20 for the product?
21         MS. CITERA:  Objection to form.
22 A.    I will say in home infusion services and
23 in that specific market, which is what I'll speak to,
24 we recognize that this was a commonly accepted way to
25 bill.  So in that regard, yes.  And that established

Page 147

1 price in the marketplace.  And as a standard of
2 protocol, we knew our costs were lower because that's
3 how you generate a profit that you turn in to the
4 corporation that your shareholders expect.  So
5 absolutely we knew.
6         And if it generated -- And we knew that we
7 were losing money, then we either had to find out a
8 way to secure a greater price or get out of the
9 market because that wouldn't provide the kind of
10 return that our shareholders would expect.
11 Q.    Right.
12 A.    So, I mean, it's --
13 Q.    And it wasn't -- But it -- To be more
14 precise, it wasn't just that Abbott Home Infusion had
15 an awareness that their -- the cost of the drugs
16 charged by Abbott to the providers was less than the
17 reimbursement, but people at Abbott Home Infusion
18 knew that it was drastically lower; hence the reason
19 why receiving 15 percent of the reimbursement was
20 still sufficient to cover both the cost of the drug
21 charged to the provider and some incremental services
22 if any?
23         MS. CITERA:  Objection to form.
24 A.    The sticker price is always going to be
25 greater than cost.  There's no business that sets a

Page 148

1 price lower than its cost or they don't stay around
2 very long.  So there was a recognition that AWP was
3 higher than our cost, yes.
4 Q.    Are you aware of any -- When you say
5 "sticker price," are you aware of any situation where
6 sticker prices on products are ten times higher than
7 the actual market prices?
8         MS. CITERA:  Objection to form.
9 A.    You want conjecture?
10 Q.    Sure.
11         MS. CITERA:  Objection to form.
12 A.    Beer, Pepsi, razor blades.  That's a lot
13 of examples.
14 Q.    What do you mean "razor blades"?
15 A.    Razor blades (indicating) that you shave
16 your face with.
17 Q.    You -- You think that the Gillette sticker
18 price is about ten times higher than what you
19 actually pay at the grocery store for razor blades?
20 A.    That's my belief.
21 Q.    Are you aware of the sticker price for any
22 vehicles being ten times higher than the actual
23 prices paid for a vehicle?
24 A.    We could -- We could keep going.  I -- No.
25 Q.    Would you say that it was fairly well

Page 149

1 known at Abbott Home Infusion at the minimum that
2 Abbott's AWPs were roughly ten times higher than the
3 actual prices Abbott was charging home infusion
4 client customers?
5         MS. CITERA:  Objection to form.
6 A.    Ten times?  I don't recall the gap.
7 Clearly there was a difference.  I don't remember the
8 exact differential between the two.  There would be
9 recognition that price was higher than cost.
10 Q.    And --
11 A.    The degree that you're referencing -- I
12 mean, I don't recall.  I mean, there are some drug
13 markets where clearly there are margins involved in
14 supporting R&D and other efforts.
15 Q.    I want to be fair to you and I'm not
16 asking you to say precisely on any given drug that an
17 AWP was ten times higher.
18 A.    I -- I -- I don't know.
19 Q.    But you and others at Abbott Home Infusion
20 at the minimum knew that the AWPs on many Abbott
21 hospital products were multitudes higher than the
22 actual prevailing market prices, correct?
23         MS. CITERA:  Objection.  He's testified to
24 this several times now.  This is ridiculous, Jarrett.
25 A.    I mean, there is a difference between net

Page 150

1  and standard cost. So it keeps just showing up, and
2  it's just reiterating the point that you are making.
3  Did I know there was a gap? Price is higher than
4  cost. Now, the degree would vary by product or
5  component or what it was, but we weren't involved in
6  setting the price.
7  Q.      When -- When you say the degree would
8  change, I understand that the degree would change,
9  sir. I'm just asking: Isn't it true that you and
10 others in Abbott Home Infusion were aware that the
11 AWPs on Abbott hospital products weren't just higher
12 than the actual prices being charged the client
13 customers, but they were multitudes higher -- three,
14 four, five, even ten times higher? Isn't that
15 correct?
16        MS. CITERA: Objection to form. Same
17 objections.
18 A.      Higher than -- To what point on the P&L
19 are we talking here, because when you go to the
20 bottom, we're generating 10 percent. Okay? So
21 whatever the spread was that you're referring to
22 between price and cost, the generated margin, it was
23 then used to cover expenses in the provision of other
24 products and services. So the net profit -- If you
25 want -- Profitability was more akin to this

Page 151

1  ten percent than -- than the gap up here.
2        MR. ANDERSON: Objection; non-responsive.
3  BY MR. ANDERSON:
4  Q.      Sir, you're pointing to Exhibit 1101 which
5  starts with a revenue received by Abbott that's based
6  off of some percentage share between 15 to
7  50 percent, correct?
8  A.      Correct.
9  Q.      All right. I'm -- We've been discussing
10 the bigger picture, and that is, isn't it true that
11 you and others at Abbott were aware that the AWPs for
12 Abbott hospital products were not just greater than
13 the actual prevailing prices charged the customers,
14 but were significantly greater on a magnitude of
15 three, four and sometimes ten times higher?
16        MS. CITERA: Objection to form.
17 A.      It's -- It's the significance. It's not
18 the principle. It's the significance that you're
19 asking me to communicate on that I'm telling you that
20 it would have varied around multiple products. I am
21 not questioning the principle that there is a
22 difference in perhaps a multiple. I'm telling you I
23 don't know -- I don't want to misreflect what that
24 multiple is because I don't remember.
25 Q.      Okay. Well, we may be able to get into

Page 152

1  some documents that refresh your memory on the
2  multiple.
3  A.      Fine.
4  Q.      You just can't remember the specifics, but
5  you do recall that there was knowledge that the AWPs
6  were multiples higher than the prevailing prices?
7        MS. CITERA: Objection to form.
8  A.      It's price and cost. So yes.
9  Q.      Okay. Now, if you could, Mr. Brincks,
10 take a look at what's marked as Exhibit 295 in this
11 case.
12        MR. ANDERSON: There's two copies.
13 A.      All right.
14 Q.      Does Exhibit 295 appear to be a standard
15 proposal that Abbott would have made to a home
16 infusion client?
17 A.      Yeah. It was made obviously after I
18 had -- I had left, but it's consistent with the
19 format and approach I recall.
20 Q.      Looking at the very first -- I mean --
21 pardon me -- the second page of Exhibit 295 but the
22 first page under the cover, do you see that section
23 titled, "Executive Summary"?
24 A.      Yes.
25 Q.      And then reading the first sentence for

Page 153

1  the benefit of the record, "The trend of moving
2  patients from hospitals into lower cost 'alternate
3  site' settings continues to increase." Did I read
4  that correctly?
5  A.      Yes.
6  Q.      What did you understand was the basic
7  reasoning behind why hospitals were moving patients
8  into alternate site settings?
9        MS. CITERA: Objection to form.
10 A.      My understanding was that patient results
11 were better from a care and recovery standpoint.
12 Patients wanted to get out of the -- the hospital.
13 And as I recall, their ability to treat without --
14 They had a certain capacity in their hospital. So as
15 opposed to building another hospital and having those
16 overheads, moving patients into the -- that treatment
17 locale was a more economic way to do that. And
18 patient care results were also better. That -- That
19 was the fundamental premise.
20 Q.      Did you have any understanding that the
21 movement of patients from an outpatient setting in a
22 hospital -- I mean -- pardon me -- from an inpatient
23 setting in a hospital to an outpatient setting was
24 related to reimbursement?
25        MS. CITERA: Objection to form.

39 (Pages 150 to 153)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 154

1    A.      I've just described it.  Really the
2  fundamental rationale was just as I described from an
3  economic overhead standpoint and moving people into
4  that care pattern.  I recognize that there were
5  differences in the reimbursement.
6    Q.      What were those differences generally?
7    A.      I -- I don't recall.  I know there was a
8  lot of confusion as the market emerged.  And that
9  was -- that was part of the challenge for some of the
10  folks that were going into home infusion was to
11  understand that landscape because that -- the payment
12  structure was different from a reimbursement
13  standpoint.  And that's what I remember.
14    Q.      And isn't it true that Abbott Home
15  Infusion held themselves out to be experts in
16  outpatient reimbursement issues?
17        MS. CITERA:  Objection to form.
18    A.      Our reimbursement area clearly was on the
19  forefront in understanding those regulations and
20  working with payers to understand those things.  So
21  yes.
22    Q.      And toward that end, Abbott could actually
23  and did actually approach prospective home infusion
24  clients and explain the differences in outpatient
25  reimbursement as compared to inpatient hospital

Page 155

1  reimbursement, correct?
2        MS. CITERA:  Objection to form.
3    A.      They would have requested that information
4  as a part of the relationship, yeah.
5    Q.      And when you say "they," you mean the --
6  the clients?
7    A.      Clients.
8    Q.      And so, for instance, there's a listing
9  here of -- of Abbott Home Infusion clients and
10  they're major hospitals, correct?
11    A.      Yes.
12    Q.      And so Abbott would go to a Baylor
13  University Medical Center and make a proposal wherein
14  Abbott would explain the outpatient reimbursement
15  system and the differences between the outpatient
16  reimbursement and the inpatient reimbursement,
17  correct?
18        MS. CITERA:  Objection to form.
19    A.      Yeah.  Typically that would have been part
20  of the ongoing relationship dependent upon how
21  involved they wanted to get.  Some would -- Some
22  would request it more than others perhaps.  I
23  don't -- I don't recall everybody asking at the same
24  level, but...
25    Q.      And -- And many times those types of

Page 156

1  proposals or discussions would result in Abbott
2  explaining to the home infusion clients or
3  prospective clients how AWP and per diems were a part
4  of outpatient reimbursement, correct?
5        MS. CITERA:  Objection to form.
6    A.      It was -- That part was industry standard.
7  It's what they would pay in response to that billing
8  that was the question and how long were the terms.
9    Q.      And did you find that most hospitals
10  already understood that AWP would be the foundation
11  for outpatient reimbursement, or was that something
12  that home infusion personnel from Abbott had to
13  explain to these clients?
14        MS. CITERA:  Objection to form.
15    A.      No.  I -- I mean, I remember it being
16  understood.  I mean, it wasn't -- It was -- It was
17  there for that reason.  It was a common way -- The
18  payers -- The payers were dictating more about how we
19  want you to explain what you're billing to us.  And
20  as I recall, it was the payers asking for AWP as a
21  common reference point or understanding.
22    Q.      Did the -- Did the hospitals understand
23  that this outpatient reimbursement system that was
24  founded, in part, on AWP would result in more or less
25  dollars for the dispensation of drugs than, for

Page 157

1  instance, a DRG reimbursement in a hospital?
2        MS. CITERA:  Objection to form.
3    A.      I think they understood they were perhaps
4  similar, but a different way to get to a standard
5  price.
6    Q.      Did you find or did Abbott find to your
7  knowledge that reimbursement in the outpatient
8  setting on drugs was greater than DRG-based
9  reimbursement inpatient?
10        MS. CITERA:  Objection to form.
11    A.      I was not part of -- I -- I don't recall
12  that, getting into a DRG versus home infusion kind of
13  dialogue or analysis.  I don't remember.
14    Q.      When you say you weren't involved, you
15  mean that was -- those types of discussions were left
16  up to the Abbott Home Infusion sales reps?
17        MR. STETLER:  Oh, come on.
18    A.      You know, I'm not even aware --
19        MR. STETLER:  Don't put words in his
20  mouth, Counsel, like that.  He didn't say there were
21  such discussions.  So when he said he wasn't aware of
22  it, he's not saying that other people did it.  Please
23  don't do that.
24        MR. ANDERSON:  Dave, I object to the
25  grandstanding.

40  (Pages 154 to 157)

Page 158

1    MR. STETLER: I don't care if you object.
2    It ain't my problem.
3    MR. ANDERSON: It's just coaching. It's
4    improper.
5    MR. STETLER: It's not coaching.
6    MR. ANDERSON: Of course it is.
7    MR. STETLER: No. You've argued with this
8    witness since your first question.
9    MR. ANDERSON: I haven't argued with him.
10   MR. STETLER: We had a full morning of
11   fair and objective questions and now we're getting in
12   an argument time and again.
13   MR. ANDERSON: That -- I move to strike
14   all of the side bar comments. I'm not arguing with
15   him.
16   BY MR. ANDERSON:
17   Q.    Sir, do you feel like I'm arguing with you
18   --
19   A.    No. But I --
20   Q.    All right.
21   MR. ANDERSON: So don't insinuate that --
22   MS. CITERA: He wasn't finished.
23   MR. STETLER: He wasn't finished.
24   A.    But you did -- You were leading me on the
25   last part. So can I -- Can I -- Is it all right if I

Page 159

1    finish that?
2    Q.    Sure.
3    A.    I know what a DRG roughly is, some care
4    group or pattern; but I am unaware of any type of
5    analysis, education of sales forces or any kind of
6    training like that. We -- We focused on home
7    infusion and we had our hands full just figuring that
8    marketplace out.
9    Q.    To the extent they occurred, would you
10   agree the reason you weren't involved in those
11   discussions is because that was handled by the home
12   infusion sales reps versus you in contract marketing?
13   MS. CITERA: Objection to form.
14   A.    I -- I have no knowledge of that type of
15   analysis that you're talking about. It --
16   Q.    You have no knowledge one way or the
17   other? It could have happened, you just don't know?
18   MS. CITERA: Objection to form.
19   A.    That's for you -- I guess you can say
20   that. I can't --
21   Q.    I'm not --
22   A.    I don't have -- I don't have knowledge.
23   You're asking me a question -- I'm saying, no, I
24   don't have knowledge of what you are asking.
25   Q.    Right.

Page 160

1    And the point is you're not aware that
2    those types of conversations by the field sales reps
3    did occur; and, likewise, you're not aware that they
4    did not occur, correct?
5    A.    That would be fair.
6    Q.    All right. In looking at Page 1, which is
7    title Page 1 but it's actually the second page of
8    Exhibit 295, in the last paragraph in the right-hand
9    column beginning with the word, "Abbott's."
10   A.    Uh-huh.
11   Q.    I'll read it for the record. "Abbott's
12   compensation will be based on a percentage of Care
13   Partners' collected revenue. By tying our revenues
14   to a percentage of collections, Abbott has every
15   incentive to strive for a successful home infusion
16   program." Did I read that correctly?
17   A.    Yes.
18   Q.    And that's consistent with this business
19   model that we've been discussing this afternoon where
20   Abbott would share in a percentage of the overall
21   revenue, correct?
22   A.    That is correct.
23   Q.    And Abbott actually touted that to these
24   home infusion clients and prospective clients as a
25   reason for Abbott striving to maximize the revenues,

Page 161

1    correct?
2    MS. CITERA: Objection to form.
3    A.    It was sharing of the risk, yes.
4    Q.    And it's actually true that Abbott strove
5    to maximize reimbursements for itself and home
6    infusion clients, correct?
7    A.    Sure. It was in -- within the guidelines
8    that were established, yeah.
9    Q.    Including reimbursements by Medicaid and
10   Medicare, correct?
11   A.    Yeah. You had to follow the Medicare
12   guidelines and rules and bill accordingly; and we
13   would take a percentage, yes.
14   Q.    And so to the extent that Abbott was
15   filing claims on -- based, in part, on the AWPs of
16   Abbott products, that was a mechanism by which Abbott
17   could maximize reimbursements?
18   MS. CITERA: Objection to form.
19   A.    The formula was taking a percentage of
20   revenues, and per diem plus AWP was a part of that
21   formula.
22   Q.    And when you say "per diem plus AWP," you
23   mean it would be -- the -- the actual requested
24   reimbursement amount would be in excess of the
25   published AWP on a given Abbott drug, correct?

41 (Pages 158 to 161)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 162

1          MS. CITERA:  Objection to form.
2     A.     Well, and sometimes it was per diem to
3   cover all of the other care components, and then the
4   AWP was more reflective of the actual antibiotic or
5   other component that was driven by AWP.
6   Q.     Right.
7          And so as a general matter, the AWP was
8   the reimbursement intended to cover the ingredient
9   cost whereas the per diem was intended to cover the
10  related expenses, correct?
11         MS. CITERA:  Objection to form.
12    A.     In general, that would be a fair
13  characterization.
14    Q.     And you and others at Abbott understood
15  that principle, correct?
16         MS. CITERA:  Objection to form.
17    A.     Fair characterization.
18    Q.     That is a fair characterization?
19    A.     Yes.
20    Q.     Thank you.
21         So as to the extent anyone built in
22  spreads on AWP, those spreads weren't intended to
23  cover related expenses incurred in the dispensation
24  of a drug, correct?
25         MS. CITERA:  Objection to form.

Page 163

1     A.     I pulled the AWP off of a Red Book and a
2   Blue Book and we applied it in our models.  That's
3   what we did.  So I'm not -- What was your question
4   about AWP?  Because we weren't involved in setting
5   AWP in home infusion.
6   Q.     Right.  You've testified to that.
7          In fact, you and others at home infusion
8   knew that the Abbott hospital personnel were the ones
9   that were responsible for AWP, correct?
10         MS. CITERA:  Objection to form.
11    A.     They were responsible for submitting what
12  went to those third-party organizations that
13  collected the data.  That was my understanding.
14    Q.     Such as First Data Bank and Red Book which
15  you accessed, correct?
16    A.     Correct.
17    Q.     So you can see how if Abbott hospital
18  section is reporting pricing to Red Book and First
19  Data Bank and then, in turn, you're accessing that
20  pricing information, you could see how that could be
21  tied back to Abbott personnel, correct?
22         MS. CITERA:  Objection to form.
23    A.     Yeah.  I mean, the economics would flow
24  through.
25    Q.     Right.

Page 164

1          And you actually understood while you were
2   at Abbott Home Infusion that that relationship
3   existed between the prices reported by Abbott
4   hospital personnel and the pricing services such as
5   First Data Bank and Red Book and the information you
6   and others at home infusion had access to?
7          MS. CITERA:  Objection to form.
8     A.     I understood that we used AWP.  The
9   mechanics behind the submission were not a central
10  part of what our responsibilities were.
11    Q.     I understand that, sir.  And I'm not
12  asking you about the specific mechanics; for
13  instance, a formula.
14         I'm asking you instead:  You understood
15  that the basic relationship existed where personnel
16  from Abbott hospital products reported information to
17  the pricing services such as First Data Bank and Red
18  Book?
19    A.     Yes.
20    Q.     And then, in turn, you and others in
21  Abbott Home Infusion, including clients, had access
22  to that information?
23         MS. CITERA:  Objection to form.
24    A.     The AW- -- Yes.
25    Q.     All right.  And now back to my original

Page 165

1   question, because we got off on a tangent.
2          You never understood that any spreads
3   being built into the AWP of a product as compared to
4   the actual market price of that product were intended
5   to compensate providers for expenses related to the
6   dispensation of a drug, did you?
7          MS. CITERA:  Objection.  Asks him to
8   speculate.
9     A.     No.  I'm not -- not part of that process.
10  You know, exactly how it was -- How the submissions
11  were put together was not part of what we got
12  involved in in home infusion.
13    Q.     The submissions -- Now you're referring
14  back to these reports by the Abbott hospital
15  personnel to First Data Book and Red Book?
16    A.     Yes.
17    Q.     Okay.  Mechanically at least from your end
18  and others at home infusion, how did you access the
19  Red Book and First Data Bank pricing information?
20    A.     Printed books that came out every month.
21    Q.     Are you also familiar with the CHIP
22  program and its automatic retrieval of AWP
23  information and other pricing information from the
24  pricing services?
25         MS. CITERA:  Objection to form.

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 166

1   A.      I don't think when I was there that that
2   capability was in place.  I don't recall that when I
3   left in '95.
4   Q.      You just recall the more kind of
5   antiquated physical reference to the books?
6   A.      Pull out the book (indicating).
7   Q.      Was it your experience that Abbott had a
8   subscription to both First Data Bank and Red Book
9   publications?
10          MS. CITERA: Objection to form.
11  A.      I had them and Abbott paid for them.
12  Q.      And it was -- It probably wasn't just you
13  that had them, was it?  Did other Abbott personnel
14  have subscriptions to the books?
15  A.      Yeah.  I would imagine they did, but I
16  don't specifically recall who.  I can't imagine that
17  they didn't.
18  Q.      Right.  Okay.
19          Now looking at Page 2 of Exhibit 295,
20  which is actually the third page.  I think you're
21  already there actually.
22  A.      Oh, Page 2?
23  Q.      Yes, sir, that block.
24          And there's different services that Abbott
25  offered to home infusion pharmacies and hospital

Page 167

1   clinics, correct?
2   A.      Yes.
3   Q.      And the first one is reimbursement,
4   correct?
5   A.      Uh-huh.
6          MS. CITERA: Objection to form.
7   BY MR. ANDERSON:
8   Q.      Then Abbott product, non-Abbott product
9   and CHIP system, correct?
10  A.      Yes.
11  Q.      How did Abbott go about offering
12  non-Abbott product to home infusion clients of
13  Abbott's?
14  A.      I don't remember the details of how the
15  pharmacy operation did that and I can't recall if it
16  was simply in that one -- for clients that we
17  compounded product for, because obviously we didn't
18  make everything that you would need.  So you would --
19  They would have had to procure it, and I don't recall
20  the specifics of how they did that, the mechanics.
21  Q.      I'll read -- And maybe this will refresh
22  your memory.  Next to non-Abbott product, there's a
23  statement that I'll read for the record.  Quote, Care
24  Partners will be able to join a nationwide buying
25  group at no cost.  Did I read that correctly?

Page 168

1   A.      Uh-huh.
2   Q.      Does that jog your memory that there was
3   some type of buying group that Abbott offered to home
4   infusion clients to buy non-Abbott drugs?
5          MS. CITERA: Objection to form.
6   A.      I don't -- You know -- And this again was
7   after I left.  So I don't know if there was some kind
8   of a buying group relationship.  I don't -- I don't
9   recall.
10  Q.      Do you believe that the CHIP system was
11  online and operational before you left the home
12  infusion services group?
13  A.      Yes.
14  Q.      And do you recall that the CHIP system was
15  utilized in the filing of reimbursement claims?
16  A.      Yes.  I don't recall as to how extensively
17  when I left, but I know it was -- it certainly was
18  involved and had the capability.
19  Q.      And was that one of the primary reasons
20  why the CHIP computer system was actually created?
21          MS. CITERA: Objection to form.
22          MR. ANDERSON: I'll rephrase to be more
23  specific.
24  BY MR. ANDERSON:
25  Q.      Sir, is it true that one of the reasons

Page 169

1   why Abbott went to the trouble of creating the CHIP
2   computer system was to assist pharmacies in filing
3   reimbursement claims?
4          MS. CITERA: Objection to form.
5   A.      I don't recall the specific motivation,
6   but clearly it was an area that they requested and
7   were looking for help.
8   Q.      And when you say --
9   A.      The clients.
10  Q.      -- "it," you mean the reimbursement
11  submissions?
12  A.      Correct.
13  Q.      Okay.  Now, looking at what's titled as
14  the third page -- it's actually the fourth page of
15  Exhibit 295.  Were you ever involved or aware of any
16  training that home infusion provided to clients
17  concerning reimbursement?
18          MS. CITERA: Objection to form.
19  A.      I -- I know that Virginia and her team did
20  some.  I don't -- I don't remember specific details
21  of it.
22  Q.      And when you say "Virginia," just so the
23  record is clear, you're talking about Virginia
24  Tobiason, correct?
25  A.      Correct.

43 (Pages 166 to 169)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 170

1  Q.      How many people did you perceive were
2  working with Virginia Tobiason in the reimbursement
3  group?
4  A.      How many people? You mean clients?
5  Q.      No. How -- I'll be more specific.
6          How many Abbott personnel worked with or
7  under Virginia Tobiason concerning reimbursement at
8  Abbott?
9  A.      I -- From straight recall, 15 to 18
10 people. A staff of 15 to 18 is roughly what I would
11 estimate.
12 Q.      Now looking at Page 4 of Exhibit 295. On
13 the left-hand side at the bottom, there's a
14 subsection titled, "Product Acquisition." Do you see
15 that?
16 A.      Yes.
17 Q.      And the first sentence reads, "Abbott will
18 supply all Abbott manufactured products needed by
19 Care Partners on a consignment basis. Payment for
20 these products will not be due until after the
21 program has received compensation from third-party
22 payers." Did I read that correctly?
23 A.      Yes.
24 Q.      And that was -- That statement is a true
25 statement, correct?

Page 171

1  A.      That -- That's revenue sharing, yes.
2  Q.      And that's consistent with the overall
3  operation by Abbott Home Infusion to basically loan
4  products to their clients, correct?
5          MS. CITERA: Objection to form.
6  A.      Correct.
7  Q.      And so that's not something that was
8  limited to Care Partners but rather was part of the
9  overall business model of Abbott Home Infusion?
10 A.      Yeah. That's part of what -- That's
11 fundamental to doing the revenue share the way we
12 structured it.
13 Q.      Now looking to the right, sir, a
14 subsection titled, "Reimbursement Services" -- Do you
15 see that?
16 A.      Yeah.
17 Q.      And the first sentence in the second
18 paragraph reads, "Abbott has been providing home
19 infusion reimbursement services for over 12 years and
20 is nationally recognized as a leader in
21 reimbursement." Did I read that correctly?
22 A.      Yes.
23 Q.      Is that a true statement?
24 A.      Yeah.
25 Q.      Reading the next sentence, "For example,

Page 172

1  two Abbott executives sit on the national -- on the
2  board of the National Association of Infusion
3  Therapy." Did I read that correctly?
4  A.      Yes.
5  Q.      Were you ever involved with the National
6  Association of Infusion Therapy?
7  A.      No.
8  Q.      In your experience, did Abbott interact
9  with provider trade groups or other organizations
10 representing providers on legislative or other
11 related issues?
12         MS. CITERA: Objection to form.
13 A.      Oh, boy. I don't recall the specific
14 groups, but clearly in the -- in the process of being
15 so involved in reimbursement, I do recall we had an
16 expertise and that -- I don't recall who the other
17 individual might have been, but Virginia sat on some
18 boards. I don't recall specific associations or what
19 they were.
20 Q.      You just have a general memory that
21 Virginia Tobiason was participating in some provider
22 organizations and sitting on some boards as a
23 representative of Abbott?
24         MS. CITERA: Objection to form.
25 A.      Yes, recognized -- well recognized as an

Page 173

1  authority in this area.
2  Q.      And your perception was that Ms. Tobiason
3  wasn't only recognized within Abbott as a
4  reimbursement expert but was actually recognized
5  outside of Abbott in the industry as a reimbursement
6  expert, correct?
7          MS. CITERA: Objection to form.
8  A.      That was my impression, yes.
9  Q.      And so to the extent she had expertise in
10 reimbursement, you would have expected her to
11 understand Medicaid rules and regulations and
12 Medicare rules and regulations, correct?
13         MS. CITERA: Objection to form.
14 A.      Yeah.
15 Q.      Now, if you could, look at what's titled
16 Page 13 of Exhibit 295. It's actually the 14th page
17 of the exhibit titled, "Product Support." And
18 specifically down at the bottom, the section titled,
19 "Non-Abbott Product," I'm going to read for the
20 record. "To access other manufacturers' products, we
21 will enroll Care Partners in a purchasing program at
22 no additional cost. Ninety plus percent of all
23 products needed for home infusion can be obtained
24 through our program at the lowest cost in the
25 industry." Did I read that correctly?

44 (Pages 170 to 173)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 174

1    A.       Yes.
2    Q.       Does that jog your memory at all about
3    Abbott's use of buying groups in the home infusion
4    arena?
5          MS. CITERA:  Objection to form.
6    A.       I -- I don't recall -- I really don't
7    recall the details of -- of who that -- There may
8    have been alternate site distributors that were in
9    this market, but I -- I don't recall the specifics
10   of -- of how that was arranged.
11   Q.       Your -- If I understand correctly, you're
12   having some vague memory that Abbott may have set up
13   some arrangements with alternate site distributors to
14   provide non-Abbott products when necessary to home
15   infusion clients?
16   A.       Correct.
17   Q.       Okay.  And so accordingly, I take it
18   Abbott was aware of what the prevailing market prices
19   were for these non-Abbott drugs, correct?
20         MS. CITERA:  Objection to form.
21   A.       Prevailing -- What do you mean by
22   "prevailing market price"?
23   Q.       Well, Abbott was actually referring home
24   infusion clients to this buying group, correct?
25         MS. CITERA:  Objection to form.

Page 175

1    A.       Again, the specifics of how -- The
2    mechanics of this I don't recall.  I mean --
3    Q.       I understand.  I don't want to get you
4    down into an area of specificity you're not familiar
5    with.
6          Just big picture, did you understand that
7    Abbott was aware of what the market prices were on
8    competitive products?
9          MS. CITERA:  Objection to form.
10   A.       I -- Clearly we had to have some rough
11   idea because we had pharmacies that were using some
12   of these products in the compounding of products.
13   So, yes, we -- we had knowledge.
14   Q.       We've got about five minutes.  I'm going
15   to keep going and hopefully we can get through this
16   before the break.
17         If you could, look at what's titled
18   Page 15, "Abbott Reimbursement Services."
19   A.       Uh-huh.
20   Q.       I'm going to specifically point your
21   attention to the section titled, "Operation."
22   A.       Uh-huh.
23   Q.       Reading for the record, quote, Our
24   centralized operation is facilitated with an
25   extensive database, a sophisticated computer system

Page 176

1    and a core of specialists with practical in-depth
2    understanding of home infusion reimbursement."  Did I
3    read that correctly?
4    A.       Yes.
5    Q.       And that's consistent with your experience
6    at Abbott, correct?
7    A.       Yeah.  I -- I might question the
8    sophisticated part remembering a lot of paperwork and
9    other stuff that was involved in working around it;
10   but we had a computer system, the CHIP that we were
11   using.
12   Q.       And over time you all were trying to
13   improve and -- and alleviate some of the need for
14   paper, correct?
15   A.       Yeah, selectively acquiring funds to do
16   some of those upgrades.  And in the meantime, those
17   18 people shuffled a lot of paper to get it done.
18   Q.       Right.
19         Continuing on, "Our reimbursement
20   specialists thoroughly understand the medical
21   language, appropriate diagnosis and different
22   requirements of payers."  Did I read that correctly?
23   A.       Uh-huh.
24   Q.       And is that basically a reference to your
25   prior testimony that Abbott was aware of the

Page 177

1    reimbursement methodologies of payers such as
2    Medicaid and Medicare?
3          MS. CITERA:  Objection to form.
4    A.       I mean, part of what that reimbursement
5    operation was billing was to third-party payers as
6    well as to Medicare and Medicaid.
7    Q.       And so just big picture, Abbott was aware
8    of those programs such as Medicaid and Medicare's
9    reimbursement methods, correct?
10         MS. CITERA:  Objection to form.
11   A.       They had to be.  It's a part of conducting
12   the business.
13   Q.       Looking at the next page, Page 16, are you
14   familiar with the entity known as a DMERC -- an
15   acronym known as a DMERC?
16   A.       I think it was like a region of
17   reimbursement.  I don't remember if it was -- I think
18   it might have been Medicare.  So there were regions
19   that were set up.  I think that's what it is.
20   Q.       And did Abbott take steps to stay abreast
21   of the reimbursement methods of the various regional
22   Medicare carriers?
23         MS. CITERA:  Objection to form.
24   A.       Well, we and anyone else that was billing
25   needed to, yes.

45 (Pages 174 to 177)

Page 178

1  Q.      Yes, sir.
2      And -- And Abbott was, in fact, billing;
3  so that's why Abbott stayed abreast of those
4  reimbursement issues, correct?
5      MS. CITERA:  Objection to form.
6  A.      Correct.
7  Q.      Did you ever have any interaction with
8  Abbott's legislative representatives based in
9  Washington D.C.?
10 A.      No.
11 Q.      Were you aware that Abbott had legislative
12 representatives based in Washington D.C.?
13 A.      Yes.
14 Q.      Were you aware that Abbott's legislative
15 personnel were, in part, responsible for following
16 Medicaid and Medicare issues?
17     MS. CITERA:  Objection to form.
18 A.      More through assumption than specific
19 knowledge.
20 Q.      But at least from your perspective, you
21 assumed that those people were, in part, following
22 Medicaid and Medicare issues, correct?
23     MS. CITERA:  Objection to form.
24 A.      Reasonable assumption, yes.  They were in
25 Washington.

Page 179

1  Q.      Now, specifically looking at the page
2  titled, "Care Partners Therapy Margin Analysis."  And
3  I can give you the Bates number, Mr. Brincks, to help
4  you.  It's ABTWV 16887.
5  A.      So therapy margin?
6  Q.      Yeah.  It's titled, "Therapy Margin
7  Analysis."
8  A.      Yeah, I see it.
9  Q.      Is this an example of a specific
10 projection that Abbott would have created for a given
11 home infusion client or prospective client?
12     MS. CITERA:  Objection to form.
13 A.      Absolutely.
14 Q.      And it's your understanding and -- and
15 memory that Abbott would have created these for all
16 of the 20 or 30 home infusion accounts that Abbott
17 Home Infusion had, correct?
18     MS. CITERA:  Objection to form.
19 A.      Yes.  This would have been a part of the
20 process.
21 Q.      Now, if you could, flip to the
22 second-to-last page of Exhibit 295.
23 A.      Uh-huh.
24 Q.      This page is titled, "Collection
25 Percentage," correct?

Page 180

1  A.      Yes.
2  Q.      And it breaks down different payers such
3  as Medicare and Medicaid, correct?
4  A.      Yes.
5  Q.      And was this also consistent with your
6  understanding and memory of how Abbott would
7  prepare -- prepare these types of packages for other
8  home infusion clients?
9  A.      Yeah.  Oh, yeah.
10 Q.      So for all of the clients at home
11 infusion, Abbott would have provided some type of
12 collection analysis, correct?
13     MS. CITERA:  Objection to form.
14 A.      Correct.
15 Q.      And is it consistent with your experience
16 that Medicare and Medicaid would usually comprise
17 about half or more of the overall reimbursements?
18 A.      That doesn't strike me as out of line, but
19 it would vary by -- by hospital or arrangement.
20 Q.      But at least Abbott personnel knew that
21 Medicare and Medicaid were major reimbursers in the
22 home infusion arena, correct?
23     MS. CITERA:  Objection to form.
24 A.      Well, they were clearly indicated on the
25 analysis and -- and every client had some clearly on

Page 181

1  here.
2  Q.      And -- And that indicates to you that
3  Abbott knew that these were important reimbursers to
4  analyze in the home infusion arena?
5      MS. CITERA:  Objection to form.
6  A.      In the home infusion market, we knew that
7  we had to include them in this analysis, yes.  To --
8  To exclude them would have been an incomplete
9  analysis for the clients that were understanding this
10 business.
11     MR. ANDERSON:  We've got to take a break
12 to switch tapes.
13     MR. STETLER:  Perfect timing.  I don't
14 care how long it is as long as it's three minutes.
15     THE VIDEOGRAPHER:  Off the record at
16 13:59.
17         (Recess taken.)
18         - - -
19     THE VIDEOGRAPHER:  On the record at 14:06.
20 BY MR. ANDERSON:
21 Q.      Mr. Brincks, looking back at the second
22 page of Exhibit -- the second-to-last page of
23 Exhibit 295, can you explain what is meant by "Payer
24 Mix"?
25 A.      It means the percentage of the total.

46 (Pages 178 to 181)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 182

1  Q.      So, for instance, under Medicare for TPN,
2  a payer mix is listed of 26.6 percent, correct?
3  A.      Yes.
4  Q.      Does that mean that roughly 27 percent of
5  the claims that are filed as projected by Abbott Home
6  Infusion for Care Partners would be Medicare claims?
7  A.      Yes.
8  Q.      Okay.  And, likewise, for Medicaid, you
9  all were projecting roughly 22 percent of the claims
10  would be Medicaid claims?
11  A.      Correct.
12  Q.      And then this analysis is broken out by
13  drug type; for instance, you've got TEN, ABT, IPC,
14  CHM and IVH, correct?
15  A.      Yes.  Therapeutic categories, I guess you
16  might call them.
17  Q.      Where did the injectable antibiotics and
18  other injectable drugs fall?
19  A.      ABT, antibiotics.
20  Q.      Okay.  Thank you.
21          And what about the fluids such as sodium
22  chloride or dextrose?
23  A.      I think that's that IVH, which is IV
24  hydration as I recall.
25  Q.      Was it your understanding when you left

Page 183

1  the home infusion group in 1995 that files were kept
2  for all of the Abbott Home Infusion customers?
3          MS. CITERA:  Objection to form.
4  A.      Those that would have been active and
5  consistent with the retention policy that I described
6  earlier.
7  Q.      Right.
8          And -- And it's your understanding that
9  when you left the home infusion group in 1995, there
10  would have been anywhere from 20 to 30 home infusion
11  clients, correct?
12          MS. CITERA:  Objection to form.
13  A.      That -- That was my estimate, yeah.
14  Q.      So you would expect that there should be
15  documentation such as Exhibit 295 and pertinent
16  contracts, et cetera, for anywhere from 20 to 30
17  customers, correct?
18          MS. CITERA:  Objection to form.
19  A.      Reasonable.
20  Q.      That's a reasonable assumption?
21  A.      Yes.
22  Q.      What is meant by the term "collection
23  percentage"?
24          MS. CITERA:  Objection to form.
25  A.      That is the percentage of the billable

Page 184

1  rate that you would anticipate collecting through the
2  various payers.
3  Q.      So I take it to the extent the collection
4  percentage is not 100, that the submitted claim for
5  reimbursement would exceed the actual amount received
6  in reimbursement?
7          MS. CITERA:  Objection to form.
8  A.      I don't -- I don't remember the actual
9  claim -- you know, the level that it went in at, but
10  I believe that would be accurate that there was a
11  billable rate and that the payment coming from
12  Medicare was at 47-and-a-half percent of that as an
13  example.  So netting $272 of revenue to the
14  operation.
15  Q.      So like, for instance, in comparing the
16  antibiotics between private and Medicaid, I notice
17  Medicaid is listed as 28 percent collection
18  percentage and private is listed as 70 percent,
19  correct?
20  A.      In which one again?
21  Q.      Antibiotics, ABT.
22  A.      Yeah.
23  Q.      Does that indicate to you that the private
24  reimbursement was greater or less than the Medicaid
25  reimbursement on antibiotics?

Page 185

1  A.      Greater.  And as I recall, it's that
2  Medicare and Medicaid were much slower to adopt that
3  therapy regimen at home.  So that is reflected in the
4  reimbursement rates.
5  Q.      Oh, I see.
6          So that some claims for antibiotics were
7  not accepted by Medicaid; they were just simply
8  rejected?
9  A.      I don't remember if they were rejected or
10  if they just paid them at a -- at a very, very low
11  rate.  I don't -- I don't recall.  They may have
12  rejected some.
13  Q.      Did -- In your view and experience, were
14  private payers basing reimbursements generally on AWP
15  for drug ingredient costs?
16  A.      Yes.
17  Q.      So in that respect, the way the government
18  was paying was not different than the way private
19  reimbursers were paying for drugs?
20  A.      Yes.
21          ---
22          And, thereupon, Exhibit No. 1102 was
23  marked for purposes of identification.
24          ---
25  BY MR. ANDERSON:

47 (Pages 182 to 185)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 186

1  Q.      Now, if you could, Mr. Brincks, please
2  review what's been marked as Exhibit 1102.
3  A.      Okay.  The profile on home infusion?
4  Q.      Yes, sir.
5          Are you familiar with this type of
6  document?
7  A.      Oh, yeah.  This would have been the
8  internal HPD newsletter -- the hospital products
9  division.
10  Q.      And who would have been -- When you say
11  "internal," would this have been transmitted to all
12  HPD personnel?
13  A.      Yes.
14  Q.      So, for instance, personnel working in the
15  business -- the hospital business sector as well as
16  alternate site as well as home infusion would have
17  all been on the mailing list for this newsletter?
18  A.      I believe so.  Yes.
19  Q.      And was this newsletter or a similar
20  newsletter published at least quarterly over your
21  tenure at Abbott?
22  A.      Quarterly?  I don't recall the frequency
23  to be honest.  I mean, I remember seeing a number of
24  these, but I don't remember if it was quarterly or if
25  it was monthly for a while and then went to

Page 187

1  quarterly.  I don't remember.
2  Q.      You -- You recall that it was circulated
3  routinely, you just don't recall the frequency?
4  A.      Yes.
5  Q.      Looking at the fifth page of the document
6  titled, "Business Profile" --
7  A.      Uh-huh.
8  Q.      -- subtitled, "Home Infusion Services
9  Contribute To Growth of Hospitals and Abbott."  Did I
10  read that subtitle correctly?
11  A.      Uh-huh.
12  Q.      You're quoted in the third paragraph?
13  A.      Uh-huh.
14  Q.      I'm going to read that.  This is a quote
15  attributed to you.  Quote, These days hospitals have
16  a strong motivation to move patients from inpatient
17  to home patient status as soon as possible, says
18  David Brincks, manager contract marketing.  Did I
19  read that correctly?
20  A.      Yeah.
21  Q.      Why was it that hospitals had a strong
22  motivation to move patients from inpatient to home
23  patient?
24  A.      The underlying premise, as I recall, again
25  was the cost of overhead and caring for patients in

Page 188

1  the actual hospital setting and that that was -- They
2  either had to expand and keep adding beds or they had
3  to figure out ways of treating people in their homes.
4  And they were finding that for, in particular, these
5  TPN or nutritional patients that there was a good
6  opportunity to deliver care and not incur incremental
7  capital expenditures that they didn't require.  That
8  was the fundamental premise.
9  Q.      Did you understand that hospitals had a
10  motivation to move patients from inpatient to home
11  patient based on different reimbursement mechanisms
12  used outpatient as opposed to inpatient?
13          MS. CITERA:  Objection to form.
14  A.      No.  Again, didn't -- I wasn't familiar
15  enough with the in-hospital reimbursement and rate,
16  just knew that underlying premise in the -- in the
17  marketplace that they were looking to try to treat
18  people outside of the hospital instead of having to
19  keep adding the beds.
20  Q.      Why would that concept of having to add
21  beds not have existed previously?
22  A.      I think the technology for infusion and
23  the ability to train technicians to do it at home
24  provided the opportunity.  So pump technologies and
25  other things emerged to a point where previously

Page 189

1  needing to bring people in under the direct
2  supervision and care of a caregiver in hospital --
3  The technology improved to the point where you could
4  care for that patient reasonably well in their own
5  home.
6  Q.      Looking at the bottom, there's a picture
7  there.  And I know the picture is not very clear, but
8  the caption reads, "Abbott Home Infusion Services
9  business development consultant Sue Sweeney discusses
10  financial results with customers from CM Healthcare
11  Resource, slash, Children's Memorial Home Health,
12  Inc., of Chicago," correct?
13  A.      Yes.
14  Q.      Is that the type of meeting where Abbott
15  would provide information similar to what was
16  reflected in Exhibit 295?
17          MS. CITERA:  Objection to form.
18  A.      No.  This would have been after -- This
19  was part of the proposal process.  So you went
20  through and -- depicting what the home infusion
21  arrangement was.  This would have been after they
22  became a client, you would meet, see how the business
23  was going, what was going well, what wasn't going so
24  well.
25  Q.      I understand your distinction.  So

48 (Pages 186 to 189)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 190

1  Exhibit 295 would be the projections as you've
2  testified, and documents similar to that would have
3  been looking forward.  And, likewise, after Abbott
4  Home Infusion had done business with a client over
5  some time period, then there would be business
6  reviews conducted, correct?
7  A.     Yeah, to the -- Sales people would meet
8  with the customer, see how the provision of services
9  was going.  They might -- They would review results.
10  Q.     Was there some type of documentation
11  created to document that business analysis?
12  A.     Not to my knowledge.  I mean, it very much
13  was driven by how the client wanted to conduct it.
14  So the sales reps would -- would go in to support and
15  be a part of that meeting, but often it was based on
16  their procedures or their process for going through
17  the business reviews as I recall.  So it was very
18  much more driven by the preferences of the clients
19  and what their normal process was for reviewing parts
20  of their business.
21  Q.     Do you expect that any documentation that
22  was created concerning these reviews would have been
23  maintained by Abbott in the clients' files?
24      MS. CITERA:  Objection to form.
25  A.     Not as a specific discipline.  My

Page 191

1  interpretation is the sales reps would have at
2  varying degrees saved some of those documents.  There
3  was not a consistent, you know, policy in that
4  regard.
5          - - -
6      And, thereupon, Exhibit No. 1103 was
7  marked for purposes of identification.
8          - - -
9  BY MR. ANDERSON:
10  Q.     Mr. Brincks, if you could, take a look at
11  what's been marked as Exhibit 1103.  I just have the
12  one copy, but it's just one page.  And I have just a
13  couple of quick questions about it.
14  A.     Okay.
15      MR. STETLER:  You make us take home copies
16  of the thick ones and then we just don't get the easy
17  ones.
18      THE WITNESS:  Can I get some water real
19  quickly?
20      MR. ANDERSON:  Sure.
21      THE WITNESS:  Thanks.
22      MR. ANDERSON:  Let's go off for just a
23  moment.
24      THE VIDEOGRAPHER:  One moment.
25      Off the record at 14:20.

Page 192

1      (Recess taken.)
2          - - -
3      THE VIDEOGRAPHER:  On the record at 14:21.
4  BY MR. ANDERSON:
5  Q.     Mr. Brincks, does what's been marked as
6  Exhibit 1103 look like the type of document you're
7  familiar with?
8      MS. CITERA:  Objection to form.
9  A.     Yes.  This -- This would have been a
10  mechanism to add a therapy that was not perhaps
11  characterized in the initial agreement.
12  Q.     And -- And so let's break that down a
13  little bit.
14      When you say "add a therapy," for
15  instance, in essence, Abbott would be agreeing to the
16  revenue share for a specific category that had not
17  been previously set forth in the contract with the
18  customer, correct?
19  A.     Yeah.  In this case, Baylor must have made
20  a decision, hey, we want to provide steroid
21  treatments for patients in the home setting and we
22  want to incorporate that through the home infusion
23  operation.  And then you would establish a -- this
24  rate.  That's the revenue share rate.
25  Q.     And it's signed by your successor and

Page 193

1  manager -- as manager of contract marketing and home
2  infusion Mike Calpin?
3  A.     Calsin, yeah.
4  Q.     Calsin.
5      And -- And you would have signed similar
6  types of documents when you were in that position,
7  correct?
8  A.     I -- Yes.
9  Q.     I notice that Karla Kreklow is shown as
10  receiving a courtesy copy, correct?
11  A.     It looks -- Yes.
12  Q.     Does that -- the fact that she's copied
13  there jog your memory that Karla was holding some
14  type of supervisory role over home infusion field
15  sales reps?
16  A.     Yes, because I know she started in
17  alternate site, but I -- I do recall that she
18  transitioned -- and it may have been right when I was
19  moving on that Karla took on a sales role within home
20  infusion services, but it was probably right at that
21  transition point.
22  Q.     So what you're remembering is that Karla
23  was working in some kind of sales role at alternate
24  site product sales and then she transitioned over to
25  some type of sales management role at home infusion

49 (Pages 190 to 193)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 194

1  services, correct?
2  A.      That is my recollection.
3  Q.      All right.  Now, if you could, sir, take a
4  look at what's been marked in this case as
5  Exhibit 905.
6  A.      Okay.
7  Q.      Do you know what position Bruce Rodman
8  held at Abbott?
9  A.      Let's see.  I remember Bruce was in --
10  reported to Virginia Tobiason.
11  Q.      So your memory is that Bruce Rodman was
12  working in home infusion reimbursement somehow?
13  A.      Yes.
14  Q.      In looking specifically at the e-mail from
15  Bruce dated March 15, 2001, do you see he references
16  the CHIP system receiving AWP information from First
17  Data Bank?
18  A.      I see it.
19  Q.      And, likewise, he references Red Book AWP
20  information being provided to the CHIP system; is
21  that correct?
22  A.      I see that, yes.
23  Q.      Is that consistent with your memory that
24  the CHIP system did, in fact, contain Red Book and
25  First Data Bank AWP information?

Page 195

1          MS. CITERA:  Objection to form.
2  A.      Yeah.  This is dated 2001.  Clearly it was
3  a part of the billing process, but I don't recall how
4  it got in there; but in order to bill, it had to have
5  AWP.  So, yes, CHIP -- CHIP would have had AWP.
6  Q.      And to the extent anyone wanted to
7  determine what AWP information was being published
8  for an Abbott product, will you agree with me that
9  that information could have been obtained both
10  through review of a physical publication or
11  electronic access to the CHIP system?
12          MS. CITERA:  Objection to form.
13  A.      I am unaware of how that was positioned at
14  all relative to CHIP versus AWP sources.  Is that
15  your question?
16  Q.      Well, it might have been a bad question.
17  I'll rephrase.
18          After reviewing Exhibit 905, does that jog
19  your memory that in addition to having physical
20  publications containing AWP and other pricing
21  information from Red Book and First Data Bank, Abbott
22  personnel also could access the CHIP computer
23  software or computer program and find AWP
24  information?
25          MS. CITERA:  Objection to form.

Page 196

1  A.      My personal experience was doing case
2  management.  And when we did case management, we
3  literally in the time I was there were pulling it off
4  the books, using them in front of us.  How the team
5  in home infusion and what specifically -- how CHIP in
6  that group -- what they were doing and using I do not
7  recall specifically, you know, what was in the
8  system, how it got in the system, how they were
9  referencing and looking up AWP.  I don't recall that.
10  Q.      I notice that Exhibit 905 dates back to
11  2001, correct?
12  A.      Yes.
13  Q.      And obviously that was after your time in
14  home infusion up through '95, correct?
15  A.      Correct.
16  Q.      Does Exhibit 905 indicate to you that --
17  that the home infusion personnel transitioned from
18  referencing the physical Red Book and First Data Bank
19  books to referencing the CHIP computer system in
20  finding AWPs?
21          MS. CITERA:  Objection to form.
22  A.      I mean, what I have to base that on is the
23  same document that you're looking at.  And it says
24  Red Book's database provided to our CHIP system
25  reports AWP per each at $99.58.  So I have no other

Page 197

1  information to base that response on.  But that would
2  indicate that it's in the system.
3  Q.      Thank you.
4          Are you familiar with a document known as
5  the CHIP Reimbursement User Guide?
6  A.      Certainly not from straight recall, no.
7  Q.      Do you recall just as a general matter
8  that while you were in home infusion that a CHIP
9  Reimbursement User Guide was created?
10  A.      I do not specifically recall it.
11          - - -
12          And, thereupon, Exhibit No. 1104 was
13  marked for purposes of identification.
14          - - -
15  BY MR. ANDERSON:
16  Q.      If you could, take a look at what's been
17  marked as Exhibit 1104.  It's a one-page document
18  that is one portion of what's labeled a CHIP
19  Reimbursement User's Guide.
20  A.      Okay.
21  Q.      Does Exhibit 1104 jog your memory at all
22  about CHIP containing Red Book information such as
23  AWP?
24  A.      No.  Consistent with what I described
25  earlier -- I -- I mean, I see the document.

50 (Pages 194 to 197)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 198

1    Q.      Do you recall any effort or discussions
2    within Abbott about the creation of CHIP and the
3    inclusion of AWP information in the CHIP system?
4           MS. CITERA:  Objection to form.
5    A.      Given that you had a system that was
6    attempting to automate billing and given that that
7    process required the use of AWP, yeah, it --
8    Q.      It inherently --
9    A.      -- more lines up just to make sense.
10   Q.      I didn't mean to step over you there.
11          Basically you recall that the CHIP system
12   inherently needed to have AWP information contained
13   in it because AWP was one key component of
14   reimbursement claims, correct?
15          MS. CITERA:  Objection to form.
16   A.      In the home infusion market, yes.
17   Q.      Mr. Brincks, please take a look at what's
18   been marked in this case as Exhibit 362.
19   A.      Okay.
20   Q.      Does any part of Exhibit 362 look familiar
21   to you in any way?
22   A.      Well, clearly I think it was linked back
23   to the question on Vancomycin earlier, but I don't --
24   You know, remembering specifically these documents --
25   I mean, I see them in front of me now.

Page 199

1    Q.      Have you in any way reviewed documents
2    similar to Exhibit 362 in preparing to testify?
3    A.      No.
4    Q.      Have you in any way discussed documents
5    similar to Exhibit 362 with Mike Sellers, Gerry
6    Eichhorn or any other Abbott personnel?
7           MS. CITERA:  Objection to form.
8    A.      In what time frame are you referring to
9    the discussion?
10   Q.      Within the past two or three years.
11   A.      Absolutely not.  I haven't talked to
12   either one of them.
13   Q.      Have you had any contacts at all with Mike
14   Sellers in the past couple years?
15   A.      No.
16   Q.      Do you think -- Do you exchange Christmas
17   cards or anything like that with Mike?
18   A.      No.
19   Q.      Which former -- Well, strike that.
20          Which Abbott employees or former employees
21   do you still communicate with on an infrequent
22   personal basis?
23          MS. CITERA:  Objection to form.
24   A.      Define Abbott for me because I've been
25   here at Ross for a long time so that I --

Page 200

1    Q.      People that you would have worked with at
2    Abbott Home Infusion or hospital products.
3    A.      I -- No one really.  I don't -- No one.
4    Q.      Do you have any familiarity with documents
5    similar to the first page of Exhibit 362?
6           MS. CITERA:  Objection to form.
7    A.      Documents familiar?  No.
8    Q.      Have you ever seen a document similar to
9    the first page of Exhibit 362?
10          MS. CITERA:  Objection to form.
11   A.      I'm looking at it in front of me now.
12   And, again, clearly as a part of this Vancomycin
13   discussion; but I -- I don't remember the details of
14   this.  This is not a regular document I would have
15   seen, but I -- This is not a regular -- Like these
16   (indicating) -- I remembered all these (indicating).
17   We did this all the time.  This I'm not familiar with
18   seeing on a regular basis.
19   Q.      Do you believe it's likely that you
20   received the documents that comprise Exhibit 362 back
21   at or near the time that you were involved in
22   Vancomycin price changes in 1995?
23          MS. CITERA:  Objection to form.
24   A.      Again, just to -- I remember the -- the --
25   the question came in from one of our clients about

Page 201

1    Vancomycin AWP.  I forwarded the question on to Gerry
2    Eichhorn; and in that correspondence, this document
3    is likely to have been in that exchange.  I just
4    don't specifically recall it.  I didn't see it on a
5    regular basis.  But it's reasonable that it was a
6    part of that exchange.
7    Q.      And when you say "this document," you're
8    talking about the four pages that comprise
9    Exhibit 362, correct?
10          MS. CITERA:  Objection to form and
11   foundation.
12   A.      Yeah.  I mean, none of them are
13   inherently, you know, again like these (indicating)
14   where I remember we did them on a regular basis, but
15   I -- but I see them.
16   Q.      Are you at all familiar with Abbott
17   comparisons of AWPs?
18          MS. CITERA:  Objection to form.
19   A.      Comparison?  What do you mean by
20   comparison of AWPs?
21   Q.      I'll -- I'll try to be more specific.
22          Did -- In your experience, did Abbott
23   personnel ever compare the AWP of an Abbott product
24   with the AWP on a competitive product?
25          MS. CITERA:  Objection to form.

51 (Pages 198 to 201)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 202

1  A.      Again, given the way that we used AWP, no,
2  I was not specifically aware.  But obviously I'm
3  sitting here looking at this document that you've now
4  placed in front of me and I see it.  But I do not
5  recall where that was a document where I was
6  involved in at all nor was aware of.  I just wasn't
7  involved in the -- in that pricing component with the
8  HBS contract marketing.
9  Q.      You felt like that any comparisons of AWP
10 between Abbott products and competitive products
11 would have been handled by the HPD contract marketing
12 department?
13        MS. CITERA:  Objection to form.
14 A.      From an analytical perspective.  I mean,
15 the -- the Red Book -- I mean, there were all sitting
16 right there all together.  It -- This wasn't --
17 didn't take a lot to see them right next to one
18 another.  So to say that you didn't have awareness of
19 AWPs looking at Red Book or Blue Book would -- would
20 not be a fair characterization.
21 Q.      I -- I think I understand what you're
22 saying.  What you're saying is it wasn't rocket
23 science to compare AWPs because the AWPs on all the
24 various Vancomycin products that competed with one
25 another were in the Red Book on the same page of

Page 203

1  paper, correct?
2        MS. CITERA:  Objection to form.
3  A.      Everybody else was looking at the same
4  documents I was looking at.  So whether you were a
5  hospital or you were me, we all got the Red Book and
6  there they were, so...
7  Q.      And so to the extent AWPs was
8  significantly higher than competitive Vancomycin
9  products, that was pretty readily available
10 information to the pharmacy providers and even
11 personnel within Abbott, correct?
12        MS. CITERA:  Objection to form.
13 A.      I think that was part of the role that Red
14 Book -- that they were playing I think.  I mean, you
15 had those documents.  So they were in there.
16 Vancomycin had them all listed.  They were all there.
17 Q.      And so the answer to my question just for
18 clarity of the record would be yes, correct?
19        MS. CITERA:  Objection to form.
20 A.      Yes.
21 Q.      Now, looking at the second page of
22 Exhibit 362, do you recognize any of the handwriting
23 on Exhibit 362 -- the second page of Exhibit 362?
24 A.      Yeah.  That's my -- Probably my
25 handwriting on the -- on the lower right.

Page 204

1  Q.      When you're -- You're indicating on the
2  lower right.  And what you mean, sir, is when you
3  turn the document horizontal like a landscape, the --
4  A.      Yeah, right here (indicating).
5  Q.      -- the parenthetical 1; is that correct?
6  A.      Yes.
7  Q.      And then, likewise, I take it these --
8  these prices that have been handwritten in the middle
9  of the page for the Abbott Vancomycin products, those
10 are your handwriting?
11 A.      I'm -- I'm less certain on that.  I can
12 tell from the script.  But it doesn't look dissimilar
13 from my writing.  I'm just not sure what the, you
14 know, calculations were or where I got it.
15 Q.      Well, I -- We'll -- We'll get to that,
16 Mr. Brincks.  And I -- I appreciate that.
17        This may seem a little strange, but do you
18 mind writing some numbers down for me?
19 A.      Sure.
20 Q.      Could you write $8.91 and $89.06 and
21 $17.81?
22 A.      (Witness complies.)
23 Q.      Now if I could take a look at that.
24 A.      Sure.
25        MS. CITERA:  Are you going to mark this as

Page 205

1  an exhibit?
2        MR. ANDERSON:  Yeah.
3  BY MR. ANDERSON:
4  Q.      Now, sir -- Now that you've written down
5  those prices --
6        MR. ANDERSON:  Let's go ahead and mark it.
7        MS. CITERA:  Can I take a look at it?
8        MR. ANDERSON:  Sure.
9        MR. STETLER:  You should keep that.
10 Do want this or should I give it to him?
11        MR. ANDERSON:  If you could, give it to
12 him.  Thank you, Dave.
13        ---
14        And, thereupon, Exhibit No. 1105 was
15 marked for purposes of identification.
16        ---
17 BY MR. ANDERSON:
18 Q.      Now that you've written -- handwritten
19 today those three prices on Exhibit 1105 and
20 comparing those to the prices that are in the middle
21 of the two right-hand columns on the second page of
22 Exhibit 362, does that indicate to you that you did,
23 in fact, write in those prices?
24 A.      I think so.
25 Q.      Do you -- Now that you've reviewed

52 (Pages 202 to 205)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 206

1  Exhibit 362, is your memory jogged at all about the
2  thought process that you had in changing these
3  Vancomycin AWPs?
4       MS. CITERA:  Objection to form.
5  A.      Again, the process -- This may -- I'm
6  trying to recall the communications that may have
7  gone with this, because what we were doing -- We had
8  a question from a client.  We were trying to explain
9  the -- the overall -- the question around Vancomycin
10  pricing.  And I don't recall if I was just collecting
11  information back from the team and recalling it.
12       I don't -- I don't remember the flow of
13  information and thought process, because, again, we
14  weren't, in home infusion, doing the actual process.
15  And so we may have been trying to understand it as a
16  part of this.  But that's what I recall.
17  Q.      When you say we, in home infusion, weren't
18  doing the actual process, you're talking about the
19  AWP calculation and submission to the pricing
20  services?
21       MS. CITERA:  Objection to form.
22  A.      Correct.  Home infusion contract
23  marketing, correct.
24  Q.      And -- And, again -- I don't want to be
25  redundant, but the group that you understood was

Page 207

1  responsible for those AWP submissions was the Abbott
2  hospital contract marketing, correct?
3       MS. CITERA:  Objection to form.
4  A.      HBS contract marketing as we've been
5  referring to it.
6  Q.      Right.  Let's look at the third page of
7  Exhibit 362.
8  A.      Okay.
9  Q.      Does that appear to be a document that was
10  faxed from Gerry Eichhorn to you back on or about
11  March 13, 1995?
12  A.      Yeah.
13  Q.      And do you recognize the handwriting
14  that's over to the side of the far right-hand column?
15  A.      Yeah.  That -- That looks like my
16  handwriting as well.
17  Q.      And you see those three prices there,
18  $8.91, $89.06 and $17.81?
19  A.      Say that -- Oh, yeah, $8.91, $89- -- Yes.
20  Q.      And those are the same prices that you had
21  written in the middle column -- the middle of the two
22  right-hand columns on the second page of Exhibit 362,
23  correct?
24  A.      $17.81 -- I see the $17.81, $8.91.  Yeah,
25  I see them.

Page 208

1  Q.      And then you had noted those with a --
2  with a Footnote 1 that reads, quote, Prices to be
3  used for December input to Red Book, et cetera, will
4  be in 1996 printed version," correct?
5  A.      Uh-huh.
6  Q.      After looking at the third page of
7  Exhibit 362 and the second page, do you recall that
8  based upon the pricing analysis that Gerry Eichhorn
9  sent you that you, in turn, made some suggested AWP
10  changes?
11       MS. CITERA:  Objection to form.
12  A.      You know, I -- I don't recall that.
13  Again, I can't -- I don't recall if this was an
14  aggregation of commentary that we had back and forth
15  on the phone, hey, here's -- here is what we've
16  decided to do, here is what it will look like.  I
17  don't -- Beyond that, I don't recall the -- I mean,
18  that's -- that's what I remember.
19  Q.      Why was it -- Big picture just stepping
20  back here, why was it that a client of home infusion
21  services was complaining about an AWP?
22       MS. CITERA:  Objection to form.
23  A.      You know, I don't recall other than when
24  you're looking at that list it -- it -- it stuck out
25  for some reason, but I don't recall the specifics

Page 209

1  behind the question other than it stuck out on that
2  list.
3  Q.      When you say it stuck out, you mean the
4  AWP for Abbott's Vanco was much higher than the
5  competitive Vancos?
6       MS. CITERA:  Objection to form.
7  A.      I literally don't remember if it was
8  higher or lower.  I literally remember it was a
9  request.  They were -- They were -- were confused.
10  They didn't understand it.  I submitted the question
11  in, and we went through this dialogue and process
12  back and forth.
13  Q.      Look at the second page of Exhibit 362,
14  and we'll -- we'll -- we'll do some direct
15  comparison.
16       Do you see Lilly's 1 gam -- 1 gram of
17  Vancomycin called Vancocin at the top of the page?
18  A.      Yes.
19  Q.      Do you see that, sir?
20  A.      I do.
21  Q.      And the AWP is listed as $16.08 roughly,
22  correct?
23  A.      Yes.
24  Q.      And then, likewise, if you go down and you
25  look at Abbott's 1 gram Vancomycin product, the AWP

53 (Pages 206 to 209)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

1  is listed as $60.44, correct?
2  A.     Yes, I see that.
3  Q.     And you'll agree that those two products
4  are competitors, right?
5  A.     Yes.
6  Q.     And then looking at, for instance, the
7  Schein Vancomycin 1 gram product, third from the
8  bottom, you see an AWP listed of $14.04?
9  A.     Yes.
10  Q.     That's also a competitive product,
11  correct?
12  A.     I don't it, but yeah.  Yes.
13  Q.     Does that indicate to you that the Abbott
14  AWP stuck out in the sense that it was, you know,
15  three, four times higher than the competitive
16  products' AWPs?
17         MS. CITERA:  Objection to form.
18  A.     That's what the numbers would say.
19  Q.     Does that jog your memory that, in fact,
20  that was what you identified as -- as the AWP was
21  sticking out?
22  A.     Yes.  That's a fair -- Making the
23  comparison on the numbers, that seems a logical
24  explanation for why we were digging into this and
25  asking.

1  Q.     Do you now remember why it is that a
2  customer of -- a client -- I mean -- pardon me -- a
3  client customer of home infusion services would have
4  been complaining about an Abbott Vancomycin product
5  AWP being much higher than competitive AWPs?
6         MS. CITERA:  Objection to form.
7  A.     Again, I don't want to dive in and -- and,
8  you know -- Obviously it was very, very different and
9  they were perhaps trying to understand why.  I don't
10  remember the -- the foundation for their complaint.
11  I don't -- I don't recall the specifics.
12  Q.     Will you agree with me that to the extent
13  reimbursements founded upon AWP where Vancomycin has
14  an AWP of $60 and yet two of its competitors have
15  AWPs of roughly $15, that that would cause the
16  reimbursement for the Abbott Vanco to be much higher
17  than the competitive reimbursement?
18         MS. CITERA:  Objection to form.
19  A.     It would until the claims were rejected, I
20  assume.
21  Q.     Do you recall that some case managers were
22  rejecting or refusing to approve claims for Abbott
23  Vanco?
24  A.     I don't specifically recall.  Other than
25  this question and this dynamic that we're talking

1  about right now, I do not recall a series of other
2  related questions around Vancomycin.
3  Q.     How often did you get involved in the
4  setting of an AWP?
5         MS. CITERA:  Objection to form.
6  A.     Other than this inquiry from the client,
7  my involvement was in using AWP.  I was not involved
8  in pricing for HBS.
9  Q.     So other than this one situation with
10  Vancomycin back in the spring of '95, you don't
11  recall any other instances where you were involved in
12  the setting of an AWP, correct?
13         MS. CITERA:  Objection to form.
14  A.     No, I don't.
15  Q.     I take it then this was extremely unique?
16  A.     Yes.
17  Q.     Given that it was unique, at the time,
18  didn't you seek to try to understand why it is that
19  customers would -- of Abbott Home Infusion Services
20  were complaining about it and try to understand how
21  it needed to change?
22  A.     Well, in response to the question, I did
23  take action.  I engaged our HBS contract marketing
24  organization and sought out that explanation.  So in
25  response to the question, I went through the Abbott

1  process and the organizations to try to sort it out.
2  So -- And that's what I think you see here.
3  Q.     Did you learn why the Abbott Vancomycin
4  AWP was roughly four times higher than competitive
5  AWPs?
6  A.     You know, I don't remember the explanation
7  that was given back.  I honestly would have to
8  conjecture as to what the reasoning was.  I do
9  remember going through this.  And, again, I don't
10  even remember what the -- what the ultimate
11  resolution or discussion back to the client was, the
12  submission.  I just remember going through the
13  process.  But I don't remember why it was so
14  apparently, you know, out of whack.
15  Q.     I -- I don't want you to speculate, but I
16  do want your best memory of -- of this situation.
17         Did anybody ever explain to you or did you
18  otherwise come to understand any reason whatsoever
19  for the Abbott Vancomycin AWPs being significantly
20  higher than competitive AWPs?
21         MS. CITERA:  Objection to form.
22  A.     I am -- I am saying, again, I do not
23  recall receiving an explanation back as to that
24  dynamic.
25  Q.     Well, you mentioned in one of your prior

54  (Pages 210 to 213)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 214

1   answers that it would require some conjecture.  And
2   really what I am saying, sir, is I would like your
3   best testimony.  If you have some vague memory of
4   what happened or what you learned, I'd like you to
5   provide that.
6           MS. CITERA:  Objection to form.
7   A.      I would have already.
8   Q.      Okay.
9   A.      I've been very forthright in the
10  conversations and I plan on maintaining that.
11          I do not recall in the conversations and
12  dialogue back and forth if there was an explanation
13  describing why that pricing was so different.
14  Q.      Did you believe that there was some kind
15  of problem with the Abbott Vancomycin product having
16  an AWP that was so much higher than the competitors?
17          MS. CITERA:  Objection to form.
18  A.      Enough to the point that I didn't just
19  tell the client that it wasn't a problem and enough
20  to the point that I proceeded and asked the question
21  of our contract marketing organization.
22  Q.      So you did perceive this to be a problem
23  in the sense that you didn't understand what
24  justified such a higher competitive AWP on the Abbott
25  product, correct?

Page 215

1           MS. CITERA:  Objection to form.
2   A.      Correct.
3   Q.      And, ultimately, as reflected in
4   Exhibit 362, you proposed in conjunction with others
5   a significant lowering of the AWPs; for instance, the
6   Abbott 1 gram you proposed the AWP decrease from
7   $60.44 to $17.81, correct?
8           MS. CITERA:  Objection to form.
9   A.      I wrote down that.  Again, I wasn't in a
10  position to propose pricing.  So I wrote down what I
11  believe in the recollections is where we arrived from
12  a pricing standpoint.  That's what I recall.
13  Q.      And you'll agree with me that that $17.81
14  AWP for the 1 gram is much more in line with the
15  Lilly $15.60, the Lederle $11.51 and the Schein $14
16  AWP, correct?
17  A.      I would say that is -- The numbers would
18  indicate that.
19  Q.      Looking at the third page of Exhibit 362
20  again, I'm going to read the text contained at the
21  bottom of the actual spreadsheet.  "Dave, my
22  suggested list price is 5 percent over RxLink and new
23  AWP is calculated at 1.1875 of new list."  Did I read
24  that sentence correctly?
25  A.      Uh-huh.

Page 216

1   Q.      Do you understand what that sentence
2   means?
3           MS. CITERA:  Objection to form.
4   A.      Again, I'm not sure -- I mean, the RxLink
5   I'm not sure the details on again.  I see AWP being
6   calculated off of list.  And so I understand what it
7   says.
8   Q.      Were you familiar with the formula
9   utilized to calculate AWPs from Abbott list prices?
10  A.      I -- I wasn't.  The first exposure I had
11  was this document, and then I don't recall ever in
12  the balance of my time in home infusion seeing it or
13  being involved in it again.
14  Q.      Will you agree that at least in the
15  context of the Vanco price change that you were
16  involved in in 1995 you gained an understanding that
17  there was a formulaic relationship between the list
18  prices set by Abbott and the AWPs that were published
19  for those Abbott products?
20          MS. CITERA:  Objection to form.
21  A.      Yeah, I -- Yeah, I see that.
22  Q.      And specifically when you say you see
23  that, you're referencing the formula of multiplying
24  list of 1.1875 to arrive at AWP, correct?
25  A.      Correct.

Page 217

1   Q.      And did you understand that that same
2   formula was being utilized for all Abbott products --
3           MS. CITERA:  Objection to form.
4   BY MR. ANDERSON:
5   Q.      -- not just Vancomycin?
6           MS. CITERA:  Objection to form.
7   A.      No.  I'm not aware of what the -- if the
8   formula was the same, who calculated it.  I don't
9   recall how that was being applied in other products
10  and in other areas.  You know, the fact that there
11  was a formula, I see.  I just don't recall what the
12  process was across all the products and was the
13  formula exactly the same or was it varied by
14  category.  I have no idea.
15  Q.      Did you discuss this formulaic
16  relationship between list and AWP with Gerry
17  Eichhorn?
18  A.      I don't recall a specific conversation on
19  it.  I -- Again, I remember some of this exchange and
20  I'm seeing these documents.  But I recall submitting
21  the question, asking for feedback and getting most of
22  it in the form of this kind of e-mail and here is
23  what -- here is where it's going to end up for the --
24  the Red Book submission.  And that's what I recall.
25  Q.      So I guess to be fair, you're saying that

55 (Pages 214 to 217)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 218

1   reviewing the four pages that comprise Exhibit 362
2   has assisted you in remembering some of the details
3   about the Vanco price changes in '95, correct?
4   A.      Well, certainly after this many years it
5   was helpful.
6   Q.      And, accordingly, if you had been shown
7   these documents months ago and discussed this issue
8   with Gerry Eichhorn or Mike Sellers, that could have
9   assisted you in remembering the details about these
10  price changes, correct?
11          MS. CITERA:  Objection to form.
12  A.      That's a very logical assumption to make,
13  but I haven't talked with Gerry or Mike in a long
14  time.
15  Q.      I remember that this morning you testified
16  the reason you contacted Gerry Eichhorn was because
17  you all had some contact in grad school, right?
18  A.      Yes, sir.
19  Q.      How long did you go to grad school?
20  A.      Four years.
21  Q.      And so it was kind of an extended time
22  frame because of the fact that you all were doing it
23  in the evenings and weekends, right?
24  A.      Absolutely.
25  Q.      Okay.

Page 219

1   A.      Yes.
2   Q.      Do you have any memory of RxLink
3   acquisition price as another term for wholesale
4   invoice price?
5   A.      You know, you say it.  It's not completely
6   foreign, but I don't remember what it was.
7   Q.      Do you remember in the ordinary course
8   getting copied on form letters to wholesalers about
9   the RxLink program or their invoice pricing?
10  A.      No.
11  Q.      How --
12  A.      No.
13  Q.      I'm sorry.  I didn't mean to step on
14  your -- the end of your answer there.
15  A.      That's all right.
16  Q.      How would that type of information be
17  pertinent to your job duties in home infusion?
18          MS. CITERA:  Objection to form.
19  A.      Not -- Literally I'm not making a
20  connection as to what its relevance would have been.
21  Q.      Let's see if we can help you a little
22  here.
23          - - -
24          And, thereupon, Exhibit No. 1106 was
25  marked for purposes of identification.

Page 220

1           - - -
2   BY MR. ANDERSON:
3   Q.      Please review what's been marked as 1106.
4   A.      Okay.  Okay.
5   Q.      Does Exhibit 1106 assist you in any way
6   remembering the RxLink program?
7   A.      No.
8   Q.      Do you see that on the second page you and
9   Mike Sellers are shown as receiving copies within
10  home infusion services?
11  A.      I do.
12  Q.      Looking at the third page of Exhibit 1106,
13  does that appear to be a form letter sent by Harry
14  Adams to RxLink partners?
15  A.      It does.
16  Q.      Do you have any kind of memory whatsoever
17  about the RxLink program or the way that Abbott
18  billed wholesalers?
19  A.      No.  This probably found its way to my bin
20  pretty quickly.  I -- I -- I do not recall this
21  program or what was done.
22  Q.      When you say found its way to the bin, you
23  mean that you got copied on it but just kind of sat
24  it aside and didn't pay any attention to it?
25  A.      Yeah.  I just don't recall this being a

Page 221

1   relevant component in home infusion.
2   Q.      Now, looking back at the third page of
3   Exhibit 362, do you believe that ultimately Gerry
4   Eichhorn was the one who was providing the analysis
5   about where to set the AWPs?
6           MS. CITERA:  Objection to form.
7   A.      I do not know.  You know, I'm not sure who
8   else on the team may have been involved in -- in
9   doing it.  I don't know if Gerry did it or passed it
10  off to others who had the responsibility, but I do
11  not recall.
12  Q.      Are you familiar in any way or have you
13  ever heard in any way of a formula for setting list
14  price at 5 percent over RxLink acquisition cost?
15  A.      No.
16  Q.      Have you ever heard of a formula for
17  setting list price at 5 percent over wholesale
18  invoice price?
19  A.      No.
20  Q.      Looking at Page 2 of Exhibit 362 and
21  comparing that with Page 4 of Exhibit 362, does
22  Page 4 appear to be just a --
23  A.      Let me get my sequence here.
24  Q.      Oh, yeah, sure.
25  A.      So which pages?

56  (Pages 218 to 221)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 222

1  Q.      If you could, compare Page 4 with Page 2.
2  And does it appear that they're identical except
3  Page 2 has handwriting on it?
4  A.      Yes.
5  Q.      Do you know how the actual printed typed
6  text would have been created?
7  A.      Oh, boy.  I -- I don't remember.
8  Q.      Is it most likely that you created it?
9  A.      No.  No.  I -- I don't recall creating it
10  and going down to NDC numbers.  And it doesn't look
11  like -- It may have been a printout from CHIP, but
12  I'm not certain.
13  Q.      Did CHIP have the capability to be
14  searched for AWP information for different
15  manufacturer drug products?
16  A.      Because our pharmacies compounded products
17  which may have been prescribed by physicians in a
18  home infusion practice and we then turned around and
19  billed, yes, that makes sense to me for us to fulfill
20  what we needed to do.
21  Q.      So is it your best testimony that most
22  likely the -- the typed text contained on Page 4 and
23  Page 2 of Exhibit 362 was created by extracting
24  information electronically from the CHIP program?
25          MS. CITERA:  Objection to form.

Page 223

1  A.      It could -- It could have been or it could
2  have been out of an Abbott HBS system as well.  I'm
3  just unclear.
4  Q.      Did -- Did the Abbott HBS -- that is the
5  hospital business sector -- have computer systems
6  that contained AWP?
7          MS. CITERA:  Objection to form.
8  A.      I do not -- You know, I don't know.  I
9  don't know.  And -- And they would -- I don't know.
10  I don't remember.
11  Q.      It's possible that those computer systems
12  had AWP, but you just don't know one way or the
13  other?
14          MS. CITERA:  Objection to form.
15  A.      I don't -- I don't know one way or the
16  other.
17  Q.      So as best you can tell, the AWP and drug
18  information that's typed on Pages 4 and 2 most likely
19  came from the CHIP system?
20          MS. CITERA:  Objection to form.
21  A.      I would -- Yes.  That would be my most
22  likely estimate.
23  Q.      After being involved in this process of
24  analyzing the relative Vancomycin AWPs reflected in
25  Exhibit 362, do you recall any other involvement you

Page 224

1  had with respect to Vancomycin AWPs in '95?
2          MS. CITERA:  Objection to form.
3  A.      No, I don't.  I don't recall anything
4  beyond this.
5  Q.      Who had access to the CHIP system within
6  Abbott?
7  A.      Who had access?  I don't recall what like
8  access codes and responsibilities were, but it was
9  mostly the reimbursement and the pharmacy operations
10  that would have been directly going in and accessing
11  CHIP, but I don't recall.
12  Q.      How did you access CHIP?
13  A.      Directly I did very little.  I had my
14  staff perhaps generate some reports, but we
15  weren't -- we weren't using in case management CHIP
16  very directly.  That was mostly in the reimbursement
17  and pharmacy operations.  So we might inquire and ask
18  for some data and information, but I don't recall
19  specifics beyond that.  But day to day what we are
20  doing was mostly these (indicating) proposals and
21  spreadsheets and -- and putting those together.
22  Q.      You're --
23          MS. ST. PETER-GRIFFITH:  If we could just
24  have the witness identify which exhibit.
25  BY MR. ANDERSON:

Page 225

1  Q.      You're indicating -- You're indicating the
2  Care Partners proposal?
3  A.      Yeah.  I'm talking about the proposal
4  document.
5  Q.      Which is Exhibit 295?
6  A.      Correct.
7  Q.      Okay.  When you say primarily the
8  reimbursement personnel had access to CHIP, you're
9  talking about -- or did, you know, actively access
10  CHIP day to day, you're talking about Virginia
11  Tobiason's group?
12  A.      Correct.  And then the three pharmacy
13  comparisons that would have been compounding and
14  putting in information into CHIP.
15  Q.      On the -- On the relatively uncommon
16  situation where you would be accessing CHIP or your
17  staff would be accessing CHIP, was it something where
18  you could just do it on your desktop?
19  A.      Boy, I'm really trying to remember.  Case
20  management would have been the one area where we
21  might have dug in for some of this information and,
22  yeah, you just did it -- you could do it up on your
23  desktop.
24  Q.      There was just an icon or something that
25  you would click and then you would be into the CHIP

57 (Pages 222 to 225)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 226

1  system?
2  A.      I don't remember exactly the trail for how
3  it would have been accessed.
4  Q.      But it was -- If you needed to do it, it
5  was relatively easy to do?
6         MS. CITERA: Objection to form.
7  A.      Yeah. But, again, it was -- it was pretty
8  restrictive from an access standpoint. But, yeah,
9  we -- we -- we would have been able to tap it.
10 Q.      Would your boss, Mike Sellers, have been
11 able to do that?
12        MS. CITERA: Objection to form.
13 A.      He might have been able to, but I find it
14 highly unlikely he ever did.
15 Q.      Just because he's probably a busy guy?
16 But he could have accessed the CHIP system if he had
17 wanted to?
18        MS. CITERA: Objection to form.
19 A.      Yeah. I -- That's a reasonable assumption
20 that he could have had the authority to do it. I
21 don't know if he did.
22 Q.      Did -- Did any contract marketing
23 personnel in HBS or -- or alternate site access CHIP?
24        MS. CITERA: Objection to form.
25 BY MR. ANDERSON:

Page 227

1  Q.      Or did they have the capabilities to
2  access CHIP?
3         MS. CITERA: Objection to form.
4  A.      No. No. I don't think they wanted to go
5  into it.
6  Q.      Why not?
7         MS. CITERA: Object to the form.
8  A.      Just -- Just a completely home infusion
9  centric system. And so they weren't dealing on a
10 regular basis in the market. They just didn't have
11 an interest. It was very unique for home infusion
12 services. And so they weren't interested.
13 Q.      Well, you could see how the alternate site
14 contract marketing personnel might be interested in
15 AWP information, couldn't you?
16        MS. CITERA: Objection to the form.
17 A.      I do not -- I don't know how alternate
18 site used AWP. I -- I know specifically what home
19 infusion -- what we were doing with it, but I don't
20 recall what the alternate site groups were doing with
21 AWP in the market.
22 Q.      Do -- Do you recall that the alternate
23 site customers that were just buying drugs from
24 Abbott, not participating in the home infusion
25 services, complained about the Vancomycin decreases

Page 228

1  in '95 and actually caused those AWPs to be
2  reincreased?
3         MS. CITERA: Objection to form.
4  A.      I am not familiar with that -- what you
5  just described at all.
6  Q.      Let's take a look at what's been marked in
7  this case as Exhibit 69.
8         MR. STETLER: Can we take a break sometime
9  soon?
10        MR. ANDERSON: Yeah. We can take a break
11 while you review the exhibit and --
12        THE VIDEOGRAPHER: One moment.
13        Off the record at 15:10.
14           (Recess taken.)
15           - - -
16        THE VIDEOGRAPHER: On the record at 15:16.
17 BY MR. ANDERSON:
18 Q.      Mr. Eichhorn [sic], have you had a chance
19 to review what's marked as 1106 -- or, no, pardon
20 me -- it's been marked in this case as Exhibit 69?
21 A.      Yeah. And I'm Dave.
22 Q.      Oh, well, I appreciate that. I may still
23 refer to you as Mr. Brincks, but --
24 A.      That's okay. I have had a chance to look
25 at it.

Page 229

1  Q.      Okay. Specifically drawing your attention
2  to the initial e-mail at the bottom of the page dated
3  March 20, '95, from Gerry Eichhorn. I'm going to
4  read the first couple of sentences.
5  A.      Sure.
6  Q.      "Jerrie, Mark Sebree and I have reviewed
7  the following Vancomycin list, open parens, catalog
8  prices. At the request of Dave Brincks, A.S. Home
9  Infusion, we have agreed to make the following
10 catalog list price changes." Did I read that
11 correctly?
12 A.      Uh-huh.
13 Q.      Then there's some prices lists there. And
14 do they correspond to the prices that were the
15 suggested list prices that are proposed on the third
16 page of Exhibit 362?
17 A.      They look like they do, yes.
18 Q.      Well, specifically the -- the Vancomycin
19 500 milligram is $7.50, correct?
20 A.      Yes.
21 Q.      And that's on the third page of
22 Exhibit 362 in handwriting, correct?
23 A.      Uh-huh.
24 Q.      And that's your handwriting, right?
25 A.      I believe so, yes.

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 230

1    Q.      And then if you look at Exhibit 69, the
2  same price appears for the same product, correct?
3    A.      Yes.
4    Q.      But then for the next package size, which
5  is the 5 -- 5 gram pharmacy bulk vial, the printed
6  suggested list price is $45.  Your handwritten
7  suggested list price is $75, correct?
8    A.      I see -- I see the number, yeah.
9    Q.      Do you know why that suggested list price
10 was written by you at a price higher than what is
11 actually typed in the spreadsheet?
12   A.      I do not -- I do not recall.  Again, if I
13 was writing this down -- I don't remember.
14   Q.      Can you think of any reason why for the 5
15 gram vial you would have used a list price that was
16 not calculated at 5 percent over RxLink?
17   A.      I -- I can't.  I -- I don't know.
18   Q.      Did the setting of a higher list price --
19 roughly $30 higher than the suggested list price have
20 anything to do with reimbursement issues?
21       MS. CITERA:  Objection to form.
22   A.      No.  I -- I don't recall that $75 -- how
23 it was arrived at.  I really just don't remember the
24 details of that number and where it came from.  I
25 just don't remember.

Page 231

1    Q.      You'll agree with me at the minimum that
2  the $75 you hand wrote for the 5 gram vial on the
3  third page of 362 is the same price that shows up for
4  the 5 gram vial on Exhibit 69, correct?
5    A.      Yeah.
6    Q.      And then like-- likewise, for 6533-01
7  which is the Vancomycin 1 gram vial, you've
8  handwritten $15 on the third page of Exhibit 362 and
9  that same $15 per each shows up on Exhibit 69, right?
10   A.      Uh-huh.
11   Q.      Now, continuing on in Exhibit 69, I'm
12 reading the second-to-last paragraph.  "Please notify
13 Red Book and Medespan of these changes ASAP.  They
14 are the sources for creating the AWP that is
15 important to alternate site."  Did I read that
16 correctly?
17   A.      Uh-huh.
18   Q.      How was AWP important to alternate site?
19       MS. CITERA:  Objection to form.
20   A.      Well, I'm not clear what the reference to
21 alternate site means here.  If it's home infusion,
22 we've talked about that already with the per diem
23 plus AWP as a billing mechanism.  As it relates to
24 other parts of alternate site, I'm -- I'm not clear.
25   Q.      Did you have any understanding of -- of

Page 232

1  how AWP decreases may cause customer complaints from
2  the alternate site product sales arena?
3        MS. CITERA:  Objection to form.
4    A.      I do not -- Could you ask the question
5  again?
6    Q.      Did you have any understanding that a
7  decrease in AWP would cause customer complaints about
8  lower reimbursement in the alternate site product
9  sales arena?
10       MS. CITERA:  Objection to form.
11   A.      No.  I'm -- I'm not sure why that would
12 occur.
13   Q.      Did you have any understanding at all
14 about whether alternate site product sales customers
15 that were not part of home infusion services would
16 care about relative AWPs?
17       MS. CITERA:  Objection to form.
18   A.      I don't specifically recall, but if they
19 were -- if they were running their operation
20 completely independent and simply procuring product
21 and billing with AWP, they may have been interested;
22 but I -- I don't specifically recall how they were
23 working with --
24   Q.      I think I follow what you're saying.
25       In essence, isn't it true that the same

Page 233

1  interest that home infusion services' clients such as
2  outpatient clinics and pharmacies had in maximizing
3  reimbursement based, in part, on AWP, that same
4  desire existed with alternate site product sales
5  customers who were pharmacies seeking to maximize
6  reimbursement, correct?
7        MS. CITERA:  Objection to form.
8    A.      That could have been the case in
9  particular in the home infusion arena given what
10 we've described as the economics and the billing.
11   Q.      Right.
12       And you knew and others at Abbott knew
13 certainly that there were home infusion providers out
14 there that were being serviced by alternate site
15 product sales, but chose not to participate in
16 home infusion reimbursement services or otherwise get
17 involved with your group, correct?
18       MS. CITERA:  Objection to form.
19   A.      Yeah.
20   Q.      Right.
21       But their desire to maximize reimbursement
22 and evaluate AWP spreads existed nonetheless,
23 correct?
24       MS. CITERA:  Objection to form.

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 234

```
1    A.      I -- Based on the economics in home
2    infusion, I can understand why they would be
3    interested in that in running their business.
4    Q.      Right.
5            And it wasn't -- It's not just an
6    assumption on your part, but you and others at Abbott
7    understood that market dynamic, correct?
8            MS. CITERA: Objection to form.
9    A.      Per diem plus AWP was a well recognized
10   way to bill in home infusion.  It's -- Yes.
11   Q.      Okay.  Now, if you could, please take a
12   look at what's been marked as Exhibit 63 in this
13   case.
14   A.      Okay.  This would line up with what I just
15   said.
16   Q.      And what you mean --
17           MR. STETLER: Why don't you wait until he
18   asks you a question.
19           THE WITNESS: Yeah.  Okay.
20   BY MR. ANDERSON:
21   Q.      Mr. Brincks, have you had a chance --
22           MR. STETLER: Otherwise, you could have a
23   role reversal here.
24           THE WITNESS: Okay.  Thanks.
25   BY MR. ANDERSON:
```

Page 235

```
1    Q.      Mr. Brincks, you've had a chance to review
2    Exhibit 63, correct?
3    A.      Yes.
4    Q.      Does Exhibit 63 indicate to you that
5    Abbott was aware that list price decreases impacted
6    reimbursement?
7            MS. CITERA: Objection to form.
8    A.      Based on my -- Yeah, based on my read of
9    the document.
10   Q.      And is this -- Is the information conveyed
11   in Exhibit 63 consistent with your understanding that
12   pharmacy providers may complain to Abbott if their
13   reimbursement was decreased as a result of price
14   changes instituted by Abbott?
15           MS. CITERA: Objection to form.
16   A.      Yes.
17   Q.      Does -- Does Exhibit 63 refresh your
18   memory in any way, sir, that after the Vancomycin
19   prices were decreased in 1995 that, in fact, a lot of
20   customers did complain --
21           MS. CITERA: Objection.
22   BY MR. ANDERSON:
23   Q.      -- about decreased reimbursement?
24           MS. CITERA: Objection to the form.
25   A.      I did not personally experience a lot of
```

Page 236

```
1    complaints as a result of what we're talking about.
2    Q.      I understand that you may not personally
3    have experienced complaints, but did you learn that
4    Abbott was receiving complaints from different
5    providers about decreased reimbursement as a result
6    of the Vanco price decreases?
7            MS. CITERA: Objection to form.
8    A.      I -- I do not recall, nor was I aware that
9    that was occurring.
10   Q.      Were you ever involved in any kind of
11   subsequent analysis about increasing the Vancomycin
12   prices that you had initially suggested be decreased?
13           MS. CITERA: Objection to form.
14   A.      I do not recall participating in that.
15   Q.      You'll agree, won't you, sir, that
16   Exhibit 63 is dated April 26, '95?
17   A.      Yes.
18   Q.      All right.  Now, if you could, now take a
19   look at what's marked in this case as Exhibit 733.
20   And it's an e-mail dated May 5, '95.
21   A.      Okay.  I see it.
22   Q.      Does your name appear as a recipient of an
23   e-mail on the first page of Exhibit 733?
24   A.      No -- Oh, yes.  Uh-huh.
25   Q.      Do you remember getting some e-mail
```

Page 237

```
1    communication or otherwise communicating with anybody
2    about increasing Vanco prices after they were
3    initially decreased on or about May of 1995?
4    A.      I do not -- I do not remember.
5    Q.      Looking at the body of the e-mail -- I'm
6    going to read for the record.  "On the attached
7    spreadsheet, the shaded May 4 list price columns
8    identifies the new Vanco list price.  As we agreed at
9    yesterday's meeting, the new price will be the
10   average between the old, parens, prior to April 1,
11   '95, closed parens, and the current, parens, April 1
12   to May 3."  Did I read that correctly?
13   A.      Uh-huh.
14   Q.      Does that jog your memory in any way, sir,
15   about analysis concerning increasing the initially
16   decreased Vanco prices?
17   A.      I -- I do not remember this.
18   Q.      Do you --
19   A.      Now, I see my name on here, but I do not
20   remember this piece.
21   Q.      Do you think that you most likely
22   participated in a meeting or otherwise communicated
23   with people about potentially increasing the Vanco
24   prices that were initially decreased?
25           MS. CITERA: Objection to form.
```

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 238

1  A.      I don't recall the meeting specifically,
2  but I clearly see the reference.  So I just -- I
3  don't remember this -- that specific meeting.
4  Q.      Do you remember anything about the -- the
5  underlying reasoning for increasing prices that had
6  only days before been decreased?
7      MS. CITERA:  Objection to form.
8  A.      I do -- I do not remember the underlying
9  dynamic.  I just don't recall.
10  Q.      Do you -- After reviewing what's been
11  marked as Exhibit 63, sir, and what's been marked as
12  Exhibit 733, does that jog your memory that Abbott
13  received a lot of complaints from customers about
14  decreased reimbursement and sought to raise the AWPs
15  and list prices as a result?
16      MS. CITERA:  Objection to form.
17  A.      It doesn't for me.  I -- I do not recall a
18  large -- I don't recall a response or fielding more
19  questions.  I don't remember that.
20  Q.      Will you agree that the front page of
21  Exhibit 733 indicates that you received the e-mail
22  along with Ginny Tobiason and Karla Kreklow?
23      MS. CITERA:  Objection to form.
24  A.      Oh, I see it, yes.
25  Q.      Did you often participate in meetings with

Page 239

1  Ginny Tobiason and Karla Kreklow about AWPs?
2  A.      No.  It would not have been a -- No.  I
3  don't -- I don't recall us sitting down and
4  discussing AWPs.  They were published in -- in the
5  Blue Book and the Red Book.  I don't remember us
6  sitting down and talking about them a lot.
7  Q.      Is it true that Ginny was involved most
8  likely because she was considered the reimbursement
9  guru at Abbott?
10      MS. CITERA:  Objection to form.
11  A.      That's -- That's a reasonable assumption
12  to make.
13  Q.      And is it reasonable to assume that Karla
14  Kreklow was involved because she was the manager of
15  these sales personnel?
16      MS. CITERA:  Objection to form.
17  A.      Yes.  That -- That could be the case here.
18  I -- I'm not certain on Karla's exact role here.
19  Q.      Looking at the top of the first page of
20  Exhibit 33, do you see John Ward is shown as a
21  recipient of the e-mail?
22  A.      Uh-huh.
23  Q.      At that time, John Ward would have been
24  the general manager of the entire alternate site
25  organization, correct?

Page 240

1  A.      Uh-huh.  He would have been, yeah, like
2  the -- I don't remember what his title was, but he
3  headed up the alternate site business unit.
4  Q.      He would have been truly the --
5  A.      Like Mike Sellers' counterpart.
6  Q.      Right.
7      Mike Sellers actually succeeded John Ward,
8  correct?
9  A.      No.  John had alternate site product.
10  Mike Sellers had home infusion.  There was a person
11  on renal.  And they all reported to Don Robertson.
12  Q.      Oh, okay.
13      So at this time back in '95, John would
14  have -- John Ward would have been the head of
15  alternate site product sales, correct?
16  A.      Yes, that business unit.  I -- That's what
17  I recall.
18  Q.      Do you have any understanding of why the
19  head of alternate site product sales would need to be
20  involved in AWP increases on Vanco?
21      MS. CITERA:  Objection to form.
22  A.      No.
23  Q.      Does his involvement indicate to you that
24  alternate product sales was interested in the
25  relative AWPs on the Vanco products?

Page 241

1      MS. CITERA:  Objection to form.
2  A.      Could.  I don't know if Gerry -- We had a
3  tendency within Abbott to cc lots of people for
4  different -- different reasons.  I'm not sure why
5  Gerry chose to copy John on this specifically.  I --
6  We talked before about AWP; but beyond that, I don't
7  know why John would have been involved in this as a
8  regular course of action.
9  Q.      It's likely that John was copied because
10  he and his personnel in alternate site product sales
11  were interested in the AWP levels on Vancomycin,
12  correct?
13      MS. CITERA:  Objection to form.
14  A.      He's copied.  And we looked at some of the
15  other things where you have clients using AWP in home
16  infusion.  So to that extent, they could have some
17  interest.
18  Q.      Did you and others at Abbott understand
19  that Abbott had advantages in the marketplace by
20  having AWPs that were greater than competitive
21  products' AWPs?
22      MS. CITERA:  Objection to form.
23  A.      I'm not aware of what they would be.  I
24  don't recall any knowledge of a strategy or a pricing
25  strategy that would have lined up with what you said.

61 (Pages 238 to 241)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 242

1      MR. ANDERSON:  Objection; non-responsive.
2  BY MR. ANDERSON:
3  Q.      I wasn't asking about a strategy,
4  Mr. Brincks.  I was asking a bigger question.
5      That is:  Do you have and did others at
6  Abbott have an awareness that Abbott had AWPs that
7  were higher than competitive products' AWPs and that
8  that was an advantage to Abbott?
9      MS. CITERA:  Objection to form.
10  A.      It's the advantage part that I can't
11  answer for you clearly --
12  Q.      Okay.
13  A.      -- because I -- I don't understand what --
14  Q.      I'll try to address that then.  Thank you.
15  A.      All right.
16  Q.      Did you and others at Abbott understand
17  that Abbott had higher AWPs than competitive
18  products?
19      MS. CITERA:  Objection to form.
20  A.      In home infusion, we would look at the
21  Blue Book and I could see what they were.
22  Q.      And by and large, when you looked in the
23  Blue Book or the Red Book, did you determine that
24  Abbott's AWPs were higher than the competitive AWPs?
25      MS. CITERA:  Objection to form.

Page 243

1  A.      You know, I don't remember a consistent
2  pattern and -- I don't remember a consistent
3  pattern -- if it was always higher or if that was
4  intentional --
5  Q.      I didn't -- Sorry.
6      MS. CITERA:  Let him finish.
7  BY MR. ANDERSON:
8  Q.      I understand that it might not have always
9  been higher, but I said in your experience when you
10  would look at AWPs of Abbott products in comparison
11  with competitive products, did you find and did
12  others find that by and large Abbott's were higher?
13      MS. CITERA:  Objection to form.
14  A.      Based on outright recall here after this
15  many years, I do not remember specifically how our
16  AWPs from an Abbott perspective compared to
17  competitive AWPs.  I cannot say that.
18  Q.      You think you may have known back at or
19  near the time, but just over the course of time
20  you've forgotten?
21      MS. CITERA:  Objection to form.
22  BY MR. ANDERSON:
23  Q.      Is that right?
24  A.      I -- I literally don't recall if I had
25  knowledge and have lost it, if I never had it.  I

Page 244

1  literally don't remember from an AWP overall pricing
2  perspective if we were consistently higher or lower
3  or on track or if it was varied.  I do not recall
4  that specific detail.
5  Q.      At least with respect to Vanco, given the
6  documents you've reviewed today, do you know that
7  Abbott had higher AWPs than the competitive products?
8      MS. CITERA:  Objection to form.
9  A.      I mean, clearly the documents we -- we
10  looked at showed that it was significantly higher,
11  yes.
12  Q.      And -- And the best way to ascertain
13  whether Abbott similarly had higher AWPs than
14  competitive products on other drugs would be just to
15  look back at the historic Red Book and First Data
16  Bank records, correct?
17      MS. CITERA:  Objection to form.
18  A.      That would be a reasonable source for the
19  type of analysis that you're talking about I would
20  think.
21  Q.      And that's the same type of information
22  that you would have reviewed in the ordinary course
23  when you went to a Red Book to look at the AWPs on a
24  given drug, correct?
25  A.      Yes.

Page 245

1  Q.      Now, if you could, Mr. Brincks, please
2  take a look at what's been marked in this case as
3  Exhibit 757.
4  A.      Okay.
5  Q.      Is this an interoffice memo or
6  correspondence from Virginia Tobiason to Bill
7  Dempsey, Mike Heggie, Mike King, Don Robertson and
8  John Ward dated June 11, 1991?
9  A.      It is.
10  Q.      And back in that time period, Bill Dempsey
11  would have been the manager of home infusion
12  services, correct?
13  A.      I -- I believe, yes.
14  Q.      And he was actually in that position when
15  you were initially brought on back in November of
16  '92, correct?
17  A.      Correct.  Actually, '91, yeah.
18  Q.      You were hired on at home infusion in
19  November of '91?
20  A.      Uh-huh.
21  Q.      Okay.  Oh, no, pardon me.  I -- I confused
22  the record.  I'll rephrase.
23      You were hired on at home infusion in
24  April of '91, correct?
25  A.      Correct.

62 (Pages 242 to 245)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 246

1   Q.      Right.
2   A.      Right.  So it was in that senior role.
3   Q.      Right.
4           And at the time Bill Dempsey was the
5   general manager of that group?
6   A.      Correct.
7   Q.      And he was the predecessor in that
8   position to Mike Sellers, correct?
9   A.      Correct.
10  Q.      And you had just started and been there
11  for a few months when this interoffice correspondence
12  was written by Ms. Tobiason, correct?
13  A.      Correct.
14  Q.      Do you think you received this type of
15  correspondence in your role at Abbott?
16          MS. CITERA:  Objection to form.
17  A.      In my -- In -- In -- At the time that it
18  came?
19  Q.      Yes.
20  A.      No.  This may have made its way to my
21  boss, who would have been Mark Gorman at the time,
22  but -- but I did -- I did not see this.  I don't
23  remember seeing it.
24  Q.      Does Exhibit 757 appear to be
25  Ms. Tobiason's analysis of possible positions Abbott

Page 247

1   could take on changes in Medicare drug reimbursement?
2           MS. CITERA:  Objection to form.
3   A.      I mean, I read this as just informing the
4   leadership team of what was -- the -- the issues,
5   then the challenges that were coming up as a part of
6   some potential reimbursement changes.  I mean, that's
7   how I read it.
8   Q.      In your experience, did Abbott ever take
9   positions on different proposed changes in drug
10  reimbursement by Medicare or Medicaid?
11          MS. CITERA:  Objection to form.
12  A.      Positions?  I do not have specific -- I
13  mean, I know Virginia was involved in those
14  associations and involved in being aware of these
15  issues.  With regard to taking a position, I'm not
16  sure exactly what you mean or have specific knowledge
17  of that.
18  Q.      I'll try to rephrase to address your
19  concern.
20          Did -- In your experience or awareness,
21  did Abbott either directly or indirectly through
22  industry trade groups provide comments or otherwise
23  try to influence Medicare or Medicaid drug
24  reimbursement policies?
25          MS. CITERA:  Objection to form.

Page 248

1   A.      Influence?  I mean, my understanding of
2   Virginia is she was trying to educate and make sure
3   that people understood the perspective of the home
4   infusion marketplace and what was going on, but --
5   but beyond -- I'm not quite sure what you mean by
6   "position" or "influence."  And I'm not familiar with
7   that type of a -- That's not what I recall.
8   Q.      Looking at the last bullet point under
9   "Major Issues" on the first page of Exhibit 757, it
10  reads, "Discounts vary among purchasers.  Some
11  providers may pay full AWP and others may get a
12  discount but not a full 15 percent due to
13  manufacturer's discounting practices."  Did I read
14  that correctly?
15  A.      Uh-huh.
16  Q.      Was it your understanding back in 1991
17  that that was a true statement?
18  A.      Well, the analysis that we showed you
19  earlier which showed the varying discounts is
20  reflective of that statement.  So the collections
21  being at different rates off of AWP lines up with
22  that.  The part I don't remember is the 15 percent
23  due to manufacturer's discounting practices.
24  Q.      So in your experience, did some providers
25  pay Abbott full AWP for drug products?

Page 249

1           MS. CITERA:  Objection to form.
2   A.      I don't -- I don't recall -- I don't think
3   there were many.  And, again, that's why even on the
4   analysis with the different payers there was
5   percentages taken.  So typically it would reflect an
6   average discount off of that per diem -- again, per
7   diem plus AWP.
8           MR. ANDERSON:  Objection; non-responsive.
9   BY MR. ANDERSON:
10  Q.      I was -- I don't think you and I were
11  communicating there and it was probably -- probably
12  my fault.  I'll try to rephrase.  I'm talking about
13  payments made by providers to Abbott for drugs.
14          When -- When Abbott would sell drugs, to
15  your knowledge did Abbott sell those drugs to
16  providers at full AWP?
17          MS. CITERA:  Objection to form.
18  A.      Again, I -- I don't know about the pricing
19  and the -- and the transaction and sales of -- of
20  drugs through HBS and the other markets from a
21  pricing standpoint.  I -- I couldn't answer that
22  question.
23  Q.      From your perspective in home infusion
24  reimbursement services, did -- did Abbott Home
25  Infusion sometimes charge home infusion clients full

63 (Pages 246 to 249)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 250

1  AWP for consigned or loaned drugs?
2  A.     We -- We charged on a revenue share.
3  Q.     Right.
4         And did you ever charge full AWP?
5  A.     We charged on a revenue share.
6         MS. CITERA:  Objection to form.
7  A.     That's how we charged our clients for the
8  consigned product.  So 15 percent of chemotherapy
9  treatments that went through that business, that's
10 what we charged them.  That was our revenue.
11 Q.     Right.
12        So Abbott charged 15 percent, not
13 100 percent, correct?
14        MS. CITERA:  Objection to form.
15 A.     Correct.
16 Q.     Okay.  So to your experience, did Abbott
17 ever charge 100 percent of AWP for product to a home
18 infusion client?
19        MS. CITERA:  Objection to form.
20 A.     One hundred percent?  Are you talking home
21 infusion services again?
22 Q.     Well, that's -- We're limiting this
23 question to that because you don't know about the
24 other sales.
25 A.     We didn't charge an AWP -- The billing

Page 251

1  occurred at AWP going to payers.  We took 15 percent
2  of that, and that's what we were charged.
3  Q.     Right.
4         And what I'm trying to learn, sir, is why
5  did Ms. Tobiason say some providers pay full AWP when
6  often Abbott was only charging 15 percent of AWP?
7         MS. CITERA:  Objection to form.
8  A.     I can't conjecture here unless she's
9  talking about insurance providers.
10 Q.     Do you think she's talking about insurance
11 providers?
12        MS. CITERA:  Objection to form.
13 A.     You're -- I mean, I'm looking at a
14 document that I've never seen before.
15 Q.     Okay.
16 A.     I --
17        MR. STETLER:  He's reading her mind as
18 best he can.
19 A.     I -- I -- I -- I don't know.
20 Q.     Let's take a look at one more document.
21 This has been marked as Exhibit 768.  I'm not -- It's
22 a pretty voluminous document.  I'm going to ask you a
23 few questions about it.
24 A.     All right.
25 Q.     And I'll give you a fair chance to review

Page 252

1  the context of any question, but --
2  A.     Okay.  All right.
3  Q.     First, do you think in looking at the
4  distribution list at the -- which is the back two
5  pages of Exhibit 768, do you think that you may have
6  received this document in the ordinary course of
7  business?
8  A.     I think given my newness in my role,
9  probably not, but I may have.  I mean, I was with
10 Abbott and the whole healthcare industry for
11 basically three months.  So I had very little
12 knowledge or experience at that point.
13 Q.     Looking in the -- in the distribution
14 list, there's different groups listed.  And one of
15 those groups on the last page at the top is titled
16 "Home Care," correct?
17 A.     At -- Which page are you on?
18 Q.     The last page.
19 A.     Yes.
20 Q.     Would that home care group include the
21 home infusion group?
22        MS. CITERA:  Objection to form.
23 A.     Let's see.  Mike King?  I think it was
24 just another way -- Dependent on who -- who sent
25 this, it's another way of referring to alternate

Page 253

1  site, because each of these are divisional pieces,
2  and home care sometimes was misconstrued with all of
3  alternate site.  So Mike King was in renal.  Don was
4  over all of alternate site.  Virginia was in home
5  infusion.  And I don't remember Pavalakis.
6  Q.     Okay.  So you think home care might
7  describe all of alternate site, including home
8  infusion, reimbursement services and product sales?
9  A.     Yes.
10 Q.     Okay.  And pharmacy to the extent Abbott
11 was operating pharmacies?
12 A.     Yes.
13 Q.     Okay.  Now, looking back at the first page
14 of Exhibit 768, you'll agree this is a memo --
15 interoffice correspondence from Don Robertson, vice
16 president and general manager, Alternate Site, dated
17 June 14, '91, correct?
18 A.     Uh-huh.
19 Q.     And it's titled, "Proposed Rule Changes
20 Published By HCFA," correct?
21 A.     Uh-huh.
22 Q.     And does it appear to be discussing the
23 same proposed rule change concerning Medicare
24 reimbursement that was discussed in Exhibit 757?
25        MS. CITERA:  Objection to form.

64  (Pages 250 to 253)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 254

1    A.      On a real quick review, it would look
2    related.
3    Q.      And, in fact, it's just a few days later,
4    isn't it?  The -- Exhibit 757 is dated June 11 and
5    this one is June 14?
6    A.      Yeah.
7    Q.      Now, reading in the second paragraph of
8    Exhibit 768, "Several professional groups have vested
9    interests in resisting these changes.  They include
10   the American Society of Clinical Oncology (ASCO),
11   the PMA, the American Society of Nephrology (ASN) and
12   the Alliance for Infusion Therapy.  These groups are
13   being contacted by appropriate Alternate Site and
14   Abbott Washington personnel to determine a response
15   to the proposed rules changes.  As these responses
16   take shape, we will discuss them with you.  The HCFA
17   proposal has significant momentum and we believe that
18   some form of reimbursement reduction has a high
19   probability of occurring.  Our efforts are to ensure
20   that these changes are as small as possible."  Did I
21   read that correctly?
22   A.      Yes.
23   Q.      Why would Abbott care whether or not the
24   proposed reimbursement was decreased?
25          MS. CITERA:  Objection to form.

Page 255

1    A.      You know, part of what I don't know is the
2    context of June of '91.  Clearly on the home infusion
3    side we have described, the per diem plus the AWP --
4    Q.      Let me stop you there if you don't mind,
5    sir.
6          When you say -- When you make that
7    reference to the per diem plus the AWP on the home
8    infusion side, are you meaning to say that to the
9    extent reimbursement was decreased my Medicare that
10   that would cause Abbott to recover less money in its
11   revenue share?
12          MS. CITERA:  Objection to form.
13   A.      That's the billing mechanism that would go
14   to all the payers.  So yeah.  If AWP was lowered, it
15   would reduce that at billing, but it was based on
16   collection.  So if the payer simply said -- but --
17   They were accepting AWP as a mark or a generally
18   accepted way to bill.  So it would have affected that
19   revenue share.
20   Q.      And not only if the AWP were decreased on
21   a given drug would the revenue share decrease because
22   the total reimbursement would decrease; but,
23   likewise, if the Medicare reimbursement formula were
24   changed to take a greater discount off of AWP, that
25   would, in turn, decrease the total reimbursement and

Page 256

1    decrease the home infusion revenue share, correct?
2          MS. CITERA:  Objection to form.
3    A.      In home infusion, yes, that's how the
4    numbers worked.
5    Q.      All right.  And after reviewing that
6    section that I've read into the record in
7    Exhibit 768, does that refresh your memory in any way
8    that Abbott did take positions or otherwise provide
9    comments to Medicare and Medicaid officials through
10   provider trade groups or other organizations
11   representing providers?
12          MS. CITERA:  Objection to form.
13   A.      Not beyond what I've described before.  I
14   mean, the nature of how they were interacting and
15   what they were communicating -- I mean, specific
16   going into another layer below this, I -- I don't
17   know.
18   Q.      You don't know the specifics, but you did
19   have some general understanding that Virginia
20   Tobiason and potentially others were communicating
21   with provider groups or trade groups or organizations
22   representing providers about reimbursement issues?
23          MS. CITERA:  Objection to the form.
24   A.      Yes.
25   Q.      All right.  Are you familiar with anything

Page 257

1    known as the Medicare Working Group?
2    A.      The Medicare Working Group?  No.
3    Q.      Have you ever sat on or otherwise had any
4    involvement whatsoever with the Medicare Working
5    Group?
6    A.      No.
7    Q.      Was list price sometimes the basis for
8    reimbursement?
9          MS. CITERA:  Objection to form.
10   A.      List price?  No, not in home infusion.  It
11   was -- It was this AWP.
12   Q.      If you could, take a look at what's been
13   marked in this case as Exhibit 298.  And for the sake
14   of time, I'll tell you I'm going to have questions
15   primarily about the last page.
16   A.      Uh-huh.
17   Q.      Do you recognize Exhibit 298 as a copy of
18   a newsletter that home infusion would circulate to
19   customers?
20   A.      I do vaguely, but I -- I remember.
21   Q.      And was it your experience that the home
22   infusion group published these newsletters on a --
23   some routine basis to customers over the time that
24   you were in the home infusion section?
25   A.      Yeah.  I don't remember the frequency

65 (Pages 254 to 257)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 258

1  again, but -- And I know that at some point that we
2  stopped doing them, but I don't remember.
3  Q.      What -- Did you all stop doing them before
4  or after you left home infusion?
5  A.      I -- I don't remember.  I remember when
6  they started.  I mean, I knew we had them for a
7  period.  I don't remember.
8  Q.      In looking at the last page of
9  Exhibit 298, do you see a section in the middle of
10 the page titled "Case Manager's Corner"?
11 A.      Uh-huh.
12 Q.      And authored by Shellie Bronson and Lynn
13 Leone, Managed Care Specialists, Abbott Home Infusion
14 Services?
15 A.      Uh-huh.
16 Q.      Back in this time frame, in the winter of
17 '95, were they reporting to you?
18 A.      Yes.
19 Q.      And it looks like they've written a little
20 parody there about the 12 days of Christmas, correct?
21 A.      I see it.  Yes.
22 Q.      And, you know, it starts off, "On the
23 first day of Christmas, my case manager approved for
24 me TPN at list price"; is that correct?
25 A.      I see it.

Page 259

1  Q.      And then it continues on and one of the
2  days of Christmas, so to speak, is six Vancos
3  dripping at list price; is that right?
4       MS. CITERA:  You should sing it, Jarrett.
5  A.      I see it.  Yes.
6  Q.      Why was Abbott interested in having the
7  reimbursement for Vancomycin, for instance, set at
8  list price?
9       MS. CITERA:  Objection to form.
10 A.      You know, I don't remember the specifics
11 here; but list price would have been per diem plus
12 AWP reimbursed at 100 percent.
13 Q.      Okay.
14 A.      So that would have been the full billing
15 rate.
16 Q.      So list price in this context means AWP
17 for the ingredient cost plus the per diem requested
18 for the associated charges, not list price as
19 published by Abbott?
20      MS. CITERA:  Objection to form.
21 A.      I -- Again, I'm conjecturing a bit here.
22 But, yes, that -- because that's what the billing
23 rate would have been at.  And if you could secure
24 100 percent, you know, at that with the payer, I
25 mean, that was a -- a profitable thing.

Page 260

1  Q.      Right.
2       And that profit was the result of AWP, in
3  part, and it was also the result of Abbott Home
4  Infusion personnel seeking to maximize reimbursement
5  for themselves as well as the providers?
6       MS. CITERA:  Objection to form.
7  A.      Yeah.  That's how the economics worked.
8       MR. ANDERSON:  At this time, I'll pass the
9  witness.
10      MS. CITERA:  Okay.  I need some time.
11      MS. NESBITT:  No questions.
12      MR. SISNEROS:  No questions.
13      MS. MOORE:  No questions.
14      MS. CITERA:  Okay.  I need about ten
15 minutes.
16      THE VIDEOGRAPHER:  One moment.
17      Off the record at 15:59.
18      (Recess taken.)
19      ---
20      THE VIDEOGRAPHER:  On the record at 16:15.
21      ---
22      EXAMINATION
23      ---
24 BY MS. CITERA:
25 Q.      Mr. Brincks, my name is Toni Citera.  I

Page 261

1  introduced you -- introduced myself earlier, and I
2  represent the defendants Abbott and Hospira.  I just
3  have a few questions.
4  A.      Uh-huh.
5  Q.      First of all, do you have any personal
6  knowledge of what prices Abbott submitted to the
7  publications Red Book, Blue Book?
8  A.      What prices?  You know, on a regular
9  course of action, we were not involved in home
10 infusion.  We went through the Vancomycin question,
11 which would have been the only exposure to that
12 process that I recall.
13 Q.      And so as I understand it, other than in
14 that one instance, home infusion services had no
15 involvement in what prices were submitted to the
16 compendia -- the pricing publications?
17 A.      Correct.
18 Q.      And you have no knowledge of whether
19 Abbott ever submitted an AWP to the compendia; is
20 that correct?
21      MR. ANDERSON:  Objection; leading.
22 A.      What -- I -- Yeah -- Could you say the
23 question again?
24 Q.      I said:  You have no knowledge of whether
25 Abbott ever submitted an AWP for the products to the

66 (Pages 258 to 261)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 262

1  publications?
2        MR. ANDERSON: Objection; leading.
3        MS. ST. PETER-GRIFFITH: I'm going to
4  object to the form as well.
5        THE WITNESS: So what do I do?
6        MR. STETLER: Answer.
7        MS. CITERA: You still --
8        MR. ANDERSON: You still answer the
9  question.
10       MR. STETLER: Same drill as earlier.
11  A.     To my knowledge, the hospital business
12  sector contract organization did send whatever it was
13  they asked for to those compendia. That was my
14  understanding of that process.
15  Q.     But you don't know what prices those were?
16  A.     Outside of the Vancomycin that we've
17  talked about, no.
18  Q.     At the time you were in home infusion,
19  were you aware of any relationship between list price
20  and AWP?
21  A.     Again, not on a consistent basis. Going
22  through the Vancomycin, there was reference to a
23  calculation that I had not been familiar with before.
24  And, no, I was not involved in list price setting or
25  any of those submissions to -- for AWP purposes to

Page 263

1  those compendia.
2  Q.     So other than your review of that document
3  today, you had no understanding of the formulaic
4  relationship at the time you were in home infusion
5  services?
6        MS. ST. PETER-GRIFFITH: Object to the
7  form.
8  A.     Again, it was not our role to do that. In
9  the process of asking a question, we may have been
10  educated some, but that's the extent of my exposure.
11  Q.     When you moved out of home infusion
12  services, am I -- did you leave your files and
13  computer with the people who succeeded you?
14  A.     Oh, yeah. Oh, yeah. No -- I mean, in
15  general, Abbott departments hold onto their own
16  computers because otherwise they would have to
17  replace the capital asset. So those were cherished.
18  You left them.
19  Q.     So your files and your computer would have
20  been left with them?
21  A.     Everything.
22  Q.     Do you have any direct knowledge of
23  Medicare's policy in setting reimbursement?
24  A.     No.
25  Q.     And so when you were talking with

Page 264

1  Mr. Anderson about what Medicare intended to cover in
2  the AWP and per diem, you were speculating, correct?
3        MR. ANDERSON: Objection; leading.
4        MS. ST. PETER-GRIFFITH: Object to the
5  form.
6        MR. ANDERSON: Object to the form.
7  A.     I'm -- You're going to have even reference
8  for me what specifically -- the comment that I made.
9  Q.     Sure.
10       Mr. Anderson asked you a few questions
11  about Medicare and Medicaid's -- or what Medicare and
12  Medicaid intended to cover in terms of the AWP and
13  the per diem -- because you talked about the AWP and
14  per diem. Do you recall that?
15  A.     Uh-huh.
16  Q.     And he asked you some questions about
17  whether Medicaid -- Medicaid and Medicare intended to
18  cover certain things through that reimbursement. Do
19  you recall that?
20  A.     In general terms, yes.
21  Q.     And because you have no direct under- --
22  knowledge of what Medicare or Medicaid intended to
23  cover, were you speculating when you answered those
24  questions?
25       MR. ANDERSON: Objection.

Page 265

1        MS. ST. PETER-GRIFFITH: Object to the
2  form.
3        MR. ANDERSON: Objection; leading.
4  A.     I -- I am not sure how to answer your
5  question. That's my answer. I don't think I even
6  follow your question.
7  Q.     Okay. Well, let me ask you another
8  question.
9        Did you have any understanding of
10  Medicaid's policy in setting reimbursement -- any
11  direct understanding?
12  A.     Medicaid's policy? No, other than an idea
13  of what in a therapeutic category they would
14  typically cover.
15  Q.     But did you have an understanding at the
16  time you were in home infusion services of why they
17  set reimbursement the way they did?
18       MR. ANDERSON: Objection; leading.
19       MS. ST. PETER-GRIFFITH: Object to the
20  form.
21  A.     As far as their rationale or their
22  process, no.
23  Q.     Okay. And the same question for Medicare.
24       Do you -- Did you have an understanding of
25  why Medicare set its reimbursement the way it did and

67 (Pages 262 to 265)

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db

Page 266

1  what they intended to cover?
2          MS. ST. PETER-GRIFFITH:  Object to the
3  form.
4          MR. ANDERSON:  Objection; leading.
5  A.      No.
6  Q.      Did you have any interaction while you
7  were in home infusion services with alternate site
8  product sales customers?
9  A.      No.
10  Q.      Did you have any conversations with
11  alternate site product sale customers as to what --
12  why they were purchasing Abbott's products?
13  A.      Well, one would eliminate the other.
14  Q.      So the answer is no?
15  A.      The answer would be no.
16  Q.      When we looked at Exhibit 733 -- I don't
17  know if you have it there.
18          MR. STETLER:  Can I show him this copy?
19          MS. CITERA:  Sure.
20          MR. STETLER:  It may help.
21  A.      Okay.
22  Q.      -- Mr. Anderson asked you some questions
23  as to why John Ward was copied.  Do you recall those
24  questions?
25  A.      I do.

Page 267

1  Q.      Do you have direct knowledge of why John
2  Ward -- Ward was copied on that e-mail?
3          MS. ST. PETER-GRIFFITH:  Objection.
4  Object to the form.
5          MR. ANDERSON:  Objection; leading.
6  A.      No.
7  Q.      So your testimony about why he may have
8  been copied would have been speculation?
9          MS. ST. PETER-GRIFFITH:  Object to the
10  form.
11          MR. ANDERSON:  Objection; leading.
12  A.      Going back 12 years, yeah -- or
13  whatever -- even more than that.
14  Q.      And the other two exhibits I wanted for
15  you to look at quickly were 757 and 765.  We can take
16  them one by one starting with 757.
17  A.      Okay.
18          MR. STETLER:  And I'll take that one back
19  so you don't have to hold it.
20          THE WITNESS:  I have got 757.  I don't
21  have the other one.
22          MR. STETLER:  Did you write on this?
23          MS. CITERA:  I wrote on this one.  I don't
24  think I wrote on that one.
25          MR. STETLER:  768 is --

Page 268

1          MS. ST. PETER-GRIFFITH:  It's right on the
2  top, isn't it?
3          MS. CITERA:  757 is -- 768 -- Oh, yeah.
4          THE WITNESS:  I've got this one
5  (indicating).
6          MS. CITERA:  He's got 757 and 768.
7          THE WITNESS:  Oh, here is 768 as well.
8  BY MS. CITERA:
9  Q.      Starting with 757, have you ever seen that
10  document before today?
11  A.      No.
12  Q.      And do you have any knowledge of what was
13  discussed in that document?
14          MS. ST. PETER-GRIFFITH:  Object to the
15  form.
16  A.      What do you mean by "knowledge"?  Again,
17  I -- a couple of these, I mean, I was handed.  I read
18  them pretty briefly.
19  Q.      But you don't recall receiving this
20  particular one or ever seeing it?
21  A.      No.  I was there about three months.  So,
22  no, I -- I do not recall this -- seeing this
23  document.
24  Q.      Okay.  And what about 768; do you recall
25  seeing that document before?

Page 269

1  A.      No.
2          MS. CITERA:  I have no further questions.
3          MR. ANDERSON:  We will reserve the -- The
4  relator reserves the remainder of its questions for
5  the time of trial or appropriate hearing.
6          And I thank you for your time today,
7  Mr. Brincks.
8          THE WITNESS:  You're welcome.
9          MS. ST. PETER-GRIFFITH:  The government
10  does as well.  We have no further questions.
11          MS. MOORE:  Same for the State of Texas.
12          MR. SISNEROS:  And California.
13          MS. NESBITT:  And Arizona as well.
14          THE VIDEOGRAPHER:  Off the record.  End of
15  deposition at 16:24.
16                      - - -
17          (Signature waived.)
18                      - - -
19          And, thereupon, the deposition was
20  concluded at approximately 4:24 p.m.
21                      - - -
22
23
24
25

68  (Pages 266 to 269)

Page 270

```
1            CERTIFICATE
2              - - -
3        The amount of time used by each party at
    the deposition is as follows:
4
    MS. ST. PETER-GRIFFITH - 2 HRS: 28 MIN
5
    MR. ANDERSON - 2 HRS: 55 MIN
6
    MS. CITERA - 9 MIN
7
8              - - -
9   State of Ohio   :
                    SS:
10  County of Franklin:
11        I, Jody M. Theado, Notary Public in and
    for the State of Ohio, duly commissioned and
12  qualified, certify that the within-named DAVID E.
    BRINCKS was by me duly sworn to testify to the whole
13  truth in the cause aforesaid; that the testimony was
    taken down by me in stenotype in the presence of said
14  witness, afterwards transcribed upon a computer; that
    the foregoing is a true and correct transcript of the
15  testimony given by said witness taken at the time and
    place in the foregoing caption specified.
16        I certify that I am not a relative,
    employee, or attorney of any of the parties hereto,
17  or of any attorney or counsel employed by the
    parties, or financially interested in the action.
18        IN WITNESS WHEREOF, I have set my hand and
    affixed my seal of office at Columbus, Ohio, on this
19  19th day of June 2007.
20
21
    _____
22        JODY M. THEADO, Notary Public
          in and for the State of Ohio
23        and Professional Court
          Reporter.
24
25  My Commission expires January 5, 2009.
```

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

7fa7acf5-f6fc-4c43-bb7f-a83c862a82db