# Exhibit 105

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )     01-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                )
United States of America,       ) Hon. Patti Saris
ex rel. Ven-a-Care of the       )
Florida Keys, Inc., v.          )
Abbott Laboratories, Inc.,      )
and Hospira, Inc.               )
CIVIL ACTION NO. 06-11337-PBS   )


*******************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
PRICE LITIGATION                ) Civil Action No.
                                )     01-CV-12257-PBS
                                )
THIS DOCUMENT RELATES TO:       )
                                ) Judge Patti B. Saris
State of Arizona v. Abbott      )
Labs., et al.                   )
Civil Action No. 06-CV-11069-PBS )


*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CHRISTINE SNEAD
April 19th, 2007


HIGHLY CONFIDENTIAL

*******************************************************

b66cc43c-5092-4127-9266-2a482f299285

Page 2

```
 1         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 2
 3 IN RE: PHARMACEUTICAL        )
   INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
 4 PRICE LITIGATION             ) Civil Action No.
                                ) 01-CV-12257-PBS
 5                              )
   THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
 6 ALL CASES                    )
 7 ************************************************
 8         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 9
10 IN RE: PHARMACEUTICAL        )
   INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
11 PRICE LITIGATION             ) Civil Action No.
                                ) 01-CV-12257-PBS
12                              )
   THIS DOCUMENT RELATES TO:    )
13                             ) Judge Patti B. Saris
   State of California, ex rel. )
14 Ven-A-Care v. Abbott         ) Magistrate
   Laboratories, et al.         ) Judge Marianne Bowler
15 Cause Nos. 03-cv-11226-PBS   )
16 ************************************************
17       NO. D-1-GV-04-001286
18 THE STATE OF TEXAS       ) IN THE DISTRICT COURT
19 ex rel.                  )
     VEN-A-CARE OF THE       )
20   FLORIDA KEYS, INC.,     )
       Plaintiffs,           )
21                           )
   VS.                       ) TRAVIS COUNTY, TEXAS
22                           )
   ABBOTT LABORATORIES INC., )
23 ABBOTT LABORATORIES, and  )
   HOSPIRA, INC.,            )
24     Defendant(s).         ) 201ST JUDICIAL DISTRICT
25 ************************************************
```

Page 3

```
 1     ORAL AND VIDEOTAPED DEPOSITION OF CHRISTINE SNEAD
 2 produced as a witness at the instance of the
 3 Plaintiff(s), and duly sworn, was taken in the
 4 above-styled and numbered causes on the 19th of April,
 5 2007, from 8:31 a.m. to 3:40 p.m., before CYNTHIA
 6 VOHLKEN, CSR in and for the State of Texas, reported
 7 by machine shorthand, at the offices of Brown
 8 McCarroll, LLP, 2001 Ross Avenue, Suite 2000, Dallas,
 9 Texas, pursuant to the Texas Rules of Civil Procedure
10 and the provisions attached previously.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         A P P E A R A N C E S
 2 FOR THE PLAINTIFF THE STATE OF TEXAS:
 3     Mr. Raymond C. Winter
       Assistant Attorney General
 4     Office of the Attorney General
       State of Texas
 5     Post Office Box 12548 (78711-2548)
       300 W. 15th Street, 9th Floor
 6     Austin, Texas 78701
 7 FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 8     Ms. Ann M. St. Peter-Griffith
       Assistant U.S. Attorney
 9     United States Attorney's Office
       Southern District of Florida
10     99 N.E. Fourth Street
       Miami, Florida 33132
11
       FOR THE PLAINTIFF THE STATE OF ARIZONA AND MDL
12 PLAINTIFFS:
13     Mr. Christopher Stuart
       Wexler Toriseva Wallace LLP
14     One North LaSalle Street, Suite 2000
       Chicago, Illinois 60602
15
16 FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
17     Mr. Eliseo Sisneros
       Deputy Attorney General
18     BMFEA
       Bureau of Medi-Cal Fraud & Elder Abuse
19     State of California Department of Justice
       110 West A Street #1100
20     San Diego, California 92101
21 FOR THE RELATOR:
22     Mr. C. Jarrett Anderson
       Anderson LLC
23     1300 Guadalupe, Suite 103
       Austin, Texas 78703
24
25
```

Page 5

```
 1 FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
   HOSPIRA, INC.:
 2
       Ms. Carol Geisler
 3     Jones Day
       77 West Wacker, Suite 3500
 4     Chicago, Illinois 60601-1692
 5
   FOR THE WITNESS:
 6
       Mr. David J. Stetler
 7     Stetler & Duffy, Ltd.
       11 South LaSalle Street, Suite 1200
 8     Chicago, Illinois 60603
 9 ALSO PRESENT:
10     Mr. Richard Rienstra, Videographer
11
12         *-*-*-*-*
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

b66cc43c-5092-4127-9266-2a482f299285

Page 6

INDEX

1
2  Appearances...................... 4
3  CHRISTINE SNEAD
      Examination by Mr. Winter............... 10
4     Examination by Mr. Anderson............ 173
      Examination by Ms. St. Peter-Griffith.... 212
5
   Reporter's Certificate...................... 288
6
7  VIDEOTAPE NUMBER
8        1 ....................................... 9
         2 ..................................... 80
9        3 ................................... 154
         4 ................................... 212
10       5 ................................... 278
11
         EXHIBITS
12
   NO.  DESCRIPTION                      PAGE
13
         (Previous Exhibits)
14
   52............................................. 270
15 480........................................... 96
   601............................................. 65
16
         (New Exhibits)
17
   700........................................... 10
18  Plaintiffs' Notice of Intention to Take
      Oral Deposition and Request for Documents
19    by Texas
   701........................................... 12
20  Notice of Deposition by the United States
      of America
21 702........................................... 14
      Documents produced by Ms. Snead
22 703........................................... 69
      January 10, 1992 Letter from Christine
23    Snead to Reid Toda, Access Biotechnology,
      Addendum to the Regional Distributor
24    Agreement (ABT 280497) (TXABT 18523)
      Highly Confidential
25

Page 7

1  NO.  DESCRIPTION                    PAGE
2  704........................................... 87
      July 31, 1992 Interoffice Correspondence
3     from Debra DeYoung to Various Individuals,
      with attachment Medi-Span listing of their
4     division's products; June 16, 1992 Letter
      from Terri Rector to Jo-Ann Hulett
5     (ABT211963-211978)
   705........................................... 114
6   December 5, 1994 Letter from Joseph Bane,
      Coram Healthcare, to Chris Snead, Request
7     for Proposal (TXABT 249852-249856) Highly
      Confidential
8  706........................................... 122
      December 22, 1994 Interoffice
9     Correspondence from Chris Snead to Don
      Carson, Re:  Coram RFP (TXABT 249849)
10    Highly Confidential
   707........................................... 124
11    December 29, 1994 Interoffice
      Correspondence from Don Carson to various
12    individuals, Re:  Coram RFP/Corporate
      Contract (TXABT 249848) Highly Confidential
13 708........................................... 132
      September 15, 1994 Interoffice
14    Correspondence from Gerald Martin to
      various individuals (ROSS 334959)
15    Confidential (ROSO117-1384)
   709........................................... 145
16  December 1, 1992 Letter from Christine
      Snead to Martha McNeill (TABBH 000758)
17 710........................................... 152
      June 3, 1993 Letter from Christine Snead to
18    Martha McNeill, enclosing application forms
      for Bupivacaine and Vancomycin
19    (TABBH 0000051-54, 48-50)
   711........................................... 213
20  July 2, 1993 Letter from Martha McNeill to
      Christine Snead regarding Vancomycin and
21    Bupivacaine (TABBH 000047)
   712........................................... 237
22  February 2, 1996 Interoffice Correspondence
      from Sharon Jones to various individuals,
23    Re:  Department of Justice Civil
      Investigative Demand No. 95-125
24    (ABT-DOJ 0228265-0228270) Confidential
25

Page 8

1  NO.  DESCRIPTION                      PAGE
2  713........................................... 240
      October 29, 1997 Interoffice Correspondence
3     from Jose Rivera, Jr. to various
      Individuals, Re:  U.S. Department of Health
4     and Human Services Subpoena
      (ABT-DOJ 0228271) Confidential
5  714........................................... 255
      July 17, 1992 Interoffice Correspondence
6     from Joyce Van Laeke to Bob Steller and
      Satish K. Shah, Re:  Medicaid - GVR
7     coordinator (ABT211873) (ABT-DOJ 0018570)
      Highly Confidential
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1        THE VIDEOGRAPHER:  Okay.  We're on the
2  record April 19th, 2007 at 8:31 a.m.
3        Would counsel like to identify
4  themselves for the record?
5        MR. WINTER:  Raymond Winter with the
6  Attorney General's Office for the State of Texas for
7  the plaintiff, State of Texas.
8        MR. ANDERSON:  Jarrett Anderson, counsel
9  for the Relator
10        MS. ST. PETER-GRIFFITH:  Ann
11  St. Peter-Griffith from the United States Attorney's
12  Office in Miami on behalf of the United States.
13        MR. SISNEROS:  Eliseo Sisneros, Deputy
14  Attorney General, State of California.
15        MS. GEISLER:  Carol Geisler representing
16  Abbott Laboratories, Abbott Laboratories, Inc. and
17  Hospira, Inc.
18        MR. STETLER:  And Dave Stetler for the
19  witness.
20        THE VIDEOGRAPHER:  Will the court
21  reporter please swear in the witness.
22        CHRISTINE SNEAD,
23  having been first duly sworn, testified as follows:
24
25

3 (Pages 6 to 9)

b66cc43c-5092-4127-9266-2a482f299285

Page 10

1           EXAMINATION
2  BY MR. WINTER:
3      Q.  Good morning, Ms. Snead.  My name is Raymond
4  Winter and we met for the very first time today just
5  about 10 minutes ago, correct?
6      A.  Correct.
7      Q.  And you and I have never spoken to each other
8  on the telephone before --
9      A.  Right.
10      Q.  -- today?
11      A.  We have not.
12      Q.  All right.  Very good.  You understand that
13  you have been asked to come speak with us today in
14  connection with a lawsuit that the State of Texas has
15  against Abbott Laboratories, your former employer?
16      A.  Yes.
17      Q.  And, in fact, have you seen a copy of the
18  subpoena that -- and deposition notice that was --
19  I'll mark here as Exhibit 700 that was presented to
20  your counsel and to the defense.  Do you recognize the
21  document that I've marked as Exhibit 700, ma'am?
22      A.  Yes.
23      Q.  And if you will flip through the several
24  pages back, there's an Exhibit A, "Documents To Be
25  Produced."  Do you see that?  I guess it's about the

Page 11

1  sixth page back.
2      A.  Yes.
3      Q.  And did you go over that list of documents to
4  see if you had anything responsive to the
5  specifications here in your possession, custody or
6  control?
7      A.  I did.
8      Q.  Okay.  Very good.  And you have actually
9  produced some documents to us this morning through
10  your counsel, Mr. Stetler, correct?
11      A.  Yes.
12      Q.  Okay.  And we're going to get a couple of
13  copies made of those documents and I'm going to ask
14  you a few questions about those in just a few minutes.
15          Were the -- I think there were maybe
16  eight documents that you produced, is that -- did you
17  count them?
18      A.  I did not count them.
19      Q.  Okay.  We'll count them here in just a minute
20  when they come back.  But is it your understanding,
21  and based upon your search, that those were the only
22  documents that you had in your possession, custody or
23  control that were responsive to the specification on
24  the State of Texas document request?
25      A.  Yes.

Page 12

1      Q.  Okay.  And I'm going to mark here, also, as
2  Exhibit 701 a notice of today's deposition and
3  document request that was propounded by the United
4  States of America.  And ask you, ma'am, if you've had
5  an opportunity to look over that document before?
6      A.  Okay.  I -- this -- the first couple of
7  pages, the District of Massachusetts, I don't remember
8  that part, but I remember -- or
9      Q.  The subpoena part attached to it?
10      A.  Yes.  Yes.
11      Q.  Okay.  And the document request that's
12  attached to that subpoena, did you review that or is
13  there a document request attached to that?
14          MR. STETLER:  Uh-huh, there is.
15          MS. GEISLER:  Yes.
16      A.  Yes.
17      Q.  (BY MR. WINTER)  Okay.  And did you search
18  your papers and records in your possession, custody
19  and control for documents responsive to the United
20  States document request?
21      A.  Yes.
22      Q.  Okay.  And, again, the documents that you
23  produced this morning were everything that you found
24  responsive to either the State of Texas document
25  request or the United States document request; is that

Page 13

1  correct?
2      A.  That's correct.
3      Q.  Okay.  And I think we are getting our
4  documents back right about now.
5          While we get those copies back,
6  Ms. Snead, let me ask you this question:  Have you
7  ever been deposed before?
8      A.  I have.
9      Q.  When was the last time you were deposed?
10      A.  It was approximately 1990, 1991.
11      Q.  So it's been quite a while?
12      A.  Yes.
13      Q.  And has there only been one prior time that
14  you were deposed?
15      A.  Yes.
16      Q.  Okay.  Well, since it's been so long ago, let
17  me go over a few ground rules.  It's -- it's real
18  important that we not speak at the same time because
19  if two or more of us are talking, it's real difficult
20  for Cindy here to take down the testimony and it's
21  very important that we get a clear record of what you
22  have to say.  It's very important that we hear what
23  you have to say.  That's why we've asked you to come
24  here this morning.
25          And so you're nodding your head in

b66cc43c-5092-4127-9266-2a482f299285

Page 14

1  agreement.  That's another thing that we like to make
2  sure that -- that we get on the record is a clear
3  answer, a "yes" or a "no" or a clear articulation of
4  your response and not just a nod or a shake of the
5  head because that can be ambiguous sometimes.  It can
6  be a negative or an affirmative.
7      A.  All right.
8      Q.  And sometimes people just say "uh-huh" or
9  "huh-uh" and that can be unclear as well.  So if
10 you'll please try to remember to -- to say a "yes" or
11 a "no" or a narrative as appropriate.
12     A.  Okay.
13     Q.  And other than that, I'll try and not
14 interrupt your responses to my questions, if you will
15 also try and let me spit out my question first before
16 you start to answer, even if you know where I'm going,
17 and sometimes you can tell.
18     A.  Okay.
19     Q.  Thank you.  So what I'm going to do now is
20 I'm going to get a copy of the documents that you
21 handed me this morning and I'm going to just call this
22 entire stack Exhibit 702.
23        MR. WINTER:  And, Cindy, I'm just going
24 to put the sticker on the very first note, handwritten
25 note here.

Page 15

1        THE REPORTER:  Yes.
2      Q.  (BY MR. WINTER)  All right, Ms. Snead.  Let
3  me just ask you to describe for us what we have here.
4  The first document marked as CS-1, can you tell me
5  what that is?
6      A.  These are notes, basically, to phone numbers
7  that I wrote down when I first received a call from
8  the attorney for Abbott.  They gave me Dave Stetler's
9  name and phone number and also told me if I had any
10 questions I could call Ellen Klaus at Abbott legal and
11 that's her phone number.
12     Q.  And who was the attorney for Abbott that gave
13 you a call?
14     A.  I don't remember her name.  It was a female.
15     Q.  Do you remember how long ago you received
16 this telephone call?
17     A.  About two months ago.
18     Q.  And was the gist of the phone call to advise
19 you that the State of Texas was interested in taking
20 your deposition testimony?
21     A.  Yes.
22     Q.  Okay.  How long did that telephone call last?
23     A.  A couple of minutes.
24     Q.  And was that all that was discussed in that
25 conversation, simply to put you on notice that Texas

Page 16

1  was interested in deposing you?
2      A.  Yes.  And that if I wanted to talk to Dave
3  Stetler, I could, to represent me.
4      Q.  Okay.
5      A.  Or call Abbott if I had other questions.
6      Q.  Did the woman who called you at that time ask
7  you if you had any documents in your possession,
8  custody or control?
9      A.  No.
10     Q.  Okay.  Had you been contacted by anyone on
11 behalf of Abbott at any time prior to that telephone
12 call two months ago in connection with litigation?
13     A.  No.
14     Q.  And when I say the "litigation," I'm
15 referring to the lawsuit that we're -- that we're here
16 on this morning.
17     A.  Correct.
18     Q.  Okay.  And did you decide that you wanted to
19 call Mr. Stetler?
20     A.  I actually gave her my phone number and said
21 he could give me a call.
22     Q.  Okay.  And subsequently Mr. Stetler is now
23 representing you here this morning, correct?
24     A.  Yes, correct.
25     Q.  Okay.  Did you ever have occasion to get in

Page 17

1  touch with Ms. Klaus and -- and seek clarification
2  from her on any issue?
3      A.  No.
4      Q.  So you never did follow up or call Ms. Klaus?
5      A.  No.
6      Q.  Okay.  In order to prepare for today's
7  deposition did you meet with Mr. Stetler?
8      A.  I met with Mr. Stetler yesterday.
9      Q.  And have you had logistical conversations
10 with him as well on the telephone?
11     A.  Yes.
12     Q.  Okay.  And in the discussions that you had
13 with Mr. Stetler, was anyone else present, either on
14 the phone or physically?
15     A.  No.
16     Q.  Did you ever have any telephone conversations
17 with any counsel for Abbott or any other
18 representatives of Abbott Laboratories to discuss the
19 substance of the testimony that you will give this
20 morning?
21     A.  No.  Just the phone call that I told you
22 about.
23     Q.  The very brief phone call when -- when the --
24     A.  Telling me that I was going to be subpoenaed.
25     Q.  Okay.  And was -- was that woman who called

5 (Pages 14 to 17)

Page 18

1  you, did you understand that she was a lawyer with --
2  who was representing Abbott?
3      A.  Yes.
4      Q.  Was she an in-house counsel or was she with a
5  law firm?
6      A.  She was with a law firm.
7      Q.  Was she with Jones Day?
8      A.  Yes.
9      Q.  Does the name Tara Fumerton ring a bell to
10  you?
11      A.  Not really.  I just -- I don't remember the
12  name, other than it was a female.
13      Q.  And I understand that you don't remember.
14  I'm going to ask you a couple of questions and may,
15  throughout the day, ask you some questions that are
16  designed to try and see if you can -- if it jogs your
17  memory any.
18          Ms. Geisler here this morning is a
19  lawyer from Jones Day.  I'll represent that to you.
20  Had you ever met her before this morning?
21      A.  No.
22      Q.  Do you think it might have been Ms. Geisler
23  that you spoke to on the phone?
24      A.  I don't know.  I don't think so because her
25  voice is different.

Page 19

1      Q.  Okay.  Would you please let us know what the
2  document marked as CS-2 is, the second page in this
3  package?
4      A.  It's the first page of my resume.
5      Q.  Is this a current resume?
6      A.  No.
7      Q.  When was this resume in effect or when was it
8  last current, let me ask you that?
9      A.  I -- let me just -- I updated it in 1997.
10      Q.  Do you recall what month in 1997?
11      A.  May.  May or June.
12      Q.  And do you say it was May or June because
13  that was approximately the time that you were getting
14  ready to leave Abbott Laboratories?
15      A.  No.  That was the time when I was
16  interviewing for a position -- a different position
17  within Abbott Laboratories.
18      Q.  Okay.
19          MS. ST. PETER-GRIFFITH:  Ray, could we
20  just go off the record to find out who has --
21          MR. STUART:  I'm sorry.
22          MS. ST. PETER-GRIFFITH:  -- come in just
23  to make sure we are all -- because we've got some
24  confidential documents.
25          (Discussion off the record)

Page 20

1      Q.  (BY MR. WINTER)  Ms. Snead, you were telling
2  us that the document marked as CS-2 is a document that
3  you had updated at or about -- or in or around June --
4  May or June of 1997 and that actually covers Pages 2,
5  3 and 4; is that correct?
6      A.  Yes.
7      Q.  Okay.  Let me back up for a minute here and
8  just ask you very briefly to describe for me when you
9  first came to work at Abbott.  It's probably on the
10  resume, but --
11      A.  I -- I first started working for Abbott in
12  '83, but it was actually -- I worked for a company
13  that was called Sorenson Research, which had just been
14  acquired by Abbott.
15      Q.  And that was in 1983?
16      A.  Yes.
17      Q.  Okay.  And I'm looking now on Page 4 of the
18  exhibit and it says from June 1980 to June of 1983 you
19  were a staff nurse; is that correct?
20      A.  Yes.
21      Q.  And so is it subsequent to June of '83 that
22  you went to work for this company acquired by Abbott?
23      A.  Yes.
24      Q.  Okay.  And that would be November '83?
25      A.  Yes.

Page 21

1      Q.  What was the name of the company?
2      A.  Sorenson Research.
3      Q.  Okay.  And you were there from November '83
4  to April of 1986?
5      A.  Yes.
6      Q.  And it was sometime during that time period
7  that Abbott acquired the company?
8      A.  I believe they had acquired Sorenson just
9  before I was hired.
10      Q.  And in April of 1986 until July of 1988 your
11  resume on Page 3 says that you were an implant
12  consultant and sold surgical implants to urologists in
13  the San Francisco market.  Was this also with Abbott
14  or did you leave Abbott's employment during this time?
15      A.  I left Abbott.
16      Q.  Okay.  And then August of '88 to January '91
17  you were with a company called American Medical
18  Systems; is that correct?
19      A.  No.  American Medical Systems is where I was
20  implant consultant --
21      Q.  Okay.  That's when --
22      A.  -- from '86 --
23      Q.  -- you went to Abbott again?
24      A.  In 1988, yes --
25      Q.  Yes.

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 22

1      A.  -- I went back to Abbott again.
2      Q.  I apologize for speaking over your answer.
3          Okay.  I'm following the format of the
4  resume now.
5          Okay.  So from August -- August of '88
6  you went back to work for Abbott for the second time.
7      A.  Yes.
8      Q.  Okay.  And you worked in the Hospital
9  Business Sector, which is sometimes known as -- or
10 called HPS; is that true?
11     A.  Yeah.  Or at that time it was called HPD --
12     Q.  HPD would be Hospital --
13     A.  -- was the division.  I'm sorry.
14     Q.  Hospital Products Division?
15     A.  Yes.
16     Q.  Okay.  And Hospital Products Division had a
17 Hospital Business Sector and also an Alternate Site
18 business unit, correct?
19     A.  Correct.
20     Q.  Okay.  So when you went back to Abbott in
21 '88, you were in the Hospital Business Sector as
22 opposed to Alternate Site, correct?
23     A.  Correct.
24     Q.  Okay.  And your resume here says that you
25 sold a full line of hospital products in the Chicago

Page 23

1  territory.  Who were you selling to?
2      A.  To hospitals.
3      Q.  Were you selling through GPOs that had
4  hospitals as members or directly to hospitals?
5      A.  Directly to hospitals.
6      Q.  Okay.
7      A.  GPOs may have been their -- they may have
8  been members of GPOs, but my point of contact was the
9  hospital.
10     Q.  Okay.  And in January of -- well, there's a
11 gap here because according to Page 3 of the resume,
12 you had this job from August of '88 until January '91.
13 Your next entry starts in July of '91.  Do you see
14 that at the top of the page?
15     A.  I do.
16     Q.  Can you explain the -- the gap there between
17 January '91 and July '91?
18     A.  I think it's a typo.
19     Q.  Okay.  Which one do you think is correct?
20     A.  I think July is correct --
21     Q.  Okay.
22     A.  -- because I can remember interviewing when
23 it was warmer.
24     Q.  And -- and so July of '91 would be when you
25 moved from the Hospital Business Sector over to

Page 24

1  Alternate Site?
2      A.  Yes.
3      Q.  Okay.  And you were brought on board in the
4  Alternate Site business sector working for John Ward
5  as a national account executive?
6      A.  Yes.
7      Q.  Okay.  And who were the accounts that you
8  were responsible for when you -- when you first came
9  on, as best as you can recall?
10     A.  The ones I can remember would be PBI, Coram,
11 Caremark.  I had general responsibility for surgery
12 centers.
13     Q.  Does Amerinet ring a bell as a surgery
14 center?
15     A.  Yes, Amerinet.  Well, Amerinet is a buying
16 group.
17     Q.  They're a buying group or a GPO that includes
18 surgery centers?
19     A.  Yes.
20     Q.  Okay.  So in the -- in the hospital -- excuse
21 me.  In the Alternate Site business unit from July of
22 '91 until the -- until the time that you left Abbott
23 Laboratories -- well, let me -- let me rephrase my
24 question here.
25         From July of '91 until January of '95

Page 25

1  you were a national account manager within Alternate
2  Site, right?
3      A.  Yes.
4      Q.  Okay.  And as such you were calling on key
5  accounts within the Alternate Site business sector,
6  that is, customers of Abbott that were not in the
7  hospital setting, but were alternative to the hospital
8  setting.
9      A.  Yes.
10         MS. GEISLER:  Objection to the form.
11     Q.  (BY MR. WINTER)  Correct?
12     A.  Yes.
13     Q.  Okay.  Such as home infusion pharmacies,
14 long-term-care pharmacies, surgery centers, things of
15 that nature; is that true?
16     A.  Let me just clarify your question.  When you
17 said "home infusion pharmacies," you mean home
18 infusion -- I don't know what you mean by that.  Two
19 separate entities or --
20     Q.  Yes, ma'am.  Well, let me ask you.  Do you
21 have an understanding of what a home infusion pharmacy
22 is?
23     A.  A home infusion -- I guess I never thought of
24 them as a home infusion pharmacy, just a home infusion
25 company, but --

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 26

1    Q.  Okay.
2    A.  -- yes, I do.
3    Q.  If you're more comfortable with that
4  language, I'll -- I'll use that.
5            Could you please explain for us what
6  your understanding of a home infusion company is?
7    A.  They handle homecare.
8    Q.  Okay.  And homecare is what?
9    A.  Taking care of patients in their homes.
10   Q.  Okay.  And -- and would that entail, to some
11  extent, providing drugs that will be delivered through
12  an infusion system?
13   A.  Yes.
14   Q.  Okay.  From time to time you may hear an
15  objection like you heard a moment ago from
16  Ms. Geisler, and don't let that throw you off.  She
17  may make an objection as to the form of the question
18  because she thinks there's some default in the
19  question and she's preserving her rights for a later
20  date.
21   A.  Okay.
22   Q.  Still means that -- that you can answer the
23  question if you know the answer.
24   A.  Okay.
25   Q.  Okay.  In -- in or about January 1995 until

Page 27

1  October '95, according to the resume, you went on to
2  become a marketing manager, correct?
3    A.  Correct.
4    Q.  And this is still at Abbott.
5    A.  Yes.
6    Q.  And was this in Alternate Site or was this in
7  the Hospital Business Sector?
8    A.  This was in neither.  This was in a whole
9  'nother division of Abbott, the HealthSystems
10  Division.
11   Q.  I see.  And what was -- can you distinction
12  for me, please, the function of the HealthSystems
13  Division from the Hospital Products Division?
14   A.  HealthSystems Division didn't really have any
15  products.  It was more of a corporate type of
16  division.
17   Q.  And what -- what was the primary business
18  model for the HealthSystems Division?
19          MS. GEISLER:  Objection to the form.
20   A.  I don't know that I can -- I don't know that
21  I understand the question or I can answer that
22  question.
23   Q.  (BY MR. WINTER)  Well, what did you do in the
24  HealthSystems Division?  Let me tackle it that way.
25   A.  Okay.  As a marketing manager I -- well, it's

Page 28

1  pretty much listed on the resume.  I pulled together
2  marketing programs or -- I basically pulled together a
3  binder of programs that various divisions had
4  pulled -- had offered and it was something that there
5  were -- there were salespeople within the
6  HealthSystems Division, a very small sales force, but
7  their role was to represent Abbott in total to key
8  customers.
9    Q.  Were there some key customers that Hospital
10  Products Division Alternate Site would call on that
11  were also called on by sales representatives from the
12  Pharmaceutical Products Division?
13          MS. GEISLER:  Objection to the form.
14   A.  I would -- yes, I would think so.
15   Q.  (BY MR. WINTER)  Is Coram an example of an
16  account that was of interest to both HPD Alt Site and
17  PPD?
18   A.  I would think so.  I don't -- when I worked
19  in Alternate Site, my sole focus was Alternate Site.
20  There wasn't much interaction with other divisions.
21   Q.  Well, do you recall either when you were
22  working at Alternate Site or when you were working in
23  the HealthSystems Division up at the corporate level
24  that there were some key accounts that were of
25  interest sort of across a broad spectrum of different

Page 29

1  Abbott divisions?
2    A.  Yes.
3          MS. GEISLER:  Objection to the form.
4    Q.  (BY MR. WINTER)  Okay.
5          MR. STETLER:  Give her time to object.
6          THE WITNESS:  I'm sorry.
7          MS. GEISLER:  That's okay.
8          MR. STETLER:  You can ignore her after
9  she objects, but not before.
10          MR. SISNEROS:  I'm sorry, I didn't hear
11  the answer.
12          THE WITNESS:  The answer was yes.
13   Q.  (BY MR. WINTER)  And in fact, on the bottom
14  of Page 2 when you were the marketing manager there,
15  there are three bullet points and you've got -- let's
16  just kind of walk through those.  The first one is
17  "Developed Shared Vision," and you have the trademark,
18  "initiative for Abbott sales executives."  Can you
19  tell me what that was?
20   A.  That was what I referred to earlier was
21  basically just a collection of -- of marketing
22  programs that were available throughout all of
23  Abbott's divisions.
24   Q.  Can you tell me what some of those marketing
25  programs were that were included in the Shared Vision

8 (Pages 26 to 29)

b66cc43c-5092-4127-9266-2a482f299285

Page 30

1  initiative?
2      A.  One example would be we had consulting
3  services that were offered actually within the
4  HealthSystems Division to help a customer look at
5  efficiency of process, for instance.  I'm drawing a
6  blank on other programs from other divisions.  I'm
7  sorry.  It's been 12, 13 years.  I just can't
8  remember.
9      Q.  Sure.  I understand.  Was this your project,
10 this Shared Vision initiative?
11         MS. GEISLER:  Objection to the form.
12     A.  I -- yes, it was my project when I --
13     Q.  (BY MR. WINTER)  And -- and how long did you
14 work on it?
15     A.  Probably six to nine months.
16     Q.  So one -- did you have a team of folks that
17 worked with you on this or was it your -- your project
18 all to yourself?
19     A.  It was -- it was my project to pull this
20 binder together, but the actual program -- marketing
21 programs themselves were developed by marketing people
22 within the divisions.
23     Q.  And -- and one of these programs was to make
24 a consulting service available to Abbott's customers,
25 did I understand you to say that?

Page 31

1      A.  That was a program that existed.
2      Q.  Okay.
3      A.  So it wasn't to make the program, it was --
4  it was already there.
5      Q.  The program was already there, but that --
6  but sort of the packaging and the selling of the
7  program was a part of what you were doing through this
8  Shared Vision initiative; is that right?
9          MS. GEISLER:  Objection to the form.
10     A.  Yes.  It was basically a one-page
11 description.
12     Q.  (BY MR. WINTER)  Okay.  And -- and can you
13 explain for me how this consulting program operated?
14     A.  We could bring in people that had
15 expertise -- there were consultants that had different
16 areas of expertise.  The only one I can really
17 remember is just looking at process and how to make --
18 how to help customers make their -- oh -- and I can't
19 remember specific examples, but maybe how -- I'm at a
20 loss because I just -- it's been so long.  But just
21 looking at process, either nursing process, how
22 nurses -- how nurses function.  Is there a way to make
23 the way they did something more efficiently done
24 time-wise versus the way they were doing it.
25     Q.  So the whole purpose of the consultant was

Page 32

1  essentially -- it was a service that Abbott offered to
2  its customers that would enable the customers to run a
3  more efficient business.
4          MS. GEISLER:  Objection to the form.
5      A.  Yes.
6      Q.  (BY MR. WINTER)  Okay.  And this consulting
7  services that Abbott offered was already available,
8  but your function was to -- to package it up in a way
9  that it was -- it was easier and more efficient for
10 Abbott to sell it to the customers; is that true?
11         MS. GEISLER:  Objection to the form.
12     A.  To explain the service to the customer.
13     Q.  (BY MR. WINTER)  Okay.  So that Abbott could
14 get the message out to the customers.  And ideally
15 what Abbott was hoping is that the customers would
16 decide that they wanted to avail themselves of the
17 consulting service, correct?
18         MS. GEISLER:  Objection to the form.
19     A.  Yes.
20     Q.  (BY MR. WINTER)  Okay.  And it was a service
21 that the customer could purchase from Abbott, right?
22     A.  No.
23     Q.  Abbott offered the consulting service for
24 free?
25     A.  I believe so.

Page 33

1      Q.  Did --
2      A.  I don't know if sometimes it was purchased or
3  not.
4      Q.  And is it your recollection that the
5  information you had that you put together on the
6  consulting service or that you included in the binder
7  was only one page of the binder?
8      A.  Yes.
9      Q.  And how big was the binder?
10     A.  Probably like a one-inch binder, a half-inch
11 binder.
12     Q.  About the size of this one here on the table?
13         MS. GEISLER:  Objection to the form.
14     A.  It was a little small -- I think it was a
15 little smaller than that, but --
16     Q.  (BY MR. WINTER)  Okay.
17     A.  -- the general vicinity.
18     Q.  Maybe 50 pages long?
19         MS. GEISLER:  Objection.
20     A.  Again, it's -- it's just too long ago.  I
21 don't remember exactly.  I would -- 25 pages, maybe.
22     Q.  (BY MR. WINTER)  Okay.  And the other 24
23 pages would have described other offerings that Abbott
24 had?  Help me out here, if you can, as best as you can
25 recall, what else was in this binder besides the

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 34

1  one-page description of the consulting service?
2      MS. GEISLER: Objection to the form.
3      A.  I just can't -- I honestly cannot remember.
4  I'm just drawing a blank.  I know other things were
5  there.
6      Q.  (BY MR. WINTER)  But you remember generally
7  that the purpose of this binder -- which as I
8  understand it, this binder we are talking about was
9  the Shared Vision initiative; is that true?
10     A.  Yes.
11     Q.  Okay.  And the purpose of that was to -- to
12  serve as a -- a selling aid to the sales executives;
13  is that true?
14     A.  Yes.
15         MS. GEISLER: Objection to the form.
16     A.  Yes.
17     Q.  (BY MR. WINTER)  Okay.
18     A.  I do -- I have one other example.  I remember
19  one.  That they -- a customer could come tour a plant.
20  For instance, our Austin plant was very well run.  The
21  inventory and the way the inventory was managed was
22  very efficient and so that was one -- another example
23  where a customer could do a tour, a site visit and
24  take a look at how we did those things.
25     Q.  Okay.  So the binder would have included some

Page 35

1  information that would have been available to the
2  sales executives where they could essentially tout the
3  fact that Abbott had very well run distribution
4  centers and that tours were available.
5         MS. GEISLER: Objection to the form.
6      A.  Yes.
7      Q.  (BY MR. WINTER)  Something to that effect.
8      A.  Something to that effect.
9      Q.  Okay.  Your second bullet point here says you
10  "Supported the Coram/Abbott negotiations with P&L and
11  competitive analyses.  Formulated Coram proposal."
12         Did I read that correctly?
13     A.  Yes.
14     Q.  What is P&L?
15     A.  Profit and loss.
16     Q.  And was that a profit and loss projection
17  that Abbott was going to present to Coram?
18         MS. GEISLER: Objection to the form.
19     A.  No.
20     Q.  (BY MR. WINTER)  Can you explain for me what
21  the profit-and-loss statement is or the P&L that
22  you're talking about here?
23     A.  It --
24     Q.  Go ahead.
25     A.  It referred to -- Abbott's profit --

Page 36

1      Q.  Okay.
2      A.  -- based on, you know, our projections.
3      Q.  And is -- is this profit and loss analysis
4  that you did here, was it something that you did on
5  your own or in conjunction with somebody in a contract
6  marketing department?
7      A.  That would have been in conjunction with
8  someone in contract marketing.
9      Q.  Would that -- and the Coram/Abbott
10  negotiations that you're describing here, are these
11  negotiations between Abbott corporate and Coram or
12  between one of the divisions and Coram?
13         MS. GEISLER: Objection to the form.
14     A.  That was an Abbott corporate negotiation.
15     Q.  (BY MR. WINTER)  Okay.  So it would have
16  been -- this would have been an example where Abbott's
17  corporate level was negotiating with Coram, but the
18  actual divisions that were selling the drugs and the
19  products would have been PPD and HPD or Alternate Site
20  or Ross, or what have you?
21         MS. GEISLER: Objection to the form.
22     A.  And when I say "Abbott corporate," I'm -- I'm
23  talking about -- yeah, divisions would have been
24  involved, correct.
25     Q.  (BY MR. WINTER)  Because corporate itself

Page 37

1  doesn't have any drugs to sell or any products, right?
2         MS. GEISLER: Objection to the form.
3      Q.  (BY MR. WINTER)  Isn't that true?
4      A.  Correct.
5      Q.  I mean, because the people who actually have
6  the products that are being sold are the different
7  divisions, correct?
8      A.  Correct.
9      Q.  And corporate is overseeing the process and
10  the reason corporate is involved is because multiple
11  divisions are interested in selling products to this
12  particular customer.
13         MS. GEISLER: Objection to the form.
14     Q.  (BY MR. WINTER)  Is that true?
15     A.  From what I remember about these
16  negotiations, multiple divisions were involved, but it
17  wasn't -- it was more -- I think there may have been
18  discussions between the different divisions, but it
19  wasn't like it was overseen, necessarily, by a
20  corporate --
21     Q.  Do you --
22     A.  -- somebody.
23     Q.  Excuse me.  Do you remember who at the
24  corporate level was involved in these discussions and
25  negotiations?

10  (Pages 34 to 37)

b66cc43c-5092-4127-9266-2a482f299285

Page 38

1    A.  Well, there was one meeting where Coram came
2  to Abbott Park.  I'm trying to remember.  Because
3  there were -- I believe Tom Hodgson was at that
4  meeting.
5    Q.  Do you remember attending a meeting with Tom
6  Hodgson and Kris Kringel?
7    A.  Kris Kringel would have been at that meeting.
8    Q.  What was Mr. Hodgson's position at the time
9  that he attended the meeting?
10   A.  He would have been CEO.
11   Q.  Of Abbott Laboratories?
12   A.  Yes.
13   Q.  Okay.  And do you remember what Mr. Kringel's
14 job was at that time?
15   A.  He was running HPD.
16   Q.  Do you remember if there was a representative
17 from PPD at the meeting?
18   A.  The only one I remember -- I do remember one,
19 but there may have been others.
20   Q.  Do you remember who that individual was?
21   A.  Chris Black.  I might be wrong on the last
22 name, but it began with a B.
23   Q.  Okay.  And, in fact, we are going to dig into
24 some documents here as we move on this morning that
25 may refresh your recollection a little bit about that.

Page 39

1        Is that the only -- this one meeting
2  that you're recalling now that Mr. Hodgson and
3  Mr. Kringel and Chris, whose last name you're fuzzy
4  on --
5    A.  Uh-huh.
6    Q.  -- attended, is that the only meeting that
7  you can recall that -- that you attended where
8  corporate level representatives participated in the
9  context of negotiations with a customer?
10        MS. GEISLER:  Objection to the form.
11   A.  Yes, that's the only one I remember.
12   Q.  (BY MR. WINTER)  Did you participate in any
13 other meetings --
14        Well, let me back up for a second and
15 ask you:  What was the purpose of this meeting -- and
16 let me lay a little bit of foundation here and make
17 sure we are talking about the same thing.
18        As I understand what you've described
19 for us, you recalled a meeting where Coram
20 representatives came to Abbott Park and met with
21 corporate level representatives of Abbott, correct?
22   A.  Correct.
23        MS. GEISLER:  Objection to the form.
24        MR. WINTER:  What's wrong with that
25 question?

Page 40

1        MS. GEISLER:  Corporate -- you said
2  corporate level representatives.  It mischaracterizes
3  her testimony.
4        MR. WINTER:  Well, she answered "yes,"
5  so I don't think it did.
6    Q.  (BY MR. WINTER)  So there was a meeting that
7  you recall attending where Coram representatives came
8  to Abbott Park and met with Abbott corporate level
9  representatives and among those representatives you
10 recall being Mr. Hodgson and Mr. Kringel, correct?
11   A.  I recall Mr. Hodgson and Mr. Kringel being
12 there, correct.
13   Q.  Okay.  What was the purpose of the meeting as
14 best as you can recall?
15   A.  It was what we called a VIP visit.  It just
16 was to give them an overview of Abbott and allow a
17 chance to get to know each other a little better.
18   Q.  Was there already a -- do you recall what
19 month and year this meeting occurred?
20   A.  It -- it probably would have been in '94, but
21 I -- I wouldn't know the month.
22   Q.  Okay.  Was there already, as best as you can
23 recall, a business relationship between Abbott and
24 Coram prior to the meeting?
25   A.  There was a business relationship between

Page 41

1  Alternate Site Product Sales and Coram.
2    Q.  Okay.
3    A.  I don't know about the other parts of Abbott.
4    Q.  So would it -- would it be a situation where
5  Alternate Site was already selling product to Coram,
6  but Abbott was essentially trying to do more business
7  with Coram and so that's why corporate and the other
8  divisions were getting involved?
9        MS. GEISLER:  Objection to the form.
10   A.  And at that time, again, my memory isn't
11 totally clear on time frame because it was so long
12 ago, but there was a lot of flux in the market and
13 Coram was really -- I don't know if it was a merging
14 or buy-out of companies, I can't remember, but there
15 were three -- I think it was three companies that came
16 together to form Coram.  So I don't know at that point
17 in time -- I think Coram had just been newly formed.
18        Now I forgot your question.  I'm sorry.
19   Q.  That's okay.  I think -- I think we'll get
20 back to it, so that's all right.  We'll move on.
21        Do you -- do you recall that Coram was a
22 homecare company?
23   A.  The -- I recall that Curaflex, who had been
24 my primary customer before Coram was formed, Curaflex
25 was one of those companies that became Coram, was a

Page 42

1   homecare company.  I don't recall what the other
2   entities were, if they indeed were just homecare or
3   had other businesses.
4       Q.   Other than this VIP meeting that you believe
5   probably occurred in 1994, did you attend meetings
6   without the higher level executives on your side
7   present with Coram representatives?
8           MS. GEISLER:  Objection to the form.
9       A.   I attended meetings with Curaflex and --
10  again, I'm just -- I can't remember when Coram became
11  Coram, but definitely with the predecessor and most
12  likely I did attend meetings with Coram
13  representatives.
14      Q.   (BY MR. WINTER)  And you said that Curaflex
15  was already your account before it merged with Coram
16  or became Coram?
17      A.   Yes.
18      Q.   Okay.  How do you spell Curaflex?
19      A.   C-u-r-a-f-l-e-x.
20      Q.   Okay.  When you had meetings and interaction
21  with Curaflex, would you travel to their location and
22  meet with their representatives on their home turf?
23      A.   Yes.
24      Q.   And where was that?
25      A.   It was in Southern California.

Page 43

1       Q.   Okay.  Did you do that frequently?
2       A.   I went probably every couple of months.
3       Q.   And I guess to give some time frame here, I'm
4   talking about from the time you became a national
5   account manager in July of '91 through January '95
6   Curaflex was your account?
7       A.   No.
8       Q.   Okay.  When did Curaflex become your account?
9       A.   Somewhere in the middle.  I -- when I first
10  was hired into the position as a national account
11  representative, that's why on my resume it says
12  manager/representative, and as a representative I had
13  less major accounts.  And then I became a national
14  account manager and at that point I -- I got Curaflex
15  as an account.  I can't tell you exactly.  I think it
16  was spring/summer of '93.
17      Q.   Is the distinction between a national account
18  representative on the one hand and a national account
19  manager on the other just a matter of which one of
20  those job titles has the more important accounts or
21  the larger accounts?
22      A.   Yes.
23      Q.   Okay.  So you were first a national account
24  representative and then you got promoted to becoming a
25  national account manager later.

Page 44

1       A.   Yes.
2       Q.   And you've got a top bullet here on Page 3
3   that indicates that you were the team leader of all
4   the Alternate Site Product Sales national accounts?
5           MS. GEISLER:  Objection to the form.
6       A.   Yes.
7       Q.   (BY MR. WINTER)  Okay.  Does that mean that
8   you were the head NAM amongst all the other NAMs?
9       A.   It meant that I was the most senior of the
10  NAMs and that would have been toward the end of this
11  four-year time frame.
12      Q.   And the other NAMs that would have been there
13  at that time would have been Dennis Walker and Mary
14  Beth Manso?
15      A.   Yes.
16      Q.   Okay.  So you were the senior of those
17  between the three of you?
18      A.   Yes.
19      Q.   Okay.  Did you have managerial
20  responsibilities over them?
21      A.   No.
22      Q.   You had your accounts, they had theirs.
23      A.   Yes.
24      Q.   And all three of you reported independently
25  to John Ward?

Page 45

1       A.   Yes.
2       Q.   Okay.  It's John Ward who hired you into the
3   position as a national account representative?
4       A.   Yes.
5       Q.   And he was still there when you left in --
6   when you left Alternate Site in 1995?
7       A.   Yes.
8       Q.   Looking at the second bullet on the bottom of
9   Page 2 again.  "Supported" the "Coram/Abbott
10  negotiations with P&L and competitive analyses."
11          And I read that accurately, right?
12      A.   Yes.
13      Q.   And then underneath that it says, "Formulated
14  Coram proposal."  Is that all part of the same entry
15  or are those two separate functions?
16      A.   That's all one bullet point.
17      Q.   Okay.  So the P&L and the competitive
18  analyses that you're referring to in the bullet would
19  have been included in the proposal; is that correct?
20      A.   No.
21      Q.   Okay.  Can you explain for me the
22  distinction, if there is any, between the P&L and
23  competitive analyses and the Coram proposal?
24      A.   The Coram proposal is the -- is the document
25  that would have been given to the customer --

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 46

1    Q.  Okay.
2    A.  -- with pricing and, you know, the whole
3  contractual document.
4        The P&L and competitive analysis was an
5  internal analysis of what we thought, based on the
6  volumes Coram likely would have given us, product
7  volumes that they thought they'd purchase over the
8  term of the contract.  So based on that information
9  and what -- and looking at our own pricing, it was
10  just the analysis that told us how profitable we
11  thought the deal could be.
12    Q.  I see.  In your experience as a national
13  account representative, and later a NAM, between July
14  of '91 and -- and January '95 -- let me withdraw the
15  question.
16        And ask you this:  This -- this Coram
17  proposal that you're describing, is that what was
18  sometimes referred to within Abbott as a proposal
19  analysis?
20        MS. GEISLER:  Objection to the form.
21    A.  The Coram proposal?
22    Q.  (BY MR. WINTER)  Yes, ma'am.
23    A.  No.
24    Q.  Are you familiar with the nomenclature
25  proposal analysis?

Page 47

1    A.  I am not.
2    Q.  During the time period that you were a NAM
3  and a national account representative over in
4  Alternate Site, did you work with contract marketing
5  department under Steve Kipperman to evaluate requests
6  for proposal and requests for bid that came in from
7  your key accounts?
8    A.  Yes.
9    Q.  Okay.  So, for example, PBI would have -- on
10  some fixed basis, whether annually or every two years
11  or at some interval, would submit an RFP or an RFB to
12  Abbott, correct?
13    A.  Yes.
14    Q.  Okay.  And as part of that process Abbott
15  would prepare a response to the request for proposal,
16  right?
17    A.  Yes.
18    Q.  And in -- in preparing that response, the
19  NAMs, such as yourself, for that key account would
20  work with a contract marketing analyst, such as
21  Mr. Kipperman, correct?
22    A.  Yes.
23    Q.  Okay.  What was the work product called that
24  you prepared to respond to the request for bid or
25  request for proposal?

Page 48

1    A.  The proposal.
2    Q.  It would -- you would just call it the
3  proposal?
4    A.  Yes.
5    Q.  Okay.  So I threw you off when I used the
6  word "proposal analysis"?
7    A.  Yes.
8    Q.  You would just call it, in your mind, just
9  the proposal?
10    A.  Yes.
11    Q.  Like the PBI proposal or the Coram proposal,
12  or what have you.
13    A.  Yes.
14    Q.  Okay.  In your experience from July '91 until
15  January of '95, who was responsible primarily for
16  preparing that proposal?  Would it have been the folks
17  in the contract marketing department or would it have
18  been the NAM's responsibility?
19    A.  Contract marketing.
20    Q.  Okay.  So they would have worked it up with
21  spreadsheets and tables and -- and you would have
22  provided input to the contract marketing analysis?
23    A.  Yes.
24    Q.  To the generation of those spreadsheets and
25  tables, correct?

Page 49

1    A.  Yes.
2    Q.  Okay.  And then ultimately, if it was
3  approved, then that proposal would be shared back with
4  the -- with the account, correct?
5    A.  Yes.
6    Q.  Okay.  Now, do you recall that there was a
7  time when Mr. Kipperman was the only individual in Alt
8  Site contract marketing?
9    A.  Yes.
10    Q.  And do you recall that there was a subsequent
11  time when he had two assistants?
12    A.  I recall Cindy Dawson being an assistant.  I
13  don't recall a second one, but there could have been.
14    Q.  Do you recall a woman by the name of Debbie
15  Longley?
16    A.  No.
17    Q.  In working with your accounts, such as
18  Caremark, PCA, PBI, I'm reading from the top of Page 3
19  of the exhibit, and you also mention Coram being one
20  of your accounts, did you have a specific assigned
21  analyst that you worked with?
22    A.  It would have been Steve Kipperman.
23    Q.  Was it always Steve Kipperman?
24    A.  He was the manager of contract marketing.
25    Q.  Did you ever work, though, with Cindy Dawson

13 (Pages 46 to 49)

b66cc43c-5092-4127-9266-2a482f299285

Page 50

1  where Mr. Kipperman was just kind of overseeing her
2  work, but you were really working day-to-day with
3  Ms. Dawson?
4          MS. GEISLER:  Objection to the form.
5      A.  I don't -- I don't recall ever going directly
6  to Cindy because I had more, you know, major accounts.
7  I would go talk to Steve.  Now, Steve may have given
8  Cindy some of the work to do.  I don't know.
9      Q.  (BY MR. WINTER)  But your interaction was
10 mostly with Steve Kipperman?
11     A.  Yes.
12     Q.  Okay.  As far as you knew, he's the one who
13 would prepare the proposals that you would have input
14 into that would then be shared back with the customer?
15     A.  As far as I know.
16     Q.  Looking back at your resume on the first
17 page.  In account 1995 it says that you -- it says
18 October '95 to present you were a marketing manager,
19 which is the same title that you had before, but it
20 looks like in a different -- a different area; is that
21 true?
22     A.  Yes.
23     Q.  Okay.  So you moved from Abbott HealthSystems
24 Division marketing to Abbott HealthSystems Division
25 disease strategies department?

Page 51

1      A.  Yes.
2      Q.  And what was the difference between those
3  two?
4      A.  The disease strategies was more focused on
5  looking at diseased states, i.e., diabetes or cancer.
6      Q.  And in that function did you interface with
7  the different Abbott divisions, such as Hospital
8  Products Division, Pharmaceutical Products Division,
9  Ross, TAP, any of the others that were selling
10 products that were germane to that specific disease
11 state?
12         MS. GEISLER:  Objection to the form.
13     A.  Yes.  I talked to people from different
14 divisions.
15     Q.  (BY MR. WINTER)  Well, did you just talk to
16 them or were you actually working with them on
17 specific projects that were related to whatever
18 disease state was that you were -- you happened to be
19 working on?
20     A.  No, I did not talk -- work with them on
21 specific projects.
22     Q.  What -- what -- it says here -- let me just
23 read from your resume.  "Led a multi-disciplinary team
24 which develops and implements cross-divisional disease
25 management programs for major health system customers

Page 52

1  to achieve incremental sales and margin."
2          What do you mean when you say "a
3  multi-disciplinary team"?
4      A.  Well, I did talk to other -- let me think
5  about this.  We -- this was a pro -- I worked on
6  developing a program which -- for instance, in -- in
7  diabetes that was really independent.  It wasn't a
8  product focus per se, it was its own program.  And so
9  my -- and part of that was working with clinicians
10 from different major health systems that were doing
11 like a clinical trial on this -- on this program.
12     Q.  Well, let's see if we can break that down a
13 little bit.
14     A.  Okay.
15     Q.  You said you -- if I understood what you just
16 said, you said you worked on a program that was
17 related to diabetes; is that correct?
18     A.  Yes.
19     Q.  And -- and part of that program involved
20 interfacing with major health systems?
21     A.  Yes.
22     Q.  Now, when you use that phrase "major health
23 systems," you're talking about healthcare providers
24 out in the real world?  I mean, is that what you're
25 talking about when you say "major health systems"?

Page 53

1      A.  Yes.
2      Q.  Can you give me an example of -- of a major
3  health system?
4      A.  Johns Hopkins Health System or here in
5  Dallas, Baylor Health System.
6      Q.  Hospital network system?
7      A.  Yes.
8      Q.  Okay.  So this -- this diabetes program
9  entailed Abbott personnel, such as yourself and your
10 multi-disciplinary team, speaking with providers of --
11 of medical care at institutions like John Hopkins --
12 Johns Hopkins or Baylor here in Dallas?
13     A.  Yes.
14     Q.  Okay.  And -- and what was the purpose of
15 your discussions?  Were you recommending therapies
16 that would be prescribed or used in the treatment
17 of -- of diabetics or were you recommending different
18 drugs?  Can you elaborate for me on -- on how this
19 program worked?
20         MS. GEISLER:  Objection to the form.
21     A.  It was basically we developed a -- like a day
22 planner type thing.  The diabetes I don't remember as
23 well as the cancer.  Could I speak to the cancer?
24     Q.  (BY MR. WINTER)  Certainly.
25     A.  That essentially was one of the problems with

14  (Pages 50 to 53)

b66cc43c-5092-4127-9266-2a482f299285

Page 54

1 patients that have cancer and are undergoing chemo and
2 radiation, and all sorts -- you know, surgeries, is
3 trying to keep track of all the meds they're on,
4 trying to keep track of their appointments for chemo.
5 So this essentially was like a day planner that was
6 specific to their disease state that would have a lot
7 of educational information, but also it had a calendar
8 where they could put stickers for all these different
9 things so they could keep track of their medical care.
10         So we talked to -- and I can't
11 remember -- I believe Baylor actually was one of the
12 sites, to -- to essentially be like a trial site for
13 us to see if this indeed helped patients.
14         And another component of it was doing --
15 collecting data, you know, doing surveys with patients
16 and collecting data to see if it really did help them.
17         So I had -- so part of this
18 multi-disciplinary team was clinical people that would
19 be collecting the data at the site, but also the
20 computer guy that developed the program so that, you
21 know, that data could be input.
22     Q.  Okay.  And -- and so the work product -- your
23 sentence says, "Implements" a "cross-divisional
24 disease management" -- let me rephrase that.
25         "Implements cross-divisional disease

Page 55

1 management programs for major health system customers
2 to achieve incremental sales and margin."
3         Now, what you've described is like a
4 plan book that had a calendar, but it also had
5 additional information that would be useful to the
6 provider, correct?
7     A.  To the patient.
8     Q.  Useful to the patient.  So it would be
9 this -- this calendar would be actually something that
10 was given to the patient?
11     A.  Yes.
12     Q.  Okay.  And it would have reminders on when
13 the patient was supposed to take certain drugs?
14     A.  No.
15     Q.  You mentioned something about reminders on
16 the calendar.
17     A.  It would have reminders on when to -- when a
18 chemotherapy appointment was coming up or that kind of
19 thing.
20     Q.  Was -- was there -- was there also some sort
21 of a product that Abbott would make available to its
22 customer, the major healthcare system?
23     A.  I don't understand your question.  That's
24 what --
25     Q.  Well --

Page 56

1     A.  Abbott sells products to major customers.
2     Q.  Abbott is selling -- when you say "products,"
3 we are talking about drugs, aren't we?
4     A.  Yes.
5     Q.  As well as some delivery devices for the
6 drugs?
7     A.  Yes.
8     Q.  Such as pumps?
9     A.  Yes.
10     Q.  Okay.  And -- but the -- the tangible product
11 that was generated in -- by this multi-disciplinary
12 team that you're describing in the first sentence of
13 your paragraph here on your resume, one tangible
14 product that we've talked about so far is this
15 calendar that was given to the patient, right?
16     A.  Yes.
17     Q.  Was there any other tangible products that
18 came out of this multi-disciplinary team that would
19 have been provided to the healthcare provider as
20 opposed to the patient?
21     A.  No.
22     Q.  Okay.  But one of the other tangible work
23 products of this multi-disciplinary team was a
24 computer database that you mentioned you had a
25 computer person working on --

Page 57

1     A.  Yes.
2     Q.  -- where you were collecting data on how this
3 program was -- was working, correct?
4     A.  Correct.
5     Q.  Okay.  Was this a program that Abbott found
6 to be successful?  Did it continue?
7     A.  It did not.
8     Q.  How long did it last?
9     A.  I don't know.  This was a pilot program and I
10 was there for the pilot.  I don't think it went beyond
11 pilot stage.
12     Q.  The rest of this paragraph reads -- I'll read
13 it and you can tell me if I misread it.
14         "Brought programs from concept through
15 implementation stage.  Includes program development,
16 vendor management, expert panel/opinion leader
17 cultivation, ROI analyses, marketing support, and
18 implementation at the customer level.  Responsible for
19 personnel management and development.  Managed
20 departmental budget of $3MM.  Also responsible for
21 developing marketing, licensing and alliance strategy
22 in collaboration with other department members."
23         Did I read that accurately?
24     A.  Yes.
25     Q.  And does all of that describe the same

15 (Pages 54 to 57)

b66cc43c-5092-4127-9266-2a482f299285

Page 58

1  multi-disciplinary team that generated these calendars
2  for the patients?
3     A.  Can you rephrase the question?
4     Q.  Sure.  Everything that I just read in that
5  first paragraph that begins with "Lead" and ends with
6  "department members," is all of that language
7  describing the very same multi-disciplinary team that
8  you and I have been talking about that had as its work
9  product this calendar that would be provided to cancer
10 patients?
11    A.  It does, except for the -- the last sentence.
12    Q.  In the second -- third sentence it says,
13 "Includes program development, vendor management,
14 expert panel/opinion leader cultivation, ROI,
15 analyses."  Does "ROI" mean return on investment?
16    A.  Yes.
17    Q.  What were the ROI analyses that you prepared?
18    A.  I don't remember.
19    Q.  Was that Abbott's return on investment from
20 this program or was this a return on investment for
21 the customer?
22    A.  It would have been Abbott's return on
23 investment.
24    Q.  And you said you prepared this in or about
25 May or June of 1997?

Page 59

1     A.  Yes.
2     Q.  Was -- was this project that we've been
3  talking about for the last few minutes that you
4  started in or about October 1995, was that the only
5  thing that you worked on when you were in the disease
6  strategies department at Abbott HealthSystems
7  Division?
8     A.  Yes.
9     Q.  And did you take a new position within Abbott
10 in or about May or June of 1997?
11    A.  Yes.
12    Q.  And where was that?
13    A.  That was in with -- with the HealthSystems
14 Division.  I became a corporate manager.
15    Q.  A corporate manager for what?
16    A.  For Abbott HealthSystems Division.
17    Q.  What were your responsibilities as a
18 corporate manager for Abbott HealthSystems Division?
19    A.  It was to call on major health systems.
20    Q.  Such as Johns Hopkins and Baylor?
21    A.  It was a local territory, so I was based here
22 in Dallas, so I called on Baylor, for instance.
23    Q.  And what was your purpose in calling on
24 Baylor when you were here in Dallas?
25    A.  One purpose was just to have more of a

Page 60

1  presence with executive level of those customers.
2     Q.  Are you familiar with Abbott's Home Infusion
3  Services business unit within Alternate Site?
4     A.  Yes.
5     Q.  Did you call on Baylor in connection with or
6  jointly with Home Infusion Services sales personnel?
7     A.  No.
8     Q.  Are you aware of the fact that Baylor was
9  enrolled in Abbott's Home Infusion Services program?
10    A.  It's ringing a bell, but I don't know any
11 detail about it.
12    Q.  Who did you report to when you were a manager
13 at the corporate level in Abbott's HealthSystems
14 Division?
15    A.  I reported to Scott Meecham.
16    Q.  Scott Meecham?
17    A.  Uh-huh.
18    Q.  And how long did you stay in that position?
19    A.  About two years.
20    Q.  So approximately 1999, summer of '99 did you
21 go --
22    A.  Yeah.  May of '99 I left Abbott.
23    Q.  And that's -- that was when you left Abbott's
24 employment?
25    A.  Yes.

Page 61

1     Q.  Okay.  Did you take a new position or did
2  you -- what did you do in May of 1999?
3     A.  I decided I wanted to stay at home with my
4  kids.
5     Q.  And are you currently employed?
6     A.  No.
7     Q.  The fifth, sixth, seventh and eighth pages in
8  the document that you produced this morning, Exhibit
9  702, those are all performance evaluations that were
10 done on you over your years at Abbott; is that true?
11    A.  Yes.
12    Q.  Okay, Ms. Snead.  I'm going to focus now on
13 the time period when you were a national account
14 representative and then later a national account
15 manager.  And you started in that position in July of
16 '91, correct?
17    A.  I'm sorry, I don't remember.  Yes.
18    Q.  Did you also have some responsibility in the
19 early 1990s for the Medicaid Rebate Program?
20    A.  Yes.
21    Q.  What was that responsibility?
22    A.  I -- I was sent forms that listed products, I
23 guess, that had been used by the states and I needed
24 to go through the products and either circle or
25 highlight the ones that were more pharmaceutical in

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 62

1  nature. It could be either IV solutions or injectable
2  drugs and -- because there was also medical equipment
3  on the list, like IV tubing, things like that.
4      Q.  And what was the purpose in distinguishing
5  between the products that were drug products on the
6  one hand versus durable medical equipment on the
7  other?
8      A.  I don't remember.  This was kind of a
9  clerical thing I did once a quarter, once a month, at
10 some interval, and I would do that and send it off to
11 someone in PPD.
12     Q.  Would that be Debra DeYoung?
13     A.  I believe, or someone that worked for Debra
14 DeYoung.
15     Q.  So all you did was just separate the drug
16 products from the equipment --
17     A.  Correct.
18     Q.  -- on -- on the printout that you got?
19     A.  (Nodded head affirmatively).
20     Q.  When you say "separate out," did you generate
21 a new list or did you just like mark it on the list
22 that you had?
23     A.  I just marked it on the list that I had.
24     Q.  You weren't looking at utilization or numbers
25 or prices or anything else, it was just distinguishing

Page 63

1  between the equipment and the drug products?
2      A.  Yes.  It was just distinguishing between
3  equipment and the drug --
4      Q.  And then you would send whatever the result
5  of your distinction was up to somebody in -- in
6  Ms. DeYoung's department at PPD?
7      A.  Yes.
8      Q.  Okay.  And did you have that responsibility
9  throughout the time that you were in Alternate Site?
10     A.  No.  I had it, I think, for a year, a year
11 and a half.
12     Q.  And who did you pass that duty on to?
13     A.  I believe it was Cindy Dawson.
14     Q.  Why did you transition that responsibility to
15 Cindy?
16     A.  Because it -- I think the reason I got it is
17 because I was the newest guy in there, you know,
18 inside and it really wasn't something that a national
19 account person needed to do.  It was more clerical in
20 nature and Cindy was a lower grade person that could
21 handle it fine.  The only requirement is that you
22 understood the product line, and she did.
23     Q.  You had mentioned that PBI, Coram, Caremark
24 were -- were accounts that you called on.  Do you
25 remember any others that you called on over that

Page 64

1  approximately four-year time period?
2      A.  Caremark?  Did you say Caremark?
3      Q.  Yes, ma'am.
4      A.  MedEcon, HSCA.
5      Q.  HFCA?
6      A.  HSCA.
7      Q.  HSCA.  What was HSCA?
8      A.  It was a buying group.
9      Q.  For what kind of -- what sort of customer?
10     A.  Primarily it was hospitals, but they had
11 Alternate Site, like surgery centers in their
12 membership as well.
13     Q.  And when you called on all of these accounts
14 as an Alternate Site sales representative or as a NAM,
15 you weren't calling on them in relation to their
16 hospital business, but rather with respect to their
17 Alternate Site business, correct?
18     A.  Correct.
19     Q.  And those would be either surgery centers,
20 the home infusion companies, long-term-care facilities
21 such as nursing homes?
22     A.  They -- they all probably could have been
23 members.  I don't know.  Specifically I remember that
24 their Alternate Site membership was heaviest with
25 surgery centers.

Page 65

1      Q.  Okay.  I'm looking at a document that was
2  marked in a different deposition as Exhibit 601 and
3  it's from, I think --
4          MR. STETLER:  Thank you.
5      Q.  (BY MR. WINTER) -- a little bit later in
6  your tenure as a national account representative or a
7  national account manager.  But if you look on Page 2
8  of that document, on the right-hand side there is a
9  list of the -- of folks we've already talked about,
10 Mary -- Ms. Manso at the top, you in the middle and
11 Mr. Walker on the bottom on the right-hand side.  And
12 then on the left-hand side there are some other names.
13 My understanding is the individuals on the left were
14 Hospital Business Sector NAMs and those on the right
15 are Alt Site NAMs.  Does that ring a bell with you?
16     A.  Yes.
17     Q.  Okay.  And it's got a listing of some your
18 accounts at that time, and this is October of 1994 on
19 the first page of the document.  You've got Caremark,
20 Coram, Abbey, Horizon Health and Medical Care
21 International mentioned.  Is -- is Medical Care
22 International, is that the same as MedEcon or is that
23 different?
24     A.  That's different.
25     Q.  You mentioned that MedEcon was one of your

17 (Pages 62 to 65)

b66cc43c-5092-4127-9266-2a482f299285

Page 66

1  accounts, right?
2      A.  I thought it was at one point.
3      Q.  Okay.  Did your accounts change over time?
4      A.  Yes.
5      Q.  Caremark, what kind of a business was
6  Caremark at the time when they were one of your
7  accounts?
8      A.  They were home infusion primarily, but they
9  also had a mail order business as well or else they
10  bought that.  I can't remember the timing of it, but
11  the part that I dealt with was home infusion.
12      Q.  And did you call on Caremark at their
13  principal place of business?
14      A.  Yes.
15      Q.  Which was where?
16      A.  That was in Illinois, a suburb of Chicago.
17      Q.  Okay.  And Coram, I think we've already
18  talked about them.  They were also a -- well, at least
19  their predecessor was a home infusion company,
20  correct?
21      A.  Correct.
22      Q.  And do you have a recollection as once the
23  merger took place, did -- they continued with a home
24  infusion business aspect, right?
25      A.  Yes.

Page 67

1      Q.  Okay.  And Abbey, what kind of company was
2  Abbey?
3      A.  I can't remember.
4      Q.  You remember them being a home infusion
5  company or a closed-door pharmacy?
6      A.  I don't remember.
7      Q.  What about Horizon Health, do you remember
8  anything about them?
9      A.  I believe they were a pharmacy, like subacute
10  care for, you know, a pharmacy for nursing homes, I
11  believe.
12      Q.  And Medical Care International, do you recall
13  anything about them?
14      A.  I believe they were a surgery center chain.
15      Q.  Did -- did your review of the companies
16  listed on this page refresh your recollection any as
17  to any of the other customers that you might have had,
18  kind of placing this in context of October of '94?
19      A.  No.  I can't think of any other ones.
20      Q.  You mentioned earlier that -- that when you
21  were initially in Alternate Site you were a national
22  account representative --
23      A.  Yes.
24      Q.  -- and then you got promoted to the position
25  of NAM, correct?

Page 68

1      A.  Correct.
2      Q.  And that included more responsibilities
3  and -- and more important accounts; is that true?
4      A.  Yes.
5      Q.  Does that help you, thinking about that,
6  which accounts you might have lost and which ones you
7  might have gained as part of that transition?
8      A.  I would have gained Curaflex or Coram,
9  whichever it was at the time.  I can't remember.  I
10  probably would have gained PBI when I became a
11  national account manager.
12      Q.  And did you go to Boulder, Colorado to call
13  on PBI representatives?
14      A.  Yes.
15      Q.  Who did you deal with at PBI?
16      A.  Bob Korenblat and David -- I can't remember
17  his last name.
18      Q.  Did you ever deal with a gentleman by the
19  name of Rich Pelanek?
20      A.  That name sounds familiar.  I believe they
21  hired him.  I may have met him, but my primary
22  contacts were David and Bob.
23      Q.  About how long was PBI one of your accounts?
24      A.  A year or two, I guess.
25      Q.  How many times did you go to Boulder,

Page 69

1  Colorado to meet with PBI representatives?
2      A.  I probably went every couple of months.
3      Q.  So maybe six or perhaps even more times over
4  the time that they were your account?
5      A.  It sounds in the ballpark.
6      Q.  Okay.  Do you remember a company by the name
7  of Access Biotechnology?
8      A.  No.
9      Q.  I'll show you what's marked as Exhibit 703.
10  And it purports to be a --
11          MR. WINTER:  I'm afraid that's the only
12  one I've got --
13          MR. STETLER:  We'll share.
14          MR. WINTER:  -- so you-all have got to
15  share.
16      Q.  (BY MR. WINTER)  A letter signed by you on
17  Abbott Alternate Site Product Sales stationery dated
18  January 10, '92 to Mr. Reid Toda at Access
19  Biotechnology.  Does that -- does this document look
20  familiar to you, Ms. Snead?
21      A.  It does.
22      Q.  Is that your signature underneath the
23  salutation?
24      A.  Yes.
25      Q.  Okay.  And does this refresh your

18  (Pages 66 to 69)

b66cc43c-5092-4127-9266-2a482f299285

Page 70

1 recollection at all as to who Access Biotechnology
2 was?
3    A.  It does.  They later changed their name to
4 Oncology Therapeutics Network and that's how I
5 remember them.
6    Q.  And what kind of -- they have something to do
7 with cancer, I take it.  What -- what -- what kind of
8 company were they?
9    A.  Again, this has been 15 years, so what I
10 vaguely remember is they were -- handled like
11 chemotherapy agents.  And I don't know if it was for
12 delivery in doctors' offices or if it was for delivery
13 at some other alternate site setting.
14    Q.  Were they -- were they the provider
15 themselves or were they a group purchasing
16 organization for providers of that nature?
17    A.  I don't remember.  I can't remember.
18    Q.  Did -- after they became Oncology
19 Therapeutics Network did you continue calling on them?
20    A.  I did.  I did.
21    Q.  All the way up until the time you left
22 Alternate Site?
23    A.  I don't believe so.  I called on them for a
24 while, but I think that was probably an account that
25 was transferred to somebody else.

Page 71

1    Q.  Why do you believe that that was an account
2 that was transferred to somebody else?
3    A.  Because I just don't vividly remember them,
4 you know, like I do Caremark or some other account.
5    Q.  Did -- did the different accounts that were
6 the -- let me rephrase the question.
7        Were the key accounts within Alternate
8 Site Product Sales assigned to the NAMs by region or
9 by type of customer or was there any protocol in -- in
10 the assignment of the accounts to the different
11 customers?
12        MS. GEISLER:  Objection to the form.
13    A.  Not that I remember.  I think it was more
14 based on trying to, you know, spread out very big
15 accounts so somebody just didn't have all the big
16 ones, kind of spread the size of the accounts.  And I
17 mentioned before, at one point I did have
18 responsibility for the surgery center market, but that
19 was the only -- I think that was when I was a national
20 account representative.  And that was the only time I
21 remember a specific area being separated out for the
22 NAMs.
23    Q.  (BY MR. WINTER)  Are you familiar with an
24 acronym AWP?
25    A.  Yes.

Page 72

1    Q.  What does it mean to you?
2    A.  Average wholesale price.
3    Q.  And what is average wholesale price?
4    A.  It's -- I know that it was something that is
5 used -- that our customers used in part for
6 reimbursement.
7    Q.  How did you know that it was something that
8 your customers used for reimbursement?
9    A.  That was just common knowledge.
10    Q.  It was common knowledge among the Abbott
11 sales representatives that Abbott's customers used AWP
12 for reimbursement?
13        MS. GEISLER:  Objection to the form.
14    A.  Yes.  I think it was common knowledge to
15 anybody in the market.
16    Q.  (BY MR. WINTER)  Did you understand that
17 there were independent publishers of AWP, also
18 sometimes called price reporting compendia, such as
19 First DataBank or Medi-Span?
20    A.  The term "First DataBank" rings a bell, but
21 were -- were you to ask me are they the ones that
22 reported AWP, I wouldn't -- I wouldn't know that.
23    Q.  Well, were --
24    A.  Remember that.
25    Q.  Certainly.  So you've heard of First DataBank

Page 73

1 then?
2    A.  I've heard of it.
3    Q.  Okay.  What about Medi-Span?  Have you heard
4 of it?
5    A.  I've heard of it.
6    Q.  Have you heard of Redbook?
7    A.  I've heard that, yes.
8    Q.  Were you aware -- let me ask you this
9 question:  When you were within Alternate Site Product
10 Sales as a national account representative and then a
11 NAM, did you have an understanding as to how the AWP
12 for Abbott's drugs was selected?
13    A.  No.
14    Q.  You said you knew that customers used AWP as
15 a reimbursement -- that it was somehow related to
16 reimbursement, right?
17    A.  Yes.
18    Q.  Did you understand that the customers who
19 purchased Abbott's drugs and dispensed those drugs to
20 patients were generally reimbursed by some third-party
21 payer, such as private insurance or government
22 insurance program?
23    A.  Yes.
24    Q.  Okay.  And did you also understand that
25 government insurance programs, such as Medicare and

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 74

1  Medicaid, generally reimbursed on the basis of AWP
2  minus a percentage?
3       MS. GEISLER: Objection to the form.
4    A.  I understood that AWP was involved in the
5  reimbursement, but I didn't know the detail.
6    Q.  (BY MR. WINTER) You didn't know the
7  specifics.  But did you have a general understanding
8  that it was AWP minus some percentage?
9       MS. GEISLER: Objection to the form.
10   A.  All I knew is that AWP was somehow used in
11 reimbursement, but I didn't know anything about the
12 percentage part.
13   Q.  (BY MR. WINTER) Okay.  You just knew it was
14 a factor in the reimbursement and that reimbursement
15 was somehow keyed off of AWP, right?
16      MS. GEISLER: Objection to the form.
17   A.  Yes.
18   Q.  (BY MR. WINTER) Okay.  And -- and, again,
19 that's something that you testified was common
20 knowledge within the market, right?
21      MS. GEISLER: Objection to the form.
22   A.  Yes.
23   Q.  (BY MR. WINTER) Okay.  And is that something
24 that was discussed, in your experience, openly with
25 customers when you would call on accounts?

Page 75

1       MS. GEISLER: Objection to the form.
2    A.  No.
3    Q.  (BY MR. WINTER) It's something that never
4  came up when you called on accounts?
5    A.  It's something that a customer might have
6  brought up, but it was -- it was basically like taboo
7  for -- for me to bring that up.
8    Q.  And why do you say it was taboo for you to
9  bring up AWP in discussions with accounts?
10   A.  I -- I just remember that that was something
11 that was not to be done.  That I was told that that
12 was something that was not to be done.
13   Q.  Do you remember who told you that it was not
14 to be brought up by you?
15   A.  I don't.
16   Q.  Well, let me -- let me try and make sure I
17 understand what you do recollect about being told it
18 was taboo in your words.
19      Were you told by somebody higher up on
20 the chain of responsibility within Abbott that it
21 would be inappropriate for you to raise the issue in a
22 discussion with one of your accounts, the issue of AWP
23 or reimbursement?
24      MS. GEISLER: Objection to the form.
25   A.  Again, I can't remember the specific

Page 76

1  conversation that -- but it would -- it would be quite
2  possible that my superior, John Ward, would have said
3  something to me about that.
4    Q.  (BY MR. WINTER) Okay.  And I'm not asking
5  you for a specific conversation, but I am asking you
6  for your best recollection, you know, as general or
7  specific as you can come up with about this issue.
8    A.  Okay.
9    Q.  I'm certainly not asking you to quote
10 verbatim, you know, what John Ward told you or anybody
11 else.  But if I'm understanding your testimony
12 accurately, you have a sense that somebody, and it may
13 well have been John Ward, had left you with the
14 impression, certainly, or perhaps the explicit
15 instruction, that it was not appropriate for you to
16 raise AWP in discussions with customers; is that true?
17   A.  Yes.
18   Q.  Okay.  Did the -- does your general sense
19 of -- of this instruction that you got, does it extend
20 to -- beyond AWP, does it extend, also, to raising the
21 issue of reimbursement with customers?
22   A.  Yes.
23   Q.  So, again, your general sense of it is that
24 you had the impression that it would be inappropriate
25 for you to raise with customers discussions of AWP or

Page 77

1  reimbursement, correct?
2    A.  Yes.
3    Q.  Okay.  Now, you mentioned that customers from
4  time to time would raise it with you, they would
5  initiate the discussion.  And in those cases would
6  you, you know, engage in the discussion?  So, for
7  example, if the customer asked you what Abbott's AWP
8  was on a drug, would you provide that information?
9       MS. GEISLER: Objection to the form.
10   A.  Again, I don't have a specific recollection
11 of this, but if they would have asked me what our AWP
12 was on a product, I would have given it to them.
13   Q.  (BY MR. WINTER) And was Abbott's AWP that it
14 had on its products information that you had ready
15 access to?
16      MS. GEISLER: Objection to the form.
17   A.  I don't know.  I don't remember.
18   Q.  (BY MR. WINTER) Well, I'm trying to get as
19 close to what you can remember, if we can, here.  You
20 say that if a customer had asked you what Abbott's AWP
21 was on a drug, you would have gotten it for them,
22 correct?
23   A.  If it was something that -- that I -- that I
24 had, I would have given it to them.
25   Q.  And if it was something that you didn't have,

20  (Pages 74 to 77)

b66cc43c-5092-4127-9266-2a482f299285

Page 78

1  would you have gone and gotten it so you could provide
2  it for the customer?
3     A.  No.
4     Q.  Would you tell the customer, "I'm sorry.  I
5  don't have that and I can't get it for you"?
6     A.  Yes.
7     Q.  Do you have a present recollection of having
8  told a customer, "I'm sorry.  I don't have the AWP for
9  that and I'm not going to get it for you"?
10    A.  I do not have a specific recollection about
11 that.  I'm -- I just have the general -- the general
12 recollection that that wasn't something I would bring
13 up and I would know the customer reimbursement was
14 their business.  They could access AWP.
15    Q.  How do you know that the customer could
16 access AWP?
17    A.  Well, I -- I don't know that for a fact, but
18 I would -- since AWP was something that they used in
19 part for reimbursement, it would be my conclusion that
20 there was a way for them to get that number.
21    Q.  Do you have an understanding as to how AWP
22 was calculated?
23    A.  No.
24    Q.  Did you know that Abbott reported prices to
25 the price reporting compendia that it called its

Page 79

1  direct prices?
2     A.  No.
3     Q.  Did you know that Abbott reported prices to
4  the price reporting compendia that it called its list
5  prices?
6     A.  No.
7     Q.  Did you know that Abbott had direct prices?
8     A.  I know Abbott had list prices.  I'm not sure
9  what you mean by "direct price."  I don't understand
10 that term.
11    Q.  You had an understanding of the term "list
12 price"?
13    A.  Yes.
14    Q.  And you knew that Abbott had them and
15 published them, right?
16    A.  In our catalog.  In the Abbott catalog.
17    Q.  Did you also know that Abbott published its
18 catalog list prices to the compendia, such as Redbook
19 or First DataBank or Medi-Span?
20    A.  They may have.  That was -- that wasn't an
21 area that I worked in.
22       MR. WINTER:  Okay.  We've got to change
23 the tape, so why don't we take a recess and take about
24 10 minutes.
25       THE WITNESS:  Okay.

Page 80

1        MR. WINTER:  I know we're on a -- on a
2  tight time frame today, so let's try and keep it right
3  at 10.
4        MR. STETLER:  Yeah.  I turn into a
5  pumpkin at 4:00.
6        THE VIDEOGRAPHER:  We are off the record
7  at 9:50 a.m.  This concludes Tape 1.
8        (Recess from 9:50 to 10:00)
9        THE VIDEOGRAPHER:  We're back on the
10 record at 10:00 a.m.  This is the beginning of Tape 2.
11    Q.  (BY MR. WINTER)  Okay.  Ms. Snead, before we
12 took a break you had mentioned that you were aware of
13 the fact that Abbott had list prices that it published
14 in its catalogs, correct?
15    A.  Yes.
16    Q.  Okay.  And you don't recall that those list
17 prices were published in the price reporting
18 compendia, but they may have been.  Is that your
19 testimony?
20    A.  Yes.
21    Q.  Okay.  Did you have an awareness of the fact
22 that the AWP on Abbott's products was a factor, an
23 up-charge from Abbott's published list prices?
24    A.  No.
25    Q.  You don't recall being aware of that fact?

Page 81

1     A.  No.
2     Q.  Were you aware of the fact that the --
3        Let me ask you this question:  Do you
4  know how the list prices on Abbott's products were
5  selected or set?
6     A.  No.
7     Q.  Were you aware of the fact that they were set
8  in the Hospital Products -- I'm speaking now about the
9  list prices on the Abbott products that were sold in
10 Alternate Site, okay, which was a subset of the
11 Hospital Products Division, correct?
12    A.  Alternate Site was a subset of Hospital
13 Products Division.
14    Q.  So when you were a NAM, a national account
15 representative, the drugs that you were selling, those
16 would have included the FirstChoice injectables and
17 the fluids, among others, correct?
18    A.  Correct.
19    Q.  Okay.  Were you aware of the fact that the
20 list prices on those products were set in the contract
21 marketing department in the Hospital Business Sector?
22    A.  Yes.
23    Q.  Okay.  So you were aware that they were set
24 by individuals in that department and they would have
25 included Jerrie Cicerale, Harry Adams, Charlie

21 (Pages 78 to 81)

b66cc43c-5092-4127-9266-2a482f299285

Page 82

1   Mitchell, do those names ring a bell to you?
2       A.  Those names --
3           MS. GEISLER:  Objection to the form.
4       A.  Those names ring a bell.
5       Q.  (BY MR. WINTER)  Okay.  And did you
6   understand that they were generally in charge of
7   setting the prices?
8       A.  I understood that contract marketing set
9   prices.
10      Q.  Okay.  They set the list prices, right?
11      A.  That I don't know.
12      Q.  Well, and you said you understood contract
13  marketing set the prices.  Do you distinguish, in your
14  mind, between contract marketing and Alternate Site,
15  which would have been Mr. Kipperman, and contract
16  marketing in the Hospital Business Sector, which would
17  have included the individuals I just mentioned, such
18  as Mr. Mitchell and Mr. Adams and Ms. Cicerale?
19          MS. GEISLER:  Objection to the form.
20      A.  Yeah.  They were two separate areas, however,
21  I know that Mr. Kipperman interacted with contract
22  marketing in the Hospital Business Sector.
23      Q.  (BY MR. WINTER)  He interacted with -- with
24  the folks over in the Hospital Business Sector, like
25  Mr. Mitchell and Mr. Adams and Ms. Cicerale.

Page 83

1       A.  Correct.
2       Q.  Okay.  Now, and did you know a gentleman by
3   the name of Gerald Eichhorn?
4       A.  Yes.
5       Q.  And do you know that he was in the Hospital
6   Business Sector contract marketing?  Do you recall
7   that?
8       A.  I don't recall specifically.  I knew he
9   worked in Hospital Business Sector, but --
10      Q.  Do you --
11      A.  -- what department, I --
12      Q.  Pardon me.  Do you recall Mr. Kipperman
13  interacting with Mr. Eichhorn as well?
14      A.  No.
15      Q.  Did you interact with Mr. Eichhorn on -- on
16  any particular issues when you were in Alternate Site?
17      A.  No.
18      Q.  A little while ago you mentioned that you
19  knew contract marketing set the prices.  Do you mean
20  the list prices or the contract prices or do you mean
21  both?
22      A.  I mean contract prices because that's who I
23  went to to get prices developed for my customers.
24      Q.  And when you say, "that's who I went to," do
25  you mean you went to Mr. Kipperman?

Page 84

1       A.  Yes.
2       Q.  Okay.  Would you go to Ms. Cicerale or
3   Mr. Mitchell or Mr. Adams or anybody in the Hospital
4   Business Sector contract marketing to get the prices
5   that would be made available to your customers?
6       A.  No.
7       Q.  Okay.  And you knew that there was a
8   distinction or, actually, a significant difference in
9   some cases between the contract prices that you could
10  make available to your customers and the list prices
11  that were published on those drugs.
12      A.  Yes.
13      Q.  You were aware of that, right?
14      A.  Yes.
15      Q.  And you also are familiar with the term
16  "reimbursement spread," aren't you?
17      A.  I've heard --
18          MS. GEISLER:  Objection to the form.
19      A.  Yes.
20      Q.  (BY MR. WINTER)  And you knew that the spread
21  was the difference between what your customer paid to
22  put the drug on their shelf and what the customer got
23  reimbursed by a third-party payer.  You knew that as
24  well, didn't you?
25      A.  Can you rephrase -- can you restate your

Page 85

1   question?  I'm sorry.
2       Q.  You knew that the reimbursement spread was
3   the difference between what the customer paid to put
4   the drug on their shelf, for example, the list -- the
5   contract price, and what the customer was reimbursed
6   by a third-party payer.  You knew --
7       A.  Yeah.
8       Q.  Okay.  Very good.  And so -- from time to
9   time you mentioned that customers would -- would ask
10  you a question about an AWP on Abbott product and if
11  you had that information, you would provide it to the
12  customer, is that --
13          MS. GEISLER:  Objection to the --
14      Q.  (BY MR. WINTER)  -- what you testified?
15          MS. GEISLER:  Objection to the form.
16      A.  I testified that if a customer asked me, I --
17  and I had the AWP, I would supply it.  I don't
18  specifically recall a customer asking me.
19      Q.  (BY MR. WINTER)  If you -- if a customer
20  asked you for the AWP and you had the AWP information,
21  you would have provided it.  What else would you do?
22  Would you discuss that AWP with the customer, would
23  you just simply provide it without comment?
24      A.  I would provide it without comment.
25      Q.  Would you provide a comparison -- if not with

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 86

1  oral commentary, would you provide a comparison in
2  writing of the Abbott AWP with one of your
3  competitor's AWPs, such as Baxter or McGaw?
4      A.  No.
5      Q.  Did you -- so is it your testimony that any
6  time that you ever provided the AWP to a customer at
7  that customer's request, that all you did was simply
8  provide the AWP to the customer?
9          MS. GEISLER:  Objection to the form.
10     A.  As far as I can recall, yes.
11     Q.  (BY MR. WINTER)  Would you provide it in
12 writing?  Would you provide a list that had the AWP on
13 it or would you just simply tell them, "The AWP is X
14 dollars and X cents"?
15     A.  Again, I don't recall this happening, so I
16 don't know how I would have done it.
17     Q.  Do you -- did you carry a laptop with you?
18     A.  No.
19     Q.  Did you carry a briefcase?
20     A.  Yes.
21     Q.  Did you have in your briefcase from time to
22 time a copy of the published AWPs on Abbott's drugs?
23     A.  Not that I recall.
24     Q.  Do you ever recall reviewing information that
25 was tendered to you in the ordinary course of business

Page 87

1  from anybody within Abbott asking you to confirm or
2  verify -- verify AWP information on drugs that you
3  were selling?
4      A.  I don't recall, no.
5      Q.  Let me hand you what's been marked as Exhibit
6  704 and I'll ask you to take a couple of minutes to
7  look over that document.
8          MR. WINTER:  And I do have two of these.
9      A.  (Witness reviewing document).
10         MR. WINTER:  For the record, this
11 document was produced to the State of Texas with the
12 Bates label ABT 211963 and it was also produced to the
13 Department of Justice with the Bates label ABT-DOJ
14 0018660.  And it runs for a number of pages ending
15 with ABT 211978.  Bates labeled consecutively.
16     Q.  (BY MR. WINTER)  Ms. Snead, this purports on
17 the first page to be a memorandum authored by Debra
18 DeYoung, Manager Contract Marketing/Major Accounts on
19 Abbott letterhead to several individuals, including
20 you; is that correct?
21     A.  Yes.
22     Q.  Dated July 31, 1992.  And I'll read from it.
23 "Attached please find the Medi-Span listing of your
24 division's products.  You may want to review this
25 listing for accuracy.  Any changes should be directed

Page 88

1  to Medi-Span.  I hope you find this helpful."
2          Did I read that accurately?
3      A.  Yes.
4      Q.  And then if you turn to the next page, it's a
5  letter on Medi-Span letterhead approximately two weeks
6  earlier dated July 16, 1992 from Terri Rector
7  addressed to Jo-Ann Hulett at Pharmaceutical Products
8  Division, Abbott Laboratories.  Do you see that?
9      A.  Yes.
10     Q.  It says, "Dear Jo-Ann, Enclosed are the
11 printouts you requested for ... Abbott, Ross, Abbott
12 Hospital, Abbott Diagnostics and Tap divisions of
13 Abbott ... The fields listed are the National Drug
14 Code, abbreviated product description, package size,
15 package quantity, unit dose code, current direct
16 price, current AWP and its effective date, the
17 activity code and the deletion date for those items
18 which are now inactive."
19         Now, did I read that accurately?
20     A.  Yes.
21     Q.  And did you have a moment to look through the
22 attached printout?
23     A.  I haven't yet.
24     Q.  Okay.  Well, let me zero you in on a page.
25 It's the one with the Bates label ABT 211977.  And I

Page 89

1  guess the easiest way to find it, it's the second from
2  the end.  And if you look towards the left of the
3  page, do you see the product name that starts with
4  Tobramycin at the top?
5      A.  I'm on the wrong page.  I'm sorry.
6      Q.  Second to last from -- yeah.  Second to last
7  page in the exhibit.
8      A.  977?
9      Q.  Yes, ma'am.  And if you look --
10     A.  Mine says -- oh, from the top.
11     Q.  Yes, ma'am, at the top.
12     A.  Okay.  I'm sorry.  Okay.
13     Q.  Do you see it begins with Tobramycin products
14 and there's several different package sizes described.
15 And then you have TPN Electrol.  Do you see that?
16     A.  Yes.
17     Q.  Trace materials (sic) and then two more drug
18 products and then you see Vancomycins.  Do you see the
19 three Vancomycins?
20     A.  Yes.
21     Q.  Okay.  And that first Vancomycin, that's --
22 the last 6 on the NDC are 63 -- it's -- it's 6533-01.
23 Do you see that?
24     A.  Yes.
25     Q.  Vancomycin injectable 100 milligrams -- 1,000

23  (Pages 86 to 89)

b66cc43c-5092-4127-9266-2a482f299285

Page 90

1 milligrams?
2    A.  Yes.
3    Q.  Okay.  Do you recognize that as a Vancomycin
4 product that you sold?
5    A.  Yes.
6    Q.  That's the flip-top vial, isn't it?
7    A.  I believe so.  It's been many years.
8    Q.  It's been a long time.  Do you remember
9 Abbott having a flip-top as well as an ADD-Vantage
10 vial?
11    A.  Yes.
12    Q.  Okay.  And do you remember your -- that many
13 of your customers were interested in purchasing the
14 flip-top?
15    A.  Yes.
16    Q.  Do you remember that many customers were
17 specifically interested in the flip-top because it had
18 a greater reimbursement than the ADD-Vantage?
19       MS. GEISLER:  Objection to the form.
20    A.  I don't remember that.
21    Q.  (BY MR. WINTER)  You don't remember that.  Is
22 it possible that could have come up in your
23 discussions, but you just don't remember it today?
24       MS. GEISLER:  Objection to the form.
25    A.  It's possible, but I have no recollection.

Page 91

1 The ADD-Vantage vial was a whole different -- it was
2 used for IV piggybacks and I think primarily it was
3 used in the hospital.  So when you say flip-top, I
4 think it's because of the market.
5    Q.  (BY MR. WINTER)  So you think that the reason
6 why your customers, who were the non-hospital
7 customers, were interested in the flip-top is because
8 it was better suited for sales to those customers than
9 the ADD-Vantage vial?
10    A.  That's what came into my mind, yes.
11    Q.  Now, if you -- if you look back at the first
12 page, Ms. DeYoung is -- is essentially telling you
13 that this is the Medi-Span listing and you may want to
14 review it for accuracy, right?
15    A.  Yes.
16    Q.  And the earlier letter from Medi-Span says
17 these are the printouts that you requested.  "You"
18 being Abbott, correct?
19    A.  Yes.
20    Q.  And it includes, among other things, some
21 pricing information, including the current direct
22 price and the current AWP.
23       MS. GEISLER:  Objection --
24    Q.  (BY MR. WINTER)  Do you see that on the -- on
25 the letter from Medi-Span?

Page 92

1       MS. GEISLER:  Objection to the form.
2    A.  Oh, I'm sorry.  I'm looking at the wrong --
3 current direct price, current AWP, yes.
4    Q.  (BY MR. WINTER)  And does that refresh your
5 recollection that Abbott had a direct price?
6    A.  It says direct price.  That's just not --
7 that's not a term that I used or was familiar with.
8    Q.  If I represent to you that the evidence
9 developed so far in this case is that Abbott used the
10 terms "direct price" and "list price" synonymously, do
11 you have any basis of knowledge to disagree with me,
12 to say, "Ray, you're just wrong about that"?
13    A.  No.
14       MS. GEISLER:  Objection to the form.
15    Q.  (BY MR. WINTER)  And if you look at
16 that Vancomycin product, you see some -- two columns
17 with pricing information towards the right-hand side.
18 There's the entry for $470.70 and then $564.84.  Do
19 you see those two?
20    A.  I'm sorry.  Vancomycin.
21    Q.  It would be easier if I give you a straight
22 edge or something.  Maybe if you flipped over one of
23 these other exhibits.
24    A.  Yes, I see that.
25    Q.  Okay.  And I guess really my question is:  Do

Page 93

1 you recall from time to time receiving printouts such
2 as the one that's listed here in Exhibit 4 -- excuse
3 me, 704 and being asked to review them for accuracy?
4    A.  I don't recall that.
5    Q.  Do you recall receiving this particular memo?
6    A.  No.
7    Q.  Do you have any reason to believe that you
8 did not receive this in the ordinary course of
9 business?
10    A.  No.
11    Q.  Was it typical that with your name --
12       Let me ask you this question:  If you
13 sent out memorandum that you -- you prepared memos
14 that you would sign, it was your practice to actually
15 put them in the mail, correct?
16    A.  Yes.
17    Q.  You wouldn't write memos and just throw them
18 in the trash can as normal practice, would you?
19    A.  No.
20    Q.  Okay.  So you do believe that you actually
21 received this document from Ms. DeYoung dated July 31,
22 1992, correct?
23    A.  Yes.
24    Q.  Okay.
25       MS. GEISLER:  Objection.

24  (Pages 90 to 93)

b66cc43c-5092-4127-9266-2a482f299285

Page 94

1    Q.  (BY MR. WINTER)  And is it your
2  interpretation, based upon what you're reading in the
3  plain language of the memo, that what Ms. DeYoung was
4  suggesting that you do was review the Medi-Span
5  attachment and verify that the AWP information for the
6  Hospital Products Division drugs and the direct price
7  information for the Hospital Products Division drugs
8  was accurate?
9          MS. GEISLER:  Objection.
10    A.  She says "Review this listing for accuracy,"
11  so yes.
12    Q.  (BY MR. WINTER)  But it -- so you would
13  agree, then, that that's what she's asking you to do,
14  is to review this printout and verify the accuracy of
15  the AWP and direct price information?
16          MS. GEISLER:  Objection to the form.
17    A.  I -- she's saying review it for accuracy.
18  Whether she meant the list number, the description,
19  everything, I don't know.
20    Q.  (BY MR. WINTER)  Well, is there anything to
21  suggest to you in looking at the face of Exhibit 704
22  that she was asking you simply to review the list
23  number for accuracy and the product description and to
24  ignore the pricing information?
25          MS. GEISLER:  Objection to the form.

Page 95

1    A.  No.
2    Q.  (BY MR. WINTER)  Okay.  There's -- I draw
3  your attention to the last sentence on the first page
4  of the exhibit.  It says, "I hope you find this
5  helpful."  Do you see that?
6    A.  Yes.
7    Q.  Why would a printout including the AWP
8  information on Abbott products be helpful to you?
9          MS. GEISLER:  Objection to the form.
10    A.  The reason I would have been copied on this
11  is because of that job I had of going through the --
12  those state listings and pulling out the
13  pharmaceutical versus nonpharmaceutical products.  So
14  I don't know why this would have been helpful to that.
15    Q.  (BY MR. WINTER)  Can you think of any reason
16  why it would be helpful -- well, strike that.  I think
17  you just -- you just answered that question.
18          You don't think this would be helpful to
19  you in that job that you had with respect to the
20  Medicaid Rebate Program?
21    A.  Not that I can remember.
22    Q.  Would it be helpful to you in your capacity
23  of selling products to customers who were interested
24  in Abbott's AWP --
25          MS. GEISLER:  Objection --

Page 96

1    Q.  (BY MR. WINTER)  -- if you had a listing that
2  had the AWP on it?
3          MS. GEISLER:  Objection to the form.
4    A.  No.
5    Q.  (BY MR. WINTER)  Well, let me --
6    A.  It's not something I would have done.
7    Q.  Let me -- let me ask -- ask you this
8  question:  You said that from time to time customers
9  would ask you what the AWP was on Abbott products,
10  correct?
11          MS. GEISLER:  Object.
12    A.  They may have.  I have no specific
13  recollection of that.
14    Q.  (BY MR. WINTER)  Okay.  Well, if they did,
15  and to the extent that customers may have asked you
16  from time to time about the AWP on Abbott products,
17  would it be helpful for you to be able to answer their
18  questions if you had a listing of those AWPs?
19          MS. GEISLER:  Objection to the form.
20    A.  Yes.
21    Q.  (BY MR. WINTER)  Okay.  Let me show you what
22  has been marked in a prior deposition as Exhibit 480.
23  Ms. Snead, after having reviewed the previous exhibit,
24  704, do you have any recollection of what you did with
25  this once you got it?

Page 97

1    A.  I do not.
2    Q.  You don't recall looking at any of the
3  product information, whether it was nomenclature or
4  description, package size, price, what have you,
5  making any corrections?
6    A.  I do not.
7    Q.  Did you have access to something called the
8  resource file when you were in Alternate Site?
9    A.  I don't remember that term.
10    Q.  So if you wanted to know what the actual
11  contract price was, the prevailing market price was on
12  one of your products or if you wanted to know what the
13  list price was, you would go to Mr. Kipperman to get
14  that information?
15    A.  Yes.
16          MS. GEISLER:  Objection to the form.
17    Q.  (BY MR. WINTER)  Did he have it on a printout
18  or did he have it on a computer or desktop, how did --
19  how would he get it?
20    A.  I don't remember.
21    Q.  Do you remember -- do you have a general
22  sense that you would go into Mr. Kipperman's office
23  and say, "I need the -- I need the contract price for
24  X drug for X customer" and he could just get it to you
25  right away or would he say, "I'll get back to you on

Page 98

1  that" --
2        MS. GEISLER: Objection.
3     Q. (BY MR. WINTER) -- "I need to research it"?
4     A. Probably some of each. Sometimes he probably
5  pulled it and others he needed to research it.
6     Q. But you don't have any kind of a sense as to
7  whether he would pull it off a computer program or off
8  a list?
9     A. I don't.
10    Q. Could it have been either? You know, from
11 time to time for some drugs it was on a computer and
12 some drugs it was on a list?
13       MS. GEISLER: Objection to the form.
14    A. It could have been either.
15    Q. (BY MR. WINTER) Did he have a desktop
16 computer?
17    A. Yes.
18    Q. Did you have a desktop computer at -- at --
19 at your office space at Abbott Park?
20    A. Yes.
21    Q. And did you-all have e-mail?
22    A. I believe so. I just can't remember when
23 that started.
24    Q. You don't remember when you got e-mail?
25    A. Yeah.

Page 99

1     Q. And there was a predecessor to e-mail, too.
2  The e-mail that we all know and love today, there was
3  some sort of an instant -- not instant, but sort of a
4  message program that was commonly used before e-mail.
5  Do you remember that?
6     A. No.
7     Q. You don't remember Abbott having any sort of
8  primitive kind of e-mail before -- before it got the
9  e-mail that you're familiar with today?
10    A. No.
11       MS. GEISLER: Objection to the form.
12    Q. (BY MR. WINTER) I'm going to ask you to take
13 a look at this document, which was marked as Exhibit
14 480.
15       MR. STETLER: I already have too many
16 copies of that.
17       MR. WINTER: You have too many of these,
18 Dave?
19       MR. STETLER: This one I know by heart.
20    Q. (BY MR. WINTER) Okay, Ms. Snead. This one
21 purports to be a memorandum with an attachment and you
22 can't really read the Bates label on the first page,
23 but you can see it better on the second page. It
24 begins with TXABT 37182 and runs through multiple
25 pages to TXABT 37225 and it purports to be a memo from

Page 100

1  Mr. Kipperman. Do you see that, dated May 26, '94?
2     A. Yes.
3     Q. On Alternate Site contract marketing
4  letterhead. Are you familiar with that letterhead?
5     A. I don't remember it specifically.
6     Q. You don't remember it specifically. But you
7  do remember that Mr. Kipperman was in contract
8  marketing at Alt Site, right?
9     A. Yes.
10    Q. And this memo is addressed to the field sales
11 force, the district managers and there are a number of
12 cc's, including yourself, correct?
13    A. Yes.
14    Q. And the subject matter is, "Current Red Book
15 AWP's." "As you are aware, on at the beginning of
16 Aril, Abbott took a list price increase. This also
17 has an effect on our AWP (Average Wholesale Price)
18 which Red Book quotes for reimbursement purposes.
19 Therefore, Mike Heggie was able to get Red Book to
20 send a listing of the 'new' AWPs for ALL of our
21 products, which will be effective through next April.
22 I hope this information is helpful and if you have any
23 questions, please feel free to contact me.
24       "Best regards Steve Kipperman."
25       Did I read that accurately?

Page 101

1     A. Yes.
2     Q. Again, is this a document that you believe
3  that you received in the ordinary course of business
4  in or about May of 1994 from Mr. Kipperman?
5     A. Yes.
6     Q. Do you recall receiving this document?
7     A. No.
8     Q. Do you recall, if not this specific document,
9  receiving any other transmittals from Mr. Kipperman or
10 anyone in contract marketing that worked for him of
11 AWP information?
12    A. No.
13    Q. Does this document refresh your recollection
14 that Abbott's list prices that it published had an
15 effect on average wholesale price?
16    A. No.
17    Q. Did you -- did you -- you saw what I read
18 here on the memo that, "As you are aware, on at the
19 beginning of Aril, Abbott took a list price increase.
20 This also has an effect on our AWP (Average Wholesale
21 Price) which Red Book quotes for reimbursement
22 purposes."
23    A. Yes.
24    Q. Do you understand from reading that that
25 Abbott's published list prices had an effect on AWP?

26  (Pages 98 to 101)

b66cc43c-5092-4127-9266-2a482f299285

Page 102

1    A.  I understand from reading that right now that
2  that's what it's saying, yes.
3    Q.  And is -- is this just news to you that you
4  didn't understand before?
5       MS. GEISLER:  Objection to the form.
6    A.  It's just something I didn't -- it wasn't in
7  the normal part of my job to worry about list price or
8  AWP.  So it probably -- obviously, you know, he sent
9  the memo, but I don't -- I didn't have anything to do
10  with list price setting.  My job was to sell to
11  customers.
12    Q.  (BY MR. WINTER) I understand that and would
13  you agree that it would -- it would assist you in
14  selling to customers if you had AWP information that
15  you could provide to the customers on request?
16    A.  That wasn't something I did.
17    Q.  Is it your testimony that you never provided
18  AWP information to customers?
19    A.  No.  It's my testimony that I don't recall
20  ever doing that.
21    Q.  Okay.  And so you also have testified this
22  morning that you were aware that at least some of
23  Abbott's customers were interested in AWP information
24  because it was connected to their reimbursement,
25  right?

Page 103

1       MS. GEISLER:  Objection to the form.
2    A.  Yes.
3    Q.  (BY MR. WINTER) And you also testified this
4  morning that you knew that there was a reimbursement
5  spread on Abbott's products because Abbott's AWPs were
6  higher than its contract prices, correct?
7       MS. GEISLER:  Objection to the form.
8    A.  Yes.
9    Q.  (BY MR. WINTER) Okay.  So you knew that the
10  customers were interested in reimbursement and in the
11  reimbursement spread and that from time to time
12  customers would ask questions about AWP, correct?
13       MS. GEISLER:  Objection to the form.
14    A.  They may ask questions, yes.
15    Q.  (BY MR. WINTER) But you don't recall any
16  specific instances where they -- and when I mean
17  specific, you don't have a black and white memory in
18  your mind of a specific circumstance where a customer
19  asked you about AWP; is that correct?
20       MS. GEISLER:  Objection to the form.
21    A.  Yes.
22    Q.  (BY MR. WINTER) You said you called on PBI
23  many, many times over a couple of years and visited
24  their facility out in Boulder, Colorado, correct?
25       MS. GEISLER:  Objection to the form.

Page 104

1    A.  Yes.
2    Q.  (BY MR. WINTER) Do you recall discussing
3  AWPs or reimbursement issues with Bob Korenblat?
4    A.  I don't.
5    Q.  Do you recall -- do you have a sense that PBI
6  and Bob Korenblat were -- were two of your customers
7  that were interested in AWP?
8    A.  I don't.  I don't recall that.
9    Q.  Do you recall that Coram was a customer that
10  was interested in AWP information?
11    A.  Again, I don't recall any specific customers
12  talking to me about AWP.
13    Q.  If Coram had asked you for AWP information,
14  would you have provided it to them?
15    A.  Yes.
16    Q.  And if you didn't have it in -- in your
17  briefcase, since Coram was asking you, is that
18  information that you would have gone and gotten from
19  somebody else, such as Mr. Kipperman, in order to
20  provide it to Coram?
21       MS. GEISLER:  Objection to the form.
22    A.  Again, I don't recall anything, but -- it
23  would depend on the context.
24    Q.  Well, let's say Coram was asking you for AWP
25  information in connection with a request for proposal

Page 105

1    A.  Okay.
2       MS. GEISLER:  Objection to the form.
3    A.  Okay.
4    Q.  (BY MR. WINTER) And if you received a
5  request for proposal from Coram asking for the AWP
6  information on Abbott products, if you didn't happen
7  to have that AWP in your briefcase, would you have
8  responded to the RFP by saying, "Sorry.  I don't have
9  it and I'm not going to get it for you" --
10       MS. GEISLER:  Objection to the form.
11    Q.  (BY MR. WINTER) -- or alternatively in
12  preparing that proposal that would go back to Coram,
13  would you obtain the AWP information since Coram said
14  they wanted it?
15    A.  I would --
16       MS. GEISLER:  Objection to the form.
17    A.  I would have obtained the AWP information.
18    Q.  (BY MR. WINTER) Okay.  So if a customer came
19  to you in connection with an RFP, whether it was Coram
20  or PBI or Abbey or any of the other customers that --
21  that were your assigned accounts --
22    A.  Uh-huh.
23    Q.  -- if they came to you in connection with
24  that RFP process and they said, "Chris, here is our
25  RFP and in responding to this we want you to give us

27 (Pages 102 to 105)

b66cc43c-5092-4127-9266-2a482f299285

Page 106

1  your AWP information," is it your testimony that you
2  would get that AWP information in order to respond to
3  the RFP?
4          MS. GEISLER: Objection to the form.
5      A.  I would bring the RFP to contract marketing
6  and they would complete that as part of the RFP
7  process.
8      Q.  (BY MR. WINTER) And if -- if they completed
9  it but omitted the AWP information, would you send it
10  to the customer without the AWP information or would
11  it be part of your job to make sure that that AWP
12  information was included?
13          MS. GEISLER: Objection to the form.
14      A.  I would probably go back to contract
15  marketing and say, "Oh, look, you missed a section."
16  Then depending what the response was, I may or may not
17  send it with the AWP information.
18      Q.  (BY MR. WINTER) So if you reviewed it before
19  you sent it to the customer and you saw that something
20  was missing such -- that had been explicitly
21  requested, such as the AWP, you probably would have
22  gone back to Mr. Kipperman and said, "Hey, Steve,
23  you've left out the AWP, what's going on," and you
24  could engage him in a discussion about it?
25      A.  Yes.

Page 107

1          MS. GEISLER: Objection to the form.
2      Q.  (BY MR. WINTER) Okay. Looking at this 480,
3  this Exhibit 480, do you see on the attachment that
4  it's got the Abbott products listed by NDC and then it
5  has a column for AWP as well as direct?
6      A.  Yes.
7      Q.  And real briefly, what I would like you to do
8  is take Exhibit 704, which is the one from Medi-Span,
9  and if you would open it up, please, to that listing
10  for Vancomycin that we saw on the second to last page.
11  And then on Exhibit 480, if you'll go to the second to
12  last page of it. And if you look at Exhibit 704,
13  which is the Medi-Span document, do you see there are
14  two columns. There's a direct, a 470 -- $470.70 and
15  then an AWP of $564.84. Do you see that?
16      A.  Yes.
17          MS. GEISLER: Objection to the form.
18      Q.  (BY MR. WINTER) And then if you look at the
19  Exhibit 480 on the second to last page. The very
20  first Vancomycin is 4332 and two drugs down is
21  6533-01. Do you see that?
22      A.  Yes.
23      Q.  And the AWP listed in that column is $586.86,
24  which is higher than $464.84. Do you see that?
25      A.  Yes.

Page 108

1      Q.  And Exhibit 480 is dated not quite two years
2  after Exhibit 704, right?
3      A.  Yes.
4      Q.  And did you know that Abbott -- Abbott's list
5  prices that it published in its catalogs were
6  typically increased on an annual basis?
7      A.  Yes.
8      Q.  Okay. And to the extent that list price has
9  an impact on AWP, that would also cause the AWPs to go
10  up, correct?
11          MS. GEISLER: Objection to the form.
12      A.  Again, I -- I don't know how list price and
13  AWP are related, but --
14      Q.  (BY MR. WINTER) I know that you don't have
15  any personal knowledge and it wasn't part of your
16  job -- it appears it wasn't part of your job to do
17  those reporting -- that reporting to the compendia,
18  but you'll agree with me, won't you, that to the
19  extent AWP is a markup off of Abbott's list price,
20  you'll agree that it just follows that if the list
21  price is increased on an annual basis, then the AWP is
22  also going to go up on an annual basis, correct?
23          MS. GEISLER: Objection to the form.
24      A.  Yes. Based on what you're telling me, yes.
25      Q.  (BY MR. WINTER) Okay. Looking at 480 again,

Page 109

1  the last sentence has language that's somewhat similar
2  to the language that Ms. DeYoung included in 704 where
3  Ms. DeYoung writes, I hope this helpful or "I hope you
4  find this helpful." Mr. Kipperman writes, "I hope
5  this information is helpful." Do you see that?
6      A.  Yes.
7      Q.  So, once again, you would agree with me,
8  wouldn't you, that it would be helpful for the field
9  sales representatives to have AWP information
10  accessible to them to the extent that their customers,
11  who they're interacting with and who they're trying to
12  sell product to, are asking for?
13          MS. GEISLER: Objection to the form.
14      A.  Yes.
15      Q.  (BY MR. WINTER) Okay. Do you have any
16  recollection of AWP information on HPD drugs ever
17  being made available in electronic format, either via
18  e-mail or on -- on a floppy disk or anything like
19  that?
20      A.  No.
21      Q.  And you didn't have a laptop that you carried
22  with you on your calls to accounts?
23      A.  No. Not that I recall.
24      Q.  But you had a briefcase, correct?
25      A.  Yes.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 110

1    Q.   And is it possible that you would have had
2   price lists, such as the Redbook AWP price list that's
3   included here at Exhibit 480, that you would have
4   carried around in your laptop?
5          MS. GEISLER: Objection to the form.
6    Q.   (BY MR. WINTER)  I mean, in your briefcase?
7   Pardon me.
8    A.   I don't think I would have carried that
9   around.
10   Q.   Is it your sense that you would have made the
11  conscious decision not to carry it around --
12         MS. GEISLER: Objection --
13   Q.   (BY MR. WINTER)  -- because of something
14  that -- that Mr. Ward or one of your other colleagues
15  or superiors in the chain of command would have told
16  you?
17         MS. GEISLER: Objection.
18   A.   It's not my sense that I made a conscious
19  decision.  I just -- I just like to carry the least
20  amount of stuff I needed for a call, so I would carry
21  things pertaining to that customer.
22   Q.   (BY MR. WINTER)  You would -- you would carry
23  documents and -- and materials that were specific to
24  whichever customer you were calling on on that
25  particular trip.

Page 111

1    A.   Correct.
2    Q.   Okay.
3    A.   Unless there was something I was studying on
4   the plane, or whatever.
5    Q.   Okay.  Do you recall having received Exhibit
6   480?
7    A.   I don't recall that.
8    Q.   But is it your expectation that you did
9   receive it?
10   A.   Yes.
11   Q.   Okay.  Do you recall -- do you have any
12  recollection whatsoever of what you did with Exhibit
13  480 when you received it?
14         MS. GEISLER: Objection to the form.
15   A.   I have no recollection.
16   Q.   (BY MR. WINTER)  All of the individuals who
17  are copied on Exhibit 480, Ms. Snead, are people who
18  have responsibility to sell HPD Alt Site products to
19  customers or have some responsibility for interfacing
20  with customers regarding the sale of the products,
21  correct?
22         MS. GEISLER: Objection to the form.
23   A.   Other than Cindy Dawson was in contract
24  marketing.
25   Q.   (BY MR. WINTER)  And Ms. Dawson would have

Page 112

1   interaction, along with Mr. Kipperman, in evaluating
2   the requests for proposal and preparing the response
3   to the request for proposal, correct?
4    A.   Yes.
5    Q.   Okay.  So in an indirect way she is
6   interfacing with a customer because that response
7   would then be communicated to the customer through the
8   NAM --
9          MS. GEISLER: Objection to the form.
10   Q.   (BY MR. WINTER)  -- right?
11   A.   Yes.
12   Q.   Okay.  And the NAMs on this page are
13  Ms. Manso, Mr. Walker and yourself, right?
14   A.   Yes.  I think Phil Elliott may have been a
15  NAM then as well.
16   Q.   Above Mary Beth Manso's name do you see
17  Debbie Longley's name?
18   A.   Yes.
19   Q.   Now, was your testimony earlier you just
20  didn't recall the name at all or you just didn't
21  remember what her job was?
22   A.   I don't remember her.
23   Q.   But you definitely remember Ms. Dawson
24  working with Mr. Kipperman, right?
25   A.   Yes.

Page 113

1    Q.   What was Ms. Kreklow's responsibility?
2    A.   She was a marketing manager.
3    Q.   And did she prepare materials that you would
4   carry with you on your sales calls?
5    A.   Yes.
6    Q.   Did she ever attend sales calls with you?
7    A.   I'm sure -- I'm not sure.  She may have.  I
8   don't recall specifically her being with me, but she
9   may have.
10   Q.   Can you think of any reason other than -- so
11  the field sales representatives and the personnel who
12  were interacting with customers could provide this AWP
13  information to the customers on request, can you think
14  of any other reason, other than that, that
15  Mr. Kipperman would be distributing this AWP
16  information to the field sales staff?
17         MS. GEISLER: Objection to the form.
18   A.   I don't know why he sent that.
19   Q.   (BY MR. WINTER)  Can you think of any reason
20  other than because the field sales staff could then
21  turn around and provide it to a customer on request?
22   A.   No, I cannot think of any other reason.
23   Q.   You can't think of any other reason besides
24  that one?
25   A.   No.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 114

1          MS. GEISLER:  Objection to the form.
2     Q.  (BY MR. WINTER)  And it stands to reason that
3  that's why he provided it to you as well so that you
4  could have it if a customer asked you for it.
5          MS. GEISLER:  Objection to the form.
6     A.  Again, I don't know what -- why he sent it.
7     Q.  (BY MR. WINTER)  Would you conclude that he
8  wanted you to have it?
9     A.  I would conclude that because I was cc'd on
10  it.
11     Q.  Okay.  Let's see.  I'm going to hand you what
12  is now marked as Exhibit 705.  And this is a multipage
13  document with a Bates label TXABT 249852 running
14  through 856 and it purports to be on Coram letterhead
15  and it's addressed to you.  Do you see that?
16     A.  Yes.
17     Q.  And do you know who Joe Bane was or is?
18     A.  I remember the name and he -- I know he
19  became the VP of materials management.  I didn't deal
20  with him a lot.
21     Q.  Did you deal with Lisa Clock?
22     A.  Again, I remember the name.
23     Q.  When you say you didn't deal with Joe Bane a
24  lot, is there somebody that stands out in your mind at
25  Coram that you did deal with?

Page 115

1     A.  Well, as I mentioned before, my longest
2  relationship with the Coram entities was with Curaflex
3  and there was a woman named Deborah St. Martin who I
4  dealt with routinely.
5     Q.  Do you know if Ms. St. Martin made the
6  transition from Curaflex to Coram?
7     A.  I believe she did, but I couldn't say with a
8  hundred percent certainty.
9     Q.  Okay.  Do you recognize the document that
10  I've handed to you, Exhibit 705?
11     A.  Yes.
12     Q.  You have a present recollection of having
13  received this in the ordinary course of business?
14     A.  I remember getting an RFP for Coram.
15     Q.  And this is the RFP that you received from
16  Coram in or around December of 1994, correct?
17     A.  It sure looks like it.
18     Q.  Okay.  On the first page of the RFP under
19  Roman numeral III, "Award Criteria."  "The following
20  award criteria should be taken into consideration when
21  preparing a response to this RFP."  And then there are
22  six enumerated criteria.  Do you see those?
23     A.  Yes.
24     Q.  The fifth one is "Reimbursement Integrity."
25  Do you see that?

Page 116

1     A.  Yes.
2     Q.  What does "reimbursement integrity" mean?
3     A.  I do not know.
4     Q.  Do you recall Coram raising as a specific
5  issue with you that they wanted to be positive that
6  whatever products they purchased from Abbott would be
7  reimbursable?
8          MS. GEISLER:  Objection to the form.
9     A.  I don't recall that.
10     Q.  (BY MR. WINTER)  Do you recall any
11  discussions with Coram personnel or with
12  Ms. St. Martin or Mr. Bane or Ms. Clock, anyone at
13  Coram, discussions about reimbursement?
14     A.  No.
15     Q.  Was it typical that an account when they were
16  in this RFP process with you would -- would send you a
17  disk that Abbott was required to put data on and then
18  submit back?
19     A.  No.
20     Q.  That wasn't typical?
21     A.  No, it was not.
22     Q.  If you look at the page that ends with 855,
23  second to last page.  Under Roman XIII, "Bid
24  Response."  "Use the diskette supplied to respond to
25  the price quotation portion of this request."

Page 117

1          Did I read that accurately?
2     A.  Yes.
3     Q.  Do you recall now having received a disk from
4  Coram with respect to this RFP?
5     A.  Yes.
6     Q.  Okay.  But that was unusual?
7     A.  Yes.
8     Q.  Okay.  "Additional" -- excuse me, "Additional
9  terms and quotations should be submitted via hard
10  copy.  Failure to submit price quotations onto the
11  diskette provided may eliminate your response from
12  consideration."
13          Did I read that accurately?
14     A.  Yes.
15     Q.  And that's actually in all caps, isn't it?
16     A.  Yes.
17     Q.  Would that indicate to you that that's a bit
18  of information that's of particular importance in the
19  handling of this RFP?
20     A.  Yes.
21     Q.  "If you need assistance, please contact Lisa
22  Clock," and it gives the phone number.  "Leave
23  products that you do not wish to bid blank.  The
24  diskette" covers "six columns to provide pricing for
25  each line item."

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 118

1      Did I read that accurately?
2   A.  Yes.
3           MS. GEISLER:  Wait a minute.  It says,
4   "The diskette provides six columns to provide pricing
5   for each line item."
6   A.  Oh, I'm sorry.  Can you re-read that?
7   Q.  (BY MR. WINTER)  That's what I said, too.
8   But, anyway.  "All columns should be priced as
9   follows:
10          "Column A:  Current Average Wholesale
11  Price (AWP)."
12          Did I read that accurately?
13  A.  Yes.
14  Q.  Okay.  "Column B:  Current wholesale
15  acquisition cost (WAC)."
16          Did I read that accurately?
17  A.  Yes.
18  Q.  And did you have an understanding of what
19  W-A-C or WAC was?
20  A.  No.
21  Q.  Did you have any -- did you have any
22  responsibility to sell any of Abbott's products to
23  distributors or wholesalers when you were in Alternate
24  Site?
25  A.  No.  Not that I recall.

Page 119

1   Q.  Are you familiar with a program called
2   RxLink?
3   A.  I've heard the term, but -- I've just heard
4   the term.  I don't know what it is.
5   Q.  Do you know what WAC is?
6   A.  Wholesale acquisition cost it says right
7   here.
8   Q.  What does that mean to you, and based on your
9   experience at Abbott what was the wholesale
10  acquisition cost?
11  A.  To me it would be the price that the
12  wholesaler paid for the product.
13  Q.  Okay.  Would that mean to you the price that
14  was printed on the invoice between Abbott and the
15  wholesaler?
16  A.  Yes.
17  Q.  Do you know what a chargeback is?
18  A.  Yeah, I remember the term.
19  Q.  You remember the term but you --
20  A.  General -- again, it's been many, many years
21  and I've had several jobs since and I've been home
22  with kids for eight years, so ...
23  Q.  Sure.  I understand.
24  A.  Generally what I remember is that it was --
25  it had something to do with the price that customer

Page 120

1   actually paid and then the difference between that and
2   what the wholesaler was charged.
3   Q.  And when you say, the customer actually paid,
4   you mean the customer who Abbott had a contract with
5   and the drug would flow from Abbott through the
6   wholesaler to that end customer?
7   A.  Yes.
8   Q.  Okay.  And it was your experience that
9   oftentimes that end customer's price, that contract
10  price, was lower than the wholesale acquisition cost
11  price.
12  A.  Yes.
13  Q.  Okay.  So the chargeback would get the
14  wholesaler whole, bring him back to what the contract
15  price was.
16  A.  I believe so.
17  Q.  Okay.  "Column C:  Current contract price as
18  it exists for Coram for each specific line item.  If
19  your company does not currently have an award for the
20  line item on a private contract with Coram, please
21  leave blank."
22          Did I read that accurately?
23  A.  Yes.
24  Q.  And Column D is, "Quote for price as a single
25  line item award."

Page 121

1           And Column E is, "Quote for price as
2   part of a bundled contract.  Describe the terms and
3   conditions associated with the acceptance of this
4   offering in the vendor terms and conditions section of
5   the diskette."
6           Did I read that all accurately?
7   A.  Yes.
8   Q.  Now, again, going back to the preceding
9   paragraph, Coram, Mr. Bane and the folks at Coram, are
10  letting you know that your failure to provide any of
11  those price quotations in Columns A through E would --
12  might eliminate Abbott from consideration in this RFP
13  process, correct?
14  A.  Yes.
15          MS. GEISLER:  Objection to the form.
16  Q.  (BY MR. WINTER)  So that indicates to you
17  that Coram certainly, among other things, wants to get
18  your AWP pricing, right?
19          MS. GEISLER:  Objection to the form.
20  A.  Yes.
21  Q.  (BY MR. WINTER)  Do you know a gentleman by
22  the name of Don Carson?
23  A.  I do not recall Don Carson.
24  Q.  Don't recall the name at all or just don't
25  recall who he was?

FREDERICKS-CARROLL REPORTING

AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 122

1    A.  Either.
2    Q.  Either/or.  I'm going to hand you now what is
3  marked as Exhibit 706 and ask you to take a look at
4  this one, please.
5        MR. WINTER:  I've only got one.  And,
6  for the record, it is Bates label TXABT 249849.
7    Q.  (BY MR. WINTER)  And, Ms. Snead, this
8  purports to be a memo from you on Abbott letterhead
9  dated December 22, 1994 addressed to Mr. Carson and
10  with a copy to John Ward.  Do you see that?
11    A.  Yes.
12    Q.  "Enclosed is information on Coram
13  Healthcare's RFP for pharmaceutical products.  Please
14  note that they have extended the due date to January
15  11; however, Don Robertson (VP Alt Site), John Ward"
16  (General Manager, "Alt Site Product Sales), and I will
17  be presenting it in person on January 6.  So, the
18  effective due date for us is January 5.
19        "You'll note they are asking for WAC,
20  AWP, price if line item award, and price for bundled
21  award.  These are to be recorded on the enclosed disc.
22  Also, the annual volumes on the disc are incorrect.
23  Updated figures are noted in hard copy.
24        "We plan on proposing a corporate
25  dividend for all Abbott purchases, which will be

Page 123

1  mutually agreed on with Ross, PPD, and us.
2        "I have meetings set up with you for
3  January 3.  We'll need to move forward quickly after
4  that.  Thanks for your help."
5        Did I read that accurately?
6    A.  Yes.
7    Q.  Does this refresh your recollection about
8  this process that Abbott undertook to respond to the
9  Coram request for proposal?
10    A.  Yes.
11    Q.  And it was -- it was a response that was
12  handled by Abbott not exclusively by Hospital Products
13  Division, but sort of, I guess, as we've discussed
14  earlier this morning, at the corporate level involving
15  many divisions within Abbott, correct?
16    A.  Yeah.  Let's see who I said in here.  It
17  definitely involved pharmaceutical products and us.
18    Q.  And it looks like it also involved --
19    A.  Oh, yeah, Ross.
20    Q.  -- Ross, right?
21    A.  Yes.
22    Q.  Okay.  And in this memo, among other things,
23  you're telling Mr. Carson that -- you're reminding him
24  of the fact that Coram has specifically requested the
25  AWP and the WAC information, as well as the bid price

Page 124

1  information in the response, correct?
2    A.  Yes.
3    Q.  So this is consistent with your earlier
4  testimony that to the extent that a customer was
5  asking you for AWP information as part of their
6  request for proposal process, if you didn't have that
7  information at your fingertips or in your briefcase,
8  you would go out and you would endeavor to get it for
9  the customer, correct?
10        MS. GEISLER:  Objection to the form.
11    A.  Yes.
12    Q.  (BY MR. WINTER)  And can you think of any
13  other reason why the customer would want that AWP
14  information other than to do an analysis on the
15  reimbursement spread?
16        MS. GEISLER:  Objection to the form.
17    A.  No.
18    Q.  (BY MR. WINTER)  Let me hand you what's
19  marked now as Exhibit 707.  And -- and, Ms. Snead, let
20  me ask you, also, that you had said that customers may
21  have asked you for AWP information, but you couldn't
22  remember any specifics.  Do the documents that we're
23  handing you now refresh your recollection that this is
24  a specific instance where a customer asked you for AWP
25  information?

Page 125

1    A.  Yes.
2    Q.  Okay.  And does it -- does it refresh your
3  recollection that there were others -- other specific
4  instances where other customers also asked you for AWP
5  information?
6    A.  It doesn't.
7    Q.  So there may have been others, but you just
8  can't remember the specific -- the other specific
9  instances?
10    A.  Correct.
11        MS. GEISLER:  Objection to the form.
12    Q.  (BY MR. WINTER)  The document we just marked
13  as 707 is dated a few days later and it's from the
14  individual who received your prior memo, Mr. Carson.
15  Do you see that?
16    A.  Yes.
17        MS. ST. PETER-GRIFFITH:  Ray, can you
18  just give us the date?
19        MR. WINTER:  I sure can.  It's dated
20  December 29, 1994.  It's on Texas/Abbott letterhead
21  2 -- excuse me.  Texas/Abbott Bates label 249848 on
22  Abbott interoffice correspondence memo head from Don
23  Carson, marketing manager.
24    Q.  (BY MR. WINTER)  Do those department building
25  and extension items on that letterhead mean anything

32 (Pages 122 to 125)

b66cc43c-5092-4127-9266-2a482f299285

Page 126

1  to you, Ms. Snead?
2      A.  AP30 does.
3      Q.  I'm sorry?
4      A.  AP30.  The building, AP30.
5      Q.  That does mean something to you?
6      A.  Yes.
7      Q.  What's that mean to you?
8      A.  That was the building where some of PPD was
9  as well as HPD.
10     Q.  Okay.  And would this be consistent with your
11 expectation that Mr. Carson was the marketing manager
12 within PPD?
13     A.  Yes.
14     Q.  Okay.  And, again, it's referenced "Coram
15 RFP/Corporate Contract," correct?
16     A.  Yes.
17     Q.  Addressed to many individuals and copies to
18 several individuals, including yourself.  The folks
19 that are copied there, Bob Altman and Chris Bleck,
20 yourself and Russ Lehn.  Is Chris Bleck the person
21 that you were trying to recall earlier?
22     A.  Yes.
23     Q.  Okay.  And what -- what is your recollection
24 as to who she was?
25     A.  He.

Page 127

1      Q.  He.
2      A.  I don't remember his exact position.  I think
3  he was in marketing, but I'm not absolutely sure.
4      Q.  And -- and HPD marketing or PPD?
5      A.  Oh, PPD.
6      Q.  Do you remember who Bob Altman is or was?
7      A.  The name is familiar, but I don't remember
8  who he was.
9      Q.  What about Russ Lehn?
10     A.  Same thing.  I -- I don't remember.
11     Q.  Do you think everybody under that cc list,
12 except for you, were PPD folks?
13     A.  I would think so, but I don't know that.
14     Q.  Why would you think that?
15     A.  Because he's from PPD, the writer of the
16 memo.
17     Q.  Because Mr. Carson was from PPD?
18     A.  Yes.
19     Q.  Is it possible that some of these individuals
20 could be TAP or Ross individuals?
21         MS. GEISLER:  Objection to the form.
22     A.  It's possible.
23     Q.  (BY MR. WINTER)  And that would be possible
24 because this was a corporate response to the RFP that
25 would have involved other divisions besides just PPD

Page 128

1  and HPD, right?
2      A.  Yes.
3         MS. GEISLER:  Objection to the form.
4      Q.  (BY MR. WINTER)  Okay.  And on the "To" line
5  you've got Bob Bryan.  Do you recall Mr. Bryan being a
6  contract analyst in the Hospital Products Division,
7  Hospital Business Sector contract marketing?
8      A.  Yes.
9      Q.  Do you know who Paul Fonteyne was?
10     A.  No.
11     Q.  Do you know somebody by the name -- Jodi
12 Person is the next person under Mr. Fonteyne.  Do you
13 know who that is?
14     A.  No.
15     Q.  Do you know who Bob Rochelle is?
16     A.  No.  That name is familiar, but I don't know
17 who it is.
18     Q.  If you'll look at the middle of the page,
19 there are three products listed.  And I apologize if I
20 mispronounce these, but you've got Urokinase, is
21 that --
22     A.  Urokinase.
23     Q.  And Tranxene; is that correct?
24     A.  I don't know how you say that one.
25     Q.  And then Biaxin, Hytrin, Depakote and Cylert,

Page 129

1  correct?
2      A.  Cylert, I think it is.
3      Q.  And there's somebody's name adjacent to each
4  of those sets of drugs, right?
5      A.  Yes.
6      Q.  Would that stand to reason that that's the
7  marketing analyst who had responsibility for that
8  product line?
9      A.  I would think so.
10     Q.  Okay.  Do you recall having received this
11 document in the ordinary course of business?
12     A.  I don't.
13     Q.  The date on this is December 29th.  So it's
14 just shortly before the new year and the first
15 paragraph says, "Attached you will find copies of
16 information on the Coram Healthcare's RFP for
17 pharmaceutical products.  Coram represents an
18 important corporate accountant for Abbott.  Jim
19 Sweeney, CEO of Coram, was at Abbott Park in early
20 November for a meeting with Tom Hodgson and Kris
21 Kringel."
22         Did I read that accurately?
23     A.  Yes.
24     Q.  Does that help fix in your mind the meeting
25 that you referred to in your testimony earlier this

33 (Pages 126 to 129)

b66cc43c-5092-4127-9266-2a482f299285

Page 130

1  morning that you attended with Tom Hodgson and Kris
2  Kringel and with Coram?
3      A.  Yes.  I think it's the same meeting.
4      Q.  So you believe that you attended this meeting
5  sometime in November of 1994?
6      A.  Yes.
7      Q.  Did you -- if I asked you this previously,
8  then I apologize, but let me ask it again now.
9          Did you attend any other meetings
10 regarding any of your other accounts with Mr. Hodgson
11 or Mr. Kringel?
12     A.  Not that I recall.
13     Q.  Does that -- do you, as you sit here today,
14 have the sense that that would be somewhat unusual for
15 high-level executives like Mr. Hodgson and Mr. Kringel
16 to be participating in a meeting with you on one of
17 your accounts?
18     A.  Yes.
19         MS. GEISLER:  Objection to the form.
20     Q.  (BY MR. WINTER)  Do you have any sense of why
21 it is that Mr. Hodgson and Mr. Kringel participated
22 with you in meeting with Coram on the issue of this
23 Coram RFP?
24         MS. GEISLER:  Objection to the form.
25     A.  As I said, they were a merger of several

Page 131

1  entities, so they were a very, very large home
2  infusion customer, so I think that's why they were
3  involved.
4          The other kind of interesting thing is
5  Jim Sweeney used to -- I believe used to head up McGaw
6  IV solutions, who was a competitor to Abbott in the
7  past, so ...
8      Q.  (BY MR. WINTER)  You think he had been the
9  head of McGaw before he went to Coram?
10     A.  Yes.
11         MS. GEISLER:  Objection to the form.
12     Q.  (BY MR. WINTER)  Do you know that for a fact
13 or is that just vague recollection?
14     A.  Vague recollection.
15     Q.  And McGaw was one of Abbott's competitors on
16 the infusion products?
17     A.  Yes.  IV solutions.
18     Q.  The IV solution, the Dextrose and the sodium
19 chlorides, correct?
20     A.  Yes.
21         MR. WINTER:  Okay.  Why don't we take a
22 short break.  It's 11 o'clock.  And want to take about
23 10 minutes?
24         MR. STETLER:  Whatever fits your --
25         THE VIDEOGRAPHER:  We are off the record

Page 132

1  at 10:56 a.m.
2          (Recess from 10:56 to 11:07)
3          THE VIDEOGRAPHER:  We're back on the
4  record at 11:07 a.m.
5      Q.  (BY MR. WINTER)  Ms. Snead, I'm going to hand
6  you now what we've marked as Exhibit 708 and this
7  purports to be a memo.  It's got a couple different
8  Bates labels on it.  One is Ross 334959.  And it's on
9  Abbott interoffice correspondence dated December 15,
10 1994 from Gerald J. Martin, Divisional Vice President,
11 AHD.  And it's addressed to several people, including
12 Chris Bleck, who you and I spoke about a moment ago.
13         And it reads, "The Coram visit to Abbott
14 Park has been postponed due to new acquisition
15 activity.  Jim Sweeney the CEO of Coram, has committed
16 that he does want to visit Abbott Park in October or
17 November.  The invitation for this visit was a
18 personal one from Tom Hodgson and Kris Kringel.
19         "This delay has afforded us the
20 opportunity to gather more data.  Specifically, we are
21 trying to find out what business we are currently
22 doing with Coram and what potential business we could
23 be doing.  Coram is primarily in the home infusion
24 business, but they ... have a mail order pharmacy and
25 an ambulatory infusion center (for chemotherapy)" and

Page 133

1  "they want to expand.  A current as of 9/1/94 list of
2  their facilities is attached.
3          "When Coram does visit, it is our
4  intention to have the framework" for "an agreement to
5  present to Jim Sweeney thus the need for this data.
6          "Chris Snead from HPD Alternate Site
7  Sales has volunteered to compile all the data.  Please
8  send your information to her at:" and it has your name
9  and address.
10         "Coram is a major target for Abbott in
11 the alternate care market.  Your cooperation is
12 greatly appreciated.
13         "Gery Martin."
14         Did I read that accurately?
15     A.  Yes.
16     Q.  Do you remember who Gerry Martin is?
17     A.  Yes.
18     Q.  Did you interact with Mr. Martin in this
19 response in or about the fall of 1994 and early 1995
20 to the Coram RFP?
21     A.  I don't remember if he was involved with the
22 RFP response specifically.
23     Q.  Was he one of the executives at the corporate
24 level who was interested in sealing the deal between
25 Abbott corporate and Coram?

34  (Pages 130 to 133)

b66cc43c-5092-4127-9266-2a482f299285

Page 134

1    A.  He was.
2        MS. GEISLER:  Objection to form.
3    Q.  (BY MR. WINTER)  Did Mr. Martin attend the
4  meeting with you and Mr. Hodgson and Mr. Kringel and
5  Mr. Sweeney that took place later in November?
6    A.  I don't specifically remember that, but I
7  believe he probably -- he would have.
8    Q.  Do you remember the meeting had been
9  scheduled at one time for September and then got
10 canceled and rescheduled?
11   A.  I don't remember that.
12   Q.  Do you remember that you were the point of
13 contact for compiling all the data?
14   A.  I don't.
15   Q.  Do you remember what data was compiled in
16 order to respond to the RFP?
17   A.  I don't.
18   Q.  Does this refresh your recollection in the
19 second paragraph, "Specifically we are trying to find
20 out what business we are currently doing with Coram
21 and what potential business we could be doing"?  Would
22 that be -- does that, in your mind, have a connection
23 to the data that you were collecting?
24   A.  Again, I'm not sure I understand your
25 question.

Page 135

1    Q.  Well, the paragraph -- the second paragraph
2  reads, "This delay has afforded us the opportunity to
3  gather more data," right?
4    A.  Yes.
5    Q.  And the memo also says that you're the person
6  who volunteered to compile all the data, right?
7    A.  Yes.
8    Q.  The second sentence in paragraph two says,
9  "Specifically, we are trying to find out what business
10 we are currently doing with Coram and what business we
11 could be doing."
12       So does that have any meaning to you as
13 far as what was the data that you were collecting in
14 order to analyze the RFP?
15       MS. GEISLER:  Objection to form.
16   A.  I don't have any recollection about this.  I
17 obviously -- according to this memo, I did collect the
18 data, but I don't have any recollection about what
19 kind of data I collected.
20   Q.  (BY MR. WINTER)  Do you have any recollection
21 as to what kind of format it came in?  Was it hard
22 copy reports that you then put on some kind of a
23 spreadsheet or did you get electronic submissions from
24 various people?
25       MS. GEISLER:  Objection to form.

Page 136

1    A.  I don't recall.
2    Q.  (BY MR. WINTER)  Do you recall if you
3  prepared any kind of a work product in order to
4  prepare for this meeting to present to the executives?
5        MS. GEISLER:  Objection to form.
6    A.  I'm sorry, any kind of a work --
7    Q.  (BY MR. WINTER)  Work product.
8    A.  Oh.
9    Q.  Do you recall whether you received this data,
10 whatever it was, and then put it into some sort of a
11 format or an executive summary or a spreadsheet or a
12 table to show to Mr. Hodgson and Mr. Kringel and
13 Mr. Martin?
14   A.  I don't recall.
15   Q.  Shortly after this meeting with Coram, which
16 was unusual in that Coram was an important -- an
17 important customer for Abbott, correct?
18   A.  Yes.
19       MS. GEISLER:  Objection to the form.
20   A.  Yes.
21   Q.  (BY MR. WINTER)  And it was also unusual in
22 that some of the high-level executives within Abbott
23 attended the meeting with the customer, correct?
24       MS. GEISLER:  Objection to the form.
25   A.  For Alternate Site businesses that was

Page 137

1  unusual, yes.
2    Q.  (BY MR. WINTER)  And it was shortly after
3  this that you -- you made the transition from
4  Alternate Site Product Sales as a national account
5  manager to -- to the HealthSystems Division, correct?
6    A.  Yes.
7    Q.  And was that a promotion for you?
8    A.  Yes.
9    Q.  And so was that, in part, a reward for how
10 you helped facilitate Abbott's securing the Coram
11 account?
12   A.  I think it was just a promotion based on my
13 performance in general in -- in my previous position.
14   Q.  And -- and your performance in general over
15 the number of years that you had been a national
16 account manager, correct, is what you mean?
17       Let me -- let me rephrase the question.
18       Your response was you feel like you got
19 promoted because of your performance in general,
20 right?
21   A.  Yes.
22   Q.  And -- and that's drawing back on the
23 previous four or five years where you had been in
24 Alternate Site Product Sales, correct?
25   A.  Yes.

35 (Pages 134 to 137)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 138

1     Q.  But your work ethic and -- and the
2  contribution you made to pulling together everything
3  that was necessary to respond to the Coram RFP was
4  certainly elevated to the attention of the executives
5  in the Coram case, since they got to see you in action
6  and you were -- it appears from the memoranda here,
7  you were kind of the driving force for putting
8  together the meetings and bringing people together and
9  getting everything that was necessary to respond to
10  the RFP; is that accurate?
11         MS. GEISLER:  Objection to the form.
12     A.  Yeah.  I was very involved with the Coram
13  thing.  I wouldn't say necessarily that I was the
14  driving force as far as pulling together different
15  divisions, but I was the person, according to this
16  memo, they sent the info to.
17     Q.  (BY MR. WINTER)  Would -- would -- would you
18  say that this was an opportunity for -- for your
19  performance to be exposed and -- and -- and to the
20  attention of the higher level executives and that
21  they -- you got noticed as a result of this exercise?
22         MS. GEISLER:  Objection to the form.
23     A.  I think it gave me more visibility to that
24  level.
25     Q.  (BY MR. WINTER)  Okay.  Do you recall the

Page 139

1  actual meeting that took place -- I know you recall it
2  because you talked about it earlier.  At the meeting
3  when Mr. Sweeney met with you and Mr. Hodgson and
4  Mr. Kringle, and perhaps Mr. Martin, do you recall any
5  other people who were present?
6     A.  There were about 20 people there.
7     Q.  And was it in a large conference room like
8  this at Abbott Park?
9     A.  Yes.
10     Q.  Okay.  And what was discussed at this
11  meeting?
12     A.  It was a number of presentations from
13  different people from different divisions about our
14  product line and just an Abbott overview, primarily.
15     Q.  Did the folks at Coram give a presentation
16  about their line of work first and then Abbott gave a
17  responsive presentation about how it wanted to do
18  business with Coram?
19     A.  I can't remember if they gave -- if Coram
20  gave a presentation or not.
21     Q.  Do you recall whether Mr. Sweeney was just
22  there to observe or was he an active participant in
23  the discussions and negotiations?
24     A.  From what I remember of the meeting, there
25  were no real negotiations that went on.  It was just

Page 140

1  presentations, basically.
2     Q.  Was it all one way or was it two way, back
3  and forth discussion?
4     A.  I don't --
5         MS. GEISLER:  Objection to the form.
6     A.  I don't remember.
7     Q.  (BY MR. WINTER)  You mentioned that
8  Mr. Sweeney had been CEO of McGaw, correct?
9     A.  I am 90 percent certain of that.
10     Q.  And -- and as such you would expect that
11  Mr. Sweeney would have been conversant on issues
12  pertaining to AWP and reimbursement and the importance
13  of spread to customers who purchased the same kinds of
14  products that McGaw and Baxter were both selling, such
15  as sodium chloride and dextrose and those fluids,
16  right?
17         MS. GEISLER:  Objection to the form.
18     A.  If he, indeed, was CEO, you know, if he,
19  indeed, ran McGaw, then he would be.
20     Q.  (BY MR. WINTER)  And, if indeed, he had run
21  McGaw before he came to Coram, you would expect him to
22  be conversant on those issues.  Do you think that he
23  brought them up at the meeting --
24         MS. GEISLER:  Object --
25     Q.  (BY MR. WINTER)  -- and talked about the

Page 141

1  importance to Coram of AWP and reimbursement issues in
2  analyzing the response to the RFP?
3         MS. GEISLER:  Objection to the form.
4     A.  I don't recall.
5     Q.  (BY MR. WINTER)  You don't have a specific
6  recollection of that?
7     A.  I do not.
8     Q.  Well, would it be your expectation that if,
9  in fact, Mr. Sweeney had been the CEO of McGaw and if,
10  in fact, he was conversant in those issues, such as
11  AWP and reimbursement, that he would have brought them
12  up in a high-level meeting such as this where Coram
13  was preparing to evaluate a response to an RFP that it
14  tendered to Abbott Labs?
15     A.  I don't think I can speak for what he would
16  or would not have done.  I don't know.
17     Q.  And my question was a little bit more
18  specific than -- than that.  It was what would you
19  expect that he would have done.  Given your -- given
20  your -- your sense of it and your belief is that
21  Mr. Sweeney was the former CEO of McGaw, and you've
22  testified that if, in fact, he was the former CEO of
23  McGaw, you would have expected that he would be
24  conversant and knowledgeable in issues such as AWP and
25  reimbursement and the importance of those matters to

36 (Pages 138 to 141)

b66cc43c-5092-4127-9266-2a482f299285

Page 142

1  customers.
2       So given those expectations and given
3  the fact that in the RFP itself, which we've already
4  looked at, Coram explicitly says that it wants to
5  analyze and look at AWP information, and, in fact, the
6  failure to include AWP information could be grounds
7  for disqualification. So given those things that --
8  that you already either know or expect and believe,
9  wouldn't you expect that Mr. Sweeney would have raised
10 in his meeting with these high-level executives in or
11 about November of 1994, issues pertaining to AWP and
12 reimbursement?
13      MS. GEISLER: Objection to form.
14   A.  When he ended up -- he did have some alone
15 time with either Mr. Kringel or Mr. Hodgson, I can't
16 remember which, it turned out that -- really, one of
17 the primary reasons for him coming was because they
18 had this home infusion business and he was -- I don't
19 remember if he was looking to sell it, potentially, to
20 Abbott's home infusion business, but I think that was
21 his primary goal, really, of coming to Abbott.  Not so
22 much -- of course, our -- from our viewpoint, we were
23 interested in getting a contract with Coram
24 ultimately, but I don't think that was Mr. Sweeney's
25 primary goal.

Page 143

1   Q.  (BY MR. WINTER) You believe that Mr. Sweeney
2  participated in this meeting because Coram had a home
3  infusion business, which it was -- your sense of it is
4  they were considering selling it to Abbott?
5   A.  Yeah --
6   Q.  Do you --
7   A.  -- that's my sense.
8   Q.  Pardon me for talking over you.
9       Do you know a gentleman by the name of
10 Mike Sellers?
11   A.  Yes.
12   Q.  Did Mr. Sellers attend this meeting in
13 November of 1994?
14   A.  I don't remember.
15   Q.  Do you know a woman by the name of Ginny
16 Tobiason?
17   A.  Yes.
18   Q.  Was Ms. Tobiason at this meeting?
19   A.  I don't remember.
20   Q.  Do you remember anybody from the Home
21 Infusion Services unit within Alternate Site that
22 attended this meeting?
23   A.  I don't recall who -- who was at the meeting.
24   Q.  Do you recall that there was somebody there
25 from Home Infusion Services?

Page 144

1   A.  I don't know.
2       MS. GEISLER: Objection to the form.
3   A.  I don't recall that.
4   Q.  (BY MR. WINTER) You don't know one way or
5  another?
6   A.  Correct.
7   Q.  At some point -- your testimony earlier this
8  morning was that you didn't have any responsibility to
9  report Abbott's list prices or wholesale prices or
10 direct prices or any of Abbott's prices to the price
11 reporting compendia, correct?
12   A.  Correct.
13   Q.  But you did, from time to time, make reports
14 of Abbott's prices to Texas Medicaid, correct?
15   A.  Yes.  Restate that question, please.
16   Q.  Isn't it true that from time to time you had
17 the responsibility within Abbott to report pricing on
18 Abbott products to the Texas Medicaid program?
19      MS. GEISLER: Objection to form.
20   A.  I routinely did those sheets I was telling
21 you about, but that wasn't -- so, no, that's not
22 something I routinely did or recall doing.
23   Q.  (BY MR. WINTER) So just so the record is
24 clear, when you say, "I routinely did those sheets I
25 was telling you about," you're referring to the

Page 145

1  process by which you would receive a list of Abbott
2  products from somebody in Pharmaceutical Products
3  Division and you would distinguish between the drug
4  products and the durable medical equipment products by
5  making some kind of a mark with a pen on the paper,
6  correct?
7   A.  Yes.
8   Q.  Okay.  Setting that aside, isn't it true that
9  from time to time you had the responsibility to report
10 pricing to the Texas Medicaid program?
11   A.  No.
12   Q.  You don't recall that?
13   A.  I don't recall that.
14   Q.  Okay.  Let me show you, first of all, a
15 document that we're going to mark as Exhibit 709 and
16 let me ask you if this rings a bell or refreshes your
17 recollection.  It's on a Bates label that's TABBH
18 000758 and it purports to be a letter from you to
19 Martha McNeill dated December 1, 1992.  Do you see
20 that?
21   A.  Yes.
22   Q.  Do you know who Martha McNeill is?
23   A.  The name rings a bell.
24   Q.  Okay.  And -- and without having read this
25 letter, do you have any sense as to who she is or was?

Page 146

1    A.  No.
2    Q.  Okay.  Well, let's read the letter.
3  "December 1, 1992, Ms. Martha McNeill, Texas
4  Department of Human Services."  And it's got a P.O.
5  Box, Austin, Texas.
6         "Dear Ms. McNeill, Jordan Pharmacy in
7  Hamilton, Texas has been ordering List Number
8  0074-7983-01, 0.9% sodium chloride 1000" milliliter
9  "from us for one of their welfare patients.  Her name
10 is Wilma Pierce, welfare" number.
11        "The price that they have been paying is
12 $7.83 each.
13        "If you have any questions, please call
14 me" and has the phone number.  Do you see that?
15   A.  Yes.
16   Q.  Did I read that accurately?
17   A.  Yes.
18   Q.  Does this refresh your recollection that
19 Ms. McNeill was an official with the Texas Medicaid
20 program?
21   A.  I can see she's at Texas Department of Human
22 Services on the memo, but I don't recall her.
23   Q.  Well, reading from that first paragraph, what
24 you're telling Ms. McNeill is that one of Abbott's
25 customers in Hamilton, Texas, has been ordering an

Page 147

1  Abbott product, the sodium chloride thousand
2  milliliter.  That's a drip bag of sodium chloride,
3  right?
4    A.  Yes.
5    Q.  For one of their welfare patients.  That's a
6  Medicaid patient, right?
7    A.  Yes.
8    Q.  Okay.  And you give the patient's name.  And
9  you're also telling Ms. McNeill that the price that
10 that pharmacy pays for that Abbott drug for that bag
11 is $7.83, right?
12   A.  Yes.
13   Q.  Now, you still appear to me to be a little
14 bit puzzled by this letter.  Is that because you don't
15 have a present recollection of having sent it?
16   A.  Yes.
17   Q.  Okay.  When you were a national account
18 manager from July of '91 through January '95 and you
19 called on some of your key accounts, did you ever have
20 occasion to go to Texas to call on accounts?
21   A.  Yes.
22   Q.  Where did you go?
23   A.  I would travel with reps, you know, at
24 different times.  I remember being in San Antonio and
25 Austin and Dallas.

Page 148

1    Q.  And which representatives did you ride along
2  with?
3    A.  Lance somebody.  Mike Beck.  That's -- that's
4  the only names I can remember.
5    Q.  Did you know a gentleman by the name of Paul
6  Lozano?
7    A.  I don't remember that, no.  I may have known
8  him, but I don't remember him.
9    Q.  Do you remember a gentleman by the name of
10 Greg Lotz?
11   A.  Yes.
12   Q.  Did you ever ride along with Mr. Lotz?
13   A.  I may have.  I don't recall that
14 specifically.
15   Q.  And you would ride along for what purpose?
16   A.  Depending on -- sometimes I rode along just
17 to get a feel for -- initially I rode -- when I
18 started my job, I rode along to get a feel for the
19 business because I had come from the hospital side.
20 Later I would sometimes go to meet with local branches
21 of, you know, national accounts that I would have.
22   Q.  So you would go to meet with, for example,
23 pharmacies or home infusion companies that were
24 members of GPOs that you called on?
25   A.  Yeah.  I could.

Page 149

1    Q.  And PBI is a -- is a group purchasing
2  organization, correct?
3    A.  Yes.
4    Q.  And its members are home infusion companies?
5    A.  Among other things.
6    Q.  Okay.  So would you call on home infusion
7  companies located in Texas that were PBI members?
8    A.  That I don't recall.
9    Q.  Would you call on home infusion companies
10 that were -- that had been bought by Coram or its
11 predecessor?
12   A.  I may have.
13   Q.  Do you recall, as part of your job, ever
14 receiving, when you were back at Abbott Park -- strike
15 that.
16        Let me ask you this question:  What
17 frequency -- with what frequency did you travel when
18 you were a national account manager or a national
19 account representative?
20   A.  A couple times a month.
21   Q.  Did you try and -- and structure your
22 schedule so that -- that you were gone for a week at a
23 time and then you didn't have to travel again the rest
24 of the month?
25   A.  No.

38 (Pages 146 to 149)

b66cc43c-5092-4127-9266-2a482f299285

Page 150

1    Q.  So it was just pot luck if it -- if it --
2  okay.
3    A.  Yeah.  I also had young children, so I didn't
4  want to be gone at long stretches if I could help it.
5    Q.  So would you try out -- and -- and then
6  minimize your overnight out-of-town stays?
7    A.  Yes.
8    Q.  Okay.  So you might make day trips a couple
9  times a month?
10   A.  Yes.
11   Q.  When you came to Texas, would those be day
12 trips or would those be overnights?
13   A.  I don't remember.
14   Q.  It seems like it would be pretty difficult
15 for you to conduct business on a day trip from Chicago
16 to Texas, wouldn't it --
17      MS. GEISLER:  Objection to form.
18 Q.  (BY MR. WINTER)  -- or is that possible?
19   A.  It's possible.
20   Q.  Okay.  Do you recall as part of your job ever
21 receiving complaints from any of the accounts that you
22 called on or from pharmacies that were members of your
23 key accounts that the products that those customers
24 wished to purchase from Abbott were not reimbursable
25 by Texas Medicaid?

Page 151

1    A.  I don't recall that.
2    Q.  Did you ever receive any kind of a complaint
3  or was it ever brought to your attention that the
4  products that those customers located in Texas were
5  purchasing from Abbott were not reimbursable from
6  Texas Medicaid at the price at which the customer was
7  paying for the product?
8    A.  It could have happened.  I just don't recall.
9    Q.  So you don't recall any -- any incidences
10 like I've described it one way or another?
11   A.  I don't.
12   Q.  Now, in addition to -- well, you don't --
13 certainly don't doubt that this is, in fact, a copy of
14 a letter that you wrote to Ms. McNeill, correct?
15   A.  Correct.
16   Q.  And in fact, it's got the Vendor Drug Program
17 received date stamp in the upper right-hand corner,
18 correct?
19   A.  Correct.
20   Q.  Have you ever heard the acronym "Vendor Drug
21 Program" before?
22   A.  No, not that I recall.
23   Q.  You don't recall that that is the
24 nomenclature for the Texas Medicaid program, at least
25 as far as the pharmacy reimbursement aspect of it?

Page 152

1    A.  I don't.
2    Q.  Do you recall any other occasion where you
3  interacted with Ms. McNeill, whether you spoke to her
4  on the telephone or whether you corresponded with her?
5    A.  I may have.  I just don't have specific
6  recollection.
7    Q.  Was it ever your job responsibility to report
8  pricing on Abbott products to any other Medicaid
9  program?  Let's exclude Texas for a minute.  Did you
10 ever have the responsibility to interface with any
11 other Medicaid program in the country and report
12 pricing on Abbott products?
13   A.  Not that I recall.
14   Q.  Let me show you what's marked now as Exhibit
15 710, which is a multipage document beginning with
16 Bates label TABBH 0000051 and purports to be a letter
17 from you to Ms. McNeill dated June 3rd, 1993.  Again,
18 it's got a received stamp in the upper right-hand
19 corner, Vendor Drug Program, received June 14, '93.
20      Do you see the letter and do you
21 recognize this to be a letter that you wrote?
22   A.  It looks like a letter I wrote, yes.
23   Q.  "Dear Martha, Enclosed are application forms
24 for the following drugs."  And then there are a number
25 of Abbott products listed.  Do you see that?

Page 153

1    A.  Yes.
2    Q.  Including the Bupivacaine.  Did I say that
3  accurately?
4    A.  Bupivacaine.
5    Q.  Bupivacaine and Vancomycin.  And attached to
6  your cover letter there is a multipage document that
7  bears your signature on the third page.  Do you see
8  that?
9    A.  Yes.
10   Q.  Do you see that?
11   A.  Yes.
12   Q.  Okay.  Do you recall having filled out this
13 application?
14   A.  It looks like I did.  Do I -- I don't have a
15 specific recollection of doing the application.
16   Q.  Is that your signature on the third page of
17 the application?
18   A.  It is.
19      MR. WINTER:  Okay.  We're going to have
20 to change the tape, and so let's go ahead and go off
21 the record very briefly and change the tape.  And then
22 I'm going to finish this line of questioning and then
23 we'll take our lunch break and get you out of here
24 before noon.
25      THE VIDEOGRAPHER:  We are off the record

39 (Pages 150 to 153)

b66cc43c-5092-4127-9266-2a482f299285

Page 154

1  at 11:31. This concludes Tape Number 2.
2      (Discussion off the record)
3      THE VIDEOGRAPHER: We are back on the
4  record at 11:32 a.m. This is the beginning of Tape 3.
5      Q. (BY MR. WINTER) Okay. Ms. Snead, I asked
6  you to take a look at that page that has the Bates
7  label 54 on the bottom and -- and that is your --
8  indeed your signature?
9      A. Yes.
10     Q. Okay. And if you look at the first page of
11 the application, which is the second page of the
12 exhibit, do you see that it's the application for
13 Vancomycin hydrochloride? Do you see that?
14     A. Yes.
15     Q. And do you recognize this application as the
16 form for drug manufacturers to report pricing on their
17 products to the Texas Medicaid program so that they
18 can be included on the Texas Medicaid formulary?
19     A. I'm just looking at this for the first time
20 in years, so I don't recognize it as a specific form,
21 but it says for -- on the top for products currently
22 included in the Drug Code -- Texas Drug Code Index.
23     Q. And is this refreshing your recollection that
24 in or about June of 1993 you, in fact, reported to
25 Texas Medicaid pricing on certain Abbott products so

Page 155

1  that those drugs could be covered on the Texas
2  Medicaid formulary?
3      A. I'll tell you what I'm remembering. I see
4  Mike Beck's name. I -- I worked with Mike in the
5  Austin area. I remember because my brother lives in
6  Austin. I stayed with my brother. But -- and I do
7  remember him bringing me into like a government-type
8  of facility just as part of the day and meeting with
9  someone. And then giving -- there was a form that
10 needed to be filled out and he said -- I said -- he
11 asked me to do him a favor and just bring it back and
12 do the form. So I said, fine, I'll bring back and do
13 the form. So I'm assuming this was the form I filled
14 out.
15     Q. Okay. And do you recall Mr. Beck telling you
16 that he was having difficulty selling these products,
17 Bupivacaine, if I didn't pronounce that --
18     A. Bupivacaine.
19     Q. Yeah. Whatever. That -- that drug, that
20 product, and the Vancomycin products because they
21 weren't on the Texas Medicaid formulary, do you --
22     A. I don't recall that, no.
23     Q. Do you recall Mr. Beck telling you that he
24 wanted those drugs to be eligible for reimbursement
25 and to be included on the Texas Medicaid formulary and

Page 156

1  that's why he asked you to fill out this form?
2      A. Again, I don't recall a specific
3  conversation.
4      Q. Well, what -- what is it of the discussion
5  with Mr. Beck and the visit to the governmental office
6  that you do recall?
7      A. What I told you. I remember being in Austin.
8  I remember him taking me into a government -- some
9  kind of government place, and that's all I remember,
10 and would I fill out the form.
11     Q. Do you recall having received a blank copy of
12 the form when you were there during that visit?
13     A. I don't know if I received it there, it was
14 mailed to me. I don't know.
15     Q. Do you think you looked at a blank copy of
16 the form when you were there at that visit?
17         MS. GEISLER: Objection to the form.
18     A. I don't recall.
19     Q. (BY MR. WINTER) But your -- your best
20 recollection is that Mr. Beck asked you to fill out
21 the form for these drugs and that you did so upon your
22 return to Abbott Park --
23     A. Yes.
24     Q. -- is that correct?
25     A. Yes.

Page 157

1      Q. And this ordinarily was not part of your job
2  description to make these kinds of reports to the
3  Texas Medicaid program; is that true?
4          MS. GEISLER: Objection to the form.
5      A. Yes.
6      Q. (BY MR. WINTER) If you look on the second
7  page of the exhibit, under Paragraph 6 it says, "Price
8  (a., b., and c. must be completed) In addition, attach
9  copies of price lists - one set of price lists is
10 sufficient for multiple submittals."
11         Do you -- do you see that?
12     A. Yes.
13     Q. And then under "a." it says, "Average of
14 suggested wholesale price to pharmacy" and you typed
15 in there, "See attached Wholesaler Price List." Do
16 you see that?
17     A. Yes.
18     Q. And then under column b. it says, "Price to
19 wholesaler and/or distributor" and you typed in there,
20 "See attached Wholesaler Price List." Do you see
21 that?
22     A. Yes.
23     Q. And then under "Direct price to pharmacy" you
24 typed in, "See attached Catalog Price List," correct?
25     A. Yes.

40 (Pages 154 to 157)

b66cc43c-5092-4127-9266-2a482f299285

Page 158

1    Q.  And you also attached to the application a
2  price list, correct?  You've got three documents that
3  follow the application and the first one says "1993"
4  catalog -- "Price Catalog," correct?
5    A.  Yes.
6    Q.  And then you have a second page that says
7  "1993 Price Catalog" and then in the upper right it
8  says "Direct."  Do you see that?
9    A.  I see that, yes.
10    Q.  And do you see there is a column that says
11  "List Number," which would be at least part of the NDC
12  for the drug, correct?
13    A.  Yes.
14    Q.  And then the package size and then there is a
15  unit and a price.  And if you look at that first
16  entry, that Pentothal five grams, that would be $43.93
17  per unit and there would be 25 in a package.  So
18  that's where you get the $1,098.25, correct?
19    A.  Yes.
20    Q.  Okay.  And on that same page where it has the
21  "Direct" written in the handwriting across the top
22  right, about six drugs down, six entries down is the
23  Vancomycin product, the flip-top vial that you and I
24  were looking at earlier.  Do you see that?
25    A.  Yes.

Page 159

1    Q.  6533-01.  So the package size is 10 and the
2  unit price is $49.42.  So that means $494.20 for the
3  package of 10, right?
4    A.  Yes.
5    Q.  And that would be the direct price, right?
6    A.  Again, direct isn't the term that I used.
7    Q.  Would "list" be a term that you would be more
8  familiar with?
9    A.  List would, yeah.
10    Q.  Okay.  And for this same drug on the next
11  page, it's the ninth entry down.  It's the Vancomycin
12  hydrochloride one gram flip-top vial.  There is a $380
13  wholesale price listed.  Do you see that?
14    A.  Yes.
15    Q.  Which is quite a bit less -- and it's for the
16  same package of 10, right?
17    A.  Yes.
18    Q.  Okay.  So that would be $38 for a single
19  vial, correct?
20    A.  Yes.
21    Q.  Okay.  And so that's lower than the list
22  price that is on the preceding page, correct?  Which
23  was $49.42 --
24    A.  Yes.
25    Q.  -- per single vial.  Now, it was your earlier

Page 160

1  testimony that it was your expectation, and indeed
2  experience, that the contract prices, the real market
3  prices when Abbott was selling its product to its
4  customers were lower than WAC?
5        MS. GEISLER:  Objection, form.
6    Q.  (BY MR. WINTER)  Correct?
7    A.  Correct.
8    Q.  Okay.  So if WAC is $38 for a single unit and
9  the list here is $49.42 for a single unit, do you see
10  a price on any of these three pages that would
11  approximate, in your mind, the actual market price,
12  the routine market price or the prevailing market
13  price to Abbott's customers?
14        MS. GEISLER:  Objection, form.
15    A.  Some customers paid list price, so --
16    Q.  (BY MR. WINTER)  How do you know that?
17    A.  Because not everybody had a contract.
18    Q.  So was it your experience that some of
19  Abbott's customers actually paid list price or is that
20  just something somebody told you?
21    A.  I did experience -- there were a few
22  customers in Alternate Site Product Sales that did pay
23  list price because customer service, when I was a
24  national account rep, would let me know, "Hey, they're
25  paying list.  Why don't you contact them so we can get

Page 161

1  them, you know, some better pricing."
2    Q.  So if Abbott -- it came to Abbott's attention
3  that there were customers out there without a
4  contract, part of your job in Alternate Site Product
5  Sales was to make contact with those customers and try
6  and get them on contract --
7    A.  Yes.
8    Q.  -- is that correct?
9    A.  Yes.
10    Q.  So it would be your expectation, and indeed
11  experience, that a very, very minuscule percentage of
12  Abbott's sales were at list price?
13        MS. GEISLER:  Objection to the form.
14    A.  Yes.
15    Q.  (BY MR. WINTER)  Okay.  When you made the
16  determination to fill out this price lists to it, was this something that
17  these price lists to it, was this something that
18  somebody up in Abbott Park directed you to do as far
19  as which prices to report or was that your own
20  decision?
21    A.  Again, I don't recall all the specifics, but
22  I -- we didn't really have a person, at least that I
23  was aware of, that did this kind of thing, so I just
24  went ahead and filled out the form to the best of my
25  ability.

41 (Pages 158 to 161)

b66cc43c-5092-4127-9266-2a482f299285

Page 162

1    Q.  Why did you decide to attach these list price
2  catalogs to the form in response to the price
3  information that was requested?  Why didn't you
4  provide the prevailing market prices or the contract
5  prices in response to those questions?
6    A.  I don't know.  I don't know.
7    Q.  Do you know a woman by the name of Tena
8  Brown?
9    A.  I know the name.  That's all I can recall.
10    Q.  Do you recall having interacted with
11  Ms. Brown in -- in preparing to complete this form and
12  submitting it to the Texas Medicaid program?
13    A.  I don't recall.
14    Q.  Do you know a gentleman by the name of
15  Michael Heggie?
16    A.  Yes.
17    Q.  Do you recall whether you spoke with
18  Mr. Heggie and sought any assistance or input from him
19  in completing this form, which is Exhibit -- whatever
20  it is?
21        MS. GEISLER:  710.
22        MR. WINTER:  Thank you.
23    A.  I don't recall, but he was -- he was in the
24  renal care business, so I don't know why I would have
25  talked to him.

Page 163

1    Q.  (BY MR. WINTER)  Did you have the
2  understanding or was it your experience that
3  Mr. Heggie was somebody who was generally viewed
4  within Abbott Alternate Site as a reimbursement --
5  someone who was knowledgeable with respect to Medicaid
6  reimbursement?
7        MS. GEISLER:  Objection to the form.
8    A.  In Renal Care, yes.
9    Q.  (BY MR. WINTER)  So your sense of it was --
10    A.  It was either Renal Care or Home Infusion.
11    Q.  Well, would it surprise you if I represented
12  to you that Mr. Heggie was, in fact, in both Home
13  Infusion and Renal Care at different parts of time,
14  over different periods of time?
15    A.  No, it wouldn't surprise me.
16    Q.  Okay.  If somebody in the Alternate Site
17  Product Sales department had a reimbursement question
18  or a concern about coverage of an Abbott product on a
19  Medicaid formulary, who would they go to?
20    A.  I don't know.
21    Q.  If you had a question from a customer, from a
22  colleague, about the reimbursability or the
23  eligibility for reimbursement of an Abbott drug, who
24  would you go to?
25    A.  I -- I guess I'd go to Steve Kipperman or

Page 164

1  Ginny Tobiason in Home Infusion or John Ward, my boss,
2  and ask him who to go to.
3    Q.  And you would have gone to Mr. Kipperman
4  because he was the guy that was in charge, the
5  manager, of Alternate Site contract marketing?
6    A.  Yes.
7    Q.  Okay.  And Mr. Ward because he's the boss,
8  right?
9    A.  Yes.
10    Q.  Why Ms. Tobiason?
11    A.  She knew reimbursement for Home Infusion.
12  But I'm speculating here.  I -- I don't remember going
13  to anybody about reimbursement in the past.
14    Q.  And I'm not asking you to speculate, but I am
15  asking you to give me your best honest answer based
16  upon your years of experience within Abbott
17  Laboratories and I'm asking you what you expect you
18  would have done.  I'm not asking you to speculate.  I
19  just want to clarify that.
20        So let's talk about Mr. Ward for a
21  minute.  Was Mr. Ward somebody that -- that, in your
22  experience, was a pretty savvy manager and who was on
23  top of things and if you had questions you -- you
24  would expect that he would be able to answer them for
25  you?

Page 165

1        MS. GEISLER:  Objection to the form.
2    A.  He was a good manager and he would answer
3  them or he -- he would help me find the right person
4  to talk to.
5    Q.  (BY MR. WINTER)  You said that you had the
6  sense that somebody, and it might have been Mr. Ward,
7  had -- had left you with the impression, and I think
8  you used the word "taboo," that it was taboo for a
9  sales representative or a NAM to initiate discussions
10  of AWP and spread with customers.
11    A.  Yes.
12    Q.  Okay.  Did you ever gain an understanding as
13  to why that was taboo or inappropriate?
14    A.  It was an issue between the customers and
15  their -- and their payers.  It didn't involve Abbott.
16    Q.  Well, isn't it true that it did involve
17  Abbott to the extent that that payment, that
18  reimbursement to the customers, was based upon
19  information that was reported by Abbott?
20    A.  I don't know that Abbott reported it.  Again,
21  I was -- that was not my area of expertise.
22    Q.  Well, you do know that Abbott reported list
23  prices and published list prices, right?
24    A.  In our catalog, yes.
25    Q.  Okay.  And you know from the documents that

42 (Pages 162 to 165)

b66cc43c-5092-4127-9266-2a482f299285

Page 166

1    you've seen this morning that those list prices that
2    Abbott reported and published had an effect on AWP.
3            MS. GEISLER: Objection to the form.
4        A. I would have to look back at that.
5        Q. (BY MR. WINTER) Well, why don't you take a
6    look at Exhibit 480. That's where Mr. Kipperman says
7    when he sends his memo dated May 26, 1994 -- it's that
8    one right there that you just -- there you go.
9        A. Okay. So could you repeat your question?
10       Q. Yes, ma'am. You know that Abbott published
11   list prices, correct?
12       A. Yes.
13       Q. Okay. And you also know, and as
14   Mr. Kipperman states in that memoranda, that Abbott's
15   published list prices have an effect on AWP, which is
16   published for reimbursement purposes, correct?
17           MS. GEISLER: Objection to the form.
18       A. Yes, that's --
19       Q. (BY MR. WINTER) Okay.
20       A. -- what he says.
21       Q. And in answer to a question I asked you just
22   a few minutes ago as to why it would be inappropriate
23   or taboo for you to initiate discussions of AWP or
24   reimbursement with customers and whether you ever
25   sought any clarification on why that is, your response

Page 167

1    to me was, "Well, it was between -- reimbursement was
2    between the customer and the payer and Abbott didn't
3    have anything to do with it." And so what I'm asking
4    you is to consider the fact that Abbott does have
5    something to do with it it to the extent that Abbott
6    reports list prices which have an effect on AWP, and
7    as we have discussed several times throughout the
8    morning, AWP is a factor in the calculation of
9    reimbursement.
10           MS. GEISLER: Objection to the form.
11       Q. (BY MR. WINTER) Right?
12       A. Yes.
13       Q. So Abbott does have something to do with this
14   discussion of reimbursement, correct?
15       A. All I can tell you is I did not -- I don't
16   recall. It just wasn't something that concerned me,
17   so I don't know any details about the links between,
18   you know, what you're trying to say about AWP and
19   Abbott and whatever. It wasn't part of my primary
20   job.
21       Q. It wasn't part of your primary job and -- and
22   I understand that you were under marching orders, so
23   to speak, not to raise it with customers.
24       A. Right.
25       Q. But to the extent customers did raise the

Page 168

1    issue with you, you would endeavor to respond to those
2    customers' questions and concerns, correct?
3        A. For instance, with the Coram RFP. When they
4    wanted AWP, yes.
5        Q. Okay. When you completed what's now marked
6    as Exhibit 720 and -- is it 720 or 7 --
7            MS. GEISLER: 10.
8        Q. (BY MR. WINTER) 710. When you completed
9    that document, Ms. Snead, and -- and reported it, were
10   you conscious of the fact that the pricing that you
11   were reporting to the Texas Medicaid program was not
12   representative of the prices that were then and there
13   routinely, currently available in the marketplace on
14   these products?
15           MS. GEISLER: Objection to the form.
16       A. I just answered, did the stuff to the best of
17   my ability.
18       Q. (BY MR. WINTER) Well --
19       A. So I'm not sure I'm -- I'm --
20       Q. -- let me --
21       A. -- following your question.
22       Q. -- break it down. I'm sorry. Let me break
23   it down. See if I can break it down for you a little
24   bit.
25           You've already established and testified

Page 169

1    this morning that you were cognizant of the fact that
2    Abbott's contract prices with its customers were
3    generally lower than WAC, right?
4        A. Yes.
5        Q. Okay. And you also understood that the WAC
6    was the price that you expected the wholesaler would
7    be invoiced at, that the wholesaler would pay for the
8    drug.
9        A. Yes.
10       Q. And that the chargeback would bring the
11   wholesaler back closer to the contract price.
12       A. Yes.
13       Q. Okay. So if you knew that the prices that
14   you were selling to your key accounts were lower than
15   WAC, then you would have known and would have been
16   conscious of the fact that the prices that were
17   reported in your submission dated June 3rd, 1993 were
18   higher than the prevailing market prices on -- on the
19   Vancomycin products.
20           MS. GEISLER: Objection to the form.
21       A. At which price are you referring to on this
22   page? Which --
23       Q. (BY MR. WINTER) Well --
24       A. Are you just saying the price list in general
25   or --

43 (Pages 166 to 169)

b66cc43c-5092-4127-9266-2a482f299285

Page 170

1    Q.  Yes, ma'am.  I'm specifically talking about
2  the three price lists that you've attached and the
3  prices in general.  They would have been -- you would
4  have been conscious of the fact that they were higher
5  than the prevailing market prices on the Vancomycin
6  products.
7    A.  Yes.
8    Q.  Okay.  Was it your expectation that the WAC
9  price that is reported here on the last page of
10  Exhibit 710, was it your belief and expectation that
11  that would have been the WAC price that was printed on
12  the invoice between Abbott and its wholesalers?
13         MS. GEISLER:  Objection to the form.
14    A.  I have no idea.  I just don't know.
15    Q.  (BY MR. WINTER)  Did you ever have any
16  expectation or understanding that Abbott had more than
17  one WAC price --
18         MS. GEISLER:  Objection to the form.
19    Q.  (BY MR. WINTER)  -- for any given drug at any
20  given time?
21    A.  No, I do not know that.
22    Q.  You would have expected that Abbott would
23  have one WAC, and that would be the price that was
24  printed on the invoice, correct?
25         MS. GEISLER:  Objection to the form.

Page 171

1    A.  Again, I don't -- I -- I had nothing to do
2  with wholesalers, so I don't know -- I didn't have any
3  expectation about prices on wholesaler invoices.  It
4  didn't concern me.
5    Q.  (BY MR. WINTER)  Okay.  But to the extent you
6  have any thoughts on it at all, you would expect that
7  Abbott would only have one WAC price and not two?
8         MS. GEISLER:  Objection to the form.
9    A.  Again, it's -- I have no expectation about
10  wholesaler prices.  I don't know how that business was
11  run.
12    Q.  (BY MR. WINTER)  So Abbott could have had
13  many WAC prices on any given drug at any given time.
14  You just wouldn't know.
15    A.  I don't know.
16         MS. GEISLER:  Objection to the form.
17         MR. WINTER:  Okay.  All right.  Well,
18  it's a couple of minutes before noon, so why don't --
19         MR. STETLER:  Perfect timing.  Thank
20  you, Counsel.
21         MR. WINTER:  -- we take our lunch break.
22         THE VIDEOGRAPHER:  We are off the
23  record, 11:52 a.m.
24         (Lunch recess from 11:52 to 12:44)
25         THE VIDEOGRAPHER:  Back on the record at

Page 172

1  12:44 p.m.
2         MS. GEISLER:  Ray, if we could, before
3  we get started, I want to make an objection on the
4  record to the use of Exhibit 708 that you used.  It's
5  marked Ross 334959.  That document was not produced in
6  this litigation to Texas and it's clearly marked
7  confidential, and so we believe it's improper for you
8  to be using this exhibit.
9         MR. WINTER:  Well, I'll state for the
10  record that it is my understanding that this document
11  was produced to the Department of Justice in the
12  Department of Justice case against Abbott and it is
13  additionally my understanding, based upon rulings from
14  the MDL, that documents produced by Abbott to the
15  Department of Justice in that litigation are, in fact,
16  available to the State of Texas and that's how we have
17  received it.  But we can certainly address this
18  off-line and get resolution.
19         MS. GEISLER:  Okay.
20         MR. WINTER:  We think it's entirely
21  proper.
22         MS. GEISLER:  Okay.  Well, we -- we
23  don't, so I want to make sure we get the objection on
24  the record.
25         MR. WINTER:  Okay.  Very good.

Page 173

1         MS. ST. PETER-GRIFFITH:  Let me just
2  state, he was -- I gave that -- I furnished that
3  document to him incident to the line of questions he
4  was asking because I had the document.  I intended to
5  use it.  To save time, primarily, given that he was in
6  the line of questioning, I furnished the document to
7  him because it was going to be used in this
8  deposition.  It's -- it's a document that is in the
9  possession of the Department of Justice and we are
10  free to give it to Texas.  That's our position.
11         MS. GEISLER:  Well, we don't agree that
12  you're free to give it to Texas because it is marked
13  confidential and it was produced in another
14  investigation or litigation.  We are still checking
15  into that, but that's our position on the document.
16         MR. WINTER:  Okay.  I think everybody's
17  position is pretty clear.
18         MS. GEISLER:  Okay.  Good.
19         MR. WINTER:  Ms. Snead, thank you for
20  your time this morning and the State of Texas is going
21  to pass the microphone over here to Mr. Anderson and
22  he's going to ask you some questions now.
23         THE WITNESS:  Okay.
24              EXAMINATION
25  BY MR. ANDERSON:

44  (Pages 170 to 173)

b66cc43c-5092-4127-9266-2a482f299285

Page 174

1    Q.  Good afternoon, ma'am.  I'm going to cover
2  some areas, so bear with me.  I'll try to move
3  quickly.
4         I believe you testified this morning
5  that from time to time you would receive a call from
6  the Abbott customer service department where they
7  would notify you that a customer was being billed at
8  list price; is that correct?
9    A.  Yes.
10   Q.  How often would you say you would receive
11 those calls?
12   A.  I don't -- I don't recall specifically, but
13 from what I recollect, it wasn't a real frequent
14 incident.
15   Q.  Would it be fair to say that it was rare for
16 you to receive a call notifying you that customers
17 were being billed at list price?
18       MS. GEISLER:  Objection to the form.
19   A.  Again, I just -- I don't have specific
20 recollection of it.  I mean, it happened enough that I
21 remember it, but how often it was, I can't tell you.
22   Q.  (BY MR. ANDERSON)  And were these kind of
23 notifications being provided to you when you were a
24 NAM?
25   A.  It was when I was a national account

Page 175

1  representative.
2    Q.  And when you say "a national account
3  representative," do you distinguish that from being a
4  national account manager?
5    A.  Yes.
6        MS. GEISLER:  Objection.
7    Q.  (BY MR. ANDERSON)  Okay.
8    A.  Yes, I do.
9    Q.  What was the basic thrust of the difference
10 between being a national account representative and a
11 national account manager?
12   A.  It was a grade level thing, you know, a pay
13 difference and typically you've got less -- smaller
14 accounts to cover as a national account
15 representative.
16   Q.  Okay.  What was the basic purpose behind the
17 customer service department of Abbott notifying you
18 that a customer was paying list price?
19   A.  It was really as a favor to the customer to
20 allow them to gain some better pricing.
21   Q.  And in turn, I take it, you did offer them
22 some better pricing, correct?
23   A.  Again, we are getting into an area that I
24 just -- I don't remember the specifics, but that would
25 be my logical conclusion, yeah.

Page 176

1    Q.  And when you would make that offer of better
2  pricing, was there a particular type of price that you
3  offered?
4    A.  I don't recall.
5    Q.  Are you familiar with a pricing type known as
6  parameter price?
7    A.  No, I'm not.
8    Q.  Do you recall, as a general matter, pricing
9  that was available for Abbott representatives to offer
10 customers, such as parameter price or RxLink, contract
11 price or some other pricing term?
12       MS. GEISLER:  Objection to the form.
13   A.  I think I mentioned this morning, I've heard
14 the term "RxLink," but I don't recall what it was.
15   Q.  (BY MR. ANDERSON)  Then let's back up a step
16 and to the extent you were offering prices to
17 customers in these rare instances where they were
18 paying list, how would you go about finding a price to
19 offer them?
20   A.  I would have asked contract marketing to come
21 up with a price list for individual contract.
22   Q.  So, for instance, that would have been
23 Mr. Kipperman and potentially his subordinate, Cindy
24 Dawson, correct?
25   A.  Correct.

Page 177

1    Q.  And then, in turn, you would have received a
2  price from them and contacted the customer and made an
3  offer, correct?
4    A.  Correct.
5    Q.  And isn't it true that those customers
6  virtually always accepted the lower pricing?
7        MS. GEISLER:  Objection to the form.
8    A.  I don't recall specifically.
9    Q.  (BY MR. ANDERSON)  Can you think of any
10 instance where a customer rejected lower pricing
11 offered by Abbott and instead chose to continue paying
12 list price?
13       MS. GEISLER:  Objection to the form.
14   A.  No, I can't.  But, again, this -- this was --
15 I don't recall any of these individual contracts and
16 what was acted upon afterwards specifically.
17   Q.  (BY MR. ANDERSON)  Is one of the reasons why
18 you don't recall this very vividly because virtually
19 all Abbott customers that you dealt with were on
20 contract?
21       MS. GEISLER:  Objection to the form.
22   A.  My primary focus was on either maintaining or
23 expanding the business at whatever customers I was
24 assigned.  Some had contracts in place already, some
25 didn't.

45 (Pages 174 to 177)

b66cc43c-5092-4127-9266-2a482f299285

Page 178

1    Q.  And to the extent a customer did not have a
2  contract, isn't it true that you were endeavoring to
3  put them on a contract?
4    A.  Yes.
5    Q.  And, in fact, you were very successful in
6  doing so, correct?
7        MR. STETLER:  Give yourself some credit.
8    A.  Okay.  Yes.
9    Q.  (BY MR. ANDERSON)  Now, do you ever recall
10  going to a customer and offering them contract pricing
11  and them rejecting the contract pricing and choosing
12  to pay list price?
13        MR. GEISLER:  Objection to the form.
14    A.  I never -- I never went to -- visited with a
15  customer and offered them a lower price and they said,
16  "No.  I want to pay list."
17    Q.  (BY MR. ANDERSON)  Okay.  Would it be fair to
18  say that the reason Abbott had a list price was as
19  some type of trigger so that if a customer rolled off
20  of a contract or their contract expired, Abbott would
21  learn that the contract had been -- had expired, so
22  Abbott could then seek to renew that contract?
23        MR. GEISLER:  Objection to the form.
24    A.  I'm sorry.  I lost you from the beginning.
25  Could you --

Page 179

1    Q.  (BY MR. ANDERSON)  Wouldn't it be fair to say
2  that the whole premise of list price was just to be
3  some type of mechanism by which Abbott would be aware
4  of customers whose contracts had expired or otherwise
5  cease to be in effect so that Abbott could put them
6  back on contract?
7        MR. GEISLER:  Objection to the form.
8    A.  I don't know.  I don't know.  That would have
9  been a contract marketing question.
10    Q.  (BY MR. ANDERSON)  Do you have any idea at
11  all what the purpose behind list price was at Abbott?
12        MR. GEISLER:  Objection to the form.
13    A.  No.  Other than it was the price in the
14  catalog.
15    Q.  (BY MR. ANDERSON)  But outside of the fact
16  that it was printed on a catalog, can you think of any
17  business purpose that Abbott utilized list price for?
18        MR. GEISLER:  Objection to the form.
19    A.  Again, this is -- I -- I was not a contract
20  marketing person and that was more an area for
21  contract marketing.  So to ask me the question, I
22  would just have to speculate.  I don't have the
23  background.
24    Q.  (BY MR. ANDERSON)  Well, I -- I don't want
25  you to speculate, but I was maybe wrongly assuming

Page 180

1  that given your years of experience as a national
2  account representative and then a national account
3  manager that you would be familiar with the usage of
4  list price.
5        MS. GEISLER:  Objection to the form.
6    Q.  (BY MR. ANDERSON)  But if you don't know,
7  that's fine.  Are you testifying that you simply don't
8  know any business usage of list price?
9        MS. GEISLER:  Objection to the form.
10    A.  I'm testifying that beyond being the price in
11  the catalog, I don't know, yes.
12    Q.  (BY MR. ANDERSON)  In your experience did you
13  ever offer catalog price to any customer?
14    A.  No.
15    Q.  All right.  Now, in reporting pricing to
16  Texas Medicaid, specifically, ma'am, if you could,
17  look at Page -- I mean, Exhibit 710.  Did I understand
18  your testimony correct this morning when you said that
19  in -- in completing this application and making this
20  submission to the Texas Medicaid program that you sent
21  in catalog prices?
22    A.  I sent in -- it appears that I sent in the
23  prices that are attached.
24    Q.  And do you agree that those are what's known
25  by Abbott as the catalog prices?

Page 181

1        MS. GEISLER:  Objection to the form.
2    A.  This is '93 price catalog prices, yes.
3    Q.  (BY MR. ANDERSON)  All right.  Knowing that
4  you had never offered a catalog price to any customer,
5  why did you send Texas Medicaid catalog prices?
6        MS. GEISLER:  Objection to the form.
7    A.  I need a minute to look at these --
8    Q.  (BY MR. WINTER)  Sure.
9    A.  -- other pages.  (Witness reviewing
10  document).  Now, your question was?  I'm sorry.
11    Q.  Knowing that you had never offered a catalog
12  price to any customer, why did you send catalog prices
13  to Texas Medicaid?
14        MS. GEISLER:  Objection to the form.
15    A.  Again, this is something that I filled out
16  13, 14 years ago, so it's difficult for me to answer
17  that question.  I -- I -- this was not a momentous
18  enough thing in my daily activity that I specifically
19  remember it.  So I don't know how to -- I can't answer
20  that question.  I don't know.
21    Q.  (BY MR. ANDERSON)  Did you believe that Texas
22  Medicaid wanted prices that were never offered to
23  customers?
24        MS. GEISLER:  Objection to the form.
25    A.  I will tell you that -- I don't know.  I --

46  (Pages 178 to 181)

b66cc43c-5092-4127-9266-2a482f299285

Page 182

1  I -- my recollection is this was an application to
2  simply -- to get on -- not formulary.  It was just
3  like a first step and then after that became a pricing
4  step.  So this was just -- that -- I guess the way I
5  interpreted this, was just to submit the base -- the
6  catalog prices and wholesaler price list.
7      Q.  (BY MR. ANDERSON)  On what information did
8  you base the decision to only send in catalog price to
9  Texas Medicaid?
10     A.  Again, I can't remember specifically filling
11  out this form, but in -- if I had a question in not
12  understanding this, since I did address the letter
13  "Dear Martha" and I remember being in Austin, I'm
14  guessing I met with her and I vaguely remember meeting
15  with someone in a government thing, I probably would
16  have called Martha to get her advice on how to do this
17  or talked to Steve Kipperman to get his advice on how
18  to fill it out.
19     Q.  In your meeting or any conversation, for that
20 matter, with Martha or any other Texas Medicaid
21 personnel, did you disclose to them that you had never
22 offered catalog price to any customer?
23         MS. GEISLER:  Objection to the form.
24     A.  Again, I don't recall specific -- you know,
25 specific details.

Page 183

1      Q.  Is it your testimony, ma'am, that any Texas
2  Medicaid official requested that you send in a catalog
3  price that was never offered to any customer?
4      A.  I lost you in the middle of the question.
5      Q.  Is it your testimony that any Texas Medicaid
6  official ever asked you to send in a catalog price
7  that was never offered to any customer?
8      A.  Again, I don't -- I don't have any
9  recollection of conversation with a Texas official.
10     Q.  Is it your testimony that any Texas Medicaid
11 personnel told you to send in catalog price?
12         MS. GEISLER:  Objection.
13         MR. STETLER:  You know, Counsel, this
14 may violate the Texas rules, but this is harassment.
15 She has no knowledge of any conversation with a Texas
16 official.  You've asked the question several times now
17 knowing what the answer is going to be and I have to
18 stick up for my client at some point.
19         MR. WINTER:  Well, Dave --
20         MR. STETLER:  I apologize.
21         MR. WINTER:  -- that's not quite fair.
22 You've not accurately characterized what she's
23 testified.  You just --
24         MR. STETLER:  It's on the record.
25 You've heard what I had to say.

Page 184

1          MR. WINTER:  I know.  And now you're
2  going to hear what I have to say.  And what you just
3  said is an inaccurate recitation of the witness's
4  testimony.  You said she has no knowledge of any
5  discussion with a Texas Medicaid official and that is
6  not correct.  So let --
7          MR. STETLER:  She said exactly what she
8  said.
9          MR. WINTER:  You're right.  And what you
10 said is not what she said.  And you're right, that was
11 not in accordance with the Texas rules.
12         MR. STETLER:  But I just don't believe
13 the Texas rules say that a witness is allowed to be
14 harassed with a lot of particularized questions for
15 the purpose of making her look bad when she doesn't
16 have a recollection of the specifics of any
17 conversation.  That's my only point.  If you can point
18 that out to me in the rules, I will withdraw my
19 objection.
20         MR. ANDERSON:  I move to strike the
21 sidebar comments.
22     Q.  (BY MR. ANDERSON)  Ma'am, all I want to know
23 is whether you were testifying that you relied upon
24 any communication from any Texas Medicaid official in
25 sending in catalog price to Texas Medicaid.

Page 185

1      A.  Again, I -- I don't recall a specific
2  conversation with a Texas official.
3      Q.  All right.  And, accordingly, I take it that
4  you are affirmatively testifying that you can't
5  remember any information, instruction or communication
6  from a Texas Medicaid official that caused you to send
7  in only catalog price, correct?
8          MS. GEISLER:  Objection.  She's already
9  answered the question for you.
10         MR. ANDERSON:  I'm trying to tie it
11 down.
12         MR. WINTER:  No, she hasn't.
13     A.  I don't recall conversation -- any
14 conversation with the Texas official.
15     Q.  (BY MR. ANDERSON)  All right.
16     A.  I'm saying -- yeah.  That's it.
17     Q.  So you mentioned a few moments ago that you
18 remember going to Texas and you remember meeting in a
19 government office and you remember -- and you
20 mentioned her name, meeting Martha; is that correct?
21     A.  I'm saying I -- I remember being in Austin,
22 because my brother lived there, so it sticks in my
23 memory.  I remember working with the rep going into
24 some government facility.
25         And I forget the second part of your

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 186

1    question. Was there a second --
2        Q. Do you remember --
3        A. -- part of your question?
4        Q. -- meeting any one particular person at all
5    at Texas Medicaid?
6        A. I remember meeting someone, yes.
7        Q. Do you believe that was a woman named Martha
8    McNeill?
9        A. I'm putting two and two together to say it --
10   it may have been Martha McNeill.
11       Q. Are you able to testify that Martha McNeill
12   instructed you to report catalog price to Texas
13   Medicaid?
14       A. I don't have any recollection of my
15   discussion with her.
16       Q. All right. Now, if you could, just as a
17   broad matter, can you explain why it is that Mike Beck
18   asked you to fill out the information that's comprised
19   in Exhibit 710?
20       A. I don't have recollection of it, but it would
21   appear, looking at this, it had to do with the State
22   of Texas.
23       Q. Well, I appreciate that, ma'am. I'm asking a
24   question as to why you were selected to complete this
25   form. Do you know why Mike asked you to do it?

Page 187

1        A. Because I was working with him that day and I
2    worked in the home office.
3        Q. Why didn't Mike complete the form himself?
4        A. I don't know.
5        Q. Now, looking at the second page of Exhibit
6    710 and specifically Section 6 b. toward the bottom of
7    the page.
8        A. Yes.
9        Q. It reads, "Price to wholesaler and/or
10   distributor," correct?
11       A. Yes.
12       Q. What do you understand that to mean?
13       A. Again, I mean, I can tell you my
14   understanding now. What my understanding was 15 years
15   ago when I was working the job may have been two
16   different things.
17       Q. All right. Are you able to testify as to
18   what you believe price to wholesaler and/or
19   distributor meant when you filled out this form?
20       A. Again, I -- I can't. I don't -- I don't
21   recall. I cannot testify what I thought it meant when
22   I filled out the form.
23       Q. As of today what do you believe "price to
24   wholesaler and/or distributor" means?
25           MS. GEISLER: Objection to the form.

Page 188

1        A. I feel like -- I -- you're asking me this
2    without -- without knowledge. I mean, I would just be
3    guessing.
4        Q. (BY MR. ANDERSON) Do you feel like back in
5    '93 when you filled out this form you were just
6    guessing as to what "price to wholesaler and/or
7    distributor" meant?
8           MS. GEISLER: Objection to the form.
9        A. I would have filled the form out to the best
10   of my ability. If -- in general terms, if I -- if
11   I -- there were areas where I questioned, I would have
12   gone and asked. I would have either called the
13   customer, I would have gone to Steve Kipperman or --
14   or John Ward, potentially, my boss, and asked them,
15   "How do I fill this out?"
16       Q. (BY MR. ANDERSON) When you say "called the
17   customer," you're talking about a particular pharmacy
18   in Texas?
19       A. I'm talking about Martha McNeill.
20       Q. All right. But you can't remember whether
21   you did or didn't talk to her; is that correct?
22       A. That is correct.
23       Q. All right.
24       A. I remember that I -- as I said, I was in
25   Austin. I met with someone from a government agency

Page 189

1    with Mike Beck or a government -- whether it was a VA
2    Hospital or -- it was something government related and
3    I believe it was a woman, but beyond that, I do not
4    have a specific recollection.
5        Q. Did -- do you recall talking to anybody, such
6    as Mr. Ward or Mr. Kipperman, about the prices that
7    Texas was requesting?
8        A. I don't have a specific recollection, but
9    I -- I would have, just as a matter of course,
10   shown -- given a copy to Steve Kipperman, I would
11   think.
12       Q. Did you --
13       A. That would have been the general, you know,
14   thing to do.
15       Q. Did Mr. Kipperman instruct you to send
16   catalog prices to Texas Medicaid?
17          MS. GEISLER: Objection to the form.
18       A. I don't recall.
19       Q. (BY MR. ANDERSON) Can -- would it be fair to
20   say, ma'am, that you simply don't have any
21   understanding of the meaning of "price to wholesaler
22   and/or distributor"?
23          MS. GEISLER: Objection to the form.
24       A. At this moment in time, 15 years after the
25   fact? I -- I don't work at Abbott. I haven't worked

48 (Pages 186 to 189)

b66cc43c-5092-4127-9266-2a482f299285

Page 190

1    there for eight years.  I've been at home with kids.
2    I would say at this point in time I am not an expert
3    or anywhere -- or close to an expert on wholesaler and
4    distributor pricing.
5              MR. ANDERSON:  Objection, nonresponsive.
6       Q.   (BY MR. ANDERSON)  Ma'am, I'm -- I'm just
7    trying to get your best testimony.  I'm not asking you
8    to be an expert about --
9       A.   Okay.
10      Q.   -- wholesale prices.
11      A.   Okay.
12      Q.   But you did complete this form, correct?
13      A.   Yes.
14      Q.   All right.
15      A.   Yes.
16      Q.   Would it be fair to say that you simply don't
17   have any understanding of the meaning of the term
18   "price to wholesaler and/or distributor"?
19             MS. GEISLER:  Objection to the form.
20      A.   I -- it says, "See attached wholesaler price
21   list," which to me would be the price to the
22   wholesaler and/or distributor.
23      Q.   (BY MR. ANDERSON)  And that you're
24   referencing back to the catalog prices, correct?
25      A.   There's a wholesaler price list on the last

Page 191

1    page.
2       Q.   Okay.  You're talking about the very last
3    page of 710, Exhibit 710, correct?
4       A.   Yes.
5       Q.   Do you believe that those are the prices that
6    Abbott was selling its products to wholesalers at?
7       A.   Again, at this point -- at this moment in
8    time, I don't know.
9       Q.   When you say "this moment in time," you mean
10   1993?
11      A.   No.  I mean 2007.  I don't know.
12      Q.   When you submitted the wholesale price list
13   that's attached as the last page of Exhibit 710, did
14   you intend for that to be the prevailing wholesale
15   price that Abbott was selling its products for?
16             MS. GEISLER:  Objection to the form.
17      A.   Again, I don't know.  I cannot recall my
18   intent 16 years ago.
19      Q.   (BY MR. ANDERSON)  Do you recall taking any
20   steps to ascertain what the prevailing price to
21   wholesalers were in reporting the prices to Texas
22   Medicaid in 1993?
23             MS. GEISLER:  Objection to the form.
24      A.   I -- again, I don't have specific
25   recollection on this form.  I can tell you as a

Page 192

1    general rule anything that had to do with pricing
2    would have gone to Kipperman for review.
3       Q.   (BY MR. ANDERSON)  You'll agree, won't you,
4    that Steve Kipperman was considered one of the most
5    knowledgeable people at Abbott Alternate Site
6    concerning pricing, correct?
7              MS. GEISLER:  Objection to the form.
8       A.   Yes.
9       Q.   (BY MR. ANDERSON)  And that's because
10   Mr. Kipperman was the head of contract marketing and
11   knew all of the different prices that were being
12   offered to all the various customers of Abbott for
13   those products, correct?
14             MS. GEISLER:  Objection to the form.
15      A.   He -- he -- yes.  He had -- he would have
16   access to prices that we're offering to different
17   customers.
18      Q.   (BY MR. ANDERSON)  Okay.  Now looking at the
19   second page of Exhibit 710.  Do you see the section 6
20   c. toward the bottom of the page?
21      A.   Yes.
22      Q.   And I'll read for the record.  "Direct price
23   to pharmacy."
24             Did I read that correctly?
25      A.   Yes.

Page 193

1       Q.   Do you have an understanding of the meaning
2    of the term "direct price to pharmacy"?
3       A.   I don't know.  I don't -- I'm not sure that I
4    do at this point.
5       Q.   You'll agree that underneath that request
6    there's some language that's typewritten by Abbott
7    that reads "See attached Catalog Price List," correct?
8       A.   Yes.
9       Q.   Do you believe you typed that?
10      A.   I don't know.
11      Q.   Now, you mentioned earlier in your testimony
12   today that you're not really familiar with a price at
13   Abbott known as direct price, correct?
14      A.   Correct.  That terminology is not something
15   that I used.
16      Q.   All right.  Why is it that in response to the
17   request by Texas for direct price to pharmacy you
18   decided to attach the catalog price list?
19      A.   Again, I'm not -- I can't say with certainty
20   that I typed this.
21      Q.   Well, whether or not you physically typed it,
22   you'll agree that you were the one who attached the
23   catalog price list.  It's under your signature,
24   correct?
25      A.   I did sign this.

49  (Pages 190 to 193)

b66cc43c-5092-4127-9266-2a482f299285

Page 194

1    Q.  All right.  And do you believe that this
2  application was your responsibility?
3    A.  I signed it.
4    Q.  And do you take responsibility for the
5  completion of the application?
6    A.  Again, I -- in a general course of events I
7  would have -- I don't have specific recollection about
8  this form, but in a general course of events I would
9  have shown something like this to Kipperman.
10    Q.  All right.  So are you saying, basically,
11  that if anyone made a decision to send catalog prices
12  in request -- in response to the Texas request for
13  direct price to pharmacy, that that decision would
14  have been Mr. Kipperman's, most likely?
15    A.  Again, I don't have a specific recollection,
16  but ultimately, yes, Steve was responsible for pricing
17  that went out.
18    Q.  All right.  When -- would you agree with me
19  that Mr. Kipperman also knew in 1993 that catalog
20  price was not a price that was being offered direct to
21  any pharmacies?
22        MS. GEISLER:  Objection to the form.
23    A.  Except there were probably some cases that
24  were paying catalog price.
25        MR. ANDERSON:  Objection, nonresponsive.

Page 195

1    Q.  (BY MR. ANDERSON)  I'm asking a slightly
2  different question, ma'am.
3    A.  I'm sorry.
4    Q.  I'm asking in 1993 would you agree that
5  Mr. Kipperman also knew that catalog price was not a
6  price that was being offered by Abbott to any
7  customers?
8    A.  Oh.
9        MS. GEISLER:  Objection to the form.
10    A.  Yes.
11    Q.  (BY MR. ANDERSON)  All right.  So can you
12  think of any justification for why Mr. Kipperman would
13  approve the transmission of catalog price to Texas
14  Medicaid when he knew that that price wasn't being
15  offered to any pharmacies?
16        MS. GEISLER:  Objection to the form.
17    A.  Unless it was just a clerical -- you know, an
18  oversight.  You got overloaded and didn't look at it
19  closely enough.
20    Q.  (BY MR. ANDERSON)  So given that it might
21  have been a mistake, don't you believe that it would
22  be Abbott's duty to correct that mistake over the
23  years?
24        MS. GEISLER:  Objection to form.
25    A.  I think that's -- that's beyond my purview.

Page 196

1    Q.  (BY MR. ANDERSON)  Well, you know just that
2  if you make a mistake, you would try to correct it,
3  wouldn't you?
4        MS. GEISLER:  Objection to the form.
5    A.  Yes.  If I made a mistake, I would correct
6  it.
7    Q.  (BY MR. ANDERSON)  All right.  And toward
8  that end you probably realized that you signed Exhibit
9  710 on the -- on the fourth page of the exhibit,
10  right?
11    A.  Yes.
12    Q.  And, in fact, you signed under the paragraph
13  that reads, "I certify that the information submitted
14  is correct to the best of my knowledge and that this
15  product is not now in violation of either Federal or
16  State Law.  I also agree to inform the Texas
17  Department of Human Services, in writing, of any
18  changes in formulation, product status, price or
19  availability as herein described within 15 days of
20  such change."
21        Did I read that correctly?
22    A.  Yes.
23    Q.  And you signed that certification back in
24  1993, correct?
25    A.  Yes.

Page 197

1    Q.  So do you believe as a result of that
2  signature Abbott owed a duty to Texas to correct any
3  mistakes --
4        MS. GEISLER:  Objection --
5    Q.  (BY MR. ANDERSON)  -- in the pricing
6  submission?
7        MS. GEISLER:  Objection to the form.
8    A.  If this caused pricing errors, then yes.
9    Q.  (BY MR. ANDERSON)  Do you have any knowledge
10  that Abbott has ever to this day sought to correct its
11  submissions of catalog prices to Texas Medicaid?
12        MS. GEISLER:  Objection to the form.
13  She doesn't work for Abbott anymore and she hasn't for
14  the last eight years.
15        MR. ANDERSON:  But she did work for them
16  for many years.  If she's aware of a correction, I'd
17  like to know about it.  I'm entitled to that, Counsel.
18    A.  I'm not aware of that.  But, again, that's
19  not an area that I worked in, so I wouldn't have been
20  aware if there was corrections sent or not.
21    Q.  (BY MR. ANDERSON)  Were you ever involved in
22  any other pricing submissions to any Medicaid program
23  similar to Exhibit 710?
24    A.  Not that I recall.
25    Q.  Would it be -- well, let me ask a broader

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 198

1  question.
2        Did you have any understanding of why it
3  was that Abbott would want the products that are
4  listed on the first page of Exhibit 710 listed by
5  Texas Medicaid?
6     A.  So that our customers -- Abbott's customers
7  could get reimbursed if they had patients that were
8  under the Medicaid system.
9     Q.  And so, in essence, Abbott was taking steps
10 to have its products eligible for Medicaid
11 reimbursement, correct?
12    A.  Yes.
13    Q.  Why, as a general matter, would Abbott want
14 its products eligible for Medicaid reimbursement?
15    A.  Because our customers would be more likely
16 to -- to buy -- we would be -- they would be more
17 likely to buy our products if they would get
18 reimbursed when they were used.
19    Q.  And so wouldn't it be fair to say that Abbott
20 would have more success selling its products if its
21 products were eligible for Medicaid reimbursement?
22    A.  Yes.
23        MS. GEISLER:  Objection to the form.
24    A.  Yes.
25    Q.  (BY MR. ANDERSON)  And, similarly, isn't it

Page 199

1  also true that to the extent Abbott's Medicaid
2  reimbursement was greater for one of its drugs than a
3  competitive drug, that Abbott would also benefit in
4  selling its products?
5        MS. GEISLER:  Objection to the form.
6     A.  I'm sorry, I lost my concentration.  Could
7  you ask me one more time.
8     Q.  (BY MR. ANDERSON)  It's okay.  I'll rephrase.
9        Isn't it also true that to the extent
10 the Medicaid reimbursement on an Abbott product was
11 greater than that of a competitive product, that
12 Abbott would also have a benefit or advantage in
13 selling its product?
14        MS. GEISLER:  Objection to the form.
15    A.  Yes.
16    Q.  (BY MR. ANDERSON)  And, in fact, is it true
17 that over the years when you were a national account
18 representative and also a national account manager,
19 that you did, in fact, learn from customers that that
20 type of relative reimbursement comparison was
21 conducted by customers?
22        MS. GEISLER:  Objection to the form.
23    A.  Yes.  They -- they conducted that comparison.
24    Q.  (BY MR. ANDERSON)  To the extent -- now I'm
25 switching topics slightly, Ms. Snead.

Page 200

1        To the extent customers would ask you
2  for AWP-type information and you didn't possess that
3  information, I believe you testified this morning you
4  would reference them to other sources; is that
5  correct?
6     A.  The customers knew where to get that
7  information.  I don't -- I don't recall specifically
8  referencing a customer where to look.  They just --
9  they just knew that.  That was their business.
10    Q.  Okay.  So, really, the customers knew that
11 they could go to First DataBank or Redbook or
12 Medi-Span and find AWPs quickly, correct?
13    A.  They knew how to find AWPs.  Where they went,
14 I don't know.
15    Q.  And would it also be true that you didn't
16 really need to discuss relative reimbursement spreads
17 or relative AWPs on Abbott products and competitive
18 products because the customers could figure that out
19 on their own?
20        MS. GEISLER:  Objection to the form.
21    A.  Yes, they could figure it out on their own.
22    Q.  (BY MR. ANDERSON)  Now, if you could,
23 Ms. Snead, please take a look at what's been marked in
24 this case as Exhibit 709.  This is a letter dated
25 December 1st, 1992 written by you, correct?

Page 201

1     A.  Yes.
2     Q.  Signed by you, correct?
3     A.  Yes.
4     Q.  And I'm looking in the middle of the page and
5  you write to Texas Medicaid and you state, "The price
6  that they have been paying is $7.83 each."
7        Did I read that correctly?
8     A.  Yes.
9     Q.  And you're referencing to this product, which
10 is a sodium chloride, and the NDC number is
11 0074-7983-01, correct?
12    A.  Yes.
13    Q.  Do you believe that that's the catalog price
14 for the sodium chloride?
15    A.  I don't know.
16    Q.  Do you believe that that's the actual
17 contract price that that pharmacy was paying for
18 sodium chloride?
19    A.  I'd have to see their price list.  I don't
20 know.
21    Q.  Do you recall why it is that you sent this
22 letter to Texas Medicaid?
23    A.  I don't.
24    Q.  Do you believe this is an instance where it
25 would assist Abbott in its sales of products for that

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 202

product to be eligible for reimbursement by Texas Medicaid?
MS. GEISLER: Objection to the form.
A. I don't know -- I don't know why I sent the letter. I don't remember anything about the letter or the context of it.
Q. (BY MR. ANDERSON) Does the sentence, "The price that they have been paying is $7.83 each," indicate to you that that's an actual price being charged by Abbott?
A. Yes.
Q. And if it turns out that that price is actually just a catalog price, would you agree with me that that could be misleading?
MS. GEISLER: Objection to the form.
A. I'm -- I'm not sure what you're -- how --
Q. (BY MR. ANDERSON) All right. Now, if you could, take a look at the document there -- it's on top of the stack, ma'am. It's Exhibit 480.
A. Okay.
Q. I believe you testified this morning that you're certainly aware that Abbott took annual price increases on its list prices, correct?
A. Yes.
Q. And isn't it true that those were taken

Page 203

generally every spring?
A. I believe so.
Q. And isn't it true that that was typically around April 1st or so?
A. Yes.
Q. Why was it that Abbott increased its list prices every year?
A. I don't know.
Q. To the extent you never offered a list price to any customer, what benefit would be derived from increasing that price every year?
MS. GEISLER: Objection to the form.
A. I don't know.
Q. (BY MR. ANDERSON) Can you think of any circumstance where any business you ever worked for raises prices every year on a price that it doesn't actually do business at?
MS. GEISLER: Objection to the form.
A. I haven't worked at that many companies, but I haven't worked at any that have. I think other -- I don't know. I really don't know.
Q. (BY MR. ANDERSON) Do you believe that the list prices were increased every year so that the AWPs in turn would go up on Abbott products?
MS. GEISLER: Objection to the form.

Page 204

A. I don't know. That was -- that was not an area that I worked in.
Q. (BY MR. ANDERSON) Do you see how Abbott could benefit from rising list prices and rising AWP prices to the extent that increased the relative reimbursement on Abbott products over the years?
MS. GEISLER: Objection to the form.
A. Yeah.
Q. (BY MR. ANDERSON) I noticed Mr. Kipperman in his last sentence on the first page of Exhibit 480 writes, "I hope this information is helpful."
Did you ever find AWP information to be helpful in your sales activities at Abbott?
A. Only in the instance -- the only -- what I can recall is that instance we discussed, where the customer wanted the AWPs in their RFP.
Q. Right. So, basically, it's true that AWPs were helpful to Abbott sales representatives to the extent they could then share them with customers upon request, correct?
MS. GEISLER: Objection to the form.
A. If the customer asked for it, yes.
Q. (BY MR. ANDERSON) Earlier this morning, and I don't want to belabor the point, but Mr. Winter walked you through various exhibits pertaining to your

Page 205

dealings over the years with Coram, correct?
A. Yes.
Q. And in sum you agreed that Coram did request AWP information be submitted in connection with a bid proposal, correct?
A. Yes.
Q. And it was your understanding that Coram considered those AWPs in connection with contract prices in making its bid award decisions, correct?
MS. GEISLER: Objection to the form.
A. I don't know how Coram analyzed it, but that would be -- that would be my supposition.
Q. (BY MR. ANDERSON) And that supposition is based on your years of experience dealing with customers at Abbott, correct?
MS. GEISLER: Objection to the form.
A. Yes.
Q. (BY MR. ANDERSON) And that experience wasn't limited merely to Coram, but rather was an experience that you had with many customers of Abbott's, correct?
A. Yes.
Q. Do you believe that to the extent Coram --
MR. ANDERSON: I'll object to my own question there.
MR. STETLER: That's against the Texas

b66cc43c-5092-4127-9266-2a482f299285

Page 206

1  rules.
2          MR. ANDERSON:  I will strike that and
3  start over.
4      Q.  (BY MR. ANDERSON)  Do you believe that Abbott
5  executives, such as Tom Hodgson, understood that
6  customers were interested in analyzing reimbursement
7  when they made purchasing decisions?
8          MS. GEISLER:  Objection to the form.
9      A.  I don't know.  I don't know how detailed Tom
10 Hodgson got.
11     Q.  (BY MR. ANDERSON)  Does that seem like a
12 relatively detailed level of knowledge or does that
13 seem like a relatively basic level of knowledge for a
14 pharmaceutical executive?
15         MS. GEISLER:  Objection to the form.
16     A.  I can't speak to that.  I don't know.
17     Q.  (BY MR. ANDERSON)  But at least with respect
18 to the people that you dealt with and the fellow
19 managers and executives that you dealt with at Abbott,
20 you understood that they recognized that customers
21 were interested in relative reimbursement in making
22 purchasing decisions?
23         MS. GEISLER:  Objection to the form.
24     A.  Yes.
25     Q.  (BY MR. ANDERSON)  Now, you mentioned this

Page 207

1  morning that it was considered taboo at Abbott to
2  actively discuss AWPs and relative AWPs with
3  customers, correct?
4      A.  It was -- it was taboo to -- to be specific
5  about the difference between the AWP and -- and the
6  price.  If a customer asked you for AWP, I wasn't
7  uncomfortable giving them AWP.
8      Q.  And -- and the reason you weren't
9  uncomfortable is because the -- the -- the kind of
10 unwritten taboo allowed you to share AWPs, it just
11 simply didn't allow you to actively discuss AWP,
12 correct?
13         MS. GEISLER:  Objection to the form.
14     A.  Again, it's hard to recall the specifics and
15 I don't even recall how I was under -- let me find the
16 right words.  I don't recall a specific discussion
17 that led to me not discussing reimbursement, but I
18 know that that was just the general -- "rule" is not
19 the right word, but that -- that you weren't to do
20 that.
21     Q.  (BY MR. ANDERSON)  Do you have any
22 understanding how it is that Abbott came to
23 distinguish providing AWP information from discussing
24 AWP information in its characterization that
25 discussion of AWP was taboo?

Page 208

1          MS. GEISLER:  Objection.
2      A.  I don't know how that was arrived at.
3          THE WITNESS:  Sorry.
4      Q.  (BY MR. ANDERSON)  Just a couple more
5  questions and then I'll be done.
6          Ms. Snead, if you could, take a look at
7  that Exhibit 710, which is the submission you made to
8  Texas Medicaid.  Specifically drawing back to your
9  certification, which I believe is on the fourth page.
10 Will you agree with me that through you Abbott agreed
11 that it would provide changes in prices within 15 days
12 of such changes?
13         MS. GEISLER:  Objection to the form.
14     A.  Yes.
15     Q.  (BY MR. ANDERSON)  Are you aware of Abbott
16 ever providing updated pricing to Texas Medicaid?
17         MS. GEISLER:  Objection to the form.
18     A.  I am not personally aware, but, again, I
19 don't -- I wouldn't work in the department that would
20 notify.
21     Q.  (BY MR. ANDERSON)  But at least to the extent
22 you were involved in making this certification, you're
23 not aware of any effort by Abbott to provide updated
24 prices?
25         MS. GEISLER:  Objection to the form.

Page 209

1      A.  Again, that would have been done in a
2  different area of Abbott, so I -- I'm not familiar
3  with what that area would or would not have done.
4      Q.  (BY MR. ANDERSON)  Which area would it have
5  been?
6      A.  I would -- think it would have been contract
7  marketing.
8      Q.  Okay.  Back with Steve Kipperman and Cindy
9  Dawson, correct?
10     A.  Again, I don't have a specific
11 recollection -- specific recollection of what you're
12 asking, but in general it would be contract marketing,
13 yes, Steve Kipperman and Cindy Dawson.
14     Q.  All right.  One more issue.  When you were
15 testifying this morning about your awareness that
16 there was some connection between list prices and
17 AWPs, do you recall that, in fact, there was some
18 mathematical connection that was relatively reliable,
19 such as a 20 percent markup from direct price or list
20 price to arrive at AWP?
21         MS. GEISLER:  Object to the form.
22     A.  I don't recall that.
23     Q.  (BY MR. WINTER)  If you could, take a look at
24 what's been marked as Exhibit 704.  You looked at it
25 this morning.  And specifically -- it is difficult to

53 (Pages 206 to 209)

b66cc43c-5092-4127-9266-2a482f299285

Page 210

1  read, but looking at the third to last page.  No,
2  pardon me.  It's the second to last page.
3          MS. GEISLER:  What's the Bates number on
4  the page, Counsel?
5          MR. STETLER:  77.  Even I remember it.
6      Q.  (BY MR. ANDERSON)  ABT 211977.  For that
7  Vancomycin product that is 0007405 -- I mean, pardon
8  me, 6533-01.
9      A.  Yes.
10      Q.  I've done the math and it appears that the
11  AWP is roughly 20 percent greater than the list price.
12  Does that refresh your memory that there was roughly a
13  20 percent relationship between AWP and list price
14  over the years?
15          MS. GEISLER:  Objection.  Are you asking
16  her to do the math in her head?
17          MR. ANDERSON:  No.  I'm representing
18  that I've done the math.
19          MS. GEISLER:  Okay.
20      Q.  (BY MR. ANDERSON)  Assume with me that I've
21  done the math correctly, ma'am.  Does that refresh
22  your memory that there was roughly a 20 percent
23  relationship over the years on Abbott product between
24  AWP and list price?
25          MS. GEISLER:  Objection to the form.

Page 211

1      A.  It doesn't refresh my memory.  Again, I
2  didn't -- I didn't really -- I was not involved in
3  determination of list or AWP and I don't even see
4  headings on these columns, so I don't know what's
5  what.
6      Q.  (BY MR. ANDERSON)  To the extent you received
7  704 in the ordinary course of business, I take it,
8  then, you didn't take any steps to correct the
9  information or otherwise change the information,
10  correct?
11      A.  Oh, on this -- on these papers?
12      Q.  Yes.
13      A.  I have no idea.
14      Q.  You just -- it's been a long time and you
15  can't remember.
16      A.  It's been a long time and I can't remember,
17  exactly.
18          MR. ANDERSON:  All right.  At this time
19  the Relator will pass the witness.
20          MS. ST. PETER-GRIFFITH:  Okay.  Why
21  don't we take a break.
22          THE WITNESS:  Thank you.
23          THE VIDEOGRAPHER:  We are off the record
24  at 1:35 p.m.
25          (Recess from 1:35 to 1:47)

Page 212

1          THE VIDEOGRAPHER:  We are back on the
2  record at 1:47 p.m.  This is the beginning of Tape 4.
3          EXAMINATION
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Good afternoon, Ms. Snead.  My name is Ann
6  St. Peter-Griffith and I'm an assistant United States
7  attorney in the Southern District of Florida.  I'm
8  here today in the federal case and I have a series of
9  questions I would like to ask you.
10      A.  Okay.
11      Q.  Some of which cover some of the areas that
12  have been covered already in this deposition as a
13  followup and some are different.  So I ask you to bear
14  with me.
15          As sort of a ground rule for this
16  deposition, if there's a question that you don't
17  understand that I've -- that I've asked, if -- I
18  request that you just tell me.  Don't be bashful about
19  telling me, because otherwise I will consider your
20  answer to me responsive to my question.  Okay?
21      A.  Okay.
22      Q.  And I would like to just get -- deal with a
23  couple of exhibits right off the bat.  The first is
24  another exhibit that's been marked as --
25          MS. ST. PETER-GRIFFITH:  What's the last

Page 213

1  number?
2          MR. WINTER:  711.
3      Q.  (BY MS. ST. PETER-GRIFFITH)  -- 711.  I would
4  like to delve into this now because it sort of follows
5  on where -- on where you left off with Mr. Anderson.
6          Do you recognize this document, ma'am?
7      A.  I don't recall it.
8      Q.  Okay.  It's a letter, is it not, from Martha
9  McNeill to you?
10      A.  Yes.
11      Q.  Do you have any recollection as to whether
12  this might have been in response to the materials that
13  were submitted by you to Ms. McNeill?
14          MS. GEISLER:  Objection.
15      A.  I don't have any recollection about this
16  letter per se.
17      Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  If you
18  could go to the last paragraph.  Do you see that last
19  sentence where it says, "Your cooperation in keeping
20  me informed of any changes to your product line,
21  including changes in cost to wholesalers and
22  retail/chain pharmacies, is hereby requested and
23  required," do you see that?
24      A.  Yes.
25      Q.  I believe your earlier testimony was that you

54 (Pages 210 to 213)

b66cc43c-5092-4127-9266-2a482f299285

**Page 214**

1  don't recall providing any updated information to
2  Texas; is that fair?
3     A.  Personally, yes.
4     Q.  Okay.  Would you have passed on this request
5  to anybody?
6     A.  Yes.  To Steve Kipperman or to contract
7  marketing.
8     Q.  Would it have been your expectation that
9  Mr. Kipperman would have assigned somebody to meet
10  Texas's requirements with regard to keeping Texas
11  updated as to changes?
12        MS. GEISLER:  Objection.
13     A.  Somehow he would take care of it.  I don't
14  know if he would assign someone or he forwarded it to
15  someone else, but he would have followed up on it in
16  whatever the normal manner was.
17     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  And there
18  are two prices referenced in this document, Vancomycin
19  and --
20     A.  Bupivacaine.
21     Q.  Thank you.  Bupivacaine.  And the letter
22  references that Bupivacaine did not receive any
23  approval.  Is that -- was that your understanding?
24     A.  That's what it says.
25     Q.  Okay.  Do you have any recollection now, as

**Page 215**

1  you sit here today, as to what -- what might have been
2  done or whether you did anything with regard to this
3  lack of approval?
4        MS. GEISLER:  Objection to the form.
5     A.  I have no recollection.
6     Q.  (BY MS. ST. PETER-GRIFFITH) Do you recall
7  whether this was the same product that was at issue in
8  your -- your June 3rd, '93 price report?
9     A.  I don't know what the June 3rd '93 price
10  report is.
11     Q.  If you could --
12        MR. ANDERSON:  710, I believe, is the
13  exhibit number.
14        MR. STETLER:  It's the application.
15        THE WITNESS:  Oh.
16     A.  Yeah, I would assume it would be.
17     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Would the
18  same be true for the Vancomycin product that's listed?
19     A.  I would think so.
20     Q.  Okay.  Do you have any recollection at all as
21  to anything further - and I just want to exhaust your
22  memory - as to anything further that occurred in
23  followup to either your submission to Ms. McNeill or
24  your receipt of this letter?
25     A.  No.

**Page 216**

1        MS. ST. PETER-GRIFFITH:  The second
2  exhibit issue that I would like to just clarify
3  relates to Exhibit 708.  And I'd just like the record
4  to reflect that the United States requested at the
5  time that it was interposed -- that this exhibit be
6  interposed at the time of the deposition.
7        And you don't need to look at it, ma'am.
8        THE WITNESS:  Oh.
9        MS. ST. PETER-GRIFFITH:  I'm just making
10  a statement for the record.
11        And that I would -- that during the
12  course of the United States's examination in the MDL
13  case we are tendering this as an exhibit in this case.
14     Q.  (BY MS. ST. PETER-GRIFFITH) I would like to
15  go back a little bit to cover some of your history.
16  We've discussed your employment history to some
17  extent.  But, first, before I do that, I want to find
18  out what you did in preparing for your deposition here
19  today.
20     A.  I met yesterday with Dave.
21     Q.  Okay.  Mr. Stetler?
22     A.  Yes, Mr. Stetler.
23     Q.  Okay.  And how did --
24        MR. STETLER:  A/k/a Dave.
25     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  And

**Page 217**

1  how -- how did it come about that Dave came to
2  represent you in this case?
3     A.  Oh, I believe I mentioned earlier I got a
4  call from an attorney with Jones Day, I believe, who
5  said that I was going to be subpoenaed and --
6        MS. GEISLER:  Objection.  I'm going to
7  instruct the witness at this point not to answer the
8  question.  That was a privileged communication between
9  her and the attorney at Jones Day and I'm going to
10  instruct her not to answer.
11        MR. STETLER:  Guys, can I have a minute
12  to consult with counsel to avoid a dispute?
13        MS. ST. PETER-GRIFFITH:  Sure.
14        MR. STETLER:  Okay.  Thanks.
15        THE VIDEOGRAPHER:  Okay.  We are off the
16  record at 1:53 p.m.
17        (Discussion off the record)
18        THE VIDEOGRAPHER:  We are back on the
19  record at 1:55 p.m.
20        MS. ST. PETER-GRIFFITH:  Counsel, does
21  your instruction still stand?
22        MS. GEISLER:  Can we have the question
23  read back, please?
24        (Requested portion was read)
25        MS. GEISLER:  She can go ahead and

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 218

1  answer that question.
2      A.  I got a call from a Jones Day attorney saying
3  that I would be subpoenaed -- I was on a list to be
4  subpoenaed, and if -- if I wanted, I could choose to
5  have Dave Stetler represent me and they gave me his
6  phone number.  If I had any other questions, I could
7  call someone at Abbott legal and they gave me the name
8  and number of a person.
9      Q.  (BY MS. ST. PETER-GRIFFITH)  And that was on
10  your notation, I believe, in one of the earlier -- in
11  Exhibit 702.  Was that Ms. Klaus?
12     A.  Yes.
13     Q.  Okay.  Did you ever contact Ms. Klaus?
14     A.  No.
15     Q.  Okay.  And I believe your earlier testimony
16  was that you asked that Mr. Stetler contact you.
17     A.  Right.  I gave my phone number and said he
18  could call me.
19     Q.  Okay.  Did you discuss anything else with
20  this Abbott attorney?
21     A.  No.
22     Q.  Okay.  Did you discuss who would be paying
23  Mr. Stetler's fees?
24     A.  Dave -- Mr. Stetler might have -- I think
25  he's the one that told me.

Page 219

1      Q.  Okay.  I don't want to know about your
2  conversations with Mr. Stetler.
3      A.  Sorry.
4      Q.  Let me ask you this:  Who's paying
5  Mr. Stetler's fees?
6          THE WITNESS:  So I can answer that?
7          MR. STETLER:  Abbott is supposed to be.
8  They're not the quickest pay.  You can put that on the
9  record.
10     Q.  (BY MS. ST. PETER-GRIFFITH)  Is that your
11  understanding, that Abbott is paying Mr. Stetler's --
12     A.  Yes.
13     Q.  Okay.  Did you consult with any other
14  lawyers?  Don't tell me what your communications were
15  with them.
16     A.  No, I did not.
17     Q.  Okay.  Had you ever met Mr. Stetler before?
18     A.  No.
19     Q.  And other than your meeting yesterday, did
20  you -- how many conversations did you have with
21  Mr. Stetler?
22     A.  Oh --
23     Q.  Don't tell me the substance.  I just want to
24  know how many.
25     A.  Five, maybe.  Four or five.

Page 220

1      Q.  And -- and approximately how long were each
2  of these conversations?
3      A.  Boy.  20 minutes, maybe.
4      Q.  Okay.  And how long was your meeting
5  yesterday with Mr. Stetler?
6      A.  Four hours.  Three or four hours.
7      Q.  Okay.  And --
8          MR. STETLER:  I billed for 10.
9      Q.  (BY MS. ST. PETER-GRIFFITH)  How long -- how
10  long did you spend searching for documents responsive
11  to the subpoenas?
12     A.  Oh, hour, hour and a half.
13     Q.  Okay.  Were they readily available to you,
14  the documents that you produced today?
15     A.  Yeah.  I found them in a, you know, old
16  resume file drawer of mine.
17     Q.  Okay.  Did you retain any other evaluations
18  from Abbott or is this the sum total of your Abbott
19  documents?
20     A.  I would have had other evaluations, but the
21  reason I had these kept is because I had used them in
22  my last interview process, which was in '97.  So I had
23  those most recent ones.  But the other ones I don't
24  have anymore.
25     Q.  Okay.  When you say your last interview

Page 221

1  process, what do you mean?
2      A.  When I interviewed for my -- the last
3  position I had with Abbott.
4      Q.  Okay.  So the interview process within
5  Abbott?
6      A.  Yes.
7      Q.  Okay.  And what was the date again that you
8  left Abbott?
9      A.  It was '99.  May of '99.
10     Q.  Okay.  And I noticed a break in your service.
11  Oh, before I -- before I get into that.  Do you recall
12  what case you were deposed in before?
13     A.  Yes.
14     Q.  Okay.  What case was that?
15     A.  It was a case against the hospital that I had
16  worked at when I first got out of school as a nurse.
17  I worked labor and delivery.
18     Q.  Okay.  Was it a med mal case?
19     A.  Yes.
20     Q.  Okay.  Were you a defendant in that case?
21     A.  I was a witness.
22     Q.  And did you testify at trial?
23     A.  No.
24     Q.  Other than your BSN from Kent State --
25     A.  Yes.

Page 222

Q. -- do you have any other post-secondary education?
A. No.
Q. Okay. How about any types of certification classes? Have you taken any of those?
A. No.
Q. Have you kept your license -- nursing licensure?
A. I actually let it go inactive and I just as of last Friday finished a refresher course to reactivate it.
Q. Where are you licensed as a BSN?
A. Well, my license is inactive --
Q. Okay.
A. -- in Illinois. And like I say, I just submitted the paperwork to Texas.
Q. Okay.
A. Or it was sent to the mail Monday, I believe. And then I had a license in Arizona and California.
Q. And did you practice nursing in -- in Arizona, California and Illinois?
A. Just in Arizona --
Q. Just in Arizona.
A. -- where I was a bedside nurse, yes.
Q. What I would like to do is go over your

Page 223

employment history. You furnished us with a resume. And what I would like to do is -- is just sort of back -- go back to Page CS-4 and ask does -- does this page reflect your -- the sum total of your nursing jobs?
A. Yes.
Q. Okay. Why did you decide to switch from nursing to going into your work with surgi-care specialists as a sales representative?
A. I -- I was frustrated, a bit, with the way nursing was and I had some friends that were in sales, so I thought medical sales would be a good fit for me.
Q. Okay. And why the switch to become an implant consultant for American Medical Systems?
A. I had had some difficulties with my immediate supervisor as a surgi-care specialist and was frustrated with that and the implant consultant was -- looked like a more fun position and was more lucrative.
Q. Okay. So you relocated?
A. No.
Q. Oh, you didn't. Okay.
A. I did not.
Q. But you were in the San Francisco market?
A. Yes.

Page 224

Q. Okay. And then with your -- your transition to the Hospital Products Division Hospital Business Sector in -- I'm sorry. At one point did you indicate that -- that American Medical Systems was taken over by Abbott?
A. No.
Q. I'm sorry.
A. No.
Q. Okay. What -- what -- when did you come to work for Abbott or an entity that was taken over by Abbott?
A. Oh. Well, Sorenson Research, which is a surgi-care specialist, they had been acquired by Abbott just prior to me starting employment.
Q. Okay. So you took -- you took a break then from Abbott, essentially --
A. Yes.
Q. -- for a two-year period.
A. Yes.
Q. And was that because of the difficulties with the supervisor?
A. Yes.
Q. Okay. And what -- why did you elect to come back to Abbott?
A. My husband got a promotion. We moved to

Page 225

Chicago and I needed a job to qualify for the mortgage and Abbott had an opening.
Q. And who's your husband?
A. Jim Snead.
Q. And he works for Abbott, doesn't he?
A. Yes.
Q. Okay. Does he still work for Abbott?
A. Yes.
Q. Okay. How long has he worked for Abbott?
A. I think since '85.
Q. Okay. And in what capacities has he worked for Abbott?
A. He's a -- oh, has he worked for Abbott --
Q. Yes.
A. -- over the years?
Q. Historically, if you could just go through his positions.
A. Sales positions, sales rep, a district manager.
Q. In which divisions?
A. In -- he was a sales rep with Oxymetrics, which, actually, was another company that Abbott acquired. And then he became a district manager with Oxymetrics. I think at that point they called it Abbott Critical Care.

b66cc43c-5092-4127-9266-2a482f299285

Page 226

1    Q.  Okay.
2    A.  I might be wrong with when the names changed,
3  but ...  And then he became an integrated sales
4  executive with HPD.  That was more, I guess -- I don't
5  know if HBS was -- existed then, but it was the
6  hospital side.  And then he became a regional sales
7  manager with Abbott Critical Care.  And then I think
8  like two years ago ACCS was spun off or reorg'd, or
9  something, and he ended up getting a regional sales
10  manager job with Renal Care.  And that's what he's
11  doing now.
12    Q.  And is he -- he's based in Texas?
13    A.  Yes.
14    Q.  Okay.  What is -- what is Renal Care in
15  Abbott?
16    A.  His business sells IV Zemplar.  It's a drug
17  used for dialysis patients.
18    Q.  Okay.  Now, did you ever work with your
19  husband?
20    A.  No.  At one point we were both sales reps
21  with similar territories, but we had different
22  managers.
23    Q.  Okay.  Was that when -- when he was in HPD
24  and you were at HPD?
25    A.  No.  That was when we lived in California.

Page 227

1  He was with Critical Care and I was with Surgi-Care.
2    Q.  Okay.  But your husband did work for HPD?
3    A.  Yes.
4    Q.  In terms of your acquiring knowledge about
5  the processes or the -- or the sales mechanism at
6  Abbott, did you discuss any of that with your husband?
7  Did you discuss, for example, AWP with your husband?
8    A.  No.
9       MR. STETLER:  Hold on.
10       THE WITNESS:  Anyway.
11       MR. STETLER:  Too late.
12       MS. ST. PETER-GRIFFITH:  Okay.
13       THE WITNESS:  Sorry.
14       MR. STETLER:  But I am going to object
15  to conversations with her husband if it's just the two
16  of them.  I think that's covered by the marital
17  privilege.
18       MS. ST. PETER-GRIFFITH:  Okay.
19    Q.  (BY MS. ST. PETER-GRIFFITH)  Was there any --
20  or -- okay.  So you -- when your husband was
21  transferred, then, to Chicago, that's when you elected
22  to come back to seek employment with Abbott again?
23    A.  Yes.
24    Q.  Okay.  What were -- or let me ask you -- let
25  me ask it this way.  Your resume, which is part of

Page 228

1  Exhibit 702, for "Hospital Representative/EDDS
2  Specialist," does that fairly represent all of your
3  duties and responsibilities or is that just a summary?
4    A.  At that point in time?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Did you have any other duties or
8  responsibilities as a hospital -- for that 8/88 to
9  1/91 period of time?
10    A.  Well, the only other thing I did is help
11  train new reps --
12    Q.  Okay.
13    A.  -- in the field.
14    Q.  And how would you do that?
15    A.  Well, I wasn't -- there was a designated
16  trainer that was in the regional office.  They would
17  just work with me.
18    Q.  Okay.  When you say "reps," do you mean sales
19  representatives?
20    A.  Yes.
21    Q.  Okay.  So is it fair to say that when you say
22  "hospital representative," that means you were a
23  salesperson to hospitals?
24    A.  Yes.
25    Q.  Okay.  Other than doing that sales training,

Page 229

1  did you have any other duties or responsibilities?
2    A.  No.
3    Q.  Or have we covered them all?
4    A.  We've covered them all, as far as I can
5  remember.
6    Q.  Okay.  Moving up to the "National Account
7  Manager/Representative," 7/91 to 1/95.  If you could
8  just look at your resume and -- and tell me whether
9  you had any other duties or responsibilities that are
10  not described there in your resume.
11    A.  The only one I can think of is that -- doing
12  those sheets.
13    Q.  Okay.
14    A.  I'm sure there were other things I didn't
15  include on my resume.
16    Q.  Approximately how long did you do the sheets
17  for, do you recall, before you passed -- handed that
18  off?
19    A.  I believe it was about a year.
20    Q.  Okay.  And how were you compensated as -- as
21  a NAM?
22    A.  We were paid a salary and then there were --
23  boy.  And, again, I'm -- it's a -- it's not a real
24  clear recollection because it is 15 years ago.  But
25  what I recall is we had impact goals and then we were

58  (Pages 226 to 229)

b66cc43c-5092-4127-9266-2a482f299285

Page 230

1  paid impact, you know, achieved -- percent of impact
2  goals achieved.  You could make a certain amount of
3  money and that was your bonus.
4      Q.  Okay.  What about when you were a hospital
5  representative, were you compensated the same way?
6      A.  That would have been based on quotas,
7  achieving quotas and there may have been other ways
8  that they -- they compensated.  I think it was -- I
9  don't know if it was a quarterly bonus.  It was some
10 kind of bonus and salary and a company car.
11     Q.  Okay.  When you were a hospital
12 representative during this approximately one and a
13 half year period, what -- what was your salary?  Or
14 two and a half year period, I'm sorry.  Do you recall?
15     A.  I don't.
16     Q.  Do you recall what your bonus was for meeting
17 quotas?
18     A.  I don't.
19     Q.  Okay.  What about when you were a national
20 account representative, do you recall what your salary
21 was?
22     A.  I don't.
23     Q.  Okay.  How about your bonus?
24     A.  I don't recall.  I'm sorry.
25     Q.  Okay.  That's okay.  I understand it was a

Page 231

1  while ago.
2          Do you have a recollection as to what
3  percentage of your total income from Abbott was
4  attributable to salary as opposed to your -- your
5  compensation for meeting certain quotas?
6      A.  I don't remember the percentage.  I know it
7  was -- it was more heavily weighted to salary once you
8  went inside than when you were in -- you know, in the
9  field as a representative.
10     Q.  Okay.  When you say, "when you went inside,"
11 does that mean when you became a national account
12 manager?
13     A.  Yes.
14     Q.  Okay.  Is that -- the national account
15 manager position, was that a position that you applied
16 for?
17     A.  Yes.
18     Q.  Okay.  Were there other individuals competing
19 for it, do you recall?
20     A.  Yes.
21     Q.  Who -- who?
22     A.  I don't remember.
23     Q.  Okay.  Going on to when you became a
24 marketing manager, which is the -- one page earlier.
25 Does your description there fairly and accurately

Page 232

1  represent all of your duties when you were a marketing
2  manager?
3      A.  I think it would cover the -- the highlights,
4  but there may have been other things I did that
5  weren't included on my resume.
6      Q.  Do you recall what they were?
7      A.  No.
8      Q.  Okay.  Do you recall what your -- how your
9  compensation was based when you were a marketing
10 manager?
11     A.  Again, it was an impact -- it was salary and
12 then impact goal achievement.
13     Q.  Okay.  Who set the impact goals?
14     A.  It was -- it was a joint process.  I think
15 first you would write your own goal draft and then it
16 would be reviewed by your manager, but ultimately your
17 manager set your goals.
18     Q.  And did you meet your goals each year?
19     A.  I don't recall.
20     Q.  Okay.  Abbott HealthSystems Division.  How --
21 how is that distinguishable from HPD?
22     A.  It was its own division.  I mean, HPD is a
23 division and AHD was its own division.  The primary --
24 I think -- I can't -- I just can't remember that much
25 specific information.

Page 233

1      Q.  Okay.  Was it a promotion to go from national
2  account manager to marketing manager?
3      A.  Yes.
4      Q.  Okay.  And was that something that you
5  applied for?
6      A.  Yes.
7      Q.  Okay.  And I believe you testified earlier
8  that it was a promotion to go from marketing manager
9  of Abbott HealthSystems Division marketing to disease
10 strategies, is that -- do I recall that correctly?
11     A.  I don't believe it was.  I think it was a
12 lateral move.
13     Q.  Okay.  Why did you make that lateral move?
14     A.  It was -- it was just a more meaty position.
15 I felt like it would be more interesting.
16     Q.  Okay.  Do you recall what your salary was
17 from 10/95 until you -- you left?
18     A.  I don't.
19     Q.  Okay.  And did you hold the marketing manager
20 position until your departure in May of '99?
21     A.  No.  After this position I became a corporate
22 manager in Dallas for AHD.
23     Q.  Okay.  Was that occasioned by your husband's
24 transfer?
25     A.  He was transferring, yes, and -- and there

59 (Pages 230 to 233)

b66cc43c-5092-4127-9266-2a482f299285

Page 234

happened to be an open spot in a position -- in the corporate manager's position at the time --
Q. Okay. Was that --
A. -- that I was interested in.
Q. Okay. Was that -- would that be considered a lateral move or a promotion?
A. Yes, that was a lateral move.
Q. Okay. And other than your husband's transfer, was there any other reason why you decided to seek that lateral move?
A. No.
Q. Okay. And approximately when was it -- did you make that move?
A. It was June or July of '97.
Q. Okay. Now, I assume, just from what you've testified as to the ages of your children or indicated as the ages of your children, that somewhere along the line here you had -- you had children. Do you recall --
A. Oh, during my working --
Q. During your work here with Abbott.
A. Yes.
Q. Did you have any breaks in service with Abbott for maternity leave?
A. Yes.

Page 235

Q. When was that?
A. Well, my daughter was born in August of '90 and I worked right up until, so -- she was born on August 25th. So I would have taken six weeks from there on out.
Q. Okay. So it wasn't an extended maternity leave then?
A. No. No.
Q. Okay. And --
A. And then my son was born in December '92 and I took 10 weeks off when I had him.
Q. Okay. And what were your responsibilities once you got to Texas?
A. I was a salesperson for AHD, basically. I called on more executive level within -- I think I had five or six accounts, Baylor Healthcare System, Loveless in Albuquerque, Integris in Oklahoma and a couple of others.
Q. With regard to your relationship with Baylor, did you work with Baylor on their home infusion?
A. No.
MS. GEISLER: Objection to the form.
A. No, I did not.
Q. (BY MS. ST. PETER-GRIFFITH) Okay. Were you aware of a relationship between Baylor's home infusion

Page 236

and Abbott?
A. I believe they were an account for Abbott Home Infusion.
Q. And by "an account" what do you mean?
A. They were a customer.
Q. Okay. Do you -- do you know anything about that customer relationship?
A. I don't. I mean, I know it was a different type of relationship than, say, Alternate Site Product Sales and our customers, but, you know, 15, 16 years later, I don't remember how that -- you know, what -- I can't describe it for you.
Q. Do you remember who worked with Baylor on their home infusion relationship?
A. No.
Q. Now, when you -- when you worked with Baylor, did you work with just a -- in a particular area of Abbott's market?
A. You mean hospital versus -- what do you mean, exactly?
Q. Well, were you the person primarily responsible for Abbott's relationship with Baylor?
A. No. There was -- there's a lot of Abbott representatives that call on Baylor.
Q. Okay.

Page 237

A. I was responsible for -- I would call on their executive level and I would work with others and -- from Abbott, me meeting with like their VP of materials management.
Q. Do you recall ever hearing about, while you were an Abbott employee, a subpoena request from the United States government for -- or HHS OIG in '96, 1996?
A. No.
Q. Did you ever receive a memorandum concerning the preservation of documents that you can recall?
A. I don't recall that.
MS. ST. PETER-GRIFFITH: Okay. Since my marker is not here, I'm going to ask Jarrett to pick up his stickers.
MR. ANDERSON: You bet.
MS. ST. PETER-GRIFFITH: Let me make sure I'm doing the right one here. Okay. This is going to be marked as Exhibit 712.
Q. (BY MS. ST. PETER-GRIFFITH) Do you have it in front of you?
A. No. Is it something new?
MS. ST. PETER-GRIFFITH: Jarrett.
MR. ANDERSON: Hold on. Hold on.
Q. (BY MS. ST. PETER-GRIFFITH) If you could

Page 238

1  just take a minute to look at that and I'd like to
2  just see if that refreshes your recollection as to
3  whether you might have received a memo.
4      A.  (Witness reviewing document).  It doesn't
5  look familiar to me.
6      Q.  Actually, I'm going to -- I'm going to ask
7  you another question because I realize my terminology
8  was off.  Did you ever remember hearing about what's
9  called a CCID from the United States Attorney General
10  that was served upon Abbott?
11      A.  No.
12      Q.  Okay.  If you could look on that exhibit that
13  I gave you.  Is there someone within your -- who was
14  within your supervisory chain in February of '96 who's
15  on that distribution list?  When I say "the
16  distribution list," I mean the "To" at the top.
17      A.  Okay.  In February of '96.
18      Q.  In February of '96.
19      A.  I don't think so.  At one point Chris Begley
20  was the head of my division, but I think that was in
21  '97.
22      Q.  Okay.  Who was the head of your division in
23  '96, do you recall?
24      A.  Rick Gonzalez.
25      Q.  Okay.  And do you see either Mr. Gonzalez or

Page 239

1  his supervisor's -- who was his supervisor in '96, do
2  you recall?
3      A.  Well, wait.  It would have been either Joy
4  Abenson or Rick Gonzales.  I don't know which one
5  exactly.
6      Q.  Okay.
7      A.  Okay.
8      Q.  Do you see your supervisor's supervisor on
9  that list?
10      A.  No.  And let me clarify.
11      Q.  Sure.
12      A.  Rick Gonzalez is -- Rick Gonzalez or Joy or
13  Chris, whoever it was at the time, was my supervisor's
14  supervisor.
15      Q.  Okay.
16      A.  And then above that person, none of these
17  people were above that person.
18      Q.  Okay.  Do you have any recollection of ever
19  receiving this document?
20      A.  I do not.
21      Q.  Do you have any recollection of anyone at
22  Abbott ever telling you of the need to preserve,
23  retain or search for documents incident to a request
24  from the United States government?
25      A.  I do not.

Page 240

1          MS. ST. PETER-GRIFFITH:  Okay.  I would
2  like to mark the next one.
3      Q.  (BY MS. ST. PETER-GRIFFITH)  Ma'am, I'm going
4  to ask you whether you -- similar series of questions.
5  Do you ever recall hearing about a subpoena served
6  upon Abbott from the HHS OIG, from the federal
7  government?
8      A.  I have heard of it, but when or -- and
9  specifics, no.
10      Q.  What -- what do you recall hearing about it?
11      A.  Nothing specific.
12      Q.  Okay.  Why do you have a recollection, then,
13  of maybe having heard about it?
14      A.  I don't know.  It's just -- you know, I don't
15  know.
16      Q.  Okay.  When did you -- do you recall when you
17  might have heard about it?
18      A.  No.
19      Q.  Okay.  Was it something that was discussed at
20  Abbott, to your recollection?
21      A.  No.
22      Q.  Okay.  Did anybody ever ask you in 1997,
23  incident to Abbott's receipt of an HHS OIG subpoena,
24  to preserve, search for or, you know, retain
25  documents?

Page 241

1      A.  No.
2      Q.  Okay.  Have you ever been made aware -- did
3  you ever have any understanding about Abbott being
4  involved in AWP litigation?
5      A.  No.
6      Q.  Okay.  What about its TAP division being
7  involved in a criminal matter, do you have any --
8          MS. GEISLER:  Objection.
9      A.  I've heard of that, yes.
10      Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  What --
11  what have you heard of that?
12      A.  Just what you said.  I haven't heard any
13  details, just that there was a criminal investigation.
14      Q.  Okay.  When did you learn about that?
15      A.  A year or two ago.
16      Q.  Okay.  Do you remember who you learned it
17  from?
18      A.  No.
19      Q.  Okay.  What about the Ross division, did you
20  ever hear about any criminal matters associated with
21  the Ross division at Abbott?
22      A.  I heard there was something with -- I thought
23  with baby formula, but I don't know what or if it was
24  civil or criminal.  That's all I really know.
25      Q.  Okay.  Did you ever hear about any civil

b66cc43c-5092-4127-9266-2a482f299285

Page 242

1  matters associated with Ross or TAP?
2      A.  Nothing other than what we just said.
3      Q.  Okay.  What about litigation in Texas, the
4  Texas litigation, when did you first learn about that?
5      A.  When I got the phone call two months ago.
6      Q.  Okay.  Did you ever hear about any litigation
7  associated with California?
8      A.  No.
9      Q.  What about the federal multidistrict
10  litigation, did you ever hear about that prior to
11  learning about this deposition?
12      A.  No.
13      Q.  Okay.  What -- what was your normal course
14  when you were at Abbott in -- in preserving and
15  maintaining documents that you used in the ordinary
16  course of business?
17      A.  Just put things in files.
18      Q.  Okay.  Did you keep those files?
19      A.  They would -- they would stay -- yeah.  They
20  would stay there until, you know, I changed positions
21  and then you hand the files over to the next person
22  that took your job.
23      Q.  Okay.  Do you recall handing over your files
24  when you transitioned to different jobs at Abbott?
25      A.  Yes.

Page 243

1      Q.  Okay.  What -- let's -- let's go back to when
2  you transitioned from being a hospital representative
3  specialist to a national account manager.  Do you
4  recall handing off your files at that time?
5      A.  I don't recall specifically, you know,
6  handing specific files, but I would have -- the
7  general thing would have been to give my, you know,
8  box of files to the next rep that was covering my
9  territory.
10      Q.  Did you ever have any -- did you ever have
11  any policy or practice with regard to destroying
12  documents that you generated in the ordinary course of
13  business?
14      A.  Not that I'm aware of.
15      Q.  Okay.  Do -- do you remember filing
16  everything or did you selectively file things?
17      A.  Oh, I'm sure if something was just --
18  there -- most things were filed that were pertinent.
19  If there was something, you know, that -- that wasn't
20  important, I probably would have pitched it.
21      Q.  Okay.  What about when you were a national
22  account manager, do you recall what your policy was
23  with regard to the retention of documents as opposed
24  to the -- the pitching of documents?
25      A.  I don't remember.

Page 244

1      Q.  Okay.  Do you recall who you handed off your
2  national account manager files to?
3      A.  It would have been to whoever took over each
4  specific account.
5      Q.  Did Abbott have a policy, to your knowledge,
6  about record retention?
7      A.  I don't recall.
8      Q.  At what point in time did you become -- did
9  you start having e-mail files at Abbott, do you
10  recall?
11      A.  I don't recall.
12      Q.  Okay.  Was -- do you recall any e-mail files
13  when you were a national account manager?  Or is that
14  too early?
15      A.  I don't know.  I just don't remember.
16      Q.  Okay.  What about when you switched from
17  being a market manager in -- in Abbott HealthSystems
18  division marketing as -- you know, moving on to the
19  disease strategies manager position, what happened to
20  your files?
21      A.  Again, I would have given them to whoever
22  took my -- replaced me in that other position.
23      Q.  Do you -- do you recall who your replacements
24  were in each of these positions?
25      A.  In the marketing manager, no, I don't.  The

Page 245

1  disease strategies marketing manager was Michelle
2  Thomas.
3      Q.  Okay.  And did you do the same thing with
4  regard to Ms. Thomas, you would have passed the files
5  off to her?
6      A.  Yes.
7      Q.  Do you remember who succeeded you when you
8  transitioned from being a national account manager?
9      A.  I -- I don't.
10      Q.  Okay.  Do you recall who took over your --
11  who took over your accounts?
12      A.  Some -- I -- I don't recall specifically.
13      Q.  Was it Mr. Kipperman?
14      A.  It may have been.  Again, I just -- I was
15  moving on to my next job, so I really didn't care,
16  frankly, what -- you know, I was passing off the
17  accounts and I didn't -- it wasn't my focus who was
18  replacing me.  My focus was where I was going.
19      Q.  Is it fair to say, though, that these were
20  important accounts --
21          MS. GEISLER:  Objection.
22      Q.  (BY MS. ST. PETER-GRIFFITH) -- to Abbott?
23      A.  Yes.  Yes.  Some of them were.
24      Q.  Okay.  So it would have been important, then,
25  for you to have complete files that you handed off to

62 (Pages 242 to 245)

b66cc43c-5092-4127-9266-2a482f299285

Page 246

1  somebody else?
2      A.  Yes.
3      Q.  Okay.  At any time during your tenure as an
4  Abbott employee, do you recall destroying or -- or
5  tossing documents within the ordinary course of
6  business?
7      A.  Just any ol' document?
8      Q.  Yeah.  Well, I mean, significant documents
9  associated with your position.
10     A.  No, I don't recall that.
11     Q.  Okay.  What about with -- with your accounts?
12     A.  You mean account documents?
13     Q.  Your account documents, yes.
14     A.  No.
15     Q.  Okay.  What about interoffice memos?  I don't
16  mean the, you know, "We are having a birthday party
17  at" --
18     A.  Yeah.
19     Q.  -- "6:00" type memos, I mean interoffice
20  memos that impacted, you know, your day-to-day job.
21     A.  Oh, no.  I would not have tossed them then.
22     Q.  Did you have a separate correspondence file?
23     A.  I don't remember.
24     Q.  Okay.  Do you recall how your files may have
25  been maintained after you left a position?

Page 247

1      A.  No.
2      Q.  Okay.  Did you have within each division your
3  own separate files and then your separate, for
4  example, account files?
5          Let me give -- that's a poorly worded
6  question.  Let me give you an example.
7          When you were a national account
8  manager, would you have your own separate, for
9  example, correspondence files or files that were
10  directed to you that were separate and apart from your
11  account files?
12     A.  I don't remember.
13     Q.  Okay.
14          THE WITNESS:  Can I -- can I take a
15  little bathroom break?
16          MS. ST. PETER-GRIFFITH:  Sure.
17  Absolutely.
18          THE WITNESS:  All right.  Thank you.
19          THE VIDEOGRAPHER:  We are off the record
20  at 2:31 p.m.
21          (Recess from 2:31 to 2:43)
22          THE VIDEOGRAPHER:  Okay.  We are back on
23  the record at 2:43 p.m.
24     Q.  (BY MS. ST. PETER-GRIFFITH) Ms. Snead, do
25  you recall your testimony earlier where you

Page 248

1  indicated -- I think your word was that it was taboo
2  to discuss AWP and reimbursement.  Do you recall that
3  testimony?
4      A.  Yes.
5      Q.  Was there ever a policy that you're aware of
6  at Abbott concerning not discussing AWP with clients?
7      A.  Not that I'm aware of.
8      Q.  Do you recall -- ever recall seeing anything
9  in writing that reflected that?
10     A.  I don't recall that, no.
11     Q.  Do you know whether there was any change in
12  that policy at any time?
13     A.  I don't know.  I don't remember any change in
14  that.
15     Q.  Did you ever come to learn of any change in
16  the policy regarding the discussion of AWP after you
17  left, you --
18     A.  I wasn't involved in that business unit
19  anymore, so I didn't hear of it.  There may have been,
20  but I wouldn't be aware of it.
21     Q.  Okay.  If there was some kind of written
22  policy, would that have been something -- or written
23  document concerning that -- that Abbott position,
24  would that have been a document that you would have
25  retained?

Page 249

1      A.  I think I would have, yes, if I would have --
2  I think so.
3      Q.  Do you know where -- where it would have been
4  retained?
5      A.  In -- in a file somewhere.
6      Q.  Okay.  Do you remember approximately when or
7  what position you were holding when you became aware
8  of that policy?
9      A.  Oh, I'm sorry.  I didn't say I was aware of a
10  policy.
11     Q.  Okay.
12     A.  I --
13     Q.  Well, when did -- when did you learn that it
14  was taboo to discuss AWP and reimbursement?
15     A.  Again, I don't recall the specific
16  conversation or learning it specifically, but I -- it
17  was just -- I just knew it.  You know, obviously
18  someone told me, but I don't remember who or when or
19  how.
20     Q.  Was this taboo something that was discussed
21  among you and other NAMs?
22     A.  I don't recall having specific discussions
23  about it.
24     Q.  Do you recall having any discussions about
25  it?

63 (Pages 246 to 249)

b66cc43c-5092-4127-9266-2a482f299285

Page 250

1      A.  No.
2      Q.  Okay.  This is going to take you back a
3  little bit, but I would like to go over in terms of
4  your document retention your work on computers at
5  Abbott.  Did you have a computer when you were at
6  Abbott?
7      A.  Yes.
8      Q.  Okay.  During your entire tenure when you
9  were at Abbott?
10     A.  No.  I think -- not as a hospital rep and I
11  would have gotten a computer when I went inside in
12  national accounts.
13     Q.  Okay.  And what did you do in terms of
14  storing your files on your computer?
15     A.  I don't remember.
16     Q.  Okay.  Did you -- when you switched from
17  position to position, did you take your computer with
18  you or did it change?
19     A.  It changed.
20     Q.  Okay.  Did you have computer information
21  concerning your accounts as a NAM?
22     A.  I'm sure I would have had some information.
23  Well, yeah.  I don't recall anything specifically, but
24  I routinely used a computer, and so I would think I
25  would have saved files and cover letters, that kind of

Page 251

1  thing.
2      Q.  Okay.  We saw earlier in the -- in the Coram
3  materials that there was computer information that --
4  a computer-generated document.  Is that -- my
5  recollection correct on that?
6      A.  There was -- on the RFP?
7      Q.  On the RFP, yes.
8      A.  Yes.  It said there was a diskette enclosed
9  with it.
10     Q.  Did you work with that diskette, to your
11  recollection?
12     A.  I don't recall.
13     Q.  If you didn't and this was your account, who
14  would have worked with that diskette?
15     A.  Steve Kipperman or someone in contract
16  marketing.
17     Q.  Okay.  Do you have any recollection as to
18  what might have happened to that diskette?
19     A.  No.
20     Q.  Okay.  What about the information on the
21  diskette, do you have any recollection as to whether
22  it was ever loaded onto somebody's computer?
23     A.  I don't know.
24     Q.  Do you recall whether it was ever loaded onto
25  your computer?

Page 252

1      A.  I don't recall.
2      Q.  Your computer information concerning your
3  various accounts, when you left each position, what
4  would happen to that?  Like, for example, when you
5  transitioned to being a marketing manager after being
6  a NAM --
7      A.  Right.
8      Q.  -- what happened to your computer information
9  concerning your accounts?
10     A.  It would have just stayed on the computer for
11  the next person because they would have my old
12  computer.
13     Q.  Now, was there a central network that the
14  information that -- your account information was
15  accessible to different people or would it just have
16  been on your computer?
17     A.  I don't remember.
18     Q.  Okay.  Do you recall any computer changes at
19  Abbott where you needed to download or -- or preserve
20  disks or anything like that?
21     A.  I don't recall that.
22     Q.  Okay.  You'd mentioned earlier knowing
23  Virginia Tobiason.  Who is Virginia Tobiason?
24     A.  She worked in the Home Infusion Services
25  business and she worked in reimbursement.

Page 253

1      Q.  And what was reimbursement?
2      A.  That I can't -- I can't remember if -- I
3  really -- I don't know the details of what it was
4  exactly.
5      Q.  Okay.  Were you ever aware of Abbott ever
6  having its own home infusion pharmacy?
7      A.  I vaguely remember something about a
8  pharmacy, but I don't know if that was just -- it was
9  in conjunction with a client, it was a joint pharmacy,
10  or it was Abbott's own.  I can't remember the
11  particulars.
12     Q.  Okay.  Well, would it surprise you to learn
13  that Abbott had at one point in time home infusion
14  pharmacies?
15         MS. GEISLER:  Objection.
16     A.  I knew Abbott was in the home infusion
17  business, so I guess not.
18     Q.  (BY MS. ST. PETER-GRIFFITH)  What do you mean
19  by "was in the home infusion business"?
20     A.  Well, I mean, that was one of the business
21  units of Abbott and -- that's all I can tell you.
22     Q.  What was your understanding of what the unit
23  did?
24     A.  I know they worked in conjunction with
25  customers, but how that -- how that arrangement was, I

64 (Pages 250 to 253)

b66cc43c-5092-4127-9266-2a482f299285

Page 254

1  don't remember the specifics.
2      Q.  Okay.  Do you remember anything about the --
3  the handling of payouts for reimbursement of Medicaid
4  or Medicare claims?
5      A.  No.
6      Q.  What about the monitoring of disputes
7  associated with claims that were submitted?
8      A.  Now, that may have had something to do with
9  those sheets I went through.  I don't know.
10     Q.  Okay.  How would it have dealt -- how would
11  it have related to the sheets that you went through?
12     A.  Well, that may have been the list of products
13  that I had to verify if it was a pharmaceutical or
14  a -- more of a medical equipment product.
15     Q.  Did you -- with regard to Abbott's home
16  infusion unit, were you ever aware that Abbott shared
17  in the proceeds from the reimbursement collected on
18  behalf of its clients?
19          MS. GEISLER:  Objection.
20     A.  I knew that they partnered with clients and
21  that I believe each customer relationship was unique
22  in how the partnering was done.
23     Q.  (BY MS. ST. PETER-GRIFFITH)  What was your
24  understanding of the partnering?
25     A.  I don't have a clear understanding of the

Page 255

1  partnering.
2      Q.  Do you have any understanding of the
3  partnering?
4      A.  Not that I can -- no more specific than what
5  I just said.
6      Q.  Were you at all involved in that business?
7      A.  No.
8      Q.  Were you aware that Abbott submitted claims
9  to Medicaid and Medicare directly?
10          MS. GEISLER:  Objection.
11     A.  No.
12          MS. ST. PETER-GRIFFITH:  Would you mark
13  the next exhibit?
14          MR. WINTER:  714.
15     Q.  (BY MS. ST. PETER-GRIFFITH)  I would like you
16  to take a few minutes and review this document.
17     A.  (Witness reviewing document).  Okay.
18     Q.  Do you recall ever seeing this document?
19     A.  I don't recall it, no.
20     Q.  Who is Joyce Van Laeke?
21     A.  I don't remember.
22     Q.  Okay.  Is it fair to say that she's someone
23  in HPD business systems from this?
24     A.  Yes.
25     Q.  Okay.  Do you ever having -- recall ever

Page 256

1  having conversations with Ms. Van Laeke?
2      A.  I don't.
3      Q.  Who is Mr. Steller, do you know?
4      A.  The name is familiar, but I don't remember
5  who he was.
6      Q.  What about Mister -- Mr. or Ms. Shah?  Do you
7  see the name below Mr. Steller's name?
8      A.  Yes.  Again, that name is familiar, but I
9  don't know who he is.
10     Q.  Okay.  And the re on this memo, which I
11  submit is dated July 17, 1992, is "Medicaid - GVR
12  coordinator."  Do you see that?
13     A.  Yes.
14     Q.  What is GVR?
15     A.  I don't know.
16     Q.  Do you have any understanding as to what
17  that -- what it was or what the GVR system was?
18     A.  No.
19     Q.  Do you ever recall being involved with the
20  GVR system?
21     A.  I don't recall that, no.
22     Q.  If you can look in the third paragraph.  The
23  third sentence.  Reads, "Chris Snead monitors the
24  acceptance or disputes that arise from the claims that
25  are submitted."  Do you see that?

Page 257

1      A.  Yes.
2      Q.  Okay.  Do you know what that is referencing?
3      A.  I think it's referencing those sheets I've
4  been talking about.
5      Q.  Okay.  But how is your review of those sheets
6  monitored -- how does that monitor the acceptance or
7  disputes of -- of claims submitted to Medicaid?
8      A.  I don't know.
9      Q.  Did you have responsibility for monitoring
10  the acceptance or disputes arising from claims that
11  were submitted to Medicaid?
12     A.  What I did was I went through these sheets
13  and I did what I said.  I showed -- I circled the
14  pharmaceutical items and Xed or maybe just did nothing
15  for the medical equipment items and I forwarded it to
16  PPD.  That's what I recall.
17     Q.  You forwarded it to PPD?
18     A.  To Debra DeYoung, I believe, or someone that
19  reported to Debra DeYoung.
20     Q.  Was that an HPD -- were you functioning in an
21  HPD capacity when you were doing that?
22     A.  Yes, because it was HPD products that were on
23  those sheets.
24     Q.  Okay.  Do you know why you would have been
25  referenced in this memorandum as monitoring the

65 (Pages 254 to 257)

b66cc43c-5092-4127-9266-2a482f299285

Page 258

1  acceptance and disputes that arise from claims that
2  are submitted to Medicaid?
3      A.  No, unless that describes what I was doing
4  when I was saying, "Yes, this is a pharmaceutical; no,
5  it's not."
6      Q.  Well, does it sound to you that that's what
7  it sounds like you were doing?
8      MS. GEISLER:  Objection.
9      A.  I don't know.  That -- that could be the
10 description of what I was doing.
11     Q.  (BY MS. ST. PETER-GRIFFITH)  Well, did you
12 ever monitor the -- how could that be the description
13 of what you were doing?
14     A.  I don't know.  I was one piece in a big
15 puzzle, so I don't know -- all I know is what I did.
16 What I explained to you.
17     Q.  Okay.  And that's -- that's all you did to
18 your -- to your knowledge that might fall within this
19 description of monitoring the acceptance or disputes
20 that arise from claims that are submitted?
21     A.  Yes.
22     Q.  Is it fair to say that you didn't deal with
23 any individual claims that were submitted to Medicaid
24 or Medicare?
25     A.  Not that I recall.

Page 259

1      Q.  Okay.  Do you have any recollection as to
2  under any circumstances when you would be -- have a
3  relationship to or involvement with the submission of
4  Medicaid or Medicare claims or disputes arising from
5  Medicaid or Medicare claims?
6      A.  I don't.
7      Q.  Did that fall at all within your -- within
8  your job responsibilities at any time when you were at
9  Abbott?
10     A.  Not that I can recall.
11     Q.  Do you have any recollection of anyone coming
12 up to you and discussing this GVR system at HPD?
13     MS. GEISLER:  Objection.
14     A.  I don't recall a GVR system.
15     MS. ST. PETER-GRIFFITH:  Counsel, when
16 you say "objection," I'm assuming you mean to the
17 form.
18     MS. GEISLER:  Yeah.  I'm not sure whose
19 rules we are operating under now, so --
20     MS. ST. PETER-GRIFFITH:  Well, I
21 think -- I think for purposes of the federal MDL
22 we're -- we're still operating under the objections
23 that are asserted are form objections.
24     MS. GEISLER:  Okay.
25     Q.  (BY MS. ST. PETER-GRIFFITH)  Do -- do you

Page 260

1  have any other -- can you think of any other reason,
2  I'm just trying to exhaust your memory here on this or
3  your knowledge on this, are you aware of any other
4  reason why you might be referenced in this memo?
5      A.  I'm not.
6      Q.  What was your understanding of the different
7  units within Alternate Site?
8      A.  The three business units were Alternate Site
9  Product Sales, Home Infusion Services and Renal Care.
10 They were three separate, distinct business units.
11     Q.  Okay.  And I would like to sort of go over
12 what your understanding of each unit was, but first I
13 want to ask you:  During your tenure at Abbott, was
14 that -- was that division constant?  Did it remain the
15 same?
16     A.  Yes.  As far as I can recall.
17     Q.  Okay.  And the first -- let's go over Renal.
18 What did Renal do?
19     A.  At that time they had a pharmaceutical called
20 Calcijex that they sold to, I believe, renal dialysis
21 centers.
22     Q.  Did they only sell Calcijex?
23     A.  That's all that I recall.
24     Q.  Okay.  Did the renal department have --
25 within Alternate Site have its own reimbursement?

Page 261

1      A.  Yes.
2      Q.  Okay.  And -- and what was your understanding
3  of what that unit did?
4      A.  I don't have -- I don't have a good
5  understanding of what that unit did.
6      Q.  What was your understanding of the nature of
7  the contracts within Renal?  Were they partnerships,
8  were they straight sales contracts?  What types of
9  contracts did Renal generate?
10     MS. GEISLER:  Objection to the form.
11     A.  Again, I -- I did not work in that area, so I
12 don't know what -- how their contracts were written.
13     Q.  (BY MS. ST. PETER-GRIFFITH)  Did you have any
14 dealings with the Renal division?
15     A.  No.
16     Q.  And is the next unit ASPS?  Is that Alternate
17 Site Products --
18     A.  Product Sales --
19     Q.  Sales.  Okay.
20     A.  Yes.
21     Q.  And what did Alternate Site Product Sales do?
22     A.  We sold HPD products to the alternate site
23 sector, which was basically everything but hospitals.
24     Q.  And did you have partnership contracts within
25 Alternate Site Product Sales?

66  (Pages 258 to 261)

b66cc43c-5092-4127-9266-2a482f299285

Page 262

1   A.  No.
2   Q.  Okay.  How, generally, did the -- did the
3   contracts work within Alternate Site Product Sales?
4   A.  It was a -- generally was a several-year
5   contract that gave customers discounted pricing based
6   on volume and, you know, there might be pricing
7   increases every year, there might not.
8   Q.  Would the price increases be reflected in the
9   contract?
10  A.  There would be a range that it could be
11  annually, yes.
12  Q.  And was that based upon usage or -- or -- or
13  consumption by the -- by the customer?
14      MS. GEISLER:  Objection to form.
15  A.  I think every contract was different.
16  Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Is it
17  fair to say that -- that there was -- there was no one
18  consistent contract within ASPS?
19      MS. GEISLER:  Objection, form.
20  A.  Again, I didn't work in contract marketing,
21  so I don't think I can characterize what the contracts
22  were like.
23  Q.  (BY MS. ST. PETER-GRIFFITH)  Who do you think
24  would be the best people to -- to give us that
25  information?

Page 263

1   A.  Contract marketing.
2   Q.  Who -- who -- but who specifically do you
3   recall being in contract marketing during your --
4   during your tenure at Abbott?
5   A.  Steve Kipperman.
6   Q.  Okay.  Did you ever get involved with the
7   contracts within ASPS?
8   A.  I would have input.  If it was one of my
9   accounts, I would -- I would give input in working
10  with Steve.
11  Q.  Okay.  How -- how did your work as a
12  national -- as a NAM connect or interrelate with ASPS?
13  A.  I was part of ASPS.
14  Q.  Okay.  But is it fair to say that you were
15  the person who interacted with the customer, but
16  somebody else worked on drawing up the contract?
17      MS. GEISLER:  Objection to the form.
18  A.  Yes, that's a general characterization.
19  Q.  (BY MS. ST. PETER-GRIFFITH)  How -- how did
20  that work?  Can you describe to me -- just take me
21  through like, for example, PBI.  How did your
22  contractual relationship that you developed as a NAM
23  with PBI work?
24      MS. GEISLER:  Objection to form.
25  A.  Well, I was basically their salesperson.  So

Page 264

1   I would meet with them, determine what their needs
2   were, what they were interested in, what kind of
3   volume they would expect to purchase from us.  And
4   bring that back in, meet with Steve Kipperman and --
5   and -- and go through that.  And then, you know, he
6   would come up with pricing, do the analysis and we'd
7   develop a proposal.  Then I would bring it back to the
8   customer.
9   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And would
10  you negotiate, then, directly with the customer on
11  that?  Was there negotiation back and forth,
12  typically?
13  A.  There could be --
14  Q.  Okay.
15  A.  -- yes.  And I would meet with the customer
16  to talk through it.
17  Q.  And who -- so you would -- would you be the
18  one who did the actual negotiation?
19  A.  I would talk with a customer.  I didn't have
20  the authority to say, "Okay.  We'll bend here.  We'll
21  give" -- you know, I didn't have that authority.  I
22  would take, then, whatever our discussion was, take it
23  back to Steve to see if we could do it.
24  Q.  Okay.  How did your role as a NAM differ from
25  that of a district manager?

Page 265

1   A.  Because I was in charge of national accounts.
2   So I met with the home offices of national homecare
3   chains like Caremark or Curaflex.  District managers
4   were managers over local sales reps in the field.
5   Q.  Okay.  Now, in your experience did the ASP
6   customers typically receive decreases in pricing from
7   Abbott over the years?
8       MS. GEISLER:  Objection to the form.
9   A.  I don't -- I don't think I can speak to that.
10  I just -- I can't recall and I wasn't -- again, I
11  wasn't contract marketing, so I didn't have a big
12  global view.
13  Q.  (BY MS. ST. PETER-GRIFFITH)  When you say
14  you're -- you're contract marketing, let's -- you
15  weren't contract marketing.  I would like to focus
16  then on your customers.
17  A.  Yes.
18  Q.  In your experience with your customers, did
19  your customers experience a decrease or a flat pricing
20  from Abbott over the years?
21  A.  There was, I think, with the buying groups.
22  I remember those specifically, yes.  Their Alternate
23  Site pricing did lower over the years.
24  Q.  Okay.  Anybody else?
25  A.  Well, I don't recall specifically, but I

67 (Pages 262 to 265)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 266

1  vaguely recall if GPO prices were falling, then I'm --
2  then home -- we'd have to follow suit with other
3  customers.
4      Q.  Okay.  You just used three letters, GPO.
5      A.  Oh.  Group --
6      Q.  Can you tell me what those are?  That's okay.
7      A.  Group purchasing organizations.
8      Q.  Okay.
9      A.  That's a buying group.
10     Q.  And is it fair to say, for lack of a better
11 term, that there were different classes of clients
12 that you worked with?
13     A.  Yes.
14     Q.  Classes of trade.  Was the pricing consistent
15 among these classes or were there differences --
16         MS. GEISLER:  Objection to the form.
17     Q.  (BY MS. ST. PETER-GRIFFITH)  -- in your
18 product?
19     A.  I -- I can't recall when you say "classes of
20 trade."  I just -- because it's been so long, I can't
21 recall what we're talking about there.
22     Q.  Okay.  Well, let me -- let me try and see if
23 I can give you an example and see if this helps.  Did
24 most of the home infusion companies that you worked
25 with, for example --

Page 267

1      A.  Yes.
2      Q.  -- enjoy roughly the same prices?
3      A.  Depending upon how much volume they would
4  bring.
5      Q.  Okay.
6      A.  If they brought more volume, we're going to
7  give better prices.
8      Q.  Now, did the -- did the home infusion
9  companies have their own GPO?
10     A.  No.  They -- no.
11     Q.  Okay.  Let me see if I can arrive at this at
12 a different way.  What types of customers did you have
13 when you were a NAM?
14     A.  Primarily home infusion companies.
15     Q.  Okay.
16     A.  That would be like Caremark or Coram,
17 although Coram had some other businesses later on.
18 But when I called on Curaflex, that was a home
19 infusion company.
20     Q.  Okay.  And what types of companies were GPOs?
21 Would that be like, for example, PBI?
22     A.  Yes.  That would be a GPO.  They were a group
23 purchasing organization for Alternate Site-type
24 customers.  Local home infusion companies that weren't
25 big enough to really negotiate lower pricing on their

Page 268

1  own.
2      Q.  Okay.  That leads into my next question.
3  What was the function of a GPO or what type of
4  organization would it be?  Is it just a collection of
5  smaller purchasers who got together so that they
6  could -- they could better enjoy a better negotiation
7  position in the -- in the market?
8         MS. GEISLER:  Objection to the form.
9      A.  Yeah.  That was the primary reason for GPOs.
10     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  And who
11 were the GPOs that you worked with?  I know you
12 discussed -- discussed your clients, but I would like
13 to go through sort of who were -- who were GPOs and
14 who were not.
15     A.  Okay.  PBI was a GPO.  HSCA was a GPO.  I
16 believe I called on Amerinet for a while.
17     Q.  Successfully?
18     A.  I can't remember.
19     Q.  Okay.
20     A.  MedEcon was a GPO.
21     Q.  Anybody else?
22     A.  Not that I can think of.
23     Q.  Were you ever aware of -- if Abbott itself
24 was part of a GPO for -- for purposes of -- of its
25 home infusion company?

Page 269

1      A.  No, I'm not aware of that.
2      Q.  Okay.  And who were -- those were the GPOs.
3  What other types of clients did you have?
4      A.  Something called subacute care.  It was
5  pharmacies that mixed medications for long-term care
6  or rehab facilities.
7      Q.  Okay.  And the subacute care pharmacies, did
8  you negotiate with them sort of in a group or did
9  you -- or were those on an individual basis?
10     A.  I had one account, PCA, and -- and I believe
11 it was like -- it was a national chain-type of
12 account.
13     Q.  Okay.  And what other types?  Subacute
14 pharmacies, home infusion companies.  Now, were the
15 home infusion companies larger companies?
16     A.  Yes.
17     Q.  And that's why you were handling them as a
18 NAM?
19     A.  Yes.
20     Q.  Is that fair to say?
21     A.  Yes.
22     Q.  What size company or what size or volume
23 purchasing, I guess, would qualify as an account that
24 would be a NAM account as opposed to one that would
25 fall into a local jurisdiction?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285

Page 270

1        MS. GEISLER:  Objection to the form.
2     A.  I don't remember the specific numbers.
3     Q.  (BY MS. ST. PETER-GRIFFITH)  Do you -- do you
4  have any vague recollection?
5        MS. GEISLER:  Objection, form.
6     A.  It would be millions.
7        MS. ST. PETER-GRIFFITH:  If I could just
8  take a second here.  If we can show this to the
9  witness and show it to counsel as well.
10        (Discussion off the record)
11     Q.  (BY MS. ST. PETER-GRIFFITH)  Ready?  Do you
12  see the document?
13     A.  Yes.
14     Q.  Okay.  I'm going to represent to you,
15  Ms. Snead, that this is a document that was marked as
16  Exhibit 52 in the Texas case and what we'll do is
17  we'll supplement the record and -- and mark it as an
18  exhibit in the federal case as well, but what I would
19  like for you to do is to first ask you whether you
20  recognize this document or this type of document?
21     A.  Yes.
22     Q.  What is it?
23     A.  It's a price list for PBI.
24     Q.  And would this have been a price list
25  comparable to one that you would have provided to PBI?

Page 271

1     A.  I -- it looks similar to price lists I've
2  provided.
3     Q.  Okay.  If you could look over to the -- more
4  towards the right-hand side of the screen.  It's the
5  right-hand side of the screen, at least for me.  Do
6  you see at the top where -- where the categories of
7  the -- are listed where it says "Spread" --
8     A.  Yes.
9     Q.  -- "AWP," "PBI Contract."
10     A.  Yes.
11     Q.  Do you see that?
12     A.  Yes.
13     Q.  Can you tell me the price lists that you
14  provided to PBI, did they contain that comparable
15  information, spread, AWP, PBI contract?
16        MS. GEISLER:  Objection to the form.
17     A.  I can't tell you that.  I don't recall
18  specifically prices provided to PBI, but typically our
19  price list had the -- I was looking at the left side
20  when you said, "Does this look comparable."
21     Q.  I'm sorry.  At the right side.
22     A.  I know.
23     Q.  Okay.
24     A.  I'm just saying, when you said, "Does it look
25  comparable," I was looking at the left and, yeah, that

Page 272

1  looked similar to what we do with the NDC number
2  and -- and pricing.  Usually it would just be the NDC
3  number and pricing.
4     Q.  Well, at any time when you -- when -- when
5  PBI was your account, do you recall providing this
6  information of spread, AWP and PBI?
7     A.  I don't.
8     Q.  If -- if PBI requested that information in
9  its -- in its RFPs, would Abbott have provided the --
10  the spread, AWP and PBI contract information?
11        MS. GEISLER:  Objection to the form.
12     A.  I don't know what -- again, that would have
13  been a contract marketing decision and I don't know.
14     Q.  (BY MS. ST. PETER-GRIFFITH)  Well, you -- but
15  you were the one who was responsible for providing the
16  information to -- to the -- to PBI as the national
17  account manager, right?
18     A.  Yes.
19     Q.  Well, wouldn't you have been familiar with
20  what would have been provided to them?
21     A.  I would have been familiar for what I brought
22  to them, yes.
23     Q.  Okay.  So would you or would you have not
24  have been familiar with this type of pricing
25  information if it was furnished to them?

Page 273

1        MS. GEISLER:  Objection to the form.
2     A.  If it was furnished by me, I would have been
3  familiar.  If it was not, then I wouldn't have.
4     Q.  (BY MS. ST. PETER-GRIFFITH)  Do you have any
5  recollection of providing spread, AWP -- or AWP
6  information to PBI?
7     A.  I don't.
8     Q.  Could you have?
9        MS. GEISLER:  Objection to the form.
10     A.  It's possible.
11     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  What
12  does -- when it says "spread" at the top, what does
13  that mean to you?
14     A.  That means the difference between AWP and
15  their -- and their contract price.
16     Q.  And "AWP," what does -- what does that number
17  mean to you?
18     A.  Average wholesale price.
19     Q.  And that's Abbott's average wholesale price?
20     A.  I would assume, since it's on the same line
21  as an -- you know, as an Abbott product that it would
22  be, but I -- I can't guarantee that without seeing
23  AWPs on a different document.
24     Q.  Okay.  Who would have provided this
25  information like, for example, on a sheet like this

69 (Pages 270 to 273)

b66cc43c-5092-4127-9266-2a482f299285

Page 274

1  that you would have provided to PBI?  Would that have
2  been anything that you would have been involved with?
3      A.  Typically contract marketing pulled together
4  the price lists and any, you know, pricing type
5  information for the customer.
6      Q.  Okay.  What about these other letters here,
7  HCF, FFP, MAC, what does that mean to you or what does
8  that mean?
9      A.  I don't -- I don't know what it means.
10     Q.  Okay.  You don't know what -- what "MAC"
11 means, for example?
12     A.  No, I do not.
13     Q.  Okay.
14     A.  H-C-F-A is HCFA.  I know that.
15     Q.  Okay.  Do you know why there would be a list
16 there or -- or a column there for that?
17     A.  No.
18     Q.  Okay.  Do you know why a group purchasing
19 organization of care providers would -- would care
20 about MACs?
21     A.  No, because I don't know what MACs are.
22     Q.  Okay.  Do you know what HCFA is?
23     A.  Yes, I know what HCFA is.
24     Q.  What is HCFA?
25     A.  Health Care Financing Administration, I

Page 275

1  think.
2      Q.  Okay.  And -- and what is Health Care
3  Financing Administration?
4      A.  I don't know.  I may have known more then,
5  but I don't now.
6      Q.  Okay.  What -- what -- where did you learn
7  the definition of -- of HCFA?
8      A.  Well, it's just a common term that's used in
9  the -- the medical field.
10     Q.  Okay.  Well, did it impact your contracts?
11     A.  I have no idea.
12     Q.  Okay.  Do you have any information as to
13 whether it's a federal agency?
14     A.  I believe it's a federal agency.
15     Q.  Okay.  Do you know whether it has anything to
16 do with Medicaid or Medicare reimbursement?
17     A.  I don't know.
18     Q.  Did you ever deal with HCFA at all in your
19 work with Abbott?
20     A.  Not that I recall.
21     Q.  Okay.  Does the term "maximum allowable cost"
22 ring any bells?
23     A.  No.
24     Q.  Do you know when this form references MAC,
25 whether that's what it can be referencing?

Page 276

1          MS. GEISLER:  Objection to the form.
2      A.  Well -- I mean, the -- the letters match what
3  you said, but other than that, I don't know.
4      Q.  (BY MS. ST. PETER-GRIFFITH)  Do you have any
5  recollection at any time of providing a spreadsheet
6  like this with information concerning HCFA, MAC,
7  spread or AWP to any of your clients at all when you
8  were at Abbott?
9      A.  I don't have a recollection of doing that.
10     Q.  Is it possible that you could have?
11     A.  It's possible.
12     Q.  And that -- would that have been information
13 that would have been compiled and put together by
14 contract marketing?
15     A.  Yes.
16     Q.  So would that be -- would that be Steve
17 Kipperman's unit?
18     A.  Yes.
19     Q.  And I believe you testified earlier that
20 really you interacted primarily with Steve Kipperman?
21     A.  Yes.
22     Q.  Do you know of anyone else within that
23 department who would have compiled the information
24 other than Mr. Kipperman?
25     A.  The information on the computer screen?

Page 277

1      Q.  Yes.  Well, the -- the --the information
2  concerning spread, AWP, HCFA, MAC.
3      A.  I don't know.  He -- you know, potentially he
4  could have had Cindy Dawson do some of it.  I don't
5  know.
6      Q.  Well, did you discuss with Mr. Kipperman at
7  all where the information came from that you were
8  providing to your national accounts?
9          MS. GEISLER:  Objection to form.
10     A.  You mean just in general?
11     Q.  (BY MS. ST. PETER-GRIFFITH)  In general.
12     A.  Not that I recall.
13     Q.  You -- you were -- you had some testimony
14 earlier regarding catalogs?
15     A.  Yes.
16     Q.  What was the purpose of Abbott's price
17 catalogs?
18     A.  Well, it wasn't just pricing.  It also had
19 pictures of the products.  So it was a way to show
20 your customers what -- you know, have all your
21 products in one place.
22     Q.  Okay.  But you didn't charge your customers
23 the prices, right, in the -- in the catalogs?
24         MS. GEISLER:  Objection to form.
25     A.  As I said before, there were times that we

70  (Pages 274 to 277)

b66cc43c-5092-4127-9266-2a482f299285

Page 278

1  did.  If a customer just called up and ordered it from
2  customer service, they were charged list price.  But
3  in most cases, no.
4      Q.  (BY MS. ST. PETER-GRIFFITH) I would like to
5  go over -- hold on just a second.
6          THE VIDEOGRAPHER:  You've got about one
7  minute, Counsel.
8          MS. ST. PETER-GRIFFITH:  Okay.  Why
9  don't -- why don't we take a break so he can change
10  the tape.
11         THE VIDEOGRAPHER:  We are off the record
12  at 3:21 p.m.  This concludes Tape Number 4.
13         (Recess from 3:21 to 3:31)
14         THE VIDEOGRAPHER:  We're back on the
15  record at 3:31 p.m.  This is the beginning of Tape 5.
16         MS. ST. PETER-GRIFFITH:  Okay.  I
17  just -- I would like to state on the record that we
18  are probably going to go for about another 15 minutes.
19  We had promised Mr. Stetler that we would get him out
20  in time so that he could catch a flight out.  The
21  deposition notice of the United States made clear that
22  this deposition would continue from day-to-day.  I can
23  represent that the United States has at least another
24  couple of hours' worth of questions, if not more, and
25  we're not going to conclude this deposition today.  So

Page 279

1  why don't I ask about another 15 more minutes of
2  questions.
3          MR. STETLER:  Well, and as long as we're
4  not going to finish today, we can put it over to
5  another day.  But let me say this as well.  My
6  understanding was that we were going to begin and end in
7  one day.  I've never seen a deposition notice that
8  didn't say "and continue from day-to-day."  So that
9  hardly put me on notice that we were going to be here
10  for more than a day.  That's my position.
11         Counsel, I hadn't talked to you about
12  this, so I'll whine to somebody else.  It probably
13  won't do me any good, but I'll probably do the whining
14  anyhow.
15         MS. ST. PETER-GRIFFITH:  Okay.
16     Q.  (BY MS. ST. PETER-GRIFFITH) Ms. Snead, I
17  would like to go over -- we went over a document a few
18  minutes ago on the computer that had certain terms and
19  one of the terms that was used was "spread," another
20  was "AWP."
21     A.  Yes.
22     Q.  Now, you've testified that for -- for your
23  group purchasing organizations, in general the prices
24  over the years when you worked with them either
25  remained flat or went down, depending upon the volume

Page 280

1  of their purchases, right?
2          MS. GEISLER:  Objection, form.
3      A.  Yes.  That was the general direction.
4      Q.  (BY MS. ST. PETER-GRIFFITH) And -- and is
5  that generally true for the -- for the large home
6  infusion companies as well?
7      A.  Generally true, yes.
8      Q.  Is it -- is it -- would it also be true for
9  most of your accounts or all of your accounts when you
10  were a national manager?
11         MS. GEISLER:  Objection to form.
12     A.  Yes.  Over the years prices went -- became
13  lower.
14     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  And I
15  believe your -- your testimony earlier was that you
16  were aware that the list prices would go up from year
17  to year.  Is that fair?  Was that your prior
18  testimony?
19     A.  Yes.
20     Q.  Okay.  And as the list prices were going up,
21  did you also have an understanding that Abbott's AWP
22  prices were going up?
23     A.  I didn't.  I didn't pay attention to that.
24     Q.  Okay.  Did you have any -- did you have any
25  recognition that AWP prices were decreasing when you

Page 281

1  were at Abbott?
2      A.  Not that I recall.
3      Q.  Do you have any recollection whether they
4  were remaining the same?
5      A.  I don't recall.
6      Q.  So they could have been increasing, but that
7  wasn't something that you paid attention to?
8          MS. GEISLER:  Objection to form.
9      A.  Correct.
10     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  So -- so
11  the difference between the contract prices that --
12  that your customers, when you were a NAM, were
13  experiencing, and the AWPs, that -- that gap could
14  have been increasing as your clients' customers -- as
15  your clients' purchase prices went down; is that fair
16  to say?
17         MS. GEISLER:  Objection to the form.
18     A.  It could have been.
19     Q.  (BY MS. ST. PETER-GRIFFITH) Okay.  Did you
20  have any discussions with your clients about the fact
21  that that spread was widening, to your recollection?
22     A.  No, not -- no.
23     Q.  Do you recall which of your clients might
24  have been concerned about spread?
25     A.  No.

71 (Pages 278 to 281)

Page 282

1    Q.  Now, was -- was an entity called MedEcon one
2  of your clients?
3    A.  Yes.
4    Q.  What was MedEcon?
5    A.  They're a buying group --
6    Q.  Okay.
7    A.  -- a GPO.
8    Q.  Were they based someplace in particular?
9    A.  In Louisville.
10   Q.  How large of an account were they for you?
11   A.  They weren't very large for Alternate Site,
12 but they were a pretty large customer for the hospital
13 business.
14   Q.  Okay.  For HPD?
15   A.  Yes.
16   Q.  Okay.  And did you have an understanding at
17 any point in time as to whether MedEcon either had a
18 relationship with GeriMed or was trying to foster a
19 relationship with GeriMed?
20   A.  I don't -- I don't know.  I don't know that.
21   Q.  Were you aware of any attempts to merge
22 GeriMed and MedEcon, do you recall that?
23   A.  No.
24   Q.  Okay.  Do you recall anything about GeriMed?
25   A.  No.  I never had that account.

Page 283

1    Q.  Okay.  But you recognize it as an account?
2    A.  Yes.  It was a national account.
3    Q.  Okay.  Are you familiar with any discussions
4  about GeriMed being particularly concerned with
5  spread?
6    A.  No.  Because, again, it wasn't my account.
7    Q.  Whose account was it?
8    A.  It was either Mary Beth Manso's or Dennis
9  Walker's.
10   Q.  Did you ever have any discussions with
11 Ms. Manso and Mr. Walker about GeriMed?
12   A.  Not that I recall.
13   Q.  Are you familiar with a program called
14 EmphaSys?
15   A.  No.
16   Q.  Okay.  Have you ever heard that term before,
17 EmphaSys?
18   A.  No.
19   Q.  Before we close out for today, I just want to
20 make sure I've covered all my preliminary questions
21 because I keep bouncing around.
22       Did you review any documents in
23 preparation for your deposition here today?
24   A.  No.
25   Q.  Okay.  Other than -- did you review the

Page 284

1  documents that you collected to provide to us?
2    A.  Oh, yes, I did.  I'm sorry.
3    Q.  Okay.  Why did you keep those documents that
4  you had?
5    A.  Because that was part of my interview packet
6  for the last job I interviewed for in '97, so I just
7  hung on to it because, you know, I wanted to have a
8  resume to start from for next time.
9    Q.  Okay.  And -- and what is your address?
10   A.  It's 1913 Big Bend Cove.
11   Q.  In Dallas?
12   A.  South Lake.
13   Q.  South Lake.
14   A.  76092.
15   Q.  At any time has any -- other than when
16 Mr. Stetler contacted you, has anyone contacted you
17 about your documents or records that you maintained
18 while you were at Abbott?
19   A.  No.  Not that I recall.
20   Q.  Do you recall anyone indicating to you that
21 requests had been made incident to litigation and --
22 and Abbott was looking for documents of its -- of its
23 former employees?
24   A.  No.
25   Q.  Okay.  So no one at Abbott sought to collect

Page 285

1  the information that you provided today to us from you
2  prior to when it was requested incident to this
3  deposition?
4    A.  Correct.
5    Q.  Okay.  Other than the positions identified in
6  your resume, have you had -- held any other positions
7  or had any other job titles at Abbott?
8    A.  Not that I -- not that I remember, no.
9    Q.  Okay.  Did you ever work on any other special
10 projects that might not be reflected as part of your
11 responsibilities identified on your resume or that
12 you've attached here today?
13   A.  No.
14   Q.  Okay.  Did you ever work on any special
15 projects at Abbott?
16   A.  The only thing I can think of, and it was on
17 my resume, was chairing a diversity task force.
18   Q.  Okay.  And what was that?
19   A.  It was just a task force to look at
20 diversity, you know, cultural diversity issues.
21   Q.  Other than your husband, do you stay in
22 contact with any of your former Abbott colleagues?
23   A.  Yes.
24   Q.  Okay.  Who do you stay in touch with?
25   A.  Oh, I get Christmas cards from Steve

72 (Pages 282 to 285)

b66cc43c-5092-4127-9266-2a482f299285

Page 286

1  Kipperman.  I've gotten cards from Mary Beth Manso in
2  the past, but not for probably three or four years.
3  That's all I can think of.
4      Q.  Okay.  Are you aware that -- that Mr. Stetler
5  represents other Abbott employees?
6          MR. STETLER:  Other than through
7  discussions with me?
8      Q.  (BY MS. ST. PETER-GRIFFITH)  Yeah.  Other
9  than through discussions --
10         MS. ST. PETER-GRIFFITH:  Yes.  I'm
11  sorry.  Thank you, Mr. Stetler.
12     A.  No.
13     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Has
14  anyone ever told you about any of the lawsuits, other
15  than -- other than Mr. Stetler, through your
16  conversations with counsel --
17     A.  Yes.
18     Q.  -- has anyone discussed with you any of the
19  AWP litigation?
20     A.  No.
21         MS. ST. PETER-GRIFFITH:  Why don't we --
22  this is a good breaking point for me, before we get
23  into my book of documents, so why don't -- why don't
24  we take a break for today.
25         THE WITNESS:  Okay.

Page 287

1          MS. ST. PETER-GRIFFITH:  Okay.
2          THE VIDEOGRAPHER:  Off the record?
3          MS. ST. PETER-GRIFFITH:  Yes, we're off
4  the record.  What time?
5          THE VIDEOGRAPHER:  We are off the record
6  at 3:40 p.m.  This concludes Tape Number 5.
7
8      (Deposition adjourned at 3:40 p.m.)
9      (Signature waived)

Page 288

1          NO. D-1-GV-04-001286
2  THE STATE OF TEXAS        ) IN THE DISTRICT COURT
                             )
3  ex rel.                   )
   VEN-A-CARE OF THE         )
4  FLORIDA KEYS INC.,        )
     Plaintiffs,             )
5                            )
   VS.                       ) TRAVIS COUNTY, TEXAS
6                            )
   ABBOTT LABORATORIES INC., )
7  ABBOTT LABORATORIES,      )
   HOSPIRA, INC., and B. BRAUN )
8  MEDICAL INC.,             )
       Defendant(s).         ) 201ST JUDICIAL DISTRICT
9
           REPORTER'S CERTIFICATION
10         DEPOSITION OF CHRISTINE SNEAD
              April 19, 2007
11
12     I, Cynthia Vohlken, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15     That the witness, CHRISTINE SNEAD, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19     That examination and signature of the witness
20  to the deposition transcript was waived by the witness
21  and agreement of the parties at the time of the
22  deposition.
23     That the amount of time used by each party at
24  the deposition is as follows:
25

Page 289

1      Mr. Raymond Winter - 03:01
       Mr. Jarrett Anders ton - 00:49
2      Ms. Ann St. Peter-Griffith -    01:27
3      That $      is the deposition officer's
4  charges to the Plaintiffs for preparing the original
5  deposition transcript and any copies of exhibits;
6      That pursuant to information given to the
7  deposition officer at the time said testimony was
8  taken, the following includes counsel for all parties
9  of record:
10     MR. RAYMOND WINTER,
          Attorney for Plaintiff State of Texas;
11     MR. JARRETT ANDERSON,
          Attorney for the Relator;
12     MS. CAROL GEISLER,
          Attorney for Defendants Abbott
13        Laboratories, Inc. and Hospira, Inc.
       MS. ANN M. ST. PETER-GRIFFITH,
14        Attorney for Plaintiff United States of
          America
15     MR. CHRISTOPHER STUART,
          Attorney for Plaintiff State of Arizona
16        and MDL Plaintiffs
       MR. ELISEO SISNEROS, Attorney for the
17        State of California
18     That a copy of this certificate was served on
19  all parties shown herein on May 4, 2007 and filed with
20  the Clerk pursuant to Rule 203.3.
21     I further certify that I am neither counsel
22  for, related to, nor employed by any of the parties or
23  attorneys in the action in which this proceeding was
24  taken, and further that I am not financially or
25  otherwise interested in the outcome of the action.

73 (Pages 286 to 289)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

Page 290

1     Certified to by me this 4th day of May, 2007.
2
3
4
5
6     CYNTHIA VOHLKEN, TX CSR 1059
      Expiration Date:  12/31/2006
      Firm Registration No. 82
7     Fredericks-Carroll Reporting
      7800 Shoal Creek Boulevard
8     Suite 200 W
      Austin, Texas 78757
9     Telephone: (512) 477-9911
           (800) 234-3376
10    Fax:   (512) 345-1417
11 Job No. 2321
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

b66cc43c-5092-4127-9266-2a482f299285