# Exhibit 106

Page 1

                C O N F I D E N T I A L

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - -x

In re: PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

- - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:          MDL No. 1456

UNITED STATES OF AMERICA ex rel.    Civil Action

VEN-A-CARE OF THE FLORIDA KEYS,     No.01-12257-

INC., v. DEY, INC., et al., Civil   PBS

Action No. 05-11084-PBS; and UNITED

STATES OF AMERICA ex rel. VEN-A-CARE

OF THE FLORIDA KEYS, INC., v.

BOEHRINGER INGELHEIM CORP., et al.,

Civil Action No. 07-10248-PBS

- - - - - - - - - - - - - - - - - - -x

(Cross-noticed captions on following pages.)

                    November 18, 2008

                    9:10 a.m.

            Videotaped deposition of Thomson

PDR Inc., by KRISTEN MINNE

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
## New York, NY

| Page 2 | Page 4 |
|---|---|
| 1  IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI | 1      IN THE CIRCUIT COURT OF |
| 2       FIRST JUDICIAL DISTRICT | 2  THE SECOND JUDICIAL CIRCUIT IN AND FOR LEON COUNTY |
| 3  - - - - - - - - - - - - - x | 3            FLORIDA |
| 4  THE STATE OF MISSISSIPPI,  : | 4  - - - - - - - - - - - - - - - - - x |
| 5       Plaintiff,  : | 5  THE STATE OF FLORIDA          : |
| 6    vs.       : Civil Action No. | 6  ex rel.                    : |
| 7  ABBOTT LABORATORIES, INC.,  : G2005-2021 | 7    VEN-A-CARE OF THE FLORIDA KEYS, : |
| 8  et al.,       : | 8    INC., a Florida Corporation, by : |
| 9       Defendants.   : | 9    and through its principal   : |
| 10  - - - - - - - - - - - - - x | 10   officers and directors, ZACHARY : |
| 11 | 11   T. BENTLEY and T. MARK JONES,  : |
| 12       UNITED STATES DISTRICT COURT | 12         Plaintiffs,: |
| 13    FOR THE DISTRICT OF MASSACHUSETTS | 13   v.            : |
| 14  - - - - - - - - - - - - - -x | 14   BOEHRINGER INGELHEIM CORPORATION;: |
| 15  IN RE: PHARMACEUTICAL    : MDL NO. 1456 | 15   BOEHRINGER INGELHEIM      : |
| 16  INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION | 16   INTERNATIONAL, GmbH, a/k/a    :Case No. |
| 17  PRICE LITIGATION     : 01-CV-12257-PBS | 17   BOEHRINGER INGELHEIM      :98-3032A |
| 18  THIS DOCUMENT RELATES TO:   : Hon. Patti B. Saris | 18   AUSLANDSBETEILGUNGS GmbH;    : |
| 19  The City of New York, et al. : | 19   BOEHRINGER INGELHEIM      :Judge |
| 20     v.       : | 20   PHARMACEUTICALS, INC.; C.H.   :William L. Gary |
| 21  Abbott Laboratories, et al. : | 21   BOEHRINGER SOHN; DEY, INC., DEY, : |
| 22  - - - - - - - - - - - - - -x | 22   LP; EMD PHARMACEUTICALS, INC.,  : |

| Page 3 | Page 5 |
|---|---|
| 1       UNITED STATES DISTRICT COURT | 1    LIPHA, S.A., MERCK, KGaA, MERCK- : |
| 2    FOR THE DISTRICT OF MASSACHUSETTS | 2    LIPHA, S.A., SCHERING CORP.;   : |
| 3  - - - - - - - - - - - - - -x | 3    SCHERING-PLOUGH CORPORATION;   : |
| 4  IN RE: PHARMACEUTICAL    : MDL NO. 1456 | 4    ROXANE LABORATORIES, INC., n/k/a : |
| 5  INDUSTRY AVERAGE WHOLESALE  : CIVIL ACTION | 5    BOEHRINGER INGELHEIM ROXANE, INC.: |
| 6  PRICE LITIGATION     : 01-CV-12257-PBS | 6    and WARRICK PHARMACEUTICALS CORP.: |
| 7  THIS DOCUMENT RELATES TO:   : Hon. Patti B. Saris | 7              : |
| 8  The State of California,   : | 8       Defendants.      : |
| 9  ex rel. Ven-A-Care       : | 9  - - - - - - - - - - - - - - - - - x |
| 10     v.       : | 10      November 18, 2008 |
| 11  Abbott Laboratories, et al. : | 11      9:10 a.m. |
| 12  Case No. 03-cv-11226-PBS   : | 12    Videotaped deposition of Thomson |
| 13  - - - - - - - - - - - - - -x | 13  PDR Inc., by KRISTEN MINNE, taken by attorneys |
| 14 | 14  for United States of America, pursuant to |
| 15 | 15  notice, held at the offices of Saterlee Stephens |
| 16 | 16  Burke & Burke, 230 Park Avenue, New York, New |
| 17 | 17  York, before Helen Mitchell, a Shorthand |
| 18 | 18  Reporter and Notary Public. |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |

                                        2 (Pages 2 to 5)

Page 6

1   A P P E A R A N C E S :
2
3       GEJAA T. GOBENA, ESQ.
4         United States Department of Justice
5         Civil Division
6         Commercial Litigation - Fraud Section
7           Attorney for United States of
8             America
9           601 D Street, NW
10          PHB-9028/P.O. Box 261
11          Washington, D.C. 20044
12          Phone: (202)307-1088
13          E-mail: gejaa.gobena@usdoj.gov
14
15
16
17
18
19
20
21
22

Page 8

1   A P P E A R A N C E S (Cont'd.):
2       NICHOLAS N. PAUL, ESQ.
3         Supervising Deputy Attorney General
4         State of California Department of
5           Justice
6         Civil Prosecutions Unit
7           Attorney for State of California
8           P.O. Box 85266
9           110 West A Street, #1100
10          San Diego, California 92186
11          Phone: (619)688-6099
12          E-mail: nicholas.paul@doj.ca.gov
13
14        KIRBY McINERNEY LLP
15          Attorneys for City of New York,
16            various New York counties and
17            State of Iowa
18          101 College Street
19          Dripping Springs, Texas 78620
20        BY:  JAMES P. CARROLL, JR., ESQ.
21          Phone: (512)858-1800
22          E-mail: jcarroll@kmllp.com

Page 7

1   A P P E A R A N C E S (Cont'd.):
2       SATERLEE STEPHENS BURKE & BURKE LLP
3         Attorneys for Thomson PDR Inc.
4         230 Park Avenue
5         New York, New York 10169
6       BY:  THOMAS J. CAHILL, ESQ.
7         Phone: (212)404-8716
8         E-mail: tcahill@ssbb.com
9           -and-
10        JOAN L. ROSENSTOCK, ESQ.
11        Phone: (212)818-9200
12        E-mail: jrosenstock@ssbb.com
13
14      ANDERSON LLC
15        Attorneys for Ven-A-Care of the
16          Florida Keys
17        208 West 14th Street, Suite 3-B
18        Austin, Texas 78701
19      BY:  C. JARRETT ANDERSON, ESQ.
20        Phone: (512)469-9191
21        E-mail: jarrett@anderson-llc.com
22

Page 9

1   A P P E A R A N C E S (Cont'd.):
2
3       DIANA SHUMANS, ESQ.
4         Office of Attorney General
5         State of Florida
6           The Capitol PL-01
7           Tallahassee, Florida 32399-1050
8           Phone: (850)414-3300
9            (Via telephone)
10
11      HOGAN & HARTSON LLP
12        Attorneys for Bristol-Myers and
13          Squibb
14        875 Third Avenue
15        New York, New York  10022
16      BY:  THOMAS J. SWEENEY, III, ESQ.
17        Phone: (212)918-3523
18        E-mail: tjsweeney@hhlaw.com
19
20
21
22

3 (Pages 6 to 9)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 10

1   A P P E A R A N C E S (Cont'd.):
2
3       HYMAN, PHELPS & McNAMARA, P.C.
4           Attorneys for Watson
5             Pharmaceuticals, Inc.
6           700 Thirteenth Street, N.W.
7           Suite 1200
8           Washington, D.C. 20005
9       BY:   DOUGLAS B. FARQUHAR, ESQ.
10          Phone: (202)737-5600
11          E-mail: dfarquhar@hpm.com
12
13      KIRKLAND & ELLIS LLP
14          Attorneys for Boehringer and
15            Roxane
16          200 East Randolph Drive
17          Chicago, Illinois 60601
18      BY:   SETH A. GASTWIRTH, ESQ.
19          Phone: (312)861-2464
20          E-mail: sgastwirth@kirkland.com
21
22

Page 11

1   A P P E A R A N C E S (Cont'd.):
2
3       KELLEY DRYE & WARREN LLP
4           Attorneys for Dey, Inc., Dey,
5             L.P., Dey, L.P., Inc. and
6             Mylan, Inc.
7           101 Park Avenue
8           New York, New York 10178
9       BY:   MARISA A. LORENZO, ESQ.
10          Phone: (212)808-7697
11          E-mail: mlorenzo@kelleydrye.com
12
13      MORGAN, LEWIS & BOCKIUS LLP
14          Attorneys for Pfizer, Inc. and
15            Pharmacia Corp.
16          1701 Market Street
17          Philadelphia, Pennsylvania 19103
18      BY:   ABBY J. KAPLAN, ESQ.
19          Phone: (215)963-5834
20          E-mail: akaplan@morganlewis.com
21
22

Page 12

1   A P P E A R A N C E S (Cont'd.):
2
3       JONES DAY
4           Attorneys for Abbott Laboratories
5             and TAP Pharmaceuticals
6           222 East 41st Street
7           New York, New York 10017-6702
8       BY:   TONI-ANN CITERA, ESQ.
9           Phone: (212)326-8376
10          E-mail: tcitera@jonesday.com
11
12      KIRKLAND & ELLIS LLP
13          Attorneys for Teva Pharmaceuticals
14            USA, Inc., Ivax Corporation,
15            Ivax Pharmaceuticals, Inc. and
16            Sicor Inc.
17          655 Fifteenth Street, N.W.
18          Washington, D.C. 20005
19      BY:   JASON PARISH, ESQ.
20          Phone: (202)879-5066
21          E-mail: jparish@kirkland.com
22

Page 13

1   A P P E A R A N C E S (Cont'd.):
2
3       DAVIS POLK & WARDWELL
4           Attorneys for Astra Zeneca
5             Pharmaceuticals LP
6           450 Lexington Avenue
7           New York, New York 10017
8       BY:   KRISTI PRINZO, ESQ.
9           Phone: (212)450-4741
10          E-mail: kristi.prinzo@dpw.com
11
12      WHITE & CASE LLP
13          Attorneys for Sandoz Inc.
14            and TAP Pharmaceuticals
15          1155 Avenue of the Americas
16          New York, New York 10036-2787
17      BY:   KARA PAGLIARULO, ESQ.
18          Phone: (212)819-7593
19          E-mail: kpagliarulo@whitecase.com
20
21
22

4 (Pages 10 to 13)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008
New York, NY

| Page 14 | Page 16 |
|---|---|
| 1   A P P E A R A N C E S (Cont'd.): | 1   A P P E A R A N C E S (Cont'd.): |
| 2 | 2      DICKSTEIN SHAPIRO LLP |
| 3      LOCKE LORD BISSELL & LIDDELL LLP | 3        Attorneys for Baxter |
| 4        Attorneys for Schering Corp., | 4          Healthcare Corp. |
| 5          B. Braun Medical and | 5          1825 I Street, N.W. |
| 6          Warrick Pharmaceutical | 6          Washington, D.C. 20006-5403 |
| 7          2200 Ross Avenue - Suite 2200 | 7      BY:   JASON D. WALLACH, ESQ. |
| 8          Dallas, Texas 75201 | 8          Phone: (202)420-2668 |
| 9      BY:   KARIN B. TORGERSON ESQ. | 9          E-mail: wallachj@ |
| 10        Phone: (214)740-8725 | 10          dicksteinshapiro.com |
| 11        E-mail: ktorgerson@lockelord.com | 11          (Via telephone) |
| 12 | 12 |
| 13 | 13      DORNBUSH SCHAEFFER STRONGIN |
| 14      KAYE SCHOLER LLP | 14        & VENAGLIA, LLP |
| 15        Attorneys for Novartis | 15        Attorneys for Forest Pharmaceuticals |
| 16          Pharmaceuticals Corp. | 16      BY:   CYNTHIA L. EBBS, ESQ. |
| 17        425 Park Avenue | 17        Phone: (212) 759-3300 |
| 18        New York, New York 10022 | 18        E-mail: ebbs@dssvlaw.com |
| 19      BY:   SAMUEL LONERGAN, ESQ. | 19        (via telephone) |
| 20        Phone: (212)836-7591 | 20 |
| 21        E-mail: slonergan@kayescholer.com | 21   ALSO PRESENT: |
| 22 | 22        MARK BRADY - Videographer |

| Page 15 | Page 17 |
|---|---|
| 1   A P P E A R A N C E S (Cont'd.): | 1            I N D E X |
| 2 | 2   WITNESS          EXAMINATION BY      PAGE |
| 3      HUGHES, HUBBARD & REED LLP | 3   KRISTEN MINNE    Mr. Gobena        34 |
| 4        Attorneys for Merck & Co., Inc. | 4          Mr. Anderson     129 |
| 5          1775 I Street, N.W. | 5          Mr. Carroll      232 |
| 6          Washington, D.C. 20006-2401 | 6          Mr. Paul         329 |
| 7      BY:   ROBERT B. FUNKHOUSER, ESQ. | 7          Mr. Farquhar       337 |
| 8        Phone: (202)721-4780 | 8 |
| 9        E-mail: funkhous@hugheshubbard.com | 9          E X H I B I T S |
| 10        (Via telephone) | 10   FOR IDENTIFICATION              PAGE |
| 11 | 11   Exhibit Minne 001 August 5, 2008 subpoena    46 |
| 12      SONNENSCHEIN NATH & ROSENTHAL LLP | 12        and notice of deposition |
| 13        Attorneys for Ethex Corporation | 13        with attachments |
| 14        2000 McKinney Avenue - Suite 1900 | 14   Exhibit Minne 002 Revised notice of      46 |
| 15        Dallas, Texas 75201-1858 | 15        deposition |
| 16      BY:   MARGARET D. HALL, ESQ. | 16   Exhibit Minne 003 Second revised notice of   46 |
| 17        Phone: (214)259-0945 | 17        deposition |
| 18        E-mail: pdhall@Sonnenschein.com | 18   Exhibit Minne 004 Excerpts from 1990 Red    59 |
| 19        (Via telephone) | 19        Book |
| 20 | 20   Exhibit Minne 005 Excerpts from 1996 Red    72 |
| 21 | 21        Book |
| 22 | 22 |

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 18

1                E X H I B I T S
2               (Continued)
3   FOR IDENTIFICATION                    PAGE
4   Exhibit Minne 006 Document bearing Bates    83
5          Nos. HHD 812-006 through
6          812-009
7   Exhibit Minne 007 Document bearing Bates    94
8          Nos. Red Book 06983
9   Exhibit Minne 008 October 2000 product     103
10          listing verification for
11          Roxane Laboratories
12   Exhibit Minne 009 Price listing           110
13          verification for Abbott
14          Hospital Products, the
15          first page bearing Bates
16          No. Red Book 01172
17   Exhibit Minne 010 Excerpts from 2001 and   116
18          2002 Red Books
19   Exhibit Minne 011 Document bearing Bates   132
20          Nos. TH 0598 through
21          0601
22

Page 19

1                E X H I B I T S
2               (Continued)
3   FOR IDENTIFICATION                    PAGE
4   Exhibit Minne 012 Document bearing Bates    138
5          Nos. TH 0256 through
6          0262
7   Exhibit Minne 013 Document bearing Bates    143
8          No. RGX 0189707
9   Exhibit Minne 014 Document bearing Bates    153
10          Nos. RGX 0189708 through
11          0189712
12   Exhibit Minne 015 Document bearing Bates   161
13          Nos. TH 353
14   Exhibit Minne 016 PowerPoint presentation  168
15          entitled "Micromedex AQP
16          analysis, October 15th,
17          2002"
18   Exhibit Minne 017 Document bearing Bates   184
19          No. TH 463
20   Exhibit Minne 018 Document bearing Bates   187
21          Nos. TH269 through 280
22

Page 20

1                E X H I B I T S
2               (Continued)
3   FOR IDENTIFICATION                    PAGE
4   Exhibit Minne 019 Document dated July 29,    188
5          2003
6   Exhibit Minne 020 Document describing       193
7          electronic file of Red
8          Book
9   Exhibit Minne 021 Revision to AWP policy    195
10   Exhibit Minne 022 Document bearing Bates    196
11          Nos. Red Book 00595
12          through 600
13   Exhibit Minne 023 October 2000              206
14          verification forms for
15          Abbott Pharmaceuticals
16   Exhibit Minne 024 Document with first page  208
17          entitled "Abbott
18          Pharmaceutical Markup
19          History"
20
21
22

Page 21

1                E X H I B I T S
2               (Continued)
3   FOR IDENTIFICATION                    PAGE
4   Exhibit Minne 025 January 1, 1995 through    212
5          September 18, 2003
6          records of Roxane
7          pricing/markup history
8   Exhibit Minne 026 Form letter to            218
9          Abbott/Ross Data Vendor
10   Exhibit Minne 027 Price change             221
11          notification sent to Red
12          Book by Abbott
13   Exhibit Minne 028 Documentation for Abbott  223
14          Pharmaceuticals
15          verification form
16   Exhibit Minne 029 1995 price change        227
17          notification by Abbott
18          Pharmaceuticals
19   Exhibit Minne 030 1999 price change        228
20          notification by Abbott
21          Pharmaceuticals
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 22

1        E X H I B I T S
2         (Continued)
3 FOR IDENTIFICATION         PAGE
4 Exhibit Minne 031 Previously used format    229
5       of Red Book product
6       verification list
7 Exhibit Minne 032 Document bearing Bates    232
8       Nos. Red Book 04693 and
9       04694
10 Exhibit Minne 033 July 6, 2004 Bayer     237
11       Corporation product
12       listing verification
13 Exhibit Minne 034 Document bearing Bates    240
14       Nos. Red Book 07589
15       through 07597
16 Exhibit Minne 035 July 6, 2004 Ethex     232
17       Corporation product
18       listing verification
19 Exhibit Minne 036 October 11, 2002 Forest    245
20       Pharmaceuticals product
21       listing verification
22

Page 23

1        E X H I B I T S
2         (Continued)
3 FOR IDENTIFICATION         PAGE
4 Exhibit Minne 037 July 25, 2003 Fujisawa    247
5       Healthcare product
6       listing verification
7 Exhibit Minne 038 July 6, 2004 Eli Lilly &    249
8       Company product listing
9       verification
10 Exhibit Minne 039 October 1, 2001     251
11       Glaxo-Wellcome product
12       listing verification
13 Exhibit Minne 040 August 16, 2001 Roche    253
14       Laboratories product
15       listing verification
16 Exhibit Minne 041 Boehringer Ingelheim    255
17       Pharmaceuticals product
18       listing verification
19       signed August 22, 2002
20
21
22

Page 24

1        E X H I B I T S
2         (Continued)
3 FOR IDENTIFICATION         PAGE
4 Exhibit Minne 042 September 18, 2001    258
5       Bedford Laboratories
6       product listing
7       verification
8 Exhibit Minne 043 October 1, 2001 Barr    260
9       Laboratories product
10       listing verification
11 Exhibit Minne 044 October 2, 2001 Merck &    262
12       Company product listing
13       verification
14 Exhibit Minne 045 Document bearing Bates    266
15       No. Red Book 09936
16 Exhibit Minne 046 Document bearing Bates    269
17       Nos. Red Book 14957
18       through 14961
19 Exhibit Minne 047 Document bearing Bates    271
20       Nos. Red Book 13418
21       through 13426
22

Page 25

1        E X H I B I T S
2         (Continued)
3 FOR IDENTIFICATION         PAGE
4 Exhibit Minne 048 July 25h, 2003 Pfizer    274
5       USA Pharma Group product
6       listing verification
7 Exhibit Minne 049 July 25, 2003     276
8       Greenstone product
9       listing verification
10 Exhibit Minne 050 October 11, 2002     278
11       Pharmacia Corporation
12       product listing
13       verification
14 Exhibit Minne 051 Document bearing Bates    280
15       Nos. Red Book 13003 and
16       13002
17 Exhibit Minne 052 Document bearing Bates    280
18       Nos. Red Book 13199 and
19       13200
20 Exhibit Minne 053 Document bearing Bates    280
21       Nos. Red Book 13198 and
22       13197

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                     November 18, 2008
New York, NY

                                                                        Page 26
1              E X H I B I T S
2                (Continued)
3  FOR IDENTIFICATION                  PAGE
4  Exhibit Minne 054 Document bearing Bates    280
5        No. Red Book 13196
6  Exhibit Minne 055 Document bearing Bates    281
7        No. Red Book 13015
8  Exhibit Minne 056 Document bearing Bates    281
9        Nos. Red Book 13109
10       through 13113
11 Exhibit Minne 057 Document bearing Bates    281
12       Nos. Red Book 13090 and
13       13091
14 Exhibit Minne 058 Document bearing Bates    281
15       No. Red Book 13086
16 Exhibit Minne 059 Document bearing Bates    281
17       No. Red Book 13087
18 Exhibit Minne 060 September 26, 1997         283
19       Schering Corporation
20       product listing
21       verification
22

                                                                        Page 28
1              E X H I B I T S
2                (Continued)
3  FOR IDENTIFICATION                  PAGE
4  Exhibit Minne 067 July 25, 2003 Par          303
5        Pharmaceuticals product
6        listing verification
7  Exhibit Minne 068 December 6, 2005 Amgen     305
8        USA product listing
9        verification
10 Exhibit Minne 069 Document bearing Bates     308
11       Nos. Red Book 02938
12       through 02962
13 Exhibit Minne 070 Document bearing Bates     310
14       Nos. Red Book 01802
15       through 1805
16 Exhibit Minne 071 Document bearing Bates     312
17       Nos. Red Book 13581
18       through 13593
19 Exhibit Minne 072 Document bearing Bates     314
20       Nos. Red Book 02073
21       through 02095
22

                                                                        Page 27
1              E X H I B I T S
2                (Continued)
3  FOR IDENTIFICATION                  PAGE
4  Exhibit Minne 061 October 27, 2000 Warrick   286
5        Pharmaceuticals product
6        listing verification
7  Exhibit Minne 062 October 2, 2001 TAP        289
8        Pharmaceuticals product
9        listing verification
10 Exhibit Minne 063 September 24, 1999 King    291
11       Pharmaceuticals product
12       listing verification
13 Exhibit Minne 064 July 25, 2003 Monarch      293
14       Pharmaceuticals product
15       listing verification
16 Exhibit Minne 065 Document bearing Bates     298
17       Nos. Red Book 11649
18       through 11673
19 Exhibit Minne 066 October 24, 2001 ESI       301
20       Lederle product listing
21       verification
22

                                                                        Page 29
1              E X H I B I T S
2                (Continued)
3  FOR IDENTIFICATION                  PAGE
4  Exhibit Minne 073 Document bearing Bates     317
5        Nos. Red Book 10863,
6        10868, 10876, 10877,
7        10878
8  Exhibit Minne 074 Document bearing Bates     320
9        Nos. Red Book 11421,
10       11432, 11436, 11439
11 Exhibit Minne 075 Document bearing Bates     323
12       Nos. Red Book 15827,
13       15838, 15839, 15841
14 Exhibit Minne 076 Document bearing Bates     325
15       Nos. Red Book 09294,
16       09302, 09306, 09329
17 Exhibit Minne 077 Document bearing Bates     329
18       Nos. California Mylan
19       03471964 through
20       03472033
21 Exhibit Minne 078 Document bearing Bates     340
22       No. WATMA 005202

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 30

1        E X H I B I T S
2          (Continued)
3   FOR IDENTIFICATION                    PAGE
4   Exhibit Minne 079 Document bearing Bates   342
5          Nos. RB00803 through
6          00874
7   Exhibit Minne 080 Document bearing Bates   346
8          No. WATED 021725
9   Exhibit Minne 081 August 30, 2000 letter   353
10         from Watson Pharma
11         Incorporated to Linda
12         Panke, with attachment
13
14      REQUEST FOR PRODUCTION
15         PAGE    LINE
16          350     9
17
18
19
20
21
22

Page 31

1        S T I P U L A T I O N S
2
3        IT IS HEREBY STIPULATED AND AGREED
4   by and among counsel for the respective
5   parties hereto, that the filing, sealing
6   and certification of the within
7   deposition shall be and the same are
8   hereby waived;
9        IT IS FURTHER STIPULATED AND
10  AGREED that all objections, except as to
11  the form of the question, shall be
12  reserved to the time of the trial.
13       IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may be
15  signed and sworn to before any officer
16  authorized to administer an oath with
17  the same force and effect as if signed
18  and sworn to before the Court.
19
20
21
22

Page 32

1        THE VIDEOGRAPHER:  We're on the
2   record.
3        The time is 9:10 on November 18th,
4   2008.  This is the case of the U.S. District
5   Court for the District of Massachusetts, and the
6   case is In Re:  Pharmaceutical Industry Average
7   Wholesale Price Litigation, and the case numbers
8   are MDL 1456 and CV 01-12257-PBS.  And today's
9   witness is Kris -- Kristin Minne.
10       At this time counsel will identify
11  themselves.
12       MR. GOBENA:  Gejaa Gobena, United
13  States Department of Justice, on behalf of the
14  United States.
15       MR. CAHILL:  I'm Thomas Cahill, from
16  Satterlee Stephens.  We represent the corporate
17  witness here today.
18       MS. ROSENSTOCK:  Joan Rosenstock,
19  Satterlee Stephens, also representing the
20  corporate witness.
21       MR. GASTWIRTH:  Seth Gastwirth, from
22  Kirkland & Ellis, representing Roxane and

Page 33

1   Boehringer defendants.
2        MS. LORENZO:  Marisa Lorenzo, from
3   Kelley Drye & Warren, representing the Dey
4   defendants and Mylan Incorporated.
5        MR. SWEENEY:  Tom Sweeney, from Hogan &
6   Hartson, representing Bristol-Myers Squibb.
7        MS. KAPLAN:  Good morning, I'm Abby
8   Kaplan from Morgan Lewis, representing Pfizer and
9   Pharmacia.
10       MR. LONERGAN:  Sam Lonergan, with Kaye
11  Scholer, Novartis Pharmaceuticals Corporation.
12       MS. TORGERSON:  Karin Torgerson, with
13  Locke Lord Bissell & Liddell, for Warrick,
14  Schering and B. Braun.
15       MS. CITERA:  Toni-Ann Citera, from
16  Jones Day, representing Abbott Laboratories and
17  TAP Pharmaceutical.
18       MR. PAUL:  Nicholas Paul, the
19  California Department of Justice, for California.
20       MR. CARROLL:  James Carroll, Kirby
21  McInerney, on behalf of the City of New York and
22  various New York counties and the State of Iowa.

9 (Pages 30 to 33)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

Page 34

1       MR. ANDERSON:  Jarrett Anderson,
2   counsel for Ven-A-Care.
3       MR. PARISH:  Jason Parish, Kirkland &
4   Ellis, for Teva, Ivax and Sicor.
5       MS. PAGLIARULO:  Kara Pagliarulo, of
6   White & Case, representing Sandoz Inc.
7       THE VIDEOGRAPHER:  At this time I'll
8   have the court reporter swear in the witness.
9       We didn't identify the person on the
10  phone.
11      THE COURT REPORTER:  Miss Hall, could
12  you please state your appearance for the record?
13      MS. HALL:  Sure.  It's Peg Hall, with
14  Sonnenschein Nath & Rosenthal, for Ethex
15  Corporation.
16      K R I S T E N   M I N N E, having been
17  first duly sworn by the Notary Public (Helen
18  Mitchell), was examined and testified as follows:
19          EXAMINATION
20  BY MR. GOBENA:
21      Q.  Good morning, Miss Minne.
22      A.  Good morning.

Page 35

1       Q.  As I mentioned earlier, my name's
2   Gejaa Gobena, I'm an attorney with the Department
3   of Justice.  And you're here this morning in a
4   connection of variety of cases, one of which --
5   or three of which actually being cases involving
6   the United States having sued several
7   pharmaceutical companies, and you've been also
8   presented here as a 30(b)(6) witness or designee
9   on behalf of Thomson.
10      You understand that; correct?
11      A.  Yes, I do.
12      Q.  Have you ever been deposed before?
13      A.  No, I have not.
14      MR. CAHILL:  Mr. Gobena, if I can just
15  state for the record, as we'd discussed before,
16  that we'd like to deem the transcript of this
17  deposition confidential to the extent provided
18  for in the governing protective order in the
19  case.
20      MR. GOBENA:  Understood.
21      Q.  So you have not been deposed before?
22      A.  No.

Page 36

1       Q.  Let me go over a couple of ground
2   rules.
3       It's relatively a straightforward
4   process, but there's a few things you probably
5   should keep in mind, one of which is that we have
6   a court reporter here who's taking down all your
7   testimony.  And it's important that we do two
8   things:  One is to give sort of affirmative
9   verbal answers to questions.  Head nods don't
10  come across on the transcript, "uh-huh" is a very
11  ambiguous term, so if you could sort of state
12  something affirmatively, that would be helpful to
13  the court reporter and all of us who are going to
14  be looking at this transcript down the road.
15      Another thing is we should both try not
16  to talk each over other.  It's a tendency people
17  have to anticipate a question's going and
18  wanting to answer it quickly, and -- and
19  sometimes there's a tendency on the part of the
20  questioner to interrupt the witness, and so we'll
21  both try and hopefully work on that so we don't
22  talk over each other and garble up the

Page 37

1   transcript.
2       And then the other thing to keep in
3   mind is that from time to time you'll hear
4   various objections, either lodged by your counsel
5   or by various other parties in the room today.
6   Unless you're instructed by your counsel not to
7   answer the question, you're supposed to answer
8   the question.  So just keep that in mind as we're
9   going through the deposition today.
10      First of all, why don't you again state
11  your name for the record for us.
12      A.  My name is Kristen Minne.
13      Q.  And Miss Minne, where are you
14  employed?
15      A.  I'm employed at Thomson Reuters.
16      Q.  And how long have you been employed at
17  Thomson Reuters?
18      A.  Since 1997.
19      Q.  And what's your current job title?
20      A.  My current job title is senior
21  manager.
22      Q.  What are your job responsibilities?

10  (Pages 34 to 37)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 38

1     A.  I oversee the day-to-day operations of
2  the editorial department at Thomson Reuters, the
3  healthcare division of Thomson Reuters.
4         MR. GOBENA:  Did someone just join the
5  call?
6         If you have, if you could identify
7  yourself for the record, that would be great.
8         Miss Hall, are you still there?
9         MS. HALL:  Yes, I am.
10        MR. GOBENA:  There's no one else.
11    Q.  Sorry.  So you're now -- you're a
12  senior manager overseeing the editorial
13  department of the healthcare division of Thomson
14  Reuters; is that correct?
15    A.  Correct.
16    Q.   And what publications are you
17  responsible for overseeing?
18    A.  Currently I'm overseeing the drug
19  decs, drug points, drug consults publications, so
20  basically the drug information.
21    Q.   And how long have you been a senior
22  manager overseeing these particular publications

Page 39

1  at Thomson Reuters?
2    A.  Since April of this year.
3    Q.  And before April of this year, what
4  was your job title?
5    A.  Prior to April of this year, my job
6  title was manager of the Red Book database.
7    Q.  And what did your job responsibilities
8  entail as the manager of the Red Book database?
9    A.  I oversaw the staff that was in charge
10  of collecting the information for Red Book, as
11  well as inputting the information for the Red
12  Book.
13    Q.   And how long did you hold that title
14  as the manager of the Red Book database?
15    A.  I had that title from 2002 until 2004,
16  and then again from 2006 to -- until April of
17  this year.
18    Q.  What did you do in that two-year gap
19  between 2004 and 2006?
20    A.  I was still a manager over what we
21  call the integrated content.  So I did not at
22  that time have direct responsibility for any of

Page 40

1  the Red Book content.
2    Q.   What's the difference between being
3  the manager of integrated content versus being
4  manager for the Red Book database?
5    A.  The integrated content is the content
6  that's used for screening, for DUR screening in a
7  pharmacy system, such as drug interactions, drug
8  allergy screening.
9    Q.  So it's clinical information?
10    A.  Yes, clinical information.
11    Q.   And in your position in 2002 to 2004
12  as the manager for the Red Book database, were
13  you not involved in the collection or publication
14  of clinical information?
15    A.  No, I was only involved in the
16  collection of the information for the Red Book.
17    Q.  And the Red Book -- what kind of
18  information is published in the Red Book, just
19  generally?
20    A.  Generally, NDCs, you know, drug names,
21  manufacturer names, prices, package sizes.
22    Q.  Prices?

Page 41

1    A.  Prices, yes.  Physical characteristics
2  of that product, therapeutic classifications of
3  that product.
4    Q.  So there's a separation -- in other
5  words, Red Book doesn't really publish
6  clinical-type information; is that correct?
7    A.  Correct.
8    Q.  We'll get into a little bit more
9  detail about what is published in the Red Book
10  over the course of the day.
11        And prior to 2002, when you became the
12  manager for sort of those two different times of
13  the Red Book database, what were your job
14  responsibilities at Thomson?
15    A.  From 2000 to 2002 I was a manager,
16  again over the -- what I call the integrated
17  content, the clinical content.  And from my start
18  of my employment in '97 until the year 2000, when
19  I became a manager, I was what we call an
20  individual contributor.  My job title was
21  actually an editor, and I wrote the clinical
22  information.

11 (Pages 38 to 41)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 42

1    Q.  I want to ask you, what did you do to
2  prepare for your testimony today?  Did you review
3  any documents, talk to any people?  What did you
4  do?
5    A.  I reviewed documents that have been
6  made available for this deposition, and met with
7  Tom yesterday.
8    Q.  And I'm not interested in your
9  conversations with Mr. Cahill, but did you have
10  any conversations with people other than counsel
11  in preparation for this deposition today?
12    A.  I had some conversations with people
13  back at the Thomson Reuters office, in the legal
14  department, regarding this deposition.
15    Q.  So these were lawyers?
16    A.  Correct.
17    Q.  You didn't talk to any non-lawyers at
18  Thomson to help you prepare for your deposition
19  today?
20    A.  No, I did not.
21    Q.  You mentioned that you reviewed some
22  documents.  Do you recall generally what types of

Page 43

1  documents you reviewed?
2    A.  Generally documents on Red Book, page
3  matter, front matter, pricing sheets that we had
4  received from various manufacturers.
5    Q.  Did you review any internal e-mails or
6  internal documents?
7    A.  Yes, internal e-mails, internal
8  presentations.
9    MR. CAHILL:  I should state for the
10  record that the materials she reviewed were
11  materials that were produced by Thomson in
12  connection with this litigation.
13    MR. GOBENA:  Okay.
14    Q.  Let me make it simpler, then.
15    Did you have a chance to review all the
16  materials that were produced by Thomson or was it
17  a selection of materials you reviewed?
18    MR. CAHILL:  I would just clarify with
19  respect to materials produced by Thomson,
20  Thomson's produced hundreds of boxes of documents
21  because the manufacturer files were made
22  available --

Page 44

1    MR. GOBENA:  Right, understood.
2    MR. CAHILL:  -- so she wouldn't have
3  reviewed those, and Thomson's also produced
4  documents that relate to certain particular drugs
5  in certain particular litigations, and she
6  wouldn't have -- we wouldn't have made those
7  documents available, you know, as part of the
8  preparation as well.
9    MR. GOBENA:  Understood.  Okay, thank
10  you, Mr. Cahill, appreciate that.
11    Q.  We'll go over specific documents, and
12  either you will have reviewed them or not have,
13  during the course of the deposition.
14    I'm going to start first by introducing
15  a few exhibits here.
16    MR. GOBENA:  Unfortunately, I didn't
17  realize we were going to be this large a cast of
18  characters here so I don't have tons of copies
19  for everyone. I do have a couple extra copies
20  here. And the first three exhibits are going to
21  be the United States' notice of deposition and
22  the subpoena that we issued, and the other

Page 45

1  exhibits are -- we're not really going to spend
2  much time on them but they're basically the
3  revised notices that set the new date for the
4  deposition, so -- I'd like to have the court
5  reporter mark this as --
6    MR. CAHILL:  And, Mr. Gobena, I should
7  interject, there is one additional document that
8  I believe that the witness reviewed in preparing
9  for the deposition that wasn't produced, and
10  that's the 1990 version of the Red Book, and
11  we've made copies with excerpts.
12    MR. GOBENA:  Right.
13    MR. CAHILL:  So I just note, maybe at a
14  break we can address that.
15    MR. GOBENA:  Understood.  Probably at
16  the first break, it makes sense to do it then.
17    And here is Exhibit 2.  Exhibit 2 is
18  the revised notice of deposition, which was
19  issued subsequent to the first notice, and then
20  the third exhibit's just going to be the
21  subsequent revised notice, which is the operative
22  one in some respects that got us here today.

12 (Pages 42 to 45)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 46

1  That's going to be Exhibit 3.
2       (August 5, 2008 subpoena and notice of
3  deposition with attachments marked Exhibit Minne
4  001 for identification.)
5       (Revised notice of deposition marked
6  Exhibit Minne 002 for identification.)
7       (Second revised notice of deposition
8  marked Exhibit Minne 003 for identification.)
9       Q.  Miss Minne, I'm going to ask you to
10 sort of quickly look through them and see if you
11 recognize the documents that are before you.
12      A.  I have seen Exhibit 1.
13      Q.  Actually, we're going to focus on
14 Exhibit 1 anyway, so why don't you hold off on
15 looking at the other two right now.
16      I want to turn your attention -- and
17 Exhibit 1, of course, is the original notice that
18 we issued here in the subpoena as well, and I'm
19 going to spend most of my time right now on a
20 couple of exhibits.  It's Exhibit A and Exhibit B
21 to the subpoena.
22      I want to first direct your attention

Page 47

1  to Exhibit A.  Have you reviewed Exhibit A to the
2  August 5th, 2008 subpoena issued by the United
3  States?
4       A.  I have reviewed it, yes.
5       Q.  And you'll see there that there are
6  seven areas of inquiry identified.
7       A.  (Nodding)
8       Q.  Let's look at the first area of
9  inquiry, which reads the area of inquiry is going
10 to be "Thomson PDR Inc.'s search for and
11 production of documents in response to the
12 subpoena duces tecum issued on behalf of the
13 plaintiff United States of America on or about
14 August 5th, 2008."
15      Miss Minne, are you prepared to testify
16 about Thomson's PDR Inc.'s search and -- for and
17 production of documents in response to the
18 subpoena duces tecum issued by the United States
19 on August 5th, 2008?
20      A.  Yes.
21      Q.  And what did you do to prepare
22 yourself to testify on -- about the topic number

Page 48

1  one?
2       A.  I performed a search of both my
3  printed files and e-mail records, looking for
4  information related to this deposition.
5       Q.  Let's spend a little time on this
6  topic.
7       Do you know -- you mentioned what you
8  just did.  Were other people involved in the
9  search and collection efforts in response to the
10 August 5th subpoena?
11      A.  Yes.
12      Q.  Do you know who was involved in the
13 search?
14      A.  I asked the existing manager of the
15 Red Book database to also search for any
16 information she might have.
17      Q.  And who was the existing manager of
18 the Red Book database?
19      A.  Her name is Deborah Siegfried.
20      Q.  And does Miss Siegfried report to you
21 as --
22      A.  She does not now.  She did in the

Page 49

1  past.
2       Q.  At some point in your current position
3  as senior manager did you have responsibility for
4  the Red Book and then lose it?  Or why does she
5  no longer report to you?
6       MR. GASTWIRTH:  Objection to form.
7       MR. GOBENA:  You could answer.
8       A.  We did a reorganization and she was
9  moved under a different senior manager.
10      MR. SWEENEY:  Can we have a stipulation
11 that if one defendant objects that would cover
12 all defendants?
13      MR. GOBENA:  Yes.
14      MR. SWEENEY:  All plaintiffs' counsel
15 agree to that?
16      MR. ANDERSON:  Yes.
17      MR. CARROLL:  Yes.
18      Q.  And under which senior manager -- you
19 mentioned she's working for another senior
20 manager.  Which senior manager is she reporting
21 to now?
22      A.  Her senior manager's name is Joanne

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 50

1  Brownhill.
2      Q.   And what are Miss Brownhill's
3  responsibilities, to the extent you know?
4      A.   They are very similar to mine except
5  that she oversees different content areas.
6      Q.   What's the different content areas
7  that Miss Brownfeld --
8      A.   Brownhill.
9      Q.   -- that Miss Brownhill oversees?
10     A.   She oversees the toxicology content
11  and the Red Book content now, as well as library
12  services.
13     Q.   Would you just state one more time
14  what content you oversee again?
15     A.   It is the drug information content.
16     Q.   Okay.
17         So Miss Siegfried did a search.  Were
18  there any other people involved in searching and
19  collecting documents in response to the August
20  5th subpoena?
21     A.   I did not ask anyone else to.  I -- it
22  is my understanding that our legal department had

Page 51

1  other people searching as well.
2      Q.   But you don't know who those people
3  are?
4      A.   No, I...
5      Q.   But it's your understanding that aside
6  from you, folks in the legal department at
7  Thomson Reuters had asked additional people to
8  collect documents?
9      A.   Correct.
10     Q.   What do you base that understanding
11  on?  I want to be careful not to get into your
12  privileged conversations, but if it involves you
13  revealing privileged conversations, you don't
14  have to answer it -- okay.
15     A.   (Nodding)
16     Q.   I take it by your nod that's how you
17  found out?
18     A.   The reason I say I believe other
19  people were searching is because I did see
20  e-mails from people who are no longer employed at
21  Thomson, so it is my assumption that the legal
22  department somehow came up with that

Page 52

1  documentation.
2      Q.   So -- you mentioned e-mails.  I want
3  to go through this kind of systematically.
4          Were there paper, hard copies of
5  documents that were collected during the search
6  and collection efforts in response to the
7  subpoena?
8      A.   My understanding is yes.
9      Q.   Do you know whose paper documents were
10  searched in order to respond to the August 5th
11  subpoena?
12     A.   Lauri Moore, who was the director of
13  drug information at the time, which was a manager
14  of Red Book.  And she is no longer employed at
15  Thomson Reuters.
16     Q.   Do you know where she is -- she's
17  currently employed?
18     A.   Yes.
19     Q.   And where is that?
20     A.   At MediSpan.
21     Q.   Small world.
22     A.   Yeah, it sure is.

Page 53

1      Q.   And other than Miss Moore's files, do
2  you know of any other person's hard paper files
3  that were searched?
4      A.   I do not know.
5      Q.   Did you look through your own paper
6  files?
7      A.   Yes, I did.
8      Q.   How about, do you know whether Miss
9  Siegfried's, you know, paper hard copy files were
10  searched as well?
11     A.   I asked her to search them.  I can
12  only assume she did.
13     Q.   But other than the people we've
14  discussed, you don't have any knowledge of other
15  people's hard copy files that were searched?
16     A.   No, I don't.
17     Q.   How about electronic files, do you
18  know whether an electronic file search was
19  conducted in response to the subpoena?
20     A.   I do not know.  Again, it's my
21  assumption that legal would have performed some
22  type of electronic search for people who are no

14  (Pages 50 to 53)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

Page 54

1  longer there, but I don't have knowledge of that.
2      Q.   Were you asked personally to go
3  through your e-mails and your computer hard drive
4  to see if there were documents responsive to the
5  August 5th subpoena?
6      A.   Not responsive to the August 5th
7  subpoena.
8      Q.   So have you been asked previously to
9  look at your e-mail and computer hard drive for
10  documents responsive to a subpoena?
11     A.   Yes.
12     Q.   And do you recall what that subpoena
13  was?
14     A.   Um --
15         MR. CAHILL:  If you recall.
16     A.   It was when another Thomson employee
17  came out here for a deposition.
18     Q.   Do you recall who that Thomson
19  employee was?
20     A.   Gail Luka.
21     Q.   And she gave a deposition.  Do you
22  know in what case?

Page 55

1      A.   I do not know.
2      Q.   Do you recall approximately when --
3         MR. CAHILL:  If it's helpful, I could
4  state for the record, Gail Luka gave a deposition
5  authenticating documents and Jeff Archibald was
6  the attorney who took the deposition.  So Thomson
7  had already produced somebody to authenticate
8  documents.  I think those documents -- the chief
9  inquiry was the manufacturer file.
10     Q.   Why don't we look at area of inquiry
11  number two in Exhibit A to the notice and
12  subpoena.  You're going to be asked today to
13  testify "From January 1, 1990 to the present
14  about the business practices concerning the
15  procedure or means by which Thomson PDR Inc.
16  determined the content, including prices
17  published, whether by print or electronically,
18  and Thomson PDR's Red Book and Red Book Update in
19  published form, including all updates of related
20  database versions."
21     Are you prepared to testify on that
22  area of inquiry?

Page 56

1      A.   Yes, I am.
2      Q.   What did you do to prepare yourself to
3  testify about this particular area of inquiry?
4      A.   I didn't do anything particular except
5  that -- my years of tenure as manager over the
6  content.
7      Q.   And during your years of tenure as a
8  manager of the content of Red Book database, did
9  you accumulate knowledge of what was done in
10  terms of the publication of the Red Book prior to
11  your tenure?  In other words, this request asks
12  for going back to 1990.  Did you develop a
13  historical knowledge based on your tenure?
14     A.   Yes, I did.
15     Q.   Topic number three, "From January 1,
16  1990 to the present, the business practices
17  concerning the procedure or means used by Thomson
18  PDR Inc. to solicit, gather, verify or confirm
19  pricing information from manufacturers for use in
20  determining the contents (including prices)
21  published, whether by print or electronically, in
22  Thomson PDR Inc.'s Red Book and Red Book Update

Page 57

1  in published form, including all updates and
2  related database versions."  That was a mouthful.
3     Are you prepared to provide testimony
4  on that area of inquiry?
5      A.   Yes, I am.
6      Q.   And what did you do to prepare to
7  provide testimony on that particular area of
8  inquiry?
9      A.   Again, just my tenure as a manager of
10  that content.
11     Q.   And just to confirm, during your
12  tenure you were able to acquire some historical
13  knowledge that allows you to testify about
14  practices that predate your tenure as manager?
15     A.   (Nodding)
16         MR. GASTWIRTH:  Objection to form.
17         MR. GOBENA:  You could answer.
18     A.   Yes.
19     Q.   And topic number four -- let me ask
20  you -- let's make it easier.
21     Are there any of the areas of inquiry
22  that you're not prepared to testify about today?

New York, NY

Page 58

1      A.  No.
2      Q.  And aside from your time as a manager
3  of the Red Book database, were there -- is there
4  any other sources of information that you're
5  going to be using to testify about any of the
6  other four topics that we haven't covered
7  specifically?
8      A.  No.
9      Q.  Let me ask, other than the subpoena
10  issued by the United States on August 5th, 2008,
11  are you aware of any other subpoenas that have
12  been issued to Thomson Reuters related to drug
13  pricing matters?
14      A.  Just the one mentioned previously that
15  Gail Luka was involved with.
16      Q.  So you're not aware of any other
17  subpoenas that might have been issued to Thomson
18  Reuters or --
19      A.  No.
20          MR. GOBENA:  Why don't we go off the
21  record now.
22          MR. CAHILL:  Sure.

Page 59

1          THE VIDEOGRAPHER:  This is the
2  videographer.  Off the record at 9:35.
3          (Recess taken)
4          MR. GOBENA:  Mark this Exhibit 4.
5          (Excerpts from 1990 Red Book marked
6  Exhibit Minne 004 for identification.)
7          THE VIDEOGRAPHER:  This is the
8  videographer.  Back on the record, 9:38.
9  BY MR. GOBENA:
10      Q.  We've had -- I just asked the court
11  reporter while we were off the record to mark
12  Exhibit 4, a copy of this 1990 Red Book.  And
13  before we even get to the substance of the
14  exhibit, why don't you explain for the record,
15  what exactly is the Red Book?
16      A.  The Red Book is a compilation of
17  pharmaceuticals, both prescription and
18  non-prescription drugs, also some
19  healthcare-related items, including their
20  identifier, which can be an NDC, UPC, HRI,
21  manufacturer, the price associated with that
22  product, package size, again, physical

Page 60

1  characteristics are sometimes displayed, Orange
2  Book codes, which are equivalency codes.
3      Q.  And how long has the Red Book been
4  published for, to your knowledge?
5      A.  To my understanding, historically it
6  goes back to 1890s.
7      Q.  And so going back as far as the 1890s,
8  was the same type of information published, or
9  how --
10      A.  I --
11      Q.  I'm asking you, to the best of your
12  knowledge, for a sense of how it's evolved over
13  time.
14      A.  I do not know what it was in the
15  beginning years.
16      Q.  How far back does your historical
17  knowledge go in terms of what was actually
18  published inside the Red Book?
19      A.  Probably to the mid-'80s, when I used
20  it as a pharmacy student, was my first exposure.
21      Q.  I probably should have gone over your
22  background a little bit further earlier.

Page 61

1          You said you were a pharmacy student.
2  Are you a pharmacist?
3      A.  Yes, I'm a licensed pharmacist.
4      Q.  And just to get the record clear, when
5  did you get your pharmacy license?
6      A.  In 1988.
7      Q.  You mentioned that in the mid-'80s as
8  a pharmacy student you first became aware of the
9  Red Book.  In what capacity did you use it?
10      A.  In the capacity of working in a
11  hospital and looking for available strengths.  I
12  did not use the pricing data since in a hospital
13  setting you're not concerned with the pricing
14  data, but just looking to see what other
15  strengths were available when trying to fill an
16  order that, you know, we didn't have in stock.
17      Q.  But in the mid-'80s, when you first
18  became aware of the Red Book, there was pricing
19  data that was published in there, to the best of
20  your recollection?
21      A.  Honestly, I don't recall, because that
22  was not what I was using the publication for.

16 (Pages 58 to 61)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 62

1    Q.  So you said you worked in the hospital
2  setting as a student.  When you graduated, did
3  you continue to work in the hospital setting, or
4  did you go somewhere else?
5    A.  I continued in the hospital setting.
6    Q.  And -- and where -- when you
7  graduated, what hospital were you working at as a
8  pharmacist?
9    A.  My first place of employment was
10 Rochester Methodist Hospital, in Rochester,
11 Minnesota, which is part of the Mayo medical
12 system.
13    Q.  And you were working there starting in
14 1988?
15    A.  Correct.
16    Q.  And where did you -- how long did you
17 work at the Rochester Medical Center?
18    A.  I worked there until 1990.
19    Q.  And where did you go after that?
20    A.  I worked at St. Mary's Hospital, also
21 in Rochester, and also part of the Mayo Medical
22 Center.

Page 63

1    Q.  And were you working there in the
2  hospital context as well, or were you working
3  outpatient?  Where were you working?
4    A.  Inpatient pharmacy in both.
5    Q.  And after -- and how long did you work
6  at St. Mary's?
7    A.  I worked there until 1991.
8    Q.  And where did you go after that?
9    A.  Then I went to Rose Medical Center in
10 Denver.
11    Q.  Let me just backtrack to St. Mary's.
12       In that context, did you at any point
13 start to become aware of any of the pricing
14 information in Red Book, or was it still not
15 important to you?
16    A.  Not important to me.
17    Q.  So you went to the Rose Medical Center
18 in Denver, and, again, were you working in an
19 inpatient capacity?
20    A.  Yes, I was.
21    Q.  So I take it you continued to be
22 uninterested in the pricing component of the Red

Page 64

1  Book at that stage?
2    A.  Correct.
3    Q.  And how long did you work at the Rose
4  Medical Center?
5    A.  I worked there until 1997.
6    Q.  And that's when you went to Red Book?
7  I'm sorry, not Red Book, Thomson Reuters.
8    A.  Right, correct.
9    Q.  And if I understood your testimony
10 earlier correctly, your first direct work on Red
11 Book in a pricing context was in 2002; is that
12 correct?
13    A.  Correct.
14    Q.  So prior to 2002 did you have any kind
15 of knowledge or awareness of the pricing
16 information that was being published in the Red
17 Book?
18    A.  No.
19    Q.  Just to clarify, though, in the
20 mid-1980s, when you first got exposed to Red
21 Book, you knew -- there was pricing information
22 published, you just didn't pay attention to it;

Page 65

1  is that an accurate reflect of your testimony;
2  earlier?
3    A.  I --
4       MR. GASTWIRTH:  Objection to form.
5    A.  I honestly don't know there was
6  pricing.  I'm assuming there was, but, yeah,
7  that's not what I was using the publication for.
8    Q.  And let me just sort of go
9  historically and clarify who exactly it was that
10 published the Red Book.
11       The Red Book is now a publication
12 that's published at least on a macro level by
13 Thomson Reuters; is that correct?
14    A.  Correct.
15    Q.  Is it published by a particular unit
16 within Thomson Reuters?
17    A.  The healthcare division.
18    Q.  And has Thomson Reuters always been
19 the entity that published the Red Book?
20       MR. CAHILL:  Or a predecessor?
21       MR. GOBENA:  Or a predecessor, yeah.
22    A.  Originally it was Medical Economics,

17 (Pages 62 to 65)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 66

1  and at some point Thomson purchased Medical
2  Economics.  I don't know when that was.
3      Q.  And I've also seen an entity
4  identified as Micromedex as well.
5          What's Micromedex?
6      A.  Micromedex is a company in Denver that
7  was started in the mid-'70s, and then Thomson at
8  some point in the '90s came in and bought
9  Micromedex.
10     Q.  Do you know when Thomson purchased
11 Micromedex?
12     A.  I believe it was the early '90s. I
13 know it was prior to my employment there.
14     Q.  And do you know when Thomson acquired
15 Medical Economics?
16     A.  I do not know.
17     Q.  That predated your employment as well?
18     A.  Either predated my employment or
19 predated my understanding of the larger Thomson
20 corporation at that point.
21     Q.  Do you know whether there is any kind
22 of relationship between Micromedex and Medical

Page 67

1  Economics?
2      A.  Other than they were both owned by
3  Thomson, no.
4      Q.  Okay, why don't we take a look at
5  Exhibit 4, which is this 1990 Red Book.  Well,
6  it's the cover page -- one of the cover pages
7  from the Red Book and some excerpts.  And I'm
8  actually going to be using excerpts of the Red
9  Book as well today when I go through other Red
10 Books, you know, and I'll represent to you that
11 at least the Red Books that I -- the excerpts
12 that I've provided, we verified that they match
13 up with the years and everything, so they're
14 accurate.
15         And let's take a look at this version
16 of the 1990 Red Book.
17         Take a look at the last page of the
18 exhibit that printed out here.  And let me ask
19 you first, have you seen the 1990 Red Book prior
20 to your deposition today?
21     A.  No.
22         MR. GASTWIRTH:  And I'll object to

Page 68

1  form, too, that to the extent that during your
2  colloquy before the question you referred to the
3  Red Book being accurate.
4          MR. GOBENA:  Okay.
5      Q.  Sorry, I missed the answer to your
6  question.
7          MR. CAHILL:  Is the question before
8  today --
9          MR. GOBENA:  Yeah.
10         MR. CAHILL:  -- or before yesterday?
11         MR. GOBENA:  It was before today,
12 actually.
13     A.  Yesterday was when I first saw the
14 1990 Red Book.
15     Q.  Prior to yesterday, did you review any
16 other Red Books in preparation for your testimony
17 today?
18     A.  No.
19     Q.  Just in the normal course of your work
20 as the manager of sort of overseeing the Red
21 Book, broken up -- is it a four or six-year
22 period?

Page 69

1      A.  Four.
2      Q.  Four, okay.
3          Yeah, the four-year period, had you had
4  an opportunity to look at historical Red Books?
5      A.  No.
6      Q.  I want to turn your attention to sort
7  of an entry here on the right side of Exhibit 4,
8  page -- it's on page 479 of the exhibit, last
9  page.  There's a box in there, and it discusses
10 -- it mentions average wholesale prices.
11         Do you see that?
12     A.  Yes, I do.
13     Q.  And the box reads, "This average
14 wholesale price (AWP) reported is the result of
15 prices independently obtained from a
16 representative group of wholesalers located in
17 different areas of the country and then averaged
18 by the Red Book's editorial staff."
19         Do you see that there?
20     A.  Yes, I do.
21     Q.  Is this entry here in this 1990 Red
22 Book an accurate reflection of what the editorial

18 (Pages 66 to 69)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 70

1  policy of Red Book was with respect to average
2  wholesale pricing in 1990?
3          MR. SWEENEY:  Object to the form.
4      A.  I do not have knowledge of what the
5  policy was in 1990.
6      Q.  How far back does your knowledge of
7  Red Book's editorial policy with respect to the
8  reporting and AWP go?
9      A.  The Denver office took over Red Book
10 in 2002, so at that point is when I received the
11 -- any historical information that I have.
12     Q.  So you can't testify today whether
13 this excerpt in the 1990 Red Book reflected the
14 actual editorial policy at the time?
15     A.  I cannot verify that.
16         MR. GOBENA:  I'm going to have marked
17 as Exhibit 5 some excerpts -- not the whole thing
18 -- some excerpts of the 1996 Red Book, but before
19 I get to that, let's go back to Exhibit 4.
20     Q.  Does that statement of AWP editorial
21 policy -- is it consistent with any understanding
22 you've ever had at any time of Red Book's AWP

Page 71

1  policy?
2          MR. GASTWIRTH:  Objection to form.
3          MR. SWEENEY:  Objection to form.
4      A.  Not prior -- yesterday was the first
5  time I had any knowledge of this definition of
6  how they obtained AWP.
7      Q.  In 1990?
8      A.  In 1990.
9      Q.  I'm asking you, though, based on your
10 historical knowledge, is that -- that description
11 of AWP editorial policy from 1990 consistent with
12 any AWP editorial policy that Red Book's had
13 during your tenure?
14         MR. GASTWIRTH:  Objection to form.
15     A.  No.
16     Q.  And we'll get to what that AW policy
17 was for Red Book in due time.
18         MR. GOBENA:  Let's have this marked as
19 Exhibit 5.
20         MR. FARQUHAR:  I'm sorry, what year is
21 that?
22         MR. GOBENA:  1996.

Page 72

1          MR. GASTWIRTH:  This is all the copies
2  you have?
3          MR. GOBENA:  Yes.  I didn't anticipate
4  all these people.
5          (Excerpts from 1996 Red Book marked
6  Exhibit Minne 005 for identification.)
7      Q.  And just to shorten the amount of time
8  it will take to look through this, I'm going to
9  ask you about the key to product listing, which
10 is the fourth page of this exhibit, in particular
11 -- you can read the whole page if you want, but
12 I'm going to ask you about sort of the section
13 that reads "How to read the listings."
14         So if you could just take a moment to
15 look at that.  And again, if you want to look at
16 the whole page you're welcome to, if you want to
17 look at the whole exhibit you're welcome to, but
18 it probably will just be a waste of time. So just
19 let me know when you're ready.
20         MR. GASTWIRTH:  And I'll just state on
21 the record that this appears to be a copy of a
22 Red Book that -- perhaps that wasn't published as

Page 73

1  a result of this case.
2          MR. ANDERSON:  By "published," you mean
3  produced?
4          MR. GASTWIRTH:  Wasn't produced in
5  connection with this case.
6          Do we have a Bates labeled version of
7  this?
8          MR. GOBENA:  I don't, no.
9          MR. SWEENEY:  Can you tell us where you
10 got it?
11         MR. GOBENA:  I think, actually, the
12 government had copies of Red Books.
13         MR. SWEENEY:  So it's from the
14 government's files?
15         MR. GOBENA:  Yeah, but I'm -- are you
16 saying that you've never had a Red Book produced
17 -- copies in litigation? If not, in the
18 government case anyways, we can remedy that.
19         MR. ANDERSON:  I believe Ven-A-Care has
20 made their Red Books available for inspection
21 over the years. I also believe that every drug
22 company in this room has copies of Red Books, so

19 (Pages 70 to 73)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                     November 18, 2008
New York, NY

Page 74

1   I doubt the Red Book is too noteworthy.
2        MR. SWEENEY:  I'm just trying to figure
3   out where the exhibit came from.
4      A.  I'm ready.
5      Q.  Let me ask you first, have you ever
6   reviewed a copy of the 1996 Red Book?
7      A.  Not prior to yesterday.
8      Q.  So yesterday you did have a chance to
9   review it?
10     A.  Yes.
11     Q.  But you testified earlier, though,
12  that you did develop some historical knowledge
13  that predates your tenure as the manager for Red
14  Book; isn't that correct?
15     A.  Correct.
16        MR. GASTWIRTH:  Objection to form.
17     Q.  Let's take a look at the section that
18  reads "How to read the listings," and I'm going
19  to go through it in some detail.
20        Let me just read it into the record,
21  and then ask you what your knowledge and
22  understanding is of the information contained

Page 75

1   herein.
2        "The first" -- it reads, "The first
3   line of an entry features the product or generic
4   name.  HCFA federal upper limit price information
5   is provided for all applicable multi-source
6   product categories.  The HCFA symbol can be found
7   immediately following the generic product name.
8   A complete listing of federal upper limit prices
9   appears in Section 8 (Third Party/Government
10  Information)."
11        Do you see that entry there?
12     A.  Yes, I do.
13     Q.  There's a mention of federal upper
14  limit prices being contained within the Red Book.
15        Was that true during your tenure
16  overseeing the publication of the Red Book?
17     A.  Yes.
18     Q.  And do you know whether that federal
19  upper limit price information was contained in
20  the Red Book prior to your tenure as a manager
21  overseeing Red Book?
22     A.  My understanding is yes, it was.

Page 76

1      Q.  Do you know where the federal upper
2   limit price information was collected from, and
3   then ultimately published in Red Book?
4        MR. GASTWIRTH:  Objection to form.
5      A.  It was collected from the CMS website.
6   It's called CMS now, it might have been called
7   something else at the time.
8      Q.  Are you familiar with the phrase
9   "HCFA"?
10     A.  Yes, I am.
11     Q.  It goes on to read, "Manufacturers are
12  listed alphabetically with generic listings.
13  Repackagers of products feature the 'repack'
14  symbol next to their names.  For trade name
15  listings, generic cross-references appear in
16  lower case on the following line."
17        It goes on to say, "A three-letter
18  abbreviation indicates the form of the drug."
19        And moving on to the next paragraph,
20  "Route of administration, product descriptive
21  information, strength, quantity and drug class
22  symbol (where applicable) appear next, followed

Page 77

1   by the National Drug Code number. The Average
2   Wholesale Price (AWP), Direct Price (DP) and the
3   Orange Book code complete the entry for each
4   product."
5        Is that basically still the same type
6   information that's being published in the Red
7   Book?
8        MR. SWEENEY:  Objection to the form.
9      A.  Yes, it is.
10     Q.  And I notice that there's -- it
11  mentions that AWP and DP, or direct price
12  information, are published.  There's no mention
13  of publication of WAC information.
14        Do you know why that is?
15     A.  I do not.
16        MR. CAHILL:  And all these questions
17  are about the hard copy --
18        MR. GOBENA:  Yeah.
19        MR. CAHILL:  -- version of the Red
20  Book, just to clarify?
21     Q.  Do you know whether -- whether WAC has
22  ever been published in the hard copy of the Red

20  (Pages 74 to 77)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 78

1  Book?
2      A.  To the best of my knowledge, no, it
3  has not.
4      Q.  Is WAC copied in any electronic
5  version of the Red Book?
6      A.  Yes, it is.
7      Q.  Let's go on to the text beneath that
8  graphic there on this page, and it reads, "All
9  prices are current as of the date Red Book went
10  to press.  However, actual prices paid by
11  retailers may vary, and all prices are subject to
12  change without notice.  The prices shown here are
13  based on data obtained from manufacturers,
14  distributors and other suppliers.  While great
15  care has been exercised in compiling this
16  information, the publisher of Red Book does not
17  warrant its accuracy."
18      Is it consistent with your
19  understanding of what -- the source of
20  information for the prices published in Red Book,
21  that that information, pricing information, came
22  from either manufacturers, distributors or other

Page 79

1  suppliers?
2      MR. GASTWIRTH:  Objection to form.
3      A.  Yes.
4      Q.  And let's focus on each of those
5  entities.
6      What kind of -- so pricing information
7  would be provided by manufacturers and then used
8  in the publication of the Red Book; is that
9  correct?
10      A.  Correct.
11      MR. GASTWIRTH:  Objection to form.
12      Q.  Would distributors provide pricing
13  information that would ultimately be published
14  somewhere in the Red Book, the hard copy anyways?
15      A.  If they are labeling the product with
16  their own label and NDC, then, yes.
17      Q.  So without labeling, you wouldn't be
18  getting pricing information from distributors?
19      A.  No.
20      Q.  How about suppliers, what kind of
21  pricing information would they provide that
22  ultimately would be used in the publication of

Page 80

1  the Red Book.
2      A.  My understanding of this definition of
3  suppliers is, again, someone who is labeling the
4  product with their own NDC, so that could involve
5  a repacker.
6      Q.  But it's safe to say, though, that the
7  vast majority of the pricing information that
8  would be provided and ultimately published in the
9  Red Book, that would come from manufacturers;
10  correct?
11      MR. GASTWIRTH:  Objection to form.
12      A.  Correct.
13      Q.  I want to shift gears slightly here,
14  but we'll come back to the Red Books, to figure
15  out exactly who was purchasing the Red Book and
16  actually using it.
17      Who actually were the Red Book's -- who
18  were the customers who purchased the Red Book?
19      A.  Currently customers include
20  manufacturers, third-party payors.  I'm assuming
21  -- I don't have direct knowledge of this -- but
22  assuming still the small pharmacies would use

Page 81

1  this publication.
2      Q.  You mentioned that small pharmacies
3  may still use the publication.  Why did you paren
4  the qualification?
5      A.  There's not a lot of small pharmacies
6  left, and probably most of them are on some type
7  of automated or direct link to payors, so claims
8  would be submitted electronically versus
9  manually.
10      Q.  What about large pharmacies, would
11  they be purchasers of the Red Book?
12      A.  Potentially.
13      Q.  You mentioned third-party payors as
14  being customers.  Can you identify certain -- any
15  specific third-party payors that you know were
16  purchasers of the Red Book?
17      A.  I know of purchasers of the electronic
18  files.
19      Q.  Okay.  Why don't we talk about that,
20  then.
21      Which third-party payors purchased the
22  electronic file version of the Red Book?

21 (Pages 78 to 81)

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL

November 18, 2008

New York, NY

Page 82

1    A.  I know --
2        MR. GASTWIRTH:  Objection to form.
3        What time period are we talking about?
4    Q.  Give me your historical -- just --
5        MR. GOBENA:  That's a fair objection.
6    Q.  From 1990 to the present, to the best
7  of your knowledge, what third-party payors were
8  using the electronic version of Red Book?
9        MR. GASTWIRTH:  Objection.
10   A.  I can speak from 2002 --
11   Q.  Okay.
12   A.  -- to present, and the ones I've been
13  aware of that have in that point or still are
14  using include Merck MedCo, EDS, Express Scripts.
15   Q.  Do you know of any governmental
16  entities that either directly or through
17  contractors use Red Book pricing information?
18   A.  I do not know.
19   Q.  What's your understanding --
20       MR. GOBENA:  Actually, strike that.
21   Q.  Are you aware of any communications or
22  discussions that have ever occurred between

Page 83

1  officials at Red Book and officials at what was
2  previously called HCFA, the Healthcare Financing
3  Administration, about the pricing information
4  that is provided in the information?
5    A.  I am not aware of any conversations.
6        MR. GOBENA:  I'll have this marked as
7    Exhibit 6.
8        (Document bearing Bates Nos. HHD
9    812-006 through 812-009 marked Exhibit Minne 006
10   for identification.)
11   Q.  Why don't you just take a quick moment
12  to review the document.
13       MR. GOBENA:  The document is Bates
14   labeled HHD 812-006 through 009, it's a memo
15   drafted by -- within HHS about chemo drugs, drug
16   pricing, memorandum of discussion, dated October
17   28th through November 4th, 1991.
18       (Pause)
19   Q.  Now, I understand, Miss Minne, this
20  probably predates your tenure at Red Book, so
21  what I'm going to do is ask you some questions
22  about what's stated in the document, and ask

Page 84

1  whether it's consistent with your historical
2  understanding of Red Book's editorial practices.
3        First of all, do you by any chance know
4  who Mr. Steve Sorkenn of Red Book is?
5    A.  I do not.
6    Q.  So he was -- to the best of your
7  knowledge, he was no longer employed at Thomson
8  or Medical Economics from the beginning of your
9  tenure?
10   A.  Correct.
11   Q.  Well, there's a section of this
12  document I want to focus in on in particular.  And
13  -- again, this is an internal HHS memo where
14  Elliot Hirschon from DHHS-OIG, OAS Region II, was
15  having a discussion with Mr. Sorkenn, and
16  memorialized that discussion.
17       I want to direct your attention to the
18  section that reads "Sources of Information."  And
19  in particular we'll start with that first
20  paragraph.
21       Mr. Hirshon writes -- and, again, he's
22  memorializing his conversation with Mr. Sorkenn

Page 85

1  -- he says, "Mr. Sorkenn stated that the average
2  wholesale price, AWP, is based on data from
3  several sources.  He explained that Red Book goes
4  through the same basic processes as its
5  competitors, MediSpan, First Data, Blue Book, to
6  develop the AWP as well as the published direct
7  price and suggested retail price."
8        The next sentence reads, "He indicated
9  that the primary source of information is the
10  manufacturer."
11       Is that sort of -- again, this is Mr.
12  Hirschon reflecting his conversation with Mr.
13  Sorkenn, but is that statement, that the primary
14  source of pricing information is the
15  manufacturer, consistent with your historical
16  knowledge as to where Red Book collected its
17  pricing data?
18       MR. GASTWIRTH:  Objection to form.
19   A.  Yes, it is.
20   Q.  He says -- he goes on to say, "This
21  information is obtained either from surveys,
22  questionnaires, which Red Book sends to the

Henderson Legal Services, Inc.

202-220-4158          www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
New York, NY

Page 86

1  manufacturers, or the manufacturers may
2  voluntarily send the information to Red Book."
3  And he goes on to say that "Mr. Sorkenn felt that
4  a blank copy of the questionnaire could not be
5  forwarded since it represents proprietary
6  information."
7         Are you aware of any questionnaires or
8  surveys that were sent to Red Book by
9  manufacturers to collect pricing information that
10  would ultimately be published in the Red Book?
11         MR. GASTWIRTH:  Objection to form.
12     A.  My assumption is he's referring to
13  something we call a PLV, product listing
14  verification form.
15     Q.  Why don't you describe what that is.
16     A.  A PLV is a listing of what Red Book
17  currently has listed for a manufacturer;
18  products, package size, NDC, also pricing, and
19  it's a form that's sent to manufacturers on a
20  yearly basis, asking them to verify and confirm
21  that the product is still available and that that
22  price, with its effective date, is still

Page 87

1  accurate.
2     Q.  We'll go over some of those -- I think
3  the product listing verifications a little bit
4  later.
5         It says, "According to Mr. Sorkenn, Red
6  Book's questionnaires ask manufacturers to supply
7  AWP as well as DP."
8         Is that consistent with your historical
9  understanding of what kind of information would
10  be asked of manufacturers by Red Book?
11         MR. GASTWIRTH:  Objection to form.
12     A.  Yes.
13         MR. SWEENEY:  Can you read back the
14  question, please.
15         (Record read)
16     Q.  Mr. Hirschon goes on to say in this
17  memo, "While he" -- and he's referring to Mr.
18  Sorkenn -- "felt that most manufacturers are
19  cooperative and supply all the requested
20  information, Red Book can use alternative sources
21  to either develop or corroborate this
22  information."

Page 88

1         I'm going to ask you first about the
2  first clause of that sentence.
3         Is it your understanding, based on your
4  experience and tenure, both overseeing Red Book
5  and at Thomson generally, that manufacturers were
6  generally cooperative about providing price
7  information that ultimately would be published in
8  the Red Book?
9         MR. GASTWIRTH:  Object to form.
10         MR. CAHILL:  Yeah, we object to form as
11  well, without a clarification of the time period.
12         MR. GOBENA:  A time period, okay.
13     Q.  Let me ask you, based on your tenure,
14  the four-year tenure -- let's at least start with
15  that -- overseeing the publication, as a manager
16  overseeing the publication of Red Book, is the
17  statement that the manufacturers were cooperative
18  in supplying requested pricing information, is
19  that consistent with your understanding?
20         MR. GASTWIRTH:  Objection to form.
21     A.  I guess -- I'm not sure what the
22  definition of "most" is.  The majority.

Page 89

1     Q.  He goes on to say, "Red Book can use
2  alternative sources to either develop or
3  corroborate pricing information," and he gives
4  some examples.  He says, "For example, Red Book
5  receives information on tape from wholesalers
6  each month."
7         Now, that might have been true in 1991.
8  I want to get your best recollection based on
9  your historical knowledge and your direct tenure
10  as a manager for Red Book.
11         Do you recall at any point wholesalers
12  providing tapes of pricing information to
13  Thomson?
14         MR. GASTWIRTH:  Objection to form.
15     A.  Not during my tenure.  We did not
16  receive tapes from wholesalers.
17     Q.  Did you receive any other kind of
18  information from wholesalers that contained
19  pricing information that would ultimately be
20  published in the Red Book, during your tenure as
21  the manager?
22     A.  Not during my tenure, we did not.

23 (Pages 86 to 89)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 90

1      Q.  If a manager was not cooperative and
2  provide --
3          MR. GOBENA:  Manager?
4      Q.  If a manufacturer was not cooperative
5  in providing pricing information to Red Book --
6  again, I'm focusing on your tenure as manager of
7  Red Book, that four-year period -- if they
8  weren't cooperative, were there alternative
9  sources of information that you could go to to
10 collect pricing information for a product listed
11 in the Red Book?
12     A.  No.
13         MR. CAHILL:  Objection to form.
14     Q.  No, okay.
15         So the sole source would be the
16 manufacturer --
17         MR. GASTWIRTH:  Objection to form.
18     Q.  -- for pricing information?
19     A.  Up until the point where we
20 implemented the AWP policy.
21     Q.  So you say up until you implemented
22 the AWP policy.  What's the start date of your

Page 91

1  knowledge and what's the end date of your
2  knowledge that the sole source of information
3  would be the manufacturers for pricing
4  information?
5          MR. GASTWIRTH:  Objection to form, and
6  I believe that's inconsistent with this witness'
7  prior testimony.
8      A.  Okay, I'm sorry, can you repeat the
9  question?
10     Q.  Sure.
11         You testified that prior to the
12 implementation of an AWP policy, the
13 manufacturers were the sole source of pricing
14 information that was ultimately published in the
15 Red Book.
16         Is that an accurate reflection of your
17 testimony?
18     A.  Yess.
19         MR. GASTWIRTH:  Objection to form.
20     Q.  And what's the start date of that
21 understanding?  I want to get a time period of
22 when you had that understanding so that the

Page 92

1  record is clear.
2      A.  My understanding is that the sole
3  source of pricing information from manufacturers
4  -- that manufacturers were the sole source of
5  pricing information up until the time we
6  implemented the Red Book policy, which was early
7  2003 -- I'm sorry, the AWP policy, which was
8  2003.
9      Q.  So the beginning date of that
10 understanding, was that when you started as the
11 manager of Red Book or can it precede that?
12 Because I remember you said you started in 2000
13 for a two-year block as manager of the Red Book
14 database.
15         MR. GASTWIRTH:  Objection to form.
16     A.  I started in 2002 as manager of the
17 Red Book database.
18     Q.  But even before 2002, based on your
19 tenure and the historical knowledge that you've
20 collected, was it true that, you know, prior to
21 the AWP policy in early 2003, was it true that
22 the manufacturers were really the primary or the

Page 93

1  sole source of pricing information that was
2  ultimately published in the Red Book?
3          MR. GASTWIRTH:  Objection to form --
4      A.  Yes.
5          MR. GASTWIRTH:  -- I believe that's
6  inconsistent with the witness' prior testimony.
7          MR. GOBENA:  We don't need a speaking
8  objection.
9          MR. ANDERSON:  Particularly when she
10 says "yes."
11         MR. GOBENA:  There's only a few minutes
12 left on the tape, so why don't we go off the
13 record then.
14         THE VIDEOGRAPHER:  This is the
15 videographer.
16         This ends tape number one of the record
17 at 10:13.  We're off the record.
18         (Recess taken)
19         THE VIDEOGRAPHER:  This is the
20 videographer.
21         This begins tape number two at 10:31.
22 We're back on the record at this time.

24  (Pages 90 to 93)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 94

1        MR. GOBENA:  I'm going to have another
2  document here marked as Exhibit 7.
3        (Document bearing Bates Nos. Red Book
4  06983 marked Exhibit Minne 007 for
5  identification.)
6        MR. GOBENA:  Since we have a shortage
7  of copies, let me just describe what the document
8  is and the Bates number.
9        It is a Red Book product listing
10  verification dated September -- well, the top
11  says September 29th, 1999, and the Bates number
12  is Red Book 06983.
13  BY MR. GOBENA:
14     Q.  Miss Minne, if you could have a chance
15  to sort of look through the document generally,
16  that would be great.  And just let me know when
17  you're ready.
18        (Pause)
19     A.  I'm ready.
20     Q.  This is a product listing
21  verification, and at the top left corner you'll
22  see it says "Dey," it has an address for Dey, and

Page 95

1  it's nine pages of product listings.
2        First, if you could tell me what
3  exactly -- we talked about this a little bit
4  earlier, but explain in detail, what exactly is a
5  product listing verification?
6     A.  A product listing verification is a
7  printout of all of the manufacturer's products
8  that the Red Book currently has in their
9  database.
10        Let me qualify that with saying it's a
11  listing of all the active products, meaning
12  products that we have listed that we believe are
13  still currently manufactured.
14     Q.  So who generates this printout that
15  we're looking at here?
16     A.  This is generated by the Red Book
17  staff.
18     Q.  And once they generate this printout,
19  what do they do with it?
20     A.  This printout is mailed once a year to
21  the manufacturer.
22     Q.  And are these product listing

Page 96

1  verification printouts, are they sent to every
2  manufacturer that has a drug listed in the Red
3  Book?
4     A.  Yes, they are.
5        MS. LORENZO:  Objection, form.
6     Q.  And why are -- why is Red Book sending
7  out this product listing verification form to
8  these manufacturers?
9        MS. LORENZO:  Objection, form.
10     A.  It is a process by which we attempt
11  to, first of all, verify that we have all the
12  correct products listed for that manufacturer,
13  and also to verify that the prices are still
14  accurate.
15     Q.  So when you're sending out these
16  tables or charts that are generated, you're
17  sending it out hoping that the manufacturers will
18  correct any errors, whether it's pricing or
19  listing of a product that's no longer active; is
20  that correct?
21        MR. GASTWIRTH:  Objection to form.
22     A.  We hope that they will return it to us

Page 97

1  with any price changes, along with their
2  effective dates, or, you know, mark things that
3  are no longer manufactured.
4     Q.  Let's take a look at this particular
5  product listing verification.  There seem to be
6  several columns here.  The first column is NDC.
7        I assume that's meant for the
8  manufacturer's NDC to be listed on the chart; is
9  that correct?
10     A.  Correct.
11     Q.  And then you have a product name
12  listed there.
13        Is that just the sort of -- the name by
14  which that particular NDC is listed?
15     A.  Correct.
16     Q.  There's a column that says "OB."  What
17  does that stand for?
18     A.  That is a column that describes the
19  Orange Book code.
20     Q.  Let's take a look at the second
21  listing.  For example, there's AN listed --  AN
22  listed in that OB column that's on that first

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                   November 18, 2008

New York, NY

Page 98

1   page.
2         What does AN stand for?
3      A.  I would -- I don't recall off the top
4   of my head; I would have to look at the list of
5   Orange Book codes.
6      Q.  There's a column that says "PT."
7   What's PT?
8      A.  That is a column I am not familiar
9   with as it no longer exists on the PLV form.
10     Q.  What does the column titled "DEA"
11  stand for?
12     A.  That is a column that designates
13  whether a product is a prescription or
14  over-the-counter item.
15     Q.  And there's a column that says "UD."
16  What does that stand for?
17     A.  That stands for unit dose, meaning
18  that the product would be packaged in unit dose
19  form.
20     Q.  And then the next column says "AWP,"
21  and there -- if you look down the column there
22  are various prices listed there.

Page 99

1         Let's take a look at the second row on
2   this first page of this exhibit.  There is a --
3   originally there was a price listed of 67.80 for
4   Acetylcysteine -- I'm probably mispronouncing
5   that -- the NDC is 49502-0181-04.
6         For this product there is a price there
7   of 67.80 and a line through it, and beneath that
8   handwritten in a price of 56.50.
9         Do you see that?
10     A.  Yes, I do.
11     Q.  That original, sort of printed price
12  that's on there, who would have generated that
13  price on this chart?
14         MS. LORENZO:  Objection to form.
15     A.  That 67.80 is the price that would
16  have been listed at the time that the PLV was
17  printed, the price that was listed in the Red
18  Book database.
19     Q.  And the handwriting -- to the best of
20  your knowledge or understanding, whose
21  handwriting would be on a PLV changing a price?
22         MS. LORENZO:  Objection to form.

Page 100

1      A.  That handwriting would be from the
2   manufacturer, from the person who signed it at
3   the bottom.
4      Q.  And let's take a look at that
5   signature at the bottom.  There's some -- on the
6   bottom left of the first page of this exhibit it
7   says, "Instructions:  Please make corrections
8   directly on this printout."
9         So those instructions, those are from
10  the Red Book staff to the manufacturers?
11     A.  Correct.
12     Q.  And that appears to be what's happened
13  in that second row with respect to the AWP for
14  Acetylcysteine --
15         MS. LORENZO:  Objection.
16     Q.  -- correct?
17     A.  Correct.
18     Q.  And then there's two -- beneath the
19  instructions there's a line that says, you know,
20  "Okay as is" or "Okay with changes." Although
21  there are changes on this first page, it looks
22  like the "Okay as is" box is checked.

Page 101

1         Do you see that there?
2      A.  Yes.
3      Q.  And then a signature as well.
4         Do you see that?
5      A.  Yes, I do.
6      Q.  And that signature, that would not be
7   a Red Book employee's signature, would it?
8         MS. LORENZO:  Object to form.
9      A.  It should not be.  I do not know that
10  name.
11     Q.  But it should be an employee of the
12  manufacturer; correct?
13     A.  Correct, it should be --
14         MS. LORENZO:  Objection to form.
15     A.  -- a representative of the
16  manufacturer.
17     Q.  Now, Dey -- Dey Labs, to your
18  knowledge, has products listed in the Red Book;
19  isn't that correct?
20     A.  Correct.
21     Q.  And to the extent to which Dey had
22  products listed in the given year, they would

26 (Pages 98 to 101)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 102

1  always receive a product listing verification; is
2  that correct?
3        MS. LORENZO:  Object to the form.
4    A.  Correct.
5    Q.  And you'd expect Dey to correct any
6  mistakes with respect to the pricing information
7  -- their pricing information in the Red Book
8  through the product listing verification process;
9  correct?
10       MS. LORENZO:  Object to form.
11   A.  Correct.  They could also provide any
12 updates to us via e-mail or any other printed
13 communication throughout the year.
14   Q.  To your knowledge, did they ever
15 refuse to engage in the process of verifying
16 their prices through the product listing
17 verification --
18       MS. LORENZO:  Object to form.
19   Q.  -- form?
20   A.  I am not aware of whether they
21 objected or -- participated or not.
22       MR. GOBENA:  I'll have that marked as

Page 103

1  Exhibit 8.
2        (October 2000 product listing
3  verification for Roxane Laboratories marked
4  Exhibit Minne 008 for identification.)
5    Q.  Just take a moment, Miss Minne, just
6  to quickly skim through it.
7        MR. GOBENA:  Just for the people who
8  don't have copies, it's an October 5th, 2000
9  price verification -- price listing verification
10 from Roxane Laboratories.  Actually, my copy has
11 a Roxane Bates number, I know that there's a Red
12 Book Bates number -- I believe it's 14216.
13       MR. GASTWIRTH:  Where do you see the
14 October 5th date?
15       MR. GOBENA:  If you go a little bit
16 further into the document, you'll see October --
17 oh, sorry, there's October -- there's various
18 dates, it's in October 2000.
19       MR. ANDERSON:  October 5th on the --
20       MR. GOBENA:  First.
21       MR. ANDERSON:  -- cover page.
22       MR. GOBENA:  It's an October 17th

Page 104

1  letter, you're right, there's a document signed
2  October 5th, and then there's signatures October
3  11th.
4        MR. ANDERSON:  The second page is dated
5  October 5th, 2000.
6  BY MR. GOBENA:
7    Q.  Miss Minne, having looked at this
8  document, do you recognize it as a product
9  listing verification for Roxane Laboratories?
10       MR. GASTWIRTH:  Objection to form.
11   A.  Yes, I do.
12   Q.  To your knowledge, did Roxane
13 Laboratories ever refuse to provide a product
14 listing verification for its entries in the Red
15 Book?
16       MR. GASTWIRTH:  Objection to form.
17   A.  I do not have knowledge of whether
18 they did or did not.
19   Q.  But every year Red Book would send out
20 product listing verifications, again, to
21 manufacturers, such as Roxane, that published
22 information in the Red Book; correct?

Page 105

1    A.  Correct.
2        MR. GASTWIRTH:  Objection to form.
3    Q.  Take a look at -- let's turn to a
4  particular page here.  If you look at the top
5  right corner there's page 1 of 31, 2, 3 -- the
6  one I'm looking at is page 13 of 31.
7        Go down to the fourth entry on page 13
8  of 31 of this 2000 Roxane product listing
9  verification.  I'm looking at the line NDC
10 00054-8402-21, it's for Ipratropium Bromide. And
11 do you see the various columns that are somewhat
12 similar to, if not exactly the same as, the
13 columns in the previous exhibit, and we see
14 there's a column there for AWP and there's a
15 price listed there of 105.74?
16       Do you see that?
17   A.  Yes, I do.
18   Q.  I notice here that there is no price
19 listed under DIRP.
20       Is that -- was that unusual, for a
21 manufacturer not to list a price under DIRP?
22       MR. GASTWIRTH:  Objection to form.

27 (Pages 102 to 105)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 106

1    A.  No.
2    Q.  Why was it not unusual?
3    A.  Umm --
4        MR. GASTWIRTH:  Objection to form.
5    A.  Many manufacturers do not provide
6 direct pricing.
7    Q.  That's what the DIRP stands for,
8 direct price?
9    A.  Correct.  And they are not required
10 to.
11   Q.  At this time period, October 2000, did
12 Red Book have that electronic version of the
13 database that we were talking about earlier?
14   A.  Yes, they did.
15   Q.  Is it possible that the direct price
16 for this product would have been listed -- if
17 there was any -- in that electronic database?
18       MR. GASTWIRTH:  Objection to form.
19   A.  If there was a direct price in the
20 electronic database, it should be on this list as
21 well.
22   Q.  So the hard copy of the price listing

Page 107

1 verification corresponds with what's both in the
2 hard copy Red Book as well as in the electronic
3 database?
4    A.  Yes.
5    Q.  If you look at the last column to the
6 right, it says, "Effective Date."
7        What does effective date mean?
8    A.  The effective date represents the date
9 that that price went into effect.
10   Q.  So this is a document that appears to
11 be dated October of 2000, yet the effective date
12 is December 10th, 1997.  Why would there be a
13 discrepancy between the two dates?
14       MR. GASTWIRTH:  Objection to form.
15   A.  What this means is that this price of
16 105.74 became effective on 12/10 of '97, and we
17 had not received any price changes since that
18 time.
19   Q.  And between December 10th, '97 and
20 this particular price listing verification of
21 October 2000, approximately how many price
22 listing verification -- product listing

Page 108

1 verification would have been sent to Dey asking
2 about that particular price?
3        MS. LORENZO:  Objection, form.
4        MR. GOBENA:  I'm sorry, Roxane.  I
5 apologize.
6        MR. GASTWIRTH:  Objection to form.
7        MR. GOBENA:  That's why you objected?
8 That's how I knew I had the question wrong.
9        MR. CAHILL:  Do you understand the
10 question?
11       THE WITNESS:  Yes.
12   A.  There should have been a PLV for 1998
13 and 1999, and this is the 2001.
14   Q.  So there would have been two PLVs sent
15 to Roxane regarding that price?
16   A.  Correct.
17       MR. GASTWIRTH:  Objection to form.
18   Q.  Before this particular --
19   A.  Correct.
20   Q.  Outside of the --
21       MR. GOBENA:  Sorry.
22   Q.  If we go to the bottom of the page,

Page 109

1 you'll see a signature there.
2        I don't suppose you recognize the
3 signature?
4    A.  No, I don't.
5    Q.  Okay.  But it's fair to say that that
6 signature would not be a Red Book employee's
7 signature; correct?
8        MR. GASTWIRTH:  Objection to form.
9    A.  Correct.
10   Q.  It would be in all likelihood a
11 manufacturer's signature; correct?
12       MR. GASTWIRTH:  Objection to form.
13   A.  Correct, it should be the person at
14 the manufacturer -- manufacturer company that's
15 listed on the page here that we have as the
16 contact person, it should be their signature.
17   Q.  And the contact person here for this
18 Roxane product listing verification is someone
19 identified as Michelle Summers.
20       Do you know Miss Summers by any chance?
21       MR. GASTWIRTH:  Objection to form.
22   A.  No, I don't.

28 (Pages 106 to 109)

Page 110

1        MR. GOBENA:  I'll have this marked as
2 Exhibit 9.
3        (Price listing verification for Abbott
4 Hospital Products, the first page bearing Bates
5 No. Red Book 01172 marked Exhibit Minne 009 for
6 identification.)
7     Q.  I just want you to take a moment to
8 skim through it, Miss Minne, and I'll describe it
9 for the record.
10        MR. GOBENA:  It's a document with the
11 Bates number Red Book 01172, it's a Red Book
12 price listing verification, and at the top left
13 corner indicates that the company at issue is
14 Abbott Hospital Products, and it's 133 pages
15 long.
16        MR. FARQUHAR:  What's the date, please,
17 Counselor?
18        MR. GOBENA:  Sorry, it's December --
19 there's a date stamp on the top right corner,
20 which may be when it was received, of December
21 17th, 2002.
22     Q.  I mean, you could skim through it, but

Page 111

1 really the pages I'm going to -- I'm going to
2 focus on one page in particular, maybe another
3 one, and that's 106 of 133.
4        MS. CITERA:  I'm just going to put my
5 objection on the record to Mr. Gobena asking
6 questions with respect to my client.  This
7 deposition is not noticed in the Abbott DOJ case
8 and is outside the scope of the Thomson notice.
9     Q.  Let me ask you first, though, before I
10 ask about page 106, you'll notice that some of
11 these pages -- skipping through it, for example,
12 page 106 has a signature and some changes, and
13 some of the pages don't have signatures at the
14 bottom.
15        Do you see that there?
16     A.  Yes, I do.
17     Q.  Have you seen any other product
18 listing verifications from other manufacturers
19 where some pages were signed and other pages were
20 not?
21     A.  Yes, I have.
22        MS. CITERA:  Objection to form.

Page 112

1     Q.  And do you have an understanding as to
2 why certain manufacturers would sign certain
3 pages and not sign certain pages of the price
4 listing verification?
5        MS. CITERA:  Objection to form.
6     A.  Certain manufacturers will only sign
7 -- because of the thickness, the number of pages
8 of this document, they will only sign the ones
9 where they actually make changes on.
10     Q.  On a particular listing?
11     A.  Yeah, if they make a change on the
12 page they'll sign that change, but if they make
13 no changes they won't bother to sign it.
14     Q.  And turning to page 106, which also
15 has the Bates number Red Book 01279, you'll see
16 there are some changes being made there for a
17 couple of listings for Sodium Chloride.
18        Do you see that?
19     A.  Yes, I do.
20     Q.  And the manufacturer here is changing
21 what appears to be the direct price and the WAC.
22        Do you see that there?

Page 113

1     A.  Yes, I do.
2        MS. CITERA:  Objection to form.
3     Q.  Is it true that some manufacturers
4 will change AWP and other prices and some
5 manufacturers will only change WAC and direct
6 prices?
7        MS. CITERA:  Objection to form.
8     A.  Yes.
9     Q.  In an instant here -- instance here
10 where you have a manufacturer changing a direct
11 and a WAC price but not the AWP price, what, if
12 anything, would Red Book do with respect to the
13 AWP listed in this product listing verification,
14 or in the database?
15        MS. CITERA:  Objection, form.
16        MR. CAHILL:  For what period of time?
17        MR. GOBENA:  The time period covered by
18 the deposition.
19        MR. GASTWIRTH:  I'll object to form
20 also.
21        MR. CAHILL:  The only clarification
22 because the AWP policy comes in 2003.

29 (Pages 110 to 113)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 114

1        MR. GOBENA:  Okay, predating -- this
2    document predates the AWP policy.
3        Q.   So predating the AWP policy, if a
4    manufacturer such as here changed only direct
5    price and the WAC in the product listing
6    verification, what, if anything, would Red Book
7    do to the AWP listed for that product?
8        MR. GASTWIRTH:  Objection.
9        MS. CITERA:  Objection to form.
10       A.   Red Book would have updated the direct
11   price and the WAC price but would not have
12   altered the AWP price.
13       MR. SWEENEY:  I'm sorry, I missed the
14   end of that.  Can you read it back, please?
15       (Record read)
16       Q.   And that's your understanding of what
17   happened prior -- Red Book would do prior to the
18   implementation of the AWP policy in early 2003?
19       A.   Correct.
20       MS. CITERA:  Objection to form.
21       Q.   Based on this document, you'll agree
22   with me that Abbott Hospital Products did review

Page 115

1    the pricing listing verification and make changes
2    where appropriate, wouldn't you?
3        MS. CITERA:  Objection to form.
4        A.   Yes, I would agree with that.
5        Q.   Do you have any recollection or
6    understanding of Abbott Hospital Products not
7    complying with Red Book's policy of seeking
8    product listing verifications from manufacturers
9    who list in the Red Book?
10       A.   I do not have --
11       MS. CITERA:  Objection to form.
12       A.   -- recollection of whether...
13       Q.   You have no reason to believe that
14   they didn't comply, though?
15       A.   Right --
16       MS. CITERA:  Objection, form.
17       A.   -- I don't know whether they did or
18   not.
19       Q.   I'm going to shift gears here and go
20   back to the Red Books themselves and have marked
21   as Exhibit 10 what actually ended up being
22   excerpts of the 2001 and 2002 Red Book, but I'm

Page 116

1    only going to ask you about the 2001 Red Book, so
2    once the court reporter's able to mark that, I'll
3    have you take a look at it.
4        (Excerpts from 2001 and 2002 Red Books
5    marked Exhibit Minne 010 for identification.)
6        MR. GASTWIRTH:  I'm sorry, what exhibit
7    number is this?
8        MR. GOBENA:  Ten.
9        MR. GASTWIRTH:  And I'll just note an
10   objection on the record that this document does
11   not appear to be produced because there's no
12   Bates label on this document.
13       MR. GOBENA:  Are you going to represent
14   that Roxane does not possess copies of the Red
15   Book?
16       MR. GASTWIRTH:  I stated my objection
17   on the record.
18       MR. SWEENEY:  Did this come from the
19   government's files again?
20       MR. GOBENA:  It might have, yes.
21       MR. SWEENEY:  It might have?
22       MR. GOBENA:  I'm not going to enter

Page 117

1    into a colloquy with you about this.  If you want
2    to talk about it off the record, fine, but I
3    don't want to waste deposition time on this.
4        MR. SWEENEY:  I want to know the Red
5    Book -- what the source of the document is.  And
6    if you won't tell me, I'll object.
7        MR. GOBENA:  Then object.
8    BY MR. GOBENA:
9        Q.   Actually, I mean, I don't want you to
10   look at the whole document, I'm only going to ask
11   you about the forward on the third page of the
12   exhibit.
13       MR. GASTWIRTH:  And I'll just object on
14   the record that this document appears to be
15   components of two -- 2002 drug topics from Red
16   Book with just portions of these Red Books
17   attached here, and I have no idea who compiled
18   this document, pulled these pages, I don't know
19   if the government did this, we're missing a lot
20   of pages.
21       MR. GOBENA:  This is definitely a
22   forward, though, from the 2001 copy.  We verified

a7b5296c-c23a-4c12-8217-ee69325ea5b1

# New York, NY

Page 118

1    that, and that's what I'm going to be asking
2    about, so...
3        Q.   Whenever you've had a chance to read
4    the forward, let me know.
5        (Pause)
6        A.   I'm ready.
7        Q.   First I wanted to find out whether or
8    not you've had a chance to review the 2001 Red
9    Book prior to -- prior to your deposition today.
10       A.   I did yesterday.
11       Q.   And was yesterday the first time you
12   looked at the 2001 Red Book?
13       A.   Yes.
14       Q.   And did you have a chance to read the
15   whole thing or parts of it?
16       A.   I read the forward.
17       Q.   So you're, at least as of yesterday,
18   familiar with the forward?
19       A.   Yes.
20       Q.   Why don't we go through it, and why
21   don't we see if you have any historical knowledge
22   of any of the information contained herein.

Page 119

1        Let me -- I'm going to -- well, I'll
2    read the first paragraph anyways.
3        "Dear Reader:  We take considerable
4    pride in presenting this edition of Red Book.  It
5    marks the 105th year of publication for this
6    trusted annual companion for pharmacists and
7    other decision makers involved in the provision
8    of pharmaceuticals and pharmaceutical care.
9        "Through the decades, the Red Book team
10   of writer, editors, data specialists, researchers
11   and designers has worked hard to produce a
12   valuable reference tool that would meet the many
13   needs of healthcare professionals in the service
14   of their patients.  Therefore, we were concerned
15   when the average wholesale price designation --
16   one of several pieces of data that Red Book
17   collects from manufacturers -- came under fire at
18   federal and state levels this past year."
19       Let me ask you first, do you have any
20   knowledge or understanding of what was being
21   referred to there in that last sentence I just
22   read?

Page 120

1        MR. GASTWIRTH:  Objection to form, the
2    document speaks for itself.
3        MR. CAHILL:  And I was just going to
4    add, outside of communications with counsel.
5        MR. GOBENA:  Okay, fair enough.
6        A.   Not outside of communication with
7    counsel.
8        Q.   But the statement that, you know --
9    the middle part of that statement that reads,
10   "the average wholesale price designation -- one
11   of several pieces of data that Red Book collects
12   from manufacturers" dash, that excerpt, that's
13   accurate?  That is, Red Book has data that's
14   collected -- I'm sorry, the AWP is data that's
15   collected from the manufacturers; correct?
16       MR. GASTWIRTH:  Objection to form.
17       MR. SWEENEY:  Objection to form.
18       A.   Correct.
19       Q.   The next paragraph reads, "Based on
20   charges that some manufacturers were inflating
21   their wholesale prices to gain a competitive
22   advantage, the Health Care Financing

Page 121

1    Administration was prepared to implement new AWPs
2    derived by the Department of Justice for some
3    outpatient drugs covered by Medicare."
4        Are you aware of the charges being
5    referred to in this paragraph?
6        MR. GASTWIRTH:  Objection to form.
7        Q.   Again, outside of counsel --
8    discussions with counsel.
9        A.   I am not.
10       Q.   It goes on to read, "That plan was
11   shelved indefinitely when it became clear that
12   Congress, responding to protests from pharmacy,
13   medical and patient groups, was not going to
14   reduce the current formula.  However, some states
15   have recalculated AWPs for certain drugs under
16   Medicaid following a survey of wholesale prices."
17       Are you aware of any of the factual
18   events that are stated here in this paragraph?
19       MR. GASTWIRTH:  Objection to form.
20       A.   I am not.
21       Q.   Is there anyone who's currently at
22   Thomson that you think would have had some --

31 (Pages 118 to 121)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                      November 18, 2008
New York, NY

Page 122

1  some knowledge of what was being referred to in
2  these paragraphs?
3          MR. GASTWIRTH:  Objection to form.
4          MR. CAHILL:  Objection to form.
5      A.  No one -- this was still done out of
6  the Montvale office, and I am not aware of who
7  was still in the Montvale Thomson office that
8  would have -- that may have had knowledge of
9  this.  I am not aware of anyone.
10     Q.  At the bottom it looks like the
11 forward was being -- not necessarily signed, but
12 there's a name there at the bottom left that says
13 "Valentine Cardinale," with an E at the end,
14 "editor."
15         Is Miss Cardinale still employed by
16 Thomson?
17     A.  I do not have knowledge.  I do not
18 recognize that name.  I have no history with that
19 person.
20     Q.  Let's read the next paragraph and see
21 if you have any knowledge about what's contained
22 therein.

Page 123

1          It starts, "As noted in the 'Rx product
2  listing section,' all prices are current as of
3  the date Red Book went to press and are based on
4  data obtained from manufacturers, distributors
5  and other suppliers."  Stop there.
6          Based on your knowledge, is that a
7  correct description of how Red Book was
8  collecting the pricing data in this -- in or
9  around 2001?
10         MR. GASTWIRTH:  Objection to form.
11     A.  Yes.  Again, going back to my previous
12 definition of what a distributor and supplier
13 was; as long as they were packaging the product.
14     Q.  Okay.
15         The next sentence reads, "While we
16 cannot vouch for the accuracy of all pricing
17 information, great care has been exercised in
18 compiling the data."
19         Let me stop there.
20         Is that an accurate statement of the
21 effort that Red Book went through to compile data
22 -- Red Book staff went through to compile data in

Page 124

1  the Red Book itself?
2          MR. GASTWIRTH:  Objection to form.
3      A.  Are you asking about -- I guess I
4  don't understand.
5      Q.  Let me change it, that was an awkward
6  question.
7          It says in the sentence basically great
8  care is exercised in compiling the data that's in
9  the Red Book.
10         Do you see that?
11     A.  Yes.
12     Q.  Do you agree that great care was
13 exercised in compiling the data?
14     A.  Yes.
15     Q.  And what great care was exercised in
16 making sure that the data was as accurate as Red
17 Book's staff could possibly get it to be?
18         MR. GASTWIRTH:  Objection to form.
19     A.  My belief is what they're referring to
20 is the process they had as far as entering the
21 content and then -- the pricing information and
22 dates and then that being verified or double

Page 125

1  checked, if you want to call it that, by another
2  staff person.
3      Q.  Is that also a reference to the
4  product listing verification process that we were
5  talking about a little bit earlier?
6          MR. GASTWIRTH:  Objection.
7      A.  All prices were double checked --
8  entered by one person and double checked by
9  another.
10     Q.  What do you mean by "double checked"?
11 I just want to make sure we're clear on that.
12     A.  One person would enter the information
13 into the system, and then hand it off to someone
14 else, who would then just verify that the correct
15 price and date were entered, as listed on the PLV
16 or whatever communication we received from the
17 manufacturer.
18     Q.  Part of that double checking process
19 was going back to the manufacturer and double
20 checking that the AWP listed for their product
21 was accurate?
22         MR. GASTWIRTH:  Objection to form.

32 (Pages 122 to 125)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 126

1      A.   No, the double checking was just that
2  it was entered as it was given to the staff.
3      Q.   By the manufacturers?
4      A.   By the manufacturer.
5      Q.   The next sentence reads, "We continue
6  to regard AWP as one guideline in the Rx pricing
7  mix and to encourage the provision and
8  dissemination of fair, accurate prices by all
9  suppliers."
10         What's -- who are the suppliers that
11  are being referenced in that sentence, to the
12  best of your knowledge?
13         MR. CAHILL:  If you know.
14     Q.   If you know.
15     A.   I would assume, again, suppliers
16  meaning the people who are supplying the
17  information.
18     Q.   And that being the --
19     A.   Being a manufacturer or a repackager.
20     Q.   So the statement here, then, by Miss
21  Cardinale is that she's encouraging manufacturers
22  to disseminate fair and accurate prices; is that

Page 127

1  a fair sort of summary of what she's saying
2  there?
3         MR. GASTWIRTH:  Objection to form. The
4  document speaks for itself.
5      A.   It's an assumption I would make.
6         MR. GOBENA:  Why don't we go off the
7  record here for a second.
8         THE VIDEOGRAPHER:  This is the
9  videographer.
10         Off the record, 11:03.
11         (Recess taken)
12         THE VIDEOGRAPHER:  This is the
13  videographer.
14         The time is 11:12. We're back on the
15  record.
16         MR. GOBENA:  I realize that there are a
17  variety of people here who want to ask questions
18  of this witness and we only have one day
19  identified in the notice. I don't know whether
20  people are going to be seeking an additional day
21  down the road, but for the sake of efficiency
22  what I'm going to do at this point is pass the

Page 128

1  witness to my colleague, Jarrett Anderson, who's
2  going to ask some questions.
3         Our goal on the plaintiff side is to
4  ask questions as quickly as possible, to reserve
5  some time at the end of the day for defendants to
6  be able to ask questions. And if it's not
7  enough, we'll have to take it up.
8         I do have a conflict tomorrow, I don't
9  know about other counsel here, what their
10  situation is, but we can work that out later on.
11  Our goal is to try and move this as quickly as
12  possible. For that purpose I'll pass the witness
13  now to my colleague.
14         We are hopeful that we can get this
15  entire deposition finished today.
16         MR. SWEENEY:  And we agree with that,
17  but a number of defendants do have questions, and
18  plaintiffs' counsel originally saying they were
19  going to go until three or four o'clock, which
20  would put us in a bind, that's why we discussed
21  tomorrow.
22         And so you're done for the moment, in

Page 129

1  other words?
2         MR. GOBENA:  I'm reserving the right to
3  ask questions later on, but for right now I'm
4  done.
5         MR. SWEENEY:  Okay.
6         MR. ANDERSON:  And we're all going to
7  try to move quickly, and hopefully we will finish
8  this today and y'all will have plenty of time to
9  ask your questions.
10         EXAMINATION
11  BY MR. ANDERSON:
12     Q.   Good morning, ma'am.
13     A.   Good morning.
14     Q.   How are you?
15     A.   Fine.
16     Q.   My name's Jarrett Anderson, I
17  represent a plaintiff in this case, Ven-A-Care of
18  the Florida Keys.
19         I understand from your testimony this
20  morning that over the years Red Book has taken
21  steps to verify the prices that it publishes for
22  drugs; correct?

33 (Pages 126 to 129)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 130

1        MR. GASTWIRTH:  Objection to form.
2      A.  Correct.
3      Q.   And that primary mechanism for price
4  verification is through what's known as a PLV,
5  price listing verification form; correct?
6        MR. GASTWIRTH:  Objection to form.
7      A.  Correct.
8      Q.   And those were forms that were
9  presented annually by Red Book staff and
10  transmitted to drug manufacturers --
11        MR. GASTWIRTH:  Objection to form.
12      Q.   -- correct?
13      A.  Correct.
14      Q.   Was that historically, I'm assuming,
15  back in the '90 -- early '90s, for which is part
16  of the time period that you're here today as the
17  corporate representative, I take it those were
18  transmitted by mail; correct?
19      A.  I'm assuming.  I know that today they
20  are still transmitted by hard copy mail.
21      Q.   All right.  Well, you kind of
22  anticipated my next question.

Page 131

1        Are they only transmitted by mail or
2  are they also transmitted electronically?
3      A.  They are printed in our Denver office
4  and transmitted by hard copy mail, U.S. mail.
5      Q.   And Red Book in turn expects to
6  receive hard copies back?
7      A.  Correct.
8        MR. GASTWIRTH:  Objection to form.
9      Q.   Why is it that Red Book desires to
10  receive hard copies of the completed verification
11  forms from drug manufacturers?
12        MR. GASTWIRTH:  Objection to form.
13      A.  They would like the -- that the bottom
14  of the PLV is signed by a representative of the
15  company.
16      Q.   Does Red Book rely upon the
17  manufacturer's signature of the verification
18  forms in Red Book's publication of pricing
19  information?
20        MR. GASTWIRTH:  Objection to form.
21      A.  I don't understand your question.
22      Q.   I'll rephrase.

Page 132

1      A.  Okay.
2      Q.   Does Red Book rely upon the
3  verifications signified by the signatures by drug
4  manufacturers in publishing drug pricing
5  information?
6        MR. GASTWIRTH:  Objection to form.
7        MR. CAHILL:  Objection to form.
8      A.  Yes.
9        (Document bearing Bates Nos. TH 0598
10  through 0601 marked Exhibit Minne 011 for
11  identification.)
12      Q.   Miss Minne, if you could take a look
13  at what's been marked as deposition Exhibit 11.
14        MR. GASTWIRTH:  We're on 12.
15        MR. ANDERSON:  The next sticker in line
16  was 11.
17        MS. ROSENSTOCK:  It's 11.
18        MR. GASTWIRTH:  It's 11?  Sorry about
19  that.
20        MR. ANDERSON:  That's okay.
21        (Pause)
22  BY MR. ANDERSON:

Page 133

1      Q.   Do you recognize this type of
2  document?
3      A.  Only since yesterday.
4        MR. FARQUHAR:  Mr. Anderson, I'm sorry,
5  for the rest of us, could you please describe
6  what the document is?
7        MR. ANDERSON:  Sure, it's a four-page
8  document, Bates labeled TH 0598 through 0601, it
9  appears to be a description of general
10  information concerning Red Book and Red Book
11  circulation.
12        MR. FARQUHAR:  Does it have a date?
13        MR. ANDERSON:  It appears it's back
14  from the early '90s -- I mean, pardon me,
15  mid-'90s.
16        MR. FARQUHAR:  Thank you.
17  BY MR. ANDERSON:
18      Q.   What is this document?
19      A.  It appears to be some type of
20  marketing information.
21      Q.   Marketing information that Red Book
22  would provide to potential subscribers or

34 (Pages 130 to 133)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 134

1 existing subscribers?
2          MR. GASTWIRTH:  Objection to form.
3     A.  Probably to advertisers.
4     Q.  To -- oh, I see, okay.  Because -- is
5 it true that Red Book, in addition to selling
6 information, such as the electronic or printed
7 publications of information, also placed
8 advertisements in those publications?
9     A.  Yes, that is correct.
10    Q.  And in turn sold those -- that space
11 for those advertisements to advertisers; correct?
12    A.  That is my understanding.
13    Q.  Including drug manufacturers.
14         MR. GASTWIRTH:  Objection to form.
15    A.  That is my understanding.
16    Q.  And so Exhibit 11 appears to you to be
17 some marketing materials that Red Book would have
18 provided to potential advertisers; is that right?
19         MS. CITERA:  Objection to form.
20    A.  That is what it appears to be.
21    Q.  All right, now, focusing your
22 attention on the third page of Exhibit 11, I see

Page 135

1 toward the upper portion of the document there's
2 some circulation statistics by classification;
3 correct?
4     A.  Correct.
5     Q.  And the number of independent
6 drugstores is listed as over 34,000; is that
7 right?
8     A.  That's what's listed.
9     Q.  Is that consistent with your
10 understanding as the corporate representative of
11 Red Book that independent drugstores, somewhere
12 in the range of 34,000 stores, received Red Book?
13         MR. GASTWIRTH:  Objection to form.
14    A.  I can't verify that number of 34,000,
15 but it is my understanding that that's who they
16 are advertising to or marketing, yes.
17    Q.  And you have no reason to distrust or
18 otherwise question the accuracy of the
19 circulation numbers that are set forth in Exhibit
20 11, do you?
21         MR. GASTWIRTH:  Objection to form.
22    A.  I do not know where these numbers came

Page 136

1 from, so I cannot verify whether they are
2 accurate or not.
3     Q.  Well, I'm not asking you to verify
4 them, I'm asking you do you have any reason to
5 question the accuracy of the data?
6     A.  I have no reason to question the
7 accuracy --
8          MS. CITERA:  Objection to form.
9     A.  -- of these circulation numbers.
10    Q.  Is it true that over the years many
11 independent drugstores have subscribed to Red
12 Book?
13    A.  That is true.
14    Q.  Is it true that over the years many
15 chain drugstores have subscribed to Red Book?
16    A.  That is true.
17    Q.  I also notice that you have, in
18 Exhibit 11, a reference to 2300 manufacturers
19 receiving Red Book.
20         Is that what's shown in Exhibit 11?
21    A.  Yes, it is.
22    Q.  Is that generally consistent with your

Page 137

1 understanding as the corporate representative of
2 Red Book?
3          MR. GASTWIRTH:  Objection to form.
4     A.  Yes, it is.
5          MR. CAHILL:  For this period of time,
6 though.
7          THE WITNESS:  For this period of time.
8          MR. CAHILL:  In other words, the
9 circulation numbers are tied back into the period
10 of time of Exhibit 11.
11         MR. ANDERSON:  I appreciate that.
12    Q.  Which appears to be sometime in '94 or
13 '95?
14    A.  Correct.
15    Q.  Likewise, there's government agencies
16 listed as classification of subscribers; correct?
17    A.  Correct.
18    Q.  And it appears that over 1300
19 government agencies are subscribing to Red Book
20 information; is that true?
21         MR. GASTWIRTH:  Objection to form.
22    A.  That's what it states.

35 (Pages 134 to 137)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 138

1      Q.   And isn't it true that for all of
2  these different classifications of subscribers,
3  whether they be independent drugstores or chain
4  drugstores or manufacturers or government
5  agencies, they would be receiving the pricing
6  information that Red Book supplied in addition to
7  the other NDC-related information?
8          MR. GASTWIRTH:  Objection to form.
9      A.   Correct.
10     Q.   Including AWP information; correct?
11         MR. GASTWIRTH:  Objection to form.
12     A.   If AWP is listed, yes.
13     Q.   And now, if you could, I'd like you to
14  take a look at what's going to be marked as
15  Exhibit 12.
16         (Document bearing Bates Nos. TH 0256
17  through 0262 marked Exhibit Minne 012 for
18  identification.)
19         MR. ANDERSON:  For the record, Exhibit
20  12 is Bates labeled TH 0256 through 0262.  It's
21  titled "1994 Red Book, Pharmacy's Fundamental
22  Resource."

Page 139

1      Q.   Does this type of document look
2  familiar to you, Miss Minne?
3      A.   I saw this type of document only as of
4  yesterday.
5      Q.   And what is it?
6      A.   This appears, again, to be some type
7  of marketing information.
8      Q.   Marketing information that would have
9  been provided to potential subscribers or
10  potential advertisers or both?
11     A.   This is --
12         MR. GASTWIRTH:  Objection to form.
13     A.   -- would be to potential subscribers
14  of the product.
15     Q.   So a slightly different focus on this
16  marketing material than what we saw in Exhibit
17  11?
18         MR. GASTWIRTH:  Objection to form, and
19  I'll object to the leading nature of your
20  questions to this witness.
21     Q.   Is that correct?
22     A.   That is what it would appear -- that

Page 140

1  is what it appears, yes.
2      Q.   Now, if you could, I'd like you to
3  focus on the third page of Exhibit 12, and I had
4  it folded there for you.
5      A.   Thank you.
6      Q.   It's -- toward the bottom of the page,
7  I'm focusing on the section that's titled "Get
8  the maximum return on third-party claims."
9          Do you see that?
10     A.   Yes, I do.
11     Q.   Reading for the record, "The Red Book
12  Update average wholesale price has become the
13  standard for many large insurance companies,
14  state and local governments and drug benefit
15  plans.  Pharmacists everywhere use the update to
16  find the latest drug price changes before they
17  file a reimbursement claim, thus maximizing the
18  return on third-party payments."
19         Did I read that correctly?
20     A.   Yes, you did.
21     Q.   As the Red Book corporate
22  representative, is that information accurate?

Page 141

1          MR. GASTWIRTH:  Objection to form.
2      A.   At the time it would have been
3  accurate.
4      Q.   And again, this is dated 1994;
5  correct?
6      A.   Correct.
7      Q.   To the extent a drug manufacturer
8  would verify or otherwise report AWPs that were
9  higher than competitive products' AWPs, would
10  that provide a reimbursement maximization
11  potential for customers?
12         MR. GASTWIRTH:  Objection to form, and
13  may I hear the question back, please.
14         MR. CAHILL:  Objection to form as well.
15         MR. ANDERSON:  I'll rephrase it.
16     Q.   Miss Minne, do you understand that
17  subscribers to Red Book, such as pharmacies,
18  could maximize reimbursement by dispensing one
19  generic that had an AWP much higher than a
20  competitive product's AWP?
21         MR. GASTWIRTH:  Objection to form.
22         MS. KAPLAN:  Objection to form.

36 (Pages 138 to 141)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 142

1     A.   I -- I have no knowledge of how
2  pharmacies dispense their products.
3     Q.   What is your understanding of the
4  statement provided by Red Book in Exhibit 12
5  concerning maximization of reimbursement?
6        MR. GASTWIRTH:  Objection to form.
7     A.   My understanding is they are talking
8  about the Red Book Update, which is a monthly
9  supplement to the annual published book, and the
10 way I interpret what they're saying is that by
11 getting the update they will see that prices have
12 changed throughout the year, so that when they
13 submit a claim, they can use the most current
14 price, which may have well been what they paid
15 for it as well.
16    Q.   All right.  And accordingly, for
17 instance, if the Red Book Update for a given
18 month happens to reflect an AWP increase taken by
19 a manufacturer, would that provide a mechanism in
20 Red Book's understanding for a pharmacy to
21 maximize reimbursement?
22       MR. GASTWIRTH:  Objection to form,

Page 143

1  calls for speculation.
2        MR. CAHILL:  If you understand.
3     A.   Again, how a pharmacy would submit
4  their claim and what price they would use to
5  submit that claim is not within the control of
6  Red Book.
7     Q.   I recognize it's not within your
8  control.  I'm asking is that within the
9  understanding of Red Book as to how a pharmacy
10 could maximize reimbursement.
11       MR. GASTWIRTH:  Objection to form,
12 calls for speculation.
13    A.   Yes.
14       (Document bearing Bates No. RGX 0189707
15 marked Exhibit Minne 013 for identification.)
16    Q.   Miss Minne, if you could take a look
17 at what's been marked as Exhibit 13.
18       MR. ANDERSON:  I apologize, I'm a
19 little short on extra copies of this one.
20    Q.   It's a one-page document, Bates
21 labeled RGX 0189707.
22       Do you recognize this type of document,

Page 144

1  ma'am?
2        MS. KAPLAN:  Could you describe it
3  again?
4        MR. ANDERSON:  Yeah, it's a single-page
5  exhibit, Bates labeled RGX 0189707, it's a Red
6  Book form letter dated July 16th, 1999 to "Dear
7  Pharmaceutical Manufacturer."
8        MS. KAPLAN:  Thank you.
9        MR. SWEENEY:  What are the Bates
10 numbers on this?  Where did this come from?
11       MR. ANDERSON:  Ropes & Gray for
12 Schering Warrick and Schering Plough.
13       MR. GASTWIRTH:  Can we just -- off the
14 record?  Could we just get a couple copies of
15 this document?
16       MR. ANDERSON:  Sure.  You want to go
17 off the record now and --
18       MR. GASTWIRTH:  Yeah, that might be --
19       THE VIDEOGRAPHER:  Off the record at
20 11:29.
21       (Pause)
22       THE VIDEOGRAPHER:  This is the

Page 145

1  videographer.
2        Back on the record at 11:31.
3        MR. ANDERSON:  Everyone has copies now.
4  BY MR. ANDERSON:
5     Q.   Miss Minne, have you had a chance to
6  review Exhibit 13?
7     A.   Yes, I have.
8     Q.   Are you familiar with this type of
9  document?
10    A.   Yes, I am.
11    Q.   What is it?
12    A.   It is a cover letter to the PLV that
13 is sent out annually.
14    Q.   And I appreciate your acronym for the
15 PLV, and that's what's known as the product
16 listing verification forms; correct?
17    A.   Correct.
18    Q.   For ease of reference, I may refer to
19 them as the verification forms.
20       Is that okay?
21    A.   Yes.
22    Q.   So this is a standard letter that

New York, NY

---

Page 146

1  would have gone out to pharmaceutical companies
2  with the printed verification forms annually from
3  Red Book; correct?
4       MR. GASTWIRTH:  Objection to form.
5    A.  Correct.
6    Q.  And why did Red Book send cover
7  letters such as Exhibit 13 to manufacturers?
8       MR. GASTWIRTH:  Objection to form.
9    A.  It provided some direction on what was
10 in the packet that was, you know, being sent, and
11 also on how to complete the information.
12   Q.  And was this type of letter one
13 mechanism by which Red Book was trying to ensure
14 the accuracy of the published pricing
15 information?
16      MR. GASTWIRTH:  Objection to form.
17   A.  It was a --
18      MR. ANDERSON:  What's the basis for the
19 objection?
20      MR. GASTWIRTH:  Can I hear the question
21 back, please.
22      MR. ANDERSON:  Well, you should know

---

Page 147

1  the basis without hearing the question.
2       MR. GASTWIRTH:  I want to base my
3  objection --
4       MR. ANDERSON:  I think, frankly, you're
5  just doing knee jerk objections without any
6  foundation.
7       MR. GASTWIRTH:  That is not correct,
8  Counsel.
9       MR. ANDERSON:  Well, provide the basis.
10      MR. GASTWIRTH:  You asked me to provide
11 a basis, I'm asking to hear the question.
12      MR. ANDERSON:  Well, fire away.
13      MS. TORGERSON:  Let's read it back.
14      (Record read)
15      MR. GASTWIRTH:  And I'll object because
16 the witness has not established in her prior
17 testimony that Red Book has attempted to
18 establish accurate pricing through any
19 communications that they sent out to anybody.
20      MS. TORGERSON:  And in addition to
21 that, the term that you're using, "accurate" is
22 vague and ambiguous.

---

Page 148

1       Accurate as to what?
2       MR. FARQUHAR:  And it's a leading
3  question.
4       MR. ANDERSON:  I would ask that if
5  someone's going to pose an objection, they need
6  to have the basis set forth, and they need to be
7  ready to explain that objection.  And, frankly,
8  even after you had the question read back, the
9  basis for your objection is not valid.
10      MR. GASTWIRTH:  The federal rules --
11      MS. TORGERSON:  Jarrett, you're not the
12 judge, okay.  Let's stop this, we're wasting the
13 witness' time.  You're not the judge, we will
14 object as proper under the federal rules.
15      MR. ANDERSON:  As long as they are
16 well-founded.
17      MS. TORGERSON:  We will make the
18 objections we will make.  You are not the judge.
19      Please continue with your questions.
20      MR. ANDERSON:  I'd like my question
21 answered, as a matter of fact.
22      MR. GASTWIRTH:  And I'll note my

---

Page 149

1  objection.
2       MR. CAHILL:  We'll have the question
3  read back.
4       MR. GASTWIRTH:  Again.
5       (Record read)
6    A.  Yes, it was a mechanism by which we
7  were trying to get the most current prices from
8  the manufacturer.
9    Q.  And looking in the first sentence
10 that's in bold and offset, Red Book writes, "Dear
11 Pharmaceutical Manufacturer:  Help us update your
12 free product listings in the 2000 Red Book to
13 ensure they are as comprehensive and accurate as
14 possible."
15      Did I read that correctly?
16   A.  Yes, you did.
17   Q.  What type of accuracy was Red Book
18 seeking?
19      MR. GASTWIRTH:  Objection to form.
20   A.  Accuracy that the NDCs are correct,
21 the product name is correct, the prices are
22 listed as the manufacturer wanted us to, the

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 150

1 effective date was -- was as the manufacturer
2 wanted us to list it as well.
3     Q.   So as to pricing, the accuracy was
4 completely dependent on the drug manufacturer;
5 correct?
6         MR. GASTWIRTH:  Objection to form.
7         MR. SWEENEY:  Objection to form.
8     A.   Yes.
9     Q.   Looking down toward the middle of the
10 document, there's a paragraph that begins with
11 the word "complete."  And I'll read for the
12 benefit of the record -- are you with me?
13     A.   Yes, I am.
14     Q.   Okay, thank you.
15         "Complete and up-to-date WAC (wholesale
16 acquisition cost) pricing is also requested for
17 our electronic database."
18         Did I read that correctly?
19     A.   Yes, you did.
20     Q.   Is it true that over the years Red
21 Book has published WAC pricing in its electronic
22 database?

Page 151

1     A.   Yes, it has.
2     Q.   And that, again, was pricing that was
3 derived from manufacturers; correct?
4     A.   That was received --
5         MR. GASTWIRTH:  Objection to form.
6     A.   -- from manufacturers, correct.
7     Q.   And annually verified by drug
8 manufacturers; correct?
9         MR. GASTWIRTH:  Objection to form.
10     A.   Correct.
11         MR. ANDERSON:  Ma'am, I appreciate your
12 answers, but if you could just hesitate a split
13 second because there are objections being lodged
14 and that way your answer's not drowned out by the
15 objection, okay.
16         THE WITNESS:  Okay.
17     Q.   Your last answer was yes; correct?
18     A.   My last answer was correct, yes.
19         Yes, you are correct, my last answer
20 was yes.
21         MR. ANDERSON:  All right.  We could do
22 a Laurel and Hardy routine...

Page 152

1     Q.   And then the closing sentence in this
2 form letter from Red Book to drug companies says,
3 "Thank you for your assistance and we look
4 forward to continuing a successful partnership in
5 maintaining the most up-to-date and accurate
6 listing for your company in the Red Book."
7         Did I read that correctly?
8     A.   Yes, you did.
9     Q.   And is that a true statement as to Red
10 Book's efforts over the years to maintain
11 accurate pricing?
12         MR. GASTWIRTH:  Objection to form. The
13 document speaks for itself.
14     A.   Accurate as far as -- that's what the
15 manufacturer wants us to list.
16     Q.   And to your knowledge, as the Red Book
17 representative, this type of form letter would
18 have gone out to all drug companies having their
19 NDC numbers published by Red Book from 1990 to
20 the present; correct?
21         MR. GASTWIRTH:  Objection.
22     A.   Correct.

Page 153

1         (Document bearing Bates Nos. RGX
2 0189708 through 0189712 marked Exhibit Minne 014
3 for identification.)
4     Q.   Now, if you could, Miss Minne, take a
5 look at what's been marked as Exhibit 14.
6         MS. CITERA:  Jarrett, could you just
7 describe it?
8         MR. ANDERSON:  Well, I've given my copy
9 to defense counsel for the moment.
10         It's a -- I think it's five pages,
11 Bates labeled RGX 0189708 through 712. It appears
12 to be a document titled "Manufacturer Directory
13 Information Form," and then the next pages are
14 some instructions.
15         MS. TORGERSON:  Can we take a break and
16 get a copy?
17         MR. ANDERSON:  Why don't we --
18         MS. TORGERSON:  Is now a good time to
19 break for lunch and make copies?
20         MR. SWEENEY:  Let's just make copies of
21 everything you've got so we won't have to do it
22 every time.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 154

1        MR. ANDERSON:  Let's take a lunch break
2   and we'll try to make copies of everything.
3        THE VIDEOGRAPHER:  This is the
4   videographer.
5        Off the record at 11:39. End of tape
6   two.
7        (Luncheon recess:  11:39 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 155

1        AFTERNOON SESSION
2        12:49 p.m.
3        THE VIDEOGRAPHER:  This begins tape
4   number three at 12:49.  We're back on the record
5   at this time.
6    K R I S T E N   M I N N E, having been
7   previously duly sworn, was examined and testified
8   further as follows:
9        EXAMINATION (Continued)
10  BY MR. ANDERSON:
11     Q.   Welcome back from lunch, Miss Minne.
12        Have you had a chance to review Exhibit
13  14?
14     A.   Yes, I have.
15     Q.   And are you familiar with this type of
16  document?
17     A.   Yes, I am.
18     Q.   What is it?
19     A.   It is again some information that is
20  sent out with a PLV.
21     Q.   And the PLVs are the verification
22  forms that Red Book would send to direct

Page 156

1   companies; correct?
2     A.   Correct.
3     Q.   All right.  And looking at the third
4   page of Exhibit 14, it appears that there are
5   some instructions set forth; is that correct?
6     A.   Correct.
7     Q.   And Mr. Gobena with the Department of
8   Justice walked you through one of the PLVs
9   earlier, and this is a document that basically
10  provides information about how manufacturers
11  should complete or verify the PLVs; correct?
12     A.   Correct.
13     Q.   Looking at the middle of the page,
14  there's a kind of depiction of a screenshot or a
15  page of a PLV, and I'm focusing your attention,
16  ma'am, on the field that's titled "AWP."
17        Do you see it?
18     A.   Yes, I do.
19     Q.   And then there's a parenthetical there
20  that says "required."  What is meant by that?
21     A.   At this time -- this was from 2000.
22  At the time the database where these prices were

Page 157

1   entered required an AWP price.
2     Q.   Why did Red Book require manufacturers
3   to report AWPs?
4        MR. LONERGAN:  Object to the form.
5        MS. CITERA:  Object to the form.
6     A.   I do not know why the database was set
7   up that way.
8     Q.   To your knowledge, did drug
9   manufacturers report AWP?
10        MR. LONERGAN:  Objection to form.
11        MR. SWEENEY:  Objection to form.
12        MS. CITERA:  Objection to form.
13     A.   To the best of my knowledge, they did.
14     Q.   And when you say "my knowledge," you
15  mean --
16     A.   My historical knowledge.
17     Q.   As Red Book's corporate
18  representative?
19        MS. TORGERSON:  Objection, form.
20     A.   Of the year 2000.
21     Q.   Only for that year, or as best you can
22  testify for the time period for which you've been

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                 November 18, 2008

New York, NY

Page 158

1 noticed as the corporate representative?
2        MS. TORGERSON: Objection to form.
3        MR. SWEENEY: Object to the form.
4        Only for that time period what?
5        MR. ANDERSON: It's from 1990 to the
6 present.
7    A.   For the time period prior to 2002,
8 when I was not involved with the Red Book data.
9    Q.   I see.  So prior to 2002 -- for the
10 time period prior to 2002 you are testifying on
11 behalf of Red Book; correct?
12   A.   Correct.
13   Q.   All right.  And you do understand that
14 prior to 2002 drug manufacturers were reporting
15 AWP information to Red Book?
16       MS. TORGERSON: Objection.
17       MR. SWEENEY: Objection to form.
18   A.   That is my understanding.
19   Q.   And in turn that reported AWP
20 information was being published by Red Book?
21       MS. TORGERSON: Object to the form.
22       MR. SWEENEY: Object to the form.

Page 159

1    A.   Correct.
2    Q.   Now, there's been some mention today
3 of what's known as an AWP policy that was
4 implemented; is that correct?
5    A.   Correct.
6    Q.   And that policy was implemented
7 sometime around 2002?
8        MR. GASTWIRTH: Objection to form.
9    A.   Very early in 2003.
10   Q.   Very early -- okay.
11       Can you provide a brief description of
12 what the Red Book AWP policy is that was
13 instituted in early 2003?
14   A.   The policy states that in a case where
15 a manufacturer will not supply an AWP, that Red
16 Book will calculate an AWP using a percentage
17 markup from WAC or direct.
18   Q.   And how does Red Book ascertain that
19 percentage markup?
20   A.   The policy is just a -- it's the same
21 for every manufacturer.  So every manufacturer
22 who will not supply it will -- their prices will

Page 160

1 be calculated using the same formula.
2    Q.   Did Red Book experience manufacturers
3 choosing to not publish an AWP, or refuse to
4 publish an AWP in the early 2000s?
5        MS. TORGERSON: Objection to form.
6    A.   Yes.
7    Q.   And was that a relatively new
8 experience in Red Book's business practices?
9        MR. SWEENEY: Objection to form.
10   A.   Yes.
11   Q.   Do you have any understanding as the
12 Red Book corporate representative as to why some
13 drug manufacturers were refusing to publish AWP?
14       MS. TORGERSON: Objection, form.
15       MR. SWEENEY: Objection, foundation.
16   A.   I do not know why they would not
17 supply AWP.
18   Q.   Did Red Book communicate to drug
19 manufacturers the standard markup that Red Book
20 would utilize to publish an AWP when drug
21 companies refused to report AWP?
22       MR. CAHILL: Under the new policy?

Page 161

1        MR. ANDERSON: Yes.
2    A.   Under the new policy, yes.
3    Q.   Why did Red Book notify manufacturers
4 of the markup?
5    A.   It allowed manufacturers a chance to
6 -- if they didn't like what we were going to
7 publish, it still allowed them an opportunity to
8 provide it to us if they chose.
9    Q.   And did some drug manufacturers choose
10 to report an AWP rather than allow Red Book to
11 utilize the markup?
12   A.   I am not aware of any.
13   Q.   So as a general matter, as the Red
14 Book corporate representative, Red Book's
15 experience was that if a manufacturer refused to
16 publish an AWP, they would allow Red Book to
17 utilize the markup in setting the AWP?
18       MR. GASTWIRTH: Objection, form.
19       MR. SWEENEY: Object to the form.
20   A.   Correct.
21       (Document bearing Bates Nos. TH 353
22 marked Exhibit Minne 015 for identification.)

41 (Pages 158 to 161)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

| Page 162 | Page 164 |
|---|---|

Page 162

1    Q.  If you could, take a moment and review
2   the one-page exhibit marked Minne Exhibit 15,
3   Bates labeled TH 353.
4       (Pause)
5    Q.  Have you had an opportunity to review
6   this e-mail?
7    A.  Yes.
8    Q.  And does this appear to be an e-mail
9   written by Michael Soares to Lauri Moore, with
10  copies to you and Karen Eckert, around October
11  14th, 2002?
12      MR. CAHILL:  Objection.
13      I think it's the other way around.
14      THE WITNESS:  Yeah.
15      MR. ANDERSON:  Oh, pardon.  I might
16  have misspoke, I'll rephrase to address that.
17   Q.  Does this appear to be an e-mail
18  written by Lauri Moore to Michael Soares, with
19  copies to you and Karen Eckert, around October
20  14th, 2002?
21   A.  Yes.
22   Q.  And the subject is "AWP Policy";

Page 164

1   Micromedex, the system was changed to make AWP an
2   optional data element."
3       Did I read that correctly?
4    A.  Yes, you did.
5    Q.  Did you, as Red Book's corporate
6   representative, understand why AWP was made an
7   optional data element?
8    A.  Yes, I do.
9    Q.  Why?
10   A.  The Red Book database, the NDCs that
11  are in the Red Book database, are used for
12  clinical screening on products.  So if an AWP was
13  required but we could not get an AWP, then we
14  couldn't enter that NDC into the database.  So
15  that product could not be screened for such
16  things as drug interactions and drug allergies.
17   Q.  And so there was an effort made in or
18  about 2000 to allow products to be input into the
19  system for clinical reasons without pricing, such
20  as AWP pricing information?
21   A.  Correct.
22   Q.  And when that decision was made, is it

Page 163

1   correct?
2    A.  Correct.
3    Q.  And it sets forth some information
4   about Red Book's experience with drug
5   manufacturers reporting AWP; correct?
6    A.  Correct.
7       MR. SWEENEY:  Object to the form.
8    Q.  Specifically in the first paragraph it
9   describes how AWP used to be a required element;
10  correct?
11   A.  Correct.
12   Q.  And NDCs would not be added to the
13  database without AWP information; is that right?
14      MR. SWEENEY:  Object to the form.
15   A.  Correct.
16   Q.  And is that true?
17   A.  To the best of my knowledge, I was not
18  involved with these products at that point that
19  that was a requirement.
20   Q.  I see.
21      Do you -- reading the next sentence in
22  that paragraph, it reads, "At the request of

Page 165

1   true that only 200 products or fewer were
2   actually input with a zero price in the AWP
3   field?
4    A.  That's what this says.  I cannot
5   confirm that number, I was not involved in the
6   analysis of how many zero prices there were.
7    Q.  Does that approximately sound correct?
8    A.  That would sound approximately
9   correct, yes.
10   Q.  And how many drug products total are
11  in the Red Book database today?
12   A.  Today, including in -- deactive and
13  active products, there are around 210,000 NDCs.
14   Q.  How many active NDCs, roughly, are in
15  the database today?
16   A.  My best guess would be 40 to 50,000.
17   Q.  So if you're comparing, roughly, 200
18  or less products with a zero price as AWP,
19  compared to 40 or 50,000 active NDC numbers,
20  obviously we're talking about a very small
21  fraction; is that right?
22   A.  Correct.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 166

1     Q.   Then there's -- in this Exhibit 15
2  there is a description of three ways in which AWP
3  is derived; is that correct?
4     A.   Correct.
5     Q.   And have you read those three
6  paragraphs?
7     A.   Yes, I have.
8     Q.   And does that accurately set forth how
9  Red Book has published AWP over the years?
10       MR. CAHILL:  Objection to form.
11       MR. SWEENEY:  Object to the form.
12    A.   At the point -- at the time this was
13  written in 2002, yes.
14    Q.   And is it true that in all three of
15  those mechanisms the manufacturer of a given NDC
16  is aware of the mechanism by which their AWP is
17  being published?
18       MR. GASTWIRTH:  Objection to form.
19       MR. SWEENEY:  Objection to form.
20       MS. TORGERSON:  Objection.
21    A.   Yes, they would have been aware.
22    Q.   And was that a purposeful --

Page 167

1        MR. ANDERSON:  Strike that.
2     Q.   Was that the purpose behind Red Book
3  formulating an AWP policy?
4        MR. GASTWIRTH:  Objection to form.
5        MS. TORGERSON:  Objection to form.
6        MR. ANDERSON:  I'll rephrase it.
7     Q.   Was the purpose behind Red Book
8  formulating that AWP policy to make sure that
9  drug manufacturers continued to be aware of the
10  mechanism by which their AWPs were being
11  published?
12       MR. CAHILL:  Objection.
13       MS. TORGERSON:  Object to form.
14    A.   That would have been one of the
15  purposes.
16    Q.   Back on Exhibit 14, I've got a
17  question about this, the bottom of the page, the
18  first page.
19    A.   Um-hum.
20    Q.   It says, "If you have any questions,
21  please call the Red Book hunt line."
22       What is the -- what is that?

Page 168

1     A.   I have no idea what the hunt line is.
2  Again, this was prior to my involvement with Red
3  Book.  I assume it's a hotline of some type.
4     Q.   Yeah, yeah.
5        So you don't know -- I was just curious
6  what that might mean.
7     A.   (No response)
8     Q.   Okay.
9        If you could, take a look at what's
10  being marked as Exhibit 16.
11       (PowerPoint presentation entitled
12  "Micromedex AQP analysis, October 15th, 2002"
13  marked Exhibit Minne 016 for identification.)
14       (Pause)
15    Q.   Have you had an opportunity to review
16  Exhibit 16?
17    A.   Yes, I have.
18    Q.   Are you familiar with this document?
19    A.   Yes, I am.
20    Q.   Were you a part of the creation of
21  this document?
22    A.   No, I was not.

Page 169

1     Q.   Can you describe generally what this
2  document is?
3     A.   This document pretty much is a
4  PowerPoint presentation of the e-mail from the
5  previous day, which is Exhibit 15, that again
6  describes where we get our pricing information
7  from.
8     Q.   Were you present when this PowerPoint
9  presentation was provided?
10    A.   No, I was not.
11    Q.   How did you become familiar with this
12  presentation?
13    A.   Through the documents made available
14  for this deposition.
15    Q.   Do you know who the audience was for
16  the presentation?
17    A.   I do not.
18    Q.   It's titled "Micromedex AQP Analysis,
19  October 15th, 2002"; correct?
20    A.   Correct.
21    Q.   And this -- if you look at the second
22  page, that page reads, "How do we gather MDX AWP

43 (Pages 166 to 169)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 170

1 information"; correct?
2    A.  Correct.
3    Q.  What does MDX stand for?
4    A.  Micromedex.
5    Q.  And is that a shorthand description of
6 the AWPs that were published by Red Book both
7 electronically and in printed publications?
8       MR. CAHILL:  The reference to
9 Micromedex, is that --
10      MR. ANDERSON:  Yes.
11   A.  What was happening at this time was
12 that Red Book was being moved from its base in
13 Montvale, New Jersey to the Denver office. So,
14 yes, Micromedex, meaning Red Book, at that time.
15   Q.  I see.
16      And the first bullet reads,
17 "Manufacturer supplies AWP"; correct?
18   A.  Correct.
19   Q.  Can you describe just generally what
20 that means?
21   A.  It would be an AWP -- an AWP that was
22 supplied to us by the manufacturer for their

Page 171

1 product.
2    Q.  All right.  And then there's a second
3 bullet that reads, "Manufacturer supplies
4 wholesale acquisition cost (WAC) or direct price
5 (DP)."
6       Did I read that correctly?
7    A.  Yes, you did.
8    Q.  And then there's a subbullet that
9 reads, "Manufacturer supplies an AWP markup
10 formula."
11      Did I read that correctly?
12   A.  Yes, you did.
13   Q.  Can you describe generally what that
14 concept is?
15   A.  That concept refers to when the
16 manufacturer would supply us with a WAC or a DP
17 price and verbally would tell us to create a WP,
18 add this merge.
19   Q.  So as opposed to providing the exact
20 numerical figure for the AWP, instead the
21 manufacturer would provide guidance on how the
22 AWP would be calculated?

Page 172

1    A.  Correct.
2    Q.  And then there's a second subbullet
3 that reads, "Manufacturer does not supply an AWP
4 markup formula."
5       Did I read that correctly?
6    A.  Yes.
7    Q.  How frequent was it that a
8 manufacturer would not provide Red Book with an
9 AWP, and not provide Red Book with markup
10 instructions to create an AWP?
11   A.  At this time -- at the time of this
12 presentation, put together in 2002 --
13   Q.  Yes.
14   A.  -- it was not very frequent.
15   Q.  Do you have an approximate number of
16 manufacturers in mind who would refuse to provide
17 either markup information or AWP information?
18   A.  It was between five and ten.
19   Q.  Do you know the names of any of those
20 manufacturers?
21   A.  I recall some of them.  I couldn't
22 list all of them.

Page 173

1    Q.  I understand.
2       As best you can, can you provide the
3 names of those manufacturers?
4    A.  Bedford, TAP, I believe Pharmacia.
5    Q.  Can you recall any others?
6    A.  Not off the top of my head.
7    Q.  Were the three that you named,
8 Bedford, TAP and Pharmacia, the larger drug
9 manufacturers who were refusing to provide AWP or
10 AWP markup information?
11      MR. GASTWIRTH:  Objection.
12      MR. SWEENEY:  Object to the form.
13   A.  Not being able to recall what the
14 other ones are, I can't answer that.
15   Q.  All right.  I'm going to go through a
16 list of some of the companies that are
17 represented here today, and ask you if they were
18 some of the companies who refused to provide both
19 AWP information and AWP markup information. All
20 right?
21   A.  Okay.
22   Q.  Schering?

44 (Pages 170 to 173)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 174

1         MS. TORGERSON:  Object to the form.
2     A.  I don't recall.
3     Q.  Schering Plough?
4         MS. TORGERSON:  Object to the form.
5     A.  I don't recall.
6     Q.  Warrick?
7         MS. TORGERSON:  Object to the form.
8     A.  I don't recall.
9     Q.  So providing you with the names isn't
10 going to assist you in recalling at all?
11    A.  No.
12    Q.  Is there some records kept -- because
13 I've been through Red Book's production, and I
14 can't find a listing.  I saw a reference to five
15 drug companies, but I couldn't find any listing
16 of the actual names of the companies.
17        Does Red Book have that information?
18    A.  Yes.
19    Q.  Would you provide that information?
20    A.  Yes.  It's actually currently on our
21 website.
22    Q.  Oh, really?

Page 175

1     A.  Yes.
2     Q.  Well, I should have just looked on the
3 web, then, rather than digging through all of the
4 produced documents.
5         All right.  When you say "our website,"
6 you mean if I just go to the website I'll be able
7 to find it fairly easily?
8     A.  It's the same website that lists our
9 AWP policy.
10    Q.  Okay, thank you.  I've got that web
11 address in the documents.
12    A.  Okay.
13    Q.  And that holds true not only as to the
14 manufacturers who were refusing to do -- report
15 AWP or AWP markup information today as well as
16 the names of the companies who refused to produce
17 AWP or AWP markup information back in the 2002
18 time frame; correct?
19    A.  It lists seven manufacturers, who were
20 the original seven that we applied the AWP policy
21 to, back starting in March of '03 --
22    Q.  Yes.

Page 176

1     A.  -- and then it lists more
2 manufacturers or specific products of a
3 manufacturer, and the date that the AWP was no
4 longer given to Red Book, so that we applied the
5 AWP policy.
6     Q.  Okay, thank you.
7         All right, now, continuing on with
8 Exhibit 16, looking at the third page now,
9 there's a bullet that reads, "Manufacturer" --
10        MR. ANDERSON:  Well, strike that.
11    Q.  The slide itself is titled
12 "Manufacturer-supplied AWP"; correct?
13    A.  Correct.
14    Q.  And then the first bullet reads, "As
15 policy, require manufacturer to supply written
16 information."
17        Did I read that correctly?
18    A.  Yes.
19    Q.  And is that Red Book's policy?
20    A.  That a manufacturer, for any price
21 that they supply to us, it has to be written, it
22 cannot be just a verbal communication.

Page 177

1     Q.  Why does Red Book require the
2 documentation to be written rather than provided
3 verbally?
4     A.  Again, to verify or make sure that
5 what we have entered into the database is what
6 the manufacturer requested that we list.
7     Q.  And then the second bullet reads,
8 "Documentation maintained indefinitely."
9         True?
10    A.  True.
11    Q.  And is that an accurate statement?
12    A.  Yes.
13    Q.  Why does Red Book maintain the
14 documentation of AWP indefinitely?
15    A.  So there's a record of why a price was
16 listed a certain way.
17    Q.  And is it true that ultimately that
18 enables Red Book to rely on the manufacturer for
19 the AWP, as opposed to any claims that Red Book
20 was controlling the AWP?
21        MS. LORENZO:  Object to the form.
22        MR. SWEENEY:  Object to the form.

45 (Pages 174 to 177)

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008

## New York, NY

Page 178

1        MR. GASTWIRTH:  Object to the form.
2     A.  Can you repeat the question?  I'm
3  sorry.
4     Q.  Is it true that ultimately that policy
5  enables Red Book to rely on the manufacturer as
6  opposed to any claims that Red Book was
7  controlling the AWP?
8        MR. SWEENEY:  Object to the form.
9        MR. GASTWIRTH:  Object to the form.
10     A.  Yes.
11     Q.  The third bullet reads, "Approximately
12  80 percent of Micromedex AWP information is
13  provided by manufacturers."
14        Correct?
15     A.  At the time that was correct.
16     Q.  And the time being back in around
17  2002?
18     A.  Correct.
19     Q.  What's the percentage today,
20  approximately?
21     A.  I would estimate 50 percent now.
22     Q.  Do you have any understanding -- and

Page 179

1  when I say "you" I mean Red Book -- does Red Book
2  have any understanding as to why fewer drug
3  companies are publishing AWP directly to Red Book
4  today?
5     A.  Yes.
6     Q.  Why?
7     A.  Our understanding is they don't want
8  to supply it because they don't want to be caught
9  up in entanglements such as this.
10     Q.  You mean this litigation?
11     A.  Correct.
12     Q.  Is there something wrong with the AWPs
13  that are published by manufacturers?
14        MS. TORGERSON:  Objection to form.
15        MR. LONERGAN:  Objection.
16        MR. GASTWIRTH:  Objection.
17        MR. SWEENEY:  Objection.
18     A.  Wrong?  I don't understand what you
19  mean by "wrong."
20     Q.  Why would drug companies back in the
21  '90s publish AWPs but not today?  Do you know, or
22  --

Page 180

1     A.  I --
2        MR. SWEENEY:  Object to form.
3        MS. TORGERSON:  Object to form.
4        MR. GASTWIRTH:  Object to form.
5        MR. FARQUHAR:  Lack of foundation.
6     A.  I don't work for a manufacturer, I
7  can't answer that question.
8     Q.  All right.  That's all I want, is just
9  Red Book's best testimony.
10        The next page, looking at the third
11  subbullet, that begins with the acronym MDX.
12        "MDX writes up verbal communication and
13  maintains it is files indefinitely."
14        Did I read that correctly?
15     A.  Yes, you did.
16     Q.  Why does Micromedex and Red Book write
17  up verbal communication of AWP for manufacturers?
18     A.  At the time the practice was if the
19  manufacturer would only supply the information as
20  far as what to -- the formula to use for creating
21  AWP, obviously that communication had to be
22  documented, so that we didn't have to continually

Page 181

1  go back to the manufacturer and ask "What would
2  you like us to do."
3     Q.  And did Red Book notify manufacturers
4  that they would be documenting the verbal
5  communication concerning AWP from the
6  manufacturer?
7     A.  I don't know.
8     Q.  Well, we'll get into some specific
9  examples in a little bit that may refresh your
10  memory.
11        Do you recall any manufacturers by name
12  who would only provide AWP markup information
13  verbally?
14     A.  No.
15     Q.  Was it a relatively small group of
16  manufacturers?
17     A.  Again, relatively, yes.
18     Q.  Can you approximate the number?  Was it
19  more than ten or less than ten?
20        MR. CAHILL:  Objection.
21     A.  It would have been more than ten.
22     Q.  More than ten?

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

Page 182

1     A.  (Nodding)
2     Q.  What about more than 20?
3     A.  Probably more than 20.
4     Q.  Is there some documentation that's
5  maintained by Red Book about the identity of the
6  drug companies who began only providing AWP
7  information verbally?
8     A.  Yes.
9     Q.  Is that also on the website?
10     A.  No.
11     Q.  Has that information been produced?
12  Because if it has, I haven't located it.
13        MR. CAHILL:  It's up to you, I could
14  respond.  If you want the witness to respond, I'm
15  not trying to interject.
16        MR. ANDERSON:  Okay.
17     Q.  First, do you know, ma'am, has it been
18  produced?
19     A.  Has it been produced for this
20  deposition?
21     Q.  Yes.
22     A.  That I do not know.

Page 183

1     Q.  Okay.
2        MR. ANDERSON:  Tom, I don't want to get
3  into a long --
4        MR. CAHILL:  And I don't want it
5  either, so I'll -- yeah.
6        MR. ANDERSON:  Do you know, has it been
7  produced?  Did I miss it?
8        MR. CAHILL:  My point was going to be
9  we produced the manufacturer files.  So, in other
10  words, if there were, to the extent there's
11  written --
12        MR. ANDERSON:  You're right, and I've
13  got some examples of those, but I'm asking more
14  as a summary.
15     Q.  Is there --
16        MR. ANDERSON:  And I'll clarify the
17  record.  Thank you, Tom.
18     Q.  Is there a document or some
19  documentation that provides a listing of the
20  identity of the manufacturers who only provide
21  AWP information verbally?
22     A.  Not that I'm aware of.

Page 184

1     Q.  So instead it's -- that information
2  about AWP communication is reflected in each
3  manufacturer's file?
4     A.  Correct.
5     Q.  Okay.  And we're going to get to some
6  examples of that, but is it true that Red Book
7  keeps a so-called "AWP policy file" on each
8  manufacturer name by name?
9        MS. TORGERSON:  Object to form.
10        MR. SWEENEY:  Object to form.
11     A.  If -- Red Book is implementing their
12  AWP policy since 2003, yes.
13     Q.  All right.  A couple of final
14  questions on Exhibit 16.
15        Do you believe as the Red Book
16  representative that Exhibit 16 was primarily an
17  internal document to Red Book and Micromedex?
18     A.  Yes.
19     Q.  Okay.  Now, if you could, take a look
20  at what's been marked as Exhibit 17.
21        (Document bearing Bates No. TH 463
22  marked Exhibit Minne 017 for identification.)

Page 185

1     Q.  Are you familiar with the one-page
2  document marked Exhibit 17, Bates labeled TH 463?
3     A.  Yes.
4     Q.  And what is this document?
5     A.  This is the AWP policy.
6     Q.  And was this information provided by
7  Red Book externally?
8     A.  This information was created by
9  Thomson.
10     Q.  Yes, I know it was created by Red
11  Book, Thomson, but I'm saying was it then in turn
12  provided external to Red Book?
13     A.  Yes.
14     Q.  And do you know how it was
15  disseminated?
16     A.  It's listed on our website, and all
17  manufacturers who were no longer supplying AWP
18  were then sent this communication to let them
19  know.
20     Q.  Thank you.
21        So this letter, marked Exhibit 17, was
22  literally sent to drug manufacturers who were

47 (Pages 182 to 185)

Page 186

1 refusing to --
2        MR. ANDERSON:  Well, strike that, I'll
3 ask a broader question.
4    Q.  Was Exhibit 17 sent to every drug
5 manufacturer who had NDCs published in Red Book?
6    A.  Not to my knowledge.
7    Q.  Okay.  Who was the --
8        MR. ANDERSON:  Strike that.
9    Q.  Which types of drug manufacturers did
10 receive what's marked as Exhibit 17?
11   A.  The manufacturers who no longer
12 supplied us with AWP or a markup formula to
13 create the AWP were sent this communication.
14   Q.  Okay.
15       And again, without beating a dead
16 horse, this just conveys the same information we
17 went over in the PowerPoint presentation marked
18 Exhibit 16; correct?
19       MR. GASTWIRTH:  Objection to form.
20   A.  Exhibit 16 is an internal -- Exhibit
21 16 --
22   Q.  I realize that.

Page 187

1    A.  -- was not shared.
2        Exhibit 16 explains where we're at and
3 why we need to create the policy.  Exhibit 17 is
4 the policy.
5    Q.  I see.
6        Has the policy changed any from May
7 22nd, 2003 to the present?
8    A.  I believe there was an update in '04,
9 just a few footnotes were updated or something
10 like that.
11   Q.  All right.  Moving right along, we'll
12 get to that update.
13       (Document bearing Bates Nos. TH269
14 through 280 marked Exhibit Minne 018 for
15 identification.)
16   Q.  If you could, take a look at what's
17 been marked as Exhibit 18.
18       MR. ANDERSON:  For the record, Exhibit
19 18 is titled "Red Book and Ready Price Average
20 Wholesale Price Communication Policy," dated July
21 23rd, 2003, and it's labeled TH269 through 280.
22   Q.  Are you familiar with this document?

Page 188

1    A.  Yes, I am.
2    Q.  And can you describe it generally?
3    A.  This document describes how we will
4 respond to customers and non-customers and
5 manufacturers when they call the company to ask
6 about our AWP policy or specific prices.
7    Q.  So this was a mechanism where Thomson
8 and Red Book could guide their representatives'
9 communications with drug manufacturers?
10   A.  Correct.
11   Q.  And looking at the second-to-last page
12 of this Exhibit 18, I see that there's the AWP
13 policy set forth; correct?
14   A.  Correct.
15   Q.  With the same effective date as the
16 policy itself, which was previously marked as
17 Exhibit 17; correct?
18   A.  Correct.
19   Q.  All right.
20       Now I've got a similar document, but
21 it's dated a few days later.
22       (Document dated July 29, 2003 marked

Page 189

1 Exhibit Minne 019 for identification.)
2    Q.  Are you familiar with this document?
3    A.  Yes, I am.
4    Q.  And just to streamline matters, can
5 you describe to me what differences, if any,
6 exist between Exhibit 19, which is dated July
7 29th, 2003, and Exhibit 18, which is dated July
8 23rd, 2003?
9    A.  My understanding between the two
10 documents is that Exhibit 19 was specific for the
11 salespeople.
12   Q.  So this was for Red Book personnel
13 involved in the promotion and sales of Red Book's
14 products and services?
15       MR. GASTWIRTH:  Objection.
16   A.  Correct.
17   Q.  The answer was "correct"?
18   A.  Correct.
19   Q.  Who was the intended audience within
20 Red Book of Exhibit 18?
21   A.  For Exhibit 18 who was the intended
22 audience?

48 (Pages 186 to 189)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 190

1    Q.  Yes, Miss Minne.
2    A.  It would have included our editorial
3  staff, our -- what we call our ETS, external tech
4  support.
5    Q.  I see.  And the person -- the entities
6  that editorial staff would be dealing with, for
7  instance, would be drug manufacturers; correct?
8      MR. GASTWIRTH:  Objection to form.
9    A.  Correct.
10    Q.  Who would be the typical type of
11  entity that the sales personnel would be
12  interacting with?
13    A.  They would be the customers.
14    Q.  Which could be subscribers such as
15  manufacturers, but it could also include
16  pharmacies, chain pharmacies and third-party
17  payors; correct?
18    A.  Correct.
19    Q.  As well as specifically government
20  agencies that subscribe to Red Book; correct?
21    A.  Correct, if they're a customer.
22    Q.  All right.

Page 191

1      And again, the second-to-last page of
2  Exhibit 19 also sets forth the AWP policy;
3  correct?
4    A.  Correct.
5    Q.  And is it true that that policy
6  basically states that the manufacturers are the
7  ones who are controlling the AWPs that are
8  published?
9      MR. GASTWIRTH:  Objection to form.
10      MR. SWEENEY:  Objection to form.
11      MS. LORENZO:  Objection to form.
12    A.  It's stating if a manufacturer won't
13  supply the AWP, we will calculate it using our
14  formula.
15    Q.  And notify the manufacturer of such?
16    A.  That we are doing such, exactly.
17    Q.  Has any manufacturer ever prevented
18  Red Book from publishing an AWP in accordance
19  with the AWP policy?
20      MS. TORGERSON:  Objection to form.
21    A.  Yes.
22    Q.  Which company?

Page 192

1    A.  Glaxo.
2    Q.  When did Glaxo take that action?
3    A.  It was only for one product, and it
4  was either the fall of '07 or the fall of '06, I
5  don't recall.
6    Q.  And how did Glaxo take that action?
7    A.  They would not provide any type -- any
8  price of any type.
9    Q.  Other than that one instance with
10  Glaxo, is there any other instance where a drug
11  company has prevented Red Book from publishing
12  pricing information in accordance with the AWP
13  policy?
14    A.  Not that I'm aware of.
15    Q.  And you're the corporate
16  representative who would be most knowledgeable
17  about that; correct?
18      MR. SWEENEY:  Object to the form.
19    A.  I'm the corporate representative, yes.
20    Q.  And -- I mean, you were in charge of
21  the editorial group during all the recent years,
22  generally?

Page 193

1      MR. SWEENEY:  Object to the form.
2    A.  With a few exceptions as noted earlier
3  --
4    Q.  Yes.
5    A.  -- a few years, yes.
6      (Document describing electronic file of
7  Red Book marked Exhibit Minne 020 for
8  identification.)
9    Q.  Now, if you could, take a look at
10  what's been marked as Minne Exhibit 20.
11      (Pause)
12    Q.  Are you familiar with this --
13      MR. ANDERSON:  I'm sorry, Doug, I know
14  you're over there and not able to see the
15  document.
16      MR. FARQUHAR:  We're getting copies
17  over here, we're fine.
18      MR. ANDERSON:  Oh, you're good now?
19  Okay.
20      MR. FARQUHAR:  Thank you, Jarrett.
21      MR. ANDERSON:  My pleasure.
22    Q.  Are you familiar with Exhibit 20, Miss

49 (Pages 190 to 193)

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 194

1  Minne?
2      A.  Yes.
3      Q.  What is it?
4      A.  It's a document that describes the
5  electronic or one of the electronic files
6  available of the Red Book.
7      Q.  And who would be the intended audience
8  of Exhibit 20?
9      A.  The intended audience would be a
10  customer who either has purchased or is
11  interested in purchasing the electronic files.
12      Q.  Subscribers who receive the electronic
13  pricing data, for instance?
14      A.  Correct.
15      Q.  And again, that could include
16  manufacturers, as well -- or does include
17  manufacturers as well as pharmacies, chain
18  pharmacies and third-party payors, like the
19  government?
20      A.  Yes.  Could include anyone.
21      Q.  And on the back page of Exhibit 20,
22  the AWP policy is set forth; correct?

Page 195

1      A.  Yes.
2      Q.  And this appears to have been sent out
3  around November 2003; correct?
4      A.  It appears that way.
5      Q.  Okay.
6      (Revision to AWP policy marked
7  Exhibit Minne 021 for identification.)
8      Q.  Now, if you could take a look at
9  what's been marked Minne 21.
10      Are you familiar with this document?
11      A.  Yes.
12      Q.  And this is the revision to the AWP
13  policy from early 2004 that you referenced
14  previously; correct?
15      A.  Correct.
16      Q.  And what is the revision that's
17  reflected in 21 -- in Exhibit 21 that's somehow
18  different than the preceding AWP policy?
19      A.  I believe it has to do with the
20  second-to-last paragraph, where we talk about
21  websites to go for more information.
22      Q.  And is that the web address that you

Page 196

1  mentioned earlier which contains the identity of
2  drug manufacturers who refused to provide AWP or
3  AWP markup information?
4      A.  Yes.
5      Q.  Miss Minne, I'm now going to be going
6  into some manufacturer-specific information.
7      (Document bearing Bates Nos. Red Book
8  00595 through 600 marked Exhibit Minne 022 for
9  identification.)
10      Q.  If you could, take a look at what's
11  been marked as Exhibit 22.
12      MR. ANDERSON:  For the record, Exhibit
13  22 is a document Bates labeled Red Book 00595
14  through 600.
15      (Pause)
16      Q.  Have you had an opportunity to review
17  Exhibit 22?
18      A.  Yes.
19      Q.  Are you familiar with Exhibit 22?
20      A.  Yes.
21      Q.  What is generally Exhibit 22?
22      A.  This exhibit is demonstrating a

Page 197

1  manufacturer who we have -- who will not supply
2  AWP or a markup, so we applied the AWP policy.
3      It's also showing that every year we
4  reconfirm that that is still what the
5  manufacturer -- that they will not supply, and we
6  -- every year we send out the communication, the
7  policy, and verification that "this is what we're
8  doing with your products."
9      Q.  And this particular company happens to
10  be Abbott Pharmaceuticals; correct?
11      A.  Correct.
12      Q.  So I take it, then, that Abbott
13  Pharmaceuticals will be one of the seven
14  companies that's listed on the website?
15      MS. CITERA:  Object to the form.
16      A.  I don't know if they were one of the
17  original seven, but they would be listed now with
18  the date that they stopped supplying AWP.
19      Q.  Can you ascertain from Exhibit 22 what
20  date Abbott Pharmaceutical chose to stop
21  reporting AWP or AWP markup information?
22      A.  No.  It would have been prior to July

50 (Pages 194 to 197)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 198

1  13th of 2004.
2      Q.  You're looking at the fourth page?
3      A.  The last page.
4      Q.  The last page.
5          And why do you say it would have been
6  before July 14th?
7      A.  Because it says, "I faxed you the Red
8  Book AWP policy back on July 13th, '04; AWP
9  equals WAC plus 20 percent per policy," so that's
10 indicating that in July of '04 that policy was
11 already in effect.
12     Q.  I see.
13         If you could, take a look at the third
14 page of Exhibit 22.
15         Do you agree that appears to be a
16 letter from Micromedex/Red Book dated August 9th,
17 2005 to April Gerzel, Abbott Pharmaceuticals?
18     A.  Yes.
19     Q.  And Traci Kellam, I take it's an
20 employee of Red Book; correct?
21     A.  Correct.
22     Q.  Was Traci actually within the

Page 199

1  editorial services department?
2      A.  Yes.
3      Q.  Working under you; correct?
4      A.  Correct.
5      Q.  And Traci writes, "This letter is in
6  regards to our verbal conversation concerning AWP
7  for Abbott Pharmaceutical's products on August
8  9th, 2005 at 11:50 a.m.  In the absence of a
9  manufacturer provided AWP or a manufacturer
10 calculated markup to establish an AWP, we will be
11 implementing a 20 percent markup above WAC to
12 calculate AWP.  We will not report a third
13 party's determination of AWP for your products.
14 As discussed in our conversation, this markup
15 will apply to all Pharmaceutical's products" --
16 "to all Abbott Pharmaceutical's products.  This
17 is in accordance with our company policy for
18 calculation of AWP."
19         Did I read that correctly?
20     A.  Yes.
21     Q.  Why did Red Book go to the trouble of
22 notifying Abbott of this information?

Page 200

1          MS. CITERA:  Objection to form.
2      A.  Again, documentation so the
3  manufacturer knows exactly how we're getting
4  those AWPs for their products.
5      Q.  Is there a historical basis for the 20
6  percent markup to calculate AWP?
7      A.  That's based on the policy.
8      Q.  And did Red Book base that policy on
9  historical information about how drug
10 manufacturers reported AWP?
11     A.  They came up with that percentage
12 based on analysis of the data that they currently
13 had in the database.
14     Q.  Right.
15         And so, simply put, over the years
16 there has been recognition that AWPs were
17 generally 20 percent higher than WACs --
18         MS. TORGERSON:  Objection to form.
19     Q.  -- correct?
20         MS. TORGERSON:  Objection to form.
21     A.  Correct.
22     Q.  Has Abbott Pharmaceuticals, to your

Page 201

1  knowledge -- and I mean Red Book's knowledge --
2  ever sought to prevent Red Book from publishing
3  an AWP for Abbott drugs?
4          MS. CITERA:  Objection to form.
5      A.  I am not aware of that.
6      Q.  Then if you could, look at the next
7  page of Exhibit 22.  It's titled "Abbott
8  Pharmaceutical Company Pricing/Markup History,"
9  and it's dated January 1st, '95 through August
10 9th, 2005; correct?
11     A.  Correct.
12     Q.  Does Red Book keep records such as
13 this for all companies, drug companies, that have
14 NDCs published by Red Book?
15     A.  Yes.
16     Q.  Why?
17     A.  Again, documentation of dates where
18 things occurred, and also documentation of verbal
19 communications between manufacturers and Red Book
20 staff.
21     Q.  And is one of the purposes behind this
22 documentation to ultimately enable Red Book to

51 (Pages 198 to 201)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

| Page 202 |
|---|

1  establish that manufacturers are controlling the
2  pricing that's published?
3          MR. CAHILL:  Objection.
4          MS. CITERA:  Object to form.
5      A.  No, the purpose behind this is to know
6  what we're doing and why we're doing it.
7      Q.  Couldn't Red Book notify manufacturers
8  without going to the steps of documenting all the
9  notifications to the manufacturers?
10     A.  It could, but it wouldn't be smart
11 practice.
12     Q.  Why?
13     A.  Pure business sense; you document why
14 you do what you do.
15     Q.  Yeah.  Because then if it wasn't
16 documented, maybe a manufacturer could dispute it
17 later?
18         MS. CITERA:  Objection to form.
19     Q.  Is that right?
20     A.  Anyone could dispute it.
21     Q.  Are these records kept in the ordinary
22 course of Red Book's business?

| Page 203 |
|---|

1      A.  Yes.
2      Q.  And are they maintained in such a way
3  that they are believed to be reliable?
4      A.  Yes.
5      Q.  I notice on this page, Bates labeled
6  Red Book 00598 of Exhibit 22, there are multiple
7  notations about communication by Red Book to
8  Abbott concerning the AWP policy.
9          Would you agree with me?
10         MS. CITERA:  Objection.
11     A.  Yes.
12     Q.  Why is it that Red Book would make
13 efforts to repeatedly notify manufacturers of the
14 AWP policy?
15         MS. CITERA:  Objection to form?
16     A.  It's our internal company policy to
17 reconfirm every year with the manufacturer that
18 our AWP policy is still in existence.
19     Q.  Looking down at the last entry of this
20 chronology, it's dated August 20th, 2002, and
21 I'll read it for the benefit of the record: "AWP
22 equal WAC plus 25 percent (previously provided)."

| Page 204 |
|---|

1          What does that information indicate to
2  you as Red Book's corporate representative?
3          MS. CITERA:  Objection, form.
4      A.  That indicates that at that time,
5  which was before implementation of the AWP
6  policy, the Abbott prices were being determined
7  by WAC plus 25 percent.  Previously provided
8  meaning Abbott would have provided that markup
9  percentage to Red Book.
10     Q.  So prior to or, frankly, potentially
11 after August 20th, 2002 as well, the AWPs that
12 were published by Red Book for Abbott
13 Pharmaceuticals' products were based on a WAC
14 plus 25 percent formula that had been provided to
15 Red Book by Abbott; correct?
16         MS. CITERA:  Object to the form.
17     A.  Correct.
18     Q.  Is there any possibility that that
19 formula was created by Red Book and Red Book
20 alone?
21         MS. CITERA:  Object to the form.
22         MR. CAHILL:  Objection.

| Page 205 |
|---|

1      A.  I have no knowledge.
2      Q.  Okay.
3          Looking at the entry dated March 5th,
4  2003, reading, "Effective 3/3/03 price list from
5  Abbott did a 25 percent markup from previous
6  notes," and then there's several drug names
7  listed.
8          Did I read that correctly?
9      A.  Yes.
10     Q.  What does that phrase, "effective
11 3/3/03 price list from Abbott did a 25 percent
12 markup," indicate to you as Red Book's corporate
13 representative?
14         MS. CITERA:  Objection, form.
15     A.  It indicates to me that we received a
16 price list from Abbott on that date, and per the
17 previous notes from 8/20/02, AWP was calculated
18 using the 25 percent formula that was provided.
19     Q.  Provided by who?
20     A.  By Abbott.
21     Q.  To Red Book; correct?
22     A.  To Red Book.

52 (Pages 202 to 205)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

Page 206

1      Q.   And in turn Red Book published that
2  information; correct?
3          MS. CITERA:  Objection to the form.
4      A.  Correct.
5          (October 2000 verification forms for
6  Abbott Pharmaceuticals marked Exhibit Minne 023
7  for identification.)
8      Q.   Now, if you could, Miss Minne, take a
9  look at what's been marked as Exhibit 23.
10         Are you familiar with documents such as
11 Exhibit 23?
12         MS. CITERA:  Object to the form.
13         (Pause)
14     A.  I'm familiar that this is a PLV, yes.
15     Q.  PLV, again, being the verification
16 forms; correct?
17     A.  Correct.
18     Q.  And this one happens to be for Abbott
19 Pharmaceuticals dated in October of 2000;
20 correct?
21     A.  Correct.
22     Q.  And there's AWPs listed; correct?

Page 207

1      A.  Correct.
2      Q.   As well as direct prices and WACs;
3  correct?
4      A.  Correct.
5      Q.  And then throughout the document,
6  apparently Krista Kleidon, an Abbott
7  representative, has signed each page; correct?
8          MS. CITERA:  Objection, form.
9      A.  Correct.
10     Q.   So this would be a practical example
11 of how a drug manufacturer would verify the
12 prices being published by Red Book on an annual
13 basis?
14         MS. CITERA:  Object to the form.
15         MR. SWEENEY:  Object to the form.
16     A.  Correct.
17         MR. ANDERSON:  Let's go off the record
18 for just a second.  We're not taking a break
19 necessarily, unless you need one.
20         THE WITNESS:  I'm fine.
21         THE VIDEOGRAPHER:  This is the
22 videographer.

Page 208

1          Off the record at 13:41.
2          (Pause)
3          THE VIDEOGRAPHER:  This is the
4  videographer.
5          This begins tape number four at 13:51.
6  We're back on the record at this time.
7          (Document with first page entitled
8  "Abbott Pharmaceutical Markup History" marked
9  Exhibit Minne 024 for identification.)
10 BY MR. ANDERSON:
11     Q.   Okay, Miss Minne, before I move on to
12 some other documents, I wanted to mark a couple
13 of other markup history documents.
14         This is Exhibit 24.  And I'm going to
15 particularly be focusing on the second page of
16 this one.
17         Do you agree the second page of Exhibit
18 24 appears to be titled "Abbott Hospital Products
19 Company Pricing/Markup History"?
20     A.  Correct.
21     Q.  And the first page is "Abbott
22 Pharmaceutical Markup History" that we had

Page 209

1  already talked about; correct?
2      A.  Correct.
3      Q.  All right.  And then this page, the
4  second page, of Exhibit 24 sets forth the
5  chronology of communications between Red Book and
6  Abbott Hospital Products concerning the
7  publication of drug prices; is that right?
8          MS. CITERA:  Object to the form.
9      A.  Correct.
10     Q.  For instance, looking at the entry
11 dated May 16th, 2002, it reads, "FDB changed
12 markup to 25 percent on January '02 for all price
13 changes.  Per manufacturer we are to continue
14 using their usual markup, 18.75 percent, per
15 Jerrie."
16         Did I read that correctly?
17     A.  Yes.
18     Q.  Are you familiar with a woman who used
19 to work at Abbott known as Jerrie Cicerale?
20     A.  No, I'm not.
21     Q.  Do you believe that this entry in the
22 Red Book markup history for Abbott Hospital

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
## New York, NY

Page 210

1  Products is referring to a person at Abbott
2  providing direction to Red Book as to how to
3  publish AWP?
4         MS. CITERA:  Object to the form.
5     A.  Yes.
6         MS. CITERA:  Also object as outside the
7  scope.
8     A.  That would be my assumption.
9     Q.  Then looking at the entry dated April
10 3rd, 2003, it reads, "Spoke to Jerrie Cicerale on
11 April 3rd, 2003 at 1:50 p.m.  Would not confirm
12 AWP.  Sent her a fax confirming the Red Book
13 policy on AWP of 20 percent markup (MDX applied
14 markup)."
15        Did I read that correctly?
16    A.  Yes.
17    Q.  Was there sometime around 2003 when
18 some companies were more hesitant to publish AWP
19 information than they had been before?
20        MS. CITERA:  Object to the form.
21        MR. SWEENEY:  Object to the form.
22        MR. GASTWIRTH:  Object to the form.

Page 211

1     A.  Starting in the early 2000s, it became
2  much more common.
3     Q.  Does Red Book have any understanding
4  why that is?
5         MS. CITERA:  Object to the form.
6         MR. GASTWIRTH:  Object to the form.
7     A.  No.
8     Q.  Look at the entry dated May 16th,
9  2002.  It reads, "AWP equal inner pack dollar
10 (trade) less 5 percent plus 25 percent (solid
11 size equal units per inner pack (18.75 percent)
12 April '97, per Michael Heggie."
13        Did I read that correctly?
14    A.  Yes.
15    Q.  Are you familiar with the fact that
16 there was a markup percentage known by Red Book
17 concerning Abbott Hospital Products of 18.75
18 percent to create an AWP?
19        MS. CITERA:  Object to the form.
20    A.  My only knowledge of that would be
21 what's written here.
22    Q.  All right.

Page 212

1     Q.  Do you have any reason to question the
2  accuracy of these entries about the pricing
3  representations?
4     A.  No.
5         MS. CITERA:  Object to the form.
6     (January 1, 1995 through September 18,
7  2003 records of Roxane pricing/markup history
8  marked Exhibit Minne 025 for identification.)
9     Q.  Now, similarly, Miss Minne, take a
10 look at what's been marked as Minne Exhibit 25,
11 which is another markup history for Roxane.
12        Do you agree that this appears to be
13 Red Book's records of the Roxane company
14 pricing/markup history?
15        MR. GASTWIRTH:  Objection.
16    A.  Yes.
17    Q.  And this is dated January 1st, '95
18 through September 18th, '03; correct?
19    A.  Correct.
20    Q.  And looking, for instance, at the
21 entry -- the last entry, which is also dated
22 September 18th, 2003, it reads, "Clarification:

Page 213

1  Per Lesli Paoletti, for all products Roxane
2  supplies AWP.  E-mail confirmation filed."
3         Did I read that correctly?
4     A.  Yes.
5     Q.  Does that statement indicate to you
6  that Roxane was directly providing AWP
7  information to Red Book for publication?
8         MR. GASTWIRTH:  Objection to form.
9     A.  Yes.
10    Q.  Looking at the last entry shown on
11 Exhibit 25, which is dated May 14th, 2001, it
12 reads, "Manuf provides AWP.  Do not list WAC even
13 if provided."
14        Did I read that correctly?
15    A.  Correct.
16    Q.  The statement "Manuf provides AWP" is
17 just reflecting that, at least according to Red
18 Book's records, Roxane was directly providing AWP
19 for Red Book's publication; correct?
20        MR. GASTWIRTH:  Objection to form.
21    A.  Correct.
22    Q.  All right.  What does the statement

54 (Pages 210 to 213)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 214

1  "Do not list WAC even if provided" indicate to
2  you, as Red Book's corporate representative?
3      A.  It indicates to me that there were
4  some, maybe all, products that WAC was -- where
5  Roxane was providing WAC.  However, they did not
6  -- it does not appear that they wanted it listed
7  in our electronic files, so we would have honored
8  that request.
9      Q.  All right.  So not only with Roxane in
10 this particular instance, but just as a general
11 matter, if a drug company directed Red Book to
12 not publish WAC pricing, whether in print form or
13 electronic form, Red Book would honor that
14 request?
15     MR. CAHILL:  Objection to form.
16     A.  Yes.
17     Q.  Do you have an understanding, as Red
18 Book's corporate representative, why some drug
19 manufacturers did not want their WACs published?
20     MS. CITERA:  Objection to form.
21     MR. GASTWIRTH:  Objection to form.
22     A.  I do not know.

Page 215

1      Q.  Is there any instance where Red Book
2  disregarded a manufacturer's instructions
3  concerning the publication of WAC, whether in
4  print form or electronic form?
5      MR. CAHILL:  Objection to form.
6      They don't publish WAC in the print, is
7  my understanding.
8      MR. ANDERSON:  Well, I know, I
9  understand that, Tom.  That's why I'm including
10 both categories.
11     MR. CAHILL:  Okay.
12     A.  Can you repeat the question?
13     Q.  Yes, I will.
14     Is there any instance to Red Book's
15 knowledge of Red Book disregarding a drug
16 company's instructions with respect to the
17 publication of WAC pricing, whether it be in
18 print form or electronic form?
19     MR. GASTWIRTH:  Objection to form.
20     A.  Not that I'm aware of.
21     Q.  So to the extent any WACs were being
22 published in electronic form over the years by

Page 216

1  Red Book, that was pursuant to a direct
2  instruction by a drug company?
3      MR. GASTWIRTH:  Objection to form.
4      MR. SWEENEY:  Object to the form.
5      A.  They might not have directly told us
6  to print them, but the fact that they were
7  supplying them to us was our understanding that
8  they were okay that we did publish them unless
9  otherwise stated, as it says here.
10     Q.  I see your distinction.  But if a drug
11 company had caused a WAC to be reported to Red
12 Book, but then in turn gone the next step and
13 said, "By the way, though, don't publish the
14 WACs," Red Book would have honored that drug
15 company's request?
16     MR. GASTWIRTH:  Objection to form.
17     A.  Yes.
18     Q.  Is there any list summarizing the
19 identities of the manufacturers who requested
20 that WAC not be published for their drugs?
21     A.  Not that I'm aware of.
22     Q.  So that information would only be

Page 217

1  reflected in the company files such as, for
2  instance, this example of the company
3  pricing/markup history marked Exhibit 25?
4      A.  Correct.
5      Q.  Okay.
6      Do you, as Red Book's company
7  representative, understand that Red Book has
8  company pricing/markup histories for all of the
9  companies that have NDCs published by Red Book?
10     A.  There would be markup or pricing
11 information in this type of format only if the
12 manufacturer was not supplying AWP directly, you
13 know, if they had supplied us instead with a
14 formula or wouldn't supply anything, in which
15 case we applied the AWP policy.
16     Q.  Oh, I see.  Okay.
17     So if a drug company is directly
18 reporting AWPs, and in turn Red Book's publishing
19 those AWPs, there may not be a company
20 pricing/markup history; is that correct?
21     A.  That's very possible.
22     Q.  The reason I ask is I've looked for

55 (Pages 214 to 217)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 218

1  the Dey Laboratories pricing history in Red
2  Book's records, and I can't find it.
3       Does the absence of a company pricing
4  history or markup history indicate to you, as the
5  company representative for Red Book, that that
6  drug manufacturer is most likely directly
7  reporting AWP to Red Book?
8       MS. LORENZO:  Objection to form.
9    A.  That would be my assumption.
10      MR. ANDERSON:  Tom, to your knowledge,
11 have any records concerning a drug company's
12 pricing history been withheld?
13      MR. CAHILL:  No.  I'm not aware of any
14 --
15      MS. ROSENSTOCK:  No.
16      MR. CAHILL:  -- withholding of such
17 information.
18      MR. ANDERSON:  Thanks.
19      (Form letter to Abbott/Ross Data Vendor
20 marked Exhibit Minne 026 for identification.)
21   Q.  Now I'm going to really move quickly.
22      If you could, take a look, Miss Minne,

Page 219

1  at Exhibit 26.
2       Does this exhibit appear to be a form
3  in which a drug company would report the pricing
4  of products upon launch?
5       MS. CITERA:  Objection to form.
6       MR. GASTWIRTH:  Objection to form.
7       MS. ROSENSTOCK:  Do you have another
8  copy?
9       MR. ANDERSON:  I don't.  I don't even
10 have a copy right now.
11   A.  This front page is something that
12 internally the Red Book staff in Montvale
13 created.
14   Q.  Yes.
15   A.  So the manufacturer did not supply
16 this page.
17   Q.  I understand that.  I need to phrase
18 my question better, so I'll do that.
19      The first page of Exhibit 26 is what,
20 ma'am?
21   A.  It is simply a cover sheet with the
22 information -- it looks like this was a new

Page 220

1  product that was coming on the market, so
2  information regarding form, route, that type of
3  stuff, that would have been entered into the
4  database, and then along with some verifications
5  that all the pieces at the bottom -- the people
6  signed off when it had been completed.
7    Q.  To assist Red Book in keeping records
8  of all of its data input?
9    A.  Correct.
10      MS. CITERA:  Object to the form.
11   Q.  And then the second page of Exhibit 26
12 is what, ma'am?
13   A.  This is a communication from the
14 manufacturer telling us their product, size, NDC,
15 and then the prices associated with that product.
16   Q.  And does that appear to be one of the
17 standard ways in which Red Book's made aware of
18 product pricing upon launch by a drug company?
19      MS. CITERA:  Objection.
20      MR. LONERGAN:  Objection.
21      MR. GASTWIRTH:  Objection to form.
22   A.  Yes, very standard.

Page 221

1    Q.  And, in fact, it looks like it's a
2  form letter to "Abbott/Ross Data Vendor";
3  correct?
4    A.  Correct.
5    Q.  And I've got some more examples of
6  these, Miss Minne.
7       (Price change notification sent to Red
8  Book by Abbott marked Exhibit Minne 027 for
9  identification.)
10   Q.  Do you agree Exhibit 27 appears to be
11 another example of a launch or, for that matter,
12 potentially a price change sent to data vendors
13 such as Red Book?
14      MS. CITERA:  I'm sorry, which is
15 Exhibit 27, this one (indicating)?
16      MR. ANDERSON:  It is, yeah.
17      MS. CITERA:  Can you repeat the
18 question?
19      MR. ANDERSON:  I will.  In fact, I'll
20 slow it down in just a second.
21   Q.  Miss Minne, if you would, take a look
22 at Exhibit 27.

Page 222

1        Does this appear to be a price change
2   notification sent to Red Book by Abbott?
3        MS. CITERA:  Objection to form.
4        A.  Yes, it does.
5        Q.  And it's apparently a form letter
6   titled "Dear Abbott/Ross Data Vendor"; correct?
7        A.  Correct.
8        MR. CAHILL:  Objection.
9        Q.  And does this look like a standard
10  mechanism, or an example of a standard mechanism,
11  by which Red Book would be made aware of price
12  changes?
13       MR. GASTWIRTH:  Object to the form.
14       MS. CITERA:  Object to the form.
15       A.  Yes.
16       Q.  And this, for instance, includes trade
17  prIce, wholesale price and AWP price; correct?
18       MS. CITERA:  Object to the form.
19       A.  Correct.
20       Q.  And in instances where Red Book could
21  be receiving direct representations of AWP
22  prices, such as those shown in Exhibit 27 from a

Page 223

1   drug company, would Red Book in turn publish
2   those AWPs?
3        MR. GASTWIRTH:  Objection to form.
4        MS. CITERA:  Object to the form.
5        A.  Yes.
6        (Documentation for Abbott
7   Pharmaceuticals verification form marked
8   Exhibit Minne 028 for identification.)
9        Q.  Miss Minne, could you take a look,
10  briefly, at Exhibit 28.
11       Miss Minne, I've got a copy problem
12  here.  You're welcome to look at the entire
13  document, but I only intended to mark the pages
14  01132 through 01145, which is the 21 of 21 pages
15  of the PVL.
16       MR. ANDERSON:  Tony, if you don't have
17  a problem, I'm going to rip off the back pages
18  and remove them from this exhibit.  They just --
19  they got mistakenly attached.  It's not part of
20  that PVL, it's part of Abbott's file, but it's
21  not part of the PVL.
22       MS. CITERA:  Just let me look for just

Page 224

1   one second.
2        MR. ANDERSON:  Sure.
3        PLV.
4        MS. CITERA:  I mean, they are
5   consecutive, the numbers on the bottom --
6        MR. ANDERSON:  Well, we can keep it --
7        MS. CITERA:  That's fine.
8        MR. ANDERSON:  -- I'm going to focus
9   primarily my questions on the PLV.
10       MS. CITERA:  Okay.
11  BY MR. ANDERSON:
12       Q.  Miss Minne, if you could, after
13  looking at the exhibit, confirm for me that the
14  first few pages, specifically the first three
15  pages, and then the next 21 pages, are an example
16  of PLV, which is a verification form, completed
17  by Abbott Pharmaceuticals?
18       MS. CITERA:  Object to the form.
19       A.  Correct.
20       Q.  And then the first three pages are
21  just some Red Book documentation that pertains to
22  the completion of the PLV; correct?

Page 225

1        MS. CITERA:  Object to the form.
2        A.  The first two are, yes.
3        Q.  Right, thank you.
4        And these pages that comprise this
5   verification form all include AWP information,
6   direct price information and WACs; correct?
7        MS. CITERA:  Object to the form.
8        A.  Correct.
9        Q.  And these were -- these prices, AWP,
10  direct and WAC, were printed and provided to
11  Abbott for verification by Red Book; correct?
12       MS. CITERA:  Object to the form.
13       A.  Correct.
14       Q.  And look, if you could, at what's
15  labeled Red Book 01139.  On that page there are
16  several Erythromycin products listed; correct?
17       A.  Correct.
18       Q.  And then in the lower right-hand
19  corner someone has handwritten "Verified changes
20  not made"; correct?
21       A.  Correct.
22       Q.  Do you believe that that would be a

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 226

1  notation made by Abbott's personnel?
2      A.  No.
3          MS. CITERA:  Object to the form.
4      Q.  This would be a data entry notice -- I
5  mean, a notation made by Red Book personnel?
6      A.  Yes.
7          MS. CITERA:  Object to the form.
8      Q.  What does that notation, "Verified
9  changes not made," indicate to you?
10         MS. CITERA:  Object to the form.
11     A.  I do not know what she meant by that
12 statement.
13     Q.  In the WAC column, do you see how
14 there's several tick marks?
15     A.  Yes.
16     Q.  What do the tick marks indicate to
17 you?
18         MS. CITERA:  Object to the form.
19     A.  I do not know if those were from the
20 manufacturer or those were made internally by Red
21 Book staff.
22     Q.  If Abbott Pharmaceuticals had chosen

Page 227

1  to update or otherwise change any of the pricing
2  published on this page for these Erythromycin
3  products and had crossed out the printed price
4  and written in another price, would Red Book have
5  input those changes and published those prices
6  accordingly?
7          MS. CITERA:  Object to the form.
8      A.  Yes.
9          (1995 price change notification by
10 Abbott Pharmaceuticals marked Exhibit Minne 029
11 for identification.)
12     Q.  Miss Minne, if you could, take a look
13 at what's been marked as Exhibit 29.
14         Does this appear to be a price change
15 notification by Abbott Pharmaceuticals?
16         MS. CITERA:  Object to the form.
17     A.  Yes.
18     Q.  And the cover letter's addressed to
19 "Dear Abbott/Ross Data Vendor"; correct?
20     A.  Correct.
21     Q.  And the prices that are listed are
22 titled "Trade price," "Wholesale price" and "AWP

Page 228

1  price"; correct?
2      A.  Yes.
3          MS. CITERA:  Objection to the form.
4      Q.  In situations such as this where Red
5  Book would receive price change notifications,
6  specifically, for instance, the AWP prices, would
7  Red Book input those?
8          MR. GASTWIRTH:  Object to the form.
9          MS. CITERA:  Object to the form.
10     A.  Yes.
11     Q.  And in turn publish those prices?
12         MS. CITERA:  Object to the form.
13     A.  Yes.
14         (1999 price change notification by
15 Abbott Pharmaceuticals marked Exhibit Minne 030
16 for identification.)
17     Q.  Does Exhibit 30 look like another
18 example of AWP price reporting by Abbott
19 Pharmaceuticals to Red Book?
20         MS. CITERA:  Object to the form.
21     A.  Yes.
22     Q.  And that one's dated '99; correct?

Page 229

1      A.  Correct.
2      Q.  And the other one was dated '95;
3  correct?
4      A.  Correct.
5          (Previously used format of Red Book
6  product verification list marked Exhibit Minne
7  031 for identification.)
8      Q.  All right.  Now, if you could, take a
9  look at what's been marked as Exhibit 31.
10         Are you familiar with this type of
11 document?
12     A.  Yes.
13     Q.  What is it?
14     A.  It is -- my understanding, from my
15 historical knowledge, this is the old format of
16 the PLV.
17     Q.  That's what I thought.
18         When was the change made from this
19 format of the PLV, or also known as the
20 verification forms, to the more standard format
21 that we've seen in the other exhibits?
22         MR. GASTWIRTH:  Objection to form.

58 (Pages 226 to 229)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
New York, NY

Page 230

1      A.  I don't know the exact date.
2      Q.  Something that's kind of curious to me
3  is, you see in that upper left-hand corner how
4  there's a date --
5      A.  Yes.
6      Q.  -- what appears to be a date listed,
7  but the last digit in the year is cut off on
8  every page.
9         Do you know why that is?
10     A.  No, I don't.
11     Q.  But nonetheless, this was a -- this
12 was the format in which Red Book notified
13 manufacturers of the pricing on the drugs for
14 their labeler code, and in turn sought
15 verification from the manufacturers for those
16 prices; correct?
17        MR. GASTWIRTH:  Object to form.
18        MS. CITERA:  Objecting to form.
19     A.  That is my understanding of this form.
20     Q.  And this form, which is marked as
21 Exhibit 31, includes a standard data field titled
22 "AWP"; right?

Page 231

1      A.  Correct.
2      Q.  "Direct price"; correct?
3      A.  Correct.
4      Q.  And "WAC"?
5      A.  Correct.
6      Q.  And at least with respect to this
7  company, Abbott Pharmaceuticals, every single one
8  of those fields is populated?
9         MS. CITERA:  Object to the form.
10     A.  It appears that way, yes.
11     Q.  Oh -- switching gears on you slightly,
12 Miss Minne, to the extent that there's a spread
13 between WAC and AWP in the pricing published by
14 Red Book which exceeds 20 percent, is it fair to
15 say that that spread must have been generated by
16 the manufacturers or the manufacturers'
17 instructions?
18        MS. CITERA:  Objection to form.
19        MR. GASTWIRTH:  Objection to form.
20     A.  If there's a greater than 20 percent
21 difference, it would indicate to me that both of
22 those prices had been supplied by the

Page 232

1  manufacturer and were not a result of AWP policy.
2      Q.  Thank you.  I think your answer was
3  more clear than my question.
4         MR. ANDERSON:  At this point I'll pass
5  the witness.
6         MR. CARROLL:  Why don't we go off the
7  record.
8         THE VIDEOGRAPHER:  This is the
9  videographer.
10        Off the record at 14:16.
11        (Pause)
12        THE VIDEOGRAPHER:  Back on the record,
13 14:18.
14           EXAMINATION
15 BY MR. CARROLL:
16     Q.  Good afternoon, Miss Minne.  My name's
17 James Carroll.  I represent the City of New York
18 and various New York counties, as well as the
19 State of Iowa.  I have a few documents that I'd
20 like to put in front of you and ask you a couple
21 questions.
22        (Document bearing Bates Nos. Red Book

Page 233

1  04693 and 04694 marked Exhibit Minne 032 for
2  identification.)
3      Q.  And the first document, as Exhibit 32.
4         Are you familiar with Exhibit 32?
5      A.  Familiar just in the fact that it's a
6  PL -- product verification list.
7      Q.  And the product verification list was
8  a document that Red Book routinely used in the
9  ordinary course of its business from 1990 to the
10 present; is that correct?
11        MR. GASTWIRTH:  Objection to form.
12     A.  I believe it was used as far back as
13 1990.  I can't verify.
14        MR. SWEENEY:  Hold on, one minute.
15        Who's representing Baxter?  Anybody?
16        MR. CARROLL:  For the record, Exhibit
17 32 is a document with the Bates numbers Red Book
18 06 -- 04693 to 04694, dated October 11th, 2002.
19 It's a two-page document, Red Book product
20 listing verification to Baxter Healthcare.
21     Q.  And this product listing verification
22 would have been provided to Baxter to verify the

59 (Pages 230 to 233)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 234

1 accuracy of Baxter's AWPs, WACs and other pricing
2 information included on the product listing
3 verification for products that were to be
4 published in Red Book or Red Book Update; is that
5 correct?
6      MR. WALLACH:  Objection.
7    A.  Correct.
8    Q.  And if you look, at the bottom on each
9 page indicates that this document was signed on
10 -- by an individual on 9/16/02.
11      And I believe you testified that the
12 signature would correspond to the company, and in
13 this case Baxter; is that correct?
14      MR. WALLACH:  Objection.
15    A.  Correct.
16    Q.  And the signature on the product
17 listing verification indicates that Baxter in
18 fact verified the accuracy of the pricing for
19 Baxter's drugs to Red Book; is that correct?
20      MR. WALLACH:  Objection.
21    A.  It indicates to me that they saw this
22 form, and had the opportunity to make changes if

Page 235

1 they wished, and they chose not to make changes.
2    Q.  On this form they chose -- I would ask
3 -- it indicates "Okay with changes."
4    A.  Well, I mean, I guess I'm talking just
5 specific to prices.
6      MR. SWEENEY:  Objection, that's not
7 what it says.
8      MR. WALLACH:  Objection if there was a
9 question there.
10    Q.  In fact, if Baxter had made changes on
11 this form, Red Book would change the price to
12 reflect Baxter's changes; is that correct?
13    A.  Correct.
14    Q.  And Red Book, in the ordinary course
15 of its business, relied on Baxter to verify the
16 accuracy of AWPs and WACs for all Baxter drugs
17 that were published in Red Book or Red Book
18 Update; is that correct?
19      MR. WALLACH:  Object to the form.
20      MR. CAHILL:  Object to the form.
21    A.  Baxter would have been our source of
22 pricing information for their products, yes.

Page 236

1    Q.  And Red Book would have relied on
2 Baxter for the accuracy of those prices; is that
3 correct?
4      MR. WALLACH:  Object to the form.
5    A.  We would have relied on them to supply
6 the prices.
7    Q.  Is it fair to say that if a price for
8 Baxter drugs products was published in Red Book
9 from 1990 to the present, that the prices were
10 verified by Baxter?
11      MR. WALLACH:  Objection.
12    A.  I do not know if Baxter would have
13 verified that the prices were accurate because I
14 don't know what your definition of accurate is.
15    Q.  Would it be fair to say that they --
16 that Baxter verified the prices per a product
17 listing verification if the pricing for Baxter's
18 drugs were published in the Red Book?
19      MR. WALLACH:  Objection.
20    A.  Yes, this signature indicates to me
21 that they had the opportunity to look at the
22 prices.

Page 237

1    Q.  Do you have any reason to doubt the
2 accuracy of the prices verified in the product
3 listing verifications by Baxter?
4      MR. WALLACH:  Objection.
5    A.  I have no reason to doubt that these
6 prices are not what Baxter supplied to us.
7    Q.  Okay.
8      (July 6, 2004 Bayer Corporation product
9 listing verification marked Exhibit Minne 033 for
10 identification.)
11    Q.  Miss Minne, what I'm handing to you
12 that's been marked as Exhibit 33 is a Red Book
13 product listing verification dated 7 -- July 6,
14 2004 to Bayer Corporation.
15      Are you familiar with Exhibit 33?
16    A.  Just to the extent that it is another
17 product listing verification.
18    Q.  And is this a product listing
19 verification that Red Book routinely used in the
20 ordinary course of its business from 1990 to the
21 present?
22      MR. GASTWIRTH:  Objection to form.

60 (Pages 234 to 237)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008

New York, NY

Page 238

1        A.   Again, not knowing when they
2   implemented this process, if it went back to '90
3   or not, but, yes.
4        Q.   And I'm sorry if I misheard the
5   testimony earlier, but how far back do you know
6   -- are you familiar, as the corporate rep for Red
7   Book, that a product listing verification was
8   used?
9            MS. TORGERSON:  Objection, form.
10       A.   I know they went back to the late
11  '90s.  I don't know how much farther back than
12  that they went.
13       Q.   Would it be fair to say that they were
14  used from 1997 on?
15           MS. TORGERSON:  Objection, form.
16       A.   I think that would be fair, yes.
17       Q.   And this is a product listing
18  verification that Red Book provided to Bayer to
19  verify the AWP, direct price and WAC prices for
20  Bayer products that were to be published in Red
21  Book and Red Book Update; is that correct?
22       A.   Correct.

Page 239

1        Q.   And the signature indicates that, in
2   fact, Bayer verified those prices; is that
3   correct?
4            MS. TORGERSON:  Objection to form.
5        A.   Correct.
6        Q.   And the fact that there are changes
7   made, I believe you testified that Red Book would
8   have made those changes per Bayer's instructions;
9   is that correct?
10       A.   Yes.
11       Q.   And in the ordinary course of Red
12  Book's business, Red Book relied on Bayer to
13  verify the accuracy of its AWPs and WACs for all
14  Bayer drugs that were published in the Red Book;
15  is that correct?
16           MR. CAHILL:  Objection, form.
17       A.   We would have relied on Bayer to
18  supply that information, yes.
19       Q.   And you have no reason to doubt the
20  accuracy of the information supplied by Bayer; is
21  that correct?
22       A.   Correct.

Page 240

1        Q.   And is it fair to say that for any
2   pricing of Bayer products published in the Red
3   Book from at least 1997 to the present, that the
4   prices were verified by Bayer?
5        A.   They would have been verified via this
6   form, yes.
7            (Document bearing Bates Nos. Red Book
8   07589 through 07597 marked Exhibit Minne 034 for
9   identification.)
10       Q.   What I'm handing to you, which is
11  marked as Exhibit 34, is a Red Book product
12  listing verification with the Bates numbers Red
13  Book 07589 through 07597, to Endo Generic
14  Products, dated October 11th, 2001.
15           And do you recognize this as the Red
16  Book product listing verification?
17       A.   Yes.
18       Q.   And is this product listing
19  verification to Endo Generic Products a document
20  that Red Book routinely used in the ordinary
21  course of its business?
22           MS. TORGERSON:  Objection, form.

Page 241

1        A.   Yes.
2        Q.   And this product listing verification
3   was provided to Endo Generic Products to verify
4   the accuracy of Endo's AWPs and WACs that were to
5   be published in Red Book and Red Book Update; is
6   that correct?
7            MR. FARQUHAR:  Objection, leading.
8        A.   It was provided to them so they could
9   see what we had listed for their products, right.
10       Q.   And the signature on the verification
11  indicates that Endo, in fact, verified the AWP
12  and WAC pricing for Endo drugs in the Red Book;
13  is that correct?
14           MR. FARQUHAR:  Objection, leading.
15       A.   I can only assume they looked at them.
16  I can't, I can't --
17       Q.   Well, what does that -- what does the
18  signature at the bottom indicate to you?
19       A.   It indicates they had the document.
20  Now, whether they went through every single price
21  and looked at it, I can't verify that.
22       Q.   Okay.  But from Red Book's

61 (Pages 238 to 241)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 242

1  perspective, the fact that they signed this
2  product listing verification and did or did not
3  change prices, Red Book followed those
4  indications in the product listing verification;
5  is that correct?
6       MR. FARQUHAR:  Objection, leading.
7    A.  Correct.
8    Q.  And in the ordinary course of its
9  business, Red Book relied on Endo to verify the
10 AWPs and WACs for all Endo products for which it
11 supplied pricing information to be published in
12 the Red Book; is that correct?
13      MR. FARQUHAR:  Objection, leading.
14   A.  Correct.
15   Q.  And is it fair to say that a price for
16 Endo's drugs that was published in the Red Book
17 from at least 1997 to the present were verified
18 by product listing verifications?
19      MR. FARQUHAR:  Objection, leading.
20 Objection, lack of foundation.
21   A.  Yes.
22      (July 6, 2004 Ethex Corporation product

Page 243

1  listing verification marked Exhibit Minne 035 for
2  identification.)
3    Q.  Miss Minne, what I'm handing to you,
4  which is Exhibit 35, is a Red Book product
5  listing verification dated July 6, 2004 for Ethex
6  Corporation.
7       MR. CARROLL:  Somebody from Ethex?
8       MR. SWEENEY:  There's somebody on the
9  phone from Ethex.
10   Q.  Do you recognize this as a Red Book
11 product listing verification?
12   A.  Yes.
13   Q.  And is this a product listing
14 verification that Red Book routinely used in the
15 ordinary course of its business?
16      MS. TORGERSON:  Objection, form.
17   A.  Yes.
18   Q.  And this was a Red Book form --
19 product listing verification that was provided to
20 Ethex Corporation to verify the accuracy of its
21 AWPs that were -- and WAC prices that were
22 published in the Red Book; is that correct?

Page 244

1    A.  Yes.
2    Q.  And at the bottom of each page you'll
3  notice that there's a signature.  And is it fair
4  to say that the signature indicates that the
5  prices were in fact verified by Endo -- Ethex
6  Corporation, excuse me?
7    A.  As far as Red Book is concerned, yes.
8    Q.  And in -- and Red Book, in the
9  ordinary course of its business, relied on Ethex
10 to verify the pricing supplied to Red Book for
11 all Ethex products that were published in the Red
12 Book; is that correct?
13      MS. TORGERSON:  Objection, form.
14   A.  Yes.
15   Q.  And is it fair to say that for a price
16 for Ethex drugs that was published in the Red
17 Book from at least 1997 to the present, that the
18 prices were, in fact, verified by Ethex
19 Corporation?
20      MS. LORENZO:  Objection.
21      MS. TORGERSON:  Objection, form.
22   A.  It's the assumption that Red Book

Page 245

1  makes when they sign this PLV form.
2       (October 11, 2002 Forest
3  Pharmaceuticals product listing verification
4  marked Exhibit Minne 036 for identification.)
5    Q.  Miss Minne, what I'm handing you,
6  which is marked as Exhibit 36, is a Red Book
7  product listing verification dated October 11th,
8  2002 to Forest Pharmaceuticals.
9       MR. CARROLL:  Anyone?  Anyone?
10   Q.  And is this a Red Book product listing
11 verification that you're familiar with?
12   A.  Yes.
13   Q.  And is it a product listing
14 verification that Red Book routinely used in the
15 ordinary course of its business?
16      MR. GASTWIRTH:  Objection, form.
17   A.  Yes.
18   Q.  And is this the product listing --
19 type of product listing verification form that
20 was provided to Forest Pharmaceuticals to verify
21 the accuracy of its AWPs and WACs that were
22 published in the Red Book?

62  (Pages 242 to 245)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

Page 246

1         MS. EPPS:  Objection to form.
2     A.   Yes.
3     Q.   And I draw your attention to the
4  bottom, it shows there is a signature dated -- on
5  each page.  And my question is, the signature on
6  the verification indicates that Forest
7  Pharmaceuticals in fact verified the AWP and WAC
8  pricing information for Forest Pharmaceutical
9  drugs that were published in the Red Book; is
10  that correct?
11         MS. EPPS:  Objection to form.
12     A.   That is the Red Book assumption.
13     Q.   And if there was a change indicated,
14  would Red Book make the change reflecting Forest
15  Pharmaceuticals' instructions?
16     A.   Yes.
17     Q.   And Red Book in the ordinary course of
18  its business relied on Forest Pharmaceuticals to
19  verify the accuracy of AWPs and WACs for all
20  Forest Pharmaceutical drugs that were published
21  in the Red Book; is that correct?
22         MS. EPPS:  Objection to form.

Page 247

1     A.   Yes.
2     Q.   And if, in fact, the price for Forest
3  Pharmaceutical products was published in the Red
4  Book from at least 1997 to the present, the
5  prices would have been verified by Forest; is
6  that correct?
7         MS. EPPS:  Objection to form.
8     A.   That is Red Book's assumption.
9         MR. CAHILL:  Is there any way we can --
10  obviously we sent questions.  Is there a way we
11  can try to do these all at once so that -- in
12  other words, if the questions are the same and
13  the answers are going to be the same?  If there's
14  no way to do it, there's no way to do it...
15         MR. FARQUHAR:  Well, we don't know who
16  we're going to trial with and who we're not going
17  to trial with.
18         MR. CAHILL:  So you need each one
19  separately?
20         MR. CARROLL:  Yes.
21         I'll go as far as I can.
22         (July 25, 2003 Fujisawa Healthcare

Page 248

1  product listing verification marked Exhibit Minne
2  037 for identification.)
3     Q.   Miss Minne, what has been handed to
4  you as Exhibit 37 is a Red Book product listing
5  verification dated July 25th, 2003 to Fujisawa
6  Healthcare.
7         Are you familiar with this as a Red
8  Book product listing verification?
9     A.   Yes.
10     Q.   And is this a product -- type of
11  product listing verification that Red Book
12  routinely used in the ordinary course of its
13  business?
14         MR. GASTWIRTH:  Objection to form.
15     A.   Yes.
16     Q.   And is this a product listing
17  verification Red Book provided to Fujisawa to
18  verify the accuracy of Fujisawa AWP and WAC
19  pricing for Fujisawa drugs that were published in
20  the Red Book?
21     A.   Yes.
22     Q.   And if you'll look at the bottom of

Page 249

1  each page, it indicates that it is signed by a
2  Carol Robey.
3         Does that signature indicate to you
4  that Fujisawa in fact verified the pricing of its
5  products that was published in the Red Book?
6     A.   Yes.
7     Q.   And in the ordinary course of its
8  business, Red Book relied on Fujisawa to verify
9  the accuracy of the AWPs and WACs for Fujisawa
10  drugs that were published in the Red Book; is
11  that correct?
12         MS. LORENZO:  Objection to form.
13     A.   Yes.
14     Q.   And if a Fujisawa -- if a price for a
15  Fujisawa drug was published in the Red Book from
16  at least 1997 to the present, that price would
17  have been verified by Fujisawa; is that correct?
18     A.   That is the Red Book assumption.
19         (July 6, 2004 Eli Lilly & Company
20  product listing verification marked Exhibit Minne
21  038 for identification.)
22     Q.   Miss Minne, what I'm handing you,

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

Page 250

1  which has been marked as Exhibit 38, is a Red
2  Book product identification listing dated 7 --
3  July 6, 2004 to Eli Lilly & Company.
4      Do you recognize this as a product --
5  Red Book product listing verification?
6      A.  Yes.
7      Q.  Is this a product listing verification
8  that Red Book routinely used in the ordinary
9  course of its business?
10     MR. GASTWIRTH:  Objection to form.
11     A.  Yes.
12     Q.  And this is a product listing
13 verification provided to you to verify the
14 accuracy of Eli Lilly's AWPs and WACs that were
15 to be published for Eli Lilly products in the Red
16 Book; is that correct?
17     A.  Yes.
18     MR. FARQUHAR:  Objection, leading.
19     Q.  And I draw your attention to the
20 bottom of each page, and it indicates that there
21 is a signature by Carol Butterfield.
22     Does that signature on the verification

Page 251

1  indicate that Eli Lilly in fact verified the
2  accuracy of the AWP and WAC pricing for Eli Lilly
3  drugs to be published in the Red Book?
4      MR. FARQUHAR:  Objection, leading.
5  Objection, foundation.
6      A.  Yes.
7      Q.  And Red Book, in the ordinary course
8  of its business, relied on Eli Lilly to verify
9  the accuracy of the AWPs and WACs for all Eli
10 Lilly drugs that were published in the Red Book;
11 is that correct?
12     MR. FARQUHAR:  Objection, leading.
13     A.  Yes.
14     Q.  And if a price for an Eli Lilly drug
15 was published in the Red Book, it would have been
16 verified by Eli Lilly from at least 1997 to the
17 present; is that correct?
18     MR. FARQUHAR:  Objection, leading.
19 Objection, lack of foundation.
20     A.  That is our assumption.
21     (October 1, 2001 Glaxo-Wellcome product
22 listing verification marked Exhibit Minne 039 for

Page 252

1  identification.)
2      Q.  Miss Minne, what I'm handing to you as
3  Exhibit 39 is a Red Book product listing
4  verification dated October 1st, 2001 to
5  Glaxo-Wellcome.
6      Are you familiar with Exhibit 39?
7      A.  Yes, in that it's a form provided by
8  Red Book.
9      Q.  Okay.  And it's a document that Red
10 Book routinely used in the ordinary course of its
11 business; is that correct?
12     MR. GASTWIRTH:  Objection to form.
13     A.  Yes.
14     Q.  And this was a product listing
15 verification that was provided to Glaxo-Wellcome
16 to verify of the accuracy of Glaxo-Wellcome AWPs
17 and WACs that were published in the Red Book; is
18 that correct?
19     A.  Yes.
20     Q.  And if you notice at the bottom of
21 each page there is a signature, and that
22 signature -- does that signature indicate that --

Page 253

1  does that signature indicate to Red Book that
2  Glaxo-Wellcome did, in fact, verify the pricing
3  contained in Exhibit 39?
4      A.  Yes.
5      Q.  And in the ordinary course of its
6  business, Red Book relied on Glaxo-Wellcome to
7  verify the accuracy of AWPs and WACs for all
8  Glaxo-Wellcome drugs that were published in the
9  Red Book; is that correct?
10     MR. FARQUHAR:  Objection, leading.
11     A.  Yes.
12     Q.  And to the extent that there was --
13     MR. CARROLL:  Excuse me.
14     Q.  -- there was a price in the Red Book
15 for a Glaxo-Wellcome drug, it was Red Book's
16 assumption that it was in fact verified by Glaxo;
17 is that correct?
18     MR. FARQUHAR:  Objection, leading.
19     A.  Yes.
20     (August 16, 2001 Roche Laboratories
21 product listing verification marked Exhibit Minne
22 040 for identification.)

64 (Pages 250 to 253)

Page 254

1      Q.  Miss Minne, what I'm handing you,
2  which has been marked as Exhibit 40, is a Red
3  Book product listing verification dated August
4  16th, 2001 to Roche Laboratories, a Division of
5  Hoffman-La Roche.
6      Are you familiar with this as a Red
7  Book product listing verification?
8      A.  Yes.
9      Q.  And is this a product listing
10  verification that Red Book routinely used in the
11  ordinary course of its business?
12      MR. GASTWIRTH:  Objection to form.
13      MS. LORENZO:  Objection to form.
14      Q.  And this was a product listing
15  verification that was provided to Roche
16  Laboratories to verify the accuracy of Roche AWP
17  and WAC pricing that was to be published in the
18  Red Book; is that correct?
19      MS. LORENZO:  Objection to form.
20      A.  Yes.
21      Q.  And if you'll notice at the bottom of
22  each page there's a signature dated August 9th,

Page 255

1  2001.
2      Does that signature indicate to you
3  that in fact Roche Laboratory verified the
4  accuracy of the AWP and WAC pricing for Roche
5  drugs that were published in the Red Book?
6      A.  Yes.
7      Q.  And in the ordinary course of its
8  business, Red Book relied on Roche Laboratories
9  to verify the accuracy of the AWP and WACs for
10  Roche drugs that were published in the Red Book;
11  is that correct?
12      A.  Yes.
13      Q.  And in fact, if a drug price for Roche
14  products was published in the Red Book from at
15  least 1997 to the present, it would have been
16  verified by Roche Laboratories; is that correct?
17      A.  It's our assumption.
18      (Boehringer Ingelheim Pharmaceuticals
19  product listing verification signed August 22,
20  2002 marked Exhibit Minne 041 for
21  identification.)
22      Q.  Miss Minne, what I'm handing you,

Page 256

1  which has been marked as Exhibit 41, is a Red
2  Book product listing verification to Boehringer
3  Ingelheim Pharmaceuticals, and requesting that
4  the response be by October 11th, 2002.
5      MR. GASTWIRTH:  Objection to form.
6      What's your question?
7      MR. CARROLL:  Pardon?
8      MR. GASTWIRTH:  If there's a question
9  pending, objection to form.
10      MR. CARROLL:  Great.
11      Q.  Are you familiar with this as a Red
12  Book product listing verification?
13      MR. GASTWIRTH:  Objection to form.
14      A.  Yes.
15      Q.  And is this a document that Red Book
16  routinely used in the ordinary course of its
17  business?
18      MR. GASTWIRTH:  Objection to form.
19      A.  Yes.
20      Q.  And is this a product listing
21  verification that Red Book provided to Boehringer
22  Ingelheim Pharmaceuticals to verify the accuracy

Page 257

1  of Boehringer AWPs and WACs that were published
2  in Red Book?
3      MR. GASTWIRTH:  Objection to form.
4      A.  Yes.
5      Q.  And if you'll please look at the
6  bottom of each page, there is a signature dated
7  August 22nd, 2002.
8      Does that signature indicate to you, as
9  representative of Red Book, that Boehringer
10  Ingelheim Pharmaceutical in fact verified the
11  accuracy of AWP and WAC pricing for Boehringer
12  drugs published in Red Book?
13      MR. CAHILL:  Objection to form.
14      A.  Yes.
15      Q.  And in fact, Red Book, in the ordinary
16  course of its business, relied on Boehringer
17  Ingelheim Pharmaceuticals to verify the accuracy
18  of AWPs and WACs for all Boehringer Ingelheim
19  pharmaceuticals published in the Red Book; is
20  that correct?
21      MR. GASTWIRTH:  Objection to form.
22      A.  Yes.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
New York, NY

Page 258

1     Q.   And if, in fact, a Boehringer
2 Ingelheim drug -- if a price for a Boehringer
3 Ingelheim Pharmaceuticals drug was published in
4 the Red Book from at least 1997 to the present,
5 Red Book would assume that the price had been
6 verified by Boehringer Ingelheim Pharmaceuticals;
7 is that correct?
8        MR. GASTWIRTH:  Objection to form,
9 calls for speculation.
10    A.   Yes.
11        (September 18, 2001 Bedford
12 Laboratories product listing verification marked
13 Exhibit Minne 042 for identification.)
14    Q.   Miss Minne, what I'm putting in front
15 of you, which has been marked as Exhibit 42, is a
16 Red Book pricing verification with a stamped date
17 of September 18th, 2001 to Bedford Laboratories.
18        Are you familiar with this as a pricing
19 list -- a price -- a product listing verification
20 --
21        MR. CARROLL:  I'm sorry.
22    Q.   -- a product listing verification?

Page 259

1        MR. GASTWIRTH:  Objection to form.
2    A.   Yes.
3    Q.   And is this a document that Red Book
4 routinely uses in the ordinary course of its
5 business?
6        MR. GASTWIRTH:  Objection to form.
7    A.   Yes.
8    Q.   And is this a product listing
9 verification form that was provided to Bedford
10 Laboratories to verify the accuracy of Bedford
11 AWP and WAC pricing that were published in the
12 Red Book?
13        MR. GASTWIRTH:  Objection to form.
14    A.   Yes.
15    Q.   And I draw your attention to the
16 bottom of -- to the various pages.  And to the
17 extent there are signatures, do those signatures
18 indicate that Bedford Laboratories in fact
19 verified the price accuracy of the AWP and WAC
20 pricing for Bedford Laboratory products that were
21 published in the Red Book?
22        MR. GASTWIRTH:  Objection to form.

Page 260

1    A.   Yes.
2    Q.   And in the ordinary course of its
3 business, Red Book relied on Bedford Laboratories
4 to verify the accuracy of AWPs and WACs for all
5 Bedford Laboratory drugs that were published in
6 the Red Book?
7        MR. GASTWIRTH:  Objection to form.
8    Q.   Is that correct?
9    A.   Yes.
10    Q.   And if, in fact, a price for a Bedford
11 Laboratory product was published in the Red Book
12 from at least 1997 to the present, it is Red
13 Book's assumption that the price was, in fact,
14 verified by Bedford Laboratories; is that
15 correct?
16        MR. GASTWIRTH:  Objection to form,
17 calls for speculation.
18    A.   Yes.
19        (October 1, 2001 Barr Laboratories
20 product listing verification marked Exhibit Minne
21 043 for identification.)
22    Q.   Miss Minne, I've placed in front of

Page 261

1 you, which has been marked as Exhibit 43, a
2 product -- a Red Book product listing
3 verification, requesting a response by October
4 1st, 2001, to Barr Laboratories.
5        Are you familiar with this as a Red
6 Book products listing verification?
7        MR. PARISH:  Objection, form.
8    A.   Yes.
9    Q.   Is this a document that Red Book
10 routinely used in the ordinary course of its
11 business?
12        MR. PARISH:  Objection, form.
13    A.   Yes.
14    Q.   And was this a -- is this a product
15 listing verification form that Red Book provided
16 to Barr Laboratories to verify the accuracy of
17 Barr AWP and WAC prices that were published in
18 Red Book?
19        MR. PARISH:  Objection to form.
20    A.   Yes.
21    Q.   And you'll notice there's a signature
22 at the bottom of the page.

66 (Pages 258 to 261)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 262

1     Does that signature indicate to you
2 that Barr Laboratories in fact verified the
3 accuracy of AWP and WAC pricing for Barr drugs
4 that were published in the Red Book?
5     MR. PARISH:  Objection, form.
6     A.  Yes.
7     Q.  And in the ordinary course of its
8 business did Red Book in fact rely on Barr
9 Laboratories to verify the accuracy of AWP and
10 WAC pricing for Barr drugs that were published in
11 the Red Book?
12     MR. PARISH:  Objection to form.
13     A.  Yes.
14     Q.  And if in fact a price for a Barr
15 Laboratories product was published in the Red
16 Book from at least 1997 to the present, the
17 product -- the price would have been verified by
18 Barr Laboratories; is that correct?
19     MR. PARISH:  Objection, form, calls for
20 speculation.
21     A.  Yes.
22     (October 2, 2001 Merck & Company

Page 263

1 product listing verification marked Exhibit Minne
2 044 for identification.)
3     Q.  Miss Minne, what I'm handing you,
4 which is marked as Exhibit 44, is a product
5 listing verification with a stamp date of October
6 2nd, 2001 to -- addressed to Merck & Company.
7     Are you familiar with this as a Red
8 Book product listing verification?
9     MR. GASTWIRTH:  Objection to form.
10     A.  Yes.
11     Q.  And is this --
12     MR. FUNKHOUSER:  This is Rob
13 Funkhouser.
14     Can you give me the Bates number?
15     MR. CARROLL:  Yeah.  I'm sorry, Rob.
16 It's Red Book 10281 through 10389.
17     MR. FUNKHOUSER:  And does this form
18 relate to NDCs for which you're asserting spreads
19 in excess of 30 percent?
20     MR. CARROLL:  Yes, I believe there are
21 some on here.
22     MR. FUNKHOUSER:  Well, have you done

Page 264

1 anything to confirm that?  Because there was some
2 issue with discovery being stayed as to NDCs that
3 did exceed that threshold.
4     MR. CARROLL:  No, I have not. However
5 -- hmmm...
6     I'm happy to look it up in a break, but
7 I'm sure they are, because I've been told that
8 there are drugs from our revised Exhibit B that
9 are in this exhibit.  In fact, all of our drugs
10 that are in our revised Exhibit B are in this
11 exhibit, and if you want me to -- I could happily
12 pull up one drug that's over 30 percent, to which
13 we are entitled to discovery.
14     MR. FUNKHOUSER:  All right, that's
15 fine, I just want to make sure you confirm your
16 compliance with CMO 33.
17     If you've done that, go ahead and
18 proceed.
19     MR. CARROLL:  Well, I personally
20 haven't done that, so --
21     MS. KAPLAN:  I think revised Exhibit D
22 includes allegations for drugs with spreads above

Page 265

1 30 --
2     MR. CARROLL:  Yes, above and below.
3 BY MR. CARROLL:
4     Q.  Are you familiar with this as a Red
5 Book product listing verification?
6     A.  Yes.
7     Q.  And is this a document that Red Book
8 routinely used in the ordinary course of its
9 business?
10     MR. CAHILL:  Objection to form.
11     A.  Yes.
12     Q.  And is this a product listing
13 verification that Red Book provided to Merck to
14 verify the accuracy of Merck AWP and WAC pricings
15 that were published in the Red Book?
16     MR. FUNKHOUSER:  Objection to form.
17     A.  Yes.
18     Q.  And if you'll look at the bottom,
19 there's a signature on each page of the exhibit.
20     Does that signature indicate to Red
21 Book that Merck in fact verified the accuracy of
22 the AWP and WAC pricing for Merck products that

67 (Pages 262 to 265)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 266

1  were published in -- pricing of Merck products
2  were published in Red Book?
3         MR. FUNKHOUSER:  Objection, form,
4  foundation.
5     A.  Yes.
6     Q.  And Red Book, in the ordinary course
7  of its business, relied on Merck to verify the
8  accuracy of AWP and WAC pricing for all Merck
9  products for which pricing was published in the
10  Red Book; is that correct?
11        MR. FUNKHOUSER:  Same objections.
12    A.  Yes.
13    Q.  And in fact, if a price for a Merck
14  product was published in the Red Book from at
15  least 1997 to the present, the prices would have
16  been verified by Merck; is that correct?
17        MR. FUNKHOUSER:  Objection, move to
18  strike.
19    A.  Yes, that is our assumption.
20        (Document bearing Bates No. Red Book
21  09936 marked Exhibit Minne 045 for
22  identification.)

Page 267

1     Q.  Miss Minne, what I've handed you as
2  Exhibit 45 is a one-page document with Bates Red
3  Book 09936, a product listing verification, the
4  Bates -- stamp date of September 9, 1999, to
5  MedImmune.
6        Are you familiar with this as a Red
7  Book product listing verification form?
8     A.  Yes.
9     Q.  And is this a document that Red Book
10  routinely used in the ordinary course of its
11  business?
12        MR. GASTWIRTH:  Objection to form.
13    A.  Yes.
14    Q.  And is this a product listing
15  verification form provided to MedImmune to verify
16  the accuracy of MedImmune AWP and WAC pricing
17  that was published in the Red Book for MedImmune
18  products?
19    A.  Yes.
20        MR. FARQUHAR:  Objection, leading.
21    Q.  I draw your attention to the signature
22  at the bottom of the page.

Page 268

1        Does this signature indicate to you
2  that MedImmune in fact verified the accuracy of
3  the AWP and WAC pricing for MedImmune drugs
4  published in Red Book?
5        MR. FARQUHAR:  Objection, leading.
6     A.  Yes.
7     Q.  And in the ordinary course of its
8  business, Red Book relied upon MedImmune to
9  verify the accuracy of AWP and WAC pricing for
10  all MedImmune products that were published in the
11  Red Book?
12        MR. FARQUHAR:  Objection, leading --
13    Q.  Is that correct?
14        MR. FARQUHAR:  -- objection, lack of
15  foundation.
16    Q.  And in fact, if a price for a
17  MedImmune product was published in the Red Book
18  from at least 1997 to the present, the prices
19  were in fact verified by MedImmune; is that
20  correct?
21        MR. FARQUHAR:  Objection, leading.
22  Objection, lack of foundation.

Page 269

1     A.  Yes, that is our assumption.
2        (Document bearing Bates Nos. Red Book
3  14957 through 14961 marked Exhibit Minne 046 for
4  identification.)
5     Q.  Miss Minne, what I'm handing you,
6  which has been marked as Exhibit 46, is a product
7  -- Red Book product listing verification with a
8  stamp date -- it says September 18th, with no
9  year, but it appears to be in 1998.  The Bates
10  number is Red Book 14957 through 14961, to Serono
11  Labs.
12        Are you familiar with this as a product
13  -- Red Book product listing verification?
14    A.  Yes.
15    Q.  And is it a document that Red Book
16  routinely used in the ordinary course of its
17  business?
18        MR. GASTWIRTH:  Objection, form.
19    A.  Yes.
20    Q.  And is this a product listing
21  verification that Red Book provided to Serono
22  Labs to verify the accuracy of Serono AWP and WAC

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                           November 18, 2008
New York, NY

Page 270

1  pricing that was published in the Red Book?
2       MR. FARQUHAR:  Objection, leading.
3  Objection, lack of foundation.
4       A.  Yes.
5       Q.  And if you notice, there's a signature
6  at the bottom of each page.
7       Does -- do -- does the signature
8  indicate that Serono Labs in fact verified the
9  accuracy of AWP and WAC pricing for Serono Lab
10  drugs that were published in the Red Book?
11       MR. CAHILL:  Same objections.
12       A.  Yes.
13       Q.  And Red Book, in the ordinary course
14  of its business, relied upon Serono Labs to
15  verify the accuracy of AWP and WAC pricing for
16  all Serono Lab products for which pricing was
17  published in the Red Book; is that correct?
18       MR. FARQUHAR:  Same objections.
19       A.  Yes.
20       Q.  And if in fact a price for a Serono
21  Labs product was published in the Red Book from
22  at least 1997 to the present, the prices were

Page 271

1  verified by Serono Labs; is that correct?
2       MR. CAHILL:  Same objection.
3       A.  That is our assumption.
4       (Document bearing Bates Nos. Red Book
5  13418 through 13426 marked Exhibit Minne 047 for
6  identification.)
7       Q.  Miss Minne, what I'm handing you is
8  marked as Exhibit 47.  It is a Red Book product
9  listing verification with a stamped date of
10  August 20th, 2001, Bates stamped Red Book 13418
11  through 13426, sent to the Purdue Frederick
12  Company.
13       Are you familiar with this as a Red
14  Book product listing verification form?
15       A.  Yes.
16       Q.  Is it a document that Red Book
17  routinely used in the ordinary course of its
18  business?
19       MR. GASTWIRTH:  Objection to the form.
20       A.  Yes.
21       Q.  And is this a product listing
22  verification form that Red Book provided to the

Page 272

1  Purdue Frederick Company to verify the accuracy
2  of Purdue Frederick Company's AWP and WACs that
3  were published in Red Book?
4       MR. FARQUHAR:  Objection, leading.
5  Objection, lack of foundation.
6       A.  Yes.
7       Q.  And you'll notice that there is a
8  signature on the bottom of each page of this
9  exhibit.
10       Does the signature indicate that the
11  Purdue Frederick Company in fact verified the
12  accuracy of AWP and WAC pricing for the Purdue
13  Frederick Company pricing for drugs published in
14  the Red Book?
15       MR. FARQUHAR:  Same objections.
16       A.  Yes.
17       Q.  And within the ordinary course of its
18  business, Red Book relied on the Purdue Frederick
19  Company to verify the accuracy of AWP and WAC
20  pricing for all Purdue Frederick drugs for which
21  pricing was published in Red Book.
22       Is that correct?

Page 273

1       MR. FARQUHAR:  Same objections.
2       A.  Yes.
3       Q.  And if a price was published for a
4  Purdue Frederick Company drug in the Red Book
5  from at least 1997 to the present, the prices
6  were, in a fact, verified by the Purdue Frederick
7  Company; is that correct?
8       MR. FARQUHAR:  Same objections.
9       A.  That is our assumption.
10       MR. GASTWIRTH:  Do you think you might
11  be going for a bit longer?  Do we need to take a
12  break soon?
13       MR. CARROLL:  I don't need to take a
14  break, I'm fine.  I have a couple more there, and
15  then more in there, but they're not as many.
16  They're mostly in this box (indicating).
17       You guys need a break?
18       Why don't we take -- off the record.
19       THE VIDEOGRAPHER:  Off the record at
20  15:08.  Ends tape number four.
21       (Recess taken)
22       THE VIDEOGRAPHER:  This is the

69 (Pages 270 to 273)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

Page 274

1  videographer.  Back on the record at 15:24.
2       (July 25h, 2003 Pfizer USA Pharma Group
3  product listing verification marked Exhibit Minne
4  048 for identification.)
5  BY MR. CARROLL:
6       Q.  Miss Minne, what I've handed you as
7  Exhibit 48 is a product listing verification
8  dated July 25th, 2003 to Pfizer USA Pharma Group.
9            Do you recognize this -- are you
10  familiar with this as a Red Book product listing
11  verification?
12       A.  Yes.
13       Q.  Is this a document that Red Book
14  routinely used in the ordinary course of its
15  business?
16          MS. KAPLAN:  Objection to form.
17       A.  Yes.
18       Q.  And is this a product listing
19  verification form that read --
20          MR. CARROLL:  Strike that.
21       Q.  Did Red Book provide this product
22  listing verification form to Pfizer?

Page 275

1       A.  Yes.
2       Q.  And was this product listing
3  verification form provided to Pfizer to verify
4  the accuracy of Pfizer AWP and WAC pricing for
5  its products that were published in the Red Book?
6          MS. KAPLAN:  Objection to form.
7       A.  Yes.
8       Q.  And if you'll notice it, there is a
9  signature on the bottom of each page.
10          Does that signature indicate to you
11  that Pfizer in fact did verify the AWP and WAC
12  pricing for the Pfizer products for which pricing
13  was published in the Red Book?
14          MS. KAPLAN:  Objection.
15       A.  Yes.
16       Q.  And did Red Book in the ordinary
17  course of its business rely upon Pfizer to verify
18  the accuracy of AWP and WAC pricing for all
19  Pfizer drugs that were published in the Red Book?
20          MS. KAPLAN:  Objection to form.
21       A.  Yes.
22       Q.  And if, in fact, a price for a Pfizer

Page 276

1  drug was published in a -- in the Red Book from
2  at least 1997 to the present, did Pfizer verify
3  the prices for a product listing verification?
4          MS. KAPLAN:  Objection to form.
5       A.  That is our assumption.
6       (July 25, 2003 Greenstone product
7  listing verification marked Exhibit Minne 049 for
8  identification.)
9       Q.  What I'm handing you, which is marked
10  as Exhibit 49, is a Red Book product listing
11  verification dated July 25th, 2003, addressed to
12  Greenstone.
13          Is this a product listing verification
14  form that you're familiar with --
15          MR. CARROLL:  Strike that.
16       Q.  Are you familiar with this Red Book
17  product listing verification form?
18       A.  Yes.
19       Q.  And is it a document that Red Book
20  routinely used in the ordinary course of its
21  business?
22          MR. GASTWIRTH:  Objection to form.

Page 277

1       A.  Yes.
2       Q.  And did Red Book provide this product
3  listing verification form to Greenstone to verify
4  the accuracy of Greenstone AWP and WAC pricing
5  that was published in the Red Book?
6          MS. KAPLAN:  Objection to form.
7          MS. LORENZO:  Objection to form.
8       A.  Yes.
9       Q.  And you'll notice there is a signature
10  on each page, at the bottom of each page.
11          Does the signature indicate that
12  Greenstone, in fact, verified the AWP and WAC
13  pricing for its products that were published in
14  the Red Book?
15          MS. KAPLAN:  Objection to form, lack of
16  foundation.
17       A.  Yes.
18       Q.  And in the ordinary course of its
19  business did Red Book rely upon Greenstone to
20  verify the accuracy of AWP and WAC pricing for
21  the Greenstone products published in the Red
22  Book?

Page 278

1        MS. KAPLAN:  Objection to form, lack of
2    foundation.
3        A.  Yes.
4        Q.   And if a price for a Greenstone
5    product was published in the Red Book from at
6    least 1997 to the present, did Red Book rely upon
7    Greenstone to verify the accuracy of that price?
8        MS. KAPLAN:  Object to the form, lack
9    of foundation.
10       A.  Yes, that was their assumption.
11       (October 11, 2002 Pharmacia Corporation
12    product listing verification marked Exhibit Minne
13    050 for identification.)
14       Q.   What I've handed you as Exhibit 50 is
15    a Red Book product listing verification form with
16    a respond date by October 11th, 2002 to Pharmacia
17    Corporation.
18       Are you familiar with Exhibit 50?
19       A.   Yes, as a document that we produced.
20       Q.   And is Exhibit 50 a document that Red
21    Book routinely used in the ordinary course of its
22    business?

Page 279

1        MS. KAPLAN:  Objection, form.
2        A.  Yes.
3        Q.   And is this Red Book product listing
4    verification --
5        MR. CARROLL:  Strike that.
6        Q.   Did Red Book provide the Red Book
7    product listing verification to Pharmacia
8    Corporation to verify the accuracy of Pharmacia
9    Corporation AWPs and WACs that were published in
10    the Red Book?
11       MS. KAPLAN:  Object to the form.
12       A.  Yes.
13       Q.   And to the extent there were any
14    changes made at the request of Pharmacia, did Red
15    Book make those changes?
16       MS. KAPLAN:  Objection, form.
17       A.  Yes.
18       Q.   And did Red Book rely on Pharmacia
19    Corporation to verify the accuracy of AWP and WAC
20    pricing for Pharmacia drugs that were published
21    in the Red Book?
22       MS. KAPLAN:  Objection, form, lack of

Page 280

1    foundation.
2        A.  Yes.
3        Q.   And to the extent a price for a
4    Pharmacia drug was published in the Red Book from
5    at least 1997 to the present, did Red Book rely
6    on Pharmacia to verify the accuracy of that
7    pricing?
8        MS. KAPLAN:  Objection to form, lack of
9    foundation.
10       A.  Yes.
11       (Document bearing Bates Nos. Red Book
12    13003 and 13002 marked Exhibit Minne 051 for
13    identification.)
14       (Document bearing Bates Nos. Red Book
15    13199 and 13200 marked Exhibit Minne 052 for
16    identification.)
17       (Document bearing Bates Nos. Red Book
18    13198 and 13197 marked Exhibit Minne 053 for
19    identification.)
20       (Document bearing Bates No. Red Book
21    13196 marked Exhibit Minne 054 for
22    identification.)

Page 281

1        (Document bearing Bates No. Red Book
2    13015 marked Exhibit Minne 055 for
3    identification.)
4        (Document bearing Bates Nos. Red Book
5    13109 through 13113 marked Exhibit Minne 056 for
6    identification.)
7        (Document bearing Bates Nos. Red Book
8    13090 and 13091 marked Exhibit Minne 057 for
9    identification.)
10       (Document bearing Bates No. Red Book
11    13086 marked Exhibit Minne 058 for
12    identification.)
13       (Document bearing Bates No. Red Book
14    13087 marked Exhibit Minne 059 for
15    identification.)
16       Q.  I'm going to hand you a group of
17    exhibits.
18       (Pause)
19       MR. CARROLL:  Can we go off the record
20    for a second.
21       THE VIDEOGRAPHER:  This is the
22    videographer.  Off the record at 15:32.

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 282

1       (Pause)
2       THE VIDEOGRAPHER:  This is the
3  videographer.  Back on the record, 15:33.
4    Q.  Miss Minne, I've handed you exhibits
5  marked 51 through 59.
6       If you could please review each one,
7  and each should have a Bates label Red Book at
8  the bottom, with a specific Bates number.
9       Can you confirm that for each of the
10 Exhibits 51 through 59?
11   A.  I confirm that.
12   Q.  And were these Exhibits 51 through 59
13 produced from Red Book's files?
14   A.  It appears that way, yes.
15   Q.  And were these documents, Exhibit 51
16 through 59, regularly maintained business records
17 of Red Book?
18   A.  Yes, they are.
19   Q.  And were they kept in the ordinary
20 course of business?
21   A.  Yes.
22   Q.  Is there any reason to question the

Page 283

1  authenticity of these exhibits as records
2  maintained in Red Book's records?
3    A.  No.
4    Q.  Did you understand the question?
5    A.  I did.
6       MS. KAPLAN:  Objection.
7       MR. CARROLL:  That's all I have for
8  those exhibits.
9       (September 26, 1997 Schering
10 Corporation product listing verification marked
11 Exhibit Minne 060 for identification.)
12   Q.  Miss Minne, what I'm handing you,
13 which has been marked as Exhibit 60, is a Red
14 Book product listing verification that requests a
15 response by September 26, 1997, to Schering
16 Corporation.
17      Are you familiar with Exhibit 60?
18      MS. TORGERSON:  Objection, form and
19 leading.
20   A.  Yes, that is a product verification
21 listing.
22   Q.  Is this a document that Red Book

Page 284

1  routinely used in the ordinary course of its
2  business?
3       MS. TORGERSON:  Objection, form.
4  Objection, leading.
5    A.  Yes.
6    Q.  Did Red Book provide this product
7  listing verification form to Schering Corporation
8  to verify the accuracy of Schering Corporation
9  AWPs and WACs that were published in the Red
10 Book?
11      MS. TORGERSON:  Objection, form and
12 leading, and misstates the document and
13 mischaracterizes the record.
14   A.  Yes.
15   Q.  If you'll notice, there is a signature
16 at the bottom of each page.
17      Does that signature indicate to you
18 that Schering Corporation in fact verified the
19 accuracy of AWP and WAC pricing for Schering
20 products for which pricing was published in the
21 Red Book?
22      MS. TORGERSON:  Objection, form.

Page 285

1  Objection, leading, mischaracterizes the
2  document, mischaracterizes the testimony.
3    A.  Yes.
4    Q.  And in the ordinary course of its
5  business did Red Book rely on Schering
6  Corporation to verify the accuracy of AWP and WAC
7  pricing for all Schering Corporation drugs for
8  which pricing was published in the Red Book?
9       MS. TORGERSON:  Objection, form.
10 Objection, leading, mischaracterizes the
11 document, mischaracterizes the evidence.
12   A.  Yes.
13   Q.  And if a price for a Schering
14 Corporation product was published in the Red
15 Book, from at least 1997 to the present, did Red
16 Book rely upon Schering Corporation to verify the
17 accuracy of that pricing?
18      MS. TORGERSON:  Objection, form.
19 Objection, leading, mischaracterizes the
20 document, mischaracterizes the evidence and
21 assumes facts not in evidence.
22   A.  Yes.

72 (Pages 282 to 285)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
**New York, NY**

Page 286

1          MR. CARROLL:  That's all I have on
2    that.
3          (October 27, 2000 Warrick
4    Pharmaceuticals product listing verification
5    marked Exhibit Minne 061 for identification.)
6      Q.   Miss Minne, what I've handed you as
7    Exhibit 61 is a Red Book product listing
8    verification with a "please respond by" date of
9    October 27th, 2000, addressed to Warrick
10   Pharmaceuticals.
11         Are you familiar with Exhibit 61?
12         MS. TORGERSON:  Objection, form.
13   Objection, leading.
14     A.   Yes.
15     Q.   Is this a document that Red Book
16   routinely used in the ordinary course of its
17   business?
18         MS. TORGERSON:  Objection, form.
19   Objection, leading.
20     A.   Yes.
21     Q.   Did Red Book provide this product
22   listing verification form to Warrick

Page 287

1    Pharmaceuticals to verify the accuracy of Warrick
2    AWP and WAC pricings that were published in the
3    Red Book?
4          MS. TORGERSON:  Objection, form.
5    Objection, leading.  Mischaracterizes the
6    document, mischaracterizes the evidence.
7      A.   Yes.
8      Q.   And I draw your attention to the fact
9    that there is a signature at the bottom of each
10   page.
11         Does that signature indicate that
12   Warrick -- indicate to Red Book that Warrick, in
13   fact, verified the accuracy of AWP and WAC
14   pricing for Warrick products for which pricing
15   was published in the Red Book?
16         MS. TORGERSON:  Objection, form.
17   Objection, leading.  Mischaracterizes the
18   document, mischaracterizes the evidence, and
19   assumes facts not in evidence.
20     A.   Yes.
21     Q.   And to the extent a change was
22   requested by Warrick, did Red Book in fact make

Page 288

1    that change?
2          MS. TORGERSON:  Objection, form.
3    Objection, leading, assumes facts not in
4    evidence, and it mischaracterizes the document,
5    mischaracterizes the evidence.
6      A.   Yes.
7      Q.   And did Red Book in the ordinary
8    course of its business rely on Warrick to verify
9    the accuracy of AWP and WAC pricing for all
10   Warrick products for which pricing was published
11   in the Red Book?
12         MS. TORGERSON:  Objection, form.
13   Objection -- get the routine going -- objection,
14   form.  Objection, leading, mischaracterizes the
15   document, mischaracterizes the evidence, assumes
16   facts not in evidence, and calls for speculation.
17     A.   Yes.
18     Q.   To the extent a price for a Warrick
19   Pharmaceutical product was published in the Red
20   Book from at least 1997 to the present, did Red
21   Book rely on Warrick Pharmaceutical to verify the
22   pricing?

Page 289

1          MS. TORGERSON:  Objection, form.
2    Objection, leading.  Assumes facts not in
3    evidence and calls for speculation.
4      A.   Yes.
5          MR. CARROLL:  Thank you.
6          (October 2, 2001 TAP Pharmaceuticals
7    product listing verification marked Exhibit Minne
8    062 for identification.)
9      Q.   Miss Minne, what I've handed you as
10   Exhibit 62 is a Red Book product listing
11   verification with a stamped date of October 2nd,
12   2001 to TAP Pharmaceuticals.
13         Are you familiar with Exhibit 62?
14     A.   Yes, in that it's a form supplied by
15   Red Book.
16     Q.   And was this a document that Red Book
17   routinely used in the ordinary course of its
18   business?
19         MS. CITERA:  Object to the form.
20     A.   Yes.
21     Q.   Did Red Book in fact provide the
22   product listing verification to TAP

73 (Pages 286 to 289)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 290

1  Pharmaceuticals to verify the accuracy of TAP
2  Pharmaceuticals' AWP and WAC pricing for its
3  products?
4       MS. CITERA:  Objection, form.
5    A.  Yes.
6    Q.  If you'll notice, there's a signature
7  on the page, on the bottom of each page.
8       Does that signature indicate to Red
9  Book that TAP Pharmaceutical in fact verified the
10  accuracy of the AWP and WAC pricing for TAP
11  Pharmaceutical products that were published in
12  the Red Book?
13       MS. CITERA:  Objection, form.
14    A.  Yes.
15    Q.  And in the ordinary course of its
16  business did Red Book rely on TAP Pharmaceuticals
17  to verify the accuracy of AWP and WAC pricing for
18  all TAP products that were published in the Red
19  Book?
20       MS. CITERA:  Object to form.
21    A.  Yes.
22    Q.  And to the extent a price for a TAP

Page 291

1  Pharmaceutical product was published in the Red
2  Book from at least 1997 to the present, did Red
3  Book rely on TAP Pharmaceuticals to verify the
4  accuracy of that pricing?
5       MS. CITERA:  Object to the form.
6    A.  Yes.
7       (September 24, 1999 King
8  Pharmaceuticals product listing verification
9  marked Exhibit Minne 063 for identification.)
10    Q.  Miss Minne, what I've handed you as
11  Exhibit 63 is a Red Book product listing
12  verification form dated September 24th, 1999 to
13  King Pharmaceuticals.
14       Are you familiar with Exhibit 63?
15    A.  Yes.
16    Q.  Is this a document that Red Book
17  routinely used in the ordinary course of its
18  business?
19       MR. GASTWIRTH:  Objection to form.
20    A.  Yes.
21    Q.  Did Red Book provide this product
22  listing verification to King Pharmaceuticals to

Page 292

1  verify the accuracy of King AWP and WAC pricing
2  for drugs for which pricing was published in the
3  Red Book for King --
4       MR. CARROLL:  Strike that.  That was a
5  terrible question.  I said it so many times.
6    Q.  Did Red Book provide this product
7  listing verification form to King Pharmaceuticals
8  to verify the accuracy of King AWP and WAC
9  pricing that was published in the Red Book?
10       MR. FARQUHAR:  Objection, leading.
11    A.  Yes.
12    Q.  And you'll see that at the bottom of
13  each page there is a signature.
14       Does this signature at the bottom of
15  each page indicate to you that King
16  Pharmaceuticals in fact verified the accuracy of
17  the AWP and WAC pricing for King Pharmaceutical
18  drugs that were published in the Red Book?
19       MR. FARQUHAR:  Objection, leading.
20  Objection, lack of foundation.
21    A.  Yes.
22    Q.  And did Red Book in the ordinary

Page 293

1  course of its business rely on King
2  Pharmaceuticals to verify the accuracy of AWP and
3  WAC pricing for King Pharmaceutical products that
4  were published in the Red Book?
5       MR. FARQUHAR:  Same objections.
6    A.  Yes.
7    Q.  And to the extent a price for a King
8  Pharmaceutical drug was published in the Red Book
9  from at least 1997 to the present, did Red Book
10  rely on King Pharmaceuticals to verify the
11  accuracy of the pricing?
12       MR. FARQUHAR:  Same objections.
13    A.  Yes.
14       MR. CARROLL:  That's all I have for
15  that one.
16       (July 25, 2003 Monarch Pharmaceuticals
17  product listing verification marked Exhibit Minne
18  064 for identification.)
19    Q.  Now, Miss Minne, what I've handed you
20  as Exhibit 64 is a Red Book product listing
21  verification dated July 25th, 2003 to Monarch
22  Pharmaceuticals.

74 (Pages 290 to 293)

Page 294

1      Are you familiar with Exhibit 64?
2    A.  Yes.
3    Q.  Is this a document that was routinely
4  used in the ordinary course of its business, of
5  Red Book's business?
6    A.  Yes.
7    Q.  Did Red Book provide this product
8  listing verification to Monarch Pharmaceuticals
9  to verify the accuracy of Monarch AWP and WAC
10  pricing that was published in the Red Book?
11      MR. FARQUHAR:  Objection, leading.
12    A.  Yes.
13    Q.  I draw your attention to the fact that
14  each page of Exhibit 64 is signed with a date
15  September 24th, 2003.
16      Does this signature, in fact, indicate
17  that Monarch verified the accuracy of AWP and WAC
18  pricing for Monarch products for which pricing
19  was published in the Red Book?
20      MR. FARQUHAR:  Objection, leading.
21  Objection, lack of foundation.
22    A.  Yes.

Page 295

1    Q.  In the ordinary course of its
2  business, did Red Book rely on Monarch
3  Pharmaceuticals to verify the accuracy of AWP and
4  WAC pricing for Monarch products that was
5  published in the Red Book?
6      MR. FARQUHAR:  Same objections.
7    A.  Yes.
8    Q.  Is it fair to say --
9      MR. CARROLL:  Strike that.
10    Q.  If a price for a Monarch
11  Pharmaceutical product was published in the Red
12  Book from at least 1997 to the present, did Red
13  Book rely on Monarch Pharmaceuticals to verify
14  the accuracy of that pricing?
15      MR. FARQUHAR:  Same objections.
16    A.  Yes.
17      (July 6, 2004 Ivax Pharmaceuticals
18  product listing verification marked Exhibit Minne
19  065 for identification.)
20    Q.  Miss Minne, what I've handed you,
21  what's been marked as Exhibit 65, is a Red Book
22  product listing verification for July 6 -- dated

Page 296

1  July 6, 2004 to Ivax Pharmaceuticals.
2      Are you familiar with Exhibit 65?
3    A.  Yes.
4      MR. PARISH:  Objection to form.
5    Q.  Is this a document that Red Book
6  routinely used in the course of its business?
7      MR. PARISH:  Object to form.
8      MR. CAHILL:  Jim, could you just check
9  the pages again, 65.
10      MR. CARROLL:  Oh, you know...
11      I see what you're saying.  It's a
12  copying issue.
13      MS. ROSENSTOCK:  Do you have a complete
14  document?
15      MR. CARROLL:  I do not.  Not here.
16      I'll note for the record that Exhibit
17  65 is Bates number Red Book 09294 -- whoa.
18      Let's -- can we just -- why don't we
19  withdraw this, it's the wrong exhibit, I
20  apologize.  Or we could take it...
21      I could take it back.
22      MR. PARISH:  Are you withdrawing the

Page 297

1  exhibit?
2      MR. CARROLL:  Yes.  I apologize for
3  that.
4      (Exhibit 065 withdrawn)
5      (Document marked Exhibit Minne 066 for
6  identification.)
7    Q.  Miss Minne --
8      MR. PAUL:  Could we go off the record
9  just for a second?
10      THE VIDEOGRAPHER:  This is the
11  videographer.
12      Off the record at 15:55.
13      (Pause)
14      THE VIDEOGRAPHER:  Back on the record,
15  15:56.
16  BY MR. CARROLL:
17    Q.  Miss Minne, what has been handed to
18  you as Exhibit 66 --
19      MR. LONERGAN:  This is Exhibit 65.
20  Whatever you want to do.
21      Why don't we do a new 65?  Is that okay
22  with you?

75 (Pages 294 to 297)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

Page 298

1       MR. CAHILL:  Sure.
2       (Document bearing Bates Nos. Red Book
3  11649 through 11673 marked Exhibit Minne 065 for
4  identification.)
5     Q.  Miss Minne, what I've handed to you as
6  Exhibit 65 is a Red Book product listing
7  verification dated November 1st -- stamped dated
8  November 1st, 2000 to Novartis Pharmaceuticals.
9       Are you familiar with Exhibit 65?
10      MR. LONERGAN:  I object to the use of
11  this document to the extent it's not a complete
12  document as produced by Red Book.  I don't know
13  if it is.
14      MR. CARROLL:  I would state for the
15  record that it is -- contains Bates Red Book
16  11649 through 11673, and states at the top that
17  it is page 1 through 22.
18     Q.  Could you please review the document
19  to see if it, in fact, is a complete document.
20      (Pause)
21     A.  It is a complete product listing
22  verification.  It does not contain any cover

Page 299

1  sheets that we would have sent with it.
2     Q.  Okay.  The cover letter that you
3  testified to -- about earlier?
4     A.  Correct, or the manufacturer
5  information form.
6     Q.  But this is a document that Red Book
7  routinely used in the ordinary course of its
8  business?
9       MR. PARISH:  Objection to form.
10     A.  Yes.
11     Q.  Did, in fact, Red Book provide this
12  product listing verification form to Novartis
13  Pharmaceuticals to verify the accuracy of
14  Novartis AWP and WAC pricing that was published
15  in Red Book?
16      MR. LONERGAN:  Objection to form.
17     A.  Yes.
18     Q.  I draw your attention to review at the
19  bottom of each page, you'll see that each page is
20  signed by -- it looks like a Michael Conley, on
21  October 30th, 2000.
22      Does that indicate -- the signature

Page 300

1  indicate that Novartis in fact verified the
2  accuracy of the AWP and WAC pricing for Novartis
3  products for which a pricing was published in Red
4  Book?
5       MR. LONERGAN:  Objection to form, lack
6  of foundation.
7     A.  Yes.
8     Q.  And did Red Book, in the ordinary
9  course of its business, rely on Novartis
10  Pharmaceuticals to verify the accuracy of the AWP
11  and WAC pricing for Novartis products for which
12  pricing was published in the Red Book?
13      MR. LONERGAN:  Objection to form, lack
14  of foundation.
15     A.  Yes.
16     Q.  And did it -- and to the extent a
17  price for a Novartis product was published in the
18  Red Book from at least 1997 to the present, did
19  Red Book rely on Novartis to verify the accuracy
20  of that pricing?
21      MR. LONERGAN:  Object to the form, lack
22  of foundation.

Page 301

1     A.  Yes.
2       (October 24, 2001 ESI Lederle product
3  listing verification marked Exhibit Minne 066 for
4  identification.)
5     Q.  Miss Minne, what I've handed you as
6  Exhibit 66 is a Red Book product listing
7  verification form dated -- stamped dated October
8  24, 2001 to ESI Lederle.
9       Are you familiar with Exhibit 66?
10     A.  Yes.
11     Q.  Is this a product listing verification
12  form to which you've been testifying to today?
13     A.  Yes.
14     Q.  And is this a document that Red Book
15  routinely used in the ordinary course of its
16  business?
17     A.  Yes.
18     Q.  Did Red Book in fact provide this
19  product listing verification form to ESI Lederle
20  to verify the accuracy of ESI Lederle AWP and WAC
21  pricing for the ESI Lederle products that were
22  published in Red Book?

## Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 302

1       MR. FARQUHAR: Objection, leading.
2    A.  Yes.
3    Q.  Did Red Book rely on ESI Lederle to
4  verify the accuracy of AWP and WAC pricing for
5  ESI Lederle products -- pricing for its products
6  published in Red Book?
7       MR. FARQUHAR: Objection, leading.
8  Objection, lack of foundation.
9    A.  Yes.
10    Q.  Do you see the handwriting on Exhibit
11  66?
12    A.  Yes.
13    Q.  Is that something -- do you recognize
14  that handwriting?
15    A.  I do not.
16    Q.  Would that handwriting come from
17  someone at Red Book or someone at ESI Lederle?
18       MR. FARQUHAR: Same objections.
19    A.  It could be either.
20    Q.  It could be either.
21    To the extent that --
22       MR. CARROLL: Strike that.

Page 303

1    Q.  If a price was published for an ESI
2  Lederle drug in the Red Book from at least 1997
3  to the present, did Red Book in fact rely on ESI
4  Lederle to verify the accuracy of that pricing?
5       MR. FARQUHAR: Same objections.
6    A.  Yes.
7    (July 25, 2003 Par Pharmaceuticals
8  product listing verification marked Exhibit Minne
9  067 for identification.)
10    Q.  Miss Minne, what I've handed you as
11  Exhibit 67 is a Red Book product listing
12  verification dated July 25th, 2003 to Par
13  Pharmaceuticals, Red -- the Bates number is Red
14  Book 12343 through 12363.  It appears that the
15  second digit of the page, at the top right, it
16  says "page 1 of," the second digit is cut off,
17  but it appears to be 21 pages.
18    Can you, please, verify that this is
19  the complete document for the record?
20    A.  I verify it's complete.
21    Q.  Thank you.
22    Are you familiar with Exhibit 67?

Page 304

1    A.  Yes.
2    Q.  And this is a product listing
3  verification form that Red Book routinely used in
4  the ordinary course of its business?
5       MR. LONERGAN: Objection to form.
6    Q.  Did Red Book provide this product
7  listing verification form to Par Pharmaceuticals
8  to verify the accuracy of Par AWP and WACs for
9  Par products that were published in the Red Book?
10       MR. FARQUHAR: Objection, leading.
11    A.  Yes.
12    Q.  And I draw your attention to the
13  bottom of each page, and you'll -- to see that
14  it's in fact signed by a Marissa Caputo.
15    Do you see that?
16    A.  Yes.
17    Q.  And does that signature indicate to
18  you that, as representative of Red Book, that Par
19  Pharmaceuticals in fact verified the accuracy of
20  the AWP and WAC pricing for Par products that
21  were published in the Red Book?
22       MR. FARQUHAR: Objection, leading.

Page 305

1  Objection, lack of foundation.
2    A.  Yes.
3    Q.  Did Red Book, in the ordinary course
4  of its business, rely on Par Pharmaceuticals to
5  verify the accuracy of AWP and WAC pricing for
6  all Par products for which pricing was published
7  in Red Book?
8       MR. FARQUHAR: Same objections.
9    A.  Yes.
10    Q.  And if a price for a Par
11  Pharmaceutical product was published in the Red
12  Book from at least 1997 to the present, did Red
13  Book rely on Par Pharmaceutical to verify the
14  accuracy of that pricing?
15       MR. FARQUHAR: Same objections.
16    A.  Yes.
17    Q.  Thank you.
18       MR. CARROLL: That's all I have on
19  that.
20    (December 6, 2005 Amgen USA product
21  listing verification marked Exhibit Minne 068 for
22  identification.)

77 (Pages 302 to 305)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008
New York, NY

Page 306

1       MR. CAHILL:  Getting near the end?
2       MR. CARROLL:  Getting near the end.
3    Q.  Miss Minne, what I've handed you as
4  Exhibit 68 is a Red Book product listing
5  verification form dated December 6, 2005 to Amgen
6  USA.
7       Are you familiar with Exhibit 68?
8    A.  Yes.
9    Q.  Is this a product listing verification
10 form that Red Book routinely used in the ordinary
11 course of its business?
12      MR. SWEENEY:  Object to the form.
13   Q.  Did Red Book provide this product
14 listing verification form to Amgen to verify the
15 accuracy of Amgen WACs and AWPs that were
16 published in the Red Book?
17      MR. SWEENEY:  Object to the form.
18   A.  Yes.
19   Q.  I draw your attention to the bottom of
20 each page, and that it is, in fact, signed on
21 each page by a Brianette McPolin -- MacPolin.
22      Does the signature on the bottom of

Page 307

1  each page indicate that Amgen in fact verified
2  the accuracy of the AWP and WAC pricing for --
3       MR. SWEENEY:  Object to the form.
4    Q.  -- the Amgen products --
5       MR. SWEENEY:  Sorry.
6    Q.  -- published in the Red Book?
7       MR. SWEENEY:  Object to the form,
8  foundation.
9    A.  Yes.
10   Q.  Did Red Book in the ordinary course of
11 its business rely on Amgen to verify the accuracy
12 of AWPs and WACs for all Amgen products --
13      MR. SWEENEY:  Object to the form.
14   Q.  -- that were published in the Red
15 Book?
16   A.  Yes.
17   Q.  And if a price for an Amgen product
18 was published in the Red Book from at least 1997
19 to the present, did Red Book rely on Amgen to
20 verify the accuracy of that pricing?
21      MR. SWEENEY:  Objection, form,
22 foundation.

Page 308

1    A.  Yes.
2       (Document bearing Bates Nos. Red Book
3  02938 through 02962 marked Exhibit Minne 069 for
4  identification.)
5    Q.  Miss Minne, what I've handed you that
6  has been marked as Exhibit 69 is a Red Book
7  product listing verification with a date stamp of
8  September 10, 2001, Bates number is Red Book
9  02938 through 02962, and it was sent to Astra
10 Zeneca.
11      Are you familiar with Exhibit 69?
12   A.  Yes.
13   Q.  Is this a product -- Red Book product
14 listing verification that Red Book routinely used
15 in the ordinary course of its business?
16      MS. PRINZO:  Objection as to form.
17   A.  Yes.
18   Q.  Did Red Book in fact provide this
19 product listing verification to Astra Zeneca to
20 verify the accuracy of Astra Zeneca AWPs and WACs
21 that were published in the Red Book?
22      MS. PRINZO:  Objection as to form.

Page 309

1    A.  Yes.
2    Q.  And if you'll look at the bottom of
3  each page, there is a signature.
4       Does that signature at the bottom of
5  each page indicate that Astra Zeneca in fact is
6  verifying the accuracy of AWP and WAC pricing for
7  its products that were published in the Red Book?
8       MS. PRINZO:  Objection as to form.
9    A.  Yes.
10   Q.  And to the extent that Astra Zeneca
11 asked Red Book to make any corrections or
12 changes, did Red Book make those changes?
13      MS. PRINZO:  Objection as to form.
14   A.  Yes.
15   Q.  Did Red Book in the ordinary course of
16 its business rely on Astra Zeneca to verify the
17 accuracy of AWPs and WACs for all Astra Zeneca
18 products that were published in the Red Book?
19      MS. PRINZO:  Objection as to form,
20 leading.
21   A.  Yes.
22   Q.  And if a price for an Astra Zeneca

78 (Pages 306 to 309)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                         November 18, 2008

# New York, NY

Page 310

1 product was published in the Red Book from at
2 least 1997 through the present, did Red Book rely
3 on Astra Zeneca to verify the pricing?
4         MS. PRINZO:  Objection as to form.
5     A.  Yes.
6         (Document bearing Bates Nos. Red Book
7 01802 through 1805 marked Exhibit Minne 070 for
8 identification.)
9     Q.  Miss Minne, what I've handed you as
10 Exhibit 70 is a Red Book product listing
11 verification form stamped dated September 1st,
12 1999 to Alpha Therapeutic Corporation, with a
13 Bates stamp Red Book 01802 through 1805.
14         Are you familiar with Exhibit 70?
15     A.  Yes.
16     Q.  Is this a product listing verification
17 form that Red Book routinely used in the ordinary
18 course of its business?
19         MR. GASTWIRTH:  Objection, form.
20     A.  Yes.
21     Q.  Did Red Book provide this product
22 listing verification form to Alpha Therapeutics

Page 312

1 Therapeutic product was published in the Red Book
2 from at least 1997 to the present, did Red Book
3 rely on Alpha Therapeutic to verify the accuracy
4 of that pricing?
5         MR. FARQUHAR:  Same objections.
6     A.  Yes.
7         (Document bearing Bates Nos. Red Book
8 13581 through 13593 marked Exhibit Minne 071 for
9 identification.)
10     Q.  Miss Minne, what I've handed you as
11 Exhibit 71 is a Red Book product listing
12 verification with the date July 25th, 2003 to
13 Purepac Pharmaceuticals.  The Red -- the Bates
14 stamp is Red Book 13581 through 13593.
15         Are you familiar with Exhibit 71?
16     A.  Yes.
17     Q.  Is it a product listing verification
18 that Red Book routinely used in the ordinary
19 course of its business?
20         MR. GASTWIRTH:  Objection to form.
21     A.  Yes.
22     Q.  Did Red Book, in fact, send --

Page 311

1 to verify the accuracy of Alpha Therapeutics'
2 AWPs and WACs that were to be published in the
3 Red Book?
4         MR. FARQUHAR:  Objection, leading.
5     A.  Yes.
6     Q.  You'll notice there is a signature at
7 the bottom of each page of the exhibit.
8         Does that signature indicate that Alpha
9 Therapeutic in fact verified AWP and WAC pricing
10 for Alpha Therapeutic products that were
11 published in the Red Book?
12         MR. FARQUHAR:  Objection, leading.
13 Objection, lack of foundation.
14     A.  Yes.
15     Q.  Did Red Book in the ordinary course of
16 its business rely on Alpha Therapeutic to verify
17 the accuracy of AWP and WAC pricing for all Alpha
18 Therapeutic products that -- for which pricing
19 was published in the Red Book?
20         MR. FARQUHAR:  Same objections.
21     A.  Yes.
22     Q.  And to the extent a price for an Alpha

Page 313

1         MR. CARROLL:  Strike that.
2     Q.  Did Red Book provide this product
3 listing verification form to Purepac
4 Pharmaceuticals to verify the accuracy of Purepac
5 AWP and WACs that were to be published in the Red
6 Book?
7         MR. FARQUHAR:  Objection, leading.
8 Objection, lack of foundation.
9     A.  Yes.
10     Q.  I draw your attention to the bottom of
11 each page where there -- this is signed by John
12 Reed.
13         Does the signature in fact indicate
14 that Purepac Pharmaceuticals did verify the
15 accuracy of the AWP and WAC pricing for Purepac
16 drugs that were published in Red Book?
17         MR. FARQUHAR:  Same objections.
18     A.  Yes.
19     Q.  Did Red Book in the ordinary course of
20 its business rely on Purepac Pharmaceuticals to
21 verify the accuracy of AWP and WACs for all
22 Purepac products --

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

| | Page 314 |
|---|---|

1     MR. GOBENA:  Strike that.
2     Q.  -- for all Purepac drugs that were
3 published in the Red Book?
4     MR. FARQUHAR:  Same objections.
5     A.  Yes.
6     Q.  And if a price for a Purepac
7 Pharmaceutical drug was published in the Red Book
8 from at least 1997 to the present, did Red Book
9 rely on Purepac Pharmaceuticals to verify the
10 accuracy of that pricing?
11     MR. FARQUHAR:  Same objections.
12     A.  Yes.
13     (Document bearing Bates Nos. Red Book
14 02073 through 02095 marked Exhibit Minne 072 for
15 identification.)
16     Q.  What I've handed you as Exhibit 72 is
17 a Red Book product listing verification with the
18 stamped date of October 26, 2000, Bates stamp Red
19 Book 02073 through 02095.  It was addressed to
20 Alpharma USPD.
21     Are you familiar with Exhibit 72?
22     A.  Yes.

| | Page 315 |
|---|---|

1     Q.  Is this a product listing verification
2 that Red Book routinely used in the ordinary
3 course of its business?
4     A.  Yes.
5     Q.  Did Red Book provide this product
6 listing verification to Alpharma USPD to verify
7 the accuracy of Alpharma AWPs and WACs that were
8 published in the Red Book?
9     MR. FARQUHAR:  Objection, leading.
10     A.  Yes.
11     Q.  I draw your attention to the bottom of
12 each page, and it indicates that a signature is
13 on each page dated October 25th, 2000.
14     Does the signature indicate that
15 Alpharma USPD in fact verified the accuracy of
16 the AWP and WAC pricing for Alpharma drugs that
17 were published in the Red Book?
18     MR. FARQUHAR:  Objection, leading.
19 Objection, lack of foundation.
20     A.  Yes.
21     Q.  To the extent that Alpharma USPD
22 requested that something on the product listing

| | Page 316 |
|---|---|

1 verification form be changed, did Red Book make
2 that requested change?
3     MR. FARQUHAR:  Objection -- same
4 objections.
5     A.  Yes.
6     Q.  Did Red Book, in the ordinary course
7 of its business, rely on Alpharma USPD to verify
8 the accuracy of AWP and WAC pricing for all
9 Alpharma drugs that were published in the Red
10 Book?
11     MR. FARQUHAR:  Same objections.
12     A.  Yes.
13     Q.  If a price for an Alpharma drug was
14 published in Red Book from at least 1997 to the
15 present, did Red Book rely on Alpharma to verify
16 that pricing?
17     MR. FARQUHAR:  Same objections.
18     A.  Yes.
19     MR. ANDERSON:  Are those the last two,
20 James?
21     MR. CARROLL:  I have to take a break
22 and check two things.

| | Page 317 |
|---|---|

1     MR. CAHILL:  You've got two more?
2     MR. CARROLL:  Two more, and then I need
3 a break to verify, and I may have two more after
4 that.
5     (Document bearing Bates Nos. Red Book
6 10863, 10868, 10876, 10877, 10878 marked
7 Exhibit Minne 073 for identification.)
8     Q.  Miss Minne, what I've handed you as --
9     MR. CARROLL:  Why don't we go off the
10 record.
11     THE VIDEOGRAPHER:  This is the
12 videographer.
13     This ends tape number five at 16:24.
14     (Recess taken)
15     THE VIDEOGRAPHER:  This begins tape
16 number six at 16:41.
17 BY MR. CARROLL:
18     Q.  Miss Minne, what I've placed in front
19 of you as Exhibit 73 are excerpts, they're Red
20 Book product listing verifications and they're
21 excerpts, and they're all dated July 6, 2004,
22 with varying Bates stamps, 10863, 10868, 10876,

80 (Pages 314 to 317)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

| Page 318 |
| --- |

1  10877, and 10878.  They're all from the same
2  product listing verification to Mylan
3  Pharmaceuticals.
4       MS. LORENZO:  I would just like to note
5  my objection that this is just portions of a
6  32-page document and that the witness does not
7  have the full document to review.
8       Q.   And do you agree that this is a
9  six-page -- five-page excerpt from a 32-page
10 document?
11      A.   Yes --
12      MS. LORENZO:  Objection.
13      A.   Yes, I do.
14      Q.   Do you recognize these excerpts?
15      A.   Yes.
16      Q.   And are these excerpts from a product
17 listing verification that Red Book routinely used
18 in the ordinary course of its business?
19      MS. LORENZO:  Objection, form.
20      A.   Yes.
21      Q.   And did Red Book in fact send these
22 excerpts, in addition to the entire document, to

| Page 319 |
| --- |

1  Mylan Pharmaceuticals to verify the accuracy of
2  Mylan AWPs and WACs that were published in Red
3  Book?
4       MS. LORENZO:  Objection, leading,
5  foundation.
6       A.   I can assume, yes.
7       Q.   Now, if you notice at the bottom of
8  each page, they're all signed by a Connie
9  Hatcher.
10      Do the signatures of Connie Hatcher
11 indicate that Mylan Pharmaceuticals in fact
12 verified the accuracy of AWP and WAC pricing for
13 Mylan drugs that were published in Red Book?
14      MS. LORENZO:  Objection, form,
15 foundation.
16      A.   Yes.
17      Q.   And did Red Book, in the ordinary
18 course of its business, rely on Mylan
19 Pharmaceuticals to verify the accuracy of AWP and
20 WAC pricing for Mylan Pharmaceutical drugs that
21 were published in Red Book?
22      MS. LORENZO:  Objection, form,

| Page 320 |
| --- |

1  foundation.
2       A.   Yes.
3       Q.   And if a price for a Mylan
4  pharmaceutical drug was published in the Red Book
5  from at least 1997 to the present, did Red Book
6  rely on Mylan Pharmaceuticals to verify that
7  pricing?
8       MS. LORENZO:  Objection, form,
9  foundation, calls for speculation.
10      A.   Yes.
11      (Document bearing Bates Nos. Red Book
12 11421, 11432, 11436, 11439 marked Exhibit Minne
13 074 for identification.)
14      Q.   Miss Minne, what I've handed you as
15 Exhibit 74 is a Red Book product listing
16 verification excerpts, four-page excerpt from a
17 37-page document, Red Book -- Bates stamp Red
18 Book 11421, 11432, 11436 and 11439.  The product
19 listing verification was to UDL Laboratories.
20      Do you recognize Exhibit 74?
21      MS. LORENZO:  Objection, form.
22      A.   Yes.

| Page 321 |
| --- |

1       MS. LORENZO:  And please note my
2  objection to the fact that this is an incomplete
3  document.
4       Q.   Is this the -- are these excerpts the
5  type -- is this product listing verification
6  excerpts the type of document that Red Book
7  routinely used in the ordinary course of its
8  business?
9       MS. LORENZO:  Objection, form.
10      A.   Yes.
11      Q.   And did Red Book provide UDL
12 Laboratories this product listing verification,
13 at least these excerpts, and probably the whole
14 document in its entirety, to UDL Laboratory to
15 verify the accuracy of UDL Laboratory's AWPs and
16 WACs to be published in Red Book?
17      MS. LORENZO:  Objection, form,
18 foundation.
19      A.   Yes.
20      Q.   And I draw your attention to the
21 bottom of each page of Exhibit 74, and there are
22 signatures.

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

New York, NY

---

Page 322

1    Does the signature on the bottom of
2  each page indicate to Red Book that UDL
3  Laboratories in fact verified the AWP and WAC
4  pricing for UDL Laboratory products that were
5  published in Red Book?
6    MS. LORENZO:  Objection, form,
7  foundation.
8    A.  Yes.
9    Q.  Did Red Book, in the ordinary course
10  of its business, rely on UDL Laboratories to
11  verify the accuracy of AWPs and WACs for all UDL
12  Laboratory drugs for which pricing was published
13  in the Red Book?
14    MS. LORENZO:  Objection, form,
15  foundation.
16    A.  Yes.
17    Q.  And if a price for a UDL Laboratory
18  drug was published in Red Book from at least 1997
19  to the present, did Red Book rely on UDL
20  Laboratories to verify that pricing?
21    MR. CAHILL:  Objection, form,
22  foundation, calls for speculation.

---

Page 323

1    A.  Yes.
2    (Document bearing Bates Nos. Red Book
3  15827, 15838, 15839, 15841 marked Exhibit Minne
4  075 for identification.)
5    Q.  Miss Minne, what I've handed you as
6  Exhibit 75 is -- are four pages excerpted from a
7  Red Book product listing verification dated July
8  25th, 2003, bearing the Bates stamp Red Book
9  15827, 15838, 15839 and 15841, sent to Watson
10  Pharma.
11    Do you recognize Exhibit 75?
12    A.  Yes.
13    Q.  And is that a price listing --
14  excerpts of a product listing verification
15  routinely used in the ordinary course of Red
16  Book's business?
17    MS. LORENZO:  Objection.
18    MR. FARQUHAR:  I object to the use of
19  an incomplete document.
20    A.  Yes.
21    Q.  Did Red Book provide these excerpts
22  for -- from this -- did --

---

Page 324

1    MR. CARROLL:  Strike that.
2    Q.  Did Red Book provide a product listing
3  verification dated 7/25/2003 to Watson
4  Pharmaceuticals to verify the accuracy of Watson
5  Pharmaceuticals' AWPs and WACs that were
6  published in the Red Book?
7    MR. FARQUHAR:  Objection, leading.
8    A.  Yes.
9    Q.  You'll notice that there's a signature
10  on the bottom of each page.  Does that signature
11  indicate that Watson Pharmaceuticals in fact
12  verified the AWP and WAC pricing for Watson
13  products that were published in the Red Book?
14    MR. FARQUHAR:  Objection, leading.
15  Objection, lack of foundation.
16    A.  Yes.
17    Q.  Did Red Book, in the ordinary course
18  of its business, rely on Watson Pharmaceuticals
19  to verify the accuracy of AWP and WAC pricing for
20  Watson products that were published in Red Book?
21    MR. FARQUHAR:  Same objections.
22    A.  Yes.

---

Page 325

1    Q.  And if a price for a Watson
2  Pharmaceutical product was published in the Red
3  Book from at least 1997 to the present, did Red
4  Book rely on Watson Pharmaceuticals to verify the
5  accuracy of that pricing?
6    MR. FARQUHAR:  Same objections.
7    A.  Yes.
8    (Document bearing Bates Nos. Red Book
9  09294, 09302, 09306, 09329 marked Exhibit Minne
10  076 for identification.)
11    Q.  Miss Minne, what I handed you marked
12  as Exhibit 76 are excerpts of a product listing
13  verification dated July 6, 2004, bearing the
14  Bates stamp Red Book 09294, 09302, 09306 and
15  09329, to Ivax Pharmaceuticals.
16    MR. PARISH:  I object on the grounds
17  that this is an incomplete document.
18    Q.  These excerpts are from a 57-page --
19  appear to be from a 57-page product listing
20  verification.
21    Are you familiar with Exhibit 76?
22    A.  Yes.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 326

1    Q.  And is this a product listing
2 verification used in the ordinary course of Red
3 Book's business?
4       MR. PARISH:  Object to the form of the
5 question.
6    A.  Yes.
7    Q.  Did Red Book provide the product
8 listing verification dated July 6, 2004 to Ivax
9 Pharmaceutical to verify the accuracy of Ivax AWP
10 and WACs that were to be published in Red Book?
11       MR. PARISH:  Object to the form of the
12 question.
13    A.  Yes.
14    Q.  And I draw your attention to the
15 bottom of each page, which indicates they are all
16 signed by a Joyce Jones.
17       Do those signatures indicate that Ivax
18 Pharmaceutical in fact verified the accuracy of
19 AWP and WACs pricing for Ivax drugs for which
20 pricing was published in the Red Book?
21       MR. PARISH:  Object to the form of the
22 question.  Object to lack of foundation.

Page 327

1    A.  Yes.
2    Q.  And to the extent that Ivax
3 Pharmaceutical requested that Red Book make a
4 change to the information included on the product
5 listing verifications, did Red Book make that
6 change?
7       MR. PARISH:  Object to the form of the
8 question, lack of foundation.
9    A.  Yes.
10    Q.  Did Red Book, in the ordinary course
11 of its business, rely on Ivax Pharmaceutical to
12 verify the accuracy of AWPs and WACs for all Ivax
13 Pharmaceutical drugs that -- for which pricing
14 was published in the Red Book?
15       MR. PARISH:  Object to the form of the
16 question.
17    A.  Yes.
18    Q.  To the extent that a price for Ivax
19 Pharmaceuticals for a --
20       MR. CARROLL:  Strike that.
21    Q.  To the extent a price for an Ivax
22 Pharmaceutical drug was published in the Red Book

Page 328

1 from at least 1997 to the present, did Red Book
2 rely on Ivax Pharmaceutical to verify that
3 pricing?
4       MR. PARISH:  Object to the form of the
5 question.
6    A.  Yes.
7    Q.  To the extent that there was pricing
8 for Teva Pharmaceutical products published in the
9 Red Book from at least 1997 to the present, did
10 Ivax --
11       MR. CARROLL:  Strike that.
12    Q.  -- did Red Book rely on Teva
13 Pharmaceuticals to verify that pricing?
14       MR. PARISH:  Object to the form of the
15 question.
16    A.  Yes.
17    Q.  To the extent there was pricing for
18 Johnson & Johnson drugs that was published in the
19 Red Book from 1997 to the present, did Red Book
20 rely on Johnson & Johnson to verify the accuracy
21 of that pricing?
22       MS. TORGERSON:  Objection, form, and

Page 329

1 objection, leading.
2    A.  Yes.
3       MR. CARROLL:  I have no further
4 questions.
5       (Pause)
6       (Document bearing Bates Nos. California
7 Mylan 03471964 through 03472033 marked
8 Exhibit Minne 077 for identification.)
9            EXAMINATION
10 BY MR. PAUL:
11    Q.  Miss Minne, I'm Nick Paul.  I
12 represent the State of California.  We have a
13 case alleging substantially the same allegations
14 that have been described previously by
15 plaintiffs' counsel to you today in California
16 and cross-noticed this deposition, and I'd like
17 to ask you some questions about this document
18 that's been marked as Exhibit 77.  Actually, just
19 four pages of it.  I know it's been a long day,
20 and I'll try to move quickly.
21       MR. PAUL:  For the record, the title
22 page here says "Micromedex Incorporated, Red Book

83 (Pages 326 to 329)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

Page 330

1  Database Services, Database Overview Manual," and
2  at the bottom right, in small letters it says,
3  "Red Book database, revised April 14th, 2000."
4      Q.  Did I read that correctly?
5      A.  Yes.
6      Q.  Are you familiar with this manual?
7      A.  Yes.
8      Q.  Could you describe the purpose of it?
9      A.  The purpose of this manual is to
10  describe the electronic Red Book file to a
11  potential customer.
12      Q.  Is that the same electronic file
13  that's been mentioned many times earlier today?
14      A.  Yes.
15      Q.  The first two pages I'd like you to
16  turn to are --
17      MR. PAUL:  And for the record, this is
18  Bates -- this is Bates number California Mylan
19  03471964 through 03472033.  I believe it's a
20  complete document.
21      Q.  And I just want to turn to pages 1968
22  and 1969, which are in the introduction.

Page 331

1      And looking at the bottom of page 1968,
2  there's a sentence that I'll read that begins,
3  "Similar," it continues, "to other advanced
4  information systems, the Red Book database is a
5  rapidly evolving knowledge base. Current uses for
6  the database include:" and then on the next page,
7  1969, there are some bulletized examples, one of
8  which, the second one, is "Claims adjudication."
9      Do you have any knowledge as to how the
10  data in this database are used for claims
11  adjudication?
12      A.  I have a general knowledge.
13      Q.  Could you tell us what that is?
14      A.  A -- a company performing claims
15  adjudication purchases pricing information, such
16  as the Red Book database, and then uses that when
17  determining what the claim -- what the claims
18  are.
19      Q.  So to the extent that a company
20  purchasing this database for the purposes of
21  claims adjudication and relying on the prices in
22  the database --

Page 332

1      MR. PAUL:  Strike that.
2      Q.  So I think earlier today you described
3  three purchasers you were aware of of the
4  electronic database, Merck MedCo and EDS and
5  Express Scripts.
6      A.  (Nodding)
7      Q.  Are there any others that come to
8  mind?
9      A.  No.  Not at this time.
10      Q.  What about the fourth bullet, which
11  reads, "Establishing and maintaining
12  reimbursement levels," do you have any knowledge
13  as to how the database is used in that
14  connection?
15      A.  No, I do not.
16      Q.  All right, if you turn, please, to --
17  the last four of the Bates are 2010.
18      MR. FARQUHAR:  I'm sorry, Counselor,
19  could you also read the page number in the upper
20  right-hand corner, because I have a different
21  version of that?  I may be able to refer to it.
22      MR. PAUL:  Sure.  With respect to the

Page 333

1  previous questions, it was "Introduction 1/2",
2  and "Introduction 1/3."
3      MR. FARQUHAR:  Thank you.
4      MR. PAUL:  And in connection with my
5  questions regarding Bates pages 2010 and 2011,
6  the top number reads "Available Fields 4-34" and
7  35.
8  BY MR. PAUL:
9      Q.  Page 2010 provides a description of a
10  field name described as average wholesale price
11  sector.  And the description reads, "Provides the
12  product's nationally recognized suggested
13  wholesale price as determined by surveys of
14  manufacturers and wholesalers.  The AWP sector
15  contains fields for the current, first previous
16  and second previous average wholesale prices."
17      Did I -- did I read that correctly?
18      A.  Yes.
19      Q.  And where would the surveys that are
20  described in there, how would they take place?
21      A.  That would be -- going back to the
22  product listing verification that we would send

84 (Pages 330 to 333)

Page 334

1  to manufacturers.
2      Q.  The same product listing verifications
3  that were discussed at length today?
4      A.  Correct.
5      Q.  So in particular, the AWP data that
6  was obtained through those product listing
7  verifications would be entered into this
8  database?
9      A.  Correct.
10     MR. GASTWIRTH:  Objection to form.
11     Q.  So is it fair to say that the AWPs
12 which were entered into the Red Book database
13 which are the subject of this manual, at least
14 until the 2003 AWP policy change, would have come
15 from drug manufacturers?
16     MR. SWEENEY:  Object to the form.
17     MS. TORGERSON:  Object to the form.
18     MR. GASTWIRTH:  Object to the form.
19     MR. CAHILL:  Do you want the question
20 read back?
21     THE WITNESS:  Please.
22     (Record read)

Page 335

1      MS. TORGERSON:  Same objections.
2      A.  Yes, the AWP would have come from the
3  manufacturers, or they would have supplied us the
4  formula to calculate that AWP.
5      Q.  And with the proviso you just
6  mentioned, you're referring to the AWP policy
7  period after 2003?
8      MS. TORGERSON:  Objection, form.
9      A.  Prior to 2003.  The manufacturers,
10 some manufacturers, would not provide an AWP
11 price but would provide a formula to calculate an
12 AWP.
13     Q.  All right.  And could you tell us --
14 if you did tell us today, I missed the inception
15 date, but could you tell us approximately when
16 this attribute of pricing at which AWPs were
17 entered based on a markup began?
18     MR. GASTWIRTH:  Objection, form.
19     A.  Are you asking when manufacturers
20 started supplying us a formula?
21     Q.  Yes.
22     A.  I do not know the exact date of when

Page 336

1  the first manufacturer was -- or who it was or
2  when it was that that became a practice.
3      Q.  All right.
4      Are there any manufacturers, to your
5  knowledge, whose prices are not featured in the
6  Red Book electronic database?
7      A.  None that I am aware of.
8      Q.  I think you confirmed that one of the
9  purchasers of the electronic database -- one of
10 the subscribers is EDS.
11     Do you -- is that correct?
12     A.  I know they were at one point.  I do
13 not know if they still are.
14     Q.  Do you have any knowledge as to the
15 type of customers that EDS services?
16     A.  I do not know.
17     Q.  And I think you've already been asked
18 this once earlier today, but could you confirm
19 either way, do you know if any government
20 Medicaid programs are purchasers of electronic
21 database, the Red Book electronic database?
22     A.  I do not know.

Page 337

1      Q.  Do you know who in Red Book might know
2  the answer to that?
3      A.  Probably the salespeople, who are more
4  familiar with the customers.
5      Q.  Any names in particular that --
6      A.  Marc Mussato would be a good person to
7  know that answer.
8      MR. PAUL:  That's all I have, thanks.
9      MS. TORGERSON:  Any other plaintiffs?
10     MR. ANDERSON:  Is there any plaintiff
11 on the phone who would like to ask questions?
12     All right, we're now passing the
13 witness to the defense bar.
14     MR. FARQUHAR:  Why don't we go off the
15 record just for a second so we can --
16     THE VIDEOGRAPHER:  This is the
17 videographer.  Off the record at 17:03.
18     (Pause)
19     THE VIDEOGRAPHER:  On the record at
20 17:05.
21     EXAMINATION
22 BY MR. FARQUHAR:

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

## New York, NY

Page 338

1     Q.  Thank you.
2          My name is Doug Farquhar, I represent
3   Watson Pharmaceuticals in a whole mess of the
4   cases that have been cross-noticed here.
5          So I'd like to start, actually, with
6   Exhibit 77, which you were looking at earlier,
7   and I'll ask you to turn back to the page where
8   the definition of AWP was included.
9          The description there has already been
10  read into the record, so I won't reread it, I
11  think it was on the Bates number 2010.
12    A.  (Nodding)
13    Q.  Okay.  And I just wanted to confirm
14  that the AWP that was provided by some of the
15  manufacturers, as you indicated, was intended to
16  be what's listed here; that is, the nationally
17  recognized suggested wholesale price; is that
18  correct?
19          MR. GOBENA:  Object to form.
20    A.  That is my assumption.
21    Q.  Now, I would ask you to turn -- it's
22  probably going to be two pages, to the definition

Page 339

1   of wholesale acquisition cost.
2          Okay.  What's the Bates number in the
3   bottom right-hand corner?  What does it end with?
4   211?
5     A.  Correct.
6     Q.  Okay.  If you would -- well, why don't
7   I read it into the record, it would probably be
8   easier that way.
9          The description for the WAC sector
10  says, "Provides manufacturer-quoted list prices
11  to wholesale distributors, alternatively referred
12  to as 'net wholesale' or 'list price' within the
13  pharmaceutical industry.  This field may be used
14  in lieu of or in conjunction with AWP for product
15  comparisons and trend analysis.  This field is not
16  reflective of bids, rebates, volume purchase
17  agreements or other types of exclusive contracts
18  which may alter the price charged on an
19  account-specific basis."
20          Did I read that paragraph accurately?
21    A.  Yes.
22    Q.  And is that consistent with the Red

Page 340

1   Book editorial policy about what a WAC is, in
2   your experience?
3          MR. CAHILL:  Objection to form.
4          MR. CARROLL:  Objection to form.
5     A.  Yes, that is our understanding of what
6   a WAC price represents.
7     Q.  Very good.
8          All right, I'd like to have you take a
9   look at what I'm going to ask to be marked as
10  Exhibit 78.
11          (Document bearing Bates No. WATMA
12  005202 marked Exhibit Minne 078 for
13  identification.)
14          MR. FARQUHAR:  And for those on the
15  phone, or those in this room that don't get a
16  copy of it, let me describe this as a letter from
17  Red Book dated April 6th, 1995 to Jesse Childs at
18  Watson Laboratories.  It bears a Bates number
19  WATMA 005202.
20    Q.  Let me start by asking you if you
21  recognize this document.
22    A.  Yes, I have not seen this document

Page 341

1   before.
2     Q.  All right.  Does this document appear
3   to be a letter on Red Book letterhead, based on
4   your knowledge and experience at Red Book?
5     A.  Yes, it does.
6     Q.  Do you have any reason to believe that
7   this was anything other than a letter from Red
8   Book on this date to Watson Laboratories?
9     A.  No.
10    Q.  It's signed by Beverly, it looks like
11  Pfohl, P-f-o-h-l.
12          Are you familiar with Miss Pfohl?
13    A.  I am not.
14    Q.  Now, the second paragraph, it says,
15  "WAC on the Red Book database refers to the
16  manufacturer's quoted list price to wholesale
17  distributors and does not reflect any deal terms
18  or specialized contract pricing."
19          Did I read that paragraph correctly?
20    A.  Yes.
21    Q.  And is that consistent with your
22  understanding of what the Red Book definition is

86 (Pages 338 to 341)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

New York, NY

Page 342

1  for WAC?
2       MR. GOBENA:  Objection to form.
3    A.  Yes.
4    Q.  Okay, I'm going to show you now what I
5  will ask to have marked as Exhibit No. 79.
6       (Document bearing Bates Nos. RB00803
7  through 00874 marked Exhibit Minne 079 for
8  identification.)
9       MR. FARQUHAR:  Now, this bears Bates
10 numbers RB00803 through 874, but I will note for
11 the record it is not a complete document.  The
12 part of this document that interests me,
13 actually, begins on the third page, which is
14 Bates numbered 805, but I didn't have the benefit
15 of having seen Exhibit 77 when I saw this
16 document in the Red Book documents, so I included
17 the first two pages because they were sequential
18 before 805, and I couldn't understand what 805
19 was.
20   Q.  So I'm going to ask -- actually, ask
21 you to ignore the first two pages of this
22 document, and look at 805, and ask you is this

Page 343

1  basically the same document as Exhibit 77, just
2  an earlier iteration of it?
3    A.  That is what it appears to be to me.
4    Q.  All right, great.
5       And on -- I'm sorry, I can't remember
6  if you mentioned this, but who did this document
7  go to?  Did it go to customers?  Was it purely an
8  internal document?
9    A.  If this document, 805, is the same as
10 or an earlier revision of Exhibit 77, it would
11 have been going to customers or potential
12 customers.
13   Q.  Okay.
14      And the purpose of -- can you tell us
15 what the purpose of this document was?  Why was
16 it developed and sent to customers?
17   A.  This document is describing the fields
18 included in the electronic Red Book file, so it
19 would just be a source of information for a
20 customer or potential customer to know what was
21 being offered in that file.
22   Q.  All right.  And where definitions are

Page 344

1  included of the fields, what is the purpose of
2  providing those definitions to the customers?
3    A.  My assumption would be just because
4  these are industry standard terms, so by calling
5  them the same term as what it is known in the
6  industry, it would make sense to a customer.
7    Q.  Okay.  So they would understand what
8  the definitions are --
9    A.  Correct.
10   Q.  -- that Red Book is using?
11   A.  Correct.
12   Q.  I would just ask you to turn to the
13 page that's marked at the bottom 807.  It's about
14 the fifth page in.
15      And it's true, is it not, that the
16 table of contents here included a reference to
17 average wholesale price, or AWP?
18   A.  Correct.
19   Q.  And then on the next page -- I'm
20 sorry, at the bottom of that same page -- or not.
21      Oh, I'm sorry, up at the top -- thank
22 you -- of the same page, wholesale acquisition

Page 345

1  cost, or WAC sector, there's an indication of
2  where you would find information about WAC in
3  this table of contents?
4    A.  Correct.
5    Q.  Okay.
6       Now, I'd ask you to turn to the very
7  last two pages in this exhibit.
8       This is the index for the document that
9  we've been referring to; correct?
10   A.  Yes.
11   Q.  All right.
12      And on the next-to-last page, 873,
13 again, if someone wanted to look at what the
14 average wholesale price was intended to be, all
15 they would have to do is turn to the index, look
16 it up and see that it is defined on page 4-34?
17      MR. GOBENA:  Objection to form.
18   Q.  Is that correct?
19      MR. GOBENA:  Same objection.
20   A.  That appears to be correct.
21   Q.  Same question with regard to WAC, or
22 wholesale acquisition cost, on the last page?

87 (Pages 342 to 345)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

## New York, NY

Page 346

1          MR. GOBENA:  Same objection.
2      A.  That appears to be correct.
3      Q.  Okay.
4          And the definitions that we read from
5  Exhibit 77 with regard to AWP and WAC are the
6  same on page 853 and 855 as the definitions that
7  were in Exhibit 77; correct?
8          MR. GOBENA:  Objection, form.
9      A.  That appears to be correct.
10     Q.  Okay.  Thank you.
11         I'd like to show you now what's been
12 marked, or will be marked, as Exhibit 80.
13         (Document bearing Bates No. WATED
14 021725 marked Exhibit Minne 080 for
15 identification.)
16         MR. FARQUHAR:  And for the record, I
17 will describe this as a document that was
18 produced by Watson in electronic form in at least
19 Kentucky, and I believe in other states, or will
20 be soon, and it bears the Bates number in
21 electronic form of WATED 021725.  It's a letter
22 dated August 23rd, 2000 to Ronnie Lane at Red

Page 347

1  Book.
2      Q.  Let me start by asking you if you're
3  familiar with this document.
4      A.  No.
5      Q.  Do you know who Ronnie Lane is?
6      A.  I did meet Ronnie Lane.
7      Q.  And she's -- who is she?
8      A.  She was what they called a data
9  analyst on the Red Book side in Montvale.
10     Q.  So she was in --
11         MR. SWEENEY:  I'm sorry, can you read
12 that back?  I didn't hear it.
13         MR. FARQUHAR:  She was a data analyst
14 in Montvale.
15         MR. SWEENEY:  Okay.
16     Q.  And she was an employee of Red Book;
17 correct?
18     A.  Correct.
19     Q.  Would -- well, let me try that again.
20         Would her responsibilities have
21 included communicating with drug manufacturers?
22     A.  Yes.

Page 348

1      Q.  Now, this letter appears to be a
2  letter from Schein to Ronnie Lane dated August
3  23rd, 2000.
4          Do you have any reason to believe that
5  this letter was not, in fact, sent by Schein and
6  received by Red Book?
7      A.  No, I do not.
8      Q.  You'll notice that the second
9  paragraph states, in relevant part -- well, I'm
10 sorry, let me start with the first -- first
11 paragraph, the last sentence.  In talking about
12 WAC, it says, "As you are aware, rebates or other
13 adjustments which, if granted, may result in an
14 effective net price to some purchasers of less
15 than the listed WAC."
16         Would that description of WAC be
17 consistent with your understanding on behalf of
18 Red Book of the definition of WAC?
19         MR. GOBENA:  Objection to form.
20     A.  The Red Book definition does state
21 that WAC does not reflect any rebates or other
22 adjustments or contract pricing, so, yes, this

Page 349

1  would be consistent with my -- with the Red Book
2  understanding of WAC.
3      Q.  Okay.
4          And the second paragraph starts with
5  the sentence, "While custom and usage by industry
6  and government entities has, for over 20 years,
7  designated manufacturer-suggested list prices to
8  providers as 'AWP,' several manufacturers have,
9  in recent years, come under investigation for
10 reporting AWP consistent with this practice."
11         My question is whether -- well, my
12 first is whether the definition of AWP as
13 manufacturer-suggested list prices to providers
14 would be consistent with Red Book's definition of
15 AWP under its editorial policy?
16         MR. GOBENA:  Objection to the form.
17     A.  Yes.
18     Q.  And my second question is whether Red
19 Book did anything with this information that was
20 provided to Red Book in this letter on August
21 23rd, 2000?
22     A.  I do not know.  Any -- any action or a

88 (Pages 346 to 349)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                November 18, 2008

New York, NY

Page 350

1  response to this letter would be contained within
2  the manufacturer files.
3      Q.  Okay.
4          And I assume you can't confirm for us
5  that this letter was, in fact, received by Red
6  Book?
7      A.  I cannot confirm that.
8      Q.  Okay.
9          MR. FARQUHAR:  I would ask counsel for
10 Red Book if they can try and locate a copy of
11 this letter from within the files of Red Book.
12         MR. CAHILL:  We'll take the request
13 under advisement.
14         MR. FARQUHAR:  Thank you.
15     Q.  All right.
16         Are you aware that some manufacturers
17 and labelers reported an SWP, or suggested
18 wholesale price, in lieu of an AWP, or average
19 wholesale price?
20         MR. GOBENA:  Objection to form.
21     A.  I have seen manufacturers list prices
22 termed something other than AWP, yes.

Page 351

1      Q.  Okay.
2          Including suggested wholesale price, or
3  SWP?
4      A.  Off the top of my head, I don't know
5  --
6      Q.  Okay.
7      A.  -- if that was a term I've seen
8  before.
9      Q.  All right.
10         MR. FARQUHAR:  I have a document that I
11 don't have extra copies of, but I think it will
12 be sufficient for me to describe this document so
13 that everybody will understand what it is.  If
14 anybody objects to that, just let me know and
15 we'll stop the deposition and get copies of it.
16         It's a letter from Watson Pharma
17 Incorporated, it's dated 8/30 of 2000, it's from
18 an employee of Watson Pharma to Miss Linda Panke,
19 P-a-n-k-e, a data specialist in Montvale for Red
20 Book.
21     Q.  Let me start by asking you, do you
22 know who Ms. Panke is?

Page 352

1      A.  I did meet her once.
2      Q.  And again -- she's an employee of Red
3  Book, or was?
4      A.  She was an employee, yes.
5      Q.  And as a data specialist, would her
6  responsibilities include communicating with drug
7  companies?
8      A.  Yes.
9      Q.  All right.
10         Now, this letter, which I will have
11 marked as an exhibit, No. 81, is a cover letter
12 that says in the text, "Please see attached
13 InfoLert" -- that's I-n-f-o, capital L, e-r-t,
14 all one word -- "regarding NDC and SWP changes to
15 BAC" -- B-A-C -- "tablets, USP. Please note that
16 this product is 'AB' rated.  If you have any
17 questions, please feel free to call us at," and
18 then it gives a phone number.
19         Attached is an InfoLert that includes
20 two -- well, it's got one, two, three, four --
21 five columns, the last two columns say "New SWP"
22 and "New WAC" and then it lists the new SWPs and

Page 353

1  new WACs for two different products.
2          MR. FARQUHAR:  I'll ask now that we
3  mark this as Exhibit No. 81.
4          (August 30, 2000 letter from Watson
5  Pharma Incorporated to Linda Panke, with
6  attachment marked Exhibit Minne 081 for
7  identification.)
8          MR. CARROLL:  Does it have a Bates
9  stamp on it, Doug?
10         MR. FARQUHAR:  It does not.
11         MR. CARROLL:  Has it been produced?
12         MR. FARQUHAR:  It's been produced
13 electronically.  I will try to track down the
14 electronic data number.
15     Q.  Showing you this Exhibit No. 81, do
16 you have any reason to believe that that was
17 anything other than a document that was actually
18 sent by my client to Red Book in the form that's
19 presented to you there?
20     A.  No, I do not.
21         MR. GOBENA:  Objection, form.
22     Q.  Okay.

89 (Pages 350 to 353)

a7b5296c-c23a-4c12-8217-ee69325ea5b1

30(b)(6) Thomson PDR Inc (Minne, Kristen)   CONFIDENTIAL                    November 18, 2008

# New York, NY

|  | Page 354 |
|---|---|

1    A.  No.
2    Q.  And if, in fact, this is the letter as
3  it was submitted, that would confirm, would it
4  not, that at least some manufacturers reported
5  SWP in lieu of AWP to Red Book; correct?
6       MR. CAHILL:  Objection to form.
7       MR. GOBENA:  Same objection.
8    A.  Correct.
9    Q.  All right.
10       And do you know what Red Book's policy
11  was when manufacturers reported SWPs? How would
12  they handle that information?  For example, would
13  they take the SWP and put it into the AWP field,
14  or would they do something different with the
15  SWP?
16    A.  I am not aware if there was a policy.
17  I would assume that in the manufacturer notes for
18  Watson there would be a note that would describe
19  what SWP -- what is done with an SWP price.
20    Q.  Okay.
21       MR. FARQUHAR:  I don't think I have any
22  other questions.

|  | Page 356 |
|---|---|

1
2
3
4
5
6       _____
7            KRISTEN MINNE
8
9
10  Signed and subscribed to before me
11  this_____day of_____, 2008.
12
13
14  _____
15       Notary Public
16
17
18
19
20
21
22

|  | Page 355 |
|---|---|

1       MR. ANDERSON:  I would ask that we do
2  have a copy of that exhibit made for us to review
3  this evening.
4       MR. FARQUHAR:  Sure, why don't we do
5  that right now.
6       MR. ANDERSON:  And, Doug, it would be
7  appreciated, in fact it is a formal request, that
8  you track down the CD with the Bates number.
9       MR. FARQUHAR:  I will try to do that
10  right now.
11       MR. ANDERSON:  Thanks.
12       THE VIDEOGRAPHER:  This is the
13  videographer.  This ends our deposition for today
14  at 17:24 on November 18th, 2008.
15       We're off the record at this time.
16       (Time noted:  5:24 p.m.)
17
18
19
20
21
22

|  | Page 357 |
|---|---|

1       C E R T I F I C A T E
2
3       I, HELEN MITCHELL, a Shorthand
4  Reporter and Notary Public, do hereby
5  certify:
6       I reported the proceedings in the
7  within-entitled matter, and that the
8  within transcript is a true record of
9  such proceedings.
10       I further certify that I am not
11  related, by blood or marriage, to any of
12  the parties in this matter and that I am
13  in no way interested in the outcome of
14  this matter.
15       IN WITNESS WHEREOF, I have
16  hereunto set my hand this_____day
17  of_____, 2008.
18
19       _____
20            HELEN MITCHELL
21
22  November 18th, 2008

90 (Pages 354 to 357)

a7b5296c-c23a-4c12-8217-ee69325ea5b1