# Exhibit 109

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


        IN RE:  PHARMACEUTICAL           )
        INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
        PRICE LITIGATION                 ) Civil Action No.
                                         )    01-12257-PBS
                                         )
        THIS DOCUMENT RELATES TO:        )
                                         )
        United States of America,        ) Hon. Patti Saris
        ex rel. Ven-a-Care of the        )
        Florida Keys, Inc., v.           )
        Abbott Laboratories, Inc.,       )
        and Hospira, Inc.                )
        CIVIL ACTION NO. 06-11337-PBS    )



        *******************************************************

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


        IN RE:  PHARMACEUTICAL           )
        INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
        PRICE LITIGATION                 ) Civil Action No.
                                         )    01-CV-12257-PBS
                                         )
        THIS DOCUMENT RELATES TO:        )
                                         ) Judge Patti B. Saris
        State of Arizona v. Abbott       )
        Labs., et al.                    )
        Civil Action No. 06-CV-11069-PBS )



        *******************************************************

                 ORAL AND VIDEOTAPED DEPOSITION OF

                          SHIRISH PATEL

                          June 13, 2007

        *******************************************************
```

Page 2

```
 1        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 2
 3  IN RE: PHARMACEUTICAL        )
    INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
 4  PRICE LITIGATION             ) Civil Action No.
                                 ) 01-CV-12257-PBS
 5                               )
    THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
 6  ALL CASES                    )
 7  *******************************************************
 8        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 9
10  IN RE: PHARMACEUTICAL        )
    INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
11  PRICE LITIGATION             ) Civil Action No.
                                 ) 01-CV-12257-PBS
12                               )
    THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
13  State of California, ex rel. )
14  Ven-A-Care v. Abbott         ) Magistrate
    Laboratories, et al.         ) Judge Marianne Bowler
15  Cause Nos. 03-cv-11226-PBS   )
16  *******************************************************
17        NO. D-1-GV-04-001286
18  THE STATE OF TEXAS           ) IN THE DISTRICT COURT
                                 )
19  ex rel.                      )
        VEN-A-CARE OF THE        )
20      FLORIDA KEYS, INC.,      )
           Plaintiffs,           )
21                               )
    VS.                          ) TRAVIS COUNTY, TEXAS
22                               )
    ABBOTT LABORATORIES INC.,    )
23  ABBOTT LABORATORIES, and     )
    HOSPIRA, INC.,               )
24      Defendant(s).            ) 201ST JUDICIAL DISTRICT
25  *******************************************************
```

Page 3

```
 1      ORAL AND VIDEOTAPED DEPOSITION OF SHIRISH PATEL,
 2  produced as a witness at the instance of the
 3  Plaintiff(s), and duly sworn, was taken in the
 4  above-styled and numbered causes on the 13th of June,
 5  2007, from 10:05 a.m. to 3:26 p.m., before CYNTHIA
 6  VOHLKEN, CSR in and for the State of Texas, reported
 7  by machine shorthand, at the offices of Jones Day, 77
 8  W. Wacker, Suite 3500, Chicago, Illinois, pursuant to
 9  the Federal and Texas Rules of Civil Procedure and the
10  provisions attached previously.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  A P P E A R A N C E S
 2  FOR THE PLAINTIFF THE STATE OF TEXAS:
 3      Mr. Raymond C. Winter
        Assistant Attorney General
 4      Office of the Attorney General
        State of Texas
 5      Post Office Box 12548  (78711-2548)
        300 W. 15th Street, 9th Floor
 6      Austin, Texas  78701
 7  FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 8      Ms. Ann M. St. Peter-Griffith
        Assistant U.S. Attorney
 9      United States Attorney's Office
        Southern District of Florida
10      99 N.E. Fourth Street
        Miami, Florida  33132
11
    FOR THE PLAINTIFF THE STATE OF ARIZONA AND MDL
12  PLAINTIFFS:
13      Mr. Christopher Stuart
        Wexler Toriseva Wallace LLP
14      One North LaSalle Street, Suite 2000
        Chicago, Illinois  60602
15
    FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
16
        Mr. Steven U. Ross
17      Deputy Attorney General
        BMFEA
18      Bureau of Medi-Cal Fraud & Elder Abuse
        State of California Department of Justice
19      110 West A Street #1100
        San Diego, California  92101
20
    FOR THE RELATOR:
21
        Mr. Rand J. Riklin
22      Goode Casseb Jones Riklin Choate & Watson
        2122 North Main Avenue
23      San Antonio, Texas  78212-9680
24
25
```

Page 5

```
 1  FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
    HOSPIRA, INC.:
 2
 3      Ms. Carol P. Geisler
        Jones Day
 4      77 West Wacker, Suite 3500
        Chicago, Illinois  60601-1692
 5
 6  ALSO PRESENT:
 7
        Mr. Joe Pate, Videographer
 8
            *-*-*-*-*
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

28fb5042-3da4-48e6-8e68-d57fa3affba9



Page 6

INDEX

2  Appearances.................................. 4
3  SHIRISH PATEL
      Examination by Mr. Winter................ 9
4     Examination by Ms. St. Peter-Griffith.... 147
      Examination by Mr. Riklin................ 216
5
   Signature and Changes........................ 232
6  Reporter's Certificates...................... 234
7
8  VIDEOTAPE NUMBER
9     1 ...................................... 8
      2 ...................................... 75
10    3 ...................................... 147
      4 ...................................... 222
11
12
         EXHIBITS
13
   NO.  DESCRIPTION                    PAGE
14
      (Previous Exhibits)
15
   9 ........................................... 19
16 15 .......................................... 30
   179.......................................... 49
17 180.......................................... 103
   182.......................................... 70
18 360.......................................... 223
   364.......................................... 218
19 493.......................................... 96
   588.......................................... 104
20 984.......................................... 98
21    (New Exhibits)
22 990.......................................... 53
      E-mail string, May 19, 2000 E-mail from
23 Jerrie Cicerale to Shirish Patel, Subject:
      FW:  Special Request for Mike Sellers
24 (TXABT 675176-675177) Highly Confidential
25

Page 7

1  NO.  DESCRIPTION                    PAGE
2  991.......................................... 117
      Quarterly Medicaid/PHS AMP & Best Price
3  Report, Government Reporting System,
      Version 1.0 5/17/00 (ABT AWP/MDL 172727-
4  172745) (CMOAL208077-208096)  Highly
      Confidential
5  992.......................................... 156
      E-mail string; January 21, 2002 E-mail
6  from Chris Blandford to various
      individuals, Subject:  FW:  PDF of Draft
7  Documentation (TXABT-E 0031788, 31790)
      (ABT072-1068 - 1069) Confidential
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      THE VIDEOGRAPHER:  Here begins the
2  videotaped deposition of Shirish Patel, Tape 1, Volume
3  1, in the matter of the State of Texas, ex rel.
4  Ven-A-Care of the Florida Keys, Incorporated versus
5  Abbott Laboratories, Incorporated, et al. in the
6  District Court of Travis County, Texas, 201st Judicial
7  District, Case Number D-1-GV-04-001286.
8      And United States of America, ex rel.
9  Ven-A-Care of the Florida Keys, Incorporated versus
10 Abbott Laboratories, Incorporated in the U.S. District
11 Court, District of Massachusetts, Civil Action Number
12 06-11337-PBS.
13     Today's date is June 13, 2007 and the
14 time on the video monitor is 10:06 a.m.  My name is
15 Joe Pate and the court reporter is Cynthia Vohlken
16 representing Fredericks-Carroll Reporting.
17     Today's deposition is being taken on
18 behalf of the plaintiff and is taking place at 77 W.
19 Wacker Drive, Chicago, Illinois.
20     Counsels will now introduce themselves
21 and state the parties they represent, after which the
22 court reporter will administer the oath.
23     MR. WINTER:  Good morning.  My name is
24 Raymond Winter representing the State of Texas.
25     MS. ST. PETER-GRIFFITH:  Good morning.

Page 9

1  Ann St. Peter-Griffith on behalf of the United States.
2      MR. RIKLIN:  Rand Riklin for the
3  Relator, Ven-A-Care of the Florida Keys, Inc.
4      MR. STUART:  Christopher Stuart for the
5  state of Arizona and the MDL plaintiffs.
6      MR. ROSS:  Steven Ross for the State of
7  California.
8      MS. GEISLER:  Carol Geisler for Abbott
9  Laboratories, Abbott Laboratories, Inc. and Hospira,
10 Inc.
11     SHIRISH PATEL,
12 having been first duly sworn, testified as follows:
13     EXAMINATION
14 BY MR. WINTER:
15  Q.  Good morning, Mr. Patel.  As I stated a
16 moment ago, my name is Raymond Winter and I'm an
17 assistant attorney general with the State of Texas.
18  A.  Okay.  Good morning.
19  Q.  Good morning.  Have you ever been deposed
20 before, sir?  Have you ever been deposed before?
21  A.  No.
22  Q.  There are a couple of standards that we like
23 to adhere to in a deposition so that the testimony can
24 be taken down clearly by our court reporter, Cindy,
25 here.  And the first one is that you and I should wait

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 10

1  until each other are finished speaking and not attempt
2  to speak over each other because it's very difficult
3  for her to take down the testimony of two people who
4  are talking at once.
5      A.  Okay.
6      Q.  And so if you will do me the favor of waiting
7  until I finish my question before you start to answer,
8  even if you think you know where I'm going, then that
9  will be very helpful for Cindy to take down your
10 testimony, which is very important.  Can we have that
11 agreement?
12     A.  Yes.
13     Q.  Thank you.  In addition, I know you are
14 nodding your head in agreement, but it's also
15 extremely important that you give an audible answer,
16 such as a "yes" or a "no" or a narrative as the
17 situation may require and not just a nod or a shake of
18 the head because a gesture can be ambiguous.
19     A.  I'll do that.
20     Q.  Very good.  If you need to take a break to
21 speak with Ms. Geisler or get a glass of water or
22 stretch your legs, just let me know and we'll be happy
23 to accommodate you.
24     A.  Okay.
25     Q.  And I think that about covers it.  From time

Page 11

1  to time you may hear an objection from Ms. Geisler to
2  one of the questions.  Typically that will be -- her
3  statement will be something along the lines of
4  "objection, form" and that means she's preserving her
5  right to challenge the question at a later date, but
6  it doesn't mean that you can't answer the question if
7  you know the answer.
8      A.  Okay.
9      Q.  Okay?
10     A.  Okay.
11     Q.  All right, sir.  What is your current
12 occupation?
13     A.  Project manager.
14     Q.  For which company?
15     A.  Hospira.
16     Q.  Okay.  Is that your entire title, just
17 project manager?
18     A.  Yes.
19     Q.  Okay.  So did you move from Abbott
20 Laboratories to Hospira at the time of the spinoff --
21     A.  Yes.
22     Q.  -- in 2000 -- in 2004?
23     A.  Yes.
24     Q.  Okay.  And just so we don't get into a bad
25 habit, my questions, sometimes you might think you

Page 12

1  know when I'm about to end, but I'll tack on something
2  right at the tail end and I'll fool you that I'm not
3  finished with my question.  So give me a second to
4  make sure that I'm really finished with the question
5  before you start to answer.  I think you anticipated
6  that time that you knew what I was going to ask you
7  and you started to answer and I wasn't quite done yet.
8      A.  I'll be careful.
9      Q.  Okay.  Thanks.  And, likewise, I'll do my
10 best not to speak over your answer.
11         Okay.  How long have you been -- before
12 you made the transition over to Hospira, how long were
13 you an employee of Abbott?
14     A.  Since 1991.
15     Q.  Since 1991.  Okay.  So from '91 until May of
16 2004 you were an Abbott employee, and since May of
17 2004 you've been a Hospira employee.
18     A.  Correct.
19     Q.  And have you always been in the technical
20 side of things?
21     A.  Yes.
22     Q.  Okay.  What was your position when you came
23 to Abbott in 1991?
24     A.  Senior analyst.
25     Q.  And did you work in a particular department

Page 13

1  within Abbott?
2      A.  Yes.
3      Q.  Which department was that, sir?
4      A.  Alternate Site.
5      Q.  Alternate Site.  Were you in the -- what was
6  the name within Alternate Site of the department that
7  you worked in?
8      A.  Department was Hospira Product Division.
9      Q.  Okay.  So Alternate Site was a unit within
10 the Hospital Products Division, correct?
11     A.  Correct.
12     Q.  Okay.  And you were specifically assigned to
13 support the Alternate Site Business Unit within
14 Hospital Products Division; is that true?
15     A.  Correct.
16     Q.  Okay.  And did you work in an information and
17 technical support department within Alternate Site?
18     A.  Correct.
19     Q.  Okay.
20     A.  We call IT area.
21     Q.  IT area.  Okay.  And IT stands for
22 information --
23     A.  Information technology.
24     Q.  Information technology.  All right.  And what
25 was your functional title within the IT area in

4 (Pages 10 to 13)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 14

1  Alternate Site?
2     A.  Senior system analyst.
3     Q.  Senior system analyst.  And how long did you
4  hold that title?
5     A.  Two years.
6     Q.  And then did you get a promotion?
7     A.  Correct.
8     Q.  And what was your next title?
9     A.  Project manager.
10    Q.  Okay.  Was there a specific project that you
11  were in charge of?
12    A.  No.
13    Q.  So project manager doesn't mean that you're
14  in charge with any certain project, it's just a title
15  that -- that means that you can be in charge of any
16  project that comes along?
17    A.  Correct.
18        MS. GEISLER:  Object.  Objection to the
19  form.
20    Q.  (BY MR. WINTER)  So in or around 1993 or 1994
21  you were promoted to the position of project manager?
22    A.  For IT area.
23    Q.  For the IT area.  Okay.  And what were your
24  duties and responsibilities as a project manager
25  within the IT area?

Page 15

1     A.  My primary responsibility was to gather the
2  requirement from the user, create the specs for the
3  programmers, hand the specs to the programmer for the
4  development of the product.
5     Q.  Okay.  Let's just break that down then.  You
6  would -- your primary responsibility was to get the
7  requirements from the user.
8     A.  Correct.
9     Q.  Develop the specs for the programmers.
10    A.  Correct.
11    Q.  Would you then instruct the programmers of
12  how to -- how to create the program that was to be
13  created based upon those specs and requirements?
14    A.  The programmer can use his own expertise to
15  create the program.
16    Q.  Okay.
17    A.  He's the expert in that area.  I may not be.
18    Q.  I see.  So you were kind of the interface,
19  then, between the business personnel, who were coming
20  to you with their requirements, and the computer
21  programmers, who were creating and writing the
22  programs in order to deliver whatever the deliverables
23  were that the business folks were requesting.
24    A.  Correct.
25    Q.  Okay.  Did you support all of the business

Page 16

1  units within the Alternate Site business -- let me
2  rephrase that question.
3        When you were in the information
4  technology section, did you support Alternate Site
5  Product Sales?
6     A.  No.
7     Q.  Who did you support?
8     A.  We support IT area only.  What requirement
9  for the IT, we support it.
10    Q.  Okay.  But did I understand your answer to my
11  earlier question, that you would receive requirements
12  from the folks who were in the business unit?
13    A.  Correct.
14    Q.  And that would be people like John Ward, who
15  was in charge of the sales force, correct?
16    A.  Correct.
17    Q.  And --
18    A.  But I would not get requirement from John
19  Ward.
20    Q.  Who would you get the requirement from?
21    A.  One of his people.
22    Q.  Okay.  Somebody that reported to Mr. Ward.
23    A.  Correct.
24    Q.  Okay.  Somebody like, for example, Steve
25  Kipperman?

Page 17

1     A.  Don't remember the name right now, so I can't
2  say it.
3     Q.  Okay.  Were -- were the -- but it was -- you
4  definitely remember that there were people who worked
5  for John Ward who would give you requests for support
6  that you would work with the programmers in order to
7  accomplish the task.
8     A.  Correct.
9     Q.  Okay.  Do you know a woman by the name of
10  Loreen Mershimer, who was in charge of Renal Care?
11    A.  Remember the name.
12    Q.  Did you provide support to the Renal Care
13  department within Alternate Site?
14    A.  I do not recall.
15    Q.  Do you recall a gentleman by the name of
16  Michael Heggie?
17    A.  I do not recall.
18    Q.  You don't remember.  Do you remember a
19  gentleman by the name of Michael Sellers?
20    A.  Yes.
21    Q.  Did you provide technical support to Michael
22  Sellers?
23    A.  Yes.
24    Q.  Okay.  Was there a particular computer
25  program -- let me rephrase the question.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 18

1         Was there a particular database or
2  computer system that you were in charge of interfacing
3  with?
4     A.  The system was based on AS400 and case tool
5  used was Synon.
6     Q.  I'm sorry, I missed the last part of your
7  answer.
8     A.  Case tool was a Synon to the screens.
9     Q.  Case two was the Synon?
10    A.  Case tool.
11        MS. GEISLER:  Case tool.
12    A.  Tool.
13    Q.  (BY MR. WINTER) Case tool.  Okay.  Case tool
14 was a Synon -- I'm still not understanding that
15 completely.
16    A.  Synon is a case tool where you display the
17 data on the screen.
18    Q.  Okay.
19        MS. GEISLER:  Can you -- can you spell
20 Synon?
21        THE WITNESS:  S-y-n-o-n.
22        MS. GEISLER:  Thank you.
23    Q.  (BY MR. WINTER) S-y-n-o-n.  Okay.  And --
24 and that was a -- is that what you call a computer
25 program?

Page 19

1     A.  It's a case tool.  It's kind of a software.
2     Q.  Okay.  So the mainframe was called an AS400?
3     A.  No, there is no mainframe.
4     Q.  There is no mainframe.  Okay.  Can you
5  explain for the jury, and for me being a nontechnical
6  layman type of guy, the difference between -- I guess
7  let me back up and ask you to look at an exhibit and
8  perhaps you can explain for me the architecture of the
9  computer system.  Maybe we can approach it that way.
10 And this is an exhibit that was marked as Deposition
11 Exhibit Number 9 in a deposition of a gentleman by the
12 name of Bruce Stowell.  Do you know Bruce Stowell?
13    A.  Yes, I heard his name.
14    Q.  You've heard his name?
15    A.  Yes.
16    Q.  Have you worked with him?
17    A.  I have not worked with him.  I have not
18 worked with him.
19    Q.  You never worked with Mr. Stowell?
20    A.  No.
21    Q.  Okay.  Do you recognize what's depicted here
22 at Exhibit 9?
23    A.  There is some where I cannot read it -- some
24 information I cannot read it, so --
25    Q.  You can't read any of it?  You don't

Page 20

1  recognize what's on the exhibit?
2     A.  This was not used by the Alternate Site at
3  all.
4     Q.  It wasn't?
5     A.  No.
6     Q.  Okay.  You mentioned an AS400.  What is an
7  AS400?
8     A.  AS400, it's kind of a hardware, a software
9  built by IBM.
10    Q.  Okay.
11    A.  It called like a mid-range computer.
12    Q.  Okay.
13    A.  A mainframe is like a -- for the larger
14 volume.  AS400 probably for the mid-range.
15    Q.  Okay.  So the AS400 is a computer system --
16    A.  Correct.
17    Q.  -- that has hardware and software in it?
18    A.  Correct.
19    Q.  Correct?  Okay.  And was there a -- and was
20 this computer housed somewhere at the Alternate Site
21 area?
22    A.  Yes.
23    Q.  Okay.  And did you have access to it on your
24 desktop?
25    A.  No.  Well, not directly.  Through the PC.

Page 21

1     Q.  Okay.
2     A.  Like physically I do not.  Like
3  electronically, yes, I do.
4     Q.  Okay.  Electronically you do.
5     A.  Yeah.
6     Q.  So you had a computer sitting on your desk
7  and you could log onto that --
8     A.  Correct.
9     Q.  -- PC and have access in electronic link to
10 the AS400.
11    A.  Correct.
12    Q.  Okay.  And were there particular -- were
13 there -- was there a specific database or were there
14 multiple databases on the AS400 that you had inputs
15 into?
16        MS. GEISLER:  Objection to the form.
17    A.  Can you specify that?  What do you mean by
18 multiple?
19    Q.  (BY MR. WINTER) Well, let me ask you the
20 first question first.
21    A.  Sure.
22    Q.  Was there a database that you had input into
23 that resided on the AS400 computer?
24    A.  Yes.
25    Q.  What was the name of that database?

6 (Pages 18 to 21)

Page 22

1    A.  I do not recall the name exactly what was
2  calling.
3    Q.  What did you refer to it as?
4    A.  Database is the -- database.
5    Q.  It was just the database?
6    A.  Correct.
7    Q.  Did that database house information that was
8  pertinent to the business operations of the Alternate
9  Site Business Unit?
10    A.  Correct.
11    Q.  Did it house contract prices, for example?
12    A.  I do not recall contract prices at that time.
13  What time period are you looking for?  Like in the
14  Alternate Site, there was no contract price.
15    Q.  Well, I'm asking specifically about the time
16  period from 1991 through 2004.
17    A.  Okay.
18    Q.  Did you use the same AS400 computer system
19  during that time period?
20    A.  Not from 1991 to 2004.
21    Q.  Okay.  In 1991 when you first came to the
22  Hospital Products Division Alternate Site area --
23    A.  Correct.
24    Q.  -- and to the IT area --
25    A.  Uh-huh.

Page 23

1    Q.  -- was there a computer system that you
2  worked with?
3    A.  Yes.
4    Q.  Was it the AS400?
5    A.  In 1991, correct.
6    Q.  Okay.  And did that transition to a different
7  computer at some time during the time period between
8  1991 and 2004?
9    A.  Correct.
10    Q.  What was the new computer called?
11    A.  After 2004 I went to the Hospital Products
12  Division.  I'm sorry, 1994 --
13    Q.  Okay.
14    A.  -- I went to HPD.  Okay.
15    Q.  Right.
16    A.  And there it was -- Oracle was the database.
17    Q.  Okay.
18    A.  Okay.  And they had plain server.  It means
19  they have like a PC only.  They did not have AS400.
20    Q.  Okay.  So you physically moved or your duties
21  and responsibilities changed.  From '91 through '94
22  you were in Alternate Site and then in '94 you moved
23  to the Hospital Business Sector.
24    A.  Correct.  Commercial area.
25    Q.  The commercial area.  Okay.  And that's --

Page 24

1  did you work in the information technical support for
2  the commercial area?
3    A.  Correct.
4    Q.  Okay.  So the AS400 that you used and that
5  you had access to or had access to the data that was
6  on it, it remained in place even though you moved in
7  '94, correct?
8    A.  Correct.
9    Q.  Okay.  What information pertinent to Abbott's
10  Alternate Site business operations was included or
11  housed on the database on the AS400?
12    A.  They have product-related information.  They
13  have patient-related information.  They have
14  pharmacy-related information.
15    Q.  Anything else?
16    A.  I don't recall all of this information,
17  but --
18    Q.  And we are speaking now specifically about
19  the time period between 1991 and 1994.  And just so
20  we're clear, my question to you is what information do
21  you recollect was housed on that AS400 database.  And
22  you've told me product information, patient
23  information and pharmacy information.
24    A.  Uh-huh.
25    Q.  Is that true?

Page 25

1    A.  Yeah.
2    Q.  Okay.  Was there pricing information included
3  in what you're referring to as product information?
4    A.  Part of it, yes.
5    Q.  Okay.  And that would include the information
6  pertaining to the prices that Abbott charged in the
7  marketplace for those products, correct?
8    A.  What is your definition of marketplace?
9    Q.  Whoever Abbott sold to.  If Abbott sold the
10  product to somebody, a purchaser, would the product
11  information include information pertaining to the
12  prices --
13    A.  Correct.
14    Q.  -- at which Abbott sold the products?
15    A.  Yes.
16    Q.  Okay.  Are you familiar with a pricing term
17  known as "list price"?
18    A.  Yes.
19    Q.  Did the AS400 product information include
20  list prices for the products?
21    A.  Yes.
22    Q.  Was there information within the product
23  information that you've described pertaining to the
24  cost to Abbott to produce the products?
25    A.  I do not recall that.

7 (Pages 22 to 25)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 26

1    Q.  Have you ever heard of a pricing descriptor
2  or nomenclature known as "factory cost"?
3    A.  I heard the term, but I do not recall if it
4  was part of the database or not.
5    Q.  Okay.  Who was it, to your knowledge, who
6  input the list pricing information into the AS400
7  database?
8    A.  I do not recall.  I'm assuming it will be
9  users, but I do not recall who puts it in.
10    Q.  Well, do you know if there was a -- was the
11  AS400 that you operated with during the time period
12  1991 until 1994, was it accessible by other
13  departments within the hospital business -- excuse me,
14  within the Hospital Products Division besides
15  Alternate Site or was it used only by the Alternate
16  Site Business Unit?
17        MS. GEISLER:  Objection to the form.
18    A.  It was only used for Alternate Site.
19    Q.  (BY MR. WINTER)  Was there an electronic link
20  between that AS400 system and the computer system that
21  was operated by the Hospital Products Division?
22    A.  No.
23    Q.  There was no connection whatsoever?
24    A.  No.
25    Q.  Are you familiar with something known as the

Page 27

1  Contract Administration System, CAS?
2    A.  Yes.
3    Q.  Did you have access to the Contract
4  Administration System?
5    A.  What period?
6    Q.  From 1991 to 1994.
7    A.  No.
8    Q.  From 1994 until 2004 did you have access to
9  the Contract Administration System?
10    A.  Yes.
11    Q.  And that's when you were over in the Hospital
12  Business Sector providing information, technology
13  support, to the Hospital Business Sector pricing
14  department?
15        MS. GEISLER:  Objection to the form.
16    Q.  (BY MR. WINTER)  Is that correct?
17    A.  Correct.
18    Q.  From 1994 until 2004, at the time of the
19  spinoff, did you have the same position?
20    A.  Yes.
21    Q.  And that's when you were -- your title was
22  project manager?
23    A.  Yes.
24    Q.  Can you recall generally what kinds of
25  situations occurred where somebody -- and I'm talking

Page 28

1  now about the time period '91 to '94, where somebody
2  in one of the business units would come to you with a
3  request for support?  You mentioned that John Ward's
4  department would sometimes send you requests for
5  support, correct?
6    A.  One of his people, yes.
7    Q.  Okay.  Do you remember who?
8    A.  There are a few number people.  I do not
9  remember the names.
10    Q.  Can you just recall generally for me what
11  kinds of requests you would receive from John Ward's
12  department?
13    A.  We need to correct the screen.  The screen
14  does not work.  And I have to go and find out why it
15  does not work and make sure the screen would work.
16    Q.  So you're talking about a situation where one
17  of the salespeople working for John Ward is in his or
18  her own office and they pull up their computer and
19  it's just not operating correctly?
20    A.  Correct.
21    Q.  And so you would provide IT support just to
22  work out the kink or whatever is wrong with the
23  computer program.
24    A.  Correct.
25    Q.  Okay.  Did you ever receive requests for a

Page 29

1  run of specific data?  For example, "We want to see
2  how many units we've sold to this customer over this
3  time period at what prices"?
4    A.  I personally did not run any.  We used to
5  call a query.  The user can use the query to select
6  the data and see what the sales was.
7    Q.  If the business user wanted to run a query,
8  could the business user do that himself or herself or
9  would they have to seek IT support in order to --
10    A.  No.  They can do by themself.
11    Q.  All the business users had the computer
12  smarts and savvy to run those queries by themselves?
13    A.  I do not know they all very savvy, but
14  they're very able to run it.
15    Q.  They were able to run the queries in your
16  experience.
17    A.  Yes.
18    Q.  From 1994 until 2004 did you have occasion
19  where the business people would come to you and seek
20  your assistance in running a query?
21    A.  1994 to 2000?
22    Q.  Yes.
23    A.  Yes.
24    Q.  That happened on occasion, didn't it?
25    A.  Yes.

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 30

1    Q.  During that 10-year time frame from '94 to
2  2004?
3    A.  Yes.
4        MS. GEISLER:  Objection to the form.
5    A.  Yes.
6    Q.  (BY MR. WINTER)  Let me show you what was
7  marked in another deposition as Exhibit 15.
8        MR. WINTER:  For the record, this is a
9  multipage document.  It begins with Bates label TXABT
10 57199 through 57234.
11   Q.  (BY MR. WINTER)  And if you would, please,
12 sir, take a minute and flip through it and let me know
13 when you're ready.
14   A.  (Witness reviewing document).
15   Q.  All right, sir.  Can you identify Exhibit 15?
16   A.  I cannot.
17   Q.  You have no idea what this is?
18   A.  No.
19   Q.  Well, let's look at the first page and do you
20 see that it looks -- appears to be a print screen from
21 a computer system?
22   A.  I do not know how they got this printed.
23 Could be from computer system, could be from PC.  I do
24 not know.
25   Q.  Okay.  Maybe we should make sure that

Page 31

1  we're -- we're speaking in the same language.
2    A.  Okay.
3    Q.  You just differentiated between a computer
4  system and a PC.  Can you explain for me the
5  difference in your mind?
6    A.  PC you can get a screen print what you see on
7  the screen.
8    Q.  Okay.
9    A.  When you print it from computer, you may not
10 able to print what you see there.
11   Q.  Okay.  Does this appear to you to be
12 something that was printed from data that was housed
13 on a computer system?
14   A.  I'll be speculating, but probably true.
15   Q.  Well, I don't want you to speculate, but I do
16 want to draw on your experience having worked for
17 Abbott and then later Hospira now since 1991.  And so
18 you've had substantial experience, it's 2007, 16 years
19 providing information technology, technical support to
20 this drug manufacturer, correct?
21   A.  Correct.
22   Q.  Okay.  Are you familiar with the class of
23 trade codes that were used in the ordinary course of
24 business by the Hospital Products Division?
25   A.  Yes.

Page 32

1    Q.  Okay.  Let's look at the first page of this
2  document then.  And do you see there are a number of
3  columns?
4    A.  Correct.
5    Q.  And do you see on the left-hand side there is
6  an entry that says "File" --
7    A.  Uh-huh.
8    Q.  -- at the top of it.  And if you -- if you
9  roll your eyes downward, do you see MSG four times and
10 then a series of digits?  Do you see that, sir?
11   A.  Uh-huh.
12   Q.  Okay.  If you move one column over to the
13 right, under what appears to line up with the one.
14   A.  Okay.
15   Q.  First row that says one.
16   A.  Okay.
17   Q.  Do you see the word "Exist"?
18   A.  Correct.  I see.
19   Q.  And then under row two there's the word
20 "Class."  Do you see that?
21   A.  Yes.
22   Q.  Okay.  If you look down underneath that,
23 you've got a bunch of alphanumeric indicators.  Do you
24 see those?  Those are called codes, aren't they?
25   A.  Yes.

Page 33

1    Q.  Okay.  Let's look at those codes.  And if you
2  flip through the rest of this document, you see
3  there's a whole series of codes on these pages,
4  correct?
5    A.  Correct.
6    Q.  Okay.  Do you recognize these codes as
7  indicators of Abbott's market channels, it's classes
8  of trade?
9    A.  Yes.
10   Q.  Okay.  Now, what I would like you to do for
11 me is I'm going to ask you about specific market
12 channels.  For example, if Abbott sold product to a
13 wholesaler -- you're familiar with wholesalers, right?
14   A.  Correct.
15   Q.  Would you recognize the code that was
16 applicable to a transaction between Abbott and a
17 wholesaler if you saw it?
18   A.  I would not recall.
19   Q.  You wouldn't?
20   A.  I would not.
21   Q.  You don't have any idea how to pull by class
22 of trade code the transactions that pertain to a sale
23 from Abbott to a wholesaler?
24   A.  Not specific one.
25   Q.  How would you go about finding out that

9 (Pages 30 to 33)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 34

1  information if you needed to pull it?  If you needed
2  to run a query, for example.
3          MS. GEISLER:  Objection to form.
4      A.  User would give me the code and I will pull
5  the data based on the code.
6      Q.  (BY MR. WINTER)  So the user who was making
7  the request would tell you, "I want you to pull all
8  the transactions for the following five or seven class
9  of trade codes"?
10     A.  Correct.
11     Q.  Let me ask you to flip through this document
12 to the third page.  And do you see the code at the
13 very top of the page, the very first one?  It's line
14 item 36.
15     A.  Uh-huh.
16     Q.  And it's A003.  Do you see that?
17     A.  Yes.
18     Q.  And there's an indicator to the right of it,
19 a description, that says "Retail Pharmacy."  Do you
20 see that?
21     A.  Yes.
22     Q.  Do you have any idea what that means?
23     A.  No.
24     Q.  Same question with the next entry, Number 37.
25 "A007 Chain Pharmacy."

Page 35

1      A.  No.
2      Q.  Do you have any idea without somebody from
3  the business side providing information to you what
4  that particular class of trade code indicates?
5      A.  No.
6      Q.  Is there somebody on the technical side
7  besides yourself who would have more information about
8  the specific meaning of any of these class -- class of
9  trade codes?
10     A.  User would know more than us.  We just take
11 the code and provide them the data.
12     Q.  And when you say "the user," who are you
13 specifically referring to?
14     A.  From 1991 to '94 Alternate Site user and from
15 1994 to 2004 contract -- like a CAS user, Contract
16 Administration System user.
17     Q.  From the period 1994 to 2004 did you provide
18 any information technology support to the Alternate
19 Site Business Sector?
20     A.  No.  '94 to 2000?  No.
21     Q.  Can you tell by looking at this document from
22 what system it came from?  Exhibit 15.
23     A.  I would be assuming.  Probably somebody
24 getting from the mainframe.
25     Q.  Okay.  Now, we spoke earlier about the AS400

Page 36

1  and you differentiated that from a mainframe, right?
2      A.  Uh-huh.
3      Q.  From '94 to 2004 when you went over to the
4  Hospital Business Sector, you mentioned there was an
5  Oracle system?
6      A.  Uh-huh.  Oracle, the client server.
7      Q.  Okay.  Is that a mainframe?
8      A.  No.
9      Q.  Okay.  What was the name of the mainframe?
10     A.  We do not have a mainframe in contract
11 administration area.
12     Q.  You didn't?
13     A.  No.
14     Q.  Okay.  But yet you think this particular
15 document, Exhibit 15, came from a mainframe?
16     A.  That is my assumption, yes.
17     Q.  What are you basing that assumption on?
18     A.  From my previous experience.
19     Q.  Well, is there anything that -- that you're
20 seeing on this document that leads you to conclude,
21 based on what you're seeing, as well as your previous
22 experience, that this came from a mainframe?
23     A.  That's what I say.  I'm speculating based on
24 my experience.
25     Q.  Well, I don't want you to speculate, but I'm

Page 37

1  asking you:  What is it on the document that indicates
2  to you that it was -- that its source is the
3  mainframe?
4      A.  Just purely speculation.
5      Q.  Okay.  So you really don't know --
6      A.  No.
7      Q.  -- that this came from a mainframe?
8      A.  Correct.
9      Q.  For all you know, this could have been
10 generated from the Contract Administration System?
11         MS. GEISLER:  Objection to form.
12     A.  I would be speculating.
13     Q.  (BY MR. WINTER)  Again, sir, I'm not asking
14 you to speculate.  I'm asking you whether you know.
15     A.  Based on my knowledge, no.
16     Q.  You know for a fact it did not come from the
17 Contract Administration System?
18     A.  Based on my knowledge, yes.
19     Q.  Well, I'm unclear because a second ago you
20 said, "Based on my knowledge, no" and now you just
21 said, "Based on my knowledge, yes."  So let me see if
22 we can narrow this down.
23     A.  Correct.
24     Q.  Okay.  Do you know for a fact that this
25 Exhibit Number 15 did not come from the Contract

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 38

1  Administration System?
2    A.  I could not be 100 percent sure, but it could
3  come from.
4    Q.  Okay.  Do you know who during the time period
5  '94 to 2004 wrote the codes that were used in the
6  Contract Administration System?
7    A.  I do not remember all those names.
8    Q.  Do you remember any of the names?
9    A.  Arun.
10   Q.  I'm sorry?
11   A.  Arun.  They were all consultants.  They were
12  like a --
13   Q.  Can you spell the one you're --
14   A.  A-r-u-n.
15   Q.  A-r-u-n.  And that was a consulting firm?
16   A.  No.  Consultant.
17   Q.  Consultant.  Okay.  Tell me about A-r-u-n.
18  What did they do?
19   A.  He would write the code.
20   Q.  That's a person's name?
21   A.  Yes.
22   Q.  Is that his first name or last name?
23   A.  No.  Could you rephrase the question?
24   Q.  A-r-u-n is somebody's name?
25   A.  Correct.

Page 39

1    Q.  Is that a first name or a last name?
2    A.  First name.
3    Q.  What was the person's last name?
4    A.  It was very long.  I would not remember it.
5    Q.  And you recall that this person -- is that a
6  man?
7    A.  Yes.
8    Q.  A gentleman by the name of A-r-u-n was a
9  consultant who wrote the codes that were used in the
10  Contract Administration System.
11   A.  Correct.
12   Q.  When?
13   A.  Between 1994 to 1998.
14   Q.  Did you work with this gentleman and provide
15  input to him that came from the business side so he
16  knew what kinds of codes to write?
17   A.  Yes.
18   Q.  Who on the business side were you working
19  with that supplied information to you for your
20  interface with Arun?
21   A.  There was a number of users.
22   Q.  Can you tell me --
23   A.  Now, let me --
24      MS. GEISLER:  Go ahead.
25   A.  -- give you the explanation from 1994 to

Page 40

1  2004.
2    Q.  (BY MR. WINTER)  Sure.
3    A.  We rewrote CAS system from 1994 to 1998.
4    Q.  Would you repeat that, please?
5    A.  We rewrote CAS system, what you see here,
6  CAS, CBS and HUB system --
7    Q.  Yes.
8    A.  -- from 1994 to 1998.
9    Q.  You rewrote it?
10   A.  Abbott -- somebody rewrote it.
11   Q.  Okay.
12   A.  Okay.  During that time my responsibility was
13  resource manager.
14   Q.  Your responsibility was resource manager?
15   A.  Correct.  During that time.  So directly I
16  did not receive any specs from end users and nobody
17  worked directly for me.
18   Q.  As a resource manager between 1994 and 1998
19  what were your duties and responsibilities?
20   A.  To hire appropriate people to complete the
21  project.  We had about 16 to 18 people working for
22  that system.
23   Q.  At the end of this time period in which you
24  rewrote the CAS system?
25   A.  CAS.

Page 41

1    Q.  CAS.  Okay.  Was the end product still called
2  CAS or did it have a new name?
3    A.  No.  At that time the end product we called
4  CAS.
5    Q.  It was still called CAS.  Okay.  Did you
6  supervise the work of these individuals who were
7  participating in the project to rewrite the CAS
8  system?
9    A.  No.
10   Q.  You were simply involved in the human
11  resources end of it --
12   A.  Correct.
13   Q.  -- hiring folks?
14   A.  Yes.
15   Q.  Who supervised the work of those who rewrote
16  the CAS system?
17   A.  Who rewrote is responsible for developing
18  CAS, who was responsible for developing CBS and who
19  was responsible for developing H-U-B, HUB.
20   Q.  That's my question.  Who was responsible for
21  that?
22   A.  There were three different individual.
23   Q.  Who were they?
24   A.  There was a Glenn Therkelson for CBS.  Mark
25  Yepsen for CAS.

11 (Pages 38 to 41)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 42

1    Q.  Could you spell the last name, please?
2    A.  Y-e-p-s-e-n.
3    Q.  First name was Mark?
4    A.  Mark.  And I do not recall who developed HUB.
5    Q.  Now, those acronyms you just used, CBS, CAS
6  and HUB, those appear on Exhibit 9 there that's in
7  front of you, correct?
8    A.  Correct.
9    Q.  Okay.  So you stated earlier that you
10  couldn't read it, but apparently you can read some of
11  it.  You see the box that says CAS, right?
12    A.  Yes.  These are three, but here I could not.
13  So that's what I say, some I could not read here.  I
14  could not read what was there (indicating).
15    Q.  Okay.  You can't read --
16    A.  And here (indicating).
17    Q.  -- what it -- let's take it one at a time.
18    A.  These two (indicating) and the other two, I
19  don't know which one they are.
20    Q.  Okay.  Well, on my copy, which my copy
21  printed in color --
22    A.  Okay.
23    Q.  -- so it gives me a little bit of an
24  advantage over you.  My copy appears that the -- if I
25  can reach across and show you, it appears to me that

Page 43

1  this box here (indicating) is the OPS system on my
2  copy.
3    A.  Okay.
4    Q.  And I'm pointing to the copy in the upper
5  right -- not the one furthest to the right, but the
6  second one from the right.
7    A.  Okay.
8    Q.  OPS.  Does that seem reasonable to you?
9    A.  Yes.
10    Q.  Do you know what the OPS system was?
11    A.  It was a mainframe base system.  That's all I
12  know.
13    Q.  Did OPS stand for order processing?
14    A.  Yes.
15    Q.  Okay.  And then on my copy, the box in the
16  upper right on the far right says COP.
17    A.  Okay.
18    Q.  What does COP stand for?
19    A.  Corporate order processing.
20       MR. RIKLIN:  I'm sorry.
21    Q.  (BY MR. WINTER)  Say again, please.
22    A.  Corporate order processing.
23    Q.  Corporate order processing.  Okay.  And what
24  does CBS stand for?
25    A.  Chargeback system.

Page 44

1    Q.  Okay.  And then we've got the HUB.
2    A.  Okay.
3    Q.  What was the HUB?
4    A.  I do not know the exact name, but the HUB was
5  developed to create a proposal.
6    Q.  Okay.  The HUB was developed to create a
7  proposal?
8    A.  Correct.
9    Q.  Can you explain for me what that means?
10    A.  Proposal, it's similar to a contract.  Before
11  you create a contract, you create a proposal.
12    Q.  Okay.
13    A.  And once a proposal is approved, then it can
14  become a contract.
15    Q.  And somehow or another the HUB system
16  was used to facilitate the creating of proposals?
17    A.  Correct.
18    Q.  Okay.  I've written on this copy of Exhibit 9
19  what I can read on my copy of the exhibit --
20    A.  Okay.
21    Q.  -- as for these other boxes.  Does that help?
22    A.  Yes.
23    Q.  Okay.  Let's talk about that HUB system.
24    A.  Okay.
25    Q.  Is that the system -- the computer system

Page 45

1  where proposal analyses would be kept?
2    A.  What is your definition of proposal analysis?
3    Q.  Well, let me ask you.  Do you know what --
4  does the acronym or the phrase "proposal analysis"
5  mean anything to you?
6    A.  No.
7    Q.  Is the HUB area where proposals that were
8  created by Abbott's contract marketing personnel would
9  be kept?
10    A.  Correct.
11    Q.  Okay.  And the picture that you're looking at
12  here that's Exhibit 9, can you place this in time?
13  Can you give me a time frame when this architecture
14  here would have been in place?
15    A.  Well, they started developing in 1994.  So
16  1998 completed it.  So I would say after 1998.
17    Q.  Okay.  So this is the completed product after
18  this rewrite occurred between '94 and '98 --
19    A.  Yes.
20    Q.  -- is that true?
21    A.  Uh-huh.
22    Q.  Okay.  So you are familiar with this
23  schematic diagram, aren't you?
24    A.  Yes.  For only CAS, HUB and CBS.
25    Q.  Okay.

12  (Pages 42 to 45)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 46

1    A.  Those are the only three were really done
2  from 1994 to 1998.
3    Q.  Run that by me one more time.  From '94 to
4  '98?
5    A.  Three system were written, which was CAS --
6    Q.  Yes, sir.
7    A.  -- CBS and HUB.
8    Q.  Okay.  And then after '98 these other systems
9  were brought on?
10   A.  Other system were there before.  OPS was
11 there before.  Okay.  COP was there before.  Was
12 before 1994.
13   Q.  Okay.
14   A.  Okay.  SER was probably.  I do not know what
15 the KAP stand for.
16   Q.  Do you know what the DELPHI system was?
17   A.  Yeah.  DELPHI system was written at the same
18 time as CAS.
19   Q.  And what was the purpose of the DELPHI
20 system?
21   A.  The DELPHI system was to house the sales --
22 sales information.
23   Q.  For both the Hospital Business Sector and the
24 Alternate Site Business Sector?
25   A.  Specifically for only Hospital Product

Page 47

1  Division.  Alternate Site was not at that time.
2    Q.  Alternate Site sales information was not
3  housed in the --
4    A.  No.
5    Q.  -- DELPHI system?
6    A.  No.
7    Q.  Where was it housed?
8    A.  It was -- Alternate Site has its own
9  computer, AS400.  It was housed in that AS400.
10   Q.  Was there a feed between the AS400 to the
11 DELPHI system --
12   A.  No.
13   Q.  -- or to some other system where the sales
14 information pertaining to Alternate Site could be
15 transmitted to the -- either the CAS or the DELPHI?
16   A.  No.
17   Q.  Well, how did the information that was housed
18 on the AS400 for Alternate Site make its way to the
19 Hospital Products Division computer system that's
20 depicted here on Exhibit 9?
21   A.  This does not include Alternate Site AS400
22 base system here at all.
23   Q.  Well, I understand that there's -- there's no
24 picture of the AS400 on this diagram.
25   A.  Uh-huh.

Page 48

1    Q.  But my question to you is, the information
2  that was housed on the AS400, are you telling me that
3  that information, there was no link between the AS400
4  so that the information housed there could get to the
5  computer system that's depicted on Exhibit 9?
6    A.  Based on my knowledge it probably would go to
7  the COP --
8    Q.  Okay.
9    A.  -- not to the -- we have corporate systems
10 and that really has its own system.  And that own
11 system is CAS, CBS, HUB and Rebate.  Corporate system,
12 which were kept on the mainframe, it's KAP and OPS.
13 There were probably line between Alternate Site to KAP
14 and OPS, not to CAS, CBS and HUB.
15   Q.  So your testimony is, and your recollection
16 is, that the Alternate Site sales and transactional
17 data went directly to the corporate system --
18   A.  Correct.
19   Q.  -- and did not go through the CAS.
20   A.  Correct.
21   Q.  Was that the area that you were responsible
22 for?  Do you have specific knowledge of that or is
23 that just your recollection looking back now?
24      MS. GEISLER:  Objection to the form.
25   A.  The sales were reported directly to the

Page 49

1  corporate, not to the CAS, so ...  Alternate Site
2  sales directly reported to corporate.
3    Q.  (BY MR. WINTER)  What about information
4  pertaining to the sales activities of the Home
5  Infusion Services area, was that housed on the AS400?
6    A.  Correct.
7    Q.  And it would be your recollection that that
8  was -- if there was a -- if that was transmitted
9  anywhere, it would have gone through some direct data
10 feed to the corporate system.
11   A.  Correct.
12   Q.  And not through the CAS, not through the
13 DELPHI, not through any of these other systems.
14   A.  Correct.
15   Q.  Was Mike Sellers somebody who would come to
16 you from time to time and give you a request for
17 support?
18   A.  I did not receive any request from Mike
19 Sellers directly.
20   Q.  Did you ever work on any project that
21 originated with Mike Sellers?
22   A.  I would not know whether he initiated it or
23 not.
24   Q.  Let me show you what's been marked as Exhibit
25 179 in a prior deposition.  Sir, have you ever seen

13 (Pages 46 to 49)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 50

1  this document before?
2      A.  My name is not here, so I -- I don't know.  I
3  don't think so, unless somebody has reroute it to me.
4      Q.  My question wasn't whether your name is on
5  it, my question is whether you've seen it before.
6      A.  I may have.
7      Q.  Well, it appears to be an e-mail from
8  Mr. Sellers dated Thursday, May 18, 2000 and it's
9  addressed to Jerrie Cicerale, Alan Greenthal and
10  Robert Lyman.  Do you see that, sir?
11      A.  Yes.
12      Q.  Who was Jerrie Cicerale?
13      A.  She was working for corporate.  She was a
14  woman working for corporate.
15      Q.  And what was her responsibility?
16      A.  I do not know.
17      Q.  You don't know if she had anything to do with
18  the input of data into the CAS system?
19      A.  In the CAS?  She does not have any.  I don't
20  think so.
21      Q.  Do you know that she had any responsibility
22  in the Hospital Products Division contract marketing
23  area to input pricing data into a computer system?
24      A.  Based on my knowledge, she was working for
25  the corporate systems, not for HPD.

Page 51

1      Q.  You believe that Jerrie Cicerale was an
2  employee not of the Hospital Products Division, but of
3  the corporate --
4      A.  Abbott corporate.  She was working for
5  corporate systems.
6      Q.  Who was Jerrie -- who was Alan Greenthal?
7      A.  He was working for contract marketing.
8      Q.  In the Hospital Business Sector?
9      A.  Yes.
10      Q.  And what about Robert Lyman?
11      A.  Yes, he was working for contract marketing
12  area.
13      Q.  The e-mail reads, "I need to have the
14  following report created by mid-next week.  This is a
15  'drop everything' request."  Do you see that, sir?
16      A.  Yes.
17      Q.  And then he goes on and he describes what he
18  wants.  "Columns:
19          "Product Description
20          "NDC
21          "List Price
22          "AWP - calculate it based" on the "First
23  DataBank formula
24          "Difference % vs. List Price
25          "ASP for year end

Page 52

1          "Difference % vs. List Price
2          "AMP - for the" fourth quarter" of each
3  year
4          "Difference % vs. List Price
5          "Annual Sales in dollars
6          "Annual Medicaid rebates paid
7          "Include all drug and solution products
8  with separate reports for each year 1995 through 1999.
9  Need this in hard copy and machine copy formats.  On
10  Monday let me know what we will have to do to make
11  this happen".
12          Did I read that accurately?
13      A.  Yes, I can read.
14      Q.  Does this look familiar to you as a request
15  that you know to have generated with Mike Sellers?
16      A.  It could be.
17      Q.  Well, sir, that's not my question.  My
18  question is:  Does this look familiar to you?  Do you
19  know this to be a request that generated with Mike
20  Sellers that you worked on?
21      A.  Based on this impression, yes.
22      Q.  Okay.  So you recognize this as Mr. Sellers'
23  request that he sent out in or around May 18th of
24  2000, right?
25      A.  To these people.

Page 53

1      Q.  Yeah.
2      A.  Uh-huh.
3      Q.  And you know that ultimately you worked on
4  this request, correct?
5      A.  I do not recall it.  I may have.
6      Q.  Well, let me show you what we'll mark now as
7  Exhibit 990.  And I'll ask you to take a few minutes
8  and look over this one.
9      A.  Okay.  (Witness reviewing document).
10      Q.  For the record, it's a two-page e-mail thread
11  from Jerrie Cicerale to you, Mr. Patel, dated Friday,
12  May 19th, 2000.  That's the e-mail at the top of the
13  page, but there's a thread on there.  And the Bates
14  label is TXABT 675176 and TXABT 177.
15          Have you had a chance to look at it,
16  sir.
17      A.  Okay.
18      Q.  Now, like any e-mail thread, you've got to go
19  to the second page and start there at the end, right?
20      A.  That's right.
21      Q.  Okay.  It actually starts at the bottom of
22  the first page with the original message and it's an
23  e-mail from you on Friday, May 19th at two -- May 19th
24  of 2000 at 12:22 p.m. to Mr. Greenthal and
25  Ms. Cicerale.  Do you see that?

Page 54

1    A.  Yes.
2    Q.  And if you compare that with the document
3  that was marked as Exhibit 179 that we just got
4  through looking at, do you see this is a day later,
5  correct?
6    A.  Yes.
7    Q.  All right.  And you write, "A meeting was
8  held on 5/19 in Alan's office to discuss the detail
9  requirements for the historical data.  Attending the
10  meeting were Alan Greenthal, Jerrie Cicerale and
11  Shirish Patel."
12    A.  Okay.
13    Q.  Did I read that accurately?
14    A.  Yes.
15    Q.  Do you recognize what follows here --
16    A.  Yes.
17    Q.  -- on the bottom of Exhibit 990 as your recap
18  of the meeting that you held with Alan Greenthal and
19  Jerrie Cicerale?
20    A.  Okay.  Yes.
21    Q.  This is your --
22    A.  Yes.
23    Q.  This is your e-mail, correct?
24    A.  Correct.
25    Q.  It's got your signature electronically on the

Page 55

1  bottom, right?
2    A.  Correct.
3    Q.  Okay.  Do you recall attending this meeting
4  with Jerrie Cicerale and Alan Greenthal on May 19th
5  where you met to talk about what needed to be done to
6  respond to Mr. Sellers' request?
7    A.  Correct.
8    Q.  You do you recall meeting with them?
9    A.  Yes.
10    Q.  Okay.  Tell me, if you would, please, how
11  this request of May 18th, 2000, which is marked as
12  Exhibit 179, that you're not copied on --
13    A.  Okay.
14    Q.  -- how was this brought to your attention?
15  What were the circumstances and events which led to
16  the meeting that you had that you recap in your e-mail
17  of May 19th at 12:22 p.m.?
18    A.  During that time Alan Greenthal was working
19  as the IT manager for contract marketing area.
20    Q.  Okay.
21    A.  He would get all request from contract
22  marketing area and we will discuss in a weekly what
23  request to work on.  He would provide that information
24  to me and I would start those projects.
25    Q.  Okay.  So this is an example of where the

Page 56

1  business person, in this case Mr. Sellers, had a
2  request for information and he -- he delivered it to
3  Mr. Greenthal because he was the --
4    A.  IT.
5    Q.  -- an IT guy.
6    A.  Uh-huh.
7    Q.  And Mr. Greenthal then turned to you.
8    A.  Correct.
9    Q.  Did you have greater expertise than he did?
10    A.  No.  He was responsible for contract
11  marketing IT.  Whatever the IT need, he has it.  And
12  I'm responsible for software development area.
13    Q.  Okay.  So why did Mr. Greenthal turn to you?
14  Why couldn't he get it himself?
15    A.  He did not have any people working for him.
16    Q.  But you had people working for you?
17    A.  Yes.
18    Q.  How many?
19    A.  It's varied.  Okay.  At that time, maybe six
20  or seven.
21    Q.  Maybe six or seven?
22    A.  Yeah.
23    Q.  Okay.  So at that time, we're talking about
24  May of 2000.
25    A.  Uh-huh.

Page 57

1    Q.  Your recollection is that you had six or
2  seven persons working for you?
3    A.  Uh-huh.
4    Q.  Were those programers?
5    A.  Yes.
6    Q.  Okay.  So Mr. Greenthal received the request
7  from Mr. Sellers -- actually, it was Mr. Greenthal and
8  Ms. Cicerale and Mr. Lyman, they all received the same
9  request from Mr. Sellers, correct, on Exhibit 179?
10    MS. GEISLER:  Objection to the form.
11    A.  If it states that, then yes.
12    Q.  (BY MR. WINTER)  Well, you can look at it as
13  well --
14    A.  Yeah.
15    Q.  -- as I can, sir.  Do you see on 179 it went
16  to all three of them, Lyman --
17    A.  Correct.
18    Q.  -- Cicerale and Greenthal.
19    A.  Correct.
20    Q.  Okay.  But Greenthal is the guy that came to
21  you; is that true?
22    A.  True.
23    Q.  What about Cicerale and Lyman, did they also
24  come to you and say, "Hey, Mr. Patel, hey, Shirish, we
25  need your help with this"?

15  (Pages 54 to 57)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 58

1    A.  I do not recall at this time.
2    Q.  Okay.  Your only --
3    A.  But that's the reason we had a meeting.  And
4  if you look in my -- I held a meeting here and that's
5  why I included Jerrie Cicerale there.
6    Q.  Okay.  What about Mr. Lyman, did he attend
7  the meeting as well?
8    A.  I have to read it.  It's all here.  No, he
9  did not attend the meeting.
10    Q.  Your e-mail only says that you met with
11  Jerrie Cicerale and Alan Greenthal, right?
12    A.  Correct.
13    Q.  Were you on first name basis with Jerrie
14  Cicerale?
15    A.  Yeah.
16    Q.  You had worked with her in the past on
17  various projects?
18    A.  Yes.
19    Q.  And what about Alan Greenthal?
20    A.  Yes, I have worked with him in the past.
21    Q.  And the reason they turned to you for support
22  on this project is because you had programmers --
23    A.  Pulling the data for them.
24    Q.  -- and Alan didn't.
25    A.  No.  Yes.  Alan did not have any.

Page 59

1    Q.  Okay.  So if you look over your e-mail, under
2  the recap portion --
3    A.  Okay.
4    Q.  -- you write, "Recap:  Create the historical
5  data with the following criteria."
6    A.  Okay.
7    Q.  "Selection Criteria."
8    A.  Uh-huh.
9    Q.  "Data from" January "1995 through December
10  1999
11        "Data for drug and solutions only."
12    A.  Okay.
13    Q.  Correct?
14    A.  Okay.
15    Q.  And then on the next page you've got the
16  outputs, right, that you're supposed to generate?
17    A.  Uh-huh.
18    Q.  The list number, the IC code, product
19  description --
20    A.  Uh-huh.
21    Q.  -- NDC, list price, average wholesale price,
22  and it goes on.  Do you see that, sir?
23    A.  Uh-huh.
24    Q.  Okay.  Where did you get that information?
25    A.  In the meeting.  Alan probably provided it to

Page 60

1  me.
2    Q.  You think Alan provided you with a copy of
3  Mr. Sellers' e-mail request?
4    A.  I do not recall he provided a copy or not,
5  but he provided this information and I may have jot it
6  down.
7    Q.  Then there's an entry in the middle of the
8  second page.  It says, "Two sets of data will be
9  created."
10    A.  Uh-huh.
11    Q.  Do you see that, sir?
12    A.  Yes.
13    Q.  A "Detail history, 1 file per each year,
14  sorted by month and product."
15        A "Summary, 1 file per each year, sorted
16  by month and product
17        "History will be summarized by product
18  within month."  Do you see that?
19    A.  Uh-huh.
20    Q.  And then you've got an "Issues" area.
21    A.  Uh-huh.
22    Q.  You need data for both direct and indirect
23  sales and then you have a question mark.  Do you see
24  that?
25    A.  Okay.  Uh-huh.

Page 61

1    Q.  Is that because you weren't sure about that
2  and you needed to follow up with somebody later?
3    A.  At that -- at that time I do not know they
4  want like a direct and indirect sales -- both sales
5  like -- you know, the direct sales and indirect sales
6  is the chargeback, direct sale is the direct sale to
7  the wholesaler, so I do not know.  Maybe that's the
8  reason I ask them, doing the sales for both.
9    Q.  So you were asking this question.
10    A.  Correct.
11    Q.  When you were recapping the meeting you still
12  had a question --
13    A.  Correct.
14    Q.  -- in your mind as to what needed to be done.
15    A.  Yes.
16    Q.  Okay.  And there was an issue on how to
17  calculate the AWP.  Do you see that?
18    A.  Yes.
19    Q.  On how to calculate the ASP and how to
20  calculate the AMP.
21    A.  Uh-huh.
22    Q.  At this meeting that you had with Alan and
23  Jerrie Cicerale, did you take notes?
24    A.  Yes.
25    Q.  It would have been your practice to have a

16  (Pages 58 to 61)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 62

1  yellow pad, or something like this, where you would
2  have jotted down notes as to what the requirements
3  were, right?
4      A.  Correct.
5      Q.  Is that something that you would have
6  maintained in the ordinary course of business?
7      A.  Yes.
8      Q.  Would you still have those notes back in your
9  office somewhere?
10     A.  No.
11     Q.  What would you have done with them?
12     A.  I would throw away.
13     Q.  You would throw them away?
14     A.  Yes.
15     Q.  After the project was completed?
16     A.  Yes.
17     Q.  How long after the project was completed
18  would you throw them away?
19     A.  I do not recall.
20     Q.  Was that your ordinary practice, whenever you
21  complete your project --
22     A.  We have like a file clean-up day, so any
23  notes you have, you throw away.
24     Q.  I'm sorry, say that again.
25     A.  We have like a file clean-up day, so any

Page 63

1  notes or those kind of papers we have, we usually
2  throw away.
3      Q.  A file clean-up day?
4      A.  Yes.
5      Q.  Okay.  So are you talking about some document
6  retention schedule that you have to follow where every
7  five years, or something, you get rid of old files, is
8  that what you're talking about?
9      A.  No.  That's -- that's my own.
10     Q.  While the project was ongoing, did you have a
11  Red Rope or a file folder like this (indicating), or
12  something, where you would keep your notes or any
13  communications that were pertinent to the ongoing
14  project?
15     A.  Yes.
16     Q.  Would you keep that in a file drawer in your
17  office?
18     A.  At that time, yes.
19     Q.  Okay.  As a result of this meeting that you
20  had with Alan and Jerrie Cicerale, did you gain any
21  understanding as to the reason behind the request?
22     A.  No.
23     Q.  Weren't you curious?
24     A.  No.
25     Q.  No?  Did you understand there was any

Page 64

1  urgency?
2      A.  Based on this e-mail, yes.
3      Q.  Well, you're saying that reading it right
4  now, you're deducing that there was some urgency
5  behind the request?
6      A.  Alan probably has told me during the meeting
7  then.
8      Q.  Did he give you a hard deadline as to when
9  this needed to be accomplished?
10     A.  I would be speculating, probably, yes.
11     Q.  Well, again, sir, I don't want you to
12  speculate.
13     A.  Okay.
14     Q.  I want you to think and give me your best
15  testimony based on your recollection of these events.
16     A.  I do not recall it, but he probably has given
17  to me.
18     Q.  Have you ever received any kind of a
19  memorandum or instruction from anyone within Abbott
20  that you should hold on to files or records or notes
21  in your possession?
22     A.  I do not recall.
23     Q.  You don't recall ever receiving any kind of
24  an instruction that you should hold on to your records
25  or files?

Page 65

1      A.  I do not recall it.
2      Q.  In the ordinary course of business did you
3  receive a lot of requests for support that were termed
4  "drop everything" requests?
5      A.  Yes, we do get that.
6      Q.  You see that language on Exhibit 179.  It's
7  in quotes in the -- in the e-mail from Mr. Sellers.
8  It says, "This is a 'drop everything' request."  Do
9  you see that, sir?
10     A.  Uh-huh.
11     Q.  That's an -- that's an ordinary course of
12  business kind of thing that happened all the time?
13     A.  Yes.
14     Q.  So there's no particular urgency associated
15  with that?
16     A.  I would get those kind of request from Alan
17  and he would prioritize the project.
18     Q.  Well, would -- would a -- if priority one is
19  the most important urgent kind of project and priority
20  10 is the least important, where would you put a "drop
21  everything" request?
22     A.  I would reallocate the resources.  If a
23  person is working on priority number 10, I would tell
24  them not to work on it, work on the next request.
25     Q.  So you would take somebody from a -- from a

Page 66

1  lesser important project and refocus them on a "drop
2  everything" request --
3      A.  Correct.
4      Q.  -- and move it to the head of the line?
5      A.  Correct.
6      Q.  But did you say that happened all the time?
7      A.  Yes.
8      Q.  You got "drop everything" requests all the
9  time, it was not unusual?
10      A.  Yes.
11      Q.  So how did you ever get anything done if you
12  were constantly reprioritizing the workload and
13  constantly moving people off of existing projects and
14  refocusing them on new projects?
15      A.  That's the balancing act.  I had to do it in
16  the --
17      Q.  But every day.  So that must have been crisis
18  management for you if every day you got in a new "drop
19  everything" request.  That must have been pretty
20  difficult for you.
21      A.  Well, when you say new drop means if
22  something does not work and business is not
23  functioning and user cannot do a certain function,
24  then we do that.  We take the resources away from the
25  project and assign those tasks then.

Page 67

1      Q.  Okay.  So in your mind when you were either
2  shown that e-mail that's marked as Exhibit 179 by Alan
3  or when he conveyed to you that this was a "drop
4  everything" request, that didn't stand out in your
5  mind as anything special because you see those every
6  day.
7      A.  Yes.
8      Q.  Well, let's look back at Exhibit 990.  And
9  after your e-mail -- at the bottom of your e-mail
10  you've got the follow-ups on Page 2.
11      A.  Okay.
12      Q.  And you said, "Alan will schedule a meeting
13  with Mike Sellers for more detail on the
14  requirements," correct?
15      A.  Uh-huh.
16      Q.  "Jerrie will provide an Excel spreadsheet
17  with list and inventory Code ... to identify" the
18  "drugs and solutions."  Do you see that?
19      A.  Uh-huh.
20      Q.  And "Shirish will secure a resource from
21  Mainframe for this request."
22      A.  Uh-huh.
23      Q.  "If the resource is not available, he will
24  contact Alan today."
25          Did you have -- other than the list and

Page 68

1  inventory codes -- let's focus on that entry that says
2  "Follow-ups" and the sentence that says, "Jerrie will
3  provide an Excel spreadsheet with list and inventory
4  Code."
5      A.  Uh-huh.
6      Q.  And then if you look up at your outputs,
7  you've got list number and IC code at the top of Page
8  2.
9      A.  Okay.
10      Q.  What's list number?
11      A.  It's a five-digit code that Abbott uses a
12  list number.
13      Q.  Have you ever heard of the acronym "NDC
14  number"?
15      A.  Yes.
16      Q.  Is list number and NDC number the same thing?
17      A.  It was part of NDC.
18      Q.  Okay.  What's an IC code?
19      A.  Inventory code that Abbott uses.
20      Q.  Is that just an internal tracking code --
21      A.  Yes.
22      Q.  -- for -- for whatever that --
23      A.  Different --
24      Q.  -- item is?
25      A.  Yes.

Page 69

1      Q.  Okay.  So your statement here that Jerrie is
2  going to provide you an Excel spreadsheet with list
3  and IC codes, is that an indicator that she was going
4  to provide you the specific products that would be the
5  subject matter of this query?
6      A.  Correct.
7      Q.  Was there any attempts by anyone to provide
8  you with any class of trade codes that would be used
9  in this query?
10      A.  Based on this one, no.
11      Q.  So did you conclude, therefore, that you ran
12  this for all classes of trade?
13      A.  It looks like based on this one, yes.
14      Q.  Okay.  If you turn to the first page of 990,
15  Ms. Cicerale writes back to you within a couple of
16  hours and she says, "Shirish -- attached is the excel
17  file we discussed.  I will have to give you the NDC
18  prefix next week but you should be able to do your
19  next step without this number.  When you pull history
20  be sure to use the List-IC column."  Do you see that,
21  sir?
22      A.  Uh-huh.
23      Q.  Do you know from what source Ms. Cicerale
24  pulled the data that went into the Excel spreadsheet
25  that she attached here?

18  (Pages 66 to 69)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 70

1      A.  I do not know.
2      Q.  Looking at the e-mail, next to your name
3  several places on this e-mail, Exhibit 990, it says
4  "APX."  Do you see that, sir?
5      A.  Uh-huh.
6      Q.  What's the APX stand for?
7      A.  In Microsoft anytime it gives you the
8  address, it just put APX then.
9      Q.  So it would have been Shirish.Patel@
10  Abbott.com and the APX is just a substitute for
11  @Abbott.com?
12      A.  I do not know what the APX stand for, but
13  usually it's put by the Microsoft e-mail system.
14      Q.  Does it have any significance to where you
15  were housed in the organization?  For example, if you
16  were in PPD, would it say something different than
17  APX, or if you were in HPD would it say something
18  different?
19      A.  It's possible.
20      Q.  You just don't know.  Okay.
21          Let me show you what was marked as
22  Exhibit 182 in a prior deposition and you'll see that
23  182 is a portion of what's on 990.
24      A.  Okay.
25      Q.  But it also has several pages of the actual

Page 71

1  spreadsheet.  This is not a complete copy of 182.  182
2  was the entire spreadsheet.  This is just an excerpt
3  from it.  I've got the whole darn thing right here, if
4  you want to look at that.
5          MR. RIKLIN:  I've got another copy of
6  it, Ray, if you --
7      Q.  (BY MR. WINTER)  Here's -- here's the entire
8  spreadsheet, if you want to look at it, but what I
9  handed to you just a minute ago was the first couple
10  of pages of it.
11          MR. WINTER:  Carol, do you want to see
12  it, too?  Here's the whole thing.
13          MS. GEISLER:  Please.  Thank you.
14          MR. RIKLIN:  You-all need another copy
15  of it?
16          MR. WINTER:  Nah.
17      Q.  (BY MR. WINTER)  All right, sir.  You're
18  looking at the Excel spreadsheet.  Does that look
19  familiar to you as the --
20          MS. GEISLER:  I think he's got something
21  on the back of his document that does not belong --
22          THE WITNESS:  No.  I think it's
23  spillover so I can --
24          MS. GEISLER:  Yeah.
25          THE WITNESS:  Like here (indicating).

Page 72

1          MS. GEISLER:  Yeah.
2          THE WITNESS:  Okay.  Correct.
3      Q.  (BY MR. WINTER)  Okay, sir.  Does that look
4  familiar to you as a copy of the Excel spreadsheet
5  that Ms. Cicerale forwarded to you?
6      A.  It could have been.
7      Q.  Well, could have been or is?
8      A.  Could have.  There is no way or a hundred
9  percent sure I can say this is exactly the same thing,
10  unless I can print by myself.
11      Q.  Well, sir, let's look at the e-mail.
12      A.  Okay.
13      Q.  The e-mail says, "Shirish -- attached is the
14  Excel file we discussed" --
15      A.  Okay.
16      Q.  -- right?  And then there's a little icon on
17  the e-mail.
18      A.  Uh-huh.
19      Q.  And it says, Prices19.xls.  Does -- it's
20  "Price519.xls."  Do you see that?  That would be May
21  19th, right?  On the icon on the first page.
22      A.  Okay.
23      Q.  And then on the lower right-hand side of the
24  actual attachment, does that appear to be the same
25  Excel spreadsheet?

Page 73

1      A.  Correct.
2      Q.  And that's certainly how this was presented
3  to us when it was produced by Abbott --
4      A.  Okay.
5      Q.  -- as coming from Abbott's business records.
6      A.  Okay.
7      Q.  You don't have any reason to disagree that
8  it's a different spreadsheet, do you?
9      A.  No.
10      Q.  Okay.  Once Ms. Cicerale transmitted this
11  spreadsheet to you, what did you do with it?
12      A.  I provided that information to the programmer
13  with the specs.
14      Q.  Okay.  And then what happened?
15      A.  He would create the data.
16      Q.  And what was the output that the provider
17  created when he ran the query?
18      A.  Based on this e-mail, he probably has created
19  hard copy and an Excel spreadsheet.
20      Q.  Okay.  Did you review the outputs that the
21  programmer created in order to ensure that they met
22  the specifications of the request?
23      A.  On the sample basis, yes.
24      Q.  Well, what about the entire end result?
25  Whenever the --

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 74

1    A.  No.
2    Q.  -- the programmer finished the project, he
3  had a deliverable, correct?
4    A.  Uh-huh.
5    Q.  And that deliverable would have been an Excel
6  spreadsheet, correct?
7    A.  Correct.
8    Q.  And according to Mr. Sellers, he wanted hard
9  copy and machine copy formats.
10    A.  Uh-huh.
11    Q.  Do you see that?
12    A.  Uh-huh.
13    Q.  What's the difference between a hard copy and
14  a machine copy format?
15    A.  Machine copy format I'm assuming right now is
16  probably electronic, like an Excel spreadsheet or
17  Access database.
18    Q.  But he wanted an e-mail, the data --
19    A.  Yes.
20    Q.  -- the spreadsheet e-mailed to him?
21    A.  Correct.  Uh-huh.
22    Q.  Plus he wanted somebody to print the hard
23  copy --
24    A.  Correct.
25    Q.  -- so he could look at it on paper.

Page 75

1    A.  Yeah.
2        MR. WINTER:  Okay.  We're going to have
3  to change the tape here, so why don't --
4        THE WITNESS:  Okay.
5        MR. WINTER:  -- we take a short break
6  and then we'll --
7        THE WITNESS:  Sure.
8        MR. WINTER:  -- be on our way.
9        THE VIDEOGRAPHER:  This marks the end of
10  Videotape Number 1, Volume 1 in the deposition of
11  Shirish Patel.  The time is now 11:19 a.m.  Going off
12  the record.
13        (Recess from 11:19 to 11:29)
14        THE VIDEOGRAPHER:  Going on the record.
15  This marks the beginning of Videotape Number 2, Volume
16  1 in the deposition of Shirish Patel.  The time is now
17  11:29 a.m.
18    Q.  (BY MR. WINTER)  Mr. Patel, did you
19  participate in the transition team when the Hospital
20  Products Division was spun off by Abbott and Hospira
21  was created?
22    A.  In what capacity?
23    Q.  In any capacity.
24    A.  Yes.
25    Q.  What capacity did you participate in the

Page 76

1  transition from -- of HPD into Hospira?
2    A.  Working that system to create their own
3  systems.
4    Q.  Was there a migration of the data that was
5  maintained by HPD over to the new system that was
6  maintained by Hospira?
7    A.  No.  Not for data.
8    Q.  Not for data.  So all the historical data of
9  Abbott Hospital Products Division transactions and
10  sales, product information, that did not transfer and
11  migrate over to the Hospira system?
12    A.  I was not part of the team I say.
13    Q.  Okay.
14    A.  It would have it.
15    Q.  Well, let me make sure I understand your
16  testimony then.  What you're telling me right now is
17  you were not part of the team that oversaw that
18  transition or that migration of data?
19    A.  Correct.
20    Q.  But, to your knowledge, did the data, the
21  historical data maintained by HPD, did it, in fact,
22  migrate over to the Hospira system?
23    A.  Probably, yes.
24    Q.  It would be your expectation it did?
25    A.  Yes.

Page 77

1    Q.  Okay.  So if you weren't part of the team
2  that -- that participated in overseeing that migration
3  of data, tell me again what you did do as part of the
4  transition?
5    A.  Some of the systems, we had to get it clean,
6  split from Abbott to Hospira and I participated -- I
7  participated in developing those pieces.
8    Q.  Those pieces?
9    A.  Yes.
10    Q.  You personally participated in the
11  development of the pieces to facilitate the split?
12    A.  Again, as a project manager level.
13    Q.  Okay.  So that means you were overseeing the
14  people who were actually doing the work?
15    A.  Correct.
16    Q.  Okay.  Looking back here at Exhibit 182 and
17  that Excel spreadsheet --
18    A.  Okay.
19    Q.  -- I had asked you shortly before we took a
20  break whether you were performing any quality control,
21  quality assurance oversight to the programmers who
22  were executing a task.
23    A.  Okay.
24    Q.  And if I understood your answer, you stated
25  that you were looking at samples of their work --

20  (Pages 74 to 77)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 78

1    A.  Correct.
2    Q.  -- to see that they were doing it properly.
3    A.  Correct.
4    Q.  Okay.  But when there -- and did you have
5  occasion to make corrections and adjustments to what
6  they were doing because --
7    A.  I do not remember.
8    Q.  You don't recall.  Do you recall who the
9  programmer was or who the programmers were that
10  actually executed this task?
11    A.  I would not remember.
12    Q.  Well, you said you had six or seven people
13  working for you, right?
14    A.  Uh-huh.
15    Q.  And given that this was a "drop everything"
16  request, would -- would you have entrusted it to
17  somebody who you felt was particularly competent?
18    A.  They were all competent, so I could give to
19  anybody.
20    Q.  They all had the same level of competency?
21    A.  Uh-huh.
22    Q.  And these six or seven programmers that you
23  detailed to execute this task, were they -- these
24  individuals that you had hired?
25    A.  Yes.

Page 79

1    Q.  So they directly reported to you?
2    A.  Yes.
3    Q.  Okay.  What were their names?
4    A.  I do not recall that.
5    Q.  You don't recall any of the names of the six
6  or seven people that worked for you just seven years
7  ago?
8    A.  Arun was one of them.
9    Q.  Arun, the guy we talked about earlier?
10    A.  Uh-huh.  Uh-huh Praveen was another one.
11    Q.  Sorry.  Say that second one.
12    A.  Praveen, P-r-a-v-e-e-n.
13    Q.  P-r-a --
14    A.  V-e-e-n.
15    Q.  And is that a first name or last name?
16    A.  First name.  Last name is too long, so --
17    Q.  Well, it's too long.  Go ahead and take a
18  crack at it.
19    A.  The first one is Viswanathiah, so I don't
20  know.  I don't know how to spell it, so ...
21    Q.  This would be in Abbott's business records.
22  It would be in the personnel records, the names of
23  these --
24    A.  If you scan that name, you will find it.
25    Q.  Okay.

Page 80

1    A.  If you look at the Abbott -- I'm sorry, at
2  the time Abbott directory, during the time you will
3  find it.  But there's other consultants, so I don't
4  know whether it would be in the directory or not.
5    Q.  Who else besides Praveen and Arun?
6    A.  There was Mike.
7    Q.  What was Mike's last name?
8    A.  Vinik, V-i-n-i-k.
9    Q.  V-i-n-i-k?
10    A.  Yeah.  Vinik.
11    Q.  Okay.  Who else?
12    A.  Alex Khokholev.  Alex.  Alex Khokholev.
13    Q.  How do you spell Khokholev?
14    A.  K-h-o-k-h-o-l-e-v.
15    Q.  K-h-o --
16    A.  K-h-o-l-e-v.
17    Q.  K-h-l-e-v.  Okay.  Who else?
18    A.  I'm just getting blanks.
19    Q.  Well, do you recall of Praveen, Arun, Mike
20  and Alex, whether any of them, or all of them,
21  participated in executing this task that's been
22  described in the documents we're looking at?
23    A.  Any one of them could have.
24    Q.  You don't have a present recollection as to
25  which one worked on it?

Page 81

1    A.  No.
2    Q.  How long did it take them to complete this
3  query?
4    A.  I do not recall it.
5    Q.  Did you personally look at the final work
6  product, the hard copy or the electronic copy format
7  that Mr. Sellers requested?
8    A.  I scan it through, not look in details.
9    Q.  You saw it, right?
10    A.  Yes.
11    Q.  What did it look like?
12    A.  I do not know.  I don't know right now.
13  Can't remember.  If it was this spreadsheet, then
14  probably.
15    Q.  Do you think this spreadsheet is the final
16  result?
17    A.  Could be.
18    Q.  Well, let's look at the e-mail again.
19    A.  Okay.
20    Q.  Let's look at 182.  According to
21  Ms. Cicerale's e-mail --
22    A.  Okay.
23    Q.  -- the spreadsheet that you're looking at
24  now --
25    A.  Okay.

21 (Pages 78 to 81)

28fb5042-3da4-48e6-8e68-d57fa3affba9

1    Q.   -- is the Excel file that has the list
2  numbers and the inventory codes.
3    A.   Okay.
4    Q.   That's not the final result of the project,
5  right?
6    A.   Could be.
7    Q.   It could be?
8    A.   I don't remember.
9    Q.   Well, let's go back and let's see --
10   A.   Okay.
11   Q.   -- if we can refresh your recollection.
12  Let's look at Exhibit 182 again.
13   A.   Okay.
14   Q.   Okay.  Remember, you had your e-mail where
15  you circulated your notes on the meeting, the recap,
16  right?
17   A.   Okay.
18   Q.   And there was going to be a query run at Mike
19  Sellers' request that was going to provide list
20  prices, IC codes, product descriptions, NDCs, AWPs,
21  average selling prices.  Do you remember that?
22   A.   Uh-huh.
23   Q.   I'm looking now on the first page of Exhibit
24  182 and you've got all the outputs written there.
25   A.   Uh-huh.

1    Q.   Do you see that?
2    A.   Uh-huh.
3    Q.   And then you've got "Two sets of data will be
4  created:"  A detail history, one file per each year,
5  sorted by month and product.  And the history will be
6  summarized by product within month.  See all that?
7    A.   Uh-huh.
8    Q.   Okay.  And then on your follow-ups, that
9  second sentence says, Jerrie will provide an Excel
10  spreadsheet with list and inventory codes to identify
11  the drugs and the solutions.  Do you see that?
12   A.   Uh-huh.
13   Q.   And if you look at the top of Exhibit 182,
14  that appears to be Jerrie providing you with those
15  list and inventory codes, right?
16   A.   Correct.
17   Q.   So this is not the final project, the final
18  outcome of the project, right?
19   A.   Yes.  Based on this e-mail.
20   Q.   Okay.  This is just Jerrie giving --
21   A.   Yeah.
22   Q.   -- you some preliminary information that you
23  needed in order to have your subordinate programmers
24  generate the final deliverable, true?
25   A.   Uh-huh.  True.

1    Q.   Okay.  Looking at the Excel spreadsheet, if
2  you would, please, sir, just take a look at the first
3  page there.
4    A.   Uh-huh.
5    Q.   And you've got several columns, correct?
6    A.   Uh-huh.
7    Q.   There's an NDC L-T.
8    A.   Uh-huh.
9    Q.   There's a list column, there's a list IC,
10  package size and then there's several prices -- price
11  columns.  Do you see that?
12   A.   Uh-huh.
13   Q.   Okay.  What is the difference between the NDC
14  L-T and the List-T-SS?
15   A.   The first two are the same as list stock.
16  It's a list stock and sales size and NDC.  You see NDC
17  list and NDC stock.  So both are the same.
18   Q.   The only difference is the list TSS has the
19  suffix at the end.  Is that the package size?
20   A.   Sale size, correct.
21   Q.   Sales size.  Okay.  Same as package
22  configuration; is that true?
23   A.   Uh-huh.
24   Q.   Okay.  And then you've got the list IC and
25  that's the inventory code?

1    A.   Uh-huh.
2    Q.   Okay.  And then there's a -- another
3  descriptor of the package size, that they come in
4  packages of one or six or 12, or whatever, right?
5  That's what's underneath package?
6    A.   Correct.
7    Q.   And then you've got "1999 Cs Price."
8  Is that the catalog or list price for that product,
9  1999?
10   A.   Cs seems like a case price.
11   Q.   It's a case price.  Okay.  But at the top of
12  this Excel spreadsheet it says "List Price Drug Items"
13  from 1995 to 1999.
14   A.   Uh-huh.
15   Q.   Do you see that?
16   A.   Uh-huh.
17   Q.   So the pricing that is depicted here would be
18  the list price for each of these products for a case
19  of them, right?
20   A.   Yes.
21   Q.   Okay.  And, to your knowledge, does Abbott
22  use the word or the phrase "list price" synonymously
23  with "catalog price"?
24   A.   I would not know that.
25   Q.   You don't know.  Well, would you agree that

22  (Pages 82 to 85)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 86

1  these appear to be list prices for these product?
2     A.  Appears to be.
3     Q.  Okay.  And for that very first one, I guess
4  it's Carbocaine HCL.  Do you see that, sir?  On the
5  far right there's --
6     A.  Uh-huh.
7     Q.  -- a description of the product.  Do you know
8  what that product is?
9     A.  No.
10     Q.  There is an intro date of 6/9/97.  Do you see
11  that?
12     A.  Uh-huh.
13     Q.  And then under the column for 1995 for case
14  price --
15     A.  Okay.
16     Q.  -- it's blank because it wasn't introduced
17  yet in '95, right?
18     A.  I would assume it.
19     Q.  That would make sense, wouldn't it --
20     A.  Correct.
21     Q.  -- if there's an introduction date of '97 --
22  okay.
23         Then you've got a 1996 case price and
24  it's $10.89.  Do you see that?
25     A.  Can you tell me which list then?  It would

Page 87

1  probably make it easier.  Where is the 1996?
2     Q.  It's right next to 1995 and before 1997.  If
3  you're looking -- you're moving from the description
4  of the product on the far right and you move left.
5     A.  Okay.
6     Q.  You've got an intro date.
7     A.  Uh-huh.  Okay.
8     Q.  You've got a --
9     A.  I see that.  You're talking about title,
10  right?
11     Q.  Yes, sir.
12     A.  Okay.
13     Q.  The title of the column.
14     A.  Okay.
15     Q.  I'm just wondering why you'd have any
16  explanation why that column under 1995 Cs price is
17  blank?
18         MS. GEISLER:  Objection.
19     A.  I don't know.
20     Q.  (BY MR. WINTER)  Okay.  So you would have
21  delivered this information to your programmer, right?
22     A.  Yes.  What's listed in the e-mail.
23     Q.  And the specifications that are listed in the
24  e-mail.
25     A.  Uh-huh.

Page 88

1     Q.  And they would have generated the end
2  product.  Is that what you call a deliverable?
3     A.  Correct.
4     Q.  Okay.  Did you personally deliver the
5  deliverable to Alan Greenthal?
6     A.  I do not recall.
7     Q.  Do you have recollection as to where the
8  deliverable resides in Abbott's system or resided in
9  Abbott's system?
10     A.  No, I would not.  I do not know where they
11  would keep it.
12     Q.  You don't know where it would have been
13  maintained?  If it was an ongoing project, what was
14  your -- what was your practice?  For example, let me
15  ask you this way.  As a project manager, you had
16  projects that you were working on probably many at the
17  same time, right?
18     A.  Uh-huh.
19     Q.  Did you maintain a -- a separate file for
20  each project on the computer system?
21     A.  Yes.
22     Q.  Okay.  How would you identify those files?
23     A.  By the project name or by the request name.
24     Q.  Did you have a practice of assigning some
25  kind of a tracking number to a specific project?

Page 89

1     A.  Currently, yes, we do have.
2     Q.  Did you in May of 2000?
3     A.  No.  At that time we did not.
4     Q.  So would you just have assigned some sort of
5  a name so you could know what --
6     A.  I would speculate historical extracts and
7  need like -- I would have some date.
8     Q.  What -- based on your review of this series
9  of e-mails, Exhibit 182, Exhibit 179, how would you
10  have identified this project --
11     A.  What the title is here, probably.
12     Q.  Special request for Mike Sellers?
13     A.  Uh-huh.
14     Q.  So you probably would have had on your
15  computer a file folder that said, "Special request for
16  Mike Sellers"?
17     A.  At that time, yes.
18     Q.  Okay.  And on what database would that file
19  folder have resided?
20     A.  I do not know at the present time because
21  it's part of Abbott, so I do not know.
22     Q.  At that time what database did it reside on?
23     A.  It would be under e-mails.  Where the e-mails
24  were stored.
25     Q.  You would have archived your e-mail, is that

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 90

1    what you're saying?
2        A.  We do have a current running listing of the
3    e-mails and I would have the folder underneath that.
4        Q.  Well, what about -- and that's where you
5    would have saved the e-mails.
6        A.  Correct.
7        Q.  Okay.  Well, what about the Excel
8    spreadsheets that you reviewed from time to time.  You
9    were doing samples, right?
10       A.  No.  But if it's in e-mail, it's attached
11   there, it would be there.
12       Q.  Okay.  So let me make sure I understand.
13   When you state that you would have checked some
14   samples that your analysts were running --
15       A.  Uh-huh.
16       Q.  -- would they have e-mailed them to you?
17       A.  No.  They would give it to me and say,
18   "Mr. Shirish, this is it."
19       Q.  They would --
20       A.  Generally Friday and then --
21       Q.  -- print it out --
22       A.  Print it out and give it to me, yes.
23       Q.  Okay.  Well, did they maintain a file folder
24   where they saved their work product?
25       A.  I do not know.

Page 91

1        Q.  You don't know what the practice was of your
2    subordinates as far as where they saved their ongoing
3    projects?
4        A.  Correct.
5        Q.  Well, if you had occasion as their supervisor
6    to look at some of their work product, you wouldn't
7    know where to go on the computer system to find it?
8        A.  No.
9        Q.  You just ask them, "Where is it"?
10       A.  Correct.
11       Q.  Well, in your experience, where did they save
12   their work product?
13       A.  I would not know it.  I would speculate it.
14       Q.  No, sir.  I don't want you to speculate.  I
15   want you to tell me --
16       A.  Then I would not know it.
17       Q.  I want you to tell me in your experience.
18   Based on your experience, when you would go to one of
19   your subordinates and say, "Hey, I need to look at
20   this special task or special project or special
21   request that you're doing for so-and-so," you know,
22   you'd say, "Where is it saved," right?
23       A.  They would save the final product, but they
24   would not save the intermediate product.  Like if I
25   created this for you, I would run it and then give you

Page 92

1    the results and then you say, "No, this is not good,"
2    I will change that query and give another results.
3        Q.  Right.
4        A.  So I would save the final, but I would not
5    know how you come up with the final point.
6        Q.  You would save the final?
7        A.  He would save it, not me.
8        Q.  Oh.  Where would he save the final?
9        A.  Same place.  Wherever he save all Oracle
10   data.
11       Q.  The same place where you saved all the --
12       A.  Oracle queries.
13       Q.  Okay.  And which is -- what was the name of
14   the file path where you saved it?
15       A.  I do not know what file path it would be.  I
16   would be guessing it.
17       Q.  So after this project was completed, and you
18   don't recall how long it took, correct?
19       A.  I don't recall it, no.
20       Q.  But after it was completed, it was delivered
21   to Mr. Sellers; is that true?
22       A.  No.  Mr. Alan.  Alan probably would have
23   brought it to Seller.
24       Q.  Did you ever get and -- you know, your
25   e-mail, 182 --

Page 93

1        A.  Uh-huh.
2        Q.  -- Exhibit 182 --
3        A.  Uh-huh.
4        Q.  -- says that Alan is going -- under
5    follow-ups.
6        A.  Yeah.
7        Q.  It says, "Alan will schedule a meeting with
8    Mike Sellers for more detail on the requirements."
9        A.  Uh-huh.
10       Q.  Did you ever receive input from Alan after
11   his meeting with Mr. Sellers that provided more detail
12   on the requirements?
13       A.  He probably -- because one of the questions I
14   had and he probably provided the answer with that.
15       Q.  And would he -- did he provide those to you
16   via e-mail or did he come to your office and verbally
17   update you?
18       A.  I do not recall how.
19       Q.  If he provided you with that input via
20   e-mail, you would have saved that on your archived
21   e-mails, correct?
22       A.  Correct.
23       Q.  Well, do you recall what the answers were to
24   any of the questions that you had asked?
25       A.  I would not.

24 (Pages 90 to 93)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 94

1    Q.  Do you recall whether Mr. Sellers was
2  satisfied with the end results or whether he came back
3  to you with some additional inquiries?
4    A.  I would not.  He probably would communicate
5  it to Alan.
6    Q.  Did you ever have interaction directly with
7  Mike Sellers?
8    A.  No.
9    Q.  Never.
10    A.  No.
11    Q.  If you saw Mike Sellers today in this room,
12  would you recognize him?
13    A.  Yes.
14    Q.  But it's not because you had interaction with
15  him in the ordinary course of business?
16    A.  Correct.
17    Q.  Well, then why is it that you would recognize
18  him?
19    A.  Because he is part of the employee.  Like if
20  I go outside, I may recognize you.
21    Q.  But it's not because you had dealings with
22  him on a daily -- on a -- over time.  In the ordinary
23  course of business in your interaction with
24  Mr. Sellers, you were always going through some third
25  party, there was always an intermediary; is that your

Page 95

1  statement?
2    A.  Correct.
3        MS. GEISLER:  Objection to form.
4    A.  Correct.
5    Q.  (BY MR. WINTER) Did you sit down and meet
6  with Mr. Sellers and with Alan Greenthal when the
7  final product was delivered to him?
8    A.  I do not recall.
9    Q.  So it's possible you had some meetings with
10  Mike Sellers where you discussed the deliverables, you
11  and Mr. Greenthal, but you just don't recall; is that
12  correct?
13        MS. GEISLER:  Objection to form.
14    A.  I would not recall any meeting with Mike
15  directly.
16    Q.  (BY MR. WINTER) I understand you don't
17  recall it.  What I'm asking you, though, is it
18  possible that you had some meetings with Mr. Sellers
19  where you discussed his request, you and others, but
20  you just don't recall it?
21        MS. GEISLER:  Objection to the form.
22    A.  I might.
23    Q.  (BY MR. WINTER) You mentioned that that HUB
24  system --
25    A.  Uh-huh.

Page 96

1    Q.  -- that we looked at on Exhibit -- yeah, that
2  one right there.
3    A.  Okay.
4    Q.  That the HUB is where the data relating to
5  analysis of proposals was kept; is that correct?
6    A.  It's proposal creations.
7    Q.  Okay.  Did you work -- did you have inputs
8  and -- and access to data that was housed in the HUB
9  system?
10    A.  Access to the data?
11    Q.  Yeah.
12    A.  Yes, I do have access to the data.
13    Q.  Let me show you what was marked as Exhibit
14  493 in an earlier deposition.  Does this look like a
15  run of the kind of data that would have been
16  maintained on that HUB system?
17    A.  I do not recall this one.
18    Q.  You don't?
19    A.  No.
20    Q.  Did the HUB system include information --
21  strike that question.
22        Let me ask you this:  You are familiar
23  with list price, correct?
24    A.  Yes.
25    Q.  Are you familiar with the acronym "AWP"?

Page 97

1    A.  Yes.
2    Q.  What does that stand for?
3    A.  Average wholesale price.
4    Q.  Average wholesale price.  All right.  What
5  does average wholesale price mean to you?
6    A.  I do not know how it's derived.
7    Q.  Okay.  I didn't ask you that question, sir.
8  My question is:  What does the word -- what do the
9  words "average wholesale price" mean to you?
10    A.  It's price for the wholesaler.
11    Q.  Price for the wholesaler and who?
12    A.  In general.
13    Q.  Is it -- in your understanding, is it the
14  price that the wholesaler sells the product or the
15  price the wholesaler pays for it?
16    A.  I do not know the definitions exact.
17    Q.  Does it mean anything to you other than the
18  plain language of the words, "average wholesale
19  price"?
20    A.  It's price charged to the wholesaler.
21    Q.  If you wanted to get the average wholesale
22  price for an Abbott product, could you go on the
23  computer system somewhere and look it up?
24    A.  I would not know that.
25    Q.  Let me show you what was marked yesterday as

Page 98

1    Exhibit 984.  And why don't you show that to your
2    counsel so she can take a look at it first and then
3    I'll ask you if you've ever seen a price list like
4    that?
5        A.  (Witness reviewing document).
6        Q.  All right, sir.  Do you recognize the price
7    list that's marked as Exhibit 984?
8        A.  Can you repeat the question, please?
9        Q.  Yes, sir.  Do you recognize the document I
10   just handed to you as Exhibit 984, whatever the number
11   is, 984?
12       A.  Okay.  No.
13       Q.  Have you ever seen a list like that that
14   included NDCs, product information for Abbott products
15   and AWP pricing?
16       A.  No.
17       Q.  If you wanted to get the AWP for Abbott
18   products, where would you go to get it?
19       A.  From 1991 to 1994 like we were loading a
20   Redbook.
21       Q.  From 1991 to 1994 you would have gone to
22   Redbook?
23       A.  Yes.
24       Q.  Did you have access to a Redbook?
25       A.  Yes.

Page 99

1        Q.  You kept one in your office?
2        A.  No.  It was electronically loaded.
3        Q.  On the computer system, the --
4        A.  Correct.
5        Q.  -- AS400?
6        A.  Yes.
7        Q.  Did everybody in Alternate Site have access
8    to that same Redbook located on the AS400?
9        A.  Yes.
10       Q.  Did Mr. Kipperman have access to it?
11       A.  I would assume, yes.
12       Q.  Because he was in Alternate Site, right?
13       A.  Correct.
14       Q.  And it was well-known within Alternate Site
15   that the Redbook was loaded onto the AS400?
16       A.  Uh-huh.
17       Q.  So Mr. Ward, if he wanted access to the
18   pricing in that Redbook, he could have gone to that
19   electronic Redbook on the AS400, correct?
20       A.  Yes.
21       Q.  Same with Mr. Sellers.  If he wanted access
22   to it, or any of the people working for both Mr. Ward
23   or Mr. Sellers, they could have gone to the AS400 and
24   accessed the Redbook, correct?
25       A.  Correct.

Page 100

1        Q.  Was it updated on an annual basis?
2        A.  Yes.
3        Q.  So at any given point in time, you would have
4    a current Redbook at your fingertips just a few clicks
5    away on your desktop, right?
6        A.  We would -- I don't know how often we would
7    load the data, but they would have the data readily
8    available.
9        Q.  To your knowledge, was that Redbook updated
10   annually?
11       A.  I do not know right now, so --
12       Q.  You don't know.
13       A.  -- I would be speculating.
14       Q.  Okay.  Well, we don't want you --
15       A.  But that's what I say.  It would be monthly.
16   I don't know.
17       Q.  It could have been monthly as far as you
18   know?
19       A.  It could be monthly, it could be yearly.  I
20   don't know.
21       Q.  In addition to the people that were located
22   at Abbott Park that all had access to the AS400, what
23   about the folks out in the field?  Did they have
24   access to that computer system used by Alt Site?
25       A.  You talking about from '91 to '95, right?

Page 101

1        Q.  Yes, sir, I am.  I appreciate your clarifying
2    that.  Yes, that's what I'm talking about.
3        A.  No.
4        Q.  So if the folks out in the field, such as the
5    district managers and the infusion specialists, the
6    people that were located around the country, if they
7    wanted the information that was on the AS400, they'd
8    have to funnel up their request through -- through the
9    field sales chain of command?
10       A.  Correct.
11       Q.  Okay.  The national account managers,
12   however, they were housed in Abbott Park, so they'd
13   have that at their fingertips, just like you.
14       A.  Correct.
15       Q.  As well as the contract marketing people, as
16   well as the marketing manager, all those folks.
17       A.  Contract marketing people you have to
18   distinguish.  They are not part of the Alternate Site.
19   They have different people working for Alternate Site.
20       Q.  Well, you have the contract marketing people
21   that were in Alternate Site contract marketing, such
22   as Steve Kipperman or --
23       A.  Okay.  You're talking about, okay, only
24   those.
25       Q.  Yes.

26 (Pages 98 to 101)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 102

1    A.  Yes.
2    Q.  Yes.  Now -- I appreciate --
3    A.  Because you have like CAS, that's contract
4  marketing administration area.  Those people do not
5  have any access to them.
6    Q.  Okay.  I -- I appreciate your clarification.
7  You're talking about the folks in --
8    A.  Alternate Site area only.
9    Q.  They had access to the AS400, but the folks
10  in the Hospital Business Sector Contract Marketing
11  Department couldn't access --
12    A.  Correct.
13    Q.  -- directly to the AS400.
14    A.  Yes.
15    Q.  Okay.  I gotcha.  Well, now after '94 when
16  you moved from Alt Site back up to the Hospital
17  Business Sector --
18    A.  Uh-huh.
19    Q.  -- did you also have access to Redbook up
20  there?
21    A.  No.  After that I do not.
22    Q.  You didn't.  The other folks within the area
23  had access to it, but you didn't.
24    A.  I would assume, yes.  Unless they
25  discontinued the product, so ...

Page 103

1    Q.  Let's look at 180, sir.  I think that's been
2  handed to you, hasn't it?
3    A.  Could you tell me which one is that 180?
4    Q.  It's got a number on the bottom, a little
5  stickie that says 180.  Did I give you that yet?
6        MS. GEISLER:  I don't think you have
7  that one.
8    Q.  (BY MR. WINTER)  Well, it's -- it's the same
9  e-mail in 182.
10    A.  Okay.
11    Q.  In 182, sir, under the issues.
12    A.  Okay.
13    Q.  It's the top of Page 2.  Where you're writing
14  the e-mail back to Alan and Jerrie.
15    A.  Okay.
16    Q.  If you knew that the AWP information was
17  available on the Redbook, and you knew that because
18  you had experience from '91 to '94 being able to
19  access it, right?
20    A.  Uh-huh.
21    Q.  Why is that an issue how to calculate AWP?
22  Why didn't you know just to get it off the Redbook?
23    A.  If you look at here, this is in parentheses,
24  I say "may be."
25    Q.  Right.

Page 104

1    A.  Because I was not sure that -- what it would
2  be.
3    Q.  Do you know how it was done?  How was the AWP
4  calculated in this deliverable?  Did it come off of
5  Redbook or was it calculated pursuant to this formula?
6    A.  I do not recall at this time, but that's
7  reasons I know what was AWP, so I probably put in
8  parentheses this could be.
9    Q.  Did you know what the markup was from
10  Abbott's list price to AWP?
11    A.  I do not know that.
12    Q.  Well, you wrote it down here.
13    A.  Okay.
14    Q.  AWP equals list price times 1.1875.
15    A.  Okay.  I don't know if that's a markup.
16    Q.  Where did you get that information to type
17  it?
18    A.  I don't recall at this time.
19    Q.  Sir, I'm going to -- if I can unroll this
20  thing, I'm going to show you what was marked --
21    A.  Sure.
22    Q.  -- in a prior deposition as Exhibit --
23    A.  Okay.
24    Q.  -- 588.
25        MR. WINTER:  Carol, I only have one copy

Page 105

1  of this thing.
2    Q.  (BY MR. WINTER)  Now, Mr. Patel --
3    A.  Uh-huh.
4    Q.  -- do you recognize the information that is
5  depicted on Exhibit 588?  Take your time and take a
6  look at it.  It's multipages, but my question to you,
7  sir, is whether you know what this is?
8    A.  I do not know what this one is.
9    Q.  Well, do you want to take a look at it first
10  before you --
11    A.  Well, from the first page, unless all the
12  pages are the same, then I have not seen this kind of
13  a report, so ...
14    Q.  So is it your testimony that the final
15  deliverable from this "drop everything" request from
16  Mike Sellers did not appear in this format?
17    A.  No.
18    Q.  Are you saying that because this page is a
19  lot bigger than eight-and-a-half-by-11 or are you
20  saying that because the configuration, the columns are
21  different?  Why -- why is it that you believe that the
22  final deliverable was not in the same format as
23  Exhibit 588?
24    A.  Because if you look at an Excel
25  spreadsheet --

27 (Pages 102 to 105)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 106

1    Q.  Yes, sir.
2    A.  -- only those information I would have
3  provided and this does not look like the same
4  information.  This has a little more.
5    Q.  This has more information than what you have?
6    A.  It seems like, yes.
7    Q.  Well, was the final deliverable that was the
8  end result of Mr. Sellers' request, was it printed on
9  eight-and-a-half-by-11?
10   A.  Yes.
11   Q.  Okay.  Well, let me ask you this question:
12 Do you know, can you tell by looking at this document,
13 588, who prepared it?  Is there any information on
14 there that would give an indicator, such as a file
15 path or a name of an analyst or an IT person, that
16 would give you some insight as to who prepared it?
17   A.  I could not.
18   Q.  You don't see anything in there that gives
19 you any clue on that?
20   A.  No.
21   Q.  You were the guy who was ultimately
22 responsible for supervising the folks who created the
23 deliverable, correct?
24   A.  Correct.
25   Q.  Would they have added anything to the final

Page 107

1  deliverable without clearing it or going through you?
2    A.  I would not recall.
3    Q.  Well, in the ordinary course of business was
4  it your expectation that your subordinates, who were
5  working on projects at your direction, were adding
6  extra things to the project that you didn't know
7  about?
8    A.  What is the --
9        MS. GEISLER:  Objection, form.
10   A.  What is the definition of excess information?
11   Q.  (BY MR. WINTER)  Any information other than
12 what you requested.
13   A.  No, he would not.
14   Q.  As you sit here today, you've -- you've
15 already stated you have a general recollection or
16 memory of the events that surrounded this May 2000
17 request that came from Mike Sellers, correct?  After
18 reviewing these documents --
19   A.  After -- based on what I read in the e-mail,
20 that's the only limited knowledge I have.
21   Q.  It refreshes your memory, though, doesn't it,
22 that you have -- as you sit here today now, do you
23 remember receiving this request from Alan and Jerrie
24 and meeting with them and talking about it?
25   A.  No, I don't because there's a number of

Page 108

1  requests coming from them, so ...
2    Q.  So you --
3    A.  I would not specifically say that this week
4  that's all.
5    Q.  You would not specifically say, I'm sorry,
6  what?
7    A.  Which one is what.  Like we already has met a
8  few time.  With Alan, it's like I was meeting almost
9  every week.
10   Q.  What about Jerrie?  Did you meet with her
11 every week?
12   A.  No.  When a specific project comes up.
13   Q.  Which was on less frequency -- of -- was with
14 less frequency than your meetings with Alan?
15   A.  Correct.
16   Q.  What about Bob Lyman, did you know him?
17   A.  Yes.
18   Q.  Did you meet with him on a frequent basis?
19   A.  Yes, based on the project.
20   Q.  As frequently as Alan?
21   A.  From 1999 to 2000, yes.
22   Q.  From 1999 to 2000, yes?
23   A.  Yes.
24   Q.  Why that one window time period?
25   A.  Because we were changing the system to

Page 109

1  calculate best price and this calculation, we were
2  changing it, that's the reason.
3    Q.  You were changing the system in the way it
4  calculated list price?
5    A.  No.  Best price.
6    Q.  Say that again, please.
7    A.  Best price.
8    Q.  Based price?
9    A.  FCP or -- federal selling price.
10   Q.  Federal selling price?
11   A.  Yes.
12   Q.  FSP?
13   A.  FCP.
14   Q.  F as in fox.
15   A.  Yeah.
16   Q.  Okay.  Federal selling price.
17   A.  Because we had projects to do that.
18   Q.  Okay.  What was the reason for changing the
19 system -- let me back up for a minute because I'm
20 still not quite sure I understand what you're telling
21 me.  You're saying that from 1999 to 2000 you worked
22 with Bob Lyman on a specific project; is that true?
23   A.  Correct.
24   Q.  And --
25   A.  And Rich Proctor.

28 (Pages 106 to 109)

Page 110

1    Q.  Pardon me?
2    A.  Rich Proctor.
3    Q.  Rich Proctor?
4    A.  Yeah.
5    Q.  Okay.  He's the other guy that you worked
6  with on this project?
7    A.  Correct.
8    Q.  Okay.
9    A.  Those other two.
10    Q.  Where was Rich Proctor housed?  Which
11  department did he work in?
12    A.  Government reporting.
13    Q.  Okay.  So you and Mr. Lyman and Mr. Proctor
14  worked on a specific project between '99 and 2000 and
15  the purpose of this was to create what?
16    A.  Quarterly reporting data for the government.
17    Q.  Quarterly reporting data for the government.
18  Okay.
19    A.  Yeah.
20    Q.  And what was the data that you reported to
21  the government on a quarterly basis?
22    A.  The sales -- rebate information.  I do not
23  know at this time.
24    Q.  You --
25    A.  Probably sales or rebate information.

Page 111

1    Q.  Rebate information.  Did it have something to
2  do with Medicaid rebates?
3    A.  Could have been.
4    Q.  You don't know?
5    A.  No.
6    Q.  Have you ever heard of the acronym "AMP"?
7    A.  Yes.
8    Q.  Average -- do you know what that stands for?
9    A.  Average manufacturing.
10    Q.  Okay.  Did that --
11    A.  That was part of that, too.
12    Q.  Okay.  So this project you worked on between
13  1999 and 2000 with Mr. Proctor and Mr. Lyman had
14  something to do with the calculation on a quarterly
15  basis of Abbott's AMP?
16    A.  Yeah, AMP.  Not Abbott AMP, only product for
17  the Hospital Product Divisions.
18    Q.  Okay.  The AMP for HPD?
19    A.  Correct.  HPD products.
20    Q.  Okay.  You're distinguishing that from PPD --
21    A.  Correct.  All other.
22    Q.  -- and Ross and TAP, et cetera.
23    A.  Yeah.  All these.
24    Q.  Okay.  Do you know if this project that you
25  worked on between 1999 and 2000 was germane to

Page 112

1  reporting to the federal government or to state
2  governments or what?
3        MS. GEISLER:  Objection to the form.
4    A.  Based on my knowledge, probably the state
5  only.
6    Q.  (BY MR. WINTER)  Which state?
7    A.  All.
8    Q.  You think it was -- had something to do with
9  reporting to all the different state governments?
10    A.  Based on my knowledge, probably.
11    Q.  You mentioned this federal selling price,
12  FSP, right?
13    A.  Uh-huh.
14    Q.  What was that?
15    A.  I don't know.  It's the price -- one of the
16  price we calculated.
17    Q.  So is that something different than AMP?
18    A.  Could be.
19    Q.  You just don't know?
20    A.  I don't know the calculations.
21    Q.  Did it have something to do with Medicare
22  reimbursement?
23    A.  I would not know that.
24    Q.  You don't.  Do you know who Harry Sellers is?
25  Pardon me, Harry Adams.  Do you know a gentleman by

Page 113

1  the name of Harry Adams?
2    A.  I heard his name.
3    Q.  Did you ever work with him on any projects?
4    A.  I don't remember directly.
5    Q.  Do you know what the acronym "WAC" stands
6  for?  W-A-C, WAC.
7    A.  I heard the name.
8    Q.  Have you heard of a pricing term called
9  "wholesale acquisition cost"?
10    A.  That's -- I heard the name.  That's what the
11  WAC stand for, right, wholesale acquisition cost?
12    Q.  You equate that to WAC, the same thing?
13    A.  Yeah, that's what I think.
14    Q.  Do you understand -- do you have any
15  understanding of what that transaction pertains to?
16    A.  No.
17    Q.  Do you know if Abbott had prices that it
18  called its WAC prices?
19    A.  They had a field called WAC, so I'm assuming
20  that, yes, they would have that.
21    Q.  They had a field called WAC where?
22    A.  On the database.
23    Q.  On which program?  Which particular database
24  are you talking about?
25    A.  Well, the database has different tables and

29  (Pages 110 to 113)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 114

1  each table contains specific information. As an
2  example, you have a customer database, has customer
3  information. Product database has the product
4  information.
5      Q. And --
6      A. So this would be under product information
7  file.
8      Q. Okay. As we talked about earlier this
9  morning, for example, when you were in Alternate Site,
10 the AS400 had product information and that included
11 certain pricing --
12     A. Correct.
13     Q. -- information, right?
14     A. Yeah.
15     Q. Including the list price, correct?
16     A. Yes.
17     Q. Including the WAC price?
18     A. I do not know that price was there or not. I
19 could not recall it.
20     Q. But you do recall over the years that you saw
21 WAC prices --
22     A. Correct.
23     Q. -- listed on the databases?
24     A. Someplace, yes.
25     Q. Okay. Do you recall a column that had AWP

Page 115

1  prices listed?
2      A. Say it again.
3      Q. Do you recall a column or a -- a space on the
4  database for AWP prices?
5      A. Correct.
6      Q. On the AS400?
7      A. Yes. I don't know about AS400.
8      Q. Do you recall that when you were on the --
9  when you -- after 1994 on the CAS system?
10     A. Correct.
11     Q. So that exhibit that we looked at a few
12 minutes ago, Exhibit 984, I believe that's in front of
13 you, it's written in -- it's your right hand.
14     A. Okay.
15     Q. That could have been generated from that
16 database that you saw where the AWP information was
17 maintained, correct?
18     A. Again, it could be.
19     Q. Well, would that be your logical expectation
20 as to where that came from?
21     A. I would speculate it, but I do not know where
22 exactly it came from.
23     Q. I don't want you to speculate, sir, but you
24 have testified that you saw AWP information maintained
25 on the HPD database, correct?

Page 116

1      A. Someplace.
2      Q. Okay. And that's an Abbott business record.
3  You see the Abbott Bates label on the bottom of the
4  page, TXABT.
5      A. Okay.
6      Q. And it's a listing of Abbott products and
7  AWPs, correct?
8      A. Okay.
9      Q. Right?
10     A. Uh-huh.
11     Q. Do you see that, sir?
12     A. Correct.
13     Q. Okay. So the logical inference is that that
14 was generated from the Abbott database that had the
15 AWP information, correct?
16         MS. GEISLER: Objection to the form.
17     A. Logically, correct.
18     Q. (BY MR. WINTER) Okay. And that's something
19 that anybody in the Abbott Hospital Products Division
20 could access if they had access to the database,
21 right?
22         MS. GEISLER: Objection to the form.
23     A. Correct.
24         MR. WINTER: Okay. I think I'm getting
25 ready to pass, but why don't we take a short break and

Page 117

1  we can --
2          MS. GEISLER: Sounds good.
3          MR. WINTER: -- just get ourselves a
4  little organized.
5          THE VIDEOGRAPHER: Going off the record.
6  The time is 12:13 p.m.
7          (Recess from 12:13 to 12:25)
8          THE VIDEOGRAPHER: Going on the record.
9  The time is now 12:25 p.m.
10     Q. (BY MR. WINTER) Mr. Patel, I've handed you a
11 document marked as Exhibit 991 and I think you had an
12 opportunity to look through it. Do you recognize it,
13 sir?
14     A. Yes.
15     Q. What is it?
16     A. It's like a conceptual definitions documents
17 for a project.
18     Q. What is a conceptual definition document?
19     A. It states what's kind of a requirement is
20 from the user's standpoint.
21     Q. Okay. And?
22     A. And what the project should do.
23     Q. Is a conceptual definition document a
24 document that is prepared at the beginning of a
25 project before the task has been executed and the

30 (Pages 114 to 117)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 118

1  deliverable has been delivered, or is it something
2  that is prepared at the end of the project when the
3  project is completed?
4      A.  It's beginning of the project.
5      Q.  Okay.  Is it something that is updated as the
6  project goes along and there are changes and
7  adjustments made to the project?
8      A.  May not be.
9      Q.  It may not be or it may be if there are
10  changes made?
11      A.  No.  They may not be updated, this document.
12      Q.  Oh, it's not -- it is not updated?
13      A.  May not be I'm saying.
14      Q.  Are you saying it may be not be, but it might
15  be, also, or are you saying that it absolutely is not
16  ever updated?
17      A.  I do not recall I have updated this document,
18  but this document may not be updated.
19      Q.  Is this a document that you prepared?
20      A.  Correct.
21      Q.  Okay.  And does this document, Exhibit 991,
22  pertain to the project that you were just describing
23  for me a few minutes ago that you worked on with
24  Mr. Proctor and Mr. Lyman?
25      A.  Correct.

Page 119

1      Q.  If we wanted to get an understanding from
2  this literature as to the purpose behind this project,
3  can you direct my attention to the page or pages that
4  would give the best description of the project?
5          MS. GEISLER:  Okay.  There are portions
6  of this project that we're claiming -- we are going to
7  claim privilege on.  So I have to instruct the witness
8  not to answer the question if he's going to reveal a
9  privilege.
10          MR. WINTER:  Well, I haven't asked him
11  to -- to reveal anything.  I've asked him to direct me
12  to the portion of the document that best describes the
13  general nature of the project.  Are you claiming a
14  privilege on that line of questioning?  On that
15  question?
16          MS. GEISLER:  We are claiming a
17  privilege on portions of this project that this
18  document relates to.  So --
19          MR. WINTER:  Are you --
20          MS. GEISLER:  And -- and he was acting
21  at the direction of counsel, along with Mr. Lyman and
22  Mr. Proctor, on portions of this project.  And so we
23  are claiming a privilege on portions of this project.
24          MS. ST. PETER-GRIFFITH:  What is the
25  basis of your privilege assertion?

Page 120

1          MS. GEISLER:  It's an attorney-client
2  privilege.  The --
3          MS. ST. PETER-GRIFFITH:  What is the
4  basis though?  What is --
5          MS. GEISLER:  The -- the work was done
6  at the direction of counsel.
7          MS. ST. PETER-GRIFFITH:  Who was this --
8  who was this disseminated to?
9          MS. GEISLER:  Who was what disseminated
10  to?
11          MS. ST. PETER-GRIFFITH:  Who was this --
12  the information that you are asserting was privileged
13  disseminated to?
14          MS. GEISLER:  Within the project team,
15  Mr. Proctor, Mr. Lyman and Mr. Patel.
16          MS. ST. PETER-GRIFFITH:  Did it exceed
17  the project team?
18          MS. GEISLER:  Not that I'm aware of.
19          MR. WINTER:  Carol, are you instructing
20  the witness, are you invoking any claim of privilege
21  as to the question that I just asked him?
22          MS. GEISLER:  Can you repeat the
23  question, please?
24      Q.  (BY MR. WINTER)  Mr. Patel, can you direct me
25  on this Exhibit 991 to the portion of the document

Page 121

1  that best describes the nature of the project?
2          MS. GEISLER:  Yes, we are going to claim
3  privilege on that.  I'm going to instruct the witness
4  not to answer.
5          MR. WINTER:  Are you -- you're not
6  snapping back the document, are you?
7          MS. GEISLER:  I haven't -- I haven't
8  seen this document.  I don't know the answer to that
9  question.
10      Q.  (BY MR. WINTER)  Mr. Patel --
11          MS. ST. PETER-GRIFFITH:  Well, it's been
12  produced.
13          MS. GEISLER:  Well, and that's why we
14  would need to snap it back, if it's been accidentally
15  produced.
16          MS. ST. PETER-GRIFFITH:  Are you
17  asserting the privilege over this entire document?
18  Because this is a very significant issue, obviously.
19  You've produced this -- you produced it.  It does
20  not on its face appear to have any attorney-client
21  privilege protection, nor is it so marked.  So what is
22  the basis of your assertion and your decision to snap
23  back this and --
24          MS. GEISLER:  There --
25          MS. ST. PETER-GRIFFITH:  -- to foreclose

31 (Pages 118 to 121)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 122

1  this line of questioning?
2        MS. GEISLER:  There are portions of this
3  project that were conducted at the direction of
4  counsel.
5        MS. ST. PETER-GRIFFITH:  Were they
6  directed incident to some type of litigation?  Because
7  counsel's involvement in business decisions is not
8  necessarily protected by privilege and that's why I'm
9  trying to ascertain what the basis of your privilege
10 assertion is.
11       MS. GEISLER:  Our privilege assertion is
12 based on the fact that some of this work was done at
13 the direction of counsel.  If we take a break, I can
14 talk to Mr. Patel and find out about this particular
15 document and then I can come back and we'll -- we can
16 proceed.
17       MR. WINTER:  Okay.
18       MS. GEISLER:  I want to make sure I
19 understand when this document was created and for what
20 purpose.
21       MR. WINTER:  Okay.
22       MS. GEISLER:  All right.
23       MR. WINTER:  Let's take a break.
24       THE VIDEOGRAPHER:  Going off the record.
25 The time is 12:31 p.m.

Page 123

1        (Recess from 12:31 to 12:56)
2        THE VIDEOGRAPHER:  Stand by, please.
3  Going on the record.  The time is now 12:56 p.m.
4        MS. GEISLER:  For the record, we're
5  going to have to investigate this document.  We
6  believe that it may be privileged and until we
7  complete our investigation, I can't tell you right now
8  whether or not we are going to snap it back.  We
9  believe right now it's privileged and so I'm going to
10 instruct the witness at this point not to answer any
11 more questions about the document.
12       MR. WINTER:  You're going to instruct
13 the witness not to answer any more questions about
14 Exhibit 991?
15       MS. GEISLER:  Correct.
16       MR. WINTER:  Well, I think I can ask
17 some questions that aren't privileged, so let's see if
18 we can -- let's take them one at a time.
19       MS. GEISLER:  Okay.  But you understand
20 that we believe we are probably going to have to snap
21 back this document.
22       MR. WINTER:  But you're not at this time
23 snapping it back, correct?
24       MS. GEISLER:  We -- I'm -- we are going
25 to conduct an investigation.  I believe right now it

Page 124

1  is privileged and until we finish that investigation,
2  I don't know whether or not we are going to snap it
3  back or not.
4        MR. WINTER:  Okay.
5        MS. ST. PETER-GRIFFITH:  And what is the
6  basis of your assertion of privilege at this time?
7        MS. GEISLER:  The basis is that the work
8  that was done in connection with this project was at
9  the direction of counsel and, therefore, it's
10 attorney-client privilege.
11       MS. ST. PETER-GRIFFITH:  Are you
12 asserting that it is attorney-client work product
13 then?
14       MS. GEISLER:  It may be, although I
15 think -- I don't know until we complete our
16 investigation.
17       MS. ST. PETER-GRIFFITH:  What litigation
18 was it produced in anticipation of?
19       MS. GEISLER:  I don't know the answer to
20 that until we complete our investigation.
21       MS. ST. PETER-GRIFFITH:  When will you
22 be completing your investigation?
23       MS. GEISLER:  Well, hopefully in the
24 next week to two weeks.
25       MS. ST. PETER-GRIFFITH:  Okay.  We will

Page 125

1  tell you that it is the position of the United States
2  that this deposition will remain open until we can
3  fully ask questions concerning this document.
4        MR. WINTER:  Texas has the same
5  position.
6        Okay.  Well, let me see if I can ask
7  some questions that aren't going to cause a big
8  ruckus.
9        Q.  (BY MR. WINTER)  Mr. Patel, you've identified
10 991 as a document that you authored, correct?
11       MS. GEISLER:  Go ahead.
12       A.  Correct.
13       Q.  (BY MR. WINTER)  Okay.  And do you recall the
14 project to which Exhibit 991 pertains?
15       A.  Correct.
16       Q.  Okay.  And as I understand it, the project
17 was the project that you testified earlier that you
18 worked on with Mr. Proctor and Mr. Lyman, correct?
19       A.  Correct.
20       Q.  Okay.  And how was it that you came to
21 receive the request or the instruction or the
22 direction to work on this project?
23       A.  I do not recall at this time.
24       Q.  Well, it would have been typical, in your
25 experience, for somebody on the business side to

32 (Pages 122 to 125)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 126

1  approach you with a request that you support a
2  specific project, correct?
3           MS. GEISLER:  Objection to the form.
4      A.  Correct.
5      Q.  (BY MR. WINTER)  That's what you testified to
6  earlier this morning, right?
7      A.  (Nodded head affirmatively).
8      Q.  Okay.  So would it make sense that if you
9  worked on this project with Mr. Lyman and Mr. Proctor,
10 that -- well, first of all, let me ask you.  Were
11 Mr. Lyman and Mr. Proctor individuals that you would
12 have received requests from on the business side to
13 work on specific projects?
14     A.  Correct.
15     Q.  So it would make sense, then, that Mr. Lyman
16 and Mr. Proctor approached you with a request for
17 support on this project?
18          MS. GEISLER:  Objection to the form.
19     Q.  (BY MR. WINTER)  Is that correct?
20     A.  Correct.
21     Q.  Okay.  Do you recall sitting down and meeting
22 with Mr. Lyman and Mr. Proctor and -- and receiving
23 from them their request that you support them on this
24 project?
25     A.  Correct.

Page 127

1      Q.  Okay.  You do recall that meeting?
2      A.  Don't recall it, but I probably sat down with
3  them and took the request.
4      Q.  Okay.  Was there anybody else present in the
5  meeting when you sat down with Mr. Lyman and
6  Mr. Proctor?
7      A.  Not to my knowledge.
8      Q.  So there wasn't a lawyer present in that
9  discussion, for example?
10     A.  Not to my knowledge.
11     Q.  Okay.  And at any time over your course of
12 working on this project that is evidenced by Exhibit
13 991, did you ever meet with attorneys on behalf of
14 Abbott?
15          MS. GEISLER:  Go ahead.
16     A.  I do not recall.
17     Q.  (BY MR. WINTER)  You don't recall ever
18 meeting with lawyers on behalf --
19     A.  Correct.
20     Q.  Okay.  And instead of just calling this thing
21 "this project" over and over again, would it be fair
22 to characterize this project as the -- as the Medicaid
23 AMP and best price reporting project?
24     A.  Correct.
25     Q.  Is that what you refer to it as?

Page 128

1      A.  Yes.
2      Q.  Okay.  When you met with Mr. Lyman and
3  Mr. Proctor, what did they tell you was the purpose
4  behind the project?
5           MS. GEISLER:  We're not going to
6  answer -- I'm going to instruct the witness not to
7  answer that question.
8           MS. ST. PETER-GRIFFITH:  And the basis
9  of the instruction?
10          MS. GEISLER:  Is that the project is
11 covered by the attorney-client privilege.
12          MS. ST. PETER-GRIFFITH:  Which attorneys
13 were involved in this matter?
14          MS. GEISLER:  Until we complete our
15 investigation, I can't answer that question.
16          MS. ST. PETER-GRIFFITH:  Well, neither
17 can the witness and that's a problem if you are
18 asserting a privilege over questions concerning
19 conversations which clearly did not involve an
20 attorney.
21          MR. WINTER:  That's my specific question
22 to you, Carol.  Are you claiming privilege on this
23 communication between individuals who are not counsel?
24 You're --
25          MS. GEISLER:  Yes.

Page 129

1           MR. WINTER:  You are claiming the
2  attorney-client privilege on a communication between
3  Bob Lyman and Richard Proctor and Shirish Patel?
4           MS. GEISLER:  Correct.
5           MS. ST. PETER-GRIFFITH:  And what's your
6  basis for that?
7           MS. GEISLER:  That the directions that
8  were given to Mr. Patel were at the direction of
9  counsel.
10          MR. WINTER:  Well --
11          MS. ST. PETER-GRIFFITH:  How do you know
12 that?
13          MS. GEISLER:  Until we complete our
14 investigation, I don't know that for certain, but it
15 is our belief that that's what the situation is and so
16 we are not going to allow the witness to answer those
17 questions.
18          MR. WINTER:  Well, Carol, I have a
19 statement to make, and that is --
20          MS. GEISLER:  Okay.
21          MR. WINTER:  -- that the position that
22 you're taking right now on claiming a privilege
23 between a communication between laymen, that obviously
24 does not involve counsel, is a position that Abbott
25 has taken in this litigation previously and it has

33 (Pages 126 to 129)

Page 130

1 been soundly rejected by the Texas courts presiding
2 over the Texas litigation. It's been rejected by the
3 trial court. It's been rejected on mandamus by the
4 intermediate level court of appeals and it's been
5 rejected by the Texas Supreme Court. This is an
6 untenantable position and if you insist on taking this
7 up, then when we get a resolution on this, we will ask
8 for sanctions on this issue.
9        MS. ST. PETER-GRIFFITH: Further,
10 just -- the United States further deems it
11 untenantable under the Federal rules and echos
12 everything that -- that the counsel from Texas has
13 said.
14        MS. GEISLER: Okay.
15        MR. WINTER: Does your instruction stand
16 to the witness not to answer that question?
17        MS. GEISLER: It does.
18        MR. RIKLIN: The Relator takes the same
19 position.
20    Q. (BY MR. WINTER) Mr. Patel, I understand
21 based upon my review of the documentation that there
22 was a problem that existed, and I'm going to
23 characterize the problem and tell me if this meets
24 with your understanding. The problem was that the
25 Pharmaceutical Products Division, PPD, had been

Page 131

1 calculating the Medicaid AMP and best price for HPD
2 and that that calculation was done using the PPD
3 system, which was known as the GVR system; is that
4 correct?
5        MS. GEISLER: Go ahead.
6    A. Yes.
7    Q. (BY MR. WINTER) And specifically the problem
8 that arose was that when PPD was calculating the AMP
9 and best price on behalf of HPD, the GVR system was
10 pulling the wrong information and was calculating thus
11 an incorrect AMP and an incorrect BP on behalf of HPD,
12 correct?
13    A. Let me clarify the wrong information. They
14 were not including all data. Information was correct,
15 but they were not including all data.
16    Q. Well, was it a situation where the GVR system
17 that was maintained by PPD was pulling list price
18 information pertaining to HPD products which was
19 inaccurate because those were prices that were not
20 actually charged in the marketplace?
21    A. I would not know about that.
22    Q. You don't know that?
23    A. No.
24    Q. Okay. Well, on the document, let me direct
25 your attention to Page 4 of 20 of Exhibit 991.

Page 132

1        MS. GEISLER: We're not going to -- I'm
2 going to state again. We are not going to answer
3 questions about this document.
4        MR. WINTER: Well, I haven't asked him a
5 question yet. Are you instructing him not to look at
6 the document?
7        MS. GEISLER: No. He can look at the
8 document. I'm just --
9    Q. (BY MR. WINTER) Okay. Well, would you
10 please look at --
11        MS. GEISLER: -- stating for the record
12 that we're not going to allow him to answer questions
13 about this document.
14    Q. (BY MR. WINTER) Okay. Mr. Patel, I want you
15 to set the document down for a minute. And it's your
16 recollection, based upon your memory of this project,
17 that the problem was that the GVR system was not
18 pulling all of the information it needed to pull; is
19 that correct?
20        MS. GEISLER: Go ahead.
21    A. Correct.
22    Q. (BY MR. WINTER) So if the problem was
23 characterized as the GVR system not accessing the
24 correct data --
25    A. Again, definition of correct, not all the

Page 133

1 data. Information was correct, but it was not pulling
2 all data.
3    Q. What was the data that the GVR system was not
4 pulling?
5    A. I cannot tell you right now without
6 investigating it.
7    Q. Well, if -- let me just see if I can refresh
8 your recollection. Was the problem that the GVR
9 system was not pulling the actual transactional market
10 prices at which HPD's products were being sold?
11    A. I don't believe so.
12    Q. Why don't you believe that to be the case?
13        MS. GEISLER: Do you believe that you
14 will be revealing a privilege if you answer his
15 question?
16        THE WITNESS: Yes.
17    Q. (BY MR. WINTER) Well, let me explore that
18 for you. What privilege do you think you would be
19 revealing?
20    A. Privacy of Abbott data.
21    Q. The privacy of Abbott data. Well, Mr. Patel,
22 the privacy of Abbott data is not a recognized
23 privilege in a court of law under the circumstances
24 that we're in right now. There are protections to
25 protect, for example, trade secret data, protections

34 (Pages 130 to 133)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 134

1 that are in place via protective orders. That is not
2 a tenantable privilege that you can stand behind in
3 response to the question that I'm asking you. Let me
4 ask you this way.
5     A.  I need to discuss with her before I answer
6 that.
7     Q.  Well, I'm going to ask you a different
8 question.
9     A.  Okay.
10     Q.  Okay. Other than what your lawyer has told
11 you today in this room or when you were outside
12 conferring with her in private, did you have the
13 belief that your communications with -- did you
14 ever -- let me strike that and let me rephrase the
15 question.
16         Prior to today, did you have any
17 understanding that your communications with
18 Mr. Proctor and Mr. Lyman were claimed by anyone to be
19 privileged for any reason?
20     A.  Let me clarify this one. When I started at
21 the Abbott, I signed a legal document that any data,
22 that's Abbott property, and before I leak to them, I
23 need to talk to them or I need their permission.
24     Q.  And that's general instruction and guidelines
25 that you received when you first came to work at

Page 135

1 Abbott?
2     A.  No.  I signed the paper.
3     Q.  Okay.  And you signed a paper pertaining to
4 proprietary information --
5     A.  Correct.
6     Q.  -- for the company. Okay. So that was
7 something in the ordinary course of business, you
8 signed a document stating that data that you
9 interacted with or had access to would be considered
10 proprietary.
11     A.  Correct.
12         MS. GEISLER:  Objection.
13     Q.  (BY MR. WINTER)  It should not be released
14 outside of Abbott.
15         MS. GEISLER:  Objection to the form.
16     Q.  (BY MR. WINTER)  Correct?
17     A.  That's my belief.
18     Q.  Okay.  Set -- setting aside that and that
19 paper that you signed, that confidentiality agreement
20 that you signed early on, okay? Separate and apart
21 from that, with respect to this specific project,
22 prior to today had you ever heard anyone tell you that
23 your communications with Mr. Lyman and Mr. Proctor
24 regarding this project were confidential?
25     A.  Yes.

Page 136

1     Q.  From whom?
2     A.  From both of them.
3     Q.  They told you?
4     A.  Yes.
5     Q.  They told you these were confidential
6 communications that they were having with you?
7     A.  Confidential information.
8     Q.  It pertained to confidential information?
9     A.  Yes.
10     Q.  Meaning the calculation of the AMP and the
11 best price?
12     A.  Yes.
13     Q.  Okay.  But there were never any lawyers
14 present in any conversation that you had with
15 Mr. Lyman and Mr. Proctor, correct?
16     A.  Correct.
17     Q.  Okay.  Did they ever indicate to you that
18 this project was being done pursuant to some threat of
19 litigation?
20     A.  I would be speculating. I don't know what
21 was the reason.
22     Q.  Well, I'm not asking you to speculate, sir.
23 I'm asking you if they ever indicated to you that this
24 project was being requested pursuant to some threat of
25 litigation or pending litigation?

Page 137

1     A.  I do not recall that.
2     Q.  The question that I had asked you a short
3 while ago was -- well, let me -- I don't remember my
4 precise question, so let me ask you a different one.
5         Was one of the problems that you were
6 asked to work on associated with this general
7 background of the PPD GVR system, calculating the AMP
8 and the best price for HPD, was one of the problems
9 that the GVR system was not using the correct logic?
10     A.  I did not say that. I said they were not
11 including all the data.
12     Q.  Okay.  So --
13     A.  It had nothing to do with logic.
14     Q.  So is the answer to my question no, that was
15 not one of the problems?
16     A.  Correct.
17     Q.  Okay.  So it was not a problem with the
18 logic, it was just simply a problem with the GVR
19 system not including all of the data.
20     A.  Correct.
21     Q.  Okay.  And I asked you is -- well, when you
22 say the GVR system was not including all of the data,
23 does that mean that the GVR system was failing to
24 capture the transactional market prices at which HPD
25 drugs were sold?

Page 138

1    A.  I do not know that.
2    Q.  You don't know.  That could have been part of
3  the problem, you just don't recall?
4    A.  I would be specu --
5        MS. GEISLER:  Objection to form.
6    A.  I would be speculating.
7    Q.  (BY MR. WINTER)  Well, again, I'm not asking
8  you to speculate, but I am asking you based upon your
9  recollection and memory of the project that you worked
10 on for a year --
11   A.  Uh-huh.
12   Q.  -- whether one of the problems was that the
13 GVR system was failing to collect or capture or factor
14 in the transactional market prices?
15   A.  I would not know about transactional market
16 prices or not.
17   Q.  Well, when you say it was not accessing the
18 correct data, what do you mean?
19   A.  It may not include -- return as an example.
20 So the return comes in, it may not be including that.
21 So if you don't include the returns there, you are --
22 you may be calculating the wrong price.
23   Q.  Prior to May 17, 2000, was the PPD GVR system
24 used to calculate the AMP and best price on HPD
25 products?

Page 139

1    A.  Yes.
2    Q.  When was the project completed?
3    A.  I do not know.  I do not recall.
4    Q.  Do you recall when the project was initiated?
5    A.  Probably sometime in 2000.
6    Q.  It would have been your normal course of
7  business to prepare this -- a document known as a
8  conceptual definition document at the outset of a
9  project, correct?
10   A.  At the beginning of the project.
11   Q.  Okay.  So if there was a conceptual
12 definition document that bore a date of May 17, 2000,
13 that would be at or near the beginning of the project?
14       MS. GEISLER:  Objection to the form.
15   A.  Could be.
16   Q.  (BY MR. WINTER)  It could be or it would be?
17   A.  Would be.
18   Q.  Okay.  And your testimony earlier was the
19 project lasted about a year, so it would have been
20 approximately May of 2001 when the project was
21 complete, correct?
22   A.  Like I say, I don't know the exact date.  I
23 don't recall it, but --
24   Q.  Well, I appreciate that.  I'm not asking you
25 for a specific date.  But your testimony earlier was

Page 140

1  that you worked on the project with Mr. Lyman and
2  Mr. Proctor for about a year, correct?
3    A.  So creating a model, it would be a year and a
4  half, correct.
5    Q.  Okay.  And a year after May of 2000 is May of
6  2001, right?
7    A.  (Nodded head affirmatively).
8    Q.  The project that you worked on for
9  Mr. Sellers that we looked at in the exhibits earlier
10 today, the "drop everything" request, do you remember
11 that?
12   A.  Uh-huh.
13   Q.  Special request for Mike Sellers for pricing?
14   A.  (Nodded head affirmatively).
15   Q.  Did you create a conceptual definition
16 document for that project?
17   A.  No.
18   Q.  Why not?
19   A.  Because we need it right away and that's the
20 reason.
21   Q.  Because it was so urgent you didn't have time
22 to create --
23   A.  Correct.
24   Q.  -- a conceptual definition document?
25   A.  Correct.  The e-mail was sufficient.

Page 141

1    Q.  Was there any relationship between the
2  project that you've testified that you worked on for
3  about a year with Mr. Proctor and Mr. Lyman, was there
4  any relationship between that and the special request
5  from Mr. Sellers to provide the pricing information
6  that we've looked at in the earlier exhibits?
7    A.  No.
8    Q.  None that you're aware of?
9    A.  No.
10   Q.  There was a gentleman that was described by
11 you earlier today with a first name Arun?
12   A.  Yeah.  You probably saw the last name there.
13   Q.  Was his last name V-i-s-w-a-n-a-t-h-i-a?
14   A.  Correct.
15   Q.  Do you know a woman by the name of Diane
16 Latz?
17   A.  Yes.
18   Q.  Did she work with you on a project that you
19 worked on between May of 2000 and May of 2001?
20   A.  Besides this one, no.
21   Q.  She worked with you on the Medicaid and AMP
22 and best price report project?
23   A.  Correct.
24   Q.  What was Ms. Latz's involvement in that
25 project?

36 (Pages 138 to 141)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 142

1    A.  She would provide me data or certain -- like
2  what kind of data she needed then.
3    Q.  She provided you with data?
4    A.  Kind of specs for data.  As example, what
5  kind of class code she needed or what kind of products
6  to be included.
7    Q.  After the project was complete,
8  was Medicaid -- was the reporting for HPD of
9  information for AMP and best price, was that function
10  performed in-house at HPD instead of being channeled
11  through PPD?
12    A.  Again, this project was to create a model for
13  that.  This was not a complete project.  This project
14  was just to create a model to calculate that.
15    Q.  Nobody.  Well, my --
16    A.  So the project was not completed.
17    Q.  Are you saying the project was never
18  completed?
19    A.  This project for creating a model was
20  completed.
21    Q.  Okay.
22    A.  But you asked me to -- the calculation was
23  changed or reporting was changed or not.
24    Q.  Right.
25    A.  It was not changed.

Page 143

1    Q.  So does the GVR system continue today to
2  report AMP and best price on behalf of Hospira?
3    A.  Today?
4    Q.  Yes, sir.
5    A.  No.  At the end of this project there was
6  still reporting from GVR.
7    Q.  At the end of the project that's evidenced by
8  Exhibit 991, the GVR system, which is owned by PPD,
9  correct?
10    A.  Correct.
11    Q.  Continued to report AMP and best price on
12  behalf of HPD.
13    A.  Correct.
14    Q.  But was it -- was it adjusted somehow so that
15  it did pull all the correct information?
16    A.  Yes.
17    Q.  Okay.  And did the correct information
18  include all of the current transactional pricing
19  information?
20    A.  I would not know what -- I would provide the
21  data to Rich Proctor and Bob Lyman and they would look
22  at the data and they would provide it to them.  So I
23  do not have any knowledge.
24    Q.  Do you know whether any of the information
25  that would have been included in Exhibit 991 as you

Page 144

1  have prepared it, as you prepared it --
2    A.  Yes.
3    Q.  -- was redacted when the document was
4  produced?
5    A.  Say it again.
6    Q.  Do you know --
7    A.  Okay.
8    Q.  -- whether any of the information included in
9  Exhibit 991, that would have been included when you
10  prepared it?
11    A.  Uh-huh.
12    Q.  -- was redacted, removed, obscured when the
13  document was produced?
14    A.  From my knowledge, no.
15    Q.  Nobody informed you that the document, which
16  is marked as Exhibit 991, was produced in any redacted
17  form?
18    A.  No.
19    Q.  In fact, before today you had no idea that
20  anybody was claiming privilege on Exhibit 991,
21  correct?
22    A.  Correct.
23    Q.  And in fact, prior to today, apart from the
24  ordinary business privilege for Abbott's proprietary
25  data, you had no idea that there was any litigation

Page 145

1  associated, a claim of attorney-client privilege or a
2  claim of work product privilege, on this project, did
3  you?
4    A.  Correct.
5    Q.  I'm going to ask you, if you would, please,
6  sir, to pick up Exhibit 991 and look at Page 12.  And
7  do you see that at the top of Page 12 it says "Request
8  Number 2"?
9    A.  Uh-huh.
10    Q.  And then underneath that it says "Programming
11  Specifications" --
12    A.  Uh-huh.
13    Q.  -- "(Direct Sales)"?
14    A.  Uh-huh.
15    Q.  And then it says, "Create another file using
16  the same criteria as indicated in request number 1
17  except 'For the classes found in PHS Medicaid Customer
18  Classes (Tagged as 'N')."  Do you see that, sir?
19    A.  Uh-huh.
20    Q.  And then after that to the bottom of the page
21  there is nothing except for the footer on the page.
22    A.  Uh-huh.
23    Q.  Is there information that you would have
24  typed into this document that you would have included
25  in this document when you prepared it that's missing

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 146

1  from the page before you?
2      A.  Not to my knowledge.
3      Q.  Similarly on Page 15 of 20.
4      A.  Same thing.
5      Q.  Under Request Number 4 there is a line of
6  instructions, programming specifications for indirect
7  sales --
8      A.  Uh-huh.
9      Q.  -- and then a lot of blank space on the page.
10     A.  Same.
11     Q.  So your testimony is that's how you typed
12  this document?
13     A.  Correct, uh-huh.
14     Q.  You intentionally left all this blank space
15  on Page 15 and Page 12?
16     A.  Correct.
17     Q.  Why is that?
18     A.  Because I just want to differentiate the
19  request number not to mix with the other request.
20  That's the reason.
21     Q.  You were differentiating between request
22  numbers?
23     A.  Correct.
24         MR. WINTER:  We've got to take a break
25  to change the tape.

Page 147

1         THE VIDEOGRAPHER:  This marks the end of
2  Videotape Number 2, Volume 1 in the deposition of
3  Shirish Patel.  The time is now 1:21 p.m.  Going off
4  the record.
5         (Lunch recess from 1:21 to 1:47)
6         THE VIDEOGRAPHER:  Going on the record.
7  This marks the beginning of Videotape Number 3, Volume
8  1 in the deposition of Shirish Patel.  The time is now
9  1:47 p.m.
10            EXAMINATION
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Good afternoon, Mr. Patel.  My name, as I
13  indicated earlier this morning, is Ann
14  St. Peter-Griffith, and I --
15     A.  Good morning or afternoon.
16     Q.  Good afternoon.  I'm an assistant United
17  States attorney from Miami and I'm here today on
18  behalf of the United States.  I have some other topics
19  of -- that I would like to go over with you today, but
20  I would like to pick up sort of where -- on the -- on
21  the average -- the AMP and best price issues that
22  Mister -- that counsel from Texas has -- had left off
23  with.  And I guess I'd just like to ask you some
24  general questions.
25         What is the federal ceiling price or

Page 148

1  what do you understand it to be?
2      A.  Based on my knowledge, that's a price that's
3  maximum price that we could charge or it could be
4  minimum price.  I do not know right now.  But based on
5  my -- it could be either one.
6      Q.  Is there something that would help refresh
7  your recollection as to that -- as to the meaning of
8  federal ceiling price?
9      A.  Like I say, I have to jog my memory.  I could
10  not recall.
11     Q.  What was your understanding about a
12  manufacturer like Abbott's participation in the
13  Medicaid Rebate Program?
14     A.  I do not know how Abbott participate in that
15  area.
16     Q.  Okay.  Is it fair to say that in your role
17  initially at Abbott, and then at Hospira, that you
18  were involved in putting together different computer
19  data; is that a fair --
20     A.  Not data, but systems.
21     Q.  But systems?  Okay.  Would the systems
22  generate data?
23     A.  Yes.
24     Q.  Okay.  Did the systems generate, for example,
25  pricing data?

Page 149

1      A.  What is your definition of "pricing data"?
2      Q.  Well, what's your definition of pricing data?
3      A.  Pricing data is like list price.
4      Q.  Okay.
5      A.  That somebody enters the list price.
6  Contract price.  Somebody enter the contract price.  I
7  do not generate those prices.
8      Q.  Okay.  Well, what is your -- what is your
9  understanding of the different definitions of price
10  that Abbott used or that you came across in your work
11  for Abbott and Hospira?
12     A.  One is a list price.
13     Q.  Okay.  What is list price?
14     A.  List price is the price that we charge
15  whoever does not have a contract with Abbott or
16  Hospira.
17     Q.  Okay.
18     A.  Contract price, whatever the contract price
19  they have with the end customer.
20     Q.  Okay.  Any other --
21     A.  If it's a wholesaler acquisition cost,
22  there's a field called that, so we charge that for the
23  wholesaler.
24     Q.  Okay.  Any other prices?
25     A.  Okay.  Those are basically the prices that I

38 (Pages 146 to 149)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 150

1  know.
2    Q.  Okay.  Does the term "AMP" mean anything to
3  you?
4    A.  Yeah.  Average manufacturing price.
5    Q.  Okay.  And what's that?  What's your
6  understanding of what --
7    A.  That's average manufacturing.
8    Q.  Is it manufacturing or manufacturer, do you
9  recall?
10   A.  Manufacturer, probably.
11   Q.  Okay.  What -- where did you get that
12  understanding of -- of the definition of AMP?
13   A.  By these meetings.
14   Q.  Okay.  Which meetings?
15   A.  The one that you saw that --
16   Q.  The meetings with Mr. Lyman?
17   A.  Yes.
18   Q.  Okay.  What about best price, what's your
19  understanding of the term -- of the definition of
20  "best price" as used at Abbott?
21   A.  Like I say, I have to read or I have to
22  recollect it.  Offhand I wouldn't -- I could not say.
23   Q.  Without turning to the document, you
24  obviously have seen it already.
25   A.  Correct.

Page 151

1    Q.  Would Exhibit 991 help refresh your
2  recollection on that?
3    A.  Correct.
4        MS. ST. PETER-GRIFFITH:  Okay.  The
5  government, obviously, reserves the right to ask
6  questions once the issue of the resolution of this
7  document is resolved.
8    Q.  (BY MS. ST. PETER-GRIFFITH)  Now, what was
9  the PPD GVR system?
10   A.  I do not know.
11   Q.  Okay.  Do you know what GVR meant as used at
12  Abbott?
13   A.  No.
14   Q.  Could it have meant government rebate?
15       MS. GEISLER:  Objection to the form.
16   A.  It could be.
17   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Did you
18  have an understanding as to whether the PPD -- well,
19  what is PPD?  What's your understanding of PPD?
20   A.  Pharmaceutical Product Division.
21   Q.  Okay.  Did you have an understanding as to
22  whether the Pharmaceutical Product Division at Abbott
23  utilized a system called the GVR system?
24   A.  I knew they were utilizing GVR system.
25   Q.  Okay.  Do you have an understanding as to

Page 152

1  what the GVR system did at -- with PPD?
2    A.  At the 50,000 level they would report rebate
3  to the state.
4    Q.  Okay.  Would they report it just for the --
5  for PPD?
6    A.  No.  The entire Abbott.
7    Q.  For Abbott -- Abbott --
8    A.  All division for Abbott.
9    Q.  All divisions of Abbott.  Would that
10  include -- have you ever heard of a division called
11  TAP or a joint venture called TAP?
12   A.  Yes.
13   Q.  Would that include TAP?  Would they --
14   A.  I would not know that.
15   Q.  Okay.  What about Ross?  Would they do
16  reporting for Ross products division?
17   A.  I believe so.
18   Q.  Okay.  Now, did you ever have an
19  understanding that the PPD GVR system was not
20  accurately assessing data to calculate average
21  manufacturer's price or best price for the Hospital
22  Products Division?
23       MS. GEISLER:  Objection to the form.
24   A.  It was my understanding.
25   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  What --

Page 153

1  how did you come to have that understanding?
2    A.  I probably would get that information from
3  Rich Proctor.
4    Q.  From?
5    A.  Rich Proctor.
6    Q.  Okay.  And what did Mr. Proctor tell you?
7    A.  He would tell me that it's not coming out
8  correctly.
9    Q.  Okay.  Did -- was there any type of
10  understanding as to why it might not be coming out
11  correctly?
12   A.  Yes.
13   Q.  Okay.  And what was that understanding?
14   A.  Understanding was return were not included.
15   Q.  The what was?
16   A.  Returns, product returns.
17   Q.  Product returns.  Okay.  Any other -- any
18  other reason?
19   A.  I do not recall that right now.
20   Q.  Okay.  Would your review of Exhibit 991 help
21  refresh your recollection on that?
22   A.  It could.
23   Q.  Okay.  What was your understanding of --
24  prior to suggested changes to the system being made,
25  what was your understanding of the current GVR PPD

39 (Pages 150 to 153)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 154

1  system or its processes?
2        MS. GEISLER:  Objection to the form.
3     A.  I do not have any knowledge about that.
4     Q.  (BY MS. ST. PETER-GRIFFITH)  Would your
5  review of Exhibit 991 help --
6     A.  Prior to you say?
7     Q.  Prior to --
8     A.  Yeah.
9     Q.  Well, let me ask you this:  You testified
10  earlier that suggested changes were made.  Do you have
11  an understanding as to whether any changes were made
12  with regard to the use of the GVR PPD system in
13  reporting AMPs and best price or in calculating AMPs
14  and best price for HPD?
15     A.  Can you repeat the question again?
16        MS. ST. PETER-GRIFFITH:  Sure.  Can you
17  read that back, please?
18        (Requested portion was read)
19     A.  I don't think I made that statement that GVR
20  has made any changes.
21     Q.  (BY MS. ST. PETER-GRIFFITH)  No, I'm not
22  saying that they did.  I'm saying that --
23     A.  Okay.
24     Q.  -- you made the statement that suggested
25  changes were made.  I mean, that's what Document 991

Page 155

1  is about in part, isn't it?
2     A.  No.  991 is part of creating a model.
3     Q.  Okay.  Was that model ever implemented?
4     A.  Yes.
5     Q.  When was it implemented?
6     A.  The model become a project and the project
7  implement, I do not recall the date.
8     Q.  Okay.  Do you know how the project that was
9  implemented changed the GVR -- the PPD GVR system?
10     A.  It did not change PPD GVR system at all.
11     Q.  Okay.
12     A.  We provided the data, correct data to them.
13     Q.  Okay.  And what -- how -- how did that
14  correction in the data, how was that different than
15  the prior system?
16     A.  How we created it is listed here --
17     Q.  So --
18     A.  -- in 991.
19     Q.  Okay.
20     A.  I do not --
21     Q.  Do you have an independent recollection
22  without reviewing 991 as to how the -- what that --
23  what those changes were?
24     A.  One of the changes I reported that the
25  returns were excluded and we included return in this

Page 156

1  data.
2     Q.  Okay.  Anything else that you can recall?
3     A.  I do not recall.
4     Q.  Okay.  But your -- would your review of
5  Document 991 assist you in that?
6     A.  It could.
7        MS. ST. PETER-GRIFFITH:  If I could just
8  take a second.
9        MS. GEISLER:  Uh-huh.
10        MS. ST. PETER-GRIFFITH:  Okay.  What I'm
11  going to do is stop this line of questioning here, but
12  reserve further questions until the issue of the use
13  of Exhibit 991 is resolved.
14     Q.  (BY MS. ST. PETER-GRIFFITH)  I have -- this
15  is a two-page exhibit, although it is not stapled.
16  Sir, I'm just going to ask you to review this quickly.
17  Or take your time, I should say.
18     A.  (Witness reviewing document).  Okay.
19     Q.  Sir, do you recognize these two-page
20  documents -- these two pages of documents?
21     A.  I recognize the first one, but not recognize
22  the second one.
23     Q.  You don't recognize the second one?
24     A.  No.
25     Q.  Okay.  What can you tell me about this first

Page 157

1  page of the document?  What do -- what do you recall
2  about it?
3     A.  It seems to me like there was a high level
4  requirement or a high level system that Navint Group
5  provided to us.
6     Q.  Okay.
7     A.  Okay.
8     Q.  What is the HPD Commercial System Software?
9     A.  CAS, CBS, HUB.
10     Q.  Okay.  And that's -- so would you -- now,
11  this -- this is an e-mail from Ms. Blandford.  Who's
12  Ms. Blandford?
13     A.  She was my boss.
14     Q.  Okay.  And you're included on this e-mail,
15  along with some other individuals.  Who are those
16  other individuals?
17     A.  They are project managers.
18     Q.  Okay.  Are so Ms. Card, Mr. Cook,
19  Mr. Lesperance and Mr. Mukkada or Ms. Mukkada, are
20  they all project managers?
21     A.  They were.  Yeah.  Some of people are not
22  there right now, but they were.
23     Q.  They were.  Where were they project managers?
24     A.  For the contract marketing area.
25     Q.  For the contract marketing.  So you were all

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 158

1  in the same -- is it HPD contract -- or HBS contract
2  marketing?
3      A.  HPD.
4      Q.  HPD.  Okay.  And what was Navint Group?
5      A.  Could be consulting company.
6      Q.  Okay.  Who is -- do you know whether it was a
7  consulting company?
8      A.  There was our understanding the consulting
9  company is doing a high level feasibility study.
10     Q.  Okay.  Did you work with them?
11     A.  No.
12     Q.  Did you work on this project at all, to your
13 recollection?
14     A.  No.
15     Q.  Okay.  Who's Satish?
16     A.  He's the director for commercial area.
17     Q.  Okay.  And what's -- what's -- is it -- is it
18 a him or a her?
19     A.  He.
20     Q.  Him.  What's his full name, do you recall?
21     A.  S-a-t-i-s-h.  Satish.
22     Q.  Okay.  Yes.
23     A.  That's his full name.
24     Q.  That's his full name?
25     A.  Uh-huh.

Page 159

1      Q.  First and --
2      A.  First name.  Last name is S-h-a-h.
3      Q.  S-h-e-h?
4      A.  A-h.
5      Q.  A-h.  Okay.  Did you work with him?
6      A.  Not directly.
7      Q.  Okay.  And his role was what?
8      A.  He's the director of the department.
9      Q.  Oh, he's the director of the department.
10 Okay.  Of the HPD?
11     A.  Commercial systems.
12     Q.  Commercial systems department.  Was he
13 comparable to you in terms of the nature of the work
14 that he did?
15     A.  No.  He's about three level higher than me.
16     Q.  Three levels.  Okay.  Was he in your chain of
17 command?
18     A.  He would be.
19     Q.  That actually -- is there anything
20 else that you can recall about this document?
21     A.  (Shakes head negatively).
22     Q.  Do you know why you received it?
23     A.  Because I was responsible for CAS, CBS and
24 HUB systems.
25     Q.  Okay.

Page 160

1      A.  And they were planning to replace those
2  systems with some other.
3      Q.  But to your -- to your recollection, you
4  didn't deal with the Navint Group?
5      A.  No, I never.
6      Q.  That actually leads me to a different topic.
7      A.  Sure.
8      Q.  First I would like to go over some
9  preliminary questions with you, sir.
10     A.  Sure.
11     Q.  What's your educational background?
12     A.  I got Bachelor of Science in computer science
13 and MBA.
14     Q.  Okay.  Where is your Bachelor of Science
15 from?
16     A.  Northwestern Illinois University.
17     Q.  Okay.  When did you receive your degree
18 there?
19     A.  When?
20     Q.  Yes.
21     A.  1974.
22     Q.  Okay.  And when did you receive your MBA?
23     A.  About 1998, '99.
24     Q.  Where did you receive your MBA?
25     A.  Lake Forest Graduate School of Management.

Page 161

1      Q.  Okay.  Were you there with any -- did you go
2  to -- did you attend Lake Forest with any Abbott
3  colleagues?
4      A.  No.
5      Q.  No?
6      A.  No.
7      Q.  We've seen several witnesses with degrees
8  from there all during the same time period.
9      A.  It was off campus and I did with Motorola,
10 so ...
11     Q.  I see.  Okay.  And, sir, can you go over for
12 me your employment history?  How long have you been
13 with Abbott?
14     A.  Since 1991.
15     Q.  Okay.  Where did you work prior to working
16 with Abbott?
17     A.  Walgreens.
18     Q.  Okay.  And what -- in what capacity did you
19 work with Walgreens?
20     A.  Same as, in systems area from 1979 through
21 there.
22     Q.  Okay.  Where -- where were you located when
23 you worked for Walgreens?
24     A.  Deerfield.  Deerfield.
25     Q.  Deerfield, Michigan?

41 (Pages 158 to 161)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 162

1    A.  No, here.
2    Q.  Oh, here.
3         MS. GEISLER:  In Illinois.
4    Q.  (BY MS. ST. PETER-GRIFFITH)  Sorry.  My
5  husband is from Michigan.  That's the only Deerfield
6  I'm really familiar with.
7         Okay.  So is it fair to say you've been
8  in the state for a while?
9    A.  Yes.
10   Q.  Okay.  And how did you come to be an Abbott
11 employee?
12   A.  I applied to the ad, newspaper ad.
13   Q.  Okay.  And did you go through an interview
14 process?
15   A.  Yes.
16   Q.  Okay.  And you were selected for the
17 position?
18   A.  Correct.
19   Q.  Did you have prior experience in the
20 pharmaceutical industry?
21   A.  No.
22   Q.  Okay.  Was your work with Walgreens in terms
23 of the types of business systems that you worked with
24 or computer systems, what general area was that in?
25   A.  It was billing --

Page 163

1    Q.  Billing?
2    A.  -- and inventory management.
3    Q.  Okay.  Now, from '91 through '94, what were
4  your job responsibilities?
5    A.  The first year my job responsibility was to
6  justify Synon to get as a case tool.  So I did a
7  feasibility study to acquire Synon as a case tool for
8  the development as well as maintenance.
9    Q.  Okay.
10   A.  And after that for about two years, we
11 converted all native codes into this case tool, using
12 this case tool.
13   Q.  I'm sorry, all what codes?
14   A.  Native codes.
15   Q.  Can you spell that?
16   A.  It's a native code.  It's a technical term.
17   Q.  Okay.
18   A.  Okay.
19   Q.  I have to tell you, I --
20   A.  Okay.
21   Q.  -- assure you, I'm the least technical person
22 in this room.
23   A.  Okay.
24   Q.  So can you just --
25        MR. RIKLIN:  Don't sell yourself short,

Page 164

1  Ann.
2    Q.  (BY MS. ST. PETER-GRIFFITH)  Can you explain
3  that?
4    A.  As an example, let's see, if you want to add
5  a product, you have to validate to make sure the
6  product is not existed and certain other
7  characteristic.
8    Q.  Okay.
9    A.  Okay.  You write your own code to do that or
10 you could use a routine which does that.
11   Q.  Okay.
12   A.  And the software has all those routines built
13 in.
14   Q.  And can you spell the name of the software?
15   A.  S-y-n-o-n.
16   Q.  Oh, S-y-n-o-n, that's the one you had --
17        MS. GEISLER:  Synon.
18   Q.  (BY MS. ST. PETER-GRIFFITH)  Synon.  Okay.
19 Well, that goes to my next question, which you've
20 answered, is how does that Synon work?
21        Okay.  What other responsibilities did
22 you have during this time frame?
23   A.  Another responsibility was in Alternate Site
24 we have various clients and my job was to gather the
25 requirement from them and prioritize the request based

Page 165

1  on the requirements --
2    Q.  Okay.
3    A.  -- and initiate projects.
4    Q.  What types of projects did you work on?
5    A.  The first project was to convert all data to
6  that.  It took me about a year, year and a half.
7    Q.  Okay.  And you worked on that straight
8  through?
9    A.  Correct.
10   Q.  Okay.  Did you work on any other projects?
11   A.  The one project I worked was on
12 reimbursements.
13   Q.  Okay.  And explain what you did -- what --
14 what project you worked on for reimbursement.
15   A.  Creating the reports, basically, of the
16 users.
17   Q.  Okay.  And what -- what reports were those?
18   A.  I do not recall at this time.
19   Q.  Who did you work with in reimbursement?
20   A.  No.  Reimbursement was the users all.
21   Q.  Just the users.  Who were the users?
22   A.  Ginny Tobiason.  That's one of the names.  I
23 don't know.  There are a bunch of other people, so ...
24   Q.  Karla Kreklow?
25   A.  No.  I don't think she was in reimbursement.

42 (Pages 162 to 165)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 166

1    Q.   Okay.  Anybody else that you can recall?
2    A.   It's been a while ago, so ...
3    Q.   Do you remember what the specifications were
4  for the -- for the report?
5    A.   I do not recall at this time.
6    Q.   Was it -- could it have been the CHIP system?
7    A.   Yes, it was for CHIP system.
8    Q.   It was for the CHIP system?
9    A.   Correct.
10    Q.   Do you remember what -- what -- well, what is
11  the CHIP system?
12    A.   It's a client home infusion program.
13    Q.   Okay.
14    A.   What it does, that -- it creates prescription
15  for patients.  It also managed inventory.  It also
16  creates reports for them.
17    Q.   Okay.  And do you recall what component you
18  worked on?
19    A.   All.
20    Q.   Okay.  Did you -- did you work on the
21  component involving submission of claims to Medicare
22  or Medicaid?
23    A.   I might have it.
24    Q.   Okay.  Do you recall what -- what you might
25  have done?

Page 167

1    A.   The one portion I could remember was to
2  create an EDI transactions.
3    Q.   Okay.  And what -- what -- explain what you
4  mean by that.
5    A.   Before that they were submitting papers and
6  we send them this information through the EDI,
7  standard EDI format.
8    Q.   Yeah.  Okay.  So in layman's terms, does that
9  mean that there was a change going from paper
10  submissions to electronic submissions?
11    A.   Correct.
12    Q.   Okay.  And so is it fair to say that you
13  assisted in converting or -- or -- or implementing a
14  part of the CHIP system so that electronic claims
15  could be submitted to Medicaid or Medicare?
16    A.   Correct.
17    Q.   Okay.  Do you recall what you did in -- in
18  putting that together?
19    A.   I work as a project manager, so I would not
20  remember any detail.
21    Q.   Okay.  Do you -- do you have any recollection
22  at all with the project?
23    A.   No.
24    Q.   I'm just trying to exhaust your memory on it.
25    A.   (Shakes head negatively).

Page 168

1    Q.   No?
2    A.   (Shakes head negatively).
3    Q.   Do you recall anything with regard to price
4  reporting or price -- reporting of pricing to Medicare
5  or Medicaid?
6    A.   No.
7    Q.   Okay.  Did you deal with any accounting
8  systems on the CHIPs program?
9    A.   Except reporting.
10    Q.   Okay.  What other reporting components do you
11  recall working on for the CHIPs program?
12    A.   I do not recall.
13    Q.   Okay.  Do you recall any other work that you
14  did on the CHIPs?
15    A.   Without looking at some documents, I cannot.
16    Q.   What documents would you look at?
17    A.   Like if they have any systems, I have to look
18  at their physical report -- reports that were created.
19    Q.   Okay.  And what was your understanding of how
20  those reports were generated?
21    A.   I do not recall.
22    Q.   Do you recall -- do you have any
23  understanding as to any policies with regard to the
24  retention of those reports?
25    A.   No.

Page 169

1    Q.   Okay.  What about with regard to the
2  maintenance of hard copies of the reports?
3        MS. GEISLER:  Objection to the form.
4    A.   I do not recall.
5    Q.   (BY MS. ST. PETER-GRIFFITH)  Okay.  Did you
6  do any other work for the reimbursement department?
7    A.   No.
8    Q.   Okay.  What about for contract marketing,
9  Home Infusion contract marketing?
10    A.   No.
11    Q.   Did you do any work for any other contract
12  marketing component of --
13    A.   From 1991 to '94?
14    Q.   '91 to '94, yeah.
15    A.   No.
16    Q.   Okay.  What were your other job
17  responsibilities from '91 to '94?
18    A.   What I have explained to you, that's all.
19    Q.   That's it?  We exhausted your memory --
20    A.   Yeah.
21    Q.   -- on what you -- what you did during that
22  time period.  Did you supervise employees during that
23  time period?
24    A.   On a project basis, yes.
25    Q.   Okay.  Do you recall who you supervised?

43 (Pages 166 to 169)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 170

1     A.  Sarah Card.
2     Q.  Okay.
3     A.  Like Anna was one of them.  Anna Mukkada, the
4  other person that you mentioned.
5     Q.  Okay.
6     A.  Paul Gleasy.
7     Q.  Okay.
8     A.  Pat Sherman.
9     Q.  When you say Anna that I mentioned, do you
10  mean Annamma --
11     A.  Yeah.
12     Q.  -- Mukkada?  Okay.  I'm sorry.  And the last
13  name?
14     A.  Pat Sherman.
15     Q.  Pat Sherman.  Okay.  Anybody else?
16     A.  And Jerry Gold -- I don't know.  Jerry
17  Goldstein or Goldstein.
18     Q.  Do you recall which of them worked on the
19  CHIP system project?
20     A.  They all are working in CHIPs.
21     Q.  They all worked on CHIPs.  Was it a big
22  project?
23     A.  It's a system, big system.
24     Q.  So was there sort of a maintenance issue that
25  you had with the CHIP system or --

Page 171

1     A.  Uh-huh.
2     Q.  -- were you developing different components?
3        MS. GEISLER:  Objection to the form.
4     A.  Can you repeat that question?
5     Q.  (BY MS. ST. PETER-GRIFFITH)  Sure.  Your work
6  on the CHIP system -- well, let me -- let me ask you
7  this.  Other than developing this EDI transaction,
8  were there other component parts of the CHIP system
9  that your team developed?
10     A.  We converted the member from native code to
11  that, so all those pieces were converted.
12     Q.  All of the pieces --
13     A.  All pieces were converted.
14     Q.  -- of CHIPs were converted.  Okay.
15     A.  So --
16     Q.  Was that a big project?
17     A.  It was a big project.
18     Q.  Okay.  Do you remember why the project was
19  undertaken?
20     A.  For efficiencies.
21     Q.  Okay.  And who asked you to work on it?
22     A.  Chris Blandford.
23     Q.  Okay.  And what was your involvement with
24  Ginny Tobiason?
25     A.  She was one of the user.

Page 172

1     Q.  Okay.  Did you have a bunch of interaction
2  with her?
3     A.  Yes.
4     Q.  Okay.  What was your interaction with her?
5     A.  Any requirement she has from the
6  reimbursement area, she would bring it to us.
7     Q.  Okay.  Would she be the one directing what
8  the requirements were for the reimbursement department
9  for the CHIPs program?
10     A.  She would provide that information.
11     Q.  Okay.  Would you -- would anybody else
12  provide that information or was she the conduit
13  for the information?
14     A.  She was like a contact, main contact person.
15     Q.  Okay.  Other than supervise -- or what did
16  your supervision of these individuals entail?
17     A.  Looking at the activities, prioritize the
18  projects.
19     Q.  Did you assist them --
20     A.  And -- and making decision-making process.
21     Q.  Decision-making process in terms of
22  how to structure the project?
23     A.  How to structure, how to navigate from one
24  screen to another.
25     Q.  Okay.  So is it fair to say that you were

Page 173

1  involved with their work then?
2        MS. GEISLER:  Objection to the form.
3     A.  Yes.
4     Q.  (BY MS. ST. PETER-GRIFFITH)  From 1994 to
5  2004 what were your job responsibilities?
6     A.  Was project manager and it was various.
7     Q.  Okay.
8     A.  From 1994 to about 1998 was like a resource
9  manager.
10     Q.  Okay.  And what is a resource manager?
11     A.  Resource manager provide the resource to each
12  area.
13     Q.  Okay.  And what do you -- can you define what
14  you mean by that?
15     A.  It means they were developing CAS, CBS and
16  HUB and they would need resources to develop the
17  screen, they needed resources to do the Oracle, so
18  whatever the resources they needed, I would provide
19  them.
20     Q.  Okay.  And did you supervise any staff during
21  this period?
22     A.  No.  Except for the project manager
23  responsible for supervising their resources.
24     Q.  Okay.  Do you remember who during this '94 to
25  '98 time frame you worked with, who -- who you worked

44  (Pages 170 to 173)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 174

1   with on projects?
2      A.  I was a resource manager is all.
3      Q.  Okay.  But did you -- did you work with
4   different people on projects within HPD?
5      A.  Not in a project.  I said I was the resource
6   manager.
7      Q.  Okay.  So were you just there to -- so you
8   didn't work on any independent project?
9      A.  Not on the project, no.
10     Q.  Okay.
11     A.  I did not work on any project during that
12  time.
13     Q.  Okay.  So you were -- is it fair to say that
14  you were available to assist people as issues came up?
15     A.  No.  As an example, you were developing the
16  CAS system, which has about 10 or 12 people.  If
17  somebody leaves, it was my responsibility to replace
18  him.  Interview the persons and get the qualified
19  persons to you.
20     Q.  Okay.  So you --
21     A.  Resource manager.
22     Q.  -- were solely in a HR function?
23     A.  Not HR.  The resource manager for that.
24  Based on the technology knowledge I had, that I would
25  get the qualified person for that.

Page 175

1      Q.  Okay.  Well, how many people -- did you
2   interview them?
3      A.  I don't recall that.  I don't know how many.
4   I would be speculating.
5      Q.  On a daily basis, what did you do from
6   day-to-day?
7      A.  I would check the resumes and then schedule
8   the interviews.
9      Q.  Okay.  And that's what -- that's what you did
10  for this four-year time period?
11     A.  Yeah.
12     Q.  Okay.  And after '98 what did you do?
13     A.  Then after the '98 slowly -- like I
14  transition to the project management role --
15     Q.  Okay.
16     A.  -- for two project, ma'am.
17     Q.  And what were your responsibilities?
18     A.  The first two years I work with contract
19  marketing area for the third-party products.
20     Q.  Okay.  And which contract marketing area?
21     A.  Same area what you are talking about here.
22     Q.  Is it the hospital --
23     A.  Commercial.  Yes, HPD commercial.
24     Q.  Okay.  HPD commercial.
25     A.  Commercial.

Page 176

1      Q.  Okay.  Did you have an understanding that
2   there was more than one contract marketing department
3   within HPD?
4      A.  Based on my knowledge, I don't think so.
5      Q.  So you primarily -- when you say "contract
6   marketing," you're referencing the HPD?
7      A.  Well, it could be two, one for the commercial
8   side and another one for the Alternate side.
9      Q.  Yeah.  Okay.
10     A.  So ...
11     Q.  But -- but when you -- when -- did you also
12  work with contract marketing for Alt Site?
13     A.  Not at that time.
14     Q.  Okay.
15     A.  Not after 1994.
16     Q.  Okay.  When you were resource manager --
17  well, when did you work as -- with Alt Site?
18     A.  From 1991 to 1994.
19     Q.  Okay.
20     A.  And after that I never worked for Alternate
21  Site.
22     Q.  Okay.  Did you ever work for Home Infusion
23  after '94?
24     A.  No.
25     Q.  Okay.  So from '98 to 2000 how did you spend

Page 177

1   your days?  What did you do?
2      A.  Like I say, I worked with the third-party
3   products.
4      Q.  Okay.  And what -- what is -- what did that
5   entail?
6      A.  Third-party product means somebody else
7   manufacture a product and Abbott will sell those
8   product.
9      Q.  Okay.
10     A.  So ...
11     Q.  And what did you do?
12     A.  I -- any issues that the third party has it,
13  I would resolve that.
14     Q.  Issues --
15     A.  With the data.
16     Q.  So issues in terms of computer information
17  and data?
18     A.  Correct.  Yeah.
19     Q.  Okay.  Did you work with anybody within HPD
20  on those issues?
21     A.  Yes.
22     Q.  Who would you work with?
23     A.  Rich Proctor.
24     Q.  Okay.
25     A.  Tom Lockowitz.

45 (Pages 174 to 177)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 178

1    Q.  Can you spell that last name?
2    A.  L-o-c-k-o-w-c-i (sic).
3    Q.  Okay.  Anybody else?
4    A.  Those were the two primary.
5    Q.  Okay.  Did you have responsibilities with
6  regard to the -- the third parties?
7    A.  Yes.
8    Q.  Okay.  What were their responsibilities?
9    A.  Tom was from a financial standpoint.
10   Q.  Okay.
11   A.  And Rich was from return standpoint.
12   Q.  Okay.  And did you have any other
13 responsibilities for this '98 to 2000 time period?
14   A.  No.
15   Q.  Okay.  Do you remember who some of the third
16 parties were that you worked with?
17   A.  Pharmacia and Upjohn.
18   Q.  Okay.  Pharmacia?
19   A.  Yeah.  PNU.
20   Q.  Yeah.
21   A.  And Berlex.
22   Q.  Anybody else?
23   A.  No.  Those are the only two.
24   Q.  After 2000 what did your job -- oh, did you
25 supervise anybody during this time period, '98 to

Page 179

1  2000?
2    A.  Not -- no, not directly.
3    Q.  Okay.  After 2000 what did you do?
4    A.  I started this project.
5    Q.  Which project, the one that's referenced
6  in --
7    A.  Yeah.
8    Q.  -- section or Document 991?
9    A.  Yeah.
10   Q.  Okay.  And did you work on that full-time?
11   A.  Yes, at that time.
12   Q.  Okay.  How long did you work on it full-time?
13   A.  About a year, year and a half.
14   Q.  Did you have anybody that you worked with who
15 you supervised on the project?
16   A.  I worked with the names listed here in this
17 document, like Arun.
18   Q.  So whoever is listed in --
19   A.  991.
20   Q.  Okay.  And what did your job responsibilities
21 entail on this project?  How did you spend your days?
22   A.  Work with the users, get the requirements and
23 pass it to -- and monitor the progress.
24   Q.  Who were the users that you worked with?
25   A.  Bob Lyman, Rich Proctor.

Page 180

1    Q.  Anybody else?
2    A.  No.
3    Q.  And when you say "monitor the progress,"
4  monitor what progress?
5    A.  On this project.
6    Q.  Okay.  In terms of formulating the model?
7    A.  Yes.
8    Q.  But that's not to be confused with
9  implementing the model --
10   A.  Correct.
11   Q.  -- right?  Okay.  You were not involved with
12 implementing the model?
13   A.  No.
14   Q.  Did they consult you with regard to the
15 implementation of the model?
16        MS. GEISLER:  Objection to the form.
17   A.  No.
18   Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  Once this
19 project was completed -- or did you have any other
20 responsibilities during this time period?
21   A.  Well, any small requests from contract
22 marketing area come, then I was responsible for that,
23 too.
24   Q.  Okay.  What -- what types of smaller
25 projects?

Page 181

1    A.  Any issues with the existing system.
2    Q.  Okay.  And about how much of your time was
3  spent on that during this period?
4    A.  Could be 50/50, 40/60.
5    Q.  Okay.  What else did you do after -- or after
6  this time, after the completion of the project what
7  were your job responsibilities?
8    A.  Started to work on the small development.
9    Q.  What's the small development?
10   A.  Creating a price list for contract marketing
11 area or improve efficiency of the systems.
12   Q.  When you say "develop price list for contract
13 marketing," what do you mean?
14   A.  They were providing a price list to the
15 wholesalers and distributor, as well as their internal
16 people.
17   Q.  Okay.  And where -- what was your
18 responsibility in -- in developing this?
19   A.  Again, getting the specs and then give to the
20 programmer and monitor the progress.
21   Q.  Who input the information concerning the
22 pricing -- the price list for the contract marketing?
23   A.  What's in the system.
24   Q.  Okay.  And what system is that?
25   A.  It's CAS.

46 (Pages 178 to 181)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 182

1    Q.  Can you --
2    A.  C-A-S, the one --
3    Q.  C-A-S.  Okay.  So -- so data was pulled from
4  an existing system?
5    A.  Correct.
6    Q.  Okay.  And who could modify that -- that
7  information in that system?
8    A.  User, contract marketing people.
9    Q.  Anybody else?
10    A.  Based on my knowledge, no.
11    Q.  And when you say "contract marketing people,"
12  do you mean HBS contract marketing people?
13    A.  HPD.
14    Q.  HPD.  So could like the Alt Site marketing
15  people change that?
16    A.  No.
17    Q.  Okay.  And what other responsibilities did
18  you have?
19    A.  That's basically it.
20    Q.  That's it.  When you say "price list," what
21  type of price list?
22    A.  What price is charged by each product --
23    Q.  Okay.
24    A.  -- for each customer or by wholesaler.
25    Q.  Okay.  Would it -- would it just be list

Page 183

1  price?
2    A.  I could not recall it.  I have to look at the
3  specs to see what price was printed.
4    Q.  Do you know where those specs would be
5  maintained?  Well, did you maintain a copy of those
6  specs?
7    A.  I do not have any copy of the spec.
8    Q.  Okay.  Did you at one point?
9    A.  One point I might have, yeah.
10    Q.  What did you do with them?
11    A.  I destroyed it.
12    Q.  Why did you --
13    A.  The physical copy.  Whatever is in the
14  electronic copy, they might be in the system.
15    Q.  Okay.  That's going to lead me to my next
16  topic here shortly.
17    A.  Okay.
18    Q.  Did you have any other responsibilities
19  during this time period?
20    A.  (Shakes head negatively).
21    Q.  Okay.  And then did that take you up through
22  to 2004?
23    A.  Yes.
24    Q.  Okay.  At some point did you assist in the
25  transition of HPD to the Hospira spinoff?

Page 184

1    A.  Yes.
2    Q.  Okay.  And what was your role in that?
3    A.  Role in changing the logo from Hospira to --
4  I'm sorry, from Abbott to Hospira, changing report
5  titles wherever Abbott was appearing.
6    Q.  Okay.  What else?
7    A.  That's about it.  And all the systems
8  wherever Abbott was displayed.
9    Q.  Did you change the systems themselves?
10    A.  No.
11    Q.  Okay.  In terms of computer data -- well, let
12  me ask you.  Did you have an understanding as to why
13  the Hospira spinoff took place?
14    A.  No.
15    Q.  Did anybody -- how did you come to learn
16  about it?
17    A.  I was off that day.  I just heard on the
18  radio.
19    Q.  Okay.  And you heard what on the radio?
20    A.  That Abbott has spin off Hospira.
21    Q.  That --
22    A.  Or Abbott has spin off Hospira.
23    Q.  Okay.  So you learned from the radio that --
24  that Hospira was spun off or that it was going to be
25  spun off?

Page 185

1    A.  No.  Was spun off.
2    Q.  Okay.  Well, at what point in time -- so you
3  didn't start doing your work in terms of transitioning
4  from Abbott to Hospira until after the spinoff?
5    A.  Correct.
6    Q.  Okay.  Where -- where were you physically
7  working prior to the spinoff?
8    A.  In AP30.
9    Q.  Okay.  What's AP30?
10    A.  That's the building name at Abbott Park.
11    Q.  Okay.  After the spinoff where were you
12  working?
13    A.  The building called H2 here, like in Lake
14  Forest.
15    Q.  Okay.  Did --
16    A.  Oh, I take it back.  Prior to the spinoff I
17  was also there, too.  I'm sorry.
18    Q.  Okay.  When you say you were -- this H2
19  building prior to the spinoff, you were also there,
20  too?
21    A.  Correct.  Yeah.  I'm sorry.
22    Q.  Prior to the spinoff --
23    A.  That's where I was, in AP30.
24    Q.  Prior to the spinoff you were in AP30.
25  Did -- did HP -- go ahead.

47 (Pages 182 to 185)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 186

1     A.  Prior to the spinoff, then it was part of the
2  Abbott still in H2.
3     Q.  Okay.  So at some point prior to the spinoff,
4  is it fair to say that HPD moved --
5     A.  Yes.
6     Q.  -- from AP30 to H2?
7     A.  Correct.
8     Q.  Did you have responsibilities with regard to
9  that move?
10    A.  No.
11    Q.  Okay.  About how long before the spinoff was
12 the move to H2?
13    A.  A year, year and a half.
14    Q.  Okay.  And one day there you just learned on
15 the radio there that was a spinoff?
16    A.  Correct.
17    Q.  So you walked into work the next day and
18 where did you walk into work?
19    A.  H2.
20    Q.  Same building.
21    A.  Correct.
22    Q.  Is that where you are today?
23    A.  In a different building, but same facility.
24    Q.  Same facility.  Okay.  Same general area?
25    A.  Yes.

Page 187

1     Q.  Okay.  How long did you remain at the H2
2  building after the Hospira spinoff?
3     A.  About a year and a half.
4     Q.  Okay.  And is it fair to say, based upon your
5  testimony, then, that you didn't start transitioning
6  report titles or the other things that you did until
7  after the spinoff?
8     A.  Correct.
9         MS. GEISLER:  Objection to the form.
10    Q.  (BY MS. ST. PETER-GRIFFITH)  Did you have any
11 idea about the spinoff prior to learning about it on
12 the radio?
13    A.  No.
14    Q.  What happened to Abbott's HPD computer
15 records at the time of the spinoff?
16    A.  They had with Abbott.
17    Q.  They what?
18    A.  They have kept with Abbott.
19    Q.  They stayed on the Abbott system?
20    A.  Yes.
21    Q.  Did they stay on the Abbott -- did Hospira
22 stay on the Abbott computer system?
23    A.  True.
24    Q.  Okay.  How long did they stay on the
25 Abbott/Hospira -- on the system?

Page 188

1     A.  I do not know.
2         MS. GEISLER:  Objection to the form.
3     Q.  (BY MS. ST. PETER-GRIFFITH)  Are they still
4  on the system?
5     A.  No.
6     Q.  Okay.  Did you participate at all in taking
7  data from the Abbott system and putting it on a
8  different system for Hospira?
9     A.  No.
10    Q.  Who did that?
11    A.  I do not know.
12    Q.  Okay.  Do you know when it was done?
13    A.  I do not know.
14    Q.  Do you have any estimation as to how long
15 after the spinoff Abbott was -- Hospira was still
16 using the Abbott system?
17    A.  Based on my knowledge, cannot be more than
18 two years, because there was regional contracts.  It
19 has to do the clean split, okay, until the two years
20 expires.  So before -- sometime before that time.
21    Q.  What do you mean by that?  Explain
22 what you mean by the two --
23    A.  It's May 2004 or 2003, I think.  I don't
24 know.  What's the date?
25        MS. GEISLER:  '4.

Page 189

1     A.  '4.
2     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.
3     A.  Two years from that date we have to have a
4  clean split from Abbott.  All data, all computer
5  system must be with Hospira.
6     Q.  (BY MS. ST. PETER-GRIFFITH)  Okay.  So from
7  May of 2004 until May of 2006 there was some
8  interaction --
9     A.  Correct.
10    Q.  -- with the Abbott computer system?
11    A.  Correct.
12    Q.  Is that because there were existing
13 contracts?
14    A.  I do not know why.
15    Q.  Okay.  Do you know what happened to the
16 physical files that Abbott -- that HPD had?  Did
17 they --
18    A.  I say that sometime between those two period,
19 it was transferred to Hospira and it came to the
20 Hospira facility.
21    Q.  Okay.  What about files that were already at
22 the H2 facility, did they stay there with Hospira?
23    A.  There were nonfiles -- okay.  Can you clarify
24 file?
25    Q.  Sure.

48 (Pages 186 to 189)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 190

1     A.  It was like computer data, correct?
2     Q.  Oh, I'm sorry.
3     A.  Or physical file?
4     Q.  I'm talking -- I was talking physical files.
5     A.  Okay.  I do not know.
6     Q.  Did you ever work with physical files?
7     A.  No.
8     Q.  Okay.  Was -- was the transition or the
9  split, as you -- to use your term, from Abbott's
10  computer system to Hospira's system, was that a
11  gradual process or was it an all-in-one thing?
12     A.  Gradual.
13     Q.  Okay.  And can you discuss the -- the
14  progression, the gradual progression?
15     A.  I do not have any knowledge about that.
16     Q.  What about you personally, what did you
17  observe as to the gradual progression?
18     A.  I do not -- I do not know.
19     Q.  Okay.  What is your -- or what are
20  your job -- what have been your job responsibilities
21  as a Hospira or Hospira employee?
22     A.  As a project manager.
23     Q.  And what do you do?
24     A.  Same.  Like get the requirement from the
25  users, create the specs and give it to the programmer.

Page 191

1     Q.  Okay.  For -- for what?
2     A.  Contract marketing systems.
3     Q.  Were there any changes in the contract
4  marketing computer and data systems and how they
5  operated after the transition to Hospira?
6     A.  No.
7        MS. GEISLER:  Object to the form.
8     Q.  (BY MR. WINTER)  There were no changes?
9     A.  (Shakes head negatively).
10     Q.  Did the clients remain the same, to your
11  knowledge?
12     A.  Yes.
13     Q.  And who were the users that you worked with?
14     A.  Same.
15     Q.  Same users --
16     A.  Uh-huh.
17     Q.  -- as before?  Who's your supervisor?
18     A.  Today Doug Ellison.
19     Q.  Okay.  And who -- who -- from 2004 to the
20  present who's been your supervisor?  From 2004 to --
21  well, is Doug Ellison --
22     A.  He's today's.
23     Q.  He's today's.
24     A.  Yeah.
25     Q.  Okay.  Who was your supervisor -- how long

Page 192

1  has Mr. Ellison been supervising you?
2     A.  Six month.
3     Q.  Okay.  And who was your supervisor before
4  him?
5     A.  Nancy Carlson.
6     Q.  Okay.  And how long was Ms. Carlson your
7  supervisor?
8     A.  About three years.
9     Q.  Okay.  Was she your supervisor prior to the
10  spinoff?
11     A.  No.
12     Q.  Okay.  Who -- who was your supervisor prior
13  to Ms. Carlson?
14     A.  Chris Blandford.
15     Q.  Okay.  And was Chris Blandford your
16  supervisor when you were at Hospira?
17     A.  Yes.  When we started.
18     Q.  When you started.  Was -- was -- is Chris a
19  he or a she?
20     A.  She.
21     Q.  Okay.  Was Chris your supervisor before the
22  spinoff?
23     A.  Yes.
24     Q.  How long was she your supervisor before the
25  spinoff?

Page 193

1     A.  I would be speculating, but two or three
2  years.
3     Q.  Okay.  And prior to Ms. Blandford who was
4  your supervisor?  I don't mean to tax your memory.
5     A.  Yeah.  His name is Bob, but I can't think of
6  his last name.  You can call him Bob, if you want.
7     Q.  Okay.  And -- and prior to Bob who was
8  your supervisor?
9     A.  It was Chris Blandford.
10     Q.  Okay.  How long was Bob your supervisor?
11     A.  When I was a resource manager for about two,
12  three years.
13     Q.  Okay.
14     A.  Bob Steller.
15     Q.  Okay.  And then Chris -- Chris Blandford was
16  your supervisor before that.  How long was she your --
17     A.  Since '91.
18     Q.  Since inception.  Okay.  Are you a salaried
19  employee, sir?
20     A.  Yes.
21     Q.  Okay.  Do you have any other job
22  responsibilities with Hospira?
23     A.  No.
24     Q.  And what -- what -- what's the nature of the
25  projects that you work on for contract marketing at

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 194

1  Hospira?
2      A.  What period?
3      Q.  Well, starting -- let's start with in 2004.
4      A.  Okay.  Any request they had or any issues
5  they have in the existing system, they would come to
6  me.
7      Q.  Okay.  Did you supervise anybody during this
8  period?
9      A.  Yes.
10     Q.  Okay.  Who did you supervise?
11     A.  Again, I'm going to give you like -- it's a
12  long name, so MK or --
13     Q.  Okay.
14     A.  Because --
15     Q.  Well, to the extent that you can spell it --
16     A.  It's Suresh.
17     Q.  I'm sorry?
18     A.  Okay.  Vinod, V-i-n-o-d.  V-i-n-o-d.
19     Q.  Okay.
20     A.  S -- that's one name.  Another S-u-r-e-s-h.
21     Q.  Okay.
22     A.  Okay.  Those are the two right now.
23     Q.  And did -- did you begin or were they with
24  you prior -- did you supervise them prior to the
25  spinoff?

Page 195

1      A.  No.
2      Q.  Okay.  When did you come to supervise them?
3      A.  Last two years.
4      Q.  The last two years.  Okay.  Did you supervise
5  anybody at the time of the spinoff?
6      A.  I don't know.  I don't recall.
7      Q.  Okay.  And did your job -- job -- you said
8  basically you -- once Hospira spun off, you sort of
9  addressed any issues that came up in contract
10  marketing; is that fair?
11     A.  Uh-huh.
12     Q.  Did your job responsibilities change?
13     A.  No.
14     Q.  No.  So that's -- you've continued with
15  that -- in that role?
16     A.  Yes.
17     Q.  Okay.  And what types of issues come up?
18     A.  Any system-related issues.
19     Q.  Okay.  And what do you mean by system-related
20  issues?
21     A.  As example, this chargeback comes in from the
22  users or from the wholesaler that submitted the
23  chargeback.  It's not working correctly or it's the
24  wrong price supplied --
25     Q.  Okay.

Page 196

1      A.  -- and we have to explain why.
2      Q.  If a -- if a wrong price is supplied, how do
3  you -- how do you know whether there's a wrong price
4  supplied or where do you go to check that information?
5      A.  We look at the contract price and see that.
6      Q.  Okay.
7      A.  If the right contract price was supplied.
8      Q.  And do you work with someone within contract
9  marketing for that or do you -- does the computer --
10     A.  No.
11     Q.  Do you physically go get the information?
12         MS. GEISLER:  Objection to the form.
13     A.  We look at the data and provide information
14  to the users and user decided whether it is right or
15  wrong.
16     Q.  (BY MS. ST. PETER-GRIFFITH)  Do you review
17  contracts and contract prices?
18     A.  No.
19     Q.  From the -- from the '91 to '94 period, what
20  types of physical documents did you maintain?
21     A.  Documents, physical documents?
22     Q.  Yes.
23     A.  None.
24     Q.  None.  Did you retain everything on computer?
25     A.  I do not recall.

Page 197

1      Q.  Okay.  Do you have a free -- did you have
2  your own personal computer there?
3      A.  No.
4      Q.  Okay.  Where on Abbott's computer system did
5  you maintain your -- your records or like, for
6  example, your e-mail, your other information?
7      A.  I do not recall that, whatever -- whatever
8  that time was.
9      Q.  Okay.  What about for '94 to 2004?
10     A.  Same thing.  I do not know what the server
11  name, what the file locations.
12     Q.  Did you -- can you still access that
13  information?
14     A.  No.
15     Q.  Okay.  While you were -- could somebody at
16  Abbott still access your information?
17     A.  If they have kept the backup, yes.
18     Q.  Okay.  Would that backup information have
19  gone with you to -- or would it have gone to Hospira?
20     A.  Based on my knowledge, not.
21     Q.  Okay.  What about the -- the information
22  during the transition period from 2006 -- or from 2004
23  to 2006, where's that information?
24     A.  With Hospira.
25     Q.  With Hospira.  Okay.  Even though it was on

Page 198

1    the Abbott system?
2        A.   Uh-huh.
3        Q.   Okay.  Would any of that be retained on the
4    Abbott system?
5        A.   I would not know.
6        Q.   Okay.  What was your understanding of what
7    happened to that -- to your files, your computer
8    files?
9        A.   They might have kept them on backup tape.
10       Q.   Do you know whether or not they did?
11       A.   I do not know it.
12       Q.   Did you ever keep hard copies of any of your
13   files?
14       A.   No.
15       Q.   So -- so when you came in to work, you always
16   had -- looked on your computer for your
17   information?
18       A.   What -- the hard copy, I keep it, but then
19   after the project is done, I will discard it.
20       Q.   Okay.  So you would keep hard copies during
21   the period of time for the project?
22       A.   And maybe a little after.
23       Q.   And where were those files maintained?
24       A.   The physical copy will be in my office.
25       Q.   Okay.  Do you have any files in your office

Page 199

1    concerning any projects that you've worked on?
2        A.   Not prior to last year.
3        Q.   Would you have destroyed all of your other
4    files, for example, your files concerning your
5    development of the CHIP system?
6             MS. GEISLER:  Objection to the form.
7        A.   Let me clarify this one.  Okay?
8        Q.   (BY MS. ST. PETER-GRIFFITH)  Okay.
9        A.   What's in the system and what's in the
10   e-mail, those are the electronic documents and they
11   might be there.
12       Q.   Okay.
13       A.   But all the physical documents I have
14   destroyed.
15       Q.   Okay.  Were you ever provided with any
16   information or any directive to retain your files,
17   either hard copy or computer?
18       A.   What period or by whom?
19       Q.   During any period of time that you've been
20   employed by either Abbott or Hospira.
21       A.   Per my knowledge, no.
22       Q.   Okay.  Do you know -- and I'm going to spell
23   this name because I might botch the -- the
24   pronunciation.  Someone named S-v-a-t-i Patel?
25       A.   (Shakes head negatively).

Page 200

1        Q.   Is it fair to assume that S-v-a-t-i Patel is
2    not you?
3        A.   No.
4        Q.   Okay.
5        A.   I'm sorry.  Yes, that's not me.
6        Q.   That's not you.  Okay.
7        A.   That's not me, so ...
8        Q.   The reason why I ask is because that Patel is
9    listed on several litigation hold memos and I just
10   want it confirmed that you're not that person.
11       A.   It's a female, for your info.
12       Q.   It's a -- how do you know that?
13       A.   Because of the name.  It's an Indian name,
14   so ...
15       Q.   Oh, okay.  But you don't know who that is?
16       A.   No.
17       Q.   Okay.  Did Abbott have any -- I'm going to
18   sort of divide this up --
19       A.   Sure.
20       Q.   -- Abbott and Hospira.
21       A.   Okay.
22       Q.   And if there are changes over time, let me
23   know that as well, but from -- for the period of time
24   that you worked for Abbott, did Abbott have, to your
25   knowledge, any formal policies or informal policies

Page 201

1    concerning retention of computer records?
2        A.   I do not have any knowledge about it.
3        Q.   Okay.
4        A.   They may have it, but I do not have any
5    knowledge.
6        Q.   What about the retention of e-mails, do
7    you -- do you know whether Abbott had any policy?
8        A.   Based on my knowledge, I do not have any
9    knowledge.
10       Q.   What did you do with the e-mails?
11       A.   I kept it there --
12       Q.   Okay.
13       A.   -- in the system.
14       Q.   Would you ever delete e-mails?
15       A.   No.
16       Q.   Okay.  So if someone can find the backup
17   files for your user --
18       A.   Sure.
19       Q.   -- profile, we should be able to find all of
20   your --
21       A.   Yes.
22       Q.   -- your e-mails.
23       A.   Yes.
24       Q.   Okay.  What was your personal, you know,
25   policy with regard to the retention of the computer

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 202

1  records that you generated while you were at Abbott?
2      A.  About electronic copy, I always kept it and I
3  never destroyed it.
4      Q.  You never deleted anything?
5      A.  No.
6      Q.  What about with regard to Hospira, are you
7  aware of any policies with regard to record retentions
8  at Hospira?
9      A.  They probably has it related to the system,
10  but nonrelated to the system, I do not have any
11  knowledge.
12      Q.  Okay.  And do you work exclusively on
13  nonrelated systems?
14      A.  I work for both.
15      Q.  Okay.  What about your own personal policy
16  with regard to retention of e-mail and computer
17  records while you've been working at Hospira?
18      A.  I have kept them all.
19      Q.  Okay.  Are you aware of any policy that would
20  require you to destroy them for any reason?
21      A.  No.
22      Q.  Did you have any interaction with the Abbott
23  legal department?
24      A.  No.
25      Q.  Have you ever spoken with anyone in the

Page 203

1  Abbott legal department?
2      A.  I have.
3      Q.  Who have you spoken with?  Don't tell me what
4  the conversation was, just who have you spoken with?
5      A.  I don't recall the names.
6      Q.  Okay.  Do you remember when?
7      A.  I would be speculating, but it would be
8  somewhere about between 1999 to 2001 or 2000.
9      Q.  Okay.  Do you remember why you were speaking
10  with them?
11      A.  I don't recall right now.
12      Q.  Were you ever involved in any TAP or Ross
13  matters?
14      A.  No.
15      Q.  Were you ever involved with any reporting to
16  Redbook?
17      A.  No.
18      Q.  Do you know what I -- do you know what
19  Redbook is?
20      A.  I just heard the name.
21      Q.  Okay.  What was your understanding of what
22  Redbook is?
23      A.  That it has the prices by the NDC.
24      Q.  Did you ever -- were you ever involved in any
25  price reporting?

Page 204

1      A.  No.
2      Q.  Did you ever work on any projects for any
3  executive, such as the president of the company?
4      A.  No.
5      Q.  Did you ever work for any projects for Miles
6  White?
7      A.  No.
8      Q.  Just trying to wind down here, so bear with
9  me.
10          What did you do to prepare for today's
11  deposition?
12      A.  Nothing.
13      Q.  Did you meet with anybody?
14      A.  Yesterday I met with Carol.
15      Q.  Okay.  And how long did you meet with her
16  for?  How long did you meet with her for?
17      A.  About three hours.
18      Q.  Did you -- did you review any documents?
19      A.  No.
20      Q.  Okay.  Have you produced any documents or
21  searched for any documents in response to litigation?
22      A.  No.
23      Q.  Has anybody asked you to search for documents
24  in response to litigation?
25      A.  No.

Page 205

1      Q.  What about for computer records, has anybody
2  asked you to search for computer records, either
3  Abbott or Hospira for litigation?
4      A.  Except they might have asked me to pull the
5  data.
6      Q.  Okay.  What data?
7      A.  Historical data.
8      Q.  What historical data?
9      A.  Like sales during such and such period.
10      Q.  Do you know whether you pulled historical
11  data for sales during particular periods?
12      A.  I have, but I would not recall the time
13  period.
14      Q.  Do you recall whether you were at Hospira or
15  at Abbott?
16      A.  It was Abbott.
17      Q.  Do you recall whether it was during the '91
18  through '94 time period or after '94?
19      A.  After '94.
20      Q.  Can we break it down a little further?  Do
21  you know whether it was during the '94 to '98 time
22  period where I thought you had a specific
23  responsibility?
24      A.  Yes, not -- not before '98.
25      Q.  Not before '98.  Do you recall why you pulled

52 (Pages 202 to 205)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 206

1  the data?
2      A.  No.
3      Q.  Do you know what data you pulled?
4      A.  I do not recall.
5      Q.  Has anybody -- or if someone needed to search
6  for data on the Hospira system concerning Abbott and
7  concerning Abbott's contract marketing, who would they
8  go to?
9      A.  They could go to any number of people.
10     Q.  Okay.  Who?
11     A.  They could go to me, they could go to some of
12  my other project manager.
13     Q.  Okay.  Would you -- would you know about it?
14  Would that be something that would have to be run
15  through you first?
16     A.  No.
17     Q.  Okay.  Did you ever do any other work in
18  the -- on reimbursement matters other than what you've
19  testified to?
20     A.  No.
21     Q.  Now, earlier in response to counsel from
22  Texas you identified three different types of
23  information that might be on the HBS system in the
24  commercial area.  You said project-related
25  information, patient-related information and

Page 207

1  pharmacy-related information.  Do you remember that?
2      A.  I believe that was for Alternate Site.
3      Q.  Oh, that's for Alternate Site?
4      A.  Yeah.  1991 through 1994.
5      Q.  Okay.  That's probably the reason why I asked
6  the question because I have commercial area HBS.  So
7  when you're talking product-related patient
8  information, pharmacy information, that's for Alt
9  Site.  What type of patient information was maintained
10  on the computer systems?
11     A.  Basic patient's name, address, et cetera.
12     Q.  Okay.  Was that generated as part of the CHIP
13  system?
14     A.  Yes.
15     Q.  Okay.  Were there any other patient records
16  outside of the CHIP system?
17     A.  Not to my knowledge.
18     Q.  Okay.  What about pharmacy-related
19  information, what do you mean by that?
20     A.  It means what drugs that -- when they created
21  the prescription, what drug was involved and how much
22  was so we can control the inventory.
23     Q.  Okay.  And is that still part of the CHIP
24  system?
25     A.  Yes.

Page 208

1      Q.  Okay.  Would that have existed outside of the
2  CHIP system?
3      A.  No.
4      Q.  Okay.  What about the product-related
5  information, what were you referencing there?
6      A.  Basic item, product, product name,
7  descriptions, case specs, et cetera.
8      Q.  Okay.  And was that part of the CHIP system?
9      A.  Correct.
10     Q.  Would it have existed outside of the CHIP
11  system?
12     A.  No.
13     Q.  You indicated that prices and costs would be
14  part of that information.
15     A.  When a product would have like a list price.
16     Q.  Okay.
17     A.  And on AWP, like Redbook, it would have AWP
18  price.
19     Q.  Okay.  How was that information, AWP
20  information, input into the CHIP system?
21     A.  You can link using an NDC number.
22     Q.  Okay.
23     A.  And the product would have an NDC number,
24  both.
25     Q.  And you would link to Redbook?

Page 209

1      A.  Yeah.
2      Q.  Okay.  Did -- did Abbott pay a subscription
3  fee for that, do you know?
4      A.  I do not have any knowledge.
5      Q.  Okay.  You just know that you were able to
6  link?
7      A.  Yes.
8      Q.  Okay.  Were you involved in connecting that
9  link?
10     A.  Well, we were getting a disk from that and we
11  will load the disk into the system.
12     Q.  Okay.  So it was a subscription for the disk?
13     A.  Subscription, yes.
14     Q.  Okay.  And so the system -- so you wouldn't
15  be linking to Redbook --
16     A.  Correct.
17     Q.  -- you would have a link to the Redbook
18  information.
19     A.  Correct.
20     Q.  Okay.  And I may have asked you this, but
21  outside of the CHIP system, that product -- would that
22  product-related information exist anywhere else?
23     A.  Not to my knowledge.
24     Q.  Okay.  If you just give me a second, I think
25  I might be ready to pass the witness, but I want

53 (Pages 206 to 209)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 210

1  to ...
2         Oh.  Earlier during your testimony you
3  indicated that you worked with or supervised
4  consultants.  When you say "consultants," what do you
5  mean?  Were they Abbott employees or independent
6  contractors or --
7     A.  It could be independent contract or they
8  might be working for any consulting company.
9     Q.  Okay.  But -- but when you said -- when you
10 referred to consultants, you weren't talking about
11 Abbott employees?
12    A.  Correct.
13    Q.  How often did you work with consultants?
14    A.  How often means up to today or during that
15 period?
16    Q.  Well, let's start with the '91 to '94 time
17 period.  How often did you work with consultants?
18    A.  We had one consultant during that entire
19 period, at least one.
20    Q.  Okay.  And was that the consultant you
21 referenced before?
22    A.  No.
23    Q.  Okay.  Who was that consultant?
24    A.  I do not recall at this time.
25    Q.  Okay.  Was it -- do you recall whether it was

Page 211

1  a company or an individual?
2     A.  It was an individual.
3     Q.  So it was an independent contractor?
4     A.  Correct.
5     Q.  And what did that independent contractor do?
6     A.  Same thing.  Like I would give him specs and
7  he would develop product or he would correct the
8  problem, the system had a problem.
9     Q.  So he would operate like an employee --
10    A.  Correct.
11    Q.  -- that you would supervise, but he was just
12 an independent contractor?
13    A.  Correct.
14    Q.  Okay.  What about after that -- the '94 time
15 frame, did you work with independent -- or did you
16 work with consultants?
17    A.  Yes.
18    Q.  Okay.  And who were the consultants that you
19 worked with?
20    A.  Some were independent and some were working
21 with the consulting companies.
22    Q.  Okay.  And who -- let's start with the
23 consulting companies.  Which consulting companies did
24 you work with?
25    A.  There were numerous, so one was like

Page 212

1  Decisions.
2     Q.  Okay.  Can you --
3     A.  Decisions.
4     Q.  Decisions?
5     A.  Yeah.
6     Q.  Okay.
7     A.  There was some from Michigan.  I don't recall
8  the names right now.
9     Q.  Okay.  And was your relationship with these
10 consultants the same, they -- they worked like -- or
11 they're employees?
12    A.  They are not employees.
13    Q.  They were not employees, but they worked --
14    A.  They worked -- correct.
15    Q.  -- just like you would --
16    A.  Correct.
17    Q.  -- with employees.
18    A.  Correct.
19        MS. GEISLER:  Objection to the form.
20    Q.  (BY MS. ST. PETER-GRIFFITH)  Do you recall
21 who the independent contractors were?
22    A.  I think one name was Dennis, but I don't know
23 the last name right now.  There are a few, so I would
24 not recall the names.
25    Q.  Okay.  What about after the transition to

Page 213

1  Hospshore, did you work with consultants?
2     A.  Yes.
3     Q.  Okay.  And who were the consultants?
4     A.  Well, we offshore the work and they all are
5  consultant and the name of the company is Cognizant,
6  C-o-g-n-i-z-e-n-t.
7     Q.  When you say you offshore the work, what do
8  you mean?
9     A.  Means this company has employees working
10 offshore.
11    Q.  Okay.  "Offshore" meaning outside of the
12 site?
13    A.  Correct.
14    Q.  Okay.
15    A.  Outside the country.
16    Q.  Outside the country.  Okay.  And what do
17 these -- what do these consultants do?
18    A.  Same as employees.
19    Q.  Same as employees.  Do you supervise them the
20 same as employees?
21    A.  Uh-huh.
22    Q.  Is that a little tough if they're offshore?
23    A.  Well, they have a liaison between me and the
24 offshore person, so --
25    Q.  Oh, they have --

54  (Pages 210 to 213)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 214

1     A.  -- they usually have one on-site.
2     Q.  Is it fair to say that your contact, then,
3  with these consultants is through this -- this on-site
4  liaison?
5     A.  Correct.  The on-site liaison is also
6  consultant working for them.
7     Q.  Okay.  And -- and how many consultants are we
8  talking about that you work with?
9     A.  Depend upon the project.  So it could be one.
10  If the project is large, it could be four.
11     Q.  Okay.  And what is the nature of the work
12  that they provide?
13     A.  Same thing.
14     Q.  Same thing as your employees would.
15     A.  Correct.
16     Q.  Okay.  Did you ever work with any sales force
17  members?
18     A.  No.
19     Q.  Were you ever responsible for any sales data?
20     A.  No.
21     Q.  Other than the patient files that you
22  referenced earlier as part of the Home Infusion, the
23  CHIP system, did you work with any other patient
24  files?
25     A.  No.

Page 215

1     Q.  Have you discussed this deposition with
2  anyone other than counsel?  I don't want to know what
3  you spoke with Abbott counsel about, but have you
4  discussed this -- your deposition with anybody?
5     A.  No.
6     Q.  Do you have any physical documents or notes
7  at all concerning your work with Abbott or Hospira?
8     A.  What time period?
9     Q.  During -- during the entire time period that
10  you've worked for either Abbott or Hospira.
11     A.  With me or at the home, none.
12     Q.  Did you have an understanding as to the "drop
13  everything" project that -- that you were asked about
14  earlier as to why it was a "drop everything" project?
15        MS. GEISLER:  Objection to the form.
16     A.  No.
17        MS. ST. PETER-GRIFFITH:  Okay.  At this
18  time the government passes the witness subject to its
19  reservation to recall this witness once we've resolved
20  this issue concerning Exhibit 991.
21        MR. RIKLIN:  I have a few questions, but
22  let's take about a five-minute break.
23        THE VIDEOGRAPHER:  We have 10 minutes
24  remaining on this tape.  Do you want to start a fresh
25  tape?

Page 216

1        MR. RIKLIN:  I don't think I will need
2  more than that.
3        THE VIDEOGRAPHER:  Okay.  Going off the
4  record.  The time is 2:57 p.m.
5        (Recess from 2:57 to 3:03)
6        THE VIDEOGRAPHER:  Stand by, please.
7  Going on the record.  The time is now 3:03 p.m.
8        EXAMINATION
9  BY MR. RIKLIN:
10     Q.  Mr. Patel, my name is Rand Riklin.  We met
11  for the first time this morning just before the start
12  of the deposition, correct?
13     A.  Correct.
14     Q.  Okay.  Mr. Patel, you told us earlier that
15  you left Alternate Site in 1994.
16     A.  Correct.
17     Q.  That you transferred to another division
18  within the company, correct?
19     A.  Correct.
20     Q.  Do you recall what month in 1994 you left
21  Alternate Site?  Or just a ballpark.  What part --
22  what time of the year?
23     A.  It was January or February.
24     Q.  January or February.  Okay.  Early part of
25  the year.

Page 217

1     A.  Early part of the year.
2     Q.  I'm going to -- I'm going to take my mic off
3  a minute.  Well, before we do that.
4        You also told us earlier that the --
5  that the database in Alternate Site at the time you
6  were there includes pricing information.
7     A.  Correct.
8     Q.  And you told us in response to counsel's
9  questions that that pricing information includes
10  Abbott list prices for its products, correct?
11     A.  Correct.
12     Q.  And Abbott's AWP prices loaded from the --
13  from Redbook.
14     A.  Correct.
15     Q.  And that those AWP prices were updated on a
16  periodic basis.
17     A.  Correct.
18     Q.  Did that pricing information in the database
19  include any competitive pricing?
20        MS. GEISLER:  Objection to the form.
21     A.  Based on my knowledge, no.
22     Q.  (BY MR. RIKLIN)  Okay.  Do you know that for
23  a fact?
24     A.  I could collect that.  True.
25     Q.  I'm sorry?

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 218

1    A.  True.  That's for a fact.
2    Q.  You know that it never contained any
3  competitive pricing?
4    A.  Based on my knowledge, no, never.
5    Q.  You never saw any in the database?
6    A.  No.
7    Q.  From the database?
8    A.  Correct.
9    Q.  All right.  What about competitive AWPs?  Did
10  the database contain any competitive AWPs while you
11  were in Alternate Site?
12    A.  Based on my knowledge, no.
13    Q.  Okay.  Let me tell you why I'm asking you
14  these questions.  I'm going to hand counsel a copy of
15  an exhibit that was previously marked in this case,
16  Exhibit 364, to let counsel look at it before --
17  before you see it.  I think we can probably pull
18  another -- I don't have another copy.
19    A.  Sure.
20    Q.  We can probably pull one from the screen, if
21  we need to.
22        MS. GEISLER:  Okay.
23    Q.  (BY MR. RIKLIN)  Do you have a copy of
24  Exhibit 364 in front of you, Mr. Patel?
25    A.  Yes.

Page 219

1    Q.  Yesterday Ms. Cindy -- do you know Cindy
2  Dawson?
3    A.  The name, I think.
4    Q.  Okay.  Well, when you were in Alternate Site,
5  she was in Alternate Site Contract Marketing --
6    A.  Uh-huh.
7    Q.  -- so she testified yesterday.
8    A.  Okay.
9    Q.  She also told us that this document, Exhibit
10  364, which is entitled "Chartwell Home Therapies
11  Injectable Comparison" was prepared, to the best of
12  her knowledge, within contract marketing, Alternate
13  Site Contract Marketing, somewhere around March or
14  April of 1994.  And you see those dates on the front
15  page there, "Unit Purchases," May '93 through March
16  '94.
17    A.  Okay.
18    Q.  Ms. Dawson testified that she did not prepare
19  this document, but that it was prepared within that
20  department either by Steve Kipperman or Debbie
21  Longley.  Do you know those individuals?
22    A.  (Nodded head affirmatively).
23    Q.  You'll have to --
24    A.  Yes.
25    Q.  -- give a -- excuse me, a verbal response.

Page 220

1        She did not know which individual
2  prepared this document, but she said it was either one
3  or the other.
4    A.  Okay.
5    Q.  Is it your recollection that -- did you
6  recall -- did you know Mr. Kipperman and Ms. Longley
7  when you were in Alternate Site back in '94 and
8  earlier?
9    A.  As users, yes.
10    Q.  Okay.  You see this document has some pricing
11  information, correct?
12    A.  I believe so.
13    Q.  It has some competitive pricing information,
14  do you see that?
15    A.  Yes.
16    Q.  Has some Abbott pricing information, correct?
17    A.  Yes.
18    Q.  Is -- is this the kind of information,
19  pricing information, that was contained in the
20  database?
21    A.  Not to my knowledge.
22    Q.  Well, do you know where this pricing
23  information came from?
24    A.  I do not know.
25    Q.  Could it have come from the database?

Page 221

1        MS. GEISLER:  Objection to the form.
2    A.  I would be speculating.
3    Q.  (BY MR. RIKLIN)  Well, I don't want you to
4  speculate, but do you know for a fact -- can you --
5  can you tell us -- can you tell us conclusively that
6  this pricing information contained in Exhibit 364 did
7  not come from the database?
8        MS. GEISLER:  Objection to the form.
9    A.  Based on my knowledge, it did not.
10    Q.  (BY MR. RIKLIN)  Okay.  And what are you
11  basing that on?  What are you basing that testimony
12  on?
13    A.  Because based on my recollections, I don't
14  think we ever kept competitive pricing in the systems.
15    Q.  Okay.  What about the Abbott pricing
16  information that's on Exhibit 364?
17    A.  Again, what I say, it is in product database,
18  they would have that, or contract database have that.
19    Q.  Okay.  So that very likely did come from the
20  database?
21    A.  Correct.
22    Q.  Abbott pricing --
23    A.  Correct.
24    Q.  And Abbott AWP information.
25    A.  Correct.

Page 222

1        MS. GEISLER:  Objection to the form.
2        MR. RIKLIN:  Why don't we change tapes
3  right now.  Off the record.
4        THE VIDEOGRAPHER:  Okay.  This marks the
5  end of Videotape Number 3, Volume 1 of the deposition
6  of Shirish Patel.  The time is now 3:09 p.m.  Going
7  off the record.
8        (Recess from 3:09 to 3:15)
9        THE VIDEOGRAPHER:  Stand by.  Going on
10  the record.  This marks the beginning of Videotape
11  Number 4, Volume 1 in the deposition of Shirish Patel.
12  The time is now 3:15 p.m.
13   Q.  (BY MR. RIKLIN)  Mr. Patel, do you know
14  whether the Redbook AWP information that was loaded
15  into the database on a periodic basis contained
16  competitive AWPs, as well as Abbott's AWPs?
17   A.  I would not know it.  Whatever the data
18  provided by the Redbook, we will load it.
19   Q.  Okay.  So you just don't know one way or the
20  other --
21        MS. GEISLER:  Objection --
22   Q.  (BY MR. RIKLIN) -- Whether the Redbook
23  information contained -- loaded into the database
24  contained competitive AWPs, as well as Abbott's AWPs?
25        MS. GEISLER:  Objection to the form.

Page 223

1   A.  I would not know what data would be there.
2  Whatever the data is available from them, we would
3  load it.
4   Q.  (BY MR. RIKLIN)  Okay.  All you know is that
5  periodically Redbook AWP information was loaded into
6  the -- into Alternate Site's database, correct?
7   A.  Correct.
8   Q.  Okay.  Take a look at Exhibit 360, please.
9  And I'll represent to you, that's also a document that
10  was identified in a previous deposition in this case.
11        And I'll also represent to you,
12  Mr. Patel, that yesterday Cindy Dawson testified that
13  this document entitled "United Professional Companies,
14  Inc. Proposal Analysis" --
15   A.  Okay.
16   Q.  -- was also prepared in the Alternate Site
17  Contract Marketing, the department, not by her, but
18  either by Mr. Kipperman or Ms. Debbie Longley.
19        And if you'll look at Page 2 of Exhibit
20  360.  And the Bates number is 38106.  You see some
21  columns up there at the top, correct?  You see some
22  column headings under which are various prices,
23  correct?
24   A.  Could you repeat it again?  Because here --
25   Q.  Yeah.

Page 224

1   A.  -- I cannot see what's the page number.
2   Q.  We have to magnify that.
3        MS. GEISLER:  It's not the size, it's --
4   A.  No.  It's like some more, like the -- I don't
5  know how you call.  Like a -- complete like a 360
6  degree, so --
7   Q.  (BY MR. RIKLIN)  You want to turn it?
8   A.  Yeah.  That's what I say, so ...
9        MR. RIKLIN:  Can we do that, Cindy?  Do
10  you know what he's talking about?
11        MS. GEISLER:  No.  It's -- it's facing
12  the right way.
13        THE WITNESS:  Okay.
14        MS. GEISLER:  See, we are looking at the
15  top of the page, Shirish.
16        THE WITNESS:  What's the page number?
17  See, that's what I'm looking at.
18   Q.  (BY MR. RIKLIN)  Oh, I see the problem.  It's
19  the second page of this exhibit.
20   A.  Okay.
21   Q.  And it's the one numbered 38106.
22   A.  So this would be the second page, right?
23  Okay.  And what would be the --
24   Q.  And what you see is a -- is a spreadsheet,
25  correct --

Page 225

1   A.  Yes.
2   Q.  -- with various column --
3   A.  Column heading, uh-huh.
4   Q.  -- correct?  And each column has a title up
5  at the top.
6   A.  Correct.
7   Q.  And you see a column for Abbott AWP, correct?
8   A.  I see Abbott prepared, Abbott prepared.
9   Q.  And it's the one, two, three, four, fifth
10  column.
11   A.  Yes, I see Abbott AWP.
12   Q.  Okay.  And then next to that you see a column
13  for competitive AWP, right?
14   A.  Correct.  Prior to that.
15   Q.  And then under each of those columns are
16  various price figures for each corresponding product
17  in the far left-hand column, correct?
18   A.  Correct.
19        THE VIDEOGRAPHER:  Excuse me, Counsel,
20  but the witness needs to put his mic on his tie.
21   Q.  (BY MR. RIKLIN)  And then -- and then next to
22  the columns you've got "Competitive AWP," "Abbott AWP"
23  and then the next column over to the right is percent
24  variance, correct?
25   A.  Correct.

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 226

1    Q.   And that shows a differential between the
2  competitive and the Abbott AWPs, correct?
3    A.   Correct.
4    Q.   Okay.  And then you've got next to that a
5  column for "AWP Spread," correct?
6    A.   Yes.
7    Q.   And -- and that "AWP Spread" column includes
8  columns under that for competitive spread, correct?
9    A.   Correct.
10    Q.   And then Abbott spread, correct?
11    A.   Correct.
12    Q.   And then the last column in that table is
13  "Profitability Improvement," correct?
14    A.   Correct.
15    Q.   And in the profitability -- the -- excuse me.
16  The -- the figures in the spread columns are simply
17  mathematical calculations determined from the
18  competitive AWP and the Abbott AWP, correct?
19         MS. GEISLER:  Objection to the form.
20    A.   If that's true, then -- I have to calculate
21  and see whether it's correct or not, but I -- based on
22  the numbers, it looks like.
23    Q.   (BY MR. RIKLIN)  Yeah.  You wouldn't --
24    A.   Yeah.
25    Q.   -- argue with the math.

Page 227

1    A.   No.
2    Q.   Okay.  Now, with regard to the competitive
3  AWP figures and the Abbott AWP figures, are those the
4  kinds of pricing data contained within the database?
5    A.   Based on my knowledge, I don't think so.  We
6  have kept this kind of data on CHIP system.
7    Q.   I'm talking about the data -- the Alternate
8  Site database.
9    A.   Alternate Site database would have basic AWP
10  information --
11    Q.   Okay.
12    A.   -- not the competitives.
13    Q.   It would have whatever was loaded into the
14  database from the Redbook.
15    A.   Correct.
16    Q.   If you don't --
17    A.   If Redbook has that comparative data, yes, we
18  would have that.
19    Q.   Okay.  And you don't know whether the Redbook
20  information loaded into the database has competitive
21  AWPs or not?
22    A.   I do not have any knowledge.
23    Q.   Okay.  With regard to the Abbott AWP
24  information contained within that exhibit, that is the
25  kind of pricing information contained within the

Page 228

1  database, correct?
2    A.   Correct.
3    Q.   Okay.  And then as far as the spread
4  calculations, those are simply mathematical
5  calculations based upon the competitive AWP and Abbott
6  AWP respective prices?
7         MS. GEISLER:  Objection to the form.
8    Q.   (BY MR. RIKLIN)  Correct?
9    A.   Correct.
10    Q.   Mr. Patel, you mentioned that the Alternate
11  Site database also includes list price information for
12  Abbott's products, correct?
13    A.   Correct.
14    Q.   Do you know the source of that list price
15  data, whether it comes from Alternate Site Contract
16  Marketing or some other source?
17         MS. GEISLER:  Objection to the form.
18    A.   I would not recall.
19    Q.   (BY MR. RIKLIN)  You don't know?
20    A.   I don't know.
21    Q.   All you know is that it's in there.
22    A.   Correct.
23    Q.   All right.  Mr. Patel, I want you to take a
24  look at Exhibit 991.  And that's the one that your
25  attorney has advised us she's not going to allow us to

Page 229

1  ask questions about.  So before you answer any of my
2  questions, give your attorney a chance to make an
3  objection.  Okay?
4    A.   Okay.
5    Q.   And give you appropriate instructions.
6         All right.  You did tell us you prepared
7  Exhibit 991?
8    A.   Correct.
9    Q.   All right.  I want to refer -- direct your
10  attention to Page 4 and I want you to read the last
11  sentence on that page to yourself.
12    A.   The current GVR --
13         MS. GEISLER:  To yourself.  To yourself.
14    A.   Sorry.  Not loud.  (Witness complies).
15    Q.   (BY MR. RIKLIN)  Okay.  And for the record,
16  the sentence I asked you to read is, "The current GVR
17  system (PPD) is not accessing the correct data and not
18  using the correct logic to calculate the AMP's and
19  BP's for HPD."  You wrote that, correct?
20    A.   Correct.
21    Q.   Okay.  Does that sentence refresh your memory
22  about the problem with the then current GVR system?
23         MS. GEISLER:  I'm going to advise
24  Mr. Patel not to answer that question.
25    Q.   (BY MR. RIKLIN)  Okay.  Does that sentence

58 (Pages 226 to 229)

28fb5042-3da4-48e6-8e68-d57fa3affba9

1    suggest to you that the problem involves something
2    more than just returns not being included?
3              MS. GEISLER:  I'm going to advise
4    Mr. Patel not to answer that question.
5         Q.   (BY MR. RIKLIN)  Well, that's what you told
6    us before, right?  That that was the problem, returns
7    not being included, right?  You told us that before?
8              MS. GEISLER:  Go ahead.
9         A.   Yes.
10        Q.   (BY MR. RIKLIN)  Okay.  Was that the only
11   problem with the then current GVR system?
12        A.   I would not recall at this time.
13        Q.   But certainly your memory was fresher at the
14   time you wrote that sentence, right?
15        A.   At that time, correct.
16        Q.   Okay.  That was about seven years ago, right?
17        A.   Correct.
18        Q.   Okay.  And certainly your memory was fresher
19   at the time you prepared this entire document back in
20   May of 2000, right?
21        A.   Correct.
22        Q.   Than it is today, correct?
23        A.   Yes.
24             MR. RIKLIN:  I believe that's all I have
25   at this time.  Thanks, Mr. Patel.

1              THE VIDEOGRAPHER:  Any other questions?
2              MS. ST. PETER-GRIFFITH:  Hold on just a
3    second.
4              MR. RIKLIN:  Of course, we're -- we're
5    also reserving the right to come back and ask
6    questions regarding Exhibit 991 after the issue of the
7    claimed privilege is -- is resolved or adjudicated.
8              That's all I have.
9              MS. ST. PETER-GRIFFITH:  Carol, do you
10   have anything?
11             MS. GEISLER:  No.
12             MR. STUART:  And we have no questions.
13   Again -- but, again, we also reserve the same right as
14   the Department of Justice, the Relator, and also we
15   have several discovery disputes that are outstanding
16   and we'll reserve under those -- under those as well.
17             THE VIDEOGRAPHER:  This marks the end of
18   Videotape Number 4, Volume 1.  This is the conclusion
19   of today's deposition.  The time is now 3:26 p.m.  We
20   are off the record.
21
22             (Deposition adjourned at 3:26 p.m.)
23
24
25

1                 CHANGES AND SIGNATURE
2    PAGE    LINE        CHANGE          REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        I, SHIRISH PATEL, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6                      SHIRISH PATEL
7
8
9    THE STATE OF                  )
10   COUNTY OF                     )
11      Before me,                   , on this day
12   personally appeared SHIRISH PATEL, known to me (or
13   proved to me under oath or through
14                    ) (description of identity
15   card or other document) to be the person whose name is
16   subscribed to the foregoing instrument and
17   acknowledged to me that they executed the same for the
18   purposes and consideration therein expressed.
19      Given under my hand and seal of office this
20        day of                , 2007.
21
22
23
24                      NOTARY PUBLIC IN AND FOR
25                      THE STATE OF

Page 234

```
 1   STATE OF TEXAS  )
 2   COUNTY OF TRAVIS )
 3
 4
 5        I, CYNTHIA VOHLKEN, CSR #1059, do hereby
 6   certify that, pursuant to the agreement hereinabove
 7   set forth, there came before me on the 13th day of
 8   June, 2007, at 10:05 o'clock a.m., in the offices of
 9   Jones Day, 77 W. Wacker, Suite 3500, Chicago,
10   Illinois, the following named person, to-wit:  SHIRISH
11   PATEL, who was by me duly sworn to testify to the
12   truth and nothing but the truth of witness' knowledge
13   touching and concerning the matters in controversy in
14   this cause; that such witness was thereupon examined
15   under oath, and the examination transcribed by
16   computer-assisted transcription by me or under my
17   supervision, and that the deposition is a true record
18   of the testimony given by the witness.
19        I further certify that I am neither attorney
20   nor counsel for, nor related to or employed by, any of
21   the parties to the action in which this deposition is
22   taken and, further, that I am not a relative or
23   employee of any attorney or counsel employed by the
24   parties hereto, or financially interested in the
25   action.
```

Page 235

```
 1        That the amount of time used by each party at
 2   the deposition is as follows:
 3        Mr. Raymond Winter - 03:04
 4        Ms. Ann St. Peter-Griffith - 01:09
 5        Mr. Rand Riklin - 00:16
 6
 7        IN WITNESS WHEREOF I have hereunto set my
 8   hand on this 26th day of June, A.D. 2007.
 9
10
11
12
13        Cynthia Vohlken, Texas CSR 1059
          Expiration Date: 12/31/2008
14        Firm Registration No. 82
          Fredericks-Carroll Reporting
15        7800 Shoal Creek Boulevard
          Suite 200 W
16        Austin, Texas 78757
          Telephone: (512) 477-9911
17                   (800) 234-3376
          Fax:       (512) 345-1417
18
     JOB NO. 2459
19
20
21
22
23
24
25
```

Page 236

```
 1           NO. D-1-GV-04-001286
     THE STATE OF TEXAS      ) IN THE DISTRICT COURT
 2                           )
     ex rel.                 )
 3     VEN-A-CARE OF THE     )
       FLORIDA KEYS, INC.,   )
 4        Plaintiffs,        )
                             )
 5   VS.                     ) TRAVIS COUNTY, TEXAS
                             )
 6   ABBOTT LABORATORIES INC.,  )
     ABBOTT LABORATORIES,    )
 7   HOSPIRA, INC., and B. BRAUN )
     MEDICAL INC.,           )
 8        Defendant(s).      ) 201ST JUDICIAL DISTRICT
 9
               REPORTER'S CERTIFICATION
10           DEPOSITION OF SHIRISH PATEL
                   June 13, 2007
11
12        I, Cynthia Vohlken, Certified Shorthand Reporter
13   in and for the State of Texas, hereby certify to the
14   following:
15        That the witness, SHIRISH PATEL, was duly sworn by
16   the officer and that the transcript of the oral
17   deposition is a true record of the testimony given by
18   the witness;
19        That the deposition transcript was submitted on
20   June 26, 2007, to the witness or to the attorney for
21   the witness for examination, signature and return to
22   me by July 20, 2007;
23
24
25
```

Page 237

```
 1        That the amount of time used by each party at the
 2   deposition is as follows:
 3        Mr. Raymond Winter - 03:04
          Ms. Ann St. Peter-Griffith - 01:09
 4        Mr. Rand Riklin - 00:16
 5        That pursuant to information given to the
 6   deposition officer at the time said testimony was
 7   taken, the following includes counsel for all parties
 8   of record:
 9        MR. RAYMOND WINTER,
            Attorney for Plaintiff State of Texas;
10        MR. RAND RIKLIN,
            Attorney for the Relator;
11        MS. CAROL GEISLER,
            Attorney for Defendants Abbott
12          Laboratories, Inc. and Hospira, Inc.
          MS. ANN M. ST. PETER-GRIFFITH,
13          Attorney for Plaintiff United States of
            America
14        MR. CHRISTOPHER STUART,
            Attorney for Plaintiff State of Arizona
15          and MDL Plaintiffs
          MR. STEVEN U. ROSS, Attorney for
16          Plaintiff State of California
17        I further certify that I am neither counsel for,
18   related to, nor employed by any of the parties or
19   attorneys in the actions in which this proceeding was
20   taken, and further that I am not financially or
21   otherwise interested in the outcome of the action.
22        Further certification requirements pursuant to
23   Rule 203 of TRCP will be certified to after they have
24   occurred.
25
```

60 (Pages 234 to 237)

28fb5042-3da4-48e6-8e68-d57fa3affba9

Page 238

```
 1      Certified to by me this 26th day of June, 2007.
 2
 3
 4
 5
              Cynthia Vohlken, Texas CSR 1059
 6            Expiration Date:  12/31/2008
              Firm Registration No. 82
 7            Fredericks-Carroll Reporting
              7719 Wood Hollow Drive, Suite 156
 8            Austin, Texas 78731
              Telephone: (512) 477-9911
 9                   (800) 234-3376
              Fax:    (512) 345-1417
10
11    JOB NO. 2459
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 239

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2      The original deposition was/was not returned to
 3    the deposition officer on          , 2007;
 4      If returned, the attached Changes and Signature
 5    page contains any changes and the reasons therefor;
 6      If returned, the original deposition was delivered
 7    to Mr. Raymond Winter, Custodial Attorney;
 8      That $      is the deposition officer's
 9    charges to the Plaintiff(s) for preparing the original
10    deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12    with Rule 203.3, and that a copy of this certificate
13    was served on all parties shown herein on and filed
14    with the Clerk.
15      Certified to by me this      day of
16          , 2007.
17
18
19
              Cynthia Vohlken, Texas CSR 1059
20            Expiration Date:  12/31/2008
              Firm Registration No. 82
21            Fredericks-Carroll Reporting
              7719 Wood Hollow Drive, Suite 156
22            Austin, Texas 78731
              Telephone: (512) 477-9911
23                   (800) 234-3376
              Fax:    (512) 345-1417
24    JOB NO. 2459
25
```

61 (Pages 238 to 239)

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

28fb5042-3da4-48e6-8e68-d57fa3affba9