# Exhibit 110

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 1

                UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - -x

In re:  PHARMACEUTICALS INDUSTRY : MDL No. 1456

AVERAGE WHOLESALE PRICE          : Civil Action No.

LITIGATION                       : 01-12257-PBS

_____ :

                                 :

THIS DOCUMENT RELATES TO:        : Judge Patti B.

                                 :    Saris

United States of America, ex     :

rel. Ven-a-Care of the Florida   : Magistrate Judge

Keys, Inc.,                      :   Marianne B.

CIVIL ACTION NO. 06-11337-PBS    :   Bowler

- - - - - - - - - - - - - - - -x

                        Washington, D.C.

                        Thursday, August 30, 2007

   HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

           Videotaped Deposition of ROSEMARY HAAS, a

witness herein, called for examination by counsel

for the United States of America in the

                Henderson Legal Services
                      202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                             August 30, 2007
                          Washington, DC

|  | Page 2 |
|---|---|
| 1 | above-entitled matter, pursuant to notice, the |
| 2 | witness being duly sworn by KAREN YOUNG, a Notary |
| 3 | Public in and for the District of Columbia, taken at |
| 4 | the offices of Jones Day, 51 Louisiana Avenue, |
| 5 | Northwest, Washington, D.C., at 9:05 a.m. on |
| 6 | Thursday, August 30, 2007, and the proceedings being |
| 7 | taken down by Stenotype by KAREN YOUNG, and |
| 8 | transcribed under her direction. |
| 9 | |
| 10 | APPEARANCES: |
| 11 | |
| 12 | On Behalf of the Class Plaintiffs in the State |
| 13 | of Arizona: |
| 14 | |
| 15 | JENNIFER FOUNTAIN CONNOLLY, ESQ. |
| 16 | Wexler Toriseva Wallace |
| 17 | 55 West Monroe Street |
| 18 | Suite 3300 |
| 19 | Chicago, Illinois 60603 |
| 20 | jfc@wtwlaw.com |
| 21 | (312) 346-2222 |
| 22 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | On Behalf of the United States of America: |
| 3 | GEJAA T. GOBENA, ESQ. |
| 4 | JENNIFER CHORPENING, ESQ. |
| 5 | U.S. Department of Justice |
| 6 | Civil Division |
| 7 | Commercial Litigation - Fraud Section |
| 8 | 601 D Street, Northwest |
| 9 | PHB - 9028 / P.O. Box 261 |
| 10 | Washington, D.C. 20044 |
| 11 | Gejaa.Gobena@usdoj.gov |
| 12 | (202) 307-1088 |
| 13 | |
| 14 | On Behalf of the State of California: |
| 15 | NICHOLAS N. PAUL, ESQ. |
| 16 | Bureau of Medical Fraud & Elder Abuse |
| 17 | Civil Prosecutions Unit |
| 18 | P.O. Box 85266 |
| 19 | 110 West A Street, #1100 |
| 20 | San Diego, California 92186 |
| 21 | nichols.paul@doj.ca.gov |
| 22 | (619) 688-6099 |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES: |
| 2 | On Behalf of Ven-a-Care of the Florida Keys, |
| 3 | Inc.: |
| 4 | RAND J. RIKLIN, ESQ. |
| 5 | Goode Casseb Jones Riklin Choate & Watson |
| 6 | 2122 North Main Avenue |
| 7 | Post Office Box 120480 |
| 8 | San Antonio, Texas 78212 |
| 9 | riklin@goodelaw.com |
| 10 | (210) 733-6030 |
| 11 | |
| 12 | On Behalf of Abbott Laboratories: |
| 13 | TINA M. TABACCHI, ESQ. |
| 14 | Jones Day |
| 15 | 77 West Wacker |
| 16 | Chicago, IL 60601-1692 |
| 17 | TMTABACCHI@JONESDAY.COM |
| 18 | (312) 269-4081 |
| 19 | |
| 20 | ALSO PRESENT: |
| 21 | Shelly Sanders Kreider, Videographer |
| 22 | |

|  | Page 5 |
|---|---|
| 1 | C O N T E N T S |
| 2 | THE WITNESS: |
| 3 | ROSEMARY HAAS |
| 4 | By Mr. Gobena ...................... 8 |
| 5 | By Mr. Riklin .................... 262 |
| 6 | By Mr. Paul ...................... 332 |
| 7 | By Ms. Tabacchi .................. 340 |
| 8 | By Mr. Paul ...................... 340 |
| 9 | |
| 10 | E X H I B I T S |
| 11 | EXHIBIT NO.                        PAGE NO. |
| 12 | Plaintiff's Exhibit 1350  Federal Register, 6/5/91 ................. 20 |
| 13 | Plaintiff's Exhibit 1351  Medicare Working Group Meeting ..........108 |
| 14 |     Minutes, 3/6/97 |
| 15 | Plaintiff's Exhibit 1352  Handwritten note, ABT-DOJ 295986 ........ 119 |
| 16 | Plaintiff's Exhibit 1353  Landside memo to Taylor, 8/21/97 ....... 124 |
| 17 | Plaintiff's Exhibit 1354  Landside memo to de Lasa, 11/7/97 ...... 125 |
| 18 | Plaintiff's Exhibit 1355  Haas memo to Luniak, 11/19/97 .......... 127 |
| 19 | Plaintiff's Exhibit 1356  Article from the Pink Sheet, 4/10/00 .... 138 |
| 20 | Plaintiff's Exhibit 1357  Handwritten Notes, ABT-DOJ 296395 ....... 138 |
| 21 | Plaintiff's Exhibit 1358  Handwritten Notes, 5/3/00 ............... 147 |
| 22 | Plaintiff's Exhibit 1359  Article from the Pink Sheet, 6/5/00 .... 175 |

                    Henderson Legal Services
                        202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
Washington, DC

---

**Page 6**

E X H I B I T S

EXHIBIT NO.                                    PAGE NO.

Plaintiff's Exhibit 1360   HCFA Program Memoranda ................... 181
Plaintiff's Exhibit 1361   Parver memo to NAIT Members, 9/19/00 .... 189
Plaintiff's Exhibit 1362   Haas memo to Barmak, 10/27/00 ........... 206
Plaintiff's Exhibit 1363   Stark letter to White, 10/31/00 ......... 212
Plaintiff's Exhibit 1364   Program Memorandum, 11/17/00 ........... 219
Plaintiff's Exhibit 1365   Haas e-mail to Johnson, 11/22/00 ........ 222
Plaintiff's Exhibit 1366   Landside fax to Schumacher, 1/4/01 ..... 236
Plaintiff's Exhibit 1367   Leavenworth e-mail to Haas, 8/28/01 ..... 249
Plaintiff's Exhibit 1368   Leavenworth e-mail to Witenstein, ...... 254
                           8/27/02
Plaintiff's Exhibit 1369   Abbott Position on Medicare Reform ..... 288
                           Key Participants
Plaintiff's Exhibit 1370   Handwritten Notes, ABT-DOJ 296822 ....... 300
Plaintiff's Exhibit 1371   Haas e-mail to Mershimer and Lane, ..... 308
                           11/27/02
Plaintiff's Exhibit 1372   Haas e-mail to Mershimer, 11/27/02 ...... 316
Plaintiff's Exhibit 1373   Patel e-mail to Schroeder et al., ...... 319
                           12/9/02

                           - - -

---

**Page 7**

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here marks the beginning of Videotape Number 1 in the deposition of Rosemary Haas, taken by counsels for the plaintiff in the matter in re Pharmaceutical Industry Average Wholesale Price Litigation, in the United States District Court, District of Massachusetts, MDL Number 1456, Civil Action Number 01-12257-PBS, held at the offices of Jones Day, 51 Louisiana Avenue, Northwest, Washington, D.C., on August 30th, 2007. The time indicated on the video screen, the time on the screen is 9:05:42.

My name is Shelly Sanders Kreider, and I am the certified legal video specialist operating the equipment today.  The court reporter is Karen Young.  We are employed by Henderson Legal Services. Counsel will now introduce themselves and the parties they represent.

MR. GOBENA:  Gejaa Gobena, Department of Justice, on behalf of the United States.

MS. CHORPENING:  Jennifer Chorpening, Department of Justice.

---

**Page 8**

MR. RIKLIN:  Rand Riklin on behalf of the relater, Ven-a-Care of the Florida Keys, Inc.

MS. CONNOLLY:  Jennifer Connolly, Wexler Toriseva, Wallace, on behalf of the class plaintiffs in the state of Arizona.

MR. PAUL:  Nicholas Paul, California Department of Justice, for California.

MS. TABACCHI:  Tina Tabacchi on behalf of Abbott Laboratories.  At this time we assert an objection to the notice of the class plaintiffs as untimely.

THE VIDEOGRAPHER:  You're on the record. Whereupon,

ROSEMARY HAAS,
called for examination by counsel for The United States of America and having been duly sworn by the Notary Public, was examined and testified as follows:
- - -
EXAMINATION BY COUNSEL FOR
THE UNITED STATES OF AMERICA
BY MR. GOBENA:

---

**Page 9**

Q.   Good morning, Ms. Haas.  As I mentioned earlier, my name is Gejaa Gobena.  I'm a trial attorney with the United States Department of Justice, and you're here this morning to give testimony in several cases, one of which is United States ex rel. Ven-a-Care of the Florida Keys versus Abbott Labs.  Have you ever had your deposition taken before?

A.   Yes.

Q.   Could you describe to us the circumstances in which you had that deposition taken?

A.   It was a personal matter related to some real estate that my husband and I were involved in. This was about ten years ago.

Q.   I see.  So you probably were given some instructions then as to how to respond to questions, but I want to start off by giving you a few instructions here so that we can have the deposition go smoothly this morning.  The first thing is that the most important rule for today is for you to give audible responses.  If you gesture or you give ambiguous answers like uh-huh or things like that,

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                     Washington, DC

Page 10

1  it doesn't make for a clear record and it won't be
2  clear to anyone reading the transcript as to what
3  exactly --
4      A.   Yes.
5      Q.   -- that you're trying to communicate, so
6  if you'd begin with that, that would be great.
7  Secondly, although you might be able to anticipate
8  where I'm going with a question, it's important that
9  you let me finish the question first, and in fact,
10  not only let me finish the question, but pause,
11  because that way we won't have us talking over each
12  other, and it also gives your counsel a chance to
13  interpose any objections she may have to the
14  question.  Third is that we're trying to get factual
15  testimony here and I want to make sure that we're on
16  the same page when it comes to a question I ask and
17  an answer that you're providing, so for any reason
18  you need clarification about a question, don't
19  hesitate to ask me.
20      A.   Uh-huh.
21      Q.   And finally, let me ask you whether or not
22  you have any medical conditions or you're on any

Page 11

1  medication that you think might impair --
2      A.   No.
3      Q.   -- your ability to give --
4      A.   No.
5      Q.   -- deposition testimony today.  You talked
6  over me.  You knew where I was going there.  I'm
7  sure we'll get better at that along the way.
8      A.   I'll keep practicing.  I'll be perfect by
9  the end of the day.
10      Q.   Super.  Let's start first by getting some
11  background.  Could you describe your post high
12  school education to us please?
13      A.   Graduate of Georgetown University in 1982.
14      Q.   And what was your degree in?
15      A.   Philosophy.
16      Q.   And did you have any further education
17  beyond getting your bachelor's from Georgetown?
18      A.   No.
19      Q.   And after graduating from Georgetown, what
20  was the first job you had?
21      A.   I went to work at Van Ness Feldman, a law
22  firm in Georgetown, as a paralegal.

Page 12

1      Q.   Were you assigned to a particular
2  department within Van Ness Feldman?
3      A.   Business development.
4      Q.   And what did your job duties entail in
5  business development at --
6      A.   Legislative monitoring, political
7  monitoring, political activities and providing
8  advice on PAC contributions.
9      Q.   So in essence, the business development
10  group at Van Ness Feldman engaged in lobbying
11  activities?
12      A.   Yes.
13      Q.   Do you recall any particular issues in
14  which you -- that you worked on when you were
15  working in the business development group at Van
16  Ness Feldman?
17      A.   Vaguely.
18      THE VIDEOGRAPHER:  I'm sorry.  We just
19  heard somebody's blackberry.  If we could -- if I
20  get an interruption in the audio, I will interrupt
21  just like I did because we can't hear.  I'm terribly
22  sorry.

Page 13

1      BY MR. GOBENA:
2      Q.   No problem.  I believe before the
3  blackberry went off and disrupted the audio, you
4  said that you had -- you vaguely remember some of
5  the issues --
6      A.   Uh-huh.
7      Q.   -- that you worked on at Van Ness Feldman
8  when you were in the business development group as a
9  paralegal.  Could you describe even your vague
10  recollection of what those activities were?
11      A.   There was a client that had an interest in
12  the government implementing a program that had been
13  authorized, and the interest was to fund it, and it
14  had to do with solar energy.
15      MS. TABACCHI:  I'm just going to caution
16  the witness not to reveal any privileged
17  communications between her former employee --
18  employer and the clients of those employers.  I'm
19  sure that's not your intention, but I don't want
20  there to be an inadvertent waiver of any other
21  privilege.
22      BY MR. GOBENA:

                                    4 (Pages 10 to 13)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                        August 30, 2007
                          Washington, DC

Page 14

1    Q.   That's an important point is that today,
2  when I ask you questions, I'm not trying to get into
3  conversations you had with counsel or whether -- you
4  know, conversations that involved, you know -- you
5  know, clients and your former law firm or anything
6  like that.
7    A.   Yes.
8    Q.   Okay.  When you were working at Van Ness
9  Feldman, did you do any work related to health care?
10   A.   No.
11   Q.   And from approximately when to when did
12 you work at Van Ness Feldman?
13   A.   It's a very short time.  I would say 1982
14 until the end of 1982.
15   Q.   And where did you go after leaving the
16 employ of Van Ness Feldman?
17   A.   I worked for a temporary agency that
18 placed me at various law firms as either a paralegal
19 or a legal secretary.
20   Q.   At some point did you -- after you worked
21 at this temp agency, did you gain permanent
22 employment somewhere?

Page 15

1    A.   Yes.
2    Q.   And where was that that you were employed
3  after working at the --
4    A.   Abbott Laboratories.
5    Q.   And approximately when were you hired by
6  Abbott Laboratories?
7    A.   1984.
8    Q.   And what position were you hired into?
9    A.   I was hired as a secretary.
10   Q.   And where did you work when you started at
11 Abbott Labs as a secretary?
12   A.   In the Washington, D.C. office.
13   Q.   And were you hired to act as a secretary
14 for a particular group within the Washington, D.C.
15 office?
16   A.   It was a small office, and I was federal
17 government affairs.
18   Q.   And what were your general job
19 responsibilities as a secretary?
20   A.   As a secretary, helping with memos, making
21 appointments, travel arrangements, answering the
22 telephone, some monitoring of legislation.

Page 16

1    Q.   Do you recall any of the legislation that
2  you monitored during this time period when you were
3  a secretary at Abbott?
4    A.   At that time period, no, I do not recall.
5    Q.   And at some point you were promoted from
6  being a secretary, correct?
7    A.   Yes.
8    Q.   Okay, and when did that happen?
9    A.   I wouldn't say there was a point at which
10 I was promoted.  It was a metamorphosis over a
11 period of years.  There wasn't a clear line of
12 demarcation.  I could say by the early '90s, I was
13 no longer doing secretarial work.
14   Q.   And what was your next title after you
15 were a secretary?  Did you get a new job title?
16   A.   I believe -- I believe it was Washington
17 representative.
18   Q.   And it's your recollection that you
19 obtained that new title sometime in the early '90s?
20   A.   Yes.
21   Q.   You mentioned that there was a sort of
22 metamorphosis in terms of your job responsibilities.

Page 17

1  Could you describe that process in terms of how your
2  job responsibilities changed during that time period
3  when you went from being a secretary to a Washington
4  representative for Abbott?
5    A.   My responsibilities evolved more towards
6  monitoring on a more regular basis legislation and
7  providing informational updates to my office and to
8  people that were interested in the issues that were
9  before the Congress.
10   Q.   You mentioned monitoring legislation.  Did
11 you also monitor any developments in the regulatory
12 arena?
13       MS. TABACCHI:  Object to the form.
14   A.   No.
15   Q.   So there were developments -- if
16 Department of Health and Human Services, for
17 example, was proposing regulatory changes or new
18 rules, it wasn't within your job responsibility to
19 -- to track those potential changes as it may affect
20 Abbott?
21   A.   No.
22   Q.   In this sort of period of the late '80s to

5 (Pages 14 to 17)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 18

1  the early '90s, who would have been within your
2  office that would have had responsibility for
3  tracking rule changes that were proposed by the
4  Department of Health and Human Services?
5       MR. GOBENA: Object to the form.
6       BY MR. GOBENA:
7    Q.  You can answer.
8    A.  I can answer? I would say that our office
9  at that time did not engage in following the
10  regulatory activities at the Department of Health
11  and Human Services.
12       MR. GOBENA: I'm going to have the first
13  exhibit marked for today. I don't know exactly
14  where we are in the sequential number of exhibits in
15  this case. There are multiple depositions over the
16  past couple of days, so --
17       MS. TABACCHI: Pick a number.
18       MR. GOBENA: Yeah, I guess I could pick a
19  number. Why don't we say -- I can't remember, are
20  we -- are the defendants doing odds and evens in
21  terms of the numbers? Does anyone know?
22       MR. RIKLIN: We were in the 1100s.

Page 19

1       MS. TABACCHI: We were in the 1100s.
2       MR. RIKLIN: So you all are in the 1200s,
3  right? But does it make any difference if Texas
4  isn't here? In a couple of depositions recently
5  when Texas wasn't there, last week in Chicago, we --
6  we did Weibking 1 -- who was the other -- the name
7  escapes me. Mershimer. Mershimer 1 et cetera,
8  because Texas wasn't --
9       MS. TABACCHI: It's confusing when we have
10  two exhibits with the same number.
11       MR. GOBENA: Yeah, I think that's right.
12       MS. TABACCHI: Start with 1300, or I don't
13  care.
14       MR. GOBENA: We used 1300 on Tuesday, so
15  -- and we ended through 1311, so to be on the safe
16  side, I don't know if they went from 1300 up or not
17  yesterday. Let's say 1350, and then if there's some
18  problems later on, we can always correct the exhibit
19  numbers to --
20       MS. TABACCHI: I'm sure that will be fine.
21       MR. GOBENA: Okay. So can we have this
22  marked as 1350, and it's probably already been

Page 20

1  marked in this case but I understand redundancy is
2  probably a good thing to mark it anyways.
3            (Plaintiff's Exhibit 1350
4                  was marked for
5                  identification.)
6       BY MR. GOBENA:
7    Q.  Ms. Haas, I'm not going to ask you about
8  the whole document. I'm just going to ask you about
9  some portions of it real quickly. If you could just
10  turn to the second page, you'll see about a fifth of
11  the way down on the column on the left of Plaintiff's
12  Exhibit 1350 there's -- it says "Action, proposed
13  rule." Do you see that there?
14    A.  Which column?
15    Q.  The column on the left, the first column?
16    A.  Uh-huh.
17    Q.  About a fifth of the way down above
18  summary, you'll see there's a line there, it reads
19  action and proposed rule. Do you see that there?
20    A.  Actually, no. Oh, yes, I see it, action,
21  proposed rule. Then there's a summary.
22    Q.  Right. And at the top, you can see that

Page 21

1  there's an indication that this is something that
2  was being published in the Federal Register on June
3  5th, 1991. Do you see that there?
4    A.  Yes.
5    Q.  Okay. I want to turn your attention now
6  to the page that's marked ABT006-0726, and I'm going
7  to turn your attention to the third column on that
8  page all the way to the right.
9    A.  Uh-huh.
10    Q.  And there's a -- the column begins in the
11  middle of a paragraph, and I'm going to direct your
12  attention to the sentence that reads, "Also" -- it's
13  about halfway into that continued paragraph there?
14    A.  Uh-huh. You mean the second paragraph on
15  the --
16    Q.  Yeah.
17    A.  -- column, okay.
18    Q.  Well, it's actually -- the continuation --
19  yeah, I'll read it and see if you can find it. It's
20  on the right side about a fifth of the way down.
21  "Also, we are proposing that we will instruct all
22  carriers to base payments for drugs on 85 percent of

                                    6 (Pages 18 to 21)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                        August 30, 2007
                        Washington, DC

Page 22

1   the national average wholesale price of the drug as
2   published in the Redbook and similar price listings,
3   but we also welcome" -- "but we welcome comments
4   regarding the appropriate discount." Do you see
5   that there?
6       A.   Yes.
7       Q.   During your time working in the government
8   affairs office for Abbott -- and you were there in
9   the early '90s, correct?
10      A.   Uh-huh.
11      Q.   Do you recall being made aware of a
12  proposed rule change that was going to discount --
13  or sorry, set government reimbursements for Part B
14  drugs at 85 percent of AWP?
15          MS. TABACCHI:  Object to the form.
16      A.   No.
17      Q.   So you've never seen -- you were never
18  aware of this proposed rule change in 1991?
19      A.   No.
20      Q.   This exhibit I'm about to hand you,
21  Ms. Haas, has already been marked in this case as
22  Exhibit 903, so we don't need it marked by the court

Page 23

1   reporter.  Sorry.  Yeah, that's the right one.  I
2   just want you to take a moment to look over this
3   memorandum with the Bates number ABT 212051.
4       A.   Uh-huh.
5       Q.   Have you had a chance to look at it?
6       A.   Yes.
7       Q.   Have you ever seen this memorandum before?
8       A.   No.
9       Q.   Let me just ask you briefly about some of
10  the people though on it.  At the top right corner
11  there, you'll see the memorandum's from Virginia
12  Tobiason, manager of reimbursement.  Do you know
13  Ms. Tobiason?
14      A.   Yes.
15      Q.   And have you had opportunity to work with
16  Ms. Tobiason over the years that you've been at
17  Abbott?
18      A.   Yes.
19      Q.   And it says here that she's manager for
20  reimbursement.  Did you see that there?
21      A.   Yes.
22      Q.   Is it your recollection that about this

Page 24

1   time, the early '90s, that that was her job
2   responsibility at Abbott?
3           MS. TABACCHI:  Object to the form.
4       A.   I couldn't comment on her exact job
5   responsibilities at that time.  She held a number of
6   positions.
7       Q.   But over the years at Abbott, she's held
8   positions that relate to her being responsible for
9   --
10      A.   Yes.
11      Q.   -- tracking reimbursement issues, correct?
12  You can answer.
13          MS. TABACCHI:  Object to the form and I'd
14  like to remind the witness that it's important to
15  allow Mr. Gobena to complete his question before you
16  begin to respond.
17          BY MR. GOBENA:
18      Q.   Would you consider Ms. Tobiason to be an
19  in-house expert at Abbott about reimbursement
20  issues?
21          MS. TABACCHI:  Object to the form.
22      A.   Yes.

Page 25

1       Q.   And if you go to the first paragraph there
2   -- actually, strike that.  Let me go ahead and ask
3   you about these people in the "to" line here real
4   quickly.  It says the memorandum's to several
5   people, including B. Dempsey.  Do you have any idea
6   who B. Dempsey might be?
7       A.   Yes.
8       Q.   Who would it be?
9       A.   Bill Dempsey.
10      Q.   And do you have an idea what Bill
11  Dempsey's position was around this time period?
12      A.   No.
13      Q.   Do you know what division at Abbott he
14  worked at?
15      A.   At that time, no.
16      Q.   Well, what's your earliest recollection as
17  to -- give me your earliest recollection as to a
18  position that Mr. Dempsey held at Abbott and the
19  approximate time frame he held it.
20          MS. TABACCHI:  Object to the form.
21      A.   Senior-level positions within the
22  pharmaceutical division, and that would have been in

                                    7 (Pages 22 to 25)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 26

1  the last seven years that my recollection is of
2  that.
3      Q.   And when you say the pharmaceutical
4  division, are you talking about the Pharmaceutical
5  Products Division?
6      A.   Yes.
7      Q.   And there's also an M. Heggie there.  Do
8  you know what that -- who that be referring
9  to?
10     A.   Yes.
11     Q.   Is that Michael Heggie?
12     A.   Yes.
13     Q.   And do you know -- does Michael Heggie
14 still work at Abbott?
15     A.   I don't believe so.
16     Q.   Do you recall approximately the earliest
17 time period in which you had a chance to work with
18 Mr. Heggie on any issues?
19         MS. TABACCHI:  Object to the form.
20     A.   I don't recall the time period.
21     Q.   Do you recall any job titles that
22 Mr. Heggie held at Abbott?

Page 27

1      A.   I don't recall his job titles.
2      Q.   Do you recall the areas of -- types of
3  issues that you worked on with Mr. Heggie?
4          MS. TABACCHI:  Object to the form.
5      A.   I didn't work on any job -- on any issues
6  with Mr. Heggie.
7      Q.   Okay.  Did you ever talk to Mr. Heggie
8  about any topics while at Abbott?
9          MS. TABACCHI:  Object to the form.
10     A.   I don't recall.
11     Q.   So you don't recall any conversations you
12 had with Mr. Heggie at any time period.
13         MS. TABACCHI:  Object to the form.
14     A.   I had conversations with Mr. Heggie, but I
15 can't recall what the issue was.
16     Q.   Do you have any recollection whether or
17 not the conversations related in any way to any
18 legislation that was pending in Congress as it may
19 affect Abbott?
20         MS. TABACCHI:  Object to the form.
21     A.   It's possible, but I don't recall.
22     Q.   We'll look at some documents later on that

Page 28

1  may refresh your recollection.  There's also listed
2  an M. King.  Do you know who that might be a
3  reference to?
4      A.   No.
5      Q.   And a D. Robertson, do you see that there?
6      A.   Uh-huh.
7      Q.   Do you know who that might be a reference
8  to?
9      A.   No.
10     Q.   Did you know a Don Robertson who worked at
11 Abbott Laboratories at some point during your tenure
12 there?
13     A.   The name sounds familiar but I didn't know
14 him.
15     Q.   There's also a J. Ward listed there.  Do
16 you know who that might be a reference to?
17     A.   No.
18     Q.   Did you ever have an opportunity to become
19 acquainted with a John Ward during your time period
20 at Abbott?
21     A.   No.
22     Q.   If you go to the first paragraph there of

Page 29

1  Exhibit 903, it reads, "On June 5th, HCFA published
2  the proposed rule on physician payment reform."
3  Before I go any further, Ms. Haas, do you understand
4  what that HCFA might be a reference to there?
5      A.   Yes.
6      Q.   That would be the Health Care Finance
7  Administration, correct?
8      A.   Yes.
9      Q.   And that's the entity within the
10 Department of Health and Human Services that
11 administers the Medicaid and Medicare programs,
12 correct?
13     A.   Yes.
14     Q.   Let's continue on here.  It says, "This
15 rule included a proposal to lower the payment for
16 drugs," quote, "incident to," unquote, "a
17 physician's services to average wholesale price
18 minus 15 percent."  Do you see that there?
19     A.   Yes.
20     Q.   Okay, and you recall the last exhibit we
21 looked at, Plaintiff's Exhibit 1350, was a proposed
22 rule that discussed lowering the reimbursement for

                                    8 (Pages 26 to 29)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 30

1  Part B drugs to 85 percent of AWP.  Do you recall
2  that?
3      A.   Yes.
4      Q.   And then if you go on further down in this
5  memorandum, there's a subsection titled "Major
6  Issues."  Do you see that there?
7      A.   Yes.
8      Q.   And I'm not going to go over every single
9  one of them, but there's a variety of issues there
10 that are listed by Ms. Tobiason.  Do you see that
11 there?
12     A.   Yes.
13     Q.   Do you have any knowledge as to whether or
14 not the issues that are listed there, and take a
15 moment if you need to to look at them, were
16 discussed within the government affairs department
17 in approximately June of 1991?
18     A.   I don't have any knowledge of these being
19 discussed in government affairs.
20     Q.   Is it your understanding that perhaps
21 during this time period, that when it came to
22 regulations that were being promulgated by the

Page 31

1  Department of Health and Human Services, that any
2  tracking or analysis of them were done by individual
3  business units within Abbott Laboratories?
4          MS. TABACCHI:  Object to the form.
5          BY MR. GOBENA:
6      Q.   And do you understand what I mean by the
7  business units?
8      A.   Yes.  I'm not sure.
9      Q.   And did you know that at some point,
10 Ms. Tobiason worked in the business unit within
11 Abbott called the Hospital Products Division?
12     A.   Yes.
13     Q.   All right.  Now, you mentioned that you --
14 in the early '90s, you transitioned into a
15 Washington rep --
16     A.   Uh-huh.
17     Q.   -- on behalf of Abbott; is that correct?
18     A.   Yes.
19     Q.   And what were your -- were there any
20 changes relating to your job responsibilities?  You
21 talked about the metamorphosis of the job
22 responsibilities over time, but can you give me

Page 32

1  specifically what your responsibilities were once
2  you held that title of Washington rep for Abbott?
3      A.   It involved more engagement outside of the
4  office with our trade associations and representing
5  in business meetings and more closely monitoring
6  legislative activities and providing reports on
7  those.  I also had some legislative responsibility
8  for environmental issues.
9      Q.   And did your job title change at any point
10 after you became a Washington representative for
11 Abbott?
12     A.   Yes.
13     Q.   And what was your next sort of job title
14 that you got?
15     A.   My recollection was it was manager of
16 government affairs.
17     Q.   And approximately when did you get
18 promoted -- that was a promotion, right?
19     A.   Yes.  It's difficult to say.  As I say,
20 there wasn't a clear line of demarcation, and I can
21 say that my duties didn't change significantly from
22 one position to the next; more that it evolved over

Page 33

1  time.
2      Q.   So there was a further evolution from --
3  in your job responsibilities from when you were a
4  Washington rep to now I guess a manager --
5      A.   Uh-huh.
6      Q.   -- for Washington affairs?  Was that the
7  title?
8      A.   I don't recall.
9      Q.   It was a manager within the Washington
10 office?
11     A.   It was basically a way to get a promotion.
12     Q.   I see.
13     A.   The title really didn't matter.
14     Q.   Could you describe the evolution of your
15 job responsibilities as you transitioned to a
16 manager within the Washington affairs office?
17     A.   As I said, I took on more responsibility
18 for representing the company at -- inside Washington
19 meetings, with trade associations and business
20 groups and more interaction with Capitol Hill.
21     Q.   So now that you're -- I'm sorry.  When you
22 became a manager for Washington affairs, is that the

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 34

1   first time you started interacting with members of
2   Congress or their staffers?
3       A.   No.
4       Q.   So prior to becoming a manager, you had
5   had that interaction with members of Congress or
6   their staffers?
7       A.   Yes.
8       Q.   Do you recall -- I'm sorry.  Let's
9   continue on with your -- I guess your C.V. in effect
10  and close the loop there.  Did your job title change
11  after you became the manager -- a manager for
12  Washington affairs in --
13      A.   Yes.
14      Q.   Okay, and what new job title did you
15  obtain?
16      A.   I believe it was regional director of
17  government affairs, federal government affairs
18  perhaps.
19      Q.   And what were your job responsibilities as
20  a regional director for federal affairs?
21      A.   Basically the same.
22      Q.   So you went from being a manager to being

Page 35

1   a regional director but the job responsibilities
2   were the same.
3       A.   Exactly.
4       Q.   And approximately when did you achieve the
5   new title of regional director?
6       A.   I don't recall.
7       Q.   Did your job title change at any point
8   after you became a regional director?
9       A.   Yes.
10      Q.   And what was your new job title after
11  that?
12      A.   Director of federal government affairs.
13      Q.   And did your job responsibilities change
14  when you became a director of federal government
15  affairs?
16      A.   As I said before, it evolved.  Rather than
17  there being now I'm director, now I have new
18  responsibilities.  It wasn't like that.  It was -- I
19  was doing things and my -- was doing more things,
20  but it didn't align with the title changes.
21      Q.   And has your job title changed since you
22  became director of federal government affairs for

Page 36

1   Abbott?
2       A.   Yes.
3       Q.   Okay, and what's your new title?
4       A.   It's 23 years.  Senior director, federal
5   government affairs.
6       Q.   And I'm assuming that's a promotion,
7   correct?
8       A.   Yes, they're all promotions.
9       Q.   But I'll ask you the same question.  Did
10  your job responsibilities in any way change --
11      A.   Over the continuum, yes.
12      Q.   Okay.
13      A.   So I took on more and more legislative
14  responsibility.  At one point I started having
15  people report to me, like my secretary, and now to
16  where I am today, I have two of our federal
17  lobbyists reporting to me, plus my secretary.
18      Q.   During your time as a Washington rep or
19  any time thereafter, do you recall participating in
20  any internal Abbott working groups related to
21  Medicare issues generally?
22      A.   Yes.

Page 37

1       Q.   Okay.  Can you describe to me or list for
2   me some of the working groups that you worked on
3   during -- during your time period -- you know,
4   during your time after you became a Washington rep
5   for Abbott?
6            MS. TABACCHI:  Object to the form.
7       A.   There have been a number of them.  We
8   worked on a broad range of issues.  We had internal
9   groups involving the environment where we worked
10  with the energy department.  We had groups relating
11  to employee benefits, also participated on groups
12  relating to health care reform.
13      Q.   Let's focus on the groups related to
14  health care reform.  Do you recall some of the
15  specific issues and the groups related to those
16  issues that you worked on that related to health
17  care reform?
18           MS. TABACCHI:  Object to the form.
19      A.   We had an internal group that was pulled
20  together around proposals to -- around health care
21  reform proposals in the early years of the Clinton
22  administration.  We also had groups pulled together

                                        10  (Pages 34 to 37)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 38

1    to evaluate activities as Congress looked to find
2    ways to provide coverage to the uninsured as well as
3    Medicare beneficiaries.
4        Q.   Let me just have this document here
5    distributed -- well, I'll distribute to you because
6    it's already been marked in this case as Exhibit
7    1167. I'm sorry.
8            MS. TABACCHI:  Thanks.
9            BY MR. GOBENA:
10       Q.   Why don't you take a moment to review that
11   -- this document, Ms. Haas.  I'm really just going
12   to focus on the cover memorandum, so you really
13   don't need to read the rest of it in any substance.
14   If you want to take a look at it, that's fine.
15   First I wanted to ask you who -- if you know
16   Mr. James E. Miller, who's listed in the from line.
17       A.   I know his name and that department.
18       Q.   Do you recall working with him on any
19   issues related to Medicare?
20       A.   No.
21       Q.   And the cc line there, midway on the page,
22   there's a Rich Rieger listed there.

Page 39

1        A.   Yes.
2        Q.   Or Rieger.  Did you know Mr. Rieger?
3        A.   Yes.
4        Q.   Do you recall working with Mr. Rieger on
5    any issues related to Medicare?
6        A.   I recall participating with Mr. Rieger in
7    meetings, but I don't recall working with Rich
8    Rieger on any issues.
9        Q.   Okay.  And then in the to line, you have a
10   couple new people listed here that we haven't seen
11   before.  The first one is Cathy Babington.  Do you
12   know Ms. Babington?
13       A.   Yes.
14       Q.   And have you had occasion to work with
15   Ms. Babington on any issues related to Medicare over
16   the years?
17           MS. TABACCHI:  Object to the form.
18       A.   Yes.
19       Q.   Also you have listed there Don Buell.  Who
20   is Don Buell?
21       A.   Don Buell was in the Pharmaceutical
22   Products Division.  I'm not sure if he's still there

Page 40

1    or not.
2        Q.   And Dr. Conway's also listed there.  Do
3    you know who Mr. Conway -- I'm sorry, Dr. Conway
4    was?
5        A.   No.
6        Q.   You've got a Paul Landauer listed right
7    below him.  Do you know who Mr. Landauer was?
8        A.   Yes.
9        Q.   And who was Mr. Landauer?
10       A.   At that time, he was with our Abbott
11   diagnostics division.
12       Q.   Do you recall what types of issues
13   Mr. Landauer was working on in this approximate time
14   frame of November of 1996?
15           MS. TABACCHI:  Object to the form.
16       A.   Issues relating to medical devices and
17   diagnostic tests.
18       Q.   Okay.  You also have Dave Olson listed
19   there.  Did you know Mr. Olson?
20       A.   No.
21       Q.   We've already talked about Jennie
22   Tobiason. Let's skip ahead.  Bill Dwyer.  Did you

Page 41

1    know Mr. Dwyer?
2        A.   Yes.
3        Q.   What division did Mr. Dwyer work in in
4    this approximate -- approximate time frame of
5    November 1996?
6        A.   It's -- he was -- I'm not completely sure,
7    but it was either the Hospital Products Division or
8    a division called the Abbott Health Systems
9    division.
10       Q.   Do you have any knowledge of what his --
11   what types of issues Mr. Dwyer was working on in
12   November of 1996?
13           MS. TABACCHI:  Object to the form.
14       A.   I don't know particularly what issues he
15   would have been working on in that time frame.
16       Q.   How about generally, do you have any
17   understanding what types of issues or job
18   responsibilities Mr. Dwyer's had over the years at
19   Abbott?
20           MS. TABACCHI:  Object to the form.
21       A.   No, I do not.
22       Q.   You also have Mike Tootell listed there.

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                   August 30, 2007
                    Washington, DC

Page 42

1    Do you see that?
2       A.   Yes.
3       Q.   Do you know Mr. Tootell?
4       A.   Yes.
5       Q.   And next to his name there it says Ross.
6    Is that because he was working in the Ross products
7    division in this time frame?
8       A.   Yes.
9       Q.   Do you know what his job responsibilities
10   were in approximately November of 1996?
11           MS. TABACCHI:  Object to the form.
12      A.   He was primarily involved with Abbott's
13   products, medical nutritionals, medical
14   nutritionals.
15      Q.   And also we have here a David Landsidle as
16   well.  Mr. Landsidle was your boss, correct?
17      A.   Yes.
18      Q.   In fact, he was the divisional vice
19   president for the -- for Washington affairs for
20   Abbott, correct?
21      A.   Yes, but I don't know if he held that
22   position at this time.

Page 43

1       Q.   Okay.  Prior to becoming the divisional
2    vice president, do you know what position
3    Mr. Landsidle held at Abbott?
4       A.   Director.
5       Q.   So that was the title that you held I
6    guess a few titles ago, correct?
7       A.   Several.
8       Q.   Okay, and that's you there listed on this
9    memorandum, correct?
10      A.   Uh-huh.
11      Q.   At the bottom, Rosemary Haas.
12      A.   Yes.
13      Q.   If you go to the re line, it says,
14   "Relating to Monday's meeting on November 25th, 1996
15   on Medicare reform, Don Buell's comments."  Do you
16   see that there?
17      A.   Yes.
18      Q.   Does this document refresh your
19   recollection that you were involved in a group at
20   Abbott that discussed Medicare reform issues in
21   approximately November of 1996?
22      A.   That -- yes.

Page 44

1       Q.   And I don't want to ask you about the
2    substance of the attachment, but when you received
3    these materials, did you typically review the
4    materials that were provided to you when you were an
5    addressee of a memorandum like this?
6            MS. TABACCHI:  Object to the form.
7       A.   Not always.
8       Q.   Under -- well, how would you -- how would
9    you decide between what materials you chose to read
10   when you got a memorandum like this and what
11   materials you chose not to read?
12      A.   Triage.
13      Q.   So it's the importance of the issue to
14   you.
15      A.   Yes.
16      Q.   Was the -- was -- if you go to the next
17   page, it says in the re line in Mr. Buell's attached
18   memorandum, it says, "Report on meeting of the AMA
19   industry round table steering committee," and the
20   rest of the memorandum is a discussion of that --
21   that meeting.  Is this the type of issue that you
22   would have decided is one that would spark your

Page 45

1    reviewing the materials that are being distributed
2    to you?
3            MS. TABACCHI:  Object to the form.
4       A.   I may have had some interest in material
5    from the legislative perspective, but I don't recall
6    this particular meeting or activity with the AMA.
7       Q.   Was the AMA one of the -- I don't know if
8    you'd characterize it as a trade group.  Would you
9    characterize the AMS as a trade group?
10      A.   I think a professional society maybe.
11      Q.   Okay.  And during this time period,
12   November '96, were you interacting with professional
13   societies as part of your job responsibilities?
14      A.   No.
15      Q.   So you didn't have any interaction with
16   the AMA in November of '96.
17      A.   No.
18      Q.   And you mentioned earlier that your
19   understanding was that Don Buell might have been
20   working in the Pharmaceutical Products Division --
21      A.   Uh-huh.
22      Q.   -- around this time period, so when it

                          12 (Pages 42 to 45)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 46

1  came to professional societies like the AMA, is it
2  more likely that someone from the business unit
3  would have been participating in interactions with
4  that type of group?
5       MS. TABACCHI:  Object to the form.
6    A.  I couldn't say.
7    Q.  I'm going to hand you a document,
8  Ms. Haas, that's been previously marked in this case
9  as Exhibit 1120.  Why don't you take a moment to
10 look at it as I distribute copies to counsel here.
11   A.  Do you need me to be looking at the
12 substance as well?
13   Q.  Yeah, actually, I'm going to ask you a
14 little bit about the --
15   A.  I need to read this a little more
16 carefully.
17   Q.  -- substance.  I'm going to focus though
18 on the first page of the attachment.
19   A.  Okay.
20   Q.  Not the second page of actual legislative
21 language.
22   A.  Okay.

Page 47

1    Q.  Let me ask you some general background
2  questions first and then we'll get into the
3  document.  In June of 1996, or sometime in 1996
4  anyways, did you have an understanding of how the
5  Medicare program reimbursed for Part B drugs?
6    A.  I had familiarity.
7    Q.  Okay.  So you had familiarity in this time
8  period of the --
9    A.  Yes.
10   Q.  -- June of '96, okay.  And what's your
11 understanding as to how Medicare reimbursed for Part
12 B drugs in the June '96 time frame?
13   A.  That Medicare reimbursed under Part B.
14   Q.  Correct.
15   A.  Yes.
16   Q.  Oh, you understood that Medicare
17 reimbursed under Part B.  I'm asking you how did
18 Medicare actually reimburse drugs.  What benchmarks
19 or information did Medicare use to reimburse for
20 drugs in that time period?
21       MS. TABACCHI:  Object to the form.
22   A.  I don't recall specifically.

Page 48

1    Q.  Okay.
2       MR. RIKLIN:  I'm sorry.  I didn't hear
3  that last --
4       THE WITNESS:  I don't recall specifically.
5       BY MR. GOBENA:
6    Q.  You're familiar with the term "average
7  wholesale price," correct?
8    A.  Yes.
9    Q.  Okay, and you were familiar with the
10 concept of average wholesale price in June of 1996,
11 correct?
12       MS. TABACCHI:  Object to the form.
13   A.  What do you mean by concept?
14   Q.  You know what the term means, right?
15       MS. TABACCHI:  Object to the form.
16   A.  I know it stands for average wholesale
17 price.
18   Q.  Okay.  What does that term mean to you?
19       MS. TABACCHI:  Object to the form.
20   A.  I just know that it was a metric and a
21 basis on which to reimburse for Medicare drugs.
22   Q.  And did you understand in June of 1996

Page 49

1  that Medicare reimbursed for drugs using average
2  wholesale price?
3    A.  Yes.
4    Q.  Let's -- and in June of 1996, or strike
5  that.  In 1996 were you working on any issues that
6  related to the way that Medicare reimbursed for
7  drugs?
8    A.  No.
9       MS. TABACCHI:  Object to the form.
10      BY MR. GOBENA:
11   Q.  Looking at the to line, there's a person
12 listed there, Dick Ribbentrop.  Do you see that?
13   A.  Yes.
14   Q.  Do you know who Mr. Ribbentrop is?
15   A.  No.
16   Q.  And if you look at the comments section
17 there, it says -- or additional comments section, it
18 says, "Dick, here's an amendment that we have given
19 to Senator Nichols and Senator Hatch regarding
20 Medicare payment for drugs.  This would be a
21 substitute for the Senate language.  This is the
22 same as the House language with the exception that

13  (Pages 46 to 49)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 50

1  it adds language to clarify that the secretary
2  should reimburse for a single-source drug based on
3  the AWP of the drug and not the AWP of a similar
4  drug.  If this language is offered, we hope that
5  Senator Graham will support it.  Thank you, Cindy."
6  The Cindy is a reference to Cynthia Sensibaugh,
7  correct?
8      A.   Yes.
9      Q.   And did you in 1996 work on any of these
10 issues related to proposed legislation as it affects
11 Medicare reimbursement for drugs?
12     A.   No.
13     Q.   So -- and if you turn to the second page,
14 you see some language there.  You see an attachment
15 here that describes some proposed legislative
16 language.  Did you ever review similar types -- or
17 this document or similar types of documents as they
18 relate to the way that Medicare pays for drugs in
19 1996?
20          MS. TABACCHI:  Object to the form.
21     A.   That's a broad question.
22     Q.   Okay.

---

Page 51

1      A.   Can you be more specific?
2      Q.   Sure.  In 1996, would you have been --
3  would you have been one -- would you have actually
4  looked at documents similar to the ones that are
5  attached here to this fax from Ms. Sensibaugh to
6  Mr. Ribbentrop?
7          MS. TABACCHI:  Object to the form.
8      A.   I did not look at this document.
9      Q.   But in the mid-'90s, '96 time frame, did
10 you review documents that related to the way that
11 Medicare reimbursed for drugs?
12     A.   I don't recall.
13     Q.   If you go to the first section there of
14 this attachment, and this is ABT-DOJ 295991, it
15 says, "Under current law, Medicare payment for
16 outpatient prescription drugs is generally limited
17 to the drugs that cannot be," quote,
18 "self-administered," unquote.  "Unless otherwise
19 required to be made on a prospective payment basis,
20 payments are generally made on the basis of
21 reasonable cost."  Does this language here reflect
22 your understanding of the state of Medicare law in

---

Page 52

1  1996?
2          MS. TABACCHI:  Object to the form.
3      A.   I wouldn't -- I couldn't answer that.
4      Q.   Is that because you don't recall whether
5  you had that understanding in 1996, that you can't
6  answer the question?
7      A.   I can't answer the question because I
8  wasn't involved with this in 1996.
9      Q.   I'm going to hand you a document that's
10 been previously marked as Exhibit 1170 in this case.
11     A.   Do you want me to be looking at the
12 attachment as well?
13     Q.   Yeah, I want you to look at the
14 attachment, but I'm only going to focus on the first
15 two pages.
16     A.   It only has two pages, so --
17     Q.   You only have two pages?
18     A.   Yes.
19     Q.   Yeah, the attachment has two pages.
20 You're right.  I meant I'm only going to focus on
21 the first two pages of the entire exhibit.
22     A.   Okay.

---

Page 53

1      Q.   You see it's a document that's dated
2  December 13th, 1996?
3      A.   Yes.
4      Q.   And there's a reference there in the re
5  line to a Medicare working group.  Do you see that?
6      A.   Yes.
7      Q.   And you're one of the addressees of this
8  memorandum, correct?
9      A.   Yes.
10     Q.   So does this document indicate to you that
11 there was a Medicare working group at Abbott in
12 which you were a participant in 1996?
13     A.   Yes.
14     Q.   And do you recall actually attending,
15 whether in person or by phone, meetings involving
16 the Medicare working group?
17     A.   Yes.
18     Q.   And how would you attend?  In person or by
19 telephone?
20     A.   By telephone.
21     Q.   Okay.  And looking at the to line of this
22 memorandum, do you recall any of the people in this

---

14 (Pages 50 to 53)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 54

1  to line that attended meetings of the Medicare
2  working group in or around December of 1996?
3          MS. TABACCHI:  Object to the form.
4      A.   I could not say as to whether these people
5  attended.  I wasn't in the room.
6      Q.   I see, so they didn't -- the participants
7  -- well, let me strike that.  Did these meetings
8  take place at Abbott's headquarters in Illinois, the
9  Medicare working group meetings?
10     A.   I believe so.
11     Q.   And when you were in Washington and there
12 were meetings taking place in Illinois, you would
13 phone in, correct?
14     A.   Correct.
15     Q.   But when you called in, no one was
16 identifying -- no one identified themselves at the
17 beginning of the meeting?  Beginning of a given
18 Medicare working group meeting, I should say.
19     A.   That may have happened but I don't recall.
20     Q.   Do you recall being in Medicare working
21 group meetings where Ms. Babington was
22 participating, to the best of your knowledge?

Page 55

1      A.   I frankly do not remember Cathy Babington
2  being on any of the calls personally.
3      Q.   Okay.  And did you recall Mr. Rieger being
4  on the calls?
5      A.   Yes.
6      Q.   How about Ms. Tobiason, do you recall her
7  being on the calls where you were calling into
8  meetings of the Medicare working group?
9      A.   She may have been, but I don't recall her
10 actual participation.
11     Q.   How about Mr. Tootell?  Do you recall him
12 being on the calls you participated in involving the
13 Medicare working group in this time frame of late
14 1996?
15     A.   I could not recall the specific meeting
16 that he would have been participating, but he did
17 participate in some of the calls.  I can recall
18 that.
19     Q.   And Mr. Landsidle's listed there in the to
20 line, correct?
21     A.   Uh-huh, yes.
22     Q.   Did he also participate in these Medicare

Page 56

1  working group meetings as well?
2          MS. TABACCHI:  Object to the form.
3      A.   Occasionally.
4      Q.   How frequently would you attend by
5  telephone meetings of the Medicare working group?
6      A.   Periodically, perhaps monthly.
7      Q.   And did Mr. Landsidle always participate
8  in the Medicare working group calls that you were
9  involved in?
10     A.   No.
11     Q.   So sometimes they'd just be you by
12 yourself participating in the Medicare working group
13 calls?
14     A.   Yes.
15     Q.   Did Ms. Sensibaugh participate in Medicare
16 working group calls as well, to your knowledge?
17     A.   I don't see her on the distribution of
18 this one.  She may have been on maternity leave at
19 that time.  I don't know if she participated in any
20 subsequent meetings.
21     Q.   If you go to the first paragraph,
22 Mr. Rieger writes in this memorandum, "In

Page 57

1  preparation for next week's meeting, I'm attaching
2  the most recent version of the proposed Abbott
3  position paper" -- sorry, "proposed Abbott position
4  re Medicare reform for your review."  You've had a
5  chance to look at the attachment, correct?
6      A.   Uh-huh.
7      Q.   Do you recognize that document that's
8  attached to this memorandum?
9      A.   I am sure I saw this document.
10     Q.   The cover sheet and the next sentence of that paragraph on
11 the cover sheet reads, "This is" -- "This is based
12 upon the original document that was presented by Don
13 Buell on November 25th, 1996 and the input that each
14 of you has provided since then."  Do you see that
15 there?
16     A.   Yes.
17     Q.   Do you recall whether you provided input
18 on this proposed Abbott position paper re Medicare
19 reform that was drafted in or around November or
20 December of 1996?
21     A.   No, I do not recall.
22     Q.   Do you recall whether anyone in the

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 58

1  government affairs department provided any input
2  into the draft, or sorry, proposed Abbott position
3  paper re Medicare reform?
4      A.   No.
5      Q.   Do you recall having any discussions with
6  Mr. Landsidle about the proposed Abbott position
7  paper re Medicare reform?
8      A.   No.
9      Q.   Do you know whether the proposed Abbott
10 position paper re Medicare reform was actually
11 finalized?
12     A.   No.
13     Q.   If it was finalized, what's your
14 understanding as to how the position paper would be
15 used?
16         MS. TABACCHI:  Object to the form.
17     A.   Just that because a position paper might
18 have been finalized doesn't mean that it was
19 approved.
20     Q.   Are you familiar with any other position
21 papers that Abbott's put out on public policy
22 issues?

Page 59

1          MS. TABACCHI:  Object to the form.
2      A.   It's possible, but I don't recall
3  specifically.
4      Q.   If there was a position paper put out on a
5  public policy issue, is that something your office
6  would have worked on?
7          MS. TABACCHI:  Object to the form.
8      A.   If it was going to become part of our
9  responsibilities to present that position.
10     Q.   So from time to time, Abbott presents
11 positions that it has on policy issues to
12 governmental entities, correct?
13         MS. TABACCHI:  Object to the form.
14     A.   Position papers would form the basis of
15 what our lobbying strategies would be.
16     Q.   So a paper like this would help guide you
17 in discussions that you had with let's say members
18 of Congress about a particular Medicare reform
19 issue, correct?
20         MS. TABACCHI:  Object to the form.
21     A.   Are you speaking directly to this
22 document?

Page 60

1      Q.   This document or documents like it.  I
2  mean --
3      A.   I believe that's too broad of a question.
4      Q.   Okay.  Let's see if we can make it a
5  little bit simpler.
6      A.   Thank you.
7      Q.   If this paper was finalized and issued --
8      A.   Uh-huh.
9      Q.   The position paper, would you have used it
10 in part -- used it or referred to it in preparing to
11 make presentations to members of Congress about
12 issues related to Medicare reform in this time
13 period?
14         MS. TABACCHI:  Object to the form.
15     A.   If this paper had been finalized and if it
16 had been approved by senior management, including
17 our federal government affairs staff, it would have
18 formed the basis for our messaging with Capitol
19 Hill.
20     Q.   You mentioned approvals by senior
21 management.  Would approval be required from people
22 in the public affairs division within Abbott prior

Page 61

1  to issuance of this type of position paper, to your
2  knowledge?
3          MS. TABACCHI:  Object to the form.
4      A.   Yes.
5      Q.   And why would public affairs be involved
6  in the approval process of a position paper?
7          MS. TABACCHI:  Object to the form.
8      A.   Well, for public affairs particularly
9  being the public affairs professionals, they would,
10 like us, want to be sure that the positions we were
11 representing out in the world were consistent with
12 Abbott's mission.
13     Q.   So they helped make sure that the message
14 was consistent that Abbott was sending out, whether
15 it -- strike that.  So they just wanted to make sure
16 that the public policy positions match up with
17 Abbott's ultimate mission; is that correct?
18         MS. TABACCHI:  Object to the form.
19         BY MR. GOBENA:
20     Q.   Sorry.  What was that?
21     A.   Yes.
22     Q.   I'm going to hand you a document,

16  (Pages 58 to 61)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 62

1  Ms. Haas, that's been previously marked as
2  Plaintiff's 1121 in this case, and I'm only going to
3  ask you about the first three pages of it, so why
4  don't you take a minute to look at that.  Ms. Haas,
5  you're listed as a recipient of this interoffice
6  correspondence from Richard Rieger dated December
7  20th, 1996, correct?
8      A.   Yes.
9      Q.   And in the re line, it says, "The Medicare
10 working group."  Do you see that there?
11     A.   Yes.
12     Q.   And you were still a member of the
13 Medicare working group as of December 20th, 1996,
14 correct?
15     A.   Yes.
16     Q.   If you go to the first paragraph, it says,
17 "Attached is the information that Mike Tootell
18 referenced in our most recent Medicare working group
19 meeting and which he asked me to circulate.  It
20 addresses the topics of average wholesale prices and
21 competitive bidding."  Do you see that there?
22     A.   Yes.

Page 63

1      Q.   Do you recall participating in Medicare
2  working group meetings where the issue of average
3  wholesale price was discussed?
4      A.   I recall participating in meetings where
5  Mike and others presented proposed position papers.
6      Q.   So you recall Mike Tootell specifically as
7  being someone who spoke and presented papers during
8  those Medicare working group meetings, correct?
9      A.   Yes.
10     Q.   Now, you said -- you mentioned others.  Do
11 you have any recollection who those others were who
12 participated in Medicare working group discussions
13 about average wholesale price?
14     A.   About average wholesale price?
15     Q.   Yes.
16     A.   No.
17     Q.   But during these calls, other people
18 spoke, correct, about average wholesale price?
19          MS. TABACCHI:  Object to the form.
20     A.   Perhaps.
21     Q.   Do you have any understanding as to why in
22 December of 1996, the Medicare working group was

Page 64

1  discussing average wholesale price?
2      A.   I believe at that time Congress was
3  looking to make changes in the program.
4      Q.   I want to turn your attention to the
5  attachment, the first one, or the one I asked you to
6  look at, Medicare Part B payment for drugs, average
7  wholesale price issue.  Actually, first I want to
8  jump ahead to ABT -- there are so many Bates numbers
9  here, so let's pick one.  53269?
10     A.   Uh-huh.
11     Q.   And in the top there, there's an entity
12 listed called the Coalition To Preserve Health Care
13 Quality and Competition.  Do you see that?
14     A.   Yes.
15     Q.   I guess that's a group within something
16 called the National Association of Medical Equipment
17 Services.  Do you see that?
18     A.   Yes.
19     Q.   Are you familiar with either entity?
20     A.   No.
21     Q.   So they're not one of the trade groups
22 that you worked with during your time period as a

Page 65

1  Washington rep or afterwards, or other titles at
2  Abbott?
3      A.   No.
4      Q.   Okay.  Let's go through the issue portion
5  of this attached document.  It reads in the first
6  sentence first paragraph, "Currently, Medicare pays
7  for those drugs that are not reimbursed on a
8  prospective payment basis or cost basis at the
9  lesser of average wholesale price or the actual
10 acquisition cost of the drug."  Do you see that
11 sentence there?
12     A.   Yes.
13     Q.   Is that consistent with your understanding
14 as to how Medicare paid for drugs in this time frame
15 of December 1996?
16          MS. TABACCHI:  Object to the form.
17     A.   Assuming that whoever wrote this document
18 was accurate.
19     Q.   But you had an understanding in December
20 1996 as to how Medicare reimbursed for drugs,
21 correct?
22          MS. TABACCHI:  Object to the form.

                                17 (Pages 62 to 65)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 66

1    A.   At a very top level.
2    Q.   And you knew that average wholesale price
3  was an element of how Medicare reimbursed for drugs
4  in December of 1996, correct?
5    A.   Yes.
6    Q.   Do you recall reviewing this document, by
7  the way, Ms. Haas?
8    A.   No.
9    Q.   Would this have been the kind of material
10 that you would have reviewed when you received this
11 interoffice correspondence regarding the Medicare
12 working group in this time period?
13   A.   If I was working on this issue.
14   Q.   Were you working in some way on the issue
15 of average wholesale price in 1996 or so?
16   A.   No, I was not.
17   Q.   Who in your office would have been the
18 person most likely to have been tracking these
19 average wholesale price issues in the '96-'97 time
20 frame?
21      MS. TABACCHI:  Object to the form.
22   A.   I would say I don't know if there was

Page 67

1  anyone tracking these particular issues in this time
2  frame.
3    Q.   Well, we saw a previous exhibit where
4  there's a fax from Ms. Sensibaugh to a Dick
5  Ribbenthorp in June '96 related to average wholesale
6  price issues, correct?
7    A.   Correct.
8    Q.   So is it fair to say that Ms. Sensibaugh
9  was at least one of the people in your office who
10 was working on average wholesale price related
11 issues in this '96-'97 time frame?
12      MS. TABACCHI:  Object to the form.
13   A.   I can't say that she was working on AWP
14 issues.  Apparently according to this memo, she was
15 working on a particular legislative position on the
16 issue, but as to whether she was tracking or
17 monitoring, I have no knowledge of that.
18   Q.   Let's skip ahead to the industry options
19 portion of this memo.  Actually, no, strike that.
20 Let's stick with the first section, the issue part.
21 In the second paragraph, it reads, "There have been
22 several studies and investigations into the

Page 68

1  appropriateness of using AWP as a determining factor
2  for payment."  Were you aware of studies and
3  investigations taking place in the mid-'90s
4  regarding AWP?
5    A.   Yes.
6    Q.   And did you ever review the actual studies
7  or any reports related to AWP in this time period?
8      MS. TABACCHI:  Object to the form.
9    A.   No, no.
10   Q.   You just had an awareness that there were
11 reports out there regarding the AWP issue.
12   A.   Yes.
13   Q.   Did anyone in your office to your
14 knowledge collect and review reports from let's say
15 the Department of Health and Human Services
16 regarding AWP issues?
17   A.   I don't recall.
18   Q.   Do you recall ever seeing copies of any
19 reports from HHS or HHS OIG regarding AWP related
20 issues?
21      MS. TABACCHI:  Object to the form.
22   A.   Yes.

Page 69

1    Q.   So there were copies in your office.
2      MS. TABACCHI:  Object to the form.
3    A.   Yes.
4    Q.   Do you recall whose office you might have
5  seen copies of those reports related to AWP issues
6  in?
7      MS. TABACCHI:  Object to the form.
8    A.   There may have been copies in my office.
9    Q.   I see.  So you might have received copies
10 of the reports, correct?
11   A.   Yes.
12      MS. TABACCHI:  Object to the form.
13      BY MR. GOBENA:
14   Q.   But it's your testimony today that you
15 don't recall actually reviewing the reports that
16 were issued by the Department of Health and Human
17 Services or OIG relating to AWP?
18      MS. TABACCHI:  Object to the form.
19   A.   I don't recall reading them, but I was
20 aware of the issues around the appropriateness of
21 AWP.
22   Q.   And what do you recall were some of the

18 (Pages 66 to 69)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                         August 30, 2007
                        Washington, DC

---

Page 70

1   issues regarding the appropriateness of AWP that
2   were being raised in these reports?
3       A.   Primarily from the legislative
4   perspective, that the AWP system was a system that
5   was not accurate for what Medicare was paying.
6       Q.   Let's skip ahead to the industry options
7   now, and the first paragraph in that subsection
8   reads, "The industry can of course attempt to
9   maintain AWP as the payment measure for Medicare-
10  covered drugs and resist all efforts within Congress
11  and HCFA to change the current formula and
12  practice."  Do you see that there?
13      A.   Yes.
14      Q.   And we discussed earlier how it was your
15  recollection that around this time period, Congress
16  was considering changes to the way Medicare
17  reimbursed for drugs, and in particular, this AWP
18  issue, correct?
19      A.   Yes.
20      Q.   So this sentence here is indicating that
21  the industry -- one position the industry could take
22  is to resist any Congressional efforts, correct?

---

Page 71

1       A.   That would be what it says, yes.
2       Q.   The next sentence reads, "In all
3   likelihood, that is not a sustainable position,
4   especially in light of the fraud and waste
5   connotations that the investigators have brought to
6   the issue."  Were you aware in this approximate time
7   period of late '96, maybe going into early '97, that
8   there were investigations that were taking place
9   into the AWP reimbursement issue that may have
10  related to waste and fraud allegations?
11          MS. TABACCHI:  Object to the form.
12      A.   I was aware of that.
13      Q.   Did you have any conversations with --
14  strike that.  When we were talking about the
15  industry here, is it fair to say that we're talking
16  about the pharmaceutical industry?
17          MS. TABACCHI:  Object to the form.
18      A.   I couldn't say.
19      Q.   You're saying that because you didn't
20  write this memo, correct?
21      A.   I didn't write this memo, and it could be
22  referring to other health care -- others within the

---

Page 72

1   health care sector as well.
2       Q.   Do you ever recall -- do you recall
3   discussing the issues related to AWP in '96 or '97
4   with other people within the pharmaceutical industry
5   outside of Abbott?
6       A.   No, I do not recall that.
7       Q.   Now, as I read this, in the second
8   sentence, whoever wrote this wrote that resisting
9   Congressional efforts to change AWP-based
10  reimbursement efforts by Congress would not be a,
11  quote, sustainable position.  You see that there?
12      A.   In the first paragraph?
13      Q.   It's in the first paragraph under industry
14  options.
15      A.   Yes, I see that.
16      Q.   Did you agree with that viewpoint in
17  approximately December of 1996?
18          MS. TABACCHI:  Object to the form.
19      A.   I'm not sure how to answer the question.
20      Q.   Let me reread the sentences then.  "They
21  say the industry can of course attempt to maintain
22  AWP as the payment measure for Medicare-covered

---

Page 73

1   drugs, and resist all efforts within Congress and
2   HCFA to change the current formula and practice.  In
3   all likelihood, that is not a sustainable position,
4   especially in light of the fraud and waste
5   connotations investigators have brought to the
6   issue."  At this time period, you know, in '96,
7   would you have agreed with that statement?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  This was apparently an
10  option as whoever wrote this was getting everything
11  on the table as potential options.  In that context,
12  just looking at this as a proposed option or
13  something to put on the table, I would have agreed
14  with that position.
15          MR. GOBENA:  Okay.  Well, we've been going
16  for about an hour and 15 minutes right now.  Is this
17  a good time for a break?
18          MS. TABACCHI:  Sure.
19          MR. GOBENA:  Okay.
20          THE VIDEOGRAPHER:  Here marks the end of
21  Videotape Number 1.  We're going off the record.
22  The time on the screen is 10:18:50.

---

Henderson Legal Services
202-220-4158

Haas, Rosemary                                      August 30, 2007
                        Washington, DC

Page 74

1        (Recessed at 10:18 a.m.)
2        (Reconvened at 10:37 a.m.)
3        THE VIDEOGRAPHER:  Here marks the
4   beginning of Videotape Number 2 in the deposition of
5   Rosemary Haas.  The time on the screen is 10:37:53.
6   We're on the record.
7        BY MR. GOBENA:
8        Q.   Ms. Haas, earlier, we were discussing some
9   of your work responsibilities over the years, and
10   you mentioned that part of your job responsibilities
11   was to interact with certain trade associations,
12   correct?
13       A.   Correct.
14       Q.   Do you recall some of the trade
15   associations that you've interacted with over the
16   course of your career at Abbott?
17       A.   Pharma, Business Round Table, National
18   Association of Manufacturers, U.S. Chamber of
19   Commerce, Health Care Leadership Council.  Those are
20   the ones I can recall off the top of my head.
21       Q.   Are you familiar with the Association of
22   -- I'm sorry, the American Society of Clinical

Page 75

1   Oncologists?
2        A.   Yes.
3        Q.   Have you interacted with that organization
4   during your tenure working at Abbott?
5        A.   Yes.
6        Q.   Do you recall some of the issues that you
7   dealt with in your interactions with we'll call it
8   ASCO for short?
9        A.   Yes.
10       Q.   Do you recall some of the issues?  Okay.
11   What were some of the issues that you worked on
12   which involved you interacting with ASCO?
13       A.   We were part of a coalition with ASCO that
14   was attempting to expand Medicare coverage to cover
15   self-administered drugs.
16       Q.   So did this coalition -- sorry.  Were you
17   Abbott's representative to this coalition in which
18   ASCO was also a member, and that dealt with Medicare
19   coverage for self-administered drugs?
20       A.   Yes.
21       Q.   Did you participate then in meetings with
22   this -- with other coalition members on this issue

Page 76

1   of Medicare coverage for self-administered drugs?
2        A.   Yes.
3        Q.   And approximately when did these meetings
4   take place with this coalition working on Medicare
5   coverage for self-administered drugs?
6        A.   To the best of my recollection, that would
7   have been 2002-2003.
8        Q.   So that would have preceded the enactment
9   of the Medicare Modernization Act of 2003, correct?
10       A.   Yes.
11       Q.   Is that the legislation upon which -- was
12   that legislation related to the activities that the
13   coalition was engaged in in 2002-2003?
14       MS. TABACCHI:  Object to the form.
15       A.   They were separate activities.
16       Q.   The Medicare Modernization Act of 2003
17   provided coverage though for self-administered
18   drugs, correct?
19       MS. TABACCHI:  Object to the form.
20       A.   Yes.
21       Q.   Did the coalition to your knowledge
22   discuss proposed legislation regarding Medicare

Page 77

1   coverage for self-administered drugs with any
2   members of Congress or their staff in 2002-2003?
3        MS. TABACCHI:  Object to the form.
4        A.   Yes.
5        Q.   Were you involved in any of those
6   discussions involving coalition members and members
7   of Congress or their staff related to the issue of
8   Medicare coverage for self-administered drugs in
9   2002-2003?
10       A.   Yes.
11       Q.   Do you recall particular Congresspeople
12   that the coalition met with where you were a
13   participant in a meeting?
14       A.   Let's see.  Jennifer Dunn, Congresswoman
15   Deborah Price.  Those are two that come to mind.
16       Q.   Do you recall any staff or Congressperson
17   that you met with who were not a staffer -- either
18   Congresswoman Dunn or Congresswoman Price?
19       A.   It's possible, but I don't recall which
20   ones.
21       Q.   And when you met with let's say
22   Congresswoman Dunn, what kind of presentation did

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 78

1  you make to the Congresswoman related to the issues
2  that the coalition was working on?
3          MS. TABACCHI:  Object to the form.
4      A.  It would have been related to patients
5  lacking access to drugs that they could administer
6  in their homes to themselves, self-administered
7  drugs.
8      Q.  And the patients were lacking access
9  because Medicare was not providing coverage for
10  those drugs?
11      A.  Yes.
12      Q.  Was there -- at the time you were meeting
13  with let's say -- stick with Congresswoman Dunn, was
14  there any proposed legislation in Congress that
15  related to the issue of Medicare coverage for
16  self-administered drugs?
17      A.  Sorry.  Could you repeat that?
18      Q.  Sure.  At the time you were meeting with
19  Congresswomen Dunn and Price, was there any pending
20  or proposed legislation that related to the issue of
21  Medicare coverage for self-administered drugs?
22      A.  Yes.

Page 79

1      Q.  And was the coalition advocating for the
2  passage of that particular piece of legislation?
3          MS. TABACCHI:  Object to the form.
4      A.  Yes.
5      Q.  Now, you know that part of the Medicare
6  Modernization Act of 2003 also addressed the way
7  that Medicare reimbursed for drugs, correct?
8          MS. TABACCHI:  Object to the form.
9      A.  Correct.
10      Q.  And that change involved a transition from
11  the use of AWP to reimburse for drugs to something
12  using average sales price, correct?
13      A.  Correct.
14      Q.  Did the coalition address anything
15  regarding average wholesale price as it related to
16  the pending legislation that ultimately -- sorry,
17  gave rise to that legislation we were just talking
18  about that related to Medicare coverage for
19  self-administered drugs?
20          MS. TABACCHI:  Object to the form.
21      A.  No.
22      Q.  So when you participated personally in

Page 80

1  meetings with Congresswoman Dunn, neither you nor
2  anyone else who joined you from the coalition
3  discussed AWP with Congresswoman Dunn.
4      A.  No.
5      Q.  Did you discuss -- did you or someone else
6  from the coalition discuss the issue of AWP with any
7  staff members for Congresswoman Dunn in this
8  2002-2003 time frame?
9      A.  No.
10      Q.  How about for Congresswoman Price, did you
11  or anyone else on the coalition discuss AWP in any
12  meetings you had with her?
13      A.  No.
14      Q.  And did you have any meetings with
15  Congresswoman Price's staff outside of that -- that
16  meeting you had with the Congresswoman?
17          MS. TABACCHI:  Object to the form.
18      A.  I'm not sure I understand the question.
19      Q.  Sure.  Did you ever talk to Congresswoman
20  Price's staffers separate from any meetings you had
21  with the Congresswoman herself?
22      A.  Yes.

Page 81

1      Q.  Okay.  And did you discuss AWP at that --
2  in any meetings you had with staff members for
3  Congresswoman Price?
4      A.  No.
5      Q.  Did you discuss generally the way that the
6  government reimburses for drugs under Medicare in
7  any conversations you had with Congresswoman Dunn?
8      A.  No.
9      Q.  How about conversations you had with
10  Congresswoman Price, did you discuss Medicare
11  reimbursement for drugs generally?
12      A.  No.
13      Q.  And is the same answer true for
14  conversations you may have had with the staff
15  members for Congresswoman Dunn and Congresswoman
16  Price?
17      A.  Yes.
18      Q.  You mentioned earlier that you had
19  expanded areas of responsibility too when you became
20  a Washington rep and -- for Abbott Labs.  Do you
21  remember particular types of issues that were the
22  focus point of your work as they related to the

21 (Pages 78 to 81)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                      August 30, 2007
                     Washington, DC

Page 82

1   Medicare program?
2         MS. TABACCHI:  Object to the form.
3      A.   I had none.
4      Q.   So just to give you an example, for
5   example, if there was an issue related to medical
6   devices, was there somebody in your office who
7   specialized in that type of -- an issue like that
8   and that would be the person who tracked legislative
9   developments in that regard?
10        MS. TABACCHI:  Object to the form.
11     A.   Yes.
12     Q.   Let's take medical devices specifically.
13  Who in your office would have been the person who
14  would have been tracking legislative developments
15  regarding medical devices?
16     A.   Cindy Sensibaugh.
17        MR. RIKLIN:  I'm sorry.  Who?
18     A.   Cindy Sensibaugh.
19     Q.   And was that true -- when did
20  Ms. Sensibaugh join Abbott, to your knowledge?
21     A.   Twelve years ago.
22     Q.   And so was it true that throughout her

Page 83

1   tenure then, she was the person who would be the --
2   you know, the point person on medical device issues
3   as they may relate to pending legislation in
4   Congress?
5         MS. TABACCHI:  Object to the form.
6      A.   Yes.
7      Q.   And were there any similar types of issues
8   that for -- for which you were the point person
9   within the Washington affairs office at Abbott
10  throughout your time period as a rep and beyond?
11     A.   Yes.
12        MS. TABACCHI:  Object to the form.
13        BY MR. GOBENA:
14     Q.   You mentioned environmental issues
15  earlier.  Is that one of them?
16     A.   Yes.
17     Q.   What other issues besides environmental
18  issues were you sort of a point person for tracking
19  legislative changes that may have been taking place
20  over the years?
21     A.   At that point in time?
22     Q.   Let's start from your days as a Washington

Page 84

1   rep and work forward, so, you know, if you had
2   certain issues when you were Washington rep, if you
3   could identify those, and then as those areas
4   expanded, if you could identify them for us, that
5   would be great.
6      A.   I'll do the best I can --
7      Q.   Sure.
8      A.   -- in terms of chronology.
9      Q.   Okay.
10     A.   That would have been environmental issues,
11  particularly Clean Water Act, Clean Air Act,
12  transportation issues relating to trucks, believe it
13  or not, energy issues pertaining to deregulation of
14  electricity, OSHA issues pertaining to -- well,
15  health issues related to OSHA.  Then I think drug
16  importation, HIV/AIDS issues, tax issues, trade
17  issues, health care reform proposals.
18        Seems I'm missing something, but I'm doing
19  the best I can here.  Privacy issues around health
20  care information.  Moving towards Medicare benefit
21  -- prescription drug benefit for seniors.  There
22  have been other things as well, but I don't recall

Page 85

1   them all, and in recent years, working on the
2   Deficit Reduction Act and proposals for Medicaid
3   reform.
4      Q.   When it came to issues related to the way
5   that Medicare reimburses for drugs under Part B,
6   talking pre-MMA, was there someone in the Washington
7   affairs office whose responsibility it was to stay
8   on top of any legislative developments on that
9   issue?
10     A.   It's possible that someone would have been
11  tracking those and keeping up to speed on those.
12     Q.   But it's your testimony that you were not
13  that person.
14     A.   I was not that person.
15     Q.   All right, I'm going to hand you what's
16  been previously marked as Plaintiff's Exhibit --
17     A.   Just could we stop just a second?
18     Q.   Sure.
19     A.   I just want to be sure I answered that
20  question appropriately.
21     Q.   Sure.
22     A.   I did have responsibility for tracking the

22  (Pages 82 to 85)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

| | |
|---|---|
| Page 86 | Page 88 |

**Page 86**

1  work that led up to passage of the Part D drug
2  benefit in 2002 and 2003.
3      Q.   Did part of that work involve tracking any
4  proposed changes in the way that Medicare was
5  reimbursing -- was going to be reimbursing for drugs
6  after passage of the Medicare Modernization Act?
7      A.   No.
8      Q.   So as we -- as you testified earlier,
9  you're aware that that was a transition from using
10  AWP to using ASP that was part of the Medicare
11  Modernization Act of 2003.  You remember that
12  testimony?
13      A.   Yes.
14      Q.   Okay.  And is it your testimony that you
15  weren't the one in the Washington affairs office who
16  was following that part of the legislation?
17      A.   That was not an issue we followed and
18  participated in as part of the Medicare Part D drug
19  benefit.
20      Q.   This has been previously marked,
21  Ms. Sensibaugh, as Plaintiff's 1123.
22          MS. TABACCHI:  Ms. Haas.

**Page 87**

1          BY MR. GOBENA:
2      Q.   Oh, sorry.  Did I call you Ms. Sensibaugh?
3      A.   We're both short, so --
4      Q.   You guys do look kind of alike.
5      A.   She's from South Carolina.  I'm from
6  Pittsburgh, so --
7      Q.   Why don't you take a moment, Ms. Haas, to
8  look at the first three pages of this document that
9  I've handed you.  You've had a chance to review the
10  document?
11      A.   Yes.
12      Q.   If you look at the top, this piece of
13  interoffice correspondence is from Richard Rieger,
14  and it's dated January 15th, 1997, and there are a
15  bunch of addressees listed, among which we find you,
16  Ms. Haas.
17      A.   Uh-huh.
18      Q.   Taking a look at this document, do you
19  recall receiving it?
20      A.   My name is on it.  It probably arrived in
21  my in box.
22      Q.   Just based on your review of this document

**Page 88**

1  and the subject matter, is this the kind of document
2  that you would have personally reviewed after
3  receiving it?
4      A.   Not necessarily.
5      Q.   And why do you say not necessarily?
6      A.   This was an internal activity to discuss
7  issues that were policy issues that were being
8  presented in Congress, and I might have -- I wasn't
9  working on these particular issues, so if I got
10  this, saw the cover, I might have just put it aside.
11      Q.   As you go to the re line, it says re
12  Medicare working group meeting.  Do you see that?
13      A.   Yes.
14      Q.   And we've already established that you
15  participated in multiple Medicare working group
16  meetings, correct?
17      A.   Yes.
18      Q.   And it says in the first paragraph the
19  next Medicare working group meeting will be held on
20  Tuesday January 21st, 1997 from 8:00 a.m. to 9:30
21  a.m. in a conference room.  Do you see that there?
22      A.   Yes.

**Page 89**

1      Q.   It goes -- Mr. Rieger goes on to say,
2  "Based upon input from several of you, I am
3  proposing the following agenda for the meeting," and
4  the first bullet point is discuss the average
5  wholesale price versus actual cost issue.  Do you
6  see that there?
7      A.   Yes.
8      Q.   Okay.  Now, this is the second memorandum
9  that we've seen today, Ms. Haas, where there's been
10  a reference to a discussion by the Medicare working
11  group about average wholesale price, correct?
12      A.   Correct.
13      Q.   So it's fair to say based on these
14  memoranda that there were multiple conversations
15  about the issue of average wholesale price held by
16  the Medicare working group.
17          MS. TABACCHI:  Object to the form.
18      A.   I would say so.
19      Q.   Were you personally involved in more than
20  -- in meetings of the Medicare working group where
21  the issue of average wholesale price was discussed?
22          MS. TABACCHI:  Object to the form.

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 90

1    A.   I recall that I participated in three or
2 four of these meetings.  I don't recall -- I do not
3 recall the subject matter of those meetings beyond
4 what we see here in front of us, and I did not
5 participate in those discussions.
6    Q.   So you said three or four meetings.  Are
7 you talking about three or four meetings of the
8 Medicare working group that -- where the issue of
9 AWP was discussed?
10    A.   Three or four meetings of the Medicare
11 working group.  I don't recall what the agenda
12 topics were.
13    Q.   Let me ask you your best recollection.
14 Was the issue of AWP discussed multiple times -- was
15 AWP -- issue of AWP discussed in multiple meetings
16 that you participated in of the Medicare working
17 group?
18        MS. TABACCHI:  I object to the form.
19    A.   Possible.
20    Q.   If you go to the bottom of the page there,
21 that paragraph after the bullet points, Mr. Rieger
22 goes on to write, "In preparation for the meeting, I

Page 91

1 am attaching two documents.  The first document is
2 an article related to AWP and President Clinton's
3 expected 1998 budget proposal.  This is in addition
4 to the documents I previously sent you on
5 December 20th, 1996 regarding AWP and competitive
6 bidding."  Do you see that there?
7    A.   Yes.
8    Q.   So does this language in Mr. Rieger's
9 memorandum refresh your recollection that President
10 Clinton was proposing changes to the way Medicare
11 reimbursed for drugs as part of his 1998 budget
12 proposal?
13        MS. TABACCHI:  Object to the form.
14    A.   Yes.
15    Q.   And in fact, if you turn to the third page
16 of the exhibit, there's an article there where if
17 you go to the second paragraph of the -- or
18 actually, it's the first paragraph of the article,
19 it reads, in capital letters, "Clinton
20 administration expected to propose Medicare
21 outpatient drug," and then small letters, "Coverage
22 be based on actual cost rather than AWP as part of

Page 92

1 the President's budget request of fiscal year '98."
2 Do you see that there?
3    A.   Yes.
4    Q.   Do you recall seeing articles in I guess
5 this is now early 1997 regarding the Clinton
6 administration's proposed changes to the way
7 Medicare reimbursed drugs from using AWP to using
8 actual cost?
9    A.   I recall that that was a significant topic
10 of discussion throughout that time frame, but I
11 don't recall specific articles or --
12    Q.   So it was a significant issue within the
13 pharmaceutical industry?
14        MS. TABACCHI:  Object to the form.
15        BY MR. GOBENA:
16    Q.   Let me strike that.  Let me make it easier
17 for you.  Was it a significant issue for Abbott
18 during this time frame?
19        MS. TABACCHI:  Object to the form.
20    A.   Not that I recall.
21    Q.   Do you have any -- do you remember having
22 any conversations with anyone else in the Washington

Page 93

1 affairs office about President Clinton's proposed
2 change to Medicare drug reimbursement to shift from
3 using AWP to using actual costs?
4    A.   No, I do not recall.
5    Q.   So you don't recall discussing the issue
6 of President Clinton's proposed change with, let's
7 say, Mr. Landsidle in this time frame?
8    A.   I don't recall.
9    Q.   And you don't recall having conversations
10 with Ms. Sensibaugh about this proposed Clinton
11 administration budget proposal to shift from using
12 AWP to actual cost?
13    A.   I don't recall having that conversation.
14    Q.   You're not testifying that you didn't have
15 it.  You're just saying that you don't remember; is
16 that correct?
17    A.   I don't remember.
18    Q.   But you could have.
19        MS. TABACCHI:  Object to the form.
20        BY MR. GOBENA:
21    Q.   Sorry?
22    A.   I don't remember.

                                24  (Pages 90 to 93)

Haas, Rosemary                                        August 30, 2007
                    Washington, DC

Page 94

1    Q.   I want to make sure I understood how you
2  characterized this budget proposal correctly.  Did
3  you say that it was a significant legislative
4  proposal that was floating around during this time
5  frame?
6        MS. TABACCHI:  Object to the form.
7    A.   I would say that it was a topic that was
8  discussed in Washington in this time frame.
9    Q.   If this change had actually passed
10 Congress, it would have significantly changed the
11 way that the government reimbursed for Abbott's
12 drugs; isn't that correct?
13       MS. TABACCHI:  Object to the form.
14   A.   That's possible.
15   Q.   You knew at this time, Ms. Haas, that --
16 and this time being 1997, that AWPs typically
17 exceeded the actual transaction costs for a
18 manufacturer's drugs, correct?
19       MS. TABACCHI:  Object to the form.
20   A.   I don't have firsthand knowledge of that.
21   Q.   Is it that you don't have firsthand
22 knowledge of that -- you didn't have firsthand

Page 95

1  knowledge of that back then, or is it that you don't
2  have firsthand knowledge of that now?
3        MS. TABACCHI:  Object to the form.
4    A.   Both.
5    Q.   But you'll recall we looked at some
6  materials earlier attached to a December 20th
7  memorandum from Mr. Rieger where -- and admittedly,
8  they weren't Abbott materials, but there were
9  materials talking about how there were all these
10 investigations and reports out there about problems
11 with AWP-based reimbursement.  You'll recall that,
12 correct?
13   A.   Correct.
14   Q.   And what was your understanding of what
15 the problems were with the use of AWP as a benchmark
16 for reimbursement in the Medicare program?
17       MS. TABACCHI:  Object to the form.
18   A.   I didn't have an active working
19 participation or knowledge of the AWP situations.
20 What I had read and learned through meetings on the
21 Hill and going to Congressional hearings is there
22 was a concern that it wasn't an accurate -- AWP was

Page 96

1  not an accurate measurement for physician
2  reimbursement.
3    Q.   And it wasn't accurate because AWPs often
4  exceeded the actual cost for the drugs, correct?
5        MS. TABACCHI:  Object to the form.
6    A.   That's my understanding.
7    Q.   Based on your review of outside materials?
8        MS. TABACCHI:  Object to the form.
9        BY MR. GOBENA:
10   Q.   I say outside materials.  I mean, it's
11 based -- not based on -- are you saying it's based
12 on your review of literature that was out there at
13 the time?
14   A.   Based upon my knowledge of the literature
15 that was out there.
16   Q.   Do you recall during meetings of the
17 Medicare working group anyone mentioning that the
18 proposed -- that President Clinton's proposed change
19 to the way Medicare would reimburse for drugs would
20 have an impact on how Abbott's drugs are reimbursed?
21   A.   It's possible.
22   Q.   Do you recall whether Mr. Tootell

Page 97

1  mentioned anything like that in the context of a
2  Medicare working group meeting?
3    A.   It's possible.
4    Q.   To your knowledge, did anyone in the
5  context of these Medicare working group meetings
6  state that this proposed change was a significant
7  issue within the industry?
8        MS. TABACCHI:  Object to the form.
9    A.   I don't recall.
10   Q.   But it's possible.
11   A.   It's possible.
12   Q.   I'm going to hand you what's been marked
13 previously as Plaintiff's 1124, and what I'd like
14 you to review, Ms. Haas, are the first page, second
15 page and the third page.
16   A.   Okay.
17   Q.   I'm going to direct your attention to the
18 line in this January 20th, 1997 memorandum from
19 Mr. Rieger.  You're listed there, correct?
20   A.   Yes.
21   Q.   Also listed there is Ms. Sensibaugh.  Do
22 you see that?

25  (Pages 94 to 97)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                      Washington, DC

Page 98

1    A.    Yes.
2    Q.    At some point did Ms. Sensibaugh become a
3  member of the -- or a participant, rather, of the
4  Medicare working group?
5    A.    Ms. Sensibaugh was on maternity leave
6  twice within a time frame, so I think she came and
7  went perhaps.
8    Q.    And Mr. Rieger goes on to write in his
9  cover memorandum, "FYI, attached is updated
10 information that I received from Cindy Sensibaugh in
11 preparation for the January 21st, 1997 Medicare
12 working group meeting."  Do you see that there?
13   A.    Yes.
14   Q.    Okay.  Do you recall having any
15 conversations with Ms. Sensibaugh in or around
16 January of 1997 regarding AWP issues?
17   A.    No.
18   Q.    And you've taken a look at at least the
19 first three pages of this exhibit, correct?
20   A.    Yes.
21   Q.    Do you recall whether you received -- do
22 you recall having received this memorandum and the

Page 99

1  attachments?
2    A.    I don't recall receiving it, but my name
3  is on here, so I assume I received it.
4    Q.    Okay, and is this the kind of memorandum
5  and attached materials that you would have reviewed
6  normally in the course of your business?
7          MS. TABACCHI:  Objection to the form.
8    A.    Possibly, possibly.
9    Q.    Do you recall whether you did review this
10 package of information that was distributed by
11 Mr. Rieger on January 20th, 1997?
12   A.    These documents appear to have been sent
13 to the group for discussion.  It's possible I might
14 have reviewed them, but I don't recall reviewing
15 them.
16   Q.    I'm going to turn your attention to the --
17 actually, the third page, and there's -- we see here
18 an article dated January 13th, 1997 from something
19 called the Pink Sheet.  Are you familiar with the
20 Pink Sheet?
21   A.    Yes.
22   Q.    What is the Pink Sheet?

Page 100

1    A.    Pink Sheet is a weekly publication that
2  covers issues related to the pharmaceutical
3  industry.
4    Q.    And did you receive copies of the Pink
5  Sheet normally in the course of your business?
6    A.    Yes.
7    Q.    And did you review them every time they
8  came into your in box, the Pink Sheets?
9          MS. TABACCHI:  Object to the form.
10   A.    When I could.  I have six in my in box
11 right now.
12   Q.    So -- and again, you do triage and you
13 pick the Pink Sheets that you want to read based on
14 how much they relate to an issue that you're
15 specifically working on?
16   A.    I scan them, and if it's something that
17 I'm working on, I'll read it, sometimes copy pages
18 from it.
19   Q.    This particular Pink Sheet says -- it's an
20 article and the headline is, "AWP overstates actual
21 pharmacy invoice costs for brand-name drugs by
22 average of 18.3 percent nationwide, HHS IG

Page 101

1  concludes.  Generic AWP overstates costs by 42.5
2  percent."  Do you see that?
3    A.    Yes.
4    Q.    Do you recall generally receiving Pink
5  Sheets in January of -- strike that.  Receiving Pink
6  Sheets in 1997 discussing OIG investigations of AWP?
7    A.    I would say there were probably dozens of
8  Pink Sheet articles that dealt with this subject in
9  1997.
10   Q.    And you recall receiving copies of those
11 Pink Sheets, correct?
12   A.    I recall receiving the Pink Sheets, and
13 these articles were undoubtedly in them.
14   Q.    Did you read these articles related to AWP
15 issues in the Pink Sheet in '97?
16   A.    I would have read some of them, I could
17 say safely.
18   Q.    Do you remember reading this article?
19   A.    No, I don't remember reading this article.
20   Q.    If you go to the bottom of the article,
21 last two paragraphs, let's read the second to last
22 one.  "The Department of Justice is also pursuing an

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 102

1  antitrust investigation of how AWP is calculated."
2      A.   Uh-huh.
3      Q.   Were you aware in -- in or around January
4  1997 that the Department of Justice was
5  investigating how AWP's calculated?
6      A.   Yes.
7      Q.   And did you gain that awareness through
8  reviewing media reports?
9      A.   Yes.
10     Q.   Did you know that one of the companies
11  that the Department of Justice was investigating in
12  January 1997 was your employer, Abbott Labs?
13     A.   Yes.
14     Q.   And I don't want to get into
15  attorney-client communications so I want to be very
16  careful here, but I'm going to ask you the question.
17  How is it that you came to be aware that the
18  Department of Justice was investigating Abbott Labs?
19  And again, I don't want to know anything about the
20  subject of discussions you had with counsel, so if
21  that's the only way you can answer the question, let
22  me know.

---

Page 103

1      A.   In large part through media reports and
2  releases that would have been issued by various
3  departments.
4      Q.   Were you ever -- were you asked sometime
5  around January of 1997 -- sorry, either by January
6  of 1997 or before January 1997 to gather any
7  documents related to AWP for production to the
8  government?
9          MS. TABACCHI:  Object to the form.
10     A.   I do not recall.
11     Q.   Were you made aware at any time let's say
12  between January '95 and this time period of January
13  1997 of any subpoenas that had been issued to Abbott
14  related to AWP issues?
15     A.   I don't remember the years, but over the
16  period of years, I have been asked to save documents
17  and keep documents and people came to our office to
18  review documents.  Documents were boxed up.  I just
19  don't remember what years these things occurred.
20     Q.   What's your best guess as to the first
21  time you were asked to collect or preserve documents
22  related to AWP issues?

---

Page 104

1          MS. TABACCHI:  Object to the form.
2      A.   In the '90s sometime.
3      Q.   Would it have been the late '90s?
4      A.   I don't recall.
5      Q.   But it's your recollection that by
6  sometime in the '90s, you were being asked to
7  preserve or collect documents related to average
8  wholesale price, correct?
9      A.   I don't know if it would have been
10  presented to me that way, but it might have been any
11  files you have pertaining to this or that, and it
12  might have been any files you have pertaining to
13  AWP.
14     Q.   Now, did you provide your AWP files --
15  once you were asked to provide them, who did you
16  provide them to?
17         MS. TABACCHI:  Object to the form.
18     A.   Usually it was a paralegal within a
19  department that would say hold these files, I'm
20  coming out to review them and copy them and -- or
21  please box them up and we'll have them picked up.
22     Q.   And did you -- were you asked to preserve

---

Page 105

1  or maintain your documents starting with, say, in
2  the -- I guess you said sometime in the '90s, as
3  they relate to AWP?
4      A.   Yes.
5      Q.   And how did you go about preserving your
6  AWP-related documents after you were asked to do
7  that?
8      A.   They were put in the files in the back of
9  the office and kept there.
10     Q.   So you had paper files that related to
11  AWP, correct?
12     A.   Uh-huh.
13     Q.   And you took those and put them in the
14  back of your office and preserved them somewhere,
15  correct?
16     A.   Uh-huh.
17     Q.   Okay.  How about electronic files like
18  e-mails you had related to AWP?  What did you do to
19  save those?
20     A.   Well, at this time frame here, I don't
21  think we were as prolific with using e-mails for
22  this kind of thing.  It was more fax and hard copies

27 (Pages 102 to 105)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 106

1  of things, so I don't recall being asked anything
2  particularly related to e-mails.
3     Q.   Were you given multiple instructions over
4  the years to preserve documents related to AWP?
5     A.   I don't recall if there were multiples of
6  that.
7     Q.   Do you recall definitely at some point
8  being asked to preserve?
9     A.   Yes.
10    Q.   But it's your testimony that you don't
11 recall whether you were asked more than once to
12 preserve.
13    A.   Yes.
14    Q.   And once you started using e-mail more
15 frequently, what kinds of measures did you use to
16 save those e-mails as they related to AWP issues?
17    A.   I did not have significant e-mails on AWP
18 and I was never asked to preserve e-mails on AWP.
19 Ask me about drug importation.  I have a lot of
20 files I'm saving on drug importation.
21    Q.   Understood.  I'm going to hand you what's
22 been previously marked as Plaintiff's 1125, and I'm

---

Page 107

1  just going to ask you a couple quick questions on
2  it.  We're not going to dwell on it.
3        MS. TABACCHI:  I'm sorry, Gejaa.  What
4  number is this?
5        MR. GOBENA:  It's 1125.
6        MS. TABACCHI:  Of course, it's right
7  there.
8        BY MR. GOBENA:
9     Q.   It's a short memorandum, Ms. Haas.  I just
10 want to know if you've ever seen this memorandum.
11    A.   No, I don't recall seeing this memo.
12    Q.   So I understood your testimony, because it
13 will help us go a lot faster, you didn't work at all
14 on the fiscal year '98 Clinton budget proposal that
15 would shift Medicare reimbursement for drugs from
16 AWP to actual costs?
17    A.   I did not work on that issue.
18    Q.   This has been marked as an exhibit
19 previously.  I just don't know the exact number
20 right now.  Let me take a moment here to check my
21 records and see if I can figure that out.  Why don't
22 we go off the record.

---

Page 108

1        THE VIDEOGRAPHER:  We're going off the
2  record.  The time on the screen is 11:17:05.
3        (Discussion off the record)
4        THE VIDEOGRAPHER:  We're back on the
5  record, 11:18:05.
6        BY MR. GOBENA:
7     Q.   It's going to be -- actually, Ms. Haas,
8  can I have this document marked as 1351 and then
9  she'll hand it back to you and continue your review.
10    A.   So I need to give this to --
11    Q.   To the court reporter.
12             (Plaintiff's Exhibit 1351
13              was marked for
14              identification.)
15        BY MR. GOBENA:
16    Q.   Have you had a chance to review the
17 document, Ms. Haas?
18    A.   Yes.
19    Q.   On the first page, you'll see it's a
20 distribution list of the Medicare working group, and
21 you're listed there on the first page, correct?
22    A.   Yes.

---

Page 109

1     Q.   And on the next page, we have a memorandum
2  from Mr. Rieger dated March 7th, 1997 that says --
3  that's to the distribution list, which you're on,
4  and it says, "Re Medicare working group meeting
5  minutes, March 6th, 1997," and it goes on to read,
6  "Due to my absence at the most recent working group
7  meeting, Jim Miller drafted the meeting minutes and
8  they're attached for your review.  As before, please
9  provide me with any changes that you would like
10 incorporated before we publish the final version of
11 the minutes."  Do you see that?
12    A.   Yes.
13    Q.   Do you recall reviewing drafts of minutes
14 prepared after Medicare working group meetings?
15    A.   I may have.
16    Q.   Did you ever provide any comments on any
17 drafts of Medicare working group meeting minutes?
18    A.   Not that I recall, and I would say that at
19 this point I was no longer really participating in
20 these meetings even though I'm on the distribution.
21    Q.   And why do you say that, Ms. Haas?
22    A.   Because I was involved in other issues and

---

Henderson Legal Services
202-220-4158

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

| Page 110 |
|---|
Page 110

1   I was not working on these particular issues.
2      Q.   What particular issues had you started to
3   work on in March of 1997 that took you away from the
4   Medicare working group?
5      A.   Part of it was we felt that we didn't need
6   to have three of us on these calls.  As you'll see
7   on the distribution list, we're listed separately as
8   the D.C. Washington office, and we just felt it
9   didn't make sense to have three of us all on these
10  calls.
11     Q.   So there were times when there were
12  Medicare working group meetings where your office
13  participated where three of you, Mr. Landside,
14  Ms. Sensibaugh and you, were all participating on
15  the same call?
16     A.   Perhaps earlier in the inception of these
17  groups, but as it went along, it -- we felt we
18  needed to have at least one person on those calls.
19  I don't recall which meetings I sat in on and which
20  I didn't.
21     Q.   And if you didn't sit in on a meeting, who
22  was more likely to sit in, Mr. Landside or

Page 111

1   Ms. Sensibaugh, to your knowledge?
2      A.   At that point it would have probably been
3   Cindy or myself.
4      Q.   Is it likely that in connection with this
5   March '97 meeting, either you or Ms. Sensibaugh
6   would have participated in this Medicare working
7   group meeting?
8      A.   I don't recall participating, and I don't
9   know if Cindy participated.
10     Q.   Well, let's go through the meeting minutes
11  and see if that refreshes your recollection as to
12  your potential participation in the meeting that's
13  discussed here.  If you go to the -- we're on the
14  third page here, ABT 52841, and it says, Medicare --
15  in the re line, "Medicare working group meeting
16  minutes," dated March 6th, 1997, and so this
17  memorandum's referencing a meeting that happened on
18  March 6th.  Is that your understanding as well?
19     A.   That's what it says.
20     Q.   Okay.  It goes on to say, The following is
21  a summary of the discussions which occurred at the
22  meeting."  The first bullet point, "Changing

Page 112

1   reimbursement price for drugs administered in
2   physicians' offices from AWP."  Do you see that
3   there?
4      A.   Yes.
5      Q.   By my count, this is the third meeting now
6   that was held -- that the Medicare working group
7   meeting held where the issue of AWP was discussed.
8   Is that consistent with your understanding as well?
9      A.   Based upon --
10        MS. TABACCHI:  Object to the form.
11     A.   Based upon what we looked at, yes.
12     Q.   The next paragraph reads, "Abbott," slash,
13  "TAP has approximately 900 million plus of sales
14  which would be affected by this proposal.  The two
15  largest products are Lupron and Calcijex."  Do you
16  see that there?
17     A.   Yes.
18     Q.   Do you recall being in any Medicare
19  working group meetings where the issue of Medicare
20  reimbursement for Lupron was discussed?
21     A.   No.
22     Q.   How about any Medicare working group

Page 113

1   meetings where the issue of reimbursement for
2   Calcijex was discussed?
3      A.   No.
4      Q.   Did you participate in any Medicare
5   working group meetings where issues related to TAP
6   Pharmaceuticals was discussed?
7      A.   No.
8      Q.   If you go to the last paragraph under this
9   bullet point, it reads, "The group consensus was
10  that," quote, "acquisition cost plus," unquote,
11  "would be the least unfavorable alternative to the
12  current Abbott TAP business."  Do you see that
13  there?
14     A.   Yes.
15     Q.   Do you recall participating in any
16  Medicare working group meetings where discussion of
17  the -- of acquisition cost plus as a way of
18  reimbursing for drugs under Medicare was discussed?
19     A.   No, I do not.
20     Q.   Did you -- do you recall having any
21  discussions within the Washington affairs office,
22  anyone in the Washington affairs office, about the

Henderson Legal Services
202-220-4158

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 114

1  potential option of using acquisition cost plus as a
2  way to reimburse for drugs under Medicare?
3      A.   No, I did not have those conversations.
4      Q.   All right.  I'm going to hand you a
5  document that's been previously marked as
6  Plaintiff's 1134.  Why don't you take a moment to
7  review it.
8      A.   Okay.
9      Q.   This document is a June 5th, 1997 piece of
10 interoffice correspondence from David Landside, who
11 I guess at that point it indicates he was a
12 divisional vice president.  Is that --
13     A.   That's correct.
14     Q.   And it's addressed to Jose M. de Lasa.  Do
15 you see that there?
16     A.   Yes.
17     Q.   Who was Mr. de Lasa?
18     A.   He was the general counsel, but our office
19 reported in to him.
20     Q.   Do you know what the reporting chain was
21 between him and your office specifically?
22        MS. TABACCHI:  Object to the form.

---

Page 115

1      A.   Specifically my recollection is that we
2  reported to Jose de Lasa.
3      Q.   Directly?
4      A.   David.  David reported to Jose de Lasa at
5  that time.
6      Q.   If you go actually three names down on the
7  cc list, do you see an M.E. Barmak there?
8      A.   Yes.
9      Q.   Who was Mr. Barmak around this --
10     A.   At that time?
11     Q.   Yeah.
12     A.   I don't recall what his title was, but he
13 was a senior lawyer in the legal department
14 reporting to Mr. de Lasa.
15     Q.   Do you know whether or not your office
16 worked closely with Mr. Barmak on any issues in this
17 June 1997 time frame?
18        MS. TABACCHI:  Object to the form.
19     A.   At that time I don't believe so, but there
20 was a time that we transitioned and reported to
21 Mr. Barmak, but I believe this was pre that time.
22     Q.   What's your best guess as to when your --

---

Page 116

1  the transition happened where your office went from
2  reporting to Mr. de Lasa to Mr. Barmak?
3      A.   This is going to take some backward
4  calculation.
5      Q.   Take your time.
6      A.   I would say as a guess '98-'99.
7      Q.   There's a D.L. Burnham listed there.
8  Would that be Duane Burnham?
9      A.   Yes.
10     Q.   And at this time in June of 1997, he was
11 the CEO of Abbott; isn't that correct?
12     A.   Yes.
13     Q.   There's a G.P. Coughlan listed there.  Did
14 you see that?
15     A.   Yes.
16     Q.   Do you know who Mr. Coughlan was?
17     A.   My recollection was he was the chief
18 financial officer at that time.
19     Q.   Well, we can skip over the remaining
20 names, that's fine.  You see in the re line, it
21 says, "Monthly highlights, May 1997"?
22     A.   Yes.

---

Page 117

1      Q.   Do you see that?
2      A.   Yes.
3      Q.   Did you have knowledge about the fact that
4  Mr. Landside was sending a memorandum every month
5  discussing what your Washington affairs office was
6  doing?
7         MS. TABACCHI:  Object to the form.
8      A.   Yes.
9      Q.   Did you ever help Mr. Landside draft any
10 of these monthly highlights memorandum that he
11 distributed to Mr. de Lasa and others in or around
12 1997?
13     A.   I don't recall the mechanics of how we did
14 this.  My recollection is that he would have asked
15 us to let him know what we worked on during the
16 month so he could include it in the report.
17     Q.   Is it possible that you might have drafted
18 something and provided to him that he then
19 integrated into the larger memorandum?
20     A.   It's possible he might have asked me to
21 pull it all together and give it to him, yes.
22     Q.   And to your knowledge -- well, let me ask

---

30 (Pages 114 to 117)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 118

1    you this.  When did your office to your knowledge
2    first start doing monthly highlights memos?
3        A.   I don't recall.
4        Q.   When you joined the -- Abbott in 1984 I
5    believe it was --
6        A.   Right.
7        Q.   Did the office prepare monthly highlights
8    memos back then?
9        A.   No.
10       Q.   Do you remember the approximate decade
11   when the monthly highlight memos were first
12   introduced as a way of informing people like Mr. de
13   Lasa about what your office was doing?
14       A.   No, I don't.  It might have been after the
15   former head of our office left and David took over
16   heading up federal government affairs.  I don't
17   recall what year that was.
18       Q.   You don't recall what year Mr. Landsidle
19   became a divisional vice president in charge of
20   Washington affairs?
21       A.   '95, '96 perhaps.
22       Q.   By this time period though of 1997 though,

Page 119

1    the monthly highlights memos were being issued
2    regularly, monthly, correct?
3        A.   Yes, to the senior folks on the list,
4    yeah.
5        Q.   Right, all right.  If you go to the next
6    page, there's a section that's Roman numeral 5,
7    Medicare reform.  Do you see that there?
8        A.   Yes, I do.
9        Q.   And in subsection A, it reads, "Met with
10   members of Congress and staff on the issue of
11   Medicare drug reimbursement being changed from
12   average wholesale price to acquisition cost."  Were
13   you a participant in any of these meetings with
14   members of Congress or their staff regarding the
15   issue of Medicare drug reimbursement being changed
16   from AWP to acquisition cost?
17       A.   No.
18            MR. GOBENA:  I'm going to have the court
19   reporter mark this as Plaintiff's Exhibit 1352.
20            (Plaintiff's Exhibit 1352
21              was marked for
22              identification.)

Page 120

1            BY MR. GOBENA:
2        Q.   It's a real short document.  I want you to
3    just glance at it, let me know when you're ready.
4        A.   Okay.
5        Q.   Is that your handwriting on the top of
6    this document, which is Bates labeled ABT-DOJ
7    295986?
8        A.   No.
9        Q.   Do you recognize whose handwriting that
10   is?
11       A.   No.
12       Q.   If you go down to the bottom of the page,
13   there's a different set of handwriting there.  Do
14   you see that?
15       A.   Yes.
16       Q.   It says, "I think this conversation
17   occurred in 1997."  This was a conversation with
18   Cindy Sensibaugh.  Do you see that there?
19       A.   Yes.
20       Q.   Whose handwriting is that?
21       A.   It appears to be Cindy Sensibaugh's
22   handwriting.

Page 121

1            MR. RIKLIN:  I'm sorry?
2        A.   Cindy Sensibaugh's handwriting is --
3        Q.   Okay.  So it's not your handwriting.
4        A.   No.
5        Q.   Okay.  I'm going to hand you, Ms. Haas,
6    what's been previously marked as Plaintiff's Exhibit
7    1139.  Take a brief moment to review it.  You'll see
8    that this is a document from David Landsidle to
9    Mr. Burnham.  Do you see that?
10       A.   Yes.
11       Q.   And it's dated June 30th, 1997, and the re
12   line is "Medicare drug reimbursement."  My first
13   question to you is have you ever seen this document
14   or drafts of it before?
15       A.   No.
16       Q.   So it's your testimony that you had no
17   involvement or participation in the creation of this
18   document?
19       A.   No.
20       Q.   If you go to the third bullet point in the
21   first set of bullet points there, it says -- it
22   talks about a Senate bill that was pending at the

31 (Pages 118 to 121)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                      Washington, DC

---

Page 122

1    time, and it says that the Senate bill calls on the
2    secretary of HHS to do a study of AWP and report
3    back to Congress within six months.  This gets HHS
4    looking at the price -- at prices.  The House bill
5    contains -- or has no such language.  Do you see
6    that there?
7        A.   Yes.
8        Q.   Did you have any discussions in your
9    office in 1997 -- with anyone in your office in 1997
10   regarding the Senate version of a bill addressing
11   Medicare drug reimbursement?
12       A.   No.
13       Q.   So you never had any discussions about
14   concerns within your office about HHS looking at
15   Abbott's prices.
16       A.   No.
17       Q.   I hand you a document that's been
18   previously marked as Plaintiff's Exhibit 1140.
19       A.   Okay.
20       Q.   First of all, have you ever seen this
21   letter before?
22       A.   No.

---

Page 123

1        Q.   So you did not participate at all in the
2    drafting of the letter?
3        A.   Not that I recall.
4        Q.   If you go to the second paragraph, there's
5    a -- it says -- sorry, strike that.  Let's go --
6    first of all, if you look at the bottom, it says
7    "Sincerely, Duane."  Do you see that?
8        A.   Yes.
9        Q.   And if you look at the top, just below the
10   Abbott insignia, it reads -- it looks like the word
11   Duane W. Burnham is listed there.  Do you see that?
12       A.   Yes.
13       Q.   So this appears to be a letter from
14   Mr. Burnham, correct?
15       A.   Yes.
16       Q.   And it's addressed to Bill Archer,
17   correct?
18       A.   Yes.
19       Q.   And at the time, Bill Archer was the
20   chairman of the Ways and Means Committee for the
21   House, correct?
22       A.   Yes.

---

Page 124

1            MS. TABACCHI:  Object to the form.
2            BY MR. GOBENA:
3        Q.   So Mr. Burnham writes, "I want to express
4    our gratitude for what you accomplished with the
5    Medicare drug reimbursement provision.  When we
6    spoke on the telephone, you said you intended to
7    hold the House language in the conference committee
8    and you did.  Your language was clearly superior to
9    the Senate's and Abbott thanks you for convincing
10   the rest of the conferees."  Do you see that there?
11       A.   Yes.
12       Q.   Did you participate in any phone calls
13   between Duane Burnham and Bill Archer related to
14   Medicare drug reimbursement issues?
15       A.   No.
16           MR. GOBENA:  I'm going to have this
17   document marked as Plaintiff's Exhibit 1353 I
18   believe.
19               (Plaintiff's Exhibit 1353
20                  was marked for
21                  identification.)
22           BY MR. GOBENA:

---

Page 125

1        Q.   This is a letter dated August 21st, 1997
2    from David Landsidle to Nancy Taylor, correct?
3        A.   Yes.
4        Q.   Have you ever worked with Ms. Taylor?
5        A.   I know Ms. Taylor, but I don't recall
6    working with her on any specific issue.  She was a
7    former Hill staffer.
8        Q.   Do you know for whom on the Hill
9    Ms. Taylor had worked?
10       A.   I don't remember.
11       Q.   Is your testimony that you may have worked
12   with her but you just don't remember the specific
13   issue?
14       A.   I don't believe I worked with Nancy Taylor
15   on any particular issue, but I knew Nancy and I'm
16   sure I saw her at fund-raisers and that sort of
17   thing.
18           MR. GOBENA:  Have this marked as
19   Plaintiff's Exhibit 1354.
20               (Plaintiff's Exhibit 1354
21                  was marked for
22                  identification.)

---

32 (Pages 122 to 125)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 126

1        BY MR. GOBENA:
2     Q.   Do you recognize this document to be an
3   October 1997 monthly highlights report from
4   Mr. Landsidle?
5     A.   Yes.
6     Q.   If I could just turn your attention first
7   to the second page, there are a variety of tasks
8   identified there, and behind some of them, for
9   example, number -- Roman numeral 9, PPD has a task
10  with a parenthetical with someone's name in it, and
11  in that instance it's you.  Do you see that?
12    A.   Yes.
13    Q.   Now, scanning this page, does this, to the
14  best of your knowledge, accurately reflect the kinds
15  of issues you were working on in 1997?
16    A.   Yes.
17    Q.   If you go back to the first page, it says
18  Roman numeral 3, "Medicare reimbursement," and
19  subsection A says, "Met with Congressional staff to
20  ensure that the Health Care Financing Administration
21  correctly interprets this summer's Medicare
22  reimbursement law," and in parentheses after that,

Page 127

1   it says "Landsidle."  Did you provide any assistance
2   to Mr. Landsidle with respect to this endeavor to
3   make -- to meet with Congressional staff about the
4   implementation of the summer Medicare reimbursement
5   law?
6     A.   Not that I recall, no.
7        MR. GOBENA:  Okay.  I'm going to have this
8   document marked as Plaintiff's Exhibit -- my
9   short-term memory is going here.  Is it 1355?
10             (Plaintiff's Exhibit 1355
11                 was marked for
12                 identification.)
13       BY MR. GOBENA:
14    Q.   Why don't you take a moment to review
15  this, Ms. Haas.  I'm going to ask you about the
16  first page, the second page and the attachments to
17  the memo, or the letter of the second page, and
18  that's it for right now.  I may ask about additional
19  pages, but if you could just focus on those right
20  now to get yourself prepared to answer the
21  questions?
22    A.   Okay, okay, I think I've looked at the

Page 128

1   ones you want me to look at.
2     Q.   You'll see this is a document with a cover
3   sheet dated November 19th, 1997.  Do you see that?
4     A.   Yes.
5     Q.   And do you recognize the handwriting to be
6   your handwriting?
7     A.   Yes.
8     Q.   Okay.  This is a memo, it seems --
9   enclosing some materials from you to a Rhonda
10  Luniak?
11    A.   Yes.
12    Q.   Who is Ms. Luniak?
13    A.   My recollection is that Rhonda was in HPD
14  public affairs.
15    Q.   If you go to the re line, it says, "Re
16  Stark correspondence regarding vancomycin."  Do you
17  see that there?
18    A.   Yes, uh-huh.
19    Q.   And you've attached -- or attached to this
20  are several documents related to that correspondence
21  about vancomycin, amongst other issues.  Do you see
22  that?

Page 129

1     A.   Yes.
2     Q.   When did you first become aware of
3   Congressman Stark's letter dated August 27, 1997
4   addressing vancomycin?
5     A.   I don't recall the specifics of this
6   issue, and the way things would work is since this
7   is to Rhonda, we may have had a phone call from
8   Stark's office out to our public affairs department,
9   or there was some communication or publication or a
10  reporter called and I was asked to provide documents
11  relating to that issue.
12    Q.   And you provided them to a public affairs
13  person, in this instance Rhonda Luniak?
14    A.   My guess is since these went to her, that
15  she requested them.
16    Q.   Aside from providing this documentation,
17  would you provide any other support to public
18  affairs people responding to these types of issues
19  in the media?
20       MS. TABACCHI:  Object to the form.
21    A.   Yes.
22    Q.   And what kinds of support would you

                              33 (Pages 126 to 129)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 130

1  provide other than just providing documents?
2      A.   Similar to this.
3      Q.   I see.  You'd provide documents regularly?
4  Let me strike that.  It's not a good question.  The
5  way you'd support the press public affairs people at
6  HPD or any other division responding to media
7  inquiries about Congressional letters or whatever is
8  to provide documents?
9      A.   In addition perhaps, attend a hearing,
10 provide a report on the hearing.
11     Q.   Would you give any kind of background
12 briefing to any of the public affairs officials to
13 help them in responding in the press to any issues
14 such as the ones raised in the correspondence
15 attached here?
16         MS. TABACCHI:  Object to the form.
17     A.   Only to the extent of providing them the
18 documents so they would have the background as to in
19 this case Mr. Stark's interest in this issue.
20     Q.   Other than providing this documentation,
21 did you provide any other support or advice to
22 Ms. Luniak regarding the Stark letter attached to

---

Page 131

1  this memo?
2      A.   I honestly do not recall, and I don't know
3  if this was related to legislation or if I did any
4  more work on it.  I don't recall.
5      Q.   Why don't you take a look at the letter,
6  which is on the second page of this exhibit.  Did
7  you review or read this letter, rather, prior to
8  transmitting it to Ms. Luniak on November 19th,
9  1997?
10     A.   Yes.
11     Q.   Okay.  Did you discuss the contents of the
12 letter with anyone within the government affairs
13 office?
14     A.   I don't recall.  It's possible, but I
15 don't recall.
16     Q.   Did you discuss the contents of the letter
17 with anyone else other than the government affairs
18 department at Abbott?
19     A.   Not that I recall, no.
20     Q.   Why don't we take a look at the substance
21 of the letter.  It's a letter from Pete Stark to the
22 Honorable June Gibbs Brown, Inspector General, dated

---

Page 132

1  August 22nd, 1997, and it says, "Dear Inspector
2  General, Enclosed are comparisons provided to me by
3  a concerned pharmacist from Florida which show
4  Medicare and Medicaid paying more for generic
5  pharmaceuticals than the brand-name products.  The
6  data" -- and you go further down a few sentences, it
7  reads, "The data indicates that in some cases, the
8  taxpayer is paying almost 500 percent more for a
9  generic drug than for the identical brand-name
10 product.  For example, Lilly's brand name Vancocin
11 is reimbursed at $6.67 per 500 milligrams.  Abbott's
12 generic vancomycin is reimbursed at $30.85 per 500
13 milligrams, and that" -- "this is just the listed
14 price.  As you know, the real actual acquisition
15 price to the health care provider is often much
16 less, but Medicare and Medicaid are paying at these
17 inflated rates."  Do you see that there?
18     A.   Yes.
19     Q.   And you read this letter around -- at
20 least at the time you transmitted it to Ms. Luniak,
21 correct?
22     A.   Yes.

---

Page 133

1      Q.   And Congressman Stark is saying that
2  Abbott's vancomycin is priced a little bit less than
3  five times that of Vancocin.  Do you see that there?
4      A.   That's what it says.
5      Q.   And he talks about the fact that because
6  of these -- of the $30 list price, that Medicare and
7  Medicaid is paying at an inflated rate.  Do you see
8  that there?
9      A.   That's what he says, yes.
10     Q.   That's a pretty serious allegation from
11 Congressman Stark, isn't it?
12         MS. TABACCHI:  Object to the form.
13     A.   Yes.
14     Q.   And when you read that, did you take that
15 allegation seriously?
16         MS. TABACCHI:  Object to the form.
17     A.   I was disturbed by reading it.
18     Q.   And given that this was a serious
19 allegation, that didn't spark you to discuss the
20 contents of this letter with anyone else at the
21 government affairs department?
22     A.   I may have mentioned it to David

---

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                      Washington, DC

Page 134

1   Landsidle.
2        MR. RIKLIN:  I'm sorry?
3        A.   I may have mentioned it to David
4   Landsidle.
5        Q.   He would have been the person that you
6   would have discussed these types of issues with
7   within government affairs?
8        A.   Because he was my boss, right.
9        Q.   Do you know whether anyone within
10  government affairs tried to reach out to Congressman
11  Stark to discuss the allegations in this letter?
12       A.   I don't believe so.
13       Q.   Do you recall whether there was any
14  specific press out there relating to the contents of
15  this letter in or around August of 1997?
16       MS. TABACCHI:  Object to the form.
17       A.   I don't recall.
18       Q.   If you go on to read the rest of the
19  letter, he says -- he asks, "Are these figures
20  accurate, and if so, what can the department do to
21  administratively stop this abuse.  I would
22  appreciate your help in sampling this data to

Page 135

1   confirm, adjust or refute the material.  If the data
2   is even half right, it is outrageous that the
3   taxpayer continue to pay more for a generic product
4   than the brand-name product."
5        He goes on to say, "Your help in ensuring
6   the immediate correction of this ripoff will be
7   appreciated."  At this point in time, at least if
8   not August of '97, by November of 1997, your office,
9   government affairs, had specific knowledge that at
10  least Congressman Stark was raising issues of
11  potential ripoffs involving the Abbott drug
12  vancomycin; isn't that correct?
13       MS. TABACCHI:  Object to the form.
14       A.   Apparently, but not -- this was the kind
15  of thing that Mr. Stark would write, so --
16       Q.   Why don't you explain that a little
17  further for us.
18       A.   He tended to be rather inflammatory in his
19  investigation of these matters.
20       Q.   But you certainly respect Congressman
21  Stark, correct?
22       MS. TABACCHI:  Object to the form.

Page 136

1        A.   I have no opinion.
2        Q.   You have no opinion about Congressman
3   Stark.
4        A.   That's correct.
5        Q.   Do you know what opinion Mr. Landsidle had
6   of Congressman Stark?
7        MS. TABACCHI:  Object to the form.
8        A.   I can't speak of his opinion.
9        Q.   What about Ms. Sensibaugh?  Do you know
10  what her opinion was of Congressman Stark?
11       A.   No.
12       Q.   So when correspondence like this comes in
13  from Congressman Stark, do you take it seriously?
14       MS. TABACCHI:  Object to the form.
15       A.   I don't recall whether he was chairing a
16  subcommittee or whatnot at that time.  If he was
17  chairing the subcommittee, we would have taken it
18  very seriously and would have wanted to manage the
19  issue.
20       Q.   But if he was a minority member of a
21  committee, you wouldn't take him seriously?
22       MS. TABACCHI:  Object to the form.

Page 137

1        THE WITNESS:  Not as seriously.
2        MR. GOBENA:  Why don't we go off the
3   record for lunch.  I think this is a good breaking
4   point.
5        THE VIDEOGRAPHER:  Here marks the end of
6   Videotape Number 2.  We're going off the record.
7   The time on the screen is 11:56:54.
8        (Recessed at 11:56 a.m.)
9        (Reconvened at 12:54 p.m.)
10       THE VIDEOGRAPHER:  Here marks the
11  beginning of Videotape Number 3 in the deposition of
12  Ms. Haas.  The time on the screen is 12:54:12.
13  You're on the record.
14       BY MR. GOBENA:
15       Q.   Ms. Haas, before we broke for the lunch
16  break, we were looking at some documents from the
17  '96 to '97 time frame.
18       A.   Uh-huh.
19       Q.   I'm going to fast-forward ahead a few
20  years to 2004 and ask you some questions about some
21  documents from that time period.
22       A.   Sure.

                              35 (Pages 134 to 137)

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 138

1        MR. GOBENA:  First I'll have the court
2   reporter mark as Plaintiff's Exhibit 1356 and
3   Plaintiff's Exhibit 1357 these two documents.
4            (Plaintiff's Exhibit 1356 &
5             Plaintiff's Exhibit 1357
6             were marked for
7             identification.)
8        MS. TABACCHI:  Which one's 56?
9        BY MR. GOBENA:
10   Q.   The article's going to be 56, and 57's
11  going to be the handwritten notes.  Ms. Haas, let me
12  know when you've had a chance to --
13   A.   Sure.
14   Q.   -- complete your review --
15   A.   I completed the article.
16   Q.   -- of the documents.  I'm only going to
17  ask you about parts of the article, so don't --
18   A.   Okay.
19   Q.   -- read the whole thing.  Before you even
20  review the second exhibit in detail, whose
21  handwriting is that?
22   A.   That I think is my handwriting.

Page 139

1    Q.   Okay.  Why don't you take a moment to look
2   over Plaintiff's Exhibit 1357 as well and let me know
3   when you're ready to --
4    A.   Okay.
5    Q.   -- talk about both of the exhibits.
6        MR. RIKLIN:  Is 56 the handwritten?
7        MR. GOBENA:  This is 56.
8        THE WITNESS:  Okay.
9        BY MR. GOBENA:
10   Q.   Okay.  Plaintiff's Exhibit 1356 is a Pink
11  Sheet article dated April 10th, 2000.  Do you recall
12  having received this article?
13   A.   Yes, because I have this to say, that I
14  read this and took notes on it.
15   Q.   So you reviewed the article --
16   A.   Yes.
17   Q.   And took notes on the article.
18   A.   Yes.
19   Q.   Let's go over the article first and then
20  we'll get to your notes.  The article is titled "AWP
21  Price Certification Sought From Manufacturers in DOJ
22  Investigation," and the text of the first paragraph

Page 140

1   reads, "Manufacturer certifications that the average
2   wholesale prices provided to the Medicaid programs
3   are the," quote, "true provider acquisition costs,"
4   unquote, "will be sought in future rebate
5   discussions."  Do you see that there?
6    A.   Yes.
7    Q.   Prior to the proposal that's indicated in
8   that first paragraph, had there been certifications,
9   to your knowledge, required of manufacturers about
10  the truth of the pricing they were providing to the
11  Medicaid programs?
12       MS. TABACCHI:  Object to the form.
13   A.   I do not know.
14   Q.   But as of April of 2000, you had at least
15  learned through this article that certifications
16  regarding the accuracy of prices reported to the
17  Medicaid programs were going to be sought by
18  Medicaid programs, correct?
19       MS. TABACCHI:  Object to the form.
20   A.   According to this article, yes.
21   Q.   The article goes on to read, "A necessary
22  component to any negotiated resolution with a

Page 141

1   manufacturer will be the obligation to certify that
2   the prices it reports to the First DataBank reflect
3   wholesale prices," unquote, "according to a recent
4   letter from the National Association of Medicaid
5   Fraud Control Units to state Medicaid pharmacy
6   directors."  Are you familiar with the National
7   Association of Medicaid Fraud Control Units?
8    A.   No.
9    Q.   And do you have an understanding as to
10  what that quote is referring to when it's talking
11  about negotiated resolutions with a manufacturer?
12   A.   No.
13   Q.   The next paragraph reads, "An ongoing
14  investigation by NAMFCU," which is also referred to
15  as NAMFCU, "the Justice Department and State
16  Attorney General will result in fundamental changes
17  regarding the reporting of pharmaceutical prices and
18  a consequent reduction in the cost of drugs to the
19  government health care programs, the letter
20  declares, and DOJ began making inquiries in the
21  calculation of AWPs more than three years ago."  Do
22  you see that there?

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                      Washington, DC

Page 142

1    A.   Yes.
2    Q.   And that last sentence about DOJ inquiries
3  is consistent with your testimony earlier this
4  morning that you were aware that DOJ was looking
5  into the way that certain manufacturers were
6  calculating AWPs as far back as '97, correct?
7    A.   Yes, according to media reports I had
8  read.
9    Q.   And this is -- this article is in April
10 2000.  By then, you had received instructions to
11 preserve and provide documents related to AWP,
12 correct?
13   A.   I would assume so, yes.
14   Q.   So your knowledge is not just from the
15 media reports, but it's also because you received
16 direction to provide AWP-related documents to
17 someone at Abbott, correct?
18       MS. TABACCHI:  Object to the form.
19   A.   I would think so, yes.
20   Q.   Okay.
21   A.   I don't know for a fact, but --
22   Q.   The next paragraph reads, "The letter

Page 143

1  informed state Medicaid pharmacy directors that
2  average wholesale drug prices reported by First
3  DataBank to Medicaid will be based," quote -- I'm
4  sorry, "based on," quote, "market prices rather than
5  the prices identified by the manufacturers,"
6  unquote.  Did you understand that manufacturers at
7  this point were not reporting market prices to
8  pricing compendia such as First DataBank?
9        MS. TABACCHI:  Object to the form.
10   A.   No, I did not.
11   Q.   So when you read that paragraph, was that
12 the first time you became aware at least through
13 this media report that manufacturers were not
14 submitting market prices to First DataBank?
15       MS. TABACCHI:  Object to the form.
16   A.   Yes.
17   Q.   A few paragraphs down, there's a paragraph
18 that starts, "The investigation."
19   A.   Uh-huh.
20   Q.   And it says, "The investigation by state
21 and federal fraud units has revealed a pattern of
22 misrepresentations by some manufacturers of the

Page 144

1  average wholesale prices and the wholesale
2  acquisition costs of certain of their products,
3  NAMFCU said."  Again, that discussion of
4  investigations of potential fraud related to average
5  wholesale price is consistent with your knowledge at
6  least from the Stark letter that there was concerns
7  raised about waste of -- relating to waste and fraud
8  and the use of AWP, correct?
9        MS. TABACCHI:  Object to the form.
10   A.   Could you repeat the question please?
11   Q.   Sure.
12   A.   I'm just reading it again.  I was reading
13 the paragraph again.
14   Q.   Sure.  The references to
15 misrepresentations in this paragraph, or allegations
16 of misrepresentations are consistent with the
17 allegations in Congressman Stark's letter back in
18 1997 generally, correct?
19       MS. TABACCHI:  Object to the form.
20   A.   I would suppose perhaps.
21   Q.   Let's go -- actually, why don't we go to
22 the last paragraph there on the left side.  It says,

Page 145

1  "While the investigation is focused on a relatively
2  small subset of government pharmaceutical purchases,
3  the front page coverage of the initial findings in
4  the USA Today April 6th carries greater weight from
5  its confluence with increasing Republican interest
6  in U.S. drug prices compared to Canada and Mexico."
7  Do you see that there?
8    A.   Yes.
9    Q.   Had you seen, to the best of your
10 recollection, articles in USA Today as of April of
11 2000 relating to the issues identified in this Pink
12 Sheet?
13       MS. TABACCHI:  Objection to the form.
14   A.   I don't recollect.
15   Q.   Actually, let's pop up to the paragraph
16 before that.  That says, "The alleged
17 misrepresentations which the organization believes
18 will be corrected with the changes to FDB's
19 reporting," quote, "relate only to a limited number
20 of medications, generally infusion, inhalation and
21 injectable products."  Do you see that there?
22   A.   Yes.

                              37 (Pages 142 to 145)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 146

1    Q.   And you know that Abbott manufactures
2   infusion products, correct?
3    A.   Yes.
4    Q.   And you know that Abbott manufactures
5   injectable products, correct?
6    A.   Yes.
7    Q.   Okay.  Now, let's turn to your notes which
8   are reflected in Plaintiff's Exhibit 1357.  Why is it
9   that you chose to take these notes relating to this
10  article?
11   A.   I would guess that I took these notes so
12  that if I needed to refer back to this sort of to
13  enhance my learning of the situation.
14   Q.   Did you take these notes in part because
15  these proposed price -- price reports that NAMFCU
16  was pushing related to injectable products, which
17  are a type of product that Abbott manufactures?
18       MS. TABACCHI:  Object to the form.
19   A.   My recollection is that I would have taken
20  these notes because I was trying to get a better
21  understanding of what the issues were involved with
22  these AWP issues.

Page 147

1    Q.   In part because some of the drugs
2   discussed in the article were Abbott drugs, correct?
3       MS. TABACCHI:  Object to the form.
4    A.   But more so that these were subjects of
5   Congressional interest and discussion in Washington,
6   and I wanted to be able to understand what the
7   issues were relating to the discussions.
8    Q.   Outside of taking the notes reflected in
9   Plaintiff's Exhibit 1357, do you recall having any
10  conversations with anyone about these price changes
11  referenced in this Pink Sheet article of April 10,
12  2000?
13   A.   No.
14       MR. GOBENA:  I'm going to have this marked
15  as Plaintiff's Exhibit 1358.
16              (Plaintiff's Exhibit 1358
17               was marked for
18               identification.)
19       THE WITNESS:  Okay.
20       BY MR. GOBENA:
21   Q.   Whose notes are these?
22   A.   These are my notes.

Page 148

1    Q.   Let's go back real quickly to Plaintiff's
2   Exhibit 1356.  If you go to the column on the left,
3   midway down, there's a paragraph that starts, "First
4   DataBank is implementing these changes," and you
5   understand these changes being the price
6   certifications referenced in the article, correct?
7    A.   Yes.
8    Q.   Okay.  "First DataBank is implementing
9   these changes on a voluntary basis and without any
10  additional charges to the states, the February
11  NAMFCU letter states.  Additionally, FDB will no
12  longer report a price for the product unless its
13  manufacturer has certified the completeness and
14  accuracy of the pricing information submitted."  Are
15  you familiar with the entity known as First
16  DataBank?
17   A.   I've heard of First DataBank and I have
18  that level of familiarity with them.
19   Q.   What's your understanding of what First
20  DataBank is?
21   A.   That they collected data on drug prices.
22   Q.   Data that was relied upon by various state

Page 149

1   Medicaid programs, correct?
2       MS. TABACCHI:  Object to the form.
3    A.   I can't answer that.  I don't know enough
4   about it.
5    Q.   If you go to Plaintiff's Exhibit 1358 in
6   the sort of upper left-hand corner, there's a date
7   there of May 3rd, 2000.  Did you typically take --
8   put dates on documents when you were taking notes?
9   Does this reflect the contemporaneous reflection --
10  strike that.  It got garbled up.  5/3/2000 -- does
11  that reflect that the conversation you have
12  memorialized here, which is with apparently Kay
13  Morgan, happened that day?
14   A.   Yes.
15   Q.   Who is Kay Morgan?
16   A.   Kay Morgan was with Abbott in HPD.
17   Q.   When was she employed by Abbott?
18   A.   She was there for quite a while.  I don't
19  recall when she was there and when she left.
20   Q.   Ms. Morgan's testified in a larger
21  multidistrict litigation case, and in her testimony
22  on page 27, the deposition she gave on January of

38 (Pages 146 to 149)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 150

1  2000, she indicated that she joined FDB or First
2  DataBank --
3      A.   Uh-huh.
4      Q.   -- in April of 1999.  Is that consistent
5  with your recollection of when she might have left
6  Abbott?
7      A.   Compared to who was leaving and coming
8  within the company at that time, I would say that's
9  about the right time, yeah.
10     Q.   So in May of 2000, Ms. Morgan was no
11 longer working at Abbott, correct?
12     A.   Correct.
13     Q.   And she was working at First DataBank,
14 correct?
15     A.   Correct.
16     Q.   So in the article we looked at and from
17 April 2000, there's a reference to First DataBank
18 requiring manufacturer certifications for pricing
19 information.  Do you recall that?
20     A.   Yes.
21     Q.   And so what this reflects is a
22 conversation you had with Ms. Morgan, who is now at

Page 151

1  First DataBank.
2      A.   Yes.
3      Q.   Do you know what Ms. Morgan's title was at
4  First DataBank?
5      A.   No.
6      Q.   Why did you call Ms. Morgan in particular
7  at First DataBank?
8      A.   Because I had known Kay for quite a while
9  and I was trying to understand these issues.
10     Q.   So you called Ms. Morgan to get some
11 background related to the subject matter of the
12 April 2000 Pink Sheet article?
13     A.   That would appear to be what I called her
14 about, yes.
15     Q.   All right.  Let's go to the first bullet
16 point.  It says, "Re AWP issue and First DataBank."
17 Beneath that, we see HPD and TAP, and it says, "Both
18 should know about this activity."  Is that you
19 stating your personal view or is that you
20 memorializing what Ms. Morgan had told you?
21     A.   That would reflect what I learned from
22 Ms. Morgan.

Page 152

1      Q.   Do you recall why Ms. Morgan indicated to
2  you that HPD and TAP should know about the AWP
3  issues raised in the April 2000 Pink Sheet article?
4          MS. TABACCHI:  Object to the form.
5      A.   Again, recollecting, I would think that I
6  was attempting to make sure that people knew about
7  this activity, and that I probably asked her that
8  and she said HPD and TAP would be aware of this
9  activity.
10     Q.   HPD stands for the Hospital Products
11 Division, correct?
12     A.   Yes.
13     Q.   And the Hospital Products Division
14 manufactures, among other things, injectable drugs,
15 correct?
16     A.   Yes.
17     Q.   And TAP stands for -- is a joint venture
18 that Abbott has with Takeda Pharmaceuticals,
19 correct?
20     A.   Yes.
21     Q.   And TAP manufactures the drug Lupron,
22 correct?

Page 153

1      A.   Correct.
2      Q.   And Lupron's a drug that's administered
3  through infusion, correct?
4      A.   Correct.
5          MS. TABACCHI:  Object to the form.
6          BY MR. GOBENA:
7      Q.   And we saw in the article that the changes
8  being proposed were for injectable and infusion
9  drugs, correct?
10     A.   Correct.
11     Q.   So is it your understanding that
12 Ms. Morgan may have been telling you that you should
13 contact HPD and TAP because the proposed changes
14 related to infusion and injectable drugs, which both
15 these entities manufactured?
16         MS. TABACCHI:  Object to the form.
17     A.   No.
18     Q.   How am I wrong there?
19     A.   I think she was trying to help me
20 understand who should know about this at Abbott, and
21 her answer to me was HPD and TAP would know about
22 this.

39 (Pages 150 to 153)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                   August 30, 2007
                    Washington, DC

| Page 154 |
|---|
| 1    Q.   I see.  Oh, so it was not so much who you |
| 2  should inform -- |
| 3    A.   Right, it was me asking her hey, this |
| 4  article, this activity's going on.  I've known Kay |
| 5  for a long time.  It's who should be informed about |
| 6  this, was the way the conversation probably went, |
| 7  and her response was HPD and TAP would both know |
| 8  about this, so therefore, I don't need to involve |
| 9  myself with that. |
| 10    Q.   Sorry.  The last part of your answer |
| 11  dropped off. |
| 12    A.   They would know about it, so I didn't need |
| 13  -- they would already know about it, so there was no |
| 14  need for me to contact them. |
| 15    Q.   There are other obviously business units |
| 16  within Abbott, such as Pharmaceutical Products |
| 17  Division, correct? |
| 18    A.   Uh-huh. |
| 19    Q.   Did you -- was she telling you here |
| 20  basically that they would not know about this -- |
| 21  this issue in the April 2000 Pink Sheet? |
| 22        MS. TABACCHI:  Object to the form. |

| Page 155 |
|---|
| 1    A.   I don't recall. |
| 2    Q.   Since you haven't indicated that they knew |
| 3  about that from your notes here, the PPD division, |
| 4  did you reach out to them to discuss the issue with |
| 5  them? |
| 6        MS. TABACCHI:  Object to the form. |
| 7    A.   No, no, I did not. |
| 8    Q.   The next bullet point says, "433 products |
| 9  on a list developed," quote, "somehow," unquote, "by |
| 10  DOJ," and then there's a dash above that and it |
| 11  says, "HHS," question mark. |
| 12    A.   Uh-huh. |
| 13    Q.   Again, is that reflecting something you |
| 14  communicated to Ms. Morgan in this conversation or |
| 15  something that she communicated to you? |
| 16    A.   This was something she communicated to me |
| 17  in trying to advance my understanding of this issue |
| 18  and this process. |
| 19    Q.   So the quoted word "somehow," that's her |
| 20  word, or characterizes what she was saying to you? |
| 21        MS. TABACCHI:  Object to the form. |
| 22    A.   I would think so, since it's in quotes. |

| Page 156 |
|---|
| 1    Q.   And that sort of dashed line above it to |
| 2  HHS, does that reflect that Ms. Morgan was |
| 3  speculating as to whether or not HHS had provided -- |
| 4  or helped develop this list referenced in this |
| 5  bullet point? |
| 6        MS. TABACCHI:  Object to the form. |
| 7    A.   I couldn't speak to that.  That could be |
| 8  my question in my mind, is is it HHS that develops |
| 9  this list. |
| 10    Q.   So either you or Ms. Morgan thought that |
| 11  HHS might have been involved in developing the list |
| 12  in this bullet point. |
| 13        MS. TABACCHI:  Object to the form. |
| 14    A.   Yes. |
| 15    Q.   It goes on underneath that bullet point to |
| 16  say, "Abbott on list," colon, "TAP," slash, "HPD |
| 17  products," comma, "primarily HPD.  Kay saw no PPD or |
| 18  Ross on that list."  Does this reflect the fact that |
| 19  Ms. Morgan was identifying for you that the products |
| 20  on the list at issue in this bullet point were HPD |
| 21  products mostly? |
| 22    A.   Yes. |

| Page 157 |
|---|
| 1    Q.   Would you be able to look at a list of |
| 2  drugs and be able to distinguish between HPD and PPD |
| 3  drugs? |
| 4    A.   Some. |
| 5    Q.   But you're not familiar with all -- |
| 6    A.   No. |
| 7    Q.   -- drugs manufactured by other divisions. |
| 8    A.   And usually it's by chemical name and |
| 9  whatnot. |
| 10    Q.   Okay.  You go to the next bullet point |
| 11  says -- there's a line there, and if you look on the |
| 12  -- it says -- the first bullet point -- the bullet |
| 13  point says certain products, and right next to it |
| 14  there, it says, parentheses, "TAP," closed |
| 15  parentheses, "Justice Department."  What do those |
| 16  notes there indicate? |
| 17    A.   It says certain products billed to |
| 18  Medicaid.  I don't know.  Perhaps this was an |
| 19  allegation that had been made. |
| 20    Q.   Actually, let's go with what you're |
| 21  reading there.  I think that's helpful.  You said |
| 22  certain products billed to Medicaid, and beneath |

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                          August 30, 2007
                         Washington, DC

| Page 158 | Page 160 |
|---|---|

**Page 158**

1  that, it says, "Charged more than others are really
2  paying in the," and there's a word missing there.
3  Do you see that there?
4      A.   Uh-huh.
5      Q.   Okay.  And above that to the right,
6  there's a reference to TAP and Justice Department.
7      A.   Uh-huh.
8      Q.   Do you see that there?
9      A.   Uh-huh, yes.
10      Q.   Were you aware of any investigation of TAP
11  by the Justice Department around this time period in
12  2000?
13      A.   Not specifically, but the way I read these
14  notes and recollecting this, that I was -- perhaps
15  that there were allegations made that TAP had done
16  this.
17      Q.   Did you and Ms. Morgan discuss whether or
18  not the proposed manufacturer certifications on
19  these products discussed in the April 2000 article
20  were somehow connected to the TAP investigation?
21      A.   No.
22      Q.   So on this bullet point here, does it not

**Page 159**

1  reflect part of your conversation with Ms. Morgan,
2  the one that starts with, "Certain products"?
3          MS. TABACCHI:  Object to the form.
4      A.   I still think this was Kay trying to
5  educate me on what this whole process was about and
6  what -- what the factors were that led to it and
7  what was driving it.
8      Q.   Let's go down to the bottom of the
9  document.  There's a -- it's kind of all -- there's
10  a lot of notes here at the bottom.  If you look at
11  sort of the right side of the page, about a third of
12  the way -- third of the way from the bottom, there's
13  a word -- the word "TAP" there and the word -- the
14  words "Ken Griesman" next to it.  Do you see that?
15      A.   Yes.
16      Q.   Who was Ken Griesman?
17      A.   Ken Griesman was formerly an Abbott
18  attorney and he went to work for TAP, but I don't
19  know if he was at TAP at this time or still with
20  Abbott.
21      Q.   Why is his name here in your notes?
22      A.   As a potential contact if I needed more

**Page 160**

1  information.
2      Q.   Was his name provided to you by Ms. Morgan
3  as a potential resource?
4      A.   Not necessarily.  I knew -- I knew Ken.
5      Q.   At the bottom there, you see there's a
6  group of notes underneath "Summary"?
7      A.   Uh-huh.
8      Q.   Number one reads, "Investigations," colon,
9  "TAP," parentheses, "Lupron," closed parentheses,
10  "Started ball," and then underneath it, it says,
11  "Medicaid being overcharged for certain products."
12  Are those your notes there?
13      A.   Yes.
14      Q.   And again, does that reflect a summary of
15  at least one issue that you discussed with
16  Ms. Morgan on May 3rd, 2000?
17      A.   Yes.
18      Q.   And item number 3 on this list says, "FDB
19  will comply.  There will be a Medicaid AWP and
20  another" -- and we lose the rest of it.
21      A.   Uh-huh.
22      Q.   So in the course of your conversation with

**Page 161**

1  Ms. Morgan on May 3rd, 2000, did you ask her whether
2  FDB would be complying with the request from NAMFCU?
3      A.   I probably asked her how this was all
4  going to play out going forward.
5      Q.   Okay.  Let's go to the questions on the
6  next page.  Is this your handwriting?
7      A.   Yes.
8      Q.   So your question number one is -- let me
9  ask you this.  Are these questions questions that
10  arose after you had your conversation with
11  Ms. Morgan on May 3rd, 2000, or are they questions
12  that you had before you had your conversation with
13  her?  Why don't you take a moment to look at it so
14  you can confirm one way or the other.
15      A.   I believe it's a combination, and -- and
16  other things that I -- sort of a laundry list of
17  other things that I might want to find out about as
18  part of my being educated on the issue.
19      Q.   Let's look at some of these questions
20  here.  We talked about the first and the second
21  questions in some form already.  The third question
22  is what process did DOJ use to come up with the

                              41 (Pages 158 to 161)

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 162

1  list.  After your call with Ms. Morgan, did you try
2  and determine what process DOJ used to come up with
3  the list of drugs that you discussed with her?
4      A.   I don't recall.
5      Q.   Underneath it, it says, "How did they
6  determine prices?"  Do you see that there?
7      A.   Yes.
8      Q.   Why was that important for you to find
9  out?
10         MS. TABACCHI:  Object to the form.
11     A.   I would guess that it was to help again my
12  understanding of how this process worked.
13     Q.   When you say how the process worked, how
14  -- you were just trying to understand better how the
15  price -- sorry, strike that.  Let me -- why don't
16  you explain to me what you meant by you wanted to
17  understand how the process worked.  It's not quite
18  clear to me.
19     A.   There was a lot of discussion about these
20  activities in Washington, and I didn't have an
21  understanding of them, and I went to Kay Morgan
22  because I knew her and asked her to help me

---

Page 163

1  understand what was going on with these activities.
2  We had a conversation.  I was thinking other things
3  that I might need to know to be able to understand
4  the situation and what was at play here and how that
5  might translate into legislation or something.
6      Q.   The next bullet point, you say, dash, "HHS
7  involvement."  Do you see that there?
8      A.   Yes.
9      Q.   And what was it that you were trying to
10  find out about HHS involvement?
11     A.   As to whether this was purely a Department
12  of Justice activity or whether HHS was involved in
13  some way as well.
14     Q.   And did you seek out that information from
15  anyone?
16     A.   I don't recall.
17     Q.   Let's go back in time for a second here to
18  that -- the legislative activity that was happening
19  in 1997 in connection with AWP.
20     A.   In '97.
21     Q.   Yeah.
22     A.   Uh-huh.

---

Page 164

1      Q.   Remember, we looked at some exhibits
2  earlier that talked about the Clinton proposal.  Do
3  you remember that?
4      A.   Uh-huh.
5      Q.   And we saw some -- at least one exhibit
6  that talked about competing bills in the House and
7  the Senate regarding AWP-based reimbursement.  Do
8  you recall that?
9      A.   Uh-huh.
10     Q.   And one of the exhibits talked about a
11  Senate version of the bill that would have the
12  Department of Health and Human Services doing
13  surveys to determine reimbursement amounts.  Do you
14  recall that?
15     A.   Yes.
16     Q.   And in the memorandum from June 30th, 1997
17  from Mr. Landsidle to Mr. Burnham, he mentioned that
18  Abbott was opposed to the Senate version because
19  they didn't want HHS looking at prices.  Do you
20  recall that from the memorandum?
21     A.   Yes.
22         MS. TABACCHI:  Object to the form.

---

Page 165

1      A.   Yes.
2      Q.   Was the concern here that's indicated in
3  your notes related to the fact that HHS might have
4  been starting to look at prices in 2000?
5         MS. TABACCHI:  Object to the form.
6      A.   I would say that in 1997, I wasn't paying
7  too much attention to this, and in 2000, David may
8  have already left or was about to leave and I felt I
9  needed to understand what was going on with these
10  issues.
11     Q.   Do you recall whether you were instructed
12  to become familiar with the issues that we've been
13  talking about the last few minutes, you know,
14  regarding the DOJ price list?  Were you instructed
15  to follow that by someone or did you decide to track
16  this issue on your own?
17     A.   I believe I would have been tracking this
18  issue on my own.
19     Q.   In April of 2000, what was your job title
20  again?
21     A.   April 2000?
22     Q.   Yeah.

---

42 (Pages 162 to 165)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

| Page 166 | Page 168 |
|---|---|

**Page 166**

1    A.    May have still been manager.
2    Q.    But part of your job responsibilities was
3  to take the initiative whenever there was an issue
4  that cropped up that may affect Abbott, a public
5  policy issue, and track it, correct?
6          MS. TABACCHI:  Object to the form.
7    A.    I would take initiative to understand
8  issues that were, you know, front and center in
9  Washington so that I could have some education on
10  what people were talking about.
11    Q.    If you go down to question number 5, you
12  say, "What about the HCFA," slash, "HHS web site?"
13    A.    Uh-huh.
14    Q.    What did you mean by that question?
15    A.    That they might be able to get information
16  from going to their web site.
17    Q.    So as a note to yourself to go check their
18  web site to see if there's further information about
19  this issue of price lists and certifications?
20          MS. TABACCHI:  Object to the form.
21    A.    A note to myself that it might be
22  something that I would go to look at.

**Page 167**

1    Q.    Question number 6 is, "By what authority
2  or agreement can DOJ make the determination?"  Why
3  were you asking that question?
4    A.    Again, so I could understand what was at
5  play and what was -- what the process was and what
6  the issues were at play.
7    Q.    So it was to educate yourself further.
8    A.    Uh-huh.
9    Q.    Number 7, you say, "Should we have a
10  conference call presentation on the subject?"  Do
11  you see that?
12    A.    Yes.
13    Q.    Did you ever have a conference call on the
14  issue of the DOJ price list and the manufacturer
15  certifications?
16    A.    Not that I recall, no.
17    Q.    You ask in question 8 can we get copies of
18  lists and DOJ communications I guess.  Did you
19  attempt to get copies of the DOJ price lists?
20    A.    I don't recall if I did that.
21    Q.    On number 9, you ask, "What is the history
22  of New York Medicaid's involvement?"

**Page 168**

1    A.    Uh-huh.
2    Q.    Did you ever find out the answer to that
3  question?
4    A.    I don't recall if I got the answer to that
5  question.
6    Q.    Finally, you ask, "What is the extent of
7  FDB business, who are their customers?"  Do you see
8  that?
9    A.    Yes.
10    Q.    Did you ever find that out from Ms. Morgan
11  in the course of your discussion?
12    A.    No.
13    Q.    Did you ask her the question?
14    A.    No.
15    Q.    So is this possibly a question that popped
16  up after you had your call with me?
17    A.    Possibly in my trying to understand First
18  DataBank and --
19    Q.    Why don't we stick with 1358 for another
20  minute here.  If you look at the first page of your
21  notes on the left side, there's something in a box
22  that says I think "Next," and I don't know -- I

**Page 169**

1  can't read that.  Do you have any idea what that is
2  there?
3    A.    Next steps?
4    Q.    Okay.
5          MR. RIKLIN:  Next what?
6          THE WITNESS:  Steps.
7          MR. RIKLIN:  Next step.
8          THE WITNESS:  That's what it looks like.
9          BY MR. GOBENA:
10    Q.    Number one, again, this is your
11  handwriting, right?
12    A.    Yes.
13    Q.    It says call B-U-S-T-A-L, Bustal?
14    A.    Uh-huh.
15    Q.    Who is that?
16    A.    I think it says call Bristol.
17    Q.    Oh, okay, Bristol, okay.  You're talking
18  about Bristol, the drug manufacturer?
19    A.    Yes.
20    Q.    Why were you going to call Bristol?
21    A.    I don't recall.
22    Q.    Did you have a point of contact at Bristol

                                    43 (Pages 166 to 169)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 170

1   that you had in mind to call?
2      A.   There was a lobbyist there that I still
3   work with.
4      Q.   And who was that lobbyist?
5      A.   Michael Carozza.
6      Q.   How do you spell the last name?
7      A.   C-A-R-O-Z-Z-A.
8          MR. RIKLIN:  C-A-R-O-U?
9          THE WITNESS:  O-Z-Z-A.
10         MR. RIKLIN:  Thank you.
11         BY MR. GOBENA:
12     Q.   And so was this a note to call him
13  potentially?
14     A.   Yes.
15     Q.   Do you recall whether you actually did
16  call Mr. Carozza?
17     A.   No, I don't recall.  As I'm reading these,
18  I'm convinced that David had left or was about to
19  leave and I didn't know much about this and I
20  thought Michael might know something about it, so
21  that would have been why that was there, but I don't
22  know if I called him.

Page 171

1      Q.   And then we talked about Mr. Griesman and
2   you have a note there to call him.
3      A.   Uh-huh.
4      Q.   Do you recall whether you called him
5   around this time period about the issues relating to
6   the DOJ price list?
7      A.   No, I don't.
8      Q.   Number three, you say -- you have Pharma
9   listed there.
10     A.   Uh-huh.
11     Q.   What were you referring to in this
12  document when you listed Pharma as part of your next
13  steps?
14     A.   Whether Pharma was involved in this issue
15  at all.
16     Q.   Did you have a point of contact at Pharma
17  at this time?  This time being May 2000.
18     A.   I can't recall who that was.  They've had
19  quite a few personnel changes there.
20     Q.   Why don't you list for me some of the
21  people that you've worked with at Pharma.
22     A.   And I'm assuming we were back in Pharma by

Page 172

1   that time.  Roger Currie.  There was a gentleman in
2   the policy shop whose name I can't remember.  That's
3   all I can remember.
4      Q.   Whether it's Mr. Currie or the policy shop
5   guy, as we'll call him --
6      A.   Uh-huh.
7      Q.   Do you recall whether any of them had
8   knowledge about AWP issues?
9          MS. TABACCHI:  Object to the form.
10     A.   I don't recall having a conversation with
11  him about it.
12     Q.   Did you actually ever reach out to Pharma
13  and discuss this issue of the DOJ price list with
14  them?
15     A.   I don't recall having a conversation with
16  them.
17     Q.   If you go to number 6 under the next
18  steps, it says -- and again, this is cut off.  I
19  don't know why.  "Pharmacies," slash, "doctors will
20  begin to feel the pinch."  Actually, let's take a
21  step back.  Let's read number five because it makes
22  more sense when you read them together.  Number five

Page 173

1   is, "FDB sent notice May 1 to Medicaid," and then
2   number 6 is, "Pharmacy," slash, "Doctor will begin
3   to feel the pinch."  Do you see that there?
4      A.   Yes.
5      Q.   What were you conveying there in those two
6   bullet -- two numbered items on the list?
7      A.   This looks like a continuation of my notes
8   from my conversation with Kay.
9      Q.   And does this memorialize what Kay was
10  communicating to you in that conversation?
11     A.   I would make that assumption, yes.
12     Q.   So Kay was then telling you in item number
13  -- as reflected in item number 6 that soon
14  pharmacies and doctors will begin to feel a pinch,
15  right?
16     A.   Yes.
17     Q.   What pinch is she talking about?
18         MS. TABACCHI:  Object to the form.
19     A.   I wouldn't -- I couldn't say particularly.
20     Q.   So it's your testimony that you didn't
21  know what Ms. Morgan was referring to in her
22  conversation with you when she started talking about

                              44 (Pages 170 to 173)

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 174

1  pharmacies and doctors beginning to feel the pinch
2  as a result of the DOJ price list?
3          MS. TABACCHI:  Object to the form.
4      A.   Not having involvement in these issues, my
5  recollection of that would have been that that would
6  be the stakeholder sector that would be reacting to
7  the change.
8      Q.   Because the DOJ price list and the issues
9  identified in the April 2000 Pink Sheet that we
10 looked at earlier were going to result in lowered
11 reimbursement for pharmacies and doctors; isn't that
12 correct?
13         MS. TABACCHI:  Object to the form.
14     A.   If that was the assumption, yes.
15     Q.   So the pinch that Ms. Morgan was talking
16 about was the fact that these pharmacies and doctors
17 were now going to be reimbursed less as a result of
18 the DOJ price list and the certifications.
19         MS. TABACCHI:  Object to the form.
20     A.   I couldn't answer to that.
21     Q.   So when she said doctors and pharmacies
22 were beginning to feel -- would begin to feel the

Page 175

1  pinch as a result of the price list, it's your
2  testimony that you didn't know what -- exactly what
3  she was referring to?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  Yes.
6          MR. GOBENA:  I'll have marked as
7  Plaintiff's Exhibit 1359 --
8             (Plaintiff's Exhibit 1359
9                 was marked for
10                identification.)
11         BY MR. GOBENA:
12     Q.   Why don't you take a moment to review it,
13 Ms. Haas.
14     A.   Okay.
15     Q.   Do you recall receiving a copy of this
16 article from the Pink Sheet dated June 5th, 2000?
17     A.   We received the Pink Sheet on a regular
18 basis.  Whether I read this one, I may have, but I
19 don't recollect if I did particularly.
20     Q.   The title of the article is "HHS Providing
21 Medicaid Average Wholesale Drug Prices To Medicaid
22 Carriers."  Do you see that?

Page 176

1      A.   Yes.
2      Q.   This is related to the issues raised in
3  the April 10th, 2000 Pink Sheet, correct?
4      A.   Yes.
5          MS. TABACCHI:  Object to the form.
6          BY MR. GOBENA:
7      Q.   Did you continue to have an interest in
8  the issues raised in the April 2000 Pink Sheet after
9  your conversation with Ms. Morgan in May of 2000?
10         MS. TABACCHI:  Object to the form.
11     A.   The April 10th Pink Sheet and the
12 corresponding conversation I had with Kay was my
13 attempt to understand what the -- this issue was and
14 the particulars of it.  Whether I was still working
15 on it at this time I don't recall.
16     Q.   Is there anyone else in the government
17 affairs department who was working on the issue of
18 the DOJ price list?
19     A.   Not to my recollection.
20     Q.   So if it wasn't you, it wouldn't be anyone
21 else.
22         MS. TABACCHI:  Object to the form.

Page 177

1      A.   There were other people in the office, but
2  I don't know if anyone else was working on this.
3      Q.   Let's read a couple of paragraphs and see
4  if you have any recollection about the issues
5  identified therein.  The first paragraph reads,
6  "Prescription drug pricing data developed for
7  Medicaid will be transmitted to Medicare carriers in
8  June for use in determining Medicare drug
9  allowances."  Do you see that there?
10     A.   Yes.
11     Q.   If you go down four paragraphs, there's a
12 paragraph that reads, "The HHS secretary explained
13 that HHS is moving administratively to take
14 advantage of the newly available more accurate data
15 on average wholesale prices developed for Medicaid
16 as a result of Department of Justice
17 investigations."  Do you see that?
18     A.   Yes.
19     Q.   And you'll agree with me that the article
20 from the April 2000 Pink Sheet sort of discussed
21 this issue of the new data that was resulting from
22 the Department of Justice investigations, correct?

45  (Pages 174 to 177)

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                         August 30, 2007
                        Washington, DC

Page 178

1        MS. TABACCHI:  Object to the form.
2     A.   It would seem to be a follow-on on that.
3  It would seem to be a follow-on to that.
4     Q.   So what this article is describing here is
5  the fact that now Medicare is going to be using the
6  data that had been developed for Medicaid resulting
7  from Department of Justice investigations, correct?
8        MS. TABACCHI:  Object to the form.
9     A.   That's what it -- the article says, yes.
10    Q.   So in some respects, the issue of DOJ
11 price information was now expanding from being used
12 in the Medicaid area to the Medicare arena as well,
13 correct?
14       MS. TABACCHI:  Object to the form.
15    A.   According to these reports, yes.
16    Q.   At least being proposed.
17    A.   Yes.
18    Q.   Was that issue of the expansion of the use
19 of DOJ pricing information something that was
20 followed and tracked in Abbott's government affairs
21 department?
22       MS. TABACCHI:  Object to the form.

Page 179

1     A.   Not to my knowledge.
2     Q.   So is it your testimony then that you
3  stopped tracking the issue of the DOJ price list
4  soon after your conversation with Ms. Morgan in May
5  of 2000?
6        MS. TABACCHI:  Object to the form.
7     A.   Going back again to the April 10th article
8  and my notes from Kay, that was my attempt to
9  understand an issue that was at play.  I do not have
10 a recollection of ever working on this issue and I
11 don't recall anyone in our office working on this
12 issue going forward.
13    Q.   Did you continue to have an interest
14 though in the issue even after your conversation
15 with Ms. Morgan?
16       MS. TABACCHI:  Object to the form.
17    A.   I continued to have an interest to the
18 extent of understanding debate in Washington.
19    Q.   And based on your conversations with
20 Ms. Morgan, it's clear that this debate in
21 Washington had implications over Abbott's customers,
22 correct?

Page 180

1        MS. TABACCHI:  Object to the form.
2     A.   Yes.
3     Q.   Because lower reimbursements would mean
4  that Abbott's customers are getting less money from
5  the government for dispensing Abbott drugs, correct?
6        MS. TABACCHI:  Object to the form.
7     A.   I would have no opinion on that.
8     Q.   But reimbursement issues were important to
9  at least some Abbott customers, correct?
10       MS. TABACCHI:  Object to the form.
11    A.   I couldn't say what was important to
12 Abbott customers.  I didn't work with Abbott
13 customers.
14    Q.   Well, I'm not asking you about direct
15 conversations you had with a customer.
16    A.   Okay.
17    Q.   I mean, you had a general understanding
18 though that Abbott had customers for whom
19 reimbursement was an important issue, correct?
20       MS. TABACCHI:  Object to the form.
21    A.   Correct.
22    Q.   I guess I'm trying to understand why you

Page 181

1  went through the trouble of trying to understand the
2  issue of the DOJ price lists if you subsequently had
3  no involvement in the issue afterwards.
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  Because Congress was
6  grappling with a major policy decision as to what
7  kind of policy changes to put in place.  I wanted to
8  be educated as to what was going on so that I would
9  be able to report if needed on some of the issues.
10       MR. GOBENA:  This is going to be marked as
11 Plaintiff's Exhibit 1360.
12            (Plaintiff's Exhibit 1360
13             was marked for
14             identification.)
15       BY MR. GOBENA:
16    Q.   Have you had a chance to look at the
17 exhibit?
18    A.   Yes, uh-huh.
19    Q.   On the cover here, or the first page of
20 Plaintiff's Exhibit 1360, there's a note that appears
21 to be on your letterhead?
22    A.   Uh-huh.

46  (Pages 178 to 181)

Henderson Legal Services
202-220-4158

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 182

1    Q.   And you're sending some materials to David
2  and Cindy.  Would the David be David Landsidle?
3    A.   Yes.
4    Q.   Okay.  If you turn to the next page, the
5  letter from Health and Human Services to members of
6  Congress, which is one of the attachments, it's
7  dated September 8th, 2000; is that correct?
8    A.   Yes.
9    Q.   So at least as of September 8th, 2000, or
10  around that time period, Mr. Landside was still an
11  employee of Abbott.
12    A.   Yes, apparently.  My recollection of his
13  departure was premature.
14    Q.   Okay.  I'm going to assume that's because
15  you didn't want him to leave.
16    A.   No, we did not want him to leave.
17    Q.   I'm going to turn your attention to the
18  letter now that's attached, and if you go to the
19  end, you'll see that the letter which is at ABT-DOJ
20  296490, you'll see it was signed by Nancy-Ann
21  DeParle, the administrator.  You knew -- you knew
22  her to be an administrator of the --

Page 183

1    A.   Yes.
2    Q.   -- HCFA in 2000.
3    A.   HCFA.
4    Q.   Okay.  She starts the letter by writing,
5  "Dear Member of Congress, I'm writing to update you
6  on the actions that the Health Care Finance
7  Administration is taking to make sure that Medicare
8  pays appropriately for the limited number of drugs
9  that it covers.  We share the concerns that have
10  been raised by members of Congress, the Department
11  of Justice and the HHS Inspector General on the
12  issue.  Medicare beneficiaries and taxpayers should
13  not be forced to pay excessive prices for drugs.
14  Our actions are intended to ensure that Medicare
15  pays a fair price for covered drugs while at the
16  same time ensuring that beneficiaries have access to
17  needed care."  Do you see that language there?
18    A.   Yes.
19    Q.   And attached to the letter is a program
20  memorandum that if you've had a chance to look at
21  it, you'll agree with me that it communicates
22  pricing information that was collected from the

Page 184

1  Department of Justice, correct?
2    A.   I assume it was collected by the
3  Department of Justice.
4    Q.   Well, if you don't want to assume, if you
5  turn to ABT-DOJ 296491 and read the attached memo,
6  if you go to the third paragraph, it says, "The data
7  and the attachments have come from the United States
8  Department of Justice and the National Association
9  of Medicaid Fraud Control Units."  Do you see that?
10    A.   Yes, I see that.
11    Q.   So what you're transmitting to
12  Mr. Landsidle, and I'm assuming that Cindy is Cindy
13  Sensibaugh?
14    A.   Yes.
15    Q.   What you're communicating to Mr. Landside
16  and Ms. Sensibaugh is the program memoranda and
17  letter to Congress transmitting DOJ pricing
18  information to the Medicare carriers.  Why is it
19  that you were providing this information to
20  Mr. Landsidle and Ms. Sensibaugh?
21    A.   Because we would not want to be surprised
22  by an Abbott product showing up on a list such as

Page 185

1  this, so we would know.
2    Q.   Well, we saw in the article from June 2000
3  that the -- the data that was being proposed to be
4  sent to the -- provided to the Medicare program was
5  the same -- was the same Medicaid data that was
6  referenced in the April 2000 article.  You recall
7  that?
8         MS. TABACCHI:  Object to the form.
9    A.   Yes.
10    Q.   Okay, and based on your conversations with
11  Ms. Morgan about the DOJ price list information that
12  was referenced in that April 2000 article, some of
13  the products on the DOJ price list were Abbott
14  products, correct?
15    A.   Correct.
16    Q.   So you already knew before September 8,
17  2000 that Abbott products were on the DOJ price
18  list, correct?
19    A.   But this is the confirmation of that.
20    Q.   I see.  So you weren't sure if the DOJ --
21  you weren't sure if Abbott information was on the
22  information communicated to the Medicare program, is

47 (Pages 182 to 185)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
Washington, DC

Page 186

1   your testimony; is that right?
2       MS. TABACCHI:  Object to the form.
3       A.   I wanted to see what was on a list, and
4   there were products of ours on the list, yes.
5       Q.   And once you identified that Abbott
6   products were on the list, what, if anything, did
7   government affairs do to respond to the presence of
8   Abbott products on the DOJ price list in this memo?
9       MS. TABACCHI:  Object to the form.
10      A.   I do not recall government affairs doing
11  anything.  We may have shared this document with the
12  headquarters, but I don't recall.
13      Q.   So do you recall having any conversations
14  with Mr. Landsidle about this memorandum, this
15  program memorandum from HHS after providing them the
16  information?
17      A.   No, I don't recall having a conversation
18  with him about it.
19      Q.   What about a conversation with
20  Ms. Sensibaugh?  Did you discuss the contents of
21  these letters and memoranda with Ms. Sensibaugh
22  after providing it to her?

Page 187

1       A.   I don't recall having that conversation.
2       Q.   It was your understanding, wasn't it,
3   Ms. Sensibaugh, that if the pricing information
4   included in the price list attached to this program
5   memorandum was used by Medicare carriers, it could
6   reduce the reimbursement received for Abbott
7   products by its customer; isn't that right?
8       MS. TABACCHI:  Object to the form.
9       A.   I didn't think it through to that degree.
10  This was just a document I came into possession of
11  and I shared it with my colleagues.
12      Q.   Well, if there's going to be someone
13  thinking about the nexus between the price
14  information here and the impact on an Abbott
15  customer, who would be the person within government
16  affairs who would have that knowledge?
17      MS. TABACCHI:  Object to the form.
18      A.   I'm not sure if anyone within government
19  affairs would have been thinking to that point.
20      Q.   Was there anyone at corporate that would
21  have been thinking about those kinds of issues?
22      MS. TABACCHI:  Object to the form.

Page 188

1       A.   I couldn't speculate as to who that would
2   be, but it was not government affairs.
3       Q.   We talked about Ms. Tobiason earlier.  Do
4   you recall that?
5       A.   Uh-huh, yes.
6       Q.   And you mentioned earlier that
7   Ms. Tobiason was one of the people -- in-house
8   people at Abbott who had some expertise in
9   government reimbursement issues.  Do you recall
10  that?
11      A.   Yes.
12      Q.   Okay.  Is she someone who would have some
13  knowledge about the impact of this price
14  information, that it may have on reimbursement for
15  Abbott's customers?
16      MS. TABACCHI:  Object to the form.
17      A.   I do not know that that would be
18  Ms. Tobiason.  She held several positions.  At that
19  time she may have been in the diagnostics division
20  or she may have been in a different office within
21  the company that was not in the business unit.
22      Q.   But certainly as of September 8, 2000, you

Page 189

1   and your colleagues in government affairs knew that
2   the DOJ price list that was going to be used by
3   Medicare potentially anyways, used by Medicare,
4   contained Abbott products on it.
5       A.   Yes.
6       MR. GOBENA:  I'm going to have this
7   document marked as Plaintiff's Exhibit 1361.
8           (Plaintiff's Exhibit 1361
9           was marked for
10          identification.)
11      BY MR. GOBENA:
12      Q.   I'm only going to ask you about the first
13  page and maybe the third page.
14      A.   Okay.
15      Q.   Why don't we focus on the first page first
16  and let me know when you've had a chance to digest
17  it.
18      A.   I'm fine.
19      Q.   Okay.  First of all, if you look on the
20  top, this appears to be a document that was faxed
21  from Powell Goldstein Frazer.  Do you see that
22  there?

48 (Pages 186 to 189)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
Washington, DC

Page 190

1    A.   Yes.
2    Q.   Okay.  And I'll represent to you this is a
3  document that was produced by Abbott to us.  Was
4  Powell Goldstein one of Abbott's external lobbyists
5  in Washington?
6    A.   Not one of government affairs' external
7  lobbyists.
8    Q.   Were they a lobbyist for some other
9  division within Abbott?
10       MS. TABACCHI:  Object to the form.
11   A.   Yes.
12   Q.   Okay.  Which division?
13   A.   The Ross products division.
14       MR. RIKLIN:  Hospital products?
15       THE WITNESS:  Ross.
16       MR. RIKLIN:  Ross.
17       BY MR. GOBENA:
18   Q.   The next -- beneath that, you see there's
19  a title there on this document that says "National
20  Alliance for Infusion Therapy."  Do you see that?
21   A.   Yes.
22   Q.   And later on, or further down on this

Page 191

1  document, it says, "To," and it says, "NAIT
2  members."  Was Abbott an NAIT member?
3        MS. TABACCHI:  Object to the form.
4    A.   I believe it was Ross that was the NAIT
5  member.
6    Q.   Ross was just a division within Abbott,
7  correct?
8        MS. TABACCHI:  Object to the form.
9    A.   Correct.
10   Q.   It wasn't a separate corporation, to your
11  knowledge.
12   A.   No, it wasn't a separate corporation.
13   Q.   And in the from line, it says it's from
14  Alan K. Parver.  Have you ever communicated at all
15  with Alan K. Parver over the years?
16   A.   I know who he is.
17   Q.   Have you ever talked to him about AWP
18  issues?
19   A.   No.
20   Q.   Looking at this document, do you recall
21  whether you received a copy of this communication
22  from the National Alliance for Infusion Therapy?

Page 192

1    A.   I do not believe I would have received a
2  copy of this.
3    Q.   You said you do not believe you would
4  receive a copy of this.
5    A.   Well, I did not work with this -- this
6  coalition.
7    Q.   I see.
8    A.   I was aware of the coalition but I did not
9  work for that coalition.
10   Q.   Mr. Carver in his memorandum goes on to
11  say -- in the re line, it says, "Latest news on AWP
12  issue," and this is dated September 19th, 2000, so
13  this is after the program memorandum --
14   A.   Yes.
15   Q.   -- we just saw was issued, correct?
16   A.   Yes.
17   Q.   He goes on to say, "In my previous
18  memorandum on the evolving AWP issue, I described
19  the HCFA decision made a few weeks ago to delay the
20  reduction in payments for Medicare-covered drugs
21  only for the oncology and hemophilia drugs on the
22  initial list of 50.  I also described efforts to

Page 193

1  secure legislative relief from the planned
2  reductions."  Were you aware that at least -- that
3  some people within the industry were trying to
4  secure legislative relief from the use of the DOJ
5  prices in that 2000 program memorandum from HHS?
6        MS. TABACCHI:  Object to the form.
7    A.   No.
8    Q.   Did you follow the issue of legislative
9  developments insofar as this -- the implementation
10  of the program memorandum that we just looked at
11  from September 2000?
12       MS. TABACCHI:  Object to the form.
13   A.   I don't believe so.
14   Q.   So is it your testimony then, Ms. Haas,
15  that, you know, you became aware -- or you looked at
16  the April 2000 Pink Sheet, saw the issue of the DOJ
17  price list, and then by September 2000, you had lost
18  interest in the issue?
19       MS. TABACCHI:  Object to the form.
20   A.   I would say in -- that the Pink Sheet and
21  my notes with Kay Morgan from earlier in the year,
22  that it was something that I was trying to learn

49 (Pages 190 to 193)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                      August 30, 2007
                          Washington, DC

---

Page 194

1  about and understand.  At this point, I would say I
2  was pulled away and working on different projects,
3  and this activity was not an activity of government
4  affairs.
5      Q.   You're saying because of the fact that
6  this is a -- this activity's reflected in a document
7  for a trade association, that -- of which Ross was a
8  member?
9          MS. TABACCHI:  Object to the form.
10     A.   I would say that government affairs -- my
11 function in federal government affairs to my
12 knowledge, we were not working on this issue with
13 the Alliance for Infusion Therapy.
14     Q.   Okay, let's leave aside the Alliance for
15 Infusion Therapy.
16     A.   Okay.
17     Q.   I mean, is your testimony that government
18 affairs was not at all following the issue of
19 whether or not the price list in the September 2000
20 memorandum from HHS was going to be implemented?
21         MS. TABACCHI:  Object to the form.
22     A.   Not to my knowledge.

---

Page 195

1      Q.   But you don't know the extent to which
2  Mr. Landsidle had been following the issue, correct?
3          MS. TABACCHI:  Object to the form.
4      A.   I can't speak to that.
5      Q.   I know for a fact this has been marked as
6  an exhibit in another deposition.  I just don't know
7  what the number is, but it doesn't really matter, so
8  I'll just give you a copy of it so you can follow
9  along.  It's already an exhibit in this case.
10     A.   Okay.
11     Q.   Why don't you take a moment to read
12 through this.  I think you get the gist of it in the
13 first paragraph or two, but if you need more time --
14     A.   So it would appear to be a story that was
15 based on the information that was released as part
16 of the reports.
17     Q.   Well, we'll get to the article and
18 substance in a second.
19     A.   Okay.
20     Q.   Have you seen this article before?
21     A.   I probably did.
22     Q.   And the reason why you say probably is

---

Page 196

1  that it involves a Congressional investigation into
2  Abbott's --
3      A.   Yes.
4      Q.   -- drug prices, correct?  And that's the
5  type of issue that government affairs would have
6  been involved in, certainly insofar as tracking it,
7  right?
8          MS. TABACCHI:  Object to the form.
9      A.   I wouldn't -- and I'd object to the word
10 "tracking."
11     Q.   Okay.  Well --
12     A.   It's the things that we felt we should
13 know about that were going on in case we were asked
14 about it.
15     Q.   So would government affairs limit its
16 involvement just to general knowledge about a
17 government investigation about Abbott's drug prices?
18         MS. TABACCHI:  Object to the form.
19     A.   It would depend if it was an issue we were
20 working on in an active way.
21     Q.   Let's say there was an investigation of
22 Abbott specifically by --

---

Page 197

1      A.   If there's an investigation by Abbott, our
2  office would not be involved.  Our attorneys at
3  Abbott and other people within that part of the
4  business would be involved.  The government affairs
5  would not be involved in an investigation.
6      Q.   You certainly would at least educate
7  yourself about the Congressional investigation as to
8  help you in the context of your general work in the
9  government affairs office, right?
10         MS. TABACCHI:  Object to the form.
11     A.   Yes.
12     Q.   Let's look at the article here.  It starts
13 off, "In a stinging rebuke to the pharmaceutical
14 industry, Congressional investigators say they have
15 uncovered evidence that several drug companies,
16 including Abbott Laboratories and Baxter, reported
17 inflated drug prices to the government to protect
18 their market share and boost profits.  The report
19 from the House Commerce Committee, which will be
20 released Wednesday, also criticizes the Medicare
21 program for ignoring flaws in its payment system,
22 that the committee should allow drug makers to

---

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 198

1  manipulate prices."  Do you see that?
2      A.  Yes.
3      Q.  In or around September of 2000, were you
4  aware of an investigation by the House Commerce
5  Committee into Abbott's drug pricing conduct?
6      A.  At that time, I was aware of
7  investigations that the Commerce Committee was
8  looking into across the board.
9      Q.  And that one of the companies that the
10  Commerce -- the Commerce Committee was looking at
11  was Abbott, correct?
12      A.  Yes.
13      Q.  Were you ever contacted by anyone at
14  Abbott after the publication of this article
15  regarding the substance of it?
16      A.  Regarding the substance of it?
17      Q.  Yeah.
18      A.  No.
19      Q.  Did anyone from Abbott outside of
20  government affairs reach out to you to ask you about
21  sort of any details about the Commerce Committee
22  investigation itself, whether you knew anything

---

Page 199

1  about who was working on it, things like that?
2      A.  I don't recall, but we may have been asked
3  to -- if there were hearings, to attend the hearing
4  and come back and report on what was discussed at
5  the hearing, and that would have been the public
6  affairs in all probability.
7      Q.  Sorry?
8      A.  Public affairs probably.
9      Q.  Public affairs would have been involved in
10  --
11      A.  I would think so, but that's just a
12  recollection.
13      Q.  When this report came out in the press,
14  were you asked to do anything personally after it
15  came out?
16          MS. TABACCHI:  Object to the form.
17          BY MR. GOBENA:
18      Q.  In response to the allegations?
19      A.  No, no.
20      Q.  No one said to you, Ms. Haas, I'd like for
21  you to go and see if you can find out who -- which
22  staffers, for example, are involved in this

---

Page 200

1  investigation?
2      A.  We would not be involved in an
3  investigation.
4      Q.  This has also been previously marked.  I
5  don't know what the number is, but I'll just hand it
6  out here.  We don't need to have it marked as an
7  exhibit.  Take a moment to review this article.
8          MR. RIKLIN:  We're not marking that one?
9          MR. GOBENA:  No, it's been previously
10  marked.  I just don't have the exhibit number with
11  me.
12          THE WITNESS:  Okay.
13          BY MR. GOBENA:
14      Q.  Do you recall seeing this article or
15  becoming familiar with the substance of this article
16  at some point around September 2000?
17          MS. TABACCHI:  Object to the form.
18      A.  It's familiar, yes.
19      Q.  This is a follow-on story --
20      A.  Uh-huh.
21      Q.  -- to the previous article we looked at,
22  correct?

---

Page 201

1      A.  Yes, Mr. Bruce Japsen.
2      Q.  Are you familiar with Mr. Japsen?
3      A.  No.
4      Q.  Or his writing anyways?
5      A.  No, I just know he's a writer with the
6  Chicago Tribune and covers Abbott and other
7  companies in the Chicago area.
8      Q.  Chicago area?
9      A.  Uh-huh.
10      Q.  The first sentence reads, "Abbott
11  Laboratories and Baxter International, Inc. defended
12  their business practices Wednesday in the wake of a
13  Congressional report that alleged some
14  pharmaceutical companies inflated drug prices."  If
15  you go down to the fourth paragraph --
16      A.  Uh-huh.
17      Q.  It says, "North Chicago based Abbott too
18  said it operated legally within a system created and
19  approved by the government."  Were you asked to
20  provide any information to anyone -- strike that.
21  Were you consulted at all around this time period
22  about whether or not -- well, strike that too.

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 202

1  Let's see if I can get this right.  Do you agree
2  with that statement?
3        MS. TABACCHI:  Object to the form.
4     A.   I have no opinion on this statement.
5     Q.   And were you at any point asked your
6  opinion about the accuracy of that statement around
7  September of 2000?
8     A.   No.
9     Q.   It goes on to say, "But Abbott chief
10 executive Miles White also said that he supports
11 changing the system to curb abuses."  Did you see
12 that there?
13    A.   Yes.
14    Q.   Did -- were you ever consulted by anyone
15 about any -- your perspective on whether there are
16 any abuses in the Medicare drug reimbursement system
17 --
18    A.   No.
19    Q.   -- around this time?
20    A.   No.
21    Q.   Do you know whether public affairs --
22 sorry, not public affairs.  Government affairs

Page 203

1  provided any input with respect to any of the
2  statements in this paragraph?
3     A.   I wouldn't know.
4     Q.   Did you consult with Mr. White --
5     A.   No.
6     Q.   -- prior to his making this statement?
7     A.   No.
8     Q.   Do you know if anyone in government
9  affairs consulted with Mr. White prior to his making
10 these statements?
11    A.   I do not know.
12    Q.   He goes on to say, "The Medicare law ought
13 to be changed" -- sorry.  Let me reread that.  "The
14 Medicare law ought to be changed," he said, "he said
15 in a statement Wednesday night."  Quote, "If the
16 intent of the law is no longer to provide benefit to
17 physicians who administer certain drugs in their
18 office, then this system should be changed."  Do you
19 see that there?
20    A.   Uh-huh.
21    Q.   Now, does Mr. White's statement there
22 reflect Abbott's position on the state of the

Page 204

1  Medicare law at this time?
2        MS. TABACCHI:  Object to the form.
3     A.   I don't believe we had a position on that
4  at that time.
5     Q.   So this was just his personal statement,
6  to the best of your knowledge?
7        MS. TABACCHI:  Object to the form.
8     A.   To the best of my knowledge.
9     Q.   It goes on to say that, "White said the
10 pricing system lacks clarity, and said Congressional
11 investigators recognize that."  Quote, "'This is
12 really nothing new,' White said in Chicago earlier
13 Wednesday in a brief interview after he addressed a
14 luncheon of business executives on the company's
15 e-commerce strategy."  Quote, "There's nothing new
16 here."  Again, seeing this statement, do you recall
17 whether Mr. White consulted with anyone in
18 government affairs to your knowledge about the
19 statements he makes here?
20    A.   I do not recall those conversations.
21    Q.   Mr. -- and then later on in the article,
22 probably midway through that second page, it says,

Page 205

1  "Asked if Bliley's report is politically motivated,
2  White said," quote, "It's six weeks before an
3  election.  What do you think?"  Does that reflect
4  the political judgment of personnel within Abbott's
5  government affairs division, that statement?
6        MS. TABACCHI:  Object to the form.
7     A.   I couldn't tell you.
8     Q.   To the best of your knowledge, was
9  Abbott's government affairs division consulted in
10 September of 2000 before Mr. White made that
11 statement that the report is politically motivated
12 and that --
13    A.   I do not know.
14       MR. GOBENA:  Okay, this is a good time
15 probably to take a break since there's only five
16 minutes left on the tape.  Let's go off the record.
17       THE VIDEOGRAPHER:  Here marks the end of
18 Videotape Number 3.  We're going off the record.
19 The time is 14:12:26.
20       (Recessed at 2:12 p.m.)
21       (Reconvened at 2:28 p.m.)
22       THE VIDEOGRAPHER:  Here marks the

52 (Pages 202 to 205)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 206

1  beginning of Videotape Number 5 in the deposition of
2  Rosemary Haas.  The time on the screen is 14:28:17.
3  You're on the record.
4      MR. GOBENA:  I'd like to have the -- this
5  document marked as Plaintiff's 1162.
6      MS. TABACCHI:  1162?
7      MR. GOBENA:  Yeah.
8      MS. TABACCHI:  1362.
9      MR. GOBENA:  Sorry, 1362.  Thank you.
10             (Plaintiff's Exhibit 1362
11             was marked for
12             identification.)
13      BY MR. GOBENA:
14      Q.  Ms. Haas, can you just take a moment to --
15      A.  Sure.
16      Q.  -- look through the document?  I'm really
17  only going to ask you about the cover memo and
18  provision little C on page ABT -- well, it's the
19  last page basically.
20      A.  The last page?
21      Q.  Yeah, the top of the page, there's a
22  subsection little C?  Do you see that?

---

Page 207

1      A.  Uh-huh.  Okay.
2      Q.  If you look on the top right corner of
3  this piece of interoffice correspondence, that's
4  your name there, correct?
5      A.  That's correct.
6      Q.  And those are your initials next to your
7  name?
8      A.  Yes.
9      Q.  And this memorandum was sent to Mark
10  Barmak.
11      A.  Yes.
12      Q.  At this time was Mr. Barmak the person to
13  whom Mr. Landsidle was reporting?
14      A.  I would think so, yes.
15      Q.  Mr. Landsidle's a cc on this memo, and
16  it's dated October 27th, 2000.  The re line says,
17  "AWP language, Senate action."  Do you see that
18  there?
19      A.  Yes.
20      Q.  And rather than read through it, isn't it
21  fair to say that this memorandum is a forwarding
22  memorandum where you are sending a copy of a

---

Page 208

1  recently passed House bill to Mr. Barmak?
2      A.  Yes.
3      Q.  And if you go to the last page of this
4  exhibit, one of the provisions in the House bill
5  under little subsection C of section 429 of the bill
6  reads, "Temporary injunction against reductions in
7  payment rates," and it says, "Notwithstanding any
8  other provision of the law, the administrator of the
9  Health Care Financing Administration may not
10  directly or indirectly increase or decrease the
11  rates of reimbursement for drugs and biologicals
12  under the current Medicare payment methodology until
13  such time as the secretary has reviewed the report
14  submitted under Section (a)(2)."  Do you see that
15  there?
16      A.  Yes.
17      Q.  If you look at Section (a)(2), which is on
18  page ABT-DOJ 296482, it refers to a report that was
19  going to be put out by the comptroller general; is
20  that correct?
21      A.  Yes.
22      Q.  Okay.  Why were you sending a copy of this

---

Page 209

1  House bill to Mr. Barmak?
2      A.  He would have asked me to send this to
3  him.
4      Q.  So this was in response to an inquiry from
5  Mr. Barmak that you provided this information?
6      A.  Yes.
7      Q.  Did you have any discussions with
8  Mr. Barmak about the information that you were
9  communicating in this memorandum?
10      MS. TABACCHI:  I'm just going to caution
11  the witness not to reveal any privileged
12  communications.  To the extent that Mr. Barmak was
13  acting in his capacity as legislative affairs
14  personnel rather than a counsel, you may answer the
15  question, but if the question causes you to reveal a
16  privileged communication, I will instruct you not to
17  answer.
18      THE WITNESS:  I would say that I would
19  have not known what function Mr. Barmak was
20  operating in when asking me to send this to him.
21      MR. RIKLIN:  When -- I'm sorry.
22      THE WITNESS:  I cannot say if Mr. Barmak

---

53 (Pages 206 to 209)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 210

1  -- in what function he was operating when he asked
2  me to send this to him.
3          MS. TABACCHI:  You can answer the question
4  yes or no as to whether you had any communications
5  with -- do you want to ask her that question?
6          MR. GOBENA:  Yes.
7          MS. TABACCHI:  You can answer the question
8  yes or no without revealing the substance.
9          BY MR. GOBENA:
10     Q.   Do you have communications with Mr. Barmak
11 about this information accompanying the memorandum?
12     A.   After I sent it to him.
13     Q.   After you sent it to him.
14     A.   No.
15     Q.   Did you have conversations with Mr. Barmak
16 about the House bill referenced in this memo and
17 attached to this memo before you sent it to him?
18         MS. TABACCHI:  You may answer the question
19 yes or no.
20         THE WITNESS:  Or I don't know.
21         MS. TABACCHI:  Or I don't know.
22         BY MR. GOBENA:

Page 211

1      Q.   We prefer yes or no, but I'll take the
2  answer.  If that's your sworn testimony --
3          MS. TABACCHI:  Was your answer I don't
4  know?
5          THE WITNESS:  I don't know.
6          BY MR. GOBENA:
7      Q.   Let me be very careful here, but -- and I
8  don't want the substance of the conversations, but
9  were you having conversations with Mr. Barmak about
10 AWP issues outside the context your work -- your
11 lobbying work at Abbott?  In other words, did you
12 have any non-lobbying discussion with Mr. Barmak
13 about AWP?  Don't tell me the substance of them.
14 Just yes or no.
15         MS. TABACCHI:  Can you clarify the time
16 period?
17         BY MR. GOBENA:
18     Q.   Yeah, around October of 2000.
19     A.   No.
20     Q.   How about before October of 2000?
21     A.   No.
22     Q.   How about after October of 2000?

Page 212

1      A.   How about never.
2      Q.   You've never had conversations with
3  Mr. Barmak outside of the context of the activities
4  of the public affairs department --
5      A.   No.
6      Q.   -- regarding AWP.
7      A.   No.
8      Q.   So there really aren't any privileged
9  conversations with Mr. Barmak, okay.  That's what I
10 was trying to get at.
11     A.   Okay, well --
12         MR. GOBENA:  Okay.  Let's have this -- it
13 might have been previously marked, but just to be on
14 the safe side, we'll have marked as 1363.
15              (Plaintiff's Exhibit 1363
16               was marked for
17               identification.)
18         BY MR. GOBENA:
19     Q.   You've been handed a document, Mr. Haas,
20 but I'm only going to ask you about the cover
21 letter, not the many pages of the attachments.  The
22 cover letter runs through ABT-DOJ 0193123, and I'm

Page 213

1  not going to ask you about all of the letter, so if
2  you want to just take a chance to skim it and become
3  familiar --
4      A.   Just skim the letter?
5      Q.   Yeah, and there's particular sections I
6  was going to ask you about.
7      A.   Okay.
8      Q.   Have you seen this letter before your
9  testimony today?
10     A.   No.
11     Q.   This is a letter from Congressman Pete
12 Stark to Miles White, correct?
13     A.   Yes.
14     Q.   Let's read the first paragraph.  It says,
15 "Dear Mr. White, You should now be" -- "You should
16 by now be aware of Congressional investigations
17 revealing that Abbott has for many years reported
18 and published inflated and misleading price data and
19 has engaged in other deceptive business practices.
20 This letter is a call for your company to
21 immediately cease overcharging taxpayers and
22 jeopardizing public health."  You'll agree with me

                              54 (Pages 210 to 213)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

---

Page 214

1 that these are pretty serious allegations here from
2 Congressman Stark, correct?
3          MS. TABACCHI:  Object to the form.
4     A.   Yes.
5     Q.   In fact, this is a somewhat unusual
6 letter, isn't it?
7          MS. TABACCHI:  Object to the form.
8          BY MR. GOBENA:
9     Q.   I mean, Abbott hadn't previously received
10 letters from any Congresspeople accusing it of
11 fraud, had it?
12          MS. TABACCHI:  Object to the form.
13          BY MR. GOBENA:
14    Q.   To your knowledge?
15    A.   Not to my knowledge, I don't know.
16    Q.   Despite the fact that this was a letter
17 from a Congressperson to Abbott, it's your testimony
18 that you didn't receive a copy of this letter?
19    A.   I did not receive a copy of this letter.
20    Q.   Do you know whether anyone else in
21 government affairs had received a copy of this
22 letter from Congressman Stark in October of 2000?

---

Page 215

1     A.   I do not know.
2     Q.   Do you recall any discussions in or around
3 October of 2000 within government affairs where
4 individuals in that office described allegations
5 being made by Congressman Stark about Abbott and its
6 drug pricing?
7          MS. TABACCHI:  Object to the form.
8     A.   I do not recall any conversations about
9 this letter.
10    Q.   You remember that exhibit that we talked
11 -- that we looked at where you were transmitting
12 Congressman --
13    A.   Uh-huh.
14    Q.   -- Stark's 1997 --
15    A.   Uh-huh.
16    Q.   -- letter to the Inspector General of HHS.
17 You remember that?
18    A.   Yes.
19    Q.   Okay.  And you read that letter and you
20 were aware of the substance of Congressman Stark's
21 allegation in that letter, correct?
22    A.   Yes.

---

Page 216

1     Q.   Was that the last time you had heard about
2 Congressman Stark making allegation about Abbott's
3 drug pricing, in 1997?
4     A.   I don't recall the dates of the previous
5 one.  That was one of my notes to Rhonda Luniak.
6     Q.   That's correct.
7     A.   What was the date there?
8     Q.   You think your memo was November 19th,
9 1997, if you recall.
10    A.   1997.
11         MR. RIKLIN:  Or 17th.
12         MR. GOBENA:  I'm pretty sure it's the
13 19th.
14         MR. RIKLIN:  Could be, could be.  You're
15 right.
16         THE WITNESS:  I don't recall any
17 conversations after that material that I sent to
18 Rhonda Luniak in 1997.
19         BY MR. GOBENA:
20    Q.   Was that the last time you heard about
21 allegations being made by Pete Stark, and that being
22 1997, was that the last time period that you heard

---

Page 217

1 about allegations being made by Pete Stark about
2 Abbott's drug pricing policies?
3     A.   I don't recall if I had heard about it in
4 between those periods.
5     Q.   So when you looked at this letter from
6 Congressman Stark, it didn't ring a bell to you that
7 he had continued to raise allegations about Abbott's
8 drug pricing practices?
9          MS. TABACCHI:  Object to the form.
10    A.   It rang a bell for me that this issue had
11 been hanging around for a while.
12    Q.   Do you know whether -- strike that.  Were
13 you involved at all in preparing any response to
14 allegations made by Congressman Stark in October
15 2000?
16    A.   No.
17    Q.   Okay.  Do you know if anyone else at
18 government affairs was involved in helping to
19 prepare responses to Congressman Stark's October
20 2000 letter to Mr. Miles White?
21    A.   No.
22    Q.   Do you know whether Congressman Stark

---

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 218

1   wrote any letters to any other drug manufacturers in
2   or around October of 2000?
3       A.   I do not know.
4       Q.   Do you know whether Abbott ultimately
5   prepared a response to this October 2000 letter from
6   Congressman Stark to Mr. Miles White?
7       A.   I don't know.
8       Q.   Was there any concerns in the government
9   affairs department about perceptions on the Hill of
10  Abbott as a result of allegations that were being
11  made by Congressman Stark in 1997?
12          MS. TABACCHI:  Object to the form.
13      A.   We in government affairs would not be
14  happy with any kinds of unflattering allegations
15  that might be made about our company.
16      Q.   Because it might undermine your ability to
17  go and communicate with members of Congress about
18  public policy issues, correct?
19      A.   Correct.
20          MS. TABACCHI:  Object to the form.
21          BY MR. GOBENA:
22      Q.   Sorry.  What was that?

Page 219

1       A.   Yes.
2       Q.   So it certainly didn't help your cause in
3   October 2000 that Congressman Stark was writing a
4   letter raising allegations about Abbott's drug
5   pricing practices; isn't that right?
6           MS. TABACCHI:  Object to the form.
7           THE WITNESS:  It was unflattering.
8           MR. GOBENA:  If we could have this marked
9   as Plaintiff's Exhibit 1364 I believe?
10              (Plaintiff's Exhibit 1364
11                was marked for
12                identification.)
13          BY MR. GOBENA:
14      Q.   Have you seen this program memorandum
15  dated November 17th, 2000 before today, Ms. Haas?
16      A.   I don't recall.
17      Q.   Let's take a look at the program
18  memorandum.  It's -- like I said, it's dated
19  November 17, 2000, and in the sort of title line, it
20  says, "This program memorandum supersedes PMAB-00-86
21  change request 1232 dated September 8th, 2000." Do
22  you see that there?

Page 220

1       A.   Yes.
2       Q.   You can look back if you want at the prior
3   exhibit, but is it your understanding that the
4   program memorandum being referred to that was being
5   superseded was the one communicating the DOJ prices?
6           MS. TABACCHI:  Object to the form.
7       A.   As it is discussed here in this program
8   memorandum.
9       Q.   Yes.
10      A.   Yes.
11      Q.   The subject says, "Source of average
12  wholesale price data and price" -- "Pricing drugs
13  and biologicals covered by the Medicare program."
14  It says, "This PM suspends until further notice
15  PMAB-00-86 dated September 8th, 2000.  This is to
16  notify you you should not use the Department of
17  Justice data attached to the program" -- "to
18  PMAB-00-86 in your next update of Medicare payment
19  allowances for drugs and biologicals.  Instead,
20  until further notice, you should delay use of this
21  source of average wholesale price and the use of AWP
22  data from your usual source."  Do you see that

Page 221

1   there?
2       A.   Yes.
3       Q.   And were you -- did you become aware in or
4   around November of 2000 that -- that the memorandum
5   -- the instructions in the memorandum you
6   distributed in September of 2000 were -- were I
7   guess superseded by a subsequent memorandum from
8   HHS?
9           MS. TABACCHI:  Object to the form.
10      A.   I would have probably been aware of that,
11  yes.
12      Q.   So you would have been aware of this
13  memorandum --
14      A.   Yes.
15      Q.   -- as was part of your duties and --
16      A.   Maybe not this particular memorandum, but
17  I may have read it in a Pink Sheet or something.
18      Q.   Okay.  It says, "While we continue to
19  believe that the AWPs reported in the usual
20  commercially available sources are inaccurate and
21  inflated above the true wholesale prices charged in
22  the marketplace, Congressional action may preclude

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 222

1  the use of this alternative source." Is it a fair
2  reading to say that HHS was suspending the September
3  8th, 2000 memorandum because it was concerned that
4  Congressional action may block the implementation of
5  PMAB-00-86?
6        MS. TABACCHI: Object to the form.
7     A.   I couldn't speak to -- to why.
8     Q.   Well, you certainly knew in November 2000
9  that there was some legislative activity going on
10  with respect to the implementation of the September
11  8th, 2000 program memorandum, correct?
12     A.   Based upon what we've seen today, yes.
13     Q.   Based on the memorandum where you sent
14  that information regarding legislative activity.
15     A.   Yes.
16     Q.   Right.
17     A.   Uh-huh.
18        MR. GOBENA: Okay. All right. I'd like
19  to have this marked as 1365.
20              (Plaintiff's Exhibit 1365
21                  was marked for
22                  identification.)

Page 223

1        BY MR. GOBENA:
2     Q.   Why don't you take a moment to review
3  that, Ms. Haas.
4     A.   Okay, okay.
5     Q.   Well, this appears to be an e-mail from
6  you, Ms. Haas, to Dale Johnson and a bunch of cc's;
7  is that right?
8     A.   Correct.
9     Q.   Can you tell me who Mr. Johnson was?
10     A.   Dale Johnson is the head of state
11  government affairs for Abbott.
12     Q.   And this e-mail -- well, I don't know if
13  it's an e-mail or memorandum. Whatever it is, it's
14  dated --
15     A.   It's an e-mail.
16     Q.   It's an e-mail? Okay, it's dated November
17  22nd, 2000, correct?
18     A.   Correct.
19     Q.   And that's five days after the program
20  memorandum we just saw from HHS, correct?
21     A.   Correct.
22     Q.   And you start off in your e-mail by saying

Page 224

1  -- I'm sorry, in the re line you say -- it says, "Re
2  AWP," colon "HCFA reverses on implementation of drug
3  payment reduction." Do you see that there?
4     A.   Yes.
5     Q.   Is that subject line a reference to the
6  program memorandum we just looked at that was
7  Plaintiff's Exhibit 1364?
8     A.   Yes.
9     Q.   You say then, "Allow me to clarify in
10  response to your question, Dale." You've had a
11  chance to review the exhibit, correct?
12     A.   Yes.
13     Q.   Do you know what question you were
14  responding to?
15     A.   No.
16     Q.   Okay.
17     A.   I was thinking it would be helpful if I
18  knew now what the question was.
19     Q.   Sure. Well, let's explore your answer
20  nonetheless. You say, "The HCFA program memorandum
21  is good news because it means that the price
22  reductions will not take place as planned on January

Page 225

1  1st, 2001." Why was it good news, Ms. Haas, that
2  the price reductions would not be taking place on
3  January 1, 2001?
4     A.   Well, we must have had an interest in the
5  prices not being reduced.
6     Q.   And was one of the reasons why you had an
7  interest in the prices not being reduced because the
8  price reduction might lead to lower reimbursement
9  for Abbott's customers?
10        MS. TABACCHI: Object to the form.
11     A.   I couldn't speak to that. It might have
12  been that there might have been concerns about level
13  playing fields and how the data was being collected
14  and reported that may have been at issue.
15     Q.   Do you recall whether there were any
16  discussions about the fact that the price
17  information on the -- that was included with the
18  September 2000 memorandum --
19     A.   Uh-huh.
20     Q.   -- included price information related to
21  Abbott but maybe not price information related to
22  Abbott's competitors?

57 (Pages 222 to 225)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

| Page 226 | Page 228 |
|---|---|

**Page 226**

1    A.   Could you repeat that question?
2    Q.   Sure.  Do you remember any conversations
3 you had with anyone at Abbott --
4    A.   Uh-huh.
5    Q.   -- about whether there were concerns that
6 the September 8th, 2000 memo had price information
7 relating to Abbott, but it didn't have any price
8 information related to competitors of Abbott?  Do
9 you understand the question?
10    A.   I understand the question.  I don't -- did
11 not have any conversations with anyone about that,
12 and I don't know what other products were on the
13 list.  I don't recall.
14    Q.   I guess I'm just trying to get a better
15 understanding of what you mean by the level playing
16 field issue.  Why don't you explain that for me.
17    A.   Concerns being that in the collection of
18 data and what were going to be used as the base data
19 for drug reimbursement, how it was going to be
20 collected and how it was going to be reported so
21 that we were comparing apples and apples I would
22 guess.

**Page 227**

1    Q.   You go on to say, "It is not good news
2 that Congress continues to have an interest in this
3 issue."  Why was it not good news that Congress
4 continued to have an interest in the issue of price
5 reductions?
6    A.   From a number of different perspectives.
7 This means we would continually to have to work on
8 this issue, continue to mean there could be negative
9 press on the issue.  Those are just two of the
10 reasons.
11    Q.   Why was having to continually work on the
12 issue of reducing Medicare reimbursements for drugs
13 a problem?
14    MS. TABACCHI:  Object to the form.
15    A.   It gets a little tiresome talking about
16 drug pricing issues all the time and reacting to
17 negative media.
18    Q.   And by negative media, are you referring
19 to articles like the September 2000 articles that we
20 saw about Congressional investigations of Abbott's
21 prices?
22    A.   No.  Media where it portrays our company

**Page 228**

1 in a negative light.
2    Q.   Did you have discussions with any of your
3 colleagues in the government affairs group about the
4 media portraying Abbott in a negative light with
5 respect to the drug pricing issue?
6    A.   In a general way?
7    Q.   Yes.
8    A.   Yes.
9    Q.   And who did you have discussions like that
10 with?
11    A.   David Landside, Cindy Sensibaugh.
12    Q.   Do you recall the substance of those
13 conversations you had with Mr. Landside about the
14 negative portrayal of Abbott in the media on drug
15 pricing issues?
16    A.   The substance would have been this is
17 something we have to deal with and be able to
18 explain and understand.
19    Q.   And is that -- does that summarize the
20 conversations you had with Ms. Sensibaugh about the
21 negative portrayal of Abbott with respect to drug
22 pricing issues?

**Page 229**

1    A.   Yes, at a very top kind of water cooler
2 kind of conversation.
3    Q.   Did you have any conversations with anyone
4 in Abbott's public affairs department about the
5 portrayal of Abbott in the media with regard to drug
6 pricing issues?
7    A.   If I did, very top line about a story
8 coming out.
9    Q.   Did you have discussions with a woman
10 named Christy Beckmann, who worked in Abbott's
11 public affairs, about the portrayal -- Abbott's
12 portrayal in the media about drug price issues?
13    A.   Christy Beckmann?
14    Q.   Yeah.
15    A.   I don't know Christy Beckmann.
16    Q.   What about Ms. Babington?  You said you
17 knew her, correct?
18    A.   Yes.
19    Q.   Did you have conversations with
20 Ms. Babington about the negative -- the potentially
21 negative press portrayals of Abbott on this drug
22 pricing issue?

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 230

1      A.   She was higher in the organization at that
2  point and I don't believe that I had a conversation
3  with Cathy Babington.
4      Q.   You say at that point in 2000.
5      A.   Yes.
6      Q.   How about earlier when she wasn't so high
7  in the organization, do you recall having
8  conversations with her about --
9      A.   Not directly.  As part of larger groups
10  perhaps, but on the general issue.
11      Q.   And would one of those groups be the
12  Medicare working group?
13          MS. TABACCHI:  Object to the form.
14      A.   Perhaps.
15      Q.   What other groups do you think you might
16  have had a conversation with Ms. Babington regarding
17  press portrayals of Abbott on the drug pricing
18  issue?
19      A.   Direct conversations, minimal, but I may
20  have been in meetings where Ms. Babington was
21  present and there was discussion about negative --
22  we don't want to be portrayed in an unflattering

---

Page 231

1  negative way to our shareholders or our Washington,
2  you know, stakeholders.
3      Q.   And it was important to have someone like
4  Ms. Babington or someone from her shop involved
5  because they were the gatekeepers of Abbott's public
6  image.
7      A.   And more likely, the pharmaceutical
8  division had their own public affairs people.  It's
9  more likely I was dealing with those people, but I
10  don't know Ms. Beckmann that you mentioned.
11      Q.   Okay.  Did you have any conversations with
12  Ms. Luniak about the negative portrayal of Abbott in
13  the press in connection with drug pricing issues?
14      A.   At this time?
15      Q.   Yeah.
16      A.   If she was still in that role, yes.
17      Q.   How about prior to this time, around the
18  time of the Stark letter from 1997, did you have
19  conversations then with her about how Abbott was
20  portrayed in the press on the drug pricing issue?
21      A.   Yes.
22      Q.   What do you recall about those

---

Page 232

1  conversations you had with Ms. Luniak back in '97?
2      A.   That these were not welcome and that we
3  had to manage -- we had to manage them from purposes
4  of our reputation and -- and to respond
5  appropriately.
6      Q.   To go on in your e-mail, you say, "The
7  House passed but the Senate has not acted and may
8  not on legislation directing the GAO to study the
9  AWP issue.  Regardless of this present legislative
10  impasse, it is likely that the GAO will study this
11  issue next year and that Congress will attempt to
12  enact changes to the existing AWP structure.
13  Congress does not need legislation to direct the GAO
14  to study an issue."  How did you collect this
15  information that you're conveying to Mr. Johnson and
16  the cc's of this e-mail about the GAO reports?
17      A.   Conversation with Congressional --
18  probably a consultant.
19      Q.   What consultant did you have working with
20  --
21      A.   It also could have been Pharma, may have
22  been information I picked up at a Pharma meeting.

---

Page 233

1      Q.   What consultants did you have working with
2  Abbott's government affairs group in Washington who
3  might have been the source of this information?
4      A.   At this time, it would have been Williams
5  & Jensen.
6      Q.   You go on to say, "It is possible that
7  Congress would hold a hearing on the subject before
8  making changes to AWP.  Despite the possibility of a
9  hearing, the lead antagonist on this issue,
10  Congressman Tom Bliley, Republican, Virginia, the
11  former chairman of the House Commerce Committee, has
12  retired.  Both Congressmen in line for taking over
13  the chairmanship, Mike Oxley and Billy Tauzin, are
14  friends of Abbott and not likely to take some
15  combative approach on the issue as Mr. Bliley."  Do
16  you see that there?
17      A.   Uh-huh.
18      Q.   First of all, why was the fact that
19  Congressmen Oxley and Tauzin were friends of Abbott
20  relevant to this issue?
21      A.   A more careful writing of this e-mail
22  would have said that they were friends of industry

---

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

---

**Page 234**

1  and that these were not particular issues that they
2  were engaged in at that time.
3      Q.   What did you mean when you said that
4  Congressmen Oxley or Tauzin were not likely to take
5  the same combative approach on the issue as
6  Mr. Bliley?
7      A.   I meant that they were not as hot on the
8  issue and weren't as likely to -- not that they
9  wouldn't take on the issue, but they might attempt
10  to take the issue on in a more constructive,
11  balanced discussion versus a combative angry kind of
12  dialogue.
13      Q.   And did you believe that the review of the
14  AWP issue by Congressman Bliley was combative based
15  on the reports that were discussed in the September
16  2000 articles that we looked at earlier?
17          MS. TABACCHI:  Object to the form.
18      A.   He was taking a more combative, attacking
19  approach on the issue, yes.
20      Q.   I mean, the articles in September 2000
21  effectively accused Abbott and other drug companies
22  of committing fraud; isn't that correct?

---

**Page 235**

1      A.   Correct.
2      Q.   And in fact, Congressman Stark, who is
3  also on the same committee investigating these
4  issues, directly accused Abbott of fraud; isn't that
5  correct?
6      A.   He was on a separate committee.
7      Q.   Oh, a separate --
8      A.   Yes.
9      Q.   The Ways and Means Committee, right?
10      A.   Yeah, and Bliley was Energy and Commerce,
11  yes.
12      Q.   I see, okay.  But you have Congressmen
13  Stark and Bliley --
14      A.   Uh-huh.
15      Q.   -- basically raising the allegations of
16  fraud against Abbott in September 2000, just a
17  couple months before your e-mail, correct?
18      A.   Uh-huh.
19      Q.   So when you're saying they wouldn't take
20  the same combative approach, it's your -- was it
21  your belief that they wouldn't start off with the
22  premise that Abbott was engaging in fraud in

---

**Page 236**

1  connection with the way it reported its drug prices?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  My belief would have been
4  that they would have wanted to find out what was
5  going on and -- versus attacking first and trying to
6  find out what was going on second.
7          MR. GOBENA:  I'll have this marked as
8  Plaintiff's Exhibit 1366.
9                  (Plaintiff's Exhibit 1366
10                  was marked for
11                  identification.)
12          BY MR. GOBENA:
13      Q.   And I'm only going to ask you to look at a
14  couple things.  So the letter that's at ABT-DOJ 296939.  You don't
15  skim the letter that's at ABT-DOJ 296939.  You don't
16  need to read it in substance, and then I want you
17  to, if you could skim the letter --
18      A.   I'm going to need better glasses for the
19  --
20      Q.   Oh, that's true.  I think a magnifying
21  glass might be more in order, or a telescope.  And
22  then there's a letter on the last two pages of the

---

**Page 237**

1  exhibit, if you can take a look at that.
2      A.   Okay, okay.
3      Q.   As you can see from the facsimile cover
4  sheet at ABT-DOJ 296937, this is a fax from David
5  Landside to Laura Schumacher; is that correct?
6      A.   Yes.
7      Q.   So as of January 4th, 2001, Mr. Landside
8  was still working at Abbott.
9      A.   It seems like he was gone longer than he
10  was.
11      Q.   Just seems like forever because he was so
12  valuable to the company?
13      A.   We just worked together a long time.
14      Q.   And if you go to the additional comments,
15  you'll note he says included is Stark's Pharmacia
16  letter and the Pharmacia letter to Stark, and then
17  he notes that the Stark puts the response in the
18  Congressional record, and the letter is addressed to
19  Laura Schumacher.  Laura Schumacher is an in-house
20  counsel for Abbott; isn't that correct?
21      A.   Yes.
22      Q.   In fact, isn't she currently the general

---

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 238

1  counsel?
2     A.   Yes.
3     Q.   So Mr. Landsidle's communicating this
4  information to Abbott's in-house counsel, and if you
5  go to the third page of the exhibit, there's that
6  letter with very small print that I asked you to
7  look at.  Do you see that?
8     A.   You're talking about the Pharmacia letter
9  or --
10    Q.   Yes, or the letter from Congressman Stark
11 to Pharmacia.
12    A.   That he published in the Congressional
13 record?
14    Q.   Yeah, it's at ABT-DOJ 296939.
15    A.   Yes, okay.
16    Q.   You don't need to read the letter, but --
17    A.   Okay.
18    Q.   From skimming it, does it look similar to
19 the letter from Congressman Stark to Mr. Miles White
20 that we looked at earlier dated October 31st, 2000?
21    A.   It starts at the top of the first column?
22    Q.   Yes.

Page 239

1     A.   Okay.  It's very difficult to read, but I
2  see it here.
3     Q.   Okay.  Well --
4     A.   Yes.
5     Q.   If you want to compare, we can read
6  passages, but based on your recollection of the
7  letter to Mr. White, does this look like a similar
8  letter from Congressman Stark to the chairman --
9  sorry, the CEO of Pharmacia, Mr. Fred Hassan?
10         MS. TABACCHI:  Object to the form.
11    A.   It seems like a longer letter.
12    Q.   Well, the gist is the same.  It's
13 basically raising allegations of fraud.
14    A.   Reading the first paragraph, it would seem
15 to say that, yeah.
16    Q.   If you turn to the letter on the next page
17 from Pharmacia, you see there's a letter there from
18 -- if you go to the last page, it's from Fred
19 Hassan.  You see the signature there.
20    A.   Uh-huh.
21    Q.   To Congressman Stark.  Do you see that?
22    A.   Yes.

Page 240

1     Q.   And it's dated October 16th, 2000,
2  correct?
3     A.   Uh-huh.
4     Q.   And he says, "I am the president, chief
5  executive officer and a member of the board of
6  directors of Pharmacia."  He goes on to say, "In my
7  capacity as CEO of Pharmacia, I write to acknowledge
8  receipt of your letter of October 3rd, 2000
9  addressed to Pharmacia and Upjohn, Inc., and to
10 address preliminarily the issues you raise regarding
11 the reporting and publishing of certain price data
12 for several prescription drug medications sold by
13 Pharmacia."  Do you see that language there?
14    A.   Yes.
15    Q.   Okay.  He goes on to say, "Initially, I
16 want to provide you with my personal assurance that
17 Pharmacia takes the issues raised in your letter
18 very seriously.  For your information, Pharmacia has
19 actively provided information regarding our pricing
20 practices to a number of investigative bodies.
21 Also, the company's committed to continuing to work
22 with the appropriate authorities until any

Page 241

1  differences that may exist in the understanding of
2  this matter are resolved."  Do you see that there?
3     A.   Yes.
4     Q.   Do you know whether or not anyone at
5  Abbott ever wrote a similar letter to Congressman
6  Stark in response to his letter to Abbott accusing
7  it of engaging in fraudulent drug pricing conduct?
8         MS. TABACCHI:  Object to the form.
9     A.   I don't know.
10    Q.   Were you involved in any discussions at
11 Abbott -- I want to stay clear of attorney-client
12 communications, but if there are some non-
13 attorney-client communications, discussions at
14 Abbott about the propriety of responding to
15 Congressman Stark's letter?
16    A.   I was not part of any of those
17 conversations.
18    Q.   I see.  Well, we see Mr. Landsidle is the
19 person sending this fax --
20    A.   Uh-huh.
21    Q.   -- containing information in the Stark
22 letter and the Pharmacia response.  Do you see that?

61 (Pages 238 to 241)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 242

1    A.   Uh-huh.
2    Q.   Is it your understanding that
3  Mr. Landside was the person -- would have been the
4  person who would have been dealing with -- from your
5  office anyways, from government affairs, would have
6  been the person who was addressing any issues
7  relating to the Stark letter?
8         MS. TABACCHI:  Objection to the form.
9    A.   Perhaps.  All I can see from this is he is
10  sharing with Laura Schumacher this information.
11    Q.   So at a minimum, he provided information
12  to Laura Schumacher.  You don't know the extent of
13  his involvement in the issue?
14    A.   Correct.
15         MS. TABACCHI:  Object to the form.
16         BY MR. GOBENA:
17    Q.   All right.  This document has already been
18  marked as an exhibit previously.  I don't know the
19  number, but we don't need to have it marked.  I want
20  you to take a moment to briefly review the article,
21  Ms. Haas.
22    A.   Okay.

Page 243

1    Q.   Do you recall having seen an article in
2  June of 2001 regarding Abbott's cutting of prices?
3         MS. TABACCHI:  Object to the form.
4    A.   I have a recollection of this, yes.
5    Q.   So this isn't the first time you saw
6  either this article or an article like it about a
7  price reduction in 2001.
8    A.   This is not the first time I heard about
9  this, no.
10    Q.   What was the first time you heard about a
11  price reduction that Abbott had initiated in 2001?
12    A.   Probably through media or this article.  I
13  don't know.
14    Q.   You didn't have any discussions --
15    A.   There may have been a press release within
16  the company, something like that.
17    Q.   Is there some sort of internal -- like
18  internet within the -- at Abbott like where
19  information's shared internally?
20         MS. TABACCHI:  Object to the form.
21    A.   Abbott puts out press releases that are
22  available to the public at large.

Page 244

1    Q.   I see.  I thought you were referring to a
2  press -- internal sort of information release --
3    A.   No, no, it would -- I meant Abbott may
4  have put a press release out that I would have seen
5  making this announcement.
6    Q.   Right.  Well, if you read the first
7  sentence of the article, it says, "Abbott
8  Laboratories has quietly lowered prices on dozens of
9  drugs and medical treatments amid multiple state and
10  federal investigations alleging that the U.S. drug
11  companies lied to the government about wholesale
12  prices of certain pharmaceuticals."  If it had
13  issued a press release --
14    A.   Yes.
15    Q.   It stands to reason that it wouldn't have
16  quietly --
17    A.   I see your point there, so I might have --
18  it must have been read in media or Pink Sheet or
19  something.
20    Q.   You were not made aware of Abbott's price
21  reduction prior to seeing it in the media.
22    A.   No.

Page 245

1    Q.   I'm going to turn your attention to the
2  second page.  In the middle paragraph that starts
3  "Yet, an Abbott spokeswoman," do you see that?
4    A.   Yes.
5    Q.   It reads, "Yet, an Abbott spokeswoman
6  characterized the price cuts as routine."  Quote,
7  "In all of our businesses, Abbott periodically and
8  routinely evaluates pricing based on a number of
9  factors, including competitor pricing, operation
10  costs, et cetera, said Abbott spokeswoman Christy
11  Beckmann."  Do you see that there?
12    A.   Yes.
13    Q.   If I recall your testimony correctly, you
14  said you didn't know Christy Beckmann, right?
15    A.   No.
16    Q.   Do you know whether -- were you personally
17  contacted by anyone at Abbott's public relations
18  department in or around June 2001 about helping to
19  prepare a response to any media about the Abbott
20  price cuts?
21    A.   No.
22    Q.   Do you know if anyone else in government

62 (Pages 242 to 245)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                        August 30, 2007
                          Washington, DC

---

**Page 246**

1  affairs was contacted by or worked with public
2  affairs to prepare a response to any media reports
3  about the price cuts?
4      A.   No.
5      Q.   Why don't we turn to the third page.  If
6  you'd look at the first full paragraph, it reads,
7  quote, "The AWP."  Do you see that?
8      A.   Uh-huh.
9      Q.   It reads, "'The AWP is not set by Abbott
10 for any of its products, nor does Abbott establish
11 the formula for calculating AWP,' Beckmann said."
12 Is -- and then he goes on to say, "Abbott said the
13 company reports its published list price through the
14 so-called reporting agencies like health information
15 from First DataBank and," quote, "they calculate
16 AWP," closed quote, "Beckmann said."  Do you see
17 that?
18     A.   Yes.
19     Q.   Is that consistent with your understanding
20 of how the AWP for Abbott's products are set?
21         MS. TABACCHI:  Object to the form.
22     A.   It's consistent of what I understood as to

---

**Page 247**

1  how it worked, but I didn't have knowledge or work
2  with that on a firsthand basis.  I don't know how it
3  actually did work, but this was my understanding as
4  to how AWPs were set.
5      Q.   Because if you read the next two
6  paragraphs, it says, "But First DataBank executive
7  vice president and chief operating officer Jim
8  Wilson said," quote, "'We have nothing to do with
9  setting the prices.  We are simply a conduit for the
10 industry.'  He goes on to say, 'We collect'" -- "'We
11 simply collect the information from drug companies
12 and wholesalers and pass it along to governments and
13 other insurers,' Wilson said."  There's obviously a
14 difference of opinion there; isn't that right?
15         MS. TABACCHI:  Object to the form.
16     A.   Appears to be in this article.
17     Q.   Right.
18     A.   Uh-huh.
19     Q.   And your testimony is that your
20 understanding was -- of how the AWP was set is
21 reflected in the quotes from the Abbott spokeswoman;
22 isn't that correct?

---

**Page 248**

1      A.   That has been -- that was my understanding
2  as to how this worked.
3      Q.   And I can't remember, did you say that you
4  recalled reviewing this particular document -- this
5  particular article or not?
6      A.   Did I review it?  Not this particular -- I
7  may have seen this particular article, but it might
8  have been my friend the Pink Sheet or something.
9      Q.   Okay.  So were you aware in June of 2001
10 there was a dispute between -- potentially between
11 Abbott and First DataBank insofar as who set the
12 AWPs for Abbott's drugs?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I'm aware there was general
15 discussion from a number of sectors that there was
16 confusion and disagreements about how this was being
17 done.
18         MR. GOBENA:  I'm going to have this marked
19 as the next exhibit number, but I've already
20 forgotten.
21         MR. RIKLIN:  1367.
22         MS. TABACCHI:  That's right.

---

**Page 249**

1             (Plaintiff's Exhibit 1367
2                  was marked for
3                  identification.)
4         THE WITNESS:  Okay.
5         BY MR. GOBENA:
6      Q.   You've had a chance to review the
7  document, Ms. Haas?
8      A.   Yes, yes.
9      Q.   Let me start at the bottom of Plaintiff's
10 Exhibit 1367 and work your way up.  It looks like
11 there's an e-mail from a Kenneth Griesman at TAP to a
12 variety of people, including Elaine R. Leavenworth;
13 isn't that correct?
14     A.   Yes.
15     Q.   And Elaine Leavenworth -- what's her --
16 what was her job title in 2001?
17     A.   Corporate vice president, government
18 affairs.
19     Q.   So did she succeed Mr. Landsidle once he
20 retired?
21     A.   She took over that responsibility, but her
22 responsibilities were higher.

---

63 (Pages 246 to 249)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                        August 30, 2007
                        Washington, DC

---

Page 250

1    Q.   In what respect were they higher than
2  Mr. Landsidle's responsibilities?
3    A.   She took over responsibility for federal
4  government affairs, which was David's purview, and
5  eventually she also took over state government
6  affairs, which was Mark Barmak's purview, but I
7  don't know if Mark Barmak was still there in August
8  2001, so --
9    Q.   In Mr. Griesman's original e-mail to
10 Ms. Leavenworth, among others, he starts by writing,
11 "This memo is to memorialize the conversation I had
12 with Chuck Clapton of the U.S. House Commerce
13 Committee this afternoon." Do you know Chuck
14 Clapton?
15   A.   Yes.
16   Q.   Does he work for the Commerce Committee or
17 does he work for a particular Congressman?
18   A.   Right now?
19   Q.   Yes.
20   A.   Right now he's with the House Ways and
21 Means Committee.
22   Q.   I see. What about in 2001, did you know

---

Page 251

1  where --
2    A.   In 2001, he would have been working with
3  -- may have still been working with Billy Tauzin.
4    Q.   And in August of 2001, Mr. Tauzin was the
5  chair of the House Commerce Committee, correct?
6    A.   I believe so, yes, correct.
7    Q.   And you say he worked with Mr. Tauzin. Do
8  you know what his position was on Mr. Tauzin's
9  staff?
10   A.   I believe he was one of the health care
11 analysts on the staff at that time.
12   Q.   In the e-mail, Mr. Griesman goes on to say
13 that Clapton explained that, "The Commerce Committee
14 will be holding hearings on the AWP issue during the
15 second week of September. Later in the call, I
16 asked if he had a specific date in mind and he said
17 he's hoping for September 12th." Do you see that
18 there?
19   A.   Yes.
20   Q.   Would a Commerce Committee hearing on the
21 AWP issue be something that your office would have
22 been somehow involved with in terms of Abbott

---

Page 252

1  monitoring or tracking or following what was going
2  on there?
3        MS. TABACCHI:  Object to the form.
4    A.   We would have been interested in following
5  the hearings.
6    Q.   Okay. He goes on to say in the next
7  paragraph, "Clapton explained that both the GAO and
8  CMS are confirmed as witnesses at the hearing and
9  that the committee wants to invite members of the
10 industry as well. He said the topics for the
11 testimony include, one, the nature of the problems
12 with using AWP for reimbursement, and two, proposed
13 solutions. He then explained that he's aware from
14 media reports that Abbott recently lowered its
15 prices on a number of drugs, and as a result,
16 thought Abbott might have much to contribute to the
17 hearing. He then extended an invitation for Abbott
18 to participate in the hearing." Do you see that?
19   A.   Yes.
20   Q.   And this e-mail was forwarded to you from
21 -- by Ms. Leavenworth?
22   A.   Yes.

---

Page 253

1    Q.   Do you know whether Abbott considered
2  having someone from Abbott participate in the
3  September 2001 hearings on AWP?
4    A.   I don't know for a fact if there were
5  discussions about that. I did not participate --
6  I'm sure there were discussions. I did not
7  participate in those discussions. I don't know if
8  we provided any written report or I don't recall --
9  I don't think that we did testify.
10   Q.   So was the FYI --
11   A.   I don't know if the invitation was
12 extended. I don't know.
13   Q.   So the FYI at the top here, was that
14 purely -- she was communicating this e-mail to you
15 for your information?
16   A.   Yes.
17   Q.   Or was she asking you to take some action
18 in response to the information therein?
19   A.   She did not ask me to take any action.
20   Q.   Did you take any action in response to the
21 e-mail listed here from Ken Griesman that was
22 forwarded to you?

---

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 254

1      A.   No, I did not.
2          MR. GOBENA:  Okay.  I think we're on our
3   last exhibit.  I can't speak for my colleagues
4   though, so it may not be so great to you.  This is
5   going to be Plaintiff's Exhibit 1368.
6               (Plaintiff's Exhibit 1368
7               was marked for
8               identification.)
9          THE WITNESS:  Okay.
10         BY MR. GOBENA:
11     Q.   So have you had a chance to review --
12     A.   Yes.
13     Q.   -- the exhibit?  Why don't we start with
14  the e-mail on the bottom half of the first page of
15  Plaintiff's Exhibit 1368.
16     A.   Uh-huh.
17     Q.   It's an e-mail from Heather Mason to
18  Elaine Leavenworth and Susan McDonald.  We've
19  already established who Ms. Leavenworth is.  Who was
20  Heather Mason?
21     A.   Heather Mason was in PPD and had
22  responsibility -- I don't know if it was specific

Page 255

1   product areas or -- I don't recall, but she was in
2   the PPD division.
3      Q.   Do you know -- your testimony is that you
4   don't recall what her specific responsibilities were
5   --
6      A.   Yes.
7      Q.   -- within PPD?
8      A.   Yes.
9      Q.   Was she a higher level corporate official
10  within PPD?
11         MS. TABACCHI:  Object to the form.
12     A.   Higher relative to --
13     Q.   Was she a senior executive within PPD?
14     A.   Yes.
15     Q.   And who was Suzanne McDonald?
16     A.   I believe Susan at that time was in -- it
17  looks like she was in AHD, but she did go over to
18  PPD.  She was in either -- this says AHD, but I
19  thought she would have been in PPD by then.  She may
20  have reported to Heather perhaps.
21     Q.   What exactly is AHD?
22     A.   Abbott Health Systems division.  I don't

Page 256

1   believe that exists anymore, and I see that her "to"
2   to Elaine identifies Elaine in Abbott Health Systems
3   division, and that wouldn't have been accurate at
4   that time.
5      Q.   Was Ms. Leavenworth in Abbott's Health
6   Care Systems division prior to taking over the
7   position as a vice president for government affairs?
8      A.   Yes.
9      Q.   All right.  The e-mail reads, "You
10  probably read, but this week's Pink Sheet shows that
11  the spread between AWPs and branded and generic
12  drugs in print shows the markup on generics is much
13  higher than on branded.  Sixty-eight percent of AWP
14  is cost for the brands and 43 percent of AWP is
15  purchaser's cost for the generics.  Can this be used
16  somehow to show why retailers want to protect their
17  margins on generics and not really protect seniors?
18  It is all about the bottom line."  Do you see that
19  there?
20     A.   Yes.
21     Q.   First, have you -- did you review the Pink
22  Sheet attached to this e-mail chain dated August

Page 257

1   26th, 2002?
2      A.   I probably read it, yes.
3      Q.   You probably read it because --
4      A.   Yes.
5      Q.   -- your boss forwarded it to you --
6      A.   Yes.
7      Q.   -- and asked you to read it; is that
8   right?
9      A.   That's right.
10     Q.   And those last two sentences about --
11  where Ms. Mason says, "Can this" -- she's talking
12  about the markup -- "be used somehow to show why
13  retailers want to protect their margins on generics
14  and not really protect seniors.  It's all about
15  bottom line," is that in reference to the negative
16  press that you were testifying to earlier today?
17         MS. TABACCHI:  Object to the form.
18     A.   This is in reference to Heather -- the
19  issue being it's all the time about the
20  single-source drugs and nobody's paying attention to
21  the generic drugs, and so this was Heather Mason
22  saying you, hey, have you guys thought about this,

65 (Pages 254 to 257)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 258

1  why are we always taking the fall.
2      Q.   Right.  And she goes on to say, you know,
3  retailers want to protect the margins on the
4  generics, and you'd agree with me that the margins,
5  based at least on the report referenced in the Pink
6  Sheet, is bigger than the margin on the brands,
7  correct?
8          MS. TABACCHI:  Object to the form.
9      A.   Well, I don't know if this is accurate and
10 I don't have an opinion.
11     Q.   Okay.  Well, that being said, isn't
12 Heather, or Ms. Mason rather, expressing her concern
13 that there may be a perception out there that
14 because the retailers want to protect the margins on
15 generics, that their interests or their bottom-line
16 interests is not in protecting seniors?  Isn't that
17 what she's saying here?
18         MS. TABACCHI:  Object to the form.
19     A.   I think she was just trying to be
20 sarcastic.
21     Q.   Well, let's go to Ms. Leavenworth's e-mail
22 to Adele Witenstein with a cc to Ms. Sensibaugh and

---

Page 259

1  you.  Do you see that there?
2      A.   Yes.
3      Q.   Who was Adele Witenstein?
4      A.   Adele is our policy director, and she at
5  that time would be the person Elaine would look to
6  to find these kinds of documents.
7      Q.   And --
8          MR. RIKLIN:  I'm sorry.  The policy
9  director what.
10         THE WITNESS:  She was -- we were very
11 small at that time.  There were only just three or
12 four of us, and she would call upon Adele to find
13 articles and reports and things when they were
14 needed.
15         BY MR. GOBENA:
16     Q.   And then Ms. Leavenworth in her e-mail
17 says, "Please find the article, Adele," which is
18 what you're referencing there, and then she says,
19 "Get copy for RH, CS, and I, then let's discuss how
20 this message works."  Do you see that there?
21     A.   Yes.
22     Q.   Is it fair to say that the RH there is a

---

Page 260

1  reference to you?
2      A.   Yes.
3      Q.   So it's -- Ms. Leavenworth in this August
4  2002 e-mail is asking Ms. Witenstein to get the
5  article that Ms. Mason's referring to, distribute it
6  to you, and then she wanted to talk about how the
7  message at the end of Ms. Mason's e-mail works; is
8  that correct?
9      A.   Uh-huh, uh-huh.
10     Q.   Did you have the discussion that
11 Ms. Leavenworth requested in August of 2002?
12     A.   I don't recall having that discussion.
13 She and Adele may have discussed it because Adele
14 was working more with outside organizations,
15 external organizations that were looking at these
16 things, like the National Pharmaceutical Council.
17     Q.   So the only people who would know about
18 any such discussions would be either Ms. Leavenworth
19 or Ms. Witenstein?  Is that your testimony?
20     A.   I'm testifying that I do not recall having
21 a subsequent conversation with Elaine about this and
22 how the messaging works.

---

Page 261

1      Q.   But -- but this kind of discussion
2  referenced here is consistent with the kind of
3  discussions you testified about earlier about how to
4  address negative perceptions in the press about
5  Abbott's drug pricing practices; isn't that right?
6          MS. TABACCHI:  Objection to form.
7      A.   This is a different kind of an issue.
8  This is an issue about the pharmaceutical division,
9  a single-source manufacturer always being criticized
10 for drug pricing and nobody looking at generics.
11     Q.   But it doesn't really help the
12 single-source drug manufacturers and brand
13 manufacturers to have generic retailers also accused
14 of being interested in margins only; isn't that
15 correct?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  It's a strange world we live
18 in.
19         MR. GOBENA:  All right.  At this stage I
20 have no further questions for the witness, although
21 I will preserve my right to ask further questions to
22 the extent documents are produced later on that

---

66 (Pages 258 to 261)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 262

1  warrant such questioning, and I will pass the
2  witness to my colleague, Mr. Rand, representing
3  Ven-a-Care of the Florida Keys.
4        MR. RIKLIN:  How much tape do we have
5  left?
6        THE VIDEOGRAPHER:  We have 19 minutes.
7  Would you like to change it now?
8        MR. RIKLIN:  Yeah, why don't we take a
9  break and then start with the new tape.
10        THE VIDEOGRAPHER:  Here marks the end of
11  Videotape Number 4.  We're going off the record.
12  The time is 15:32:35.
13        (Recessed at 3:32 p.m.)
14        (Reconvened at 3:41 p.m.)
15        THE VIDEOGRAPHER:  Here marks the
16  beginning of Videotape Number 5 in the deposition of
17  Rosemary Haas.  The time on the screen is 15:41:22.
18  You're on the record.
19        EXAMINATION BY COUNSEL FOR
20    VEN-A-CARE OF THE FLORIDA KEYS, INC.
21        BY MR. RIKLIN:
22     Q.   Good afternoon, Ms. Haas.  How are you?

Page 263

1  Ms. Haas, my questioning won't be nearly as lengthy
2  as Mr. Gobena's because he's covered a lot of ground
3  I would have covered had I gone first, but there are
4  some things I'd like to clarify, and there probably
5  are -- I can tell you, there will be a few documents
6  that I want to talk to you that Mr. Gobena has not
7  -- did not introduce to you, present to you.
8  Earlier, you told us that you at least at some point
9  participated in the Medicare working group meetings
10  at least by telephone, correct?
11     A.   Yes, correct.
12     Q.   Was one of the purposes of the Medicare
13  working group to monitor any changes that Congress
14  was considering to Medicare reimbursement?
15     A.   Yes.
16     Q.   Okay.  Take a look at Exhibit 1170, which
17  is a December 13, 1996 memo from Richard Rieger to
18  the Medicare working group.
19     A.   I guess I should have kept these in order.
20     Q.   Yeah.  You were shown that document
21  earlier.
22     A.   I just didn't keep them in order.  Let's

Page 264

1  see.  Here's one from Rieger.  What exhibit did you
2  say?
3     Q.   1170.  It's one of the first documents
4  that was introduced this morning.
5     A.   Sorry.  I would have put them in order on
6  the break.
7     Q.   Not a problem.  It's a December 13, 1996
8  memo, interoffice correspondence from --
9     A.   Okay, we got it.
10     Q.   Okay, all right, and you're shown as a
11  recipient of that memo, correct?
12     A.   Yes.
13     Q.   At the time, you were a member of the
14  Medicare working group committee or group.
15     A.   Yes.
16     Q.   And the subject line says, "Medicare
17  working group meeting, 12/16/1996," and it -- and
18  Mr. Rieger starts off, "In preparation for next
19  week's meeting."  Does that indicate to you that
20  there was a Medicare working group meeting on
21  December 12 -- excuse me, December 16, 1996?
22     A.   That's what this says, yes.

Page 265

1     Q.   Okay, and I realize you don't recall
2  whether -- or did you say you thought you did
3  participate by telephone in connection with this
4  meeting?
5     A.   I don't recall.
6     Q.   Okay.
7     A.   I know I participated in some.
8     Q.   During this time period, you did
9  participate in at least some --
10     A.   Yes.
11     Q.   -- Medicare working group meetings by
12  telephone, correct?
13     A.   Yes, correct.
14     Q.   Because some of these people were in
15  Chicago at the time, and then you and your
16  colleagues in government affairs were in Washington.
17     A.   Correct.
18     Q.   Okay.  Mr. Rieger states that, "For next
19  week's meeting, we would like to propose the
20  following agenda," and then he has three bullet
21  points, correct?
22     A.   Yes.

67 (Pages 262 to 265)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                        August 30, 2007
                        Washington, DC

---

Page 266

1    Q.   And the third bullet point is, "Next steps
2 in further developing the Abbott position re
3 Medicare reform."  Ms. Haas, was that also a purpose
4 of the Medicare working group, to attempt to develop
5 Abbott's position regarding Medicare reform?
6         MS. TABACCHI:  Object to the form.
7    A.   The purpose of the Medicare working group
8 was to provide a forum for the discussion of a
9 variety of issues, and there was the discussion
10 about what to do about Medicare was a key issue, and
11 so yes, it would have been a part of it, the
12 discussion.
13   Q.   Okay.  That was my question.  That was a
14 purpose.
15   A.   But that wasn't the sole, yeah.
16   Q.   Not the purpose.
17   A.   Yeah, a purpose.
18   Q.   Okay.  Take a look at Exhibit 1121, which
19 is the next exhibit in sequence and I believe the
20 next exhibit in --
21   A.   We got it.
22   Q.   -- in chronology.

---

Page 267

1    A.   Yes.
2    Q.   Okay, and that's a December 20, 1996 memo
3 from Mr. Rieger again to the Medicare working group
4 circulation list, correct?
5    A.   Correct.
6    Q.   Of which you are one.
7    A.   Yes.
8    Q.   Okay.  And in that letter, Mr. Rieger
9 attaches a copy of information that Mike Tootell
10 referenced, in -- he says in our most recent
11 Medicare working group meeting; is that correct?
12   A.   Correct.
13   Q.   And there's an attachment called "Medicare
14 Part B Payment for Drugs, Average Whole Price
15 Issue," correct?
16   A.   Correct.
17   Q.   Is it your recollection that this
18 attachment was provided by Mr. Tootell?
19   A.   I would assume that that came from
20 Mr. Tootell.
21   Q.   Okay.  It's a logical inference --
22   A.   Yeah, it's an inference.

---

Page 268

1    Q.   At least based on this letter.
2    A.   Uh-huh.
3    Q.   Okay.  And Mr. Tootell at the time was at
4 Ross, correct?
5    A.   Correct.
6    Q.   And I believe you told us earlier,
7 Ms. Haas, that at this time, that Medicare
8 reimbursement was based upon AWP, or at least that
9 was your understanding.
10   A.   Yes.
11   Q.   And I believe you also told us that it was
12 your understanding at the time that AWPs for
13 Abbott's products were higher than the prices
14 actually paid by wholesalers and providers, correct?
15        MS. TABACCHI:  Object to the form.
16   A.   I don't recall saying that.
17   Q.   Was that your understanding at the time?
18        MS. TABACCHI:  Object to the form.
19   A.   That was not my understanding.
20   Q.   Okay.  What was your understanding that
21 the AWPs represented?
22        MS. TABACCHI:  Object to the form.

---

Page 269

1    A.   That it stood for average wholesale price,
2 and that was the extent of my understanding.
3    Q.   Was it your understanding that Abbott's
4 wholesaler customers and providers paid less than
5 AWP for Abbott's products?
6         MS. TABACCHI:  Object to the form.
7    A.   I had no knowledge of that.
8    Q.   Have you ever heard the term "spread"?
9    A.   Yes.
10   Q.   Okay, and have you ever heard the term
11 "spread" in terms of -- or in the context of
12 Medicare reimbursement?
13   A.   Yes.
14   Q.   And is it your understanding that the
15 spread as used in that context is the difference
16 between what a third-party payer such as Medicare
17 reimburses a provider for a product and the actual
18 acquisition cost to that provider for the product?
19   A.   Yes.
20   Q.   And was the term "spread" a commonly
21 understood term by you at this time back in December
22 of 1996?

---

68 (Pages 266 to 269)

Henderson Legal Services
202-220-4158

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

---

Page 270

1        MS. TABACCHI:  Object to the form.
2     A.    No, my knowledge of spread was talked
3  about frequently in media and in Congressional
4  briefings et cetera, so you would hear the term
5  "spread."
6     Q.    So was it generally understood in the
7  industry what that term meant?
8        MS. TABACCHI:  Object to the form.
9     A.    I couldn't speak to that.
10    Q.    Well, but you -- but you heard it -- you
11 heard it used in connection with discussions of the
12 -- of the industry, correct?
13       MS. TABACCHI:  Object to the form.
14    A.    I heard it used in media reports and in
15 discussion and testimony at Congressional briefings.
16    Q.    Did you ever hear any of your colleagues
17 use the term "spread"?
18    A.    No.
19    Q.    Never.
20    A.    Not that I recall.
21    Q.    Did you ever hear the term "spread" used
22 in any of the Medicare working group meetings?

---

Page 271

1     A.    No.
2     Q.    Never.
3     A.    Not that I recall.
4     Q.    You received a copy of this attachment
5  that's part of Exhibit 1121 entitled "Medicare Part
6  B Payment for Drugs Average Wholesale Price Issue"
7  on or about December 20, 1996, correct?
8     A.    It's attached to this, yes, so -- I don't
9  know if it was attached then, but it's attached now.
10    Q.    In the second paragraph, it states, "There
11 have been several studies and investigations into
12 the appropriateness of using AWP as the determining
13 factor for payment.  The common conclusion of these
14 efforts is that the use of AWP as a payment measure
15 results in excessive reimbursement that is far out
16 of line with the estimated acquisition costs of the
17 drugs and that AWP has little meaning to the drug
18 manufacturer or the pharmacy to which it sells the
19 drug.  In other words, there is some evidence that
20 often the AWP for a drug is set at a particular
21 level to establish third-party reimbursement but has
22 no relevance to any party beyond the third-party

---

Page 272

1  payer.  For these reasons, the AWP issue is being
2  presented and considered not as a program policy
3  issue, but rather, as an issue steeped in fraud,
4  abuse and waste," and I believe you told us -- did I
5  read that correctly?
6     A.    I don't know if you read it.  I mean,
7  verbatim, did you read the words that are on the
8  paper, yes.
9     Q.    That was my intent.
10    A.    Yes.
11    Q.    Okay.
12    A.    Yes.
13    Q.    That's what I meant by correct, verbatim.
14    A.    Yes, yes.
15    Q.    And I believe you told us early that you
16 were familiar or had reviewed some of these studies,
17 correct?
18       MS. TABACCHI:  Object to the form.
19    A.    Yes, but I don't know who did this study.
20    Q.    You don't know the author of this
21 document.
22    A.    No, no, I do not, and I don't know that I

---

Page 273

1  reviewed this particular document.
2     Q.    Right, but the studies referred to in that
3  document --
4     A.    Uh-huh.
5     Q.    You have reviewed at least some of those.
6        MS. TABACCHI:  Object to the form.
7     A.    I don't know that I have.
8     Q.    Well, you told us earlier that you were
9  familiar with some studies that discussed this
10 subject matter.
11    A.    I said I was familiar with some studies.
12    Q.    Okay, and you don't know whether -- well,
13 you've read studies discussing this subject matter.
14 You're just not -- you just can't identify specific
15 studies at this time 11 years down the road.
16    A.    Yes.
17    Q.    Okay, and this -- that -- this document
18 and the portion of it I just read discusses that
19 concept of spread, correct, the difference between
20 the reimbursement price and the actual acquisition
21 cost, correct?
22    A.    I don't know that it says that, but I can

---

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 274

1    read it again.
2        Q.   Well, it doesn't use the term "spread,"
3    but that's the concept, right?
4            MS. TABACCHI:  Object to the form.
5        A.   I couldn't say that that's the concept.
6        Q.   Okay, but you did tell us that you
7    understand that the concept -- you understand the
8    concept of spread.
9        A.   Yes.
10       Q.   The difference between the third-party
11   reimbursement --
12       A.   Uh-huh.
13       Q.   -- and actual acquisition cost, right?
14       A.   I'm going to read the paragraph again if
15   you want me to answer.
16       Q.   Sure, go ahead.
17       A.   Maybe I'm obtuse, but I don't see where it
18   actually says that this is a spread.  It's talking
19   about the -- that the accuracy of the number maybe
20   doesn't have any meaning --
21       Q.   Well --
22       A.   -- is the way I read it.

Page 275

1        Q.   It says the common conclusion of these
2    efforts is that the use of AWP as a payment measure
3    results in excessive reimbursement that is far out
4    of line with the estimated acquisition cost of the
5    drugs and that AWP has little meaning to the drug
6    manufacturer or the pharmacy to which it sells the
7    drugs.  Do you understand that to mean that the AWP
8    upon which reimbursement is based is higher than the
9    actual acquisition cost?
10           MS. TABACCHI:  Object to the form.
11       A.   I really cannot speak to that and to that
12   level of specificity because I'm not involved with
13   pricing, and my awareness and knowledge of AWP is
14   very top line.
15       Q.   But apparently this average wholesale
16   price issue was the -- was a subject of discussion
17   at at least this Medicare working group meeting; is
18   that correct?
19       A.   It was a hot topic in the policy arena.
20       Q.   Right, at the time.
21       A.   At the time.
22       Q.   And would you agree, Ms. Haas, that a

Page 276

1    reason that it was a hot topic at the time is that
2    Congress was considering proposals to move away from
3    AWP-based Medicare reimbursement, correct?
4            MS. TABACCHI:  Object to the form.
5        A.   Yes.
6        Q.   And more specifically, at the time,
7    Congress was considering moving away from AWP-based
8    Medicare reimbursement to actual cost-based
9    reimbursement, correct?
10       A.   Correct.
11       Q.   And at the time, the Medicare working
12   group was discussing this issue and how best to
13   respond, correct?
14           MS. TABACCHI:  Object to the form.
15       A.   Or if to respond.
16       Q.   Or whether to respond.
17       A.   Right.
18       Q.   And also whether to take a position and
19   what position to take regarding these proposals
20   before Congress, correct?
21           MS. TABACCHI:  Object to the form.
22       A.   That was what was put on the table for us

Page 277

1    to discuss, yes.
2        Q.   And you did.
3        A.   Perhaps.
4        Q.   Well, I'm asking you.
5        A.   I don't remember if I was a part of this
6    meeting or not.
7        Q.   Well, when I say you, the Medicare working
8    group discussed those issues.
9            MS. TABACCHI:  Object to the form.
10       A.   If I was at the meeting, I would know, but
11   I don't know that they discussed it.  Just because
12   it's attached to be discussed doesn't mean that they
13   discussed it.
14       Q.   Okay.  Well, what's your recollection?
15   You've told us that it was a hot topic at the time,
16   it was a prominent feature in this agenda.  Is it
17   your recollection that at the time, the Medicare
18   working group did discuss the average wholesale
19   price issue, whether to take a position on it and
20   what position Abbott should take?
21           MS. TABACCHI:  Object to the form.
22       A.   Well, looking at this particular document,

70 (Pages 274 to 277)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 278

1  it could have been nothing more than this document
2  being provided and Mr. Tootell may have reviewed the
3  document.  There might not have been a discussion
4  about what position Abbott should take.
5      Q.   Well, that wasn't my question though.
6      A.   Okay.  What was your question?
7      Q.   My question was did the Medicare working
8  group discuss the proposals before Congress to
9  change the Medicare reimbursement system from an
10 AWP-based system to an actual cost-based system.
11     MS. TABACCHI:  Object to the form.
12     A.   I don't see that in this particular
13 document, but maybe in one of the others, recalling
14 from our discussions earlier this morning, there may
15 have been on the agenda discussions of the different
16 proposals and for us to discuss at those meetings
17 yes.
18     Q.   Okay, well, we're going to look at those
19 documents.
20     A.   Okay.
21     Q.   But I'm asking you based on your
22 recollection --

Page 279

1      A.   You're asking me a specific question about
2  a specific document, and I don't see that this was a
3  document we were asked to take a position on
4  something or to develop a position.  It was more --
5      Q.   Well, let's put the document aside for a
6  moment.
7      A.   Okay.
8      Q.   Do you recall that the Medicare working
9  group during this time period, December 1996 and
10 subsequently, discussed the proposals then pending
11 in Congress to move away from an AWP-based Medicare
12 reimbursement system to an actual cost-based system?
13     A.   That would have been on the agenda at one
14 of the meetings I'm sure, yes.
15     Q.   At least one.
16     A.   At least one, yeah.
17     Q.   Take a look at Exhibit 1123 please.
18     A.   Okay.
19     Q.   1123 is a copy of a January 15, 1997
20 interoffice correspondence from Richard Rieger to
21 the Medicare working group distribution list,
22 correct?

Page 280

1      A.   Uh-huh.
2      Q.   Regarding the next Medicare working group
3  meeting to be held on January 21, 1997, correct?
4      A.   Yes.
5      Q.   And it contains a proposed agenda for the
6  meeting, correct?
7      A.   Correct.
8      Q.   And it also attaches an article related to
9  AWP and President Clinton's expected 1998 budget
10 proposal, correct?
11     A.   Correct.
12     Q.   And I believe you earlier told us that at
13 the time, the President was proposing a change in
14 the Medicare reimbursement system from AWP to actual
15 cost, correct?
16     A.   Correct.
17     Q.   Was that proposal discussed by the
18 Medicare working group during this time period?
19     MS. TABACCHI:  Object to the form.
20     A.   We would have discussed the proposed
21 legislation.
22     Q.   Okay, and did the Medicare working group

Page 281

1  also discuss the effect that implementation of an
2  actual cost Medicare reimbursement system would have
3  had on Abbott?
4      MS. TABACCHI:  Object to the form.
5      A.   It would appear to be that the group would
6  have, yes.
7      Q.   And it also appears that the group,
8  Medicare working group, discussed the effect of the
9  implementation of President Clinton's proposal on
10 TAP as well, correct?
11     A.   As far as because Lupron's on the list
12 here or --
13     Q.   Well, Lupron's a TAP product, right?
14     A.   Is that why you're asking about TAP?
15     Q.   Yes.
16     A.   Because Lupron's on the list?  Perhaps.
17     Q.   Well, it says -- item 1 on the agenda
18 according to this document is discuss average
19 wholesale price versus actual cost issue, correct?
20     A.   Uh-huh, uh-huh.
21     Q.   Correct?
22     A.   Correct, yes.

71 (Pages 278 to 281)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

---

Page 282

1    Q.   You've got to give a verbal rather than an
2    uh-huh.
3    A.   Sorry.
4    Q.   That's all right.
5    A.   I apologize.
6    Q.   It makes it hard for the court reporter.
7    A.   I apologize.  Correct.
8    Q.   Okay, and that was the issue presented by
9    the Clinton administration's proposal at the time.
10   A.   You mean going to the natural cost
11   mechanism.
12   Q.   From AWP.
13   A.   Yes.
14   Q.   Okay.  And then under that first bullet
15   point, it lists Lupron, correct?
16   A.   Correct.
17   Q.   Which is a TAP product.
18   A.   Correct.
19   Q.   Calcijex, which is an Abbott product,
20   right?
21   A.   Correct.
22   Q.   Other Abbott products, correct?

---

Page 283

1    A.   Correct.
2    Q.   And medical nutritionals.
3    A.   Correct.
4    Q.   Now, is it reasonable to conclude from
5    that that the Medicare working group during this
6    time period discussed the effect of a change from
7    AWP-based reimbursement to actual cost-based
8    Medicare reimbursement would have had on Abbott
9    products?
10        MS. TABACCHI:  Object to the form.
11   A.   It would have been accurate that the group
12   would have been doing a laundry list of what the
13   impact this could have on the company, yes.
14   Q.   Okay, and when you say impact on the
15   company, do you mean impact on sales of Abbott
16   products?
17        MS. TABACCHI:  Object to the form.
18   A.   Do I mean sales.  Yes.
19   Q.   And likewise, the effect that such a
20   change would have on sales of TAP's product, Lupron.
21   A.   I find it interesting that Lupron is on
22   this list because I don't recall working with -- I

---

Page 284

1    don't see anybody from TAP on this list, so I find
2    it interesting that it's on the list.
3    Q.   But it's there, isn't it?
4    A.   Yes.
5    Q.   And was Lupron at the time TAP's biggest
6    profit-generating product?
7         MS. TABACCHI:  Object to the form.
8    A.   I don't know.
9    Q.   Ms. Haas, would it be correct to say that
10   Abbott opposed the Clinton administration's proposal
11   to change the Medicare reimbursement system from an
12   AWP-based system to an actual cost-based system?
13        MS. TABACCHI:  Object to the form.
14   A.   That would be incorrect.
15   Q.   Abbott did not oppose the Clinton
16   administration's proposal to change Medicare
17   reimbursement from an AWP-based system to actual
18   cost?
19   A.   Not to my recollection.
20   Q.   Did Abbott support that proposal?
21        MS. TABACCHI:  Object to the form.
22   A.   We may have been neutral --

---

Page 285

1    Q.   Well, were you --
2    A.   -- on the proposal.
3    Q.   Were you neutral?
4    A.   My recollection --
5         MS. TABACCHI:  Form.
6    A.   -- is that we were neutral.
7    Q.   Okay, and so it's your testimony that
8    Abbott took no action as a company to defeat the
9    proposal pending before Congress in 1997 to change
10   Medicare reimbursement from AWP to actual cost.
11   A.   What was the first part of your question?
12   Q.   Is it your testimony that Abbott took no
13   position on the proposals before Congress in 1997 to
14   change Medicare reimbursement from AWP to actual
15   cost?
16        MS. TABACCHI:  Object to the form.
17   A.   I did not work on any such proposals, and
18   I do not recall that we did as a company, as an
19   office.
20   Q.   All right.  I understand that you told us
21   that, and I'm really -- I really didn't ask you
22   whether you worked on it.  What I asked you was is

---

72 (Pages 282 to 285)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 286

1   it your testimony --
2       A.   If we take a position, we're going to work
3   on it.
4       Q.   -- if you were neutral.
5           MS. TABACCHI:  Object to the form.
6           BY MR. RIKLIN:
7       Q.   Was Abbott neutral on the proposals before
8   Congress in 1997?
9       A.   My recollection is that this particular
10  time, we were neutral.
11      Q.   Okay.  But you've got to let me -- I mean,
12  even though you know where I'm going, you've got to
13  let me finish.
14          MS. TABACCHI:  You need to let her finish
15  too.
16          BY MR. RIKLIN:
17      Q.   Okay, let me try again.  Is it your
18  testimony that Abbott was, as a company, was neutral
19  on the proposals pending in Congress in 1997 to
20  change Medicare reimbursement from an AWP-based
21  system to actual cost?
22          MS. TABACCHI:  Object to the form, asked

Page 287

1   and answered.
2           THE WITNESS:  Do I answer?
3           MS. TABACCHI:  Yes, you can answer again.
4           THE WITNESS:  My recollection is that
5   Abbott was neutral at this time.
6           BY MR. RIKLIN:
7       Q.   Okay, and when you say at this time, what
8   time was that?
9       A.   At the time that this discussion was
10  underway.
11      Q.   Okay, so as of January 15, 1997.
12      A.   Yes.
13      Q.   Did Abbott later take a position on that
14  issue?
15          MS. TABACCHI:  Object to the form.
16      A.   Well, according to some other documents
17  that we saw this morning, Abbott took a position on
18  a particular piece of legislation I believe that
19  impacted this area.
20      Q.   Okay, and do you know what that piece was?
21      A.   We'll have to dig it out for me to recall.
22          MR. RIKLIN:  Well, we may see it.  Let's

Page 288

1   mark this.
2                   (Plaintiff's Exhibit 1369
3                    was marked for
4                    identification.)
5           MR. RIKLIN:  What is this?  13 what?
6           MS. TABACCHI:  1369.
7       Q.   1369, okay.  Ms. Haas, the court reporter
8   has handed you Plaintiff's Exhibit 1369, which is a
9   one-page document entitled "Abbott Position on
10  Medicare Reform, Key Participants."  Do you see that?
11      A.   Yes.
12      Q.   Have you ever seen that document before,
13  or a copy of it?
14      A.   I don't recall seeing it.
15      Q.   Okay.  Now, do you see down at the bottom,
16  there's a date down there, 2/7/97?
17      A.   Yes, I see that.
18      Q.   Do you recognize these people on this
19  sheet as being members of the Medicare working
20  group?
21      A.   The people that I know, yes.

Page 289

1       Q.   Okay.
2       A.   And I've seen some of the other names on
3   the other documents, so yes.
4       Q.   I'm sorry?
5       A.   Yes.
6       Q.   Okay.  As of 2/7/97, was Abbott
7   formulating a position on Medicare reform?
8           MS. TABACCHI:  Object to the form.
9       A.   It would appear and my recollection is
10  that there may have been attempt to reach an Abbott
11  position on Medicare reform, and that this would
12  have been a meeting to have that discussion.
13      Q.   Okay, and is Plaintiff's Exhibit 1369 a
14  list of the participants that were involved in that
15  effort?
16      A.   I cannot say who participated in the
17  meeting.  I don't know that I participated in the
18  meeting.
19      Q.   Okay.  Do you know who generated this
20  document entitled "Abbott Position on Medicare
21  Reform, Key Participants"?
22      A.   I could make an assumption that it was

73 (Pages 286 to 289)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 290

1    Rich Rieger, since he was running the other
2    meetings, but I don't know that for a fact.
3        Q.   And do you know John Campbell from TAP?
4        A.   I don't know John Campbell.
5        Q.   You know who he is?
6        A.   No.
7        Q.   Never had a discussion with him?
8        A.   No.
9        Q.   Never participated in a meeting with him
10   either by telephone or in person?
11       A.   Perhaps, but I didn't know him.
12       Q.   Was he a member of the Medicare working
13   group at any time?
14       A.   I don't see him on these other lists, but
15   I see him on this meeting.
16       Q.   Okay.
17       A.   I did not manage the list.
18       Q.   Was there a particular department at
19   Abbott that was ultimately responsible for
20   developing a position on Medicare reform in this
21   time frame, 1997?
22       MS. TABACCHI:  Object to the form.

Page 291

1        A.   Our office would have had to agree and
2    been on board with any position taken.
3        Q.   Okay.  Did your -- in 1997, did your
4    office consider a proposed -- any proposed Abbott
5    position on Medicare reform?
6        MS. TABACCHI:  Object to the form.
7        A.   We may -- we participated in some of these
8    meetings where there were discussions about the
9    options that were out there, but we did not
10   recommend an Abbott position, and I don't recall
11   there having been an Abbott position reached through
12   this process.
13       Q.   Okay, so to your recollection, this effort
14   to discuss an Abbott position on Medicare reform did
15   not ultimately result in a -- in a product.
16       A.   That's my recollection.
17       Q.   Okay.  And do you recall if that was
18   because the members, the so-called -- the key
19   participants couldn't agree on a position, or
20   whether it was decided for some other reason that it
21   was best not to take a position?  Do you recall?
22       MS. TABACCHI:  Object to the form.

Page 292

1        A.   I would say that this was a forum for
2    people within the company that had an interest in
3    the issues, and we participated in the forum as
4    being the government affairs team and the -- perhaps
5    some had more of an interest in having a position
6    than others, and so we were not able to reach an
7    agreement on going forward.
8        Q.   Take a look at Plaintiff's Exhibit 1355,
9    Ms. Haas.
10       A.   Okay, we're back to this one.
11       Q.   And I'm going to direct your attention to
12   page 2 of that document.
13       A.   Okay.
14       Q.   Mr. Stark's letter.
15       A.   Yes.
16       Q.   And in that letter, he discusses an Abbott
17   generic product known as vancomycin, right?
18       A.   Yes.
19       Q.   And he also discusses a Lilly product -- a
20   Lilly brand-name product by the name of Vancocin,
21   correct?
22       A.   Yes.

Page 293

1        Q.   And Lilly at the time was a competitor of
2    Abbott, correct?
3        MS. TABACCHI:  Object to the form.
4        A.   I don't know.
5        Q.   But was it your -- is it your
6    understanding that vancomycin is a generic product
7    that has competitive equivalence?
8        MS. TABACCHI:  Object to the form.
9        A.   I don't know.
10       Q.   Do you know that vancomycin is a strong
11   antibiotic, powerful antibiotic?
12       MS. TABACCHI:  Object to the form.
13       A.   I know it is an antibiotic.
14       Q.   And according to this letter, Vancocin is
15   reimbursed at $6.67 per 500 milligrams, correct?
16       A.   That's what it says, yes.
17       Q.   Okay, and according to this same letter,
18   Abbott's generic vancomycin is reimbursed at $30.85
19   per 500 milligrams, correct?
20       A.   That's what it says, yes.
21       Q.   Does that indicate -- and Mr. Stark goes
22   on to say, "And this is just the listed price.  As

Henderson Legal Services
202-220-4158

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 294

1   you know, the real actual acquisition price to the
2   health care provider is often much less, but
3   Medicare and Medicaid are paying at these inflated
4   rates," and you told us earlier that you -- you
5   understood at the time that Medicare reimbursement
6   was based upon AWP, correct?
7       A.   Correct, yes.
8       Q.   So at least according to this, does it
9   appear to you that the spread on Abbott's vancomycin
10  is much greater than the spread on Lilly's
11  brand-name equivalent product?
12          MS. TABACCHI:  Object to the form.
13      A.   I don't have an opinion on that.
14      Q.   Okay.  Well, at the time you provided this
15  letter and the other attached information to Rhonda
16  -- is it Luniak?
17      A.   Luniak.
18      Q.   Did you discuss the contents of
19  Congressman Stark's letter with her?
20      A.   I don't recall discussing the contents,
21  but I do recall gathering these documents for her to
22  give her a history of what was going on.

Page 295

1       Q.   All right.  Take a look at Plaintiff's
2   Exhibit 1365 please.  This is another document you
3   discussed earlier, correct?
4       A.   Correct.
5       Q.   An e-mail dated November 22, 2000 from you
6   to Dale Johnson, correct?
7       A.   Correct.
8       Q.   And you've cc'd numerous Abbott employees,
9   correct?
10      A.   Correct.
11      Q.   And without identifying each one, can you
12  -- can you tell us just generally who you were
13  cc-ing?
14          MS. TABACCHI:  Object to the form.
15      A.   Not having the benefit of seeing the
16  e-mail that Dale sent to me to provoke my response,
17  I probably just replied to all.
18      Q.   Okay, okay.  So in other words,
19  Mr. Johnson's e-mail to you may have cc'd these very
20  same people.
21      A.   Yes, and my guess is his e-mail maybe was
22  skewed a little in the wrong direction, and so I had

Page 296

1   to clarify some things.
2       Q.   I'm sorry?
3       A.   His e-mail may have been skewed and I
4   needed to correct some things, because he's in state
5   government affairs and I'm in federal, so he may --
6   his characterization may have been slightly off.
7       Q.   In this -- in this e-mail, you state that
8   it is likely that Congress will attempt to enact
9   changes to the existing AWP structure --
10      A.   Yes.
11      Q.   -- correct?  And Congress had previously
12  attempted to do that in 1997, correct?
13      A.   Yes.
14      Q.   And evidently, the effort to change the
15  AWP reimbursement structure in 1997 was not
16  successful, correct?
17      A.   Correct.
18      Q.   The AWP -- or as of November 2000,
19  Medicare reimbursement was still based upon AWP,
20  correct?
21      A.   Correct.
22      Q.   And in this e-mail, you're anticipating

Page 297

1   another attempt by Congress to enact changes to the
2   then-existing AWP structure, correct?
3       A.   Yes.
4       Q.   And you told Mr. Johnson that that is not
5   good news, correct?
6           MS. TABACCHI:  Object to the form.
7       A.   No, I said it is not good news that
8   Congress continues to have an interest in this
9   issue.
10      Q.   Okay, and the issue being AWP.
11      A.   But my reference there being not to the
12  substance of AWP, but my references to -- that this
13  is going to continue to be a hot topic in Congress
14  that could have the potential of being inflammatory.
15      Q.   Okay, so you were -- is it your testimony
16  you're not stating that it is not good news for
17  Abbott that Congress will likely attempt to change
18  the existing AWP structure?
19      A.   That is not what I meant.
20      Q.   Okay.
21      A.   I meant are concerned with the
22  inflammatory nature of the debate.

75 (Pages 294 to 297)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

Page 298

1    Q.    You state that Mike Oxley, Republican,
2  Ohio and Billy Tauzin, Republican, Louisiana, are
3  friends of Abbott and not likely to take the same
4  combative approach on the issue as Mr. Bliley, and
5  then when Mr. Gobena asked you about that, you said
6  a better choice of words would have been friends of
7  the industry, correct?
8    A.    Uh-huh.
9    Q.    Correct?
10   A.    Correct.
11   Q.    And Mr. Tauzin, you say that both
12 Congressmen are in line for taking over the
13 chairmanship, and I assume you mean upon
14 Mr. Bliley's --
15   A.    Retirement.
16   Q.    Retirement.
17   A.    Yes.
18   Q.    And it was Billy Tauzin that ended up
19 becoming the chairman, right?
20   A.    Correct.
21   Q.    And Mr. Tauzin is a friend of the
22 industry, isn't he?

Page 299

1    A.    Yes, that's correct.
2    Q.    In fact, he's currently executive director
3  of Pharma, right?
4    A.    That's correct.
5    Q.    And Pharma is the -- your industry's trade
6  group, correct?
7    A.    Correct.
8    Q.    Of which Abbott is a member.
9          MS. TABACCHI:  Object to the form.
10         BY MR. RIKLIN:
11   Q.    Correct?
12   A.    Correct, but he was not at the time.
13   Q.    No, at that time he was a member of
14 Congress.
15   A.    Yes.
16   Q.    But upon his retirement, he became
17 executive director of Pharma, correct?
18   A.    Correct.
19   Q.    And that's his current position.
20   A.    Correct.
21         MR. RIKLIN:  I don't think we're going to
22 spend much time on this document, but I want to mark

Page 300

1  it.
2                (Plaintiff's Exhibit 1370
3                 was marked for
4                 identification.)
5          MR. RIKLIN:  What is that?  1160?
6          MS. TABACCHI:  1370.
7          BY MR. RIKLIN:
8    Q.    1370, okay.  Ms. Haas, the court reporter
9  has handed you Plaintiff's Exhibit 1370, consisting
10 of some handwritten notes, and up at the top, you see
11 a date?
12   A.    Uh-huh.
13   Q.    June 6th, '01 and then the name Greenwood.
14 Do you recognize the -- is this your handwriting?
15   A.    Yes.
16   Q.    And did you make these notes on June 6th,
17 2001?
18   A.    Yes.
19   Q.    Okay.  Who is Greenwood?
20   A.    Mr. Greenwood at that time was chairman I
21 believe of the -- he was on the Energy and Commerce
22 Committee.  I believe he was chairman of the health

Page 301

1  subcommittee, I believe.
2    Q.    Okay.  And did either of those committees
3  have jurisdiction over Medicare reimbursement
4  issues?
5    A.    Not Medicare so much.  It was more Ways
6  and Means with the Medicare reimbursement, but they
7  did have an interest and held quite a few hearings
8  on pricing matters in general.
9    Q.    Including AWP?
10   A.    Yes.
11   Q.    Okay.  Do you recall what the context was
12 for these notes when you wrote them at the time?
13   A.    In rereading it now, I am trying to
14 recall.  I don't recall if this was a hearing or a
15 meeting.
16   Q.    Okay, but do you believe that on June 6th,
17 2001 --
18   A.    I remember now.
19   Q.    Okay.
20   A.    This was a meeting that Mark Barmak and I
21 had with Mr. Greenwood's staff.
22   Q.    Okay, and Mark Barmak at the time was --

76 (Pages 298 to 301)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                              August 30, 2007
                    Washington, DC

Page 302

1    A.   Heading up government affairs.
2    Q.   Okay, so did he -- he took Mr. Landsidle's
3  place, no?
4    A.   No, he was Mr. Landsidle's boss.
5    Q.   Okay.
6    A.   And I think as we've seen from previous
7  documents, that maybe David was still here then, or
8  no, maybe David might have been gone by June '01 I
9  think.
10   Q.   Okay, Elaine --
11   A.   Elaine came I think in July '01.
12   Q.   Elaine took --
13   A.   David's --
14   Q.   -- David Landsidle's place.
15   A.   Yes, uh-huh.
16   Q.   And Mr. Barmak was Mr. Landsidle's boss.
17   A.   Yes, Mr. Barmak had responsibility for
18  federal and state government affairs.
19   Q.   Okay.
20   A.   David had responsibility for federal.
21  When David left, Elaine came in with federal
22  government affairs.

Page 303

1    Q.   And you believe that Mr. Barmak attended
2  this meeting with you.
3    A.   I think that Mr. Barmak and I attended
4  this meeting.
5    Q.   And who is Allan Eisenburg?
6    A.   Allan Eisenburg and Mark Paolini are staff
7  members of the committee, and it was the oversight
8  and investigation subcommittee I recall now.
9    Q.   Okay.  And under the date and name
10  Greenwood, you've got a bullet point that says
11  "Difficulties With Actual Acquisition," correct?
12   A.   Yes.
13   Q.   And then under that, the names Allan
14  Eisenburg and Mark Paolini, correct?
15   A.   Yes.
16   Q.   And then in the center of the page up at
17  the top, AWP, right?
18   A.   Yes.
19   Q.   And then you've got three numbered items,
20  correct?
21   A.   Yes.
22   Q.   The first one, another reference, AWP, WAC

Page 304

1  and what's -- AMP?
2    A.   Uh-huh.
3    Q.   AMP point?
4    A.   No, it just -- I don't know what that
5  means.
6    Q.   Okay, but the second item is another
7  Bayer-like reimbursement corporate integrity
8  agreement; is that --
9    A.   Correct.
10   Q.   And then the first item is cost-based
11  reimbursement, correct?
12   A.   Correct.
13   Q.   Was -- was AWP a subject of that meeting?
14   A.   I don't know what the purpose of this
15  meeting was.  I don't recall what the purpose of
16  this meeting was.  I don't know if they called us in
17  to talk about something particular related to Abbott
18  or if they called us in to get our opinion on some
19  of the things they were looking at.
20   Q.   As of -- well, does it appear that
21  difficulties with actual acquisition cost was a
22  subject of the meeting?

Page 305

1    A.   Seems it was like one of the first things
2  that was discussed in terms -- it's coming back to
3  me now.  We were in there to discuss the need to do
4  something besides AWP, and I think that Mark said
5  why don't we go to an acquisition cost, and then the
6  response from the staff was there are difficulties
7  with an actual acquisition system.
8    Q.   And then you listed three difficulties
9  with an actual acquisition system, correct?
10   A.   I don't know that those are difficulties
11  or if those are other options that was discussed --
12  that were discussed there.
13   Q.   Okay.  Well, actual acquisition -- item 3
14  is cost-based reimbursement, right?
15   A.   That's what it says, yeah.
16   Q.   And that -- that's the same as an
17  acquisition cost system, correct?
18        MS. TABACCHI:  Object to the form.
19   A.   I don't know.  I was taking notes here.
20   Q.   Well, what -- do you know what the
21  reference was to the -- another Bayer-like
22  reimbursement corporate integrity agreement, or

                                77 (Pages 302 to 305)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

| Page 306 | Page 308 |
|---|---|

**Page 306**

1  reference to difficulties of another Bayer-like
2  reimbursement corporate integrity agreement?  Do you
3  recall what the nature of that discussion was?
4      A.   I don't recall the details of the
5  Bayer-like reimbursement corporate integrity
6  agreement, and I don't know that there was a
7  discussion about that being a difficulty.  It looks
8  to me that it was listed as one of the three things
9  or approaches that could be taken to move to
10  something beyond an AWP.
11      Q.   At the time, were there proposals pending
12  before Congress to change from an AWP-based
13  reimbursement system to an actual cost-based system?
14      A.   My recollection is there were a number of
15  conversations going on as to AWP needs to go away,
16  what do we need to put in its place.  That's what I
17  recall.
18      Q.   And was the purpose of your and
19  Mr. Barmak's meeting with the Congressional staff to
20  advocate a particular position?
21      A.   Our position at that meeting was that we
22  need to get rid of AWP.

**Page 307**

1      Q.   Okay.
2      A.   We didn't offer an alternative as a
3  preferred.
4      Q.   You were advocating getting rid of AWP on
5  behalf of the company.
6          MS. TABACCHI:  Object to the form.
7          BY MR. RIKLIN:
8      Q.   Correct?
9      A.   Our opinion that AWP -- Mark Barmak and
10  my's opinion that AWP should be -- not be the system
11  for reimbursement any longer.
12      Q.   Okay, but you were speaking on behalf of
13  the company at the time, right?
14          MS. TABACCHI:  Object to the form.
15      A.   I can't say to that.  Mr. Barmak put the
16  meeting together.
17      Q.   But you were there on behalf of Abbott,
18  correct?
19      A.   I was there because Mr. Barmak asked me to
20  be with him.
21      Q.   Okay, and Mr. Barmak was your boss' boss
22  at the time.

**Page 308**

1      A.   Yes.  He may have been my boss at the
2  time.  David may have been gone by then, so --
3      Q.   So you were there in the capacity as a
4  representative of Abbott.
5      A.   Yes.
6      Q.   As was Mr. Barmak.
7      A.   Yes.
8      Q.   Do you recall the results of that meeting?
9          MS. TABACCHI:  Object to the form.
10      A.   No.
11      Q.   Did you reach any agreement with the
12  members of the staff?
13      A.   Not to my recollection.  It was just a
14  discussion of things that were on the table.
15      Q.   Okay.
16              (Plaintiff's Exhibit 1371
17                 was marked for
18                 identification.)
19          MR. RIKLIN:  Is this 1370?  1371?
20          MR. GOBENA:  1371.
21          BY MR. RIKLIN:
22      Q.   Before we discuss 1371, Ms. Haas, this

**Page 309**

1  June 6th, 2001 meeting with these Congressional
2  staffers --
3      A.   Uh-huh.
4      Q.   And I believe you said they were
5  Congressional staffers on the Energy and Commerce
6  Committee?
7      A.   Uh-huh.
8      Q.   You got to say --
9      A.   I'm sorry.  Energy and Commerce Committee,
10  yes.
11      Q.   That meeting was -- occurred during the
12  same time period as Abbott's list price reduction,
13  correct?
14          MS. TABACCHI:  Object to the form.
15      A.   I would have no way of remembering that.
16      Q.   Well, if we look back --
17      A.   There was a document we looked at earlier?
18      Q.   Right.
19      A.   I just don't recall the date.  Am I to
20  trust you?
21      Q.   No, take a look, it's a June 14, 2001
22  Chicago Tribune article.

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

| Page 310 | Page 312 |
|---|---|

Page 310

1    A.   Okay.
2    Q.   Abbott Laboratories cuts prices amid
3  investigation into drug costs.
4    A.   Okay.
5    Q.   So we're talking about the same general
6  time frame.
7    A.   And what was the date of that one again?
8    Q.   The article was June 14th, 2001.
9    A.   June 14th?  I don't know why we had this
10 meeting.  I don't recall.  It may have been
11 instigated by us because we wanted to get out front
12 of this article perhaps or it may have been
13 instigated by the staff.  I don't know.
14   Q.   I'll represent to you, Ms. Haas, that
15 there's been prior testimony of Abbott employees in
16 prior -- or documents previously marked and
17 introduced that date the list price reduction as in
18 or about May of 2001.  Is that consistent with your
19 recollection?
20       MS. TABACCHI:  Object to the form.
21   A.   I have no recollection of that timing.
22   Q.   You don't have any recollection of the

Page 311

1  list price reduction in 2001?
2        MS. TABACCHI:  Object to the form.
3    A.   I have recollection of that today, but I
4  have no recollection of May 2001, June 2001.  I have
5  no recollection of that.
6    Q.   Well, regardless of what month it
7  occurred, do you recall the event?
8        MS. TABACCHI:  Object to the form.
9    A.   Yes.
10   Q.   Because I mean, at the time, that was a --
11 that was a significant event, wouldn't you say?
12       MS. TABACCHI:  Object to the form.
13   A.   I knew that it was getting a lot of
14 attention, but for my work, it was not a significant
15 event.
16   Q.   Okay, but was it a discussion among your
17 colleagues at the time?
18       MS. TABACCHI:  Object to the form.
19   A.   Not that I'm aware of.
20   Q.   You never discussed with any Abbott
21 colleagues Abbott's list price reduction in May of
22 2001?

Page 312

1    A.   No.
2    Q.   Never.
3    A.   No.
4    Q.   Never came up.
5    A.   No.
6    Q.   Take a look at Plaintiff's Exhibit 1371
7  please.  That's an e-mail from Scott Olsen dated
8  November 26th, 2002 to you, Cynthia Sensibaugh and
9  Adele, is it --
10   A.   Witenstein.
11   Q.   Witenstein?
12   A.   Uh-huh.
13   Q.   Witenstein?
14   A.   Yes.
15   Q.   Correct?
16   A.   Yes.
17   Q.   And subject is CMS changing AWP, question
18 mark, correct?
19   A.   Correct.
20   Q.   Who -- who is Scott Olsen?
21   A.   Scott Olsen was an employee in the
22 government affairs shop at Pharma.

Page 313

1    Q.   Okay, and during -- did you regularly
2  correspond with Mr. Olsen during this time period?
3        MS. TABACCHI:  Object to the form.
4    A.   Pharma regularly communicates with its
5  member companies on issues.
6    Q.   Issues of importance to the industry.
7    A.   Yes.
8    Q.   Correct?  And a proposed or a potential
9  change by -- potential change in AWP by CMS -- that
10 was a -- something that would be of interest to
11 Abbott, correct?
12       MS. TABACCHI:  Object to the form.
13   A.   And other member companies.
14   Q.   The next day, at 10:00 a.m., you forwarded
15 this e-mail to Loreen Mershimer, correct?
16   A.   Is that in here?
17   Q.   Annika Lane, correct?
18   A.   Oh, okay, it's different print.
19   Q.   If you look up at the top --
20   A.   Yes.
21   Q.   Cynthia Sensibaugh, correct?
22   A.   Yeah, Annika, Cindy, Elaine, yeah.

                              79 (Pages 310 to 313)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                August 30, 2007
Washington, DC

Page 314

1    Q.   Annika Lane, Cynthia Sensibaugh, Elaine
2  Leavenworth and Loreen Mershimer, correct?
3    A.   Right.
4    Q.   And the e-mail from Mr. --
5    A.   Someone sent it on my behalf, so -- I must
6  have instructed my assistant to send it.
7    Q.   Okay.  You instructed somebody in your
8  office to forward this e-mail to those people,
9  correct?
10   A.   Yes, I would think so.
11   Q.   And the subject of Mr. Olsen's e-mail is
12 that CMS may be considering a change away from an
13 AWP-based reimbursement system, correct?
14   A.   Yes.
15   Q.   And do you recall why you notified
16 Ms. Mershimer of this proposed change?
17   A.   This was an FYI document to Ms. Mershimer
18 because I knew that she was working on some issues.
19   Q.   Who -- who is Loreen Mershimer?
20   A.   Loreen Mershimer is in the pharmaceutical
21 product division.  She at that time worked very
22 closely on our Calcijex and Zemplar products.  I

Page 315

1  didn't know her title at the time.  I don't know her
2  title now.
3    Q.   Okay, and what involvement did
4  Ms. Mershimer have with regard to AWP issues?
5        MS. TABACCHI:  I object to the form.
6    A.   I do not know.
7    Q.   Well, then why did you -- for what purpose
8  did you notify Ms. Mershimer of this potential
9  change --
10   A.   Uh-huh.
11   Q.   -- in AWP reimbursement?
12   A.   Because I knew that she was working on
13 Abbott products that were paid by AWP and felt that
14 she would want to know that this was forthcoming --
15   Q.   Okay.
16   A.   -- as an FYI.
17   Q.   So in other words, if this -- if this
18 potential change went into effect, it could
19 potentially affect Abbott's products in
20 Ms. Mershimer's jurisdiction.
21   A.   Yeah, and it's important for a company to
22 keep abreast of developments that are going to

Page 316

1  impact their business.
2    Q.   Okay, and what about Annika Lane?  Who's
3  she?
4    A.   I believe she worked -- reported to
5  Lorraine Mershimer at the time.
6    Q.   Okay.  Same department.
7    A.   Yes.
8              (Plaintiff's Exhibit 1372
9               was marked for
10              identification.)
11       BY MR. RIKLIN:
12   Q.   Ms. Haas, Plaintiff's Exhibit 1372 is the
13 same -- contains the same e-mail from Mr. Olsen to
14 you.
15   A.   Uh-huh.
16   Q.   And your FYI to Loreen Mershimer, Annika
17 Lane and others, correct?
18   A.   Correct.
19   Q.   And then another e-mail from Annika
20 forwarding your and Mr. Olsen's e-mail to Svati
21 Patel, correct?
22   A.   Correct.

Page 317

1    Q.   Who is Svati Patel?
2    A.   She worked on that team with Loreen and
3  Annika Lane in PPD.
4    Q.   Okay, and -- did you say team?
5    A.   Yeah, the -- Loreen's team, Loreen
6  Mershimer's team, her business team.
7    Q.   Did that team have a name, do you recall?
8    A.   No.  Just the people that reported to her.
9    Q.   And it appears that Ms. -- Ms. Lane
10 e-mailed or forwarded the e-mail you sent her to
11 Mr. Patel three minutes after you sent your e-mail
12 to her, correct?
13   A.   It would appear to be so.
14   Q.   And the first word in Ms. Lane's e-mail to
15 Mr. Patel is --
16   A.   It's a Ms.  It's Ms. Patel.  It's a
17 Ms. Patel.
18   Q.   Oh, Ms. Patel.  I'm sorry.  Ms. Patel.
19   A.   Yes, I see that.
20   Q.   You know, there's a Mr. Patel too.
21   A.   We have several Patels at Abbott.
22   Q.   Okay, this is Ms. Patel.  Do you know what

80 (Pages 314 to 317)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 318

1  the urgency was --
2     A.   No.
3     Q.   -- with regard to that matter?
4     A.   No, I do not.
5     Q.   And Ms. Patel says -- asks, "Can you find
6  out any additional information?  We'll have to have
7  a game plan by Monday."  Do you know why it was
8  necessary to have a game plan by the following
9  Monday?
10    A.   No, I do not.
11    Q.   Do you know what the game plan was?
12    A.   No, I do not.
13    Q.   Did you ever discuss the game plan with
14 Ms. Lane or Ms. Patel?
15    A.   No, I did not.
16              (Plaintiff's Exhibit 1373
17              was marked for
18              identification.)
19         MS. TABACCHI:  Can I ask whether this is
20 one of the documents that was snapped back recently
21 as an inadvertently produced privileged document?
22         MR. RIKLIN:  I don't know, but I thought

Page 319

1  all the snatched back -- I don't think I ever saw
2  the snatched back documents.  I thought they were --
3         MS. TABACCHI:  Okay.  It's --
4         MR. RIKLIN:  The answer is I don't know.
5         MS. TABACCHI:  It's my understanding, I
6  believe that this was one of the documents that --
7         MR. RIKLIN:  Let's go off the record a
8  minute.  We don't need to talk -- is that okay with
9  you, Tina?
10        MS. TABACCHI:  Sure.
11        THE VIDEOGRAPHER:  We're going off the
12 record, 16:44:13.
13              (Discussion off the record)
14    (The previous Plaintiff's Exhibit 1373 was
15 withdrawn.)
16              (Plaintiff's Exhibit 1373
17              was marked for
18              identification.)
19        THE VIDEOGRAPHER:  We're back on the
20 record, 16:49:59.
21        BY MR. RIKLIN:
22    Q.   Ms. Haas, take a moment to review

Page 320

1  Plaintiff's Exhibit 1373 please.
2     A.   Uh-huh, yes.
3     Q.   And just let me know when you're through.
4     A.   Okay.
5     Q.   Okay, at the bottom of the first page,
6  there's a copy of an e-mail from you to Marta
7  Schroeder, Loreen Mershimer, Annika Lane, Laura
8  Schumacher, Elaine Leavenworth, Cynthia Sensibaugh,
9  Adele Witenstein and Virginia Tobiason, right?
10    A.   Correct.
11    Q.   Dated December 4, 2002?
12    A.   Correct.
13    Q.   And the subject is CMS program memo, AWP
14 single drug price, correct?
15    A.   Correct.
16    Q.   And according to the e-mail, you attached
17 to the original the CMS program memorandum
18 indicating how they will move forward on setting
19 Part B drug payment.  This is, and then you've
20 underlined "not a restructuring of the AWP system,"
21 correct?
22    A.   Correct.

Page 321

1     Q.   And you go on to say that AWP minus five
2  percent stays in effect but a single drug pricer
3  will be established to bring all carrier payments
4  into alignment, correct?
5     A.   Correct.
6     Q.   And then in the last sentence, you state,
7  "We are having consultant take a look at the
8  document for more explanation, Annika, have you
9  heard anything further from Grant Bagley.  Was Grant
10 Bagley Abbott's consultant at the time?
11    A.   Yes.
12    Q.   Okay, and is Grant Bagley a law firm?
13    A.   I believe he is with a law firm and that
14 he is an attorney, yes.
15    Q.   He's an attorney with a law firm.
16    A.   Yes, I believe so.  He is with a law firm
17 and I believe he's an attorney at the law firm.
18    Q.   Okay.  At the time, was he with Reed Smith
19 or another firm?
20    A.   He was with another firm.
21    Q.   And what did Abbott hire Mr. Bagley to do?
22    A.   Our office did not hire Mr. Bagley.  He

81 (Pages 318 to 321)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                        August 30, 2007
                         Washington, DC

Page 322

1  was reporting in to the renal folks, and I do not
2  know what they hired Mr. Bagley to do.
3     Q.   Okay, and when you say renal folks, was
4  that Ms. Mershimer's group at the time?
5     A.   Yes.
6     Q.   But at the time, December 4, 2002, at
7  least according to this, Medicare reimbursement was
8  still based on AWP, correct?
9     A.   Yes.
10    Q.   And then the top of that first page is an
11 e-mail from Ms. Patel dated December 9, 2002,
12 correct?
13    A.   Correct.
14    Q.   To some of the same people that -- that
15 you e-mailed on December 4, 2002, correct?
16    A.   Correct.
17    Q.   In fact, it appears to be a forwarding of
18 your e-mail to those same people and others,
19 correct?
20    A.   Yes.
21    Q.   And in addition, Ms. Patel adds a letter
22 relating to AWP CMS program memo, correct?

Page 323

1     A.   Yes.
2     Q.   And Ms. Patel's e-mail letter starts off,
3  Rosemary and Elaine.  Are you Rosemary?
4     A.   Yes, but I don't believe this is a letter.
5  I believe this was the body of her e-mail to the
6  group.
7     Q.   Okay, so in Ms. Patel's letter, e-mail of
8  December 9 --
9     A.   Could I pause a second?
10    Q.   Sure.
11    A.   The e-mail body says Rosemary and Elaine,
12 but I am not in the distribution.
13    Q.   That's right.  That was going to be my
14 next question.  You don't appear to be on the
15 distribution list of Ms. Patel's December 9 e-mail,
16 but the e-mail starts off "Rosemary and Elaine."
17 Can you explain --
18    A.   That's correct.
19    Q.   Did you get a copy of that e-mail?
20    A.   No, I don't -- I do not see myself on the
21 distribution.  I do not recall getting a copy of
22 this.

Page 324

1     Q.   Okay.  Having read it, do you recall ever
2  seeing it?
3     A.   Okay, I'll read a little closer.
4     Q.   Sure.
5     A.   I don't remember reading this.
6     Q.   But is the subject matter of Ms. Patel's
7  December 9 e-mail the same subject of your December
8  4 e-mail?
9     A.   The subject of my December 4 e-mail was to
10 forward a program memorandum on a single drug pricer
11 system, which we did not understand, and asked --
12 subsequently asked consultants to help us
13 understand.  I was forwarding it along.  The e-mail
14 from Svati Patel subsequent to that on December the
15 9th appears to be their discussion of what this
16 single drug pricer policy could mean --
17    Q.   Okay.
18    A.   -- for their business.
19    Q.   And when you say their discussion, do you
20 mean the renal group's discussion?
21    A.   Yes.
22    Q.   Okay, and at least according to the -- to

Page 325

1  Ms. Patel's e-mail, the single drug price plan would
2  be cause for concern for Abbott on two possible
3  fronts, correct?
4         MS. TABACCHI:  Object to the form.
5     A.   That's what she says here in this e-mail,
6  yes, Ms. Patel.
7     Q.   Ms. Patel is expressing concern about the
8  single drug price plan, correct?
9     A.   It appears -- yes.
10    Q.   And the first concern is the spread of
11 Zemplar LCA.  Do you understand LCA to mean least
12 costly alternative?
13    A.   I'm familiar with that term, yes.
14    Q.   The first concern of Ms. Patel's is the
15 spread of Zemplar LCA throughout the country,
16 correct?
17    A.   That's what she says here, yes.
18    Q.   And is Zemplar an Abbott product?
19    A.   Yes.
20    Q.   Do you know what Zemplar is?
21    A.   Yes.
22    Q.   What is it?

82 (Pages 322 to 325)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 326

1     A.   It's a drug that was used in connection
2  with end-stage renal disease.
3     Q.   Okay, and that was of course one of the
4  products sold by the renal group, correct?
5     A.   Correct, yes.
6     Q.   And the second concern Ms. Patel mentions
7  is a fundamental shift in drug pricing away from 95
8  percent of AWP, correct?
9     A.   Yes, that's what she has here, yes.
10    Q.   Okay, so at least --
11    A.   And this is Ms. Patel's opinion, yes.
12    Q.   I understand.  Ms. Patel's opinion -- and
13 Ms. Patel at the time was in the renal group,
14 correct?
15    A.   Correct.
16    Q.   As are the -- many of the recipients of
17 her December 9 e-mail, correct?
18        MS. TABACCHI:  Object to the form.
19    A.   Yes.
20    Q.   Loreen Mershimer, correct?
21    A.   Yes.
22    Q.   Marta Schroeder?

Page 327

1     A.   I think Marta was in a different division.
2     Q.   Okay.
3     A.   But within PPD.
4     Q.   Okay, and where was Virginia Tobiason at
5  the time?
6     A.   Virginia Tobiason at that time I believe
7  was in what we called the corporate office of ethics
8  and compliance.  She was helping them run that
9  program and -- but she was called on on a regular
10 basis on reimbursement matters because she was our
11 most knowledgeable person in the company on
12 reimbursement.
13    Q.   She was the reimbursement guru.
14    A.   Yes.
15    Q.   Okay, and what about -- oh, and the ethics
16 -- did you say ethics and compliance office?
17    A.   Uh-huh.
18    Q.   Was that at the time a newly established
19 office at Abbott?
20        MS. TABACCHI:  Object to the form.
21    A.   I don't recall how long she had been in
22 that office, or how long the office had been around.

Page 328

1     Q.   Okay.  You don't remember when the ethics
2  and compliance office -- Abbott's ethics and
3  compliance office was started.
4     A.   No, I don't.
5     Q.   Who is Susan Rodriguez?
6     A.   Susan Rodriguez was in the renal group,
7  and I believe that Annika reported to Susan and
8  Susan reported to Loreen.
9     Q.   Okay, Loreen --
10    A.   Mershimer.
11    Q.   -- was the divisional VP of the group,
12 correct?
13    A.   I don't know of her title, but she -- of
14 the group, was the head of it, yes.
15    Q.   What about Donald White, Junior?  Who's
16 he?
17    A.   I don't know who he reported to, but he
18 was in the same group, the renal group.
19    Q.   Okay, and Ms. Patel's second concern about
20 the SDP plan administered by Palmetto was a
21 fundamental shift in drug pricing away from 95
22 percent of AWP, correct?

Page 329

1     A.   According to what she says here, yes, that
2  was what she said.
3     Q.   And at the time, December 9, 2002,
4  Medicare still reimbursed on the basis of AWP,
5  correct?
6     A.   Yes.
7     Q.   Ninety-five percent of AWP.
8     A.   Yes.
9     Q.   And Ms. Patel expressed concern for Abbott
10 on a fundamental shift in drug pricing away from 95
11 percent of AWP, correct?
12        MS. TABACCHI:  Object to the form.
13    A.   That's what she indicates here, yes.
14    Q.   Would it be fair to deduce from that,
15 Ms. Haas, that Ms. Patel was opposed to any shift in
16 reimbursement from AWP?
17    A.   I could not make that deduction.
18    Q.   Well, that's the sentiment she's
19 expressing in this e-mail, correct?
20    A.   I wouldn't read into this what she was
21 deducting from that.
22    Q.   Well, how else would you read Ms. Patel's

                            83 (Pages 326 to 329)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 330

1  expressed concern for Abbott on two possible fronts,
2  including a fundamental shift in drug pricing away
3  from 95 percent of AWP?
4        MS. TABACCHI:  Object to the form.
5     A.   I couldn't say.
6     Q.   You don't read that as Ms. Patel being
7  opposed to a shift in drug pricing away from 95
8  percent of AWP.
9        MS. TABACCHI:  Object to the form, asked
10  and answered.
11     A.   I read this as Ms. Patel wanting -- being
12  -- appearing knowledgeable on the topic of --
13     Q.   Do you read this as Ms. Patel expressing
14  concern for Abbott about a proposed shift in drug
15  pricing away from 95 percent of AWP?
16        MS. TABACCHI:  Object to the form, asked
17  and answered.
18     A.   She said it would be cause for concern.
19     Q.   For Abbott.
20     A.   For Abbott, yes.
21        MR. RIKLIN:  I believe that's all the
22  questions I have at this time.  Thanks for your

Page 331

1  time, subject to being able to ask about the --
2        MS. TABACCHI:  Former exhibit -- exhibit
3  formerly known as 1373?
4        MR. RIKLIN:  It's not 1373.  Yeah, the
5  program memorandum.  What's it called?
6        MS. TABACCHI:  It's a memorandum from Reed
7  Smith.
8        MR. RIKLIN:  Memorandum from Reed Smith.
9        MS. TABACCHI:  Bates number Texas 0239271.
10        MR. RIKLIN:  Right.
11        MR. GOBENA:  Why don't we go off the
12  record.
13        THE VIDEOGRAPHER:  Are we finished?
14        MR. RIKLIN:  Let's go off the record.
15        MR. PAUL:  I have questions.
16        MS. TABACCHI:  This marks the end of
17  Videotape Number 5.  We're going off the record.
18  The time on the screen is 17:02:56.
19        (Discussion off the record)
20        THE VIDEOGRAPHER:  Here marks the
21  beginning of Videotape Number 6 in the deposition of
22  Rosemary Haas.  The time on the screen is 17:05:37.

Page 332

1  EXAMINATION BY COUNSEL FOR THE STATE OF CALIFORNIA
2        BY MR. PAUL:
3     Q.   Ms. Haas, we met earlier this morning.
4  I'm Nick Paul and I represent the State of
5  California --
6     A.   Yes.
7     Q.   -- with the California Bureau of Medicare
8  and Fraud Elder Abuse, and I know it's late in the
9  day and I appreciate you accommodating these last
10  few questions, which are basically sort of cleanup
11  questions just here and there.  Are you aware that
12  California has filed suit against Abbott in a case
13  which is now in Boston in federal district court?
14     A.   No.
15     Q.   Okay.  Are you aware of any other states
16  that currently have suits on file against Abbott in
17  connection with drug pricing?
18     A.   I know there are cases out there, but I
19  don't know the specifics or what states or how many.
20     Q.   With regard to the Medicaid program, do
21  you have an understanding of how Medicaid providers
22  are reimbursed for the drugs that they dispense?

Page 333

1     A.   You mean pharmacies?
2     Q.   Sure.
3     A.   They're reimbursed by the states based
4  right now on AWP.
5     Q.   And to elaborate on that briefly, do you
6  have an understanding of how AWP figures in that
7  reimbursement, how it's used by the states?
8     A.   No, I do not.
9     Q.   And I think Mr. Gobena earlier today asked
10  you for your understanding of the term "AWP," so we
11  won't go through that again, but could you tell us
12  if you have an understanding of the term "direct
13  price"?
14     A.   Direct price?  No.
15     Q.   Yes.  Have you ever heard of "direct
16  price" or "DP" being used in connection with
17  Medicaid reimbursement by Medicaid programs?
18     A.   No.
19     Q.   Have you ever attended any programs or
20  meetings sponsored by Abbott internally that had as
21  their purpose or part of the purpose to educate your
22  office about state Medicaid programs?

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                        Washington, DC

Page 334

1    A.  No.
2    Q.  You testified earlier today that Dale
3  Johnson, if I got this correctly, is the -- he's the
4  divisional vice president for state government
5  affairs; is that correct?
6    A.  That's correct.
7    Q.  And do you know how long he's occupied
8  that position?
9    A.  Eight to ten years.
10    Q.  And could you describe for us how the
11  state government affairs office, if that's the right
12  term, is organized, who is in it other than Dale
13  Johnson and where those people are located
14  physically?
15    A.  Dale's people are located throughout the
16  country in different states.
17    Q.  Is it just Dale in Washington?
18    A.  He's not in Washington.  He's at corporate
19  headquarters.
20    Q.  All right.  Is there anybody who works for
21  Dale located in Washington?
22    A.  No.  There was a woman in Maryland that

Page 335

1  covered Washington, but she lived in Maryland, but
2  her state responsibilities included the northeast
3  corridor.
4    Q.  So she's one of the regional --
5    A.  One of the regional, uh-huh.
6    Q.  -- people.  So with respect to the
7  Washington, D.C. office in which you work, if there
8  are any issues that people in the office become
9  aware of that concern Medicaid, a high-profile
10  Medicaid issue, to whom would you communicate about
11  that type of an issue?
12    A.  You mean such as federal legislation that
13  was being proposed?
14    Q.  That's a good example.
15    A.  To Dale Johnson.
16    Q.  Back in Abbott Park?
17    A.  In Abbott Park, yes.
18    Q.  Do you have any knowledge of the people
19  who are under Dale Johnson's supervision who would
20  have themselves responsibility for the western part
21  of the country, and in particular, California?
22    A.  Now or at that time?

Page 336

1    Q.  Thanks for that clarification.  Both, if
2  you could explain.
3    A.  Currently it's a gentleman by the name of
4  David Topp, and previously it was a woman by the
5  name of Barbara Ortega that had responsibility for
6  California.
7    Q.  Ortega?
8    A.  Ortega.  She had -- she was Barbara
9  Cavalier and then she married and her name became
10  Barbara Ortega.
11    Q.  And does Barbara Ortega still work with
12  Abbott?
13    A.  She is still with Abbott to my knowledge,
14  but she's not in state government affairs.
15    Q.  So is it your understanding that about the
16  time you became -- your first formal position at
17  Abbott I think as you described earlier was when you
18  became a manager?
19    A.  Uh-huh.
20    Q.  And at that time, would you say Barbara
21  Ortega would have been responsible for California?
22    A.  I don't know if Barbara had been hired by

Page 337

1  then.  Dale's shop of lobbyists built over a period
2  of time.  At one point it was just Dale Johnson, and
3  then as he was able to get funding, was able to add
4  more regional lobbyists, so I don't know where the
5  timing was as far as Barbara Cavalier at that time
6  coming on board.
7    Q.  But she's the first individual who you're
8  aware of who had responsibility for California?
9    A.  Correct.
10    Q.  And at what point did Mr. Topp take over
11  for Barbara Ortega?
12    A.  I'll say in the last 14, 15 months.
13    Q.  And do you have an understanding of the
14  nature of the job assignment of the regional people,
15  if I'm characterizing that accurately, such as
16  Barbara Ortega and David Topp, as to what their job
17  responsibilities entail for their region, for their
18  states?
19    A.  In large part representing our positions
20  before the state legislatures and the governors'
21  offices, and also they deal very much on local plant
22  issues where we have facilities.

85 (Pages 334 to 337)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                    August 30, 2007
                    Washington, DC

| Page 338 |
|---|
| 1   Q.   Are you aware of any Abbott facilities in |
| 2 California? |
| 3   A.   Yes. |
| 4   Q.   Where? |
| 5   A.   We're in Santa Clara, we're outside of |
| 6 Sacramento, we're in -- oh, goodness. We were in |
| 7 Redwood City. There are several others. |
| 8   Q.   Do you happen to know which of Abbott's |
| 9 business units those various city locations you just |
| 10 described would report to? |
| 11     MS. TABACCHI:  Object to the form. |
| 12   A.   Sorry. I think Diagnostics Division has a |
| 13 facility out there, one or two, and then we no |
| 14 longer have the Hospital Products Division, so that |
| 15 facility's no longer there, so I believe it's pretty |
| 16 much Abbott Diagnostics at this point in California. |
| 17 We have different names now for these. Abbott |
| 18 Diagnostics is now Abbott Molecular, Abbott |
| 19 Vascular, but the diagnostics business for Abbott. |
| 20   Q.   Is it accurate to characterize Elaine |
| 21 Leavenworth's replacement of David Landside as a |
| 22 situation where she took over -- her |

| Page 339 |
|---|
| 1 responsibilities covered a greater area than his |
| 2 had, than Mr. Landside's had? |
| 3   A.   Yes. |
| 4   Q.   Is that because she's a corporate officer |
| 5 as a vice president? |
| 6   A.   Yes. |
| 7   Q.   Is she an attorney? |
| 8   A.   No. |
| 9   Q.   Are you aware of any request by counsel to |
| 10 locate and preserve any documents in connection with |
| 11 any state litigation against Abbott? And I realize |
| 12 you've told me you're not familiar with California's |
| 13 case, so -- |
| 14     MS. TABACCHI:  Object to the form. |
| 15   A.   No, I'm not. |
| 16   Q.   You're obviously aware of a request to |
| 17 preserve documents in connection with the United |
| 18 States case against Abbott. |
| 19   A.   Activities and files that we would have, |
| 20 yes. |
| 21   Q.   But there's been no request to preserve |
| 22 any documents -- |

| Page 340 |
|---|
| 1   A.   Not to federal -- |
| 2     MS. TABACCHI:  Object to form. |
| 3     THE WITNESS:  Not to federal government |
| 4 affairs. |
| 5     MR. PAUL:  That's all I have. |
| 6 EXAMINATION BY COUNSEL FOR ABBOTT LABORATORIES |
| 7 BY MS. TABACCHI: |
| 8   Q.  I have one question. Ms. Haas, the |
| 9 requests that you get to preserve documents, do they |
| 10 specify the caption of every litigation that the |
| 11 documents pertain to or have you received more |
| 12 general requests that ask you to preserve general |
| 13 categories of documents? |
| 14   A.   General categories of documents, like AWP, |
| 15 like drug importation. |
| 16     FURTHER EXAMINATION BY COUNSEL |
| 17     FOR THE STATE OF CALIFORNIA |
| 18     BY MR. PAUL: |
| 19   Q.  And I'm not trying to provoke a litigation |
| 20 fight with counsel. It's just an honest question, |
| 21 but having heard her question -- |
| 22   A.   I don't know enough not to know what |

| Page 341 |
|---|
| 1 they're talking about. |
| 2   Q.   Could you tell me at what point in time |
| 3 you last remember being so requested, and if you've |
| 4 already answered -- |
| 5   A.   Regarding AWP? |
| 6   Q.   Litigation, right. |
| 7   A.   Very recently again we were asked about |
| 8 additional documents that might be in the office and |
| 9 people came and took them and they were packed up |
| 10 and shipped away. |
| 11   Q.   Very recently being -- |
| 12   A.   The last several months. |
| 13     MR. PAUL:  Thanks. |
| 14     MR. RIKLIN:  Before we go off the record, |
| 15 I'd just like to request, Tina, that you confirm to |
| 16 us that -- once you hear back from the office that |
| 17 that former Plaintiff's Exhibit 1373 is a snapped- |
| 18 back document. |
| 19     MS. TABACCHI:  I have confirmed that it's |
| 20 a snapped-back document. If I'm wrong, I will let |
| 21 everybody know. |
| 22     MR. RIKLIN:  Great. |

                              86 (Pages 338 to 341)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                   August 30, 2007
                    Washington, DC

---

Page 342

1        MS. TABACCHI:  Okay.
2        THE VIDEOGRAPHER:  Here marks the end of
3   the videotaped deposition of Ms. Haas.  We're going
4   off the record.  The total number of tapes used
5   today is six, for a total running time of
6   approximately six hours and 30 minutes.  We're going
7   off the record.
8
9        (Whereupon, at 5:17 p.m., the taking of
10  the instant deposition ceased.)
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 344

1   UNITED STATES OF AMERICA )
2            ss:
3   DISTRICT OF COLUMBIA     )
4        I, KAREN C. YOUNG, a Notary Public within
5   and for the District of Columbia, do hereby certify
6   that the witness whose deposition is hereinbefore
7   set forth was duly sworn and that the within
8   transcript is a true record of the testimony given
9   by such witness.
10       I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage and that I am in no way interested in the
13  outcome of this matter.
14       IN WITNESS WHEREOF, I have hereunto set my
15  hand this _____day of_____, 200__.
16
17
18       _____
19  My Commission Expires:
20  July 31, 2009
21
22

---

Page 343

1        CERTIFICATE OF DEPONENT
2        I have read and examined the foregoing
3   pages and find the answers contained therein with
4   changes made by me, if any, to be true and correct.
5
6        _____
7        Signature of the Witness
8
9        Subscribed and sworn to before me this
10  _____ day of_____, 200__.
11
12
13       _____
14       Notary Public in and for
15       _____
16
17
18
19  My Commission Expires _____.
20
21
22

---

                                87 (Pages 342 to 344)