# Exhibit 111

Miller, James E.                              July 30, 2007
                    Chicago, IL

            IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS


    ----------------------------X

    IN RE:  PHARMACEUTICAL        )

    INDUSTRY AVERAGE WHOLESALE    )

    PRICE LITIGATION              ) MDL No. 1456

    ----------------------------) Civil Action

    This document relates to:     ) No. 01-12257-PBS

    United States of America,     )

    ex. rel. Ven-a-Care of the    )

    Florida Keys, Inc.,           ) Hon. Patti Saris

        vs.                       )

    Abbott Laboratories, Inc.,    ) Magistrate Judge

    CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler

    ----------------------------X


            VIDEOTAPED DEPOSITION OF

            JAMES E. MILLER

            CHICAGO, IL

            JULY 30, 2007

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 2

1
2          Videotaped deposition of JAMES E. MILLER,
3    called by the Plaintiffs for examination, taken
4    pursuant to notice, agreement and by the provisions of
5    the Rules of Civil Procedure for the United States
6    District Courts pertaining to the taking of
7    depositions, taken before DEBORAH HABIAN, a Notary
8    Public within and for the County of Cook, State of
9    Illinois, and a Certified Shorthand Reporter of said
10   State, at the offices of Katten Muchin Rosenman,
11   525 West Monroe Street, 19th Floor, Chicago, Illinois,
12   on the 30th day of July, 2007, at 9:12 a.m.
13
14
15
16
17
18
19
20
21
22

---

Page 3

1    APPEARANCES:
2
3        STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
4        BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
5        BY:  ELISEO SISNEROS, ESQ.
6           DEPUTY ATTORNEY GENERAL
7        110 West A Street
8        No. 1100
9        San Diego, California  92101
10       (619) 688-6043
11          on behalf of the State of California;
12
13       U.S. DEPARTMENT OF JUSTICE
14       COMMERCIAL LITIGATION, FRAUD
15       BY:  REBECCA A. FORD, ESQ.
16       601 D Street, N.W.
17       Patrick Henry Building - 9133
18       Washington, D.C.  20044
19       (202) 514-1511
20          on behalf of the United States;
21
22   (CONTINUED)

---

Page 4

1    APPEARANCES: (CONTINUED)
2
3        BERGER & MONTAGUE, P.C.
4        BY:  SUSAN SCHNEIDER THOMAS, ESQ.
5        1622 Locust Street
6        Philadelphia, Pennsylvania  19103
7        (215) 875-3000
8           on behalf of the Realtor, Ven-a-Care;
9
10       WEXLER TORISEVA WALLACE, LLP
11       BY:  CHRISTOPHER J. STUART, ESQ.
12       55 West Monroe Street
13        Suite 300
14       Chicago, Illinois  60602
15       (312) 346-2222
16          on behalf of the State of Arizona
17          and the MDL Plaintiffs;
18
19
20
21
22   (CONTINUED)

---

Page 5

1    APPEARANCES: (CONTINUED)
2
3        JONES DAY
4        BY:  TINA M. TABACCHI, ESQ.
5        77 West Wacker Drive
6        Chicago, Illinois  60601-1692
7        (312) 782-3939
8           on behalf of the Defendants;
9
10       KATTEN MUCHIN ROSENMANN, LLP
11       BY:  GIL M. SOFFER, ESQ.
12          DEAN V. HOFFMAN, ESQ.
13       525 West Monroe Street
14       Chicago, Illinois  60661-3693
15       (312) 902-5200
16          on behalf of the deponent.
17
18
19   ALSO PRESENT:
20       ANTHONY MICHELETTO, VIDEOGRAPHER
21       HENDERSON LEGAL SERVICES
22

2 (Pages 2 to 5)

Miller, James E.                                      July 30, 2007
                        Chicago, IL

---

Page 6

1           I N D E X
2
3  WITNESS: JAMES E. MILLER              PAGE
4    EXAMINATION BY ELISEO SISNEROS, ESQ.......... 010
5    EXAMINATION BY REBECCA A. FORD, ESQ.......... 224
6    EXAMINATION BY SUSAN SCHNEIDER THOMAS........ 311
7
8         E X H I B I T S
9  NUMBER          DESCRIPTION          PAGE
10 Exhibit Miller 1160, curriculum vitae.......... 012
11 Exhibit Miller 1161, subpoena duces tecum...... 046
12 Exhibit Miller 1162, Abbott MWG lists.......... 052
13 Exhibit Miller 1163, ABT 52840 to 52842,
14          ABT 52898 to 52899........ 069
15 Exhibit Miller 1164, ABT 52705 to 52707,
16          ABT 52710 to 52712,
17          ABT 52808 to 52811,
18          ABT 52836 to 52838........ 094
19 Exhibit Miller 1165, handwritten notes......... 099
20 Exhibit Miller 1166, ABT 52901 to 52903........ 193
21 Exhibit Miller 1167, ABT 53315 to 53318........ 196
22 Exhibit Miller 1168, ABT 53161 to 53169........ 202

---

Page 7

1       E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit Miller 1169, 11/26/96 memoranda........ 216
4  Exhibit Miller 1170, ABT 53140 to ABT 53142.... 264
5  Exhibit Miller 1171  ABT 53217 to ABT 53238.... 266
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 8

P R O C E E D I N G S

1
2
3          THE VIDEOGRAPHER:  This is Anthony
4  Micheletto of Henderson Legal Services.  I am the
5  operator of this camera.
6          This is the videotaped deposition of
7  James Miller as being taken pursuant to Federal
8  Rules of Civil Procedure on behalf of the
9  Plaintiffs.
10         We are on the record on July 30th,
11 2007.  The time is 9:12, as indicated on the
12 video screen.  We are located at 525 West Monroe
13 Street, Chicago Illinois.
14         This case is captioned In Re:
15 Pharmaceutical Industry Average Wholesale Price
16 Litigation, Case No. 0112257-PBS.
17         Will the attorneys please identify
18 themselves for the video record?
19         MR. SISNEROS:  Eliseo Sisneros, Deputy
20 Attorney General for the State of California.
21         MS. THOMAS:  Susan Schneider Thomas
22 representing Ven-a-Care.

---

Page 9

1          MR. STUART:  Christopher Stuart, Wexler
2  Toriseva Wallace representing the State of
3  Arizona and the MDL Plaintiffs.
4          MS. TABACCHI:  Tina Tabacchi from Jones
5  Day on behalf of the Defendants.
6          MR. SOFFER:  Gil Soffer of Katten
7  Muchin Rosenman on behalf of the deponent James
8  Miller.
9          THE WITNESS:  James Miller.
10         THE VIDEOGRAPHER:  The court -- the
11 court reporter is Deborah Habian from Henderson
12 Legal Services.
13         Please swear in the witness.
14         THE REPORTER:  Please raise your right
15 hand, Mr. Miller.
16         (Witness sworn.)
17         THE REPORTER:  Thanks.
18         MS. TABACCHI:  Before we begin, I just
19 need to interject my standard objection to the
20 notice of the Class Plaintiffs as untimely.
21         MR. SISNERO:  Morning, Mr. Miller.
22         THE WITNESS:  Morning.

3 (Pages 6 to 9)

Miller, James E.                                    July 30, 2007
                        Chicago, IL

| | |
|---|---|
| Page 10 | Page 12 |

Page 10

1
2              JAMES E. MILLER,
3    called as a witness herein by the Plaintiffs,
4    having been first duly sworn, was examined and
5    testified as follows:
6
7              DIRECT EXAMINATION
8    BY MR. SISNERO:
9       Q.  Mr. Miller, what is your current
10   address?
11      A.  New Smyrna Beach, Florida.
12      Q.  Have you ever had your deposition taken
13   before?
14      A.  Yes.
15      Q.  How many times?
16      A.  Once.
17          (Enter Ms. Rebecca Ford)
18      Q.  And what were the circumstances of that
19   deposition?
20      A.  It was a product liability issue
21   between Abbott and a vendor.
22      Q.  When was this?

Page 11

1       A.  Early '80s.
2       Q.  What was the product?
3       A.  IV sets.
4       Q.  And the vendor?
5       A.  I do not remember.
6       Q.  All right.  Well, then let me go over
7    some -- briefly some of the ground rules.
8           Although there is no judge here, there
9    is no jury here, this proceeding is a very formal
10   one because you have been put under oath.  Do you
11   understand that?
12      A.  Yes.
13      Q.  To the best of our ability, both of us
14   should try to avoid talking over each other
15   because the court reporter can only put down what
16   one person speaks at a time.  Do you understand
17   that?
18      A.  Yes.
19      Q.  To the best of your ability, your
20   responses should be audible expressions rather
21   than a nod, an uh-huh, uh-uh, yes, no.  You
22   follow that?

Page 12

1       A.  Yes.
2       Q.  Okay.  Is there any reason we can't go
3    forward with this deposition this morning, any
4    medical reason?
5       A.  No.
6           MR. SISNERO:  Okay.  All right -- all
7    right, could I this marked as Exhibit Miller
8    1160, please?
9           THE REPORTER:  Sure.
10          (Exhibit Miller 1160 was marked
11   for ID)
12   BY MR. SISNEROS:
13      Q.  All right, Mr. Miller, I've had marked
14   and identified as Exhibit Miller 1160 to your
15   deposition your CV.  You've seen that before?
16      A.  Yes.
17      Q.  You prepared that document?
18      A.  Yes.
19      Q.  Okay.  The -- excuse me.
20          (Off record discussion)
21   BY MR. SISNEROS:
22      Q.  All right, if we could just talk a

Page 13

1    little bit about your CV.
2           Going back to your formal education
3    starting with -- with your college, you graduated
4    1968 from Wilmington College in Ohio; is that
5    correct?
6       A.  That is correct.
7       Q.  And was your degree in Industrial
8    Technology?
9       A.  Yes.
10      Q.  And, briefly, what -- what discipline
11   is that, Industrial Technology?
12      A.  Industrial engineering.
13      Q.  Industrial engineering.
14      A.  (Witness nodding.)
15      Q.  Thereafter, your employment with Abbott
16   began in 1972; is that correct?
17      A.  That is correct.
18      Q.  What did you do between 1968 and 1972?
19      A.  I worked for Ross Laboratory, a
20   division of Abbott Laboratories, in Columbus,
21   Ohio, and I went to grad school at Wright State
22   University.

                              4 (Pages 10 to 13)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                          Chicago, IL

Page 14

1    Q.   When you worked for Ross Labs, was that
2    right out of college?
3       A.   No.  I worked -- I'm sorry.  I worked
4    for Ford Motor Company in Claycomo, Missouri.
5       Q.   How long did you work for Ford?
6       A.   About nine months.
7       Q.   And what did you do for them?
8       A.   I was a Production Foreman.
9       Q.   After Ford, you went to Ross?
10      A.   Yes, sir.
11      Q.   And -- well, let me ask this.  When did
12   you graduate from Wilmington?
13      A.   December 1968.
14      Q.   When did you start working for Ford?
15      A.   January of 1969.
16      Q.   So you went over to Ross sometime in
17   the fall of '69?
18      A.   Yes, sir.
19      Q.   And you remained at Ross until you
20   started at Abbott?
21      A.   No, MBA program.  I went full-time to
22   the MBA program at Wright State University.

Page 15

1       Q.   I see.  So you worked for Ross from '69
2    until?
3       A.   '70.
4       Q.   What did you do for Ross?
5       A.   I was a Financial Analyst in the
6    Distribution Department.
7       Q.   What were your duties?
8       A.   I worked on determining the optimum
9    location for distribution points and negotiating
10   with carriers' freight rates.
11      Q.   So your focus was to save the company
12   money?
13      A.   Yes, sir.
14      Q.   All right, after that, then you went to
15   school at Wright State in Dayton to get your
16   master's --
17      A.   Yes.
18      Q.   -- In Corporate Finance?
19      A.   Yes.
20      Q.   And thereafter, is -- well, when did
21   you complete that program?
22      A.   In 1971.

Page 16

1       Q.   Oh, I'm sorry.  That's right there.
2       A.   Yeah.
3       Q.   Then what did you do between -- well,
4    when did you finish your master's, what year --
5    what month in '71?
6       A.   I do not remember.
7       Q.   Did -- after completing your master's,
8    did you go directly to Abbott Labs?
9       A.   No.
10      Q.   What did you do next?
11      A.   When I was getting my master's, I also
12   was approached by National Cash Register and went
13   to work at National Cash Register while I was
14   finishing my master's in Dayton, Ohio.
15      Q.   How long did you work for NCR?
16      A.   I worked for them until December '72
17   when I went to work for Abbott.
18      Q.   What did you do for NCR?
19      A.   I was a Financial Analyst --
20      Q.   Any specific duties?
21      A.   -- in the factory.  Again, I focused on
22   budgeting and cost reductions.

Page 17

1       Q.   Okay.  All right, thereafter, you went
2    to Abbott?
3       A.   (Witness nodding.)
4       Q.   Correct?
5       A.   Correct.
6       Q.   All right.  Let's talk a little bit
7    about your career at Abbott.  You have there from
8    -- in your CV Exhibit Miller 1160 a list of
9    positions you held from 1972 to 2003.  You see
10   that?
11      A.   Correct.
12      A.   Yes.
13      Q.   Is that a full and complete list of all
14   the positions that you held at Abbott during this
15   period of time?
16      A.   Yes.
17      Q.   So when you started it -- at Abbott,
18   you started as a Cost Accounting Manager here in
19   Chicago?
20      A.   North Chicago.
21      Q.   North Chicago.  I'm from the West.
22         Is that correct?

5 (Pages 14 to 17)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                          Chicago, IL

Page 18

1    A.   North Chicago is about 50 miles north
2  of here.
3    Q.   Oh, okay.  But that's where you
4  started?
5    A.   Yes, sir.
6    Q.   And when you retired, you retired as
7  Division Vice President - E-Commerce, correct?
8    A.   Correct.
9    Q.   All right, starting with your first
10  position with Abbott back in 1972, what is it
11  that you did as a Cost Accounting Manager?
12    A.   I was responsible for the monthly close
13  of the factory books.
14    Q.   What does that mean?
15    A.   Determining whether the factory
16  achieved its budget and whether -- basically
17  determine whether the factory made its budget for
18  the month or was over or under -- or positive or
19  negative versus its budget.
20    Q.   Again, it seems to be the focus is that
21  you were focused in on cost savings to stay
22  within budget?

Page 19

1    A.   Yes.
2         MS. TABACCHI:  Object to form.
3  BY MR. SISNEROS:
4    Q.   All right, and you did that for about a
5  year?
6    A.   Six months.
7    Q.   And were you -- was that a supervisory
8  position?
9    A.   Yes.
10    Q.   And how many folks did you supervise?
11    A.   I do not remember.
12    Q.   Okay.  Then from '73 to '76, you were
13  Plant Controller for Hospital Products; is that
14  correct?
15    A.   Same plant.
16    Q.   Is that Hospital Products Division?
17    A.   Yes, sir.
18    Q.   And you did that for -- from 19 -- how
19  long did you do that for?
20    A.   '73 through '76.
21    Q.   And what is it that you did as Plant
22  Controller?

Page 20

1    A.   I was responsible for all accounting
2  for that plant.
3    Q.   And when you say "all accounting," are
4  you talking about the physical plant or
5  additional activity?
6         MS. TABACCHI:  Object to the form.
7  BY MR. SISNEROS:
8    Q.   All right, let me ask, when you say you
9  are responsible for all accounting for the plant,
10  what do you mean?
11    A.   A plant is composed of many
12  departments, okay?  So I was responsible for the
13  accounting for the fixed assets of that plant as
14  well as the operational aspects of that plant.
15    Q.   What are the operational aspects?
16    A.   A plant makes many products, and we
17  were responsible for, again, determining whether
18  those products were produced to budget or over or
19  under budget.
20    Q.   Okay, I understand.  And, additionally,
21  you're responsible for the -- what you call the
22  fixed assets?

Page 21

1    A.   Yes, sir.
2    Q.   The building?
3    A.   The building, the equipment.
4    Q.   Okay.  And then from -- again, were you
5  -- was this a supervisory position?
6    A.   Yes.
7    Q.   And from there, you went to Assistant
8  Division Controller FP & A.  What does FP & A
9  stand for?
10    A.   No, that was not the next job.  The
11  next job was Assistant Division Controller -
12  Manufacturing.
13    Q.   Oh, yeah, you're right.  Again, that's
14  with Hospital Products Division?
15    A.   Correct.
16    Q.   And that was from 1976 to 1981?
17    A.   Correct.
18    Q.   And what were your duties there?
19    A.   I had multiple Plant Controllers that
20  worked for me.
21    Q.   What areas?
22    A.   Manufacturing.

6 (Pages 18 to 21)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                        Chicago, IL

Page 22

1    Q.  How is that different from your duties
2  as the North Chicago Plant Controller with
3  respect to accounting for the products that are
4  being manufactured?
5    A.  I just moved up a layer.
6    Q.  You just moved up the supervisor layer?
7    A.  (Witness nodding.)
8    Q.  And so how many folks did you supervise
9  as Assistant Division Controller?
10   A.  I do not remember.
11   Q.  All right.  But that was a promotion
12 from Plant Controller?
13   A.  Yes, sir.
14   Q.  All right.  And then from there, we go
15 to Assistant Division Controller, FP & A -
16 Hospital Products; is that right?
17   A.  Yes, sir.
18   Q.  And, again, that's still in the
19 Hospital Products Division?
20   A.  Yes, sir.
21   Q.  What's FP & A?
22   A.  Financial planning and analysis.

Page 23

1    Q.  And what is that?
2    A.  That means you work with the -- a group
3  to do budgets again.
4    Q.  In what areas would you -- would -- in
5  what areas would you work on budgeting?
6    A.  Staff areas.  Sales marketing, R & D,
7  administration.
8    Q.  The -- again, this was in the Hospital
9  Products Division?
10   A.  Yes, sir.
11   Q.  In terms of the product that was
12 manufactured by the Hospital Products Division,
13 that was for the most part generic products?
14     MS. TABACCHI:  Object to the form.
15 BY MR. SISNEROS:
16   Q.  Let me ask this.  The pharmaceutical
17 products that were developed by the Hospital
18 Products Division, were they generic products?
19   A.  I don't know.
20   Q.  So you were unfamiliar as to the type
21 of product that they were developing?
22     MS. TABACCHI:  Object to the form.

Page 24

1      THE WITNESS:  I'm not --
2      MR. SOFFER:  If you can answer, you
3  may.
4      THE WITNESS:  I'm not qualified to
5  answer whether they were generic or not.
6  BY MR. SISNEROS:
7    Q.  Okay.  With regard to your duties as
8  Assistant Division Controller, FP & A in the
9  Hospital Products Division, I believe you
10 testified that one -- one of the aspects of your
11 work was to see if product was being manufactured
12 according to budget?
13   A.  (Witness nodding.)
14   Q.  Yes?
15   A.  In the manufacturing jobs, yes.
16   Q.  How -- did you develop the budgets?
17   A.  Early in my career.
18   Q.  But not at that point?
19   A.  In that point, I would be in a
20 management review of budgets.
21   Q.  How would a manufacturing budget for a
22 product be developed?

Page 25

1      MS. TABACCHI:  Object to the form.
2      MR. SOFFER:  Again, if you're able to
3  answer, you may do so.
4      THE WITNESS:  You -- we're going to
5  have a discussion on cost accounting.
6  BY MR. SISNEROS:
7    Q.  Well, okay, let me ask -- let me ask
8  you this.  In your experience at least within the
9  Hospital Products Division --
10   A.  Um-hum.
11   Q.  -- the line of positions that you held,
12 you were very involved in cost benefit analysis?
13   A.  No.
14   Q.  You were very involved in -- in cost of
15 product or the physical plant in relation to what
16 was budgeted for that?
17     MS. TABACCHI:  Object to the form.
18     THE WITNESS:  Yes, sir.
19 BY MR. SISNEROS:
20   Q.  So you were -- you were primarily
21 responsible for -- for containing costs?
22     MS. TABACCHI:  Object to the form.

                                 7 (Pages 22 to 25)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                           Chicago, IL

---

Page 26

1        MR. SOFFER:  You may answer if you can.
2        THE WITNESS:  I was primarily
3    responsible to assist line management in the
4    identification of causes of cost variances versus
5    budget.
6    BY MR. SISNEROS:
7        Q.  Okay.  All right, then from Hospital --
8    then from FP & A at the Hospital Products
9    Division, you became Division Controller For
10   Corporate Materials Management in 1982; is that
11   right?
12       A.  Yes, sir.
13       Q.  Okay, what is that?
14       A.  Corporate Materials Management was a
15   service division that distributed -- let me back
16   up -- operated distribution centers and trucks to
17   move product from plants to distribution centers
18   and from distribution centers to major customers.
19       Q.  And what was your responsibility?
20       A.  I was again responsible for the
21   accuracy and the integrity of the books for that
22   division.

---

Page 27

1        Q.  Okay.  And then from there, you got
2    promoted to Division Controller - Home Care in
3    '83, correct?
4        A.  Yes, sir.
5        Q.  Were your duties functionally the same
6    as they had been at the Corporate Materials
7    Management?
8        MS. TABACCHI:  Object to the form.
9        MR. SOFFER:  You may answer if you can.
10   BY MR. SISNEROS:
11       Q.  All right, let me just ask it this way.
12   What were your duties as Division Controller At
13   Home Care?
14       A.  I was responsible for, again,
15   maintaining the integrity and accuracy of the
16   books for that division and for establishing the
17   pricing for our products when we billed Medicare,
18   Medicaid and private insurance companies.
19       Q.  How did you do that?
20       MS. TABACCHI:  Object to the form.
21   BY MR. SISNEROS:
22       Q.  How -- how would you price products in

---

Page 28

1    the context of Medicare and Medicaid?
2        A.  There were DRGs.
3        Q.  DRG stands for?
4        A.  Diagnosis related codes -- diagnosis
5    related groups.
6        Q.  Well, what products or services were
7    you setting Medicaid/Medicare prices for?
8        MS. TABACCHI:  Object to the form.
9        MR. SOFFER:  If you're able to answer,
10   you may.
11       THE WITNESS:  We were in the total
12   parental nutrition business, the total enteral
13   nutrition business, and the renal care business.
14   BY MR. SISNEROS:
15       Q.  These are products and services that
16   involve infusion therapies; is that right?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Some of these project --
19   well --
20       MR. SOFFER:  You can answer.
21       THE WITNESS:  Some of these products
22   are injected in human beings, and some of them

---

Page 29

1    are fed orally to human beings.
2    BY MR. SISNEROS:
3        Q.  When you would -- what did you call
4    that, DRGs?  I'm sorry, DRGs?
5        A.  Right.
6        Q.  When you said pricing -- well, can you
7    explain to me how you would set a pricing through
8    the DRGs?
9        MS. TABACCHI:  Object to the form.
10       MR. SOFFER:  You can answer if you're
11   able.
12       THE WITNESS:  Abbott was a late entrant
13   in this market, and there were lots of
14   competitive pricing available.
15       We were setting the product for the
16   individual components that went into a therapy.
17   Like if you were on home enteral nutrition, you
18   would take a product like Ensure, you would need
19   a tube and other ancillary supplies.  We set the
20   prices for those individual supplies that went
21   within a diagnosis group.
22   BY MR. SISNEROS:

---

8 (Pages 26 to 29)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
Chicago, IL

Page 30

1      Q.  I see.  You -- you weren't responsible
2  for -- for a pharmaceutical product.  You were
3  responsible for equipment?
4      A.  We sold no pharmaceutical products.
5      Q.  You sold equipment?
6      A.  Yes.
7      Q.  Okay.  All right, then from there, you
8  went to, again, Assistant Corporate Controller -
9  FP & A?
10      A.  Right, correct.
11      Q.  And your duties there?
12      A.  Abbott has a budget cycle three times a
13  year, and all the groups submit budgets.  My job
14  was to help line management review, analyze and
15  make recommendations.
16      Q.  What specific areas of budgeting did
17  you review --
18          MS. TABACCHI:  Object to the form.
19  BY MR. SISNEROS:
20      Q.  (Continuing) -- as Assistant Corporate
21  Controller of FP & A?
22          MR. HOFFMAN:  You can answer.

Page 31

1          THE WITNESS:  Every division and every
2  corporate staff function submitted a budget, a
3  budget -- yeah, submitted a budget.
4  BY MR. SISNEROS:
5      Q.  So you reviewed all aspects of the
6  business for every division?
7          MS. TABACCHI:  Object to the form.
8          MR. SOFFER:  You can answer if you can.
9          THE WITNESS:  I assisted line
10  management in that task.
11  BY MR. SISNEROS:
12      Q.  Those that you supervised?
13      A.  No, accounting does not supervise
14  operating units.
15      Q.  Well, this particular position then,
16  your duties required that you worked with
17  individuals from the different divisions?
18      A.  Yes, and corporate management.
19      Q.  And corporate management.
20      A.  (Witness nodding.)
21      Q.  Did you have a contact in Hospital
22  Products Division?

Page 32

1      A.  I would have worked with the division
2  controller.
3      Q.  Do you recall who that would have been?
4      A.  No.
5      Q.  Can you give me an example of what you
6  would have been reviewing with a representative
7  from the Hospital Products Division?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  It could be as simple as
10  the wage -- the annual merit wage increase they
11  built in, the annual wage progression they built
12  in to -- could.
13  BY MR. SISNEROS:
14      Q.  Well, let me ask you this specific
15  question.  Would you -- would your duties have
16  required for a review, for example, of product
17  price increases?
18      A.  No.
19      Q.  Was there anyone in the controller's
20  office who would have been responsible for that
21  type of review?
22          MS. TABACCHI:  Object to form.

Page 33

1          THE WITNESS:  At the corporate level?
2  BY MR. SISNEROS:
3      Q.  Yes.
4      A.  No.
5      Q.  At the divisional level?
6          MS. TABACCHI:  Object to the form.
7          MR. SOFFER:  You can answer if you
8  know.
9          THE WITNESS:  Yes.
10  BY MR. SISNEROS:
11      Q.  And at the divisional level, who had
12  responsibility for reviewing price increases?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  At that point in time, I
15  cannot tell you.  I -- I do not know.
16  BY MR. SISNEROS:
17      Q.  And, actually, I'm not looking for an
18  individual's name.  I'm looking for a position.
19      Who -- what position in -- within a
20  division would be responsible for reviewing that
21  division's increase -- a price increase of
22  product?

9  (Pages 30 to 33)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
Chicago, IL

Page 34

1          MS. TABACCHI:  Object to the form.
2          MR. SOFFER:  You can answer if you know
3    the answer to the question.
4          THE WITNESS:  You -- you can -- Abbott
5    was six companies -- is six companies.  Well, I
6    don't know what it is today.  When I was there,
7    it was six companies.
8          You cannot generically say this
9    individual in this division is responsible for
10   that. They're all organized differently.
11   BY MR. SISNEROS:
12      Q.  So the responsibility for that duty
13   within that division would -- would have been
14   identified within the division?
15      A.  Yes, sir.
16      Q.  Thereafter, you went to Area Finance
17   Director - Europe International?
18      A.  Yes, sir.
19      Q.  Were you actually in Europe?
20      A.  No.
21      Q.  Okay, what were your duties?
22      A.  My first duty was to close the Paris

Page 35

1    office and bring it back.
2      Q.  Was that a cost saving?
3      A.  A million dollars.
4      Q.  What else did you do for them?
5          MS. TABACCHI:  Object to the form.
6    BY MR. SISNEROS:
7      Q.  Well, what else did you do as Division
8    Vice President of Finance International?
9      A.  I was responsible for the accuracy and
10   integrity of the books at the -- financial books
11   at the division level and each of the hundred
12   affiliates.
13      Q.  And I see that during this period of
14   time you also became a CPA?
15      A.  Yes, sir.  Well, I was a CPA before I
16   went to International.
17      Q.  I see.  That's correct.  Are you
18   currently a CPA?
19      A.  I am a retired CPA.
20      Q.  Okay, are you -- are you doing any kind
21   of work presently?
22          MS. TABACCHI:  Object to the form.

Page 36

1    BY MR. SISNEROS:
2      Q.  Consulting?
3      A.  Yes.
4      Q.  What -- do you have your own company?
5      A.  No.
6      Q.  What -- who do you consult for?
7      A.  From a Fortune 500 to a baby company.
8      Q.  And pharmaceutical companies?
9      A.  No, sir.
10     Q.  All right.  After a stint as Division
11   Vice President - Finance International, you went
12   -- became Divisional Vice President - Corporate
13   Planning?
14     A.  Yes, sir.
15     Q.  What were your duties there?
16     A.  The primary duties were product
17   acquisition either through purchase or licensing.
18     Q.  Okay.  What -- what -- give me some
19   examples of what you did --
20     A.  Um-hum.
21     Q.  -- as Corporate Planning product
22   acquisition.

Page 37

1          MS. TABACCHI:  Object to the form.
2          MR. SOFFER:  You may answer if you can.
3          THE WITNESS:  Okay.  I had -- let's
4    back up.
5          Our job was to analyze business areas
6    we were not in to see if they would fit with the
7    overall Abbott portfolio and to find products at
8    small companies generally that would be licensed
9    that would complement Abbott's existing strengths
10   in its product portfolio.
11   BY MR. SISNEROS:
12     Q.  You were looking to license products
13   developed by others?
14     A.  Yes, sir.
15     Q.  Would that include looking for products
16   that had been patented by other companies?
17     A.  Yes.
18     Q.  Would it include products that had been
19   patented by other institutions, say,
20   universities?
21     A.  Yes.
22     Q.  This is something I guess you did for a

10 (Pages 34 to 37)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 38

1  couple of years?
2      A.  Yes.
3      Q.  In your -- in this position, about how
4  many products did you license from other
5  institutions?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Other institutions?
8  BY MR. SISNEROS:
9      Q.  Universities, other companies.
10     A.  Oh.
11         MS. TABACCHI:  Object to the form.
12 BY MR. SISNEROS:
13     Q.  Let me -- let me rephrase the question.
14         You've testified that as part of your
15 duties, you were looking for a product that may
16 have been patented by another company or other
17 institutions like a university, correct?
18     A.  Um-hum.
19     Q.  Yes?
20     A.  Yes.
21     Q.  And my question is, to your best of
22 your recollections, how many products did you

Page 39

1  license for Abbott --
2          MS. TABACCHI:  Object to the form.
3  BY MR. SISNEROS:
4      Q.  (Continuing) -- from other
5  institutions?
6          MS. TABACCHI:  Object to the form.
7          MR. SOFFER:  If you're able, you may
8  answer.
9          THE WITNESS:  Well, let me -- let me
10 rephrase, okay?
11         We would identify a product either with
12 or without a division.  Corporate does not market
13 -- I guess -- corporate really doesn't market
14 products.  Divisions sell products at Abbott.  So
15 -- can I give a real example?
16         MR. SOFFER:  Why don't we have the
17 question asked again.
18 BY MR. SISNEROS:
19     Q.  Well, look, let me ask this.
20         MR. SOFFER:  Go ahead.
21 BY MR. SISNEROS:
22     Q.  Did Abbott -- did you at this time at -

Page 40

1  - as Division Vice President - Corporate Planning
2  get involved in the licensing of a product that
3  had not been manufactured by Abbott?
4      A.  Yes.
5          MS. TABACCHI:  Object to the form.
6  BY MR. SISNEROS:
7      Q.  Could you give me some examples?
8      A.  Yeah.
9      Q.  Please for the record give me some
10 examples.
11     A.  There was a product called Synagis
12 marketed by Ross Division, which was -- which is,
13 I assume -- I don't know about -- it's -- the
14 manufacturer's Medimmune.
15     Q.  Okay, there were others?
16     A.  Oh, yeah.
17     Q.  All right.  And so my question is with
18 respect to your duties at this time as Division
19 Vice President of Corporate Planning, you were
20 concerned with budgets for acquiring product from
21 other companies or institutions and licensing
22 them through Abbott; is that accurate?

Page 41

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  I would say that we were
3  concerned with licensing products, not budgets.
4  Our job was to identify and to assist the
5  divisions in licensing or acquiring products.  We
6  did not have the budgets.
7  BY MR. SISNEROS:
8      Q.  Was cost a consideration in that
9  process of acquiring those products that you
10 would license?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Every -- every product
13 had a P & L prepared for it.
14 BY MR. SISNEROS:
15     Q.  What's --
16     A.  A profit and loss statement when you
17 had -- when you went to license it.
18     Q.  All right, thereafter, you went to --
19 by the way, when you were Division Vice President
20 of Corporate Planning, who was your immediate
21 supervisor?
22     A.  During the period of time I was there,

11 (Pages 38 to 41)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                              Chicago, IL

---

Page 42

1  I had two supervisors.
2      Q.  And who were they?
3      A.  Dick Moorehead -- Richard Moorehead.
4      Q.  Who else?
5      A.  Steve Weiger.
6      Q.  What was Moorehead's position?
7      A.  He --
8          MS. TABACCHI:  Object to the form.
9          MR. SOFFER:  You can answer.
10         THE WITNESS:  He was Vice President -
11  Corporate Strategic Planning.  That title may not
12  be a hundred percent accurate.
13  BY MR. SISNEROS:
14     Q.  Okay, how about Mr. Weiger?
15     A.  Same title basically.
16     Q.  Mr. Weiger had the same title?
17     A.  (Witness nodding.)  Mr. Moorehead
18  retired.
19     Q.  Okay, and who was Weiger's supervisor?
20     A.  Gary Coughlin.
21     Q.  And what was Coughlin's --
22     A.  Chief Financial Officer.

---

Page 43

1      Q.  Who was Coughlin's boss?
2      A.  CEO.
3      Q.  '96 through '98, who would have been
4   the CEO?
5      A.  There was a change in there.  I'm not
6   positive.
7      Q.  Well, who were the two?
8      A.  Dwayne Burnham.
9      Q.  And the other one?
10     A.  Miles White.
11     Q.  All right, thereafter, you went to
12  Division Vice President of E-Commerce from 1998
13  until you -- your retirement in 2003, correct?
14     A.  Correct.
15     Q.  And what were your duties there?
16     A.  The primary duty was I installed a new
17  order entry system for Abbott in the U.S.
18     Q.  Order entry system, what is that?
19     A.  It's what -- it's the computer software
20  that accepts customers' inventory -- customers'
21  orders, signs inventory, and then fulfills that
22  request.

---

Page 44

1      Q.  When did you develop that program?
2      A.  We bought it.  Well, you've heard of
3   SAP?
4      Q.  No, I haven't.
5      A.  Okay.
6      Q.  What is SAP?
7      A.  SAP is a German software company,
8   Systems Application and Programming.  It's a big
9   ER -- what's called enterprise related -- ERP
10  software.
11     Q.  When did you buy this for Abbott?
12     A.  In 1999, 2000, somewhere in that time
13  frame.
14     Q.  When was it implemented for customers
15  to use this service?
16         MS. TABACCHI:  Object to the form.
17  BY MR. SISNEROS:
18     Q.  When was it implemented so customers
19  could use this software?
20     A.  We went -- there was -- it was
21  implemented for the domestic divisions.  We
22  started with the Diagnostics Division first.

---

Page 45

1      Q.  When?
2      A.  It would have been two thousand and --
3   2001.
4      Q.  To the best of your recollection, when
5   did the Hospital Products Division get onboard
6   with this program?
7      A.  2002.
8      Q.  Is the program one that is accessible
9   to your -- to Abbott customers?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  Define "accessible."
12  BY MR. SISNEROS:
13     Q.  If a customer wants to order product,
14  can they do it online through this program?
15         MS. TABACCHI:  Object to the form.
16         MR. SOFFER:  You may answer, if you
17  can.
18         THE WITNESS:  Hospital Products'
19  products cannot.
20  BY MR. SISNEROS:
21     Q.  Who -- what customers -- I understood
22  that you said that this was something that was

12  (Pages 42 to 45)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 46

1   implemented so that customers could order
2   product.  How do they do that?
3        A.  The Diagnostics -- well, you can do it
4   via EDI, electronic data interchange, you can do
5   it via calling or, in some divisions, you can do
6   it via the Internet.
7        Q.  But -- okay, but Hospital Products
8   Division did not -- never had access through the
9   Internet?
10       A.  No.
11       Q.  Okay.  So I -- excuse me, let me
12  rephrase the question.
13            Customers of the Hospital Products
14  Division could not order their product through
15  this program?
16       A.  They had to call in their orders or
17  they had to place them via EDI.
18       Q.  I see.  Okay.  All right, I want to
19  change focus now from -- from your employment
20  history a bit, and I wanted to ask you that -- or
21  mark as Exhibit Miller 1161 --
22            (Exhibit Miller 1161 was marked

Page 47

1   for ID)
2   BY MR. SISNEROS:
3        Q.  All right, I've had marked and
4   identified as Exhibit Miller 1161 to your
5   deposition a copy of a subpoena duces tecum that
6   was attached to your notice of deposition.
7            Have you seen that document before?
8        A.  Yes, my lawyers provided it to me.
9        Q.  Did you provide any documents to your
10  attorneys pursuant to that subpoena?
11       A.  Only the resume.
12       Q.  Okay.  Did you make a search for
13  documents pursuant to that subpoena?
14       A.  Yes, sir.
15       Q.  And the only document you found was
16  your resume?
17       A.  Yes, sir.
18       Q.  Okay.  Now, other than your attorneys,
19  did you speak to anyone about your deposition
20  here today?
21       A.  No.
22       Q.  Were you aware of this litigation --

Page 48

1            MS. TABACCHI:  Object to the form.
2   BY MR. SISNEROS:
3        Q.  (Continuing) -- or this lawsuit?  Were
4   you aware of this lawsuit?
5            MS. TABACCHI:  Object to the form.
6            MR. SOFFER:  Objection.
7            What period of time was he aware?
8   BY MR. SISNEROS:
9        Q.  Well, before this deposition, were you
10  -- before you were noticed for this deposition,
11  were you aware that Abbott was being sued by
12  various government agencies?
13           MS. TABACCHI:  Object to the form.
14           MR. SOFFER:  You may answer if you can.
15           THE WITNESS:  Until I got a call from
16  the Abbott Legal Department, no.
17  BY MR. SISNEROS:
18       Q.  When did you get a call from the Abbott
19  Legal Department?
20       A.  The last 60 days sometime.
21       Q.  Okay, in the last couple months?
22       A.  Yeah.

Page 49

1        Q.  All right, okay.
2            All right, I want to now again shift
3   over and I want to turn your attention to the
4   period of time when you were Division Vice
5   President of Corporate Planning.  Have you heard
6   of the Medicare Working Group?
7        A.  Yes.
8        Q.  What is it?
9        A.  The Medicare Working Group was a --
10  it's called a working group of personnel from the
11  divisions and interested corporate functions on
12  product reimbursement.
13       Q.  How was this group created?
14       A.  I was asked by Mr. Moorehead to call a
15  meeting.
16       Q.  And Mr. Moorehead was your direct
17  supervisor --
18       A.  Yes, sir.
19       Q.  -- Vice President of Corporate
20  Strategic Planning?
21       A.  (Witness nodding.)
22       Q.  Yes?

13  (Pages 46 to 49)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                          Chicago, IL

| Page 50 |
|---|

1    A.  Yes.
2    Q.  Okay.  And what were Mr. Moorehead's
3  instructions to you?
4    A.  I do not recall specifically, but it
5  was generally to call a meeting of these people
6  who were responsible for I'm going to call it
7  insurance coverage in the divisions and certain
8  corporate functions that were interested.
9        MR. SOFFER:  Why don't we have a break
10 now?
11       MR. SISNEROS:  Okay.
12       THE WITNESS:  Okay.
13       THE VIDEOGRAPHER:  We are off the
14 record at 9:56 a.m.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  We are back on the
17 record at 10:08 a.m.
18 BY MR. SISNEROS:
19   Q.  Mr. Miller, I'm going to have the court
20 reporter read off a couple of questions and
21 answers just before we took the first break
22 because I want to follow up with some questions

| Page 51 |
|---|

1  to your response.
2        (Record read as follows:
3    Q.  Have you heard of the Medicare Working
4  Group?
5    A.  Yes.
6    Q.  What is it?
7    A.  The Medicare Working Group was a --
8  it's called a working group of personnel from the
9  divisions and interested corporate functions on
10 product reimbursement.")
11 BY MR. SISNEROS:
12   Q.  Mr. Miller, what did you mean by the
13 words "interested corporate functions on product
14 reimbursement"?
15   A.  The corporate groups that I remember
16 attending via person or in phone was Public
17 Affairs and the Washington office and, obviously,
18 my department.
19   Q.  If you know, is there a reason why Mr.
20 Moorehead asked you to create this group?
21   A.  I do not remember a specific reason.
22   Q.  Do you have a general recollection of

| Page 52 |
|---|

1  why you were asked to create this group?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No.  I'd be guessing.
4        MR. SISNEROS:  Don't guess.
5        (Exhibit Miller 1162 was marked
6  for ID)
7  BY MR. SISNEROS:
8    Q.  I'm handing you what I've marked and
9  identified as Exhibit Miller 1162 to your
10 deposition, pages 1 and 2, and these are two
11 lists.
12       Are -- if you could take a moment and
13 review both lists?
14   A.  (Witness reviewing document.)
15       Okay.
16   Q.  Have you had a chance to review both
17 lists, Mr. Miller?
18   A.  Yes, sir.
19   Q.  All right, the first page of Exhibit
20 Miller 1162 is entitled, "Abbott's Medicare
21 Working Group Key Participants."  Do you see
22 that?

| Page 53 |
|---|

1    A.  Yes, sir.
2    Q.  And then the second list is entitled,
3  "Abbott's Medicare Working Group Distribution
4  List;" is that correct?
5    A.  Correct.
6    Q.  And it appears to me that in both lists
7  it's the same group of individuals.  Is that
8  correct?
9    A.  There's sixteen names on both pages.
10   Q.  The difference between page 1 and page
11 2 is that it identifies each of the individuals -
12 - or strike that.
13       Page 1 of the exhibit identifies the
14 division from which those individuals come from;
15 is that correct?
16   A.  Division and corporate function.
17   Q.  That's correct.  Now, who was
18 responsible for the individuals that composed the
19 Medicare working group?
20       MS. TABACCHI:  Object to the form.
21 BY MR. SISNEROS:
22   Q.  All right, let me try it a different

                              14  (Pages 50 to 53)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 54

1   way. Who picked the members of the Medicare
2   Working Group?
3       A.   The initial participants were suggested
4   by Mr. Moorehead.
5       Q.   And the individuals that are listed in
6   Exhibit Miller 1162, are those the individuals
7   that were suggested by Mr. Moorehead?
8       A.   I do not remember.
9       Q.   Are some of the individuals that are to
10  be found on the list of Exhibit Miller 1162 some
11  of the individuals that Mr. Moorehead suggested?
12      A.   Yes.
13      Q.   What individuals are those?
14      A.   I cannot answer with total accuracy.
15      Q.   To the best of your recollection.
16      A.   I mean there are people -- I don't
17  know. I mean ADD, Paul Landauer had -- well, I'm
18  not -- I'm not sure who was on the original list.
19  I mean that's ten years ago, guys.
20      Q.   From the best of your recollection,
21  were most of the individuals that Moorehead
22  suggested to you in fact the members of the

Page 55

1   Medicare Working Group?
2       A.   I remember there were people that
3   showed up for the initial meetings that said,
4   "Why am I here?"
5       Q.   When was that initial meeting?
6       A.   It would have to be in the fall of '96.
7       Q.   August, September, October, November of
8   '96?
9       A.   Somewhere after I was there.
10      MS. TABACCHI:  Object to form.
11  BY MR. SISNEROS:
12      Q.   And when these individuals asked, "Why
13  am I here," what did you tell them?
14      A.   "It's a working group to share
15  information on the reimbursement products.  If
16  you're responsible for that, you belong here.  If
17  you're not responsible for that, give me a name."
18      Q.   So at least in the -- in identifying
19  the members that were to be on the Medicare
20  Working Group, they were to be individuals that
21  were responsible for reimbursement issues in
22  their division?

Page 56

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  Knowledgeable.
3   BY MR. SISNEROS:
4       Q.   Knowledgeable on reimbursement issues
5   in their division?
6       A.   Yes.
7       Q.   Since your name is on this list, then
8   you are an individual that is knowledgeable on
9   reimbursement issues?
10      A.   No, sir.
11      Q.   Why are you here?
12      A.   I was assigned a coordination role.
13      Q.   And what -- in coordination role, what
14  were your responsibilities?
15      A.   To get the individuals together for a
16  one-hour meeting once a month.
17      Q.   To discuss reimbursement?
18      A.   To discuss --
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  To discuss coverage
21  issues for their products.  I'm going to
22  interchange "reimbursement" and "coverage" as the

Page 57

1   same word.
2   BY MR. SISNEROS:
3       Q.   Okay.  And "coverage," you mean
4   coverage by third-party payers?
5       A.   Any third-party payer.
6       Q.   Private health insurance?
7       A.   Hospitals, yeah, right.
8       Q.   Medicare/Medicaid?
9       A.   Any third-party payer.
10      Q.   Including Medicare and Medicaid?
11      A.   Yes, sir.
12      Q.   All right.  Was Rich Rieger someone who
13  was knowledgeable in reimbursement?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  I do not believe so.
16  BY MR. SISNEROS:
17      Q.   How about Cathy Babington?
18      A.   I do not believe so.
19      Q.   Hank Doyle?
20      A.   I do not believe so.
21      Q.   Don Buell?
22      MS. TABACCHI:  Object to the form.

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 58

1        THE WITNESS:  I'm not qualified to
2   answer on these individuals, what their specific
3   knowledge levels are.
4   BY MR. SISNEROS:
5        Q.  Based on your experience in working
6   with -- by the way, how long did you work with
7   these folks on the Medicare Working Group?
8        A.  I believe --
9        MS. TABACCHI:  Object to the form.
10  BY MR. SISNEROS:
11       Q.  All right, let me ask it this way.  How
12  long did the Medicare Working Group exist?
13       A.  I believe it existed through the end of
14  '97.
15       Q.  So its existence basically was for one
16  year?
17       A.  Yeah.
18       Q.  What changed that became defunct?
19       MS. TABACCHI:  Object to the form.
20  BY MR. SISNEROS:
21       Q.  Well, let me try another way.  What
22  change -- what event led to the group disbanding?

Page 59

1        A.  It was not in one of the top five
2   priorities for my organization.  So I assume it
3   fell by the way side.
4        Q.  Well, does that mean when this group
5   was created, it was one of the top five
6   priorities for your -- for your division?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  I cannot answer that.  It
9   was an assignment from my boss.  The --
10  BY MR. SISNEROS:
11       Q.  So in the course -- in the course of
12  your one-year participation --
13       A.  Um-hum.
14       Q.  -- with the Medicare Working Group, was
15  it ever clear to you why this group was created?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I'd be guessing.
18  BY MR. SISNEROS:
19       Q.  I'm not asking you to guess.  Based --
20  I'm asking you, based on your 30 years of
21  experience at Abbott, you know, did you ever have
22  an understanding why this group was created?

Page 60

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I'm an operational
3   efficiency expert.
4   BY MR. SISNEROS:
5        Q.  And what's that?
6        A.  I did a lot of -- in my job, I look at
7   how you make organizations more efficient, okay?
8   That's part of the budgeting management --
9   management of the budgeting process at Abbott.
10       Q.  When you say "make things more
11  efficient," are you talking about financial-wise?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  Organization.
14  BY MR. SISNEROS:
15       Q.  Organizational-wise?
16       A.  (Witness nodding.)
17       Q.  So this Medicare Working Group -- or
18  are you saying that this Medicare Working Group
19  was an experiment at efficiency?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  I don't know what was in
22  management's mind when they assigned the task.

Page 61

1   BY MR. SISNEROS:
2        Q.  What was in your mind?  What did you
3   think?
4        A.  I went out and looked at the processes
5   for getting products reimbursed in the various
6   divisions or getting insurance coverage for the
7   various products in the divisions.
8        Q.  How did you do that?
9        A.  By asking questions like you're doing.
10       Q.  Okay.  What questions did you ask and
11  what did you learn?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  I learned that products
14  of the divisions have very little similarities in
15  how they are approved or reimbursed.
16  BY MR. SISNEROS:
17       Q.  With respect to the Hospital Products
18  Division, what did you learn about how their
19  products were reimbursed?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  In that time frame, the
22  majority, vast majority of their products were

                            16  (Pages 58 to 61)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                              Chicago, IL

Page 62

1  sold directly to hospitals on contract.
2  BY MR. SISNEROS:
3      Q.  With regard to their product that was
4  not sold to hospital, what did you learn about
5  reimbursement of those products?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I don't -- nothing that I
8  recall.
9  BY MR. SISNEROS:
10     Q.  Okay, all right.  Prior to the creation
11 of the Medicare Working Group, was there some
12 mechanism at Abbott to deal with the type of
13 issues that you dealt with in the Medicare
14 Working Group?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  I -- I'm not qualified to
17 answer. I wasn't at the corporate level.
18 BY MR. SISNEROS:
19     Q.  You were at the corporate level when
20 this was formed, correct?
21     A.  Yes, sir.
22     Q.  How long had you been at the corporate

Page 63

1  level when this was formed?
2      A.  30 days, 60 days.
3      Q.  This was one of your first assignments?
4      A.  Yes, sir.
5      Q.  Did you ever do any other -- did you
6  have other types of assignments similar to this
7  where you were part of a working group, perhaps
8  other issues?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  They would have been more
11 business or financial related.  This is about as
12 far afield as I ever worked.
13 BY MR. SISNEROS:
14     Q.  Okay.  Now, just so I'm clear, with
15 respect to the reimbursement issues, what we --
16 what your discussion in this group was was about
17 the reimbursement to the third-party payers?
18     A.  Yes, sir.
19     Q.  Why were you looking at issues
20 regarding reimbursement to third-party payers?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  There were a lot of

Page 64

1  proposed changes during those years.
2  BY MR. SISNEROS:
3      Q.  Proposed changes to the Medicare
4  program?
5      A.  To state programs, Medicare programs.
6      Q.  Okay.  This was -- I'm sorry, let me --
7  let me look at this.
8          This was around the '96, '98 time
9  period?  Well, '96, '97 you said earlier,
10 correct?
11     A.  Yes.
12     Q.  That was the Clinton presidency.
13 Clinton was President at the time, correct?
14     A.  He served two terms, yes.
15     Q.  He had two terms.  And it was around
16 that time, I believe, that -- that Hilary Clinton
17 was proposing sweeping changes to the healthcare
18 program; is that correct?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Your memory's better than
21 mine.
22 BY MR. SISNEROS:

Page 65

1      Q.  Well, there was some Medicare proposals
2  that was put forward by the Clinton
3  administration? Do you remember that?
4      A.  Yes.
5      Q.  Was -- were at least -- were some of
6  those proposals on the table at the time this
7  Medicare Working Group was formed?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  I do not remember.
10 BY MR. SISNEROS:
11     Q.  You do not recall?
12     A.  (Witness shaking head.)
13     Q.  Do you recall any discussion within the
14 Medicare Working Group regarding proposals at --
15 on the table and before state legislatures and
16 the federal legislature regarding changes to
17 Medicaid or Medicare?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I do not recall the
20 specifics of discussions ten years ago.
21 BY MR. SISNEROS:
22     Q.  Okay, all right.  You were the person

17 (Pages 62 to 65)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                              Chicago, IL

<table>
<tr><td>

Page 66

1  primarily responsible to make -- for keeping the
2  Working Group moving along, working?
3      A.  It was called the information sharing
4  of the Working Group.
5      Q.  The what?
6      A.  Information sharing.
7      Q.  Okay, you were responsible for
8  information sharing?
9      A.  (Witness nodding.)
10     Q.  What kind of information would you be
11 sharing?
12     A.  A person could come in and say, Senator
13 so and so has a proposal to do X, Y and Z in
14 Congress.  The Washington office could say that.
15     Q.  And you'd be the contact person?
16     A.  No, we'd all be in a room.
17     Q.  Oh, I see.
18     A.  See, the Washington office would be on
19 the phone, and they might say, you know, Senator
20 -- Senator Clinton.  We're going to make Hilary a
21 senator back then.  Senator Clinton has a
22 proposal to do this, to pricing to or to

</td><td>

Page 68

1      Q.  But -- but in terms of what had been
2  identified as the key participants of the
3  Medicare Working Group, those three were part of
4  it?
5      A.  The Washington office was a key
6  participant.
7      Q.  Okay.  And so with -- in the context of
8  the Washington office, they would keep the
9  Medicare Working Group informed as to any pending
10 proposals to change the Medicare or Medicaid
11 systems?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  Yes, sir.
14 BY MR. SISNEROS:
15     Q.  So the -- Abbott's Washington office
16 would pass on to the Medicare Working Group any
17 pending legislation regarding Medicare --
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Yes, sir.
20 BY MR. SISNEROS:
21     Q.  (Continuing) -- or Medicaid?
22     A.  Yes, sir.

</td></tr>
<tr><td>

Page 67

1  reimbursement, to coverage, however you want to
2  use the words.
3      Q.  And the example you've given, the
4  hypothetical you've given, that makes sense
5  because you've testified before that the
6  Washington -- Abbott's Washington office made --
7  were some of the members of this Working Group,
8  correct?
9      A.  Yes, sir.
10     Q.  And that would be Cindy Sensibaugh,
11 David Landside and Rosemary Haas --
12         MS. TABACCHI:  Object to the form.
13 BY MR. SISNEROS:
14     Q.  -- is that right?
15     A.  Those are members of the Washington
16 office, yes.
17     Q.  And they were part of the Medicare
18 Working Group?
19     A.  Yeah.  Who was on the phone, again, I
20 do not remember ten years ago.
21     Q.  No, I understand.
22     A.  Okay.

</td><td>

Page 69

1      Q.  All right.  Now, were minutes kept of
2  the Medicare Working Group meetings?
3      A.  To the best of my knowledge, minutes
4  were issued for every meeting.
5      Q.  Did you take down, write down the
6  minutes or take them down yourself?
7         MS. TABACCHI:  Object to the form.
8  BY MR. SISNEROS:
9      Q.  I'll just ask it this way.  Strike the
10 question.
11         Who was responsible for the minutes of
12 the Medicare Working Group meetings?
13     A.  Generally, it would have been Rich
14 Rieger.
15         (Exhibit Miller 1163 was marked
16 for ID)
17 BY MR. SISNEROS:
18     Q.  Okay, Mr. Miller, I'm handing you a
19 packet of documents which have been marked and
20 identified as Exhibit Miller 1163 to your
21 deposition, and I'd like for you to take a moment
22 to review those documents.

</td></tr>
</table>

18 (Pages 66 to 69)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 70

1     A.  (Witness reviewing document.)
2     Q.  Mr. Miller, have you had an opportunity
3  to review the 11 -- Exhibit Miller 1163?
4     A.  Yes, sir.
5     Q.  All right, just a housecleaning matter,
6  I need for you to confirm that Exhibit Miller
7  1163 consists of five pages.  Is that correct?
8     A.  Yes, sir.
9     Q.  And the documents, each page is Bates
10  stamped.  And for the record, there are two Bates
11  stamps, one starting ABT and the other one TX
12  ABT.
13        Starting with the ABT Bates stamp, the
14  Exhibit Miller 1163 is ABT 52840, 41, 42, 52898
15  and 52899; is that correct?
16     A.  That is correct.
17     Q.  All right.  Now, starting at -- with
18  the first page of that exhibit, ABT 52840, this
19  is an e-mail from Richard Rieger to -- and it's
20  addressed to the distribution list, Medicare
21  Working Group minute meetings of March 6th, 1997;
22  is that correct?

Page 71

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Correct.
3  BY MR. SISNEROS:
4     Q.  Previously, we had an exhibit where it
5  was Exhibit Miller 1162, which should be in front
6  of you, and if you'd look at the second page of
7  Exhibit Miller 1162, at the top, it's "Abbott's
8  Medicare Working Group distribution list."
9        Do you see that?
10     A.  Yes, sir.
11     Q.  And your name is on that distribution
12  list; is that correct?
13     A.  That is correct.
14     Q.  Do you -- is it your -- do you expect
15  that you received this memo from Mr. Rieger dated
16  March the 7th, 1997 with the minutes of the March
17  6th, 1997 meeting?
18     A.  Yes.
19     Q.  Was -- was Mr. Rieger someone who you
20  supervised?
21     A.  Yes.
22     Q.  And he -- he is identified as one of

Page 72

1  the participants in the Medicare Working Group;
2  is that correct?
3     A.  That is correct.
4     Q.  And in Mr. Rieger's memo of March 7th,
5  1997 to the Medicare Working Group, he states in
6  there that you drafted the minutes of the March
7  6th, 1997 meeting due to his absence; is that
8  correct?
9     A.  That's what it says.
10     Q.  And then if you look at the second page
11  of it, Exhibit Miller 1163, having Bates stamp
12  ABT 52841 is a draft memo from you dated March
13  7th, 1997 addressed to the distribution list
14  regarding the Medicare Working Group meeting
15  minutes of March 6th, 1997; is that correct?
16     A.  Correct.
17     Q.  Is this the memo that -- that -- are
18  these the minutes that you prepared in memo form
19  for the March 7th, 1997 Medicare Working Group
20  meeting?
21     A.  No.
22     Q.  No?

Page 73

1     A.  It's March 6th.
2     Q.  I'm sorry.  You are correct.  So -- but
3  these are the ones that you produced?
4     A.  Yes.
5     Q.  Okay.  You've highlighted three points.
6  You've got three bullet points, sir, highlighting
7  at least some of the discussion in the meeting,
8  correct?
9     A.  Correct.
10     Q.  And one of the -- one of the bullets
11  entitled -- the first bullet is entitled,
12  "Changing reimbursement price for drugs
13  administered in physician's office from AWP."
14        Do you see that?
15     A.  Yes, sir.
16     Q.  And when you -- when you reference in
17  there -- when you wrote in there "a change in
18  reimbursement price," you meant -- you meant any
19  proposals before Congress or State Houses that
20  would change the reimbursement method for drugs
21  administered in a physician's office; is that
22  correct?

                                    19  (Pages 70 to 73)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 74

1       MS. TABACCHI:  Object to the form.
2   BY MR. SISNEROS:
3       Q.  Well, let me ask you this.  When you
4   wrote down "changing reimbursement price for
5   drugs administered in physician's office from
6   AWP," what did you mean?
7       A.  It was a discussion of a change in the
8   methodology for reimbursement of drugs
9   administered in the physician office.
10      Q.  Who was proposing the change?
11      A.  Which government agency, I do not
12  remember.
13      Q.  But you do remember that it was a
14  proposal from the government?
15      A.  Whether it be states or the federal, I
16  do not know.
17      Q.  But -- that's okay.
18      A.  Okay.
19      Q.  But you do recall that there was a
20  proposal to change the reimbursement method by
21  either the state or the federal government or
22  both?

---

Page 75

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  States or federal
3   government, yes.
4   BY MR. SISNEROS:
5       Q.  Okay.  Do you recall who at the meeting
6   discussed this issue or brought this issue up or
7   identified this issue?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  No, sir.  No.
10  BY MR. SISNEROS:
11      Q.  Okay.  And under that bullet point of
12  "changing reimbursement," someone identified that
13  Abbott had about almost -- well, 900 million plus
14  of sales which would have been affected by this
15  proposal; is that right?
16      A.  Abbott/TAP.
17      Q.  I'm sorry, Abbott/TAP, yes, correct.
18      A.  Yes, sir.
19      Q.  So there was some discussion at least
20  about the financial impact in changing of the
21  reimbursement method for drugs administered in a
22  physician's office, is that --

---

Page 76

1       MS. TABACCHI: Objection.
2   BY MR. SISNEROS:
3       Q.  Is that correct?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  Rephrase, please.
6   BY MR. SISNEROS:
7       Q.  Okay.  There was some discussion
8   regarding loss to Abbott if this method off
9   reimbursement was made; is that right?
10      A.  There was --
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  There was a
13  quantification of the sales that could be
14  impacted.  There's no quantification of the
15  financial impact.
16  BY MR. SISNEROS:
17      Q.  Okay.  And do you have any recollection
18  now of what that discussion was about the impact
19  on -- on these total number of sales?
20      A.  No, sir.
21      Q.  All right.  The second paragraph under
22  that first bullet -- or strike that.

---

Page 77

1       Let's go back to the -- to that -- to
2   the first paragraph under the first bullet.  In
3   it, it reads, "Abbott/TAP has approximately 900
4   million plus of sales which would be affected by
5   this proposal. The two largest products are
6   Lupron and Calcijex."
7       Is that correct?  Did I read that
8   correctly?
9       A.  That is correct.
10      Q.  Okay.  Then the -- the second paragraph
11  under the first bullet point reads, "The
12  implementation of a rebate system similar to
13  Medicaid was discussed -- discussed as a
14  potential alternative to be put forward.  TAP
15  believes that a rebate system would have a larger
16  negative impact on sales than changing to
17  acquisition cost."
18      Did I read that paragraph correctly?
19      A.  That's what it says.
20      Q.  Okay.  With respect to that second
21  paragraph under that first bullet point, does
22  this refresh your recollection that the committee

20  (Pages 74 to 77)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                              Chicago, IL

Page 78

1  discussed a rebate system as a potential
2  alternative to be put forward?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  That was TAP's view, not
5  the committee's view.
6  BY MR. SISNEROS:
7     Q.   Okay, do you recall why that was TAP's
8  view?
9     A.   No, sir.  I mean, obviously, it says
10 "would have a larger negative impact."  That's
11 what I wrote.
12    Q.   So would it be fair to say from your
13 review of your minutes here that there was some
14 discussion about a rebate system?
15    A.   There was a mention of a rebate system.
16 I would not call it a discussion.
17    Q.   Okay.  Now, let's look at the second
18 sentence of the second paragraph under the first
19 bullet point.  And it reads, "TAP believes that a
20 rebate system would have a larger negative impact
21 on sales than changing to acquisition cost."
22        Did I read that correctly?

Page 79

1     A.   Yes, sir.
2     Q.   And would it be fair to -- fair to say
3  that, because you wrote that down, that there was
4  at least a mention or a discussion of
5  reimbursement based on acquisition cost?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  There was a mention of
8  acquisition cost.
9        MR. SISNEROS:  All right, we're taking
10 a break now to switch tapes.
11        THE VIDEOGRAPHER:  We are off the
12 record at 10:42 a.m. with the end of Tape No. 1.
13        (Recess taken.)
14        THE VIDEOGRAPHER:  We are back on the
15 record at 10:52 a.m. with the start of Tape No.
16 2.
17 BY MR. SISNEROS:
18    Q.   All right, Mr. Miller, going back to 11
19 -- Exhibit Miller 1163, on the second page Bates
20 numbered ABT 52841, and again, this is your
21 minutes of the March 6th, 1997 Medicare Working
22 Group meeting -- you with me so far?

Page 80

1     A.   Yes, sir.
2     Q.   Okay, again, directing your attention
3  to the first bullet point in your minutes,
4  "Changing Reimbursement Price," I'd like to go to
5  the last paragraph under that bullet, and I'm
6  going to read it for the record.
7        "The group consensus was that
8  acquisition -- strike that.  Let me reread it.
9        "The group consensus was that
10 (acquisition cost plus) would be the least
11 unfavorable alternative to current Abbott/TAP
12 business."
13        Did I read that correctly?
14    A.   That's as stated.
15    Q.   All right, and your words "group
16 consensus" suggests to you that there was some
17 discussion of acquisition cost plus?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  I do not know.
20 BY MR. SISNEROS:
21    Q.   I'm sorry?
22    A.   I do not know.

Page 81

1     Q.   Based on your years of experience at
2  Abbott, would you have written, "The group
3  consensus was that acquisition cost plus was at
4  least unfavorable" if there had not been
5  discussion?
6     A.   Possib --
7        MS. TABACCHI:  Objection.
8        THE WITNESS:  Possibly.  There are two
9  groups -- two divisions here, groups, divisions,
10 operations.  So I may have used "group" to mean
11 two.
12 BY MR. SISNEROS:
13    Q.   I don't follow you.  Could you --
14    A.   Sure.
15    Q.   Could you explain it?
16    A.   Sure.  Lupron is sold by TAP.  Calcijex
17 was sold by Household Products Division.
18    Q.   Okay, so when you say, "The group
19 consensus," are you saying that it's possible
20 that you meant TAP only or -- is that what you're
21 saying?
22    A.   No, I'm saying it may have meant TAP

21 (Pages 78 to 81)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                          Chicago, IL

Page 82

1  and HPD agreed.
2      Q.   And as to their divisions, acquisition
3  cost plus was the least unfavorable?
4      A.   Yes.
5          MS. TABACCHI:  Object to the form.
6  BY MR. SISNEROS:
7      Q.   Okay, so -- so -- just so I'm clear
8  that what your thinking is, is "the group"
9  references the HPD and TAP business's divisions?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  Yes.
12 BY MR. SISNEROS:
13     Q.   So going back to Exhibit Miller 1162,
14 which is the list of participants in the Medicare
15 Working Group -- do you have that before you?
16     A.   Yes, sir.
17     Q.   The -- the members of HPD would have
18 been Michael Heggie, Dave Olson, and Ginny
19 Tobiason; is that right?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Those are the members of
22 the Working Group.

Page 83

1  BY MR. SISNEROS:
2      Q.   From HPD?
3      A.   According to this document.
4      Q.   Do you have any disagreement with this
5  document, the way they are identified, in what
6  division they're identified?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  Some of these people I do
9  not recall ever meeting.
10 BY MR. SISNEROS:
11     Q.   Do you remember meeting Michael Heggie?
12     A.   No.
13     Q.   Dave Olson?
14     A.   I -- yes.
15     Q.   Ginny Tobiason?
16     A.   Yes.
17     Q.   All right, then referring again to
18 Exhibit Miller 1162, the representative on the
19 Medicare Working Group would have been John
20 Campbell --
21         MS. TABACCHI:  Object to the form.
22 BY MR. SISNEROS:

Page 84

1      Q.   -- is that right, from TAP?  John
2  Campbell from TAP; is that correct?
3      A.   Yes.
4      Q.   Do you remember meeting him?
5      A.   I'm not sure.
6      Q.   Okay, and so getting back to Exhibit
7  Miller 1163, on your minutes of March 6th, '97,
8  in your -- where you are talking about the group
9  consensus regarding acquisition cost plus, the
10 individuals that we just discussed from TAP and
11 from HPD would have been the individuals that you
12 identified as "the group"?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I cannot say that. By MR.
15 SISNEROS:
16     Q.   Well, they would have been from that
17 pool of four people; is that right?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I cannot say that -- I
20 cannot say they attended this meeting.
21 BY MR. SISNEROS:
22     Q.   Okay.  Well --

Page 85

1      A.   I do not know.
2      Q.   You do not know?
3      A.   No.
4      Q.   Would there be any basis for you to be
5  saying "group consensus" --
6      A.   I know that there were representatives
7  from the two divisions.  Who they were, I do not
8  know.
9      Q.   Okay, fair enough.  So when -- so when
10 you're -- in this paragraph when you use the word
11 "group consensus," you are talking about the
12 representatives from TAP and the Hospital
13 Products Division that would have attended the
14 Medicap -- the Medicare Working Group's meeting
15 of March 6th, 1997, correct?
16     A.   That is an accurate representation.
17     Q.   Okay.  All right, back to that -- to
18 that -- to your minutes of the March 6th, 1997
19 Medicare Working Group meeting.  I want to go to
20 your third bullet entitled "AMA proposal."  Do
21 you see that?
22     A.   Which one?

22 (Pages 82 to 85)

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 86

1    Q.  On Exhibit --
2    A.  Give me --
3    Q.  Exhibit 63.
4    A.  What's your lead-in word?
5    Q.  Oh.  So do you see the bullet point?
6    A.  Yes, sir.
7    Q.  Okay.
8    A.  Okay.
9    Q.  You know what?  I forgot to ask you one
10   question.  Let me go back to -- to the first
11   bullet point.
12        On that last paragraph, you put in
13   parenthesis the term "acquisition cost plus."  Why
14   did you do that?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  I do not remember.
17   BY MR. SISNEROS:
18   Q.  Was there a -- well, what does that
19   mean?
20        MS. TABACCHI:  Object to the form.
21   BY MR. SISNEROS:
22   Q.  What does "acquisition cost plus" mean

Page 87

1    to you, sir?
2    A.  As used here, I do not know.  I don't
3    recall.
4    Q.  All right.  All right, let's go back to
5    your third bullet point entitled, "The AMA
6    proposal."  Do you see that?  Do you see that
7    bullet?
8    A.  Yes, sir.
9    Q.  Okay.  Underneath it states the
10   following: "AMA has three priorities:
11   Implementation of prescription plan for fee-for-
12   service Medicare, physician as patient advocate,
13   continuing funding of U.S. citizens' graduate
14   medical education."
15        Do you see that?
16   A.  Yes, sir.
17   Q.  All right.  With regard to -- well, did
18   I read that accurately?
19   A.  That's as stated.
20   Q.  As stated, okay.  Now, with regard to
21   "implementation of prescription plan for fee-for-
22   service Medicare," do you recall what you meant

Page 88

1    by that?
2    A.  No, sir.
3    Q.  Why -- why was the AMA proposal being
4    discussed by the Medicare Working Group?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  I recall there was
7    discussion, as the memo states, on getting a
8    position for Abbott.
9    BY MR. SISNEROS:
10   Q.  Position regarding what?
11   A.  The AMA proposal.
12   Q.  Why did you list that the AMA had as a
13   priority that the physician act as a patient
14   advocate?
15   A.  That's what the representative from PPD
16   put forward.
17   Q.  Why -- why was the -- why was that of a
18   concern to the -- to the representative from PPD?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  I don't know if it was a
21   concern.
22   BY MR. SISNEROS:

Page 89

1    Q.  Okay.  All right, turn to the next page
2    of that -- of your -- of your minutes of the
3    March 6th, '97 Medicare Working Group meeting.
4    A.  (Witness so doing.)
5    Q.  The second paragraph under your third
6    bullet entitled "AMA proposal" reads as follows:
7    "Recommendation is that Abbott continue to attend
8    AMA meetings in a low profile status and avoid
9    putting forward any Abbott's position."
10        Did I read that correctly?
11   A.  Correct.  That's what it states.
12   Q.  Why was -- why was Abbott trying to
13   maintain a low profile with the AMA?
14        MS. TABACCHI:  Object to the form.
15   BY MR. SISNEROS:
16   Q.  Or, rather, why was Abbott trying to
17   maintain a low profile with regards to the AMA's
18   proposal for Medicare reform?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  I'd be speculating.
21   BY MR. SISNEROS:
22   Q.  Well, you attended these meetings?

23 (Pages 86 to 89)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

| Page 90 | Page 92 |
|---|---|

**Page 90**

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  I did not attend the AMA
3  meetings.
4  BY MR. SISNEROS:
5      Q.  Were you ever informed of what went on
6  -- well, Abbott had representatives at the AMA
7  meeting, correct?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  Yes.
10  BY MR. SISNEROS:
11      Q.  They were briefing you as to what was
12  going on at those meetings, correct?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  Correct.
15  BY MR. SISNEROS:
16      Q.  So you were aware of the discussions on
17  the AMA Medicare proposals?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  Abbott typically takes a
20  low profile on any controversial issue.
21  BY MR. SISNEROS:
22      Q.  Why was the AMA proposal for Medicare

**Page 91**

1  reform controversial?
2      A.  There were people that supported both
3  sides.
4      Q.  When you say, "There were people who
5  supported both sides," are you talking about
6  people in Abbott's -- Abbott -- Abbott folks?
7      A.  Our customers.
8      Q.  Okay, give me some examples.
9      A.  I'm sure that all the doctors a hundred
10  percent agreed with the AMA proposal.
11      Q.  And who would not?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  I'm not qualified to
14  answer that.
15  BY MR. SISNEROS:
16      Q.  Well, what was your understanding?
17  Because you were being briefed on these -- on
18  those proposals.
19      A.  My understanding was there was
20  controversy with the proposal.
21      Q.  And with regard to Abbott's interests,
22  where was that controversy?

**Page 92**

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  Our position was to be
3  neutral in relationship to our customers whenever
4  possible.
5  BY MR. SISNEROS:
6      Q.  And when you say "to our customers,"
7  what customers are you identifying?  Who do you
8  mean?
9      MS. TABACCHI:  Object to the form.
10      THE WITNESS:  In this particular case,
11  I'm referring to physicians.  They're the
12  prescribers of our products.
13  BY MR. SISNEROS:
14      Q.  I believe you just testified that the
15  physicians were in favor of the AMA proposal?
16      A.  I did not.
17      MS. TABACCHI:  Object to the form.
18  BY MR. SISNEROS:
19      Q.  I'm sorry, what is that is that you
20  said?
21      A.  I said there were physicians in favor
22  and physicians against.

**Page 93**

1      Q.  I see.  And who were physicians who
2  were in favor of the AMA proposal?
3      MS. TABACCHI:  Object to the form.
4      THE WITNESS:  I am not qualified to
5  answer to that question.
6  BY MR. SISNEROS:
7      Q.  Okay.  And further on in that second
8  paragraph under the third bullet, it says that --
9  that "the recommendation was to avoid putting
10  forward -- forward any of Abbott's positions."
11  Why was that?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  Abbott's historical
14  position is that we take a neutral position
15  whenever possible.
16  BY MR. SISNEROS:
17      Q.  At this very time, the AMA was seeking
18  Abbott's position?
19      A.  I do not know if Abbott ever gave a
20  position to the AMA.
21      Q.  Okay, but that wasn't my question.  My
22  question was is that the AMA was actually seeking

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 94

1  Abbott's position; is that correct?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  I do not know that.
4  BY MR. SISNEROS:
5     Q.  You do not know that?
6     A.  No.  Only the divisional
7  representatives would know that.
8        MR. SISNEROS:  Okay.  All right.
9        (Exhibit Miller 1164 was marked
10  for ID)
11  BY MR. SISNEROS:
12     Q.  All right, I've -- I'm handing you what
13  I've marked and identified as Exhibit Miller
14  1164, Exhibit Miller 1164 to your deposition.
15        Would you take a moment and review it?
16  I believe it's about 13 pages.
17        MR. HOFFMAN:  Thank you.
18        MS. TABACCHI:  Thank you.
19        (Witness reviewing document.)
20        THE WITNESS:  Okay.
21  BY MR. SISNEROS:
22     Q.  Ready to go, Mr. Miller?

Page 95

1     A.  Yes, sir.
2     Q.  Okay, just for housecleaning purposes,
3  I am going to identify Exhibit Miller 1163 by
4  Bates stamp numbers, and I'd like for you to
5  verify that I've identified it correctly by the
6  Bates stamp numbers.
7     A.  This is Exhibit Miller 1164, sir.
8     Q.  Oh, it is?  Well, thank you for that.
9  That's great housecleaning then.
10        Okay, with respect to 11 -- Exhibit
11  Miller 1164, I'll identify the pages by the ABT
12  number, and it is ABT 52705, 52706, 52707, 52710,
13  52711, 52712, 52808, 52809, 52810, 52811, 52836,
14  52837, 52838.
15        Do you have all those pages with you?
16     A.  Yes, sir.
17     Q.  You -- and that's the total pages
18  you've got --
19     A.  Yes, sir.
20     Q.  -- for Exhibit Miller 1164?
21        All right, I'd like to ask you some
22  questions starting at ABT 52808, which is about -

Page 96

1  - about the seventh page from the end.  Tell me
2  when you're there, please.
3     A.  I'm there.
4     Q.  Okay.  And that is a memo dated January
5  15th, 1997 from Rich -- Richard Rieger to the
6  Medicare Working Group; is that correct?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  Correct.
9  BY MR. SISNEROS:
10     Q.  And it's regarding the upcoming meeting
11  on January 21st, 1997, Medicare Working Group
12  meeting with a proposed agenda; is that right?
13     A.  Correct.
14     Q.  And this email -- excuse me, this memo
15  is directed to you?  You're carbon copied on
16  that; is that right?
17     A.  I am cc'd.
18     Q.  And in the ordinary course of business
19  in your years at Abbott, if Mr. Rieger had cc'd
20  you a memo, you expect that you would have
21  received it?
22     A.  In the ordinary course, yes.

Page 97

1     Q.  And was it your practice that when you
2  received memos such as this in the ordinary
3  course of business, that you would have reviewed
4  the memo or read it?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  52808 and 52809 consists
7  of what the email system could have transmitted.
8  BY MR. SISNEROS:
9     Q.  Is that an e-mail?
10     A.  Well, I call it -- it's -- it's
11  internal email, yes.
12     Q.  This interoffice correspondence was an
13  internal email?  This was received in email form
14  -- format, you're saying?
15     A.  I wouldn't bet my life on it, but --
16     Q.  Okay.
17     A.  -- I think so.
18     Q.  Well, my question was if you had
19  received --
20     A.  Either hard copy or email, I would have
21  typically read this document.
22     Q.  Okay.  And Mr. Rieger is in this -- in

25  (Pages 94 to 97)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 98

1  this memo identifying points to be discussed at
2  the next -- or, rather, strike that.
3         He is identifying matters that members
4  want to discuss at the next Medicare Working
5  Group meeting, correct?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  That's as stated.
8  BY MR. SISNEROS:
9     Q.  And one of the bullet points that he
10  brings up is they -- someone wants "to discuss
11  average wholesale price versus actual cost
12  issue."
13         Do you see that?
14     A.  That is what's stated.
15     Q.  Do you know what is meant by "average
16  wholesale price"?
17     A.  Do I know what's -- no.
18     Q.  You do not know?  You never heard that
19  term before?
20     A.  I've read the term.
21         MS. TABACCHI:  Object to the form.
22  BY MR. SISNEROS:

Page 99

1     Q.  You've read the term?
2     A.  (Witness nodding.)
3     Q.  What do you mean you've read the term?
4     A.  It's in newspapers, it's in magazines.
5  It's a common term.
6     Q.  You have no idea how it's defined?
7     A.  I've never been responsible for its
8  calculation or setting.
9     Q.  Well, no, I understand that.  My
10  question is do you know what it is?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  No.
13         In 52706, there is a definition.
14         MR. SISNEROS:  We'll get to that in a
15  minute.
16         THE WITNESS:  Okay, fine.
17         (Exhibit Miller 1165 was marked
18  for ID)
19  BY MR. SISNEROS:
20     Q.  All right, I am handing to you for your
21  review what I've -- what's been marked and
22  identified as Exhibit Miller 1165 to your

Page 100

1  deposition.
2         Could you please review that?
3     A.  (Witness reviewing document.)
4     Q.  Have you had a chance to review it?
5     A.  Yes.
6     Q.  Mr. Miller, that is an undated copy of
7  handwritten notes on what appears to be a pad
8  "From the desk of James E.  Miller."  Do you see
9  that?
10     A.  Correct.
11     Q.  Is that -- is that you?
12     A.  That's me.
13     Q.  And is that your handwriting?
14     A.  That is my handwriting.
15     Q.  Could you please -- who is it addressed
16  to?
17     A.  Rich Rieger.
18     Q.  And -- and could you please read into
19  the record what you -- what is -- you've written
20  down in this handwritten message?
21     A.  "Medicare allowable equals AWP.
22  Medicare pays physician 80% of Medicare

Page 101

1  allowable.  AWP's equals acquisition cost plus 20
2  to 25%."
3     Q.  And going to that first line where you
4  wrote, "Medicare allowable equals AWP," do you
5  mean by that that that is the amount that
6  Medicare pays or reimburses a provider?
7         MS. TABACCHI:  Object to the form.
8         THE WITNESS:  I have no idea what this
9  buck slip was in relationship to.
10  BY MR. SISNEROS:
11     Q.  Well, okay, but that wasn't my question
12  if you wrote down was in -- what you wrote
13  down was in relationship to.  But my question was
14  "Medicare allowable," what does that mean to you?
15     A.  It says, "Medicare allowable equals
16  AWP."
17     Q.  And this note, it was -- it was
18  directed at Mr. Rieger, who you supervised; is
19  that correct?
20     A.  That is correct.
21     Q.  Is it fair to say that this was
22  information you were providing him?

26 (Pages 98 to 101)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                July 30, 2007
Chicago, IL

Page 102

1    A.  No.
2    Q.  No?
3    A.  No.
4    Q.  Why not?
5    A.  I would say it is information I wanted
6  verified.
7    Q.  Why do you say that?
8    A.  Why do you say I was providing him
9  information?
10    Q.  Because it's directed to him in your
11  note, sir.
12    A.  Right.  But I look at it and say
13  somebody gave me this.  I gave it to Rich to be a
14  verified.
15    Q.  Okay.  So at some point -- and this is
16  undated, correct?
17    A.  It -- there is no date.
18    Q.  At some point, you had information that
19  you believe was provided to you that stated that
20  "AWP equalled acquisition cost plus 20 to 25%
21  markup," right?
22    A.  Yes.

Page 103

1    Q.  All right, let's go back now to Exhibit
2  Miller 1164, to Mr. Rieger's January 15th, 1997
3  memo to the Medicare Working Group starting at
4  ABT 52808.  Are you there, sir?
5    A.  Yes, sir.
6    Q.  Okay.  Back to the first bullet point.
7  Mr. Rieger has identified some areas that -- for
8  the agenda -- some topics for the agenda for the
9  January 21, 1997 Working Group meeting; is that
10  correct?
11    A.  Correct.
12    Q.  And one of those is "a discussion of
13  the average wholesale price versus the actual
14  cost issue." Do you see that?
15    A.  Yes, sir.
16    Q.  Does that have any meaning to you, that
17  bullet point?
18    A.  No.
19    Q.  Okay.  And underneath that bullet
20  point, there has been -- he has identified
21  basically four products from Abbott in which this
22  item -- this item is of concern -- well, I don't

Page 104

1  -- strike that.
2        Underneath the first bullet point, the
3  products that he's identified, Abbott products
4  he's identified for this discussion are "Lupron,
5  Medical Nutritionals, Calcijex, and Other Abbott
6  Products"; is that correct?
7    A.  Correct.
8    Q.  And Lupron, I believe from your earlier
9  testimony, would be TAP?
10    A.  Correct.
11    Q.  The Medical Nutritionals, what division
12  would that be, if you know?
13    A.  Ross Laboratories.
14    Q.  Calcijex?
15    A.  Hospital Products.
16    Q.  And do you recall what other Abbott
17  products might have been discussed at the January
18  21, '97 meeting?
19    A.  I do not, sir.
20    Q.  Okay.  And then the second bullet point
21  is "a review of proposed legislation regardings
22  to -- regarding diabetes outpatient self

Page 105

1  management service."
2        Do you see that?
3    A.  Yes, sir.
4    Q.  All right, so would it be fair to say
5  that one of the points of discussion that would
6  be brought up before the Medicare Working Group
7  was pending legislation?
8        MS. TABACCHI:  Objection to form.
9        (Witness reviewing document.)
10        THE WITNESS:  Yes.
11  BY MR. SISNEROS:
12    Q.  Okay.  And, finally, with regard to Mr.
13  Rieger's January 15th, 1997 memo to the Medicare
14  Working Group, towards the end of that memo, he
15  is identifying two attachments for your reading.
16  One is a document relating to AWP.  Another one
17  is President Clinton's expected '98 budget
18  proposal.
19        Do you see that?
20    A.  Something's not in order. Blah-blah-
21  blah-blah.  Here's Clinton's proposal.  Oh, wait.
22    Q.  Actually, I'm just referring to his

27  (Pages 102 to 105)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 106

1  memo.
2      A.  Oh, okay fine.
3      Q.  Let's go to that paragraph --
4      A.  Okay.
5      Q.  -- the last paragraph of ABT 52808.
6          In there, Mr. Rieger is telling the
7  Medicare Working Group that he is attaching two
8  documents, one relating to AWP, and an article
9  relating to President Clinton's '98 budget
10 proposal; is that right?
11     A.  That's what it says.
12     Q.  Okay, and if Mr. -- and earlier, I'd
13 asked you if -- in the normal course of business
14 if Mr. Rieger sent out a memo such as this to the
15 Working Group, including you, you know, would you
16 normally have received it, and I believe you
17 said, "Yes."  Is that right?
18     A.  That is correct.
19     Q.  And if he had attached -- if he had
20 attachments to his memo, would you normally have
21 reviewed them?
22     A.  It depends on how voluminous they were.

Page 107

1      Q.  I know what you mean.  But do you
2  believe that -- if you turn over to Page 52810 --
3      A.  52810.
4      Q.  -- which sequentially follows the end
5  of his memo, 52809.  That's the end of Mr.
6  Rieger's memo, and then the attachment is 52810.
7  Do you see that?
8      A.  Yes.
9      Q.  And they're talking about "President
10 Clinton's expected proposed Medicare outpatient
11 drug coverage."  Do you see that?
12     A.  Yes.
13     Q.  Okay, and if you look at -- just look
14 to the next page, that particular article ends at
15 52811. Do you see that?
16     A.  Yes.
17     Q.  All right, with -- with respect to the
18 two-page article, it would -- the attached
19 article would have been only two pages.  Was it
20 your normal practice to review small articles
21 such as that?
22         MS. TABACCHI: Object to the form.

Page 108

1          THE WITNESS: Yes.
2  BY MR. SISNEROS:
3      Q.  And if you could review at the top of
4  52810, one of the articles attached by Mr. Rieger
5  to his memo, the -- basically what would be the
6  second paragraph starting with, "Health News
7  Daily via Individual, Inc."  Do you see that, the
8  beginning of that paragraph?
9      A.  Yes, sir.
10     Q.  And it's an introduction paragraph.  Do
11 you see where they are basically summarizing
12 that, "The new Medicare outpatient drug coverage
13 be based on actual cost rather than AWP."  Do you
14 see -- do you see what that mem -- see that?
15     A.  Yes, sir.
16     Q.  Okay, earlier in your testimony, --
17 well, strike that.
18         Now, if you go back to ABT 5808, the
19 beginning of Mr. Rieger's January 15th, 1997
20 memo, and look at the first bullet point there,
21 "Discussed average wholesale price versus actual
22 cost issue," do you see that?

Page 109

1      A.  Yes, sir.
2      Q.  Do you believe that "actual cost" point
3  raised in that bullet may reference President
4  Clinton's proposal that reimbursement of
5  outpatient drugs be based on actual cost rather
6  than AWP?
7          MS. TABACCHI: Object to the form.
8          THE WITNESS: I do not know.
9  BY MR. SISNEROS:
10     Q.  Does reviewing the article in any way
11 refresh your recollection about the actual cost
12 issue?
13     A.  I would have read this and said,
14 "Actual cost would never be approved."
15     Q.  Why would you say that?
16     A.  I spent nine years in manufacturing
17 accounting.  You can get 40 cost accountants on
18 the head of a pin, and they will never agree on
19 actual cost.
20     Q.  Because each one of them would have a
21 different definition for --
22     A.  Yes, sir.

28 (Pages 106 to 109)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

---

Page 110

1     Q.  -- actual cost?
2     A.  Yes, sir.
3     Q.  Well, that's interesting because in
4  that Exhibit number -- that last one I had,
5  Exhibit Miller 1165, can you turn to that?
6     A.  Exhibit Miller 1165?  Which is Exhibit
7  Miller 1165?
8     Q.  It's your handwritten note to Rich
9  Rieger on AWP.
10    A.  Um-hum.
11    Q.  Do you see that last line, "AWP equal
12  acquisition cost plus a markup of 20 to 25%"?
13    A.  Right.
14    Q.  Although we're uncertain where that
15  information came from, at least that would be one
16  of the viewpoints an accountant might have about
17  the relationship of acquisition cost to AWP?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  No, no, no.  You're
20  changing the words.  Actual cost and acquisition
21  cost are not synonymous.
22  BY MR. SISNEROS:

---

Page 111

1     Q.  What's the difference?
2     A.  Acquisition cost could be defined as
3  what somebody paid for a service or product.
4  Actual cost is something that is only calculated,
5  in my understanding, for somebody like the IRS in
6  a tax suit.
7     Q.  Okay, well, let's talk about
8  acquisition cost in your handwritten notes on
9  Exhibit Miller 1165.
10        With regard to your last line there,
11  "AWP equals acquisition cost plus a markup of 20
12  to 25%," would "acquisition cost" in that context
13  reference what one of your customers bought the
14  product for?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  I do not know.  Someone
17  gave me that information.  Who at Abbott, I do
18  not recall.
19  BY MR. SISNEROS:
20    Q.  Well, let me ask you -- let me ask you
21  this, and this is backing off a little bit.
22  Earlier, you gave testimony about generally what

---

Page 112

1  the purpose of the Medicare Working Group was.
2     A.  (Witness nodding.)
3     Q.  Remember that?
4     A.  Yes.
5     Q.  And do you -- and do you recall that
6  you testified, you said you folks -- that you
7  folks were looking at how third-party payers were
8  being paid -- were being reimbursed?
9        MS. TABACCHI:  Object to the --
10  BY MR. SISNEROS:
11    Q.  Is that accurate?
12        MS. TABACCHI:  Object to the form.
13  BY MR. SISNEROS:
14    Q.  Or at least -- strike it.
15        Was one of the things your group was
16  looking at was how third-party payers were being
17  reimbursed?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  We were updated, as I
20  stated earlier, on proposed pending legislation
21  in the federal government or the states.
22  BY MR. SISNEROS:

---

Page 113

1     Q.  Concerning reimbursement?
2     A.  Concerning financial coverage of
3  products.
4     Q.  Okay, and I think you testified earlier
5  that when you say "financial coverage of
6  products," it would be another word for the word
7  "reimbursement"?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  But not specific product
10  pricing.
11  BY MR. SISNEROS:
12    Q.  You were interested in the formula? -
13        MS. TABACCHI:  Object to the form.
14  BY MR. SISNEROS:
15    Q.  (Continuing)-- for reimbursement?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I don't know if I can
18  answer that.
19  BY MR. SISNEROS:
20    Q.  Well, I don't think I understand what
21  it is that you were doing.
22        How -- I mean I don't understand how

---

29  (Pages 110 to 113)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                         July 30, 2007
                        Chicago, IL

| Page 114 |
| --- |

1  you could -- why were you doing -- looking at the
2  coverage of product to third-party payers?
3      MS. TABACCHI:  Object to the form.
4      THE WITNESS:  Recognize this was a one-
5  hour meeting every six weeks.  It wasn't an in-
6  depth study of anything.
7  BY MR. SISNEROS:
8      Q.  I understand that.
9      A.  Okay.
10     Q.  But this was one of your first
11 assignments when you had been promoted -- you had
12 received a promotion -- I think you testified
13 earlier this was 30 days into your new promotion
14 this was laid on your lap; is that right?
15     A.  But this didn't -- was not, as I stated
16 earlier, this was not my primary job duties.
17     Q.  I understand.  But your boss gave you
18 this job, your immediate supervisor; is that
19 right?
20     A.  I understand.
21     Q.  Okay.  And so what I'm trying to
22 identify here is when you say you were looking at

| Page 115 |
| --- |

1  the coverage of product for third-party payers,
2  what you mean by that.
3      A.  We're looking at proposed sweeping
4  changes to reimbursement levels or methodology
5  for products.
6      Q.  And to understand the impact of
7  proposed legislation on reimbursement
8  methodology, wouldn't you have to understand the
9  existing methodology of reimbursement?
10     A.  That responsibility rests with a
11 division. Divisions market and sell products, not
12 corporate.
13     Q.  Now, I understand that, but did you as
14 a member of this Working Group get some type of
15 basic knowledge on how reimbursement worked?
16     MS. TABACCHI:  Object to the form.
17     THE WITNESS:  I understand the broad
18 concepts of reimbursement.
19 BY MR. SISNEROS:
20     Q.  And would Exhibit Miller 1165 at least
21 demonstrate a concept someone fed to you?
22     A.  Yes.

| Page 116 |
| --- |

1      Q.  Okay.  All right, now back to Mr.
2  Rieger's memo dated January 15th, 1997 directed
3  to the Medicare Working Group starting at ABT
4  52808.
5          In the second sentence of the last
6  paragraph, he -- it states, "This is in addition
7  to the documents that I previously sent to you on
8  12/20/96 regarding AWP and competitive bidding."
9          Do you see that?
10     A.  Yes, sir.
11     Q.  So it suggests that the Medicare
12 Working Group was already receiving at least
13 background information of some sort in late 1996;
14 is that right?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  The memo states he mailed
17 something.  I don't know.
18 BY MR. SISNEROS:
19     Q.  Okay.  But that would have been in late
20 '96?
21     A.  12/26, right.
22     Q.  Okay, all right.  All right, now

| Page 117 |
| --- |

1  turning to -- your attention to the same exhibit,
2  Exhibit Miller 1164, at Page 52711.
3      A.  Okay.  Yes, sir.
4      Q.  And this is a -- this is a -- this is a
5  memo from Cynthia Sensibaugh in your Washington
6  office to Mr. Rieger dated January 17th, 1997
7  regarding the Medicare conference call; is that
8  right?
9      A.  Yes, sir.
10     Q.  And in her -- in her memo, she
11 references two articles that she's included, one
12 of which is an article regarding AWP.
13         If you look at the last sentence of her
14 memo, "Also encloses an article about awp," do
15 you see that?
16     A.  Yes, sir.
17     Q.  Okay, and then the document following
18 her memo is ABT 52712, while Miss Sensibaugh's
19 memo is ABT 52711.  So are you at 712?
20     A.  Either one.
21     Q.  Okay, at 712.  ABT 52712, do you see
22 that?

30 (Pages 114 to 117)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
Chicago, IL

Page 118

1    A.  Yes, sir.
2    Q.  And it's something called "the Pink
3  Sheet" where it -- entitled, "AWP overstates
4  actual pharmacy invoice cost for brand name drugs
5  by average of 18.3% nationwide, HHS IG
6  concludes;" and then, "Generic AWP overstates
7  costs by 42.5%."
8       Do you see that?
9    A.  Yes, sir.
10    Q.  Do you recall ever seeing this
11  document?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  No.
14  BY MR. SISNEROS:
15    Q.  Okay.  All right, turn to -- to Exhibit
16  Miller 1164, same exhibit, to document -- I mean
17  to page ABT 52710.
18    A.  52710.  Yes, sir.
19    Q.  All right, and you see that is a memo
20  from Richard Rieger dated January the 20th, 1997
21  and it's addressed to the Medicare Working Group
22  and cc'd to you.  Do you see that?

Page 119

1    A.  Yes, sir.
2    Q.  And then the body of his memo to
3  everyone is just basically a one-liner.  It says,
4  "F.Y.I. Attached is updated information I
5  received from Cindy Sensibaugh in preparation for
6  1/21/97 Medicare Working Group."
7       Do you see that?
8    A.  Yes, sir.
9    Q.  Okay.  And the Bates stamp on Rieger's
10  memo of January the 20th is ABT 52710.  The Bates
11  stamp for Sensibaugh's memo to Rieger is ABT
12  52711, correct?
13    A.  Correct, sir.
14    Q.  And then the article on AWP from the
15  Pink Sheet is ABT 52712; is that right?
16    A.  Yes, sir.
17    Q.  Okay.  Now, let's turn back to Mr.
18  Rieger's January 15th, 1997 memo.  And did you --
19       MR. HOFFMAN:  Where are we now?
20       MR. SISNEROS:  Oh, I'm sorry, ABT
21  52808.
22       MR. HOFFMAN:  Okay.

Page 120

1  BY MR. SISNEROS:
2    Q.  Did you have any input into "points to
3  be discussed" in the Medicare Working Group
4  meeting?  Did you suggest any points for the
5  agenda?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  I would have generally
8  seen the agendas before they were issued.
9  BY MR. SISNEROS:
10    Q.  Okay.  Did you have veto power over the
11  setting of an agenda?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  Yes.
14  BY MR. SISNEROS:
15    Q.  Under what circumstances would you veto
16  items on an agenda?
17    A.  We did not allow any specific pricing
18  discussions.
19    Q.  Why not?
20    A.  We had members from various divisions
21  in that room.  We didn't allow it.
22    Q.  Okay, you had members from different

Page 121

1  divisions, but why wouldn't you allow it?
2       Why is it -- why would have different -
3  - having members from different divisions
4  preclude a discussion of pricing?
5    A.  We didn't feel it was legally correct.
6    Q.  Did an attorney tell you that?
7       MS. TABACCHI:  Object to the form of
8  the question.
9       And I'm also going to instruct the
10  witness not to reveal the substance of any
11  communications with counsel.
12       THE WITNESS:  I refuse -- I'm not going
13  to answer.
14       MS. TABACCHI:  Okay.
15  BY MR. SISNEROS:
16    Q.  Were there any attorneys in the
17  Medicare Working Group?
18    A.  There are none on the distribution
19  list.
20    Q.  I understand, but that's not my
21  question. Was there an attorney in the Medicare
22  Working Group?

31 (Pages 118 to 121)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                            Chicago, IL

Page 122

1       A.  I do not recall.
2       Q.  Did the Medi -- did the Medicare
3   Working Group seek the advice of counsel on its
4   operations?
5       MS. TABACCHI:  Object to the form of
6   the question.
7       I'm going to caution the witness not to
8   reveal the substance of any communications --
9       THE WITNESS:  I'm not going to answer
10  that question.
11      MR. SISNEROS:  I'm not asking for
12  communication.  I'm just asking whether the
13  Medicare Working Group consulted with an attorney
14  regarding its work.
15      MS. TABACCHI:  And I'm just going to
16  caution the witness not to --
17      MR. SISNEROS:  That's a yes or no
18  question.
19      MS. TABACCHI:  I'm just going to
20  caution the witness not to reveal the substance
21  of any attorney-client communications.
22      If the witness has difficulty

Page 123

1   navigating this issue, I suggest he consult with
2   his counsel.
3       THE WITNESS:  Let's take a break.
4       MR. SISNEROS:  I'm sorry?
5       THE WITNESS:  Let's take a break.
6       MR. SISNEROS:  Well, it's in the middle
7   of a question.  It's a yes or no answer.
8       Could we have the yes or no answer?
9       MS. TABACCHI:  It's a difficult
10  question, Mr. Sisneros, that you're asking.  But
11  your question asks both for the -- it could call
12  for the substance of a communication.
13      MR. SISNEROS:  Okay.
14      MS. TABACCHI:  So it's not an easy
15  question to answer.
16      MR. SISNEROS:  Okay.  Well, let me ask
17  the question in a way that doesn't ask for
18  anything that would have been discussed.
19  BY MR. SISNEROS:
20      Q.  The question is did the Medicare
21  Working Group have an attorney it consulted with?
22      MS. TABACCHI:  Object to the form.

Page 124

1       Again, I'm going to caution the witness
2   not to reveal the substance of any communications
3   with counsel.
4       MR. SISNEROS:  And it's a yes or no
5   question.
6   BY MR. SISNEROS:
7       Q.  Answer the question, please.
8       MR. SOFFER:  If you can answer that
9   question with a "yes" or a "no," you may do so.
10      THE WITNESS:  I'm going to say I don't
11  know.
12  BY MR. SISNEROS:
13      Q.  You don't know?
14      A.  Right.  It's ten years ago.
15      Q.  All right.
16      Okay, let's turn over to the beginning
17  page of Exhibit Miller 1164 --
18      A.  Okay.
19      Q.  -- ABT 52705.  You there?
20      A.  Um-hum.
21      Q.  And that is a January 29th, 1997 memo
22  to the Medicare Working Group from Mr. Rieger; is

Page 125

1   that correct?
2       A.  Yes.
3       Q.  Okay, and previously we have identified
4   in one of the exhibits who the Medicare Working
5   Group was, and that would have included you,
6   correct?
7       A.  Yes, sir.
8       Q.  And so in the normal course of
9   business, do you expect that you would have
10  received this January 29th, 1997 memo from Mr.
11  Rieger?
12      A.  Yes, sir.
13      Q.  All right, and in this memo, Mr. Rieger
14  in that first paragraph -- well, let me read the
15  first paragraph.
16      "Since Medicare seems to be heating up,
17  our Working Group seems interested in continuing
18  to meet and others are becoming interested in
19  what we are doing.  Jim and I would like to find
20  a way to communicate outside of our Working
21  Group.  To that end, we are thinking about
22  documenting each of our Working Group meetings

32 (Pages 122 to 125)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                              Chicago, IL

---

Page 126

1   via minutes and using this as a communications
2   tool."
3        Did I read that correctly?
4        A.  As stated.
5        Q.  And the reference to "Jim and I" in
6   that paragraph, he's talking about you?
7        A.  Yes, sir.
8        Q.  And what he's referencing when he says
9   "Jim and I," he is talking -- he is saying that
10  the two of you are trying to find a way to
11  communicate outside of the Medicare Working
12  Group; is that right?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  Outside of the Medicare
15  Working Group meetings.
16  BY MR. SISNEROS:
17       Q.  Okay, when -- you wanted to communicate
18  to who?
19       A.  Not everybody was able to attend every
20  meeting.
21       Q.  Okay.
22       A.  So how did you keep the people informed

Page 127

1   who could not attend the meetings?
2        Q.  Well, the sentence says -- starting
3   where it says "Jim and I," it says, "Jim and I
4   would like to find a way to communicate outside
5   of our Working Group."
6        A.  He left out "meetings."
7        Q.  I'm sorry?
8        A.  He left out the word "meetings."  If
9   you look, the vehicle of communication that was
10  recommended was the minutes of the meetings.
11       Q.  So what you're -- what you and Jim
12  talked about was using the minutes as a
13  communications tool with members within the
14  Medicare Working Group?  Is that what you're
15  saying?
16       MS. TABACCHI: Objection.
17       THE WITNESS:  Who did not attend the
18  meetings.
19  BY MR. SISNEROS:
20       Q.  Who did not attend the meetings.  Okay,
21  all right.  All right, and then in the second
22  paragraph, he reference -- I'll read the second

Page 128

1   paragraph.
2        "However, in order to do this
3   effectively, we need your help in making sure
4   that the information that we have captured is
5   accurate. Attached are the minutes from the last
6   meeting based upon the notes that Jim and I took
7   and which we would like you to review.  I would
8   appreciate any comments that you can provide, be
9   it errs, ommissions, embellishments, points, et
10  cetera.  Also if you have any suggestions for an
11  alternative or more efficient way of capturing
12  these communications, I would appreciate that
13  feedback as well."
14       Did I read that correctly?
15       A.  As stated.
16       Q.  Okay, and consistent with -- with that
17  earlier exhibit of the March minutes, Mr. Rieger
18  is identifying you and he as the ones that were
19  keeping minutes of the meetings, correct?
20       A.  Yes, sir.
21       Q.  And with respect to the -- excuse me.
22  And with respect to the minutes of the meeting

Page 129

1   preceding this January 29th, 1997 date, you and
2   Rieger took minutes of that meeting as well,
3   correct?
4        MS. TABACCHI:  Object to the form.
5        (witness reviewing document.)
6        THE WITNESS:  I cannot tell you that I
7   was even at the meeting.
8   BY MR. SISNEROS:
9        Q.  Well, look at the second page of
10  Exhibit Miller 1164, the page right behind Mr.
11  Rieger's memo.
12       A.  Um-hum.
13       Q.  Okay, and the Bates stamp on that --
14  and, by the way, this is Abbott's Bates stamp.
15  This is ABT 52706.  Do you see that?
16       A.  Yes, sir.
17       Q.  And Mr. Rieger, the memo, the page
18  before it is ABT 52705.  Do you see that?
19       A.  Yes, sir.
20       Q.  So the two pages are sequential.  You
21  follow me?
22       A.  Yes, sir.

33 (Pages 126 to 129)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    Q.  Okay.  And 52706 references minutes
2  from Medicare Working Group meeting on 1/21/97.
3  Do you see that?
4    A.  1/21/97?  Yes.
5    Q.  You see that?  It's the page right
6  after Mr. Rieger's memo, sir, the second page.
7    A.  Right.
8    Q.  Okay, so this exhibit shows that there
9  are minutes for a meeting that occurred January
10  the 21st, 1997, correct?
11    A.  Correct.
12    Q.  And the first page of Exhibit Miller
13  1164, Mr. Rieger's memo, is dated January the
14  29th, 1997, correct?
15    A.  Correct.
16    Q.  And -- and that's -- Mr. Rieger's memo
17  is like eight days later after the minutes of the
18  meeting, correct?
19    A.  The meeting was the twenty -- yeah.
20    Q.  Okay.
21    A.  Correct.
22    Q.  And in earlier testimony, you've said

**Page 131**

1  that you folks met only every four to six weeks,
2  something like that, correct?
3    A.  Correct.
4    Q.  So when Mr. Rieger is writing to the
5  Medicare Working Group on January the 29th, 1997,
6  and in it -- in that memo, he says, "Attached are
7  the minutes from the last meeting based on the
8  notes that Jim and I took," --
9    A.  Ah, okay.
10    Q.  -- chances are that the minutes of
11  January 21st, 1997 are minutes that you and Mr.
12  Rieger took, correct?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  That's what it says.
15  BY MR. SISNEROS:
16    Q.  And it's a meeting that you would have
17  attended, correct?
18    A.  I cannot testify to that.
19    Q.  But based upon Mr. Rieger's memo and
20  the dates of his memo and the dates of the
21  minutes, would it be reasonable that you did
22  attend?

**Page 132**

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I do not know.
3  BY MR. SISNEROS:
4    Q.  Okay, look at the minutes, the second
5  page of Exhibit Miller 1164, the Bates stamp ABT
6  52706.
7    A.  Okay.
8    Q.  And look under the heading that says
9  "Average Wholesale Price."  Do you see that?
10    A.  Yes.
11    Q.  Okay, and the first bullet under that
12  heading reads as follows:
13        "Average wholesale price, AWP, is
14  generally based on the manufacturer's price plus
15  a markup of 15 to 20%.  The AWP is documented in
16  the Red Book, Blue Book and Medi-Span book and is
17  used by Medicare, Medicaid and commercial
18  insurance carriers to determine reimbursement
19  levels.  There is a consensus that the AWP is
20  artificial and that actual acquisition cost would
21  be better.  However, it is unclear whether actual
22  acquisition cost can be determined."

**Page 133**

1        Did I read that correctly?
2    A.  As stated.
3    Q.  Okay.  Do you remember earlier I asked
4  you some questions about whether you had veto
5  power over an agenda?
6    A.  Yes, sir.
7    Q.  With regard to the minutes, before they
8  were disseminated, would you review them?
9        MS. TABACCHI:  Object to the form.
10        THE WITNESS:  I may or may not.
11  BY MR. SISNEROS:
12    Q.  Now, do you -- do you -- do you have
13  any recollection at any of these Medicare Working
14  Group meetings having a discussion of average
15  wholesale price?
16    A.  As it relates to what?
17    Q.  In any context.
18    A.  Well, if we disseminated these Pink
19  Sheets and these other articles, there would have
20  been some discussion.
21    Q.  Well, with respect to that heading,
22  "Average Wholesale Price" in the minutes of

                                34 (Pages 130 to 133)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 134

1  1/21/97 and that first bullet point, had you ever
2  heard that average wholesale price was generally
3  based on the manufacturer's price plus a markup
4  of 15 to 20%?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  I don't know where -- I
7  mean if I look at my handwritten note, it says
8  "acquisition cost."  This says "manufacturer's
9  price."
10 BY MR. SISNEROS:
11     Q.  That's correct.  In your way of
12 thinking, is -- are those two -- are those two
13 different measures?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  Yes.
16 BY MR. SISNEROS:
17     Q.  Explain the difference between one and
18 the other.
19     A.  You could define acquisition cost to
20 include the marketing, selling, R & D costs of
21 the company.
22     Q.  Okay, and how is that?

Page 135

1      A.  Which not -- which is not the
2  manufacturer's price.
3      Q.  What is the manufacturer's price?
4      A.  The manufacturer's price is -- is it
5  list price, is it -- what is it?
6      Q.  Basically, if I understand you
7  correctly -- and you correct me if I'm wrong, but
8  the way I understand this, you're saying that
9  acquisition cost would be the manufacturer's
10 price plus a markup for research and development
11 and other associated costs?
12        MS. TABACCHI:  Object to the form.
13 BY MR. SISNEROS:
14     Q.  Or am I wrong?  Did I understand you
15 incorrectly?
16     A.  Well, I think "manufacturer's price"
17 needs to be defined.
18     Q.  Okay, so you're saying you don't know
19 what "manufacturer's price" is?
20     A.  No.  As used in this sentence, I do not
21 know.
22     Q.  Okay, let's look at the second sentence

Page 136

1  of that first bullet point under "Average
2  Wholesale Price."
3         "The AWP is documented in Red Book,
4  Blue Book and Medi-Span book and is used by
5  Medicare Medicaid and commercial insurance
6  carriers to determine reimbursement levels."
7         As far as you know, is that statement
8  accurate?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  I'm not qualified to
11 answer.  I don't know.
12 BY MR. SISNEROS:
13     Q.  Were you aware that AWP was used to
14 reimburse third-party payers?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  I cannot define in what
17 circumstances it would have been used or not
18 used.
19 BY MR. SISNEROS:
20     Q.  Well, at the time that you were given
21 the task of putting together this Working Group
22 meeting, you were involved in discussions of reim

Page 137

1  -- as you call it, coverage to third-party
2  payers, correct?
3      A.  Correct.
4      Q.  Did you have a basic understanding how
5  they were reimbursed or how they were covered?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  You have to define "basic
8  understanding."
9  BY MR. SISNEROS:
10     Q.  Well, what understanding did you have
11 on how third-party payers were covered?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  Let's take Medicare.
14 BY MR. SISNEROS:
15     Q.  Okay.
16     A.  I knew that drugs not administered in
17 the physician's office were not covered under
18 Medicare at that time.
19     Q.  All right, how about drugs that were
20 administered in the physician's office?
21     A.  I knew they were reimbursed.
22     Q.  How?

35 (Pages 134 to 137)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                July 30, 2007
                        Chicago, IL

---

Page 138

1    A.  Either under the federal program,
2  Medicare, or sometimes under the state programs,
3  Medicaid.
4    Q.  Did you know by what method they were
5  reimbursed?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  I did not know how the
8  prices were set.  I was never involved in that.
9  BY MR. SISNEROS:
10   Q.  No, no, no.  I'm -- I don't understand
11 what you mean "how the prices were set."  What do
12 you mean "how the prices were set"?
13   A.  I don't know how a division obtained a
14 price for its products from Medicare.
15   Q.  I'm not asking that.
16   A.  Okay, fine.
17   Q.  I don't want to know how a division
18 determined its price.  All I want to know is were
19 you -- well, were you aware that AWP was a
20 numerical value?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I know AWP is a numerical

Page 139

1  value, yes.
2  BY MR. SISNEROS:
3    Q.  Did you know that this value was
4  published in Red Book, Blue Book and Medi-Span?
5       MS. TABACCHI:  Object to the form.
6       THE WITNESS:  I have never seen any one
7  of those three documents.
8  BY MR. SISNEROS:
9    Q.  Okay, and I can appreciate you've never
10 seen it, but were you aware that those values
11 that are called "AWP" were published in these
12 compendia?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I have heard of Red Book.
15 I have never heard of Blue Book or Medi-Span.
16 BY MR. SISNEROS:
17   Q.  Okay, we know you've heard of Red Book.
18 Were you aware that AWP values were being
19 published in Red Book?
20   A.  Yes.
21       MS. TABACCHI:  Object to the form.
22 BY MR. SISNEROS:

Page 140

1    Q.  Okay, were you aware that the Medicare,
2  Medicaid and commercial insurance carriers used
3  AWP to set their reimbursement levels?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  "Medicare allowable
6  equals AWP," I wrote it down.  Somebody told me
7  that.
8  BY MR. SISNEROS:
9    Q.  So you were aware of that?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  Yes.
12 BY MR. SISNEROS:
13   Q.  All right, let's go to the second
14 bullet under "Average Wholesale Price."  Let me
15 read it into the record.
16       "Medicare pays 80% of the AWP, which
17 basically covers the provider's cost, and the
18 provider generally bills the other 20% of the AWP
19 directly to the patient or Medigap carrier.  The
20 latter is essentially the provider's profit."
21       Did I read that correctly?
22   A.  That's what it states.

Page 141

1    Q.  Okay.  And is it accurate to say that
2  what that paragraph is saying, that the
3  provider's cost of product is 80% of the AWP
4  value?
5       MS. TABACCHI:  Object to the form.
6       THE WITNESS:  That is not accurate.
7  BY MR. SISNEROS:
8    Q.  It is not accurate?
9    A.  No.
10   Q.  Well, look at that first part of the
11 sentence.  "Medicare pays 80% of the AWP, which
12 basically covers the provider's costs," what does
13 that mean?
14   A.  That could have been taken out of a
15 Pink Sheet.  I don't know where that came from.
16   Q.  So you believe that part is inaccurate?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Oh, do I object to the --
19 the first part, "Medicare pays 80% of the AWP"?
20       MR. SISNEROS:  No, no.
21       THE WITNESS:  No, I do not object to
22 that.

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
Chicago, IL

Page 142

BY MR. SISNEROS:
1  BY MR. SISNEROS:
2      Q.  No, no, no, that's -- I'm not talking
3  about that.  What I'm asking is -- let me read --
4  let me read the first part of that sentence.
5          "Medicare pays 80% of the AWP, which
6  basically covers the provider's cost?"  Do you
7  see that?
8      A.  Yes, as stated.
9      Q.  Okay.  I read that as saying that that
10 80% of AWP is what the -- is the provider's cost
11 for the product.  Is that inaccurate?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  I do not know.
14         MR. SISNEROS:  Okay.
15         MR. SOFFER:  Counsel, why don't we take
16 this time to break for lunch?  It's already noon.
17         MR. SISNEROS:  Well, can I do the last
18 bullet point under that heading?  I think I --
19 I'll be done with at least that little section.
20 Is that all right?
21         MR. SOFFER:  Yes.
22         MR. SISNEROS:  Okay.

Page 143

1  BY MR. SISNEROS:
2      Q.  All right, let's look at the last
3  paragraph of that bullet point of "Average
4  Wholesale Price," and I'll read it for the
5  record.
6          "A problem with current AWP system is
7  the perception per the Inspector General's report
8  that prices are too high.  Specifically, it is
9  believed that the brand named drugs are 18%
10 overpriced and generic drugs are 40% overpriced."
11         Did I read that correctly?
12     A.  As stated.
13     Q.  Now, from Mr. Rieger's earlier memo,
14 the first page of this exhibit, he identifies you
15 and he as the writers of these -- of these
16 minutes; is that correct?
17     A.  (Witness nodding.)
18     Q.  Is that a yes?
19     A.  Yes, sir.
20     Q.  Okay.  If you know, what do you mean by
21 the word "perception" when you're referencing the
22 IG's report?

Page 144

1      A.  I'm not sure the pharmaceutical
2  industry would agree with the IG report.
3      Q.  Well, are you talking about Abbott?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  I'm talking generalities.
6  BY MR. SISNEROS:
7      Q.  Okay.  All right, fine.  You -- so, in
8  other words, what you're saying is -- is that you
9  don't agree with the IG's report, and the I --
10 what the IG is talking about is not a problem,
11 just a perceived problem?  Is that what you're
12 saying?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I'm not qualified to
15 answer that.
16 BY MR. SISNEROS:
17     Q.  Well, then what do you mean by the word
18 "perception"?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  There was not agreement
21 between the suppliers and the IG that the prices
22 were overstated.

Page 145

1  BY MR. SISNEROS:
2      Q.  And who -- is Abbott a supplier?
3      A.  Yes.
4          MS. TABACCHI:  Object to the form.
5  BY MR. SISNEROS:
6      Q.  Okay, so what you're saying is Abbott
7  had a disagreement with the conclusions drawn by
8  the IG?
9          MS. TABACCHI:  Object to the form,
10 asked and answered.
11 BY MR. SISNEROS:
12     Q.  Yes?
13         MR. SOFFER:  If you're able to answer,
14 you can answer it.
15         MR. HOFFMAN:  You can answer it.
16         THE WITNESS:  Yes.
17 BY MR. SISNEROS:
18     Q.  How were you aware of that
19 disagreement?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  How am I aware of this
22 disagreement?

37 (Pages 142 to 145)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                            Chicago, IL

Page 146

1  BY MR. SISNEROS:
2      Q.  Well, strike it.
3          How did you know there was a
4  disagreement --
5      A.  How do I know?
6          MS. TABACCHI:  Object to the form.
7  BY MR. SISNEROS:
8      Q.  (Continuing) -- between Abbott and what
9  you believe is the IG's perception of a problem
10  here?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Abbott would believe that
13  the IG did not have an accurate representation of
14  the total cost.
15  BY MR. SISNEROS:
16     Q.  Where did you get that information?
17     A.  Abbott.
18     Q.  Who at Abbott told you that?
19     A.  I do not recall.
20     Q.  Do you recall if that information came
21  from within the Medicare Working Group or from
22  someone further up the chain from you?

Page 147

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  I do not recall.
3          MR. SISNEROS:  All right.
4  Okay, let's break for lunch.
5          THE VIDEOGRAPHER:  We are off the
6  record at 12:07 p.m. with the end of Tape No. 2.
7              (Recess taken.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 148

1          A F T E R N O O N   S E S S I O N
2
3          THE VIDEOGRAPHER:  We are back on the
4  record at 1:00 p.m. with the start of Tape No. 3.
5          MR. SISNEROS:  Good afternoon, Mr.
6  Miller.
7          THE WITNESS:  Good afternoon.
8
9          CONTINUING DIRECT EXAMINATION
10  BY MR. SISNEROS:
11     Q.  Back to Exhibit Miller 1164.  Are you
12  there?
13     A.  Exhibit Miller 1164, yes, sir.
14     Q.  Okay.  And let's go to the second page
15  of Exhibit Miller 1164, ABT 52706.  Are you
16  there?
17     A.  Yes, sir.
18     Q.  All right, when we broke for lunch, I
19  had asked you questions regarding the three
20  bullets under the item that -- in bold there
21  called "Average Wholesale Price."  Do you
22  remember?

Page 149

1      A.  Yes, sir.
2      Q.  And regarding the last bullet under
3  "Average Wholesale Price" where it's mentioned
4  that -- that there is a -- that -- well, let me
5  read it to you.
6          This is what it says:  "A problem with
7  the current AWP system is the perception per the
8  Inspector General's report that prices are too
9  high. Specifically, it is believed that brand
10  name drugs are 18% overpriced and generic drugs
11  are 40% overpriced."
12         Did I read that correctly?
13     A.  Yes, that's as stated.
14     Q.  Okay.  And you testified earlier that
15  Abbott disagreed with the IG reports; is that
16  correct?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  I cannot speak for
19  Abbott.
20  BY MR. SISNEROS:
21     Q.  Well, that's what you said.
22     A.  It's my perception that Abbott didn't

38 (Pages 146 to 149)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                          Chicago, IL

---

Page 150

1  agree.
2     Q.  Okay.  Well, how about you?  Did you
3  disagree with the IG's report?
4     A.  I had no access to the detail of their
5  report.
6     Q.  But this was a matter of -- I believe
7  that you testified earlier that you thought that
8  the IG didn't get full and accurate information.
9  I believe that was your testimony.  Am I -- is
10 that right?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I believe the IG would
13 have difficulty getting that.
14 BY MR. SISNEROS:
15    Q.  Why is that?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  Getting a complete total
18 cost picture on anything is difficult.
19 BY MR. SISNEROS:
20    Q.  Why?
21    A.  Accounting systems are not built that
22 way.

---

Page 151

1     Q.  You know, I'm sorry, I don't follow.
2  The OIG's -- Office of Investigative General,
3  when you said earlier you thought they did not
4  have full and accurate information, what
5  information were you referring to that they did
6  not have?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  Either acquisition cost
9  or actual cost.
10 BY MR. SISNEROS:
11    Q.  And when you say "actual cost," you're
12 referencing Abbott's actual cost for product?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I'm talking in general
15 about the industry.
16 BY MR. SISNEROS:
17    Q.  Why would they have difficulty getting
18 actual cost?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  I already answered the
21 question. Accounting systems do not readily
22 provide that data.

---

Page 152

1  BY MR. SISNEROS:
2     Q.  Why not?
3        MS. TABACCHI:  Object to the form.
4        MR. SOFFER:  You can answer only if you
5  can.
6        THE WITNESS:  Accounting systems deal -
7  - I mean that's not a question that is normally
8  asked of an accounting system.
9  BY MR. SISNEROS:
10    Q.  Well, where would the OIG get the full
11 and accurate information they required for their
12 report?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I have no access to what
15 they did.
16 BY MR. SISNEROS:
17    Q.  Well, why -- why do you have a sense
18 that their report then did not have the full and
19 accurate information?
20        MS. TABACCHI:  Object to the form.
21 BY MR. SISNEROS:
22    Q.  Well, let me ask it this way.  What is

---

Page 153

1  your basis for saying that the findings of the
2  OIG report do not reflect full and accurate
3  information?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  I've been asked that same
6  question by my management at times and found it
7  very difficult to answer.
8  BY MR. SISNEROS:
9     Q.  Who asked you?  What management asked
10 you?
11    A.  Various people I worked for over the
12 years.
13    Q.  Who?
14    A.  I cannot recall a specific name.
15    Q.  Your supervisors?
16    A.  Yes.
17    Q.  Was that asked -- question asked of you
18 when you were -- first entered the corporate
19 level?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  No.
22 BY MR. SISNEROS:

---

39 (Pages 150 to 153)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                    Chicago, IL

Page 154

1      Q.  When you were asked by management, what
2   was your answer?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  I gave them the same
5   answer I gave you.
6   BY MR. SISNEROS:
7      Q.  Yeah.  Which is?
8      A.  It's very difficult to do; it's not an
9   answer an accounting system will readily provide.
10     Q.  Okay, and what you're saying is the
11  pricing information they did not have was
12  acquisition cost?
13         MS. TABACCHI:  Object to the form.
14  BY MR. SISNEROS:
15     Q.  Correct?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  I do not know what the
18  OIG had.
19  BY MR. SISNEROS:
20     Q.  No, I'm asking you -- I think you
21  testified earlier -- you identified two pieces of
22  information that you believe the OIG's report was

Page 155

1   not accurate in, in acquisition cost and in
2   industry costs or costs to the manufacturer.  Am
3   I right?  Is that what you said?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  Yes.
6   BY MR. SISNEROS:
7      Q.  And in the -- in the -- when you say
8   "acquisition cost," you're talking about the
9   acquisition cost of the provider, the medical
10  provider?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  I have no knowledge of
13  what the providers submitted to Medicare or
14  Medicaid for a product.
15  BY MR. SISNEROS:
16     Q.  That's not what I asked.  What I asked
17  was whose acquisition costs are you referencing?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  What --
20         MR. SOFFER:  You can answer.
21         THE WITNESS:  What the payer would have
22  seen.

Page 156

1   BY MR. SISNEROS:
2      Q.  "The payer" being Medicare, Medicaid or
3   a third-party payer?
4      A.  Yes.
5      Q.  What amount they would have reimbursed
6   the provider?
7      A.  Yes.
8          MS. TABACCHI:  Object to the form.
9   BY MR. SISNEROS:
10     Q.  All right, and then the -- why would it
11  be difficult for the Office of Investigator
12  General to have obtained that information?
13         MR. SOFFER:  Objection.
14         MS. TABACCHI:  Object to the form.
15         MR. SOFFER:  If you can answer, you
16  may.
17         THE WITNESS:  There are product --
18  there are prices for products, there are fees for
19  services, there are rebates.  There are all kinds
20  of cost that go along with these products.  I
21  have no idea how they were bundled or not bundled
22  or provided to the payers.

Page 157

1   BY MR. SISNEROS:
2      Q.  Is that -- is that information secret
3   information?
4      A.  No.
5          MS. TABACCHI:  Object to the form.
6   BY MR. SISNEROS:
7      Q.  And then I think that the second item
8   that you identified as potentially inaccurate
9   with respect to the OIG's report would be I think
10  you said manufacturer's cost; is that correct?
11     A.  I do not recall the exact term.
12     Q.  Well, what term would you use?
13     A.  Let's stay with manufacturer's cost.
14     Q.  And is that value, is that number --
15  would that be secret?
16     A.  It's proprietary within the company.
17     Q.  So that's information that the company
18  -- that the industry does not disclose?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Disclose?  To whom?
21  BY MR. SISNEROS:
22     Q.  Publicly.

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

| | Page 158 | | Page 160 |
|---|---|---|---|

**Page 158**

1    A.  Yes, we do not disclose publicly.
2    Q.  Do you disclose it to the government?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  Only in an IRS tax suit.
5    BY MR. SISNEROS:
6    Q.  When the IRS would be suing Abbott?
7    A.  Yeah.
8         MS. TABACCHI:  Object to the form.
9    BY MR. SISNEROS:
10   Q.  All right, did -- to your knowledge,
11   was the -- these disagreements that folks within
12   Abbott had with the OIG's report, was that ever
13   communicated to the government?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  I'm not qualified to
16   answer.
17   BY MR. SISNEROS:
18   Q.  I'm sorry, I don't know what that
19   means. I mean either you know or you don't.
20   A.  I don't know.
21   Q.  You don't know?
22   A.  No.

**Page 159**

1    Q.  Did you take any steps to see if your -
2    - the objections within this committee or
3    Medicare Working Group, did you take any steps to
4    see that any objections to that report were
5    communicated up the chain and possibly to the
6    government?
7    A.  No.
8         MS. TABACCHI:  Object to the form.
9    BY MR. SISNEROS:
10   Q.  Why not?
11   A.  In my opinion, there was no positive
12   outcome on that.
13   Q.  What does that mean?
14   A.  The OIG wasn't going to change its
15   report either way.
16   Q.  Well, but if there was some
17   disagreement as to a perceived error in their
18   report, would it not have been beneficial to at
19   least get some dialogue going?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  I don't know.
22   BY MR. SISNEROS:

**Page 160**

1    Q.  Did you even consider that perhaps what
2    was being perceived as errors in this report
3    within the -- within the Medicap -- Medicare
4    Working Group be communicated to someone who
5    possibly could do something about these errors?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  No.
8    BY MR. SISNEROS:
9    Q.  Was there discussion within the
10   Medicare Working Group to look at the findings of
11   the OIG's report?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  I do not -- no.
14   BY MR. SISNEROS:
15   Q.  Was there any research that was
16   conducted by the Medicare Working Group to at
17   least evaluate the accuracy of the OIG's report?
18   A.  No.
19   Q.  Was there any activity at all to
20   prepare some type of challenge or rebuttal to the
21   OIG's report?
22   A.  No, not that I'm aware of.

**Page 161**

1    Q.  Was the OIG's report ever discussed by
2    you with any of your supervisors up the chain of
3    command?
4    A.  No.
5    Q.  Could we look at Exhibit Miller 1162,
6    the members of the Medicare Working Group?
7    A.  (Witness so doing).
8    Q.  In terms of position of authority, who
9    is the highest ranking individual on that list?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  Cathy Babington.
12   BY MR. SISNEROS:
13   Q.  And thereafter?
14   A.  I'm not -- I don't know.
15   Q.  Would that be you?
16   A.  Maybe.
17   Q.  All right, did Cathy Babington take a
18   leadership role in the Medicare Working Group?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  No.
21   BY MR. SISNEROS:
22   Q.  Did you?

                              41  (Pages 158 to 161)

Miller, James E.                                        July 30, 2007
                        Chicago, IL

---

Page 162

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  I was in charge of
3    coordinating the meetings.
4    BY MR. SISNEROS:.
5          Q.  Were there any -- anyone else in this -
6    - in this list of members of the Medicare Working
7    Group leaders in the group's work?
8          MS. TABACCHI:  Object to the form.
9          MR. SOFFER:  Objection, vague.
10   BY MR. SISNEROS:
11         Q.  Did anyone else on that list take a
12   leadership role in the Medicare Working Group --
13         MS. TABACCHI:  Same objection.
14   BY MR. SISNEROS:
15         Q.  (Continuing) -- other than you?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  It's too broad to answer.
18   BY MR. SISNEROS:
19         Q.  I -- I don't follow you.  Within the
20   work -- within the activity of the Medicare
21   Working Group, other than your leadership, was
22   there anyone else recognized as a leader of this

---

Page 163

1    group?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Each division is
4    responsible for its own marketing/selling
5    activities.
6    BY MR. SISNEROS:
7          Q.  But I thought you testified those were
8    not discussed in the Medicare Working Group?
9          A.  Right.
10         Q.  Okay, I'm not talking about marketing
11   and selling of -- with different divisions.  What
12   I am addressing my question to are to the
13   activities of the Medicare Working Group.
14         A.  The Medicare Working Group was an
15   informational-sharing group.
16         Q.  Who took the leadership role within the
17   context of that activity?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  My office called the
20   meetings for the informational-sharing
21   activities.
22   BY MR. SISNEROS:

---

Page 164

1          Q.  All right, could you turn to the third
2    page of the minutes at ABT 52707?
3          A.  Which document are we on?
4          Q.  Oh, we're still on the same one,
5    Exhibit Miller 1164.
6          A.  Okay.
7          Q.  Third page, ABT 52707, third or fourth
8    page.
9          A.  Okay.
10         Q.  Under "Miscellaneous," in your minutes
11   you state in there -- excuse me.  Under
12   "Miscellaneous," first bullet in your minutes,
13   you state the following:
14         "Due to Congress's inaction in 1996,
15   Laboratory Services will receive a 2.7 increase
16   in 1997.  An alternate site will receive a 3.0
17   increase in 1997."
18         Do you see that?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  That's what -- I agree it
21   states that.
22   BY MR. SISNEROS:

---

Page 165

1          Q.  Did I read it accurately?
2          A.  Yes, sir.
3          Q.  When you say "alternate site," what do
4    you reference?  What do you mean?
5          A.  I'm not sure.
6          Q.  Is there an alternate site unit within
7    the Home -- Hospital Products Division?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  That term was used to
10   describe non-hospital activities.
11   BY MR. SISNEROS:
12         Q.  The "alternate site"?
13         A.  Right.
14         Q.  So are you referring to non-hospital
15   activities by the term "alternate site"?
16         A.  I do not know, sir.
17         Q.  And the 3% increase that you refer --
18   that you refer to in there, what is that?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I do not know.
21   BY MR. SISNEROS:
22         Q.  Okay.  Let's go to the next highlighted

---

42 (Pages 162 to 165)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                          Chicago, IL

Page 166

1   area called "Next Steps."
2        Are you there?
3        A.  Yes, sir.
4        Q.  With that first bullet point, let me
5   read it into the record.  "Obtain notice of
6   inherent reasonableness document from Mike
7   Tootell and distribute to the Medicare Working
8   Group."
9        Did I read that accurately?
10       A.  That's as stated.
11       Q.  What is "notice of inherent
12   reasonableness"?
13       A.  I do not know.
14       Q.  All right, let's go to the next bullet
15   point under "Next Steps."
16       "Obtain list of drugs."  Let me read it
17   into the record.  "Obtain list of drugs from John
18   Campbell that comprise the 1.4 billion drug
19   market, 900 million of which is projected to be
20   Lupron and other drugs, and distribute to
21   Medicare Working Group."
22       Did I read that accurately?

Page 167

1        A.  That's as stated.
2        Q.  Okay, what -- who is John Campbell?
3        A.  I believe he worked at TAP.  Yes.
4        Q.  And why -- why were you obtaining a
5   list of drugs --
6            MS. TABACCHI:  Object to the form.
7   BY MR. SISNEROS:
8        Q.  -- for the Medicare Working Group?
9        A.  I do not remember.
10       Q.  And the reference to 1.4 billion drug
11   market in that one item, is that -- does that
12   refer to Abbott's drug market?
13           MS. TABACCHI:  Object to the form.
14           THE WITNESS:  I do not know.
15   BY MR. SISNEROS:
16       Q.  Would you agree that a 1.4 billion drug
17   market is a significant drug market?
18           MS. TABACCHI:  Object to the form.
19           THE WITNESS:  There are many one
20   billion dollar drug products.
21   BY MR. SISNEROS:
22       Q.  So the -- your answer is, no, it's not

Page 168

1   significant?
2        A.  Well, a billion dollars is always
3   significant.
4        Q.  So it is significant?
5        A.  Yes.
6        Q.  And why would you be trying to obtain
7   lists of drugs that compromise -- that comp --
8   that make up a significant drug market and
9   distribute to the Medicare Working Group?
10           MS. TABACCHI:  Object to the form,
11   asked and answered.
12           THE WITNESS:  I do not know.
13   BY MR. SISNEROS:
14       Q.  All right, let's go back to the first
15   page of Exhibit Miller 1164.
16       A.  (Witness so doing.)
17       Q.  Are you there --
18       A.  Um-hum.
19       Q.  -- at ABT 52705?
20       A.  Yes, sir.
21       Q.  And earlier, I asked you some questions
22   regarding that first sentence, and I'll read it

Page 169

1   into the record again.
2        "Since Medicare seems to be heating up
3   in our" -- strike that.
4        "Since Medicare seems to be heating up,
5   our Working Group seems interested in continuing
6   to meet and others are becoming interested in
7   what we are doing.  Jim and I would like to find
8   a way to communicate outside our Working Group.
9   To that end, we are thinking about documenting
10   each of our Working Group meetings via minutes
11   and using this as a communications tool."
12       Did I read that accurately?
13       A.  That's as stated.
14       Q.  Okay, did -- did -- this is Mr.
15   Rieger's memo, correct?
16       A.  Correct.
17       Q.  Did you have a sense that, back in
18   January of '97, "Medicare seemed to be heating
19   up," as Mr. Rieger says?
20           MS. TABACCHI:  Object to the form.
21           THE WITNESS:  I don't remember.
22   BY MR. SISNEROS:

                              43 (Pages 166 to 169)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

| Page 170 | Page 172 |

**Page 170**

1    Q.  Earlier in your testimony, you
2  testified that when you first met with the --
3  with the Medicare Working Group, that some of the
4  folks that were present were asking, "Why am I
5  here?"
6         Do you recall that testimony?
7    A.  Yes, sir.
8    Q.  Then by January of '97, according to
9  Mr. Rieger's memo, he writes that, "Our Working
10 Group seems interested in continuing to meet."
11        Do you see that?
12   A.  Yes, sir.
13   Q.  Do you agree with that statement, that
14 there -- that the group was interested --
15 interested in continuing these meetings?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  Yes.
18 BY MR. SISNEROS:
19   Q.  All right, in the last part of that
20 first sentence, Mr. Rieger writes, "Others are
21 becoming interested in what we are doing."
22        Would you agree with that?

**Page 171**

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  I do not recall what
3  "others" mean in that context.
4  BY MR. SISNEROS:
5    Q.  Well, the way I read his sentence is he
6  is -- "others" refers to others outside of your
7  Working Group.  Do you read that sentence that
8  way?
9    A.  It could be read that way, yes.
10   Q.  Do you read it that way?
11   A.  Yes.
12   Q.  Then what follows is, "Jim and I would
13 like to find a way to communicate outside of our
14 Working Group."  Correct?  Did I read that
15 correctly?
16   A.  That's part of the sentence, right.
17   Q.  It is part of the sentence?
18   A.  Right.
19   Q.  Because I can't -- I can't determine
20 whether that's a comma or a period between the
21 words "doing" and "Jim."
22        Do you see that?

**Page 172**

1    A.  I read it as a comma, okay?
2    Q.  Okay.  All right, then I'll put it back
3  in the record again.
4         THE WITNESS:  Back in the record.
5         MR. SOFFER:  We can agree to this,
6  right?
7         THE WITNESS:  Compound, complex, run-on
8  sentence.
9  BY MR. SISNEROS:
10   Q.  But you do agree as part of that
11 sentence that what's being communicated is that
12 others outside the Working Group are interested
13 in what you are doing within the Medicare Working
14 Group?
15   A.  That's what it says.
16   Q.  Okay.  So it follows that the last part
17 of that sentence, "Jim and I would like to find a
18 way to communicate outside of our Working Group,"
19 that he is addressing the interests of others
20 outside of your group who have become interested
21 in your work?
22        MR. SOFFER:  Objection.

**Page 173**

1         MS. TABACCHI:  Object to the form,
2  asked and answered.
3         MR. SOFFER:  Do you understand the
4  question?
5         THE WITNESS:  (Witness nodding.)
6         MR. SOFFER:  Do you need to hear it
7  again?
8         THE WITNESS:  No.
9         I mean attendance was not limited at
10 the meetings.  If you wanted to show up, you
11 could show -- anybody could show up.
12 BY MR. SISNEROS:
13   Q.  Outside of the Medicare Working Group?
14   A.  Sure.
15   Q.  And did that happen?
16   A.  People substituted for people who
17 couldn't make meetings, okay?  So I mean if you
18 had an issue you wanted to talk about, you could
19 come to the meeting.
20   Q.  So there were others outside of the
21 distribution list who attended your meetings?
22   A.  If they attended the meetings, they

                          44 (Pages 170 to 173)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
Chicago, IL

Page 174

1  would be on the documents.
2      Q.  Okay, that's -- I understand what you
3  said, but that wasn't my question.  My question
4  was there were others outside the distribution
5  lists who attended the meetings?
6      A.  If you give me all the documents and
7  we'll cross reference them back to the members of
8  the Working Group, I can tell you whether other
9  people attended.
10     Q.  Is it your belief that they did?
11     A.  I -- I do not know.
12     Q.  Okay, well, then let's get back to that
13 first sentence.
14     A.  Okay.
15     Q.  Is it a fair -- is it reasonable to
16 believe that Mr. Rieger was communicating there
17 that they were trying -- that you two were trying
18 to find a way to communicate to others, other
19 than the ones that are listed in the distribution
20 list of the Medicare Working Group?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I don't know how to

Page 175

1  answer that question.  There was no -- the
2  minutes are the official discussion document, and
3  if those minutes were distributed to non-members
4  of the group, I would not have had a problem with
5  that.
6  BY MR. SISNEROS:
7      Q.  Would -- well, let me ask it this way.
8  Could you have been considering distributing the
9  minutes to others outside the Medicare Working
10 Group?
11     A.  No.
12     Q.  You would not have considered sharing
13 this information with your supervisor?
14     A.  No.
15     Q.  Why not?
16     A.  If I needed to talk to my supervisor,
17 I'd go to his office and talk to him.
18     Q.  So you would discuss what was going on
19 with the Medicare Working Group, but just not in
20 written form?
21     A.  No, it --
22         MS. TABACCHI:  Object to the form.

Page 176

1          THE WITNESS:  That's paraphrase.  I
2  would -- if there was an issue that I felt I
3  needed my boss's input, I would raise it to him.
4  BY MR. SISNEROS:
5      Q.  In what manner?
6      A.  Either --
7          MS. TABACCHI:  Objection to form.
8          THE WITNESS:  This was an information-
9  sharing group.  It was not a decision-making
10 group.
11 BY MR. SISNEROS:
12     Q.  Would some of that information have
13 been relevant to the decision makers?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  The decision makers were
16 in the divisions.
17 BY MR. SISNEROS:
18     Q.  Would the information of the Medicare
19 Working Group been important information for the
20 decision makers within the divisions?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  If you add in that

Page 177

1  division, I would say yes.
2  BY MR. SISNEROS:
3      Q.  Okay.  Now, isn't it possible when you
4  read that first sentence that it indicates it
5  possibly -- couldn't you have been considering
6  distributing the minutes outside of the Medicare
7  Working Group?
8          MS. TABACCHI:  Objection to form.
9          MR. SOFFER:  Objection.
10         THE WITNESS:  No.
11 BY MR. SISNEROS:
12     Q.  And you can remember that specifically?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  Yes.
15 BY MR. SISNEROS:
16     Q.  All right, and the last part of that
17 sentence, "Jim and I would like to find a way to
18 communicate outside of our Working Group," it is
19 your testimony that it's referencing
20 communicating within your -- within your Working
21 Group?
22         MS. TABACCHI:  Object to the form.

45 (Pages 174 to 177)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 178

1         MR. SOFFER:  Objection, asked and
2    answered.
3    BY MR. SISNEROS:
4         Q.   Is that your testimony?
5         A.   It is my -- to the best of my
6    knowledge, the minutes of these meetings were
7    only distributed to the members of the Working
8    Group.
9         Q.   Okay, let me ask it this way.  With
10   regard to the last part of that first sentence,
11   and I'll read that part, "Jim and I would like to
12   find a way to communicate outside of our Working
13   Group," it's your testimony that you did not want
14   to communicate what was going on with the
15   Medicare Working Group outside of the group; is
16   that right?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  I wanted the
19   communication of that group to go back through
20   the representatives of that group.
21   BY MR. SISNEROS:
22        Q.   So you did want the information from

Page 179

1    the Medicaid -- Medicare Working Group to be
2    disseminated to others outside the group through
3    the division representatives on the Medi --
4         A.   No.
5         Q.   No?
6         A.   That was not the intent.  I didn't say
7    -- I mean these were not stamped "do not
8    distribute," "do not make copies," but we never
9    had -- I think what Mr. -- I'm guessing -- see,
10   I'm guessing what Rich meant.  I'm not -- I can't
11   do that.
12        Q.   All right.  All right, with respect to
13   the Medicare Working Group's discussion of how
14   third-party payers like Medicare and Medicaid and
15   third-party payers, what they reimbursed, why
16   would Abbott even care?
17        MS. TABACCHI:  Objection, form.
18        MR. SOFFER:  Objection.
19        THE WITNESS:  If a product is not
20   prescribe -- if a product is not reimbursed, it
21   is generally not prescribed.
22   BY MR. SISNEROS:

Page 180

1         Q.   Well, if you want -- if you want
2    Abbott's products to be reimbursed, you just get
3    them on the formulary for Medicare and state
4    Medicaid programs, don't you?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  I'm not qualified to
7    answer that.
8    BY MR. SISNEROS:
9         Q.   Well, then how do you know if it's --
10   that it's not reimbursed, it's not going to sell?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I have a -- personal
13   experience.
14   BY MR. SISNEROS:
15        Q.   Well, let me ask this.  Who does
16   Medicaid Medicare and third-party payers
17   reimburse when they pay for beneficiaries under
18   their plan?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  I don't know all of --
21   BY MR. SISNEROS:
22        Q.   Do they reimburse Abbott?

Page 181

1         A.   No.
2         Q.   How do you know that?
3         A.   We don't sell directly to -- well, I
4    don't know.  I'm probably not qualified to answer
5    that.
6         Q.   Why do you say that?
7         A.   I -- I don't believe that Medicare or
8    Medicaid is a direct customer of Abbott, but I'm
9    not a hundred percent sure of that.
10        Q.   I see.  So -- so the reimbursement for
11   Medicaid/Medicare goes -- goes to the medical
12   provider that provides a service to the Medicaid
13   or Medicare beneficiary?
14        MS. TABACCHI:  Object to the form.
15        MR. SOFFER:  Objection.
16        You may answer if you know the answer
17   to the question.
18   BY MR. SISNEROS:
19        Q.   Do you have a health plan at Abbott?
20   Did you have a health plan at Abbott?
21        A.   Yes.
22        Q.   When you went to get a prescription,

                              46  (Pages 178 to 181)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
Chicago, IL

---

Page 182

1  did you pay for it?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  It had a deductible and a
4  co-pay.
5  BY MR. SISNEROS:
6     Q.  And you paid the co-pay?
7     A.  And the deductible, yes.
8     Q.  And who paid the balance?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Abbott.
11  BY MR. SISNEROS:
12    Q.  Abbott.  So who would Abbott pay?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  Abbott had a what I would
15  call -- characterize as a pharmacy benefit
16  manager who did that for Abbott.
17  BY MR. SISNEROS:
18    Q.  All right, so whoever filled your
19  prescription got the pay -- got the
20  reimbursement?
21    A.  (Witness nodding.)
22    Q.  Is that accurate?

---

Page 183

1     A.  That's fine.
2        MS. TABACCHI:  Object to the form.
3  BY MR. SISNEROS:
4     Q.  Okay, within the context of Medicaid
5  and Medicare reimbursement on pharmaceutical
6  products, reimbursement would go to the pharmacy
7  that filled the prescription for the Medicaid or
8  Medicare beneficiary, correct?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  I do not know.
11  BY MR. SISNEROS:
12    Q.  You do not know?
13    A.  No.
14    Q.  All right, can you look at Exhibit 163?
15    A.  Exhibit Miller 1163?
16    Q.  Yes.  And we will go to I guess that
17  would be the second page, ABT 52841.
18    A.  Okay.
19    Q.  You see that?
20    A.  Yes, sir.
21    Q.  All right, and this is -- this is
22  minutes of March -- of March 6th, 1997 minutes,

---

Page 184

1  which you wrote, correct?
2     A.  Correct.
3     Q.  And in it, you -- you're -- the first
4  bullet point, you're talking about changing
5  reimbursement price for drugs administered in a
6  physician's office from AWP.  Do you see that?
7     A.  Correct.
8     Q.  You've testified that you --
9  reimbursement -- that the money we're talking
10  about was -- that reimbursement wasn't going to
11  go to Abbott, correct?
12    A.  Correct.
13    Q.  All right.  In the context of
14  reimbursement for drugs administered in a
15  physician's office, who would be receiving the
16  reimbursement, Mr. Miller?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  My assump -- I mean I --
19  I've never personally done this.  I don't know.
20  I'm not qualified to answer.  My assumption is
21  the doctor got paid.
22  BY MR. SISNEROS:

---

Page 185

1     Q.  Okay.  Would your assumption be also
2  that a pharmacist would get paid for drugs that
3  he is dispensing to a Medicaid or Medicare
4  beneficiary by the Medicaid or Medicare program?
5        MS. TABACCHI:  Object to the form.
6        MR. SOFFER:  Objection.
7        THE WITNESS:  I don't know.
8  BY MR. SISNEROS:
9     Q.  How does -- how does a doctor or a
10  pharmacist get paid for Abbott products that they
11  -- that are prescribed out to Medicaid or
12  Medicare beneficiaries?
13       MS. TABACCHI:  Object to the form.  I'm
14  going to object to this entire line of
15  questioning as calling for speculation from the
16  witness that has no experience in this area.
17  We've spent hours on this.
18       I'm hopeful that the parties plan to
19  finish the deposition today, but let me note now
20  my objection to continuing to ask these type of
21  questions of a witness that clearly are beyond
22  his experience.

47 (Pages 182 to 185)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                         July 30, 2007
                        Chicago, IL

                                                              Page 186
1  BY MR. SISNEROS:
2      Q.  Can you answer the question?
3      A.  No.  I don't know.
4      Q.  Okay.  But one thing you are certain of
5  is that reimbursement was not -- wasn't anything
6  that was going to go into Abbott's pocket, right?
7          MS. TABACCHI:  Object to the form.
8          MR. SOFFER:  Objection.
9          THE WITNESS:  As I stated earlier, I do
10 not believe Medicare or Medicaid is a direct
11 customer of Abbott.
12 BY MR. SISNEROS:
13     Q.  Okay, so in your thinking,
14 reimbursement is tied to the direct customer of
15 Medicare and Medicaid?
16         MS. TABACCHI:  Object to the form.
17         Can the reporter please read -- repeat
18 that question?
19         THE REPORTER:  Sure.
20         (Record read.)
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  Yes.

                                                              Page 187
1  BY MR. SISNEROS:
2      Q.  All right, would you look at Exhibit
3  Miller 1165, a one-page handwritten note?
4      A.  Um-hum.
5      Q.  At some -- if I recall correctly, this
6  is something that you -- that you -- that you
7  sent to Mr. Rieger; is that true?
8      A.  That is -- that is accurate.
9      Q.  And there is a piece of information
10 that you really don't recall where you got it,
11 but at one point or another, it was in your hand?
12     A.  Correct.
13     Q.  And because it -- because Mr. Rieger's
14 name is there, it would have been at a time point
15 you were in your first corporate level position,
16 correct?
17     A.  I can't put a time frame on it.
18     Q.  Well, did Mr. Rieger work for you in
19 any capacity outside of your corporate level
20 positions?
21     A.  No.
22     Q.  So --

                                                              Page 188
1      A.  It could have been anytime during that
2  tenure.
3      Q.  Okay, that's fine.  And in the second
4  line you've got in there, "Medicare pays
5  physician 80% of Medicare allowable."  Is that
6  correct?
7      A.  That's what I wrote.
8      Q.  And you've -- and you've identified in
9  the earlier line that "Medicare equals AWP,"
10 correct?
11     A.  That's what I wrote.
12         MS. TABACCHI:  Object to the form.
13 BY MR. SISNEROS:
14     Q.  And so at one point or another, you
15 would have had information that the Medicare
16 program provides a medical provider
17 reimbursement?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I will repeat myself.  I
20 do not know the context in which I got this
21 information or passed it on to Rich.
22 BY MR. SISNEROS:

                                                              Page 189
1      Q.  But that piece of information
2  identifies for you that Medicare pays the
3  physician 80% of the Medicare allowable?
4          MS. TABACCHI:  Object to the form.
5  BY MR. SISNEROS:
6      Q.  Isn't that what you wrote?
7      A.  But I don't know in what context it was
8  written.
9      Q.  I understand that, but it indicates to
10 you that Medicare pays a physician?
11     A.  In some instance.
12     Q.  Okay.  All right, now, let's -- I want
13 to go back to an area earlier, and I -- I may
14 have misunderstood your answer, so I need you to
15 clarify it for me.
16         And that is I asked you some questions
17 why pricing was not discussed in the Medicare
18 Working Group.  Do you recall?
19     A.  Yes, sir.
20     Q.  And at one point, you said there was
21 some issue of legality.  You recall that?
22     A.  That -- yes.

                                        48  (Pages 186 to 189)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 190

1    Q.  And the question that I had followed up
2  with and your response, which I may have
3  misunderstood, concerns whether any legal advice
4  was received by the Medicare Working Group.
5        So my question to you is did the
6  Medicare Working Group receive legal advice from
7  either Abbott's counsel or outside counsel?  Yes
8  or no question.
9        MS. TABACCHI:  Object to the form.
10       I'm going to caution -- I'm also going
11 to caution the witness not to reveal the
12 substance of any communications with counsel.
13 BY MR. SISNEROS:
14   Q.  And I'm not asking for the substance.  I
15 just want to know yes or no.
16   A.  No.
17   Q.  On what basis then do you say that
18 there might have been an issue of legality?
19       MS. TABACCHI:  Object to the form.
20 Again, I will caution the witness not to reveal
21 the substance of any communications with counsel.
22       MR. SISNEROS:  And I'm only going here

Page 191

1  because --
2        MS. TABACCHI:  I'm just reminding the
3  witness.
4        MR. SISNEROS:  Okay, good.  Yeah, good,
5  good.
6        MS. TABACCHI:  Because I think you're
7  mixing apples and oranges, really.
8        MR. SISNEROS:  All right, well --
9        THE WITNESS:  My training was never to
10 discuss pricing in a room with multiple
11 divisions.
12 BY MR. SISNEROS:
13   Q.  Where did -- where did -- where did you
14 receive this training?
15   A.  My --
16   Q.  At the corporate level?
17   A.  No.  Throughout my career.  We just
18 never talked prices.
19   Q.  And, again, why is that?
20   A.  (Gesturing.)
21       MS. TABACCHI:  Object to the form and -
22 -

Page 192

1        THE WITNESS:  I don't know.  We were
2  just trained never to do it.
3  BY MR. SISNEROS:
4    Q.  And, again, who are the multiple
5  divisions?
6    A.  The multiple divisions are the
7  Pharmaceutical Division, the Ross Division,
8  Hospital Products Division, the Abbott
9  Diagnostics Division.
10   Q.  The folks that were representative --
11 represented on the Medicare Working Group?
12   A.  Yes.
13   Q.  Okay.
14       MS. TABACCHI:  Let me know when it's a
15 good time to take a few minutes.
16       MR. SISNEROS:  How much time?
17       THE VIDEOGRAPHER:  We've got about a
18 half hour left on this tape.
19       MR. SISNEROS:  Can it wait?  We can
20 take a break right now.
21       MR. SOFFER:  I won't be able to wait a
22 half hour.

Page 193

1        MS. TABACCHI:  Sorry, my Starbucks cup
2  is empty.
3        THE VIDEOGRAPHER:  We are off the
4  record at 1:47 p.m.
5        (Recess taken.)
6        (Exhibit Miller 1166 was marked
7  for ID)
8        THE VIDEOGRAPHER:  We are back on the
9  record at 1:59 p.m.
10 BY MR. SISNEROS:
11   Q.  All right, Mr. Miller, I'm handing you
12 what I've marked and identified as Exhibit 166 to
13 your deposition.
14       MS. TABACCHI:  Is that Exhibit Miller
15 1166?
16       MR. SISNEROS:  Yes.
17 BY MR. SISNEROS:
18   Q.  Take a moment and review it, please,
19 and as just a housecleaning matter, you should
20 have three pages, Bates No. ABT 52901 through ABT
21 52903.  Do you have them?
22   A.  Yes, sir.

                              49  (Pages 190 to 193)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                        Chicago, IL

Page 194

1    Q.  Okay.
2    A.  (Witness reviewing document. )
3        Yes, sir.
4    Q.  You ready sir?
5    A.  Yep.
6    Q.  All right, the first page is a memo
7   from Mr. Rieger dated April 23rd, 1997 to the
8   Medicare Working Group attaching the Medicare
9   Working Group meeting minutes' most recent
10  meeting; is that correct?
11   A.  As stated.
12   Q.  As stated, okay.  And the following
13  page is -- or the following two pages, rather,
14  are the actual minutes from the Medicare Working
15  Group meeting of April 17th, 1997; is that right?
16   A.  As stated.
17   Q.  Okay, and do you recall whether you
18  made this meeting or not?
19   A.  I do not recall.
20   Q.  Okay.  And if you could turn to the --
21  to the last page under the section entitled
22  "Diabetes," do you see that?

Page 195

1    A.  Yes, sir.
2    Q.  All right.  And it has three bullet
3   points discussing bill spending before the House
4   of Representative regarding coverage of different
5   procedures or services by the Medicare program.
6   Is that accurate?  Actually, strike that.
7        Let me say there would -- under the
8   "Diabetes" heading, the third bullet, they're
9   talking about "a pending House bill regarding the
10  Medicare coverage of diabetes outpatients self-
11  management training services."
12       Do you see that, sir?
13   A.  Yes, sir.
14   Q.  And then in the first bullet, there's
15  some discussion about another House bill, but no
16  reference is made to Medicare there; is that
17  correct?
18   A.  That is correct.
19   Q.  And then the second bullet discusses
20  Cindy Sensibaugh and Rich Rieger distributing
21  general office accounting material to the
22  Medicare Working Group; is that right?

Page 196

1    A.  As stated.
2    Q.  And Miss Sensibaugh works in Abbott's
3   Washington, D.C. office?
4    A.  Yes, sir.
5    Q.  So at least in your review of these
6   minutes, it would be accurate to say that the
7   Medicare Working Group did at times discuss
8   pending legislation regarding Medicare coverage?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  As I've testified
11  earlier, the Washington office kept the members
12  abreast of pending legislation.
13  BY MR. SISNEROS:
14   Q.  So the answer is yes to my question?
15   A.  Yes.
16       MR. SISNEROS:  Okay.
17       (Exhibit Miller 1167 was marked
18  for ID)
19  BY MR. SISNEROS:
20   Q.  Mr. Miller, I am handing you what I --
21  what has been marked and identified as Exhibit
22  Miller 1167 to this deposition.

Page 197

1        Could you take a moment and review
2   those pages, please?
3    A.  (Witness reviewing document).
4        MS. TABACCHI:  Thank you.
5        THE WITNESS:  Yes, sir?
6   BY MR. SISNEROS:
7    Q.  All right, a little housekeeping first.
8   I need you to confirm that the following Bates
9   Numbers making up Exhibit Miller 1167, starting
10  with ABT 533815, ABT 53172, ABT 53713?
11   A.  No, wait, wait.  We have different
12  documents.  I have 53315, 53316, 53317, 53318.
13       MS. TABACCHI:  And this is why we do
14  this.
15       MR. SISNEROS:  That's why we do it. Let
16  me see what you have.
17       THE WITNESS:  (Tendering document).
18       MR. SISNEROS:  Actually, I believe it's
19  the same -- we have the same document that was
20  received twice from Abbott, and so it's going to
21  have two different Bates Numbers, but let's clean
22  it up.

                                 50 (Pages 194 to 197)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                              Chicago, IL

|  | Page 198 |  | Page 200 |
|---|---|---|---|

Page 198

1      Can we go off the record a second?
2      THE VIDEOGRAPHER:  We are off the
3  record at 2:08 p.m.
4      (Recess taken.)
5      THE VIDEOGRAPHER:  We are back on the
6  record at 2:10 p.m.
7  BY MR. SISNEROS:
8      Q.  Mr. Miller, I have handed you what's
9  been marked and identified as Exhibit Miller
10  1167.  Have you read it?
11      A.  Yes, sir.
12      Q.  All right, and the Bates stamps on the
13  exhibit you have are ABT 53315, 53172 --
14      MR. SOFFER:  No.
15      THE WITNESS:  No.
16  BY MR. SISNEROS:
17      Q.  53316, excuse me.  Right?  53316 is the
18  second page of this?
19      A.  Yes, sir.
20      Q.  And the third page is 53317?
21      A.  Yes, sir.
22      Q.  And 53318, correct?

Page 199

1      A.  Correct.
2      Q.  Okay.  And just so we'll identify them
3  for the record, what it is is a memo from you to
4  what appears the Medicare Working Group dated
5  November 21st, 1996 relating to the "Monday's
6  meeting, 11/25/96 on Medicare reform - Don
7  Buell's comments."  Is that right?
8      A.  Yes.
9      Q.  And the meeting that you're referencing
10  in your memo of November 21st, 1996 references a
11  Medicare Working Group meeting?
12      A.  Yes.
13      Q.  And attached to your memo is a memo
14  from Don Buell, Director of Health, Economics and
15  Policy, addressed to you dated November 21st,
16  1996, giving a summary of the AMA/Industry Round
17  Table Steering Committee; is that correct?
18      A.  Yes.
19      Q.  And essentially what your memo does is
20  it distributes Mr. Buell's memo to you, and you
21  redistribute it to the Medicare Working Group?
22  That's what you did, right?

Page 200

1      A.  Yes.
2      Q.  Okay, and so one of the discussions or
3  at least mention that would have been made in the
4  Medicare Working Group was the American Medical
5  Association's proposed Medicare reforms; is that
6  right?
7      MS. TABACCHI:  Object to the form.
8      I'm sorry, could you -- would you mind
9  reading the question back to him?
10      (Record read.)
11      MS. TABACCHI:  I object to the form.
12      THE WITNESS:  The memo was distributed,
13  and there would have been -- well, I don't know.
14  I mean I'm -- I'm assuming there was discussion.
15  BY MR. SISNEROS:
16      Q.  Okay.  But we do know from Exhibit
17  Miller 1167 that the information that you passed
18  on to the Medicare Working Group concerned the
19  activity of the American Medical Association's
20  ideas on Medicare?
21      A.  Yes.
22      MS. TABACCHI:  Object to the form.

Page 201

1  BY MR. SISNEROS:
2      Q.  And this is something you yourself
3  brought up to the attention of the Medicare
4  Working Group, correct?
5      A.  I distributed the document.
6      Q.  You brought it to their attention by
7  distributing it, right?
8      MS. TABACCHI:  Object to the form.
9      MR. SOFFER:  Objection.
10      THE WITNESS:  I re --
11      MS. TABACCHI:  Is there a question
12  pending? I'm sorry, what's the question that's
13  pending?
14  BY MR. SISNEROS:
15      Q.  Well, do you recall your testimony that
16  the purpose of the Medicare Working Group was
17  information sharing?
18      A.  (Witness nodding.)
19      Q.  Would you agree --
20      MS. TABACCHI:  Can I --
21      MR. SOFFER:  You have to answer --
22      MS. TABACCHI:  Mr. Miller, you need to

                                    51 (Pages 198 to 201)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                       July 30, 2007
                            Chicago, IL

Page 202

1  answer audibly.
2        MR. SOFFER: -- audibly.
3        THE WITNESS:  Oh, yes.  Sorry.
4  BY MR. SISNEROS:
5    Q.  Do you agree that your memo with the
6  ABA attachment is a step you took to share
7  information with the Medicare Working Group?
8    A.  Yes.
9        MR. SISNEROS:  All right.
10       (Exhibit Miller 1168 was marked
11 for ID)
12 BY MR. SISNEROS:
13   Q.  All right, I'm handing to you what has
14 been marked and identified as Exhibit Miller 1168
15 to your deposition, and if you could take a few
16 moments and review it, please?
17   A.  (Witness reviewing document.)
18   Q.  Have you had a chance to review the
19 documents, Mr. Miller?
20   A.  Yes, sir.
21   Q.  All right, let's do some housecleaning
22 and see if I screwed it up again.  All right, on

Page 203

1  Exhibit Miller 1168, Page 1, ABT 531161 --
2    A.  53161.
3    Q.  53161.
4    A.  Correct.
5    Q.  Second page ABT 53162; is that correct?
6    A.  Yes, sir.
7    Q.  Next page is 53163?
8    A.  Yes, sir.
9    Q.  53164?
10   A.  Yes, sir.
11   Q.  53165?
12   A.  Yes, sir.
13   Q.  53166?
14   A.  Yes, sir.
15   Q.  53167?
16   A.  Yes, sir.
17   Q.  53168?
18   A.  Yes, sir.
19   Q.  And 53169?
20   A.  Yes, sir.
21   Q.  All right, if you could turn to the
22 first page, ABT 53161?

Page 204

1    A.  (Witness so doing).
2    Q.  Can you identify this document?
3        MS. TABACCHI:  Object to the form to
4  the extent that you are assuming that Exhibit
5  Miller 1168 comprises a single document.
6        MR. SISNEROS:  No, I'm -- actually, I'm
7  going to ask about every page.
8        MS. TABACCHI:  The question as stated -
9  -
10       MR. SISNEROS:  Oh, I'm sorry.
11 BY MR. SISNEROS:
12   Q.  Okay, regarding the first page of the
13 exhibit, "Abbott position on Medicare reform,
14 Monday, November 25th, 1996," do you see that?
15   A.  Yes, sir.
16   Q.  Does that indicate to you that the
17 Medicare -- strike that.
18       Is this referencing a meeting conducted
19 by the Medicare Working Group on Abbott's
20 position on Medicare reform?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  It's a list of

Page 205

1  participants in a meeting of the Medicare Working
2  Group.
3  BY MR. SISNEROS:
4    Q.  Okay.  And when you say "participants,"
5  are you saying participants at the meeting of
6  November the 25th, 1996?
7    A.  It's labeled with those that were --
8  it's labeled to distinguish between those that
9  attended, those that participated via phone
10 calls, and those that weren't there.
11   Q.  And those that weren't there, there is
12 an asterisk next to their name, correct?
13   A.  Correct.
14   Q.  And those who participated by phone,
15 there is a double asterisk next to their name?
16   A.  Correct.
17   Q.  And does that mean that those who
18 attended, there is nothing next to their name?
19       MS. TABACCHI:  Object to the form.
20 BY MR. SISNEROS:
21   Q.  Or let me ask it this way.  How is it
22 indicated who attended that meeting?

52 (Pages 202 to 205)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                July 30, 2007
                          Chicago, IL

| Page 206 |
|---|
| 1         MS. TABACCHI:  Object to the form.<br>2         THE WITNESS:  There is no positive<br>3 identification.<br>4 BY MR. SISNEROS:<br>5     Q.  Do you recall attending this meeting?<br>6     A.  Do I recall?  No.<br>7     Q.  From -- from this first page, ABT<br>8 53161, it does though indicate that there was a<br>9 meeting of the Medicare Working Group regarding<br>10 Abbott's position on Medicare reform, correct?<br>11     A.  Correct.<br>12     Q.  Okay.  If you could turn to the next<br>13 page, ABT 53162, do you have that in front of<br>14 you?<br>15     A.  Yes, sir.<br>16     Q.  Do you know Bill Dwyer?<br>17     A.  Yes, sir.<br>18     Q.  Okay, he was part of the Medicare<br>19 Working Group; is that right?<br>20     A.  Yes, sir.<br>21     Q.  Okay.  Page ABT 53162 of Exhibit Miller<br>22 1168 seems to memorialize a phone conference, |

| Page 207 |
|---|
| 1 telephone conference with Mr. Dwyer. Do you<br>2 agree?<br>3     A.  It purports to be that.<br>4     Q.  Are these your notes?<br>5     A.  I have no idea whose notes these are.<br>6     Q.  Okay.  All right, let's go to the third<br>7 page of Exhibit Miller 1168, ABT 53163.  You see<br>8 that?<br>9     A.  Yes, sir.<br>10     Q.  And that is a -- a faxed cover sheet of<br>11 a fax being sent by you to Don Buell, Director<br>12 Health Economics and Policy; is that correct?<br>13     A.  No, sir.  Reverse.<br>14     Q.  Oh, to you from Mr. Buell?<br>15     A.  Yes, sir.<br>16     Q.  Okay.  And what he has sent you is the<br>17 "Revised position re Medicare," correct?<br>18     A.  That's what it states.<br>19     Q.  And at the top of the fax that you<br>20 received, it's "page 1 of 3," and then the<br>21 following page, ABT 53164, at the very top says<br>22 "page 2 of 3" and then the following page, ABT |

| Page 208 |
|---|
| 1 53165, at the top of the page says "page 3 of 3."<br>2 Do you see that?<br>3     A.  Yes, sir.<br>4     Q.  Does that indicate to you that those<br>5 three pages, ABT 53163, 64 and 65, are a fax that<br>6 you received?<br>7     A.  It's my hand -- it's my hand -- yes.<br>8     Q.  And what you received from him was a<br>9 "Proposed Abbott position re Medicare reform"<br>10 dated 11/25/96, right?<br>11     A.  Correct.<br>12     Q.  But by the way the -- is that your<br>13 handwriting on the upper right-hand corner of ABT<br>14 531163, the fax cover sheet?  Is that your<br>15 handwriting up at the -- above?<br>16     A.  Yes.<br>17         MR. SOFFER:  Counsel, just for<br>18 clarification, I hear you doubling the 1, I<br>19 think, in 53163.<br>20         MR. SISNEROS:  All right.<br>21         MR. SOFFER:  We are talking about<br>22 53163, correct? |

| Page 209 |
|---|
| 1         MR. SISNEROS:  That is correct.<br>2         MR. SOFFER:  All right.<br>3         MR. SISNEROS:  And it's entitled "fax<br>4 cover sheet."<br>5         THE WITNESS:  I'm sorry?<br>6         MR. SOFFER:  I'm just confirming that<br>7 we're talking about the same page.<br>8         THE WITNESS:  All right.<br>9 BY MR. SISNEROS:<br>10     Q.  All right, you see where that says "fax<br>11 cover sheet"?<br>12     A.  Yes.<br>13     Q.  And to the right of that, there's some<br>14 handwriting?<br>15     A.  Um-hum.  Yes, sir.<br>16     Q.  Is that your handwriting?<br>17     A.  Those are my notes.<br>18     Q.  Okay.  Okay, was this fax -- excuse me.<br>19 Was Mr. Buell's fax to you discussed within the<br>20 Medicare Working Group?<br>21         MS. TABACCHI:  Object to the form.<br>22         THE WITNESS:  I believe -- I believe |

                                  53 (Pages 206 to 209)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 210

1  this document is covered in Exhibit Miller 1167.
2  BY MR. SISNEROS:
3      Q.  I'm sorry, say again?
4      A.  I believe this document is covered in
5  your document Exhibit Miller 1167.
6      Q.  Okay, if you would turn to Exhibit
7  Miller 1167 and review that, that is Mr. Buell's
8  memo to you of his report on "meeting of the
9  AMA/Industry Round Table."  Do you see that?
10     A.  So this was after.  11/25?  So this was
11 written after the meeting.
12     Q.  Okay, well, let me ask the --
13     A.  Go ahead.
14     Q.  What do you mean this was written
15 after? What are you referring to?
16     A.  I'm referring to -- I'm sorry, I'm
17 looking at the dates on the document.
18     Q.  Okay, and the sequence of documents
19 that you commented on, could you please clarify
20 for the record what documents you were referring
21 to in --
22     A.  I'm looking at Abbott document 53316

Page 211

1  dated November 21st, 1996.
2      Q.  Actually, I wasn't even asking
3  questions about that.
4      A.  Oh.
5      Q.  I was asking questions about on Exhibit
6  16 -- Exhibit Miller 1168.  On Exhibit Miller
7  1168 -- you got that?
8      A.  Yep.
9      Q.  (Continuing) -- I was asking whether
10 Mr. Miller's fax to you --
11     A.  Mr. Buell's fax.
12     Q.  Excuse me.  (Continuing) -- Mr. Buell's
13 fax to you of three pages where he's sent to you
14 "proposed Abbott position Medicare reform,"
15 whether that fax and his two pages of the
16 proposed Abbott position, whether that was
17 discussed in the Medicare Working Group?
18     A.  I do not know whether this specific
19 document was discussed.
20     Q.  Was the subject matter --
21     A.  Yes.
22     Q.  -- discussed?

Page 212

1      A.  Yes.
2      Q.  Okay.  All right, now let's go to
3  Exhibit -- same exhibit, Exhibit Miller 1168, but
4  to page -- to ABT 53166.
5      A.  (Witness so doing.)
6      Q.  And those are handwritten notes
7  entitled, "Medicare 11/25/96."  Is that right?
8      A.  That is correct.
9      Q.  Is that your handwriting?
10     A.  That is my handwriting.
11     Q.  The fourth line from the bottom --
12     A.  One, two, three, four.
13     Q.  -- you wrote the following:  "Estimated
14 acquisition cost (invoice versus waste,
15 distribution) - reimbursement - oncology."
16         What do you mean by those notes?
17     A.  I do not remember.
18     Q.  And the top of the page where you have
19 -- where it says, "Medicare 11/25/96," does the
20 11/25/96 reference the day that you wrote these
21 notes?
22     A.  Yes.

Page 213

1      Q.  All right, now, going back to Exhibit
2  Miller 1167 --
3      A.  Um-hum.
4         MR. SISNEROS:  Let's go off the record
5  for a change of tape.
6         THE VIDEOGRAPHER:  We are off the
7  record at 2:32 p.m. with the end of Tape No. 3.
8         (Recess taken.)
9         THE VIDEOGRAPHER:  We are back on the
10 record at 2:34 p.m. with the start of Tape No. 4.
11 BY MR. SISNEROS:
12     Q.  All right, let me make a little change
13 here.  Stay on Exhibit Miller 1168, the page
14 you're on, your handwritten notes, ABT 53166.  Do
15 you see that?
16     A.  Okay.  Yes, sir.
17     Q.  All right, you've testified this is
18 your handwriting?
19     A.  Yes.
20     Q.  What -- what is this?
21     A.  It appears to be my notes from a
22 presentation or discussion.

54 (Pages 210 to 213)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                                July 30, 2007
                              Chicago, IL

Page 214

1    Q.  By Don Buell?
2    A.  I do not know.
3    Q.  And would you agree that the subject
4  matter of -- of your handwritten notes seems to
5  be "the American Medical Association" and some
6  notes regarding Medicare reform?
7        MS. TABACCHI:  I'll object to the form.
8  BY MR. SISNEROS:
9    Q.  Well, let me ask it this way.  What is
10  the subject matter of your handwritten notes?
11    A.  The AMA proposal.
12    Q.  Now, who was monitoring the AMA and
13  their activity with regard for the Medicare --
14  proposed Medicare reform?
15    A.  It would have been the Pharmaceutical
16  Division and the Washington office.
17    Q.  Well, what about Don Buell?
18    A.  He is a member of the Pharmaceutical
19  Division.
20    Q.  Okay.  How about Dr. Conway?
21    A.  He is a member of the Pharmaceutical
22  Division.

Page 215

1    Q.  Were both of them involved in
2  monitoring the AMA activity?
3    A.  I --
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  I do not know, sir.
6  BY MR. SISNEROS:
7    Q.  Well --
8    A.  We --
9    Q.  Go ahead.
10    A.  Question not asked.
11    Q.  Yeah, okay.  Well, look at Exhibit
12  Miller 1167 --
13    A.  Um-hum.
14    Q.  -- starting at the page ABT 531 --
15    A.  Yeah.
16    Q.  I'm sorry, at ABT 53316.
17    A.  Yes, sir.
18    Q.  And that is Buell's memo to you of four
19  days earlier --
20    A.  Yes.
21    Q.  -- is that correct?
22    A.  Yes, sir.

Page 216

1    Q.  And by four days earlier, I'm
2  referencing four days earlier than your
3  handwritten notes; is that right?
4    A.  That is correct.
5    Q.  And he is reporting to you regarding
6  the meeting of the AMA/Industry Round Table
7  Steering Committee; is that right?
8    A.  That is correct.
9    Q.  Did -- do you know if Buell attended
10  this meeting?
11    A.  The AMA meeting?
12    Q.  Yes.
13    A.  I do not know with certainty.
14        (Exhibit Miller 1169 was marked
15  for ID)
16  BY MR. SISNEROS:
17    Q.  Okay.  Okay, I'm going to hand to you
18  what has been marked and identified as Exhibit
19  Miller 1169 to your deposition.
20        Could you please take a few minutes and
21  review those notes or memos?
22    A.  (Witness reviewing document. )

Page 217

1        Yes, sir.
2    Q.  You done reading?
3    A.  (Witness nodding.)
4    Q.  Okay, this is email -- excuse me.  This
5  is a memoranda from you dated November the 26th,
6  1996 addressed to Mary Quinn Boyd and cc to D.
7  Buell and R. Rieger, correct?
8    A.  Correct.
9    Q.  And the subject matter of your memo is,
10  "Proposed Abbott position Medicare reform."  Is
11  that right?
12    A.  Correct.
13    Q.  And the sentence -- the sentence that
14  follows the re line is, "Attached is a revised
15  draft reflecting the inputs of all the divisions'
16  representatives.  I see the approval process as
17  follows:"  And then you lay it out, right?
18    A.  Correct.
19    Q.  Okay, and so when you're talking about
20  the the inputs of all the division
21  representatives in that first sentence, you're
22  referring to the input of the division

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
Chicago, IL

Page 218

1  representatives in the Medicaid -- Medicare
2  Working Group; is that right?
3      A.  Yes.
4      Q.  And so the attached two documents that
5  are the proposed Abbott position paper re
6  Medicare reform is a -- your final product that
7  is being run up the chain, is that right, up the
8  chain of command?
9          MS. TABACCHI:  Object to the form.
10 BY MR. SISNEROS:
11     Q.  Okay, let me try to be more clear.  Who
12 is Mary Quinn Boyd?
13     A.  She's -- she was in Corporate Public
14 Affairs.
15     Q.  In terms of corporate level, was she
16 above your level?
17     A.  No.
18     Q.  Was she below your level?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I do not know that with a
21 hundred percent certainty.
22 BY MR. SISNEROS:

Page 219

1      Q.  Was she -- okay, was she at your level?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  I do not believe so.
4  BY MR. SISNEROS:
5      Q.  Okay, why were you sending this to Mary
6  Quinn Boyd?
7      A.  She was the person in Public Affairs
8  that would take it to her boss for approval.
9      Q.  I see.  Now, am I accurate in saying
10 that the attached Abbott position paper was the
11 work product of the Medicare Working Group?
12         MR. SOFFER:  Objection.
13         MS. TABACCHI:  Object to the form as
14 well.
15 BY MR. SISNEROS:
16     Q.  Oh.  Well, let me try this differently.
17 Was the attached proposed Abbott position work
18 generated in the Medicare Working Group?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  It is a draft document.
21 BY MR. SISNEROS:
22     Q.  That was generated by who?

Page 220

1      A.  By the Medicare Working Group.
2      Q.  And in your memo to Mary Quinn Boyd, is
3  -- you are proposing approval of that document?
4      A.  Yes.
5      Q.  Then what follows is -- is a schedule.
6  For example, "Monday, 12/2/96, Public Affairs
7  approves."  Did I read that correctly?
8      A.  Correct.
9      Q.  And what you're doing is you're getting
10 approvals of different divisions or different
11 offices on this document, right?
12     A.  That was what was proposed.
13     Q.  Okay.  We're talking about the proposed
14 document here.
15     A.  Yes, sir.
16     Q.  Okay, and then for Tuesday's agenda --
17 then you have, "Tuesday, 12/3/96, division
18 representatives obtained their division
19 presidents' approval."
20         Did I read that correctly?
21     A.  You read that correctly.
22     Q.  And the reference to "division

Page 221

1  representatives" means the division
2  representatives that sat on the Medicare Working
3  Group, correct?
4      A.  Correct.
5      Q.  And their job was to go back and get
6  the approval on the draft from the presidents of
7  their division?
8      A.  Correct.
9      Q.  And then for Wednesday, December the
10 4th, 199 --
11     A.  Can I stop this discussion for a
12 second? This document was never approved.
13     Q.  That's fine.
14     A.  Okay.
15     Q.  Then going -- then going on to your
16 schedule of Wednesday, December 4th -- excuse me.
17 Let me read this different. It says, "Wednesday"
18 -- it says, "Wednesday, 12/4/96, distribute to
19 GPC, TRH and DLB."
20         Did I read that correctly?
21     A.  That's as stated.
22     Q.  I'm sorry?

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
Chicago, IL

Page 222

1    A.  As stated.
2    Q.  Yeah.  And DLB is Dwayne Burnham,
3  right?
4    A.  Yes, sir.
5    Q.  Who -- who became what, CEO?
6    A.  He was CEO.
7    Q.  He was CEO.  And then TRH is -- is --
8  who's that, Tom --
9    A.  Hudson.
10    Q.  Hudson.  He was also CEO or --
11    A.  President.
12    Q.  He was President.  Was he ever CEO?
13    A.  No.
14    Q.  So he was Abbott's President.  And
15  Burnham was Abbott's Chief Executive Officer,
16  correct?
17    A.  Yes, sir.
18    Q.  And GPC is --
19    A.  Gary Coughlin.
20    Q.  Okay, and he wasn't your immediate
21  supervisor, but he was Moorehead's supervisor; is
22  that right?

Page 223

1    A.  Yes, sir.
2    Q.  And what what was his title?
3    A.  Chief Financial Officer.
4    Q.  There's some notes down at the bottom
5  of the memo, Mr. Miller.  Are those handwritten
6  notes in your handwriting?
7    A.  Those are not my notes.
8    MR. SISNEROS:  Okay.  All right, thank
9  you for your time, Mr. Miller.  I pass the
10  witness.
11    THE WITNESS:  Thank you.
12    MS. FORD:  Can we go off the record for
13  just a second?
14    THE VIDEOGRAPHER:  We are off the
15  record at 2:46 p.m.
16    (Recess taken.)
17    THE VIDEOGRAPHER:  We are back on the
18  record at 2:54 p.m.
19    MS. FORD:  Mr. Miller, good afternoon.
20  I introduced myself this morning briefly off the
21  record, but for purposes of the record, I'll
22  introduce myself again.

Page 224

1    My name is Rebecca Ford.  I'm with the
2  Department of Justice, and I represent the United
3  States in the case U.S. ex. rel. Ven-a-Care,
4  Florida Keys vs. Abbott laboratories.
5    THE WITNESS:  Thank you.
6
7    DIRECT EXAMINATION
8  BY MS. FORD:
9    Q.  And this is one of the cases in which
10  your deposition has called today.  It's separate
11  from the action in which Mr. Sisneros represents
12  the State of California, but they're related
13  litigation.
14    Do you understand that there are
15  multiple lawsuits that you are being deposed in
16  today?
17    A.  That's what my lawyers have advised me.
18    Q.  Okay.  And although we've switched
19  questioners, you're still under oath, and we're
20  still continuing the deposition.  And I'll just
21  remind you that counsel may object from time-to-
22  time, both your counsel and counsel from Abbott

Page 225

1  may object from time-to-time, but unless they
2  instruct you not to answer, you may answer the
3  question.
4    I believe you testified earlier that
5  you retired from Abbott in 2003; is that correct?
6    A.  December 31st, 2003.
7    Q.  Okay.  And have you held any
8  professional positions since that time?
9    MS. TABACCHI:  Object to the form.
10  BY MS. FORD:
11    Q.  Do you understand my question?
12    A.  Rephrase, please.
13    Q.  Have you worked since December of 2003?
14    A.  Yes.
15    Q.  And what was your job most recently
16  after retiring from Abbott in December of 2003?
17    A.  Oh, everything I've done is of a
18  consulting nature.
19    Q.  Okay.
20    A.  I consulted for Abbott for several
21  months after I retired as part of the transition
22  of the lady that replaced me.

57 (Pages 222 to 225)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                          Chicago, IL

Page 226

1    Q.  Okay.  And when did that consulting
2  end?
3    A.  It was probably March 2004.
4    Q.  Okay.  And other than consulting with
5  Abbott to help train your replacement, have you
6  done any consulting for Abbott or any Abbott
7  affiliate since that time?
8    A.  No.
9    Q.  Okay.  Have you worked for -- done any
10  consulting work for TAP since that time?
11    A.  No.
12    Q.  Okay.  Do you currently receive any
13  retirement benefits from Abbott?
14    A.  Yes.
15    Q.  Okay, and do you own Abbott stock?
16    A.  I do not.
17    Q.  Okay.  Other than currently receiving
18  retirement benefits, do you have any other
19  connections to Abbott at this point in time?
20      MS. TABACCHI:  Object to the form.
21      MR. SOFFER:  Objection.
22  BY MS. FORD:

Page 227

1    Q.  Let me see if I can help you out.  Do
2  you have any family members that work for Abbott?
3    A.  No.
4    Q.  Okay.  Any close friends that still
5  work at Abbott?
6      MS. TABACCHI:  Object to the form.
7      THE WITNESS:  No.
8  BY MS. FORD:
9    Q.  And what is your understanding of how
10  you're being represented today?  Are you being
11  represented by Abbott counsel?
12      MS. TABACCHI:  Object to the form.
13      I'm going to caution the witness not to
14  reveal the substance of any communications with
15  counsel.
16      MR. SOFFER:  Objection.
17  BY MS. FORD:
18    Q.  I'm not asking you to discuss anything
19  you have discussed with your counsel.  I'm just
20  asking your understanding of who is reprsenting
21  you.
22      MS. TABACCHI:  I'm going to instruct

Page 228

1  the witness that, to the extent his understanding
2  is based purely on communications with counsel,
3  he should not reveal the substance of
4  communications with counsel.
5      MR. SOFFER:  Are you able to answer
6  that question without necessarily disclosing
7  conversations you have had with either me or Mr.
8  Hoffman or Ms. Tabacchi?
9      THE WITNESS:  I have my own attorneys.
10  BY MS. FORD:
11    Q.  And are you receiving a bill for your
12  legal services?
13    A.  No.
14    Q.  Do you know who is paying for your
15  legal services?
16    A.  Abbott.
17    Q.  Okay.  Earlier this morning, I believe
18  you testified that you thought of Abbott at some
19  point in time as six companies.  Did I -- am I
20  remembering correctly?
21    A.  That's my characterization of Abbott.
22    Q.  Okay, what did you mean by that?

Page 229

1    A.  They operate fairly autonomously and
2  report up through -- in 31 years, the
3  organization changed many times, but they
4  basically operate up through a line structure.
5    Q.  Okay, and when you say "they," who are
6  referring to?
7    A.  The divisions.
8    Q.  Okay, and could you just for my own
9  purposes list out the six divisions that you were
10  discussing or that you're referring to?  Excuse
11  me.
12    A.  You've got Ross Laboratories, Hospital
13  Products Division, Pharmaceutical Products
14  Division, Diagnostics Division, and the
15  International Division. Is that five or six?
16    Q.  That's five.
17    A.  Five, okay.
18    Q.  Can you think of the last one?
19    A.  No.
20    Q.  Okay.  Could the last one have been
21  TAP?
22      MS. TABACCHI:  Object to the form.

                          58 (Pages 226 to 229)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 230

1        THE WITNESS:  TAP is a joint venture.
2   BY MS. FORD:
3       Q.   Okay, so when you referenced six
4   companies, were you referring -- was TAP on of
5   the six that you were referring to?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  No.
8   BY MS. FORD:
9       Q.   So there's one other you just can't
10  remember at this time?
11      A.   There's basically Corporate.
12      Q.   Corporate, okay.
13          I wanted to ask you just a little bit
14  more about TAP.  You have indicated throughout
15  your testimony today that TAP was at least at
16  some of the Medicare Working Group meetings; is
17  that correct?
18      A.   That is correct.
19      Q.   And a representative of TAP is on the
20  Medicaid Working Group distribution list; is that
21  correct?
22          MS. TABACCHI:  Object to the form.

---

Page 231

1        MS. FORD:  What is wrong?
2        MS. TABACCHI:  It's Medicare.
3        MS. FORD:  Oh, thank you.
4   BY MS. FORD:
5       Q.   At least one representative of TAP is
6   listed on the Medicare Working Group distribution
7   list; is that correct?
8       A.   That is correct.
9       Q.   And that is John Campbell; is that
10  correct?
11      A.   Yes.
12      Q.   Okay.  Did you work with anyone else
13  from TAP in the context of the Medicare Working
14  Group?
15      A.   I do not recall.
16      Q.   Okay.  Do you recall any -- anyone else
17  from TAP attending Medicare Working Group
18  meetings?
19      A.   No.
20      Q.   Okay.  If Abbott is a separate company
21  from TAP, why was TAP included on Abbott's
22  internal Medicare Working Group distribution

---

Page 232

1   list?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  TAP was jointly owned by
4   Abbott and Takeda of Japan.  So anything that
5   would have affected TAP would 50% flow through to
6   Abbott.
7   BY MS. FORD:
8       Q.   To your knowledge, was TAP included on
9   other internal committees of Abbott?
10      A.   Oh, yes.
11      Q.   Okay.  Can you give me an example of a
12  few of those?
13      A.   Sure.  I mean in the Controller's
14  Council, the MIS areas.  I mean it's not unusual
15  for TAP to have been on an Abbott committee.
16      Q.   What about public relations, did TAP
17  have their own public relations?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  I'm not qualified to
20  answer that.
21  BY MS. FORD:
22      Q.   Do you know?

---

Page 233

1       A.   I think so.
2       Q.   You think they had their own public
3   relations?
4       A.   Yes, but I wouldn't swear to it.
5       Q.   Okay.
6        MS. TABACCHI:  That's the standard.
7        MR. SOFFER:  There you go.  That's one
8   of those rare moments where it actually makes
9   sense to say that.
10  BY MS. FORD:
11      Q.   I want to go back to a little bit of
12  your testimony this morning when you and Mr.
13  Sisneros talked about the inception of the
14  Medicare Working Group, and I believe you
15  testified that Mr. Moorehead asked you to create
16  the group.  Is that correct?
17      A.   That is correct.
18      Q.   Okay, and do you recall the discussions
19  that you had with Mr. Moorehead around that time?
20          MS. TABACCHI:  Object to the form.
21  BY MS. FORD:
22      Q.   Let me be more specific.  Do you recall

---

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

---

Page 234

1  having discussions with Mr. Moorehead in which he
2  asked you to -- to head up the Medicare Working
3  Group?
4      A.   Yes.
5      Q.   Did those discussions occur over the
6  telephone?
7      A.   No.
8      Q.   Were they in person?
9      A.   Our offices were next to each other.
10     Q.   Okay --
11     A.   Yes.
12     Q.   -- so, yes, they were in person.
13          And do you recall how many times that
14 you had discussions with Mr. Moorehead about the
15 creation of the Medicare Working Group?
16     A.   No.
17     Q.   Do you think it was more than two?
18     A.   Probably.
19     Q.   Okay.  Generally, what do you call --
20 recall from those discussions about the reasons
21 for the creation of the Medicare Working Group?
22     A.   I do not remember the reason for the

---

Page 235

1  formation.
2      Q.   Do you recall whether Mr. Moorehead
3  gave you a particular objective for the Medicare
4  Working Group?
5      A.   Set up an information sharing group.
6  And that's what we did.  Why we --
7      Q.   Is it your testimony that you probably
8  knew why at the time, you just can't recall
9  today?  Is that what you're --
10          MS. TABACCHI:  Object to the form.
11          THE WITNESS:  I don't remember, you
12 know.
13 BY MS. FORD:
14     Q.   Okay, let me ask you this.  Based on
15 your history with Abbott, would it have been
16 typical for someone to ask you to form a working
17 group, but you not -- but for you not to know why
18 you were forming the group?
19          MS. TABACCHI:  Object to the form.
20          THE WITNESS:  This was a new assignment
21 for me. There had never been a person of my level
22 in this group before.  So it was -- again, we all

---

Page 236

1  have bosses, and it was, your boss asks you to do
2  it, you do it.
3  BY MS. FORD:
4      Q.   Okay, you indicated that no one at your
5  level had been involved with the group before.
6  Does that mean the group existed prior to your
7  becoming a part of it?
8      A.   I do not know.
9      Q.   Okay.  And upon getting this new
10 assignment, you -- do you think that you would
11 have inquired about the purpose or the goals of
12 the group?
13     A.   Oh, we had -- as I've testified
14 earlier, we had people show up and say, "Why am I
15 here?"  So we had some difficulty in even getting
16 the right representatives in the room.
17     Q.   And in response to their question of,
18 "Why am I here," what did you say?
19     A.   "We're setting up an information-
20 sharing group so that we can be -- you can keep
21 us informed of changes in your area of -- you
22 know, of healthcare coverage."

---

Page 237

1      Q.   Was anyone in the Medicare Working
2  Group tasked with doing anything with the
3  information they received?
4          MS. TABACCHI:  Object to the form.
5          MR. SOFFER:  Objection, vague.
6          THE WITNESS:  Beyond sharing?
7  BY MS. FORD:
8      Q.   (Counsel nodding.)
9      A.   No.
10     Q.   So what was the purpose of sharing the
11 information if there was no objective to
12 accomplish?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  I'd be giving you my
15 opinion.
16 BY MS. FORD:
17     Q.   Well, as a head of the group, I would
18 be interested in what your opinion is.
19     A.   Okay, my opinion would be it was to --
20 if a state was making changes to a TAP product in
21 the doctor's office, that same change might
22 affect a hospital product sold in the doctor's

---

                          60  (Pages 234 to 237)

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 238

1  office.
2     Q.  Okay.  And so if a state were to make a
3  change in Medicaid that would affect a TAP
4  product that could also have some spill-over
5  effect on an HPD product, would it be your
6  expectation that someone from TAP and/or HPD
7  would do something with that information?
8        MS. TABACCHI:  Object to the form.
9        MR. SOFFER:  Objection, vague.
10       THE WITNESS:  I'd be speculating.
11 BY MS. FORD:
12    Q.  Okay.  You indicated earlier that the
13 group disbanded sometime in late '97; is that
14 correct?
15    A.  That's my understanding.
16    Q.  Okay.  And I believe you said it was
17 because it was no longer a top five priority for
18 Abbott.
19       Did I summarize your earlier testimony
20 accurately?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  In my opinion, the -- Mr.

Page 239

1  Moorehead retired, Mr. Weiger came in, and we
2  increased the emphasis on product acquisition,
3  licensing focus.  That was our focus.
4  BY MS. FORD:
5     Q.  Okay.  So after Mr. Moorehead retired,
6  was his -- did the person who took his place, was
7  he no longer asking you about the Medicare
8  Working Group?
9     A.  It --
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  In my opinion, it became
12 a lower priority.
13 BY MS. FORD:
14    Q.  Okay, and on what basis are you saying
15 it became a lower priority?
16    A.  Based on the emphasis the group put on
17 it.
18    Q.  The Medicare Working Group?
19    A.  No.
20    Q.  Which group?
21    A.  My department.
22    Q.  Your department?

Page 240

1     A.  (Witness nodding.)
2     Q.  Your department, okay.
3        I think you spoke at length with Mr.
4  Sisneros about who the Medicare Working Group
5  minutes were distributed to.  Aside from that,
6  did you have discussions with others in your
7  department about the workings or the discussions
8  of the Medicare Working Group?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  No.  I mean it's hard to
11 -- you know, to the best of my knowledge, no.
12 BY MS. FORD:
13    Q.  So after the conversations that you had
14 with Mr. Moorehead prior to the group forming,
15 you didn't have any more discussions with him
16 about the Medicare Working Group?
17    A.  It would be a lunch-time conversation:
18 How's it going?
19    Q.  Okay.  Were you ever asked to report on
20 the workings of the Medicare Working Group to Mr.
21 Moorehead?
22    A.  I gave Mr. Moorehead a monthly report

Page 241

1  of my activities.
2     Q.  Okay, and did that include all of the
3  activities that you were responsible for as
4  Divisional Vice President --
5     A.  Yes.
6     Q.  -- of Corporate Development?
7        And did that monthly report typically
8  include an update on the Medicare Working Group?
9     A.  If there were events that warranted
10 their inclusion.
11    Q.  Okay.  What types of events warranted
12 inclusion in your monthly update to Mr.
13 Moorehead?
14    A.  If there -- if there was a pending
15 legislation that would have a -- potentially a
16 significant financial impact, you would at least
17 put it in your monthly report so he would be
18 aware of it.
19    Q.  And what would be the purpose of making
20 Mr. Moorehead aware of that legislation, for
21 example?
22    A.  If his boss came to see him and said,

                                   61 (Pages 238 to 241)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

| Page 242 |
| --- |

1  "What about HR 321," that Dick would not be
2  embarrassed?
3      Q.   Okay, was it your understanding that
4  Mr. Moorehead and some of his superiors were
5  interested in the subject of Medicare and
6  Medicaid reform?
7          MS. TABACCHI:  Object to the form.
8          MR. SOFFER:  Objection, calls for
9  speculation.
10         THE WITNESS:  Rephrase?
11 BY MS. FORD:
12     Q.   Did you understand my question?
13     A.   Yes.
14     Q.   Okay.  Then if you -- okay, then you
15 may answer.
16         MS. TABACCHI:  Same objection.
17         THE WITNESS:  Anything that would have
18 a negative financial impact, management would be
19 concerned about.
20 BY MS. FORD:
21     Q.   So was that -- is that a yes?
22     A.   Yes.

| Page 243 |
| --- |

1      Q.   Okay.  Did you ever have any
2  discussions with Mr. Moorehead about any
3  particular legislation?
4      A.   I do not recall.
5      Q.   Okay.  Did Mr. Moorehead ever indicate
6  to you that he was taking the information that
7  you provided him and passing it up the chain?
8      A.   No.
9      Q.   Did you ever have a meeting with anyone
10 who was above Mr. Moorehead's level?
11         MS. TABACCHI:  Object to the form.
12 BY MS. FORD:
13     Q.   I'll ask you more specific.  About the
14 Medicare Working Group?
15     A.   No.
16     Q.   About Medicare or Medicaid
17 reimbursement generally?
18     A.   No.
19     Q.   You indicated that the Medicare Working
20 Group was discontinued in late '97.  Did someone
21 tell you to disband the group?
22     A.   No.

| Page 244 |
| --- |

1      Q.   Okay.  How did it -- how did it end?
2      A.   It just -- in my opinion, it died due
3  to lack of direction.
4      Q.   Okay, so you had what would have been
5  one of your last meetings, and another meeting
6  just never got scheduled?  Was it something like
7  -- of that nature?
8      A.   Yes.
9      Q.   Okay.  When you first got the
10 assignment from Mr. Moorehead to head up the
11 Medicare Working Group, did you do anything to
12 educate yourself about the issues that would be
13 discussed in the Medicare Working Group?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I think I asked for
16 background documents from the divisions.
17 BY MS. FORD:
18     Q.   Okay, and do you recall who you would
19 have made that request from -- or made the
20 request to?
21     A.   I would have made the request to Rich
22 to get me some information.

| Page 245 |
| --- |

1      Q.   Okay.  And is it your recollection that
2  he did in fact get you some background
3  information?
4      A.   Yes.
5      Q.   Okay, and do you recall the nature of
6  those background documents?
7      A.   I think that the AMA stuff was
8  provided.
9      Q.   Did you make an attempt at that point
10 to learn about the current reimbursement system?
11         MS. TABACCHI:  Object --
12         THE WITNESS:  No.
13 BY MS. FORD:
14     Q.   I think you testified earlier that Mr.
15 Rieger's primarily responsible for generating the
16 minutes of the meeting; is that correct?
17     A.   That is accurate.
18     Q.   Was there anyone responsible for
19 maintaining the minutes, keeping them?
20     A.   Keeping them?  Keeping them?  You mean
21 keeping a file copy.
22     Q.   Keeping a file copy.

                              62 (Pages 242 to 245)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 246

1    A.  Mr. Rieger.
2    Q.  Okay.  Was Mr. Rieger similarly
3  responsible for distributing the minutes?
4    A.  I'm going to sound sexist here.  Our
5  admini -- our admin was responsible for
6  distributing the minutes.
7    Q.  Okay, who was responsible for directing
8  your admin to distribute the minutes?
9    A.  Rich.
10    Q.  Rich.  And what -- who was responsible
11  for determining who the minutes would be
12  distributed to?
13    A.  We followed the protocol that was on
14  the memo, if -- you know, double asterisk, single
15  asterisk, no asterisk, to the best of my
16  knowledge.
17    Q.  And so what does that mean exactly, the
18  term -- in terms of distribution of the minutes?
19    A.  I'm sorry.  Everybody that was a member
20  of the group should have gotten a copy of the
21  minutes for every meeting.
22    Q.  Okay.  I meant to tell you at the

---

Page 247

1  outset I might have a pause from time-to-time.
2  I'm trying not to retread any ground that you
3  covered this morning unless I have some more
4  specific questions.
5    A.  I'd be most appreciative.
6    MR. SOFFER:  We'd all be.
7    MS. FORD:  So if you can just give me a
8  minute to get the right document.
9    THE WITNESS:  We'll give you all the
10  time you want.
11  BY MS. FORD:
12    Q.  I'm going to ask you a few more
13  questions about Exhibit Miller 1167, which you
14  should have in front of you.  It's a memo --
15  excuse me.  It's an interoffice correspondence
16  dated November 21st, 1996 on your letterhead.
17    Do you see that document?
18    A.  Yes, ma'am.
19    Q.  Okay, great.  And I believe that your
20  earlier testimony -- through your earlier
21  testimony, you established that this memorandum
22  is a cover to a memorandum sent to you by Don

---

Page 248

1  Buell on November 21st, 1996.  Is that correct?
2    A.  I'd have to go through the documents to
3  agree with you.
4    Q.  Okay, if you want to turn to page 2 --
5    A.  Okay.
6    Q.  -- and if you'd look up on the top
7  right-hand corner, it's --
8    A.  Page 2, okay.
9    MR. SOFFER:  What's the Bates page?
10    MS. FORD:  The Bates is ABT 53172.
11    MS. TABACCHI:  Or?
12    MR. SOFFER:  Yeah
13    MS. FORD:  Or 53316.
14    THE WITNESS:  53316.
15  BY MS. FORD:
16    Q.  Yes.
17    A.  Okay.
18    Q.  Okay.  So up in the top right-hand
19  corner, in the -- next to "firm," it says, "Don
20  Buell --
21    A.  Um-hum.
22    Q.  -- to Jim Miller --

---

Page 249

1    A.  Yes.
2    Q.  -- re report on meeting of the
3  AMA/Industry Round Table Steering Committee."  Is
4  that accurate?
5    A.  That's what it says.
6    Q.  Okay.  Do you remember this document
7  from a little bit earlier today or do you want to
8  take a minute to refresh your recollection?
9    A.  No, I remember this document.
10    Q.  And does there appear to be a memo from
11  Mr. Buell to you updating you on the AMA/Industry
12  Round Table Steering Committee?
13    A.  It appears to be documentation of a
14  meeting, yes.
15    Q.  Now, if you turn back to page 1 of the
16  exhibit, 55315, we're back to the interoffice
17  correspondence on your letterhead to what appears
18  to be members of the Medicare Working Group; is
19  that correct?
20    A.  That is correct.
21    Q.  Okay.  And the re line says, "Relating
22  to Monday's meeting, 11/25/96, on Medicare

---

63 (Pages 246 to 249)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                              July 30, 2007
                          Chicago, IL

Page 250

1  reform, Don Buell's comments."  And then
2  following that, it says, "Following is some
3  background material for the meeting on Monday."
4      Did I read that accurately?
5      A.  That is correct.
6      Q.  Okay.  And you indicate that it's --
7  you're incorporating a three-page attachment?
8      A.  That is correct.
9      Q.  Okay.  So does it appear that you are
10  forwarding to members of the Medicare Working
11  Group a memo that was provided to you by Don
12  Buell?
13      A.  That is correct.
14      Q.  Okay.  Do you know why Mr. Buell was
15  reporting to you on the AMA/Industry Round Table
16  Steering Committee?
17          MR. SOFFER:  Objection, calls for
18  speculation.
19          THE WITNESS:  I do not recall.
20  BY MS. FORD:
21      Q.  Okay, do you recall asking him to
22  report to you on the AMA/Industry Round Table

Page 251

1  Steering --
2      A.  That is a logical conclusion.
3      Q.  Okay.  Did Mr. Buell report to you?
4      A.  No.
5      Q.  Did you have any connection with Mr.
6  Buell outside of the Medicare Working Group?
7          MS. TABACCHI:  Object to the form.
8  BY MS. FORD:
9      Q.  Did you work together on any other
10  projects?
11      A.  Not that I recall.
12      Q.  Okay.  So in terms of a professional
13  relationship with Mr. Buell, was that limited to
14  the Medicare Working Group?
15      A.  To the best of my knowledge, yes.
16      Q.  Okay.  Did you consider the
17  AMA/Industry Round Table Steering Committee's
18  work to be of importance to the Medicare Working
19  Group?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  It was presented as
22  important to the Pharmaceutical Division of

Page 252

1  Abbott.
2  BY MS. FORD:
3      Q.  And if it was important to the --
4  Pharmaceutical Division, is that what you said?
5      A.  (Witness nodding.)
6      Q.  Do you mean by that Pharmaceutical
7  Products Division?
8      A.  Yes.
9      Q.  Okay.  So if it was only important to
10  the Pharmaceutical Products Division, why was it
11  being elevated to a cross-divisional group such
12  as the Medicare Working Group?
13          MS. TABACCHI:  Object to the form.
14          MR. SOFFER:  Objection, calls for
15  speculation.
16          THE WITNESS:  Many of the divisions
17  sell products to physicians.  So if you offended
18  the physician community, you could affect more
19  divisions than the Pharmaceutical Division.
20  BY MS. FORD:
21      Q.  So in the -- in the vein of information
22  sharing, was it your understanding that it was

Page 253

1  important for all the divisions of Abbott to be
2  aware of the AMA -- the work of the AMA's
3  Steering Committee?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  I can't answer for all
6  the divisions.
7  BY MS. FORD:
8      Q.  Okay, let's -- looking at your
9  distribution list on page 1, did you limit this
10  to representatives of PPD?
11      A.  No.
12      Q.  Okay.  It looks like from the list and
13  from what we've established earlier, there are
14  members of several Abbott divisions on the
15  distribution list; is that correct?
16      A.  That is correct.
17      Q.  Okay.  Was it your habit to forward
18  them information that you thought would be
19  useless to them?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  We shared all information
22  that would be discussed at a meeting.

64 (Pages 250 to 253)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                        Chicago, IL

Page 254

BY MS. FORD:
1
2      Q.   Okay.  If you look on page 1 of Mr.
3   Buell's memo, which is again Abbott 53316, a
4   couple of lines after the heading "Executive
5   Summary," it says, "The AMA stated that it would
6   like to see this committee, number one, find
7   common goals to advance in the upcoming policy
8   debate on Medicare and Medicaid."
9          Did I read that correctly?
10     A.   That's what it -- as stated.
11     Q.   Okay.  And then further down on the
12  page, if you look at the third paragraph from the
13  bottom, Mr. Buell wrote, "AMA's goals appear to
14  be to get industry support for its goals, both in
15  lobbying efforts and financially."
16         Did I read that accurately?
17     A.   As stated.
18     Q.   Okay.  Were you involved in the process
19  of deciding whether Abbott would partner with the
20  AMA on its Medicare/Medicaid lobbying efforts?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I would answer no.

Page 255

BY MS. FORD:
1
2      Q.   Okay, was that a decision that was made
3   by the Medicare Working Group?
4      A.   No.
5      Q.   Okay, did you -- was it your
6   understanding that Abbott did partner in the
7   effort with the AMA's Steering Committee on
8   Medicare/Medicaid reform?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I do not know.
11  BY MS. FORD:
12     Q.   Okay.  Do you know whether Abbott
13  provided financial assistance to the -- to the
14  AMA Steering Committee?
15     A.   I do not know.
16     Q.   Okay.  Do you know whether anyone from
17  Abbott participated as part of the policy
18  Steering Committee?
19     A.   Of the AMA?
20     Q.   AMA, yes.
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I do not know.

Page 256

BY MS. FORD:
1
2      Q.   If you turn to Page 2 of Mr. Buell's
3   memo, ABT 53317, about halfway down the page it
4   says, "It was agreed that," and then the third
5   bullet point says "There would be dues of 5,000
6   to $10,000 for any manufacturer who wanted to be
7   a part of the Steering Committee."
8          Did I read that accurately?
9      A.   As stated.
10     Q.   Okay, do you know whether Abbott became
11  part of the Steering Committee?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  I do not know.
14  BY MS. FORD:
15     Q.   Okay.  If you'd turn to the last page
16  of the exhibit, which is ABT 53318, the very last
17  paragraph, it says, "I believe it will be
18  difficult to get the Pharmaceutical members of
19  the Steering Committee to agree among themselves
20  on priorities for Medicare much less get AMA to
21  go along with any of it.  However, it is an
22  opportunity we should not miss.  Perhaps we

Page 257

1   could just get AMA to endorse 'access' for
2   patients, 'access' to the physician of their
3   choice and to the medical technologies best
4   suited for their individual conditions, it would
5   be a major accomplishment.  Thanks again for
6   setting up the November 25th meeting."
7          Did I read that accurately?
8      A.   As stated.
9      Q.   Okay, was it your understanding at this
10  time that Abbott continued to participate in the
11  AMA Steering Committee?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  I do not know if Abbott
14  was a member of the Steering Committee.
15  BY MS. FORD:
16     Q.   Okay.  We -- you testified earlier
17  about the creation of of policy statement by
18  Abbott to be submitted to the AMA; is that
19  correct?
20     A.   There was a draft of a policy
21  statement.
22     Q.   Okay.  To your understanding, it was in

                              65 (Pages 254 to 257)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 258

1   connection with the AMA/Industry Round Table
2   Steering Committee?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  Yes.
5   BY MS. FORD:
6      Q.   And I believe you indicated that the
7   draft of that policy was generated by the
8   Medicare Working Group; is that correct?
9      A.   It was generated by the
10  representatives, yes.
11     Q.   If you could take a look at Exhibit
12  Miller 1169, which you should have in front of
13  you -- yeah, I think that's it.
14     A.   Um-hum.
15     Q.   You had talked with Mr. Sisneros about
16  this proposed Abbott position on Medicare reform
17  and the process for sending it for approval
18  through the various Abbott divisions.  Is that an
19  accurate summary of your earlier testimony?
20     A.   Yes.
21     Q.   Okay, and I believe you indicated that
22  the document was never approved; is that correct?

Page 259

1      A.   To the best of my knowledge, it was
2   never approved.
3      Q.   And when you said "the document," were
4   you referring to the "Proposed Abbott position on
5   Medicare reform"?
6      A.   Yes.
7      Q.   And that would be page 2 of Exhibit --
8   excuse me, pages 2 and 3 of Exhibit Miller 1169?
9      A.   Yes.
10     Q.   Okay.  And what was your understanding
11  of why the proposed Abbott position on Medicare
12  reform was never approved?
13     A.   I was not in those discussions.
14     Q.   Regardless of whether you were in the
15  discussions, do you have an understanding of why
16  the proposed position on Medicare reform for
17  Abbott was never approved?
18     A.   I'd be speculating.
19     Q.   Okay.  So the Medicare Working Group
20  created the position, and from Exhibit Miller
21  1169, it looks like you sent a memo to Ms. Boyd
22  proposing a process for getting the position

Page 260

1   paper approved through Abbott; is that correct?
2      A.   Correct.
3      Q.   Okay.  And how did you find out that
4   the proposed Abbott position on Medicare reform
5   was not going to be approved?
6      A.   There were discussions with Public
7   Affairs, and then it was given back to the
8   Pharmaceutical Division.
9      Q.   And who was involved in the discussions
10  with Public Affairs?
11     A.   All I know is I was there.
12     Q.   Okay.  Do you recall anyone else being
13  there?
14     A.   I cannot tell you who was there.
15     Q.   Okay.  But do you recall anyone else
16  being there?
17     A.   Yes.
18     Q.   I'm not trying to trick you.  I know
19  it's late in the day.  You were not alone?
20     A.   I was not alone.
21     Q.   Okay, and was this discussion in
22  person?

Page 261

1      A.   Yes.
2      Q.   And was there one discussion?
3      A.   I remember one discussion.
4      Q.   Do you remember any follow-up
5   discussions?
6      A.   No.
7      Q.   Okay, and what was -- what was the
8   content of the discussion, to the best of your
9   recollection?
10     A.   It dealt with the approval process, it
11  dealt with the pros and cons of taking the
12  position.
13     Q.   Okay, and who -- do you have an
14  understanding of who disliked the proposed
15  position on Medicare reform?
16     A.   No.
17         MS. TABACCHI:  Object to the form.
18  BY MS. FORD:
19     Q.   Was it your understanding that Public
20  Affairs was saying, We can't approve this?
21     A.   No.
22     Q.   Was it your understanding that the

66 (Pages 258 to 261)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                          Chicago, IL

Page 262

1  Pharmaceutical Products Division was not happy
2  with the proposal?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  I'd be speculating.
5  BY MS. FORD:
6     Q.  Okay.  I'm not trying to trick you
7  here. I'm just trying to figure out the Medicare
8  Working Group has gone to all this trouble,
9  you've generated this proposal, you've taken it
10 to various divisions to shop it around, and
11 somebody puts a quash on it, and --
12    A.  Well, and, you know, I'm not --
13        MS. TABACCHI:  Object to the form.
14        MR. SOFFER:  Let's wait for a question.
15        THE WITNESS:  Okay.
16 BY MS. FORD:
17    Q.  And I'm just trying to understand to
18 the best of your recollection what happened in
19 this process to stop Abbott from putting for the
20 their proposal on Medicare reform?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  The last step that I can

Page 263

1  testify to that I know happened was the meeting
2  with Public Affairs.
3  BY MS. FORD:
4     Q.  And if you were to meet with Public
5  Affairs, would that typically be with the head of
6  Public Affairs?
7     A.  I do not recall.
8     Q.  Okay.  To your knowledge, was there
9  anything in particular about the proposal that
10 was objected to?
11    A.  No.
12    Q.  To your knowledge, did Abbott generate
13 another proposal on Medicare reform?
14    A.  I do not know.
15    Q.  Okay.  So you weren't involved in any
16 process after this was disapproved to generate a
17 new proposal?
18    A.  That is correct.
19    Q.  Okay, do you if anyone was involved in
20 a process to generate a new Medicare reform
21 position on behalf of Abbott?
22        MS. TABACCHI:  Object to the form.

Page 264

1         THE WITNESS:  I do not know.
2         MS. FORD:  I think we're up to Exhibit
3  Miller 1170 now, so I'm going to mark this
4  document and introduce it.
5            (Exhibit Miller 1170 was marked
6  for ID)
7  BY MS. FORD:
8     Q.  You can take a look at that.
9     A.  (Witness reviewing document. )
10    Q.  You're welcome to read the document in
11 its entirety, but for purpose of -- I'd happy to
12 point you to a specific area of the document --
13    A.  Go ahead.
14    Q.  -- I wanted to ask you about.
15    A.  Thank you.
16    Q.  For the record, this is document ABT
17 53140 through ABT 53142.
18    A.  Agreed.
19    Q.  Do you recognize this document?
20    A.  No.  I mean it looks -- no.
21    Q.  Okay, for the record, it's an internet
22 office correspondence dated December 13th, 1996

Page 265

1  from Richard Rieger to members of the Medicare
2  Working Group, and you are copied on this
3  document.  Is that correct?
4     A.  That is correct.
5     Q.  And do you believe that you would have
6  received this document in the ordinary course of
7  business?
8     A.  Yes.
9     Q.  Okay.  About halfway down, it says,
10 "For next week's meeting, we would like to
11 propose the following agenda," and then the
12 second bullet point says, "Abbott's role in
13 future participation on the AMA/Industry Round
14 Table Steering Committee," and the third bullet
15 point says, "Next steps in further developing the
16 Abbott position re Medicare reform."
17        Did I read that accurately?
18    A.  As stated.
19    Q.  Do you recall attending the January
20 meeting of the Medicare Working Group?
21    A.  I do not know.
22    Q.  Okay.  Do you recall attending a

67 (Pages 262 to 265)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                         Chicago, IL

Page 266

1  meeting of the Medicare Working Group where
2  Abbott's role in future participation in
3  AMA/Industry Round Table Steering Committee was
4  addressed?
5       MS. TABACCHI:  Object to the form.
6       THE WITNESS:  I do not know.
7  BY MS. FORD:
8       Q.  Just so I make sure I understand, are
9  you saying you don't recall.
10      A.  I don't recall.
11      Q.  Okay.
12      A.  I don't recall.
13      MS. FORD:  I'm going to mark Exhibit
14 Miller 1171, and I ask you to take a look at that
15 document.
16      (Exhibit Miller 1171 was marked
17 for ID).
18      THE WITNESS:  (Witness reviewing
19 document.)
20      MS. FORD:  For the record, this is ABT
21 53217 through ABT 53238.
22 BY MS. FORD:

Page 267

1       Q.  Mr. Miller, do you recognize this
2  document?
3       A.  No.
4       Q.  It appears to be interoffice
5  correspondence from Richard Rieger dated February
6  10th, 1997 to the Medicare Working Group.  Is
7  that correct?
8       A.  That's as stated.
9       Q.  As a member of the Medicare Working
10 Group, is it your expectation that you would have
11 received this document in the ordinary course of
12 business?
13      A.  Yes.
14      Q.  If you look at Item No. 1, it says,
15 "Attached are the following documents for your
16 review: No. 1) Healthcare Leadership Council
17 Principles For Effective Medicare Reform."
18      Are you familiar with the Healthcare
19 Leadership Council?
20      A.  No.
21      Q.  Have you ever heard of that group
22 before?

Page 268

1       A.  Yes.
2       Q.  Do you recall in what context you've
3  heard of the Healthcare Leadership Council?
4       A.  I believe Mr. Burnham was on it at one
5  time.
6       Q.  And you're referencing Dwayne Burnham,
7  the CEO?
8       A.  Yes.
9       Q.  Okay.  Do you know why members of the
10 Medicare Working Group would have been receiving
11 a copy of the Healthcare Leadership Council's
12 Principles For Effective Medicare Reform?
13      A.  The flippant answer is we distributed
14 it.
15      Q.  I'm sorry, I didn't hear you.
16      A.  The flippant answer is we distributed
17 it.
18      Q.  Okay.  Do you have any idea why Mr.
19 Rieger would have distributed this to the members
20 of the Medicare Working Group?
21      A.  I'd be guessing.
22      Q.  To your knowledge, were any Abbott

Page 269

1  employees or officers, aside from Mr. Burnham,
2  members of the Healthcare Leadership Council?
3       A.  I do not know.
4       Q.  To your knowledge, was there a group
5  within Abbott formed to develop Abbott's position
6  on Medicare reform prior to the Medicare Working
7  Group?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  I do not know.
10 BY MS. FORD:
11      Q.  Okay.  I'm going to show you a document
12 that's been previously marked in a prior
13 deposition as Plaintiffs' Exhibit 1121 and ask
14 you to take a look at that.
15      A.  (Witness reviewing document).
16      MS. FORD:  For the record, this is ABT
17 53263 through ABT 53275.
18 BY MS. FORD:
19      Q.  Mr. Miller, this appears to be a
20 December 20th, 1996 interoffice correspondence
21 from Richard Rieger to members of the Medicare
22 Working Group; is that correct?

68 (Pages 266 to 269)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 270

1    A.  As stated.
2    Q.  And you are copied on this document; is
3  that correct?
4    A.  Yes.
5    Q.  Okay.  And, again, in the ordinary
6  course of business, do you believe that you would
7  have received a copy of this document?
8    A.  Yes.
9    Q.  It says, "Attached is the information
10  that Mike Tootell referenced in our most recent
11  Medicare Working Group meeting and which he asked
12  me to circulate.  It addresses the topic of
13  average wholesale prices and competitive
14  bidding."
15       Did I read that accurately?
16    A.  As stated.
17    Q.  Okay.  If you could turn to Page 2 of
18  this exhibit.
19    A.  (Witness so doing).
20    Q.  It's titled, "Medicare Part B payment
21  for drugs average wholesale price issue."  Is
22  that correct?

Page 271

1    A.  As stated.
2    Q.  Okay, the first paragraph says,
3  "Currently, Medicare pays for those drugs that
4  are not reimbursed on a prospective payment basis
5  or a cost basis at the lesser of the average
6  wholesale price or the actual acquisition cost of
7  the drug.  In actuality, however, Medicare pays
8  at the average wholesale price level because the
9  program has not acquired acquisition cost
10  information sufficient to establish reimbursement
11  rates."
12       Did I read that accurately?
13    A.  As stated.
14    Q.  Okay.  Does this reflect your
15  understanding in or around December 20th, 1996
16  about how Medicare reimbursed for drugs?
17       MS. TABACCHI:  Object to the form.
18       I'm sorry, did you say "reflect" or
19  "refresh"?
20       MS. FORD:  Reflect.
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I'm going to say I don't

Page 272

1  know.
2  BY MS. FORD:
3    Q.  Okay.  What was your understanding
4  around December of 1996 about the basis of -- for
5  which Medicare reimbursed for drugs?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  I'm not sure I knew the
8  specifics of any product.
9  BY MS. FORD:
10    Q.  Okay.  Did you understand around that
11  time period that reimbursement was based on
12  average wholesale price?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I do not know.
15  BY MS. FORD:
16    Q.  Okay.  When you received a copy of this
17  document in or around December 20th of 1996,
18  would it have been your common practice to review
19  it?
20    A.  It would have been my common practice
21  to read it, yes.
22    Q.  If you look about halfway down the page

Page 273

1  under the heading "Industry Options," it says,
2  "The industry can, of course, attempt to maintain
3  AWP as the payment measure for Medicare covered
4  drugs and resist all efforts within Congress and
5  HCFA to change the current formula and practice.
6  In all likelihood, that is not a sustainable
7  position, especially in light of the fraud and
8  waste connotations the investigators have brought
9  to this issue."  Excuse me, "to the issue."
10       "In addition, numerous people from
11  within the industry have conceded publicly that
12  AWP makes little sense as a basis for
13  reimbursement.  At the very least, it will be
14  difficult to make a strong case for the retention
15  of AWP as the determinator of Medicare payment
16  for drugs."
17       Did I read that accurately?
18    A.  As stated.
19    Q.  Okay.  What was your understanding of
20  the purpose for distributing this document to
21  members of the Medicare Working Group?
22    A.  As I've stated previously, all

69 (Pages 270 to 273)

Henderson Legal Services
202-220-4158

Miller, James E.                                          July 30, 2007
                           Chicago, IL

---

Page 274

1  documents that were to be discussed were
2  distributed to all members.
3      Q.  Okay.  And the cover member -- memo
4  says, "Attached is the information that Mike
5  Tootell referenced in our most recent Medicare
6  Working Group meeting and which he asked me to
7  circulate."
8          That's correct, isn't it?
9      A.  That is as stated.
10     Q.  Okay.  Do you recall a discussion of
11 AWP-based reimbursement and industry options in
12 your --
13     A.  No.
14     Q.  -- Medicare Working Group meeting?
15     A.  No.
16     Q.  To your knowledge, did the Medicare
17 Working Group adopt a position on reform efforts
18 for Medicare?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  No.
21 BY MS. FORD:
22     Q.  Okay.  You would agree with me, though,

---

Page 275

1  wouldn't you, that their -- the Medicare Working
2  Group was cognizant of this controversy around
3  AWP in -- in around December of '96?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  Yes.
6  BY MS. FORD:
7      Q.  And that at least some members of the
8  industry were opposed to changing reimbursement
9  system away from an AWP-based system; is that
10 correct?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  I cannot speak for the
13 industry.
14 BY MS. FORD:
15     Q.  I'm not asking you to speak for them.
16 I'm just asking if you had an understanding that
17 at least some members of the pharmaceutical
18 industry were opposed to moving away from an AWP-
19 based reimbursement system?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I do not know.
22 BY MS. FORD:

---

Page 276

1      Q.  Okay, well, Mr. Rieger's cover memo,
2  which you indicated you most likely received a
3  copy of and read, says that, "This is being
4  circulated, as referenced in the most recent
5  Medicare Working Group meeting."
6          Does that lead you to believe that this
7  was a topic of discussion at a Medicare Working
8  Group meeting in or around December of 1996?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't know who prepared
11 the attachment.
12 BY MS. FORD:
13     Q.  Okay.  But I'm not really asking about
14 who prepared the attachment.
15         It -- the cover memo indicates that --
16 that the attachment "is being circulated pursuant
17 to discussion that was held in a recent Medicare
18 Working Group meeting;" is that correct?
19     A.  That's what it says.  I believe that --
20 that's what it says.
21     Q.  Do you recall discussions of the
22 Medicare Working Group about proposals to change

---

Page 277

1  the reimbursement system away from AWP?
2      A.  I do not recall the specifics.
3      Q.  Okay.  Regardless of whether you recall
4  the specifics of who said what and when, do you
5  recall a discussion of the topic generally?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Yes.
8  BY MS. FORD:
9      Q.  Okay.  Do you believe that was a topic
10 of discussion at more than one Medicare Working
11 Group meeting?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  I do not recall.
14 BY MS. FORD:
15     Q.  Okay.  Do you also recall a discussion
16 of industry options in opposing a change away
17 from an AWP-based Medicare reimbursement system?
18         MR. SOFFER:  Objection, vague.
19         MS. TABACCHI:  Object to the form.
20         First would you mind re-reading the
21 question?
22         (Record read.)

---

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                          Chicago, IL

| Page 278 | Page 280 |

**Page 278**

1       MS. TABACCHI:  Object to the form.
2       MS. FORD:  One objection is sufficient.
3       MS. TABACCHI:  Right.
4       MS. FORD:  You already objected.
5       MS. TABACCHI:  You can never have too
6   many objections.
7       THE WITNESS:  Yes.
8   BY MS. FORD:
9       Q.  Do you recall any specifics about the
10  particular options that were discussed?
11      A.  The documents that you have already
12  shown me talk about a rebate-based system versus
13  AWP.
14      Q.  Okay, do you recall any other options
15  that were discussed?
16      A.  And we've talked about acquisition
17  cost, we've talked about actual cost.
18      Q.  And did the Medicare Working Group come
19  to some consensus about what would be the best
20  alternative if the reimbursement system were
21  going to change?
22      MS. TABACCHI:  Object to the form.

**Page 279**

1       THE WITNESS:  I do not recall.
2   BY MS. FORD:
3       Q.  We've talked generally about the
4   keeping of minutes for the Medicare Working
5   Group, but in addition to minutes, did you take
6   handwritten notes at the meetings you attended?
7       A.  That was my general practice.
8       Q.  Okay.  And was it your general practice
9   to maintain those notes?
10      MS. TABACCHI:  Object to the form.
11      THE WITNESS:  I would give my notes to
12  Rich, and he would incorporate them in the
13  minutes of the meeting.
14  BY MS. FORD:
15      Q.  Okay, and then do you know what
16  happened to your notes after that point?
17      A.  No.
18      Q.  So, to your knowledge, Mr. Rieger did
19  not give them back to you?
20      A.  I do not recall.
21      Q.  Okay.  Other than the proposed Abbott
22  position on Medicare reform that you indicated

**Page 280**

1   was generated by the Medicare Working Group, did
2   the Medicare Working Group generate any other
3   policy statements?
4       A.  No.
5       Q.  Any other position papers?
6       A.  No.
7       Q.  To your knowledge, other than that
8   proposed policy statement and the minutes, did it
9   generate any other written documentation?
10      A.  No.
11      MS. FORD:  I'm getting an indication
12  from the videographer that we've got just a few
13  minutes left on the tape.  So we'll go ahead and
14  take a break, and I'll find my next exhibit, and
15  we'll resume.
16      THE WITNESS:  Okay.
17      THE VIDEOGRAPHER:  We are off the
18  record at 3:57 at the end of Tape No. 4.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  We are back on the
21  record at 4:07 p.m. with the start of Tape No. 5.
22  BY MS. FORD:

**Page 281**

1       Q.  Mr. Miller, could I ask you to take a
2   look at Exhibit Miller 1163, which you should
3   have in front of you?  It's -- a March 7th, 1997
4   cover memo should be the first page of that
5   exhibit.
6       A.  Exhibit Miller 1164. Exhibit Miller
7   1163?
8       Q.  Correct.
9       A.  Correct.
10      Q.  And this is a document you discussed
11  with Mr. Sisneros earlier today.  And the cover
12  page indicates -- the coverage page is from Mr.
13  Rieger, and it indicates that you drafted the
14  meeting minutes from the March 6th, 1997 meeting;
15  is that correct?
16      A.  As stated.
17      Q.  And then attached to that cover page
18  are the minutes that you drafted; is that
19  correct?
20      A.  Correct.
21      Q.  And under the first bullet point on ABT
22  52841, it says, "Changing the reimbursement price

                                    71 (Pages 278 to 281)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                        Chicago, IL

Page 282

1   for drugs administered in physicians' offices
2   from AWP."
3         Did I read that accurately?
4      A.  As stated.
5      Q.  Okay.  And the first point under there
6   says, "Abbott/TAP has approximately $900 million
7   in sales which would be affect by this proposal.
8   The two largest products are Lupron and
9   Calcijex."
10        How -- what is your understanding of
11  how Abbott or TAP would have been affected by
12  changing reimbursement price for drugs
13  administered in physicians' offices from AWP?
14        THE REPORTER:  You know what?  Can you
15  repeat the end of your question?
16        MS. FORD:  Sure.
17        THE REPORTER:  I'm sorry, I'm just
18  getting tired.
19  BY MS. FORD:
20     Q.  What was your understanding of how
21  changing reimbursement price for drugs
22  administered in physicians' offices from AWP

Page 283

1   would impact Abbott and/or TAP?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  Any change could have
4   potentially affected the profitability of the two
5   products.
6   BY MS. FORD:
7      Q.  Okay, so the $900 million plus
8   reference is referring to a negative effect; is
9   that accurate?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  It's quantifying the
12  sales of the two products.
13  BY MS. FORD:
14     Q.  Sales that would be negatively impacted
15  --
16     A.  Yes.
17     Q.  -- is that accurate?
18        Okay.  And how is it -- if you could
19  explain to me your understanding of how a change
20  in reimbursement from AWP would affect Abbott's
21  sales?
22        MS. TABACCHI:  Object to the form.

Page 284

1         THE WITNESS:  I cannot answer the
2   question without you telling me how you're going
3   to change it.
4   BY MS. FORD:
5      Q.  Okay.  Well, at the time, in around
6   March 6th of 1997 --
7      A.  Um-hum.
8      Q.  -- President Clinton had a proposal to
9   change from AWP reimbursement to actual
10  acquisition cost.  Do -- do you recall that
11  proposal?
12     A.  No, but go ahead.
13     Q.  Okay.  So assume with me then, if the
14  change was going to be from AWP to actual
15  acquisition cost, how would such a change
16  negatively affect Abbott's sales?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  Without knowing the
19  number that was calculated for the actual
20  acquisition cost, I cannot answer it.
21  BY MS. FORD:
22     Q.  Okay.  Well, let me ask you, you wrote

Page 285

1   these minutes on March -- the March 6th, 1997
2   meeting?
3      A.  Um-hum.
4      Q.  What were you referring to when you
5   said, "The change from reimbursement from AWP
6   could negatively impact Abbott/TAP sales by $900
7   million"?
8      A.  No, no, no.
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  It does not say that.
11  BY MS. FORD:
12     Q.  Okay.  Why don't you go ahead and then
13  explain to me what bullet point one means and how
14  it would affect Abbott's sales?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  What the first paragraph
17  -- first stop point appears to say -- okay, I'm
18  going back -- is that we had $900 million of
19  sales at that point in time on Lupron and
20  Calcijex, and that's all that's quantified in
21  that statement.  There's no quantification of a
22  negative impact.

                          72 (Pages 282 to 285)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 286

1  BY MS. FORD:
2     Q.  Okay.  Correct me if I'm wrong, but a
3  few minutes ago you said if there was going to be
4  an impact on Abbott's sales that you were
5  quantifying here, it would be a negative impact;
6  is that accurate?
7        MS. TABACCHI:  Object to the form.
8  BY MS. FORD:
9     Q.  Let me ask it this way.  Would you have
10 been concerned if there would have been an upside
11 to a change in AWP reimbursement?
12    A.  Yes.
13    Q.  Okay, and what would be the nature of
14 your concern?
15    A.  You'd have to quantify how it would
16 impact Abbott and then also impact its
17 competitors.
18    Q.  Okay.  I guess let's step back and
19 speak a little more generally.  How would any
20 change in reimbursement to providers from
21 Medicare affect a drug manufacturer such as
22 Abbott?

Page 287

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  You -- I'd have to make a
3  generalization.  You know, a reduction in price
4  is unfavorable generally.  It could be positive
5  if volume increases more than price goes down.
6  BY MS. FORD:
7     Q.  Was Abbott reimbursed directly by
8  Medicare?
9     A.  No.
10    Q.  Okay, so we're not talking about a
11 change in reimbursement that would affect Abbott
12 directly; is that accurate?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  These are products
15 administered in a doctor's office.  It is my
16 understanding they do not get any other fees for
17 service except the product reimbursement.
18 BY MS. FORD:
19    Q.  Okay, but Abbott manufacturers the
20 drug, right?
21    A.  Right.
22    Q.  And Abbott sets the price of that drug

Page 288

1  that they want to charge to providers; is that
2  accurate?
3     A.  Right.
4     Q.  So a change to reimbursement would not
5  impact the price at which Abbott sold its drugs,
6  would it?
7     A.  If a physician office does not recover
8  its cost, it's highly unlikely it's going to stay
9  in business or prescribe those products.
10    Q.  Okay, but would a change to the
11 reimbursement system affecting all of Medicare
12 single out Abbott and have a negative impact only
13 on Abbott?
14    A.  No.
15    Q.  Okay, so what I'm trying to understand
16 here is what you put under bullet point one of
17 your -- of the minutes that you drafted, that
18 "Abbott/TAP has approximately $900 million in
19 sales which would be affected by this proposal."
20       What was your understanding of how
21 those sales would be affected by changing
22 reimbursement away from an AWP-based system?

Page 289

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  The perception was that
3  it would be negative to Abbott because it would
4  be a reduction to the total system revenues.
5  BY MS. FORD:
6     Q.  And can you -- I'm going to try to get
7  you to connect those dots for me.  The doctor
8  gets reimbursed less --
9     A.  Right.
10    Q.  -- if the reimbursement system is
11 changed away from AWP?
12    A.  Potentially.
13    Q.  Okay.  And how is that going to impact
14 Abbott's sales?
15    A.  Again, the physician must make -- must
16 recover his cost, get an adequate return, or he's
17 in the going to stay in business.
18    Q.  Okay.  So was the focus of Abbott's
19 concerns about physicians staying in business?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  It was on the total
22 revenue in that segment of business.

73 (Pages 286 to 289)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 290

1   BY MS. FORD:
2       Q.   And let's go on to bullet number two.
3   "The implementation of a rebate system similar to
4   Medicaid was discussed as a potential alternative
5   to put forward.  TAP believes that rebate system
6   would have a larger negative impact on sales than
7   changing to acquisition cost."
8           Do you recall a discussion at the
9   Medicare Working Group meeting on March 6th
10  regarding --
11      A.   That was TAP's position.
12      Q.   Okay, do you recall who expressed --
13      A.   No.
14      Q.   -- that position at the meeting?
15      A.   No.
16      Q.   Do you recall anyone, aside from Mr.
17  Campbell, who participated in Medicare Working
18  Group meetings on behalf of TAP?
19      A.   I've answered that question.  No.
20      Q.   Okay.  So is it logical to assume that
21  it was Mr. Campbell who was putting forth TAP's
22  position?

Page 291

1           MS. TABACCHI:  Object to the form.
2           MR. SOFFER:  Objection.
3   BY MS. FORD:
4       Q.   Could it have been anyone else?
5           MR. SOFFER:  Objection.
6           MS. TABACCHI:  Object to the form.
7           THE WITNESS:  I don't remember.
8   BY MS. FORD:
9       Q.   Okay.  And then the final point under
10  this bullet is, "The group consensus was that
11  'acquisition cost plus' would be the least
12  favorable alternative to current Abbott/TAP
13  business."
14          Did I read that accurately?
15      A.   As stated.
16      Q.   And the acquisition --
17          MS. THOMAS:  Did you say "least
18  favorable" or "least unfavorable"?
19          MS. FORD:  I meant to say "least
20  unfavorable." I don't know what I said.
21          THE WITNESS:  That's what I heard.
22          MS. FORD:  Okay.

Page 292

1   BY MS. FORD:
2       Q.   And "acquisition cost plus" is in
3   quotation marks.
4           What was your understanding of what
5   "acquisition cost plus" meant?
6       A.   I do not have an understanding.
7       Q.   Is it your testimony that when you
8   drafted these minutes, you didn't have an
9   understanding of what it meant or you don't
10  recall it today?
11      A.   I don't recall it today.
12      Q.   Okay.  Do you know whether this
13  consensus was conveyed to anyone outside of the
14  Medicare Working Group?
15      A.   I do not know.
16      Q.   Do you recall any discussions, for
17  example, with your -- with your superior about
18  this consensus?
19      A.   No.
20      Q.   Do you know whether Abbott took any
21  actions to to promote the acquisition cost plus
22  alternative to AWP-based reimbursement?

Page 293

1       A.   I do not know.
2       Q.   To your knowledge, did the Medicare
3   Working Group take any steps to promote the
4   acquisition cost plus alternative to AWP-based
5   reimbursement?
6       A.   The Working Group did not.
7       Q.   Okay.  Do you have an understanding of
8   why members of the Medicare Working Group
9   preferred the AWP-based reimbursement system to
10  an alternative?
11          MS. TABACCHI:  Object to the form.
12          MR. SOFFER:  Objection.
13          THE WITNESS:  I would be speculating.
14  BY MS. FORD:
15      Q.   Did the Medicare Working Group discuss
16  it?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  My answer is all change
19  is difficult.
20  BY MS. FORD:
21      Q.   Okay.  Was it your understanding that
22  Abbott would prefer the reimbursement system to

                Henderson Legal Services
                    202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                        Chicago, IL

---

Page 294

1   stay as it was at that time, AWP?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  I cannot speak for
4   Abbott.
5   BY MS. FORD:
6        Q.  Was it your understanding that members
7   of the Medicare Working Group thought that
8   maintaining the AWP-based reimbursement system
9   would be preferable to Abbott?
10       MS. TABACCHI:  Object to the form.
11       MR. SOFFER:  Objection, calls for --
12       THE WITNESS:  Members of the Working
13  Group expressed their opinion that AW -- staying
14  with the current methods was preferable.
15  BY MS. FORD:
16       Q.  And I believe you testified earlier
17  that the Working Group was comprised of
18  representatives of various Abbott divisions who
19  had knowledge and/or expertise in reimbursement;
20  is that correct?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  Yes.

---

Page 295

1   BY MS. FORD:
2        Q.  If you could take a look at Exhibit
3   Miller 1165, which you should have in front of
4   you and which I believe are the handwritten
5   notes, the one page of your handwritten notes?
6        A.  Oh, yes.
7        Q.  I believe that you testified earlier
8   that you gave this information to Mr. Rieger to
9   verify; is that correct?
10       A.  That's my recollection.
11       Q.  Okay.  Do you recall if it was in fact
12  verified?
13       A.  I do not know.
14       Q.  Okay, did you give any instructions to
15  him about how to verify the information or how to
16  go about trying to verify it?
17       A.  No.
18       Q.  If in fact the information was
19  verified, did you have a plan to use it in some
20  way?
21       A.  I do not remember.
22       Q.  Okay.  Sitting here today, do you have

---

Page 296

1   any recollection of why you would ask Mr. Rieger
2   to go verify this information?
3        A.  Yes.  It was my nature.
4        Q.  Okay.  So you would ask him to verify
5   it just for your own peace of mind, perhaps?
6        A.  Yes.
7        Q.  Okay.  Do you recall in fact whether
8   this information was verified?
9        A.  I do not remember.
10       Q.  Do you recall any further action being
11  taken with respect to your note here?  After
12  giving this over to Mr. Rieger, do you recall
13  anything else happening --
14       A.  No.
15       Q.  -- with respect to this information?
16       Mr. Miller, prior to preparing for your
17  deposition or being contacted about your
18  deposition, did you know that Abbott was being
19  sued by the United States and by several states?
20       MR. SOFFER:  Objection, asked and
21  answered.
22       THE WITNESS:  I didn't know until

---

Page 297

1   Abbott Legal called me and said, You got --
2   you're getting a subpoena.
3   BY MS. FORD:
4        Q.  So you hadn't read anything in
5   newspapers about --
6        A.  No.
7        Q.  -- average wholesale price litigation?
8        A.  No.
9        Q.  So there were no discussions in the
10  Medicare Working Group about investigations into
11  Abbott's pricing practices that you recall?
12       A.  Wait, wait, wait, wait, wait.  Let me -
13  - let's go back.
14       Q.  Okay.
15       A.  What time period?
16       Q.  Well --
17       A.  Are we talking today or --
18       Q.  My first question was today.
19       A.  Okay.
20       Q.  And then I went back to the time period
21  of the Medicare Working Group --
22       A.  Okay, fine.

---

75  (Pages 294 to 297)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                                July 30, 2007
                            Chicago, IL

Page 298

1    Q.  -- and asked whether there were any
2  discussions of the Medicare Working Group about
3  at that point investigations into Abbott's
4  pricing practices.
5    A.  I do not recall.
6    Q.  Okay.  I'm going to hand to you what's
7  been previously marked as Plaintiff's Exhibit
8  1124 and ask you to just briefly look it over.
9  I'll point you to -- direct you to a specific
10  question in the document so you don't have to
11  read it in full, but if you'd like to, we'll
12  certainly give you the time to do that.
13    A.  (Witness so doing).
14    Q.  For the record, this is ABT 52710
15  through ABT 52725.  This is a -- this appears to
16  be an interoffice correspondence from Mr. Rieger
17  to members of the Medicare Working Group; is that
18  correct?
19    A.  That's what it states.
20    Q.  Okay, and you again are copied on this
21  interoffice correspondence?
22    A.  Yes.

Page 299

1    Q.  It says, "F.Y.I.  Attached is updated
2  information that I received from Cindy Sensibaugh
3  in preparation for the 1/21/97 Medicare Working
4  Group meeting."
5      Did I read that accurately?
6    A.  As stated.
7    Q.  Okay.  And, again, under the ordinary
8  course of business, do you believe that you would
9  have received a copy of this cover memorandum and
10  attachments?
11    A.  Yes.
12    Q.  Okay, and do you believe that you would
13  have reviewed this at least briefly in
14  preparation for the meeting?
15    A.  I don't know.
16    Q.  Okay.  Well, let me ask you to turn to
17  page 3, which is ABT 52712.
18    A.  This is our -- okay.
19    Q.  This is dated January 13th, 1997 and
20  it's titled, "F.D.C reports -- 'The Pink Sheet.'"
21      Do you recall seeing this document
22  before?

Page 300

1    A.  No.
2    Q.  Okay.
3    A.  But it's in one of the other
4  attachments, but -- before.
5    Q.  Okay.  And I believe it's in one of the
6  other attachments that was made an exhibit here
7  today; is that right?
8    A.  That's correct.
9    Q.  And you indicated in response to Mr.
10  Sisneros, that being a one-page article, you
11  probably -- it would have been your practice to
12  review it.  Is that accurate?
13    A.  It would have been my practice to read
14  it, yes.
15    Q.  Okay.  Before I ask you specific
16  questions about this document, we had talked
17  about whether you're aware of investigations or
18  lawsuits related to Abbott's pricing practices;
19  is that accurate?
20    A.  Yes.
21    Q.  Okay, and you said that at least but
22  not prior to -- prior to being contacted about

Page 301

1  your deposition, you were not aware of any such
2  investigations or lawsuits; is that accurate?
3    A.  As it relates to this.
4    Q.  To pricing practices --
5    A.  Yes.
6    Q.  -- in average wholesale price, for
7  example?
8      Aside from Abbott, were you aware of
9  any other pharmaceutical manufacturers being
10  investigated related to pricing issues?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  No.
13  BY MS. FORD:
14    Q.  Do you recall any discussions in the
15  Medicare Working Group about investigations of
16  pharmaceutical manufacturers relating to their
17  pricing practices?
18    A.  I do not recall any.
19    Q.  Okay.  If you'd look about halfway down
20  the page, there's a sentence which is indented
21  about one inch on each side and it's in bold, and
22  it says, "The federal government is also

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

---

Page 302

1  investigating payment rates for covered
2  outpatient drugs under Medicare and the
3  relationship of AWP to actual pharmacy cost."
4      A.  ". . .outpatient drugs under Medicare."
5      Q.  Does that refresh your recollection
6  about discussions during this time period, again,
7  December -- late December, early -- late December
8  of '96 or early '97 about investigations into
9  pricing issues or average wholesale price?
10     A.  I don't know how this relates to
11 Abbott.
12     Q.  I'm not asking in relationship to
13 Abbott.
14     A.  Oh.
15     Q.  I'm saying does it refresh your
16 recollection of general discussion or awareness
17 of investigations in the late '96, early '97 time
18 period?
19     A.  My answer is it did not relate to my --
20 to Abbott, so I didn't -- I might have read it,
21 but it didn't register.
22     Q.  Okay, and then the second paragraph on

Page 303

1  the bottom, it says, "The Department of Justice
2  is also pursuing an antitrust investigation of
3  how AWP is calculated.  The DOJ is understood to
4  be requesting information from drug companies.
5  The prescription drug price reference lists Red
6  Book, First DataBank's Price Alert, and Medi-Span
7  say they have not been contacted by DOJ to say
8  how their prices are determined."
9          Did I read that accurately?
10     A.  That's as stated.
11     Q.  Were you aware of this effort on the
12 part of DOJ to investigate AWP and how it was
13 calculated by drug manufacturers?
14     A.  No.
15     Q.  Okay.  And then, finally, the
16 concluding paragraph on that page says, "The DOJ
17 inquiry is understood to stem at least in part
18 from drug pricing information provided by a home
19 infusion and nutritional service provider
20 involved in a separate investigation by the
21 General Accounting Office that had assembled
22 Medicare and drug pricing data."

Page 304

1          Again, does that refresh your
2  recollection about any investigations ongoing in
3  late '96, early '97 in the pharmaceutical
4  industry?
5      A.  No.
6      Q.  At any point in time did you become
7  aware of any government investigations into TAP's
8  marketing or sales practices?
9      A.  Yes.
10     Q.  And about when did that occur?
11     A.  In the 1990s, they were accused.
12     Q.  And do you recall how you became aware
13 of the investigation into TAP's marketing and
14 sales practices?
15     A.  I assume via the newspaper.
16     Q.  Was it a discussion at any Medicare
17 Working Group meetings that you can recall?
18     A.  No.
19     Q.  I'm going to focus now on the latter
20 part of your tenure at Abbott, so let's say from
21 about 1996 through 2003.
22         And do I understand correctly that from

Page 305

1  that period, 1996 to 1998, you were the
2  Divisional Vice President for Corporate Planning?
3      A.  Yes.
4      Q.  And following that, Divisional Vice
5  President for E-Commerce?
6      A.  Yes.
7      Q.  And during that time period, 1996 to
8  2003, do you recall receiving any document called
9  "memoranda" related to investigations of Abbott?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  No.
12 BY MS. FORD:
13     Q.  And let me ask you more generally.  Do
14 you know what I'm speaking of?
15     A.  Yes.  Oh, yes, yes.
16     Q.  Okay, and so we're on the same page, do
17 you understand me to be speaking about a
18 memoranda or some communication that would come
19 to you and say there's either an investigation or
20 a lawsuit and you're not to destroy documents and
21 you may be asked to collect them and provide them
22 to the Legal Department?

77 (Pages 302 to 305)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 306

1    A.  Yes.
2    Q.  We have the same understanding about
3  that?
4    A.  We have a common understanding.
5    Q.  So you don't recall anything between
6  the 1996 to 2003 time period, any such document
7  called "memoranda" coming your way?
8    A.  I got to answer it this way.  I took no
9  files from Corporate Planning when I left and
10  went to my next assignment.
11   Q.  Okay.  And prior to leaving Corporate
12  Planning, do you recall receiving an instruction
13  to preserve documents?
14   A.  No.
15   Q.  Okay.  And when you left Corporate
16  Planning to go to E-Commerce, what did you do
17  with your files?
18   A.  Left them in the office.
19   Q.  Okay.  And what happened to your
20  computer, if you know?
21   A.  My computer?  I think I took it with
22  me.

Page 307

1    Q.  Okay.  And would you have also taken
2  with you the -- the working files that you had
3  generated during your 1996 to '98 time period in
4  Corporate Planning?
5    A.  I don't know.
6    Q.  Okay.  Did someone replace you in your
7  position as Divisional Vice President for
8  Corporate Planning?
9    A.  Yes.
10   Q.  And who was that?
11   A.  I don't know the gentleman's name.  I
12  would -- or I should say I don't recall his name.
13   Q.  Okay.  Was there any time period that
14  you two overlapped?
15   A.  No.
16   Q.  Was there any effort on your part to
17  transition between the two of you for that --
18   A.  No.
19   Q.  -- position?
20   A.  There was a gap.
21   Q.  Okay.  Do you recall taking it --
22  taking any efforts to prepare your working files

Page 308

1  from Corporate Development for him -- for your
2  predecessor, whoever that may have been?
3        MS. TABACCHI:  Object to the form.
4  BY MS. FORD:
5    Q.  Or I should say your successor, excuse
6  me.
7    A.  Yeah.
8    Q.  The other would have been a little bit
9  hard to do.
10       Do you recall having your assistant
11  make copies of any records and say, Leave these
12  for my successor, he may need them when he gets
13  here?
14   A.  I would have purged dead files --
15   Q.  Okay.
16   A.  -- you know, things we assumed we'd
17  never go back into, business analysis.
18   Q.  Would that have included the Medicare
19  Working Group?  Was that a dead file by 1998?
20   A.  I left in '97.  Oh, I left December
21  '98. I left -- I do not -- I do not re -- I don't
22  know.

Page 309

1    Q.  Okay, and remind me again, what month
2  did you leave in '98?
3    A.  Oh, God.  I say December '98 --
4    Q.  Okay.
5    A.  -- but I'm not positive, you know.
6    Q.  And do you recall making any attempts
7  to transfer information that was on your computer
8  to save for the person who was going to be in
9  that position?
10   A.  I'm not -- let me go back.  I'm not --
11  I cannot say for certainty that I took it or did
12  not take it.
13   Q.  Okay.
14   A.  I just don't -- I mean I don't know.
15   Q.  Okay.  Regardless of whether you took
16  your computer or you didn't, do you recall doing
17  anything with the information on the computer to
18  preserve or provide that to your successor?
19   A.  No.
20   Q.  So I take it that, since you weren't
21  aware of any investigations into Abbott's pricing
22  practices, that you weren't aware of a simple

78 (Pages 306 to 309)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                        Chicago, IL

| Page 310 | Page 312 |
|---|---|

**Page 310**

1  investigative demand issued by the Office of
2  Inspector General of the Department of Health and
3  Human Services in 1996; is that -- is that a fair
4  --
5      A.  That is fair.
6      Q.  -- assessment?
7          Okay.  And, similarly, were you aware
8  of a subpoena by the Department of Health and
9  Human Services issued to Abbott in 1997 for
10  documents?
11      A.  No.
12          MS. FORD:  Okay.  Would you all mind if
13  we take a five-minute break and --
14          MS. TABACCHI:  And rest?
15          THE VIDEOGRAPHER:  We are off the
16  record at 4:38 p.m.
17          (Recess taken.)
18          THE VIDEOGRAPHER:  We are back on the
19  record at 4:48 p.m.
20          MS. THOMAS:  Good afternoon, Mr.
21  Miller.
22          THE WITNESS:  Good afternoon.

**Page 311**

1          MS. THOMAS:  I introduced myself
2  earlier, but I will again, Susan Schneider
3  Thomas.  I am an attorney representing the
4  Relator, Ven-a-Care of the Florida Keys, who was
5  involved in the California and federal
6  litigations as well as the litigation brought by
7  the State of Texas.
8          I will try even harder, since I'm
9  third, to avoid repeating, although you may not
10  think so at first because my questions will
11  relate to some of the same documents, but they
12  will be limited.
13
14          DIRECT EXAMINATION
15  BY MS. THOMAS:
16      Q.  If you would, sir, earlier today you
17  testified in response to one of Mr. Sisneros's
18  questions talking about if a product is not
19  reimbursed, it's generally not prescribed.  Do
20  you vaguely recall that testimony?
21      A.  I recall.
22      Q.  Okay, and in part, in elaborating on

**Page 312**

1  your answer to that, you noted that you know this
2  from personal experience.  And I wanted to know,
3  please, if you could describe for us what
4  personal experience you were referring to?
5      A.  My mother, Medicare Part D.
6      Q.  Could you explain that?
7      A.  Yeah.
8          MS. TABACCHI:  Object to the form.
9          You're asking him to explain Medicare
10  Part D?
11          MS. THOMAS:  Yes, absolutely.  He'll do
12  it briefly, I'm sure.
13          THE WITNESS:  Drugs that are -- when
14  patients go to the doctor, if the -- if the drug
15  is reimbursed, they are much more willing to take
16  that drug than if it's not reimbursed and they
17  have to take it -- pay for it out of their own
18  pocket.
19  BY MS. THOMAS:
20      Q.  You also testified in response to a
21  question by Ms. Ford that any change in
22  reimbursement could affect the profitability of a

**Page 313**

1  product.  Do you recall that testimony?
2      A.  Yes.
3      Q.  Okay.  Could you explain whose
4  profitability you were referring to?  Was that
5  from Abbott's perspective?
6      A.  Anybody in the chain.
7      Q.  From Abbott's perspective, could you
8  explain how a change in reimbursement methodology
9  could affect the profitability of one of Abbott's
10  drugs?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  That question's been
13  answered, I think, but I'll go back again.
14          Basically, if it's a drug in the --
15  I'll use a drug in a physician office as an
16  example. If the only reimbursement that physician
17  gets is the AWP of that drug, and that's reduced
18  enough, that doctor will not do that -- continue
19  that business or he'll find alternative
20  therapies.
21  BY MS. THOMAS:
22      Q.  And that affects the profitability of

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                           Chicago, IL

Page 314

1    the product for Abbott in what manner?
2        A.  Abbott may not -- its -- Abbott's sales
3    may go down.
4        Q.  If you would look, please, back at
5    Exhibit Miller 1163 --
6        A.  Exhibit Miller 1163.
7        Q.  And, to your knowledge, by the way,
8    when you refer to the fact that Abbott's sales
9    may go down, is that a concept that was discussed
10   in the Medicaid -- in the Medicare Working Group?
11       MS. TABACCHI:  Objection form.
12       MR. SOFFER:  Objection, vague.
13       THE WITNESS:  Yes.
14   BY MS. THOMAS:
15       Q.  And is that how you came to that
16   understanding or was it just more or less a
17   matter of common sense for you to understand
18   that?
19       A.  It's common sense for me.
20       MS. TABACCHI:  Object to the form.
21   BY MS. THOMAS:
22       Q.  On Exhibit Miller 1163, if you would

Page 315

1    look at page 2, Abbott 52841?
2        A.  (Witness so doing).
3        Q.  Under the bullet point "Changing the
4    reimbursement price," there's the first paragraph
5    that talks about the 900,000 million in sales
6    that would be affected, and then there's the
7    second paragraph talking about the rebate system,
8    correct?
9        A.  Correct.
10       Q.  You probably almost know these by heart
11   at this point.
12           The first part of that is referring to
13   what would happen if there was a change from an
14   AWP-based reimbursement to an acquisition cost
15   reimbursement system, correct?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  No.
18   BY MS. THOMAS:
19       Q.  What is the first point talking about?
20       A.  The first stop point only states the
21   sales value of two products, well, or products
22   and that Abbott and TAP sell in the physician

Page 316

1    office.
2        Q.  But when it says "would be affected by
3    this proposal," what is "the proposal"?
4        A.  It could potentially be impacted by a
5    change in Medicare pricing.
6        Q.  Okay.  And was the proposal that was
7    being discussed here, as I believe has been
8    talked about at length today, a possible change
9    from AWP-based reimbursement to acquisition-cost-
10   based reimbursement?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  I think there were --
13   that was one of the proposals.
14   BY MS. THOMAS:
15       Q.  And do you believe that's the proposal
16   that you were referring to when you said "would
17   be affected by this proposal" --
18       A.  I do not --
19       Q.  -- in the paragraph?
20       A.  I do not recall.
21       Q.  And if you could look, sir, please at
22   Exhibit Miller 1164 and Exhibit Miller 1165?

Page 317

1        A.  (Witness so doing).
2        Q.  If you look at your handwritten note,
3    which is Exhibit Miller 1165, and you look at the
4    minutes from the Medicare Working Group meeting
5    on 1/21/97, which is the beginning of the second
6    page of Exhibit Miller 1164, the discussion under
7    "Average Wholesale Price" in the minutes more or
8    less tracks your handwritten notes, does it not?
9        A.  The same subject matter is there.
10       Q.  And it kind of goes through the
11   different points that Medicare is based on the
12   AWP and the payment is 80% of AWP and the
13   reference to AWP as the manufacturer's price plus
14   a markup of 15 to 20%, which in your handwritten
15   notes appears to be expressed as "AWP equals
16   acquisition cost plus 20 to 25%."
17           Do they seem to be fairly parallel
18   concepts to you?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  The same points are in
21   both documents.
22   BY MS. THOMAS:

80 (Pages 314 to 317)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                          Chicago, IL

| Page 318 | Page 320 |
|---|---|

**Page 318**

1    Q.   Okay.  And it was talked about a little
2   bit earlier, but I'm wondering if you would
3   please reread the second bullet point under
4   "Average Wholesale Price" in those minutes?  If
5   you would just read that to yourself, "The
6   Medicare pays 80%"?
7        A.   (Witness so doing).
8             Okay.
9        Q.   Do you understand from this or did you
10  believe that the minutes from the Medicare
11  Working Group were attempting to explain that it
12  is the co-pay, the 20% co-pay that is paid by the
13  patient or the Medigap carrier that provides the
14  provider's profit?
15           MS. TABACCHI:  Object to the form.
16           THE WITNESS:  That's --
17  BY MS. THOMAS:
18       Q.   Let me ask you this way.  You are, I
19  believe, a self-proclaimed numbers guy.  Could
20  you explain what this paragraph is trying to say?
21       A.   The answer is no, but I will tell from
22  you my personal experience this is not consistent

**Page 319**

1   with the market.
2        Q.   So it's essentially your understanding
3   that the way this paragraph is written is not
4   accurate?
5             MS. TABACCHI:  Object to the form.
6             THE WITNESS:  Based on Abbott's
7   experience in the home care business, it is not
8   accurate.
9   BY MS. THOMAS:
10       Q.   And what experience are you referring
11  to, sir?
12       A.   Abbott was in the home care business
13  '83, '84, I believe.  I'm going from memory.
14  Maybe '84, '85.
15       Q.   And what knowledge did you obtain from
16  that Abbott experience that allows you to
17  conclude that this is not an accurate statement
18  here in the minutes?
19       A.   30% -- 30% of our sales were
20  uncollectable.
21       Q.   Can you explain what that means?
22       A.   We wrote them off as bad debt expense.

**Page 320**

1        Q.   And by "our sales," you're referring to
2   Abbott's home care business?
3        A.   Yes.
4        Q.   And these are sales to whom?
5        A.   Medicare, Medicaid, private insurance.
6        Q.   Sales to them or sales to people that
7   are covered by those programs?
8        A.   Sales to people who are covered by
9   those programs.  We billed on behalf of the
10  patient.
11       Q.   And 30% of what was deemed
12  uncollectable, the co-pay or --
13       A.   The total sales.
14       Q.   So medicines that were provided to
15  patients who were Medicare or Medicaid recipients
16  were what, not reimbursed by Medicare/Medicaid at
17  approximately 30% of those total sales?
18       A.   Yes.
19       Q.   Did you come to some understanding of -
20  - as to why that was?
21       A.   That was -- the industry trend was over
22  20%.  It's published.

**Page 321**

1        Q.   But why was that?  I mean what was the
2   explanation for Medicare, Medicaid or other
3   third-party payers not paying --
4             MS. TABACCHI:  Object to the form.
5   BY MS. THOMAS:
6        Q.   (Continuing) -- for approximately 30%?
7        A.   I do not know.
8             MS. TABACCHI:  Object to the form.
9             MR. SOFFER:  Objection.
10  BY MS. THOMAS:
11       Q.   You never had heard an explanation for
12  that?
13       A.   (Witness shaking head.)
14           MS. TABACCHI:  Mr. Miller, you need to
15  answer audibly.
16           THE WITNESS:  I don't know.
17  BY MS. THOMAS:
18       Q.   How did you obtain any understanding
19  from Abbott's home care business?  Had you been
20  involved in that business?
21       A.   I was the division controller.
22       Q.   That's right.  You said that earlier.

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                July 30, 2007
                        Chicago, IL

Page 322

1       If you would look down a couple of
2   bullet points to the new heading "Lupron"?  It's
3   on the same page of the minutes, 52706.
4       A.  Yes.
5       Q.  And it says, "In two states, an
6   acquisition cost strategy was implemented, which
7   caused serious problems for Abbott.  Since the
8   providers were being reimbursed at 80% of the
9   acquisition cost (which is 15 to 20% lower than
10  AWP) the providers were losing all of their
11  profit."
12      Do you see where I was reading?
13      A.  As stated.
14      Q.  Okay.  Do you have any recollection of
15  discussing that in a Medicare Working Group
16  meeting?
17      A.  This is as was reported by TAP.
18      Q.  Do you recall whether the issue had to
19  do with a payer refusing to provide coverage or
20  reimbursement at all for Lupron versus lowering
21  the reimbursement for Lupron?
22      A.  I do not recall.

Page 323

1       MS. TABACCHI:  Object to the form.
2       MR. SOFFER:  Objection.
3   BY MS. THOMAS:
4       Q.  When it makes reference to "an
5   acquisition cost strategy," what do you
6   understand that to be?
7       A.  I do not recall.
8       Q.  In the context of all of the discussion
9   and documents that have been talked about today,
10  do you understand that to refer to a
11  reimbursement methodology that is based on
12  acquisition cost rather than AWP?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  I do not have a
15  definition for action -- acquisition cost
16  strategy.
17  BY MS. THOMAS:
18      Q.  Do you have any understand what that's
19  referring to or can --
20      A.  No.
21      Q.  Can you derive an understanding by
22  reading that paragraph?

Page 324

1       A.  No.
2       MS. TABACCHI:  Object to the form.
3   BY MS. THOMAS:
4       Q.  And in the second sentence, when it
5   refers to "the providers losing all of their
6   profit," do you understand what that refers to?
7       A.  No.
8       Q.  Sir, did you have any involvement in
9   about 2000 or 2001 with a multi-product list
10  price change that was engaged in by Abbott?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  No.
13  BY MS. THOMAS:
14      Q.  Do you ever recall hearing, whether
15  from your work at Abbott or in the public press,
16  of an effort undertaken by Abbott in that time
17  period to change its reported prices for a wide
18  range of its products?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  No.
21  BY MS. THOMAS:
22      Q.  You lived in or about Chicago at that

Page 325

1   point in time, 2000, 2001?
2       A.  Yes, ma'am.
3       Q.  Okay, and you don't recall seeing
4   anything even in the public press about Abbott
5   changing its prices?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  No.
8   BY MS. THOMAS:
9       Q.  And you don't recall hearing anything
10  at work about that?
11      A.  No.
12      Q.  Okay.  You testified earlier when you
13  were asked about the establishment of the
14  Medicare Working Group that one of the things you
15  did at the outset was you looked at the processes
16  for getting reimbursement or coverage in various
17  divisions, and you mentioned that the different
18  divisions had limited similarities in terms of
19  how products are approved or reimbursed.
20      Do you generally remember that
21  testimony?
22      A.  I do.

82 (Pages 322 to 325)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                July 30, 2007
                        Chicago, IL

Page 326

1    Q.  Could you explain, sir, in more detail
2  what you did to ascertain how products got
3  approved or the reimbursement methodology in the
4  various Abbott divisions?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  There were discussions
7  with the representatives on what government
8  agencies approved their products.
9  BY MS. THOMAS:
10    Q.  To the best of your recollection, was
11  this an oral discussion at a meeting?
12    A.  Yes.
13    Q.  Did you get any type of reports from
14  the various divisions?
15    A.  No.
16    Q.  And you -- you indicated that you
17  learned that the products in the different
18  divisions had limited similarities in terms of
19  approval or reimbursement?
20    A.  That is correct.
21    Q.  Okay.  So you just noted that there
22  were discussions with representatives about what

Page 327

1  government agencies approved their products.
2        How did you learn about how products
3  were reimbursed in the different divisions?
4    A.  Same discussion.
5    Q.  And do you have any recollection of
6  what you learned about reimbursement methodology
7  as you embarked on this Medicare Working Group
8  project?
9        MS. TABACCHI:  Object to the form.
10        THE WITNESS:  It was more a discussion
11  of who is your customer and who pays your
12  customer.
13  BY MS. THOMAS:
14    Q.  Why was it important to know who the
15  customers were?
16    A.  I was looking for potential for
17  synergies among the divisions.
18    Q.  And what you found instead was that
19  there were differences from a reimbursement
20  perspective among the divisions at Abbott?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  There were differences in

Page 328

1  who our customers were among the divisions.  We
2  had very little overlap of customers.
3  BY MS. THOMAS:
4    Q.  And what is the connection between who
5  the customers are and the reimbursement
6  methodology, as you understood it?
7    A.  Tried to identify if a business risk
8  opportunity would affect more than one division.
9    Q.  Would that apply, say, to trying to
10  understand whether a change in Medicare or
11  Medicaid reimbursement methodology would impact
12  across divisions for Abbott?
13    A.  That is correct.
14    Q.  And did you learn anything about the
15  different divisions that led you to conclude that
16  there were similar concerns across the divisions
17  about changes specifically in Medicare or
18  Medicaid reimbursement methodology?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  There was limited sales
21  of products to common customers.
22  BY MS. THOMAS:

Page 329

1    Q.  And what is the significance of that,
2  if any, to concerns about reimbursement
3  methodology or the impact of Medicaid/Medicare
4  reimbursement methodology?
5    A.  If you have a common customer, I assume
6  you have a common payer.
7    Q.  So when you're referring to the
8  differences in customers, are you saying that the
9  ultimate users of the drug product were
10  reimbursed by -- were covered by different third-
11  party payers depending upon who Abbott's direct
12  customers were?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I'm confused.
15  BY MS. THOMAS:
16    Q.  You've indicated that you've learned
17  that the different divisions had different
18  customers?
19    A.  (Witness nodding.)
20    Q.  And I'm asking if you could explain why
21  that is of significance in evaluating possible
22  changes in Medicare or Medicare reimbursement

83 (Pages 326 to 329)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                        July 30, 2007
                          Chicago, IL

Page 330

1  methodology?
2     A.  Let's take an example.
3     Q.  Okay.
4     A.  The drugs dispensed in the doctor's
5  office, there were only two drugs mentioned in
6  the memos among all the divisions and including
7  the joint venture TAP.  So there's not a lot of
8  overlap.  So any change to reimbursement for the
9  doctor's office would affect two groups.
10    Q.  How about drugs other than physician-
11 administered drugs, drugs that are dispensed by
12 pharmacies?
13       MS. TABACCHI:  Object to the form.
14       MR. SOFFER:  Objection.
15 BY MS. THOMAS:
16    Q.  Did Abbott have any drugs like that
17 that were subject to Medicare or Medicaid
18 coverage?
19    A.  I do not know.
20    Q.  Do you ever recall any discussion of
21 drugs other than those few physician-administered
22 drugs that you referenced?

Page 331

1     A.  I do not recall.
2     Q.  Do you recall any discussion with the
3  division representative from the HPD about
4  differences among the sort of subgroups of HPD in
5  terms of Medicare/Medicaid reimbursement?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  No.
8  BY MS. THOMAS:
9     Q.  Did you learn anything about alternate
10 site and its relationship to Medicare or Medicaid
11 reimbursement?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  Alternate site was never
14 discussed in the Medicare meetings, to the best
15 of my knowledge.
16 BY MS. THOMAS:
17    Q.  If you would look back, please, at the
18 exhibit that was handed to you earlier that was
19 previously marked as Plaintiff's Exhibit 1121?
20 It's the December 20th, 1996 memo with
21 attachments.
22    A.  Bear with me.  Oh, Plaintiff's Exhibit

Page 332

1  1121?
2     Q.  Yes.
3     A.  Got it.
4     Q.  And the cover memo refers to
5  information -- and I'm not going to pronounce the
6  guy's name any better.  How do you pronounce his
7  name?
8     A.  I don't know.
9     Q.  Okay.  (Continuing) -- Mike Tootell,
10 that he asked Mr. Rieger to circulate, and it
11 attaches two different articles.  And I'm
12 wondering, sir, if you would look to the first
13 one, the Medicare Part B payment for drugs?
14    A.  (Witness so doing).
15    Q.  Do you know anything about that
16 document, i.e., who generated it, where it came
17 from?
18    A.  No, ma'am.
19    Q.  Do you have any idea if that's an
20 Abbott document?
21    A.  I have no idea.
22    Q.  If you would look in the second

Page 333

1  paragraph, sir, where it -- which starts, "There
2  have been several studies," and then it talks
3  about, "The common conclusion of these efforts is
4  that the use of AWP as a payment measure results
5  in excessive reimbursement."
6        Do you remember discussing that issue
7  at any of the Medicare Working Group meetings?
8     A.  Repeat the question, please.
9     Q.  Do you remember discussing the issue of
10 excessive reimbursement due to AWP-based
11 reimbursement?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  No.
14 BY MS. THOMAS:
15    Q.  And then the next sentence, sir, reads,
16 "In other words, there is some evidence that
17 often the AWP for a drug is set at a particular
18 level to establish third-party reimbursement, but
19 has no relevance to any party beyond the third-
20 party payer."
21       Do you see that sentence?
22    A.  Yes.

84 (Pages 330 to 333)

Miller, James E.                                    July 30, 2007
                        Chicago, IL

Page 334

1    Q.  Do you have any understanding what that
2   is referring to, sir?
3    A.  As I stated previously, I don't know
4   where -- who prepared this document.
5    Q.  Did you have any understanding, as best
6   you recall, of what that was referring to?
7    A.  No.
8    Q.  Do you recall discussing that notion
9   that the AWP for a drug is set essentially with
10  an eye towards third-party reimbursement?
11   A.  No.
12   Q.  Do you ever recall anybody mentioning
13  that topic?
14   A.  No.
15   Q.  Okay, do you ever recall any discussion
16  while you were at Abbott of the notion that
17  physicians or pharmacies need to be paid more
18  than their actual acquisition cost of a drug in
19  order to make sure to provide them with an
20  adequate profit or payment for the services that
21  they render?
22       MS. TABACCHI:  Object to the form.

Page 335

1        THE WITNESS:  As I testified earlier,
2   the reimbursement price for a product must
3   compensate the doctor or pharmacist for the cost
4   of acquiring the product and their services and
5   some return.
6   BY MS. THOMAS:
7    Q.  Do you ever recall any discussion while
8   you were at Abbott of the concept that it would
9   be appropriate for the -- well, strike that.
10       Are you aware, sir, in general that
11  physicians and pharmacies receive more than just
12  a drug ingredient cost component of reimbursement
13  --
14       MS. TABACCHI:  Object to the form.
15  BY MS. THOMAS:
16   Q.  (Continuing) -- either a service fee or
17  a dispensing fee?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  In what setting?
20  BY MS. THOMAS:
21   Q.  In -- being reimbursed by a government
22  --

Page 336

1    A.  Is this a hospital, alternate site,
2   office?
3    Q.  I'm referring to physicians and
4   pharmacies.
5    A.  Physicians and pharmacies?
6    Q.  Physicians and pharmacies.  Sorry.
7    A.  I'm going to say no.
8    Q.  Do you have any knowledge on that
9   subject one way or the other?
10   A.  No.
11   Q.  Okay.  Did you ever hear any
12  conversation or see any documents while you were
13  at Abbott about the concept of trying to insure
14  that the reimbursement for the ingredient portion
15  of a drug needs to be set high because the
16  service and dispen -- and/or dispensing fees to
17  the providers was too low?
18   A.  No.
19       MS. TABACCHI:  Object to the form.
20  BY MS. THOMAS:
21   Q.  Okay, if you would look, sir, please,
22  to the next attachment to that same exhibit,

Page 337

1   Plaintiff's Exhibit 1121, Abbott page 53266
2   called, "Competitive bidding and you, the
3   consumer."
4    A.  (Witness so doing).
5    Q.  Do you have any idea whose document
6   this is?
7    A.  No, ma'am.
8    Q.  Do you have any idea whether it's an
9   Abbott document?
10   A.  I have no idea.
11   Q.  In the second paragraph, about two-
12  thirds of the way down, when it says, "Our
13  coalition strongly believes in competition" --
14   A.  I have no idea.
15   Q.  You have no idea what that means --
16   A.  Who that is.
17   Q.  -- by "our coalition"?
18   A.  Right.
19   Q.  If you would look towards the end of
20  the document where it says, "The coalition to
21  preserve healthcare quality and competition" --
22  actually, it's at the very end.  I'm sorry.

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                      July 30, 2007
                        Chicago, IL

Page 338

1     A.  Which page?
2     Q.  53269.
3     A.  53269.  53269?
4     Q.  Yeah.  I believe it's the last page.
5  Well, it's the last page of my copy of it.
6     A.  Mine says --
7     Q.  I think you're on it.  No?
8     A.  "The President can be reached by
9  contacting the White House at 202"?
10    Q.  Yes.
11    A.  Oh.
12    Q.  I'm sure that's a direct dial number
13  too.
14    A.  I'm sorry.
15    Q.  But maybe Bush had it changed.
16    A.  I was astounded.
17    Q.  This was Clinton's.  Perhaps it's
18  different with Bush.
19    A.  Okay.
20    Q.  In any event, do you see "the coalition
21  to preserve healthcare quality and competition."
22    A.  I -- as stated.

Page 339

1     Q.  Have you -- do you have any
2  recollection of having heard of that coalition?
3     A.  No, ma'am.
4     Q.  Does the name underneath it, the
5  National Association of Medical Equipment
6  Services, mean anything to you?
7     A.  No, ma'am.
8     Q.  Sir, you were asked earlier if you were
9  aware of government investigations or litigation
10  with various drug companies.
11        I just want to ask you specifically do
12  you have any recollection in about the year of
13  2000, 2001 of hearing about a settlement by Bayer
14  with the government concerning an AWP lawsuit?
15    A.  I do not.
16    Q.  Do you recall hearing anything about
17  settlements with several drug companies with the
18  State of Texas in about 2003 regarding price
19  reporting practices?
20    A.  I do not.
21    Q.  You testified about the demise or end
22  of the Medicare Working Group, whatever you would

Page 340

1  refer to it as.
2        Given what you had indicated you
3  understood to be its purpose, which was sharing
4  information across divisions, was there some
5  reason -- well, strike that.
6        Did you decide that sharing information
7  about reimbursement was not serving any purpose
8  or was no longer important for some reason?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  I believe it died of
11  inertia.  There was no drive from the divisions or
12  corporate to keep it alive.
13  BY MS. THOMAS:
14    Q.  Was it your perception that anyone
15  within Abbott affirmatively thought that that
16  group should not continue because it posed some
17  problem?
18    A.  No.
19    Q.  So basically you stopped getting
20  pressure from above, you stopped setting it up,
21  and nobody came to meetings because nobody called
22  them?

Page 341

1     A.  That's my recollection.
2     Q.  You've indicated earlier that you gave
3  Mr. Moorehead monthly reports that might
4  reference the Medicare Working Group if there was
5  anything significant that happened.
6        Were those written reports, sir?
7     A.  Yes.
8     Q.  To your knowledge, do they still exist?
9     A.  I have no knowledge.
10    Q.  When you left your position, do you
11  know what you did with your copies of those
12  monthly reports?
13    A.  No.
14       MS. THOMAS:  We'll just take a quick
15  break --
16       THE WITNESS:  Sure.
17       MS. THOMAS:  -- and then we won't --
18       THE VIDEOGRAPHER:  We are off the
19  record at 5:23 p.m.
20       (Recess taken.)
21       THE VIDEOGRAPHER:  We are back on the
22  record at 5:26 p.m.

86  (Pages 338 to 341)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                          July 30, 2007
                        Chicago, IL

Page 342

1       MS. THOMAS:  This seems very
2  anticlimactic, but we are finished.  I have no
3  further questions unless anyone else does.
4       MR. STUART:  No.
5       MR. SISNEROS:  No.
6       MS. TABACCHI:  I will ask the court
7  reporter to mark the transcript under the
8  protective order, please.  Thank you.
9       THE VIDEOGRAPHER:  We are off the
10  record at 5:27 p.m. with the conclusion of the
11  deposition of James Miller.
12         (WHEREUPON, FURTHER DEPONENT
13  SAYETH NOT)
14
15
16
17
18
19
20
21
22

Page 343

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3  IN RE: PHARMACEUTICAL        )
4  INDUSTRY AVERAGE WHOLESALE   )
5  PRICE LITIGATION          ) MDL No. 1456
   ---------------------------) Civil Action
6  This document relates to:   ) No. 01-12257-PBS
7  United States of America,   )
8  ex. rel. Ven-a-Care of the  )
9  Florida Keys, Inc.,         ) Hon. Patti Saris
      vs.             )
10  Abbott Laboratories, Inc.,  ) Magistrate Judge
11  CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler

12       I hereby certify that I have read the
13  foregoing transcript of my deposition given at the
14  time and place aforesaid, consisting of pages 1 to
15  283, inclusive, and I do again subscribe and make oath
16  that the same is a true, correct, and complete
17  transcript of my deposition so given as aforesaid and
18  includes changes, if any, so made by me.

18  _____
19          JAMES E. MILLER
   SUBSCRIBED AND SWORN TO
19  before me this _____ day
20  of _____, A.D. _____.

21  _____
22     Notary Public

Page 344

1  STATE OF ILLINOIS   )
              ) ss:
2  COUNTY OF C O O K   )
        I, Deborah Habian, a Certified Shorthand
3  Reporter within and for the State of Illinois, do
   hereby certify:
4        That previous to the commencement of the
   examination of the witness, the witness was duly sworn
5  to testify the whole truth concerning the matters
   herein;
6        That the foregoing deposition was reported
   stenographically by me, was thereafter reduced to
7  printed transcript by me, and constitutes a true
   record of the testimony given and the proceedings had;
8        That the said deposition was taken before
   me at the time and place specified;
9        That the reading and signing by the
10  witness of the deposition transcript was agreed upon
11  as stated herein;
12        That I am not a relative or employee of
13  attorney or counsel, nor a relative or employee of
14  such attorney or counsel for any of the parties
15  hereto, nor interested directly or indirectly in
16  the outcome of this action.
17        IN WITNESS WHEREOF, I do hereunto set my
18  hand this _____ day of _____, 2007.
19
20        DEBORAH HABIAN, CSR, RMR, CRR, CBC
21        Notary Public
22        CSR No. 084-022432

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb