# Exhibit 112

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS


---------------------------X

In re:  PHARMACEUTICAL        )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  No. 01-12257-PBS

---------------------------X


      VIDEOTAPED DEPOSITION OF MICHAEL TOOTELL

                OCTOBER 25, 2007

                CHICAGO, ILLINOIS


Videotaped Deposition of MICHAEL TOOTELL, at

71 South Wacker Drive, 32nd Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

October 25, 2007, before Donna M. Kazaitis, RPR,

CSR  No. 084-003145.

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                October 25, 2007
                        Chicago, IL

---

Page 2

1   APPEARANCES OF COUNSEL:
2
3   FOR THE UNITED STATES:
4
5       U.S. DEPARTMENT OF JUSTICE
6       CIVIL DIVISION
7       BY:  MS. ANN ST. PETER-GRIFFITH
8       99 N.E. 4th Street
9       Miami, Florida 33132
10      (305) 961-9003
11      ann.stpeter-griffith@usdoj.gov
12
13  FOR THE STATE OF CALIFORNIA:
14
15      STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
16      BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
17      BY:  MR. ELISEO SISNEROS
18         (via teleconference)
19      110 West A Street, Suite 1100
20      San Diego, California 92101
21      (619) 688-6043
22      eliseo.sisneros@doj.ca.gov

---

Page 3

1   APPEARANCES OF COUNSEL:  (CONTINUED)
2
3   FOR THE RELATOR VEN-A-CARE OF THE FLORIDA
4   KEYS, INC.:
5
6       ANDERSON LLC
7       BY:  MR. C. JARRETT ANDERSON
8       1300 Guadalupe, Suite 103
9       Austin, Texas 78701
10      (512) 469-9191
11
12  FOR ABBOTT LABORATORIES:
13
14      JONES DAY
15      BY:  MR. JASON G. WINCHESTER
16      77 West Wacker Drive
17      Chicago, Illinois 60601-1692
18      (312) 782-3939
19      jgwinchester@jonesday.com
20
21
22  (CONTINUED)

---

Page 4

1   APPEARANCES OF COUNSEL:  (CONTINUED)
2
3   FOR THE DEPONENT:
4
5       MAYER BROWN LLP
6       BY:  MR. JAMES R. FERGUSON
7       71 South Wacker Drive
8       Chicago, Illinois 60606
9       (312) 701-7282
10      jferguson@mayerbrownrowe.com
11
12
13  ALSO PRESENT:
14
15      Anthony Micheletto, Videographer
16
17
18
19
20
21
22

---

Page 5

1               I N D E X
2
3   WITNESS:  MICHAEL TOOTELL                    PAGE
4     Examination By Ms. St. Peter-Griffith..... 007
5     Examination By Mr. Anderson............... 222
6
7               E X H I B I T S
8   NUMBER          DESCRIPTION              PAGE
9   Exhibit Tootell 001, MT 01286-01510............ 009
10  Exhibit Tootell 002, Two CDs, ABT-DOJ-E 0545292
11        -941 and ABT-DOJ 0309695
12        -997...................... 011
13  Exhibit Tootell 003, MT 01260-01261............ 030
14  Exhibit Tootell 004, ABT-DOJ-E 0545739-770..... 114
15  Exhibit Tootell 005, ABT-DOJ-E 0545771-791..... 153
16  Exhibit Tootell 006, ABT-DOJ-E 0545901-922..... 167
17  Exhibit Tootell 007, ABT-DOJ-E 0545899-900..... 188
18  Exhibit Tootell 008, ABT-DOJ-E 0545620-653..... 216
19  Exhibit Tootell 009, ABT 52704-707............. 295
20  Exhibit Tootell 010, ABT 52795-797............. 299
21  Exhibit Tootell 011, ABT 53177-180............. 303
22  Exhibit Tootell 012, ABT-DOJ 296250-256........ 307

---

2 (Pages 2 to 5)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 6

1              P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  This is Anthony
4    Micheletto representing Henderson Legal Services.
5    I am the operator of this camera.
6          This is the videotaped deposition of
7    Mike Tootell.  It is being taken pursuant to
8    Federal Rules of Civil Procedure on behalf of the
9    plaintiff.
10         We are on the record on October 25,
11   2007.  The time is 9:37 a.m. as indicated on the
12   video screen.  We are at the offices of Mayer
13   Brown, 71 South Wacker Drive, Chicago, Illinois.
14         This case is captioned In Re
15   Pharmaceutical Industry Average Wholesale Price
16   Litigation.  Case No. 01-12257-PBS.
17         Will the attorneys please identify
18   themselves for the video record.
19         MS. ST. PETER-GRIFFITH:  Ann St. Peter-
20   Griffith from the United States Attorney's
21   Office, Southern District of Florida, on behalf
22   of the United States.

---

Page 7

1          MR. ANDERSON:  Jarrett Anderson for the
2    relator.
3          MR. SISNEROS:  Eliseo Sisneros, Deputy
4    Attorney General, on behalf of the State of
5    California.
6          MR. FERGUSON:  Jim Ferguson on behalf
7    of Mike Tootell.
8          MR. WINCHESTER:  Jason Winchester for
9    the defendants.
10         THE VIDEOGRAPHER:  The Court Reporter
11   today is Donna Kazaitis from Henderson Legal
12   Services of Washington, D.C.
13         Please swear in the witness.
14
15           MICHAEL TOOTELL,
16   having been first duly sworn, was examined and
17   testified as follows:
18
19           EXAMINATION
20   BY MS. ST. PETER-GRIFFITH:
21     Q.  Good morning, Mr. Tootell.  I apologize
22   for a little bit of the late start and the

---

Page 8

1    confusion about a request that I had made.
2          As I indicated earlier, my name is Ann
3    St. Peter-Griffith.  I've come up here from
4    Florida, and I'm here today on behalf of the
5    United States in the AWP Multi-District
6    Litigation, which is a nationwide litigation.
7          Sir, before we get going, you were
8    served with a, or your counsel was served, with a
9    Subpoena on your behalf.  Your counsel has
10   indicated that you've produced documents which I
11   have in front of me beginning with what appears
12   to be a Bates label MT 00001 through MT 01510.
13   Does that sound about right?
14     A.  I provided many documents to Mayer
15   Brown, and I'm not sure about the coding numbers
16   of them.
17         MS. ST. PETER-GRIFFITH:  Counsel, can I
18   just ask, is the 1510 the last number?  Do you
19   know?
20         MR. FERGUSON:  I don't know.
21         MS. ST. PETER-GRIFFITH:  Well, if you
22   tell me that this stack that you've given me is

---

Page 9

1    the complete stack, that's the highest number I
2    could find.  So does that sound about right?
3          MR. FERGUSON:  That sounds about right.
4          MS. ST. PETER-GRIFFITH:  Okay.
5          What I'd like to do is mark as the
6    first exhibit the entire production that you
7    produced incident to the Subpoena.  However, I do
8    appreciate that there is some more sensitive
9    financial information in here.  Therefore, I'm
10   going to ask that copies of only the last three
11   hundred pages be actually made for this
12   deposition, and then if I could just ask your
13   counsel to retain the balance.  Is that all
14   right?
15         MR. FERGUSON:  No problem.
16         MS. ST. PETER-GRIFFITH:  Jason, is that
17   okay?
18         MR. WINCHESTER:  That's fine.
19         (WHEREUPON Deposition Exhibit
20   Tootell 001 was marked as of 10/25/2007.)
21   BY MS. ST. PETER-GRIFFITH:
22     Q.  A little bit more housekeeping before

---

3 (Pages 6 to 9)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 10

1  we start talking about some questions here, Mr.
2  Tootell.
3        I also want to represent to you, and
4  I've discussed this with both counsel for Abbott
5  and your attorney, that I have copies of CDs of
6  documents that were produced to the United States
7  on Tuesday, and they are CDs which counsel for
8  Jones Day has represented are documents
9  responsive to discovery requests in this
10 litigation that came from your files.
11       You haven't had a chance to see these.
12 We're going to go over some of them today.  And
13 what I'd just like to do is mark as Exhibit
14 Tootell 002 to the deposition the two CDs which
15 are labeled with ABT-DOJ-E 0545292 through ABT-
16 DOJ-E 0545941, and the second CD is ABT-DOJ
17 0309695 through ABT-DOJ 0309973.  And I'm going
18 to give copies to your counsel, which is okay,
19 I've ascertained from Jason, is okay with Jones
20 Day.
21       MR. FERGUSON:  So this is Exhibit
22 Tootell 002?

Page 11

1        MS. ST. PETER-GRIFFITH:  That's Exhibit
2  Tootell 002.
3        (WHEREUPON Deposition Exhibit
4  Tootell 002 was marked as of 10/25/2007.)
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Sir, before we start talking about some
7  documents, I'd like to go over some preliminary
8  matters.
9        Have you ever had your deposition taken
10 before?
11    A.  Yes.
12    Q.  In what context?
13    A.  A divorce proceeding about nine years
14 ago in Franklin County.
15    Q.  Other than in that divorce proceeding,
16 have you had your deposition taken at any other
17 time?
18    A.  Yes.
19    Q.  When?
20    A.  Before coming to Abbott I was director
21 of reimbursement for a Blue Cross plan, a
22 national marketing director had been set up, he

Page 12

1  set up a dummy company, I was director of
2  marketing at that point, had spent most of my
3  career as director of reimbursement.  I wrote the
4  memo to the legal counsel of the Blue Cross plan
5  identifying the fraudulent activity, and that
6  resulted in a legal proceeding, and I testified
7  on behalf of Blue Cross.
8     Q.  Any other time that you've been
9  deposed?
10    A.  No.
11    Q.  Is there any other time when you have
12 given testimony under oath although not in a
13 deposition?
14    A.  Yes.  This goes way back.  I was a
15 hospital social worker in Sparrow Hospital in
16 Lansing, Michigan.  I had responsibility for the
17 spinal cord unit.  One of our patients had been
18 injured in a snowmobile accident, and the
19 insurance company was reluctant to accept full
20 liability for that injury.  The patient was a
21 quadriplegic.  I worked with the family and
22 suggested that they contact the Department of

Page 13

1  Insurance.  They did.  That resulted in a legal
2  proceeding, and I testified under oath at that
3  point.
4     Q.  Any other time?
5     A.  No.
6     Q.  Did you ever testify before a Grand
7  Jury in any matter pertaining to Abbott or Ross?
8     A.  No.
9     Q.  What I'd like to do is go through a few
10 ground rules.  I know you've been deposed before.
11 I'm going to ask some questions.  If I could ask
12 you to just before you respond take a deep
13 breath, maybe count to three inside your head,
14 because there might be objections that are
15 interposed and we want to make sure we get those
16 down, and if we're all talking at the same time
17 unfortunately the Court Reporter can't get down
18 the information.
19       Additionally, if I ask a question and
20 you don't understand the question or you're
21 uncertain about it, let me know because that way
22 I will know that the response that you give is

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 14

1  responsive to my question.
2       At any time if you need me to clarify
3  anything, just let me know.
4       A.  Thank you.
5       Q.  Okay?
6       A.  Thank you.
7       Q.  Sir, can you starting with your college
8  education take us through your educational
9  background, please.
10      A.  I graduated in 1966 from Villa Park
11  High School in Orange County, California, was
12  student body president.  Went to Occidental
13  College, graduated in June of 1970.  Then I went
14  to the University of Chicago, Divinity School,
15  for one year.  Then I spent two years as
16  alternative military service working in a
17  hospital in Rochester, New York.
18      Then I went to the School of Social
19  Work at Michigan State, received a Master's in
20  social work two years later, which would have
21  been mid '70s. Was working at Sparrow Hospital
22  as a respiratory therapist during school and then

---

Page 15

1  was hired in that hospital as a social worker.
2  Stayed there for four years.  And the last two
3  years I began working on my Master's in Business
4  Administration.  Received my Master's in Business
5  Administration in fall of 1989.
6       Q.  Fall of 1989 or 1980?
7       A.  It would have been 1980, right.  Thank
8  you.
9       Q.  I say that, sir, because I'm looking at
10  your CV.
11      A.  It's a long time ago.
12      Then I worked for the Ohio Board of
13  Regions, which is the coordinating group of, it's
14  the state agency for higher education in Ohio.
15  At the end of my career I was there, I was chair
16  of the Medical School Dean's Committee, associate
17  to the chancellor for health plans, health
18  programs, did legislative and budget work for the
19  Ohio medical, seven Ohio medical schools.
20      Q.  I don't want to interrupt you, but can
21  you just give us the timeframe when you were with
22  the Ohio Board of Regions?

---

Page 16

1       A.  It was about four years, from '80
2  through about '84.  And then I went to Central
3  Benefits Blue Cross, which was a small Blue Cross
4  plan.
5       Q.  Located where?
6       A.  In Columbus, Ohio.  And I spent about
7  five years with that plan.  For four years I was
8  director of reimbursement, responsible for
9  hospital negotiations, rate setting, established
10  a DRG system for that computer, that Blue Cross
11  plan, and then was called by a head hunter
12  representing Abbott.  And I have been essentially
13  in the same job with three titles since November,
14  middle of November, 1989.
15      Q.  So just to backtrack a little bit, you
16  worked with Central Benefits Blue Cross Blue
17  Shield --
18      A.  It was just Blue Cross.
19      Q.  Oh, just Blue Cross, okay.  From
20  approximately '84 to November of '89?
21      A.  Uh-huh.
22      Q.  And then you came to Abbott through a

---

Page 17

1  solicitation from a head hunter?
2       A.  Yes.
3       Q.  When you worked for Abbott in this
4  essentially same role with three titles, what
5  location were you at?
6       A.  The Ross headquarters, which is now
7  Abbott Nutrition, located in Columbus, Ohio.
8       Q.  Do you live in Columbus?
9       A.  Yes, in Westerville, a suburb.
10      Q.  We're going to go over in detail your
11  history with Abbott.  What I'd like to do now is
12  to just ask what conversations you've had about
13  this litigation, not discussing conversations
14  with your attorney.
15      A.  I've talked about the content of this
16  conversation with two people.
17      Q.  Okay.
18      A.  One is my wife, Rebecca Craig.
19      Q.  Okay.
20      A.  The other is my best man at my wedding.
21  His name is Berkeley McGowan, former VP for
22  compliance for Beverly Nursing Home chain.

---

5 (Pages 14 to 17)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

---

Page 18

1    Q.  And what did you discuss with Mr.
2  McGowan?
3    A.  What it's like emotionally to go
4  through a process like this.  He's a friend.
5  This was a conversation between friends.  It's
6  not a conversation about what to say.
7    Q.  Did you have any discussions with
8  anyone at Abbott about today's deposition?
9    A.  No.
10    Q.  Did you discuss, did you have any
11  conversations with any legal counsel representing
12  Abbott?
13    A.  Mr. Winchester.
14    Q.  When did you confer with Mr.
15  Winchester?
16    A.  Yesterday.
17    Q.  Yesterday?
18    A.  Uh-huh.  It's the first time I had met
19  him.
20    Q.  And what did you discuss with Mr.
21  Winchester?
22        MR. FERGUSON:  Instruct the witness not

Page 19

1  to answer.
2        MS. ST. PETER-GRIFFITH:  Can I ask the
3  basis for instruction?
4        MR. FERGUSON:  Joint defense.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Sir, do you have any interest in this
7  litigation, in the outcome of this litigation?
8    A.  I don't understand.  Of course.
9  Explain your question.
10    Q.  Sure, sure.
11        Do you have any concern about having
12  any liability or exposure in this litigation?
13    A.  I don't understand your question.
14    Q.  Are you concerned that you might
15  personally be held responsible for some of the
16  claims asserted in this lawsuit?
17    A.  The claims in the lawsuit, as I see
18  them, are restricted to pharmaceutical business.
19  I have no concern about my role with the small
20  number of pharmaceuticals that Abbott had or the
21  Ross division had.
22    Q.  Okay.  What did you do, any other

Page 20

1  conversations with counsel other than, with
2  Abbott counsel, other than Mr. Winchester?
3    A.  I've had other conversations with other
4  Abbott counsels over seventeen years.
5    Q.  I meant in preparation for this
6  litigation, or for this deposition.
7    A.  No.
8    Q.  Sir, approximately how long did you
9  confer with Mr. Winchester?
10    A.  We started at 12:00 and finished about
11  4:30 yesterday.
12    Q.  Was your counsel present at all times?
13    A.  I believe so.
14    Q.  What did you do to prepare for this
15  deposition today?
16    A.  I read your Complaint, I reviewed my
17  files, my personal files.
18    Q.  Is that what you've produced here
19  today?
20    A.  Absolutely.
21    Q.  Okay.  Anything else?
22    A.  I visited Chicago to confer with

Page 21

1  counsel last week.
2    Q.  When you conferred with counsel, was
3  that just your attorney?
4    A.  Yes.
5    Q.  I don't want to know what you
6  discussed.
7    A.  The two of us, and there was an
8  associate also with us.
9    Q.  And, sir, how did you come to be
10  represented by Mayer Brown?
11    A.  When I received your Complaint, I was
12  notified by Jones Day of your interest in my
13  testimony.  I asked Jones Day for a personal
14  counsel.
15    Q.  Is Abbott responsible for your legal
16  fees?
17    A.  Yes, they are.
18    Q.  Did you confer with any other lawyers
19  before conferring with Mr. Ferguson?
20    A.  During what time?
21    Q.  At any time concerning representation
22  of you in this litigation.

6  (Pages 18 to 21)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                October 25, 2007
                        Chicago, IL

Page 22

1    A.  I only knew of your interest in me
2  fairly recently.  And, no, I did not talk with
3  any other attorneys between the time I received
4  your Complaint and today regarding this issue.
5    Q.  Was it Jones Day or counsel for Abbott
6  that suggested you be represented by Mr.
7  Ferguson?
8    A.  It was my suggestion.
9    Q.  Your suggestion?
10   A.  Uh-huh.
11   Q.  Had you worked with Mayer Brown before?
12   A.  I knew Mr. Ferguson.
13   Q.  Sir, have you been involved in any
14 other legal proceedings other than on a personal
15 matter, your divorce?
16   MR. FERGUSON:  Object to form.
17   MS. ST. PETER-GRIFFITH:  You can go
18 ahead and answer.
19   MR. FERGUSON:  You can answer.  I was
20 objecting to the form of the question.
21   THE WITNESS:  Could you ask me again?
22 BY MS. ST. PETER-GRIFFITH:

Page 23

1    Q.  Sure.  Let me ask it a different way.
2      Other than your divorce, have you been
3  involved in any other legal proceedings?
4    MR. FERGUSON:  Same objection.
5    THE WITNESS:  I'm chair of the legal
6  committee of my homeowners association, which is
7  forty-four units.  And we have a, the building
8  right next to me is partially constructed and the
9  legal committee is involved in clarifying title
10 and getting the construction to be completed.
11 This is Lakeside Forest Association.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.  Sir, have you ever been interviewed by
14 any federal or state law enforcement agencies?
15   A.  No.
16   Q.  Are you familiar with litigation
17 against Abbott concerning its Ross Products
18 Division?
19   A.  Yes.
20   Q.  Were you interviewed incident to that?
21   A.  No.
22   Q.  Sir, what I think I'd like to do right

Page 24

1  now is go over some of the documents that you've
2  produced before we delve into the questions.
3      Unfortunately, we just got one copy
4  here, so I've kind of stickied this up.  So I'll
5  show them to you --
6    MR. FERGUSON:  Forgive me for
7  interrupting, but I think I have another copy.
8  Is this what we produced today?
9    MS. ST. PETER-GRIFFITH:  This is what
10 you produced today, yeah.  Do you think that
11 would be helpful?  I mean I can defer asking
12 these questions now if you want to --
13   MR. FERGUSON:  I can send an e-mail to
14 the paralegal and ask her to bring another copy
15 down.
16   MS. ST. PETER-GRIFFITH:  Okay.  That
17 would be helpful, that would be helpful.  Then we
18 can just move on to a different subject.
19   MR. FERGUSON:  Go ahead.  You don't
20 have to wait for me.  I can multi-task.
21   MS. ST. PETER-GRIFFITH:  You're far
22 more adept at your Blackberry than I am.

Page 25

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Sir, what do you know about this
3  lawsuit?
4    A.  Which lawsuit?
5    Q.  The lawsuit that you're being deposed
6  in today, the AWP litigation pending against
7  Abbott in the Multi-District, in the MDL.
8    A.  MDL is?
9    Q.  The Multi-District Litigation.
10   A.  This is the Ven-a-Care lawsuit?
11   Q.  Right.
12   A.  It's been well publicized in the
13 healthcare press.  I haven't followed it closely,
14 but we've watched this percolate.
15   Q.  When you say "we've watched this
16 percolate," what do you mean?
17   A.  There have been a number of newspaper
18 articles, some of which I think were produced,
19 that site even the early history of this case.
20 Those were in my files and were relevant to your
21 request.
22   Q.  Have you yourself ever prepared any

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                        October 25, 2007
                         Chicago, IL

---

Page 26

1   information concerning Ven-a-Care or KTM
2   litigation?
3       A.  Absolutely not.  Ven-a-Care was not a
4   Ross customer as far as I know.
5       Q.  What about litigation by Whistle
6   Blowers, have you prepared any materials
7   concerning that?
8       A.  No.  I have not.
9       Q.  Sir, are you currently an Abbott
10  employee?
11      A.  No.
12      Q.  When did you leave Abbott's employ?
13      A.  May 26th.
14      Q.  Why did you leave?
15      A.  I was able to retire.
16      Q.  So you decided to retire?
17      A.  Yes.
18      Q.  What are you doing now?
19      A.  Several things.  Pretty important to me
20  as a hospice volunteer.
21      Q.  That's tremendous.
22      A.  I spend sometime with hospice and

---

Page 27

1   hospice patients.  That's important to me.
2       I also have a small consulting company.
3   It's called MGT Decisions.  It's focused on
4   Medicare's competitive bidding program.  And I've
5   been selected by, nominated by, an organization
6   called AdvaMed, Health Industry Manufacturers
7   Association, and that association nominated me to
8   represent healthcare manufacturers on Medicare's
9   Program Advisory and Oversight Committee.  So I'm
10  helping Medicare to craft a competitive bidding
11  program.
12      Q.  Are you drawing from your experience
13  with Abbott and with Blue Cross for that
14  particular consulting?
15      A.  Absolutely.
16      Q.  Is your consulting work limited to the
17  parenteral or enteral nutrition market, or do you
18  provide consulting services that go beyond that
19  particular market?
20      A.  My consulting is focusing on the
21  competitive bidding initiative that Medicare is
22  doing now.  There are ten products involved.

---

Page 28

1   Enteral is included, parenteral is not included.
2   We include wheelchairs, hospital beds, walkers,
3   several kinds of oxygen equipment.
4       Q.  So is your consulting then limited to
5   the issue concerning Medicare's competitive
6   bidding?
7       A.  Yes, absolutely, yes, it is.
8       Q.  Is Abbott a client of yours?
9       A.  No.  We have a six-month rule.  You
10  can't work for Abbott within six months.  No.
11      Q.  I understand.  We've got comparable
12  rules in the government.
13          Sir, what I'd like you to do now is
14  take us through your employment history with
15  Abbott and the titles that you've held with
16  Abbott.
17      A.  Okay.  I was brought in as manager for
18  insurance development I believe, and for
19  several years that title became senior manager
20  for health policy and reimbursement, which
21  several years later became director of health
22  policy.

---

Page 29

1       Q.  What were your job responsibilities --
2   well, let me ask you, during the course that you
3   held these three titles did you have the same job
4   responsibilities?
5       A.  Similar.
6       Q.  Why don't we start with your position
7   in insurance development.  What does that mean?
8   What did the position entail?
9       A.  This was the beginning of a marketing
10  theme called market expansion.  It was a major
11  initiative to improve the size of the Ross
12  nutritional division, particularly opening up
13  retail markets in oral supplement uses and other
14  products I'm sure.
15      Q.  What were your responsibilities?
16      A.  I was the liaison between third-party
17  payors, particularly Medicare, which is our tube
18  feeding business, and the Ross business unit and
19  division leadership.
20      Q.  What other responsibilities did you
21  have?
22      A.  I did a fair amount of calling on

---

8 (Pages 26 to 29)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 30

1  Medicare carriers, explaining the features and
2  benefits of Ross products to them, variety of
3  associated chores as issues came up.
4      Q.  Okay.  And you've listed --
5         MS. ST. PETER-GRIFFITH:  Great timing
6  because I'd like to discuss with you how you'd
7  describe this.
8         MR. FERGUSON:  Are those the right
9  ones?
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Actually, if I could put that in front
12 of the witness.
13        MS. ST. PETER-GRIFFITH:  And why don't
14 we label this separately, is that all right, as
15 the next exhibit, Exhibit Tootell 003.
16        (WHEREUPON Deposition Exhibit
17 Tootell 003 was marked as of 10/25/2007.)
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  I've noticed on what's been marked as
20 Exhibit Tootell 003, which says at the top MGT
21 Tootell, MGT Decisions LLC.  (Document tendered
22 to the witness.)

Page 31

1      Let me ask you first, is that your
2  consulting company?
3      A.  Yes, it is.
4      Q.  And you've identified your work with
5  Ross Products Division.
6      A.  Absolutely.
7      Q.  You only have one title there.  It says
8  Director of Health Policy, 2002 to 2007.
9      A.  That's true.
10     Q.  Is that when you held that --
11     A.  No.  As I said before, I had several
12 titles, similar responsibilities.  This is a
13 resume to be used by MGT clients, and clearly I
14 finished my time at Ross with that title.
15     Q.  Well, you've listed several items under
16 Medicare, Medicare Competitive Billing, and
17 Medicaid.  Do you see that?
18     A.  Uh-huh.
19     Q.  Do those particular listings identify
20 what you did in your capacity as Director of
21 Health Policy for Ross Products Division, Abbott
22 Laboratories?

Page 32

1      A.  Yes, and with the preceding titles as
2  well.
3      Q.  Under Medicare it says "Successfully
4  protected $140-$180 million in annual Medicare
5  Part B reimbursed sales for seventeen years."  Do
6  you see that?
7      A.  Yes.
8      Q.  What do you mean by that?
9      A.  That Ross business, Ross is the major
10 market leader for enteral tube feeding, and we
11 had a major part of that business.  I was the key
12 person for Ross explaining the features and
13 benefits of our products to Medicare carriers and
14 Medicare policy makers.
15     Q.  Was that to secure the ability to have
16 Medicare or Medicaid reimbursement for those
17 products?
18     A.  Yes.
19     Q.  It also indicates that you worked with
20 ten trade and professional associations to modify
21 adverse Medicare policies.  Do you see that?
22     A.  Yes.

Page 33

1      Q.  What do you mean by that?
2      A.  There are ten different trade
3  associations that we were members of over the
4  time, they were not always the same.  There was
5  ebb and flow as Washington organizations grow and
6  merge and flounder, whatever.  And I worked with
7  those associations.
8         AdvaMed, Health Industry Manufacturers
9  Association, is a key group.  For years I was
10 chair of their competitive bidding working group.
11 So I would help out writing papers and writing
12 presentations helping the associations craft
13 position statements that would be helpful.
14     Q.  Were there any particular Medicare
15 policies that Abbott or Ross or you considered
16 adverse that you were successful in modifying?
17     A.  Yes.
18        MR. WINCHESTER:  Objection, form.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  What were those?
21     A.  Well, over seventeen years a number of
22 things come up.  Do you want to narrow it more

9 (Pages 30 to 33)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Page 34

1  specifically?
2     Q.  Yes, please.  If you can just identify
3  what those particular policies were.
4     A.  There was a proposal to reduce payment
5  rates for our enteral nutritional products using
6  a legal principle called inherent reasonableness.
7        The Medicare carriers, there are four
8  insurance companies that worked with Medicare and
9  had contracts to cover enteral nutritional
10 products, did a bad survey.  It was statistically
11 flawed.  We pointed out the statistical flaws.
12 We worked with a national association, National
13 Alliance for Infusion Therapy, that took some of
14 my concepts and went to outside economic research
15 programs who wrote up a complete draft, an
16 explanation of that situation.
17        That was reviewed by a number of
18 Washington agencies, and at the end new
19 provisions were put into law, or procedures, that
20 required more statistical rigor in the use of
21 inherent reasonableness rate reductions.
22    Q.  Any other policies that you can think

Page 35

1  of that you, to use your terms, were successful
2  in modifying?
3     A.  I'm looking at other things that I
4  mentioned in this process.
5        There was an effort in the early '90s
6  to include enteral nutritional products in a drug
7  rebate program, working with Washington attorneys
8  I identified the legislative language.  It was
9  restricted to pharmaceutical products, not to
10 nutritional products.
11        A number of us worked to point this out
12 to the CMS group in charge of the OBRA rebate
13 negotiations, and that resulted in a letter from
14 the National Medicaid Program to all the state
15 Medicaid directors explaining that OBRA did not
16 include nutritional products and that nutritional
17 products were not subject to the rebate
18 requirements.  And it's because of the craft of
19 the underlying legislation did not permit
20 rebates.
21    Q.  Anything else?
22    A.  I prefer to take issues as they come

Page 36

1  forward.  Obviously I spent seventeen years with
2  Ross.  There's many activities.
3     Q.  Okay.  Well, I'm just trying to exhaust
4  your memory before we start reviewing the
5  documents.  I just want to exhaust your memory as
6  to what initiatives that you can recall that,
7  again, to use your language, involved your
8  working to modify adverse Medicare policies.
9     A.  I think I've covered those and will be
10 glad to take any further questions.
11    Q.  Okay.  Were you involved -- well, let
12 me ask you this:  Was this something that you did
13 on your own, or was this part of your job
14 responsibilities with Abbott?
15    A.  These were consistent with my job
16 responsibilities.
17    Q.  You were the reimbursement, to use lack
18 of a better term, sort of guru within the Ross
19 division; is that fair?
20        MR. FERGUSON:  Object to form.
21        MR. WINCHESTER:  Object to form.
22 BY MS. ST. PETER-GRIFFITH:

Page 37

1     Q.  Go ahead.
2     A.  I was responsible for reimbursement
3  policies for the Ross division for the medical
4  nutritional product line.
5     Q.  Were there other people within other
6  divisions that were similarly responsible for
7  other Abbott product lines for reimbursement?
8     A.  Yes.
9     Q.  Who can you think of?
10    A.  There were a number of other people
11 that we, you know, from the documents we've
12 produced.  And those names changed over time, as
13 people, for some people this was a career.  For
14 me it was.  For Virginia Tobiason it was.  For
15 other people it was a shorter term program, part
16 of a much larger career.
17    Q.  Did you work with Virginia Tobiason?
18    A.  Yes.
19    Q.  What was your relationship with
20 Virginia?
21    A.  When I came to Ross, my hiring vice
22 president brought me to meet Virginia.  He and

                                    10  (Pages 34 to 37)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 38

1    Virginia had worked together on the Alliance for
2    Medical Nutrition as a trade association, so he
3    knew her.  And he in some ways had crafted the
4    job that he provided to me on the work that
5    Virginia had done.
6        Q.  When you say "on the work that Virginia
7    had done," what do you mean?
8        A.  She was the reimbursement guru, if you
9    want to use that word, for other divisions.
10       Q.  When you came to Ross, did they have a
11   reimbursement person?
12       A.  No.
13       Q.  So you essentially originated the
14   position?
15       A.  Yes.
16       Q.  Did you work closely with Virginia
17   Tobiason?
18           MR. FERGUSON:  Object to form.
19   BY MS. ST. PETER-GRIFFITH:
20       Q.  Go ahead.  You can answer.
21       A.  I'm not sure what that means.
22       Q.  How did you, how often did you interact

Page 39

1    with her?
2        A.  We were colleagues, and as issues would
3    come forward we felt comfortable calling each
4    other.
5        Q.  What types of issues would she call you
6    concerning?
7        A.  I don't recall.
8        Q.  Did you ever work with her on AWP
9    pricing issues?
10       A.  No.
11       Q.  Did you ever discuss AWP issues with
12   her?
13       A.  Yes.
14       Q.  What is AWP?
15       A.  AWP is, the phrase stands for average
16   wholesale price.  It's a pricing system mostly
17   applied to pharmaceuticals.
18       Q.  Was it applied though in the Ross
19   products, in the context of Ross products?
20       A.  Ross has over the time I was there had
21   four pharmaceutical products, and each of those
22   of course had AWPs.

Page 40

1        Q.  And what were they?
2        A.  Survanta, Synagis, a product called
3    Santyl, and a product called Oxandrin.
4        Q.  Did AWP at all come up --
5        A.  No.
6        Q.  Let me finish.
7            MR. FERGUSON:  Mike, you got to wait
8    for her to finish the question and then answer
9    the question.  That way we've got a clean record
10   of what she's asking and what your response is.
11           THE WITNESS:  Okay.
12           MR. FERGUSON:  So don't anticipate the
13   question.  Wait for her to complete the question
14   and then answer the question.
15   BY MS. ST. PETER-GRIFFITH:
16       Q.  Did any AWP issues come up concerning
17   reimbursement for enteral products or Jevity?
18       A.  Yes.
19       Q.  What issues came up with regard to AWP?
20       A.  There are about ten Medicaid programs
21   that reimburse for nutritional supplements under
22   an AWP format.

Page 41

1        Q.  Do you remember what they were?
2        A.  The states or the products?
3        Q.  The states.
4        A.  California is the largest.  There are
5    about a dozen others, ten to a dozen.
6        Q.  Do you remember which products?
7        A.  It would be the medical nutritional
8    product line.
9        Q.  Sir, what I'd like to do is go through
10   these documents with you before we proceed any
11   further, so bear with me.
12           At any time if you want to take a
13   break, just speak up and let me know.
14       A.  I'm fine.
15       Q.  The first title that you held
16   concerning insurance development, did you have
17   any other job responsibilities other than what
18   we've discussed so far?
19       A.  I'm sure I did, yes.
20       Q.  Can you just take me through what you
21   did on a day-to-day basis when you held that
22   position?

11  (Pages 38 to 41)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Page 42

1    A.  I was working, I wrote a Medicaid or
2  Medicare reimbursement manual, went actually
3  through eight editions.  You have a copy in the
4  materials we provided.  It's now become an
5  eighty-page document.
6    Q.  And who used that manual?
7    A.  Customers, people in the industry who
8  needed a reference to describe Medicare billing
9  processes and procedures.
10    Q.  Would it be made available to your
11  sales force?
12    A.  Sure.
13    Q.  Who would give it to customers?  Your
14  sales force?
15    A.  Yes.  Or customers could call our
16  reimbursement help line and they would ask for a
17  manual and we would send them as many manuals as
18  they needed for their training purposes.
19    Q.  What is the reimbursement help line?
20    A.  It was developed as a way to help
21  customers answer questions.  It was informally,
22  people were just given my phone number and I

Page 43

1  could answer customer calls.
2        And following the Corporate Integrity
3  Agreement that Ross has, we formalized that
4  program.  We took the program to customer
5  relations as a department.  We had about eight
6  customer relations people who would answer
7  questions according to text.  And it was all
8  developed as an ingredient of the Corporate
9  Integrity Agreement, compliance agreement.
10    Q.  Were you involved in formulating
11  Abbott's compliance with the Corporate Integrity
12  Agreement?
13    A.  Yes.
14    Q.  How so?
15    A.  I reviewed several policies at draft
16  stage, made suggestions.
17    Q.  Who else was involved with implementing
18  and formulating Abbott's compliance with the
19  Corporate Integrity Agreement?
20    A.  It's developed by our Compliance
21  Department, which includes our corporate
22  compliance attorney, Melissa Penslavey, and it

Page 44

1  was a staff of about four.
2    Q.  Who was on the staff?
3    A.  Greg Wessinger was the director.  He
4  reported directly to the president of Ross.  He
5  had a staff of Julie Tomlinson, managed
6  reimbursement issues, Tammy Regal managed
7  marketing issues, and Brent Seymour was in charge
8  of training.
9    Q.  Now, are these folks all within
10  Abbott's Compliance Department?
11    A.  They were Ross division employees, but
12  I believe there was a direct line to the Abbott
13  Compliance Department.  I don't know the
14  organizational arrangement.
15    Q.  Who was in the Abbott Compliance
16  Department?
17    A.  Charlie Brock was the Abbott vice
18  president for compliance.
19    Q.  Who else?
20    A.  He had a staff of probably a dozen
21  people.
22    Q.  Was Virginia Tobiason included among

Page 45

1  them?
2    A.  For a time, yes.
3    Q.  For how long?
4    A.  I don't recall.
5    Q.  Do you know what she's doing today?
6    A.  Yes.
7    Q.  What is she doing today?
8    A.  She is corporate health policy and
9  reimbursement reporting to the Washington
10  Government Affairs office.
11    Q.  Was Virginia Tobiason involved in
12  formulating the Abbott compliance with the
13  Corporate Integrity Agreement?
14    A.  Yes.
15    Q.  What was her role?
16    A.  I don't know.
17    Q.  Was Mr. Brock involved?
18    A.  Of course.  He was in charge of that.
19  It was his program.
20    Q.  Are you aware of any other division
21  that has its own Compliance Department other than
22  Ross?

12 (Pages 42 to 45)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                              October 25, 2007
                        Chicago, IL

Page 46

1      A.  I think Abbott has Compliance
2  Departments in all of our divisions.
3      Q.  Do you know when that originated?
4      A.  No.
5      Q.  Are you familiar with the Hospital
6  Products Division?
7      A.  Yes.
8      Q.  Do you know whether the Hospital
9  Products Division prior to it being spun off to
10  Hospira had a Compliance Department?
11      A.  I don't know.
12      Q.  Did you ever deal with any compliance
13  personnel within the Hospital Products Division?
14      A.  No.  I don't think so.
15      Q.  Did you ever consult on compliance
16  issues with the Hospital Products Division -- and
17  when I say "compliance" I mean with Medicare or
18  Medicaid.
19      A.  Ask the question again.
20      Q.  Sure.  Let me rephrase.
21          Did you work on any Medicare or
22  Medicaid compliance issues for the Hospital

Page 47

1  Products Division?
2      A.  I did not.
3      Q.  What other job responsibilities did you
4  have when you held that title, that we haven't
5  discussed here today?
6      A.  Worked with the sales force.  I did a
7  training class for, I would meet with the sales
8  training classes for new employees.
9      Q.  What was your role in working with the
10  sales force?
11      A.  To explain relevant healthcare policies
12  to them.
13      Q.  And what healthcare policies would you
14  explain to them?
15      A.  Explained the mechanisms of Medicare
16  and Medicaid and the way those government payors
17  recognized nutritional products.
18      Q.  Anything else?
19      A.  Not that I recall.
20      Q.  Are you familiar with the term
21  "spread"?
22      A.  Yes.

Page 48

1      Q.  What is spread?
2      A.  Spread refers to the gap between an
3  average wholesale price reimbursement rate and
4  its acquisition cost.
5      Q.  Did you ever discuss spread with the
6  sales force?
7      A.  I don't recall.
8      Q.  Could you have but you just don't
9  remember?
10      MR. FERGUSON:  Object to form.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Go ahead.  You can answer.
13      A.  I don't recall talking about spread
14  with the sales force.
15      Q.  Do you recall whether there was any
16  prohibition concerning discussing spread by the
17  sales force?
18      A.  There were no policy about discussion
19  of spread before the Corporate Integrity
20  Agreement.
21      Q.  Could Abbott sales force, Abbott Ross -
22  - strike that.  Let me rephrase it.

Page 49

1          Could members of the Abbott Ross sales
2  force discuss AWP or spread with customers --
3      MR. WINCHESTER:  Object to the form.
4      MR. FERGUSON:  Same objection.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  -- prior to the CIA?
7          Go ahead.  You can answer.  They're
8  just going to object and they're preserving their
9  objections.
10      A.  Okay.  So clarify your question again.
11      Q.  Sure.
12          Prior to the CIA --
13      A.  Okay, 2002.
14      Q.  2002 and before.  Could Abbott Ross,
15  could the Abbott Ross sales force discuss spread
16  or AWP with customers?
17      MR. WINCHESTER:  Object to the form.
18      MR. FERGUSON:  Same objection.
19      THE WITNESS:  Understanding spread to
20  apply to pharmaceutical products, the Synagis,
21  there would be no reason to talk about the spread
22  with those products.

13 (Pages 46 to 49)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                          October 25, 2007
                              Chicago, IL

---

Page 50

1      Survanta is an entirely hospital
2  product, so there would not be a meaningful
3  spread for Survanta.  It's a drug used for
4  intensive care unit babies.  It's a respiratory
5  drug.
6      Synagis is a drug administered by
7  injection once a month to prevent respiratory
8  syncytial virus which is a serious disease for
9  children.
10      And Oxandrin and Santyl were more minor
11  products.  I would be surprised if spread came up
12  in that context because of pharmaceutical
13  products.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  What about the ten states whose
16  Medicaid programs reimbursed in part based upon
17  AWP?
18      MR. FERGUSON:  Object to form.
19      THE WITNESS:  Our instructions to the
20  sales force were to focus on the features and
21  benefits of the products.  And prior to the
22  Corporate Integrity Agreement, there was not, the

---

Page 51

1  focus was on features and benefits of the
2  products, not on the economic dimensions of their
3  business.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  But was there any prohibition from
6  discussing the Medicaid reimbursement based upon
7  AWP for the medical nutritional products?
8      MR. FERGUSON:  Same objection.
9      MR. WINCHESTER:  Objection, form.
10      THE WITNESS:  I don't recall any policy
11  that would prohibit the discussion of spread
12  prior to 2003 or so.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Do you know whether there was any
15  policy within any other Abbott divisions
16  concerning sales force discussing spread or AWP
17  with customers?
18      A.  No.  I do not.
19      Q.  How did you learn about reimbursement
20  spreads?
21      A.  Through a whole variety of news
22  articles as well as my own training in business.

---

Page 52

1      Q.  When did you learn about it?
2      A.  I don't recall.
3      Q.  Was there any concern at Abbott at all
4  about spreads for their products and the
5  dissemination of either spread information or the
6  differences between AWP-based reimbursement and
7  the actual cost of the product?
8      MR. FERGUSON:  Object to the form.
9      MR. WINCHESTER:  Objection form,
10  speculation.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Go ahead.  You can answer.
13      A.  Can you repeat the question then?
14      Q.  Sure.
15      MS. ST. PETER-GRIFFITH:  Can you read
16  it back.
17      (WHEREUPON said record was read
18  back as requested.)
19      THE WITNESS:  Yes.
20      MR. WINCHESTER:  Before you answer, let
21  me additionally caution you not to answer the
22  question if it would require you to reveal the

---

Page 53

1  substance of any conversations you had with
2  counsel for Abbott.
3      If you can answer the question without
4  revealing those conversations, go ahead.
5      THE WITNESS:  Okay, sure.
6      Abbott is, as all members of the
7  industry are, concerned about the legal
8  dimensions of this issue.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Okay.  What were the concerns?
11      A.  Well, there were lawsuits, there was a
12  public relations risk, there was a variety of
13  downside concerns that people had about the
14  average wholesale price as it stood.
15      Q.  What did Abbott do about those
16  concerns?
17      MR. FERGUSON:  Object to form and
18  foundation.
19      THE WITNESS:  I was not involved in
20  those decisions.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Do you know who was?

---

14 (Pages 50 to 53)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 54

1     A.  I'm not sure which decisions you're
2  talking about.  This is obviously an industry
3  issue that went on for at least fifteen years
4  now.
5     Q.  Well, let me ask you this:  Did you
6  work with any of your reimbursement counterparts
7  in other divisions on Medicaid and Medicare
8  policy issues that affected Abbott as a whole?
9     A.  Yes.
10     Q.  What issues did you work with them on?
11     A.  There were many.  I'd like to be more
12  specific about --
13     Q.  Well, I'm asking you what your
14  recollection of those many issues were.
15        THE WITNESS:  Let's go back to the
16  details of the question, please.
17        MS. ST. PETER-GRIFFITH:  Can you read
18  it back.
19           (WHEREUPON said record was read
20  back as requested.)
21        THE WITNESS:  Yes, I did.  I've given
22  you a couple of examples about inherent

---

Page 55

1  reasonableness, and in those conversations
2  obviously I worked with colleagues, particularly
3  Ginny.
4           After the Corporate Integrity Agreement
5  when she moved to compliance, she had review
6  responsibilities for all reimbursement documents
7  generated by anybody at Ross as a compliance
8  officer.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay.  Did you discuss with Virginia
11  Tobiason AWP issues?
12     A.  I don't recall.
13     Q.  Did you work with any organization
14  within Abbott known as the Medicare Working
15  Group?
16     A.  Can you clarify which year that was?
17     Q.  Any year.
18     A.  I believe there was a group in the mid
19  '90s with that name.  I don't remember its
20  membership or the tasks it was assigned.  It's
21  eleven years ago.
22     Q.  What about the Medicare/Medicaid

---

Page 56

1  Reimbursement Task Force?
2     A.  I believe that group met in the early
3  2000s, but I don't remember its content or its
4  membership.
5     Q.  Do you remember any work that you did
6  on either of those organizations?
7     A.  No, I don't.
8     Q.  Was your work with the Medicare Working
9  Group in the '90s, or the Medicare/Medicaid
10  Reimbursement Task Force in the early 2000s let's
11  say, was that part of your job responsibilities?
12     A.  Yes.
13     Q.  How much time did you spend working on
14  Medicare Working Group or Medicaid and Medicare
15  Reimbursement Task Force matters?
16     A.  Ross is a division in another time
17  zone, so that coordination between Ross and
18  Abbott is not as close as it would be for the
19  Abbott park divisions.
20        I believe they came in a couple of
21  times for each of those groups.  I don't remember
22  the content or the agenda or the outcome of those

---

Page 57

1  meetings.
2     Q.  What was the purpose of the groups?
3     A.  I don't recall.
4     Q.  How much time did you spend working on,
5  let's start with Medicare Working Group matters?
6     A.  I don't recall.  I had many
7  responsibilities over many years.  Those specific
8  responsibilities associated with that task force
9  I don't recall.
10     Q.  What about the Medicare/Medicaid
11  Reimbursement Task Force, how much time did you
12  spend working on the Medicare/Medicaid
13  Reimbursement Task Force matters?
14     A.  I think there were a couple of trips
15  into Chicago.  Abbott has my calendar.  I don't
16  have my calendar.  And it was probably a minor
17  part of my reimbursement work.
18     Q.  How often did the Medicare/Medicaid
19  Reimbursement Task Force meet?
20     A.  I think only two or three times.
21     Q.  Do you know whether there was a regular
22  monthly meeting that was conducted?

---

15  (Pages 54 to 57)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 58

1     A.  I don't recall.
2     Q.  What about the Medicare/Medicaid, I'm
3  sorry, the Medicare Working Group, do you recall
4  how often that group met?
5     A.  Can you refresh me on the time of that?
6     Q.  Sure.  That was in the '90s, mid to
7  late '90s.
8     A.  I don't recall that one.  I don't
9  recall the issues about that group.
10    Q.  You don't recall any issues working
11  with the Medicare Working Group at all?
12    A.  No.
13    Q.  Do you recall whether or not
14  individuals from Washington, D.C., were involved
15  in that group?
16    A.  It's likely.
17    Q.  Why do you say it's likely?
18    A.  One would expect them to be there
19  because the Washington office was in charge of
20  our lobbying activities, and they were
21  responsible for Capital Hill and the Executive
22  Department presentations.

---

Page 59

1     Q.  Do you recall giving any presentations
2  or preparing any presentations jointly with
3  Virginia Tobiason?
4        MR. WINCHESTER:  Objection to form.
5        THE WITNESS:  I recall working with
6  Ginny, and some of them could have been
7  presentations.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Do you recall her giving any
10  presentations or your jointly giving
11  presentations?
12    A.  I don't recall any that we did
13  together.  We probably did.
14    Q.  Would they have been significant to
15  you?
16       MR. FERGUSON:  Object to form.
17       THE WITNESS:  Not sure how you're using
18  the word "significant."  It was a part of my job
19  that I was doing, assuming I did presentations
20  with Ginny.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  What about, well, let me ask you this:

---

Page 60

1  How often were you in contact with Virginia
2  Tobiason?
3     A.  It varied over time.
4     Q.  What caused it to vary over time?
5     A.  Basically our calenders.
6     Q.  Do you know why she left her position
7  in the Compliance Department?
8     A.  No, I don't.
9     Q.  What were your job responsibilities
10  when you were the senior manager for
11  reimbursement?
12    A.  Those were in the late '90s, and they
13  built on the same kinds of responsibilities I had
14  before.
15       Medicare's competitive bidding program
16  was beginning to emerge, and I was quite involved
17  in that as an issue.  And I continue to be.
18    Q.  What other responsibilities did you
19  have?
20    A.  We set up a reimbursement corner of
21  what's called Ross.com, which is an Internet data
22  resource publicly available for customers and for

---

Page 61

1  those interested in reimbursement policies
2  associated with the Ross products.
3     Q.  Would AWP information be available on
4  Ross.com?
5        MR. WINCHESTER:  Objection, form.
6        THE WITNESS:  There were state
7  summaries that summarized the state reimbursement
8  payment policies.  There would not be any
9  specific product information, product specific
10  AWPs.  We're talking as a policy website.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Did you help institute that?
13    A.  Yes.
14    Q.  Was that your idea?
15    A.  Yes.
16    Q.  What caused you to, why did you come up
17  with the idea?  Did you identify a need?
18    A.  Yes.
19       MR. FERGUSON:  Object to form.
20       THE WITNESS:  Yes.  I identified a
21  need.
22  BY MS. ST. PETER-GRIFFITH:

---

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                      October 25, 2007
                         Chicago, IL

Page 62

1    Q.  And who would you go to to implement
2  something like that?
3    A.  It was a whole budgetary process.  This
4  would go through our regular division budgetary
5  process.
6    Q.  Well, who --
7    A.  So those would be the business unit
8  vice president.  I usually reported to business
9  unit vice presidents, and they would have primary
10  budget responsibility.
11    Q.  Okay.  But you could just, other than
12  the budgeting, if you came up with an idea like
13  this in your capacity as senior management for
14  reimbursement, is that something that generally
15  they'd let you run with?
16    MR. FERGUSON:  Object to form.
17    THE WITNESS:  In this case after a
18  period of time, I don't remember how long, it was
19  an approved project.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Other than budgetary approval, would
22  you need to get any other kind of approval to

Page 63

1  implement a program like that?
2    A.  The content was all reviewed by Abbott
3  Compliance.
4    Q.  When was the Ross.com started?
5    A.  It was in the late '90s.
6    Q.  And when was Abbott's Compliance
7  Department founded?
8    A.  I'm not sure.
9    Q.  Do you remember who reviewed the
10  content for compliance?
11    A.  Melissa Penslavey was compliance
12  attorney, and often they were reviewed by Ginny
13  Tobiason at Abbott.  And then any modifications
14  had a process that required multiple reviews by
15  myself, then by Compliance, and then to the
16  computer folks.  That was all automated, that
17  review process.
18    Q.  Why would, well, in the late '90s what
19  position did Ginny hold?
20    A.  At that point she was not reviewing the
21  Ross.com material.  I was in charge of them
22  before the compliance program.

Page 64

1    Q.  Okay.
2    A.  But after the compliance program, she
3  had formal responsibilities for all reimbursement
4  documents.
5    Q.  I see.  Okay.  Other than the
6  compliance review and the budgetary review, what
7  else would be involved in getting approval to set
8  up a Web page like Ross.com?
9    A.  You need the support of the marketing
10  departments, the people who were responsible for
11  managing that business unit.
12    Q.  Would the marketing departments have
13  input into the content?
14    A.  No.
15    Q.  Did you have any other responsibilities
16  when you were the senior manager for
17  reimbursement?
18    A.  None others that I haven't already
19  discussed.
20    Q.  What about when you were the director
21  of health policy, what were your
22  responsibilities?

Page 65

1    A.  As I said before, the responsibilities
2  stayed with the person as the title changed.
3    Q.  Did you add any responsibilities when
4  you assumed that title?
5    A.  Not as a part of assuming that title.
6    Q.  Not as a part of assuming that title?
7    A.  No.
8    Q.  Over time did you accumulate more
9  responsibilities?  How about that.
10    A.  Over time, yes.
11    Q.  What additional responsibilities did
12  you assume?
13    A.  A year ago I assumed responsibility for
14  supervising a senior manager.  That was spring
15  2006.
16    Q.  Any other additional responsibilities?
17    A.  I took committee responsibilities for
18  AdvaMed, as chair of their competitive bidding
19  working group.
20    Q.  What is AdvaMed?
21    A.  AdvaMed is Health Industry
22  Manufacturers Association.  It was referred to as

                              17 (Pages 62 to 65)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                          October 25, 2007
                    Chicago, IL

Page 66

1  Health Industry Manufacturers Association for
2  many years.
3      Q.  Okay.
4      A.  It changed names about three or four
5  years ago.  And I took responsibilities for as
6  product chairman, medical products committee, of
7  a group called the National Association for the
8  Support of Long-Term Care.
9      Q.  And these were all responsibilities
10 that still fell within your work with Abbott?
11     A.  Absolutely.
12     Q.  Any other committee responsibilities
13 that you had?
14     A.  No.
15     Q.  Any other additional responsibilities
16 that you had in your employment with Abbott that
17 we haven't discussed here today?
18     A.  Yes, but I'm not recalling them.
19     Q.  If at any time you do, just speak up,
20 please.
21     A.  Okay.
22     Q.  We want to make sure we cover

Page 67

1  everything.
2          Were those additional responsibilities
3  that you can't recall, were they a smaller part
4  of your job?
5          MR. WINCHESTER:  Object to the form.
6          MR. FERGUSON:  Object to form.
7          THE WITNESS:  They would vary depending
8  on the topic.
9          For example, I was in charge of
10 obtaining what you call Medicare HCPC codes,
11 Healthcare Common Procedure Coding System codes
12 for our products.  I would write an application,
13 arrange for supportive materials from, you know,
14 the Labeling Different, you have to have a label,
15 you have to have a picture of the product, we'd
16 have to have a medical description of the
17 features and benefits, characteristics of the
18 product.  We'd have to have composition,
19 vitamins, minerals, all those ingredients.
20         I would file those applications, and
21 then with a group called the Statistical Analysis
22 Durable Medical Equipment Regional Carrier

Page 68

1  located in South Carolina, then I would work with
2  the SADMERC to make sure that they had complete
3  files and complete applications.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Did you deal with customers at all?
6      A.  Yes.
7      Q.  What were your interactions with
8  customers?
9      A.  For many years we would be in common
10 membership in common associations.
11         For example, the National Association
12 for Support of Long-term Care is a group
13 primarily of our customers.  We would be members
14 of that.  I worked with American Healthcare
15 Association, which is a national association of
16 nursing home industry, and would be responsible
17 for those groups.  On a number of issues such as
18 inherent reasonableness, their political
19 resources would be useful and we would coordinate
20 common activities, for example, if a Medicare
21 policy was not one that we favored, customers
22 would help out with that.

Page 69

1          I would have some meetings with
2  customers involving speakers and present
3  information to them.
4      Q.  Do you recall, I mean I notice in your
5  materials there's at least one presentation.  Do
6  you recall any presentations that you made?
7      A.  I would usually chair those meetings.
8      Q.  Do you remember how often did you have
9  them?
10     A.  We did ten over ten years.
11     Q.  And do you recall who the customers
12 were that attended?
13     A.  There would be about thirty-five
14 customers.  We would have speakers from Medicare,
15 members of Congress.
16     Q.  Was this particular program where you
17 would have ten meetings over ten years, was that
18 something that you implemented?
19     A.  Yes.
20     Q.  How would you go about picking the
21 topics for those particular meetings?
22     A.  These would be the critical topics for

18 (Pages 66 to 69)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

---

Page 70

1  reimbursement of concern to people in the
2  industry.
3      Q.  Was AWP reimbursement, the AWP
4  reimbursement, ever a topic of conversation?
5      A.  No.
6      Q.  Did you ever give presentations to,
7  yourself, or prepare presentations for Abbott
8  clients?
9      A.  Yes, for Ross clients.
10     Q.  Who do you recall making presentations
11 to?
12     A.  There were many.
13     Q.  Was Cardinal one of them?
14     A.  Cardinal was one of them.
15     Q.  Huh?
16     A.  Yes.
17     Q.  Why did you give a presentation to
18 Cardinal?
19     A.  They asked for a presentation.
20     Q.  And what did they ask you to present
21 concerning?
22     A.  I've not looked at those slides for a

---

Page 71

1  long time.
2      Q.  Any other presentations that you can
3  recall?
4      A.  No.
5          MS. ST. PETER-GRIFFITH:  What time are
6  we at?  Why don't we take a break and see if we
7  can get some of the documents.
8          MR. FERGUSON:  Okay.
9          THE VIDEOGRAPHER:  We are off the
10 record at 10:51 a.m. with the end of Tape No. 1.
11         (WHEREUPON a recess was taken.)
12         THE VIDEOGRAPHER:  We are back on the
13 record at 11:14 a.m. with the start of Tape No.
14 2.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Mr. Tootell, before the break you had
17 referenced that you had prepared a reimbursement
18 manual.
19     A.  Yes.
20     Q.  Is that a Ross --
21         (WHEREUPON a discussion was had
22 off the record.)

---

Page 72

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  You were referencing before, Mr.
3  Tootell, the reimbursement manual that you put
4  together.
5          Was that distributed just within Ross,
6  or did it also find distribution to other
7  divisions like HPS, HPD?
8          MR. WINCHESTER:  Objection to form.
9          THE WITNESS:  The manual was related to
10 enterals, enteral nutritional reimbursement.
11 They may have gotten copies in the other
12 divisions, but it would not have been relevant to
13 their product lines.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Did you work at all with the Alternate
16 Site Home Infusion Group within the Hospital
17 Business --
18         MR. WINCHESTER:  Objection, form.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  -- Hospital Products Division?
21         MR. WINCHESTER:  Sorry.  Objection to
22 form.

---

Page 73

1          THE WITNESS:  Some.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  What was your interaction with Alt.
4  Site Home Infusion?
5      A.  Alternate Site folks would be in the
6  same committees that I would be on.  You
7  mentioned the Medicare Working Group, the task
8  forces, those groups and members of the Alternate
9  Site working group were part of that formal and
10 informal group.
11     Q.  Who do you recall working with from the
12 Alt. Site group?
13     A.  Ginny of course, she was the
14 reimbursement director there.  I know that Mike
15 Heggie worked for her for a while.  Those are all
16 the folks that I remember.
17     Q.  Do you recall whether Abbott Home
18 Infusion sold Ross products or distributed Ross
19 products to their clients?
20     A.  Yes, they did.
21     Q.  Did you interact with anyone in Abbott
22 Alternate Site or Home Infusion concerning the

19 (Pages 70 to 73)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
Chicago, IL

Page 74

1  distribution of Ross products?
2      MR. WINCHESTER:  Objection, form.
3      THE WITNESS:  No.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Do you know whether anyone within
6  Alternate Site or Home Infusion received your
7  reimbursement manual?
8      A.  Probably.
9      Q.  Would you deal with compliance issues
10 with Alternate Site Home Infusion at all?
11     A.  No.
12     Q.  Who do you recall were the members of
13 the Medicare Working Group?
14     A.  I remember Ginny, I remember Mike
15 Sellers, I remember Mike Heggie.  That's about
16 it.
17     Q.  Who is Mike Sellers?
18     A.  He was in the Marketing Department at
19 HPD.
20     Q.  And you believe he was on the Medicare
21 Working Group?
22     A.  I thought so.

Page 75

1      Q.  What about Mr. Heggie, who is Mr.
2  Heggie?
3      A.  He was a reimbursement manager at
4  Alternate Sites.
5      Q.  Sir, did you work at all with any
6  third-party reporting compendia?  Do you know
7  what I mean when I say "third-party reporting
8  compendia"?
9      A.  Yes.
10     Q.  Okay.  What do I mean -- I'm sorry.
11 Strike that.
12         What are third-party reporting
13 compendia?
14     A.  These are publishers of average
15 wholesale price data.  The largest is the First
16 Databank, which is a division of Hearst.  There
17 are half a dozen other companies that are also
18 pharmaceutical compendia.
19     Q.  How did you interact with them?
20     A.  I was the troubleshooter getting Ross
21 products recorded in their database, databases.
22 Primary responsibility was in our Pricing

Page 76

1  Department, but they would often have
2  difficulties.
3      Q.  When you say "they would often have
4  difficulties," what do you mean?
5      A.  The Ross products were not at the top
6  of their list.  The pharmaceutical compendia did
7  pharmaceutical products first and would regularly
8  tell us that they would get to ours eventually.
9      Q.  When you say "get to ours," what do you
10 mean?  Have them listed?
11     A.  Have our listed, our products, the
12 nutritional products listed.
13     Q.  What were your obligations with regard
14 to reporting pricing to the third-party
15 compendia?
16     A.  I had none except to make sure the task
17 was completed.
18     Q.  Who did the reporting of the Ross
19 pricing to the third-party compendia?
20     A.  It was our Pricing Department.
21     Q.  Who determined what prices would be
22 reported to the third-party pricing compendia?

Page 77

1      MR. FERGUSON:  Object to foundation.
2      THE WITNESS:  There's a process that is
3  established requiring multiple signatures by a
4  number of appropriate business unit people.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  And who were those individuals?
7      A.  They would be positions rather than
8  individuals.
9      Q.  Okay.  What would be the positions?
10     A.  The product manager, the director of
11 that product group, the business unit vice
12 president, and the head of pricing, those
13 signatures were all required.
14     Q.  I'm sorry.  The head of pricing what?
15     A.  The head of the Pricing Department.
16 All those signatures would be required.
17     Q.  Do you know whether other divisions had
18 comparable processes for signing off on prices
19 reported to third-party compendia?
20     A.  No.  I do not.
21     Q.  How did the policy concerning reporting
22 to third-party compendia develop at Ross?

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 78

1       MR. WINCHESTER: Objection, form.
2       THE WITNESS: Can you ask the question
3  again?
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Sure.  Let me see if I can rephrase it.
6       You indicated that there was a process
7  requiring multiple signatures for reporting
8  pricing to third-party compendia; right?
9    A.  For setting list prices and the list
10 prices were reported to.
11   Q.  And how is the process established for
12 setting list prices?
13   A.  I was not part of that process.
14   Q.  Who at Ross was responsible for that?
15   A.  I listed the names of the signatories,
16 the positions that would be responsible for
17 setting the price.
18   Q.  Do you recall who any of these
19 individuals were, like who the pricing head was?
20      MR. WINCHESTER: Objection. Timeframe?
21      THE WITNESS: Which timeframe?
22 BY MS. ST. PETER-GRIFFITH:

Page 79

1    Q.  At any time.
2    A.  The problem is that those positions
3  were changing and people were changing.  We've
4  had seven Ross presidents in the seventeen years
5  I was there.  So many of the people have changed.
6       If you want any particular name, any
7  particular time, the most recent process would be
8  Kevin Garleb, who is director of contract
9  management, and then depending on which product,
10 the appropriate product manager, that would
11 differ depending upon which product.
12   Q.  Was the director of contract, did you
13 say director of contract marketing?
14   A.  Contract marketing.
15   Q.  Would that be the pricing head?
16   A.  He'd have responsibilities for that.  I
17 believe his signature was required in that
18 process.
19   Q.  What is a list price?
20   A.  A list price is the price for one to
21 nine cases of product sold to customers who are
22 without a contract.

Page 80

1    Q.  Why would the list prices be reported
2  to the pricing compendia?
3       MR. WINCHESTER: Objection, form.
4       MR. FERGUSON: Same objection.
5       THE WITNESS: The policy of the
6  compendia was to request the highest published
7  price.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  How do you know that?
10   A.  It was common knowledge.  It was
11 specifically told to me by Kay Morgan, First
12 Databank vice president.
13   Q.  So you had a conversation with Kay
14 Morgan concerning reporting the highest published
15 price to First Databank?
16   A.  My conversation was about the policies
17 of the First Databank, which prices did they
18 want.  Her instruction to me was to provide the
19 highest published price available to customers, a
20 price without volume discounts or associated
21 other discounting that surround.
22   Q.  When did you have that conversation

Page 81

1  with her?
2    A.  I don't recall.
3    Q.  Do you recall any timeframe, what the
4  year might have been?
5    A.  It was in the '90s.
6    Q.  Did you memorialize this conversation
7  anywhere?
8    A.  I don't believe so.
9    Q.  What did you do with that information
10 that Kay Morgan gave to you?
11   A.  I instructed the Pricing Department
12 that the First Databank policy was to ask
13 manufacturers to provide their undiscounted
14 price, the highest published price.  And we
15 provided data consistent with the First Databank
16 request.
17   Q.  Do you know whether that was the policy
18 for other pricing compendia?
19   A.  I believe it was.
20   Q.  What do you base that belief upon?
21   A.  I don't have specific recollection of
22 how that happened.

21 (Pages 78 to 81)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                October 25, 2007
                        Chicago, IL

---

Page 82

1    Q.  Did you personally have any
2  conversations with any other of the third-party
3  compendia?
4    A.  Those mostly happened at the staff
5  level.
6    Q.  Which staff members?
7    A.  Deb Trotter who was in the Pricing
8  Department at that point, and she was responsible
9  for filing applications with compendia.  She was
10  replaced by Kelly Chastine.  And I'm forgetting
11  the name of the current person.
12    Q.  Why were you having this conversation
13  with Kay Morgan?
14      MR. FERGUSON:  Object to form.
15      THE WITNESS:  Folks would call me to
16  solve problems.  And if the First Databank was
17  not cooperating, then they would call me.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Was that part of your responsibility to
20  communicate with the third-party compendia?
21    A.  Yes, it was.  On difficulties and
22  policy issues, not on specific application for

---

Page 83

1  particular products.
2    Q.  Well, what difficulties and policy
3  issues would you discuss with the third-party
4  compendia?
5    A.  I've listed one already, and that was
6  what price do you want and what is your policy
7  about which price you want.
8      More importantly, the problems were
9  housekeeping.  These compendia would treat
10  pharmaceutical products with priority, and
11  nutritional products would be handled with many
12  excuses later.  We were dissatisfied with their
13  performance for most of the time that they were
14  receiving data from us.
15    Q.  Why would you identify as a difficulty
16  the question of what price First Databank wanted
17  Abbott Ross division to report?
18      MR. WINCHESTER:  Objection, form.
19      THE WITNESS:  I didn't say it was a
20  difficulty.  I was asking what prices they
21  wished, what was their data request from this
22  manufacturer.

---

Page 84

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  And why were you the person making that
3  call?
4    A.  I was involved in a number of issues
5  like that, and Ross is a matrix kind of
6  organization where folks help each other.  The
7  staff had gotten to the point where they were
8  frustrated and asked for my help.
9    Q.  Why was the staff frustrated?
10      MR. WINCHESTER:  Objection, form,
11  speculation.
12      THE WITNESS:  They were having
13  difficulty getting responses and getting their
14  information properly recorded in the compendia.
15  They'd submit an application and wait weeks.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  Did you know Kay Morgan when she worked
18  at Abbott?
19    A.  Yes.
20    Q.  How did you know her?
21    A.  Some of those common committees.
22    Q.  What committees were you on in common

---

Page 85

1  with her?
2    A.  I don't remember the names of them.
3  Kay Morgan was a reimbursement person at Abbott.
4  She's in charge of pricing for PPD.
5    Q.  Do you recall any other contacts at any
6  other third-party compendia that you had?
7    A.  I talked to Kay after she started a new
8  company called Gold Star or Gold Coast.
9    Q.  What is Gold Coast?
10    A.  It's a compendia that she published
11  herself after she left First Databank.
12    Q.  Do you remember how long ago that was?
13    A.  A couple years.
14    Q.  Are you in regular contact with her?
15    A.  No.
16    Q.  Do you recall any other interactions
17  with the third-party pricing compendia?
18    A.  No.
19    Q.  Do you recall whether this policy that
20  Kay Morgan articulated to you was memorialized by
21  First Databank anyplace?
22    A.  No.

22 (Pages 82 to 85)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

1    Q.  Did you discuss this policy that Kay
2  Morgan described to you of First Databank with
3  anyone outside of Ross?
4    A.  Not to my recollection.
5    Q.  Are you familiar at all with any of the
6  reporting practices or procedures of the Hospital
7  Products Division?  And when I say "reporting," I
8  mean reporting to third-party compendia?
9       MR. FERGUSON:  Object to form.
10      THE WITNESS:  I don't know.  No, the
11  answer is no.
12  BY MS. ST. PETER-GRIFFITH:
13   Q.  Did you discuss with anyone outside of
14  Ross reporting to third-party compendia?
15   A.  Not that I recall.
16   Q.  Sir, I'm going to ask you whether
17  you're familiar with some terms, okay.
18      Have you ever heard the term "WAC"?
19   A.  Yes.
20   Q.  What is WAC?
21   A.  It's called the wholesale acquisition
22  cost.

1    Q.  And how are you familiar with it?
2    A.  It's one of the columns on the First
3  Databank standard reports.  It's essentially the
4  list price, it is the list price.
5    Q.  Do you know how WAC is used?
6       MR. FERGUSON:  Object to form.
7       THE WITNESS:  It's an ingredient in the
8  pharmaceutical reimbursement formula for some
9  states.
10  BY MS. ST. PETER-GRIFFITH:
11   Q.  We talked about AWP earlier.  What is
12  AWP?
13   A.  I believe I've answered that question
14  before.  It stands for average wholesale price.
15      This is a price published by the
16  compendia that you're referring to.  The process
17  for setting an average wholesale price for a
18  product is product and package size specific, and
19  the list price is sent to the compendia.
20      The compendia have done surveys, and I
21  understand there's some controversy about that
22  now, but they made it clear that they had done

1  surveys of wholesale mark-ups, and that as a
2  result of the survey that mark-up percentage was
3  added to the list price, and the list price was
4  published as an average wholesale price.
5    Q.  Who does the calculation of the average
6  wholesale price?
7    A.  I don't know.
8    Q.  We talked before about the term
9  "spread," and I want to ask you whether it was a
10  term that you heard when you were at Abbott.
11   A.  Certainly.
12   Q.  When did you hear the term "spread"
13  when you were at Abbott?
14   A.  As we discussed it before, spread
15  refers to the gap between a reimbursement rate
16  for a pharmaceutical and the acquisition cost of
17  a pharmaceutical.
18   Q.  And how is it used at Abbott?
19      MR. FERGUSON:  Object to form.
20      MR. WINCHESTER:  Objection, form.
21      THE WITNESS:  By who, when?
22  BY MS. ST. PETER-GRIFFITH:

1    Q.  That's my question to you.  When do you
2  recall the term "spread" being used?
3       MR. WINCHESTER:  Objection, form,
4  foundation.
5       THE WITNESS:  It's a common concept.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Do you know whether Virginia Tobiason
8  was familiar with spread?
9       MR. FERGUSON:  Objection, foundation,
10  form.
11      THE WITNESS:  Yes.  She understands
12  spread.
13  BY MS. ST. PETER-GRIFFITH:
14   Q.  How do you know that?
15   A.  She has been in this business for a
16  long time.
17   Q.  Did you ever discuss spread with her?
18   A.  I don't recall.
19   Q.  Did you ever discuss spread with anyone
20  that you can recall within the Hospital Products
21  Division?
22   A.  No.

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                              October 25, 2007
                        Chicago, IL

---

Page 90

1      Q.  Do you recall discussing spread in your
2  work with the Medicare Working Group?
3      A.  I do not recall.  As I said before,
4  that's eleven years ago.
5      Q.  What about your work with the
6  Medicare/Medicaid Reimbursement Task Force?
7      A.  I don't recall the spread being
8  discussed, but it could have been.
9      Q.  Do you recall who created the Medicare
10  Working Group?
11      A.  Is that the mid '90s?
12      Q.  That's the mid '90s group, the first
13  one.
14      A.  No, I don't.  It came out of PPD and
15  there were some effort to get some cross-division
16  communication about what is Medicare and what's
17  going on in the Medicare and Medicaid worlds.
18      Q.  Is that your recollection of how it was
19  created or its inception?
20      A.  This was a cross-divisional group
21  communicating about current changes in policy.
22      Q.  Do you recall who the PPD individuals

---

Page 91

1  were that worked on the Medicare Working Group?
2      A.  No.
3      Q.  Do you know who Don Buell is?
4      A.  I remember Don.  He's been retired for
5  many years.
6      Q.  And who's Mr. Buell?
7      A.  He was a senior vice president in the
8  Pharmaceutical Products Division and has been
9  retired for I think about ten years.
10      Q.  Do you recall whether he was on the
11  Medicare Working Group?
12      A.  You were the one who brought his name
13  forward.  I don't recall that, but it's very
14  conceivably he could have been.
15      Q.  What about Dr. Don Conway?
16      A.  I don't remember him.
17      Q.  The next time I'd like to go over with
18  you is "contract price."
19          What is a contract price?
20      A.  Contract price quite simply is the
21  price in a contract.  We have many contracts and
22  each of those contracts would have a large number

---

Page 92

1  of products included.  Obviously that contract
2  price would be set by what product and what
3  contract.
4      Q.  "RxLink Price"?
5      A.  I don't know that, I don't know that
6  prize.
7      Q.  "Ven-a-Care AWP"?
8      A.  Ven-a-Care is our colleague here.
9      Q.  Okay.
10      A.  And I've never used the phrase "Ven-a-
11  Care AWP" together.
12      Q.  Had you heard it before?
13      A.  No.
14      Q.  What about "DOJ AWP"?
15          MR. FERGUSON:  What's the question?
16  Hold on a second.
17          MS. ST. PETER-GRIFFITH:  Whether he's
18  heard the term "DOJ AWP" before.
19          THE WITNESS:  I don't recall.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  What about "Resource File," have you
22  heard that term before?

---

Page 93

1      A.  Not without a context here.
2      Q.  Did the Ross Products Division have a
3  resource file?
4      A.  That's such a generic phrase.  We have
5  many resources and many files.  I simply don't
6  understand the phrase.
7      Q.  Sure.
8          Do you know whether there was ever a
9  computer, a file within Abbott's computer system
10  called the "Resource File"?
11      A.  I didn't use that particular phrase.
12      Q.  Sir, were you ever consulted on or are
13  you at all familiar with the reimbursement for
14  Hospital Products Division generic products?
15      A.  No.
16      Q.  I'd like to list some names for you of
17  individuals and --
18      A.  Sure.
19      Q.  -- if you can tell me whether you
20  worked with them before.
21          The first we've discussed before is
22  Virginia Tobiason.  When did you first start

24 (Pages 90 to 93)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 94

1  working with Virginia Tobiason?
2      A.  I think I had been at Ross for two or
3  three weeks, and my hiring vice president brought
4  me to Abbott to meet her, and that opened up a
5  conversation that's very useful.
6      Q.  When you say it's "very useful," why?
7      A.  I would call her a friend.
8      Q.  Do you have a friendship with her?  Do
9  you interact with her in a social context?
10     A.  Yes.
11     Q.  What about Mike Sellers?
12     A.  I have not seen him for ten years.
13     Q.  Did you work with him?
14     A.  Not very closely.
15     Q.  Duane Burnham?
16         MR. FERGUSON:  Excuse me.  What is the
17 question?  Is the question when did you first
18 meet him?
19         If you could specify what the question
20 is so then he can answer the question, it would
21 be very helpful.
22         MS. ST. PETER-GRIFFITH:  Sure.

---

Page 95

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Are you familiar with Duane Burnham?
3      A.  Yes.
4      Q.  And who is Mr. Burnham?
5      A.  He's the former president of Abbott.
6      Q.  Did you interact with him?
7      A.  No.
8      Q.  What about Miles White, are you
9  familiar with Miles White?
10     A.  He's the current Abbott president.
11     Q.  Would you have occasion to interact
12 with Mr. White?
13     A.  I have not, no.
14     Q.  What about incident to the Ross CIA,
15 would you have any interaction with any Abbott
16 president concerning the Ross CIA?
17     A.  I did not have any interaction with any
18 Abbott president about the CIA.
19     Q.  Tom Hodgson --
20     A.  No.
21     Q.  Let me -- I'm sorry.
22     A.  Same question, same answer.

---

Page 96

1          MR. FERGUSON:  Let her ask the
2  question.
3          THE WITNESS:  Okay.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Did you have any interaction with Tom
6  Hodgson?
7      A.  No.
8      Q.  Did you have any interaction with David
9  Landsidle?
10     A.  Yes.
11     Q.  What was your interaction with Mr.
12 Landsidle?
13     A.  Mr. Landsidle chaired our Washington
14 Government Affairs office.
15     Q.  And how did you interact with him?
16     A.  We would have issues.  I kept him
17 informed about enteral Medicare issues that might
18 require political activity.  And he would flag
19 laws and rules and proposals that came to his
20 attention from the Government Affairs office and
21 get those to me.
22     Q.  Would you work with the Government

---

Page 97

1  Affairs office?
2      A.  Yes.
3      Q.  Were you involved in making proposals
4  for legislation or regulation changes?
5      A.  Yes.  I've been involved in making
6  regulation changes and proposals for legislation.
7      Q.  Do those include the two that we
8  discussed earlier today?
9      A.  Yes, they do.
10     Q.  Any others that you can think of?
11     A.  Well, I've been involved with
12 competitive bidding as a member of Medicare's
13 Program Advisory and Oversight Committee, and in
14 that process the committee has responsibilities
15 set by Congress to advise the Secretary of Health
16 & Human Services about several different issues
17 which I have participated in as a committee
18 member.
19     Q.  Are you familiar with Cindy Sensibaugh?
20     A.  Yes.
21     Q.  How are you familiar with her?
22     A.  She reported to David Landsidle and now

---

25  (Pages 94 to 97)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                              October 25, 2007
                        Chicago, IL

Page 98

1  reports to Elaine Leavenworth as a I believe a
2  senior director in the Abbott Government Affairs
3  office in Washington.
4      Q.  What would your interaction with her
5  be?
6      A.  She was the staff person most commonly
7  associated with AdvaMed, and she was the
8  Government Affairs office representative to
9  AdvaMed.
10        I had a number of committee
11  responsibilities for AdvaMed.  So we were
12  colleagues representing the same company, often
13  on the same conference calls, organized under the
14  umbrella of AdvaMed.
15      Q.  When you represented Abbott on the
16  AdvaMed committee, would you just be there for
17  purposes of representing the Ross Products
18  Division, or did you represent Abbott corporation
19  itself and all of its divisions?
20      A.  My primarily responsibilities were to
21  represent Ross.  There were often issues of
22  Abbott's that I would help out with.

Page 99

1      Q.  During your affiliation with AdvaMed or
2  its predecessor named organization, were there
3  any individuals from the Hospital Products
4  Division that represented Abbott's interest on
5  that committee?
6      A.  I don't recall.  It would have been
7  before the Hospira spinoff.
8      Q.  Are there any Hospira representatives
9  on the AdvaMed committee?
10      A.  Actually not.  I've seen very few of
11  them.
12      Q.  Did you have any interaction with Cathy
13  Babington?
14      A.  No.
15      Q.  Did you have any interaction with Carla
16  Creklow?
17      A.  No.
18      Q.  Did you have any interaction with Bruce
19  Rodman?
20      A.  Yes.
21      Q.  What was your interaction with him?
22      A.  After Bruce resigned from HPD or

Page 100

1  Alternate Sites, he went to work for NAHC,
2  National Association for Home Care, and he wanted
3  Ross to join NAHC in his new responsibilities.
4  We gracefully told him no.  But Bruce has done
5  some useful work with Medicare coding especially
6  for parenteral nutrition and infusion drugs.
7      Q.  What about Lynn Leone, did you have any
8  interaction with her?
9      A.  That's an old name, but I don't
10  remember where she's from.
11      Q.  Did you have any interaction with Peter
12  Baker?
13      A.  No.
14      Q.  Did you have any interaction with Dawn
15  Robertson?
16      A.  No.
17      Q.  Did you have any interaction with Guy
18  Wiebking?
19      A.  No.
20      Q.  Did you have any interaction with Rick
21  Gonzalez?
22      A.  No.  I shook his hand once.

Page 101

1      Q.  Did you have any interaction with
2  Loreen Mershimer?
3      A.  No.
4      Q.  Did you have any interaction with Mark
5  Barmak?
6      A.  Yes.
7      Q.  What was your interaction with him?
8      MR. FERGUSON:  Was he a lawyer?
9      THE WITNESS:  Yes, he is.
10      MR. FERGUSON:  So in answering this
11  question, I don't want you to discuss any
12  substantive issues that you may have --
13      THE WITNESS:  This would be an
14  interesting side-bar, going back to my divorce
15  proceeding.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Okay.
18      A.  Documents weren't provided in time for
19  a resolution of my divorce at the time when I
20  hoped.  Mr. Barmak and I discussed the
21  performance of the Legal Department and delivery
22  of documents.

26 (Pages 98 to 101)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                          October 25, 2007
                    Chicago, IL

Page 102

1        MS. ST. PETER-GRIFFITH:  Just to be
2  clear, is your instruction to him that any
3  conversations he's had with Abbott's legal
4  counsel, even if they pertain to policy or
5  business decisions, are off limits?
6        MR. FERGUSON:  My instruction to him is
7  that I will instruct him not to answer any
8  conversations that he had with Abbott lawyers,
9  unless Abbott lawyers tell me that it's not a
10  privileged conversation.
11        MS. ST. PETER-GRIFFITH:  What's your
12  position regarding Mark Barmak, Jason?
13        MR. WINCHESTER:  My position regarding
14  Mark Barmak is that he was a very senior counsel
15  at Abbott.  I mean you're treading pretty lightly
16  on privilege issues.  You haven't asked him about
17  anything specific.  I think he just told you the
18  gist of his interaction with Barmak.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Other than your personal interaction
21  with him concerning your divorce, did you have
22  any conversations with Mr. Barmak?

Page 103

1    A.  Yes.
2    Q.  What did they pertain to?
3    A.  Those would be substantive and related
4  to Abbott policy issues.
5    Q.  Were they related to Abbott legal
6  issues, to your knowledge?
7    A.  I would think they're privileged.
8    Q.  But were they --
9    A.  Yes.
10    Q.  They were legal matters?
11    A.  Absolutely.
12    Q.  Do you know whether they pertained to
13  litigation?
14        THE WITNESS:  What's the boundary here?
15        MR. FERGUSON:  If you can answer that
16  question "Yes" or "No," if you understand what's
17  encompassed by "litigation" and can answer that
18  question "Yes" Or "No," then answer it "Yes" or
19  "No."
20        THE WITNESS:  Ask me the question
21  again, please.
22        MS. ST. PETER-GRIFFITH:  Can you read

Page 104

1  it back, please.
2        (WHEREUPON said record was read
3  back as requested.)
4        THE WITNESS:  Litigation that was
5  current at that time in the conversation?
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  In any litigation.
8    A.  Yes.
9    Q.  Did you have any conversations or did
10  you have any interaction with Mike Heggie?
11    A.  Yes.
12    Q.  We already discussed him before.
13    A.  Yes.
14    Q.  What were your interactions with Mr.
15  Heggie?
16    A.  Few and far between.  He was a
17  reimbursement, he had reimbursement
18  responsibilities for HPD in parallel to what I
19  did with Ross.  We would occasionally meet at
20  conferences.
21        I remember once when I was asked to
22  speak at an HPD meeting a long time ago and he

Page 105

1  was there.
2        I saw him most recently last spring.
3  He came to a speech I was giving on competitive
4  bidding in Baltimore.
5    Q.  I'd like to go back to your
6  conversations with Mr. Barmak.
7        Do you know what litigation they
8  pertained to, or was it different varying
9  litigation?
10        MR. WINCHESTER:  I think you're getting
11  into the substance of his conversation.  If he's
12  told you that it's about litigation, then they're
13  privileged conversations.
14        MS. ST. PETER-GRIFFITH:  Are you
15  instructing him not to answer?
16        MR. WINCHESTER:  I would.  I mean I
17  think you have the answer to your question and
18  establishes the privilege and now you're trying
19  to invade it.  So my advice would be not to
20  answer that question.
21        MR. ANDERSON:  I'm trying to understand
22  the context of his answer and simply giving his

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 106

1  understanding about which litigation doesn't call
2  for him to disclose any privileged information.
3         MR. WINCHESTER: I think it does
4  depending on what the case was.
5         I mean I don't know what's in his head.
6  But you've established with him that the
7  conversations he had with counsel for Abbott were
8  about litigation. I'm not sure where else there
9  is to go on this.
10        MS. ST. PETER-GRIFFITH: Well, except
11 that I did want to circle back and make sure that
12 were all of your conversations with Mr. Barmak
13 other than the ones concerning your divorce
14 related to litigation?
15        MR. FERGUSON: So that's a different
16 question?
17        MS. ST. PETER-GRIFFITH: That's a
18 different question.
19        MR. WINCHESTER: And he answered that
20 question before.
21        MS. ST. PETER-GRIFFITH: No. He didn't
22 answer that question before because I didn't ask

Page 107

1  that question.
2         THE WITNESS: Could I have that
3  question again.
4         MS. ST. PETER-GRIFFITH: Sure. Can you
5  read it back, please.
6         (WHEREUPON said record was read
7  back as requested.)
8         THE WITNESS: No. I don't remember any
9  other, I don't remember the specifics of any
10 other conversation.
11 BY MS. ST. PETER-GRIFFITH:
12        Q.  How often approximately did you
13 communicate with Mr. Barmak?
14        A.  Rarely. He was a senior counsel. I
15 was a senior manager.
16        Q.  Without telling me the substance of any
17 conversations concerning litigation, did you
18 interact at all with any other members of the
19 Legal Department?
20        A.  From time to time as issues would come
21 up, yes. A number of the reimbursement issues
22 required approval by Legal Department.

Page 108

1         Q.  What reimbursement issues required
2  approval by the Legal Department?
3         A.  For example, publication of my manuals
4  was reviewed. Certainly after the compliance
5  agreement, the communications with the sales
6  force about reimbursement issues was reviewed by
7  Legal. Most of those legal reviews were done at
8  Ross by Melissa Penslavey, had a solid line to
9  the Abbott Legal office.
10        Q.  Any other conversations with Abbott
11 Legal Department other than those pertaining to
12 litigation? I don't want to know about those.
13        MR. FERGUSON: What's the question?
14 I'm sorry.
15        MS. ST. PETER-GRIFFITH: Other than
16 what he's discussed, whether he had any other
17 communications with the Abbott Legal Department,
18 but I'm not seeking any information concerning
19 conversations he had about litigation.
20        THE WITNESS: Yes, many over seventeen
21 years.
22 BY MS. ST. PETER-GRIFFITH:

Page 109

1         Q.  Do you recall what they were?
2         MR. WINCHESTER: Wait a minute.
3         MR. FERGUSON: Hold on a second.
4         I don't want you to get into the
5  substance of any conversations you had with
6  Abbott Legal.
7         THE WITNESS: Okay.
8         MR. FERGUSON: So if answering that
9  question requires you to get into the substance
10 of any conversations you had with Abbott Legal,
11 let me know.
12        THE WITNESS: Yes.
13        MR. FERGUSON: And do not answer.
14        THE WITNESS: Okay.
15        MS. ST. PETER-GRIFFITH: So you're
16 instructing him to answer concerning the
17 substance of matters that might not be related to
18 litigation.
19        MR. FERGUSON: Absolutely. If he's
20 talking to Abbott's lawyers, it's not the Work
21 Product Doctrine. If he's talking to Abbott
22 lawyers about any legal issue, unless Abbott's

                                28 (Pages 106 to 109)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

|  | Page 110 |
|---|---|

1  counsel instructs me that it's not privileged,
2  then I'm going to instruct him not to answer the
3  question.
4       MS. ST. PETER-GRIFFITH:  What's your
5  instruction, Jason?
6       MR. WINCHESTER:  It would be the same.
7  It doesn't matter if it's litigation.  If he's
8  seeking counsel from Abbott's lawyers, then
9  that's privileged communication.
10       MS. ST. PETER-GRIFFITH:  Well, we do
11  take exception to that because there are
12  exceptions concerning the nonprivileged character
13  of legal advice from in-house counsel giving
14  advice concerning policy or operational matters.
15       You've got the instruction, I will note
16  my objection to it, and then we'll just move on.
17  BY MS. ST. PETER-GRIFFITH:
18       Q.  Tina Brown, are you familiar with Tina
19  Brown?  Does that name ring a bell?
20       A.  That rings a very distant bell, but I
21  don't recall who she is.
22       Q.  Sir, what I'd like to do now is go over

|  | Page 111 |
|---|---|

1  some documents with you.
2       A.  Sure.
3       MS. ST. PETER-GRIFFITH:  I notice Jason
4  looking at his watch.  Are we close to lunch?
5       THE WITNESS:  It's noon now.
6       MS. ST. PETER-GRIFFITH:  Well, if it's
7  noon, before we jump into this, what would
8  everyone like to do for lunch?  Now's a good
9  breaking point.
10       MR. FERGUSON:  Do you have a
11  preference?
12       THE WITNESS:  I'll take a break.
13       MS. ST. PETER-GRIFFITH:  Okay.
14       MR. ANDERSON:  Let's go off the record.
15       MS. ST. PETER-GRIFFITH:  Do you want to
16  come back in say forty-five minutes?  Is that
17  good?
18       MR. FERGUSON:  Okay.  Works for us.
19       MS. ST. PETER-GRIFFITH:  Does that give
20  you enough time, sir?
21       THE WITNESS:  Sure.
22       THE VIDEOGRAPHER:  We are off the

|  | Page 112 |
|---|---|

1  record at 11:54 a.m.
2       (WHEREUPON a lunch recess was
3  taken, and said deposition continued as follows:)
4       THE VIDEOGRAPHER:  We are back on the
5  record at 12:51 p.m.
6
7       MICHAEL TOOTELL,
8  having been previously duly sworn, was examined
9  and testified further as follows:
10
11       EXAMINATION (CONTINUED)
12  BY MS. ST. PETER-GRIFFITH:
13       Q.  Mr. Tootell, you testified earlier this
14  morning that you were the contact person for
15  Medicare and the Medicaid programs for the Ross
16  Products Division.  Is that accurate?
17       A.  Yes.
18       Q.  Did you ever, in the approximately
19  seventeen years that you had that role, did you
20  ever report to either Medicare or any Medicaid
21  programs prices for Ross products?
22       A.  No.

|  | Page 113 |
|---|---|

1       Q.  Did you ever see a need to report
2  either contract prices or acquisition cost prices
3  that Ross customers were paying to either
4  Medicare or any of the Medicaid programs?
5       MR. WINCHESTER:  Objection, form.
6       THE WITNESS:  Ask the question again.
7       MS. ST. PETER-GRIFFITH:  Sure.  Can you
8  read it back.
9       (WHEREUPON said record was read
10  back as requested.)
11       MR. WINCHESTER:  Same objection.
12       THE WITNESS:  There was one time when
13  the State of California asked us for what our
14  prices were, and I sent a note back saying which
15  prices, saying we had many prices.  And the
16  conversation was not, there was no follow-up from
17  the State of California on that.
18  BY MS. ST. PETER-GRIFFITH:
19       Q.  Did you ever report acquisition costs
20  for Ross customers or contract prices to the
21  State of Texas?
22       A.  I don't believe we were ever asked.

29  (Pages 110 to 113)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 114

1     Q.  Do you recall who your contact was or
2  who you spoke with when you interfaced with the
3  Texas Medicaid program?
4     A.  I don't remember her name.
5     Q.  You remember it was a she?
6     A.  It was a she.  She was a CPA.  She was
7  in charge of pricing for this group.  I have not
8  recalled her name.
9     Q.  Do you recall Texas ever requesting
10  such information?
11       MR. WINCHESTER:  Objection.
12       THE WITNESS:  I don't recall that.
13       MS. ST. PETER-GRIFFITH:  If we can mark
14  this as the next exhibit, please.
15          (WHEREUPON Deposition Exhibit
16  Tootell 004 was marked as of 10/25/2007.)
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Sir, I'm just going to ask you to take
19  your time but flip through this and see if you
20  recognize it.  (Document tendered to the
21  witness.)
22     A.  I believe I have two copies here.

Page 115

1     Q.  Oh, there are two?
2       Sir, have you reviewed the document?
3     A.  Skimmed it.
4     Q.  Do you recognize this document?
5     A.  Yes.
6     Q.  What is it?
7     A.  A presentation I did for a small group
8  of folks at Cardinal.
9     Q.  Do you remember who the group of folks
10  were?
11     A.  No.
12     Q.  Sir, do you consider this document to
13  be confidential?
14     A.  No.
15     Q.  Why did you prepare this document?
16     A.  I was asked to do a presentation.
17     Q.  By who?
18     A.  Folks at Cardinal.
19     Q.  What was the topic that you were asked
20  to present concerning?
21     A.  People know that I had been following
22  Washington office's, Washington issues pretty

Page 116

1  closely and they wanted an update about what was
2  going on in those issues, and I tried to line
3  those out for them.
4     Q.  Was it important for you to provide
5  accurate information to Cardinal Health?
6     A.  Of course.
7     Q.  Where did you get your information
8  contained in this presentation?
9       MR. FERGUSON:  Object to form.
10       THE WITNESS:  Many sources.  I don't
11  recall them.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Did you draft it?
14     A.  Yes.
15       MR. FERGUSON:  Could I note for the
16  record that this document appears to be two
17  presentations, or at least has two dates.
18       THE WITNESS:  Are they two
19  presentations?
20       MR. WINCHESTER:  The document starting
21  ABT-DOJ-E 545771 is a different date.
22       MS. ST. PETER-GRIFFITH:  Oh, okay, yes.

Page 117

1  That's where he thought it was a duplicate.
2       THE WITNESS:  Then could I have the
3  other section back then?
4       MS. ST. PETER-GRIFFITH:  Sure.  Why
5  don't we do this:  Let's take out this second one
6  and mark it as the next exhibit.
7       MR. WINCHESTER:  Sure.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Sir, we're going to concentrate on this
10  one first.  It was copied together.
11       Did you speak with anyone in collecting
12  the information for this presentation?
13     A.  I don't recall.
14     Q.  Did you tell anyone that you were
15  giving this presentation to Cardinal?
16     A.  Yes.
17     Q.  Who did you tell?
18     A.  I would have told appropriate people at
19  Ross.
20     Q.  Anyone else?
21     A.  Not that I recall.
22     Q.  Did you discuss it at all with Virginia

30 (Pages 114 to 117)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                   October 25, 2007
                           Chicago, IL

Page 118

1  Tobiason?
2      A.  I don't know.
3      Q.  It says "Medicare and Medicaid Pharmacy
4  Issues."  Do you see that?
5      A.  Uh-huh.
6      Q.  Sir, were you giving a presentation
7  that was limited to Ross, or did your
8  presentation encompass more than just the enteral
9  market?
10         MR. FERGUSON:  Object to form.
11         THE WITNESS:  The issue is entitled
12  "Medicare and Medicaid Pharmacy Issues," and that
13  clearly, the focus of the presentation was on
14  Medicare and Medicaid policy.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.  Is that something that you're familiar
17  with?
18     A.  Yes.
19     Q.  Did you provide the information
20  contained within this particular presentation to
21  Abbott, anyone outside of the Ross Products
22  Division?

Page 119

1      A.  I don't recall.
2      Q.  Did you run it by anyone else at Abbott
3  to confirm its accuracy before you made the
4  presentation?
5      A.  It's our normal process to do that,
6  yes.
7      Q.  And who did you provide it to for
8  review?
9      A.  I don't recall.
10     Q.  Well, you mentioned earlier that you
11  would run reimbursement matters through Virginia
12  Tobiason.
13     A.  I'm not sure what --
14         MR. FERGUSON:  Hold on.  Excuse me.
15  There's no question pending.  Wait for the
16  question.
17         THE WITNESS:  Okay.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Was this something that you would have
20  run by her?
21         MR. FERGUSON:  Object to form.
22         THE WITNESS:  This is dated 2000.

Page 120

1  There were not formal procedures required at this
2  point.
3         There were a number of people whose
4  judgment I valued, and it was my custom to seek
5  green lights from appropriate folks within Ross,
6  and Abbott.
7         I don't recall that review process.
8  This is seven years ago.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Well, would it have been important to
11  ensure that the presentation that you're making
12  to an Abbott client was accurate and something
13  that was approved of by Abbott?
14         MR. WINCHESTER:  Objection, form.
15         MR. FERGUSON:  Objection, form.
16         THE WITNESS:  I believed that this was
17  properly vetted.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Within Abbott?
20     A.  Within Abbott.
21     Q.  Do you have any recollection as to who
22  it was vetted before or with?

Page 121

1      A.  No.
2      Q.  Sir, if we could turn to the next page,
3  it says "Overview."
4      A.  Uh-huh.
5      Q.  "Background, Average Wholesale Prices,
6  DOJ, Congressional Pharmacy Proposal, and
7  Future."
8         Is this an outline for the presentation
9  that you were making?
10     A.  Yes.
11     Q.  What did you mean by "Average Wholesale
12  Prices"?
13     A.  This is the year 2000, and as I say in
14  later slides there was a good deal of legal
15  activity and legislative activity surrounding
16  that issue.
17     Q.  The next item it says "DOJ."  What did
18  you mean he when you included that?
19     A.  Your department was closely involved
20  with this investigation at that point.
21     Q.  How did you know that?
22     A.  I don't recall.  It was certainly part

31 (Pages 118 to 121)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                           Chicago, IL

Page 122

1   of the trade press at that point.
2       Q.  Did you look to anything to provide the
3   information for your presentation or for your
4   overview?
5       A.  I'm sure I did.
6       Q.  Do you recall what you reviewed?
7       A.  No.  I do not.
8       Q.  Let me ask you, did you orally or
9   verbally present this presentation?
10      A.  It was a Powerpoint presentation, and I
11  presented it in person.
12      Q.  Was anyone else from Abbott in
13  attendance?
14      A.  No.
15      Q.  And you say, the next item says
16  "Congressional Pharmacy Proposals."  Do you see
17  that?
18      A.  Uh-huh.
19      Q.  Is that just your description of you're
20  going to discuss congressional pharmacy
21  proposals?
22      A.  Yes.

Page 123

1       Q.  If you can flip to the next page, it
2   says "Background, Average Wholesale Prices."  Oh,
3   let me ask you, did anyone else participate in
4   the drafting of this or was this exclusively your
5   drafting?
6       A.  Not that I recall.  I don't recall
7   anybody else working on drafting this.
8       Q.  Is it fair to then for us to conclude
9   this was your work product?
10      A.  This was my work product, sure.
11      MR. WINCHESTER:  Objection, form.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Can you explain the information that's
14  contained in each of the bullet points on this
15  page, please?
16      A.  As I described earlier this morning,
17  the process of setting average wholesale prices
18  is two participants.  The manufactures are asked
19  to provide their list prices, their highest
20  published prices.  And we had an extensive
21  discussion this morning about that.
22      Those prices are delivered to the

Page 124

1   compendia, your phrase.  The compendia add a
2   mark-up from their own processes and publish and
3   charge publication prices for the average
4   wholesale price publications.
5       The process of setting an AWP requires
6   two participants, the manufactures and the
7   compendia of publishers.
8       Q.  When it says "Manufacturer List Catalog
9   Prices, Plus A Mark-up," is that the mark-up that
10  you're discussing the compendia attached?
11      A.  Yes.
12      Q.  Your next bullet point says "Published
13  by First Databank, Medi-Span, and Red Book."  Is
14  that just a description of the compendia?
15      A.  Yes.  Those are three different
16  compendia.  And First Databank and Medi-Span I
17  believe have merged.
18      Q.  The next item says "First Databank
19  Survey of Wholesale Distributors."  What survey
20  are you referencing?
21      A.  First Databank has a survey that they
22  cite as a, or certainly did in 2000, as a

Page 125

1   reference for the mark-up.
2       Q.  And the next item is "AWPs are
3   determined by manufacturers."  Do you see that?
4       A.  Yes.  I see that.
5       Q.  What did you mean by that?
6       A.  Well, it clearly needs to be understood
7   in the context of that whole thing that
8   manufacturers start the process and can't be
9   completed without the compendia.
10      Q.  Did you communicate this information to
11  the folks at Cardinal that you made this
12  presentation to?
13      A.  Sure.
14      Q.  Let me ask you, is there anything in
15  this presentation that you can think of that you
16  left out --
17      MR. FERGUSON:  Object to form.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  -- in your verbal -- it was poorly
20  phrased.
21      When you verbally presented this
22  Powerpoint presentation, did you present each of

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 126

1  these slides?
2      A.  Yes.  I presented each of the slides.
3      Q.  The next page says "AWP."  Do you see
4  that, sir?
5      A.  Okay.
6      Q.  "Payment Basis for Medicaid, AWP minus
7  eight to fifteen percent, plus $3 to $5
8  dispensing fee for common formula."
9      A.  Uh-huh.
10     Q.  What does that mean?
11     A.  Many state Medicaid programs for
12  nutritional products and for pharmaceutical
13  products the formula was average wholesale price
14  minus eight to fifteen.  Each state would set
15  their own percentage.  And then there would be a
16  dispensing fee per prescription, and that
17  recognized the value of the pharmacist services.
18  That's a common formula.
19     Q.  The next bullet point says "Payment
20  Foundation for Medicare, Ninety-five percent of
21  AWP, Median within relevant HCPCS if multiple
22  drugs are a common code."  What did you mean by

Page 127

1  that?
2      A.  I'd have to refresh my memory on what
3  that description was in the year 2000.
4          For Medicare clearly the median was the
5  number of products within a relevant HCPC code.
6  If there are multiple drugs in a common code, the
7  payment rate would be the median of that.
8      Q.  Is this applicable both to nutritional
9  products as well as pharmaceutical products?
10         MR. FERGUSON:  Objection to form.
11         THE WITNESS:  It does not apply to
12  nutritional products.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Where did you get your information
15  concerning the application of these two bullet
16  points to the pharmaceutical market?
17     A.  I don't recall.
18     Q.  Would that have been something that you
19  would have known, or is that something that you
20  would have had to research?
21         MR. FERGUSON:  Object to form.
22         THE WITNESS:  I would have had to

Page 128

1  research in order to know it, but yes, I probably
2  did both.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Do you recall when you did that
5  research?
6      A.  No.
7          MR. FERGUSON:  Objection to the form of
8  the question.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Do you recall when you learned that the
11  payment basis for, these two -- strike that.
12         Do you recall when you learned that
13  these two bullet points applied to pharmaceutical
14  products?
15     A.  I do not know when I learned that.
16     Q.  If you could go to the next page,
17  "Average Wholesale Price," the first item there,
18  no bullet points, the first item says "Whistle
19  blower lawsuit released wholesale supplier
20  catalog pricing for pharmaceutical products."  Do
21  you see that?
22     A.  Yes.

Page 129

1      Q.  Where did you learn that information?
2      A.  From the trade press.
3      Q.  What whistle blower lawsuit were you
4  referencing?
5      A.  The current lawsuit.
6      Q.  The AWP Ven-a-Care?
7      A.  Yes.
8      Q.  What did you know about that lawsuit at
9  that point in time?
10     A.  What I learned in the newspapers, and
11  that is that Ven-a-Care had released its pricing
12  catalog.
13     Q.  Were you aware of any impending
14  litigation from sources within Abbott?
15     A.  I don't recall learning that from
16  people at Abbott.
17     Q.  Did you ever receive a litigation hold
18  memorandum concerning the AWP Ven-a-Care
19  litigation?
20     A.  Yes.
21     Q.  Do you recall when you received it?
22     A.  Two months ago.

33 (Pages 126 to 129)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

| Page 130 |
|---|
| 1    Q.  Two months, oh, okay. |
| 2    A.  That was a document production record. |
| 3    Q.  Do you recall receiving a litigation |
| 4  hold memorandum prior to a couple months ago |
| 5  concerning the AWP litigation? |
| 6    A.  I recall several different document |
| 7  hold orders.  I do not remember if one is for |
| 8  Ven-a-Care or not, or others. |
| 9    Q.  Do you recall having discussions with |
| 10 anyone within Abbott concerning the Ven-a-Care |
| 11 lawsuit at any time? |
| 12    MR. WINCHESTER:  I would just instruct |
| 13 you that I don't think she's asking for this but |
| 14 not to reveal the substance of any conversations |
| 15 about the litigation you may have had with Abbott |
| 16 lawyers. |
| 17 BY MS. ST. PETER-GRIFFITH: |
| 18    Q.  Correct, sir.  If I don't reference it, |
| 19 I don't want to know about any conversations |
| 20 you've had with lawyers. |
| 21    A.  Okay.  Let's go back to the question |
| 22 again. |

| Page 131 |
|---|
| 1    Q.  Sure.  Did you have any discussions |
| 2  with anyone within Abbott other than lawyers |
| 3  about the AWP litigation? |
| 4    A.  I think the, yes. |
| 5    Q.  Who? |
| 6    A.  I don't remember with whom, but I do |
| 7  remember that this was a topic of conversation. |
| 8    Q.  When do you recall it was a topic of |
| 9  conversation? |
| 10    A.  Well, it was hot news. |
| 11    Q.  Who was it hot news to? |
| 12    MR. FERGUSON:  Object to form, |
| 13 foundation. |
| 14    THE WITNESS:  This was a lawsuit in the |
| 15 press that affected Abbott. |
| 16 BY MS. ST. PETER-GRIFFITH: |
| 17    Q.  Do you recall any conversations that |
| 18 you had concerning the AWP litigation? |
| 19    A.  I don't remember any specific |
| 20 conversations about this lawsuit. |
| 21    Q.  What do you remember about the |
| 22 conversations? |

| Page 132 |
|---|
| 1    MR. FERGUSON:  Objection, asked and |
| 2  answered. |
| 3    THE WITNESS:  I remember this being a |
| 4  pretty important news event, that the opening up |
| 5  of the average wholesale price issue changed much |
| 6  of our market. |
| 7  BY MS. ST. PETER-GRIFFITH: |
| 8    Q.  How did it change much of your market? |
| 9    A.  This was an inflexion point moment. |
| 10    Q.  What do you mean by that? |
| 11    A.  Until this date there had not been |
| 12 publicly available information in this situation, |
| 13 and it put a brighter light on the spread issue |
| 14 that you raised this morning. |
| 15    Q.  When you say "there had not been |
| 16 publicly available information," what do you mean |
| 17 by that? |
| 18    A.  In terms of acquisition costs from a |
| 19 particular customer.  I wasn't aware of any other |
| 20 publication of that kind of information. |
| 21    Q.  Do you recall any initiatives |
| 22 undertaken by Abbott to address the issue? |

| Page 133 |
|---|
| 1    MR. WINCHESTER:  Objection, form. |
| 2    THE WITNESS:  I was not involved in |
| 3  those. |
| 4  BY MS. ST. PETER-GRIFFITH: |
| 5    Q.  But are you aware of any initiatives |
| 6  that were undertaken? |
| 7    MR. WINCHESTER:  Objection, form. |
| 8    THE WITNESS:  I have no direct |
| 9  information about actions that Abbott took.  I |
| 10 was not involved. |
| 11    I was in a division one time zone away, |
| 12 and those reactions were made by the appropriate |
| 13 division with responsibility for those products. |
| 14 BY MS. ST. PETER-GRIFFITH: |
| 15    Q.  And what division was that? |
| 16    A.  I believe most of that happened on the |
| 17 Hospital Products Division and also with the |
| 18 assistance of the Pharmaceutical Products |
| 19 Division as well. |
| 20    Q.  And what was the reaction? |
| 21    MR. FERGUSON:  Object to form, |
| 22 foundation. |

                              34 (Pages 130 to 133)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                           October 25, 2007
                    Chicago, IL

Page 134

1    THE WITNESS:  Reaction to which?
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  Well, you said you had no direct
4   information but you cited to a reaction.  Do you
5   know what the reaction was?
6       MR. FERGUSON:  Same objections.
7       THE WITNESS:  I had heard that there
8   was a price reduction, but I was not involved in
9   that process and had only second- and third-hand
10  information.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  And who did you get your second- and
13  third-hand information from?
14      A.  I don't recall.
15      Q.  What did you tell Cardinal about the
16  whistle blower lawsuit?
17      A.  I don't remember anything more than the
18  content you have here.
19      Q.  Okay.  The next item says "Presentation
20  to state Medicaid fraud officers."  Do you see
21  that?
22      A.  Yes.

Page 135

1       Q.  What did you mean by that when you
2   included this in your Powerpoint presentation?
3       A.  There was a presentation to Medicaid
4   fraud officers regarding the whistle blower
5   lawsuit that was reported in the press.
6       Q.  Who are Medicaid fraud officers?
7       A.  Each state Medicaid program has a fraud
8   and control unit, what they call a MCFU, and each
9   of those organizations have senior officers.
10  They have a national association.  And apparently
11  at some point seven years ago there was a
12  presentation to them on this particular issue.
13      Q.  Did you attend the presentation?
14      A.  No.
15      Q.  The next item says "May 1st Department
16  of Justice informed First Databank of new AWPs."
17  Do you see that?
18      A.  Yes.
19      Q.  You referenced earlier a price
20  reduction.  Is this the price reduction that you
21  were referencing?
22      A.  No.

Page 136

1       Q.  What price reduction were you
2   referencing?
3       A.  This was a price reduction over I
4   believe four products.  Again, I was not involved
5   in any of those.
6       Q.  Do you know what the products were?
7       A.  Vancomycin, there was a saline and a
8   distilled water, and I've forgotten the fourth
9   product.
10      Q.  Who took those price reductions?
11      A.  It was a decision by Abbott.
12      Q.  Within a particular division?
13      A.  I believe those are all HPD products.
14      Q.  When you say a price reduction, which
15  price?
16      A.  It was a reduction in the list price.
17      Q.  Do you know why there was a price
18  reduction?
19      A.  No.
20      Q.  Why did you include reference to the
21  "May 1st Department of Justice informed First
22  Databank of new AWPs" and then it says "for 50

Page 137

1   drugs, 433 NDC codes, and data source
2   undeclared." Do you see that?
3       A.  Yes.
4       Q.  Why did you include that in your
5   Powerpoint?
6       A.  This clearly was a current event.  It
7   was seven weeks earlier.  It was an event that
8   was going to have direct impact for companies who
9   were working on that AWP, or who had products
10  subject to that new AWP.
11      Q.  What do you mean by "data source
12  undeclared"?
13      A.  I don't recall.
14      Q.  Okay.
15      A.  I probably didn't know the data source
16  and the data source was not declared.
17      MR. FERGUSON:  I'm sure she doesn't
18  want you to guess.  So if you don't recall --
19      THE WITNESS:  I don't recall.  I don't
20  know.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Your counsel is correct.  I don't want

35 (Pages 134 to 137)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                            Chicago, IL

Page 138

1   you to guess.  If you don't know or can't recall,
2   just let me know.
3       A.  I believe my comment was that the
4   Department of Justice did not declare the data
5   source.
6       Q.  The last item is "Most Medicaid states
7   using lower AWPs."  Do you see that?
8       A.  I see that.
9       Q.  What was the source for that
10  information?
11      A.  I don't recall.
12      Q.  Why did you include it in this
13  presentation?
14      A.  Because Cardinal would be participating
15  in many state Medicaid programs.
16      Q.  The next page says "Shalala Action" at
17  the top.  Do you see that?
18      A.  Yes.
19      Q.  Why did you title this "Shalala
20  Action"?
21      A.  I believe it was referring to a
22  communication sent by Donna Shalala, who was

Page 139

1   administrator of Medicaid, Center of Medicare and
2   Medicaid services at that point.
3       Q.  Is this intended to describe HCFA's
4   response?
5       A.  Yes.
6       Q.  The first bullet point says "HCFA to
7   send Medicaid pricing data to Medicare carriers
8   for October 1st update."  What you mean by
9   that?
10      A.  I don't recall.
11      Q.  The next item says "First Databank will
12  revise the way it collects," and this is in
13  quotes, "and reports average price data based on
14  information in wholesaler catalogs."  Do you see
15  that?
16      A.  (Witness nodding.)
17      Q.  First of all, what are you quoting
18  from?
19      A.  I don't recall.
20      Q.  What did you mean?
21      A.  I believe that's a quote from First
22  Databank.

Page 140

1       Q.  Okay.  And are you conveying to
2   Cardinal that First Databank is going to change
3   how it deals with information collected from
4   manufacturers?
5       A.  As best I recall, First Databank sent a
6   communication to manufacturers and I'm passing
7   that message along.
8       Q.  Why did you think it was important to
9   include that?
10      A.  I had been asked to talk to this topic
11  by the customer.
12      Q.  The next item says "Proposed payment
13  rate is eighty-three percent of AWP."  Do you see
14  that?
15      A.  Uh-huh.
16      Q.  Where did you get the information
17  concerning that?  Do you recall?
18      A.  I don't recall.  And I don't even
19  recall that part of the issue.
20      Q.  The next item says "Considering actual
21  acquisition costs."  Do you see that?
22      A.  Uh-huh.

Page 141

1       Q.  And that's in quotes.
2       A.  Uh-huh.
3       Q.  Do you know what that's quoted from?
4       A.  No.  I don't know.
5       Q.  What did you mean when you included
6   that?
7       A.  Well, clearly there are two
8   participants here, HCFA and the First Databank,
9   and that there is a process of evaluating the
10  calculation of AWP that's going on here.  And
11  "considering" is a present tense verb.  People
12  were looking at how to find the most appropriate
13  payment mechanism given the system as it was.
14      Q.  Did you learn that from your review of
15  trade material?  How did you come about to learn
16  that information?
17      A.  I don't recall the source.
18      Q.  The next page says "Available
19  Databases."  Do you see that?
20      A.  Yes.
21      Q.  That's the title.  Can you explain how
22  the title "Available Databases" relates to what

                                    36 (Pages 138 to 141)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                              October 25, 2007
                         Chicago, IL

Page 142

1  appears to be definitional information that's
2  conveyed on this slide?
3       A.  I don't recall.  I don't recall any
4  points I made on this slide either.
5       Q.  Do you know why you included these
6  definitions?
7       A.  I don't recall.
8       Q.  Well, the first bullet point says
9  "Wholesale supplier catalogs = new AWP."  Do you
10  recall what you meant by that?
11      A.  No.  I do not.
12      Q.  Do you recall what you meant by
13  including the definition of average manufacturer
14  price where it says "Average price to
15  nongovernmental purchasers"?
16      A.  That was a definition used in the
17  Medicaid calculation.  It's used in calculation
18  of rebates under the OBRA calculation for
19  Medicaid.
20      Q.  Then the next item says "Medicaid best
21  price = lowest price for any nongovernmental
22  purchaser."  Do you see that?

Page 143

1       A.  Yes.
2       Q.  What did you mean by that?
3       A.  Well, you're asking me to talk about
4  available databases, and we're speculating about,
5  and I am as a speaker speculating, about how the
6  AWP problem could be resolved.  One of the
7  databases that's available is the Medicaid best
8  prices.
9       Q.  Were you proposing that as a possible
10  alternative to the issue?
11      A.  That's an available database.
12      Q.  When you were presenting this
13  information, were you presenting it as Mike
14  Tootell or were you presenting it as a
15  representative of Abbott?
16          MR. FERGUSON:  Object to form.
17          THE WITNESS:  I would take personal
18  responsibility for the communication.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  But the content of this particular
21  presentation was, as you said earlier --
22      A.  Yes.

Page 144

1       Q.  -- vetted at Abbott?
2       A.  Uh-huh.
3          MR. ANDERSON:  I'm sorry, sir.  Could
4  you answer verbally?  Was that a "Yes"?  You said
5  "Uh-huh."
6          THE WITNESS:  Yes.
7          MR. ANDERSON:  Thank you.
8  BY MS. ST. PETER-GRIFFITH:
9       Q.  Sir, if Abbott objected to any of the
10  content of your presentation, would someone at
11  Abbott have let you know that?
12          MR. FERGUSON:  Objection, form.
13          MR. WINCHESTER:  Objection, form,
14  speculation.
15          THE WITNESS:  Speculation of other
16  people.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Well, no, sir.  My question is if
19  someone at Abbott objected to the content of your
20  presentation -- well, let me ask it a different
21  way.
22          Did anyone at Abbott object to the

Page 145

1  content of your presentation?
2          MR. WINCHESTER:  Object to form,
3  foundation.
4          MR. FERGUSON:  Same objection.
5          THE WITNESS:  No.
6          MS. ST. PETER-GRIFFITH:  Counsel, I'd
7  prefer if you just reserve your objections to
8  form.  That's what's called for in the court's
9  order.
10          MR. WINCHESTER:  That isn't what's
11  called for.  Those objections are proper under
12  the federal rules.  Go ahead.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  If someone had objected to the content
15  of this information, would they have let you
16  know?
17          MR. FERGUSON:  Object to form.
18          MR. WINCHESTER:  Objection, form.
19          THE WITNESS:  Of course, if they had
20  seen it, yes.  And I would have welcomed that.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  When you say you would have welcomed

                                37 (Pages 142 to 145)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007

Chicago, IL

Page 146

1    that, what do you mean?
2        A.  If you're working with colleagues and
3    someone has a suggestion that is appropriate on a
4    point, then you make the change.
5        Q.  The next page says "Average Wholesale
6    Price."  Do you see that?  The first bullet point
7    says "Legislative efforts now to study actual
8    pricing differences."  Do you see this?
9        A.  Uh-huh.
10       Q.  What did you mean by that?
11       A.  Citing a variety of things that's going
12   on in Congress and the agency to approach the
13   problem of the pharmaceutical pricing.
14       Q.  Do you know whether Abbott was a
15   participant in any of those legislative efforts?
16       A.  I don't know.
17       Q.  The next bullet point says "Cancer
18   community generated 41,0000 letters."  Do you see
19   that?
20       A.  Yes.
21       Q.  What did you mean by that?
22       A.  There was an effort to reduce pricing

Page 147

1    for cancer drugs for cancer patients, and their
2    trade associations became involved and generated
3    41,000 letters in the context of the pricing
4    difference.
5        Q.  The next item says "DOJ and state
6    Medicaid fraud officers threatening civil
7    action." Do you see that?
8        A.  Uh-huh.
9        Q.  What did you mean by that?
10       A.  There were widespread rumors and press
11   reports of interest by your agency and by state
12   agencies in this issue.
13       Q.  And what's the basis of your
14   information?
15       A.  Multiple sources.
16       Q.  What were the multiple sources?
17       A.  As I said before, trade press, personal
18   communications, a variety of sources.
19       Q.  Who were your personal communications
20   with concerning DOJ and state Medicaid fraud
21   officers threatening civil action?
22       A.  I don't recall.

Page 148

1        Q.  The next bullet point says "Outcome
2    uncertain:  Watch legal and political decisions."
3    Do you see that?
4        A.  Yes.
5        Q.  What do you mean by "Outcome
6    uncertain"?
7        A.  Well, it's a process that we are about
8    seven years later, and the process of setting
9    public policy on this issue is ongoing.
10       Q.  Sir, I'm not going to ask you about
11   each slide, but I would like you to flip through
12   the next eleven pages up to the point where it
13   says "Uncertain Consequences" and just tell me
14   as, well, as you flip through that my question to
15   you is going to be do you recall what the source
16   of your information was for this information.
17       A.  I don't recall.  I don't recall
18   specific sources for these things.
19       Q.  Okay.  If you could flip to the page
20   that says "Uncertain Consequences."  On the slide
21   titled "Uncertain Consequences" the first bullet
22   point says "Pricing mechanism undetermined."  Do

Page 149

1    you see that?
2        A.  Yes.
3        Q.  What did you mean by that?
4        A.  Well, clearly we were in 1970 on our
5    way to developing a new Medicaid pharmacy benefit
6    that came to fruition in 2003, and the pricing
7    mechanism was determined to handle it by market
8    negotiations between pharmaceutical drug plans.
9            In 2000 I am saying that we have an
10   uncertain political issue here, as I've said
11   before, that people need to pay attention to the
12   changes, they have dramatic consequences.  And
13   that there are a variety of ranges that could
14   have happened in a variety of ways that as a
15   country we could have determined how to pay for
16   pharmaceutical products.
17       Q.  The next bullet point lists three
18   different options.  Do you see that?
19       A.  Yes.
20       Q.  Where did you or how did you formulate
21   these different options that you've identified as
22   the options range?

38  (Pages 146 to 149)

Henderson Legal Services
202-220-4158

Tootell, Michael                                    October 25, 2007
                    Chicago, IL

Page 150

1    A.  Obviously this is a presentation I did.
2   There are public policy options, there were
3   several.  They could have revised the AWP and
4   done that legislatively.  We ended up with
5   competitive contracts for formulary participation
6   within regions, and that became the way in which
7   the Medicare drug plan is now arranged.  And
8   there could have been some middle grounds, as I
9   point out, that could have taken pieces and parts
10  of either one.
11       At this point in my speech, I am giving
12  listeners options and political possibilities of
13  things that might occur.  And it's my
14  speculation, and it's labeled as such.
15       MS. ST. PETER-GRIFFITH:  I don't mean
16  to cut you off.  Are you concluded with your
17  answer?
18       THE WITNESS:  Yes.
19       MS. ST. PETER-GRIFFITH:  Because we
20  need to change the tape.
21       THE WITNESS:  Sure.
22       MS. ST. PETER-GRIFFITH:  So why don't

Page 151

1   we take a brief break to change the tape.
2       THE WITNESS:  Okay.
3       THE VIDEOGRAPHER:  We are off the
4   record at 1:31 with the end of Tape 2.
5       (WHEREUPON a recess was taken.)
6       THE VIDEOGRAPHER:  We are back on the
7   record at 1:45 p.m. with the start of Tape No. 3.
8   BY MS. ST. PETER-GRIFFITH:
9    Q.  Sir, if you could just go to what I
10  think are the last two pages, although there's an
11  intervening, no, I'm sorry, the third to the last
12  and fourth to the last pages, which just appear
13  to be concluding quotes.
14   A.  Yes.
15   Q.  Do you see those, sir?
16   A.  Uh-huh.
17   Q.  The first is the "Devil will be in the
18  details and the opportunity will be there too."
19       Why did you include this quote, and did
20  you have any additional discussion?
21       MR. FERGUSON:  Objection to the form of
22  the question.  Those are two questions.

Page 152

1   BY MS. ST. PETER-GRIFFITH:
2    Q.  Why don't we start with why did you
3   include the quote?
4    A.  I'm summarizing content and I'm not, I
5   don't recall the, I'm bringing together a number
6   of themes that we talked about.  Reimbursement
7   issues are often detailed, and this requires a
8   careful analysis of the situation.
9    Q.  Do you recall having any, other than
10  providing the quote to the representatives from
11  Cardinal at this particular presentation, do you
12  recall having any discussion concerning the quote
13  or --
14       MR. FERGUSON:  Could I hear that
15  question -- I'm sorry.  Did I interrupt you?
16       MS. ST. PETER-GRIFFITH:  Yes, that's
17  okay.  Let me rephrase it.
18  BY MS. ST. PETER-GRIFFITH:
19   Q.  Do you recall whether you had any
20  discussion centered around the theme of the quote
21  at the Cardinal presentation?
22   A.  I do not.

Page 153

1    Q.  The next quote that I'd like you to
2   look at, and I'd have to say this is one of my
3   favorite pages in your production, sir, "Skate
4   where the puck is going to be."
5       Now, I grew up watching hockey in
6   Canada and I think I know what that means, but
7   why did you include that quote, sir?
8    A.  Well, the whole theme of the
9   presentation is that reimbursement and
10  recognition of the pharmaceutical products is
11  changing, and that, as Wayne Gretzky said, you
12  need to imagine where the puck is going to be.
13  I'm encouraging my listeners to think about what
14  their future will be and how that will shape the,
15  you know, their business.
16       MS. ST. PETER-GRIFFITH:  If we could
17  mark this as the next exhibit.  And, Jason and
18  Jim, that's that second part, the August 21st.
19       (WHEREUPON Deposition Exhibit
20  Tootell 005 was marked as of 10/25/2007.)
21  BY MS. ST. PETER-GRIFFITH:
22   Q.  Sir, before we start talking about this

39 (Pages 150 to 153)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                         Chicago, IL

Page 154

1  next exhibit, how was your first July 17, 2000
2  presentation received by Cardinal?  (Document
3  tendered to the witness.)
4       MR. FERGUSON:  Object to form.
5       MR. WINCHESTER:  Object to form.
6       THE WITNESS:  I can't speculate on
7  their response.  I'm not sure.  I only remember
8  giving one speech to Cardinal.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Oh, okay.
11      A.  And I do not know which of those
12 speeches I did deliver.
13          Obviously they are different and
14 obviously when I began the analysis at your
15 request I wasn't aware that there were two
16 speeches.
17      Q.  Well, do you recall the second, what
18 we've just marked as now Exhibit Tootell 005?  If
19 you want to take a few minutes to review it,
20 that's fine.
21      A.  I'm concerned that I don't know which
22 of these speeches I did give.

Page 155

1       Q.  Okay.  Is this second document, Exhibit
2  Tootell 005, something that you prepared?
3       A.  It's the same format.  I believe I did
4  prepare it.
5       MR. FERGUSON:  Have you had a chance to
6  review it?
7       THE WITNESS:  I have not.
8       MR. FERGUSON:  Okay.  Why don't you
9  review it and then you can answer counsel's
10 question.
11 BY MS. ST. PETER-GRIFFITH:
12      Q.  Sir, have you reviewed it?
13      A.  Yes.
14      MS. ST. PETER-GRIFFITH:  Could you read
15 back the question, please.
16 BY MS. ST. PETER-GRIFFITH:
17      Q.  Sir, did you prepare this document?
18      A.  I prepared the document.
19      Q.  What is this document?
20      A.  This is a presentation labeled "Program
21 for Cardinal Health."
22      Q.  Do you recall giving a second

Page 156

1  presentation to Cardinal Health?
2       A.  I recall giving one presentation.  I do
3  not recall which of these packages of slides I
4  used.
5       Q.  Is there anything that you can think of
6  that might refresh your recollection as to which
7  presentation you gave?
8       A.  If I had access to my calendar that's
9  retained on computer at Ross, I would be able to
10 know whether or not I was at Cardinal on the 21st
11 of August or on the 17th of July.
12      Q.  Do you recall whether Cardinal asked
13 you to make more than one presentation?
14      A.  I don't recall a second request.
15      Q.  The content of the exhibit that we've
16 labeled as Exhibit Tootell 005, what is the
17 source of your information for the content of
18 this presentation?
19      A.  Clearly the legal, the congressional
20 process had changed dramatically in that month
21 and I'm talking about the consensus bills that
22 are emerging.  The issue has matured a good deal

Page 157

1  over that intervening week, or month.
2       Q.  Do you recall who your contact was at
3  Cardinal who requested that you give a
4  presentation?
5       A.  Linde McDaniel.
6       Q.  I'm sorry?
7       A.  Linde McDaniel.
8       Q.  Is it Mr. or Ms.?
9       A.  Ms. I believe.
10      Q.  What was Ms. McDaniel's title?
11      A.  She was a mid-level manager at
12 Cardinal.
13      Q.  Do you recall anything about your
14 conversation with her concerning the
15 presentation?
16      A.  No.
17      Q.  Prior to the request from Ms. McDaniel
18 for you to give this presentation, had you had
19 any prior interactions with her?
20      A.  She had been an employee at Ross.
21      Q.  Was she a subordinate or superior of
22 yours?

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 158

1    A.  No.
2    Q.  Do you recall whether you solicited any
3  input from anyone else at Abbott for the content
4  of the August 21, 2000 Powerpoint?
5    A.  I don't recall.
6    Q.  Sir, it's clear from these two
7  presentations that you have collected some
8  information that transcended information
9  concerning Ross products about the effect of
10  changes in the AWP reimbursement scheme.  Is that
11  fair?
12    A.  Yes.
13        MR. WINCHESTER:  Objection, form.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Did you communicate that knowledge base
16  that you had acquired to anyone else at Abbott?
17        MR. FERGUSON:  Object to form.
18        THE WITNESS:  I don't know who, which,
19  or when.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Well, I guess that's my question to
22  you, sir.  Did anyone else at Abbott know that

Page 159

1  you were developing this information?
2        MR. WINCHESTER:  Objection, form.
3        THE WITNESS:  That asks for me
4  speculate on other people's knowledge.  Yes.  I
5  told them that I was involved on these issues and
6  we would have conversations about them.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  That is my question.  Do you recall
9  having communications or conversations with
10  individuals about the knowledge base that you
11  were acquiring concerning these issues?
12        MR. FERGUSON:  Object to form.  Do you
13  understand the question?
14        THE WITNESS:  Did I talk to anybody
15  ever?  I mean is that your question?
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  My question is did you communicate with
18  anyone at Abbott that you were collecting this
19  information and studying this AWP issue?
20        MR. WINCHESTER:  Objection to form.
21        MR. FERGUSON:  Same objection.
22        THE WITNESS:  People at Abbott who were

Page 160

1  involved in reimbursement knew that I was
2  interested and involved in AWP issues.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Did anyone at Abbott ever ask you to
5  help formulate Abbott's responses to some of
6  these AWP issues that were emerging in the late
7  '90s and early 2000?
8    A.  Not that I recall.
9    Q.  Were you ever asked to consult on AWP
10  issues within Abbott?
11    A.  I don't believe so.
12    Q.  Why were you studying this issue?
13    A.  My graduate degree is in finance and
14  I'm interested in this as a health policy issue.
15  It's one of the central health policy issues of
16  our time.
17    Q.  Did you ever volunteer to anyone at
18  Abbott that you could assist in this issue or in
19  Abbott's response to the issue?
20        MR. WINCHESTER:  Objection, form.
21        MR. FERGUSON:  Same objection.
22        THE WITNESS:  Yes, I did.

Page 161

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Who?
3    A.  In the 1995 working group discussions,
4  I offered an e-mail or a communication from the
5  trade association pointing out the importance of
6  average wholesale prices and the potential of
7  developing compromises and developing new
8  systems.  I circulated that to my colleagues at
9  Abbott.
10    Q.  Which colleagues at Abbott did you
11  circulate it to?
12    A.  I don't recall.
13    Q.  Do you recall whether it was members of
14  the Medicare Working Group?
15    A.  I think it was circulated by that
16  group.  I passed it on to whoever was
17  coordinating that group, and that group passed it
18  on to their colleagues.
19    Q.  Was there a response that you can
20  recall to your offering that e-mail information?
21    A.  It was a contribution to the corporate
22  conversation.

                              41 (Pages 158 to 161)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 162

1    Q.  How do you know that it contributed to
2  the corporate conversation?
3    A.  It was distributed to the members of
4  the working group.
5    Q.  Did anyone respond back to you
6  concerning the information?
7    A.  Not that I recall.
8    Q.  Was the AWP issue or the changes in AWP
9  pricing of concern to you?
10   A.  Yes.
11   Q.  Why?
12   A.  There's a legal dimension, there's a
13 public relations issue.  Both of those were
14 important.
15   Q.  Did you have concern that Abbott had
16 exposure on the issue?
17       MR. WINCHESTER:  Objection, form.
18       MR. FERGUSON:  Same objection.
19       THE WITNESS:  Yes.  I had a personal
20 concern about this.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  What was the basis of your concern?

Page 163

1    A.  There were evident press reports that
2  documented a divergence between acquisition price
3  and AWP, list price, that were gathering notice
4  in the press.
5    Q.  Any other reason why it was of concern?
6    A.  I could foresee serious difficulties
7  from a legal point of view coming forward.
8    Q.  What were the serious difficulties that
9  you could foresee?
10   A.  Well, we're experiencing them today,
11 it's a legal action against a company.
12   Q.  Why did you have a concern that Abbott
13 might have that exposure?
14       MR. WINCHESTER:  Objection, form.
15       MR. FERGUSON:  Same objection.
16       THE WITNESS:  You're asking me to
17 speculate on other people's opinions.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.  No.  I'm asking you what your concern
20 was.
21   A.  It looked like other divisions had
22 gotten discordant in their relationship between

Page 164

1  their action, the list prices and their actual
2  sales prices.
3    Q.  What do you mean by "discordant"?
4    A.  The gap was becoming quite commonly
5  known and as seen by the information that
6  Medicare brought forward.
7    Q.  And why was that of concern?
8        MR. WINCHESTER:  Objection, form.
9        MR. FERGUSON:  Asked and answered as
10 well.
11       THE WITNESS:  I was concerned that the
12 issue would end badly for Abbott.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.  Sir, were you aware of the spread
15 levels on products outside of the Ross Products
16 Division?
17   A.  Not in any systematic way.  I had the
18 press reports that I referred to.
19   Q.  Did you have a concern about the fact
20 that some of Abbott's products may have had
21 spreads of fifty percent, a hundred percent, two
22 hundred percent, up to a thousand percent?

Page 165

1        MR. FERGUSON:  Object to form.
2        MR. WINCHESTER:  Object to form.
3        MR. FERGUSON:  Foundation.
4        THE WITNESS:  The potential of a bad
5  legal result, a bad result in a legal arena, was
6  present, sure.  I was concerned about that.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Did you have a concern, any concerns,
9  regarding Abbott practices in selling the spread?
10       MR. WINCHESTER:  Objection, form,
11 foundation.
12       MR. FERGUSON:  Same objections.
13       THE WITNESS:  I was very uninformed
14 about the way that this showed up as a sales
15 tactic.  It's another division.  I did not know
16 how it was being used as a sales activity.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.  Had you heard the term "selling the
19 spread" before?
20   A.  I had heard the term, yes.
21   Q.  What does "selling the spread" mean?
22   A.  It means as an element of your

42 (Pages 162 to 165)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
Chicago, IL

Page 166

1  promotion, talking, drawing attention to the
2  profit potential of the product, the gap between
3  average wholesale price and acquisition cost, as
4  a sales technique.
5      Q.  Were you aware of any Abbott policies
6  regarding selling the spread?
7      A.  After 2003, yes, we were very, very
8  careful about that.
9      Q.  What about prior to 2003?
10     A.  I don't recall policies before 2003 on
11 that topic.
12     Q.  Did the policies that originated in
13 2003 arise from the Corporate Integrity Agreement
14 that Abbott entered into on behalf of its Ross
15 Products Division with the United States?
16     MR. FERGUSON:  Object to form and
17 foundation.
18     THE WITNESS:  I'm sure that was an
19 ingredient for Abbott's reform.  But I believe
20 that the new policies that came forward were
21 applied to all Abbott divisions, not just the
22 Ross division.

Page 167

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Sir, I'm going to show you another
3  document which I'd like to mark as the next
4  exhibit, which I believe is Exhibit Tootell 006.
5      (WHEREUPON Deposition Exhibit
6  Tootell 006 was marked as of 10/25/2007.)
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Please take your time in reviewing
9  this, sir. (Document tendered to the witness.)
10     A.  Do we have a date?
11     Q.  That's all I have, sir.
12     A.  So I did do a speech with Ginny.
13     Q.  Sir, do you recognize this document?
14     A.  No.
15     Q.  Do you recall participating in drafting
16 this document at all?
17     MR. FERGUSON:  Objection, asked and
18 answered.
19     THE WITNESS:  The fonts are similar,
20 the issues are similar, but no, I don't recall.
21 I don't recall if this speech was ever given.
22 BY MS. ST. PETER-GRIFFITH:

Page 168

1      Q.  Okay.  We'll get to the speech in a
2  second.
3          My question though is in terms of this
4  particular document do you have any recollection
5  of drafting this document?
6      A.  No.
7      Q.  Do you know whether it's possible that
8  Virginia Tobiason drafted this document?
9      MR. FERGUSON:  Objection, form.
10     MR. WINCHESTER:  Objection, form.
11     THE WITNESS:  I would say this is a
12 collaborative project that Ginny and I did for
13 the Ross sales force.  I don't know if it was
14 given or not.  I would guess she wrote the first
15 part.  I wrote the second part.
16     MR. FERGUSON:  Mike, Mike, I don't want
17 you to guess.
18     THE WITNESS:  Okay.
19     MR. FERGUSON:  Do you recall or do you
20 not recall?  That's the question.
21     THE WITNESS:  I do not recall ever
22 giving this presentation.

Page 169

1      MR. FERGUSON:  Read the question back.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  We could read it back.  But my
4  question, sir, went to the drafting of this
5  particular document.  Do you have a --
6      A.  I don't recall drafting it or the
7  presentation.
8      Q.  Do you know why your name would be on
9  the front of it?
10     MR. FERGUSON:  Object to form.
11     THE WITNESS:  Like I said, I don't
12 recall drafting or presenting this presentation.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  But my question is do you know why your
15 name would be on the front of it?
16     MR. FERGUSON:  Object to form.
17     THE WITNESS:  I don't know who, I'm not
18 saying who wrote it.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  My question doesn't go to who
21 wrote it.  My have question is -- let me ask it
22 this way:  Is it possible that someone could have

43 (Pages 166 to 169)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 170

1  planned a presentation for you to give and
2  included your name on a draft of the first page
3  of that presentation?
4      MR. FERGUSON:  Object to form.
5      MR. WINCHESTER:  Objection to form.
6      THE WITNESS:  Bad things could have
7  happened, yes.
8      MR. ANDERSON:  I'm sorry.  What did you
9  say?  I didn't hear you.  What did you say?
10         (WHEREUPON said record was read
11 back as requested.)
12     MR. ANDERSON:  "Bad things"?
13     THE WITNESS:  I do not know.  I said I
14 don't remember drafting this.  I don't remember
15 presenting it.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Why did you indicate earlier that you
18 may have drafted the second half of the
19 presentation?
20     A.  Because it's, we don't even know how
21 old it is.
22     MR. ANDERSON:  Objection,

Page 171

1  nonresponsive.
2      THE WITNESS:  I've answered --
3      MR. FERGUSON:  Are you going to let him
4  finish his answer?
5      MR. ANDERSON:  I thought he was.
6      MR. FERGUSON:  No.
7      THE WITNESS:  You asked whether or not
8  some person I don't know could have forged my
9  name, and I'd say I don't know.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Well, let me ask you this:  If you
12 drafted this, would you expect that your name was
13 on it?
14     MR. WINCHESTER:  Object to form.
15     MR. FERGUSON:  Object to form.
16     THE WITNESS:  If I drafted it, I would
17 expect, yes, if I had drafted it I would have
18 expected my name to be on it.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  If someone else had drafted it, would
21 you expect your name to be on it?
22     A.  No.

Page 172

1      MR. FERGUSON:  Same objection.
2      THE WITNESS:  No.  I would not.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  I'd like to go back to the earlier
5  question concerning your statement earlier that
6  you may have drafted the last portion of it.
7      Why do you believe it's possible that
8  you drafted the last portion and that Virginia
9  Tobiason may have drafted the first portion?
10     MR. WINCHESTER:  Objection to form.
11     MR. FERGUSON:  Same objection.
12     THE WITNESS:  There is a natural break
13 in the presentation between, about where you get
14 to Ross issues.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Where do you see that?  What page is
17 that on?  And we're all squinting but at the very
18 bottom there are some little numbers.  Do you
19 see?
20     A.  Uh-huh.
21     Q.  Can you identify which number, which
22 page number, reflects that natural break that

Page 173

1  you're referencing?
2      A.  I would say after the "Sales
3  Representative Job" phrase and then we get into
4  the "Always Lease Pump Contract," that would be
5  the first presentation.  If I did do this, that's
6  where the break I would see.
7      Q.  Other than you or -- strike that.
8      Can you think of anyone other than you
9  or Virginia Tobiason that would have either made
10 or drafted such presentation?
11     A.  No.
12     Q.  I'd like to concentrate first on the
13 first portion of this presentation.
14     MR. WINCHESTER:  Before you go on, Ann,
15 what's your last page of this?  I have a last
16 page that I'm not sure goes with the rest.
17 (Indicating.)
18     MS. ST. PETER-GRIFFITH:  That is my
19 last page as well.  You could be completely
20 right.  Why don't we just take that last page off
21 this exhibit.
22     MR. WINCHESTER:  Okay.

                              44  (Pages 170 to 173)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                              Chicago, IL

Page 174

1        THE WITNESS: My last page is "Take-
2   Away."
3        MS. ST. PETER-GRIFFITH: Okay.
4   BY MS. ST. PETER-GRIFFITH:
5     Q.  Sir, did you have any discussions with
6   Virginia Tobiason about investigations of
7   healthcare fraud?
8     A.  Yes.
9     Q.  What were your conversations with her?
10    A.  They were collegial and related to the
11  events of the day.
12    Q.  And what events of the day?
13    A.  What timeframe are you looking at?
14    Q.  At any time.
15       MR. FERGUSON: What's the question?
16       MS. ST. PETER-GRIFFITH: My question to
17  him is whether he had conversations with Virginia
18  Tobiason concerning healthcare fraud matters.
19       MR. FERGUSON: And I think he answered
20  that. I thought there was another question that
21  I didn't understand.
22       THE WITNESS: Yes. I've had

Page 175

1   conversations with Virginia Tobiason about
2   healthcare fraud issues.
3   BY MS. ST. PETER-GRIFFITH:
4     Q.  What were those conversations?
5     A.  We worked together for seventeen years.
6     Q.  What were the conversations?
7     A.  And different issues came to us
8   throughout those seventeen years.
9     Q.  And what different issues came to you
10  during those seventeen years?
11       MR. WINCHESTER: Objection to form.
12       MR. FERGUSON: Same objection.
13       THE WITNESS: Here is an example: If
14  the two of us did it together, we're talking
15  about the fact that this is an important issue
16  for the company. It's an important issue for the
17  sales force, that it's real, that people do get
18  excluded, there are criminal issues involved, and
19  --
20       MR. FERGUSON: Excuse me, Mike, forgive
21  me. If I've got the question wrong tell me, was
22  your question what specific issues did he discuss

Page 176

1   with Virginia Tobiason?
2        MS. ST. PETER-GRIFFITH: Yes.
3        MR. FERGUSON: Do you recall any
4   specific issues that you discussed with Virginia
5   Tobiason relating to healthcare fraud? If you
6   do, please provide the answer.
7        MR. ANDERSON: I object to the coaching
8   and the interruption. I would like the witness
9   to be able to finish his answer.
10       MR. FERGUSON: If he wants to go
11  through the document, that's fine.
12       MS. ST. PETER-GRIFFITH: No. He was in
13  the middle of an answer and you just interrupted
14  without an objection and tried to divert him on
15  to another answer.
16       MR. FERGUSON: He finished his answer.
17       MS. ST. PETER-GRIFFITH: No. He didn't
18  finish his answer. You interrupted him, and then
19  you proceeded to hijack the question. Please
20  allow the witness to finish his answers.
21       MR. FERGUSON: I'm asking my witness,
22  my client, to respond to her questions. She

Page 177

1   acknowledged that that was her question. She
2   acknowledged that that was her question.
3        MR. ANDERSON: If you want to question
4   your client, then when we pass the witness you
5   can take him on direct, Counsel, but you cannot
6   ask him questions during our part of the
7   deposition.
8        MR. FERGUSON: I didn't ask him
9   questions.
10       MR. ANDERSON: You did.
11       MS. ST. PETER-GRIFFITH: Sir, if you
12  can finish the answer that you were providing
13  before.
14       MR. FERGUSON: Do you remember the
15  question?
16       THE WITNESS: The question was over
17  seventeen years did I talk with Virginia Tobiason
18  about fraud issues, and my answer was yes. And
19  your follow-up question was about specifics, and
20  I am searching my memory to find specific
21  examples in response to your question.
22  BY MS. ST. PETER-GRIFFITH:

                              45 (Pages 174 to 177)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                              October 25, 2007
                        Chicago, IL

Page 178

1    Q.  Okay.
2    A.  I am going back to this draft of a
3  speech that I don't know that it was ever given.
4        The point that Virginia and I were both
5  trying to make was that fraud issues are
6  important, they require careful compliance, that
7  the sales force need to understand some limits to
8  where there were.  We specifically object to
9  selling the spread.
10       There are lessons referred to about
11  TAP.  We stressed to the sales force important to
12  emphasize clinical benefits, not financial
13  benefits.  And we try to keep salespeople on task
14  with what their job is, to sell the clinical
15  benefits of our products.
16   Q.  Did you discuss TAP with Virginia
17  Tobiason?
18   A.  I'm sure we did.  I don't recall
19  specifics about those conversations.
20   Q.  Do you recall Virginia Tobiason having
21  any knowledge about TAP?
22       MR. WINCHESTER:  Objection, form.

Page 179

1        MR. FERGUSON:  Same objection.
2        THE WITNESS:  I recall she had some
3  information about TAP.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  What information did she have that you
6  can recall?
7    A.  I can't recall specifics.  Those would
8  be for her to explain.
9    Q.  What other conversations did you have
10  with Virginia Tobiason about healthcare fraud?
11   A.  There were a number of issues that
12  occurred with the Ross Corporate Integrity
13  Agreement, the compliance issues.  Virginia was a
14  key, given key responsibility from Abbott
15  Compliance to supervise the entire reimbursement
16  area in terms of those reimbursement policies.
17   Q.  What were the number of issues that
18  occurred with the Ross CIA?
19       MR. WINCHESTER:  Objection, form.
20       MR. FERGUSON:  Same objection.
21       THE WITNESS:  The issues that were
22  settled in that action included, and these are

Page 180

1  matters of public record, there were pre-bates
2  and objections to the linking of the sale of Ross
3  pumps and plastic, the plastic tubing and the
4  pumps.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Are those the issues that occurred
7  within the Ross CIA that you and Virginia
8  discussed?
9    A.  I believe we did discuss those issues.
10   Q.  Did you discuss any other issues
11  concerning healthcare fraud?
12   A.  None that come to my mind right now.
13   Q.  Do you recall any specific
14  conversations about the TAP matter?
15   A.  I don't recall specific conversations
16  about the TAP matter.
17   Q.  If you didn't draft this document and
18  Virginia Tobiason didn't draft this document, can
19  you think of anyone else who would have drafted
20  this document?
21   A.  I don't recall if this document was, I
22  don't recall anything about this document.  I

Page 181

1  don't recall drafting it, I don't recall giving
2  it.
3    Q.  Well, is there anyone else at Abbott
4  that would have the expertise to draft such a
5  document?
6        MR. WINCHESTER:  Objection, form.
7        MR. FERGUSON:  Objection, foundation.
8        THE WITNESS:  It's speculation.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  My question to you is is there anyone
11  else at Abbott that would have had the expertise
12  to draft this document?
13       MR. WINCHESTER:  Same objection.
14       MR. FERGUSON:  Same objection.
15       THE WITNESS:  There are fifty thousand
16  people working for Abbott.
17  BY MS. ST. PETER-GRIFFITH:
18   Q.  Well, in your experience.  I mean
19  you're in the reimbursement area, your colleagues
20  were in the reimbursement area, some of them;
21  weren't they?
22   A.  Uh-huh.

46  (Pages 178 to 181)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 182

1    Q.  Can you think of who else might have
2  had the expertise to draft this document?
3        MR. FERGUSON:  Same objections.
4        THE WITNESS:  I don't know of anyone
5  else who could have, who would have done this.
6  If they did, they were people I did not know of.
7  BY MS. ST. PETER-GRIFFITH:
8        Q.  And is it likely that people that you
9  did not know of would draft a document with your
10  name and Virginia Tobiason's name on it?
11        MR. WINCHESTER:  Objection, form.
12        MR. FERGUSON:  Same objection.
13        THE WITNESS:  It's speculation.  It's
14  speculation.  I don't know.
15  BY MS. ST. PETER-GRIFFITH:
16        Q.  Well, my question to you is is it
17  likely that someone would have done that?
18        MR. WINCHESTER:  Same objection.
19        MR. FERGUSON:  Asked and answered.
20        THE WITNESS:  I think it's unlikely
21  that anybody else did this.
22  BY MS. ST. PETER-GRIFFITH:

Page 183

1    Q.  You identified a natural break in this
2  document.  Did you and Virginia Tobiason ever
3  discuss selling the spread before?
4    A.  Not that I recall.
5        MR. WINCHESTER:  Objection, form.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Why do you think that it's possible
8  that she drafted the first portion of this
9  document?
10        MR. FERGUSON:  Objection, asked and
11  answered.
12        THE WITNESS:  I believe I've answered
13  that.  You're asking me to make definitive
14  comments about a presentation I don't even
15  remember drafting or doing.  And I'm trying to be
16  responsive to your questions.
17        MS. ST. PETER-GRIFFITH:  Can you read
18  back the last question, please.
19        (WHEREUPON said record was read
20  back as requested.)
21        MR. WINCHESTER:  Same objections.
22        THE WITNESS:  Because the first are

Page 184

1  larger issues and the second half is Ross issues.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  Would you have discussed TAP issues
4  with the Ross division or salesmen within the
5  Ross division?
6        MR. WINCHESTER:  Objection, form.
7        MR. FERGUSON:  Objection, form.
8        THE WITNESS:  As a reimbursement
9  professional charged with helping my people
10  understand the issue, there were lessons that our
11  sales force needed to learn from the public
12  information circulating around the TAP lawsuit,
13  and they are summarized here.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  In undertaking your responsibilities as
16  the compliance, as a reimbursement compliance
17  person within Ross, what do you recall doing to
18  undertake that responsibility?
19        MR. WINCHESTER:  Objection, form.
20        THE WITNESS:  At what time?
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  Well, after TAP occurred.

Page 185

1    A.  There were efforts communicated with
2  the sales force to say what we say here, don't
3  sell the spread, don't calculate the spread,
4  focus on the clinical benefits of the products,
5  not on the financial benefits of the products.
6    Q.  Do you recall when those efforts were
7  undertaken?
8    A.  If this is a paper that I drafted, that
9  Ginny and I drafted together, and it includes a
10  slide that talks about TAP issues, this was in
11  the newspapers, our salespeople were reading it,
12  they were getting, we were getting questions from
13  our help line and a variety of things, we needed
14  to carefully teach our people what needed to
15  happen and how the lessons from this situation
16  could apply to our sales force.
17    Q.  Do you have any specific recollection
18  of what measures you undertook with regard to
19  educating the Ross division or the sales force
20  concerning TAP?
21    A.  No.  I do not.
22    Q.  Why would it have been important to

47 (Pages 182 to 185)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 186

1  communicate this information to the Ross
2  division?
3        MR. WINCHESTER: Objection, form.
4        THE WITNESS: As we've established
5  earlier, I was concerned about the legal exposure
6  and the legal risks of drawing attention to
7  spreads and the presentation of this volatile
8  material in a sales situation.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  If Abbott had other products other than
11  -- strike that.
12        If Abbott had products which were sold
13  by sales personnel by selling the spread --
14  strike that. That's still a poor question.
15        If divisions within Abbott undertook
16  selling the spread, do you think that is a
17  practice that should have been remedied at
18  Abbott?
19        MR. FERGUSON: Object to form.
20        MR. WINCHESTER: Objection, form.
21        THE WITNESS: It's not my
22  responsibilities to do that.

Page 187

1        Clearly in this presentation I talk
2  about not selling the spread, not calling
3  attention to the economic dimensions.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Whose responsibility would it have
6  been?
7    A.  It's primarily a Compliance Department
8  responsibility, but it's also an issue that any
9  responsible administrator of Ross shares.
10        MS. ST. PETER-GRIFFITH: Why don't we
11  take a brief break.
12        THE VIDEOGRAPHER: We are off the
13  record at 2:27 p.m.
14        (WHEREUPON a recess was taken.)
15        THE VIDEOGRAPHER: We are back on the
16  record at 2:35 p.m.
17        THE WITNESS: Thank you for the break.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Are you okay?
20    A.  Uh-huh.
21    Q.  Mr. Tootell, do you recall a meeting
22  that Virginia Tobiason had with several hundred

Page 188

1  employees at Ross, including members of the sales
2  force?
3    A.  No.
4    Q.  The meeting was in Columbus. Do you
5  have any recollection of that?
6    A.  I do not remember that meeting.
7    Q.  Is it possible that Ms. Tobiason would
8  have met with members of the Ross sales force as
9  well as other staff members to discuss Medicare
10  and Medicaid compliance issues without you?
11    A.  Yes.
12        MR. WINCHESTER: Objection, form.
13        MS. ST. PETER-GRIFFITH: Let's move on
14  to the next document.
15        (WHEREUPON Deposition Exhibit
16  Tootell 007 was marked as of 10/25/2007.)
17        THE WITNESS: Do you have a date when
18  this --
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Sir, I do not. All I can tell you is
21  that it was part of a production from Jones Day
22  on Abbott's behalf that was represented to us as

Page 189

1  coming from your files. (Document tendered to
2  the witness.)
3        Sir, do you recognize this document?
4    A.  I don't recognize it.
5    Q.  It says at the top "Medical Nutritional
6  Reimbursement Strategy."
7        Do you know whether this is a document
8  that you may have drafted?
9        MR. WINCHESTER: Objection, form.
10        MR. FERGUSON: Same objection.
11        THE WITNESS: I may have drafted this.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Can you think of anyone else within
14  Abbott that would have drafted a medical
15  nutritional reimbursement strategy?
16    A.  No.
17    Q.  Sir, if you could look at under item,
18  it says "Key Environmental Issues."
19    A.  Yes.
20    Q.  Under Item B it says "State budgets are
21  severely constrained." Do you see that?
22    A.  Yes.

48 (Pages 186 to 189)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                         Chicago, IL

Page 190

1    Q.  Then the second sentence reads
2  "Medicaid coverage and payment rates will be
3  challenged for nutritional and pharmaceutical
4  products."
5    A.  Yes.
6    Q.  Is that an accurate statement?
7    A.  Yes.  In a number of states we had
8  issues of coverage and payment rates.
9    Q.  Was that of concern to you in your
10 capacity as the reimbursement --
11   A.  Yes.
12   Q.  The next Item C says "Increased
13 scrutiny and public notice of pharmaceutical
14 prices, including congressional consideration of
15 revising the average wholesale price, AWP,
16 formula brings additional review of enteral
17 Medicaid reimbursement rates."  Do you see that?
18   A.  I do.
19   Q.  Why would that increased scrutiny have
20 brought additional review of enteral Medicaid
21 reimbursement rates?
22      MR. WINCHESTER:  Objection, form.

Page 191

1      THE WITNESS:  The attention to the
2  pricing on the pharmaceutical side has
3  implications for pricing decisions for other
4  products.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Okay.
7    A.  I was clearly identifying areas of
8  concern and areas of my future activity.
9    Q.  Why was this of concern to you?
10   A.  Because of the potential legal
11 situations that could have occurred around
12 average wholesale prices.
13   Q.  So you were concerned about legal
14 exposure?
15   A.  Uh-huh.
16   Q.  Is that a "Yes," sir?
17   A.  That's a "Yes."  I'm sorry.
18   Q.  That's okay.  We'll try and remind you.
19      Under Item D it says "Attention to
20 enteral nutrition by various federal agencies has
21 created new attention to sales and marketing
22 practices."  Do you see that?

Page 192

1    A.  Uh-huh.
2    Q.  What attention was brought to sales and
3  marketing practices?
4    A.  Difficult to answer without knowing the
5  date and the time of this note.
6      Clearly throughout the last decade,
7  there has been more attention to sales and
8  marketing practices by pharmaceutical companies,
9  and clearly that would cause attention for this
10 division of a pharmaceutical company.
11   Q.  Sir, just to try and put, maybe narrow
12 the timeframe of this document, if you could look
13 under A it references "Nursing homes are
14 particularly vulnerable, as temporary rate
15 increases implemented in 1999 and 2000 will
16 expire October 1, 2002," does that suggest to you
17 that maybe the date of this document occurred, or
18 the creation date of this document occurred after
19 2000 but perhaps before October 1, 2002?
20   A.  I would agree.
21   Q.  Does that help frame for you what Item
22 D may have meant?

Page 193

1    A.  Throughout the early part of 2000,
2  there were a number of OIG studies calling
3  attention to, and OIG guidances, calling
4  attention to marketing practices.  And this was a
5  public issue in newspapers as well as in the
6  Department of Justice OIG guidances.
7    Q.  Did any marketing practices at Ross
8  change as a result of the scrutiny?
9      MR. FERGUSON:  Object to form.
10     MR. WINCHESTER:  Same objection.
11     THE WITNESS:  Changes followed the
12 implementation of the Corporate Integrity
13 Agreement.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  But prior to the implementation of the
16 Corporate Integrity Agreement in or around 2003
17 is that when it occurred?
18   A.  Not that I recall.
19   Q.  Did you have concern about needing to
20 change sales and marketing practices at Ross
21 because of the scrutiny that was caused by this
22 evaluation of AWP?

49 (Pages 190 to 193)

Henderson Legal Services
202-220-4158

Tootell, Michael                                    October 25, 2007
Chicago, IL

Page 194

1      MR. WINCHESTER:  Objection, form.
2      THE WITNESS:  Yes.  I had concern.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  What were your concerns?
5      THE WITNESS:  Let's go back to the
6  question again.
7      (WHEREUPON said record was read
8  back as requested.)
9      THE WITNESS:  Your question is about my
10 concern, and yes, I had a concern.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Did you make any recommendations to
13 address your concerns with regard to policies or
14 practices that might need to be implemented?
15     A.  I believe those issues go to privilege.
16     Q.  So you're telling me you can't answer
17 the question without divulging communications
18 with counsel?
19     A.  Yes.
20     Q.  Did any practice, did any -- strike
21 that.
22     Prior to the implementation of the CIA,

Page 195

1  did any policies or practices change within Ross'
2  sales and marketing force as a result of the AWP
3  scrutiny?
4      A.  Not that I recall.
5      Q.  Why did you have the AWP concerns?
6      MR. WINCHESTER:  Object to the form.
7      MR. FERGUSON:  Asked and answered.
8      THE WITNESS:  I was concerned about the
9  legal exposure of the company.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  What particular practices caused you
12 concern?
13     MR. FERGUSON:  Actually, would you read
14 the prior question.  I don't know what the
15 antecedent is.
16     (WHEREUPON said record was read
17 back as requested.)
18     MR. FERGUSON:  Object to form.
19     THE WITNESS:  This was an issue that
20 affected the industry and was widely reported in
21 the health policy press.
22     MR. ANDERSON:  Objection,

Page 196

1  nonresponsive.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Sir, did you have a concern about the
4  sales force within Ross marketing the spread?
5      MR. FERGUSON:  I think that was asked
6  and answered, so I'll object.
7      THE WITNESS:  We were concerned that
8  the sales force manage the process consistent
9  with Abbott standards.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  And what were Abbott's standards?
12     A.  As described in this document, we were
13 avoiding, that the sales force should concentrate
14 their activity on sales, the features and
15 benefits of the products, not on the economic
16 benefits of the products.
17     Q.  Did you have a concern that the sales
18 force was not doing so?
19     A.  A concern that the training was
20 appropriate to make sure that that did not occur.
21     Q.  Was it occurring, to your knowledge?
22     A.  There were occasions where it did

Page 197

1  occur.
2      Q.  How frequently?
3      MR. FERGUSON:  Object to form and
4  foundation.
5      THE WITNESS:  I didn't know about very
6  many of them.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  And the document when you just said "in
9  this document," which document were you pointing
10 to?
11     A.  This draft.
12     Q.  Which exhibit number is this?
13     A.  This would be Exhibit Tootell 006.
14     Q.  Other than as identified in Exhibit
15 Tootell 006, the practices that you hoped that
16 the sales force conformed to that were Abbott
17 practices or policies, were they published
18 anyplace?
19     A.  There were elaborate compliance guides
20 published after 2003.
21     Q.  Prior to 2003 were there any, was it
22 published?

50  (Pages 194 to 197)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 198

1    A.  I don't recall.
2    Q.  Where would the sales force have gone
3  to identify what the appropriate practices and
4  policies were as endorsed by Abbott?
5    A.  To their district manager.
6    Q.  And where would the district manager go
7  to identify what Abbott's policies and practices
8  were?
9    A.  To the regional manager.
10   Q.  And where would the regional manager
11  go?
12   A.  Either to me or to the Legal
13  Department.
14   Q.  Did you have any inquiries from a
15  district or regional manager concerning spread
16  marketing or reference to AWP by the sales force?
17   A.  Not that I recall.
18   Q.  Under Item 2 on this document it says
19  "Reimbursement-Based Market Strategies.  Do you
20  see that?  And Item B says "Improve data
21  reporting to First Databank and associated data
22  warehouses to assure sound calculation of AWP

Page 199

1  rates."  What did you mean by that?
2    A.  To be sure that the data was accurate
3  as provided to the First Databank and associated
4  compendia.
5    Q.  And what did you mean by "to assure
6  sound calculation of AWP rates"?
7    MR. FERGUSON:  Object to form.
8    THE WITNESS:  They needed to have
9  accurate data to make a calculation of the rates.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Did you have a concern that there was
12  too large of a spread on Ross products?
13   A.  A personal concern?
14   Q.  Yes.
15   A.  I had a personal concern.
16   Q.  Why did you have that concern?
17   A.  I was concerned about the potential
18  legal exposures and potential negative
19  consequences for the company should these issues
20  stretch to our product line.
21   Q.  Did you communicate those concerns?
22   A.  Yes.

Page 200

1    Q.  Who did you communicate them to?
2    A.  Those are privileged communications.
3    Q.  Other than communications with counsel
4  for Abbott -- well, first of all, without telling
5  me the substance of the communication, who did
6  you make the communication to?
7    A.  Various people within the Abbott Legal
8  Department.
9    Q.  Who within the Abbott Legal Department?
10  You can tell me who you spoke with.
11   MR. FERGUSON:  Yes.
12   MS. ST. PETER-GRIFFITH:  Just not the
13  substance of the conversations.
14   THE WITNESS:  Okay.  Melissa Penslavey,
15  Cliff Berman.  I don't remember others, other
16  names.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.  Were there others, but you just can't
19  recall?
20   A.  There were others, but I can't recall.
21   Q.  How many others?  Can you guesstimate?
22   A.  I can't guess.

Page 201

1    Q.  Was it under five?
2    A.  Approximately.
3    Q.  Prior to the implementation of the CIA,
4  were your concerns addressed?
5    MR. FERGUSON:  Object to form.
6    MR. WINCHESTER:  Objection, form.
7    MR. FERGUSON:  I don't want you to, if
8  answering that question requires you to get into
9  the substance of any legal communications, then I
10  don't want you to answer the question.
11   THE WITNESS:  I believe answering that
12  question would open up --
13 BY MS. ST. PETER-GRIFFITH:
14   Q.  I'm not interested in what counsel
15  communicated to you.
16   I want to find out whether Ross
17  institutionally addressed your concerns.
18   MR. WINCHESTER:  Same objection.
19   THE WITNESS:  I don't understand your
20  verb.  What do you mean by "addressed"?
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  Huh?

51 (Pages 198 to 201)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 202

1    A.  What do you mean by "addressed"?
2    Q.  Meaning were any of your concerns prior
3  to the implementation of the CIA alleviated?
4        MR. WINCHESTER:  Objection, form.
5        MR. FERGUSON:  Same objection.
6        THE WITNESS:  No.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  When did you start communicating your
9  concerns to Abbott legal counsel?
10   A.  Well, we've established sometime
11 between 2000 and 2002.
12   Q.  Oh, I just want to ask this question
13 then.  Is this a communication that you had with
14 counsel?
15   A.  No.  This is to my business unit vice
16 president, goals for the year kind of task.
17   Q.  And who was your business unit vice
18 president?
19   A.  I had a number of them, but at this
20 time Matthew Fisher.
21   Q.  And, sir, you have just reminded me of
22 a question that I did not ask you earlier on and

Page 203

1  I meant to.  Can you take us through your
2  historical supervisory chain?
3        MR. ANDERSON:  But before you do, I'm
4  sorry to interject, Mr. Tootell, but for the
5  record you just indicated Exhibit Tootell 007 was
6  written by you for Mr. Fisher?
7        THE WITNESS:  I believe so, yes.
8        MR. ANDERSON:  Thank you.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Can you take us through your historic
11 supervisory chain?
12   A.  I was hired in 1989 by Jeff Doherty.
13 Then he retired and Matthew Fisher became vice
14 president for that business unit.  Then I'm not
15 sure who I reported, there were a series of
16 people that I reported to for a short period of
17 time as the organization shifted.
18       I reported to Maureen Doyle Scarf.  In
19 between I would have reported to Jackie Nickel
20 before Maureen.  Richard Schaefer.  I believe
21 that's the bulk of the list.
22   Q.  When your concerns about spread

Page 204

1  marketing were not addressed, did you take that
2  issue to your supervisor?
3        MR. WINCHESTER:  Objection, form,
4  foundation, mischaracterizes.
5        MR. FERGUSON:  Same objections.
6        THE WITNESS:  I don't recall.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Let's clarify, sir.  What exactly were
9  your concerns?
10       MR. FERGUSON:  If identifying this is
11 identifying the communications you made to Abbott
12 counsel, I would instruct you not to answer.
13       MS. ST. PETER-GRIFFITH:  Hold on.  I
14 want to make this clear.  I'm not asking about
15 what his communications were.  He independent of
16 his communications with counsel had concerns.
17 I'm asking him what his thought process was
18 regarding his concerns.  That's not privileged.
19       MR. FERGUSON:  He articulated legal
20 risk; right?
21       MS. ST. PETER-GRIFFITH:  I'm asking him
22 what his concerns are.

Page 205

1        MR. FERGUSON:  And I'm telling him I
2  don't want you to get into the substance of any
3  conversations you had with legal counsel.  If you
4  can answer her question without doing that, then
5  answer her question.
6        MR. WINCHESTER:  I'd object to it as
7  asked and answered because you did ask him this
8  question before.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Go ahead, sir.  You can answer the
11 question.
12   A.  I'm concerned by what instructions I've
13 received and I think they're appropriate.  I
14 don't know --
15       MR. FERGUSON:  Let me talk to him about
16 this.  Do you object to that?
17       MS. ST. PETER-GRIFFITH:  Yes.  I object
18 to your talking to him while a question is
19 pending.  I mean he's got the instruction.  I
20 think we're entitled to a response.
21       MR. FERGUSON:  I'm instructing him not
22 to answer until I can talk to him and find out

52 (Pages 202 to 205)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 206

1  whether there's any valid basis for asserting the
2  privilege.
3         MS. ST. PETER-GRIFFITH:  I'm not asking
4  him about his communications with counsel.  All I
5  want to know is what are his concerns, what were
6  his concerns.
7         MR. FERGUSON:  Is this the same
8  question you asked previously?
9         MS. ST. PETER-GRIFFITH:  Yes, which
10 Jason says I mischaracterized.  So I want him to
11 make clear as to what his concerns were.
12        MR. WINCHESTER:  No.  My objection to
13 mischaracterization did not go to that issue at
14 all.  It was to a question that you phrased,
15 which was different than the one he had answered
16 previously.  It wasn't this one.
17        MS. ST. PETER-GRIFFITH:  Do you have an
18 objection to him answering the question what are
19 his concerns?
20        MR. FERGUSON:  Yes.  If you're going to
21 communications he had with counsel, the answer is
22 yes.  If you're asking him the same question that

Page 207

1  you did before about what were his concerns, then
2  I want to read back the same answer.
3         MS. ST. PETER-GRIFFITH:  Okay.  He can
4  answer the question.
5         MR. FERGUSON:  Do you feel you can
6  answer this question without getting into
7  privilege issues?
8         THE WITNESS:  The question is about my
9  private concerns?
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Yes.
12     A.  Late at night I was concerned about
13 gaps on the nutritional product line between list
14 price and actual price.  And that was a personal
15 concern.  Implementation of that was all
16 privileged.
17     Q.  Without disclosing any communications
18 with counsel, my next question to you is when
19 your concerns were not addressed did you raise
20 the fact that they were not addressed with anyone
21 other than legal counsel?
22        MR. WINCHESTER:  Objection, form,

Page 208

1  foundation.
2         MR. FERGUSON:  Object to the form.
3         MR. WINCHESTER:  And mischaracterizes.
4         MR. FERGUSON:  Yes.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Go ahead, sir.  You can answer the
7  question.
8     A.  I don't recall any communications on
9  this issue that were not accompanied by counsel.
10    Q.  Well, did you discuss it with your
11 supervisor at all?
12    A.  I don't recall.
13    Q.  Would that have been a matter that you
14 would have thought important to raise with your
15 supervisor?
16        MR. WINCHESTER:  Objection, form.
17        MR. FERGUSON:  Same objection.
18        THE WITNESS:  In Item D I am talking
19 about data reporting to my supervisor.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  But my question is the concerns that
22 you had identified that you had, was that

Page 209

1  something that you thought should have been
2  raised with your supervisor?
3         MR. WINCHESTER:  Objection, form.
4         MR. FERGUSON:  Same objection.
5         THE WITNESS:  Yes.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  Did you raise it with your supervisor?
8     A.  I don't recall those particular
9  conversations.
10    Q.  Do you have any, without recalling the
11 specifics of the conversations, do you have a
12 general recollection of whether you discussed it
13 with your supervisor?
14    A.  Yes.  I have a general recollection
15 that I discussed this with my supervisor.
16    Q.  And which supervisor was it?
17    A.  That would have been Matt Fisher.
18    Q.  And what did Mr. Fisher do to address
19 your concerns?
20    A.  He authorized me to talk with legal
21 counsel about this.
22    Q.  After your conversations with legal

                        53 (Pages 206 to 209)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                          October 25, 2007
                              Chicago, IL

Page 210

1  counsel, when your concerns were not addressed
2  did you go back to Mr. Fisher and tell him my
3  concerns have not been addressed?
4        MR. FERGUSON:  Object to the
5  characterization.
6        MR. WINCHESTER:  Same objection.
7        THE WITNESS:  I don't recall that
8  conversation.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   When your concerns were not being
11 addressed, did you raise that issue with anyone
12 other than legal counsel?
13       MR. WINCHESTER:  Objection, form,
14 mischaracterizes.
15       MR. FERGUSON:  Same objection.
16       THE WITNESS:  Not that I recall.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Sir, if you could flip to the second
19 page.
20     A.   Yes.
21     Q.   Oh, I'm sorry.  We didn't go over Item
22 F I believe.  Item F says on the first page

Page 211

1  "Maintain reimbursement elements of www.Ross.com
2  website."  Do you see that?
3      A.   Yes.
4      Q.   What does that mean?
5      A.   We have a reimbursement section on the
6  Ross.com website.
7      Q.   Is that what we discussed earlier
8  today?
9      A.   We did discuss it earlier today.
10     Q.   What reimbursement elements were
11 maintained on the Ross website?
12     A.   There were two major ingredients.  One
13 is a state-by-state list of Medicaid
14 reimbursement policies.
15     Q.   Okay.
16     A.   And the second is a product list that
17 lists all of our products and their appropriate
18 Medicare and Medicaid, or Medicare and NDC codes.
19     Q.   Okay.  The next item says "Develop and
20 implement a secure audit trail to assure data
21 integrity and footnote data changes."
22     A.   Yes.

Page 212

1      Q.   And, sir, I will profess to be probably
2  one of the least computer illiterate people that
3  you will meet.  Can you explain what that means?
4      A.   Audit trail is a computer program that
5  will track any changes in a, for example, if a
6  new product is listed, there was a process where
7  one person would make the data entry, they would
8  get referred to Compliance, it would get referred
9  to me.  We would each do a computer entry to
10 approve those changes, and then they would be
11 sent to the software folks to be integrated.  So
12 that there was a tracking, a careful audit trail,
13 showing any changes in that database, who made
14 them and on what footnote.
15     Q.   Why was it important to have such an
16 audit trail?
17     A.   We wanted to keep track of those
18 changes and make sure that we were assured that
19 the data had integrity.
20     Q.   If you could go to the next page.  The
21 first bullet point says -- well, first of all,
22 can you tell me is this part of the prior

Page 213

1  document?  I'll represent to you that they were
2  produced this way sequentially.
3      A.   I've never seen this page before.
4      Q.   Do you know whether you may have
5  drafted it?
6      A.   I don't think I would have.
7      Q.   Do you know why it says at the bottom
8  "Refer AWP inquiries to Mike Tootell"?
9      A.   I was the reimbursement director and
10 would take all variety of complicated questions.
11     Q.   The first bullet point on it says
12 "Provide accurate and timely updates to all
13 third-party publishers of pricing data."  Do you
14 see that?
15     A.   It's an obligation by the Pricing
16 Department, one of their responsibilities.
17     Q.   Do you think that this might have been
18 a document generated by the Pricing Department?
19       MR. FERGUSON:  Object to form.
20       THE WITNESS:  It's speculation, but
21 probably.
22 BY MS. ST. PETER-GRIFFITH:

                                      54 (Pages 210 to 213)

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 214

1    Q.  Was there a policy that AWP inquiries
2   within Ross needed to be directed to you?
3    A.  I don't remember a written policy at
4   this point.
5    Q.  Was there a nonwritten policy?
6    A.  Issues often like this would come to
7   me.
8    Q.  Would you be the sort of identified go-
9   to person on AWP issues within the Ross division?
10      MR. FERGUSON:  Object to form.
11      THE WITNESS:  Yes.
12  BY MS. ST. PETER-GRIFFITH:
13   Q.  Mr. Tootell, did you have any concerns
14  about spreads on non-Abbott products that you
15  communicated to anyone?
16   A.  Non-Abbott products?
17   Q.  I'm sorry, non-Abbott Ross division
18  products.
19   A.  No.
20   Q.  Were you aware of any spreads on any
21  products other than Ross products?
22   A.  Only from press reports.

Page 215

1    Q.  When you saw the press reports, did you
2   have any concerns about what you were reading?
3       MR. WINCHESTER:  Objection, form, asked
4   and answered.
5       MR. FERGUSON:  Same objections.
6       THE WITNESS:  Yes.
7   BY MS. ST. PETER-GRIFFITH:
8    Q.  Did you communicate those concerns to
9   anybody?
10   A.  I don't recall specific conversations.
11   Q.  Do you recall general conversations?
12   A.  No.
13   Q.  Sir, I'm going to give you another
14  document.  We're not going to go over it in as
15  much detail.  I know it's pretty thick.  We're
16  not going to go over in as much detail as the
17  prior documents, but I do want you to flip
18  through it.
19      And I will tell counsel and you in
20  advance that this is primarily an identification
21  issue.  He's an addressee.
22      MS. ST. PETER-GRIFFITH:  Can we mark

Page 216

1   this as the next exhibit?  We're up to Exhibit
2   Tootell 008.
3       (WHEREUPON Deposition Exhibit
4   Tootell 008 was marked as of 10/25/2007, and
5   tendered to the witness.)
6       MS. ST. PETER-GRIFFITH:  You know,
7   we've got five minutes until the end of the tape.
8   While everyone is flipping through the document,
9   why don't we take a couple minutes so that he can
10  change the tape now.
11      THE VIDEOGRAPHER:  We are off the
12  record at 3:08 p.m. with the end of Tape No. 3.
13      (WHEREUPON a recess was taken.)
14      THE VIDEOGRAPHER:  We are back on the
15  record at 3:25 p.m. with the start of Tape No. 4.
16  BY MS. ST. PETER-GRIFFITH:
17   Q.  Mr. Tootell, I'd like to ask you about
18  the document that was marked as Exhibit Tootell
19  008.
20   A.  I see this.
21   Q.  Do you see at the top it appears to be
22  an e-mail from Pamela McDonald?

Page 217

1    A.  Yes.
2    Q.  Who is Ms. McDonald?
3    A.  I believe she was Virginia Tobiason's
4   secretary at one point in time.
5    Q.  And this is dated 12/12/2003?
6    A.  Yes.
7    Q.  Do you recall what position Ms.
8   Tobiason held at that time?  Was she still in the
9   Compliance Department?
10   A.  I don't recall.
11   Q.  Sir, are you one of the addressees on
12  this particular e-mail?
13   A.  Yes, I am.
14   Q.  And the e-mail purports to have an
15  attachment attached to it concerning, or the
16  subject at least on the subject line reads
17  "Medicare Bill Highlights."  Do you see that?
18   A.  Yes, I do.
19   Q.  After the e-mail there's a document
20  that starts out, it appears to be another
21  Powerpoint presentation, or at least formatted as
22  similar to a presentation, labeled "Medicare

Henderson Legal Services
202-220-4158

Tootell, Michael                                October 25, 2007
                        Chicago, IL

|                                        | Page 218 |
|---|---|

1  Overhaul highlights."  Do you see that?
2      A.  Page 1?
3      Q.  I'm sorry, the third page of this
4  document.  Yes, Page 1.
5      A.  Page 1.  Okay.
6      Q.  My question to you, sir, is do you
7  recall receiving this e-mail?
8      A.  I don't recall it.
9      Q.  Do you recall reviewing a document
10  Medicare Overhaul Highlights?
11      A.  I don't recall.
12      Q.  If we can go back to the e-mail.  It
13  says "Good morning" in the text area, "Good
14  morning.  Ginny requested that I forward this e-
15  mail to you.  Please review for today's 2 p.m.
16  Medicaid/Medicare Reimbursement Task Force
17  meeting."  Do you see that?
18      A.  Yes, I do.
19      Q.  Sir, does that refresh your
20  recollection as to when the Medicare/Medicaid
21  Reimbursement Task Force may have been in
22  existence?

|                                        | Page 219 |
|---|---|

1      A.  It refreshes my memory that there was a
2  meeting on December 12, 2003, of that task force.
3      Q.  Do you recall anything about that
4  meeting?
5      A.  I would guess that this attachment is
6  the primary content of that meeting.
7          MR. FERGUSON:  I don't want you to
8  guess.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  My question, sir, is do you have an
11  independent recollection?
12      A.  I don't recall reading this anyway.
13      Q.  Do you recall a Medicare, attending a
14  Medicare or Medicaid Reimbursement Task Force
15  meeting concerning Medicare overhaul highlights
16  or Medicare overhaul?
17      A.  I do not recall.
18      Q.  Do you recall whether that may have
19  been an issue that you discussed with Virginia
20  Tobiason?
21      A.  I don't recall.
22      Q.  Sir, does this refresh your

|                                        | Page 220 |
|---|---|

1  recollection at all as to the span of time that
2  the Medicare/Medicaid Reimbursement Task Force
3  might have been in existence?
4      A.  It certainly seems that it was in
5  existence on 12/12/2003.
6      Q.  If I represent to you, sir, that we
7  have documentation from the Medicare/Medicaid
8  Reimbursement Task Force dating back to
9  approximately 1991, does that refresh your
10  recollection that this task force might have been
11  in existence from '91 to 2003?
12          MR. FERGUSON:  Object to form.
13          THE WITNESS:  That's not accurate.
14  There were a number of sequential series of
15  meetings and groups and task forces and
16  committees that were assembled and disassembled
17  over the years.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Were they all comparable committees in
20  terms of what their responsibilities were
21  concerning Medicaid and Medicare?
22          MR. WINCHESTER:  Objection, form.

|                                        | Page 221 |
|---|---|

1          MR. FERGUSON:  Objection, form.
2          THE WITNESS:  Many of the people in
3  this group were members of other groups.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Do you remember what the names of those
6  other groups were?
7      A.  We've talked about a Medicare task
8  force.  We've talked about a, I don't remember
9  any other names to groups.
10      Q.  You don't remember any other names?
11      A.  No.
12      Q.  Do you remember approximately how many
13  years there were task force or committees in
14  existence?
15      A.  It would ebb and flow.
16      Q.  Ebb and flow over the period of how
17  many years?
18      A.  Well, you've identified some early
19  committees, and this committee goes back to
20  12/12/03.  They weren't all the same people.
21  Like I said, it ebbed and flowed.  They would
22  pull committees together as issues came forward.

56 (Pages 218 to 221)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 222

1    Q.  Is that how the committees were
2  formulated?  As issues came forward a Medicare or
3  Medicaid or some comparably titled group would
4  get together to evaluate an issue that came
5  forward?
6    A.  For different groups you'd have
7  different purposes.  But, yes, they were convened
8  as need be and as appropriately, as people felt
9  the need.
10    Q.  Do you remember what issues may have
11  created these types of committees or groups?
12    A.  No, I don't.
13    MS. ST. PETER-GRIFFITH:  At this time
14  what I'm going to do is pass the witness out of
15  turn subject to the Government seeking to
16  reconvene this deposition and picking up so that
17  we have an opportunity to review the documents
18  that were produced to us by Jones Day somewhat,
19  well, very, very recently.
20
21          EXAMINATION
22  BY MR. ANDERSON:

Page 223

1    Q.  I'm going to try to move quickly, Mr.
2  Tootell, because I realize that you'd like to
3  stop around 5:00 today.
4    A.  Thank you.
5    Q.  If you could, look at what's been
6  marked as Mike Tootell Exhibit Tootell 006.  And
7  specifically, sir, the slide labeled with the
8  Bates number ABT-DOJ-E 0545911.
9    A.  Yes.
10    Q.  It's titled Reimbursement Spreadsheets;
11  correct?
12    A.  Yes.
13    Q.  Do you believe it's most likely that
14  you created this slide?
15    MR. FERGUSON:  Object to form.
16    THE WITNESS:  I've said that I don't
17  recall drafting it or presenting it.
18  BY MR. ANDERSON:
19    Q.  You've also testified, sir, that you
20  believe you created, it's likely you created the
21  second half of this exhibit; correct?
22    MR. FERGUSON:  Object to form.

Page 224

1    THE WITNESS:  I believe it's my phrase
2  that I could have.
3  BY MR. ANDERSON:
4    Q.  You could have, right.
5    Well, given that you could have created
6  the second half of this exhibit, you'll agree
7  that this slide titled Reimbursement Spreadsheets
8  is in the second half of the exhibit that you
9  previously identified; correct?
10    MR. WINCHESTER:  Objection, form.
11    THE WITNESS:  I think so.
12  BY MR. ANDERSON:
13    Q.  Do you have an understanding of what
14  selling the spread means?
15    A.  Yes.
16    Q.  What is selling the spread?
17    MR. WINCHESTER:  Objection, asked and
18  answered.
19    THE WITNESS:  Answering again, selling
20  the spread is using the profitability of a gap
21  between an average wholesale price and an
22  acquisition cost as an ingredient of the sales

Page 225

1  presentation.
2  BY MR. ANDERSON:
3    Q.  Would sharing AWP information
4  constitute selling the spread?
5    MR. WINCHESTER:  Object to form.
6    MR. FERGUSON:  Object to form.
7    THE WITNESS:  AWPs are commonly
8  available in publications from the First Databank
9  and Red Book.
10  BY MR. ANDERSON:
11    Q.  I understand that, sir, but that wasn't
12  my question.
13    My question is would sharing AWP
14  information with customers constitute selling the
15  spread?
16    MR. WINCHESTER:  Object to form.
17    MR. FERGUSON:  Same objection.
18    THE WITNESS:  Not on its own.  The
19  spread has two components to it.
20  BY MR. ANDERSON:
21    Q.  And those two components are?
22    A.  The average wholesale price and the

                              57 (Pages 222 to 225)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 226

1  acquisition cost.
2      Q.   Would comparing AWP information with
3  market price information constitute selling the
4  spread?
5          MR. WINCHESTER:  Objection, form.
6          MR. FERGUSON:  Objection, form.
7          THE WITNESS:  Say again.
8  BY MR. ANDERSON:
9      Q.   Would comparing AWP information with
10 market price information constitute selling the
11 spread?
12         MR. WINCHESTER:  Objection, form.
13         THE WITNESS:  With those data elements,
14 that could become a sales presentation.  It would
15 depend on how those calculations were used.
16 BY MR. ANDERSON:
17     Q.   And in addition to the fact that it
18 could constitute a sales presentation, would it
19 additionally also constitute selling the spread
20 in your view?
21         MR. FERGUSON:  Object to form.
22         THE WITNESS:  Not necessarily, but it

Page 227

1  could.
2  BY MR. ANDERSON:
3      Q.   In what situations could it constitute
4  selling the spread?
5          MR. WINCHESTER:  Objection, form.
6          MR. FERGUSON:  Same objection.
7          THE WITNESS:  We're talking individual
8  sales presentations with customers, I think that
9  I would go to intent.  Are you intending to use
10 those calculations as a way to motivate the sale.
11 BY MR. ANDERSON:
12     Q.   Do you know that in fact sometimes
13 sales persons did compare AWPs with market prices
14 with the intent to garner a sale?
15         MR. WINCHESTER:  Objection, form.
16         MR. FERGUSON:  Same objection.
17         THE WITNESS:  Repeat the question
18 again.
19 BY MR. ANDERSON:
20     Q.   Do you know that some sales persons did
21 compare AWP with market price information in
22 order to get a sale?

Page 228

1      A.   When we became aware of it in Columbus,
2  we reversed it and handled it responsibly.
3      Q.   So I take it then in turn that you did
4  become aware of those practices; correct?
5          MR. WINCHESTER:  Objection, form.
6          MR. FERGUSON:  Same objection.
7          THE WITNESS:  Those issues were
8  responsibility of the Compliance Department.  I
9  was not part of that department.  And I'd refer
10 you to folks who were much closer to it than I
11 was.
12 BY MR. ANDERSON:
13     Q.   Well, I understand there might have
14 been people closer to it, but you became aware
15 that sales persons were contrasting AWP with
16 market price in order to get sales; correct?
17     A.   Retrospectively I'm not remembering any
18 specific situations.  But I think it's
19 appropriate for the training to be as clear and
20 as direct as this slide projects.
21     Q.   Do you have a general memory that you
22 had become aware of those sales practices?

Page 229

1          MR. FERGUSON:  Object to form.
2          THE WITNESS:  I'm not sure what a
3  general memory is.
4          I think it was very appropriate for us
5  to conduct an aggressive and comprehensive
6  training program to make sure that it didn't
7  happen.  Clearly there were examples in other
8  pharmaceutical companies and there were examples
9  in the press widely where that had happened.  We
10 were concerned that it not happen at Ross.
11 BY MR. ANDERSON:
12     Q.   A few moments ago you testified that
13 the Abbott Ross division had taken steps to
14 reverse that conduct; correct?
15         MR. FERGUSON:  Object to the form.
16         THE WITNESS:  "That conduct" being
17 selling the spread?
18 BY MR. ANDERSON:
19     Q.   The comparison of AWP with market price
20 information.
21         MR. FERGUSON:  Object to the
22 characterization.  If you want to read the answer

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 230

1  back --
2      MR. ANDERSON:  We don't have time for
3  that.  I'm trying to get you out of here.
4      MR. FERGUSON:  Okay.  Well, then let's
5  not test his memory as to what he said
6  previously.  Just ask him a new question.  The
7  record is clear on what he testified previously.
8      MR. ANDERSON:  Well, I'm trying to lay
9  a foundation for the question.
10     MR. FERGUSON:  But if it's going to
11 depend on your characterization of his prior
12 testimony, let's just get the prior testimony out
13 so we'll be accurate.
14     MR. ANDERSON:  It's pages away now.  We
15 don't have time for that.
16 BY MR. ANDERSON:
17     Q.  Sir, a few moments ago did you testify
18 that Ross took steps to reverse sales practices
19 where AWPs were compared with market prices?
20     A.  When the compliance agreement came
21 forward, selling the spread and these themes as
22 you see on this page became very important to, an

Page 231

1  important ingredient of our compliance agreement.
2  And I believe we managed that and implemented
3  that effectively and responsibly.
4      Q.  And the compliance agreement that
5  you're referring to is the CIA that was
6  instituted as a result of the Ross settlement
7  with United States; correct?
8      A.  Absolutely.
9      Q.  And in the context of implementing that
10 CIA, did you become aware that there was a
11 necessity to reverse past sales conduct by sales
12 persons in contrasting AWPs with market prices?
13     MR. WINCHESTER:  Objection, form.
14     MR. FERGUSON:  Same objection.
15     THE WITNESS:  I was not in the
16 department responsible for that activity.  I'd
17 refer you to the people who were closer to it.
18 The Compliance Department had that
19 responsibility.
20 BY MR. ANDERSON:
21     Q.  Well, whether or not you were in the
22 department, did you become aware that there was a

Page 232

1  need to reverse that conduct?
2      MR. FERGUSON:  Object to form.
3      THE WITNESS:  There was a need for us
4  to have a policy that made sure that my division
5  was not wrapped up in issues that were in the
6  press.
7  BY MR. ANDERSON:
8      Q.  Objection, nonresponsive.
9      Sir, I'm asking did you become aware
10 that there was a need to reverse the conduct of
11 sales persons in contrasting AWPs with market
12 prices?
13     MR. FERGUSON:  Object to form.
14     THE WITNESS:  I'm not aware of specific
15 uses by our sales force of selling the spread in
16 the way that you're trying to characterize.
17 BY MR. ANDERSON:
18     Q.  Did you become aware from others, did
19 you learn from others, that sales persons were
20 comparing AWPs with market prices?
21     A.  Not to the best of my recollection.
22     Q.  Why was there a need to train Ross

Page 233

1  personnel on selling the spread and Ross'
2  instructions to not sell on the spread?
3      A.  Because we had just gone through a $662
4  million settlement and didn't want to go through
5  that again.  It was very important and we
6  believed that the policies had to assure
7  compliance at a level that would protect the
8  division and the corporation.
9      So we didn't want to have the problems
10 that happened in the rest of the industry, and
11 there are many examples that we all know about,
12 we didn't want to have those examples come home
13 to Ross.
14     Q.  What are some of those examples?
15     A.  Familiar with the press surrounding the
16 TAP situation, a whole variety of Ven-a-Care
17 issues and other AWP kinds of issues have been in
18 the press, and the litigation risk to the
19 division in the company was significant.
20     And also I would like to stress how
21 much effort Ross and Abbott did in the aftermath
22 of the compliance agreement to make sure that

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
Chicago, IL

Page 234

1  nothing like this could be happening again.
2      Q.  What were some of the Ven-a-Care issues
3  as you understood them?
4      A.  It was primarily an average wholesale
5  price issue.
6      Q.  Do you understand that other drug
7  companies marketed based upon the difference
8  between AWPs and market prices?
9      A.  We understand that, and that was one of
10  our concerns about making sure that our practices
11  were appropriate.
12      Q.  Were these companies that were
13  competing with Abbott?
14      A.  I don't remember specific companies.
15  And the ones that I remember from the press were
16  pharmaceutical companies.
17      Q.  Including Abbott?
18      A.  Excuse me?
19      Q.  Do you remember reports in the press
20  about Abbott?
21      A.  I do.
22      Q.  You mentioned earlier in your testimony

Page 235

1  that you were concerned about potential public
2  relations problems resulting from marketing
3  practices based upon AWP spreads.  Do you recall
4  that testimony?
5      A.  Yes, I do.
6      Q.  Would you consider news articles or
7  other public discussions of AWP spreads to be a
8  public relations problem?
9      A.  Quite easily could become.
10      Q.  When did you begin to perceive that
11  there might be a public relations problem about
12  AWP spreads?
13      A.  As soon as I saw the earliest of the
14  AWP news articles.
15      Q.  Did you have some concerns about AWP
16  spreads back for instance in 1997 or '98?
17      A.  Clearly an industry practice was coming
18  apart that early.
19      Q.  "Federally," is that what you said,
20  sir?
21      A.  No.  There was a reimbursement system
22  that was needing revision, and we were going

Page 236

1  through a process of making that revision happen.
2      Q.  Who is "we"?
3      A.  I think the industry and Congress and
4  administration and all people who look at
5  mechanisms to reimburse products.  It was a
6  development of some different policies and
7  different processes.
8      Q.  How did Abbott work with the government
9  to decrease its AWPs?
10      MR. WINCHESTER:  Objection, form,
11  foundation.
12      THE WITNESS:  I don't know.  I'm not
13  part of those discussions.
14  BY MR. ANDERSON:
15      Q.  Do you understand that Abbott openly
16  worked with the government to decrease Abbott's
17  AWPs?
18      A.  I was not part of those discussions.
19  And anything I would have heard would have been
20  third- or fourth-hand.
21      Q.  I'm not asking if you were part of the
22  discussions.  I'm asking do you understand that

Page 237

1  Abbott went to the government and worked with the
2  government to lower the AWPs on Abbott products?
3      A.  I have no first-hand information about
4  that.
5      Q.  Do you have any information about it?
6      A.  No.
7      Q.  So you don't have any information,
8  second-hand, third-hand, or otherwise?
9      A.  Right.
10      Q.  All right.  So when you say we were
11  working on the AWP problem, who specifically to
12  your knowledge was working on the AWP problem?
13      MR. WINCHESTER:  Objection, form,
14  mischaracterizes.
15      MR. FERGUSON:  Same objection.
16      THE WITNESS:  I think a whole, this was
17  an important industry issue and many concerned
18  people put their best attention to this problem.
19  BY MR. ANDERSON:
20      Q.  Is it true that Abbott worked with
21  provider trade groups concerning the government's
22  investigation of AWP reimbursement?

60  (Pages 234 to 237)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 238

1      A.  I have no knowledge of that.
2      Q.  Is it true that Abbott worked with
3  manufacturer trade groups concerning the
4  government's investigation of AWP reimbursement?
5      A.  I was not part of any of those AWP
6  discussions.
7      Q.  You were in fact though a chair in the
8  manufacturer trade group AdvaMed?
9      A.  For a committee devoted to competitive
10 bidding, which is another reimbursement system
11 and in fact a systematic alternative to average
12 wholesale prices.
13     Q.  Did you become aware through your
14 involvement in AdvaMed, or for that matter your
15 work for Abbott, that Abbott was working with
16 that manufacturer trade group to influence the
17 government's review of AWP reimbursement?
18     A.  I'm not aware of those discussions.
19     Q.  You're not aware of the specific
20 discussions but you are aware that those
21 discussions occurred?
22         MR. FERGUSON:  Object to form.

Page 239

1          THE WITNESS:  I'm not aware of any
2  discussions between Abbott people and AdvaMed on
3  average wholesale prices.
4  BY MR. ANDERSON:
5      Q.  So would it be fair to say that the
6  work that was being performed by Abbott personnel
7  concerning AWP was being done in-house at Abbott?
8          MR. FERGUSON:  Object to form.
9          THE WITNESS:  I'm not aware of those
10 discussions.
11         You've asked me specific questions
12 about what Abbott people have done with AdvaMed
13 on average wholesale prices.  And my answer is I
14 wasn't part of those discussions and I don't know
15 about them.
16 BY MR. ANDERSON:
17     Q.  Yes, sir.  So that's why I backed up
18 and I've now asked you a question about just
19 internal discussions at Abbott.  And I'll phrase
20 the question, would it be fair to say that the
21 work that was being performed by Abbott personnel
22 on the AWP reimbursement issue was being

Page 240

1  conducted exclusively internal to Abbott as far
2  as you knew?
3          MR. WINCHESTER:  Objection, form.
4          MR. FERGUSON:  Object to form.
5          THE WITNESS:  As far as I know, the
6  primary work on average wholesale prices was done
7  at Pharmaceutical Products Division and at
8  Hospital Products Division.
9  BY MR. ANDERSON:
10     Q.  Which are divisions within Abbott;
11 correct?
12     A.  Yes.  They're divisions of Abbott.
13     Q.  Right.
14     A.  And they're located in Abbott Park,
15 North Chicago.
16     Q.  Yes, okay.  Now, for instance, we've
17 talked today at length about some AWPs that were
18 published by First Databank in 2000 that were
19 known as the DOJ or Ven-a-Care AWPs; correct?
20     A.  Yes.
21         MR. WINCHESTER:  Objection, form.
22 BY MR. ANDERSON:

Page 241

1      Q.  And those AWPs were lower for roughly
2  five hundred products than the AWPs that had been
3  previously published for those same drugs;
4  correct?
5      A.  Yes.
6      Q.  And those AWPs were published by the
7  government independent of any input from Abbott;
8  correct?
9          MR. WINCHESTER:  Objection, form.
10         MR. FERGUSON:  Same objection.
11         THE WITNESS:  I have no knowledge about
12 that, the source of their data.
13 BY MR. ANDERSON:
14     Q.  Do you have any knowledge whatsoever
15 that Abbott provided any input whatsoever
16 directly to the government in the government's
17 involvement in publishing what were known as the
18 DOJ AWPs?
19     A.  I do not know.
20     Q.  All right.
21     A.  I have no knowledge of that.
22     Q.  Now, back to the reimbursement

                            61 (Pages 238 to 241)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 242

1   spreadsheet slide made a part of Exhibit Tootell
2   006.  Were you ever aware that Abbott personnel
3   created reimbursement spreadsheets?
4        MR. WINCHESTER:  Objection to form.
5        THE WITNESS:  Can you narrow that
6   question at all?
7   BY MR. ANDERSON:
8        Q.  No, sir.
9        MR. FERGUSON:  Object to form.
10       THE WITNESS:  Were there ever Abbott
11  spreadsheets?  I'm sure that there are.
12  BY MR. ANDERSON:
13       Q.  And on what do you base that testimony?
14       A.  There were analyses done.
15       Q.  By whom?
16       A.  The contract analysis, contract
17  management department, at Ross did some
18  reimbursement spreadsheets.
19       Q.  And those spreadsheets were in turn
20  provided by Abbott personnel to customers;
21  correct?
22       MR. FERGUSON:  Object to form,

Page 243

1   foundation.
2        THE WITNESS:  I don't know of those.
3   BY MR. ANDERSON:
4        Q.  You just know that spreadsheets were
5   created?
6        A.  Yes.
7        Q.  Are you also aware that Abbott HPD
8   personnel created reimbursement spreadsheets?
9        A.  I'm not aware of that.
10       Q.  Your knowledge is limited to Ross
11  personnel in the Ross division of Abbott?
12       A.  As to this question, yes.
13       Q.  During what time period were
14  reimbursement spreadsheets created?
15       A.  The one I'm aware of is early mid, late
16  1990s.
17       Q.  From the early '90s to the mid '90s --
18  pardon me.
19       A.  I'm saying the one I'm remembering is
20  late '90s.
21       Q.  There was a particular spreadsheet
22  template that was created?

Page 244

1        A.  Yes.
2        Q.  And it was modified by the contract
3   marketing personnel from time to time?
4        A.  This was used in a presentation to
5   Beverly Nursing Homes.
6        Q.  How did you come to learn of that?
7        A.  Conversations from, with contract
8   administration.
9        Q.  Within Abbott?
10       A.  Within Ross.
11       Q.  Yes, sir, within the Ross division of
12  Abbott.
13       A.  Yes.
14       Q.  Did you ask the contract marketing
15  personnel if they had been creating reimbursement
16  spreadsheets?
17       A.  No.
18       Q.  How did you come to learn that they had
19  been creating reimbursement spreadsheets?
20       MR. WINCHESTER:  Objection, form,
21  foundation, mischaracterizes.
22       THE WITNESS:  Jarrett, ask me the

Page 245

1   question again.
2   BY MR. ANDERSON:
3        Q.  Yes.  How did you come to learn that
4   contract marketing personnel had been creating
5   reimbursement spreadsheets?
6        MR. WINCHESTER:  Same objections.
7        THE WITNESS:  I've only referred to
8   one, and that was helpful in persuading Beverly
9   Nursing Home to stay with Ross.  This is in the
10  late '90s.
11  BY MR. ANDERSON:
12       Q.  So it was your understanding that the
13  reimbursement spreadsheet was advantageous to
14  Ross in selling product to Beverly; correct?
15       A.  In this single instance.
16       Q.  How did you come to learn that the
17  contract marketing personnel had used such a
18  spreadsheet?
19       A.  I think they told me in casual
20  conversation.
21       Q.  And what was your reaction?
22       A.  I don't recall.  I simply don't recall

62 (Pages 242 to 245)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 246

1  that part of the conversation.
2      Q.  Well, do you recall advising them that
3  they should not be creating such reimbursement
4  spreadsheets?
5          MR. WINCHESTER:  Objection, form.
6          THE WITNESS:  I don't recall making
7  that objection.
8  BY MR. ANDERSON:
9      Q.  Do you recall doing anything with
10 respect to learning that contract marketing
11 personnel were creating reimbursement
12 spreadsheets, a spreadsheet or sheets?
13     A.  I don't recall doing anything on that.
14     Q.  Is it just coincidence, sir, that
15 Beverly Nursing Home was the company that your
16 good friend Mr. McGowan was the vice president of
17 compliance for?
18     A.  There's no relationship between those
19 two.
20     Q.  Have you ever discussed spread issues
21 or reimbursement issues with Mr. McGowan?
22     A.  No.  Reimbursement issues, yes, but

Page 247

1  spread issues, no.
2      Q.  Did you discuss substantive issues with
3  Mr. McGowan in preparing to testify?
4      A.  He told me to use short answers and
5  that he had every confidence things would work
6  out well.
7      Q.  And just as a good friend you had
8  called him because you were feeling a little
9  anxious about the process; is that right?
10     A.  He called me this morning.
11     Q.  But he knew you were being deposed;
12 correct?
13     A.  Yes.
14     Q.  So you had initially contacted him
15 about the dep?
16     A.  Absolutely, sure.
17     Q.  And you had contacted him because you
18 felt a little anxious; correct?
19     A.  Because he's a good friend.
20     Q.  Yes, sir.  I understand.  I call the
21 best man at my wedding from time to time too.
22         Is it true that the reason you called

Page 248

1  him is because you were feeling a little anxious
2  about the deposition?
3      A.  No.
4      Q.  No?
5      A.  We're planning a Thanksgiving trip to
6  New York for the Macy's Day parade and we're
7  hoping that he and his friend could join us.
8          MS. ST. PETER-GRIFFITH:  Now that
9  sounds like fun.
10         THE WITNESS:  That's the real reason we
11 talked.
12 BY MR. ANDERSON:
13     Q.  Well, I'm glad you're going to be
14 taking that trip.  But this morning I wrote down
15 in my notes that you had discussed the deposition
16 with Mr. McGowan because of how quote emotional
17 this process is, close quote.  Do you recall
18 testifying to that?
19     A.  I said those words.
20     Q.  Yes, sir.  What did you mean when you
21 said that this is an emotional process?
22     A.  That it is.  I mean I don't understand

Page 249

1  your question.  Can you ask me another way?
2      Q.  Well, I'll try to be more specific.
3          Is it an emotional process because you
4  feel a little anxious about the past conduct of
5  Abbott in having drugs that had significant AWP
6  spreads?
7      A.  I think the anxiety is because I'm
8  meeting with the Department of Justice, important
9  issues, and I have to be very careful about every
10 sentence and phrase.
11     Q.  Yes, sir.  And in addition to that, as
12 you've testified several times today, you
13 recognized over the years that there were some
14 products that had significant AWP spreads at
15 Abbott; correct?
16         MR. WINCHESTER:  Objection, form,
17 foundation.
18         MR. FERGUSON:  Same objections.
19         THE WITNESS:  Yes.  I recognize there
20 were spread issues on some Abbott products.
21 BY MR. ANDERSON:
22     Q.  And you had even predicted that there

63  (Pages 246 to 249)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007

Chicago, IL

Page 250

1  may come a day when there would be some legal
2  problems concerning those spreads; correct?
3     A.  I hoped that there would not be a day
4  when that would happen.
5     Q.  You hoped that there wouldn't be, but
6  you had predicted that there may be; correct?
7     A.  That there may be a problem, yes.  That
8  there was significant legal and litigation risk
9  for my pharmaceutical company as well as others.
10    Q.  And specifically what is that
11 litigation risk as you understand it, outside of
12 anything you've learned from lawyers?
13    A.  Well, this is a public policy issue
14 that's being wrestled with.  This is an
15 important, the downside for a pharmaceutical
16 company for the kind of investigation we're in
17 the part of is a significant risk.
18    Q.  Do you feel like that the AWPs that
19 were published on some Abbott products over the
20 years misled the government about the prices of
21 the drugs?
22    MR. FERGUSON:  Objection, form.

Page 251

1     MR. WINCHESTER:  Objection, form,
2  speculation.
3     THE WITNESS:  I think that the AWP
4  system is a very inadequate system and needs to
5  be fixed.  That's not responsive to your
6  question.
7  BY MR. ANDERSON:
8     Q.  No, sir, it wasn't.  I was about to
9  object.  I'll phrase my question again, and I
10 appreciate your honesty.
11    Do you feel like, sir, looking back
12 there were products at Abbott for which the AWPs
13 that were published were misleading about the
14 prices of those drugs?
15    MR. WINCHESTER:  Objection, form,
16 speculation.
17    MR. FERGUSON:  Same objections.
18    THE WITNESS:  I think that all
19 pharmaceutical systems, companies, were
20 participating in a flawed structure.
21 BY MR. ANDERSON:
22    Q.  And one of the flaws of that structure

Page 252

1  was that for some pharmaceutical companies and
2  some drugs sold by those companies the AWPs that
3  were caused to be published were misleading about
4  the prices of the drugs; correct?
5     MR. WINCHESTER:  Objection, form,
6  speculation, calls for a legal conclusion.
7     MR. FERGUSON:  Same objections.
8  BY MR. ANDERSON:
9     Q.  You can still answer the question, sir.
10    A.  Okay.  Bring me back again.  What's
11 your question, Jarrett?
12    Q.  You mentioned that in your view the
13 system was flawed; correct?
14    A.  Yes.
15    Q.  And is it true that one of those flaws
16 was that the AWPs for some drugs sold by some
17 drug manufacturers were misleading with respect
18 to the prices of those products?
19    MR. WINCHESTER:  Same objections.
20    MR. FERGUSON:  Same objections.
21    THE WITNESS:  I think the major flaw is
22 that the instructions from the pharmaceutical

Page 253

1  companies, the publishers, the compendias, to the
2  manufacturers to provide list prices was not
3  understood by the payors, and that the payors or
4  the general public thought of average wholesale
5  price as average wholesale price when in fact the
6  instructions provided by the compendia were to
7  provide a list price.
8  BY MR. ANDERSON:
9     Q.  And when you say average whole say
10 price, you mean just the plain ordinary meaning
11 of the words "average wholesale price"; correct?
12    A.  Small letters.
13    Q.  Yes, sir, small letters.
14    And as a result, did you understand or
15 at least did you, Mike Tootell, have a feeling
16 that the AWPs that were being published for some
17 Abbott drugs were misleading?
18    MR. WINCHESTER:  Objection, form,
19 foundation, calls for a legal conclusion.
20    MR. FERGUSON:  Asked and answered.
21    THE WITNESS:  I guess it's been asked
22 and answered.

64 (Pages 250 to 253)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                               October 25, 2007
                        Chicago, IL

Page 254

1  BY MR. ANDERSON:
2      Q.  Well, let's leave that up to the court
3  at the appropriate time, Mr. Tootell.  But for
4  the moment despite your counsel's objection and
5  the objection of Abbott's counsel, I do need you
6  to answer the question.  All right?
7      A.  All right.  Go ahead.  The question
8  being?
9      Q.  The question being that isn't it a fact
10 that in the past you had a personal belief that
11 the AWPs for some Abbott products that were being
12 published were misleading?
13         MR. FERGUSON:  Same objections.
14         THE WITNESS:  Yes.
15 BY MR. ANDERSON:
16     Q.  Now, if you could, going back to the
17 slide titled Reimbursement Spreadsheet, it's on
18 Exhibit Tootell 006, Mr. Tootell.  It's there in
19 front of you.  The fourth bullet down reads quote
20 "Can provide list price/customer's price."  Did I
21 read that correctly?
22     A.  Yes.

Page 255

1      Q.  Why would it be appropriate for an
2  Abbott salesperson to share list price compared
3  to customer price?
4          MR. WINCHESTER:  Objection, form.
5          THE WITNESS:  I think the slash means
6  or customer's price.  They can provide, the list
7  price is on the web, you can get it on eRoss.com,
8  all of the list prices are right there.  The
9  customer prices would need to be provided anyway
10 in a sales presentation.
11 BY MR. ANDERSON:
12     Q.  And is that in your view appropriate?
13         MR. WINCHESTER:  Objection, form.
14 BY MR. ANDERSON:
15     Q.  I'll be more specific.  I'm sorry.  I
16 saw the quizzical look on your face.  It was too
17 vague.
18         Is it appropriate in your view given
19 your understanding of the policies at Abbott for
20 Abbott sales persons to share list price
21 information with customers and also share
22 customer's actual prices?

Page 256

1          MR. WINCHESTER:  Objection, form.
2          THE WITNESS:  I don't understand what
3  you're asking.
4          Is it legal?  I'm not sure why someone
5  would provide a list price anyway.  In some cases
6  the customer would be getting a list price if
7  they were not in a contract, and in that
8  situation you're persuading somebody to take a
9  contract and to join a group purchasing
10 organization and qualify for a lower price.
11 BY MR. ANDERSON:
12     Q.  You mentioned that the list prices for
13 Abbott products in the Ross division are on
14 Ross.com; is that correct?
15     A.  The list prices are on eRoss as
16 available for customer looks.
17     Q.  Is that a website that's available to
18 the public?
19     A.  Yes.
20     Q.  Do you need a customer number or
21 password of any sort in order to access that
22 website?

Page 257

1      A.  There are three sections depending on
2  different kinds of products, and two of them do
3  not require a password.
4      Q.  Are the list prices published on the
5  Internet by Ross in a section of the website
6  that's open to the public?
7      A.  Yes.
8      Q.  And it's only logical of course to
9  understand that customers know their prices
10 between themselves and Ross; correct?
11     A.  Yes.
12         MR. FERGUSON:  Object to form.
13 BY MR. ANDERSON:
14     Q.  So in order for a customer to evaluate
15 the list price of a given product relative to the
16 actual price of a given product, all they need to
17 do is go onto the website; correct?
18     A.  They'd need their own actual prices,
19 but yes, the list prices are publicly available.
20     Q.  And once a customer were to go onto the
21 website and find those list prices, they could do
22 a comparison between the product's list price and

65 (Pages 254 to 257)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

| Page 258 |
| --- |

1  the product's actual price themselves; correct?
2      A.  One could, yes.
3      Q.  Do you consider that activity by the
4  customer to constitute marketing or selling the
5  spread?
6      A.  There wouldn't have been any marketing
7  activity by a Ross representative or an Abbott
8  sales representative in that process.  That's
9  research by the customer themselves.
10     Q.  So in Abbott's view so long as the
11 calculation is done by the customer, the spread
12 has not been marketed; is that correct?
13         MR. FERGUSON:  Object to form.
14         MR. WINCHESTER:  Object to the form.
15         THE WITNESS:  As I've defined the
16 spread, it's between AWP and acquisition cost,
17 and those are calculations that a customer can do
18 if they want.
19 BY MR. ANDERSON:
20     Q.  Do you believe that Abbott is marketing
21 the spread by causing inflated list prices to be
22 published in the first place?

| Page 259 |
| --- |

1          MR. WINCHESTER:  Objection to form.
2          MR. FERGUSON:  Object to form.
3          THE WITNESS:  No.
4  BY MR. ANDERSON:
5      Q.  Why not?
6      A.  The list price has several functions.
7  First, we want to encourage people to be involved
8  in group purchasing organizations.  And the other
9  is we have a number of contracts where we
10 encourage customers to buy specific stated pre-
11 arranged pre-contracted percentage of their
12 product from Ross.
13         So if a person wants to be eighty
14 percent devoted to Ross, they can qualify for
15 some incentive prices.  If we find that they are
16 violating those contracts, then we can ask that
17 they be excluded from the group purchasing
18 organization that negotiated that, and it becomes
19 a penalty rate.
20     Q.  Do you find that virtually all
21 customers are on contract?
22     A.  Virtually all.

| Page 260 |
| --- |

1      Q.  Have you also known over the years that
2  the same list prices that a noncontract customer
3  however rare might pay are the same list prices
4  that are used for the publication and calculation
5  of AWP?
6          MR. FERGUSON:  Object to form.
7          THE WITNESS:  I believe so.  I don't
8  know.  I have not done that comparison, but I
9  would believe so.
10 BY MR. ANDERSON:
11     Q.  Did you or anyone else to your
12 knowledge ever consider the affect that a high
13 list price would have on the publication of AWP?
14         MR. WINCHESTER:  Objection to form.
15         THE WITNESS:  Did I consider the affect
16 that a high list price would have on AWP?
17 BY MR. ANDERSON:
18     Q.  Yes, sir.
19     A.  Yes.
20     Q.  And that was one of the reasons why you
21 had concerns about the publication of some Abbott
22 products AWP's; correct?

| Page 261 |
| --- |

1          MR. WINCHESTER:  Objection to form.
2          MR. FERGUSON:  Object to form.
3          THE WITNESS:  As we talked in the very
4  first slide about the process that AWP is set,
5  that the AWP is set with a combination of the
6  manufacturer's input and the, manufacturer's
7  input and the mark-up from the publication, from
8  the publisher.
9  BY MR. ANDERSON:
10     Q.  So the answer to my question is yes;
11 correct?
12         MR. FERGUSON:  Object to form.
13         THE WITNESS:  Let's go back to your
14 question again.
15 BY MR. ANDERSON:
16     Q.  My question is given your understanding
17 that the list price was the foundation for the
18 calculation and publication of AWP, that's why
19 you had some concerns about the high AWPs on some
20 Abbott products; correct?
21     A.  Absolutely.
22         MR. WINCHESTER:  Objection to form.

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 262

1      THE WITNESS:  Yes.
2  BY MR. ANDERSON:
3      Q.  The answer was "Absolutely"?
4      A.  The answer is "Yes."
5      Q.  Thank you.
6          Mr. Tootell, if you could look at
7  what's been marked today as Mike Tootell Exhibit
8  Tootell 007.  Looking at II, Subsection (b) on
9  the first page of that exhibit.  I'll read for
10 benefit of the record, "Improved data reporting
11 to First Databank and associated data warehouses
12 to assure sound calculation of AWP rates."  Did I
13 read that correctly?
14     A.  Yes, you did.
15     Q.  What is a sound calculation of an AWP
16 rate?
17     A.  The sound calculation begins with the
18 manufacturer's list price and it results in the
19 plus a mark-up by the publisher.  That's the
20 process of developing a sound calculation.
21     Q.  And what mark-up specifically
22 constitutes a sound mark-up?

Page 263

1      MR. WINCHESTER:  Objection, form.
2      THE WITNESS:  That would be the
3  business of the publisher.  And each of the
4  publishers did a survey and there were some
5  differences between the publishers about the size
6  of their mark-up.
7  BY MR. ANDERSON:
8      Q.  What was the standard mark-up for
9  Abbott products?
10     A.  For Abbott pharmaceutical products it's
11 twenty-five percent.  For Ross products they were
12 in the eighteen and a half to nineteen percent.
13     Q.  And what about for HPD products?
14     A.  I have no idea.
15     Q.  When you say "pharmaceutical products,"
16 do you mean products sold by the division known
17 as PPD, or do you mean drugs generally?
18     A.  Products recognized as drugs.
19     Q.  So that would encompass HPD products as
20 well; correct?
21     A.  The drug part of their business, yes.
22     Q.  And when you say a mark-up of twenty-

Page 264

1  five percent, what price term specifically would
2  be marked up to twenty-five percent?
3      MR. WINCHESTER:  Objection, asked and
4  answered.
5      THE WITNESS:  I believe it's the list
6  price provided by the pricing people in those
7  divisions.
8  BY MR. ANDERSON:
9      Q.  The Abbott personnel; correct?
10     A.  Yes.
11     Q.  I think along those lines you testified
12 this morning that WAC price is known as list
13 price; is that correct?
14     A.  That's the way we use that phrase.
15     Q.  The list price from whom to whom?
16     A.  The list price as designated by the
17 manufacturer.
18     Q.  Is it also the -- strike that and I'll
19 rephrase to be more specific.
20         Is the WAC price the price charged by
21 Abbott to wholesalers?
22     MR. WINCHESTER:  Objection, form.

Page 265

1      THE WITNESS:  No.  There would be other
2  prices and there would be other contracts
3  directly between the pharmaceutical distributors
4  and Ross, and I have not seen those contracts.  I
5  don't know the content of those.
6  BY MR. ANDERSON:
7      Q.  What customer, if any, to your
8  knowledge is charged WAC?
9      A.  We wouldn't use that phrase in Ross.
10     Q.  Ross does not charge customers WAC, to
11 your knowledge?
12     A.  To my knowledge, no.
13     Q.  To your knowledge, does Abbott or any
14 other division of Abbott other than Ross charge
15 any customer WAC?
16     A.  Those are pricing decisions that I
17 don't, I just don't have that information.  I
18 don't know of any either way.
19         Pricing decisions tend to be
20 confidential, and appropriately so.  I did not
21 hear those.  I did not participate in those
22 discussions.

67 (Pages 262 to 265)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 266

1    Q.  I've referred here to my notes, sir,
2  and I'm trying to be as precise as possible.  I
3  believe earlier this morning you testified that
4  you learned from Kay Morgan that First Databank
5  wanted the quote highest published price close
6  quote.
7    A.  Yes.  That's a quote.
8    Q.  Is that your testimony?
9    A.  That is my testimony.
10   Q.  When approximately did you have that
11 conversation with Ms. Morgan?
12       MR. FERGUSON:  Asked and answered.
13       MR. WINCHESTER:  Asked and answered.
14       THE WITNESS:  Early '90s.
15 BY MR. ANDERSON:
16   Q.  Did you know that Kay Morgan did not
17 leave Abbott and begin working for First Databank
18 until the late '90s?
19   A.  Well, then it would have been after Kay
20 got there.
21   Q.  All right.  I take it that the Ross
22 division of Abbott had been reporting prices to

---

Page 267

1  First Databank prior to the late '90s; correct?
2    A.  Yes.
3    Q.  How did Ross know what to report prior
4  to your conversation with Ms. Morgan?
5    A.  I don't recall.
6    Q.  Do you have any understanding
7  whatsoever about how Ross decided what to report
8  to First Databank prior to your conversation with
9  Ms. Morgan?
10   A.  We would have been instructed by the
11 First Databank on what data they wanted.
12   Q.  How do you know that?
13   A.  Well, that would have been a
14 conversation that happened even before I got to
15 Ross in 1989.  That was a practice in place upon
16 my arrival.
17   Q.  On what information do you base that
18 testimony?
19   A.  I got there, people said would you help
20 us out with AWPs and the NDC codes, which were
21 more important.  And at that point they already
22 had a process in place.

---

Page 268

1    Q.  "They" being who?
2    A.  It would have been the Pricing
3  Department in 1989.  And I don't remember who
4  those would be.
5    Q.  Can you provide any testimony about any
6  specific instructions provided by First Databank
7  whatsoever to Abbott or the Ross division of
8  Abbott about what prices to report to First
9  Databank?
10   A.  I think I've answered that question
11 fully.  There were conversations with First
12 Databank at the staff level, and instructions
13 that we had from them were provide your highest
14 published price, provide your list price.  And I
15 continued that practice after I arrived, and I
16 helped out with that process, which was primarily
17 driven by an entirely different department.
18   Q.  If you believed that Ross had been
19 instructed to report its quote highest published
20 price close quote to First Databank prior to your
21 conversation with Ms. Morgan, why did you call
22 Ms. Morgan?

---

Page 269

1    A.  I don't recall.  I mean this is a
2  critical issue, and we can double check things.
3    Q.  How would you go about doublechecking
4  it?
5    A.  I called Kay and she double checked and
6  confirmed what the historical practice had been.
7    Q.  What was the confusion that led you to
8  double check?
9    A.  I don't recall.
10   Q.  But you do recall there was some
11 confusion?
12   A.  No.  I recall that there was an issue
13 that had been percolating in the public sector
14 and in newspapers and in press for many years
15 before then, and I wanted to make sure that our
16 company was well taken care of.
17   Q.  Did you document this by writing a
18 letter of any sort to Ms. Morgan?
19       MR. WINCHESTER:  Asked and answered.
20       THE WITNESS:  I did not, did not.
21 BY MR. ANDERSON:
22   Q.  Do you know of any documentation

---

                          68 (Pages 266 to 269)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 270

1  whatsoever to support the statement that First
2  Databank instructed you to report the highest
3  published price?
4      A.  I thought I had written it down, but I
5  have not found it.
6      Q.  You looked for it?
7      A.  Yes, I did.
8      Q.  Are you aware of the pricing fields
9  requested by First Databank?
10       MR. FERGUSON:  Object to form.
11       THE WITNESS:  No, I'm not.
12  BY MR. ANDERSON:
13      Q.  Are you aware of the pricing terms that
14  are requested by First Databank?
15      A.  The Pricing Department handles those
16  applications.
17      Q.  You mentioned this morning in your
18  testimony that you believe that First Databank
19  had requested in its forms a pricing term known
20  as quote WAC close quote; correct?
21       MR. WINCHESTER:  Objection, form,
22  mischaracterizes.

Page 271

1       THE WITNESS:  It's my understanding
2  that list and WAC data was the same number.
3  BY MR. ANDERSON:
4      Q.  Do you have any understanding about
5  whether or not First Databank requested a pricing
6  term known by the acronym of WHN?
7      A.  Come to think about it, they do use
8  that in the column heading.
9      Q.  Do you understand what that stands for?
10      A.  I've forgotten.  I'd have to go back
11  and look at their column headings.
12      Q.  Have you heard of a pricing term known
13  as wholesale net?
14      A.  No.
15      Q.  Did you consider the WAC prices that
16  Abbott published to First Databank to be net
17  prices?
18      A.  No.
19      Q.  Do you have any explanation of why
20  Abbott would have published non-net prices if
21  First Databank had requested wholesale net
22  prices?

Page 272

1       MR. WINCHESTER:  Objection, form.
2       THE WITNESS:  I don't know.
3       MR. FERGUSON:  Object to form.
4       MR. WINCHESTER:  Foundation.
5       THE WITNESS:  I don't know.  I was not
6  part of that discussion at all.
7  BY MR. ANDERSON:
8      Q.  You mentioned in your testimony this
9  morning that you provided a speech to HPD; is
10  that correct?
11      A.  I don't recall.
12      Q.  I'll refresh your memory in the context
13  you were asked if you knew Michael Heggie and you
14  responded and said yes, and I think you also said
15  yeah, I gave a speech to HPD that Mr. Heggie
16  requested.
17      A.  No, no.  I gave a speech for last
18  spring at, sponsored by a group called the IIC,
19  International Conference Group on Competitive
20  Bidding, and he attended that group as part of
21  their reimbursement conference, and that was just
22  last spring.

Page 273

1       There was an earlier meeting in
2  Florida, I gave a speech.  I don't remember the
3  sponsor.  I don't remember the speech.  I don't
4  remember the date.  I remember talking to Mike
5  and he was there.
6  BY MR. ANDERSON:
7      Q.  Do you feel like that earlier speech in
8  Florida was an Abbott meeting --
9      A.  That would have been an Abbott meeting
10  --
11       MR. FERGUSON:  Mike, you've got to wait
12  for him to finish the question.
13       THE WITNESS:  Okay.
14  BY MR. ANDERSON:
15      Q.  What time period do you think you spoke
16  at that Abbott meeting?
17      A.  It would have been in the 1990s.
18      Q.  And what was the general topic of your
19  speech?
20      A.  I don't recall.
21      Q.  Did it have to do with reimbursement of
22  drugs?

                          69 (Pages 270 to 273)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                        October 25, 2007
Chicago, IL

Page 274

1     A.  Probably reimbursement of nutritionals.
2     Q.  Why would HPD personnel need to
3   understand the reimbursement of nutritionals?
4         MR. WINCHESTER:  Objection, foundation.
5         MR. FERGUSON:  Objection.
6         THE WITNESS:  I don't recall the
7   speech.  I recall the conversation.
8   BY MR. ANDERSON:
9     Q.  Well, given that, I'll utilize your
10  words, sir, given that it probably had to do with
11  the reimbursement of nutritionals, why would a
12  speech to Abbott HPD personnel on reimbursement
13  of nutritionals be necessary?
14        MR. WINCHESTER:  Object to the
15  mischaracterization.
16        MR. FERGUSON:  Object to the form.
17        THE WITNESS:  I don't recall.
18        MR. WINCHESTER:  And the testimony.
19        THE WITNESS:  I don't recall the
20  speech.  I did lots of speeches, and I don't
21  remember this one.
22  BY MR. ANDERSON:

Page 275

1     Q.  What city in Florida?  Do you recall?
2     A.  No.  I do not.
3     Q.  I thought maybe you played a memorable
4   round of golf or something.
5     A.  I don't recall that presentation.
6         My point being that I've had few and
7   far between conversations with Mr. Heggie.  And
8   he's had two other companies since he's been at
9   Abbott.
10    Q.  How did you come to learn that?
11    A.  I saw him last spring.
12    Q.  Did you know he worked for Baxter?
13    A.  Yes, yes.  He was pleased with that.
14    Q.  And Baxter competes with Abbott on some
15  products; correct?
16    A.  Yes.
17    Q.  Did you ever discuss Mr. Heggie's
18  employment with Baxter with him?
19    A.  No, nothing more than the social
20  exchange.  He likes his job.
21    Q.  Sir, my notes reflect that in the
22  context of prior questioning concerning

Page 276

1   investigations about AWP pricing, you testified
2   that quote people get excluded and there are
3   criminal repercussions close quote.  Do you
4   recall that testimony?
5     A.  Is that in the context of I think
6   Exhibit Tootell 006?
7     Q.  Yes, sir.  I do believe it was, you
8   testified to that effect in the context of the
9   questioning on Exhibit Tootell 006.
10    A.  And my concern is that our sales force
11  needs to understand this is an important issue,
12  that serious consequences follow for getting out
13  of bounds, and that this needs to be recognized
14  and they need to be sure that their conduct,
15  whatever it was before, in the future is on the
16  straight and narrow.
17    Q.  And would you consider that discussion
18  to be part of the reversal of behavior that you
19  mentioned earlier?
20        MR. WINCHESTER:  Objection, form.
21        MR. FERGUSON:  Object to form.
22        THE WITNESS:  Clearly there was an

Page 277

1   important tone that Ross had a new attention, not
2   casting fault on what happened before, but
3   following the compliance agreement there was a
4   very serious effort to bring appropriate
5   remedies.
6   BY MR. ANDERSON:
7     Q.  And this effort in 2003 was derived
8   from the corporate level and involved Abbott
9   personnel such as Ms. Tobiason; correct?
10    A.  Yes.
11    Q.  When you say people get excluded, can
12  you explain a little what you mean by excluded?
13    A.  Exclusion is a technical phrase in
14  Medicare language that when a provider or even a
15  manufacturer is convicted of a felony and related
16  to healthcare fraud, then they are no longer able
17  to be a participant in government programs,
18  Medicare/Medicaid and other associated programs,
19  and that that exclusion can be life long, it can
20  be for a period of time.  I was referring to the
21  exclusion penalty under Medicare law.
22    Q.  Are you talking about individual sales

70 (Pages 274 to 277)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                          October 25, 2007
                    Chicago, IL

Page 278

1  persons being excluded from the industry, or are
2  you talking about companies being excluded from
3  participating in the Medicaid or Medicare
4  program?
5      A.  I think my conversation would have been
6  about individuals, but it clearly applies to
7  companies.  I was not talking to companies in
8  this discussion.
9      Q.  If Abbott were to be excluded from
10 participating in the Medicare and Medicaid
11 programs, would that be a business problem?
12     A.  Yes.
13         MR. FERGUSON:  Object to form.
14 BY MR. ANDERSON:
15     Q.  And why?
16         MR. FERGUSON:  Same objection.
17         THE WITNESS:  Medicare and Medicaid are
18 significant sources for our, for every healthcare
19 company in America.
20 BY MR. ANDERSON:
21     Q.  When you say "significant sources," can
22 you elaborate a little bit?

Page 279

1      A.  Were Abbott to be excluded, we're
2  talking about significant loss of our business.
3      Q.  In a nutshell --
4      A.  And huge injury to America's healthcare
5  patients.
6      Q.  In a nutshell, would it be true that if
7  Abbott's products are not eligible for Medicaid
8  and Medicare reimbursement, it would cause
9  providers such as physicians and pharmacies to
10 not purchase Abbott's drugs?
11         MR. WINCHESTER:  Object to form.
12         MR. FERGUSON:  Object to form.
13         THE WITNESS:  You're asking me to
14 speculate on physicians.  But of course, yes,
15 this would be, that would be financially
16 devastating, in my opinion.
17 BY MR. ANDERSON:
18     Q.  And the reason you mention the caveat
19 about physicians is that you don't have actual
20 business experience with respect to marketing to
21 physicians; correct?
22     A.  Individually I do not sell to

Page 280

1  physicians.  I'm not in the sales program.
2      Are you asking that --
3      Q.  But you know as a general matter that
4  if Abbott's drugs are not eligible for Medicaid
5  and Medicare reimbursement, that providers would
6  not buy Abbott drugs; correct?
7         MR. FERGUSON:  Objection, form.
8         MR. WINCHESTER:  Objection, form.
9         THE WITNESS:  If you're asking me to
10 speculate, but, yes, that would be huge.
11 BY MR. ANDERSON:
12     Q.  Well, I don't want you to speculate,
13 sir.  I want you to base your testimony upon your
14 roughly eighteen years of experience working for
15 the Abbott Ross division.
16     Is it your belief based on that
17 experience that the lack of Medicaid
18 reimbursement coverage for Abbott drugs would be
19 a major business problem for Abbott?
20         MR. WINCHESTER:  Objection, form, asked
21 and answered.
22         MR. FERGUSON:  Same objection.

Page 281

1         THE WITNESS:  It would be a significant
2  business event for Abbott should the exclusion
3  conversation move forward.
4  BY MR. ANDERSON:
5      Q.  Along those same lines, sir, is it true
6  that if the Medicaid reimbursement on an Abbott
7  drug were higher than the Medicaid reimbursement
8  on a competing drug, that could provide a
9  competitive selling advantage for Abbott?
10         MR. WINCHESTER:  Objection, form.
11         THE WITNESS:  You're asking for me to
12 speculate.  The product purchasing decisions are
13 made on a whole variety of characteristics,
14 including the quality and availability of a
15 particular drug.
16 BY MR. ANDERSON:
17     Q.  I appreciate that distinction, and I'll
18 rephrase my question to address that.
19     Is it true, sir, based on your
20 experience that higher relative Medicaid
21 reimbursement on an Abbott product can be one
22 factor that would be a selling advantage over a

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 282

1  competitor product?
2         MR. WINCHESTER:  Objection, form.
3         MR. FERGUSON:  Same objection.
4         THE WITNESS:  Yes.  The difference
5  between reimbursement rates between products
6  throughout the whole healthcare industry is an
7  important, is a factor in decisions.
8         You asked is it one factor, yes.  It is
9  one factor in decisions about which products to
10 select.  And that occurs regardless of the
11 reimbursement program, regardless of the
12 reimbursement system, regardless of the payment
13 arrangements.
14 BY MR. ANDERSON:
15     Q.  Switching gears on you, Mr. Tootell.  I
16 take it given your testimony here today and your
17 resume, that you've had some interactions with
18 government personnel at CMS, formerly known as
19 HCFA, over the years; correct?
20     A.  Yes.
21     Q.  In any of your dealings with those
22 persons, have you ever disclosed the market

Page 283

1  prices for any Abbott products?
2      A.  I've never been asked.
3      Q.  So the answer to my question is no?
4      A.  The answer is no.
5      Q.  To your knowledge, has anybody --
6      A.  There is one exception, and that is in
7  the process of filing a HCPC code if you have a
8  new nutritional product for a tube feeding
9  product there is a pricing page that's attached
10 at the end.
11     Q.  And what prices --
12     A.  We add the list prices to that.
13     Q.  Did you include any prices other than
14 the so-called list prices?
15     A.  We were only asked for one.  And I
16 clearly label it as list price on those
17 applications.
18     Q.  How does labeling it list price assist
19 the government?
20        MR. WINCHESTER:  Objection, form.
21        MR. FERGUSON:  Same objection.
22        THE WITNESS:  The data is available to

Page 284

1  them about our publicly published list prices.
2  I've never been asked contract prices.  I've
3  never been asked any follow-up questions.
4  BY MR. ANDERSON:
5      Q.  Did you ever inform the government that
6  you had contract prices?
7         MR. WINCHESTER:  Objection, form.
8         THE WITNESS:  I don't recall any
9  conversation like that.
10 BY MR. ANDERSON:
11     Q.  Why did you list the prices as list
12 prices?
13     A.  Those are the Ross public prices.
14 Contract prices are often private.
15     Q.  You say "often."  Are there instances
16 where contract prices are not private?
17     A.  Not that I know of.
18     Q.  Who decides whether the contract prices
19 are private or not?
20     A.  It's a contractual decision, first of
21 all.  If there's a language in the contract or
22 the GPO contract about privacy and disclosure, in

Page 285

1  many contracts there is that language.
2      Q.  So I take it from your answer that the
3  parties to the contract decide whether the
4  contract price will be private or not?
5         MR. WINCHESTER:  Objection, form.
6         THE WITNESS:  As I understand it, yes.
7  I am not part of those contract negotiations.
8  BY MR. ANDERSON:
9      Q.  And typically the parties to these
10 contracts for drug purchases are providers on the
11 one hand and manufacturers on the other; correct?
12     A.  Yes.
13     Q.  So, for instance, my client which was a
14 pharmacy privy to certain market prices would be
15 in a position to disclose those prices; correct?
16        MR. WINCHESTER:  Objection, form.
17        MR. FERGUSON:  Same objection.
18        THE WITNESS:  I've never met your
19 client.
20 BY MR. ANDERSON:
21     Q.  Well, you've mentioned several times
22 today that you're aware Ven-a-Care disclosed

                              72 (Pages 282 to 285)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 286

1  market prices; correct?
2      A.  Yes.  It's well known in the press.
3      Q.  Outside of my client disclosing market
4  prices to the government, are you aware of any
5  other disclosures of market prices?
6      A.  Not to the best of my knowledge.
7      Q.  Sir, earlier in your testimony you
8  mentioned that you assisted Ross in expanding its
9  business in the early '90s; is that correct?
10     A.  That's correct.
11     Q.  And part of the function that you
12  performed in helping Ross expand its business was
13  in your role as a quote manager of insurance
14  development; correct?
15     A.  That was my title in the beginning,
16  yes.
17     Q.  Is it true that the basic function as
18  manager of insurance development was to ensure
19  that the Abbott products were eligible for
20  reimbursement by public and private third
21  parties?
22     A.  Yes.  But the answer is more complex

Page 287

1  than that.  Part of that becomes making sure that
2  we're building the right products that are going
3  to be recognized by existing payment
4  arrangements.
5      Q.  I understand that.
6          And by assisting Abbott in getting
7  coverage eligibility for its drugs, that in turn
8  expands the market for Abbott drugs; correct?
9      A.  I was not involved in drugs, in the
10  drug program.  My work with the drug programs was
11  very limited.
12     Q.  I'll rephrase to address that.
13         In assisting Abbott in getting
14  reimbursement coverage for its products such as
15  the nutritionals --
16     A.  Yes.
17     Q.  -- that was in turn assisting Abbott to
18  grow the market for those products; correct?
19     A.  We hoped.
20     Q.  And, in fact, did you experience a
21  growth in the demand for the products?
22     A.  Yes, we did.  There were other things

Page 288

1  we were doing besides that helped that growth to
2  happen, including flavor improvements and real
3  activity to move products through retail
4  sections.  We did a lot of things at the same
5  time.
6      Q.  But one aspect was reimbursement
7  eligibility by public and private payors?
8      A.  One of many factors, yes.
9      Q.  Thank you.
10         You mentioned in your testimony that
11  reimbursement expertise was a career for others
12  at Abbott beyond you and Ms. Tobiason.  Is that a
13  correct --
14     A.  Yes.
15     Q.  Who other than yourself and Ms.
16  Tobiason do you consider to be a reimbursement
17  expert at Abbott?
18         MR. WINCHESTER:  Objection, form.
19         THE WITNESS:  This is my personal
20  opinion about my colleagues.
21  BY MR. ANDERSON:
22     Q.  I realize that.  Yes, sir.

Page 289

1      A.  I would think that Julie Tobiason is
2  quite able.
3      Q.  Who?
4      A.  Julie Tobiason.  Her name was Julie
5  Shonk.
6      Q.  Is it any relation to Ginny Tobiason?
7      A.  No.  Julie Tomlinson.  I'm sorry.  This
8  is late.
9      Q.  That's okay.  I understand.
10     A.  Julie Tomlinson.  I'm sorry.  It's been
11  a long day.  Julie Tomlinson.  Thank you for
12  stopping me.
13     Q.  I thought maybe Virginia had a brother
14  and Julie had married him.
15     A.  No, no.
16     Q.  All right.
17     A.  And Eileen Bachoff from the Diabetes
18  Group.  She followed me in the AdvaMed
19  competitive bidding group.  And then there are a
20  number of other people who I have not met who
21  came in in the last period of time.
22     Q.  They were brought into the loop more

73 (Pages 286 to 289)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                         Chicago, IL

Page 290

1  recently?
2      A.  Yes.  There have been some new hires
3  adding to the reimbursement side of things.
4      Q.  Back in the mid and late '90s other
5  than yourself and Ms. Tobiason, were there other
6  individuals working for Abbott that you would
7  consider reimbursement experts?
8      A.  You have a long list of people invited
9  to the 2003 meeting.
10     Q.  You're pointing to the
11  Medicare/Medicaid Reimbursement Task Force?
12     A.  Yes, right.
13     Q.  And, likewise, the individuals on the
14  Medicare Working Group were considered experts in
15  reimbursement?
16         MR. WINCHESTER:  Objection, form,
17  foundation.
18         MR. FERGUSON:  Same objection.
19         THE WITNESS:  Not all experts.  Some
20  were knowledgeable.  Some were involved with
21  reimbursement as only part of their job.
22  BY MR. ANDERSON:

Page 291

1      Q.  And those persons were most
2  particularly the lobbyists that were based at
3  Abbott's Washington office; correct?
4      A.  That would be a part of it, yes.
5      Q.  Why did Abbott personnel coordinate
6  their knowledge about reimbursement across
7  divisions?
8         MR. WINCHESTER:  Object to form.
9         MR. FERGUSON:  Object to form.
10         MR. WINCHESTER:  Foundation.
11         THE WITNESS:  You're asking me to
12  speculate on other people's opinions, but --
13  BY MR. ANDERSON:
14     Q.  No.  I really don't want you to
15  speculate, sir.
16         If given your years of experience you
17  didn't understand --
18     A.  I didn't pull the groups together.
19     Q.  I know that.
20         If you gained an understanding of why
21  these Abbott personnel would form these different
22  committees and groups, then I would like to know.

Page 292

1  If you don't, then I understand.  And I'll
2  rephrase my question so we can start from the
3  top.
4      A.  Okay.
5      Q.  Do you know or have some understanding
6  of why Abbott had personnel from different groups
7  coming together in the reimbursement task force,
8  the Medicare Working Group, and potentially other
9  committees to stay abreast of reimbursement
10  issues?
11     A.  That was a corporate decision.  And the
12  issue was, at a number of times, their needed to
13  be sure that the divisions were adopting similar
14  policies, you know, working on common issues and
15  aware of changing elements and changing issues in
16  Washington, D.C.  As those issues changed, it's
17  important for the divisions to be able to react
18  to those changes.
19     Q.  And in laymen's terms that's basically
20  what you meant when you created the slide that
21  said skate to where the puck is, or as my dad
22  likes to say, anticipate what the next move is?

Page 293

1      A.  Exactly.  That's the point I was trying
2  to make.
3      Q.  Okay.  You've mentioned a couple of
4  times, Mr. Tootell, that Abbott has your
5  calendar; is that correct?
6      A.  I don't have it.  We were for the last
7  fifteen years on Lotus Notes, and that would have
8  all my appointments from the time that they began
9  Lotus Notes to now.
10     Q.  So as far as you know when you retired,
11  the Lotus Notes that maintained your calendar for
12  the past fifteen years was in existence; correct?
13     A.  I do not know what happened to my Lotus
14  Notes after I left.  When I left, I was using
15  them.
16     Q.  And they had been preserved for as long
17  as you can remember?
18         MR. FERGUSON:  Object to form.
19         THE WITNESS:  I don't know.  To the
20  best of my knowledge, they're archived someplace.
21  But I do not know that and don't do that.
22  BY MR. ANDERSON:

                              74 (Pages 290 to 293)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

---

Page 294

1    Q.  Now.
2    A.  Now, and then I didn't.  You used your
3  calendar for your appointments, and I don't know
4  what's happened to it after I left.
5    Q.  I know.  I mean I realize that you
6  don't know what's happened to it since you left.
7  But I'm asking as of the day you left, it was
8  your understanding that your calendar had been
9  preserved in this electronic Lotus Notes
10 software; correct?
11   A.  Yes.
12   Q.  And so, for instance, if you wanted to
13 go back and see what day you made the
14 presentation to Cardinal, you could do so even
15 though it would require you to go back to the
16 summer of 2000?
17   A.  I really don't know how far back Lotus
18 Notes goes in my desk, on my laptop on my desk.
19 And I don't know how that's archived.  But I do
20 know that there were document orders, and I would
21 expect it was archived in a place that's
22 acceptable.  But no, I do not know.

---

Page 295

1    Q.  When you say "document orders," do you
2  mean --
3    A.  Hold orders.
4    Q.  -- related to litigation or just
5  typical holds?
6    A.  They would show up and you'd hold
7  documents in a particular category.
8    Q.  Did you understand whether it pertained
9  to litigation or not?
10   A.  The inquiries came from Abbott
11 litigation.  I assumed so.
12   Q.  What would you say the overall
13 accomplishments were of the Medicare Working
14 Group of which you were a member?
15   A.  I don't recall that.  I'd have to
16 refresh my mind even on the contents of those
17 meetings.
18        (WHEREUPON Deposition Exhibit
19 Tootell 009 was marked as of 10/25/2007.)
20 BY MR. ANDERSON:
21   Q.  Mr. Tootell, please take a moment and
22 review what's been marked as Exhibit Tootell 009.

---

Page 296

1  It's also been marked in this case as I believe
2  Exhibit 551.  (Document tendered to the witness.)
3        MR. ANDERSON:  Let's change tapes while
4  the witness is reviewing the document.
5        THE VIDEOGRAPHER:  We are off the
6  record at 4:44 with the end of Tape No. 4.
7          (WHEREUPON a recess was taken.)
8        THE VIDEOGRAPHER:  We are back on the
9  record at 4:49 p.m. with the start of Tape No. 5.
10 BY MR. ANDERSON:
11   Q.  Sir, does Exhibit Tootell 009 appear to
12 be the notes of a Medicare Working Group meeting
13 that you attended?
14   A.  I don't recall it, but they appear to
15 be.
16   Q.  Looking at the third page of the
17 exhibit titled "Minutes for Medicare Working
18 Group Meeting" on January 21, 1997, do you see a
19 section entitled "Average Wholesale Price"?
20   A.  I do.
21   Q.  I'm going to read the first bullet
22 point.  Quote "Average wholesale price, AWP, is

---

Page 297

1  generally based upon the manufacturer's price
2  plus a mark-up of fifteen to twenty percent.  The
3  AWP is documented in the Red Book, Blue Book, and
4  Medi-Span book and is used by Medicare/Medicaid
5  and commercial insurance carriers to determine
6  reimbursement levels."  Did I read that
7  correctly?
8    A.  You read that accurately.
9    Q.  Is that a true statement?
10       MR. WINCHESTER:  Objection as to
11 timeframe.
12 BY MR. ANDERSON:
13   Q.  Back in 1997 was that a true statement?
14   A.  Yes.
15   Q.  Is there any question in your mind that
16 all the members of the Abbott Medicare Working
17 Group understood that issue in 1997?
18       MR. FERGUSON:  Object to form and
19 foundation.
20       MR. WINCHESTER:  Objection to form.
21       THE WITNESS:  I can't speak for others,
22 but I believe, I understood it this way.

---

75 (Pages 294 to 297)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 298

1  BY MR. ANDERSON:
2     Q.  Then continuing on it reads quote
3  "There is consensus that the AWP is artificial
4  and that actual acquisition costs would be
5  better.  However, it is unclear whether actual
6  acquisition costs can be determined."  Did I read
7  that accurately?
8     A.  You read it accurately.
9     Q.  Within which group of individuals was
10 there consensus that AWP was artificial?
11       MR. FERGUSON:  Object to form and
12 foundation.
13       THE WITNESS:  These are not my notes.
14 These are written by Mr. Rieger.  And he is
15 claiming in this draft, which is not final, that
16 there is a consensus about AWP among this group.
17 BY MR. ANDERSON:
18    Q.  Among the Medicare Working Group?
19    A.  As I read his minutes, which are draft
20 minutes.
21    Q.  So the answer to my question would be
22 yes, as you read the minutes; correct?

Page 299

1     A.  As I read the minutes.
2       MR. FERGUSON:  Object to form.
3  BY MR. ANDERSON:
4     Q.  Now, we're going to look quickly at
5  another set of --
6       (WHEREUPON Deposition Exhibit
7  Tootell 010 was marked as of 10/25/2007.)
8  BY MR. ANDERSON:
9     Q.  Mr. Tootell, if you could take a look
10 at another set of Medical Working Group minutes
11 marked as Exhibit Tootell 010.
12    A.  January 1997, okay.
13       MR. FERGUSON:  Is this a complete
14 document?
15       MR. ANDERSON:  As far as I know.
16 BY MR. ANDERSON:
17    Q.  Mr. Tootell, does this appear to be a
18 memo that was sent out in advance of the January
19 21, 1997 Medicare Working Group meeting?
20       MR. FERGUSON:  Object to form.
21       THE WITNESS:  It appears to be the
22 first page of a several page document.

Page 300

1  BY MR. ANDERSON:
2     Q.  And I apologize for that.  If there's
3  other pages, I don't have them.  But I'm only
4  going to be asking you questions about the first
5  bullet point.
6     A.  Fine.
7     Q.  You're shown as a recipient of this
8  memo; correct?
9     A.  Yes.
10    Q.  And the first bullet reads "Discuss
11 average wholesale price versus actual cost
12 issue."  Did I read that correctly?
13    A.  Yes, you did.
14    Q.  Do you recall discussions about
15 differences between actual cost and AWP?
16    A.  I don't recall those conversations.
17    Q.  Do you have any doubt that the Medicare
18 Working Group did discuss back in 1997
19 differences between AWPs and actual cost?
20       MR. WINCHESTER:  Objection, asked and
21 answered.
22       THE WITNESS:  I don't recall that

Page 301

1  meeting, and I don't recall that conversation.
2  BY MR. ANDERSON:
3     Q.  Do you have any idea why Medicare
4  Working Group personnel would have been
5  discussing differences between average wholesale
6  price and actual cost, if in fact they were?
7       MR. WINCHESTER:  Objection to form.
8       MR. FERGUSON:  Same objection.
9       THE WITNESS:  I refer the question to
10 Mr. Rieger who's the author of this memo.
11 BY MR. ANDERSON:
12    Q.  Looking at like sub-bullets of Bullet
13 No. 1, there's a drug named Lupron.
14    A.  Yes.
15    Q.  And then it reads "Medical
16 Nutritionals"; correct?
17    A.  Yes.
18    Q.  Would those be considered the Ross
19 products?
20    A.  Yes.
21    Q.  Those were the products that you had
22 primary reimbursement responsibility for;

76 (Pages 298 to 301)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                           Chicago, IL

Page 302

1  correct?
2      A.  Yes.
3      Q.  Do you recall any discussions
4  whatsoever about the difference between AWPs and
5  actual cost on nutritionals?
6      A.  I don't recall that conversation.  It's
7  ten years ago.
8      Q.  I realize that, but I still need to ask
9  the question, sir.
10        Do you recall any of those discussions?
11       MR. FERGUSON:  Objection, asked and
12  answered.
13       THE WITNESS:  I do not know.  I don't
14  recall this.
15  BY MR. ANDERSON:
16     Q.  Do you think that back in 1997 or
17  potentially earlier you first started being
18  concerned about differentials between the
19  published AWPs and the actual prices on Ross
20  drugs?
21       MR. WINCHESTER:  Objection, form.
22       MR. FERGUSON:  Same objection.

Page 303

1        THE WITNESS:  Your concern, I would
2  guess that -- I've been told not to guess.  The
3  agenda seems to reflect concerns of members of
4  the committee, and one of the concerns was
5  medical nutritionals.
6  BY MR. ANDERSON:
7      Q.  So that would indicate to you that you
8  did have concerns about differences between AWPs
9  and market prices as far back as 1997?
10       MR. WINCHESTER:  Object to form.
11       MR. FERGUSON:  Object to form.
12       THE WITNESS:  Yes.
13         (WHEREUPON Deposition Exhibit
14  Tootell 011 was marked as of 10/25/2007.)
15  BY MR. ANDERSON:
16     Q.  Mr. Tootell, if you could, take a look
17  at what's been marked as Exhibit Tootell 011.
18  I'm only going to ask you questions about the
19  second paragraph, which is the first paragraph of
20  Section 1.  (Document tendered to the witness.)
21       Does this appear to be a memo from you
22  and Susan Finn dated May 19, 1995?

Page 304

1      A.  Yes, it does.
2      Q.  And back in that time period what
3  position did David Schaefer hold, roughly?
4      A.  I don't recall.  It's an Abbott fax
5  number.
6      Q.  So you believe Mr. Schaefer was with
7  Abbott, either HPD or PPD?
8      A.  I believe he was with Abbott.  I don't
9  know his position at that point.
10     Q.  But he wasn't part of the Ross division
11  as you were; correct?
12     A.  No.
13     Q.  And then reading, as I said, in the
14  first paragraph, "Has your division done an
15  assessment of the potential impact of Medicare
16  changes on your business?  What were the major
17  findings?"  Did I read those questions correctly?
18     A.  Yes, you did.
19     Q.  And then you write, along with Ms. Finn
20  "Continual ongoing evaluation of the impact of
21  payor policies on medical nutritional sales and
22  margins."  Did I read that correctly?

Page 305

1      A.  You did.
2      Q.  How would you go about evaluating the
3  impact of payor policies on sales and margins?
4      A.  It depended on the product specifically
5  that was in concern.  I was obviously watching
6  Medicare's policies for tube feeding and
7  Medicare's policies, for example about treatment
8  of disease specific products, and what kind of
9  positions they had about the kinds of products
10  that we would be providing to patients, an
11  ongoing evaluation of the impact of those
12  policies on our sales and business.
13     Q.  Okay.  Let me back up a step then.
14        When you say back in 1995 evaluate the
15  impact of payor policies on medical nutritional
16  sales and margins, are you referring to Abbott's
17  sales and Abbott's margins?
18     A.  To the extent that Ross is a part of
19  Abbott, yes.  But this is an interview or this is
20  a survey from David Schaefer in a corporate
21  position asking specific questions about sales
22  and margins, and we are responding to a corporate

                                    77 (Pages 302 to 305)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 306

1    data request.
2        Q.  So just at a high level would it be
3    fair to say that Abbott understood that
4    reimbursement policies impacted Abbott's sales of
5    drugs and in turn the amount of profit margin
6    earned by Abbott?
7            MR. WINCHESTER:  Objection,
8    speculation, foundation.
9            THE WITNESS:  David Schaefer would have
10   received this information.  Abbott is fifty
11   thousand people.  I don't know how this
12   information was used once it was provided by each
13   of the divisions and compiled by Mr. Schaefer.
14   BY MR. ANDERSON:
15       Q.  Well, let's limit it to what you do
16   know for sure.
17           You knew that you conveyed personally
18   to Mr. Schaefer your best evaluation of the
19   impact on Abbott's sales and Abbott margins that
20   reimbursement policies would have; correct?
21       A.  Ordinarily I answered what the policies
22   of Medicare and Medicaid, what impact they would

Page 307

1    have on the Ross division.  And of course those
2    numbers rolled up to Abbott.  But my only answers
3    related to the Ross division here.  And I don't
4    recall seeing the results of this survey anyway
5    as it's compiled by anybody else.
6            (WHEREUPON Deposition Exhibit
7    Tootell 012 was marked as of 10/25/2007.)
8    BY MR. ANDERSON:
9        Q.  Mr. Tootell, I've just got a quick
10   question or two about Exhibit Tootell 012, and
11   then I'm going to have a couple of questions
12   about a previous exhibit, and then we'll close
13   for the day because I realize you would like to
14   leave for the airport.  (Document tendered to the
15   witness.)
16       A.  I appreciate that.
17       Q.  In an effort to be quick, I'll just
18   direct your attention to the portions of Exhibit
19   Tootell 012 that I'm going to have questions for
20   you about.
21           Just as a general matter, do you agree
22   that you're shown as a recipient of this

Page 308

1    document?
2        A.  I received this document.  I'm one of
3    fifteen or twenty.
4        Q.  Yes, sir.  And it looks like it's
5    members in the Government Affairs office of
6    Abbott as well as others that are involved in
7    reimbursement issues; correct?
8        A.  There's a variety of people in a
9    variety of responsibilities here.
10       Q.  But as a general matter, did I
11   accurately characterize their roles at Abbott?
12           MR. FERGUSON:  Object to form.
13           THE WITNESS:  There are many different
14   people in different roles here.
15   BY MR. ANDERSON:
16       Q.  Some of whom are either Government
17   Affairs or reimbursement specialists; correct?
18       A.  Some of them.  There's an attorney Mark
19   Barmak, head of public relations, some senior
20   executives from several divisions in this group.
21       Q.  And this memo is dated January 27,
22   1998; correct?

Page 309

1        A.  Yes, exactly.
2        Q.  And it's titled "Medicare Fraud &
3    Abuse"; correct?
4        A.  That's the title of this memo.
5        Q.  And it reads, and I'm beginning in the
6    first paragraph of the first page, "In tonight's
7    State of the Union Address, President Clinton is
8    expected to mention the need to crack down on
9    Medicare fraud and abuse.  Reimbursement for
10   prescription drugs and competitive bidding have
11   been thrown into the heading of fraud and abuse.
12   They were both singled out in his Sunday radio
13   address.  The radio address and an HHS summary of
14   fraud and abuse proposals which will be included
15   in his budget are attached."  Did I read that
16   correctly?
17       A.  Yes.
18       Q.  Do you recall that President Clinton
19   was characterizing some drug reimbursement as
20   fraud and abuse?
21       A.  I don't recall that comment of the
22   President's.

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                        Chicago, IL

Page 310

1    Q.  Do you recall generally understanding
2  that the government was seeking to investigate
3  claims of fraud and abuse in drug reimbursement
4  back in 1998?
5    A.  I've said that several times today,
6  that I'm concerned, I was concerned about the
7  legal and public relations consequences of this
8  issue.
9    Q.  Did those government investigations
10 into drug reimbursement lead you to conclude that
11 the government was seeking to reimburse as
12 accurately as it could for drugs?
13       MR. WINCHESTER:  Object to form.
14       MR. FERGUSON:  Objection to form.
15       THE WITNESS:  I don't know what the
16 government was intending at that point.
17 BY MR. ANDERSON:
18    Q.  Let's take a look at the actual
19 transcript of President Clinton's January 24,
20 1998 radio address.
21    A.  Yes.
22    Q.  Specifically I'll draw your attention

Page 311

1  to the third page of Exhibit Tootell 012.  In the
2  middle of the page there's a paragraph that
3  begins with the word "But."
4    A.  Okay.
5    Q.  Are you with me?
6    A.  I have read that paragraph.
7    Q.  I'll read for the benefit of the
8  record.  "But we must do more to crack down on
9  fraud and abuse in the Medicare system.  The
10 balance budget I'll submit to Congress next month
11 will include anti-fraud and waste provisions that
12 will save Medicare more than $2 billion.  First,
13 it will eliminate overpayment for certain drugs
14 by making sure doctors receive no more and no
15 less than the price they paid for the medicines
16 they give Medicare patients."  Did I read that
17 correctly?
18    A.  Yes.
19    Q.  Does that text refresh your memory that
20 the government wanted to pay accurately for
21 drugs?
22       MR. WINCHESTER:  Objection, form,

Page 312

1  speculation.
2       MR. FERGUSON:  Same objection.
3       THE WITNESS:  I don't recall.
4  BY MR. ANDERSON:
5    Q.  Do you have any evidence whatsoever
6  that the government purposefully overpaid drug
7  ingredient costs?
8    A.  My primary responsibilities were not
9  for drugs.  And I don't recall that, that narrow
10 issue.
11    Q.  I'll limit it to your nutritional
12 experience.  Do you have any information
13 whatsoever that the government purposefully
14 overpaid in its reimbursement for the cost of
15 nutritionals?
16    A.  I don't believe the government
17 purposefully overpaid.
18    Q.  Now, sir, if you could, take a look at
19 --
20       MR. ANDERSON:  Well, in fairness, we're
21 passed the time.  I'm not going to be able to
22 conclude today, and I apologize for that, but we

Page 313

1  got a late start and there's just a lot of
2  material to review.
3       THE WITNESS:  Fine.
4       MR. ANDERSON:  So I will conclude the
5  deposition for the day, but I'm certainly not
6  waiving any rights to recall the witness and
7  continue the deposition.
8       MS. ST. PETER-GRIFFITH:  Additionally,
9  the United States reserves that right as well and
10 let the Relator go out of turn so that he could
11 get questions in today, but we would like to
12 resume at one point.
13       MR. ANDERSON:  And I don't want to
14 argue the point or cast stones, but we did
15 receive a significant volume of production from
16 the defendants only within the past couple of
17 days that due to travel simply could not be
18 thoroughly reviewed and triaged in preparation
19 for the deposition.  I just want to make that
20 statement on the record.
21       MR. FERGUSON:  We'll reserve our
22 respective rights as I indicated earlier.

                              79  (Pages 310 to 313)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                    October 25, 2007
                          Chicago, IL

Page 314

```
 1        MR. WINCHESTER:  The same for Abbott as
 2   well.
 3        MR. SISNEROS:  And on behalf of
 4   California we have yet to take our turn to ask
 5   our questions.
 6        MR. ANDERSON:  Let's go off the record.
 7        THE VIDEOGRAPHER:  We are off the
 8   record at 5:07 p.m. with the conclusion of
 9   today's deposition of Michael Tootell.
10        (WHEREUPON said deposition was so
11   adjourned.)
12
13
14        _____
15             MICHAEL TOOTELL
16
17   Subscribed and sworn to and before me
18   this _____ day of _____, 20____.
19
20
21   _____
22        Notary Public
```

Page 315

```
 1   STATE OF ILLINOIS )
 2   COUNTY OF C O O K )
 3        I, Donna M. Kazaitis, RPR, CSR No.
 4   084-003145, do hereby certify:
 5      That the foregoing deposition of MICHAEL
 6   TOOTELL was taken before me at the time and place
 7   therein set forth, at which time the witness was
 8   put under oath by me;
 9      That the testimony of the witness and all
10   objections made at the time of the examination
11   were recorded stenographically by me, were
12   thereafter transcribed under my direction and
13   supervision and that the foregoing is a true
14   record of same.
15      I further certify that I am neither counsel
16   for nor related to any party to said action, nor
17   in any way interested in the outcome thereof.
18      IN WITNESS WHEREOF, I have subscribed my name
19   this 29th day of October, 2007.
20
21        _____
22        Donna M. Kazaitis, RPR, CSR 084-003145
```

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3