# Exhibit 113

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL                February 28, 2008
                              Chicago, IL

Page 335

                    UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL              )

INDUSTRY AVERAGE WHOLESALE        )

PRICE LITIGATION                  ) MDL No. 1456

                                  ) Civil Action

THIS DOCUMENT RELATES TO:         ) #01-12257-PBS

United States of America,         )

ex rel. Ven-A-Care of the         ) Judge Patti B. Saris

Florida Keys, Inc., v.            )

Abbott Laboratories, Inc.,        )

and Hospira, Inc.                 )

CIVIL ACTION NO. 06-11337-PBS)


*****************************************************


                    HIGHLY CONFIDENTIAL

Videotaped deposition of PETER D. BAKER - Volume II

                    FEBRUARY 28, 2008


           (CAPTIONS CONTINUE ON FOLLOWING PAGE)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 336

1            UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MASSACHUSETTS
3    IN RE PHARMACEUTICAL      ) MDL No. 1456
4    INDUSTRY AVERAGE WHOLESALE ) Master File No.
5    PRICE LITIGATION        ) 01-12257-PBS
6    THIS DOCUMENT RELATES TO:   ) Judge Patti B. Saris
7    State of California, ex rel.)
8    Ven-A-Care v. Abbott       ) Magistrate Judge
9    Laboratories, Inc., et al., ) Marianne Bowler
10   Case #: 1:03-cv-11226-PBS   )
11   *********************************************
12          HIGHLY CONFIDENTIAL
13   Videotaped deposition of PETER D. BAKER, Volume II,
14   reconvened in the above-entitled cause pursuant to
15   the Federal Rules of Civil Procedure of the United
16   States District Courts, pertaining to the taking of
17   depositions, taken before ROBIN M. CHIMNIAK, a
18   Notary Public within and for the County of DuPage,
19   and the State of Illinois, and a Certified
20   Shorthand Reporter, taken at 77 West Wacker Drive,
21   Suite 3500, Room C, Chicago, Illinois, on the 28th
22   day of February, 2008, at the hour of 10:01 a.m.

Page 337

1    APPEARANCES:
2
3    FOR THE PLAINTIFF UNITED STATES OF AMERICA:
4
5        R. ALEXANDER ACOSTA
6        United States Attorney General
7        Southern District of Florida
8        MS. ANN ST. PETER-GRIFFITH
9        Assistant Attorney General
10       99 N.E. 4th Street, 3rd Floor
11       Miami, Florida 33132
12
13
14   FOR THE PLAINTIFF THE STATE OF CALIFORNIA
15   (Telephonically):
16
17       MR. ELISEO SISNEROS
18       Deputy Attorney General
19       BMFEA
20       State of California Department of Justice
21       110 West A Street #1100
22       San Diego, California 92101

Page 338

1    APPEARANCES: (CONTINUED)
2
3    FOR THE RELATOR:
4
5        MR. GARY AZORSKY
6        Berger & Montague, P.C.
7        1622 Locust Street
8        Philadelphia, Pennsylvania 19103
9
10
11   FOR THE DEFENDANTS ABBOTT LABORATORIES, INC.,
12   AND HOSPIRA, INC.:
13
14       MS. TINA TABACCHI
15       Jones Day
16       77 West Wacker Drive
17       Chicago, Illinois 60601-1692
18
19
20   ALSO PRESENT:
21
22       Mr. Ben Stanson, Videographer

Page 339

1            I N D E X
2
3    WITNESS:  PETER D. BAKER          PAGE
4    Examination By Ms. St. Peter-Griffith..... 343
5
6
7          E X H I B I T S
8    NUMBER       DESCRIPTION        PAGE
9    Exhibit Baker 031-ABT-DOJ 351004 - 006......... 458
10   Exhibit Baker 032-ABT-DOJ 351002 - 003......... 465
11   Exhibit Baker 033-VTP081-1656.................. 472
12   Exhibit Baker 034-VTP164-1105 - 114............ 474
13   Exhibit Baker 035-ABT-DOJ 313821 - 825......... 484
14   Exhibit Baker 036-ABT-DOJ 325725 - 727......... 486
15   Exhibit Baker 037-ABT275-0023 - 0035........... 490
16   Exhibit Baker 038-ABT-DOJ 0263671 - 673........ 500
17   Exhibit Baker 039-ABT-DOJ-E 0365481 - 485...... 501
18   Exhibit Baker 040-ABT-DOJ-E 0359154 - 158...... 502
19   Exhibit Baker 041-ABT-DOJ-E 0314047 - 067...... 512
20   Exhibit Baker 042-ABT-DOJ-E 0458207 - 210...... 518
21   Exhibit Baker 043-ABT-DOJ-E 0388435 - 439...... 521
22   Exhibit Baker 044-ABT-DOJ 0185561 - 574........ 529

2 (Pages 336 to 339)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

---

Page 340

1       E X H I B I T S  (CONTINUED)
2    NUMBER       DESCRIPTION          PAGE
3    Exhibit Baker 045-ABT-DOJ-E 0518134 - 147...... 545
4    Exhibit Baker 046-ABT-DOJ-E 0517558 - 575...... 546
5    Exhibit Baker 047-ABT-DOJ-E 0517803 - 817...... 547
6    Exhibit Baker 048-ABT-DOJ-E 0408126 - 133...... 547
7    Exhibit Baker 049-ABT-DOJ-E 0517585 - 592...... 548
8    Exhibit Baker 050-ABT-DOJ-E 0512710 - 732...... 549
9    Exhibit Baker 051-ABT-DOJ-E 0408353 - 364...... 550
10   Exhibit Baker 052-ABT-DOJ-E 0512752 - 754...... 552
11   Exhibit Baker 053-ABT-DOJ-E 0512739 - 751...... 555
12   Exhibit Baker 054-ABT-DOJ-E 0512783............ 558
13   Exhibit Baker 055-ABT-DOJ-E 0515232 - 248...... 561
14   Exhibit Baker 056-ABT-DOJ-E 0513748 - 762...... 564
15   Exhibit Baker 057-ABT-DOJ-E 0513737 - 747...... 568
16   Exhibit Baker 058-ABT-DOJ-E 0353861 - 863...... 570
17
18
19
20
21
22

---

Page 341

1            P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  This is Ben Stanson
4    representing Henderson Legal Services.  I'm the
5    operator of this camera.  This is Volume 2 of the
6    videotaped deposition of Peter D. Baker, as being
7    taken pursuant to Federal Rules of Civil
8    Procedure on behalf of the plaintiffs.
9        We are on the record on February 28th,
10   2008.  The time is 10:01 a.m., as indicated on
11   the video screen.  We are at the offices of Jones
12   Day, 77 West Wacker Drive in Chicago, Illinois.
13       This case is captioned Pharmaceutical
14   Industry Average Wholesale Price Litigation.
15   Case No. 01-12257-PBS.
16       Will the attorneys please identify
17   themselves for the video record.
18       MS. ST. PETER-GRIFFITH:  Ann St.
19   Peter-Griffith from the United States Attorney's
20   Office, Southern District of Florida, on behalf
21   of the United States.
22       MR. SISNEROS:  Eliseo Sisneros, deputy

---

Page 342

1    attorney general, State of California, on behalf
2    of State of California.
3        MR. AZORSKY:  Gary Azorsky with Berger
4    & Montague in Philadelphia, on behalf of the
5    relator Ven-a-Care Florida Keys.
6        MS. TABACCHI:  Tina Tabacchi on behalf
7    of the defendants.
8        THE VIDEOGRAPHER:  Thank you.
9        The court reporter today is Robin
10   Chimniak with Henderson Legal Services of
11   Washington, D.C.
12       Will you please swear in the witness.
13          (Witness sworn.)
14       THE VIDEOGRAPHER:  Thank you.  You may
15   proceed.
16       MS. ST. PETER-GRIFFITH:  Good morning,
17   Mr. Baker.  I apologize to you for the delays
18   we've had this morning.
19       And I've indicated to your counsel my
20   objective for today is to go over new material or
21   follow-up material that may not have been covered
22   in your prior deposition.

---

Page 343

1            PETER D. BAKER,
2    called as a witness herein, having been first
3    duly sworn, was examined and testified as
4    follows:
5            EXAMINATION
6    BY MS. ST. PETER-GRIFFITH:
7        Q.  But before I do that, I want to ask
8    you, what have you done to prepare for today's
9    deposition?
10       A.  I have met with Tina.
11       Q.  How long did you meet with Ms.
12   Tabacchi?
13       A.  Several hours; maybe three hours.
14       Q.  When was that?
15       A.  Yesterday.
16       Q.  Have you had a chance to review your
17   prior testimony?
18       A.  I have been deposed, I think, three
19   times now.  I -- I was able to review the first
20   deposition.  I have not reviewed the prior -- or
21   the ones subsequent to that.
22       Q.  As you sit here today, can you think of

---

3  (Pages 340 to 343)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II    HIGHLY CONFIDENTIAL         February 28, 2008
                              Chicago, IL

---

Page 344

1  any of your prior testimony that you believe
2  maybe needed further clarification or further
3  amplification?
4      A.  I don't know at this point, having not
5  reviewed --
6      Q.  Okay.
7      A.  (Continuing) -- reviewed the document
8  to see.
9      Q.  Well, if at any time you feel the need
10 to amplify -- because we're trying to not repeat
11 --
12     A.  Yes.
13     Q.  (Continuing) -- go over what we did
14 before, just feel free to speak up, okay?
15     A.  Okay.  I sure will.  Thank you.
16     Q.  Mr. Baker, in going over your prior
17 testimony, I notice that at least for purposes of
18 the federal case we don't have any place
19 where you've gone through and given us your
20 background.
21         So what I'd like to do is start with,
22 what is your educational background?

---

Page 345

1      A.  I have a degree in marketing from
2  Southern Illinois University.
3      Q.  And when did you obtain that degree?
4      A.  Oh, wow.  In 1980.
5      Q.  And was that a B.A. or B.S.?
6      A.  B.S.
7      Q.  Okay.  And after you graduated from
8  Southern Illinois, what did you do?
9      A.  I went to work for a company called
10 Foleys in Houston, Texas.
11     Q.  Can you please spell that?
12     A.  F-o-l-e-y-s, Foleys.
13     Q.  And what -- and what is Foleys?
14     A.  It is a retail operation.
15     Q.  And how long did you work for Foleys?
16     A.  Approximately two years.
17     Q.  And what was your position at Foleys?
18     A.  I was a -- like a
19 departmental manager.
20     Q.  Okay.  Did -- did Foleys have any
21 business associated with pharmaceuticals?
22     A.  No, none whatsoever.

---

Page 346

1      Q.  Okay.  After you left Foleys, where did
2  you go?
3      A.  I went to work for Abbott Laboratories.
4      Q.  Okay.  And what year was that?
5      A.  I think around '8- -- 1981.
6      Q.  And what was your position with Abbott?
7      A.  I was a sales representative.
8      Q.  Where were you a sales rep?
9      A.  Cape Girardeau, Missouri.
10     Q.  Okay.  And how long were you in
11 Missouri?
12     A.  That was about two years.
13     Q.  Okay.  And was there a particular
14 division that you worked with?
15     A.  I was within the Hospital Products
16 Division.
17     Q.  And did you eventually leave Missouri?
18     A.  Yes.  I went -- my next position was as
19 a sales representative as well, but in Rockford,
20 Illinois.
21     Q.  Okay.
22     A.  And that was probably about a year.

---

Page 347

1  And then I came into our home office after that
2  in -- to Abbott Park.
3      Q.  So around '84 you came to Abbott Park?
4      A.  About then, yes.
5      Q.  And what division did you work with?
6      A.  With the Hospital Products Division.
7      Q.  Is it safe to say that you worked with
8  HPD throughout your entire tenure as an Abbott
9  employee?
10     A.  Yes.  Well, I did spend a short period
11 of time, two-and-a-half years or so, in what was
12 called corporate hospital marketing --
13     Q.  And when was that --
14     A.  (Continuing) -- which I think we've
15 discussed that one.
16         Oh, you're going to ask me the timing;
17 about 1993 maybe.
18     Q.  Okay.  And when you came to Abbott
19 Park, what position did you have?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I was an analyst in our
22 contracting department.

---

4 (Pages 344 to 347)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL             February 28, 2008
                            Chicago, IL

Page 348

1        MR. SISNEROS: I'm sorry. Ann, I'm
2 having a hard time hearing Mr. Baker. Can the
3 speakerphone be moved?
4        MS. TABACCHI: We'll move you right up,
5 Eliseo.
6        MR. SISNEROS: Thank you.
7 BY MS. ST. PETER-GRIFFITH:
8    Q.  You were a contract analyst within HPD?
9    A.  Yes.
10    Q.  Was there -- did you work within a
11 particular subdivision within HPD, or was it just
12 with --
13       MS. TABACCHI: Object to the form.
14       THE WITNESS: I'm not sure I
15 understand.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Well, were you with -- did -- at that
18 point in time, you know, around '84, did -- did
19 Abbott's Hospital Products Division have further
20 subdivision of business units within it?
21       MS. TABACCHI: Object to the form.
22       THE WITNESS: I was -- I was

Page 349

1 responsible for, I guess, contracting with acute-
2 care hospitals.
3 BY MS. ST. PETER-GRIFFITH:
4    Q.  Okay. And how long were you
5 responsible for that as a contract analyst?
6    A.  Several years. Two, two-and-a-half,
7 three years, something like that.
8    Q.  So in approximately '87 you moved on to
9 a different position?
10    A.  Approximately.
11    Q.  And what was that position?
12    A.  I -- I believe I was in -- moved on to
13 a role in national accounts at our home-care
14 group.
15    Q.  Just to clarify, is -- is a position
16 with national accounts, is that a NAM, or is that
17 something that's different than a NAM?
18    A.  Well, I --
19       MS. TABACCHI: Object to the form.
20       THE WITNESS: It -- I'm not sure in
21 that -- I mean, I think -- you -- there is a lot
22 of different, I guess, iterations of what a

Page 350

1 national account manager would do --
2 BY MS. ST. PETER-GRIFFITH:
3    Q.  Okay.
4    A.  (Continuing) -- I guess. So I'm not
5 sure I know how to answer you on that.
6    Q.  Okay. Well, let's -- let's just go
7 through the history, and then we'll go back.
8        Was the -- is the home-care unit, was
9 that a precursor to the home infusion business
10 unit?
11    A.  I think, if memory serves me right,
12 that was when there was a home-care business. We
13 looked at -- or the responsibility I had was
14 looking at relationships that were product-
15 specific.
16    Q.  Okay.
17    A.  A number of individuals would like to
18 acquire IV solutions, IV pumps, things like that.
19 So if someone had an interest who was not an
20 acute-care hospital, that's who we would work
21 with.
22    Q.  Okay. And how long did you hold that

Page 351

1 national accounts position in home care?
2    A.  About -- about eight months.
3    Q.  Okay. So --
4    A.  Then I went to Sherwood Medical.
5    Q.  Okay. What is Sherwood Medical?
6    A.  It's a -- it's a medical company
7 located in St. Louis, Missouri.
8    Q.  Is it Abbott-owned?
9    A.  No, it had no --
10    Q.  Okay. So you left Abbott then?
11    A.  I left Abbott, yes.
12    Q.  Okay. And what did you do at Sherwood
13 Medical?
14    A.  I was a marketing manager.
15    Q.  What did Sherwood Medical sell?
16    A.  They sold a number of products. I was
17 responsible for respiratory products.
18    Q.  Okay. And how long were you with
19 Sherwood?
20    A.  Approximately two-and-a-half years. I
21 think we did go through all this in that first
22 deposition.

5 (Pages 348 to 351)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II    HIGHLY CONFIDENTIAL              February 28, 2008
Chicago, IL

Page 352

1    Q.  We did -- well, it might have been your
2  first deposition way back when, but I wanted to
3  get it in the federal case.
4    A.  Okay.
5    Q.  After Sherwood Medical, where did you
6  go?
7    A.  I came back to Abbott Laboratories.
8    Q.  In what position?
9    A.  I was in Abbott home care.
10   Q.  And that was in or around '91?
11   A.  Approximately, yes.
12   Q.  Okay.  And what was your position?
13   A.  I -- I believe the title was like an
14  area business manager --
15   Q.  Okay.
16   A.  (Continuing) -- in the Midwest.
17   Q.  And this is where we're going to expand
18  a little bit on the questions.
19       Did you have -- well, how long were you
20  in this position?
21   A.  Three or four years.
22   Q.  What was your area?

Page 353

1    A.  Midwest.
2    Q.  And did you live in the Chicago area?
3    A.  Yes, I did.
4    Q.  Did you have an office at Abbott Park?
5    A.  Actually, the entire group was located
6  at a facility just down the street from Abbott
7  Park.
8    Q.  Okay.  And did you have a computer, a
9  PC computer?
10   A.  I believe so, yes.
11   Q.  Did you generate documents on that
12  computer?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  Sure.  Yes.
15  BY MS. ST. PETER-GRIFFITH:
16   Q.  Did you also have hard-copy files that
17  you maintained?
18   A.  Yes, I did.
19   Q.  What type -- what types of documents
20  did you generate on the computer?
21   A.  I don't know that I -- well, I would
22  generate e-mail with internal peers and

Page 354

1  counterparts and various information like that.
2    Q.  Do you know approximately during this
3  early time frame in '91 how many e-mail you would
4  send on a daily basis?
5       MS. TABACCHI:  Object to the form.
6       THE WITNESS:  No, I have no idea.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Can you give a ballpark?
9    A.  I would have to surely guess.  At the
10  time I don't know if -- how -- how much e-mail
11  was happening at the time.  It's quite a while
12  ago.
13       You know, I don't know.  Maybe --
14   Q.  More than ten?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  You know, I don't know.
17  Maybe.  About ten maybe.
18  BY MS. ST. PETER-GRIFFITH:
19   Q.  Okay.  What types of hard-copy
20  documents did you generate in your position as an
21  -- as an area business manager?
22   A.  Well, I would have customer files,

Page 355

1  personnel files.
2    Q.  Would the personnel files be for your
3  subordinates?
4       MS. TABACCHI:  Object to the form.
5       THE WITNESS:  Yes.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Okay.  And who were your subordinates
8  during this point in time?
9    A.  Well, it varied the time that I was in
10  there.  People would come and go out of that
11  organization.
12   Q.  Okay.  Who can you recall for this
13  four-year period?
14   A.  For -- for a while I worked
15  independently, and then I had some sales
16  representatives; wow.
17       At one point Robert Martin, who managed
18  our pharmacy operation.
19   Q.  Did you have oversight over the
20  pharmacies, over the home-care pharmacies?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  Only for a small period

6 (Pages 352 to 355)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 356

1  of time I did, yes.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Did you oversee the sales
4  through that pharmacy?
5          MS. TABACCHI:  Object to the form.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Or to Abbott pharmacies?
8      A.  Well, it wasn't really the sales
9  through the pharmacy.  It was the compounding
10 operation.
11     Q.  Okay.  And how did that compounding
12 operation work?
13     A.  Well, we -- we had relationships with
14 hospital customers that would want support from
15 Abbott to compound drugs for home-care patients,
16 et cetera.  And so as they received orders, they
17 would compound the product, and we would deliver
18 it for them.
19     Q.  Through this '91 through approximate
20 '95 time period, did you work with home infusion
21 business unit, or was that part of the home-care
22 unit?

Page 357

1      A.  No, that was part of the home infusion,
2  I believe.
3      Q.  And were you responsible for generating
4  any contracts for the home infusion business
5  unit?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I wasn't responsible for
8  generating the contracts.  I was responsible for
9  going out and work -- or developing the
10 relationships with the customer so that we could
11 achieve contracts.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  And what were the relationships that
14 you developed with the customers?
15         MS. TABACCHI:  Object to the form.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  What were the nature of the
18 relationships?  Were they pure sales?  Were they
19 consignment arrangements, for example?
20     A.  They -- they --
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  Well, they were

Page 358

1  agreements where Abbott would work with the
2  individual customers to determine their needs,
3  and with that we would supply different services.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  What were the nature of the services
6  that you supplied?
7      A.  Well, as I just suggested, it may be
8  compounding services, it may be support for how
9  they would want to market their program
10 internally in their organizations, things like
11 that.
12     Q.  Did you work at all with any of the
13 revenue-share customers or revenue-share
14 partners?
15     A.  I believe that some of those were
16 revenue-share-type agreements.
17     Q.  And what was your understanding of how
18 the revenue-share agreements worked?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Again, they could pick
21 from the different services that were provided,
22 and based on the services that Hospira or

Page 359

1  Hospira-Abbott provided, that would determine the
2  amount of compensation that Abbott would receive.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  And would Abbott share in a percentage
5  of the reimbursements that would be received by
6  the revenue-share partner?
7          MS. TABACCHI:  Object.
8          THE WITNESS:  It could.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Are you aware of any joint-venture
11 arrangements that Abbott home care or Abbott home
12 infusion entered into with its customers?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I'm not -- I don't recall
15 how they were classified, if that makes sense.  I
16 mean, if it was really classified as a joint
17 venture or whether that was just a -- a
18 relationship where, again, we provided different
19 services, and they were compensated based on
20 those -- the services we provided.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Okay.  So you, as part of your

7 (Pages 356 to 359)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

| Page 360 |
| --- |

1  responsibilities, developed the relationships.
2  What would happen once you developed the
3  relationship? Would someone else be responsible
4  for writing up the contract with the -- with the
5  customer?
6      A.  Yes. Our contracting team would --
7  would put together an appropriate document, yes.
8      Q.  Would you have input into that?
9      A.  Possibly, yes.
10     Q.  Did anyone, to your knowledge, ever
11 raise any concerns about the legality of these
12 consignment arrangements or joint-venture
13 arrangements that may -- that Abbott may have
14 entered into with its home infusion partners?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  No.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Do you recall any customer or any
19 consignment partner or joint-venture partner
20 raising a concern about these relationships
21 possibly violating either the safe harbor
22 provisions or any Medicare or Medicaid statute or

| Page 361 |
| --- |

1  regulation?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  No.  My recollection is
4  that -- and we always involved legal counsel --
5  is all -- if there were any questions, it would
6  be on how that arrangement was set up and to make
7  sure that there -- there was an appropriate
8  relationship between Abbott and whoever we were
9  working with.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  How did you, as someone who was
12 developing this relationship, have peace of mind
13 that the relationships that you were fostering or
14 developing and ultimately were memorialized
15 in contracts complied with federal and state
16 Medicare statutes and regulations?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  Well, I was very
19 comfortable that anything that would have gone
20 out would have been worked on and supported by
21 our legal counsel to make sure that it was
22 something that -- that Abbott Laboratories was

| Page 362 |
| --- |

1  comfortable with.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  So you essentially relied upon
4  legal counsel?
5      A.  Yes, very much so.
6      Q.  Was there a separate compliance person?
7  When I say "compliance," I don't mean contract
8  compliance.  I mean compliance with fraud and
9  abuse statutes and regulations.
10         Was there a compliance person during
11 this period of time, '91 through '95, that you
12 would consult?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I -- I don't recall.  I
15 don't know that there was.  I know, again, we
16 relied on legal counsel.  Whether there was legal
17 -- whether they reviewed with other people within
18 the legal organization, I don't know.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  My question is more just your
21 personal interaction outside of legal counsel.
22 Do you recall there being any person designated

| Page 363 |
| --- |

1  that you could go to with compliance questions?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  Well, compliance can be
4  very broad.  I'm not sure I understand exactly
5  what you're saying.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Fraud and abuse compliance.  Not -- not
8  contract compliance, but compliance with state
9  and federal Medicare and Medicaid statutes?
10     A.  No, but I was very comfortable, I
11 guess, that our legal counsel, if there were
12 issues in that regard, that would have been
13 contemplated in what we were putting together.
14     Q.  Why were you comfortable with that?
15     A.  I guess I also had no reason not to
16 believe that that was taking place, and -- nor
17 did we have questions or concerns on that nature
18 from the majority of our customers.
19     Q.  Okay.  Did you have any from any of
20 your customers?
21     A.  I don't recall.
22     Q.  Okay.  Is there any other reason that

8 (Pages 360 to 363)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

| Page 364 | Page 366 |
|---|---|

Page 364

1  you can think of as to why you would have a
2  comfort level that the consignment arrangements
3  of joint-venture arrangements that were entered
4  into with Abbott's home infusion customers
5  complied with state and federal Medicare and
6  Medicaid statutes, other than what you've
7  testified to?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  Well, it's a difficult
10  question.  I know -- as I say, I've felt
11  comfortable that my responsibilities were -- I
12  guess I -- I have always felt comfortable that
13  Abbott would represent those needs appropriately
14  and had no reason to think otherwise.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Okay.  Let me simplify this then.
17          Other than your conversations with
18  legal counsel, what is the basis for that feeling
19  comfortable that you just described?
20      A.  Maybe it was the -- I guess my -- my
21  personal feeling, that over the years that we
22  have always dealt with things, I felt, in an

Page 365

1  appropriate manner, or that Abbott had, and that
2  ...
3      Q.  Well, do you have any personal way of
4  verifying whether or not the arrangements that
5  home infusion entered into complied with state
6  and federal Medicare and Medicaid laws?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  I've -- I've no way of
9  knowing one way or another.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Okay.  After -- oh, let me ask you.
12  When you moved on to a different position -- you
13  said you were in this position for about three or
14  four years -- what happened to your computer
15  desktop files and your personal work files, hard-
16  copy work files that you were working on?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  You mean when I went to a
19  new position?
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  When you went to a new position.
22      A.  They stayed where they were.

Page 366

1      Q.  Okay.  And where physically was that?
2      A.  That was in the -- that facility that
3  was down the street from Abbott Park.
4      Q.  Okay.  Did you just leave them in the
5  office that you worked --
6      A.  Yes.
7      Q.  (Continuing) -- that you had occupied?
8      A.  Yes.
9      Q.  Did you have a successor?
10      A.  I believe I did.  I don't remember who
11  that was.
12      Q.  Okay.  Now we -- now I think we're up
13  to '95.
14      A.  Yes.
15      Q.  Approximately '95?
16      A.  I think I rounded up a little on you on
17  some of those, because I then went -- that is
18  when I went to the corporate hospital marketing
19  role.
20      Q.  Okay.
21      A.  And was there probably about a year.
22      Q.  Okay.  And was that at Abbott as well?

Page 367

1      A.  Yes.
2      Q.  At Abbott Park?
3      A.  Yes, it was.
4      Q.  When you say you've rounded up, is that
5  approximately the '95 time frame?
6      A.  It's probably a little earlier than
7  that.
8      Q.  Okay.  '94 maybe?
9      A.  Yeah.
10      Q.  So in '94, '95 you worked in the
11  corporate hospital marketing?  Is that still
12  within HPD?
13      A.  That was in -- within Abbott.  So it
14  was a little bit more of a corporate function.
15      Q.  Okay.  And what were your
16  responsibilities there?
17      A.  It was a marketing role, and I was -- I
18  was a liaison with a number of the divisions to
19  try to make sure that -- well, I wasn't trying to
20  make sure of anything.  It was to make sure that
21  we could talk about the value of Abbott
22  Laboratories as a total and to support customers

9 (Pages 364 to 367)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                        Chicago, IL

Page 368

1  if they had questions about were there ways that
2  we could help customers other than just with
3  products.
4      Q.  Okay.  And who was your supervisor?
5      A.  Joy Amundson.
6      Q.  What divisions did you work with in
7  this liaison-type capacity?
8      A.  Most of it was within the Hospital
9  Products Division, but I also worked with our
10 diagnostics division, et cetera; a little bit
11 with the pharmaceutical division.
12     Q.  What about TAP?  Did you work with TAP?
13     A.  No.
14     Q.  Then after that -- did you say it was
15 for about a one-year time frame?
16     A.  Yes.
17     Q.  Okay.  So that brings us to
18 approximately '95?
19     A.  About, yes.
20     Q.  Okay.  And what happened in '95?  Where
21 did you go on to?
22     A.  I became the marketing manager for our

Page 369

1  pain management products within the Hospital
2  Products Division.
3      Q.  And where was your office?
4      A.  That was in Abbott Park.
5      Q.  How long were you in this position?
6      A.  About a year.
7      Q.  So '95 to '96.  Did you similarly have
8  a desktop computer and hard-copy files in your
9  office in Abbott Park for the position?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  Yes.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  And when you left that position, where
14 did -- where did you leave those files?
15     A.  They stayed --
16     Q.  They stayed there?
17     A.  (Continuing) -- where I was, yes.
18     Q.  And what types of documents did you
19 generate when you were in this marketing manager
20 for the pain management product line?
21     A.  Okay.  That -- well, I had
22 administrative assistants.  So if there was a

Page 370

1  letter that had gone out to the field, et cetera,
2  then those would have been things that they --
3  they would have had.
4          My own computer was probably designed
5  more around, again, internal communications.
6      Q.  Okay.  During this period of time, can
7  you approximate how many e-mails you would send
8  out?
9          MS. TABACCHI:  Object to the form.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  On a daily basis.
12     A.  No, probably not much different than
13 before.
14     Q.  Than early on?  About ten a day or so?
15     A.  Yeah.  Yeah.
16     Q.  Okay.  So this was from '95 to '96?
17     A.  Yeah, I think that was closer to '95.
18 Because my next role was around '95, when I went
19 into director of sales for the Alternate Site
20 business.
21     Q.  Okay.  So that brings us back to the
22 Alt Site business unit?

Page 371

1      A.  Yes.
2      Q.  Was the home-care unit a subcomponent
3  of the Alt Site business unit?
4      A.  Yes.
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Yes, I was the director
7  of sales for the product group.  So yes, within
8  Alternate Site.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  So you were -- you were the director of
11 sales for Alt Site product sales?
12     A.  Yes.
13     Q.  And for approximately how long?
14     A.  Three years.
15     Q.  Okay.  And did you have direct
16 supervisory responsibility over the sales force
17 for Alt Site product sales?
18     A.  Yes.
19     Q.  Okay.  Who do you remember for -- for
20 sales force members?
21     A.  Well, there -- there were -- there
22 were, like, 50.

10 (Pages 368 to 371)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL                    February 28, 2008
Chicago, IL

Page 372

1    Q.  Okay.  Who can you remember?
2    A.  Craig Smith, Mike Ramsey, Trudy
3  Bucheri, you know -- let's see.  I'm trying to go
4  back because my next role is with -- as the
5  general manager, and all -- you know, I -- there
6  were a number of sales reps.
7    Q.  Okay.  But you think there were
8  approximately 50 during this '95 to '9- --
9    A.  A few less than that.  But yes, in the
10  40 to 50 ballpark.
11    Q.  Did -- was it at any given time there
12  were 40 to 50 sales reps, or in total there were
13  40 to 50 sales reps that you supervised during
14  this three-year period?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  In total.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  And other than Mr. Smith, Mr. Ramsey,
19  and Ms. Bucheri, you don't recall any other
20  names?
21    A.  It would take me a while; worked with
22  Sherry May, I worked with -- probably a little

Page 373

1  nervous.  I -- it will come to me but I --
2    Q.  Take your time.  If any name comes to
3  you during the course of this deposition, feel
4  free to pipe up --
5    A.  Okay.
6    Q.  (Continuing) -- okay?
7    A.  Thank you.
8    Q.  Did you work -- did you have direct
9  supervisory responsibility over the sales force,
10  or was there an intervening, for example,
11  district manager?
12    A.  I had several district managers.
13    Q.  Okay.  And who were the district
14  managers?
15    A.  Well, those are the -- really the names
16  that I was giving you, I think.  Mr. Smith was
17  one.  Mike Ramsey was another.  Debbie Poulson
18  was another.  Mike Beck was one at one point.  I
19  don't know if when I started, but when I finished
20  that responsibility, I believe Mike was one.  And
21  I don't remember the gentleman on the East Coast,
22  but that would have been it.

Page 374

1    Q.  What types of files did you maintain
2  from this '95 through '98 time period?  Let's
3  start with hard copies.  What types of documents
4  did you generate and did you retain?
5    A.  Most of that would have been, again,
6  personnel files for direct reports.  Maybe on
7  rare -- well, I may have had literature and other
8  things, training, some training documents, things
9  like that.
10    Q.  And when you left the director of sales
11  of Alt Site position, what happened to those
12  hard-copy files?
13    A.  They would have stayed there.
14    Q.  Did you have a successor?
15    A.  Yes.
16    Q.  Who was your successor?
17    A.  I believe that was Scott Glover.
18    Q.  Okay.  Let's talk about electronic
19  documents that you may have had.  Do you recall
20  what types of documents you generated on your
21  computer?
22    A.  Again, I -- there wasn't a lot of

Page 375

1  generation.  It was mostly used as a
2  communication tool, so it was a lot of e-mails
3  and things like that.
4    Q.  Okay.  And did you e-mail the sales
5  force?
6    A.  Typically, no.
7    Q.  Okay.  Did the sales force have -- why
8  not?
9    A.  They did not -- at the time they did
10  not have computers.  So things would have been
11  sent out from the home office, and that would
12  have been something -- a contact or a letter
13  would have been generated with my assistant, and
14  she would have mailed that out, then, to the
15  field.  But it wouldn't have been an e-mail
16  necessarily to the field because they didn't have
17  computers.  They would have had to have them
18  personally, and we weren't set up that well.
19    Q.  Do you recall when it was that the
20  sales force was required to have computers at
21  their homes or at their office locations and to
22  maintain an e-mail account?

11 (Pages 372 to 375)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 376

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  Not while I was in an
3  Alternate Site role.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay.  Did you communicate with your
6  district managers via e-mail?
7      A.  I -- I may have.  I don't -- I don't
8  remember if they were set up or not.
9      Q.  Do you recall who you did communicate
10  with via e-mail?
11      A.  It would have been the internal staff.
12      Q.  Okay.  Such as -- it would have -- just
13  be clerical staff?
14      A.  No.  It could have been marketing
15  managers.  It could have been the national
16  account managers, et cetera.
17      Q.  Did you communi- -- okay.  So you could
18  have communicated with the NAMs via e-mail?
19      A.  Yes.
20      Q.  And what were your responsibilities
21  over the marketing staff during this period of
22  time?

Page 377

1      A.  As -- as the director of sales?
2      Q.  Yes.
3      A.  It was more in coordination of as they
4  were developing and looking at programs or --
5  that we would make sure they were communicated to
6  the -- the sales organization.
7      Q.  Where would your communications with
8  your sales staff be maintained or saved?
9          MS. TABACCHI:  Object to the form.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Would it just -- go ahead.
12      A.  It was -- my administrative assistant.
13      Q.  So in hard-copy form in some -- in a
14  file?
15      A.  Or they had -- they had a -- they may
16  have had it in their computer as well.
17      Q.  During this period of time do you
18  recall ever receiving -- from '95 through '98 do
19  you recall at any time receiving a litigation
20  hold memoranda?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  I believe I -- I received

Page 378

1  it.  I don't know the timing of when I received
2  those.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay.  What did -- what did you do when
5  you received it?
6      A.  It's a document you would take very
7  seriously.  I'd put -- I'd try to gather any
8  documents and communicated, as it was -- as it
9  was given in the memorandum.  If it was directed
10  at myself, I would make sure that I tried to
11  comply and put those documents together.  If it
12  suggested that I needed to go further than that,
13  I would have communicated with the appropriate
14  people or -- and -- and make sure they were
15  trying to be compliant as well.
16      Q.  So, for example, if it directed you to
17  send the lit hold memo down your chain of
18  command, would you do that?
19      A.  Yes.
20      Q.  Do you recall doing that?
21      A.  I -- I don't remember specifically.  I
22  know, as I say, that I -- again, you would look

Page 379

1  at those and take them very seriously that it was
2  something that we needed to accomplish and that
3  we would work towards making that happen.
4      Q.  At any time -- and we're going to go
5  back to sort of your history with Abbott.  But at
6  any time during your tenure, what do you recall
7  about providing documents incident to a
8  litigation hold memo, you personally?
9      A.  I remember getting those requests and -
10  - and putting that together and sending it to --
11  I believe it was typically a paralegal that we
12  would have a contact with, and then I think I
13  typically tried to follow up to make sure that
14  they had received whatever I had put together.
15      Q.  Do you recall which documents you put
16  together for them?
17      A.  No, not really.
18      Q.  Do you recall receiving actual copies
19  of the requests to produce that were the subject
20  of the litigation hold requests?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  I'm not sure I know what

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 380

1  you mean.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Sure.  Do you recall receiving requests
4  -- did the memoranda that you received from the
5  paralegal or from the legal department, was it
6  also accompanied with the actual request from a
7  party in litigation seeking particular
8  information?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I'll try to answer as
11  best I can.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Okay.
14     A.  I think it was -- if there was a copy
15  of a document from legal that had -- requesting
16  us to do that, that's what I would read through,
17  try to make sure I understood what it was asking
18  for, and then put the appropriate materials
19  together and send that to him.
20     Q.  Do you ever recall seeking guidance
21  from the legal department as to what materials
22  you should be searching for?

Page 381

1      A.  I -- I don't remember a specific
2  incident, but I think I do remember if there were
3  questions of the types of information that we
4  asked, that -- or that I asked that question.
5      Q.  Do you recall discussing the litigation
6  hold memoranda with anyone within your
7  supervisory chain?
8      A.  Again, to the best of my knowledge not
9  if it did not request that.  And if it did, I
10  would then forward that on.
11     Q.  Going back to this time frame, '95
12  through '98, did you have any, either when you
13  were the marketing manager or the director of
14  sales for Alt Site business unit, did you have
15  any involvement in pricing?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  No, I did not.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Okay.  For your sales reps, at any time
20  that you -- that you had sales reps that were
21  your direct reports at any time when you were
22  within HPD, how did your sales reps know what

Page 382

1  prices they were authorized to offer to customers
2  without any supervisory approval?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  They didn't really have -
5  - they -- they didn't have access -- they would
6  work with our contracting department to determine
7  an appropriate price to offer to a customer.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.  So did -- well, let me ask it
10  this way.  Did your sales reps, then, have any
11  authority to offer customers prices without first
12  having that reviewed or approved by the contract
13  marketing division or department?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  For the most part the
16  responsibility was to check in with the
17  contracting department.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Can you think of any time when the
20  sales force did have authority to, you know,
21  offer prices without needing to get approval
22  first from the contract marketing department?

Page 383

1      A.  Well, the only -- and I don't remember
2  the timing of this, but I think there was a time
3  when we had established a -- an access price that
4  said if -- if someone came to you and was
5  interested in a contract position, that we gave
6  them pricing that they could go out and -- and
7  suggest that if they wanted -- if a customer came
8  back and wanted something necess- -- better than
9  that price, then that's when they would go work
10  with our contract department.
11     Q.  Was -- do you recall Abbott ever -- or
12  Abbott Hospital Products Division ever having
13  pricing grids?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I -- I don't recall
16  pricing grids.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Is that a term that's familiar to you,
19  pricing grids?
20     A.  No.
21     Q.  Was it a term that just wasn't used
22  within Abbott Hospital Products Division?

13 (Pages 380 to 383)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. – Vol. II HIGHLY CONFIDENTIAL                February 28, 2008
Chicago, IL

Page 384

1       A.  I -- not that I recall, no.
2       Q.  Okay.  What about resource files?  Do
3   you remember resource files?
4       A.  I've heard the term.  I'm not sure how
5   or what that -- in relationship, I'm not sure I
6   know what that means necessarily.
7       Q.  Okay.  Do -- do you know what a
8   resource file was?  Or was that just a term that
9   you've heard?
10      A.  I think that was a term that I'd
11  heard.
12      Q.  Okay.  Did you work at all with
13  resource files?
14      A.  No, I did not.
15      Q.  Did your sales force at all, that you
16  are aware of, work with resource files?
17      A.  Not that I'm aware of.
18      Q.  Okay.  What about your district
19  managers?
20      A.  Not that I'm aware of.
21      Q.  What about any contract marketing staff
22  that you had supervisory responsibility for?  Did

Page 385

1   they work with resource files to your knowledge?
2       A.  I don't really know how it's defined,
3   so -- I'd like to help you, but I don't know that
4   I can tell you that yes or no.
5       Q.  Okay.
6       A.  Okay.
7       Q.  But you know for sure that you didn't
8   work with them and that your sales staff didn't
9   work with them?
10      A.  No, didn't.
11      Q.  No, they didn't work with them?
12      A.  No, they did not.
13      Q.  Okay.  Going back to the '95 through
14  '98 time period when you were the director of
15  sales for Alt Site, when you switched positions -
16  - well, first -- in '98, what position did you
17  assume?
18      A.  I became the general manager for
19  Alternate Site product sales.
20      Q.  Did you switch offices?
21      A.  Yes, I believe I did.
22      Q.  Okay.  What happened to the -- the --

Page 386

1   either your computer, your desktop computer or
2   your hard-copy files when you switched to that
3   general manager position?
4       A.  They would have stayed where they were.
5       Q.  Okay.  And do you recall at any time
6   while you were an HPD employee saving e-mail on
7   your desktop?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  Saving e-mail.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Meaning rather than deleting e-mail,
12  saving -- you know, dragging it to a file or
13  saving it in a separate file?
14      A.  No, I don't remember.
15      Q.  Do you remember ever being asked to do
16  that incident to a litigation hold memorandum?
17      A.  You know, I don't recall what was in
18  those.
19      Q.  Okay.  Let's go to when you were the
20  general manager of Alt Site product sales.
21          How long did you hold that position?
22      A.  Through about 2002.  So about four

Page 387

1   years.
2       Q.  Okay.  And what types of hard-copy
3   documents did you generate during this four-year
4   time period?
5       A.  Well, sales report documents; again,
6   personnel documents; if there were customer-
7   specific documents.
8       Q.  Did you participate in any of the
9   August or April plans, marketing plans?
10      A.  Yes.
11      Q.  Okay.  Did you have copies of those?
12          MS. TABACCHI:  Object to the form.
13          THE WITNESS:  Yes, I would have had
14  copies of them.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Where did you maintain the copies of
17  the April or August marketing plans for Alt Site?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  I'm not -- I'd like to
20  clarify if I could.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Sure.

14 (Pages 384 to 387)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 388

1      A.   Typically the April and August reviews
2   were financial reviews on the state of business,
3   not necessarily marketing plans.
4      Q.   Okay.
5      A.   And so I would have -- they -- with
6   each of those financial reviews there was
7   typically a book where you would put together,
8   "Here is how you've done year-to-date and here is
9   how you estimate financially you'll come out at
10  the end of the year for that year."
11     Q.   Okay.
12     A.   So I would have had those documents.
13     Q.   And did you help generate those
14  documents?
15        MS. TABACCHI:  Objection to the form.
16        THE WITNESS:  I participated in the
17  generation of some of those forms, yes.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   Okay.  And who did you participate
20  with?
21     A.   Our financial team and -- and our
22  marketing teams as well.

Page 389

1      Q.   And who would have copies of these
2   documents?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  Well, it was reviewed
5   with our management team.  I don't know -- so I
6   obviously had that and Don Robertson, my boss,
7   who they -- it would have been whoever else they
8   had in that review.
9         The -- the Abbott management team,
10  either financial or the people running the
11  business.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   When you -- when you say "the Abbott
14  management team," do you mean outside of the
15  Hospital Products Division?
16     A.   No, no.
17     Q.   Okay.  Would you have expected that --
18  or do you know whether the president of Hospital
19  Products Division had copies or received copies?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  Well, he would have
22  received a component of it, which was our -- our

Page 390

1   -- the review for the products that I had, yes.
2   BY MS. ST. PETER-GRIFFITH:
3      Q.   Okay.
4      A.   My documents would have been rolled up
5   into the Alternate Site totals document, which
6   was then rolled up into something for the
7   president.
8      Q.   Was there a separate document known as
9   a marketing plan that you can recall?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  Marketing plans were
12  produced.  There isn't a standard -- not like the
13  -- the financial packages that were relatively
14  consistent.  There wasn't that same type of
15  consistency with marketing plans.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   When were they produced?
18        MS. TABACCHI:  Objection to the form.
19        THE WITNESS:  There was -- there was no
20  set time.  It was just a matter of did you do it
21  before -- you know, before the start of the next
22  year?  What were you trying to accomplish in the

Page 391

1   following year?  Et cetera.
2         Or they may have been done after the
3   first of the year.  But around that period of
4   time, anywhere from, you know, fourth quarter to
5   the first quarter of the following year.  If they
6   were going to be produced, that's when they would
7   have been asked for.
8   BY MS. ST. PETER-GRIFFITH:
9      Q.   Okay.  Did you -- at any time when you
10  were within HPD, do you recall generating a
11  marketing plan?
12     A.   I think the only time was when I was in
13  -- the marketing manager for the pain management
14  products where -- you know, the pain management
15  device that I had responsibility for.
16     Q.   Other than when you were overseeing the
17  pain management product line, do you recall
18  anyone within your supervisory chain having
19  responsibility for developing a marketing plan?
20     A.   You know, I -- I don't recall whether
21  that was something that was asked for and that
22  was -- that we had.

15 (Pages 388 to 391)

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL            February 28, 2008
Chicago, IL

Page 392

1    Q.  Okay.  When you were within Alt Site
2  product sales at any time, did you have
3  responsibility for reviewing or commenting upon
4  marketing plans?
5    A.  I may have, yes.
6    Q.  Okay.  For what products or for what
7  business, do you recall?
8    A.  Ambulatory devices or our injectable
9  product portfolio.
10    Q.  Do you have a specific recollection of
11  recalling -- reviewing any marketing plans for
12  either your ambulatory devices or your injectable
13  products?
14    A.  I don't recall anything specific.
15    Q.  Do you remember during what period of
16  time that you were with Alt Site that you would
17  have had that responsibility?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  As the general manager.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Do you remember who would have put
22  together that information?

Page 393

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  Well, the -- the people
3  responsible from a marketing perspective.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Okay.  So the contract marketing group?
6      MS. TABACCHI:  Object to the form.
7      THE WITNESS:  No.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Okay.  Is there another subcomponent of
10  the business unit that --
11    A.  There were marketing managers.
12    Q.  Okay.  And who were the marketing
13  managers?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  Mike Novak was one,
16  Michelle -- and I'm searching here.  We had
17  several.  Jim Custed, I think, was at one point.
18  Again, it's been a few years.  Michelle Warner.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Did you retain copies of the marketing
21  plans?
22      MS. TABACCHI:  Object to the form.

Page 394

1      THE WITNESS:  I -- I don't know.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  Would they have been retained within
4  your files by your administrative assistants if
5  you did?
6      MS. TABACCHI:  Object to the form.
7      THE WITNESS:  If I had them and -- and
8  had kept them, they would have been in my files.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Well, can you -- if you had them, can
11  you think of any reason why you would have not
12  kept them or would have destroyed them?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  Like some of the
15  financial documents, when you move into the next
16  year, you know, they weren't necessary.  And if
17  you were going to go through the process again,
18  you would start over.  So there was no need to
19  keep those types of documents.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  When you say "like some of the
22  financial documents," let me backtrack.  Did you

Page 395

1  keep the August and April plan information?
2      MS. TABACCHI:  Object to the form.
3      THE WITNESS:  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Okay.
6    A.  As soon as the year was over, though,
7  as I say, then you look at it and you say -- you
8  would move to the next year and those weren't as
9  relative or relevant any more, and so those
10  became less important.  And if you -- if you held
11  on years at a time, you'd end up with -- you
12  know, you could fill your office with that.
13      And so the practice was -- well, I
14  don't know if there was a -- my practice was I
15  didn't hold on to those for a great period of
16  time.
17    Q.  Do you recall how long you did hold on
18  to them?
19    A.  I -- I don't know exactly.  It depends
20  on how much space I had and what was there, but
21  there was, as I say -- after a year, there wasn't
22  a lot of necessity for it.

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 396

1     Q.  Well, what if they were subject to a
2  lit hold memo?
3     A.  I would have -- I would have turned
4  them in at the time, I believe.
5     Q.  Okay.  Is the same true for marketing
6  plans?  If they were subject to a lit hold memo,
7  you would have turned them in at the time?
8     A.  Oh, yes.
9     Q.  Okay.  After you turn them in, would
10  you do anything to preserve them or save them?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I'm not sure I understand
13  your question.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Sure.  Sure.
16        After you turned them in, if they were
17  subject to a lit hold memo, if you already gave
18  copies to the legal department, would you then
19  just retain them or not retain them, according to
20  your own, you know, personal practice in terms of
21  your file retention?
22        MS. TABACCHI:  Object to the form.

Page 397

1        THE WITNESS:  You know, I don't -- I
2  don't know.  I'm not even sure I received them
3  back all the time.  I think I gave everything I
4  had and don't know -- I couldn't tell you whether
5  I got a big stack back and put them in a file or
6  not.  I don't -- I don't recall.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Okay.  What -- after you left the --
9  well, when did you leave the position of general
10  manager?  You said 2002?
11     A.  Approximately, yes.
12     Q.  Okay.  What happened to your computer
13  and your hard-copy files when you left that
14  position?
15     A.  Those would have stayed in the office
16  that I was in.
17     Q.  Okay.  During this period of time, do
18  you recall whether the Alt Site product sales --
19  sales staff was communicating by e-mail --
20        MS. TABACCHI:  Object to the form.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  (Continuing) -- from '98 through 2002?

Page 398

1     A.  I don't believe so.
2     Q.  Okay.  Do you recall when at any time
3  they had e-mail capabilities or were
4  communicating by e-mail?
5     A.  Well, some had e-mail capabilities, and
6  we were trying to establish some e-mail
7  capabilities, but I don't know -- we did not
8  supply the field sales organization at that time
9  with an Abbott computer that they would be able
10  to do that on.  So I think around that 2002 time
11  frame we were beginning to try to establish that
12  mechanism, but I don't know how much was actually
13  done with that.
14     Q.  Okay.  Did you generate, during this
15  period of time, '98 through 2002, documents known
16  as significant event reports?
17     A.  Yes.
18     Q.  How did you maintain those documents?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  My admin assistant would
21  help me put those together and forward them on to
22  my boss, and then she would maintain those.

Page 399

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Do you recall whether at any time
3  during the '98 to 2002 time period you may have
4  e-mailed significant event reports?
5     A.  I don't believe that was the practice
6  at that time.
7     Q.  Do you recall how -- from '98 through
8  2002 how often you utilized e-mail?
9        MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Again, I don't -- I don't
11  remember how much.  It was mostly communicated in
12  hard copy, but it was probably similar.  Maybe --
13  maybe just a little bit more than what had been
14  done earlier.  Again, as the years go on you end
15  up doing a little bit more, but it was for the
16  same process, I guess.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Do you recall whether people sent you
19  more e-mail?
20     A.  I believe I began to get more e-mails,
21  yes.
22     Q.  Do you recall the types of documents

17 (Pages 396 to 399)

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 400

1  that were e-mailed to you or that you e-mailed
2  out?
3      A.  I think it was mostly not documents,
4  rather than just communication.
5      Q.  Okay.  So not -- you wouldn't
6  necessarily attach documents?
7      A.  No.
8      Q.  Then in 2002 what position did you
9  assume?
10     A.  I was vice president of major
11 healthcare systems.
12     Q.  Okay.  Until when?
13     A.  Until -- really till the spin to
14 Hospira.
15     Q.  So 2004?
16     A.  Yes.
17     Q.  Do you recall whether you had an
18 appreciable increase in your e-mail use during
19 this period of time, 2002 to 2004?
20     MS. TABACCHI:  Object to the form.
21     THE WITNESS:  I did have an -- yes, I
22 believe so.  I don't know if I'd classify it as

Page 401

1  appreciable.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  But -- well, can you -- can you
4  quantify the increase?
5      A.  I -- no.
6      Q.  But did you still generate hard-copy
7  documents as well and maintain hard-copy files?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  Some, yes.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Okay.  And at the time of the spin,
12 what happened to either your desktop computer and
13 your e-mails or your hard-copy files?
14     A.  Still -- well, they remained where they
15 were.
16     Q.  Meaning they remained in the same
17 office at Abbott?
18     MS. TABACCHI:  Object to the form.
19     THE WITNESS:  No, where -- where I was
20 located is where Hospira is located today.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Okay.  So at the time of the spin,

Page 402

1  nothing changed for you physically in terms of
2  the location of your office?
3      A.  Correct.
4      Q.  Okay.
5          Do you still have documents dating back
6  to 2002?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  I don't believe so.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Do you recall anyone, during your
11 tenure when you were at Hospira, either providing
12 you with a lit hold memo or a collection memo,
13 seeking to collect documents that you might have
14 had that were from 2002 until to the time of the
15 spin?
16     MS. TABACCHI:  Object to the form.
17     THE WITNESS:  I don't recall.  I -- I
18 couldn't tell you one way or another.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  And what were your responsibilities
21 when you were the vice president of major
22 healthcare from 2002 to 2004?

Page 403

1      A.  It's a support function with our --
2  both to the external customer and to our -- I
3  think our internal organization.  I have a
4  national account responsibility working with a
5  group called commercial service operations that
6  develops the brochures and -- and product
7  information and things like that.
8      Q.  Did you have any responsibilities over
9  any sales force members?
10     A.  The hospital national account managers.
11     Q.  Okay.  Did that cover any of the Alt
12 Site product --
13     MS. TABACCHI:  Object to the form.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  (Continuing) -- sales?
16     A.  No, it did not.
17     Q.  Okay.  Do you recall physically where
18 your -- the copies of the August or April plan
19 information or updates that you saved -- I know
20 you testified that you may have, as you lost
21 space, thrown some out or moved them around, but
22 do you recall physically where they were located?

18 (Pages 400 to 403)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

Page 404

1    A.  Well, the offices have shelving units
2  in them that typically they would have been on
3  those shelving units.
4    Q.  Is that near your office or --
5    A.  Typically in the office.
6    Q.  Okay.  Would that have been something
7  that would have been filed and maintained by, for
8  example, an administrative assistant or some
9  other clerical staff member?
10   A.  Not necessarily, no.
11   Q.  Okay.  Would you have filed them?
12   A.  I wouldn't -- I'd put them on a shelf.
13   Q.  Okay.  So you would physically put them
14  on a shelf?
15   A.  I'd physically put them on there, yeah.
16   Q.  Okay.  Did you ever have -- have
17  occasion to go back and look at them or need to
18  access them?
19   A.  Well, again, when -- well, if you did
20  an April update, as you put together an August
21  update, you would look at what had been said, how
22  it was said, or what the financials were from

Page 405

1  that -- what had been presented so that you could
2  update it based on how your business was now
3  characterized and were there -- the idea was to
4  determine if there were changes in the -- what
5  you'd predicted from a financial impact.  So I
6  would refer back to what had been done so that
7  you could say, "Hey, you know what?  Here, let's
8  change," and what that means.
9    Q.  Mr. Baker, what I'm going to do is put
10  a list in front of you, and I'll have your
11  counsel look at it.  It's just a list of subject
12  drugs that are the drugs at issue in this case.
13  And the reason why I'm -- I want to have that
14  list in front of you is I'm going to have it -- I
15  have a series of questions for you which refer to
16  subject drugs, and I just want you to know that -
17  - that that's the list of drugs that we're
18  talking about that are at issue in this lawsuit,
19  okay?  So when I refer to them, those are the
20  drugs, those are the products I'm referring to.
21        (Witness examines document.)
22        THE WITNESS:  Okay.

Page 406

1        MS. TABACCHI:  Are you going to switch
2  topics now?
3        MS. ST. PETER-GRIFFITH:  Yeah.
4        MS. TABACCHI:  Is this -- can we take a
5  five minute break.
6        MS. ST. PETER-GRIFFITH:  Sure.
7  Absolutely.
8        THE VIDEOGRAPHER:  We are off the
9  record at 11:02 a.m. with the end of Tape No. 1.
10        (Brief pause.)
11        THE VIDEOGRAPHER:  We are back on the
12  record at 11:11 a.m. with the beginning of Tape
13  No. 2.
14  BY MS. ST. PETER-GRIFFITH:
15   Q.  Mr. Baker, I know I asked you what you
16  did to prepare for today's deposition.  Other
17  than talking -- speaking with Ms. Tabacchi, did
18  you speak with anyone else?
19   A.  No.
20   Q.  Okay.  Did you review any documents in
21  preparation for today's deposition?
22   A.  A couple of documents, yes.

Page 407

1    Q.  What documents did you review?
2    A.  They were documents that -- that had
3  information about holding the information, and
4  the documents that I think -- that had my name on
5  them that covered asking for me to hold the
6  materials and -- and to preserve the documents.
7    Q.  Okay.  So the lit hold memoranda?
8    A.  Yes, thank you.  It's much easier for
9  you to say.
10   Q.  Mr. Baker, what information are you
11  aware of or do you personally possess concerning
12  the benefits of the subject drugs, which I have a
13  list in front of you, in the treatment of
14  patients?
15   A.  Could you ask me that question again?
16   Q.  Sure.  What information are you
17  personally aware of concerning the benefits of
18  the subject drugs in the treatment of patients?
19   A.  Well, I know that vancomycin is an
20  important antibiotic.  I know that the others are
21  part of our injectable portfolio, and all are
22  important in patient safety and patient health.

19 (Pages 404 to 407)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL        February 28, 2008
Chicago, IL

Page 408

1    Q.  Okay.  How so?
2    A.  Well, they're -- they're utilized to, I
3  think, either support in the administer -- the
4  administration of other drugs, or in -- or
5  themselves in patient care.
6    Q.  Okay.  Do you have any other
7  information concerning the benefits of the
8  subject drugs in the treatment of patients?
9    A.  I'm not sure what you're looking for, I
10  guess.
11    Q.  Well, I just want to exhaust your
12  understanding or your personal knowledge of the
13  benefits of the subject drugs in the treatment of
14  patients.
15    A.  Yeah, I -- I don't know the specific
16  indications or pharmacoeconomics or any of the
17  things.  I just know we have a very large
18  portfolio of products, and I know you're talking
19  about the subject drugs, but it's one of many to
20  me that, I think, have value to our patient
21  population.
22    Q.  Okay.  Well, I just want to make sure

Page 409

1  have we exhausted sort of your familiarity and
2  understanding of the benefits of the subject
3  drugs and the treatment of patients?
4    A.  Thank you.  I'm not a pharmacist, so
5  it's not deep.
6    Q.  So that's about it; right?
7    A.  Yes.
8    Q.  Okay.
9       Sir, do you have any awareness or
10  personal knowledge or familiarity with the
11  Medicare or Medicaid reimbursement systems?
12    A.  Not specifically, no.
13    Q.  Okay.  Sir, do you have any -- well,
14  you said not specifically.  Do you have any?
15    A.  Oh, I know that's a system out there,
16  and that is how some -- I mean, just a broad
17  sense that -- that it's a component of how people
18  are paid, just like some are paid by private,
19  some have Medicare, some have Medicaid.
20    Q.  Okay.  Other than that, do you have any
21  familiarity with the reimbursement systems of
22  Medicare --

Page 410

1    A.  Not really, no.
2    Q.  Okay.  I just -- when you say "not
3  really," I just want to --
4    A.  No, I do not.
5    Q.  Sir, do you have any personal
6  understanding or knowledge or familiarity with
7  the meaning of "AWP," as that term is used in the
8  Medicare or Medicaid reimbursement systems?
9    A.  No.
10    Q.  Sir, do you have any personal knowledge
11  or familiarity or information concerning the
12  calculation of AWP for pharmaceutical products,
13  including the subject drugs?
14    A.  No, I do not.
15    Q.  Sir, do you have any information
16  concerning the lack of direct transactions
17  between the United States and Abbott?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  I don't know what that
20  means.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  Okay.

Page 411

1    A.  So, no, I don't believe so, unless you
2  can explain it further.
3    Q.  Well, I -- I first want to find out
4  whether you can answer the question as I have it
5  phrased.  Is the answer no?
6    A.  The answer is no.
7    Q.  Okay.  Do you have any information
8  concerning the lack of direct transactions
9  between Ven-a-Care and Abbott?
10    A.  No, I do not.
11    Q.  Do you have any information or personal
12  knowledge concerning the lack of any
13  misrepresentations to the United States
14  concerning AWP for the subject drugs?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  No, I do not.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  Sir, do you have any information
19  concerning the lack of any misrepresentations to
20  Ven-a-Care concerning AWP for the subject drugs?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  No, I do not.

Henderson Legal Services, Inc.

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

---

Page 412

BY MS. ST. PETER-GRIFFITH:
1
2    Q.  Do you have any information or
3  knowledge or personal awareness of any lack of
4  fraud on behalf of Abbott?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  No.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Sir, are you aware -- are you familiar
9  with or aware of any transactions between the
10 United States and Abbott?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  No.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.  All right, now that we've gone through
15 this list, I've got a couple more questions.
16       Sir, do you have any personal knowledge
17 or information or familiarity with the sale and
18 marketing of the subject drugs?
19   A.  I -- I may.  That's a very broad
20 statement, so --
21   Q.  Okay.  Well, let's -- I want to break
22 down -- I mean, I want you to answer the question

---

Page 413

1  as asked, but if we need to break it down, we can
2  do that as well.
3    A.  I would -- I would respond with I may,
4  depending upon how you --
5    Q.  Okay.  Well, what -- what -- what is
6  your familiarity with the marketing of any of the
7  subject drugs that are on that list in front of
8  you at any time during your tenure with HPD?
9    A.  I would say none from a marketing
10 perspective.
11   Q.  Okay.  What about from a sales
12 perspective?  What's your familiarity with the
13 sale of any of the subject drugs on that list?
14   A.  It -- it was one of Abbott's products,
15 and that was part of a portfolio that we
16 would offer as -- as part of a potential contract
17 opportunity with customers.
18   Q.  Are you familiar with the sales --
19 Abbott sales history within its Hospital Products
20 Division of vancomycin?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I know there is one.

---

Page 414

BY MS. ST. PETER-GRIFFITH:
1
2    Q.  Okay.
3    A.  But I don't -- I mean, other than that
4  it's a product that we've had for some time.
5    Q.  Okay, and is -- do you -- do you recall
6  what the dollar value -- volume of the sales was
7  for vancomycin?
8    A.  No, I do not.
9    Q.  Okay.  Is that something that you,
10 within any of the various positions that you've
11 held within HPD, would have had to have been
12 familiar with or would have had any
13 responsibility over?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  Only as part of a -- on a
16 broader context of overall sales, for example
17 within Alternate Site, how that fit in the
18 portfolio, but not -- I was responsible for the
19 total portfolio.  So no specific drugs
20 necessarily.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  Do you recall whether there was a

---

Page 415

1  marketing plan for vancomycin?
2    A.  Not -- I -- not that I've ever seen.
3    Q.  Okay.  There may have been, but it
4  might have been something that you didn't see?
5    A.  No --
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I would say there may
8  have been one for all overall portfolio of
9  injectable products, but I don't know that there
10 was ever one specifically for vancomycin, to my
11 recollection.
12 BY MS. ST. PETER-GRIFFITH:
13   Q.  Okay.  What was the marketing plan for
14 your injectable products?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I -- I don't remember any
17 details of any specific marketing plans for our
18 products.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  Can you identify how the Alt Site sales
21 force sold the subject drugs as part of Abbott's
22 product line?

21 (Pages 412 to 415)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 416

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Well, the customer would
3   ask for or maybe send out a bid or would ask for
4   the subject drugs or our entire portfolio and ask
5   for pricing on those products, and the
6   representative would then talk to our contracting
7   area to determine what might be appropriate
8   pricing for that institution or customer, and
9   then they would put an offer together that
10  included a price list for those products.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Were there parameters for the price
13  list? Like, was there sort of a ceiling and a
14  floor as to what could be offered?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  No, I don't -- not --
17  none that I recall, no.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Who set the pricing?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  From -- from what
22  perspective?

Page 417

1   BY MS. ST. PETER-GRIFFITH:
2      Q.  From -- from the perspective of --
3   well, let me ask you this.  That's a good
4   question.  Let me divide this up.
5         For the contract pricing for the
6   products, who would set the contract pricing?
7      A.  The contracting department would work
8   on trying to establish the relative size of the
9   customer and -- and the value and try to
10  determine appropriate price based on -- on those
11  types of criteria.
12     Q.  Were you at all involved with -- with
13  that type of contract pricing determinations?
14     A.  No, not -- not specifically, no.
15     Q.  Okay.  What about catalog pricing?
16        MS. TABACCHI:  Object to the form.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Were you involved with catalog pricing?
19     A.  No.
20     Q.  Did catalog pricing -- how did catalog
21  pricing affect, if at all, your sale of the
22  subject drugs?

Page 418

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I -- I don't know, and I
3   don't -- I don't think there was any specific
4   impact.
5   BY MS. ST. PETER-GRIFFITH:
6      Q.  Okay.  Now, are you familiar with how
7   your home infusion department sold Abbott
8   product, including the subject drugs?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Well, I -- I have a,
11  again, dated memory of how I think it was done at
12  the time that I was part of that group --
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Okay.
15     A.  (Continuing) -- many, many years ago.
16     Q.  What's your memory?
17     A.  My memory was, I think as I already
18  stated, that we looked at the different
19  components of what Abbott could offer and do for
20  a customer from a home-care perspective, and
21  based on those components that we participated
22  in, we would establish a mech- -- a mechanism to

Page 419

1   get paid for the services that we provided.
2      Q.  Okay.  But in addition to providing
3   services, would Abbott also sell product or
4   provide product on a consignment basis to its
5   home infusion consignment partners?
6      A.  Well, I think we're saying the same
7   thing.  That was part of the overarching -- they
8   -- consignment was just a mechanism of having the
9   product available when it was needed for the
10  compounding.
11        The service it was provided may have
12  been the compounding, or if they took that, it
13  was the other things that we were providing.
14     Q.  Okay.
15     A.  Having the product was a component of
16  that.
17     Q.  Okay.  So when you -- when you say
18  "services," you include within that the provision
19  of Abbott product, to the extent it was needed --
20     A.  It --
21     Q.  (Continuing) -- to provide --
22     A.  It could have been part of it.

22 (Pages 416 to 419)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                        Chicago, IL

Page 420

1    Q.  Okay.  What price did Abbott charge its
2  consignment partners for the sale of the products
3  that were utilized as part of these services?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  It -- it was part of the
6  overall component of the -- it was one aspect of
7  the entire contract.  So I don't know that I
8  could give you a specific.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Okay.  So was the cost of the product,
11  then, incorporated within the percentage of
12  revenue collection?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  That's one aspect of what
15  it could have been, yes.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  Okay.  Was it ever, to your knowledge,
18  sold separately to the home infusion clients?
19    A.  Well, that's why there were two groups.
20  There was a product group, and there was a -- a
21  group that worked with the home infusion, so that
22  was part of the differentiation.

Page 421

1    Q.  Okay.  So by definition if they were
2  within the home -- if they were a home infusion
3  client, they weren't buying the product
4  separately?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  That was a decision, I
7  think, that they could make.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Okay.  Well, did you ever have
10  customers who were Alt Site customers, but -- who
11  were Alt Site product sales customers, but also
12  who were home infusion consignment partners?
13    A.  Well, they -- they typically weren't
14  both.  I think they fit into one or the other.
15    Q.  Okay.  What other facts or information
16  are you -- are you familiar with concerning the
17  sale of the subject drugs?
18    A.  No other specifics that I can think of.
19    Q.  Okay.  So that exhausts your memory and
20  your knowledge?
21    A.  Yes.
22    Q.  Okay.  Is there any other information

Page 422

1  that you are aware of concerning the subject
2  matter of the lawsuit that the United States has
3  filed against Abbott?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  No.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  What I'd like to do now, sir, is to --
8  before we jump into reviewing documents, I'd like
9  to follow up on a few questions that Mr. Anderson
10  had asked you.  And you had -- you had a long
11  discussion with him about ethics and compliance,
12  and you indicated that you were involved in one
13  initiative.  I don't think -- you talked about
14  various other initiatives.  I don't think he ever
15  asked you flat out, what do you recall about the
16  compliance -- and when I say "compliance," I
17  don't mean contract compliance.  I mean fraud and
18  abuse, ethics compliance.
19        What do you recall about the initiative
20  that you indicated you were involved with?
21        MS. TABACCHI:  I'm going to object to
22  the form and -- I don't know if you have the

Page 423

1  specific portion of the transcript or something
2  that further illuminates what it is that you're
3  referring to from the first day of the
4  deposition.
5        MS. ST. PETER-GRIFFITH:  Sure.  Page
6  26.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  On page 25 you testified, and I can
9  show this to you, you say:
10        "For a short time I was support-" -- "I
11  supported some of the ethics and compliance
12  operations."
13        It's at page 25.
14        And I guess, sir, what do you recall --
15  my question is what do you recall about those
16  ethics and compliance operations that you
17  supported?
18    A.  For a short period of time I supported
19  our Hospital Products Division as a
20  representation.  So that if there were corporate
21  initiatives, they had -- I was the liaison, I
22  guess, for sharing that information with the

                                    23 (Pages 420 to 423)

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL        February 28, 2008
                          Chicago, IL

Page 424

1  Hospital Products Division.
2      Q.  Did you participate at all in develop -
3  - developing any compliance, either programs or
4  procedures or policies?
5      A.  No.
6      Q.  So was your role then limited to being
7  the liaison communicating to the Hospital
8  Products Division other corporate compliance
9  initiatives?
10     A.  Yes.
11     Q.  Was safeguarding trusts one of those?
12     A.  I believe -- that -- I think that was a
13  name of one of the initiatives, and I believe
14  that -- if that's what you're referring to --
15     Q.  Okay.
16     A.  (Continuing) -- I believe that was one
17  of the things that they had put together that we
18  wanted to -- to incorporate with the rest of the
19  Hospital Products Division, yes.
20     Q.  Other than the legal department, as you
21  testified earlier, if at any time during your
22  tenure within the Hospital Products Division you

Page 425

1  had a question about fraud and abuse, or Medicare
2  or Medicaid statute or regulation compliance, who
3  would you go to?
4      MS. TABACCHI:  Object to the form.
5      THE WITNESS:  That's a -- a broad
6  question.
7      Let me try to -- one, I don't recall
8  ever having any kinds of questions about
9  Medicaid, fraud and abuse, those types of things.
10     If there was a question about something
11  of a compliance or ethical nature other than the
12  legal counsel, you always had our -- our HR
13  organization that if you were uncomfortable with,
14  that you could begin there to determine, okay,
15  there is -- you know, if there was something -- I
16  mean, that was -- I mean, something that was
17  known, I think, within Abbott, that if there is a
18  question about something -- anything that you
19  would be uncomfortable about, that you would --
20  you could start there.  And they would either
21  work with you or -- or help you go to the
22  appropriate position to ask any questions if you

Page 426

1  had something specific.
2      But I don't ever recall having the
3  knowledge or a concern about anything with
4  Medicare or Medicaid.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  As the general manager of the Alt Site
7  product sales, how did you know that the
8  practices that your subordinates were engaging in
9  complied with state and federal Medicare and
10  Medicaid statutes and regulations?
11     A.  Well, to some degree you never
12  completely know.  It's just like I never know
13  that if a -- if a representative is speeding
14  today.  But we signed -- when you become an
15  Abbott representative or an Abbott employee, you
16  sign a code of conduct, and there is expectations
17  that you're going to act in an appropriate
18  fashion as an Abbott employee.  And I think that
19  was something that was spoken to in training
20  programs and other places as well.
21     So to the degree that you have to trust
22  that people follow their -- their own moral

Page 427

1  compass and understand kind of what they have
2  signed up for as an Abbott employee, I think, you
3  know, you can never be a hundred percent sure,
4  but I think I can feel as comfortable as anything
5  that that was being done.
6      Q.  How would you identify the parameters
7  of the compass?  How would you know that what was
8  being done conformed with state and federal
9  Medicare and Medicaid statutes and regulations?
10     MS. TABACCHI:  Object to the form.
11     THE WITNESS:  Well, I think that's an
12  unfair question.  That's kind of like saying how
13  do I make sure a rep isn't robbing a bank?
14     I don't know how I would know that
15  other than my sense would tell me that that
16  doesn't happen.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Do you recall any -- there being a
19  resource or a policy drafted anyplace that says
20  pursuant to state and federal Medicare or
21  Medicaid regulations and statutes, the following
22  activities are forbidden?

24 (Pages 424 to 427)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II  HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 428

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  Again, I -- I'm not sure
3    that's a fair question you're asking.  In my
4    entire Abbott career?  I mean, we -- we -- I
5    guess I'm comfortable with trying to answer it.
6    It may be vague enough that I don't quite
7    understand what you really want me to say or how
8    --
9    BY MS. ST. PETER-GRIFFITH:
10        Q.  Well, no, here -- let's --
11        A.  (Continuing) -- you want me to respond
12   to that.
13        Q.  Then let me rephrase it.
14        When you were the -- when you were
15   within Alt Site products sales, either as the
16   general manager or overseeing the sales force as
17   the director of sales --
18        A.  Yes.
19        Q.  (Continuing) -- did you have a resource
20   that you could go to to make sure that the
21   conduct that your subordinates were engaging in
22   complied with state and federal Medicare and

Page 429

1    Medicaid statutes and regulations?
2         A.  I don't remember the date that our
3    office of ethics and compliance was put into
4    place, but that was a very obvious resource for
5    that type of question.
6         Again, I would say before -- before
7    that we knew that if there was a question that
8    you had, you had -- you had areas to go.
9         If they were part of a -- from a
10   contractual nature, if something came up and
11   someone wanted to understand the obligations of a
12   written document, that we would use our legal
13   counsel for that.  And if it was something of
14   what would fall under a comfort level from any
15   other aspect, again, I felt that they were -- you
16   could start with your HR group, and they would
17   then point you to maybe an appropriate -- someone
18   else more appropriate to answer the questions if
19   they were uncomfortable.
20        So I don't know that there was anything
21   that I could point to that was very specific
22   until the time that, you know -- and again, when

Page 430

1    I began working with our office of ethics and
2    compliance group.
3         Q.  Okay.  So prior to the development of
4    the office of ethics and compliance, which
5    occurred probably in 2001, 2002 -- does that ring
6    a bell?
7         A.  That time frame sounds familiar, yes.
8         Q.  Okay.  Prior to that point in time,
9    other than going to the legal department or HR,
10   was there any other place where you could go or
11   where an Alt Site employee could go to say, "Hey,
12   is this practice in compliance with state and
13   federal Medicare and Medicaid statutes?"
14        A.  Again, you're being very specific on
15   one specific statute.  What I would tell you is
16   anyone, when they have a question, they are
17   directed to go to their manager.  And if they're
18   not comfortable with their manager, to go above
19   that and to go -- as I say, a human resource
20   function to some degree is considered a true
21   resource where if there are any questions that
22   you have whatsoever that you could go to, and

Page 431

1    they would then direct you to someone maybe more
2    appropriate if it didn't -- if it wasn't for them
3    within the corporation.
4         So especially in a field sales
5    organization, I think that's what we tried to --
6    to do.  To make sure that they had a place that
7    they -- they could go for whatever the reason
8    was.
9         Q.  So if the -- if a sales force member,
10   let's say in 2000, had a question about whether
11   or not the practices that they were engaging in
12   complied with state and federal Medicare and
13   Medicaid statutes and regulations, their first
14   step would be to take their question to their
15   manager?  Is that fair?
16        A.  That was an option.
17        Q.  Okay.  And then if their manager --
18   would the managers be familiar with state and
19   federal Medicare and Medicare statutes and
20   regulations?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  No, I'm not saying that.

25 (Pages 428 to 431)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL                February 28, 2008
Chicago, IL

Page 432

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay.
3      A.  I'm saying they would then again begin
4  to try to -- to try to get them to someone who
5  could, and it would probably be someone in that
6  HR function.
7      Q.  Okay.  What -- what are you familiar
8  with or what information are you aware of
9  concerning the HR department's familiarity with
10  state and federal Medicare and Medicaid
11  regulations and statutes?
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  Again, I would tell you
14  that I don't know that they have any familiarity,
15  but my expectation would be that they would send
16  or find someone who had additional information as
17  appropriate.  You know, if someone was
18  uncomfortable with the -- if they were -- were
19  asked to drive their car too fast, they -- they
20  always had a mechanism to go to if there was a
21  question, and that's -- that's the idea.
22  BY MS. ST. PETER-GRIFFITH:

Page 433

1      Q.  Okay.  And my question to you is what
2  was that mechanism?
3      MS. TABACCHI:  Object to the form,
4  asked and answered.
5      THE WITNESS:  Yeah, it was as I said,
6  the mechanism was that they always have a place
7  to go, a safe place to go, which was to ask
8  someone in HR, who could then act as a -- a
9  liaison to wherever they needed to be within the
10  corporation.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  To your knowledge, were -- were the
13  policies, practices, and procedures of the
14  Alternate Site division, prior to 2001 and 2002,
15  at any time reviewed to ensure their compliance
16  with Medicare and Medicaid statutes and
17  regulations?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  I don't know that.  They
20  may have.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Okay.  Well, as general manager, during

Page 434

1  your tenure as general manager, if that occurred,
2  would you know about it?
3      MS. TABACCHI:  Object to the form.
4      THE WITNESS:  Not if it was in the
5  context of how we were working through a
6  contractual relationship, which may have come up.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Okay.  What if it wasn't in the context
9  of working through a contractual relationship?
10      A.  I don't remember it ever coming up.
11      Q.  Do you -- you don't remember it ever
12  coming up at any time during your tenure within
13  Hospital Products Division?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  I don't think until my
16  first deposition or when I got a note that says
17  there was an issue.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Okay.  Now, do you -- what work did you
20  do on the I-many program for CARS?  Does that
21  sound familiar?
22      MS. TABACCHI:  Object to the form.

Page 435

1      THE WITNESS:  What work did I do?
2  Nothing, because I don't know what that -- I've
3  heard the phrase "I-many," but --
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay.
6      A.  Now you've hit the depth of my
7  knowledge once again.
8      Q.  Did either you or Mike Sellers, as your
9  subordinate, to your recollection, work on a CARS
10  program?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  I do not recall.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Do you recall at any time working with
15  TAP on any initiatives?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  No.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Okay.  Do you recall hearing about TAP
20  -- first of all, what is TAP?
21      A.  I it's a -- an Abbott and a Takeda
22  relationship.

26 (Pages 432 to 435)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 436

1    Q.  Okay.  Did you ever learn that TAP
2  entered into a criminal plea?
3    A.  Only, I think, what was published in
4  the daily newspapers.
5    Q.  Do you recall any initiatives being
6  undertaken after TAP entered into a criminal plea
7  to evaluate whether or not the Hospital Products
8  Division was engaging in conduct similar to that
9  which TAP pled guilty for?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  I -- I would not know
12  that.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Okay.  Well, you were a pretty senior
15  manager within Hospital Products Division,
16  weren't you?
17    A.  That's relative, I guess.
18    Q.  Okay.  Well, you were -- you were at
19  least -- you reported to a divisional vice
20  president; right?
21    A.  Yes.
22    Q.  Okay.  And then the only person above

Page 437

1  the divisional vice president is divisional
2  president; right?
3    A.  Yes.
4    Q.  If there were any initiatives
5  undertaken to evaluate whether or not the
6  Hospital Products Division or business units
7  within it, such as Alt Site, were violating state
8  and federal law, do you think you'd know about
9  that?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  There -- what I would
12  tell you is this probably -- I shouldn't say --
13  there are always reviews as to how contractually
14  we conduct business, and so I -- I don't know --
15  I don't recall anything that was specifically
16  talked about in regards to TAP.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  Okay.  Do you recall any -- in terms of
19  the reviews and how you contractually conduct
20  business, do you recall any reviews or
21  consideration as to whether Abbott's alternate
22  site business unit was improperly marketing the

Page 438

1  AWP spread?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  Can you ask that again,
4  please?
5       MS. ST. PETER-GRIFFITH:  Sure.
6       Could you read it back, please?
7       THE REPORTER:  "Question:  In terms of
8  the reviews and how you contractually conduct
9  business, do you recall any reviews or
10  consideration as to whether Abbott's alternate
11  site business unit was improperly marketing the
12  AWP spread?"
13       THE WITNESS:  No, I do not.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  In terms of compliance with state and
16  federal laws, who -- who did the buck stop with
17  to ensure that Abbott -- that Abbott's Hospital
18  Products Division was complying with state and
19  federal Medicare and Medicaid statutes and
20  regulations?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I don't know that that's

Page 439

1  a fair question.  I think there is -- there are
2  reviews that, as I said, happen with our -- with
3  our legal counsel.  And so making sure and
4  keeping us up to date on those aspects that we
5  need to ensure I think are probably in place, and
6  that would have been done with them and with our
7  contracting area.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  What reviews do you recall that were
10  conducted with legal counsel concerning the
11  Hospital Products Division's compliance with
12  state and federal Medicare and Medicaid statutes
13  and regulations?
14    A.  I --
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I don't know.  But I
17  don't know that I would have been involved in any
18  of that.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  Who do you believe would have been
21  involved in that?
22    A.  I don't know that.  I know our

27 (Pages 436 to 439)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

Page 440

1  contracting department.
2      Q.  Anyone else?
3      A.  I -- I don't know.
4      Q.  Did the buck stop with your contracting
5  department on ensuring that Abbott's Hospital
6  Products Division was complying with state and
7  federal Medicare and Medicaid statutes and
8  regulations?
9      MS. TABACCHI:  Object to the form.
10     THE WITNESS:  Yeah, that -- you're
11 asking me a personal question, on whether I felt
12 that -- you know, again, you're asking me to
13 determine something that I wasn't part of, and
14 then where it -- where ownership should be.
15     I think our -- between our legal
16 counsel and the contracting department, that they
17 had a -- probably had the best feel for that.
18     Where they shared that information and
19 how high it went up into the organization, I -- I
20 can't tell you, so --
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  But it didn't filter up to you?

Page 441

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  Not in the role that I
3  was in, no.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  At any time when you were within the
6  Hospital Products Division?
7      A.  Well, no.
8      Q.  Okay.  What role -- you indicated that
9  you had a liaison role for compliance.  What did
10 that role entail?
11     A.  Working with the corporate compliance
12 group in -- if there was a training program, to
13 see that it was administered within the Hospital
14 Products Division.
15     If there was information to be passed
16 on or they wanted to -- or if they were
17 publishing a document, to make sure that it was
18 getting sent to the entire organization or that
19 we were participating in what we needed to do as
20 a division.
21     Q.  Do you recall discussing with anyone in
22 this liaison role issues pertaining to compliance

Page 442

1  with federal and state Medicare and Medicaid
2  statutes and regulations?
3      A.  No, I don't.
4      Q.  Do you recall at any time during your
5  tenure within the Hospital Products Division
6  discussing issues concerning Medicare, Medicaid
7  statutes or compliance with state and federal
8  Medicaid and Medicare statutes and regulations?
9      MS. TABACCHI:  Object to the form.
10     THE WITNESS:  No, I don't.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Would the responsibility for ensuring
13 that the Hospital Products Division complied with
14 state and federal statutes and regulations rest
15 with your superiors or with your subordinates?
16     MS. TABACCHI:  Object to the form.
17     THE WITNESS:  Well, it's an interesting
18 question.  I'm not sure I know how to answer you.
19     It's kind of like, it can't be -- it
20 could be one or the other.  It could be both,
21 depending on what it is.
22     I mean, I don't --

Page 443

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay.  Well, let's start with
3  subordinates.  How would your subordinates know
4  whether or not their practices and how they were
5  conducting business violated state or federal
6  law?
7      A.  I guess I -- I don't know that they
8  ever did, so -- but at the same time if there was
9  something that, again, review of our legal
10 counsel said there was a practice that should be
11 changed, then that would have been identified and
12 the subordinates would have been responsible for
13 either modifying or changing that behavior.
14     Q.  Who would bring it to the attention of
15 the legal department?
16     MS. TABACCHI:  Object to the form.
17     THE WITNESS:  Well, it could be in any
18 number of different ways, I would imagine.  If
19 there was an individual that had that concern,
20 they would have shared that, and it would have
21 gone through, and legal may have done it that
22 way.  There may have been a legal interpretation

28 (Pages 440 to 443)

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                        Chicago, IL

Page 444

1  that could have also done that.  There were any -
2  - any number of ways, I would imagine, that they
3  could become aware of something, and if they were
4  -- felt there was an issue, then it would be
5  dealt with and responded to.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  So would this all be up to the
8  subjective consideration of your subordinates, as
9  to whether or not a question might arise
10  concerning state and federal Medicare, Medicaid
11  statute compliance?
12         THE WITNESS:  I don't --
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I don't think that's what
15  I said.  I think it's up to whoever had knowledge
16  or was uncomfortable with something --
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Okay.
19      A.  (Continuing) -- at any level.
20      Q.  But how do you know that what you were
21  doing and what your subordinates were doing
22  complied with state and federal Medicare,

Page 445

1  Medicaid statutes and regulations?
2         MS. TABACCHI:  Object to the form,
3  asked and answered.
4         THE WITNESS:  Yeah, I don't know -- I
5  don't think that's a -- a question that I'll -- I
6  can really answer for you.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Well, did you --
9      A.  As I say, I don't know if a rep is --
10  is speeding today, so I don't -- I don't think I
11  have a magic answer for you that will please you
12  at this point, because there are -- we, again,
13  have a -- a code of conduct we try to follow as
14  best we can, and what we know at the time, and we
15  work within that, so --
16      Q.  Did the code of conduct that you
17  referenced identify practices that were not in
18  compliance with state and federal Medicare and
19  Medicaid regulations and statutes?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I don't know.
22  BY MS. ST. PETER-GRIFFITH:

Page 446

1      Q.  What do you recall about this code of
2  conduct?
3      A.  I don't think there was anything that
4  was that specific.  It was more on the
5  professionalism and -- and making sure that you -
6  - you worked with integrity and that you -- but,
7  again, you're asking some very specific questions
8  that I don't know were -- were ever covered.
9      Q.  Okay.  Well, let me ask it this way.
10         You have a -- a sales force, right?
11  You've got a sales force, district managers,
12  national account managers, and they come into an
13  already existing system within the Hospital
14  Products Division; this is how we do business.
15  Is that fair?  They come in as a new employee?
16      A.  To some degree, yes.
17      Q.  And they -- Abbott has a procedure in
18  place for communications with customers, contact
19  with customers, et cetera?  Is that fair?
20      A.  That's fair.
21      Q.  Okay.  And at the same time it also has
22  its -- Abbott also has its catalog prices, the

Page 447

1  contract marketing division does what it does
2  with regard to pricing; is that fair?
3      A.  Okay.
4      Q.  Okay.  How would someone within -- who
5  comes into that system have assurances that that
6  system that was in place complied with state and
7  federal Medicare and Medicaid statutes and
8  regulations?
9         MS. TABACCHI:  Object to the form.
10         THE WITNESS:  Well, again, you're
11  asking something that's incredibly specific, I
12  guess, in my mind.  When a new person comes into
13  a responsibility, there is certain training that
14  is conducted.  It is conducted at a divisional
15  manager level.  It would be conducted at the --
16  the training level and the product level and
17  everything else.
18         Whether -- again, you're asking
19  something very specific, I think.  The
20  understanding of how we -- how we work and within
21  what guidelines are part of any of those or could
22  be part of those.

                                    29 (Pages 444 to 447)

                                          8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL                February 28, 2008
                              Chicago, IL

Page 448

1        As far as -- again, as -- you know, we
2   -- when someone is hired, we -- we do a
3   background check, but you can't necessarily say
4   that, you know -- again, I -- I can't tell you
5   that we say, "Hey, you know what? Don't rob a
6   bank either," but I'm pretty comfortable that
7   that doesn't happen or we would find out about
8   that.
9        So I don't know how you're -- I
10  struggle for how to even respond to that, to that
11  type of question.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Let me ask you this.  As part of the
14  training program, did Abbott Hospital Products
15  Division go over with its new employees or its
16  existing employees, if there was updated
17  training, matters concerning state and federal
18  Medicare and Medicaid statutes and regulations?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  I would doubt it.  I do
21  think that in the code of conduct it would say
22  that we will and will continue to comply with all

Page 449

1   state and local laws.
2   BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Let's start from there.  How do
4   you know?  How can Abbott verify -- let me ask
5   this question first.  Strike that.
6        How does your sales force or your
7   district managers or your NAMs or you, sir, as
8   the general manager, how do you know what the
9   parameters are for the Medicare and Medicaid
10  programs and whether or not you're complying with
11  them?
12     A.  Well, I think I stated earlier that I
13  didn't have a deep knowledge of that, so I don't
14  know how to help you with that answer.
15     Q.  Okay.  Are you aware of any place where
16  you -- other than the HR department, are you
17  aware of any place that the sales force could go
18  to or that the district managers could go to or
19  the national account managers could go to, to
20  evaluate what are permitted and impermissible
21  practices under the Medicare and Medicaid
22  statutes and regulations?

Page 450

1        MS. TABACCHI:  Object to the form,
2   asked and answered.
3        THE WITNESS:  What I would tell you is
4   that there is a -- or there was established an
5   office of ethics and compliance.  So that gave
6   another opportunity, other than HR, that someone
7   could go to if there was a question.  And I think
8   they established an 800 number so that if there
9   was a specific question, they had a place to go.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.  Okay.  Do you know who would answer
12  those questions?
13     A.  No.  I think they would be triaged to
14  someone -- whether -- you know, that had a
15  broader knowledge of that.
16     Q.  Okay.  Are you familiar with anyone who
17  had a broader knowledge of that?
18       MS. TABACCHI:  Object to the form.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Within Hospital Products Division.
21     A.  Not specifically, no.
22     Q.  Okay, what about outside of Hospital

Page 451

1   Products Division?
2      A.  Well, I don't know specifically other
3   than the individuals that I worked with on the --
4   as that liaison on the -- on our compliance.
5      Q.  Okay.  But that was after the
6   development of the office of ethics and
7   compliance?
8      A.  Yes.
9      Q.  Okay.  And who were they?
10     A.  I worked with Catherine Sazdanoff.
11     Q.  Okay.
12     A.  And she was the one that I remember
13  dealing with most.
14     Q.  What particular ethics and compliance
15  matters do you recall being involved with as a
16  liaison?
17     A.  The responsibility I had was mostly in
18  -- there were some training initiatives, and to
19  make sure that as an organization that we -- we
20  established or carried out the training that was
21  given.
22     Q.  Okay.  And that training was developed

                    Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 452

1  sometime around 2002?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Yeah, I don't remember
4  the time frame specifically.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Well, do you recall --
7      A.  I'm sorry.
8      Q.  Do you recall whether it was during
9  your tenure as the general manager of Alt Site?
10     A.  I believe it started while I was in
11 that role, yes.
12     Q.  Okay.  Do you remember when?
13     A.  No, I do not.
14     Q.  Do you recall when the office of ethics
15 and compliance was developed?
16     A.  No, I do not.
17     Q.  Is it fair to say you didn't have that
18 liaison role until after the office of ethics and
19 compliance was developed?
20     A.  Yes, but I had a knowledge of that, of
21 the office prior to that.
22     Q.  Okay.  When you say you had a knowledge

Page 453

1  of the office prior to that, what do you mean?
2      A.  Well, there was an office of ethics and
3  compliance.  I was the liaison, actually after my
4  stint as the general manager.
5      Q.  Okay.  So you were the liaison after
6  your stint, but my question goes to when was the
7  office of ethics and compliance developed, and
8  did you have a relationship with -- with that
9  office prior to becoming a liaison?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  I don't know, and -- and
12 not specifically, no.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Okay.  Other than the legal department
15 and the HR department, prior to the development
16 of the office of ethics and compliance, can you
17 think of anybody else who you could have gone to
18 with a question concerning compliance with state
19 and federal Medicare and Medicaid statutes and
20 regulations?
21     A.  No, I can't think of anyone
22 specifically.  But I do think there are -- you

Page 454

1  know, there are -- there are places to go, as I
2  say.  You would ask -- ask the appropriate
3  questions, I'm sure someone would triage you to
4  the right place.
5      Q.  Okay.  But are you familiar with where
6  any of those right places are?
7      A.  No, I'm not.
8      Q.  Would they be outside of the Hospital
9  Products Division?
10         MS. TABACCHI:  Objection to form.
11         THE WITNESS:  I don't know.
12 Potentially, yes.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Okay.  Do you recall having any
15 conversations or communications with the HR
16 department concerning state and federal Medicare
17 or Medicaid statutes and regulations?
18     A.  No, I do not.
19     Q.  Do you recall having any communications
20 with the legal department concerning state or
21 federal Medicare, Medicaid statutes and
22 regulations and the Hospital Products Division's

Page 455

1  compliance therewith?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  No.
4          MS. TABACCHI:  I caution the witness --
5  did you answer already?
6          THE WITNESS:  No.  No, I don't recall.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Okay.  Sir, I just want to exhaust your
9  memory on this.  Did you have any involvement
10 whatsoever in the pricing of either the subject
11 drugs or any other Abbott products within
12 Hospital Products Division?
13     A.  No.
14     Q.  Do you recall, sir, 2001 changes in
15 pricing for Abbott products, including the
16 subject drugs?
17     A.  No, I don't.
18     Q.  Do you recall a request coming from
19 either the division -- coming from above the
20 division president requesting that Abbott's
21 Hospital Products Division evaluate the impact of
22 changes to its AWPs upon Hospital Products

31 (Pages 452 to 455)

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 456

1  Division's business?
2          MS. TABACCHI:  Object to the form.
3      Would you mind reading that back?
4          THE REPORTER:  "Question:  Do you
5  recall a request coming from either the division
6  -- coming from above the division president
7  requesting that Abbott's Hospital Products
8  Division evaluate the impact of changes to its
9  AWPs upon Hospital Products Division's business?"
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  And let me say in '91 -- I'm sorry. --
12  in 2001.
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  No, I do not.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Do you recall at any time either you or
17  any of your subordinates undertaking an
18  evaluation of the impact of price changes in 2001
19  upon hospital products -- upon the Hospital
20  Products Division's product sales, including the
21  subject drugs?
22      A.  Not that I recall.

Page 457

1          MS. ST. PETER-GRIFFITH:  What time are
2  we at?
3          MS. TABACCHI:  We're at lunch, so
4  wherever you finish.
5          MS. ST. PETER-GRIFFITH:  Yeah, why
6  don't we -- this is a good stopping place for me.
7  We can move on to the documents in the afternoon.
8          MS. TABACCHI:  Okay.
9          THE VIDEOGRAPHER:  We are off the
10  record at 12:03 p.m.
11          (Lunch recess.)
12
13
14
15
16
17
18
19
20
21
22

Page 458

1          A F T E R N O O N   S E S S I O N
2
3          (Whereupon Exhibit Baker 031 was
4  marked for identification.)
5          THE VIDEOGRAPHER:  We are back on the
6  record at 12:49 p.m.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Good afternoon, Mr. Baker.  What I
9  think we're going to spend the rest of our time
10  in this deposition doing is going through a
11  series of documents that we have not gone over
12  before, and the first has been marked Exhibit 31.
13  If you could take a look at that, sir, and my
14  first question to you is going to be whether or
15  not you recognize this document.  But take as
16  much time as you need in reviewing it.
17      A.  Okay.
18      Q.  Mr. Baker, do you recognize this
19  document? I know it dates back to '92.
20      A.  It's been a long time, so I don't -- I
21  recognize it, yes.  I don't know that I would
22  have remembered it.  How's that?

Page 459

1      Q.  Okay.  At the very bottom it says P.
2  Baker.  Do you see that under one of the cc's at
3  the  bottom of the very first page?
4      A.  Yes.
5      Q.  Is that you?
6      A.  Yes, I believe so.
7      Q.  Do you have any doubt that you received
8  this document, or do you believe you may have
9  received this document?
10          MS. TABACCHI:  Object to the form.
11          THE WITNESS:  I would guess that I
12  received the document.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Sir, do you recall anything about the
15  CM Providers contractual relationship with Abbott
16  home infusion?
17      A.  Other than we had one, not a great
18  deal, no.
19      Q.  Okay.  Do you recall anything about
20  that relationship?
21      A.  It was one that we maintained for
22  several years.

32 (Pages 456 to 459)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 460

1    Q.  Okay.  Were you personally involved in
2  any of the negotiations associated with it?
3    A.  I believe at different times within
4  that agreement there were times when I was
5  involved, yes.
6    Q.  Okay.  Let me ask you:  Before when you
7  came to the home care or home infusion business
8  unit, did they already have in place the business
9  model whereby they -- whereby Abbott agreed to
10  share in revenues of its contractual partners?
11    A.  Yes, I believe so.
12    Q.  Okay.  So that wasn't something that
13  you helped develop then.  That was already in
14  place when you arrived there?
15    A.  Yes.
16    Q.  If you could flip to the second page of
17  this document where it says compensation
18  schedule, do you see where the first -- at the
19  top there are three different categories:  type
20  of home and care therapy, and then net revenue
21  distributions, and under net revenue
22  distributions there is CM Providers and Abbott.

Page 461

1  Do you see that?
2    A.  Yes.
3    Q.  Can you explain what this particular
4  chart in the middle of the page reflects?
5    A.  I believe it -- again to the best of my
6  recollection, that it was distinguishing
7  responsibility or the percentage of revenue
8  collected that would go to one party or the
9  other.
10    Q.  So for example, for total parenteral
11  nutrition therapies, 35 percent of the revenue
12  derived by CM Providers would go to CM Providers
13  and 65 percent would go to Abbott?  Is that what
14  that means?
15    MS. TABACCHI:  Object to the form.
16    THE WITNESS:  I believe that
17  characterizes it appropriately.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  And in terms of the revenues that were
20  collected that Abbott shared in, did that include
21  revenues from Medicaid and Medicare?
22    MS. TABACCHI:  Object to the form.

Page 462

1    THE WITNESS:  I believe so.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  If you could turn to the next page,
4  sir, it says at the top Exhibit A, Abbott
5  Laboratories, Secrecy and Inventions Agreement.
6  Do you see that?
7    A.  Yes.
8    Q.  Was this an addenda or a part of many
9  of the contracts within home infusion during this
10  '92 timeframe?  Do you recall?
11    A.  I don't recall.
12    Q.  Do you recall ever seeing this?
13    A.  No.
14    Q.  I'll refer you to the bottom of the
15  page, sir.  I think that's your signature.
16    A.  I understand that.  I just don't
17  remember it, but yes.
18    Q.  Is that your signature at the bottom of
19  the page?
20    A.  Yes.
21    Q.  Under Item 1 where it says "Secrecy,"
22  do you see that?

Page 463

1    A.  Yes.
2    Q.  Does this provision apply to Abbott's
3  prices of its drug products including without
4  limitations subject drugs?
5    MS. TABACCHI:  Object to the form.
6    THE WITNESS:  Can you please repeat
7  that.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Sure.  Did the provisions concerning
10  secrecy contained within this provision -- and if
11  you need time to read it, you know, take your
12  time -- did that apply to drug prices or the
13  prices of drugs and products that Abbott home
14  infusion consigned to CM Providers?
15    MS. TABACCHI:  Object to the form.
16    THE WITNESS:  Let me try.  I think I
17  remember what you asked.  It's kind of a standard
18  confidentiality clause which says that we really
19  don't want you talking about this agreement to
20  other parties, nor do we think that's
21  appropriate.  So I don't know if that answered
22  your question.

33 (Pages 460 to 463)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II    HIGHLY CONFIDENTIAL                 February 28, 2008
                              Chicago, IL

Page 464

BY MS. ST. PETER-GRIFFITH:
1
2      Q.  Okay.  So anything pertaining to this
3   agreement or the relationship you didn't want
4   discussed?  You wanted to keep -- Abbott wanted
5   to keep that secret?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Yeah, it was proprietary
8   between ourselves and the customer.
9   BY MS. ST. PETER-GRIFFITH:
10     Q.  Well, who would the customer be
11  precluded from disclosing this relationship to?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  Well, based on this,
14  anyone.  But there are many times other
15  competitors or other hospitals that may be
16  interested in types of agreements that were set
17  forth, and so this is to try to make sure that we
18  keep it between ourselves and them.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  And what aspects of the
21  agreement were supposed to remain secret, or was
22  the entire agreement supposed to remain secret?

Page 465

1      A.  I think the entire agreement.
2          MS. ST. PETER-GRIFFITH:  This is an
3   exhibit.
4          THE WITNESS:  Let me clarify that.  It
5   may not be the fact that we had an agreement, but
6   it's the potential terms of the agreement and the
7   way that it was then put together.
8   BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.  So the fact that you had a
10  contractual relationship with CM Resources or
11  Providers could be disclosed, but not the nature
12  of it?
13     A.  Well, not the nature of the financial
14  relationship and how all that was characterized.
15     Q.  Did that include maintaining secrecy
16  concerning any prices of drug products?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  I would tell you it was
19  pricing in any format.  That's what we wouldn't
20  want shared with either our competition or other
21  hospitals in which we were engaged.
22         (Whereupon Exhibit Baker 032 was

Page 466

1   marked for identification.)
2          THE WITNESS:  Okay.
3   BY MS. ST. PETER-GRIFFITH:
4      Q.  Sir, do you recognize this document?
5      A.  Yes.
6      Q.  Okay.  Down at the bottom it says, cc
7   P. Baker.  Do you have any reason to believe
8   that you didn't receive this document?
9      A.  No.
10     Q.  What is this document?
11     A.  It looks like a letter of amendment to
12  an existing contract.
13     Q.  Okay.  And if you flip to the second
14  page, it appears that the amendment pertains to
15  an agreement by Abbott and CM HealthCare
16  Resources to bear the cost of two operational
17  personnel for certain services provided by both
18  parties.  Do you see that?
19     A.  Yes, I do.
20     Q.  Would that be something you would have
21  had to authorize in your position in '92?
22     A.  I don't know that I would say that it

Page 467

1   was my role to authorize it as much as I was in
2   more of the sales role responsibility to
3   determine there was a need for the customer and
4   that it was a request that was made, and so that
5   I would have said, hey, this is something that
6   we'd like to do, can we do it, and how would we
7   do that.
8      Q.  Okay.  And was the joint funding of two
9   -- well, let me ask you.  This pertains to the
10  joint funding of two operational personnel.  Who
11  were the personnel employed by?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  My impression is that
14  they would have been employed by CM HealthCare.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.  I believe the third sentence or the
17  second sentence of this particular addendum
18  indicates that; is that fair?
19     A.  Yes.
20     Q.  Okay.  Why was Abbott contributing or
21  why would Abbott contribute to the payment of
22  part of the salaries for two operational

34 (Pages 464 to 467)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL                February 28, 2008
                        Chicago, IL

Page 468

1  personnel for CM HealthCare?
2      A.  Well, from what perspective are you
3  asking the question, I guess.
4      Q.  Let me ask you this question.  Would
5  Abbott home infusion frequently help its
6  consignment partners bear the cost of some of
7  their personnel?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  You're determining them
10 as a consignment partner, and I don't remember
11 whether that was the case or not in the
12 agreement.  What I would tell you is that part of
13 our contractual component was that there may be
14 promotional components of responsibility and that
15 we would -- to the degree that we could jointly
16 work on that was something that I don't know that
17 it was done a lot, but it was done in certain
18 instances.
19     Q.  And that included paying the salaries
20 for some of the employees of Abbott's customers?
21     MS. TABACCHI:  Object to the form.
22     THE WITNESS:  Well, what it was was it

Page 469

1  was supporting.  I don't know to what degree it
2  paid for an employee.  It may have paid -- it was
3  a portion.  I don't know what the end result was
4  of how much they were paying these individuals,
5  but it was a component of what they were trying
6  to accomplish.  And that would have been -- there
7  is a support mechanism to gain additional
8  business, and it looks like in this instance they
9  felt that having someone go out and sell the
10 program that they have was appropriate.  And we
11 felt that would help their overall business
12 model, so we supported that, yes.
13     Q.  Okay.  Well, do you see -- if you could
14 look at the second to last sentence, it says
15 these contributions are intended to be used for
16 base salary, bonus, and traditional fringe
17 benefits.  Do you see that?
18     A.  Yes.
19     Q.  Do you have any reason to doubt that
20 the funds provided by Abbott were not utilized to
21 pay for the salaries, bonus, and fringe benefits
22 for these operational personnel, at least in

Page 470

1  part?
2      A.  Oh, in part.  I think that was what I
3  was saying, yes.
4      Q.  Oh, Okay.  Well, I wasn't saying that
5  they paid the entire salary, but certainly they
6  contributed to it; right?
7      A.  Yes.
8      Q.  Okay.  Do you know whether this type of
9  arrangement -- well, let me ask you, was CM
10 HealthCare Resources a client of Abbott home
11 infusion or Abbott Alt Site?
12     MS. TABACCHI:  Object to the form.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Product sales?
15     A.  Home infusion.
16     Q.  Okay.  Do you know whether there might
17 be any Stark or any kickback implications or any
18 other Medicare or Medicaid regulations or
19 statutory implications associated with Abbott
20 paying for the salary of one of its customers --
21 personnel for its customers?
22     MS. TABACCHI:  Object to the form.

Page 471

1      THE WITNESS:  No, I don't know that.  I
2  know that this is a legal document so it would
3  have been supported or come from our legal
4  department.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  What do you recall about your legal
7  department passing on this particular document?
8      MS. TABACCHI:  I'm going to caution the
9  witness not to reveal the substance of any
10 communications with counsel.
11     THE WITNESS:  I don't recall.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  You don't recall?
14     A.  Anything.
15     Q.  Okay.  How many other types of
16 arrangements do you recall Abbott, either home
17 infusion or Alt Site, agreeing to bear a portion
18 of the cost of salaries or bonuses or benefits
19 for its customers' personnel?
20     MS. TABACCHI:  Object to the form.
21     THE WITNESS:  You know, I don't
22 remember.  I really don't remember any others

                                    35 (Pages 468 to 471)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 472

1  that are like that.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Do you remember anything at all
4  about this particular arrangement?
5      A.  No.  It's been some time.  Sorry.
6          MS. ST. PETER-GRIFFITH:  Let's mark
7  this as Exhibit 33.
8          (Whereupon Exhibit Baker 033 was
9  marked for identification.)
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  And, Mr. Baker, I'll represent to you
12 that this is not an Abbott document.  It came
13 from third-party discovery undertaken by the
14 United States, so please take your time in
15 reviewing this document.
16     A.  Okay.
17     Q.  Sir, do you recall receiving a letter
18 from -- this letter from Mr. Bulich at PBI?
19     A.  I don't remember it, no, but...
20     Q.  Do you ever recall PBI or Mr. Bulich
21 requesting that Abbott participate or sponsor a
22 portion of a program for business partners

Page 473

1  concerning Ambulatory Infusion Centers?
2      A.  I don't remember, but again it's been a
3  long time.
4      Q.  Okay.  Do you recall attending any
5  program for -- sponsored by PBI concerning
6  Ambulatory Infusion Centers?
7      A.  No, I don't.
8      Q.  Did you have much contact with Mr.
9  Bulich at PBI?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  On occasion I did.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  What was the nature of your contact?
14     A.  Well, PBI was a good size customer and
15 there were -- probably once a year or so there
16 was at least a conversation or a potential
17 meeting where we would have with our large
18 customers to just check on the business and see
19 how they were doing.
20     Q.  Was that a VIP meeting?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  It could be classified

Page 474

1  that way.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  What is a VIP meeting, or what was your
4  understanding of it?  Was that term used, I
5  should say, within Abbott home infusion?
6      A.  Well, very important --
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  -- people.  I mean, so it
9  was just getting members of your customers to
10 meet with the appropriate people within Abbott as
11 well.
12         MS. ST. PETER-GRIFFITH:  Mark this as
13 Exhibit 34.
14         (Whereupon Exhibit Baker 034 was
15 marked for identification.)
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Sir, I will again represent to you that
18 this is a document that was obtained from a third
19 party through the course of our discovery and was
20 not obtained from Abbott.
21     A.  Okay.
22     Q.  Sir, do you recognize this document?

Page 475

1      A.  No.
2      Q.  Do you notice that in the first
3  sentence it references Peter Baker?
4      A.  I do.
5      Q.  Do you have any doubt that that's you?
6      A.  No.
7      Q.  Do you recall having a conversation
8  with Mr. Sweeney and Mr. Maloney?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't recall it.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Okay.  But it's possible?
13     A.  Yes, it's possible.
14     Q.  Who is Omnicare?
15     A.  Omnicare was one of our customers.
16     Q.  And who is Mr. Sweeney?
17     A.  Joe Sweeney was an employee of Abbott
18 Laboratories.
19     Q.  And do you know whether he was
20 responsible for handling the Omnicare account?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I don't know that that

                              36 (Pages 472 to 475)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

Page 476

1  was his responsibility or whether this just
2  happened to fall under his -- the guise of timing
3  and he was in the right place at the right time
4  to say, hey, we need help on this agreement, and
5  he was chosen.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Okay.  And is this a listing of the
8  prices or is this a cover letter with attachments
9  that are the listing of the prices offered to
10 Omnicare --
11         MS. TABACCHI:  Object to the form.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   -- in 1999?
14         MS. TABACCHI:  Object to the form.
15         MS. ST. PETER-GRIFFITH:  And, sir,
16 while you're looking at that, why don't we change
17 the tape.
18         THE WITNESS:  Okay.
19         THE VIDEOGRAPHER:  We are off the
20 record at 1:12 p.m. at the end of tape No. 2.
21 (Recess taken.)
22         THE VIDEOGRAPHER:  We are back on the

Page 477

1  record at 1:14 p.m. at the beginning of tape No.
2  3.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Just before the tape change, sir, I
5  asked you -- let me ask you a different question.
6  What are the attachments to this particular
7  letter?
8      A.   They put together, it looks like, kind
9  of a top ten listing, and then it looks like the
10 contractual prices for their agreement.
11     Q.   Okay.  The contractual prices for
12 Omnicare, and it appears to be dated from April
13 1, '99, to March 31, 2000; is that right?
14     A.   Yes.
15     Q.   So these are the actual prices that
16 were offered to Omnicare for that period of time?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  I believe it would be,
19 yes.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.   And in terms of the Omnicare top ten
22 products, was that something that Abbott

Page 478

1  frequently -- or Abbott would evaluate for its
2  customers what its top ten sales were?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  No.  My impression was
5  that was something that was asked for.  It
6  wouldn't be something we would normally do.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   Okay.  And do you recall whether
9  vancomycin and sodium chloride were among the top
10 products that were -- that Omnicare purchased
11 from Abbott?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  I wouldn't have known
14 that.  If I read this, yes, it look like they
15 were.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   Okay.  But that's not something you
18 have an independent recollection of?
19     A.   No.
20     Q.   Okay.  What were your top selling
21 products in Alt Site?
22        MS. TABACCHI:  Object to the form.

Page 479

1         THE WITNESS:  Our foundation actually
2  came from selling ambulatory infusion devices, so
3  that was probably our biggest product was the
4  device business.  Secondary to that then were
5  some of the injectable product lines.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Okay.  Do you recall what the top
8  injectable product lines were?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  No, I know vancomycin was
11 one that, you know, was a substantial one.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   Okay.  What about sodium chloride?
14     A.   I'm not sure that that was one that was
15 a big seller of ours.
16     Q.   Did you ever at any time when you were
17 the general manager or director of -- sales
18 director within Alt Site do any kind of
19 evaluation as to what your top products were?
20        MS. TABACCHI:  Object to the form.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.   And when I say products, I'm excluding

37 (Pages 476 to 479)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL            February 28, 2008
                         Chicago, IL

Page 480

1  like the pump devices.
2      A.  Oh, then, well, we -- I was going to
3  say we kind of constantly looked at the device
4  sales and how we were doing against our
5  projections, et cetera.  You know, we tended to
6  look at them as a whole because our customers
7  were buying product categories.  They were either
8  going to make a capital acquisition of our
9  ambulatory devices and they were either going to
10 have a contract or noncontract on the injectable
11 product lines, so there wasn't a lot of specific
12 product analysis that was done.
13     Q.  Okay.  So it was the product lines as
14 opposed to individual products?
15     A.  Yes.
16     Q.  Okay.  Is that generally how the
17 product lines, you know, sold themselves or were
18 sold, that they were sold in consideration of the
19 lines as opposed to on an individual product-by-
20 product basis?
21     A.  Yeah.  Well, what I would tell you is
22 some of the value that Abbott brought was our

Page 481

1  breadth of portfolio in that we had a number of
2  products across that entire product line, so it
3  wasn't specific to one or two.  It was the value
4  that we had many, and many different sizes,
5  shapes, strengths, et cetera.
6      Q.  But when you sold as a product line,
7  you didn't sell like units that were -- you know,
8  you get one flip-top vial of vancomycin, you get
9  ten bags of sodium chloride, you get, you know,
10 15 units of Tazicef.  Individual purchases could
11 be made, could they not, of the products within
12 the product line?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  Well, no.  We sell it in
15 case quantities.  Is that...
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Okay.  Well, exactly, but you wouldn't
18 sell -- you could order individual cases of
19 certain products; right?
20         MS. TABACCHI:  Object to the form.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Let me ask you this:  How did the sale

Page 482

1  of your product lines work?  Did you have to buy
2  every single item in the product line, or was it
3  that all of the products in the product line were
4  made available and you could buy them on a drug-
5  by-drug basis?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Typically the product
8  line was covered and they could make the
9  distinction as to what was important to them.
10 The type of customer could make a little
11 difference in that a home care customer has a
12 very different mix of what they felt was
13 important to their patient population versus a
14 long-term care facility, for example.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Okay.  But when you say that you sold
17 by product lines, that doesn't mean that they had
18 to buy everything soup to nuts.  It means that --
19 does it mean that everything was made available
20 to them at a particular price range?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I want to make sure that

Page 483

1  I'm answering it correctly based on how you're
2  saying it, so do you mind repeating that for me?
3          MS. ST. PETER-GRIFFITH:  Sure.  Can you
4  read it back.  (Record read.)
5          MS. TABACCHI:  Same objection.
6          THE WITNESS:  Typically we put a
7  contract together that had compliance to the
8  agreement, and so that we made the offering but
9  we couldn't determine what the most important
10 products were to them or what quantities they
11 would buy of any specific product, but we did ask
12 that they buy then from that entire product
13 offering.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay.  But they would only buy it if
16 they needed it?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  Yes.  We wouldn't make
19 them buy something they did not need.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  That's what I wanted to check.
22 It wasn't like going into Costco and they've got

                              38 (Pages 480 to 483)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                             Chicago, IL

| | |
|---|---|
| Page 484 | Page 486 |

1  items that are packaged together and you'd have
2  to buy the whole package together?
3      A.  No.  We would have them commit to
4  Abbott products.
5      Q.  Okay.  So a particular sales volume of
6  Abbott products, but they chose what they needed
7  or they bought what they needed as they needed
8  it?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  If you needed razor
11 blades, we didn't say you have to buy Band-Aids
12 too.
13         MS. ST. PETER-GRIFFITH:  Okay.  Let'
14 move on to Exhibit 35.
15         (Whereupon Exhibit Baker 035 was
16 marked for identification.)
17         THE WITNESS:  Okay.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Sir, do you recall -- well, do you
20 recall this document?
21     A.  No.
22     Q.  Or series of documents.  If you could

1  flip to the last two pages of this particular
2  exhibit, the first one I want to concentrate on
3  is this one.
4      A.  Yes.
5      Q.  Sir, do you recognize this particular
6  page or this particular document?
7      A.  No.  I recognize the handwriting.
8      Q.  Whose handwriting is that?
9      A.  That's mine.
10     Q.  Okay.  Did you write this, sir?
11     A.  Yes.
12     Q.  Do you recall writing this?
13     A.  No.
14     Q.  Do you remember dealing with an account
15 entitled Georgetown?
16     A.  Vaguely.
17     Q.  Or Georgetown University.  What was the
18 nature of the account?
19     A.  I think that was a account that we were
20 looking at as a prospect that we would try to put
21 an agreement together on.
22     Q.  Do you recall whether it was an account

1  that Abbott ever was able to land?
2      A.  That, I don't know.
3      Q.  Okay.  Do you recall anything about --
4  if you could flip to the last page, do you recall
5  anything about the conversation that's reflected
6  in this memorandum that's addressed to you?
7      A.  No, unfortunately I don't remember.
8      Q.  Do you recall receiving this
9  memorandum?
10     A.  No.
11     Q.  Do you have any doubt that you received
12 this memorandum?
13     A.  No.
14         MS. ST. PETER-GRIFFITH:  Mark this.
15         (Whereupon Exhibit Baker 036 was
16 marked for identification.
17         THE WITNESS:  Okay.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Sir, do you recognize this document?
20     A.  No.
21     Q.  It appears to be a memorandum from Tom
22 Olinger, and it's addressed to you and Mark

1  Gorman.
2      A.  Yes.
3      Q.  Who's Mr. Gorman?
4      A.  Mark Gorman is an Abbott employee, or
5  was at the time.
6      Q.  Okay.  Do you remember his position?
7      A.  You know, I don't remember the time,
8  whether he was -- he may have been in the
9  contracting part of the business, but I really
10 don't remember.
11     Q.  Okay.  Do you recall anything about the
12 Carolinas Medical Center account?
13     A.  Not a great deal, no.
14     Q.  Okay.  What do you recall about it?
15     A.  Well, obviously from reading this, this
16 was at least a prospect of Mr. Olinger's.
17     Q.  Okay.  Do you have any recollection as
18 to whether or not that you were able to -- Abbott
19 was able to land the account?
20     A.  I don't recall.
21     Q.  Okay.  Do you recall any discussions
22 about Carolina Medical concerns or feelings that

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

| Page 488 | Page 490 |
|---|---|
| 1 there was an opportunity for physicians to be<br>2 brought back into the fold through present safe<br>3 harbor regulations?<br>4     MS. TABACCHI: Object to the form.<br>5     THE WITNESS: No, I don't remember<br>6 that.<br>7 BY MS. ST. PETER-GRIFFITH:<br>8     Q. Do you know what safe harbor<br>9 regulations are?<br>10     A. Not in any specific context, no.<br>11     Q. Do you have a general familiarity?<br>12     A. Generally safe harbor means that<br>13 they're within an area that everyone is very<br>14 comfortable.<br>15     Q. Okay. Other than that, you don't have<br>16 any understanding of safe harbor regulations?<br>17     A. No.<br>18     Q. If you could look on the last page of<br>19 this document, at the bottom it says cc Bill<br>20 Dempsey. Do you see that?<br>21     A. Yes.<br>22     Q. Who is Mr. Dempsey? | 1 different times over the years, but Bill was my<br>2 boss for part of the that that I was in home<br>3 infusion.<br>4 BY MS. ST. PETER-GRIFFITH:<br>5     Q. Okay. Do you recall anything else<br>6 about the Carolina account?<br>7     A. No, I don't. I'm sorry.<br>8         (Whereupon Exhibit Baker 037 was<br>9 marked for identification.)<br>10     THE WITNESS: Okay.<br>11 BY MS. ST. PETER-GRIFFITH:<br>12     Q. Sir, do you recognize this document?<br>13     A. No.<br>14     Q. Okay. I'm going to represent to you<br>15 this was produced to us by Abbott, but it was<br>16 actually produced from the personal files of Mr.<br>17 Harling. Do you know who Mr. Harling is?<br>18     A. Yes.<br>19     Q. Okay. Who's Mr. Harling?<br>20     A. An Abbott employee, worked in the<br>21 Alternate Site group.<br>22     Q. Are you familiar with a competitive |

| Page 489 | Page 491 |
|---|---|
| 1     A. Bill Dempsey was the -- he's another<br>2 Abbott employee.<br>3     Q. What position did he hold in October of<br>4 '91?<br>5     A. Well, it says area business manager of<br>6 the mid-east. He had responsibility at some<br>7 point for the home infusion business.<br>8     Q. Okay. Well, do you think that that<br>9 area business manager mid-east described Mr.<br>10 Dempsey?<br>11     MS. TABACCHI: Object to the form.<br>12 BY MS. ST. PETER-GRIFFITH:<br>13     Q. Or could that be construed as another<br>14 person?<br>15     A. No, I don't think so. I'm sure that's<br>16 who he was referring to.<br>17     Q. Okay. Did you work with Mr. Dempsey?<br>18     A. Yes, I did.<br>19     Q. Okay. What was your relationship with<br>20 him?<br>21     MS. TABACCHI: Object to the form.<br>22     THE WITNESS: I worked with him | 1 cross-reference within contract marketing?<br>2     MS. TABACCHI: Object to the form.<br>3     THE WITNESS: Well, I am familiar that<br>4 on occasion people that were using a competitor's<br>5 product asked us to do a cross-reference so that<br>6 we could match a competitive product to Abbott's<br>7 product.<br>8 BY MS. ST. PETER-GRIFFITH:<br>9     Q. Okay. And what would you cross-<br>10 reference?<br>11     A. They would have a list number or a<br>12 package number that was represented and that we<br>13 would look for a like product that Abbott offered<br>14 and try to put those together so that they were -<br>15 - you'd have a comparable.<br>16     Q. Okay. And what would you compare in<br>17 the comparable?<br>18     A. You would compare if it was the same<br>19 size, the same -- if it was an I.V. set, for<br>20 example, you'd compare does it have the same<br>21 number of Y sites, things like that. If it was a<br>22 IV solution, is it a 500-milligram or it says |

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 492

1  500, or are you comparing a liter to a half-
2  litter, and those types of things.  So you'd try
3  to get as close as you could to have like product
4  to like product.
5      Q.  Okay.  Would you ever compare prices?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Well, in what -- if
8  someone on an internal basis wanted to understand
9  if there was a differential and we had access to
10 what we thought a Baxter or a competitive price
11 might be, that could be done.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  You could compare prices to a Baxter's
14 --
15         MS. TABACCHI:  Object to the form.
16     Q.  -- if you had the information?
17     A.  If we had any, yes.
18     Q.  Okay.  Would you compare AWP prices?
19     A.  I don't think that was anything that we
20 would do typically.
21     Q.  Why not?
22         MS. TABACCHI:  Object to the form.

Page 493

1          THE WITNESS:  Because we sold at
2  contract prices.  BY MS. ST. PETER-GRIFFITH:
3      Q.  If you could look at the third page of
4  this document, do you recognize this particular
5  page?
6      A.  Not in particular, but...
7      Q.  Do you remember a contract marketing
8  presentation entitled "Close the 'Window' Deal"?
9      A.  It sounds vaguely familiar, yes.
10     Q.  Okay.  What was that particular
11 program?
12     A.  Well, it's explained on the document.
13 You know, if you had a customer that would buy
14 four devices, they could actually get one free.
15     Q.  Okay.  How as a business model would
16 Abbott be able to sustain giving away free
17 devices?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Well, they didn't -- they
20 sold five devices.  And what they would do then
21 is you would just cover the cost and spread that
22 -- the cost of the five over four.  BY MS. ST.

Page 494

1  PETER-GRIFFITH:
2      Q.  Okay.  Would you ever give away free
3  devices in relation to the sale of other
4  products, like other non-device products like
5  solutions or injectables?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Not to my recollection.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Flip to -- I'll represent to you, sir,
10 that this might not be all one document, but this
11 was how it was produced to us.
12     A.  Okay.  Well, there's a lot of different
13 things in here.
14     Q.  If you could go to at the bottom, it
15 says ABT275-028.  Do you see that?
16     A.  Yes.
17     Q.  It's National Sales Meeting, Contract
18 Marketing, Business Analysis?
19     A.  Yes.
20     Q.  Do you recall attending in '99 the
21 national sales meeting?
22     A.  I'm sure I attended the meeting.

Page 495

1      Q.  Did you attend most or all of the sales
2  meetings?
3      A.  When I was the leader of that
4  organization, yes.
5      Q.  Okay.  The next page of this particular
6  -- what appears to be a PowerPoint presentation -
7  - well, do you recall a PowerPoint presentation?
8      A.  No.
9      Q.  It appears at the top to say "Business"
10 -- and I'll try and fill in the blanks.  I assume
11 that's "Analysis" on this.  Do you see where I'm
12 looking?
13     A.  Yes.
14     Q.  And it says "Focus:  Sales Dollars."
15 Was that the focus of the meeting?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  No.  I would imagine it
18 was the focus of whoever's presentation it was,
19 whether this was Mr. Harling's or whoever had
20 presented this.  BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  If you could flip to the next
22 page, again it says "Business Analysis," and then

41 (Pages 492 to 495)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 496

1  there appears to be some language that is
2  difficult to read, and then there's ASP minus
3  COGS equals standard margin.  Do you see that?
4      A.   Yes.
5      Q.   What does that mean?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Well, I would guess, but
8  if you'd like me to guess, it's Alternate Site
9  Products less our cost of goods sold equal our
10 margin.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.   Well, I was more looking for if you
13 understood what ASP means minus COGS.  So you
14 think COGS is cost of goods sold?
15     A.   Most likely.  That would be my
16 interpretation, but that's my interpretation.
17     Q.   Okay.  And then at the bottom it says,
18 "Why is it important?  Division Commitments/Plan.
19 Pete and Don get paid."  Do you see that?
20     A.   Yes, I do.
21     Q.   Who are Pete and Don?
22     A.   I'm guessing they're referring to

Page 497

1  myself and Don Robertson who was my boss, I would
2  imagine, in 1999.
3      Q.   And what is the focus on Pete and Don
4  getting paid?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  It was probably in
7  reference to the Alternate Site products group
8  making their number out here.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   Okay.  Well, did you get paid if they
11 didn't make their number?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  We had various incentive
14 programs as a management team.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.   Okay.  So you might have gotten paid
17 less?
18     A.   Maybe, yes.
19     Q.   Then the next page says Profit and Loss
20 something.  Do you understand this formula that's
21 -- I understand it's difficult to read, but do
22 you understand this formula that's laid out here:

Page 498

1  Factory costs less rebates equals standard margin
2  plus distribution costs equals distribution
3  margin?
4      A.   Well...
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  I'm sorry.  Can you be
7  more -- what is your question?
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   I guess my question is:  Can you
10 explain what's reflected here on this page?
11 Let's start with that.
12     A.   Yes -- well, again my interpretation is
13 that they're trying to get at how -- what Abbott
14 looked at as what is contribution or division
15 margin, so it's all the components that go into
16 that.
17     Q.   Okay.  And what are the components that
18 go into division margin?
19     A.   I can't see the top.  You know, I can
20 only see -- factory costs is the first one that I
21 make out, so you obviously sell the product and
22 there's a factory cost.  And if there are

Page 499

1  rebates, you take that away and that equals then
2  your standard margin.  Then there's a cost to
3  getting the product to the customer which then
4  equals the distribution margin.  SG&A is usually
5  the sales expense, the cost of having
6  representatives out there calling on customers.
7  And if you take that away, that gets down then to
8  the division or contribution margin.
9      Q.   Is that generally your understanding of
10 how you got to division contribution margin?
11     A.   Oh, I don't know.  I think it is an
12 example to show representatives.  I don't know if
13 that's our typical definition or not.
14     Q.   Well, how would you define division
15 contribution margin?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  You know, I've had a lot
18 of roles, not a finance role, so they wouldn't
19 tell us what the division margin was.
20         MS. ST. PETER-GRIFFITH:  Then I'm not
21 going to ask you to interpret the next page.
22         THE WITNESS:  Thank you.

42 (Pages 496 to 499)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

Page 500

1     MS. ST. PETER-GRIFFITH:  That was
2  Exhibit 37?
3     MS. TABACCHI:  Yes.
4        (Whereupon Exhibit Baker 038 was
5  marked for identification.)
6     MR. SISNEROS:  What's the next exhibit
7  now?
8     MS. ST. PETER-GRIFFITH:  Exhibit 38.
9     MR. SISNEROS:  Thanks.
10    THE WITNESS:  Okay.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Mr. Baker, do you recognize this
13 document?
14    A.  No.
15    Q.  Okay.  Who's Marianne Sutcliffe?
16    A.  An Abbott employee.
17    Q.  Do you remember in what capacity?
18    A.  No, I don't.  I would have to guess.
19    Q.  Okay.  I don't want you to do that.  Do
20 you notice that you're on the two lists of
21 addressees?
22    A.  I do.

Page 501

1     Q.  This appears to be dated from August
2  13th, '99.  Do you see that at the top --
3     A.  Yes.
4     Q.  -- the fax number?
5        Does this refresh your recollection as
6  to whether you were using e-mail in '99?
7     A.  Well, yes.  This is when I -- I believe
8  at this time, based on what I'm looking at, I was
9  in the director of corporate house marketing
10 role.
11    Q.  Okay.
12    A.  Okay.
13    Q.  Do you recall working on an
14 Owen/NeighborCare Key Vendor Partnership?
15    A.  No, I don't recall.
16       (Whereupon Exhibit Baker 039 was
17 marked for identification.)
18    THE WITNESS:  Okay.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Mr. Baker, what is this document?
21    A.  It looks like Mike Sellers' division
22 incentive goals.

Page 502

1     Q.  Okay.  What are division incentive
2  goals?
3     A.  It was a mechanism to determine what an
4  individual's goals were for the year and based on
5  the ability to meet and obtain those goals.  They
6  were -- there was an incentive program that was
7  in place that they could get paid on.
8     Q.  Was that -- was this, for example,
9  their annual review or performance evaluation?
10    A.  Not necessarily.  Not necessarily.
11    Q.  Okay.  Would the division incentive
12 plan goals or the ability to meet the plan goals
13 define compensation?
14    MS. TABACCHI:  Object to the form.
15    THE WITNESS:  A component of the
16 potential compensation, yes.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  Okay.  Would that the incentive
19 compensation or the bonus structure?
20    A.  Yes.
21       (Whereupon Exhibit Baker 040 was
22 marked for identification.)

Page 503

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  If we could look at Exhibit 40, and my
3  question, sir, is what's the difference between a
4  division incentive plan goals third-quarter
5  update and then 2002 LBE results, or is there a
6  difference?
7     A.  Well, it's a picture of time.  I'm not
8  sure when each of these was developed, but I
9  think Mike was responding to where do you think
10 you're going to come out in achieving those
11 goals, and they were probably at two different
12 times.
13    Q.  Okay.  And it says manager, Peter
14 Baker.  Do you see that?
15    A.  Yes.
16    Q.  Were you -- did you -- were you Mr.
17 Sellers' supervisor?
18    MS. TABACCHI:  Object to the form.
19    THE WITNESS:  At that time, yes.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Okay.  Well, at what points in time
22 were you Mr. Sellers' supervisor?

43 (Pages 500 to 503)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                            Chicago, IL

|                                                              Page 504 |
| --- |

1       A.   When I became the vice president of
2   Major Health Care Systems.
3       Q.   And as your subordinate, what were your
4   expectations of Mr. Sellers?
5           MS. TABACCHI:  Object to the form.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.   In terms of his job performance?
8       A.   It's very broad.  Can you be more
9   specific?
10      Q.   Okay.  Well, what were Mr. Sellers'
11  responsibilities when you supervised him?
12      A.   He was the general manager of the
13  contract marketing area, and then based on this
14  he also had home infusion Services while that was
15  kind of ramping down.
16      Q.   Okay.  And you supervised him in both
17  of those roles?
18      A.   Yes.
19      Q.   Okay.  How did you find Mr. Sellers as
20  an employee?
21          MS. TABACCHI: Object to the form.
22          THE WITNESS:  I thought he was a very

|                                                              Page 505 |
| --- |

1   good employee.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.   Did you ever have any problems with Mr.
4   Sellers or his job performance?
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  No, I did not.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.   Did you hire Mr. Sellers into his
9   position as general manager of Contract
10  Marketing?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  No, I did not.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   Who did?
15      A.   I don't know.
16      Q.   Okay.  Was he in that position when you
17  assumed your position within Hospital Products
18  Division?
19      A.   Yes, he was.
20      Q.   Okay.  Did you write -- for Exhibit 39
21  did you write the content of this particular
22  document?

|                                                              Page 506 |
| --- |

1       A.   No.
2       Q.   Do you know who did?
3       A.   My assumption would be Mr. Sellers.
4       Q.   Did you review this?
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  I probably would have
7   reviewed the final document.  I may have reviewed
8   it if this was on an interim if it was asked to
9   determine where he was on making his goals, but I
10  don't recall.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.   Could you edit his division plan goals?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  No.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   Okay.  Under Item 5 on the first page
17  of Exhibit 39 it says make difficult decisions.
18  Do you see that in the first -- in the top -- I'm
19  sorry, on the first page where it says leadership
20  competencies at the top?
21      A.   Yes.
22      Q.   And it says under No. 5 make difficult

|                                                              Page 507 |
| --- |

1   decisions?
2       A.   Yes.
3       Q.   And under competency assessment, it
4   says compliance guidelines have required new
5   limits and changes to be implemented.  Do you see
6   that?
7       A.   Yes.
8       Q.   Do you know what Mr. Sellers is
9   referencing there?
10          MS. TABACCHI:  Object to the form.
11          THE WITNESS:  No, I don't.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   If you could turn to the third page of
14  this document.
15      A.   Yes, ma'am.
16      Q.   It says under -- it says impact goal
17  categories.  Do you see that?
18      A.   Yes.
19      Q.   What are impact goals?
20      A.   Well, you see a lot of different names,
21  but these are the impact goals.
22      Q.   Okay.  So everything that is identified

44 (Pages 504 to 507)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                            Chicago, IL

Page 508

1  here are the target goals for Mr. Sellers' job
2  performance?
3      A.  Yes, for the incentive program.
4      Q.  Okay.  So not necessarily for his job
5  performance evaluation, but in order to be
6  compensated under the incentive plan there has to
7  be an evaluation?
8      A.  Yes.
9      Q.  And that's the impact goals that are
10 evaluated?
11     A.  Yes.
12     Q.  Okay.  Under item No. 6(e) it says
13 continue to strengthen the division's ethics and
14 compliance initiatives by working with ethics and
15 compliance department.  Do you see that?
16     A.  Yes, I do.
17     Q.  What was Mr. Sellers' involvement in
18 ethics and compliance within the Hospital
19 Products Division, to your recollection?
20     A.  Well, I think, as I stated earlier,
21 leading the contract department meant that if
22 changes were necessary to contract status and

Page 509

1  structure that they would have informed Mr.
2  Sellers that they felt that that was an area that
3  may have to be modified, changed, whatever, and
4  that his responsibility then was to make sure
5  that that was carried out from a division
6  perspective.
7      Q.  Do you know what he did to ensure, you
8  know, the contract marketing department's
9  alignment with various ethics and compliance
10 initiatives?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Well, it looks like he
13 outlined in e) the results of that, or at least
14 some examples of that.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Do you recall him doing that?  I guess,
17 independent of this document my question is:  Do
18 you recall what his compliance initiatives were?
19     A.  Well, not specifically, no.
20     Q.  Under item e) in the next column where
21 it says results achieved --
22     A.  Yes.

Page 510

1      Q.  -- it says active involvement on
2  compliance task force and chairman of pricing and
3  contracting subcommittee.  Do you see that?
4      A.  Yes.
5      Q.  Do you know what that's referencing?
6      A.  No.  I think you'd have to ask Mike
7  that.
8      Q.  Well, who evaluates the overall
9  performance and the grading of that performance?
10         MS. TABACCHI:  Object to the form.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Is that a self-evaluation by Mr.
13 Sellers?
14     A.  It's a self-evaluation.  I would then
15 review it and determine if I agree with that and
16 then pass that on.
17     Q.  And what would happen if you didn't
18 agree with it?
19     A.  It wasn't as much agree or disagree as
20 much as we could determine the weighting and
21 whether it was actually achieved or not achieved
22 or partially achieved.  It was -- and then we

Page 511

1  would grade it accordingly like that.  You see
2  the performance weighting.  If there was a
3  component of that that we felt wasn't met, then
4  the weighting could be -- he wouldn't receive the
5  full weight of that.
6      Q.  Okay.  If you could look at Exhibit 40
7  and turn to the last page, it appears that for
8  his performance goal for the 2002 LBE -- well,
9  first of all, what are LBE results?
10     A.  LBE is latest best estimate.
11     Q.  Okay.  Then would that be sort of the
12 final estimate?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  It's the final estimate.
15 And also looking at the date down there, a lot of
16 times if there are sales numbers that have to be
17 met in something like this we may not always get
18 that as quickly at the end of the year, so there
19 could be some minor modifications based on, you
20 know, we didn't get year-end sales data until a
21 later date, et cetera.  So it's just that.  It's
22 an estimate of how you think you're going to end

                          45 (Pages 508 to 511)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

Page 512

1  up.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  Okay.  And it appears that Mr. Sellers'
4  overall goal performance was 103.75 percent.  Do
5  you see that?
6     A.  Yes.
7     Q.  Would that have been -- would that
8  performance rating have been something that you
9  would have signed off on?
10    A.  Yes.
11    Q.  And did you feel that Mr. Sellers
12 deserved that high of a rating?
13    A.  Yes.
14        (Whereupon Exhibit Baker 041 was
15    marked for identification.)
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Mr. Baker, do you recognize this
18 document?
19    A.  No.
20    Q.  Do you recall a PowerPoint presentation
21 or attending a presentation on the Hospital
22 Products Division Financial Planning and Analysis

Page 513

1  Contract Marketing Forum?
2     A.  I don't remember it, no.
3     Q.  Would this have been something that you
4  would have attended, this particular forum?
5     A.  Well, based on the timing when they're
6  showing the organization, this was right about
7  the time that Mr. Weibking was getting ready to
8  retire and I was going to assume that role.  So I
9  may have been announced, but I don't know if I
10 was participating yet as I was moving from my
11 responsibilities from Alternate Site.  So I don't
12 remember attending a meeting where this was done,
13 but...
14    Q.  Okay.  If you could turn to page 5 of
15 this document, it should say what does contract
16 marketing do.  Do you see that?
17    A.  Yes.
18    Q.  Then it says pricing strategies?
19    A.  Yes.
20    Q.  And there are 1, 2, 3, 4 items under
21 that develop with business units.  Do you see
22 that?

Page 514

1     A.  Yes.
2     Q.  What was your understanding of what HBS
3  contract marketing did in terms of developing
4  with business units?
5     A.  They would look at -- work with the
6  goals and objectives of the marketing teams to
7  determine what products they wanted to highlight.
8  Are there pricing goals that they wanted to make
9  for that year? Were there -- is there competitive
10 information?  Did you know, for example, in at --
11 the business units always have -- you know, is
12 there going to be a new competitor?  Do you have
13 new products that are being introduced by us?
14 And how would you then put those into your
15 portfolio?  And those types of things.  So it was
16 just basically working with the business unit to
17 determine their goals and objectives and then how
18 we would work with them to price that.
19    Q.  What about implementing pricing
20 strategies? What did contract marketing do?
21    A.  Well, once we talked about it, it was
22 then making sure that over the course of the year

Page 515

1  that we actually participated and worked in
2  trying to achieve it.
3     Q.  And what was contract marketing's
4  involvement with pricing strategies concerning
5  GPOs?
6     A.  Well, a lot of this business is
7  developed based on those group purchasing
8  organization relationships, and so depending on
9  the timing of bids we would implement those
10 strategies across, like a GPO bid.
11    Q.  And then it's -- the last item is
12 pricing strategies, compliance and fraud and
13 abuse.  Do you see that?
14    A.  Yes.
15    Q.  What does that mean?
16    A.  Well, I think as we talked earlier, as
17 our counsel looked at different potential issues
18 or potential modifications, the way that we
19 structured our agreements or worked within the
20 guidelines of our contracting that we would make
21 sure that those were being upheld or modified
22 based on input from counsel.

46 (Pages 512 to 515)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                              Chicago, IL

Page 516

1      Q.  And what recollections do you have
2  about communications with counsel concerning
3  that?
4          MS. TABACCHI:  I'm going to caution the
5  witness not to reveal the substance of any
6  communications with counsel.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Does Abbott intend to rely upon any
9  advice of counsel's defense?
10         MS. TABACCHI:  We have this
11  conversation every time.  In the course of this
12  deposition I will not allow Mr. Baker to reveal
13  the substance of communications with counsel and
14  waive any privilege that there may be.  To the
15  extent that he has a recollection of a specific
16  substantive communication with counsel, I don't
17  want that to be revealed in his response.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Do you have any recollection of
20  communications with counsel?
21     A.  No, other than I think training
22  obviously went on.  We tried to work within --

Page 517

1  that team did at that time --
2      Q.  Okay.  Go ahead.
3      A.  -- to make sure that they were -- if
4  there were modifications needed that they were
5  implemented.
6      Q.  Well, what training do you recall was
7  being conducted concerning, you know, fraud and
8  abuse, compliance matters?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't -- as I say, I
11  think I was transitioning into that role.  You'd
12  have to ask probably Mr. Sellers.  But again, I
13  don't know if this was his document either.  But
14  I don't know that I can tell you what was being
15  done at the time.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Do you recall whether there was any
18  training done by anyone within the general
19  counsel's office?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I don't know.
22         MS. ST. PETER-GRIFFITH:  Is now a good

Page 518

1  time to take a break?
2          MS. TABACCHI:  Sure.
3          THE VIDEOGRAPHER:  We are off the
4  record at 2:08 p.m.  (Recess taken.)
5          THE VIDEOGRAPHER:  We are back on the
6  record at 2:16 p.m.
7          MS. ST. PETER-GRIFFITH:  Mark this as
8  the next exhibit.
9          (Whereupon Exhibit Baker 042 was
10  marked for identification.)
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Mr. Baker, as you look at this next
13  exhibit, I will tell you that my focus is going
14  to be on the first page under the heading
15  "Government Significant Events," but certainly
16  take your time and review it as you deem
17  necessary.
18     A.  Okay.
19     Q.  Mr. Baker, do you recognize this
20  document?
21     A.  Not specifically, no.
22     Q.  It appears to be a significant events

Page 519

1  report for September of 2002 from Mr. Sellers
2  directed to you.  Do you see that?
3      A.  Yes, I do.
4      Q.  Do you have any doubt that you received
5  this?
6      A.  No.
7      Q.  My question concerning this document --
8  well, first let me ask you:  How often did Mr.
9  Sellers provide you with significant events
10  reports?
11     A.  They were done on a monthly basis.
12     Q.  Under that first subheading where it
13  says government significant events, do you see
14  that?
15     A.  Yes.
16     Q.  The last bullet point references the
17  CARS/Many Medicaid rebate payment system has been
18  implemented in HPD, PPD and TAP.  Do you see
19  that?
20     A.  Yes.
21     Q.  What is the CARS/Many Medicaid rebate
22  payment system?

                              47 (Pages 516 to 519)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 520

1     MS. TABACCHI:  Object to the form.
2     THE WITNESS:  I think it's I-many, but
3 I believe it's a software program that
4 information is loaded which helps you to
5 calculate any information that's utilized in
6 government reporting.
7 BY MS. ST. PETER-GRIFFITH:
8     Q.  Do you know what was in place prior to
9 the implementation of the CARS I-many Medicaid
10 rebate system?
11     A.  No, I don't.  I don't know if this was
12 a new system or what had happened prior.
13     Q.  Do you recall there being a problem
14 with how Abbott calculated Medicaid rebates?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  No.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Do you know why TAP was included as
19 part of the -- as one of the divisions or one of
20 the entities that Mr. Sellers helped implement
21 the CARS I-many Medicaid rebate payment system?
22     MS. TABACCHI:  Object to the form.

Page 521

1     THE WITNESS:  No.
2 BY MS. ST. PETER-GRIFFITH:
3     Q.  Do you recall TAP being involved with
4 that?
5     MS. TABACCHI:  Object to the form.
6     THE WITNESS:  No, I don't.
7 BY MS. ST. PETER-GRIFFITH:
8     Q.  Do you know why Mr. Sellers would
9 reference TAP --
10     MS. TABACCHI:  Object to the form.
11     Q.  -- as being involved with the CARS I-
12 many Medicaid rebate payment system?
13     A.  Well, only in that if it was considered
14 a Abbott entity that also participated.
15     Q.  Do you know of other areas where TAP
16 participated as an Abbott entity with other
17 divisions within Abbott?
18     MS. TABACCHI:  Object to the form.
19     THE WITNESS:  No, I don't.
20     MS. ST. PETER-GRIFFITH:  Mark the next
21 exhibit, please.
22     (Whereupon Exhibit Baker 043 was

Page 522

1 marked for identification.)
2 BY MS. ST. PETER-GRIFFITH:
3     Q.  Mr. Baker, do you recognize this
4 document?
5     A.  Yes.
6     Q.  Okay.  What is this document?
7     A.  It is the divisional incentive program
8 goals for myself and Mr. O'Donnell.
9     Q.  Did you have the same goals?
10     A.  This was in my -- when I was
11 transitioning responsibilities, so to some
12 degree, yes.
13     Q.  Okay.  And it appears from the first
14 page of this document that Mr. O'Donnell took the
15 first stab at drafting this and then he gave it
16 to you for comments.  Do you see that?
17     A.  Yes.
18     Q.  Do you recall having any comments to
19 this particular document?
20     A.  No.
21     Q.  If you'd turn to the last page.
22     A.  Yes.

Page 523

1     Q.  Under where it says people management,
2 it says under Item 7 achieve the following
3 diversity and ethics compliance goals.  Do you
4 see that?
5     A.  Yes, I do.
6     Q.  And under item b of No. 7, it says
7 continue to strengthen the division's ethics and
8 compliance initiatives by working with the ethics
9 and compliance department.  Do you see that?
10     A.  Yes.
11     Q.  Was this something you did or Mr.
12 O'Donnell did, or both of you?
13     A.  Both of us would have.
14     Q.  And what was your involvement?  What
15 did you do to achieve this initiative or goal?
16     A.  Well, I think he's got in the goals
17 resulted that we participated in learn modules.
18     Q.  Okay.  So you participated in learn
19 modules.  Anything else?
20     A.  Strictly adhered to them.
21     Q.  Okay.  Well, it says key actions
22 include implement corporate standards.  Do you

48 (Pages 520 to 523)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. – Vol. II   HIGHLY CONFIDENTIAL                    February 28, 2008
Chicago, IL

Page 524

1  see that?
2      A.  Uh-huh.
3      Q.  Ensure ongoing active involvement in
4  the divisional steering committee with the ethics
5  and compliance department and implementation of
6  the company's compliance program?
7      A.  Yes.
8      Q.  Were you on this divisional steering
9  committee?
10     A.  Well, as I mentioned earlier, I was
11 that liaison.  So the steering committee, as they
12 developed the programs from our corporate
13 perspective, they would determine is that -- how
14 would we pass that on like the learn modules
15 teach in the division, and so I would participate
16 in that.
17     Q.  Okay.  What do you recall about the
18 divisional steering committee's meetings --
19 perhaps I should ask were there meetings.
20     A.  Well, I think when there were
21 initiatives that were developed by the corporate
22 ethics and compliance group, they would call us

Page 525

1  together to say, for example, we are going to put
2  this learn module together.  This is what it will
3  look like.  This is when we would expect to roll
4  that out.  Here's how we would need your help in
5  making sure that it was something that could get
6  passed along through your division.  How is the
7  best way to make sure that that is accomplished?
8          So we would give them input in that,
9  you know, we'll make it available to -- you know,
10 like we'd have a checklist of employees that as
11 they go through it, then we would make sure that
12 it was actually -- you know, it was done and
13 support them in any way we could in making sure
14 that those initiatives happened.
15     Q.  Do you recall which particular
16 initiatives you helped bring to the Hospital
17 Products Division?
18     A.  No.  Again -- well, I was in for a
19 relatively short period of time.  I know there
20 were a couple of different occasions where they
21 would have meetings where we would get together.
22 and it was -- I would help set up times so that

Page 526

1  the corporate team could come in and talk about
2  different learning activities, et cetera, with
3  maybe the marketing and sales teams and then
4  again support them in -- again, I think the learn
5  module is a big one where they wanted to make
6  sure organizationally everybody had gone through
7  this training program.  So there were a couple
8  different meetings on, okay, what was really in
9  this, why was it important, and then how would we
10 implemented it.
11     Q.  Okay.  But you don't have a specific
12 recollection as to which modules those were or
13 which programs those were?
14     A.  I don't -- I think there was all the
15 ones that they developed we ultimately ended up
16 participating in.
17     Q.  Do you remember which those were,
18 though?  Do you remember which?
19     A.  I'm sorry, no.
20     Q.  And then the next item says ensure
21 continued compliance with mandatory training
22 programs.  Do you see that?

Page 527

1      A.  Yes.
2      Q.  When you say -- when it says continued
3  compliance, is that compliance meaning making
4  everybody go to the mandatory training programs
5  or ensuring that everybody followed what was
6  discussed in the training programs?
7      A.  Well, mostly that they participated and
8  that we understood that they had gone through the
9  training.
10     Q.  Was there any way to -- or did your HPD
11 division develop any mechanism to ensure that the
12 compliance initiatives that your employees were
13 receiving training on were actually followed by
14 your employees?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Well, first and foremost,
17 I think it was the understanding that they do
18 participate in the training and that there are --
19 there were training goals that were set out, that
20 they would be followed.
21         I guess the second piece of that, if
22 there were questions -- and at that time we did

49 (Pages 524 to 527)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 528

1  have an 800 number to call, et cetera, if there
2  were questions or any thought -- we were actually
3  rigorous if anyone even saw any type of activity
4  that they felt went against our code of conduct
5  or what had been learned, that they had a place
6  to call in and suggest that additional follow-up
7  would take place.
8        So it was -- to some degree I guess it
9  was making sure that everyone knew and understood
10  and were following those things through the
11  training, and then second that there was an
12  opportunity for almost -- you know, to
13  participate and to watch your fellow employees to
14  make sure we're all being compliant to the best
15  of our abilities.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  The next final sort of clause says
18  participate actively in the business conduct
19  committee.  Do you see that?
20     A.  Yes.
21     Q.  What was your involvement with the
22  business conduct committee?

Page 529

1     A.  I think those all begin to kind of go
2  together when you would meet with the compliance
3  organization, that they would say is there
4  anything different or unique about your division
5  that we need to make sure that we participate in
6  different programs, et cetera, so that you would
7  -- when they called that meeting you were
8  representing -- it was, -- you know, you were the
9  liaison to the Hospital Products Division, but at
10  the same time if there were things that were
11  unique to the Hospital Products Division that you
12  would make sure that they were aware of those as
13  well.
14        MS. ST. PETER-GRIFFITH:  Mark that as
15  the next exhibit, please.
16        (Whereupon Exhibit Baker 044 was
17  marked for identification.)
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Mr. Baker, I understand this is a long
20  document.  I'm actually going to have you focus
21  on the third to the last page, and in particular
22  page 16.

Page 530

1     A.  Okay.  Okay.
2     Q.  My question to you, Mr. Baker, first
3  is: Is this the code of business conduct that you
4  were referencing earlier in your testimony?
5     A.  Yes.
6     Q.  Do you recall whether there was a code
7  of business conduct that existed prior to October
8  of 1999, which appears to be the date of the
9  first page of this document?
10     A.  I don't recall.  There may have been
11  one.  I just don't remember.
12     Q.  Do you recall when corporate policy No.
13  3414 was initiated?
14     A.  No, I don't.
15        MS. TABACCHI:  Object to the form.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Now, this particular provision deals
18  with Medicare and Medicaid fraud and abuse laws.
19  Do you see that?
20     A.  Yes.
21     Q.  Okay.  Other than what you testified to
22  earlier, can you think of any other way that

Page 531

1  employees within the Hospital Products Division
2  could verify whether or not the conduct that they
3  were engaging in violated Medicare, Medicaid
4  fraud and abuse laws?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  Well, again I think
7  violations, if there were violations, they could
8  have come in many forms.  Divisional manager may
9  have -- you know, if they saw something that was
10  inappropriate they would have known that with
11  their representatives.  I think, you know, if a
12  customer brought up an issue, we had mechanisms
13  that it could get them -- I mean, at that point I
14  think we did establish an 800 number, et cetera,
15  so there were ways that people could inform them
16  if -- or inform Abbott if they thought there was
17  issues, but I don't know any more new or
18  additional ways of doing that.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  Well, this particular policy
21  says all of employees shall comply with all
22  applicable federal and state fraud and abuse or

50 (Pages 528 to 531)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                            Chicago, IL

Page 532

1  anti-kickback laws and regulations as well as all
2  applicable provisions of the Federal False Claims
3  Act.  Do you see that?
4      A.  Yes.
5      Q.  In your capacities, in your various
6  capacities either as general manager or head of
7  the sales force in Alt Site or as head of the
8  Hospital Products Division, what did you do to
9  educate your employees about these particular
10 statutes?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Well, we spent the time
13 with the support of our corporate ethics group to
14 not only have these, but to go through it and
15 make sure that every employee went through the
16 training for that, and that also determine that
17 if there were questions or concerns that they had
18 a place to call.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  What about prior to 2001?  Let's
21 say in 1999 when this particular policy is dated.
22         MS. TABACCHI:  Object to the form.

Page 533

1          THE WITNESS:  Well, I don't know.  I
2  would go back to what I said earlier.  Any time
3  there was a potential for an issue that I feel
4  the organization had the opportunity to call,
5  whether it was through their manager or through
6  HR, to determine ways that if they thought there
7  was anything improper going on that they could
8  articulate that and make sure that they got
9  answers to any questions that they had.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Further down in this policy -- it's
12 about three-quarters of the way down -- it begins
13 common business practices such as providing
14 discounts, rebates, or services to customers may
15 have potential fraud and abuse law implications
16 if the company does not document and structure
17 these practices properly.  Do you see that?
18     A.  Yes.
19     Q.  What initiatives did Abbott's Alternate
20 Site -- either home infusion or Alternate Site
21 product sales undertake to document its practices
22 with regard to discounts, rebates, or services

Page 534

1  provided to customers to ensure that they were in
2  compliance with federal and state Medicare and
3  Medicaid fraud and abuse laws?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  It's a long question.
6  Let me try to do my best to respond.  The
7  contract department was headed by Mr. Sellers, as
8  you brought up earlier.  There were a number of
9  initiatives I think that were taken.  One was the
10 training that went on to our contract marketing
11 organization.
12         Two, I know there was additional people
13 and policies that were put in place in the
14 contract marketing area.  There was an entire
15 compliance group now, and I say -- or at that
16 time that they had put in place, and part of it
17 was from that reporting perspective to make sure
18 that if there were rebates or discounts, et
19 cetera, that they were being reported.
20         And so I think that's one, I guess,
21 that I do know happened, that the reporting
22 mechanisms were modified to make sure that that

Page 535

1  accounting of these types of things had taken
2  place.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  And when did that occur?
5      A.  I can't tell you when.  I don't know
6  the timing of that.
7      Q.  Was it before or after the development
8  of the corporate ethics and compliance group?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  You know, I apologize.  I
11 don't know that I can tell you the timing of that
12 versus the timing of the office of ethics and
13 compliance committee.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Well, if I submit to you that the
16 office of ethics and compliance was formulated no
17 earlier than 2002, what was done prior to 2002
18 and, for example, in October 1999 to ensure that
19 home infusion and Alt Site product sells were
20 complying with this requirement that the company
21 document and structure its practices properly
22 with regard to discounts, rebates, and services

                                51 (Pages 532 to 535)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL               February 28, 2008
                              Chicago, IL

Page 536

1  to customers?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  Again, I would state I
4  don't think that's a fair question.  I don't
5  know.  I've tried to answer to the best of my
6  ability in the past.  I don't know how much more
7  I can give you on that.
8         I would tell you before this obviously
9  those had taken place.  If I looked at Mr.
10 Sellers' -- you know, that's a review that's a
11 year old, so that would have happened in 2001.
12 So depending on if you say the office of ethics
13 and compliance started in 2002, it could have
14 started before that that some changes were being
15 made.  I don't know that I can go back to 1999.
16 I'm not sure that I can help you with that.
17        MS. ST. PETER-GRIFFITH:  Okay.  Why
18 don't we change the tape.
19        THE VIDEOGRAPHER:  We are off the
20 record at 2:38 p.m. at the end of tape No. 3.
21 (Recess taken.)
22        THE VIDEOGRAPHER:  We are back on the

Page 537

1  record at 2:40 p.m. at the beginning of tape No.
2  4.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Mr. Baker, I don't mean this to be a,
5  you know, difficult question.  I just want to
6  know prior to 2000.  Let's start there.  Prior to
7  2000 are you personally aware of any particular
8  practices or policies that existed within the Alt
9  Site product sales or home infusion business
10 units that ensured that those particular business
11 units documented their practices with regard to
12 rebates, discounts, and services to customers in
13 conformity with this policy?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  What I would tell you is
16 that we did document and understand, if I look at
17 this, rebates and programs such as that to ensure
18 that they were written and adhered to in a
19 compliant fashion.  And I think that was in part
20 due to constantly working with our legal counsel
21 to make sure that that was happening.
22        I think also just in our policy with

Page 538

1  our sales organization and how we train them, if
2  there was some form of inappropriate inducement
3  or something, that was something that as managers
4  -- the divisional managers or the district
5  managers would have seen and responded to if they
6  thought something inappropriate was going on, and
7  I think those types of things would have bubbled
8  up.
9         So on a couple different fronts I think
10 it was -- I don't want to say that it wasn't ever
11 addressed.  There's more of a constant relook, I
12 guess, at how we did things and why they were
13 done and trying to make sure that we incorporated
14 those into our day-to-day activities.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  And who was responsible for doing that
17 constant review?
18     A.  Well, it was done in part with -- in
19 partnership, I guess, with our legal department
20 and our contracting department and as part of
21 being, you know, an Abbott employee.
22     Q.  And what did your legal department do

Page 539

1  in terms of monitoring that compliance?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  You know, you would have
4  to ask someone in our legal department the types
5  of things that they did, whether it was looking
6  at the structure of the agreements that we put in
7  place -- I know those things happened and they
8  went on, but they can tell you more specifically
9  how often any of those reviews took place and to
10 what degree and how they determined what they
11 were going to look at and why.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Other than reviews by the legal
14 department of your contracts, did you have any
15 other mechanism for ensuring that you properly
16 documented discounts, rebates, and services to
17 customers to ensure their compliance with fraud
18 and abuse laws?
19        MS. TABACCHI:  Object to the form.
20 Asked and answered.
21        THE WITNESS:  I think it goes beyond
22 contracts.  I think it goes to the SOPs of how to

52 (Pages 536 to 539)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL               February 28, 2008
                              Chicago, IL

Page 540

1  handle contracts.  And so I would tell you that
2  our legal counsel looks at more than just the
3  words printed on the page but how they were
4  administered and upheld.  So if I came across it,
5  it was only the document itself.  I don't think
6  that was the case.  They looked at the entire
7  process to see if it made sense and was
8  appropriate.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Were those SOPs documented anywhere?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  I don't know.  I use that
13 as a -- operating procedures as part of how it
14 was put together.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Okay.  Were they standard operating
17 procedures, though, of contract marketing within
18 Alt Site or standard operating procedures within
19 the legal department?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  You would have to ask the
22 legal department.

Page 541

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay.  The next item says the
3  submission of the False Claims Act prohibits
4  submission or causing the submission of
5  fraudulent claims to Medicare or other federal
6  and state programs.  Do you see that?
7      A.  Yes.
8      Q.  What policies, practices, or procedures
9  did Abbott's Alternate Site product sales or its
10 home infusion business unit do to ensure that it
11 was not submitting or causing the submission of
12 fraudulent claims to Medicare or other federal or
13 state programs?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I don't know.  That
16 wasn't my area of expertise.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Who would you defer to on that?
19     A.  I don't know.
20     Q.  Whose responsibility -- where did the
21 buck stop with regard to ensuring that Alternate
22 Site product sales and home infusion did not

Page 542

1  submit or cause the submission of fraudulent
2  claims to Medicare or other federal state
3  programs?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  I feel uncomfortable with
6  the question.  I'm not sure I know how to even
7  respond to that.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Well, I mean, you at one point were the
10 head of Alt Site.  Was it your responsibility
11 ultimately to ensure compliance with the False
12 Claims Act?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I really can't answer
15 that.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Who would you go to if a question came
18 up concerning compliance with the federal False
19 Claims Act?
20     A.  I would go to our legal counsel and ask
21 for advice.
22     Q.  Did you ever do that?

Page 543

1          MS. TABACCHI:  I caution the witness
2  not to reveal the substance of any communications
3  with counsel.  You can answer yes or no.
4          THE WITNESS:  No.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Did you, as the head of Alternate Site,
7  ever do anything to ensure that Abbott's
8  Alternate Site product sales, business unit, or
9  it's home infusion business unit complied with
10 the federal False Claims Act and did not submit
11 or cause the submission of fraudulent claims to
12 Medicare or Medicaid?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I worked with our legal
15 counsel to make sure that we maintained a
16 consistent approach in how we conducted business.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  And how did your work with legal
19 counsel in that regard ensure that Abbott's
20 Alternate Site product sales and home infusion
21 business units were not violating the federal
22 False Claims Act?

53 (Pages 540 to 543)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 544

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  I had confidence that in
3  our legal review that if there were issues that
4  they would have been addressed.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Do you recall any of these issues
7  coming up?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  I don't remember any
10 specific issues, no.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Do you remember anyone ever raising the
13 issue of do we need to evaluate our Alternate
14 Site product sales or home infusion business
15 units to see whether or not they are violating
16 the federal False Claims Act?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  No, I don't remember that
19 ever coming up.
20 BY MS. ST. PETER-GRIFFITH:
21   Q.  Whose responsibility would it have been
22 to raise that issue?

Page 545

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  I think anyone who
3  thought there was an issue.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Did you ever learn that Mike DuTell had
6  a concern about Abbott's spreads and its marking
7  of the spreads?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  I don't think I know the
10 gentleman you mentioned.
11      (Whereupon Exhibit Baker 045 was
12 marked for identification.)
13      THE WITNESS:  Okay.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  Mr. Baker, do you recognize this
16 document?
17   A.  No.
18   Q.  Do you recall ever seeing it before?
19   A.  No.
20   Q.  Do you know whether Mr. O'Donnell was
21 sharing responsibilities with you at the point in
22 time when this was drafted?

Page 546

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  I don't know.  I don't --
3  we didn't really share -- we shared a year.  I
4  took over for Mr. Weibking in around the July
5  timeframe in 2002, and I think Mr. O'Donnell took
6  over my responsibilities probably a month later.
7  So I would imagine this was the following year,
8  yeah, 2003, so...
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  So he succeeded you in the Alt Site?
11   A.  Yes.
12   Q.  Okay.  Did you oversee -- was he in
13 your supervisory chain?  Did you supervise him?
14   A.  No.
15   Q.  Okay.
16      (Whereupon Exhibit Baker 046 was
17 marked for identification.)
18 BY MS. ST. PETER-GRIFFITH:
19   Q.  Let's move to the next exhibit, and for
20 the next couple this is going to be -- you don't
21 need to spend that much -- you can take as much
22 time as you want with the document, sir, but I'm

Page 547

1  going to be asking you again whether you
2  recognize it.
3    A.  Okay.  I do not.
4    Q.  You don't recognize this document, sir?
5    A.  No, I don't.
6       (Whereupon Exhibit Baker 047 was
7  marked for identification.)
8       THE WITNESS:  Do you have that same
9  question?
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Yeah, I do.  Do you recognize this
12 document, sir?
13   A.  No, I do not.
14      (Whereupon Exhibit Baker 048 was
15 marked for identification.)
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  I'm going to ask you the same question
18 here.
19   A.  I don't remember seeing anything like
20 this.
21   Q.  Do you remember an issue coming up
22 concerning CAS discount accrual tracking?

54 (Pages 544 to 547)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 548

1    A.  No, I don't.
2    Q.  Do you have any idea what CAS discount
3  accrual tracking is?
4    A.  I think I know if it's CAS, which is
5  one of the systems at Abbott.  That's about all I
6  can tell you.
7    Q.  That's why we call this discovery.
8        (Whereupon Exhibit Baker 049 was
9  marked for identification.)
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  This is going to be another one of
12 those, sir.
13   A.  Okay.  I'll do my best.
14   Q.  Sir, do you recognize that document?
15   A.  No.
16   Q.  Let me ask you, as sort of the former
17 into the 2001 turning over in 2002 Alt Site --
18 head of Alt Site, would you have had input into a
19 2003 incentive plan for Alternate Site product
20 sales even though you'd left?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  Only on an advisory

Page 549

1  level.  I think what -- I see a Pete here, and I
2  think it was Sean's first attempt at developing a
3  new incentive program.  I had obviously set the
4  incentive programs in prior years, and I think as
5  -- appearing as an advisor role, that would be
6  the only way that I would be involved.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Okay.  Do you have a recollection of
9  being involved in advising on the 2003 incentive
10 plan?
11   A.  No, not really.
12       (Whereupon Exhibit Baker 050 was
13 marked for identification.)
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  Sir, I'm going to have the same
16 question for you, but I'll have some additional
17 questions not necessarily related to this
18 document.  But my first question is:  Do you
19 recognize this document?
20   A.  No.
21   Q.  Prior to 2003 or 2002 during your
22 tenure with Alternate Site, do you recall

Page 550

1  Alternate Site product sales formulating annual
2  pricing actions and strategies?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  No, not specific pricing
5  strategies.  As I said, when we put our planning
6  process together and our financial plans, we
7  would have set -- you know, we would have set
8  goals as far as, you know, maximizing
9  opportunities, but I don't remember any specific
10 pricing strategies.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Do you recall a document like this
13 being generated prior to 2003 or 2002 during your
14 tenure at Alt Site?
15   A.  No.
16   Q.  We couldn't find any, sir.  I just
17 wanted to ask.
18   A.  That's why.
19       MS. TABACCHI:  Glad we cleared that up.
20       (Whereupon Exhibit Baker 051 was
21 marked for identification.)
22 BY MS. ST. PETER-GRIFFITH:

Page 551

1    Q.  Again, sir, this is going to be one of
2  those do-you-recognize-this-document questions.
3    A.  No, I do not.
4    Q.  It says at the bottom here I-many.
5    A.  Yes.
6    Q.  Is this the initiative -- the CARS
7  initiative that Mr. Sellers worked on that was
8  referenced in his incentive goals?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Well, I'll try to answer
11 as best I can.  I think what Mr. Sellers worked
12 on is -- this looks like a presentation of, to
13 some degree, the capabilities or something
14 presented from I-many.  It may, and I say may,
15 have been, you know, given to Mr. Sellers to help
16 explain what the system does, but I don't know
17 that.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.  So you've never seen this document
20 before?
21   A.  No.
22   Q.  Did Mr. Sellers confer with you

55 (Pages 548 to 551)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 552

1   concerning the CARS I-many program?
2       A.  To some degree, yes.  And when I say
3   that, it means he would update me that he was --
4   that they were looking at the system and that
5   that was something that he thought was important.
6       Q.  Did he communicate with you that there
7   were any problems with the existing rebate
8   system?
9       A.  No.
10          MS. ST. PETER-GRIFFITH:  Mark this.
11          MS. TABACCHI:  We're on 52?
12          MS. ST. PETER-GRIFFITH:  Yes.
13          (Whereupon Exhibit Baker 052 was
14   marked for identification.)
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  My question to you, sir, is first:  Do
17  you recognize this document?  I appreciate that
18  it's a June 2003 document from Alt Site.
19      A.  No, I do not.
20      Q.  My next question is:  Do you recall
21  whether during your tenure with Alt Site
22  spreadsheets like this one concerning sales reps,

Page 553

1   their territories, and their quotas was ever
2   routinely developed?
3           MS. TABACCHI:  Object to the form.
4           THE WITNESS:  Well, on an annual basis
5   we would determine how our sales organization
6   responded to their goals and overall a dollar
7   commitment may be part of that, so there were
8   calculations that were done on the incentive
9   programs per representative.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.  Okay.  How would those reports be
12  generated, or what would they look like?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  They would take sales
15  tracking and determine what total sales were and
16  if there were specific programs.  Like if one of
17  the goals was to sell a number of pumps, we would
18  have, hey, here's how many pumps each
19  representative had sold so that we could
20  calculate it based on that.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Would that information be contained in

Page 554

1   the individual sales rep's personnel files?
2           MS. TABACCHI:  Object to the form.
3           THE WITNESS:  Not necessarily.  I think
4   we send out -- there were tracking documents as
5   far as sales in the territory, et cetera, that
6   they may have had.  But a final calculation,
7   other than did you make your number and was there
8   a payout on that was the only thing that they may
9   have received, and that's something with all
10  representatives.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Do you recall what was contained in the
13  personnel records --
14          MS. TABACCHI:  Object to the form.
15      Q.  (Continuing) -- for Alt Site's sales
16  force?
17      A.  By whom?
18      Q.  By anybody.
19      A.  It was pretty much at the discretion of
20  the manager of what they thought was appropriate
21  to put in there.
22      Q.  Okay.  So the district managers would

Page 555

1   control sort of what went -- what was put in the
2   file and what was not put in the file?
3       A.  Yes.
4           (Whereupon Exhibit Baker 053 was
5   marked for identification.)
6           THE WITNESS:  I've not seen this.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.  Okay.  You don't recognize this
9   document?
10      A.  No.
11      Q.  It appears to be something that was to
12  Sean O'Donnell from Caroline Hanner.  Do you see
13  that?
14      A.  Yes.
15      Q.  Who's Ms. Hanner?
16      A.  I believe there's an Abbott person who
17  worked in a sales administration role.
18      Q.  Okay.  The reason why -- well, do you
19  note on the second page that this pertains to
20  2001 payout analysis by district?  If you flip to
21  the next page, sir.
22      A.  Yeah.

56 (Pages 552 to 555)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                           Chicago, IL

Page 556

1    Q.  What does that mean?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Well, what do you mean?
4    I'm sorry.
5    BY MS. ST. PETER-GRIFFITH:
6        Q.  I mean, you were in Alternate Site or
7    heading Alternate Site in 2001.  And I guess my
8    question to you is:  Do you understand what
9    information this particular report conveys?
10       A.  It looks like -- well, it's not a
11   document that I produced.  I think what it's
12   trying to convey is what the actual incentive
13   payouts were in 2001 --
14       Q.  Okay.
15       A.  -- to those representatives.  But
16   that's my guess as to what they were trying to
17   convey.
18       Q.  And what does AHAHJ -- or AHH, AHJ,
19   AHK, AHL, and AHM reflect?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  Those are the territory
22   alignments.

Page 557

1    BY MS. ST. PETER-GRIFFITH:
2        Q.  Okay.  What were the territories within
3    Alternate Site during your tenure?
4        A.  What do you mean?
5        Q.  Meaning how was the Alternate Site
6    sales force divided up into territories?  What
7    were the names of the territories or how were
8    they subdivided?
9        A.  I think you're looking at them there.
10   They were divided up into regions and then broken
11   down into territories or districts.  So each of
12   these represents a district.  Five districts,
13   five district managers, and then the
14   representatives underneath that.
15       Q.  Okay.  And were there ten
16   representatives to a district?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  They varied.  Not usually
19   more than that.  Many times less.
20   BY MS. ST. PETER-GRIFFITH:
21       Q.  Would that depend upon the volume of
22   business within a particular district?

Page 558

1        A.  And just pure geography.
2        Q.  Let me ask you before we get away from
3    this document:  Does this document refresh your
4    recollection as to the names of some of the sales
5    force individuals who may have worked for you?
6        A.  Well, I was going to say that, but I
7    didn't want to -- yes, it does.
8        Q.  Okay.
9        A.  Some are new, but many of them did work
10   with me.
11           (Whereupon Exhibit Baker 054 was
12   marked for identification.)
13       THE WITNESS:  Yes, ma'am.
14   BY MS. ST. PETER-GRIFFITH:
15       Q.  Sir, do you recognize this document?
16       A.  No, I don't.
17       Q.  Do you see that it's an e-mail at the
18   top from Mr. Lyman to Mr. O'Donnell.  Do you see
19   that?
20       A.  Yes.
21       Q.  It attaches interoffice correspondence
22   that appears to be another e-mail from Mr. Lyman

Page 559

1    to Chris Begley and Loreen Mershimer.  Do you see
2    that?
3        A.  Yes.
4        Q.  And you are identified as on the cc
5    list?
6        A.  Yes.
7        Q.  Do you have any doubt that you received
8    that -- maybe not the top e-mail, but this e-mail
9    that's addressed as interoffice correspondence?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  No, I don't.
12   BY MS. ST. PETER-GRIFFITH:
13       Q.  Who's Mr. Begley?
14       A.  Chris Begley was at that time I believe
15   president of the Hospital Products Division.
16       Q.  Okay.  Do you recall, Mr. Baker, being
17   updated on various Medicare or Medicaid statutes
18   or initiatives?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  On occasion, yes.
21   BY MS. ST. PETER-GRIFFITH:
22       Q.  Okay.  Which initiatives do you recall

57 (Pages 556 to 559)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 560

1  receiving information about?
2      A.  I don't know that I remember anything
3  specifically, just that if there were updates --
4  there were periodic updates.
5      Q.  And what would you do with those
6  updates?
7      A.  I would review them.  Most of the time
8  there wasn't -- it was informational and there
9  wasn't action that needed to be taken.
10     Q.  Why did you receive these updates?
11     A.  Just the role that I was in.
12     Q.  And how would you know whether or not
13  you were required to take action?  Would you
14  expect that someone would ask you for information
15  or to take action on a particular initiative?
16     A.  Well, for example, Mr. Lyman reported
17  to Mr. Sellers who reported to me, and I would
18  rely on Mr. Sellers to let me know if there was
19  some action that needed to be taken.
20     Q.  So if a particular change came about
21  with regard to a Medicare or Medicaid statute
22  that impacted the Hospital Products Division's

Page 561

1  business, you would expect that Mr. Sellers would
2  notify you of that but it would be up to Mr.
3  Sellers to take whatever action needed to be
4  taken?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Or that he would let me
7  know.  We would work again with -- if there was
8  an action needed, we would work with legal
9  counsel to determine if an action needed to be
10  taken and we would then work to make that happen.
11  I don't remember any such instances.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Okay.  You anticipated my next
14  question.
15     A.  I'm getting better at this.
16     Q.  Well, I'm working through my stack.
17          (Whereupon Exhibit Baker 055 was
18  marked for identification.)
19          THE WITNESS:  Okay.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  Do you recognize this document, Mr.
22  Baker?

Page 562

1      A.  I do not.
2      Q.  Okay.  Who's Mr. Karas?
3      A.  Mr. Karas is the vice president of
4  sales, or was at the time.
5      Q.  Vice president of sales of?
6      A.  The Hospital Products Division.
7      Q.  And was he your subordinate?
8      A.  No.
9          MS. TABACCHI:  Object to the form.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.  Sir, if you could look to the third
12  page of this document, you'll see there are a
13  couple of icons.  Do you see that?
14     A.  Yes.
15     Q.  Let me ask you this:  Do you remember
16  Mr. Karas ever making a presentation to the
17  Hospital Products Division?
18     A.  Yes.
19     Q.  Okay.  What do you recall about that
20  presentation?
21     A.  Well, I remember national sales
22  meetings.  I'm trying to remember if this was the

Page 563

1  presentation that was given at that national
2  sales meeting.  I believe it was.
3      Q.  Do you recall having any input into
4  this?
5      A.  No.
6      Q.  On page 3 there you see two icons, the
7  two pictures.  The first appears to be one of the
8  code of business conduct that looks similar to
9  the one we reviewed before.  Do you see that?
10     A.  Yes.
11     Q.  The next one says compliance with
12  Medicare, Medicaid fraud and abuse laws, handbook
13  for business executives.  Do you see that?
14     A.  Yes.
15     Q.  It says at the bottom, Legal Division,
16  Abbott Labs?
17     A.  Yes.
18     Q.  Did you have a copy of that book?
19     A.  I don't believe I did.
20     Q.  Do you know who did?
21     A.  I'd be guessing.  No.
22     Q.  Have you ever seen a copy of that book?

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. IIHIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

Page 564

1    A.  I don't recall.
2    Q.  Do you know whether it was distributed
3  to anyone within the Hospital Products Division?
4    A.  I don't remember.  We may have received
5  it when we went through the business code of
6  conduct, but I do not recall.
7        MS. ST. PETER-GRIFFITH:  I will
8  represent that I haven't been able to find this
9  book in Abbott's production, Tina, so I request
10 that especially before the depositions upcoming I
11 need a copy of this book.
12       MS. TABACCHI:  Understood.
13       MS. ST. PETER-GRIFFITH:  Thanks.
14       (Whereupon Exhibit Baker 056 was
15 marked for identification.)
16       THE WITNESS:  Yes, ma'am.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.  Sir, do you recognize this document?
19   A.  No, I do not.
20   Q.  Okay.  It appears to be an Alternate
21 Site product sales business sector strategy.
22 That's a four-year strategy from 2003 to 2007.

Page 565

1  Do you see that?
2    A.  Yes.
3    Q.  Do you recall anyone ever consulting
4  with you concerning putting together such a
5  business strategy given your historical
6  relationship with Alt Site?
7    A.  No.
8    Q.  Do you know why this particular --
9  well, did you -- were you aware that a business
10 strategy -- a long-term business strategy
11 covering four years was put together for all Alt
12 Site product sales?
13   A.  I believe each of the businesses was
14 requested to put together a long-term strategy.
15   Q.  Given the impending Hospira spin, why?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Well, I don't know the
18 timing or...
19 BY MS. ST. PETER-GRIFFITH
20   Q.  It says November 2003.
21   A.  Business had to continue.  Well, many
22 of the products are similar.  So, I mean, a

Page 566

1  strategy is always a good thing.  I don't know
2  why it was asked.
3    Q.  Okay.  Were you asked to put together a
4  strategy for Hospital Products Division -- for
5  HBS?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  No, not in the role that
8  I was in.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Okay.  Were you asked to put together
11 any strategy at all for any of the roles that you
12 were in?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I may have been asked at
15 different times to put something together.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Okay.  Was that incident to the Hospira
18 spin?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  I'm sorry?
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  Were you asked to put together --

Page 567

1  strike that.
2        Do you recall what you were asked to
3  put together?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  No.  Just occasionally
6  that it was asked where are you going and what's,
7  you know, your long-term business opportunities.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  What was your understanding as to why
10 Abbott decided to spin the Hospital Products
11 Division?
12   A.  You know, that was done way above my
13 level, so anything that I told you would be a
14 guess.
15   Q.  Well, did you have an understanding as
16 to why the decision was made?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I think Hospira or the
19 hospital products were a product line that wasn't
20 getting a lot of funding because Abbott had other
21 opportunities.  And so again this is my -- this
22 is Pete Baker's opinion that they felt that a

59 (Pages 564 to 567)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL            February 28, 2008
Chicago, IL

Page 568

1 focus on those products individually may help it
2 to grow faster.
3         MS. ST. PETER-GRIFFITH:  Mark the next
4 exhibit, please.
5         MS. TABACCHI:  Do you have one for me?
6         MS. ST. PETER-GRIFFITH:  Oh my, I'm
7 sorry.
8         (Whereupon Exhibit Baker 057 was
9 marked for identification.)
10        THE WITNESS:  Okay.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Mr. Baker, do you recognize this
13 document?
14    A.  No.
15    Q.  Do you see on the front page that it
16 appears to be an e-mail on behalf of Pam Collins,
17 and then among -- you are listed among the two
18 addressees.  Do you see that?
19    A.  I do.
20    Q.  Do you have any doubt that you received
21 this?
22    A.  No.

Page 569

1    Q.  Do you know why you would have received
2 this document?
3    A.  Pete Karas, in his role there was --
4 this is an informational document that he felt
5 could be supported with my organization as well.
6    Q.  Did your organization contribute to the
7 content of this?  Do you recall?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  No, we did not.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  Did your organization or did you
12 prepare for Mr. Begley your own significant
13 events reports?
14    A.  Yes.
15    Q.  Did you do that on a monthly basis?
16    A.  Yes.
17    Q.  Did you send them via e-mail?
18    A.  Yes.
19    Q.  Do you recall when you started sending
20 them via e-mail?
21    A.  No, I do not.
22    Q.  Do you know, did you maintain your

Page 570

1 significant events reports in hard-copy form?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  I did not.  My admin
4 assistant may have.
5 BY MS. ST. PETER-GRIFFITH:
6    Q.  Okay.  Do you know whether she did or
7 didn't?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I don't know that for
10 sure.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Did you maintain them on your computer?
13    A.  No.
14         MS. TABACCHI:  Object to the form.
15         MS. ST. PETER-GRIFFITH:  This is, I
16 dare say, the final exhibit.
17         (Whereupon Exhibit Baker 058 was
18 marked for identification.)
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Sir, I believe a mistake was made.  I'm
21 only going to ask you about the first three pages
22 of this document.  The remainder I think was

Page 571

1 inadvertently stapled.
2    A.  Okay.
3    Q.  So why don't we just --
4         MS. TABACCHI:  Can we pull it out?
5         MS. ST. PETER-GRIFFITH:  Yeah.  Why
6 don't we take it -- thanks.
7         MS. ST. PETER-GRIFFITH:  This is 58?
8         MS. ST. PETER-GRIFFITH:  I believe so.
9         THE WITNESS:  Okay.  I'll try to
10 answer.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Do you recognize this document, Mr.
13 Baker?
14    A.  No.
15    Q.  Do you see where it says approved Peter
16 Baker, Director, HPD ethics and compliance?
17    A.  I do.
18    Q.  Were you the director of HPD ethics and
19 compliance?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  No, I was actually the
22 vice president of Major Health Care Systems, but

60 (Pages 568 to 571)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II   HIGHLY CONFIDENTIAL          February 28, 2008
                         Chicago, IL

Page 572

1  that was that interim time period so I think
2  someone felt that they would put that there for
3  me, so...
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  But you never held that title?
6      A.  I've never held that title, no.
7      Q.  Okay.  Is it fair to say that the only
8  role that you've ever played during this time
9  period in ethics and compliance is that liaison
10 role you referenced?
11     A.  Yes, it is.
12     Q.  Okay.  Do you recall reviewing and
13 approving this particular policy?
14     A.  No, I don't.
15     MS. ST. PETER-GRIFFITH:  Why don't we
16 take a break now.  I'm going to go over and see
17 what else I have left.  I don't think it's much
18 more, and I want to talk with counsel.
19     MS. TABACCHI:  Okay.
20     THE WITNESS:  Okay.
21     THE VIDEOGRAPHER:  We are off the
22 record at 3:29 p.m.  (Recess taken.)

Page 573

1      THE VIDEOGRAPHER:  We are back on the
2  record at 3:40 p.m.
3      MS. ST. PETER-GRIFFITH:  Mr. Baker, I
4  thank you for your time today.  Subject to your
5  being recalled in the event that Abbott produces
6  additional documents we are closing this
7  deposition out, again subject to that potential
8  that if additional documents come up later we may
9  recall you.
10     THE WITNESS:  Okay.
11     MS. ST. PETER-GRIFFITH:  Thank you for
12 your time.
13     THE WITNESS:  Thank you.
14     MS. TABACCHI:  Any other comments from
15 any of the plaintiffs?
16     MR. AZORSKY:  No comment.
17     MS. TABACCHI:  Based on a conversation
18 that we had during the break and the fact that
19 this deposition has involved documents that have
20 been produced by third parties and marked highly
21 confidential by third parties, also involved
22 personnel information, salary information, and

Page 574

1  other financial and pricing strategy documents
2  from within the last five years, we are
3  designating this transcript as highly
4  confidential under the protective order.
5      MS. ST. PETER-GRIFFITH:  Well, are you
6  designating the whole thing confidential for now,
7  and then we'll go back and --
8      MS. TABACCHI:  At some point we can go
9  back through, but I'm not in a position to make
10 any type of a line-by-line designation at this
11 point.
12     MS. ST. PETER-GRIFFITH:  Okay.  That's
13 fine, but we will at a later point in time.
14     MS. TABACCHI:  Yes.
15     MR. SISNEROS:  Bart, California, we
16 pass on any questions, but we do reserve as to
17 any new material that may be received through the
18 course of discovery in our case in chief.
19     MS. ST. PETER-GRIFFITH:  Well, Okay.
20 Thank you.  Thank you, Mr. Baker, for your time.
21     THE WITNESS:  Thank you.
22     THE VIDEOGRAPHER:  We are off the

Page 575

1  record at 3:43 of the deposition of Mr. Peter
2  Baker.
3      (Whereupon the proceedings
4  concluded at 3:37 p.m.)

61 (Pages 572 to 575)

8b29a9b9-a086-45f7-9c61-b10a880eef09

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
                          Chicago, IL

Page 576

1          SIGNATURE OF THE WITNESS
2
3          SIGNATURE OF WITNESS
4      I, the undersigned, declare under penalty of
5   perjury that I have read the foregoing transcript,
6   and I have made any corrections, additions, or
7   deletions that I was desirous of making; that the
8   foregoing is a true and correct transcript of my
9   testimony contained therein.
10
11
12
13          EXECUTED this      day of          ,
14          2008, at          ,          .
15               (city)      (state)
16
17
18
19
20          PETER BAKER
21
22

Page 577

1   STATE OF ILLINOIS  )
                        )
2   COUNTY OF DuPAGE   )
        I, ROBIN M. CHIMNIAK, a certified
3   shorthand reporter, and CARMAN L. BROOKS, a certified
4   shorthand reporter, certify that heretofore, to wit,
5   on the 28th day of February, 2008, personally appeared
6   before me PETER BAKER a witness in the cause now
7   pending and undetermined in the United States District
8   Court, District of Massachusetts, in the
9   Pharmaceutical Industry Average Wholesale Price
10  Litigation.
        We further certify that the witness was by
11  ROBIN CHIMNIAK first duly sworn to testify the truth,
12  the whole truth and nothing but the truth in the cause
13  aforesaid; that the testimony then given by the said
14  witness was reported stenographically by us in the
15  presence of said witness and was thereafter
16  transcribed under our personal direction, and the
17  foregoing is a true and complete transcript of the
18  testimony so given by the said witness as aforesaid.

19  _____
20      Robin M. Chimniak, CSR No. 084-001999
21  _____
22      Carman L. Brooks, CSR No. 084-003927

                          62 (Pages 576 to 577)

8b29a9b9-a086-45f7-9c61-b10a880eef09