# Exhibit 114

Page 559

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )   MDL No. 1456

                                )   Civil Action

THIS DOCUMENT RELATES TO:       )   #01-12257-PBS

United States of America,       )

ex rel. Ven-A-Care of the       )   Judge Patti B. Saris

Florida Keys, Inc., v.          )

Abbott Laboratories, Inc.,      )

and Hospira, Inc.               )

CIVIL ACTION NO. 06-11337-PBS )


*****************************************************


HIGHLY CONFIDENTIAL

DEPOSITION OF VIRGINIA TOBIASON - VOLUME III

JANUARY 22, 2008


(CAPTIONS CONTINUE ON FOLLOWING PAGES)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

| Page 560 | Page 562 |
|---|---|

**Page 560**

1      UNITED STATES DISTRICT COURT
2      DISTRICT OF MASSACHUSETTS
3  IN RE PHARMACEUTICAL        )
4  INDUSTRY AVERAGE WHOLESALE  )
5  PRICE LITIGATION        ) MDL No. 1456
6              ) Civil Action
7  THIS DOCUMENT RELATES TO:   ) #01-CV-12257-PBS
8  State of Arizona, v. Abbott )
9  Labs, et al., Civil Action  ) Judge Patti B. Saris
10 No. 06-CV-11069-PBS        )
11 ***********************************************
12      UNITED STATES DISTRICT COURT
13      FOR THE DISTRICT OF MASSACHUSETTS
14 IN RE PHARMACEUTICAL       ) MDL No. 1456
15 INDUSTRY AVERAGE WHOLESALE  ) Master File No.
16 PRICE LITIGATION        ) 01-12257-PBS
17              )
18 THIS DOCUMENT RELATES TO:    ) Judge Patti B. Saris
19 State of California, ex rel. )
20 Ven-A-Care v. Abbott       ) Magistrate Judge
21 Laboratories, Inc., et al., ) Marianne Bowler
22 Case #: 1:03-cv-11226-PBS   )

**Page 561**

1      HIGHLY CONFIDENTIAL
2      DEPOSITION OF VIRGINIA TOBIASON - VOLUME III
3
4      Continuation of the videotaped
5  deposition of VIRGINIA TOBIASON, Volume III,
6  pages 559 through 833, taken pursuant to the
7  Federal Rules of Civil Procedure of the United
8  States District Courts pertaining to the taking of
9  depositions, taken before LAURA R. RENKE, RDR,
10 CRR, Certified Shorthand Reporter of the State of
11 Illinois, at 77 West Wacker Drive, 35th Floor,
12 Conference Room A, Chicago, Illinois, on Tuesday,
13 January 22, 2008, at 9:08 a.m.
14
15
16
17
18
19
20
21
22

**Page 562**

1  APPEARANCES:
2
3  On behalf of the United States of America;
4      UNITED STATES ATTORNEY'S OFFICE
5      SOUTHERN DISTRICT OF FLORIDA
6      by MS. ANN M. ST. PETER-GRIFFITH
7      Assistant U.S. Attorney
8      99 N.E. Fourth Street
9      Miami, Florida 33132
10     (305) 961-9419
11
12 On behalf of the State of California;
13     STATE OF CALIFORNIA
14     DEPARTMENT OF JUSTICE by
15     MR. ELISEO SISNEROS
16     Deputy Attorney General
17     Bureau of Medi-Cal Fraud & Elder Abuse
18     110 West A Street
19     Suite 1100
20     San Diego, California 92101
21     (619) 688-6043
22

**Page 563**

1  APPEARANCES:  (CONTINUED)
2
3  On behalf of the Relator Ven-a-Care of
4  the Florida Keys;
5      THE BREEN LAW FIRM by
6      MR. JAMES JOSEPH BREEN
7      5755 North Point Parkway
8      Suite 39
9      Alpharetta, Georgia 30022
10     (770) 740-0008
11
12 On behalf of the Defendants.
13     JONES DAY by
14     MS. TINA M. TABACCHI
15     MR. GABRIEL H. SCANNAPIECO
16     77 West Wacker Drive
17     Chicago, Illinois 60601-1692
18     (312) 782-3939
19
20
21 ALSO PRESENT:
22     MR. ANTHONY MICHELETTO, Videographer

2 (Pages 560 to 563)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 564

1          I N D E X
2
3   WITNESS: VIRGINIA TOBIASON          PAGE
4     Examination by Ms. St. Peter-Griffith....... 570
5     Examination by Mr. Breen.................... 809
6
7
8          E X H I B I T S
9   NUMBER          DESCRIPTION          PAGE
10  Exhibit Tobiason 001-ABT-DOJ 351271............ 597
11  Exhibit Tobiason 002-ABT-DOJ 351097............ 598
12  Exhibit Tobiason 003-ABT-DOJ 306631............ 624
13  Exhibit Tobiason 004-ABT211873................ 629
14  Exhibit Tobiason 005-TAPAWPDOJ 001476 - 001480. 635
15  Exhibit Tobiason 006-ABT-DOJ 316200............ 639
16  Exhibit Tobiason 007-ABT 53315................ 640
17  Exhibit Tobiason 008-ABT 53319................ 642
18  Exhibit Tobiason 009-ABT 53284................ 645
19  Exhibit Tobiason 010-ABT 53345................ 647
20  Exhibit Tobiason 011-ABT 53140................ 649
21  Exhibit Tobiason 012-ABT 53263 - 53265......... 651
22  (CONTINUED)

Page 565

1          E X H I B I T S (CONTINUED)
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Tobiason 013-TAPAWPDOJ 001151 -
4           001157, 001159, 001114
5           - 001125................. 654
6   Exhibit Tobiason 014-ABT 52791................ 661
7   Exhibit Tobiason 015-ABT 53258................ 664
8   Exhibit Tobiason 016-ABT 52704 - 52707......... 666
9   Exhibit Tobiason 017-ABT 53216................ 673
10  Exhibit Tobiason 018-TAPAWPDOJ 001390 - 001394. 675
11  Exhibit Tobiason 019-TAPAWPDOJ 001179 - 001204. 677
12  Exhibit Tobiason 020-ABT-DOJ 296304............ 680
13  Exhibit Tobiason 021-BRCD 35222................ 686
14  Exhibit Tobiason 022-10/99 Abbott Laboratories
15          Code of Business Conduct
16          (no Bates numbers)........ 689
17  Exhibit Tobiason 023-ABT-DOJ 296443, 0236621 -
18          0236623, 0236626, 296897 -
19          296898, 0236629........... 720
20  Exhibit Tobiason 024-ABT-DOJ-E 0545901 -
21          0545922................. 731
22  Exhibit Tobiason 025-ABJ-DOJ 0377093 - 0377118. 741

Page 566

1          E X H I B I T S (CONTINUED)
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Tobiason 026-10/1/03 Safeguarding
4           Trust: Marketing & Selling
5           Enteral Nutrition document
6           (no Bates numbers)........ 745
7   Exhibit Tobiason 027-CIA in Practice
8           Safeguarding Trust -
9           Marketing and Selling
10          Enteral Nutrition document
11          (no Bates numbers)........ 753
12  Exhibit Tobiason 028-7/22/03 Abbott
13          Laboratories Office of
14          Ethics and Compliance
15          Procedure document (no
16          Bates numbers)............ 760
17  Exhibit Tobiason 029-ABT-DOJ 297299 and
18          attached 9/8/03 memo
19          (no Bates numbers)........ 779
20  Exhibit Tobiason 030-ABT-DOJ-E 0545325,
21          ABT-DOJ 297243 - 297244... 782
22  (CONTINUED)

Page 567

1          E X H I B I T S (CONTINUED)
2   NUMBER          DESCRIPTION          PAGE
3   Exhibit Tobiason 031-ABT-DOJ-E 0545508 -
4           0545517................. 785
5   Exhibit Tobiason 032-ABT-DOJ 297112 - 297113... 787
6   Exhibit Tobiason 033-ABT-DOJ-E 0545473......... 789
7   Exhibit Tobiason 034-ABT-DOJ-E 0545479......... 801
8

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 568

1        P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  This is Anthony
4   Micheletto, representing Henderson Legal
5   Services.  I am the operator of this camera.
6        This is the videotaped deposition of
7   Virginia Tobiason as being taken pursuant to
8   Federal Rules of Civil Procedure on behalf of the
9   plaintiff.
10        We are on the record on January 22nd,
11   2008.  The time is 9:08 a.m. as indicated in the
12   video screen.  We are at the offices of Jones
13   Day, 77 West Wacker Drive, Chicago, Illinois.
14        The case is captioned In Re
15   Pharmaceutical Industry Average Wholesale Price
16   Litigation, Case No. 01-12257-PBS.
17        Will the attorneys please identify
18   themselves for the video record?
19        MS. ST. PETER-GRIFFITH:  Ann St. Peter-
20   Griffith from the United States Attorney's
21   office, Southern District of Florida, on behalf
22   of the United States.

Page 569

1        MR. BREEN:  Jim Breen on behalf of the
2   relator, Ven-A-Care of the Florida Keys.
3        MR. SISNEROS:  Eliseo Sisneros, Deputy
4   Attorney General, State of California.
5        MS. TABACCHI:  Tina Tabacchi and
6   Gabriel Scannapieco on behalf of the defendants.
7        THE VIDEOGRAPHER:  The court reporter
8   today is Laura Renke from Henderson Legal
9   Services of Washington, D.C.
10        Please swear in the witness.
11        THE REPORTER:  If you would raise your
12   right hand, please.
13        THE WITNESS:  Mm-hmm.
14        (Witness sworn.)
15        THE WITNESS:  I do.
16        THE REPORTER:  Thank you.
17        MS. ST. PETER-GRIFFITH:  Before we get
18   started, a couple of preliminary matters.  Tina,
19   we're now operating under the Federal Rules.  I
20   think we started that the last time around.  Is
21   that --
22        MS. TABACCHI:  The Federal Rules apply,

Page 570

1   I'll agree.
2        MS. ST. PETER-GRIFFITH:  Okay.  And
3   would you mind, since we left off last summer in
4   the 700s for the Texas exhibits just starting
5   numbering today's exhibits with Tobiason 1,
6   Tobiason 2?
7        MS. TABACCHI:  However you want to
8   number them is fine.
9        MS. ST. PETER-GRIFFITH:  Okay.
10
11        VIRGINIA TOBIASON,
12   called as a witness herein, having been first
13   duly sworn and having testified, was examined and
14   testified further as follows:
15
16        EXAMINATION (Resumed)
17   BY MS. ST. PETER-GRIFFITH:
18      Q.  Good morning, Ms. Tobiason.
19      A.  Good morning.
20      Q.  Ma'am, what did you do to prepare for
21   your deposition here today?
22      A.  I had Tin -- my attorneys and I met

Page 571

1   yesterday.
2      Q.  Okay.  And how long did you meet?
3      A.  Oh, a few hours.
4      Q.  Approximately how many hours?
5      A.  I don't know.  Probably maybe four.
6      Q.  Okay.  And did you review any documents
7   in preparation for today's deposition?
8      A.  No.
9      Q.  Have you reviewed your prior testimony?
10      A.  I did not.
11      Q.  Okay.  Do you recall after your last
12   deposition whether there was any testimony that
13   you needed to change or that, upon further
14   reflection, wanted to amplify in any way?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  I don't -- I don't recall
17   any, but I -- I don't know if I went through
18   every -- every bit of it.
19   BY MS. ST. PETER-GRIFFITH:
20      Q.  Okay.  Did you at some point review
21   your prior testimony?
22        MS. TABACCHI:  Object to the form.

4 (Pages 568 to 571)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 572

1        THE WITNESS:  Some of it.
2   BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Which portions?
4      A.  I don't remember.
5        MS. TABACCHI:  Can we just clarify
6   because there have been three different
7   depositions.
8        MS. ST. PETER-GRIFFITH:  Mm-hmm.
9        MS. TABACCHI:  And Ms. Tobiason has
10  reviewed it, so I had some but not others because
11  the deposition remains open.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Okay.  I'm talking about the
14  depositions in the AWP litigation --
15     A.  Mm-hmm.
16     Q.  -- starting with the Texas deposition
17  which was started last March.
18     A.  I don't -- I don't think I have any
19  changes, but I don't recollect everything that I
20  said.
21     Q.  Okay.  Ma'am, at any time --
22     A.  Mm-hmm.

Page 573

1      Q.  -- during your tenure with Abbott, did
2   you ever consider making any reports to HHS OIG
3   or to the federal government or to any state
4   government concerning any practices of the Abbott
5   Home Infusion division?
6      A.  No.
7      Q.  Why not?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  Is there anything in
10  specific -- specifically that I would have that
11  you're trying to point me about?
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  No, I just want to know why it is that
14  you never felt the need to report any practices
15  to any state or federal entity in home infusion.
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I never saw any need to.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Okay.  At any time during your tenure
20  as an Abbott employee, did you ever consider
21  making any reports to any state or federal
22  official concerning the spreads that were

Page 574

1   maintained on Abbott drugs and products sold
2   within the Hospital Products division?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Could you clarify what
5   you mean by spread?
6   BY MS. ST. PETER-GRIFFITH:
7      Q.  Well, how do you interpret spread?
8      A.  Well, I interpret spread to mean what's
9   in the OIG guidance.  And it's, as I understand
10  it, the difference between what the payor pays
11  and cost of product.
12     Q.  And cost of product?  What cost of
13  product?
14     A.  I assume it's the cost of cost of the
15  product, supplying the product, and all the
16  services involved with the product.
17     Q.  Have you ever heard of the term "AWP
18  spread"?
19     A.  Yes.
20     Q.  Okay.  What is that?
21     A.  That if a payor pays based on average
22  wholesale price, a payor requires -- you know,

Page 575

1   payors decided they will pay on AWP, that it's --
2   that it's the amount that they used AWP as their
3   payment amount and that that would be the
4   difference between that and what the cost of the
5   product is.
6      Q.  At any time --
7      A.  Cost of -- I should say cost of product
8   and services.  I should say it's -- I should
9   clarify that.
10     Q.  And where did you get -- have -- how
11  did you come to have that understanding of the
12  term "AWP spread"?
13     A.  Oh.  Well, I believe that that -- I --
14  that came out starting with newspaper articles
15  and also the OIG guidelines.
16     Q.  Which OIG guidelines?
17     A.  On pharmaceutical practices.  I think
18  it was -- I think -- I'm not positive -- around
19  2003.
20     Q.  Okay.
21     A.  When they issued a -- some kind of
22  report.

5 (Pages 572 to 575)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 576

1          MS. TABACCHI:  I'm sorry.  I don't mean
2    to --
3          THE WITNESS:  Guidelines.
4          MS. TABACCHI:  I don't mean to
5    interrupt, Ms. Tobiason.  I'm just not sure
6    whether your glasses is going to interfere with
7    your --
8          THE WITNESS:  Oh.
9          MS. TABACCHI:  -- microphone.
10         THE WITNESS:  I'm sorry.  Okay.  Thank
11   you.
12   BY MS. ST. PETER-GRIFFITH:
13      Q.  Ma'am, at any time during your tenure
14   as an Abbott employee --
15      A.  Mm-hmm.
16      Q.  -- did you ever consider reporting to
17   any state or federal official the differences
18   between Abbott's list price or catalog price and
19   the prices charged to Abbott customers in the
20   contracts?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  No.

Page 577

1          MS. TABACCHI:  Lack of foundation.
2    BY MS. ST. PETER-GRIFFITH:
3       Q.  Why not?
4       A.  I never thought there was an issue.
5       Q.  Okay.  To your knowledge, did anyone
6    within Abbott ever report that information to any
7    state or federal official?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  Hmm.  Anyone?
10   BY MS. ST. PETER-GRIFFITH:
11      Q.  To your knowledge.
12      A.  To my knowledge -- and there's a lot of
13   Abbott employees -- I have no knowledge of
14   anybody doing that.
15      Q.  While you were working within Abbott's
16   compliance department, Office of Compliance, did
17   anyone ever make any disclosures concerning AWP
18   spread or the differences between contract price
19   and catalog price that they felt needed to be
20   disclosed to any state or federal official?
21         MS. TABACCHI:  Object to the form.
22         I'm also going to caution the witness

Page 578

1    not to reveal the substance of any communications
2    with counsel to the extent that your answer would
3    require you to do so.
4          THE WITNESS:  Mm-hmm.  No.
5    BY MS. ST. PETER-GRIFFITH:
6       Q.  Would that have been something that you
7    would have been aware of had such a disclosure
8    been made given your position?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I would not -- I would
11   not necessarily have been aware of that.
12   BY MS. ST. PETER-GRIFFITH:
13      Q.  Now, ma'am, are you anticipating
14   retiring from Abbott?
15         MS. TABACCHI:  Object to the form.  At
16   any time?
17         THE WITNESS:  Well, eventually, yes.
18   BY MS. ST. PETER-GRIFFITH:
19      Q.  Okay.
20      A.  I've been there 26 years.  Yes, I think
21   so.
22      Q.  Now, I could be mistaken, but I thought

Page 579

1    that I had heard that you may be contemplating
2    retirement soon.  Is that an inaccurate statement
3    or --
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  I haven't made a decision
6    yet.
7    BY MS. ST. PETER-GRIFFITH:
8       Q.  Okay.  Is it something that you may be
9    considering doing in the near future?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  There's a possibility,
12   yes.
13   BY MS. ST. PETER-GRIFFITH:
14      Q.  Okay.  When -- when might that -- when
15   might you possibly retire, make your decision to
16   retire?
17      A.  I don't know.  I haven't made a
18   decision.
19      Q.  Ma'am, what I'd like to do is go over a
20   couple of exhibits that Mr. Haviland had raised
21   with you the last time you were.  And I can give
22   you copies, although I don't have copies of them

6  (Pages 576 to 579)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 580

1  as numbered. I'd just like to -- it's Exhibits
2  757 and 768.
3      MS. ST. PETER-GRIFFITH: And, Tina,
4  I've got extra copies over here.
5      MS. TABACCHI: Okay.
6      THE WITNESS: Can I ask a question?
7  Who is Mr. Haviland?
8      MS. ST. PETER-GRIFFITH: He was the
9  gentleman who was asking you questions the last
10 time we were here.
11     MS. TABACCHI: One of the last times
12 that we were here.
13     THE WITNESS: Oh, okay. I don't
14 remember. Okay. All right.
15     MR. SISNEROS: Sorry. What was the
16 number of the exhibit?
17     MR. BREEN: 767 and 768.
18     MS. TABACCHI: 767 and 768.
19 BY MS. ST. PETER-GRIFFITH:
20     Q. Ma'am, if you want to just take a few
21 minutes and review them.
22     A. Mm-hmm.

Page 581

1          (Off-the-record discussion.)
2      MS. TABACCHI: Ann, the first one is
3  just two pages, and the second one is one page.
4  Is that right?
5      MS. ST. PETER-GRIFFITH: Well, she has
6  -- I didn't copy the regulation that's on the
7  back of --
8      MS. TABACCHI: Oh, okay.
9  BY MS. ST. PETER-GRIFFITH:
10     Q. Ma'am, have you had an opportunity to
11 review these?
12     A. No, I'm still doing it.
13     Q. Ma'am, are you done reviewing?
14     A. I'm still working on it.
15         Yes, I'm done.
16     Q. Okay. Ma'am, do you recognize these
17 documents?
18     MS. TABACCHI: Object to the form.
19     THE WITNESS: I don't actually remember
20 -- recollect these documents.
21 BY MS. ST. PETER-GRIFFITH:
22     Q. Okay. Do you --

Page 582

1      A. But I remember them from my last
2  deposition.
3      Q. Okay. My question is, other than from
4  your last deposition, do you have any further
5  recollection of these documents?
6      A. To the best of my knowledge, I -- I
7  don't remember them. But --
8      Q. Do you know whether the -- do you have
9  any recollection as to whether the two might be
10 related?
11     MS. TABACCHI: Object to the form.
12     THE WITNESS: Well, I'm -- concerning
13 the timing, it looks like they may be related.
14 BY MS. ST. PETER-GRIFFITH:
15     Q. Do you have -- do you know -- are you
16 familiar with the regulation that's attached to
17 the memorandum from -- the interoffice
18 correspondence from you?
19     MS. TABACCHI: Object to the form.
20 BY MS. ST. PETER-GRIFFITH:
21     Q. I'm sorry. The proposed rule, not the
22 regulation.

Page 583

1      A. Well, I -- I see the proposed rule, and
2  I -- I believe I remember that this did come out,
3  yes.
4      Q. Okay.
5      A. Mm-hmm.
6      Q. And was it the start of national drug
7  pricing controls?
8      MS. TABACCHI: Object to the form.
9      THE WITNESS: I think that this
10 regulation talks about establishing national fee
11 screens.
12 BY MS. ST. PETER-GRIFFITH:
13     Q. Okay. Do you see in your memo wherein
14 it says, "This is definitely the start of
15 national 'drug pricing' controls," under Major
16 Issues?
17     A. Yes, I -- I see that.
18     Q. Was this particular proposed rule the
19 start of national drug pricing control?
20     MS. TABACCHI: Object to the form.
21     THE WITNESS: I -- I don't -- this
22 proposed rule laid out different options that CMS

7 (Pages 580 to 583)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 584

1  might take. I see that. And then over the --
2  over the following years, I don't remember
3  specific CMS proposals or legislation that put in
4  place national drug pricing controls. I just
5  know this was part of -- just, you know, this was
6  proposed to change the way they paid for drugs.
7  BY MS. ST. PETER-GRIFFITH:
8      Q. Now, in June of 1991, you were still
9  the director of reimbursement within home
10 infusion?
11     A. I was the manager of reimbursement
12 services.
13     Q. Okay. Why would you be writing this
14 particular memo?
15         MS. TABACCHI: Object to the form.
16         THE WITNESS: I believe I would have
17 written this memo because, as I stated, that they
18 could have a change in reimbursement for pain
19 management and home chemotherapy.
20 BY MS. ST. PETER-GRIFFITH:
21     Q. Okay. If you'll look on page 2 of the
22 memo.

Page 585

1      A. Mm-hmm. Mm-hmm.
2          MS. TABACCHI: Ms. Tobiason, I need to
3  remind you to answer audibly for the court
4  reporter, yes or no.
5          THE WITNESS: Yes. Okay. Sorry.
6  BY MS. ST. PETER-GRIFFITH:
7      Q. Do you see that last bullet point, the
8  last sentence? It says, "I would think Renal" --
9  or "TAP or Renal could use this argument
10 effectively." Do you see that?
11     A. I do.
12     Q. Did you provide any guidance concerning
13 federal or state Medicare or Medicaid statutes or
14 regulations or proposed rules beyond the home
15 infusion arena in '91?
16         MS. TABACCHI: Object to the form.
17         THE WITNESS: I don't recollect doing
18 that.
19 BY MS. ST. PETER-GRIFFITH:
20     Q. Do you know why you would have been
21 providing a possible argument for TAP or renal in
22 this memo?

Page 586

1      A. I think I would have thought because
2  Lupron was an oncology drug and renal was
3  reimbursed incident to Part B that there could
4  have been some implications. And I was an Abbott
5  employee.
6      Q. Did Abbott's home infusion consign or
7  otherwise dispense Ross and TAP products to its
8  consignment partners?
9          MS. TABACCHI: Object to the form.
10         THE WITNESS: I didn't handle the
11 contracting process, nor the inventory. But I do
12 believe that we probably did consign Ross. But I
13 don't remember us doing TAP.
14 BY MS. ST. PETER-GRIFFITH:
15     Q. Is it possible, but you just don't
16 remember?
17         MS. TABACCHI: Object to the form.
18         THE WITNESS: I -- I don't think that
19 was my area of responsibility, what we consigned.
20 BY MS. ST. PETER-GRIFFITH:
21     Q. Well, would reimbursement have
22 submitted claims for Lupron?

Page 587

1          MS. TABACCHI: Object to the form.
2          THE WITNESS: Well, we -- I just don't
3  think Lupron was involved. I don't remember
4  claims with Lupron. But I didn't look at every
5  claim.
6  BY MS. ST. PETER-GRIFFITH:
7      Q. Okay. Ma'am, if you could take the
8  second memo -- I'm sorry. Not -- not the first
9  page, the second memo right in front of you.
10     A. The one dated June 14?
11     Q. Correct. It says at the top from --
12     A. Mm-hmm.
13     Q. -- Donald Robertson. Now, I deposed
14 Mr. Robertson, and he indicated that he did not
15 write this memo. He signed it, but he didn't
16 write this memo. And he thought you might have.
17 Do you have any recollection of writing this
18 memo?
19     A. No. No.
20     Q. No, you don't have a recollection
21 writing the memo? Is it possible that you could
22 have written the memo?

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 588

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  I have no recollection of
3   writing this memo, and with the information in
4   here, I have -- I don't remember any of this
5   information, so I doubt I would have written this
6   memo.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.  Do you remember receiving this memo?
9       A.  No.
10      Q.  Do you know who else within Abbott
11  alternate site may have written this memo on
12  behalf of Mr. Robertson?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  No.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   Did you during your tenure as the
17  manager of reimbursement services provide any
18  guidance on state or federal Medicare or Medicaid
19  statutes, regulations, rules, proposed rules
20  beyond the home infusion arena?
21      MS. TABACCHI:  Object to the form.  Did
22  you just ask the same question --

Page 589

1       MS. ST. PETER-GRIFFITH:  No.
2       MS. TABACCHI:  -- a minute ago?  Okay.
3       THE WITNESS:  Could you repeat that
4   question?
5       MS. ST. PETER-GRIFFITH:  Sure.
6       Can you read it back, please?
7       (Record read.)
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  Well, it's possible, but
10  I don't recollect specifics.  I -- we have a lot
11  of different areas.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Was there someone else within the Alt
14  Site Products division that helped with the
15  interpretation or construction of Medicare or
16  Medicaid statutes, rules, regulations, or
17  proposed rules?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  Yes.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Who?
22      A.  Well, I believe there was a manager

Page 590

1   reimbursement product sales.  There was also
2   legal.  There was -- that's a very broad
3   category.  There were government affairs people.
4   It depended on what issue.
5       Q.  Okay.  Well, let me ask you it this
6   way.  Do you recall anyone from alt site coming
7   to you with questions concerning Medicaid or
8   Medicare statutes, regulations, rules, or
9   proposed rules during your tenure within home
10  infusion?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  I'm sure it's possible.
13  I don't recollect specific conversations.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Who within product sales, to your
16  knowledge, could individuals within alt site go
17  to with questions about Medicare or Medicaid?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  Alt site.  Could you be
20  more specific?
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Sure.  Alternate Site Product Sales.

Page 591

1       A.  Product sales.  I -- I don't remember
2   the time frame, but they did have a manager
3   reimbursement at Alternate Site Product Sales.
4       Q.  Do you know who that was?
5       A.  Michael Heggie.
6       Q.  And do you know whether Mr. Heggie was
7   responsible for ensuring alternate site's
8   compliance with state and federal Medicare or
9   Medicaid --
10      MS. TABACCHI:  Object --
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  -- statutes, regulations, rules?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  I -- I don't know the
15  answer to that.  I -- I -- he didn't report to
16  me.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Were you responsible within home
19  infusion for compliance with state and federal
20  Medicaid and Medicare statutes, rules, and
21  regulations?
22      MS. TABACCHI:  Object to the form.

9 (Pages 588 to 591)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 592

1         THE WITNESS: No. I was manager of
2   reimbursement services. We were in charge of
3   claims processing.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay. With regard to claims
6   processing, were you responsible for ensuring
7   compliance with Medicaid or Medicare statutes,
8   regulations, or rules concerning reimbursement?
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Well, I -- I felt I was
11  responsible for ensuring that we followed payors'
12  requirements for submitting claims.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  And does that include Medicaid and
15  Medicare?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  Yes.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Did you have any other compliance
20  responsibilities within home infusion?
21     A.  I was not -- I was not given a title of
22  compliance. I felt, though, that we needed to

Page 593

1   submit claims correctly.
2      Q.  And how did you ensure that you were
3   submitting claims within home infusion -- how did
4   you ensure that the home infusion unit that you
5   managed was submitting claims in compliance with
6   state and federal Medicare or Medicare statutes,
7   regulations, and rules?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  The Medicare program used
10  contractors. And the contractors would issue
11  bulletins. There would be training sessions, and
12  we would attend the training sessions. We'd read
13  the bulletins. We'd talk to the ombudsmen at the
14  Medicare carrier. And we -- we would try and
15  follow their requirements.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Did anyone, to your knowledge, ever
18  question whether these consignment arrangements
19  within home infusion with the consignment
20  partners complied with state and federal Medicaid
21  and Medicare statutes, regulations, and rules?
22        MS. TABACCHI:  Object to the form.

Page 594

1         THE WITNESS:  That wouldn't have been
2   an area I would have even been involved with.
3   But not that -- not to my knowledge, no.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.  Who would -- who would have been
6   responsible for ensuring that the business model
7   for home infusion complied -- complied with state
8   and federal Medicare and Medicaid statutes,
9   regulations, and rules?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  Well, that would have
12  been the people running the business, as well as
13  the contracting area.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay. And who -- who in particular?
16     A.  During what time period?
17     Q.  During any time period that you were
18  within home infusion. Who was responsible for
19  ensuring that compliance?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  On -- on consignment?
22  BY MS. ST. PETER-GRIFFITH:

Page 595

1      Q.  Mm-hmm -- yes.
2      A.  Well, I don't -- I don't specifically
3   remember the contracting. But I think it was --
4   there were different managers of the contracting
5   area and different general managers of home
6   infusion.
7      Q.  Okay. Who were they that you -- that
8   you can recall?
9      A.  Well, Bill Dempsey, Mike Sellers, Dave
10  Brincks, Mark Gorman. That's all I remember.
11     Q.  Okay. Did anyone ever come to you with
12  a concern about how your reimbursement personnel
13  were billing Medicaid and Medicare for claims on
14  behalf of consignment partners?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  No, not to my knowledge.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Did anyone ever raise with you concerns
19  about your reimbursement department's billing and
20  whether it complied with the False Claims Act and
21  the anti-kickback statute?
22        MS. TABACCHI:  Object to the form.

10 (Pages 592 to 595)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 596

1       THE WITNESS:  No.  Not to my knowledge.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.   Whose responsibility was it to ensure
4   that billing by your department complied with
5   state and federal False Claims Act and the anti-
6   kickback statute?
7       MS. TABACCHI:  Object to the form.
8       THE WITNESS:  I don't know.  Wasn't my
9   responsibility.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   I'm sorry.  It wasn't what?
12      A.   I did not have the responsibility of
13  ensuring that we complied with anti-kickback.
14      Q.   Do you know who did?
15      A.   No.
16      Q.   Did anybody?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  I -- I can't even answer
19  that question.  I don't know.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Well, you'd agree with me that
22  complying with the anti-kickback statute is a

Page 597

1   pretty significant thing for Abbott Hospital
2   Products division, isn't it?
3       MS. TABACCHI:  Object to the form.
4       THE WITNESS:  I believe complying with
5   all federal regulations is important.
6       MS. ST. PETER-GRIFFITH:  If we can mark
7   this as -- I'm sorry.  Ms. Tobiason, actually,
8   could you give that to Ms. Tabacchi.  We'll mark
9   this --
10      THE WITNESS:  Oh, sure.
11      MS. ST. PETER-GRIFFITH:  We'll mark
12  this as Tobiason Exhibit 1, please.
13      MS. TABACCHI:  Exhibit?
14      MS. ST. PETER-GRIFFITH:  1.
15      MS. TABACCHI:  1.
16      (Exhibit Tobiason 001 marked.)
17      MS. ST. PETER-GRIFFITH:  And can we
18  mark this as Exhibit 2 as well?
19      THE WITNESS:  Should I give this to
20  her?
21      MS. ST. PETER-GRIFFITH:  No, that's for
22  you to review.

Page 598

1       THE WITNESS:  Okay.
2       MS. ST. PETER-GRIFFITH:  Can we mark
3   that as Exhibit 2?
4       (Exhibit Tobiason 002 marked.)
5       MS. ST. PETER-GRIFFITH:  And, Tina,
6   while she's reviewing that, this is one document
7   that I only have one copy of.  So this is going
8   to be the next one.  I wanted you to see that
9   before I gave it to her.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Ma'am, do you recognize the document
12  that's been marked as Exhibit 1?
13      A.   No.
14      Q.   Have you ever seen it before?
15      A.   Not that I recall.
16      Q.   Do you remember anyone ever raising
17  with you a concern about needing to advise
18  Abbott's home infusion consignment partners
19  Abbott's view of or intent concerning its home
20  infusion services program?
21      MS. TABACCHI:  Object to the form.
22      THE WITNESS:  No, not that I recall.

Page 599

1   BY MS. ST. PETER-GRIFFITH:
2       Q.   Do you remember anyone ever telling you
3   or advising you that Abbott Home Infusion
4   consignment partners canceled contracts because
5   of concerns about the legality of the consignment
6   arrangements?
7       MS. TABACCHI:  Object to the form.
8       I'll also caution the witness not to
9   reveal the substance of any communications with
10  counsel.
11      THE WITNESS:  No, not that I recall.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   Do you recall an Abbott Home Infusion
14  consignment partner named Ingalls Home Care?
15      A.   Yes.
16      Q.   Do you recall whether it was a
17  relatively large account?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  Oh.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   And let me clarify.  By large, I mean
22  billings of 800,000 to over a million dollars a

11 (Pages 596 to 599)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                 January 22, 2008
Chicago, IL

Page 600

1  year.
2      MS. TABACCHI:  Object to the form.
3      THE WITNESS:  No, I don't actually
4  remember what their billings were.  I thought
5  they were -- if I would hazard a guess, I would
6  think they were in the small to medium.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Okay.  Relative to other consignment --
9      A.  Yes.
10     Q.  -- partners?
11     A.  Yes.
12     Q.  Okay.  Do you recall what the contract
13  term was with Ingalls Home Care?
14     MS. TABACCHI:  Object to the form.
15     THE WITNESS:  I do not remember their
16  specific contract, no.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Do you recall Ingalls Home Care
19  canceling its consignment arrangement two years
20  into the five-year contract it had with Abbott
21  Home Infusion?
22     A.  No.

Page 601

1      Q.  You don't remember anything about that?
2      A.  No.
3      Q.  What do you remember about the Ingalls
4  contract?
5      A.  Not much, no.  I -- all I know is that
6  we did reimbursement services, I believe, to the
7  best of my recollection, for Ingalls.  I don't
8  remember them canceling their contract, no.
9      Q.  Would that have been something that you
10  would have learned about if they'd canceled their
11  contract?
12     MS. TABACCHI:  Object to the form.
13     THE WITNESS:  Well, because I was
14  responsible for reimbursement services and making
15  sure that we had appropriate headcount, you know,
16  people to handle the clients, I may have learned
17  that we no longer had Ingalls and that we may
18  have shifted some headcount to other accounts.
19     But I don't -- I don't specifically
20  recall it at all about Ingalls.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Ma'am, if you could take Exhibit 1 and

Page 602

1  look at the second sentence in the first
2  paragraph.  Do you see it begins, "Abbott has
3  invested significant funds and resources"?  The
4  first paragraph at the top, second sentence.
5      A.  Oh, yeah.  Okay.  Yes.
6      Q.  Do you know what kind of investment
7  Abbott Home Infusion Services made to develop its
8  home infusion services program?
9      MS. TABACCHI:  Object to the form.
10     THE WITNESS:  Well, I know that we did
11  have a business and that obviously every business
12  requires resources and funds.  And I know that on
13  our reimbursement side, we had a number of people
14  involved in reimbursement services.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.  Okay.  Anything else?
17     A.  I know we had pharmacy people, nurses.
18  There were headcount involved.
19     Q.  Okay.  Anything else?
20     A.  But I'm not -- I don't know
21  specifically what they're referring to here.  I
22  can only just assume it's -- there was

Page 603

1  significant resources.
2      Q.  Do you have any idea why this
3  particular flyer would be sent out to Abbott Home
4  Infusion consignment partners?
5      MS. TABACCHI:  Object to the form.
6      THE WITNESS:  Was this sent to all of
7  them?  I don't know.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.
10     A.  I'm asking you.  I don't know who this
11  went to.  I don't even know if this went out to
12  anybody.
13     Q.  Okay.  Well, do you know why Abbott
14  Home Infusion Services would draft this document?
15     MS. TABACCHI:  Object to the form.
16     THE WITNESS:  No.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Would you expect that you would have
19  been consulted on the content of this document?
20     A.  No.
21     Q.  Why not?
22     A.  This appears to be a business decision

12 (Pages 600 to 603)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                 January 22, 2008
Chicago, IL

Page 604

1  on how we structured our contracts.  This would
2  have been a contracting issue.
3      Q.  Okay.
4      A.  I was not doing contracts; I was doing
5  reimbursement services.
6      Q.  If you read the third paragraph, it
7  says, "In a few instances, Abbott has been asked
8  whether this percentage-of-collections approach
9  is consistent with Medicare laws and safe
10 harbors." And then it says, "Abbott believes this
11 percentage approach is sound under the law."
12     Do you see that?  It's in the third
13 paragraph, first two sentences.
14     A.  Yes.
15     Q.  Okay.  Do you know -- do you have any
16 understanding or basis for Abbott's belief that
17 the percentage-of-collections approach is sound
18 under state and federal Medicare and Medicaid
19 laws?
20     MS. TABACCHI:  Object to the form.
21     I will also caution the witness not to
22 reveal the substance of any communications with

Page 605

1  counsel.
2      THE WITNESS:  Repeat the question
3  again.
4      MS. ST. PETER-GRIFFITH:  Can you read
5  it back, please?
6      (Record read.)
7      THE WITNESS:  That would be speculation
8  on my part.  I'm -- I wasn't involved in the
9  decision.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Did you consult any attorneys
12 concerning whether or not the consignment
13 arrangements run afoul with Medicare safe harbor
14 laws?
15     MS. TABACCHI:  Object to the form.
16     And the witness may answer the question
17 "yes" or "no" or "I don't know," "I don't
18 recall." But please do not reveal the substance
19 of any communications with counsel, if there were
20 any.
21     THE WITNESS:  That would have been a
22 contracting issue.  I didn't do contracting.

Page 606

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Who would you -- who within the
3  contracting department based upon your
4  familiarity with the home infusion business unit
5  would have been responsible for ensuring that the
6  percentage- of-collections approach for the home
7  infusion consignment contracts complied with
8  Medicare and Medicaid laws and the safe harbor
9  regulations?
10     MS. TABACCHI:  Object to the form.
11     THE WITNESS:  That requires speculation
12 on my part on what they -- what their
13 responsibilities were.  But I would think it
14 would be contracting and -- and the management of
15 home infusion services.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Now, would that be Mr. Dempsey, Mr.
18 Sellers, Mr. Brincks, and Mr. Gorman?
19     A.  I can't speak for them, but I would
20 think so, yes.
21     Q.  Anyone else?
22     A.  There -- there possibly -- I mean,

Page 607

1  there could have been legal involved.  I -- I
2  really don't know.
3      Q.  Did you hear of or learn of any home
4  infusion clients canceling their contracts
5  because of concerns about the legality of the
6  consignment relationship with Abbott Home
7  Infusion?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  I -- I think you've asked
10 that and I'd said no.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Ma'am, I'd like to show you what's been
13 marked as Tobiason Exhibit 2.  And I'll represent
14 to you that this is a page from a home infusion
15 consignment contract.
16     A.  Hmm.
17     Q.  And the language I'm going to ask you
18 to focus on is the Medicare Disclosure Agreement.
19     Ma'am, are you familiar with the Abbott
20 Home Infusion consignment contracts?
21     MS. TABACCHI:  Object to the form.
22 BY MS. ST. PETER-GRIFFITH:

13 (Pages 604 to 607)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 608

1    Q.  Just in general.
2    A.  Well, in -- in general, I believe I may
3  have read some of them.
4    Q.  Okay.  Were you aware of this
5  particular Medicare disclosure agreement
6  provision within those contracts?
7    A.  I don't recollect reading this, no.
8    Q.  To your knowledge, did Abbott Home
9  Infusion ever consider putting in a disclosure
10  requirement whereby Abbott Home Infusion partners
11  needed to disclose to payors that they were
12  receiving their product on a consignment basis?
13    MS. TABACCHI:  Object to the form.
14    THE WITNESS:  Repeat that question.
15    MS. ST. PETER-GRIFFITH:  Sure.
16    Can you read it back, please?
17    (Record read.)
18    THE WITNESS:  No, not that I can
19  recall.  But that wouldn't have been an area I
20  was involved with.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  Okay.  Why wouldn't that have been an

Page 609

1  area that you were involved with?  Wouldn't it
2  impact reimbursement?
3    MS. TABACCHI:  Object to the form.
4    THE WITNESS:  I was manager of
5  reimbursement services.  We submitted claims for
6  products and services dispensed to patients.  I -
7  - I view that as -- as an inventory and
8  contracting issue.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Okay.  You review the disclosure
11  requirements as an inventory and contracting
12  issue?
13    MS. TABACCHI:  Object to the form.
14    THE WITNESS:  I have no opinion about
15  that.  I don't know where it fits in.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  Okay.  Well, is it possible that it
18  could have fit into reimbursement compliance?
19    MS. TABACCHI:  Object to the form.
20    THE WITNESS:  I really -- I don't -- I
21  don't know how that applies to -- I mean, for us
22  submitting a claim on behalf of a customer, no.

Page 610

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Well, in terms of making the
3  disclosure, who would make the disclosure, the
4  individuals responsible for submitting the claims
5  or the actual partners themselves?
6    MS. TABACCHI:  Object to the form.
7    THE WITNESS:  You know, I'm not an
8  attorney.  So for me to interpret this would be
9  difficult.  But it looks like the customer's
10  responsible.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Under this particular provision?
13    A.  Yeah.  But, as I said, I'm not an
14  attorney; I'm not -- I'm not totally familiar
15  with this statute.
16    Q.  Well, in terms of submitting claims,
17  were you aware of customers who interacted with
18  Medicaid and Medicare officials beyond the
19  interaction that your reimbursement services
20  department had --
21    MS. TABACCHI:  Object --
22  BY MS. ST. PETER-GRIFFITH:

Page 611

1    Q.  -- if they contracted for reimbursement
2  services?
3    MS. TABACCHI:  Object to the form.
4    THE WITNESS:  I think you need to be
5  more specific.  I don't even understand the
6  question.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Okay.  Let me try it this way.  Your
9  reimbursement department interacted with Medicare
10  and Medicaid for the submission of claims if the
11  consignment partner contracted for reimbursement
12  services, correct?
13    MS. TABACCHI:  Object to the form.
14    THE WITNESS:  Yes.  We submitted
15  claims, yes.  We submitted HCFA 1500 claims.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  Okay.  Would it be your expectation
18  that if disclosures needed to be made pursuant to
19  state or federal law that those disclosures would
20  be made at the time of the submission of the
21  claims or at another time?
22    MS. TABACCHI:  Object to the form.

14 (Pages 608 to 611)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 612

1      THE WITNESS:  The claim submittal
2  process requires you to put down, you know, what
3  the patient received, the patient information,
4  the diagnosis claims, and -- and the -- the
5  agreed-upon -- follow the payor's requirements.
6  If it was a per diem, we submitted a per diem,
7  whatever.  I don't really understand where you
8  would even -- what you would be disclosing.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Well, how about disclosing that they
11  were getting the product for free --
12     MS. TABACCHI:  Object to the form.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  -- on a consignment basis?
15     A.  Well, consignment doesn't mean that
16  products are given for free.
17     Q.  Well, how much are they charged for the
18  consignment products then?  How much were the
19  home infusion partners charged for the consigned
20  products?
21     MS. TABACCHI:  Object to the form.
22     THE WITNESS:  That wasn't my area.

Page 613

1  That would be the contracting, what the contract
2  said.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.  Were you aware that the contracts with
5  the consignment partners provided prices for the
6  consigned products?
7     MS. TABACCHI:  Object to the form.
8     THE WITNESS:  My understanding is, to
9  the best of my knowledge, even though I didn't
10  handle contracting, was that partners, consigned
11  partners, customers, paid for the consigned
12  inventory that was actually dispensed to the
13  patient.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay.  Let's look at the last sentence
16  of this particular provision.  It says, "The
17  customer shall report, and ensure that its
18  Participants shall report, as the case may be,
19  any discounts, rebates or other reductions in
20  price."
21     Do you see that?
22     A.  Mm-hmm.

Page 614

1     Q.  Do you know when those reports needed
2  to be made to Medicare or Medicaid?
3     MS. TABACCHI:  Object to the form.
4     THE WITNESS:  No.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Could it have been at the time that the
7  claims were submitted?
8     MS. TABACCHI:  Object to the form.
9     THE WITNESS:  I don't know.  It would
10  require a legal interpretation.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Well, your -- your staff was submitting
13  claims, right?
14     A.  Correct.
15     Q.  Do you recall your staff ever advising
16  any state or federal official that the
17  consignment partner on whose behalf you were
18  submitting claims received a discount, rebate, or
19  other reduction?
20     MS. TABACCHI:  Object to the form.
21     THE WITNESS:  No.
22  BY MS. ST. PETER-GRIFFITH:

Page 615

1     Q.  Why not?
2     A.  But then I wouldn't know.  We followed
3  -- if a customer -- customer established the
4  pricing, it was the customer's responsibility.
5  And we followed what the customer wanted us to
6  do.
7     Q.  Did Abbott help in establishing the
8  customer pricing, to your knowledge?
9     MS. TABACCHI:  Object to the form.
10     THE WITNESS:  It was the customer's
11  responsibility to tell us what the pricing was.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  But that's not my question.  Did Abbott
14  assist in establishing the pricing?
15     MS. TABACCHI:  Object to the form.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  If the client wanted help, for example?
18     A.  Not to my knowledge, no.
19     Q.  So to your knowledge, no discount,
20  rebate, or other reduction in price was ever
21  reported by your reimbursement staff on behalf of
22  a consignment partner?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 616

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  It could have been.  I --
3    I just am not aware of any.
4    BY MS. ST. PETER-GRIFFITH:
5         Q.   Well, if it was, would you have been
6    aware of the circumstances under which it needed
7    to be reported?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  I -- not necessarily.  I
10   just don't -- I don't even --
11   BY MS. ST. PETER-GRIFFITH:
12        Q.   Well, you were the manager of
13   reimbursement services, weren't you?
14        A.   Yes, I was.
15        Q.   Well, if you have a staff member who is
16   reporting on behalf of a consignment partner a
17   rebate or discount or other reduction, is that a
18   practice that you would want to know about?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  We followed our
21   customer's instructions.
22   BY MS. ST. PETER-GRIFFITH:

Page 617

1         Q.   Even if those instructions may have
2    meant that your customer was violating state and
3    federal law?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  I -- I -- violating?  I -
6    - I don't -- I would -- I wouldn't assume that
7    they were violating any state and federal laws.
8    BY MS. ST. PETER-GRIFFITH:
9         Q.   Why would you make that assumption?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  I think that's
12   speculation on my part.  I don't know what the
13   customer's relationship was with their legal
14   counsel or -- I mean, I -- I just can't say that
15   customers -- I would assume that customers -- a
16   lot of these were hospitals.  They were very --
17   they understood federal and state laws.
18   BY MS. ST. PETER-GRIFFITH:
19        Q.   Well, did you have different varying
20   practices from customer to customer?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  In terms of practices,

Page 618

1    you'd have to be more specific.
2    BY MS. ST. PETER-GRIFFITH:
3         Q.   Practices in terms of what they
4    directed for claims re -- for claims submission
5    to third-party payors, including Medicare and
6    Medicaid.
7         MS. TABACCHI:  Object to the form.
8         THE WITNESS:  Well, customers had
9    different contracts with payors.  So there were
10   different -- differences involved in claims
11   submission because they may have different
12   contracts.
13   BY MS. ST. PETER-GRIFFITH:
14        Q.   Okay.  Well, what about for Medicare or
15   Medicaid?  Can we agree that there really wasn't
16   that big of a variation in their practice -- in
17   their requirements for reporting to Medicaid or
18   Medicare?
19        A.   Medicare was pretty much a national
20   program even though there were four carriers, so
21   there could have been differences.
22        Medicaid was each state had their own

Page 619

1    requirements.  I'm not familiar with every
2    state's requirement.
3         Q.   Who was within your department?
4         A.   That would have been each reimbursement
5    specialist who handled the state.  They would
6    have known what the requirements were for that
7    state.
8         Q.   Okay.  And who taught them those
9    requirements?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  Well, in many cases, the
12   specialist was -- was responsible for working
13   with the Medicaid and Medicares to determine what
14   the -- what the rules and regulations were.  And
15   they had supervisors.
16   BY MS. ST. PETER-GRIFFITH:
17        Q.   In terms of who ultimately was
18   responsible for ensuring that the claims
19   submission by the home infusion staff complied
20   with state and federal Medicare and Medicaid
21   laws, who bore that responsibility?  Was it the
22   client, the home infusion consignment partner, or

16 (Pages 616 to 619)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 620

1  was it your department?
2      A.  I believe it was both.
3      Q.  Okay.  Explain that, please.
4      A.  Well, many cases clients obtained
5  information, and they may have had certain
6  policies or procedures that they wanted us to
7  follow in terms of claims submission and also
8  that we tried to follow what the Medicare,
9  Medicaid, and private payors asked us to do in
10  terms of submitting claims to -- for
11  adjudication.
12      Q.  Okay.  So who bore the responsibility
13  of ensuring that what was being done in terms of
14  your staff's claims submission complied with
15  state and federal law?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  Well, I believe it was
18  both Abbott's and the customers'.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  So if Abbott had a consignment partner
21  who didn't want to disclose a discount, rebate,
22  or other reduction, but they needed to pursuant

Page 621

1  to law, whose responsibility was it to ensure
2  that that discount, rebate, or reduction was
3  reported to Medicare or Medicaid?
4      MS. TABACCHI:  Object to the form.
5      Can I object to this line of
6  questioning as calling for a lot of legal
7  conclusions and legal interpretation and
8  hypotheticals and ask --
9      MS. ST. PETER-GRIFFITH:  She's -- she's
10  responsible for the division that submitted these
11  claims.  I'm just asking her whether they
12  complied with the law.
13      MS. TABACCHI:  She's answered your
14  questions, I think been very patient about it.
15  But the questions are hypothetical questions that
16  call for legal conclusions and are not factual --
17      MS. ST. PETER-GRIFFITH:  They're --
18      MS. TABACCHI:  -- in nature.
19      MS. ST. PETER-GRIFFITH:  They are not -
20  - they are not calling for legal conclusions, and
21  they are very factual in nature.
22  BY MS. ST. PETER-GRIFFITH:

Page 622

1      Q.  Ma'am, can you --
2      MS. TABACCHI:  Your question assumes
3  that there were certain obligations, and that I
4  think that, you know, is a matter that is not
5  necessarily established.
6      MS. ST. PETER-GRIFFITH:  Can you read
7  back the last question, please?
8      (Record read.)
9      MS. TABACCHI:  Same objection.  And I
10  also object to the form.
11      THE WITNESS:  Well, I think you're
12  asking me whether somebody didn't disclose it.
13  And I'm not aware of any instance where anybody
14  didn't follow the rules.  So I don't understand
15  the -- I really don't understand the question.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Okay.  Let me ask you this.  If
18  pursuant to law Abbott's home infusion partner
19  was required to report that they were receiving
20  goods on a consignment basis, who was responsible
21  for ensuring that that was reported to Medicaid
22  or Medicare?

Page 623

1      A.  I --
2      MS. TABACCHI:  Object to the form.
3      THE WITNESS:  I think you'd have to ask
4  the client.  I'm sure they had discussions with
5  their legal department.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Did you just then follow the client's
8  instructions, whatever they were, with regard to
9  whether or not the consignment relationship
10  needed to be disclosed to Medicare or Medicaid?
11      MS. TABACCHI:  Object to the form.
12      THE WITNESS:  I don't believe that ever
13  came up.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Do you know why it never came up?
16      MS. TABACCHI:  Object to the form.
17      THE WITNESS:  That's speculation.  I
18  have no idea.
19      MS. TABACCHI:  Are you moving to a new
20  topic, Ann?
21      MS. ST. PETER-GRIFFITH:  Yeah.
22      MS. TABACCHI:  Is it -- can we take a

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 624

1   five-minute break?
2         MS. ST. PETER-GRIFFITH:  Sure.  Yeah,
3   that's fine.
4         THE VIDEOGRAPHER:  We are off the
5   record at 10:11 a.m.
6         (Recess taken.)
7         MS. ST. PETER-GRIFFITH:  Would you mark
8   this as the next exhibit, please?
9         (Exhibit Tobiason 003 marked.)
10        (Off-the-record discussion.)
11        THE VIDEOGRAPHER:  We are back on the
12  record at 10:27 a.m.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Ms. Tobiason, you've -- I've handed to
15  you what's been marked as Tobiason Exhibit 3.  Do
16  you recognize this document?
17     A.  Yes.
18     Q.  And what is it?
19     A.  It's my CV.
20     Q.  Okay.  Do you know what this particular
21  CV was used for in home infusion?
22        MS. TABACCHI:  Object to the form.

Page 625

1         THE WITNESS:  Not that I recall.  I
2   don't even remember the time frame this was
3   applicable.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay.  Do you see in the first
6   paragraph, the third sentence:  "Responsibilities
7   include reimbursement operations, development of
8   reimbursement strategy and active lobbying of
9   government and private payors"?
10        Do you see that?
11     A.  Yes.
12     Q.  I believe in the last deposition round,
13  we covered your responsibilities for
14  reimbursement operations.  What I'd like to ask
15  you, ma'am, is what were your responsibilities
16  with regard to lobbying of the government?
17     A.  Well, I would have said my lobbying of
18  the government was primarily done through our
19  trade association and the National Alliance for
20  Infusion Therapy.
21     Q.  Okay.  And did you do any other
22  lobbying or consulting with lobbyists on behalf

Page 626

1   of Abbott during your tenure within home
2   infusion?
3      A.  We were -- in my tenure in home
4   infusion -- and I -- this dates back -- and I
5   don't know if this is -- it's the 1980s, I
6   believe -- we worked on the catastrophic health
7   care plan.
8      Q.  And do you recall any other legislative
9   initiatives that you worked on, either state or
10  federal, during your tenure within home infusion,
11  either with trade groups or with Abbott's
12  government relations department?
13     A.  I think we did work on coverage
14  policies.
15     Q.  Okay.  What are coverage policies?
16     A.  Coverage policies are -- there's
17  national and local coverage policies that lay out
18  the -- how procedures, devices, drugs are
19  actually covered, the medical necessity, if
20  there's medical necessity requirements.
21     Q.  Did you work on coverage policies that
22  transcended the home infusion area?

Page 627

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  Not that I recall.
3   During that -- during what time period?
4   BY MS. ST. PETER-GRIFFITH:
5      Q.  During your tenure with home infusion.
6      A.  Not that I recall.
7      Q.  Okay.  Do you recall when you were
8   within home infusion any other lobbying
9   initiatives that you were involved with?
10     A.  My best recollection would be that it
11  mostly involved coverage and the medical
12  necessity requirements.
13     Q.  And at your testimony last time, or
14  during -- in your testimony last time, you
15  indicated that you have no recollection of the
16  Medicare working group.  Since your last
17  deposition, has -- has your memory at all been
18  refreshed about the Medicare working group?
19     A.  To be honest, I have a vague
20  recollection now of there was a group.
21     Q.  Okay.  And what's your recollection?
22     A.  That I believe that a corporate -- the

18 (Pages 624 to 627)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

---

Page 628

1  corporate group -- I don't even remember who was
2  in charge of it -- had had a Medicare -- they had
3  a Medicare working group or whatever.  And --
4       Q.  And did you work -- I'm sorry.  Go
5  ahead.
6       A.  And I don't remember that much of the
7  details about it.  I just vaguely remember that
8  there was a gentleman who convened a group.
9       Q.  And were you a member of that group?
10      A.  I -- yes, I believe I was.
11      Q.  And what was your involvement with that
12  group that you can recall?
13      A.  I think it was very limited.  I may
14  have attended a few meetings, but I don't even
15  remember the substance of them.
16      Q.  And do you recall receiving any
17  materials concerning the Medicare working group?
18      A.  No.
19      Q.  If you did receive materials concerning
20  the Medicare working group, what -- do you recall
21  what you may have done with them?
22      MS. TABACCHI:  Object to the form.

---

Page 629

1       THE WITNESS:  No, I don't -- I don't
2  recall what I did with them.
3       MS. ST. PETER-GRIFFITH:  Ma'am, I'm
4  going to ask this next deposition exhibit be
5  marked, please, as -- I believe we're up to 4.
6       (Exhibit Tobiason 004 marked.)
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Ma'am, do you recognize this document?
9       A.  No.
10      Q.  Do you recall ever seeing it before?
11      A.  No.
12      Q.  Do you see that you're referenced in
13  the third paragraph?
14      A.  I do.
15      Q.  Okay.  And the sentence reads:
16  "Currently Virginia" -- or "Ginny Tobiason
17  handles payout for reimbursement of Medicaid
18  claims."
19       Do you see that?
20      A.  Yeah, I do.
21      Q.  Do you understand what that sentence
22  is?

---

Page 630

1       A.  No.
2       Q.  Okay.  Did you have any responsibility
3  for handling for HPD or home infusion the payout
4  of reimbursement of Medicaid claims --
5       MS. TABACCHI:  Object to the form.
6  BY MS. ST. PETER-GRIFFITH:
7       Q.  -- as referenced here?
8       A.  I -- I believe at this point I had a
9  very limited role.
10      Q.  Were you still within -- were you still
11  the manager of reimbursement services in '92?
12      A.  Yes, I was.
13      Q.  Okay.  And what was your -- what was
14  your role with regard to the GVR system within
15  HPD?
16      A.  I don't even know what the GVR system
17  is.
18      Q.  Okay.  What role is it -- what limited
19  role is it that you recall that you just
20  referenced?
21      A.  It was a very limited role for a very
22  short time payment -- time period where if the

---

Page 631

1  state sent us, you know, some kind of report for
2  payment -- which I didn't even do the payment
3  side of it -- was that they would ask me, does
4  this make sense in terms of that it was a --
5  covered by the Medicaid rebate.
6       Like, for example, if -- if it was a
7  product that was -- would have been covered under
8  the agreement -- for example, sometimes we got
9  claims for anesthesia products, which certainly
10  weren't administered in outpatient setting.  So I
11  would look at the drug and say -- or the claim or
12  whatever they put and say, well, I don't think
13  that fits, so you need to go back and perhaps ask
14  them for more information.
15      Q.  And would your responsibilities be
16  limited to the home infusion area, or would they
17  transcend to the Hospital Products division or
18  were they alt site?
19      MS. TABACCHI:  Object to the form.
20      THE WITNESS:  Well, at this point they
21  really -- I -- because of my nursing background,
22  they would ask could I look at the products.

---

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 632

BY MS. ST. PETER-GRIFFITH:
2      Q.   Okay.  So you -- you -- so it would be
3   you'd be looking at it for -- within -- in HPD as
4   a whole?
5           MS. TABACCHI:  Object to the form.
6           THE WITNESS:  Well -- well, they were
7   submitted to HPD.  So it was for products that we
8   agreed that were covered under the Medicaid
9   rebate agreement.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Okay.  And what is your familiarity
12  with the Medicaid rebate agreement?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  Well, my understanding --
15  well, it's changed.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   Okay.  What --
18     A.   During what time period?
19     Q.   During this time period, during '92.
20     A.   Well, that -- that it was the product
21  sold to the retail pharmacy class of trade.  So
22  it would have been products administered outside

Page 633

1   the four walls of the hospital and that we had to
2   pay some kind of rebate amount, which varied --
3   and I don't really remember anything about the
4   amounts -- and -- and that they would send us
5   reports.
6      Q.   Who is "they"?
7      A.   The states.
8      Q.   Okay.  And is this indicating that you
9   had responsibility for reviewing the reports from
10  the states?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  Well, this says "handles
13  payout," but I'm telling you what I -- what I
14  did.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Okay.  And why was it that you were
17  tasked to do that responsibility?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  Well, I -- I think it was
20  because my nursing background, and they needed
21  somebody who had some kind of knowledge of
22  products used in -- in outside the four walls of

Page 634

1   the hospital.
2   BY MS. ST. PETER-GRIFFITH:
3      Q.   Did you have any other responsibilities
4   during your tenure as the manager of
5   reimbursement services pertaining to Hospital
6   Products division or outside of the home infusion
7   area?
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  That's really broad.  I -
10  - you know, I don't recollect.  I remember we
11  were so busy just doing reimbursement services
12  that that's what I spent the majority of my time
13  with.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.   And do you think in this instance they
16  just -- they needed someone with a nursing
17  background to help out for HPD, and that's why
18  you got tasked with the responsibility?
19     A.   I don't know if they needed somebody
20  with nursing; they needed somebody with a medical
21  background or had some familiarity with what
22  products were used outside the four walls of the

Page 635

1   hospital.
2      Q.   Can you think of any other reason why
3   you were tasked with the responsibility for
4   reviewing the rebate reports from the states?
5      A.   I know that I looked at the products.
6   I didn't look at the amounts.  I didn't look at
7   any of the information on what the payments were.
8   I looked at whether the products looked like they
9   were administered outside the four walls of the
10  hospital.
11     Q.   Okay.  Can you think of any other
12  reason why you would be tasked with that
13  assignment, though?  That's my question.
14     A.   No.
15          MS. ST. PETER-GRIFFITH:  Why don't we
16  mark this next exhibit.  And while we're marking
17  it, we can go off the record and take a break
18  because Tony needs to change the tape.
19          THE VIDEOGRAPHER:  We are off the
20  record at 10:40 a.m. with the end of Tape No. 1.
21          (Brief interruption.)
22          (Exhibit Tobiason 005 marked.)

20 (Pages 632 to 635)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
                           Chicago, IL

Page 636

1        THE VIDEOGRAPHER:  We are back on the
2   record at 10:42 a.m. with the start of Tape No.
3   2.
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  Ma'am, I'm going to primarily ask you
6   about the first page.  You're free to flip
7   through the other pages, but I just want to see
8   if you recall receiving this document.
9        MR. SISNEROS:  Excuse me, Ann.  I don't
10  think that document has been marked and
11  identified for the record.
12        MS. ST. PETER-GRIFFITH:  I'm sorry.
13  The witness has been handed what's been marked as
14  Exhibit 5.
15  BY MS. ST. PETER-GRIFFITH:
16        Q.  Ma'am, do you recall receiving this
17  document, or do you recognize this document?
18        A.  No.
19        Q.  Okay.  Do you see at the -- on the --
20  would you agree with me that the top page appears
21  to be a fax cover sheet --
22        A.  Yes.

Page 637

1        Q.  -- from Abbott's Washington, D.C.,
2   office?  Do you see that?
3        A.  Yes.
4        Q.  Okay.  And at the top, do you see --
5   I'm sorry.  On the -- on the To lines, do you see
6   the first name appears to be G. Tobiason?  Do you
7   see that?
8        A.  Yes.
9        Q.  Do you have any doubt that you received
10  this fax at one point in time?
11        A.  Well, if they -- if they are -- it
12  doesn't have a -- I don't know.  I assume so,
13  yes.
14        Q.  Okay.  Would you have any reason to
15  doubt that you didn't receive this fax?
16        A.  I -- I would --
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  I would have no reason to
19  doubt it.
20  BY MS. ST. PETER-GRIFFITH:
21        Q.  Would you have retained a document like
22  this within your files?

Page 638

1        A.  Probably not.
2        Q.  Okay.  How come?
3        A.  I got a lot of faxes.  I mean, I got a
4   lot of information.  I don't -- I -- I would run
5   out of space.
6        Q.  Okay.  What about -- this is dated --
7   do you see 3/30/94?  Do you see that?
8        A.  Yes, I do.
9        Q.  Down at the bottom.
10        A.  Mm-hmm.
11        Q.  Would you retain these documents, a
12  document like this, for any particular period of
13  time, or would you just throw it away --
14        MS. TABACCHI:  Object to the form.
15  BY MS. ST. PETER-GRIFFITH:
16        Q.  -- once you've reviewed it?
17        A.  I -- I don't -- I don't have any idea.
18  But I would think it -- I would have tossed it.
19        Q.  Okay.  Do you recall anything else
20  about this document at all?
21        A.  I recall nothing about this document.
22        MS. ST. PETER-GRIFFITH:  Move on to the

Page 639

1   next exhibit, please.
2        (Exhibit Tobiason 006 marked.)
3        MS. ST. PETER-GRIFFITH:  The witness
4   has been handed what's been marked as Deposition
5   Exhibit 6.
6   BY MS. ST. PETER-GRIFFITH:
7        Q.  Ma'am, I'm going to ask you to take a
8   few minutes and look at this document and see if
9   you recognize it.
10        A.  Okay.
11        Q.  Do you recognize this document, ma'am?
12        A.  Don't remember it.
13        Q.  Do you -- it says at the top -- do you
14  see where it says From, and then that's scratched
15  out and it says To:  Virginia Tobiason?
16        A.  Yes.
17        Q.  Do you know whether you generated the
18  typewritten portion of this particular memo?
19        A.  I don't remember this memo, so I don't
20  know.
21        Q.  Okay.  Well, do you have any doubts
22  that at least a portion of this document is

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 640

1  generated by you given the To/From line at the
2  top?
3      A.  It's crossed out.  I just don't know.
4      Q.  Okay.  Do you recall an issue arising
5  concerning TAP setting up a reimbursement area to
6  process private insurance claims for Lupron or
7  any discussions with Mr. Sellers concerning such
8  a -- such an issue?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't -- I don't
11  remember discussions on this.  I don't.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Do you have any idea why you would be
14  addressing a TAP issue with Mr. Sellers?
15     A.  No.
16         MS. ST. PETER-GRIFFITH:  Can you mark
17  the next exhibit, please?
18         (Exhibit Tobiason 007 marked.)
19         MS. ST. PETER-GRIFFITH:  Let the record
20  reflect that the witness has been handed a
21  document that's been marked as Deposition Exhibit
22  7.

Page 641

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Ma'am, do you recognize this document?
3      A.  No.
4      Q.  Do you recall attending a meeting on or
5  about 11/25/96 concerning Medicare reform?
6      A.  No.
7      Q.  Do you have any doubts that you
8  received this document as one of the addressees
9  on the To line?
10     A.  I would assume I received it.
11     Q.  Who is Mr. Miller?
12     A.  Jim Miller was corporate development.
13     Q.  And what is corporate development?
14     A.  Well, they were a corporate group that
15  I -- I believe just did certain projects.
16     Q.  Okay.  Do you recall working on any
17  projects concerning Medicare reform with Mr.
18  Miller?
19     A.  No.
20     Q.  Do you recall working on a Medicare
21  reform or any issues concerning Medicare reform
22  with any of the addressees on this list?

Page 642

1      A.  I -- I don't recall.
2      Q.  Okay.  Is it possible that you could
3  have, but you just don't recall?
4          THE WITNESS:  Oh, it's pos --
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Sorry.  It's possible I
7  could have, and I -- I may not have.  I just
8  don't know.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Do you have any recollection at all of
11  working on Medicare reform in late '96 or early
12  '97?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I think Medicare reform
15  is pretty broad.  I -- I just don't know if there
16  were specifics.  No, I don't remember it.
17         MS. ST. PETER-GRIFFITH:  Mark the next
18  exhibit, please.
19         (Exhibit Tobiason 008 marked.)
20         MS. ST. PETER-GRIFFITH:  Let the record
21  reflect the witness has been handed what's been
22  marked as Tobiason Exhibit 8.

Page 643

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Ma'am, do you recognize this document?
3      A.  No.
4      Q.  Does it help refresh your recollection
5  as to whether you might have been a participant
6  in a meeting concerning Abbott's position on
7  Medicare reform on November 25th, 1996?
8      A.  I -- I don't know.  I don't remember
9  this at all.
10     Q.  Okay.  Do you notice your name under
11  HPD?
12     A.  Yes.
13     Q.  And you see an asterisk there?  Do you
14  see an asterisk or a little squiggly after your
15  name?
16     A.  I see a squiggly.
17     Q.  Okay.
18     A.  I don't know.  Is there an asterisk
19  there?  It looks like it, but --
20     Q.  Well, I don't know that it's -- whether
21  the squiggly is -- is deleting the asterisk or
22  not because the asterisk down at the bottom says,

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                 January 22, 2008
Chicago, IL

Page 644

1  "Not available to attend."  Do you see that?
2      A.  I do.
3      Q.  Does it appear that someone might have
4  initially identified you as not available to
5  attend and then maybe crossed that off?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I have no idea.  It -- it
8  looks like it says I wasn't available to attend.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay.  But -- or that someone thought
11 you weren't available to attend and that maybe
12 you did?
13     A.  I have no idea.  I don't know what that
14 means.
15     Q.  Do you have any recollection at all of
16 attending such a meeting?
17     A.  No.
18     Q.  Okay.  Do you have any recollection of
19 declining to attend such a meeting or having a
20 scheduling conflict?
21     A.  No.
22     Q.  Okay.

Page 645

1          MS. ST. PETER-GRIFFITH:  Mark this as
2  the next exhibit.
3          (Exhibit Tobiason 009 marked.)
4          MS. ST. PETER-GRIFFITH:  The record
5  will reflect that the witness is being handed a
6  document that's been marked as Tobiason Exhibit
7  9.
8          Are we up to 9?
9          THE REPORTER:  Yes.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Ma'am, do you recognize this document?
12     A.  No.
13     Q.  Do you recall ever receiving a copy of
14 a Healthcare Leadership Council statement of
15 policy?
16     A.  No.
17     Q.  Do you know what the Healthcare
18 Leadership Council is?
19     A.  Well, I know it's -- it's a group.  I
20 think it's in Washington.
21     Q.  Okay.  Do you recall having any
22 involvement at all with their statement of

Page 646

1  policy?
2      A.  No, I was not involved.
3      Q.  Okay.  Do you see that you are an
4  addressee on the To line at the top of this
5  interoffice correspondence?
6      A.  I do.
7      Q.  Do you have any doubts that you
8  received this memo?
9      A.  I -- I would assume if my name is on it
10 I received it.
11     Q.  Okay.  Let me ask you.  Is Mr. Miller a
12 -- he's a divisional vice president.  I assume
13 that that's a relatively senior position?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  Yes.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  If Mr. Miller asked you to become
18 involved with something, would you anticipate
19 that you probably would become involved with
20 something?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  Yes.

Page 647

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  But you just have no recollection of
3  reviewing a statement of policy on behalf of the
4  Healthcare Leadership Council?
5      A.  I don't remember it at all.
6      Q.  Do you know why you would be an
7  addressee on this interoffice correspondence?
8      A.  No.
9          MS. ST. PETER-GRIFFITH:  Move on to the
10 next exhibit, please.
11         (Exhibit Tobiason 010 marked.)
12         MS. ST. PETER-GRIFFITH:  Let the record
13 reflect that the witness has been handed what's
14 been marked as Tobiason Exhibit 10.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Ma'am, do you recognize this document?
17     A.  No.
18     Q.  You were an addressee on the To line,
19 correct?
20     A.  Yes.
21     Q.  Do you have any doubts that you
22 received this document?

23 (Pages 644 to 647)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 648

1      A.  I -- I would assume I received it.
2      Q.  Who is Mr. Rieger?
3      A.  Mr. Rieger appears to be a manager in
4  strategic planning.
5      Q.  Do you recall him?
6      A.  Vaguely.  I have a -- I vaguely recall
7  that he worked for -- I think he worked for Jim
8  Miller.
9      Q.  Okay.  Do you recall working on a
10 particular group within Abbott with Mr. Rieger?
11     MS. TABACCHI:  Object to the form.
12     THE WITNESS:  I believe he was charged
13 with this Medicare working group.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay.  And does this document help
16 refresh your recollection as to your involvement
17 with the Medicare working group?
18     A.  No.
19     Q.  Do you recall anything concerning or
20 being involved with or commenting upon an AMA
21 plan for overhauling the Medicare system?
22     MS. TABACCHI:  Object to the form.

Page 649

1      THE WITNESS:  I don't recall ever
2  working on this.
3      MS. ST. PETER-GRIFFITH:  Can you mark
4  the next exhibit, please?
5      (Exhibit Tobiason 011 marked.)
6      MS. ST. PETER-GRIFFITH:  Let the record
7  reflect that the witness has been handed what's
8  been marked as Tobiason Exhibit 11.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Ma'am, do you recognize this document?
11     A.  No, I don't recognize it.
12     Q.  Do you remember attending a Medicare
13 working group meeting on 12/16/96?
14     A.  I don't recall.
15     Q.  Do you remember having discussions with
16 anyone within Abbott concerning Abbott's role or
17 future participation in the AMA industry
18 roundtable steering committee?
19     A.  No.
20     Q.  Do you remember having any discussions
21 with anyone at Abbott concerning Abbott's steps
22 in or about late '96 or early '97 concerning its

Page 650

1  position on Medicare reform?
2      A.  I don't recall, no.
3      Q.  Ma'am, do you notice at the top of this
4  document that you are one of the To addressees?
5      A.  Well, I'm sorry.  One of the two
6  addressees?
7      MS. TABACCHI:  Object to the form.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  You were one of the addressees under
10 the To section.  I'm sorry.
11     A.  Oh, okay.
12     Q.  To, T-O.
13     A.  There's a number of people here.  I see
14 that my name is listed on this memo.
15     Q.  Okay.  Do you have any doubt that you
16 received this document, ma'am?
17     A.  I -- I would -- I have no doubt that I
18 -- I know neither way, if I got it or didn't get
19 it.
20     Q.  Okay.  But you have no recollection of
21 ever attending a meeting on 12/16/96?
22     MS. TABACCHI:  Object to the form.

Page 651

1      THE WITNESS:  No.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Is it possible that you could have, but
4  you just don't recall?
5      A.  Oh, it's possible I could have.  I just
6  don't recall.  This is 12 years ago.
7      MS. ST. PETER-GRIFFITH:  Mark the next
8  exhibit, please.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  And, ma'am, my focus on this next
11 exhibit is to -- is to again ask you your
12 familiarity.  I understand it's a longer
13 document.  You're free to take your time to look
14 at it --
15     A.  Mm-hmm.
16     Q.  -- but I'm just going to ask you
17 initially whether you recognize it or not, and
18 then we can go from there.
19     A.  Mm-hmm.
20     MS. ST. PETER-GRIFFITH:  If we can mark
21 the next exhibit.
22     (Exhibit Tobiason 012 marked.)

24 (Pages 648 to 651)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL          January 22, 2008
Chicago, IL

Page 652

1      MS. ST. PETER-GRIFFITH:  The witness is
2 being handed what's been marked as Tobiason
3 Exhibit 12.  And I'll just state for the record
4 that this is a document that is at least a
5 portion of a document that was used previously by
6 Mr. Haviland and marked as Exhibit 761.
7 BY MS. ST. PETER-GRIFFITH:
8    Q.  Ma'am, do you recall receiving this
9 document?  Not in deposition.
10    A.  Oh, because I remember from the
11 deposition.
12    Q.  Okay.
13    A.  No, I don't remember receiving this
14 document.
15    Q.  Okay.  Do you recall ever having any
16 discussions with Mr. Tootell concerning average
17 wholesale price issues?
18      MS. TABACCHI:  Object to the form.
19      THE WITNESS:  I don't recall from this
20 time period, no.
21 BY MS. ST. PETER-GRIFFITH:
22    Q.  At any time.  I'm asking you, I guess,

Page 653

1 more generally, not necessarily related to this
2 document, ma'am.
3      First of all, who is Mr. Tootell?
4    A.  Mr. Tootell was the manager of
5 reimbursement for Ross products.
6    Q.  So was he essentially your counterpart
7 to home infusion except in the Ross division?
8      MS. TABACCHI:  Object to the form.
9      THE WITNESS:  Well, his position was
10 different than mine.  They didn't have a -- they
11 didn't do reimbursement services.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.  Okay.  Ma'am, were you friendly with
14 Mr. Tootell?
15      MS. TABACCHI:  Object to the form.
16      THE WITNESS:  Well, I knew Mike, and we
17 talked, yes.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  Did Mr. Tootell -- did you ever speak
20 with Mr. Tootell concerning his concerns about
21 Abbott's AWP policies and procedures?
22      MS. TABACCHI:  Object to the form.

Page 654

1      THE WITNESS:  Not that I recall.
2 BY MS. ST. PETER-GRIFFITH:
3    Q.  Do you ever recall Mr. Tootell telling
4 you that he went to Abbott's legal counsel to
5 express his concerns about Abbott's AWP policies
6 and procedures?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  No, not that I recall.
9 BY MS. ST. PETER-GRIFFITH:
10    Q.  Ma'am, if we could go back to Exhibit
11 12.  You're an addressee -- are you not? -- on
12 this memo from Mr. Rieger.
13    A.  Yes, I am.
14    Q.  Do you ever recall working with anyone
15 on issues raised concerning average wholesale
16 price in or around late '96/early '97?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  Not that I recall.
19      MS. ST. PETER-GRIFFITH:  If we could
20 mark the next exhibit.
21      (Exhibit Tobiason 013 marked.)
22      MS. ST. PETER-GRIFFITH:  Let the

Page 655

1 witness -- let the record reflect that the
2 witness is being handed what's been marked as
3 Deposition Exhibit 13.
4 BY MS. ST. PETER-GRIFFITH:
5    Q.  Ma'am, once again, this is a longer
6 document.  I'm going to focus on your familiarity
7 or your recollection of your receipt of this
8 document, not necessarily about the specifics of
9 its content.
10      Ma'am, do you recall receiving --
11    A.  Well, I'm looking at it so I can -- if
12 I can recall it.
13    Q.  Okay.
14    A.  Hold on one second.
15    Q.  Ma'am, do you recall receiving what's
16 been marked as Tobiason Exhibit 13?
17    A.  I don't recall receiving it.
18    Q.  You are an addressee on the To list,
19 correct?
20    A.  I am.
21    Q.  Do you have any doubts that you would
22 have received this document?

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 656

1      A.  I have no -- I mean, I could have, and
2  I may not have.  I don't know.
3      Q.  Do you recall receiving a litigation
4  hold memorandum in or about '96?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  I remember receiving a
7  few litigation hold, yes.  But I don't remember
8  the dates.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  If you had received a litigation hold
11 memorandum before January 15th, '97, would this
12 have been a document that you would have retained
13 in your files?
14         MS. TABACCHI:  Object to the form.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  If you received it.
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  I -- I think I would have
19 complied with the hold request, yes, if I thought
20 it applied.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Ma'am, does this -- the Re line says

Page 657

1  "Medicare Working Group Meeting."  Do you see
2  that?
3      A.  Yes.
4      Q.  Does this memo help refresh your
5  recollection as to any work that you did on the
6  Medicare working group?
7      A.  No.
8      Q.  Do you recall anything about a meeting
9  on 1/21/97 at 8:00 a.m. until 9:30?
10     A.  I don't remember a meeting.
11     Q.  Do you remember any discussions with
12 anyone about average wholesale price versus
13 actual cost issue?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  Not that I recall.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Do you know what that means, "Discuss
18 Average Wholesale Price vs. actual cost issue"?
19     A.  I -- I don't know what they mean by
20 actual cost.
21     Q.  Okay.  Do you remember an issue arising
22 in or about '97 concerning average wholesale

Page 658

1  price as compared to actual cost or estimated
2  acquisition cost?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  I do remember there --
5  there may have been proposals on estimated
6  acquisition cost, but I don't recall where they
7  came from or whatever.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.  When you say proposals, what do
10 you mean?
11     A.  Well, I don't -- I don't know.  It
12 could have been -- I just remember there was
13 something about estimated acquisition cost.
14 Whether it was a regulation or a proposed or
15 legislation, I just don't remember.
16     Q.  Do you recall any Abbott discussions
17 about that particular regulation or policy --
18         MS. TABACCHI:  Object --
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  -- that you have a recollection?
21         MS. TABACCHI:  -- to the form.
22         THE WITNESS:  I remember vaguely that

Page 659

1  on estimated acquisition that there may have been
2  some discussion -- with who, I don't remember --
3  about the fact that -- that estimated acquisition
4  may not cover the true cost of the provider.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  When you say the true cost of the
7  provider, what do you mean?
8      A.  Well, maybe not true cost.  But because
9  if they -- if the 20 percent copays because
10 patients have to pay 20 percent of the estimated
11 acquisition.  And if the provider didn't collect
12 it, it may not cover their -- their cost.
13     Q.  Well, if they collected AWP, would they
14 be able to cover that 20 percent copay in the
15 event that a patient wouldn't pay it?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  I don't know.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Well, why do you recall the issue of
20 the ability to collect the copay being a matter
21 of concern when discussing estimated acquisition
22 cost versus average wholesale price?

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 660

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  All I know is that we
3   discussed estimated acquisition cost in that
4   context.
5   BY MS. ST. PETER-GRIFFITH:
6        Q.   Was it up to Abbott to ensure that in
7   the event a patient could not pay a 20 percent
8   copay that their pricing structure enabled the
9   provider to cover that copay through
10  reimbursements from Medicare or Medicaid?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS: Repeat that question.
13       MS. ST. PETER-GRIFFITH: Can you read
14  it back, please?
15       (Record read.)
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I have no opinion on
18  that.
19  BY MS. ST. PETER-GRIFFITH:
20       Q.   Do you have a recollection of any
21  discussions about the need to assist providers or
22  physicians in covering their copays through

Page 661

1   Abbott's pricing schemes?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  I have no recollection of
4   any discussions.
5   BY MS. ST. PETER-GRIFFITH:
6        Q.   Do you have any other recollection
7   about any issue raised in this memorandum?
8        A.   No.
9        Q.   Does this memorandum help refresh your
10  recollection as to your involvement with the
11  Medicare working group?
12       A.   No.
13       MS. ST. PETER-GRIFFITH: Mark the next
14  exhibit.
15       (Exhibit Tobiason 014 marked.)
16       MS. ST. PETER-GRIFFITH: Let the record
17  reflect that the witness has been handed what's
18  been marked as Tobiason Exhibit 14.
19  BY MS. ST. PETER-GRIFFITH:
20       Q.   Ma'am, do you recognize this document?
21       A.   No.
22       Q.   You're one of the addressees on the To

Page 662

1   line, correct?
2        A.  I am.
3        Q.   Do you have any doubt that you received
4   this memo?
5        A.   I could have received it, and I may not
6   have.
7        Q.   Do you know why you were an addressee
8   on this memo?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  No.
11  BY MS. ST. PETER-GRIFFITH:
12       Q.   Do you remember receiving information
13  from Cindy Sensibaugh in preparation for a
14  1/21/97 Medicare working group meeting?
15       A.   No.
16       Q.   Do you remember a 1/21/97 Medicare
17  working group meeting?
18       A.   I don't remember any meeting.
19       Q.   Who is Ms. Sensibaugh?
20       MS. TABACCHI:  Object to the form.
21       THE WITNESS:  Cindy Sensibaugh works in
22  our government affairs office in Washington.

Page 663

1   BY MS. ST. PETER-GRIFFITH:
2        Q.   Did you interact with Ms. Sensibaugh?
3        A.   Yes.
4        Q.   How would -- for what purpose did you
5   interact with Ms. Sensibaugh?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  We would have -- I think
8   she worked with HIMA, the Health Industry
9   Manufacturers Association, and I worked with our
10  trade association too.  We may have had -- I
11  don't remember specifics, but we might have
12  talked, yes.
13  BY MS. ST. PETER-GRIFFITH:
14       Q.   But your recollection is that your
15  conversations would have been in the context of
16  her in relation to your work with the trade
17  associations?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  It could have been.  It
20  could have been I might have discussed some
21  coverage or coding issues with her.
22  BY MS. ST. PETER-GRIFFITH:

27 (Pages 660 to 663)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 664

1    Q.  Would you have any other reason to
2  interact with Ms. Sensibaugh?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  You know, that's pretty
5  broad.  I -- I don't know.  I could have.  I just
6  don't remember any.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Does --
9    A.  I don't remember specific
10  conversations.
11    Q.  Does this memorandum help refresh your
12  recollection as to your involvement in the
13  Medicare working group?
14    A.  I think you asked that, but no.
15    Q.  Might have asked I'm not sure about
16  this document.  We've got a number of them.  Just
17  going to ask you every time.
18         (Exhibit Tobiason 015 marked.)
19         MS. TABACCHI:  Sorry.  Is there a
20  question?
21         MS. ST. PETER-GRIFFITH:  Oh, sure.
22  BY MS. ST. PETER-GRIFFITH:

Page 665

1    Q.  Ma'am, are you done reviewing the
2  document?
3    A.  Yes.
4    Q.  Do you recognize this document, ma'am?
5    A.  No, I do not.
6    Q.  You are listed on the To -- as one of
7  the addressees on the To line.  Do you see that?
8    A.  Yes.
9    Q.  Do you have any doubt that you received
10  this document?
11    A.  I could have received it and may not
12  have.  I -- I am on the -- the list, yes.
13    Q.  Does this document help refresh your
14  recollection concerning your involvement on the
15  Medicare working group?
16    A.  No.
17    Q.  Do you recall receiving or reviewing an
18  announcement of President Clinton's Medicare
19  reform package in or around '97?
20    A.  I don't even remember that President
21  Clinton had a Medicare reform package.
22    Q.  Do you remember anything else about the

Page 666

1  substance of this document?
2    A.  No.
3         (Exhibit Tobiason 016 marked.)
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Ma'am, I am going to spend a little bit
6  of time with this document, so I --
7    A.  Okay.
8    Q.  Ma'am, do you recognize what's been
9  marked as Tobiason Exhibit 16?
10    A.  No.
11    Q.  Do you see --
12    A.  I don't recall.
13    Q.  -- on the first page that handwritten
14  that says at the top, "To:  Marie.  Please fax
15  this document to:" and then you're listed as one
16  of the individuals?  Do you see that?
17    A.  I do.
18    Q.  And it's from Mr. Rieger, down bottom?
19    A.  Yes.
20    Q.  Do you have a recollection of receiving
21  this facsimile from Mr. Rieger?
22    A.  No.

Page 667

1    Q.  Does this document help refresh your
2  recollection of your involvement on the Medicare
3  working group?
4    A.  No.
5    Q.  Ma'am, if you could turn to the third
6  page of this document.
7    A.  Mm-hmm.
8    Q.  And I'd like to direct your attention
9  to the paragraph that says -- or the sentence or
10  the section that says Average Wholesale Price.
11  Do you see that?
12    A.  I do.
13    Q.  And this document at the top reflects
14  minutes from the Medicare working group meeting.
15  Do you see that?
16    A.  Yes.
17    Q.  The first sentence under Average
18  Wholesale Price reads:  "Average wholesale price
19  is generally based upon the manufacturer's price
20  plus a markup of 15-20%."
21         Do you see that?
22    A.  I do.

28 (Pages 664 to 667)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
                              Chicago, IL

Page 668

1     Q.  Ma'am, was that your understanding of
2  what average wholesale price was?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  At this time, I -- I knew
5  that AWP was put out and -- by the drug
6  databases.  I wasn't sure of the exact
7  methodology used to calculate it.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Did you have an understanding, though,
10 that AWP was based in part upon the
11 manufacturer's price?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  I -- no.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Okay.  Ma'am, the third sentence in
16 this bullet point reads:  "There is a consensus
17 that 'AWP' is artificial and that the actual
18 acquisition costs would be better, however, it is
19 unclear whether actual acquisition costs can be
20 determined."
21        Do you see that?
22    A.  "There is consensus."  I do.

Page 669

1     Q.  Do you have any recollections of any
2  discussions with anyone in Abbott concerning a
3  consensus that AWP is artificial and that actual
4  acquisition costs would be better?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  I don't -- no, I don't
7  know where this came from.  No.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Well, do you agree that this -- these
10 are the minutes of the working group meeting?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I -- I don't remember
13 these being the minutes, so I can't say yes or
14 no.  But it appears to be.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  Okay.  Do you recall at any time in
17 this '97 time frame discussing with anyone a
18 concern that AWP may be artificial and that the
19 use of actual acquisition costs would be a better
20 practice?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  No, I don't recall any

Page 670

1  conversations.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  Did you have any opinion one way or
4  another as to whether actual acquisition costs
5  should be used for purposes of Medicare
6  reimbursement or Medicaid reimbursement as
7  compared to AWP?
8         MS. TABACCHI:  Object to the form.
9         THE WITNESS:  No, I had no opinion.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  If you could flip to the last page of
12 this document, where it says Next Step.  Do you
13 see that?
14    A.  I do.
15    Q.  The first bullet reads, "Obtain 'Notice
16 of Inherent Reasonableness' document from Mike
17 Tootell and distribute to Medicare Working
18 Group."
19        Do you see that?
20    A.  I do.
21    Q.  Do you recall receiving or having been
22 distributed to you a notice of inherent

Page 671

1  reasonableness document?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  I recall an inherent
4  reasonableness document.  I just don't know where
5  it came from.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  Okay.  What is inherent reasonableness?
8     A.  Well --
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  It's a -- it's a
11 mechanism whereby CMS can determine whether a
12 product, device, anything in the Medicare program
13 the payment level is inherently reasonable.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Okay.  What do you recall about the
16 document that you may have reviewed?
17    A.  And this is truly my vague recollection
18 that this may have been when they announced that
19 they may use inherent reasonableness authority.
20    Q.  Okay.  And what is your recollection
21 about the end result of that?
22        MS. TABACCHI:  Object to the form.

                                    29 (Pages 668 to 671)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
                          Chicago, IL

| Page 672 | Page 674 |
|---|---|

**Page 672**

1        THE WITNESS:  The end result during
2   what time period?
3   BY MS. ST. PETER-GRIFFITH:
4        Q.  During this time period.
5        A.  I don't really remember.  There's been
6   ongoing discussions about IR with the agen -- I
7   mean, CMS has been sending out a lot of notices
8   on I -- I mean, discussions about IR.
9        Q.  Do you recall what Abbott's position
10  was concerning IR --
11        MS. TABACCHI:  Object --
12  BY MS. ST. PETER-GRIFFITH:
13        Q.  -- during this time period?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  No, I don't remember.
16  BY MS. ST. PETER-GRIFFITH:
17        Q.  Do you recall working on any
18  legislative initiatives or providing any
19  commentary on IR in furtherance of Abbott's
20  position?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  No, I don't.

**Page 673**

1        (Exhibit Tobiason 017 marked.)
2        MS. ST. PETER-GRIFFITH:  Let the record
3   reflect that the witness has been handed what's
4   been marked as Tobiason Exhibit 17.
5   BY MS. ST. PETER-GRIFFITH:
6        Q.  Ma'am, do you recognize this document?
7        A.  No.
8        Q.  At the top it reads Abbott Position on
9   Medicare Reform Key Participants.  Do you see
10  that?
11        A.  I do.
12        Q.  And do you see that you are listed on
13  this document under HPD?  Do you see that?
14        A.  I do.
15        Q.  Down at the bottom, the document
16  appears to be dated 2/7/97.  Do you see that?  In
17  very fine print.
18        A.  I do.
19        Q.  Okay.  Ma'am, were you a key
20  participant on Abbott's position on Medicare
21  reform in or around February or early '97?
22        MS. TABACCHI:  Object to the form.

**Page 674**

1        THE WITNESS:  I don't even remember
2   discussions about Medicare reform.
3   BY MS. ST. PETER-GRIFFITH:
4        Q.  Do you have any idea why you might be
5   listed on this particular document as a key
6   participant on Abbott's position on Medicare
7   reform?
8        A.  No.
9        Q.  Do you remember any recollection -- do
10  you have any recollection of any conversations
11  with anyone concerning Medicare reform or
12  Abbott's position on Medicare reform in or around
13  '97?
14        A.  No.
15        Q.  Ma'am, this lists you as manager of
16  client services under the HPD category.
17        A.  Mm-hmm.
18        Q.  In '97, were you -- what was your job
19  title?
20        A.  I was manager of client services, and I
21  was in the infusion business.
22        Q.  Okay.

**Page 675**

1        A.  Which was an operating area within
2   hospital products.
3        Q.  Okay.  But were you still within home
4   infusion?
5        A.  Yes.
6        Q.  Did you have any responsibilities
7   outside of home infusion --
8        A.  No.
9        Q.  -- in this time frame?
10        A.  Not that I'm aware of, no.
11        (Exhibit Tobiason 018 marked.)
12  BY MS. ST. PETER-GRIFFITH:
13        Q.  Ma'am, do you recognize this package of
14  documents that's been marked as Tobiason Exhibit
15  18?
16        A.  No, I don't.
17        Q.  Do you recall ever working on any draft
18  language concerning AWP in or about the spring or
19  summer of '97?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  No.
22  BY MS. ST. PETER-GRIFFITH:

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 676

1      Q.  Do you know what AWP language may have
2  been submitted by Congressmen Archer or Hastert
3  on behalf of Abbott?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  No.  Not that I recall.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Ma'am, if we could go back to Exhibit
8  16.
9      A.  16.  Mm-hmm.
10      Q.  And if we could flip to, again, the
11  third page --
12      A.  Yes.
13      Q.  -- of that document.
14      A.  Mm-hmm.
15      Q.  Do you agree that the minutes of this
16  meeting give a general formula for determining
17  AWP from a manufacturer's list price?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  I -- it says here that
20  it's based upon the manufacturer price plus a
21  markup of 15 to 20 percent.  I have no opinion on
22  that.

Page 677

1          MS. ST. PETER-GRIFFITH:  Mark the next
2  exhibit, please.
3          (Exhibit Tobiason 019 marked.)
4          MS. ST. PETER-GRIFFITH:  Let the record
5  reflect that the witness has been handed what's
6  been marked as Tobiason Exhibit 19.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  And, ma'am, I'm primarily going to
9  spend time on the first two pages of this
10  exhibit.
11      A.  Mm-hmm.  Yes.
12      Q.  Ma'am, do you recognize this document?
13      A.  No.
14      Q.  You are -- you are listed as one of the
15  addressees under the To line, correct?
16      A.  Yes.
17      Q.  Does this refresh your recollection as
18  to information that you may have had on the
19  Medicare working group?
20          MS. TABACCHI:  Object to the form.
21          THE WITNESS:  I don't know.  Was this -
22  - was this a memo to the Medicare working group?

Page 678

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  I'm just asking whether this refreshes
3  your recollection as to your involvement on the
4  Medicare working group?
5      A.  No.
6      Q.  Does this refresh your recollection as
7  to your involvement with Ms. Sensibaugh on any
8  legislative matters?
9          MS. TABACCHI:  Object to the form.
10          THE WITNESS:  No, not that I recall.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  This is a memo from Ms. Sensibaugh,
13  right?
14      A.  Yes.
15      Q.  Do you know why Ms. Sensibaugh would
16  have listed you as -- on the -- as one of the To
17  addressees on this particular memorandum?
18      A.  Well, I believe she would have
19  addressed it to me because of the freezes, that
20  the payment level for DME would have been frozen
21  and also enteral would have been frozen.
22      Q.  Any other reason?

Page 679

1      A.  No, I think that would have been it
2  because that impacted infusion services.
3      Q.  Under item number 1, AWP:
4  "Reimbursement for Medicare drugs will be at 95%
5  of AWP effective January 1, '98."
6          Do you see that?
7      A.  Mm-hmm.  Yeah, I do.
8      Q.  Would that have affected reimbursement
9  services?
10          MS. TABACCHI:  Object to the form.
11          THE WITNESS:  It could have.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Would part of the reason why you might
14  have received this document been because of that
15  change to 95 percent of AWP effective January 1,
16  1998?
17          MS. TABACCHI:  Object to the form.
18          THE WITNESS:  I -- I -- I don't know.
19  I would have assumed it would have been the
20  parental and enteral nutrition.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Can you think of any other reason why

31 (Pages 676 to 679)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 680

1  you would have received this document?
2      A.  No.
3      Q.  Do you recall any conversations with
4  Ms. Sensibaugh concerning the substance of the
5  Balanced Budget -- Budget Agreement?
6      A.  I don't recall any conversations.
7      Q.  Do you recall anything else about the
8  subject matter of this particular memorandum?
9      A.  No.
10         (Exhibit Tobiason 020 marked.)
11         MS. ST. PETER-GRIFFITH:  Let the record
12 reflect that the witness has been handed what's
13 been marked as Tobiason Exhibit 20.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Ma'am, do you recognize this document?
16     A.  No.
17     Q.  Do you recall -- you are one of the
18 addressees on the To list, correct?
19     A.  I am.
20     Q.  Do you have any doubt that you received
21 this document?
22     A.  No.  I -- I presume I received it.

Page 681

1      Q.  If it was responsive to a lit hold
2  memo, do you recall whether this was a document
3  that you would have retained upon receipt?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  I -- I don't know.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Do you know why Ms. Sensibaugh included
8  you as an addressee on this interoffice
9  correspondence?
10     A.  No.
11     Q.  Do you recall anything about the
12 Medicare Fraud and Overpayment Act introduced
13 into Congress?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  No.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Does any of the subject matter of this
18 particular memorandum impact at all your
19 responsibilities or duties as manager of
20 reimbursement services within home infusion in or
21 around 1998?
22         MS. TABACCHI:  Object to the form.

Page 682

1          THE WITNESS:  No.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Do you recall having any communications
4  with anyone in or around 1998 concerning the
5  Medicare Fraud or Overpayment Act introduced into
6  Congress?
7      A.  No, I don't remem -- recollect any
8  conversations.
9      Q.  Do you recall having any conversations
10 with anyone concerning the change in
11 reimbursement for Medicare drugs from 95 percent
12 of AWP to acquisition cost?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I don't recall any
15 specific conversations, no.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  We can start -- I'd like to spend a
18 little time with this document.
19     A.  Mm-hmm.
20     Q.  Do you recall -- I'm sorry.  On -- the
21 third sentence of the first paragraph reads,
22 "Most importantly for Abbott, the bill includes a

Page 683

1  provision (Section 2) that would change the
2  reimbursement for Medicare drugs from 95% of AWP
3  to acquisition cost, which is similar to the
4  provision proposed by Clinton" -- "by President
5  Clinton last year."
6          Do you see that?
7      A.  I do.
8      Q.  Do you know why it is that, most
9  importantly, that change would impact Abbott?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  No.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Do you have any opinion at all as to
14 why you may have received this document?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  There was a reference to
17 parenteral nutrients.  That could be why I
18 received it.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  That references in the next sentence,
21 "Unlike last year's proposal, Section 2 applies
22 to parenteral nutrients" --

32 (Pages 680 to 683)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
                              Chicago, IL

Page 684

1    A.  Mm-hmm.
2    Q.  -- "and includes payment for
3  administrative, storage and handling costs in the
4  definition of acquisition cost."
5        Do you see that?
6    A.  Yes.
7    Q.  What impact would that have upon your
8  responsibilities or the operation of
9  reimbursement services within home infusion?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  We might have been
12  notified by a carrier that they might have
13  changed the fee schedule for parenteral
14  nutrients.
15  BY MS. ST. PETER-GRIFFITH:
16   Q.  Did you work at all with Ms. Sensibaugh
17  on this Medicare fraud and abuse legislation?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  Not that I recall.
20  BY MS. ST. PETER-GRIFFITH:
21   Q.  Do you recall working with anyone or
22  discussing with anyone this Medicare fraud and

Page 685

1  abuse legislation or AWP language?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  No, not that I recall.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Does this memorandum help refresh your
6  recollection as to your involvement on the
7  Medicare working group?
8    A.  No.  I don't even know if this was a
9  Medicare working group document.
10   Q.  Ma'am, do you recall working with Ms.
11  Sensibaugh on any comments to any proposed rules
12  in or around '98?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I -- I don't recall
15  talking to Cindy about any comments.
16  BY MS. ST. PETER-GRIFFITH:
17   Q.  Do you recall any -- with -- how
18  frequently you spoke with Cindy?
19   A.  No.
20       MS. TABACCHI:  Object to the form.
21       MS. ST. PETER-GRIFFITH:  Mark this as
22  the next exhibit.

Page 686

1        (Exhibit Tobiason 021 marked.)
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  Ma'am, does this --
4        MS. ST. PETER-GRIFFITH:  Let the record
5  reflect that the witness has been handed what's
6  been marked as Tobiason Exhibit 21.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Ma'am, does this refresh your
9  recollection as to any involvement that you may
10  have had with Ms. Sensibaugh commenting upon any
11  proposed rules by DHHS?
12   A.  No.  This memo looks like it's from
13  Bruce to Cindy.
14   Q.  Okay.  But it references a conversation
15  that you may have had with Ms. Sensibaugh, does
16  it -- doesn't it?
17   A.  It does, yes.
18   Q.  Do you recall any conversation with Ms.
19  Sensibaugh --
20       MS. TABACCHI:  Object --
21  BY MS. ST. PETER-GRIFFITH:
22   Q.  -- concerning the proposed rules

Page 687

1  involving standards for electronic data
2  interchange of insurance transactions?
3    A.  No, I don't recollect any.
4    Q.  Ma'am, what do you recall about
5  Abbott's maintaining a formal written policy on
6  fraud and abuse?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  I -- I don't -- I don't
9  know one way or the other whether we had a
10  written policy.
11  BY MS. ST. PETER-GRIFFITH:
12   Q.  Well, do you know whether you had --
13  whether Abbott had a written policy after
14  entering into the 2003 CIA incident to the Ross
15  settlement?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Well, Abbott created a
18  number of policies.
19  BY MS. ST. PETER-GRIFFITH:
20   Q.  Okay.  Do you recall a policy
21  concerning fraud and abuse being one of them?
22       MS. TABACCHI:  Object to the form.

33 (Pages 684 to 687)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 688

1        THE WITNESS:  I don't know what you
2   mean by the fraud and abuse.
3   BY MS. ST. PETER-GRIFFITH:
4        Q.   Ma'am, what do you recall about Abbott
5   maintaining a code of business conduct at any
6   time?
7        A.   I recall that Abbott's had a code of
8   conduct.
9        Q.   How long has -- did Abbott maintain a
10  code of written -- maintain a written code of
11  conduct?
12       A.   Oh, I think for many years.
13       Q.   Where would this -- where would you as
14  an Abbott employee access this code of written
15  conduct?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I would think we would
18  have gotten it from our human resources
19  department.
20  BY MS. ST. PETER-GRIFFITH:
21       Q.   Did you participate at all in any
22  drafting of any portion of the code of business

Page 689

1   conduct at any time during your tenure as an
2   Abbott employee?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Well, I think there was a
5   revision done some -- sometime in the 2000s.  And
6   I -- I believe I looked at a draft.
7   BY MS. ST. PETER-GRIFFITH:
8        Q.   Do you recall whether that was before
9   or after the Ross CIA?
10       A.   I don't remember.
11       Q.   Do you recall Abbott's code of business
12  conduct in 1999?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  I know we had -- I'm
15  pretty sure we had a business -- a code of
16  conduct, yes.
17       MS. ST. PETER-GRIFFITH:  If you can
18  mark this as the next exhibit, please.
19       (Exhibit Tobiason 022 marked.)
20  BY MS. ST. PETER-GRIFFITH:
21       Q.   Ma'am, my focus is going to be upon
22  page 16.  And I'm sorry.  Is your page 16 folded

Page 690

1   over?
2        MS. ST. PETER-GRIFFITH:  Or is yours,
3   Tina?
4        MS. TABACCHI:  Mine is okay.
5        THE WITNESS:  Yes.
6   BY MS. ST. PETER-GRIFFITH:
7        Q.   Okay.  Ma'am, if we could just swap out
8   our page 16s.
9        A.   Mm-hmm.
10       Q.   Thank you.
11            And my particular focus on questioning
12  -- on questions is going to be in the Medicare
13  Fraud & Abuse Laws section.
14       A.   Mm-hmm.
15       Q.   First, ma'am, do you recognize what's
16  been marked as Tobiason Exhibit 22?
17       A.   Yeah, this looks like our code of
18  conduct.  Yes.
19       Q.   Okay.  Do you recall reading this code
20  of conduct?
21       A.   Oh, I'm sure I did at some point.
22       Q.   Okay.

Page 691

1        A.   When, I don't remember.
2        Q.   Ma'am, if you could look at -- on page
3   16.
4        A.   Mm-hmm.
5        Q.   Under the section Medicare Fraud &
6   Abuse Laws.  Do you see that?
7        A.   Yes.
8        Q.   The first sentence reads:  "It is the
9   policy of the Company to comply, and all
10  employees shall comply, with all applicable
11  federal and state fraud and abuse or 'anti-
12  kickback' laws and regulations as well as all
13  applicable provisions of the Federal False Claims
14  Act."
15            Do you see that?
16       A.   Yes.
17       Q.   What did you as the manager of home
18  infusion reimbursement services do to ensure that
19  home infusion reimbursement services complied
20  with all federal and state fraud and abuse or
21  anti-kickback laws and regulations and the
22  federal False Claims Act?

34 (Pages 688 to 691)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 692

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Well, I followed any
3   policies and procedures that we had, and I also
4   conformed with that I was told.
5   BY MS. ST. PETER-GRIFFITH:
6      Q.  Okay.  When you say you followed any
7   policies and procedures, what policies and
8   procedures?
9      A.  Well, we did have policies and
10  procedures on how to submit claims.
11     Q.  Okay.  How do you know that they were
12  in compliance with state or federal anti-kickback
13  fraud and abuse -- or anti-kickback or fraud and
14  abuse laws or the federal False Claims Act?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  Well, our legal
17  department was involved with.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Were they involved with developing
20  those policies and procedures?
21     A.  Well, a lot of policies and procedures
22  were involved with just how -- how often you did

Page 693

1   follow up, a lot of the just operational issues.
2        But I don't know how this would apply
3   to -- the legal department approved all the
4   arrangements that we had.
5      Q.  Okay.  But how did you as the manager
6   of reimbursement services know that your staff
7   was not violating fraud and abuse laws or anti-
8   kick -- the anti-kickback statutes or the federal
9   False Claims Act?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  Can you be more specific?
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Sure.  Did you have any way of
14  monitoring whether or not the policies and
15  practices within your home infusion unit complied
16  with state and federal fraud and abuse, anti-
17  kickback statutes, or the federal False Claims
18  Act?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  Well, we made sure that
21  we followed medical necessity.  There were rules
22  and regulations regarding medical necessity, that

Page 694

1   -- that the physician had to fill in the CMNs --
2   we weren't allowed to fill in the CMNs -- that we
3   put the correct information on the claim form
4   regards to the diagnosis and the products.  We
5   made sure that what the pharmacy dispensed was
6   what we put on the claim form.
7        We put a lot of emphasis on making sure
8   that we got the patient's permission to bill and
9   that we followed appropriate claims submission
10  rules.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Well, how did you know that -- what was
13  appropriate claims submission rules in term --
14  how did you know that those rules complied with
15  the anti-kickback laws or fraud and abuse laws
16  and the False Claims Act?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  Well, we -- if we had any
19  -- I don't remember any specific questions.  But
20  we would have used our legal department.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Did your legal department review your

Page 695

1   policies, practices, and procedures within home
2   infusion to ensure that you were not violating
3   any fraud and abuse laws or the federal False
4   Claims Act?
5        MS. TABACCHI:  Object to the form.
6        You can answer that question without
7   revealing the substance --
8        THE WITNESS:  Mm-hmm.
9        MS. TABACCHI:  -- of any communications
10  with counsel, if there are any.
11        MS. ST. PETER-GRIFFITH:  Well, hold on.
12  Tina, are you taking the position that Abbott
13  will not be relying upon any advice-of-counsel
14  defense with regard to such compliance?
15        MS. TABACCHI:  I -- I only am
16  cautioning the witness that to the extent that
17  she can answer yes or no or some similar answer
18  without revealing the substance of any specific
19  conversation she had with counsel that that's my
20  preference.  I'm not instructing her not to
21  answer the question.
22        I just don't want her to reveal the

35 (Pages 692 to 695)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 696

1    substance of a specific conversation until I have
2    a chance to discuss that with her.  I don't know
3    what privileged conversations might be triggered
4    by your inquiry.
5          MS. ST. PETER-GRIFFITH:  Can you read
6    back the question, please?
7          (Record read.)
8          THE WITNESS:  I don't remember
9    specifically if -- what -- what policies or
10   procedures legal looked at.  And I don't know --
11   I can't say if they looked at them regards to the
12   -- the fraud and abuse statutes.  I just don't
13   know.
14   BY MS. ST. PETER-GRIFFITH:
15      Q.  Well, then how do you know that the
16   policies, practices, and procedures within the
17   home infusion reimbursement department didn't
18   violate fraud and abuse laws or the False Claims
19   Act?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  We tried to bill as
22   accurately as possible.  We put -- our -- our

Page 697

1    concern was getting the information correctly and
2    putting it on the claim form.  Medical necessity,
3    we worried about that, and we also wanted to make
4    sure that what we -- what products were used,
5    what was actually dispensed to the -- to the
6    patient.
7    BY MS. ST. PETER-GRIFFITH:
8       Q.  How did you ensure that your actual
9    billing, meaning the charges that you charged to
10   Medicare and Medicaid, did not violate fraud and
11   abuse laws, the anti-kickback statute, or the
12   False Claims Act?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  That wasn't my decision
15   to the charges.
16   BY MS. ST. PETER-GRIFFITH:
17      Q.  Whose decision was it?
18      A.  The customer's.
19      Q.  Whose responsibility was it to ensure
20   that the billing and the claims submitted by
21   Abbott on behalf of the customer complied with
22   fraud and abuse laws, the anti-kickback statute,

Page 698

1    and the federal False Claims Act?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  I think that's a very
4    hard question to answer.  The customers were
5    ultimately responsible.
6    BY MS. ST. PETER-GRIFFITH:
7       Q.  But did Abbott have a role in making
8    decisions regarding claims submission --
9          MS. TABACCHI:  Object to the form.
10   BY MS. ST. PETER-GRIFFITH:
11      Q.  -- on behalf of the customer?
12      A.  In what regard?
13      Q.  In any regard.
14         MS. TABACCHI:  Object --
15         THE WITNESS:  Well, I mean, there's a
16   lot of things with claims submission.  As I
17   mentioned, in terms of policies and procedures on
18   medical information, we would review these
19   procedures with the customer.  We would review
20   all our policies and procedures with the
21   customer.  So we tried to adhere to what the
22   customer wanted.

Page 699

1          We did not set prices.  The prices was
2    the customer's responsibility.
3    BY MS. ST. PETER-GRIFFITH:
4       Q.  Did you have an understanding that
5    causing a false claim to be submitted violated
6    the anti-kickback statute or the federal False
7    Claims Act?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  Well, my understanding is
10   that, you know, there -- there is a False Claims
11   Act, yes.
12   BY MS. ST. PETER-GRIFFITH:
13      Q.  Okay.  And how did the home infusion
14   unit ensure that when it submitted claims on
15   behalf of its home infusion clients that it was
16   not violating any state fraud and abuse laws or
17   the anti-kickback statute?
18         MS. TABACCHI:  Object to the form.
19   Asked and answered.
20         THE WITNESS:  It was we followed any
21   legal re -- legal -- if legal had requirements,
22   we followed them.

36 (Pages 696 to 699)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 700

BY MS. ST. PETER-GRIFFITH:
1
2    Q.   Okay.  What were the legal requirements
3 that you can recall that you -- that you followed
4 to ensure that you didn't violate any fraud and
5 abuse laws or the False Claims Act?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  You know, I'm not a
8 lawyer.  I don't know what the specifics of the
9 Fraud and Abuse Act are.  All I know is that we
10 did follow policies and procedures.  We tried to
11 get the medical necessity correct.  We coded them
12 as appropriately as possible.  We wanted to make
13 sure the coding was -- identified the products
14 correctly, and we used customers' prices.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.   But how -- if you used customers'
17 prices and the customer pricing that you used
18 violated the fraud and abuse laws and the federal
19 claims -- the federal False Claims Act when
20 submitted, would you submit those claims?
21        MS. TABACCHI:  Object to the form.
22 Object to the form.

Page 701

1        THE WITNESS:  It would be -- if the
2 customer approved it, I -- they would have
3 checked it with their legal department.
4 BY MS. ST. PETER-GRIFFITH:
5    Q.   So you then would rely upon the
6 customer to ensure that the billing that was done
7 through the home infusion unit did not violate
8 the federal fraud and abuse laws and the False
9 Claims Act.
10        MS. TABACCHI:  Object to the form.
11 This has been asked and answered.
12        THE WITNESS:  I -- the customer would
13 take the information initially regarding the
14 patient.  So therefore, we followed what the
15 customer said.  In many cases, the customer sent
16 out the medical necessity forms.  Sometimes we'd
17 do it.  And they would set the prices.
18        We would follow their requirements.  If
19 they had special requirements of their legal
20 department, we would follow it because I assume
21 that they -- well, not assume.  I knew that they
22 would have checked it with their legal

Page 702

1 department.
2        MS. ST. PETER-GRIFFITH:  Okay.  Why
3 don't we take a break to change the tape.
4        THE VIDEOGRAPHER:  We are off the
5 record --
6        MS. TABACCHI:  Take a break for --
7        THE WITNESS:  Lunch.
8        MS. TABACCHI:  -- for lunch here?  It's
9 after 12:00.
10        MS. ST. PETER-GRIFFITH:  Sure.
11        THE VIDEOGRAPHER:  We are off the
12 record at 12:02 p.m. with the end of Tape No. 2.
13        (Lunch recess taken.)
14
15
16
17
18
19
20
21
22

Page 703

1        AFTERNOON SESSION
2
3        THE VIDEOGRAPHER:  We are back on the
4 record at 1:07 p.m. with the start of Tape No. 3.
5
6        VIRGINIA TOBIASON,
7 called as a witness herein, having been
8 previously duly sworn and having testified, was
9 examined and testified further as follows:
10
11        EXAMINATION (Resumed)
12 BY MS. ST. PETER-GRIFFITH:
13    Q.   Ms. Tobiason, before the break, we were
14 talking about the Medicare/Medicaid Fraud & Abuse
15 Laws section of the code of business conduct.
16 And prior to the break, you'd referenced that the
17 prices are set by the client.  Can you -- page
18 16.  Can you explain what you meant by that?
19    A.   What I meant was that the -- I guess
20 the charges that we charge insurance companies
21 for the services and products they provided --
22 you know, that were provided were set by the

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Page 704

1  customers.
2      Q.  What about the charges to Medicaid and
3  Medicare?
4      A.  Oh, they would set those.
5      Q.  Medicaid and Medicare would set those?
6      A.  No, they would -- the clients would set
7  their usual and customaries.
8      Q.  Okay.  Were the clients' usual and
9  customaries at all predicated upon or based upon
10 the AWPs published for the Abbott products that
11 they used?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  I -- I don't know.  They
14 set their -- they -- they determined their
15 methodology and what prices they set.  I -- I
16 wasn't involved in that decision.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Was there any consideration at all
19 within the home infusion unit given to reporting
20 to Medicaid or Medicare the AWP spreads on the
21 Abbott products utilized by the consignment
22 partners for which Abbott Home Infusion

Page 705

1  reimbursement was submitting claims on behalf of
2  their clients?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  Could you repeat that?
5  That was -- had a lot in it.
6         MS. ST. PETER-GRIFFITH:  Could you read
7  that back, please?
8         (Record read.)
9         MS. TABACCHI:  Object to the form.
10        THE WITNESS:  Not that I'm aware of,
11 no.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Who would make a decision as -- about
14 whether or not AWP spreads needed to be reported
15 to Medicaid or Medicare for the claims submitted
16 by home infusion reimbursement?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  I don't know.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Other than relying upon advice from the
21 home infusion client, was there any other way or
22 manner that Abbott Home Infusion reimbursement

Page 706

1  ensured that when it submitted claims on behalf
2  of a home infusion client that it was not
3  violating federal or state fraud and abuse or
4  anti-kickback laws or the False Claims Act?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  Well, we had policies and
7  procedures.  I had -- we -- it was -- there was
8  ongoing audits of the specialist claims to make
9  sure they adhered to our policies and procedures.
10        We also were audited by government
11 payors at times.  So I felt pretty comfortable
12 that we were submitting claims correctly.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  What policies and procedures are you
15 referencing?
16     A.  Well, we had reimbursement policies and
17 procedures on -- that were operational in nature,
18 as well as -- and we also followed -- we went to
19 training sessions by Medicare and Medicaid so
20 that we made sure that we followed what they
21 required and tried to incorporate in our policies
22 what we were told by the different carriers.

Page 707

1      Q.  Okay.  What specific policies and
2  procedures did Abbott Home Infusion have or
3  maintain that ensured that they did not violate
4  the state and federal fraud and abuse, anti-
5  kickback statutes, or the False Claims Act?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  We did policies and
8  procedures so that we conform with what the
9  payors required.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Okay.  What were those policies and
12 procedures?
13     A.  I don't remember them specifically, but
14 they were -- there were policies on -- on getting
15 the information up front, the types of insurance,
16 the -- the re -- there were policies on getting
17 the assignment of benefit forms, the medical
18 necessity, follow-up on the HCFA 1500.
19        Also making sure that what did the
20 payors require?  Were there specific
21 requirements?  Also, you know, running different
22 reports like the aging report, follow-up on

38 (Pages 704 to 707)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

| | |
|---|---|
| Page 708 | Page 710 |

**Page 708**

1  outstanding claims, things like that.  There were
2  -- there was a fair amount of operational issues.
3      Q.  Well, how did those operational issues
4  or the policies governing those operational
5  issues ensure that Abbott Home Infusion was not
6  violating applicable federal and state anti-
7  kickback statutes or the False Claims Act?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  Our goal was to submit
10  claims as accurately as possible in compliance
11  with what the payors required.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  But if the payors -- I'm sorry -- if
14  the clients were giving you false information
15  concerning the pricing on their services that
16  they were providing, how would you know that
17  before you submitted a claim on their behalf?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  Why would I assume they
20  were giving us false information?
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Would you have a way of checking

**Page 709**

1  whether or not they were giving you false or
2  inflated charges to bill to Medicaid or Medicare?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  Inflated, I -- I -- the
5  clients had put together their -- their charges.
6  I -- I -- they always seemed reasonable to me.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  They always seemed reasonable to you?
9      A.  Well, I didn't look at every charge, to
10  be honest with you.  I have no -- I shouldn't
11  have said that.  That's incorrect.  I didn't look
12  at the individual charges.
13          But, you know, there were audits, and
14  Medicare audited certain things, and there was
15  never any -- any indication that these charges
16  weren't in line.
17      Q.  What Medicare audits do you recall?
18      A.  Well, I remember there were -- there
19  were a couple of Medicare audits.
20      Q.  When were they?
21      A.  I don't remember the exact time.
22      Q.  Do you remember the decade?

**Page 710**

1      A.  I think -- I think one was in the --
2  could have been in the 1990s.  I don't remember.
3      Q.  Any --
4      A.  Early probably.
5      Q.  Okay.  Were they both in the '90s?
6      A.  I don't remember.
7      Q.  And how do you know that those Medicare
8  audits -- strike that question.
9          And did you do anything else within
10  home infusion to ensure that Abbott's home
11  infusion practices and procedures did not violate
12  the anti-kickback statutes and regulations or the
13  federal False Claims Act?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  Our goal was to submit
16  the claims as correctly as possible in accordance
17  with what the payors required.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  But how do you know you complied with
20  the law?
21          MS. TABACCHI:  Object to the form.
22          THE WITNESS:  Well, we went to training

**Page 711**

1  sessions by the payors.  We did -- we checked to
2  make sure that the reimbursement specialists
3  followed the guidelines.  We -- if there was --
4  if there was a payment change or there was -- we
5  mon -- we -- we looked at denials of claims to
6  make sure that we were doing them appropriately.
7  And we changed our policies if there were
8  changes.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Did you attend any training by Medicare
11  or Medicaid concerning these consignment
12  arrangements that served as the predicate for the
13  business model for Abbott Home Infusion?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  I -- they would have
16  training sessions on -- on requirements for home
17  infusion for Medicare, enteral and parenteral,
18  and the DME benefit, and we attended those.  If
19  it was discussed, I don't really remember
20  discussions about it.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Do you --

39 (Pages 708 to 711)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 712

1    A.  But it could have been gone over.  They
2  could have.
3    Q.  Do you recall it being gone over?
4    A.  No.
5    Q.  Do you recall anyone at all ever
6  discussing with any state or Medicaid -- Medicaid
7  official -- any state Medicaid official or any
8  federal Medicare official these consignment
9  arrangements for which Abbott Home Infusion was
10  billing?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I'm not aware of any.
13  BY MS. PETER-GRIFFITH:
14    Q.  Where were these policies and
15  procedures that you've referenced in your
16  testimony maintained?
17    A.  They were maintained in the
18  reimbursement department.
19    Q.  Do you know where they are today?
20    A.  No.
21    Q.  Would you have retained them and
22  preserved them incident to a litigation hold

Page 713

1  memorandum?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  If they met the
4  requirements of the litigation hold, yes, I think
5  we would have.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Do you recall specifically whether any
8  were maintained --
9        MS. TABACCHI:  Object --
10  BY MS. ST. PETER-GRIFFITH:
11    Q.  -- in response to a litigation hold
12  memorandum?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  No, I don't.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.  Are you familiar with the closure of
17  the Abbott Home Infusion unit?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  I'm aware that they
20  closed it, yes.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  Were you involved in any way with the

Page 714

1  closure?
2    A.  No.
3    Q.  Did you retain any materials, any
4  policies or procedures, guidebooks, anything from
5  your days in home infusion that you took with you
6  after you left home infusion?
7    A.  No.
8    Q.  Where did you leave your -- any
9  reference materials that you had, including
10  policies and procedures, when you left home
11  infusion?
12    A.  They would have been in the home
13  infusion reimbursement department.
14    Q.  Okay.  Now, Ms. Tobiason, earlier today
15  we went over a series of documents.  And you have
16  in front of you Exhibits 5, 7, 8, 11, 15, and 16,
17  which on their face appear to deal with the
18  Medicare working group.  We went over those
19  earlier today.
20        I just have some general questions
21  about --
22    A.  Mm-hmm.

Page 715

1    Q.  -- Abbott's -- first of all, if these
2  documents were -- were -- came from -- were
3  supplied to the United States by Abbott's counsel
4  and were represented as being business records of
5  Abbott, would you have any reason to doubt that?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I have no reason, no.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  Was there any business practice that
10  you're aware of at Abbott whereby individuals who
11  were addressees on particular memoranda would not
12  receive the memoranda?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  No, except that these
15  would go through interoffice mail and regular
16  mail.  If they got there, they -- I mean, I would
17  assume they did, but I don't know for a fact.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Well, would you have any reason to
20  doubt the accuracy or the ability to receive --
21  the accuracy of interoffice mail?
22    A.  No.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 716

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  No.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Okay.  Were you aware of any problems
5  in terms of the receipt of documents through
6  interoffice mail within -- within Abbott Home
7  Infusion?
8    A.  No.
9    Q.  What about Abbott-wide?  Are you
10  familiar with any major problem receiving
11  documents from other divisions within Abbott when
12  you were in home infusion?
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  No, not really, except
15  they had to get everything correct on the
16  envelopes.  So things got missed, but I wouldn't
17  say it was -- it would be more an exception.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Well, do you have any reason to doubt
20  that any of the documents that you reviewed
21  earlier today that I just referenced wouldn't
22  have come to you if they were addressed to you?

Page 717

1      MS. TABACCHI:  Object to the form.
2      THE WITNESS:  I -- I assume they would
3  have come to me.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Ms. Tobiason, with regard to Exhibits
6  9, 14, 17, 20, and 19, these are documents which
7  don't on their face reference the Medicare
8  working group, but they pertain to Medicare-type
9  issues and were generally derived from either Ms.
10  Sensibaugh, Mr. Rieger, or Mr. Miller.
11      Would you have any reason to doubt that
12  you received any of those documents if they were
13  addressed to you via interoffice mail?
14    A.  I would assume they got there, yes.
15    Q.  What did you do when you received these
16  documents?  Did you just not address them?
17      MS. TABACCHI:  Object to the form.
18      THE WITNESS:  I don't recall.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  You've obviously received a number of
21  correspondence that we've shown you here today.
22  There might be other correspondence that -- that

Page 718

1  we're unaware of.
2      Based upon the exhibits that we've seen
3  here today, do you have any doubt that you were a
4  member of a group called the Medicare working
5  group and that you worked on Medicare-type
6  issues, including AWP issues?
7      MS. TABACCHI:  Object to the form.
8      THE WITNESS:  I believe I was on the
9  Medicare working group.  The specific subjects, I
10  don't remember what I worked on.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  What was your practice when you
13  received a document such as the memoranda that --
14  that we saw here today?
15      MS. TABACCHI:  Object to the form.
16      THE WITNESS:  Well, in general, if I
17  got a document, I might read it; I might not.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Okay.  Under what circumstances would
20  you not read a document that you received?
21    A.  Depends how busy I was.
22    Q.  Did you receive a lot of memoranda

Page 719

1  during the day?
2      MS. TABACCHI:  Object to the form.
3      THE WITNESS:  My primary responsibility
4  was the operations of home infusion services.
5  So, therefore, if there were -- if I -- if I had
6  a lot of work to do with -- with reimbursement
7  services, if I got a memo on things that weren't
8  -- may not be directly related, I may not have
9  read it.  I may not have even acknowledged it.  I
10  may have put it aside to read later.  I -- I
11  really don't know what I did with any of these
12  documents.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Ms. Tobiason, we've deposed now a
15  number of people in this case, many of whom refer
16  to you as the reimbursement guru, not just for
17  home infusion, but for Abbott HPD itself.  Would
18  you agree with that characterization of your role
19  within Abbott HPD?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  The reimbursement guru?
22  Well, there weren't many people in HPD dealing

41 (Pages 716 to 719)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 720

1   with reimbursement at that time. So since I was
2   doing infusion services, that may be why they
3   referred to me.
4   BY MS. ST. PETER-GRIFFITH:
5       Q. Well, do you know -- well, strike that.
6       A. There was nobody -- I mean --
7       Q. Did individuals come to you outside of
8   home infusion with reimbursement questions?
9           MS. TABACCHI: Object to the form.
10          THE WITNESS: Well, possibly. I -- I
11  don't really remember any specifics.
12          MS. ST. PETER-GRIFFITH: I'd like to
13  mark the next composite package -- oh, dear -- as
14  the next exhibit.
15          And this is a composite, Tina, of
16  several -- a series of several e-mails.
17          MS. TABACCHI: Are we on 23 now?
18          MS. ST. PETER-GRIFFITH: Yeah, I
19  believe so.
20          (Exhibit Tobiason 023 marked.)
21  BY MS. ST. PETER-GRIFFITH:
22      Q. And, ma'am, my focus is going to be on

Page 721

1   the content of the actual e-mail themselves.
2       A. Okay.
3           MS. TABACCHI: Ann, my copy is
4   highlighted. Do you want to trade me?
5           MS. ST. PETER-GRIFFITH: Oh, my. Yes.
6   That would explain -- that would explain why I
7   thought I didn't have any questions on one of
8   them.
9           MS. TABACCHI: I could have kept that
10  to myself.
11          MS. ST. PETER-GRIFFITH: Oh, Tina. I
12  know you wouldn't have done that.
13  BY MS. ST. PETER-GRIFFITH:
14      Q. Ma'am, this composite Exhibit 23 is a
15  series of e-mails.
16      A. Mm-hmm.
17      Q. I realize that the first one labeled is
18  11/22/02. They're a little bit out of sequence.
19      A. No, the first one says 2000.
20      Q. I'm sorry. 2000, yes.
21      A. Mm-hmm.
22      Q. And then there's an 11/15/2001 and then

Page 722

1   11/16/2001. Actually, I don't think they are out
2   of sequence now that I look at that.
3       A. Mm-hmm.
4       Q. Ma'am, do you recognize these e-mail?
5       A. No.
6       Q. Do you recognize that you are an
7   addressee on each of the e-mails, either as a cc
8   or someone directed on the To line?
9       A. Yes.
10      Q. Who is Rosemary Haas?
11      A. Rosemary Haas works in our federal
12  government affairs.
13      Q. Do you know why Ms. Haas would have
14  included you either as a cc or an addressee on
15  each of these e-mail?
16          MS. TABACCHI: Object to the form.
17          THE WITNESS: No.
18  BY MS. ST. PETER-GRIFFITH:
19      Q. Do you recall at all being involved on
20  any Medicare or Medicaid legislative matters in
21  or around late 2000 or in 2001?
22          MS. TABACCHI: Object to the form.

Page 723

1           THE WITNESS: I believe in 2000 and
2   2001, I was in our diagnostics division and I
3   dealt with diagnostic devices.
4   BY MS. ST. PETER-GRIFFITH:
5       Q. Okay. Which diagnostic devices did you
6   deal with?
7       A. Lab test.
8       Q. Okay.
9       A. Clinical laboratory test.
10      Q. Do you know then why Ms. Haas would
11  include -- let me strike that.
12          Would your role in the diagnostics
13  division create a reason for Ms. Haas to send you
14  information concerning AWP reform in late 2000 or
15  in 2001?
16          MS. TABACCHI: Object to the form.
17          THE WITNESS: No.
18  BY MS. ST. PETER-GRIFFITH:
19      Q. Do you know why you're on these e-mail?
20      A. No.
21      Q. Were you -- did you regularly receive
22  e-mail when you were an Abbott employee --

42 (Pages 720 to 723)

Henderson Legal Services, Inc.

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                  January 22, 2008
Chicago, IL

Page 724

1        MS. TABACCHI:  Object --
2   BY MS. ST. PETER-GRIFFITH:
3        Q.  -- or during your tenure at Abbott?
4        A.  On what?
5        MS. TABACCHI:  Object to the form.
6   BY MS. ST. PETER-GRIFFITH:
7        Q.  On anything.
8        A.  Oh, I get e-mails on things, yeah,
9   sure.
10       Q.  Okay.  Was the e-mail system originated
11  or did it originally become commonplace in or
12  around '92?  Do you recall that?
13       MS. TABACCHI:  Object to the form.
14       THE WITNESS:  God, I have no idea.
15  BY MS. ST. PETER-GRIFFITH:
16       Q.  Do you recall receiving e-mails in the
17  '90s?
18       A.  Yes.  I believe so, yes.
19       Q.  Do you know approximately how many e-
20  mails a day you received in the '90s?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  No clue.

Page 725

1   BY MS. ST. PETER-GRIFFITH:
2        Q.  Okay.
3        A.  I don't, really.
4        Q.  Did you use e-mail with some -- any
5   frequency that you can recall in the 1990s?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I -- I suppose I did.  I
8   would think if it was available, then I would
9   have used it, yes.
10  BY MS. ST. PETER-GRIFFITH:
11       Q.  Do you recall receiving e-mails in the
12  '90s on a regular basis or on a daily basis?
13       A.  Oh, I'm sure, I did, yeah.  If it was
14  up and running and I was on it, yes, I'm sure I
15  did.
16       Q.  If you received a litigation hold memo,
17  how would you retain your e-mails?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  Well, the litigation
20  hold, typically there wouldn't have been a
21  deletion of e-mails.  There's a system that
22  deletes e-mails, and they would have just kept

Page 726

1   them on my system.
2   BY MS. ST. PETER-GRIFFITH:
3        Q.  Okay.  So you relied upon them being
4   saved on your system as opposed to, for example,
5   individually printing them out and saving them
6   separately in a file?
7        MS. TABACCHI:  Object to the form.
8   BY MS. ST. PETER-GRIFFITH:
9        Q.  In a hard-copy file.
10       A.  I would have -- yeah, or I would have
11  put them in a folder on my system.
12       Q.  Okay.  You mean on your computer
13  system?
14       A.  Yes, mm-hmm.
15       Q.  Okay.  When you left home infusion, did
16  you take your computer with you?
17       A.  No.
18       Q.  What would have happened to those e-
19  mails that were saved in the folder on your
20  computer system, on your PC?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I -- I don't -- I would

Page 727

1   assume that IT would have kept them, yes.
2   BY MS. ST. PETER-GRIFFITH:
3        Q.  Okay.  Would you have done anything to
4   alert in-house counsel or Ellen Klaus or anyone
5   else responsible for the collection of documents
6   that you might have e-mail responsive to lit hold
7   memos saved on your PC?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  Well, they -- I believe
10  they would have had them by then, yes.
11  BY MS. ST. PETER-GRIFFITH:
12       Q.  Okay.  Were they regularly downloaded
13  and saved or provided to the in-house legal
14  department who was collecting this information?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  Yes, I believe so.  Yes.
17  BY MS. ST. PETER-GRIFFITH:
18       Q.  Do you recall how that worked?
19       A.  I don't remember.  It's too long ago.
20       Q.  Ma'am, do you recall at your earlier
21  deposition when Mr. Breen was questioning you in
22  the Texas case that he asked you a series of

43 (Pages 724 to 727)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 728

1  questions about TAP?  Do you remember that?
2      A.  I remember there were questions about
3  TAP.  I don't remember the specifics.
4      Q.  Okay.  What did you know in or around
5  2001 about TAP or the TAP criminal plea or the
6  TAP civil settlement or the TAP CIA?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  I pretty much knew what
9  was put in the newspapers.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Anything else?
12     A.  Not really, no.  Not that I remember,
13 no.
14     Q.  Did you ever discuss TAP with anyone?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  In -- in what regard?
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  In any regard.
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Well, I -- there could
21 have been a discussion that -- that this happened
22 to TAP.

Page 729

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay.  What --
3      A.  I mean --
4      Q.  Who did you have that discussion with?
5      A.  Oh, I have no idea.
6      Q.  Did you ever have any discussions with
7  Mike Tootell about TAP or the consequences of the
8  TAP criminal plea, civil settlement, or CIA?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  There could have been a
11 discussion where we discussed that TAP -- you
12 know, that there was a -- that they -- I don't --
13 I don't -- that they had a corporate integrity
14 agreement or whatever.  I don't even -- that they
15 -- that they -- I don't even remember what
16 happened.  I -- that they settled or what.  But
17 they did pay a fine.  I think I remember
18 discussing with Mike that there was a big fine.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Do you recall ever discussing with Mike
21 any need to evaluate -- strike that.
22         Do you recall ever discussing with

Page 730

1  anyone the need to evaluate either Ross products
2  division's or HPD products division's policies
3  and practices to ensure that HPD and Ross didn't
4  have the same problems that TAP had?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Well, I wasn't exactly
7  sure of the same problems.  You'd have to tell me
8  what problems.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Sure.  Spread marketing.
11     A.  I don't recall having discussions with
12 Mike about spread marketing.
13     Q.  Did you ever discuss with Mike or
14 anyone else the need to make any presentations to
15 either the sales force or any Ross or HPD
16 employees concerning the ramifications of TAP?
17         MS. TABACCHI:  Object to the form.
18         THE WITNESS:  No.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Do you recall creating any documents
21 concerning TAP or TAP spread marketing activity
22 or spread marketing activity in general?

Page 731

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  No.
3          MS. ST. PETER-GRIFFITH:  Mark this as
4  the next exhibit, please.
5              (Exhibit Tobiason 024 marked.)
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Ma'am, do you recognize this document?
8      A.  I think it -- it might -- yeah, I think
9  I recognize it vaguely.
10     Q.  What is this document?
11     A.  Well, I think it was a -- a draft
12 presentation.
13     Q.  Okay.  And who drafted this draft
14 presentation?
15     A.  I think Mike Tootell drafted it.
16     Q.  If Mike Tootell testified that you
17 drafted most of this presentation, would that
18 surprise you?
19         MS. TABACCHI:  Object to the form.  Are
20 you representing to Ms. Tobiason that that's what
21 Mr. Tootell testified under oath?
22         MS. ST. PETER-GRIFFITH:  That's what

44 (Pages 728 to 731)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
                              Chicago, IL

Page 732

1   I'm representing to Ms. Tobiason.
2        THE WITNESS:  I don't remember creating
3   this document.  Don't recall.  But it certainly
4   has some things that relate to our -- our
5   reimbursement policy that I may have helped with.
6   BY MS. ST. PETER-GRIFFITH:
7        Q.  Okay.  And which portions do you think
8   you may have helped with?
9        A.  The physician must determine the
10  specific patient diagnosis.
11       Q.  Which page are you looking at, ma'am?
12       A.  I don't know.  I can't find page
13  numbers.
14       Q.  Do you have a -- any --
15       A.  Medical Necessity.
16       Q.  What's the Abbott DOJ-E number at the
17  bottom?  I know it's a small number.
18       A.  0545916.
19       Q.  Okay.  Is there any other document that
20  you could have -- within this presentation that
21  you could have drafted?
22       A.  I -- I just don't remember.  It looks

Page 733

1   like some of this stuff conforms with some of the
2   -- our -- our reimbursement policy, like
3   "Encourage Customer to check with DMERC on Codes
4   and Medicare Allowances."
5        That -- let's see.  Because -- I mean,
6   a lot of -- some of this stuff is very specific
7   like to Glucerna and Ross products, so that
8   wouldn't have been me.
9        The physician must determine specific.
10  Do not fill out HCFA 1500 claim form.
11       Q.  Okay, ma'am.  Why don't we do this.
12       A.  I mean, there's -- it's just woven into
13  it, some of the things from our policy that I may
14  have just reiterated with him.  I don't really
15  remember doing this -- this presentation.
16       Q.  What do you recall?  Let's start with
17  this.  What do you recall about this draft
18  presentation?
19       A.  I remember that I seemed to have
20  received it, and I think Mike sent it to me.
21       Q.  Do you remember drafting any portion of
22  it at all?

Page 734

1        A.  I don't remember sitting down and
2   typing these words, no.
3        Q.  Which pages do you believe you may have
4   had input into?
5        A.  Let's see.
6        Q.  If you could identify them by the
7   Abbott DOJ-E number, that would be helpful.
8        A.  Well, 0545906.
9        Q.  Okay.
10       A.  "Medicare is Complicated."
11       Q.  You think you included that?
12       A.  Well, I say that.
13       This next page was the "Always Lease
14  Pump Contract."  I'm not familiar with the Ross
15  contracting arrangements.
16       Oh, page 0545911.  "Can show Publicly
17  Available Reimbursement Codes and Reimbursement
18  Amounts."
19       Q.  Is there anything else on this page
20  that you would have been responsible for the
21  content of?
22       MS. TABACCHI:  Object to the form.

Page 735

1        THE WITNESS:  Well, I'm not sure
2   responsible.  Just explained to him what our
3   policy was.
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  Well, do you know what "Cannot 'Sell
6   the Spread'" means?
7        A.  Well, I think this refers to that we
8   don't want to -- from like the OIG marketing
9   compliance guidelines.
10       Q.  Okay.
11       A.  Don't discuss the difference between
12  what the customer gets reimbursed and what they
13  pay.
14       Q.  Okay.  And that was a policy in 2001,
15  correct?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  When was this
18  presentation from?
19  BY MS. ST. PETER-GRIFFITH:
20       Q.  2001.
21       A.  Mm-hmm.  I -- I don't really remember.
22       Q.  Do you recall --

                                    45 (Pages 732 to 735)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 736

1       A.  There could have been a policy.  I -- I
2   -- I don't remember.
3       Q.  Do you recall when those OIG guidelines
4   came into existence?
5       A.  Oh, I don't.  I don't remember.  The
6   early 2000s.
7       Q.  When did you first become familiar with
8   them?
9           MS. TABACCHI:  Object to the form.
10          THE WITNESS:  When they were issued.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Any other pages that you believe you
13  might have had input into the content of?
14      A.  I wouldn't have had anything on
15  Glucerna.
16          As we mentioned, 0545916, I might have
17  had input into "Medical Necessity."
18          And 0545917, "Medicare Forms."
19          And 0545918, we always -- that we
20  couldn't waive the copay.  I think that's
21  probably where I had input.
22      Q.  What about the sections dealing with

Page 737

1   TAP, for example, 0545903?
2       A.  No.
3       Q.  And '04?  You're certain --
4       A.  I am --
5       Q.  And '05, you're certain that you didn't
6   have any input on that?
7       A.  I -- yes.
8           MS. TABACCHI:  Object to the form.
9           THE WITNESS:  As to my recollection,
10  yes, because I wasn't even that aware of what the
11  specifics from the TAP agreement were.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Well, if Mr. Tootell doesn't believe
14  that he wrote it and you don't believe that you
15  wrote it, who would have written it?
16          MS. TABACCHI:  Object to the form.
17          THE WITNESS:  All I can tell you is
18  that I did not write this.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Do you know Mike Tootell?
21      A.  Yes.
22      Q.  Do you think he's an honest,

Page 738

1   trustworthy guy?
2           MS. TABACCHI:  Object to the form.
3           THE WITNESS:  Yes, I think -- I think
4   Mike is honest and trust -- I think he's honest,
5   yes.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.  Do you know any reason why we would
8   have -- that we would have to doubt his testimony
9   concerning the content of this particular
10  document?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  I'm not doubting his
13  testimony.  I -- I'm just telling you what I
14  remember.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Is it possible that you could have
17  written those TAP sections and you just don't
18  remember?
19          MS. TABACCHI:  Object to the form.
20  Asked and answered.
21          THE WITNESS:  I -- to the best of my
22  recollection, I did not write those -- that TAP

Page 739

1   section.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  But is it possible that you did?
4           MS. TABACCHI:  Object to the form.
5   Asked and answered.
6           THE WITNESS:  No, I don't believe it's
7   possible.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.  Why not?
10      A.  I just -- I just didn't follow the
11  specifics of the TAP.  And I believe -- I -- I
12  believe Mike wrote those.
13      Q.  Ma'am, if you'll recall at your last
14  deposition, there was a document that you
15  indicated you had provided to Ms. Tobiason I
16  believe the day before the deposition.  Can you
17  confirm that --
18          MS. ST. PETER-GRIFFITH:  Actually, can
19  we mark that as the next --
20          MS. TABACCHI:  You might want to fix --
21  you have her providing a document to herself.
22          MS. ST. PETER-GRIFFITH:  Okay.  I'm

46 (Pages 736 to 739)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 740

1 sorry.
2 BY MS. ST. PETER-GRIFFITH:
3    Q.  That you provided a document to Ms.
4 Tabacchi.  There are too many -- two Ts.
5        What I'd like to do is mark this next
6 exhibit.  And I'm going to ask you whether or not
7 this is the document that you provided to Ms.
8 Tabacchi.
9        MS. TABACCHI:  And I don't want to
10 split hairs here.  But just for clarification, do
11 you want to know whether she provided it to me
12 specifically or to her lawyers?  Because if
13 you're asking her me specifically, we didn't have
14 a specific exchange.  I think you care about
15 whether she gave it to counsel, right?
16        MS. ST. PETER-GRIFFITH:  Yes, although
17 you told me that the day of her -- the second day
18 of her deposition that she gave it to you the
19 night before.
20        MS. TABACCHI:  Not me personally.
21        MS. ST. PETER-GRIFFITH:  Okay.  Well,
22 then perhaps I misunderstood.

Page 741

1        If we could mark that as the next
2 exhibit.
3        MS. TABACCHI:  I'm trying to help you
4 out.  I don't want to answer no to a question --
5        MS. ST. PETER-GRIFFITH:  Sure.  I
6 understand.
7        (Exhibit Tobiason 025 marked.)
8        THE WITNESS:  Thank you.
9        (Off-the-record discussion.)
10 BY MS. ST. PETER-GRIFFITH:
11    Q.  Ma'am, do you recognize this document?
12    A.  No.
13    Q.  You don't recognize this document?
14    A.  No.
15    Q.  Did you give this document to counsel
16 for Abbott?
17    A.  Not that I recall, no.
18    Q.  Well, if --
19        MS. TABACCHI:  Do you want to go off
20 the record or --
21        MS. ST. PETER-GRIFFITH:  Yeah, why
22 don't we go off the record for a second.

Page 742

1        THE VIDEOGRAPHER:  We are off the
2 record at 1:52 p.m.
3        (Off-the-record discussion.)
4        (Recess taken.)
5        THE VIDEOGRAPHER:  We are back on the
6 record at 2:03 p.m.
7 BY MS. ST. PETER-GRIFFITH:
8    Q.  Ms. Tobiason, let me ask you.  The
9 document that's been marked as Deposition Exhibit
10 25 -- is that correct?  Am I on the right number?
11    A.  Yes.
12    Q.  Do you recognize that document?
13    A.  Yes.
14    Q.  What is that document?
15    A.  I believe it was a presentation that
16 was given to the Ross sales force.
17    Q.  And at your deposition -- the last time
18 we convened for your deposition, in my initial
19 questions to you, I asked you whether you
20 searched for any documents.
21    A.  Mm-hmm.
22    Q.  And you had indicated that you had and

Page 743

1 that you turned over a document concerning the
2 Ross meeting to legal counsel.  Is this document
3 the document that you found and referenced in
4 your testimony?
5    A.  Yes.  I believe so, yes.
6    Q.  Since your last deposition, have you
7 searched for and found any other documents?
8    A.  Well, we've been through -- I've looked
9 in my files and legal counsel's also looked at my
10 -- at my computer.  And we've turned over
11 everything we believe relates to this.
12        MS. ST. PETER-GRIFFITH:  Okay.  And,
13 Tina, do you know whether everything that Ms.
14 Tobiason has just referenced has been turned
15 over?
16        MS. TABACCHI:  I am sorry.  I'm not
17 responsible for the document production.  So we
18 can ask Carol or Jason.  I'm not aware of
19 anything else, but I'm not -- really not the
20 right person to ask.
21 BY MS. ST. PETER-GRIFFITH:
22    Q.  Okay.  Well, let me ask you this, Ms.

47 (Pages 740 to 743)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 744

1  Tobiason.  Do you recall when those searches were
2  made and conducted?
3      A.  Oh, last year sometime.
4      Q.  When you say last year, do you mean
5  '07?
6      A.  Yeah.  Could have been '06, '7.  I
7  don't remember exactly.
8      Q.  Do you recall whether --
9      A.  But we went through a lot of files.
10     Q.  Do you recall whether it was before or
11  after your first deposition?
12     A.  I don't recall.
13     Q.  Okay.  So you do recognize Exhibit 25.
14  And in March when you were deposed, in response
15  to some of Mr. Breen's questions, you indicated
16  that you gave a presentation to the Ross sales
17  force.
18     A.  Well, I was involved in a presentation
19  to the Ross sales force.
20     Q.  Okay.  Is that -- when you say you were
21  involved, does that mean that you attended and
22  were involved in the preparation of the content

Page 745

1  but that the actual presentation was -- was
2  delivered by other people?
3      A.  I think I was involved in the content,
4  and I also was available for Q&A, but I believe
5  somebody else gave this presentation.  I don't
6  remember giving this specific presentation.
7          MS. ST. PETER-GRIFFITH:  If you can
8  mark this as the next exhibit.
9          (Exhibit Tobiason 026 marked.)
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Ma'am, have you ever seen this document
12  before that's been marked as Exhibit 26?
13     A.  I haven't seen this, no.
14     Q.  Okay.  If I represent to you that this
15  is a document that came from the HHS OIG files
16  and it was represented to HHS OIG as being a
17  transcript of the October 1, 2003, safeguarding
18  trust presentation, does that help familiarize
19  you with this document?
20     A.  Yes, I remember Gary Flynn did speak.
21     Q.  Okay.  And was the -- the meeting that
22  you assisted with in 2003, was that the October

Page 746

1  1, 2003, safeguarding trust presentation to the
2  Ross sales force?
3          MS. TABACCHI:  Object --
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Do you recall?
6          MS. TABACCHI:  -- to the form.
7          THE WITNESS:  Do you remember where
8  this was?
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  It was in Columbus, Ohio.
11     A.  I believe so.  I can't remember totally
12  100 percent, but I believe so.
13     Q.  Okay.  Well, let me -- let me ask you
14  this.  What is the safeguarding trust program or
15  presentation?
16          MS. TABACCHI:  Object to the form.
17          THE WITNESS:  I just -- I would have
18  just had a piece of it.  I don't really know how
19  to describe the safeguarding trust.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  Well, is it -- was it a presentation
22  that was put together in furtherance of the -- of

Page 747

1  Abbott's obligations under the corporate
2  integrity agreement?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  Well, I believe so.
5  There were training requirements, as I remember.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  What was your involvement in compliance
8  issues for the Ross CIA?
9          MS. TABACCHI:  Object to the form.
10          THE WITNESS:  Hmm.  Well, I wasn't
11  responsible for adhering to the Ross CIA or -- or
12  specifically developing, deciding on the
13  training.  I -- I was responsible for working on
14  reimbursement policies, helping with that, and
15  also ensuring that -- you know, that we -- for
16  reviewing materials to make sure that we adhered
17  to those guidelines.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Adhered to what guidelines?
20     A.  The reimbursement policy.
21     Q.  Other than reimbursement policies, did
22  you review any other policies or initiatives

48 (Pages 744 to 747)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
                              Chicago, IL

Page 748

1  developed in conformity with the requirements of
2  the Ross CIA?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  I'm not sure what
5  specifically.  I know that at times I was in
6  meetings where we'd discuss other policies, but
7  they were general OEC policies.  They may not
8  have been directly related to the Ross CIA.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Well, if Ms. Tomlinson testified that
11  you reviewed all of the policies and the
12  procedures that they put together before they
13  were submitted to HHS OIG, would that surprise
14  you?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  No.  They were
17  reimbursement policies.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Just reimbursement policies?
20     A.  Yes.
21     Q.  Were there any other policies or
22  procedures that you reviewed incident to the Ross

Page 749

1  CIA?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Not that I'm aware of,
4  no.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Do you recall exactly which policies or
7  procedures pursuant to the Ross CIA you were
8  responsible for reviewing or developing?
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Well, if they were on the
11  -- involved with the reimbursement, I -- they
12  probably were.  I did review them.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Anything else?
15     A.  Not -- not that I remember.
16     Q.  Now, the document that was marked as
17  Exhibit 25, did you write that?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  When you say write, do
20  you mean --
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Did you draft any portion of it, or

Page 750

1  were you responsible in any way for its content?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  I believe I reviewed it.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Okay.  Who put it together?  Who
6  drafted it?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  I -- I think it might
9  have been Julie, but I'm -- I don't want to -- I
10  just don't remember exactly.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Well, other than Ms. Tomlinson, do you
13  know of anyone else who would have been
14  responsible for developing these materials?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  Well, I -- I really don't
17  know.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Well, who do you recall being
20  responsible or involved with the development of
21  reimbursement policies and procedures incident to
22  the Ross CIA?

Page 751

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  Well, it would have been
3  the divisions, legal, the OEC department.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Who within either the OEC department,
6  legal, or the divisions may have also had a hand
7  in developing Exhibit 25?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I would think those were
10  the ones.  But there could have been others.  I
11  just don't know.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  But who -- who in terms of actual
14  individuals, the names of the actual individuals
15  within those particular areas that may have been
16  responsible for helping develop Exhibit 25?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Names?  Well, Julie.  I
19  don't remember who was legal.  I don't remember
20  the legal counsel.  And I don't remember who else
21  at OEC at Ross, or if it was OEC at Abbott.  I
22  just don't remember who was involved.

                              49 (Pages 748 to 751)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 752

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Other than assisting with the review of
3  reimbursement policies and procedures, did you
4  have any other role in working on or ensuring
5  compliance with the requirements of the Ross CIA?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Could you repeat that
8  question?
9          MS. ST. PETER-GRIFFITH:  Sure.
10         Could you read it back, ma'am?
11         (Record read.)
12         THE WITNESS:  My responsibility was
13  solely with reimbursement.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Okay.  So the answer is no?
16     A.  I guess, yeah.  If I can understand the
17  question, yeah.
18     Q.  Well, let me rephrase it.  Other than
19  working on reimbursement policies and procedures,
20  what else did you work on in furtherance of the
21  Ross CIA?
22     A.  Not -- nothing else to my knowledge,

Page 753

1  no.
2          MS. ST. PETER-GRIFFITH:  If we can mark
3  this as the next exhibit.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  And, ma'am, I've tagged the page that I
6  --
7      A.  Mm-hmm.
8      Q.  -- would like you to turn to.
9      A.  Okay.
10         MS. ST. PETER-GRIFFITH:  I understand
11  it's a thick document.
12         Oh, my gosh, Tina.  I think I just gave
13  you mine.
14         MS. TABACCHI:  Well, I don't want
15  yours.  It would have your secret notes on it.
16         MS. ST. PETER-GRIFFITH:  It's actually
17  my secret folds.
18         MS. TABACCHI:  27?
19         MS. ST. PETER-GRIFFITH:  27, yes.
20         (Exhibit Tobiason 027 marked.)
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  And, ma'am, what I'd like you to do is

Page 754

1  compare Exhibit 27 where I've marked to Exhibit
2  25.  And can you just confirm that the content of
3  Exhibit 25 is the same as the marked -- beginning
4  on the marked page of Exhibit 27?
5          MS. TABACCHI:  You want her -- you want
6  her to compare every page of 25 and match it up?
7          MS. ST. PETER-GRIFFITH:  I just want
8  her to see if for her -- to her satisfaction
9  whether they appear to be the same content.
10         THE WITNESS:  Yes.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Okay.  Ma'am, I'm going to represent to
13  you that Exhibit 27 is a copy of the Safeguarding
14  Trust PowerPoint presentation that was submitted
15  to HHS OIG as part of the materials provided to
16  HHS OIG concerning Abbott's compliance with the
17  Ross CIA.
18         To your recollection, was Exhibit 25,
19  which you indicated you participated in
20  reviewing, included as part of the presentation
21  that is represented in Exhibit 27?
22         MS. TABACCHI:  Object to the form.

Page 755

1          THE WITNESS:  Well, it appears to be,
2  yes.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Do you recall when the presentation
5  that is identified as Exhibit 27 was made at the
6  Safeguarding Trust October 1, 2003, meeting?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  No, I don't remember.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Do you recall fielding any questions
11  concerning reimbursement matters at the October
12  1, 2003, meeting?
13     A.  No, I don't.
14     Q.  Do you recall why you didn't identify
15  for Mr. Breen when he first asked you about this
16  meeting in 2003, why you didn't identify for him
17  that it was a Ross CIA meeting?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I may not put -- I just
20  know it was a Ross training meeting.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Okay.  And it pertained to Medicare,

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 756

1  correct?
2      A.  Well --
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  -- it was a Ross training
5  meeting.  I -- I didn't -- I probably didn't -- I
6  know they did a Ross training meeting.  That's
7  what I -- I -- that's the way I think of it.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay.  But the Ross training dealt with
10  Medicare and Medicaid, fraud and abuse, the anti-
11  kickback statute, the False Claims Act, et
12  cetera.  Correct?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  Well, I remember being
15  there for this presentation.  I'm not sure that I
16  was there for the other presentations.  So I
17  remember this presentation.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Okay.  But this presentation that you
20  helped work on dealt with the anti-kickback
21  statute, the False Claims Act, and Medicare and
22  Medicaid fraud and abuse in the reimbursement

Page 757

1  context.  Is that correct?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  Well, it -- it's -- it --
4  I -- I view it as dealing with reimbursement
5  information and support.  And there are
6  references to the anti-kickback statute and the
7  False Claim Act.  I don't know exactly what was
8  specifically discussed about them.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  Well, do you recall working on those
11  materials in -- in preparing the presentation?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  I believe I reviewed the
14  materials, yes.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Okay.  And why did you review the
17  materials?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I -- I just -- because I
20  was in the ethics and compliance department and I
21  dealt with reimbursement issues.
22  BY MS. ST. PETER-GRIFFITH:

Page 758

1      Q.  What are your responsibilities in the
2  ethics and compliance department dealing with
3  reimbursement?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  Well, I think I -- at
6  that point I helped develop our reimbursement
7  policy.  If questions came up involving some
8  specific issues in Medicare, I would try to -- I
9  could research them or attempt to answer them.
10      I also worked on trying to secure --
11  worked with the divisions on coverage and coding
12  for a number of our products, especially devices.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Anything else?
15      A.  Oh, I would review -- if there were
16  materials dealing with reimbursement, I was
17  responsible for reviewing them.  For example, if
18  they were issuing CPT codes, I would go through
19  to make sure that the CPT codes looked correct.
20  If there was -- if they wanted to issue a
21  publicly available policy, I would make sure that
22  it was the most recent coverage policy from the

Page 759

1  carriers, things like that.
2      Q.  Do you recall who was a covered person
3  under the Ross CIA?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  Covered person?  Covered
6  person?  No.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Do you recall whether you were?
9         MS. TABACCHI:  Object to the form.
10         THE WITNESS:  You know, I don't know.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Did anyone ever tell you that you were
13  a covered person under the Ross CIA?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I don't know.  They may
16  have.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Well, who within the Ross ethics -- or
19  who within Abbott ethics and compliance was
20  responsible for tracking who was a covered person
21  under the CIA?
22         MS. TABACCHI:  Object to the form.

51 (Pages 756 to 759)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 760

1       THE WITNESS:  I don't know.
2       MS. ST. PETER-GRIFFITH:  If you could
3  mark this as the next exhibit, please.
4       (Exhibit Tobiason 028 marked.)
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Before you take a look at that --
7    A.  Mm-hmm.
8    Q.  -- Ms. Tobiason, I actually have a
9  couple of questions.  When Mr. Breen questioned
10  you in March about presentations that you had
11  made concerning Medicare or Medicaid, you'd
12  referenced that you'd made a -- you'd gone to
13  Puerto Rico to give a presentation, correct?
14    A.  Yes.
15    Q.  Was that also a presentation that was
16  made incident to the Ross CIA?
17    A.  No.
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  Oh, sorry.  Sorry, Tina.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Did you give any presentations in
22  Puerto Rico incident to the Ross CIA?

Page 761

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  No.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Ma'am, you've been handed what's been
5  marked as Exhibit 28.  Do you recognize this
6  document?
7    A.  Hmm.  Yes, I think this was a policy
8  that was created.
9    Q.  Did you participate in the creation of
10  that policy?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  I don't remember
13  participating in it.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  Is this a policy that applied to -- or
16  applied Abbott-wide?
17    A.  It says it applies to Abbott's ethics
18  compliance program globally.
19    Q.  Okay.  So did it apply Abbott -- does
20  that mean it applied Abbott-wide?
21    A.  I would think so, yes.
22    Q.  And this policy deals with Medicare and

Page 762

1  Medicaid fraud and abuse, correct?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  Well, this policy deals
4  with that they'll update the code.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Okay.  And they'll update the code to
7  include the additional materials that are set
8  forth in the policy, right?
9       MS. TABACCHI:  Object to the form.
10       THE WITNESS:  Attachment A.  Well, it
11  appears to apply to the code.  I don't see
12  Attachment A, so I assume that's it.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Are you familiar with this policy,
15  ma'am?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Are -- are you referring
18  to this policy or this (indicating)?  I'm
19  confused.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  I'm referring to this entire package,
22  Exhibit 28.

Page 763

1    A.  Well, this first is a policy on
2  updating the code.
3    Q.  Okay.  And does the September 8th,
4  2003, document that begins on the third page of
5  Exhibit 28, does that reflect how the code is
6  going to be updated?
7    A.  Well, that's what appears, yes.
8    Q.  And my question to you, ma'am, is, are
9  you familiar with this?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  Yes.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Ma'am, to your knowledge, did Abbott
14  undertake any initiative to evaluate whether its
15  policies, practices, and procedures for the
16  Hospital Products division complied with the
17  policy outlined in Exhibit 28?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  What's 28, this
20  (indicating)?
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  This.

52 (Pages 760 to 763)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL          January 22, 2008
                              Chicago, IL

Page 764

1    A.  Oh, you mean about the code?
2    Q.  The provisions that are set forth in
3  the code, ma'am.
4        MS. TABACCHI:  I'm sorry.  Would you
5  mind rereading the question or -- I'm not sure
6  what the question is.
7        (Record read.)
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I don't -- to be honest
10 with you, I don't know if this was the -- a broad
11 Abbott policy or just a -- refers to Ross.  So I
12 don't know if this applies to hospital products,
13 but that's -- because it talks here about the --
14 the covered persons and corporate integrity
15 agreement.  So I don't know if this -- this was
16 used with hospital products or not.  I just don't
17 know.  I wouldn't be -- I wouldn't know that
18 answer.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  Okay.  If you look at page 3 of this
21 document.
22   A.  Page 3.  Yeah.  Well --

Page 765

1    Q.  It references, "The purpose of this
2  memorandum is to update Abbott's Code of Business
3  Conduct."  Do you see that?
4    A.  I -- I do see that in this document
5  (indicating).  I don't see it in the other
6  document.
7    Q.  Well, do you see under Purpose on the
8  first page of this memo?
9    A.  Mm-hmm.
10   Q.  "This Corporate Office of Ethics and
11 Compliance Procedure sets forth the Abbott
12 Laboratories Code of Business Conduct."
13       Do you see that?
14   A.  I do, on this document.
15   Q.  Well, do you -- I mean, ma'am, I'll
16 represent to you that I personally photocopied
17 these pages together from the HHS OIG file.  They
18 are a document that is together.  At least they
19 were provided to HHS OIG as a document that was
20 together by Abbott.
21   A.  Well, if you say so.  Okay.
22   Q.  Okay?  Do you have any reason to

Page 766

1  believe that this policy was not implemented?
2    A.  Oh, I have no reason to --
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  I -- I have no reason to
5  believe it wasn't.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Okay.  And my question to you is, are
8  you aware of any initiative to evaluate whether
9  the Hospital Products division complied with this
10 particular policy?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  Well, this was sent to
13 officers, employees, and agents of Abbott
14 Laboratories.  So my assumption would be that
15 they were expected to comply with it.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Okay.  But was there any evaluation
18 done as to whether or not Abbott HPD was already
19 conforming to this policy at the time that this
20 particular policy was implemented?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  I wouldn't know that

Page 767

1  answer.
2  BY MS. ST. PETER-GRIFFITH:
3    Q.  Were you at all involved in any
4  evaluation of Abbott HPD's policies, practices,
5  and procedures concerning its compliance with
6  federal and state fraud and abuse laws?
7        MS. TABACCHI:  Object to the form.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  At any time.
10   A.  If it dealt with our reimbursement
11 policy, I was involved in -- as -- with all the
12 divisions on reimbursement policies.
13   Q.  Okay.  What reimbursement policies were
14 you involved with pertaining to Medicaid and
15 Medicare fraud and abuse?
16   A.  I was respon --
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I'm sorry.
19       I was involved with our policy that we
20 created in OEC on reimbursement information and
21 support.
22 BY MS. ST. PETER-GRIFFITH:

53 (Pages 764 to 767)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 768

1    Q.  Okay.  Did that pertain to Medicaid and
2  Medicare fraud and abuse?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  It was pertaining to the
5  information we provided to customers about
6  reimbursement and the support services we
7  offered.  Whether that was involved with the
8  fraud and abuse, I -- you'd have to ask legal.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Okay.  Well, did you work with legal on
11 the policies?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  Yes.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  What do you recall about the content
16 concerning Medicaid and Medicare fraud and abuse?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  I don't remember specific
19 discussions about how it connected to fraud and
20 abuse.  But I -- that -- I -- I'm not as familiar
21 with the fraud and abuse statute as -- I'm just -
22 - I'm not a lawyer.

Page 769

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Okay.  But as a reimbursement
3  individual, did you have concerns about ensuring
4  that the company that you worked for with regard
5  to reimbursement practices and procedures
6  complied with federal and state Medicaid and
7  Medicare fraud and abuse statutes?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I was concerned that
10 Abbott comply with all regulations.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Okay.  And what did you do to ensure
13 that they were in compliance with federal and
14 state Medicare and Medicaid fraud and abuse
15 statutes?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I -- we -- we discussed
18 with legal certain things that we felt were
19 appropriate and not appropriate.
20       MS. TABACCHI:  I want to just caution
21 the witness not to reveal the substance of any --
22       THE WITNESS:  Right.

Page 770

1        MS. TABACCHI:  -- communications
2  between you and the lawyers.
3        MS. ST. PETER-GRIFFITH:  Okay.  In
4  making that instruction, are you making a
5  representation at this time, Tina, that Abbott
6  does not intend to rely upon an advice-of-counsel
7  defense in this case?
8        MS. TABACCHI:  I don't understand what
9  your question is.  I'm just trying to make sure
10 that we don't waive privilege as to some specific
11 communication that she had with a lawyer.  It
12 sounded like that's where you were headed with
13 her.
14       MS. ST. PETER-GRIFFITH:  Well, to the
15 extent that the development of a policy or
16 procedure with Abbott counsel might be relied
17 upon at a later point in time as a defense in
18 this matter, I think I've got the right to
19 inquire as to the substance of those
20 communications unless you're willing to represent
21 to me right now that you don't -- that Abbott
22 does not intend to assert an advice-of-counsel

Page 771

1  defense.
2        MS. TABACCHI:  I don't understand your
3  question.
4        If you have a question for Ms.
5  Tobiason, go ahead.
6        MS. ST. PETER-GRIFFITH:  Are you
7  prepared to make that representation, Tina?
8        MS. TABACCHI:  No, I'm not making that
9  representation.
10       MS. ST. PETER-GRIFFITH:  But you're
11 instructing her not to answer --
12       MS. TABACCHI:  I didn't instruct her
13 not to answer.
14       MS. ST. PETER-GRIFFITH:  Could you read
15 back the question, please?
16       (Record read.)
17       THE WITNESS:  That was the legal
18 responsibility.
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  When you say that was the legal
21 responsibility, what do you mean?  What do you
22 mean?  That was the responsibility of the legal

54 (Pages 768 to 771)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 772

1  department?
2      A.  Well, if there was a policy written
3  that they would review it to make sure it was in
4  compliance with the statutes.
5      Q.  What discussions did you have with
6  counsel concerning that?
7          MS. TABACCHI:  I'm --
8          THE WITNESS:  I don't think I can
9  answer that.
10         MS. ST. PETER-GRIFFITH:  Are you
11 instructing her not to answer?
12         MS. TABACCHI:  I'd like to take a
13 break.
14         MS. ST. PETER-GRIFFITH:  Okay.  Why
15 don't we take a break.  We've got to change the
16 tape anyway.
17         THE VIDEOGRAPHER:  We are off the
18 record at 2:37 p.m. with the end of Tape No. 3.
19             (Recess taken.)
20         THE VIDEOGRAPHER:  We are back on the
21 record at 2:59 p.m. with the start of Tape No. 4.
22         MS. ST. PETER-GRIFFITH:  I'd like to

Page 773

1  ask the court reporter to just identify where we
2  last left off.
3              (Record read.)
4          MS. ST. PETER-GRIFFITH:  Where do we
5  stand, Tina?  May Ms. Tobiason answer the
6  question?
7          THE WITNESS:  Repeat the question.
8              (Record read.)
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  About that.  Well, I
11 don't remember any specific conversations with
12 counsel about fraud and abuse.  We were creating
13 a policy regarding reimbursement information and
14 support.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Okay.  What do you recall about your
17 conversation -- or let me ask you.  Did you have
18 any conversations with anyone at Abbott about
19 whether in formulating these reimbursement
20 policies Abbott needed to look at or disclose its
21 AWP spreads, either historically or current?
22         MS. TABACCHI:  Object to the form.

Page 774

1          THE WITNESS:  AWP spreads.  I don't
2  recall any discussions.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Were you ever advised that maintaining
5  high AWP spreads may contravene the False Claims
6  Act or anti-kickback statutes?
7          MS. TABACCHI:  Object to the form.
8          I'm going to caution the witness not to
9  reveal the substance of communications with
10 counsel.
11         THE WITNESS:  I'm not aware of any
12 conversations, no.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Were you aware of any obligation to
15 report AWP spreads?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  AWP spreads.  No.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  What was your understanding of Abbott's
20 respons -- Abbott HPD's responsibility to report
21 -- or strike that.
22         What was your understanding of whether

Page 775

1  Abbott had any duties with regard to its price
2  reporting?
3          MS. TABACCHI:  Object to the form.
4          THE WITNESS:  Price reporting?  I don't
5  know what you mean.  Price reporting to whom?
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Price reporting to either Medicaid or
8  Medicare or to the pricing compendia.
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  Well, reporting to the
11 pricing compendia whatever they did, that wasn't
12 my responsibility.  So I didn't even know what
13 they reported.
14         And in terms of other entities, I'm not
15 aware of any issues.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Did you have any understanding as to
18 whether reporting to the pricing compendia may
19 have impacted reimbursement on Abbott HPD
20 products or drugs?
21         MS. TABACCHI:  Object to the form.
22         I'm sorry.  Would you mind reading that

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 776

1    back?  I'm not sure I heard the last part.
2            (Record read.)
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  Well, my understanding
5    was the pricing compendia set AWP, and in certain
6    cases we were required to -- we -- payors may
7    have had requirements for us to bill AWP.  So
8    there would have been -- they would have been
9    reimbursed off of some methodology of AWP which
10   was set by the drug databases.
11   BY MS. ST. PETER-GRIFFITH:
12       Q.  What was your understanding of how list
13   price reporting by Abbott HPD impacted the
14   calculation of AWP?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I didn't do that.  I
17   don't know.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.  Did you have any understanding about
20   AWP or how it was calculated?
21       MS. TABACCHI:  Object to the form.
22   This is also duplicative of prior testimony.

Page 777

1        THE WITNESS:  Mm-hmm.  Well, I know
2    that we did do some reporting to drug databases.
3    There was some methodology the drug databases
4    employed to set AWP.  Whether it was based on
5    that or other -- or other -- I think they also
6    did surveys.  I -- I don't really know how they
7    set their prices.  That was really their
8    decision.  I mean, their AWP, they -- they made
9    that decision.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.  Do you have an understanding as to
12   whether or not Abbott's reporting of list prices
13   that exceeded their actual contract prices of
14   sometimes 100, 200, 300, 1000 percent might have
15   impacted the calculation of AWP?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I -- I have no idea what
18   our -- our contract prices were.
19   BY MS. ST. PETER-GRIFFITH:
20       Q.  Did you have any understanding as to
21   whether or not Abbott's HPD products and drugs
22   might have had high spreads?

Page 778

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  No.
3    BY MS. ST. PETER-GRIFFITH:
4        Q.  Did you ever hear that?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  Well, I heard that when
7    it came out in some newspaper articles.
8    BY MS. ST. PETER-GRIFFITH:
9        Q.  When was that?
10       A.  Oh, I don't know.  Recent.  It was a
11   few years ago.  I remember a New York Times
12   article on it.
13       Q.  Okay.  And did that raise any concerns
14   for you?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I -- that would be
17   speculation on my part.  It didn't raise any
18   concerns, no.
19   BY MS. ST. PETER-GRIFFITH:
20       Q.  Did you as an Abbott HPD employee have
21   any concerns about whether your division may be
22   engaging in the same conduct for which TAP may

Page 779

1    have gotten into trouble?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Well, I'm not really
4    clear on what TAP got in trouble for.  So I never
5    made a connection between TAP and hospital
6    products.
7        MS. ST. PETER-GRIFFITH:  If we can mark
8    this next exhibit, please.
9            (Exhibit Tobiason 029 marked.)
10   BY MS. ST. PETER-GRIFFITH:
11       Q.  Ma'am, do you recognize this document?
12       A.  I don't remember it specifically, no.
13       Q.  Is it an e-mail that you drafted?
14       A.  It appears to be.
15       Q.  Do you recall a PhRMA letter that you
16   provided commentary on?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  Well, I'm not sure it's a
19   PhRMA letter.  There's a note here that says
20   "Amgen letter."
21   BY MS. ST. PETER-GRIFFITH:
22       Q.  Okay.  Well, it says "PhRMA," "Amgen."

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 780

1        Let me ask you, do you recognize that
2    handwriting?
3        A.  No.
4        Q.  Do you know what letter this particular
5    e-mail that you drafted to Adele Weinstein is
6    referencing?
7        A.  No.
8        Q.  Do you see where it says on the subject
9    line, "Thoughts on PhRMA letter"?  At the top.
10       A.  Yeah, I see that.
11       Q.  Okay.  Does that refresh your
12   recollection as to whether you might have been
13   providing commentary on a PhRMA letter?
14       A.  I -- I don't know.  I don't know if it
15   was a PhRMA letter or an Amgen letter.
16       Q.  Do you recall a PhRMA letter or an
17   Amgen letter?
18       A.  No.
19           MS. TABACCHI:  Object to the form.
20           THE WITNESS:  Sorry.  Sorry, Tina.
21   No.
22   BY MS. ST. PETER-GRIFFITH:

Page 781

1        Q.  Do you recall anything about providing
2    commentary on either a PhRMA or an Amgen letter?
3            MS. TABACCHI:  Object to the form.
4            THE WITNESS:  No.
5    BY MS. ST. PETER-GRIFFITH:
6        Q.  Do you know why you might have felt
7    that the mom -- the letter which appeared to be
8    "Mom and apple pie" was disturbing?
9        A.  Well, it says here, "The letter's main
10   point appears to be lobbying against the Average
11   selling price provision in the house bill."
12       Q.  Okay.  And why would that be
13   disturbing?
14       A.  I think that at this point we were
15   supporting -- and -- and I'm not the person who
16   was doing the -- the policy.  But I think we were
17   supporting an average selling price provision.
18       Q.  Okay.  And at the end of the first
19   paragraph it says, "And, as you know, we are
20   against an AWP based methodology."
21           Do you see that?
22       A.  I see that.

Page 782

1        Q.  Do you know what that means or what you
2    meant when you wrote that?
3        A.  I think that at this point we were
4    saying that we needed to have a different
5    methodology for reimbursement.
6        Q.  Why?
7            MS. TABACCHI:  Object to the form.
8            THE WITNESS:  You know, I -- I don't
9    really know why.  I just know that we were moving
10   towards a different methodology for payment for -
11   - for Medicare.
12   BY MS. ST. PETER-GRIFFITH:
13       Q.  Was that something that you supported?
14           MS. TABACCHI:  Object to the form.
15           THE WITNESS:  I think it was just what
16   it is.
17           MS. ST. PETER-GRIFFITH:  Can you mark
18   the next exhibit?
19           (Exhibit Tobiason 030 marked.)
20           THE WITNESS:  Thank you.
21   BY MS. ST. PETER-GRIFFITH:
22       Q.  Ma'am, do you recognize these -- these

Page 783

1    documents that comprise Composite Exhibit 30?
2        A.  I don't remember this, but --
3    specifically, no.
4        Q.  Well, are you familiar with the subject
5    matter of this series of e-mails?
6        A.  Yes.
7        Q.  Okay.  What is the subject matter of
8    this series of e-mails?
9        A.  I think there's a couple.  One is the -
10   - that ESRD drugs would be paid at some sort of
11   ASP and -- and also what would be the methodology
12   for ASP.
13       Q.  Okay.  And what is ASP?
14       A.  Average selling price.
15       Q.  Okay.  Is -- does this pertain to some
16   of the reform that was referenced in Exhibit 29?
17       A.  Where is 29?
18       Q.  29 was the one that you just reviewed.
19   It's the e-mail concerning the PhRMA/Amgen.
20       A.  Yes.  Appears to.
21       Q.  Ma'am, do you have any recollection as
22   to what your involvement was on the commentary

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 784

1  for the proposed rule on reforming Medicare Part
2  D drug payments?
3      A.  Part D?
4      Q.  Part B.
5      A.  Oh, Part B.  I don't remember if we --
6  we commented on this.  I do know that our -- I
7  think one of our main concerns is that during the
8  ASP calculation that the calculation be done
9  correctly.
10     Q.  Okay.  And what do you mean by
11  correctly?
12     A.  Well, that it -- it gets to the true
13  average selling price and as CMS has issued a
14  number of rules since then, you know, refining
15  the reporting requirements.
16     Q.  Okay.  And how -- how did Abbott
17  contend was the proper way to get at the correct
18  average selling price?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  Well, we believed that it
21  should include all the correct discounts.  There
22  was questions about the timing of taking rebates,

Page 785

1  and CMS has acknowledged that and correct -- and
2  -- and issued rules defining like a 12-month
3  rolling average to make sure that there's not
4  swings in ASPs.  I mean, there's been a lot of
5  back and forth to try and refine it to get the
6  most correct ASP possible.
7         MS. ST. PETER-GRIFFITH:  Could you mark
8  this as the next exhibit, please?
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  And, ma'am, I'm just going to ask you
11  generally about your recollection of --
12     A.  Mm-hmm.
13     Q.  -- of receiving this particular
14  document.  It's somewhat of a lengthy document.
15     A.  Sure.
16         (Exhibit Tobiason 031 marked.)
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Ma'am, do you recognize what's been
19  handed to you as Exhibit 31?
20     A.  Yes.
21     Q.  And can you tell us, what is this
22  document?

Page 786

1      A.  Well, it appears to be our final
2  comments on CMS's proposed AWP reform rule.
3      Q.  And there's an e-mail from Adele
4  Witenstein.  Do you see that?
5      A.  Yes.
6      Q.  And who is Ms. Witenstein?
7      A.  She's in our federal government affairs
8  office.
9      Q.  Okay.  And she's sending a copy, and
10  you're the first addressee on the To list -- are
11  you not? -- for this e-mail.
12     A.  I'm on the list, yes.
13     Q.  Do you have any doubts that you
14  received this document?
15     A.  I assume I received it, yes.
16     Q.  Why did you receive -- do you know why
17  she sent you this document?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  Well, because I was
20  involved with in OEC on reimbursement.  I don't
21  know if this is when I moved over to government
22  affairs yet or not.  I'm not sure.  I don't

Page 787

1  remember the date.
2         MS. ST. PETER-GRIFFITH:  If we can mark
3  this as the next exhibit, please.
4         (Exhibit Tobiason 032 marked.)
5         THE WITNESS:  Thank you.
6         MS. ST. PETER-GRIFFITH:  Record will
7  reflect the witness has been handed Exhibit 32.
8         THE WITNESS:  Mm-hmm.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  And, ma'am, do you recognize this
11  document?
12     A.  No, I don't remember it.
13     Q.  Does it appear to be another e-mail
14  from Ms. Weinstein addressed to you?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Yeah.  It's Witenstein,
17  yes.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Okay.  And do you have any recollection
20  of receiving this e-mail?
21     A.  No.
22     Q.  Do you have any recollection following

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL          January 22, 2008
                        Chicago, IL

Page 788

1  any of the steps outlined by Ms. Witenstein to
2  you?
3      A.  No.
4      Q.  Ma'am, I have just two more documents.
5      A.  Okay.
6      Q.  First, ma'am, do you recall a -- being
7  a member of or participating in a
8  Medicare/Medicaid task force?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't -- I don't know.
11  That's pretty broad.  I -- you'd have to be more
12  specific.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Do you recall any entity that you may
15  have led or may have participated in called the
16  Medicaid or Medicare task force?
17     A.  Oh, yeah, I did have -- when I was -- I
18  think I -- in government affairs, we had a task
19  force that updated divisions on different
20  policies.
21     Q.  Well, what was -- is that the
22  Medicare/Medicaid task force?

Page 789

1      A.  I don't remember the name of it.  I
2  think that's the name of it, but I don't
3  remember.
4      Q.  See if this will refresh your
5  recollection.
6          (Exhibit Tobiason 033 marked.)
7          MS. ST. PETER-GRIFFITH:  Let the record
8  reflect that the witness has been handed what's
9  been marked as Tobiason Exhibit 33.
10         THE WITNESS:  Mm-hmm.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Ms. Tobiason, do you recognize this
13  document?
14     A.  No, I don't remember it.  But it looks
15  like it's from me.
16     Q.  It's an e-mail --
17     A.  Mm-hmm.
18     Q.  -- from you to a whole series of
19  individuals?
20     A.  Yes.
21     Q.  Okay.  And the subject line reads,
22  "Medicare-Medicaid Task Force Meeting" --

Page 790

1      A.  Mm-hmm.
2      Q.  -- "September 15th"?
3      A.  Yes.
4      Q.  And then it reflects that the meeting
5  was canceled?
6      A.  Yes.
7      Q.  What was the Medicare/Medicaid task
8  force?
9      A.  Well, that was a group that was loosely
10  got together from the different divisions to just
11  -- we just updated everybody on if there were
12  updates involving Medicare and Medicaid.
13     Q.  Were you the head of that group?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I -- well, it wasn't
16  really there was a head.  I convened the
17  meetings.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Okay.  And how many meetings did the
20  Medicare/Medicaid task force have?
21     A.  I don't remember.
22     Q.  Do you remember what the time period

Page 791

1  was that it existed?
2      A.  Maybe a year.
3      Q.  Do you recall any conversations that
4  were conducted at the meetings of the Medicaid
5  and Medicare task force?
6          MS. TABACCHI:  I'm going to caution the
7  witness not to reveal the substance of any
8  communications with lawyers who --
9          THE WITNESS:  Mm-hmm.
10         MS. TABACCHI:  -- may have participated
11  in those meetings.
12         THE WITNESS:  Mm-hmm.  I think some of
13  it was -- each -- each division went around and
14  just talked about perhaps if they have a -- a
15  reimbursement issue, like, for example, if there
16  was a coverage issue at Ross or if there was a
17  state Medicaid program that was asking for
18  additional rebates or whatever.  There would just
19  be an update on if there were anything specific
20  that the divisions wanted to update others on.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Anything else?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 792

1     A.  That was mainly an update.  It was just
2  a way to update pretty much, I believe.
3     Q.  Were there any discussions about the
4  need to evaluate whether the various divisions
5  complied with federal and state Medicare and
6  Medicaid fraud and abuse laws?
7        MS. TABACCHI:  Again, I'm going to
8  caution the witness not to reveal the substance
9  of any attorney-client communications that may
10  have happened in the course of this meeting
11  involving a number of Abbott lawyers.
12        THE WITNESS:  Mm-hmm.  I don't remember
13  any specific conversations.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Were there any lawyers attending these
16  meetings?
17     A.  Yes.
18     Q.  What was the purpose of the lawyers
19  being at the meetings?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  I -- I think it was they
22  wanted to be updated.

Page 793

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Were they providing any legal advice at
3  these meetings?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  I don't -- I don't
6  remember.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Do you remember anything else about the
9  Medicare and Medicaid task force meetings?
10     A.  We had refreshments.
11     Q.  Okay.  Other than --
12        MS. TABACCHI:  It's that time of the
13  day.
14        THE WITNESS:  That was sort of a --
15  yes.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Anything other than that you had
18  refreshments?
19     A.  They weren't well-attended.  Let me put
20  it that way.
21     Q.  Okay.  Were they disbanded?
22     A.  Yes.

Page 794

1     Q.  Okay.  Why?
2        MS. TABACCHI:  Object to the form.
3        THE WITNESS:  Well, I -- I just think
4  that -- I don't know.  They just petered out.  It
5  just wasn't -- didn't seem necessary.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  Why didn't it seem necessary?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I -- I don't know.  It
10  was like it -- it was just that I -- I took a
11  different role in government affairs and didn't
12  continue them.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.  Did you initiate the meetings, the task
15  force?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  Yes -- well, there were -
18  - I -- I can't say that because we incorporated
19  some -- I -- I -- I -- I would say yes.  Okay.
20  Yes.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Why?

Page 795

1     A.  Well, because there may be things that
2  were going on with coding coverage.  Many things
3  in reimbursement that -- and a lot of them didn't
4  even cross divisions, but it was just so that
5  they -- so people would be informed in case, you
6  know -- so they knew what was going on in the
7  environment.
8     Q.  Were there any minutes maintained of
9  these particular meetings?
10     A.  No.
11     Q.  Were there any notes that were taken
12  concerning the meetings?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  I don't think -- there
15  was no official note taker.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Well, did you take notes?
18     A.  Maybe.  I don't remember.
19     Q.  Where -- where would you maintain your
20  notes?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  Well, I would have kept

60 (Pages 792 to 795)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                    January 22, 2008
Chicago, IL

Page 796

1  them in my office.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Do you still have them?
4      A.  I doubt it, no.
5      Q.  Why not?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  Well, they dealt with
8  perhaps a device or reimbursement issues.  I
9  don't keep everything that I -- that I have on
10 reimbursement.  There didn't seem to be any need
11 to keep these -- these notes.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  You mean other than the litigation hold
14 memos that you've received over the years?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  A lot of the discussion
17 didn't revolve around AWP.
18 BY MS. ST. PETER-GRIFFITH:
19     Q.  Did it revolve around Medicare or
20 Medicaid reimbursement?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  Not necessarily, no.  A

Page 797

1  lot of it was private.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Well, this was the Medicare or Medicaid
4  task force.
5      A.  It was just --
6          MS. TABACCHI:  Object to the form and
7  the tone.
8          THE WITNESS:  -- updates.  It was
9  updates.  And I don't -- I don't even remember
10 taking notes, to be honest with you.  I -- I
11 honestly don't remember.  And I didn't -- I never
12 thought that it revolved around the AWP
13 litigation.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Well, did it pertain to Medicare or
16 Medicaid?
17     A.  Well, it could have, yes.
18     Q.  And do you have a specific recollection
19 of taking any notes during these meetings?
20     A.  No, I do not.
21     Q.  Did you do anything to document these
22 meetings or the substance of these meetings?

Page 798

1      A.  No.
2      Q.  How does Abbott know what took place at
3  these meetings?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  What do you mean, what
6  does Abbott know?
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Meaning Abbott internally as a
9  business, as a corporation.  Was it important to
10 Abbott to maintain a record of what occurred at
11 these meetings?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  Well, I didn't think so,
14 but I was -- you know, I -- I didn't -- we just -
15 - were just updating on -- there wasn't -- I
16 didn't see any need.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Did you destroy any records concerning
19 the Medicare or Medicaid task force?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I don't know.  I don't --
22 I don't remember.  I don't know.  I just don't

Page 799

1  know.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  What have you done to ensure that
4  you've complied with the litigation hold memos
5  that you've received?
6      A.  I have gone through my files.  I have
7  gone through my e-mails.  I have gone through my
8  -- my files on my computer.  I have turned over -
9  - I -- there's -- there's other things besides
10 just this litigation.  I have tried to keep my
11 files, send them to legal when I see something
12 that -- that appears to be part of the hold.
13     Q.  Did anyone come and search your files
14 to ascertain what was part -- whether or not you
15 had documents that were part of the hold?
16     A.  Yes.
17     Q.  Who?
18     A.  Well, Gabe looked at my computer files.
19     Q.  Who is Gabe?
20     A.  Right here (indicating).
21     Q.  Oh, I'm sorry.
22         When did Gabe look at your computer

61 (Pages 796 to 799)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

```
                                   Page 800
 1   files?
 2        A.  Oh, last year sometime.
 3        Q.  Did you do anything else?
 4        A.  Anything else?  Well, I've gone through
 5   my files.
 6        Q.  Did anyone go through your files to
 7   ascertain whether you had documents responsive to
 8   any subpoena served by the United States or the
 9   relator in this case?
10        MS. TABACCHI:  Object to the form.
11        THE WITNESS:  I don't know.  I don't
12   remember.  I just know that -- that there's been
13   a lot of people looking at my files.
14   BY MS. ST. PETER-GRIFFITH:
15        Q.  Did you throw anything away in your
16   files?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  Well, I -- I throw things
19   away, yes, of course.
20   BY MS. ST. PETER-GRIFFITH:
21        Q.  What do you throw away?
22        A.  Well, things that seem to be outdated.
```

```
                                   Page 801
 1   I have a lot of things dealing with coverage,
 2   coding, devices, diagnostics, vascular, you name
 3   it.  We have a lot of divisions.  Diabetes
 4   products.  I -- I discard things that involve
 5   Medicare and Medicaid be -- you know, that may be
 6   related to other things than -- I mean, if I kept
 7   everything, I'd run out of space.
 8        Q.  Okay.  But have you destroyed anything
 9   pertaining to Medicaid or Medicare reimbursement
10   for either home infusion products or Abbott's HPD
11   drugs or products?
12        A.  Not that I'm aware of.
13        MS. ST. PETER-GRIFFITH:  Last exhibit
14   we'll mark today.
15        (Exhibit Tobiason 034 marked.)
16   BY MS. ST. PETER-GRIFFITH:
17        Q.  Ma'am, do you recognize this document?
18        A.  No.
19        Q.  It appears to be an e-mail from Sarah
20   McDaniel to Michael Tootell.  Do you see that?
21        A.  It does.
22        Q.  With a cc to Julie Shonk?
```

```
                                   Page 802
 1        A.  Yes.
 2        Q.  Do you recall ever telling Ms. Shonk,
 3   Ms. McDaniels, or Mr. Tootell or anyone else at
 4   Ross in and around 2003 that it was okay to
 5   communicate AWP Red Book information to Abbott
 6   customers?
 7        MS. TABACCHI:  Object to the form.
 8        THE WITNESS:  I don't really remember
 9   this.  Mm-mmm.
10   BY MS. ST. PETER-GRIFFITH:
11        Q.  You don't remember having such a
12   conversation?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  No, I don't.
15   BY MS. ST. PETER-GRIFFITH:
16        Q.  Would you at any time have told Ross --
17   anyone in the Ross products division or anyone
18   else at Abbott that it was okay to either
19   verbally or fax a copy of Red Book AWP
20   information on Abbott products to customers?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  I -- I thought our policy
```

```
                                   Page 803
 1   was to tell them to call the drug databases.
 2   BY MS. ST. PETER-GRIFFITH:
 3        Q.  Okay.
 4        A.  So I don't -- I don't know.  I might
 5   have; I don't know.  I don't remember.
 6        Q.  Well, if you had advised --
 7        A.  Mm-hmm.
 8        Q.  -- that it was okay to provide
 9   customers with AWP Red Book information in 2003,
10   would that have violated Abbott's policy?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  I think Abbott's policy
13   allowed centralized reimbursement functions to do
14   more than -- than -- and we did allow certain
15   entities to receive AWP information.
16   BY MS. ST. PETER-GRIFFITH:
17        Q.  What entities?
18        A.  Managed care.
19        Q.  Okay.  What about customers?
20        A.  I -- you know, I don't remember.
21        Q.  Could you have provided such advice?
22        MS. TABACCHI:  Object to the form.
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 804

1        THE WITNESS:  I could have; I just
2   don't remember.
3   BY MS. ST. PETER-GRIFFITH:
4        Q.   Would that advice have violated Abbott
5   policy?
6        MS. TABACCHI:  Object to the form.
7        THE WITNESS:  I -- I don't know if the
8   policy was in place then.
9   BY MS. ST. PETER-GRIFFITH:
10       Q.   Okay.
11       A.   I don't know which policies were in
12   place.
13       Q.   Well, if it wasn't -- if Abbott didn't
14   have a formal policy in place, would it have been
15   wrong to do so?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I don't necessarily think
18   it would have been wrong.  It just -- I don't
19   know what policy was in place.  It could have
20   been a violation of our policy; it may not have
21   been wrong.
22   BY MS. ST. PETER-GRIFFITH:

Page 805

1        Q.   Do you recall anything else about any
2   advice given to anyone within Abbott that you
3   might have given concerning the provision of AWP
4   Red Book information --
5        MS. TABACCHI:  Object to the form.
6   BY MS. ST. PETER-GRIFFITH:
7        Q.   -- to customers?
8        MS. TABACCHI:  Same objection.
9        THE WITNESS:  Well, I believe our
10   reimbursement guidelines discuss not giving AWP
11   information.
12   BY MS. ST. PETER-GRIFFITH:
13       Q.   And in --
14       A.   And that was when the policy was put in
15   place.
16       Q.   Okay.  Prior to the policy being in
17   place, would it have been wrong to provide
18   customers with Red Book AWP information, or any
19   AWP information --
20       MS. TABACCHI:  Object --
21   BY MS. ST. PETER-GRIFFITH:
22       Q.   -- concerning Abbott products?

Page 806

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  I don't necessarily think
3   it was wrong; I just don't know if they had a
4   policy in place.
5   BY MS. ST. PETER-GRIFFITH:
6        Q.   Well, if it wasn't wrong, why did
7   Abbott develop a policy --
8        MS. TABACCHI:  Object to the form.
9   BY MS. ST. PETER-GRIFFITH:
10       Q.   -- prohibiting it?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  Well, I believe that --
13   that Abbott believed that it was more appropriate
14   for any information regarding reimbursement to
15   come from a centralized reimbursement department.
16   BY MS. ST. PETER-GRIFFITH:
17       Q.   So is that the basis for the policy?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  That was just part of it.
20   BY MS. ST. PETER-GRIFFITH:
21       Q.   What was -- what were the other parts
22   of the policy, the bases for the policy?

Page 807

1        A.   Well, there was a lot of things
2   happening in the environment then.  There were --
3   PhRMA was creating marketing guidelines.  There
4   were the OIG guidelines for compliance.  There
5   were a number of things happening that we felt
6   that we needed to clarify our policy.
7        Q.   Prior to the implementation of this
8   policy --
9        A.   Mm-hmm.
10       Q.   -- did you at any time during your
11   tenure as an Abbott employer -- employee see any
12   problem with providing customers with AWP
13   information?
14       MS. TABACCHI:  Object to the form.
15       THE WITNESS:  Well, that's my opinion.
16   I'm not -- I don't really have an opinion on
17   this.  I don't think it was prohibited.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.   Ma'am, you're in the Office of Ethics
20   and Compliance, aren't you?
21       MS. TABACCHI:  Object to the form.
22       THE WITNESS:  At this time?  I was in

63 (Pages 804 to 807)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 808

1  ethics and compliance.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Do you think it's appropriate
4  for someone within the ethics and compliance
5  department to be telling Ross products division
6  that it's okay to provide customers with Red Book
7  information --
8          MS. TABACCHI:  Object to the form.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  -- on Abbott's AWPs?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Well, this was -- this
13  was very specific to one individual and as a
14  reimbursement specialist as a centralized help
15  line.  And I think that our overall policy was
16  that it was preferable for them to get this data
17  from the drug databases.  I know that for a fact.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  But when you were in -- strike that.
20         MS. ST. PETER-GRIFFITH:  Ms. Tobiason,
21  at this time I'm going to pass you --
22         THE WITNESS:  Mm-hmm.

Page 809

1          MS. ST. PETER-GRIFFITH:  -- as a
2  witness to Mr. Breen, Relator's counsel.  I thank
3  you for your time.
4          THE WITNESS:  Thank you.
5          MS. TABACCHI:  Do you want to take a
6  five-minute break while we're switching the mike
7  and everything?
8          MR. BREEN:  Sure.
9          MS. ST. PETER-GRIFFITH:  Sure.
10         THE VIDEOGRAPHER:  We are off the
11  record at 3:41 p.m.
12         (Recess taken.)
13         THE VIDEOGRAPHER:  We are back on the
14  record at 3:53 p.m.
15
16         EXAMINATION
17  BY MR. BREEN:
18     Q.  Good afternoon, Ms. Tobiason.
19     A.  Hi.
20     Q.  We met before.  My name is Jim Breen.
21  I represent Ven-A-Care, one of the plaintiffs in
22  these cases.

Page 810

1          I just want to make sure before I go
2  into more specific questions that I understand
3  your testimony over the last -- I guess this is
4  the third day of testimony -- when it comes to
5  the following issue.  I want to make sure I
6  understand when you first gained any knowledge
7  whatsoever that there was an issue relating to
8  government concern about Abbott AWPs for HPD
9  products.
10     A.  Do you have a question?
11     Q.  Right.  So my question is, when did you
12  first get -- become knowledgeable at all that the
13  government had any concern about Abbott's H --
14  AWPs for HPD products?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  I -- I don't know.  I
17  think there was -- I knew there was concern about
18  AWP in the 1990s, not necessarily relating to
19  Abbott's products.  I do remember reading in the
20  New York Times about some of our drugs were
21  listed as concerns.  Now, that's what I remember.
22  BY MR. BREEN:

Page 811

1      Q.  So your recollection that you knew --
2  learned something about concerns about AWPs in
3  the 1990s, did you gain that from the New York
4  Times?
5      A.  No.  In some of the regulations, CMS,
6  you know, that there were -- they put out
7  regulations -- not regulations or notices or
8  whatever about that they wanted to look at
9  differences in -- from AWP, and they felt there
10  was -- they were going to look at an alternative
11  methodology.  I don't know if that means a
12  concern.  I know they were saying that they felt
13  that they wanted to get different methodology.
14     Q.  What is the earliest time that you had
15  any knowledge that the United States government
16  was concerned about the way Abbott's AWPs were
17  being reported?
18     A.  I honestly don't remember.  I -- I
19  don't have any idea.
20     Q.  So you don't even know if you were
21  aware of this at some time in the '90s?
22         MS. TABACCHI:  Object to the form.

64 (Pages 808 to 811)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 812

1       THE WITNESS:  My first recollection was
2  in the -- in the 2000s that the government may be
3  looking at it, that there was lawsuits.  But do I
4  know?  I don't remember.  I know they -- they
5  were looking at alternative methodologies.  I
6  don't -- it's very hard to distinguish it in my -
7  - in -- in my mind.
8  BY MR. BREEN:
9     Q.  Well, during the time that you've
10 worked at Abbott, has it been your experience
11 that when Abbott as a corporation has concerns
12 that one of its divisions or one of its personnel
13 may be doing something that can get Abbott in
14 trouble that Abbott takes corrective action to
15 look into the matter and take whatever action
16 might be appropriate?
17    A.  Abbott Laboratories expects everybody
18 to follow the code of conduct.
19    Q.  So they just expect people to follow
20 the code of conduct.  And if something comes up
21 where Abbott's concerned, they just don't bother
22 looking into it.  Is that what you're saying?

Page 813

1       MS. TABACCHI:  Object to the form.
2       THE WITNESS:  I don't have specific
3  instances, but I know that Abbott has taken
4  corrective action.
5  BY MR. BREEN:
6     Q.  Okay.  But to your knowledge, Abbott
7  never took any corrective action regarding AWP
8  until the 2003 policy that you discussed with Ms.
9  St. Peter-Griffith during the early -- earlier
10 today.  Is that correct?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  When you say corrective
13 action, what do you mean?
14 BY MR. BREEN:
15    Q.  Corrective action regarding Abbott's
16 use of AWP in discussions with customers.  Let's
17 start there.
18    A.  I don't -- I don't know.  They may have
19 had policies in the past.  All I know is that
20 when we created an ethics and compliance policy,
21 we put that in there.
22    Q.  Okay.  Let me ask the question this

Page 814

1  way.  I'm only asking this based upon your
2  knowledge.  Do you have any knowledge sitting
3  here today that Abbott has ever taken corrective
4  action when it comes to communications about AWP
5  with its customers?
6       MS. TABACCHI:  Object to the form.
7       THE WITNESS:  Based on my very limited
8  knowledge, I -- I don't -- I don't know of any.
9  But I don't deal with investigations, corrective
10 action, or any of that.
11 BY MR. BREEN:
12    Q.  And you didn't have any role whatsoever
13 in the implementation of Abbott's policy
14 regarding communication of AWP information with
15 its customers?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  We -- I was involved in
18 helping to create the policy, and the divisions
19 then were responsible for implementing it.
20 BY MR. BREEN:
21    Q.  Okay.  What policy are you talking
22 about when you say you were involved in helping

Page 815

1  to create the policy and implement the policy?
2     A.  I'm talking about the Office of Ethics
3  and Compliance policy on reimbursement
4  information and support.
5     Q.  And is that -- does that include
6  discussions with customers or prospective
7  customers about topics such as Abbott's AWPs?
8       MS. TABACCHI:  Object to the form.
9       THE WITNESS:  The policy prohibits
10 Abbott employees, except in certain limited
11 instances, from providing AWPs and many other
12 things they're prohibited from providing to
13 customers.
14 BY MR. BREEN:
15    Q.  Such as what?
16    A.  Like they can't provide ICD-9 codes,
17 diagnosis codes.  They can't provide -- they
18 can't provide copay information.
19    Q.  How long has it been Abbott's policy
20 that customers should not be provided with ICD-9
21 codes by Abbott?
22    A.  We wrote -- we -- we put it in an OEC

65 (Pages 812 to 815)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 816

1  format in 2003.  Whether there were other
2  policies, I -- I just don't know.
3      Q.  So the whole time you were in charge of
4  reimbursement, as far as you know, until 2003,
5  there was never a policy prohibiting or
6  precluding Abbott employees from communicating
7  about ICD-9 codes with customers.  Is that your
8  testimony?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I was involved in home
11 infusion services.  And so we didn't really deal
12 with specific ICD-9 codes for products.
13         When I was in diagnostics, we provided
14 publicly available information, which is on the
15 carrier Medicare websites about ICD-9 codes for
16 diagnostic tests.  So it just depends on -- it
17 depended on the circumstance.
18 BY MR. BREEN:
19     Q.  Did Abbott, to your knowledge, prepare
20 a script for its help line regarding the issue of
21 the communications about AWPs with customers --
22         MS. TABACCHI:  Object to the form.

Page 817

1  BY MR. BREEN:
2      Q.  -- at any time in 2003?
3      A.  Which help line?
4      Q.  Any help line.
5      A.  I don't remember which help lines were
6  in effect then.
7      Q.  So you don't recall -- do you ever
8  recall you yourself being involved with preparing
9  a help line script as it related to communication
10 about reimbursement information with customers?
11     A.  Yes.  We have a requirement that
12 scripts need to be approved.
13     Q.  And who approves the scripts?
14     A.  Well, it goes through the -- the ethics
15 and compliance, and then I also am involved in
16 approving it to make sure it conforms with our
17 OEC policy on reimbursement information and
18 support.
19     Q.  As a matter of fact, you've got final
20 approval authority, don't you?
21     A.  I may, yes.
22     Q.  You're a final approver, aren't you?

Page 818

1      A.  In some --
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  -- instances.  It depends
4  on the division's procedures.
5  BY MR. BREEN:
6      Q.  Well, what about this policy that was
7  in the 2003 policy prohibiting Abbott employees
8  from discussing AWP information with customers?
9  Is that policy implemented in any help line
10 script, to your knowledge?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  Yes, it could be.  I just
13 don't remember specifically.
14 BY MR. BREEN:
15     Q.  Do you --
16     A.  And I think it depends on which
17 division you're talking about.
18     Q.  Well, let's talk about Ross first.
19     A.  Mm-hmm.
20     Q.  Does Ross have a help line with a
21 script that deals in any way with communication
22 about AWP information with customers --

Page 819

1      A.  They have this --
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Oh, sorry.
4          They have a script.  I don't remember.
5  I -- I just don't remember what it says about the
6  AWP.  I don't remember.
7  BY MR. BREEN:
8      Q.  Yet you were the final approver on that
9  script, weren't you?
10     A.  Like -- yes, I -- I believe, yes.
11     Q.  And you have no recollection whatsoever
12 if it even mentions AWP.
13         MS. TABACCHI:  Object to the form.
14 BY MR. BREEN:
15     Q.  Is that your testimony?
16     A.  Well, it also goes through not just me.
17 It goes through the legal department too.  And I
18 -- I just don't remember.  I review a lot of
19 scripts.  They may have something in there, and -
20 - but they may not.  I just don't remember.
21     Q.  So it's your testimony that as far as
22 you recall, the Ross help line script as it

66 (Pages 816 to 819)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 820

1  relates to reimbursement questions has nothing in
2  it about communicating -- communications
3  regarding AWP with customers as far -- excuse me
4  -- as far as you know today.
5      A.  That's not --
6      MS. TABACCHI:  Object to the form.
7      THE WITNESS:  That's not what I said.
8  I said it -- it could and it most likely does.  I
9  just don't remember it.
10 BY MR. BREEN:
11     Q.  Well, if you don't remember it, what
12 makes you think it's in the script if you were
13 the final approver?
14     MS. TABACCHI:  Object to the form.
15     THE WITNESS:  Because it's in our
16 policy, and I know they -- they try to
17 incorporate a number of things in the policy in
18 the scripts.  But I don't remember the specific
19 script on that.  You'd have to -- I'd have to see
20 it.  I don't remember it.  But I -- I think it's
21 unfair to characterize it that I -- that it
22 wouldn't be in there.

Page 821

1  BY MR. BREEN:
2      Q.  I'm not characterizing that way; I'm
3  asking if you recall that it's in there.  That's
4  my question.  Do you recall that it's in the
5  script?  Yes or no.
6      MS. TABACCHI:  Object to the form.
7  BY MR. BREEN:
8      Q.  That's my question.
9      A.  I don't --
10     Q.  You either recall or you don't.
11     A.  I don't recall, and I -- that's --
12 that's what -- I don't recall.
13     Q.  Then that's all I want to know, if you
14 recall.
15         Now, how about Hospital Products
16 division?  Does Hospital Products division have a
17 help line that relates to reimbursement matters?
18     MS. TABACCHI:  Object to the form.
19     THE WITNESS:  I have no idea.
20 BY MR. BREEN:
21     Q.  How about renal care?
22     A.  Yes, renal care does.

Page 822

1      Q.  Is that part of Hospital Products
2  division?
3      MS. TABACCHI:  Object to the form.
4      THE WITNESS:  No.
5  BY MR. BREEN:
6      Q.  All right.  Did Hospital Products
7  division ever have a help line script relating to
8  reimbursement, to your knowledge?
9      A.  Well, hospital products was spun off to
10 Hospira, so I can't -- I -- I don't -- I don't
11 remember when the spinoff was.
12     Q.  What does that have to do with whether
13 you recall if Hospital Products division ever had
14 a help line script or a help line?
15     MS. TABACCHI:  Object --
16 BY MR. BREEN:
17     Q.  You either recall they had a help line
18 or you don't.
19     MS. TABACCHI:  Object to the form.
20 BY MR. BREEN:
21     Q.  Do you recall if Hospital Products
22 division ever had a help line relating to

Page 823

1  reimbursement?
2      MS. TABACCHI:  Object to the form.
3      MR. BREEN:  Wait one second.  What's
4  wrong with that question, Counsel?
5      MS. TABACCHI:  Jim, this is the third
6  day of her testimony.  It's the end of the day.
7  You do not need to take that tone with her.
8      MR. BREEN:  So it's the tone.
9      MS. TABACCHI:  The tone.
10     MR. BREEN:  Then I'll change the tone.
11     MS. TABACCHI:  The tone and you've
12 asked the question four times.  She's already
13 tried to answer it.
14     MR. BREEN:  I'm not asking it --
15 BY MR. BREEN:
16     Q.  Well, my question is, do you recall if
17 Hospital Products division ever had a help line
18 script relating to reimbursement?
19     A.  Well, prior to the spinoff, I don't
20 recall them ever having a help line.
21     Q.  Okay.  Do you recall them having a help
22 line after the spinoff?

67 (Pages 820 to 823)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 824

1        MS. TABACCHI:  Object to the form.
2   BY MR. BREEN:
3        Q.  Or would you even know that?
4        A.  I wouldn't know that.  I wasn't with
5   Hospira.
6        Q.  Okay.  How about TAP?  Did it ever have
7   a help line relating to reimbursement, to your
8   knowledge?
9        A.  I don't know.
10       Q.  Now, do you have any idea whatsoever
11   why Abbott developed a policy in 2003 precluding
12   its employees from discussing -- or at least its
13   salespeople from discussing AWP information with
14   customers?
15       MS. TABACCHI:  Objection.  Asked and
16   answered.
17       THE WITNESS:  Well, we create the
18   policy, and we included a number of things, not
19   just AWP, but there's a number of things that
20   they -- that they're -- we don't want them to
21   discuss because we -- we don't expect them to be
22   reimbursement experts and to have to keep up to

Page 825

1   date with all this information.
2   BY MR. BREEN:
3        Q.  Now, I'm going to ask that you look at
4   Exhibit 767, which was one of the early ones that
5   Ms. --
6        MS. ST. PETER-GRIFFITH:  They should be
7   right on top.
8   BY MR. BREEN:
9        Q.  -- St. Peter-Griffith showed you this
10   morning.
11       A.  767?
12       Q.  Right.
13       MS. ST. PETER-GRIFFITH:  Ma'am, they
14   should be right on top.
15       THE WITNESS:  It's 757.
16   BY MR. BREEN:
17       Q.  I believe it's '67, but I may have
18   misspoke.
19       A.  It says '57 on mine.
20       Q.  It's the -- it's dated June 11th, 1991.
21       A.  Mm-hmm.  It says 757.
22       Q.  It's a memo from you.

Page 826

1        A.  Mm-hmm.
2        Q.  And the Bates number on the bottom is
3   ABT212051.
4        A.  Right.  It says 757.
5        Q.  All right.  Now -- and I'll represent
6   to you that this was provided to us by Abbott's
7   counsel, and it was represented to us that it was
8   provided from Abbott's files.
9        And do you have -- I just want to know,
10   sitting here today, do you have any reason to
11   doubt that this document came from Abbott's
12   business records?
13       A.  I have no reason to doubt that.
14       Q.  The entire time that you were at
15   Abbott, did you ever experience a situation where
16   your name was placed on a memo or -- or a
17   correspondence such as what we're looking at here
18   as being the person who sent it -- in this case
19   it says, "From:  Virginia Tobiason" -- do you see
20   that? -- "Manager, Reimbursement."
21       A.  I do.
22       Q.  Have you ever had any -- a situation

Page 827

1   arise where it came to your attention that
2   somehow a memo or correspondence got sent out as
3   being from you when, in fact, you did not send
4   it?
5        A.  No.
6        Q.  Okay.  Now, you'll see here you're
7   manager, reimbursement.  What division were you
8   manager of reimbursement of?
9        MS. TABACCHI:  Object to the form.
10   BY MR. BREEN:
11       Q.  In '91.
12       A.  Well, I was in home infusion services.
13       Q.  Home infusion services.  Okay.  And so
14   you were sending this purely on behalf of home
15   infusion services.  Is that correct?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  Yes, I believe so.
18   BY MR. BREEN:
19       Q.  Now, if you'll go down to the very
20   bottom.
21       A.  Mm-hmm.
22       Q.  You state -- and there's a bullet point

68 (Pages 824 to 827)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 828

1  at the bottom -- "Discounts vary among
2  purchasers. Some providers may pay full A.W.P.
3  and others may get a discount but not a full 15%
4  due to manufacturers discounting practices."
5      A.  Mm-hmm.
6      Q.  Do you see that?
7      A.  Mm-hmm.
8      Q.  Was it your understanding in June of
9  1991 that some providers may pay full AWP for
10 drugs?
11         MS. TABACCHI: Objection. Asked and
12 answered. I'll just let you know that it's 4:10,
13 and we're not going past 5:00 today. If you want
14 to ask her questions that you've already asked
15 her once before, that's your use of your time. I
16 object to you doing so.
17         MR. BREEN: I didn't ask her this
18 question before, Counsel.
19 BY MR. BREEN:
20     Q.  Was that your understanding back in
21 1991?
22     A.  Yes, I believe my understanding whether

Page 829

1  there could be -- that there were a variety of --
2  of different arrangements.
3      Q.  My question is, was it your
4  understanding back in 1991 -- in June, at least -
5  - that some providers paid AWP for drugs?
6      A.  I said may. Yes, I -- I think I
7  thought there -- there may be some that do pay
8  AWP.
9      Q.  Okay. And you had been manager of
10 reimbursement for how long at that point?
11     A.  Oh, since about 1984 or '5.
12     Q.  So you'd been manager of reimbursement
13 then for about six years at least, correct?
14     A.  Yes.
15     Q.  And I'll now ask you to go to Exhibit
16 12. It should be in order there, which is the
17 exhibits that you were asked about today.
18     A.  12?
19         MS. ST. PETER-GRIFFITH: 12. It should
20 be -- it's at the top. They're in sequential
21 order.
22         THE WITNESS: Well, this says Exhibit

Page 830

1  768.
2          MS. ST. PETER-GRIFFITH: No. If you
3  flip through, 1, 2, 3, 4, 5 -- just keep flipping
4  through, ma'am -- they're in sequential order.
5          THE WITNESS: Yes.
6  BY MR. BREEN:
7      Q.  Now, this should be a three-page
8  document. The first page is from Richard Rieger
9  and is Bates numbered ABT 53263 and is forwarding
10 a two-page memo that's titled Medicare Part B
11 Payments for Drugs Average Wholesale Price Issue.
12 Do you see that?
13         MS. TABACCHI: I do just want to state
14 for the record that I believe Ms. St. Griffith
15 has clarified earlier that this is not the
16 complete document, just using a few pages of it.
17 BY MR. BREEN:
18     Q.  Okay. All right. Well, I'm
19 specifically going to direct your attention to
20 ABT 53263, '264, and '265.
21         MS. ST. PETER-GRIFFITH: Actually, I
22 don't think I made that representation. I think,

Page 831

1  according to Mr. Tootell's testimony, this is a
2  complete document.
3          MS. TABACCHI: Okay.
4          MR. BREEN: And I'm going to go by
5  Abbott's production of this.
6          MS. TABACCHI: Sure.
7          MR. BREEN: Abbott produced it and
8  Bates-labeled it. I trust that Abbott would
9  provide it to us in the order that it came out of
10 their business records. Now --
11         MS. TABACCHI: And I'm not disputing
12 that. I just -- I think there are more pages to
13 the back of this. So if you want to use the
14 first three, that's fine.
15         MR. BREEN: I'm just going to use the
16 first three right now.
17 BY MR. BREEN:
18     Q.  If you'll look, you'll see that this
19 purports to be an interoffice correspondence on
20 Abbott stationery dated December 20th, 1996. Do
21 you see that?
22     A.  Yes.

69 (Pages 828 to 831)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL          January 22, 2008
                              Chicago, IL

Page 832

1        Q.   Okay.  And you can see that you're on
2    the circulation list there, Ginny Tobiason.  Do
3    you see that?
4        A.   I do.
5        Q.   All right.  And specifically I'm going
6    to ask if you at least recall being a participant
7    in the Medicare working group during 1996.
8        A.   I really don't recall.
9        Q.   So you don't -- sitting here today, you
10   can't recall whether you participated in the
11   Medicare working group or not, right?
12       A.   It -- yes.
13       Q.   So since you have no recollection,
14   would the fact that your name is on this from Mr.
15   Rieger and it relates to the Medicare working
16   group, would that indicate to you that you
17   probably had some involvement in the Medicare
18   working group in December of 1996?
19            MS. TABACCHI:  Object to the form.
20   Asked and answered.
21            THE WITNESS:  Yes.
22   BY MR. BREEN:

Page 833

1        Q.   Okay.  So do you know of any reason why
2    the court should not assume that you were a
3    participant in the Medicare working group in
4    December of 1996?
5            MS. TABACCHI:  Object to the form.
6            THE WITNESS:  Yes, though I don't
7    remember it.
8    BY MR. BREEN:
9        Q.   Just the only -- just sitting here
10   today, you don't remember it.
11       A.   Mm-mmm.
12       Q.   And so you believe that is a reason why
13   the court should question whether you
14   participated in the Medicare working group in
15   December of 1996?
16            MS. TABACCHI:  Object to the form.
17            THE WITNESS:  I really don't remember
18   if I went to meetings or I read any of the memos.
19   I just don't remember.
20   BY MR. BREEN:
21       Q.   Just don't remember.  Okay.
22            Well, let me ask you this question.

Page 834

1    Were you the manager of reimbursement in December
2    of 1996?
3        A.   I was the manager of reimbursement
4    services.
5        Q.   Reimbursement services?  Okay.
6        A.   Mm-hmm.
7        Q.   And so that's that position you've held
8    since about 1984, right?
9        A.   Yes.
10       Q.   Okay.  So when Abbott personnel sent
11   you memos relating to reimbursement issues as the
12   manager of reimbursement services on December
13   20th of 1996, was it part of your job to consider
14   the information that Abbott personnel such as Mr.
15   Rieger sent to you?
16            MS. TABACCHI:  Object to the form.
17            THE WITNESS:  My job was to provide
18   reimbursement services and to oversee the billing
19   operation.  Whether I got a memo or not doesn't
20   necessarily mean that I -- that was my job
21   responsibility.
22   BY MR. BREEN:

Page 835

1        Q.   Okay.  So I just want to know, is it
2    your testimony that if you would have gotten a
3    memo from Mr. Rieger in December of 1996 such as
4    what has now been marked as Exhibit 12, I just
5    want to know whether or not it would have been
6    your job to read it.
7        A.   Not necessarily, no.
8        Q.   Okay.  So how would you decide what
9    memos were part of your job to read and what
10   memos were not part of your job to read?
11       A.   If it related to operations and
12   reimbursement services, I would generally read
13   them.  If it involved other issues, I may not
14   have had time; I may not have read it; I may have
15   put it aside.  I -- I just -- it was up to me to
16   just -- I mean, I just didn't read everything.
17       Q.   What if it involved the potential
18   legality of the claims that were being processed
19   by your reimbursement services customers with
20   reimbursement services assistance?  If it related
21   to that, would it be your job to read it?
22            MR. BREEN:  Object to the form.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 836

1        THE WITNESS:  The legality.  Well, I --
2   I'm sure if legal sent me something, I would have
3   read it if it involved claims processing, yes.
4   BY MR. BREEN:
5        Q.   Okay.  Now, let's go to the second page
6   of this exhibit, which is the memo.
7        A.   Mm-hmm.
8        Q.   And I'll direct your attention to the
9   second paragraph.  And I'll specifically --
10   beginning on the -- I'll direct your attention to
11   the second and third and fourth sentences, which
12   read -- well, let's just start with the first
13   sentence.
14        "There have been several studies and
15   investigations into the appropriateness of using
16   AWP as the determining factor for payment.  The
17   common conclusion of these efforts is that the
18   use of AWP as a payment measure results in
19   excessive reimbursement that is far out-of-line
20   with the estimated acquisition costs of the
21   drugs" --
22        A.   Mm-hmm.

Page 837

1        Q.   -- "and AWP has little meaning to the
2   drug manufacturer or the pharmacy to which it
3   sells the drugs.  In other words, there is some
4   evidence that often the AWP for a drug is set at
5   a particular level to establish third-party
6   reimbursement, but has no relevance to any party
7   beyond the third-party payor.  For these reasons,
8   the AWP issue is being presented and considered
9   not as a program policy issue, rather as an issue
10   steeped in fraud, abuse, and waste."
11        Do you see that?
12        A.   Yes.
13        Q.   Now, if you would have gotten a memo
14   like this in December of 1996 informing you about
15   concerns that the AWPs may be steeped in fraud,
16   abuse, and waste, would that have got your
17   attention?
18        MS. TABACCHI:  Object to the form.
19        THE WITNESS:  Well, this was a -- a
20   memo from an individual.  I -- I don't know.  I
21   would have tempered it with if I knew something
22   else.  But I don't -- I don't even remember

Page 838

1   reading this.
2   BY MR. BREEN:
3        Q.   Okay.  Let's go to Exhibit 23.  This is
4   a multipart document beginning with ABT-DOJ
5   296443, and then on the next -- the next page --
6        A.   Mm-hmm.
7        Q.   -- begins with another Bates sequence,
8   TXABT 675301, '302, '303.  Do you see that?
9        A.   Yes.
10        Q.   And then after that, the Bates sequence
11   changes again.
12        I specifically want to direct your
13   attention to the second, third, and fourth pages
14   of this composite exhibit.  If you recall that
15   this was a group of documents that Ms. St. Peter-
16   Griffith showed you --
17        A.   Mm-hmm.
18        Q.   -- as coming from Rosemary Haas.  Do
19   you recall that?
20        A.   Yes.
21        Q.   Okay.  And I want to start with the --
22   I want to look at the second, third, and fourth

Page 839

1   pages of this exhibit.  And specifically, it's an
2   e-mail from Rosemary Haas dated 11/15/2001 at
3   11:22 a.m.  Do you see that?
4        A.   Yes.
5        Q.   And on the other side, in the To
6   section, about halfway through it, you'll see
7   your name there, Virginia Tobiason.
8        A.   Yes.
9        Q.   And you see the subject, House Plan for
10   Reform of AWP.  Do you see that?
11        A.   Yes.
12        Q.   Okay.  And it says, "Attached is a
13   letter sent yesterday to CMS Administrator Tom
14   Scully announcing the House Energy and Commerce
15   Committee's plan to reform" -- "for reform of
16   AWP."
17        Do you see that?
18        A.   Yes.
19        Q.   Okay.  Now, my first question is, in
20   November of 2001, were you still involved with
21   the Medicare working group?
22        MS. TABACCHI:  Object to the form.

71 (Pages 836 to 839)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 840

1        THE WITNESS:  Oh, I have no idea.
2   BY MR. BREEN:
3        Q.   Well, what position did you have in
4   November of 2001 that would have resulted in Ms.
5   Haas sending you a communication such as we're
6   looking at right now?
7        A.   I may have just moved over from doing
8   the manager of reimbursement for diagnostics
9   products to government affairs.
10       Q.   Okay.  So was it your --
11       A.   I don't remember the date, though.  I
12  really don't.
13       Q.   Well, if Ms. Haas would have sent --
14  sent you this e-mail --
15       A.   Mm-hmm.
16       Q.   -- on November 15th, 2001, would it
17  have been your job to read it?
18       A.   Well, it dealt with House plan for
19  reform of AWP, which is federal government.  Not
20  necessarily, no.  I don't deal with the House
21  activities, Congress.
22       Q.   You don't deal with the House -- the

Page 841

1   Congress activities?
2        A.   The congressional act -- no, I'm not
3   directly involved with those.
4        Q.   So if we go back to the Medicare
5   working group documents, we'll see that you were
6   never involved with anything that was going on in
7   Congress?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I -- if it -- if it --
10  sometimes there were issues that came up, freezes
11  on DME, things like that that may have -- that
12  may have involved me.  I -- I don't know.  That's
13  a very broad question.
14  BY MR. BREEN:
15       Q.   Okay.  Well, let's be more specific.
16  Let's look at the -- the actual letter --
17       A.   Mm-hmm.
18       Q.   -- which you can see was purportedly
19  sent on November 14th, 2001, just a day before
20  the e-mail was sent to you.  Do you see that?  Do
21  you see the November 14th, 2001, date --
22       A.   Yes.

Page 842

1        Q.   -- on the letter?
2        A.   Yes.
3        Q.   Okay.  Now, I'm advised that we're
4   running out of tape, so why don't we take a
5   moment to change the tape.  And if you want to
6   take some time and look at this, we can do so.
7        THE VIDEOGRAPHER:  We are off the
8   record at 4:25 p.m. with the end of Tape No. 4.
9        (Brief interruption.)
10       THE VIDEOGRAPHER:  We are back on the
11  record at 4:28 p.m. with the start of Tape No. 5.
12  BY MR. BREEN:
13       Q.   Okay.  Now, going back to November 14,
14  2001, the date of the letter to Mr. Scully from
15  chairman of the House commerce and energy
16  committee Billy Tauzin.
17       A.   Mm-hmm.
18       Q.   Now, you see based upon the e-mail to
19  you from Ms. Haas on the 15th that she sent you
20  this letter to Mr. Scully within 24 hours of the
21  letter being sent on November 14th, 2001.  Do you
22  see that?

Page 843

1        A.   Yes.
2        Q.   Okay.  And Mr. Scully was the head of
3   the whole Medicare and Medicaid programs,
4   correct?
5        A.   He was the administer -- administrator
6   for the center's first Medicare and Medicaid
7   services, yes.
8        Q.   The guy in charge of Medicare and
9   Medicaid, correct?
10       A.   Well, yeah.  He reported to the HHS
11  administrator, yeah.
12       Q.   And this letter is going to him by the
13  chairman of the House commerce/energy committee,
14  correct?
15       A.   Yes.
16       Q.   And if you'll look with me in the
17  second paragraph, start with the second sentences
18  -- sentence:  "These prices, known as Average
19  Wholesale Prices (AWPs), do not necessarily
20  represent what manufacturers actually charge
21  health providers for the covered drugs.  Some
22  drug manufacturers use the AWPs to inflate

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 844

1  dramatically the payments made for drugs by
2  Medicare and Medicare beneficiaries.  Government
3  investigations have revealed that, as a result of
4  abuse in the current system, beneficiaries are
5  paying hundreds of millions of dollars in
6  inflated co-payments every year.  Medicare also
7  pays upwards of one billion dollars in excess
8  payments every year."
9       Do you see that?
10     A.  I do, yes.
11     Q.  And do you see that he's talking about
12  manufacturers inflating AWPs?
13     A.  Where it says "dramatically the
14  payments made for drugs," yes.
15     Q.  Okay.  Now, do you recall reading this
16  memo in this e-mail with the attached letter back
17  in 2001?
18     A.  No.
19     Q.  Well, if you had read it, do you think
20  you'd remember something like that?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  I don't remember.  I -- I

Page 845

1  can't answer that.
2  BY MR. BREEN:
3     Q.  Did anybody at Abbott ever inform you
4  prior to November 14th, 2001, in your capacity as
5  manager of reimbursement services or any other
6  capacity that the United States Department of
7  Justice had accused Abbott of this exact kind of
8  AWP inflation conduct?
9     A.  I don't remember anything, no.
10    Q.  Well, if somebody would have told you
11  as -- as a person in charge of reimbursement
12  services for customers of Abbott that the AWPs
13  that were being used in the reimbursement area
14  for Abbott products were AWPs that the justice
15  department had told Abbott's counsel were being
16  inflated and were causing excess Medicare or
17  Medicaid reimbursement, if anybody would have
18  told you that, would that be something you'd
19  remember?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  Well, that calls for
22  speculation.  I don't remember anybody ever

Page 846

1  saying that, so I don't know how I'd react.
2  BY MR. BREEN:
3     Q.  Now, let's go to Exhibit 24.
4     A.  Yes.
5     Q.  And this is -- who -- that's your name,
6  the first name on the front of this document,
7  correct?
8     A.  Yes, it is.
9     Q.  But yet it's your testimony that you
10  have no recollection of this document whatsoever?
11    A.  I never --
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  I -- I -- I may recollect
14  that I -- I definitely didn't -- didn't do this.
15  BY MR. BREEN:
16    Q.  Is it possible that one or more people
17  at Abbott were using your name on documents
18  without you knowing about it?
19        MS. TABACCHI:  Object to the form.
20  BY MR. BREEN:
21    Q.  On documents that related to
22  reimbursement and fraud and abuse issues in

Page 847

1  reimbursement?
2     A.  This says draft.  I -- I don't know
3  what the genesis of this was.  I don't know why
4  it was prepared.  I don't know what purpose it
5  was being used for.  I don't know if it was even
6  ever used.  It says draft.  I just don't know.  I
7  don't know why my name is on it.
8     Q.  Could you go to the second page of this
9  draft, the one that starts "Health Care Fraud"?
10    A.  Mm-hmm.
11    Q.  See where it says "Providers and
12  manufacturers under scrutiny"?
13    A.  Yes.
14    Q.  And then the bullet point below that.
15  In 2001, it says, that 3,756 individuals were
16  excluded from Medicare and Medicaid, and there
17  were 423 criminal convictions.  Do you see that?
18    A.  Yes.
19    Q.  Now, if a presentation had been
20  prepared at some time after 2001, since this is
21  talking about 2001, with your name on it
22  regarding health care fraud and exclusions from

73 (Pages 844 to 847)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL          January 22, 2008
                              Chicago, IL

Page 848

1  Medicare and Medicaid and criminal convictions,
2  do you think that's something that -- that they
3  would have run by you before they put your name
4  on the draft, from your recollection as to how
5  business was done at Abbott?
6      A.  They could have prepared this draft and
7  then sent it to me after.  There's no indication
8  that I even was involved in preparing this draft.
9      Q.  Go to the next page, "Investigation of
10 Health Care Fraud."  It says in 2001 -- this is
11 halfway down -- OIG recovered $1.5 billion in
12 fines, recoveries, and penalties and 875 million
13 from TAP.  Do you see that?
14     A.  I do.
15     Q.  Now, were you aware that OIG recovered
16 $875 million from TAP in 2001?
17     A.  Yes.
18     Q.  And TAP was that affiliate or partially
19 owned corporation of Abbott that had
20 representatives on the Medicare working group,
21 wasn't it?
22          MS. TABACCHI:  Object to the form.

Page 849

1          THE WITNESS:  I don't know.  I don't
2  know.  Were they?  I don't remember.  I didn't
3  look to see if TAP was on the Medicare working
4  group.
5  BY MR. BREEN:
6      Q.  Really.  Well, let's go to some of
7  those exhibits then.
8      A.  Yeah, we'd have to look.  I don't
9  remember.
10     Q.  Let's just pick any one.  How about No.
11 13, dated January 15th, 1997.  Purports to be an
12 e-mail correspondence -- and you're on it -- from
13 Mr. Rieger again.  Do you see that?
14     A.  Yes, I do.
15     Q.  Regarding the Medicare working group.
16     A.  Yes.
17     Q.  Of course, you don't recall whether you
18 were even on the Medicare working group in '97,
19 do you?
20     A.  I don't recall much about the Medicare
21 working group, no.
22     Q.  You have no idea, sitting there today,

Page 850

1  whether you were even on that group back in 1997.
2          MS. TABACCHI:  Objection.
3  BY MR. BREEN:
4      Q.  Is that correct?
5          MS. TABACCHI:  Asked and answered.
6  BY MR. BREEN:
7      Q.  Is that correct?
8      A.  I -- I seem to remember that there was
9  a Medicare working group.  I don't remember
10 attending -- specifics about this group.  I -- I
11 -- I know there was a Medicare working group, and
12 I said that earlier.
13     Q.  Well, I'm not asking you if there was a
14 Medicare working group; we know that.  I'm asking
15 if you have any recollection sitting here today
16 of having any involvement with it in 1997.
17 That's my question.
18     A.  I don't remember.
19     Q.  So but there's your name again.  Do you
20 see that?
21     A.  Yes.
22     Q.  But that could be a mistake; maybe you

Page 851

1  weren't even involved.  Correct?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  My name is on there.
4  BY MR. BREEN:
5      Q.  But that could be a mistake; maybe you
6  weren't involved.  Correct?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  I -- I don't recollect.
9  So I can't answer that question.
10 BY MR. BREEN:
11     Q.  Okay.  Now, let's go down there, and
12 you'll see the first bullet point, "Discuss
13 Average Wholesale Price vs. actual cost issue."
14 Do you see that?
15     A.  Yes.
16     Q.  And what's the first drug under that
17 bullet point?
18     A.  It says Lupron.
19     Q.  And what -- did Abbott make Lupron?
20         MS. TABACCHI:  Object to the form.
21 BY MR. BREEN:
22     Q.  And market Lupron?

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 852

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  It was Takeda.
3    BY MR. BREEN:
4     Q.  Takeda.
5     A.  TAP, TAP.
6     Q.  TAP.
7     A.  Takeda Abbott.  It was our --
8     Q.  So why would TAP's drug be on a
9    Medicare working group document with -- under
10   Abbott stationery in 1997?
11    A.  I don't know.
12         MS. TABACCHI:  Object to the form.
13   BY MR. BREEN:
14    Q.  Okay.  And then look down.  You see
15   Calcijex on there?
16    A.  Yes.
17    Q.  Now, who was -- well, let's go back up
18   to the -- to the Tos.  Do you see a guy's name
19   there, John Campbell?  Oh, he's not -- you're not
20   on that one.  Never mind.
21         Do you see -- let's go to Exhibit 14,
22   the next one.

Page 853

1     A.  Yes.
2     Q.  Do you see Mr. -- you're on there
3    again, right?
4     A.  Yes.
5     Q.  And, again, you don't recall if you
6    were really on that group in '97.  But did you
7    know a Mr. John Campbell?
8     A.  The name is familiar.  I don't remember
9    him.
10    Q.  Do you see his name is one, two, three,
11   four, five above yours?
12    A.  Yes.
13    Q.  And what's the name -- what's that --
14   there's three letters next to his name.  What is
15   that?
16    A.  TAP.
17    Q.  And what -- and what does TAP mean to
18   you?
19    A.  It means our joint venture, Takeda --
20   Takeda Abbott Products.
21    Q.  Okay.  And how about Exhibit 17, which
22   is the next Bates number -- which is ABT 53216.

Page 854

1     A.  Yes.
2     Q.  And it's -- it says "Abbott Position on
3    Medicare Reform Key Participants."  Do you see
4    that?
5     A.  Yes.
6     Q.  And look down at the bottom.  There's a
7    date under the document's computer file called 2
8    -- dated 2/7/97.  Do you see that?
9     A.  Yes.
10    Q.  Okay.  Now, under Corporate, we've got
11   Jim Miller, Rich Rieger, and Cathy Babington.  Do
12   you see that?
13    A.  Yes.
14    Q.  You knew those folks, right?
15    A.  Yes.
16    Q.  And then under -- down towards the
17   bottom, next-to-the-last, we've got TAP, John
18   Campbell.  Do you see that?
19    A.  Yes.
20    Q.  And that's TAP again, right?
21    A.  Yeah.  Well, yes, I guess.
22    Q.  And then under HPD, we've got Dave

Page 855

1    Olson, the director of strategic planning, right?
2     A.  Yes.
3     Q.  And then your name, Ginny Tobiason.  Do
4    you see that?
5     A.  Yes.
6     Q.  But sitting here today, is it your
7    testimony, Ms. Tobiason, that you have no present
8    recollection whatsoever of ever participating in
9    a Medicare working group meeting when a
10   representative of TAP was present?  Is that your
11   testimony?
12         MS. TABACCHI:  Object to the form.
13   Asked and answered.
14         THE WITNESS:  I don't recollect who
15   attended these meetings and which meetings I even
16   attended.
17   BY MR. BREEN:
18    Q.  That's not my question.  My question
19   is, do you have any recollection of ever
20   attending a Medicare working group meeting when a
21   TAP representative was present?
22    A.  I have no recollection.

75 (Pages 852 to 855)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 856

1    Q.  Okay.  Now, can you go to Exhibit 27?
2    A.  You know, I'm -- I'm getting a little
3  tired.  Do you think we're going to be finishing
4  soon?
5        MR. BREEN:  I think your counsel is
6  going to ensure that we finish within the next 15
7  minutes, but if you'd like to take a break, I'd
8  be happy to do that.
9        THE WITNESS:  Yeah, let's take a few --
10  a minute break.  That would be great.
11        MR. BREEN:  That's fine.
12        THE VIDEOGRAPHER:  We are off the
13  record at 4:42 p.m.
14          (Recess taken.)
15        THE VIDEOGRAPHER:  We are back on the
16  record at 4:47 p.m.
17  BY MR. BREEN:
18    Q.  Now, do you have Exhibit 25 in front of
19  you?
20    A.  No.
21    Q.  Why don't you get 25.  It's shorter.
22    A.  Yes.

Page 857

1    Q.  All right.  Now, as I recall it, you
2  have no recollection of this document, correct?
3        MS. TABACCHI:  Object to the form.
4  Mischaracterizes the witness's testimony.
5        THE WITNESS:  I do recollect that form.
6  BY MR. BREEN:
7    Q.  Okay.  Then I'm mistaken then.  Can you
8  -- do you recall this document?
9    A.  Yes.  It was on my files as a
10  presentation to Ross.
11    Q.  Okay.  And do you recall participating
12  in the preparation of this document?
13    A.  Yes.
14    Q.  Okay.  If you could go to the fourth
15  page, which is ABT-DOJ 0377096.  It says
16  "Reimbursement Information and Support" and then
17  "Anti-Kickback and False Claims."  Do you see
18  that?
19    A.  Mm-hmm.  Yes.
20    Q.  All right.  Now, it says here that --
21  the word "Prevent," and then it has
22  "Overutilization or unnecessary purchases,"

Page 858

1  "Increased costs," "Inflated or distorted costs,"
2  "Selection of inappropriate product or services."
3  Do you see that?
4    A.  Yes.
5    Q.  Now, was it your understanding at the
6  time that this presentation was prepared that
7  some -- some of the purposes of the anti-kickback
8  and false claims statutes was to prevent these
9  items that are listed here?
10    A.  Yeah, my understanding was really from
11  the DME perspective, and definitely
12  overutilization or selection of inappropriate
13  product or services, yes.
14    Q.  And by the way, when you mention the
15  DME perspective, are you including in the DME
16  perspective -- when you say DME, to your
17  knowledge, does that include the pumps that are
18  used to infuse infusion medications of the type
19  that were sold by the HPD division?
20        MS. TABACCHI:  Object to the form.
21        THE WITNESS:  Pumps?  Yeah, pumps were
22  part of the DME, yeah.

Page 859

1  BY MR. BREEN:
2    Q.  So when -- when you -- when the
3  reimbursement services -- or when the -- the home
4  infusion services would provide reimbursement
5  assistance to customers that were providing home
6  infusion services, did it include billing for the
7  pumps?
8    A.  Yes.
9    Q.  As a matter of fact, Medicare Part B
10  would only pay for home infusion services when
11  the medication was delivered by way of a durable
12  medical equipment device such as a pump, correct?
13    A.  Well, that's part of it.
14    Q.  When it -- is that correct?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  Or if it was under the --
17  the infusion benefit, yes.
18  BY MR. BREEN:
19    Q.  And the pump was paid for -- and there
20  was a certain amount of profit associated with
21  the reimbursement for the pump by Medicare,
22  correct?

76 (Pages 856 to 859)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 860

1        MS. TABACCHI:  Object to the form.
2        THE WITNESS:  There was a reimbursement
3   amount that was reimbursed.  Whether it generated
4   profit or not, I can't say.
5   BY MR. BREEN:
6     Q.   But the pump was not reimbursed on the
7   basis of cost, was it?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  It was based on a fee
10  schedule.
11  BY MR. BREEN:
12    Q.   Fee schedule.  Okay.  Thank you.
13       Now, would you agree with me that if a
14  drug company took action to cause its AWPs to be
15  reported at an inflated amount -- for example,
16  1,000 percent higher than the actual cost of the
17  drugs -- that that would contribute to increase
18  costs to the Medicare or Medicaid programs?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  That would call for
21  speculation on my part.  I -- I don't know.
22  BY MR. BREEN:

Page 861

1     Q.   Would you agree that there's a
2   possibility it could result in increased costs to
3   the Medicare or Medicaid -- and the Medicaid
4   programs?
5        MS. TABACCHI:  Object to the form.
6        THE WITNESS:  I -- I think it would
7   depend on what the actual reimbursement amount
8   was.  I just -- I don't know how to answer that
9   question.
10  BY MR. BREEN:
11    Q.   Okay.  So depending on the
12  reimbursement amount then, as far as you know?
13    A.   Yes.
14       MS. TABACCHI:  Object to the form.
15  BY MR. BREEN:
16    Q.   Okay.  Now, if you could go to --
17  several pages ahead.  It's workbook page -- well,
18  they're all 35, so that doesn't help.  DOJ
19  0377104 begins with "Key Concepts."
20    A.   Mm-hmm.
21    Q.   And "Topics not appropriate when
22  selling to Customers."  Do you see that?

Page 862

1     A.   I do.
2     Q.   The first topic there is "Third-party
3   profitability."  Do you see that?
4     A.   I do.
5     Q.   And prior to preparing this
6   presentation, had anybody at Abbott ever told you
7   that it was not appropriate for salespeople from
8   Abbott to talk about third-party profitability
9   with customers?
10    A.   I actually don't recall.
11    Q.   But you would agree with me that at
12  least by the time that you prepared this
13  presentation, you knew that it was not
14  appropriate --
15    A.   Mm-hmm.
16    Q.   -- for Abbott salespeople to discuss
17  third-party profitability with customers,
18  correct?
19    A.   I think we thought it wasn't
20  appropriate, yes.
21    Q.   But you have no present recollection as
22  to whether or not you thought it was appropriate

Page 863

1   before you prepared this presentation, correct?
2        MS. TABACCHI:  Object to the form.
3   You're asking a different question now.
4        MR. BREEN:  It is a different question.
5   That's why I'm asking it.
6        Could you read the question back,
7   please?  Thank you.
8        (Record read.)
9        MS. TABACCHI:  Object to the form.
10       THE WITNESS:  I could have thought it
11  was appropriate, not appropriate.  I -- I just
12  don't recall.
13  BY MR. BREEN:
14    Q.   Okay.  Now if you'd go to -- almost to
15  the end.  It's DOJ 0377113, "Field Sales Can't
16  Do's."  Do you see that?
17    A.   I do.
18    Q.   "Cannot Provide:  AWPs."  Do you see
19  that?
20    A.   Yes.
21    Q.   Do you have a present recollection as
22  to whether or not you knew that it was not

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 864

1 appropriate for field sales personnel to provide
2 AWPs to customers before your involvement with
3 this presentation?
4      MS. TABACCHI:  Object to the form.
5      THE WITNESS:  Say that again.
6 BY MR. BREEN:
7    Q.  I'll restate the question.  Let's do it
8 this way.  Well, you will agree with me, won't
9 you, that at least by the time you prepared this
10 presentation or participated in its preparation,
11 you believed it would not be appropriate for
12 field sales reps to provide AWPs to customers.
13 Correct?
14      MS. TABACCHI:  Object to the form.
15      THE WITNESS:  I think at this point we
16 felt it was better if sales reps didn't provide
17 this information.
18 BY MR. BREEN:
19    Q.  So you called it a "can't do," correct?
20    A.  Yes.
21    Q.  All right.  Okay.  Now, do you have a
22 present recollection of -- before you did this

Page 865

1 presentation of believing that it would not be
2 appropriate for a field sales rep to provide AWP
3 information to customers?
4      MS. TABACCHI:  Object to the form.
5      THE WITNESS:  I actually don't -- don't
6 know if I had an opinion or not.
7 BY MR. BREEN:
8    Q.  Okay.  Now, two bullets down,
9 "Profitability information or calculation tools,"
10 and, in parens, "marketing the spread."  Do you
11 see that?
12    A.  Mm-hmm, yes.
13    Q.  Now, when you prepared the presentation
14 --
15    A.  Mm-hmm.
16    Q.  -- did you believe it would not be
17 appropriate for field sales representatives to
18 discuss profitability information or calculation
19 tools or market the spread with customers?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  That appears to be what
22 it -- what it says here, yes.

Page 866

1 BY MR. BREEN:
2    Q.  Okay.  Do you have a present
3 recollection today of whether or not you thought
4 that providing profitability information or
5 calculation tools, marketing the spread, was
6 inappropriate before you prepared this
7 presentation?
8      MS. TABACCHI:  Object to the form.
9      MR. BREEN:  What's wrong with that
10 question, Counsel?
11      MS. TABACCHI:  You haven't established
12 a foundation that she's prepared -- your
13 questions assume that she is the one that
14 prepared this.  It's inconsistent.
15 BY MR. BREEN:
16    Q.  All right.  Let me ask the question
17 this way.
18    A.  Mm-hmm.
19    Q.  At the time that this presentation was
20 -- was prepared, did you believe it would be
21 inappropriate for field sales reps to discuss
22 profitability information or calculation tools,

Page 867

1 i.e., marketing the spread, with customers?
2    A.  I believed it was better not to provide
3 this information.
4    Q.  So you believed it was a "can't do,"
5 correct?
6    A.  Well, I reviewed this presentation, so
7 I suppose I agreed with what they were saying
8 here.
9    Q.  And did you agree that that was
10 Abbott's policy, that it was a "can't do" as of
11 the time of this presentation?
12    A.  I believe that this policy was
13 applicable to Ross.
14    Q.  Oh.  So was it inapplicable to the rest
15 of Abbott?
16    A.  I don't know.  I wouldn't -- I wouldn't
17 know that.
18    Q.  Well, right now your position at Abbott
19 is what?
20    A.  I don't remember if it -- I might have
21 just joined OEC at that point.  So I was pretty
22 new in the position, I believe.

78 (Pages 864 to 867)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

Page 868

1    Q.   Okay.  Is it a -- is this particular
2  conduct a "can't do" for all Abbott salespeople
3  today?
4    A.   It -- it would be a violation of our
5  policy.
6    Q.   Okay.  Now, do you have a present
7  recollection, sitting here today, as to whether
8  it was a violation of any Abbott policy for any
9  division prior to the time of this presentation
10  for salespeople to discuss profitability
11  information or calculation tools such as
12  marketing the spread?
13    A.   I -- I don't know.  I don't know if
14  there was a policy.  I don't remember.
15    Q.   Okay.  Go to the next page.  Can't do,
16  first bullet point, "Conduct reimbursement
17  presentations to Customers."  Do you see that?
18    A.   Yes.
19    Q.   At the time that this presentation was
20  prepared, the one that's now Exhibit 25, did you
21  believe that it was improper for Ross sales
22  personnel to conduct reimbursement presentations

Page 869

1  to customers?
2         THE WITNESS:  Repeat that question.
3         (Record read.)
4         THE WITNESS:  I believe that it's
5  better if -- if the information is not provided
6  by the sales reps.
7  BY MR. BREEN:
8    Q.   As a matter of fact, today that's a
9  violation of Abbott policy companywide, correct?
10    A.   There are instances where there can be
11  reimbursement presentations to customers.  It --
12  there -- and there can also be exceptions to
13  policy.  So that's not a blanket --
14    Q.   Now --
15    A.   -- policy.
16    Q.   -- you work in the corporate compliance
17  department now, right?
18    A.   No.
19    Q.   You work in what right now?
20    A.   Government affairs.
21    Q.   Government affairs.  Okay.  You no
22  longer have any corporate compliance

Page 870

1  responsibilities?
2    A.   Well, I do review reimbursement
3  materials to assure that they comply with our
4  reimbursement policy.
5    Q.   Okay.  So today is it okay for Abbott -
6  - any Abbott employee to market an Abbott product
7  by showing the customer that Medicare or Medicaid
8  reimbursement based upon Abbott's inflated AWPs
9  will result in a significant profit to the
10  customer if the customer buys Abbott's drugs?  Is
11  that okay today at Abbott?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  Our policy is that cus --
14  that sales -- that Abbott employees cannot
15  discuss profits with customers.
16  BY MR. BREEN:
17    Q.   Can they discuss AWPs at all with
18  customers?
19    A.   Sales -- managed care can provide AWPs.
20  All other Abbott employees are prohibited.
21    Q.   Okay.  And to your knowledge, does
22  Abbott have any policy in place designed to

Page 871

1  ensure that it doesn't report information that
2  will result in inflated AWPs?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  That's not in the
5  reimbursement information.  I'm sure they do, but
6  I don't know it.  I don't -- I'm sure they do,
7  but I don't know where it is.
8  BY MR. BREEN:
9    Q.   Okay.  But you're just speculating when
10  you say you're sure they do?
11    A.   I -- I am actually speculating.  I have
12  no idea.
13    Q.   Okay.  Right.  You have no information
14  available to you --
15    A.   Right.
16    Q.   -- one way or the other, do you?
17    A.   Right, no.
18         MR. BREEN:  Okay.  It's 6:02, and we
19  said we were going to end unless --
20         THE WITNESS:  5:02.
21         MR. SISNEROS:  5:02.
22         MR. BREEN:  Sure, 5:02.

79 (Pages 868 to 871)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Tobiason, Virginia - Vol. III   HIGHLY CONFIDENTIAL                January 22, 2008
Chicago, IL

| | |
|---|---|
| Page 872 | Page 874 |

Page 872

1       MS. TABACCHI:  It feels like 6:02.
2       MR. BREEN:  Is that fine?
3       MS. ST. PETER-GRIFFITH:  Yeah, that's
4   fine --
5       THE WITNESS:  Feels like 8:02.
6       MS. ST. PETER-GRIFFITH:  -- except the
7   United States would make the reservation that at
8   present, Abbott's production appears to be still
9   ongoing, and it sounds like there might be some
10  production concerning Ms. Tobiason and her e-
11  mails that predate 2002 that have not been
12  produced.
13      So the United States reserves the right
14  to recall this witness in the event that Abbott
15  produces additional documents.
16      MR. SISNEROS:  California makes the
17  same reservation.  We are just initiating our
18  discovery in our case.
19      Additionally -- and this is in an
20  effort to bring a common into this case.  Would
21  you be willing to stipulate that California can
22  use as their own the deposition of Ms. Tobiason

Page 874

1       (Off-the-record discussion.)
2       MS. TABACCHI:  We'll reserve signature.
3   Mark it also --
4       MS. ST. PETER-GRIFFITH:  Tina, will she
5   be reading now that we're done?
6       MS. TABACCHI:  Yeah.  As soon as we're
7   done, yeah, we'll send it back to you when it's
8   final --
9       MS. ST. PETER-GRIFFITH:  Okay.
10      MS. TABACCHI:  -- because I don't think
11  she read the other one.
12      MS. ST. PETER-GRIFFITH:  Yeah, that's
13  what I meant is that will she be --
14      MS. TABACCHI:  Yeah.  Okay.  I need to
15  talk to her about that.  Okay.
16      (Proceedings concluded at 5:04
17  p.m.)
18
19
20
21
22

Page 873

1   taken in, I guess, the Texas case, part of the
2   MDL, on March 28th, 2007?
3       MR. BREEN:  I think you already agreed
4   to that, haven't you?
5       MS. TABACCHI:  We did have this
6   agreement off the record.  I think Eliseo is just
7   putting it on the record.
8       MR. SISNEROS:  Okay.  Thank you.
9       MS. TABACCHI:  I'm taking you on good
10  faith that you're not going to go out of your way
11  to ask Ms. Tobiason questions again some other
12  day.
13      MR. SISNEROS:  No, no, no.
14      MS. TABACCHI:  But we can address that
15  when --
16      MR. SISNEROS:  But if I do ask her
17  questions, it's going to be on new material.
18      MR. BREEN:  Are you done?
19      MR. SISNEROS:  We're done.
20      THE VIDEOGRAPHER:  We are off the
21  record at 5:03 p.m. with the conclusion of the
22  deposition of Virginia Tobiason.

Page 875

1       ACKNOWLEDGMENT OF DEPONENT
2
3   IN RE PHARMACEUTICAL      )  MDL No. 1456
4   INDUSTRY AVERAGE WHOLESALE   )  Master File No.
5   PRICE LITIGATION          )  01-12257-PBS
6
7       I hereby certify that I have read the
8   foregoing transcripts of my deposition,
9   consisting of pages 559 to 874 and given at the
10  times and places aforesaid, and I do again
11  subscribe and make oath that the same are true,
12  correct, and complete transcripts of my deposition
13  so given as aforesaid and include changes, if any,
14  so made by me.
15
16      _____
17          VIRGINIA TOBIASON
18  SUBSCRIBED AND SWORN TO before me this _____ day
19  of _____, A.D. 2008.
20
21  _____
22      Notary Public

80 (Pages 872 to 875)

5782fcad-66ca-441d-b9e5-098bbaf172a6

Page 876

1   STATE OF ILLINOIS )
2              ) SS:
3   COUNTY OF C O O K )
        I, LAURA R. RENKE, a Certified Shorthand
4   Reporter within and for the State of Illinois, do
    hereby certify:
5          That previous to the commencement of the
    examination of the witness, the witness was duly
6   sworn to testify the whole truth concerning the
    matters herein;
7          That the foregoing deposition was
    reported stenographically by me, was thereafter
8   reduced to an electronic transcript by me,
    pages 559 through 876, inclusive, and constitutes
9   a true record of the testimony given and the
    proceedings had;
10         That the said deposition was taken
    before me at the time and place specified;
11         That the reading and signing by the
    witness of the deposition transcript was agreed
12  upon as stated herein;
           That I am not a relative or employee or
13  attorney or counsel, nor a relative or employee of
    such attorney or counsel for any of the parties
14  hereto, nor interested directly or indirectly in
    the outcome of this action.
15         IN WITNESS WHEREOF, I do hereunto set my
    hand at Chicago, Illinois, this 29th day of
16  January, 2008.
17
18      _____
19          Certified Shorthand Reporter
20          State of Illinois
21
22  CSR License No. 084-003184.

5782fcad-66ca-441d-b9e5-098bbaf172a6