# Exhibit 115

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


--------------------------------X
In re: PHARMACEUTICAL INDUSTRY   )  MDL DOCKET NO.
AVERAGE WHOLESALE PRICE           )  CIVIL ACTION
LITIGATION.                       )  01CV12257-PBS
--------------------------------X


DEPOSITION OF LYNN E. LEONE

JANUARY 17, 2008


        The videotaped deposition of LYNN E.
LEONE, called by the United States for examination,
Taken pursuant to subpoena and pursuant to the
Federal Rules of Civil Procedure for the United
States District Courts pertaining to the taking of
depositions, taken before Rachel F. Gard, Certified
Shorthand Reporter, at 77 West Wacker Drive, Suite
3500, Chicago, Illinois, commencing at 9:05 a.m. on
the 17th day of January, A.D., 2008.

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 2

1  APPEARANCES:
2
3  Telephonically on behalf of the United
4  States:
5       U.S. DEPARTMENT OF JUSTICE
6       CIVIL DIVISION
7       MS. ANN ST. PETER-GRIFFITH
8       99 N.E. 4th Street
9       Miami, Florida 33132
10      Phone: (305) 961-9003
11      Email: ann.stpeter-griffith@usdoj.gov
12
13 On behalf of the State of California:
14      STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
15      BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
16      MR. ELISEO SISNEROS
17      110 West A Street
18      Suite 1100
19      San Diego, California 92101
20      Phone: (619) 688-6043
21      Email: eliseo.sisneros@doj.ca.gov
22

Page 3

1  APPEARANCES: (CONTINUED)
2
3  On behalf of the Relator Ven-A-Care of the
4  Florida Keys, Inc.:
5       ANDERSON, LLC
6       MR. C. JARRETT ANDERSON
7       208 West 14th Street
8       Suite 3-B
9       Austin, Texas 78701
10      Phone: (512) 469-9191
11      Email: jarrett@anderson-llc.com
12
13 On behalf of Abbott Laboratories and the
14 Deponent:
15      JONES DAY
16      MS. TONI-ANN CITERA
17      222 East 41st Street
18      New York, New York 10017
19      Phone: (212) 326-3939
20      Email: tcitera@jonesday.com
21
22 ALSO PRESENT: Anthony Micheletto, Videographer

Page 4

1            I N D E X
2
3  WITNESS: LYNN E. LEONE          PAGE
4  Examination by Ms. St. Peter-Griffith...... 009
5  Examination by Mr. Anderson................ 279
6
7
8         E X H I B I T S
9  NUMBER          DESCRIPTION          PAGE
10 Exhibit Leone 001-ABT-DOJ 319883 - 984 and
11        ABT-DOJ319889................ 157
12 Exhibit Leone 002-ABT-DOJ 303226 - 245......... 159
13 Exhibit Leone 003-ABT-DOJ 3180124.............. 171
14 Exhibit Leone 004-ABT-DOJ 321673 - 674......... 181
15 Exhibit Leone 005-ABT-DOJ 319885............... 185
16 Exhibit Leone 006-ABT-DOJ 320059 - 060......... 191
17 Exhibit Leone 007-ABT-DOJ 317622 - 635......... 199
18 Exhibit Leone 008-ABT-DOJ 324178 and
19        ABT-DOJ 324166 - 175......... 205
20 Exhibit Leone 009-Coram 0451................... 215
21 Exhibit Leone 010-Coram 0452 - 460............. 215
22 Exhibit Leone 011-LNHQ-05157.................. 230

Page 5

1       E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit Leone 012-ABT-DOJ-E 0193744............ 233
4  Exhibit Leone 013-ABT-DOJ-E 0012023 and
5        ABT-DOJ-E 0012099............ 237
6  Exhibit Leone 014-ABT-DOJ 0201419 - 420........ 249
7  Exhibit Leone 015-ABT-DOJ 0173355 - 356........ 253
8  Exhibit Leone 016-ABT-DOJ 0377119 - 164........ 332
9  Exhibit Leone 017-ABT-DOJ 0377165 - 201........ 332
10 Exhibit Leone 018-Harling 000035 - 047......... 281
11 Exhibit Leone 019-TXTABT-E 0065052 - 067....... 300
12 Exhibit Leone 020-ABT AWP/MDL 197141 - 162..... 315
13 Exhibit Leone 021-ABT AWP/MDL 143317........... 336
14 Exhibit Leone 022-BR 02495.................... 356
15 Exhibit Leone 023-BR 02418.................... 361
16 Exhibit Leone 024-BR 02422.................... 365
17
18
19
20
21
22

2 (Pages 2 to 5)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 6

```
 1            P R O C E E D I N G S
 2
 3        THE VIDEOGRAPHER:  This is Anthony
 4   Micheletto representing Henderson Legal Services.
 5   I am the operator of this camera.  This is the
 6   videotaped deposition of Lynn Leone as being
 7   taken pursuant to Federal Rules of Civil
 8   Procedure on behalf of the plaintiff.
 9        We are on the record on January 17th,
10   2008.  The time is 9:05 a.m. as indicated on the
11   video screen.  We are at the offices of Jones
12   Day, 77 West Wacker Drive, Chicago, Illinois.
13        The case is captioned In Re:
14   Pharmaceutical Industry, Average Wholesale Price
15   Litigation, Case No. 01-12257-PBS.
16        Will the attorneys please identify
17   themselves for the video record.
18        MR. ANDERSON:  Jarrett Anderson for the
19   relator.
20        MS. ST. PETER-GRIFFITH:  Ann St. Peter-
21   Griffith on behalf of the United States.
22        MR. SISNEROS:  Eliseo Sisneros,
```

Page 7

```
 1   Attorney General, State of California.
 2        MS. CITERA:  Toni Citera for the
 3   defendant.
 4        THE VIDEOGRAPHER:  The court reporter
 5   is Rachel Gard from Henderson Legal Services of
 6   Washington, D.C.  Please swear in the witness.
 7        (Witness sworn.)
 8        MR. ANDERSON:  Good morning, Ms. Leone.
 9        THE WITNESS:  Good morning.
10        MR. ANDERSON:  You realize this is a
11   continuation of a prior deposition that you've
12   given in this matter?
13        THE WITNESS:  Yes.
14        MR. ANDERSON:  I was asking you
15   questions, I believe, at the time that the prior
16   questioning was concluded for the day.  And at
17   this point, I'm going to pass the witness.  And
18   depending on how the questions go for the
19   remainder of the day, I may or may not have
20   additional questions for you toward the end of
21   the day.
22        THE WITNESS:  Okay.
```

Page 8

```
 1        MR. ANDERSON:  Okay, Ann.
 2        MS. ST. PETER-GRIFFITH:  Okay.  Toni,
 3   before we get started with questioning, I'd just
 4   like to get on the record that now -- the Texas
 5   deposition is concluded and now we're -- we've
 6   moved on to the federal portion, so can we
 7   operate -- Do you have an objection to operating
 8   under the Federal Rules?
 9        MS. CITERA:  No.
10        MS. ST. PETER-GRIFFITH:  Okay.  Good
11   morning, Ms. Leone.
12        THE WITNESS:  Good morning.
13        MR. ANDERSON:  Can I interject one
14   thing, Ann?
15        MS. ST. PETER-GRIFFITH:  Sure.
16        MR. ANDERSON:  When you say the federal
17   deposition, you mean both cases pending in the
18   MDL, both the California case and the United
19   States case?
20        MS. ST. PETER-GRIFFITH:  Correct, yes.
21   I meant a reference to AWP/MDL litigation.
22        MR. ANDERSON:  Right, thank you.
```

Page 9

```
 1   WHEREUPON:
 2        LYNN E. LEONE,
 3   called as a witness herein, having been first
 4   duly sworn, was examined and testified as
 5   follows:
 6
 7            EXAMINATION
 8   BY MS. ST. PETER-GRIFFITH:
 9      Q.  Good morning, Ms. Leone.
10      A.  Good morning.
11      Q.  Ma'am, we've had some time pass between
12   when you last sat down for your deposition.  And
13   I wanted to inquire of you what you've done to
14   prepare for today's reconvened deposition.
15      A.  I met with Toni Citera yesterday, and
16   we had a conference call on Monday morning.  And
17   I reviewed my deposition from last summer and the
18   exhibits that went along with it.
19      Q.  And when you met with Ms. Citera, was
20   anyone else with you?
21      A.  For part of the time, there was in-
22   house counsel.
```

3 (Pages 6 to 9)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

| Page 10 |
| --- |

1    Q.   And do you recall the name of that in-
2  house counsel?
3    A.   Yes.  It was Royce Bedward.
4    Q.   Okay.  And is that in-house counsel for
5  Abbott or in-house counsel for Hospira?
6    A.   In-house counsel for Hospira.
7    Q.   And I apologize.  I know I frequently
8  mispronounce Hospira.  You can correct me,
9  please.
10    A.   Okay.
11    Q.   Did you meet with anybody else?
12    A.   No.
13    Q.   Approximately how much time did you
14  spend meeting with Ms. Citera?
15    A.   For two hours on Monday morning and for
16  about six hours yesterday.
17    Q.   And the two hours was the telephonic
18  conference you referenced?
19    A.   Yes.
20    Q.   Okay.  And was anybody else on that
21  telephonic conference?
22    A.   No.

| Page 11 |
| --- |

1    Q.   Other than reviewing your deposition
2  transcript and the exhibits, did you review any
3  other documents?
4    A.   Ms. Citera showed me a couple of pages
5  out of the case management training manual from
6  Home Infusion Services.
7    Q.   Do you have a copy of those documents?
8        MS. CITERA:  They were produced by
9  Bruce Rodman.
10        MS. ST. PETER-GRIFFITH:  Okay.  Which
11  pages?  Do you have them?
12        MS. CITERA:  Oh, I don't have them with
13  me.
14        MS. ST. PETER-GRIFFITH:  Toni, can you
15  just at some point email me the Bates numbers of
16  those pages?
17        MS. CITERA:  Sure.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   Ma'am, since your -- the last time we
20  were together at your deposition, have you had
21  any conversations with anyone concerning your
22  deposition or the subject matter of the lawsuit?

| Page 12 |
| --- |

1    A.   No, other than Ms. Citera and Abbott
2  counsel when they sent me the deposition and then
3  Royce from Hospira.
4    Q.   Okay.  Who did -- Did you speak with
5  someone at Abbott in-house counsel?
6    A.   Not about the deposition per se.  Just
7  about reviewing the deposition, and that's pretty
8  much -- that was pretty much it.
9    Q.   Okay.  So when the deposition
10  transcript was forwarded to you, it was forwarded
11  by someone in-house at Abbott?
12    A.   Yes.
13    Q.   Okay.  Other than conversations with
14  counsel -- So then other than conversations with
15  counsel or communications with counsel, you
16  haven't spoken with anyone else about your
17  deposition or about the subject matter of this
18  lawsuit?
19    A.   No.
20    Q.   Okay.  You referenced at your first
21  deposition that you did have a conversation with
22  Mike Sellers.  Do you recall giving that

| Page 13 |
| --- |

1  testimony?
2    A.   Yes.
3    Q.   Okay.  What did you discuss with him?
4    A.   He asked me a couple of questions.  I
5  think this was -- I think he was asking me
6  questions in relationship to the deposition that
7  he was going to give as the 30(b), or whatever
8  that is, something (b).
9    Q.   30(b)(6) witness?
10    A.   Yes, the 30(b)(6) witness.  There were
11  a couple of questions.  I don't remember what we
12  talked about.  I don't remember what those
13  specific questions were that he asked me.
14    Q.   Okay.  Do you recall whether they
15  pertained to Abbott or Hospira -- Hospira?
16    A.   I believe they were Abbott questions.
17    Q.   Okay.  Do you know whether they
18  pertained to Abbott HPD or Abbott Alt Site more
19  specifically?  Do you remember the general
20  subject matter?
21    A.   I believe they were Alternate Site
22  questions, but that was -- that's as far as my

                                    4 (Pages 10 to 13)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 14

1  recollection goes.
2     Q.  Okay.  Do you recall what responses you
3  gave to him?
4     A.  No, because if I remembered the
5  questions, I'd probably remember what I
6  responded.
7     Q.  Okay.  Were you able to respond to the
8  questions that he asked?  Or did he ask you
9  questions and you just didn't know the answer or
10 couldn't remember the answer?
11    A.  I don't recall what we talked about.  I
12 mean, that's how blank my memory is on that.
13    Q.  Okay.  Other than it may have pertained
14 to Alt Site --
15    A.  Right.
16    Q.  Okay.  Ma'am, have you had any other
17 conversations with anyone other than counsel
18 concerning this lawsuit at all either before your
19 deposition or -- we've covered after, but before
20 your deposition?
21    A.  No.
22    Q.  Okay.  Has anyone asked you to help

Page 15

1  identify Alternate Site sales force individuals
2  or individuals who served on Abbott's Alt Site
3  sales force?
4     A.  No.
5     Q.  Do you know whether there are Alt Site
6  or former Alt Site sales force members who are
7  currently Hospira employees?
8     A.  Yes, there are.
9     Q.  Okay.  Do you know whether Hospira has
10 sort of Hospira or company-wide email
11 capabilities?
12    A.  Yes, there is.
13    Q.  Do you ever recall seeing any email
14 inquiry or hearing about any inquiry of Hospira
15 employees as to whether or not someone or -- as
16 to the identification of former Alt Site sales
17 force members?
18        MS. CITERA:  I'm just going to caution
19 you not to reveal any discussions with counsel
20 that you may have had.
21 BY THE WITNESS:
22    A.  Okay.  Because that was what I was just

Page 16

1  going to say.  A couple of years ago, I was asked
2  to help pull some flow charts of individuals; and
3  that's -- that was a couple of years ago, just to
4  identify the people within Hospira who might have
5  them.  And that's as involved as I ever got in
6  that, and that was at the request of counsel.
7     Q.  Okay.  Did those flow charts include
8  the identification of sales force individuals?
9     A.  It had their names on it.
10    Q.  Okay.  And that was a couple years ago?
11    A.  Yeah, that was in relation to pulling
12 some data.
13    Q.  Okay.  And where did you pull that data
14 from?
15    A.  I went to the various organizations to
16 ask them if they had those organizational flow
17 charts.  And then I forwarded them on to Abbott
18 who I believe forwarded them on to Jones Day.
19    Q.  When you say those organizations, what
20 do you mean?  Within Hospira or at Abbott?
21    A.  They were old flow charts, old
22 organization charts from Abbott days.

Page 17

1     Q.  From, I'm sorry, Abbott what?
2     A.  From when we were a part of Abbott
3  Laboratories.
4     Q.  Okay.  Did you pull that information,
5  though, from Abbott records at an Abbott
6  facility; or did you pull them from Abbott
7  records at a Hospira facility?
8     A.  Abbott records at a Hospira facility.
9     Q.  Have you been involved -- Have you been
10 with any pulling of records at Hospira that are
11 old Abbott records other than those particular
12 flow charts?
13        MS. CITERA:  Again, I'm just going to
14 caution you not to reveal any conversations.  You
15 can answer the question that's posed to you.
16 BY THE WITNESS:
17    A.  Okay.  When -- When we have been
18 requested by counsel to pull any type of
19 information, I have been the key person that's
20 been contacted to get in touch with the
21 appropriate individuals to pull that data.
22    Q.  Okay.  So let's break this out a little

5 (Pages 14 to 17)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                          January 17, 2008
                          Chicago, IL

Page 18

1  bit. How many times have you been contacted to
2  pull information?
3      A.  I don't know how many times.  I would
4  guess that whenever there was data that needed to
5  be pulled, I was the one who ended up being
6  contacted to pull it.  So I mean, I can't tell
7  you how many times because I don't remember.
8      Q.  Okay.  Well, when did the requests
9  first start coming in?
10     A.  Several years ago.  I can't say how far
11 back, but several years ago.
12     Q.  And would you receive copies of the
13 production requests from the United States?
14     A.  Yes.
15         MS. CITERA:  Objection to form.
16 BY THE WITNESS:
17     A.  Oh.  Yes, I would for the information
18 that was pertaining to what they were asking us
19 to get.
20     Q.  Okay.  And how many times do you recall
21 receiving requests for production from the United
22 States?

Page 19

1      A.  You know, I don't remember when it was
2  information for the United States or whether it
3  was information for Texas.  I just would take the
4  requests and see what I could do about finding
5  the data and -- so that we could pull it.
6      Q.  Okay.  And you can't quantify how many
7  times? Just can you ballpark?  Was it more than
8  25?
9          MS. CITERA:  Objection, form.
10 BY THE WITNESS:
11     A.  You know, I really don't know how many
12 times.
13     Q.  Well, you can't even ballpark it?  I
14 mean, approximately how frequently did you
15 receive them?  Once a month?  Once a week?
16         MS. CITERA:  Objection to form.
17 BY THE WITNESS:
18     A.  Well, certainly not once a month.  I
19 would just say whenever those requests came in
20 and they were looking for information related to
21 HPD, I was the person who was contacted.  And I
22 would try to determine where to go to get that

Page 20

1  information.  I have -- You know, I have some
2  files with all of the information; but I don't
3  know how many times those requests came through.
4      Q.  Okay.  What did you do once you
5  received a request for information?
6          MS. CITERA:  Objection, form.
7  BY THE WITNESS:
8      A.  I would try to determine who might have
9  access to the information that was being
10 requested, contact that organization, and ask
11 them or that group or if it was, you know, the
12 product and price data, I would get in touch with
13 our IT department and ask them to start pulling
14 the data.
15     Q.  Okay.  Let's start with your IT
16 department.  Who would you contact at your IT
17 department?
18         MS. CITERA:  Objection to form.
19 BY THE WITNESS:
20     A.  I would most frequently contact Nancy
21 Carlson, and we would work together to determine
22 the appropriate individuals -- excuse me -- the

Page 21

1  appropriate individuals to start gathering the
2  data.
3      Q.  Okay.  And who would some of those
4  individuals be?
5          MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7      A.  There was one person on her team who
8  was the main contact.  That was Anna Mukkada.
9      Q.  Can you spell that, please?
10     A.  M U K K A D A.  And then most
11 frequently we were subcontracting pulling the
12 data out to another company which I believe was
13 offshore.  And they would actually pull the data,
14 pull the data for us, send it back to me, I'd
15 review it, a sample of it to make sure it was
16 what was being requested.  Then they'd pull the
17 final data, and we would get all of the discs
18 together.  And then I would get them to Abbott to
19 forward on to all of you.
20     Q.  Okay.  And what was the name of that
21 offshore company?
22     A.  Cognizant.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 22

1    Q.  And where are they based?
2    A.  I think they're in India, but I'm not
3  sure.
4    Q.  And would they be provided with access
5  to Hospira's databases?
6        MS. CITERA:  Objection to form.
7  BY THE WITNESS:
8    A.  They had access to the historical
9  information for both Abbott and the current
10  Hospira information.
11    Q.  Okay.  And what requests did they
12  fulfill that you can recall, what data requests?
13    A.  All of the data requests that we've had
14  for pulling indirect sales with all of the
15  charge-back information, all of the wholesaler
16  information; as part of Hospira, the information
17  that we pulled for Texas for the Hospira direct
18  and indirect sales since we became Hospira.  And
19  those I think are the most recent requests.
20  Those are the ones that I remember, obviously
21  have the greatest recollection of.
22    Q.  Okay.  Other than the charge-back info,

Page 23

1  the wholesaler info, and the Hospira direct and
2  indirect sales, any other data requests that were
3  made to Cognizant at your direction?
4    A.  Any other -- Any other requests that
5  we've received to pull sales data went through
6  that process.  And, you know, I'm talking about
7  going back several years.  So I can't remember
8  all of the different data requests we received.
9  But any one of them that we did receive went
10  through that process.
11    Q.  When was the -- You indicated that the
12  Hospira request was the last request.  When did
13  that come in?
14    A.  Last summer.
15    Q.  And when was it -- When did Cognizant
16  complete the job?
17    A.  I believe we completed that in August.
18  I believe that's when we provided the data for
19  that.
20    Q.  Okay.  And what about the indirect
21  sales, the charge-back and wholesaler
22  information?  When did you receive that request,

Page 24

1  and when was it completed?
2    A.  The Abbott or the Hospira?
3    Q.  Let's start with the Abbott.
4    A.  I think the last time we pulled sales -
5  - sales information for Abbott was a year, year
6  and a half ago.  But I can't -- I mean, I can't
7  remember the exact dates.
8    Q.  Okay.  And when -- What's the time
9  frame for the Abbott data that you have, the
10  Abbott computer data that you have access to?
11        MS. CITERA:  Objection to form.
12  BY THE WITNESS:
13    A.  I'm not sure how far back it goes.  I
14  know that since all of the -- this litigation has
15  started, nothing has been purged.  So whatever we
16  had at that point when all of that started, we've
17  not purged anything.  So however far back that
18  went for the indirect data, we have that
19  information as far as I know.
20    Q.  And that data that you have is the
21  former Hospital Products Division data?
22    A.  The former Hospital Products Division

Page 25

1  indirect sales data.
2    Q.  Indirect sales data?
3    A.  Yes.
4    Q.  Do you have any other data?
5        MS. CITERA:  Objection to form.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Does the Hospital Products Division
8  have any other computer -- I'm sorry.
9        Does Hospira have any other historical
10  computer data that is HPD computer information?
11        MS. CITERA:  Object to the form.
12  BY THE WITNESS:
13    A.  I don't know the answer to that.  I
14  think that's probably a question that would have
15  to be directed to our IT department.  I'm not
16  sure what -- what all we have in our files versus
17  what Abbott has.
18    Q.  Well, when you initiate a request, what
19  do you request?
20        MS. CITERA:  Objection to the form.
21  BY THE WITNESS:
22    A.  It depends what's being requested.  The

7 (Pages 22 to 25)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

---

Page 26

1  majority of the requests we've received have been
2  for sales data, and I've just kind of explained
3  to you the sales data process.  But I'm not sure
4  about any other data.  I know when we -- when we
5  received the requests for the flow -- the
6  organizational flow charts, I went to the various
7  organizations that we were requested to provide
8  that information for and they forwarded on what
9  they had.
10     Q.  Okay.  Do you know how complete that
11 information was concerning the sales force?
12         MS. CITERA:  Objection to form.
13 BY THE WITNESS:
14     A.  No, I don't.
15     Q.  Okay.  Do you have any sense of whether
16 you obtained, you know, a less significant amount
17 or a large percentage of the information
18 concerning the sales force?
19         MS. CITERA:  Objection to the form.
20 BY THE WITNESS:
21     A.  No, I don't.
22     Q.  Okay.  Do you know whether the computer

---

Page 27

1  information, the historical computer information
2  for Hospital Products Division that -- Well, let
3  me ask you this:  Why is the historical -- Why is
4  the request for the historical data or computer
5  information for Hospital Products Division being
6  directed to someone at Hospira?
7          MS. CITERA:  Objection to form.
8  BY THE WITNESS:
9      A.  I don't know -- I don't know that.  I
10 know that when they're looking for information
11 that Abbott doesn't have, they ask me if I can
12 see what I can find.
13     Q.  Okay.  Well, do you have a sense as to
14 what -- Well, let me ask you:  Is Hospira
15 maintaining computer records that contain Abbott
16 historical information?
17         MS. CITERA:  Objection to the form.
18 BY THE WITNESS:
19     A.  I can only respond to the sales data
20 that I know that we've been keeping.  Anything
21 else, I'm not -- I can't answer the question.
22     Q.  Okay.  Do you know whether you have any

---

Page 28

1  email files, whether Hospira has any historical
2  HPD email files?
3          MS. CITERA:  Objection to form.
4  BY THE WITNESS:
5      A.  Again, I don't know the answer to that
6  question.
7      Q.  Let me ask you, you were an Abbott HPD
8  employee prior to January 1, 2002, right?
9      A.  Yes, I was.
10     Q.  Did you utilize email?
11     A.  Yes, I did.
12     Q.  Okay.  How frequently?
13     A.  I think like everyone, we all have been
14 using email more and more over the last few
15 years.  So I would guess that was a good piece of
16 the way people communicated and I communicated
17 with other people.
18     Q.  Okay.  So in 2001, is it fair to say
19 that you used it with some frequency?
20     A.  Yes.
21         MS. CITERA:  Objection to form.
22 BY MS. ST. PETER-GRIFFITH:

---

Page 29

1      Q.  Okay.  What about 2000?
2          MS. CITERA:  Objection to form.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Did you use email with some frequency?
5      A.  Yes, I would say I did.
6      Q.  What about in '99?  Did you use email
7  with some frequency?
8          MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.  I would say yes.
11     Q.  What about '98?  Did you use email with
12 some frequency?
13         MS. CITERA:  Same objection.
14 BY THE WITNESS:
15     A.  We first had -- or I first had access
16 to email in 1992, and it was very limited.  As
17 the years went on, it was used more frequently.
18     Q.  Okay.  But in '98, were you using it
19 with some frequency?
20         MS. CITERA:  Objection to the form.
21 BY THE WITNESS:
22     A.  Yes.

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

---

Page 30

1    Q.  Were you using it daily?
2    A.  Yes.
3    Q.  Okay.  Were you using it daily in 1999
4  through 2001?
5    A.  Yes.
6    Q.  Approximately how many times a day?
7        MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9    A.  I can't say how many emails I got or
10  how many emails I wrote.
11    Q.  Was it a lot on a daily basis?
12        MS. CITERA:  Objection to the form.
13  BY THE WITNESS:
14    A.  I don't know what you would consider a
15  lot.
16    Q.  More than 50?
17    A.  I was just going to say, probably
18  around 50.
19    Q.  Okay.  What about in '97, '96 and '97?
20  Were you using email with some frequency when you
21  were an HPD employee?
22        MS. CITERA:  Objection to form.

---

Page 31

1  BY THE WITNESS:
2    A.  I was using it on a daily basis.
3  Probably the numbers at that point were below 50
4  a day.
5    Q.  What about in '94 -- Well, if it's
6  below 50 a day, can you guesstimate how -- Or I
7  don't want you to guess actually.  Do you have a
8  recollection as to the general frequency that you
9  used it on a daily basis?
10        MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12    A.  As I said, as the years went on, there
13  was more communication through email.  So I would
14  say it was less than 50.  Maybe somewhere between
15  25 and 40 --
16    Q.  Okay.
17    A.  -- a day.
18    Q.  For the '95/96 time frame?
19    A.  Yes.
20    Q.  Okay.  What about for the '94 -- '93
21  and '94 time frame?
22        MS. CITERA:  Objection to the form.

---

Page 32

1  BY THE WITNESS:
2    A.  I would say, again, probably 25 would
3  be the max per day.
4    Q.  Okay.  Is that true for '92 as well?
5        MS. CITERA:  Objection to the form.
6  BY THE WITNESS:
7    A.  Probably less than for '92.
8    Q.  Okay.  Is that just because you just
9  started on the system?
10    A.  Yes.
11    Q.  Okay.  Ma'am, you received the
12  litigation hold memos -- or let me ask you --
13  Strike that.
14        Did you receive any litigation hold
15  memos from Abbott's legal department when you
16  were an Abbott employee?
17    A.  Yes.
18    Q.  When was the first year that you can
19  recall receiving a litigation hold memo?
20        MS. CITERA:  Objection to form.
21  BY THE WITNESS:
22    A.  I cannot recall what year that was.  I

---

Page 33

1  just know that whenever -- when we received them,
2  that's when we started holding files and not --
3  and keeping them.
4    Q.  Okay.  And do you recall whether or not
5  you deleted emails if you -- if you received a
6  litigation hold request?
7        MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9    A.  After we received the litigation hold
10  request, we didn't -- I don't recall deleting
11  emails after that fact.
12    Q.  Okay.
13    A.  And I believe that our IT department
14  was keeping all of them and backing everything up
15  every day so that there was a record of them, of
16  all emails.
17    Q.  Okay.  Ma'am, do you know whether the
18  historical data, any of the historical computer
19  data at Hospira includes some of that backed up
20  email information?
21        MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

9 (Pages 30 to 33)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 34

1     A.  I don't know whether it does or it
2  doesn't.
3     Q.  Have you ever checked?
4     A.  No.
5     Q.  Okay.  Do you know whether anyone else
6  at Hospira has checked?
7     A.  No, I do not.
8     Q.  Is it fair to say that if an inquiry
9  came in concerning this litigation and the need
10  for data or information, that you would be the
11  person who would receive it?
12        MS. CITERA:  Objection to the form.
13  BY THE WITNESS:
14     A.  I have been the main contact for a lot
15  of the requests.  I don't know whether I've been
16  the main contact for all of the requests.
17     Q.  Okay.  Do you know who else might have
18  been a contact for the requests?
19     A.  For something like the IT information
20  of emails, that probably would have gone directly
21  to our IT department and not come to me.
22     Q.  Okay.  Would that -- Would that go to

Page 35

1  Nancy Carlson, then?
2        MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4     A.  I'm not sure if Nancy would be the
5  right person for that.  Nancy is the right person
6  for all the sales data.  I'm not sure who it
7  would go -- who a request for all the email
8  files, et cetera, would go to.
9     Q.  Okay.  Well, if you received a request,
10  who would you go to at Hospira --
11        MS. CITERA:  Objection to the form.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  -- to seek out the information in the
14  historical Abbott files?
15        MS. CITERA:  Objection to the form.
16  BY THE WITNESS:
17     A.  If I received that request, I would
18  probably go to the head of our IT department and
19  ask who the right person was to receive that.
20     Q.  And who's the head of your IT
21  department?
22     A.  Mike Carlin.

Page 36

1     Q.  Okay.  And have you had any
2  conversations with Mr. Carlin concerning whether
3  he's received requests?
4     A.  No, I have not.
5        MS. CITERA:  Objection, form.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  Okay.  I'd like to go back to where we
8  were before.  Other than the sales data
9  information and the more recent Hospira
10  information, do you recall any other computer
11  information that you have requested that the IT
12  staff pull incident to any litigation?
13        MS. CITERA:  Objection to the form.
14  BY THE WITNESS:
15     A.  As I recall, the majority of -- the
16  information -- the information that I have worked
17  with our IT department to pull has been the sales
18  data that we've talked about.
19     Q.  Okay.
20     A.  Yeah.
21     Q.  How long does it take to process a
22  request?

Page 37

1        MS. CITERA:  Objection to form.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  Let me clarify.  How long does it take
4  -- would it take to process a request that you
5  would make, take to the IT department concerning
6  getting some of this historical computer
7  information from Abbott, from the Abbott file?
8        MS. CITERA:  Objection to the form.
9  BY THE WITNESS:
10     A.  I would guess the average amount of
11  time has been six -- six weeks or so.
12     Q.  Okay.  That's -- Do you recall making
13  any other requests -- I just want to exhaust your
14  memory on this.
15        Do you recall making any other requests
16  to your IT department for information related to
17  the AWP litigation that we haven't discussed so
18  far?
19        MS. CITERA:  Objection to the form.
20  BY THE WITNESS:
21     A.  No, I don't.  I don't recall any other
22  instances.

Henderson Legal Services, Inc.

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

| Page 38 |
| --- |

1    Q.  Okay.  Now, let's jump back a little
2  bit.  You said that you would determine once you
3  received a request where you would need to go to
4  request it.  Is that fair to say?
5    A.  Correct.
6    Q.  Okay.  Other than the IT department,
7  who would you go to to seek information?
8       MS. CITERA:  Objection to the form.
9  BY THE WITNESS:
10   A.  Well, for instance, when we received
11  those requests for the organizational flow
12  charts, they were requests for flow charts not
13  just for the Alternate Site sales force but there
14  were requests in that included for the marketing
15  organizations and -- I think it was mostly the
16  marketing organizations.  And so I went to the
17  various organizations and asked them to get me
18  copies of any of the org charts that they had on
19  file, and that was essentially what I did.  So to
20  each one of those marketing organizations.
21   Q.  Let me ask you, in terms of determining
22  what was responsive to the request, who would be

| Page 39 |
| --- |

1  -- who would be the person making that
2  determination?  Would it be you, or would you
3  have somebody telling you what information you
4  needed to look for?
5       MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7    A.  I believe that the majority of the
8  requests as they came to us from Abbott, they
9  were telling me what they needed.  And I was
10  trying to pull the data based on those requests.
11   Q.  Okay.  How would you know that you got
12  it all?
13       MS. CITERA:  Objection to the form.
14  BY THE WITNESS:
15   A.  I could only trust that when I asked
16  individuals to give me everything they had that
17  they were doing that.
18   Q.  Okay.  And who were the individuals in
19  particular that you would contact to pull
20  information?
21       MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

| Page 40 |
| --- |

1    A.  In the case of the Alt Site
2  organization charts, I went to whoever was -- who
3  -- the individual the general manager who was in
4  charge of Alt Site.  I went to the marketing
5  managers and, in most cases, they would have
6  their administrative assistants pull whatever
7  organizational charts they had on file.
8    Q.  Okay.  Would those be in the current
9  Hospira files?
10       MS. CITERA:  Objection to the form.
11  BY THE WITNESS:
12   A.  Whatever Abbott information was still
13  in those current Hospira files is what they
14  pulled for me.
15   Q.  Okay.  Let me ask you, at Hospira, do
16  you have any hard files, paper files that are
17  former -- that were formerly HPD Abbott files?
18       MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20   A.  I'm not sure I understand the question.
21   Q.  Okay.  The -- Let me rephrase it, then.
22       Do you know whether when you would ask

| Page 41 |
| --- |

1  that requests be made if anyone searched any
2  noncurrent Hospira files?
3       MS. CITERA:  Objection to the form.
4  BY THE WITNESS:
5    A.  Well, if I was asking them to pull data
6  from our Abbott days, then they were pulling from
7  files that preceded our becoming Hospira.
8    Q.  And where are those files maintained?
9    A.  Each organization has their own file
10  areas.
11       The other thing, and I didn't even
12  think about this, the other piece of information
13  that I've taken the lead on is whenever anybody
14  has asked for copies of all of our contracts and
15  our Contract Marketing files; and we have that
16  file history in our Contract Marketing department
17  or in our central records area.  So we've also --
18  we also have all of that information, and we've
19  pulled that.  I just thought of it now, and I
20  didn't want to leave that out.
21   Q.  Okay.  The -- Well, are the former HPD
22  files maintained as part of Hospira's current

Henderson Legal Services, Inc.

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                      January 17, 2008
Chicago, IL

Page 42

1  file system?
2       MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4       A.   For contract files for contracts that
5  expired when we were a part of Abbott, Abbott has
6  all of those files.  The current files we have
7  for contracts are contracts that may have been
8  initiated when we were a part of Abbott but
9  became Hospira contract files, and so Hospira is
10  maintaining those files.
11       Q.   Okay.  So is it fair to say that if a
12  contract was closed, closed out, and the contract
13  was no longer in place that at the time of the
14  spin, those particular files stayed at Abbott;
15  but if there was an ongoing contractual
16  obligation, those files went with Hospira at the
17  time of the spin?
18       A.   Correct.
19       Q.   Okay.  Other than the Contract
20  Marketing files, what other files does Hospira
21  have that are former HPD files?
22       MS. CITERA:  Objection to the form.

Page 43

1  BY THE WITNESS:
2       A.   I don't know.  I can only -- I can only
3  speak to what I know about the Contract Marketing
4  files.  I'm not sure what any other organization
5  has done or where their files went when we spun
6  off from Abbott.
7       Q.   Okay.  When you say "any other
8  organization," what are you talking about?
9       A.   Like the marketing organizations.  We
10  were talking about them a few minutes ago.  Or
11  any other -- any other departments within
12  Hospira.
13       Q.   Okay.  But -- Well, did anyone else
14  make requests of them for documents responsive to
15  discovery requests in the AWP litigation other
16  than you?
17       MS. CITERA:  Objection to the form.
18  BY THE WITNESS:
19       A.   I don't know.
20       Q.   Okay.  You said -- You indicated that
21  you went to the Contract Marketing files.  You
22  also spoke with individuals within the marketing

Page 44

1  organization, and you looked for the Alt Site
2  sales force.  What other document searches have
3  you done?
4       MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6       A.   Those are all -- Those are all the
7  document searches I can recall being involved in.
8       Q.   Okay.  And do you remember which
9  general managers and who these particular
10  marketing managers were that you spoke with in
11  looking for this information?
12       A.   I believe I spoke with Sean O'Donnell
13  for Alternate Site -- Actually, I believe in that
14  case, I went directly to his administrative
15  assistant.
16       Q.   And who is that?
17       A.   Patricia Castor.
18       Q.   And then was Ms. Castor then
19  responsible for identifying and pulling the
20  responsive documents?
21       A.   Yes, she pulled what she could find.
22  And I believe Sean was aware she was doing that

Page 45

1  based on the requests that I had given.  So it
2  was at -- I mean, Sean was aware; and they were
3  pulling it for -- I believe that we went to the
4  Specialty Pharmaceutical Group which at that time
5  reported to Tom Moore.
6       Q.   When you say "at the time," do you
7  recall when approximately that was?
8       A.   It was a couple of years ago when we
9  received those requests for those org charts.
10       Q.   Do you recall going to anybody else
11  other than Mr. Moore and Ms. Castor and Mr.
12  O'Donnell's department?
13       A.   I'm trying to remember if there was
14  anybody else, but I think that -- I think they
15  were the individuals I went to, went to.
16       Q.   Okay.  And how many times did you go to
17  them?
18       A.   I made the initial request and kept in
19  contact with them until they were able to find --
20  until they got to me whatever they could find in
21  the way of the data.
22       Q.   Okay.  Did anyone like a lawyer or any

12  (Pages 42 to 45)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 46

1   other -- a paralegal supervise the pulling of the
2   documents by Ms. Castor and somebody in Mr.
3   Moore's department?
4       A.  I believe the paralegals that we were
5   working with at Abbott knew who I contacted
6   because I kept them apprised of where they were
7   in the process.
8       Q.  Okay.  So they knew who you had
9   contacted.  But it was up to the secretary or the
10  administrative assistant and somebody in Mr.
11  Moore's department to actually pull the
12  documents?
13      MS. CITERA:  Objection to form.
14  BY THE WITNESS:
15      A.  Yeah.  As I understand it, that was the
16  process that we followed.
17      Q.  Okay.  How do you know they didn't miss
18  anything?
19      MS. CITERA:  Objection to form.
20  BY THE WITNESS:
21      A.  I don't know that they did.  All I can
22  do is, you know, say that I asked them to pull

Page 47

1   everything that they could find, and that's what
2   they said they did.
3       Q.  Okay.  Ma'am, in talking about this a
4   little bit more, do you have any -- do you have a
5   better recollection as to how many requests you
6   responded to?
7       A.  No --
8       MS. CITERA:  Objection to form.
9   BY THE WITNESS:
10      A.  No, because there have been so many
11  different requests over the years that I just --
12  I don't recall, you know, all of the requests
13  that we've received.
14      Q.  Does Abbott have access to its
15  historical computer information that is currently
16  in Hospira's possession, custody, and control?
17      MS. CITERA:  Objection to the form.
18  BY THE WITNESS:
19      A.  Could you ask that question again?
20      Q.  Sure.
21      Does Abbott have access to the
22  historical computer information that is in --

Page 48

1   within Hospira's custody and control?
2       MS. CITERA:  Objection to the form.
3   BY THE WITNESS:
4       A.  Are you asking whether Abbott has
5   Hospira files or whether the same information
6   that Hospira may have in the historical files,
7   does Abbott have copies of it?
8       Q.  Actually, that's a fair distinction.
9   What I was asking was -- Well, first, do you know
10  whether Abbott has copies of that information?
11      A.  I don't know whether Abbott has copies
12  of that information.
13      Q.  Okay.  Does Abbott have access or a way
14  to access that computer information other than
15  making a request of you?
16      MS. CITERA:  Objection to the form.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Or someone at Hospira?
19      A.  Abbott cannot -- Abbott does not have
20  access to any of Hospira's records or files since
21  we became Hospira.
22      Q.  Okay.  So if Abbott, then, did not keep

Page 49

1   copies of your computer information, of your
2   historical computer -- like, for example, the
3   sales data, et cetera, the searches that you had
4   run, then the only place to look for it is at --
5   is within Hospira's historic HPD records; is that
6   fair?
7       MS. CITERA:  Objection to the form.
8   BY THE WITNESS:
9       A.  I don't think that's accurate.  I
10  believe that based on receiving all of the
11  requests that we've received, that Abbott has
12  kept all of the historical HPD data that was when
13  we were HPD.
14      Q.  Okay.
15      A.  I believe that they would have that
16  simply because of the requests and having to keep
17  everything.  I can't imagine that they -- and I
18  guess I'm speculating when I'm saying that, so
19  ...
20      Q.  Well, you knew, for example, that they
21  had litigation hold memos, right?
22      A.  Right, yes.  And that's why I'm making

13 (Pages 46 to 49)

Henderson Legal Services, Inc.

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

---

Page 50

1   -- That's why I guess I'm speculating that they
2   have all that information.
3       Q.   Do you know why, then, they would make
4   the request of you or of Hospira?
5           MS. CITERA:  Objection to form.
6   BY THE WITNESS:
7       A.   No, I don't know why.
8       Q.   Okay.
9       A.   I know that for the indirect sales
10  data, Abbott does not have the indirect sales
11  data.  Hospira has all of it.
12      Q.   Do you know why at the time of the
13  spin, given that there's a litigation hold memo,
14  why Abbott wouldn't preserve that?
15          MS. CITERA:  Objection to form.
16  BY THE WITNESS:
17      A.   I don't know why Hospira has that data
18  and not Abbott.
19      Q.   Well, was there any discussion at the
20  time of the spin that you can recall about what
21  information needed to be preserved incident to
22  the litigation hold memo?

---

Page 51

1           MS. CITERA:  I'm going to object to the
2   form.  I'm also going to caution you not to
3   reveal any conversations with counsel.
4   BY THE WITNESS:
5       A.   I don't know how the decisions were
6   made when we did the spin regarding what
7   information Hospira was going to maintain and
8   what information Abbott was going to maintain.
9   So I wasn't involved in those discussions.
10      Q.   Okay.  Who was, do you know?
11          MS. CITERA:  Objection to form.
12  BY THE WITNESS:
13      A.   No, I don't.
14      Q.   Does Hospira currently maintain any
15  other computer or hard copy files that you're
16  aware of that are former Abbott HPD files that
17  Abbott does not have copies of?
18          MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20      A.   I can't answer the question.  I don't
21  know.
22      Q.   Okay.  Is it possible?

---

Page 52

1           MS. CITERA:  Objection to the form.
2   BY THE WITNESS:
3       A.   Is what possible?
4       Q.   Is it possible that Hospira currently
5   has former HPD files that Abbott did not retain
6   or retain copies of?
7           MS. CITERA:  Objection to the form.
8   BY THE WITNESS:
9       A.   Again, I don't know the answer to that
10  because I don't know, as I said a couple minutes
11  ago, when we did the spin, what it was determined
12  that was going to stay in the Hospira files
13  versus the Abbott files.
14      Q.   Okay.  To your knowledge, other than
15  the administrative assistants, Ms. Castor, and
16  somebody -- Well, first let me ask you -- Strike
17  that question.
18          Do you know who in Mr. Moore's unit did
19  the searching for documents?
20      A.   I don't recall.
21      Q.   Other than Mr. Moore's unit and Ms.
22  Castor, do you recall any -- someone from Mr.

---

Page 53

1   Moore's unit and Ms. Castor, do you recall anyone
2   else searching for Abbott or Hospira documents
3   pursuant to a request that you made?
4       A.   And, again, my request when I went to
5   Sean O'Donnell and Tom Moore was strictly related
6   to organizational charts.  So I don't know about
7   requests for any other documents.  And I can't
8   recall -- I don't believe I spoke with anybody
9   else about organizational charts.
10      Q.   Okay.  Other than the organizational
11  charts, have you asked anyone to search for any
12  noncomputer records?
13      A.   No.  Except --
14      Q.   Okay.  So the only searches, then,
15  you've done are searches -- searches you've
16  requested are searches of the computer
17  information, which included Hospira information
18  as well as historic Abbott information, and then
19  you've asked for searches of the hard copies of
20  the org charts; is that fair?
21          MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

---

                              14  (Pages 50 to 53)

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

---

Page 54

1       A.  Yes, and the contract files from
2  Contract Marketing.
3       Q.  Okay.  And who did you make the request
4  for the search of Contract Marketing files to?
5       A.  I was in Contract Marketing at the
6  time, so I actually directed the requests to the
7  people in our file room to pull files.
8       Q.  Okay.  And who did you make that
9  request to?
10      A.  It was actually Jeri Parkhanan.  She's
11  the supervisor in charge of the file room.
12      Q.  Okay.  Anybody else?
13      A.  Well, and her boss, Joe Brunza.
14      Q.  Okay.  Anybody else?
15      A.  No, but we really marked as an
16  organization to pull all of the files.  I mean,
17  there was a group effort within Contract
18  Marketing to pull copies of all the contracts
19  that we could find for all of the customers based
20  on the requests we received.
21      Q.  Okay.  And do you recall which
22  contracts you pulled?

---

Page 55

1          MS. CITERA:  Object to the form.
2  BY THE WITNESS:
3       A.  There were hundreds of contracts that
4  we pulled.
5       Q.  Okay.  And do you recall the nature of
6  the contracts that you pulled?
7          MS. CITERA:  Objection.
8  BY MS. ST. PETER-GRIFFITH:
9       Q.  Were they Alt Site?  Were they Home
10  Infusion?
11      A.  They were Alt Site and then hospital
12  contracts that -- where there could have been
13  Alternate Site sales based on that organization
14  having an entity that could have been in the
15  nonhospital market, including the major group
16  purchasing organizations.
17      Q.  Okay.  And who set that criteria?
18      A.  It was the criteria that we received
19  from Abbott.
20      Q.  Okay.  From Abbott in-house counsel?
21      A.  Yes.
22      Q.  Okay.  And when did this pulling, you

---

Page 56

1  know, this sort of community effort of pulling
2  hundreds of contracts occur?
3       A.  I actually think we've pulled contract
4  files several times.  I mean, I think we pulled
5  files in the late '90s and we pulled again in the
6  2002/2003 time frame.  And I think we've pulled
7  some files since then also.
8       Q.  When you say "since then," when
9  specifically?
10      A.  I'm thinking --
11          MS. CITERA:  Objection to the form.
12  BY THE WITNESS:
13      A.  I'm thinking maybe in the last two
14  years we've pulled some additional contract
15  files.
16      Q.  When was the last time that you pulled
17  contract files?
18      A.  I think it's, like, 2005 time frame.
19      Q.  Okay.  So since 2005, you haven't
20  pulled any contract files?
21          MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

---

Page 57

1       A.  Not that I recall.
2       Q.  Okay.  And when you say that you've
3  pulled some in the late '90s and the 2002 to 2003
4  time period, I'm assuming you mean when you were
5  with HPD?
6       A.  Yes.
7       Q.  At Abbott?
8       A.  Yes.
9       Q.  And why did you pull those files in the
10  late '90s and in 2002 and 2003?
11      A.  I believe that's when we started to
12  receive the original requests for files for all
13  of the litigation, and we were pulling those
14  files in response to those requests.
15      Q.  And who did you give those files to?
16      A.  We gave them to Abbott.
17      Q.  When you say "Abbott," you mean Abbott
18  in-house counsel?
19      A.  Abbott in-house counsel, yes.
20      Q.  Can you think of any other documents
21  that you have searched for that you -- oh, let me
22  -- Strike that.

---

15 (Pages 54 to 57)

Leone, Lynn E.                                        January 17, 2008
                          Chicago, IL

Page 58

1         In the late '90s and 2002, 2003, did
2   you participate in the pulling of -- the search
3   for contracts?
4         A.  In the late '90s, I participated in
5   pulling Alternate Site files because that's where
6   I was at the time.
7         Q.  Okay.
8         A.  For the files that have been pulled
9   since then -- and again Alternate Site by that
10  time had been incorporated -- all the Alternate
11  Site contract files had been incorporated by that
12  time into HPD Contract Marketing, so I
13  participated in pulling all of those files in the
14  early 2000s when we pulled them.
15        Q.  Okay.  And do you think that you pulled
16  all the contracts responsive to what you were
17  asked to pull?
18        MS. CITERA:  Objection, form.
19  BY THE WITNESS:
20        A.  I think that we have pulled everything
21  that's been requested.
22        Q.  And when the contracts were pulled,

Page 59

1   were they pulled and copied and given to in-house
2   legal department?  Or did you just give them the
3   originals of what you had?
4         A.  They actually took the files, copied
5   them, and returned them to us.
6         Q.  Okay.  So you have copies, then -- or
7   they have copies of what you have?
8         A.  Correct.
9         Q.  Okay.  And are those documents that are
10  the historic contract files still with Hospira?
11        MS. CITERA:  Objection to form.
12  BY THE WITNESS:
13        A.  Again, if it was a contract that
14  expired while we were still part of Abbott, it's
15  in their central records area.  If it's something
16  that started then but continued into our -- after
17  the spin, then Hospira has it.
18        Q.  Okay.  And you haven't -- Does Hospira
19  have a document retention policy?
20        A.  Yes, we do.
21        Q.  Okay.  And do you have a particular --
22  a policy pertaining to former Abbott files?

Page 60

1         A.  I'm not sure I understand the question.
2         Q.  Okay.  Let me ask you this:  What's
3   your document retention policy?
4         MS. CITERA:  Okay.  I'm just going to
5   object.  I mean, I'm fine with her answering as
6   it relates to Abbott files; but this is not about
7   Hospira, and it shouldn't relate to Hospira
8   files.
9         MS. ST. PETER-GRIFFITH:  Oh, sure it
10  does.
11        MS. CITERA:  No, it doesn't.
12        MS. ST. PETER-GRIFFITH:  You people are
13  not responding to a subpoena, and we're going to
14  get into that.
15        MS. CITERA:  This is an Abbott -- This
16  is taken in an Abbott case.  Hospira is not a
17  defendant.  She can talk about Hospira as it
18  relates to Abbott's policies, she cannot talk
19  about Hospira's policies.
20        MR. ANDERSON:  Well, this is a fact
21  deposition.
22        MS. ST. PETER-GRIFFITH:  This is a fact

Page 61

1   deposition, Toni.  I'm not looking for her to
2   speak as a corporate representative.
3         MS. CITERA:  First of all, Judge Bowler
4   has already said you can't get into discovery
5   past 2003.  So that's yet another reason why what
6   Hospira's -- Hospira's retention policies as it
7   relates to Hospira's documents is not
8   appropriate.
9         MS. ST. PETER-GRIFFITH:  You know, we
10  can agree to disagree on that, Toni.  Can I
11  proceed with my questioning?
12        MS. CITERA:  As it relates to the
13  Hospira, yes -- I mean, as it relates to Abbott,
14  yes.
15        MS. ST. PETER-GRIFFITH:  Are you
16  instructing her not to answer?
17        MS. CITERA:  Yes.
18        MS. ST. PETER-GRIFFITH:  Why?  What's
19  the basis of your instruction not to answer?
20        MS. CITERA:  Because it's not related
21  to this case.  Hospira is not a defendant here.
22        MS. ST. PETER-GRIFFITH:  Do you have a

16  (Pages 58 to 61)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 62

1  privilege assertion?
2      MS. CITERA:  No.
3      MS. ST. PETER-GRIFFITH:  Okay.  Then
4  when we fly back to get answers to this question,
5  it's going to be on Abbott's dime.  Moreover, are
6  you directing her not to answer because you're
7  representing her?
8      MS. CITERA:  I am representing her and
9  the defendant.
10      MS. ST. PETER-GRIFFITH:  Okay.  And who
11  are the defendants?
12      MS. CITERA:  Abbott.
13      MS. ST. PETER-GRIFFITH:  Okay.  So
14  you're not representing her as a Hospira
15  employee?
16      MS. CITERA:  I am representing the
17  witness.
18      MS. ST. PETER-GRIFFITH:  Okay.
19      MS. CITERA:  I also obviously represent
20  Hospira in other matters.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  Ms. Leone, let me ask you this:  Did

Page 63

1  the files that used to be Abbott HPD files, do
2  they -- are they maintained under the current
3  Hospira document retention policy?
4      MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6      A.  Yes, they are.
7      Q.  Okay.  And what is that policy?
8      A.  I believe that the policy is seven
9  years; but I also believe that based on the
10  litigation, nothing is being destroyed.
11  Everything is being maintained.
12      Q.  Okay.  Do you recall whether Hospira
13  has received a subpoena from the United States?
14  Are you aware of any subpoena that Hospira has
15  received from the United States?
16      A.  I am not aware that Hospira has
17  received a subpoena from the United States.
18      Q.  Has anyone asked you to search for
19  documents to respond to a subpoena that has been
20  served upon Hospira by the United States?
21      MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

Page 64

1      A.  I have not received any requests to
2  pull data relating to that that I recall.
3      Q.  If Hospira received a subpoena from the
4  United States requesting the production of all
5  former Abbott HPD information, who would you
6  anticipate that that request would go to?
7      MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9      A.  I expect it would go to our in-house
10  counsel, and they would determine who to ask to
11  start pulling that data.
12      Q.  Do you anticipate that you would be one
13  of the people that they would request given your
14  historic role?
15      MS. CITERA:  Object to the form.
16  BY THE WITNESS:
17      A.  I would guess I would probably be
18  included as one of the people that they would
19  ask.
20      Q.  Okay.  Other than what we've talked
21  about here today, do you recall any other
22  involvement in responding to or seeking requests

Page 65

1  for information responsive to discovery requests
2  in the AWP litigation?
3      MS. CITERA:  Objection to the form.
4  BY THE WITNESS:
5      A.  I've -- I think I've -- Everything that
6  I can remember I think I've identified.
7      Q.  Okay.  So we've exhausted your memory
8  on that?
9      MS. CITERA:  Objection to the form.
10  BY THE WITNESS:
11      A.  Yeah, I think so.
12      Q.  Okay.  Ma'am, I don't think this
13  question was asked at your first deposition; so
14  I'd like to briefly go over what your educational
15  background is.
16      A.  I have an MBA.
17      Q.  Okay.  And when did you obtain your
18  MBA?
19      A.  In 1996.
20      Q.  And where did you obtain it from?
21      A.  Northern Illinois University.
22      Q.  Okay.  And what is your undergraduate

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                January 17, 2008
Chicago, IL

---

Page 66

1 degree?
2     A.  It's a degree in general studies from
3 Roosevelt University in Chicago.
4     Q.  Okay.  And when did you receive that?
5     A.  1991.
6     Q.   And do you have any other educational
7 degrees, or have you taken any other course work?
8     A.  No.
9     Q.   Ma'am, do you have any educational
10 background in Medicare- or Medicaid-related
11 areas?
12         MS. CITERA:  Objection to the form.
13 BY THE WITNESS:
14     A.  Nothing educational.
15     Q.  Okay.  Just on-the-job?
16     A.  Yes.
17     Q.  Okay.  Well, we're going to get into
18 that.  But do you have any -- I want to ask you
19 whether you have any training or any educational
20 background in the medical field.
21     A.  No.
22     Q.  Ma'am, I'm going to ask you a series of

---

Page 67

1 questions, and I'm going to predicate my series
2 of questions upon -- I want you to -- when you
3 respond, I'd like for you to respond for the time
4 period of 1991 until 2003.  Okay?
5     A.  Okay.
6     Q.   Ma'am, do you have any familiarity with
7 the sale and marketing or any knowledge or
8 familiarity with the sale and marketing of any of
9 the following products: sodium chloride, sterile
10 water, vancomycin, dextrose, or acyclovir by
11 Abbott?
12         MS. CITERA:  Objection to the form.
13 You went through them kind of fast.  Did you get
14 them all?
15         THE WITNESS:  Yes.
16         MS. CITERA:  Okay.
17 BY THE WITNESS:
18     A.  All of those are products that were
19 sold by the Hospital Products Division.
20     Q.  Okay.  Ma'am, I'd like you just to
21 describe for me what your knowledge is concerning
22 the sale and marketing of those products for the

---

Page 68

1 time period of 1991 to 2003.
2         MS. CITERA:  Objection to the form.
3 BY THE WITNESS:
4     A.  I'm not sure what you're asking for.
5     Q.  Well, I'd like to know what you know
6 about the sale and marketing of those products.
7         MS. CITERA:  Objection to the form.
8 BY THE WITNESS:
9     A.  The dextrose and the saline -- I'm
10 sorry.  Let me just remember.  Dextrose, saline,
11 Vanco, acyclovir -- was there a fifth product?
12     Q.  Sterile water.
13     A.  Sterile water.
14         The dextrose, saline and sterile water
15 are part of the IV solutions line that Hospira
16 sold; and they're used in -- they're used as
17 basic IV solutions.
18     Q.  Okay.  Ma'am, I'm going to stop right
19 there because you said Hospira.
20     A.  I'm sorry.  Abbott.
21     Q.  Okay.  I just wanted to clarify.
22     A.   And vancomycin and acyclovir are what

---

Page 69

1 we consider specialty pharmaceuticals or
2 injectables.  And, again, they were sold as part
3 of our injectables product line as Abbott HPD.
4         And the -- Obviously, or maybe not
5 obviously, when people are doing an infusion of
6 vancomycin or acyclovir, they're mixed with most
7 frequently sodium chloride for those infusions.
8 And it would probably be one of the -- one of the
9 sizes of sodium chloride that we sell of the IV
10 solutions because we also have -- HPD also had
11 some pharmacy injectables that were sodium
12 chloride and some pharmacy injectables that were
13 water also, sterile water, which is small vials -
14 - 10 mls, 20 mls, 30 mls, and so on.  We looked
15 at the IV solutions as being -- the smallest one
16 would be 150 mls up to 1 liter.
17         Does that answer your question?
18     Q.  Okay.  Well, I think it may be a start.
19 My question was more what do you know about
20 Abbott's -- for the time period of '91 to 2003,
21 what is your knowledge of what Abbott's, you
22 know, policies, practices, procedures were, if

---

18 (Pages 66 to 69)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                     January 17, 2008
                        Chicago, IL

---

Page 70

1   you have any knowledge, of it concerning the sale
2   and marketing of these particular products?
3        MS. CITERA:  Objection to the form.
4   BY THE WITNESS:
5        A.  Well, from 1991 to 1996, I was in Home
6   Infusion Services and so those products were sold
7   as part of the Home Infusion Services programs.
8   And then from '96 to 2001, when I was in
9   Alternate Site, they were selling those products
10  as individual products based on the full
11  portfolio of the products that we would offer to
12  a customer on a contract.  It was highly unlikely
13  that we were writing a contract for just one of
14  those products.  It was always in conjunction
15  with the full product line or, say, the IV
16  solutions as a contract with probably IV
17  equipment to go along with it and then maybe a
18  separate agreement for the injectables, which
19  would have been the vancomycin and acyclovir.
20       And 2001 to 2003, I was -- part of that
21  time I was on special projects.  And then by
22  2003, I was back in Contract Marketing as part of

---

Page 71

1   the Hospital Business Sector.  And, again, they
2   were selling it in the hospitals as part of the
3   full product line, those products.
4        Q.  Okay.  Do you have any other knowledge
5   of Abbott's sale and marketing of these
6   particular products during the '91 through '03
7   time period?
8        MS. CITERA:  Object to the form.
9   BY THE WITNESS:
10       A.  I mean, that's the high-level, you
11  know, description of how they were sold.  I'm not
12  sure what else --
13       Q.  Okay.  Well, let's go down on that a
14  little bit.  First of all, you said products sold
15  as part of the HI program.  Which is the home
16  infusion program?
17       A.  The home infusion program was when we
18  were selling Abbott products with the services
19  that could be provided through the home infusion
20  program.  We had a system, the CHIP system.  We
21  could provide reimbursement services where --
22  excuse me -- on behalf of one of the partners, we

---

Page 72

1   would be providing -- we would be working with
2   the insurance companies and other payors in order
3   to be reimbursed for the services.
4        And under those circumstances, those
5   products were part of a therapy that a patient
6   could have been on.  They could have been on say,
7   for instance, an enteral therapy or a total --
8   TPN therapy or IV antibiotic.  And these, again,
9   would have all been in the home setting.  And we
10  were working with those partners to provide those
11  services.
12       Q.  Okay.  And when you say "partners" --
13  Well, let me ask you this:  Initially you said
14  the products were sold as part of.  Were they
15  consigned to the home infusion partners?
16       A.  Yes.
17       MS. CITERA:  Objection to the form.
18  BY THE WITNESS:
19       A.  Yeah, and that's probably what I should
20  have said --
21       Q.  Okay.
22       A.  -- is that they were under most

---

Page 73

1   circumstances provided as a -- on a consignment
2   basis.
3        Q.  Okay.  And do you recall what the
4   overall market -- Strike that.
5        Well, what else do you recall about
6   this consignment program?
7        MS. CITERA:  Objection to the form.
8   BY THE WITNESS:
9        A.  If -- If there were Abbott products,
10  Abbott HPD products, that could be used for the
11  therapies that were being provided by those
12  partners, they had the option to use those
13  products in their infusion therapy program -- in
14  their home infusion programs.  And that was --
15  that was what we considered the consignment piece
16  of it.
17       Q.  Okay.  How did Abbott get -- How was
18  Abbott compensated under these arrangements?
19       A.  Under most circumstances, those
20  programs were written -- were created or the
21  arrangements were set up in that as they were --
22  as the partners were reimbursed by the payors for

---

19 (Pages 70 to 73)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                      January 17, 2008
                          Chicago, IL

Page 74

1  the services, there would be a sharing of that
2  reimbursement from the payors.
3      Q.  Okay.  And by "payors," did that
4  include Medicare and Medicaid?
5      A.  Yes.
6      Q.  Did Abbott have its own provider
7  number, to your knowledge?
8      A.  Yeah, Abbott had its own provider
9  number because when Home Infusion Services
10 originally started in the mid 1980s, the majority
11 of the patients we had in those early days were
12 Abbott patients.  So it was our own -- we were
13 billing -- We were doing everything as Abbott
14 Home Infusion Services.
15         And then the programs -- Then the
16 direction changed in the late, late '80s to where
17 we started partnering with hospital programs.
18     Q.  Do you know initially were those
19 partnerships joint venture arrangements?
20         MS. CITERA:  Objection to the form.
21 BY THE WITNESS:
22     A.  I'm not sure what you mean by a joint

Page 75

1  venture.
2      Q.  Okay.  What was your understanding of
3  the relationship between the partner and Abbott?
4         MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6      A.  Well, again, it's what I just
7  described.  Depending on -- As we negotiated
8  agreements with these various hospital-based
9  programs, there was a determination during that
10 contractual process regarding what services they
11 were going to perform versus what Abbott would
12 perform on their behalf.  And then based on --
13 And then based on that, there was -- the decision
14 was made about how that -- how the risk sharing
15 would then take place between the partners.
16     Q.  Okay.  And then -- And when did that
17 business model change or did it ever change
18 within Home Infusion?
19     A.  Well, it changed from being -- for us
20 billing as Abbott to these partnering programs.
21 I'm going to guess that happened sometime
22 probably '87, '88, somewhere in that time frame.

Page 76

1  I can't give you an exact date.
2      Q.  Do you know whether any partners ever
3  raised with Abbott a concern about whether or not
4  these arrangements violated Medicare or Medicaid
5  statutes or regulations or the Antikickback
6  Statute or the False Claims Act?
7         MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9      A.  No, I do not know that.
10     Q.  Did Abbott ever loan its -- or provide
11 its provider number to its partners so that the
12 partners could bill under the Abbott provider
13 number, to your knowledge?
14     A.  To my knowledge, that never happened.
15     Q.  Do you know whether that would be a
16 legal use of Abbott's provider number, to loan it
17 to or provide it to a partner to use?
18         MS. CITERA:  Objection to form.
19 BY THE WITNESS:
20     A.  I do not know -- I don't know whether
21 that would be legal or not.
22     Q.  Were you at all involved during this

Page 77

1  '91 through '96 time frame with evaluations of
2  whether or not the policies, practices, and
3  procedures of the Home Infusion unit were in
4  compliance with state and federal regulations?
5         MS. CITERA:  I'm just going to object
6  to the form.  I'm also going to caution you that
7  to the extent you had any conversations with
8  counsel, that you not reveal the substance of
9  those conversations.
10 BY THE WITNESS:
11     A.  I don't recall that that ever happened.
12     Q.  When you say you don't recall that
13 ever happened, what do you mean?
14     A.  I think --
15         MS. CITERA:  Same instruction.
16 BY THE WITNESS:
17     A.  I think your question was did -- Well,
18 repeat your question, would you please again?
19     Q.  Sure.  Let me clarify.
20         Who or what efforts did -- were you
21 aware of that Abbott Home Infusion undertook to
22 verify whether or not its policies, practices,

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                          January 17, 2008
                              Chicago, IL

| Page 78 |
| --- |

1  and procedures complied with state and federal
2  Medicare and Medicaid laws?
3       MS. CITERA:  Objection to the form and
4  also the same instruction to you.
5  BY THE WITNESS:
6     A.  Okay.  I am not aware that any -- that
7  there were any discussions about that.
8     Q.  Who would you anticipate those -- Well,
9  let me ask you, was it within your responsibility
10 when you were in Home Infusion to deal with
11 compliance with state and federal Medicare and
12 Medicaid laws?
13      MS. CITERA:  Objection to the form.
14 BY THE WITNESS:
15    A.  During that period, I was not involved
16 in Medicare and Medicaid at all.  I was doing the
17 case management at that point, so I had no
18 knowledge of anything related to Medicare and
19 Medicaid at that point.
20    Q.  Okay.  When did you first learn -- When
21 did you first have involvement with or knowledge
22 of Medicare and Medicaid?

| Page 79 |
| --- |

1       MS. CITERA:  Object to the form.
2  BY THE WITNESS:
3     A.  When I first went into Home Infusion
4  Services in 1985.
5     Q.  Okay.  And for how long were you
6  involved with Medicare or Medicaid?
7     A.  From 1985 until '91 when I moved into
8  the case management position.  I moved into that
9  position in 19 -- January of 1992.
10    Q.  Do you know during the period of time
11 that you -- from '85 to '91, did you have any
12 involvement with monitoring Home Infusion's
13 compliance with state and federal Medicare and
14 Medicaid statutes?
15      MS. CITERA:  Objection to the form.
16 BY THE WITNESS:
17    A.  No, I did not have any involvement in
18 that.
19    Q.  Who would have had that responsibility?
20      MS. CITERA:  Objection to form.
21 BY THE WITNESS:
22    A.  I would probably say Ginnie Tobiason

| Page 80 |
| --- |

1  because she was our manager of reimbursement at
2  the time, so I would probably say that Virginia
3  would have been the main person.
4     Q.  How did Abbott Home Infusion employees
5  know that these consignment arrangements complied
6  with state and federal Medicare and Medicaid
7  laws?
8       MS. CITERA:  Objection, form.
9  BY THE WITNESS:
10    A.  I --
11      MS. CITERA:  I just want to again
12 caution you about that instruction too.  Sorry.
13 BY THE WITNESS:
14    A.  I'm trying to understand what you're
15 asking because I guess I'm kind of confused about
16 what it is you're asking me.
17    Q.  Okay.  Well, let me back up a little
18 bit.
19      Your consignment -- Abbott's
20 consignment partners obviously billed the
21 Medicare and Medicaid programs, right?
22    A.  Correct.

| Page 81 |
| --- |

1     Q.  Okay.  How did the Abbott Home Infusion
2  employees who were, you know, facilitating these
3  contracts, how did they know that these contracts
4  complied with state and federal Medicaid and
5  Medicare laws?
6       MS. CITERA:  Objection to the form.
7  Same instruction.
8  BY THE WITNESS:
9     A.  When contracts were negotiated -- And,
10 again, at that point, I was working in our
11 reimbursement area and not working on negotiating
12 the contracts.  The people who worked on our
13 contracts worked with our legal counsel to
14 develop those agreements.  So I believe that
15 based on what -- what we understood at that
16 point, that those contracts were valid.
17      MR. ANDERSON:  Ann, if I can interject,
18 I think we have about one minute left on the
19 tape.
20      MS. ST. PETER-GRIFFITH:  Okay.  Why
21 don't we take a break.  Is now a good time to
22 take a break, folks?

                                          21 (Pages 78 to 81)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

---

Page 82

1        MS. CITERA:  Yeah.
2        MR. ANDERSON:  Yeah.
3        THE VIDEOGRAPHER:  We are off the
4    record at 10:25 a.m. with the end of Tape No. 1.
5            (A short break was had.)
6        THE VIDEOGRAPHER:  We are back on the
7    record at 10:38 a.m. with the start of Tape No.
8    2.
9        MS. ST. PETER-GRIFFITH:  If I could
10   just have the court reporter read where we left
11   off.
12           (Record read as requested.)
13   BY MS. ST. PETER-GRIFFITH:
14      Q.  Okay.  Ms. Leone --
15      A.  Yes.
16      Q.  -- during your tenure in the Home
17   Infusion Services department, did you ever learn
18   of any concerns being raised about the compliance
19   of the Home Infusion model with Medicare or
20   Medicaid laws or regulations?
21       MS. CITERA:  Objection to the form.
22   BY THE WITNESS:

---

Page 83

1       A.  No.
2       Q.  Who within Home Infusion would have
3    been responsible for ensure that the business
4    model complied with state and federal Medicaid
5    and Medicare laws?
6        MS. CITERA:  Object to the form.
7    BY THE WITNESS:
8       A.  Well -- And I think I want to go back
9    to my previous answer.  Our contracting people
10   and probably our management at the time would
11   have worked with our legal counsel to determine,
12   you know, how to write these contracts and how we
13   could build the relationships with these
14   customers.
15      Q.  Okay.  And is it fair to say, then,
16   that you as an employee of Home Infusion relied
17   upon the managers and legal counsel to ensure
18   that what you were doing complied with state and
19   federal Medicare and Medicaid statutes?
20       MS. CITERA:  Objection to form.
21   BY THE WITNESS:
22      A.  Yes, I believe we did.

---

Page 84

1       Q.  I'd like to go back to the -- We got
2    sidetracked a little bit.  Under the Home
3    Infusion business model, were these consignment
4    arrangements the only way that dextrose, sodium
5    chloride, vancomycin, sterile water were sold and
6    marketed?
7        MS. CITERA:  Objection to the form.
8    BY THE WITNESS:
9       A.  I believe that -- Well, first of all,
10   that's only when we were doing those partnership
11   arrangements that we had that consignment.  But I
12   believe there were also a few customers, although
13   I can't off the top of my head think of who they
14   were, where they were actually purchasing the
15   product from us for their home infusion programs
16   to do it, so --
17      Q.  Okay.  And how would they purchase the
18   product?  For example, would they negotiate a
19   contract with Home Infusion?
20      A.  Yes.
21      Q.  And in terms of the sale and marketing
22   of -- Well, first let me ask you, acyclovir, at

---

Page 85

1    this point in time from '91 to '96 was that --
2    was acyclovir part of the Home Infusion program?
3       A.  I don't remember when acyclovir became
4    available for -- that it was -- that it was an
5    Abbott product that we sold.  I know that when we
6    first -- when we first started Home -- when I
7    first went into Home Infusion, I don't believe
8    that there was an Abbott acyclovir at that time;
9    but I don't remember when they did have acyclovir
10   available.  So, I mean, I can't tell you the
11   dates.
12      Q.  Okay.  Well, then, for any of these
13   products -- dextrose, sodium chloride, sterile
14   water, vancomycin, acyclovir -- do you recall any
15   other information about how they were sold or
16   marketed from the '91 through '96 time frame --
17       MS. CITERA:  Object to the form.
18   BY MS. ST. PETER-GRIFFITH:
19      Q.  -- by the Home Infusion department?
20       MS. CITERA:  Objection to the form.
21   BY THE WITNESS:
22      A.  No, just what we've just described.  It

---

Henderson Legal Services, Inc.

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                          January 17, 2008
                              Chicago, IL

Page 86

1   was either in one of these partnership agreements
2   or, you know, purchasing the product directly.
3       Q.   And how -- For the purchasing of
4   product directly, what prices were charged or how
5   was the pricing determined for the contracts or
6   for the sales to the nonconsignment partner -- or
7   to the nonconsignment customers?
8           MS. CITERA:  Objection to the form.
9   BY THE WITNESS:
10      A.   I was not involved in that contracting,
11  so I don't know how those prices were determined
12  or what they did.
13      Q.   Okay.  So in terms of your knowledge of
14  the sales and marketing of these drugs in Home
15  Infusion, you don't have any familiarity to the
16  '91 through '96 time frame of pricing; is that
17  fair?
18          MS. CITERA:  Object to the form.
19  BY THE WITNESS:
20      A.   I don't have any knowledge of pricing
21  for a contract where one of the home infusion
22  customers was actually purchasing the Abbott

Page 87

1   products.
2       Q.   Okay.
3       A.   Okay.
4       Q.   Fair enough.  Do you have knowledge of
5   pricing for -- under the consignment
6   arrangements?
7       A.   No.
8       Q.   Okay.  Is it fair to say, then, that
9   your knowledge of sales and marketing of
10  dextrose, sodium chloride, sterile water,
11  vancomycin, and acyclovir from '91 to '96 by the
12  Home Infusion department does not include
13  knowledge about pricing for those products?
14          MS. CITERA:  Object to the form.
15  BY THE WITNESS:
16      A.   It doesn't include knowledge about
17  pricing between Abbott and its partners -- or
18  customers.
19      Q.   Okay.  Do you have any other knowledge
20  of pricing for those products during this time
21  frame?
22      A.   Only as it related to -- Again, during

Page 88

1   that period of time I was the case manager.  So I
2   was working with the third-party insurance
3   companies -- I was working with the third-party
4   insurance companies to negotiate prices or
5   negotiate therapies, negotiate the services that
6   were being provided to the patients.  And so
7   there wasn't -- and so then the pricing that I
8   was aware of there is what the billable charges
9   were going to be for those third-party -- those
10  third-party -- those third-party insurance
11  companies.
12      Q.   Okay.  Well, would you do that
13  negotiation, then, on behalf of the home infusion
14  partner?
15      A.   Yes.
16      Q.   For their patients?
17      A.   Yes.
18      Q.   And did you do any negotiations for
19  Medicare or Medicaid patients?
20      A.   No.
21      Q.   Why not?
22      A.   Because the managed care -- the managed

Page 89

1   care that was going on at that point and what I
2   was responsible for was with third-party
3   insurance companies, it was -- so that was the
4   sole -- that was the sole -- that was my sole
5   area of responsibility.
6       Q.   When you were negotiating pricing with
7   the case managers, were you familiar with AWP?
8           MS. CITERA:  Objection to form.
9   BY THE WITNESS:
10      A.   If a patient was on an infusion therapy
11  other than being on TPN or enteral nutrition --
12  so, for instance, if they were receiving an IV
13  antibiotic at home or if they were receiving
14  chemotherapy or pain management therapies at home
15  -- when I would negotiate with those case
16  managers, they were looking at those negotiations
17  to be based on a per diem for all the services
18  and supplies that were being provided to that
19  patient and then AWP for the actual drug that was
20  being dispensed to the patient.
21      Q.   Okay.  So would it be -- So then you
22  would -- as you're negotiating charges then it

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                         Chicago, IL

---

Page 90

1  would be the per diem -- for those particular
2  therapies, it would be the per diem plus the AWP?
3      A.  Yes.
4      Q.  Why would it be the AWP figure?
5          MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7      A.  That was -- That was how the case
8  managers wanted to negotiate.  That was -- that
9  was their preferred way of reimbursing for those
10 services,so --
11     Q.  When you say the case managers --
12         MS. CITERA:  Could you let her finish?
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  -- I have to tell you, I thought you
15 were a case manager during this period of time.
16     A.  I'm sorry.  My role was to be the case
17 manager for -- on behalf of all of our partners
18 working with the insurance company case managers,
19 so -- And in most circumstances, they were
20 nurses.
21     Q.  Okay.
22     A.  And they were -- What they were

---

Page 91

1  managing -- What they were managing was the
2  entire patient care for that individual when they
3  came out of the hospital on some type of home
4  service.
5          So they were managing what type of
6  services the patient was receiving, were they
7  getting nursing visits, was there oxygen,
8  whatever they were doing at home.  And in
9  conjunction with that, they were also managing
10 the costs for -- for those patients at home.  So
11 they would -- they would work with our partner to
12 determine what was appropriate from a therapy
13 perspective that that patient was going to be
14 receiving in a home setting, and then they would
15 work with us when there was an infusion therapy -
16 - when there was an infusion therapy that the
17 patient was receiving to determine how that
18 infusion therapy in the home setting should be --
19 should be paid, should be paid for.
20     Q.  Okay.
21     A.  So ... So that's what I meant by "case
22 manager."

---

Page 92

1      Q.  Okay.  And that's how you're familiar
2  with the term AWP during that period of time?
3      A.  Yes.
4      Q.  Okay.
5          MS. CITERA:  Ann, Ann --
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  And is it fair to say the higher the
8  AWP, that meant the higher the reimbursement for
9  a particular therapy?
10         MS. CITERA:  Objection to form.
11 BY THE WITNESS:
12     A.  The therapy was based on what the
13 doctor was prescribing, whatever the patient --
14 Whatever the doctor prescribed was the -- was
15 what the drug that was going to be used.  And
16 then the partners would let us know whose product
17 they were -- whose drug that they were using so
18 that we would know the correct product to use
19 when we were discussing things with the insurance
20 companies.
21     Q.  Okay.  Well, what -- how would the
22 partners determine which product they wanted to

---

Page 93

1  use?
2          MS. CITERA:  Object to the form.
3  BY THE WITNESS:
4      A.  I don't know.  They -- I don't know how
5  they would determine what products they were
6  going to use.
7      Q.  Well, if the AWP -- If you have the
8  same product that's the same -- basically the
9  same drug but it's a generic drug marketed under
10 different names and one has an AWP that's higher,
11 if you use -- if your partner determined to use -
12 - that they should use the product with the
13 higher AWP, wouldn't that mean that there would
14 be a higher reimbursement for that particular
15 therapy?
16         MS. CITERA:  Object to the form.
17 BY THE WITNESS:
18     A.  It could mean that, yes.
19     Q.  Okay.  And Abbott would share in that
20 reimbursement, right?
21         MS. CITERA:  Objection, form.
22 BY THE WITNESS:

---

                                    24  (Pages 90 to 93)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 94

1      A.  It depended on whether -- Let me think
2   through the answer on this.
3      Q.  Let me see if I can clarify it.  For
4   these consignment arrangements, Abbott would
5   share in the reimbursement, right?
6      A.  Correct.
7      Q.  Okay.
8      A.  But, for instance, when there was an --
9   a patient who was on antibiotics, the majority of
10  the antibiotics that the partners were using were
11  not Abbott products.  Abbott only had one or two.
12  They were -- all the rest of the products were
13  from other manufacturers.
14     Q.  Okay.  But still, if they used -- if
15  there were several products to choose from and
16  they used the product with the higher AWP, it
17  still would generate a larger reimbursement for
18  that particular therapy, right?
19          MS. CITERA:  Objection to form.
20  BY THE WITNESS:
21     A.  Yes.
22     Q.  Okay.  Ma'am, I want to sort of close

Page 95

1   out all of your knowledge about the sale and
2   marketing of dextrose, sodium chloride, sterile
3   water, vancomycin, and acyclovir during your
4   period of time in the -- or during your tenure in
5   Home Infusion Services from '91 to '96.  Have we
6   exhausted your memory on that or your knowledge
7   on that?
8          MS. CITERA:  Objection to form.
9   BY THE WITNESS:
10     A.  Yes.
11          MS. CITERA:  Ann --
12          MS. ST. PETER-GRIFFITH:  Yes.
13          MS. CITERA:  -- I was just thinking,
14  and I asked Jarrett -- And it's up to you.  But I
15  wrote down the drugs, and I'm thinking that might
16  be easier to put it in front of her.
17          MS. ST. PETER-GRIFFITH:  Oh, sure.
18  That's fine.  We'll just call them the subject
19  drugs.
20          MS. CITERA:  Yeah, that's fine.
21  Jarrett looked them over and approved them.
22          MS. ST. PETER-GRIFFITH:  Okay.  I know.

Page 96

1   I'm starting to get lost in my questions.
2          MS. CITERA:  I'm just going to tell
3   her, she's going to call those drugs "the subject
4   drugs."  And when she says "the subject drugs,"
5   she's referring to those five.
6          MR. ANDERSON:  And why don't you read
7   it, Ms. Leone, just to make sure it's right.
8          THE WITNESS:  Vancomycin, sodium
9   chloride, sterile water, dextrose, and acyclovir.
10         MR. ANDERSON:  Thank you.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.  Okay.  Ms. Leone, for the '91 through
13  '96 time period, can you describe what your job
14  responsibilities were?
15     A.  During 1991, I was still a
16  reimbursement specialist.  So at that point, I
17  was completing insurance forms for the services
18  that were being provided.  And there were two or
19  three of those partners that I was responsible
20  for completing those insurance forms for.  And so
21  it was my responsibility to submit those billable
22  charges to those -- to those insurance companies;

Page 97

1   when reimbursement was received, to review it; if
2   the patient had a copay, because it only paid,
3   like, 80 percent, they had their out-of-pocket
4   expenses or whatever, to balance bill whoever the
5   appropriate party was for the second part of it;
6   if there were denials received from the insurance
7   companies to determine -- to work with the
8   insurance companies to understand, you know, why
9   the services were being denied and what we needed
10  to do for resubmittal.  So that was in 1991.
11         And then in 1992 to 1996 when I left, I
12  was doing the managed care contracting that we've
13  just discussed.
14     Q.  Okay.  And the managed care
15  contracting, that was the negotiating -- the
16  working with the insurance companies, et cetera,
17  to work on negotiating particular therapies for
18  your consignment partners' patients?
19         MS. CITERA:  Object to the form.
20  BY THE WITNESS:
21     A.  Yes.
22     Q.  Okay.  Ma'am, during this period of

25  (Pages 94 to 97)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 98

1   time, were you involved in developing any -- or
2   actually during -- at any time during your tenure
3   in Home Infusion Services, were you involved in
4   developing any manuals or procedures for Home
5   Infusion?
6        MS. CITERA:  Objection to form.
7   BY THE WITNESS:
8        A.  Yes, I was.  And this is what I
9   referenced earlier, the one document that I
10  looked at.  I developed a training manual for how
11  to do insurance company case management, to work
12  with the insurance companies for the therapies
13  that were being provided, and so -- And I did
14  that, I'm going to say, probably the '95/96 --
15  sometime '94, '95, '96.  I can't remember exactly
16  when we did that.
17       But we put -- we created this training
18  manual because more and more of those partners
19  were choosing to do their own reimbursement
20  instead of having Abbott do the reimbursement
21  services for them.  And so we put together this
22  manual as kind of a training manual for the

Page 99

1   things that these partners should do when they're
2   doing the same thing that I was, which was
3   negotiating with the third-party payors.
4        Q.  Do you know why that emerged as a
5   trend, that certain services, your home infusion
6   partners were electing to do themselves?
7        MS. CITERA:  Object to the form.
8   BY THE WITNESS:
9        A.  I just think it was just a change in
10  the market, change in the industry, and they were
11  looking on -- looking at taking on more of those
12  responsibilities themselves.
13       Q.  Did it have an impact on the sort of
14  bottom line of the level of reimbursement that
15  Abbott's Home Infusion was able to participate in
16  with their home infusion partners?
17       MS. CITERA:  Object to the form.
18  BY THE WITNESS:
19       A.  Again, I wasn't involved in the
20  negotiations for any of those contracts, so I
21  don't know if that had an impact on that piece of
22  it.

Page 100

1        Q.  Did you keep a copy of this manual?
2        A.  No, I don't have one.
3        Q.  Okay.  Are you familiar with any other
4   -- Was that the only manual that you helped
5   develop when you were in Home Infusion?
6        A.  That's the only manual I can recall,
7   but it's been a long time.
8        Q.  Okay.  Do you recall any other manuals
9   that were developed and utilized within the Home
10  Infusion department?
11       A.  No, I don't.
12       Q.  What other responsibilities did you
13  have from '91 to '96 when you were within the
14  Home Infusion department?  Or have we exhausted
15  it?
16       A.  We've exhausted it.
17       Q.  Okay.  Well, we'll move on to a
18  different time frame, then.
19       From '96 to '01, first let's go over,
20  what were your job responsibilities?
21       A.  From '96 to 2001 I was the manager of
22  Contract Marketing for Alternate Site Product

Page 101

1   Sales.
2        Q.  What were your job responsibilities,
3   then?
4        A.  I was responsible for negotiating and
5   developing the contracts that we had with all of
6   our Alternate Site Product Sales customers, and I
7   had -- I had I think seven people reporting to me
8   by the end.  I mean, the department grew a little
9   bit during that period of time, who were actually
10  the people who were developing the contracts and
11  implementing them into our contracting system.
12       Q.  Okay.  And what day-to-day did your job
13  responsibilities entail?
14       MS. CITERA:  Object to the form.
15  BY THE WITNESS:
16       A.  It include managing those people,
17  reviewing the types of contracts that we were
18  working on, determining pricing parameters for
19  those customers with those contracts and then,
20  for that period of time in '98 and '99, as we've
21  already discussed, I was responsible for the --
22  in my last deposition -- for the Medicaid price

                              26  (Pages 98 to 101)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                           Chicago, IL

---

Page 102

1  reporting.
2      Q.  Okay.  And how did you determine or --
3  determine pricing parameters?
4      A.  The pricing parameters were based on
5  the volume of business that a customer was going
6  to bring us or what the customer was willing to
7  commit to bring us.  And, again, the contracts
8  that we wrote were for the -- in most
9  circumstances, the full product line where it was
10 either a solutions and equipment contract, in
11 which case the solutions contract -- the
12 solutions and equipment contract would have
13 included the sodium chloride, sterile water, and
14 dextrose or it could have been an injectables
15 contract, and that would have included all of our
16 pharmaceutical injectables including the
17 vancomycin and acyclovir.  And in some cases, all
18 of the products were in one agreement that we
19 signed.
20      But, again, pricing was determined
21 based on what type -- how much business we
22 thought that customer -- I'm still thinking Home

---

Page 103

1  Infusion -- that that customer could bring to
2  Abbott.
3      Q.  And did you work within Alt Site with
4  anyone else within the Hospital Products Division
5  to arrive at setting those prices?
6      A.  I had dotted -- I had a dotted-line
7  responsibility to the director of Contract
8  Marketing in the hospital side; and one of the
9  things that we would look at when we were
10 negotiating the agreements was what we thought
11 the -- where the hospital -- where the hospital
12 was pricing those products for the Hospital
13 Business Sector at that time.  So we would make
14 sure that our pricing was within those same or
15 similar guidelines based on what the hospital was
16 doing.
17      Q.  And where would you get that
18 information about what the hospital was doing in
19 terms of its -- the Hospital Products Division
20 was doing in terms of its pricing?
21      A.  We had access to their pricing file,
22 their on-line pricing file.  And so we would --

---

Page 104

1  We could review that, and then we would -- if we
2  had questions, we would get in touch with the
3  appropriate individual within that Contract
4  Marketing department to understand what was
5  happening.  So we would make sure that we were
6  pricing appropriately based on what was going on
7  in the hospital market.
8      Q.  Did you have some flexibility, though,
9  within Alt Site in terms of price determinations?
10 Or were you -- were your prices dictated to you
11 by Hospital Products Division?
12     A.  No, we had --
13        MS. CITERA:  Objection to the form.
14 BY THE WITNESS:
15     A.  I'm sorry.  We had some flexibility.
16     Q.  Okay.  And who were the seven people
17 reporting to you during this '96 through '01 time
18 frame?
19     A.  Well, there were a variety of different
20 people who came in and left the department.  So I
21 can -- I can tell you all the names, but I can't
22 tell you exactly when each one of them was in or

---

Page 105

1  out of the department.  Is that what you'd like
2  to hear?
3      Q.  Yes, please.
4      A.  Okay.  There was Debbie Longley, Cindy
5  Dawson, Joe Sweeney, Angie Massaro, Scott Moore,
6  Eric -- and I can't remember Eric's last name --
7  Dave Harling, Linda Ozark, Roberta Green, Sherry
8  Burke, Nadine Hansen, Pat Gloss, and I think
9  there's probably one or two people whose names I
10 can't think of right now off the top of my head.
11     Q.  Okay.  When you were in Alt Site, did
12 you have to prepare or did Alt Site prepare
13 marketing plans?
14        MS. CITERA:  Objection to the form.
15 BY THE WITNESS:
16     A.  Our marketing managers would put
17 together marketing plans for the year during the
18 plan process.
19     Q.  Okay.  Can you explain what you mean by
20 that?
21     A.  Every year, it usually happened in the
22 fall, the marketing managers would have to put

---

27 (Pages 102 to 105)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 106

1  together what they projected to be their sales
2  for the next year.  And that would be part of our
3  plan process to determine what we thought we
4  could sell for the next year.
5     Q.  Okay.  And how was your plan process
6  memorialized?
7       MS. CITERA:  Object to the form.
8  BY THE WITNESS:
9     A.  I'm not sure what you mean by
10  "memorialized."
11     Q.  Well, you have these marketing plans.
12  Was the process itself written down someplace?
13  Would you bless these plans and put them into a
14  larger document?  How would that work?
15     A.  The marketing managers would review the
16  historical sales information for the products
17  that they were -- that they were looking at.
18  Some products they looked at on an individual
19  basis.  Other products they looked at as part of
20  a family of products.  And they would -- excuse
21  me.  They would determine whether they thought
22  that we would have opportunities to grow that

Page 107

1  business during the next year or whether they
2  thought that something else would happen and we
3  wouldn't be able to grow that, whether there
4  would be opportunities for us to take price
5  increases on those based on -- the majority of
6  our contracts had language written into them that
7  there could be inflationary anniversary price
8  changes.  So they would look at them in
9  relationship to that and see whether there was
10  the opportunity to take that up, when that gating
11  would take place.  And so then they would put all
12  that together into some spreadsheets that went
13  into a book every year.
14     Q.  Okay.  When considering pricing or
15  planning pricing, would any consideration be made
16  to the dispensing costs of a particular
17  physician?
18       MS. CITERA:  Object to the form.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Or I'm sorry.  Let me rephrase that.
21       Would any consideration be made to
22  physician dispensing cost and the need to perhaps

Page 108

1  cover dispensing costs of physicians when
2  considering pricing?
3       MS. CITERA:  Object to the form.
4  BY THE WITNESS:
5     A.  No, because our customers were not
6  physicians.  Our customers were the group
7  purchasing organizations, the home infusion
8  companies, the nursing -- the long-term care
9  facilities.  They were not the doctors.  It was
10  whoever was going to be compounding or mixing
11  those products for patients.  So our customer
12  wasn't the doctor, so that was never a
13  consideration.
14     Q.  Okay.  Let me ask you, when you
15  started, did Alt Site monitor its market share on
16  particular products, like, for example,
17  vancomycin?
18       MS. CITERA:  Object to the form.
19  BY THE WITNESS:
20     A.  Not that I recall.
21     Q.  Do you recall what -- when you started
22  in '96 what the market share for Abbott's

Page 109

1  vancomycin was in the alt site market?
2     A.  No, I don't know what that is.
3     Q.  Okay.
4     A.  Or was.  I'm sorry, what that was.
5     Q.  You don't know what that was?
6     A.  Yeah.  I can't say is because that's 12
7  years ago.
8     Q.  Okay.  Do you recall there being,
9  during the '96 through '01 time period, a -- an
10  increase in customer purchasing -- purchases, I'm
11  sorry, of vancomycin?
12       MS. CITERA:  Object to the form.
13  BY THE WITNESS:
14     A.  I do not recall the sales growth for
15  vancomycin for Alternate Site Product Sales for
16  the period of 1996 to 2001.
17     Q.  Do you recall whether there was a sales
18  growth or vancomycin during this period?
19       MS. CITERA:  Object to the form.
20  BY THE WITNESS:
21     A.  No, I don't recall that.
22     Q.  What else can you tell me about your

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 110

1   knowledge of the sale and marketing of the
2   subject drugs during the '96 to '01 time period?
3        MS. CITERA:  Objection to form.
4   BY THE WITNESS:
5        A.  Well, again, as I said before, those --
6   none of these products were sold as -- as
7   individual products.  I do not recall writing --
8   ever writing a product -- a contract for just one
9   of these five products for any of our customers.
10  They were always included as part of the full
11  portfolio of the products that we had available
12  to those customers to buy.
13       Q.  Okay.  Anything else? I want to make
14  sure that we -- before we move on that we exhaust
15  your knowledge of the sale and marketing of the
16  subject drugs by Abbott Home Infusion -- I'm
17  sorry -- by Abbott Alternate Site during the '96
18  through '01 time period.
19       MS. CITERA:  Object to form.
20  BY THE WITNESS:
21       A.  What was the question?
22       Q.  I want to know what else can you tell

Page 111

1   me about Abbott Alt Site's sale and marketing of
2   the subject drugs from' '96 to '01.
3        MS. CITERA:  Object to form.
4   BY THE WITNESS:
5        A.  I think we've talked about the fact
6   that we contracted as part of the larger
7   portfolio; and I think -- you know, I think that
8   pretty much covers it.
9        Q.  Okay.  And those are -- your customers
10  -- Do you recall who your customers were?
11       A.  Our customers could have been home care
12  companies; they could have been long-term care
13  facilities; they could have been members of group
14  purchasing organizations.  We actually sold a lot
15  of our products to distributors who then sold to
16  end-users, and they were noncharge-back
17  distributors.  So we had a good piece of the
18  business that went through them, and then they
19  sold the products to an end-user.
20       Q.  Okay.  Do you recall whether Abbott's
21  Alternate Site had, you know, recognized an
22  increase or had an increase in business during

Page 112

1   this five-year time period that you were there?
2        MS. CITERA:  I'll object to the form.
3   BY THE WITNESS:
4        A.  Yeah, sales grew on a year-to-year
5   basis.  And the sales growth was tied to more
6   customers signing agreements with us, taking
7   advantage of the companies who had signed
8   agreements with us, their members or the
9   distributors selling more of those products.  So
10  yeah, we had sales growth based on those types of
11  things.
12       Q.  Do you have any knowledge or
13  appreciation of whether or not an increase in the
14  vancomycin AWP during this time period had any
15  effect on the Alt Site increased sales from '96
16  to '01?
17       MS. CITERA:  Object to the form.
18  BY THE WITNESS:
19       A.  I do not know if that was a reason for
20  any of the price -- the growth.  But, again, it
21  was the growth across all of our products that
22  grew the sales on a year-to-year basis.

Page 113

1        Q.  Okay.  But you have no information
2   about that?
3        MS. CITERA:  Objection, form.
4   BY THE WITNESS:
5        A.  I have no information about that.
6        Q.  Did anyone at any time to your
7   recollection from '96 to '01 when you were in Alt
8   Site, did anyone discuss the impact of increased
9   AWPs of vancomycin on the sales growth within Alt
10  Site?
11       MS. CITERA:  Object to the form.
12  BY THE WITNESS:
13       A.  Within our Alternate Site
14  organizations, we never had any discussions about
15  that.
16       Q.  You know -- You recall definitively
17  that you personally never had any discussions or
18  that there definitively were no discussions?
19       A.  I personally was never involved in any
20  discussion about AWP as a reason for growth in
21  sales.
22       Q.  Okay.  Is there anything else that you

29 (Pages 110 to 113)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                        January 17, 2008
                        Chicago, IL

Page 114

1   can tell me about your knowledge of the sales and
2   marketing of the subject drugs within the
3   hospital -- I'm sorry, within the home -- the Alt
4   Site Product Sales?
5       A.   Too many organizations.
6       Q.   Yeah.  Within Alt Site Product Sales
7   from '96 to '01?
8           MS. CITERA:  Object to the form.
9   BY THE WITNESS:
10      A.   No, I don't believe we've discussed it
11  fully.
12      Q.   Okay.  So we're exhausted on that?
13      A.   Yes.
14      Q.   Now, your special projects from '01 to
15  '03, did that in any way deal with the sales and
16  marketing of Abbott Hospital Products Division
17  products?
18      A.   Only in that I was working on a project
19  for us to change our order management system, and
20  so obviously that would have an impact when
21  customers placed orders.  But it had nothing to
22  do with pricing or anything else.  It was just

Page 115

1   the new order processing system.
2       Q.   Okay.  And when you joined Contract
3   Marketing in '03 -- or should I say rejoined
4   because you were originally in Contract
5   Marketing, were you not, early on?
6       A.   Yes, yes.
7       Q.   When you rejoined Contract Marketing in
8   '03 within the Hospital Products Division, let me
9   ask you, by that point in time, had Alt Site
10  essentially merged into Hospital Products?
11      A.   Yes.
12      Q.   Okay.
13      A.   Yeah.
14      Q.   What is your knowledge of -- from --
15  once you assume your responsibilities within the
16  Contract Marketing division, what's your
17  knowledge of the sales and marketing of the
18  subject drugs?
19      A.   At that point, I wasn't -- I wasn't
20  involved in writing contracts anymore or the
21  sales and marketing.  I was starting to work on
22  all of the compliance activities within Contract

Page 116

1   Marketing and the compliance with our operating
2   procedures and the training activities.  The only
3   thing that I can -- the only -- the only thing
4   relating to the sales and marketing is that I was
5   also working with our legal department to update
6   all of our contract templates that were used for
7   writing contracts with all of our customers, both
8   Hospital and Alternate Site.
9       Q.   Okay.  When you say "compliance," what
10  do you mean?
11      A.   Compliance to the operating procedures
12  for Contract Marketing and compliance to
13  contractual agreements.
14      Q.   Okay.  So it's not compliance in a
15  statutory or regulatory framework?  For example,
16  you weren't responsible for monitoring whether or
17  not Abbott Hospital Products Division Contract
18  Marketing was complying with state or federal
19  statutes, right?
20          MS. CITERA:  Objection to form.
21  BY THE WITNESS:
22      A.   No, I was not.  It was making sure that

Page 117

1   we had operating procedures in place for all of
2   the activities and that we were in compliance
3   with the policies, the Abbott policies, and then
4   later the Hospira policies.
5       Q.   Okay.  Other than what you've just
6   described, do you have any other knowledge about
7   Abbott's -- Abbott Hospital Products Division
8   sale and marketing of the subject drugs?
9           MS. CITERA:  Object to the form.
10  BY THE WITNESS:
11      A.   No.
12      Q.   Okay.  Have we exhausted, then, for
13  this period from '91 to '03, your knowledge of
14  any information concerning the sale and marketing
15  of the subject drugs?
16          MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18      A.   Yes, I believe we have exhausted it.
19      Q.   Okay.  Let's move on to the next topic.
20          Ma'am, can you describe your knowledge
21  during the '91 through '03 time period of the
22  benefits of the subject drugs in the treatment of

30 (Pages 114 to 117)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 118

1  patients?
2      MS. CITERA:  Object to the form.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  If you have any knowledge, I should ask
5  -- Let me ask you this first.  Strike that
6  earlier question.
7      Do you have any knowledge for the time
8  period of '91 through '03 of the benefits of the
9  subject drugs in the treatment of patients?
10     MS. CITERA:  Object to the form.
11 BY THE WITNESS:
12     A.  No, I don't.
13     Q.  Okay.  Do you have any knowledge for
14 the time period from '91 through '03 of Medicare
15 and Medicaid reimbursement systems?
16     MS. CITERA:  Object to the form.
17 BY THE WITNESS:
18     A.  Well -- And, again, in '91 I was still
19 doing some reimbursement, although the majority
20 of the partners that I was doing reimbursement
21 for were -- were not -- did not have patients
22 that were being billed through Medicare and

Page 119

1  Medicaid.  I did do some claims for Medicare for
2  TPN and enteral patients, and I did have to
3  submit some claims for -- to Illinois Medicaid
4  for one of the partners that we had.
5      Q.  Okay.  And what was your familiarity --
6  This was '91 through what time period?
7      A.  Just in '91 because that was the last
8  year I was doing reimbursement.
9      Q.  Okay.  So your knowledge would have
10 been -- is it fair to say it would have been
11 confined to what you were doing within home
12 infusion reimbursement?
13     A.  Right, submitting -- submitting claims
14 to Illinois Medicaid for patients whose insurance
15 company was -- who was insured through Illinois
16 Medicaid.
17     Q.  Okay.  Other than during this '91 time
18 period -- Well, let me ask you, what was your
19 knowledge or familiarity with Medicaid or
20 Medicare reimbursement systems --
21     MS. CITERA:  Object to form.
22 BY MS. ST. PETER-GRIFFITH:

Page 120

1      Q.  -- in '91?
2      MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4      A.  What do you mean by "systems"?  The
5  actual systems that they used?
6      Q.  Well, Medicaid -- Let's just say
7  Medicare or Medicaid programs.
8      MS. CITERA:  Object to the form.
9  BY THE WITNESS:
10     A.  Again, I knew how to submit claims to
11 Medicare for TPN and enteral patients who were
12 covered under the prosthetic device benefit.  And
13 then I knew how to submit the forms to Illinois
14 Medicaid for Medicaid patients.
15     Q.  Okay.  Well, let's start with Medicare.
16 How did you submit claims to Medicare?
17     A.  We -- It was using the -- I believe --
18 It's been such a long time.  I believe it's a
19 1600 or 1500 form.
20     Q.  Is it a HCFA-1500; does that ring a
21 bell?
22     A.  That's it.  That's it.  Completing a

Page 121

1  form depending on how Medicare paid for those two
2  therapies, which was -- there was -- I think
3  there were five HCPCS codes that you could use to
4  bill for Medicare, one for a pump, one for the
5  TPN solution, one for supplies, one for flushing
6  supplies, and one for lipids if the patient was
7  receiving IV fats.
8      And there was something similar for
9  Medicaid -- I mean, not for Medicaid -- for
10 enteral nutrition for the pump, the enteral
11 nutrition, and the supplies that they used to do
12 tube feedings.  So that was on the majority of my
13 -- of how to bill Medicare for those therapies.
14     For Medicaid, Illinois had specific
15 forms that you had to fill out where you had to
16 itemize, if I recall this correctly -- again,
17 it's been a long, long time -- where you had to
18 go in and itemize each item that the patient was
19 receiving, and then Illinois would reimburse
20 based on whatever they thought the appropriate
21 reimbursement would be for those products.
22     Q.  Okay.  Anything else that you can

31 (Pages 118 to 121)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 122

1  recall?
2      A.  I know that for a period of time, we
3  were able to bill Medicare for pain management
4  and liver cancer.  And I think for a short period
5  of time, IV vancomycin was covered.  But I never
6  submitted any -- I never had to submit claims for
7  those therapies, so I'm not exactly sure how to
8  do that.
9      Q.  Okay.  Anything else that you can
10 recall?
11         MS. CITERA:  Object to the form.
12 BY THE WITNESS:
13     A.  That's really all I can recall about
14 how to bill for Medicare and Medicaid based on
15 what I was doing in 1991.
16     Q.  Okay.  What about after '91?  Did you
17 have any knowledge -- do you have any knowledge
18 of Medicaid and Medicare reimbursement systems or
19 programs after '91?
20         MS. CITERA:  Object to the form.
21 BY THE WITNESS:
22     A.  No, because I was in Product Sales by

Page 123

1  that time, and so we were -- we were actually
2  selling the products to other people who were
3  using them for any type of services that they
4  were providing for patients.  So I essentially
5  did not have any -- I wasn't involved in any
6  changes that could have taken place with Medicare
7  or Medicaid after that.
8      Q.  Well, you were involved for a period of
9  time late during your tenure in Alt Site with
10 reporting to state Medicaid agencies, weren't
11 you?
12     A.  Right.
13         MS. CITERA:  Object to the form.
14 BY THE WITNESS:
15     A.  I'm sorry.  I was thinking in terms of
16 submitting claims to it as opposed --
17     Q.  I got you.  I got you.
18         Did you have any -- During your tenure
19 in Alt Site when you were responsible for
20 submitting information to state Medicaid
21 programs, did you have an understanding or any
22 knowledge of how the submission of that

Page 124

1  information to different Medicaid programs would
2  impact Medicaid reimbursement?
3         MS. CITERA:  Object to the form.
4  BY THE WITNESS:
5      A.  No.  My understanding of the program
6  was that this was to pay the rebates to the State
7  for the products that were being dispensed to
8  patients.  I never connected paying the rebates
9  to reimbursement.
10     Q.  Okay.  Do you have -- For the time
11 period from '91 through '03, do you have any
12 other knowledge of Medicaid or Medicare
13 reimbursement programs or systems that we haven't
14 already discussed?
15         MS. CITERA:  Object to the form.
16 BY THE WITNESS:
17     A.  Not that I can recall.
18     Q.  Okay.  Ma'am, for the time period from
19 '91 to '03, do you have an understanding of the
20 meaning of AWP as that term is used in the
21 Medicare or Medicaid reimbursement programs or
22 systems?

Page 125

1         MS. CITERA:  Object to the form.
2  BY THE WITNESS:
3      A.  As I said last summer when we -- when
4  we talked about this, I know that AWP stood for
5  average wholesale price; but I never really
6  understood what that meant.  And I knew it was a
7  calculation, and I knew that it was being used
8  for reimbursement; but I never really understood
9  what average wholesale price could have been.
10     Q.  Okay.  So is it fair to say that you
11 don't have an understanding or knowledge of the
12 meaning of AWP as that term is used in Medicare
13 and Medicaid reimbursement systems or programs?
14         MS. CITERA:  Object to the form.
15 BY THE WITNESS:
16     A.  Well, again, I know it stood for
17 average wholesale price; but I never quite
18 understood what that meant from a price
19 perspective or --
20     Q.  Okay.
21     A.  Okay.
22     Q.  Well, do you have any other

32 (Pages 122 to 125)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 126

1  understanding as to the meaning of AWP as that
2  term is used in the Medicare or Medicaid
3  reimbursement systems?
4        MS. CITERA:  Object to the form.
5  BY THE WITNESS:
6     A.  No, I do not.
7     Q.  So we've exhausted your knowledge or
8  understanding of that meaning as we've discussed?
9        MS. CITERA:  Object to the form.
10 BY THE WITNESS:
11    A.  Yes.
12    Q.  Okay.  Do you, Ms. Leone, have
13 knowledge or an understanding of the calculation
14 of AWP for pharmaceutical products?
15       MS. CITERA:  Object to the form.
16 BY THE WITNESS:
17    A.  I think we talked about this last
18 summer in my deposition also.  I know that it was
19 calculated by the compendia based on information
20 provided by a manufacturer.
21    Q.  Okay.  Hello?
22    A.  Hello, I'm here.

Page 127

1     Q.  Yeah, I'm sorry.  We're getting a
2  little bit fuzzy, which concerns me because
3  sometimes that means that the US Attorney's phone
4  system is going to konk out.  So if it does, I
5  will try to call you guys on my BlackBerry.  Can
6  you hear me okay?
7     A.  Yes.
8     Q.  Ma'am, do you have any other
9  understanding or knowledge of the calculation of
10 AWP for pharmaceutical products?
11       MS. CITERA:  Object to the form.
12 BY THE WITNESS:
13    A.  Other than what I just described, no.
14    Q.  Okay.  So we've exhausted your
15 knowledge on the calculation of AWP for
16 pharmaceutical products?
17       MS. CITERA:  Object to the form.
18 BY THE WITNESS:
19    A.  Yes.
20    Q.  Okay.  Ma'am, do you have any knowledge
21 or understanding of the lack of direct
22 transactions between the United States and

Page 128

1  Abbott?
2        MS. CITERA:  Object to the form.
3  BY THE WITNESS:
4     A.  I don't know what that question means.
5     Q.  Okay.  Do you have any knowledge or
6  understanding of the lack of product sales
7  between the United States and Abbott?
8        MS. CITERA:  Object to the form.
9  BY THE WITNESS:
10    A.  You mean the government buying Abbott
11 products?
12    Q.  Well, I don't know.  I'm asking you.
13 If you don't understand the sentence, then it's
14 fair to say no too.
15    A.  Okay.
16    Q.  But do you have any knowledge or
17 understanding of the lack of direct transactions
18 between the United States and Abbott?
19       MS. CITERA:  Object to the form.
20 BY THE WITNESS:
21    A.  And, again, I guess what I don't
22 understand is what you mean by "lack of direct

Page 129

1  transactions," what that means.  So I can't
2  answer the question.
3     Q.  Okay.  That's fine.  Then we'll move
4  on.
5        Do you have an understanding, ma'am, or
6  do you have any knowledge of the lack of any
7  misrepresentations between the United States --
8  or I'm sorry -- to the United States concerning
9  AWP for the subject drugs?
10       MS. CITERA:  Object to the form.
11 BY THE WITNESS:
12    A.  I don't know anything about what you
13 just said.
14    Q.  Okay.  Ma'am, do you have any knowledge
15 or understanding about the lack of any fraud
16 committed by Abbott --
17       MS. CITERA:  Objection to the form.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  -- to the Medicaid or Medicare
20 programs?
21       MS. CITERA:  Objection to the form.
22 BY THE WITNESS:

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

| Page 130 | Page 132 |

**Page 130**

1    A.   So is the question did Abbott think
2   they committed fraud or do I know that Abbott
3   thought they committed fraud; is that the
4   question you're asking?
5    Q.   You're free to answer both questions.
6        MS. CITERA:  Objection to the form.
7   BY THE WITNESS:
8    A.   I don't understand the question that
9   you're asking me to answer.
10   Q.   Okay.  Well, then, that's fine.  Let me
11  try and ask it this way:  During your tenure as
12  an Abbott employee, were you aware of any
13  violations of the Medicare or Medicaid statutes
14  or regulations while you were at Abbott?
15       MS. CITERA:  Object to the form.  I'd
16  also counsel you not to reveal any discussions
17  you had with counsel.
18  BY THE WITNESS:
19   A.   I was not aware that there was -- that
20  Abbott did that, that Abbott could have done
21  that.
22   Q.   That Abbott could have done what?

**Page 131**

1    A.   However you phrased that.
2    Q.   Okay.  Violated the Medicare or
3   Medicaid statutes or regulations?
4    A.   Yeah, I don't know that Abbott did
5   that, violated any of the fraud and abuse
6   statutes.
7    Q.   That's based on your knowledge and
8   experience with Abbott?
9        MS. CITERA:  Object to the form.
10  BY THE WITNESS:
11   A.   Yeah, I do not believe -- Well, I do
12  not know that Abbott or -- there was never
13  anything -- See, I'm not sure what I'm answering.
14   Q.   Okay.  It's very simple.  Let me --
15       MS. CITERA:  It's actually not.
16  BY MS. ST. PETER-GRIFFITH:
17   Q.   Let me try and simplify it, I should
18  say.  Are you aware of Abbott at any time during
19  your tenure as an employee at Abbott violating
20  any Medicare or Medicaid statutes or regulations?
21       MS. CITERA:  Objection to form.  Also
22  the same caution.

**Page 132**

1   BY THE WITNESS:
2    A.   I am not aware Abbott violated any of
3   those regulations.
4    Q.   And that's based upon your personal
5   experience with Abbott; is that correct?
6    A.   Yeah, that's strictly based on my
7   personal experience and understanding, yes.
8    Q.   Are you aware of any measures that
9   Abbott undertook to ensure that it did not
10  violate Medicare or Medicaid statutes or
11  regulations?
12       MS. CITERA:  Objection to the form.
13  Also the same instruction.
14  BY THE WITNESS:
15   A.   Abbott had -- No, I am not aware of
16  that.
17   Q.   You're not aware of any measures that
18  Abbott undertook to ensure that it did not
19  violate the Medicare Medicaid statutes or
20  regulations?
21       MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

**Page 133**

1    A.   I'm sorry.  I misunderstood the
2   question.
3    Q.   That's why I asked it again.
4    A.   Yes.  We had -- Abbott had in place
5   operating -- policies, corporate policies that
6   were created and developed with our legal
7   department and our Office of Ethics and
8   Compliance that were the policies that we
9   operated under as Abbott employees.  And there
10  were the corporate policies, and then there were
11  divisional procedures for -- for each one of the
12  divisions to make sure that they acted within
13  those -- make sure that they acted within those
14  corporate policies.
15   Q.   Okay.  Let me --
16   A.   So we did have that.
17   Q.   -- let me start with the corporate
18  policies -- First let me start with the Office of
19  Ethics and Compliance.  When did the Office of
20  Ethics and Compliance within Abbott, when was it
21  formulated?
22   A.   I don't know.

34 (Pages 130 to 133)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 134

1    Q.  Do you recall whether it existed prior
2  to 2000?
3    A.  I don't know when it -- when it was
4  initiated.
5    Q.  Okay.  If you had a question concerning
6  ethics or compliance matters prior to 2001, who
7  would you take those concerns to?
8    A.  We would probably start with our
9  counsel, go to our counsel and work with them;
10  and then based on direction from them, we would
11  take it from there.
12    Q.  Okay.  When you say "counsel," do you
13  mean in-house counsel?
14    A.  Yes.
15    Q.  Do you know whether the Abbott in-house
16  lawyer was also during -- prior to 2001 the
17  corporate ethics officer?
18      MS. CITERA:  Object to the form.
19  BY THE WITNESS:
20    A.  I do not recall within our in-house
21  counsel who had responsibility for what during
22  that period of time.

Page 135

1    Q.  Okay.  What about after 2001?  Who
2  would you take your concerns about or your
3  questions about ethics and compliance -- And when
4  I say "compliance," I mean compliance with state
5  and federal statutes -- who would you take those
6  concerns to?
7      MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9    A.  I think again at that point, we
10  probably still would have started with our
11  counsel, in-house counsel, and then they would
12  have directed us to someone else.
13    Q.  Was there someone within your in-house
14  counsel's office you were familiar with that you
15  could take these concerns to?
16      MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18    A.  I think we would take them to -- If I
19  recall correctly, we probably started with Honey
20  Lynn Goldberg at the time and then somebody else
21  -- and then whoever she would designate for us to
22  work with after that.

Page 136

1    Q.  Okay.  Do you recall taking questions
2  concerning ethics and compliance to Honey Lynn
3  Goldberg?
4      MS. CITERA:  I object to the form.  I'm
5  also going to caution you that's a yes or no, not
6  to reveal what you discussed, if you did discuss
7  anything.
8  BY THE WITNESS:
9    A.  What I meant to say was if we had
10  questions, the person we would probably start
11  with would be Honey Lynn or someone in her
12  organization.
13    Q.  Okay.  And my question, though, is, do
14  you ever recall taking any questions to her?
15    A.  I did not take any questions to her.
16    Q.  Do you recall whether any of your
17  employees within Alt Site who were under your
18  supervision took questions to her?
19    A.  I don't recall that that ever happened
20  during my tenure in Alternate Site Product Sales.
21    Q.  And as --
22    A.  As the manager.

Page 137

1    Q.  As the manager, do you think that you
2  would have learned if a concern had been taken?
3    A.  Yes.
4    Q.  What about when you were in Alt Site?
5  Do you recall taking any ethics and compliance
6  questions to in-house counsel?
7    A.  That was what I was just addressing,
8  was Alt Site.
9    Q.  I'm sorry, Home Infusion.  When you
10  were in Home Infusion, do you recall having any
11  ethics or compliance questions that you took to
12  in-house counsel?
13    A.  I would have probably taken it to my
14  manager, and I don't recall ever having any
15  questions regarding that.
16    Q.  Okay.  What about after, in '03 when
17  you were in Contract Marketing?  Do you recall
18  taking any ethics and compliance questions to in-
19  house counsel?
20    A.  I don't recall taking any questions to
21  them because, at that point, I was more focused
22  on our internal activities.

Henderson Legal Services, Inc.

202-220-4158               www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 138

1     Q.  Okay.  Developing different policies
2  and procedures, you mean?
3     A.  Yes.
4     Q.  Okay.
5     A.  And I did -- I mean, I did have some
6  conversations with the Office of Ethics and
7  Compliance about what we were putting into place
8  within our organization.  But, again, it wasn't
9  related to fraud and abuse and the Antikickback.
10  It was regarding what we were trying to implement
11  in the department.
12     Q.  Okay.  The procedures that you did take
13  to the Office of Ethics and Compliance, why did
14  you take them there?
15         MS. CITERA:  Objection to the form.
16  BY THE WITNESS:
17     A.  Some of it was related to the policies,
18  the corporate policies that were implemented and
19  then the divisional policies that were created --
20  that were created for the Hospital Products
21  Division in relationship to those corporate
22  policies.  I was -- I was involved in writing

Page 139

1  those HPD policies -- HPD procedures for us based
2  on those corporate policies.
3     Q.  Okay.  What corporate policies are you
4  referencing?
5     A.  I believe we called them "Federal
6  Healthcare Program Guidelines."  I believe that
7  was the -- I believe that was what they were --
8  that they were called, and I think there were six
9  or seven of them.
10     Q.  Okay.  And do you know why -- When were
11  they created?
12     A.  I think that was the 2002/2003 time
13  frame, but I can't remember exactly.
14     Q.  Do you know whether they were created
15  incident to Abbott's entry into a corporate
16  integrity agreement with the United States?
17         MS. CITERA:  Objection to form.
18  BY THE WITNESS:
19     A.  I think it was probably about the same
20  time.  I can't answer whether that was the reason
21  why.
22     Q.  Well, was a reason given to you as to

Page 140

1  why you needed to develop these policies and
2  procedures?
3         MS. CITERA:  Object to the form.
4  BY THE WITNESS:
5     A.  You know, I think it did have -- I
6  think it had something to do with that corporate
7  integrity agreement, yes.
8     Q.  Okay.  What -- What particular policies
9  and procedures did you develop?
10     A.  I developed one for discounts and
11  rebates, for no-charge products, for -- There was
12  one for reimbursement, one for group purchasing
13  organization relationships, one for -- one or two
14  relating to how we handled receivables.  I think
15  -- Is that seven?  That's what I can remember.
16         MS. CITERA:  I didn't count.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  I've got I think five here.  That's all
19  you can remember?
20     A.  Yeah.
21     Q.  Who asked you to develop them?
22     A.  Katherine Zasdenoff from our Office of

Page 141

1  Ethics and Compliance, from the Abbott Office of
2  Ethics and Compliance.
3     Q.  Now, during this period in '03, were
4  these the only project you were working on, the
5  development of these particular policies; or were
6  there other items you were working on?
7     A.  Well, I was responsible for the
8  training activities for the individuals within
9  Contract Marketing; and I was also working with
10  legal counsel to develop all of the contract
11  templates that we use for writing -- writing
12  contracts with all of the Hospital Products
13  Division customers.
14     Q.  Okay.  Why were you changing the
15  contract templates?
16     A.  What we had determined is that we had a
17  lot of different templates based on the different
18  products that we were selling, and what we said
19  is we really need to standardize these.  And so
20  what we did is we came back and looked at all of
21  them and standardized so that they would all --
22  they were all in the some format.  We made sure

                              36  (Pages 138 to 141)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                          January 17, 2008
Chicago, IL

Page 142

1  that we had all of the same clauses in them that
2  needed to be in those agreements.  And then we
3  identified, you know, if we were going to -- to
4  write a contract with a customer for this
5  product, this product line, we wanted to make
6  sure that there were some things that were
7  included for that, for those products.  And if
8  there was different products, there were other
9  things we included in a different template.  So
10 we just looked at what we had been doing and said
11 we need to get standardized a little more on what
12 was being written.
13     Q.  Okay.  Did the decision to change the
14 contract templates have anything to do with the
15 corporate integrity agreement?
16        MS. CITERA:  Object to the form.
17 BY THE WITNESS:
18     A.  No.  That project actually started
19 before that, and there were other people working
20 on it before I came back into the department; and
21 then they gave that to me as one of my
22 responsibilities.

Page 143

1     Q.  Okay.  What training activities did you
2  undertake?
3     A.  We have -- We have over -- We had and
4  still do today as Hospira, over a hundred people
5  in Contract Marketing.  And we were implementing
6  training activities to teach new people how to
7  use our Contract Marketing systems.  We have --
8  And we have four or five systems, so it was how
9  to use those.  We did training on how to use Word
10 and Excel.  What we did is we actually created a
11 class that taught people all of the functions of
12 Excel that were used most frequently in Contract
13 Marketing, so it was really a focused class.
14        We also had some classes that we called
15 Management Development, and those were actually
16 courses that people could take to get them
17 additional skill sets to possibly get them ready
18 for another position in another area.  So those
19 were the types of training activities that I was
20 responsible for.
21     Q.  Okay.  And during the time period,
22 other than developing these six or seven policies

Page 144

1  we discussed, your training activities, and your
2  development of the contract templates, do you
3  have any other responsibilities?
4     A.  No, because that was pretty much full-
5  time.
6     Q.  Sounds like it could be.
7     A.  Yeah.
8     Q.  Did you have any responsibilities with
9  regard to preparing for the spin of Hospira --
10 Hospira?
11     A.  I was peripherally involved in the
12 order to cash team, and that was only near the
13 end.  And that was making sure that when -- And
14 part of this was because I had been on the SAP
15 project a couple years earlier when we moved to
16 SAP for order management.  They brought me in on
17 the spin stuff because of my knowledge of the
18 order management system, the SAP system, which we
19 were keeping even though we were separating from
20 Abbott.  So we were still keeping SAP for order
21 management.  So they included me on that team to
22 make sure that all of those things -- we could

Page 145

1  continue to have customers place orders and get
2  invoiced correctly.
3     Q.  Going back to the corporate policies
4  that we were discussing earlier concerning
5  Medicare and Medicaid compliance, do you recall
6  what particular policies were developed?
7        MS. CITERA:  Object to the form.
8  BY THE WITNESS:
9     A.  Well -- And, again, we created -- There
10 was an -- There was an Abbott corporate policy,
11 and we created HPD procedures for each one of
12 those; and that's what I was describing.
13     Q.  Okay.  So what you were describing,
14 then, were the division -- That leads to my next
15 question -- were the divisional procedures that
16 were developed pursuant to the Abbott corporate
17 policy?
18     A.  Right.  And I was developing those for
19 the Hospital Products Division.
20     Q.  Okay.  Prior to this '02 to '03 time
21 frame, what corporate policy or divisional
22 policies do you recall being in place concerning

37 (Pages 142 to 145)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

| Page 146 |
|---|
| 1    Medicare or Medicaid statutory and regulatory |
| 2    compliance? |
| 3         MS. CITERA:  Objection to form. |
| 4    BY THE WITNESS: |
| 5         A.  I don't recall what types of procedures |
| 6    and policies we had in place before that. |
| 7         Q.  Do you know whether there were any in |
| 8    place? |
| 9         MS. CITERA:  Objection to form. |
| 10   BY THE WITNESS: |
| 11        A.  No, I do not know. |
| 12        Q.  Ma'am, do you recall or are you |
| 13   familiar with the term "spread"? |
| 14        A.  Yeah, we discussed that in -- last |
| 15   summer. |
| 16        Q.  Okay.  Do you recall any policies or |
| 17   procedures concerning the sales force members |
| 18   discussing spread or the difference between |
| 19   contract price and AWP? |
| 20        MS. CITERA:  Objection to the form. |
| 21   BY THE WITNESS: |
| 22        A.  I do not recall whether or not we had a |

| Page 147 |
|---|
| 1    policy that discussed that. |
| 2         Q.  Okay. |
| 3         A.  I do believe, though, that when we did |
| 4    -- And I'd have to go back and review it.  It's |
| 5    been a while.  But I do believe that the |
| 6    reimbursement policy that was written and then |
| 7    the HPD procedure that was written in |
| 8    relationship to that, there was something that |
| 9    referenced AWP, although I can't remember exactly |
| 10   what -- what it was, but that we did not discuss |
| 11   it and what the policy would be on that.  But I |
| 12   don't recall whether we had something prior to |
| 13   that. |
| 14        Q.  Okay.  When you say -- Are you talking |
| 15   about the policies that you participated in |
| 16   drafting in '02 and '03? |
| 17        A.  Yes. |
| 18        Q.  Okay.  Ma'am, do you -- are you |
| 19   familiar with the Contract Marketing Basic |
| 20   Operating Procedures Manual? |
| 21        A.  Yes. |
| 22        Q.  What is that document? |

| Page 148 |
|---|
| 1         A.  It was a document that was created -- I |
| 2    was in Alternate Site at the time.  And it was a |
| 3    document that was created on the hospital side |
| 4    for, I believe, the hospital pricing analysts to |
| 5    use when they were writing contracts for |
| 6    customers. |
| 7         Q.  Okay.  Do you remember when it was |
| 8    developed? |
| 9         A.  No.  Like I said, I know it was when I |
| 10   was in Alternate Site.  I'm thinking somewhere |
| 11   between '98 and 2000; but I don't remember |
| 12   exactly when it was, when it was initially |
| 13   created. |
| 14        Q.  Do you remember how long it was in |
| 15   place for? |
| 16        MS. CITERA:  Object to the form. |
| 17   BY THE WITNESS: |
| 18        A.  No, I do not recall how long it was in |
| 19   place. |
| 20        Q.  Do you recall seeing it when you |
| 21   returned to Contract Marketing in '03? |
| 22        A.  No, I do not.  It was -- I do not |

| Page 149 |
|---|
| 1    believe it was in place -- I do not believe it |
| 2    was being used anymore. |
| 3         Q.  In '03? |
| 4         A.  Yes. |
| 5         Q.  Okay.  Did you have access to it when |
| 6    you were in Alt Site? |
| 7         A.  Yes. |
| 8         Q.  And what did you use that -- the |
| 9    Contract Marketing Basic Operating Procedures |
| 10   Manual for when you were in Alt Site? |
| 11        MS. CITERA:  Object to the form. |
| 12   BY THE WITNESS: |
| 13        A.  We did not use it in Alternate Site.  I |
| 14   think that there was -- At one point, we looked |
| 15   at it and talked about creating some type of a |
| 16   comparable document for us in Alt Site.  But as I |
| 17   recall, we never moved forward with doing |
| 18   anything along those lines. |
| 19        Q.  Do you recall any discussion about the |
| 20   accuracy or utility of the document? |
| 21        MS. CITERA:  Objection to form. |
| 22   BY THE WITNESS: |

                                    38 (Pages 146 to 149)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 150

1    A.  I think that may have been part of the
2  reason why we never adopted it, but I don't
3  recall any specific conversations where we
4  discussed it.
5    Q.  Okay.  Ma'am, are you familiar with
6  Virginia Tobiason?
7    A.  Yes.
8    Q.  Who is she?
9    A.  I believe she's still at Abbott today.
10  In -- doing re- -- something in their Office of
11  Ethics and Compliance for reimbursement.  But I
12  worked for Virginia when I was in Home Infusion
13  Services.
14    Q.  Okay.  And how was your relationship
15  with her?
16      MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18    A.  I liked Ginnie.
19    Q.  Okay.  How was she as a manager?
20      MS. CITERA:  Objection to form.
21  BY THE WITNESS:
22    A.  She was different.

Page 151

1    Q.  How was she different?
2    A.  She had good days and bad days as a
3  manager.
4    Q.  Okay.  And what do you mean she had
5  good days and bad days?
6    A.  There were -- There were days when
7  working with Ginnie was a joy.  She knew --
8  Ginnie knew everything that there was to know
9  about what -- her area of responsibility.  She's
10  very, very bright; but sometimes she was a little
11  moody.
12    Q.  Okay.  Did her moodiness affect her
13  relationships?
14      MS. CITERA:  Object to the form.
15  BY THE WITNESS:
16    A.  It may have.
17    Q.  Okay.  Do you know Mr. Bruce Rodman?
18    A.  Yes.
19    Q.  Who is he?
20    A.  He was -- He worked in reimbursement in
21  Home Infusion Services.  I don't exactly remember
22  when he started in reimbursement, but he stayed

Page 152

1  in Home Infusion until it closed down.  We did
2  work together for a period of time; but I don't
3  remember when he started and when, you know,
4  versus when I left in '96.  But we did work
5  together for a while.
6    Q.  Okay.  Other than your work with her in
7  Home Infusion, did you work with Virginia
8  Tobiason at any other time?
9    A.  When I was working on the HPD operating
10  procedures, I worked with Ginnie to create the
11  HPD procedure for reimbursement.
12    Q.  Okay.
13    A.  And --
14    Q.  And how did that -- What were your
15  contributions to that project, and what were her
16  contributions to that project?
17    A.  I was --
18      MS. CITERA:  Object to the form.
19  BY THE WITNESS:
20    A.  I was really struggling with how to
21  write it, and Ginnie gave me a very good draft of
22  what we should say in the procedure.  And then I

Page 153

1  was able to fill in all of the rest of the blanks
2  regarding who the responsible parties would be
3  and how we would handle things from a
4  reimbursement perspective within HPD.
5    Q.  Do you know where she got the draft
6  from, or did she write it?
7    A.  No, I don't know where she got it from
8  or whether she wrote it.
9    Q.  Okay.  Any other interaction with
10  Virginia Tobiason?
11    A.  Not on a business basis.
12    Q.  Okay.  Do you have a personal
13  relationship with her?
14      MS. CITERA:  Object to the form.
15  BY THE WITNESS:
16    A.  We had -- You know, we would
17  periodically get together, mostly when I was
18  working in Home Infusion Services.  But I saw her
19  a couple of times -- you know, after she left
20  Home Infusion, she went to the Diagnostics
21  division before she went to the Office of Ethics
22  and Compliance.  So, you know, we'd kind of talk

39 (Pages 150 to 153)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

| Page 154 |
| --- |

1  to each other now and then, find out what's going
2  on.
3     Q.  Okay.  Do you know, have you heard that
4  she may be retiring?
5     A.  Good for her.
6     Q.  Oh.  I'm just wondering whether that
7  was something that you were aware of.
8     A.  No, I'm not.
9     Q.  Okay.  You know, folks, what time do
10 you have because I'm about to -- I can start
11 launching into the documents.  But if now is a
12 good breaking time, we can take a break as well.
13    MR. ANDERSON:  We need to because of
14 the tape, and it's lunchtime so --
15    MS. ST. PETER-GRIFFITH:  Let's do that.
16    MR. ANDERSON:  -- I think that's a good
17 idea.
18    MS. ST. PETER-GRIFFITH:  Okay.
19 Everyone enjoy your lunch.  Are we going to try
20 and reconvene back in about 45 minutes?
21    MR. ANDERSON:  We'll connect the phone
22 -- you know, we'll recall in at 12:45.

| Page 155 |
| --- |

1     MS. ST. PETER-GRIFFITH:  Okay.  Is that
2  good for everybody?  Ms. Leone, does that give
3  you enough time?
4     THE WITNESS:  Yes.
5     THE VIDEOGRAPHER:  We are off the
6  record at 11:57 a.m. with the end of Tape No. 2.
7     (A short break was had.)
8     THE VIDEOGRAPHER:  We are back on the
9  record at 12:58 p.m. with the start of Tape No.
10 3.
11 BY MS. ST. PETER-GRIFFITH:
12    Q.  Welcome back, Ms. Leone.
13    A.  Thank you.
14    Q.  First, I want to ask, is there -- And I
15 should have asked this morning as well.  Is there
16 any -- As you've had a lunch break, is there any
17 testimony that you've given so far today that
18 you've thought about and want to either augment
19 or change or supplement in any way?
20    MS. CITERA:  Objection to the form.
21 BY THE WITNESS:
22    A.  Not at this -- not that I can think of.

| Page 156 |
| --- |

1     Q.  Well, I should have told you at the
2  beginning of the day that if there's anything you
3  can think of as we move along during the day,
4  feel free to pipe up and we can -- we can add
5  that to the record.
6     A.  Okay.
7     Q.  Ma'am, you had testified earlier that
8  Virginia Tobiason was extremely bright and knew
9  everything that there was to know about her area.
10 Do you remember that testimony?
11    A.  Yes.
12    Q.  What is Virginia Tobiason's area?
13    A.  Virginia was the manager of
14 reimbursement when I was in Home Infusion
15 Services.
16    Q.  Okay.  So when you say "about her
17 area," do you mean about reimbursement services?
18    A.  About the reimbursement services, about
19 what Abbott Home Infusion Services was doing from
20 a reimbursement perspective.  And, again, that's
21 my opinion of what -- of Ginnie's area of
22 expertise.

| Page 157 |
| --- |

1     Q.  Do you believe that she's -- that she
2  can continues to this day to have that area of
3  expertise?
4     MS. CITERA:  Objection to form.
5  BY THE WITNESS:
6     A.  I don't -- I don't know.
7     Q.  Okay.  Ma'am, if you could --
8     MS. ST. PETER-GRIFFITH:  Jarrett, I'm
9  looking at file folder No. 4.
10    MR. ANDERSON:  Yes.  I'm marking it.
11    MS. ST. PETER-GRIFFITH:  Can we start
12 with that document?
13    MR. ANDERSON:  It's marked as Leone
14 Deposition Exhibit 1.
15    (Deposition Exhibit Leone 001
16 marked as requested.)
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  Okay.  Ms. Leone, could you take a few
19 minutes and look at this document?
20    A.  Okay.
21    Q.  Okay.  I appreciate that it's a May 27,
22 '92 document.  But do you recall this document?

                              40  (Pages 154 to 157)

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

| Page 158 | Page 160 |

**Page 158**

1    A.  No.
2    Q.  Do you recall Abbott Home Infusion
3  having a relationship with Cedars-Sinai Medical
4  Center?
5    A.  Yes.
6    Q.  Do you recall an issue concerning the
7  management price negotiations for Cedars and
8  having authority of up to 20 percent discount on
9  any therapy without the approval of Cedars?
10   A.  No, I don't.
11   Q.  Okay.  Do you recall anything about the
12  subject matter of this letter?
13   A.  No.
14   Q.  Okay.  Do you have any doubt that you
15  received a copy of this letter?
16   A.  I have no doubts that I received a copy
17  of this letter.
18   Q.  Do you have any reason to dispute the
19  accuracy of the information contained in this
20  letter?
21   A.  No, I do not.
22       MS. CITERA:  Objection to form.

**Page 159**

1  BY THE WITNESS:
2    A.  I'm sorry.  No, I do not.
3       MS. ST. PETER-GRIFFITH:  Okay.
4  Jarrett, if we could move on to No. 5.
5       MR. ANDERSON:  I'm handing the witness
6  what's now been marked as Leone Deposition
7  Exhibit No. 2.
8       (Deposition Exhibit Leone 002
9  marked as requested.)
10  BY MS. ST. PETER-GRIFFITH:
11   Q.  Ma'am, I appreciate that this is a
12  longer document.  I can -- You're welcome to read
13  the entire document, but I can tell you the pages
14  that I am going to ask you questions about --
15   A.  Okay.
16   Q.  -- are Pages 6, 7, 8, and 11.
17   A.  Okay.
18       MS. CITERA:  Just to be clear, 6 like
19  the sixth page of the document, not 6, because
20  some of these pages are numbered?
21       MS. ST. PETER-GRIFFITH:  It's numbered
22  at the top.

**Page 160**

1       MS. CITERA:  Yeah.  Is that the page
2  you're referring to --
3       MS. ST. PETER-GRIFFITH:  It's the page
4  number at the top I'm referring to.
5       MS. CITERA:  I don't think you
6  understood that.
7       THE WITNESS:  No.
8       MS. ST. PETER-GRIFFITH:  It should be
9  Home Infusion Therapy Agreement.
10       MS. CITERA:  Yeah, yeah.  It's just she
11  was just thinking the sixth page of the entire
12  document.
13       MS. ST. PETER-GRIFFITH:  Oh, I'm sorry.
14       THE WITNESS:  Okay.  6, 7, and 8,
15  correct?
16  BY MS. ST. PETER-GRIFFITH:
17   Q.  Yes.
18   A.  Okay.
19   Q.  First, flipping to the first page of
20  this agreement or of this exhibit, ma'am, do you
21  recognize this document?
22   A.  Again, no.

**Page 161**

1    Q.  Okay.  Were you familiar with the
2  Licking Memorial Hospital, or LMH, home infusion
3  account within Home Infusion Services?
4    A.  Yes, I was.
5    Q.  Was that an account that you worked on?
6    A.  Yes, it was.
7    Q.  Ma'am, if you could turn to Page 6,
8  could you tell me under sub -- under Paragraph 8,
9  Reimbursement Services, do you see that?  And
10  there's an enumerated A through F?
11   A.  Yes.
12   Q.  Were those services that were provided
13  by Abbott Home Infusion to LMH?
14   A.  To the best of my knowledge, yes, they
15  were.
16   Q.  Were you responsible for providing
17  those services?
18       MS. CITERA:  Objection to the form.
19  BY THE WITNESS:
20   A.  At one point, and I don't remember
21  when, I was responsible for doing the
22  reimbursement for Licking.  And then -- and then

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 162

1  later on, obviously in 1992 when we started doing
2  case management -- but it looks as if this was
3  cancelled by that time.
4      Q.  That this particular contract was
5  cancelled by that time?
6      A.  No, wait a minute, because I went into
7  that position.
8      Q.  Oh, I see.
9      A.  Yeah.
10     Q.  So is it your testimony that this
11  contract had been cancelled by that time?
12     A.  No.  As I'm looking at it, it looks
13  like this contract started in '92 so -- If I
14  recollect the history on Licking correctly, prior
15  to my taking the case management position, I was
16  going to be the reimbursement specialist for
17  Licking.  But by the time this contract was
18  signed, I had moved over to the managed care
19  position.  So I did not -- I did not do the
20  reimbursement services for them.
21     Q.  Okay.  Do you know whether this
22  contract looks similar or is a comparable

Page 163

1  contract to other home infusion consignment
2  partnerships that Abbott had?
3          MS. CITERA:  Objection to form.
4  BY THE WITNESS:
5      A.  Based on my review of these three
6  pages, this appears to be comparable or similar
7  to other contracts that were written for these
8  services for home infusion.
9      Q.  Okay.  If you could look under No. 9
10  where it says "Overdue accounts," that first
11  sentence of that section reads, "In the event an
12  account is deemed uncollectible, Abbott may file
13  legal proceedings to collect such overdue patient
14  account"; do you see that?
15     A.  Yes.
16     Q.  Why is it that Abbott could file legal
17  proceedings to collect the overdue patient
18  account?
19         MS. CITERA:  Objection to form.
20  BY THE WITNESS:
21     A.  I think that was just included as part
22  of the services that we would perform on behalf

Page 164

1  of the customers.
2      Q.  Okay.  So you contracted to provide
3  reimbursement services, but you also contracted
4  to initiate legal proceedings on behalf of the
5  partnership?
6      A.  Yes.
7      Q.  On behalf of the partner, I'm sorry.
8          MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.  Yes.
11     Q.  In the event an overdue account
12  occurred?
13         MS. CITERA:  Objection to form.
14  BY THE WITNESS:
15     A.  Yes.  I believe that when we contracted
16  for reimbursement services, we also made -- this
17  was an option that the customers could choose.
18     Q.  Okay.  Do you know whether -- Did you
19  sue on behalf of the client, or did you sue in
20  Abbott's own name?
21         MS. CITERA:  Object to the form.
22  BY THE WITNESS:

Page 165

1      A.  I don't know the answer to that because
2  I'm not sure if and when that ever happened, how
3  it was done.
4      Q.  Okay.  Do you recall any instance when
5  Abbott initiated on behalf of a consignment
6  partner a legal proceeding to collect overdue
7  patient accounts?
8      A.  No, I do not recall whether that ever
9  happened.
10     Q.  Okay.  Under these consignment
11  arrangements, who received the assignment of
12  benefits?
13         MS. CITERA:  Objection, form.
14  BY THE WITNESS:
15     A.  The assignment of benefits was to the
16  partner.
17     Q.  Okay.  At all times?
18     A.  If -- If it was an arrangement that --
19  where we were billing in that customer's name to
20  the third-party payors, then the assignment of
21  benefits was also in their name.
22     Q.  Would there be any other arrangement?

42 (Pages 162 to 165)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                            January 17, 2008
                            Chicago, IL

Page 166

1   Would there be an arrangement where under these
2   partnerships, you would bill in Abbott's name?
3       MS. CITERA:  Objection to form.
4   BY THE WITNESS:
5       A.  I do not recall once we started writing
6   contracts this way that there were ever any
7   circumstances where -- when we had an arrangement
8   like this, where we billed in Abbott's name as
9   opposed to the partner's name.
10      Q.  Okay.  Do you recall any -- Prior to
11  the implementation of this particular contract
12  type, do you recall instances where Abbott was in
13  a consignment arrangement with a particular
14  customer where Abbott billed under its provider
15  number in its own name?
16      MS. CITERA:  Objection, form.
17  BY THE WITNESS:
18      A.  I don't recall any circumstances where
19  that happened.
20      Q.  Okay.  If you could flip to Page 7,
21  Paragraph 10 where it says "Low Reimbursement
22  Patients"; do you see that?

Page 167

1       A.  Yes.
2       Q.  What does that paragraph mean?
3       MS. CITERA:  Objection, form.
4   BY THE WITNESS:
5       A.  The paragraph, as I would interpret it,
6   was written that if there's patients who do not
7   have any type of insurance, whether it's
8   Medicare, Medicaid, or private insurance, the
9   parties are going to discuss whether it makes
10  sense to take that patient on and provide
11  services for them.
12      Q.  Well, does it also cover patients who
13  might not have sufficient coverage as opposed to
14  no coverage?
15      A.  It may.
16      Q.  Okay.  And was that the practice when
17  implementing these consignment contracts, if
18  there was a patient who had insufficient
19  reimbursement or no reimbursement, that Abbott
20  would confer with the customer and then a
21  decision would be made about whether or not to
22  continue providing services to the client?

Page 168

1       MS. CITERA:  Objection to the form.
2   BY THE WITNESS:
3       A.  I believe that when it was identified
4   that there was limited or no insurance, that
5   there were discussions to determine whether or
6   not it was -- it made sense to take that patient
7   on.
8       Q.  Okay.  What about continuing with the
9   patient if they lost their coverage or lost a
10  portion of their coverage?
11      MS. CITERA:  Objection to the form.
12  BY THE WITNESS:
13      A.  I'm not sure how those patients were
14  handled.
15      Q.  Do you recall any instances where that
16  occurred?
17      A.  Not that I can think of at this time.
18      Q.  Okay.  If you could turn to Page 8,
19  please, it says under paragraph -- or under Item
20  No. 18, "Compensation:  Billings for products and
21  services provided under the terms of this
22  agreement shall be submitted to third parties of

Page 169

1   -- to the third party of medical benefits and/or
2   the patient's"; do you see that?
3       A.  Yes.
4       Q.  What were the patients billed in terms
5   of the products?
6       A.  If, for instance, the customer had a
7   policy where there was -- the insurance paid 80
8   percent and there was a customer copay, and the
9   same would hold true for Medicare, once the --
10  once the Medicare claim was paid and there was a
11  patient copay, we would -- the patient -- if the
12  patient did not have secondary insurance of some
13  sort or another, that patient would be balance
14  billed.
15      Q.  Okay.  And would that be part of the
16  services that Abbott would provide, billing the
17  patient?
18      MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20      A.  Yes.  That was part of the billing and
21  reimbursement services.
22      Q.  Okay.  As part of the billing and

                                   43 (Pages 166 to 169)

Leone, Lynn E.                                          January 17, 2008
                              Chicago, IL

Page 170

1  reimbursement services -- Or I'm sorry.
2       As a reimbursement specialist, were you
3  responsible for also identifying what collections
4  needed to be collected from the consignment
5  partner and paid back to Abbott?
6       A.  No.
7       Q.  If you could, last page, flip to Page
8  11 and my -- the question I'm going to ask you
9  pertains to Item No. 24.  I know we discussed
10  earlier whether or not these arrangements were
11  joint ventures.  But I want to ask you whether
12  you recall the issue of joint ventureship with a
13  consignment partner coming up --
14       MS. CITERA:  Objection.
15  BY MS. ST. PETER-GRIFFITH:
16       Q.  -- at all during your tenure in Home
17  Infusion?
18       MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20       A.  No, I do not.
21       Q.  Okay.
22       MS. ST. PETER-GRIFFITH:  Jarrett, if we

Page 171

1  could move on to document No. 6 or File No. 6,
2  which will be Exhibit 3, right?
3       MR. ANDERSON:  Yes.  I am marking
4  what's been marked as Exhibit 3 and providing
5  that to the witness.
6       (Deposition Exhibit Leone 003
7  marked as requested.)
8  BY MS. ST. PETER-GRIFFITH:
9       Q.  I'll give you a few minutes, and look
10  at this.
11       A.  Okay.
12       Q.  Do you recognize this document, ma'am?
13       A.  No.
14       Q.  All right.  Do you know whether you
15  created it?
16       A.  I'm going to make the assumption that I
17  did create it.
18       Q.  Is that because you are identified as
19  the contact person?
20       A.  Yes.
21       Q.  Okay.  Ma'am, what is this document?
22       MS. CITERA:  Objection to the form.

Page 172

1  BY THE WITNESS:
2       A.  I believe -- And, again, it's been
3  almost 15 years now that this -- Infusion Care
4  Associates was one of those home infusion
5  customers, and this was the maximum percentages
6  that could be negotiated with the third-party
7  payors on behalf of patients for Infusion Care
8  Associates.
9       Q.  Can you explain what you mean by that?
10       A.  Well, for instance, in a negotiation
11  with the insurance company for a patient who was
12  on TPN, which is the first item on here, I was
13  given the authority to negotiate up to a 50
14  percent discount off of the billable charges for
15  any TPN patients that they had.
16       Q.  Okay.  And how were the billable
17  charges determined?
18       A.  They're -- Every one of the -- The
19  customers that we had relationships with had
20  prices -- had a billable charge set up for all of
21  the components of what they would be shipping to
22  a patient who was on a home infusion therapy.

Page 173

1       So, for instance, a patient who was
2  receiving TPN would -- for, say, a seven-day
3  supply of TPN would get seven bags of compounded
4  TPN solution.  There might be IV fat emulsions
5  sent to them.  There would be an IV set that they
6  would receive.  There would be dressing supplies.
7  There would be heparin and saline for flushing,
8  needles and syringes for doing those flushes, and
9  so on and so forth.  And each one of those items
10  had a billable charge for that item.
11       And when you totaled it up and you
12  divided it by however many bags of TPN that was
13  being sent to that patient, that would be a daily
14  charge.  And that was the starting point for the
15  negotiation because for that patient, that could
16  come up to whatever that -- whatever that value
17  was.  And then I had the ability to negotiate
18  that price by half, if necessary, with an
19  insurance company.
20       Q.  Okay.  And who would set the billable
21  charge?
22       A.  The customers could set up those

44 (Pages 170 to 173)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 174

1  billable charges.  They -- based on all the
2  products that they knew they were going -- that
3  they were going to be using for those patients,
4  they had -- they had the ability to set up those
5  billable charges.
6      Q.  Did Abbott ever do that for them?
7      A.  There may have been situations where
8  one of those customers might have said they would
9  like us to do it on their behalf, in which case
10 we would probably make some determinations and
11 then have them review it; and if they were
12 comfortable with that, we would then -- those
13 would be the billable charges for that customer.
14     Q.  Okay.  For charges that had product
15 components like, for example, an antibiotic,
16 would the billable charge be based in part upon
17 the AWP for that product?
18         MS. CITERA:  Objection to the form.
19 BY THE WITNESS:
20     A.  When I was first in Home Infusion
21 Services, all of those prices had been created;
22 and I don't know how they were originally

Page 175

1  created, so I don't know what the original
2  formula was for how the antibiotics --
3      Q.  Were --
4      A.  Then in 1994, late 1994/1995 time
5  frame, there were a lot of new antibiotics that
6  were coming on the market that were being used in
7  a home setting.  And we determined that we needed
8  to come up with some kind of a formula for
9  determining what a bag of that compounded drug
10 would be.  And so what we did is we came up with
11 a value that we said was -- included the pharmacy
12 labor and overhead for compounding that bag of
13 antibiotic, and then we added in a drug cost.
14 And I believe under most circumstances, we used
15 the AWP for the drug as that value.
16     Q.  Is that what your -- is that what the
17 consignment customer paid for that product, the
18 AWP price?
19         MS. CITERA:  Objection to form.
20 BY THE WITNESS:
21     A.  No.  What they were paying for was --
22 If it was on consignment -- again, for an

Page 176

1  antibiotic patient, there were very few
2  antibiotics that Abbott had; so they were really
3  purchasing the majority of their antibiotics from
4  wherever they were able to source those products
5  from.  So the products that they got from Abbott
6  on consignment were -- and then, again, that was
7  consignment and it was factored into the value of
8  how the reimbursement was shared.  And I don't
9  know how that formula was done.
10     Q.  Well, why use AWP?  Why not use -- for
11 the Abbott products, why not use, for example,
12 the contract prices for the GPOs?
13         MS. CITERA:  Objection to form.
14 BY THE WITNESS:
15     A.  Well, again, the majority of the
16 antibiotics were not Abbott products.
17     Q.  Okay.  I'm talking about for the Abbott
18 products.
19     A.  I know.  And so we were trying to come
20 up with a formula that would work across the
21 board and that would make the pricing consistent
22 for each bag of antibiotics.  And we weren't

Page 177

1  looking at that pricing based on the consignment.
2  We were looking at trying to come up with a
3  pricing formula that was consistent for all
4  products.
5          And then the customers -- Again, as I
6  said, the customers had the choice of saying
7  "Yes, this makes sense to me" or "No, I would
8  rather do something else"; and in that case, they
9  had the option to change what was being done and
10 how they wanted it done.
11     Q.  Okay.  When you say "we came up with
12 this," who is "we"?
13     A.  I worked with my manager at the time,
14 and I can't remember whether it was Dave Brincks
15 or Kathy Riddle, to come up with a formula.  And
16 then we went back and repriced all the
17 antibiotics, all of the pain management drugs,
18 the morphines, all of the chemotherapy drugs, or
19 any other -- any other product that would have
20 been compounded in a bag and then infused through
21 an IV for that type of a --
22     Q.  Under these consignment arrangements,

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                January 17, 2008
                        Chicago, IL

Page 178

1   would Abbott also procure the non-Abbott products
2   and provide them to the consignment partner?
3        MS. CITERA:  Objection to the form.
4   BY THE WITNESS:
5        A.  No.
6        Q.  So the consignment partner would have
7   an independent responsibility for securing those
8   products?
9        A.  Correct.
10       Q.  Are you aware of any instance where
11  Abbott participated in a GPO and was able to
12  secure other products by -- other non-Abbott
13  products for its consignment partners?
14       MS. CITERA:  Objection to the form.
15  BY THE WITNESS:
16       A.  I am not aware of that ever being a
17  circumstance for Home Infusion.
18       Q.  Okay.  For the period that you were
19  there?
20       A.  For the period that I was there.
21       Q.  Okay.  So it could have occurred after;
22  you just don't know about it?

Page 179

1        MS. CITERA:  Objection to form.
2   BY THE WITNESS:
3        A.  Yes, it could have occurred afterwards
4   and I didn't know about it.
5        Q.  Well, let me ask you, if you're taking
6   discounts of up to 50 percent, is somebody losing
7   money there?  That seems a pretty steep discount,
8   doesn't it?
9        MS. CITERA:  Objection to the form.
10  BY THE WITNESS:
11       A.  Yes, it is.  And I would -- And I would
12  guess that it was only in very extreme
13  circumstances that the negotiations ever went to
14  that point.
15       Q.  Well, what circumstances would permit
16  the negotiations to get to that point?
17       MS. CITERA:  Objection to the form.
18  BY THE WITNESS:
19       A.  This would probably be a situation
20  where the institution -- And, again, the
21  institution had the final say on whether they
22  wanted to take patients or not and whether they -

Page 180

1   - you know, whether they felt that it was
2   appropriate for them to take those patients on in
3   a home setting.  So, I mean, I can't -- I -- at
4   this point, it's so many years later, I can't
5   recall -- you know, when that could have happened
6   or why, but ...
7        Q.  Well, is it fair to say -- is it fair
8   to say that you could only do these types of
9   discounts for larger -- for larger institutions?
10       MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12       A.  I think the discounts were based on
13  what that -- that customer said that they were
14  comfortable with for their patient population.
15       Q.  Okay.  Did Abbott have a say in the
16  level of discount that could be agreed to?
17       MS. CITERA:  Objection to form.
18  BY THE WITNESS:
19       A.  If I recall the way we handled this
20  correctly, we pretty much left that to the
21  discretion of the institution.
22       Q.  Okay.

Page 181

1        MS. ST. PETER-GRIFFITH:  If we could
2   move on to No. 11, Jarrett.
3        MR. ANDERSON:  I am now handing the
4   witness what's been marked as Leone Deposition
5   Exhibit 4.
6        (Deposition Exhibit Leone 004
7   marked as requested.)
8   BY MS. ST. PETER-GRIFFITH:
9        Q.  Ma'am, if you could take a few minutes
10  and look at this document.
11       A.  Okay.
12       Q.  Have you had a chance to look at it?
13       A.  Yes.
14       Q.  Do you recognize this document?
15       A.  Again, no.
16       Q.  Okay.  On the first page -- First of
17  all, I hope we're looking at the same document.
18  It's a fax cover sheet?
19       A.  Yes.
20       Q.  6/17/94?
21       A.  Correct.
22       Q.  Does this appear to be a fax from you

46 (Pages 178 to 181)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 182

1  to someone named Susan Winter?
2      A.  Yes, it is.
3      Q.  Who is Ms. Winter?
4      A.  She was one of the Home Infusion sales
5  representatives back in the mid '90s.
6      Q.  Okay.  And if you could turn to the
7  second page of this document, who created this
8  document, do you know?
9          MS. CITERA:  Objection to the form.
10 BY THE WITNESS:
11     A.  This looks like something that I
12 probably created.
13     Q.  Okay.  And what is this document?
14         MS. CITERA:  Objection to the form.
15 BY THE WITNESS:
16     A.  Based on the fax cover sheet, it was
17 something that Susan requested from me for
18 Presbyterian.  They probably wanted to see what
19 their -- They probably -- These were probably --
20 And, again, I'm -- I'm making a guess here for
21 why these were the products on this -- on this
22 worksheet.  But I'm going to guess these were the

Page 183

1  high-running antibiotic products that they used -
2  - Presbyterian Home Care used in their home
3  infusion program, and they were -- it was -- they
4  wanted to see what the usual and customary was
5  for each one of these, for a gravity infusion for
6  each one of these prescriptions based on the
7  dosage.  And then there was a discount rate and
8  then a low -- and I don't know what that lowest
9  rate patient pay is.
10     Q.  Oh, you anticipated my next question.
11     A.  Yeah, I have no idea what that was.
12     Q.  Okay.  What is the discount percentage?
13     A.  The discount there is a 20 percent
14 discount.
15     Q.  Okay.  And is that the same discount
16 that we were talking about in the prior -- with
17 the prior exhibit, that's the discount range that
18 could be negotiated?
19     A.  I'm going to guess --
20         MS. CITERA:  Objection, form.
21 BY THE WITNESS:
22     A.  My guess would be that this is what

Page 184

1  they were allowing us to negotiate on their
2  behalf with the third-party payors, up to -- up
3  to a 20 percent discount for these -- for these
4  drugs.
5      Q.  Okay.  And is there anything else that
6  you can recall about this document or explain
7  about this document?
8      A.  No.
9      Q.  I know we're taxing your memory a
10 little bit.
11     A.  You are.
12     Q.  Okay.  Well, we can move on to the next
13 document which we're going to spend a little time
14 with.
15         MS. ST. PETER-GRIFFITH:  Jarrett, it's
16 No. 12 -- I'm sorry.  That's the following
17 document.  If we could go to No. 12, and it's
18 going to be marked as Exhibit 5.  Hello?
19         MR. ANDERSON:  Yeah, I'm marking 5 now
20 and presenting that to the witness.
21         MS. ST. PETER-GRIFFITH:  Okay.  Thank
22 you.  I'm sorry.  I thought we cut off there a

Page 185

1  little bit.
2          MS. CITERA:  He's slacking off.
3          (Deposition Exhibit Leone 005
4  marked as requested.)
5  BY THE WITNESS:
6      A.  Okay.
7      Q.  Ma'am, have you had a chance to look at
8  this document?
9      A.  Yes.
10     Q.  Do you recognize this document?
11     A.  No.
12     Q.  It appears to be an April 24, 1995
13 interoffice correspondence from you to Sharon
14 Clarey; do you see that?
15     A.  Yes.
16     Q.  Who is Ms. Clarey?
17     A.  I believe that at the time that this
18 was done, Sharon was one of our reimbursement
19 specialists, and Cedars -- she was responsible
20 for doing -- providing the reimbursement services
21 for Cedars-Sinai Medical Center in California.
22     Q.  Okay.  And can you explain what this

47 (Pages 182 to 185)

Leone, Lynn E.                                           January 17, 2008
                          Chicago, IL

---

Page 186

1  document is?
2       MS. CITERA:  Objection to the form.
3  BY THE WITNESS:
4       A.  Cedars -- Cedars -- compounding for
5  Cedars was done out of our Los Angeles pharmacy.
6  They did not have their own pharmacy to do
7  compounding.  It was being done in our -- we had
8  a home infusion pharmacy in California, and the
9  compounding for Cedars was being done there.
10      As I read this, they were going to
11  start using this Baxa syringe infuser for some of
12  their patients.  What I'm telling her is that
13  she's going to start seeing that on -- on the
14  billable charges for Cedars patients, and this is
15  the price that we're going to be charging them,
16  which is going to be $8 a day for the rental of
17  that equipment.  And in addition our Los Angeles
18  pharmacy is renting those pumps from Baxa.
19      Q.  Okay.  So you're going to rent them
20  from Baxa?
21      A.  Yes.
22      Q.  Okay.  And then it says in the second

---

Page 187

1  paragraph, "On the Cedars fee-for-service
2  contract, we will bill Cedars $5 for day for
3  patients using this device."  Do you see that?
4       A.  Yes.
5       Q.  What does that mean?
6       MS. CITERA:  Objection to the form.
7  BY THE WITNESS:
8       A.  Cedars' agreement was not one of those
9  -- was not a revenue-sharing agreement like the
10 one we talked about for Licking.  For Cedars,
11 there was a flat -- there was a flat fee that we
12 charged them on a per-patient basis.  And then in
13 the case of Cedars, I believe we were billing in
14 Abbott's name and not in Cedars' name.
15      Q.  Why is that?
16      A.  Well, because -- I don't remember all
17 the particulars on it.  But I believe that the
18 relationship that we had with Cedars preceded
19 doing the revenue-share-type programs that we
20 were looking at for Licking.  And so they were
21 invoiced on a per-patient basis.
22      And so what we were saying was if there

---

Page 188

1  was a -- if there was a syringe infuser used for
2  a Cedars patient, we were going to bill Cedars $5
3  for it.  But the rental rate that was going to be
4  put on the patient bills was $8 a day.
5       Q.  Why is it the rate on the patient bills
6  was $8 a day but you were only billing Cedars $5
7  a day?
8       MS. CITERA:  Object to the form
9  BY THE WITNESS:
10      A.  Well, again, you know, you're in
11 business to make money and that would be -- that
12 would be what -- what Abbott would hope to have
13 made on that pump, on that syringe pump for --
14 based on the patient days.
15      Q.  Okay.  Who gets the -- who collects the
16 $8?
17      A.  Abbott.
18      Q.  And what does it pay to Cedars?
19      MS. CITERA:  Objection to the form.
20 BY THE WITNESS:
21      A.  It's going to pay Cedars $5.  No, wait
22 a minute.  This is backwards.

---

Page 189

1       Q.  That's why I got a little confused
2  there.
3       A.  It's backwards.  I'm sorry.  On the
4  fee-for-service, they're paying us based on the
5  rates that we've identified.
6       Q.  Okay.
7       A.  See, now I can't remember whether we
8  billed in Abbott's name or whether we billed in
9  Cedars' name.  I think -- I think we billed in
10 Cedars' name for private insurance and Medicare
11 but for Medicaid, because it was being compounded
12 in the -- in an Abbott pharmacy, we were billed
13 Medicaid in Abbott's name.
14      Q.  Well, who would you represent to
15 Medicaid was the provider?
16      A.  Right.  And so that's what we did.
17      Q.  Well, no.  Who would be the provider
18 you were billing to Medicaid?
19      MS. CITERA:  Objection to form.
20 BY MS. ST. PETER-GRIFFITH:
21      Q.  Would it be Abbott, or would it be
22 Cedars?

---

                                        48 (Pages 186 to 189)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                        January 17, 2008
                            Chicago, IL

| Page 190 |
|---|
| 1    A.  It would be Abbott for the Medicaid |
| 2 patients. |
| 3    Q.  Do you know whether you could use your |
| 4 Abbott provider number to do that? |
| 5        MS. CITERA:  Objection to form. |
| 6 BY THE WITNESS: |
| 7    A.  We could use the Abbott provider number |
| 8 to bill in Abbott's name. |
| 9    Q.  Okay. |
| 10    A.  And that's what we did. |
| 11    Q.  Okay.  Even though this was a Cedars |
| 12 client? |
| 13        MS. CITERA:  Objection to form. |
| 14 BY THE WITNESS: |
| 15    A.  Cedars provided us with the referral |
| 16 for that patient, and we -- and we took care of |
| 17 that patient, if it was Medicaid, in Abbott's |
| 18 name. |
| 19    Q.  And what would -- what would Cedars |
| 20 receive as compensation for the referral? |
| 21        MS. CITERA:  Objection to form. |
| 22 BY THE WITNESS: |

| Page 191 |
|---|
| 1    A.  I don't remember; and I haven't seen |
| 2 the Cedars contract, so I can't -- I can't say. |
| 3    Q.  But would there be -- would there be |
| 4 some kind of remuneration for the referral? |
| 5        MS. CITERA:  Objection to form. |
| 6 BY THE WITNESS: |
| 7    A.  I don't know. |
| 8    Q.  If we could go on to the next exhibit. |
| 9 And, ma'am, I am going to ask you to look at both |
| 10 pages of this carefully because we're going to |
| 11 spend some time on this one. |
| 12    A.  Okay. |
| 13        MR. ANDERSON:  I'm handing the witness |
| 14 what's been marked as Exhibit 6. |
| 15        (Deposition Exhibit Leone 006 |
| 16 marked as requested.) |
| 17 BY THE WITNESS: |
| 18    A.  Okay. |
| 19    Q.  Okay.  Ms. Leone, do you recognize this |
| 20 document? |
| 21    A.  No. |
| 22    Q.  It appears to be an interoffice memo |

| Page 192 |
|---|
| 1 from you; do you see that? |
| 2    A.  Yes. |
| 3    Q.  Do you have any doubts that you drafted |
| 4 this memorandum? |
| 5        MS. CITERA:  Objection to form. |
| 6 BY THE WITNESS: |
| 7    A.  No, I do not have any doubts I drafted |
| 8 this. |
| 9    Q.  What is CM Healthcare Resources? |
| 10    A.  It's Children's Memorial Healthcare. |
| 11 It was Children's Memorial Hospital in Chicago. |
| 12 They were one of the home infusion customers. |
| 13    Q.  Okay.  And do you recall this meeting |
| 14 that you had with them? |
| 15        MS. CITERA:  Objection, form. |
| 16 BY THE WITNESS: |
| 17    A.  I don't recall it, no, but it appears |
| 18 to have happened. |
| 19    Q.  Okay.  And what from the context of the |
| 20 minutes of the meeting reflected in this document |
| 21 that you drafted do you recall about that |
| 22 meeting? |

| Page 193 |
|---|
| 1        MS. CITERA:  Objection to the form. |
| 2 BY THE WITNESS: |
| 3    A.  What this pertains to is when we first |
| 4 initiated our relationship with Children's |
| 5 Memorial in Chicago, everything was billed in |
| 6 Abbott's name.  And there was a relationship with |
| 7 Children's where they received part of the -- |
| 8 what was collected from the insurance companies |
| 9 and Medicaid.  I don't recall how that -- how |
| 10 that -- how that was set up.  But initially |
| 11 everything was done in Abbott's name. |
| 12        Then in June of '95, we agreed that it |
| 13 was going to change to Children's name instead of |
| 14 Abbott's name except for the Medicaid patients |
| 15 because, again, it was being compounded in the |
| 16 Abbott pharmacy with -- the products that those |
| 17 Medicaid patients were receiving, it was going to |
| 18 be compounded in the Abbott pharmacy; so it was |
| 19 the Abbott provider number that was going to be |
| 20 used. |
| 21    Q.  Okay.  You said that CM Healthcare |
| 22 would receive a part of what was collected from |

                                 49 (Pages 190 to 193)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                        January 17, 2008
                              Chicago, IL

---

Page 194

1   insurers and Medicaid.  Is that also true for
2   Medicare as well?
3         MS. CITERA:  Objection to form.
4   BY THE WITNESS:
5       A.  Children's Memorial had no Medicare
6   patients because they were all kids.
7       Q.  Okay.  Can you explain Item 7, then?
8         MS. CITERA:  Objection to form.
9   BY THE WITNESS:
10      A.  I believe that part of the reason that
11  they changed -- that it was changing was that
12  they wanted to expand their services to be -- to
13  cover more than just children.  So that's why the
14  name was CM Healthcare Resources when previously
15  it had been Children's Memorial.  And they
16  changed it to CM Healthcare Resources so that it
17  wouldn't be just focused on kids, and they were
18  then going to start expanding their home infusion
19  services and try to expand their patient
20  population and not just be focused on a pediatric
21  population.
22      Q.  Okay.  Did Abbott ever use its provider

---

Page 195

1   number to bill Medicare on behalf of CM
2   Healthcare Resources, to your recollection?
3       A.  To my recollection, that never
4   happened.
5       Q.  Okay.  But Abbott did use its provider
6   number to bill Medicaid?
7       A.  But they billed in Abbott's name, not
8   in CM Healthcare Resources' name.  So those bills
9   were in Abbott's name.  Abbott submitted the
10  claims as Abbott for those patients.
11      Q.  Okay.  And then paid a fee to
12  Children's Memorial?
13        MS. CITERA:  Objection to form.
14  BY THE WITNESS:
15      A.  If I recall the contract correctly,
16  there was -- there was something that went back
17  to Children's, although I don't remember what it
18  was or how the contract was structured.
19      Q.  Prior to approving this arrangement,
20  did you check with anyone concerning the legality
21  of Abbott's ability to do that?
22        MS. CITERA:  Objection to form.

---

Page 196

1   BY THE WITNESS:
2       A.  Again, I was not involved in the
3   renegotiation of the contract with Children's
4   where all of this changed.  But as I said before,
5   when we -- when we did contracts -- we worked
6   with our legal counsel when we did these
7   contracts.  And this was -- All I was -- All I
8   was working on at this point was the
9   implementation of the change.
10      Q.  Did you ask any questions about whether
11  or not this was -- whether or not Abbott's
12  provider number could be used in such a way?
13        MS. CITERA:  Objection to form.
14  BY THE WITNESS:
15      A.  Since the billings were being done in
16  Abbott's name using Abbott's provider number to
17  Illinois Medicaid, and based on -- based on the
18  renegotiations and what we did -- Well, to answer
19  your question, I did not have any discussions
20  with anyone.
21      Q.  Okay.  You relied upon the people who
22  negotiated the contract to verify that -- I

---

Page 197

1   apologize for the horn out there -- to verify
2   that everything was kosher under this
3   arrangement?
4         MS. CITERA:  Objection to the form.
5   BY THE WITNESS:
6       A.  Yes.  I relied that during that
7   negotiation process, our -- the people who were
8   negotiating the contracts were working with our
9   legal counsel.
10      Q.  Do you recall who negotiated the
11  contract?
12      A.  No, I do not.
13      Q.  Who was -- Who would have been some of
14  the folks who may have been negotiating the
15  contract at that point in time?  Who was in the
16  Contract Marketing component of Home Infusion at
17  that time?
18        MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20      A.  It would have been either Dave Brincks
21  or Kathy Riddle as my manager, and I can't
22  remember when Dave left and Kathy came in.  And

---

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                January 17, 2008
                          Chicago, IL

|  | Page 198 |
|---|---|
| 1 | Mike Sellers, who was the general manager of Home |
| 2 | Infusion Services, would also have been included |
| 3 | in those conversations. |
| 4 | Q.  Could any contract like this have been |
| 5 | approved without Mike Sellers signing off on it? |
| 6 | MS. CITERA:  Objection to form. |
| 7 | BY THE WITNESS: |
| 8 | A.  To the best of my knowledge, Mike would |
| 9 | have probably been aware of or been involved in |
| 10 | the discussions. |
| 11 | Q.  Do you recall how many other |
| 12 | arrangements Home Infusion had that were like |
| 13 | this? |
| 14 | MS. CITERA:  Objection to the form. |
| 15 | BY THE WITNESS: |
| 16 | A.  No, I do not. |
| 17 | Q.  Do you recall anything else about this |
| 18 | particular memorandum or this meeting? |
| 19 | A.  No, I do not. |
| 20 | Q.  Do you recall anything else concerning |
| 21 | the contractual relationship with Children's |
| 22 | Memorial? |

|  | Page 199 |
|---|---|
| 1 | A.  No, I don't. |
| 2 | Q.  Okay.  Let's move on to the next |
| 3 | document. |
| 4 | MR. ANDERSON:  I'm now marking Exhibit |
| 5 | 7 and providing that to Ms. Leone. |
| 6 | (Deposition Exhibit Leone 007 |
| 7 | marked as requested.) |
| 8 | BY MS. ST. PETER-GRIFFITH: |
| 9 | Q.  Ma'am, I'm not going to ask you to go |
| 10 | through chapters and verse of this document.  I - |
| 11 | - My focus is actually going to be on the third- |
| 12 | to-the-last page, but you're welcome to look |
| 13 | through the document and take as much time as you |
| 14 | need with it. |
| 15 | MS. ST. PETER-GRIFFITH:  I'm sorry, |
| 16 | Jarrett.  What exhibit was this? |
| 17 | MR. ANDERSON:  7. |
| 18 | BY THE WITNESS: |
| 19 | A.  Okay. |
| 20 | Q.  Ma'am, do you recognize this document? |
| 21 | A.  No. |
| 22 | Q.  Okay.  On the front page it says -- it |

|  | Page 200 |
|---|---|
| 1 | appears to be a fax cover sheet that says, "Lynn |
| 2 | Leone, from Lynn Leone, managed care specialist." |
| 3 | Do you see that? |
| 4 | A.  Yes. |
| 5 | Q.  Do you have any doubt you faxed this |
| 6 | document to Ms. Christine Hayne? |
| 7 | MS. CITERA:  Objection to form. |
| 8 | BY THE WITNESS: |
| 9 | A.  No, I do not. |
| 10 | Q.  Who's Christine Hayne? |
| 11 | A.  I don't know. |
| 12 | Q.  Ma'am, if you could turn to the third |
| 13 | to last page of this document which has at the |
| 14 | bottom Abbott DOJ 317633. |
| 15 | A.  Yes. |
| 16 | Q.  Do you see where it says, "Infusion |
| 17 | Therapy Services"? |
| 18 | A.  Uh-huh. |
| 19 | Q.  The third bullet point reads, "Average |
| 20 | Wholesale Price (AWP) of medications will be |
| 21 | obtained from sources which are mutually agreed |
| 22 | upon by all parties."  Do you see that? |

|  | Page 201 |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  Do you recall what that means? |
| 3 | MS. CITERA:  Objection to the form. |
| 4 | BY THE WITNESS: |
| 5 | A.  No, I do not recall what that means. |
| 6 | Q.  Do you recall whether this was a |
| 7 | standard contractual provision in Abbott's home |
| 8 | infusion contracts? |
| 9 | MS. CITERA:  Objection to the form. |
| 10 | BY THE WITNESS: |
| 11 | A.  I don't recall that. |
| 12 | Q.  Do you know what the mutually agreed |
| 13 | upon -- Sorry. |
| 14 | Do you know what the mutually agreed |
| 15 | upon sources were for ascertaining AWP? |
| 16 | MS. CITERA:  Objection to form. |
| 17 | BY THE WITNESS: |
| 18 | A.  I would expect that we would either be |
| 19 | talking about Medi-Span or Red Book. |
| 20 | Q.  Why do you say that? |
| 21 | A.  Because those were the two main sources |
| 22 | for us and for our home infusion customers to |

51 (Pages 198 to 201)

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 202

1   obtain the average wholesale price for the
2   infusion therapy drugs.
3       Q.   Okay.  Would Abbott's Home Infusion
4   employees have access to the Red Book?
5          MS. CITERA:  Object to the form.
6   BY THE WITNESS:
7       A.   I believe that there was one copy,
8   maybe two copies of Red Book in some place in the
9   area where Home Infusion Services was, was
10  located.
11      Q.   Do you know if AWP information or
12  information from Red Book or Medi-Span was
13  contained on the CHIP system?
14      A.   I do not recall that we had it in the
15  CHIP system; but when we did the deposition last
16  summer, I believe it came up that it was in the
17  CHIP system.  But I don't remember that it was
18  there.
19      Q.   How would the Home Infusion employees
20  use the Red Book?
21         MS. CITERA:  Objection to form.
22  BY THE WITNESS:

Page 203

1       A.   They would use it when -- when we had
2   situations where we had negotiated a price -- a
3   billing charge on behalf of one of the customers
4   for an infusion therapy where it was per diem
5   plus the AWP, we would then enter that, that
6   information in the CHIP system for that patient
7   so that when the invoice -- the bill came out of
8   the CHIP system to be submitted to the insurance
9   company, it would come out with that negotiated
10  price on it.  And that's why the AWPs would be
11  there.  And, again, it's been almost 20 years
12  since I used CHIP, so I can't exactly remember
13  how all that information got entered in there.
14  But that was the intent.
15      Q.   Okay.  Do you recall Presbyterian
16  Hospital or Hospice at Charlotte as a client?
17      A.   Yes.
18      Q.   Were they a client that you worked
19  with?
20      A.   I did -- I did their negotiations for
21  their insurance payments --
22      Q.   Okay.

Page 204

1       A.   -- for their third party --
2       Q.   Okay.  Were they a large client of Home
3   Infusion?
4       A.   I don't remember their size in relation
5   to other customers.
6       Q.   Okay.  Before we move on to the next
7   document, let me ask, is now a good time to take
8   a break?
9          MS. CITERA:  Sure.
10         THE VIDEOGRAPHER:  We have 20 minutes
11  left on the tape.
12         MS. CITERA:  We have 20 minutes left on
13  the tape, but we're fine to take a break.  It's
14  up to you.
15         MS. ST. PETER-GRIFFITH:  Why don't we
16  take a break, if you don't mind.
17         THE VIDEOGRAPHER:  We are off the
18  record at 1:57 p.m.
19         (A short break was had.)
20         THE VIDEOGRAPHER:  We are back on the
21  record at 2:13 p.m.
22         MS. ST. PETER-GRIFFITH:  Jarrett, can

Page 205

1   you hand off File No. 16, please?
2          MR. ANDERSON:  Yes.
3   BY MS. ST. PETER-GRIFFITH:
4       Q.   While that's being -- Oh, I'm sorry.
5   She can't mark and take transcription at the same
6   time.
7          MR. ANDERSON:  Okay.  I'm now handing
8   the witness what's been marked as Leone
9   Deposition Exhibit 8.
10         (Deposition Exhibit Leone 008
11  marked as requested.)
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   Ms. Leone, before we move to that
14  document, do you recall any other Home Infusion
15  contracts where the arrangements were similar to
16  the one with Children's Memorial?
17         MS. CITERA:  Objection to form.
18  BY THE WITNESS:
19      A.   Where the changes -- where the program
20  was or was not similar to Children's Memorial?
21      Q.   Where it was similar to Children's
22  Memorial, where Abbott would use its own provider

                              52 (Pages 202 to 205)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

|  | Page 206 |
|---|---|

1  number at times to bill Medicaid or Medicare.
2      MS. CITERA:  Objection to the form.
3  BY THE WITNESS:
4      A.  I cannot recall any others at this
5  time.
6      Q.  Do you recall whether there were any
7  others?
8      MS. CITERA:  Object to the form.
9  BY THE WITNESS:
10     A.  If there were programs like that, those
11  would have been prior to -- prior to doing these
12  types of programs that we've talked about when --
13  and it was when we were doing everything as
14  Abbott.
15     Q.  Okay.  So it would have been prior to
16  the initiation of these partnerships, the
17  consignment partnerships then?
18     A.  Yes.
19     Q.  Why did Abbott shift to these
20  consignment partnership arrangements?
21     MS. CITERA:  Objection.
22  BY MS. ST. PETER-GRIFFITH:

|  | Page 207 |
|---|---|

1      Q.  Do you know?
2      MS. CITERA:  Objection, to form.
3  BY THE WITNESS:
4      A.  No, I do not know.
5      Q.  Did it happen all of a sudden or
6  gradually?
7      MS. CITERA:  Objection to form.
8  BY THE WITNESS:
9      A.  I don't remember the exact genesis of
10  the change in direction for the program.
11     Q.  Okay.  Do you recall how many customers
12  Abbott had where it did the billing under
13  Abbott's provider number prior to the initiation
14  of these consignment partnerships?
15     MS. CITERA:  Object to the form.
16  BY THE WITNESS:
17     A.  No, I do not.
18     Q.  Were you in the department at that
19  time?
20     A.  I was in Home Infusion Services from --
21  beginning in 1985; so yes, I was when that
22  happened.

|  | Page 208 |
|---|---|

1      Q.  Okay.  Is it fair to say that then from
2  '85 to '91, the billings that you were doing were
3  largely under Abbott's provider number?
4      MS. CITERA:  Objection to the form.
5  BY THE WITNESS:
6      A.  I don't -- I don't remember when it
7  changed.  But in the early period of time when I
8  was in reimbursement, we were billing --
9  everything was being billed as Abbott under
10  Abbott's provider numbers.  And I just don't know
11  when the shift took place.
12     Q.  But were there comparable client
13  relationships where there would be providers of
14  Home Infusion Services who Abbott would pay a
15  referral fee to or share in the percentage of
16  collections with?
17     MS. CITERA:  Objection, form.
18  BY THE WITNESS:
19     A.  I don't recall.
20     Q.  Okay.  Do you recall what Abbott's
21  provider number was?
22     A.  No.

|  | Page 209 |
|---|---|

1      Q.  Okay.  Just thought I'd ask.
2      MR. ANDERSON:  I do remember my phone
3  number from 20 years ago.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Could you turn to Exhibit 8, please?
6      A.  I'm sorry.  What was the question?
7      MS. CITERA:  8.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Could we turn to Exhibit 8.  And,
10  again, ma'am, I understand this is a long
11  document.  I'm not going to ask you detailed
12  questions about the content, but I do want you to
13  flip through it to identify your familiarity with
14  the document.
15     A.  Okay.
16     Q.  Okay.  Ma'am, do you recognize this
17  document?
18     A.  Yes, I do.
19     Q.  What is this document?
20     A.  It was an agreement with PBI,
21  Pharmaceutical Buyers, Inc., for Abbott to
22  provide compounding services for PBI members.

                              53 (Pages 206 to 209)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

| Page 210 |
| --- |

1   And PBI was an alternate site group purchasing
2   organization.
3       Q.   Okay.  Was this contract executed, to
4   your knowledge?
5       A.   Yes, it -- To my knowledge, it was
6   executed.
7       Q.   Did Abbott's pharmacies provide the
8   services contracted for?
9           MS. CITERA:  Objection, form.
10  BY THE WITNESS:
11      A.   I do not recall that any of PBI's
12  members ever took advantage of this compounding
13  service, this compounding service that we were
14  going to offer to them.
15      Q.   Okay.  Do you recall how long the
16  contract was in effect for?
17      A.   Well, this was implemented in June of
18  '96; and I left Home Infusion Services in
19  December, so I don't know what happened after I
20  left Home Infusion.
21      Q.   Okay.  Was this a consignment-type
22  contract or a fee-for-service contract?

| Page 211 |
| --- |

1       A.   It was a fee-for-service-type contract.
2       Q.   Okay.  And if you could look to the
3   last page of this exhibit, hopefully it says at
4   the top, looking at the same document, Abbott
5   Home Infusion Services, Pharmaceutical Buyers,
6   Inc.; do you see that?
7       A.   Yes.
8       Q.   Okay.  Can you tell me where it says
9   "Drug Price," do you see that?
10      A.   Yes.
11      Q.   What -- what price was charged?
12          MS. CITERA:  Objection, form.
13  BY THE WITNESS:
14      A.   I don't --
15      Q.   Excuse me.  What price would have been
16  charged if any PBI member had taken advantage of
17  this contract?
18          MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20      A.   I don't know.
21      Q.   Okay.  What was your involvement with
22  this particular agreement?

| Page 212 |
| --- |

1       A.   I actually wrote this agreement,
2   working with our legal counsel.
3       Q.   And what was the genesis of this
4   agreement? Why did it come about?
5           MS. CITERA:  Objection to form.  And I
6   also just counsel you not to reveal any
7   discussions with counsel.
8   BY THE WITNESS:
9       A.   PBI came to us and asked if we could
10  put a program together for members of PBI who
11  didn't have compounding capabilities for Abbott
12  to use its compounding pharmacies to mix the
13  drugs on those members' behalf.
14      Q.   Okay.  And who would be -- and then
15  what would happen to that mixed product once that
16  service was provided by Abbott's -- by Abbott's
17  pharmacies?
18      A.   As I look at the page with the page
19  number 5 on it --
20      Q.   Yes.
21      A.   -- it said we would be delivering, but
22  I don't recall whether we were delivering to the

| Page 213 |
| --- |

1   patient or whether we were delivering to the
2   member.
3       Q.   Okay.  Do you recall who would have
4   billed either the insurer or Medicaid or
5   Medicare?
6           MS. CITERA:  Objection to form.
7   BY THE WITNESS:
8       A.   No, I do not.
9       Q.   Is it possible that Abbott Pharmacy may
10  have billed Medicaid or Medicare or the insurer?
11          MS. CITERA:  Objection to form.
12  BY THE WITNESS:
13      A.   I don't know.
14      Q.   Okay.  Is there anything else that you
15  can remember about this particular contract?
16      A.   No.
17      Q.   Who did you work with in legal -- I
18  don't want to know what you discussed with them.
19  But who did you work with in legal to put this
20  contract together?
21      A.   I don't remember.
22      Q.   Do you remember anyone else that you

54 (Pages 210 to 213)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                              January 17, 2008
                              Chicago, IL

Page 214

1  consulted in the Hospital Products Division
2  concerning this particular contract?
3      A.  I worked with Mr. Sellers on this
4  contract.
5      Q.  Okay.  What was his involvement?
6      A.  This was a different kind of a contract
7  than we had written -- than the other types of
8  arrangements, and so I worked with Mike pretty
9  closely to determine what we wanted to do here
10 and then worked with our legal counsel for all
11 the terms and conditions of it.
12     Q.  Okay.  Was PBI an account of Alt Site?
13     A.  Yes.
14     Q.  And did you work with anyone within Alt
15 Site in putting together this contract or in
16 communicating with PBI?
17     A.  No.
18     Q.  Okay.  Were you just contacted -- cold
19 contacted by someone at PBI to come up with this
20 type of arrangement?
21         MS. CITERA:  Objection to form.
22 BY THE WITNESS:

Page 215

1      A.  No.  It actually came from Mr. Sellers.
2      Q.  Okay.  It was his idea?
3      A.  No, PBI contacted him.
4      Q.  Oh, okay.
5      A.  And he assigned it to me.
6      Q.  Okay.  Is there anything else that you
7  can recall about this contract?
8      A.  No.
9          MS. ST. PETER-GRIFFITH:  Okay.
10 Jarrett, if we can, No. 19, please, which has
11 several documents in it.  Can we have the May 18,
12 2001 marked as Exhibit -- as the next exhibit.
13         MR. ANDERSON:  Yes.
14         MS. ST. PETER-GRIFFITH:  And then the
15 next multi-page marked as the following exhibit.
16         MR. ANDERSON:  Okay.  I am tendering to
17 the witness Exhibit 9, which is a May 18, 2001
18 letter and Exhibit 10, which is a May 7, 2001
19 letter.
20         (Deposition Exhibit Leone 009 and
21 Exhibit Leone 010 marked as requested.)
22 BY MS. ST. PETER-GRIFFITH:

Page 216

1      Q.  Before we -- before -- Why don't you
2  take a couple of minutes, Ms. Leone, to look at
3  these two exhibits.  And why don't we take a
4  break so Tony can change the tape.
5          THE VIDEOGRAPHER:  We are off the
6  record at 2:27 p.m. with the end of Tape No. 3.
7          (A short break was had.)
8          THE VIDEOGRAPHER:  We are back on the
9  record at 2:28 p.m. with the start of Tape No. 4.
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Ma'am, do you recognize Exhibit 9?
12     A.  No.
13     Q.  It references a letter from you; do you
14 see that?
15     A.  Yes.
16     Q.  And it's concerning explaining the
17 rebate and account breakdown for the first
18 quarter?
19     A.  Yes.
20     Q.  Can you tell me, is that the letter, to
21 your knowledge, that's Exhibit 10?
22     A.  Exhibit 10 was for a different customer

Page 217

1  than Exhibit 9.
2      Q.  Exhibit 10 is not --
3          MS. ST. PETER-GRIFFITH:  I'm sorry.
4  Jarrett --
5          MR. ANDERSON:  Yes.
6          MS. ST. PETER-GRIFFITH:  -- do you have
7  a May 7, 2001 letter as Exhibit 10?
8          MR. ANDERSON:  Yes.
9          MS. CITERA:  No, no, no.  You know
10 what?  I think she's referring to this, the
11 second page of Exhibit 9.
12         THE WITNESS:  Right.
13         MS. CITERA:  Which is very similar
14 looking, but it's to a different addressee.
15         THE WITNESS:  Right.
16         MS. ST. PETER-GRIFFITH:  I have to tell
17 you, I only have one page to Exhibit 9.
18         MR. ANDERSON:  Okay.  Our Exhibit 9 has
19 multiple pages.
20         MS. ST. PETER-GRIFFITH:  No.  I'm just
21 looking at Exhibit 9 as a one-page May 18, 2001
22 letter.  Can we take off the remaining pages?

55 (Pages 214 to 217)

Leone, Lynn E.                                        January 17, 2008
                        Chicago, IL

| Page 218 | Page 220 |
|---|---|

Page 218

1     MS. CITERA:  So from Craig Smith to
2  Frank Geiger?
3     MS. ST. PETER-GRIFFITH:  Yes.
4     MR. ANDERSON:  Then we will -- Why
5  doesn't everybody just return the extra pages to
6  9 back to me.
7     MS. CITERA:  Well, I guess the only
8  thing is that I think she was asking if 10
9  referred to the -- was referring to 9.
10     MR. ANDERSON:  Oh, I see.
11     MS. CITERA:  And I think she's really
12  thinking of this.
13     MR. ANDERSON:  Okay.  Ann, what's
14  happened here is we have here the exhibit -- I
15  mean, pardon me, the letter that goes with
16  Exhibit 9 apparently.
17     MS. ST. PETER-GRIFFITH:  Oh.  What is
18  the -- What is the rest of Exhibit 9?  What does
19  it look like?
20     MR. ANDERSON:  Well, I might have to do
21  the questioning on it, I guess.  It is a -- It's
22  a very similar letter to Exhibit 10 that contains

Page 219

1  the disclosure that's contained in the second
2  paragraph of the letter that's marked as Exhibit
3  10.
4     MS. ST. PETER-GRIFFITH:  Yeah.
5     MR. ANDERSON:  It has the same
6  language.
7     MS. ST. PETER-GRIFFITH:  What I wanted
8  to talk about was, and we can -- because I wanted
9  to put the May 18th letter with the May 7th
10  letter.
11     MR. ANDERSON:  Right.
12     MS. ST. PETER-GRIFFITH:  Okay.  So why
13  don't we do that.  And anything additional to
14  that that was attached to Exhibit 9, Jarrett,
15  you're free to ask about.
16     MR. ANDERSON:  Okay.  Well, let's go
17  off the record just a second and we'll get this
18  May 7th letter with the May 18th letter.
19     MS. ST. PETER-GRIFFITH:  Okay.  Well,
20  no.  It's okay to have the May 18th letter as
21  Exhibit 9 and the May 7th as Exhibit 10.  I
22  intended it that way.

Page 220

1     MR. ANDERSON:  Right.  What I'm trying
2  to point out to you is there's -- we might not
3  need to do all this on the record.
4     MS. ST. PETER-GRIFFITH:  Okay.
5     MS. CITERA:  I think we might want to
6  read the last question.  That might clarify.
7     MS. ST. PETER-GRIFFITH:  Toni, I'll
8  just ask the question over again.
9     MS. CITERA:  Okay.  Okay.  So what are
10  we doing?
11     MS. ST. PETER-GRIFFITH:  It's troubling
12  that these are not the same.
13     MR. ANDERSON:  Let's go off the record.
14     THE VIDEOGRAPHER:  We are off the
15  record at 2:32 p.m.
16        (Discussion off the record.)
17     THE VIDEOGRAPHER:  We are back on the
18  record at 2:35 p.m.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.  Ms. Leone, have you had a chance to
21  look at Exhibit 9 and Exhibit 10?
22     A.  Yes.

Page 221

1     Q.  Okay.  And is Exhibit 10 a May 7, 2001
2  letter from you to Mr. Geiger?
3     A.  Yes.
4     Q.  And is that Exhibit 10 letter the
5  letter that is referenced in the May 18, 2001
6  letter from Craig Smith?
7     A.  Yes.
8     Q.  Okay.  Did you see the letter that Mr.
9  Smith sent out that references your letter?
10     A.  Yes.
11     Q.  Do you recall seeing that?
12     A.  No.
13     Q.  Okay.  Do you recall learning from Mr.
14  Smith about any meeting with Coram?
15     A.  No.
16     Q.  Okay.  If we could turn to Exhibit 10,
17  please, ma'am, what is this document?
18     A.  This is the cover letter identifying
19  for Coram the rebates that they earned during the
20  first quarter of 2001.
21     Q.  Okay.  And can you explain how, for Alt
22  Site customers were rebates earned?

56 (Pages 218 to 221)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

| Page 222 |
| --- |

1       MS. CITERA: Objection to the form.
2    BY THE WITNESS:
3       A.  Different agreements were set up
4    differently.  In some contracts, the customer
5    might have had to reach certain thresholds in
6    order to earn rebates.  And based on whatever
7    those sales thresholds were, they were able to
8    earn dollars.
9       In other rebates, it could have been a
10   guaranteed rebate where they reached a certain --
11   where they just earned -- regardless of what
12   their sales were, they earned a rebate.  I do not
13   recall which the Coram agreement was.
14      Q.  Okay.  Is a rebate distinguishable --
15   Well, let me ask you this:  What at Abbott was
16   known as a credit memo?
17      MS. CITERA:  Objection, form.
18   BY THE WITNESS:
19      A.  A credit memo was a document that could
20   have been a rebate in that the rebate was paid to
21   the customer in the form of a credit memo that
22   would be used to purchase additional product

| Page 223 |
| --- |

1    going forward.  A credit memo would also be
2    initiated if a customer purchased something and
3    then returned it, and we would issue a credit
4    memo for the original -- for the original product
5    that they purchased.  So it could have been one
6    or the other of those things.
7       Q.  Okay.  If it was the former, if it was
8    the first, would you advise or would Abbott
9    Alternate Site advise clients receiving the
10   credit memo that they -- that the credit memo may
11   constitute a discount within the meaning of 42
12   U.S.C. 1320 comparable to the language contained
13   in Exhibit 10, Paragraph 2?
14      MS. CITERA:  Objection to form.
15   BY THE WITNESS:
16      A.  There was discount disclosure language
17   on the credit memos.
18      Q.  Okay.  What is the discount disclosure
19   -- Why does Abbott provide the discount
20   disclosure language to its clients when it
21   provided them with rebates or credit memos?
22      MS. CITERA:  Object to the form, and

| Page 224 |
| --- |

1    also counsel you not to reveal any discussions
2    with counsel.
3    BY THE WITNESS:
4       A.  Abbott had a policy of including
5    disclosure language in all of our contracts and
6    all of our invoices and all of our credit memos
7    for as long as I can remember.  It was part of --
8    It was part of just our -- the way we did
9    business.
10      Q.  And do you recall when that practice
11   started?
12      A.  No, I do not.
13      Q.  Was it before you started at -- in your
14   position as Contract Marketing manager in
15   Alternate Site?
16      A.  I don't recall.
17      Q.  Do you recall how many of these types
18   of letters you sent out?
19      MS. CITERA:  Objection, form.
20   BY THE WITNESS:
21      A.  Whenever we -- You're talking about the
22   May 7th letter to Frank Geiger?

| Page 225 |
| --- |

1       Q.  Yes.
2       A.  This was the cover -- This is the cover
3    letter that we -- we prepared to go along with
4    every rebate payment that we paid to any one of
5    our customers.  We were identifying what the
6    value of the rebate was.  We included the backup
7    documentation that showed the rebate, how they
8    earned it, and then we had the disclosure
9    language.
10      Q.  Okay.
11      A.  And that's what the backup was --
12   that's what the backup is.
13      Q.  The backup meaning the pages that are
14   attached as Pages 2 through, I think, 7 or 8 of
15   this -- of the rest of the exhibit?
16      A.  Correct.
17      Q.  Okay.  How was that backup information
18   generated?
19      A.  It was generated through our systems.
20   We ran sales reports through our systems.
21      Q.  Within Abbott Alternate Site or within
22   HPD, to your knowledge, was there ever any

                        57 (Pages 222 to 225)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

|  | Page 226 |
|---|---|

1   discussions about providing a disclosure to
2   Abbott's customers that it might need to report
3   the -- that the customers or Abbott might need to
4   report the differences between the contract price
5   that you negotiated with the client and AWP?
6           MS. CITERA: Objection to the form. I
7   also caution you not to reveal discussions with
8   counsel.
9   BY THE WITNESS:
10      A.  The disclosure that we provided was
11  based on the products that the customers were
12  purchasing, and AWP didn't have anything to do
13  with -- to do with that.
14      Q.  What do you mean AWP didn't have
15  anything to do with that?
16      A.  AWP didn't have anything to do with
17  what products -- what -- what we were providing
18  them.  When we gave them this backup
19  documentation, it was -- this was based on all of
20  the products that they purchased, not just -- not
21  just products that could have had an NDC number
22  that would have had an AWP tied to them.  So this

|  | Page 227 |
|---|---|

1   was -- what we were providing disclosure for was
2   the purchases that they made for all of the
3   products.  So it wasn't -- it wasn't tied to AWP;
4   it was tied to everything that they purchased.
5   And AWP --
6       Q.  I understand that, but I'm asking
7   actually a different question.  I want to step
8   back from -- And I'm not asking questions about
9   the disclosure of a rebate as a discount.
10          My question to you is:  Abbott engaged
11  in the practice of providing disclosures to its
12  clients, correct, that a rebate may constitute a
13  discount; is that right?
14      A.  Correct.
15      Q.  My question is, with regard to
16  differences in prices between AWPs or the catalog
17  prices, Abbott's catalog prices, and the contract
18  prices negotiated with the clients, was there
19  ever any consideration to Abbott making a
20  disclosure to clients that it need -- that either
21  Abbott or its clients needed to disclose that
22  difference between AWP and the contract price to

|  | Page 228 |
|---|---|

1   federal officials or to state officials?
2           MS. CITERA: Objection to the form.
3   Also the same caution.
4   BY THE WITNESS:
5       A.  I don't know that that -- that that
6   type of disclosure ever happened.
7       Q.  Okay.  Do you know whether it was ever
8   considered?
9       A.  I do not --
10          MS. CITERA: Objection to form.
11  BY THE WITNESS:
12      A.  I do know whether it was ever
13  considered.
14      Q.  Okay.  Would you have been involved in
15  such considerations as a manager of Contract
16  Marketing?
17          MS. CITERA: Objection to form.
18  BY THE WITNESS:
19      A.  I don't know whether I would have or
20  not.
21      Q.  Did -- Were there ever any discussions
22  at all within your Contract Marketing unit about

|  | Page 229 |
|---|---|

1   whether there needed to be some disclosure about
2   the spread between Abbott's contract prices or
3   AWPs and -- I'm sorry, its catalog prices or AWPs
4   and its contract prices?
5           MS. CITERA: Objection to form and same
6   caution.
7   BY THE WITNESS:
8       A.  I was never involved in any discussions
9   regarding reporting the discount between contract
10  prices or AWP.
11      Q.  Okay.  Were there discussions, to your
12  knowledge?
13          MS. CITERA: Objection to form.
14  BY THE WITNESS:
15      A.  I don't know whether there were ever
16  discussions.
17      Q.  Who would you have expected to have
18  those discussions, if there were any?
19          MS. CITERA: Objection to form.
20  BY THE WITNESS:
21      A.  I don't know.
22          MS. ST. PETER-GRIFFITH: Okay.  If we

                                58 (Pages 226 to 229)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 230

1  could move on to the next exhibit, which I
2  believe is Exhibit 11.
3          MR. ANDERSON:  I'm marking a May 7th,
4  2001 letter to Lincare as Exhibit 11.
5          (Deposition Exhibit Leone 011
6  marked as requested.)
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Ma'am, have you had a chance to look at
9  this?
10     A.  Yes, I have.
11     Q.  Do you recognize this document?
12     A.  No.
13     Q.  It appears to be a letter drafted by
14  you to Lincare; do you see that?
15     A.  Yes.
16     Q.  Do you have any doubt that you drafted
17  and sent this letter?
18         MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20     A.  Actually, I did not draft this letter.
21  It was a form letter, as was the Coram letter.
22     Q.  Okay.

Page 231

1      A.  Because you can see that it was a form
2  letter when we -- when we did our calculations
3  for rebates, what we would do is we had this form
4  letter that was created for us by our legal
5  department and then we just filled in the
6  customer's name, the period, and the amount of
7  the rebates.  And in this case, Pat Glotz
8  actually did it on my behalf.
9      Q.  Okay.  And who is Ms. Glotz?
10     A.  She was my supervisor for contract
11  administration, and it was her responsibility to
12  do the calculations for rebates, to run the sales
13  reports and do the calculations.
14     Q.  Okay.  Ma'am, what is a quarterly
15  performance dividend?
16     A.  It's what I described to you a few
17  minutes ago.  In this case, Lincare had a
18  contract with us where they were eligible to earn
19  rebates based on hitting certain performance
20  levels in sales.  And based on whatever those
21  levels were, we paid them X percent of the total
22  sales.  So the same type of backup documentation

Page 232

1  that we have with the Coram letter, there was
2  something comparable to that with this Lincare
3  letter that showed how the 16,209 was calculated.
4      Q.  Okay.  So it's comparable to a rebate?
5      A.  It is a rebate.
6      Q.  Okay.  Are there -- Were there any
7  other terms for rebates that was used within Alt
8  Site?
9      A.  Probably either a dividend, rebate, or
10  a discount.  It probably would have been one of
11  those three.
12     Q.  Okay.  Or a credit memo?
13     A.  Well, the rebate would have been
14  payable as a credit memo.
15     Q.  Oh, I see.  Okay.  Was Lincare a large
16  account?
17         MS. CITERA:  Object to the form.
18  BY THE WITNESS:
19     A.  You know, I don't remember what their -
20  - what their -- where they -- where they ranked
21  in the customers.
22     Q.  Okay.

Page 233

1          MS. ST. PETER-GRIFFITH:  If we could
2  move on to the next exhibit, which is 23,
3  Jarrett.
4          MR. ANDERSON:  Yes.  I'm marking
5  Exhibit 12 and tendering that to the witness.
6          (Deposition Exhibit Leone 012
7  marked as requested.)
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Ma'am, are you familiar with this
10 document?
11     A.  Yes.
12     Q.  What is this document?
13     A.  We were in late 2002 looking at having
14  a consultant come in and look at everything we
15  were doing in Contract Marketing, do an
16  assessment of our systems, our business
17  processes, and our structures.  And so this was
18  the -- the base letter that we sent to nine
19  different consulting companies asking them to
20  come in.  And what we did is we met with all nine
21  of them and then we submitted -- we sent them an
22  RFP and asked them to submit a proposal to us.

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 234

1    Q.  Is this the special project that you
2  were referencing that you worked on?
3    A.  No, although this was another project.
4  But this was a project once I was back in
5  Contract Marketing.
6       The special project I was talking about
7  from 2001 through the summer of 2002 was working
8  on the order management system, the transition
9  for -- I was representing the Hospital Products
10 Division on the transition team from the old
11 order processing system to the SAP system that
12 Abbott eventually adopted.
13   Q.  Okay.
14   A.  So this was a different project that I
15 was working on.
16   Q.  What -- Why did Abbott decide to go
17 through this evaluation process?
18       MS. CITERA:  Objection to the form.
19 BY THE WITNESS:
20   A.  Well, I think if you look at the first
21 five dot points, it kind of describes what we
22 were looking for:  somebody to come in and do an

Page 235

1  assessment, see if we have the right people doing
2  the right jobs, looking at our systems to see if
3  the systems -- our contract administration
4  system, our charge-back system, and all the other
5  systems we had in place were still appropriate
6  for the way we were doing business or whether we
7  needed to do something as we went forward as an
8  organization.
9    Q.  To your knowledge, who's -- who signed
10 off on this project being done?
11       MS. CITERA:  Object to the form.
12 BY THE WITNESS:
13   A.  It was actually -- Alan Greenthal and I
14 actually worked on it based on a request from
15 Mike Sellers.  And really what the project was
16 that we worked on was meeting with these nine
17 consulting firms that we spoke with, walking them
18 through what we were currently doing, and then we
19 submitted an RFP to them for them to come back
20 and give us an estimate for what they thought it
21 would cost and what the project would entail.
22   Q.  Okay.  And did you end up hiring

Page 236

1  someone?
2    A.  No, we did not.  We never got the
3  funding to do the project.
4    Q.  Okay.  And was this Mr. Seller's idea
5  to do this?
6    A.  I don't know whether Mike initiated it
7  or somebody asked Mike to initiate it.
8    Q.  Okay.  Somebody within Hospital
9  Products Division or outside of Hospital Products
10 Division?
11   A.  It would have been somebody within the
12 Hospital Products Division.
13   Q.  Do you know who that someone might have
14 been?
15   A.  No.  That's what I'm saying, if
16 somebody asked Mike to initiate this project, it
17 probably would have been somebody within HPD.
18   Q.  Well, it seems like kind of an
19 important project.  Do you know why you didn't
20 get funding for it?
21       MS. CITERA:  Objection to form.
22 BY THE WITNESS:

Page 237

1    A.  No.
2    Q.  Was it something that you thought
3  needed to be done within -- an evaluation that
4  needed to be done of HPD?
5    A.  We thought it was something that needed
6  to be done within the Contract Marketing
7  department.
8    Q.  Okay.  If you could turn to the next
9  exhibit.  I'm not going to spend too much time
10 with this because I think you've answered a lot
11 of my questions already.
12       MS. ST. PETER-GRIFFITH:  It's No. 31,
13 Jarrett.
14       MR. ANDERSON:  13, yes.  Here we go,
15 tendering what's been marked as Leone Deposition
16 Exhibit No. 13, a response to a request for
17 proposal.
18       (Deposition Exhibit Leone 013
19 marked as requested.)
20 BY MS. ST. PETER-GRIFFITH:
21   Q.  Ma'am, is this a response that was
22 provided by one of these nine groups that you're

60 (Pages 234 to 237)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 238

1  talking about?
2      A.  Yes.
3      Q.  Okay.  Was -- Do you know whether this
4  request was initiated incident to or as a follow-
5  up to the TAP criminal plea?
6          MS. CITERA:  Objection to the form.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  When I say the "TAP criminal plea," do
9  you know what I'm talking about?
10     A.  Yes, I do.
11     Q.  What is your understanding of the TAP
12 criminal plea?
13         MS. CITERA:  Objection to form.
14 BY THE WITNESS:
15     A.  There was -- there was allegations I
16 believe that sample products that TAP provided to
17 physicians, samples of I believe Lupron, provided
18 to patients were then billed to payors.  I mean,
19 I think that was -- that was the over -- that was
20 the main thrust of that.
21     Q.  Were you aware of any allegations
22 concerning TAP engaging in spread marketing

Page 239

1  illegally?
2          MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4      A.  I was not aware of that piece of it.
5      Q.  Okay.  Were there any concerns about
6  after the -- after Abbott consented to, as a
7  joint venturer of TAP, the criminal plea, were
8  there any concerns within Hospital Products
9  Division that maybe you folks needed to look at
10 how you were doing business to ensure that you
11 were conforming to federal and state law?
12         MS. CITERA:  Objection to the form, and
13 also caution you not to reveal any discussions
14 with counsel.
15 BY THE WITNESS:
16     A.  Actually, our bigger concern when we
17 did this study was the fact that our current
18 contract administration system at that time was
19 ten years old, our charge-back system was ten
20 years old.  We were really looking at doing -- We
21 were really looking at the fact that, from a
22 systems perspective, they were antiques and we

Page 240

1  needed to start thinking about doing something
2  different.  And that was really -- And going in
3  and restructuring the department was just another
4  piece of that.  But the biggest issue we had was
5  the fact that our systems, our contracting
6  systems were so old.
7      Q.  Okay.  I'm actually asking a slightly
8  different question.  I'd like to just kind of
9  separate -- get out of your mind sort of the
10 prior issue that we were discussing concerning
11 the consulting group.
12     A.  Okay.
13     Q.  Independent of the reasons behind
14 engaging or contemplating engaging a consulting
15 group, what I'd like to know is within Abbott,
16 HPD, after Abbott consented to, as a joint
17 venturer, the criminal plea in the TAP case, was
18 there any concern or consideration that maybe the
19 Abbott Hospital Products Division needed to look
20 at how it engaged in the marketing of its
21 pharmaceutical products?
22         MS. CITERA:  Object to the form and

Page 241

1  same caution.
2  BY THE WITNESS:
3      A.  I was not aware or involved in any
4  discussions along those lines.
5      Q.  Well, were you aware of any concerns
6  along those lines?
7          MS. CITERA:  Object to the form and
8  same caution.
9  BY THE WITNESS:
10     A.  I was not -- I was not involved in any
11 discussions that there were any concerns for the
12 Hospital Products Division related to that.
13     Q.  Well, do you think that the TAP
14 criminal plea was a pretty big deal?
15         MS. CITERA:  Objection, form.
16 BY THE WITNESS:
17     A.  Yeah, I do think it was a big deal.
18     Q.  Do you know -- Well, do you think it
19 would have been prudent for maybe Abbott Hospital
20 Products Division to look at its own conduct and
21 evaluate whether or not it had comparable
22 problems to the problems at TAP?

                           61 (Pages 238 to 241)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 242

1        MS. CITERA:  Objection to the form,
2   same caution.
3   BY THE WITNESS:
4        A.  I don't know that -- I was never
5   involved in any discussions that indicated that
6   the Hospital Products Division had any concerns
7   related to activities that could have been
8   comparable to what TAP was -- the TAP situation.
9        Q.  Were you aware of any spread marketing
10  activities within the Hospital Products Division?
11       MS. CITERA:  Objection to the form.
12  BY THE WITNESS:
13       A.  I do not believe that we marketed our
14  products based on the spread or that -- it was
15  not the way the hospital products business --
16  Hospital Products Division and Alternate Site
17  product sales ever did its business.
18       Q.  What is the genesis of your belief?
19  Why do you believe that?
20       A.  Going back to when I first went into
21  Alternate Site Product Sales, it was always our
22  business practice to not market against the

Page 243

1   spread and -- the AWP spread, and we marketed our
2   products based upon the depth and breadth of the
3   product line and what the entire portfolio of
4   products and a relationship with Abbott could
5   bring to those customers and not based on the
6   spread for a few individual products.
7        Q.  Was that a published policy someplace?
8        MS. CITERA:  Objection to the form.
9   BY THE WITNESS:
10       A.  I do not know or recall if there was a
11  published policy related to that.
12       Q.  Then how do you know that that was what
13  was followed within the Alternate Site business
14  unit?
15       A.  The -- Our business practice was to
16  sell on the products and the portfolio and not to
17  sell on the spread.
18       Q.  But how do you know as a matter of fact
19  that that's what your sales force was doing?
20       MS. CITERA:  Objection to the form.
21  BY THE WITNESS:
22       A.  They were -- At some point I believe

Page 244

1   there were some discussions with the sales force
2   -- I don't know when and I don't know who had
3   those discussions, and I don't -- that our
4   business practice was not to sell against the
5   spread or to discuss AWP with our customers.
6        Q.  Well, wouldn't your sales force know
7   that if that's their business practice?  Why
8   would you need to have a discussion with them?
9        MS. CITERA:  Object to the form.
10  BY THE WITNESS:
11       A.  Mostly to reiterate that is our policy
12  and to remind them that our business practices
13  were to sell based on our entire portfolio of
14  products.
15       Q.  Well, why did you have a need to remind
16  them of that if they were not engaging in those
17  practices --
18       MS. CITERA:  Objection to the form.
19  BY MS. ST. PETER-GRIFFITH:
20       Q.  -- marketing practices?
21       A.  Just as a reminder to let people know.
22  New people were always coming into the

Page 245

1   organization.  You wanted to make sure everybody
2   was aware of what our policies were and our
3   processes as an organization and how to sell, how
4   to sell those products.
5        Q.  Ms. Leone, as the Contract Marketing --
6   as the former Contract Marketing manager, do you
7   know as a fact that during your tenure in
8   Alternate Site none of the sales force marketed
9   the spread?
10       MS. CITERA:  Object to the form.
11  BY THE WITNESS:
12       A.  I can only tell you that it was not our
13  business practice to do that.  If it happened, I
14  don't know about it.
15       Q.  How did you verify whether or not the
16  sales force was or was not marketing the spread
17  or was complying with Abbott's policy?
18       MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20       A.  I don't recall that we had anything in
21  place in the late -- mid to late '90s -- well,
22  late '90s to identify that.

                              62 (Pages 242 to 245)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
Chicago, IL

Page 246

1   Q.  Okay.  What about in early 2000, in the
2   early 2000s?
3      A.  When we -- When we did all of those
4   policies and procedures that we worked on, we --
5   there was company-wide training on the Federal
6   Healthcare Program Guidelines.  And although I
7   can't remember specifically, I believe that there
8   was discussion in that training about the --
9   those types of guidelines.
10          In addition, our legal department in
11  the -- in early 2000 did training sessions with
12  whole groups of employees across the Hospital
13  Products Division talking about the general --
14  general fraud and abuse guidelines.  And they
15  were some -- they did do some sessions with our
16  entire sales force at different times.  They did
17  each district separately.  And then they also had
18  sessions with people in home office.
19     Q.  Okay.  Let's break that down a little
20  bit.  With regard to the -- before the 2000
21  meetings with legal, you were talking about a
22  policy -- or you were talking about the policies.

Page 247

1   Those are the ones developed in 2003, correct?
2      A.  Correct.
3      Q.  Okay.  That you helped work on?
4      A.  Yes.
5      Q.  And in terms of the training, is that
6   the "Safeguarding Trust" program.
7      A.  Yes.
8      Q.  And wasn't the "Safeguarding Trust"
9   program developed incident to Abbott's entry into
10  a corporate integrity agreement with the United
11  States?
12          MS. CITERA:  Objection to the form.
13  BY THE WITNESS:
14     A.  I believe that that was part of it,
15  yes.
16     Q.  Okay.  So prior to 2003, other than
17  this meeting with legal, you have -- it's your
18  testimony that you're unaware of any way of
19  verifying whether or not sales force members out
20  in the field engaged in spread marketing?
21          MS. CITERA:  Objection to form.
22  BY THE WITNESS:

Page 248

1      A.  All I can say is that it was our
2   business practice not to do that.  And if it
3   happened, I was not aware of it.
4      Q.  Okay.  But it could have happened; you
5   just weren't aware of it?
6          MS. CITERA:  Objection to form.
7   BY THE WITNESS:
8      A.  Again, I don't know whether it did or
9   not.
10     Q.  But it could have happened?
11          MS. CITERA:  Objection to form.
12  BY THE WITNESS:
13     A.  It could have happened.
14     Q.  Okay.  If this was an important policy
15  to Abbott, why didn't Abbott Alternate Site
16  implement some kind of methodology to ensure that
17  its sales force was not marketing the spread?
18          MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20     A.  I don't know.
21     Q.  Okay.  If you could turn to --
22          MS. ST. PETER-GRIFFITH:  Have we marked

Page 249

1   the next exhibit, Jarrett, No. 32?
2          MR. ANDERSON:  No, but I will.  Hold on
3   one second.
4          MS. ST. PETER-GRIFFITH:  Actually what
5   I'd like to do is skip No. 32 and move on to No.
6   54, please.
7          MR. ANDERSON:  Okay.
8          MS. ST. PETER-GRIFFITH:  And, Jarrett,
9   could you just look at that and ensure that
10  that's not a prior exhibit?
11          MR. ANDERSON:  Sure.  Hold on.  I'm
12  marking as Exhibit 14 a two-page document.  Ann,
13  it appears similar to some past exhibits but not
14  identical.
15          MS. ST. PETER-GRIFFITH:  Okay.
16          (Deposition Exhibit Leone 014
17  marked as requested.)
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Ma'am, if you could just take this two-
20  page document and take a look at it.
21     A.  Okay.
22     Q.  Do you recognize this document?

63 (Pages 246 to 249)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 250

1     A.  I -- I mean, it's got my name on it, so
2  I must have gotten it.  But I don't remember it.
3     Q.  Do you have any doubts you received
4  this email?
5        MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7     A.  I have no doubts that I received this
8  email.
9     Q.  Would you routinely receive emails from
10 Mr. Cicerale of this type, of this nature?
11       MS. CITERA:  Objection to form.
12 BY THE WITNESS:
13    A.  No, I did not.
14    Q.  Okay.  The second or the third sentence
15 of this email says, "You should calculate the AWP
16 using the same percentage as our other HPD
17 items."  Do you see that?
18    A.  Yes.
19    Q.  Do you know what that means?
20       MS. CITERA:  Objection to form.
21 BY THE WITNESS:
22    A.  No.

Page 251

1     Q.  Do you recall having any commentary on
2  this particular email?
3     A.  No, I do not.
4     Q.  Do you know what Abbott's policy was
5  with regard to setting AWP?
6        MS. CITERA:  Objection to form.
7  BY THE WITNESS:
8     A.  As I said earlier this morning, my
9  understanding was that HPD sent a price to the
10 compendia and they calculated an AWP based on the
11 price that we sent them.  Based on the last
12 sentence, it would appear that that's what Jerrie
13 is asking them to do.
14    Q.  Okay.  Do you know what "using the same
15 percentage as our other HPD items" means?
16       MS. CITERA:  Objection to form.
17 BY THE WITNESS:
18    A.  No.
19    Q.  Okay.  Did Abbott identify for Red Book
20 a particular percentage to be utilized in
21 calculating AWP?
22       MS. CITERA:  Objection to form.

Page 252

1  BY THE WITNESS:
2     A.  Not that I know of.
3     Q.  Okay.  Is it possible that they could
4  have?
5        MS. CITERA:  Objection to form.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  That Abbott could have and you just
8  weren't aware of it?
9        MS. CITERA:  Objection to form.
10 BY THE WITNESS:
11    A.  I don't believe that Abbott ever
12 identified for the compendia what the percentage
13 was that should be used to calculate the AWP.
14    Q.  Except in this email?
15       MS. CITERA:  Object to the form.
16 BY THE WITNESS:
17    A.  And I don't know why Jerrie wrote that.
18    Q.  Okay.  Ma'am, if you could --
19       MS. ST. PETER-GRIFFITH:  Jarrett, if we
20 can move on to the next exhibit.  And it's going
21 to be my last exhibit for the day.  And it's File
22 No. 57, Jarrett.  We're skipping 52.

Page 253

1        MR. ANDERSON:  Okay.  I'm tendering to
2  the witness what's been marked as Exhibit 15, a
3  March 8, 1999 letter.
4        (Deposition Exhibit Leone 015
5  marked as requested.)
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  Ma'am, I'm not going to spend a lot of
8  time on this document with you.  My primary focus
9  is going to be on the last sentence of this --
10 the last typewritten sentence of this memo.  But
11 you're free to take as much time as you need with
12 this document.
13    A.  What were you going to focus on here?
14 I'm sorry.
15    Q.  The last typewritten sentence.
16    A.  Okay.
17    Q.  Ma'am, do you recognize this document?
18    A.  No.
19    Q.  Do you recognize that you are an
20 addressee on this particular memo from Marianne
21 Sutcliffe?
22    A.  Yes, I do.

                          64 (Pages 250 to 253)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                          January 17, 2008
                        Chicago, IL

Page 254

1     Q.  Do you have any doubt that you received
2  this memo?
3     A.  I have no doubt --
4        MS. CITERA:  Objection to form.
5  BY THE WITNESS:
6     A.  I have no doubt that I received this.
7     Q.  Ma'am, do you remember anything about
8  the subject matter of this memo concerning Owen
9  and Cardinal contracting groups?
10    A.  I do not recall this at all.
11    Q.  Do you recall a meeting being scheduled
12 with Rick Gonzalez to discuss the response to an
13 Owen or Cardinal issue?
14    A.  I do not recall a meeting, nor do I
15 recall being in a meeting with Mr. Gonzalez to
16 discuss this.
17    Q.  Okay.  We're done with that exhibit.
18       Ma'am, I'd like to follow up a little
19 on a statement you made earlier concerning the
20 legal department having meetings with groups --
21 is it within the Hospital Products Division or
22 Abbott-wide?

Page 255

1     A.  All I can speak to is the Hospital
2  Products Division and Alternate Site Product
3  Sales.
4     Q.  Okay.  At the time of the meeting, you
5  were in Alt Site?
6     A.  Yes.  And I believe these meetings were
7  held in 2000.
8     Q.  Okay.  And what were the meetings
9  about?
10       MS. CITERA:  Objection to form.  I'm
11 going to counsel you not to reveal discussions
12 with attorneys, so -- I'm sorry.  Can you -- Your
13 question is what were the meetings about?
14       MS. ST. PETER-GRIFFITH:  Yes.
15       MS. CITERA:  The meetings with the
16 attorneys?
17       MS. ST. PETER-GRIFFITH:  Well, the
18 group meetings, yeah, where the attorneys were.
19       MS. CITERA:  I need to think about that
20 one, Ann.  Can we take a break, a few-minute
21 break?
22       MS. ST. PETER-GRIFFITH:  Sure.  We can

Page 256

1  take a break.
2        MS. CITERA:  I mean, maybe you can ask
3  a foundational question as to whether she
4  remembers.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Okay.  What do you remember -- Do you
7  remember these meetings taking place?
8     A.  Yes, I do remember those meetings
9  taking place.
10    Q.  Who conducted the meetings?
11    A.  One of the attorneys from our inside
12 counsel.
13    Q.  Who was that?
14    A.  Tajal Vakharia.
15    Q.  And who attended the meeting?
16    A.  I attended two of them.  One was with
17 people in our office within -- you know, in the
18 home office; and the second was a district
19 meeting for one of the sales districts.
20    Q.  Okay.  And where was that district
21 meeting located?
22    A.  I'm thinking it was at the -- at the

Page 257

1  Marriott Lincolnshire Resort in Lincolnshire,
2  Illinois.
3     Q.  Okay.  Who attended that meeting?
4     A.  The district, that was the Midwest
5  district -- It was a district sales meeting, and
6  it was the Midwest district sales reps.
7     Q.  Okay.  And who attended the meeting at
8  the home office?
9     A.  All of the people in Alternate Site
10 Product Sales who were in the home office.
11    Q.  Okay.  And how many people did that
12 include?
13    A.  I'd say there's probably 20 or 25,
14 maybe that's too many.
15    Q.  Okay.  And were the attorneys at the --
16 Okay.  And how many people attended the Midwest
17 district sales meeting?
18    A.  I believe that it was the entire
19 Midwest district sales force, and there were some
20 marketing managers who were there also.
21    Q.  Okay.  And how many were there?
22    A.  Probably about 15 to 20.

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                              January 17, 2008
                              Chicago, IL

Page 258

1    Q.  Okay.  And what was the purpose of the
2  meeting?
3    MS. CITERA:  Object to the form.
4  BY THE WITNESS:
5    A.  To give us a general overview of fraud
6  and abuse guidelines.
7    Q.  And were there any written materials
8  handed out at these meetings?
9    A.  I don't remember.
10    Q.  Would you have saved them?
11    A.  Actually, I think there was a little
12  pamphlet that Abbott had put together.  I don't
13  know whether I have a copy of it anymore, but ...
14    Q.  Was that the business code of conduct?
15    A.  No, there was a separate -- I believe
16  there was a separate document that the legal
17  department put together on fraud and abuse.
18    Q.  And do you remember what that pamphlet
19  said?
20    MS. CITERA:  I'm going to just caution
21  you.  I mean, was this -- I'm going to caution
22  you not to reveal any advice from counsel.

Page 259

1    MS. ST. PETER-GRIFFITH:  Hold it, Toni.
2  I mean, are you cautioning her not to discuss the
3  contents of this stuff?  Because obviously this
4  isn't privileged.  They're group-wide meetings.
5    MS. CITERA:  Well, that's why I said I
6  wanted to take a break because I wanted to think
7  about it.  I'm happy you asked some foundational
8  questions so I can understand it better, but I'd
9  like to take a few minutes to think about it.
10    MS. ST. PETER-GRIFFITH:  Why don't you
11  take a break, then, and do that.
12    MS. CITERA:  Okay.
13    THE VIDEOGRAPHER:  We are off the
14  record at 3:19 p.m.
15    (Brief pause.)
16    THE VIDEOGRAPHER:  We're back on the
17  record at 3:19 p.m.
18    MS. ST. PETER-GRIFFITH:  Madam Court
19  Reporter, can you please read the question back?
20    (Record read as requested.)
21  BY THE WITNESS:
22    A.  No, it wasn't.  It was a separate

Page 260

1  little pamphlet that we received.
2    Q.  And what was discussed in the pamphlet?
3    A.  Just an overview of fraud and abuse
4  guidelines.  I believe there was -- That's all I
5  can remember.
6    Q.  Do you recall whether there was
7  discussion of the False Claims Act and
8  Antikickback Statute?
9    A.  I believe both of those were addressed
10  in that document.
11    Q.  What about the spread and marketing the
12  spread?
13    A.  No, that was not -- that was not
14  included.
15    Q.  Okay.  What was discussed at the
16  meeting with the Alt Site sales -- Well, let me
17  ask you this:  Was the meeting with the Alt Site
18  sales force generally the same subject matter as
19  the meeting with the district sales force?
20    A.  Yes.
21    Q.  I'm sorry.  Did you respond?
22    A.  Yes, I did.  I said yes, it was.  And

Page 261

1  it was again discussion of the Fraud and Abuse
2  and Antikickback statutes.
3    Q.  Do you recall what was discussed there?
4    A.  Just some high-level discussion of
5  those two -- of those two acts and what they
6  meant.
7    Q.  Okay.  And in discussing what they
8  meant was there any discussion about spread
9  marketing?
10    A.  I do not recall that that was part of
11  the presentation that was done.
12    Q.  Do you know why the presentation was
13  being made at that time?
14    MS. CITERA:  Objection to form.
15  BY THE WITNESS:
16    A.  No, I don't remember why.
17    Q.  Could it have been incident to the TAP
18  investigation?
19    MS. CITERA:  Objection to form.
20  BY THE WITNESS:
21    A.  I don't remember what precipitated it
22  at all.

66 (Pages 258 to 261)

Page 262

1    Q.  Do you remember learning about the
2  United States issuing a civil investigative
3  demand in '96 to Abbott?
4    A.  I didn't remember when -- I don't
5  remember when it happened.  I remember becoming
6  aware of things in the late '90s, but I didn't
7  remember exactly when it started.
8    Q.  Okay.  Do you know whether this
9  presentation may have been made by the legal
10 department because of the investigations by the
11 United States or any state officials -- for
12 example, the State of Texas officials?
13       MS. CITERA:  Objection to form.
14 BY THE WITNESS:
15   A.  No, I do not.
16   Q.  Do you know why -- or did you have any
17 concerns at that time that there might be spread
18 marketing activity that should be discussed or
19 spread marketing prohibitions that should be
20 discussed at this meeting?
21       MS. CITERA:  Objection to form.
22 BY THE WITNESS:

Page 263

1    A.  The meeting that legal called?
2    Q.  Yes.
3    A.  No, I do not remember that that -- that
4  that had anything to do with the intent of the
5  meetings that were held.
6    Q.  What else do you remember about the
7  meetings?
8    A.  That's about it.
9    Q.  Okay.  Did you have any input in the
10 content of the meetings?
11   A.  No.
12   Q.  And to your knowledge, were these
13 meetings held Abbott-wide or just within the
14 Hospital Products Division?
15   A.  All I knew about was the Hospital
16 Products Division.
17   Q.  Okay.  And other than -- is it Pajal
18 Sacharia, did you say?
19   A.  Tajal Vakharia.
20   Q.  Vakharia, I'm sorry.  Can you spell
21 that, please?
22   A.  Her first name was T A J A L, and her

Page 264

1  last was V A K H A R I A.
2    Q.  And was she the sole presenter?
3    A.  As I remember it, yes.
4    Q.  Do you recall how long these meetings
5  lasted?
6    A.  I believe it was about an hour, hour
7  and a half, something like that.
8    Q.  And were they mandatory for all of the
9  Alternate Site staff and all of the district
10 sales individuals attending the meeting?
11   A.  I believe they were.
12   Q.  Did you have to, you know, for example,
13 sign a sheet indicating that you were attending
14 the meeting?
15   A.  I don't remember.
16   Q.  And have we exhausted your memory
17 concerning that meeting?
18   A.  Yes.
19   Q.  Or those two meetings, I should say.
20       Do you recall any other compliance-type
21 meetings or initiatives undertaken within the
22 Hospital Products Division that we haven't

Page 265

1  discussed here today?
2    A.  None that I can remember except when we
3  initially implemented all of our operating
4  procedures within Contract Marketing, we had
5  training sessions for everybody -- for everybody
6  -- for everybody within the department.
7    Q.  Okay.
8    A.  And those very first meetings were
9  after we had written the HPD policies -- I'm
10 sorry, the Abbott policies and the HPD procedures
11 because some of the operating procedures within
12 Contract Marketing directly related to some of
13 those HPD policies -- procedures, I'm sorry, HPD
14 procedures.
15   Q.  So that's in around 2003, then, and
16 afterwards?
17   A.  Yes, the spring of 2003.
18   Q.  And would these -- the new folks coming
19 in, would they see the "Safeguarding Trust" DVD
20 or VHS tape?
21   A.  Yes.
22   Q.  Is that the training that you're

67 (Pages 262 to 265)

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 266

1  talking about, the review of that "Safeguarding
2  Trust" material?
3      A.  Well, they had to do that.  But in
4  addition to that, they had to do training on the
5  operating procedures that we implemented within
6  Contract Marketing.
7      Q.  Okay.
8      A.  So they attended training sessions, and
9  then we had a short quiz that they had to take.
10     Q.  Do you recall any other conversations
11 that you've had during your tenure within HPD
12 concerning HPD's compliance with state or federal
13 Medicaid or Medicare laws that we haven't
14 discussed here today?
15     A.  No, I don't.
16     Q.  Did you ever have any interaction with
17 Mike Tutell?
18     A.  That's a name from the past.  Was he at
19 Ross Laboratories?
20     Q.  Yes.
21     A.  Then I met him once and talked to him
22 once.

Page 267

1      Q.  Okay.  As part of its consignment
2  arrangement, did Abbott's Home Infusion division
3  also consign Ross products and pumps?
4      A.  Yes, they did.
5      Q.  Did they also consign Lupron?
6      A.  I don't recall whether we did or we
7  didn't do Lupron.
8      Q.  Okay.  That might have come after your
9  time in Home Infusion?
10         MS. CITERA:  Objection to form.
11 BY THE WITNESS:
12     A.  Okay.  I just -- I just don't remember.
13     Q.  Okay.  But it's possible?
14         MS. CITERA:  Objection to form.
15 BY THE WITNESS:
16     A.  Yes, it is possible.
17     Q.  Okay.  Other than what we've discussed
18 here today, do you recall any other discussions
19 that you've had concerning the Ross CIA?
20     A.  With whom?
21     Q.  With anybody within the Hospital
22 Products Division or outside of the Hospital

Page 268

1  Products Division.
2          MS. CITERA:  And I would just caution
3  you not to reveal discussions with counsel.
4  BY THE WITNESS:
5      A.  I think over the years, as Abbott
6  employees, there's been -- you know, there were
7  discussions about what happened with Ross.  I
8  don't remember anything specific or anybody I
9  specifically had a conversation with.  But I'm
10 sure that as an Abbott employee, we had -- you
11 know, people would talk about it.  I just don't
12 remember any of those conversations or who I had
13 them with.
14     Q.  Do you recall whether there were any
15 discussions about the need to verify within the
16 Hospital Products Division that some of the
17 problems that Ross had were not problems that
18 also existed in the Hospital Products Division?
19         MS. CITERA:  Objection to form.
20 BY THE WITNESS:
21     A.  I don't recall -- I don't recall having
22 any of those conversations.

Page 269

1      Q.  Do you recall -- Did you ever at any
2  time have any -- make any consideration of
3  whether you should disclose to any state or
4  federal official the practices and procedures
5  within the Home Infusion unit?  Did you ever
6  consider those, reporting those?
7          MS. CITERA:  Objection to the form.
8  Also the same caution regarding discussions with
9  counsel.
10 BY THE WITNESS:
11     A.  Again, as those contracts were written,
12 we worked with our legal counsel to prepare those
13 and to develop them.  So anything that came up
14 would probably have happened within those --
15 within those discussions.
16     Q.  Okay.  So it's possible that you may
17 have discussed -- had discussions about the need
18 to report to state or federal officials, but it
19 would have come up in the context of discussions
20 with counsel?
21         MS. CITERA:  Objection to the form.
22 BY THE WITNESS:

                              68 (Pages 266 to 269)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

| Page 270 | Page 272 |

**Page 270**

1       A.   Again, I never had any of those
2   conversations when we were negotiating those home
3   infusion agreements.  What I meant was the people
4   who were writing those agreements worked with
5   counsel to create those, to develop and create
6   those agreements.
7       Q.   Okay.  My question is actually a little
8   bit different.
9           At any time including after you watched
10  the "Safeguarding" -- First, let me ask you this:
11  Did you watch the "Safeguarding Trust" program?
12      A.   Yes.
13      Q.   Okay.  At any time, including after
14  Abbott entered into the CIA and you watched the
15  "Safeguarding Trust" program, did you ever have
16  any thoughts or consideration of reporting the
17  conduct within the Home Infusion unit to any
18  state or federal official?
19          MS. CITERA:  Objection, form.
20  BY THE WITNESS:
21      A.   Well, by 2003, the Home Infusion
22  program -- the Home Infusion was gone, and I had

**Page 271**

1   been out of it for so long that it was never --
2   it never occurred to me as I was watching
3   "Safeguarding Trust" that that was something I
4   should -- to think about.
5       Q.   Okay.  So the answer is no?
6       A.   The answer is no.
7           MS. ST. PETER-GRIFFITH:  Okay.  I think
8   I'm almost ready to pass the witness.  But what
9   I'd like to do now is take a break, confer with
10  my counsel, identify my cleanup questions, and in
11  some -- now is a good time to take a break.
12          MS. CITERA:  Sure.
13          THE VIDEOGRAPHER:  We are off the
14  record at 3:31 p.m.
15          (A short break was had.)
16          THE VIDEOGRAPHER:  We are back on the
17  record at 3:42 p.m.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Ms. Leone, I just have a few follow-up
20  questions for you.
21      A.   Okay.
22      Q.   The first pertains to documents.

**Page 272**

1   During your entire tenure within the Hospital
2   Products Division, did you -- what types of
3   documents did you create?
4           MS. CITERA:  Objection to form.
5   BY THE WITNESS:
6       A.   I'm not sure what you mean by the
7   question.
8       Q.   Sure.  Let me rephrase it differently.
9           Throughout your work at the hospital --
10  with the Hospital Products Division, whether it
11  was in Home Infusion, Alternate Site, or within
12  Contract Marketing, did you generate more than a
13  couple of banker's boxes full of documents?
14          MS. CITERA:  Objection to form.
15  BY THE WITNESS:
16      A.   I have no idea.
17      Q.   Well, is it fair to say that you signed
18  a lot of letters or worked on a lot of reports?
19      A.   Yes.
20      Q.   Okay.  And prior to 2002, is that a
21  fair statement?
22      A.   Yes, I guess.

**Page 273**

1       Q.   What types of reports would you work on
2   when you were in the Alt Site Products Division?
3           MS. CITERA:  Objection to form.
4   BY THE WITNESS:
5       A.   Well, I worked on contracts with our
6   customers.  There were spreadsheets doing pricing
7   analyses.  I can't even think of other things
8   that I would have worked on.
9       Q.   Well, did you write letters to
10  customers?
11      A.   I think I probably did write some
12  letters to customers.
13      Q.   Did you write memos, internal memos?
14      A.   Yes, I wrote internal memos.
15      Q.   Did you write significant events
16  reports?
17      A.   Yes, we did significant events on a
18  monthly basis.
19      Q.   Okay.  Any other type -- Did you always
20  do your significant events reports?
21          MS. CITERA:  Objection to form.
22  BY THE WITNESS:

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 274

1    A.  I'm pretty sure I did them all every
2  month.
3    Q.  Okay.  There were required -- were they
4  required -- were they a requirement for your
5  position?
6    A.  My boss wanted a significant events
7  report from me and everybody who was his direct
8  report on a monthly basis identifying our
9  activities during the previous month.
10   Q.  Okay.  Did that include the sales
11  force?
12   A.  The sales force had different kinds of
13  forms that they filled out.
14   Q.  I'm sorry, what --
15   A.  But, again, it was on a monthly basis.
16   Q.  Okay.  What kind of forms did the sales
17  force; put out -- have to put out on a monthly
18  basis?
19   A.  They did a document identifying all of
20  the people -- all of the customers that they had
21  had activities with during the month, people that
22  were working on contracts with, what the products

Page 275

1  were that were going to be on those contracts,
2  kind of identifying all of their activities
3  during the month.
4    Q.  Okay.  And were they required to -- was
5  the sales force within Alt Site required to
6  maintain files on each of their clients?
7    A.  I don't know how the sales force
8  maintained and kept track of their activities
9  with each of their customers.
10   Q.  Was that a -- something that was left
11  to each individual member of the sales force?
12   A.  I don't know whether it was left to the
13  sales force or whether it was based on direction
14  from theirs -- from their divisional manager.
15   Q.  Okay.  When you were in -- Well, what
16  other types of documents would you work on or
17  generate when you were in Alternate Site?
18        MS. CITERA:  Objection to the form.
19  BY THE WITNESS:
20   A.  I think you remembered more than I do,
21  but I can't think of anything else.
22   Q.  Okay.  What about when you were in the

Page 276

1  Home Infusion business unit, did you generate
2  letters to clients?
3    A.  I did letters to clients.  I did -- We
4  did a monthly report for our case management
5  identifying all the case management that we had -
6  - had done for the month.  I did -- Every time we
7  negotiated a price, we had a worksheet that we
8  completed that was put into the patient file for
9  that patient identifying what their pricing would
10  be for that -- for that therapy that they were
11  going to be on.  I developed and created this
12  case manager training manual.  I think we
13  mentioned that earlier this morning.  I think
14  there were some presentations.  And probably all
15  the way through in every position I've had, I've
16  done PowerPoint presentations on various topics.
17        When I was a reimbursement specialist,
18  I completed those 1500 claim forms and any other
19  kind of medical -- you know, forms that needed to
20  be completed for -- for billing those customers
21  or billing -- yeah, billing on behalf of those
22  patients, so --

Page 277

1    Q.  Okay.  When you were in the Alternate
2  Site, what manuals did you use?
3        MS. CITERA:  Objection to form.
4  BY THE WITNESS:
5    A.  I can't remember any manuals other than
6  these that we just --
7    Q.  Located?
8    A.  Yes.
9    Q.  Okay.  Ms. Leone, when you received a
10  litigation hold memo, would you retain your
11  documents pursuant to those memos?
12   A.  Yes.
13   Q.  Would you provide them to the paralegal
14  who requested them?
15   A.  Yes.
16   Q.  Would you update the requests -- When
17  you received updated requests, would you provide
18  your documents responsive to the request?
19   A.  Yes.
20   Q.  Do you have any knowledge or reason or
21  understanding as to why Abbott to date may not
22  have produced all of your documents?

70 (Pages 274 to 277)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 278

1      MS. CITERA: Objection to form.
2  BY THE WITNESS:
3      A.  I don't know what has and hasn't been
4  produced.
5      Q.  Okay.  Ms. Leone, at any time during
6  your tenure as an employee at HPD, did you ever
7  consider reporting Abbott's Hospital Products
8  Division spreads or the differences between the
9  contract prices and the catalog prices or
10 published AWPs to any state or federal Medicaid
11 official?
12     MS. CITERA:  Objection to the form.  I
13 also caution you not to reveal any discussions
14 with counsel.
15 BY THE WITNESS:
16     A.  I do not recall ever doing that.
17     Q.  Do you ever recall considering doing
18 that?
19     MS. CITERA:  Same objections.
20 BY THE WITNESS:
21     A.  No, I do not recall ever considering
22 doing that.

Page 279

1      Q.  Why not?
2      MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4      A.  Again, it wasn't our business practice
5  to sell against the spread or to -- to do
6  anything with AWP; so I never considered that we
7  needed to do any reporting based on AWP.
8      Q.  Okay.  Subject to being recalled once
9  Abbott produces additional documents that may
10 pertain to you, Ms. Leone, at this time, the
11 United States passes the witness to relator's
12 counsel.  Thank you for your time, ma'am.
13     A.  You're welcome.
14     MR. ANDERSON:  Good afternoon, Ms.
15 Leone.  I'll try to move quickly.  I have some
16 questions for you about the documents you
17 produced today, but I'm going to go with some
18 other questions given where we just left off.
19
20     EXAMINATION
21 BY MR. ANDERSON:
22     Q.  Do you recall setting up a Contract

Page 280

1  Marketing internship where basically the NAMs, or
2  national account managers, within Alternate Site
3  were asked to perform a fictitious RFP response
4  or a bid response?
5      A.  Yes.
6      MS. CITERA:  Objection to form.
7  BY MR. ANDERSON:
8      Q.  And you were the manager in Contract
9  Marketing who kind of set up this training
10 exercise for the NAMs, correct?
11     A.  Yes, I was.
12     Q.  And what was the basic purpose of the
13 training exercise?
14     A.  To help the national accounts managers
15 understand the things that could come up and what
16 they needed to bring to contract -- what they
17 needed to bring to their Contract Marketing
18 analysts to help them put together pricing and
19 proposals for those customers.
20     Q.  To better facilitate the communications
21 between the NAMs who were out in the field
22 dealing with customers and interfacing with

Page 281

1  customers and the Contract Marketing personnel in
2  Chicago who are helping the NAMs fill out the bid
3  proposals or responses to bids?
4      A.  Yes.  Correct.
5      Q.  Okay.  And is it true that the name of
6  this fictitional -- or fictitious company, pardon
7  me -- was called CLAD?
8      A.  Uh-huh.  Yes, it was.  It was CLAD.
9      Q.  Which is like the initials of Cindy,
10 Dave, and whoever else were the Contract
11 Marketing analysts, correct?
12     A.  Cindy, Lynn, Angie, and Dave.
13     Q.  Right.
14     (Deposition Exhibit Leone 018
15 marked as requested.)
16 BY MR. ANDERSON:
17     Q.  If you could, take a look at what's
18 been marked as Exhibit 18.  And I realize 16 and
19 17 have already marked.  Those are the documents
20 you produced today, and we'll get to those in a
21 second.  But take a look at what's marked Exhibit
22 18.

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 282

1      If you could, ma'am, just flip through
2   the document and confirm for me that this appears
3   to be the documentation that pertains to the
4   Contract Marketing training exercise that you
5   oversaw?
6      A.  Yes.
7      Q.  Okay.  And now directing your attention
8   specifically to the first page, you copied Pete
9   Baker, Scott Glover, and Mike Novak, correct?
10     A.  Correct.
11     Q.  And were you copying those gentlemen
12  because they were supervisors of the NAMs?
13     A.  Yes.  I mean -- yes, essentially.
14     Q.  Right.  They were in the upper chain of
15  command above the NAMs, correct?
16         MS. CITERA:  Objection to form.
17  BY THE WITNESS:
18     A.  Well, the national accounts managers
19  reported directly to Pete.  Scott was our
20  national sales manager for the sales reps, not
21  the national accounts managers.  And Mike Novak
22  was the marketing manager.  So in case they had

Page 283

1   to contact any of those people as they put this
2   together, we wanted them to be aware of what we
3   were doing and what was being proposed, you know,
4   what they would have to do if this was a true
5   RFP.
6      Q.  I see.  Okay.  And focusing your
7   attention now on the page within Exhibit 18
8   that's part of the CLAD training exercise,
9   specifically Bates number Harling 42, you see
10  that page titled "CLAD Proposal/Vendor Meeting"?
11     A.  Yes.
12     Q.  And what was the basic purpose behind
13  the vendor meeting?
14     A.  It was kind of -- what the plan was is
15  we gave them this fictitious company with this
16  information regarding who the company was and
17  what they were doing.  And the vendor meeting was
18  then those individuals meeting with me as the
19  vendor and asking questions for the proposal so
20  that it would help them then complete their
21  response.
22     Q.  And so you were role playing as the

Page 284

1   purchasing manager at the vendor, correct?
2      A.  Correct.
3      Q.  And you met with each of the NAMs for
4   Abbott HPD Alternate Site, and you explained the
5   business of this fictitious company?
6      A.  Correct.
7      Q.  And some of the information that you
8   provided in this vendor meeting is listed on Page
9   42 of Exhibit 18, correct?
10     A.  Correct.
11     Q.  And looking at Bullet 6, you provided
12  information about computer systems within the
13  organization for reimbursement, pharmacy,
14  inventory management, et cetera.  Did I read that
15  correctly?
16     A.  Correct.
17     Q.  What type of information did you share
18  with the NAMs about reimbursement?
19     A.  I don't remember that they -- that -- I
20  don't remember what we did as far as
21  reimbursement was concerned.
22     Q.  Is it true that in your experience at

Page 285

1   Abbott, particularly in the Contract Marketing
2   department, that customers would include
3   reimbursement information in bid -- requests for
4   bids or requests for proposals?
5          MS. CITERA:  Objection to form.
6   BY THE WITNESS:
7      A.  You know, it's been so long, I don't
8   remember.
9      Q.  Do you remember that typically in
10  requests for bids or requests for proposals that
11  came from companies such as GPOs or other
12  customers of Abbott to Contract Marketing that
13  they requested AWP information?
14         MS. CITERA:  Objection to form.
15  BY THE WITNESS:
16     A.  Yes.  And we talked about that last
17  summer, like MHA and Geri-Med and --
18     Q.  Right.
19     A.  -- I can't remember who else, but yes.
20     Q.  Do you recall that those same types of
21  providers had computer systems that included AWP
22  information and other reimbursement-related

72 (Pages 282 to 285)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                              Chicago, IL

Page 286

1  information?
2        MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4        A.  I don't know whether their computer
5  systems had it.  I don't know what their computer
6  systems had.  I know what they asked us to put on
7  their -- and made it a condition of completing
8  those bids was to include the AWP.  But I don't
9  know what their systems did.
10       Q.  Do you think that this Bullet 6 has to
11 do with them having computer systems that assists
12 them in filing reimbursement claims and includes
13 reimbursement information?
14       MS. CITERA:  Objection to form.
15 BY THE WITNESS:
16       A.  I don't recall what I was thinking
17 about when we did this with computer systems for
18 reimbursement.  I don't recall what I -- what I
19 was thinking about.
20       Q.  Do you have any general recollection
21 outside of the training exercise, but just
22 generally an awareness that customers of Abbott's

Page 287

1  had computer systems related to reimbursement?
2        MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4        A.  I know that there was one company that
5  had reimbursement software, I don't remember who
6  it was, for companies like a Coram or a Lincare
7  to help them create their invoices on a therapy-
8  by-therapy basis because we previewed it at one
9  time when I was Home Infusion Services.  But that
10 -- that's my limited knowledge on that.
11       Q.  And was that computer software or
12 system that assisted providers in reimbursements
13 akin to Abbott's CHIP system?
14       MS. CITERA:  Objection to form.
15 BY THE WITNESS:
16       A.  As I recall, it was.
17       Q.  And would you consider -- I apologize,
18 but we've got to switch the tape.  We've only got
19 a minute left.
20       A.  Okay.
21       THE VIDEOGRAPHER:  We are off the
22 record at 4:00 o'clock p.m. with the end of Tape

Page 288

1  No. 4.
2        (A short break was had.)
3        THE VIDEOGRAPHER:  We are back on the
4  record at 4:02 p.m. with the start of Tape No. 5.
5  BY MR. ANDERSON:
6        Q.  Back on these computer systems that
7  assist providers in filing reimbursement claims,
8  did Abbott compete with this other company that
9  had software that assisted Coram and other
10 providers in filing reimbursement?
11       MS. CITERA:  Objection to form.
12 BY THE WITNESS:
13       A.  I don't recall.
14       Q.  Why did you have reason to preview that
15 software?
16       A.  This was when I was still in Home
17 Infusion Services, and we were looking at
18 possibly moving away from CHIP and using
19 something else.  And so we looked at this one
20 system and decided to stay with CHIP at that
21 time.
22       Q.  Related to this computer system issue,

Page 289

1  in some recent production, I've seen reference to
2  a system called the System 50 back in the, like,
3  early '90s at Home Infusion.  Was it, like, a
4  predecessor to CHIP?
5        A.  Yeah.  It was one of those big main-
6  frame computers.  It was probably the size of a
7  room, and it was called the 50.
8        Q.  And was the 50 a computer system that
9  assisted Abbott in filing reimbursement claims?
10       A.  Yes.
11       Q.  And, in turn, it also assisted Abbott
12 in filing reimbursement claims on behalf of or in
13 connection with Home Infusion partners, correct?
14       A.  Yeah.  It was part of CHIP.
15       Q.  Oh, it was part of CHIP?
16       A.  Yeah, it was part of CHIP.  It was an
17 early part of CHIP.
18       Q.  I see.  I just hadn't never seen
19 reference to it until recently.
20       A.  Yeah.
21       Q.  Now, if you could flip to Page 45 of
22 the training materials that are marked as Exhibit

73 (Pages 286 to 289)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                January 17, 2008
                        Chicago, IL

Page 290

1   18, is this basically like a checklist of the
2   items that the NAMs were supposed to include in
3   the responses to bid?
4       A.  Yes.  These were the things that we
5   were saying that they had to include with the
6   proposal.
7       Q.  And if they included those, then they
8   got credit, so to speak?  And ultimately if they
9   had the high score, they were going to win a
10  prize?
11      A.  Yes.
12      Q.  Okay.  And so this is an example of
13  Chris Finkel's score sheet, so to speak.  And
14  she's scored one point for providing these
15  various pieces of information, correct?
16      A.  Correct.
17      Q.  And do you notice in the kind of upper
18  middle part of the page, there's a listing there,
19  AWP/Medi-Span program?
20      A.  Yes.
21      Q.  What type of AWP information was
22  supposed to be included in the proposal?

Page 291

1       A.  I don't know.  I guess we'd have to go
2   back because I'm sure it said something in the
3   original RFP about what they needed to provide.
4       Q.  Okay.  Where in the materials is the
5   original RFP?
6       A.  I don't know, so I don't know why I put
7   that in there.
8       Q.  Would you agree that it was kind of
9   standard procedure for AWP information to be
10  included in responses for proposal or bids made
11  by Abbott to customers?
12          MS. CITERA:  Objection to form.
13  BY THE WITNESS:
14      A.  I don't know what we were calling that
15  AWP/Medi-Span program, so I'm not sure what we
16  were asking for there.  So I can't answer the
17  question.
18      Q.  Well, you know what AWP is?
19      A.  Yeah, but I don't know what a Medi-Span
20  program would have been.  So it leads me to
21  believe we weren't asking for AWP, we were asking
22  for something else.

Page 292

1       Q.  Something that was, like, more than a
2   listing of all the AWPs?
3       A.  I don't know.  I don't know what we
4   were asking for, so I can't answer the question.
5       Q.  Did Abbott ever provide access to its
6   Medi-Span subscription to providers?
7          MS. CITERA:  Objection to form.
8   BY MR. ANDERSON:
9       Q.  I'll back up and ask a foundational
10  question.  Abbott had a subscription to Medi-
11  Span, right?
12      A.  Correct.
13      Q.  So basically what that meant is every
14  month, Abbott would get new pricing information
15  from Medi-Span, including AWPs, on all the drugs
16  that Medi-Span published AWPs for, correct?
17      A.  Correct.
18      Q.  That included Abbott's own drugs,
19  obviously?
20      A.  Yes.
21      Q.  Okay.  Did Abbott ever share those
22  Medi-Span subscriptions or access to the Medi-

Page 293

1   Span pricing data with providers?
2          MS. CITERA:  Objection to form.
3   BY THE WITNESS:
4       A.  To providers?  What do you mean?
5       Q.  Customers.
6       A.  Not that I recall.
7       Q.  Except when Abbott provided the AWPs in
8   a spreadsheet or whatever attached to a bid,
9   correct?
10          MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12      A.  The only time that I ever used the
13  Medi-Span was when I was in Home Infusion
14  Services, and we were using it for the managed
15  care contracting with the third-party payors.
16  Alternate Site Product Sales did not have a
17  subscription to Medi-Span, and they didn't get a
18  copy of it.  This was strictly from my Home
19  Infusion days I had a subscription to Medi-Span.
20      Q.  Well, setting aside the subscription to
21  Medi-Span for a moment, you'll agree, and I think
22  you've already testified, that Abbott Contract

74 (Pages 290 to 293)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 294

1    Marketing did share AWPs with customers in the
2    context of the bid or response for proposal
3    context?
4         MS. CITERA:  Objection to form.
5    BY THE WITNESS:
6         A.  If it was a requirement for completing
7    the RFP, then yes, we did.  And the majority of
8    the prices came out of Red Book and not Medi-
9    Span.
10        Q.  All right.  And isn't it true that
11   typically the bids did require AWP information to
12   be included; therefore, typically Abbott Contract
13   Marketing did include AWPs in its responses to
14   the bids?
15        MS. CITERA:  Objection to form.
16   BY THE WITNESS:
17        A.  If we -- if it was a requirement for
18   completing the bids, then we provided AWP.
19        Q.  I know.  I understand that contingency.
20   And I'm saying that isn't it true that typically
21   the customers requested AWP; therefore, typically
22   AWP was included by Abbott?

Page 295

1         MS. CITERA:  Objection to form.
2    BY THE WITNESS:
3         A.  I only remember a handful of customers
4    making that a requirement for completing the bid.
5    And when that happened, those are the ones we
6    did.  I do not remember it being something we had
7    to do on a regular basis.
8         Q.  Do you know that personnel that
9    reported to you have testified under oath in this
10   case that they did typically include AWP in the
11   bids?
12        MS. CITERA:  Objection to form.
13   BY THE WITNESS:
14        A.  No, I didn't know that.
15        Q.  Is the reason that you may not know
16   about how many or the regularity with which AWP
17   was included because you were a manager who
18   didn't fill out the bids herself but instead
19   delegated that to others?
20        MS. CITERA:  Objection to form.
21   BY THE WITNESS:
22        A.  That would probably be my --

Page 296

1         Q.  Right.
2         A.  Yes.
3         Q.  So you would defer to the memory of the
4    people reporting to you, such as Debbie Longley,
5    about whether or not AWP was typically included,
6    correct?
7         MS. CITERA:  Objection to form.
8    BY THE WITNESS:
9         A.  Yes.
10        Q.  Okay.  Now, would you also agree that
11   in this training exercise called CLAD, Abbott
12   Contract Marketing was indicating to the NAMs
13   that AWP should be included in their proposal?
14        MS. CITERA:  Objection, form.
15   BY THE WITNESS:
16        A.  No, I will not agree to that.  And
17   because it says "Medi-Span program," I don't
18   recall what was -- what we were asking for here;
19   so I'm not going to agree we were asking them to
20   complete AWP for this proposal because I don't
21   recall what that Medi-Span program meant.  And
22   that's a key to what we were asking for, but I

Page 297

1    don't know what it was that we were asking.
2         Q.  Can you think of any way that the
3    phrase "Medi-Span program" somehow changes the
4    request for AWP?
5         MS. CITERA:  Objection to form.
6    BY THE WITNESS:
7         A.  That's my point.  I don't know what I
8    meant by that.  And that leads me to believe that
9    we weren't asking for AWP, that we were asking
10   for something else.  So I'm not going to agree.
11        Q.  Okay.  Well, I don't want to argue with
12   you.  But, I mean, you'll agree at a minimum that
13   the actual CLAD proposal documentation before you
14   includes AWP?
15        A.  But it includes "AWP/Medi-Span
16   program," and I don't know what we meant by that.
17   I can't remember.
18        Q.  Okay.  All right.  Will you agree at
19   the minimum that Abbott sharing AWP information
20   with customers in the context of a bid or an RFP
21   response would be a violation of Abbott's current
22   policies?

                              75 (Pages 294 to 297)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 298

1        MS. CITERA: Objection to form.
2    BY THE WITNESS:
3        A.  I would say -- I don't know that any of
4    our policies specifically state that, and I don't
5    know that we respond for Alternate Site Product
6    Sales with AWP in anything today.  So I don't
7    know that that is an issue any longer.
8        Q.  Well, I understand that.  But I'm
9    saying, will you agree that if AWP information
10   were to be shared by Abbott with a customer in
11   the context of a bid or RFP response or for that
12   matter in any other context, that that sharing of
13   AWP would be a violation of Abbott's policies
14   today?
15       MS. CITERA: Objection to the form.
16   Also she doesn't work for Abbott today.
17   BY THE WITNESS:
18       A.  That's right.
19       Q.  Okay.  I can address that.  Abbott and
20   Hospira have the same policy prohibiting the
21   sharing of AWP, correct?
22       MS. CITERA: Objection to form.

Page 299

1    BY THE WITNESS:
2        A.  Correct.
3        Q.  Okay.  Today, isn't it true that if AWP
4    information were to be shared by Abbott or
5    Hospira to a customer in the context of a bid
6    response or in any other context, that would be a
7    violation of Abbott and Hospira's policies?
8        MS. CITERA: You can answer as to
9    Abbott.  You cannot answer as to Hospira,
10   although I'm not sure how she can answer to
11   Abbott because she doesn't work there anymore.
12   BY THE WITNESS:
13       A.  Yeah, I don't know what the answer to
14   that question is; so I can't answer them.
15       Q.  Well, do you think looking at the
16   storyboards themselves might refresh your memory
17   about what constitutes a violation?
18       A.  Storyboards for the learn program?
19       Q.  The "Safeguarding Trust."
20       A.  Okay.
21       Q.  Do you think you would possibly have
22   your memory refreshed if you looked at those?

Page 300

1        A.  Probably.
2        Q.  Okay.  Let's look at those.  I've got
3    what's marked previously as Fiske 523, now also
4    marked as Leone Exhibit 19.
5        (Deposition Exhibit Leone 019
6    marked as requested.)
7    BY THE WITNESS:
8        A.  Is this the TAP version?  I mean, is
9    this the HPD version because each one of the
10   divisions had --
11       Q.  I believe this is the HPD version.  I
12   know what you're talking about, Ms. Leone.
13       A.  Yeah.
14       Q.  Look at what's been marked -- well,
15   I'll tell you, just look at Page 11 of 15.  And
16   it looks like this is the version with the path,
17   the so-called HPD path.  Do you see that?
18       A.  Yeah.  Okay.
19       Q.  Does that lead you to believe that this
20   is the HPD version?
21       A.  Yes.
22       Q.  Okay.  Can you confirm that this looks

Page 301

1    like the storyboards that were utilized to train
2    Abbott employees on the policy concerning
3    reimbursement in late 2003?
4        A.  Yes.
5        Q.  And if I understand your prior
6    testimony correctly, prior to the institution of
7    these storyboards and this training, there had
8    been no written prohibition regarding
9    reimbursement or AWP discussion, correct?
10       A.  Correct.
11       MS. CITERA: Objection, form.
12   BY MR. ANDERSON:
13       Q.  Now, if you could, looking at Page 6 of
14   15, you see a storyboard there that's subtitled,
15   "What reimbursement actions are not allowed"?
16       A.  Yes.
17       Q.  Okay.  And the very first one reads,
18   "Do not discuss the spread verbally or in writing
19   or verbally quote reimbursement rates."  Did I
20   read that correctly?
21       A.  Correct.
22       Q.  Then continuing on, "Do not provide

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                      January 17, 2008
Chicago, IL

Page 302

1  Average Wholesale Price (AWP) information to non-
2  managed care customers."  Did I read that
3  correctly?
4      A.  Correct.
5      Q.  Given that statement, is your memory
6  refreshed that sharing AWP information with
7  customers by Abbott personnel is a violation of
8  Abbott's current policies?
9          MS. CITERA:  Same objections as before.
10  BY THE WITNESS:
11     A.  It was their policies in December of
12  2003, so ...
13     Q.  So at least as of that time, it became
14  a violation of their policies to share AWP,
15  correct?
16     A.  Yes.
17     Q.  Was sharing AWP information with
18  customers a violation of any Abbott policy prior
19  to December of 2003?
20         MS. CITERA:  Objection, form.
21  BY THE WITNESS:
22     A.  When I was in Alternate Site Product

Page 303

1  Sales we told our sales force not to discuss or
2  talk about AWP with their customers.  As I
3  previously said, I don't recall that we had it
4  documented in a procedure or policy anywhere.
5      Q.  When you told these personnel not to
6  discuss AWP, did you also tell them not to
7  include AWP in the context of a bid response or
8  response to a request for proposal?
9      A.  Well -- And, again, my understanding
10  had always been that we only provided AWP in our
11  Contract Marketing department when it was
12  something that was specifically requested as a
13  condition of completing the bid proposal and if
14  we did not complete -- include AWP, then we would
15  not be able to -- we would not be considered.
16         The other piece of this is Debbie
17  Longley left Alternate Site Product Sales 19- in
18  late 1996 -- I'm sorry, late -- sometime in 1997.
19  And she may have provided AWP prior to my being
20  in the department.  But after I came into the
21  department, the rule of thumb was that we would
22  not include AWP unless it was a specific

Page 304

1  requirement of the bid.
2          MR. ANDERSON:  Objection,
3  nonresponsive.
4  BY MR. ANDERSON:
5      Q.  When you instructed personnel not to,
6  quote, discuss AWP, did you instruct them not to
7  share AWP information with customers in the
8  context of a bid response or a response to a
9  request for proposal?
10     A.  What I told my team was the only time
11  to include AWP was if it was a requirement of
12  completing the bid.  Otherwise, if it was an
13  optional field, not to complete it.
14     Q.  So in the instances where a customer of
15  Abbott's required that AWP information be
16  submitted, Abbott did provide AWP and doing so
17  was not considered a violation of any Abbott
18  policy, correct?
19         MS. CITERA:  Objection to form.
20  BY THE WITNESS:
21     A.  I don't -- I don't -- I did not know if
22  there was a policy in place at that time that

Page 305

1  said not to.
2      Q.  Accordingly, providing AWP was not a
3  violation, correct?
4          MS. CITERA:  Objection to form.
5  BY THE WITNESS:
6      A.  It was not part of our standard
7  business practices to discuss AWP, so the only
8  time it happened was if it was a requirement for
9  completing a bid.
10     Q.  When you say "standard practices," what
11  do you refer to?
12     A.  It wasn't part of how we were trying to
13  sell our products.  We were trying to sell our
14  products based on the depth and breadth of the
15  product line, what buying products from Abbott --
16  the whole idea of the services, the service and
17  products that -- quality that Abbott could bring
18  to the table and not based on the spread of the
19  AWP.
20     Q.  So the standard practices were, so to
21  speak, the aspirations of Abbott in selling
22  products, correct?

77 (Pages 302 to 305)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                      January 17, 2008
                          Chicago, IL

Page 306

1      A.  Correct.
2          MS. CITERA:  Objection to form.
3   BY MR. ANDERSON:
4      Q.  But despite those aspirations, there
5   were other practices that also were utilized such
6   as the sharing of AWP when it was required to be
7   part of the bid?
8          MS. CITERA:  Objection, form.
9   BY THE WITNESS:
10     A.  Yes.
11     Q.  Today, would Hospira or Abbott provide
12  AWP information in a bid response if it was a
13  required field?
14         MS. CITERA:  Objection to the form, and
15  I'm going to instruct you not to answer as to
16  Hospira.
17  BY THE WITNESS:
18     A.  I don't know what Abbott does today,
19  and I'm not going to answer for Hospira.
20     Q.  All right.  Back in 2003 when you were
21  at Abbott and these policies first came into
22  existence, would it have been a violation for

Page 307

1   Abbott to share AWP information in the context of
2   a bid response even if the customer demanded it
3   in the bid?
4          MS. CITERA:  Objection to form.
5   BY THE WITNESS:
6      A.  Based on this, yes.
7      Q.  So these policies were a change in the
8   governance of Abbott's business practices,
9   correct?
10         MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12     A.  It was -- It was documenting our
13  standard business practices.
14     Q.  And it was doing more than that, wasn't
15  it, ma'am?
16     A.  Yes.
17     Q.  Okay.  Thank you.  And, again, one of
18  the roots for the implementation of these
19  December 2003 policies on reimbursement was a
20  corporate integrity agreement that had been
21  triggered by the TAP criminal settlement,
22  correct?

Page 308

1          MS. CITERA:  Objection to form.
2   BY THE WITNESS:
3      A.  I thought this had to do with the Ross
4   Laboratories.
5      Q.  Okay.  The Ross criminal settlement?
6          MS. CITERA:  Objection.
7   BY MR. ANDERSON:
8      Q.  I'll rephrase for purposes of the
9   record.
10         One of the underlying reasons why
11  Abbott instituted these reimbursement policies
12  that are reflected in Leone Exhibit 19 in
13  December of 2003 was the Ross corporate integrity
14  agreement that was connected with the Ross
15  criminal plea, correct?
16         MS. CITERA:  Objection to form.
17  BY THE WITNESS:
18     A.  As I understand it, yes.
19     Q.  Thank you.
20         Now, you mentioned earlier in your
21  testimony that Contract Marketing personnel from
22  time to time were involved in creating proposal

Page 309

1   spreadsheets; is that correct?
2      A.  Correct.
3      Q.  And were those also sometimes known as
4   proposal analyses?
5      A.  Yes.
6      Q.  And there was actually a standard
7   template titled "Proposal Analyses," correct?
8          MS. CITERA:  Objection to the form.
9   BY THE WITNESS:
10     A.  I don't know that we had a standard
11  template for it.  I know that we -- we put the
12  same information in time after time, so ...
13     Q.  And typically that information included
14  AWP up until 2003, correct?
15     A.  No, it did not.
16     Q.  Are you aware that that information --
17  that -- Strike that.
18         Are you aware that many proposal
19  analyses included AWP information?
20         MS. CITERA:  Objection to the form.
21  BY THE WITNESS:
22     A.  No, I was not aware that AWP was

78 (Pages 306 to 309)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                        January 17, 2008
                           Chicago, IL

Page 310

1  included in any of those analyses.
2      Q.  Do you know where Abbott keeps all of
3  its past proposal analyses, whether
4  electronically on a computer somewhere or in
5  paper files?
6          MS. CITERA:  Objection to the form.
7  BY THE WITNESS:
8      A.  Electronically, there's a file on a
9  shared drive that Contract Marketing had.  In the
10 files, it's in the individual customer files.
11 There's -- in most cases, there's copies of those
12 analyses.
13     Q.  And are those kept historically, for
14 instance, year after year when a bid is made to
15 GPO such as MHA or PBI or whoever it may be such
16 that there would be a '94 proposal analyses all
17 the way running through 2007?
18         MS. CITERA:  Objection to form.
19 BY THE WITNESS:
20     A.  It's what we talked about earlier this
21 morning, that the files would be kept based on
22 the term of the agreement.  And so if it was

Page 311

1  something that expired while we were still part
2  of Abbott, then it would be in the Abbott
3  corporate records now.  If it's something that
4  crossed over, then there might -- then there's
5  probably copies of it someplace in Hospira.
6      Q.  Did typically the people reporting to
7  you in Contract Marketing create those proposal
8  analyses?
9      A.  Yes, they did.
10     Q.  Did you normally review those proposal
11 analyses?
12     A.  Yes.
13     Q.  And you took on that role as manager
14 within Contract Marketing in '98?
15     A.  '96.
16     Q.  '96?
17     A.  Yeah, December of 1996.
18     Q.  And did you find that in 1996 that the
19 proposal analyses typically included AWP
20 information?
21         MS. CITERA:  Objection to form.
22 BY THE WITNESS:

Page 312

1      A.  Yeah, some of those that I saw that had
2  been created prior to my time had AWP in them.  I
3  can't say that all of them did, but some of them
4  did.
5      Q.  Right.  I'm not asking about all.  I
6  said most.
7          Did you find that in '97, most of the
8  proposal analyses included AWP information?
9          MS. CITERA:  Objection to form.
10 BY THE WITNESS:
11     A.  I don't recall seeing AWP in that -- in
12 anything other than the MHA's and the GeriMed's
13 and IVMed's and RxMed's.
14     Q.  And PBI's?
15     A.  AWP was not in the PBI analysis that we
16 did in our analysis.  I do not recall seeing AWP
17 in our analysis.
18     Q.  Do you recall seeing AWP in the Olsten
19 analysis?  I'll rephrase to be more specific.
20         Do you recall seeing AWP information in
21 the proposal analyses that Abbott created
22 concerning Olsten?

Page 313

1          MS. CITERA:  Objection to form.
2  BY THE WITNESS:
3      A.  I don't recall the -- any proposals
4  that we did for Olsten.
5      Q.  Do you recall that AWP information was
6  included in the proposal analyses created by
7  Abbott for Chartwell?
8          MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.  The Chartwell proposal that you showed
11 me that was an exhibit in my last deposition was
12 done prior to my -- to my being in Contract
13 Marketing.
14     Q.  So did you take affirmative steps to
15 try and prevent the inclusion of AWP in proposal
16 analyses?
17     A.  That was one of my directions to the
18 people on my team.
19     Q.  Did you make that determination on your
20 own, or did one of your superiors ask that you
21 make that direction?
22     A.  I don't remember what precipitated it.

                                   79 (Pages 310 to 313)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 314

1    Q.  Why do you feel like AWP needed to be
2  deleted from the standard proposal analyses?
3    A.  Because it wasn't a factor in how we
4  were going to do the pricing and what the pricing
5  was that we were offering our customers.
6    Q.  Do you recall that the proposal
7  analyses that you had inherited, so to speak,
8  included AWP spread calculations?
9       MS. CITERA:  Objection, form.
10 BY THE WITNESS:
11   A.  And, again, going back to the Chartwell
12 or Coram or whichever one it was that we looked
13 at before, that was in that.  That was in that
14 analysis.
15   Q.  Yeah.  And who was your predecessor as
16 manager of Contract Marketing?
17   A.  There was Michael Rativan for a short
18 period of time and Steve Kipperman prior to that.
19   Q.  Do you feel like Kipperman probably
20 oversaw the department when these proposal
21 analyses were created and typically included AWP
22 spread analysis?

Page 315

1       MS. CITERA:  Objection to form.
2  BY THE WITNESS:
3    A.  Since Michael was there for such a
4  short period of time, I would -- and Steve was
5  there for several years, probably Steve was
6  involved in those.
7    Q.  Was Kipperman punished in any way or
8  reprimanded or otherwise instructed that the way
9  he had previously had proposal analyses created
10 was improper?
11      MS. CITERA:  Objection to form.
12 BY THE WITNESS:
13   A.  I don't know.
14   Q.  Did you assist Trudi Burchieri, the
15 manager for sales training, in creating a sales
16 training manual?
17   A.  I don't remember.
18      (Deposition Exhibit Leone 020
19 marked as requested.)
20 BY MR. ANDERSON:
21   Q.  If you could, Ms. Leone, flip through
22 what's been marked as Leone Exhibit 20, also

Page 316

1  marked in this litigation as Exhibit 1192.
2    A.  Oh.  I do recall this.
3    Q.  And you're listed as an author on the
4  first page, correct?
5    A.  Yes, yes.
6    Q.  And then to speed things along, Ms.
7  Leone, I've got questions for you about Page 7,
8  Bates-labeled CMOAL 232499.
9    A.  Okay.
10   Q.  And actually, to get a context, see the
11 preceding page.  It reads, quote:  Account
12 assessment strategies, Contract Marketing
13 guidelines for a proposal.  Did I read that
14 correctly?
15   A.  Yes.
16   Q.  And this was information that you
17 probably had a hand in providing, correct?
18   A.  Correct.
19   Q.  And these are as listed on this sheet,
20 quote, universal questions to ask, correct?
21   A.  Correct.
22   Q.  And these were universal questions that

Page 317

1  you were instructing the salespersons to ask
2  their customers out in the field, correct?
3    A.  Correct.
4    Q.  And now looking at the page that I've
5  initially referenced, Page 7, do you see in the
6  middle of the page, one of the standard questions
7  is about reimbursement mix, percentage Medicare,
8  Medicaid, Medi-Cal, HMO contracts, private.  Did
9  I read that had correctly?
10   A.  Uh-huh.
11   Q.  Why did you suggest that Abbott
12 salespersons should ask those types of questions?
13   A.  This document was created overall based
14 on helping our sales reps go in and have
15 conversations with their customers and understand
16 the right questions to ask so that they could
17 understand their customers' business.  And as
18 part of that, we thought that understanding what
19 their reimbursement mix by payor type would be,
20 would be helpful for them in understanding who
21 their customer was and overall how they were
22 doing their business.

80 (Pages 314 to 317)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                  January 17, 2008
                           Chicago, IL

Page 318

1     Q.  And in what way would the reimbursement
2  knowledge that a salesperson would gain about a
3  customer pharmacy, for instance, help Abbott in
4  selling its drugs?
5     A.  Well, for instance, if you've got -- if
6  you've got a large Medicare population, is your
7  therapy mix more tied to TPN and enteral
8  nutrition?  Do you have a very young patient
9  population so you're not going to have Medicare
10  patients; you're going to have private insurance
11  patients.  So those were the kinds of questions.
12  That was the direction that we felt would help
13  the sales reps understand who their customers
14  were.
15     Q.  Would it also help the sales reps in
16  understanding how the providers are paid when
17  they dispense products?
18     A.  I don't know that -- I don't know that
19  knowing that would help them understanding the
20  reimbursement -- I mean understanding how the
21  payors paid.
22     Q.  Well, if you knew that a given provider

Page 319

1  had a large Medicaid business, for instance,
2  would that assist Abbott in knowing more about
3  how that pharmacy is actually paid when it
4  dispenses a drug?
5     MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7     A.  I think it would have helped more in
8  understanding what they were looking for from a
9  pricing perspective because Medicaid -- Medicaid
10  reimbursement was significantly less than paying
11  -- say, having an insurance company.  So they
12  might have more push-backs from their customers
13  for lower prices based on that.  So that was the
14  intent of understanding that piece of the -- of
15  what was happening.
16     Q.  You're saying the pharmacies may have
17  some push-back to the Abbott salespersons?
18     A.  No, no.  I'm saying that there could be
19  -- When we put the proposals together with the
20  pricing that we were offering them, they may say,
21  "You know, I've got a big Medicaid population.  I
22  need lower prices because Medicaid reimbursement

Page 320

1  is less than what I could get if I was -- if I
2  was submitting claims to an insurance company."
3     Q.  And would Abbott consider the
4  provider's reimbursement in Abbott's pricing of
5  the drugs?
6     MS. CITERA:  Objection to form.
7  BY THE WITNESS:
8     A.  No, Abbott wouldn't consider that.  But
9  they would at least understand where that
10  objection was coming from, and so they would be
11  better able to deal with positioning the pricing
12  that we were offering those customers better.
13     Q.  How could they better position it?
14     A.  As the full -- Again, going back to the
15  full product line, "Here's all the products we
16  can provide to you.  Here's all of the different
17  -- different things that we can give you that we
18  can offer you as part of this proposal."  But not
19  -- I mean, that's how they would use it.  That's
20  how they would position that.
21     Q.  Would highlighting higher relative
22  reimbursement on an Abbott product versus a

Page 321

1  competitor also be an advantage?
2     MS. CITERA:  Objection to form.
3  BY THE WITNESS:
4     A.  But again we're going back to we told
5  our sales force that they were supposed to be
6  selling based on the product line, the portfolio
7  of products, what the Abbott name brought to
8  them.  That's how they were supposed to be
9  selling our products, the fact that you've got
10  all these products that we can provide to you.
11     Q.  Do you see or do you recall any
12  directive in the sales training manual to not
13  discuss AWP?
14     A.  No, I don't see it.  I mean, I'd have
15  to go through the entire document; but I don't
16  see anything in here that references that.
17     Q.  And do you recall that those types of
18  prohibitions about reimbursement discussions or
19  AWP discussions were included in any written
20  training manuals?
21     MS. CITERA:  Objection to form.
22  BY THE WITNESS:

                              81 (Pages 318 to 321)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 322

1     A.  I don't believe we ever put anything in
2  writing relating to that.
3     Q.  Was there a reason why Abbott did not
4  put any of its informal positions prior to 2003
5  in writing?
6        MS. CITERA:  Objection to form.
7  BY THE WITNESS:
8     A.  I don't remember.
9     Q.  You don't remember if there was a
10 reason for everything being oral?
11       MS. CITERA:  Objection to form.
12 BY THE WITNESS:
13    A.  Yeah, I don't remember if there was a
14 reason.  I don't remember why we didn't put --
15 why it wasn't in writing.
16    Q.  Would you agree that it would be easier
17 for employees of Abbott such as salespersons to
18 get away with talking about AWP if there wasn't a
19 written policy against it?
20       MS. CITERA:  Objection to form.
21 BY THE WITNESS:
22    A.  That was never the intent.

Page 323

1     Q.  Can you recall any instance where any
2  Abbott employee was ever reprimanded in any way
3  for discussing AWP with a customer?
4     A.  I don't know of any employees who
5  discussed AWP with customers, so I can't say
6  whether anybody was reprimanded if management
7  became aware of that.
8     Q.  Are you aware of any situation where
9  any Abbott employee was ever reprimanded for
10 sharing AWPs with customers?
11    A.  I'm not aware of that ever happening.
12    Q.  But you are aware that that type of AWP
13 sharing occurred, correct?
14       MS. CITERA:  Objection to form.
15 BY THE WITNESS:
16    A.  No, I was not aware of that.
17    Q.  Well, you knew it was in the bids?
18    A.  Again, those bids went directly to
19 those -- to those GPOs.  On an individual basis,
20 on an individual basis with our sales reps, my
21 understanding and my belief was that they were
22 not sharing AWP.

Page 324

1     Q.  Well, the GPOs are ultimately the
2  decision-makers for lots of pharmacies, right?
3        MS. CITERA:  Objection to form.
4  BY THE WITNESS:
5     A.  Uh-huh.
6     Q.  So sharing --
7     A.  Yes.  I'm sorry.
8     Q.  So sharing the AWPs with the GPOs at a
9  corporate level would be covering many, many,
10 many pharmacy members of that GPO, correct?
11       MS. CITERA:  Objection to form.
12 BY THE WITNESS:
13    A.  But, again, under my direction, we were
14 only supposed to be including AWP if it was a
15 requirement to complete the bid and not under any
16 other circumstances.
17    Q.  Right.  And when those AWPs were
18 shared, no one at Abbott was disciplined,
19 correct?
20       MS. CITERA:  Objection to the form.
21 BY THE WITNESS:
22    A.  I recall when we submitted the GeriMed

Page 325

1  -- when we received the GeriMed and the MHA bids,
2  we specifically called the customers and said we
3  don't want to include AWP.  We had a national
4  accounts manager.  And we were told if we did not
5  include that information, then we would -- then
6  our bid would be rejected.  And so we felt that
7  we were required to do that in order to be able
8  to submit those bids to those customers.  We were
9  providing it as a courtesy and for no other
10 reason.
11    Q.  Well --
12    A.  And, again, we had to actually look up
13 all those AWPs.
14    Q.  Out of the Red Book?
15    A.  Yes.
16    Q.  And you all knew that those AWPs were
17 being published by Red Book based in part on the
18 information that Abbott was reporting to Red
19 Book, correct?
20       MS. CITERA:  Objection to form.
21 BY THE WITNESS:
22    A.  Abbott reported a price that we knew

82 (Pages 322 to 325)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 326

1  was used by the compendia to calculate the AWP.
2      Q.  Right.  When -- When you mentioned that
3  Abbott informed MHA and GeriMed that they didn't
4  want to provide AWP and MHA and GeriMed informed
5  Abbott that their bid would be considered,
6  couldn't Abbott have just chosen not to bid on
7  that business?
8          MS. CITERA:  Objection to form.
9  BY THE WITNESS:
10     A.  Again, we were not bidding on just two
11 or three products.  We were bidding on the entire
12 product line, all of the products we had
13 available.  And that included products that
14 didn't have AWP.  We wanted -- we wanted the
15 opportunity to -- to sell products to their
16 members.  We wanted that ability to do that.
17     Q.  But Abbott could have chosen simply not
18 to make the sale, correct?
19         MS. CITERA:  Objection to form.
20 BY THE WITNESS:
21     A.  I don't know -- I don't know that
22 anybody ever considered that.

Page 327

1      Q.  Foregoing the opportunity to make a
2  sale to GeriMed wasn't even considered?
3          MS. CITERA:  Objection to form.
4  BY THE WITNESS:
5      A.  I don't know that that discussion ever
6  took place.
7      Q.  Well, whether the discussion took place
8  or not, it certainly was an option, correct?
9          MS. CITERA:  Objection to form.
10 BY THE WITNESS:
11     A.  Yes, it was an option.
12     Q.  I mean, Abbott doesn't have to sell its
13 drugs to GeriMed, does it?
14         MS. CITERA:  Objection to form.
15 BY THE WITNESS:
16     A.  No, they didn't have to their product -
17 - and they weren't selling them to GeriMed.  They
18 were selling them to the members of GeriMed.
19     Q.  I realize that.  Abbott doesn't have to
20 do that, do they?
21     A.  And we wanted the opportunity to build
22 those relationships with those members for

Page 328

1  products that would not have been awarded.  By
2  having the award for those products with those
3  people who were members of that GPO, it gave our
4  sales reps entry into meeting with those
5  customers to sell other products like pumps and -
6  - especially pumps and other products that we had
7  available to us.
8          So it was -- and, again, those members
9  didn't -- those members didn't have to buy those
10 products from Abbott.  Even after GeriMed awarded
11 it to us, there was no requirement that they had
12 to buy from us.
13     Q.  That's right.  But Abbott had the pole
14 position, right?
15         MS. CITERA:  Objection to form.
16 BY MR. ANDERSON:
17     Q.  They had the preferred status?
18         MS. CITERA:  Objection to form.
19 BY THE WITNESS:
20     A.  I don't know how they had the preferred
21 status.
22     Q.  Well, that's what the whole premise of

Page 329

1  the bid award was?  Once GeriMed selects Abbott,
2  then Abbott is the preferred generic provider for
3  the selected drugs, correct?
4          MS. CITERA:  Objection to form.
5  BY THE WITNESS:
6      A.  Correct.
7      Q.  Right.
8      A.  But they awarded many products to us,
9  not just the four or five that we've been talking
10 about.
11     Q.  Sure.
12     A.  So it was again back to the entire
13 portfolio of products and the fact that Abbott
14 had a significant product line of products that
15 were available to their membership.
16     Q.  Right.  And Abbott had AWPs on lots of
17 drugs, most of its product line, not just the
18 four or five that are listed in the United States
19 lawsuit, correct?
20         MS. CITERA:  Objection to form.
21 BY THE WITNESS:
22     A.  Correct.

                          83 (Pages 326 to 329)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 330

1    Q.  And when Abbott chooses to share AWP
2  with GeriMed or other customers and participate
3  in the bid process, that means ultimately more
4  sales for Abbott, right?
5       MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7    A.  Correct.
8    Q.  And more dollars to Abbott?
9       MS. CITERA:  Objection to form.
10  BY THE WITNESS:
11    A.  Correct.
12    Q.  And Abbott doesn't have to sell those
13  drugs to those GeriMed members or whoever it may
14  be in order to stay in business, does it?
15       MS. CITERA:  Objection to form.
16  BY THE WITNESS:
17    A.  Well, again, it's a business.  They
18  want to grow their business.  They want to expand
19  the people who are buying those products.  And
20  one of the ways to do it is to respond to a
21  proposal for a GPO, like a GeriMed that has a
22  significant membership, making those products

Page 331

1  available to that membership.  I mean, Abbott was
2  in business to make money.
3    Q.  Right.
4    A.  And to grow the business and sell more
5  of their products.
6    Q.  Even --
7    A.  Responding to a bid was one of the ways
8  that they tried to grow the business.
9    Q.  That's right.
10       Even if it involves sharing AWP
11  information which you're uncomfortable doing?
12       MS. CITERA:  Objection to form.
13  BY MR. ANDERSON:
14    Q.  Is that right?
15       MS. CITERA:  Objection to form.
16  BY THE WITNESS:
17    A.  I guess it's right.
18    Q.  All right.  Now let's look at these two
19  documents that you produced today.  I've marked
20  them as Exhibit 16 and 17.
21       MR. ANDERSON:  Toni, I think you've got
22  them.

Page 332

1       MS. CITERA:  Yeah.
2            (Deposition Exhibit Leone 016 and
3  Exhibit Leone 017 marked as requested.)
4  BY MR. ANDERSON:
5    Q.  16 is the 2000 version, 17 is the 2001
6  version.  I understand you pulled these from your
7  files; is that correct?
8    A.  Last night.
9    Q.  Last night.  What caused you to look
10  for those last night?
11    A.  In my meeting with Ms. Citera yesterday
12  --
13       MS. CITERA:  I'm going to just caution
14  you, you're not to reveal any discussions.
15  BY THE WITNESS:
16    A.  Right.  I said -- I asked her if she
17  had copies of the -- of these handbooks.  And so
18  she asked me to -- and she said -- you know, she
19  didn't know whether she did or not.  I said,
20  "Well, I have copies of these handbooks in my
21  office," and I gave them to her.
22    Q.  Prior to last night, had you ever

Page 333

1  looked for these handbooks before?
2    A.  No.  I just moved to a new office; and
3  as I was cleaning stuff out, I found these.  I
4  didn't even know that these still existed.
5    Q.  When did you move offices?
6    A.  A couple months ago.  And I didn't even
7  think about these in relationship to this until
8  yesterday.
9    Q.  Are you the only person who has these
10  handbooks?
11    A.  I don't know.
12       MS. CITERA:  Objection to the form.
13  BY MR. ANDERSON:
14    Q.  Well, was this a standard handbook that
15  was handed out?
16    A.  This was a handbook that we handed out
17  to the Alternate Site sales force.  The first
18  year we did it was 2000, and we did an update in
19  2001 when I was still in Contract Marketing.  And
20  my understanding was that it was not maintained
21  after that.  It was a guide for the sales reps in
22  how to -- we were allowing the sales force to

                              84 (Pages 330 to 333)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                January 17, 2008
Chicago, IL

| Page 334 |
|---|

1  have some contracts that they could negotiate on
2  their own without having to come to Contract
3  Marketing and create -- and having an analyst
4  have to work on it. And so these handbooks were
5  created to give them kind of the rules of the
6  road in how to do that type of contracting.
7      Q. So long story short, everybody in Alt
8  Site sales got one?
9      A. Yes.
10     Q. Do you have any understanding of why
11 these weren't produced to the plaintiffs in this
12 case until today?
13        MS. CITERA: Objection to form.
14 BY THE WITNESS:
15     A. No.
16     Q. How would you compare this handbook to
17 what's known as the Basic Operating Procedures
18 Manual for Contract Marketing?
19     A. This was for the sales force. And that
20 Basic Operating Procedures for Contract Marketing
21 was I believe the one we discussed earlier this
22 morning, that was really for the Hospital

| Page 335 |
|---|

1  Business Sector more than -- that was really a
2  Hospital document as opposed to Alternate Site.
3  And then this was really a document for the sales
4  force to use.
5      Q. So that Basic Operating Procedures
6  Manual, the big, like, 400-page document, that
7  pertained to HPD Contract Marketing as a whole,
8  which included both Alternate Site Contract
9  Marketing and Hospital Business Sector Contract
10 Marketing, correct?
11        MS. CITERA: Objection to form.
12 BY THE WITNESS:
13     A. We were never included in its creation
14 or the -- and we were never told that what was in
15 that document was something that we in Alternate
16 Site needed to use for our -- for our purposes.
17        As I said this morning, we looked at it
18 at one point to see if there was a way to modify
19 it and update it and use it in Alternate Site and
20 again decided not to, to make it more -- what we
21 were talking about was making it more compatible
22 with the Alternate Site business.

| Page 336 |
|---|

1      Q. Right. But the fundamental truth is
2  that Alternate Site Contract Marketing was part
3  of HPD Contract Marketing?
4      A. Not then.
5      Q. Not then?
6      A. No. We were not a part of -- we were
7  not a part of HPD Contract Marketing then. We
8  reported directly into the general manager of
9  Alternate Site Product Sales. There was only
10 dotted-line responsibility to Contract Marketing.
11     Q. Well, back in -- when you say "then," I
12 mean back in certainly 2000?
13     A. No. We came back under the umbrella of
14 -- of Contract Marketing, I don't remember
15 whether it was late 2000 or early 2001.
16        (Deposition Exhibit Leone 021
17 marked as requested.)
18 BY MR. ANDERSON:
19     Q. All right. I've got another exhibit
20 that bears on this issue. If you could, take a
21 look at this org chart marked as Leone Exhibit
22 21.

| Page 337 |
|---|

1      A. I would not -- I did not and never
2  reported to Pat Keely. What this was was an
3  organizational chart for --
4      Q. I understand you want to respond, and
5  I'll let you; I promise, Ms. Leone.
6      A. All right.
7      Q. But right now there's not a question
8  pending. I just asked you to look at the
9  document, okay?
10     A. I'm sorry.
11     Q. Okay. Do you agree that this appears
12 to be an org chart for Contract Marketing dated
13 HPD 1998?
14     A. No.
15     Q. Okay. What do you believe that this
16 org chart reflects?
17     A. It reflects the Contract Marketing team
18 for the implementation of the VHA/Abbott HPD
19 contract. That's what it reflects.
20     Q. Okay.
21     A. And that's different.
22     Q. Because the VHA contract impacted both

85 (Pages 334 to 337)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 338

1  hospitals as well as non-hospital customers?
2      A.  Correct.
3      Q.  And Alternate Site needed to be
4  included?
5      A.  Yes.
6      Q.  Okay.  So this org chart was a
7  functional kind of job-specific org chart?
8      A.  Yes.
9      Q.  All right.
10     A.  In relationship to the VHA contract.
11     Q.  How many other instances were there
12  job-related organizational reporting structures
13  between HPD and Alternate Site?
14         MS. CITERA:  Objection to the form.
15  BY THE WITNESS:
16     A.  I don't know.
17     Q.  There were others, but you don't know
18  how many?
19     A.  I don't know if there were others, and
20  I don't know how many there were.  If there were
21  -- I don't know if there were any others; and if
22  there were any others, I don't know how many

Page 339

1  there were and who was on them and what they were
2  in relationship to.
3      Q.  You do know, though, that there were --
4  there were multiple group purchasing
5  organizations who did business with Abbott who
6  also had members that were hospital and non-
7  hospital Alternate Site type customers, correct?
8      A.  Correct.
9      Q.  All right.  Do you believe that in each
10  one of those situations, there would be direct
11  reporting between HBS Contract Marketing and
12  Alternate Site Contract Marketing?
13     A.  No.
14     Q.  Why not?
15     A.  This was a very unique contract.  And
16  because of that, they put something like this
17  together.  This was -- this was unique unto the
18  relationship Abbott created with VHA when that
19  contract was signed in 1998.  I do not recall any
20  other contract or any other GPO where anything
21  like this ever happened.
22     Q.  Okay.  Let's now jump to Exhibit 16,

Page 340

1  specifically -- And just by way of reference,
2  this is the 2000 Contract Marketing Handbook.  Do
3  you see it?
4      A.  Yes.
5      Q.  Okay.  Go to Bates No. 377132, please.
6  It's also labeled A-6.
7      A.  Uh-huh.
8      Q.  Do you see that titled, "One-Time Price
9  Parameters"?
10     A.  Uh-huh.
11     Q.  You're familiar with that term?
12     A.  It's been a long time.  I truly haven't
13  looked at this in six or seven years.
14     Q.  Have you some familiarity with the term
15  "accommodation price"?
16     A.  Do you mind if I read through this
17  quickly?
18     Q.  No, I don't mind at all.
19         MS. CITERA:  While she's doing that, I
20  just want to note for the record that I think
21  this was -- the prefix for the Bates label is
22  wrong.  It should probably be ABT-DOJ.  It's ABJ-

Page 341

1  DOJ.  Same thing with 17.
2         MR. ANDERSON:  Yeah.
3  BY THE WITNESS:
4      A.  Okay.
5      Q.  Does this -- Now that you've read this
6  page of the Contract Marketing Handbook about
7  one-time price parameters, does that refresh your
8  memory?
9      A.  Yes.
10     Q.  I note in the middle of the document it
11  says, "There are a set of prices on file,
12  accommodation prices."  Did I read that opening
13  phrase --
14     A.  Yes.
15     Q.  Okay.  Where were these accommodation
16  prices kept?
17     A.  They were actually in our Contract
18  Administration System.
19     Q.  They're in CAS?
20     A.  Yes.
21     Q.  What field?  I'll be more specific.
22         What field of data within CAS handles

86 (Pages 338 to 341)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 342

1   the accommodation prices?
2       A.  There was a profile set up in CAS with
3   these prices.
4       Q.  A specific contract number that was the
5   accommodation profile?
6       A.  Yes, yes.
7       Q.  Okay.  So are accommodation prices
8   contract prices?
9       A.  No.
10      Q.  But they were given a profile number,
11  nonetheless?
12      A.  Yes.
13      Q.  Kind of akin to Rx-Link?
14      A.  Yes.
15      Q.  Kind of akin to a field-generated
16  price?
17      A.  Much closer to Rx-Link.
18      Q.  Okay.  Would you consider Rx-Link and
19  accommodation prices to be noncontract price?
20      MS. CITERA:  Objection to form.
21  BY THE WITNESS:
22      A.  I would not consider the Rx-Link prices

Page 343

1   to be noncontract prices because the reason they
2   were created was so that we could get the charge-
3   backs and know who the customers were.  For this,
4   I would consider this noncontract prices.
5       Q.  Why did Abbott have the accommodation
6   prices?
7       A.  Actually, this was because customers --
8   Alternate Site customers placing orders for --
9   who did not have a contract with the wholesaler,
10  if they -- if those wholesaler charge-backs came
11  through, the Hospital Business Sector got sales
12  credit for those sales instead of Alternate Site
13  getting sales credit.  And Alternate Site wanted
14  sales credit for those sales.
15      So this would have been comparable to
16  an Rx-Link for Alt Site.  And what happened is,
17  when a customer placed an order, we would tie
18  them to that profile in the future so that
19  Alternate Site could get sales credit for it.
20  And, you know, it says that they were pretty high
21  -- they were really a price that was just a
22  little bit lower than the Rx-Link prices, just

Page 344

1   lower enough so that we could make sure that
2   those charge-backs would come through and we
3   would be able to identify those customers and
4   then know who they were.
5       That's really scary.
6       Q.  Why were the accommodation prices set
7   slightly below the Rx-Link customer prices?
8       A.  So that we would make sure that
9   Alternate Site would get sales credit so that
10  those customers could then be tied to that
11  profile and Alternate Site would get sales credit
12  instead of the hospital side.
13      And I believe this -- this was killed
14  in 2002.
15      Q.  Why?
16      A.  Because -- I don't remember why.  I was
17  out of the department then; but I know that it
18  was killed, and I don't remember the reason why.
19      Q.  Can -- Strike that.
20      Looking at the very first paragraph of
21  this page, it says, "Objective:  In an effort to
22  streamline the amount of time spent on pricing

Page 345

1   orders that are routed for manual pricing on a
2   daily basis, the following guidelines have been
3   implemented effective July 1, '98," correct?
4       A.  Correct.
5       Q.  And that's the accommodation prices
6   a/k/a one-time price parameters, correct?
7       A.  Uh-huh.
8       Q.  If I understand manual pricing
9   correctly, that's, in essence, a price that comes
10  in at list, correct?
11      A.  Correct.
12      Q.  And once that occurs, a flag is
13  triggered and customer service evaluates it to
14  make sure it's not a mistake, correct?
15      MS. CITERA:  Object to the form.
16  BY THE WITNESS:
17      A.  Customer -- the system automatically
18  sends them.  Customer care doesn't have to touch
19  them.
20      Q.  That's right.  That's what I mean --
21      A.  Yeah.
22      Q.  -- when I said "flag."  I'm sorry.

87 (Pages 342 to 345)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 346

1     A.  Customer care doesn't touch them.  The
2  system automatically sends them.
3     Q.  Right.  Send the -- It puts a hold on
4  it and sends it so Abbott personnel can evaluate
5  why there's been a list price billing at all,
6  correct?
7     A.  Correct.
8     Q.  And basically what occurred upon the
9  institution of accommodation prices was a
10  mechanism by which those list price billings
11  would be overridden with an accommodation price,
12  correct?
13     MS. CITERA:  Objection to the form.
14  BY THE WITNESS:
15     A.  Unfortunately this isn't very well
16  written.  But this first -- this process, number
17  one, is really for indirect sales, not direct
18  sales.  And unfortunately this isn't very well
19  written.  It doesn't explain it correctly and --
20     Q.  It really is akin to Rx-Link customer?
21     A.  Yes.
22     MS. CITERA:  Objection to form.

Page 347

1  BY MR. ANDERSON:
2     Q.  Okay.  Was there some similar manual
3  override parameter price in place for direct
4  sales to pharmacies?
5     MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7     A.  I believe we let direct orders, if
8  there was nothing in process as identified in
9  number two, go through at list price.
10     Q.  Right.  But the list billing would
11  still create a flag, correct?
12     A.  Correct.
13     Q.  And there would still be an effort
14  undertaken to either (A), get them on contract,
15  or (B) -- and in turn reverse the list price
16  billing -- or (B), then allow the list price
17  billing to proceed?
18     MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20     A.  Right.  And the first circumstance
21  would happen if there was a contract in process.
22  And the second would happen if we couldn't find

Page 348

1  anything in process, we would release the order
2  at list price and ask them to put an invoice
3  remark on the order that said "Please contact
4  your sales rep."
5     Q.  Right.  To further --
6     A.  Right.  If they're going to continue to
7  buy those products, then they want to get them
8  under contract.
9     Q.  Right.  At prices lower than list?
10     A.  Correct.  On the assumption they're
11  going to make a commitment to buy some products
12  from us.
13     Q.  Yes.  Now, look at what's been labeled
14  377140.  And, again, this is also labeled as B-2
15  of Exhibit 16, the 2000 Contract Marketing
16  Handbook.
17     A.  Yes.
18     MS. CITERA:  While she's doing that,
19  Jarrett, what's your -- I mean, it's 5:00
20  o'clock, five after 5:00.
21     MR. ANDERSON:  Yeah.  I want to get
22  through -- I've got a few more questions on this

Page 349

1  document.  I want to get through these documents.
2  I've got a couple of other documents.  I don't
3  think more than about 20 minutes.
4     MS. CITERA:  Okay.  I was going to say,
5  we can go to 5:30.  That's it.  5:30.
6     MR. ANDERSON:  20 minutes, yeah, yeah.
7     MS. CITERA:  Did you have a question?
8  BY MR. ANDERSON:
9     Q.  Are you through reviewing the page, Ms.
10  Leone?
11     A.  Okay.
12     Q.  This is titled, "Field-Generated
13  Contract," correct?
14     A.  Correct.
15     Q.  And you're familiar with this, aren't
16  you?
17     A.  Yes.
18     Q.  And specifically it is a mechanism by
19  which a customer who doesn't have a contract can
20  get one quickly, correct?
21     A.  Correct.
22     Q.  Because the field has authority to

88 (Pages 346 to 349)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                        January 17, 2008
                          Chicago, IL

| | |
|---|---|
| Page 350 | Page 352 |

**Page 350**

1  offer those prices to customers without going
2  through Contract Marketing?
3      A.  Correct.
4      Q.  All right.  And is it true that those
5  field-generated prices do not have any minimum
6  purchase requirements?
7      A.  Correct.
8      Q.  So the smallest pharmacy in America
9  could buy the minimum order size of any given
10  product, one package literally, and receive
11  field-generated price, correct?
12        MS. CITERA:  Objection to form.
13  BY THE WITNESS:
14      A.  If they signed the agreement.
15      Q.  If they signed the agreement.
16      A.  Signed the agreement and there's no
17  commitment tied to this agreement, but the prices
18  were also very high.  They weren't at list price;
19  they were -- they were below WAC.  They were
20  below the WAC prices.  They were pretty high
21  prices, but they weren't list.
22      Q.  So given that reference point of WAC

**Page 351**

1  and knowing what I know about the WAC and list
2  prices over time, particularly before 2001, these
3  field prices were still quite a bit less than
4  list, sometimes probably half of list?
5        MS. CITERA:  Objection to form.
6  BY THE WITNESS:
7      A.  This contract was created in 2000, and
8  it was -- you know, and it was in 2000 when -- or
9  2001 when --
10      Q.  You brought it down?
11      A.  -- we brought it down significantly.
12      Q.  Yeah.
13      A.  These were -- This was the first
14  offering of this field-generated contract for
15  customers.  This one, this contract, this full-
16  line contract, this was the first offering for
17  it.
18      Q.  But field-generated prices existed
19  prior to 2000, correct?
20      A.  On the hospital side.
21      Q.  Yeah.
22      A.  There was nothing available for the --

**Page 352**

1  for the Alternate Site sales reps.  And so we
2  gave them some ability to do some of these
3  contracts, but the prices in all cases were very
4  high.  If there was anything that they -- that
5  they wanted to negotiate that they felt that
6  there was a lot of business that we could get,
7  then those requests had to come into Contract
8  Marketing for us to do a full analysis and for us
9  to do a full analysis and figure out, you know,
10  what would be appropriate pricing for that
11  customer based on them making a commitment to us.
12        With this agreement, there was no
13  commitment.  What we did say is, if you look at -
14  - down near the bottom, it says, "If after 12
15  months, a customer is purchasing at least $25,000
16  a year," remember $25,000 a year for a lot of our
17  Alternate Site customers was a big -- was
18  significant dollar amount, then we would talk to
19  them about negotiating an individual contract.
20  This was really -- And we called it a bucket
21  agreement.  You know, it was a bucket in CAS.  So
22  -- But if the customer wanted to buy something

**Page 353**

1  from us, there was one or two products that they
2  wanted to buy from us, we didn't want to give
3  them a contract with real aggressive pricing; so
4  we offered them this, which was a little bit
5  better than list but certainly not good or --
6  even good pricing.
7      Q.  Why do you need list pricing at all if
8  field prices were available?
9        MS. CITERA:  Objection to form.
10  BY THE WITNESS:
11      A.  Well, we still have customers who buy
12  at list.  And there's still sales that -- that
13  come in at list and that gets -- that gets put
14  into our plan every year that there's going to be
15  some customers who are going to buy our products
16  at list for a variety of reasons.  Their current
17  vendor may have something on back-order and they
18  have to buy from us for a time.  They don't want
19  to make a commitment to us, but they want to buy
20  a certain product from us and so -- and, again,
21  and they're willing to pay list price for it.
22  And we --

89  (Pages 350 to 353)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 354

1   Q.  What's the commitment with the field
2  price, though?
3      A.  With this?
4   Q.  Yeah.
5      A.  There is no commitment.
6   Q.  Right.  So what incentive does the
7  customer have to go with list when they can go
8  with field price and have no greater commitment
9  to Abbott than they otherwise would at list?
10      MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12      A.  And there were customers who chose
13  that, and they were invoiced at list price.
14   Q.  Why?
15      MS. CITERA:  Objection to form.
16  BY THE WITNESS:
17      A.  I don't know why.  There are so many
18  customers in the Alternate Site market that our
19  sales reps have never even talked to who could
20  call in and want to order something from us that
21  our sales reps never have discussions with.
22   Q.  Would it be fair to characterize those

Page 355

1  list price billings as flukes?
2      MS. CITERA:  Objection to the form.
3  BY THE WITNESS:
4      A.  No, I don't think it's fair to
5  characterize them.  There are truly customers who
6  will pay list price and --
7   Q.  But Abbott approaches them with a field
8  price by policy, correct?
9      MS. CITERA:  Objection to form.
10  BY THE WITNESS:
11      A.  This is something that was available to
12  our sales reps if they felt that they wanted to
13  use it.
14   Q.  Oh, but you're saying the sales reps
15  don't approach every customer who gets billed at
16  list?
17      A.  No.
18   Q.  But they're suggested -- or at least
19  encouraged to do so, correct?
20      MS. CITERA:  Objection to form.
21  BY THE WITNESS:
22      A.  No, there was no encouragement.  This

Page 356

1  was just pricing that was available to them to
2  use if there was a customer that they thought
3  they might have an opportunity to grow the
4  business with.  This was a first step for them to
5  work with that customer to do something.
6      (Deposition Exhibit Leone 022
7  marked as requested.)
8  BY MR. ANDERSON:
9   Q.  All right.  Let's move quickly because
10  I want to get you out of here on time.  Here is
11  Leone Exhibit 22.  It appears to be a memo you
12  wrote back in June of '95.  Does that appear to
13  be a memo you wrote, ma'am?
14      A.  Yes, it does.
15   Q.  And it's to all the reimbursement
16  specialists and all the reimbursement clerks,
17  correct?
18      A.  Correct.
19   Q.  And it's titled, "Therapy Infusion
20  Day/AWP Flags," correct?
21      A.  Correct.
22   Q.  What was an AWP flag?

Page 357

1      A.  This was in the CHIP system for -- We
2  talked about this earlier when I talked about
3  being able to go into CHIP and have CHIP create
4  the invoice, the bill charges for -- the bill
5  charges to go to the third-party payors because
6  this was when I was doing the managed care.  We
7  had made a change to the CHIP system so that we
8  could actually have the -- when we negotiated
9  contracts for home -- for individual patients
10  with a third-party payor and insurance company
11  and that third-party -- and that was based on a
12  per diem plus AWP as we talked about this
13  morning, this was a change that we made to the
14  CHIP system so we could put those prices with the
15  AWP in CHIP so the bill would come out with the
16  correct prices that we negotiated.  Remember I
17  said I filled out a worksheet?  Well, I passed
18  that worksheet on with the customer -- with the
19  patient file to the reimbursement specialist, and
20  then they would enter that information in CHIP.
21  So when we -- when the orders -- when we billed
22  them, it would come out and the invoice would be

90 (Pages 354 to 357)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                         Chicago, IL

Page 358

1   correct.
2       Q.  Okay.  I follow what you're saying.  I
3   want to make this very specific, though.
4           When you say the prices would be
5   calculated, can you describe the names or types
6   of pricing that would be calculated from AWP in
7   the CHIP system?
8       A.  Oh --
9           MS. CITERA:  Objection, form.
10  BY THE WITNESS:
11      A.  No, it's not the AWP that's being
12  calculated.
13      Q.  No, no, no, from the AWP.
14          MS. CITERA:  Objection to form.
15  BY MR. ANDERSON:
16      Q.  I realize the AWP is not being
17  calculated in CHIP.  Let me take it from the top.
18  We'll break it down.
19          You under -- you've just testified that
20  AWP was the basis for some other prices in the
21  home infusion arena, correct?
22      A.  Correct.

Page 359

1       Q.  What prices in the home infusion area
2   were calculated based off of AWP by CHIP system?
3           MS. CITERA:  Objection to form.
4   BY THE WITNESS:
5       A.  What I just told you about.  When we
6   were doing managed care contracting and we would
7   negotiate a per diem price, excuse me, with a
8   case manager and that per diem price would be a
9   per diem, whatever it was, plus the AWP for the
10  drug that the patient was receiving --
11      Q.  Yes.
12      A.  -- what would happen is the
13  reimbursement specialist or the clerk would go in
14  and set up for that patient the per diem and what
15  the AWP was based on what we put on that
16  worksheet.  They would enter that.  And then when
17  the order was put into the system for that
18  patient, it would identify how many bags -- how
19  many compounded bags of the drug the patient got
20  and how many days of service that it got.  So
21  then you would then see seven -- and it would do
22  the seven times the AWP and seven times the per

Page 360

1   diem.
2       Q.  Right.
3       A.  And that's what it would do, and that's
4   what that was for.
5       Q.  In addition to calculating the per diem
6   prices that are negotiated between Abbott and --
7   or a provider or Abbott on behalf of a provider
8   on the one hand and, on the other hand, the case
9   managers for the private insurance companies, is
10  it true the AWPs were also the foundation for the
11  calculation of the usual and customary charges?
12      A.  Yeah.  And we talked about that this
13  morning, too.
14      Q.  I know.  I just want to confirm, is
15  that true?
16      A.  But that wouldn't have been this.
17      Q.  I know.  I'm shifting gears now to the
18  next exhibit.
19      A.  Okay.
20      Q.  When you say the 80/20 rule, by the
21  way, in Exhibit 22, what are you talking about
22  there?

Page 361

1       A.  When we looked at how to -- how to set
2   this up and make the changes in CHIP so that it
3   could do the pricing for us, we had a lot of,
4   "What if the request to bill the customer was
5   done this way?  What if it was requested to do
6   that way?"  And we said, you know, there were a
7   lot of nuances and twists and there were some
8   things that we had to go in and we still had to
9   do the billing manually.
10          So what we looked at was, what are we
11  going to see the majority of the time?  And that
12  was the 80/20 rule.  And so that's when we did
13  this, and we set it up on this per diem plus AWP.
14  And so we could set it up as a Q 24, a Q 12, a Q
15  8, and so forth.
16      Q.  The different negotiated per diems that
17  were founded on AWP?
18      A.  Correct.
19          (Deposition Exhibit Leone 023
20  marked as requested.)
21  BY MR. ANDERSON:
22      Q.  Okay.  Now, take a look, if you could,

91 (Pages 358 to 361)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                        Chicago, IL

Page 362

1  at Exhibit 23, which I think pertains to the use
2  of AWP in calculating usual and customary
3  charges.
4       Just for speed, Ms. Leone, I'm going to
5  be directing your attention to the fifth bullet
6  from the middle of the page.
7       A.  Okay.
8       Q.  You've got a good context for the
9  document now?
10      A.  Yes.
11      Q.  Okay.  This is a memo you wrote back in
12  September '96, correct?
13      A.  Correct.
14      Q.  And your title is senior managed care
15  specialist, correct?
16      A.  Correct.
17      Q.  And in the middle of the page, you
18  reference -- you write a bullet, and I'll read
19  for the record, quote, "The AWP of the drug is
20  $599.21 per 2.5 gram vial.  Our usual and
21  customary," or U & C as you wrote it, "will be
22  $778.98 per 2.5 gram vial."  Did I read that

Page 363

1  correctly?
2       A.  Yes.
3       Q.  How were you going about calculating
4  the U & C there?
5       A.  I don't remember.
6       Q.  Is it your experience that generally
7  the usual and customary charges were based upon
8  AWPs?
9       MS. CITERA:  Objection to form.
10  BY THE WITNESS:
11      A.  The AWP was a part of the calculation
12  as well as -- you know, we looked at what costs
13  would be for pharmacy, labor, and overhead and
14  everything else that could be included in it.
15      Q.  And were those usual and customary
16  formulas utilized by Abbott personnel in advising
17  or working on behalf of providers?
18      A.  When we signed those agreements, you
19  know, we asked them, again, as we talked about
20  this morning, "How do you want to do your
21  pricing?"  If they had something they wanted us
22  to use, we would use it.  If they said, "Can you

Page 364

1  give us some ideas," then we would give them
2  that.  If they wanted us to make changes or
3  modify it, then we did that.
4       Q.  I'm sorry.
5       A.  That's okay.  No, that's it.
6       Q.  Were there some standard formulas or
7  other calculations set up in CHIP much akin to
8  what you were describing with the per diem
9  calculations?
10      MS. CITERA:  Objection to the form.
11  BY THE WITNESS:
12      A.  I don't remember how we -- how we
13  calculated this.  But I'm -- Again, as I said
14  before, we did something where we came up with a
15  formula that included the AWP plus a -- some
16  pharmacy, labor, and overhead.  And that was it,
17  but I can't give you the exact --
18      Q.  I don't want the exact, just generally
19  there was a formula?
20      A.  Yes, yes.
21      Q.  We've got one minute, and we've got one
22  document.  I don't know if we're going to be able

Page 365

1  to do it or not.
2       (Deposition Exhibit Leone 024
3  marked as requested.)
4  BY MR. ANDERSON:
5       Q.  Do you realize that -- or recognize,
6  rather, that this Exhibit 24 is a memo you wrote?
7       A.  Yes.  And obviously when I said this
8  morning I don't recall ever doing anything on
9  Lupron --
10      Q.  Yeah.
11      A.  -- I was wrong.
12      Q.  Right.  This appears to be a listing of
13  AWPs for Lupron, correct?
14      A.  Yes.
15      Q.  And you mentioned that the Lupron AWPs
16  have increased, correct?
17      A.  Correct.
18      Q.  And why would an increase in AWP over
19  time be important?
20      MS. CITERA:  Objection to form.
21  BY THE WITNESS:
22      A.  Well, again, when we were talking about

                              92 (Pages 362 to 365)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                    January 17, 2008
                          Chicago, IL

Page 366

1  the formula for these products, when we were
2  talking about the formula, the formulas that we
3  did for the pricing for the drugs was AWP plus
4  whatever that formula was that we put in there.
5      Q.   Right.
6      A.   And since the AWP changed, it appeared
7  that we were going to adjust the Lupron prices.
8      Q.   And when you say "the Lupron prices,"
9  you're talking about the Lupron per diems or, for
10 that matter, the Lupron usual and customary
11 charges, correct?
12     MS. CITERA:  Objection to form.
13 BY THE WITNESS:
14     A.   I don't know.  I mean, there's the AWP
15 and then there's the list price.  So I think the
16 list price would be what our -- what that
17 billable charge would have been for us.
18     Q.   Right.  Billable by the provider or by
19 Abbott on behalf of the provider to a third-party
20 payor?
21     A.   Yes.
22     Q.   So in some, the AWPs going up on a

Page 367

1  drug, in turn allowed providers to be paid more
2  by providers --
3      MS. CITERA:  Objection.
4  BY MR. ANDERSON:
5      Q.   Pardon me.  I've got to start over.
6          In some, the AWP increasing over time
7  enabled providers to seek reimbursement for
8  greater amounts from third-party payors?
9      MS. CITERA:  Objection to form.
10 BY THE WITNESS:
11     A.   Yes.  But that's no different than
12 taking any other price increase over time.  It's
13 just the price increase was based on the increase
14 in the AWP.  It could have been the increase in
15 CPIU or something else.  It was just we used AWP
16 at that point.
17     Q.   At this point, we've got to go off the
18 record to change the tape or at least go off the
19 video.  We may be able to talk about the
20 deposition.
21     THE VIDEOGRAPHER:  We are off the
22 record at 5:23 p.m. with the end of Tape No. 5.

Page 368

1      (A short break was had.)
2      MR. ANDERSON:  So let's go back on.
3  Let's go back on.  Okay.  Toni, I at this point
4  am willing to conclude the deposition.  However,
5  there are concerns about the completeness of the
6  production, as you gathered, I'm sure from some
7  of the questioning.  And I'm reserving the
8  relator's rights to recall the witness as
9  necessary to question about additional production
10 that we feel is due, and I'll at this point allow
11 my colleagues to make any comments, if they have
12 any.
13     MS. ST. PETER-GRIFFITH:  The United
14 States concurs with the realtor's position and
15 similarly reserves its rights to recall this
16 witness at such time as Abbott produces
17 additional documents concerning the witness.
18     MR. SISNEROS:  California joins in the
19 realtor's comments and reservation.
20     And, additionally, I believe that
21 Abbott has just produced some documents in our
22 discovery request in our case, and we need -- and

Page 369

1  we're making a reservation based upon review of
2  those documents to make sure there haven't been
3  any additional or new documents produced.  So
4  we'd like to reserve on that basis as well.
5      MS. CITERA:  I mean, obviously I
6  disagree with the completeness of the production.
7  But it is what it is, so okay.
8      MS. ST. PETER-GRIFFITH:  I mean, Toni,
9  let's keep this on the record, then.  Do you
10 believe that the production is complete?
11     MS. CITERA:  Well --
12     MS. ST. PETER-GRIFFITH:  Is it Abbott's
13 position the production is complete?
14     MS. CITERA:  I'm not saying what
15 Abbott's position is.  I think we have pulled
16 documents from this witness, and I don't know
17 what else there is.  So I'm just making --
18     MR. ANDERSON:  That was kind of the
19 concern, Toni, in part is it does appear from her
20 testimony that she's turned over a great volume
21 of documents or at least others that she's aware
22 of have turned over a great volume of documents.

93 (Pages 366 to 369)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                        January 17, 2008
                          Chicago, IL

|  | Page 370 |
|---|---|

1   But we have not received them, and that's a
2   problem.  For instance, it sounds like there's a
3   large volume of contract files that have been
4   retrieved but not produced.  There's been some
5   production of contract files.
6          MS. CITERA:  I was going to say, I
7   think a lot of contract files have been produced.
8          MS. ST. PETER-GRIFFITH:  Yeah.  But if
9   you're willing to make a representation regarding
10  the --
11         MS. CITERA:  I'm not going to make any
12  representation.
13         MS. ST. PETER-GRIFFITH:  --
14  completeness of Abbott's production, that's one
15  thing.  But, Toni, I don't think you're in a
16  position to do that right now.
17         MS. CITERA:  I'm not going to make any
18  representations.  I'm allowed to disagree with
19  you.
20         Okay.  Anything else?
21         MS. ST. PETER-GRIFFITH:  Nope, that's
22  it.

|  | Page 371 |
|---|---|

1          MR. ANDERSON:  Let's go off the record.
2          (WHEREUPON, the deposition was
3   adjourned.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

|  | Page 372 |
|---|---|

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3   --------------------------------X
4   In re:  PHARMACEUTICAL INDUSTRY  ) MDL DOCKET NO.
5   AVERAGE WHOLESALE PRICE          ) CIVIL ACTION
6   LITIGATION.                      ) 01CV12257-PBS
7   --------------------------------X
8          I, LYNN E. LEONE, state that I have read
9   The foregoing transcript of the testimony given by
10  me at my deposition on the 17th day of January,
11  A.D., 2008, and that said transcript constitutes a
12  true and correct record of the testimony given by
13  me at the said deposition except as I have so
14  indicated on the errata sheets provided herein.
15
16         _____
17              LYNN E. LEONE
18  SUBSCRIBED AND SWORN to before me this _____ day
19  of _____, 2008.
20
21  _____
22    NOTARY PUBLIC

|  | Page 373 |
|---|---|

1   UNITED STATES OF AMERICA        )
2   NORTHERN DISTRICT OF ILLINOIS   )
3   EASTERN DIVISION                ) SS.
4   STATE OF ILLINOIS               )
5   COUNTY OF COOK                  )
6          I, Rachel F. Gard, Certified Shorthand
7   Reporter, do hereby certify that LYNN E. LEONE was first
8   duly sworn by me to testify to the whole truth and that
9   the above videotaped deposition was reported
10  stenographically by me and reduced to typewriting under
11  my personal direction.
12         I further certify that the said videotaped
13  deposition was taken at the time and place specified and
14  that the taking of said videotaped deposition commenced
15  on the 17th day of January, A.D., 2008, at 9:05 a.m. at
16  the offices of Jones Day, 77 West Wacker Drive, Suite
17  3500, Chicago, Illinois.
18         I further certify that I am not a relative or
19  employee or attorney or counsel of any of the parties,
20  nor a relative or employee of such attorney or counsel,
21  nor financially interested directly or indirectly in
22  this action.

94 (Pages 370 to 373)

59ff07d5-29b2-44b9-93d6-1d061a73b41f

Leone, Lynn E.                                January 17, 2008
                        Chicago, IL

```
                                    Page 374
 1          In witness whereof, I have hereunto set my
 2   hand and affixed my seal of office this 21st day of
 3   January, A.D., 2008.
 4
 5
 6
 7
 8   _____
 9        RACHEL F. GARD, CSR
10        CSR No. 084-003324
11
12
13
14
15
16
17
18
19
20
21
22
```

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

59ff07d5-29b2-44b9-93d6-1d061a73b41f