# Exhibit 116

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
Chicago, IL

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


----------------------------X

In re:  PHARMACEUTICAL        )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

PRICE LITIGATION              )  No. 01-12257-PBS

----------------------------X


HIGHLY CONFIDENTIAL


VIDEOTAPED DEPOSITION OF KARLA KREKLOW

FEBRUARY 7, 2008

CHICAGO, ILLINOIS


Videotaped Deposition of KARLA KREKLOW,

at 77 West Wacker Drive, 35th Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

February 7, 2008, before Donna M. Kazaitis, RPR,

CSR No. 084-003145.

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                              Chicago, IL

---

Page 2

1  APPEARANCES OF COUNSEL:
2
3  FOR THE UNITED STATES:
4
5      U.S. DEPARTMENT OF JUSTICE
6      CIVIL DIVISION
7      BY:  MS. ANN ST. PETER-GRIFFITH, ESQ.
8      99 N.E. 4th Street
9      Miami, Florida 33132
10     (305) 961-9003
11     ann.stpeter-griffith@usdoj.gov
12
13 FOR THE STATE OF CALIFORNIA:
14
15     STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
16     BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
17     BY:  MR. ELISEO SISNEROS, ESQ.
18     110 West A Street
19     Suite 1100
20     San Diego, California 92101
21     (619) 688-6043
22     eliseo.sisneros@doj.ca.gov

---

Page 3

1  APPEARANCES OF COUNSEL: (CONTINUED)
2
3  FOR THE RELATOR VEN-A-CARE OF THE FLORIDA
4  KEYS, INC.:
5
6      ANDERSON LLC
7      BY:  MR. C. JARRETT ANDERSON, ESQ.
8         (via teleconference)
9      1300 Guadalupe, Suite 103
10     Austin, Texas 78701
11     (512) 469-9191
12
13
14 FOR ABBOTT LABORATORIES:
15
16     JONES DAY
17     BY:  MR. JASON G. WINCHESTER, ESQ.
18     77 West Wacker Drive
19     Chicago, Illinois 60601
20     (312) 782-3939
21
22 ALSO PRESENT:  Anthony Micheletto, Videographer

---

Page 4

1              I N D E X
2
3  WITNESS: KARLA KREKLOW                    PAGE
4      Examination By Ms. St. Peter-Griffith....... 008
5      Examination By Mr. Anderson................. 343
6      Examination By Mr. Sisneros................. 382
7
8            E X H I B I T S
9  NUMBER         DESCRIPTION         PAGE
10 Exhibit Kreklow 001, ABT-DOJ 0217187........... 177
11 Exhibit Kreklow 002, ABT-DOJ 310439 - 441...... 180
12 Exhibit Kreklow 003, ABT-DOJ 320070 - 072...... 182
13 Exhibit Kreklow 004, ABT-DOJ 310235............ 189
14 Exhibit Kreklow 005, ABT-DOJ 310897 - 913...... 195
15 Exhibit Kreklow 006, ABT-DOJ 310797............ 201
16 Exhibit Kreklow 007, ABT-DOJ 331936, 331931.... 201
17 Exhibit Kreklow 008, ABT-DOJ 310643 - 645...... 211
18 Exhibit Kreklow 009, ABT-DOJ 351347 - 349...... 212
19 Exhibit Kreklow 010, ABT-DOJ 337484............ 226
20 Exhibit Kreklow 011, ABT-DOJ 349893............ 232
21 Exhibit Kreklow 012, ABT 148-3591.............. 234
22 Exhibit Kreklow 013, ABT-DOJ-E 0338380 - 394... 251

---

Page 5

1         E X H I B I T S (CONTINUED)
2  NUMBER         DESCRIPTION         PAGE
3  Exhibit Kreklow 014, ABT-DOJ-E 0338362 - 379... 256
4  Exhibit Kreklow 015, ABT-DOJ-E 0338163 - 167... 261
5  Exhibit Kreklow 016, Kipperman 481,
6         TXABT 131263.............. 266
7  Exhibit Kreklow 017, ABT-DOJ-E 0339844 - 865... 276
8  Exhibit Kreklow 018, ABT-DOJ-E 0538913 - 934... 285
9  Exhibit Kreklow 019, ABT-DOJ-E 0009028 - 032... 288
10 Exhibit Kreklow 020, ABT-DOJ-E 0338128 - 129... 291
11 Exhibit Kreklow 021, ABT-DOJ-E 0339940 - 945... 298
12 Exhibit Kreklow 022, ABT-DOJ-E 0339914 - 928... 300
13 Exhibit Kreklow 023, ABT-DOJ-E 0338638 - 645... 305
14 Exhibit Kreklow 024, ABT-DOJ-E 0338714 - 722... 311
15 Exhibit Kreklow 025, ABT 258-1446.............. 315
16 Exhibit Kreklow 026, ABT-DOJ-E 0338730 - 821... 321
17 Exhibit Kreklow 027, ABT-DOJ-E 0380213 - 215... 326
18 Exhibit Kreklow 028, ABT-DOJ-E 0340012 - 016... 329
19 Exhibit Kreklow 029, ABT-DOJ-E 0339255 - 257... 333
20 Exhibit Kreklow 030, ABT-DOJ-E 0338116 - 111... 335
21 Exhibit Kreklow 031, ABT-DOJ 0155001........... 414
22 Exhibit Kreklow 032, ABT-DOJ-E 0339946 - 949... 419

2 (Pages 2 to 5)

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 6

1              P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  This is Anthony
4   Micheletto representing Henderson Legal Services.
5   I am the operator of this camera.
6          This is the videotaped deposition of
7   Karla Kreklow as being taken pursuant to Federal
8   Rules of Civil Procedure on behalf of the
9   plaintiff.
10         We are on the record on February 7,
11  2008.  The time is 9:25 a.m. as indicated on the
12  video screen.  We are at the offices of Jones
13  Day, 77 West Wacker Drive, Chicago, Illinois.
14         The case is captioned In Re
15  Pharmaceutical Industry Average Wholesale Price
16  Litigation, Case No. 01-12257-PBS.
17         Will the attorneys please identify
18  themselves for the record.
19         MS. ST. PETER-GRIFFITH:  Ann St. Peter-
20  Griffith from the United States Attorney's
21  Office, Southern District of Florida, on behalf
22  of the United States.

Page 7

1          MR. SISNEROS:  Eliseo Sisneros, Deputy
2   Attorney General, State of California, on behalf
3   of the State of California.
4          MR. ANDERSON:  Jarrett Anderson,
5   counsel for Ven-a-Care.
6          MR. WINCHESTER:  Jason Winchester for
7   Abbott Laboratories.
8          THE VIDEOGRAPHER:  The Court Reporter
9   today is Donna Kazaitis from Henderson Legal
10  Services of Washington, D.C.  Please swear in the
11  witness.
12         (Witness sworn.)
13         MS. ST. PETER-GRIFFITH:  Jason, before
14  we get started, during Ms. Kreklow's prior day of
15  deposition we were operating under the Texas
16  rules.  Can we all be in agreement that now we're
17  under the federal rules?
18         MR. WINCHESTER:  Yes.
19         MS. ST. PETER-GRIFFITH:  Okay.
20
21         KARLA KREKLOW,
22  having been duly sworn, was examined and

Page 8

1   testified as follows:
2
3              EXAMINATION
4   BY MS. ST. PETER-GRIFFITH:
5      Q.  Good morning, Ms. Kreklow.
6      A.  Good morning.
7      Q.  Ma'am, can you tell me what you did to
8   prepare for today's deposition?
9      A.  I met with Jason yesterday for about
10  three hours and forty minutes.
11     Q.  Did you review any documents?
12     A.  I reviewed my own deposition from June.
13     Q.  Your transcript from earlier?
14     A.  Yes.
15     Q.  Let the record reflect that I've got a
16  copy of that in front of you as well as in front
17  of your counsel in the event you want to refer to
18  anything --
19     A.  Great.
20     Q.  -- that you have previously testified
21  to.  Okay?
22     A.  Thank you.

Page 9

1      Q.  Ma'am, did you have an opportunity to
2   review your transcript?
3      A.  Yes.
4      Q.  Is there any testimony in there that
5   you would like to either clarify or amplify or
6   change before we get started here today?
7      A.  No.
8      Q.  Did you review any other documents in
9   preparation for your deposition today?
10     A.  A couple documents I think that we had
11  seen last time.
12     Q.  Which documents?
13     A.  I can't tell you which ones they were,
14  but they were ones that I had previously seen.
15     Q.  Did you review those with counsel?
16     A.  Yes.
17         MS. ST. PETER-GRIFFITH:  Jason, which
18  documents are those?
19         MR. WINCHESTER:  We looked through the
20  stuff that had been marked at her prior dep.
21         MS. ST. PETER-GRIFFITH:  All the
22  exhibits?

3 (Pages 6 to 9)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL     February 7, 2008
                         Chicago, IL

Page 10

1      MR. WINCHESTER:  I don't know whether
2  we looked through them all.  I had some in a
3  binder, we looked through those.  There may have
4  been a couple others.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Ms. Kreklow, today what I'd like to do
7  is we're going to go over some of the areas where
8  you testified before, but since your last
9  deposition we've also received a large production
10  of additional documents that we didn't have at
11  the time of your first deposition.
12      A.  Okay.
13      Q.  I'm going to try my best not to rehash
14  a lot of testimony that you had previously
15  testified to before, but there are some areas
16  where your response led me to develop questions
17  that are further in need of amplification.
18      A.  Sure.
19      Q.  Before we start looking though at
20  documents, what I'd like to ask you, ma'am, is
21  just generally you testified that you were in the
22  Alternate Site business unit from approximately

Page 11

1  '91 to '96; is that right?
2      A.  Well, I was, yes, that's right, yes.
3      Q.  Ma'am, what were your duties and
4  responsibilities when you were in Alternate Site
5  during that time period?
6      A.  I was a national account manager, I was
7  marketing manager in product sales.  Those two
8  positions were in product sales.  Then I went
9  over to Home Infusion, and I was an area business
10  manager, national sales manager, and the
11  operations director.
12      Q.  Now, you moved to Home Infusion in '96;
13  is that correct?
14      A.  I believe so, yes.
15      Q.  What I'd like to concentrate on for
16  right now, we'll move on to Home Infusion in a
17  little bit, is during the period of time that you
18  were marketing manager and national account
19  manager for product sales -- and I assume that's
20  in Alternate Site product sales?
21      A.  Correct.
22      Q.  Let's start with in your role as a

Page 12

1  national account manager, what were your duties
2  and responsibilities?
3      A.  We signed up large home infusion
4  companies and provided product with them.  We
5  had, well, I was responsible for one group
6  purchasing organization, a GPO, and we were
7  chartered to grow the business.  It was
8  relatively new at the time.
9      Q.  Okay.  And during your tenure from '91
10  to '96, did you help grow the business or did the
11  business grow within Alt. Site?
12      A.  It did.
13      Q.  How much did it grow?
14      A.  I can't tell you for certain.
15      Q.  Do you have a -- well, let me ask you -
16  -
17      A.  I remember at one point we were $50
18  million.
19      Q.  Sometime during the '91 through '96
20  time frame?
21      A.  Uh-huh.
22      Q.  Do you remember when you started --

Page 13

1      MR. WINCHESTER:  You have to answer out
2  loud, Karla.
3      THE WITNESS:  Oh, I'm sorry.  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  When you started in '91, what level you
6  were at, what dollar volume Alt. Site was at?
7      A.  I can give you --
8      MR. WINCHESTER:  Can I ask a
9  clarification, if we're talking about revenue or
10  some other number?
11      MS. ST. PETER-GRIFFITH:  Fair enough.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  When you said $50 million before, were
14  you discussing revenue?
15      A.  Product sales.
16      Q.  Product sales, okay.  So $50 million in
17  product sales?
18      A.  Correct.
19      Q.  So that would be a gross number then?
20      A.  Yes.
21      Q.  Do you know what the profit level was
22  at that time?

4 (Pages 10 to 13)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                      Chicago, IL

Page 14

1      A.  I have no idea.
2      Q.  When you started in '91, do you know
3  approximately what the dollar volume in gross
4  sales for product sales was?
5      A.  I don't recall that I knew that.
6      Q.  Was it substantially less than $50
7  million?
8      A.  Define "substantially."
9      Q.  Was it one-fifth, let's say $10
10  million?
11      A.  I can't, I honestly I don't know.  I
12  was never given that information.
13      Q.  Okay.  Let me ask it this way then:  Do
14  you think then that the $50 million reflects a
15  figure that was larger, a growing number, from
16  what it was previously when you started?
17      A.  Yes.
18      MR. WINCHESTER:  Object to the form.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  When you say you were chartered to grow
21  the business, what did you as a national account
22  manager do to help grow the business?

Page 15

1      A.  I met with home infusion companies and
2  the GPO and signed contracts with them so we
3  could provide product for their home infusion
4  business.
5      Q.  Did you negotiate contracts?
6      A.  Yes, part of the process.
7      Q.  Well, let me ask you:  How did you go
8  about negotiating a contract with a particular
9  home infusion company or GPO?
10      MR. WINCHESTER:  Object to the form.
11      THE WITNESS:  We determined their
12  potential volume.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  How did you do that?
15      A.  Well, all of these people were in
16  business --
17      Q.  Okay.
18      A.  -- so they had those figures for us.
19      Q.  So you got them from the prospective
20  clients?
21      A.  Yes.
22      Q.  So you determined the potential volume

Page 16

1  and then what?
2      A.  Then we submitted a request for prices
3  from the Hospital Business Sector pricing
4  department, and they generated our contracts and
5  prices.
6      Q.  So HBS generated your contracts and
7  prices?
8      A.  Yes.
9      Q.  Did anyone within Alt. Site have any
10  responsibility whatsoever for generating pricing?
11      A.  No.  Not alone, no.
12      Q.  When you say "not alone," what do you
13  mean?
14      A.  We had input, but we were not, we were
15  still dependent on HBS to give approval for any
16  pricing that we had.
17      Q.  Well, did you have, could you ask for
18  flexibility in pricing, for example, as a
19  national account manager?  Could you go to HBS
20  and say this isn't going to work, can we talk
21  about a better number?
22      A.  Yes, that's correct.

Page 17

1      Q.  And how often did you do that?
2      A.  Probably every time I negotiated a
3  contract.
4      Q.  Who did you talk to within HBS to get a
5  better number from HBS?
6      MR. WINCHESTER:  Objection, form.
7      THE WITNESS:  Different people.
8  Analysts, pricing analysts.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  And who were they?
11      A.  I can't tell you.  There were probably
12  fifteen people over there.  And it was a constant
13  rotation.
14      Q.  Do you remember any of them?
15      A.  No.
16      Q.  Did you work with anyone above the
17  contract, the pricing analyst level?
18      A.  No.
19      Q.  Did the pricing analysts have full
20  authority to make decisions regarding adjustments
21  in pricing for your negotiations of these Alt.
22  Site contracts?

5 (Pages 14 to 17)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 18

1      A.  No.  They did not.  They went to their
2  supervisor.
3      Q.  Do you know who their supervisor was?
4      A.  No.
5      Q.  Did you ever go directly to the
6  supervisor, or did you always work through the
7  pricing analysts?
8      A.  Only through the analyst.
9          MR. WINCHESTER:  Objection to form.
10         Give me just a second before you
11  answer.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.  Okay.  So you submitted a request for
14  prices to Hospital Business Sector.
15         The information that you got from
16  Hospital Business Sector, was that what you
17  presented to the client, the prospective client,
18  or did you try to negotiate first with HBS before
19  you presented the numbers to the client?
20         MR. WINCHESTER:  Objection, form.
21         THE WITNESS:  It could have been either
22  instance.

Page 19

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  So did both happen?
3      A.  Yes.
4      Q.  And then what would happen?
5      A.  We would either, if I was still within
6  -- before I had presented to the customer, I
7  would try to negotiate a better price based on
8  the volume of that particular item.  Or, if I met
9  with the customer and they brought up a concern
10  over a particular price, I took that information
11  back to Abbott and was either given approval or
12  not.
13     Q.  Do you know where or how -- strike
14  that.
15         Do you know how the Hospital Business
16  Sector pricing analysts came up with the pricing
17  that they were suggesting for your Alt. Site
18  contracts?
19     A.  No.  I do know it was higher than
20  Hospital.
21     Q.  When you say "higher than Hospital,"
22  what do you mean?

Page 20

1      A.  It was a more expensive price than the
2  Hospital, than a hospital would pay.
3      Q.  And how do you know that?
4      A.  That's what I was told.
5      Q.  By who?
6      A.  My boss.
7      Q.  Who at the time?
8      A.  Mike Sellers.
9      Q.  Do you know how much higher than
10  Hospital it was?
11     A.  I do not.
12     Q.  What factored into your request to
13  Hospital Business Sector to adjust their pricing
14  recommendations?
15     A.  The volume of the particular item that
16  would be utilized by the customer.
17     Q.  Do you know whether the Hospital
18  Business Sector had a high-low range within which
19  they could work when proposing pricing?
20     A.  I do not know.
21     Q.  Do you know whether the pricing that
22  was offered for the Alt. Site contracts was the

Page 21

1  catalog pricing for the products?
2      A.  I don't know that.
3      Q.  When I say "catalog pricing," do you
4  know what I mean?
5      A.  What's published in the back of the
6  catalog I would assume.
7      Q.  When you say "in the back of the
8  catalog," do you mean in the Abbott pricing
9  catalog?
10     A.  Yes.
11     Q.  Do you know whether at any time when
12  you were offering pricing to the Alt. Site
13  customers from this '91 through '96 time frame
14  did you ever offer catalog prices?
15     A.  I can't tell you if one particular item
16  or more were priced at catalog.
17         I can tell you that sometimes customers
18  would call, they would not have a contract, and
19  then their price would be catalog price.
20     Q.  Would you expect then that if someone
21  had a contract, that their pricing would be lower
22  than catalog price?

6 (Pages 18 to 21)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                         Chicago, IL

Page 22

1    A.  Yes.
2         MR. WINCHESTER:  Objection, form.
3    BY MS. ST. PETER-GRIFFITH:
4    Q.  Do you know how much lower than catalog
5    price, what percentage lower?
6    A.  No.
7         MR. WINCHESTER:  Objection, form.
8    BY MS. ST. PETER-GRIFFITH:
9    Q.  Did you ever deal with any customers
10   who called in seeking to purchase product who did
11   not have contracts?
12   A.  Yes.
13   Q.  How often would you do that?
14        MR. WINCHESTER:  Objection, form.  Time
15   frame.
16   BY MS. ST. PETER-GRIFFITH:
17   Q.  I'm sorry.  For the '91 to '96 time
18   frame.
19   A.  How often did I do that?  It wasn't
20   very common.
21   Q.  Can you during this '91 through '96
22   time frame estimate approximately how many sales

Page 23

1    were made to Alt. Site customers at contract
2    price, or I'm sorry, at catalog price versus
3    another price?
4    A.  I wouldn't know that.
5    Q.  Can you identify any range as to what
6    percentage it might be?
7    A.  A smaller percent than had contracts,
8    but I can't tell you what the percentages would
9    be.
10   Q.  Do you know what percentage of Alt.
11   Site customers during this contract, during this
12   '91 to '96 time period, actually had contracts?
13   A.  Would you repeat the beginning of your
14   sentence?
15   Q.  Sure.  Let me rephrase it.
16        During the '91 through '96 time frame
17   when you were in Alt. Site, do you know what
18   percentage of Alt. Site customers had contracts?
19   A.  I don't know for certain.  There were
20   two people in my role.
21   Q.  Okay.  Who was the other person?
22   A.  Doug McGill.

Page 24

1    Q.  Let's start then with what you do know.
2    A.  Okay.
3    Q.  For the customers that you were working
4    with, what percentage of the Alt. Site customers
5    had contracts?
6    A.  I would say ninety-nine percent because
7    if they didn't have a contract, I didn't call on
8    them.
9    Q.  Now, when you were negotiating pricing
10   with the Alt. Site customers that you worked
11   with, did they ever discuss with you what factors
12   factored into their decision making for deciding
13   upon whether or not to sign up a contract?
14   A.  They wanted the lowest price.
15   Q.  They wanted the lowest price.  Anything
16   else?
17   A.  No.
18   Q.  Did their or their customers' ability
19   to seek reimbursement from any third-party payor,
20   to your knowledge, ever factor into a decision to
21   sign a contract for Alt. Site, with Alt. Site?
22        MR. WINCHESTER:  Objection, form.

Page 25

1         THE WITNESS:  That was never discussed
2    with me.
3    BY MS. ST. PETER-GRIFFITH:
4    Q.  Would it have been important for you in
5    Alt. Site to understand how your customers or
6    their end user customers were ultimately
7    reimbursed for Abbott product?
8    A.  No.
9         MR. WINCHESTER:  Objection, form,
10   speculation.
11   BY MS. ST. PETER-GRIFFITH:
12   Q.  Why not?
13   A.  We were only concerned with selling
14   product to them.  We weren't privy to their
15   business.
16   Q.  Did you have an understanding as to how
17   your clients or the ultimate, their clients, were
18   reimbursed by third-party payors?
19   A.  Not at that time.
20   Q.  When did you come to have an
21   understanding as to how they were reimbursed?
22   A.  When I went to Home Infusion.

7 (Pages 22 to 25)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 26

1    Q.  And you don't think it would have been
2  important -- or do you think it would have been
3  important for you to have an understanding as to
4  how your Alt. Site customers or their customers
5  were reimbursed by third-party payors?
6        MR. WINCHESTER:  Objection, asked and
7  answered.
8        THE WITNESS:  I did not believe it to
9  be important.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Why not?
12       MR. WINCHESTER:  Objection, asked and
13 answered.
14       THE WITNESS:  Because it had nothing to
15 do with us selling product.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Okay.  After you presented the pricing
18 from or the presented the contract or your
19 proposed contract with the pricing to your Alt.
20 Site customers, what was the next step in the
21 negotiation process?
22   A.  Presuming they signed it.

Page 27

1    Q.  Okay.
2    A.  We would take it back and it would be
3  recorded and loaded with the wholesalers and the
4  GPOs, and then I was in the maintenance mode.
5    Q.  Let's break that down a little bit.
6        When you say "loaded," what do you
7  mean?
8    A.  Put into the Abbott customer service
9  computer system that has prices for all the
10 customers that have contracts.
11   Q.  Do you know what server that was on?
12   A.  I have no idea.
13   Q.  If you needed to, could you access it
14 on the computer?
15   A.  No.
16   Q.  Who could?
17   A.  Customer service.
18   Q.  Was that Alt. Site customer service?
19   A.  No.  Well, not at that time, no.
20   Q.  Which customer service?
21   A.  Customer service, corporate customer
22 service.  Those were the people that our

Page 28

1  customers called to place orders.
2    Q.  When you say "corporate customer
3  service," I don't think I know what you mean.
4  What do you mean?
5    A.  I can't tell you now that I say, well,
6  we refer to it as corporate customer service.  It
7  might have been Hospital Products Division
8  customer service.  I don't know.  But there was
9  half of a floor in a building that had people
10 that answered the phone.  They were the customer
11 service group that customers talked to to place
12 orders.
13   Q.  And where was that half floor of people
14 located?
15   A.  AP-30.
16   Q.  And was that the same area or that's
17 the same building where Hospital Products
18 Division was located?
19   A.  Yes.
20   Q.  Do you know who managed the customer
21 service corporate or HPD customer service?
22   A.  No.

Page 29

1    Q.  Okay.  Now, you said it was put into,
2  after it was loaded in you went into maintenance
3  mode.  Is that what you said?
4    A.  Yes.
5    Q.  What do you mean by that?
6    A.  If we had a new product, we would add
7  it to the customer's contract.  We would call
8  them, visit them, make sure that they were happy.
9  We would go to shows, like consultant pharmacy
10 meetings and meet with customers there.
11   Q.  When you say "make sure they were
12 happy," what do you mean by that?  How did you
13 make sure the customers were happy?
14   A.  Well, they had a contact.
15   Q.  Okay.
16   A.  That always makes people happy.
17   Q.  Were you the contact?
18   A.  For the customers that I signed the
19 contracts for, yes.
20   Q.  And what types of issues did they
21 contact you about?
22       MR. WINCHESTER:  Objection, form.

8 (Pages 26 to 29)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

Page 30

1        THE WITNESS:  Could be returns, product
2   returns.  They could have ordered the wrong
3   product and wanted to have that returned.  So I
4   had to approve that.  They might need training on
5   infusion devices, things like that.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.  Okay.  Let me backtrack to the issue of
8   you indicated that you had Home Infusion clients
9   in one GPO.
10       Let's start with the GPO.  Who was the
11  GPO that you worked with?
12      A.  Pharmaceutical Buyers, Incorporated.
13      Q.  Is that commonly known as PBI?
14      A.  Yes, it is.
15      Q.  Was that a large account?
16      A.  It was for us at that time, yes.
17      Q.  When you say "for us," you mean Alt.
18  Site?
19      A.  Yes.
20      Q.  Was that the largest account within
21  Alt. Site?
22      A.  I can't tell you if it was or not.

Page 31

1   They were our first GPO that we signed.
2       Q.  Were you involved in getting them
3   signed up?
4       A.  I was involved in renegotiating their
5   contracts.
6       Q.  Can you take me through -- well, first,
7   did you sign the contracts with PBI?
8       A.  No.
9       Q.  Who did?
10      A.  Mike Sellers.
11      Q.  What was your involvement in
12  renegotiating the contract with PBI?
13      A.  Again, looking at their volume, looking
14  at which products their customers purchased most
15  often, adjusted any prices if necessary based on
16  market.  And they would sign up for us one year
17  at a time, and then eventually they signed up two
18  years at a time.  So that was part of the
19  negotiation.
20      Q.  When you say you adjusted prices based
21  upon market, can you elaborate?  What do you mean
22  by that?

Page 32

1       A.  If the price in the market goes down
2   because there are several other manufacturers
3   that make the same thing, the price would
4   normally go down.
5       Q.  Did you experience that a lot?
6           MR. WINCHESTER:  Objection, form.
7           THE WITNESS:  It was an ongoing
8   process.
9   BY MS. ST. PETER-GRIFFITH:
10      Q.  What types of products were susceptible
11  to adjustments based upon market changes?
12          MR. WINCHESTER:  Objection, form.
13          THE WITNESS:  Really all products.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  What other involvement did you have in
16  renegotiating the PBI contract?
17      A.  That's it.
18      Q.  Who else participated in that
19  renegotiation with you?
20      A.  People at PBI.
21      Q.  Who specifically at PBI?
22      A.  Well, it was various people.  As they

Page 33

1   received more, they grew.
2       Q.  Anyone else within Abbott that worked
3   with you on the renegotiation with PBI?
4       A.  Mike Sellers and I conferred.
5       Q.  Did you work with anyone within
6   Hospital Business Sector contract marketing?
7       A.  To generate the price list and
8   contracts, yes.
9       Q.  And they would have to generate that as
10  part of the renegotiation?
11      A.  Yes.
12      Q.  How often did you renegotiate with PBI?
13  Was it on this annual basis except when they
14  converted to two-year contracts?
15          MR. WINCHESTER:  Objection, form.
16          THE WITNESS:  Yes.
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Do you remember when they converted to
19  two-year contracts?
20      A.  I think it was two or three years after
21  I had assumed that national account manager
22  position.

9 (Pages 30 to 33)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

---

Page 34

1    Q.  Did you work with them prior to
2  assuming the NAM position?
3    A.  No.
4    Q.  Who were the other home infusion
5  companies or businesses that you worked with when
6  you were a NAM within Alt. Site?
7    A.  I think one was called Infusion Care,
8  Home Medco.  They're not in business anymore.
9  It's hard for me to remember.
10   Q.  Well, I understand this is a memory
11  exercise, but I'm trying to exhaust what you do
12  remember.
13   A.  Sure.  I'm thinking.
14   Q.  Okay.  Take your time.
15   A.  Just going through the states in my
16  head trying to find them.  That's all I can think
17  of.
18   Q.  Where was Home Medco based out of?  Do
19  you recall?
20   A.  I believe California.
21   Q.  And Infusion Care?
22   A.  Same.

---

Page 35

1    Q.  How large were these accounts --
2      MR. WINCHESTER:  Objection, form.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  -- relative to other accounts within
5  Alt. Site?
6    A.  I can't tell you that because I can't
7  remember who the other accounts were.
8    Q.  Okay.  At any given time from '91 to
9  '96, do you recall how many accounts you were
10  working on?
11   A.  Possibly a dozen.
12   Q.  Did you work with any Alt. Site field
13  sales reps during your course of working with
14  these dozen or so clients?
15   A.  Occasionally I would work with the
16  sales rep and just do what we call a ride-along,
17  just work with them for a day as they went into a
18  facility.  It could or could not be one of my
19  customers.  It didn't really matter.
20   Q.  What took place during these ride-
21  alongs?
22   A.  Normally we would try to sell them

---

Page 36

1  infusion devices.  That was our big push.
2      Another time we had a new product
3  called LifeShield.  We went in and introduced all
4  of the LifeShield products.
5    Q.  What were the LifeShield products?
6    A.  They were parts of, well, in a nutshell
7  it was a needle with a shield around it so people
8  wouldn't get stuck.  This was at the time when
9  people weren't as careful as they are now about
10  needles and used needles.
11     So we developed that product, and other
12  companies developed their own.
13   Q.  Do you recall who you went along on
14  this ride-along with?
15   A.  It was in California.  It was whatever
16  her name was, she was in LA.
17   Q.  Do you recall which clients you called
18  upon?
19   A.  No.
20   Q.  Do you recall any names of any of the
21  Alt. Site product sales sales reps?
22   A.  Jack Miller, Frank Ginardi.  There was

---

Page 37

1  another woman in California named Debbie, but I
2  don't remember her last name.  That's all I can
3  think of.
4      They had very big territories at that
5  time.  Jack Miller, for example, was in
6  Springfield and he called on Chicago and
7  Milwaukee.
8    Q.  Anyone else that you can think of?  I'm
9  just trying to exhaust your memory on the Alt.
10  Site sales reps.
11   A.  Not at this time.
12   Q.  If any names pop into your head, feel
13  free to let us know.
14   A.  I will.  I will.  That usually happens.
15   Q.  Okay.  What other responsibilities did
16  you have -- well, let me ask you, were your
17  contract negotiations with the home infusion
18  companies like Infusion Care, Home Med, similar
19  in nature to what you described for PBI?
20   A.  Yes.
21   Q.  Were there any distinctions between a
22  group purchasing organization and negotiating

---

10 (Pages 34 to 37)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                         Chicago, IL

Page 38

1  with a GPO versus negotiating with a home
2  infusion company?
3      A.   Just the volume, the dollar volume that
4  would be generated.
5      Q.  I assume that the GPO had a larger
6  dollar volume?
7      A.   Yes.
8      Q.  Do you recall during this period of
9  time what PBI's dollar volume was of business
10 under the Alt. Site contract?
11     MR. WINCHESTER:  Objection, form.
12     THE WITNESS:  During the time I was
13 there?
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Yes.
16     A.  I do remember them at $1 million at
17 some point in time.
18     Q.  Do you recall whether that was when you
19 were the NAM on their account?
20     A.   Yes.
21     Q.  So that would have been sometime
22 between '91 through '96?

Page 39

1      A.   Yes.
2      Q.  Would that be a big account --
3      A.   Yes.
4      Q.  -- for Alt. Site?
5      A.   Yes.
6      Q.  What other responsibilities did you
7  have when you were a national account manager?
8      A.  We would go to shows, like I mentioned,
9  the American Society of Consultant Pharmacists,
10 and I would man the booth.  That was it.  I had
11 half the country.
12     Q.  As a national account manager?
13     A.   Yes.
14     Q.  Okay.  Can you think of anyone else who
15 you worked with in your capacity as a national
16 account manager in fulfilling your
17 responsibilities?
18     A.  Inside Abbott?
19     Q.  Yes, or inside Hospital Products
20 Division.  Let's start there.
21     A.  Yes, anyone in Abbott.  Only our
22 assistant.

Page 40

1      Q.  Other than your assistant, anyone else?
2      A.  When I was national accounts, no.
3      Q.  Is there any other responsibility that
4  you can think of that you had when you were a
5  NAM? I just want to exhaust your memory on this.
6      A.  No.
7      Q.  Did you have any other involvement with
8  regard to pricing or setting pricing during your
9  tenure as a NAM?
10     A.  No.
11     Q.  Now, you transitioned in '96 to the
12 Home Infusion business unit.
13     A.  Yes.
14     Q.  Relative to Alt. Site, how large was
15 the Home Infusion business unit when you
16 transitioned there?
17     A.  People-wise, it was probably the same
18 if you look at our field salespeople.  They were
19 larger inside Abbott.
20     Q.  Home Infusion was larger inside Abbott?
21     A.  Yes.
22     Q.  Was there ever a time when Home

Page 41

1  Infusion became smaller with inside?
2      A.  Oh, definitely.
3      Q.  Was that during your tenure within Home
4  Infusion?
5      A.  Yes.
6      Q.  From a dollar volume standpoint, dollar
7  volume of business, do you know when you
8  transitioned over in '96 what the difference was
9  between Alt. Site and Home Infusion?
10     A.  No.  That number was not shared with
11 me.
12     Q.  Who would know that?
13     A.  Mike Sellers.
14     Q.  Did you have any sense as to whether or
15 not from a dollar volume standpoint one business
16 unit was larger than another?
17     A.  No.  Plan numbers were not shared with
18 anyone except the general manager.
19     Q.  When you say "plan numbers," what do
20 you mean?
21     A.  What their dollar sales would be,
22 annual dollar sales.

11  (Pages 38 to 41)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                        Chicago, IL

Page 42

1    Q.  Do you know who that would be shared
2  with other than the general managers?
3    A.  The president of the division and the
4  controller.
5    Q.  And when you say "the controller," do
6  you mean the controller of Abbott?
7    A.  No, of Hospital Products Division.
8    Q.  And when you say "the president of the
9  division," you mean the president of Hospital
10 Products?
11   A.  HPD.
12   Q.  During your tenure within HPD, who were
13 those presidents?
14   A.  Chris Kringle, John Kringle is his
15 name, Rick Gonzalez.  During my tenure in Home
16 Infusion; correct?
17   Q.  Yes, no, well, at any time.
18   A.  At any time.  And Chris Begley.
19   Q.  Do you know why the plan dollars would
20 be shared with the presidents of these divisions?
21     MR. WINCHESTER:  Objection, form,
22 speculation.

Page 43

1      THE WITNESS:  They were responsible for
2  total divisional sales and reporting that to the
3  corporation.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Do you know whether the presidents had
6  input in the direction of the various business
7  units within Hospital Products Division?
8      MR. WINCHESTER:  Objection, form.
9      THE WITNESS:  "Direction" meaning?
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Meaning, you know, decision making
12 concerning whether or not to expand a particular
13 business or for Home Infusion input into the
14 business models for Home Infusion, for example?
15     MR. WINCHESTER:  Objection, form.
16     THE WITNESS:  I don't know about the
17 business models because those were all in place
18 before I came over.
19     They obviously would comment when the
20 plan numbers were discussed with them.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  Do you recall what some of their

Page 44

1  comments were or learning about what their
2  comments were?
3    A.  They always wanted to know when we were
4  going to get new models for our devices.  They
5  wanted updates on large customers, and especially
6  if we did not have device sales they wanted to
7  know how we could get device sales.
8    Q.  Were those requests communicated to
9  you?
10   A.  At various -- I'm talking product
11 sales; right?
12   Q.  Anything, but we can compartmentalize
13 it if you'd like to.
14   A.  Okay.
15   Q.  Let's start with Alt. Site product
16 sales.
17   A.  Yes.  At one point in time I was
18 responsible for infusion devices when we acquired
19 a company.
20   Q.  Oh, okay.  Let's go back then.
21   A.  Okay.
22   Q.  Did you have any other responsibilities

Page 45

1  when you were within Alt. Site that we didn't
2  discuss?
3    A.  That was part of my marketing
4  responsibility.
5    Q.  And what did you do with regard to
6  marketing for this particular line?
7    A.  For the devices?
8    Q.  For the devices.
9    A.  I met with the people in the newly-
10 acquired company and worked on specs with them in
11 the development of new devices.
12   Q.  What was the newly-acquired company?
13   A.  Pancretec.
14   Q.  Can you spell that?
15   A.  P-A-N-C-R-E-T-E-C.
16   Q.  What was the device?
17   A.  An ambulatory infusion device, which
18 means a small pump for patients at home.
19   Q.  Was that the AIM?
20   A.  It was the predecessor for the AIM.
21   Q.  Do you recall what the model was at the
22 time of the acquisition?

12 (Pages 42 to 45)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                           Chicago, IL

Page 46

1     A.  I will change my answer.  It was the
2  AIM.  The ANNE was what came later.
3     Q.  Can you spell ANNE?
4     A.  A-N-N-E.
5     Q.  Well, that's a good name.
6         Were you involved in developing, in the
7  transition of this particular pump model, from
8  the AIM to the ANNE?
9     A.  I was not.
10    Q.  Were you just involved then with the
11  marketing for this product?
12    A.  Yes.  I never marketed the ANNE.  That
13  was an anesthesia product.  Anesthesia was not
14  used in home infusion.
15    Q.  Would that have been someone within the
16  Hospital Products Division who took that?
17    A.  Yes.
18    Q.  Do you recall who that was?
19    A.  I don't.
20    Q.  Okay.  Now, was it your recollection
21  that the division president had an interest in
22  this particular device or devices that you were

Page 47

1  responsible for marketing within Alt. Site?
2     A.  Yes.
3     Q.  Which president was it at that time?
4     A.  Chris Kringle.
5     Q.  And what was your recollection of
6  either his interest in the device marketing or
7  your responsibilities in terms of getting
8  information to him concerning the device
9  marketing?
10        MR. WINCHESTER:  Objection to form.
11        THE WITNESS:  He was, I can't tell you
12  if he was the only person, I doubt that he was,
13  but he was key in getting approval from the
14  corporation to purchase Pancretec.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.  Okay.  Any other involvement?
17    A.  Just the general number update, dollar
18  sales update, so he knew he made a good decision.
19    Q.  Did he take any other interest in any
20  other product lines or products within Alt. Site
21  product sales?
22    A.  Not to the same degree.

Page 48

1     Q.  But he did take some interest?
2     A.  All the products, he took interest in
3  all the products because they were all involved
4  in sales.  He didn't specifically call out any
5  products.  He was just concerned about, for
6  example, the S&E line.
7     Q.  When you say "S&E," do you mean
8  solutions and equipment?
9     A.  Yes.
10    Q.  Let me ask you whether the following
11  products were involved with your solutions and
12  equipment.
13    A.  Okay.
14    Q.  Dextrose?
15    A.  Yes.
16    Q.  Sodium chloride?
17    A.  Yes.
18    Q.  Sterile water?
19    A.  Yes.
20    Q.  Acyclovir?
21    A.  Yes, but that wasn't available to me
22  when I was in products sales.

Page 49

1     Q.  What about vancomycin?
2     A.  Yes.
3     Q.  Did I say saline?  Was that part of --
4     A.  That's sodium chloride.
5     Q.  Why did he have concern?  You used the
6  word "concern."
7         MR. WINCHESTER:  Objection,
8  mischaracterizes, and it's calling for
9  speculation.
10        THE WITNESS:  An interest.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Why did he have an interest?
13        MR. WINCHESTER:  Same objection.
14        THE WITNESS:  Because it was a good
15  part of our sales.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  What part of your sales?
18    A.  Percentage-wise?
19    Q.  Yes, for Alt. Site, during your tenure.
20    A.  Half.
21    Q.  Did you communicate directly with Mr.
22  Begley?  Do you recall?

13 (Pages 46 to 49)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
                    Chicago, IL

Page 50

1      A.  I did communicate, yes.
2      Q.  What do you recall about your
3  communications with Mr. Begley?
4      A.  We talked about the shutdown of Home
5  Infusion.
6      Q.  So that was much later than your tenure
7  as a NAM?
8      A.  Correct.
9      Q.  Let's go to that.  What do you recall
10 about your conversations with Mr. Begley about
11 the shutdown of Home Infusion?
12     A.  We updated him on which customers,
13 which clients, were transitioned to product sales
14 contracts.  And we updated him on our progress in
15 placing our people into new positions.
16     Q.  Were you able to place everybody?
17     A.  Ninety-nine percent.
18     Q.  Were you able to place Bruce Rodman?
19     A.  No.
20     Q.  How come?
21     A.  He chose to retire.
22     Q.  When you say "progress in placing," do

Page 51

1  you mean in other areas within Abbott?
2      A.  Yes.
3      Q.  Any other conversations that you can
4  recall with Mr. Begley about the shutdown of Home
5  Infusion?
6      A.  No.
7      Q.  We're going to leap ahead.  We'll come
8  back to what we were discussing before.
9          But while we're on the topic, why did
10 Home Infusion shut down?
11     A.  I was never told directly, but from
12 what I heard, I shouldn't say, by "told" I mean I
13 was not involved in any of the meetings
14 concerning the shutdown.
15     Q.  Okay.  Let's stop right there.
16     A.  Okay.
17     Q.  Who was involved in the meetings about
18 the shutdown?
19     A.  I assume Mike Sellers, Don Rodman, or
20 Don Robertson, who the president was at the time.
21     Q.  Do you know who made the ultimate
22 decision to shut down -- when you say

Page 52

1  "president," do you mean president of HPD?
2      A.  Yes.
3      Q.  Do you know who played the ultimate
4  decision to shut down Home Infusion?
5      A.  I was never told.
6      Q.  In your experience with this company,
7  would that have been a decision that could have
8  been made by Mr. Sellers alone?
9      A.  No.
10         MR. WINCHESTER:  Objection,
11 speculation.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Would that have been a decision that
14 would have been made by Mr. Robertson alone?
15         MR. WINCHESTER:  Objection,
16 speculation.
17         THE WITNESS:  I can tell you that major
18 decisions had final approval from our president.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  The president of the division?
21     A.  Yes.
22     Q.  Would you consider the closure of Home

Page 53

1  Infusion, which was a business unit within the
2  Hospital Products Division, to be a major
3  decision?
4      A.  Yes.
5      Q.  Would you have expected that it would
6  have been the type of decision that the president
7  of HPD would have made?
8      A.  Yes.
9          MR. WINCHESTER:  Objection,
10 speculation.
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  At the time that the decision was made
13 to close down Home Infusion, was Mr. Robertson
14 still with HPD?
15     A.  Yes, he was.
16     Q.  Now, let's go back to your knowledge of
17 the decision to close Home Infusion.
18         What did you understand was the reason
19 why Home Infusion was closed?
20     A.  Our dollar volume did not warrant
21 divisional investment.
22     Q.  Do you know what the dollar volume was

14 (Pages 50 to 53)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 54

1  at the time that the decision was made?
2      A.  I do not.
3      Q.  During your tenure within the Home
4  Infusion business unit, did the Home Infusion
5  business unit experience growth based upon your
6  experience, or did it experience a decline in
7  business?
8      A.  Decline.
9      Q.  Do you recall the nature of the volume
10  of the decline?
11      A.  No.
12      Q.  Do you know why it declined?
13      A.  Are you talking the whole time I was
14  there?
15      Q.  Yes.
16      A.  Because we were transitioning our
17  customers.  We were no longer going to be
18  supporting them.
19         So in answer to your other question,
20  the dollar volume went down to zero.
21      Q.  But why was a decision made to
22  transition your customers?

Page 55

1      A.  So we could continue to supply product
2  to them.
3      Q.  When you say so you could continue to
4  supply product, what do you mean?
5      A.  We would transition them over to
6  Alternate Site product sales --
7      Q.  Oh, I see.
8      A.  -- and then they would sell them the
9  product.
10      Q.  But why was the decision made to
11  transition these clients to Alt. Site?  Why
12  didn't you just keep them under the Home Infusion
13  business model?
14         MR. WINCHESTER:  Objection,
15  speculation, form.
16         THE WITNESS:  Because we were going out
17  of business.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Why were you going out of business?
20         MR. WINCHESTER:  Objection, asked and
21  answered.
22         THE WITNESS:  Because we weren't large

Page 56

1  enough for the division to make an investment in
2  us.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Was that because you were experiencing
5  a decline, because Home Infusion was declining in
6  terms of its business?
7         MR. WINCHESTER:  Objection,
8  speculation, form.
9         THE WITNESS:  I can't state if it was
10  because we were experiencing a decline.  We were
11  just not large enough.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Was a similar evaluation made, to your
14  knowledge, of the Alt. Site products division?
15      A.  Not to my knowledge.
16      Q.  When you joined Home Infusion, was it
17  your experience that Home Infusion was larger
18  than Alt. Site?
19         MR. WINCHESTER:  Objection, form.
20         THE WITNESS:  Only in, well, people
21  were about the same.  I didn't have, I wasn't
22  privy to their total sales numbers.

Page 57

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  At the time that a decision was made to
3  close the Home Infusion business unit, to your
4  knowledge what was the state of business within
5  Alt. Site?  Was it declining?  Was it growing?
6      A.  Alternate Site product sales?
7      Q.  Alternate Site product sales, yes.
8      A.  It was continuing to grow.
9      Q.  Continuing to grow, okay.
10         And ultimately at some point did
11  Alternate Site product sales merge into HBS?
12      A.  No.
13      Q.  Are you familiar with the spin of the
14  Hospital Products Division into a company called
15  Hospira?
16      A.  I know it happened, and I know how I
17  was affected.
18      Q.  Okay.  Can you explain?
19      A.  How I was affected?
20      Q.  Yes.  How were you affected?
21      A.  I was retained by Abbott.
22      Q.  At the time of the spin, was there a

15  (Pages 54 to 57)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 58

1  separate business unit within Hospital Products
2  Division known as Alternate Site?
3      A.  Yes.
4      Q.  Who oversaw the Alternate Site business
5  unit during that time period?
6      A.  At the time of the spin?
7      Q.  Yes.
8      A.  Shaun O'Donnell.
9      Q.  What was your role, if any, in the
10 Hospira spin?
11     A.  None.
12     Q.  When did you learn about it?
13     A.  I learned about it when the public
14 learned about it.
15     Q.  Was it a surprise to you?
16     A.  Very much so.
17     Q.  Do you know why the decision was made?
18     A.  I do not know.
19     Q.  Were you assigned any tasks associated
20 with helping transition the spin?
21     A.  No.
22     Q.  Had it basically occurred or the public

Page 59

1  announcement had been made and then it
2  transpired? One day you're at HPD and then the
3  next day there's Hospira?
4      A.  Exactly.
5      Q.  How did you learn that you would be
6  retained by Abbott?
7      A.  The three area directors had a call
8  with our vice president that morning, the morning
9  of the announcement.
10     Q.  Who were the three area directors?
11     A.  Me, Shirley Beyer -- oh, no. I'm
12 sorry. I'm going back to another job.
13     Q.  Okay.
14     A.  Bob Satterlee and Ruth Abdulmassih.
15     Q.  Where did Bob and Ruth go? Were they
16 also retained by Abbott?
17     A.  Yes.
18     Q.  So it must have come as a bit of a
19 shock to you that you were going to have a job
20 change.
21     A.  Very much so.
22     Q.  What did your job transition to at the

Page 60

1  time of the spin?
2      A.  My job stayed the same.
3      Q.  Okay.
4      A.  We went into a different division.
5      Q.  Was that PPD?
6      A.  Yes.
7      Q.  Did you retain all of the same
8  responsibilities?
9      A.  Yes.
10     Q.  Did you discuss with anyone your
11 surprise as to the spin?
12         MR. WINCHESTER:  Let me just register
13 an objection here. I'll give you a little leeway
14 with it, but I would object to all this stuff as
15 being outside of the time frame as affirmed by
16 the court for discovery in this case.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  Go ahead. You can answer the question.
19     A.  Ruth and Bob.
20     Q.  What did you discuss with them?
21     A.  It was like, wow.
22     Q.  Were you disappointed?

Page 61

1      A.  Yes, I was.
2      Q.  Why were you disappointed?
3      A.  I spent most of my career in HPD, I
4  knew all the people there, I didn't want to be
5  part of a new division that I knew nothing about.
6      Q.  Is it fair to say though that you
7  brought the business that you were working on
8  with you to that business, to that division, and
9  continued to work on it within PPD?
10     A.  Correct.
11     Q.  Now we're going to jump back.
12     A.  Okay.
13     Q.  Let's go back to '96. Ma'am, when you
14 were within the Home Infusion unit, from '96 to
15 2000 I believe you testified earlier that you
16 were the business manager; is that right?
17     A.  Yes.
18     Q.  What were your responsibilities, job
19 responsibilities, as the business manager within
20 Home Infusion?
21     A.  To supervise the salespeople and
22 negotiate contracts.

16  (Pages 58 to 61)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                    Chicago, IL

Page 62

1    Q.  Let's start with the first.
2        What were your duties and
3    responsibilities with regard to supervision of
4    the salespeople?
5        A.  Being aware of what their activities
6    were, encouraging them in general, and also
7    focusing them on particular customers, trying to
8    grow the business.  They also maintained the
9    current clients that we had.
10       Q.  When you say "maintained the current
11   clients that we had" --
12       A.  Much like I did when I was in product
13   sales, visiting the customers, making sure that
14   everything is going to their expectations.
15       Q.  Okay.  So client maintenance?
16       A.  Client maintenance, yes.
17       Q.  Were you at all involved with training
18   of the Home Infusion sales force?
19       A.  No, not at that time.
20       Q.  Was there any training for the Home
21   Infusion sales force?
22       A.  I imagine there was.

Page 63

1    Q.  Do you know who would have been
2    responsible for it?
3        A.  No, not directly.
4        Q.  Were you familiar with the types of
5    discussions that your sales force was permitted
6    and not permitted to have with their Home
7    Infusion customers?
8        A.  Yes.
9        Q.  What types of conversations were they
10   not permitted to have?
11       A.  They were not to discuss other clients.
12   They were not to discuss specific contracting
13   issues with regards to other clients in general.
14   They of course shouldn't and wouldn't say
15   anything they didn't know anything about.
16       Q.  Did you have any other responsibilities
17   with regard to supervision of the sales force?
18       A.  No.
19       Q.  Did you do reviews of the sales force?
20   Like annual reviews or --
21       A.  Business reviews?
22       Q.  Either business reviews or personnel

Page 64

1    type reviews.
2        A.  Both.
3        Q.  What was involved in doing a personnel
4    review of a member of the Home Infusion sales
5    force?
6        A.  Throughout Abbott we are required to do
7    a self-performance review and submit that to our
8    manager.
9        Q.  Okay.
10       A.  I would review that and either agree or
11   disagree with their memory.  And add growth plan
12   for them, developmental plan.
13       Q.  What about for business review?
14       A.  They would come in and present a formal
15   review lasting about forty-five minutes of their
16   current clients and what their dollar volume was.
17   And then they would review any clients that they
18   were in negotiations with or had on their, what
19   we call on their radar.
20       Q.  Was there a certain core competency
21   that the sales force within Home Infusion needed
22   in order to sell the Home Infusion business

Page 65

1    models?
2        A.  Yes.
3        MR. WINCHESTER:  Objection, form.
4    BY MS. ST. PETER-GRIFFITH:
5        Q.  Did the sales force have to understand
6    how reimbursement by third-party payors worked,
7    the mechanics of it, in order to sell the Home
8    Infusion business model?
9        A.  No.
10       Q.  Why not?
11       MR. WINCHESTER:  Objection, form.
12       THE WITNESS:  There was no reason for
13   them to have that specific information.  They
14   weren't asked that.
15   BY MS. ST. PETER-GRIFFITH:
16       Q.  If they were asked questions about
17   reimbursement, what should they do with those
18   questions?
19       A.  Refer them to the reimbursement manager
20   that was responsible for the account.
21       Q.  Was that the group that Virginia
22   Tobiason oversaw?

17  (Pages 62 to 65)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                          Chicago, IL

Page 66

1    A.  Yes.
2    Q.  Did you have any other responsibilities
3  in supervising the sales force?
4    A.  No.
5    Q.  What additional responsibilities did
6  you have when you were a business manager in Home
7  Infusion?
8    A.  An annual budget for my particular
9  area.
10   Q.  How did you go about -- well, first of
11  all, let me ask you, the annual budget for what?
12  For payment of salaries?
13   A.  Yes.
14   Q.  Business expenses?
15   A.  Yes.  Travel.
16   Q.  What other types of budget items?
17   A.  Telephone, car, gas, airplane flights,
18  you know.  It's all part of travel.
19   Q.  When you started in '96, do you recall
20  what your annual budget was?
21   A.  No.
22   Q.  Do you recall at any time from '96 to

Page 67

1  2000 what your annual budget was?
2    A.  No.
3    Q.  Can you ballpark?  Was it in the
4  millions?
5    A.  No.
6    Q.  How many sales force members were there
7  within Home Infusion that you supervised?
8    A.  Approximately five.
9    Q.  Do you recall who they were?
10   A.  One was Chris Hurden, a man, Diana
11  Young.  There was a nurse, I just had his name.
12   Q.  It was a he, a male nurse?
13   A.  Yes.  Sondra Raider.  That's all I can
14  think of right now.
15   Q.  Now, you also negotiated contracts,
16  Home Infusion contracts?
17   A.  Yes.
18   Q.  What was involved in your
19  responsibilities for negotiating Home Infusion
20  contracts?
21   A.  I usually went in, after most of the
22  negotiations had been done, I would go in for the

Page 68

1  final.
2    Q.  Would the sales force do the
3  negotiations?
4    A.  Yes.
5    Q.  Would they do that in conjunction with
6  the contract marketing division within Home
7  Infusion?
8    A.  Definitely.
9    Q.  Who was within the contract marketing
10  division?
11   A.  Kathy Riddle.
12   Q.  Anyone else?
13   A.  Not that I am aware of, no.
14   Q.  What about Dave Brincks?
15   A.  Not when I was there.
16   Q.  Okay.  Now, did you have supervisory
17  responsibilities over the contract marketing
18  group?
19   A.  No.
20   Q.  How did your sales force interact with
21  them?  What were the mechanics of that
22  relationship?

Page 69

1      MR. WINCHESTER:  Objection, form.
2      THE WITNESS:  They would submit a
3  request for proposal.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Okay.
6    A.  And when they got it, when the
7  salespeople got it, then they went and presented
8  it to the customer.
9    Q.  When you say "they," you mean the --
10   A.  Salesperson.
11   Q.  The salesperson would present it to the
12  customer, but who put together the RFP?  Contract
13  marketing?
14   A.  Well, it wouldn't be an RFP.  We didn't
15  really deal with RFPs.
16      They would put the contract together.
17  Contract marketing would develop the contract.
18   Q.  A contract proposal?
19   A.  Yes.  And it was always approved by
20  Mike Sellers.
21   Q.  Now, would you expect that with regard
22  to each component of the contract that your sales

18 (Pages 66 to 69)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

Page 70

1  force would be familiar with the terms?
2        MR. WINCHESTER:  Objection, form,
3  speculation.
4        THE WITNESS:  Yes, they should.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  Would you expect that the contract
7  marketing unit would be familiar with the terms
8  of the various contracts that they proposed?
9     A.  Yes.
10       MR. WINCHESTER:  Objection,
11  speculation.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Would anyone within the Hospital
14  Business Sector have any involvement in the
15  negotiation or approval of or putting together
16  the contract proposals?
17       MR. WINCHESTER:  Objection, form.
18       THE WITNESS:  I don't know that.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  In terms of pricing, where did either
21  your sales force, you, or the contract marketing
22  division, get their pricing information in

Page 71

1  putting together these contract proposals?
2     A.  The salespeople received the pricing
3  information from contract marketing.
4     Q.  Is that Home Infusion contract
5  marketing?
6     A.  Yes.
7     Q.  Do you know where the Home Infusion
8  contract marketing individuals received their
9  pricing information?
10    A.  Where they received it?  I can tell you
11  they developed it based on how much Abbott
12  product was utilized by the client.
13    Q.  And in developing that pricing, do you
14  know what prices for Abbott product they used?
15    A.  I do not.
16    Q.  Did you ever discuss with anyone how
17  they came up with the figures that they did?
18    A.  No.
19    Q.  Would that have been something that
20  would have been important for your sales force to
21  know or for you to know in negotiating these
22  contracts?

Page 72

1     A.  No.
2        MR. WINCHESTER:  Objection, form,
3  speculation.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.  Did you have any other responsibilities
6  during this '96 through 2000 time period when you
7  were the business manager for Home Infusion?
8     A.  No.
9     Q.  What were the business models for Home
10  Infusion?
11       I know the counsel from Texas touched
12  upon that, but I wanted you to explain what were
13  -- first of all, was it more than one business
14  model for Home Infusion during your tenure there?
15       MR. WINCHESTER:  Objection, form.
16       THE WITNESS:  We had the same products
17  to offer during the time I was there.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Did you have different business models
20  for selling those products?
21    A.  Sure.
22    Q.  What were the business models that you

Page 73

1  used for selling those products?
2     A.  It would depend on what the needs of
3  the customer were.
4     Q.  Well, how many different business
5  models did you have?
6        MR. WINCHESTER:  Objection, form.
7        THE WITNESS:  It could be an infinite
8  number depending on how many people wanted, if
9  they wanted one item or five items that we
10  offered or two or three of this and two, you
11  know.  It's just different.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  When you say "items," do you mean
14  different services that you offered?
15    A.  Yes, yes.
16    Q.  Okay.  Let's start with that.
17    A.  Okay.
18    Q.  During your tenure when you were the
19  business manager in Home Infusion, were all of
20  the contracts consignment arrangements?
21    A.  To my memory, yes.
22    Q.  When I say "consignment arrangements" -

19 (Pages 70 to 73)

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                         Chicago, IL

---

Page 74

1  - or let me ask you, what do you understand
2  "consignment arrangements" to be?
3      A.  Abbott product would be supplied to the
4  customer to utilize for their business.
5      Q.  And what price was charged to the
6  Abbott client for those products?
7      A.  No specific item prices were charged.
8  That was done with the therapy price.
9      Q.  When you say "done with the therapy
10  price," what do you mean?  What's a therapy
11  price?
12      A.  If you have enteral nutrition, that had
13  one price, or two prices, whether they used a
14  pump or not.  That price was determined based on
15  how much Abbott product was utilized.
16      Q.  Was there a fixed price for a
17  particular therapy, or did Abbott share in the
18  collection of revenue collected by the Home
19  Infusion client?
20      A.  We shared in the revenue.
21      Q.  Was there ever during your tenure
22  within Home Infusion a business model whereby

---

Page 75

1  Abbott Home Infusion just sold straight product
2  to the Home Infusion client and did not share in
3  the revenue?
4      MR. WINCHESTER:  Objection, form.
5      THE WITNESS:  No.  That would have been
6  a product sales customer.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Is that sort of the distinction between
9  sales by Home Infusion and sales by Alt. Site
10  product sales?
11      A.  Right.
12      Q.  So we've got one component for the
13  business model whereby Abbott Home Infusion would
14  provide products on a consignment basis; right?
15      A.  Yes.
16      Q.  To your knowledge, did anyone at any
17  time ever raise concerns about whether or not the
18  provision of products on a consignment basis
19  complied with or violated federal and state law?
20      A.  I never heard of such concern.
21      Q.  Are you aware of any customers raising
22  a concern about whether or not the provision of

---

Page 76

1  consignment goods in exchange for a share in
2  revenue violated federal or state law?
3      A.  Not to my knowledge, no.
4      Q.  You never heard anything of that sort?
5      A.  Never.
6      Q.  What services were offered or what
7  services could a consignment customer within Home
8  Infusion choose from?
9      A.  The computer system, the CHIP system,
10  reimbursement, training.  We could assist them in
11  building out a pharmacy, with the design of it.
12      Q.  Okay.
13      A.  Inventory management.  That was it.
14      Q.  So when your sales force or when you
15  were negotiating with a particular client, is it
16  fair to say that depending upon how many of these
17  services they chose, that would impact the
18  percentage that Abbott would expect to collect,
19  the percentage of reimbursements that Abbott
20  would expect to collect from the Home Infusion
21  client?
22      MR. WINCHESTER:  Objection, form.

---

Page 77

1      THE WITNESS:  Not exactly.  The number
2  of services would be taken into consideration
3  when we developed the pricing for the therapy, if
4  that's what you mean.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Oh, okay.  Can you explain what you
7  mean by that?
8      A.  If the customer wanted to do their own
9  reimbursement, then the price of the therapy that
10  we would charge them would be less than if we did
11  the reimbursement because we would not be
12  providing that service.
13      Q.  And when you say the price would be
14  less, do you mean the percentage of their
15  reimbursements that you would expect to collect,
16  or would there be an actual fixed price?
17      MR. WINCHESTER:  Objection, form.
18      THE WITNESS:  Well, it's not, I think
19  I'm confused by you saying by the percent that we
20  would collect.  That varies depending on if we
21  get paid at all.
22  BY MS. ST. PETER-GRIFFITH:

20  (Pages 74 to 77)

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

Page 78

1    Q.  Okay.  Well, then what is the price for
2  the therapy?  What price would be charged for a
3  particular therapy?
4    A.  An example, I'll pick just a number, it
5  might not be exact, for enteral therapy, $23 a
6  day.
7    Q.  So the $23 a day, would that be what
8  Abbott would expect to collect from the Home
9  Infusion consignment client?
10    A.  Yes.  That's what we would hope to
11  collect.  Well, hope to be paid.
12    Q.  Well, were these considered risk-share
13  arrangements?
14    A.  Yes.
15        MR. WINCHESTER:  Objection, form.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  How were they risk-share arrangements?
18    A.  If the customer did not receive
19  reimbursement at all or if they did not receive
20  the expected amount of reimbursement, we would
21  still, we would take a smaller percentage.
22    Q.  Now, you just used the term

Page 79

1  "percentage."
2    A.  Right.  I know.
3    Q.  Can you explain sort of how percentages
4  of reimbursement worked in terms of identifying a
5  particular therapy price, or was there a
6  relationship?
7        MR. WINCHESTER:  Objection, form.
8        THE WITNESS:  To my memory, we would
9  look at average payments and say the customer did
10  know what the dollar amount was per therapy, say
11  they were aware of the $23 as an example.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Okay.
14    A.  And if they were paid $90 or $70,
15  whatever they were paid, on average, then we'd
16  determine what percent that $23 was.
17    Q.  Okay.
18    A.  So then there was the percentage number
19  that way.
20    Q.  In terms of how the contracts reflected
21  the compensation that would be due to Abbott,
22  would it be reflected on a percentage of revenue

Page 80

1  collection, or would there be a fixed therapy
2  price?
3        MR. WINCHESTER:  Objection, form.
4        THE WITNESS:  It was a fixed therapy
5  percentage, not based on collection.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  A fixed therapy percentage based upon
8  collection?
9    A.  Not based on collection.
10    Q.  What do you mean by "not based on
11  collection"?
12    A.  It didn't matter if we got, well, it
13  mattered to us if we got paid.  We wanted to get
14  paid.
15    Q.  Understood.
16    A.  But it would still be, it would be ten
17  percent whether we got paid $100 or $10, for one
18  particular therapy.
19    Q.  Okay.  In terms of developing a
20  pricing, a fixed pricing, like an identifiable
21  amount like $23 a day for a particular therapy
22  for example --

Page 81

1    A.  Yes.
2    Q.  -- was that pricing that your contract
3  marketing used to ballpark what percentage you
4  were going to negotiate?
5    A.  Yes.
6        MR. WINCHESTER:  Objection,
7  speculation.
8        THE WITNESS:  And that was shared with
9  the customer.
10  BY MS. ST. PETER-GRIFFITH:
11    Q.  So when you're explaining to the
12  customer how you're arriving at your percentages,
13  you're looking at hard dollars in terms of what
14  the value of the product and services were that
15  were being provided by Abbott Home Infusion under
16  the contract?
17    A.  Yes.
18    Q.  And how were those particular dollar
19  amounts monitored within Home Infusion, or were
20  they monitored within Home Infusion?
21        MR. WINCHESTER:  Objection, form.
22  BY MS. ST. PETER-GRIFFITH:

                                21 (Pages 78 to 81)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla         HIGHLY CONFIDENTIAL      February 7, 2008
                          Chicago, IL

Page 82

1    Q.  Was there a computer program, for
2  example, for a particular client that identified
3  what Abbott estimated its therapy day costs were
4  for a particular client?
5         MR. WINCHESTER:  Objection, form.
6         THE WITNESS:  That was part of the
7  contract negotiation.  Once it was negotiated and
8  we had the percentage, there was no need to refer
9  to it.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Where would that information go?  Would
12 it be just thrown away, or would it be maintained
13 in the file?
14        MR. WINCHESTER:  Objection, form.
15        THE WITNESS:  It was in the client's
16 file at Abbott, and the client also had a copy.
17 BY MS. ST. PETER-GRIFFITH:
18   Q.  What other business models were there
19 within -- or let me ask you this:  Other than
20 this model whereby Abbott consigned product and
21 then there was a menu of services that a
22 particular client can choose, other than that

Page 83

1  business model were there any other business
2  models for Abbott Home Infusion that you can
3  recall?
4    A.  Not that I'm aware of.
5         MS. ST. PETER-GRIFFITH:  Now might be a
6  good breaking point.  Do you want to do that?
7         MR. WINCHESTER:  Sure.
8         THE VIDEOGRAPHER:  We are off the
9  record at 10:39 a.m. with the end of Tape No. 1.
10        (WHEREUPON a recess was taken.)
11        THE VIDEOGRAPHER:  We are back on the
12 record at 10:49 a.m. with the start of Tape No.
13 2.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  Ms. Kreklow, we've gone over your job
16 responsibilities within Home Infusion when you
17 were the Home Infusion business manager up
18 through 2000.
19        Are there any other job
20 responsibilities that you had from the '96 to
21 2000 time frame that we haven't discussed?
22   A.  No.  Just different people.

Page 84

1    Q.  Meaning different people were under
2  your supervision?
3    A.  Yes.
4    Q.  Anyone else that you can recall who was
5  under your supervision that we haven't discussed
6  today?
7    A.  No.
8    Q.  With regard to a change that took place
9  in '99, sometime in '99, you became the national
10 sales manager of Home Infusion?  Does that sound
11 right?
12   A.  Yes.
13   Q.  Did you take on additional
14 responsibilities as the national sales manager?
15 How did that change your job responsibilities?
16        MR. WINCHESTER:  Objection, form.
17        THE WITNESS:  A larger geography.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.  What was your previous geography prior
20 to '99?
21   A.  The central area.
22   Q.  How did your geography expand?

Page 85

1    A.  To the entire country.
2    Q.  Were there other national sales
3  managers within Home Infusion?
4    A.  No.
5    Q.  You were it?
6    A.  Yes.
7    Q.  Did it change your responsibility in
8  terms of your supervision of larger numbers of
9  people?
10   A.  No.
11   Q.  Did you still supervise the same group
12 that you supervised prior to your promotion to
13 national sales manager?
14   A.  No.  Some of them have left.
15   Q.  But did you still have a core group of
16 approximately five sales force members that you
17 supervised?
18   A.  Yes.
19   Q.  When you were the business manager for
20 Home Infusion, were there other business managers
21 for Home Infusion?
22   A.  Yes.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                          Chicago, IL

Page 86

1    Q.  Who were they?
2    A.  Shirley Beyer and Tom Ollinger.
3    Q.  Were they similarly promoted to
4  national sales manager at any time?
5    A.  No.
6    Q.  Did you have any supervisory
7  responsibilities over Shirley or Tom?
8    A.  No.
9    Q.  Do you know why the decision was made
10  to -- well, let me ask you this:  Was the
11  position of national sales manager for Home
12  Infusion created for you?  Were you the first
13  person to hold that position?
14   A.  Yes.
15   Q.  Do you know why the Home Infusion
16  leadership model changed so that that position
17  was created for you?
18   A.  Yes.  The shutdown was announced.
19   Q.  So the shutdown was announced in '99?
20   A.  Yes.
21   Q.  How was that announcement made?
22   A.  On the phone for people that were in

Page 87

1  the field, and I was in the office on the
2  conference call.
3    Q.  Who else participated?
4      MR. WINCHESTER:  Objection, form.
5      THE WITNESS:  Mike Sellers conducted
6  it.  All of the Home Infusion managers were
7  either on the line or in the office.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  And that include Shirley and Tom?
10   A.  Yes.
11   Q.  And anyone else?
12   A.  Tim Sykes, Ginny Tobiason.
13   Q.  Did this come as a surprise to you?
14   A.  Yes.
15   Q.  So we have Ms. Tobiason, Tim Sykes,
16  Tom, Shirley, you, Mike Sellers, and then the
17  field sales reps?
18   A.  Not at that time, no.
19   Q.  Who were the people on the phone who
20  were in the field?
21   A.  Tom and Shirley.
22   Q.  Were they not based in Abbott Park?

Page 88

1    A.  No.
2    Q.  Where was Tom based?
3    A.  Someplace out east.
4    Q.  And where was Shirley based?
5    A.  California.
6    Q.  Why did it come as a surprise to you?
7    A.  Because I wasn't aware that there were
8  any issues at all.
9    Q.  To your knowledge, did it come as a
10  surprise to Ginny Tobiason?
11   A.  To my knowledge, it came as a surprise
12  for everybody.
13   Q.  Did you discuss it with the people in
14  the room?
15   A.  Not after the call.
16   Q.  What was your interaction with Virginia
17  Tobiason?
18      MR. WINCHESTER:  Objection, form.
19      THE WITNESS:  Hardly any interaction at
20  all.
21  BY MS. ST. PETER-GRIFFITH:
22   Q.  Did you have a good working

Page 89

1  relationship with her?
2    A.  Sure.
3    Q.  Do you know whether other people had
4  difficulties with her as a manager?
5    A.  I do not know that.
6    Q.  Who is Mr. Sykes?
7    A.  He is, I don't remember his title, but
8  the pharmacies reported to him.
9    Q.  Was the closure of Home Infusion also
10  an announcement of the closure of the Home
11  Infusion pharmacies?
12   A.  Not at that time.
13   Q.  When was the decision made to close the
14  Home Infusion pharmacies?
15      MR. WINCHESTER:  Objection, form.
16      THE WITNESS:  Sometime after that, but
17  I can't remember when.
18  BY MS. ST. PETER-GRIFFITH:
19   Q.  What was your interaction with the
20  reimbursement department in general when you were
21  within the Home Infusion business unit?
22   A.  Really no interaction until 2000, 1999,

23  (Pages 86 to 89)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

Page 90

1   when I became the director of operations.  I
2   didn't interact with them prior to that.
3        Q.   So the announcement is made that
4   they're going to close the business unit.  What
5   was the plan for the closure of the business
6   unit?
7        A.   Actually, I think at that time when we
8   were all in the office, it was presented more of
9   a slowdown rather than a closure.  Meaning that
10  we were not going to solicit new clients, but
11  there was no talk of transitioning clients.
12       Q.   When did the discussion become about
13  closure?
14       A.   I believe a year later.
15       Q.   Did that coincide with your promotion
16  to director of Home Infusion?
17       A.   No.  There were several months in
18  between.
19       Q.   Which occurred first?
20       A.   I was director afterwards.
21       Q.   So what was the plan for the slowdown,
22  to your recollection?

Page 91

1        A.   Business as usual for our current
2   clients, but we would not take on any new
3   clients.
4        Q.   What about re-signing old clients as
5   contracts were to expire?
6        A.   No.
7        Q.   Was a decision made to communicate this
8   with the clients?
9        A.   There was some communication.  I
10  believe it was in a letter.
11       Q.   I'm sorry?
12       A.   A letter.
13       Q.   Do you know who sent the letter?
14       A.   Mike Sellers.
15       Q.   Did you participate at all in
16  communicating with clients about the decision to
17  slow down Home Infusion?
18       A.   No.
19       Q.   Did you communicate with clients
20  concerning the decision to terminate any Home
21  Infusion contracts, for any reason?
22       A.   Later I did, when the decision to shut

Page 92

1   down the business came about.
2        Q.   How did you learn about the decision to
3   shut down the business?
4        A.   Either Mike or Don.
5        Q.   Did that come as a surprise to you?
6        A.   Yes.  I heard it when everyone else
7   did.
8        Q.   So they didn't tell you separately?
9        A.   No.
10       Q.   So by the time that you learned that
11  they were closing down the business, there had
12  already been a slowdown for the business unit
13  itself?
14       A.   Yes, not taking on any new clients.  I
15  don't believe we had any contracts that expired
16  during that period, but I can't be certain.
17       Q.   At that point in time had there been a
18  staff reduction?
19       A.   Yes.
20       Q.   Do you recall what the staff reduction
21  was?
22       A.   I know Tom and Shirley and some of

Page 93

1   their salespeople, I guess almost all of their
2   salespeople.
3        Q.   At some point in time in between -- or
4   let me ask you, when did Virginia Tobiason leave
5   the business unit?
6        A.   I don't remember.  Before I was
7   director.  She never reported to me.
8        Q.   Do you know where she went?
9        A.   No.
10       Q.   So when the decision was made to close
11  the business unit, what was the process for the
12  subsequently occurred for the closure of the
13  business unit?
14            MR. WINCHESTER:  Objection, form.
15            THE WITNESS:  With regard to the
16  employees or the clients?
17  BY MS. ST. PETER-GRIFFITH:
18       Q.   Let's start with the clients.
19       A.   We informed them that when their
20  contract expired, it would not be renewed.
21            And with all I believe we only had one
22  client whose contract went beyond that, beyond

24  (Pages 90 to 93)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                          Chicago, IL

Page 94

1  our point in time when we expected to be out of
2  the business.
3      Q.  Do you recall what client that was?
4      A.  PharmaThera.
5      Q.  How did you deal with the PharmaThera
6  contract?
7      A.  Explained to them what the situation
8  was and transferred them over to product sales.
9      Q.  Is that what happened?  Were all of the
10 Home Infusion clients transferred over to product
11 sales?
12     A.  No.
13     Q.  What happened to the clients?
14     A.  Some of them chose to go with a
15 competitor.
16     Q.  Which competitor?
17     A.  Usually Baxter, for solutions and
18 equipment.
19     Q.  For the sale of solutions and
20 equipment?
21     A.  For the purchase.  They purchased it
22 from them.

Page 95

1      Q.  To your knowledge, did any go to any
2  other consignment type arrangements with anyone
3  else?
4      A.  Oh, I have no idea.  That would not be
5  shared with me.
6      Q.  They wouldn't tell you that, your
7  clients?
8      A.  No.
9      Q.  But were some clients -- well, let me
10 ask you, what percentage of the clients do you
11 recall stayed with Abbott and were transferred to
12 Alt. Site?
13     A.  In excess of eighty percent.
14     Q.  Do you recall at all what the dollar
15 volume of business was at any time when you were
16 in Home Infusion?
17     A.  $150 million.
18     Q.  Annually?
19     A.  Yes.
20     Q.  Was it $150 million during your entire
21 tenure within Home Infusion?
22     A.  I didn't know what the total number was

Page 96

1  until I became director.
2      Q.  What did you learn when you became
3  director?
4      A.  It was $150 million, and it went down
5  from there.
6      Q.  And it went down from there.
7      A.  Uh-huh.
8      Q.  Okay.  At the time that you became
9  director, do you recall how much it declined?
10     A.  It declined, over the three years it
11 declined to zero.
12     Q.  Do you recall learning prior to your
13 becoming director what the trend had been for
14 Home Infusion?  Were they losing business?
15     A.  I don't know.
16     Q.  Now, you learned, I believe you
17 testified earlier in response to questions from
18 counsel for Texas that you learned about AWP as a
19 factor in reimbursement when you were within Home
20 Infusion; is that right?
21     A.  That's when I had an understanding of
22 it, yes.

Page 97

1      Q.  What was your understanding?
2      A.  That it's average wholesale price.
3      Q.  And prior to joining Home Infusion, you
4  had no idea what average wholesale price was?
5      A.  No.  I had no, no reason to know that
6  until I talked to Dave Brincks at the end of my
7  tenure in product sales.
8      Q.  So you learned about it in '95 --
9      A.  A few months before I left.
10     Q.  Did you have an understanding as to how
11 average wholesale price impacted third-party
12 reimbursement?
13     A.  No.
14     Q.  When did you first learn about the
15 relationship between average wholesale price and
16 third-party reimbursement?
17         MR. WINCHESTER:  Objection, form,
18 assumes facts.
19         THE WITNESS:  When the reimbursement
20 department reported to me.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Was that after you assumed the

25 (Pages 94 to 97)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla         HIGHLY CONFIDENTIAL     February 7, 2008
                       Chicago, IL

Page 98

1  directorship?
2      A.  Yes.
3      Q.  Let me back up a little bit because I
4  don't think, once you assumed the directorship
5  what were your responsibilities within Home
6  Infusion, other than obviously to shepherd it
7  along to closure I assume?
8      A.  Right.  All of the managers reported to
9  me.
10     Q.  And it was at that time that you
11 learned for the first time that AWP had an impact
12 on reimbursement?
13     A.  It was the first time that I learned
14 that there was a formula for payment that
15 included AWP.  I might have heard it before, but
16 I did not understand it.
17     Q.  Well, would it have been important to
18 understand how Abbott's Home Infusion clients
19 were reimbursed as part of your sales
20 responsibilities?
21     MR. WINCHESTER:  Objection,
22 speculation.

Page 99

1      THE WITNESS:  It would be important for
2  me only in the sense that we wouldn't want to
3  necessarily take on a client that was very risky
4  as far as payment.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  When you say "very risky as far as
7  payment," what do you mean?
8      A.  A heavy Medicaid population.
9      Q.  Why would that be risky?
10     A.  Because many times you're not paid.
11     Q.  How do you know that?
12     A.  I remember hearing that.
13     Q.  How did you monitor the risk levels of
14 various clients and their reliance upon Medicaid
15 reimbursement or Medicare reimbursement?
16     A.  Can you rephrase that please so I
17 understand what you're looking for?
18     Q.  Sure.  Let me rephrase this.
19         You indicated that a client's heavy
20 reliance upon a Medicaid population posed a risk
21 or they were a riskier client.
22     A.  Correct.

Page 100

1      Q.  Would you not take on those clients?
2      A.  We would take them on, we certainly
3  would take them on.  We wouldn't go out and seek
4  to have a relationship with a client that had a
5  large risk to us.
6      Q.  How would you know when you're seeking
7  out clients whether or not they're heavily
8  dependent upon a riskier reimbursement method
9  like Medicaid reimbursement?
10     A.  They would tell us that.
11     Q.  Would it have been important to you in
12 your business manager function to understand how
13 Medicaid and Medicare reimbursed your clients?
14     MR. WINCHESTER:  Objection, form.
15     THE WITNESS:  No.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  How come?
18     A.  Because that was handled by our
19 reimbursement department.  All I was responsible
20 for knowing was the payor mix.
21     Q.  Were you responsible for knowing
22 whether the contract arrangements that your sales

Page 101

1  force worked on and that you ultimately assisted
2  in negotiating complied with state and federal
3  law?
4      MR. WINCHESTER:  Objection, form.
5      THE WITNESS:  It's important, yes.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  How did you know that the consignment
8  arrangements within Home Infusion complied with
9  state and federal law?
10     MR. WINCHESTER:  I would instruct you
11 not to answer that question to the extent it
12 would require you to reveal the substance of any
13 conversations that you might have had with
14 counsel for Abbott or the substance of any legal
15 advice that was received from counsel for Abbott.
16     THE WITNESS:  I decline.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  What do you mean you decline?
19     A.  To answer.
20     Q.  Why do you decline to answer?
21     A.  My counsel recommended I did.
22     Q.  Let me ask you this:  Did you have any

26 (Pages 98 to 101)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla         HIGHLY CONFIDENTIAL      February 7, 2008
                        Chicago, IL

Page 102

1   conversations with anyone within the legal
2   department concerning whether or not -- strike
3   that.
4         Have you had any conversations, don't
5   necessarily tell me the substance, but have you
6   had any conversations with anyone within the
7   legal department when you were within Home
8   Infusion?
9      A.  I never did, no.
10     Q.  How did you know that the contracts
11  that you were negotiating complied with state and
12  federal law?
13        MR. WINCHESTER:  Again, I'd instruct
14  you not to answer the question if it would
15  require you to reveal the substance of advice
16  that you know came from counsel for Abbott.
17        THE WITNESS:  I decline to answer.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  He hasn't instructed you not to answer.
20  Why are you declining not to answer?
21        MR. WINCHESTER:  I have instructed her
22  not to answer if it would require her to reveal

Page 103

1   the substance of communications that she know
2   came from counsel.
3         MS. ST. PETER-GRIFFITH:  Jason, this is
4   a basic question in this case concerning
5   compliance.  Are you telling me that Abbott is
6   going to be relying upon an advice of counsel
7   defense?
8         MR. WINCHESTER:  I'm telling you that
9   you're not entitled in this deposition to
10  question this witness about the advice that was
11  received from counsel.  That's it.
12        You don't get to do that in any dep.
13  You know this.
14        MS. ST. PETER-GRIFFITH:  She hasn't
15  spoken with counsel.
16        MR. WINCHESTER:  That doesn't matter.
17  That's why I phrased my objection the way that I
18  did.  If she knows information, she may not have
19  heard it directly from counsel, you haven't
20  covered that, my objection is if she knows
21  information that you're seeking would require her
22  to reveal the substance of communications and

Page 104

1   legal advice that she knows was received from
2   counsel, you are not entitled to discover that.
3         MS. ST. PETER-GRIFFITH:  Are you
4   relying upon an advice of counsel defense?  Are
5   you telling me that you are or are not relying
6   upon an advice of counsel defense?
7         MR. WINCHESTER:  I'm not staking that
8   position out, nor do I need to.
9         I am telling you right now you are not
10  going to inquire into the substance of
11  communications with legal counsel.  That's basic.
12  You know this.
13        MR. ANDERSON:  Jason, if I might
14  interject.  She hasn't had any communications
15  with counsel.
16        MR. WINCHESTER:  I just covered that,
17  Jarrett.
18        MR. ANDERSON:  How can she have an
19  attorney-client communication if she's not
20  communicating with attorneys?
21        MR. WINCHESTER:  I will allow you to
22  close this out.

Page 105

1         My objection was if she knows that the
2   communications that she's aware of came from
3   counsel, it doesn't necessarily matter that she
4   got them directly herself from counsel --
5         MS. ST. PETER-GRIFFITH:  Absolutely it
6   does.
7         MR. WINCHESTER:  No, it doesn't.
8         MS. ST. PETER-GRIFFITH:  Yes, it does,
9   Jason.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.  Have you had any communications with
12  anyone concerning the compliance of these
13  consignment arrangements with federal and state
14  law?
15     A.  Have I had or, yes.
16     Q.  Who have you had those communications
17  with?
18     A.  I've seen something.
19     Q.  You've seen something.
20     A.  Uh-huh.
21     Q.  What have you seen?
22     A.  A letter.

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                      Chicago, IL

Page 106

1    Q.  And what letter is this?
2    A.  It's a letter from Abbott legal.
3    Q.  A letter from Abbott legal.
4        Have you had any communications about
5  this letter?
6    A.  No.
7    Q.  What is the date of this letter?
8    A.  I have no idea.  It's old.
9    Q.  Who is the letter to?
10   A.  I don't remember.
11   Q.  Do you remember whether it was someone
12  outside of Abbott?
13   A.  I don't remember that.
14   Q.  Could it have been a communication with
15  a third party?
16   A.  I don't know.
17   Q.  Then what was the substance of this
18  letter that you had?
19       MR. WINCHESTER:  No, I'm sorry.  She's
20  not going to testify to that.  I will instruct
21  you not to answer that question.
22       MS. ST. PETER-GRIFFITH:  What's the

Page 107

1  basis of your instruction?
2        MR. WINCHESTER:  The basis of the
3  instruction is I haven't seen this document, I
4  don't know what it is, but it's quite possible
5  the document is an attorney-client communication.
6  It came from Abbott counsel.
7        You certainly haven't laid a record
8  that it was distributed to anybody outside of
9  Abbott.  So on that basis until at least I can
10  satisfy myself that this letter was not
11  privileged, I have to instruct her not to answer
12  the question.
13  BY MS. ST. PETER-GRIFFITH:
14   Q.  Who was the letter to and from, ma'am?
15   A.  I don't remember.
16   Q.  When did you see it?  Under what
17  circumstances did you see it?
18       MR. WINCHESTER:  Objection, form.
19       THE WITNESS:  Probably in a file that I
20  assumed when I took other.
21  BY MS. ST. PETER-GRIFFITH:
22   Q.  A file that you assumed?

Page 108

1    A.  Uh-huh.
2    Q.  A client file?
3    A.  No, not a client file.  I had many,
4  many files when I assumed the business, many
5  personnel files, many office files in general.
6    Q.  How do you know it was from counsel?
7    A.  It said the person, it came on Abbott
8  letterhead.
9    Q.  So it came on Abbott letterhead.  How
10  do you know it was advice from counsel?
11   A.  It was signed by an attorney.
12   Q.  Who was the attorney?
13   A.  I don't know.
14   Q.  Do you remember when you saw this?
15   A.  No.
16   Q.  Do you know why Abbott would be
17  maintaining privileged attorney-client, do you
18  have any reason to know why Abbott would be
19  maintaining privileged attorney-client
20  communications in files that you were
21  maintaining?
22       MR. WINCHESTER:  Objection, form,

Page 109

1  speculation.
2        THE WITNESS:  I don't really even
3  understand what "privileged attorney-client
4  communication" means.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Do you have any reason to know why a
7  letter that was supposed to be a privileged
8  communication between Abbott and its counsel
9  would be in your files?
10       MR. WINCHESTER:  Objection, form,
11  speculation.
12       THE WITNESS:  No.  I don't know why
13  it's in there.  I didn't put it in there.
14  BY MS. ST. PETER-GRIFFITH:
15   Q.  What was the substance of the letter?
16       MR. WINCHESTER:  Objection.  She's not
17  going to answer that question.
18       MS. ST. PETER-GRIFFITH:  Jason, if
19  you're maintaining, if you're maintaining --
20       MR. WINCHESTER:  Ann, c'mon, c'mon,
21  c'mon, it's a letter from Abbott counsel.
22       MS. ST. PETER-GRIFFITH:  So what?

28  (Pages 106 to 109)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 110

1      MR. WINCHESTER: She doesn't have to be
2  able to lay that.
3      MS. ST. PETER-GRIFFITH: She doesn't
4  even know who it's to.
5      MR. WINCHESTER: Neither do you.
6      You have not established the basis that
7  would allow you to get to this letter because you
8  have not established that it went to anybody
9  outside of Abbott or that it wasn't communication
10  from legal counsel, legal advice from legal
11  counsel.
12      I'd have to see this letter. I haven't
13  seen it. I can't let her testify about it.
14      MS. ST. PETER-GRIFFITH: Well, we
15  certainly expect you to search for it --
16      MR. WINCHESTER: Well, that would be
17  great.
18      MS. ST. PETER-GRIFFITH: -- because
19  it's not on a privilege log.
20      MR. WINCHESTER: That's great. And we
21  can. But you have not established the basis to
22  inquire about the substance of the letter from

Page 111

1  the witness, and she's not going to answer those
2  questions.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  What file did you find it in, ma'am?
5      MR. WINCHESTER: It's asked and
6  answered. Object.
7      MS. ST. PETER-GRIFFITH: No. She
8  hasn't answer that.
9      MR. WINCHESTER: She did.
10      THE WITNESS: I don't remember which
11  file it was. It was a file I assumed.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  When you say a file you assumed, was it
14  located in any particular place?
15      A.  In a file drawer.
16      Q.  Who did you assume it from?
17      A.  I don't remember exactly because I
18  don't remember when I first saw it.
19      Q.  Where was this file drawer located?
20      MR. WINCHESTER: Objection,
21  mischaracterizes.
22      THE WITNESS: Either in the office, one

Page 112

1  of the offices I assumed. It was in the office.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Did you move around from office to
4  office?
5      A.  I did.
6      Q.  Did you move around from office to
7  office when you were within Home Infusion?
8      A.  I did.
9      Q.  Did you assume someone else's files?
10  Did you take over someone else's files when you
11  would move from office to office?
12      A.  I did.
13      Q.  Whose files did you take over when you
14  became business manager in Home Infusion?
15      A.  Chris George.
16      Q.  And who is Mr. George?
17      A.  An area, a former area business
18  manager.
19      Q.  Did you assume anybody else's files?
20      A.  Mike Sellers.
21      Q.  Do you have any recollection as to
22  whether or not the file that you assumed in which

Page 113

1  you saw this letter came from either Mr. George
2  or Mr. Sellers?
3      A.  I don't remember.
4      Q.  Do you remember anybody else's files
5  that you assumed at any other time when you were
6  within Home Infusion?
7      A.  Not that I assumed, no.
8      Q.  So is it safe to say that these files
9  which contained this particular letter that you
10  remember came from either Mr. George or Mr.
11  Sellers?
12      A.  Yes.
13      Q.  Where was the file physically located?
14      A.  In one of the offices.
15      Q.  In one of the offices that you took
16  over?
17      A.  Yes.
18      Q.  Do you remember which office number it
19  was?
20      A.  No.
21      Q.  Do you know what happened to the files
22  in that office?

29 (Pages 110 to 113)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
                         Chicago, IL

Page 114

1     A.  They were all sent to corporate
2  records.
3         MR. WINCHESTER:  Can I ask again before
4  you leave this what's the first name of George?
5         THE WITNESS:  Chris.
6         MR. WINCHESTER:  Chris.  Thanks.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  Do you remember anything else about the
9  letter?
10    A.  No.
11    Q.  Do you know whether or not Abbott's
12  Home Infusion consignment arrangements were in
13  compliance with state and federal law?
14        MR. WINCHESTER:  Objection, calls for a
15  legal conclusion.
16        THE WITNESS:  I can't say.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  It has nothing to do with the letter.
19        I want to know do you know whether
20  Abbott's consignment arrangements complied with
21  state and federal law?
22        MR. WINCHESTER:  Same objection, calls

Page 115

1  for a legal conclusion.
2         THE WITNESS:  I can't answer that.
3  BY MS. ST. PETER-GRIFFITH:
4     Q.  Why can't you answer that?
5     A.  Because I can't tell you, I'm not an
6  attorney and I did not review it.
7     Q.  Would you expect that Abbott's
8  consignment arrangements were in compliance with
9  state and federal law?
10        MR. WINCHESTER:  Objection, form.
11        THE WITNESS:  I expect that everything
12  that Abbott does is within all guidelines.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Who would you rely upon to ensure that
15  the work that you were doing and the contracts
16  that you were negotiating within Home Infusion
17  were in compliance with state and federal law?
18    A.  I rely on my superiors.
19    Q.  Who was that when you were in Home
20  Infusion?
21    A.  Mike Sellers.
22    Q.  What about when you were at Alt. Site,

Page 116

1  the activities that you undertook when you were
2  at Alt. Site, how do you know that they complied
3  with state and federal law?
4         MR. WINCHESTER:  Again, I'd instruct
5  you not to answer if it would require you to
6  reveal the substance of any communications that
7  you received or you know were received from
8  Abbott counsel.
9         If you can answer the question without
10  revealing that sort of information, go ahead.
11        THE WITNESS:  I'm not aware of any
12  communication.
13        Again, being a long-time Abbott
14  employee, I assume that everything that Abbott
15  does is within all guidelines.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.  At any time during your tenure within
18  Alt. Site or Home Infusion or within HPD, did you
19  ever have cause to question whether or not any of
20  your activities for any division or business unit
21  that you worked in complied with state and
22  federal law?

Page 117

1     A.  I've never had --
2         MR. WINCHESTER:  I think I know your
3  answer, but I would instruct you that you are not
4  to answer the question if it would require you to
5  reveal the substance of any communication you had
6  with counsel for Abbott.
7         If you can answer it without revealing
8  that sort of communication, go ahead.
9         THE WITNESS:  When I was in -- I'm
10  sorry.  Would you --
11        MS. ST. PETER-GRIFFITH:  Sure.  Can you
12  read back the question, please.
13        (WHEREUPON said record was read
14  back as requested.)
15        THE WITNESS:  When I was in Alternate
16  Site product sales, I never had any reason to
17  question and never saw any documents.  I did see
18  a document when I was in Home Infusion.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  And was this that letter that you were
21  referencing?
22    A.  Yes.

30 (Pages 114 to 117)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 118

1    Q.  Did you have any concerns at any time
2  when you were in Home Infusion that what you were
3  doing may not have complied with state and
4  federal law?
5    A.  I never did, no.
6    Q.  Did you ever have any compliance
7  questions at all that you raised with anyone?
8    A.  Not to my memory.
9    Q.  And when I say "compliance" because I
10 know that there's a different term, or that same
11 term is used differently within HPD, I mean
12 compliance with state and federal law, okay.  Can
13 we just agree upon that for purposes --
14   A.  Sure.
15   Q.  Okay.  If a compliance question ever
16 arose, who would you take it to?
17       MR. WINCHESTER:  Objection,
18 speculation, hypothetical.
19       THE WITNESS:  I would take it to my
20 superior first if anything like that would have
21 occurred.  But to my memory it did not.
22 BY MS. ST. PETER-GRIFFITH:

Page 119

1    Q.  Ma'am, a while back we were discussing
2  what was permissible and not permissible for the
3  sales force to discuss with clients.
4        Are you aware of at any time any
5  prohibition against the disclosure of
6  reimbursement or AWP information to Abbott HPD
7  clients?
8        MR. WINCHESTER:  Objection, form.
9        THE WITNESS:  No, I'm not.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Do you know whether any Abbott HPD
12 sales force members ever discussed reimbursement
13 or AWP matters with HPD clients?
14       MR. WINCHESTER:  Objection,
15 speculation.
16       THE WITNESS:  I would have no
17 knowledge.
18 BY MS. ST. PETER-GRIFFITH:
19   Q.  Did you ever?
20   A.  Absolutely not.
21   Q.  Did you ever at any time evaluate the
22 AWP of a product and its impact on reimbursement?

Page 120

1    A.  I did not.
2    Q.  Did you ever at any time evaluate AWP
3  and whether or not Abbott's ability to -- strike
4  that.
5        Did you ever at any time evaluate
6  whether or not Abbott could profit from a
7  particular product or on a particular product if
8  it purchased that product at AWP?
9        MR. WINCHESTER:  Objection, form.
10       THE WITNESS:  If a client purchased
11 that product?
12 BY MS. ST. PETER-GRIFFITH:
13   Q.  No, if Abbott did.
14   A.  If Abbott purchased a product at AWP?
15   Q.  Right.
16   A.  I don't understand the question.
17   Q.  Okay.  If Abbott had cause to purchase
18 a product -- or let me ask it this way:  Did you
19 ever know Abbott to evaluate whether or not it
20 should purchase a product at AWP?
21       MR. WINCHESTER:  Objection, form.
22       THE WITNESS:  No.  Any product that was

Page 121

1  purchased by Abbott was by prescription from the
2  physician.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  And as part of the Home Infusion
5  business unit, did Abbott procure product on
6  behalf of its Home Infusion clients?
7    A.  Not on, yes, in a way, yes, if we did
8  the mixing from our pharmacy.
9    Q.  Can you explain that?
10   A.  We had three pharmacies.  Some of our
11 clients did not want to be in the pharmacy
12 business but they didn't want their patients
13 going to competitors, competitor hospitals.  So
14 they wanted to start up their own home infusion
15 company, and they would ask us to do all of the
16 ad. mixing for them in our pharmacy.  That was
17 all done by prescriptions.  So if a physician
18 ordered a product and it was not Abbott, we
19 bought whatever the physician told us to
20 purchase.
21   Q.  Who do you recall were your clients
22 within Home Infusion that you worked with?

31 (Pages 118 to 121)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL    February 7, 2008
                          Chicago, IL

Page 122

1      A.  Children's Memorial, University of
2  Michigan.
3      Q.  Did University of Michigan's home
4  infusion business operate under a different name
5  that you can recall?
6      A.  I don't remember.
7          Northwestern, Loyola, Cedar Sinai,
8  University of Chicago, Aurora Medical purchased
9  or utilized the CHIP system only, Carl Clinic,
10 University Health Services, OSU.
11     Q.  What is OSU?
12     A.  Ohio State.
13     Q.  Is that University Health Services, is
14 that OSU or --
15     A.  That's different.  That's in Ohio.
16     Q.  Okay.
17     A.  Those are the ones that come to mind.
18     Q.  Did you work with Baylor?
19     A.  Yes.
20     Q.  Now, in terms of working with
21 Northwestern, did Abbott have a different
22 arrangement with them other than a consignment

Page 123

1  arrangement?
2      A.  No.
3      Q.  Did you work with Northwestern to build
4  out a pharmacy?
5      A.  Yes.
6      Q.  Did that come to fruition?  Is the
7  pharmacy built out?
8      A.  Yes.
9      Q.  Is there anything else that you can
10 recall that we haven't discussed here today
11 concerning the closure of the Home Infusion
12 business unit and the process for doing that?
13         MR. WINCHESTER:  Objection, form.
14         THE WITNESS:  I can tell you that it
15 went very smoothly.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  How so?
18     A.  Clients understood our position and
19 were in the most part very willing to continue
20 utilizing Abbott product.
21     Q.  When you closed out a contract, was
22 there still at times product that was still with

Page 124

1  your client?
2      A.  Yes.
3      Q.  And what would happen to that product?
4      A.  I don't remember for one hundred
5  percent, but I would assume that they purchased
6  it.
7      Q.  Do you know what price they purchased
8  it at?
9      A.  Their new contract price.
10     Q.  What about for those twenty percent or
11 so customers that didn't enter into a contract
12 with Alt. Site?
13     A.  I don't remember what happened to that.
14     Q.  Is there anything else about the
15 closure of the Home Infusion business unit that
16 you can recall?
17     A.  No.
18     Q.  Do you recall what physically happened
19 to the materials that were within the Home
20 Infusion business unit?
21     A.  They were sent to corporate records and
22 the computers were sent to salvage.

Page 125

1      Q.  And the computers were sent to where?
2      A.  Salvage.
3      Q.  Do you know whether anyone extracted
4  information from the computers before they were
5  sent to salvage?
6      A.  I don't remember.
7      Q.  So is it possible that computers were
8  sent to -- well, what is salvage?
9      A.  It's a place where Abbott would take
10 used equipment and sometimes sell it, reuse it.
11     Q.  Do you recall having any concerns about
12 information that was on these computers?
13         MR. WINCHESTER:  Objection, form.
14         THE WITNESS:  No.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  What about like manuals and training
17 materials and different materials that were in
18 hard copy within the Home Infusion business unit,
19 what happened to them?
20     A.  We didn't have very many of them.  I
21 assume they were sent to corporate records.  I
22 didn't have any in my office.

Henderson Legal Services, Inc.

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla         HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 126

1    Q.  Was there any protocol at the time of
2  the closure of the Home Infusion business unit
3  concerning the preservation of Home Infusion
4  records and information?
5    A.  Yes.
6    Q.  What was that protocol?
7    A.  We all met with corporate records many
8  times and were given instructions as to what the
9  retention rate would be.  And it was different
10 between if it was patient record from one of our
11 pharmacies and then it was different if it was an
12 adult or a child from one of our pharmacies.  But
13 I don't remember what those numbers of years are.
14   Q.  What about for documents that were not
15 patient records?
16   A.  They were sent to corporate records,
17 but I don't know how long they were retained.
18   Q.  Are you aware of any activities that
19 took place within Home Infusion whereby certain
20 members of the staff, for example David Brincks
21 and others, just engaged in a wholesale house
22 cleaning and threw away materials?

Page 127

1      MR. WINCHESTER:  Objection, form.
2      THE WITNESS:  I never worked with David
3  Brincks.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Oh, I'm sorry.  Bruce Rodman.
6    A.  Am I aware --
7    Q.  Let me reask the question.
8    A.  Thank you.
9    Q.  Were you aware that Bruce Rodman and
10 others engaged in a house cleaning of sorts of
11 the Home Infusion business unit and threw away
12 nonpatient materials such as training materials,
13 manuals, and hard copy information that was
14 maintained within Home Infusion?
15   A.  That was never communicated to me.
16   Q.  Would that have been something that you
17 would have approved?
18     MR. WINCHESTER:  Objection, form,
19 hypothetical.
20     THE WITNESS:  If it was duplicate of
21 something that we had, yes.
22 BY MS. ST. PETER-GRIFFITH:

Page 128

1    Q.  Do you know whether any provisions were
2  made for the retention of nonpatient files such
3  as operating manuals or manuals that were
4  utilized within Home Infusion for Home Infusion's
5  business operations?
6    A.  One copy of such item should have been
7  sent to corporate records.  That was the
8  intention.
9    Q.  Do you know whether it was?
10   A.  I don't physically remember seeing it
11 in a box.  When I give a request to someone, I
12 expect it to be followed.
13   Q.  Okay.  So you requested that?
14   A.  Yes.
15   Q.  But you didn't personally verify that
16 it was done?
17   A.  I trust my people.
18   Q.  Were you aware of or was, were you
19 aware of any litigation hold memos that might
20 have impacted or informed decision making
21 concerning the retention of records within the
22 Home Infusion business unit at the time of its

Page 129

1  closure?
2    A.  Any litigation?
3    Q.  Litigation hold memoranda or
4  instructions.
5    A.  There wasn't anything against Home
6  Infusion.
7    Q.  When you say "there wasn't anything
8  against Home Infusion," what do you mean?
9    A.  None of our clients were suing us, if
10 that's what you mean.
11   Q.  Well, were you -- let me ask you this
12 question:  Did you ever receive or were you aware
13 that Abbott's Home Infusion business unit needed
14 to retain documents and information that
15 pertained to the litigation that's at issue in
16 this case?
17     MR. WINCHESTER:  Objection, form,
18 mischaracterizes.
19     MS. ST. PETER-GRIFFITH:  Jason, I'd
20 appreciate it if you'd just limit, under the
21 federal rules, your objections to form objections
22 and not make speaking objections.

33 (Pages 126 to 129)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 130

1         MR. WINCHESTER:  Well, that's not the
2    federal rules, Ann.  I'm entitled to state a
3    basis for the objection.
4         MS. ST. PETER-GRIFFITH:  When I ask
5    you.
6         MR. WINCHESTER:  One word is not a
7    speaking objection.
8         MS. ST. PETER-GRIFFITH:  Go ahead.
9         MR. WINCHESTER:  No, not when you ask
10   me.  My objections are proper.  Move on.
11   BY MS. ST. PETER-GRIFFITH:
12       Q.  You can answer the question.
13       A.  I do not remember, but that would have
14   more to do with reimbursement, with the
15   reimbursement group than me.
16       Q.  Why do you see it would have more to do
17   with the reimbursement group than you?
18       A.  Are you referring to AWP?
19       Q.  Well, this litigation concerns AWP.
20   But why do you feel that a litigation hold memo
21   concerning this litigation is more properly
22   directed to reimbursement as opposed to your

Page 131

1    sales force?
2         A.  Well, neither I nor the sales force had
3    any AWP information.
4         Q.  Well, you negotiated the contracts;
5    didn't you?
6         A.  Yes.  But that didn't include AWP
7    information.
8         Q.  Let me ask you this:  Did your sales,
9    did the individuals that you were responsible for
10   as well as yourself, did any of you retain
11   records pursuant to a litigation hold memo
12   concerning the AWP litigation?
13       A.  We didn't have anything to retain.
14       Q.  Why do you say you didn't have anything
15   to retain?
16       A.  Because there was no need for us to
17   have any AWP information.
18       Q.  Well, how do you know whether or not
19   your documents were responsive to litigation
20   requests in this matter?
21       A.  How do I know?  Because it didn't
22   mention AWP.  My documents didn't mention AWP.

Page 132

1         Q.  Well, do you know whether a document
2    had to mention AWP in order to be responsive to a
3    litigation hold memo or discovery requests in
4    this case?
5         A.  I wasn't aware of this case until
6    earlier in the year.
7         Q.  So you and your staff then did nothing
8    to preserve records or documents concerning or
9    incident to a litigation hold memo relating to
10   the AWP litigation?
11       A.  Reimbursement would have.  They were
12   the only ones that had AWP information.
13       Q.  But "Yes" or "No," your department did
14   or did not?
15       MR. WINCHESTER:  Objection,
16   speculation.
17       THE WITNESS:  Yes.  They retained it.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.  Yes, your department retained it?
20       A.  Yes.
21       Q.  How do you know your department
22   retained it?

Page 133

1         A.  Because there was a letter that was
2    sent to the managers and possibly the field, I
3    don't remember, instructing that to occur.
4         Q.  What did you and your staff do in order
5    to retain documents after receiving the
6    litigation hold memoranda?
7         A.  I didn't throw anything away.
8         Q.  What did you do with those documents?
9         A.  They went to corporate records.
10       Q.  Did you at any time verify that
11   information was being retained in compliance with
12   the litigation hold memoranda by you or your
13   staff?
14       A.  No.
15       Q.  What kind of computers did you have or
16   did you utilize within the Home Infusion business
17   unit -- let me ask it this way:  Did you have a
18   personal computer on your desk?
19       A.  Yes.
20       Q.  What happened to that computer when you
21   left Home Infusion?
22       A.  It went to salvage.

34 (Pages 130 to 133)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL      February 7, 2008
                       Chicago, IL

Page 134

1    Q.  Did you do anything to back up or
2  produce the information on your computer prior to
3  your computer going to salvage?
4    A.  No.
5    Q.  Did you print off any or did you print
6  off the information on your computer prior to
7  your computer going to salvage?
8    A.  Oh, sure.  I did that all the time.
9    Q.  What about e-mail, how many e-mail did
10 you generally use or did you receive or send
11 during this time frame?
12       MR. WINCHESTER:  I'm sorry.  Which time
13 frame?
14       MS. ST. PETER-GRIFFITH:  During the
15 time frame that she was within Home Infusion.
16       THE WITNESS:  E-mail wasn't used very
17 much back then.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  It wasn't used in 2000, 2002?
20    A.  It was used, but I can tell you not
21 like it is today.
22    Q.  Did you print off every e-mail you

Page 135

1  received?
2    A.  Not every e-mail.  There was no need to
3  print it off.  It could have been the cafeteria
4  menu.
5    Q.  Well, how do you know -- did you print
6  off every e-mail that was responsive to the
7  litigation hold memoranda that you received?
8    A.  That came hard copy.
9    Q.  What do you mean?
10    A.  That memorandum came hard copy.
11    Q.  Let me clarify my question for you.
12    A.  Okay.  Thank you.
13    Q.  When did you receive the first lit.
14 hold memo?  Do you recall?
15    A.  I don't recall, I don't recall.
16    Q.  After you received it, what did you do
17 in terms of your e-mail practices to ensure that
18 if you received an e-mail that was responsive to
19 the lit. hold instructions that it was maintained
20 and preserved?
21    A.  If I would have had any information, I
22 would have put it into a folder on my e-mail.

Page 136

1    Q.  Did you have a separate litigation hold
2  folder?
3    A.  No.
4    Q.  What did you do with that information
5  in the folder on your computer?
6    A.  It stayed there.
7    Q.  Did you print it off before your
8  computer was sent to salvage?
9    A.  No.
10    Q.  Are you aware of any efforts at the
11 time of the closure of the Home Infusion business
12 unit to search individual computers for
13 information that might be the subject of
14 litigation hold memoranda?
15    A.  I don't remember, but I wouldn't have
16 been involved in that.
17    Q.  Who would have?
18    A.  Somebody from IT.
19    Q.  Do you remember anyone from IT coming
20 down and doing that?
21    A.  I remember IT people being around.  I
22 believe they were even on our floor, but I don't,

Page 137

1  that was not anything that I needed to be aware
2  of.
3    Q.  Well, you were at that point in time
4  the head of Home Infusion; weren't you?
5    A.  Yes.
6    Q.  Would it have been important for you to
7  ensure that before the computers were sent to
8  salvage that information on those computers that
9  was responsive to a litigation hold memo was
10 preserved before they were sent to salvage?
11       MR. WINCHESTER:  Objection, form,
12 argumentative.
13       THE WITNESS:  Anything like that would
14 have been hard copy from the reimbursement
15 department.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  So you're telling me now that anything
18 that was on your computer or your staff's
19 computer other than reimbursement was not
20 responsive to a litigation hold request?
21    A.  I didn't have any information regarding
22 AWP on my computer.  There wasn't anything to

35 (Pages 134 to 137)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 138

1   save.
2      Q.   But there might be additional documents
3   that were responsive to the litigation hold
4   request that didn't just involve AWP.  Did you
5   understand that?
6      A.   I don't even remember the document
7   specifically.  But if I was told to do something,
8   I did it.
9      Q.   So what did you do, if anything, prior
10  to the closure of the Home Infusion business unit
11  to ensure that your Home Infusion business unit
12  complied with the litigation hold memos?
13         MR. WINCHESTER:  Objection, asked and
14  answered.
15         THE WITNESS:  I didn't personally check
16  anyone's computer.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   Did you issue any instructions with
19  regard to the search or preservation of that
20  information?
21     A.   Only what was sent out, the original
22  memo.

Page 139

1      Q.   Did you distribute the original memo to
2   your staff?
3      A.   I forwarded it, yes.
4      Q.   And what did you do to verify that your
5   staff complied with that memo at any time?
6         MR. WINCHESTER:  Objection, asked and
7   answered.
8         THE WITNESS:  I didn't specifically do
9   anything.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   So it's possible that they didn't
12  comply with it and you would have no way of
13  knowing?
14         MR. WINCHESTER:  Objection,
15  speculation.
16         THE WITNESS:  Highly unlikely.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   When you say "highly unlikely," why do
19  you say that?
20     A.   Because these people were responsible
21  for all kinds of confidential information
22  regarding patients.  They were very rigorous in

Page 140

1   what they preserved.
2      Q.   Well, what do you recall them doing in
3   response to the receipt of the litigation hold
4   memoranda that you forwarded to them?
5      A.   I don't recall anything.
6      Q.   Other than forwarding the litigation
7   hold memoranda, do you recall doing anything else
8   with regard to the Home Infusion business unit in
9   response to the litigation hold memoranda?
10     A.   I don't recall.
11     Q.   Did you personally search your files in
12  your computer information to see if you had
13  documents responsive to the lit. hold memoranda?
14     A.   I would have, yes.
15     Q.   Do you have a recollection of doing
16  that?
17     A.   I recall searching for different
18  things.  I can't tell you for sure if it was
19  that.
20     Q.   Do you recall any other activity that
21  you partook in regarding the litigation hold
22  memoranda?

Page 141

1      A.   No.
2      Q.   Ma'am, I'd like to go back to AWP --
3   well, let me ask you, was there any software that
4   was retained at the time of the closure of the
5   Home Infusion business unit?
6      A.   The CHIP software.
7      Q.   What happened to that software?
8      A.   We negotiated a contract with a company
9   in I believe Vermont that was going to take over
10  maintenance of that for the clients that wanted
11  to remain on that.
12     Q.   Did Abbott still own a proprietary
13  interest in the CHIP system?
14     A.   Yes.
15     Q.   Do you still?
16     A.   I don't know.
17     Q.   At the time that you left or at the
18  time of the spin, did Abbott still to your
19  knowledge own the rights to the CHIP system?
20     A.   I don't know.
21     Q.   Do you have any idea what happened to
22  the CHIP system other than a company in Vermont

36 (Pages 138 to 141)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                          Chicago, IL

Page 142

1    may have maintained it?
2        A.   No.
3        Q.   Earlier you had testified or you had
4    said that you were responsible for payor mix.  Do
5    you recall that?
6        A.   Yes.
7            MR. WINCHESTER:  Objection.
8    BY MS. ST. PETER-GRIFFITH:
9        Q.   What does that mean?
10       A.   What percent is private pay, what
11   percent is Medicare, what percent is Medicaid.
12       Q.   What were your responsibilities for
13   payor mix?
14       A.   To report that to contract marketing.
15   When we would present a contract request, that
16   would be one of the things that would be in
17   there.
18       Q.   How did the payor mix impact your
19   decision making with regard to the negotiation of
20   that contract?
21       A.   It was never my decision.  I was told
22   either we're going to go forward with something

Page 143

1    or not.
2        Q.   Do you know why contract marketing
3    would request the information or would need the
4    information?
5            MR. WINCHESTER:  Objection,
6    speculation.
7            THE WITNESS:  I assume based on history
8    whether or not we were going to get paid by
9    certain payors.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.   Did you ever discuss with anyone why it
12   was that you were collecting this information for
13   them?
14       A.   No.
15       Q.   Would it have been important for you to
16   know why they needed to know what the payor mix
17   was?
18           MR. WINCHESTER:  Objection, form.
19           THE WITNESS:  Yes.  Well, it's
20   important for me because we wanted to make, stay
21   in business.  And we weren't very good at it I
22   guess because we went out of business.

Page 144

1    BY MS. ST. PETER-GRIFFITH:
2        Q.   Ma'am, what did you learn about AWP
3    when you were in Home Infusion?
4        A.   That some payors used AWP in their
5    formula for payment to us.
6        Q.   Did you have an understanding as to AWP
7    being somewhat of a reliable indicator for the
8    actual market prices for the products?
9            MR. WINCHESTER:  Objection, form.
10           THE WITNESS:  I never had any knowledge
11   of that.  I never dealt with AWP.  I just knew it
12   was in the formula.
13   BY MS. ST. PETER-GRIFFITH:
14       Q.   Would you have dealt with AWP in the
15   context of purchasing product that was used for
16   compounding by the pharmacy?
17       A.   Any product that was purchased was
18   purchased because the physician prescribed it.
19       Q.   Okay.  How did Abbott Home Infusion go
20   about purchasing that product that was needed
21   pursuant to the physician prescription, that was
22   a nonAbbott product?

Page 145

1        A.   I don't know.
2        Q.   Do you know who within Home Infusion
3    had that responsibility for securing that
4    product?
5        A.   Somebody in the pharmacies.
6        Q.   Oh, somebody in the pharmacies?
7        A.   Right.
8        Q.   Well, would the need to procure that
9    nonAbbott product impact contract negotiations?
10       A.   Yes.
11       Q.   How would it impact contract
12   negotiations?
13       A.   We would only purchase nonAbbott
14   product if we were doing the mixing.  So we would
15   be paid for mixing as well.
16       Q.   So that would increase Abbott's fee?
17       A.   Correct.
18       Q.   Would Abbott under the consignment
19   arrangements secure the product on behalf of the
20   client, or would it be up to the client to secure
21   it and get it to the Abbott pharmacy?
22       A.   We ordered it.

37 (Pages 142 to 145)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla          HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 146

1    Q.  How is the cost for that product
2  accounted for under the consignment arrangement?
3    A.  It's not because anybody that, we
4  didn't do a consigned inventory for somebody that
5  we mixed for because we managed all patients.
6    Q.  Can you explain what you mean by that?
7    A.  Children's Memorial, for example, we
8  did the mixing for them.  They didn't want to be
9  in the infusion business but yet they wanted to
10  have an infusion, a home infusion company, so the
11  patients wouldn't go to Lutheran General.  They
12  wanted to retain their patients.
13       So we did all of their ad. mixing for
14  them, we delivered the product to their patients.
15  They never physically touched the product.  No
16  one at, with the exception of their nurses, no
17  one at Children's Memorial physically touched the
18  product.
19    Q.  Who would be the recipient of the
20  reimbursement for that product?  Would it be
21  billed to a third-party payor under Children's
22  name or under Abbott's name?

Page 147

1       MR. WINCHESTER:  Objection, form.
2       THE WITNESS:  I believe under
3  Children's name.
4       We couldn't do it, I remember hearing
5  that it was under Children's name.  We were
6  billing on their behalf.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  When you say "we couldn't do it," what
9  do you mean?
10    A.  I just remember hearing we can't do
11  that, it's got to be under the client's name.
12    Q.  Who told you that?  Do you recall?
13    A.  No.
14    Q.  In terms of paying for that product
15  that's ultimately compounded, how would under
16  this consignment arrangement payment for that
17  product work?
18    A.  You mean under the mixing agreement?
19    Q.  Yes.
20    A.  It was a percentage again.
21    Q.  So Abbott's pharmacy would procure the
22  product, and then the compensation for that

Page 148

1  component part of the product would be factored
2  into the compensation for the compounding?
3    A.  Yes.
4       MR. WINCHESTER:  Objection, form.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  When Abbott pharmacies purchased
7  nonAbbott product, do you know what price they
8  paid?
9    A.  No.
10    Q.  Do you know whether they participated
11  in a group purchasing organization?
12    A.  I don't know.
13    Q.  Do you know whether that was part of
14  the contractual negotiations or arrangements, the
15  securing of that product for Abbott's pharmacies?
16    A.  With a client for example?
17    Q.  Yes, with a client.
18    A.  Yes, because we would have to supply
19  whatever the physician ordered.
20    Q.  Do you recall whether Abbott's
21  contracts or their proposals to clients discussed
22  Abbott's participation in group purchasing

Page 149

1  organizations?
2    A.  I never remember seeing that.  Why
3  would they care?
4    Q.  Well, if Abbott could secure the
5  nonAbbott product at a lower price, wouldn't that
6  impact both Abbott and the client?
7    A.  I never thought about that.
8    Q.  Who would be responsible for monitoring
9  that?
10    A.  The pharmacy director was the person
11  ordering, or someone in the pharmacy.  He
12  specifically wouldn't do the ordering.
13    Q.  Prior to negotiating a contract, if
14  there was the possibility that there was going to
15  be a need to compound or mix nonAbbott products,
16  how would that be accounted for as part of the
17  negotiation process in working with the client?
18       MR. WINCHESTER:  Objection, form.
19       THE WITNESS:  For example, if a client
20  had a large chemo patient population, we didn't
21  manufacture I think all but one, we only
22  manufactured one chemo agent.  That percentage

38 (Pages 146 to 149)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL      February 7, 2008
                        Chicago, IL

Page 150

1  would be greater than if we would have those
2  products.
3       Does that answer your question?
4       MS. ST. PETER-GRIFFITH:  I think so.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   So Abbott would just expect a greater
7  percentage because it would have to go out and
8  secure the nonAbbott product?
9    A.   Right.
10    Q.   And you have no idea at what price
11  point or price level Abbott's pharmacies would
12  secure that product at?
13    A.   I do not.
14    Q.   Was there any consideration that you
15  know of that was made in identifying Abbott's
16  ability to secure nonAbbott product either
17  through a group purchasing organization or at a
18  lower rate other than at the list price of the
19  drug manufacturer that Abbott's pharmacies were
20  purchasing the nonAbbott product from?
21       MR. WINCHESTER:  Objection, form.
22       THE WITNESS:  Am I aware of any effort

Page 151

1  to do that?
2  BY MS. ST. PETER-GRIFFITH:
3    Q.   Or was there any conversation that was
4  made?
5    A.   I wasn't involved in that.  I don't
6  know.
7    Q.   Would that have been a contract
8  marketing issue?
9       MR. WINCHESTER:  Objection, form.
10       THE WITNESS:  I don't believe so.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.   What about after you assumed
13  responsibility for directorship of Home Infusion,
14  did the purchase of nonAbbott products by Abbott
15  pharmacies come on your radar screen at all?
16    A.   It didn't because we didn't have any
17  pharmacies at that time.
18    Q.   That goes to my next question.  You
19  mentioned at one point in time after the decision
20  to slow down the Home Infusion department the
21  decision was made to close the Abbott pharmacies;
22  is that right?

Page 152

1    A.   Yes.
2    Q.   When was that decision made?
3    A.   I don't know.
4    Q.   Well, was it prior to your assuming
5  directorship?
6    A.   It was because they were all closed by
7  that time.
8    Q.   Oh, so you learned about the slowdown
9  in '99.
10    A.   Right.
11    Q.   You assumed the directorship in 2000,
12  and somewhere in between that period of time the
13  Abbott pharmacies closed?
14    A.   Yeah.  The one in New Jersey closed
15  first, and then California closed.  I can't
16  remember if Chicago or California closed first.
17    Q.   So if these pharmacies closed in or
18  around 2000, how did Abbott service its
19  obligations for compounding under its existing
20  contracts for the next two years?
21    A.   Children's Memorial was already, their
22  contract had expired long before that.  And I'm

Page 153

1  not aware of who the other pharmacies were even
2  mixing for.  So I don't know.
3    Q.   Well, do you know whether at the time
4  that the Abbott pharmacies closed there were any
5  outstanding contractual obligations for the
6  provision of compounding services?
7    A.   No.  I don't know that, not in Chicago.
8    Q.   Not in Chicago?
9    A.   Not to my knowledge.
10    Q.   But you became the director of Home
11  Infusion though; right?  Would that have been
12  something that would have come under your
13  supervision?
14       MR. WINCHESTER:  Objection, form.
15       THE WITNESS:  No, because it was
16  already done when I became director.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.   So by the time that you became
19  director, there were no more Abbott pharmacies
20  and there were no more obligations to provide
21  compounding services to any of the Home Infusion
22  clients?

39 (Pages 150 to 153)

Kreklow, Karla       HIGHLY CONFIDENTIAL   February 7, 2008
                        Chicago, IL

---

Page 154

1    A.  Correct.
2    Q.  Okay.  Ma'am, going back to the CHIP
3  system a little bit.  After Abbott licensed the
4  CHIP software to the company in Vermont, did
5  Abbott receive a percentage payment or some kind
6  of royalty or any type of fee for the CHIP
7  system?
8         MR. WINCHESTER:  Objection, form.
9         THE WITNESS:  Yes.  Our clients, I
10  can't really remember all the details, but I
11  believe we did charge the clients that wanted to
12  stay on the system, we charged them a one-time
13  fee.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  One-time fee.  Do you remember what
16  that was?
17    A.  No.
18    Q.  Did the CHIP system include information
19  from Red Book?
20    A.  I was told last time it did.
21    Q.  But you don't have any personal
22  recollection of that?

---

Page 155

1    A.  No.  I never went on the CHIP system.
2    Q.  Do you know whether Abbott Home
3  Infusion at any time during your tenure with
4  Abbott Home Infusion, do you know whether it had
5  a subscription to Red Book?
6    A.  I wasn't aware of that.
7    Q.  Would it surprise you to learn that
8  they did?
9    A.  No.
10        MR. WINCHESTER:  Objection, form.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  Do you know whether the, do you know
13  how -- strike that.
14        If Red Book information was contained
15  on the CHIP system, do you know how that
16  licensure arrangement worked?
17    A.  No.  I have no idea.
18    Q.  Whose bailiwick I guess within Abbott
19  Home Infusion did the CHIP system fall under?
20        MR. WINCHESTER:  Objection, form.
21        THE WITNESS:  Various people.  At the
22  end it was Bruce Rodman.

---

Page 156

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Anyone else?
3    A.  Phil Hollenbeck.
4    Q.  Can you spell that, please?
5    A.  H-O-L-L-E-N-B-E-C-K, I believe, who was
6  the director of Pharmacy.
7    Q.  Anyone else?
8    A.  No, not that I know of.
9    Q.  What was your familiarity with the CHIP
10  system?
11    A.  That it was an inventory management
12  system.  Clients or our Abbott pharmacies would
13  load all the patient information in there, the
14  prescriptions, it would help print out the
15  prescriptions.  It assisted in reimbursement.
16  That's what I remember.
17    Q.  Do you know how it assisted in
18  reimbursement?
19    A.  No.
20    Q.  What was your familiarity of how the
21  Abbott reimbursement department worked?
22    A.  Describe "familiarity."

---

Page 157

1    Q.  Sure.  How did you understand the
2  Abbott reimbursement department working?
3    A.  We had maintained the patient records -
4  - this is how I thought it happened.  Clients
5  would load all the patient information into the
6  CHIP system.  All of our reimbursement people had
7  access to the CHIP system.  They could print out
8  forms when they were, which was a big deal when
9  we could go electronic.  So they could print out
10  forms for clients, and then we would
11  electronically bill, towards the end we had that
12  capability.
13    Q.  Do you remember when that capacity to
14  electronically bill came into place?
15    A.  I don't remember.
16    Q.  Prior to the electronic billing, was
17  billing done in hard copy form on those forms
18  that were printed out?
19    A.  Yes.
20    Q.  Do you know where those forms were
21  maintained or stored?
22    A.  In the patient record.

---

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                        Chicago, IL

Page 158

1      Q.  Were the patient records part of the
2  records that you indicated went to the corporate
3  records at the closure?
4      A.  If they were in, if they were from our
5  pharmacy, we kept them in corporate records.  If
6  they were in the client's, if the client's
7  pharmacy was mixing for them, all of those
8  records went back to the clients.
9      Q.  So if there was hard copy billing
10  documents and Abbott's pharmacy was not involved,
11  did Abbott keep any record itself of the hard
12  copy billing documents outside of the patient
13  files?
14      A.  Yes.
15      Q.  Where did it maintain those?
16      A.  Well, did they keep it -- I
17  misunderstood your question.  No.  There was no
18  other place.  It all went into the specific
19  patient file.
20      Q.  And when Abbott Home Infusion, as it
21  would phase out clients would it turn over the
22  patient files to the clients?

Page 159

1      A.  Yes.
2      Q.  Was there any effort made whatsoever to
3  retain information concerning Abbott's billing on
4  behalf of its Home Infusion clients who did not
5  subscribe to Abbott's pharmacy services?
6      A.  I don't believe so.
7      Q.  Was there any other way to track
8  Abbott's hard copy billing for Home Infusion
9  other than to make copies of those forms that
10  were put in the patient files?
11      A.  No.  That's the only place they were
12  kept.
13      Q.  Was there any consideration made to
14  retaining information or copies of those forms
15  after the litigation hold memoranda went out?
16      A.  Anything having to do with the patient
17  and their reimbursement was kept in the patient
18  file.
19      Q.  Which were turned over as clients were
20  phased out?
21      A.  Right.
22      Q.  So there was no attempt to, was there

Page 160

1  any attempt -- let me ask you this:  Was there
2  any attempt to evaluate, prior to turning over
3  those patient files, the need to retain copies of
4  any documents in those patient files incident to
5  a litigation hold memoranda?
6      A.  I don't know.
7      Q.  Do you know who would have made that
8  evaluation?
9      A.  The reimbursement manager.
10      Q.  Who was the reimbursement manager?
11      A.  Mike Snouffer.
12      Q.  Mike Snouffer?
13      A.  Uh-huh.  All of the reimbursement
14  information that we did for clients was on the
15  CHIP system.
16      Q.  Even if there was hard copy billing?
17      A.  Sure.  And the CHIP system files were
18  all maintained.  They were all on the server.
19      Q.  Would the CHIP system show the actual
20  forms themselves that were sent out?
21      A.  Yes.
22      Q.  Do you know where it would be on the

Page 161

1  CHIP system?
2      A.  Could I find it, no.  I mean there's a
3  section under Reimbursement that they can access.
4  I don't know where they keep it.
5      Q.  Do you know when the CHIP system was
6  initiated?
7      A.  No.  Before I came over.
8      Q.  Is there any way to identify on the
9  CHIP system prior to electronic billing -- let me
10  ask you this:  Prior to electronic billing, how
11  were the hard copies of the bills that were sent
12  out to third-party payors maintained on the CHIP
13  system?
14      A.  Hard copies were kept in the patient
15  file.
16      Q.  And is that the only way, the only
17  place where you could find them?
18      A.  To my knowledge, yes, because
19  everything else was on the CHIP system.  So it
20  would be a duplicate.
21      Q.  Was the actual hard copy form on the
22  CHIP system?

41 (Pages 158 to 161)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL       February 7, 2008
Chicago, IL

Page 162

1    A.  It wasn't a hard copy.  But when we
2  printed it out, it looked the same.
3    Q.  So there would be a HCFA 1500 form for
4  example?
5    A.  Yes.
6    Q.  And if that was on the CHIP system, you
7  could just print it out?
8    A.  Yes.  That's my understanding, yes.
9    Q.  What happened to the CHIP's data?
10   A.  It was retained on a server, but I
11 don't know which server or how that really works.
12   Q.  Would there be anything that was on the
13 hard copy form that was not on the CHIPs?
14   A.  Should not be, no, because it would
15 have to be typed in, and no one had typewriters.
16 So I can't imagine.
17      MS. ST. PETER-GRIFFITH:  We've got five
18 minutes left on the tape.  So why don't we take a
19 break now.  Do you want to take a lunch break
20 now? Jason, is that good?
21      MR. WINCHESTER:  That's fine.
22      MS. ST. PETER-GRIFFITH:  Is that good

Page 163

1  for you, Ms. Kreklow?
2      THE WITNESS:  Yes.  Thanks very much.
3      THE VIDEOGRAPHER:  We are off the
4  record at 12:05 p.m. with the end of Tape 2.
5      (WHEREUPON a lunch recess was
6  taken, and said deposition continued as follows:)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 164

1    A F T E R N O O N   S E S S I O N
2
3      THE VIDEOGRAPHER:  We are back on the
4  record at 1:12 p.m. with the start of Tape No. 3.
5
6      KARLA KREKLOW,
7  having been previously duly sworn, was examined
8  and testified further as follows:
9
10      EXAMINATION (Continuing)
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Good afternoon, Ms. Kreklow.
13   A.  Good afternoon.
14   Q.  We're going to start looking at some
15 documents.  I'm going to try not to repeat the
16 ones you've seen before, but there are a couple
17 areas I want to finish up before we do.
18      First, we were talking just before the
19 lunch break about the hard copies of the claims
20 form which you said could be printed off the CHIP
21 system.
22   A.  Yes.

Page 165

1    Q.  When did that capability first come
2  into play?  When was it that Abbott started
3  storing on the CHIP system the hard copies of the
4  claims forms?
5    A.  I don't know.
6    Q.  Do you know when the CHIP system came
7  into existence?
8    A.  It was some point in time when I had
9  recently started in product sales.
10   Q.  Recently started in Alt. Site product
11 sales?
12   A.  Yes.
13   Q.  So sometime in the '90s?
14   A.  Right.
15   Q.  Early '90s?
16   A.  Yes.
17   Q.  Do you know at that point in time
18 whether you could actually store the claims form
19 on CHIPs?
20   A.  I had nothing to do with it at that
21 time.
22   Q.  For claims forms that were not retained

42 (Pages 162 to 165)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                            Chicago, IL

Page 166

1  on the CHIP system, would those just be hard copy
2  retained in the Home Infusion patient files?
3      A.  Yes.
4      Q.  At the time of the closure of Home
5  Infusion, those then, if they were not retained
6  on the CHIP system, would the only copy have gone
7  to whoever the client was?
8      A.  I don't know.
9      Q.  We've covered your job
10 responsibilities.  I just want to make sure that
11 during the last period of time when you were in
12 Home Infusion, that we exhaust your memory on any
13 other responsibilities that you may have had when
14 you were the director of Home Infusion.
15     A.  Okay.
16     Q.  Do you recall any other
17 responsibilities that you had during that time
18 period that we haven't discussed already?
19     A.  No, I don't.
20     Q.  After the closure of Home Infusion --
21 well, let me ask you, do you recall which month
22 Home Infusion was formally not in existence?

Page 167

1      A.  The end of December.
2      Q.  December '02?
3      A.  Yes.
4      Q.  What did you do after that within the
5  Hospital Products Division?
6      A.  Area sales director for anesthesia
7  products.
8      Q.  Did you remain in that position until
9  the time of the spin?
10     A.  I still have that same title, the same
11 position.
12     Q.  And the anesthesia product line I
13 assume went to PPD and was not part of the spin
14 operation?
15     A.  Correct.
16     Q.  Ma'am, did you ever hear about the Ross
17 or Abbott's criminal plea with regard to conduct
18 by its Ross products division?
19     A.  Yes.
20     Q.  What do you know about that?
21     A.  From what I read in the Chicago paper,
22 that some representatives in Texas were advising

Page 168

1  I believe a distributor on how to bill.  Although
2  I don't know why that was being done.
3      Q.  Did you have any concerns when you
4  learned about that, about any of the practices or
5  about the legality or possible problems
6  associated with any of the practices within the
7  Hospital Products Division?
8      A.  No.
9      Q.  Why not?
10         MR. WINCHESTER:  Objection, form.
11         THE WITNESS:  Because we never told
12 anybody how to bill.
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  But you did do billing on behalf of
15 clients; right?
16     A.  Sure.
17     Q.  Other than what you read in the Chicago
18 paper, do you have any other familiarity with the
19 Ross case?
20     A.  No.
21     Q.  Are you familiar with any compliance
22 initiatives that were undertaken after the Ross

Page 169

1  criminal plea?
2      A.  I don't know if it was a direct result
3  of that or not, but we did and still do have
4  several modules that we are required to take and
5  pass every year.  And a few of the questions on
6  one of the modules, I don't remember which one,
7  talk about reimbursement, and that is not to be
8  discussed with clients or customers.
9      Q.  Do you recall participating or viewing,
10 either participating in a live meeting or viewing
11 a video of a live meeting entitled "Safeguarding
12 Trust"?
13     A.  Yes.
14     Q.  What is that?
15     A.  That's one of those modules.
16     Q.  Okay.  Did anyone ever ask you to
17 evaluate the business practices of either Alt.
18 Site or Home Infusion after the Ross criminal
19 plea?
20     A.  No.
21     Q.  Are you familiar with the term DOJ
22 AWPs?

                    43 (Pages 166 to 169)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL    February 7, 2008
                         Chicago, IL

Page 170

1     A.  Yes.
2     Q.  What is a DOJ AWP?
3     A.  At some point in time when I was in
4  Home Infusion some states had a change in AWP.
5     Q.  And how did you know that?
6     A.  It was in one of the home care
7  newsletters that I get, or used to get.
8     Q.  Is that an outside source?
9     A.  Yes.
10    Q.  It's not an Abbott-generated source?
11    A.  No.
12    Q.  Did you have any other understanding of
13 the term DOJ AWP?
14    A.  Just from what I read there that some
15 of the AWPs had changed in some states.
16    Q.  Were you aware that -- let me ask you
17 this:  At any time did anyone ever ask you as the
18 director of Home Infusion to evaluate the impact
19 of DOJ AWPs upon Abbott's Home Infusion business
20 unit?
21    A.  No.
22    Q.  Are you aware of any studies that were

Page 171

1  done concerning changes to AWPs in the early
2  2000s, 2000, 2001, 2002, and the impact that it
3  might have on Abbott's customers?
4     A.  I didn't initiate anything like that.
5     Q.  I'm not asking if you initiated it.  My
6  question is a little bit broader than that.
7         Are you aware of or did you learn of
8  any reviews or studies that were undertaken
9  concerning changes in AWPs and the impact upon
10 Abbott's business within the Hospital Products
11 Division?
12    A.  To a certain degree, yes.
13    Q.  What are you familiar with?
14    A.  A client, University of Michigan,
15 looked at it.
16    Q.  Okay.
17    A.  And that's all I remember about it.
18    Q.  What about within Abbott?  Do you
19 recall any directives from above you like at the
20 Don Robertson level, Rick Gonzalez level, or even
21 above that, to evaluate the impact of changes
22 upon AWP to your particular business unit?

Page 172

1     A.  No.
2     Q.  Are you familiar with the TAP criminal
3  plea?
4     A.  Yes.  I know it was for a large sum of
5  money, but I don't remember what it was for.
6     Q.  And what do you know?  How did you come
7  to learn about the TAP criminal plea?
8     A.  It was in the Chicago Tribune.
9     Q.  So from the paper?
10    A.  Right.
11    Q.  Do you recall at any time any
12 discussions within Abbott about either the Ross
13 criminal plea, settlement agreement and CIA, or
14 the TAP criminal plea, settlement, and CIA?
15    A.  No.
16    Q.  Do you recall anyone at any time saying
17 hey, you know, maybe we should evaluate our
18 policies, practices, and procedures within Home
19 Infusion or Alt. Site in light of the Ross CIA or
20 the TAP CIA?
21        MR. WINCHESTER:  Objection, form.
22        THE WITNESS:  No.

Page 173

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Ma'am, are you familiar with the term
3  "spread"?
4     A.  Yes.
5     Q.  Are you familiar with the term "spread
6  marketing"?
7     A.  No.
8     Q.  What is spread?
9     A.  In the context that I learned about it
10 last time, that we talked about it last time, it
11 is the difference between what is billed and what
12 is paid.
13    Q.  Are you aware of any prohibitions at
14 Abbott within the Hospital Products Division upon
15 spread marketing activities?
16    A.  I am not.
17        MR. WINCHESTER:  Objection, form.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  Did you participate in the drafting of
20 any Significant Events Reports?
21    A.  Yes.
22    Q.  Which Significant Events Reports?

44 (Pages 170 to 173)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL   February 7, 2008
                        Chicago, IL

Page 174

1         MR. WINCHESTER:  Objection, form.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  Let me ask this:  Were there
4  Significant Events Reports within Alt. Site
5  itself, or were they just HPD Significant Events
6  Reports?
7     A.  Well, it's nothing formal.  When we
8  would have one-on-ones with our superiors, we
9  would send in beforehand a Significant Events for
10 the last month or whatever.
11    Q.  So you drafted Significant Events and
12 then would hand them in to, for example, Mike
13 Sellers?
14    A.  Right.
15    Q.  Did you participate in any drafting of
16 any Significant Events Reports that Mike Sellers
17 authored and sent on to his superiors?
18    A.  No.
19    Q.  Do you know where the Significant
20 Events Reports are that you drafted when you
21 submitted them to Mike Sellers?
22    A.  Should be in his file.

Page 175

1     Q.  Did you retain copies?
2     A.  No.
3     Q.  Did you retain any copies
4  electronically, like on your computer?
5     A.  Yes.
6     Q.  At the time of the Home Infusion
7  closure, did you print off any of those and
8  retain them?
9     A.  After Mike left I didn't provide
10 Significant Events.
11    Q.  Okay.  What about prior to -- when you
12 say "when Mike left," when do you mean?
13    A.  When I took over Home Infusion.
14    Q.  When you took over Home Infusion, did
15 you have any contact with Mr. Sellers at all?
16    A.  Well, I still reported to him, but we
17 were about ten miles apart.
18    Q.  So at the time that he moved to a
19 different location, that's when you stopped
20 providing Significant Events Reports?
21    A.  To my memory, yes.
22    Q.  Ma'am, what I'd like to do at this time

Page 176

1  is to start going over some exhibits, okay?
2     A.  Okay.
3     Q.  This one is --
4         MS. ST. PETER-GRIFFITH:  And what I'd
5  like to do, Jason, is just mark these, so that
6  we're not trying to keep track of the Texas
7  numbers, just Kreklow Exhibit 1, Exhibit 2.
8         I know that we went over this before,
9  but I've actually got --
10        MR. WINCHESTER:  Wait a minute.  How
11 were they marked the first time?
12        MS. ST. PETER-GRIFFITH:  They were
13 marked with, we had two different numbers.  We
14 had like, we started I think in the 800 range and
15 then we moved on to 1104.
16        MR. WINCHESTER:  So Ray and Riklin all
17 used Texas numbers?
18        MS. ST. PETER-GRIFFITH:  They all used
19 Texas numbers, yes.
20        MR. WINCHESTER:  So we don't have
21 another set of Kreklow 1 through whatever?
22        MS. ST. PETER-GRIFFITH:  No, no.  We do

Page 177

1  not.
2         MR. WINCHESTER:  So some of these are
3  going to be the same documents, though we're just
4  going to have two different exhibit designations
5  on them?
6         MS. ST. PETER-GRIFFITH:  Right,
7  exactly.  I think we're only going to have maybe
8  a couple that repeat.  I'm trying to reduce
9  those.
10        MR. WINCHESTER:  Okay.  This is Kreklow
11 1 you just gave me?
12        MS. ST. PETER-GRIFFITH:  Kreklow 1.
13        (WHEREUPON Deposition Exhibit
14 Kreklow 001 was marked as of 2/7/2008 and
15 tendered to the witness.)
16        THE WITNESS:  Okay.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  Ma'am, do you recall reviewing this
19 document?
20    A.  Last time.
21    Q.  The last time at your deposition.
22    A.  Yes.

45 (Pages 174 to 177)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                        Chicago, IL

Page 178

1     Q.  And I believe your testimony before was
2  you did not recall this document previously.
3     A.  That's true.
4     Q.  Since your last deposition, has your
5  memory been refreshed at all as to whether you
6  may have reviewed this document prior to your
7  last deposition?
8     A.  No.
9     Q.  If you could look at the top and at the
10 bottom.  Can I just ask you, was that the
11 standard Alternate Site contract marketing I
12 guess letterhead, for lack of a better word?
13    A.  I don't know.  I don't know if it was
14 or not.
15    Q.  Had you seen this before, this type of
16 letterhead?
17    A.  It looks vaguely familiar, but I can't
18 tell you because I would have never gotten
19 anything normally that would have that on there.
20    Q.  That would have this type of --
21    A.  Yeah, that logo or whatever you want to
22 call it.

Page 179

1     Q.  Does reviewing this document now
2  refresh your recollection with regard to AWP
3  issues that you might have been involved in?
4     A.  No.
5     Q.  Do you know why you would have been on
6  this memo?
7     A.  No.
8     Q.  Is there anyone that you can see on the
9  cc list that would have a better familiarity with
10 the issues concerning Red Book and AWP?
11    A.  Not to my knowledge, no.
12    Q.  Is everyone on this list some kind of
13 sales marketing manager?
14    A.  Some national account managers, there
15 are some NAMs, two marketing managers, a sales
16 director, distributor, distributor manager, and
17 then I don't know what Cindy Dawson did.
18    Q.  Do you recall at any time, independent
19 of this document, do you recall at any time
20 discussing AWPs or Red Book or reimbursement with
21 Mr. Kipperman?
22    A.  No.

Page 180

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Ma'am, there are a couple of exhibits
3  that I only have two copies of, so I'm going to
4  ask you to slide it on over to Jason so that he
5  could take a look at it first.
6        MR. WINCHESTER:  Ann, I think you might
7  have given us one that has your handwriting on
8  it.  It's got some pen, what appears to be fresh
9  pen.
10       MS. ST. PETER-GRIFFITH:  We can mark
11 this as the next exhibit actually.
12       (WHEREUPON Deposition Exhibit
13 Kreklow 002 was re-marked as of 2/7/2008.)
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  If you want to take a few minutes to
16 look at this.  (Document tendered to the
17 witness.)
18    A.  Okay.
19    Q.  Ma'am, do you recognize this document?
20    A.  No, not particularly, no.
21    Q.  I appreciate that it's from 1996.
22       It appears to be a memorandum addressed

Page 181

1  to the area business managers including you as
2  well as business development and regional nurse
3  consultants.  Do you see that?
4     A.  Right.
5     Q.  Do you have any doubt that you would
6  have received this memo?
7     A.  I don't remember getting it.
8     Q.  But did you normally receive sales
9  results memoranda from Michael Calsin?
10    A.  Yes.
11    Q.  If you'll note in the body of this
12 memorandum, the second sentence says "As you will
13 notice on the following pages, I have now
14 adjusted the sales reports to reflect the recent
15 organization of HIS field staff."  Do you see
16 that?
17    A.  Yes.
18    Q.  Do you know what recent organization is
19 being referenced there?
20    A.  No.
21    Q.  Do you recall any reorganization or
22 changes in or around the first few months of

46 (Pages 178 to 181)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL    February 7, 2008
Chicago, IL

Page 182

1  1996?
2      A.  No.
3          (WHEREUPON Deposition Exhibit
4  Kreklow 003 was marked as of 2/7/2008.)
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  We're going to actually spend some time
7  on this particular document, ma'am, so take your
8  time in reading it.  (Document tendered to the
9  witness.)
10     A.  I'm done.
11     Q.  Okay.  Ma'am, do you recognize this
12  document?
13     A.  No.
14     Q.  Are you familiar with the issue raised
15  in it concerning the product, is it Ceredase?
16     A.  Yes.
17     Q.  What are you familiar with?
18     A.  This reminded me of it.
19     Q.  What do you recall about the Ceredase
20  issue?
21     A.  Only from what I read.  That's what I
22  recall.  But it was familiar to me.

Page 183

1      Q.  How is it familiar to you?
2      A.  Because when I read it, something in my
3  brain said you know about this.
4      Q.  You remember an issue coming up?
5      A.  Yes.
6      Q.  Is Ceredase a drug product that was an
7  Abbott product?
8      A.  No.
9      Q.  So in April of '96 you were in Home
10  Infusion?
11     A.  Yes.
12     Q.  Was Lynn Leone in Home Infusion?
13     A.  Yes.
14     Q.  Do you know why Lynn Leone wrote this
15  memorandum?
16     A.  No.
17     Q.  And you're one of the addressees;
18  right?
19     A.  Yes.
20     Q.  The memorandum appears to be notifying
21  you that a request had been made from CMHR;
22  right?

Page 184

1      A.  Yes.
2      Q.  What's that?
3      A.  Children's Memorial Hospital.  I don't
4  know what the "R" is for.
5      Q.  Is that a Home Infusion client?
6      A.  It was, yes.
7      Q.  It appears that the Home Infusion
8  client made a request to either take on patients
9  or to have Abbott provide Ceredase; is that fair?
10     A.  That's right.
11     Q.  If you could flip to the back page
12  first, under where it says Item 7 "This
13  information has been shared with Charles Such at
14  CM Healthcare, and he understands that we will
15  not be taking on any Ceredase patients."  Do you
16  see that?
17     A.  Yes.
18     Q.  What does that mean that "we will not
19  be taking on"?  Does that mean that Abbott
20  pharmacies will not be taking on or that CMHCR
21  will not be taking on?
22     A.  We, Abbott.

Page 185

1      Q.  What does that mean in terms of you, if
2  Abbott did not take on Ceredase patients, what
3  did that mean for the Home Infusion client?
4      A.  That they would continue to have the
5  drug provided by Nova Factor.
6      Q.  Now, Ceredase appears to be a very
7  expensive drug?
8      A.  Yes.
9      Q.  According to this memorandum, Ms. Leone
10  or someone made an inquiry and determined that
11  Abbott could only acquire the drug at AWP; right?
12     A.  That's what it says, right.
13     Q.  Do you recall an issue about that
14  coming up, about needing to buy Ceredase at AWP?
15     A.  No.  Again, I'm sure I was told that
16  and I read it here, but I don't remember that.
17     Q.  Did Abbott make money off the nonAbbott
18  products that it compounded at its pharmacies?
19         MR. WINCHESTER:  Objection, form.
20         THE WITNESS:  I don't know.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Well, if Abbott acquired the drug, this

47 (Pages 182 to 185)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                        Chicago, IL

Page 186

1  particular drug product, Ceredase, at AWP and was
2  able to acquire it at AWP --
3      A.  Yes.
4      Q.  -- and it could be billed at AWP, why
5  not cover the Ceredase patient?
6          MR. WINCHESTER:  Objection,
7  hypothetical.
8          THE WITNESS:  Because we would have to
9  deliver the product, bill for the product, and
10  that would be a cost up and above the AWP.  So we
11  would be losing money.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Okay.  In Item 6 it says "Since our
14  cost is AWP, there was no way that we can make
15  any money on this drug."  Do you see that?
16      A.  Yes.
17      Q.  Why couldn't Abbott charge separately
18  for its compounding fee in addition to the AWP?
19          MR. WINCHESTER:  Objection, form.
20          THE WITNESS:  I don't know.  But that
21  wouldn't cover delivery costs and everything else
22  that went along with it.

Page 187

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Why couldn't delivery costs be
3  allocated in the per diem?
4          MR. WINCHESTER:  Objection, form.
5          THE WITNESS:  It may not be a per diem.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Did you have an understanding that if
8  drug products are charged at AWP, the biller for
9  that product could not make a profit?
10      A.  No.  What this tells me is that we
11  couldn't get this product at a discount.  So
12  we're not going to provide it because our cost
13  would be higher.
14      Q.  As a former national account manager,
15  do you know whether your clients had the some
16  philosophy?
17      A.  I don't know.
18      Q.  Well, if all of your clients purchased
19  Abbott product at AWP, do you know how they could
20  make a profit?
21          MR. WINCHESTER:  Objection,
22  hypothetical.

Page 188

1          THE WITNESS:  They didn't purchase the
2  product at AWP.  They had it on consignment.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  So they didn't pay anything for the
5  product until such time as a percentage of the
6  reimbursement was collected by Abbott?
7      A.  That's correct.
8      Q.  Let's go to before you were at Home
9  Infusion, when you were at Alt. Site, or I'm
10  sorry, yes, Alt. Site product sales.
11      A.  Product sales.
12      Q.  If Abbott's clients within Alt. Site
13  product sales bought product at AWP, could they
14  make a profit?
15          MR. WINCHESTER:  Objection,
16  hypothetical.
17          THE WITNESS:  It would depend on the
18  payor.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  How so?
21      A.  If a private pay company would pay more
22  than AWP, if they acquired it at AWP, then they

Page 189

1  would make money.  If they didn't, they wouldn't.
2  But I don't know if, I don't have any knowledge
3  of that.
4      Q.  Do you know whether it was important
5  when you were a NAM within product sales, whether
6  it was important for your clients to procure
7  product at a discounted amount less than AWP?
8      A.  I did not know that.
9      Q.  Did you have any discussions at any
10  time when you were a NAM about AWP with any of
11  your clients?
12      A.  Never.
13          MS. ST. PETER-GRIFFITH:  Mark this as
14  the next exhibit, please.
15          (WHEREUPON Deposition Exhibit
16  Kreklow 004 was marked as of 2/7/2008.)
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Okay.  Ma'am, can you tell me what is
19  this document?  (Document tendered to the
20  witness.)
21      A.  It's an explanation of my commission.
22      Q.  How were you compensated when you were

48  (Pages 186 to 189)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 190

1  within Home Infusion?
2      A.  For signing accounts and for
3  implementing accounts in a proper way so they
4  would grow.
5      Q.  Did you have a base salary?
6      A.  Yes.
7      Q.  But you also had commissions?
8      A.  Yes.
9      Q.  What does this document reflect?
10         MR. WINCHESTER:  Hold on.  I don't mean
11  to interrupt in the middle of a question, but I
12  think for matters dealing with sort of personal
13  information like this, Becky hasn't been marking
14  them as exhibits when it's people's personal
15  info.
16         MS. ST. PETER-GRIFFITH:  Okay.  Well,
17  we can keep this as a highly confidential
18  document.  That's fine.
19         MR. WINCHESTER:  I mean I think that's
20  been the process.  Just so we're not having any
21  risk of airing people's personal financial
22  information.

Page 191

1         MS. ST. PETER-GRIFFITH:  Sure, sure.
2  And for everything what we can do is we'll treat
3  these as highly confidential documents.
4         Is there a question pending?
5         MR. WINCHESTER:  There was.  I
6  interrupted.  I'm sorry.  I think you just said
7  what is the document.
8             (WHEREUPON said record was read
9  back as requested.)
10         THE WITNESS:  It's an explanation of my
11  incentive.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  And how did your general, you don't
14  have to go through and explain item by item, but
15  generally how did your incentive work?
16      A.  I got a certain amount for signing a
17  new agreement and a certain amount for properly
18  implementing new clients so that they could start
19  to grow sooner rather than later.
20      Q.  So it was in your best interest then to
21  see Home Infusion sort of thrive?
22      A.  Sure.

Page 192

1      Q.  Did any of your sales force operate on
2  a commission basis?
3      A.  Yes.
4      Q.  Did they also have a base salary and
5  then they worked off a partial commission as
6  well?
7      A.  Yes.
8      Q.  So it was in their best interests too
9  to see these contracts signed up and thrive?
10      A.  Sure.
11      Q.  Did you start to see your commissions
12  change during the course of your tenure within
13  Home Infusion?
14      A.  Sometimes they went up, sometimes they
15  went down.
16      Q.  Did they go down as you approached the
17  closure of Home Infusion?
18      A.  Not to my recollection.
19      Q.  Did you have or did you maintain this
20  compensation structure during your entire tenure
21  when you were in Home Infusion?
22      A.  I had an incentive program.

Page 193

1      Q.  Did you have an incentive program when
2  you were a NAM?
3      A.  Yes, I did.
4      Q.  So prior to joining Home Infusion, you
5  had an incentive program?
6      A.  Yes.
7      Q.  Was it similar to this?  How did it
8  work?
9         MR. WINCHESTER:  Objection, form.
10         THE WITNESS:  I can't remember.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  So this reflects, just generally, from
13  July to December of '96 you received an incentive
14  commission of $9,479?
15      A.  Right.
16      Q.  Generally, what percentage of your
17  income as an Abbott Home Infusion employee was
18  allocated to base salary as opposed to --
19      A.  Base salary was greater.
20      Q.  Base salary was greater?
21      A.  Uh-huh.
22      Q.  Can you give a general approximation as

49 (Pages 190 to 193)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 194

1  to what percentage of your compensation was
2  attributable to commission?
3      A.  Fifteen percent maybe, twenty percent.
4      Q.  Well, I assume it might have varied
5  from year to year?
6      A.  Yes.  There was always a target, and it
7  followed some Abbott guidelines, but I don't
8  remember what that is.
9      Q.  Did you have input into what those
10 targets would be?
11     A.  No.
12     Q.  Who set the target?
13     A.  I don't know.
14     Q.  Could it have been Mike Sellers or
15 someone above you?
16         MR. WINCHESTER:  Objection, form.
17         THE WITNESS:  It was a corporate
18 directive.
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  So it would have been someone outside
21 of HPD?
22     A.  Yes.

Page 195

1      Q.  Within the personnel department?  Do
2  you know?
3      A.  I don't know.
4         MS. ST. PETER-GRIFFITH:  Mark this as
5  the next exhibit.
6         (WHEREUPON Deposition Exhibit
7  Kreklow 005 was marked as of 2/7/2008.)
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Ma'am, you don't necessarily need to
10 study this.  Take as much time as you need, but
11 I'm only going to be asking you really about the
12 first couple of pages, the first three pages I
13 guess.  The top one is a file folder cover it
14 appears.  (Document tendered to the witness.)
15     A.  Okay.
16     Q.  Ma'am, the second page of this document
17 appears to be another one of those sales results
18 memoranda?
19     A.  Yes.
20     Q.  Is that what that is?
21         And you received that along with other
22 area business managers and business development

Page 196

1  and regional nurse consultants?
2      A.  Yes.
3      Q.  The second sentence of the text says
4  "At this point in the campaign, your sales should
5  be running at or above fifty percent of your base
6  sales."
7      A.  Right.
8      Q.  Do you see that?
9      A.  Yes.
10     Q.  First of all, do you know what campaign
11 is being referenced in this memo?
12     A.  In HPD we split the year into two six-
13 month campaigns.  For sales, it's for rep
14 purposes.
15     Q.  Do you know what it means when the memo
16 says "your sales should be running at or above
17 fifty percent of your base sales"?
18     A.  Yes.
19     Q.  What does that mean?
20     A.  It means that the sales through March,
21 it's three months.  So the campaign is six
22 months, they should be fifty percent there.

Page 197

1      Q.  The attachment to this document, do you
2  recognize maybe not necessarily this document but
3  the format of this document?
4      A.  Yes.
5      Q.  What is this?
6      A.  It's sales results for the specific
7  areas and by the specific representative.
8      Q.  Were these distributed quarterly?
9      A.  Oh, I don't remember.
10     Q.  Do you remember receiving them on some
11 form of regular basis?
12     A.  Yes.
13     Q.  Do you know where copies would be
14 retained or maintained?
15     A.  No.
16     Q.  Did you retain copies of these as part
17 of your own records?
18     A.  Yes.
19     Q.  Do you still have them?
20     A.  They would be in corporate records for
21 mine.  I don't know where Mike Calsin's are.
22     Q.  So when you left Home Infusion, did

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                              Chicago, IL

Page 198

1  they go to corporate records or when Home
2  Infusion closed?
3      A.  They went to corporate records.
4      Q.  Did all of your documents when you were
5  in Home Infusion go to corporate records?
6      A.  Yes.
7      Q.  So you started a new in anesthesia with
8  new computer, new files?
9      A.  Correct.
10     Q.  Do you recall how these sales summaries
11  were generated, or do you know how these sales
12  summaries were generated?
13     A.  I don't know.
14     Q.  Did you have to input any information
15  to assist someone like Mike Calsin in producing
16  this information?
17     A.  No.
18     Q.  Who is Mike Calsin?
19     A.  Contract marketing analyst, or whatever
20  it says here.
21     Q.  Do you recall him personally?
22     A.  Sure.

Page 199

1      Q.  So he worked in contract marketing?
2      A.  Yes.
3      Q.  But that was separate and distinct from
4  your sales role?
5      A.  Yes.
6      Q.  Did he ever work for you?
7      A.  Yes.
8      Q.  He did?
9      A.  Yes.
10     Q.  When you were the director of Home
11  Infusion?
12     A.  Yes.
13     Q.  Did his responsibilities change?
14     A.  Yes.
15     Q.  How did they change?
16     A.  He was the contract marketing manager
17  at that time.
18     Q.  At that time?
19     A.  Yes.
20     Q.  Was there a woman who you said was also
21  the contract marketing manager?
22     A.  Kathy Riddle.

Page 200

1      Q.  During what period of time was she the
2  manager?
3      A.  She left shortly, I would guess about
4  six months after I started in Home Infusion.
5      Q.  So I mean this memo is dated '97.  So
6  clearly she wasn't there for that long, right,
7  while you were there?
8      A.  Not that I remember.
9          Well, yes, I do believe she was because
10  I worked with her on several contracts.  So she
11  was.  I just remember I was very sad to see her
12  go.
13     Q.  You liked working with her?
14     A.  Yeah, I did.  But I don't remember.
15  She left sometime in the summer of a year.  I
16  don't know which year.
17         MR. WINCHESTER:  Let me just say
18  gratuitously for the record that Renee was
19  beating my head in in court just last week saying
20  we had not given you guys any documents showing
21  financial performance for Home Infusion.  So I'm
22  happy to see all of these.

Page 201

1          (WHEREUPON Deposition Exhibit
2  Kreklow 006 was marked as of 2/7/2008.)
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Ma'am, I'm just going to ask you
5  briefly is this another one of the every six
6  month reports that you get concerning your
7  incentive?  (Document tendered to the witness.)
8      A.  Yes.
9      Q.  And this is for '97?
10     A.  Yes.
11     Q.  Did you retain copies of these?
12     A.  It would be in my file, yes.
13     Q.  In your file that ultimately went to
14  corporate records?
15     A.  Right.
16     Q.  Did you retain personal copies at all?
17     A.  No.
18         MS. ST. PETER-GRIFFITH:  If we can mark
19  this as the next exhibit.  And, Jason, I have to
20  tell you I marked your name on this because I
21  inadvertently circled something on it.
22         (WHEREUPON Deposition Exhibit

51 (Pages 198 to 201)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL   February 7, 2008
Chicago, IL

Page 202

1  Kreklow 007 was marked as of 2/7/2008 and
2  tendered to the witness.)
3       THE WITNESS:  Okay.
4  BY MS. ST. PETER-GRIFFITH:
5       Q.  If you could flip to the next page, I
6  grouped this as one exhibit because they appear
7  to be related documents, but they're two
8  different documents.  I just want to bring that
9  to your attention.
10      A.  Okay.
11      Q.  Ma'am, do you recognize either of these
12  two pages?
13      A.  No.
14      Q.  Do you recall in or around, the first
15  page appears to be an inter-office memorandum
16  from Kathy Riddle to Sondra Raider.  Do you see
17  that?
18      A.  From Sondra to Kathy.
19      Q.  Oh, from Sondra to Kathy.  I'm sorry.
20      A.  Yes.
21      Q.  Then down in the bottom there's a cc
22  and you're listed as a cc?

Page 203

1       A.  Right.
2       Q.  And the second is a July 8, '97 letter
3  from Michael Calsin where you were also cc'd to
4  Mike Drees at Mercy Medical Center.  Do you see
5  that?
6       A.  Yes.
7       Q.  What was Mercy Medical Center?
8       A.  It was a client of Home Infusion.
9       Q.  Do you recall that their contract was
10  terminated?
11      A.  No.  I don't recall anything about
12  them.
13      Q.  You don't?
14      A.  No.
15      Q.  Do you know why you would have been a
16  cc on both the letter and the inter-office memo?
17      A.  Sondra reported to me.
18      Q.  Generally, did the folks who reported
19  to you have wide latitude with regard to
20  terminating contracts?
21      MR. WINCHESTER:  Objection, form.
22      THE WITNESS:  Meaning what?

Page 204

1  BY MS. ST. PETER-GRIFFITH:
2       Q.  Meaning could -- let me ask it this
3  way: Could a contract termination have taken
4  place without your being involved in it?
5       MR. WINCHESTER:  Objection, form.
6       THE WITNESS:  Mercy Medical Center
7  wanted to terminate.  It was their idea to
8  terminate the agreement.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.  But would that have been something that
11  would have been brought to your attention?
12      A.  Yes.
13      Q.  And it appears that there's a reference
14  to Karla in the inventory section.  Do you see
15  that?
16      A.  Yes.
17      Q.  It says "Karla agreed to take back full
18  cases."
19      Do you have any doubts that that's you
20  that's being referenced?
21      A.  No, that's me.
22      Q.  Would you have had to have approved the

Page 205

1  taking back of any provider cases?
2       A.  Yes.
3       Q.  What does that mean, full cases of
4  provider sets if they decide not to use provider
5  pumps?
6       A.  Provider pumps is like the AIM pump and
7  the ANNE pump that we talked about before.
8       Q.  Okay.
9       A.  And they use a specific infusion set
10  that can only be used in that pump.  And if
11  they're not using that pump, they don't need the
12  sets.  And they're not going to use our pumps,
13  they're going to rent them from somebody else and
14  use a different pump.
15      Q.  Were these pumps provided to clients
16  like Mercy Medical for rent or were they sold to
17  them?
18      A.  It was part of the consigned inventory.
19      Q.  So it wasn't just drug products then
20  that were consigned, it was also devices?
21      A.  Yes.
22      Q.  What rental rates or what rates would

52 (Pages 202 to 205)

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                      Chicago, IL

Page 206

1  be charged to Abbott Home Infusion clients for
2  the use of these particular devices?
3      A.  I can't say specifically because it was
4  in the, it was in the percentage that we got.
5      Q.  So there wasn't necessarily a separate
6  charge.  It was just part of the percentage of
7  overall revenue collection?
8      A.  Right.
9      Q.  Are you familiar with the nature of the
10 Ross conduct that was at issue in the criminal
11 case?
12     A.  It had to do with pumps.
13     Q.  Do you know whether it had to deal with
14 the provision of basically free pumps?
15     A.  I don't remember that specifically.
16     Q.  Well, isn't the provision of pumps
17 under these consignment arrangements essentially
18 the same as the provision of free pumps?
19     A.  No.
20     Q.  How so?
21     A.  Because if they were using a pump on a
22 therapy, their price, our percentage was higher

Page 207

1  than if they were not using a pump.
2      Q.  Well, how would you know what price was
3  being charged for the use or sale of the pump?
4          MR. WINCHESTER:  Objection, form.
5          THE WITNESS:  How would I know?
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Or how would Abbott know what the price
8  was for the use or lease of the pump?
9      A.  It was in the calculation that was done
10 by contract marketing.
11     Q.  Would there be a specific number that
12 would be allocated to pump rental or pump use?
13     A.  I don't know.
14     Q.  In that same Inventory section, a
15 couple of sentences down it says "I told them we
16 would price product based on PBI rates."  Do you
17 see that?
18     A.  Yes.
19     Q.  When Abbott terminated contracts or
20 when there was a contract termination, for
21 product that was retained by the consignment
22 client how did you decide what rates you would

Page 208

1  charge them if they didn't have a contract?
2      A.  I'm sorry.  Say that again.
3      Q.  Sure.  In those instances where there
4  was a contract termination and there wasn't a
5  separate agreement for example with Alt. Site for
6  pricing of product --
7      A.  Okay.
8      Q.  -- so Abbott is severing its
9  relationship, it doesn't have any other
10 relationship with the former Home Infusion
11 client.  What price, how would you determine what
12 price would be charged for the product that was
13 retained by the Home Infusion client?
14     A.  That they were going to pay us for.  It
15 was done at the buying group rate that they
16 belonged to.
17         All Abbott Home Infusion clients became
18 members of a company or of a GPO called Purchase
19 Connection.
20     Q.  Okay.
21     A.  So it would be priced at the Purchase
22 Connection price.

Page 209

1      Q.  Why not charge them the catalog or list
2  price?
3          MR. WINCHESTER:  Objection,
4  hypothetical.
5          THE WITNESS:  Because they had access
6  to the GPO price.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Even though they weren't acquiring it
9  through the GPO process?
10     A.  Yes.
11     Q.  And every Home Infusion customer could
12 access at the GPO price?
13     A.  Every Home Infusion company was
14 automatically signed up with Purchase Connection.
15     Q.  Do you see where it says "Reimbursement
16 Training"?
17     A.  Right.
18     Q.  There's a fee that appears to be
19 allocated for $1,250.  Do you see that?
20     A.  Yes.
21     Q.  For one day.
22     A.  Right.

53 (Pages 206 to 209)

Kreklow, Karla       HIGHLY CONFIDENTIAL     February 7, 2008
                          Chicago, IL

Page 210

1    Q.  Do you know whether Abbott Home
2  Infusion had a way of or a methodology for
3  determining the cost to Abbott of its particular
4  services, for example reimbursement training?
5    A.  No.
6    Q.  At times like this when there was a
7  termination of a contract, do you know how those
8  types of service fees were arrived at?
9    A.  I don't know that.
10   Q.  Would the terms of a termination with a
11 contract like Mercy be something that you would
12 have to approve when you were in your role in
13 Home Infusion?
14   A.  No.
15   Q.  Who would have to approve that?
16   A.  Contract marketing.
17   Q.  I'd like to go back a little bit to our
18 discussion earlier about AWP.
19        Was there any particular reason why you
20 didn't discuss when you were a NAM or within Home
21 Infusion why you didn't discuss AWP with
22 customers?

Page 211

1    A.  There was no reason for me to discuss
2  it.
3    Q.  So it wasn't because you couldn't, it
4  was just there was no reason that came up for you
5  to discuss it?
6    A.  Right.
7    Q.  Do you recall any discussions with
8  customers about vancomycin AWPs?
9    A.  Not specifically with me, no.
10       MS. ST. PETER-GRIFFITH:  Mark this as
11 the next exhibit.
12       (WHEREUPON Deposition Exhibit
13 Kreklow 008 was marked as of 2/7/2008 and
14 tendered to the witness.)
15       THE WITNESS:  Okay.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Ma'am, I'm going to ask you if you
18 recognize this document.
19   A.  I don't recognize it.  I know what it
20 is, but I don't recognize it.
21   Q.  Okay.  What is it?
22   A.  It is a summary of my incentives for

Page 212

1  the second campaign of 1997.
2    Q.  And the second campaign is that six-
3  month period from July to December?
4    A.  Right.
5    Q.  Now, the second page appears to be a
6  different calculation.  Do you see that?
7    A.  Yes.
8    Q.  Do you recall sometime for that second
9  campaign in '97 that there was a recalculation of
10 your commission?
11   A.  No.  That was not uncommon.
12   Q.  What would prompt a recalculation?
13       MR. WINCHESTER:  Objection, form.
14       THE WITNESS:  Something was incorrect,
15 but I can't tell you what.  I can't even tell you
16 what's incorrect on this one that I'm looking at.
17       MS. ST. PETER-GRIFFITH:  Okay.
18       Mark this as the next exhibit.
19       (WHEREUPON Deposition Exhibit
20 Kreklow 009 was marked as of 2/7/2008.)
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  Ma'am, we're going to spend a little

Page 213

1  bit of time on this document, so take your time.
2  (Document tendered to the witness.)
3    A.  Okay.  Do you want me to read the whole
4  thing?  I remember this.
5    Q.  You do?
6    A.  Yes.
7    Q.  Ma'am, what is this document?
8    A.  It's a letter to the consultant
9  utilized by Northwestern Hospital.
10   Q.  And Northwestern is here in Chicago?
11   A.  Yes.
12   Q.  And the consultant was in Texas?
13   A.  Yes.
14   Q.  And this is a letter authored by you?
15   A.  Yes.
16   Q.  Can you identify whether this is the
17 final letter?
18   A.  No.  Is it signed?  No.  I can't tell
19 you if it's the final letter.
20   Q.  Okay.  What do you recall about dealing
21 with this particular consultant concerning
22 Northwestern?

                         54 (Pages 210 to 213)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
Chicago, IL

Page 214

1    A.  He was pretty tough.
2    Q.  Okay.  How so?
3    A.  He was.  He was very demanding.
4    Q.  What type of consulting role did he
5  play or did he serve for Northwestern?
6    A.  He reviewed all documents and was in on
7  the negotiations.  He was the one that told
8  Northwestern what they should be looking for,
9  what kind of prices they should be paying for
10 various services.
11   Q.  And ultimately I think you testified
12 earlier that you entered into a successful
13 relationship with Northwestern?
14   A.  Yes.
15   Q.  And that there was a successful build-
16 out of a pharmacy for Northwestern.
17   A.  Yes.
18   Q.  If you could go to the bullet points
19 sort of in the middle of the page.
20   A.  Yes.
21   Q.  The first bullet point says "Per diem
22 pricing as discussed in our letter to you on

Page 215

1  October 14."  Do you see that?
2    A.  Yes.
3    Q.  What did you mean by "per diem
4  pricing"?
5    A.  They would pay us a fixed amount for a
6  particular therapy.
7    Q.  Then the next bullet point says "Abbott
8  Home Infusion Services Pharmacy is willing to
9  assume compounding for all Northwestern patients
10 immediately up until the time Northwestern
11 pharmacy is completed."  Do you see that?
12   A.  Yes.
13   Q.  That per diem fee, was that the fee for
14 the compounding services that are referenced in
15 that next bullet point?
16   A.  I don't know what was discussed in the
17 letter to him on October 14th, but that never
18 happened.  We never did compounding for them.
19   Q.  Oh, you never did compounding for
20 Northwestern?
21   A.  No, no.
22   Q.  How come?

Page 216

1    A.  They didn't, they chose not to have us
2  do that.
3    Q.  So you helped them develop the home
4  infusion business and build out the pharmacy, but
5  they didn't take advantage of Abbott's
6  pharmacies' compounding services?
7    A.  Right.
8    Q.  If you could go to the next page.  How
9  did you ensure that you were not, under the
10 second bullet point, that you were not competing
11 with Northwestern for patient referrals?
12   A.  That would mean that we would not go
13 into Northwestern Hospital, call on the
14 physicians, and at requests for patients.
15   Q.  In the fifth bullet point down it says
16 "Northwestern would be a member of the Abbott
17 Home Infusion national clinical network of
18 prestigious institutions, including twelve other
19 academic medical centers."
20       What is the Abbott Home Infusion
21 national clinical network of prestigious
22 institutions?

Page 217

1    A.  It was a loose network of our clients
2  so they could exchange information.
3    Q.  Was there any formalized way that they
4  could exchange information?
5    A.  We at some point in time, and I don't
6  know when we stopped it, but we used to have a
7  client meeting and we would invite clients, I
8  don't know if it was only these from the twelve
9  or not, and we'd have presenters and we would
10 talk to them about our new products and then they
11 interacted.
12   Q.  Did Abbott Home Infusion target as
13 clients academic medical centers?
14   A.  Yes.
15   Q.  Who were the twelve other academic
16 medical centers referenced?
17   A.  Well, OSU was one, University of
18 Michigan was one, University of Chicago, Loyola,
19 that UHIC, University Health System in Ohio.
20 That's what comes to mind.
21   Q.  The next bullet point says
22 "Northwestern would receive continuous access to

55 (Pages 214 to 217)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                       Chicago, IL

Page 218

1  reimbursement expertise and training resources."
2        Is that the same thing as participating
3  or contracting for Abbott reimbursement services?
4     A.  No.
5     Q.  What is this referencing?
6     A.  That we would train their own
7  reimbursement people on Home Infusion
8  reimbursement.
9     Q.  Would you charge a fee for that?
10    A.  That was all part of the per diem.
11    Q.  Who would do the training?
12    A.  People from Abbott's reimbursement
13 department.  I don't remember who.
14    Q.  Do you know whether they had like a
15 training team that they put together that they
16 would send out to service this part of Abbott's
17 contractual arrangements?
18    A.  I don't know that.
19    Q.  Do you recall working with anyone on
20 that?
21    A.  No.
22    Q.  The next item says "Abbott Home

Page 219

1  Infusion provides nationally recognized care
2  pharmacy, clinical and reimbursement staff."
3        Why did you say "nationally
4  recognized"?
5     A.  Because we were.  We were in the home
6  care magazines as a national home care company.
7  There are a lot of home care companies out there
8  that are not national, they're regional.
9     Q.  What home care magazines are you
10 referencing?
11    A.  The NHIA Journal, and I don't know,
12 there were some others, but I don't remember what
13 they were.
14    Q.  What was Abbott Home Infusion's
15 relationship with NHIA?
16       MR. WINCHESTER:  Objection, form.
17       THE WITNESS:  Abbott Home Infusion
18 didn't have a relationship with NHIA.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Well, were you members of NHIA?  Was
21 Abbott a member of NHIA?
22    A.  I don't know.

Page 220

1     Q.  Do you know where Bruce Rodman ended
2  up?
3     A.  Yes.
4     Q.  Where?
5     A.  NHIA.
6     Q.  Do you know whether he did work when he
7  was an Abbott employee with NHIA?
8     A.  I know he did work on billing codes
9  with other home infusion personnel from other
10 companies, but I don't know that he, he wasn't
11 employed by NHIA.
12    Q.  I don't necessarily mean employed by.
13 I mean did Abbott participate either through Mr.
14 Rodman's participation or someone else's
15 participation in the organization of NHIA, in
16 that association?
17       MR. WINCHESTER:  Objection, form.
18       THE WITNESS:  I would answer that as
19 no.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Are you aware of any lobbying
22 activities undertaken by Abbott?

Page 221

1     A.  No.
2     Q.  Are you aware of Abbott's affiliation
3  with any other healthcare organization or
4  organizations?
5       MR. WINCHESTER:  Objection, form.
6       THE WITNESS:  Yes.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.  What?
9     A.  I don't even know the title of it, but
10 I know that Miles White was the president of some
11 Pharma organization.
12    Q.  Could it have been Pharma?
13    A.  Could have been.  I didn't keep track
14 of that.
15    Q.  Any other organizations that you can
16 recall?
17    A.  No.
18    Q.  After the bullet points you have a
19 chart where you do estimates of square footage
20 requirements.  Do you see that?  On that same
21 page.
22    A.  Yes.

56 (Pages 218 to 221)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL    February 7, 2008
                     Chicago, IL

Page 222

1   Q.  Then you have total patients, the chart
2  total patients.
3   A.  Right.
4   Q.  The sentence immediately underneath
5  that, you quote from the Northwestern RFP.
6   A.  Right.
7   Q.  And it appears that the payor mix,
8  which is what we discussed a little bit before in
9  terms of the mix of third-party payors, is
10  twenty-three percent Medicare, twenty-four
11  percent Medicaid, and fifty-three percent
12  commercial self-payors.  Do you see that?
13   A.  Yes.
14   Q.  At twenty-four percent Medicaid, would
15  Northwestern be considered a riskier client?
16       MR. WINCHESTER:  Objection, form.
17       THE WITNESS:  No.
18  BY MS. ST. PETER-GRIFFITH:
19   Q.  What types of payor mixes would raise
20  an eyebrow for you as to possibly creating a risk
21  situation?
22       MR. WINCHESTER:  Objection, form.

Page 223

1       THE WITNESS:  Very low commercial
2  payors.
3  BY MS. ST. PETER-GRIFFITH:
4   Q.  When you say "low," do you mean under -
5  -
6   A.  Percentage.
7   Q.  Under what percent?
8   A.  I don't know.  I would say anything
9  under fifty.  That's something I would be
10  concerned about.
11   Q.  And why do you think, if commercial
12  payors were under fifty percent why do you think
13  that that would be a riskier client?  Just
14  because of the irregularity of Medicaid
15  reimbursements?
16       MR. WINCHESTER:  Objection, form.
17       THE WITNESS:  That's part of it.  And
18  it's my understanding that commercial payors paid
19  more.
20  BY MS. ST. PETER-GRIFFITH:
21   Q.  Paid more?
22   A.  Yes.

Page 224

1   Q.  Do you know how when Abbott's contract
2  marketing was calculating the per diems that
3  would be charged to third-party payors whether
4  AWP factored into that?
5   A.  I have no idea.
6   Q.  On the final page in the middle of the
7  paragraph you indicate that Northwestern was able
8  to take over pharmacy operations at any time
9  during this five-year agreement.
10       Do you recall how long it took to get
11  Northwestern's pharmacy up and running?
12   A.  Well, that's not what this means.  This
13  means that we were going to be involved during
14  the five-year period, but at any time during that
15  five years they could tell us goodbye.
16   Q.  I see, okay.  And did they ever tell
17  you goodbye?
18   A.  They did.
19   Q.  When was that?
20   A.  I believe it was three years.
21       We transitioned them over to Alt.  Site
22  product sales because we really didn't have

Page 225

1  anything to do with them anymore.  They didn't
2  need us anymore.  They didn't need reimbursement
3  training.  They knew how to run the pharmacy.
4  They hired their own pharmacy director.  So they
5  didn't need us.  So we transferred them over to
6  product sales.  And they lost it sometime after
7  they had it.
8   Q.  Who?  Alt. Site product sales?
9   A.  Yes.
10   Q.  Was that generally what happened with a
11  lot of these consignment partners who you helped
12  develop, that that the Home Infusion unit would
13  develop them and then at some point they would be
14  able to go on their own?
15   A.  Yes.  That was the whole idea.
16   Q.  So the whole idea was help them create
17  the business and then transition them to be Alt.
18  Site customers, hopefully?
19   A.  Well, that was towards the end.
20       But in Home Infusion it was to be
21  involved in their business, to help them start
22  up.  We had Abbott people come in there and act

57 (Pages 222 to 225)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
                        Chicago, IL

Page 226

1   as directors of pharmacy, we would help them
2   interview people, all of that.
3          Once they had their director of
4   pharmacy on board and they were up and running
5   and confident in what they were doing, then we
6   pretty much backed out, backed away, provided the
7   consigned inventory, and we still did
8   reimbursement for them if that's what was in the
9   contract.
10      Q.   Before you turned over the client
11  essentially to Alt. Site, was there a profit to
12  be made though from these revenue share
13  relationships?
14          MR. WINCHESTER:  Objection, form.
15          THE WITNESS:  Yes.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   And part of that is reflected in the
18  fact that you were able to get a commission,
19  right, every six months or so?
20      A.   By running a corporation, yes.  I
21  wouldn't pay somebody unless I made a profit.
22          (WHEREUPON Deposition Exhibit

Page 227

1   Kreklow 010 was marked as of 2/7/2008 and
2   tendered to the witness.)
3          THE WITNESS:  Okay.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.   Before we move on to this document,
6   just to follow up on a train of questions from
7   before.
8          Was it always your understanding that
9   Medicaid paid less than private payors?
10      A.   That was my understanding.
11      Q.   How did you have that understanding?
12      A.   I don't know where it came from.
13  Because I know we had trouble getting Medicaid to
14  pay.  Some states ran out of money and we still
15  service the patients at no cost.
16          So, to me, if we're not getting paid
17  for a patient and they're all within Medicaid, I
18  assumed on my own that that's probably not a
19  group that I want to focus on.
20      Q.   If you had a high-risk client who was
21  having difficulty getting reimbursement, would
22  Abbott Home Infusion drop them as a client?

Page 228

1      A.   No.
2      Q.   Was that just part of the risk that
3   Abbott Home Infusion undertook and sometimes that
4   risk takes a downturn?
5      A.   Yes.
6      Q.   Did you have any understanding as to
7   what private payors paid in terms of AWP?
8      A.   No.
9      Q.   Does AWP less than fifty percent ring
10  any bells with you --
11      A.   No.
12      Q.   -- about either Medicaid reimbursement
13  or private payor reimbursement?
14      A.   No.
15      Q.   Okay.  Ma'am, do you recognize this
16  document?
17      A.   No.
18      Q.   Do you see that it's an inter-office
19  correspondence from Dana Hosseini?
20      A.   Yes.
21      Q.   Who is Dana Hosseini?
22      A.   He was Kathy Riddle's replacement.

Page 229

1      Q.   Who's Jane Bradley?
2      A.   She was a representative that worked
3   for me.
4      Q.   And you're cc'd.  Do you see that?
5      A.   Yes.
6      Q.   Do you have any doubt that you received
7   this memorandum?
8      A.   There's no reason for me to doubt that
9   I received it.
10      Q.   Ma'am, was the Mayo Clinic a Home
11  Infusion client?
12      A.   Not to my knowledge.
13      Q.   Were they someone that Home Infusion
14  targeted as a prospective client?
15      A.   Yes.
16      Q.   Did you put together, did Abbott Home
17  Infusion put together a proposal for them?
18      A.   I don't remember if we ever did or not.
19  I do remember Jane and I went up to Mayo Clinic,
20  but that was the initial meeting.
21      Q.   Do you recall at any time what the Mayo
22  Clinic's -- well, let me ask you this:  Did you

58 (Pages 226 to 229)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL   February 7, 2008
Chicago, IL

Page 230

1  initiate the meeting or did the Mayo Clinic
2  initiate the meeting?
3      A.  I don't remember.  Jane was the one
4  that coordinated it.  I don't know if she called
5  them or they called her.
6      Q.  In the middle of this first paragraph,
7  the third sentence reads "With the information
8  currently in hand, a strategy discussion, i.e.,
9  per diem revenue share business development,
10 might be more prudent."  Do you see that?
11     A.  Yes.
12     Q.  Did you have different models within
13 Home Infusion that you were potentially going to
14 pitch to the Mayo Clinic?
15     A.  I don't remember.
16     Q.  Well, do you know what the difference
17 between per diem revenue share and business
18 development is?
19     A.  Yes.
20     Q.  What's the differences?
21     A.  Per diem is it's not a risk share for
22 us.  The customer pays us per therapy regardless.

Page 231

1  They usually do the billing when we do per diem.
2      Q.  Okay.
3      A.  Revenue share is the risk share that
4  we've been talking about.
5      Q.  Okay.
6      A.  And business development would be where
7  we would help them build out a pharmacy.
8      Q.  But provide no other services or
9  product?
10     A.  Oh, no.  Then do the full boat.
11     Q.  When you say "the full boat," what do
12 you mean?
13     A.  Well, consigned inventory, we would ask
14 them if they wanted us to do reimbursement.  I
15 don't remember what they wanted.
16     Q.  In terms of the per diem arrangements,
17 do you recall how many Home Infusion clients had
18 these per diem arrangements?
19     A.  No.
20     Q.  Do you recall what happened to the
21 pitch that was made to the Mayo Clinic?
22     A.  Nothing happened.

Page 232

1      Q.  They didn't --
2      A.  It went nowhere.
3      Q.  Did they raise any concerns about the
4  nature of the business relationships that --
5      A.  No.
6          MR. WINCHESTER:  Let her finish her
7  question before you answer.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  -- that Abbott Home Infusion was
10 proposing?
11     A.  No.
12         (WHEREUPON Deposition Exhibit
13 Kreklow 011 was marked as of 2/7/2008 and
14 tendered to the witness.)
15         THE WITNESS:  Okay.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Ma'am, do you recognize this document?
18     A.  No, I don't.
19     Q.  Do you recall, this appears to be a
20 letter from Michael Calsin to Dennis Welvang.  Do
21 you see that?
22     A.  Denise, yes.

Page 233

1      Q.  Denise, oh, I'm sorry, Denise, the
2  director of home care pharmacy.
3      A.  Yes.
4      Q.  ITS Infusion.  Do you recall ITS
5  Infusion as a client?
6      A.  I do not.
7      Q.  Do you recall meeting with Denise, Mike
8  Sellers, and yourself in the last quarter of 1999
9  to review the commitments between Abbott Home
10 Infusion and ITS Infusion?
11     A.  I don't.
12     Q.  Do you remember anything at all about
13 this termination?
14     A.  Nothing.
15     Q.  Do you know whether this was a
16 termination that Abbott initiated?
17     A.  I believe it says that.
18     Q.  Why would Abbott initiate a
19 termination?
20         MR. WINCHESTER:  Objection, form.
21         THE WITNESS:  One reason would be if
22 the client never solicited any patients.

59 (Pages 230 to 233)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                         Chicago, IL

Page 234

1   BY MS. ST. PETER-GRIFFITH:
2      Q.   Do you know if that's what happened
3   here?
4      A.   I don't know.  It has happened in the
5   past.
6      Q.   Would Abbott terminate its home
7   infusion contractual arrangements if it was
8   losing money?
9      A.   No.
10        MR. WINCHESTER:  Objection, form.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.   Under Item B it says "ITS shall
13  purchase the Abbott manufactured product in ITS'
14  inventory as of the termination date."  Do you
15  see that? It's under Item B.
16     A.   Okay, yes.
17     Q.   As a Home Infusion customer, would ITS
18  be afforded those same GPO prices?
19     A.   I don't know.
20     Q.   Do you know what price was charged?
21     A.   No.
22        (WHEREUPON Deposition Exhibit

Page 235

1   Kreklow 012 was marked as of 2/7/2008 and
2   tendered to the witness.)
3        THE WITNESS:  Okay.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.   Ma'am, do you recognize this document?
6      A.   No, I don't.
7      Q.   It appears to be an e-mail memorandum
8   from Bruce Rodman.  Do you see that?
9      A.   Yes.
10     Q.   And you're listed as a cc?
11     A.   Yes.
12     Q.   Do you know why Mr. Rodman would have
13  included you as a cc on this?
14        MR. WINCHESTER:  Objection, form.
15        THE WITNESS:  Rhea, Nikki, and
16  Charlotte reported to me.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   Do you know why Mr. Rodman was sending
19  this e-mail to people who reported to you?
20        MR. WINCHESTER:  Objection, form,
21  speculation.
22        THE WITNESS:  I don't know why he did

Page 236

1   this.
2   BY MS. ST. PETER-GRIFFITH:
3      Q.   Did your sales folks have an interest
4   in the Medicare Relief Bill?
5        MR. WINCHESTER:  Objection, form.
6        THE WITNESS:  I don't know because I
7   don't even remember what it was or is.
8   BY MS. ST. PETER-GRIFFITH:
9      Q.   Well, would your sales staff have an
10  interest in a one-year moratorium on AWP
11  decreases for outpatient drug pricing?
12        MR. WINCHESTER:  Objection,
13  speculation.
14        THE WITNESS:  I can't say.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Well, you're their boss.  Would a one-
17  year moratorium on decreases in outpatient drug
18  pricing have an impact on your sales staff?
19     A.   It's possible it would have an impact
20  on reimbursement.
21     Q.   Would that have an impact on your sales
22  staff?

Page 237

1        MR. WINCHESTER:  Objection, form.
2        THE WITNESS:  No.
3   BY MS. ST. PETER-GRIFFITH:
4      Q.   Well, would Abbott's ability to collect
5   a percentage of reimbursement or your client's
6   ability to collect reimbursement impact your
7   sales force's ability to sell?
8        MR. WINCHESTER:  Objection, form,
9   hypothetical.
10        THE WITNESS:  No.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.   Do you recall anything else about
13  discussions concerning the Medicare Relief Bill?
14     A.   No, I don't.
15        MS. ST. PETER-GRIFFITH:  At this time
16  why don't we take a brief break.  We've got to
17  change the tape.
18        MR. WINCHESTER:  Okay.
19        THE VIDEOGRAPHER:  We are off the
20  record at 2:28 p.m. with the end of Tape No. 3.
21        (WHEREUPON a recess was taken.)
22        THE VIDEOGRAPHER:  We are back on the

60 (Pages 234 to 237)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 238

1  record at 2:37 p.m. with the start of Tape No. 4.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Mr. Kreklow, if we could go back to
4  Exhibit 12 for a second.
5      A.  Yes.
6      Q.  I said earlier that, I may have
7  misspoken and said that Bruce Rodman may have
8  sent this.
9          It appears that this was printed off by
10  Bruce Rodman, which is consistent with the fact
11  that I can represent to you based upon the Bates
12  number that it was a document produced by Mr.
13  Rodman.  But it appears that this e-mail came
14  from Mike Snouffer.  Do you see that?
15      A.  Yes.
16      Q.  Why is Mr. Snouffer discussing AWP
17  matters or reimbursement sales matters with your
18  sales staff?
19          MR. WINCHESTER:  Objection,
20  speculation.
21          THE WITNESS:  I don't know.
22  BY MS. ST. PETER-GRIFFITH:

Page 239

1      Q.  Do you think it's a proper thing to do?
2          MR. WINCHESTER:  Objection, form.
3          THE WITNESS:  I don't know in what
4  context this was done.  I don't remember.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Well, do you know whether the
7  reimbursement department freely shared with your
8  sales staff AWP information?
9          MR. WINCHESTER:  Objection, form.
10          THE WITNESS:  No.  They wouldn't have
11  done that, shared information.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  Why not?
14      A.  Because it wasn't anything that they
15  would be discussing, that they would initiate a
16  conversation about.
17      Q.  Well, do you think it's improper for
18  Mr. Snouffer to be doing this?
19          MR. WINCHESTER:  Objection, form.
20          THE WITNESS:  Again, I don't know in
21  what context he did this.
22  BY MS. ST. PETER-GRIFFITH:

Page 240

1      Q.  In general would it be improper for Mr.
2  Snouffer or anyone else from reimbursement to be
3  discussing AWP information with your sales staff?
4          MR. WINCHESTER:  Objection, form,
5  hypothetical, argumentative.
6          THE WITNESS:  It would be a very rare
7  occurrence, if not this being the only one.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Well, would it be a practice that you
10  would encourage?
11          MR. WINCHESTER:  Objection, form.
12          THE WITNESS:  No.  I would not go to
13  Mike and say let's learn about AWP.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Well, would it be, in what context
16  would it be proper for someone from reimbursement
17  to discuss AWP information with your sales force?
18          MR. WINCHESTER:  Objection, form,
19  hypothetical.
20          THE WITNESS:  If a client brought up a
21  question to the salesperson, they would go to
22  reimbursement.

Page 241

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  And could reimbursement answer
3  questions that your sales staff would in turn
4  provide to the client?
5      A.  No.
6          MR. WINCHESTER:  Objection, form,
7  hypothetical.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  What would happen?
10          MR. WINCHESTER:  Again, objection to
11  the hypothetical.
12          THE WITNESS:  The reimbursement
13  department would speak with the client.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Okay.  Then why would there be, can you
16  think of any context in which your sales staff
17  needed to know about reimbursement information or
18  AWP?
19          MR. WINCHESTER:  Objection, form.
20          THE WITNESS:  Because if their customer
21  brought up a concern, they would know to contact
22  reimbursement.

61 (Pages 238 to 241)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                      Chicago, IL

Page 242

1    BY MS. ST. PETER-GRIFFITH:
2        Q.   Would it be appropriate for your sales
3    staff to discuss with customers AWP and
4    reimbursement matters?
5            MR. WINCHESTER:  Objection, form.
6            THE WITNESS:  No.
7    BY MS. ST. PETER-GRIFFITH:
8        Q.   How come?
9        A.   Because it's something that we really
10   know nothing about, and it's dangerous to discuss
11   things you know nothing about.
12       Q.   Well, do you know for a fact that they
13   didn't?
14           MR. WINCHESTER:  Objection, form.
15           Are you done with that question?
16           MS. ST. PETER-GRIFFITH:  Yes.
17           THE WITNESS:  These people on the list?
18   Yes, I know they didn't, they were not well
19   versed in that, if at all.
20   BY MS. ST. PETER-GRIFFITH:
21       Q.   How do you know for a fact that your
22   sales staff did not discuss AWP or reimbursement

Page 243

1    matters with their clients?
2        A.   Because they were instructed not to.
3        Q.   Who instructed them not to?
4        A.   It has always been that way in Home
5    Infusion.  It started with Mike Sellers.
6    Contract marketing always emphasized it, as did
7    I.
8        Q.   Did you ever discuss with your staff
9    directly do not discuss AWP or reimbursement with
10   your clients?
11       A.   Yes, and not to discuss any pricing at
12   all.
13       Q.   When did you have that discussion with
14   them?
15       A.   At various times.
16       Q.   Do you recall any specific times?
17       A.   No.
18       Q.   Why is it prohibited, why would it be
19   prohibited?
20           MR. WINCHESTER:  Objection, form.
21           THE WITNESS:  It's something that only
22   our reimbursement department should work with and

Page 244

1    deal with.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.   Any other reason?
4        A.   I'm sure there are many reasons, but
5    that's the reason.
6        Q.   Are you aware of anyone else discussing
7    with your sales staff not to discuss pricing
8    reimbursement or AWP with clients?
9        A.   Contract marketing.
10       Q.   Who in contract marketing?
11       A.   Mike Calsin and Kathy Riddle.
12       Q.   How do you know that they had those
13   discussions?  Were you involved with them?
14       A.   I've heard them, yes.
15       Q.   What did they say?
16       A.   I can't tell you verbatim.  The gist of
17   it was that we don't discuss those issues with
18   our clients, and we would refer every question
19   like that to the reimbursement specialist.
20       Q.   And who did they have that conversation
21   with?
22       A.   Who did Mike Calsin have that

Page 245

1    conversation with?
2            MR. WINCHESTER:  Objection, form.
3    BY MS. ST. PETER-GRIFFITH:
4        Q.   Yes.
5        A.   The salespeople.
6        Q.   In what context?
7        A.   In various context.  On the phone, in
8    person, at sales meetings.
9        Q.   How many conversations do you have a
10   direct recollection of concerning prohibitions
11   about discussing AWP pricing or reimbursement by
12   the sales staff?
13       A.   Ten.
14       Q.   In what context?
15       A.   Usually it has something to do with
16   contract marketing.
17       Q.   What's the first one that you recall?
18       A.   I recall Mike saying we can't price
19   anything for anybody else.  That's one thing.  I
20   don't remember, you know, I can't tell you.
21       Q.   Well, then how do you know it's ten?
22       A.   You asked me about how many.  So about

62 (Pages 242 to 245)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                         Chicago, IL

Page 246

1  ten.
2     Q.   Did you have regular meetings where you
3  discussed it?
4     A.   No.
5     Q.   Well, if Home Infusion is, as some of
6  the documents reflected that we just reviewed,
7  touting itself as a reimbursement expert, why
8  couldn't your sales staff discuss it?
9     A.   Because --
10       MR. WINCHESTER:  Objection, form,
11  assumes facts.
12       THE WITNESS:  -- they were not
13  reimbursement specialists.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.   Could they discuss the fact that Abbott
16  Home Infusion had reimbursement expertise?
17     A.   Yes.
18     Q.   What would happen when a client would
19  ask them what that expertise was?
20       MR. WINCHESTER:  Objection, form,
21  hypothetical.
22       THE WITNESS:  We would do your billing

Page 247

1  for you, we'll put it in the CHIP system, we'll
2  follow up.  It was very basic steps of the
3  billing process.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Well, did your sales staff then have to
6  understand the basic steps of the billing
7  process?
8     A.   No.
9     Q.   Would your sales staff be accompanied
10  by people from Home Infusion reimbursement in
11  order to explain some of the contractual benefits
12  of signing with Abbott Home Infusion?
13     A.   No.
14       MR. WINCHESTER:  Objection, form.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Would all questions concerning AWP and
17  reimbursement be automatically referred to the
18  reimbursement department?
19     A.   Yes.
20       MR. ANDERSON:  I'm sorry.  But I did
21  not hear the answer prior to the last answer.  So
22  maybe we can move the speaker up a little bit

Page 248

1  closer to the witness.
2       MS. ST. PETER-GRIFFITH:  Sure.
3       MR. ANDERSON:  What was that answer, by
4  the way?
5       MS. ST. PETER-GRIFFITH:  Can you read
6  it back, please.
7       (WHEREUPON said record was read
8  back as requested.)
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   Ma'am, if Virginia Tobiason testified
11  that really her Home Infusion reimbursement staff
12  had little or nothing to do with client contacts
13  on the sales front, how do you reconcile that?
14       MR. WINCHESTER:  Objection, form.
15       THE WITNESS:  That's true.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   That's true?
18     A.   Sure.  I just said it was.  I said the
19  reimbursement people do not accompany the
20  salespeople on sales calls.
21     Q.   Well, then if your sales people don't
22  know anything about reimbursement or AWP --

Page 249

1     A.   Yes.
2     Q.   -- how is it that questions get
3  answered from clients?
4     A.   They would call, once they were a
5  client they would call their reimbursement
6  specialist.
7     Q.   And their reimbursement specialist can
8  discuss the nuances of AWP and reimbursement?
9       MR. WINCHESTER:  Objection,
10  argumentative, assumes facts.
11       THE WITNESS:  The calls typically were
12  regarding specific patients.
13  BY MS. ST. PETER-GRIFFITH:
14     Q.   Would any AWP or reimbursement
15  questions be posed to your sales staff?
16       MR. WINCHESTER:  Objection, form.
17       THE WITNESS:  I can't say did any of
18  our clients ever ask one of the salespeople from
19  Home Infusion a reimbursement question, I can't
20  answer that.
21  BY MS. ST. PETER-GRIFFITH:
22     Q.   Is it possible?

63 (Pages 246 to 249)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL   February 7, 2008
Chicago, IL

Page 250

1    A.  Anything is possible.  They can ask
2  them how to get to the moon.
3    Q.  Well, if a question was asked, how
4  would it get answered?
5    A.  We would refer them to the
6  reimbursement department, to their reimbursement
7  specialist.
8    Q.  With regard to Exhibit 12, would there
9  be any point at all that you can think of for Mr.
10 Snouffer advising members of your staff about the
11 Medicare Relief Bill?
12       MR. WINCHESTER:  Objection, asked and
13 answered.
14       THE WITNESS:  I don't know why he did
15 it.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Can you think of any reason why he
18 would do it?
19   A.  No.
20       MS. ST. PETER-GRIFFITH:  If you can
21 mark this as the next exhibit, and unfortunately
22 this is one of those that I only have two copies

Page 251

1  of.  So if you could show that to Mr. Winchester.
2       (WHEREUPON Deposition Exhibit
3  Kreklow 013 was marked as of 2/7/2008 and
4  tendered to the witness.)
5       THE WITNESS:  Okay.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Ma'am, do you know what this document
8  is?
9    A.  No.
10   Q.  It appears to be an e-mail from Lynn
11 Coomans.  Do you see that?
12   A.  Yes.
13   Q.  To Michael Calsin, and then it's also
14 addressed to you.  Do you see that?
15   A.  Yes.
16   Q.  Do you have any doubt that you would
17 have received this e-mail?
18   A.  I can't be a hundred percent certain
19 that I did or didn't receive it.
20   Q.  Would you have any reason to doubt that
21 you received it --
22   A.  No.

Page 252

1    Q.  -- if it was sent in the ordinary
2  course?
3    A.  No.
4    Q.  Who's Michelle Smith?
5    A.  Someone over in HBS contract marketing
6  or maybe she was in product sales.  I don't
7  remember.  She was away from us.
8    Q.  In January of 2002 you were still the
9  director of Home Infusion?
10   A.  Yes.
11   Q.  This says "Checklist on contract bids
12 from ASPS."  Do you see that?
13   A.  Okay, yes.
14   Q.  Did you have any responsibilities with
15 regard to Alt. Site product sales in or around
16 2002?
17   A.  No.
18   Q.  Do you know why you would have received
19 a checklist on contract bids from Alt. Site
20 product sales?
21   A.  No.  I can't fathom what she's talking
22 about.

Page 253

1    Q.  Have you ever seen this document that's
2  attached to this e-mail?
3    A.  No, I haven't.  And I've never heard of
4  anything referred to as a checklist.
5    Q.  What was your interaction in 2002 with
6  Alt. Site product sales?
7        MR. WINCHESTER:  Objection, form.
8        THE WITNESS:  We were transferring
9  clients to them.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  Incident to that transfer, would it
12 have been important for you to know information
13 about Alt. Site product sales pricing?
14       MR. WINCHESTER:  Objection, form.
15       THE WITNESS:  Yes.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  How so, or why?
18   A.  Because we'd want to use the same
19 parameters for the clients.
20   Q.  There are certain terms that are
21 contained on this document.  I'd just like to ask
22 you if you're familiar with these terms.

64 (Pages 250 to 253)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 254

1        The first is RxLink WAC.  Are you
2  familiar with that term?
3        A.  I'm familiar with RxLink.
4        Q.  Have you ever heard the term RxLink
5  WAC?
6        A.  No.
7        Q.  What is RxLink?
8        A.  RxLink is a price, or was a price, for
9  HPD products that was less than list price that
10  was given to customers without a contract.
11        Q.  Do you know why Abbott would give an
12  RxLink price as opposed to just charging a list
13  price?
14        A.  No.
15        Q.  What is parameter pricing?
16        A.  I don't know.
17        Q.  Are you familiar with HBS High and HBS,
18  I'm sorry, HBS Group High and HBS Group Low?
19        A.  I am not.
20        Q.  At any time when you were transitioning
21  contracts to Alt. Site product sales, did anyone
22  ever give you an instruction to hold firm on

Page 255

1  vancomycin pricing?
2        A.  No.
3        Q.  Do you know what that would mean if
4  someone said "hold firm"?
5        A.  I wouldn't know.  No one has ever said
6  that to me.
7        Q.  If you can look at the third to last
8  page of this document.
9        A.  I'm sorry.  Third to the last?
10        Q.  Yes.  Looks like this.  (Indicating.)
11        A.  Got it.  All right.
12        Q.  If you look midway through the page is
13  the word "Vancomycin."  Do you see that?
14        A.  Yes.
15        Q.  Under Remarks it says "Hold firm."  Do
16  you see that?
17        A.  Yes.
18        Q.  Do you have any idea what that means?
19        A.  No.
20        Q.  Do you recall asking Ms. Coomans why
21  she sent this to you?
22        A.  No.  I don't remember, I don't remember

Page 256

1  receiving this or reading it or anything.
2        MS. ST. PETER-GRIFFITH:  If we could
3  mark the next exhibit, please.
4        (WHEREUPON Deposition Exhibit
5  Kreklow 014 was marked as of 2/7/2008 and
6  tendered to the witness.)
7        THE WITNESS:  Okay.
8  BY MS. ST. PETER-GRIFFITH:
9        Q.  Ma'am, do you recognize this document?
10        A.  No.
11        Q.  It appears to be an e-mail with an
12  attachment, and the e-mail is from Michelle Smith
13  and directed to you?
14        A.  Right.
15        Q.  Who is Ms. Smith again?
16        A.  She was a financial analyst in product
17  sales I guess.
18        Q.  Do you have any idea why she sent you
19  this e-mail?
20        A.  No.
21        Q.  Who is PharMerica?
22        A.  I never heard of that.  I'm not

Page 257

1  familiar with the name PharMerica.
2        Q.  Do you know what PharMerica high
3  runners are?
4        A.  High runners are products that they use
5  a lot of.  But, again, I don't know who
6  PharMerica is.
7        Q.  So that's not a client that you dealt
8  with then?
9        A.  No, never heard of them.
10        Q.  This appears to be an e-mail, it says
11  "Hi Karla, How are things in Home Infusion.  I'm
12  so excited for Trudy to get a spot over in HBS
13  contract marketing."  Do you see that?
14        A.  Yes.
15        Q.  Do you know what she's referencing?
16        A.  Trudy getting a job.
17        Q.  Is Trudy Trudy Brushiari?
18        A.  No.
19        Q.  Okay.  Who's Trudy?
20        A.  Trudy Lauer.
21        Q.  Did Trudy Lauer work with you in Home
22  Infusion?

65 (Pages 254 to 257)

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                        Chicago, IL

Page 258

1   A.  Not that I remember.  She never
2   reported to me.  I know that.
3   Q.  The next sentence says "Here is the
4   spreadsheet for PharMerica high runners."  Do you
5   see that?
6   A.  Yes.
7   Q.  And then "We have cross-referenced
8   these list numbers with Baxter and B. Braun
9   (closest match).  Let me know if you need
10  anything else."  Do you see that?
11  A.  Right.
12  Q.  Would that suggest to you that you
13  perhaps requested this information?
14  A.  Yes.
15  Q.  Do you know why you would be requesting
16  or do you have any recollection as to why you
17  would request PharMerica high runner pricing?
18  A.  I don't know who Michelle Smith is.  I
19  don't know if she's misspoken or what.
20  Q.  Do you know what she means when she
21  says "we've cross-referenced these list numbers
22  with Baxter and B. Braun (closest match)"?

Page 259

1   A.  Right, I do know.
2   Q.  What's it mean?
3   A.  That means if we have a particular
4   product and Baxter and B. Braun has a similar
5   product, it'll have a different list number.
6   So the way it could be is that this
7   PharMerica was using Baxter and Braun products
8   and so we wanted the closest match to what they
9   were using.  That's the only time I've ever done
10  cross-referencing.
11  Q.  But you have no recollection of
12  PharMerica?
13  A.  No, I'm sorry.  I don't.
14  Q.  Did you ever request any other high
15  runner reports?  Do you recall?
16  A.  No.
17  Q.  Why would you go to Michelle Smith or
18  someone like Michelle Smith to get that
19  information for you?
20  A.  I'm not even sure what kind of
21  information this is.  But she was in the contract
22  marketing department, and no one else would know

Page 260

1   pricing but someone in contract marketing or the
2   sales rep that delivered the contract.
3   Q.  Why would it be important for you to
4   get the cross-reference information?
5       MR. WINCHESTER:  Objection, form.
6       THE WITNESS:  When I requested, or I
7   performed the cross-referencing when I was a NAM.
8   BY MS. ST. PETER-GRIFFITH:
9   Q.  Okay.
10  A.  And we were negotiating against Baxter
11  Braun, and the client was utilizing their
12  products, and I wanted to show them the closest
13  match with our products.
14  Q.  When you say "the closest match," do
15  you mean in terms of the product for product or
16  price comparison?
17  A.  No, product for product.
18  Q.  Would you have any consideration for
19  price comparisons?
20  A.  No.  I wouldn't know prices,
21  competitive prices.
22  Q.  Then why would you compare the two?

Page 261

1   A.  Just so I can show them that we have
2   all the products that they're currently using
3   from a competitor.
4       (WHEREUPON Deposition Exhibit
5   Kreklow 015 was marked as of 2/7/2008 and
6   tendered to the witness.)
7       THE WITNESS:  Okay.
8   BY MS. ST. PETER-GRIFFITH:
9   Q.  Ma'am, do you recognize this document?
10  A.  Not specifically, but I am aware of it.
11  Q.  This appears to be an e-mail memorandum
12  to you attaching a Cleveland Clinic Executive
13  Summary.  Do you see that?
14  A.  Right.
15  Q.  Who is Scott Gallaher?
16  A.  He worked for Mike Calsin.
17  Q.  Below?  He worked below Mike Calsin?
18  A.  Yes.  He worked for him.
19  Q.  Why are you receiving this Cleveland
20  Clinic Executive Summary?
21  A.  Because we --
22      MR. WINCHESTER:  Objection, form,

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Kreklow, Karla       HIGHLY CONFIDENTIAL     February 7, 2008
                          Chicago, IL

Page 262

1  speculation.
2       Go ahead.
3       THE WITNESS:  -- we were negotiating
4  the transition from their risk share agreement.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  So you had a risk share agreement with
7  Cleveland Clinic?
8     A.  Yes.
9     Q.  Was that a large account?
10    A.  Yes.
11    Q.  Did Cleveland Clinic convert to an Alt.
12 Site product sales client?
13    A.  Yes.
14    Q.  So what purpose or role does an exec.
15 summary serve?
16       MR. WINCHESTER:  Objection, form.
17       THE WITNESS:  It summarizes the
18 contract.
19 BY MS. ST. PETER-GRIFFITH:
20    Q.  Which contract?  The old one or the
21 anticipated new one?
22    A.  Anticipated new one.

Page 263

1     Q.  Can you just look at this and identify
2  -- well, let me ask you, is an executive summary
3  put together at the initial stages of contract
4  negotiations or at the end?
5     A.  It usually accompanies the contract
6  proposal.
7     Q.  So some of what's reflected in an
8  executive summary might change if there are
9  further contract negotiations?
10    A.  It's possible, but rare.
11    Q.  But rare?
12    A.  Yes.
13    Q.  So do you think that this executive
14 summary probably accurately summarizes the
15 Cleveland Clinic contract?
16    A.  Yes.
17       MR. WINCHESTER:  Objection, form.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  According to this memo, it says that
20 "so here is the final draft for your records."
21 Do you see that, on the front page?
22    A.  Right.  And it also says we're not

Page 264

1  sending it to the client.
2     Q.  What does that tell you?
3     A.  I don't know.  I don't know why he
4  would say that.
5     Q.  Do you recall disagreeing and
6  suggesting that it should go to the client?
7     A.  No.  I believe Rhea would take this in.
8     Q.  Who's Rhea?
9     A.  She was a sales rep for me.
10    Q.  For you?
11    A.  Yes.
12    Q.  Okay.
13    A.  That's why we wouldn't send it to the
14 client.  She would go in and present it to the
15 client, which was typical.  Typically we don't
16 send these things.  We want to present them.
17    Q.  Do you recall anything else about the
18 Cleveland Clinic transfer to Alt. Site product
19 sales?
20    A.  No.
21    Q.  Ma'am, who is Ted Lyjak?
22    A.  He was an employee in product sales.

Page 265

1  He came on board right before I left.
2     Q.  Would you have any reason to discuss
3  Medicaid payment with Mr. Lyjak?
4     A.  Not to my memory.  I rarely discussed
5  anything with Ted or anybody in that group.
6     Q.  Why?
7     A.  Because they were far away from us
8  physically, and there was no reason for me to
9  communicate with them.
10    Q.  Can you think of a reason why you would
11 have interaction with them?
12    A.  Regarding our contract transition at
13 that point in time when we were shutting down the
14 business.  Prior to that, I can't remember
15 speaking with them.
16    Q.  Would you have any reason to discuss
17 AWP with Mr. Lyjak?
18    A.  Not that I can recall.
19    Q.  Ma'am, I'm not going to mark this as
20 another exhibit because it's already been marked
21 previously, but we went over this, or counsel for
22 Texas went over.  What's marked at the bottom is

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 266

1  Exhibit 481 to Mr. Kipperman's deposition in
2  Texas.  (Document tendered to the witness.)
3        Do you remember going over this
4  document?
5     A.  I remember an e-mail referencing a
6  meeting over there.  I don't remember looking at
7  this.
8     Q.  Why don't you take a look at it then.
9        MR. WINCHESTER:  Did this get a
10  separate number in her earlier deposition?
11       MS. ST. PETER-GRIFFITH:  You know, why
12  don't we mark it now.
13       MR. WINCHESTER:  Okay.
14       (WHEREUPON Deposition Exhibit
15  Kreklow 016 was marked as of 2/7/2008.)
16       MR. WINCHESTER:  This was used the
17  first time; right?
18       MS. ST. PETER-GRIFFITH:  I believe so,
19  although I'm going back to double check.
20       MR. WINCHESTER:  I'm virtually positive
21  it was.
22       MS. ST. PETER-GRIFFITH:  Yeah.  I

Page 267

1  thought it was too.
2        MR. WINCHESTER:  All right.  We're
3  going to call it 16 again?
4        MS. ST. PETER-GRIFFITH:  Yes.
5        MR. SISNEROS:  What is the old exhibit
6  number?
7        MS. ST. PETER-GRIFFITH:  481.
8        MR. SISNEROS:  I will note in reviewing
9  the prior deposition of June 28, 2007, 481 is
10  listed as a previous exhibit.
11       MS. ST. PETER-GRIFFITH:  And it appears
12  at Page 313 of the prior.
13       THE WITNESS:  Okay.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.  Ma'am, does that refresh your
16  recollection as to whether you may have discussed
17  AWP or been involved in discussions concerning
18  AWP with Mr. Lyjak?
19     A.  I don't remember the conversation.
20     Q.  Do you have any recollection at all of
21  meeting with Mr. Baker or Mr. Balzer?
22     A.  No.  And I would remember that because

Page 268

1  Jeff and I worked together as sales reps and so
2  did Peter and I.  And I don't remember going over
3  to their offices, and they never came over to
4  mine.
5     Q.  Okay.
6     A.  I didn't type this, by the way.  I use
7  Arial 12 on all of my communications.
8     Q.  Well, do you know why there would be
9  notes reflecting that you were a participant at
10  this meeting?
11     A.  I don't know.
12     Q.  Is it possible that you were a
13  participant and you just don't remember?
14     A.  I would have remembered a meeting.  If
15  they came to my place or I went to his, I would
16  have remembered it.
17     Q.  Well, do you think someone just got
18  this wrong, that you were never a participant at
19  the meeting?
20     A.  I was never at the meeting, if they had
21  a meeting.  I don't know.  I wasn't there.
22     Q.  Can you think of, is there another

Page 269

1  Karla Kreklow at Abbott?
2     A.  Not with either the correct or
3  incorrect spelling.
4     Q.  I know that that's an incorrect
5  spelling.
6        Is it possible that you could have
7  participated by phone --
8     A.  Yes.
9     Q.  -- in this meeting?
10    A.  Yes.
11    Q.  Do you recall having a telephonic
12  conversation with anyone where you discussed AWP
13  customer, probing customer complaints concerning
14  AWP?
15    A.  I believe it was Jeff.
16    Q.  You had a conversation with Jeff?
17    A.  Yes.
18    Q.  And what do you remember about that
19  conversation?
20    A.  I really don't remember anything about
21  the conversation, but I know that Jeff would call
22  me because I was the only one he knew in Home

68 (Pages 266 to 269)

Kreklow, Karla       HIGHLY CONFIDENTIAL       February 7, 2008
                         Chicago, IL

Page 270

1  Infusion.
2      Q.  Okay.
3      A.  And Ted probably didn't even know who I
4  was, to tell you the truth.
5      Q.  Did you have any other communication
6  that you're aware of with Ted Lyjak?
7      A.  Yes, when we were transitioning the
8  Children's Memorial contract.
9      Q.  Do you recall having any conversations
10  consistent with the substance of these meeting
11  notes?
12      A.  No.
13      Q.  Do you know why you would have any
14  conversations concerning the substance of these
15  meeting notes?
16      A.  Jeff must have called and asked me
17  something.
18      Q.  Do you see above Questions the last
19  bullet point, do you see that there's a listing
20  of drug products?
21      A.  Yes.
22      Q.  It says "Experience tells us the effect

Page 271

1  of AWP changes in Home Care have only been on the
2  following," and then there's a list of products.
3  Do you see that?
4      A.  Yes.
5      Q.  Do you know what the basis for a
6  statement like that would be?
7          MR. WINCHESTER:  Objection, form,
8  speculation.
9          THE WITNESS:  I do know that some
10  products AWP changed, but I can't tell you when.
11  But I remember that.  That was part of the,
12  around the time of that DOJ state ruling that we
13  talked about before.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  The DOJ AWPs?
16      A.  Yes.
17      Q.  And do you know whether the timing of
18  7/12/01, whether that would have coincided with
19  the DOJ AWPs?
20      A.  Oh, I don't know.  I don't know if it
21  did or not, but I would presume it did.
22      Q.  Do you have any doubt that you had a

Page 272

1  discussion with Mr. Balzer telephonically about
2  the substance of these meeting notes?
3          MR. WINCHESTER:  Objection, form, asked
4  and answered, mischaracterizes the testimony.
5          THE WITNESS:  It's quite possible.  I
6  cannot remember the conversation.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Who within Abbott Home Infusion would
9  probe customer AWP cost complaints?
10      A.  Nobody would probe it.  No one would
11  probe for AWP complaints.
12      Q.  Well, not probe for.  Let me rephrase.
13          If a customer had a complaint and they
14  voiced that complaint, who would be responsible
15  for addressing it?
16          MR. WINCHESTER:  Objection, form,
17  hypothetical, assumes facts.
18          THE WITNESS:  I guess I'm a little
19  confused by "AWP complaint" because we didn't
20  field complaints.  If somebody had a question on
21  a particular patient's therapy, they would
22  discuss AWP.

Page 273

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Well, if AWPs were dropped --
3      A.  Right.
4      Q.  -- and that had a corresponding impact
5  in reducing a time substantially reimbursement
6  that clients collected, do you think that that
7  might cause a complaint to be generated?
8          MR. WINCHESTER:  Objection,
9  speculation, assumes facts.
10          THE WITNESS:  It wouldn't be a, I don't
11  know, I wouldn't characterize it as a complaint.
12  I would characterize it as an inquiry.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Okay.  If an inquiry was made, who
15  would be responsible for addressing it?
16          MR. WINCHESTER:  Objection, form.
17          THE WITNESS:  The reimbursement
18  specialist for that particular client.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Is it possible that the sales staff
21  might because of their relationship with the
22  client receive that type of inquiry?

                    69 (Pages 270 to 273)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                           Chicago, IL

Page 274

1        MR. WINCHESTER: Objection, form,
2   hypothetical.
3        THE WITNESS: No. I don't ever
4   remember that occurring.
5   BY MS. ST. PETER-GRIFFITH:
6        Q. Do you recall any outcry from Abbott's
7   clients when the AWP, DOJ AWPs, were published or
8   when Abbott reduced its own list prices?
9        MR. WINCHESTER: Objection, form.
10       THE WITNESS: Not in Home Infusion.
11  BY MS. ST. PETER-GRIFFITH:
12       Q. Do you recall hearing about it outside
13  of Home Infusion?
14       A. No.
15       Q. Can you think of any reason why someone
16  would include you on these meeting notes if you
17  didn't attend this meeting?
18       MR. WINCHESTER: Objection, form.
19       THE WITNESS: No.
20  BY MS. ST. PETER-GRIFFITH:
21       Q. Can you think of any context in which
22  your sales staff would discuss AWP reimbursement?

Page 275

1        MR. WINCHESTER: Objection, asked and
2   answered.
3        THE WITNESS: No.
4   BY MS. ST. PETER-GRIFFITH:
5        Q. Is that just because it's not something
6   that would come up or because there was a
7   prohibition?
8        MR. WINCHESTER: Objection, form.
9        THE WITNESS: Well, we went over this
10  before. We were told not to discuss that or
11  prices to anybody regarding anything.
12  BY MS. ST. PETER-GRIFFITH:
13       Q. Other than the contract marketing
14  people discussing that prohibition and you
15  testified earlier that you discussed it --
16       A. Yes.
17       Q. -- who else, if anyone, made that
18  prohibition?
19       MR. WINCHESTER: Objection, asked and
20  answered.
21       THE WITNESS: I don't know who else
22  because I wasn't there.

Page 276

1   BY MS. ST. PETER-GRIFFITH:
2        Q. But was it in writing anywhere?
3        A. I don't remember.
4        (WHEREUPON Deposition Exhibit
5   Kreklow 017 was marked as of 2/7/2008 and
6   tendered to the witness.)
7        THE WITNESS: Okay.
8   BY MS. ST. PETER-GRIFFITH:
9        Q. Ma'am, do you recognize this document?
10       A. No.
11       Q. It appears to be an e-mail with an
12  attachment from you to Ted Lyjak and Michelle
13  Smith. Do you see that?
14       A. Yes.
15       Q. And the Subject line says PharMerica.
16  Do you see that?
17       A. Yes.
18       Q. Does this refresh your recollection as
19  to who PharMerica may have been?
20       A. It doesn't.
21       Q. Does it refresh your recollection as to
22  why you might have requested information from

Page 277

1   Michelle Smith concerning PharMerica high
2   runners?
3        A. No. It does not refresh my
4   recollection.
5        Q. Do you recall receiving a request from
6   Ted Lyjak concerning PharMerica high runners?
7        A. No.
8        Q. The first sentence in this e-mail says
9   "Attached is the information that you requested."
10  Do you see that?
11       A. Yes.
12       Q. Do you know why Mr. Lyjak would be
13  making a request concerning PharMerica high
14  runners to you?
15       MR. WINCHESTER: Objection,
16  speculation.
17       THE WITNESS: To me specifically, no.
18  BY MS. ST. PETER-GRIFFITH:
19       Q. Would you say that that would be an
20  unusual request?
21       A. Yes.
22       Q. Who would be the best source for high

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Kreklow, Karla      HIGHLY CONFIDENTIAL   February 7, 2008
                    Chicago, IL

Page 278

1  runner information?
2       MR. WINCHESTER:  Objection, form.
3       THE WITNESS:  Well, someone in product
4  sales would be the best source for PharMerica's
5  high runners.  I wouldn't know that.
6  BY MS. ST. PETER-GRIFFITH:
7       Q.   The next sentence says "Keep in mind
8  that each state pays Medicaid differently, which
9  is why I asked for the state information, Ted."
10      A.   Yes.
11      Q.   What did you mean by that statement?
12      A.   I wanted to know which state PharMerica
13  was in.
14      Q.   The next sentence says "For both
15  commercial and government payors, TPN is usually
16  paid on a per diem basis and not on AWP."  Do you
17  see that?
18      A.   Yes.
19      Q.   What did you mean by that statement?
20      A.   TPN is not paid on AWP, it's paid on a
21  per diem, per day.
22      Q.   What's TPN?

Page 279

1       A.   Total parenteral nutrition.
2       Q.   Do you recall whether Mr. Lyjak ever
3  made a request concerning information regarding
4  TPN reimbursement?
5       A.   Well, the TPN products were the most
6  expensive products.
7       Q.   What are the TPN products?
8       A.   Amino acids, heavy dextrose, sterile
9  water, trace elements like zinc, electrolytes
10  like calcium, in small volumes, not sodium
11  chloride bags, but potassium, vitamins, IV sets,
12  pumps, always IV sets and pumps.
13      Q.   Do you know whether the per diem
14  charges that were paid by either commercial
15  payors or government payors were calculated based
16  upon AWP?
17      A.   Oh, I have no idea.
18      Q.   Is it possible but you just don't know?
19      MR. WINCHESTER:  Objection, form.
20      THE WITNESS:  I don't know.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.   When you say that they're paid on a per

Page 280

1  diem and not on AWP, what do you mean by that?
2       A.   That it is paid in a lump sum per day.
3  Each individual product is not calculated.
4       Q.   Separately out?
5       A.   Yes.
6       Q.   The next sentence says "Part-fills are
7  frequently paid as part of the supplies and not
8  on an AWP basis either."  Do you see that?
9       A.   Right.
10      Q.   What does that mean?
11      A.   Part-fills are the smaller bags, 5100
12  or 250 MLs.  They contain dextrose, sodium
13  chloride, or sodium chloride, and they add an
14  antibiotic to it, usually an antibiotic.  It
15  could be a chemo.  And it's calculated as a
16  supply.  It's not calculated individually.
17      Q.   Is that supply cost part of the per
18  diem or is it a separate?
19      A.   It's whatever, whomever, whatever type
20  of insurance.  Even if they are paying AWP on the
21  drugs, they wouldn't pay AWP on the part-fill.
22      Q.   Okay.  So it's possible that, for

Page 281

1  example, a client could utilize Abbott vancomycin
2  and that would be billed based upon AWP, but the
3  part-fill would not be billed, it would just be
4  treated as a supply?
5       MR. WINCHESTER:  Objection,
6  hypothetical.
7       THE WITNESS:  If the patient had an
8  antibiotic or a chemo that was paid on AWP, then
9  the part-fill would not be also calculated in
10  AWP.  That would be part of the $5 or whatever
11  they would get for supplies.
12       There was a fixed amount that they
13  would get for supplies.  It was like a little
14  supply package, if you will, not physically but
15  on paper, like gauze pads, needles.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   And would that supply charge cover the
18  cost of the part-fill?
19      A.   I don't know.
20      Q.   Then you write "Only drugs have AWPs,
21  not sets or LifeShield products."  Do you see
22  that?

71 (Pages 278 to 281)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL    February 7, 2008
                          Chicago, IL

Page 282

1    A.  Right.
2    Q.  What did you mean by that?
3    A.  Well, IV sets are not paid on AWP
4  because they're not a drug, and neither is
5  LifeShield.
6    Q.  What are the LifeShield products?
7    A.  They're that protected needle that we
8  talked about in the beginning.
9    Q.  Then the second to last sentence says
10 "Let me know if you require any additional
11 information."
12   A.  Yes.
13   Q.  Does that suggest to you that Mr. Lyjak
14 made an inquiry of you?
15   A.  Yes.
16   Q.  And then "I'd be happy to discuss this
17 further with you."  Do you see that?
18   A.  Yes.
19   Q.  Do you recall discussing anything
20 further with Mr. Lyjak on this topic?
21   A.  No.
22   Q.  Did you ever discover what states

Page 283

1  PharMerica was practicing in or where their
2  pharmacies were located?
3    A.  I must have because doesn't it say
4  that's why I asked for state information?
5    Q.  Right.
6    A.  I don't know if I ever got it or not,
7  but this doesn't say anything about that, that I
8  know of.
9    Q.  Do you have any recollection at all
10 about why you provided this information to Mr.
11 Lyjak?
12   A.  I don't.
13   Q.  Do you know whether -- oh, let me ask
14 you, what's the source of your information
15 concerning AWP reimbursement?
16      MR. WINCHESTER:  Objection, form.
17      THE WITNESS:  Are you talking about
18 where I say TPN is usually paid on per diem?
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  Yes.
21   A.  Our reimbursement department.
22   Q.  Do you know who you made that inquiry

Page 284

1  to?
2    A.  No.  I don't remember making it to
3  anybody specifically.
4    Q.  Let me ask you, would it have been
5  important to understand which state PharMerica
6  participated in so that you could compare or
7  identify different state Medicaid reimbursement?
8      MR. WINCHESTER:  Objection,
9  speculation.
10      THE WITNESS:  Yes.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  Do you have any idea why these
13 inquiries were not made to someone in Home
14 Infusion reimbursement?
15   A.  Because Ted only knew me in Home
16 Infusion.
17   Q.  In March of 2002 do you recall who was
18 in Home Infusion reimbursement?
19   A.  Mike Snouffer was the manager.
20   Q.  Do you recall any of the staff?
21   A.  No, not particularly.  I don't know
22 what the shutdown time was when certain people

Page 285

1  left.  Not everybody left at once.
2    Q.  Okay.
3    A.  I had it staggered.
4    Q.  Was the staggering of the shutdown or
5  the staggering of the transition of employees
6  somewhat tied to your transitioning of contracts
7  to Alt. Site product sales?
8    A.  Yes.
9      (WHEREUPON Deposition Exhibit
10 Kreklow 018 was marked as of 2/7/2008 and
11 tendered to the witness.)
12      THE WITNESS:  Okay.
13 BY MS. ST. PETER-GRIFFITH:
14   Q.  Ma'am, do you recognize this document?
15   A.  No.
16   Q.  It appears to be an e-mail chain with
17 your e-mail to Mr. Lyjak at the bottom.  Do you
18 see that?
19   A.  Yes.
20   Q.  And it appears that Mr. Lyjak forwarded
21 your e-mail to Pete Baker?
22   A.  Yes.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
Chicago, IL

Page 286

1    Q.  The text of the e-mail says "Attached
2  is Karla's response on AWPs for various high
3  runner PharMerica products.  There appear to be
4  significant disparities."  Do you see that?
5    A.  Yes.
6    Q.  "I think it would be worth pursuing
7  with legal.  Let me know if you need anything
8  from me."
9    A.  Yes.
10    Q.  Do you have any idea what Mr. Lyjak is
11  referencing when he says "there appear to be
12  significant disparities"?
13    A.  No, I don't.
14    Q.  Do you know what issue would need to be
15  pursued with legal?
16    A.  I can't imagine.
17    Q.  Did you know that your information was
18  going to Mr. Baker?
19    A.  I don't remember that.  But no, I would
20  have copied Pete on it if I would have thought it
21  was going to go to him.
22    Q.  Did you work with Mr. Baker?

Page 287

1    A.  When I was initially in sales, we were
2  both sales reps together.
3    Q.  So you had a relationship with him?
4    A.  Yes.  We knew each other.
5    Q.  And you also had a relationship with
6  Mike Sellers?
7    A.  I worked for him.
8    Q.  You worked for him in several different
9  departments; right?
10    A.  I worked for him in product sales and
11  in Home Infusion.
12    Q.  Would you say you had a strong
13  relationship with Mr. Sellers?
14        MR. WINCHESTER:  Objection, form.
15        THE WITNESS:  I wouldn't know what:
16  "strong" means.  I worked for him for a lot of
17  years.
18  BY MS. ST. PETER-GRIFFITH:
19    Q.  Did you hold him in high regard?
20        MR. WINCHESTER:  Objection, form.
21        THE WITNESS:  Yes, I did.  I do, I
22  still do.

Page 288

1        (WHEREUPON Deposition Exhibit
2  Kreklow 019 was marked as of 2/7/2008 and
3  tendered to the witness.)
4        THE WITNESS:  Okay.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Ma'am, do you recognize this document?
7    A.  No.
8    Q.  It appears to be an e-mail from Joan
9  Barter, who's an administrative assistant, to a
10  series of people.  Do you see that?
11    A.  Yes.
12    Q.  And you're included on the
13  distribution.
14    A.  Yes.
15    Q.  Did you routinely receive copies of
16  Mike Sellers Significant Events Reports?
17    A.  No.
18    Q.  Did you participate at all, to your
19  recollection, in drafting any?
20    A.  Any to him?
21    Q.  Yeah.
22    A.  I don't remember doing that.  We did

Page 289

1  meet occasionally for one-on-ones.
2    Q.  If you could turn to the second page of
3  this document.
4    A.  Right.
5    Q.  Do you see where it says Home Infusion
6  Services?
7    A.  Yes.
8    Q.  "To support placement activities, three
9  'Lunch and Learn' sessions were held on
10  interviewing skills."  Do you see that?
11    A.  Yes.
12    Q.  And then a resume writing class was
13  scheduled.
14    A.  Yes.
15    Q.  Why did you have a lunch and learn
16  session?
17    A.  It was for the people in Home Infusion
18  because they were all going to be displaced,
19  every one of them, and they were afraid.
20        So I wanted to prepare them for
21  interviewing.  I wanted to prepare them how to
22  write their resume.  I wanted them to get good

73 (Pages 286 to 289)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL   February 7, 2008
Chicago, IL

Page 290

1  jobs.
2     Q.  When you say "displaced," what do you
3  mean?
4     A.  When we shut down Home Infusion, they
5  lost their job.  They went to another place in
6  Abbott, but they had to interview for it.  It
7  wasn't an automatic.
8     Q.  Other than Mr. Rodman; right?
9     A.  He retired.
10    Q.  Was that a voluntary decision on his
11 part?
12    A.  Yes.
13    Q.  Can you think of any reason why you
14 wouldn't want to have Mr. Rodman if he chose to
15 not retire?
16    A.  No.  I was very sad to hear that he was
17 retiring.
18    Q.  Was he a good employee?
19    A.  Yes, for me very good.
20    Q.  Ma'am, if you could just look at the
21 last page of this document.
22    A.  Okay.

Page 291

1     Q.  Have you seen not necessarily this
2  particular RxLink Sales report but other
3  comparable reports like this?
4     A.  No, not that I remember.  And I would
5  have no use for it.
6     Q.  This particular RxLink Sales doesn't
7  account at all for Home Infusion.  Is that
8  because Home Infusion didn't sell under the
9  RxLink program?
10    A.  It's because none of our clients
11 purchased product.
12        (WHEREUPON Deposition Exhibit
13 Kreklow 020 was marked as of 2/7/2008 and
14 tendered to the witness.)
15        THE WITNESS:  Okay.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Ma'am, do you recognize this document?
18    A.  No, but I'm familiar with this
19 situation.
20    Q.  What are you familiar with?
21    A.  This is regarding the transition of
22 Home Infusion from a risk share agreement to a

Page 292

1  product sales agreement, or a line item
2  agreement.
3     Q.  Was this for University of Michigan or
4  Home Med?
5     A.  Yes.
6     Q.  Was University of Michigan also known
7  as Home Med?
8     A.  Yes.
9     Q.  Who is Rhea Alston?
10    A.  She was a sales representative that
11 worked for me.
12    Q.  Under Item 1 -- well, first of all,
13 what do you recall about the transition of the
14 University of Michigan contract?  Were there
15 issues associated with it?
16    A.  It was a very long process.
17    Q.  Do you recall why?
18    A.  Because they were making a lot of
19 demands.
20    Q.  Like what?
21    A.  Like they wanted the CHIP system at no
22 cost.  They wanted very aggressive pricing.  They

Page 293

1  threatened to go through the hospital.  So things
2  like that.
3     Q.  What do you mean "threatened to go
4  through the hospital"?
5     A.  Well, if it went through the hospital,
6  then Alternate Site wouldn't get sales credit for
7  it.
8     Q.  Oh, okay.  Was there a competition
9  between the Hospital Business Sector and Alt.
10 Site for clients?
11    A.  For Michigan there was.
12    Q.  Did they have an existing relationship
13 with HBS?
14    A.  Yes.
15    Q.  How did the issues with the University
16 of Michigan ultimately resolve?
17    A.  They were very happy and so were we.
18    Q.  Did they sign up with Alt. Site?
19    A.  Yes.
20    Q.  If you could look under Item 1 where it
21 says "Other discussion."
22    A.  Uh-huh.

74 (Pages 290 to 293)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL   February 7, 2008
Chicago, IL

---

Page 294

1    Q.  The last sentence says "This makes me
2  leery because while it may be true we cannot
3  provide a service without revenue, it's a
4  contractual obligation more than anything else."
5  Do you see that?
6    A.  Yes.
7    Q.  Do you know what that meant or what
8  that means to you?
9    A.  No.  I'll have to read the paragraph.
10   Q.  Okay.  Go ahead and read that, please.
11   A.  Okay.
12   Q.  In the context of this -- well, let me
13  ask you, what do you understand this paragraph to
14  be conveying?
15        MR. WINCHESTER:  Objection, form.
16        THE WITNESS:  They wanted, Home Med
17  wanted to do their own reimbursement.  We wanted
18  to transition them.  They wanted to just take it
19  over without, and they weren't properly trained.
20  So we wanted to make sure they were properly
21  trained.
22        They were a big, big account.  Nobody

Page 295

1  could just take them overnight.  So that's why we
2  thought we would transition, I believe it was in
3  thirds.  We started with the simple therapies
4  like enteral, they would get first, and then
5  build up to TPN.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  What do you mean by that?  Meaning they
8  would take over the billing responsibilities?
9    A.  Yes, yes.
10   Q.  Gradually?
11   A.  Yes.
12   Q.  And what happened with that suggestion
13  or plan?
14   A.  That's what we did.
15   Q.  In the middle of this paragraph it says
16  "When we discussed the AR, I stated that it would
17  be impossible for us to continue to provide
18  reimbursement without revenue."  Do you see that?
19   A.  Yes.
20   Q.  What does that mean?
21   A.  It means that we wouldn't do it for
22  free.

Page 296

1    Q.  So were they expecting you to provide
2  free reimbursement services?
3    A.  Yes.
4    Q.  And you said no?
5    A.  Right.
6    Q.  And I assume that your division won out
7  on that particular demand?
8    A.  Yes, we did.
9    Q.  And at the same time you were still
10  able to transition it to Alt. Site as opposed to
11  Hospital Products Division?
12   A.  Yes.
13   Q.  Is there anything else that you can
14  recall about the University of Michigan
15  transition or transfer?
16   A.  They were very complimentary about the
17  process.
18   Q.  Under Item 5 where it says "Lost
19  infusion devices/Already purchased devices," the
20  first sentence says "States they've already paid
21  for some of the devices on our pump installment
22  agreement."  Do you see that?

Page 297

1    A.  Uh-huh.
2    Q.  What's a pump installment agreement?
3    A.  I have to think about that for a
4  moment.
5        I believe it is, it has to do, I can't
6  remember the specifics, with purchasing a certain
7  number of pump sets.  And when they purchase a
8  certain number of pump sets, the pump becomes
9  theirs.
10   Q.  So it would be just given to them?
11   A.  Well, they would have already paid for
12  it.
13   Q.  By purchasing the sets?
14   A.  The upcharge on the set covered the
15  price of the pump.
16   Q.  The upcharge on the set covered the
17  price of the pump.
18   A.  Yes.
19   Q.  Do you know how that would be billed to
20  a third-party payor?
21   A.  No, I don't.
22   Q.  Then under Item 2 it says "Inventory

75 (Pages 294 to 297)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                      Chicago, IL

Page 298

1  buyout." Do you see that?
2      A.  Yes.
3      Q.  "Disputing IV poles, battery packs, and
4  AC adapters counted in patient's home using
5  query." Do you see that?
6      A.  Yes.
7      Q.  What does that mean?
8      A.  They didn't want, they did not want to
9  count those things that were out with patients in
10  their homes.
11     Q.  Okay.
12     A.  And we say using query, meaning on the
13  CHIP system, we could query which patients had
14  what, okay.
15     Q.  How did that dispute resolve?
16     A.  They paid for it.
17         MS. ST. PETER-GRIFFITH:  We'll move on
18  to the next exhibit.
19         (WHEREUPON Deposition Exhibit
20  Kreklow 021 was marked as of 2/7/2008 and
21  tendered to the witness.)
22         THE WITNESS:  Okay.

Page 299

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Ma'am, do you recognize this document?
3      A.  I'm familiar with this situation.  I do
4  not recognize the document.
5      Q.  It appears to be an e-mail from you to
6  Lynn Coomans?
7      A.  Yes.
8      Q.  Do you have any doubt that you sent
9  this?
10     A.  No.
11     Q.  It's a PharmaThera Executive Summary;
12  right?
13     A.  Yes.
14     Q.  Not to be confused with PharMerica?
15     A.  That's why I'm still wondering if
16  that's what they mean.
17     Q.  Oh, okay.  Who is A-U-I-X Health --
18     A.  Auxi, Auxi Health bought PharmaThera.
19     Q.  Is this comparable to the executive
20  summary that we saw earlier for Cleveland Clinic?
21     A.  It's the same format.
22     Q.  Is the purpose behind this to present

Page 300

1  the contract terms or summarize the contract
2  terms for the transition from a Home Infusion
3  agreement to an Alt. Site?
4      A.  Yes.
5         (WHEREUPON Deposition Exhibit
6  Kreklow 022 was marked as of 2/7/2008 and
7  tendered to the witness.)
8         THE WITNESS:  Okay.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Ma'am, do you recognize this document?
11     A.  No.
12     Q.  Are you familiar with the issue raised
13  in it?
14     A.  I'm familiar that this had to do with
15  the Cleveland Clinic negotiation which was long
16  and involved.
17     Q.  Why was the Cleveland Clinic
18  negotiation long and involved?
19     A.  That's the way they do things there.
20     Q.  And when you say "negotiation," do you
21  mean the negotiation to transition them from Home
22  Infusion to Alt. Site product sales?

Page 301

1      A.  Yes.
2      Q.  Did they ultimately go to Alt. Site
3  product sales?
4      A.  If I remember correctly, yes.
5      Q.  As part of your Home Infusion
6  contracts, did you also consign Ross product?
7      A.  Yes.
8      Q.  Did you also consign TAP product like
9  Lupron?
10     A.  No.
11     Q.  You're sure of that?
12     A.  Positive.
13     Q.  You're sure that Home Infusion has
14  never consigned Lupron?
15     A.  Never as long as I have been affiliated
16  with Home Infusion.
17     Q.  If we have testimony from other
18  individuals that Lupron was distributed through
19  Abbott Home Infusion, would that surprise you?
20     A.  Yes.
21     Q.  Why so?
22     A.  Because I didn't think we did it.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL     February 7, 2008
                    Chicago, IL

Page 302

1      Q.  Is it possible that you just didn't
2  know?
3      A.  Well, anything is possible, but I
4  don't, I never have ever heard that we have.  I
5  never have seen it on any price list.  Nor did we
6  ever put Calcijex out there.  So we only did Ross
7  in HPD.  That's what I was told.
8      Q.  Who told you that?
9      A.  Mike Sellers.
10     Q.  What price list do you mean?  Did you
11  have price lists within Home Infusion?
12     A.  Well, I shouldn't say "price list."
13  Product list.
14     Q.  Okay.  I just wanted to make sure I
15  wasn't missing anything.
16     A.  No.  I've been in contracting so long,
17  I call everything a price list.
18     Q.  But you did consign Ross product?
19     A.  Yes.
20     Q.  When Abbott's Home Infusion clients
21  transitioned from Home Infusion to Alt. Site,
22  what happened to the consigned Ross product

Page 303

1  arrangement?
2      A.  Ross took it over.
3      Q.  So at the same time that you're
4  transitioning contracts with Alt. Site product
5  sales, Ross is at the same time transitioning to
6  get the Ross business?
7      A.  Correct.
8      Q.  Did you work with Ross in doing that?
9      A.  Yes.
10     Q.  What does this memo concern?
11     A.  It concerns, it sounds like it's an
12  inventory thing, how much product Cleveland
13  Clinic used versus how much we shipped to them.
14     Q.  Okay.
15     A.  And there was a discrepancy, which
16  there shouldn't be because everything should be
17  in the CHIP system.  But then again we say we
18  added hide-a-port, which is a Ross product, and
19  then the total was reconciled.
20     Q.  Would the Ross inventory that's
21  consigned also be entered into the CHIP system?
22     A.  Yes.

Page 304

1      Q.  So you were able to keep track of both
2  the HPD products as well as the Ross products in
3  the system?
4      A.  Yes.
5      Q.  If you could flip to the second page
6  where it says Cleveland Clinic Product Receipts.
7  Do you know what AHIS Product means?
8      A.  Abbott Home Infusion Services.
9      Q.  And then there's receipts.  Do you see
10  that?
11     A.  Yes.
12     Q.  What is that?  Is that how much was
13  charged for the returned product?
14         MR. WINCHESTER:  Objection, form.
15         THE WITNESS:  I don't know what that
16  means.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  Do you know what List IC means?
19     A.  No.
20     Q.  Do you recall seeing this report?
21     A.  I don't recall seeing this.  I don't
22  even know if we generated it.

Page 305

1      Q.  So this could have been something that
2  --
3      A.  Cleveland Clinic did.  I don't know.
4      Q.  But ultimately any disputes were
5  resolved through the contract negotiation process
6  and ultimately you got them as a contract?
7      A.  If I remember right, yes.  We got them
8  as a customer, and yes, everything was resolved
9  to both of our satisfactions.
10     Q.  Do you know whether for every Alt. Site
11  contract that was transitioned from Home Infusion
12  the client also went with Ross?
13     A.  I believe there was one, and I don't
14  remember which one, that did not go with Ross.
15     Q.  Do you recall why?
16     A.  Pricing.
17     Q.  They could get their enteral products
18  someplace else for a better price?
19     A.  Yes, less money.
20     Q.  We're not necessarily going to study
21  the contract in detail.
22         (WHEREUPON Deposition Exhibit

77 (Pages 302 to 305)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 306

1 Kreklow 023 was marked as of 2/7/2008 and
2 tendered to the witness.)
3       THE WITNESS:  Okay.  I don't remember
4 the memo, but I'm familiar with the situation.
5 BY MS. ST. PETER-GRIFFITH:
6    Q.  Let me ask you this:  When the
7 transition was made from Home Infusion to Alt.
8 Site product sales, who did the actual contract
9 negotiation?  Would it have been Alt. Site
10 product sales staff?
11    A.  No.
12    Q.  Yours, your staff?
13    A.  Yes.
14    Q.  Does that mean that you had to become -
15 - I mean you obviously served as a NAM, so you
16 were somewhat familiar I assume with Alt. Site
17 product sales contract negotiations?
18    A.  I was very familiar with all the
19 products.
20    Q.  Was there any learning curve associated
21 with needing to get up to speed on certain topics
22 in order to negotiate these contracts?

Page 307

1       MR. WINCHESTER:  Objection, form.
2       THE WITNESS:  No.
3 BY MS. ST. PETER-GRIFFITH:
4    Q.  Did you work with anyone within Alt.
5 Site in terms of formulating the contracts?
6    A.  No.
7    Q.  Did you work with anyone in the legal
8 department?
9    A.  Yes.
10    Q.  Do you recall who you worked with?
11    A.  Mike Calsin did that.
12    Q.  So Mike was the one who contacted
13 legal?
14    A.  Yes.
15    Q.  Did you work with Mike in negotiating
16 these contracts?
17    A.  Which Mike?
18    Q.  Calsin.
19    A.  Yes.
20    Q.  Did you work with Mike Sellers?
21    A.  Sure.
22    Q.  Even though Mike Sellers by this point

Page 308

1 in time was in contract marketing and HPS?
2    A.  Yes.
3    Q.  Why was he still involved?
4    A.  Well, I reported to him, number one,
5 and I respected his opinion.
6    Q.  Do you recall which contracts he was
7 involved with?
8    A.  Well, he was involved in, our contracts
9 are pretty much all the same.  He was involved in
10 reviewing them initially.  So it met all of our
11 divisional requirements as a contract.
12    Q.  Do you know whether he reviewed each of
13 the transition contracts from Home Infusion to
14 HPD, or to Alt. Site?
15    A.  I don't know if he did or not.
16    Q.  Were you the conduit that got the
17 contracts to him for review?
18    A.  No.  Lynn Coomans sent it over to
19 Alternate Site.  I don't know what they did with
20 it.
21    Q.  Do you recognize this document?
22    A.  No.

Page 309

1    Q.  It says Cleveland Clinic Product
2 Agreement.
3    A.  Yes.  I'm familiar with the situation,
4 but I don't, I don't specifically remember this.
5    Q.  Well, is the product agreement the Alt.
6 Site product sales contract?
7    A.  Yes.
8    Q.  Do you know whether this is the final
9 form of that contract?
10    A.  I don't know if it was final.  But if
11 it wasn't final, it was near final.
12    Q.  Near final, okay.
13       Under Item 3 there's a note from Lynn
14 to you, and she lists under Item 3 "I have
15 reviewed the requirements language for HPD and
16 Ross."
17       What is the requirements language?
18    A.  Requirements means your purchase
19 requirements, certain dollar amount that you
20 would purchase, you as a customer would purchase
21 every year.
22    Q.  So the customer would be obligating

78 (Pages 306 to 309)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 310

1  itself to buy a certain level every year?
2      A.  Yes.  It's a commitment.
3      Q.  And it says "for both HPD and Ross."
4  Do you see that?
5      A.  Yes.
6      Q.  Would you also be involved in reviewing
7  the Ross language?
8      A.  No.
9      Q.  Do you know why Lynn did?
10     A.  She maintained the contract files.  So
11  she would have received it, not me.
12     Q.  It says "I think it might be more clear
13  if we changed the HPD language to mirror the Ross
14  section where it says eighty-five percent of its
15  total home infusion pharmacy infusion therapy
16  needs to be available through the HPD product
17  catalog per contract year."  Do you see that?
18     A.  Yes.
19     Q.  What does that contract term mean?
20     A.  Well, if you look at the next
21  paragraph, it says Ross put eighty-five percent
22  of the items listed in Exhibit A, which is their

Page 311

1  price list.  That's what the commitment was for
2  the customer.  So we were just going to make it
3  eighty-five percent as well.
4      Q.  But it wouldn't be charged the catalog
5  price; right?  It would be charged --
6      A.  No -- go ahead.
7      Q.  Go ahead.  I just want to confirm that
8  when you say HPD product catalog, the reference
9  is to the listing of products as opposed to the
10  price.
11     A.  That's right.  We didn't want them to
12  include other divisional products.
13        MS. ST. PETER-GRIFFITH:  Okay.  This is
14  a good breaking point.  We've got to change the
15  tape.
16        THE VIDEOGRAPHER:  We are off the
17  record at 3:53 p.m. with the end of Tape No. 4.
18        (WHEREUPON a recess was taken.)
19        THE VIDEOGRAPHER:  We are back on the
20  record at 4:03 p.m. with the start of Tape No. 5.
21        (WHEREUPON Deposition Exhibit
22  Kreklow 024 was marked as of 2/7/2008 and

Page 312

1  tendered to the witness.)
2        THE WITNESS:  Okay.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Ma'am, do you recognize this document?
5      A.  No, but I'm familiar with similar
6  documents.
7      Q.  This appears to be an e-mail from Jim
8  Watson --
9      A.  Yes.
10     Q.  -- to Cathy Hamilton.
11     A.  Yes.
12     Q.  And then it's a cc to you and Jim
13  Scuglik.
14     A.  Scuglik.
15     Q.  Who's Mr. Watson?
16     A.  He was my controller.
17     Q.  What division was he in?
18     A.  HPD.
19     Q.  And Mr. Scuglik?
20     A.  All these people are HPD.
21     Q.  But Mr. Scuglik's position was where?
22     A.  In AP-30.  I don't know what he did.

Page 313

1      Q.  What's AP-30?  Is that the building?
2      A.  Yes.
3      Q.  And Ms. Hamilton?
4      A.  I don't know her.
5      Q.  This appears to be forwarding a profit
6  and loss.  Is that what "P&L" stands for?
7      A.  Yes.
8      Q.  Schedule for HIS.  Is that Home
9  Infusion Services?
10     A.  Yes.
11     Q.  How regularly were P&L schedules for
12  Home Infusion Services generated?
13     A.  I don't remember.  I don't know.
14     Q.  I'm sorry?
15     A.  I don't know.
16     Q.  Are you familiar with the every year
17  twice a year a plan would need to be generated?
18     A.  Yes.
19     Q.  Would profit and loss statements be
20  generated incident to those plans?
21     A.  What do you mean by that?
22     Q.  Meaning would you need information from

79 (Pages 310 to 313)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
                        Chicago, IL

Page 314

1  a profit and loss schedule to generate those
2  plans?
3      A.  Yes.
4      Q.  Is it safe to say that at least twice a
5  year P&L schedules were generated?
6      A.  Yes.
7      Q.  Who would be responsible for generating
8  them?
9      A.  Jim Watson.
10     Q.  Do you know where they would be
11 maintained?
12     A.  In his files and probably Cathy
13 Hamilton's file.
14     Q.  Would you have any reason to retain
15 them within Home Infusion Services?
16     A.  I did retain some, not all.
17     Q.  Would your retained records be either
18 on your computer or would they be hard copies?
19     A.  Hard copy.
20     Q.  And would they be with those corporate
21 records that we discussed earlier?
22     A.  Yes.

Page 315

1      Q.  Ma'am, did you have any input in the
2  generation of these reports?
3      A.  Not in the generation of these, no.
4      Q.  Would you be consulted?
5      A.  No.  It's all actual numbers.
6      Q.  Would you have a way of tracking what
7  the actual numbers are other than through the
8  generation of a P&L schedule?
9      A.  No.
10     Q.  Is it fair to say that then you would
11 need to wait until a document like this was
12 generated in order to see how Home Infusion was
13 doing?
14     A.  Yes.
15     Q.  Do you recall anything else about the
16 generation of the P&L schedules?
17     A.  No.
18     Q.  Okay.  Ma'am, I only have one copy of
19 this document, so I'm going to mark it and I'm
20 going to ask you to show it to Abbott's counsel.
21         (WHEREUPON Deposition Exhibit
22 Kreklow 025 was marked as of 2/7/2008 and

Page 316

1  tendered to the witness.)
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Ma'am, do you recognize that document?
4      A.  No.
5      Q.  Do you recall an inquiry being made
6  from Mr. Rodman about the renewal of the Red Book
7  subscription?
8      A.  Give me a second to read it.
9      Q.  Oh, I'm sorry.  Go ahead and read it.
10     A.  Okay.
11     Q.  Do you recall an inquiry being made
12 concerning whether or not to continue with Red
13 Book subscription?
14     A.  Yes.
15     Q.  Does that refresh your recollection as
16 to whether Abbott Home Infusion Services had a
17 subscription to Red Book?
18     A.  Yes.
19     Q.  What was that Red Book used for?
20     A.  The way I know it, it was an actual
21 book with AWPs.
22     Q.  And why would Abbott Home Infusion

Page 317

1  Services maintain a subscription to that book?
2         MR. WINCHESTER:  Objection, form.
3         THE WITNESS:  So they would know what
4  an AWP was when they billed.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Would your sales staff have access to
7  the Red Book?
8      A.  No.
9      Q.  Do you know whether Red Book
10 information was also contained on the CHIP
11 system?
12         MR. WINCHESTER:  Objection, asked and
13 answered.
14         THE WITNESS:  That's what this says.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Would the subscription also include in
17 addition to the hard copy book the computer
18 version of the Red Book maintained on the CHIP
19 system?
20     A.  I don't know how that would be
21 transferred.
22     Q.  Well, are you aware that Red Book also

80 (Pages 314 to 317)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 318

1  furnished electronic information?
2      A.  No, I wasn't.  But that's what this
3  says.
4      Q.  Would Abbott share that Red Book
5  information on its CHIP system with its CHIP
6  licensees?
7      A.  Yes.
8      Q.  Do you know whether that was consistent
9  with its licensure agreement with Red Book?
10     A.  I don't know.  I don't know what the
11 agreement was.  And I can't specifically say that
12 we would share it with everybody, but we
13 certainly would share it with the people that did
14 their own billing.
15     Q.  Okay.
16     A.  Because I don't know what the
17 reimbursement screen looked like for people that,
18 if there was a difference in screens between if
19 we did the billing or they did the billing.
20     Q.  Well, would you have ever suggested to
21 the individual clients that they go out and get
22 their own subscription to Red Book?

Page 319

1      A.  No.  I didn't even remember we had it,
2  and I didn't know we had it until I was in the
3  director job.
4      Q.  Did you ever wonder where the Red Book
5  information on the CHIP system came from?
6      MR. WINCHESTER:  Objection, form,
7  mischaracterizes.
8      THE WITNESS:  From Red Book.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  But in terms of the actual Red Book
11 information, do you know whether it came from Red
12 Book itself on an electronic form, or was it
13 something that would have been input by the Home
14 Infusion staff?
15     A.  I don't know.
16     Q.  Is it fair to say that if you licensed
17 the CHIP system, you also got whatever Red Book
18 information was on the CHIP system?
19     MR. WINCHESTER:  Objection, form.
20     THE WITNESS:  Again, I don't know
21 specifically if there was a differentiation
22 between whether they did the billing, the client

Page 320

1  did the billing, or we did the billing.  I don't
2  know if they had any restricted access to
3  anything.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  I see.  Okay.
6      So you're saying that it might have
7  been that it was available on Abbott's CHIP
8  system, but if it was something that was licensed
9  out to a client, the client might have to get its
10 own information?
11     A.  Right.
12     Q.  And you don't know whether that
13 occurred or not?
14     A.  I don't know.
15     Q.  Did you see any reason to renew the Red
16 Book subscription for Home Infusion?
17     A.  No.
18     Q.  How come?
19     A.  We were going out of business.
20     Q.  Who are the cc's on that e-mail?
21     A.  Me and Daniel Davidson.
22     Q.  What is Daniel Davidson?

Page 321

1      A.  He is, he was a help desk person.
2      Q.  A CHIP help desk person?
3      A.  Yes.
4      Q.  What is the CHIP help desk?
5      A.  It's when a customer has a problem with
6  CHIP, it's a computer system, they do have
7  glitches, then they call our help desk.  And
8  Daniel Davidson or someone else would walk them
9  through the issue.
10     (WHEREUPON Deposition Exhibit
11 Kreklow 026 was marked as of 2/7/2008 and
12 tendered to the witness.)
13     THE WITNESS:  Okay.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Ma'am, do you recognize this document?
16     A.  I don't remember that we had this
17 document, but I recognize it as a price list.
18     Q.  And because it's a price list, does
19 that mean that this was something that was
20 utilized for purposes of an Alt. Site product
21 sales transition to contract?
22     A.  Yes.

81 (Pages 318 to 321)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla          HIGHLY CONFIDENTIAL     February 7, 2008
                        Chicago, IL

Page 322

1    Q.  This is an e-mail with attachments sent
2  to you from Lynn Coomans; is that right?
3    A.  Yes.
4    Q.  Who, again, is Ms. Coomans?
5    A.  She reports to Mike Calsin.  She was a
6  pricing analyst.
7    Q.  Why would she be sending you this
8  pricing list?
9        MR. WINCHESTER:  Objection, form,
10 speculation.
11       THE WITNESS:  Because this was Auxi
12 Health, the company that bought PharmaThera.  It
13 wasn't really PharmaThera anymore but we were
14 calling it PharmaThera.  And they were very
15 extremely difficult to deal with, extremely
16 difficult.
17       So that's why she sent it to me.  And I
18 just wanted to be involved to see if I could ease
19 the transition.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Were you involved at all with some of
22 the price negotiations?

Page 323

1    A.  Yes.
2    Q.  What were the prices that ultimately
3  were negotiated?  It appears, for example, on the
4  first page it says "PBI III Each."  Do you see
5  that?
6    A.  Yes.
7    Q.  Does that mean they received the PBI
8  GPO pricing?
9    A.  I don't know.  That's what they
10 compared it to though.
11    Q.  Is that what that reflects, a
12 comparison?
13    A.  I would think.  I don't know for
14 certain.  I can't tell you.  And that is
15 something that we would have looked at.
16    Q.  That you would have looked at?
17    A.  Sure.
18    Q.  How come?
19    A.  Because that is a price that the
20 customer could access by joining PBI.
21       So if we were substantially higher than
22 that, they would just join PBI and they would get

Page 324

1  an individual agreement, and then we would have a
2  commitment from them to purchase a certain amount
3  of product.
4    Q.  Is that the difference between the Home
5  infusion transition customer's participation with
6  Alt. Site directly as opposed to participating
7  with a group purchasing organization, that you
8  were able to get a commitment from them?
9        MR. WINCHESTER:  Objection, form.
10       THE WITNESS:  The customers that did
11 not transition to product sales contracts went
12 with a competitor.  So they were no longer
13 purchasing Abbott product.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Did you have a concern though that
16 instead of transitioning to an Alt. Site product
17 sales contract, that the former Home Infusion
18 clients would just go join a GPO?
19       MR. WINCHESTER:  Objection, form.
20       THE WITNESS:  It was never anything
21 that came to my mind as being a concern.
22 BY MS. ST. PETER-GRIFFITH:

Page 325

1    Q.  Why was Auxi Health difficult to deal
2  with?  Do you recall?
3        MR. WINCHESTER:  Objection, form.
4        THE WITNESS:  They didn't want to pay
5  us.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  When you say they didn't want to pay
8  you, what do you mean?
9    A.  Well, this was the, they did their own
10 reimbursement.  This was a very, very old, old
11 contract from when Home Infusion started.  We
12 allowed them to do their own reimbursement, so
13 they had to give us the percentage, they had to
14 pay us.  And they wouldn't do it.
15    Q.  I see.
16    A.  But they were happy to take our product
17 on consignment.
18    Q.  What are the benefits to a client
19 taking product on consignment?
20       MR. WINCHESTER:  Objection, form.
21       THE WITNESS:  Cash flow.
22 BY MS. ST. PETER-GRIFFITH:

Henderson Legal Services, Inc.

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL       February 7, 2008
                     Chicago, IL

Page 326

1    Q. How do you mean? Can you explain that?
2    A. They don't have to outlay any cash to
3  have product to use and wait to get reimbursed
4  for it.
5    Q. What about storage costs, was that a
6  consideration or inventory maintenance?
7    A. Inventory maintenance was done on the
8  CHIP system. And all the pharmacies had plenty
9  of storage because they didn't just use Abbott
10 product, they used a lot of things.
11   Q. So it was primarily the cash flow
12 issue?
13   A. Yes.
14       (WHEREUPON Deposition Exhibit
15 Kreklow 027 was marked as of 2/7/2008 and
16 tendered to the witness.)
17       THE WITNESS: Okay.
18 BY MS. ST. PETER-GRIFFITH:
19   Q. Ma'am, do you recognize this document?
20   A. Not this specific document, but I
21 recognize getting things like this.
22   Q. This appears to be an e-mail sent on

Page 327

1  behalf of Chris Anderson. Who's Mr. Anderson?
2    A. I don't know.
3    Q. It says it's to a number of addressees,
4  but do you see where you're listed as an
5  addressee?
6    A. Yes.
7    Q. By the way, what does APX mean?
8    A. Abbott Park.
9    Q. In the body of the first page of the e-
10 mail says "To All, I wanted this opportunity to
11 share with you the standard process that the
12 Ethics and Compliance Exception Review Committee
13 is using to determine the appropriate action for
14 issues brought before the committee." Do you see
15 that?
16   A. Yes.
17   Q. Do you know what that means?
18   A. This is referring to salespeople. If
19 there was any issue with, for example, when we do
20 dinners, when we have dinners, the physicians can
21 come but their spouses can't.
22       A lot of doctors want to bring their

Page 328

1  spouses. In the event that it would happen, and
2  I'm not familiar with it ever happening, that the
3  spouse was allowed in, this would be brought
4  before that Ethics Committee, it would be
5  reviewed, and the representative would be
6  reprimanded in some, a determination depending on
7  what it was.
8    Q. Do you know whether reports would need
9  to be made to anyone concerning -- well, let me
10 ask you this: Is that what the Ethics and
11 Compliance Exception Review Committee is? Did
12 they review this type of conduct?
13       MR. WINCHESTER: Objection, form.
14       THE WITNESS: Yes.
15 BY MS. ST. PETER-GRIFFITH:
16   Q. Do you know who served on that
17 committee?
18   A. No.
19   Q. Do you recall when this committee came
20 into existence?
21   A. No.
22   Q. Could it have been incident to the

Page 329

1  development of the Office of Ethics and
2  Compliance?
3        MR. WINCHESTER: Objection, form.
4        THE WITNESS: I don't know.
5  BY MS. ST. PETER-GRIFFITH:
6    Q. Do you know whether the development of
7  this procedure or process was made incident to
8  the Ross CIA?
9    A. I don't know that.
10   Q. Do you recall any of your sales force
11 members ever being referred to the Ethics and
12 Compliance Exception Review Committee?
13   A. I don't believe that they have been.
14       (WHEREUPON Deposition Exhibit
15 Kreklow 028 was marked as of 2/7/2008 and
16 tendered to the witness.)
17       THE WITNESS: Okay.
18 BY MS. ST. PETER-GRIFFITH:
19   Q. Ma'am, do you recognize this document?
20   A. Yes.
21   Q. What is it?
22   A. It's my graded goals for 2002.

83 (Pages 326 to 329)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

Page 330

1    Q.  What are graded goals?
2    A.  How I achieved a goal or missed a goal,
3  performance on attaining a goal.
4    Q.  Under the area where it says Competency
5  Assessment and Results Achieved, did you complete
6  that?
7    A.  No.
8    Q.  Do you know who completed it?
9    A.  Oh, wait a minute.  This is a different
10 form.  Yes.  I completed that.
11   Q.  Where would this particular document
12 go?
13      MR. WINCHESTER:  Objection, form.
14      THE WITNESS:  In my personnel file.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.  Would you receive some kind of annual
17 review?
18   A.  Yes, well, this was reviewed by Mike
19 Sellers, and he either, it's always reviewed by a
20 manager, and they either approve it or they don't
21 approve it.
22   Q.  Do they sometimes ask you to change it?

Page 331

1    A.  Well, no.  They would just change goal
2  performance, they would change that from the
3  maximum to whatever, if you partially achieved or
4  didn't achieve.
5    Q.  Under Item 5 it says "Make difficult
6  decisions."
7    A.  Yes.
8    Q.  And under Competency Assessment it says
9  "Held firm on client and staff reduction
10 timeliness.  Held firm on value of CHIP software
11 and accounts receivable buyouts despite client
12 push-back resulting in sales rather than
13 donations and increased respect for us by our
14 clients."
15      Let's break that down a little bit,
16 okay.  What do you mean by "held firm on client
17 and staff reduction timeliness"?
18   A.  I was reducing headcount, and I had it
19 all staged.  I didn't make the decision myself,
20 there were several meetings with Jim Watson, and
21 I maintained that.  So I didn't keep anybody
22 longer than we needed them.

Page 332

1    Q.  Would you wait until they got another
2  job before transitioning them out of Home
3  Infusion?
4    A.  They all did.  They started early.  I
5  gave people a heads-up, your job's going to go
6  away in March, we've got to find you a job now,
7  and that's how we did it.
8    Q.  Then the next phrase is "held firm on
9  value of CHIP software."  Do you see that?
10   A.  Yes.
11   Q.  What does that mean?
12   A.  Most of our clients just wanted us to
13 give them the CHIP software.
14   Q.  And you said no, you're going to pay a
15 one-time fee?
16   A.  Yes.
17   Q.  Do you recall what that one-time fee
18 was?
19   A.  I don't.
20   Q.  Then it says "and accounts receivable
21 buyouts despite client push-back resulting in
22 sales rather than donations."  What does that

Page 333

1  mean?
2    A.  Well, an example of that would be what
3  Home Med wanted, those pumps that were in
4  patients' homes.  They thought we should just
5  forgive that and not charge them for those.
6    Q.  Do you know whether that type of
7  forgiveness or that type of donation would have
8  been in compliance with state and federal
9  Medicare or Medicaid laws?
10      MR. WINCHESTER:  Objection, calls for a
11 legal conclusion.
12      THE WITNESS:  It would have to be
13 reported.  Any donated product has to be
14 reported.  That I know.  But we didn't let it
15 happen.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.  Then it says "increased respect for us
18 by our clients."  What did you mean by that?
19   A.  That we held firm.  I believe that if
20 you don't value what you have, your client isn't
21 going to value it either.
22      (WHEREUPON Deposition Exhibit

84 (Pages 330 to 333)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 334

1   Kreklow 029 was marked as of 2/7/2008 and
2   tendered to the witness.)
3        THE WITNESS:  Okay.
4   BY MS. ST. PETER-GRIFFITH:
5        Q.  Ma'am, do you recognize this document?
6        A.  Yes.
7        Q.  What is it?
8        A.  It's a review of my second half
9   incentive plan for 2002.
10       Q.  I mean given that Home Infusion closed
11  out during this time period --
12       A.  Right.
13       Q.  -- how was your incentive then
14  calculated?
15       A.  I don't remember how Mike did it.  Mike
16  came up with these.  I don't remember how he did
17  it.
18       Q.  But is it fair to say at the end you
19  got $30,138 for that six-month time frame?
20       A.  I did.
21       MS. ST. PETER-GRIFFITH:  This is a
22  composite exhibit.

Page 335

1        (WHEREUPON Deposition Exhibit
2   Kreklow 030 was marked as of 2/7/2008.
3   BY MS. ST. PETER-GRIFFITH:
4        Q.  Ma'am, I'll represent that these appear
5   to be a series of e-mails.  (Documents tendered
6   to the witness.)
7        A.  Okay.
8        Q.  Ma'am, do you recognize these series of
9   e-mails?
10       A.  No.
11       Q.  Each of them, there are three e-mails,
12  all appear to have been sent on June 27, 2003.
13  Do you see that?
14       A.  Yes.
15       Q.  They appear to be from you.  The first
16  is to Pete Karas.
17       A.  Right.
18       Q.  The second is to Ruth Abdulmassih.
19       A.  Abdulmassih.
20       Q.  And Bob Satterlee.
21       A.  Yes.
22       Q.  And then the last one, again, is to

Page 336

1   Pete Karas.  Do you see that?
2        A.  Yes.
3        Q.  In the text of your e-mail, at least in
4   the first one to Pete Karas, or actually on each
5   of these e-mails, you're attaching a Chicago
6   Tribune article concerning the parent of Ross
7   Products to pay $622 million in federal probe.
8   Is that accurate?
9        A.  Yes.
10       Q.  Prior to reviewing this Chicago Tribune
11  article, did you know about the Ross Products
12  settlement?
13       A.  No.  I did not.
14       Q.  You forwarded, in the text of the first
15  e-mail you said "Pete, Here is the summary
16  article in the event you want to send it out."
17  Do you see that?
18       A.  Yes.
19       Q.  What did you mean by that?
20       A.  It summarized what was in the news that
21  day.
22       Q.  And then you suggested "It would be

Page 337

1   nice to have a conference call on this so that we
2   can proactively explain this to our staff."
3        A.  Yes.
4        Q.  Why were you suggesting that?
5        A.  Because the nature of our business is
6   we call on physicians all day long and the first
7   thing they always say is what's new, or in this
8   instance they would tell us what was new.  And I
9   didn't want a salesperson to walk into that and
10  not understand what was going on.
11       Q.  Did you end up having a -- first of
12  all, did you learn what Abbott's position was
13  regarding the settlement?
14       A.  What do you mean by "position"?
15       Q.  Well, let me strike that question.
16       Do you recall ever receiving a
17  memorandum that was sent out Abbott-wide from
18  Miles White explaining the settlement?
19       A.  I don't specifically remember that.
20       Q.  Did you end up having a conference call
21  with your staff?
22       A.  I don't specifically remember, but in

85 (Pages 334 to 337)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
Chicago, IL

Page 338

1  here Pete says he's going to do it.  So I'm sure
2  he did it.
3      Q.  Do you recall what was discussed?
4      A.  Whatever, I didn't reread this whole
5  thing, but whatever the dot points where in this
6  Chicago Tribune article.
7      Q.  Did the Ross settlement create any
8  concerns within Abbott's Hospital Products
9  Division?
10         MR. WINCHESTER:  Objection,
11  speculation, form.
12         THE WITNESS:  Well, the concern was
13  company-wide, I'm sure, that our stock was going
14  to go down.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  What about any other concerns about
17  needing to evaluate conduct within other
18  divisions?
19         MR. WINCHESTER:  Object to the
20  question, irrelevant.  I think this has already
21  been ruled on by the court.
22         Go ahead.

Page 339

1         THE WITNESS:  Yes.  We had several
2  communications following this on conduct,
3  including those modules that I was discussing
4  earlier that we have to take and pass every year.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Okay.
7      A.  It discusses whatever happened in here,
8  and other things.
9         MS. ST. PETER-GRIFFITH:  If you could
10  just give me a couple of minutes, Jason.  I'm
11  going to go over my list, and then I might be
12  prepared to pass the witness.
13         MR. WINCHESTER:  Do you want us to
14  leave?
15         MS. ST. PETER-GRIFFITH:  No.  That's
16  all right.
17         MR. WINCHESTER:  While you're doing
18  that, Ann, I think in terms of a confidentiality
19  designation on this transcript, I believe that I
20  will be able to go through these eventually and
21  say that there are several of them for which we
22  do not have an issue whether they're marked as

Page 340

1  "Confidential" or "Highly Confidential" on this
2  transcript.  There are several of them, you know,
3  most particularly I know the ones that you've
4  been discussing with her about her personal
5  financial information, that we certainly would --
6         MS. ST. PETER-GRIFFITH:  Absolutely.
7         MR. WINCHESTER:  -- and at least the
8  portions of the transcript that dealt with that,
9  we would.
10         There also were a number of pricing
11  memoranda that you talked about today that are
12  from the mid 2000s that I think we could have
13  some issues with as well.
14         So I guess for now I would want to make
15  sure that this transcript is marked as "Highly
16  Confidential," particularly given those couple
17  areas.  I will go through however when we get it
18  and we have it finalized and try and adjust the
19  designations such that the portions of it that
20  are not subject to that would be not so
21  designated.
22         MS. ST. PETER-GRIFFITH:  Okay.  Well,

Page 341

1  certainly with regard to those areas discussing
2  the exhibits and the portions of the transcript
3  discussing Ms. Kreklow's personal financial
4  information, we can consent to those being
5  "Highly Confidential."  Everything else you know
6  our position on.
7         THE WITNESS:  Yes.
8         MS. ST. PETER-GRIFFITH:  We don't
9  agree.
10         I think at this time I'm ready to pass
11  the witness but not adjourn for purposes of the
12  United States this deposition.
13         I'm passing the witness subject to any
14  future production of documents and reserve the
15  right to recall this witness on behalf of the
16  United States, particularly since it sounds like
17  there might be a number of documents that we
18  haven't seen that might be in the corporate
19  records area.
20         I'm going to pass the witness but
21  subject to the reservation of recalling her if
22  additional documents are produced.

86 (Pages 338 to 341)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
Chicago, IL

Page 342

1      MR. WINCHESTER: Just as to that, I
2  don't actually think that's true in terms of the
3  documents. And we are not agreeing that this
4  witness can be recalled, but we'll take that up
5  if you have to make the request at a future time.
6      MS. ST. PETER-GRIFFITH: Well, can you
7  represent to me, Jason, that you've produced all
8  documents pertaining to this witness?
9      MR. WINCHESTER: It is certainly my
10  understanding we have, that anything that came
11  out of corporate records that had to do with Home
12  Infusion and certainly would have come from her
13  files, we have produced. That's part of that
14  ninety plus boxes that you've already got.
15      MS. ST. PETER-GRIFFITH: Well, I've
16  done an exhaustive search of those records and
17  basically what you've seen here today is largely
18  what we've seen. So obviously there's stuff that
19  appears to be missing.
20      MR. WINCHESTER: I don't think so.
21  That's our position.
22      MS. ST. PETER-GRIFFITH: Okay, Jarrett.

Page 343

1
2      EXAMINATION
3  BY MR. ANDERSON:
4      Q. Good afternoon, ma'am. I have a few
5  questions for you. My name is Jarrett Anderson.
6      If I understand your testimony
7  correctly, are you testifying that you were not
8  involved in discussions about AWP?
9      A. That's correct.
10      MR. WINCHESTER: Can I ask why Jarrett
11  is asking questions? Ven-a-Care closed out it's
12  examination the first time.
13      MS. ST. PETER-GRIFFITH: It's Texas
14  deposition. It has every right to take
15  questions. And we've been doing that process
16  throughout this litigation.
17      MR. ANDERSON: As you are aware, Jason,
18  my client is a party in multiple suits.
19      MR. WINCHESTER: Yeah. I don't think
20  it was specified earlier that Rand was only there
21  asking on behalf of Ven-a-Care with its Texas hat
22  on. But that's your position, that he was only

Page 344

1  asking for Ven-a-Care Texas? So that when he
2  said Ven-a-Care was done and we stayed late the
3  first day, that that was not Ven-a-Care for both
4  purposes?
5      MR. ANDERSON: Well, what I'm telling
6  you is that the cases are on different tracks,
7  and, therefore, a party for instance in the
8  federal case has production that's coming in that
9  is pertinent to the witness, and, therefore, the
10  questioning of the witness is different in the
11  subsequently held section of her deposition.
12      MS. ST. PETER-GRIFFITH: Moreover, the
13  clock didn't start to run on the fourteen hours
14  for the federal deposition until we started
15  today.
16      MR. WINCHESTER: I'm not talking about
17  you, Ann. I'm not sure why you're jumping in on
18  this.
19      I just want to know when I read the
20  transcript and Rand had me stay late so Ven-a-
21  Care could complete its questions the first day
22  and he said Ven-a-Care is done, if now we're

Page 345

1  taking the position that that was Ven-a-Care only
2  for Texas purposes, because that certainly was
3  not made clear on the last day of her deposition.
4      MR. ANDERSON: What I think it's really
5  more a function of is that the federal production
6  was forthcoming, and, in fact, there's been
7  production of documents that were fairly
8  voluminous that pertained to this witness that
9  were reviewed. And then in turn the United
10  States was deposing this witness and elicited
11  testimony that I want to follow up on.
12      MR. WINCHESTER: Well, I get that. And
13  I'll give you some leeway to it I guess. I don't
14  think that answers my question when Ven-a-Care
15  says it's done, but I think I see what you're
16  doing. Go ahead.
17  BY MR. ANDERSON:
18      Q. Ma'am, were you ever involved in
19  discussions about AWP?
20      A. No.
21      Q. Were you or your staff ever involved in
22  discussions about AWP?

87 (Pages 342 to 345)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL     February 7, 2008
                        Chicago, IL

Page 346

1       MR. WINCHESTER:  Objection, asked and
2  answered.
3       THE WITNESS:  No.
4  BY MR. ANDERSON:
5     Q.  Were you or your colleagues ever
6  involved in discussions about AWP?
7       MR. WINCHESTER:  Objection, form, asked
8  and answered, speculation.
9       THE WITNESS:  With customers?
10  BY MR. ANDERSON:
11     Q.  Yes.
12     A.  No.
13     Q.  Were you involved in internal
14  discussions about AWP?
15       MR. WINCHESTER:  Objection, asked and
16  answered.
17       THE WITNESS:  Certainly the
18  reimbursement group spoke about it amongst
19  themselves.
20  BY MR. ANDERSON:
21     Q.  Were you ever involved in the setting
22  of a list price?

Page 347

1     A.  No.
2     Q.  Were you ever involved in the setting
3  of an AWP?
4     A.  No one at Abbott is involved in that.
5     Q.  How do you know that?
6     A.  Because we don't set AWP.  No
7  manufacturing company does.
8     Q.  How do you know that?
9     A.  I've been told that.
10     Q.  By who?
11     A.  Mike Sellers.
12     Q.  Other than Mr. Sellers, do you have any
13  information whatsoever that Abbott does not
14  control the setting of AWP?
15     A.  I've seen several documents, but I
16  can't tell you which ones.
17     Q.  Do you recall being involved back in
18  1995 with the setting of the list price on
19  vancomycin?
20     A.  No.  I was not.
21     Q.  You're confident of that?
22     A.  Positive.

Page 348

1     Q.  Do you recall looking at Exhibit 999 in
2  your prior deposition which involved the setting
3  of a list price on vancomycin in 1995?
4       MR. WINCHESTER:  Objection, asked and
5  answered.
6       THE WITNESS:  I'm not sure which
7  document that is, but I did not set the price for
8  vancomycin or any other product.
9  BY MR. ANDERSON:
10     Q.  Were you involved in the setting of the
11  price?
12     A.  No.
13     Q.  Did you discuss with Mr. Sellers or
14  others at Abbott customer inquiries about changes
15  in AWP on vancomycin in 1995?
16       MR. WINCHESTER:  Objection, asked and
17  answered.
18       THE WITNESS:  I did in one instance.
19  BY MR. ANDERSON:
20     Q.  And what was that instance?
21       MR. WINCHESTER:  Objection, asked and
22  answered.

Page 349

1       THE WITNESS:  A customer called Abbott
2  Park and wanted to know why the AWP had changed.
3  And I went over and talked with someone about
4  that.
5  BY MR. ANDERSON:
6     Q.  What customer?
7     A.  I have no idea.
8     Q.  What was the basic focus of your
9  discussion?
10       MR. WINCHESTER:  Objection, asked and
11  answered.
12       THE WITNESS:  What is AWP, did AWP go
13  up or did it go down.
14  BY MR. ANDERSON:
15     Q.  Who did you talk to?
16     A.  Dave Brincks.
17     Q.  And what did you learn?
18       MR. WINCHESTER:  Objection, asked and
19  answered.
20       We spent a long time on this in the
21  first day, Jarrett.
22       THE WITNESS:  I eventually learned that

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                        Chicago, IL

Page 350

1  it had been reduced.
2  BY MR. ANDERSON:
3      Q.  Did you subsequently suggest that it be
4  increased?
5      A.  No, I didn't.
6      Q.  Did you subsequently advocate that it
7  be increased?
8          MR. WINCHESTER:  Objection, asked and
9  answered.
10         THE WITNESS:  No.
11 BY MR. ANDERSON:
12     Q.  Do you consider Mike Sellers to be an
13 honest person?
14     A.  Of course.
15     Q.  You said that you hold him in high
16 regard; correct?
17     A.  Yes.
18     Q.  Are you aware that he's sworn under
19 oath that you advocated that the AWP on
20 vancomycin be increased in 1995?
21         MR. WINCHESTER:  Objection,
22 argumentative, asked and answered.

Page 351

1          Go ahead and answer him again.
2          THE WITNESS:  Please repeat your
3  question.
4  BY MR. ANDERSON:
5      Q.  Are you aware that Mr. Sellers has
6  testified under oath that you suggested or
7  advocated that the AWP on vancomycin be increased
8  in 1995?
9      A.  I remember reading a portion of his
10 testimony that suggested that.
11     Q.  Do you believe his testimony is false?
12         MR. WINCHESTER:  Objection, form,
13 argumentative.
14         THE WITNESS:  I believe that's how he
15 remembers things.
16 BY MR. ANDERSON:
17     Q.  Do you think that he's got it wrong?
18     A.  It's not the way I remember it.
19     Q.  What do you remember?
20     A.  That I was not involved.
21     Q.  At all?
22     A.  No.

Page 352

1      Q.  Why do you think you were copied on e-
2  mails about the setting of the vanco list price?
3          MR. WINCHESTER:  Objection, asked and
4  answered.
5          THE WITNESS:  Because the one customer
6  had inquired about it.
7  BY MR. ANDERSON:
8      Q.  Now, shifting gears to the documents
9  you saw today concerning the PharMerica high
10 runners.  Do you agree that those e-mails pertain
11 to AWPs on those high runner products?
12     A.  No.
13     Q.  Are you disputing that there's
14 references to AWPs in Mr. Lyjak's e-mails?
15         MR. WINCHESTER:  If you need to look at
16 these documents again --
17         MS. ST. PETER-GRIFFITH:  Jarrett, which
18 number are you looking at?  PharMerica?  The e-
19 mails from Ted Lyjak?
20         MR. ANDERSON:  Yes.
21         I'll ask another foundational question
22 hopefully to get into this.

Page 353

1  BY MR. ANDERSON:
2      Q.  Ma'am, do you recall Mr. Lyjak pointing
3  out some discrepancies between the AWPs on Abbott
4  products and competitive products?
5      A.  No.
6      Q.  Do you have any understanding of why
7  you would have been consulted about a comparison
8  of AWPs on Abbott products versus competitor
9  products?
10         MR. WINCHESTER:  Objection, asked and
11 answered.
12         THE WITNESS:  I don't believe I was
13 ever asked to do that.
14 BY MR. ANDERSON:
15     Q.  Asked to do what?
16     A.  Compare AWPs between our product and
17 other companies.
18     Q.  Were you ever requested to retrieve AWP
19 information at all?
20     A.  Not to my memory.  It's public
21 information.  But not to my memory.
22     Q.  Were you involved at all in

89 (Pages 350 to 353)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                      Chicago, IL

Page 354

1  coordinating the retrieval of AWP information by
2  the reimbursement department at Abbott?
3      A.  No.
4      Q.  Were you considered a person who had
5  some expertise or knowledge about reimbursement
6  given your past experience in Home Infusion?
7      A.  Not whatsoever.
8          MR. WINCHESTER:  Objection, form,
9  speculation.
10 BY MR. ANDERSON:
11     Q.  Why do you think Mr. Lyjak was
12 directing those inquiries to you?
13         MR. WINCHESTER:  Objection, asked and
14 answered, speculation.
15         THE WITNESS:  I was the only one in
16 Home Infusion that he knew.
17 BY MR. ANDERSON:
18     Q.  Are people in Home Infusion looked to
19 for expertise in AWP or reimbursement issues?
20         MR. WINCHESTER:  Objection, form.
21         THE WITNESS:  He did.
22 BY MR. ANDERSON:

Page 355

1      Q.  And can you understand why he directed
2  those inquiries to you?
3          MR. WINCHESTER:  Objection, asked and
4  answered.
5          THE WITNESS:  He directed them to me
6  because I'm the only one that he knew in Home
7  Infusion.
8  BY MR. ANDERSON:
9      Q.  Right.  But do you agree that personnel
10 with Home Infusion background at Abbott are
11 considered more knowledgeable about AWP and
12 reimbursement?
13         MR. WINCHESTER:  Objection,
14 speculation, form.
15         THE WITNESS:  Alternate Site product
16 sales personnel understood that Home Infusion
17 Services performed reimbursement functions.
18 BY MR. ANDERSON:
19     Q.  And do you think that that's why you
20 were called upon or received some inquiries from
21 Mr. Lyjak?
22     A.  I don't know what prompted him to do

Page 356

1  that or why he chose me.
2      Q.  You've mentioned several times this
3  afternoon that the reimbursement department at
4  Abbott would from time to time discuss
5  reimbursement issues with customers; is that
6  true?
7      A.  That's correct.
8      Q.  Is it also true that from time to time
9  personnel at Abbott in the reimbursement
10 department would discuss AWPs with customers?
11     A.  Not to my knowledge.  It's public
12 information.  There would be no reason for us to
13 discuss it with the customer.
14     Q.  And it's your testimony that customers
15 do not inquire of Abbott about AWPs?
16     A.  Not to my knowledge because it's public
17 information.
18     Q.  What do you mean by that?
19     A.  It's published in the Red Book.
20     Q.  Don't you have to have a subscription?
21     A.  I don't know.  I personally never did.
22     Q.  When you say it's public information,

Page 357

1  what do you mean?
2      A.  Anyone can access it.
3      Q.  On what do you base that?
4      A.  Because it's a published book.
5      Q.  How do you know that?
6      A.  I have seen a large red book.
7      Q.  And is it your understanding that those
8  are free to the public or they need to be
9  purchased?
10     A.  I never thought about it.
11     Q.  Is it appropriate for Abbott personnel
12 to discuss reimbursement with customers?
13         MR. WINCHESTER:  Objection, asked and
14 answered, speculation.
15         THE WITNESS:  Only if it's specifically
16 related to one of their patients in Home
17 Infusion.
18 BY MR. ANDERSON:
19     Q.  How long has that been the policy?
20         MR. WINCHESTER:  Objection,
21 mischaracterizes, assumes facts.
22         THE WITNESS:  It's always been a policy

90 (Pages 354 to 357)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL      February 7, 2008
                        Chicago, IL

Page 358

1  for us to provide information regarding a
2  client's own patient.
3       MR. ANDERSON:  Objection,
4  nonresponsive.
5  BY MR. ANDERSON:
6    Q.  Ma'am, how long has it been the policy
7  at Abbott for Abbott personnel to only be
8  authorized to discuss reimbursement about an
9  individual patient?
10      MR. WINCHESTER:  Objection, assumes
11  facts, argumentative.
12      THE WITNESS:  I can't tell you that.
13  BY MR. ANDERSON:
14    Q.  Do you have any information whatsoever
15  to support that testimony?
16      MR. WINCHESTER:  Objection,
17  argumentative.
18      THE WITNESS:  I was involved in
19  conversations, but I can't tell you what time
20  they were, and I can't tell you if conversations
21  such as that occurred prior to my introduction in
22  Home Infusion.

Page 359

1  BY MR. ANDERSON:
2    Q.  What was your understanding of the
3  reasons why it was considered inappropriate for
4  Abbott personnel to discuss reimbursement other
5  than reimbursement on a specific patient?
6       MR. WINCHESTER:  Objection,
7  mischaracterizes, calls for speculation.
8       THE WITNESS:  It had nothing to do with
9  us, nor did we have the expertise.
10  BY MR. ANDERSON:
11    Q.  The expertise in what?
12    A.  In reimbursement.
13    Q.  Is it your testimony that Abbott did
14  not represent itself as an expert in
15  reimbursement matters?
16      MR. WINCHESTER:  Objection,
17  mischaracterizes.
18      THE WITNESS:  Only the reimbursement
19  department were expert in reimbursement.
20  BY MR. ANDERSON:
21    Q.  And they're part of Abbott; aren't
22  they?

Page 360

1    A.  Yes.
2    Q.  So Abbott was in fact expert in
3  reimbursement matters?
4       MR. WINCHESTER:  Objection, form.
5       THE WITNESS:  The reimbursement
6  department in Home Infusion Services was, yes.
7  BY MR. ANDERSON:
8    Q.  Well, given that expertise, on what do
9  you base your testimony that Abbott was not
10  skilled in reimbursement matters?
11      MR. WINCHESTER:  Objection, form,
12  mischaracterizes the testimony.
13      THE WITNESS:  I was referring to people
14  outside of the reimbursement department.
15  BY MR. ANDERSON:
16    Q.  I see.  Okay.
17      You mentioned that you have nothing to
18  do with AWP.  On what do you base your testimony
19  that Abbott has nothing to do with AWP?
20    A.  Abbott, I said Abbott does not set AWP.
21    Q.  Does Abbott have something to do with
22  the publication of AWP?

Page 361

1    A.  It's my understanding, not the
2  publication necessarily, but it's my
3  understanding that AWP is arrived at using a
4  formula with the list price of a product.
5    Q.  Which those list prices are published
6  by Abbott; correct?
7    A.  Yes.
8    Q.  So in that sense Abbott does have
9  involvement in the publication of AWP; correct?
10      MR. WINCHESTER:  Objection, form,
11  argumentative.
12      THE WITNESS:  Yes, they do.  I said
13  they do not set the AWP.
14  BY MR. ANDERSON:
15    Q.  Is Abbott's involvement in the
16  publication of AWP one reason that customers
17  would inquire of Abbott over the years about AWP
18  on Abbott products?
19      MR. WINCHESTER:  Objection, calls for
20  speculation, mischaracterizes, argumentative.
21      THE WITNESS:  Not in my experience.
22  BY MR. ANDERSON:

91 (Pages 358 to 361)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
                      Chicago, IL

Page 362

1     Q.  What in your experience was the
2  reasoning for customers inquiring of Abbott about
3  AWPs?
4         MR. WINCHESTER:  Objection,
5  mischaracterizes, assumes facts.
6         THE WITNESS:  It is possible that it
7  was part of a conversation when a client called
8  our reimbursement department regarding a specific
9  patient claim.
10  BY MR. ANDERSON:
11     Q.  More so than just being possible, is it
12  true that you in fact know that that has occurred
13  over the years?
14     A.  No.  I cannot tell you I was witness to
15  any conversation.
16     Q.  Can you testify that that has not
17  occurred over the years?
18     A.  No.
19     Q.  Can you point to any instance where any
20  Abbott employee was disciplined for discussing
21  reimbursement or AWP?
22     A.  Any Abbott employee?

Page 363

1     Q.  Yes.
2     A.  The Ross claim.
3     Q.  It's your understanding that Ross
4  personnel were disciplined in connection with the
5  government investigation and ultimate settlement
6  concerning Ross?
7     A.  It's my opinion that, yes.
8     Q.  Okay.  Setting aside the Ross criminal
9  settlement, are you aware of any other instance
10  where an Abbott employee was disciplined in any
11  way for discussing reimbursement?
12     A.  No.  I am not.
13     Q.  Are you aware of any reason why
14  Abbott's policies concerning reimbursement were
15  kept in oral form only prior to 2004?
16     A.  I have no idea.
17         MR. WINCHESTER:  Objection, form.
18  BY MR. ANDERSON:
19     Q.  Would you agree that it's easier for
20  employees to violate policies if those policies
21  are not documented in writing?
22         MR. WINCHESTER:  Objection,

Page 364

1  argumentative.
2         THE WITNESS:  Absolutely not.
3  BY MR. ANDERSON:
4     Q.  Is it your testimony that no Abbott
5  employees discussed reimbursement with customers
6  over the years?
7         MR. WINCHESTER:  Objection, asked and
8  answered.
9         THE WITNESS:  Yes, to my knowledge,
10  yes.
11  BY MR. ANDERSON:
12     Q.  Would you be surprised to know that
13  numerous Abbott employees have testified under
14  oath in this matter that they did discuss
15  reimbursement and AWP with customers?
16     A.  Yes, I would be.
17     Q.  Would you consider that to be a
18  violation of Abbott policy?
19         MR. WINCHESTER:  Objection, calls for -
20  -
21         MR. ANDERSON:  I'll rephrase.
22  BY MR. ANDERSON:

Page 365

1     Q.  Ma'am, would you consider it to be a
2  violation of Abbott policy if Abbott employees
3  admitted to discussing AWP and reimbursement
4  issues with customers over the years?
5         MR. WINCHESTER:  Objection,
6  speculation, form.
7         THE WITNESS:  Well, it wouldn't be
8  against Abbott policy for them to admit
9  something.  But, yes, it's against Abbott policy
10  for them to discuss reimbursement.
11  BY MR. ANDERSON:
12     Q.  And it has been for as long as you know
13  back to the early '90s?
14     A.  As long as I know, yes.
15     Q.  You mentioned earlier in your testimony
16  that you in part were responsible for
17  ascertaining Home Infusion clients' payor mix; is
18  that correct?
19     A.  Yes -- no.  Correction.  I did not
20  ascertain their payor mix.  I brought that
21  information back to Abbott Park, and it was
22  provided by the client.

92 (Pages 362 to 365)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 366

1    Q.   Right.  I'm sorry.  I may not have made
2  that question clear.
3        Part of your job was to ask the client
4  companies that Home Infusion did business with
5  what their payor mix was; correct?
6    A.   That was part of the contract proposal
7  preparation, yes.
8    Q.   And in those instances the Home
9  Infusion customers of Abbott would disclose to
10 Abbott the general percentages in which they were
11 reimbursed by Medicaid, Medicare, private
12 insurance, et cetera; correct?
13       MR. WINCHESTER:  Objection.
14       THE WITNESS:  Only those three, yes.
15 BY MR. ANDERSON:
16   Q.   And then in turn you would share that
17 information with the personnel in contract
18 marketing; correct?
19   A.   Yes.
20   Q.   What was your understanding of the
21 significance of the payor mix?
22       MR. WINCHESTER:  Objection, asked and

Page 367

1  answered.
2        THE WITNESS:  I don't know specifically
3  how they utilized the information.
4  BY MR. ANDERSON:
5    Q.   Well, did you have any understanding of
6  why the information was important to the Home
7  Infusion customer process?
8    A.   To determine if the client proposal
9  would be profitable for Abbott.
10   Q.   And how would understanding the payor
11 mix help Abbott ascertain profitability?
12       MR. WINCHESTER:  Objection, form,
13 speculation.
14       THE WITNESS:  As I mentioned earlier in
15 my testimony today, if we had a customer that had
16 a large population of historically poor paying
17 whatever, then we would look at maybe not taking
18 that client on.
19 BY MR. ANDERSON:
20   Q.   In the context of analyzing payor mix,
21 did Abbott consider whether or not a given
22 reimburser paid off AWP?

Page 368

1    A.   No, not to my knowledge.
2    Q.   Why not?
3        MR. WINCHESTER:  Objection,
4  speculation.
5        THE WITNESS:  I don't know.
6  BY MR. ANDERSON:
7    Q.   Do you believe that you've previously
8  provided any type of input to any other personnel
9  at Abbott about how given payors reimburse on AWP
10 or otherwise?
11   A.   Only what we've seen today where I said
12 some states pay on AWP.
13   Q.   You're referring to an exhibit you saw
14 today?
15   A.   Yes.
16   Q.   Which one?
17   A.   I don't remember.
18   Q.   If you could pull out what's been
19 marked today as Kreklow Exhibit 16.  It was also
20 previously marked as Kipperman Exhibit 481.
21   A.   Okay.
22   Q.   Looking at the bottom section of the

Page 369

1  first page of Exhibit 16, do you see a section
2  that begins with the word "Questions"?
3    A.   Yes.
4    Q.   I'll read for the benefit of the
5  record.  "Questions to use when probing customer
6  with AWP cost complaints:  Get them to do
7  analysis on the following if they are looking to
8  quantify losses."  Did I read that correctly?
9    A.   Yes.
10       MR. WINCHESTER:  Objection, asked and
11 answered.
12 BY MR. ANDERSON:
13   Q.   Then the first bullet reads "What
14 percentage of your patients are reimbursed based
15 on AWP"; correct?
16   A.   Yes.
17   Q.   Then the next sub-bullet reads "What
18 percentage of your business is reimbursed by
19 Medicaid?"  Did I read that correctly?
20   A.   Yes.
21   Q.   Were you involved at all in the
22 discussion of those issues?

93 (Pages 366 to 369)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL    February 7, 2008
                    Chicago, IL

Page 370

1         MR. WINCHESTER:  Objection, asked and
2  answered twice now.
3         THE WITNESS:  Those specific issues,
4  no.  And I did not write this document.
5  BY MR. ANDERSON:
6     Q.  Did you have any involvement in any
7  discussion of those issues, whether you wrote the
8  memo setting forth the minutes or not?
9         MR. WINCHESTER:  Objection, asked and
10  answered.
11         THE WITNESS:  Not to my recollection.
12  BY MR. ANDERSON:
13     Q.  Do you agree that between you, Pete
14  Baker, Jeff Balzer, and Ted Lyjak you had the
15  experience in Home Infusion concerning payor mix?
16     A.  Define experience on payor mix.
17     Q.  Well, Mr. Baker never worked in Home
18  Infusion --
19     A.  Yes, he did.
20     Q.  -- other than holding a job similar to
21  yours; correct?
22     A.  That's correct.

Page 371

1     Q.  Jeff Balzer did not work in Home
2  Infusion; correct?
3     A.  Correct.
4     Q.  Ted Lyjak did not work in Home
5  Infusion; correct?
6     A.  Yes.
7     Q.  Do you believe that you were involved
8  in discussions about AWP and payor mix in the
9  context of the meeting that was held around July
10  12th of 2001?
11         MR. WINCHESTER:  Objection, asked and
12  answered.
13         THE WITNESS:  I have previously worked
14  with Pete Baker and Jeff Balzer and Ted Lyjak.  I
15  was the only person that they knew in Home
16  Infusion, which is why Jeff called me.  And I do
17  not remember Jeff's specific questions.
18  BY MR. ANDERSON:
19     Q.  Do you recall generally that you
20  provided some input about payor mix, AWP, or
21  reimbursement at all?
22         MR. WINCHESTER:  Objection, asked and

Page 372

1  answered, and to the form.
2         THE WITNESS:  No.
3  BY MR. ANDERSON:
4     Q.  Do you believe that the author of
5  Exhibit 16 is flatly wrong to document your
6  involvement in a meeting about such things as AWP
7  and payor mix?
8         MR. WINCHESTER:  Objection, asked and
9  answered, argumentative.
10         THE WITNESS:  Yes, I do.
11  BY MR. ANDERSON:
12     Q.  Do you believe you've been set up?
13         MR. WINCHESTER:  Objection,
14  argumentative.
15         THE WITNESS:  Certainly not.
16  BY MR. ANDERSON:
17     Q.  Can you think of any reason why someone
18  would mistakenly include your name in meeting
19  minutes about reimbursement issues?
20         MR. WINCHESTER:  Objection, asked and
21  answered.
22         THE WITNESS:  No, I cannot.

Page 373

1  BY MR. ANDERSON:
2     Q.  Can you recall any other instance where
3  you were noted as being an attendee at a meeting
4  that you did not actually participate in?
5     A.  Not in my memory.
6     Q.  Does it seem a little strange to you
7  that you would be noted as participating in a
8  meeting that you're now testifying you were not
9  involved in?
10         MR. WINCHESTER:  Objection, asked and
11  answered.
12         THE WITNESS:  It's a puzzlement, but
13  it's not strange.
14  BY MR. ANDERSON:
15     Q.  Is there something wrong about holding
16  meetings about reimbursement?
17         MR. WINCHESTER:  Objection, asked and
18  answered, also calls for speculation.
19         THE WITNESS:  It depends in which
20  context.
21  BY MR. ANDERSON:
22     Q.  In this context, in the context set

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 374

1  forth in Exhibit 16.
2         MR. WINCHESTER:  Objection, form.
3         THE WITNESS:  Where only Abbott
4  managers were apparently discussing AWP?  I don't
5  see that that is against policy.
6  BY MR. ANDERSON:
7     Q.  Do you agree that Exhibit 16 is setting
8  forth questions that could be used by Abbott
9  personnel in conversations with Abbott customers?
10        MR. WINCHESTER:  Objection, asked and
11  answered.
12        THE WITNESS:  No.  I don't know why
13  they had those questions.  I don't know what they
14  were going to do with them.
15  BY MR. ANDERSON:
16     Q.  Well, looking at that text that I read,
17  and I'll read again for the record, "Questions to
18  use when probing customers with AWP cost
19  complaints:  Get them to do an analysis of the
20  following if they are looking to quantify
21  losses."  Did I read that correctly?
22     A.  Yes.

Page 375

1     Q.  Would having Abbott personnel probe
2  customers about AWP issues be improper?
3         MR. WINCHESTER:  Objection, asked and
4  answered, argumentative, calls for speculation.
5         THE WITNESS:  I can only speak for Home
6  Infusion Services, and I already discussed how
7  that was done.
8  BY MR. ANDERSON:
9     Q.  Why can you only speak to Home
10  Infusion?
11     A.  Because I can't speak to that memo and
12  who they were referring to.
13     Q.  Well, I'm not limiting my questions to
14  the memo, ma'am.
15        I'm asking you based on your years of
16  experience at Abbott, would it be inappropriate
17  for Abbott personnel to probe customers about AWP
18  cost complaints?
19        MR. WINCHESTER:  Objection, form, asked
20  and answered.
21        THE WITNESS:  I'm not familiar with any
22  customer complaints about AWP.

Page 376

1         MR. ANDERSON:  Objection,
2  nonresponsive.
3  BY MR. ANDERSON:
4     Q.  I realize that you're saying you don't
5  specifically remember a given complaint other
6  than one in 1995 on vanco.  I'm asking a broader
7  question, ma'am.
8         Would it be improper in your experience
9  at Abbott for many years for Abbott personnel to
10  probe customers with questions about AWP?
11        MR. WINCHESTER:  Objection, form, asked
12  and answered.
13        THE WITNESS:  It would depend on the
14  person that was quote unquote probing and it
15  would depend on the customer and the situation.
16  BY MR. ANDERSON:
17     Q.  So there are some Abbott personnel who
18  are authorized to discuss reimbursement?
19     A.  Yes.
20     Q.  And those are the personnel in the
21  reimbursement department?
22     A.  Again, depending, not anymore.  There

Page 377

1  is a separate group, I don't know who they are,
2  I've never had to utilize them because now I'm
3  selling in the hospital market.  Our
4  reimbursement people in Home Infusion only spoke
5  with Home Infusion clients.
6     Q.  And those people were authorized to
7  discuss reimbursement; correct?
8     A.  The people in the Home Infusion
9  reimbursement department were authorized to
10  discuss reimbursement with their client.
11     Q.  Okay.  Now, shifting to Alternate Site
12  product sales personnel, would it be appropriate
13  for those personnel to probe customers with AWP
14  questions?
15        MR. WINCHESTER:  Objection, asked and
16  answered.
17        Jarrett, my fuse is getting real short
18  here.  It's 5:00 o'clock and you've spent your
19  entire questioning not asking one single question
20  that wasn't asked at length by Ray Winter all day
21  the last time we were here and by the government
22  today.  If you've got something new, get to it

95 (Pages 374 to 377)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                           Chicago, IL

Page 378

1  fast.
2  BY MR. ANDERSON:
3      Q.   Ma'am, you can answer the question.
4      A.   Please repeat it.
5      Q.   Yes.  Was it authorized or appropriate
6  for Alternate Site product sales personnel to
7  probe customers with AWP questions in your
8  experience at Abbott?
9          MR. WINCHESTER:  Same objections.
10         THE WITNESS:  My experience when I was
11 in Alternate Site product sales was yes, it was
12 not authorized.
13 BY MR. ANDERSON:
14     Q.   So do you believe that suggesting in
15 July of 2001 that Abbott personnel probed
16 customers with AWP questions to be inappropriate?
17         MR. WINCHESTER:  Objection, asked and
18 answered, to the form, argumentative.
19         THE WITNESS:  I don't believe that.  I
20 have no knowledge of it.
21         MR. ANDERSON:  Objection,
22 nonresponsive.

Page 379

1  BY MR. ANDERSON:
2      Q.   Ma'am, if in July of 2001 Abbott
3  personnel were told they could probe customers
4  with AWP questions, would that be appropriate or
5  inappropriate?
6          MR. WINCHESTER:  Objection to the
7  hypothetical.
8          THE WITNESS:  To customers?
9  BY MR. ANDERSON:
10     Q.   Yes.
11     A.   No.  We wouldn't recommend that.
12     Q.   Did you ever advise Mr. Baker, Mr.
13 Balzer, and Mr. Lyjak that that type of inquiry
14 is inappropriate?
15     A.   I don't remember.
16     Q.   You simply don't remember one way or
17 the other anything about a meeting in July of
18 2001?
19         MR. WINCHESTER:  Objection,
20 mischaracterizes the testimony.
21         THE WITNESS:  A physical meeting, no.
22 I do not remember anything about that.

Page 380

1  BY MR. ANDERSON:
2      Q.   Do you remember anything about any
3  conversations, whether they be physical or
4  metaphysical?
5          MR. WINCHESTER:  Objection,
6  argumentative, asked and answer.
7          THE WITNESS:  Jeff Balzer and I had a
8  conversation, and I cannot tell you what the
9  content was, but he and I did have a
10 conversation.
11 BY MR. ANDERSON:
12     Q.   Have you ever --
13         MR. WINCHESTER:  She's not answering
14 the question, Jarrett.
15         THE WITNESS:  And it was mostly about
16 his wife who passed away.
17         I said and the conversation was mostly
18 about his wife who had passed away.
19 BY MR. ANDERSON:
20     Q.   Have you ever been party to any or for
21 that matter become aware of any decision by
22 Abbott to price its products in consideration of

Page 381

1  provider dispensing fees?
2      A.   I am not aware of any such instance.
3      Q.   Do you believe it's appropriate for
4  Abbott to price its products in consideration of
5  provider or pharmacy dispensing fees?
6          MR. WINCHESTER:  Objection to the form.
7          THE WITNESS:  I don't know why you
8  would assume that I have an opinion or have a
9  thought on that because it's nothing that ever
10 entered my mind.
11 BY MR. ANDERSON:
12     Q.   In 1995 in the context of the
13 vancomycin list price and AWP issues, did you
14 have any thought or consideration of provider
15 dispensing fees?
16         MR. WINCHESTER:  Objection,
17 mischaracterizes the testimony, assumes facts.
18         THE WITNESS:  No.  I did not.
19 BY MR. ANDERSON:
20     Q.   Are you aware of anyone at Abbott
21 deciding to price vancomycin at any level based
22 upon provider or pharmacy dispensing fees?

96 (Pages 378 to 381)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 382

1      A.  I'm not aware of any such instance.
2      Q.  Can you think of any justification for
3   setting list prices at a certain level based on
4   provider or pharmacy dispensing fees?
5           MR. WINCHESTER:  Objection, form.
6           THE WITNESS:  Again, I have no
7   knowledge how list prices are set.
8           MR. ANDERSON:  I'll pass the witness.
9
10              EXAMINATION
11  BY MR. SISNEROS:
12      Q.  Could you turn to --
13          MR. WINCHESTER:  What kind of time are
14  we talking about here?
15          MR. SISNEROS:  I don't know --
16          MR. WINCHESTER:  We pushed passed 5:00
17  with forty minutes of absolute rehash.
18          MR. SISNEROS:  Well, I mean I am going
19  to be going over some exhibits that were admitted
20  into the record by the federal government.  I am
21  going to be putting in some documents that are
22  not exhibits to this deposition.  And there are

Page 383

1   some areas that could very well become open-
2   ended.  But I don't have plans of walking over
3   the same areas that have been walked over before.
4           MR. WINCHESTER:  How much time do you
5   think you're going to need?  This is abusive.
6           MR. SISNEROS:  Well, California hasn't
7   asked --
8           MR. ANDERSON:  Needless to say, we
9   totally disagreed with that position.
10          MR. WINCHESTER:  Please.  Check the
11  record.
12              How much time are you going to need?
13          MR. SISNEROS:  I don't know, Jason.  I
14  have new documents that I'm going to put into the
15  record and I'm going to go over some of the
16  exhibits that have already been admitted into
17  evidence in this deposition.
18          MR. WINCHESTER:  I need to know if this
19  is something you think you can finish within a
20  very reasonable amount of time tonight because
21  this witness is not going to stay here until 8:00
22  o'clock.

Page 384

1           MR. SISNEROS:  Well, then my suggestion
2   is that the deposition not be adjourned and that
3   we continue at another date.
4           I mean I'll note that California's
5   discovery has begun.  We anticipate that a lot of
6   the document productions already made, probably
7   are documents that we have received, or should
8   shortly receive.
9           With respect to what the federal
10  government received, it's my understanding of, I
11  don't know how many boxes, I don't know if it's
12  over a hundred or a hundred boxes, whatever,
13  certainly California hasn't had the opportunity
14  to review that.  Some of the documents that were
15  admitted into this deposition here today were new
16  to us.
17          So, yes, we have some questions on the
18  new documents that have been put forth.  And I'm
19  not going to limit myself in terms of questions.
20  And I do have a lot of follow-up questions for
21  Ms. Kreklow.
22          MR. WINCHESTER:  My only question for

Page 385

1   you is time, Eliseo, and we're at 5:10.
2           MR. SISNEROS:  I'm not going to limit
3   myself.  I mean I don't understand.  You're the
4   one that's putting the time limitation.  What
5   time limitation are you imposing?
6           MR. WINCHESTER:  We customarily end
7   these depositions at 5:00.  I mean I'm beyond
8   irritated with things that were gone over and
9   over and over again that were covered in the
10  first nine hours of this witness' deposition.
11          I understand you need your ability to
12  ask questions.  What I want to know is can you
13  be, if we, and I would have to ask the witness,
14  could stay another hour or something like that or
15  a little more than that, can you be done?
16  Because if not, and you're telling me that no
17  matter what time we stay until reasonably tonight
18  that you're going to keep this thing open, then
19  we may as well be done.
20          MR. SISNEROS:  Well, and I would keep
21  it open based upon the fact that, you know, in
22  the California case discovery has begun.  The

97 (Pages 382 to 385)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL       February 7, 2008
                           Chicago, IL

Page 386

1  first production from Abbott has been made. That
2  production is being reviewed.
3        We also have to under the MDL see what
4  production was made to the federal governments so
5  we can make that determination. It's all about
6  timing, the timing of the production of
7  documents.
8        I don't want to be difficult about
9  this. My concern is if any new documents are
10 revealed through the discovery process, we want
11 to be, we want to have access to Ms. Kreklow if
12 the need comes up to ask questions about those
13 documents. That's where I'm coming from.
14       MR. WINCHESTER: Okay. Well, it sounds
15 to me like your view is you haven't even had a
16 chance to go through what you've got yet. So
17 you're telling me you need to go through the
18 documents that you have in order to be ready to
19 question her.
20       MR. SISNEROS: Well, we have reviewed
21 the documents that we have, and a lot of the
22 documents that we have are part of the record of

Page 387

1  this deposition already.
2        What is new are the documents that were
3  put into, some of the documents that were put
4  into the record today. And I am going to have
5  follow-up questions to that, and I am going to
6  have some documents that were produced today that
7  I would like to ask questions on. So I don't
8  know. I mean you --
9        MR. WINCHESTER: Let me take a few
10 minutes with the witness and see what she's
11 feeling like.
12       MR. SISNEROS: All right.
13       THE VIDEOGRAPHER: We are off the
14 record at 5:12 p.m. with the end of Tape No. 5.
15       (WHEREUPON a recess was taken.)
16       THE VIDEOGRAPHER: We are back on the
17 record at 5:17 p.m. with the start of Tape No. 6.
18 BY MR. SISNEROS:
19    Q.  Good afternoon, Ms. Kreklow. I'm
20 Eliseo Sisneros with the State of California
21 Attorney General's Office. I represent the State
22 of California in California's lawsuit in Abbott

Page 388

1  and now in the MDL.
2        Could I turn your attention to Exhibit
3  3, please.
4     A.  Okay. Yes.
5     Q.  Is that before you?
6     A.  Right there.
7     Q.  Is that the memo from Leone dated April
8  5, 1996?
9     A.  Yes.
10    Q.  You have a cover page in front of
11 yours, okay.
12       With respect to this inter-office memo
13 dated April 15, 1996, did you have e-mail at the
14 time?
15    A.  Yes.
16    Q.  Was Ms. Leone in your chain of command?
17    A.  No.
18    Q.  Whose chain of command was she in?
19    A.  I believe Ginny Tobiason.
20    Q.  This inter-office memo is addressed to
21 you; correct?
22    A.  Yes.

Page 389

1     Q.  Sondra Raider?
2     A.  Yes.
3     Q.  Who's Sondra Raider?
4     A.  She was my sales representative in the
5  Chicago area.
6     Q.  And Tim Sykes?
7     A.  He was the pharmacy director.
8     Q.  Would you have expected Ms. Leone to
9  have included her supervisor or her chain of
10 command?
11       MR. WINCHESTER: Objection, form.
12       THE WITNESS: Not necessarily.
13 BY MR. SISNEROS:
14    Q.  And I'm sorry, I'm sure you were asked,
15 but Kathy Riddle is?
16    A.  The contract marketing manager.
17    Q.  And she is in a separate chain of
18 command; is that right?
19    A.  Yes.
20    Q.  So the information that Leone is
21 sharing here is being shared between two
22 different chains of command within the business

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
Chicago, IL

Page 390

```
 1   units that -- well, strike that.
 2        Contract marketing, Kathy Riddle in
 3   contract marketing, she worked in contract
 4   marketing with the ASPS, Alt. Site product sales?
 5        A.  No.
 6        Q.  Okay.  What contract marketing?
 7        A.  Home Infusion.
 8        Q.  And Raider and Sykes who you supervised
 9   were also in Home Infusion?
10        A.  I did not supervise Sykes.  But, yes,
11   all these people are in Home Infusion.
12        Q.  Who supervised Sykes?
13        A.  Mike Sellers.
14        Q.  Were Raider and Sykes, did they hold
15   equivalent positions?
16        A.  No.
17        Q.  I'm sorry.  What was Mr. Sykes' title?
18        A.  He was director of pharmacy.  Sondra
19   Raider was a sales representative.
20        Q.  So of all the individuals involved in
21   this inter-office memo, Leone, Raider, Sykes, and
22   Riddle, you only supervised Raider?
```

Page 391

```
 1        A.  Yes.
 2        Q.  And Sykes was supervised by Sellers you
 3   say?
 4        A.  Yes.
 5        Q.  And Leone was supervised of course by
 6   Tobiason?
 7        A.  Yes.
 8        Q.  All right.  Now, I have some questions
 9   with regard to the content of this inter-office
10   memo.
11        If I understood your testimony earlier,
12   this is a discussion about one of Home Infusion's
13   clients asking Abbott's Home Infusion Services to
14   provide this Ceredase drug to CMHR's patients; is
15   that right?
16        A.  Yes.
17        Q.  And this Ceredase product is a product
18   that is produced by a manufacturer other than
19   Abbott?
20        A.  Yes.
21        Q.  To comply with your client's request,
22   what Ms. Leone has done an assessment, financial,
```

Page 392

```
 1   of what would be involved in Abbott buying that
 2   product from another manufacturer; is that right?
 3        A.  What the cost would be to us, yes.
 4        Q.  With regard to Paragraphs 4, 5, and 6,
 5   that is what she has done, she's identified what
 6   the cost would be to Abbott; right?
 7        A.  Yes.
 8        Q.  And the cost would be that AWP, which
 9   is reported by First Data Bank and Red Book; is
10   that right?
11        A.  Yes.
12        Q.  She also identifies that there is one
13   other company that sells it for less than AWP but
14   only to their specific distributors; is that
15   right?
16        A.  It's a different product altogether.
17        Q.  But it's a product that would have been
18   equivalent to this Ceredase?
19        A.  I don't know.  I'm not familiar with
20   the drugs.
21        Q.  If I understand what Ms. Leone is
22   saying, basically what she is saying that Abbott
```

Page 393

```
 1   as a buyer of this product will not make a profit
 2   if it buys at AWP; is that right?
 3        MR. WINCHESTER:  Objection, asked and
 4   answered.
 5        THE WITNESS:  Yes.
 6   BY MR. SISNEROS:
 7        Q.  So is it fair to characterize what Ms.
 8   Leone is doing here is analyzing for Abbott as a
 9   buyer of another manufacture's product whether or
10   not it will be profitable to Abbott?
11        A.  She's analyzing whether or not we
12   should assume any patients where we would have to
13   buy a nonAbbott product, which we frequently did.
14        Q.  Well, could I draw your attention to
15   the last sentence of Paragraph 6 where she is
16   saying, or Bullet Point 6, excuse me, where she
17   is saying "Since our cost is AWP, there is no way
18   we can make any money on this drug."  Do you see
19   that?
20        A.  Yes.
21        Q.  Did I read that correctly?
22        A.  Yes.
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Kreklow, Karla      HIGHLY CONFIDENTIAL    February 7, 2008
                    Chicago, IL

Page 394

1    Q.  What she is saying there that if we
2  paid this cost, we make no profit; is that right?
3    A.  Yes.
4    Q.  Now, if I understood your testimony
5  correctly, you were a sales representative at one
6  time?
7    A.  Yes.
8    Q.  And I'm sorry, I've forgotten, but what
9  period of time are we talking about?
10    A.  It depends.  Whenever I was in product
11  sales.
12    Q.  Would it have been before 1996?
13    A.  Yes.
14    Q.  Okay.  You sold product before 1996?
15    A.  Yes.
16    Q.  Did you find that the concern that Ms.
17  Leone is stating in Bullet Point 6 of Exhibit 3,
18  the concerns of cost and the return on this
19  product, those concerns, did you find as a sales
20  rep that potential buyers of Abbott's products
21  had the same concerns?
22    A.  No.  I never did.

Page 395

1    Q.  They never had a concern of how much
2  they would pay for product?
3    A.  For how much they would pay for
4  product, but not on a return.  You said a return.
5    Q.  So in all the years that you were
6  involved in sales where you made sales, your
7  customers or potential customers they had no
8  concern about profit that they would make on
9  Abbott's products?
10        MR. WINCHESTER:  Objection, form.
11        THE WITNESS:  To my knowledge, yes.
12  BY MR. SISNEROS:
13    Q.  They were concerned about that?
14    A.  To my knowledge, I have no idea if they
15  were concerned.  It was not discussed if they
16  were going to be profitable or not by utilizing
17  our product.
18    Q.  As a buyer of -- strike that.
19        The concerns expressed by Ms. Leone in
20  Bullet Point 6 of Exhibit 3 on behalf of Abbott
21  as a buyer of drug product, do you consider those
22  concerns to be reasonable?

Page 396

1        MR. WINCHESTER:  Objection, form.
2        THE WITNESS:  That our pharmacy would
3  want to make money on a patient, make money on
4  performing a service for a patient, that's
5  reasonable.
6  BY MR. SISNEROS:
7    Q.  Do you expect that the folks who bought
8  Abbott products, the folks that you sold product
9  to, would have had that same type of reasonable
10  concern?
11        MR. WINCHESTER:  Objection, calls for
12  speculation.
13        THE WITNESS:  I think that anybody
14  that's in business wants to make a profit, no
15  matter what kind of business they're in.
16  BY MR. SISNEROS:
17    Q.  And certainly when you sold product for
18  Abbott directly to a customer, that was an
19  assumption that you made; correct?
20    A.  It never came up at that point in time.
21    Q.  Well, I don't quite understand your
22  response when you say "it never came up."  Did

Page 397

1  you believe I was asking you if there was a
2  discussion about that because that's not what I'm
3  asking.
4    A.  Please ask it again.
5    Q.  Okay.  When you sold product to
6  Abbott's customers, you assumed that they would
7  want to make some profit off or some reasonable
8  profit from Abbott's products.  Isn't that a fair
9  assumption?
10    A.  When I sold product to Alternate Site
11  product sales customers, we were very hopeful
12  that they would stay in business and continue to
13  buy product from us.  So to stay in business,
14  they would have to be profitable.
15    Q.  And that was an assumption you made?
16    A.  Yes.
17    Q.  Okay.  Getting back to Bullet Points 4,
18  5, and 6 of Exhibit 3 -- strike that.
19        Look at Bullet Point 5, the last
20  sentence reads "All other providers are paying
21  AWP."  Do you see that?
22    A.  Yes.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 398

1    Q.  I don't quite understand that sentence.
2  What do you understand that Ms. Leone is saying
3  there, the providers are paying AWP?
4        MR. WINCHESTER:  Objection, form.
5        THE WITNESS:  I understood that or
6  understand that by reading this memo that two out
7  of the three approved distributors pay AWP.
8  BY MR. SISNEROS:
9    Q.  Okay.  And finally in the last bullet
10  point of Exhibit 3 it reads "In Sandra's
11  telephone conversation with Nova Factor, she was
12  told most payors are only paying AWP plus a per
13  diem for this therapy."  Did I read that correct?
14    A.  Yes.
15    Q.  By the word "payors," is she meaning
16  third-party payors?
17    A.  Yes.
18    Q.  Such as Medicare, Medicaid, and private
19  insurance companies?
20    A.  Yes.
21    Q.  So what you're being told in that
22  bullet point is that third-party payors reimburse

Page 399

1  at AWP at least for this product?
2    A.  That's what I'm being told here.
3        MR. WINCHESTER:  Objection, form.
4  BY MR. SISNEROS:
5    Q.  So would it be fair to say that one
6  piece of information that can be garnered from
7  this memo is that third-party payors pay at AWP?
8        MR. WINCHESTER:  Objection, form.
9        THE WITNESS:  It says she was told most
10  payors are only paying AWP, yes.
11  BY MR. SISNEROS:
12    Q.  So at least one piece of information
13  that you got is that third-party payors reimburse
14  at AWP?
15    A.  Most of them do it says, yes.
16    Q.  Okay.  In 1996 were you aware that AWP
17  was a price that was published in the pricing
18  compendia?
19        MR. WINCHESTER:  Objection, asked and
20  answered.
21        THE WITNESS:  In Red Book yes, I was
22  aware of that.

Page 400

1  BY MR. SISNEROS:
2    Q.  If you could please pull out Exhibit
3  No. 1.
4    A.  Okay.
5    Q.  Let me just ask you, in May of 1994
6  what were you doing?
7    A.  Marketing manager for product sales.
8    Q.  In the Alternate Site product sales
9  business unit?
10    A.  Yes.
11    Q.  With respect to this memo, the cc list,
12  are any of those folks listed there, Cindy Dawson
13  -- strike all that.
14        Let me just ask you this way:  The
15  folks that are cc'd there, and I'll only give you
16  the last names, Dawson, Dorr, Elliott, Krajewski,
17  Kreklow, well, that's you, Longley, Manso, Snead,
18  and Walker, are any of those folks under your
19  chain of command?
20    A.  No.
21    Q.  Now, Cindy Dawson was a contract,
22  worked in contract marketing; correct?

Page 401

1    A.  At one point.  She had several
2  positions.
3    Q.  I'm sure you discussed Dorr today, and
4  I just don't recall.
5    A.  National sales manager.
6    Q.  Phil Elliott?
7    A.  He was my counterpart for infusion
8  devices, marketing manager.
9    Q.  Krajewski?
10    A.  Cliff was the manager for distributor
11  sales, we called it distributor relations.
12    Q.  And you were marketing manager you said
13  at the time?
14    A.  Yes.
15    Q.  And Longley worked in contract
16  marketing; is that right?
17    A.  I really hardly remember that she was
18  there.  So I can't say for sure.
19    Q.  How about Manso?
20    A.  She was a NAM.
21    Q.  And Snead?
22    A.  The same.

101 (Pages 398 to 401)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
Chicago, IL

Page 402

1    Q.  And Walker?
2    A.  National account manager.
3    Q.  All right.  Well, there's several folks
4  that are listed here that come from within
5  different business units of Alternate Site
6  product sales; is that correct?
7    A.  Yes.
8    Q.  And the field sales force, and that's
9  to all the sales reps that are out in the field;
10  is that right?
11    A.  The field --
12    MR. WINCHESTER:  Objection, asked and
13  answered.
14    THE WITNESS:  That's what we refer to
15  as the reps in the field is field sales reps.
16  BY MR. SISNEROS:
17    Q.  And Mr. Kipperman, who was he at the
18  time?
19    A.  He was in contract marketing.
20    Q.  He was the director of contract
21  marketing and Alternate Site product sales?
22    A.  He was contracting manager.

Page 403

1    Q.  He was the head of contract marketing
2  Alternate Site product sales?
3    A.  Yes.
4    Q.  So he wasn't in your chain of command
5  either?
6    A.  No.
7    Q.  So it's fair to say that what he's done
8  here is he's sent out a bunch of AWPs for
9  Abbott's products to different chains of command
10  within the different business units of the
11  Alternate Site product sales division?
12    MR. WINCHESTER:  Object to form.
13    THE WITNESS:  This is just about
14  everybody in product sales.
15  BY MR. SISNEROS:
16    Q.  Just briefly, you would agree that what
17  Kipperman's telling everyone is that Abbott's
18  list prices reflect or have an effect on average
19  wholesale price quoted in Red Book; is that
20  right?
21    MR. WINCHESTER:  Objection, form, asked
22  and answered.

Page 404

1    THE WITNESS:  Yes.
2  BY MR. SISNEROS:
3    Q.  And he's also informing everyone that
4  AWP is quoted for reimbursement purposes?
5    MR. WINCHESTER:  Same objection.
6    THE WITNESS:  He said, yes, AWP which
7  Red Book quotes for reimbursement purposes.
8  BY MR. SISNEROS:
9    Q.  So do you take that to mean
10  reimbursement by third-party payors?
11    A.  Yes.
12    MR. WINCHESTER:  Objection,
13  speculation.
14  BY MR. SISNEROS:
15    Q.  Like Medicare, Medicaid, and private
16  insurance companies?
17    A.  I don't know for certain what Steve was
18  thinking, but reimbursement to me means that.
19    Q.  Third-party payors?
20    A.  Yes.
21    Q.  And he concludes as saying that he
22  hopes this information will be helpful.

Page 405

1    If you know, how would this information
2  be helpful to the field sales force?
3    MR. WINCHESTER:  Objection, asked and
4  answered.
5    THE WITNESS:  I don't know how this
6  information would be utilized by the sales force.
7  BY MR. SISNEROS:
8    Q.  All right.  Could you please turn, you
9  know what, I didn't mark what exhibit number it's
10  in your deposition but it's those notes that were
11  written up of a meeting with you.
12    MR. WINCHESTER:  16.
13    MR. SISNEROS:  16?
14    MR. WINCHESTER:  Yes.
15    THE WITNESS:  Okay.
16  BY MR. SISNEROS:
17    Q.  You were asked by Mr. Anderson given
18  your experience in Home Infusion whether some of
19  these bullet points were the subject matter that
20  would have reflected your experience level -- or
21  let me put it this way, I'm going to be asking
22  you that question.

102  (Pages 402 to 405)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 406

1          But with respect to, for example, the
2    bullet point, the next to last, "Do they pay on
3    AWP for TPN."  I believe there was testimony that
4    you said that's parenteral, what does TPN stand
5    for?
6        A.   Total parenteral nutrition.
7        Q.   Is that a unique Home Infusion area?
8             MR. WINCHESTER:  Objection, form.
9             THE WITNESS:  TPN is usually paid per
10   diem.  So it would be unusual for it to be paid
11   at AWP.
12   BY MR. SISNEROS:
13       Q.   So it would have been a type of service
14   tied to a product that was sold exclusively by
15   Home Infusion?
16       A.   No.  It's a product that, it's a
17   combination of products that are utilized for
18   administration to patients that can't eat.  And
19   as part of their whole therapy procedure, they
20   would get a combination of the products, a pump
21   set and pump, an IV pole and numerous other
22   things, ancillary supplies.

Page 407

1        Q.   All right.  Now, with respect to the
2    second bullet point, the twenty-seven of the
3    thirty states have adapted reimbursement to AWP,
4    is that a piece of information that you gained in
5    your experience in any of the positions that
6    you've held at Abbott?
7        A.   That was published information that I
8    received in one of the home care newsletters I
9    got.
10       Q.   The home care newsletters, was that a
11   newsletter that was unique to Home Infusion
12   Services?
13       A.   No.
14       Q.   Were there other business units within
15   the ASPS that would receive that newsletter?
16       A.   Anybody that subscribed to it, would
17   receive it.  I don't know who would receive it at
18   Abbott.
19       Q.   Would you have to be a member of an
20   organization to receive that newsletter?
21       A.   No.
22       Q.   Look at the fourth bullet point,

Page 408

1    "Experience has told us that roughly one half pay
2    on AWP and one half pay on per diem."  Did I read
3    that correctly?
4        A.   Yes.
5        Q.   Is that accurate?
6        A.   I don't know.  I didn't write this.
7        Q.   But based on your experience in Home
8    Infusion Services, do you have any basis to know
9    whether that statement there is accurate or not?
10       A.   No.  I do not know.
11       Q.   Then the next bullet point reads
12   "Experience has told us that the net effect on
13   home care customers has been an increase of four
14   percent in their costs."
15            Do you know if that's accurate or not?
16       A.   I don't know.  And I don't understand
17   what the bullet point even means.
18       Q.   Do you recall your earlier testimony
19   about I think it was payor mix, that sometimes
20   you obtained that information, payor mix?
21       A.   From the customer, yes.
22       Q.   And you gave that to contract

Page 409

1    marketing?
2        A.   Yes.
3        Q.   Look at the bottom third of Exhibit 16
4    where it starts off, it says "What percentage of
5    your patients are reimbursed based on AWP."  Do
6    you see that?
7        A.   Yes.
8        Q.   The bullet point directly below that,
9    "What percentage of your business is reimbursed
10   by Medicaid."  Did I read that correctly?
11       A.   Yes.
12       Q.   Is that a question that you would ask
13   to get payor mix?
14       A.   No.
15       Q.   What would you ask to get payor mix?
16       A.   I would say what is your payor mix.
17       Q.   What kind of information would they
18   provide you?
19       A.   Percentages of private pay and
20   government pay.
21       Q.   Which is sort of what those questions
22   in the bullet points are directed to; is that

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla      HIGHLY CONFIDENTIAL      February 7, 2008
Chicago, IL

Page 410

1  right?
2      MR. WINCHESTER:  Objection, form.
3  BY MR. SISNEROS:
4      Q.  I mean they're asking for the same
5  information that you would get from a customer
6  for contract marketing on payor mix; is that
7  right?
8      A.  It only says for Medicaid.  It doesn't
9  call out any other payor.
10     Q.  So you would get more information than
11 is identified in this document; is that right?
12     A.  Yes, that's right.
13     Q.  So that's part of what you would,
14 information that you would get from your
15 customer?
16     A.  Yes.
17     Q.  Can you pull out No. 12.
18         I just want to clarify a couple of
19 things about this e-mail.  I may have
20 misunderstood, but it appears this is not from
21 Bruce Rodman but from Michael Snouffer; is that
22 right?

Page 411

1      A.  Yes.
2      Q.  And it appears that one of the
3  recipients of this e-mail was Rodman, and
4  apparently he's copied this e-mail?
5      A.  Yes.
6      Q.  And, again, I'm sorry, I'm sure you've
7  said this, but who was Snouffer?
8      A.  The manager of reimbursement.
9      Q.  For Home Infusion?
10     A.  Home Infusion.
11     Q.  Home Infusion Services, okay.  And in
12 2000 you were director of Home Infusion Services?
13     A.  Yes.
14     Q.  And all of these folks listed here as
15 recipients, they all worked in Home Infusion; is
16 that right?  Did I understand that correctly?
17     A.  Yes.
18     Q.  They may have had different
19 responsibilities or different job titles, but
20 they were all Home Infusion?
21     A.  I didn't.
22     Q.  Again, the reference to AWP on the one-

Page 412

1  year moratorium, it references outpatient drug
2  pricing.  Do you see that?
3      A.  Yes.
4      Q.  Outpatient drug pricing was at least
5  one component of how Home Infusion Services
6  calculated reimbursement or when it billed?
7      A.  Outpatients in general are patients
8  that are serviced outside of the hospital.
9      Q.  And in the context of HIS, Home
10 Infusion Services, outpatient drug pricing is
11 done by NDC; is that right?
12     A.  I don't know.
13     Q.  With respect to the, are you -- I think
14 you described earlier that reimbursement services
15 were done on the basis of therapy.  Do you recall
16 that testimony?
17     A.  Yes.
18     Q.  Have you ever heard of HCPCS?
19     A.  I've heard of it.
20     Q.  What is it?
21     A.  Asking me now, I think it's coding.
22     Q.  It's coding.

Page 413

1          And by "coding" you mean it's a process
2  that your folks would employ in doing the
3  reimbursement services for your clientele; is
4  that right?
5      MR. WINCHESTER:  Objection, form.
6      THE WITNESS:  That would be one of the
7  questions on the reimbursement form, what their
8  code was, diagnosis.
9  BY MR. SISNEROS:
10     Q.  Diagnosis.
11     A.  Yes.
12     Q.  All right.  To your knowledge, did that
13 code have anything to do with reimbursement?
14     A.  Well, it identified which, what the
15 diagnosis was and what the therapy was.
16         So if you were giving somebody
17 antibiotics and the code was for enteral feeding,
18 then they wouldn't pay because it didn't make
19 sense to give somebody that.  So they had to
20 coordinate with that.
21     Q.  I think earlier you testified that TPN
22 isn't based on, reimbursement isn't based on AWP

104 (Pages 410 to 413)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL       February 7, 2008
Chicago, IL

Page 414

1  anyway; is that right?
2      A.  To my knowledge.  Although in this
3  other document it said that, but, to my
4  knowledge, it was per diem.  And maybe it changed
5  over the years.  I don't know.
6      Q.  But is it fair to say that it was your
7  understanding that some therapies did have a
8  basis for reimbursement in AWP?
9      A.  Yes.  That was part of the formula for
10  some of the payors.
11      Q.  And as long as you were at HIS, that
12  was your understanding?
13      A.  At some point in time I gained that
14  knowledge.  I can't tell you from the moment I
15  walked into the door.
16      Q.  When do you think you gained that
17  knowledge?
18      A.  I have no idea.
19          MR. WINCHESTER:  Objection, form.
20          (WHEREUPON Deposition Exhibit
21  Kreklow 031 was marked as of 2/7/2008.)
22          MR. SISNEROS:  This is the only copy

Page 415

1  we've got, and I'm going to pass this for your
2  attorney to review and then to pass it on to you.
3  (Document tendered to counsel and the witness.)
4          MR. WINCHESTER:  I'm pretty sure that
5  was used in the earlier dep.
6          MR. SISNEROS:  Yeah.  I think so too.
7  But I'm just going to touch bases on it too.
8          THE WITNESS:  I remember this.
9  BY MR. SISNEROS:
10      Q.  Could I see it a second?  I'm going to
11  give it right back to you.  I'm not going to ask
12  you any questions unless it's in front of you.
13          For the record, Kreklow 31 is a copy of
14  a letter dated December 13, 1993, addressed to
15  Red Book that states it was sent via fax to
16  someone named Lisa and seems to indicate that you
17  were cc'd in this letter.  I'm going to hand it
18  over to you so that you can review it.
19      A.  Okay.
20      Q.  It's a letter where Mr. Heggie is
21  telling Lisa from Red Book that it's his
22  understanding that Abbott sets AWP.

Page 416

1      A.  No.  It says Abbott has a policy of
2  allowing Red Book to establish AWP.
3      Q.  Okay.  I'm sorry.  Could I see that
4  again?  Yes, that's correct.
5          Then he references a formula that is
6  minus five percent and plus twenty-five percent.
7  Do you see that?
8      A.  Yes.
9      Q.  But I don't see what the base point is
10  where you take the minus five percent and plus
11  twenty-five percent.  Do you see that?
12      A.  No.  It's not on here.
13      Q.  Now, do you have any reason to believe
14  you did not get a copy of this communication?
15      A.  I don't remember getting it.  I don't
16  know.
17      Q.  Back in 1993, the date of that memo --
18  I'm sorry.  What is the date of that memo?
19      A.  December 13, '93.
20      Q.  What were you doing at that time at
21  Abbott?
22      A.  I believe I was marketing manager.

Page 417

1      Q.  In ASPS?
2      A.  Yes.
3      Q.  And this would have been product sales,
4  not Home Infusion.
5      A.  Right.
6      Q.  And Mr. Heggie was in another business
7  unit; is that right?
8      A.  Yes.
9      Q.  He was still in Home Infusion?
10      A.  Right.
11      Q.  And he was reimbursement?
12      A.  Right.
13      Q.  In that letter to Lisa for some reason
14  he's included you if there are any questions
15  while he is out, direct questions to you.  Is
16  that a fair statement, what he's saying in there?
17      A.  Not any questions.  If he's not there,
18  to call me and give me the verified AWP.
19          So that's not a question.  That's to
20  say if that formula that he used is correct or
21  not.
22      Q.  Did you ever get verified AWPs from any

105 (Pages 414 to 417)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla       HIGHLY CONFIDENTIAL       February 7, 2008
Chicago, IL

Page 418

1 pricing compendia like Red Book or First Data
2 Bank?
3     A.  No.
4     Q.  Why would Mr. Heggie be directing that
5 verified AWP be directed to you if you weren't
6 around?
7         MR. WINCHESTER:  Objection, asked and
8 answered, also calls for speculation.
9         THE WITNESS:  I don't know why he said
10 this.
11 BY MR. SISNEROS:
12     Q.  Would you agree that -- well, let me
13 ask you, do you have any reason to believe that
14 you did not receive this?
15     A.  No.  Neither way, that I received it or
16 not received it, because I don't remember it.
17 So, no, I don't have any feeling one way or
18 another.
19     Q.  In 1993 would you have understood that
20 AWP was a basis for reimbursement?
21     A.  Not to my recollection.  It wasn't
22 important to me.

Page 419

1     Q.  Okay.  I can appreciate that you're
2 saying it wasn't important to you, but that's not
3 really my question.
4         I guess what I'm asking, whether it was
5 important to you or not, in 1993 would you have
6 had a knowledge that AWP was tied to
7 reimbursement?
8     A.  I can't remember if I knew that then or
9 not.
10     Q.  Do you have any recollection of knowing
11 that before you went to HIS?
12     A.  That it was used in reimbursement --
13     Q.  Yes.
14     A.  When I talked to Dave Brincks.
15     Q.  Were you already in HIS when you talked
16 to Dave Brincks?
17     A.  No.
18         MR. SISNEROS:  Here's another document
19 that wasn't, if I could have it marked again.
20         (WHEREUPON Deposition Exhibit
21 Kreklow 032 was marked as of 2/7/2008.)
22 BY MR. SISNEROS:

Page 420

1     Q.  Again, this is one of those documents I
2 saw today, and this is the only copy.  I'll pass
3 it to your attorney who will give it to you.
4 (Document tendered to counsel and the witness.)
5     A.  Oh, yes.  I saw this.
6     Q.  Today?
7     A.  Yes.
8     Q.  Oh, I'm sorry.  Well, I know there was
9 another one --
10     A.  Oh, it was another one.  Different
11 date.
12         MS. ST. PETER-GRIFFITH:  That's the
13 2001 one.
14         MR. SISNEROS:  2002 I believe; isn't
15 it?
16         THE WITNESS:  It's a 2001 goal.
17         MR. SISNEROS:  Oh, okay.
18 BY MR. SISNEROS:
19     Q.  If you look on the second page in the,
20 I think you were on the correct page right there,
21 yes, right there, on the Comment section there's
22 a comment about you revamped reimbursement.  Do

Page 421

1 you see that?
2     A.  Yes.
3     Q.  Now, is that something you wrote into
4 that form?
5     A.  Yes.
6     Q.  This was something that was reviewed by
7 Robertson, Mr. Robertson or Mr. Sellers?
8     A.  Don did.
9     Q.  And Mr. Robertson was the president of
10 all those business units?  What division did he
11 head?
12     A.  Vice president of Alternate Site.
13     Q.  Vice president of Alternate Site.
14         He wasn't your direct supervisor; was
15 he?
16     A.  At one point in time he was.
17     Q.  Do you think he was your direct
18 supervisor at that point in time?
19     A.  He must have been or I wouldn't have
20 given it to him.
21     Q.  And in there you wrote that you
22 revamped reimbursement; is that right?

106 (Pages 418 to 421)

Kreklow, Karla        HIGHLY CONFIDENTIAL        February 7, 2008
                        Chicago, IL

Page 422

1     A.   Yes.
2     Q.   Could you read for the record exactly
3  what you wrote in there?
4     A.   Revamped reimbursement and cash app.
5  processes to react to market setbacks.
6     Q.   What market setbacks are you talking
7  about?
8     A.   I don't remember.  I don't remember
9  what I did here.
10    Q.   Okay.  Well, my question was how did
11  you revamp reimbursement?
12    A.   I don't remember what I did there.  I
13  don't remember how I changed it.
14         I don't remember if I had different
15  people working on different accounts, if that's
16  what I did, if I cleaned house and moved people
17  around.  At one point in time I did that.  I
18  don't know if that's referring to this or not.
19    Q.   What do you mean you cleaned house and
20  moved people around?
21    A.   I made sure that we had the best people
22  there.

Page 423

1     Q.   Was there a time where you moved people
2  out because you didn't have the best people in
3  reimbursement?
4     A.   There was a time when someone was
5  taking a lot of time off.
6     Q.   Are we talking about issues that don't
7  relate to the ability to be a reimbursement
8  specialist?
9     A.   Yes.
10    Q.   You're talking about personnel issues
11  that have nothing to do with job duty?
12    A.   Yes.
13    Q.   Okay.  When you used the term "revamped
14  reimbursement," are you talking about changing
15  people out of positions or changing the whole
16  process of reimbursement?
17    A.   It was the people, the people and I
18  seem to remember it had something to do with
19  communication between the reimbursement
20  department and the cash app. department.
21    Q.   The cash app. department?
22    A.   The cash application.

Page 424

1     Q.   What is cash application department?
2     A.   That's when, and I don't know exactly
3  what they did, I never saw what their paper was,
4  but they would work and take the percentages that
5  we got in dollars and apply it to specific
6  accounts.
7     Q.   Percentages of dollars, are you talking
8  about sales?
9     A.   Well, I guess you could call it sales.
10  But the percent that we received for the therapy
11  that the patient received, what was reimbursed we
12  got a percentage of the reimbursement.  That
13  information was sent over to cash app., and cash
14  app. applied it to the specific client.
15    Q.   Okay.  With respect to your statement
16  there in one sentence that you revamped
17  reimbursement linking it to setbacks, what do you
18  mean by "setbacks"?
19    A.   I don't know.  I don't know what that
20  means.
21    Q.   Do you believe that revamping
22  reimbursement in the business unit -- well,

Page 425

1  strike that.
2         In 2001 you were director of HIS;
3  right?
4     A.   Yes.
5     Q.   So in 2001 I guess Robertson was your
6  direct supervisor; right?
7     A.   Yes.
8     Q.   So in terms of the chain of command at
9  Abbott's Home Infusion Services, you were pretty
10  much at the top of the pile.  Only Robertson was
11  above you; correct?
12    A.   Yes.
13    Q.   And in your evaluation you've written
14  one of the high points for that year is that you
15  revamped reimbursement in your business unit.
16    A.   It says I revamped reimbursement and
17  cash app. processes.  And that was the
18  communication process between the two groups.
19    Q.   What had been the problem between the
20  two groups?
21    A.   Cash application was not receiving the
22  information from reimbursement in a timely

                        107 (Pages 422 to 425)

e271a76c-1535-4191-aa6d-7e64ad1eb24d

Kreklow, Karla        HIGHLY CONFIDENTIAL     February 7, 2008
Chicago, IL

Page 426

1  manner, so we couldn't apply it to an account.
2      Q.   So you weren't crediting payment on
3  accounts?  Is that the problem?  Accounts weren't
4  being --
5      A.   We were crediting it, but not fast
6  enough in my estimation.
7      Q.   Is that the problem, the setback you're
8  talking about?
9      A.   Yes.  That was the whole issue that I'm
10  referring to here.  It was the communication
11  between the two groups.
12      Q.   So now you do have a recollection of
13  what the setback is?
14      A.   Well, I don't know what "market
15  setback" means.  I don't know what that means.  I
16  do know what revamp reimbursement and cash app.
17  processes mean.
18      Q.   Well, the problem that you've been
19  describing between these two sections within your
20  business unit, is that to you a market setback?
21      A.   No.
22      Q.   A market setback would signify a more

Page 427

1  serious problem?
2      A.   I don't know what I meant when I wrote
3  this seven years ago.
4          MR. WINCHESTER:  She's got to go,
5  Eliseo.  I know you're not done but it's 6:00.
6  We need to get her out of here.
7          MR. SISNEROS:  Okay.  We'll adjourn the
8  deposition.
9          THE VIDEOGRAPHER:  We are off the
10  record at 6:00 o'clock p.m. with the conclusion
11  of today's deposition of Karla Kreklow.
12          (WHEREUPON said deposition was so
13  adjourned.)
14
15          _____
16          KARLA KREKLOW
17
18  Subscribed and sworn to and before me
19  this _____ day of _____, 20____.
20
21  _____
22      Notary Public

Page 428

1  STATE OF ILLINOIS )
2  COUNTY OF C O O K )
3      I, Donna M. Kazaitis, RPR, CSR No.
4  084-003145, do hereby certify:
5      That the foregoing deposition of KARLA
6  KREKLOW was taken before me at the time and place
7  therein set forth, at which time the witness was
8  put under oath by me;
9      That the testimony of the witness and all
10  objections made at the time of the examination
11  were recorded stenographically by me, were
12  thereafter transcribed under my direction and
13  supervision and that the foregoing is a true
14  record of same.
15      I further certify that I am neither counsel
16  for nor related to any party to said action, nor
17  in any way interested in the outcome thereof.
18      IN WITNESS WHEREOF, I have subscribed my name
19  this 18th day of February, 2008.
20
21      _____
22      Donna M. Kazaitis, RPR, CSR 084-003145

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

e271a76c-1535-4191-aa6d-7e64ad1eb24d